**Exhibit 18**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

CONFIDENTIAL

Page 1

1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
2                  -   -   -
3   IN RE: SOCIAL MEDIA      : Case No.
    ADOLESCENT               : 4:22-MD-03047-YGR
4   ADDICTION/PERSONAL       : MDL No. 3047
    INJURY PRODUCTS          :
5   LIABILITY LITIGATION,    :
                             :
6   This Document Relates to:
    All Actions              :
7
8
                     -   -   -
9
              SEPTEMBER 5, 2025
10
                     -   -   -
11
12
13           Videotaped deposition of
14   ROBERT KLEIN, taken pursuant to notice,
15   was held at the law offices of Kessler
16   Topaz Meltzer & Check, LLP, 280 King of
17   Prussia Road, Radnor, Pennsylvania 19087,
18   commencing at 9:29 a.m., on the above
19   date, before Amanda Dee Maslynsky-Miller,
20   a Court Reporter and Certified Realtime
21   Reporter.
22
23                   -   -   -
         GOLKOW, A VERITEXT COMPANY
24      877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 2

1    APPEARANCES:
2
         KESSLER TOPAZ MELTZER & CHECK, LLP
3        BY: MELISSA L. YEATES, ESQUIRE
         BY: JORDAN E. JACOBSON, ESQUIRE
4        280 King of Prussia Road
         Radnor, Pennsylvania 19087
5        (610) 667-7706
         myeates@ktmc.com
6        jjacobson@ktmc.com
         Representing the Plaintiff
7
8
         CARELLA, BYRNE, CECCHI, BRODY &
9        AGNELLO, P.C.
         BY: ZACHARY S. BOWER, ESQUIRE
10       2222 Ponce De Leon Boulevard
         Miami, Florida 33134
11       (973) 994-1700
         zbower@carellabyrne.com
12       Representing the Plaintiff,
         Irvington Public Schools
13
14
         COVINGTON & BURLING LLP
15       BY: CHRISTIAN J. PISTILLI, ESQUIRE
         One CityCenter
16       850 Tenth Street, NW
         Washington, DC 20001
17       (202) 662-6000
         cpistilli@cov.com
18
         - and -
19
         BY: BREE PEILEN, ESQUIRE
20       The New York Times Building
         620 Eighth Avenue
21       New York, New York 10018
         (212) 841-1000
22       bpeilen@cov.com
         Representing the Defendant,
23       Meta Platforms, Instagram and
         Siculus
24

CONFIDENTIAL

Page 3

```
1    APPEARANCES: (Continued)
2
3            WILLIAMS & CONNOLLY LLP
             BY: DANIEL WHITELEY, ESQUIRE
4            680 Maine Avenue SW
             Washington, DC 20024
5            (202) 434-5000
             dwhiteley@wc.com
6            Representing the Defendants,
             YouTube, LLC, and Google LLC
7
8
9            KIRKLAND & ELLIS LLP
             BY: FARAZ SHAHIDPOUR, ESQUIRE
10           333 West Wolf Point Plaza
             Chicago, Illinois 60654
11           (312) 862-2000
             faraz.shahidpour@kirkland.com
12           Representing the Defendants,
             Snap Inc.
13
14
     VIA ZOOM:
15
16
             KESSLER TOPAZ MELTZER & CHECK, LLP
17           BY: ALEX PARK, ESQUIRE
             280 King of Prussia Road
18           Radnor, Pennsylvania 19087
             (610) 667-7706
19           apark@ktmc.com
             Representing the Plaintiff
20
21
22
23
24
```

CONFIDENTIAL

```
                                              Page 4

 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
             EILAND & BONNIN LAW FIRM
 4           BY: DAVID BONNIN, ESQUIRE
             2200 Market Street
 5           Suite 501
             Galveston, Texas 77550
 6           (409) 763-3260
             dbonnin@eilandlaw.com
 7           Representing the Plaintiffs
 8
 9
             O'HANLON, DEMERATH & CASTILLO
10           BY: KAYLIE MORGAN, ESQUIRE
             117 West Craig Place
11           San Antonio, Texas 78212
             (210) 310-3030
12           kmorgan@808West.com
             Representing the Texas Plaintiffs
13
14
             KING & SPALDING LLP
15           BY: LISA ANN HORVATH, ESQUIRE
             500 West 2nd Street
16           Suite 1800
             Austin, Texas 78701
17           (512) 457-2000
             lhorvath@kslaw.com
18           Representing the Defendants,
             TikTok Inc., ByteDance Inc.,
19           ByteDance Ltd., TikTok Ltd., and
             TikTok, LLC
20
21
22
23
24
```

CONFIDENTIAL

Page 5

1    APPEARANCES: (Continued)

2    VIA ZOOM:

3

4            COVINGTON & BURLING LLP
             BY: SANTIAGO M. ZALAZAR, ESQUIRE

5            One CityCenter
             850 Tenth Street, NW

6            Washington, DC 20001
             (202) 662-6000

7            szalazar@cov.com
             Representing the Defendant,

8            Meta Platforms, Instagram and
             Siculus

9

10

11

12

13

     ALSO PRESENT:

14   Brian McGee, Videographer

15

16                    -   -   -

17

18

19

20

21

22

23

24

Page 6

```
 1                        -   -   -
 2                      I N D E X
 3                        -   -   -
 4
    Testimony of:   ROBERT KLEIN
 5
 6       By Attorney Pistilli              13, 314
         By Attorney Shahidpour           272
 7       By Attorney Whiteley             288, 319
         By Attorney Horvath              298
 8       By Attorney Jacobson             313
 9
10                        -   -   -
11                  E X H I B I T S
12                        -   -   -
13
    NO.            DESCRIPTION                    PAGE
14
    Klein-1        No Bates
15                 5/18/25 Social Media and
                   Teacher Time Survey
16                 Methodology and Results,
                   Breathitt                      18
17
    Klein-2        No Bates
18                 LexisNexis Results, Steak-umm
                   Co, LLC v Steak 'Em
19                 Up, Inc.                        26
20  Klein-3        No Bates
                   LexisNexis Result, Maker's
21                 Mark Distillery, Inc. v
                   Diageo N. Am., Inc.            31
22
    Klein-4        No Bates
23                 LexisNexis Result, ComponentOne
                   LLC v ComponentArt Inc.        37
24
```

CONFIDENTIAL

```
                                               Page 7

 1                     -  -  -
 2                E X H I B I T S
 3                     -  -  -
 4
    NO.              DESCRIPTION                 PAGE
 5
    Klein-5          No Bates
 6                   LexisNexis Result, Avocado
                     Plus Inc. v Johanns         42
 7
    Klein-6          No Bates
 8                   Robert Klein LinkedIn
                     Profile                     48
 9
    Klein-7          No Bates
10                   Applied Marketing Science
                     Web Page                    55
11
    Klein-8          No Bates
12                   Expert Witnesses: When Are
                     They Necessary and Does
13                   Daubert/Kumho Make a
                     Difference?                 58
14
    Klein-9          No Bates
15                   5/18/25 Social Media and
                     Teacher Time Survey
16                   Methodology and Results,
                     Charleston                  78
17
    Klein-10         No Bates
18                   5/18/25 Social Media and
                     Teacher Time Survey
19                   Methodology and Results,
                     DeKalb                      78
20
    Klein-11         No Bates
21                   5/18/25 Social Media and
                     Teacher Time Survey
22                   Methodology and Results,
                     Harford                     78
23
24
```

CONFIDENTIAL

Page 8

<pre>
 1                      -  -  -
 2                 E X H I B I T S
 3                      -  -  -
 4
   NO.              DESCRIPTION                 PAGE
 5
   Klein-12         No Bates
 6                  5/18/25 Social Media and
                    Teacher Time Survey
 7                  Methodology and Results,
                    Irvington                    79
 8
   Klein-13         No Bates
 9                  5/18/25 Social Media and
                    Teacher Time Survey
10                  Methodology and Results,
                    Tucson                       79
11
   Klein-14         No Bates
12                  Teachers' Working Time From
                    Time-Use Data: Consequences
13                  of the Invalidity of Survey
                    Questions For Teachers,
14                  Researchers, and Policy     165
15 Klein-15         No Bates
                    Improving the Quality of
16                  Retrospective Reports:
                    Calendar Interviewing
17                  Methodologies               193
18 Klein-16         No Bates
                    8/1/25 Rebuttal Expert Report
19                  Replying to the Reports of
                    Dr. Michael J. Stern and
20                  Dr. Darius Lakdawalla,
                    Charleston                  194
21
   Klein-17         No Bates
22                  Event History Calendar,
                    Lavrakas                    199
23
24
</pre>

CONFIDENTIAL

```
                                              Page 9

 1                      -   -   -
 2                E X H I B I T S
 3                      -   -   -
 4
   NO.              DESCRIPTION                     PAGE
 5
   Klein-18         No Bates
 6                  8/1/25 Rebuttal Expert Report
                    Replying to the Reports of
 7                  Dr. Michael J. Stern and
                    Dr. Darius Lakdawalla,
 8                  Breathitt                       216
 9   Klein-19       No Bates
                    8/1/25 Rebuttal Expert Report
10                  Replying to the Reports of
                    Dr. Michael J. Stern and
11                  Dr. Darius Lakdawalla,
                    DeKalb                          216
12
     Klein-20       No Bates
13                  8/1/25 Rebuttal Expert Report
                    Replying to the Reports of
14                  Dr. Michael J. Stern and
                    Dr. Darius Lakdawalla,
15                  Harford                         216
16   Klein-21       No Bates
                    8/1/25 Rebuttal Expert Report
17                  Replying to the Reports of
                    Dr. Michael J. Stern and
18                  Dr. Darius Lakdawalla,
                    Irvington                       217
19
     Klein-22       No Bates
20                  8/1/25 Rebuttal Expert Report
                    Replying to the Reports of
21                  Dr. Michael J. Stern and
                    Dr. Darius Lakdawalla,
22                  Tucson                          217
23   Klein-23       No Bates
                    Reference Manual on
24                  Scientific Evidence,
```

CONFIDENTIAL

Page 10

1                          -   -   -

2                    E X H I B I T S

3                          -   -   -

4

   NO.              DESCRIPTION                    PAGE

5

   Klein-24      Klein000001-0005

6                 Invoices                          271

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 11

1                          -   -   -

2              DEPOSITION  SUPPORT  INDEX

3                          -   -   -

4

5    Direction  to  Witness  Not  to  Answer

6    Page  Line      Page  Line      Page  Line

7    None

8

9

10   Request  for  Production  of  Documents

11   Page  Line      Page  Line      Page  Line

12   73      12

13

14

15   Stipulations

16   Page  Line      Page  Line      Page  Line

17   12      1

18

19

20   Question  Marked

21   Page  Line      Page  Line      Page  Line

22   None

23

24

CONFIDENTIAL

Page 12

```
 1                 -  -  -
 2              (It is hereby stipulated and
 3          agreed by and among counsel that
 4          sealing, filing and certification
 5          are waived; and that all
 6          objections, except as to the form
 7          of the question, will be reserved
 8          until the time of trial.)
 9                 -  -  -
10              VIDEO TECHNICIAN:  We are
11          now on the record.  My name is
12          Brian McGee.  I'm the videographer
13          for Golkow, a Veritext division.
14          Today's date is September 5th,
15          2025, and the time is 9:29 a.m.
16              This video deposition is
17          being held in Radnor, PA, in the
18          matter of In Re: Social Media
19          Adolescent Addiction/Personal
20          Injury Products Liability
21          Litigation for the United States
22          District Court Northern District
23          of California.
24              The deponent is Robert
```

CONFIDENTIAL

Page 13

1          Klein.  Counsel will be noted on
2          the stenographic record.
3                  The court reporter is Amanda
4          Miller and will now swear in the
5          witness.
6                      -   -   -
7                  ROBERT KLEIN, after having
8          been duly sworn, was examined and
9          testified as follows:
10                     -   -   -
11                  EXAMINATION
12                     -   -   -
13    BY ATTORNEY PISTILLI:
14          Q.    Good morning, Mr. Klein.  My
15    name is Chris Pistilli, and I represent
16    the Meta defendants in this lawsuit.
17                  Will you please state your
18    full name for the record?
19          A.    Robert Lawrence Klein.
20          Q.    And you were engaged by
21    plaintiff school districts as an
22    expert --
23                  ATTORNEY HORVATH:  Sorry, I
24          can't hear the witness.  Can

CONFIDENTIAL

Page 14

1          everybody else hear him?  Maybe
2          it's my issue.
3   BY ATTORNEY PISTILLI:
4          Q.    Mr. Klein, you were engaged
5   by the plaintiff school districts in this
6   litigation against Meta, TikTok, YouTube
7   and Snap?
8          A.    Yes.
9          Q.    Are you represented by
10  counsel at this deposition?
11         A.    Personally?  I don't believe
12  so.
13         Q.    Let's go over some ground
14  rules today.
15              Do you understand that
16  you're under oath today just as if you
17  were in a court in front of a judge?
18         A.    Yes.
19              ATTORNEY HORVATH:
20         Mr. Klein, can you say something?
21              THE WITNESS:  Yes.
22              Who is speaking?
23              ATTORNEY YEATES:  Who is
24         this?

CONFIDENTIAL

Page 15

```
 1                    -  -  -
 2              (Whereupon, a discussion off
 3         the record occurred.)
 4                    -  -  -
 5   BY ATTORNEY PISTILLI:
 6         Q.    Mr. Klein, is there anything
 7   that would prevent you from giving
 8   complete and accurate testimony today?
 9         A.    No.
10         Q.    You understand that the
11   court reporter is writing down everything
12   that you and I say, right?
13         A.    Yes.
14         Q.    And that's very difficult to
15   do if we're talking over one another.  So
16   let's both try our best to not do that.
17              Can you do that with me?
18         A.    Yes.
19         Q.    And if at any point you
20   don't understand my question for any
21   reason, could you please let me know, and
22   I'll rephrase it for you?
23         A.    Okay.
24         Q.    And unless you do that and
```

CONFIDENTIAL

Page 16

1    you go ahead and answer my question, I'm

2    going to assume you understood my

3    question.

4              Is that fair?

5         A.   Yes.

6         Q.   If at any point today you

7    need a break, please just let me know and

8    we can make that happen, okay?

9         A.   Yes.

10        Q.   Have you ever been deposed

11   before?

12        A.   Yes, I have.

13        Q.   Approximately how many

14   times?

15        A.   Between 90 and 100.

16        Q.   And were those depositions

17   as expert witnesses?

18        A.   Yes.

19        Q.   And did those depositions

20   typically involve marketing studies that

21   you had performed?

22        A.   Surveys.  Yes.

23        Q.   What sort of surveys?

24        A.   Surveys related to Lanham

Page 17

```
 1   Act litigation.  Issues of likelihood of
 2   confusion, secondary meaning, genericism,
 3   consumer behavior.
 4          Q.     Anything else?
 5          A.     Patent damages.
 6                 Let me see if I can -- false
 7   advertising.
 8                 That covers the vast
 9   majority of them.
10          Q.     And have you ever testified
11   in court?
12          A.     Yes.
13          Q.     Approximately on how many
14   occasions?
15          A.     Twenty to 25.  Some in the
16   U.S. and -- some in Canada and the rest
17   in the U.S.
18          Q.     Have you ever offered expert
19   opinions in cases involving Meta?
20          A.     Yes.
21          Q.     On how many occasions?
22          A.     Once.
23                 ATTORNEY PISTILLI:  Do we
24          want to go off the record for a
```

CONFIDENTIAL

Page 18

1       minute?

2               VIDEO TECHNICIAN:  The time

3       is 9:34 a.m.  We are off the

4       record.

5                    -   -   -

6               (Whereupon, a brief recess

7       was taken.)

8                    -   -   -

9               VIDEO TECHNICIAN:  The time

10      is 9:35 a.m., and we are on the

11      record.

12                   -   -   -

13              (Whereupon, Exhibit Klein-1,

14      No Bates, 5/18/25 Social Media and

15      Teacher Time Survey Methodology

16      and Results, Breathitt, was marked

17      for identification.)

18                   -   -   -

19  BY ATTORNEY PISTILLI:

20          Q.    Mr. Klein, I've handed you a

21  document that's been marked as Exhibit-1.

22              Is that a report that you

23  submitted in the Breathitt case?

24          A.    Yes, it appears to be.

CONFIDENTIAL

Page 19

1        Q.    And am I right that you
2    submitted a total of 12 reports in
3    connection with these matters?
4        A.    That's correct.
5        Q.    One each for Breathitt,
6    Charleston, DeKalb, Harford, Irvington
7    and Tucson, opening reports?
8        A.    I believe that's correct,
9    yes.
10        Q.    And then a rebuttal report
11    in each of those same six cases?
12        A.    Yes.
13        Q.    Is there anything in your
14    reports that you need to correct or
15    amend?
16        A.    No.
17        Q.    So the reports are final,
18    complete and accurate?
19        A.    Yes.
20        Q.    Did you draft these 12
21    reports yourself?
22        A.    Yes.
23        Q.    Did you have staff assisting
24    you in preparing the reports?

CONFIDENTIAL

Page 20

1          A.     Yes.

2          Q.     Who are -- what staff?

3          A.     Staff at Applied Marketing

4    Science.

5          Q.     And approximately how many

6    people at Applied Marketing Science

7    assisted you in drafting the report?

8          A.     Well, when you say "drafting

9    the report," and "in preparing the

10   report," I mean, all the words are mine.

11              But the issues of the

12   appendices and putting all that together,

13   I was -- I was assisted by four

14   individuals at Applied Marketing Science.

15         Q.     Okay.  And you're a

16   principal of Applied Marketing Science?

17         A.     No.  I'm an employee.

18         Q.     You're an employee.

19              Do you receive a share in

20   the profits of Applied Marketing Science?

21         A.     Applied Marketing Science

22   has a profit sharing plan that all the

23   employees participate in.

24         Q.     And what's your position at

CONFIDENTIAL

Page 21

1  Applied Marketing Science?

2          A.    I'm a chairman emeritus.  I

3  started the company 35 years ago and

4  turned over the day-to-day management

5  about ten years ago.

6          Q.    Did the attorneys for the

7  plaintiffs review drafts of your report?

8          A.    Yes.

9          Q.    Provide input?

10          A.    Certainly helped with proper

11  identification of the parties and the,

12  you know, formatting issues.

13          Q.    Anything else?

14          A.    Not beyond minor wording

15  changes.

16          Q.    How many hours did you spend

17  drafting your 12 reports?

18          A.    I'm not really sure how to

19  answer that.  I know how much time I

20  spent in total.

21          Q.    Sure.  How much time did you

22  spend in total?

23          A.    Just over 100 hours between

24  February and -- through July.

CONFIDENTIAL

Page 22

1          Q.     And do you know how much
2    time other individuals at your firm spent
3    working on the report during that same
4    period?
5          A.     No, I don't.
6          Q.     And what is your hourly
7    rate?
8          A.     I think it's $835 an hour.
9          Q.     So to date you've made
10   approximately $83,500 on this matter?
11         A.     No.
12         Q.     Why is that?
13         A.     I don't get a -- that's --
14   that doesn't come to me directly.  I get
15   paid a salary.
16                Applied Marketing Science
17   got that much money for time that I spent
18   on it.
19         Q.     What did you do to prepare
20   for your deposition today?
21         A.     I read over my report, the
22   various rebuttal reports that made
23   reference to me, my reply report, and I
24   met with counsel.

CONFIDENTIAL

Page 23

1        Q.    Did you review any

2    literature in preparing for your

3    deposition today?

4        A.    Not in preparation for the

5    deposition, no.

6        Q.    On how many occasions did

7    you meet with counsel in preparation for

8    your deposition?

9        A.    Twice.

10        Q.    And for how long did you

11    meet with them?

12        A.    Three or four hours on

13    Wednesday and a couple of hours

14    yesterday.

15        Q.    Other than counsel, did you

16    discuss the subject of your deposition

17    with anyone?

18        A.    Not the subject of the

19    deposition, no.

20        Q.    Did you discuss anything

21    related to your deposition with others?

22        A.    Yes.  Several of the

23    individuals at Applied Marketing Science

24    were listening in to the discussions we

CONFIDENTIAL

Page 24

1    had in preparation for the deposition.

2           Q.    What did you discuss with

3    your colleagues at Applied Marketing?

4           A.    I really didn't discuss

5    anything with the colleagues.  They were

6    able to provide certain details about the

7    billing, for example.

8           Q.    Approximately when were you

9    first retained in this matter?

10          A.    It was in February of 2025.

11          Q.    All right.  If you could,

12   please, take a look at Exhibit-1, take a

13   look at Page A-2, A-2.

14          A.    A-2?  Oh, I thought you said

15   18.

16          Q.    Sorry.

17                Starting here on Page A-2,

18   is this a complete list of your prior

19   expert testimony in the past four years?

20          A.    It's the list of the cases

21   in which I have provided testimony either

22   in deposition or in court, yes.

23          Q.    And if you look at Page A-3,

24   one of the matters referenced is Klein,

CONFIDENTIAL

Page 25

1    et al., versus Meta Platforms, Inc.

2            Do you see that?

3        A.    Yes.

4        Q.    And that's the case you

5    referred to previously?

6        A.    That's correct.

7        Q.    And you were also engaged by

8    the plaintiffs' lawyers in that case,

9    correct?

10        A.    That's correct.

11        Q.    And you submitted two expert

12    reports in that case?

13        A.    I believe so, yes.

14        Q.    And you testified at two

15    depositions?

16        A.    Yes.

17        Q.    You were testifying against

18    Meta in those depositions, right?

19        A.    Yes.

20        Q.    But then before trial, the

21    plaintiffs dropped your opinions,

22    correct?

23        A.    I really don't know what's

24    going on in that case.

CONFIDENTIAL

Page 26

1          Q.    You weren't asked to testify
2     at trial?
3                ATTORNEY JACOBSON:
4          Objection.  Foundation.
5                THE WITNESS:  I didn't
6          realize there had been a trial.
7     BY ATTORNEY PISTILLI:
8          Q.    To your knowledge, has your
9     testimony ever been excluded?
10         A.    Not to my knowledge, no.
11         Q.    To your knowledge, has a
12    judge ever discounted your testimony in a
13    written opinion?
14         A.    Yes.
15               ATTORNEY PISTILLI:  Could we
16         look at Tab 27?
17                    -   -   -
18               (Whereupon, Exhibit Klein-2,
19         No Bates, LexisNexis Results,
20         Steak-umm Co, LLC v Steak 'Em Up,
21         Inc., was marked for
22         identification.)
23                    -   -   -
24    BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 27

1          Q.    Have you seen Exhibit-2
2     before, Mr. Klein?
3                ATTORNEY JACOBSON:  Are
4          there hard copies for counsel?
5                THE WITNESS:  Yes.
6     BY ATTORNEY PISTILLI:
7          Q.    And does this relate to
8     litigation matter entitled Steak-umm Co.,
9     LLC v Steak 'Em Up, Inc.?
10         A.    Yes.
11         Q.    And did you testify as an
12    expert in that matter?
13         A.    Yes, I did.
14         Q.    And if you could look at
15    Page 19.
16               Do you see the top of Page
17    19?
18         A.    Yes.
19         Q.    And in this -- well, strike
20    that.
21               This is a written opinion by
22    the court in the Steak-umm matter?
23         A.    That's what it appears to
24    be, yes.

Page 28

1          Q.      And do you see where the
2    court wrote, Accordingly, numerous flaws
3    in Mr. Klein's survey undermine the
4    reliability of his numbers.
5    Dr. Rappeport estimates that no more than
6    a 10 percent likelihood of confusion is a
7    fair estimate for Mr. Klein's results.
8    Dr. Rappeport's estimate is based solely
9    on his expertise.  I find and conclude
10   there is no evidence of likelihood of
11   confusion due to the multiple flaws in
12   the Klein's survey and Dr. Rappeport's
13   critique of the Klein survey.  Having no
14   evidence demonstrating a reliable
15   percentage of a likelihood of confusion,
16   this court gives no weight to the survey
17   results.
18               Do you see that?
19          A.      Yes.
20          Q.      And so in this opinion, the
21   court concluded that there were numerous
22   fundamental flaws in your survey,
23   correct?
24          A.      The flaws that the judge is

CONFIDENTIAL

Page 29

1  referring to has to do with the -- my

2  client in that case's theory of the case.

3               They -- Steak-umm brought

4  the action because they were -- believed

5  that the name Steak 'Em Up would confuse

6  people and lead them to believe that the

7  Steak 'Em Up product was made with

8  Steak-umms.  And the judge in this case

9  didn't believe that that constituted a

10  likelihood of confusion.

11               And so what I was measuring

12  wasn't what the judge thought the case

13  was all about but was what my client

14  thought the case was all about.

15               So my survey was directed at

16  the issue raised by my client in this

17  matter.  And the judge decided that that

18  really wasn't the relevant theory of the

19  case.

20         Q.    If you look at Page 18, it

21  says, Because Mr. Klein failed to ask the

22  connection affiliation question to all

23  consumers, his survey fails to show

24  source confusion.

CONFIDENTIAL

Page 30

1              Do you see that?

2      A.     On which page?

3      Q.     The very bottom of Page 18.

4      A.     This is basically what I

5  just described to you, that the results

6  of a survey asking respondents whether a

7  restaurant named Steak 'Em Up serves

8  Steak-umm products is almost meaningless.

9  Relevant survey questions concern

10  source -- confusion of source,

11  sponsorship and this wasn't that.

12              This was, though, what the

13  plaintiff in the matter believed was --

14  was relevant, so.

15      Q.     As an expert, you just did

16  what the plaintiffs told you in that

17  case?

18              ATTORNEY JACOBSON:

19         Objection.

20              THE WITNESS:  No.  As an

21         expert, I did what was alleged to

22         be the -- the harm.  And so I

23         designed the survey to address

24         that issue.

CONFIDENTIAL

Page 31

1    BY ATTORNEY PISTILLI:

2         Q.    Well, the court criticized

3    you for failing to ask an important

4    question, correct?

5         A.    In the court's mind, yes.

6               But it wasn't the important

7    question in the -- in terms of the theory

8    of the case that the plaintiff's attorney

9    had raised.

10              ATTORNEY PISTILLI:  Tab 28.

11                   -   -   -

12              (Whereupon, Exhibit Klein-3,

13         No Bates, LexisNexis Result,

14         Maker's Mark Distillery, Inc. v

15         Diageo N. Am., Inc., was marked

16         for identification.)

17                   -   -   -

18              THE WITNESS:  There are two

19         here.  I have two copies.

20              This is one of my favorites.

21         Go ahead.

22    BY ATTORNEY PISTILLI:

23         Q.    Do you recognize the

24    document that's been marked as Exhibit-3?

Page 32

1          A.      Yes.

2          Q.      What is it?

3          A.      It's the -- well, it's a

4    LexisNexis document that includes the

5    opinion of the court, yes.

6          Q.      It includes the opinion of

7    the court in a case called Maker's Mark

8    Distillery, Inc. v Diageo North American,

9    Inc.?

10         A.      Yes.

11         Q.      And that was a case in which

12   you served as an expert witness?

13         A.      That's correct.

14         Q.      You conducted a market

15   research survey in that case?

16         A.      Yes.

17         Q.      Let's turn to Page 25.

18                 Do you see the first full

19   paragraph on Page 25?

20         A.      Yes.

21         Q.      The court writes, quote,

22   Cuervo offered the survey evidence of

23   Robert Klein to show that confusion did

24   not exist.  Klein concluded that only

CONFIDENTIAL

Page 33

1   2 percent of respondents were confused

2   about the two brands.  In the court's

3   view, the study and its conclusions were

4   flawed in several significant ways.

5                Do you see that?

6        A.    Yes.

7        Q.    Do you agree that the court,

8   in this case, reached the conclusion that

9   your study was flawed in several

10  significant ways?

11       A.    Well, that's what they

12  wrote.  The -- his main problem with

13  the -- with my survey was that it was

14  conducted online.  And in his view, no

15  one would ever buy alcoholic beverages

16  online.  But that's clearly not the case.

17       Q.    Well, he, in fact -- the

18  court goes on to give four separate

19  reasons that, in its view, your survey

20  was flawed, correct?

21       A.    Yes.

22                I don't want to go too far

23  out on a limb, but this was home cooking.

24  It was a case brought in Louisville,

CONFIDENTIAL

Page 34

1    Kentucky, by an international firm

2    against a local -- local firm.

3              I disagree with his -- his

4    conclusions here.

5         Q.    So your view is that the

6    judge was acting in bad faith?

7              ATTORNEY JACOBSON:

8         Objection.  Mischaracterizes

9         testimony.

10             THE WITNESS:  I think the

11        judge did not completely

12        understand the survey I conducted

13        and the basis on which I offered

14        my opinion.

15   BY ATTORNEY PISTILLI:

16        Q.    Just so we're clear, only

17   one of the four reasons offered by the

18   judge had to do with the fact that the

19   survey was conducted online, correct?

20        A.    The second item has to do

21   with the way in which the products were

22   identified, the -- which he believes

23   suggests that they're not affiliated.

24             This was a $100 bottle of

CONFIDENTIAL

Page 35

1    tequila that Jose Cuervo put out.  And

2    they used a drippy wax seal on the top of

3    the bottle.  And Maker's Mark was

4    claiming that that would confuse people

5    and they would see that drippy wax seal

6    and think that Maker's Mark was the

7    source of the Jose Cuervo tequila.

8              You've got tremendous price

9    differences between these products, you

10   know, as well as the fact that the Jose

11   Cuervo product is sold in a custom-made

12   wooden box, and each year a different

13   Mexican artist produces that

14   commemorative box.  Also, they had

15   stopped using that drippy wax seal

16   several years earlier.

17             And so what the judge

18   actually did was award no damages and

19   told them to stop doing something that

20   they had already stopped doing.

21        Q.    Well, one of the reasons

22   that the court excluded your opinion was

23   because it found that your control group

24   was problematic and may have skewed the

CONFIDENTIAL

Page 36

1  results, correct?

2        A.    That -- and that was related

3  to the color of the wax seal that was

4  used.  Maker's Mark brought -- raised

5  that issue long after I had done my

6  survey.

7        Q.    Well, that wasn't my

8  question, sir.

9              My question was just, did

10  the court find that your control group

11  was problematic and may have skewed the

12  results?

13        A.    That's what it says.  I

14  don't agree, but.

15        Q.    And then the court also

16  noted that a number of other courts had

17  criticized your surveys.

18              Do you see that?

19        A.    This was an interesting

20  case, because the case cited didn't

21  involve me and took place years before I

22  ever served as an expert witness.

23              The Indianapolis Colts case

24  was Jacob Jacoby, not me, and was in, I

CONFIDENTIAL

Page 37

1    think, 1985.  As I said, it was long

2    before I ever served as an expert

3    witness.

4         Q.    But you were an expert

5    witness in Board of Regents v KST

6    Electronics Limited, right?

7         A.    That's correct.  And in that

8    case, the judge found that I was very

9    persuasive in my arguments, if you want

10   to look at that case, and found for my --

11   my client in that case.

12        Q.    Well, the court here says

13   that you asked leading questions, right?

14        A.    Yes.  I disagree.

15             But that -- that case,

16   you're talking about the Board of Regents

17   case.  That was a case in which the --

18   again, that was the original case in

19   which the judge had mistaken me for

20   somebody else.

21             ATTORNEY PISTILLI:  Let's

22        take a look at Tab 29.

23                  -   -   -

24             (Whereupon, Exhibit Klein-4,

CONFIDENTIAL

```
 1          No Bates, LexisNexis Result,

 2          ComponentOne LLC v ComponentArt

 3          Inc., was marked for

 4          identification.)

 5                    -   -   -

 6  BY ATTORNEY PISTILLI:

 7          Q.    I've handed you a document

 8  that's been marked as Exhibit-4.

 9                Do you recognize this

10  document?

11          A.    Yes.

12          Q.    What is it?

13          A.    It's a decision in the case

14  of ComponentOne v ComponentArt.

15          Q.    And this was a case in

16  federal district court?

17          A.    Yes.

18          Q.    And you testified as an

19  expert in that case?

20          A.    Yes.

21          Q.    Let's take a look at

22  Page 18.

23                You see there where it says,

24  ComponentOne has offered the opinion of
```

CONFIDENTIAL

Page 39

1  Robert Klein?

2          A.     Yeah.   Mine has some

3  highlighting in it.

4                      -  -  -

5                  (Whereupon, a discussion off

6          the record occurred.)

7                      -  -  -

8  BY ATTORNEY PISTILLI:

9          Q.     This was another case where

10  you did a marketing survey, correct?

11          A.     Correct.

12          Q.     If you look with me at

13  Page 20, do you see there where it says,

14  The court finds that Klein's survey

15  suffers from fundamental methodological

16  flaws that prevent it from creating a

17  genuine issue of material fact as to

18  actual confusion.  Although defendant's

19  argument that many grounds exist in which

20  the court could find Klein's survey

21  fundamentally unsound is strong, the

22  court will focus on Klein's choice of

23  stimuli.

24                  Do you see that?

Page 40

1          A.     No.  But --

2          Q.     The bottom of Page -- on

3     Page 20, the bottom of the first column.

4          A.     Okay.  Yes.

5          Q.     So in this decision, another

6     federal court found that there were

7     fundamental methodological flaws in your

8     survey, correct?

9          A.     That's what they wrote, yes.

10               I disagree, but.

11         Q.     But that's -- that's what

12     the court concluded, right?

13         A.     Yes.  This is another

14     situation like the Steak-umm's case where

15     the confusion that was alleged was due to

16     ComponentArt changing its name from --

17     and I forget what they were called before

18     they were ComponentArt, but they changed

19     their name to Component -- to

20     ComponentArt, which meant that in

21     listings of component -- these are

22     software components.

23               In any listing of

24     manufacturers or providers of these

CONFIDENTIAL

Page 41

1    components, ComponentArt's name would now

2    be listed above ComponentOne in a

3    directory or list of exhibitors or

4    anything like that.  And that's what

5    upset the ComponentOne people.

6              And so that was the type of

7    stimulus I used in conducting the survey,

8    which -- so it was a survey that was

9    directed specifically at what the

10   allegations were in the complaint.

11             And the court found that

12   there were other ways in which people

13   would encounter the marks that weren't

14   covered by my survey.

15        Q.    When you're doing a

16   marketing survey, you need to replicate

17   market conditions, right?

18             ATTORNEY JACOBSON:

19        Objection.  Foundation.

20             THE WITNESS:  In general,

21        the more you can replicate market

22        conditions, the better.  But it is

23        a survey, so there is that type of

24        limitation.

CONFIDENTIAL

Page 42

1   BY ATTORNEY PISTILLI:

2        Q.     And the court found that

3   your survey failed to replicate market

4   conditions, correct?

5        A.     It replicated the market

6   condition that my client was -- was

7   concerned about.

8            But I recognize, and the

9   court recognized, that there were other

10  situations in which people would

11  encounter the marks.

12            ATTORNEY PISTILLI:  Tab 30.

13                 -   -   -

14            (Whereupon, Exhibit Klein-5,

15        No Bates, LexisNexis Result,

16        Avocado Plus Inc. v Johanns, was

17        marked for identification.)

18                 -   -   -

19  BY ATTORNEY PISTILLI:

20       Q.     I've handed you a document

21  that's been marked as Exhibit-5.

22            Do you recognize Exhibit-5?

23       A.     Yes.  This was from a case

24  that was, what, 20 years ago?  Yes.

CONFIDENTIAL

Page 43

1          Q.    This is a federal court
2    litigation in a matter called Avocados
3    Plus Inc. versus Johanns?
4          A.    Yes.
5          Q.    And you testified as an
6    expert in this case?
7          A.    Yes.
8          Q.    This was another marketing
9    research survey?
10         A.    That's correct.
11         Q.    Take a look with me at
12    Page 13, please.
13              Do you see where it says, In
14    support of this contention, plaintiffs
15    hired a marketing consultant and
16    statistician to conduct a survey gauging
17    the likelihood that consumers will, in
18    fact, attribute the avocado promotions to
19    them.
20              Do you see that?
21         A.    No.  I --
22         Q.    Sure.  Look under the
23    section, Defendants will be given an
24    opportunity --

CONFIDENTIAL

Page 44

1          A.      Yes.

2          Q.      -- to conduct limited

3    discovery.

4          A.      Okay.  Yes.

5          Q.      And does this reflect that

6    you were hired to conduct a survey

7    gauging the likelihood of consumers

8    attributing avocado promotions to

9    plaintiffs?

10          A.      That wasn't what I was

11    actually hired -- hired to survey.  The

12    original assignment had to do with the

13    use of the check-off provision in the

14    Agricultural Department in promotion of

15    various agricultural products.

16              And I don't know if you're

17    familiar with the check-off procedure,

18    but essentially ads, like, you know,

19    "beef, it's what for dinner" or "got

20    milk" or stuff like that are actually ads

21    put out by the Agricultural Department

22    and funded by a tax or check-off of the

23    manufacturers.

24              And each of the various

CONFIDENTIAL

Page 45

1    industry groups has sued the Agricultural
2    Department over the use of this
3    check-off, saying that it's compelled
4    speech and they're being forced to
5    finance speech that they don't
6    necessarily agree with.
7              The beef industry, for
8    example, would rather be able to promote
9    its own Angus beef or grass-fed beef or
10   something like that as opposed to just
11   beef in general.
12             And each of the industry
13   groups has sued the Agricultural
14   Department and generally won until the --
15   until the beef case came along.
16             And in that beef case, the
17   argument was -- or the argument that won
18   was, this really isn't personal speech,
19   this is government speech and the
20   government can say anything it wants.
21   And if you don't like what the government
22   says, elect a different government.
23             And that argument actually
24   won at the Supreme Court.  And that took

CONFIDENTIAL

Page 46

1  place about six months before this
2  particular case came up.
3              And so the avocado growers
4  had been in -- in litigation with the
5  Agricultural Department.  And so the
6  survey that I did tried to measure who
7  they would attribute the avocado ads to.
8  And no one that saw the ads would
9  attribute it to the U.S. government, they
10 would attribute it to avocado growers and
11 so on.
12             The judge in this case felt
13 that there was a need for the avocado
14 purchasers or potential purchasers of
15 avocados to actually attribute it to the
16 specific growers who had brought the
17 suit.
18             And so at the last minute,
19 we had to modify the survey that I was
20 conducting to add a question about the
21 specific Mexican growers who, of course,
22 no one would recognize.
23             And that was the source of
24 the argument about a leading question.

CONFIDENTIAL

Page 47

1          Q.    Just so I'm clear, you were
2     tasked with conducting a survey to figure
3     out whether consumers thought the
4     advertisement was speech by the
5     government or speech by the plaintiffs,
6     correct?
7          A.    Yes.  Correct.
8          Q.    And what the court concluded
9     was that in conducting that survey, the
10    format you used was unnecessarily
11    suggestive, correct?
12         A.    That's what they concluded,
13    yes.
14         Q.    Let's talk a little bit
15    about your background.
16               You have a Bachelor's degree
17    in mechanical engineering?
18         A.    That's correct.
19         Q.    And a Master's degree in
20    management?
21         A.    That's correct.
22         Q.    You don't have any other
23    post-secondary degrees, do you?
24         A.    No.

CONFIDENTIAL

Page 48

1          Q.     You're not a sociologist?

2          A.     No.

3          Q.     Let's take a look at your

4     LinkedIn profile.

5                 ATTORNEY PISTILLI:  Tab 25.

6                      -  -  -

7                 (Whereupon, Exhibit Klein-6,

8          No Bates, Robert Klein LinkedIn

9          Profile, was marked for

10         identification.)

11                     -  -  -

12    BY ATTORNEY PISTILLI:

13         Q.     Do you recognize the

14    document I've handed you that's been

15    marked as Exhibit-6?

16         A.     I don't believe I've ever

17    seen it before.  But I guess I know what

18    it is.

19         Q.     Is it your LinkedIn profile?

20         A.     It appears to be.

21         Q.     And you've never seen your

22    own LinkedIn profile before?

23         A.     If I have, it was a long

24    time ago.

CONFIDENTIAL

Page 49

1          Q.    But to the best of your

2     understanding, is this your current

3     LinkedIn profile?

4                ATTORNEY JACOBSON:

5          Objection.   Foundation.

6                THE WITNESS:   I don't know.

7          I mean, it could be.

8     BY ATTORNEY PISTILLI:

9          Q.    Have you been at Applied

10    Marketing Science for approximately 36

11    years and six months?

12         A.    Yes.

13         Q.    And do you see that your

14    LinkedIn profile says that you've been at

15    Applied Marketing Science for 36 years

16    and six months?

17         A.    Yes.

18         Q.    And do you see in the

19    summary section it says you're an expert

20    witness on issues relating to survey

21    research related to trademarks, secondary

22    meaning, customer confusion, class

23    certification, antitrust, false

24    advertising and sales forecasting,

CONFIDENTIAL

Page 50

1  et cetera.

2              Do you see that?

3       A.    Yes.

4       Q.    This isn't a case about

5  trademarks, secondary meaning, customer

6  confusion, class certification,

7  antitrust, false advertising or sales

8  forecasting, is it?

9       A.    No, it's not.

10      Q.    Then do you see where it

11 goes on to list your specialties?

12      A.    Yes.

13      Q.    And it, again, says your

14 specialties are survey research related

15 to trademarks, secondary meaning,

16 customer confusion, class certification,

17 antitrust, false advertising, and sales

18 forecasting.

19      A.    Et cetera, yes.

20      Q.    Yes.  And so this case

21 doesn't fall into any of the specifically

22 enumerated categories of your

23 specialties, correct?

24      A.    It's not one of these listed

CONFIDENTIAL

Page 51

1    specialties, no.

2         Q.    And the survey you conducted

3    in this case is not a market research

4    study, correct?

5         A.    I think it falls into the

6    general category of market research.  I

7    mean, it's a survey of a population to

8    understand what their experiences have

9    been.

10         Q.    Market research surveys are

11    focused on consumer decisions about, for

12    instance, whether to buy a product,

13    right?

14              ATTORNEY JACOBSON:

15         Objection.  Foundation.

16              THE WITNESS:  They can be

17         that.

18    BY ATTORNEY PISTILLI:

19         Q.    What's your definition of a

20    market research survey?

21         A.    It would be a survey of

22    people to understand their beliefs,

23    behaviors, motivations.

24         Q.    Relating to market goods?

CONFIDENTIAL

Page 52

1          A.    I think market research
2    generally refers to survey research that
3    covers a wide range of topics.
4               I don't think that market
5    research is -- has a fundamentally
6    different definition than survey
7    research.
8          Q.    But market research surveys
9    focus on consumer preferences, attitudes,
10   behaviors and needs regarding products,
11   right?
12               ATTORNEY JACOBSON:
13          Objection.
14               THE WITNESS:   It's certainly
15          not limited to that.
16   BY ATTORNEY PISTILLI:
17          Q.    Have you ever offered expert
18   testimony before in a case regarding
19   anything other than a consumer product?
20          A.    Sure.
21          Q.    What are some examples?
22          A.    The -- consumer products?
23   Pharmaceuticals and hip implants.
24               Let me just -- this is only

Page 53

1    in the last four years, so.

2              Strip clubs, pesticides,

3    travel websites.

4              Those are the ones that come

5    to mind.

6         Q.    Everything you just

7    mentioned, though, involved goods or

8    services available for purchase, correct?

9              ATTORNEY JACOBSON:

10        Objection.

11             THE WITNESS:  Not

12        necessarily.  But in general,

13        probably most of them were.

14   BY ATTORNEY PISTILLI:

15        Q.    Pharmaceuticals are products

16   that people can buy, right?

17        A.    Right.  But it wasn't people

18   that we were interviewing.  We were

19   interviewing doctors.

20        Q.    Right.  Because doctors have

21   to prescribe medicines in order for

22   consumers to be able to purchase them,

23   right?

24        A.    Yes.

CONFIDENTIAL

Page 54

1           Q.    Same thing with hip
2    implants?
3           A.    Well, it really had to do
4    with the -- how doctors recognize one
5    product compared to another, or one brand
6    versus another.
7           Q.    Right.  So it had to do with
8    the purchase -- the market purchase of
9    products?
10                ATTORNEY JACOBSON:
11          Objection.
12                THE WITNESS:  Not -- not so
13          much the market purchase of
14          products, but physicians or
15          doctor -- sorry, doctors'
16          preferences for one manufacturer
17          over another.
18    BY ATTORNEY PISTILLI:
19          Q.    So preferences between two
20    different brands?
21          A.    Okay.
22          Q.    Similarly, travel websites
23    sell services, right?
24          A.    The -- yes.

CONFIDENTIAL

Page 55

1          Q.    And pesticides are consumer
2    products that people can buy, consumers
3    and others?
4          A.    And others, yes.
5          Q.    Commercial products?
6          A.    Right.
7                ATTORNEY PISTILLI:  Let's
8          take a look at Tab 31.  We'll mark
9          this as Exhibit-7.
10                    -  -  -
11               (Whereupon, Exhibit Klein-7,
12          No Bates, Applied Marketing
13          Science Web Page, was marked for
14          identification.)
15                    -  -  -
16    BY ATTORNEY PISTILLI:
17          Q.    Do you recognize Exhibit-7?
18          A.    It appears to be a page from
19    Applied Marketing Sciences' website.
20          Q.    And that's the firm that
21    you're chair emeritus of, right?
22          A.    Employee of, yes.
23          Q.    Employee and chair emeritus?
24          A.    Yes.

CONFIDENTIAL

Page 56

1            Q.     And this lists various
2     specialties of your firm, correct?
3            A.     Yes.
4            Q.     It lists eight specific
5     specialties, right?
6            A.     Specific areas in which we
7     provide litigation support services, yes.
8            Q.     And one of those is
9     trademark infringement, right?
10           A.     Yes.
11           Q.     This isn't a trademark
12    infringement case, right?
13           A.     That's correct.
14           Q.     One of them is deceptive
15    advertising?
16           A.     Yes.
17           Q.     This isn't a deceptive
18    advertising case, right?
19           A.     That's correct.
20           Q.     One of them is class
21    actions?
22           A.     That's correct.
23           Q.     This isn't a class action,
24    right?

CONFIDENTIAL

Page 57

1          A.     No, it's not a class action.
2          Q.     Next is claim
3    substantiation, right?
4          A.     Yes.
5          Q.     This isn't a case involving
6    claim substantiation, right?
7          A.     I don't believe so.
8          Q.     Next is patent infringement?
9          A.     Yes.
10          Q.     This isn't a patent case,
11    right?
12          A.     This is not a patent case.
13          Q.     The next is content
14    analysis?
15          A.     Yes.
16          Q.     This case doesn't involve
17    content analysis, right?
18          A.     Correct.
19          Q.     The next is antitrust,
20    right?
21          A.     Yes.
22          Q.     This isn't an antitrust
23    case, right?
24          A.     That's correct.

1          Q.    And the last is rebuttal
2     surveys and reports.
3               You didn't do a rebuttal
4     survey in this case, did you?
5          A.    No, I didn't.
6               ATTORNEY PISTILLI:  Let's
7          take a look at Tab 32.
8                    -   -   -
9               (Whereupon, Exhibit Klein-8,
10         No Bates, Expert Witnesses: When
11         Are They Necessary and Does
12         Daubert/Kumho Make a Difference?,
13         was marked for identification.)
14                    -   -   -
15    BY ATTORNEY PISTILLI:
16         Q.    I'm handing you a document
17    that's been marked as Exhibit-8.
18               Let me know if you recognize
19    Exhibit-8.
20               Do you recognize Exhibit-8?
21         A.    Yes.
22         Q.    What is it?
23         A.    It's an article that I
24    co-authored with two attorneys that --

Page 59

1    based on a presentation that we made at a
2    conference for, I think, IP litigators.
3         Q.    And do you stand by the
4    opinions that you offered in this
5    article?
6         A.    I think this article was
7    accurate at the time that I wrote it.
8         Q.    Do you think it's become
9    inaccurate in some way since you wrote
10   it?
11        A.    I haven't really looked at
12   it since then.
13        Q.    Look with me, if you would,
14   at Page 14, Requirements of a good
15   survey.
16        A.    Yes.
17        Q.    And you list a number of
18   relevant factors that you believe are
19   requirements of a good survey.
20             Do you see that?
21        A.    Yes.  They are taken from
22   the reference Manual for Complex
23   Litigation.
24        Q.    Do you agree that those are,

CONFIDENTIAL

Page 60

1  in fact, requirements of a good survey?

2        A.    I think these are dimensions

3  on which a good survey, or any survey,

4  should be evaluated.

5        Q.    And do you agree that one of

6  the requirements of a good survey is that

7  the questions asked were clear and not

8  leading?

9        A.    That's an important piece,

10  yes.

11        Q.    It's also important that the

12  survey was conducted by qualified persons

13  following proper interview procedures?

14        A.    Yes.  That's -- again, these

15  are taken from the Manual for Complex --

16        Q.    Well, I'm just asking if

17  you -- since you quoted them in your

18  article, I'm just asking if you agree

19  with them?

20        A.    Yeah.  I probably quoted

21  them in the -- in my report.

22        Q.    You also agree it's

23  important that the process -- survey

24  process be conducted in a way to ensure

CONFIDENTIAL

Page 61

1   objectivity?

2          A.    Yes.

3          Q.    And one of the things that

4   you note specifically in order to ensure

5   objectivity is having an understanding of

6   whether the persons surveyed are aware of

7   its purpose in litigation?

8          A.    The -- yes.  That has to do

9   with making sure that the survey is

10  double-blind.

11         Q.    Well, because it can lead to

12  non-objective results if the survey

13  participants are aware that they're

14  responding to a litigation survey,

15  correct?

16         A.    It's possible.  But it's

17  not -- it's not been my -- my experience

18  that that changes people's opinions.

19         Q.    One of the things you wrote

20  here was that in order to ensure

21  objectivity, you need to determine if the

22  survey involved persons who are aware of

23  its purpose in the litigation, right?

24         A.    I didn't really follow your

CONFIDENTIAL

Page 62

1    question.

2            Q.    That's fine.  We can move

3    on.

4                  This was not a peer-reviewed

5    article, correct?

6            A.    No, it wasn't.

7            Q.    If we can go back to

8    Exhibit-1, Tab 1.  And if you could go to

9    Page A-1 with me.

10           A.    Okay.

11           Q.    Sorry.  Page A-2, apologies.

12                 Do you see there there's a

13   list of publications?

14           A.    Yes.

15           Q.    Is that a complete list of

16   your publications in the past ten years?

17           A.    Yes.

18           Q.    What was the subject matter

19   of the quality function deployment

20   article?

21           A.    Quality function deployment

22   is a technique for product design that

23   was imported from Japan by the auto

24   industry in the early '80s and has now

Page 63

1  been widely used in a variety of

2  industries to make sure that the

3  customer's wants and needs are linked to

4  the features of a particular product.

5              And so quality function

6  deployment, or QFD for short, is what we

7  started Applied Marketing Science to be

8  focused on.  And John Hauser, Abbie

9  Griffin were -- Abbie was an employee.

10  John Hauser was my MIT professor that I

11  co-founded Applied Marketing Science

12  with.  And he's written a number of

13  articles about QFD and its application.

14        Q.    Was this publication that

15  you co-authored in the Wiley

16  International Encyclopedia of Marketing

17  peer reviewed?

18        A.    I don't know.

19        Q.    Do you remember going

20  through a peer-review process as part of

21  your publication of the article?

22        A.    I know it was reviewed for

23  inclusion in the -- in this encyclopedia.

24  But I don't know if there was a formal

Page 64

1    peer-review process.  It was reviewed by

2    peers, but.

3            Q.    The third and final article

4    listed is called, Voice of the Customer.

5                 What was the subject matter

6    of that publication?

7            A.    So similar to QFD, the voice

8    of the customer is an input to the QFD

9    process.  So it's understanding customer

10   wants and needs and structuring them in a

11   way that allows you to link them up with

12   the product engineering features of a

13   particular product.

14           Q.    And this was published in

15   the same encyclopedia?

16           A.    Yes.

17           Q.    So I take it your answer

18   about whether or not it was peer reviewed

19   would be the same?

20           A.    Yes.

21           Q.    Do you have any publications

22   prior to 2010?

23           A.    Yes.

24           Q.    To your knowledge, were any

CONFIDENTIAL

Page 65

1   of them peer reviewed?

2          A.    I don't believe so.

3          Q.    Let's turn -- sticking with

4   Exhibit-1, let's look at Appendix E.

5                Could you just help me

6   understand what these different

7   categories are?

8                I think I know invitations

9   sent is just how many people received an

10  e-mail from your firm inviting them to

11  participate in the survey, correct?

12         A.    Yes.

13         Q.    And then completed survey,

14  does that mean everyone who filled it out

15  all the way to the end?

16         A.    That's correct.

17         Q.    Can you explain to me what

18  disqualified means?

19         A.    In -- if you look at the --

20  starting with D -- Page D-12, you can see

21  the program -- the program -- the teacher

22  survey with the programmer instructions.

23  And so there are various places in which

24  people can respond and it wouldn't be --

CONFIDENTIAL

Page 66

1    they wouldn't continue.

2              For example, the screening

3    question at the top, QS2, Are you a --

4    and it asks, Teacher, administrator,

5    counselor, other.  And so if they don't

6    choose teacher, then they -- they don't

7    continue the survey and so they are

8    terminated, in survey language.

9              And so, you know -- or if

10   they are an elementary school teacher,

11   pre-K to kindergarten, or something like

12   that, then they're not going to continue.

13        Q.    Thanks.

14              And then can you help me

15   understand what are all the different

16   ways that one could get disqualified from

17   the survey?

18        A.    The -- let me see if I can.

19              So if they answer QS2 with

20   something other than being a teacher,

21   they would be disqualified.  If they

22   chose the wrong school district, they

23   would be disqualified.  If they didn't

24   choose middle or high school, they would

CONFIDENTIAL

Page 67

1    be disqualified.  If they were under 21,

2    they were disqualified -- if they

3    answered that they were under 21 they

4    were disqualified.

5              And QS7 is a quality control

6    check where we make sure they're really

7    paying attention to the question.  And if

8    they don't answer that correctly, they're

9    disqualified or terminated.

10             QS8 has a list of

11   instructions that they qualified for the

12   survey, but we want to make sure that

13   they do it in one session without being

14   interrupted, that they keep the browser

15   minimized -- maximized for the entire

16   survey, that while taking the survey they

17   don't consult with other websites or

18   other electronic or written materials,

19   that they answer the questions on their

20   own without consulting any other person,

21   and if they normally wear glasses when

22   viewing electronic screens to wear them

23   during the survey.

24             And if they answer that they

Page 68

```
 1   don't understand or don't agree with the
 2   instructions, then they are terminated.
 3          Q.    And then are -- you have
 4   separate listings for disqualified and
 5   terminated.
 6              But are those always going
 7   to be the same?
 8          A.    Where -- where are you
 9   looking?
10          Q.    Sorry.  I'm back on E-1.
11          A.    So disqualified is the sum
12   of the terminates and the failed district
13   validation.
14          Q.    And what does failed
15   district validation mean?
16          A.    They chose a different
17   district than the one that they were
18   actually in.
19          Q.    You're referring there to
20   their answer to QS3?
21              ATTORNEY JACOBSON:  Can you
22        point us what page you're on,
23        counsel?
24              ATTORNEY PISTILLI:  D-13.
```

CONFIDENTIAL

Page 69

```
 1              THE WITNESS:  I believe so,
 2       yes.
 3  BY ATTORNEY PISTILLI:
 4       Q.    And now could you just help
 5  me understand what incomplete/break-offs
 6  are?
 7       A.      Incompletes or break-offs
 8  are when they get partway through the
 9  questionnaire and don't complete it.
10       Q.    And let me ask you some
11  questions about that.
12              When you're -- when you open
13  up the questionnaire, can you click
14  through without putting in an answer?
15       A.    No.
16       Q.    So you can never get past
17  the very first page unless you answer the
18  question on the first page?
19       A.    I can't see the first page.
20              There it is.
21              So unless they click next,
22  they can't get to the next page.
23       Q.    And then on the next page
24  they have to put in the CAPTCHA
```

CONFIDENTIAL

Page 70

1    information or they can't go forward?

2            A.    That's correct.

3            Q.    And then I understand we're

4    looking at this specific example that

5    doesn't have any incomplete or

6    break-offs.

7                But could you tell me

8    generally how your survey treated

9    incomplete/break-offs?

10           A.    They weren't included in the

11   analysis data set.

12           Q.    So you essentially assumed

13   that they were similarly situated as

14   non-respondents?

15           A.    I'm not sure we made any

16   assumptions about them.  We just didn't

17   have a complete data set for them.

18           Q.    But they were treated, for

19   purposes of your analysis, the same way

20   that you treated someone who didn't

21   respond at all, correct?

22                ATTORNEY JACOBSON:

23           Objection.  Foundation.

24                THE WITNESS:  Well, that

CONFIDENTIAL

Page 71

1          would be the effect of not
2          including them in the sample,
3          analysis sample.
4                    ATTORNEY PISTILLI:  Take a
5          five-minute break?
6                    ATTORNEY JACOBSON:  Sounds
7          good.
8                    VIDEO TECHNICIAN:  The time
9          is 10:44 a.m., and we are off the
10         record.
11                        -   -   -
12                   (Whereupon, a brief recess
13         was taken.)
14                        -   -   -
15                   VIDEO TECHNICIAN:  The time
16         is 10:58 a.m., and we are on the
17         record.
18    BY ATTORNEY PISTILLI:
19         Q.    If you could, please, turn
20    back to Exhibit-1 again, which is your
21    opening report in Breathitt and take a
22    look with me at Page 5.
23         A.    Yes.
24         Q.    Do you see in Paragraph 20

CONFIDENTIAL

Page 72

1   you write, Prior to sending survey

2   invitations to each teacher on the list,

3   the district was instructed to send a

4   warming e-mail to the teachers on the

5   list informing them of an upcoming survey

6   and asking for their cooperation in

7   promptly completing the survey.  The

8   district was instructed to make sure not

9   to reveal the purpose of the survey or to

10  make any mention of social media.

11            Do you see that?

12       A.   Yes.

13       Q.   Do you know whether warming

14  e-mails were sent to the six districts?

15       A.   It's my understanding they

16  were, yes.

17       Q.   Do you have copies of those

18  warming e-mails?

19       A.   No, I do not.

20       Q.   Have you ever seen the text

21  of the warming e-mails sent by any of the

22  six districts?

23       A.   I believe I have.

24            Actually -- that's the

CONFIDENTIAL

Page 73

```
1   invitation.  They were sent by the
2   districts, and we provided them with some
3   wording to use.  But they essentially
4   composed the e-mail and sent it.
5           Q.    What wording did you provide
6   for them to use?
7           A.    Something along the lines of
8   what was shown here in Paragraph 20.
9           Q.    Do you know what words each
10  or any of the districts actually used?
11          A.    As I sit here today, I don't
12  think I can -- I know how to answer that.
13              ATTORNEY PISTILLI:  We call
14          for the production of the warming
15          e-mails.
16  BY ATTORNEY PISTILLI:
17          Q.    So you don't know, for
18  instance, if they --
19              ATTORNEY JACOBSON:  And I'll
20          just ask counsel to make that
21          request in writing after this so
22          that we can consider it.
23  BY ATTORNEY PISTILLI:
24          Q.    So you don't know whether
```

CONFIDENTIAL

Page 74

1    they followed your instructions or not,

2    correct?

3                   ATTORNEY JACOBSON:

4         Objection.  Foundation.

5                   THE WITNESS:  Certainly, I

6         expect them to follow the

7         instructions, yes.

8    BY ATTORNEY PISTILLI:

9         Q.   But you didn't verify by

10   looking at what they actually sent,

11   correct?

12                  ATTORNEY JACOBSON:

13        Objection.

14                  THE WITNESS:  One of my

15        staff may have.  But I did not.

16   BY ATTORNEY PISTILLI:

17        Q.   Let's look at some of the

18   results of your survey, starting with

19   Breathitt.

20                  You also see in Paragraph 20

21   it says, Plaintiff provided a list of all

22   the middle and high school teachers

23   currently employed full time in the

24   district.  This list contained a total of

CONFIDENTIAL

Page 75

1    70 e-mails.

2                    Do you see that?

3         A.    Yes.

4         Q.    So that means there were 70

5    full-time middle and high school teachers

6    in Breathitt?

7                    ATTORNEY JACOBSON:

8         Objection.  Foundation.

9                    THE WITNESS:  That would be

10        my understanding, yes.

11   BY ATTORNEY PISTILLI:

12        Q.    And now let's take a look at

13   Page 12 of your report.

14                   Does Page 12 tell us, in the

15   chart on the top, that only three

16   Breathitt middle school teachers

17   responded to the question regarding

18   classroom distraction for a decade ago,

19   i.e., 2014?

20        A.    Three out of the 19 who

21   responded for the current --

22        Q.    Well, there are 70 teachers

23   in the district total?

24        A.    There were 70 names we

CONFIDENTIAL

Page 76

1    received, yes.

2           Q.     Yes.

3                  And of those 70 names, only

4    seven individuals responded to the

5    question regarding in-class distraction a

6    decade ago, correct?

7           A.     There were seven teachers

8    that were currently employed who were

9    eligible to answer that question, yes.

10          Q.     Only seven answered it,

11   right?

12          A.     There were only seven that

13   were asked it, yes.

14          Q.     And you extrapolated from

15   those seven answers to the entire

16   Breathitt teacher population, correct?

17          A.     No, I don't think that's a

18   correct -- correct statement.

19          Q.     Well, you -- you reported

20   time spent addressing what you call

21   social media distraction in class for the

22   2014 time period, correct?

23          A.     I reported the data that we

24   collected, yes.

CONFIDENTIAL

Page 77

1          Q.    Right.  And that data showed
2     a number of minutes that you assert
3     are -- were spent dealing with social
4     media-related in-class distraction in
5     2014, correct?
6          A.    For these respondents, yes.
7          Q.    But just so we're clear, the
8     figure you reported was based on only a
9     total of seven responses, correct?
10          A.    There were only seven
11     teachers who were employed in --
12     currently employed full time who were
13     eligible to answer that -- that question,
14     either because they started teaching
15     after 2014, which would be the main
16     reason that they wouldn't have been
17     asked.
18          Q.    Right.  But just so the jury
19     is clear, the figure you report for
20     Breathitt for the 2014 time period is
21     based on a sum total of seven answers?
22               ATTORNEY JACOBSON:
23          Objection.  Asked and answered.
24               THE WITNESS:  There were

CONFIDENTIAL

Page 78

1    seven teachers who were eligible
2    to answer that question, yes.
3        ATTORNEY PISTILLI:  Let's go
4    ahead and mark the next five
5    reports all at once.
6              -  -  -
7        (Whereupon, Exhibit Klein-9,
8    No Bates, Social Media and Teacher
9    Time Survey Methodology and
10   Results, Charleston, was marked
11   for identification.)
12             -  -  -
13       (Whereupon, Exhibit
14   Klein-10, No Bates, 5/18/25 Social
15   Media and Teacher Time Survey
16   Methodology and Results, DeKalb,
17   was marked for identification.)
18             -  -  -
19       (Whereupon, Exhibit
20   Klein-11, No Bates, 5/18/25 Social
21   Media and Teacher Time Survey
22   Methodology and Results, Harford,
23   was marked for identification.)
24             -  -  -

CONFIDENTIAL

Page 79

1              (Whereupon, Exhibit

2         Klein-12, No Bates, 5/18/25 Social

3         Media and Teacher Time Survey

4         Methodology and Results,

5         Irvington, was marked for

6         identification.)

7                    -   -   -

8              (Whereupon, Exhibit

9         Klein-13, No Bates, 5/18/25 Social

10        Media and Teacher Time Survey

11        Methodology and Results, Tucson,

12        was marked for identification.)

13                   -   -   -

14   BY ATTORNEY PISTILLI:

15        Q.    So we've handed you exhibits

16   9, 10, 11, 12 and 13.  We'll go through

17   them one by one.

18              But I can represent to you

19   that those are your -- copies of your

20   opening report for the other five

21   bellwether cases.

22        A.    Okay.

23        Q.    And we'll start with

24   Exhibit-9, which is Tab 2.

Page 80

1              If you would look with me,

2     please, again, at Paragraph 20, which is

3     on Page 5 of Exhibit-9.

4          A.    Sorry, which page?

5          Q.    Page 5, Paragraph 20.

6                Have you found Paragraph 20?

7          A.    Paragraph 20, yes.

8          Q.    And does this indicate that

9     you sent your survey for the Charleston

10    School District to a total of 1,620

11    e-mail addresses?

12         A.    Yes.

13               I wish I had titled the --

14    these with the name of the school

15    district.  But --

16         Q.    I can help -- we're going to

17    flip, in a second, to Page 12, which is

18    titled, if that helps you.

19         A.    Yeah.  Yes.

20         Q.    Okay.  And so looking now at

21    Page 12, there were just 15 middle school

22    teachers who responded to the

23    a-decade-ago question?

24         A.    Right.  Out of the 102 that

CONFIDENTIAL

Page 81

1    responded to the invitation.

2         Q.    And there were just 18 high

3    school teachers who responded to the

4    a-decade-ago question?

5         A.    Right.  Out of the 131 who

6    were qualified to complete the survey,

7    yes.

8         Q.    So that means that the

9    figures you report supposedly relating to

10   in-class social media distraction for

11   2014 were based on the responses of only

12   33 individuals, correct?

13        A.    Right.  Out of -- they were

14   the ones who were qualified to provide an

15   answer in that -- that time period.

16        Q.    Let's flip back to Page 2,

17   if you would.

18        A.    Of Exhibit-9?

19        Q.    Yes.

20        A.    Okay.

21        Q.    And your conclusion is that,

22   From 2014 through the present, middle and

23   high school teachers in Charleston had an

24   increasing amount of scheduled classroom

Page 82

1    instruction time diverted to the use of

2    social media platforms?

3           A.    I'm sorry, I don't

4    understand your question.

5           Q.    Is your conclusion that from

6    2014 through the present, middle and high

7    school teachers in Charleston had an

8    increasing amount of scheduled classroom

9    instruction time diverted due to the use

10   of social media platforms?

11                ATTORNEY JACOBSON:

12          Objection to form.

13                THE WITNESS:  The data shows

14          that over that, you know, ten-year

15          time period there was an increase

16          in diverted time.

17   BY ATTORNEY PISTILLI:

18          Q.    Well, let's look at some of

19   the numbers.

20                You see that once in-person

21   teaching resumed after the pandemic, high

22   school teachers allegedly spent an

23   average of 14.9 percent of time diverted

24   to deal with social media issues?

CONFIDENTIAL

Page 83

1          A.    You're reading from
2    Paragraph 2?
3          Q.    Yes.
4          A.    Okay.  And, I'm sorry, could
5    you ask -- do that again?
6          Q.    You see that once in-person
7    teaching resumed after the pandemic, high
8    school teachers allegedly spent an
9    average of 14.9 percent of time diverted
10   to deal with social media use issues?
11         A.    That's not what's written
12   here exactly.
13              It says, Once in-person
14   teaching resumed, following the pause on
15   in-person teaching due to the pandemic,
16   the diverted time was 12 percent, 12.0
17   percent for middle school teachers and
18   14.9 percent for high school teachers.
19         Q.    Well, I'm just asking you,
20   do you agree that once in-person teaching
21   resumed post-pandemic, high school
22   teachers allegedly spent an average of
23   14.9 percent of time diverted to deal
24   with social media issues?

Page 84

1              ATTORNEY JACOBSON:

2         Objection.  Form.

3              THE WITNESS:  Well, it's not

4         allegedly.  I mean, this is the

5         data I collected.

6    BY ATTORNEY PISTILLI:

7         Q.    The data you collected shows

8    that 14.9 percent of time was diverted to

9    deal with social media issues after

10   in-person teaching resumed after the

11   pandemic?

12        A.    Yes.  Just after.

13        Q.    And it was 12.9 percent for

14   middle school students -- middle school

15   teachers?

16        A.    Yes.

17        Q.    And then in school year

18   '23/'24, high school teachers spent

19   13.7 percent of their classroom time

20   diverted due to social media use?

21        A.    That's what the survey

22   indicates, yes.

23        Q.    And 9.2 percent for middle

24   school teachers?

CONFIDENTIAL

Page 85

1          A.     Yes.

2          Q.     So from post-pandemic to

3    2023/2024, the average amount of time

4    diverted due to social media use fell for

5    high school teachers, right?

6                 ATTORNEY JACOBSON:

7          Objection.  Form.

8                 THE WITNESS:  Compared to

9          the just after in-person classes

10         resumed.  But compared to the

11         baseline of 2014, they're still

12         significantly larger.

13   BY ATTORNEY PISTILLI:

14         Q.     But you'll agree that from

15   2023 -- from post-pandemic to 2023/2024,

16   the time spent by high school teachers

17   diverted to social media use fell,

18   correct?

19                ATTORNEY JACOBSON:

20         Objection.  Form.

21                THE WITNESS:  That's what

22         the survey measured, yes.

23   BY ATTORNEY PISTILLI:

24         Q.     Yes.

CONFIDENTIAL

Page 86

1            And it fell by 3.7 percent
2    for middle school teachers, right?
3            A.    I'm sorry, where are you
4    looking for that number?
5            Q.    Well, what -- what did you
6    report for 2023/2024 for middle school
7    teachers?
8            A.    8 -- 9.2 percent.
9            Q.    And what did you report for
10   immediate post-pandemic?
11           A.    12.9 percent.
12           Q.    So it went from 12.9 percent
13   to 9.2 percent, correct?
14           A.    Yes.
15           Q.    So it went down by
16   3.7 percent, correct?
17                ATTORNEY JACOBSON:
18           Objection to form.
19                THE WITNESS:  Yes, that's
20           what we measured.
21   BY ATTORNEY PISTILLI:
22           Q.    And then for the current
23   year, 2025, high school teachers spent
24   4.3 percent of their classroom

CONFIDENTIAL

Page 87

1    instruction time on time devoted to

2    social media use?

3            A.    That's what we measured,

4    yes.

5            Q.    And you measured 7.1 percent

6    for middle school teachers?

7            A.    Yes.

8            Q.    And so from 2023/'24 to

9    2025, the average amount of time diverted

10   due to social media use fell 9.4 percent

11   for high school teachers?

12                ATTORNEY JACOBSON:

13           Objection to form.

14                THE WITNESS:   9.4 percentage

15           points, yes.

16   BY ATTORNEY PISTILLI:

17           Q.    And it also fell for middle

18   school teachers, correct?

19                ATTORNEY JACOBSON:

20           Objection.  Form.

21                THE WITNESS:   That's what we

22           measured.

23   BY ATTORNEY PISTILLI:

24           Q.    So from '23/'24 school year

CONFIDENTIAL

Page 88

1    to the '25 current school year, teachers
2    overall spent less classroom instruction
3    time diverted due to social media, right?
4              ATTORNEY JACOBSON:
5         Objection.  Form.
6              THE WITNESS:  Again, that
7         was what the survey showed.
8    BY ATTORNEY PISTILLI:
9         Q.   Now, if you could bear with
10   me, I want to go back for a minute to
11   Exhibit-8 -- sorry.  Exhibit-1.
12             If you could look at Page 12
13   with me -- no, not Page 12.
14             Sorry.  Let's look at
15   Page 2.
16             Do you see that post -- from
17   post-pandemic to 2023, would you agree
18   with me that the average amount of time
19   diverted due to social media use for high
20   school teachers fell by 1.2 percent?
21             ATTORNEY JACOBSON:
22        Objection.  Form.
23             THE WITNESS:  This is
24        Exhibit-1?

CONFIDENTIAL

Page 89

1    BY ATTORNEY PISTILLI:

2          Q.    Yes.

3          A.    And in total or --

4          Q.    For high school teachers.

5          A.    For high school teachers?

6                From -- and the time period,

7    again, was from just after --

8          Q.    From post -- well, for

9    post-pandemic for high school teachers,

10   it was 5.9 percent, correct?

11         A.    Right.

12         Q.    And then in the 2023/2024

13   school year, it was 5.5 percent, right?

14         A.    Yes.

15         Q.    And so it fell from

16   post-pandemic to 2023-2024, right?

17                ATTORNEY JACOBSON:

18         Objection.  Form.

19                THE WITNESS:  According to

20         the data we collected, yes.

21   BY ATTORNEY PISTILLI:

22         Q.    And then, similarly, for

23   middle school teachers, post-pandemic it

24   was 7.8 percent?

CONFIDENTIAL

Page 90

1          A.     Yes.
2          Q.     And then in the 2023/2024
3    school year, it was 6.3 percent?
4          A.     Yes.
5          Q.     Which, again, means it
6    dropped from post-pandemic to 2023/2024,
7    correct?
8                 ATTORNEY JACOBSON:
9          Objection.  Form.
10                THE WITNESS:  Yes, that's
11         what we measured.
12   BY ATTORNEY PISTILLI:
13         Q.     And then looking from 2023
14   to 20 -- 2023/'24 to the '25 school year,
15   the average amount of time diverted due
16   to social media use fell 9.4 percent for
17   high school teachers, right?
18                ATTORNEY JACOBSON:
19         Objection to form.
20                THE WITNESS:  No.
21                Am I looking at the right --
22         I've got -- mine shows 5.5 percent
23         going to 3.9 percent.
24   BY ATTORNEY PISTILLI:

Page 91

1        Q.    So it's 3.9 percent for the
2   2025 school year, correct?
3        A.    '24/'25, yes.
4        Q.    And it was higher than that,
5   6.3 percent, in the prior school year,
6   correct?
7        A.    I thought you were looking
8   at high school teachers.
9        Q.    Sorry.  Let's start over,
10   and we'll do high school first, okay?
11        A.    Okay.
12        Q.    So just doing high school.
13        5.9 percent was the
14   post-pandemic number, correct?
15        A.    Correct.
16        Q.    And then in '23/'24, it went
17   down from 5.9 percent to 5.5 percent,
18   correct?
19              ATTORNEY JACOBSON:
20         Objection to form.
21              THE WITNESS:  That's what we
22         measured, yes.
23   BY ATTORNEY PISTILLI:
24        Q.    And then you measured that

CONFIDENTIAL

Page 92

1   in '24/'25, it went down further to

2   3.9 percent?

3                   ATTORNEY JACOBSON:

4        Objection to form.

5                   THE WITNESS:  That's what I

6        measured, yes.

7   BY ATTORNEY PISTILLI:

8        Q.    So you measured that from

9   return to class after the pandemic to the

10  current school year, it went down by --

11  from 5.9 percent to 3.9 percent, right?

12                  ATTORNEY JACOBSON:

13       Objection.  Form.

14                  THE WITNESS:  Yes, that's

15       what we measured.

16  BY ATTORNEY PISTILLI:

17       Q.    Yep.

18             And now we'll turn to middle

19  school.

20             Middle school, post-pandemic

21  was 7.8 percent, correct?

22       A.    That's correct.

23       Q.    And then when we get to the

24  '23/'24 school year, it goes down to

```
                                         Page 93
 1   6.3 percent, correct?
 2                   ATTORNEY JACOBSON:
 3           Objection to form.
 4                   THE WITNESS:  Yes, that's
 5           what we measured.
 6   BY ATTORNEY PISTILLI:
 7           Q.    And then it goes down
 8   further in the current school year to
 9   5.2 percent?
10                   ATTORNEY JACOBSON:
11           Objection to form.
12                   THE WITNESS:  Again, that's
13           what we measured.
14   BY ATTORNEY PISTILLI:
15           Q.    Yep.
16                   So what you measured is that
17   the amount of diverted time went down
18   from return to class after the pandemic
19   to the current school year, correct?
20                   ATTORNEY JACOBSON:
21           Objection.  Form.
22                   THE WITNESS:  Yes, that's
23           correct.
24   BY ATTORNEY PISTILLI:
```

CONFIDENTIAL

Page 94

1          Q.    All right.  Let's take a
2    look at Exhibit-10.
3                Is Exhibit-10 your opening
4    report for the DeKalb plaintiff?
5          A.    Yes.
6          Q.    And then let's look again,
7    if we could, at Paragraph 2.
8          A.    Okay.
9          Q.    And in the 2023/'24 school
10   year, you reported that high school
11   teachers spent 14.9 percent of their
12   classroom time diverted due to social
13   media use?
14         A.    Yes.
15         Q.    And 10.2 percent for middle
16   school teachers?
17         A.    That's correct.
18         Q.    And then in the current
19   year, high school teachers, you reported,
20   spent 11.7 percent of their classroom
21   time diverted due to social media?
22         A.    Yes.
23         Q.    And 5.2 percent for middle
24   school teachers?

CONFIDENTIAL

Page 95

```
 1          A.    That's correct.
 2          Q.    And so from 2023/'24 school
 3    year to the '24/'25 school year, the
 4    average amount of time diverted due to
 5    social media use fell 3.2 percent for
 6    high school teachers?
 7               ATTORNEY JACOBSON:
 8          Objection.  Form.
 9               THE WITNESS:  That's -- I
10          believe that's correct, yes.
11          That's what we reported --
12          measured.
13    BY ATTORNEY PISTILLI:
14          Q.    And you reported that it
15    fell, over that same time period,
16    5 percent for middle school teachers?
17               ATTORNEY JACOBSON:
18          Objection.  Form.
19               THE WITNESS:  Five
20          percentage points.
21    BY ATTORNEY PISTILLI:
22          Q.    Five percentage points, yes.
23               So from '23/'24 to '24/'25,
24    teachers overall spent less classroom
```

CONFIDENTIAL

Page 96

1   instruction time diverted due to social

2   media use according to your data, right?

3                   ATTORNEY JACOBSON:

4           Objection.  Form.

5                   THE WITNESS:  Yes.

6   BY ATTORNEY PISTILLI:

7           Q.    If you could turn to

8   Paragraph 20 with me.

9           A.    Of Exhibit-10?

10          Q.    Exhibit-10, yes.  Sticking

11  with Exhibit-10.

12                  And does this indicate that

13  you sent a total of 2,977 surveys out to

14  DeKalb teachers?

15                  ATTORNEY JACOBSON:

16          Objection.  Form.

17                  THE WITNESS:  Which -- which

18          paragraph?

19  BY ATTORNEY PISTILLI:

20          Q.    20.

21          A.    Yes.  The list we had was

22  2,977 e-mail addresses.

23          Q.    And then let's take a look

24  at Page 12, starting with the middle

CONFIDENTIAL

Page 97

1    school teachers column.

2                Of the 2,977 surveys you

3    sent out, you only had 12 responses from

4    middle school teachers for the

5    a-decade-ago, i.e., 2014 question,

6    correct?

7                    ATTORNEY JACOBSON:

8            Objection to form.

9                    THE WITNESS:  Well, again,

10           only -- we had 70 total responding

11           middle school teachers, and 12 of

12           them were eligible to be asked the

13           question about the 2014 time

14           period.

15   BY ATTORNEY PISTILLI:

16           Q.    But you sent the survey to

17   2,977 people, correct?

18           A.    Who are currently employed

19   full time in the school district, yes.

20           Q.    And of those, only 12 middle

21   school teachers responded to that

22   particular question?

23           A.    No.  Seventy middle school

24   teachers responded to the survey, and 12

CONFIDENTIAL

Page 98

1    of them were eligible to be asked the

2    2014 question.

3         Q.    Right.  So only 12

4    responded, right?

5              ATTORNEY JACOBSON:

6         Objection to form.

7              THE WITNESS:  There are

8         12 -- we have 12 responses for

9         that time period.

10   BY ATTORNEY PISTILLI:

11        Q.    And you have, from high

12   school teachers, only 18 responses from

13   that time period, right?

14             ATTORNEY JACOBSON:

15        Objection.  Form.

16             THE WITNESS:  We have 18

17        responses from that time period.

18   BY ATTORNEY PISTILLI:

19        Q.    And you extrapolated from

20   those just 30 responses when you provided

21   your amount-of-time-diverted figure for

22   the 2014 time period, correct?

23             ATTORNEY JACOBSON:

24        Objection to form.

CONFIDENTIAL

Page 99

1              THE WITNESS:  The 2014 data
2         is based on the number of teachers
3         who responded.
4    BY ATTORNEY PISTILLI:
5         Q.    Which is just 30, right?
6              ATTORNEY JACOBSON:
7         Objection.  Form.
8              THE WITNESS:  In total
9         between the two, yes.
10   BY ATTORNEY PISTILLI:
11        Q.    Let's turn now to
12   Exhibit-11.
13              Does Exhibit-11 appear to be
14   your opening report in the Harford case?
15        A.    Yes.
16        Q.    Let's take a look at
17   Paragraph 2.
18              You reported that when
19   in-person teaching resumed post-pandemic,
20   high school teachers spent 18.6 percent
21   of their classroom time on social media
22   disruptions?
23        A.    Well, the -- you paraphrased
24   what it says there.  The number is

CONFIDENTIAL

Page 100

1    9.4 percent for middle school teachers
2    and 18.6 percent for high school
3    teachers.
4         Q.    And then for the '23/'24
5    school year, high school teachers
6    reported 16.5 percent of their classroom
7    disruptions were due to social media use?
8         A.    Yes.
9         Q.    And for middle school
10   teachers that same year, it was
11   8.9 percent?
12        A.    That's correct.
13        Q.    And so between when
14   in-person teaching resumed post-pandemic
15   and the '23/'24 school year, the amount
16   of classroom disruption time reported by
17   high school teachers fell 2.1 percentage
18   points?
19             ATTORNEY JACOBSON:
20        Objection.  Form.
21             THE WITNESS:  Yes, that's
22        what we measured.
23   BY ATTORNEY PISTILLI:
24        Q.    You also measured that it

CONFIDENTIAL

Page 101

```
1   fell for middle school teachers, right?
2              ATTORNEY JACOBSON:
3         Objection.  Form.
4              THE WITNESS:  Yes, that's
5         correct.
6   BY ATTORNEY PISTILLI:
7         Q.    And then for the current
8   school year, '24/'25, high school
9   teachers reported 10.6 percent of their
10  classroom disruption time was spent
11  dealing with social media issues?
12        A.    Yes.
13        Q.    And 5.7 percent for middle
14  school teachers that school year?
15        A.    Yes, that's correct.
16        Q.    So from '23/'24 to '24/'25,
17  the amount of time high school teachers
18  reported spending dealing with social
19  media issues fell 5.9 percentage points?
20              ATTORNEY JACOBSON:
21         Objection to form.
22              THE WITNESS:  For high
23         school teachers.
24  BY ATTORNEY PISTILLI:
```

CONFIDENTIAL

Page 102

1          Q.     Yep.

2          A.     Yes.

3          Q.     And it fell 3.2 percentage

4    points for middle school teachers over

5    that same one-year period?

6                 ATTORNEY JACOBSON:

7          Objection.  Form.

8                 THE WITNESS:  Yes.

9    BY ATTORNEY PISTILLI:

10         Q.     Let's take a look at

11   Paragraph 20.

12                Does this indicate that you

13   sent 1,378 e-mails to middle and high

14   school teachers in Harford?

15         A.     That's correct.

16         Q.     Let's turn to Page 12.

17                From the 1,378 surveys that

18   you sent out, you only have 12 valid

19   responses to the question relating to a

20   decade ago from middle school teachers,

21   right?

22                ATTORNEY JACOBSON:

23         Objection.  Form.

24                THE WITNESS:  Maybe I'm in

CONFIDENTIAL

                                                    Page 103

1          the wrong exhibit.  Which --

2          Exhibit-11?

3   BY ATTORNEY PISTILLI:

4          Q.    Yes.  Oh, 21, not 12.  My

5   apologies.

6          A.    Yes.  I mean, that's how

7   many were eligible to be asked the

8   question out of the total respondents.

9               And we got the response rate

10  that's not uncommon for unidentified

11  surveys that are used without an

12  incentive, Internet surveys.

13         Q.    And then for high school

14  teachers, you only had 26 valid responses

15  to the questions relating to a decade ago

16  from the 1,378 surveys you sent out,

17  right?

18               ATTORNEY JACOBSON:

19         Objection to form.

20               THE WITNESS:  I think the

21         more appropriate is to look at the

22         number that were teaching in the

23         current year versus that because,

24         you know, you can't ask questions

Page 104

1          about ten years ago for someone
2          who just started teaching.
3   BY ATTORNEY PISTILLI:
4          Q.    Right.  But your -- the
5   percentages you report for time spent on
6   in-class distraction relating to social
7   media for the 2014 time period were based
8   entirely on the responses of the 47
9   individuals, correct?
10                 ATTORNEY JACOBSON:
11         Objection to form.
12                 THE WITNESS:  Yes, we --
13         those were the only ones who were
14         eligible to be asked the question.
15   BY ATTORNEY PISTILLI:
16         Q.    Let's take a look at
17   Exhibit-12.
18                 Is Exhibit-12 the opening
19   report you submitted in the Irvington
20   case?
21         A.    Yes.
22         Q.    Let's take a look at
23   Paragraph 2.
24                 When in-person teaching

Page 105

1   resumed post-pandemic, high school

2   teachers reported that 13.4 percent of

3   their classroom disruptions were due to

4   social media?

5          A.    Yes.  I mean, that's the

6   number that's reported on Page 12 in the

7   table.

8          Q.    And it was 10 percent

9   post-pandemic for middle school teachers?

10         A.    Yes.  Again, that's what --

11  what's presented in the table on Page 12.

12         Q.    And then last school year,

13  '23/'24, high school teachers reported

14  17.6 percent of their classroom

15  disruptions were due to social media use?

16         A.    Yes.

17         Q.    And 4.9 percent for middle

18  school teachers?

19         A.    Yes.

20         Q.    And so between when

21  in-person teaching resumed post-pandemic

22  and the '23/'24 school year, the amount

23  of classroom disruption time reported by

24  middle school teachers fell 5.1 percent?

CONFIDENTIAL

Page 106

```
 1              ATTORNEY JACOBSON:
 2         Objection.  Form.
 3              THE WITNESS:   5.1 percentage
 4         points, yes.
 5  BY ATTORNEY PISTILLI:
 6         Q.    And for the current year,
 7  2025, high school teachers reported
 8  9.9 percent of their classroom disruption
 9  time was spent dealing with social media
10  issues?
11         A.    That's correct.
12         Q.    And it was 2.2 percent for
13  middle school teachers?
14         A.    Yes.
15         Q.    So between '23/'24 and
16  '24/'25, the amount of time high school
17  teachers reported spending dealing with
18  social media issues fell 7.7 percentage
19  points?
20              ATTORNEY JACOBSON:
21         Objection.  Form.
22              THE WITNESS:  Yes, that's
23         the number reported.
24  BY ATTORNEY PISTILLI:
```

```
                                    Page 107
 1          Q.    And for middle school
 2   teachers from '23/'24 to '24/'25, it fell
 3   by 2.7 percentage points?
 4                 ATTORNEY JACOBSON:
 5          Objection.  Form.
 6                 THE WITNESS:  That's what we
 7          measured, yes.
 8   BY ATTORNEY PISTILLI:
 9          Q.    Let's take a look at
10   Paragraph 20.
11                 Does Paragraph 20 indicate
12   that you sent the survey to a total of
13   270 middle and high school teachers in
14   Irvington?
15          A.    Yes.
16          Q.    And let's take a look at
17   Page 12.
18                 Does Page 12 indicate that
19   of all the surveys you sent out, you only
20   had nine responses to the question
21   relating to social media in-class
22   distraction during the 2014 time period
23   from middle school teachers?
24                 ATTORNEY JACOBSON:
```

Page 108

1          Objection.  Form.
2                    THE  WITNESS:   Yes.   Of  the
3          41  who  responded  to  the  survey,
4          yes.
5    BY  ATTORNEY  PISTILLI:
6          Q.    But  you  sent  out  a  total  of
7    270  surveys,  right?
8          A.    That's  correct.
9          Q.    And  then  from  high  school
10   teachers,  you  had  just  13  responses  for
11   the  2014  time  period?
12                   ATTORNEY  JACOBSON:
13         Objection.  Form.
14                   THE  WITNESS:   Of  the  49  who
15         are  currently  full-time  teachers
16         in  high  school  --  the  same  high
17         school,  actually.
18   BY  ATTORNEY  PISTILLI:
19         Q.    And  so  that  means  that  your
20   percentages  that  you  report  relating  to
21   2014  are  based  on  the  responses  of  just
22   22  individuals?
23                   ATTORNEY  JACOBSON:
24         Objection.  Form.

CONFIDENTIAL

Page 109

1           THE WITNESS:  Yeah, again, I
2       wouldn't have said just 22.  But
3       that's the number who are eligible
4       to be asked that question, given
5       that they're currently full-time
6       teachers in the high school or
7       middle school.
8   BY ATTORNEY PISTILLI:
9       Q.    All right.  Let's take a
10   look at Exhibit-13.
11           Is this the opening report
12   that you submitted in the Tucson case?
13       A.    Yes.
14       Q.    Let's take a look at
15   Paragraph 2.
16           In 2014 for Tucson, middle
17   school teachers reported 2.6 percent of
18   their classroom disruptions were due to
19   social media?
20       A.    Middle school teachers in
21   2014?  Is that what you --
22       Q.    Yes.
23       A.    Yes.  We measured
24   2.6 percent.

Page 110

1          Q.     And then at the beginning of
2    2020, middle school teachers reported the
3    same amount of classroom disruptions due
4    to social media, right, 2.6 percent?
5          A.     Yes.
6          Q.     So for middle school
7    teachers, there wasn't any increase from
8    2014 to 2020?
9               ATTORNEY JACOBSON:
10         Objection.  Form.
11              THE WITNESS:  For these
12         respondents, that's correct.
13   BY ATTORNEY PISTILLI:
14         Q.     And then when in-person
15   teaching resumed post-pandemic, high
16   school teachers reported 20.2 percent of
17   their classroom disruptions were due to
18   social media use?
19         A.     That's correct.
20         Q.     And 5.5 percent for middle
21   school teachers?
22         A.     Yes.
23         Q.     Last school year, '23/'24,
24   high school teachers reported 20 percent

CONFIDENTIAL

Page 111

1    of their classroom disruptions were due

2    to social media use?

3            A.    Yes.

4            Q.    And 5.3 percent for middle

5    school teachers?

6            A.    Yes.

7            Q.    So between when in-person

8    teaching resumed post-pandemic and the

9    '23/'24 school year, the amount of

10   classroom disruption time reported by

11   high school teachers fell, right?

12               ATTORNEY JACOBSON:

13           Objection.  Form.

14               THE WITNESS:  By .2

15           percentage points.

16   BY ATTORNEY PISTILLI:

17           Q.    And it also fell for middle

18   school teachers, right?

19               ATTORNEY JACOBSON:

20           Objection.  Form.

21               THE WITNESS:  By the same .2

22           percentage points.

23   BY ATTORNEY PISTILLI:

24           Q.    And then for the current

CONFIDENTIAL

Page 112

1   year, '24/'25, high school teachers

2   reported 14.8 percent of their classroom

3   disruption time was spent dealing with

4   social media issues?

5          A.    Yes.

6          Q.    And 5.2 percent for middle

7   school teachers?

8          A.    Yes.

9          Q.    So between the '23/'24

10  school year and the '24/'25 school year,

11  the amount of time high school teachers

12  reported spending dealing with social

13  media issues fell 5.2 percentage points?

14              ATTORNEY JACOBSON:

15         Objection to form.

16              THE WITNESS:   That's

17         correct.

18  BY ATTORNEY PISTILLI:

19         Q.    And it also fell for middle

20  school teachers over that same period?

21              ATTORNEY JACOBSON:

22         Objection to form.

23              THE WITNESS:   Yes.

24  BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 113

1          Q.     Let's take a look at
2     Paragraph 20.
3               Does this indicate to you
4     that for Tucson, you sent your survey to
5     a total of 1,077 middle and high school
6     teachers?
7          A.     Yes.
8               But, I mean, to be
9     completely accurate, you know, what was
10    sent to them was an invitation to
11    complete the survey, not the survey
12    itself.
13         Q.     Fair enough.
14              And let's look together at
15    Page 12.
16              Does this indicate to you
17    that of all the surveys that you sent out
18    in Tucson, you only received four
19    responses to the question relating to
20    in-class distraction relating to social
21    media for the 2014 time period?
22              ATTORNEY JACOBSON:
23         Objection.  Form.
24              THE WITNESS:  No, I think

Page 114

1           you're mischaracterizing it.

2                   We had 22 responses from

3           middle school teachers.  And of

4           those 22, only four were eligible

5           to be asked that question.

6   BY ATTORNEY PISTILLI:

7           Q.    Right.  So there were only

8   four valid responses, correct?

9                   ATTORNEY JACOBSON:

10          Objection.  Form.

11                  THE WITNESS:  There were

12          four responses for that time

13          period.  I certainly believe they

14          were valid.

15  BY ATTORNEY PISTILLI:

16          Q.    And you sent out a total of

17  1,077 surveys, correct?

18                  ATTORNEY JACOBSON:

19          Objection.  Form.

20                  THE WITNESS:  Yes.  But

21          you've got, you know, two

22          different filters here.

23                  One being response to the

24          survey itself.  And the second

CONFIDENTIAL

```
                                        Page 115

 1          being still employed in the same
 2          school at the same -- ten years
 3          earlier.
 4   BY ATTORNEY PISTILLI:
 5          Q.    But now turning to high
 6   school teachers, you only had eight
 7   responses to the question relating to a
 8   decade ago, correct?
 9               ATTORNEY JACOBSON:
10          Objection to form.
11               THE WITNESS:  Well, we had
12          eight responses out of the 32 who
13          were -- there were eight people
14          who were eligible to be asked the
15          question out of the 32 that
16          responded to the survey.
17   BY ATTORNEY PISTILLI:
18          Q.    And so the percentages that
19   you report for Tucson relating to the
20   2014 time period were extrapolations
21   based on only 12 responses, correct?
22               ATTORNEY JACOBSON:
23          Objection.  Form.
24               THE WITNESS:  They weren't
```

CONFIDENTIAL

Page 116

1          extrapolations.  They were --
2          these were the numbers we
3          collected and what we reported.
4    BY ATTORNEY PISTILLI:
5          Q.    You collected and reported
6    them as figures for the Tucson School
7    District for the 2014 school year, right?
8          A.    Right.  Because these were
9    the only ones who were eligible to be --
10   to be counted there.
11         Q.    Right.  But that figure for
12   the 2014 school year is based only on 12
13   responses?
14              ATTORNEY JACOBSON:
15         Objection.  Form.
16              THE WITNESS:  In total,
17         there were 12 respondents who were
18         eligible to be asked that
19         question, yes.
20   BY ATTORNEY PISTILLI:
21         Q.    And then the figures you
22   report for 2014 were based only on those
23   12 responses?
24              ATTORNEY JACOBSON:

Page 117

```
 1        Objection.  Form.
 2                THE  WITNESS:   Yes,  that's
 3        correct.
 4   BY ATTORNEY PISTILLI:
 5        Q.    Let's  take  a  look  for  a
 6   minute  at  Page  10.
 7        A.    For  Tucson?
 8        Q.    Yes.
 9                And  then  the  question  you
10   asked  here,  Question  5  --  first,  other
11   than  --  just  so  we're  on  the  same  page,
12   other  than  having  the  --  strike  that.
13                This  is  --  you  asked
14   essentially  the  same  question  to  each  of
15   the  six  school  districts,  right?
16        A.    Yes.
17        Q.    And,  then,  the  question  you
18   asked  had  them  fill  in  numbers  of
19   minutes,  right?
20        A.    That  is  correct.
21        Q.    And  then  how  did  you  go  from
22   those  number  of  minutes  to  calculating
23   the  percentages  that  you  report?
24        A.    We  used  the  data  that  we
```

CONFIDENTIAL

Page 118

1    collected in Questions 1 -- well, really

2    Question 2.  But, In terms of a typical

3    day, how much of your time is scheduled

4    instruction time?

5         Q.    So the percentages have the

6    minutes diverted as the numerator and the

7    total scheduled instruction time as the

8    denominator, essentially?

9         A.    Yes, essentially.

10        Q.    Let's take a look at

11    Paragraph 26.

12             Do you see you say there,

13    Respondents who indicated they did not

14    know how many hours and/or minutes they

15    are at school in a typical day were

16    skipped to the end and subsequently

17    removed from the data prior to analysis.

18             Do you see that?

19        A.    Yes.

20        Q.    And does that accurately

21    describe your methodology for all six of

22    the cases?

23        A.    Yes.

24        Q.    And so if somebody said they

Page 119

1    didn't know how many hours or minutes
2    they worked, then you didn't ask them any
3    questions about in-class distraction,
4    correct?
5            A.    Yes, that's correct.
6            Q.    So no further data was
7    collected from those individuals?
8            A.    That's correct.
9            Q.    And you essentially treated
10   them as if they hadn't responded to the
11   survey at all?
12               ATTORNEY JACOBSON:
13           Objection.  Form.
14               THE WITNESS:  I guess that's
15           the implication, yes.
16   BY ATTORNEY PISTILLI:
17           Q.    And so you assumed that they
18   were representative despite the fact that
19   they revealed they were different in the
20   sense that they were unable to recall the
21   amount of time they spent working, right?
22               ATTORNEY JACOBSON:
23           Objection.  Foundation.
24               THE WITNESS:  I'm not sure I

CONFIDENTIAL

Page 120

1            agree with that.
2     BY ATTORNEY PISTILLI:
3            Q.    We know that they are
4     different in some way from the people who
5     you included in your data set, right?
6                 ATTORNEY JACOBSON:
7            Objection.  Foundation.
8                 THE WITNESS:  No, I don't
9            think we know that they're
10           different.  They answered the
11           question in a way that made it
12           impossible to continue the survey.
13                So that's all I know.  I
14           mean, I have no reason to believe
15           that we don't have a
16           representative sample here.
17    BY ATTORNEY PISTILLI:
18           Q.    Well, there -- there were
19    two categories of people who responded to
20    your survey, right?
21                There were people who felt
22    that they could estimate the amount of
23    time they spent on in-class instruction
24    and there were people who felt that they

CONFIDENTIAL

Page 121

1   couldn't, correct?
2              ATTORNEY JACOBSON:
3         Objection.  Compound.
4              THE WITNESS:  No, that -- I
5         don't think that's a way to
6         describe --
7   BY ATTORNEY PISTILLI:
8         Q.    How would you describe it?
9         A.    -- describe them.
10             There were people who
11  responded to the survey and there were
12  people who didn't.  And I have no reason
13  to believe that we don't have a
14  representative sample of people
15  responding.
16        Q.    Well, we'll get to people
17  who didn't respond.
18             But right now I'm asking you
19  about people who indicated they didn't
20  know how many hours and/or minutes they
21  were at school in a typical day.
22             Because there were some
23  people who said they didn't know how many
24  hours or minutes they were at school in a

CONFIDENTIAL

Page 122

1    typical day, right?

2          A.    Yes.    There are some people

3    who did that.

4          Q.    And then there were other

5    people who felt that they were capable of

6    answering that question, correct?

7                ATTORNEY JACOBSON:

8          Objection.    Form.

9                THE WITNESS:    They did

10         answer the question.

11   BY ATTORNEY PISTILLI:

12         Q.    Right.    And that's a

13   difference between those two groups,

14   right?

15                ATTORNEY JACOBSON:

16         Objection.    Form.

17                THE WITNESS:    It's just

18         their response to the

19         questionnaire was different -- to

20         the question was different.

21                I mean, I don't know that

22         that means that they're different

23         types of people.

24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 123

1          Q.     Well, you just don't know,
2    right?
3                ATTORNEY JACOBSON:
4          Objection.  Form.
5                THE WITNESS:  I have no
6          reason to believe that they are
7          really different types of people.
8          They just answered the question in
9          a way that made it illogical to
10         continue an interview with them.
11   BY ATTORNEY PISTILLI:
12         Q.     But you didn't do anything
13   to test whether they were, in fact,
14   different types of people, right?
15               ATTORNEY JACOBSON:
16         Objection to form.
17               THE WITNESS:  They had
18         qualified for the survey.  And we
19         got to the point where we asked
20         how long -- how many hours they
21         spend in a typical day.  And, you
22         know, they felt they couldn't
23         answer that question.
24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 124

1          Q.     Right.  And that makes them
2     different from the people who felt they
3     could answer the question?
4                    ATTORNEY JACOBSON:
5             Objection.  Form.  And asked and
6             answered.
7                    THE WITNESS:  Well, I mean,
8             any difference between responses
9             of any individual are going to --
10            you know, you could characterize
11            it that way.
12                   So I wouldn't say that
13            they're different.  They just gave
14            different answers.
15    BY ATTORNEY PISTILLI:
16            Q.     Different answers relating
17    to their ability to recall past events?
18                    ATTORNEY JACOBSON:
19            Objection.  Form.
20                    THE WITNESS:  No, not past
21            events.  Current events.
22    BY ATTORNEY PISTILLI:
23            Q.     Different in terms of their
24    ability to confidently give estimates

CONFIDENTIAL

Page 125

1    regarding time spent on tasks.

2              ATTORNEY JACOBSON:

3         Objection to form.

4              THE WITNESS:  No.  I mean,

5         the question is, you know, in a

6         typical day for the current school

7         year, how many hours and/or

8         minutes are you at school?

9              And of the -- and we take

10        the answer to that question and

11        say, of the, say, five hours

12        you're at school on a typical day

13        for the current school year, how

14        much of that time is scheduled

15        instruction time, i.e., the total

16        time that you're scheduled to be

17        teaching a class.

18             And if they say they don't

19        know, then we're not going to

20        continue the survey.

21   BY ATTORNEY PISTILLI:

22        Q.    But you -- I understand your

23   view that you don't think this is likely.

24             But you would agree with me

Page 126

1   that if those people were different from
2   the people who were able to answer that
3   question in a relevant way, that would
4   mean that your sample is not
5   representative?
6                   ATTORNEY JACOBSON:
7        Objection.  Form.
8                   THE WITNESS:  Well, I mean,
9        you know, hypothetically.  You
10       presented a situation that I don't
11       know that I agree that they're any
12       different from the people who did
13       respond, they just answered the
14       question differently.
15   BY ATTORNEY PISTILLI:
16       Q.    Right.  But if they were
17   different, that would call into question
18   the representativeness of your data?
19                   ATTORNEY JACOBSON:
20       Objection.  Form.  And asked and
21       answered.
22                   THE WITNESS:  If they were
23       different hypothetically, then
24       under that hypothetical, they

Page 127

1          would be different.
2                  I mean, I'm -- I mean,
3          you've -- but I have no reason to
4          believe that they're any
5          different.
6    BY ATTORNEY PISTILLI:
7          Q.    You didn't perform any
8    testing to determine whether they're
9    different, correct?
10                  ATTORNEY JACOBSON:
11          Objection.  Form.
12                  THE WITNESS:  I had no
13          reason to believe that they were
14          different.
15   BY ATTORNEY PISTILLI:
16          Q.    So you just assumed they
17   were the same?
18                  ATTORNEY JACOBSON:
19          Objection.  Form.
20                  THE WITNESS:  We sent the
21          invitation and reminders and got a
22          response rate that was not
23          atypical for an Internet survey
24          with no incentive.

CONFIDENTIAL

Page 128

1    BY ATTORNEY PISTILLI:
2          Q.    That wasn't my question,
3    sir.
4                You effectively assumed that
5    individuals who are unable to estimate
6    the amount of time they spent on in-class
7    instruction were similarly situated to
8    the individuals who completed your
9    survey?
10                ATTORNEY JACOBSON:
11          Objection.  Form.
12                THE WITNESS:  And I have no
13          reason to believe they are any
14          different.
15                ATTORNEY PISTILLI:  This is
16          a natural stopping point.  I'm
17          happy to take, like, a five-minute
18          break.  I'm also happy if you guys
19          want to do lunch.  I defer to you
20          all.  And we can do a short lunch.
21                ATTORNEY JACOBSON:  I'm not
22          positive if food has been
23          delivered, so that would factor in
24          a little bit.

CONFIDENTIAL

Page 129

1            ATTORNEY PISTILLI:  Can we
2        go off the record?
3            VIDEO TECHNICIAN:  The time
4        is 11:59 a.m.  We are off the
5        record.
6                  -   -   -
7            (Whereupon, a brief recess
8        was taken.)
9                  -   -   -
10            VIDEO TECHNICIAN:  The time
11        is 12:13 p.m., and we are on the
12        record.
13    BY ATTORNEY PISTILLI:
14        Q.    If you could continue with
15    Exhibit-13 and look at Page 12.
16            We've been talking about the
17    number of people responding to the
18    a-decade-ago question.
19            And I think you said that
20    what you're reporting there is the total
21    number of people eligible to respond; is
22    that correct?
23        A.    Yes, that's what I said.
24        Q.    And could you explain what

CONFIDENTIAL

Page 130

1   you mean by "eligible"?

2        A.    That they were still

3   teaching at the same school ten years

4   earlier.

5        Q.    But does it include everyone

6   who was still teaching at the school ten

7   years earlier?

8        A.    It includes everyone who was

9   qualified to start the -- and provide an

10  answer for the current school year.

11       Q.    And in order to be qualified

12  to offer estimates for the current school

13  year, what criteria applied?

14       A.    They had to pass all the

15  screening questions, the quality control

16  check, and they needed to know how

17  many -- how much time they spent at

18  school in a typical day and how much of

19  that was instruction time.  Essentially,

20  Questions 1 and 2.

21       Q.    Take a look, if you would,

22  with me, at Appendix E, Page E-1.

23            Now, you say there were 59

24  completed surveys.

CONFIDENTIAL

Page 131

1          A.     Yes.
2          Q.     But then you only report 54
3    data points for that current school year;
4    is that correct?
5          A.     That's correct.
6          Q.     And so, then, who are the
7    other four?
8          A.     This was something that we
9    actually looked into yesterday in
10   understanding the differences between the
11   reported numbers and -- the completed
12   surveys and the number reported in, you
13   know, Paragraph 40.
14             And I'm trying to recall the
15   conclusions.  And I believe it had to do
16   with the respondents who answered "don't
17   know" to the Questions 1 and 2.  So they
18   wouldn't be included in the tables on
19   Page 12, but they were counted as
20   completed surveys.
21         Q.     So you're saying for Tucson,
22   four people dropped out of Table 12
23   because they were unable to recall the
24   amount of time they had spent working and

Page 132

1  the amount of that time that was
2  instructional?
3        A.    That's my remembrance of
4  looking at these yesterday.
5        Q.    And then to maybe save us
6  all some time and paper shuffling, if we
7  were to look at all the other reports, if
8  there was a difference between the number
9  of people with reported responses for the
10  current school year and that number of
11  completed surveys shown in Appendix E, it
12  would be for that same reason?
13        A.    Yes.
14        Q.    When -- when you asked
15  people about the amount of time they
16  spent providing instruction, you only
17  asked for the current time period,
18  correct?
19        A.    Correct.
20        Q.    So you didn't, for instance,
21  require someone to remember the amount of
22  time they spent on in-class instruction
23  in 2014 prior to answering questions
24  about diverted time in 2014, correct?

CONFIDENTIAL

Page 133

1          A.    That's correct.  But we
2    were -- you know, it was the same teacher
3    in the same school.  So, you know, their
4    instruction time would have been, you
5    know, basically, the same.
6          Q.    So you essentially assumed
7    that the amount of time teachers spend on
8    in-class instruction was the same in 2014
9    as it was when you administered the
10    survey?
11                ATTORNEY JACOBSON:
12          Objection.  Form.  Misstates
13          testimony.
14                THE WITNESS:  I think we
15          assumed that it was the same
16          throughout this -- this time
17          period.
18    BY ATTORNEY PISTILLI:
19          Q.    Right.  So you assumed that
20    each teacher spent the same amount of
21    time on in-class instruction for the
22    entirety of their tenure at the school?
23                ATTORNEY JACOBSON:
24          Objection.  Form.

CONFIDENTIAL

Page 134

1              THE WITNESS:  It might -- it
2         might vary from, you know, one
3         year to the next.
4              But, again, these were the
5         same -- same teachers and the
6         same -- in the same schools.
7    BY ATTORNEY PISTILLI:
8         Q.    Right.  But that doesn't
9    mean that the amount of time they spend
10   on instruction doesn't change over time,
11   does it?
12             ATTORNEY JACOBSON:
13        Objection.  Form.
14             THE WITNESS:  It doesn't
15        necessarily mean that.  But I
16        think it's a fair assumption.
17   BY ATTORNEY PISTILLI:
18        Q.    Did you do anything to test
19   that assumption?
20        A.    No, I did not do anything to
21   test that assumption.
22        Q.    Did you look at any data
23   from the district regarding time spent in
24   school by teachers?

```
                                        Page 135
 1              ATTORNEY JACOBSON:
 2         Objection.  Form.
 3              THE WITNESS:  It was my
 4         assumption that, actually,
 5         Dr. Ward would -- had that
 6         information.
 7  BY ATTORNEY PISTILLI:
 8         Q.    But it's not something you
 9  looked at?
10         A.    No, it was not something I
11  looked at.
12         Q.    Let's turn to Page 10.
13         A.    Are we still on Exhibit-13?
14         Q.    Yes.
15              But, again, is -- Page 10,
16  Exhibit-13, contains the text of
17  Question 5, correct?
18         A.    Correct.
19         Q.    And that was the same
20  question that you asked in all six of the
21  districts?
22         A.    That's correct.
23         Q.    And you asked respondents to
24  estimate how many minutes in a typical
```

Page 136

1  day were diverted away from teaching
2  during scheduled instruction time due to
3  student use of social media, right?
4          A.    Yeah.  Paraphrased, yes.
5          Q.    And you asked that of
6  respondents even if they didn't select
7  social media as one of the causes of
8  disruption to their scheduled instruction
9  time in the current school year, right?
10          A.    Yes.  If they didn't
11  identify that as a disruption, it was
12  coded as a zero.
13          Q.    Right.  But you,
14  nonetheless, went and asked them the
15  question as to other time periods,
16  correct?
17                ATTORNEY JACOBSON:
18          Objection.  Form.
19                THE WITNESS:  That's
20          correct.
21  BY ATTORNEY PISTILLI:
22          Q.    And such a follow-up
23  question could have led the teachers to
24  reconsider their initial answer, correct?

CONFIDENTIAL

Page 137

1                  ATTORNEY JACOBSON:

2           Objection to form.

3                  THE WITNESS:  Well, they

4           reconsidered their initial

5           estimate, they only increased the

6           amount of time diverted.  So I

7           think it's conservative the way we

8           treated it.

9    BY ATTORNEY PISTILLI:

10          Q.    Well, could they go back and

11   change their prior answer?

12          A.    No.

13          Q.    And, then, you didn't ask

14   any other questions about -- follow-up

15   questions about time diverted due to

16   other issues, correct?

17          A.    That's correct.

18                But the respondents would

19   have no way of knowing that they weren't

20   going to be asked about it.

21          Q.    Well, they knew they weren't

22   asked about it, right?

23          A.    Only when the survey ended.

24          Q.    But you didn't -- after

CONFIDENTIAL

Page 138

1   asking an initial question about

2   unauthorized texting, you didn't follow

3   up on that in your survey at all?

4               ATTORNEY JACOBSON:

5         Objection.  Form.

6               THE WITNESS:  We didn't

7         follow it up on the survey.  But

8         the teachers didn't know that we

9         weren't going to.

10  BY ATTORNEY PISTILLI:

11        Q.    You didn't ask questions

12  about student tardiness?

13        A.    Again, the -- we weren't

14  trying to do a comparative -- comparative

15  measures.  And the teachers didn't know

16  that was the only thing we were going to

17  be following up on.

18        Q.    But you didn't follow up on

19  classroom technology failure during

20  class, right?

21               ATTORNEY JACOBSON:

22         Objection.  Asked and answered.

23               THE WITNESS:  That wasn't

24         one of the -- as I said, we only

CONFIDENTIAL

Page 139

1          followed up on the social media
2          issues.  And teachers would have
3          no way of knowing that those were
4          the only ones -- that was the only
5          thing we were going to follow up
6          on.
7    BY ATTORNEY PISTILLI:
8          Q.    You didn't follow up on any
9    of the items that you asked about in your
10   threshold question regarding in-class
11   diversion, correct?
12              ATTORNEY JACOBSON:
13         Objection.  Asked and answered.
14              THE WITNESS:  The only thing
15         we followed up on was the social
16         media issues.
17   BY ATTORNEY PISTILLI:
18         Q.    And so you're not able to
19   say how much time teachers spent being
20   diverted in class, total, correct?
21         A.    That's correct.
22         Q.    And so, for instance, you
23   can't tell me whether time spent on
24   social media-related diversions have

CONFIDENTIAL

Page 140

1    merely replaced other forms of diversion
2    in earlier time periods, correct?
3                    ATTORNEY JACOBSON:
4            Objection to form.
5                    THE WITNESS:  We didn't ask
6            about the other time periods.  So
7            we don't have a comparative
8            measure.
9    BY ATTORNEY PISTILLI:
10           Q.    Well, you asked about other
11   time periods, correct?
12           A.    Other time periods, yes.
13           Q.    But you didn't ask about
14   other forms of diversion during any of
15   those time periods?
16           A.    That's correct.
17           Q.    And so it's possible that
18   any increase in time spent diverted due
19   to social media issues merely replaced
20   other forms of in-class distraction
21   during earlier time periods?
22                   ATTORNEY JACOBSON:
23           Objection.  Form.
24                   THE WITNESS:  Well,

CONFIDENTIAL

Page 141

1          hypothetically, you know, maybe
2          that's possible.  But I -- you
3          know we measured the diversion due
4          to social media.  If that were to
5          have declined, it doesn't mean
6          that others would have increased.
7    BY ATTORNEY PISTILLI:
8          Q.    Well, the point is, you
9    don't know if total time spent on
10   in-class diversions went down, went up or
11   stayed the same during your survey
12   period?
13         A.    Right.  We asked about
14   social media-related issues only.
15         Q.    Let's go back to Page 9.
16               And this is Question 3,
17   correct?
18         A.    Page 9?
19         Q.    Page 8 of this one.
20         A.    Yes.
21         Q.    So on Page 8, Question 3,
22   this is the question that you asked for
23   each of the six districts, correct?
24         A.    Yes.

Page 142

1          Q.    And would you agree to me --
2     with me that there are two separate
3     questions that you asked relating to
4     social media?
5          A.    Yes.
6          Q.    And there's no other
7     category of potential in-class
8     distraction that is listed twice here,
9     correct?
10         A.    I think that's correct.
11         Q.    And isn't it possible that a
12    person looking at this survey might find
13    it significant that you asked two social
14    media-related questions whereas every
15    other category is only asked once?
16              ATTORNEY JACOBSON:
17          Objection.  Form.
18              THE WITNESS:  Well, these
19          items are presented in randomized
20          order.  I mean, for our
21          convenience, we put the social
22          media ones right up at the top, in
23          terms of just, you know, coding
24          and so on.  But every teacher sees

CONFIDENTIAL

Page 143

1          it in a different order.
2                And so, you know, whether
3          they see -- see them separated by
4          seven other items or next to each
5          other, you know, it doesn't, you
6          know -- they're not necessarily
7          going to say, oh, wow, this must
8          be about social media.
9                But even if it is, this only
10         takes them, then, to the next
11         question which has to do with,
12         okay, so how much time was
13         diverted due to social media?
14    BY ATTORNEY PISTILLI:
15         Q.    Well, I understand that they
16    don't necessarily appear in this order.
17                But you agree with me, don't
18    you, that there are two social
19    media-related questions here, correct?
20         A.    Yes.
21         Q.    And no other category of
22    possible in-class distraction is listed
23    twice, correct?
24         A.    That's correct.

CONFIDENTIAL

Page 144

1          Q.    And do you agree with me
2    that someone responding to this survey
3    could find that significant?
4          A.    No, I don't think I agree
5    with that.
6          Q.    So no one would have a
7    reason to wonder whether this survey was,
8    in fact, about social media where it
9    alone, among all of the possible options,
10   is listed twice?
11             ATTORNEY JACOBSON:
12        Objection.  Form.
13             THE WITNESS:  No.  I think
14        that, you know, even if they do
15        notice that it's listed twice,
16        they're immediately taken to the
17        question that asks about time
18        spent on social media and they
19        could, then, think, okay, and next
20        I'm going to be asked about this
21        and next I'm going to be asked
22        about something else.
23   BY ATTORNEY PISTILLI:
24        Q.    But it's a cue that this is

CONFIDENTIAL

Page 145

1   a survey focused on social media,

2   correct?

3                    ATTORNEY JACOBSON:

4            Objection.  Form.

5                    THE WITNESS:  No, I don't

6            believe so.

7                    I mean, yes, I -- you're

8            certainly correct that they're

9            mentioned twice.  But it's

10           certainly in different contexts.

11                   One has to do with use and

12           activities in classroom, others

13           have activities outside the

14           classroom.  I mean, if we -- you

15           know, someone could just as easily

16           assume that what we're talking

17           about is how in-classroom

18           distractions in total manifest

19           themselves in terms of diverted

20           time or outside the classroom.

21                   I mean, you've got all sorts

22           of stuff here.

23   BY ATTORNEY PISTILLI:

24           Q.    Right.  But it's your expert

CONFIDENTIAL

Page 146

1    opinion that you're not in any way
2    tipping people off that this is a social
3    media survey when you include it, and
4    only it, twice?
5              That's your expert opinion
6    for the jury?
7              ATTORNEY JACOBSON:
8         Objection.  Form.
9              THE WITNESS:  Yes.  I don't
10        see that as -- as biassing in any
11        way.
12   BY ATTORNEY PISTILLI:
13        Q.    You're aware, aren't you,
14   that each of these school districts have
15   brought lawsuits involving social media,
16   correct?
17        A.    Yes.
18        Q.    And you're aware that those
19   lawsuits are public?
20        A.    I was unaware of these
21   lawsuits prior to being contacted for
22   this case.  So I'm not sure what to say
23   about how public the knowledge is.
24        Q.    Well, are you aware that

CONFIDENTIAL

Page 147

1   each of these districts trumpeted the
2   filing of the lawsuits and press?
3                   ATTORNEY JACOBSON:
4           Objection.  Form.
5                   THE WITNESS:  I haven't seen
6           any press coverage of these
7           lawsuits.
8   BY ATTORNEY PISTILLI:
9           Q.    It's not something you
10  looked at?
11          A.    Not something I was aware
12  of.
13          Q.    And are you aware that
14  school district personnel have been
15  involved in discovery in these lawsuits?
16          A.    I've been informed of that,
17  yes.
18          Q.    And did you even consider
19  the possibility that the teachers to whom
20  you sent this survey were, in fact, well
21  aware of the fact that their employer had
22  brought these social media lawsuits?
23                  ATTORNEY JACOBSON:
24          Objection.  Form.

CONFIDENTIAL

Page 148

1                    THE WITNESS:  I don't have
2         any knowledge of what the teachers
3         are aware of in terms of the
4         lawsuits.
5    BY ATTORNEY PISTILLI:
6         Q.    That's not something you
7    considered when you were crafting your
8    survey, correct?
9         A.    You're carefully, I think,
10   crafting the survey to, you know, make
11   sure that we had a -- didn't have any
12   leading questions and didn't motivate a
13   response by people who had a particular
14   axe to grind or anything like that.
15        Q.    But you didn't do anything
16   to rule out the possibility that some of
17   the people who received your survey knew
18   about this lawsuit?
19                  ATTORNEY JACOBSON:
20        Objection.  Form.
21                  THE WITNESS:  I mean, it's
22        possible that they may have known
23        about the lawsuit.  But whether
24        they connected the survey to that

CONFIDENTIAL

Page 149

1          or not, until we get to the -- you
2          know, the key questions about time
3          diverted, it certainly wouldn't
4          disqualify them from the survey.
5    BY ATTORNEY PISTILLI:
6          Q.    Well, when we get to the key
7    question about time diverted, isn't it
8    possible that a teacher would connect the
9    survey to the litigation?
10              ATTORNEY JACOBSON:
11          Objection.  Form.
12              THE WITNESS:  I mean,
13          hypothetically, I guess that's
14          possible.
15    BY ATTORNEY PISTILLI:
16          Q.    And you didn't ask any
17    questions, for instance, about teachers'
18    awareness of the litigation?
19          A.    No.  The questions that we
20    asked are identified here.
21          Q.    And would you agree that if
22    a teacher connected this survey to the
23    litigation, that could impact the way
24    that they responded to the questions

CONFIDENTIAL

Page 150

1    about time diverted?

2           A.    I have no reason to think

3    that there was any influence based on

4    knowledge of a -- of a lawsuit.

5           Q.    But you didn't do any

6    testing to rule that possibility out?

7           A.    As I said, I had no reason

8    to believe that there would be a problem.

9           Q.    But sitting here today, you

10   don't know whether the individuals who

11   filled out this survey were aware of the

12   litigation or took the litigation into

13   account when answering your questions,

14   right?

15              ATTORNEY JACOBSON:

16         Objection.  Asked and answered.

17              THE WITNESS:  I think we

18         got -- I think people answered the

19         questions honestly and to the best

20         of their ability.  The -- yeah.

21   BY ATTORNEY PISTILLI:

22           Q.    So it's your expert

23   testimony that if a survey recipient

24   understands that a survey is related to

CONFIDENTIAL

Page 151

1    litigation and understands that they can

2    help their school out by responding in a

3    certain way there's no potential that

4    they did so?

5                ATTORNEY JACOBSON:

6           Objection.  Form.

7                THE WITNESS:  Well, I don't

8           think there's necessarily a right

9           or wrong answer to this question

10          about, you know, time diverted.

11   BY ATTORNEY PISTILLI:

12          Q.    You don't think that --

13               ATTORNEY JACOBSON:  The

14          witness was still speaking.  So I

15          would ask that you please let him

16          finish his testimony before asking

17          another question.

18   BY ATTORNEY PISTILLI:

19          Q.    Were you still speaking?

20          A.    I think so.  But go ahead.

21               ATTORNEY JACOBSON:  It's

22          happened a few times now.  So I

23          would just be cognizant, as you

24          asked at the beginning of the

CONFIDENTIAL

Page 152

1          deposition that both of you make
2          sure the other is done speaking.
3    BY ATTORNEY PISTILLI:
4          Q.    My question is not whether
5    there's a right-or-wrong answer.
6                My question is, if someone
7    knows about the lawsuit, isn't it
8    possible that they will understand that
9    saying they spent more time diverted to
10   social media would be helpful to the
11   lawsuit?
12               ATTORNEY JACOBSON:
13         Objection.  Form.
14               THE WITNESS:  I really don't
15         know what they would -- what they
16         would think under that
17         hypothetical situation.
18   BY ATTORNEY PISTILLI:
19         Q.    But it's not anything that
20   you tried to test for?
21         A.    That's right.  There's no
22   mention of the lawsuit in this survey.
23         Q.    You also didn't ask teachers
24   any questions designed to test their

CONFIDENTIAL

Page 153

1  ability to recall events going, in some

2  cases, back more than a decade, correct?

3              ATTORNEY JACOBSON:

4         Objection.  Form.

5              THE WITNESS:  Well, we did

6         pre-testing of the survey in

7         which, you know, it was clear that

8         teachers were able to

9         appropriately provide answers for

10        both the current year as well as

11        looking back over sometimes as

12        much as a decade.

13             The survey was carefully

14        designed to provide kind of

15        guardrails or use the current time

16        diverted estimate as a way of them

17        being able to say, is it more or

18        less now than it was then and how

19        much more or less, so that they

20        essentially were able to give us

21        the pattern of time diverted

22        over -- over these time periods.

23             And as you point out, I

24        mean, the numbers went down

CONFIDENTIAL

Page 154

1          over -- in a number of cases,
2          which would certainly indicate
3          that, you know, they weren't
4          biassing their responses to help
5          the school district.
6    BY ATTORNEY PISTILLI:
7          Q.    Let's talk a little bit
8    about the pre-testing.
9               Can you describe generally
10   what you did to pre-test the survey?
11         A.    So we recruited teachers in
12   a variety of both middle and high school,
13   teaching a variety of grades and
14   subjects.  And these were teachers who
15   were not in any of the 12 original
16   districts.
17              They were invited to
18   participate in the -- in this interview
19   process.  They were sent a link to the
20   program survey.
21              And we spoke -- spoke to
22   them by phone as they were taking the
23   survey in what I term a ride-along kind
24   of situation.  Where, as they answer each

Page 155

1    question, they explained the thinking and
2    the thought process about that -- about
3    that question and how they arrived at
4    their answer.
5          Q.    How many individual teachers
6    were involved in the pre-testing?
7          A.    Twenty-three.
8          Q.    And, then, did your staff
9    who were on the phone with those teachers
10   have a script that they used?
11         A.    Well, we had the survey.
12   And so at each point it was asking -- you
13   know, asking them, you know, so where did
14   that -- how did you reach that
15   conclusion?  Why did you answer it that
16   way?
17         Q.    Right.  But were they
18   provided with a list of questions that
19   they should ask to follow up on for each
20   question?
21         A.    No.  Just the general, you
22   know, how did you reach that conclusion,
23   how did you reach -- you know, and it was
24   trying to keep it conversational.

CONFIDENTIAL

Page 156

1          Q.    And were they -- the

2     pre-tests recorded?

3          A.    No.

4          Q.    Were there any memos

5     prepared that memorialized the calls

6     after they happened?

7          A.    Not beyond just having the

8     schedule of calls.  I was briefed after

9     the calls, and I listened to at least a

10    half a dozen of them myself.

11         Q.    And what, if any, questions

12    were asked to probe the ability of

13    teachers to recall down to the minute

14    time spent relating to social media

15    diversion up to a decade ago?

16              ATTORNEY JACOBSON:

17         Objection.  Form.

18              THE WITNESS:  In each case,

19         you know, as they answered the

20         question, we would ask them to

21         explain, you know, how did you

22         reach that conclusion, how did you

23         arrive at that?

24              And what we heard was that,

CONFIDENTIAL

Page 157

1              you know, they were looking and
2              thinking about, okay, so was, you
3              know, a year ago more or less than
4              it is now and how much more or
5              less and then going back and back
6              and back.
7    BY ATTORNEY PISTILLI:
8              Q.    Did you ask them whether
9    they felt confident in their ability to
10   recall the amount of time spent on
11   in-class disruption down to the minute?
12             A.    They -- you know, my
13   perception, in listening to the
14   interviews, was that they were very
15   comfortable making those -- those
16   estimates.
17             Q.    But did you actually ask
18   them the question?
19             A.    No, I don't believe we did.
20             Q.    Did you ask them any other
21   questions that were designed to probe the
22   accuracy of their recall over a
23   significant number of years?
24                   ATTORNEY JACOBSON:

CONFIDENTIAL

                                        Page 158

1        Objection.  Form.

2               THE WITNESS:  Well -- and to

3        the extent that we were asking

4        them to explain their thought

5        process and how they reached a

6        particular -- reached a particular

7        answer, we felt that was -- that

8        was the appropriate way to gauge

9        their comfort in making those

10       estimates.

11   BY ATTORNEY PISTILLI:

12       Q.    Did you make any changes to

13   the survey as a result of the pre-test?

14       A.    The -- I don't recall any

15   specific or significant changes.  There

16   might have been some wording changes.

17            But, you know, I was very

18   comfortable that we were able to get

19   accurate and well-thought-out answers to

20   the questions.

21       Q.    But you didn't do anything

22   to try to objectively verify their

23   ability to recall, down to the minute,

24   events over a significant number of

CONFIDENTIAL

```
                                          Page 159
 1   years, correct?
 2                ATTORNEY JACOBSON:
 3           Objection.  Form.
 4                THE WITNESS:  Well, again,
 5           the process of kind of asking
 6           about the current time period and
 7           then time periods prior to that
 8           gives a -- kind of these -- what I
 9           was terming as guardrails around
10           their answer.
11                And so the thought process
12           was, is it more or is it less, how
13           much more, how much less was what
14           was -- was what I was hearing in
15           the interviews.
16   BY ATTORNEY PISTILLI:
17           Q.   Well, my question was a
18   little bit different.
19                It's about whether you did
20   anything to objectively verify their
21   ability to accurately recall, down to the
22   minute, events over a significant period
23   of years?
24                ATTORNEY JACOBSON:
```

Page 160

1          Objection.  Form.
2                  THE  WITNESS:  We didn't have
3          any -- any questions to do that.
4          And I have no reason to believe
5          that they weren't accurate
6          estimates.
7     BY ATTORNEY PISTILLI:
8          Q.    But it's not something you
9     tested?
10          A.    Yeah, I'm not sure what sort
11     of test you're thinking about.
12          Q.    But you agree with me you
13     didn't test it?
14                  ATTORNEY JACOBSON:
15          Objection.  Form.
16          Mischaracterizes testimony.
17                  THE  WITNESS:  Well, I mean,
18          as I said, in the pre-test, you
19          know, we heard people were very
20          comfortable with making these
21          estimates and responding to the
22          questions as we -- as we drew them
23          up.
24     BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 161

1           Q.    Right.   But my question is

2    about the pre-test and whether, during

3    the course of the pre-test, you did

4    anything to objectively verify their

5    ability to perform these

6    down-to-the-minute recollections over a

7    significant period of time.

8                    ATTORNEY JACOBSON:

9           Objection.   Form.

10                   THE WITNESS:   Well, what we

11          did was, they took the survey and

12          as they answered the questions,

13          they explained the thought

14          process.

15                   And I felt that was the

16          appropriate way to conduct the

17          pre-test.

18    BY ATTORNEY PISTILLI:

19          Q.    You would agree with me that

20    that's not any form of objective

21    verification?

22                   ATTORNEY JACOBSON:

23          Objection.   Form.

24                   THE WITNESS:   The -- it

CONFIDENTIAL

Page 162

1           wasn't an attempt to verify their
2           responses.  We accepted their
3           responses because they sounded,
4           you know, appropriately well
5           reasoned.
6      BY ATTORNEY PISTILLI:
7           Q.    And turning back to the
8      survey itself, you didn't ask teachers
9      any follow-up questions to ascertain
10     their ability to reliably recall, down to
11     the minute, events over a significant
12     time period, right?
13                ATTORNEY JACOBSON:
14          Objection to form.
15                THE WITNESS:  You know, if
16          they didn't recall or didn't
17          remember, there was a clear option
18          of checking "don't know."
19                And so to the extent that
20          they did that, you know, we didn't
21          include that as -- as their
22          response there.
23     BY ATTORNEY PISTILLI:
24          Q.    But my question is about

Page 163

1    what, if anything, you did to verify the

2    accuracy of reports of people who, for

3    whatever reason, chose to answer the

4    question?

5                    ATTORNEY JACOBSON:

6            Objection.  Form.

7                    THE WITNESS:  Yeah, I'm not

8            sure what you're suggesting should

9            have been done.

10                    The -- as I said, the

11            description of the thought process

12            sounded, to me and in my

13            experience, as being, you know,

14            appropriate for the question.

15                    And they had plenty of

16            opportunity to say they don't know

17            or no minutes were diverted.

18    BY ATTORNEY PISTILLI:

19            Q.    You didn't ask them any

20    objectively verifiable facts to test

21    their memory, right?

22                    ATTORNEY JACOBSON:

23            Objection.  Form.

24                    THE WITNESS:  We didn't --

CONFIDENTIAL

Page 164

1    it wasn't a -- there wasn't a
2    separate memory -- memory test.
3 BY ATTORNEY PISTILLI:
4       Q.    Would you agree with me that
5 the longer time passes, the more
6 challenging it is for a person to recall
7 events accurately?
8       A.    I think it depends on what
9 the event is and how you characterize it
10 to them.
11            I think -- you know, for
12 example, I think everyone can probably
13 know where they were on 9/11, of a
14 certain age, I guess.  But that doesn't
15 mean I can ask them what they had for
16 dinner that night.
17       Q.    Right.  And you couldn't ask
18 them how many minutes they spent grocery
19 shopping on 9/11?
20       A.    I could probably ask them if
21 they went grocery shopping on 9/11.  I
22 mean, it depends on what the question is
23 and the context that you're asking it.
24       Q.    Right.  So even if with a

CONFIDENTIAL

Page 165

1  salient anchor like 9/11, it wouldn't be

2  reason to believe for people to remember

3  down to the minute the tasks they spent

4  time on that day?

5              ATTORNEY JACOBSON:

6       Objection.  Form.

7              THE WITNESS:  I think it

8       depends on what the task is.

9  BY ATTORNEY PISTILLI:

10      Q.    If you asked them how many

11 minutes they spent on the phone that day?

12      A.    I mean, that's an

13 interesting -- you know -- but I could

14 probably ask them how much time they

15 spent watching television that day.

16              I mean, it's -- you know,

17 it's one of those it depends.

18              ATTORNEY PISTILLI:  Let's

19       take a look at Tab 39.

20                   -   -   -

21       (Whereupon, Exhibit

22       Klein-14, No Bates, Teachers'

23       Working Time From Time-Use Data:

24       Consequences of the Invalidity of

CONFIDENTIAL

Page 166

1          Survey Questions For Teachers,
2          Researchers, and Policy, was
3          marked for identification.)
4                    -   -   -
5     BY ATTORNEY PISTILLI:
6          Q.    In the course of preparing
7     your report or rebuttal report, did you
8     look at this article?
9          A.    I don't believe so.
10         Q.    Are you aware that this was
11    cited by Stern in his report?
12         A.    I believe I remember that.
13         Q.    And this is a research paper
14    entitled, Teachers' Working Time From
15    Time Use Data:  Consequences of the
16    Invalidity of Survey Questions for
17    Teachers, Researchers and Policy.
18              Do you see that?
19         A.    I see the title, yes.
20         Q.    And this was published in
21    Teaching and Teacher Education in 2022?
22         A.    It looks like the copyright
23    is 2021.  But I don't know.
24         Q.    I'm just looking at the --

CONFIDENTIAL

Page 167

1          A.     It says -- the heading

2     says -- yeah, I'm not sure why the

3     copyright would be different, but.

4          Q.     And did you, in either of

5     your reports, cite any literature

6     addressing the ability of teachers to

7     recall time spent on discrete tasks over

8     significant periods of time?

9          A.     I think I did in looking at

10    the -- one of -- one of his footnotes

11    that talked about tying estimates to

12    important dates, which is exactly what we

13    did.

14          Q.     You're referring to the

15    event calendar study?

16          A.     Yes.

17          Q.     Okay.  We'll get to that.

18               But nothing that you cited,

19    including what you just referred to, was

20    an academic article discussing the

21    ability of teachers to recall time spent

22    over significant periods, correct?

23               ATTORNEY JACOBSON:

24          Objection to form.

CONFIDENTIAL

Page 168

1                    THE WITNESS:  I'm sorry, I
2          didn't understand the question.
3     BY ATTORNEY PISTILLI:
4          Q.    Sure.
5                    This is an article
6     specifically about the ability of
7     teachers to recall time spent on tasks at
8     work over significant periods of time,
9     correct?
10                   ATTORNEY JACOBSON:
11         Objection.  Form.
12                   THE WITNESS:  I haven't
13         really read this article, so --
14    BY ATTORNEY PISTILLI:
15         Q.    Did you read it after you
16    got the Stern report?
17         A.    No.
18         Q.    Did you cite any articles
19    specifically addressing the question of
20    teacher recall over significant periods
21    of time?
22                   ATTORNEY JACOBSON:
23         Objection.  Form.
24                   THE WITNESS:  No, I don't

CONFIDENTIAL

Page 169

1       believe so.

2              Or we can look at my

3       rebuttal report and see.  But I

4       don't recall that.

5   BY ATTORNEY PISTILLI:

6       Q.    So if we look together at

7   Page 2, Section 2.2.

8              And this academic article

9   reports that, The difficulties that

10  teachers face when estimating their

11  working hours in questionnaires can

12  result in systematic error related to the

13  validity of the measuring instrument.

14             Do you disagree with the

15  sociology professor who wrote this

16  article?

17             ATTORNEY JACOBSON:

18       Objection.  Form.

19             THE WITNESS:  I would need

20       to read the article in more detail

21       to understand what they're asking

22       teachers to estimate.

23  BY ATTORNEY PISTILLI:

24       Q.    Take your time.

CONFIDENTIAL

Page 170

1          A.    You really want me to read
2     the whole article?
3          Q.    Well, I want you to answer
4     my question whether or not you disagree
5     with the academic literature indicating
6     that teachers face difficulties when
7     estimating their working hours in
8     questionnaires that can lead to
9     systematic error?
10              ATTORNEY JACOBSON:  And the
11         witness has testified that he
12         hadn't read this article before
13         and would need to to understand
14         the article in its entirety to
15         answer that question.
16              THE WITNESS:  This seems to
17         be addressing the issue of total
18         working time as opposed to
19         specific elements of --
20     BY ATTORNEY PISTILLI:
21          Q.    Well, in the first instance,
22     would you agree with me that it's easier
23     to estimate total work time than to
24     estimate subcomponents?

CONFIDENTIAL

Page 171

1              ATTORNEY JACOBSON:
2        Objection.  Form.
3              THE WITNESS:  I don't
4        necessarily agree with that.
5    BY ATTORNEY PISTILLI:
6        Q.    So you think it's easier to
7    tell me each of the specific tasks you
8    did in a workday than to tell me how long
9    your workday was?
10             ATTORNEY JACOBSON:
11       Objection.  Mischaracterizes
12       testimony.
13             THE WITNESS:  I think it
14       depends on what the task is and
15       how the question is asked.
16             ATTORNEY JACOBSON:  We're
17       coming up on an hour pretty soon,
18       and I've been told lunch has been
19       delivered.
20             ATTORNEY PISTILLI:  Sure.
21       We can stop now.  That's fine.
22             VIDEO TECHNICIAN:  The time
23       is 1:06 p.m., and we are off the
24       record.

CONFIDENTIAL

Page 172

```
 1                   -  -  -

 2              (Whereupon, a brief recess

 3         was taken.)

 4                   -  -  -

 5              VIDEO TECHNICIAN:  The time

 6         is 1:44 p.m., and we are on the

 7         record.

 8  BY ATTORNEY PISTILLI:

 9         Q.    So before the break,

10  Mr. Klein, we were looking at Exhibit-14,

11  which is the research paper titled,

12  Teachers' Working Time From Time Use

13  Data:  Consequences of the Invalidity of

14  Survey Questions for Teachers,

15  Researchers and Policy.

16              Do you recall that?

17         A.    Yes.

18         Q.    The lead author of that

19  article is Petrus te Braak?

20         A.    Yes.

21         Q.    He's a sociology professor?

22         A.    I didn't look at his

23  credentials, but --

24         Q.    And I believe you suggested
```

CONFIDENTIAL

Page 173

1  before the break you thought that this

2  article concerned estimates of total work

3  time?

4           A.    I don't remember what I

5  said.

6           Q.    Let me direct your attention

7  to Page 8 and Section 4.3.

8                 Do you see that's titled,

9  Working Hours Per Subactivity?

10          A.    Yes.

11          Q.    You say, In Step 3, we

12  examined differences in the average

13  working time per subactivity.

14                Do you see that?

15          A.    Yes.

16          Q.    And then if you look back on

17  Page 6, in Table 2, it lists the six

18  subactivities that they asked teachers

19  about?

20          A.    Yes.

21          Q.    And so do you understand now

22  that part of what this article talks

23  about is the ability of teachers to

24  recall the amount of time spent on

CONFIDENTIAL

Page 174

1  discrete tasks during the school day?

2              ATTORNEY JACOBSON:  And I

3          would just note that earlier the

4          witness had testified that he

5          would need to read the entire

6          document to --

7              ATTORNEY PISTILLI:  I gave

8          him the opportunity to read for as

9          long as he wanted.

10             ATTORNEY JACOBSON:  Correct.

11         And that was still going on before

12         the break.

13  BY ATTORNEY PISTILLI:

14         Q.    Do you need to --

15         A.    Well, I do know note that

16  these subactivities mention social media

17  or dealing with classroom interruptions.

18         Q.    This is an article about the

19  ability of teachers to recall

20  subactivities during the workday,

21  correct?

22         A.    Yes.

23              But it also, as I recall

24  when I -- when I looked at it, it was --

CONFIDENTIAL

Page 175

1   labeled the surveys as being the current
2   standard for how you go about doing --
3   here, measuring the work times has become
4   standard practice in teachers'
5   questionnaires.
6                   So I don't know whether
7   diaries are more or less accurate.  This
8   says they give different results.  But I
9   don't know if they would give different
10  results if the subactivity was dealing
11  with interruptions due to social media.
12          Q.    Do you see on Page 2 it
13  says, The difficulties that teachers face
14  when estimating their working hours in
15  questionnaires can result in systemic
16  error related to the validity of the
17  measuring instrument.
18                  Do you have any basis to
19  dispute that statement?
20                  ATTORNEY JACOBSON:
21          Objection.  Form.
22                  THE WITNESS:  It says that
23          it can result.  It doesn't say
24          does result.  And it says that

CONFIDENTIAL

Page 176

1          the -- it is often assumed that
2          the related error is random and
3          would, therefore, have no effect
4          on the results.
5               So I don't know whether -- I
6          don't think this says anything
7          about social media.
8    BY ATTORNEY PISTILLI:
9          Q.    I'm not asking you about
10   social media.
11              I'm asking you questions
12   about the ability of teachers to
13   accurately report the amount of time
14   spent on events in the past.
15         A.    And I think what I -- what
16   I've said has been that in the pre-test
17   interviews, it sounded like the teachers
18   were, you know, perfectly able to
19   estimate the amount of classroom
20   disruption time they had to deal with due
21   to social media issues.
22         Q.    I'm asking -- let me ask you
23   this: Do you have any literature you can
24   cite that would support the proposition

CONFIDENTIAL

Page 177

1  that teachers are capable of recalling,

2  down to the minute, time spent on issues

3  relating to social media?

4        A.    I can't quote a study that

5  would match up with each one of those

6  elements of your -- your question.

7             But the -- you know, as I

8  note here, the, you know, teacher working

9  time estimates are typically --

10 traditionally measured by interviews or

11 questionnaires, okay.

12            I mean, so we did it the way

13 it's typically done.

14       Q.    And did you -- take a look

15 with me at Page 13.

16            Do you see where it says,

17 Recent research has raised concerns about

18 the accuracy of teachers' working time

19 through traditional questionnaires.  Our

20 study demonstrates that these concerns

21 are indeed justified.

22            Do you have any basis to

23 dispute that statement, sir?

24       A.    Having not read this entire

CONFIDENTIAL

Page 178

1   article or really seen it before, no, I

2   can't -- I'm not qualified to dispute

3   that.

4        Q.    Well, again, I'd invite you

5   to take as much time as you need to look

6   at the article.

7             After you've done that,

8   please let me know if you have any basis

9   to dispute the conclusions of this

10  academic literature.

11       A.    Well, again, this academic

12  literature doesn't have anything to do

13  with social media.

14            But -- and, you know, I

15  don't think I'm qualified to dispute the

16  results in a -- in a field that I'm not

17  an expert in.

18       Q.    And that field we're talking

19  about here is sociology?

20       A.    I suppose.

21       Q.    And what the sociologists

22  are doing is measuring the amount of time

23  that teachers spend on tasks, right?

24            ATTORNEY JACOBSON:

CONFIDENTIAL

Page 179

1          Objection to form.
2                  THE WITNESS:  Okay.  So let
3          me -- let me do some reading here.
4                  Well, I think the, you know,
5          the -- when you look at the
6          activity list used for the time
7          diary, there's nothing in here
8          that deals with dealing with
9          disruptions in classrooms due to
10         anything, much less due to social
11         media.
12                 And I don't understand the
13         claim of a diary being more
14         accurate than -- than a
15         questionnaire.  A questionnaire
16         is, as it notes, the typical and
17         traditional way of measuring
18         teacher time.
19                 So, you know, I guess this
20         is -- you know, falls into the
21         interesting if true category.
22   BY ATTORNEY PISTILLI:
23         Q.    So my question was, do you
24   agree with the conclusion of this

CONFIDENTIAL

Page 180

1   academic research paper that, Recent

2   research has raised concerns about the

3   accuracy of teachers' working time

4   through traditional questionnaires.  Our

5   study demonstrates that these concerns

6   are, indeed, justified.

7           A.    I have no reason to agree or

8   disagree with that.

9           Q.    And you can't cite me any

10  literature that reaches a different

11  conclusion, can you?

12          A.    No, I cannot.

13          Q.    And then do you see this

14  academic researcher also concludes that

15  questionnaires gauging teachers' working

16  hours are prone to a number of

17  measurement errors?

18                Do you see that?

19          A.    That's in, what, 2.2?

20          Q.    6.

21          A.    2.6?

22          Q.    No, 6.  Right after the

23  second sentence of the conclusion.

24                Questionnaires gauging

CONFIDENTIAL

Page 181

1  teachers' working hours are prone to a
2  number of measurement errors when
3  stratifying by teachers' profiles or the
4  various work-related activities.
5              Do you see that?
6       A.    Yes, I see that.
7       Q.    And do you have any basis to
8  dispute that statement?
9       A.    I don't have any basis to
10  support that statement.
11             I do note that this is a
12  study that was done in Belgium, which,
13  you know, may be very different than the
14  U.S.
15       Q.    Are you aware of any
16  literature that calls into question the
17  validity of these authors' conclusion?
18             ATTORNEY JACOBSON:
19        Objection.  Form.
20             THE WITNESS:  I don't have
21        any basis for either accepting or
22        disputing these.
23  BY ATTORNEY PISTILLI:
24       Q.    And are you aware of any

CONFIDENTIAL

Page 182

1    literature supporting the proposition

2    that there are differences between the

3    ability of teachers in Belgium and the

4    United States to recollect issues?

5            A.    No.  But, again, this has

6    nothing to do with social media.

7                    VIDEO TECHNICIAN:  Can we go

8            off the record?

9                    ATTORNEY PISTILLI:  Yes.

10           Can we go off the record?

11                   VIDEO TECHNICIAN:  The time

12           is 2:02 p.m.  We are going off the

13           record.

14                       -   -   -

15               (Whereupon, a brief recess

16           was taken.)

17                       -   -   -

18                   VIDEO TECHNICIAN:  The time

19           is 2:11 p.m., and we are on the

20           record.

21   BY ATTORNEY PISTILLI:

22           Q.    Do you -- continuing with

23   Exhibit-14, could you turn to Page 9,

24   please?

CONFIDENTIAL

Page 183

1          A.    Okay.

2          Q.    Do you see Section 5,

3    Discussion, second paragraph, it says,

4    Given the complexity of teachers' work,

5    classic questionnaire methodologies are

6    prone to a number of measurement errors

7    when estimating teachers' working time.

8                Do you see that?

9          A.    Yes.

10          Q.    And you see it then cites a

11    couple academic articles for that

12    proposition?

13          A.    I see the citations, yes.

14          Q.    And so sitting here today,

15    do you have any basis to dispute the

16    conclusion that, given the complexity of

17    teachers' work, classic questionnaire

18    methodologies are prone to a number of

19    measurement errors when estimating

20    teachers' working time?

21          A.    I don't have any basis for

22    disputing or supporting that.

23          Q.    Are you aware of any

24    literature calling that conclusion into

                                           Page 184

1   question?

2            A.    No, I'm not aware of any

3   literature calling that into question.

4                 I don't -- I don't

5   understand why the complexity of their

6   work would make classic questionnaire

7   methodologies more prone to measurement

8   error than a diary would be, but.

9            Q.    Well, look with me, if you

10  would, at Page 2.

11                 Do you see where it says,

12  Collecting data on the working time of

13  teachers on a regular basis is

14  challenging, as the teaching profession

15  consists of a number of complex tasks

16  that take place in different contexts.

17                 Do you see that?

18           A.    No.

19           Q.    The top of Page 2, first

20  full paragraph.

21           A.    Okay.

22                 So this is looking at the

23  total work time, not the specific number

24  of minutes that are taken up by social

CONFIDENTIAL

Page 185

1    media disruptions.

2         Q.    Well, my -- my question is

3    whether you have any basis to dispute the

4    statement that, Collecting data on the

5    working time of teachers on a regular

6    basis is challenging, as the teaching

7    profession consists of a number of

8    complex tasks that take place in

9    different contexts?

10        A.    And the question is do I

11   have any -- I'm sorry?

12        Q.    Do you have any basis to

13   dispute that statement?

14        A.    I don't have any basis for,

15   you know, supporting that statement

16   either.

17             I mean, it seems to be

18   drawing the conclusion that because it

19   consists of a number of complex tasks

20   that take place in different contexts,

21   that collecting data is difficult.  I

22   mean, maybe that is true.

23             But I don't see what that

24   has to do with social media and

Page 186

1  disruptions in the classroom.

2          Q.      Well, but it has to do with

3  the measurement of teacher work time,

4  right?

5          A.      Total time, yes.

6                  ATTORNEY JACOBSON:   Object

7          to the form.

8  BY ATTORNEY PISTILLI:

9          Q.      Take a look with me, if you

10  would, further on in the second column of

11  Page 2.

12                  Do you see the paragraph

13  toward the middle that starts, Teachers'

14  working time?

15          A.      Yes.

16          Q.      And then do you see it cites

17  the Chenu article for the proposition

18  that, Compared to other occupational

19  sectors, it is particularly difficult for

20  teachers to assess working time through

21  such methods, by which it means

22  traditional interviews or questionnaires?

23          A.      Yes, I see that.

24          Q.      And do you have any basis to

CONFIDENTIAL

Page 187

1   dispute that statement?

2          A.    I haven't seen the Chenu

3   article, so I'm not sure.  I don't have a

4   basis for saying anything one way or the

5   other.  I don't have an opinion on it.

6          Q.    This is not something you

7   looked at?

8          A.    That's correct.

9          Q.    Take a look with me, if you

10  would, at Page 3.

11                Do you see the first full

12  paragraph on Page 3 relating to recall

13  bias?

14         A.    I'm sorry, which paragraph?

15         Q.    Page 3, first full

16  paragraph.

17         A.    Where it starts, A second

18  measurement error?

19         Q.    Yes.

20                And this paragraph relates

21  to recall bias, right?

22         A.    Okay.  I see that, yes.

23         Q.    And are you familiar with

24  the concept of recall bias?

                                                    Page 188

1              A.      I'm not sure.

2              Q.      When you design surveys, do

3   you attempt to ensure that the results

4   aren't impacted by recall bias?

5              A.      I'm not sure how recall bias

6   is being defined in this situation.

7              Q.      How do you define recall

8   bias?

9              A.      I don't think I have a

10  working definition of recall bias.  I'm

11  not sure what it means, what it's

12  referring to here.  It doesn't seem to

13  define it.

14             Q.      Would you agree that in

15  order for a survey to generate valid

16  results, the respondent must have the

17  correct information, manage to recall it

18  at the time of the survey, and be able to

19  provide it in the correct way?

20                  ATTORNEY JACOBSON:

21        Objection.  Compound.

22                  THE WITNESS:  Well, that's

23        the -- you know, you're

24        paraphrasing the sentence in the

CONFIDENTIAL

Page 189

1    paper.

2            You know, I think that in

3        the pre-test we found that the

4        teachers did have that information

5        and were able to recall it at the

6        time of the survey.

7            So if that's what recall

8        bias is, then that -- I'm not

9        concerned about it.

10    BY ATTORNEY PISTILLI:

11        Q.    Do you see the statement, In

12    the case of teachers, the question arises

13    as to whether or not teachers correctly

14    recalled their working hours over a given

15    period of time that takes into account

16    the irregularity of their daily cycles,

17    the number of different aspects of their

18    job and the open-ended nature of their

19    work?

20            Do you see that?

21        A.    Yes.

22        Q.    Do you have any basis to

23    dispute that statement?

24        A.    It doesn't seem to be making

CONFIDENTIAL

Page 190

1    a statement.  It says the question arises

2    as to whether or not teachers correctly

3    recall, not making a statement that the

4    teachers don't recall or can't recall.

5         Q.    Well, in fact, as we

6    discussed previously, the conclusion of

7    this article is that recent research

8    raises concerns about the accuracy of

9    teachers' working time estimates through

10   survey questionnaires, right?

11                ATTORNEY JACOBSON:

12        Objection.  Form.

13                THE WITNESS:  In Belgium,

14        yes.  In total.

15                But not involving

16        disruptions due to social media.

17   BY ATTORNEY PISTILLI:

18        Q.    But this survey specifically

19   looks at teachers' ability to recall the

20   amount of time they devoted to an

21   enumerated set of discrete tasks during a

22   workday, correct?

23        A.    Correct.  It seems a pretty

24   burdensome process compared to the

```
                                      Page 191
 1   simplicity of focusing in on
 2   repercussions of social media use in the
 3   classroom.
 4          Q.    Do you see where it says, A
 5   third measure of error relates to the
 6   assumption that the respondent is sincere
 7   in their responses?
 8                Do you see that?
 9          A.    And this is?
10          Q.    Directly below the paragraph
11   we've been looking at.
12          A.    I'm sorry.  What page are we
13   on?
14          Q.    We're on Page 3.
15          A.    Yes, I see that.
16          Q.    And do you agree that error
17   can be introduced into survey responses
18   if the respondent is not sincere in their
19   responses?
20                ATTORNEY JACOBSON:
21          Objection to form.
22                THE WITNESS:
23          Hypothetically, if they're not
24          sincere in their responses, then,
```

Page 192

1          you know, that could result in

2          measurement error.

3                  But I have no reason to

4          believe that the respondents to

5          our survey weren't sincere in

6          their responses.

7    BY ATTORNEY PISTILLI:

8          Q.     But you didn't do anything

9    to test whether they were sincere in

10   their responses, correct?

11         A.     My experience as a market

12   researcher is that when respondents

13   undertake to take a survey, you know,

14   they are sincere in their responses and

15   are responding to the best of their

16   ability.

17         Q.     But in the market research

18   work you do --

19         A.     Survey research, in general.

20   Not just market research.

21         Q.     Well, the survey here

22   directly related to a subject about which

23   the respondent very well could have been

24   aware that their school district had a

CONFIDENTIAL

Page 193

1    direct financial interest, correct?

2              A.    Hypothetically, that's

3    possible.

4              Q.    And, again, not something

5    you tested?

6                    ATTORNEY JACOBSON:

7              Objection to form.

8                    THE WITNESS:  We didn't test

9              for knowledge of the lawsuit.

10   BY ATTORNEY PISTILLI:

11             Q.    Let's take a look at another

12   article.

13                   ATTORNEY PEILEN:  Tab 37.

14                         -   -   -

15                   (Whereupon, Exhibit

16             Klein-15, No Bates, Improving the

17             Quality of Retrospective Reports:

18             Calendar Interviewing

19             Methodologies was marked for

20             identification.)

21                         -   -   -

22   BY ATTORNEY PISTILLI:

23             Q.    Exhibit-15.  Take a minute

24   to look at Exhibit-15 and let me know if

CONFIDENTIAL

Page 194

1   this is something you're familiar with.

2          A.    Yeah, I recognize this as

3   a -- as one of the articles that was

4   cited by -- in the rebuttal to my report

5   that described an event history calendar.

6                I didn't read the article,

7   though.

8          Q.    So you cite it in your

9   report, but you didn't read it?

10         A.    I said -- I think I said

11  I -- that I noted that it was footnoted

12  in one of the rebuttal reports.

13               But no, I did not read it.

14                     -   -   -

15               (Whereupon, Exhibit

16          Klein-16, No Bates, 8/1/25

17          Rebuttal Expert Report Replying to

18          the Reports of Dr. Michael J.

19          Stern and Dr. Darius Lakdawalla,

20          Charleston, was marked for

21          identification.)

22                     -   -   -

23  BY ATTORNEY PISTILLI:

24         Q.    So we're going to mark as

CONFIDENTIAL

Page 195

1   Exhibit-16 just one of your rebuttal

2   reports.

3               If you could turn to Page 3.

4        A.     Yes.

5        Q.     Paragraph 8.

6        A.     Yes.

7        Q.     And do you see that Footnote

8   3 is a citation to Belli?

9        A.     Yes.

10       Q.     And then the title is,

11  Improving Retrospective Reports and

12  Surveys?

13       A.     Yes.

14       Q.     Now this citation is a

15  little bit different, but is it your

16  understanding that this was the article

17  that you meant to refer to in your

18  report?

19       A.     I believe so.

20       Q.     And you, in your report,

21  don't you rely on this article to respond

22  to some of Mr. Stern's critiques, right?

23       A.     Yes.

24       Q.     And in particular, you cite

CONFIDENTIAL

Page 196

1  this on the topic of retrospective
2  reporting and validity of results based
3  on retrospective reporting?
4          A.    Yes.
5          Q.    And, in fact, this is the
6  only thing that you cite in order to
7  support the proposition that your survey
8  is aligned with the concept of an event
9  history calendar; is that right?
10         A.    That's correct.
11         Q.    What's an event history
12 calendar?
13         A.    Let me make sure I get the
14 definition here right.
15               So event history calendar
16 uses, as it says here on -- there's no
17 page number.
18               It includes dates of
19 noteworthy events for interviewers to use
20 as temporal anchors.  It's really
21 describing the qualitative interviewing
22 not quantitative interviewing as we did
23 here.
24               But it points out that by

CONFIDENTIAL

Page 197

1    using clearly identified dates, the

2    interview produces more information,

3    better information, and that the

4    interviewee enjoys the task more, which

5    is kind of irrelevant here, given it's an

6    Internet interview.

7                But I think what it implies

8    for our -- my survey is that by tying it

9    to specific events, the shutdown prior to

10   COVID or -- and the coming back to

11   in-person instruction, allows the

12   respondent to think about those dates and

13   recognize what was going on at that time

14   as it relates to classroom -- diversion

15   of classroom time due to social media.

16        Q.    So just so it's clear, event

17   history calendars are survey

18   methodologies that involve a narrative or

19   conversational style of respondent

20   expression, right?

21        A.    It's a qualitative

22   interviewing style, yes.

23        Q.    And you didn't do that,

24   right?

CONFIDENTIAL

Page 198

1          A.    No, we used a quantitative
2    style.
3          Q.    Just a couple of other
4    questions about this article.
5                First, you found it
6    appropriate to rely on this article,
7    right?
8          A.    I point -- I used it to
9    support the validity of the data that we
10   collected, just as Dr. Stern did to
11   criticize it.
12         Q.    But there's nothing in this
13   article about social media, right?
14         A.    No, there's not.
15         Q.    But, still, somehow you're
16   able to find some relevance to it, right?
17               ATTORNEY JACOBSON:
18         Objection.  Form.
19               THE WITNESS:  I think so,
20         yes.
21   BY ATTORNEY PISTILLI:
22         Q.    Because that's -- that's
23   what you do, right?  The articles aren't
24   going to be about exactly the question

Page 199

1  you're asking and they still have some

2  relevance to the debate, right?

3        A.    Some relevance, usually.

4        Q.    All right.  We'll come back

5  to this article?

6              ATTORNEY PISTILLI:  But

7        right now I'm going to give you

8        Exhibit-17, which is --

9                  -  -  -

10             (Whereupon, Exhibit

11       Klein-17, No Bates, Event History

12       Calendar, Lavrakas, was marked for

13       identification.)

14                  -  -  -

15  BY ATTORNEY PISTILLI:

16       Q.    Do you see that Exhibit-17

17  is an entry from the Encyclopedia of

18  Survey Research Methods?

19       A.    Yes.

20       Q.    Is that a reference that

21  you're familiar with?

22       A.    No.

23       Q.    Do you see that this is an

24  encyclopedia entry defining an event

CONFIDENTIAL

Page 200

1  history calendar?

2          A.    That's what it appears to

3  be, yes.

4          Q.    So we can look at getting

5  another copy of this.  But for now I can

6  represent to you -- I'm not sure why it's

7  not appearing -- that this entry was

8  co-authored by Belli, whose article we

9  were just discussing.

10              ATTORNEY JACOBSON:  I would

11         object to any testimony being

12         offered without a complete exhibit

13         and without information that

14         counsel is representing without it

15         being shown in the exhibit.

16  BY ATTORNEY PISTILLI:

17         Q.    So looking at Page 2, do you

18  see the definition of an event history

19  calendar begins by saying, The event

20  history calendar is a conversational

21  interviewing approach, right?

22         A.    Yes.

23         Q.    So, again, that's not what

24  you did, right?

CONFIDENTIAL

Page 201

1          A.    That's correct.  We used a
2     quantitative Internet survey.
3          Q.    And then do you see, looking
4     further down, toward the middle of the
5     page, one of the points it makes is that
6     an event history calendar uses parallel
7     retrieval cues?
8               Do you see that?
9          A.    Can you give me an
10    approximate line?
11         Q.    Sure.  Look -- look starting
12    where the Page 247 break is.
13         A.    Oh, okay.
14               Okay.  Yes, I see it.
15         Q.    And parallel retrieval,
16    right, involves using different types of
17    events to help the respondent situate
18    specific events in a timeline, right?
19         A.    It's not a phrase I'm
20    familiar with.
21         Q.    Are you familiar with the
22    fact that it's a component of the event
23    history calendar approach?
24               ATTORNEY JACOBSON:

Page 202

1          Objection to form.

2                    THE WITNESS:  Again, I'm --

3          it's -- I'm not familiar with

4          the -- with the phrase.  I mean,

5          the concept seems straightforward.

6    BY ATTORNEY PISTILLI:

7          Q.    But the concept here, as

8    they -- they give an example as, you

9    know, you might ask about periods of

10   unemployment and periods of change in

11   residence because those may help the

12   respondent more accurately situate those

13   events in time, right?

14         A.    Right.

15         Q.    But you didn't rely on any

16   parallel retrieval cues in your survey,

17   right?

18                    ATTORNEY JACOBSON:

19         Objection.  Form.

20                    THE WITNESS:  Well, I

21         didn't, for example, put a date --

22         I didn't say March of 2020 and the

23         school shut down.

24                    I guess that would be an

CONFIDENTIAL

Page 203

1          example of a parallel or --
2    BY ATTORNEY PISTILLI:
3          Q.    Well, no.  You didn't, for
4    instance, ask teachers about a timeline
5    of their life events to help them situate
6    responses relating to social media,
7    right?
8          A.    Well, we asked them, you
9    know, when you first started teaching.
10               And life events like, you
11   know, losing your job due to COVID and so
12   on, I think, would qualify as a life
13   event.
14         Q.    It's your testimony that the
15   teachers lost their job due to COVID?
16         A.    Some did.
17         Q.    Do you see where it says,
18   It's the use of the respondents' own
19   remembered events as cues to recall less
20   easily retrieved information that is
21   hypothesized to lead to benefits in data?
22         A.    I'm sorry, where would that
23   be?
24         Q.    The very bottom of the page

CONFIDENTIAL

Page 204

1  we're looking at.

2          A.    It's hypothesized to do

3  that.  I see that.

4          Q.    And you didn't allow your

5  respondents, through a flexible

6  conversational interviewing style, to

7  themselves generate the life events that

8  were used as cues in your survey, right?

9                  ATTORNEY JACOBSON:

10          Objection.  Form.

11                  THE WITNESS:  No.  We

12          used -- we used an Internet survey

13          that tied their responses to

14          events that they would be

15          naturally familiar with.

16  BY ATTORNEY PISTILLI:

17          Q.    But you didn't allow them

18  to -- strike that.

19                  You didn't use the

20  respondents' own remembered events as

21  cues, correct?

22          A.    Except when we asked them,

23  you know, to estimate the time diverted

24  when they first began teaching.

CONFIDENTIAL

Page 205

1          So that was their own event.
2     Their own life event.
3          Q.   They didn't select the life
4     events that they would use as anchors,
5     correct?
6          A.   That's correct.  This was a
7     quantitative interview where we wanted to
8     tabulate results.
9          Q.   Right.  But in a
10    conversational -- in an event history
11    calendar approach, the respondents select
12    the life events that are used as the
13    cues.
14               ATTORNEY JACOBSON:
15          Objection.  Form.
16               THE WITNESS:  In this
17          version of it, yes.
18    BY ATTORNEY PISTILLI:
19          Q.   Take a look with me, if you
20    would, at the next page.
21               Do you see where it says, In
22    addition to the length of the reference
23    period, instrument designers need to
24    determine the smallest units of time in

CONFIDENTIAL

Page 206

1   which life events are to be allocated,

2   whether years, months or, in some

3   instances, thirds of a month.

4           Do you see that?

5       A.    No.

6       Q.    The third full sentence on

7   Page 3.

8       A.    Third full sentence.

9           Oh, okay.  Thank you.

10          Okay.  I see that.

11      Q.    And so this indicates that

12  the smallest acceptable unit of time

13  would be, in some instances, thirds of a

14  month, correct?

15      A.    For locating life events,

16  not for estimating the amount of time

17  diverted to teaching due to social media.

18      Q.    And the life events here --

19  you asked people to estimate social media

20  diversion going back multiple years down

21  to the minute, right?

22          ATTORNEY JACOBSON:

23      Objection.  Form.

24          THE WITNESS:  No, not down

Page 207

1      to the minute.  How many

2      minutes --

3  BY ATTORNEY PISTILLI:

4      Q.    Right.

5      A.    -- were spent dealing with

6  disruptions due to student use of social

7  media.

8           And it is in the context of

9  what that experience has been in the

10 current school year, the most recent past

11 school year, and so on as appropriate for

12 how long they've been teaching.

13     Q.    Can you point me to any

14 academic article or other support for the

15 proposition that an event calendar

16 history can appropriately be used to ask

17 questions getting down as granular as the

18 number of minutes devoted in a day to

19 specific tasks?

20     A.    I hadn't seen the, you know,

21 specific definition of event history

22 calendar before seeing the rebuttal

23 report.

24           And what I do believe and

CONFIDENTIAL

Page 208

1    recognize I've done is essentially used
2    that concept in the design of the survey,
3    not the, you know, prescribed
4    step-by-step qualitative interviewing
5    process that is -- was the basis for
6    these event history calendars, but
7    converted that to a quantitative survey
8    that could be administered to over 2,000
9    teachers over the Internet.
10          Q.    My question -- so there
11   was -- my question, sir, was whether you
12   can point me to any academic literature
13   supporting use of calendar interviewing
14   methodologies that ask the respondents to
15   recall time spent down to the level of
16   minutes on a given day?
17               ATTORNEY JACOBSON:
18          Objection.  Form.
19               THE WITNESS:  The -- no, I
20          can't point you to a -- any
21          specific academic reference.
22               But it feels like -- and I
23          believe that this definition that
24          you've provided supports what we

CONFIDENTIAL

Page 209

1        did.

2    BY ATTORNEY PISTILLI:

3        Q.    Let's turn back to

4    Exhibit-15, which, again, is the article

5    that you cited in support of your

6    methodology, right?

7        A.    And which Dr. Stern

8    supported -- cited in support of his

9    criticism.

10       Q.    And do you see in the

11   introduction there where it says,

12   Research on human memory suggests that

13   the quality of data obtained through

14   retrospective reporting is seriously

15   compromised by the limitations on

16   respondent memory?

17             Do you see that?

18       A.    Yes.

19       Q.    Do you have any basis to

20   dispute that statement?

21       A.    I think we actually dealt

22   with that in our survey by tying it to

23   specific memorable events.

24             I think if we -- if we'd

CONFIDENTIAL

Page 210

1   picked a random date and asked about

2   that, that would have been a challenge

3   for a respondent.

4           But the -- you know, the --

5   by tying it to the events around COVID, I

6   think we got good results, valid results

7   that -- that are accurate and usable for

8   Dr. Ward's purposes.

9       Q.    Well, but this study we're

10  looking at is about the use of event

11  history calendar techniques, correct?

12      A.    Yes.

13      Q.    If you'd look with me, if

14  you would, and I recognize this doesn't

15  have pages, but the section toward the

16  very beginning titled, The Potential of

17  Event History Calendars?

18      A.    Yes.

19      Q.    And it says, Problems with

20  the quality of retrospective reports

21  obtained with Q-list interviews may be

22  ameliorated with new methodologies that,

23  A, optimize usage of autobiographical

24  memory cues, and, B, allow for a more

CONFIDENTIAL

Page 211

1    narrative or conversational style of
2    respondent expression, correct?
3          A.    That's what it says, yes.
4          Q.    And you didn't do anything
5    that involved a narrative or a
6    conversational style of respondent
7    expression, correct?
8                ATTORNEY JACOBSON:
9          Objection.  Form.
10                THE WITNESS:  No.  We
11          basically translated that into the
12          quantitative interviewing that we
13          did.
14    BY ATTORNEY PISTILLI:
15          Q.    Well, but the conclusion we
16    were just looking at suggests that there
17    are serious recall issues when you do it
18    via quantitative interviewing method,
19    correct?
20                ATTORNEY JACOBSON:
21          Objection.  Form.
22                THE WITNESS:  No, I don't
23          think that's what I said.
24    BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 212

1          Q.     That's what this article
2     says, right?
3          A.     I don't think this article
4     says anything about quantitative
5     interviewing.
6          Q.     The use of traditional
7     Q-list approaches results in
8     retrospective reporting errors that
9     become considerably more pronounced with
10    events that have occurred in the more
11    distant past.
12               Do you see that right below
13    the introduction?
14         A.     Yes.
15         Q.     You don't have any basis to
16    dispute that statement, do you?
17         A.     No.  I think that that's why
18    we designed the survey the way we did.
19         Q.     You did a Q-list survey?
20         A.     The -- we did a quantitative
21    survey and tabulated the results.  I
22    don't think that what we did would
23    necessarily fall into the category of a
24    Q-list, question list.

CONFIDENTIAL

Page 213

1          We asked questions, as I've

2    done for 50 years or more, and got

3    answers that we tabulated and that

4    Dr. Ward appropriately used in his

5    analysis.

6          Q.    You asked a list of

7    questions, right?

8               ATTORNEY JACOBSON:

9          Objection.  Form.

10              THE WITNESS:  It was a

11         questionnaire, yes.

12   BY ATTORNEY PISTILLI:

13         Q.    Now, let's look further back

14   in this article and talk about the types

15   of things that these event history

16   calendars attempt to measure.

17              And take as much time as

18   you'd like, but let me know if this

19   article indicates or provides any

20   examples of event history calendars being

21   used to represent -- to -- strike that.

22              Let me know if this article

23   provides any examples of event history

24   calendars being used to measure time

CONFIDENTIAL

```
                                    Page 214
 1   spent on a daily or even weekly basis.
 2              Are you able to answer my
 3   question, sir?
 4        A.    Could you repeat your
 5   question, please?
 6              ATTORNEY JACOBSON:  And I'll
 7        just note for the record the
 8        witness was continuing to review
 9        the document, as he had been
10        invited to do by counsel before
11        answering the question.
12   BY ATTORNEY PISTILLI:
13        Q.    And to remind you, the
14   question is, does this article provide
15   any examples of event history calendars
16   being used to measure time spent on a
17   daily or weekly basis?
18        A.    It's doesn't appear to have
19   any examples of that.
20        Q.    It measures things like
21   whether, at a given point in time, you
22   were employed and whether you were full
23   time or part time, right?  That's the
24   sort of thing that --
```

CONFIDENTIAL

Page 215

1          A.     That's right.
2          Q.     -- that's being used here.
3                 And can you point me to any
4    other examples of event historical
5    calendars being used in the academic
6    literature to measure time spent on a
7    daily basis?
8          A.     No.  As I said earlier, I
9    hadn't come across the term "event
10   history calendar" until I saw it in the
11   rebuttal report and realized that we've
12   been doing it that way ourselves without
13   reference to this report -- this
14   particular paper.
15                ATTORNEY PISTILLI:  Good
16           time for a break?
17                ATTORNEY JACOBSON:  Yes.
18                VIDEO TECHNICIAN:  The time
19           is 2:58 p.m.  We are off the
20           record.
21                     -   -   -
22                (Whereupon, a brief recess
23           was taken.)
24                     -   -   -

CONFIDENTIAL

Page 216

1              (Whereupon, Exhibit

2         Klein-18, No Bates, 8/1/25

3         Rebuttal Expert Report Replying to

4         the Reports of Dr. Michael J.

5         Stern and Dr. Darius Lakdawalla,

6         Breathitt, was marked for

7         identification.)

8                   -   -   -

9              (Whereupon, Exhibit

10        Klein-19, No Bates, 8/1/25

11        Rebuttal Expert Report Replying to

12        the Reports of Dr. Michael J.

13        Stern and Dr. Darius Lakdawalla,

14        DeKalb, was marked for

15        identification.)

16                  -   -   -

17             (Whereupon, Exhibit

18        Klein-20, No Bates, 8/1/25

19        Rebuttal Expert Report Replying to

20        the Reports of Dr. Michael J.

21        Stern and Dr. Darius Lakdawalla,

22        Harford, was marked for

23        identification.)

24                  -   -   -

CONFIDENTIAL

Page 217

```
 1              (Whereupon, Exhibit
 2         Klein-21, No Bates, 8/1/25
 3         Rebuttal Expert Report Replying to
 4         the Reports of Dr. Michael J.
 5         Stern and Dr. Darius Lakdawalla,
 6         Irvington, was marked for
 7         identification.)
 8                   -  -  -
 9              (Whereupon, Exhibit
10         Klein-22, No Bates, 8/1/25
11         Rebuttal Expert Report Replying to
12         the Reports of Dr. Michael J.
13         Stern and Dr. Darius Lakdawalla,
14         Tucson, was marked for
15         identification.)
16                   -  -  -
17              VIDEO TECHNICIAN:  The time
18         is 3:18 p.m.  We are on the
19         record.
20  BY ATTORNEY PISTILLI:
21         Q.    All right.  Mr. Klein, we've
22  handed you what have been marked as
23  Exhibit-18, 19, 20, 21 and 22.
24              Do you have those in front
```

CONFIDENTIAL

Page 218

1    of you?

2            A.    Yes.

3            Q.    And just to make sure we

4    have them in the record.

5                  Is Exhibit-18 a copy of your

6    rebuttal report in the Breathitt case?

7            A.    Yes.

8            Q.    And is Exhibit-19 a copy of

9    your rebuttal report in the DeKalb case?

10           A.    Yes.

11           Q.    Is Exhibit-20 a copy of your

12   rebuttal report in the Harford case?

13           A.    Yes.

14           Q.    Is Exhibit-21 a copy of your

15   rebuttal report in the Irvington case?

16           A.    No.  Tucson.

17           Q.    Exhibit-21 is a copy of your

18   rebuttal report in the Tucson case?

19           A.    Yes.

20           Q.    And is Exhibit-22 a copy of

21   your rebuttal report in the DeKalb case?

22           A.    No.  It's also Tucson.

23           Q.    Sorry about that.  Give us

24   22 back, and we'll get you a replacement

CONFIDENTIAL

Page 219

1   of DeKalb.
2            ATTORNEY PISTILLI:  What's
3        the tab number?  What's DeKalb?
4            ATTORNEY WHITELEY:  19.
5            ATTORNEY PISTILLI:  Can you
6        bring up Tab 19, please?  DeKalb
7        is Tab 19?
8            ATTORNEY PEILEN:  Yes.
9            ATTORNEY PISTILLI:  Tab 19.
10           ATTORNEY PEILEN:  Sorry,
11       it's Exhibit-19.  It's Tab 10.
12   BY ATTORNEY PISTILLI:
13       Q.    And could we just scroll
14   through this, please?
15       A.    DeKalb?
16       Q.    And do you see that -- we'll
17   mark this as Exhibit-22.
18           Is that a copy of your
19   report in the DeKalb case on the screen?
20       A.    What's on the screen, yes.
21   I thought I had one for DeKalb.
22           ATTORNEY WHITELEY:
23       Irvington and Tucson.  Thought
24       that was --

CONFIDENTIAL

Page 220

1           ATTORNEY PEILEN:  18 is
2      Breathitt.  19 is DeKalb.  20 is
3      Harford.  21, Irvington.  22,
4      Tucson
5           ATTORNEY WHITELEY:  The one
6      we marked as 20 is Tucson.
7           ATTORNEY PEILEN:  It should
8      be 22.
9           ATTORNEY JACOBSON:  We have
10     all the rebuttal reports in
11     Mr. Klein's binder if you want to
12     mark those rebuttal reports.
13          ATTORNEY PISTILLI:  Sure.
14     Can we just mark the binder as a
15     composite of all the rebuttal
16     reports?  Does that work for you?
17          ATTORNEY JACOBSON:  Sure,
18     yes.
19          ATTORNEY PISTILLI:  Let's
20     just mark that as Exhibit-22.
21     Appreciate the courtesy.
22          ATTORNEY JACOBSON:  We'll
23     have to take out the openings,
24     but --

CONFIDENTIAL

Page 221

1           ATTORNEY PISTILLI:  We can
2       work on that.
3   BY ATTORNEY PISTILLI:
4           Q.    And just a couple other
5   clean-up questions from earlier in the
6   day.
7               We talked some about the
8   drafting of your report.  But who
9   actually designed the survey instrument?
10          A.    I did.
11          Q.    And did you work with staff
12  on the design of the survey instrument?
13          A.    Yes.
14          Q.    What role did staff play in
15  that?
16          A.    Designing a good survey is a
17  collaborative process.  And the staff
18  assisted in some of the wording issues,
19  but, also, they were conducting the
20  pre-test interviews and managing the
21  logistics of that.
22          Q.    We also talked earlier today
23  about some of your work relating to
24  marketing studies.

CONFIDENTIAL

Page 222

1          A.     I stepped on my microphone.

2                 I broke it.  Sorry.

3          Q.     Do you recall we also talked

4    earlier today about some of your work on

5    marketing studies?

6          A.     Yes.

7          Q.     And when you, for instance,

8    do a survey regarding Maker's Mark, do

9    you make any effort to not include

10   employees of Maker's Mark manufacturer?

11                ATTORNEY JACOBSON:

12         Objection to form.

13                THE WITNESS:  Well, I mean,

14         I've never done a survey for

15         Maker's Mark, so --

16   BY ATTORNEY PISTILLI:

17         Q.     Just, it's a hypothetical.

18         A.     Yeah.  Hypothetical.

19                It depends on what the

20   survey is.  You want to screen out anyone

21   who would have an unusual amount of

22   knowledge about a particular subject.

23                So I wouldn't ask, do you

24   work for Maker's Mark?  But anyone in the

CONFIDENTIAL

Page 223

1  alcoholic beverage industry would be --
2  would be screened out, because they would
3  have, let's say, more information about
4  the category than the average consumer.
5      Q.    And would you ever do a
6  consumer survey about a product and
7  survey just the employees of the product
8  manufacturer?
9            ATTORNEY JACOBSON:
10       Objection.  Form.
11           THE WITNESS:  I guess it
12       depends on what the survey is for.
13  BY ATTORNEY PISTILLI:
14      Q.    To see how much they like
15  the brand.
16      A.    That is a situation that
17  could be relevant for a survey in some,
18  you know, limited subpopulation, even
19  employees.
20      Q.    But if you were -- if you
21  were trying to understand just general
22  consumer sentiment, you wouldn't survey
23  just a group of people who were employed
24  by that manufacturer, right?

CONFIDENTIAL

Page 224

```
 1              ATTORNEY JACOBSON:
 2         Objection.  Form.
 3              THE WITNESS:  Again, it
 4         depends on -- on the situation in
 5         which you're trying to -- trying
 6         to measure.  It might be very
 7         important to understand the
 8         attitude your employees have
 9         toward your particular product.
10              ATTORNEY PISTILLI:  Let's
11         move on to a new topic.
12                   -   -   -
13              (Whereupon, Exhibit
14         Klein-23, No Bates, Reference
15         Manual on Scientific Evidence,
16         Third Edition, was marked for
17         identification.)
18                   -   -   -
19    BY ATTORNEY PISTILLI:
20         Q.    I'm handing you a document
21    that's been marked as Exhibit-23.
22              What is Exhibit-23?
23         A.    I'm sorry?
24         Q.    What is Exhibit-23?
```

CONFIDENTIAL

Page 225

1          A.    It's a chapter from the
2   Reference Manual on Scientific Evidence
3   called The Reference Guide on Survey
4   Research by Shari Diamond.
5          Q.    And is this something that
6   you rely on when you offer expert
7   testimony?
8          A.    I find this to be a very
9   helpful guide.
10          Q.    I mean, as we discussed
11   before, a valid survey needs to include a
12   sample that's representative of the
13   target population, right?
14          A.    That's correct.
15                Well, I guess it depends on
16   what the survey is orienting towards.
17   But, generally, you would like to have a
18   representative sample of whatever
19   universe you've defined.
20          Q.    And look with me, if you
21   would, at Page 382.
22          A.    Yes.
23          Q.    Do you see where it says,
24   Nonetheless, when respondents are not

CONFIDENTIAL

Page 226

1  selected randomly from the relevant

2  population, the expert should be prepared

3  to justify the method used to select

4  respondents.  Special precautions are

5  required to reduce the likelihood of

6  biased samples.

7           Do you see that?

8      A.    Yes.

9      Q.    And do you agree with that

10 statement?

11     A.    In general.

12     Q.    What, if any, steps did you

13 take to ensure that the individuals who

14 completed your survey were, in fact,

15 representative of the overall target

16 population?

17     A.    Well, rather than taking a

18 sample of the population, we invited

19 every member of the identified universe

20 to participate in the survey and sent

21 them multiple reminders to do so.

22           And so I have no reason to

23 believe that we don't have a

24 representative sample.

CONFIDENTIAL

Page 227

1          Q.    So you sent it to everyone,
2    right?
3          A.    Yes.
4          Q.    But then only a relatively
5    small subset of the people you sent it to
6    responded, correct?
7          A.    As is typical with Internet
8    surveys with no incentive.
9          Q.    But my question, sir, is
10   what, if anything, did you do to ensure
11   that the population that responded was
12   representative of the larger group of
13   people who were given the opportunity to
14   respond?
15         A.    By sending the multiple
16   reminders and trying not to -- not
17   trying, but by not disclosing the nature
18   of the survey or the reason why their
19   opinion is being solicited.
20         Q.    Well, I understand that you
21   didn't, at least in your communications,
22   say what the purpose of the survey was
23   and that you sent multiple reminders.
24                But explain to me how that

CONFIDENTIAL

Page 228

1   ensures that there isn't a relevant

2   difference between the people who chose

3   to respond and the people who chose not

4   to respond?

5            A.    As I said, I have no reason

6   to believe that these people who did not

7   respond are any different or had any

8   particular reason for not responding.

9                But, you know, beyond the

10  multiple reminders and inviting everyone

11  rather than just a sample, that's what we

12  did.

13           Q.    Take a look with me, if you

14  would, at Page 383 of the Reference Guide

15  on Survey Research.

16           A.    Yes.

17           Q.    Do you see where it says,

18  Even when a sample is drawn randomly from

19  a complete list of elements in the target

20  population, responses or measures may be

21  obtained on only part of the selected

22  sample.

23                Do you see that?

24           A.    Yes.

Page 229

1          Q.    And that's what happened

2    here, right?  You only obtained responses

3    from a portion of the sample?

4                    ATTORNEY JACOBSON:

5          Objection.  Form.

6                    THE WITNESS:  We received --

7          we got a sample -- we got

8          responses from a sample of the

9          population, yes.

10   BY ATTORNEY PISTILLI:

11         Q.    And then it goes on to say,

12   that, If this lack of response is

13   distributed randomly, valid inferences

14   about the population can be drawn with

15   the assurance using the measures obtained

16   from the available elements of the

17   sample.

18                    Do you see that?

19         A.    Yes.

20         Q.    But then it goes on to say,

21   right, that the difficulty is that

22   non-response often is not random.

23                    Do you see that?

24         A.    Yes.

Page 230

```
 1          Q.    And do you agree with that
 2   statement?
 3          A.    As it says, it may not be
 4   random.  But that doesn't say it's always
 5   not random.
 6          Q.    You see where it goes on to
 7   say, The key to evaluating the effect of
 8   non-response in a survey is to determine,
 9   as much as possible, the extent to which
10   non-respondents differ from the
11   respondents and the nature of the
12   responses they would provide if they were
13   present in the sample.
14                Do you see that?
15          A.    Yes.
16          Q.    And do you agree with that
17   statement?
18          A.    In -- in general.
19          Q.    And what efforts, if any,
20   did you take to determine whether
21   non-respondents differ from respondents
22   in the nature of the responses they would
23   provide in this case?
24          A.    We had no information about
```

CONFIDENTIAL

Page 231

1    the non-respondents.  And so we did what

2    we do in cases related to trademarks or

3    confusion or false advertising, don't do

4    anything to tip off what the nature of

5    the survey is and take as broad a sample

6    as you can.

7                We got response rates that

8    were in line with what we expect from an

9    Internet survey with no incentive.

10        Q.    But just to be clear, you

11   didn't undertake any efforts to determine

12   whether non-respondents and respondents

13   are similarly situated, correct?

14                ATTORNEY JACOBSON:

15        Objection.  Form.

16                THE WITNESS:  And I have no

17        reason to think they're not.

18   BY ATTORNEY PISTILLI:

19        Q.    But you have no basis to say

20   that they are?

21        A.    I have no basis to say they

22   aren't.

23        Q.    You also have no basis to

24   say that they are?

CONFIDENTIAL

Page 232

```
 1          A.    I think we're agreeing with
 2     each other.
 3          Q.    So you're --
 4          A.    -- I have no --
 5          Q.    -- agreeing with me --
 6          A.    I have no basis for saying
 7     that they're any different than the
 8     people who did respond.  And, you know,
 9     the various rebuttal reports that I've
10     seen don't suggest any reason why they
11     would be different.
12          Q.    You have no basis to say
13     that the people who did respond aren't
14     different from the people who didn't,
15     correct?
16               ATTORNEY JACOBSON:
17          Objection.  Form.  And asked and
18          answered.
19               THE WITNESS:  As I -- as I
20          said before, the -- by inviting
21          everyone to participate and
22          sending multiple reminders, that
23          meets kind of the standards that
24          we've used in -- in all of our
```

CONFIDENTIAL

Page 233

1          other surveys.

2     BY ATTORNEY PISTILLI:

3          Q.    What is your basis, if any,

4     for the claim that the individuals who

5     did not respond are similarly situated to

6     the individuals who did?

7          A.    I have no basis for -- for

8     believing that they are not -- that there

9     is any difference.

10          Q.    Right.  And -- my apologies,

11     were you done?

12          A.    Yes.

13          Q.    But it's equally true that

14     you have no basis for saying that they're

15     the same?

16          A.    We used the standards that

17     we've used in hundreds of surveys that

18     have been, you know, presented in court

19     and accepted.

20               And in terms of taking a --

21     using a complete census of -- trying to

22     get a complete census of the population

23     and get the maximum number of

24     respondents.

CONFIDENTIAL

Page 234

1          Q.    But respectfully, sir, that

2    wasn't my question.

3               My question is, do you have

4    any basis for assuming that the

5    non-responders and responders are

6    similarly situated?

7          A.    As I've said, I have no

8    basis for thinking that they aren't

9    similarly situated.

10         Q.    And you have no basis for

11   thinking that they are?

12              ATTORNEY JACOBSON:

13         Objection.  Asked and answered.

14         Repeatedly.

15              THE WITNESS:  I think I've

16         said clearly that I don't have any

17         reason or any information that

18         would lead me to believe that they

19         are not -- that we don't have a

20         valid, representative sample.

21   BY ATTORNEY PISTILLI:

22         Q.    You also have no data or

23   information that shows that they are a

24   valid sample?

Golkow Technologies,
A Veritext Division

www.veritext.com

CONFIDENTIAL

Page 235

1              ATTORNEY JACOBSON:

2         Objection.  Form.  And asked and

3         answered.

4              THE WITNESS:  Well, we don't

5         have data from the respondents who

6         did not answer.  So I'm not sure

7         what you would, you know, expect

8         me to do in that situation.

9              Again, by not making the

10        subject matter apparent in the

11        invitation and getting the warming

12        letter by the -- from the school

13        board or the district office,

14        wherever it came from, you know,

15        we did everything we could to get

16        the maximum response rate.  And we

17        got a response rate that was in

18        line with what we've seen in other

19        surveys on the Internet with no

20        incentive.

21   BY ATTORNEY PISTILLI:

22        Q.    Well, sir, but response rate

23   and representativeness are related but

24   distinct concepts, right?

CONFIDENTIAL

Page 236

```
1          A.    Yes.
2          Q.    Yes.
3                And all else equal, the
4    lower the response rate, the greater the
5    concerns about representativeness,
6    correct?
7                     ATTORNEY JACOBSON:
8          Objection.  Form.
9                     THE WITNESS:  It depends on
10         the situation.  I mean, that's
11         not -- I don't think that's
12         universally true.
13   BY ATTORNEY PISTILLI:
14         Q.    Well, isn't it more likely
15   that if two people out of 100 answer a
16   survey, they're not going to be
17   representative than if 98 out of 100
18   answer a survey?
19                     ATTORNEY JACOBSON:
20         Objection to form.
21                     THE WITNESS:  I think small
22         samples can be just as accurate as
23         large samples.
24   BY ATTORNEY PISTILLI:
```

CONFIDENTIAL

Page 237

1          Q.    Yeah.  And they -- they can
2    be.  And, in fact, the reference guide
3    we've been looking at acknowledges that
4    they can, right?
5          A.    Yes.
6          Q.    But in order for them -- in
7    order for small samples to be
8    representative, the lack of response has
9    to be distributed randomly, correct?
10         A.    I think that's correct.
11         Q.    And here you don't have any
12   basis to know, one way or the other,
13   whether the lack of response was
14   distributed randomly?
15              ATTORNEY JACOBSON:
16         Objection.  Form.
17              THE WITNESS:  Again, I don't
18         have any reason to think that it
19         isn't.
20   BY ATTORNEY PISTILLI:
21         Q.    And you don't have any
22   reason to think that it is?
23              ATTORNEY JACOBSON:
24         Objection.  Form.

Page 238

1                    THE WITNESS:  I like my
2          description of it better.
3     BY ATTORNEY PISTILLI:
4          Q.    Well, but, respectfully, I'm
5     allowed to ask a question.
6          A.    Yes.
7          Q.    And it's your responsibility
8     to answer it truthfully.
9                    And so the question, again,
10    is, do you have any evidence or data that
11    would support the proposition that, in
12    this case, the lack of response was
13    distributed randomly?
14                    ATTORNEY JACOBSON:
15          Objection.  Form.
16                    THE WITNESS:  And as I've
17          said, while I may not have any
18          evidence that it's not random, I
19          also don't have any reason to
20          believe that it isn't.
21    BY ATTORNEY PISTILLI:
22          Q.    You asked the survey
23    participants some questions about their
24    age, right?

CONFIDENTIAL

Page 239

1          A.     Let me -- yes.

2          Q.     Question --

3          A.     QS6.

4          Q.     QS6 asks if they're under

5     21, between 21 and 34, between 35 and 54

6     and between 55 and over, right?

7          A.     Yes.

8          Q.     And each of the school

9     districts has information about the age

10    of its teaching staff, correct?

11         A.     I don't know.

12         Q.     Did you make any effort to

13    determine whether the responses you got

14    in your survey reporting the age of the

15    respondents was representative of the

16    teacher pool in the six districts?

17              ATTORNEY JACOBSON:

18         Objection.  Form.

19              THE WITNESS:  There was no

20         data -- data available on the age

21         distribution of teachers in the

22         school district.

23    BY ATTORNEY PISTILLI:

24         Q.     Did you ask whether the

CONFIDENTIAL

Page 240

1    school districts had demographic

2    information available about its teachers?

3            A.    And I was told that they did

4    not.  It would not be available.

5            Q.    You were told that the

6    school districts don't know the age,

7    gender, race, tenure of its teachers?

8            A.    You asked specifically about

9    age -- or I asked specifically about age

10   in the survey.  And I was told that that

11   data was not available.

12           Q.    And is the reason you asked

13   is that you would have liked to be able

14   to determine whether the ages of your

15   respondents were representative of the

16   ages of the overall teacher population?

17                 ATTORNEY JACOBSON:

18           Objection.  Form.

19                 THE WITNESS:  You know, I

20           think that could be one use of

21           that.

22                 I think another would be to,

23           you know, set quotas or do other

24           things.

CONFIDENTIAL

Page 241

1              But when we decided to send
2         the invitation to everybody, then
3         we didn't need that.
4    BY ATTORNEY PISTILLI:
5         Q.    When you say "set quotas,"
6    you mean ensure that, you know, each of
7    the age bands is appropriately
8    represented in the responses, right?
9              ATTORNEY JACOBSON:
10        Objection.  Form.
11             THE WITNESS:  That would be
12        one possible use of that
13        information.
14   BY ATTORNEY PISTILLI:
15        Q.    And did you ask about any
16   other demographic data that you might
17   have used to determine whether the
18   respondent population was representative
19   of the overall teacher population?
20        A.    No --
21             ATTORNEY JACOBSON:
22        Objection to form.
23             THE WITNESS:  -- because I
24        had all the information that I

CONFIDENTIAL

Page 242

1          needed to construct and conduct
2          the survey.
3     BY ATTORNEY PISTILLI:
4          Q.    So you don't know, for
5     example, whether the folks who responded
6     to the survey were disproportionately old
7     or young?
8               ATTORNEY JACOBSON:
9          Objection.  Form.
10              THE WITNESS:  The data was
11         certainly collected and provided
12         to Dr. Ward as part of his
13         analysis.
14    BY ATTORNEY PISTILLI:
15         Q.    What data are you referring
16    to?
17         A.    The data collected from the
18    survey.
19         Q.    Well, my question was, you
20    don't know whether the survey respondents
21    were disproportionately old or young as
22    compared to the overall teacher
23    population?
24              Do you understand that

Page 243

1    question?

2                    ATTORNEY JACOBSON:

3         Objection.  Form.

4                    THE WITNESS:  Yes, I think I

5         understand the question.

6    BY ATTORNEY PISTILLI:

7         Q.    And is that a true

8    statement?

9         A.    As I said, that information

10   was not -- not available.

11        Q.    And you don't know whether

12   the respondents disproportionately teach

13   certain subjects?

14                   ATTORNEY JACOBSON:

15        Objection.  Form.

16                   THE WITNESS:  We didn't ask

17        what subjects they taught.

18   BY ATTORNEY PISTILLI:

19        Q.    And you -- so then you don't

20   know whether a disproportionate number of

21   responders teach specific subjects?

22                   ATTORNEY JACOBSON:

23        Objection.  Form.  And asked and

24        answered.

CONFIDENTIAL

Page 244

1            THE WITNESS:  The question

2         wasn't asked in the survey, so I

3         certainly wouldn't have any basis

4         for answering.

5    BY ATTORNEY PISTILLI:

6         Q.    And it's certainly possible

7    that students are more distracted in math

8    class than social studies, right?

9            ATTORNEY JACOBSON:

10        Objection.  Form.

11            THE WITNESS:  I know I

12        wasn't but -- no, I really don't

13        know anything about the prevalence

14        of distraction by subject matter.

15   BY ATTORNEY PISTILLI:

16        Q.    Just at a general level, it

17   is possible, right, that the run of

18   students in a given school district are

19   more engaged in certain subjects than

20   they are in others?

21            ATTORNEY JACOBSON:

22        Objection.  Form.

23            THE WITNESS:  You know,

24        that's possible.  I mean, you

CONFIDENTIAL

Page 245

1          certainly see differences across

2          the school districts in terms of

3          the disruptions due to social

4          media, so.

5    BY ATTORNEY PISTILLI:

6          Q.    And if it were true that,

7    hypothetically, kids were more distracted

8    in math class than social studies and all

9    the math teachers responded and none of

10   the social studies teachers responded,

11   your survey wouldn't be representative,

12   right?

13                ATTORNEY JACOBSON:

14          Objection.   Form.

15                THE WITNESS:   Well, I mean,

16          under that hypothetical --

17          accepting your hypothetical, then

18          if, hypothetically, we've got a

19          biased sample, then we've got a

20          biased sample.

21   BY ATTORNEY PISTILLI:

22          Q.    And then, for instance, you

23   didn't ask for any information relating

24   to teacher tenure from the districts,

Page 246

1  correct?

2          A.    Yes, that's -- that's

3  correct, because the teacher tenure

4  really wasn't relevant in the survey.

5  Because we were looking at teachers who

6  had been in the same school as opposed to

7  teachers who had switched schools and so

8  on.

9          Q.    Well, but, for instance, you

10  don't have information about whether a

11  disproportionate number of newer teachers

12  responded to your survey, correct?

13          A.    I guess that's correct, yes.

14          Q.    And if, in general, newer

15  teachers had greater difficulty with

16  classroom management that could introduce

17  bias into your survey, correct?

18              ATTORNEY JACOBSON:

19          Objection.  Form.

20              THE WITNESS:  Well,

21          hypothetically, if -- and I don't

22          know whether newer teachers would

23          have more or less of a problem

24          with disruptions due to social

CONFIDENTIAL

Page 247

1          media.  It could work one way --
2          it could work either way.
3   BY ATTORNEY PISTILLI:
4          Q.    But, again, it's just not
5   something that you looked into at all?
6          A.    That's correct.  We had all
7   the information we needed for the survey.
8          Q.    If I could ask you to turn
9   all the way back to Exhibit-1.
10                And can we go to Page 8,
11   please?
12          A.    Exhibit-1.  Yes.  Okay.
13   And?
14          Q.    Page 8.
15          A.    Page 8.
16          Q.    I want to look with you at
17   Question 3.
18          A.    Okay.
19          Q.    And though we're looking at
20   Exhibit-1, which I believe is your
21   Breathitt report, Question 3 was the same
22   for each of the six surveys, correct?
23          A.    That's correct.
24          Q.    And then do you see in the

CONFIDENTIAL

Page 248

1    first listed question, it says,
2    Unauthorized student use of social media,
3    e.g., Facebook, Instagram, Snapchat,
4    TikTok, YouTube, et cetera, during class.
5             Do you see that?
6        A.    Yes.
7        Q.    And then that same phrasing
8    is repeated in the other social media
9    question.
10            It says some, e.g.,
11   Facebook, Instagram, Snapchat, TikTok,
12   YouTube, et cetera.
13            Do you see that?
14       A.    Yes.
15       Q.    And so your survey defines
16   social media as including but not being
17   limited to Facebook, Instagram, Snapchat,
18   TikTok and YouTube; is that fair?
19            ATTORNEY JACOBSON:
20        Objection.  Form.
21            THE WITNESS:  I think these
22        are the primary social media
23        platforms that middle and high
24        school students would routinely

CONFIDENTIAL

Page 249

1          access.
2     BY ATTORNEY PISTILLI:
3          Q.    "e.g." means for example,
4     right?
5          A.    Yes.
6          Q.    And then at the end you also
7     say, et cetera, which means there are
8     more?
9          A.    Yes.
10         Q.    So Facebook, Instagram,
11    Snapchat, TikTok and YouTube, according
12    to the survey question that you
13    administered, are examples of social
14    media but not the only examples, correct?
15              ATTORNEY JACOBSON:
16         Objection.  Form.
17              THE WITNESS:  They may not
18         be the only forms of social media,
19         but those are the ones that the
20         students are -- are accessing and
21         making use of.
22    BY ATTORNEY PISTILLI:
23         Q.    Did you ask them that?
24         A.    We asked the -- you know,

CONFIDENTIAL

Page 250

1   when we were doing the teacher
2   interviews, they had no problem with --
3   with that kind of construction.
4                And the e.g. and et cetera
5   were important there to make that
6   parallel to all the other examples that
7   we gave.
8                Because if we didn't, then
9   it would really stand out as -- as being
10  the focus of what the survey was all
11  about.
12       Q.    So I understand that your
13  testimony is that teachers understood the
14  phraseology.  But that's really not my
15  question.
16                It's just that on its face
17  the clear meaning of the e.g. and the
18  et cetera is that social media includes
19  but is in no way limited to the five
20  platforms you specifically reference,
21  correct?
22                ATTORNEY JACOBSON:
23        Objection.  Form.
24                THE WITNESS:  Well, I think

CONFIDENTIAL

                                              Page 251

1          that teachers recognize that these

2          are the platforms that students

3          make use of.  And so rather than

4          trying to create a -- some other

5          definition of social media, we

6          simply listed the platforms that

7          we know students use.

8   BY ATTORNEY PISTILLI:

9          Q.   If a teacher experienced

10  disruption that they attributed to X,

11  formerly known as Twitter, they should

12  include that in their answer, right?

13              ATTORNEY JACOBSON:

14          Objection.  Form.

15              THE WITNESS:  The -- X

16          probably isn't a platform that

17          students make much use of.

18  BY ATTORNEY PISTILLI:

19          Q.   But if a student -- if a

20  teacher experienced disruption that they

21  attributed to X, the teacher should

22  include it in their answer?

23              ATTORNEY JACOBSON:

24          Objection.  Form.  Asked and

Page 252

1        answered.

2                THE WITNESS:  Well, if,

3        hypothetically, the -- a teacher

4        thinks that students are using X

5        and that's -- causing diversion of

6        time, then, hypothetically, they

7        would be including that, that

8        recognition.

9                But my understanding, based

10       on the pre-test, is that Facebook,

11       Instagram, Snapchat, TikTok and

12       YouTube are the, you know, huge

13       percentage of the social media

14       usage.  And there may be some

15       outside that, but the -- you know,

16       it requires, you know -- well,

17       never mind.

18   BY ATTORNEY PISTILLI:

19       Q.    Are you familiar with

20   Discord?

21       A.    I have heard of it in the

22   context of gaming, yes.

23       Q.    It's a social media

24   platform, right?

CONFIDENTIAL

Page 253

1                    ATTORNEY JACOBSON:
2            Objection.  Form.
3                       THE WITNESS:  I'm not sure.
4            I've never been on Discord.
5     BY ATTORNEY PISTILLI:
6            Q.   So you -- you don't know,
7     sitting here today, one way or the other,
8     whether Discord is a social media app?
9                    ATTORNEY JACOBSON:
10           Objection.  Form.  And asked and
11           answered.
12                      THE WITNESS:  As I say, I've
13           never been on Discord.
14    BY ATTORNEY PISTILLI:
15           Q.   Have you ever heard of
16    Omegle?
17           A.   O --
18           Q.   Omegle?
19           A.   No.
20           Q.   Have you ever heard of Yik
21    Yak?
22           A.   No.
23           Q.   There's a lot of social
24    media apps out there, though, right?

CONFIDENTIAL

                                            Page 254

1              ATTORNEY JACOBSON:
2         Objection to form.
3              THE WITNESS:  I'm not sure.
4    BY ATTORNEY PISTILLI:
5         Q.    You don't know?
6         A.    Well, I know that these are
7    the five main ones that are used by
8    students.
9         Q.    But whether and to what
10   extent there are other ones is outside
11   your expertise?
12             ATTORNEY JACOBSON:
13        Objection.  Form.
14             THE WITNESS:  My expertise
15        is in the creating of surveys.
16        And I think that the listing of
17        the -- these five platforms
18        appropriately directs teachers to
19        think about those platforms and
20        student use of those platforms.
21   BY ATTORNEY PISTILLI:
22        Q.    Among others?
23        A.    I think that the way this is
24   listed -- and, again, it wouldn't be the

CONFIDENTIAL

Page 255

1   first thing that -- or necessarily be the
2   first thing that the teacher saw.  And so
3   they're going to see a number of
4   alternative, let's say, disrupting events
5   or disrupting situations all that are
6   followed by e.g. and et cetera.
7                 And so when they run across
8   the -- any of the first two that are
9   listed here, it won't look any different
10  than the ones that they saw in student
11  tardiness or unauthorized messaging, that
12  sort of thing.
13          Q.    So when a teacher looks at
14  this and they see, Student tardiness to
15  school or class, e.g., disrupting class
16  when walking in late, bus is running
17  late, et cetera, a teacher would
18  understand that there could be other ways
19  of student tardiness creating disruptions
20  besides walking in late and buses running
21  late, correct?
22                ATTORNEY JACOBSON:
23          Objection.  Form.
24                THE WITNESS:  The -- could

                                    Page 256

1          you repeat the question?  I'm
2          sorry.
3    BY ATTORNEY PISTILLI:
4          Q.     Sure.
5                 When a teacher looks at this
6    survey and sees, Student tardiness to
7    school or a class, e.g., disrupting class
8    when walking in late, buses running late,
9    et cetera, or early departures, they
10   would understand that student tardiness
11   might create disruptions other than by
12   walking in late or buses running late,
13   correct?
14                ATTORNEY JACOBSON:
15         Objection to form.
16                THE WITNESS:  I guess that's
17         possible, yes.
18   BY ATTORNEY PISTILLI:
19         Q.     And then when they see,
20   Classroom environment issues, e.g.,
21   uncomfortable seating, poor lighting,
22   temperature issues, et cetera, they would
23   understand that there could be classroom
24   environment issues other than

Page 257

1  uncomfortable seating, poor lighting and
2  temperature issues, correct?
3            ATTORNEY JACOBSON:
4        Objection.  Form.
5            THE WITNESS:  I -- that's
6        entirely possible.
7  BY ATTORNEY PISTILLI:
8        Q.    So did you make any effort
9  in your survey to understand whether any
10  particular features of Facebook,
11  Instagram, Snapchat, TikTok or YouTube
12  were causing classroom disruption?
13        A.    No.  It was the student use
14  of those platforms.
15        Q.    So student use no matter
16  which features they were using?
17            ATTORNEY JACOBSON:
18        Objection.  Form.
19            THE WITNESS:  We really
20        didn't inquire about any specific
21        features.
22  BY ATTORNEY PISTILLI:
23        Q.    And so if the teacher
24  attributed a disruption to Facebook,

CONFIDENTIAL

Page 258

1    Instagram, Snapchat, TikTok or YouTube,
2    you included it in your calculations
3    irrespective of the particular feature
4    that caused the disruption?
5                    ATTORNEY JACOBSON:
6            Objection.  Form.
7                    THE WITNESS:  Again, we
8            didn't ask about specific
9            features.  So there was no way we
10           could attribute it to that.
11   BY ATTORNEY PISTILLI:
12           Q.    And then, for instance, your
13   social media disruption would include
14   disruptions caused by the algorithmic
15   promotion of addictive engagement?
16                    ATTORNEY JACOBSON:
17           Objection to form.
18                    THE WITNESS:  Whatever that
19           means.
20   BY ATTORNEY PISTILLI:
21           Q.    Are you aware of plaintiffs'
22   allegations in this lawsuit?
23           A.    Yes.
24           Q.    And are you aware that one

CONFIDENTIAL

Page 259

1    of the things they allege is that the

2    defendants' platforms use algorithms to

3    promote addictive engagement?

4            A.    Yes.

5            Q.    So when you ask teachers

6    about social media-related disruption, it

7    would include disruptions that they

8    attribute to the algorithmic promotion of

9    addictive engagement?

10           A.    Well, I don't know,

11   hypothetically, if they attribute it to

12   any one particular feature or if one

13   particular feature is causing the

14   disruption that needs to be dealt with,

15   so.

16           Q.    But irrespective of what the

17   feature is, if the teacher attributes it

18   to social media, it's included in your

19   analysis?

20           A.    If the teacher believes that

21   social media is causing the disruption

22   that diverts time from -- from teaching,

23   then I would hope they would include it

24   here.

CONFIDENTIAL

Page 260

1        Q.    And you're aware that

2   defendants' platforms sometimes send

3   notifications to users?

4                ATTORNEY JACOBSON:

5        Objection.   Form.

6                THE WITNESS:   Yeah, I think

7        I've seen those.

8   BY ATTORNEY PISTILLI:

9        Q.    And if a student is

10  distracted because they receive a

11  notification during class, that's another

12  thing that the teacher should include in

13  their survey response, correct?

14       A.    If it causes a disruption

15  that they need to deal with to -- because

16  it diverts -- and if it diverts time from

17  teaching, then I would hope they would

18  include all of those.

19       Q.    Let's look back at

20  Question 3 again.

21                And do you see where -- the

22  second question -- and I recognize it's

23  not always the second question someone

24  receives, you ask about, Repercussions

CONFIDENTIAL

Page 261

1    from student use of social media outside

2    of the classroom, e.g., students anxious

3    or inattentive due to prolonged social

4    media use, students suffering from sleep

5    deprivation due to late night social

6    media use, dealing with student conflicts

7    stemming from social media use.

8                    Do you see that?

9         A.    Yes.

10        Q.    And when you say something

11   like "dealing with student conflict

12   stemming from social media use," you mean

13   things like, you know, maybe someone is

14   being bullied by another student and

15   that's done, in part, through comments or

16   posts on a social media platform, right?

17                    ATTORNEY JACOBSON:

18        Objection to form.

19                    THE WITNESS:  I mean, that's

20        certainly one possibility.

21   BY ATTORNEY PISTILLI:

22        Q.    Or two students could be

23   having, like, a war of words with one

24   another in a -- in a comment section on a

CONFIDENTIAL

Page 262

1  social media post, right?

2                    ATTORNEY JACOBSON:

3          Objection.  Form.

4                    THE WITNESS:

5          Hypothetically, yes.

6  BY ATTORNEY PISTILLI:

7          Q.    Now let's talk about some of

8  these other categories.

9                    You refer to things like

10 students being anxious or inattentive as

11 repercussions from student use of social

12 media?

13         A.    Those are examples.

14         Q.    So you're -- you're drawing

15 to the teachers' mind a link between

16 anxiety and inattention and social media

17 use in the formation of the question,

18 correct?

19                    ATTORNEY JACOBSON:

20         Objection.  Form.

21                    THE WITNESS:  I'm sorry,

22         could you repeat that?

23 BY ATTORNEY PISTILLI:

24         Q.    The question suggests a link

CONFIDENTIAL

Page 263

1    between social media use and anxiety and

2    inattentiveness, correct?

3                    ATTORNEY JACOBSON:

4            Objection.  Form.

5                    THE WITNESS:  I think it

6            provides examples that -- what

7            social media could potentially

8            manifest itself in student

9            behavior.

10   BY ATTORNEY PISTILLI:

11           Q.    But if you wanted to, right,

12   instead of asking this question, you

13   could have, for instance, asked, how much

14   time do you spend dealing with anxiety or

15   inattentiveness, correct?

16                   ATTORNEY JACOBSON:

17           Objection.  Form.

18                   THE WITNESS:  Well, I think

19           there are a lot of questions we,

20           you know, could ask.

21                   I mean, I think this gets at

22           the issue we were trying to

23           measure.

24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 264

1          Q.    But rather than asking a

2     question in a way that presupposes that

3     social media causes anxiety or

4     inattention, you could have more

5     neutrally asked, for example, in the

6     first instance, about anxiety or

7     inattention, correct, and then followed

8     up?

9               ATTORNEY JACOBSON:

10          Objection.  Form.

11               THE WITNESS:  Well, I'm not

12          sure how that would -- that would

13          work and stay parallel with the

14          other -- other issues.

15     BY ATTORNEY PISTILLI:

16          Q.    Well, you could have had --

17     instead of your second category there,

18     you could have asked whether disruptions

19     were caused by students who were anxious

20     or inattentive; you could have asked

21     whether disruptions were caused by

22     students being sleep deprived; you could

23     have asked whether students were being

24     disruptive because of conflict, right?

CONFIDENTIAL

Page 265

1                    ATTORNEY JACOBSON:
2          Objection.   Form.   Compound.
3                    THE WITNESS:   And then what?
4    BY ATTORNEY PISTILLI:
5          Q.     And then if, and only if,
6    they said yes asked whether, in fact, the
7    teachers attributed any of that to social
8    media?
9          A.     Sounds like a pretty leading
10   question.  I don't think I would do
11   something like that.
12         Q.     Well, you don't think it's
13   leading to put in the question itself a
14   linkage between social media use and all
15   of these harms?
16                   ATTORNEY JACOBSON:
17         Objection.   Form.
18                   THE WITNESS:   No, I don't
19         think that's leading.
20   BY ATTORNEY PISTILLI:
21         Q.     You don't think it would be
22   more neutral to ask about the harms
23   without, in the question itself, tying
24   the harms to social media?

CONFIDENTIAL

Page 266

1              ATTORNEY JACOBSON:
2          Objection.  Form.
3                  THE WITNESS:  No, I think --
4          I think the way we asked it was
5          neutral and essentially surrounded
6          by, you know, a bunch of other
7          similar types of issues.
8   BY ATTORNEY PISTILLI:
9          Q.    Let me ask you this: What,
10  if anything, did you do to determine
11  whether teachers have the ability to
12  reliably gauge the cause of a student's
13  sleep deprivation?
14              ATTORNEY JACOBSON:
15          Objection.  Form.
16                  THE WITNESS:  Teachers get
17          to know their students.  And, you
18          know, it's -- and they talk to
19          their students.  They care about
20          their students.
21                  And from the pre-test
22          interviews, it was clear that they
23          were able to, in some cases,
24          attribute these symptoms to social

CONFIDENTIAL

Page 267

1          media and in other cases not.
2     BY ATTORNEY PISTILLI:
3          Q.    What, if anything other than
4     the pre-testing, did you do to determine
5     whether teachers are able to reliably
6     determine the cause of a student's sleep
7     deprivation?
8               ATTORNEY JACOBSON:
9          Objection.  Form.
10              THE WITNESS:  The -- if a
11         teacher believes that the sleep
12         deprivation is due to overuse of
13         social media, then they'll select
14         this alternative.
15              And, you know, if they
16         don't, if they think it's because
17         of an unstable home environment
18         or, you know, the -- they'll --
19         they'll recognize that.
20    BY ATTORNEY PISTILLI:
21         Q.    But my question is, what, if
22    anything, did you do to determine whether
23    those teacher-reported beliefs are
24    reliable?

CONFIDENTIAL

Page 268

1              ATTORNEY JACOBSON:

2         Objection.  Form.

3              THE WITNESS:  I think that

4         the pre-test interviews we did

5         made it clear that the teachers

6         could answer this question

7         appropriately.

8    BY ATTORNEY PISTILLI:

9         Q.   Did you ask teachers in the

10   pre-test interview whether they believed

11   that they can reliably determine the

12   reason that a given student is sleep

13   deprived on a given day?

14             ATTORNEY JACOBSON:

15        Objection.  Form.

16             THE WITNESS:  We did not ask

17        that specific question.

18   BY ATTORNEY PISTILLI:

19        Q.   Did you ask them, in a

20   pre-test interview, whether they believed

21   that they could reliably determine the

22   reason that a student was anxious or

23   inattentive on a given day?

24             ATTORNEY JACOBSON:

Page 269

1        Objection to form.
2              THE WITNESS:  Again, it's a
3        question of the teacher getting to
4        know their student and
5        understanding what's causing
6        particular behaviors.
7   BY ATTORNEY PISTILLI:
8        Q.    Well, my question was
9   different, though, sir.
10             It was, did you ask the
11  teachers in the pre-test interview
12  whether they believe that they could
13  reliably determine the reason a student
14  was anxious or inattentive on a given
15  day?
16             ATTORNEY JACOBSON:
17        Objection.  Form.
18             THE WITNESS:  We didn't ask
19        that specific question, no.
20  BY ATTORNEY PISTILLI:
21        Q.    And did you ask them whether
22  they believed that they could reliably
23  determine the reason for conflict between
24  students in a given instance?

CONFIDENTIAL

Page 270

1              ATTORNEY JACOBSON:
2         Objection to form.
3              THE WITNESS:  The -- I mean,
4         it's the same kind of an answer.
5              As the teachers were going
6         through these -- the list of items
7         and they could say, oh, yeah, that
8         happened or no, that doesn't
9         happen.
10              So while we didn't ask the
11         teachers specifically that
12         question, it was clear from the
13         pre-test that they were -- they
14         understood -- understood their
15         students.
16    BY ATTORNEY PISTILLI:
17         Q.    The pre-test for which you
18    have no records?
19              ATTORNEY JACOBSON:
20         Objection.  Form.
21              THE WITNESS:  Correct.
22              ATTORNEY PISTILLI:  Why
23         don't we take a quick break?  I
24         think I'm done.  I think my

CONFIDENTIAL

Page 271

1          colleagues may have a couple of

2          minutes.

3                  VIDEO TECHNICIAN:  The time

4          is 4:13 p.m., and we are off the

5          record.

6                          -   -   -

7                  (Whereupon, a brief recess

8          was taken.)

9                          -   -   -

10                 (Whereupon, Exhibit

11         Klein-24, Klein000001-0005,

12         Invoices, was marked for

13         identification.)

14                         -   -   -

15                 VIDEO TECHNICIAN:  The time

16         is 4:36 p.m., and we are on the

17         record.

18                 ATTORNEY PISTILLI:

19         Mr. Klein, thank you for your time

20         today.  I have no further

21         questions for you at this time,

22         and I'm going to pass the witness

23         to my co-counsel.

24                         -   -   -

CONFIDENTIAL

Page 272

```
 1                  EXAMINATION
 2                   -   -   -
 3  BY ATTORNEY SHAHIDPOUR:
 4        Q.    Good afternoon, Mr. Klein.
 5        A.    Good afternoon.
 6        Q.    My name is Faraz Shahidpour.
 7  I'm with Kirkland and Ellis, and I
 8  represent Snap, the maker of Snapchat.
 9              I've handed you what's been
10  marked as Exhibit-24.
11              Have you seen these
12  documents before?
13        A.    Yes.
14        Q.    And does Exhibit-24 reflect
15  all the payment and compensation you've
16  received in connection with your work in
17  this litigation?
18        A.    Not my compensation.  But
19  this is the -- these are the invoices
20  that Applied Marketing Science sent for
21  my work on this case through July of this
22  year.
23              So this is -- this isn't my
24  compensation, this is what the firm has
```

CONFIDENTIAL

Page 273

1    billed for my time.

2             Q.      Got it.

3                     So does Exhibit-24 reflect

4    all of the payment or compensation that

5    AMS has received in connection with your

6    work in this litigation through July

7    2025?

8             A.      With my work, yes.

9             Q.      Do you recall testifying

10   earlier that your team conducted some

11   pre-test interviews in connection with

12   the surveys --

13            A.      Yes.

14            Q.      -- that -- excuse me -- that

15   the surveys that you sent to teachers

16   within the school districts?

17            A.      Yes.

18            Q.      And you listened to those

19   pre-test interviews after?

20            A.      I listened to, I believe,

21   six of the 23.

22            Q.      So you listened to six of

23   the 23 pre-test interviews that your team

24   conducted with teachers in anticipation

CONFIDENTIAL

Page 274

1  of the survey; is that right?

2          A.    As a -- as a pre-test of the

3  survey.

4          Q.    And then do you also recall

5  testifying earlier that it's your

6  understanding that TikTok, Facebook,

7  Instagram, Snapchat and YouTube are the

8  only platforms that students use?

9          A.    I think I said that they

10  were the primary platforms that students

11  use.  They may peripherally use others at

12  various times, but these are the main

13  ones that are used by students of this

14  age group.

15          Q.    And is your basis that those

16  five platforms are the primary platforms

17  that students use your having listened to

18  the six pre-test interviews?

19               ATTORNEY JACOBSON:

20          Objection.  Form.

21          Mischaracterizes testimony.

22               THE WITNESS:  I'm not sure I

23          understand your question.

24  BY ATTORNEY SHAHIDPOUR:

CONFIDENTIAL

Page 275

```
 1         Q.    So you -- is your only basis
 2   for asserting that TikTok, Facebook,
 3   Instagram, Snapchat and YouTube are the
 4   primary platforms that students use the
 5   six pre-test interviews that you listened
 6   to?
 7              ATTORNEY JACOBSON:
 8         Objection.  Form.
 9              THE WITNESS:  No.  It
10         certainly came from looking at the
11         original complaint, from speaking
12         with counsel and kind of the --
13         sort of informal exploratory
14         interviewing with friends --
15         friends and family that is common
16         before any survey is undertaken in
17         some field that we don't have
18         extensive experience in.
19   BY ATTORNEY SHAHIDPOUR:
20         Q.    So when you say -- excuse
21   me.
22              When you say "informal
23   exploratory interviewing with friends and
24   family," are you referring to your own
```

CONFIDENTIAL

Page 276

1  friends and family?

2          A.     Friends and family is sort

3  of a catchall term for, does anyone in

4  the company know high school teachers or

5  middle school teachers and do you have

6  kids in high school or middle school

7  and -- so that we can talk about issues

8  related to social media just informally

9  to inform ourselves of the -- what the

10  landscape is like.

11          Q.     And so who -- what are the

12  names of the friends and family that you

13  spoke with?

14          A.     I don't have those names.

15          Q.     Are they recorded anywhere?

16          A.     Probably not.

17          Q.     Were there any notes taken

18  from these friends and family interviews?

19          A.     Not that I'm aware of.

20          Q.     Is there anyone who would be

21  aware of whether notes exist from those

22  interviews?

23          A.     The -- it would not be

24  typical to save notes from those kinds of

Page 277

1    informal -- informal discussions.

2               These weren't, you know,

3    hour-long kinds of interviews scheduled

4    with -- where we didn't pay an incentive

5    or anything like that.

6               Again, it was just kind of

7    the informal, as I said, exploratory kind

8    of stuff that we would undertake in -- in

9    any situation before -- if we were

10   working in a field that we didn't have

11   extensive experience in already.

12          Q.    Okay.  Do you have a

13   Snapchat account?

14          A.    No.

15          Q.    Have you ever used Snapchat?

16          A.    Not to my knowledge.

17          Q.    Do you have a Facebook

18   account?

19          A.    I do have a Facebook

20   account.

21          Q.    How long have you had a

22   Facebook account?

23          A.    I'd say probably eight

24   years -- I'm trying to picture the -- I

CONFIDENTIAL

Page 278

1  know the picture that I'm using was taken
2  in Patagonia, and I'm trying to think
3  when I was there.
4           So it was probably from
5  about ten years ago.
6       Q.    And how frequently do you
7  use Facebook?
8                ATTORNEY JACOBSON:
9       Objection.  Form.
10               THE WITNESS:  Almost never.
11 BY ATTORNEY SHAHIDPOUR:
12      Q.    How frequently did you use
13 Facebook when you first made your
14 account?
15               ATTORNEY JACOBSON:
16      Objection.  Form.
17               THE WITNESS:  Very little.
18      I mean, it was -- I thought it --
19      I thought it would be useful.  It
20      wasn't.
21 BY ATTORNEY SHAHIDPOUR:
22      Q.    How many hours a day did you
23 use Facebook when you first downloaded
24 it?

CONFIDENTIAL

Page 279

1          A.     Five minutes.  But not --
2     that wouldn't have been an everyday type
3     of occurrence.
4                 Again, it was -- it just --
5     it seemed like something that was
6     appropriate to do, but I didn't find any
7     use for it.
8          Q.     Do you have an Instagram
9     account?
10         A.     I do.
11         Q.     Since when?
12         A.     That's a lot more recent.
13    The last two or three years.
14         Q.     And how frequently do you
15    use Instagram?
16         A.     Maybe once a month.
17         Q.     And what do you do on
18    Instagram when you use it?
19         A.     Kind of keep track of my
20    grandkids.  They tend to post more --
21    more frequently.
22         Q.     Do you have a TikTok
23    account?
24         A.     I don't think so.

CONFIDENTIAL

Page 280

1          Q.    Have you ever used TikTok?

2          A.    My granddaughter has shown

3    me some TikTok videos.  But beyond that,

4    no, I haven't used it.

5          Q.    She sent them to you or she

6    has shown --

7          A.    No.  She showed me.  And she

8    likes to produce them herself, dance

9    moves and stuff.

10          Q.    And do you have a YouTube

11    account?

12          A.    I access YouTube -- videos

13    on YouTube.  I don't know whether I have

14    an account -- whether that means I have

15    an account or not.

16          Q.    And how long have you been

17    accessing videos on YouTube?

18          A.    For quite a while.  I mean,

19    probably at least ten years.

20          Q.    It's not possible to derive

21    the amount of time diverted from

22    instruction, if any, due to Snapchat in

23    particular from any of your survey

24    results in this litigation, right?

CONFIDENTIAL

Page 281

1              ATTORNEY JACOBSON:

2         Objection.  Form.

3              THE WITNESS:  Well, the

4         survey clearly identifies Snapchat

5         as one of the social media

6         platforms that teachers were

7         responding to.

8              So to that extent, we have

9         information about diverted time

10        due to those five platforms that

11        were named, but not specific to

12        any one of those five platforms.

13   BY ATTORNEY SHAHIDPOUR:

14        Q.   Well, you have information

15   about social media in particular and

16   teachers responded using -- by --

17   teachers responded with the understanding

18   in the question that social media

19   encompassed more than just those five

20   platforms, right?

21              ATTORNEY JACOBSON:

22         Objection.  Form.

23         Mischaracterizes testimony.

24              THE WITNESS:  I don't think

CONFIDENTIAL

Page 282

1          that teachers necessarily thought
2          about the social media platforms
3          as being broader than those five.
4               But those five are clearly
5          identified and make up the, I
6          think, bulk of student use and the
7          resulting disruption of classes
8          that need to be dealt with.
9    BY ATTORNEY SHAHIDPOUR:
10        Q.   So if, say, your survey
11   results showed that 20 percent of high
12   school teachers' time in a given district
13   in a given year was diverted due to
14   students' social media use, you wouldn't
15   be able to derive the exact percent that
16   would be attributable -- attributable to
17   a particular one of defendants'
18   platforms, right?
19              ATTORNEY JACOBSON:
20          Objection.  Form.
21              THE WITNESS:  We -- we
22          measured the social media as a --
23          as a unit and did not break out
24          individual platforms.

CONFIDENTIAL

Page 283

1    BY ATTORNEY SHAHIDPOUR:

2         Q.    Right.   I understand what

3    you measured.   I'm trying to understand

4    what can be derived from your

5    measurement.

6              Is it possible to derive

7    particular percentages of time diverted

8    due to student use of any particular one

9    of the platforms?

10              ATTORNEY JACOBSON:

11         Objection.   Form.   Asked and

12         answered.

13              THE WITNESS:   Not to any one

14         specific platform from my data.

15              My understanding and belief

16         is that there's other data that

17         can be used to allocate student

18         usage across those platforms.   But

19         that wasn't part of my assignment.

20    BY ATTORNEY SHAHIDPOUR:

21         Q.    And when you say "other

22    data," does that other data to which

23    you're referring include teacher survey

24    data that you conducted?

CONFIDENTIAL

Page 284

1        A.    No.

2        Q.    Did you consider any

3    internal Snap documents in formulating

4    your opinions?

5        A.    I don't think I was exposed

6    to any internal Snap documents.

7        Q.    You never conducted a survey

8    containing any questions that sought to

9    measure Snapchat usage in particular,

10   have you?

11              ATTORNEY JACOBSON:

12         Objection.  Form.

13              THE WITNESS:  Not Snapchat

14         usage in itself, no.  Certainly,

15         included, again, as one of the

16         five services -- platforms.

17   BY ATTORNEY SHAHIDPOUR:

18        Q.    What did you do, if

19   anything, to learn about how the Snapchat

20   app works in connection with providing

21   your opinions in this case?

22        A.    As I think I said before, I

23   don't have a Snap account -- Snapchat

24   account.  I really don't know much about

CONFIDENTIAL

Page 285

1  Snapchat.

2          Q.    You didn't undertake to

3  learn about the app when you designed the

4  survey?

5                ATTORNEY JACOBSON:

6          Objection to form.

7                THE WITNESS:  That's

8          correct.  It wasn't necessary in

9          determining the total average of

10         time diverted from teaching by

11         social media platforms.

12 BY ATTORNEY SHAHIDPOUR:

13         Q.    And you didn't undertake to

14 learn about the Snapchat app in forming

15 your opinions based on the results of the

16 surveys?

17         A.    I think, as I said, I saw --

18 it wasn't part of my assignment.  It

19 wasn't necessary.

20         Q.    What is your income as

21 chairman emeritus at Applied Marketing

22 Science?

23                ATTORNEY JACOBSON:

24         Objection.  Form.  And scope.

CONFIDENTIAL

Page 286

1              THE WITNESS:  I don't think
2        I'm going to answer that.  I
3        wouldn't want that information on
4        the public record.
5   BY ATTORNEY SHAHIDPOUR:
6        Q.    Do you earn any income
7   outside of your salary at Applied
8   Marketing Science?
9        A.    Not from employment
10  anywhere, no.
11       Q.    From anywhere else?
12       A.    Yeah.  I mean, you know,
13  Medicare, investments, that sort of
14  stuff.
15       Q.    Have you reached out to any
16  public health authorities to share the
17  opinions about social media that you're
18  offering in this litigation?
19       A.    No.  My understanding is
20  this is to be confidential.  I wouldn't
21  presume to publicize it myself.
22       Q.    Prior to this litigation,
23  did you have any familiarity with the
24  specific school district plaintiffs for

Page 287

1    which you were retained to conduct

2    surveys?

3            A.    No -- no relevant contact or

4    information.  I grew up in Atlanta, so

5    DeKalb is -- you know, I know about the

6    DeKalb school system.

7                But not -- I certainly

8    didn't have any contact with them.

9            Q.    You didn't go to -- you

10   didn't go to a school within the DeKalb

11   County system?

12           A.    No.

13           Q.    Do you believe that social

14   media should be banned?

15               ATTORNEY JACOBSON:

16           Objection.  Form.

17               THE WITNESS:  I don't really

18           have an opinion about that.

19   BY ATTORNEY SHAHIDPOUR:

20           Q.    Do you --

21           A.    Certainly not as an expert.

22           Q.    Sorry.  I didn't mean to cut

23   you off.

24               Do you believe that Snapchat

CONFIDENTIAL

Page 288

1    should be banned?

2              ATTORNEY JACOBSON:

3         Objection.  Form.

4              THE WITNESS:  I really don't

5         have an expert opinion on whether

6         Snapchat should be banned.

7              ATTORNEY SHAHIDPOUR:  Okay.

8         Thank you, Mr. Klein.  I have no

9         further questions.  But I'll open

10        it for my colleagues.

11             ATTORNEY WHITELEY:  Are we

12        okay if I question over here?

13             Thank you.

14                  -  -  -

15             EXAMINATION

16                  -  -  -

17   BY ATTORNEY WHITELEY:

18        Q.    Good afternoon, Mr. Klein.

19        A.    Good afternoon.

20        Q.    My name is Daniel Whiteley.

21   I represent the Google and YouTube

22   defendants in this case.

23             And I have a few more

24   questions for you, okay?

CONFIDENTIAL

Page 289

1          A.    Okay.

2          Q.    You're still good to keep

3    answering questions?

4          A.    Sure.

5          Q.    All right.  During that last

6    segment of questioning, you said, my

7    understanding and belief is that there's

8    other data that can be used to allocate

9    student usage across those platforms.

10               What data are you referring

11   to in that answer?

12         A.    I was instructed to focus on

13   social media use for these five platforms

14   specifically as an aggregate and told

15   that I didn't have to worry about trying

16   to allocate it by individual defendant.

17               So I guess I was making the

18   assumption that someone else was going to

19   be worrying about that.

20         Q.    Okay.  So no one told you

21   specifically, you know, the school

22   districts themselves have data that

23   allocates the percentage of student usage

24   across those platforms?

CONFIDENTIAL

```
                                        Page 290

 1                ATTORNEY JACOBSON:
 2          Objection.  Form.
 3                THE WITNESS:  That's right.
 4          No one told me that.
 5  BY ATTORNEY WHITELEY:
 6          Q.    No one told you another
 7  expert in this litigation has data that
 8  can be used to allocate student usage
 9  across those platforms?
10                ATTORNEY JACOBSON:
11          Objection.  Form.
12                THE WITNESS:  No, I wasn't
13          told that.  I mean, it seemed
14          logical.  But I may be getting
15          outside of my lane in assuming
16          that.
17  BY ATTORNEY WHITELEY:
18          Q.    Regardless, your scope of
19  work was to look at all of these
20  platforms together, right?
21          A.    That's correct.
22          Q.    And I believe earlier you
23  talked about AMS having profit sharing;
24  is that right?
```

CONFIDENTIAL

Page 291

1          A.     Yes.

2          Q.     And you receive a share of

3    the profits from AMS on a yearly basis?

4          A.     As do all the employees.

5          Q.     Okay.  What is your share of

6    AMS's yearly profits?

7          A.     I have no idea.

8          Q.     How is the percentage of

9    profit sharing determined at AMS?

10         A.     There's a committee of

11   principals that meets to decide what the

12   profit sharing percentage will be and

13   that -- and then I -- they tell me.

14         Q.     Safe to say you're not on

15   that committee?

16         A.     I'm not on that committee.

17   I used to be, but.

18         Q.     Okay.  When did you stop

19   being on that committee?

20         A.     About eight -- eight years

21   ago; eight to ten years ago.

22         Q.     And you said earlier you're

23   not comfortable sharing your income.

24                If I represent to you that

CONFIDENTIAL

Page 292

1    this transcript is confidential and will

2    not be publicly available, would that

3    change your willingness to answer that

4    question?

5              ATTORNEY JACOBSON:

6         Objection.  Form.

7              THE WITNESS:  I'm sorry, I

8         really don't feel comfortable with

9         answering that question.

10   BY ATTORNEY WHITELEY:

11        Q.    Even if it's not in the

12   public record?  If this transcript is not

13   in the public record?

14        A.    Even in that situation.

15        Q.    Other than the pre-test of

16   the survey and the informal interviews

17   you described during my last colleagues'

18   questionings, do you have any other basis

19   for your assertion that the five

20   defendant platforms are the platforms

21   that are most used by students?

22              ATTORNEY JACOBSON:

23         Objection.  Form.

24              THE WITNESS:  Well, I guess

CONFIDENTIAL

Page 293

```
 1          did you -- from discussions with
 2          counsel as well who, it's my
 3          understanding, have access to
 4          other data that I don't.
 5  BY ATTORNEY WHITELEY:
 6          Q.    Anything else that forms the
 7  basis for your assertion that the five
 8  defendant platforms are the ones that are
 9  most used by students?
10                ATTORNEY JACOBSON:
11          Objection.  Form.  And asked and
12          answered.
13                THE WITNESS:  Not really,
14          no.
15  BY ATTORNEY WHITELEY:
16          Q.    During your pre-test
17  interviews, did teachers tell you what
18  percentage of students in their school
19  use Snapchat?
20                ATTORNEY JACOBSON:
21          Objection.  Form.
22                THE WITNESS:  No.  We didn't
23          ask about the usage of individual
24          platforms.
```

CONFIDENTIAL

Page 294

1  BY ATTORNEY WHITELEY:
2        Q.    Did they tell you what
3  percentage of students in their school
4  use any of the defendants' platforms?
5              ATTORNEY JACOBSON:
6        Objection to form.
7              THE WITNESS:  No.  Although,
8        I would be surprised if it was
9        much less than 100 percent.
10  BY ATTORNEY WHITELEY:
11        Q.    Why do you say that?
12        A.    Again, my grandchildren and
13  their extensive use, as well as their
14  parents.
15        Q.    Do you have any other basis
16  for saying that you would be surprised
17  that less than 100 percent of students
18  use defendants' platforms?
19              ATTORNEY JACOBSON:
20        Objection.  Form.
21              THE WITNESS:  Again, sort of
22        it's more of the common knowledge
23        idea.
24  BY ATTORNEY WHITELEY:

CONFIDENTIAL

Page 295

1          Q.    You were asked whether you
2     reviewed any internal documents from
3     Snap.
4               Have you reviewed any
5     internal documents from any of the
6     defendant companies in this case?
7          A.    Not to my knowledge, no.
8          Q.    Can you give me the names of
9     any individuals that you interviewed as a
10    part of the pre-test?
11         A.    No.
12         Q.    Can you tell me what school
13    districts these individuals work in?
14         A.    Not as I sit here.  But they
15    weren't any of the 12 bellwether
16    districts.
17         Q.    Right.  And do you know the
18    names of any of the districts, with the
19    understanding that they're not among the
20    12 that you originally offered reports
21    for?
22         A.    I don't have that
23    information.  I don't think I've ever --
24    I don't think I've ever seen that

Page 296

1    information.

2         Q.    How long were the pre-test

3    interviews?

4         A.    They generally ran, like, 30

5    minutes.

6         Q.    And why did you not record

7    or take notes of these interviews?

8         A.    We didn't need to.

9         Q.    Why did you not need to?

10        A.    Because we were in there in

11   the moment and listening to them.

12        Q.    But now, sitting here today,

13   I don't have any document that I can look

14   at to verify what was said in these

15   interviews.  And so I can't verify what

16   they said about how much students are

17   using these platforms in their districts.

18             Do you agree?

19             ATTORNEY JACOBSON:

20        Objection.  Form.

21             THE WITNESS:  Yes, I agree

22        with that statement.

23   BY ATTORNEY WHITELEY:

24        Q.    And I believe you said you

CONFIDENTIAL

Page 297

1  have kids and grandkids, right?

2          A.    Yes.

3          Q.    When your children were in

4  high school and middle school, do you

5  know if any of the five defendant

6  platforms were operating?

7          A.    They weren't.

8          Q.    They were not?

9          A.    They were not.

10         Q.    Have you ever conducted a

11 survey of teachers about their use of

12 YouTube during instruction time?

13         A.    No.

14         Q.    Are you aware of any studies

15 about teachers' use of YouTube during

16 instruction time?

17         A.    No.

18              ATTORNEY WHITELEY:  Thank

19         you, Mr. Klein.  I have no further

20         questions at this time.

21              Do we want to go off the

22         record?

23              ATTORNEY HORVATH:  I have

24         questions.

CONFIDENTIAL

Page 298

1           ATTORNEY WHITELEY:  We're
2       getting a bad echo.  Let's go off
3       the record and try to figure that
4       out.
5           VIDEO TECHNICIAN:  The time
6       is 5:02 p.m.  We are going off the
7       record.
8               -  -  -
9           (Whereupon, a brief recess
10      was taken.)
11              -  -  -
12          VIDEO TECHNICIAN:  The time
13      is 5:03 p.m., and we are on the
14      record.
15              -  -  -
16              EXAMINATION
17              -  -  -
18  BY ATTORNEY HORVATH:
19      Q.    Mr. Klein, my name is Lisa
20  Horvath.  I am here on behalf of TikTok.
21          Are you ready to proceed?
22      A.    Yes, I am.
23      Q.    The good news is I have only
24  a few follow-up questions.

CONFIDENTIAL

Page 299

1          Earlier in your deposition,
2   you were asked questions about the
3   different -- or the ability of the
4   teachers to identify what their students
5   were using and what was causing
6   disruptions in the classroom.
7              Do you recall that
8   testimony?
9              ATTORNEY JACOBSON:
10        Objection.  Form.
11             THE WITNESS:  Well, I think
12        I testified about that they were
13        able to determine that it was
14        social media use, not necessarily
15        the specific platform they were
16        using.
17  BY ATTORNEY HORVATH:
18        Q.    Right.  And I think you said
19  you were able to determine that because
20  teachers know their students, correct?
21        A.    No.  I think that was in the
22  context of teachers being able to
23  attribute certain behaviors of students
24  to social media use.

CONFIDENTIAL

Page 300

```
 1          Q.    Okay.  And the reason that
 2    you determined teachers could determine
 3    certain behaviors of students were caused
 4    by social media was because you believe
 5    teachers know their students?
 6                    ATTORNEY JACOBSON:
 7          Objection.  Form.
 8    BY ATTORNEY HORVATH:
 9          Q.    Is that correct?
10          A.    That's what teachers told
11    us, yes.
12          Q.    Okay.  And how many students
13    does -- did each teacher answering the
14    survey have from year to year?
15          A.    That wasn't one of the
16    questions we asked.
17          Q.    Okay.  So you don't know if
18    the teacher had 30 students all day long
19    or had 60 students in five different
20    class periods, correct?
21                    ATTORNEY JACOBSON:
22          Objection.  Form.
23                    THE WITNESS:  As -- as I
24          said, we don't have any
```

CONFIDENTIAL

Page 301

1           information on the number of
2           students that each teacher
3           interacted with.
4     BY ATTORNEY HORVATH:
5           Q.    So the answer to my question
6     is, yes, you have no idea if teachers
7     were with their students all day or part
8     of a day, correct?
9           A.    That's correct.
10          Q.    And you don't know if the
11    classroom size was 10 students, 20
12    students or 50 students, correct?
13                ATTORNEY JACOBSON:
14          Objection.  Form.  And asked and
15          answered.
16                THE WITNESS:  That's
17          correct.  We didn't ask any
18          questions about that.
19    BY ATTORNEY HORVATH:
20          Q.    And you would agree that in
21    addition to there being different teacher
22    demographics, there are also differences
23    in student demographics, correct?
24                ATTORNEY JACOBSON:

Page 302

1          Objection.  Form.
2                 THE  WITNESS:   When  you  say
3          "student  demographics,"  what  are
4          you  referring  to?
5    BY ATTORNEY HORVATH:
6          Q.    I'm  referring  to  things  like
7    family  income  level,  gender --
8          A.    There's  clearly --
9          Q.    -- academic  background,
10   interests?
11         A.    There's  clearly  differences
12   by  student -- in  students  in  those -- on
13   those  dimensions.
14         Q.    Okay.  And  we  don't  have  any
15   information  from  your  survey  regarding
16   the  demographics  of  the  students  for  the
17   teachers  who  answered  the  survey,
18   correct?
19                 ATTORNEY  JACOBSON:
20         Objection.  Form.
21                 THE  WITNESS:   Not  from  my
22         survey.  But  I'm -- it's  my
23         understanding  that  the
24         demographics  of  the  school

CONFIDENTIAL

Page 303

1          districts are -- are public
2          knowledge.
3     BY ATTORNEY HORVATH:
4          Q.    Well, you can have different
5     demographics within a single school
6     district from school to school, can't
7     you?
8                    ATTORNEY JACOBSON:
9          Objection.  Form.
10                   THE WITNESS:  Of course.
11    BY ATTORNEY HORVATH:
12         Q.    And do we have -- or can you
13    tell from your survey if there were any
14    schools within a district who provided no
15    survey responses?
16         A.    Not from my survey, no.
17         Q.    Okay.  So it's possible that
18    there are schools within each district
19    that provided no responses to the survey,
20    true?
21                   ATTORNEY JACOBSON:
22         Objection.  Form.
23                   THE WITNESS:
24         Hypothetically, that's possible,

CONFIDENTIAL

Page 304

1          yes.
2    BY ATTORNEY HORVATH:
3          Q.    Okay.  You don't know one
4    way or the other, correct?
5                ATTORNEY JACOBSON:
6          Objection.  Form.  And asked and
7          answered.
8                THE WITNESS:  As I said, we
9          didn't -- we don't have data on
10         which school each individual
11         respondent taught at.
12   BY ATTORNEY HORVATH:
13         Q.    And so it's possible that we
14   have zero responses from some of the
15   schools in the district, correct?
16               ATTORNEY JACOBSON:
17         Objection.  Form.
18               THE WITNESS:  That's
19         possible.
20   BY ATTORNEY HORVATH:
21         Q.    Did I hear you say that no
22   surveys were sent to teachers unless they
23   were currently employed by the district
24   at the time of the survey?

Page 305

```
 1              ATTORNEY JACOBSON:
 2        Objection.  Form.
 3              THE WITNESS:  That's
 4        correct.
 5  BY ATTORNEY HORVATH:
 6        Q.   So there were no surveys
 7  sent to teachers who were employed in
 8  2014 but were not employed, at the time
 9  of the survey, by the district, correct?
10        A.   Yes, that -- well, that's
11  correct.  I think it would have been
12  extraordinarily difficult to collect that
13  kind of a sample.
14        Q.   Difficult or not, it wasn't
15  done, fair?
16              ATTORNEY JACOBSON:
17        Objection.  Form.
18              THE WITNESS:  We only
19        interviewed people who were
20        full-time teachers currently.
21        The -- yeah, that's who we
22        interviewed.
23  BY ATTORNEY HORVATH:
24        Q.   Okay.  And then when you
```

CONFIDENTIAL

Page 306

1    were performing the analysis of the data,
2    you looked at different response rates
3    that were reflected in Appendix E for
4    each of your school district reports,
5    correct?
6            A.    I just want to make sure I
7    understand what Appendix E was -- or
8    remind myself.
9                 That was the response
10   statistics.  Yes.  And we reported those
11   for each of the school districts.
12           Q.    Right.  And under those
13   response statistics, you did not include
14   a line that reflected the response rate
15   of usable survey responses to the total
16   number of surveys, right?
17                ATTORNEY JACOBSON:
18           Objection.
19   BY ATTORNEY HORVATH:
20           Q.    You provide that percentage?
21                ATTORNEY JACOBSON:
22           Objection.  Form.
23                THE WITNESS:  I'm not sure I
24           understand what -- what I --

Page 307

1    BY ATTORNEY HORVATH:

2          Q.    Sure.  Let me see if I can

3    do a better job.

4                The last line in Appendix E

5    is a response rate.

6                Do you see that?

7          A.    Yes.

8          Q.    And the formula you noted

9    for the response rate was to take Line E,

10   which is the total responding as the

11   numerator, and use Line A as the

12   denominator, Line A being the number of

13   invitations sent, right?

14         A.    Correct.

15         Q.    So you got to that

16   percentage by dividing the total

17   responding by the total number of surveys

18   sent, correct?

19         A.    Correct.

20         Q.    You did not include the

21   percentages for the actual completed

22   surveys, Line B, divided -- or, actually,

23   it would be -- yeah, Line B divided by

24   the number of invitations sent, right?

CONFIDENTIAL

Page 308

```
 1              ATTORNEY JACOBSON:
 2        Objection.  Form.
 3              THE WITNESS:  No, we didn't
 4        calculate that percentage.  It's
 5        fairly straightforward.
 6   BY ATTORNEY HORVATH:
 7        Q.    Okay.  But
 8   straightforward -- if you wanted to find
 9   out the usable response rate, that's what
10   you would do; you would divide Line B by
11   Line A in each of your Appendix Es,
12   correct?
13              ATTORNEY JACOBSON:
14        Objection.  Form.
15              THE WITNESS:  If -- if
16        that's what you wanted to do.
17        That's not what would typically be
18        done, but.
19   BY ATTORNEY HORVATH:
20        Q.    And if you wanted to look at
21   the percentage of teachers who could
22   respond from a decade ago versus the
23   number of total surveys sent, the way to
24   do that math would be to take the number
```

CONFIDENTIAL

Page 309

1    of teachers who answered from 2014 and
2    divide that by the total number of
3    surveys sent, correct?
4          A.    That sounds reasonable.
5          Q.    That would be just simple
6    math, right?
7          A.    Yes.
8          Q.    And you did not include that
9    percentage on your Appendix E, did you?
10         A.    No.  But as you pointed out,
11   it's a fairly straightforward
12   calculation.
13         Q.    Is there a reason you did
14   not provide that information on
15   Appendix E?
16         A.    Because it's not typically
17   reported in survey research.
18               We didn't hide the data.  I
19   mean, as you point out, it's easy enough
20   to calculate.
21         Q.    We were talking earlier
22   about event calendars.
23               Do you recall that
24   testimony?

CONFIDENTIAL

Page 310

1          A.    Yes.

2          Q.    Is the only purported

3    anchoring event that is included in your

4    survey the pandemic?

5               ATTORNEY JACOBSON:

6          Objection.  Form.

7               THE WITNESS:  Well, the --

8          there's an anchor that's created

9          by their estimate of the current

10         usage or current disruption rate.

11         And so that becomes one anchor.

12              And the -- then the COVID

13         pandemic is a second.

14              And we also asked them, when

15         they first started teaching, what

16         was the disruptions due to social

17         media use.

18    BY ATTORNEY HORVATH:

19         Q.    For the teachers that

20    answered with information from 2014, the

21    pandemic was six years after the 2014

22    timeframe, correct?

23         A.    Yes.

24         Q.    And just to class the loop

Page 311

1    on the surveys that were not sent to all

2    the teachers that were there in 2014, is

3    the reason that was not done was just

4    that it would be difficult?

5              ATTORNEY JACOBSON:

6         Objection.  Form.

7              THE WITNESS:  The -- well,

8         first of all, we wouldn't know how

9         to reach -- reach them.  The --

10        and, you know, they wouldn't be

11        able to have the same kind of

12        anchoring that teachers that are

13        there now have in looking back.

14             So it did not seem that a

15        survey that was directed at

16        teachers who, you know, maybe

17        retired ten years ago would yield

18        any kind of data that would be

19        useful.

20   BY ATTORNEY HORVATH:

21        Q.   It's my understanding you're

22   refusing to answer any questions

23   regarding your current salary, correct?

24        A.   That's correct.

CONFIDENTIAL

Page 312

1              ATTORNEY JACOBSON:

2         Objection.   Form.

3    BY ATTORNEY HORVATH:

4         Q.    What percentage of revenue

5    from Applied -- from Applied Marketing --

6         A.    Science.

7         Q.    -- Science, what percentage

8    of revenue from Applied Marketing

9    Science, Inc., is related to surveys done

10   for litigation?

11        A.    So I don't -- I'm -- that's

12   not something that's -- that's published

13   for the -- internally.  My understanding

14   is that it has generally been about 60 to

15   70 percent.

16             ATTORNEY HORVATH:  I'll pass

17         the witness.

18             ATTORNEY JACOBSON:  All

19         right.  If all defense counsel

20         have gone, I have just a couple of

21         questions for you, Mr. Klein.

22                   -  -  -

23             EXAMINATION

24                   -  -  -

CONFIDENTIAL

Page 313

1    BY ATTORNEY JACOBSON:

2         Q.    As you know, my name is

3    Jordan Jacobson.  I represent plaintiffs

4    in this matter.

5              You've offered expert

6    opinions in litigation before this case,

7    correct?

8         A.    That's correct.

9         Q.    And in approximately how

10   many cases have you served as an expert

11   witness?

12        A.    I've served as an expert

13   witness in several hundred cases.  I've

14   provided testimony in about 100 cases.

15        Q.    And do you know if there

16   were Daubert motions submitted to exclude

17   your testimony in those hundreds of cases

18   where you've served as an expert?

19        A.    Yes.

20        Q.    And are you aware of any of

21   those Daubert motions being granted and

22   your testimony being excluded?

23        A.    No, none of them were

24   granted.  And my testimony has never been

CONFIDENTIAL

Page 314

1  excluded or limited in any way.

2              ATTORNEY JACOBSON:  No

3          further questions from me.

4              ATTORNEY PISTILLI:  Just a

5          couple quick follow-ups.

6                  -   -   -

7                  EXAMINATION

8                  -   -   -

9  BY ATTORNEY PISTILLI:

10         Q.    You've never submitted a

11  survey in litigation before examining a

12  sociological question, correct?

13         A.    There is nothing that comes

14  to mind, except that I'm remembering a

15  case that had to do with employee

16  behavior and the extent to which they

17  were paid for the time spent putting on

18  protective gear and stuff like that.

19              So, I mean, that sort of

20  gets at the -- one of the issues you

21  raised earlier.

22              But I'm not sure what

23  qualifies as a sociological issue.  I

24  mean, the -- we talked earlier about the

Page 315

1  case against Meta that I was involved in.
2  And I hadn't realized it had settled, or
3  maybe it hasn't settled, but my survey in
4  that case had to do with individuals'
5  attitudes toward privacy.  And I guess
6  that would fall into the category of a
7  sociological survey.
8            Q.    I think we earlier discussed
9  that all of your prior testimony related
10 to goods or services made available to
11 the consumer public or other businesses,
12 correct?
13            ATTORNEY JACOBSON:
14       Objection.  Form.
15            THE WITNESS:  Well, it had
16       to do with consumer behavior.  And
17       often there was a product or a
18       service involved in that.
19 BY ATTORNEY PISTILLI:
20            Q.    Right.  So your -- your
21 testifying experience relates to consumer
22 behavior?
23            ATTORNEY JACOBSON:
24       Objection.  Form.  Misstates

CONFIDENTIAL

Page 316

1          testimony.
2                  THE WITNESS:  Well,
3          surveys -- I'm sorry.
4                  Surveys that describe
5          consumer behavior or consumer
6          wants and needs.
7    BY ATTORNEY PISTILLI:
8          Q.    Just one other quick point
9    to follow up on.
10                 You testified a moment ago
11   that you asked information in your survey
12   about when teachers began teaching at
13   their school?
14         A.    I believe that's correct.
15         Q.    And if you want, I can help
16   and we can look at Exhibit-1 as an
17   example.
18                 ATTORNEY JACOBSON:  Is --
19         this seems outside the scope of
20         redirect.
21                 ATTORNEY PISTILLI:  I'm just
22         trying to clarify.  I mean, you
23         can object.
24                 ATTORNEY JACOBSON:  You're

Page 317

1          clarifying my four questions about
2          whether testimony had been
3          excluded before?
4               ATTORNEY PISTILLI:  After I
5          finished examining, he said
6          something that I don't think was
7          accurate.  And I'm trying to
8          follow up on that.
9               ATTORNEY JACOBSON:
10         During --
11              ATTORNEY PISTILLI:  If
12         you're unwilling to let me
13         question on that, you can make
14         your objection, and we'll take it
15         to the court if we need to.
16              ATTORNEY JACOBSON:  You had
17         passed the witness.  And so we
18         will object to questioning that's
19         outside the scope of redirect.
20    BY ATTORNEY PISTILLI:
21         Q.   Am I right, sir, that in
22    Screening Question 2, you did ask about
23    when teachers -- oh, not Screening
24    Question 2 --

CONFIDENTIAL

Page 318

1          A.    5.

2          Q.    -- Screening Question 5, you

3    asked about when teachers started at

4    their current school, right?

5          A.    Yes.

6          Q.    But, in fact, when you asked

7    teachers about social media use in Survey

8    Question 5, you didn't use that

9    information as an anchor, correct?

10          A.    If it was prior to -- and

11    I'm looking at Page D-19.

12                If it was prior to 2015,

13    then -- or 2014, then we didn't ask about

14    their current -- when they first started

15    teaching.

16                ATTORNEY PISTILLI:  Thank

17          you.  No further questions.

18                ATTORNEY WHITELEY:  I have

19          one follow-up question based on

20          plaintiffs' questioning.

21                      -  -  -

22                  EXAMINATION

23                      -  -  -

24    BY ATTORNEY WHITELEY:

CONFIDENTIAL

Page 319

1            Q.    Okay.  Mr. Klein, this is
2    Daniel Whiteley again.
3                In how many of those
4    hundreds of cases that plaintiffs'
5    counsel just asked you about did you
6    conduct a survey asking employees of one
7    of the parties to estimate the minutes
8    they have spent on certain tasks over a
9    period of years?
10                ATTORNEY JACOBSON:
11           Objection.  Form.
12                THE WITNESS:  I don't think
13           I've ever done something in the --
14           that -- in the -- that would meet
15           the characteristics that you just
16           described.
17                ATTORNEY WHITELEY:  Thank
18           you.
19                I'll give this back to you.
20                ATTORNEY PISTILLI:  Are we
21           done?
22                ATTORNEY WHITELEY:  Lisa,
23           did you have more questions?
24                ATTORNEY HORVATH:  Mr.

CONFIDENTIAL

Page 320

1      Whiteley just asked mine.  So I

2      think I'll pass.

3            VIDEO TECHNICIAN:  I'll now

4      be stating the on-record times for

5      each party.

6            Christian Pistilli,

7      representing Meta, 5 hours 12

8      minutes.  Faraz Shahidpour,

9      representing Snap, went 16

10     minutes.  Daniel Whiteley,

11     representing YouTube, went nine

12     minutes.  Lisa Horvath,

13     representing TikTok, went 15

14     minutes.  Jordan Jacobson,

15     representing plaintiff, went one

16     minute.

17            The time is 5:26 p.m., and

18     we are off the record.

19                  -   -   -

20            (Whereupon, the deposition

21     concluded at 5:26 p.m.)

22                  -   -   -

23

24

CONFIDENTIAL

Page 321

1                    CERTIFICATE

2

3

4          I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10

          Amanda Maslynsky-Miller

11        Certified Realtime Reporter

          Dated:  September 7, 2025

12

13

14

15

16

17              (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

CONFIDENTIAL

Page 322

1              INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                    After doing so, please sign

9    the errata sheet and date it.

10                   You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                   It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 323

1                    - - - - - -

                     E R R A T A

2                    - - - - - -

3    PAGE   LINE   CHANGE

4    ____   ____   _____

5    ____   ____   _____

6    ____   ____   _____

7    ____   ____   _____

8    ____   ____   _____

9    ____   ____   _____

10   ____   ____   _____

11   ____   ____   _____

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21   ____   ____   _____

22   ____   ____   _____

23   ____   ____   _____

24   ____   ____   _____

CONFIDENTIAL

Page 324

1          ACKNOWLEDGMENT OF DEPONENT

2

           I,_____, do
3   hereby certify that I have read the
    foregoing pages,  1 - 321, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.

7

8    _____
     ROBERT KLEIN                    DATE

9

10

    Subscribed and sworn
11  to before me this
    _____ day of _____, 20_____.

12

    My commission expires:_____
13

14  _____
    Notary Public

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 325

1                        LAWYER'S NOTES

2     PAGE    LINE

3     ____    ____    _____

4     ____    ____    _____

5     ____    ____    _____

6     ____    ____    _____

7     ____    ____    _____

8     ____    ____    _____

9     ____    ____    _____

10    ____    ____    _____

11    ____    ____    _____

12    ____    ____    _____

13    ____    ____    _____

14    ____    ____    _____

15    ____    ____    _____

16    ____    ____    _____

17    ____    ____    _____

18    ____    ____    _____

19    ____    ____    _____

20    ____    ____    _____

21    ____    ____    _____

22    ____    ____    _____

23    ____    ____    _____

24    ____    ____    _____

CONFIDENTIAL

**[& - 2]**                                                                  Page 1

| **&** |
| --- |

**&**   1:16 2:2,8,14
3:3,9,16 4:3,9
4:14 5:4

| **0** |
| --- |

**03047**   1:3

| **1** |
| --- |

**1**   6:14 11:17
18:13,21 24:12
62:8,8,9 65:4
68:10 71:20
88:11,24 118:1
130:20,22
131:17 247:9
247:12,20
316:16 324:3
**1,077**   113:5
114:17
**1,378**   102:13,17
103:16
**1,620**   80:10
**1.2**   88:20
**10**   7:17 28:6
78:14 79:16
94:2,3 96:9,10
96:11 105:8
117:6 135:12
135:15 219:11
301:11
**10.2**   94:15
**10.6**   101:9

**100**   16:15
21:23 34:24
236:15,17
294:9,17
313:14
**10018**   2:21
**102**   80:24
**10:44**   71:9
**10:58**   71:16
**11**   7:20 78:20
79:16 99:12,13
103:2
**11.7**   94:20
**117**   4:10
**11:59**   129:4
**12**   8:5 11:12,17
19:2,20 21:17
65:20 75:13,14
79:2,16 80:17
80:21 83:16
88:12,13 96:24
97:3,11,20,24
98:3,8,8
102:16,18
103:4 104:17
104:18 105:6
105:11 107:17
107:18 113:15
115:21 116:12
116:17,23
129:15 131:19
131:22 154:15
295:15,20
320:7

**12.0**   83:16
**12.9**   84:13
86:11,12
**12:13**   129:11
**13**   6:6 8:8
43:12 68:24
79:9,16 108:10
109:10 129:15
135:13,16
177:15
**13.4**   105:2
**13.7**   84:19
**131**   81:5
**14**   8:11 59:14
165:22 172:10
182:23
**14.8**   112:2
**14.9**   82:23 83:9
83:18,23 84:8
94:11
**15**   8:15 80:21
193:16,23,24
209:4 320:13
**16**   8:18 194:16
195:1 320:9
**16.5**   100:6
**165**   8:14
**17**   8:21 199:8
199:11,16
**17.6**   105:14
**18**   6:16 9:5
24:15 29:20
30:3 38:22
81:2 98:12,16

216:2 217:23
218:5 220:1
**18.6**   99:20
100:2
**1800**   4:16
**19**   9:9 27:15,17
75:20 216:10
217:23 218:8
219:4,6,7,9,11
220:2 318:11
**19087**   1:17 2:4
3:18
**193**   8:17
**194**   8:20
**1985**   37:1
**199**   8:22
**1:06**   171:23
**1:44**   172:6

| **2** |
| --- |

**2**   6:17 24:13,13
24:14,17 26:18
27:1 33:1
62:11 79:24
81:16 83:2
88:15 94:7
99:17 104:23
109:15 111:14
111:21 118:2
130:20 131:17
169:7 173:17
175:12 184:10
184:19 186:11
200:17 317:22

**[2 - 3]**                                                                 Page 2

| | | | |
|---|---|---|---|
| 317:24 | 108:11,21 | 220:3 239:5,5 | 111:9 112:1,9 |
| **2,000**   208:8 | 109:16,21 | **210**   4:11 | 112:10 271:11 |
| **2,977**   96:13,22 | 110:8 113:21 | **212**   2:21 | 272:10,14 |
| 97:2,17 | 115:20 116:7 | **216**   9:8,11,15 | 273:3 |
| **2.1**   100:17 | 116:12,22 | **217**   9:18,22 | **247**   201:12 |
| **2.2**   106:12 | 132:23,24 | **22**   9:19 108:22 | **25**   17:15 32:17 |
| 180:19 | 133:8 305:8 | 109:2 114:2,4 | 32:19 48:5 |
| **2.2.**   169:7 | 309:1 310:20 | 217:10,23 | 88:1 90:14 |
| **2.6**   109:17,24 | 310:21 311:2 | 218:20,24 | 91:3 92:1 95:3 |
| 110:4 180:21 | 318:13 | 219:17 220:3,8 | 95:23 101:8,16 |
| **2.7**   107:3 | **2015**   318:12 | 220:20 | 106:16 107:2 |
| **20**   9:12 39:13 | **202**   2:17 3:5 | **2200**   4:4 | 112:1,10 |
| 40:3 42:24 | 5:6 | **2222**   2:10 | **26**   6:19 103:14 |
| 71:24 73:8 | **2020**   110:2,8 | **23**   9:23 84:18 | 118:11 |
| 74:20 80:2,5,6 | 202:22 | 87:24 91:16 | **27**   26:16 |
| 80:7 90:14 | **2021**   166:23 | 92:24 95:23 | **270**   107:13 |
| 96:8,20 102:11 | **2022**   166:21 | 100:4,15 | 108:7 |
| 107:10,11 | **2023**   85:15 | 101:16 105:13 | **271**   10:6 |
| 110:24 113:2 | 87:8 88:17 | 105:22 106:15 | **272**   6:6 |
| 216:18 217:23 | 90:13,14 94:9 | 107:2 110:23 | **28**   31:10 |
| 218:11 220:2,6 | 95:2 | 111:9 112:9 | **280**   1:16 2:4 |
| 282:11 301:11 | **2023-2024** | 224:14,21,22 | 3:17 |
| 324:11 | 89:16 | 224:24 273:21 | **288**   6:7 |
| **20.2**   110:16 | **2023/2024**   85:3 | 273:23 | **29**   37:22 |
| **20001**   2:16 5:6 | 85:15 86:6 | **24**   10:5 84:18 | **298**   6:7 |
| **20024**   3:4 | 89:12 90:2,6 | 87:8,24 90:14 | **2:02**   182:12 |
| **2010**   64:22 | **2025**   1:9 12:15 | 91:3,16 92:1 | **2:11**   182:19 |
| **2014**   75:19 | 24:10 86:23 | 92:24 94:9 | **2:58**   215:19 |
| 76:22 77:5,15 | 87:9 91:2 | 95:2,3,23,23 | **2nd**   4:15 |
| 77:20 81:11,22 | 106:7 273:7 | 100:4,15 101:8 | |
| 82:6 85:11 | 321:11 | 101:16,16 | **3** |
| 97:5,13 98:2 | **21**   9:16 67:1,3 | 105:13,22 | |
| 98:22 99:1 | 103:4 217:2,23 | 106:15,16 | **3**   6:20 24:23 |
| 104:7 107:22 | 218:14,17 | 107:2,2 110:23 | 31:12,24 |
| | | | 141:16,21 |

CONFIDENTIAL

**[3 - 8/1/25]**                                                                 Page 3

173:11 187:10
187:12,15
191:14 195:3,8
206:7 247:17
247:21 260:20
**3.2**   95:5 102:3
**3.7**   86:1,16
**3.9**   90:23 91:1
92:2,11
**30**   42:12 98:20
99:5 296:4
300:18 322:16
**3047**   1:4
**31**   6:21 55:8
**310-3030**   4:11
**312**   3:11
**313**   6:8
**314**   6:6
**31605**   321:10
**319**   6:7
**32**   58:7 115:12
115:15
**321**   324:3
**33**   81:12
**33134**   2:10
**333**   3:10
**34**   239:5
**35**   21:3 239:5
**36**   49:10,15
**37**   6:23 193:13
**382**   225:21
**383**   228:14
**39**   165:19

**3:18**   217:18

**4**

**4**   6:22 37:24
38:8
**4.3**   86:24
**4.3.**   173:7
**4.9**   105:17
**40**   131:13
**409**   4:6
**41**   108:3
**42**   7:6
**434-5000**   3:5
**457-2000**   4:17
**47**   104:8
**48**   7:8
**49**   108:14
**4:13**   271:4
**4:22**   1:3
**4:36**   271:16

**5**

**5**   1:9 7:5 42:14
42:21,22 71:22
80:3,5 95:16
117:10 135:17
183:2 318:1,2
318:8 320:7
**5.1**   105:24
106:3
**5.2**   93:9 94:23
112:6,13
**5.3**   111:4
**5.5**   89:13 90:22
91:17 110:20

**5.7**   101:13
**5.9**   89:10 91:13
91:17 92:11
101:19
**5/18/25**   6:15
7:15,18,21 8:6
8:9 18:14
78:14,20 79:2
79:9
**50**   213:2
301:12
**500**   4:15
**501**   4:5
**512**   4:17
**54**   131:2 239:5
**55**   7:10 239:6
**58**   7:13
**59**   130:23
**5:02**   298:6
**5:03**   298:13
**5:26**   320:17,21
**5th**   12:14

**6**

**6**   7:7 48:7,15
173:17 180:20
180:22
**6.3**   90:3 91:5
93:1
**60**   300:19
312:14
**60654**   3:10
**610**   2:5 3:18

**620**   2:20
**662-6000**   2:17
5:6
**667-7706**   2:5
3:18
**680**   3:4

**7**

**7**   7:9 55:9,11
55:17 321:11
**7.1**   87:5
**7.7**   106:18
**7.8**   89:24 92:21
**70**   75:1,4,22,24
76:3 97:10
312:15
**73**   11:12
**763-3260**   4:6
**77550**   4:5
**78**   7:16,19,22
**78212**   4:11
**78701**   4:16
**79**   8:7,10

**8**

**8**   7:11 58:9,17
58:19,20 86:8
88:11 141:19
141:21 173:7
195:5 247:10
247:14,15
**8.9**   100:11
**8/1/25**   8:18 9:6
9:9,13,16,20
194:16 216:2

[8/1/25 - addictive]                                            Page 4

| | | | |
|---|---|---|---|
| 216:10,18 217:2,10 **808west.com** 4:12 **80s** 62:24 **83,500** 22:10 **835** 22:8 **841-1000** 2:21 **850** 2:16 5:5 **862-2000** 3:11 **877.370.3377** 1:24 | **9:35** 18:10 **a** **a.m.** 1:18 12:15 18:3,10 71:9 71:16 129:4 **abbie** 63:8,9 **ability** 124:17 124:24 150:20 153:1 156:12 157:9 158:23 | 178:11 180:1 180:14 183:11 207:14 208:12 208:21 215:5 302:9 **acceptable** 206:12 **accepted** 162:2 233:19 **accepting** 181:21 245:17 **access** 249:1 | **accurately** 118:20 159:21 164:7 176:13 202:12 **acknowledges** 237:3 **acknowledg...** 324:1 **act** 17:1 **acting** 34:6 **action** 29:4 56:23 57:1 |

**9**
**9** 7:14 78:7 79:16,24 80:3 81:18 141:15 141:18 182:23
**9.2** 84:23 86:8 86:13
**9.4** 87:10,14 90:16 100:1
**9.9** 106:8
**9/11** 164:13,19 164:21 165:1
**90** 16:15
**917.591.5672** 1:24
**973** 2:11
**98** 236:17
**994-1700** 2:11
**9:29** 1:18 12:15
**9:34** 18:3

159:21 161:5 162:10 167:6 167:21 168:6 173:23 174:19 176:12 182:3 190:19 192:16 266:11 299:3
**able** 24:6 45:8 53:22 126:2 139:18 153:8 153:17,20 158:18 176:18 188:18 189:5 198:16 214:2 240:13 266:23 267:5 282:15 299:13,19,22 311:11
**above** 1:18 41:2
**academic** 167:20 169:8 170:5 178:10

280:12 293:3
**accessing** 249:20 280:17
**account** 150:13 189:15 277:13 277:18,20,22 278:14 279:9 279:23 280:11 280:14,15 284:23,24
**accuracy** 157:22 163:2 177:18 180:3 190:8
**accurate** 15:8 19:18 59:7 113:9 158:19 160:5 175:7 179:14 210:7 236:22 317:7 322:20

**actions** 1:6 56:21
**activities** 145:12,13 181:4
**activity** 179:6
**actual** 39:18 307:21
**actually** 35:18 44:11,20 45:23 46:15 68:18 72:24 73:10 74:10 108:17 131:9 135:4 157:17 209:21 221:9 307:22
**add** 46:20
**addiction** 1:4 12:19
**addictive** 258:15 259:3,9

**[addition - analysis]**                                    Page 5

| | | | |
|---|---|---|---|
| **addition** 205:22 301:21 | **ages** 240:14,16 | **agreeing** 232:1 232:5 | **alternative** 255:4 267:14 |
| **address** 30:23 | **aggregate** 289:14 | **agricultural** 44:14,15,21 | **amanda** 1:19 13:3 321:10 |
| **addresses** 80:11 96:22 | **agnello** 2:9 | 45:1,13 46:5 | **ameliorated** 210:22 |
| **addressing** 76:20 167:6 168:19 170:17 | **ago** 21:3,5 42:24 48:24 75:18 76:6 80:23 81:4 | **ahead** 16:1 31:21 78:4 151:20 | **amend** 19:15 |
| **administered** 133:9 208:8 249:13 | 97:5 102:20 103:15 104:1 115:8 129:18 | **al** 25:1 **alcoholic** 33:15 223:1 | **american** 32:8 **amount** 81:24 82:8 85:3 87:9 88:18 90:15 |
| **administrator** 66:4 | 156:15 157:3 278:5 291:21 291:21 308:22 | **alex** 3:17 **algorithmic** 258:14 259:8 | 93:17 95:4 98:21 100:15 101:17 105:22 |
| **adolescent** 1:3 12:19 | 311:17 316:10 | **algorithms** 259:2 | 106:16 110:3 111:9 112:11 |
| **ads** 44:18,20 46:7,8 | **agree** 33:7 36:14 45:6 59:24 60:5,18 | **aligned** 196:8 **allegations** 41:10 258:22 | 119:21 120:22 128:6 131:24 132:1,15,21 |
| **advertisement** 47:4 | 60:22 68:1 83:20 85:14 | **allege** 259:1 **alleged** 30:21 | 133:7,20 134:9 137:6 157:10 |
| **advertising** 17:7 49:24 50:7,17 56:15 56:18 231:3 | 88:17 120:1 125:24 126:11 142:1 143:17 | 40:15 **allegedly** 82:22 83:8,22 84:4 | 173:24 176:13 176:19 178:22 190:20 206:16 |
| **affiliated** 34:23 | 144:1,4 149:21 160:12 161:19 | **allocate** 283:17 289:8,16 290:8 | 222:21 280:21 **ams** 273:5 |
| **affiliation** 29:22 | 164:4 170:22 171:4 179:24 | **allocated** 206:1 **allocates** 289:23 | 290:23 291:3,9 **ams's** 291:6 |
| **afternoon** 272:4,5 288:18 288:19 | 180:7 188:14 191:16 226:9 230:1,16 | **allow** 204:4,17 210:24 | **analysis** 57:14 57:17 70:11,19 |
| **age** 164:14 238:24 239:9 239:14,20 240:6,9,9 241:7 274:14 | 296:18,21 301:20 **agreed** 12:3 | **allowed** 238:5 **allows** 64:11 197:11 | 71:3 118:17 213:5 242:13 259:19 306:1 |

CONFIDENTIAL

**[anchor - arguments]**                                          Page 6

**anchor**   165:1
   310:8,11 318:9
**anchoring**
   310:3 311:12
**anchors**   196:20
   205:4
**angus**   45:9
**ann**   4:15
**answer**   11:5
   16:1 21:19
   64:17 66:19
   67:8,19,24
   68:20 69:14,17
   73:12 76:9
   77:13 78:2
   81:15 122:10
   123:23 124:3
   125:10 126:2
   130:10 136:24
   137:11 151:9
   152:5 154:24
   155:4,15 158:7
   159:10 163:3
   170:3,15 214:2
   235:6 236:15
   236:18 238:8
   251:12,22
   268:6 270:4
   286:2 289:11
   292:3 301:5
   311:22
**answered**   67:3
   76:10 77:23
   120:10 123:8

   124:6 126:13
   126:21 131:16
   138:22 139:13
   150:16,18
   156:19 161:12
   232:18 234:13
   235:3 243:24
   252:1 253:11
   283:12 293:12
   301:15 302:17
   304:7 309:1
   310:20
**answering**
   122:6 132:23
   150:13 214:11
   244:4 289:3
   292:9 300:13
**answers**   76:15
   77:21 124:14
   124:16 153:9
   158:19 213:3
   324:4
**anticipation**
   273:24
**antitrust**   49:23
   50:7,17 57:19
   57:22
**antonio**   4:11
**anxiety**   262:16
   263:1,14 264:3
   264:6
**anxious**   261:2
   262:10 264:19
   268:22 269:14

**apark**   3:19
**apologies**   62:11
   103:5 233:10
**app**   253:8
   284:20 285:3
   285:14
**apparent**
   235:10
**appear**   99:13
   143:16 214:18
**appearances**
   2:1 3:1 4:1 5:1
**appearing**
   200:7
**appears**   18:24
   27:23 48:20
   55:18 200:2
**appendices**
   20:12
**appendix**   65:4
   130:22 132:11
   306:3,7 307:4
   308:11 309:9
   309:15
**application**
   63:13
**applied**   7:10
   20:3,6,14,16,20
   20:21 21:1
   22:16 23:23
   24:3 49:9,15
   55:12,19 63:7
   63:11 130:13
   272:20 285:21

   286:7 312:5,5
   312:8
**apply**   321:18
**appreciate**
   220:21
**approach**
   200:21 201:23
   205:11
**approaches**
   212:7
**appropriate**
   103:21 158:8
   161:16 163:14
   198:6 207:11
   279:6 322:6
**appropriately**
   153:9 162:4
   207:16 213:4
   241:7 254:18
   268:7
**approximate**
   201:10
**approximately**
   16:13 17:13
   20:5 22:10
   24:8 49:10
   313:9
**apps**   253:24
**areas**   56:6
**argument**
   39:19 45:17,17
   45:23 46:24
**arguments**
   37:9

CONFIDENTIAL

**[arises - attorney]**                                    Page 7

**arises**  189:12
  190:1
**arrive**  156:23
**arrived**  155:3
**article**  58:23
  59:5,6 60:18
  62:5,20 63:21
  64:3 166:8
  167:20 168:5
  168:13 169:8
  169:16,20
  170:2,12,14
  172:19 173:2
  173:22 174:18
  178:1,6 186:17
  187:3 190:7
  193:12 194:6
  195:16,21
  198:4,6,13
  199:5 200:8
  207:14 209:4
  212:1,3 213:14
  213:19,22
  214:14
**articles**  63:13
  168:18 183:11
  194:3 198:23
**artist**  35:13
**ascertain**  162:9
**asked**  26:1
  37:13 60:7
  76:13 77:17,23
  97:12 98:1
  103:7 104:14

109:4 114:5
115:14 116:18
117:10,13,18
123:19 124:5
126:20 132:14
132:17 135:20
135:23 136:5
136:14 137:20
137:22 138:22
139:9,13
140:10 141:13
141:22 142:3
142:13,15
144:20,21
149:20 150:16
151:24 156:12
165:10 171:15
173:18 203:8
204:22 206:19
210:1 213:1,6
232:17 234:13
235:2 238:22
240:8,9,12
243:23 244:2
249:24 251:24
253:10 263:13
264:5,18,20,23
265:6 266:4
283:11 293:11
295:1 299:2
300:16 301:14
304:6 310:14
316:11 318:3,6
319:5 320:1

**asking**  30:6
  60:16,18 72:6
  83:19 121:18
  138:1 151:16
  155:12,13
  158:3 159:5
  164:23 169:21
  176:9,11,22
  199:1 263:12
  264:1 319:6
**asks**  66:4
  144:17 239:4
**aspects**  189:17
**assert**  77:2
**asserting**  275:2
**assertion**
  292:19 293:7
**assess**  186:20
**assignment**
  44:12 283:19
  285:18
**assisted**  20:7
  20:13 221:18
**assisting**  19:23
**assume**  16:2
  145:16
**assumed**  70:12
  119:17 127:16
  128:4 133:6,15
  133:19 176:1
**assuming**  234:4
  290:15
**assumption**
  134:16,19,21

135:4 191:6
289:18
**assumptions**
  70:16
**assurance**
  229:15
**atlanta**  287:4
**attached**
  322:12 324:6
**attempt**  162:1
  188:3 213:16
**attention**  67:7
  173:6
**attitude**  224:8
**attitudes**  52:9
  315:5
**attorney**  6:6,6
  6:7,7,8 13:13
  13:23 14:3,19
  14:23 15:5
  17:23 18:19
  26:3,7,15,24
  27:3,6 30:18
  31:1,8,10,22
  34:7,15 37:21
  38:6 39:8
  41:18 42:1,12
  42:19 48:5,12
  49:4,8 51:14
  51:18 52:12,16
  53:9,14 54:10
  54:18 55:7,16
  58:6,15 68:21
  68:24 69:3

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[attorney - attorney]**                                                  Page 8

| | | | |
|---|---|---|---|
| 70:22 71:4,6 | 112:18,21,24 | 151:21 152:3 | 205:14,18 |
| 71:18 73:13,16 | 113:22 114:6,9 | 152:12,18 | 206:22 207:3 |
| 73:19,23 74:3 | 114:15,18 | 153:3 154:6 | 208:17 209:2 |
| 74:8,12,16 | 115:4,9,17,22 | 156:16 157:7 | 211:8,14,20,24 |
| 75:7,11 77:22 | 116:4,14,20,24 | 157:24 158:11 | 213:8,12 214:6 |
| 78:3 79:14 | 117:4 119:12 | 159:2,16,24 | 214:12 215:15 |
| 82:11,17 84:1 | 119:16,22 | 160:7,14,24 | 215:17 217:20 |
| 84:6 85:6,13 | 120:2,6,17 | 161:8,18,22 | 219:2,4,5,8,9 |
| 85:19,23 86:17 | 121:2,7 122:7 | 162:6,13,23 | 219:10,12,22 |
| 86:21 87:12,16 | 122:11,15,24 | 163:5,18,22 | 220:1,5,7,9,13 |
| 87:19,23 88:4 | 123:3,11,15,24 | 164:3 165:5,9 | 220:17,19,22 |
| 88:8,21 89:1 | 124:4,15,18,22 | 165:18 166:5 | 221:1,3 222:11 |
| 89:17,21 90:8 | 125:2,21 126:6 | 167:23 168:3 | 222:16 223:9 |
| 90:12,18,24 | 126:15,19 | 168:10,14,22 | 223:13 224:1 |
| 91:19,23 92:3 | 127:6,10,15,18 | 169:5,17,23 | 224:10,19 |
| 92:7,12,16 | 128:1,10,15,21 | 170:10,20 | 229:4,10 |
| 93:2,6,10,14,20 | 129:1,13 | 171:1,5,10,16 | 231:14,18 |
| 93:24 95:7,13 | 133:11,18,23 | 171:20 172:8 | 232:16 233:2 |
| 95:17,21 96:3 | 134:7,12,17 | 174:2,7,10,13 | 234:12,21 |
| 96:6,15,19 | 135:1,7 136:17 | 175:20 176:8 | 235:1,21 236:7 |
| 97:7,15 98:5 | 136:21 137:1,9 | 178:24 179:22 | 236:13,19,24 |
| 98:10,14,18,23 | 138:4,10,21 | 181:18,23 | 237:15,20,23 |
| 99:4,6,10 | 139:7,12,17 | 182:9,21 186:6 | 238:3,14,21 |
| 100:19,23 | 140:3,9,22 | 186:8 188:20 | 239:17,23 |
| 101:2,6,20,24 | 141:7 142:16 | 189:10 190:11 | 240:17 241:4,9 |
| 102:6,9,22 | 143:14 144:11 | 190:17 191:20 | 241:14,21 |
| 103:3,18 104:3 | 144:23 145:3 | 192:7 193:6,10 | 242:3,8,14 |
| 104:10,15 | 145:23 146:7 | 193:13,22 | 243:2,6,14,18 |
| 106:1,5,20,24 | 146:12 147:3,8 | 194:23 198:17 | 243:22 244:5,9 |
| 107:4,8,24 | 147:23 148:5 | 198:21 199:6 | 244:15,21 |
| 108:5,12,18,23 | 148:19 149:5 | 199:15 200:10 | 245:5,13,21 |
| 109:8 110:9,13 | 149:10,15 | 200:16 201:24 | 246:18 247:3 |
| 111:12,16,19 | 150:15,21 | 202:6,18 203:2 | 248:19 249:2 |
| 111:23 112:14 | 151:5,11,13,18 | 204:9,16 | 249:15,22 |

**[attorney - bachelor's]**                                                   Page 9

| | | | |
|---|---|---|---|
| 250:22 251:8 | 292:5,10,22 | **attributable** | 90:15 95:4 |
| 251:13,18,23 | 293:5,10,15,20 | 282:16,16 | 173:12 223:4 |
| 252:18 253:1,5 | 294:1,5,10,19 | **attribute** 43:18 | 285:9 |
| 253:9,14 254:1 | 294:24 296:19 | 46:7,9,10,15 | **avocado** 7:6 |
| 254:4,12,21 | 296:23 297:18 | 258:10 259:8 | 42:16 43:18 |
| 255:22 256:3 | 297:23 298:1 | 259:11 266:24 | 44:8 46:3,7,10 |
| 256:14,18 | 298:18 299:9 | 299:23 | 46:13 |
| 257:3,7,17,22 | 299:17 300:6,8 | **attributed** | **avocados** 43:2 |
| 258:5,11,16,20 | 300:21 301:4 | 251:10,21 | 46:15 |
| 260:4,8 261:17 | 301:13,19,24 | 257:24 265:7 | **award** 35:18 |
| 261:21 262:2,6 | 302:5,19 303:3 | **attributes** | **aware** 61:6,13 |
| 262:19,23 | 303:8,11,21 | 259:17 | 61:22 146:13 |
| 263:3,10,16,24 | 304:2,5,12,16 | **attributing** | 146:18,24 |
| 264:9,15 265:1 | 304:20 305:1,5 | 44:8 | 147:11,13,21 |
| 265:4,16,20 | 305:16,23 | **atypical** 127:23 | 148:3 150:11 |
| 266:1,8,14 | 306:17,19,21 | **austin** 4:16 | 166:10 181:15 |
| 267:2,8,20 | 307:1 308:1,6 | **author** 172:18 | 181:24 183:23 |
| 268:1,8,14,18 | 308:13,19 | **authored** 58:24 | 184:2 192:24 |
| 268:24 269:7 | 310:5,18 311:5 | 63:15 200:8 | 258:21,24 |
| 269:16,20 | 311:20 312:1,3 | **authorities** | 260:1 276:19 |
| 270:1,16,19,22 | 312:16,18 | 286:16 | 276:21 297:14 |
| 271:18 272:3 | 313:1 314:2,4 | **authors** 181:17 | 313:20 |
| 274:19,24 | 314:9 315:13 | **auto** 62:23 | **awareness** |
| 275:7,19 278:8 | 315:19,23 | **autobiograph...** | 149:18 |
| 278:11,15,21 | 316:7,18,21,24 | 210:23 | **axe** 148:14 |
| 281:1,13,21 | 317:4,9,11,16 | **available** 53:8 | **b** |
| 282:9,19 283:1 | 317:20 318:16 | 229:16 239:20 | **b** 6:11 7:2 8:2 |
| 283:10,20 | 318:18,24 | 240:2,4,11 | 9:2 10:2 |
| 284:11,17 | 319:10,17,20 | 243:10 292:2 | 210:24 307:22 |
| 285:5,12,23 | 319:22,24 | 315:10 | 307:23 308:10 |
| 286:5 287:15 | 322:16 | **avenue** 2:20 3:4 | **bachelor's** |
| 287:19 288:2,7 | **attorneys** 21:6 | **average** 82:23 | 47:16 |
| 288:11,17 | 58:24 | 83:9,22 85:3 | |
| 290:1,5,10,17 | | 87:9 88:18 | |

**[back - bias]** Page 10

| | | | |
|---|---|---|---|
| **back** 62:7 | 185:3,6,12,14 | **began** 204:24 | 169:1 172:24 |
| 68:10 71:20 | 186:24 187:4 | 316:12 | 192:4 195:19 |
| 81:16 88:10 | 189:22 208:5 | **beginning** | 207:24 208:23 |
| 137:10 141:15 | 209:19 212:15 | 110:1 151:24 | 226:23 228:6 |
| 153:2,11 157:5 | 214:1,17 215:7 | 210:16 | 234:18 238:20 |
| 157:5,6 162:7 | 231:19,21,23 | **begins** 200:19 | 247:20 269:12 |
| 173:16 197:10 | 232:6,12 233:3 | **behalf** 298:20 | 273:20 287:13 |
| 199:4 206:20 | 233:7,14 234:4 | **behavior** 17:3 | 287:24 290:22 |
| 209:3 213:13 | 234:8,10 | 263:9 314:16 | 296:24 300:4 |
| 218:24 247:9 | 237:12 244:3 | 315:16,22 | 316:14 |
| 260:19 311:13 | 274:15 275:1 | 316:5 | **believed** 29:4 |
| 319:19 | 291:3 292:18 | **behaviors** | 30:13 268:10 |
| **background** | 293:7 294:15 | 51:23 52:10 | 268:20 269:22 |
| 47:15 302:9 | **bates** 6:14,17 | 269:6 299:23 | **believes** 34:22 |
| **bad** 34:6 298:2 | 6:20,22 7:5,7,9 | 300:3 | 259:20 267:11 |
| **bands** 241:7 | 7:11,14,17,20 | **belgium** 181:12 | **believing** 233:8 |
| **banned** 287:14 | 8:5,8,11,15,18 | 182:3 190:13 | **belli** 195:8 |
| 288:1,6 | 8:21 9:5,9,12 | **belief** 283:15 | 200:8 |
| **based** 28:8 59:1 | 9:16,19,23 | 289:7 | **bellwether** |
| 77:8,21 81:11 | 18:14 26:19 | **beliefs** 51:22 | 79:21 295:15 |
| 99:2 104:7 | 31:13 38:1 | 267:23 | **benefits** 203:21 |
| 108:21 115:21 | 42:15 48:8 | **believe** 14:11 | **best** 15:16 49:1 |
| 116:12,22 | 55:12 58:10 | 19:8 25:13 | 150:19 192:15 |
| 150:3 196:2 | 78:8,14,20 | 29:6,9 48:16 | **better** 41:22 |
| 252:9 285:15 | 79:2,9 165:22 | 57:7 59:18 | 197:3 238:2 |
| 318:19 | 193:16 194:16 | 65:2 69:1 | 307:3 |
| **baseline** 85:11 | 199:11 216:2 | 72:23 95:10 | **beverage** 223:1 |
| **basically** 30:4 | 216:10,18 | 114:13 120:14 | **beverages** |
| 133:5 211:11 | 217:2,10 | 121:13 123:6 | 33:15 |
| **basis** 34:13 | 224:14 | 127:4,13 | **beyond** 21:14 |
| 175:18 177:22 | **bear** 88:9 | 128:13 131:15 | 156:7 228:9 |
| 178:8 181:7,9 | **beef** 44:19 45:7 | 145:6 150:8 | 280:3 |
| 181:21 183:15 | 45:9,9,11,15,16 | 157:19 160:4 | **bias** 187:13,21 |
| 183:21 184:13 | | 165:2 166:9,12 | 187:24 188:4,5 |

**[bias - case]**                                      Page 11

188:8,10 189:8
246:17
**biased** 226:6
245:19,20
**biassing** 146:10
154:4
**billed** 273:1
**billing** 24:7
**binder** 220:11
220:14
**bit** 47:14
128:24 154:7
159:18 195:15
**blind** 61:10
**board** 37:5,16
235:13
**bonnin** 4:3,4
**bottle** 34:24
35:3
**bottom** 30:3
40:2,3 203:24
**boulevard** 2:10
**bower** 2:9
**box** 35:12,14
**bpeilen** 2:22
**braak** 172:19
**brand** 54:5
223:15
**brands** 33:2
54:20
**break** 16:7 69:5
69:7 70:6,9
71:5 128:18
172:9 173:1

174:12 201:12
215:16 270:23
282:23
**breathitt** 6:16
9:8 18:16,23
19:5 71:21
74:19 75:6,16
76:16 77:20
216:6 218:6
220:2 247:21
**bree** 2:19
**brian** 5:14
12:12
**brief** 18:6
71:12 129:7
172:2 182:15
215:22 271:7
298:9
**briefed** 156:8
**bring** 219:6
**broad** 231:5
**broader** 282:3
**brody** 2:8
**broke** 222:2
**brought** 29:3
33:24 36:4
46:16 146:15
147:22
**browser** 67:14
**building** 2:20
**bulk** 282:6
**bullied** 261:14
**bunch** 266:6

**burdensome**
190:24
**burling** 2:14
5:4
**bus** 255:16
**buses** 255:20
256:8,12
**businesses**
315:11
**buy** 33:15
51:12 53:16
55:2
**byrne** 2:8
**bytedance** 4:18
4:19

**c**

**calculate** 308:4
309:20
**calculating**
117:22
**calculation**
309:12
**calculations**
258:2
**calendar** 8:16
8:22 167:15
193:18 194:5
196:9,12,15
199:12 200:1
200:19,20
201:6,23
205:11 207:15
207:22 208:13

210:11 215:10
**calendars**
197:17 208:6
210:17 213:16
213:20,24
214:15 215:5
309:22
**california** 1:1
12:23
**call** 73:13
76:20 126:17
**called** 32:7
40:17 43:2
64:4 225:3
**calling** 183:24
184:3
**calls** 156:5,8,9
181:16
**canada** 17:16
**capable** 122:5
177:1
**captcha** 69:24
**care** 266:19
**carefully** 148:9
153:13 322:4
**carella** 2:8
**carellabyrne....**
2:11
**case** 1:3 18:23
25:4,8,12,24
29:2,8,12,14,19
30:17 31:8
32:7,11,15
33:8,16,24

CONFIDENTIAL

[case - citations]                                                              Page 12

36:20,20,23
37:8,10,11,15
37:17,17,18
38:13,15,19
39:9 40:14
42:23 43:6
45:15,16 46:2
46:12 50:4,20
51:3 52:18
56:12,18 57:5
57:10,12,16,23
58:4 99:14
104:20 109:12
146:22 156:18
189:12 218:6,9
218:12,15,18
218:21 219:19
230:23 238:12
272:21 284:21
288:22 295:6
313:6 314:15
315:1,4
**case's**  29:2
**cases**  17:19
19:11 24:20
79:21 118:22
153:2 154:1
231:2 266:23
267:1 313:10
313:13,14,17
319:4
**castillo**  4:9
**catchall**  276:3

**categories**
50:22 65:7
120:19 262:8
**category**  51:6
142:7,15
143:21 179:21
212:23 223:4
264:17 315:6
**cause**  266:12
267:6
**caused**  258:4
258:14 264:19
264:21 300:3
**causes**  136:7
260:14 264:3
**causing**  252:5
257:12 259:13
259:21 269:5
299:5
**cecchi**  2:8
**census**  233:21
233:22
**certain**  24:6
151:3 164:14
243:13 244:19
299:23 300:3
319:8
**certainly**  21:10
52:14 74:5
114:13 145:8
145:10 149:3
154:2 242:11
244:3,6 245:1
261:20 275:10

284:14 287:7
287:21
**certificate**
321:1
**certification**
12:4 49:23
50:6,16 321:17
**certified**  1:20
321:11
**certify**  321:4
324:3
**certifying**
321:21
**cetera**  50:1,19
248:4,12 249:7
250:4,18 255:6
255:17 256:9
256:22
**chair**  55:21,23
**chairman**  21:2
285:21
**challenge**  210:2
**challenging**
164:6 184:14
185:6
**change**  134:10
137:11 202:10
292:3 323:3
**changed**  40:18
**changes**  21:15
61:18 158:12
158:15,16
322:11 324:5

**changing**  40:16
**chapter**  225:1
**characteristics**
319:15
**characterize**
124:10 164:9
**charleston**  7:16
8:20 19:6
78:10 80:9
81:23 82:7
194:20
**chart**  75:15
**check**  1:16 2:2
3:16 44:13,17
44:22 45:3
67:6 130:16
**checking**
162:18
**chenu**  186:17
187:2
**chicago**  3:10
**children**  297:3
**choice**  39:22
**choose**  66:6,24
**chose**  66:22
68:16 163:3
228:2,3
**chris**  13:15
**christian**  2:15
320:6
**citation**  195:8
195:14
**citations**
183:13

[cite - company]                                                        Page 13

cite   167:5
  168:18 176:24
  180:9 194:8
  195:24 196:6
cited   36:20
  166:11 167:18
  194:4 209:5,8
cites   183:10
  186:16
citycenter   2:15
  5:5
claim   57:2,6
  179:13 233:4
claiming   35:4
clarify   316:22
clarifying
  317:1
class   49:22
  50:6,16 56:20
  56:23 57:1
  76:5,21 77:4
  81:10 92:9
  93:18 104:6
  107:21 113:20
  119:3 120:23
  125:17 128:6
  132:22 133:8
  133:21 138:20
  139:10,20
  140:20 141:10
  142:7 143:22
  157:11 244:8
  245:8 248:4
  255:15,15

  256:7,7 260:11
  300:20 310:24
classes   85:9
  282:7
classic   183:5,17
  184:6
classroom
  75:18 81:24
  82:8 84:19
  86:24 88:2
  94:12,20 95:24
  99:21 100:6,16
  101:10 105:3
  105:14,23
  106:8 109:18
  110:3,17 111:1
  111:10 112:2
  138:19 145:12
  145:14,17,20
  174:17 176:19
  186:1 191:3
  197:14,15
  246:16 256:20
  256:23 257:12
  261:2 299:6
  301:11
classrooms
  179:9
clean   221:5
clear   34:16
  47:1 60:7 77:7
  77:19 153:7
  162:17 197:16
  231:10 250:17

  266:22 268:5
  270:12
clearly   33:16
  197:1 234:16
  281:4 282:4
  302:8,11
click   69:13,21
client   29:2,13
  29:16 37:11
  42:6
clubs   53:2
coded   136:12
coding   142:23
cognizant
  151:23
collaborative
  221:17
colleagues   24:3
  24:5 271:1
  288:10 292:17
collect   305:12
collected   76:24
  84:5,7 89:20
  116:3,5 118:1
  119:7 198:10
  242:11,17
collecting
  184:12 185:4
  185:21
color   36:3
colts   36:23
column   40:3
  97:1 186:10

come   22:14
  53:4 199:4
  215:9
comes   314:13
comfort   158:9
comfortable
  157:15 158:18
  160:20 291:23
  292:8
coming   171:17
  197:10
commemorat...
  35:14
commencing
  1:18
comment
  261:24
comments
  261:15
commercial
  55:5
commission
  324:12
committee
  291:10,15,16
  291:19
common
  275:15 294:22
communicati...
  227:21
companies
  295:6
company   1:23
  21:3 276:4

CONFIDENTIAL

**[comparative - conservative]**                                          Page 14

comparative
138:14,14
140:7
compared  54:5
85:8,10 186:18
190:24 242:22
compelled  45:3
compensation
272:15,18,24
273:4
complaint
41:10 275:11
complete  15:8
19:18 24:18
62:15 69:9
70:17 81:6
113:11 200:12
228:19 233:21
233:22
completed
65:13 128:8
130:24 131:11
131:20 132:11
226:14 307:21
completely
34:11 113:9
completing
72:7
complex  59:22
60:15 184:15
185:8,19
complexity
183:4,16 184:5

component
40:19,21
201:22
componentart
6:23 38:2,14
40:16,18,20
componentart's
41:1
componentone
6:23 38:2,14
38:24 41:2,5
components
40:22 41:1
composed  73:4
composite
220:15
compound
121:3 188:21
265:2
compromised
209:15
concept  187:24
196:8 202:5,7
208:2
concepts
235:24
concern  30:9
concerned  42:7
173:2 189:9
concerns
177:17,20
180:2,5 190:8
236:5

conclude  28:9
concluded
28:21 32:24
40:12 47:8,12
320:21
concludes
180:14
conclusion  33:8
81:21 82:5
155:15,22
156:22 179:24
180:11,23
181:17 183:16
183:24 185:18
190:6 211:15
conclusions
33:3 34:4
131:15 178:9
condition  42:6
conditions
41:17,22 42:4
conduct  43:16
44:2,6 161:16
242:1 287:1
319:6
conducted
32:14 33:14
34:12,19 51:2
60:12,24
273:10,24
283:24 284:7
297:10
conducting
41:7 46:20

47:2,9 221:19
conference
59:2
confident  157:9
confidential
286:20 292:1
confidently
124:24
conflict  261:11
264:24 269:23
conflicts  261:6
confuse  29:5
35:4
confused  33:1
confusion  17:2
28:6,11,15
29:10,24 30:10
32:23 39:18
40:15 49:22
50:6,16 231:3
connect  149:8
connected
148:24 149:22
connection
19:3 29:22
272:16 273:5
273:11 284:20
connolly  3:3
consequences
8:12 165:24
166:15 172:13
conservative
137:7

Golkow Technologies,
A Veritext Division

**[consider - correct]**                                          Page 15

| | | | |
|---|---|---|---|
| **consider** 73:22 | **containing** | **cooking** 33:23 | 92:22 93:1,19 |
| 147:18 284:2 | 284:8 | **cooperation** | 93:23 94:17 |
| **considerably** | **contains** | 72:6 | 95:1,10 97:6 |
| 212:9 | 135:16 | **copies** 27:4 | 97:17 98:22 |
| **considered** | **content** 57:13 | 31:19 72:17 | 100:12 101:5 |
| 148:7 | 57:17 | 79:19 | 101:15 102:15 |
| **consists** 184:15 | **contention** | **copy** 200:5 | 104:9 106:11 |
| 185:7,19 | 43:14 | 218:5,8,11,14 | 108:8 110:12 |
| **constituted** | **context** 164:23 | 218:17,20 | 110:19 112:17 |
| 29:9 | 207:8 252:22 | 219:18 | 114:8,17 115:8 |
| **construct** 242:1 | 299:22 | **copyright** | 115:21 117:3 |
| **construction** | **contexts** 145:10 | 166:22 167:3 | 117:20 119:4,5 |
| 250:3 | 184:16 185:9 | **correct** 19:4,8 | 119:8 121:1 |
| **consult** 67:17 | 185:20 | 19:14 25:6,9 | 122:6 127:9 |
| **consultant** | **continue** 66:1,7 | 25:10,22 28:23 | 129:22 131:4,5 |
| 43:15 | 66:12 120:12 | 31:4 32:13 | 132:18,19,24 |
| **consulting** | 123:10 125:20 | 33:20 34:19 | 133:1 135:17 |
| 67:20 | 129:14 | 36:1 37:7 | 135:18,22 |
| **consumer** 17:3 | **continued** 3:1 | 39:10,11 40:8 | 136:16,20,24 |
| 51:11 52:9,19 | 4:1 5:1 | 42:4 43:10 | 137:16,17 |
| 52:22 55:1 | **continuing** | 47:6,7,11,18,21 | 139:11,20,21 |
| 223:4,6,22 | 182:22 214:8 | 50:23 51:4 | 140:2,11,16 |
| 315:11,16,21 | **control** 35:23 | 53:8 56:2,13 | 141:17,23 |
| 316:5,5 | 36:10 67:5 | 56:19,22 57:18 | 142:9,10 |
| **consumers** | 130:15 321:20 | 57:24 61:15 | 143:19,23,24 |
| 29:23 43:17 | **convenience** | 62:5 65:11,16 | 145:2,8 146:16 |
| 44:7 47:3 | 142:21 | 70:2,21 74:2 | 148:8 153:2 |
| 53:22 55:2 | **conversational** | 74:11 76:6,16 | 159:1 167:22 |
| **contact** 287:3,8 | 155:24 197:19 | 76:18,18,22 | 168:9 174:10 |
| **contacted** | 200:20 204:6 | 77:5,9 81:12 | 174:21 187:8 |
| 146:21 | 205:10 211:1,6 | 85:18 86:13,16 | 188:17,19 |
| **contained** | **converted** | 87:18 89:10 | 190:22,23 |
| 74:24 | 208:7 | 90:7 91:2,6,14 | 192:10 193:1 |
| | | 91:15,18 92:21 | 196:10 201:1 |

[correct - customer's]                                              Page 16

204:21 205:5,6
206:14 210:11
211:2,7,19
225:14 227:6
231:13 232:15
236:6 237:9,10
239:10 246:1,3
246:12,13,17
247:6,22,23
249:14 250:21
255:21 256:13
257:2 260:13
262:18 263:2
263:15 264:7
270:21 285:8
290:21 299:20
300:9,20 301:8
301:9,12,17,23
302:18 304:4
304:15 305:4,9
305:11 306:5
307:14,18,19
308:12 309:3
310:22 311:23
311:24 313:7,8
314:12 315:12
316:14 318:9
324:4
**corrections**
322:5,7 324:5
**correctly** 67:8
189:13 190:2
**counsel** 12:3
13:1 14:10

22:24 23:7,15
27:4 68:23
73:20 200:14
214:10 271:23
275:12 293:2
312:19 319:5
**counselor** 66:5
**counted** 116:10
131:19
**county** 287:11
**couple** 23:13
183:11 198:3
221:4 271:1
312:20 314:5
**course** 46:21
161:3 166:6
303:10
**court** 1:1,20
12:22 13:3
14:17 15:11
17:11 24:22
27:22 28:2,16
28:21 31:2
32:5,7,21 33:7
33:18 35:22
36:10,15 37:12
38:16 39:14,20
39:22 40:6,12
41:11 42:2,9
43:1 45:24
47:8 233:18
317:15 322:20
**court's** 31:5
33:2

**courtesy**
220:21
**courts** 36:16
**cov.com** 2:17
2:22 5:7
**coverage** 147:6
**covered** 41:14
**covers** 17:8
52:3
**covid** 197:10
203:11,15
210:5 310:12
**covington** 2:14
5:4
**cpistilli** 2:17
**crafting** 148:7
148:10
**craig** 4:10
**create** 251:4
256:11
**created** 310:8
**creating** 39:16
254:15 255:19
**credentials**
172:23
**criteria** 130:13
**criticism** 209:9
**criticize** 198:11
**criticized** 31:2
36:17
**critique** 28:13
**critiques**
195:22

**cue** 144:24
**cuervo** 32:22
35:1,7,11
**cues** 201:7
202:16 203:19
204:8,21
205:13 210:24
**current** 49:2
75:21 86:22
88:1 92:10
93:8,19 94:18
101:7 103:23
106:6 111:24
124:21 125:6
125:13 130:10
130:12 131:3
132:10,17
136:9 153:10
153:15 159:6
175:1 207:10
310:9,10
311:23 318:4
318:14
**currently** 74:23
76:8 77:12
97:18 108:15
109:5 304:23
305:20
**custom** 35:11
**customer** 49:22
50:5,16 64:4,8
64:9
**customer's**
63:3

**[cut - dekalb]**                                                      Page 17

| | | | |
|---|---|---|---|
| **cut**  287:22 | 239:20 240:11 | **days**  322:16 | **declined**  141:5 |
| **cycles**  189:16 | 241:16 242:10 | **dbonnin**  4:6 | **dee**  1:19 |
| **d** | 242:15,17 | **dc**  2:16 3:4 5:6 | **deemed**  322:19 |
| **d**  6:2 65:20,20 | 283:14,16,22 | **de**  2:10 | **defendant**  2:22 |
| 68:24 318:11 | 283:22,24 | **deal**  82:24 | 5:7 289:16 |
| **daily**  189:16 | 289:8,10,22 | 83:10,23 84:9 | 292:20 293:8 |
| 214:1,17 215:7 | 290:7 293:4 | 176:20 260:15 | 295:6 297:5 |
| **damages**  17:5 | 304:9 306:1 | **dealing**  77:3 | **defendant's** |
| 35:18 | 309:18 311:18 | 101:11,18 | 39:18 |
| **dance**  280:8 | **date**  1:19 12:14 | 106:9,17 112:3 | **defendants**  3:6 |
| **daniel**  3:3 | 22:9 202:21 | 112:12 174:17 | 3:12 4:18 |
| 288:20 319:2 | 210:1 322:9 | 175:10 179:8 | 13:16 43:23 |
| 320:10 | 324:8 | 207:5 261:6,11 | 259:2 260:2 |
| **darius**  8:20 9:7 | **dated**  321:11 | 263:14 | 282:17 288:22 |
| 9:11,14,18,21 | **dates**  167:12 | **deals**  179:8 | 294:4,18 |
| 194:19 216:5 | 196:18 197:1 | **dealt**  209:21 | **defense**  312:19 |
| 216:13,21 | 197:12 | 259:14 282:8 | **defer**  128:19 |
| 217:5,13 | **daubert**  7:13 | **debate**  199:2 | **define**  188:7,13 |
| **data**  8:12 70:11 | 58:12 313:16 | **decade**  75:18 | **defined**  188:6 |
| 70:17 76:23 | 313:21 | 76:6 80:23 | 225:19 |
| 77:1 82:13 | **david**  4:4 | 81:4 97:5 | **defines**  248:15 |
| 84:5,7 89:20 | **day**  21:4,4 | 102:20 103:15 | **defining**  199:24 |
| 96:2 99:1 | 118:3,15 | 115:8 129:18 | **definition** |
| 117:24 118:17 | 121:21 122:1 | 153:2,12 | 51:19 52:6 |
| 119:6 120:5 | 123:21 125:6 | 156:15 308:22 | 188:10 196:14 |
| 126:18 131:3 | 125:12 130:18 | **deceptive**  56:14 | 200:18 207:21 |
| 134:22 165:23 | 136:1 165:4,11 | 56:17 | 208:23 251:5 |
| 166:15 172:13 | 165:15 174:1 | **decide**  291:11 | **degree**  47:16 |
| 184:12 185:4 | 207:18 208:16 | **decided**  29:17 | 47:19 |
| 185:21 198:9 | 221:6 268:13 | 241:1 | **degrees**  47:23 |
| 203:21 209:13 | 268:23 269:15 | **decision**  38:13 | **dekalb**  7:19 |
| 234:22 235:5 | 278:22 300:18 | 40:5 | 9:11 19:6 |
| 238:10 239:20 | 301:7,8 324:11 | **decisions**  51:11 | 78:16 94:4 |
| | | | 96:14 216:14 |

CONFIDENTIAL

**[dekalb - different]**                                                            Page 18

218:9,21 219:1
219:3,6,15,19
219:21 220:2
287:5,6,10
**delivered**
  128:23 171:19
**demerath**  4:9
**demographic**
  240:1 241:16
**demographics**
  301:22,23
  302:3,16,24
  303:5
**demonstrates**
  177:20 180:5
**demonstrating**
  28:14
**denominator**
  118:8 307:12
**department**
  44:14,21 45:2
  45:14 46:5
**departures**
  256:9
**depends**  164:8
  164:22 165:8
  165:17 171:14
  222:19 223:12
  224:4 225:15
  236:9
**deployment**
  62:19,21 63:6
**deponent**  12:24
  324:1

**deposed**  16:10
**deposing**
  322:16
**deposition**  1:13
  11:2 12:16
  14:10 22:20
  23:3,5,8,16,19
  23:21 24:1,22
  152:1 299:1
  320:20 321:6
  322:3,13,17,19
**depositions**
  16:16,19 25:15
  25:18
**deprivation**
  261:5 266:13
  267:7,12
**deprived**
  264:22 268:13
**derive**  280:20
  282:15 283:6
**derived**  283:4
**describe**
  118:21 121:6,8
  121:9 154:9
  316:4
**described**  30:5
  194:5 292:17
  319:16
**describing**
  196:21
**description**
  6:13 7:4 8:4
  9:4 10:4

163:11 238:2
**design**  62:22
  188:2 208:2
  221:12
**designed**  30:23
  152:24 153:14
  157:21 212:18
  221:9 285:3
**designers**
  205:23
**designing**
  221:16
**despite**  119:18
**detail**  169:20
**details**  24:6
**determine**
  61:21 127:8
  205:24 230:8
  230:20 231:11
  239:13 240:14
  241:17 266:10
  267:4,6,22
  268:11,21
  269:13,23
  299:13,19
  300:2
**determined**
  291:9 300:2
**determining**
  285:9
**devoted**  87:1
  190:20 207:18
**diageo**  6:21
  31:15 32:8

**diamond**  225:4
**diaries**  175:7
**diary**  179:7,13
  184:8
**differ**  230:10
  230:21
**difference**  7:13
  58:12 122:13
  124:8 132:8
  228:2 233:9
**differences**
  35:9 131:10
  173:12 182:2
  245:1 301:22
  302:11
**different**  35:12
  45:22 52:6
  54:20 65:6
  66:15 68:16
  114:22 119:19
  120:4,10
  122:19,20,22
  123:7,14 124:2
  124:13,14,16
  124:23 126:1
  126:12,17,23
  127:1,5,9,14
  128:14 143:1
  145:10 159:18
  167:3 175:8,9
  180:10 181:13
  184:16 185:9
  185:20 189:17
  195:15 201:16

**[different - district]** Page 19

228:7 232:7,11
232:14 255:9
269:9 299:3
300:19 301:21
303:4 306:2
**differently**
126:14
**difficult** 15:14
185:21 186:19
305:12,14
311:4
**difficulties**
169:9 170:6
175:13
**difficulty**
229:21 246:15
**dimensions**
60:2 302:13
**dinner** 44:19
164:16
**direct** 173:6
193:1 321:20
**directed** 29:15
41:9 311:15
**direction** 11:5
**directly** 22:14
191:10 192:22
**directory** 41:3
**directs** 254:18
**disagree** 34:3
37:14 40:10
169:14 170:4
180:8

**disclosing**
227:17
**discord** 252:20
253:4,8,13
**discounted**
26:12
**discovery** 44:3
147:15
**discrete** 167:7
174:1 190:21
**discuss** 23:16
23:20 24:2,4
**discussed** 190:6
225:10 315:8
**discussing**
167:20 200:9
**discussion** 15:2
39:5 183:3
**discussions**
23:24 277:1
293:1
**disproportion...**
243:20 246:11
**disproportion...**
242:6,21
243:12
**dispute** 175:19
177:23 178:2,9
178:15 181:8
183:15 185:3
185:13 187:1
189:23 209:20
212:16

**disputing**
181:22 183:22
**disqualified**
65:18 66:16,21
66:23 67:1,2,4
67:9 68:4,11
**disqualify**
149:4
**disrupting**
255:4,5,15
256:7
**disruption**
100:16 101:10
105:23 106:8
111:10 112:3
136:8,11
157:11 176:20
251:10,20
257:12,24
258:4,13 259:6
259:14,21
260:14 282:7
310:10
**disruptions**
99:22 100:7
105:3,15
109:18 110:3
110:17 111:1
179:9 185:1
186:1 190:16
207:6 245:3
246:24 255:19
256:11 258:14
259:7 264:18

264:21 299:6
310:16
**disruptive**
264:24
**distant** 212:11
**distillery** 6:21
31:14 32:8
**distinct** 235:24
**distracted**
244:7 245:7
260:10
**distraction**
75:18 76:5,21
77:4 81:10
104:6 107:22
113:20 119:3
140:20 142:8
143:22 244:14
**distractions**
145:18
**distributed**
229:13 237:9
237:14 238:13
**distribution**
239:21
**district** 1:1,1
12:22,22 38:16
66:22 68:12,15
68:17 72:3,8
74:24 75:23
80:10,15 97:19
116:7 134:23
147:14 154:5
192:24 235:13

Golkow Technologies,
A Veritext Division

[district - e]                                                          Page 20

239:22 244:18
282:12 286:24
303:6,14,18
304:15,23
305:9 306:4
**districts**   13:21
14:5 72:14,22
73:2,10 117:15
135:21 141:23
146:14 147:1
154:16 239:9
239:16 240:1,6
245:2,24
273:16 289:22
295:13,16,18
296:17 303:1
306:11
**diversion**
139:11 140:1
140:14 141:3
156:15 197:14
206:20 252:5
**diversions**
139:24 141:10
**diverted**   82:1,9
82:16,23 83:9
83:16,23 84:8
84:20 85:4,17
87:9 88:3,19
90:15 93:17
94:12,21 95:4
96:1 98:21
118:6 132:24
136:1 137:6,15

139:20 140:18
143:13 145:19
149:3,7 150:1
151:10 152:9
153:16,21
163:17 204:23
206:17 280:21
281:9 282:13
283:7 285:10
**diverts**   259:22
260:16,16
**divide**   308:10
309:2
**divided**   307:22
307:23
**dividing**   307:16
**division**   12:13
**doctor**   54:15
**doctors**   53:19
53:20 54:4,15
**document**   1:6
18:21 31:24
32:4 38:7,10
42:20 48:14
58:16 174:6
214:9 224:20
296:13
**documents**
11:10 272:12
284:3,6 295:2
295:5
**doing**   35:19,20
41:15 91:12
175:2 178:22

215:12 250:1
322:8
**double**   61:10
**downloaded**
278:23
**dozen**   156:10
**dr**   8:19,20 9:7,7
9:10,11,14,14
9:17,18,21,21
28:5,8,12
135:5 194:18
194:19 198:10
209:7 210:8
213:4 216:4,5
216:12,13,20
216:21 217:4,5
217:12,13
242:12
**draft**   19:20
**drafting**   20:7,8
21:17 221:8
**drafts**   21:7
**drawing**
185:18 262:14
**drawn**   228:18
229:14
**drew**   160:22
**drippy**   35:2,5
35:15
**dropped**   25:21
90:6 131:22
**due**   28:11
40:15 82:9
83:15 84:20

85:4 87:10
88:3,19 90:15
94:12,21 95:4
96:1 100:7
105:3,15
109:18 110:3
110:17 111:1
136:2 137:15
140:18 141:3
143:13 175:11
176:20 179:9
179:10 190:16
197:15 203:11
203:15 206:17
207:6 245:3
246:24 261:3,5
267:12 280:22
281:10 282:13
283:8 310:16
**duly**   13:8 321:5
**dwhiteley**   3:5

e

**e**   2:3 6:2,11 7:2
8:2 9:2 10:2
65:4,10 68:10
72:4,14,18,21
73:4,15 75:1
80:11 96:22
102:13 130:22
130:22 132:11
306:3,7 307:4
307:9 309:9,15
323:1

CONFIDENTIAL

**[e.g. - error]**                                                    Page 21

**e.g.** 248:3,10
249:3 250:4,17
255:6,15 256:7
256:20 261:2
**earlier** 35:16
115:3 130:4,7
140:2,21 174:3
215:8 221:5,22
222:4 273:10
274:5 290:22
291:22 299:1
309:21 314:21
314:24 315:8
**early** 62:24
256:9
**earn** 286:6
**easier** 170:22
171:6
**easily** 145:15
203:20
**easy** 309:19
**echo** 298:2
**edition** 224:16
**education**
166:21
**effect** 71:1
176:3 230:7
**effectively**
128:4
**effort** 222:9
239:12 257:8
**efforts** 230:19
231:11

**eight** 56:4
115:6,12,13
277:23 291:20
291:20,21
**eighth** 2:20
**eiland** 4:3
**eilandlaw.com**
4:6
**either** 24:21
77:14 167:4
181:21 185:16
247:2
**elect** 45:22
**electronic**
67:18,22
**electronics**
37:6
**elementary**
66:10
**elements**
170:19 177:6
228:19 229:16
**eligible** 76:9
77:13 78:1
97:12 98:1
103:7 104:14
109:3 114:4
115:14 116:9
116:18 129:21
130:1
**ellis** 3:9 272:7
**em** 6:18 26:20
27:9 29:5,7
30:7

**emeritus** 21:2
55:21,23
285:21
**employed**
74:23 76:8
77:11,12 97:18
115:1 214:22
223:23 304:23
305:7,8
**employee** 20:17
20:18 55:22,23
63:9 314:15
**employees**
20:23 222:10
223:7,19 224:8
291:4 319:6
**employer**
147:21
**employment**
286:9
**encompassed**
281:19
**encounter**
41:13 42:11
**encyclopedia**
63:16,23 64:15
199:17,24
**ended** 137:23
189:18
**engaged** 13:20
14:4 25:7
244:19
**engagement**
258:15 259:3,9

**engineering**
47:17 64:12
**enjoys** 197:4
**ensure** 60:24
61:4,20 188:3
226:13 227:10
241:6
**ensures** 228:1
**entire** 67:15
76:15 174:5
177:24
**entirely** 104:8
257:6
**entirety** 133:22
170:14
**entitled** 27:8
166:14
**entry** 199:17,24
200:7
**enumerated**
50:22 190:21
**environment**
256:20,24
267:17
**equal** 236:3
**equally** 233:13
**errata** 322:6,9
322:12,15
324:6
**error** 169:12
170:9 175:16
176:2 184:8
187:18 191:5
191:16 192:2

**[errors - exhibit]** Page 22

| | | | |
|---|---|---|---|
| **errors** 180:17 | **et** 25:1 50:1,19 | 209:23 210:5 | **except** 12:6 |
| 181:2 183:6,19 | 248:4,12 249:7 | 212:10 255:4 | 204:22 314:14 |
| 212:8 | 250:4,18 255:6 | **everybody** 14:1 | 324:5 |
| **es** 308:11 | 255:17 256:9 | 241:2 | **exclude** 313:16 |
| **esquire** 2:3,3,9 | 256:22 | **everyday** 279:2 | **excluded** 26:9 |
| 2:15,19 3:3,9 | **evaluated** 60:4 | **evidence** 9:24 | 35:22 313:22 |
| 3:17 4:4,10,15 | **evaluating** | 28:10,14 32:22 | 314:1 317:3 |
| 5:4 | 230:7 | 224:15 225:2 | **excuse** 273:14 |
| **essentially** | **event** 8:22 | 238:10,18 | 275:20 |
| 44:18 70:12 | 164:9 167:15 | **exact** 282:15 | **exhibit** 18:13 |
| 73:3 117:14 | 194:5 196:8,11 | **exactly** 83:12 | 18:21 24:12 |
| 118:8,9 119:9 | 196:15 197:16 | 167:12 198:24 | 26:18 27:1 |
| 130:19 133:6 | 199:11,24 | **examination** | 31:12,24 37:24 |
| 153:20 208:1 | 200:18,19 | 13:11 272:1 | 38:8 42:14,21 |
| 266:5 | 201:6,22 | 288:15 298:16 | 42:22 48:7,15 |
| **estimate** 28:7,8 | 203:13 205:1,2 | 312:23 314:7 | 55:9,11,17 |
| 120:22 128:5 | 205:10 207:15 | 318:22 | 58:9,17,19,20 |
| 135:24 137:5 | 207:21 208:6 | **examined** 13:8 | 62:8 65:4 |
| 153:16 169:22 | 210:10,17 | 173:12 | 71:20 78:7,13 |
| 170:23,24 | 213:15,20,23 | **examining** | 78:19 79:1,8 |
| 176:19 204:23 | 214:15 215:4,9 | 314:11 317:5 | 79:24 80:3 |
| 206:19 310:9 | 309:22 310:3 | **example** 24:7 | 81:18 88:11,11 |
| 319:7 | **events** 124:17 | 45:8 66:2 70:4 | 88:24 94:2,3 |
| **estimates** 28:5 | 124:21,21 | 164:12 202:8 | 96:9,10,11 |
| 124:24 130:12 | 153:1 158:24 | 202:21 203:1 | 99:12,13 103:1 |
| 157:16 158:10 | 159:22 162:11 | 242:5 249:3 | 103:2 104:17 |
| 160:6,21 | 164:7 176:14 | 264:5 316:17 | 104:18 109:10 |
| 167:11 173:2 | 196:19 197:9 | **examples** 52:21 | 129:15 135:13 |
| 177:9 190:9 | 201:17,18 | 213:20,23 | 135:16 165:21 |
| **estimating** | 202:13 203:5 | 214:15,19 | 172:10 182:23 |
| 169:10 170:7 | 203:10,19 | 215:4 249:13 | 193:15,23,24 |
| 175:14 183:7 | 204:7,14,20 | 249:14 250:6 | 194:15 195:1 |
| 183:19 206:16 | 205:4,12 206:1 | 262:13 263:6 | 199:8,10,16 |
| | 206:15,18 | | 200:12,15 |

CONFIDENTIAL

**[exhibit - feature]**                                               Page 23

209:4 216:1,9
216:17 217:1,9
217:23 218:5,8
218:11,14,17
218:20 219:11
219:17 220:20
224:13,21,22
224:24 247:9
247:12,20
271:10 272:10
272:14 273:3
316:16
**exhibitors** 41:3
**exhibits** 79:15
**exist** 32:24
39:19 276:21
**expect** 74:6
231:8 235:7
**experience**
61:17 163:13
192:11 207:9
275:18 277:11
315:21
**experienced**
251:9,20
**experiences**
51:8
**expert** 7:12
8:18 9:6,9,13
9:16,20 13:22
16:17 17:18
24:19 25:11
27:12 30:15,21
32:12 36:22

37:2,4 38:19
43:6 49:19
52:17 58:10
145:24 146:5
150:22 178:17
194:17 216:3
216:11,19
217:3,11 225:6
226:2 287:21
288:5 290:7
313:5,10,12,18
**expertise** 28:9
254:11,14
**expires** 324:12
**explain** 65:17
129:24 156:21
158:4 227:24
**explained**
155:1 161:13
**exploratory**
275:13,23
277:7
**exposed** 284:5
**expression**
197:20 211:2,7
**extensive**
275:18 277:11
294:13
**extent** 158:3
162:19 230:9
254:10 281:8
314:16
**extraordinarily**
305:12

**extrapolated**
76:14 98:19
**extrapolations**
115:20 116:1

**f**

**face** 169:10
170:6 175:13
250:16
**facebook** 248:3
248:11,17
249:10 252:10
257:10,24
274:6 275:2
277:17,19,22
278:7,13,23
**fact** 33:17
34:18 35:10
39:17 43:18
60:1 119:18
123:13 144:8
147:20,21
190:5 196:5
201:22 226:14
237:2 265:6
318:6
**factor** 128:23
**factors** 59:18
**facts** 163:20
**fail** 322:18
**failed** 29:21
42:3 68:12,14
**failing** 31:3

**fails** 29:23
**failure** 138:19
**fair** 16:4 28:7
113:13 134:16
248:18 305:15
**fairly** 308:5
309:11
**faith** 34:6
**fall** 50:21
212:23 315:6
**falls** 51:5
179:20
**false** 17:6 49:23
50:7,17 231:3
**familiar** 44:17
187:23 194:1
199:21 201:20
201:21 202:3
204:15 252:19
**familiarity**
286:23
**family** 275:15
275:24 276:1,2
276:12,18
302:7
**far** 33:22
**faraz** 3:9 272:6
320:8
**faraz.shahidp...**
3:11
**favorites** 31:20
**fax** 1:24
**feature** 258:3
259:12,13,17

CONFIDENTIAL

**[features - form]**                                                                 Page 24

| | | | |
|---|---|---|---|
| **features**  63:4 | **filing**  12:4 | 318:14 | 318:19 |
| 64:12 257:10 | 147:2 | **five**  71:5 78:4 | **followed**  74:1 |
| 257:16,21 | **fill**  117:18 | 79:20 95:19,22 | 139:1,15 255:6 |
| 258:9 | **filled**  65:14 | 125:11 128:17 | 264:7 |
| **february**  21:24 | 150:11 | 250:19 254:7 | **following**  60:13 |
| 24:10 | **filters**  114:22 | 254:17 274:16 | 83:14 138:17 |
| **fed**  45:9 | **final**  19:17 64:3 | 279:1 281:10 | **follows**  13:9 |
| **federal**  38:16 | **finance**  45:5 | 281:12,19 | **food**  128:22 |
| 40:6 43:1 | **financial**  193:1 | 282:3,4 284:16 | **footnote**  195:7 |
| **feel**  292:8 | **find**  28:9 36:10 | 289:13 292:19 | **footnoted** |
| **feels**  208:22 | 39:20 142:12 | 293:7 297:5 | 194:11 |
| **fell**  85:4,17 | 144:3 198:16 | 300:19 | **footnotes** |
| 86:1 87:10,17 | 225:8 279:6 | **flawed**  33:4,9 | 167:10 |
| 88:20 89:15 | 308:8 | 33:20 | **forced**  45:4 |
| 90:16 95:5,15 | **finds**  39:14 | **flaws**  28:2,11 | **forecasting** |
| 100:17 101:1 | **fine**  62:2 | 28:22,24 39:16 | 49:24 50:8,18 |
| 101:19 102:3 | 171:21 | 40:7 | **foregoing** |
| 105:24 106:18 | **finish**  151:16 | **flexible**  204:5 | 321:17 324:3 |
| 107:2 111:11 | **finished**  317:5 | **flip**  80:17 81:16 | **forget**  40:17 |
| 111:17 112:13 | **firm**  4:3 22:2 | **florida**  2:10 | **form**  12:6 |
| 112:19 | 34:1,2 55:20 | **focus**  39:22 | 82:12 84:2 |
| **felt**  46:12 | 56:2 65:10 | 52:9 250:10 | 85:7,20 86:18 |
| 120:21,24 | 272:24 | 289:12 | 87:13,20 88:5 |
| 122:5 123:22 | **first**  24:9 32:18 | **focused**  51:11 | 88:22 89:18 |
| 124:2 157:9 | 40:3 69:17,18 | 63:8 145:1 | 90:9,19 91:20 |
| 158:7 161:15 | 69:19 91:10 | **focusing**  191:1 | 92:4,13 93:3 |
| **field**  178:16,18 | 117:10 170:21 | **folks**  242:5 | 93:11,21 95:8 |
| 275:17 277:10 | 184:19 187:11 | **follow**  61:24 | 95:18 96:4,16 |
| **figure**  47:2 | 187:15 198:5 | 74:6 136:22 | 97:8 98:6,15 |
| 77:8,19 98:21 | 203:9 204:24 | 137:14 138:2,7 | 98:24 99:7 |
| 116:11 298:3 | 248:1 255:1,2 | 138:18 139:5,8 | 100:20 101:3 |
| **figures**  81:9 | 255:8 264:6 | 155:19 162:9 | 101:21 102:7 |
| 116:6,21 | 278:13,23 | 298:24 314:5 | 102:23 103:19 |
| | 310:15 311:8 | 316:9 317:8 | 104:11 106:2 |

CONFIDENTIAL

**[form - full]**                                                        Page 25

| | | | |
|---|---|---|---|
| 106:21 107:5 | 186:7 190:12 | 275:8 278:9,16 | **formulating** |
| 108:1,13,24 | 191:21 193:7 | 281:2,22 | 284:3 |
| 110:10 111:13 | 198:18 202:1 | 282:20 283:11 | **forward**  70:1 |
| 111:20 112:15 | 202:19 204:10 | 284:12 285:6 | **found**  35:23 |
| 112:22 113:23 | 205:15 206:23 | 285:24 287:16 | 37:8,10 40:6 |
| 114:10,19 | 208:18 211:9 | 288:3 290:2,11 | 41:11 42:2 |
| 115:10,23 | 211:21 213:9 | 292:6,23 | 80:6 189:3 |
| 116:15 117:1 | 222:12 223:10 | 293:11,21 | 198:5 |
| 119:13 122:8 | 224:2 229:5 | 294:6,20 | **foundation** |
| 122:16 123:4 | 231:15 232:17 | 296:20 299:10 | 26:4 41:19 |
| 123:16 124:5 | 235:2 236:8,20 | 300:7,22 | 49:5 51:15 |
| 124:19 125:3 | 237:16,24 | 301:14 302:1 | 70:23 74:4 |
| 126:7,20 | 238:15 239:18 | 302:20 303:9 | 75:8 119:23 |
| 127:11,19 | 240:18 241:10 | 303:22 304:6 | 120:7 |
| 128:11 133:12 | 241:22 242:9 | 304:17 305:2 | **founded**  63:11 |
| 133:24 134:13 | 243:3,15,23 | 305:17 306:22 | **four**  20:13 |
| 135:2 136:18 | 244:10,22 | 308:2,14 310:6 | 23:12 24:19 |
| 137:2 138:5 | 245:14 246:19 | 311:6 312:2 | 33:18 34:17 |
| 140:4,23 | 248:20 249:16 | 315:14,24 | 53:1 113:18 |
| 142:17 144:12 | 250:23 251:14 | 319:11 324:5 | 114:4,8,12 |
| 145:4 146:8 | 251:24 253:2 | **formal**  63:24 | 131:7,22 317:1 |
| 147:4,24 | 253:10 254:2 | **format**  47:10 | **frequently** |
| 148:20 149:11 | 254:13 255:23 | **formation** | 278:6,12 |
| 151:6 152:13 | 256:15 257:4 | 262:17 | 279:14,21 |
| 153:4 156:17 | 257:18 258:6 | **formatting** | **friends**  275:14 |
| 158:1 159:3 | 258:17 260:5 | 21:12 | 275:15,23 |
| 160:1,15 161:9 | 261:18 262:3 | **formerly** | 276:1,2,12,18 |
| 161:20,23 | 262:20 263:4 | 251:11 | **front**  14:17 |
| 162:14 163:6 | 263:17 264:10 | **forming**  285:14 | 217:24 |
| 163:23 165:6 | 265:2,17 266:2 | **forms**  140:1,14 | **full**  13:18 32:18 |
| 167:24 168:11 | 266:15 267:9 | 140:20 249:18 | 74:23 75:5 |
| 168:23 169:18 | 268:2,15 269:1 | 293:6 | 77:12 97:19 |
| 171:2 175:21 | 269:17 270:2 | **formula**  307:8 | 108:15 109:5 |
| 179:1 181:19 | 270:20 274:20 | | 184:20 187:11 |

**[full - grocery]** Page 26

187:15 206:6,8
214:22 305:20
**function** 62:19
62:21 63:5
**fundamental**
28:22 39:15
40:7
**fundamentally**
39:21 52:5
**funded** 44:22
**further** 92:1
93:8 119:6
186:10 201:4
213:13 271:20
288:9 297:19
314:3 318:17

**g**

**galveston** 4:5
**gaming** 252:22
**gauge** 158:8
266:12
**gauging** 43:16
44:7 180:15,24
**gear** 314:18
**gender** 240:7
302:7
**general** 41:20
45:11 51:6
53:12 155:21
192:19 223:21
226:11 230:18
244:16 246:14

**generally** 45:14
52:2 70:8
154:9 225:17
296:4 312:14
**generate**
188:15 204:7
**genericism**
17:2
**genuine** 39:17
**getting** 200:4
207:17 235:11
269:3 290:14
298:2
**give** 33:18
124:24 153:20
175:8,9 199:7
201:9 202:8
218:23 295:8
319:19
**given** 43:23
109:4 183:4,16
189:14 197:5
208:16 214:21
227:13 244:18
268:12,13,23
269:14,24
282:12,13
321:7 324:4
**gives** 28:16
159:8
**giving** 15:7
**glasses** 67:21
**go** 14:13 16:1
17:24 31:21

33:22 62:7,8
70:1 78:3
79:16 88:10
117:21 129:2
137:10 141:15
151:20 175:2
182:7,10
247:10 287:9
287:10 297:21
298:2
**goes** 33:18
50:11 92:24
93:7 229:11,20
230:6
**going** 16:2
25:24 63:19
66:12 68:6
80:16 90:23
124:9 125:19
137:20 138:9
138:16 139:5
143:7 144:20
144:21 153:1
157:5 174:11
182:12 194:24
197:13 198:24
199:7 206:20
236:16 255:3
270:5 271:22
286:2 289:18
298:6
**golkow** 1:23
12:13

**good** 13:14
59:14,19 60:1
60:3,6 71:7
210:6 215:15
221:16 272:4,5
288:18,19
289:2 298:23
**goods** 51:24
53:7 315:10
**google** 3:6
288:21
**government**
45:19,20,21,22
46:9 47:5
**grades** 154:13
**grandchildren**
294:12
**granddaughter**
280:2
**grandkids**
279:20 297:1
**granted** 313:21
313:24
**granular**
207:17
**grass** 45:9
**greater** 236:4
246:15
**grew** 287:4
**griffin** 63:9
**grind** 148:14
**grocery** 164:18
164:21

**[ground - hours]**                                    Page 27

| | | | |
|---|---|---|---|
| **ground**  14:13 | **happened** | **hide**   309:18 | 199:11 200:1 |
| **grounds**   39:19 | 151:22 156:6 | **high**   66:24 | 200:18,20 |
| **group**   35:23 | 229:1 270:8 | 74:22 75:5 | 201:6,23 |
| 36:10 223:23 | **happy**   128:17 | 81:2,23 82:6 | 205:10 207:16 |
| 227:12 274:14 | 128:18 | 82:21 83:7,18 | 207:21 208:6 |
| **groups**   45:1,13 | **hard**   27:4 | 83:21 84:18 | 210:11,17 |
| 122:13 | **harford**   7:22 | 85:5,16 86:23 | 213:15,20,23 |
| **growers**   46:3 | 9:15 19:6 | 87:11 88:19 | 214:15 215:10 |
| 46:10,16,21 | 78:22 99:14 | 89:4,5,9 90:17 | **home**   33:23 |
| **guardrails** | 102:14 216:22 | 91:8,10,12 | 267:17 |
| 153:15 159:9 | 218:12 220:3 | 94:10,19 95:6 | **honestly** |
| **guess**   48:17 | **harm**   30:22 | 98:11 99:20 | 150:19 |
| 119:14 149:13 | **harms**   265:15 | 100:2,5,17 | **hope**   259:23 |
| 164:14 179:19 | 265:22,24 | 101:8,17,22 | 260:17 |
| 202:24 223:11 | **hauser**   63:8,10 | 102:13 103:13 | **horvath**   4:15 |
| 225:15 246:13 | **heading**   167:1 | 105:1,13 106:7 | 6:7 13:23 |
| 256:16 289:17 | **health**   286:16 | 106:16 107:13 | 14:19 297:23 |
| 292:24 315:5 | **hear**   13:24 14:1 | 108:9,16,16 | 298:18,20 |
| **guide**   225:3,9 | 304:21 | 109:6 110:15 | 299:17 300:8 |
| 228:14 237:2 | **heard**   156:24 | 110:24 111:11 | 301:4,19 302:5 |
| **guys**   128:18 | 160:19 252:21 | 112:1,11 113:5 | 303:3,11 304:2 |
| **h** | 253:15,20 | 115:5 154:12 | 304:12,20 |
| **h**   6:11 7:2 8:2 | **hearing**   159:14 | 248:23 276:4,6 | 305:5,23 |
| 9:2 10:2 | **held**   1:15 12:17 | 282:11 297:4 | 306:19 307:1 |
| **half**   156:10 | **help**   65:5 66:1 | **higher**   91:4 | 308:6,19 |
| **handed**   18:20 | 69:4 80:16 | **highlighting** | 310:18 311:20 |
| 38:7 42:20 | 151:2 154:4 | 39:3 | 312:3,16 |
| 48:14 79:15 | 201:17 202:11 | **hip**   52:23 54:1 | 319:24 320:12 |
| 217:22 272:9 | 203:5 316:15 | **hired**   43:15 | **hour**   22:8 |
| **handing**   58:16 | **helped**   21:10 | 44:6,11,11 | 171:17 277:3 |
| 224:20 | **helpful**   152:10 | **historical**   215:4 | **hourly**   22:6 |
| **happen**   16:8 | 225:9 | **history**   8:22 | **hours**   21:16,23 |
| 270:9 | **helps**   80:18 | 194:5 196:9,11 | 23:12,13 |
| | | 196:15 197:17 | 118:14 119:1 |

CONFIDENTIAL

**[hours - indicates]**                                                    Page 28

121:20,24
123:20 125:7
125:11 169:11
170:7 173:9
175:14 180:16
181:1 189:14
278:22 320:7
**huge** 252:12
**human** 209:12
**hundred**
313:13
**hundreds**
233:17 313:17
319:4
**hypothesized**
203:21 204:2
**hypothetical**
126:24 152:17
222:17,18
245:16,17
**hypothetically**
126:9,23 141:1
149:13 191:23
193:2 245:7,18
246:21 252:3,6
259:11 262:5
303:24

**i**

**i.e.** 75:19 97:5
125:15
**idea** 291:7
294:23 301:6

**identification**
18:17 21:11
26:22 31:16
38:4 42:17
48:10 55:14
58:13 78:11,17
78:23 79:6,12
166:3 193:20
194:21 199:13
216:7,15,23
217:7,15
224:17 271:13
**identified**
34:22 149:20
197:1 226:19
282:5
**identifies** 281:4
**identify** 136:11
299:4
**illinois** 3:10
**illogical** 123:9
**immediate**
86:10
**immediately**
144:16
**impact** 149:23
**impacted** 188:4
**imperative**
322:14
**implants** 52:23
54:2
**implication**
119:15

**implies** 197:7
**important** 31:3
31:6 60:9,11
60:23 167:12
224:7 250:5
**imported** 62:23
**impossible**
120:12
**improving** 8:15
193:16 195:11
**inaccurate** 59:9
**inattention**
262:16 264:4,7
**inattentive**
261:3 262:10
264:20 268:23
269:14
**inattentiveness**
263:2,15
**incentive**
103:12 127:24
227:8 231:9
235:20 277:4
**include** 130:5
146:3 162:21
222:9 225:11
251:12,22
258:13 259:7
259:23 260:12
260:18 283:23
306:13 307:20
309:8
**included** 70:10
120:5 131:18

258:2 259:18
284:15 310:3
**includes** 32:4,6
130:8 196:18
250:18
**including** 71:2
167:19 248:16
252:7
**inclusion** 63:23
**income** 285:20
286:6 291:23
302:7
**incomplete**
69:5 70:5,9
**incompletes**
69:7
**increase** 82:15
110:7 140:18
**increased**
137:5 141:6
**increasing**
81:24 82:8
**index** 11:2
**indianapolis**
36:23
**indicate** 80:8
96:12 102:12
107:11,18
113:3,16 154:2
**indicated**
118:13 121:19
**indicates** 84:22
206:11 213:19

**[indicating - interviewing]** Page 29

**indicating**
170:5
**individual**
124:9 155:5
282:24 289:16
293:23 304:10
**individuals**
20:14 22:2
23:23 76:4
81:12 104:9
108:22 119:7
128:5,8 150:10
226:13 233:4,6
295:9,13 315:4
**industries** 63:2
**industry** 45:1,7
45:12 62:24
223:1
**inferences**
229:13
**influence** 150:3
**inform** 276:9
**informal**
275:13,22
277:1,1,7
292:16
**informally**
276:8
**information**
70:1 135:6
188:17 189:4
197:2,3 200:13
203:20 223:3
230:24 234:17

234:23 239:9
240:2 241:13
241:24 243:9
245:23 246:10
247:7 281:9,14
286:3 287:4
295:23 296:1
301:1 302:15
309:14 310:20
316:11 318:9
**informed**
147:16
**informing** 72:5
**infringement**
56:9,12 57:8
**initial** 136:24
137:4 138:1
**injury** 1:4
12:20
**input** 21:9 64:8
**inquire** 257:20
**instagram** 2:23
5:8 248:3,11
248:17 249:10
252:11 257:11
258:1 274:7
275:3 279:8,15
279:18
**instance** 51:12
73:18 132:20
139:22 149:17
170:21 203:4
222:7 245:22
246:9 258:12

263:13 264:6
269:24
**instances** 206:3
206:13
**instructed** 72:3
72:8 289:12
**instruction**
82:1,9 87:1
88:2 96:1
118:4,7 120:23
125:15 128:7
130:19 132:16
132:22 133:4,8
133:21 134:10
136:2,8 197:11
280:22 297:12
297:16
**instructional**
132:2
**instructions**
65:22 67:11
68:2 74:1,7
322:1
**instrument**
169:13 175:17
205:23 221:9
221:12
**interacted**
301:3
**interest** 193:1
**interesting**
36:19 165:13
179:21

**interests**
302:10
**internal** 284:3
284:6 295:2,5
**internally**
312:13
**international**
34:1 63:16
**internet** 103:12
127:23 197:6
201:2 204:12
208:9 227:7
231:9 235:19
**interrupted**
67:14
**interruptions**
174:17 175:11
**interview** 60:13
123:10 154:18
197:2,6 205:7
268:10,20
269:11
**interviewed**
295:9 305:19
305:22
**interviewee**
197:4
**interviewers**
196:19
**interviewing**
8:16 53:18,19
193:18 196:21
196:22 197:22
200:21 204:6

**[interviewing - jacobson]**                                         Page 30

| | | | |
|---|---|---|---|
| 208:4,13 | **invite** 178:4 | 170:17 263:22 | 51:14 52:12 |
| 211:12,18 | **invited** 154:17 | 314:23 | 53:9 54:10 |
| 212:5 275:14 | 214:10 226:18 | **issues** 17:1 | 68:21 70:22 |
| 275:23 | **inviting** 65:10 | 20:11 21:12 | 71:6 73:19 |
| **interviews** | 228:10 232:20 | 49:20 82:24 | 74:3,12 75:7 |
| 157:14 159:15 | **invoices** 10:6 | 83:10,24 84:9 | 77:22 82:11 |
| 176:17 177:10 | 271:12 272:19 | 101:11,19 | 84:1 85:6,19 |
| 186:22 210:21 | **involve** 16:20 | 106:10,18 | 86:17 87:12,19 |
| 221:20 250:2 | 36:21 57:16 | 112:4,13 | 88:4,21 89:17 |
| 266:22 268:4 | 197:18 | 137:16 139:2 | 90:8,18 91:19 |
| 273:11,19,23 | **involved** 53:7 | 139:16 140:19 | 92:3,12 93:2 |
| 274:18 275:5 | 61:22 147:15 | 141:14 176:21 | 93:10,20 95:7 |
| 276:18,22 | 155:6 211:5 | 177:2 182:4 | 95:17 96:3,15 |
| 277:3 292:16 | 315:1,18 | 211:17 221:18 | 97:7 98:5,14 |
| 293:17 296:3,7 | **involves** 201:16 | 256:20,22,24 | 98:23 99:6 |
| 296:15 | **involving** 17:19 | 257:2 264:14 | 100:19 101:2 |
| **introduce** | 57:5 146:15 | 266:7 276:7 | 101:20 102:6 |
| 246:16 | 190:15 | 314:20 | 102:22 103:18 |
| **introduced** | **ip** 59:2 | **item** 34:20 | 104:10 106:1 |
| 191:17 | **irregularity** | **items** 139:9 | 106:20 107:4 |
| **introduction** | 189:16 | 142:19 143:4 | 107:24 108:12 |
| 209:11 212:13 | **irrelevant** | 270:6 | 108:23 110:9 |
| **invalidity** 8:13 | 197:5 | | 111:12,19 |
| 165:24 166:16 | **irrespective** | **j** | 112:14,21 |
| 172:13 | 258:3 259:16 | **j** 2:15 8:19 9:7 | 113:22 114:9 |
| **investments** | **irvington** 2:12 | 9:10,14,17,21 | 114:18 115:9 |
| 286:13 | 8:7 9:18 19:6 | 194:18 216:4 | 115:22 116:14 |
| **invitation** 73:1 | 79:5 104:19 | 216:12,20 | 116:24 119:12 |
| 81:1 113:10 | 107:14 217:6 | 217:4,12 | 119:22 120:6 |
| 127:21 235:11 | 218:15 219:23 | **jacob** 36:24 | 121:2 122:7,15 |
| 241:2 | 220:3 | **jacobson** 2:3 | 123:3,15 124:4 |
| **invitations** 65:8 | **issue** 14:2 | 6:8 26:3 27:3 | 124:18 125:2 |
| 72:2 307:13,24 | 29:16 30:24 | 30:18 34:7 | 126:6,19 |
| | 36:5 39:17 | 41:18 49:4 | 127:10,18 |

| | | | |
|---|---|---|---|
| 128:10,21 | 222:11 223:9 | 293:10,20 | 46:12 |
| 133:11,23 | 224:1 229:4 | 294:5,19 | **july**  21:24 |
| 134:12 135:1 | 231:14 232:16 | 296:19 299:9 | 272:21 273:6 |
| 136:17 137:1 | 234:12 235:1 | 300:6,21 | **jury**  77:18 |
| 138:4,21 | 236:7,19 | 301:13,24 | 146:6 |
| 139:12 140:3 | 237:15,23 | 302:19 303:8 | **justified**  177:21 |
| 140:22 142:16 | 238:14 239:17 | 303:21 304:5 | 180:6 |
| 144:11 145:3 | 240:17 241:9 | 304:16 305:1 | **justify**  226:3 |
| 146:7 147:3,23 | 241:21 242:8 | 305:16 306:17 | **k** |
| 148:19 149:10 | 243:2,14,22 | 306:21 308:1 | **k**  66:11 |
| 150:15 151:5 | 244:9,21 | 308:13 310:5 | **kaylie**  4:10 |
| 151:13,21 | 245:13 246:18 | 311:5 312:1,18 | **keep**  67:14 |
| 152:12 153:3 | 248:19 249:15 | 313:1,3 314:2 | 155:24 279:19 |
| 156:16 157:24 | 250:22 251:13 | 315:13,23 | 289:2 |
| 159:2,24 | 251:23 253:1,9 | 316:18,24 | **kentucky**  34:1 |
| 160:14 161:8 | 254:1,12 | 317:9,16 | **kessler**  1:15 2:2 |
| 161:22 162:13 | 255:22 256:14 | 319:10 320:14 | 3:16 |
| 163:5,22 165:5 | 257:3,17 258:5 | **jacoby**  36:24 | **key**  149:2,6 |
| 167:23 168:10 | 258:16 260:4 | **japan**  62:23 | 230:7 |
| 168:22 169:17 | 261:17 262:2 | **jjacobson**  2:6 | **kids**  245:7 |
| 170:10 171:1 | 262:19 263:3 | **job**  189:18 | 276:6 297:1 |
| 171:10,16 | 263:16 264:9 | 203:11,15 | **kind**  153:14 |
| 174:2,10 | 265:1,16 266:1 | 307:3 | 154:23 159:5,8 |
| 175:20 178:24 | 266:14 267:8 | **johanns**  7:6 | 197:5 232:23 |
| 181:18 186:6 | 268:1,14,24 | 42:16 43:3 | 250:3 270:4 |
| 188:20 190:11 | 269:16 270:1 | **john**  63:8,10 | 275:12 277:6,7 |
| 191:20 193:6 | 270:19 274:19 | **jordan**  2:3 | 279:19 305:13 |
| 198:17 200:10 | 275:7 278:8,15 | 313:3 320:14 | 311:11,18 |
| 201:24 202:18 | 281:1,21 | **jose**  35:1,7,10 | **kindergarten** |
| 204:9 205:14 | 282:19 283:10 | **judge**  14:17 | 66:11 |
| 206:22 208:17 | 284:11 285:5 | 26:12 28:24 | **kinds**  276:24 |
| 211:8,20 213:8 | 285:23 287:15 | 29:8,12,17 | 277:3 |
| 214:6 215:17 | 288:2 290:1,10 | 34:6,11,18 | |
| 220:9,17,22 | 292:5,22 | 35:17 37:8,19 | |

[king - kumho]                                                    Page 32

| | | | |
|---|---|---|---|
| **king**   1:16 2:4 | **klein's**   28:3,7 | 151:10 152:15 | 252:15,16 |
| 3:17 4:14 | 28:12 39:14,20 | 153:7 154:3 | 253:6 254:5,6 |
| **kirkland**   3:9 | 39:22 220:11 | 155:13,13,22 | 259:10 261:13 |
| 272:7 | **klein000001-...** | 155:23 156:19 | 263:20 266:6 |
| **kirkland.com** | 10:5 271:11 | 156:21 157:1,3 | 266:17,18 |
| 3:11 | **kmorgan**   4:12 | 157:12 158:17 | 267:15,18 |
| **klein**   1:14 6:4 | **knew**   137:21 | 160:19 162:4 | 269:4 276:4 |
| 6:14,17,20,22 | 148:17 | 162:15,18,20 | 277:2 278:1 |
| 7:5,7,8,9,11,14 | **know**   15:21 | 163:13,16 | 280:13 284:24 |
| 7:17,20 8:5,8 | 16:7 21:12,19 | 164:11,13 | 286:12 287:5,5 |
| 8:11,15,18,21 | 22:1 25:23 | 165:13,16 | 289:21 295:17 |
| 9:5,9,12,16,19 | 35:10 44:16,18 | 166:23 174:15 | 297:5 299:20 |
| 9:23 10:5 13:1 | 48:17 49:6 | 175:6,9 176:5 | 300:5,17 |
| 13:7,14,19 | 58:18 63:18,22 | 176:18 177:7,8 | 301:10 304:3 |
| 14:4,20 15:6 | 63:24 65:8 | 178:8,14 179:4 | 311:8,10,16 |
| 18:13,20 24:24 | 66:9 72:13 | 179:19,20 | 313:2,15 |
| 26:18 27:2 | 73:9,12,17,24 | 181:13 185:15 | **knowing** |
| 28:13 29:21 | 82:14 103:24 | 188:23 189:2 | 137:19 139:3 |
| 31:12 32:23,24 | 113:9 114:21 | 192:1,13 | **knowledge** |
| 37:24 39:1 | 118:14 119:1 | 193:24 202:9 | 26:8,10,11 |
| 42:14 48:7,8 | 120:3,9,13 | 203:9,11 | 64:24 146:23 |
| 55:11 58:9 | 121:20,23 | 204:23 207:20 | 148:2 150:4 |
| 78:7,14,20 | 122:21 123:1 | 208:3 210:4 | 193:9 222:22 |
| 79:2,9 165:22 | 123:22 124:10 | 213:18,22 | 277:16 294:22 |
| 172:10 193:16 | 125:5,19 126:9 | 223:18 228:9 | 295:7 303:2 |
| 194:16 199:11 | 126:11 130:16 | 232:8 233:18 | **known**   148:22 |
| 216:2,10,18 | 131:13,17 | 235:7,14 | 251:11 |
| 217:2,10,21 | 133:2,3,5 | 237:12 239:11 | **knows**   152:7 |
| 224:14 271:11 | 134:2 138:8,15 | 240:6,19,23 | **kslaw.com**   4:17 |
| 271:19 272:4 | 141:1,3,9 | 241:6 242:4,20 | **kst**   37:5 |
| 288:8,18 | 142:23 143:2,5 | 243:11,20 | **ktmc.com**   2:5,6 |
| 297:19 298:19 | 143:6 144:14 | 244:11,13,23 | 3:19 |
| 312:21 319:1 | 145:15 148:10 | 246:22 249:24 | **kumho**   7:13 |
| 324:8 | 149:2 150:10 | 251:7 252:12 | 58:12 |

CONFIDENTIAL

**[l - lists]**                                                           Page 33

| l | | | |
|---|---|---|---|
| **l**  2:3 | **lawsuits**  146:15 | **lighting**  256:21 | **linked**  63:3 |
| **labeled**  175:1 | 146:19,21 | 257:1 | **linkedin**  7:8 |
| **lack**  229:12 | 147:2,7,15,22 | **liked**  240:13 | 48:4,8,19,22 |
| 237:8,13 | 148:4 | **likelihood**  17:1 | 49:3,14 |
| 238:12 | **lawyer's**  325:1 | 28:6,10,15 | **lisa**  4:15 298:19 |
| **lakdawalla** | **lawyers**  25:8 | 29:10 43:17 | 319:22 320:12 |
| 8:20 9:7,11,14 | **lead**  29:6 61:11 | 44:7 226:5 | **list**  24:18,20 |
| 9:18,21 194:19 | 170:8 172:18 | **likely**  125:23 | 41:3 50:11 |
| 216:5,13,21 | 203:21 234:18 | 236:14 | 59:17 62:13,15 |
| 217:5,13 | **leading**  37:13 | **likes**  280:8 | 67:10 72:2,5 |
| **landscape** | 46:24 60:8 | **limb**  33:23 | 74:21,24 96:21 |
| 276:10 | 148:12 265:9 | **limitation** | 155:18 179:6 |
| **lane**  290:15 | 265:13,19 | 41:24 | 210:21 212:7 |
| **language**  66:8 | **learn**  284:19 | **limitations** | 212:19,24,24 |
| **lanham**  16:24 | 285:3,14 | 209:15 | 213:6 228:19 |
| **large**  236:23 | **led**  136:23 | **limited**  37:6 | 270:6 |
| **larger**  85:12 | **length**  205:22 | 44:2 52:15 | **listed**  41:2 |
| 227:12 | **leon**  2:10 | 223:18 248:17 | 50:24 64:4 |
| **late**  255:16,17 | **letter**  235:12 | 250:19 314:1 | 142:8 143:22 |
| 255:20,21 | **level**  208:15 | **line**  11:6,6,6,11 | 144:10,15 |
| 256:8,8,12,12 | 244:16 302:7 | 11:11,11,16,16 | 248:1 251:6 |
| 261:5 | **lexisnexis**  6:18 | 11:16,21,21,21 | 254:24 255:9 |
| **lavrakas**  8:22 | 6:20,23 7:6 | 201:10 231:8 | **listened**  156:9 |
| 199:12 | 26:19 31:13 | 235:18 306:14 | 273:18,20,22 |
| **law**  1:15 4:3 | 32:4 38:1 | 307:4,9,11,12 | 274:17 275:5 |
| **lawrence**  13:19 | 42:15 | 307:22,23 | **listening**  23:24 |
| **lawsuit**  13:16 | **lhorvath**  4:17 | 308:10,11 | 157:13 296:11 |
| 148:18,23 | **liability**  1:5 | 323:3 325:2 | **listing**  40:23 |
| 150:4 152:7,11 | 12:20 | **lines**  73:7 | 254:16 |
| 152:22 193:9 | **life**  203:5,10,12 | **link**  64:11 | **listings**  40:21 |
| 258:22 | 204:7 205:2,3 | 154:19 262:15 | 68:4 |
| | 205:12 206:1 | 262:24 | **lists**  56:1,4 |
| | 206:15,18 | **linkage**  265:14 | 173:17 |

CONFIDENTIAL

**[literature - make]**                                                    Page 34

| | | | |
|---|---|---|---|
| **literature** 23:2 | **logical** 290:14 | 186:9 187:9 | **losing** 203:11 |
| 167:5 170:5 | **logistics** 221:21 | 193:11,24 | **lost** 203:15 |
| 176:23 178:10 | **long** 23:10 36:5 | 200:4 201:11 | **lot** 253:23 |
| 178:12 180:10 | 37:1 48:23 | 201:11 205:19 | 263:19 279:12 |
| 181:16 182:1 | 123:20 171:8 | 210:13 213:13 | **louisville** 33:24 |
| 183:24 184:3 | 174:9 207:12 | 225:20 228:13 | **lower** 236:4 |
| 208:12 215:6 | 277:3,21 | 247:16 255:9 | **lunch** 128:19 |
| **litigation** 1:5 | 280:16 296:2 | 260:19 290:19 | 128:20 171:18 |
| 12:21 14:6 | 300:18 | 296:13 308:20 | **m** |
| 17:1 27:8 43:2 | **longer** 164:5 | 316:16 | |
| 46:4 56:7 | **look** 24:12,13 | **looked** 59:11 | **m** 5:4 |
| 59:23 61:7,14 | 24:23 26:16 | 131:9 135:9,11 | **made** 22:9,22 |
| 61:23 149:9,18 | 27:14 29:20 | 147:10 174:24 | 29:7 35:11 |
| 149:23 150:12 | 37:10,22 38:21 | 187:7 247:5 | 59:1 70:15 |
| 150:12 151:1 | 39:12 43:11,22 | 306:2 | 120:11 123:9 |
| 272:17 273:6 | 48:3 55:8 58:7 | **looking** 68:9 | 268:5 278:13 |
| 280:24 286:18 | 59:13 65:4,19 | 70:4 74:10 | 315:10 322:7 |
| 286:22 290:7 | 71:22 74:17 | 80:20 86:4 | **mail** 65:10 72:4 |
| 312:10 313:6 | 75:12 80:1 | 90:13,21 91:7 | 73:4 80:11 |
| 314:11 | 82:18 88:12,14 | 132:4 142:12 | 96:22 |
| **litigators** 59:2 | 94:2,6 96:23 | 153:11 157:1 | **mails** 72:14,18 |
| **little** 47:14 | 99:16 102:10 | 166:24 167:9 | 72:21 73:15 |
| 128:24 154:7 | 103:21 104:16 | 172:10 184:22 | 75:1 102:13 |
| 159:18 195:15 | 104:22 107:9 | 191:11 200:17 | **main** 33:12 |
| 278:17 | 107:16 109:10 | 201:3 204:1 | 77:15 254:7 |
| **llc** 3:6,6 4:19 | 109:14 113:1 | 210:10 211:16 | 274:12 |
| 6:18,23 26:20 | 113:14 117:5 | 237:3 246:5 | **maine** 3:4 |
| 27:9 38:2 | 118:10 129:15 | 247:19 275:10 | **majority** 17:9 |
| **llp** 1:16 2:2,14 | 130:21 132:7 | 311:13 318:11 | **make** 7:13 16:8 |
| 3:3,9,16 4:14 | 134:22 165:19 | **looks** 166:22 | 58:12 63:2 |
| 5:4 | 166:8 169:2,6 | 190:19 255:13 | 67:6,12 72:8 |
| **local** 34:2,2 | 172:22 173:16 | 256:5 | 72:10 73:20 |
| **locating** 206:15 | 177:14 178:5 | **loop** 310:24 | 148:10 152:1 |
| | 179:5 184:9 | | 158:12 184:6 |

**[make - meaning]**                                    Page 35

| | | | |
|---|---|---|---|
| 196:13 218:3 | **march** 202:22 | 23:23 24:3 | **mcgee** 5:14 |
| 222:9 239:12 | **mark** 6:21 | 39:10 41:16 | 12:12 |
| 250:5 251:3,17 | 31:14 32:7 | 43:8,15 49:10 | **md** 1:3 |
| 257:8 282:5 | 35:3,6 36:4 | 49:15 55:12,19 | **mdl** 1:4 |
| 306:6 317:13 | 55:8 78:4 | 63:7,11,16 | **mean** 20:10 |
| 322:4 | 194:24 219:17 | 221:24 222:5 | 49:7 51:7 |
| **maker** 272:8 | 220:12,14,20 | 272:20 285:21 | 65:14 68:15 |
| **maker's** 6:20 | 222:8,10,15,24 | 286:8 312:5,8 | 84:4 103:6 |
| 31:14 32:7 | **marked** 11:20 | **marks** 41:13 | 105:5 113:8 |
| 35:3,6 36:4 | 18:16,21 26:21 | 42:11 | 120:14 122:21 |
| 222:8,10,15,24 | 31:15,24 38:3 | **maslynsky** 1:19 | 124:7 125:4 |
| **makes** 124:1 | 38:8 42:17,21 | 321:10 | 126:4,8 127:2 |
| 201:5 | 48:9,15 55:13 | **master's** 47:19 | 127:2 130:1 |
| **making** 61:9 | 58:13,17 78:10 | **match** 177:5 | 134:9,15 141:5 |
| 157:15 158:9 | 78:17,23 79:5 | **material** 39:17 | 142:20 145:7 |
| 160:20 189:24 | 79:12 166:3 | **materials** 67:18 | 145:14,21 |
| 190:3 235:9 | 193:19 194:20 | **math** 244:7 | 148:21 149:12 |
| 249:21 289:17 | 199:12 216:6 | 245:8,9 308:24 | 153:24 160:17 |
| **manage** 188:17 | 216:14,22 | 309:6 | 164:15,22 |
| **management** | 217:6,14,22 | **matter** 12:18 | 165:12,16 |
| 21:4 47:20 | 220:6 224:16 | 22:10 24:9 | 177:12 185:17 |
| 246:16 | 224:21 271:12 | 27:8,12,22 | 185:22 202:4 |
| **managing** | 272:10 | 29:17 30:13 | 222:13 225:10 |
| 221:20 | **market** 4:4 | 43:2 62:18 | 236:10 241:6 |
| **manifest** | 32:14 41:17,21 | 64:5 235:10 | 244:24 245:15 |
| 145:18 263:8 | 42:3,5 51:3,6 | 244:14 257:15 | 261:12,19 |
| **manual** 9:23 | 51:10,20,24 | 313:4 | 263:21 270:3 |
| 59:22 60:15 | 52:1,4,8 54:8 | **matters** 19:3 | 278:18 280:18 |
| 224:15 225:2 | 54:13 192:11 | 24:24 | 286:12 287:22 |
| **manufacturer** | 192:17,20 | **maximized** | 290:13 309:19 |
| 54:16 222:10 | **marketing** 7:10 | 67:15 | 314:19,24 |
| 223:8,24 | 16:20 20:3,6 | **maximum** | 316:22 |
| **manufacturers** | 20:14,16,20,21 | 233:23 235:16 | **meaning** 17:2 |
| 40:24 44:23 | 21:1 22:16 | | 49:22 50:5,15 |

**[meaning - meta]**                                                                    Page 36

250:17
**meaningless**
30:8
**means** 65:18
75:4 81:8 90:5
108:19 122:22
186:21 188:11
249:3,7 258:19
280:14 321:19
**meant** 40:20
195:17
**measure** 46:6
140:8 191:5
213:16,24
214:16 215:6
224:6 263:23
284:9
**measured**
85:22 86:20
87:3,5,22
90:11 91:22,24
92:6,8,15 93:5
93:13,16 95:12
100:22,24
107:7 109:23
141:3 177:10
282:22 283:3
**measurement**
180:17 181:2
183:6,19 184:7
186:3 187:18
192:2 283:5
**measures**
138:15 214:20

228:20 229:15
**measuring**
29:11 169:13
175:3,17
178:22 179:17
**mechanical**
47:17
**media** 1:3 6:15
7:15,18,21 8:6
8:9 12:18
18:14 72:10
76:21 77:4
78:8,15,21
79:3,10 81:10
82:2,10,24
83:10,24 84:9
84:20 85:4,17
87:2,10 88:3
88:19 90:16
94:13,21 95:5
96:2 99:21
100:7 101:11
101:19 104:7
105:4,15 106:9
106:18 107:21
109:19 110:4
110:18 111:2
112:4,13
113:21 136:3,7
139:1,16,24
140:19 141:4
141:14 142:4
142:14,22
143:8,13,19

144:8,18 145:1
146:3,15
147:22 152:10
156:14 174:16
175:11 176:7
176:10,21
177:3 178:13
179:11 182:6
185:1,24
190:16 191:2
197:15 198:13
203:6 206:17
206:19 207:7
245:4 247:1
248:2,8,16,22
249:14,18
250:18 251:5
252:13,23
253:8,24
258:13 259:6
259:18,21
261:1,4,6,7,12
261:16 262:1
262:12,16
263:1,7 264:3
265:8,14,24
267:1,13 276:8
281:5,15,18
282:2,14,22
285:11 286:17
287:14 289:13
299:14,24
300:4 310:17
318:7

**medicare**
286:13
**medicines**
53:21
**meet** 23:7,11
319:14
**meets** 232:23
291:11
**melissa** 2:3
**meltzer** 1:16
2:2 3:16
**member** 226:19
**memorable**
209:23
**memorialized**
156:5
**memory** 163:21
164:2,2 209:12
209:16 210:24
**memos** 156:4
**mention** 72:10
152:22 174:16
**mentioned** 53:7
145:9
**merely** 140:1
140:19
**messaging**
255:11
**met** 22:24
**meta** 2:23 5:8
13:16 14:6
17:19 25:1,18
315:1 320:7

CONFIDENTIAL

**[method - natural]**                                                      Page 37

| | | | |
|---|---|---|---|
| **method** 211:18 | 94:15,23 95:16 | 162:11 165:3 | **morgan** 4:10 |
| 226:3 | 96:24 97:4,11 | 177:2 193:23 | **morning** 13:14 |
| **methodologi...** | 97:20,23 100:1 | 206:21 207:1 | **motions** 313:16 |
| 39:15 40:7 | 100:9 101:1,13 | 320:16 | 313:21 |
| **methodologies** | 102:4,13,20 | **minutes** 77:2 | **motivate** |
| 8:17 183:5,18 | 105:9,17,24 | 117:19,22 | 148:12 |
| 184:7 193:19 | 106:13 107:1 | 118:6,14 119:1 | **motivations** |
| 197:18 208:14 | 107:13,23 | 121:20,24 | 51:23 |
| 210:22 | 109:7,16,20 | 125:8 135:24 | **move** 62:2 |
| **methodology** | 110:2,6,20 | 163:17 164:18 | 224:11 |
| 6:16 7:16,19 | 111:4,17 112:6 | 165:11 184:24 | **moves** 280:9 |
| 7:22 8:7,10 | 112:19 113:5 | 207:2,18 | **multiple** 28:11 |
| 18:15 78:9,16 | 114:3 154:12 | 208:16 271:2 | 206:20 226:21 |
| 78:22 79:4,11 | 186:13 201:4 | 279:1 296:5 | 227:15,23 |
| 118:21 209:6 | 248:23 276:5,6 | 319:7 320:8,10 | 228:10 232:22 |
| **methods** | 297:4 | 320:12,14 | **myeates** 2:5 |
| 186:21 199:18 | **milk** 44:20 | **mischaracteri...** | |
| **mexican** 35:13 | **miller** 1:19 | 34:8 160:16 | **n** |
| 46:21 | 13:4 321:10 | 171:11 274:21 | **n** 6:2,21 31:15 |
| **miami** 2:10 | **mind** 31:5 53:5 | 281:23 | **name** 12:11 |
| **michael** 8:19 | 252:17 262:15 | **mischaracteri...** | 13:15,18 29:5 |
| 9:7,10,14,17,21 | 314:14 | 114:1 | 40:16,19 41:1 |
| 194:18 216:4 | **mine** 20:10 | **misstates** | 80:14 272:6 |
| 216:12,20 | 39:2 90:22 | 133:12 315:24 | 288:20 298:19 |
| 217:4,12 | 320:1 | **mistaken** 37:19 | 313:2 |
| **microphone** | **minimized** | **mit** 63:10 | **named** 30:7 |
| 222:1 | 67:15 | **modify** 46:19 | 281:11 |
| **middle** 66:24 | **minor** 21:14 | **moment** 296:11 | **names** 75:24 |
| 74:22 75:5,16 | **minute** 18:1 | 316:10 | 76:3 276:12,14 |
| 80:21 81:22 | 46:18 71:5 | **money** 22:17 | 295:8,18 |
| 82:6 83:17 | 88:10 117:6 | **month** 206:3,14 | **narrative** |
| 84:14,14,23 | 128:17 156:13 | 279:16 | 197:18 211:1,5 |
| 86:2,6 87:6,17 | 157:11 158:23 | **months** 46:1 | **natural** 128:16 |
| 89:23 92:18,20 | 159:22 161:6 | 49:11,16 206:2 | |

**[naturally - objection]**                                                    Page 38

**naturally**
  204:15
**nature** 189:18
  227:17 230:11
  230:22 231:4
**necessarily**
  45:6 53:12
  134:15 143:6
  143:16 151:8
  171:4 212:23
  255:1 282:1
  299:14
**necessary** 7:12
  58:11 285:8,19
  322:4
**need** 16:7 19:14
  41:16 46:13
  61:21 169:19
  170:13 174:5
  174:14 178:5
  205:23 241:3
  260:15 282:8
  296:8,9 317:15
**needed** 130:16
  242:1 247:7
**needs** 52:10
  63:3 64:10
  225:11 259:14
  316:6
**neutral** 265:22
  266:5
**neutrally** 264:5
**never** 48:21
  69:16 222:14

252:17 253:4
253:13 278:10
284:7 313:24
314:10
**new** 2:20,21,21
  210:22 224:11
**newer** 246:11
  246:14,22
**news** 298:23
**night** 164:16
  261:5
**nine** 107:20
  320:11
**non** 61:12
  70:14 229:22
  230:8,10,21
  231:1,12 234:5
**normally** 67:21
**north** 32:8
**northern** 1:1
  12:22
**notary** 324:14
**note** 61:4 174:3
  174:15 177:8
  181:11 214:7
**noted** 13:1
  36:16 194:11
  307:8 322:11
  324:6
**notes** 179:16
  276:17,21,24
  296:7 325:1
**noteworthy**
  196:19

**notice** 1:14
  144:15
**notification**
  260:11
**notifications**
  260:3
**number** 36:16
  59:17 63:12
  77:2 86:4
  91:14 99:2,24
  103:22 105:6
  106:23 109:3
  117:22 129:17
  129:21 131:12
  132:8,10 154:1
  157:23 158:24
  180:16 181:2
  183:6,18
  184:15,23
  185:7,19
  189:17 196:17
  207:18 219:3
  233:23 243:20
  246:11 255:3
  301:1 306:16
  307:12,17,24
  308:23,24
  309:2
**numbers** 28:4
  82:19 116:2
  117:18 131:11
  153:24
**numerator**
  118:6 307:11

**numerous** 28:2
  28:21
**nw** 2:16 5:5

**o**

**o** 253:17
**o'hanlon** 4:9
**oath** 14:16
**object** 186:6
  200:11 316:23
  317:18
**objection** 26:4
  30:19 34:8
  41:19 49:5
  51:15 52:13
  53:10 54:11
  70:23 74:4,13
  75:8 77:23
  82:12 84:2
  85:7,20 86:18
  87:13,20 88:5
  88:22 89:18
  90:9,19 91:20
  92:4,13 93:3
  93:11,21 95:8
  95:18 96:4,16
  97:8 98:6,15
  98:24 99:7
  100:20 101:3
  101:21 102:7
  102:23 103:19
  104:11 106:2
  106:21 107:5
  108:1,13,24

CONFIDENTIAL

**[objection - okay]**                                              Page 39

| | | | |
|---|---|---|---|
| 110:10 111:13 | 190:12 191:21 | 275:8 278:9,16 | **occasions**  17:14 |
| 111:20 112:15 | 193:7 198:18 | 281:2,22 | 17:21 23:6 |
| 112:22 113:23 | 202:1,19 | 282:20 283:11 | **occupational** |
| 114:10,19 | 204:10 205:15 | 284:12 285:6 | 186:18 |
| 115:10,23 | 206:23 208:18 | 285:24 287:16 | **occurred**  15:3 |
| 116:15 117:1 | 211:9,21 213:9 | 288:3 290:2,11 | 39:6 212:10 |
| 119:13,23 | 222:12 223:10 | 292:6,23 | **occurrence** |
| 120:7 121:3 | 224:2 229:5 | 293:11,21 | 279:3 |
| 122:8,16 123:4 | 231:15 232:17 | 294:6,20 | **offer**  130:12 |
| 123:16 124:5 | 234:13 235:2 | 296:20 299:10 | 225:6 |
| 124:19 125:3 | 236:8,20 | 300:7,22 | **offered**  17:18 |
| 126:7,20 | 237:16,24 | 301:14 302:1 | 32:22 34:13,17 |
| 127:11,19 | 238:15 239:18 | 302:20 303:9 | 38:24 52:17 |
| 128:11 133:12 | 240:18 241:10 | 303:22 304:6 | 59:4 200:12 |
| 133:24 134:13 | 241:22 242:9 | 304:17 305:2 | 295:20 313:5 |
| 135:2 136:18 | 243:3,15,23 | 305:17 306:18 | **offering**  286:18 |
| 137:2 138:5,22 | 244:10,22 | 306:22 308:2 | **office**  235:13 |
| 139:13 140:4 | 245:14 246:19 | 308:14 310:6 | **offices**  1:15 |
| 140:23 142:17 | 248:20 249:16 | 311:6 312:2 | **offs**  69:5,7 70:6 |
| 144:12 145:4 | 250:23 251:14 | 315:14,24 | 70:9 |
| 146:8 147:4,24 | 251:24 253:2 | 317:14 319:11 | **oh**  24:14 103:4 |
| 148:20 149:11 | 253:10 254:2 | **objections**  12:6 | 143:7 201:13 |
| 150:16 151:6 | 254:13 255:23 | **objective**  61:12 | 206:9 270:7 |
| 152:13 153:4 | 256:15 257:4 | 161:20 | 317:23 |
| 156:17 158:1 | 257:18 258:6 | **objectively** | **okay**  15:23 |
| 159:3 160:1,15 | 258:17 260:5 | 158:22 159:20 | 16:8 20:15 |
| 161:9,23 | 261:18 262:3 | 161:4 163:20 | 40:4 44:4 |
| 162:14 163:6 | 262:20 263:4 | **objectivity**  61:1 | 54:21 62:10 |
| 163:23 165:6 | 263:17 264:10 | 61:5,21 | 79:22 80:20 |
| 167:24 168:11 | 265:2,17 266:2 | **obtained** | 81:20 83:4 |
| 168:23 169:18 | 266:15 267:9 | 209:13 210:21 | 91:10,11 94:8 |
| 171:2,11 | 268:2,15 269:1 | 228:21 229:2 | 143:12 144:19 |
| 175:21 179:1 | 269:17 270:2 | 229:15 | 157:2 167:17 |
| 181:19 188:21 | 270:20 274:20 | | 177:11 179:2 |

**[okay - page]**                                                    Page 40

| | | | |
|---|---|---|---|
| 183:1 184:21 | **openings** | 275:11 322:15 | 24:23 27:15,16 |
| 187:22 201:13 | 220:23 | **originally** | 29:20 30:2,3 |
| 201:14 206:9 | **operating** | 295:20 | 32:17,19 38:22 |
| 206:10 247:12 | 297:6 | **outside** 145:13 | 39:13 40:2,3 |
| 247:18 277:12 | **opinion** 26:13 | 145:20 252:15 | 43:12 55:13,18 |
| 288:7,12,24 | 27:21 28:20 | 254:10 261:1 | 59:14 62:9,11 |
| 289:1,20 291:5 | 32:5,6 34:14 | 286:7 290:15 | 65:20 68:22 |
| 291:18 300:1 | 35:22 38:24 | 316:19 317:19 | 69:17,18,19,22 |
| 300:12,17 | 146:1,5 187:5 | **overall** 88:2 | 69:23 71:22 |
| 302:14 303:17 | 227:19 287:18 | 95:24 226:15 | 75:13,14 80:3 |
| 304:3 305:24 | 288:5 | 240:16 241:19 | 80:4,5,17,21 |
| 308:7 319:1 | **opinions** 17:19 | 242:22 | 81:16 88:12,13 |
| **old** 242:6,21 | 25:21 59:4 | **overuse** 267:12 | 88:15 96:24 |
| **omegle** 253:16 | 61:18 284:4,21 | **own** 45:9 48:22 | 102:16 105:6 |
| 253:18 | 285:15 286:17 | 67:20 203:18 | 105:11 107:17 |
| **once** 17:22 78:5 | 313:6 | 204:20 205:1,2 | 107:18 113:15 |
| 82:20 83:6,13 | **opportunity** | 275:24 | 117:6,11 |
| 83:20 142:15 | 43:24 163:16 | **p** | 129:15 130:22 |
| 279:16 | 174:8 227:13 | | 131:19 135:12 |
| **ones** 53:4 81:14 | **opposed** 45:10 | **p.c.** 2:9 | 135:15 141:15 |
| 104:13 116:9 | 170:18 246:6 | **p.m.** 129:11 | 141:18,19,21 |
| 139:4 142:22 | **optimize** | 171:23 172:6 | 169:7 173:7,17 |
| 249:19 254:7 | 210:23 | 182:12,19 | 175:12 177:15 |
| 254:10 255:10 | **option** 162:17 | 215:19 217:18 | 182:23 184:10 |
| 274:13 293:8 | **options** 144:9 | 271:4,16 298:6 | 184:19 186:11 |
| **online** 33:14,16 | **order** 53:21 | 298:13 320:17 | 187:10,12,15 |
| 34:19 | 61:4,20 130:11 | 320:21 | 191:12,14 |
| **open** 69:12 | 142:20 143:1 | **pa** 12:17 | 195:3 196:17 |
| 189:18 288:9 | 143:16 188:15 | **page** 6:13 7:4 | 200:17 201:5 |
| **opening** 19:7 | 196:6 237:6,7 | 7:10 8:4 9:4 | 201:12 203:24 |
| 71:21 79:20 | **orienting** | 10:4 11:6,6,6 | 205:20 206:7 |
| 94:3 99:14 | 225:16 | 11:11,11,11,16 | 225:21 228:14 |
| 104:18 109:11 | **original** 37:18 | 11:16,16,21,21 | 247:10,14,15 |
| | 44:12 154:15 | 11:21 24:13,17 | 318:11 323:3 |

CONFIDENTIAL

**[page - percent]**                                                    Page 41

| | | | |
|---|---|---|---|
| 325:2 | 195:5 | **particularly** | **pennsylvania** |
| **pages**  210:15 | **parallel**  201:6 | 186:19 | 1:17 2:4 3:18 |
| 324:3 | 201:15 202:16 | **parties**  21:11 | **people**  20:6 |
| **paid**  22:15 | 203:1 250:6 | 319:7 | 29:6 35:4 41:5 |
| 314:17 | 264:13 | **partway**  69:8 | 41:12 42:10 |
| **pandemic** | **paraphrased** | **party**  320:5 | 51:22 53:16,17 |
| 82:21 83:7,15 | 99:23 136:4 | **pass**  130:14 | 55:2 65:9,24 |
| 83:21 84:11 | **paraphrasing** | 271:22 312:16 | 97:17 115:13 |
| 85:2,15 86:10 | 188:24 | 320:2 | 120:4,19,21,24 |
| 88:17 89:9,16 | **parents**  294:14 | **passed**  317:17 | 121:10,12,14 |
| 89:23 90:6 | **park**  3:17 | **passes**  164:5 | 121:16,19,23 |
| 91:14 92:9,20 | **part**  63:20 | **past**  24:19 | 122:2,5,23 |
| 93:18 99:19 | 173:22 214:23 | 62:16 69:16 | 123:7,14 124:2 |
| 100:14 105:1,9 | 228:21 242:12 | 124:17,20 | 126:1,2,12 |
| 105:21 110:15 | 261:15 283:19 | 176:14 207:10 | 129:17,21 |
| 111:8 310:4,13 | 285:18 295:10 | 212:11 | 131:22 132:9 |
| 310:21 | 301:7 | **patagonia** | 132:15 146:2 |
| **paper**  132:6 | **participants** | 278:2 | 148:13,17 |
| 166:13 172:11 | 61:13 238:23 | **patent**  17:5 | 150:18 160:19 |
| 180:1 189:1 | **participate** | 57:8,10,12 | 163:2 165:2 |
| 215:14 | 20:23 65:11 | **pattern**  153:21 | 206:19 223:23 |
| **paragraph** | 154:18 226:20 | **pause**  83:14 | 227:5,13 228:2 |
| 32:19 71:24 | 232:21 | **pay**  277:4 | 228:3,6 232:8 |
| 73:8 74:20 | **particular**  46:2 | **paying**  67:7 | 232:13,14 |
| 80:2,5,6,7 83:2 | 63:4 64:13 | **payment** | 236:15 305:19 |
| 94:7 96:8,18 | 97:22 148:13 | 272:15 273:4 | **people's**  61:18 |
| 99:17 102:11 | 158:6,6 195:24 | **peer**  62:4 63:17 | **percent**  28:6 |
| 104:23 107:10 | 215:14 222:22 | 63:20 64:1,18 | 33:1 82:23 |
| 107:11 109:15 | 224:9 228:8 | 65:1 | 83:9,16,17,18 |
| 113:2 118:11 | 257:10 258:3 | **peers**  64:2 | 83:23 84:8,13 |
| 131:13 183:3 | 259:12,13 | **peilen**  2:19 | 84:19,23 86:1 |
| 184:20 186:12 | 269:6 280:23 | 193:13 219:8 | 86:8,11,12,13 |
| 187:12,14,16 | 281:15 282:17 | 219:10 220:1,7 | 86:16,24 87:5 |
| 187:20 191:10 | 283:7,8 284:9 | | 87:10 88:20 |

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[percent - pistilli]**                                                                Page 42

89:10,13,24
90:3,16,22,23
91:1,5,13,17,17
92:2,11,11,21
93:1,9 94:11
94:15,20,23
95:5,16 99:20
100:1,2,6,11
101:9,13 105:2
105:8,14,17,24
106:8,12
109:17,24
110:4,16,20,24
111:4 112:2,6
282:11,15
294:9,17
312:15
**percentage**
28:15 87:14
95:20,22
100:17 101:19
102:3 106:3,18
107:3 111:15
111:22 112:13
252:13 289:23
291:8,12
293:18 294:3
306:20 307:16
308:4,21 309:9
312:4,7
**percentages**
104:5 108:20
115:18 117:23
118:5 283:7

307:21
**perception**
157:13
**perfectly**
176:18
**perform** 127:7
161:5
**performed**
16:21
**performing**
306:1
**period** 22:4
76:22 77:20
81:15 82:15
89:6 95:15
97:14 98:9,13
98:17,22 102:5
104:7 107:22
108:11 112:20
113:21 114:13
115:20 132:17
133:17 141:12
159:6,22 161:7
162:12 189:15
205:23 319:9
**periods** 136:15
140:2,6,11,12
140:15,21
153:22 159:7
167:8,22 168:8
168:20 202:9
202:10 300:20
**peripherally**
274:11

**person** 67:20
82:20 83:6,13
83:15,20 84:10
85:9 99:19
100:14 104:24
105:21 110:14
111:7 142:12
164:6 197:11
**personal** 1:4
12:19 45:18
**personally**
14:11
**personnel**
147:14
**persons** 60:12
61:6,22
**persuasive** 37:9
**pesticides** 53:2
55:1
**petrus** 172:19
**ph** 1:24
**pharmaceutic...**
52:23 53:15
**phone** 154:22
155:9 165:11
**phrase** 201:19
202:4
**phraseology**
250:14
**phrasing** 248:7
**physicians**
54:14
**picked** 210:1

**picture** 277:24
278:1
**piece** 60:9
**pistilli** 2:15 6:6
13:13,15 14:3
15:5 17:23
18:19 26:7,15
26:24 27:6
31:1,10,22
34:15 37:21
38:6 39:8 42:1
42:12,19 48:5
48:12 49:8
51:18 52:16
53:14 54:18
55:7,16 58:6
58:15 68:24
69:3 71:4,18
73:13,16,23
74:8,16 75:11
78:3 79:14
82:17 84:6
85:13,23 86:21
87:16,23 88:8
89:1,21 90:12
90:24 91:23
92:7,16 93:6
93:14,24 95:13
95:21 96:6,19
97:15 98:10,18
99:4,10 100:23
101:6,24 102:9
103:3 104:3,15
106:5,24 107:8

**[pistilli - please]**                                                  Page 43

| | | | |
|---|---|---|---|
| 108:5,18 109:8 | 169:23 170:20 | 254:21 256:3 | 318:20 319:4 |
| 110:13 111:16 | 171:5,20 172:8 | 256:18 257:7 | **plan** 20:22 |
| 111:23 112:18 | 174:7,13 176:8 | 257:22 258:11 | **platform** |
| 112:24 114:6 | 179:22 181:23 | 258:20 260:8 | 251:16 252:24 |
| 114:15 115:4 | 182:9,21 186:8 | 261:21 262:6 | 261:16 283:14 |
| 115:17 116:4 | 189:10 190:17 | 262:23 263:10 | 299:15 |
| 116:20 117:4 | 192:7 193:10 | 263:24 264:15 | **platforms** 2:23 |
| 119:16 120:2 | 193:22 194:23 | 265:4,20 266:8 | 5:8 25:1 82:2 |
| 120:17 121:7 | 198:21 199:6 | 267:2,20 268:8 | 82:10 248:23 |
| 122:11,24 | 199:15 200:16 | 268:18 269:7 | 250:20 251:2,6 |
| 123:11,24 | 202:6 203:2 | 269:20 270:16 | 254:17,19,20 |
| 124:15,22 | 204:16 205:18 | 270:22 271:18 | 257:14 259:2 |
| 125:21 126:15 | 207:3 209:2 | 314:4,9 315:19 | 260:2 274:8,10 |
| 127:6,15 128:1 | 211:14,24 | 316:7,21 317:4 | 274:16,16 |
| 128:15 129:1 | 213:12 214:12 | 317:11,20 | 275:4 281:6,10 |
| 129:13 133:18 | 215:15 217:20 | 318:16 319:20 | 281:12,20 |
| 134:7,17 135:7 | 219:2,5,9,12 | 320:6 | 282:2,18,24 |
| 136:21 137:9 | 220:13,19 | **place** 4:10 | 283:9,18 |
| 138:10 139:7 | 221:1,3 222:16 | 36:21 46:1 | 284:16 285:11 |
| 139:17 140:9 | 223:13 224:10 | 184:16 185:8 | 289:9,13,24 |
| 141:7 143:14 | 224:19 229:10 | 185:20 | 290:9,20 |
| 144:23 145:23 | 231:18 233:2 | **places** 65:23 | 292:20,20 |
| 146:12 147:8 | 234:21 235:21 | **plaintiff** 2:6,12 | 293:8,24 294:4 |
| 148:5 149:5,15 | 236:13,24 | 3:19 13:21 | 294:18 296:17 |
| 150:21 151:11 | 237:20 238:3 | 14:5 30:13 | 297:6 |
| 151:18 152:3 | 238:21 239:23 | 74:21 94:4 | **play** 221:14 |
| 152:18 154:6 | 241:4,14 242:3 | 320:15 | **plaza** 3:10 |
| 157:7 158:11 | 242:14 243:6 | **plaintiff's** 31:8 | **please** 13:17 |
| 159:16 160:7 | 243:18 244:5 | **plaintiffs** 4:7 | 15:21 16:7 |
| 160:24 161:18 | 244:15 245:5 | 4:12 21:7 25:8 | 24:12 43:12 |
| 162:6,23 | 245:21 247:3 | 25:21 30:16 | 71:19 80:2 |
| 163:18 164:3 | 249:2,22 251:8 | 43:14 44:9 | 151:15 178:8 |
| 165:9,18 166:5 | 251:18 252:18 | 47:5 258:21 | 182:24 214:5 |
| 168:3,14 169:5 | 253:5,14 254:4 | 286:24 313:3 | 219:6,14 |

**[please - prior]**                                                Page 44

247:11 322:3,8
**plenty** 163:15
**plus** 7:6 42:16
  43:3
**point** 3:10
  15:19 16:6
  68:22 123:19
  128:16 141:8
  153:23 155:12
  198:8 207:13
  208:12,20
  214:21 215:3
  309:19 316:8
**pointed** 309:10
**points** 87:15
  95:20,22
  100:18 101:19
  102:4 106:4,19
  107:3 111:15
  111:22 112:13
  131:3 196:24
  201:5
**policy** 8:14
  166:2,17
  172:15
**ponce** 2:10
**pool** 239:16
**poor** 256:21
  257:1
**population**
  51:7 76:16
  225:13 226:2
  226:16,18
  227:11 228:20

229:9,14
233:22 240:16
241:18,19
242:23
**portion** 229:3
**position** 20:24
**positive** 128:22
**possibility**
  147:19 148:16
  150:6 261:20
**possible** 61:16
  140:17 141:2
  142:11 143:22
  144:9 148:22
  149:8,14 152:8
  193:3 230:9
  241:12 244:6
  244:17,24
  256:17 257:6
  280:20 283:6
  303:17,24
  304:13,19
**post** 47:23
  83:21 85:2,15
  86:10 88:16,17
  89:8,9,16,23
  90:6 91:14
  92:20 99:19
  100:14 105:1,9
  105:21 110:15
  111:8 262:1
  279:20
**posts** 261:16

**potential** 46:14
  142:7 151:3
  210:16
**potentially**
  263:7
**practice** 175:4
**pre** 66:11 153:6
  154:8,10 155:6
  156:2 158:13
  160:18 161:2,3
  161:17 176:16
  189:3 221:20
  252:10 266:21
  267:4 268:4,10
  268:20 269:11
  270:13,17
  273:11,19,23
  274:2,18 275:5
  292:15 293:16
  295:10 296:2
**precautions**
  226:4
**preferences**
  52:9 54:16,19
**preparation**
  23:4,7 24:1
**prepare** 22:19
**prepared** 156:5
  226:2
**preparing**
  19:24 20:9
  23:2 166:6
**prescribe** 53:21

**prescribed**
  208:3
**present** 5:13
  81:22 82:6
  230:13
**presentation**
  59:1
**presented**
  105:11 126:10
  142:19 233:18
**press** 147:2,6
**presume**
  286:21
**presupposes**
  264:2
**pretty** 171:17
  190:23 265:9
**prevalence**
  244:13
**prevent** 15:7
  39:16
**previously** 25:5
  190:6
**price** 35:8
**primary**
  248:22 274:10
  274:16 275:4
**principal** 20:16
**principals**
  291:11
**prior** 24:18
  64:22 72:1
  91:5 118:17
  132:23 137:11

CONFIDENTIAL

**[prior - published]**                                                    Page 45

146:21 159:7
197:9 286:22
315:9 318:10
318:12
**privacy** 315:5
**probably** 53:13
60:20 164:12
164:20 165:14
251:16 276:16
277:23 278:4
280:19
**probe** 156:12
157:21
**problem** 33:12
150:8 246:23
250:2
**problematic**
35:24 36:11
**problems**
210:19
**procedure**
44:17
**procedures**
60:13
**proceed** 298:21
**process** 60:23
60:24 63:20
64:1,9 154:19
155:2 158:5
159:5,11
161:14 163:11
190:24 208:5
221:17

**produce** 280:8
**produces** 35:13
197:2
**product** 29:7
35:11 51:12
52:19 54:5
62:22 63:4
64:12,13 223:6
223:7 224:9
315:17
**production**
11:10 73:14
**products** 1:4
12:20 30:8
34:21 35:9
44:15 52:10,22
53:15 54:9,14
55:2,5
**profession**
184:14 185:7
**professor** 63:10
169:15 172:21
**profile** 7:8 48:4
48:9,19,22
49:3,14
**profiles** 181:3
**profit** 20:22
290:23 291:9
291:12
**profits** 20:20
291:3,6
**program** 65:21
65:21 154:20

**programmer**
65:22
**prolonged**
261:3
**promote** 45:8
259:3
**promotion**
44:14 258:15
259:8
**promotions**
43:18 44:8
**promptly** 72:7
**prone** 180:16
181:1 183:6,18
184:7
**pronounced**
212:9
**proper** 21:10
60:13
**proposition**
176:24 182:1
183:12 186:17
196:7 207:15
238:11
**propounded**
324:5
**protective**
314:18
**provide** 21:9
24:6 56:7 73:5
81:14 130:9
153:9,14
188:19 214:14
230:12,23

306:20 309:14
**provided** 24:21
73:2 74:21
98:20 155:18
208:24 242:11
303:14,19
313:14
**providers**
40:24
**provides**
213:19,23
263:6
**providing**
132:16 284:20
**provision** 44:13
**prussia** 1:17
2:4 3:17
**public** 2:12
146:19,23
286:4,16
292:12,13
303:1 315:11
324:14
**publication**
63:14,21 64:6
**publications**
62:13,16 64:21
**publicize**
286:21
**publicly** 292:2
**published**
64:14 166:20
312:12

CONFIDENTIAL

**[purchase - questions]**                                         Page 46

| | | | |
|---|---|---|---|
| **purchase** 53:8 | **qualify** 203:12 | 123:8,23 124:3 | 263:12 264:2 |
| 53:22 54:8,8 | **qualitative** | 125:5,10 126:3 | 265:10,13,23 |
| 54:13 | 196:21 197:21 | 126:14,17 | 267:21 268:6 |
| **purchasers** | 208:4 | 128:2 129:18 | 268:17 269:3,8 |
| 46:14,14 | **quality** 8:15 | 135:17,20 | 269:19 270:12 |
| **purported** | 62:19,21 63:5 | 136:15,23 | 274:23 281:18 |
| 310:2 | 67:5 130:15 | 138:1 139:10 | 288:12 292:4,9 |
| **purpose** 61:7 | 193:17 209:13 | 141:16,21,22 | 301:5 314:12 |
| 61:23 72:9 | 210:20 | 143:11 144:17 | 317:13,22,24 |
| 227:22 | **quantitative** | 149:7 151:9,17 | 318:2,8,19 |
| **purposes** 70:19 | 196:22 198:1 | 152:4,6 155:1 | **questioning** |
| 210:8 | 201:2 205:7 | 155:3,20 | 289:6 317:18 |
| **pursuant** 1:14 | 208:7 211:12 | 156:20 157:18 | 318:20 |
| **put** 35:1 44:21 | 211:18 212:4 | 159:17 161:1 | **questionings** |
| 69:24 142:21 | 212:20 | 162:24 163:4 | 292:18 |
| 202:21 265:13 | **question** 11:20 | 163:14 164:22 | **questionnaire** |
| **putting** 20:12 | 12:7 15:20 | 168:2,19 170:4 | 69:9,13 122:19 |
| 69:14 314:17 | 16:1,3 29:22 | 170:15 171:15 | 179:15,15 |
| **q** | 31:4,7 36:8,9 | 177:6 179:23 | 183:5,17 184:6 |
| **qfd** 63:6,13 | 46:20,24 62:1 | 181:16 184:1,3 | 213:11 |
| 64:7,8 | 66:3 67:7 | 185:2,10 | **questionnaires** |
| **qs2** 66:3,19 | 69:18 75:17 | 189:12 190:1 | 169:11 170:8 |
| **qs3** 68:20 | 76:5,9 77:13 | 198:24 208:10 | 175:5,15 |
| **qs6** 239:3,4 | 78:2 80:23 | 208:11 212:24 | 177:11,19 |
| **qs7** 67:5 | 81:4 82:4 97:5 | 214:3,5,11,14 | 180:4,15,24 |
| **qs8** 67:10 | 97:13,22 98:2 | 227:9 234:2,3 | 186:22 190:10 |
| **qualified** 60:12 | 102:19 103:8 | 238:5,9 239:2 | **questions** 8:13 |
| 67:11 81:6,14 | 104:14 107:20 | 242:19 243:1,5 | 30:9 37:13 |
| 123:18 130:9 | 109:4 113:19 | 244:1 247:17 | 60:7 67:19 |
| 130:11 178:2 | 114:5 115:7,15 | 247:21 248:1,9 | 69:11 103:15 |
| 178:15 | 116:19 117:9 | 249:12 250:15 | 103:24 118:1 |
| **qualifies** | 117:10,14,17 | 256:1 260:20 | 119:3 130:15 |
| 314:23 | 118:2 120:11 | 260:22,23 | 130:20 131:17 |
| | 122:6,10,20 | 262:17,24 | 132:23 137:14 |

**[questions - rebuttal]**                                          Page 47

| | **r** | **rather**  45:8 | 292:8 293:13 |
|---|---|---|---|
| 137:15 138:11 | | 226:17 228:11 | **realtime**  1:20 |
| 142:3,14 | **r**  323:1,1 | 251:3 264:1 | 321:11 |
| 143:19 148:12 | **race**  240:7 | **reach**  155:14 | **reason**  15:21 |
| 149:2,17,19,24 | **radnor**  1:17 2:4 | 155:22,23 | 77:16 120:14 |
| 150:13,19 | 3:18 12:17 | 156:22 311:9,9 | 121:12 123:6 |
| 152:24 155:18 | **raised**  29:16 | **reached**  33:8 | 127:3,13 |
| 156:11 157:21 | 31:9 36:4 | 158:5,6 286:15 | 128:13 132:12 |
| 158:20 160:3 | 177:17 180:2 | **reaches**  180:10 | 144:7 150:2,7 |
| 160:22 161:12 | 314:21 | **read**  22:21 | 160:4 163:3 |
| 162:9 166:1,16 | **raises**  190:8 | 168:13,15 | 165:2 180:7 |
| 172:14 176:11 | **ran**  296:4 | 169:20 170:1 | 192:3 226:22 |
| 198:4 207:17 | **random**  176:2 | 170:12 174:5,8 | 227:18 228:5,8 |
| 213:1,7 221:5 | 210:1 229:22 | 177:24 194:6,9 | 231:17 232:10 |
| 238:23 263:19 | 230:4,5 238:18 | 194:13 322:3 | 234:17 237:18 |
| 271:21 284:8 | **randomized** | 324:3 | 237:22 238:19 |
| 288:9,24 289:3 | 142:19 | **reading**  83:1 | 240:12 268:12 |
| 297:20,24 | **randomly** | 179:3 | 268:22 269:13 |
| 298:24 299:2 | 226:1 228:18 | **ready**  298:21 | 269:23 300:1 |
| 300:16 301:18 | 229:13 237:9 | **realize**  26:6 | 309:13 311:3 |
| 311:22 312:21 | 237:14 238:13 | **realized**  215:11 | 322:5 |
| 314:3 317:1 | **range**  52:3 | 315:2 | **reasonable** |
| 318:17 319:23 | **rappeport**  28:5 | **really**  21:18 | 309:4 |
| 324:4 | **rappeport's** | 24:4 25:23 | **reasoned**  162:5 |
| **quick**  270:23 | 28:8,12 | 29:18 45:18 | **reasons**  33:19 |
| 314:5 316:8 | **rate**  22:7 103:9 | 54:3 59:11 | 34:17 35:21 |
| **quite**  280:18 | 127:22 235:16 | 61:24 67:6 | **rebuttal**  8:18 |
| **quotas**  240:23 | 235:17,22 | 118:1 123:7 | 9:6,9,13,16,20 |
| 241:5 | 236:4 306:14 | 152:14 168:13 | 19:10 22:22 |
| **quote**  32:21 | 307:5,9 308:9 | 170:1 178:1 | 58:1,3 166:7 |
| 177:4 | 310:10 | 196:20 244:12 | 169:3 194:4,12 |
| **quoted**  60:17 | **rates**  231:7 | 246:4 250:9,14 | 194:17 195:1 |
| 60:20 | 306:2 | 257:19 284:24 | 207:22 215:11 |
| | | 287:17 288:4 | 216:3,11,19 |

**[rebuttal - related]**                                                      Page 48

| | | | |
|---|---|---|---|
| 217:3,11 218:6 | **receives** 260:24 | 39:6 71:10,17 | 188:12 242:15 |
| 218:9,12,15,18 | **recent** 177:17 | 129:2,5,12 | 275:24 283:23 |
| 218:21 220:10 | 180:1 190:7 | 171:24 172:7 | 289:10 302:4,6 |
| 220:12,15 | 207:10 279:12 | 182:8,10,13,20 | **refers** 52:2 |
| 232:9 | **recess** 18:6 | 214:7 215:20 | **reflect** 44:5 |
| **recall** 119:20 | 71:12 129:7 | 217:19 218:4 | 272:14 273:3 |
| 124:17 131:14 | 172:2 182:15 | 271:5,17 286:4 | **reflected** 306:3 |
| 131:23 153:1 | 215:22 271:7 | 292:12,13 | 306:14 |
| 156:13 157:10 | 298:9 | 296:6 297:22 | **refusing** 311:22 |
| 157:22 158:14 | **recipient** | 298:3,7,14 | **regarding** |
| 158:23 159:21 | 150:23 | 320:4,18 321:6 | 52:10,18 75:17 |
| 162:10,16 | **recognition** | **recorded** 156:2 | 76:5 125:1 |
| 164:6 167:7,21 | 252:8 | 276:15 | 134:23 139:10 |
| 168:7,20 169:4 | **recognize** | **records** 270:18 | 222:8 302:15 |
| 172:16 173:24 | 31:23 38:9 | **recruited** | 311:23 |
| 174:19,23 | 42:8,22 46:22 | 154:11 | **regardless** |
| 187:12,21,24 | 48:13 54:4 | **redirect** 316:20 | 290:18 |
| 188:4,5,7,10,17 | 55:17 58:18,20 | 317:19 | **regents** 37:5,16 |
| 189:5,7 190:3 | 194:2 197:13 | **reduce** 226:5 | **regular** 184:13 |
| 190:4,4,19 | 208:1 210:14 | **refer** 195:17 | 185:5 |
| 203:19 208:15 | 251:1 260:22 | 262:9 | **relate** 27:7 |
| 211:17 222:3 | 267:19 | **reference** 9:23 | **related** 16:24 |
| 273:9 274:4 | **recognized** | 22:23 59:22 | 23:21 36:2 |
| 299:7 309:23 | 42:9 | 199:20 205:22 | 49:21 50:14 |
| **recalled** 189:14 | **recollect** 182:4 | 208:21 215:13 | 77:4 139:24 |
| **recalling** 177:1 | **recollections** | 224:14 225:2,3 | 141:14 142:14 |
| **receipt** 322:17 | 161:6 | 228:14 237:2 | 143:19 150:24 |
| **receive** 20:19 | **reconsider** | 250:20 | 169:12 175:16 |
| 260:10 291:2 | 136:24 | **referenced** | 176:2 181:4 |
| **received** 65:9 | **reconsidered** | 24:24 | 192:22 231:2 |
| 76:1 113:18 | 137:4 | **referred** 25:5 | 235:23 259:6 |
| 148:17 229:6 | **record** 12:11 | 167:19 | 276:8 312:9 |
| 272:16 273:5 | 13:2,18 15:3 | **referring** 29:1 | 315:9 |
| | 17:24 18:4,11 | 68:19 167:14 | |

| relates 1:6 | 162:17 165:2 | replying 8:19 | 101:18 105:2,6 |
|---|---|---|---|
| 187:20 191:5 | 166:12 173:4 | 9:6,10,13,17,20 | 105:13,23 |
| 197:14 315:21 | **remembered** | 194:17 216:3 | 106:7,17,23 |
| **relating** 49:20 | 203:19 204:20 | 216:11,19 | 109:17 110:2 |
| 51:24 81:9 | **remembering** | 217:3,11 | 110:16,24 |
| 102:19 103:15 | 314:14 | **report** 8:18 9:6 | 111:10 112:2 |
| 104:6 107:21 | **remembrance** | 9:9,13,16,20 | 112:12 116:3,5 |
| 108:20 113:19 | 132:3 | 18:22 19:10 | 131:11,12 |
| 113:20 115:7 | **remind** 214:13 | 20:7,9,10 21:7 | 132:9 267:23 |
| 115:19 124:16 | 306:8 | 22:3,21,23 | 306:10 309:17 |
| 142:3 156:14 | **reminders** | 60:21 71:21 | **reporter** 1:20 |
| 177:3 187:12 | 127:21 226:21 | 75:13 77:19 | 1:21 13:3 |
| 203:6 221:23 | 227:16,23 | 79:20 81:9 | 15:11 321:11 |
| 245:23 | 228:10 232:22 | 86:6,9 94:4 | 321:21 |
| **relatively** 227:4 | **removed** | 99:14 104:5,19 | **reporting** |
| **relevance** | 118:17 | 108:20 109:11 | 129:20 196:2,3 |
| 198:16 199:2,3 | **repeat** 214:4 | 115:19 116:22 | 209:14 212:8 |
| **relevant** 29:18 | 256:1 262:22 | 117:23 131:2 | 239:14 |
| 30:9,14 59:18 | **repeated** 248:8 | 166:7,7,11 | **reports** 8:16,19 |
| 126:3 223:17 | **repeatedly** | 168:16 169:3 | 9:6,10,13,17,20 |
| 226:1 228:1 | 234:14 | 176:13 194:4,9 | 19:2,7,14,17,21 |
| 246:4 287:3 | **repercussions** | 194:17 195:18 | 19:24 21:17 |
| **reliability** 28:4 | 191:2 260:24 | 195:20 207:23 | 22:22 25:12 |
| **reliable** 28:14 | 262:11 | 215:11,13 | 58:2 78:5 |
| 267:24 | **rephrase** 15:22 | 216:3,11,19 | 132:7 163:2 |
| **reliably** 162:10 | **replaced** 140:1 | 217:3,11 218:6 | 167:5 169:9 |
| 266:12 267:5 | 140:19 | 218:9,12,15,18 | 193:17 194:12 |
| 268:11,21 | **replacement** | 218:21 219:19 | 194:18 195:2 |
| 269:13,22 | 218:24 | 221:8 247:21 | 195:11 210:20 |
| **rely** 195:21 | **replicate** 41:16 | **reported** 76:19 | 216:4,12,20 |
| 198:6 202:15 | 41:21 42:3 | 76:23 77:8 | 217:4,12 |
| 225:6 | **replicated** 42:5 | 94:10,19 95:11 | 220:10,12,16 |
| **remember** | **reply** 22:23 | 95:14 99:18 | 232:9 295:20 |
| 63:19 132:21 | | 100:6,16 101:9 | 306:4 |

CONFIDENTIAL

**[represent - responses]**                                              Page 50

| | | | |
|---|---|---|---|
| **represent** | **requires** | 97:21,24 98:4 | **responders** |
| 13:15 79:18 | 252:16 | 99:3 108:3 | 234:5,5 243:21 |
| 200:6 213:21 | **research**  32:15 | 115:16 119:10 | **responding** |
| 272:8 288:21 | 43:9 49:21 | 120:19 121:11 | 61:14 97:10 |
| 291:24 313:3 | 50:14 51:3,6 | 149:24 227:6 | 121:15 129:17 |
| **representative** | 51:10,20 52:1 | 227:11 242:5 | 144:2 151:2 |
| 119:18 120:16 | 52:2,5,7,8 | 245:9,10 | 160:21 192:15 |
| 121:14 126:5 | 166:13 172:11 | 246:12 281:16 | 228:8 281:7 |
| 225:12,18 | 177:17 180:1,2 | 281:17 | 307:10,17 |
| 226:15,24 | 190:7 192:17 | **respondent** | **response**  103:9 |
| 227:12 234:20 | 192:19,20 | 188:16 191:6 | 114:23 122:18 |
| 236:17 237:8 | 199:18 209:12 | 191:18 192:23 | 127:22 148:13 |
| 239:15 240:15 | 225:4 228:15 | 197:12,19 | 162:22 229:12 |
| 241:18 245:11 | 309:17 | 201:17 202:12 | 229:22 230:8 |
| **representativ...** | **researcher** | 209:16 210:3 | 231:7 235:16 |
| 126:18 235:23 | 180:14 192:12 | 211:2,6 241:18 | 235:17,22 |
| 236:5 | **researchers** | 304:11 | 236:4 237:8,13 |
| **represented** | 8:14 166:2,17 | **respondents** | 238:12 260:13 |
| 14:9 241:8 | 172:15 | 30:6 33:1 | 306:2,9,13,14 |
| **representing** | **reserved**  12:7 | 70:14 77:6 | 307:5,9 308:9 |
| 2:6,12,22 3:6 | **residence** | 103:8 110:12 | **responses**  77:9 |
| 3:12,19 4:7,12 | 202:11 | 116:17 118:13 | 81:11 97:3 |
| 4:18 5:7 | **respectfully** | 131:16 135:23 | 98:8,12,17,20 |
| 200:14 320:7,9 | 234:1 238:4 | 136:6 137:18 | 102:19 103:14 |
| 320:11,13,15 | **respond**  65:24 | 192:4,12 | 104:8 107:20 |
| **reproduction** | 70:21 121:17 | 203:18 204:5 | 108:10,21 |
| 321:19 | 126:13 129:21 | 204:20 205:11 | 113:19 114:2,8 |
| **request**  11:10 | 195:21 227:14 | 208:14 225:24 | 114:12 115:7 |
| 73:21 | 228:3,4,7 | 226:4 230:10 | 115:12,21 |
| **require**  132:21 | 232:8,13 233:5 | 230:11,21,21 | 116:13,23 |
| **required**  226:5 | 308:22 | 231:1,12,12 | 124:8 132:9 |
| **requirements** | **responded** | 233:24 235:5 | 154:4 162:2,3 |
| 59:14,19 60:1 | 75:17,21 76:4 | 239:15 240:15 | 191:7,17,19,24 |
| 60:6 | 80:22 81:1,3 | 242:20 243:12 | 192:6,10,14 |

Golkow Technologies,
A Veritext Division

877-370-3377                                                          www.veritext.com

CONFIDENTIAL

**[responses - right]**                                                    Page 51

| | | | |
|---|---|---|---|
| 203:6 204:13 | 84:10 85:10 | 40:12 41:17 | 162:12 163:21 |
| 228:20 229:2,8 | 99:19 100:14 | 51:13 52:11 | 164:17,24 |
| 230:12,22 | 105:1,21 | 53:16,17,20,23 | 178:23 180:22 |
| 239:13 241:8 | 110:15 111:8 | 54:7,23 55:6 | 186:4 187:21 |
| 303:15,19 | **retained** 24:9 | 55:21 56:5,9 | 190:10 195:22 |
| 304:14 306:15 | 287:1 | 56:12,18,24 | 196:9,14 |
| **responsibility** | **retired** 311:17 | 57:3,6,11,17,20 | 197:20,24 |
| 238:7 | **retrieval** 201:7 | 57:23 61:23 | 198:7,13,16,23 |
| **rest** 17:16 | 201:15 202:16 | 76:11 77:1,18 | 199:2,4,7 |
| **restaurant** 30:7 | **retrieved** | 80:24 81:5,13 | 200:21,24 |
| **result** 6:20,23 | 203:20 | 85:5 86:2 88:3 | 201:16,18 |
| 7:6 31:13 38:1 | **retrospective** | 89:11,13,16 | 202:13,14,17 |
| 42:15 158:13 | 8:16 193:17 | 90:17,21 92:11 | 203:7 204:8 |
| 169:12 175:15 | 195:11 196:1,3 | 94:1 96:2 98:3 | 205:9 206:21 |
| 175:23,24 | 209:14 210:20 | 98:4,13 99:5 | 207:4 209:6 |
| 192:1 | 212:8 | 101:1 102:21 | 212:2,12 213:7 |
| **resulting** 282:7 | **return** 92:9 | 103:17 104:4 | 214:23 215:1 |
| **results** 6:16,18 | 93:18 322:15 | 108:7 109:9 | 217:21 223:24 |
| 7:16,19,22 8:7 | **reveal** 72:9 | 110:4 111:11 | 225:13 227:2 |
| 8:10 18:16 | **revealed** | 111:18 114:7 | 229:2,21 |
| 26:19 28:7,17 | 119:19 | 116:7,8,11 | 233:10 235:24 |
| 30:5 36:1,12 | **revenue** 312:4 | 117:15,19 | 237:4 238:24 |
| 61:12 74:18 | 312:8 | 119:21 120:5 | 239:6 241:8 |
| 78:10,16,22 | **review** 21:7 | 120:20 121:18 | 244:8,17 |
| 79:4,11 175:8 | 23:1 63:20 | 122:1,12,14 | 245:12 249:4 |
| 175:10 176:4 | 64:1 214:8 | 123:2,14 124:1 | 251:12 252:24 |
| 178:16 188:3 | **reviewed** 62:4 | 126:16 133:19 | 253:24 261:16 |
| 188:16 196:2 | 63:17,22 64:1 | 134:8 136:3,9 | 262:1 263:11 |
| 205:8 210:6,6 | 64:18 65:1 | 136:13 137:22 | 264:24 274:1 |
| 212:7,21 | 295:2,4 | 138:20 141:13 | 280:24 281:20 |
| 280:24 282:11 | **ride** 154:23 | 142:22 145:24 | 282:18 283:2 |
| 285:15 | **right** 15:12 | 150:14 151:8 | 289:5 290:3,20 |
| **resumed** 82:21 | 19:1 24:11 | 152:5,21 | 290:24 295:17 |
| 83:7,14,21 | 25:18 37:6,13 | 155:17 161:1 | 297:1 299:18 |

306:12,16
307:13,24
309:6 312:19
315:20 317:21
318:4
**road** 1:17 2:4
3:17
**robert** 1:14 6:4
7:8 12:24 13:7
13:19 32:23
39:1 48:8
324:8
**role** 221:14
**routinely**
248:24
**rule** 148:16
150:6
**rules** 14:14
**run** 244:17
255:7
**running** 255:16
255:20 256:8
256:12

**s**

**s** 2:9 6:11 7:2
8:2 9:2 10:2
**safe** 291:14
**salary** 22:15
286:7 311:23
**sales** 49:24
50:7,17
**salient** 165:1

**sample** 71:2,3
120:16 121:14
126:4 225:12
225:18 226:18
226:24 228:11
228:18,22
229:3,7,8,17
230:13 231:5
234:20,24
245:19,20
305:13
**samples** 226:6
236:22,23
237:7
**san** 4:11
**santiago** 5:4
**save** 132:5
276:24
**saw** 46:8
215:10 255:2
255:10 285:17
**saying** 45:3
131:21 152:9
187:4 200:19
232:6 233:14
294:16
**says** 29:21
36:13 37:12
38:23 39:13
43:13 45:22
49:14,19 50:13
74:21 83:13
99:24 167:1,2
175:8,13,22,24

176:6 177:16
183:3 184:11
190:1 191:4
196:16 203:17
205:21 209:11
210:19 211:3
212:2,4 225:23
228:17 230:3
248:1,10
**schedule** 156:8
**scheduled**
81:24 82:8
118:3,7 125:14
125:16 136:2,8
277:3
**school** 13:21
14:5 66:10,22
66:24 74:22
75:5,16 80:10
80:14,21 81:3
81:23 82:7,22
83:8,17,18,21
84:14,14,17,18
84:24 85:5,16
86:2,6,23 87:6
87:11,18,24
88:1,20 89:4,5
89:9,13,23
90:3,14,17
91:2,5,8,10,12
92:10,19,20,24
93:8,19 94:9
94:10,16,19,24
95:2,3,6,16

97:1,4,11,19,21
97:23 98:12
99:20 100:1,2
100:5,5,9,15,17
101:1,8,8,14,14
101:17,23
102:4,14,20
103:13 105:1,9
105:12,13,18
105:22,24
106:7,13,16
107:1,13,23
108:9,16,17
109:6,7,17,20
110:2,6,16,21
110:23,24
111:5,9,11,18
112:1,7,10,10
112:11,20
113:5 114:3
115:2,6 116:6
116:7,12
117:15 118:15
121:21,24
125:6,8,12,13
130:3,6,10,12
130:18 131:3
132:10 133:3
133:22 134:24
136:9 146:14
147:14 151:2
154:5,12 174:1
192:24 202:23
207:10,11

**[school - sending]**                                         Page 53

235:12 239:8
239:22 240:1,6
244:18 245:2
246:6 248:24
255:15 256:7
273:16 276:4,5
276:6,6 282:12
286:24 287:6
287:10 289:21
293:18 294:3
295:12 297:4,4
302:24 303:5,6
303:6 304:10
306:4,11
316:13 318:4
**schools** 2:12
134:6 246:7
303:14,18
304:15
**science** 7:10
20:4,6,14,16,20
20:21 21:1
22:16 23:23
49:10,15 55:13
63:7,11 272:20
285:22 286:8
312:6,7,9
**sciences** 55:19
**scientific** 9:24
224:15 225:2
**scope** 285:24
290:18 316:19
317:19

**screen** 219:19
219:20 222:20
**screened** 223:2
**screening** 66:2
130:15 317:22
317:23 318:2
**screens** 67:22
**script** 155:10
**scroll** 219:13
**seal** 35:2,5,15
36:3
**sealing** 12:4
**seating** 256:21
257:1
**second** 34:20
80:17 114:24
180:23 183:3
186:10 187:17
260:22,23
264:17 310:13
**secondary** 17:2
47:23 49:21
50:5,15
**section** 43:23
49:19 169:7
173:7 183:2
210:15 261:24
**sectors** 186:19
**see** 17:6 25:2
27:16 28:1,18
30:1 32:18
33:5 35:5
36:18 38:23
39:13,24 43:13

43:20 49:13,18
50:2,10 59:20
62:12 65:20
66:18 69:19
71:24 72:11
74:20 75:2
82:20 83:6
88:16 118:12
118:18 143:3,3
146:10 166:18
166:19 169:3
173:8,14
175:12 177:16
180:13,18
181:5,6 183:2
183:8,10,13
184:11,17
185:23 186:12
186:16,23
187:11,22
189:11,20
191:4,8,15
195:7 199:16
199:23 200:18
201:3,8,14
203:17 204:3
205:21 206:4
206:10 209:10
209:17 212:12
219:16 223:14
225:23 226:7
228:17,23
229:18,23
230:6,14 245:1

247:24 248:5
248:13 255:3
255:14 256:19
260:21 261:8
307:2,6
**seeing** 207:22
**seem** 188:12
189:24 311:14
**seemed** 279:5
290:13
**seems** 170:16
185:17 190:23
202:5 316:19
**seen** 27:1 48:17
48:21 72:20
147:5 178:1
187:2 207:20
232:10 235:18
260:7 272:11
295:24
**sees** 142:24
256:6
**segment** 289:6
**select** 136:6
205:3,11 226:3
267:13
**selected** 226:1
228:21
**sell** 54:23
**send** 72:3 241:1
260:2
**sending** 72:1
227:15 232:22

CONFIDENTIAL

**[sense - situated]**                                                      Page 54

| | | | |
|---|---|---|---|
| **sense**  119:20 | **served**  32:12 | **sharing**  20:22 | 162:11 167:8 |
| **sent**  65:9 72:14 | 36:22 37:2 | 290:23 291:9 | 167:22 168:8 |
| 72:21 73:1,4 | 313:10,12,18 | 291:12,23 | 168:20 |
| 74:10 80:9 | **serves**  30:7 | **sheet**  322:7,9 | **significantly** |
| 96:13 97:3,16 | **service**  315:18 | 322:12,15 | 85:12 |
| 102:13,18 | **services**  53:8 | 324:6 | **signing**  322:10 |
| 103:16 107:12 | 54:23 56:7 | **shopping** | **similar**  64:7 |
| 107:19 108:6 | 284:16 315:10 | 164:19,21 | 266:7 |
| 113:4,10,17 | **session**  67:13 | **short**  63:6 | **similarly**  54:22 |
| 114:16 127:20 | **set**  70:11,17 | 128:20 | 70:13 89:22 |
| 147:20 154:19 | 120:5 190:21 | **show**  29:23 | 128:7 231:13 |
| 226:20 227:1,5 | 240:23 241:5 | 32:23 | 233:5 234:6,9 |
| 227:23 272:20 | **settled**  315:2,3 | **showed**  77:1 | **simple**  309:5 |
| 273:15 280:5 | **seven**  76:4,7,10 | 88:7 280:7 | **simplicity** |
| 304:22 305:7 | 76:12,15 77:9 | 282:11 | 191:1 |
| 307:13,18,24 | 77:10,21 78:1 | **shown**  73:8 | **simply**  251:6 |
| 308:23 309:3 | 143:4 | 132:11 200:15 | **sincere**  191:6 |
| 311:1 | **seventy**  97:23 | 280:2,6 | 191:18,24 |
| **sentence** | **several**  23:22 | **shows**  82:13 | 192:5,9,14 |
| 180:23 188:24 | 33:4,9 35:16 | 84:7 90:22 | **single**  303:5 |
| 206:6,8 | 313:13 | 234:23 | **sir**  36:8 128:3 |
| **sentiment** | **shahidpour**  3:9 | **shuffling**  132:6 | 177:23 208:11 |
| 223:22 | 6:6 272:3,6 | **shut**  202:23 | 214:3 227:9 |
| **separate**  33:18 | 274:24 275:19 | **shutdown** | 234:1 235:22 |
| 68:4 142:2 | 278:11,21 | 197:9 | 269:9 317:21 |
| 164:2 | 281:13 282:9 | **siculus**  2:23 5:8 | **sit**  73:11 |
| **separated** | 283:1,20 | **sign**  322:8 | 295:14 |
| 143:3 | 284:17 285:12 | **signature** | **sitting**  150:9 |
| **september**  1:9 | 286:5 287:19 | 321:10 | 183:14 253:7 |
| 12:14 321:11 | 288:7 320:8 | **significant**  33:4 | 296:12 |
| **serious**  211:17 | **share**  20:19 | 33:10 142:13 | **situate**  201:17 |
| **seriously** | 286:16 291:2,5 | 144:3 157:23 | 202:12 203:5 |
| 209:14 | **shari**  225:4 | 158:15,24 | **situated**  70:13 |
| | | 159:22 161:7 | 128:7 231:13 |

**[situated - sorry]**                                            Page 55

| | | | |
|---|---|---|---|
| 233:5 234:6,9 | **snapchat** 248:3 | 139:1,15,24 | 281:18 282:2 |
| **situation** 40:14 | 248:11,17 | 140:19 141:4 | 282:14,22 |
| 126:10 152:17 | 249:11 252:11 | 141:14 142:4 | 285:11 286:17 |
| 154:24 188:6 | 257:11 258:1 | 142:13,21 | 287:13 289:13 |
| 223:16 224:4 | 272:8 274:7 | 143:8,13,18 | 299:14,24 |
| 235:8 236:10 | 275:3 277:13 | 144:8,18 145:1 | 300:4 310:16 |
| 277:9 292:14 | 277:15 280:22 | 146:2,15 | 318:7 |
| **situations** | 281:4 284:9,13 | 147:22 152:10 | **sociological** |
| 42:10 255:5 | 284:19,23 | 156:14 174:16 | 314:12,23 |
| **six** 19:11 46:1 | 285:1,14 | 175:11 176:7 | 315:7 |
| 49:11,16 72:14 | 287:24 288:6 | 176:10,21 | **sociologist** 48:1 |
| 72:22 117:15 | 293:19 | 177:3 178:13 | **sociologists** |
| 118:21 135:20 | **social** 1:3 6:15 | 179:10 182:6 | 178:21 |
| 141:23 173:17 | 7:15,18,21 8:6 | 184:24 185:24 | **sociology** |
| 239:16 247:22 | 8:9 12:18 | 190:16 191:2 | 169:15 172:21 |
| 273:21,22 | 18:14 72:10 | 197:15 198:13 | 178:19 |
| 274:18 275:5 | 76:21 77:3 | 203:6 206:17 | **software** 40:22 |
| 310:21 | 78:8,14,20 | 206:19 207:6 | **sold** 35:11 |
| **size** 301:11 | 79:2,9 81:10 | 244:8 245:3,8 | **solely** 28:8 |
| **skewed** 35:24 | 82:2,10,24 | 245:10 246:24 | **solicited** 227:19 |
| 36:11 | 83:10,24 84:9 | 248:2,8,16,22 | **somebody** |
| **skipped** 118:16 | 84:20 85:4,17 | 249:13,18 | 37:20 118:24 |
| **sleep** 261:4 | 87:2,10 88:3 | 250:18 251:5 | **soon** 171:17 |
| 264:22 266:13 | 88:19 90:16 | 252:13,23 | **sorry** 13:23 |
| 267:6,11 | 94:12,21 95:5 | 253:8,23 | 24:16 54:15 |
| 268:12 | 96:1 99:21 | 258:13 259:6 | 62:11 68:10 |
| **small** 227:5 | 100:7 101:11 | 259:18,21 | 80:4 82:3 83:4 |
| 236:21 237:7 | 101:18 104:6 | 261:1,3,5,7,12 | 86:3 88:11,14 |
| **smallest** 205:24 | 105:4,15 106:9 | 261:16 262:1 | 91:9 168:1 |
| 206:12 | 106:18 107:21 | 262:11,16 | 185:11 187:14 |
| **snap** 3:12 14:7 | 109:19 110:4 | 263:1,7 264:3 | 191:12 203:22 |
| 272:8 284:3,6 | 110:18 111:2 | 265:7,14,24 | 218:23 219:10 |
| 284:23 295:3 | 112:4,12 | 266:24 267:13 | 222:2 224:23 |
| 320:9 | 113:20 136:3,7 | 276:8 281:5,15 | 256:2 262:21 |

CONFIDENTIAL

**[sorry - stemming]**                                    Page 56

| | | | |
|---|---|---|---|
| 287:22 292:7 | 268:17 269:19 | 140:18 141:9 | **starting** 24:17 |
| 316:3 | 281:11 283:14 | 144:18 152:9 | 65:20 74:18 |
| **sort** 16:23 | 286:24 299:15 | 156:14 157:10 | 96:24 201:11 |
| 160:10 214:24 | **specifically** | 164:18 165:3 | **starts** 186:13 |
| 255:12 275:13 | 41:9 50:21 | 165:11,15 | 187:17 |
| 276:2 286:13 | 61:4 168:6,19 | 167:7,21 168:7 | **state** 13:17 |
| 294:21 314:19 | 190:18 240:8,9 | 173:24 176:14 | 322:5 |
| **sorts** 145:21 | 250:20 270:11 | 177:2 207:5 | **statement** |
| **sought** 284:8 | 289:14,21 | 208:15 214:1 | 76:18 175:19 |
| **sounded** 162:3 | **speech** 45:4,5 | 214:16 215:6 | 177:23 181:8 |
| 163:12 176:17 | 45:18,19 47:4 | 314:17 319:8 | 181:10 185:4 |
| **sounds** 71:6 | 47:5 | **spoke** 154:21 | 185:13,15 |
| 265:9 309:4 | **spend** 21:16,22 | 154:21 276:13 | 187:1 189:11 |
| **source** 29:24 | 123:21 133:7 | **sponsorship** | 189:23 190:1,3 |
| 30:10,10 35:7 | 134:9 178:23 | 30:11 | 209:20 212:16 |
| 46:23 | 263:14 | **staff** 19:23 20:2 | 226:10 230:2 |
| **space** 322:6 | **spending** | 20:3 74:15 | 230:17 243:8 |
| **spalding** 4:14 | 101:18 106:17 | 155:8 221:11 | 296:22 |
| **speaking** 14:22 | 112:12 | 221:14,17 | **states** 1:1 12:21 |
| 151:14,19 | **spent** 21:20 | 239:10 | 182:4 |
| 152:2 275:11 | 22:2,17 76:20 | **stand** 59:3 | **stating** 320:4 |
| **special** 226:4 | 77:3 82:22 | 250:9 | **statistician** |
| **specialties** | 83:8,22 84:18 | **standard** 175:2 | 43:16 |
| 50:11,14,23 | 85:16 86:23 | 175:4 | **statistics** |
| 51:1 56:2,5 | 88:2 94:11,20 | **standards** | 306:10,13 |
| **specific** 46:16 | 95:24 99:20 | 232:23 233:16 | **stay** 264:13 |
| 46:21 56:4,6 | 101:10 104:5 | **start** 79:23 | **stayed** 141:11 |
| 70:4 158:15 | 106:9 112:3 | 91:9 130:9 | **steak** 6:18,18 |
| 170:19 171:7 | 119:21 120:23 | **started** 21:3 | 26:20,20 27:8 |
| 184:23 197:9 | 125:1 128:6 | 63:7 77:14 | 27:9,22 29:3,5 |
| 201:18 207:19 | 130:17 131:24 | 104:2 203:9 | 29:7,8 30:7,8 |
| 207:21 208:21 | 132:16,22 | 310:15 318:3 | 40:14 |
| 209:23 243:21 | 133:20 134:23 | 318:14 | **stemming** |
| 257:20 258:8 | 139:19,23 | | 261:7,12 |

CONFIDENTIAL

**[stenographic - suggestive]**    Page 57

| | | | |
|---|---|---|---|
| **stenographic** 13:2 | **strike** 27:19 117:12 204:18 213:21 | 269:24 270:15 274:8,10,13,17 | **subject** 23:16 23:18 62:18 |
| **step** 173:11 208:4,4 | **strip** 53:2 | 275:4 282:14 292:21 293:9 | 64:5 192:22 222:22 235:10 |
| **stepped** 222:1 | **strong** 39:21 | 293:18 294:3 294:17 296:16 | 244:14 322:10 |
| **steps** 226:12 | **structuring** 64:10 | 299:4,20,23 300:3,5,12,18 | **subjects** 154:14 243:13,17,21 |
| **stern** 8:19 9:7 9:10,14,17,21 166:11 168:16 194:19 198:10 209:7 216:5,13 216:21 217:5 217:13 | **student** 136:3 138:12 207:6 248:2 251:19 254:20 255:10 255:14,19 256:6,10 257:13,15 | 300:19 301:2,7 301:11,12,12 302:12,16 | 244:19 |
| | | **studies** 16:20 221:24 222:5 244:8 245:8,10 297:14 | **submitted** 18:23 19:2 25:11 104:19 109:12 313:16 314:10 |
| **stern's** 195:22 | 260:9 261:1,6 261:11,14 | **study** 33:3,9 51:4 167:15 | **subpopulation** 223:18 |
| **sticking** 65:3 96:10 | 262:11 263:8 268:12,22 | 177:4,20 180:5 181:12 210:9 | **subscribed** 324:10 |
| **stimuli** 39:23 | 269:4,13 282:6 | **stuff** 44:20 | **subsequently** 118:16 |
| **stimulus** 41:7 | 283:8,17 289:9 289:23 290:8 | 145:22 277:8 280:9 286:14 | **subset** 227:5 |
| **stipulated** 12:2 | 301:23 302:3 302:12 | 314:18 | **substance** 324:6 |
| **stipulations** 11:15 | **student's** 266:12 267:6 | **style** 197:19,22 198:2 204:6 | **substantiation** 57:3,6 |
| **stop** 35:19 171:21 291:18 | **students** 84:14 244:7,18 | 211:1,6 | **sued** 45:1,13 |
| **stopped** 35:15 35:20 | 248:24 249:20 251:2,7,17 | **subactivities** 173:18 174:16 | **suffering** 261:4 |
| **stopping** 128:16 | 252:4 254:8 | 174:20 | **suffers** 39:15 |
| **straightforward** 202:5 308:5,8 309:11 | 261:2,4,22 262:10 264:19 264:22,23 | **subactivity** 173:9,13 175:10 | **suggest** 232:10 |
| **stratifying** 181:3 | 266:17,19,20 | **subcompone...** 170:24 | **suggested** 172:24 |
| **street** 2:16 4:4 4:15 5:5 | | | **suggesting** 163:8 |
| | | | **suggestive** 47:11 |

CONFIDENTIAL

**[suggests - survey]**                                    Page 58

| | | | |
|---|---|---|---|
| **suggests** 34:23 | 163:8 167:2 | 60:3,3,6,12,23 | 190:10,18 |
| 209:12 211:16 | 168:4 171:20 | 61:9,12,14,22 | 191:17 192:5 |
| 262:24 | 187:3 188:1,5 | 65:11,13,22 | 192:13,19,21 |
| **suit** 46:17 | 188:11 196:13 | 66:7,8,17 | 196:7 197:8,17 |
| **suite** 4:5,16 | 200:6 201:11 | 67:12,16,16,23 | 199:18 201:2 |
| **sum** 68:11 | 218:3 220:13 | 70:8 72:1,5,7,9 | 202:16 204:8 |
| 77:21 | 220:17 235:6 | 74:18 78:9,15 | 204:12 208:2,7 |
| **summary** 49:19 | 253:3 254:3 | 78:21 79:3,10 | 209:22 212:18 |
| **supervision** | 256:4 264:12 | 80:9 81:6 | 212:19,21 |
| 321:21 | 274:22 289:4 | 84:21 85:22 | 221:9,12,16 |
| **support** 11:2 | 306:6,23 307:2 | 88:7 97:16,24 | 222:8,14,20 |
| 43:14 56:7 | 314:22 | 107:12 108:3 | 223:6,7,12,17 |
| 176:24 181:10 | **surprised** | 113:4,11,11 | 223:22 225:3 |
| 196:7 198:9 | 294:8,16 | 114:24 115:16 | 225:11,16 |
| 207:14 209:5,8 | **surrounded** | 119:11 120:12 | 226:14,20 |
| 238:11 | 266:5 | 120:20 121:11 | 227:18,22 |
| **supported** | **survey** 6:15 | 123:18 125:20 | 228:15 230:8 |
| 209:8 | 7:15,18,21 8:6 | 127:23 128:9 | 231:5,9 236:16 |
| **supporting** | 8:9,13 18:15 | 133:10 137:23 | 236:18 238:22 |
| 182:1 183:22 | 28:3,12,13,16 | 138:3,7 141:11 | 239:14 240:10 |
| 185:15 208:13 | 28:22 29:15,23 | 142:12 144:2,7 | 242:2,6,18,20 |
| **supports** | 30:6,9,23 | 145:1 146:3 | 244:2 245:11 |
| 208:24 | 32:15,22 33:13 | 147:20 148:8 | 246:4,12,17 |
| **suppose** 178:20 | 33:19 34:12,19 | 148:10,17,24 | 247:7 248:15 |
| **supposedly** | 36:6 39:10,14 | 149:4,9,22 | 249:12 250:10 |
| 81:9 | 39:20 40:8 | 150:11,23,24 | 256:6 257:9 |
| **supreme** 45:24 | 41:7,8,14,16,23 | 152:22 153:6 | 260:13 274:1,3 |
| **sure** 21:18,21 | 42:3 43:9,16 | 153:13 154:10 | 275:16 280:23 |
| 43:22 52:20 | 44:6,11 46:6 | 154:20,23 | 281:4 282:10 |
| 61:9 63:2 67:6 | 46:19 47:2,9 | 155:11 158:13 | 283:23 284:7 |
| 67:12 70:15 | 49:20 50:14 | 161:11 162:8 | 285:4 292:16 |
| 72:8 119:24 | 51:2,7,20,21 | 166:1,16 | 297:11 300:14 |
| 146:22 148:11 | 52:2,6 58:4 | 172:14 188:15 | 302:15,17,22 |
| 152:2 160:10 | 59:15,19 60:1 | 188:18 189:6 | 303:13,15,16 |

CONFIDENTIAL

303:19 304:24
305:9 306:15
309:17 310:4
311:15 314:11
315:3,7 316:11
318:7 319:6
**surveyed** 61:6
**surveys** 16:22
16:23,24 36:17
51:10 52:8
58:2 96:13
97:2 102:17
103:11,12,16
107:19 108:7
113:17 114:17
130:24 131:12
131:20 132:11
175:1 188:2
195:12 227:8
233:1,17
235:19 247:22
254:15 273:12
273:15 285:16
287:2 304:22
305:6 306:16
307:17,22
308:23 309:3
311:1 312:9
316:3,4
**sw** 3:4
**swear** 13:4
**switched** 246:7
**sworn** 13:8
321:5 324:10

**symptoms**
266:24
**system** 287:6
287:11
**systematic**
169:12 170:9
**systemic**
175:15
**szalazar** 5:7

**t**

**t** 6:11 7:2 8:2
9:2 10:2 323:1
**tab** 26:16 31:10
37:22 42:12
48:5 55:8 58:7
62:8 79:24
165:19 193:13
219:3,6,7,9,11
**table** 105:7,11
131:22 173:17
**tables** 131:18
**tabulate** 205:8
**tabulated**
212:21 213:3
**take** 24:12,12
37:22 38:21
43:11 48:3
55:8 58:7
64:17 71:4,21
75:12 94:1
96:23 99:16
102:10 104:16
104:22 107:9

107:16 109:9
109:14 113:1
117:5 118:10
125:9 128:17
130:21 165:19
169:24 177:14
178:5 184:16
185:8,20 186:9
187:9 192:13
193:11,23
205:19 213:17
220:23 226:13
228:13 230:20
231:5 270:23
296:7 307:9
308:24 317:14
**taken** 1:14 18:7
59:21 60:15
71:13 129:8
144:16 172:3
182:16 184:24
215:23 271:8
276:17 278:1
298:10
**takes** 143:10
189:15
**talk** 47:14
154:7 213:14
262:7 266:18
276:7
**talked** 167:11
221:7,22 222:3
290:23 314:24

**talking** 15:15
37:16 129:16
145:16 178:18
309:21
**talks** 173:22
**tardiness**
138:12 255:11
255:14,19
256:6,10
**target** 225:13
226:15 228:19
**task** 165:8
171:14 197:4
**tasked** 47:2
**tasks** 125:1
165:3 167:7
168:7 171:7
174:1 178:23
184:15 185:8
185:19 190:21
207:19 319:8
**taught** 243:17
304:11
**tax** 44:22
**te** 172:19
**teach** 243:12,21
**teacher** 6:15
7:15,18,21 8:6
8:9 18:15
65:21 66:4,6
66:10,20 72:2
76:16 78:8,15
78:21 79:3,10
133:2,20

CONFIDENTIAL

**[teacher - techniques]**                                              Page 60

| | | | |
|---|---|---|---|
| 142:24 149:8 | 97:11,21,24 | 176:12,17 | 318:3,7 |
| 149:22 166:21 | 98:12 99:2,20 | 177:1,18 | **teachers'** 8:12 |
| 168:20 177:8 | 100:1,3,5,10,17 | 178:23 180:3 | 165:22 |
| 179:18 186:3 | 101:1,9,14,17 | 180:15 181:1,3 | **teaching** 77:14 |
| 239:16 240:16 | 101:23 102:4 | 182:3 183:4,7 | 82:21 83:7,14 |
| 241:19 242:22 | 102:14,20 | 183:17,20 | 83:15,20 84:10 |
| 245:24 246:3 | 103:14 105:2,9 | 184:13 185:5 | 99:19 100:14 |
| 250:1 251:9,20 | 105:13,18,24 | 186:13,20 | 103:22 104:2 |
| 251:21 252:3 | 106:7,13,17 | 189:4,12,13 | 104:24 105:21 |
| 255:2,13,17 | 107:2,13,23 | 190:2,4,9,19 | 110:15 111:8 |
| 256:5 257:23 | 108:10,15 | 203:4,15 208:9 | 125:17 130:3,6 |
| 259:17,20 | 109:6,17,20 | 239:21 240:2,7 | 136:1 154:13 |
| 260:12 267:11 | 110:2,7,16,21 | 245:9,10 246:5 | 166:21 184:14 |
| 267:23 269:3 | 110:24 111:5 | 246:7,11,15,22 | 185:6 203:9 |
| 283:23 300:13 | 111:11,18 | 250:13 251:1 | 204:24 206:17 |
| 300:18 301:2 | 112:1,7,11,20 | 254:18 259:5 | 207:12 239:10 |
| 301:21 | 113:6 114:3 | 262:15 265:7 | 259:22 260:17 |
| **teachers** 8:13 | 115:6 133:7 | 266:11,16 | 285:10 310:15 |
| 72:4 74:22 | 134:5,24 | 267:5 268:5,9 | 316:12 318:15 |
| 75:5,16,22 | 136:23 138:8 | 269:11 270:5 | **team** 273:10,23 |
| 76:7 77:11 | 138:15 139:2 | 270:11 273:15 | **technician** |
| 78:1 80:22 | 139:19 147:19 | 273:24 276:4,5 | 12:10 18:2,9 |
| 81:3,23 82:7 | 148:2 149:17 | 281:6,16,17 | 71:8,15 129:3 |
| 82:22 83:8,17 | 152:23 153:8 | 282:1,12 | 129:10 171:22 |
| 83:18,22 84:15 | 154:11,14 | 293:17 297:11 | 172:5 182:7,11 |
| 84:18,24 85:5 | 155:5,9 156:13 | 297:15 299:4 | 182:18 215:18 |
| 85:16 86:2,7 | 162:8 166:1,14 | 299:20,22 | 217:17 271:3 |
| 86:23 87:6,11 | 166:17 167:6 | 300:2,5,10 | 271:15 298:5 |
| 87:18 88:1,20 | 167:21 168:7 | 301:6 302:17 | 298:12 320:3 |
| 89:4,5,9,23 | 169:10,22 | 304:22 305:7 | **technique** |
| 90:17 91:8 | 170:6 172:12 | 305:20 308:21 | 62:22 |
| 94:11,16,19,24 | 172:14 173:18 | 309:1 310:19 | **techniques** |
| 95:6,16,24 | 173:23 174:19 | 311:2,12,16 | 210:11 |
| 96:14 97:1,4 | 175:4,13 | 316:12 317:23 | |

| | | | |
|---|---|---|---|
| **technology** 138:19 | 142:23 145:19 148:3 233:20 245:2 | **testimony** 6:4 15:8 24:19,21 26:9,12 34:9 | 214:24 255:1,2 255:12 260:12 |
| **television** 165:15 | **test** 123:13 134:18,21 | 52:18 133:13 150:23 151:16 | **things** 61:3,19 213:15 214:20 |
| **tell** 70:7 75:14 139:23 171:7,8 291:13 293:17 294:2 295:12 303:13 | 152:20,24 154:10 158:13 160:11,13,18 161:2,3,17 163:20 164:2 | 160:16 171:12 200:11 203:14 225:7 250:13 274:21 281:23 299:8 309:24 | 240:24 259:1 261:13 262:9 302:6 **think** 22:8 34:10 35:6 37:1 51:5 52:1 |
| **temperature** 256:22 257:2 | 176:16 189:3 192:9 193:8 | 313:14,17,22 313:24 315:9 | 52:4 59:2,6,8 60:2 65:8 |
| **temporal** 196:20 | 221:20 252:10 266:21 268:4 | 316:1 317:2 321:7 | 73:12 76:17 103:20 113:24 |
| **ten** 21:5 62:16 82:14 104:1 115:2 130:3,6 278:5 280:19 291:21 311:17 | 268:10,20 269:11 270:13 270:17 273:11 273:19,23 274:2,18 275:5 | **testing** 127:8 150:6 153:6 154:8 155:6 267:4 **tests** 156:2 | 120:9 121:5 125:23 129:19 133:14 134:16 137:7 142:10 144:4,13,19 |
| **tend** 279:20 | 292:15 293:16 | **texas** 4:5,11,12 | 148:9 150:2,17 |
| **tenth** 2:16 5:5 | 295:10 296:2 | 4:16 | 150:18 151:8 |
| **tenure** 133:22 240:7 245:24 246:3 | **tested** 160:9 193:5 | **text** 72:20 135:16 | 151:12,20 152:16 164:8 |
| **tequila** 35:1,7 | **testified** 13:9 17:10 25:14 | **texting** 138:2 **thank** 206:9 | 164:11,12 165:7 167:9 |
| **term** 154:23 215:9 276:3 | 38:18 43:5 170:11 174:4 | 271:19 288:8 288:13 297:18 | 171:6,13 176:6 176:15 178:15 |
| **terminated** 66:8 67:9 68:2 68:5 | 299:12 316:10 **testify** 26:1 27:11 | 318:16 319:17 **thanks** 66:13 **theory** 29:2,18 | 179:4 188:9 189:2 194:10 197:7,12 |
| **terminates** 68:12 | **testifying** 25:17 273:9 274:5 | 31:7 **thing** 54:1 | 198:19 203:12 209:21,24 |
| **terming** 159:9 | 315:21 | 138:16 139:5 | 210:6 211:23 |
| **terms** 31:7 118:2 124:23 | | 139:14 196:6 | 212:3,17,22 |

**[think - time]**                                                      Page 62

| | | | |
|---|---|---|---|
| 231:17 232:1 | 91:7 155:2 | 83:9,16,23 | 144:17 145:20 |
| 234:15 236:11 | 158:4,19 | 84:8,19 85:3 | 149:2,7 150:1 |
| 236:21 237:10 | 159:11 161:13 | 85:16 87:1,1,9 | 151:10 152:9 |
| 237:18,22 | 163:11 173:1 | 88:3,18 89:6 | 153:15,21,22 |
| 240:20,22 | 219:21,23 | 90:15 93:17 | 156:14 157:10 |
| 243:4 248:21 | 278:18,19 | 94:12,21 95:4 | 159:6,7 161:7 |
| 250:24 254:16 | 282:1 | 95:15 96:1 | 162:12 164:5 |
| 254:19,23 | **three** 23:12 | 97:13,19 98:9 | 165:4,14,23,23 |
| 260:6 263:5,18 | 75:15,20 155:7 | 98:13,17,21,22 | 166:14,15 |
| 263:21 265:10 | 279:13 | 99:21 100:16 | 167:7,8,21 |
| 265:12,19,21 | **threshold** | 101:10,17 | 168:7,8,21 |
| 266:3,4 267:16 | 139:10 | 104:5,7 105:23 | 169:24 170:18 |
| 268:3 270:24 | **tied** 204:13 | 106:9,16 | 170:23 171:22 |
| 270:24 274:9 | **tiktok** 4:18,19 | 107:22 108:11 | 172:5,12,12 |
| 278:2 279:24 | 4:19 14:6 | 108:15 109:5 | 173:3,13,24 |
| 281:24 282:6 | 248:4,11,18 | 111:10 112:3 | 176:13,20 |
| 284:5,22 | 249:11 252:11 | 112:11 113:21 | 177:2,9,18 |
| 285:17 286:1 | 257:11 258:1 | 114:12 115:20 | 178:5,22 179:6 |
| 295:23,24 | 274:6 275:2 | 118:3,4,7 | 179:18 180:3 |
| 299:11,18,21 | 279:22 280:1,3 | 119:21 120:23 | 182:11,18 |
| 305:11 315:8 | 298:20 320:13 | 125:1,14,15,16 | 183:7,20 |
| 317:6 319:12 | **time** 6:15 7:15 | 128:6 129:3,10 | 184:12,23 |
| 320:2 | 7:18,21 8:6,9 | 130:17,19 | 185:5 186:3,5 |
| **thinking** 155:1 | 8:12,12 12:8 | 131:24 132:1,6 | 186:14,20 |
| 157:2 160:11 | 12:15 18:2,9 | 132:15,17,22 | 188:18 189:6 |
| 234:8,11 | 18:15 21:19,21 | 132:24 133:4,7 | 189:15 190:9 |
| **thinks** 252:4 | 22:2,17 48:24 | 133:16,21 | 190:20 197:13 |
| **third** 64:3 | 59:7 71:8,15 | 134:9,10,23 | 197:15 202:13 |
| 191:5 206:6,8 | 74:23 75:5 | 136:2,9,15 | 204:23 205:24 |
| 224:16 | 76:20,22 77:12 | 137:6,15 | 206:12,16 |
| **thirds** 206:3,13 | 77:20 78:9,15 | 139:19,23 | 208:15 213:17 |
| **thirty** 322:16 | 78:21 79:3,10 | 140:2,6,11,12 | 213:24 214:16 |
| **thought** 24:14 | 81:15 82:1,9 | 140:15,18,21 | 214:21,23,23 |
| 29:12,14 47:3 | 82:15,16,23 | 141:9 143:12 | 215:6,16,18 |

CONFIDENTIAL

**[time - tucson]**                                         Page 63

217:17 252:6
259:22 260:16
263:14 271:3
271:15,19,21
273:1 280:21
281:9 282:12
283:7 285:10
297:12,16,20
298:5,12
304:24 305:8
305:20 314:17
320:17
**timeframe**
310:22
**timeline**  201:18
203:4
**times**  2:20
16:14 151:22
175:3 274:12
320:4
**tip**  231:4
**tipping**  146:2
**title**  166:19
195:10
**titled**  80:13,18
172:11 173:8
210:16
**today**  14:14,16
15:8 16:6
22:20 23:3
73:11 150:9
183:14 221:22
222:4 253:7
271:20 296:12

**today's**  12:14
**together**  20:12
113:14 169:6
290:20
**told**  30:16
35:19 171:18
240:3,5,10
289:14,20
290:4,6,13
300:10
**took**  36:21
45:24 150:12
161:11
**top**  27:16 35:2
66:3 75:15
142:22 184:19
**topaz**  1:16 2:2
3:16
**topic**  196:1
224:11
**topics**  52:3
**total**  19:2 21:20
21:22 74:24
75:23 77:9,21
80:10 89:3
96:13 97:10
99:8 103:8
107:12 108:6
113:5 114:16
116:16 118:7
125:15 129:20
139:20 141:9
145:18 170:17
170:23 173:2

184:23 186:5
190:14 285:9
306:15 307:10
307:16,17
308:23 309:2
**toward**  186:13
201:4 210:15
224:9 315:5
**towards**  225:16
**track**  279:19
**trademark**
56:9,11
**trademarks**
49:21 50:5,15
231:2
**traditional**
177:19 179:17
180:4 186:22
212:6
**traditionally**
177:10
**transcript**
292:1,12
321:18 322:17
322:19
**transcription**
324:4
**translated**
211:11
**travel**  53:3
54:22
**treated**  70:8,18
70:20 119:9
137:8

**tremendous**
35:8
**trial**  12:8 25:20
26:2,6
**tried**  46:6
152:20
**true**  179:21
185:22 233:13
236:12 243:7
245:6 303:20
321:6
**trumpeted**
147:1
**truthfully**
238:8
**try**  15:16
158:22 298:3
**trying**  131:14
138:14 155:24
223:21 224:5,5
227:16,17
233:21 251:4
263:22 277:24
278:2 283:3
289:15 316:22
317:7
**tucson**  8:10
9:22 19:7
79:11 109:12
109:16 113:4
113:18 115:19
116:6 117:7
131:21 217:14
218:16,18,22

**[tucson - usable]**                                              Page 64

219:23 220:4,6
**turn**   32:17 65:3
  71:19 92:18
  96:7 99:11
  102:16 135:12
  182:23 195:3
  209:3 247:8
**turned**   21:4
**turning**   115:5
  162:7
**twenty**   17:15
  155:7
**twice**   23:9
  142:8 143:23
  144:10,15
  145:9 146:4
**twitter**   251:11
**two**   25:11,14
  31:18,19 33:2
  54:19 58:24
  99:9 114:21
  120:19 122:13
  142:2,13
  143:18 236:15
  255:8 261:22
  279:13
**tying**   167:11
  197:8 209:22
  210:5 265:23
**type**   41:6,23
  279:2
**types**   122:23
  123:7,14
  201:16 213:14

266:7
**typical**   118:2
  118:15 121:21
  122:1 123:21
  125:6,12
  130:18 135:24
  179:16 227:7
  276:24
**typically**   16:20
  177:9,13
  308:17 309:16

**u**

**u.s.**   17:16,17
  46:9 181:14
**umm**   6:18
  26:20 27:8,22
  29:3 30:8
**umm's**   40:14
**umms**   29:8
**unable**   119:20
  128:5 131:23
**unauthorized**
  138:2 248:2
  255:11
**unaware**
  146:20
**uncomfortable**
  256:21 257:1
**uncommon**
  103:10
**under**   14:16
  43:22 67:1,3
  126:24 152:16

239:4 245:16
  306:12 321:20
**undermine**
  28:3
**understand**
  14:15 15:10,20
  34:12 51:8,22
  65:6 66:15
  68:1 69:5 70:3
  82:4 125:22
  143:15 152:8
  168:2 169:21
  170:13 173:21
  179:12 184:5
  223:21 224:7
  227:20 242:24
  243:5 250:12
  255:18 256:10
  256:23 257:9
  274:23 283:2,3
  306:7,24
**understanding**
  49:2 61:5 64:9
  72:15 75:10
  131:10 195:16
  252:9 269:5
  274:6 281:17
  283:15 286:19
  289:7 293:3
  295:19 302:23
  311:21 312:13
**understands**
  150:24 151:1

**understood**
  16:2 250:13
  270:14,14
**undertake**
  192:13 231:11
  277:8 285:2,13
**undertaken**
  275:16
**unemployment**
  202:10
**unidentified**
  103:10
**unit**   206:12
  282:23
**united**   1:1
  12:21 182:4
**units**   205:24
**universally**
  236:12
**universe**
  225:19 226:19
**unnecessarily**
  47:10
**unsound**   39:21
**unstable**
  267:17
**unusual**   222:21
**unwilling**
  317:12
**upcoming**   72:5
**ups**   314:5
**upset**   41:5
**usable**   210:7
  306:15 308:9

CONFIDENTIAL

**[usage - voice]**                                                Page 65

| | | | |
|---|---|---|---|
| **usage** 210:23 | 282:6,14 283:8 | 252:4 257:16 | **verification** |
| 252:14 283:18 | 289:13 293:19 | 278:1 281:16 | 161:21 |
| 284:9,14 289:9 | 294:4,13,18 | 296:17 299:5 | **verify** 74:9 |
| 289:23 290:8 | 297:11,15 | 299:16 | 158:22 159:20 |
| 293:23 310:10 | 299:14,24 | **usually** 199:3 | 161:4 162:1 |
| **use** 8:12 44:13 | 307:11 310:17 | | 163:1 296:14 |
| 45:2 73:3,6 | 318:7,8 | **v** | 296:15 |
| 82:1,9 83:10 | **used** 35:2 36:4 | **v** 6:18,21,23 | **veritext** 1:23 |
| 84:20 85:4,17 | 41:7 47:10 | 7:6 26:20 27:9 | 12:13 |
| 87:2,10 88:19 | 63:1 73:10 | 31:14 32:8 | **version** 205:17 |
| 90:16 94:13 | 103:11 117:24 | 37:5 38:2,14 | **versus** 25:1 |
| 95:5 96:2 | 155:10 179:6 | 42:16 | 43:3 54:6 |
| 100:7 105:15 | 198:1,8 201:1 | **valid** 102:18 | 103:23 308:22 |
| 110:18 111:2 | 204:8,12,12 | 103:14 114:8 | **video** 12:10,16 |
| 136:3 145:11 | 205:12 207:16 | 114:14 188:15 | 18:2,9 71:8,15 |
| 153:15 165:23 | 208:1 213:4,21 | 210:6 225:11 | 129:3,10 |
| 166:15 172:12 | 213:24 214:16 | 229:13 234:20 | 171:22 172:5 |
| 191:2 196:19 | 215:2,5 226:3 | 234:24 | 182:7,11,18 |
| 203:18 204:19 | 232:24 233:16 | **validation** | 215:18 217:17 |
| 205:4 207:6 | 233:17 241:17 | 68:13,15 | 271:3,15 298:5 |
| 208:13 210:10 | 254:7 274:13 | **validity** 169:13 | 298:12 320:3 |
| 212:6 240:20 | 277:15 280:1,4 | 175:16 181:17 | **videographer** |
| 241:12 248:2 | 283:17 289:8 | 196:2 198:9 | 5:14 12:12 |
| 249:21 251:3,7 | 290:8 291:17 | **variety** 63:1 | **videos** 280:3,12 |
| 251:17 254:20 | 292:21 293:9 | 154:12,13 | 280:17 |
| 257:13,15 | 322:20 | **various** 22:22 | **videotaped** |
| 259:2 261:1,4 | **useful** 278:19 | 44:15,24 56:1 | 1:13 |
| 261:6,7,12 | 311:19 | 65:23 181:4 | **view** 33:3,14,19 |
| 262:11,17 | **users** 260:3 | 232:9 274:12 | 34:5 125:23 |
| 263:1 265:14 | **uses** 196:16 | **vary** 134:2 | **viewing** 67:22 |
| 274:8,11,11,17 | 201:6 | **vast** 17:8 | **voice** 64:4,7 |
| 275:4 278:7,12 | **using** 35:15 | **verifiable** | |
| 278:23 279:7 | 197:1 201:16 | 163:20 | |
| 279:15,18 | 229:15 233:21 | | |

CONFIDENTIAL

**[waived - witness]**                                                           Page 66

| w | | | |
|---|---|---|---|
| **waived** 12:5 | **way** 34:21 59:9 | **wednesday** | **witness** 11:5 |
| **walking** 255:16 | 60:24 64:11 | 23:13 | 13:5,24 14:21 |
| 255:20 256:8 | 65:15 70:19 | **weekly** 214:1 | 26:5 27:5 |
| 256:12 | 120:4,11 121:5 | 214:17 | 30:20 31:18 |
| **want** 17:24 | 123:9 124:11 | **weight** 28:16 | 32:12 34:10 |
| 33:22 37:9 | 126:3 137:7,19 | **went** 86:12,15 | 36:22 37:3,5 |
| 67:12 88:10 | 139:3 146:1,11 | 91:16 92:1,10 | 41:20 49:6,20 |
| 128:19 170:1,3 | 149:23 151:3 | 93:17 136:14 | 51:16 52:14 |
| 220:11 222:20 | 153:16 155:16 | 141:10,10 | 53:11 54:12 |
| 247:16 286:3 | 158:8 161:16 | 153:24 164:21 | 69:1 70:24 |
| 297:21 306:6 | 177:12 179:17 | 320:9,11,13,15 | 74:5,14 75:9 |
| 316:15 | 187:4 188:19 | **west** 3:10 4:10 | 77:24 82:13 |
| **wanted** 174:9 | 212:18 215:12 | 4:15 | 84:3 85:8,21 |
| 205:7 263:11 | 237:12 247:1,2 | **whiteley** 3:3 | 86:19 87:14,21 |
| 308:8,16,20 | 247:9 250:19 | 6:7 219:4,22 | 88:6,23 89:19 |
| **wants** 45:20 | 253:7 254:23 | 220:5 288:11 | 90:10,20 91:21 |
| 63:3 64:10 | 258:9 264:2 | 288:17,20 | 92:5,14 93:4 |
| 316:6 | 266:4 304:4 | 290:5,17 | 93:12,22 95:9 |
| **war** 261:23 | 308:23 314:1 | 292:10 293:5 | 95:19 96:5,17 |
| **ward** 135:5 | **ways** 33:4,10 | 293:15 294:1 | 97:9 98:7,16 |
| 213:4 242:12 | 41:12 66:16 | 294:10,24 | 99:1,8 100:21 |
| **ward's** 210:8 | 255:18 | 296:23 297:18 | 101:4,22 102:8 |
| **warming** 72:4 | **wc.com** 3:5 | 298:1 318:18 | 102:24 103:20 |
| 72:13,18,21 | **we've** 79:15 | 318:24 319:2 | 104:12 106:3 |
| 73:14 235:11 | 129:16 191:11 | 319:17,22 | 106:22 107:6 |
| **washington** | 215:11 217:21 | 320:1,10 | 108:2,14 109:1 |
| 2:16 3:4 5:6 | 232:24 233:17 | **wide** 52:3 | 110:11 111:14 |
| **watching** | 235:18 237:3 | **widely** 63:1 | 111:21 112:16 |
| 165:15 | 245:18,19 | **wiley** 63:15 | 112:23 113:24 |
| **wax** 35:2,5,15 | **wear** 67:21,22 | **williams** 3:3 | 114:11,20 |
| 36:3 | **web** 7:10 55:13 | **willingness** | 115:11,24 |
| | **website** 55:19 | 292:3 | 116:16 117:2 |
| | **websites** 53:3 | **wish** 80:13 | 119:14,24 |
| | 54:22 67:17 | | 120:8 121:4 |

CONFIDENTIAL

**[witness - writing]**                                            Page 67

| | | | |
|---|---|---|---|
| 122:9,17 123:5 | 213:10 214:8 | 288:4 290:3,12 | 220:16 221:2 |
| 123:17 124:7 | 222:13 223:11 | 292:7,24 | 221:11,23 |
| 124:20 125:4 | 224:3 229:6 | 293:13,22 | 222:4,24 247:1 |
| 126:8,22 | 231:16 232:19 | 294:7,21 | 247:2 264:13 |
| 127:12,20 | 234:15 235:4 | 296:21 299:11 | 272:16,21 |
| 128:12 133:14 | 236:9,21 | 300:23 301:16 | 273:6,8 290:19 |
| 134:1,14 135:3 | 237:17 238:1 | 302:2,21 | 295:13 |
| 136:19 137:3 | 238:16 239:19 | 303:10,23 | **workday**   171:8 |
| 138:6,23 | 240:19 241:11 | 304:8,18 305:3 | 171:9 174:20 |
| 139:14 140:5 | 241:23 242:10 | 305:18 306:23 | 190:22 |
| 140:24 142:18 | 243:4,16 244:1 | 308:3,15 310:7 | **worked**   119:2 |
| 144:13 145:5 | 244:11,23 | 311:7 312:17 | **working**   8:12 |
| 146:9 147:5 | 245:15 246:20 | 313:11,13 | 22:3 119:21 |
| 148:1,21 | 248:21 249:17 | 315:15 316:2 | 131:24 165:23 |
| 149:12 150:17 | 250:24 251:15 | 317:17 319:12 | 166:14 169:11 |
| 151:7,14 | 252:2 253:3,12 | 321:5,7 322:1 | 170:7,18 |
| 152:14 153:5 | 254:3,14 | **witnesses**   7:12 | 172:12 173:9 |
| 156:18 158:2 | 255:24 256:16 | 16:17 58:10 | 173:13 175:14 |
| 159:4 160:2,17 | 257:5,19 258:7 | **wolf**   3:10 | 177:8,18 180:3 |
| 161:10,24 | 258:18 260:6 | **won**   45:14,17 | 180:15 181:1 |
| 162:15 163:7 | 261:19 262:4 | 45:24 | 183:7,20 |
| 163:24 165:7 | 262:21 263:5 | **wonder**   144:7 | 184:12 185:5 |
| 168:1,12,24 | 263:18 264:11 | **wooden**   35:12 | 186:14,20 |
| 169:19 170:11 | 265:3,18 266:3 | **wording**   21:14 | 188:10 189:14 |
| 170:16 171:3 | 266:16 267:10 | 73:3,5 158:16 | 190:9 277:10 |
| 171:13 174:4 | 268:3,16 269:2 | 221:18 | **works**   284:20 |
| 175:22 179:2 | 269:18 270:3 | **words**   20:10 | **worry**   289:15 |
| 181:20 188:22 | 270:21 271:22 | 73:9 261:23 | **worrying** |
| 190:13 191:22 | 274:22 275:9 | **work**   168:8 | 289:19 |
| 193:8 198:19 | 278:10,17 | 170:23 173:2 | **wow**   143:7 |
| 202:2,20 | 281:3,24 | 175:3 181:4 | **write**   72:1 |
| 204:11 205:16 | 282:21 283:13 | 183:4,17 184:6 | **writes**   32:21 |
| 206:24 208:19 | 284:13 285:7 | 184:23 186:3 | **writing**   15:11 |
| 211:10,22 | 286:1 287:17 | 189:19 192:18 | 73:21 |

CONFIDENTIAL

**[written - zoom]**                                          Page 68

**written**  26:13
  27:21 63:12
  67:18 83:11
**wrong**  66:22
  103:1 151:9
  152:5
**wrote**  28:2
  33:12 40:9
  59:7,9 61:19
  169:15

**x**

**x**  6:2,11 7:2 8:2
  9:2 10:2
  251:10,15,21
  252:4

**y**

**yak**  253:21
**yeah**  39:2
  60:20 80:19
  109:1 136:4
  150:20 160:10
  163:7 167:2
  194:2 222:18
  237:1 260:6
  270:7 286:12
  305:21 307:23
**year**  35:12
  82:14 84:17
  86:23 87:24
  88:1 89:13
  90:3,14 91:2,5
  92:10,24 93:8
  93:19 94:10,19

95:3,3 100:5
100:10,15
101:8,14 102:5
103:23 105:12
105:22 106:6
110:23 111:9
112:1,10,10
116:7,12 125:7
125:13 130:10
130:13 131:3
132:10 134:3
136:9 153:10
157:3 207:10
207:11 272:22
282:13 300:14
300:14
**yearly**  291:3,6
**years**  21:3,5
  24:19 35:16
  36:21 42:24
  49:11,15 53:1
  62:16 104:1
  115:2 130:3,7
  157:23 159:1
  159:23 206:2
  206:20 213:2
  277:24 278:5
  279:13 280:19
  291:20,21
  310:21 311:17
  319:9
**yeates**  2:3
  14:23

**yep**  92:17
  93:15 102:1
**yesterday**
  23:14 131:9
  132:4
**ygr**  1:3
**yield**  311:17
**yik**  253:20
**york**  2:20,21,21
**young**  242:7,21
**youtube**  3:6
  14:6 248:4,12
  248:18 249:11
  252:12 257:11
  258:1 274:7
  275:3 280:10
  280:12,13,17
  288:21 297:12
  297:15 320:11

**z**

**zachary**  2:9
**zalazar**  5:4
**zbower**  2:11
**zero**  136:12
  304:14
**zoom**  3:14 4:2
  5:2

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.