**Exhibit 45**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

2

                      - - - - -

3

4    IN RE: SOCIAL MEDIA              CASE NO.

5    ADOLESCENT ADDICTION/PERSONAL    4:22-md-03047-YGR

6    INJURY PRODUCTS LIABILITY        MDL No. 3047

7    LITIGATION

8

9    THIS DOCUMENT RELATES TO

10   ALL ACTIONS

11                    - - - - -

12          Friday, August 15, 2025

13       CONFIDENTIAL - ATTORNEYS' EYES ONLY

14             PURSUANT TO PROTECTIVE ORDER

15

16          Videotaped deposition of BRYCE WARD, PhD,

17   held at the offices of Kessler Topaz Meltzer &

18   Check, LLP, 280 King of Prussia Road, Radnor,

19   Pennsylvania, commencing at 9:06 a.m. Eastern, on

20   the above date, before Robin L. Clark, Professional

21   Reporter and Notary Public in and for the

22   Commonwealth of Pennsylvania.

23

24

25

CONFIDENTIAL

Page 2

1    APPEARANCES:

2

3            KESSLER TOPAZ MELTZER & CHECK, LLP
             BY:   TYLER GRADEN, ESQ.
             JORDAN JACOBSON, ESQ.

4            MELISSA YEATES, ESQ. (ZOOM)
             JUSTIN SWOFFORD, ESQ. (ZOOM)

5            280 King of Prussia Road
             Radnor, Pennsylvania 19087

6            610-667-7706
             tgraden@ktmc.com

7            jjacobson@ktmc.com
             myeates@ktmc.com

8            jswofford@ktmc.com
                         For the Plaintiffs

9

10           WILLIAMS & CONNOLLY, LLP
             BY:   JOSEPH S. SANDOVAL-BUSHUR, ESQ.

11           and KEY'TOYA BURRELL, ESQ.
             680 Maine Avenue SW

12           Washington, D.C.  20024
             202-434-5013

13           jsandoval-bushur@wc.com
             kburrell@wc.com

14                   For the Defendants, Alphabet,
             Inc., Google, LLC and YouTube, LLC

15

16

             SHOOK, HARDY & BACON, L.L.P.

17           BY:   BRIAN M. LANDS, ESQ.
             Two Commerce Square

18           2001 Market Street, Suite 3000
             Philadelphia, Pennsylvania 19103

19           215-278-2555
             blands@shb.com

20                   For the Defendants, Meta
             Platforms, Inc., f/k/a Facebook, Inc.;

21           Facebook Holdings, LLC;
             Facebook Operations, LLC; Facebook

22           Payments, Inc.; Facebook Technologies,
             LLC; Instagram, LLC; and Siculus, Inc.

23

24

25

CONFIDENTIAL

```
                                              Page 3

 1   APPEARANCES, CONTINUED:
 2
             MUNGER, TOLLES & OLSON LLP
 3           BY  STEPHANY REAVES, ESQ.
             601 Massachusetts Avenue NW
 4           Suite 500E
             Washington, D.C. 20001
 5           202-220-1126
             stephany.reaves@mto.com
 6                   For the Defendant, Snap, Inc.
 7
     ALSO PRESENT:
 8
             WILLIAM CHAN, VIDEOGRAPHER
 9
             VINCE ROSICA, EXHIBIT TECH
10
11   REMOTE APPEARANCES:
12
             CARELLA, BYRNE, CECCHI, BRODY
13           & AGNELLO, P.C.
             BY:  MICHAEL A. INNES, ESQ.
14           ZACHARY S. BOWER, ESQ.
             5 Becker Farm Road
15           Roseland, New Jersey 07068
             973-994-1700
16           minnes@carellabyrne.com
             zbower@carellabyrne.com
17                   For the Irvington Plaintiffs
18
             MOTLEY RICE, LLC
19           BY:  ESTHER E. BEREZOFSKY, ESQ.
             210 Lake Drive East, Suite 101
20           Cherry Hill, New Jersey 08002
             856-667-0500
21           eberezofsky@motleyrice.com
                     For the Plaintiffs
22
23
24
25
```

CONFIDENTIAL

```
                                              Page 4

 1   REMOTE APPEARANCES, CONTINUED:
 2
             EILAND & BONNIN, P.C.
 3           BY:  DAVID BONNIN, ESQ.
             CRAIG EILAND, ESQ.
 4           2200 Market Street, Suite 501
             Galveston, Texas 77550
 5           409-763-3260
             dbonnin@eilandlaw.com
 6           ceiland@eilandlaw.com
                      For the Texas ISD Plaintiffs
 7
 8           KING & SPALDING LLP
             BY:  PHILIP GREEN, ESQ.
 9           1180 Peachtree Street, NE
             Suite 1600
10           Atlanta, Georgia 30309
             404-572-2728
11           pgreen@kslaw.com
                      For the Defendants,
12           TikTok, Ltd.; TikTok, LLC;
             TikTok, Inc.; ByteDance Ltd.; and
13           ByteDance Inc.
14                   - - - - -
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 5

```
 1                    I N D E X
 2   WITNESS                                       PAGE
 3   BRYCE WARD
        BY MR. SANDOVAL-BUSHUR:                     10
 4
 5                  E X H I B I T S
 6   NUMBER          DESCRIPTION                  MARKED
 7   Ward
 8   Exhibit 1A      Amended Expert Report for      11
                     Breathitt case
 9
     Exhibit 1B      Amended Expert Report for      11
10                   Charleston case
11   Exhibit 1C      Amended Expert Report for      12
                     DeKalb case
12
     Exhibit 1D      Amended Expert Report for      13
13                   Harford case
14   Exhibit 1E      Amended Expert Report for      13
                     Irvington case
15
     Exhibit 1F      Amended Expert Report for      14
16                   Tucson case
17   Exhibit 2A      Reply Report for Breathitt      14
                     case
18
     Exhibit 2B      Reply Report for Charleston     15
19                   case
20   Exhibit 2C      Reply Report for DeKalb         15
                     case
21
     Exhibit 2D      Reply Report for Harford        15
22                   case
23   Exhibit 2E      Reply Report for Irvington      16
                     case
24
     Exhibit 2F      Reply Report for Tucson         16
25                   case
```

CONFIDENTIAL

Page 6

```
1    Exhibit 3A      Breathitt Original Expert      20
                     Report
2
     Exhibit 3B      Charleston Original Expert     21
3                    Report
4    Exhibit 3C      DeKalb Original Expert         21
                     Report
5
     Exhibit 3D      Harford Original Expert        22
6                    Report
7    Exhibit 3E      Irvington Original Expert      22
                     Report
8
     Exhibit 4       Email dated 4/11/25            30
9
     Exhibit 5A      Appendix B Materials           37
10                   Considered Breathitt
                     Documents
11
     Exhibit 5B      Appendix B Materials           38
12                   Considered Charleston
                     Documents
13
     Exhibit 5C      Appendix B Materials           39
14                   Considered DeKalb Documents
15   Exhibit 5D      Appendix B Materials           39
                     Considered Harford
16                   Documents
17   Exhibit 5E      Appendix B Materials           40
                     Considered Irvington
18                   Documents
19   Exhibit 5F      Appendix B Materials           40
                     Considered Tucson Documents
20
     Exhibit 6       Invoices Bates Ward000001      60
21                   to Ward 000005
22   Exhibit 7       Robert L. Klein Breathitt     124
                     Expert Report dated 5/18/25
23
     Exhibit 8       Nominet Article               335
24
     Exhibit 9       NEA Article                   346
25
```

Page 7

1    Exhibit 10
     Exhibit 11       Affidavit of Lisa Kathryn      387
2                     Allison
3    Exhibit 12       Affidavit of Anita Huggins      388
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 8

1          DEPOSITION SUPPORT INDEX

2

                    - - - - -

3

4    Direction to Witness Not to Answer

5    Page  Line

6    NONE

7    Request for Production of Documents

8    Page  Line

9    NONE

10   Question Marked

11   Page  Line

12   NONE

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 9

```
 1              THE VIDEOGRAPHER:  We are now
 2         on the record.  My name is William
 3         Chan.  I am a videographer for
 4         Golkow, a Veritext division.
 5         Today's date is Friday, August 15,
 6         2025.  The time is 9:06 a.m.
 7         Eastern.  This video deposition is
 8         being held at the offices of
 9         Kessler Topaz Meltzer and Check,
10         280 King of Prussia Road, Radnor,
11         Pennsylvania, in re:  Social Media
12         Adolescent Addiction, Personal
13         Injury Products Liability
14         Litigation for the United States
15         District Court, Northern District
16         of California.  The deponent is
17         Bryce Ward, PhD.
18             All counsel will be noted on
19         the stenographic record.  The
20         court reporter is Robin Clark who
21         will now swear in the witness.
22                  - - - - -
23             BRYCE WARD, PhD, having been
24         duly sworn, was examined and
25         testified as follows:
```

Page 10

```
                          - - - - -
 1
 2   BY MR. SANDOVAL-BUSHUR:
 3          Q.      Good morning, Dr. Ward.
 4          A.      Good morning.
 5          Q.      My name is Joseph
 6   Sandoval-Bushur.  I represent YouTube and
 7   Google in this case and I'll be asking
 8   questions today on behalf of the
 9   Defendants.  You have been deposed a number
10   of times before, correct?
11          A.      That is correct.
12          Q.      So I expect that you know the
13   drill and the rules for the day, but just
14   as a reminder, please wait until I finish
15   asking a question to begin answering your
16   question and if you need a break at any
17   time, please just let me know.
18                  Do you understand?
19          A.      I agree, yes, I understand,
20   sorry.
21          Q.      Okay.  I am going to hand you
22   a binder and this binder contains documents
23   marked Exhibits 1A through 1F.  Exhibit 1A
24   is a copy of your amended expert report for
25   the Breathitt case, right?
```

CONFIDENTIAL

Page 11

1          A.      Yes.

2                      - - - - -

3                      (Amended Expert Report for

4              Breathitt case marked Ward

5              Exhibit 1A for identification.)

6                      - - - - -

7     BY MR. SANDOVAL-BUSHUR:

8          Q.      And this is your operative

9     report in the Breathitt case, correct?

10         A.      That is correct.

11         Q.      Exhibit 2B is the amended

12    expert report -- your amended expert report

13    for the Charleston case?

14                    MR. GRADEN:  I'm sorry, is it

15            1B?

16                    MR. SANDOVAL-BUSHUR:  1B, yes.

17                      - - - - -

18                      (Amended Expert Report for

19              Charleston case marked Ward

20              Exhibit 1B for identification.)

21                      - - - - -

                        --

22    BY MR. SANDOVAL-BUSHUR:

23         Q.      Sorry, I will ask that again,

24    thank you.  Exhibit 1B is your expert

25    report for the Charleston case, correct?

CONFIDENTIAL

Page 12

1        A.    It is, although, actually,
2   I'm noticing, when we submitted these, we
3   forgot to attach the Exhibit B, which is
4   the list of materials considered.  It's the
5   same as the original report, so I brought
6   copies of those here with me today.
7        Q.    Okay.
8        A.    Do I hand them to you?  Do I
9   keep them here?
10        Q.    Okay.  Yeah, I will take
11   those and we'll deal with them in a second
12   once we get through.
13        A.    Okay.  Yeah, yes, so B is
14   Charleston, that is correct.
15        Q.    Okay.  Exhibit 1C is your
16   amended report for the DeKalb case,
17   correct?
18        A.    Yup.
19                - - - - -
20            (Amended Expert Report for
21          DeKalb case marked Ward Exhibit
22          1C for identification.)
23                - - - - -
24   BY MR. SANDOVAL-BUSHUR:
25        Q.    And that is the operative

CONFIDENTIAL

Page 13

1  report for the DeKalb case, correct?

2          A.      Yes.

3          Q.      Exhibit 1D is your amended

4  expert report for the Harford case,

5  correct?

6          A.      Yup.

7                      - - - - -

8                  (Amended Expert Report for

9            Harford case marked Ward Exhibit

10           1D for identification.)

11                     - - - - -

12  BY MR. SANDOVAL-BUSHUR:

13         Q.      And that is your operative

14  report for the Harford case?

15         A.      Yup.

16         Q.      Exhibit 1E is your amended

17  report for the Irvington case, right?

18         A.      Yup.

19                     - - - - -

20                 (Amended Expert Report for

21           Irvington case marked Ward

22           Exhibit 1E for identification.)

23                     - - - - -

24  BY MR. SANDOVAL-BUSHUR:

25         Q.      And that's your operative

CONFIDENTIAL

Page 14

1    report for the Irvington case, correct?

2          A.      That is correct.

3          Q.      And Exhibit 1F is your expert

4    report for the Tucson case, correct?

5          A.      That is correct.

6                  - - - - -

7                  (Amended Expert Report for

8              Tucson case marked Ward Exhibit

9              1F for identification.)

10                 - - - - -

11   BY MR. SANDOVAL-BUSHUR:

12         Q.      And that is the operative

13   report for the Tucson case?

14         A.      That is the operative report.

15         Q.      All right.  And I'm going to

16   go ahead and give you a binder marked "tab

17   2" binder and that contains exhibits that

18   have been marked Exhibits 2A through 2F.

19   Exhibit 2A is your reply report for the

20   Breathitt case, correct?

21         A.      Correct.

22                 - - - - -

23                 (Reply Report for Breathitt

24              case marked Ward Exhibit 2A for

25              identification.)

CONFIDENTIAL

Page 15

```
 1                    - - - - -
 2   BY MR. SANDOVAL-BUSHUR:
 3        Q.      Exhibit 2B is your reply
 4   report for the Charleston case, correct?
 5        A.      Correct.
 6                    - - - - -
 7                 (Reply Report for Charleston
 8            case marked Ward Exhibit 2B for
 9            identification.)
10                    - - - - -
11   BY MR. SANDOVAL-BUSHUR:
12        Q.      Exhibit 2C is your reply
13   report for the DeKalb case, correct?
14        A.      Correct.
15                    - - - - -
16                 (Reply Report for DeKalb
17            case marked Ward Exhibit 2C for
18            identification.)
19                    - - - - -
20   BY MR. SANDOVAL-BUSHUR:
21        Q.      Exhibit 2D is your reply
22   report for the Harford case?
23        A.      Correct.
24                    - - - - -
25                 (Reply Report for Harford
```

Page 16

```
 1              case marked Ward Exhibit 2D for
 2              identification.)
 3                      - - - - -
 4   BY MR. SANDOVAL-BUSHUR:
 5         Q.      And Exhibit 2E is your reply
 6   report for the Irvington case?
 7         A.      Correct.
 8                      - - - - -
 9              (Reply Report for Irvington
10              case marked Ward Exhibit 2E for
11              identification.)
12                      - - - - -
13   BY MR. SANDOVAL-BUSHUR:
14         Q.      Exhibit 2F is your reply
15   report for the Tucson case, correct?
16         A.      Correct.
17                      - - - - -
18              (Reply Report for Tucson
19              case marked Ward Exhibit 2F for
20              identification.)
21                      - - - - -
22   BY MR. SANDOVAL-BUSHUR:
23         Q.      And so Exhibits 1A through 1F
24   and Exhibits 2A through 2F are the complete
25   set of reports that are your operative
```

Page 17

1   reports in this case, correct?

2           A.      That is correct.

3           Q.      And if I refer to the

4   bellwether cases, will you understand that

5   I am referring to the Breathitt,

6   Charleston, DeKalb, Irvington, and Tucson

7   cases?

8           A.      Correct.

9           Q.      Your expert report

10  Exhibits 1A through 1F and 2A through 2F

11  contain a complete statement of all the

12  opinions that you may express in the

13  bellwether cases and the basis and reasons

14  for them, correct?

15          A.      Correct.

16          Q.      Is there anything in your

17  expert reports, Exhibits 1A through to 1F

18  and 2A to 2F that you believe should be

19  corrected?

20          A.      I did notice a typo in the

21  Breathitt case report, 1A.

22          Q.      Can you please identify the

23  paragraph in which --

24          A.      Yes, I'll do that.

25          Q.      -- the typo in the Breathitt

CONFIDENTIAL

Page 18

1    report, Exhibit 1A, is located?

2          A.      So paragraph 17, I think

3    that's where it's referring to, so

4    footnotes, the footnote 3, wherever that

5    is, yes, okay, I relied on data provided to

6    me by Breathitt, so all those XLSX files

7    that are footnotes three, four, five, six,

8    those, should all be listed under footnote

9    three.  And then the variable names for --

10   that are cited for footnotes four, five,

11   and six, should be listed for those, so

12   it's like job desk and stuff like that.

13         Q.      So footnotes four, five, and

14   six contain the correct citations?

15         A.      They're the citations that

16   should have been under three, right, so

17   three -- because they're separate year

18   files and I somehow got them into the

19   different things as opposed to the right

20   line and then that supplanted the variable

21   names that were supposed to be listed in

22   four, five, and six.

23         Q.      Sorry, just to make sure I

24   understand, so what citations should appear

25   in footnote four?

CONFIDENTIAL

Page 19

1        A.        That should say, like, job
2   desk, it's like a variable name.
3        Q.        Okay.  Uh-huh.  Okay.  And
4   what should the footnote say for footnote
5   five?
6        A.        I think it's site.
7        Q.        How do you spell that?
8        A.        S-I-T-E.
9        Q.        Okay.  And what should the
10   footnote be for footnote six?
11        A.        Off the top of my head, I
12   think it's salary or gross salary or
13   something along those lines, you know, some
14   demarcation of wages.
15        Q.        You issued amended reports
16   for four districts, Breathitt, Charleston,
17   DeKalb, and Harford on Friday, August 8,
18   correct?
19        A.        That is correct.
20        Q.        What prompted you to issue
21   the amended reports for Breathitt,
22   Charleston, DeKalb and Harford?
23        A.        As I was reviewing for my
24   deposition, as I was going back through all
25   of my calculations, I noticed some

CONFIDENTIAL

Page 20

1    calculation errors.

2          Q.     Did anything about your

3    methodology for estimating damages change

4    between your original report and your

5    amended report --

6          A.     No change in methodology.

7          Q.     Did you change any of the

8    inputs you used between your original

9    report and your amended report for any

10   district?

11         A.     No.

12         Q.     Okay.  I am going to give you

13   a binder titled, "tab three" and this

14   contains Exhibits 3A through 3E.

15   Exhibit 3E is a copy of your original

16   expert report in the Breathitt case,

17   correct?

18         A.     3E?

19         Q.     Sorry, I misstated.

20   Exhibit 3A is a copy of your original

21   report in the Breathitt case, correct?

22         A.     Correct.

23                  - - - - -

24              (Breathitt Original Expert

25         Report marked Ward Exhibit 3A for

CONFIDENTIAL

Page 21

1                identification.)

2                        - - - - -

3    BY MR. SANDOVAL-BUSHUR:

4          Q.      Exhibit 3B is a copy of your

5    original report in the Charleston case,

6    correct?

7          A.      Correct.

8                        - - - - -

9                  (Charleston Original Expert

10             Report marked Ward Exhibit 3B for

11             identification.)

12                        - - - - -

13   BY MR. SANDOVAL-BUSHUR:

14         Q.      Exhibit 3C is a copy of your

15   original report in the DeKalb case,

16   correct?

17         A.      Correct.

18                        - - - - -

19                  (DeKalb Original Expert

20             Report marked Ward Exhibit 3C for

21             identification.)

22                        - - - - -

23   BY MR. SANDOVAL-BUSHUR:

24         Q.      Exhibit 3D is a copy of your

25   original report in the Harford case?

Page 22

1          A.      Correct.

2                       - - - - -

3                  (Harford Original Expert

4            Report marked Ward Exhibit 3D for

5            identification.)

6                       - - - - -

7    BY MR. SANDOVAL-BUSHUR:

8          Q.      And Exhibit 3E is a copy of

9    your original case in the -- your original

10   report in the Irvington case, correct?

11         A.      Correct.

12                      - - - - -

13                 (Irvington Original Expert

14           Report marked Ward Exhibit 3E for

15           identification.)

16                      - - - - -

17   BY MR. SANDOVAL-BUSHUR:

18         Q.      None of the reports in

19   Exhibits 3A through 3E are currently your

20   operative reports for any of these

21   districts, correct?

22         A.      That is correct.

23         Q.      For Breathitt, in your

24   amended report, Exhibit 1A, you are now

25   estimating damages that are approximately

CONFIDENTIAL

Page 23

1   30 to 40 percent higher than you estimated

2   in your original Breathitt report, correct?

3          A.     I don't know the exact

4   calculation off the top of my head, but

5   it's higher.

6          Q.     Why are you now estimating

7   damages for Breathitt that are higher than

8   what you estimated in your original report?

9          A.     So the change has to do with

10  this 2014 to 20 -- or I guess 2015 to 2020

11  period, where in the original calculation,

12  I had intended to sum two numbers and I had

13  averaged them.  And that's what's driving

14  the increase for the most part.  There's

15  also a slight change in the benefits

16  multiplier, I applied an incorrect benefits

17  multiplier to that particular portion to

18  the calculation.  It's different than the

19  one I applied above in Table 5, the earlier

20  part -- the 2021 to 2024 part of the

21  calculation.

22         Q.     Why did you change the

23  benefits multiplier that you used in the

24  Breathitt case --

25         A.     I didn't change -- sorry.

CONFIDENTIAL

Page 24

1          Q.     Sorry -- between your
2    original report your amended report?
3          A.     I was inconsistent between
4    two tables in the report, right?  So I
5    didn't change -- I just changed it so that
6    the one in Table 6, the second part of the
7    table or the second table that has summary
8    damages matched the one in Table 5.,
9    because that was the one that I intended to
10   use.
11         Q.     So in your original Breathitt
12   report, you used an incorrect benefit
13   multiplier for some of your damages
14   estimates?
15         A.     For part of the calculation,
16   correct.
17         Q.     And are you now using the
18   correct benefit multiplier for all of your
19   calculations in Breathitt?
20         A.     Yes.
21         Q.     When did you discover that
22   you had made an error in your Breathitt
23   damages calculations?
24         A.     Last Wednesday.
25         Q.     Did you yourself discover

CONFIDENTIAL

Page 25

1   that you had made an error in your

2   Breathitt damages calculations or did

3   someone else bring it to your attention?

4           A.      No, I found it.

5           Q.      For DeKalb, you are now

6   estimating damages that are approximately

7   20 to 40 percent higher than you estimated

8   in your original report; is that correct?

9           A.      I don't remember, I don't

10  know the math off the top of my head, but

11  I'll trust that you did the math.

12          Q.      You are aware that for

13  DeKalb, you are now estimating damages that

14  are higher than you estimated in your

15  original report, correct?

16          A.      I believe that's correct.

17          Q.      Why are you now estimating

18  damages for DeKalb that are higher than

19  what you estimated in your original report?

20          A.      So I had intended to -- you

21  know, I missed some cells in a spreadsheet,

22  so instead of summing 2018 for middle

23  schoolers and 2018 for high schoolers, I

24  had somehow done 2018 and 2015 and then

25  carried that down.  So some of the years

CONFIDENTIAL

Page 26

1  were, you know, lower years and so,

2  essentially, they're older years, and so

3  for part of the calculation, and so when

4  you correct it, you get whatever the

5  correct answer is.

6      Q.      When did you discover that

7  you had made an error in your DeKalb

8  damages calculations?

9      A.      Last Thursday.

10     Q.      And what prompted that

11  discovery?

12     A.      I was reviewing all of my

13  stuff as part of the deposition, preparing

14  for deposition.

15     Q.      For Harford, you are now

16  estimating damages that are approximately

17  34 percent higher than you estimated in

18  your original report, correct?

19     A.      Correct.

20     Q.      Why?

21     A.      So I was -- when I was doing

22  the high school and middle school teacher

23  calculations, I applied the share of time

24  loss for middle school to both middle and

25  high school instead of doing the

CONFIDENTIAL

Page 27

1  appropriate share for high school applied

2  to the value for high school, so I just

3  multiplied the wrong cells together.

4          Q.      Were there any other

5  corrections that you made to your Harford

6  report?

7          A.      I think that's it.

8          Q.      Did you make any corrections

9  in your amended Harford report to damages

10 relating to middle school teachers for the

11 school 2025?

12         A.      Oh, yeah, there was one, I

13 had applied the total value for 2025

14 instead of 2024 for the last year.

15         Q.      When did you discover that

16 you had made an error in your Harford

17 damages calculations?

18         A.      That was Thursday.

19         Q.      And what prompted that

20 discovery?

21         A.      Part of my reviewing my files

22 in preparation for deposition.

23         Q.      For Charleston, you are now

24 estimating damages that are approximately

25 13 percent lower than you estimated in your

CONFIDENTIAL

Page 28

1    original report, correct?

2            A.      Correct.

3            Q.      Why?

4            A.      So they had sent me a file

5    which had the different years for data and

6    the tabs were labeled 2017-18, '19, '20,

7    '21, '22, '23, '24 and in my world when you

8    see a year and it's a fiscal year, the year

9    assigned is for the later year, so 2016-17

10   to 23-24.  But it turns out that they

11   actually had labeled 2017 for 2017-2018 and

12   so when I input the data, I assigned them

13   the wrong year.  So that just shifted

14   everything off by a year and made it so

15   that I included effectively an extra year

16   that I didn't have data for.  Because 24-25

17   is outside of my damages calculation.  So

18   it's effectively the removal of that year

19   of data is what drives the decrease in the

20   calculation.

21           Q.      How did you discover that you

22   had made that error?

23           A.      As I was reviewing everything

24   in preparation for my deposition.

25           Q.      How did you come to realize

CONFIDENTIAL

Page 29

```
 1   that you had misinterpreted that Excel
 2   spreadsheet?
 3            A.      Oh, as I was literally going
 4   through all of the raw files again and
 5   within the raw file, it says that it's FY,
 6   whatever it is.  I had just written code.
 7   I had opened the file and just written code
 8   to import it and, you know, hadn't paid
 9   close attention to what was actually in the
10   files, because I'm just importing it and
11   then running it through my program.
12            Q.      Were there any other changes
13   in your damages estimates for Charleston
14   between your original report and your
15   amended report?
16            A.      Everything just stems from
17   the shifting of the years.
18            Q.      Did you make any change in
19   how you determined whether certain district
20   employees were teachers and included them
21   in your calculations?
22            A.      No.
23            Q.      Did you apply any discount to
24   the base pay values that you used for your
25   calculations?
```

CONFIDENTIAL

Page 30

1          A.       No, my understanding for

2     Charleston is that the data I was provided

3     are the base pay data.

4          Q.       And when did you discover

5     that you had made an error in your

6     Charleston damages calculations?

7          A.       That was last Wednesday.

8          Q.       All right.  Let's mark tab

9     four as Exhibit 4.

10                        - - - - -

11                   (Email dated 4/11/25 marked

12              Ward Exhibit 4 for

13              identification.)

14                        - - - - -

15     BY MR. SANDOVAL-BUSHUR:

16          Q.       And, Mr. Ward, do you see

17     that this is an email exchange between

18     Plaintiff's counsel, Tyler Graden, and

19     myself relating to your expert reports in

20     this case?

21          A.       Yes.

22          Q.       Have you briefly seen the

23     response that Mr. Graden provided regarding

24     the reasons for the changes to your expert

25     reports --

Page 31

1        A.       Yes.
2        Q.       -- on August 11?
3        A.       Sorry, yes.
4        Q.       Did you provide that
5    information to Mr. Graden?
6        A.       I did.
7        Q.       And the list of changes in
8    Mr. Graden's email, as we've just gone
9    over, is accurate, but it's not quite
10   complete; is that right?
11       A.       I did forget the one middle
12   school year issue in Harford.
13       Q.       Okay.  And you also -- okay,
14   I got it.
15                You also issued an amended
16   report for Irvington, correct?
17       A.       That is correct.
18       Q.       And you issued that amended
19   report on May 31st, correct?
20       A.       I believe that's the date.
21       Q.       Your amended report for
22   Irvington increased the damages that you
23   estimated for Irvington, correct?
24       A.       I don't recall, but I'll
25   trust you on that.

CONFIDENTIAL

Page 32

1         Q.      Why did your amended report

2    for Irvington increase the damages that you

3    estimated for Irvington?

4         A.      The issue for Irvington was

5    one of the affidavits when I was entering

6    the data, the percentage should have

7    applied for 2025 and it got entered as

8    2015.  So then when I was doing the

9    calculations for interpolating and figuring

10   out what percentage to apply in each year,

11   that was just wrong, so you had to correct

12   it and whatever it corrected came out of

13   it, I don't remember -- I actually don't

14   remember whether it went up or down.

15        Q.      So your testimony is that the

16   only thing that changed in Irvington was a

17   single time estimate from an employee

18   affidavit that the year associated with

19   that estimate changed from 2015 to 2025?

20        A.      Yeah, I think it was

21   principals and vice principals, I think.

22   It may have been all of the ones for that

23   person, I can't remember, but it was, yeah,

24   it was 2015 to 2025 was the issue.

25        Q.      What prompted your discovery

CONFIDENTIAL

Page 33

1  that you had made that error in the
2  Irvington report?
3        A.    I think the attorneys for
4  Irvington were reviewing it and noticed
5  that the table in 2015 didn't -- or the
6  table of percentages didn't make sense
7  because it had a number for 2015 in it that
8  they hadn't provided and so they were,
9  like, this seems like an error and so I
10  went in and I was, like, yes, you are
11  correct, that's an error.
12        Q.    Did you have a quality
13  control process that you followed before
14  you issued your opening reports to ensure
15  that you had accurately calculated your
16  damages estimates?
17        A.    I did for most of it.  There
18  was some stuff that was -- I was doing, you
19  know, kind of outside of my normal process,
20  which was to do it in Stata code that,
21  obviously, didn't get through the full
22  quality control checks.
23        Q.    So what is your normal
24  quality control process before reaching
25  conclusions?

CONFIDENTIAL

Page 34

1         A.      Well, you know, you do your
2    work.  You go back through your work.  You
3    make sure that when you're looking at
4    results, they all make sense.  That there's
5    nothing that's, you know, nonintuitive or
6    looks out of place.  You know, you recheck
7    your code or your calculations.
8         Q.      What was different in your
9    work in this case regarding your quality
10   control process as compared to your normal
11   process?
12                MR. GRADEN:  Objection.  You
13           can answer.
14                THE WITNESS:  Well, you know,
15           the spreadsheet errors, I didn't do
16           it in my normal Stata code process
17           where I make --
18                     - - - - -
19        (Stenographer clarification.)
20                     - - - - -
21                THE WITNESS:  It's called
22           Stata, S-T-A-T-A, right, where I'm
23           writing in, I want to multiply this
24           by this or add this by this, right,
25           which kind of forces you to be a

CONFIDENTIAL

Page 35

1            little bit more diligent about what

2            you're doing.  I thought these were

3            relatively simple calculations and

4            I could just do them in a simpler,

5            quicker manner in Excel.  And, you

6            know, I just -- there's typos in

7            there, that's pretty much what it

8            is.

9                 The Charleston thing, that

10           was just, you know, that's just

11           me thinking of data that I'm

12           going to be provided or going to

13           be what I assume them to be.  And

14           you know, the original one,

15           that's also just a typo that

16           those data were checked and

17           somehow didn't get caught.

18    BY MR. SANDOVAL-BUSHUR:

19         Q.    Why did you not follow your

20    normal process of using Stata code in your

21    work in this case?

22                  MR. GRADEN:  Objection.

23                  THE WITNESS:  It didn't

24           seem -- I thought it would be

25           quicker and easier to do it in

CONFIDENTIAL

Page 36

1          Excel, because it was a relatively
2          straightforward calculation.
3  BY MR. SANDOVAL-BUSHUR:
4          Q.     Was using Excel instead of
5  Stata a choice that you made?
6          A.     Yeah.
7          Q.     Were you asked to work in
8  Excel?
9          A.     No, no, it was literally just
10  me being, like, oh, I just need to make
11  these adjustments, these are all kind of,
12  these are these protection things, like, it
13  will be a little bit easier for me to do
14  that just doing it in Excel and, you know,
15  just got some -- got some cells wrong.
16          Q.     Who entered the cells wrong?
17          A.     Me.
18          Q.     Do you feel certain that
19  there are no other errors in your damages
20  calculations that you have not yet
21  discovered?
22          A.     I have been through
23  everything.  I feel pretty good that
24  everything is now correct.
25          Q.     A few minutes ago, you handed

CONFIDENTIAL

Page 37

1   me a set of folders that each have the name

2   of the school district on the tab and then

3   contain a document that is titled,

4   "Appendix B Materials Considered," correct?

5          A.      That is correct.

6          Q.      And it's your testimony that

7   the list of materials considered on this

8   Appendix B for each of the districts is

9   identical to the list of materials

10  considered in your opening reports in each

11  of the cases; is that correct?

12         A.      That is correct.

13         Q.      Okay.  Just so that we have a

14  clean record, let's go ahead and mark all

15  of these.  I am going to mark your Appendix

16  B materials considered for Breathitt as

17  Exhibit 5A.  I guess I'll hand that back to

18  you.

19         A.      You can hand it back, yeah.

20                  - - - - -

21              (Appendix B Materials

22         Considered Breathitt Documents

23         marked Ward Exhibit 5A for

24         identification.)

25                  - - - - -

CONFIDENTIAL

Page 38

1                MR. SANDOVAL-BUSHUR:  Counsel,

2            can we get another copy of each of

3            these just so that both the witness

4            can have one and I can have one?

5                MR. GRADEN:  I believe there

6            are multiple copies of each.

7                MR. SANDOVAL-BUSHUR:  I only

8            see one copy in each folder.

9                THE WITNESS:  Yeah, there's

10            only one there.

11                MR. GRADEN:  Okay.  We can --

12            do you want to take a beat and get

13            those copies now or we can do that

14            at the next break --

15                MR. SANDOVAL-BUSHUR:  We can

16            do it at the next break.

17                MR. GRADEN:  -- whatever you

18            prefer.  That's fine.

19    BY MR. SANDOVAL-BUSHUR:

20        Q.    Exhibit 5B is your Appendix B

21    materials considered for the Charleston

22    case, correct?

23        A.    Correct.

24                - - - - -

25                (Appendix B Materials

CONFIDENTIAL

Page 39

```
 1            Considered Charleston Documents
 2            marked Ward Exhibit 5B for
 3            identification.)
 4                   - - - - -
 5   BY MR. SANDOVAL-BUSHUR:
 6        Q.    Exhibit 5C is your Appendix B
 7   materials considered for the DeKalb case,
 8   correct?
 9        A.    Correct.
10                   - - - - -
11            (Appendix B Materials
12            Considered DeKalb Documents
13            marked Ward Exhibit 5C for
14            identification.)
15                   - - - - -
16   BY MR. SANDOVAL-BUSHUR:
17        Q.    Exhibit 5D is your Appendix B
18   materials considered for the Harford case,
19   correct?
20        A.    Correct.
21                   - - - - -
22            (Appendix B Materials
23            Considered Harford Documents
24            marked Ward Exhibit 5D for
25            identification.)
```

CONFIDENTIAL

Page 40

```
 1                    - - - - -
 2   BY MR. SANDOVAL-BUSHUR:
 3        Q.    Exhibit 5E is your Appendix B
 4   materials considered for the Irvington
 5   case, correct?
 6        A.    Correct.
 7                    - - - - -
 8              (Appendix B Materials
 9         Considered Irvington Documents
10         marked Ward Exhibit 5E for
11         identification.)
12                    - - - - -
13   BY MR. SANDOVAL-BUSHUR:
14        Q.    And Exhibit 5F is your
15   Appendix B materials considered for the
16   Tucson case, correct?
17        A.    Correct.
18                    - - - - -
19              (Appendix B Materials
20         Considered Tucson Documents
21         marked Ward Exhibit 5F for
22         identification.)
23                    - - - - -
24   BY MR. SANDOVAL-BUSHUR:
25        Q.    And, again, just so that we
```

CONFIDENTIAL

Page 41

1    have a clean record, the list of materials

2    considered in Exhibits 5A through 5F are

3    identical to the list of materials

4    considered in your opening reports for each

5    of the six bellwether districts, correct?

6            A.    Correct.

7            Q.    Do your expert reports,

8    Exhibits 1A through 1F and Exhibits 2A

9    through 2F, including the list of materials

10   in Exhibits 5A through 5F, identify all of

11   the materials that you considered in

12   forming your opinions?

13           A.    Yes.

14           Q.    And there are no other

15   materials that are considered in forming

16   your opinions that are not contained in 1A

17   through 1F, 2A through 2F, and 5A through

18   5F, correct?

19           A.    Correct.

20           Q.    In forming your opinions in

21   this case, you did not consider any

22   internal documents of any Defendants, like,

23   internal emails or presentations, correct?

24           A.    That is correct.

25           Q.    In forming your opinions in

CONFIDENTIAL

Page 42

1    this case, you did not consider any

2    deposition or other testimony of any

3    current or former employee of any

4    Defendant, correct?

5         A.    That is correct.

6         Q.    Were there any materials that

7    would have been helpful to you in forming

8    your opinions in this case that you did not

9    have access to?

10        A.    The information I had was

11   sufficient to support my opinions.

12        Q.    Were there any documents that

13   you ever asked for in order to help form

14   your opinions in this case that you were

15   not able to obtain?

16        A.    I had asked for, you know,

17   data from DeKalb, I never got the

18   individual level data that I got for other

19   districts from that group.  I don't recall

20   anything else where I didn't get anything

21   that was -- that I requested.

22        Q.    So for all of the bellwether

23   districts except for DeKalb, you received

24   salary data that identified at the

25   individual employee level the salary that

Page 43

1   was paid to that employee; is that correct?

2           A.      Yeah, for each of the other

3   five, I have data that speaks to salaries

4   for -- you know, Harford slightly is

5   different, it only includes middle and high

6   school teachers and counselors and

7   psychologists.  But for all five of them, I

8   have at least some data that is at the

9   employee level and includes their salary.

10          Q.      For DeKalb, you did not have

11  any data that identified the salary of

12  individual employees, correct?

13          A.      That's correct.

14          Q.      Do you know why DeKalb did

15  not provide you with data that identified

16  the salary of the individual employees who

17  were included in your damages calculations?

18          A.      I do not.

19          Q.      In forming your opinions in

20  this case, you considered some documents

21  that were produced by the school district

22  Plaintiffs, correct?

23          A.      Yes.

24          Q.      For the documents that were

25  produced by the school districts, did

CONFIDENTIAL

Page 44

1   Plaintiffs' attorneys identify and provide
2   those to you?
3                    MR. GRADEN:   Objection.
4            Compound.
5                    THE WITNESS:   Some of them.
6   BY MR. SANDOVAL-BUSHUR:
7            Q.      There were documents that
8   were produced by the school districts in
9   this case that you considered in forming
10  your opinions that Plaintiffs' attorneys
11  did not identify and provide to you?
12           A.      Oh, I'm sorry, I
13  misunderstood, no, yeah, everything they
14  provided -- I'm sorry --
15           Q.      Let me just maybe ask the
16  question again.
17           A.      Yeah, let me -- I thought you
18  were saying that they just decided what to
19  give me as opposed to, hey, do you have
20  something like this, right, that's where
21  I'm confused.
22           Q.      Okay.
23           A.      The genesis of the request.
24           Q.      Did you request any
25  information from the school districts?

CONFIDENTIAL

Page 45

1          A.      Yes.

2          Q.      Was there a list of

3     information that you requested from each

4     school district?

5          A.      No, I would just call

6     attorneys and say, hey, do you have, say, a

7     contract or information on salaries.

8          Q.      So there was no step in your

9     process of formulating your opinions in

10    which you identified a list of the

11    documents or information that you needed or

12    wanted from each district in order for you

13    to form your opinions; is that correct?

14                 MR. GRADEN:  Objection.

15                 THE WITNESS:  Oh, I mean, I

16            did not write them a list and send

17            them a list.  I said, hey, I would

18            like data on individuals that

19            identifies their position, their

20            sites, and their base salary.

21            Before we got that, I was, like, do

22            we have information on FTEs or

23            average salaries or benefits, you

24            know, so it was essentially me

25            saying what kind of data can I get

Page 46

1              to do my calculation.
2    BY MR. SANDOVAL-BUSHUR:
3         Q.     There were some documents
4    that you relied on in reaching your
5    opinions that you did not specifically
6    request from Plaintiffs' attorneys but
7    Plaintiffs' attorneys provided to you; is
8    that right?
9         A.     I mean, yeah, they sent me
10   lots of stuff.
11        Q.     Aside from the documents that
12   were produced by the Plaintiffs, were there
13   any other documents that were provided to
14   you by Plaintiffs' attorneys?
15        A.     I'm sorry, what?
16        Q.     So publicly available
17   documents, academic articles --
18        A.     Oh.
19        Q.     -- were there any documents
20   in that category that were provided to you
21   by Plaintiffs' attorneys?
22        A.     Not that I recall.
23        Q.     You went out and found all of
24   those documents on your own?
25        A.     I found those, yes.

CONFIDENTIAL

Page 47

1          Q.      Did you communicate in any
2    way whether by speaking in person, by
3    telephone, corresponding by email or
4    otherwise with any employees or people
5    otherwise affiliated with any of the
6    bellwether districts in forming your
7    opinions?
8                     MR. GRADEN:  Objection,
9              compound.
10                    THE WITNESS:  I had a brief
11             conversation with, I believe it was
12             the CFO in Charleston.  Everything
13             else was mediated through
14             attorneys.
15   BY MR. SANDOVAL-BUSHUR:
16         Q.      So you spoke directly with
17   the Charleston CFO, correct?
18         A.      That is correct.
19         Q.      What is the name of that
20   individual?
21         A.      Oh, I don't even know.  I
22   just referred to him as the CFO.
23         Q.      So, sitting here today, you
24   cannot tell me the name of the Charleston
25   CFO whom you spoke with?

CONFIDENTIAL

Page 48

1        A.      No, I cannot.

2        Q.      Why did you speak with the

3  Charleston CFO?

4        A.      I had asked for information

5  on the benefits and he was going to be on a

6  call and so they were, like, hey, join this

7  call and you can get the benefits

8  description from him.

9        Q.      What information did the

10  Charleston CFO provide to you?

11        A.      Just described the benefits

12  multiplier over time.

13        Q.      Did you rely on that

14  information in forming your opinion?

15        A.      I did.

16        Q.      Did you take any notes or

17  otherwise record, memorialize your

18  conversation with the Charleston CFO?

19                MR. GRADEN:  Objection.

20          Compound.

21                THE WITNESS:  I just typed it

22          right into the calculations.

23  BY MR. SANDOVAL-BUSHUR:

24        Q.      So can you explain to me, you

25  were on the call, the Charleston CFO --

CONFIDENTIAL

Page 49

1        A.        Oh, yeah, so I know I'm
2    getting the benefits multiplier.  There's a
3    part of my code where I just have a little
4    program that has this is the benefits
5    multiplier for this year.  And so he said
6    something to the effect of if it started
7    here and it ended it here and it increased
8    by 1 percentage point between there, and so
9    I just typed in the base year, I typed in
10   the end year, and then I typed in the
11   numbers that would go between them.
12        Q.        Did you ask for any
13   documentation to support what the
14   Charleston CFO told you was the benefits
15   multiplier for Charleston?
16        A.        No, I trusted he knows that.
17        Q.        Did you speak -- let me ask
18   it a little differently.
19             Did you communicate in any
20   way with any other employees other than the
21   Charleston CFO of any school districts in
22   forming your opinions in this case?
23        A.        Not directly, no.
24        Q.        What do you mean when you
25   say, "not directly"?

Page 50

```
 1          A.     If I had questions, I would
 2    ask attorneys and the attorneys would go
 3    and get the information and then they would
 4    bring it back to me.
 5          Q.     Who did you receive
 6    information from from any of the school
 7    districts via an attorney in the way you
 8    just described?
 9          A.     Who were they talking to?  I
10    don't remember who they talked to.  I don't
11    recall off the top of my head.
12          Q.     So to the extent you received
13    information via the Plaintiffs' attorneys
14    from any employees of any of the school
15    districts, you do not know the identities
16    of those district employees, correct?
17               MR. GRADEN:  Objection.
18               THE WITNESS:  Oh, they might
19          have told me, I don't remember as
20          I'm sitting here.
21    BY MR. SANDOVAL-BUSHUR:
22          Q.     Okay.  So sitting here today,
23    for the district employees for whom you
24    received information via Plaintiffs'
25    attorneys, you cannot provide the names of
```

Page 51

1   any of those employees, correct?

2                   MR. GRADEN:  Objection,

3             foundation and vague.

4                   THE WITNESS:  Not off the top

5             of my head, no.

6   BY MR. SANDOVAL-BUSHUR:

7        Q.    Well, this is my chance to

8   ask you who those people might be, but it

9   sounds like you, sitting here today, cannot

10  tell me any of those names, correct?

11       A.    Nope.

12       Q.    When you say, "no," you mean

13  that is correct?

14       A.    I'm sorry, yes, no, I cannot.

15                  MR. GRADEN:  Objection.

16            Vague.

17  BY MR. SANDOVAL-BUSHUR:

18       Q.    Did you receive any

19  assistance from anyone other than

20  Plaintiffs' attorneys and the Charleston

21  CFO in preparing your reports?

22       A.    What do you mean by

23  "assistance"?

24       Q.    Did you have anyone who

25  assisted you in performing research

CONFIDENTIAL

Page 52

1   relating to the formation of your opinions

2   in this case?

3           A.      No.

4           Q.      Did you have anyone who

5   assisted you in performing the

6   calculations --

7           A.      No.

8           Q.      -- that you did in the course

9   of your work in this case?

10          A.      No.

11          Q.      Did you have anyone who

12  assisted you in any data entry in

13  connection with this case?

14          A.      Yes.

15          Q.      Who was that?

16          A.      Margaret Ward.

17          Q.      Who is Margaret Ward?

18          A.      She's my wife.

19          Q.      And how specifically did

20  Margaret Ward assist you in connection with

21  this case?

22          A.      I've had her first check the

23  data entry in -- for the affidavits and

24  then I got a few more affidavits and so I

25  had her just enter those.  She also helped

CONFIDENTIAL

Page 53

1   me format tables.

2          Q.      Did anyone other than

3   Margaret Ward provide you with assistance

4   in connection with this case?

5          A.      No.

6          Q.      Did your wife, Margaret Ward,

7   perform any calculations or data analysis

8   in this case?

9          A.      No.

10          Q.      Did you use ChatGPT in your

11   work in this case?

12          A.      Probably not, but maybe at

13   some point, I asked it a question.

14          Q.      Do you believe that ChatGPT

15   is a reliable source of information?

16          A.      I use it like a search

17   engine.  So I think it's a -- to the extent

18   it provides me a link, I'm happy to follow

19   the link and see where it goes.

20          Q.      Do you believe it is

21   appropriate to use ChatGPT for academic

22   research?

23          A.      I mean, it's -- I think it's

24   a pretty good search engine.  I think it's

25   very useful for surfacing information.

CONFIDENTIAL

Page 54

1          Q.      Are you able to tell me
2    whether or not you used ChatGPT in your
3    work in this case?
4          A.      I don't recall if I did any
5    searches using ChatGPT or not.  I'm still
6    kind of figuring out, you know, whether I'm
7    using it or not and this period of time was
8    when I was literally really just starting
9    to use ChatGPT.  So maybe I did, maybe I
10   didn't, I don't recall.  I certainly didn't
11   use it to actually, like, summarize
12   information.  For me, it's just like,
13   please, find me articles that -- about X.
14         Q.      So you may have used ChatGPT
15   in this case to help you find articles that
16   supported your opinions; is that right?
17                 MR. GRADEN:  Objection.
18                 THE WITNESS:  No, that might
19             inform my opinions, that might
20             help, you know, I'm not sure what
21             it would have been in this case,
22             but, you know, to the extent that I
23             do searches on the internet now, it
24             is a tool that I sometimes use.
25

CONFIDENTIAL

Page 55

1    BY MR. SANDOVAL-BUSHUR:

2           Q.      If you used ChatGPT to help

3    you find articles that might inform your

4    opinions in this case, was that the only

5    search engine that you used to identify

6    those articles?

7           A.      No.

8                   MR. GRADEN:  Objection to

9           form.  Foundation.

10                  THE WITNESS:  No, as I said,

11          like, I'm also using Google, and

12          yeah, I guess Google would be the

13          main one that I use.

14   BY MR. SANDOVAL-BUSHUR:

15          Q.      When were you retained by

16   Plaintiffs to work on this case?

17          A.      Last summer or last fall,

18   somewhere in there.

19          Q.      Who retained you?

20          A.      This firm.

21          Q.      And that is the Kessler Topaz

22   firm?

23          A.      Yes, Kessler Topaz Meltzer

24   and whatever the last name is.

25          Q.      Was there a particular

CONFIDENTIAL

Page 56

1  attorney at Kessler Topaz who retained you?

2         A.     No, I mean, I feel it has

3  been the same basic group the whole time,

4  so I couldn't tell you if there was one

5  specifically or not.

6         Q.     What is Rubin Anders

7  Scientific?

8         A.     They help match attorneys and

9  people who do expert witness testimony.

10        Q.     And do you have a

11 relationship with Rubin Anders Scientific?

12        A.     I mean, you know, I have been

13 in their little profile of experts for some

14 time.

15        Q.     Do you have any relationship

16 with any other expert firms other Rubin

17 Anders?

18        A.     I feel like, yeah.

19        Q.     What other expert firms?

20        A.     I couldn't tell you.

21        Q.     For your work in this case,

22 were you initially contacted by Plaintiffs

23 through Rubin Anders?

24        A.     Yeah, Rubin Anders reached

25 out to me.

Page 57

1          Q.      What did you understand your

2    assignment was when you were retained?

3          A.      I was going to do something

4    related to damages in a case involving

5    school districts and social media.

6          Q.      Did your understanding of

7    your assignment change at any point during

8    the course of your work in this matter?

9          A.      No, I mean, at the beginning

10   I didn't really understand what it was, so

11   yeah, it changed to what do you want me to

12   do to this is what we want you to do.

13         Q.      And then so once you received

14   a more detailed assignment for your work in

15   this case, what did you understand your

16   assignment in this case to be?

17         A.      It's exactly what's in my

18   reports.  I was going to estimate the value

19   of time for staff and teachers.

20         Q.      And so estimating the value

21   of time for staff and teachers, calculating

22   damages in that way was something that was

23   assigned to you by Plaintiffs' attorneys;

24   is that right?

25         A.      Yeah, so it was we will

Page 58

1    provide you with estimates that describe

2    time loss, but we need somebody to go and

3    assemble the data to figure out what the

4    value of that time is and to apply that to

5    the time loss and so that was my assignment

6    and that's what's in my reports.

7            Q.      You were paid $665 an hour

8    for all of your work relating to this case,

9    correct?

10           A.      That is correct.

11           Q.      Do you perform any work that

12   is compensated at a different rate in

13   connection with this case?

14           A.      Do I?

15           Q.      Yeah.

16           A.      Yeah, I mean, I have rates

17   from all sorts of periods of time and

18   various different types of clients.

19           Q.      Sorry, I will reask that

20   question.

21                   Was all of your time in this

22   case billed --

23           A.      Oh, this case?

24           Q.      Yes -- at $665 an hour?

25           A.      Yeah, $665 an hour.

CONFIDENTIAL

Page 59

1          Q.     Did anyone else other than

2    yourself bill for work relating to your

3    reports at that $665 an hour rate?

4          A.     No.

5          Q.     Did your wife also bill for

6    her work performed in connection with this

7    case?

8          A.     Yes.

9          Q.     And what rate did she bill

10   at?

11         A.     I can't remember.

12         Q.     Did your wife bill at $250 an

13   hour?

14         A.     If that's what's on the

15   invoices, that probably is what it is.

16         Q.     Okay.  In calendar year 2025,

17   what percentage of your total income has

18   come from compensation for your work on

19   this case?

20                MR. GRADEN:  Objection.

21                THE WITNESS:  Forty percent,

22          40, maybe half.  I don't -- I do

23          not have a running total of how

24          much I've billed this year. But it

25          seems like, I mean, there was

CONFIDENTIAL

Page 60

1              another big chunk at the beginning
2              of the year, so that seems about
3              right.
4    BY MR. SANDOVAL-BUSHUR:
5         Q.      So your best estimate is
6    somewhere between 40 and 50 percent of your
7    total income for calendar year 2025 has
8    come from compensation for work on this
9    case, correct?
10                   MR. GRADEN:  Objection.
11                   THE WITNESS:  I think so.
12                   MR. SANDOVAL-BUSHUR:  We're
13              going to mark tab five as
14              Exhibit 6.
15                   - - - - -
16              (Invoices Bates Ward000001
17              to Ward 000005 marked Ward
18              Exhibit 6 for identification.)
19                   - - - - -
20    BY MR. SANDOVAL-BUSHUR:
21         Q.      Dr. Ward, Exhibit 6 is a set
22    of invoices relating to your work in this
23    case, correct?
24         A.      Yes.
25         Q.      Is this a complete set of

CONFIDENTIAL

Page 61

1    invoices for your work relating to this
2    case?
3            A.      I mean, it doesn't have stuff
4    for this month, but as of the end of July,
5    yes.
6            Q.      So Exhibit 6 is a complete
7    set of the invoices for your work in this
8    case through the end of July 2025, correct?
9            A.      That is correct.
10           Q.      And all of the time in
11   Exhibit 5 is -- that is billed at the $665
12   an hour rate is time that you personally
13   worked, correct?
14                   MR. GRADEN:  Objection.
15                   THE WITNESS:  That is correct.
16                   MR. GRADEN:  Just for clarity,
17           which exhibit?
18   BY MR. SANDOVAL-BUSHUR:
19           Q.      Oh, thank you for saying
20   that.  I'll reask the question.
21                   All of the time in Exhibit 6
22   that is billed at $665 an hour is time that
23   you personally worked, correct?
24           A.      That is correct.
25           Q.      All of the time in Exhibit 6

CONFIDENTIAL

Page 62

1    that is billed at the rate of $250 an hour

2    is time that your wife spent on this case;

3    is that correct?

4          A.      That is correct.

5          Q.      You billed a total of

6    335,000, a little more than $335,000 for

7    your work on this case; is that right?

8          A.      I haven't summed it up, but I

9    will trust that you have.

10         Q.      Assuming that that's right

11   that you've billed a little over $335,000

12   through July for your work on this case,

13   does that change at all your estimate of

14   what percentage of your total compensation

15   for calendar year 2025 relates to your work

16   on this case?

17         A.      No.

18         Q.      We do not have an invoice for

19   the month of August 2025.  How much time

20   have you billed working on this case in the

21   month of August?

22         A.      I have no idea.

23         Q.      Can you offer any sort of

24   estimate?

25         A.      So the reply reports were

Page 63

1  submitted before August, right?  So

2  that's -- that was July 31st, so there's

3  none of that time, so it's just depo prep

4  time.

5          Q.     You also submitted amended

6  reports.

7          A.     Yeah, that rose out of the

8  depo prep, so, you know, there wasn't a ton

9  of time into that.  I mean, it will be less

10  than, probably less than 40 hours, maybe

11  right around 40 hours.

12          Q.     I would like to ask you about

13  your time billed in the period of May 10th

14  through May 19th.

15          A.     Okay.

16          Q.     And May 10th to May 19th is

17  the ten days leading up to your submission

18  of your expert report, correct?

19          A.     That is correct.

20          Q.     You billed a lot of time in

21  that period of May 10th to May 19th,

22  correct?

23          A.     It was a very miserable

24  period, yes.

25          Q.     It looks like you billed at

CONFIDENTIAL

Page 64

1   least 20 hours eight of those ten days and
2   billed 17 hours the remaining two days; is
3   that right?
4           A.      That is correct.
5           Q.      Is that accurate that you
6   actually worked that many hours in the ten
7   days leading up to your submission of your
8   reports?
9           A.      It is.
10          Q.      How much sleep did you get in
11  those ten days?
12          A.      Those four hours, I would
13  sleep four hours a day and I would work the
14  rest of the day.
15          Q.      So your testimony is
16  100 percent of the time that you spent
17  other than sleeping was spent working on
18  your reports in this case?
19          A.      Yup.
20          Q.      Did you eat any meals during
21  the ten days leading up to to your
22  submission of reports in this case?
23          A.      I mean, while I would work, I
24  would eat some food, but, typically, I was
25  eating about once a day.

CONFIDENTIAL

Page 65

1        Q.      So in the ten days leading up
2   to your submission of your reports in this
3   case, you were eating only about one meal a
4   day?
5        A.      Only one meal, I might have,
6   you know, grabbed a banana or something as
7   I paced around and thought about stuff,
8   but, you know, it was -- I literally just
9   did work.
10       Q.      Did getting such a small
11  amount of sleep in those ten days leading
12  up to your submission of your report
13  negatively impact your work at all?
14       A.      I mean, it may have
15  contributed to those errors we talked about
16  earlier, but other than that, no, I mean,
17  it's just getting the calculations done.
18       Q.      Were you working on any other
19  matters or projects other than this case in
20  the month of May 2025?
21       A.      During the entire month, I
22  think there was, like, maybe a few hours
23  here and there where I had to take a phone
24  call or do something, but no, pretty much
25  this was what I was doing.

Page 66

1          Q.      In those ten days leading up
2    to your submission of your report, May 10th
3    through May 19, 2025, were you working on
4    any other matters or projects other than
5    this?
6          A.      Not that I recall.
7          Q.      Was there a reason why you
8    had to cram so much work into the ten days
9    leading up to your submission of your
10   reports in this case?
11                 MR. GRADEN:  Objection.
12                 THE WITNESS:  I had to write
13              reports and I'm downstream of
14              pretty much everybody else.  All
15              right.  So I have to wait for
16              everybody to provide me the
17              information and so, yeah, you know,
18              it was a real sprint at the end.
19   BY MR. SANDOVAL-BUSHUR:
20         Q.      Was there any change in the
21   methodology for calculating damages that
22   occurred in the month of May 2025?
23         A.      I mean, the methodology is
24   pretty straightforward, right?  Multiply
25   time loss by value of time, right?  So, no,

CONFIDENTIAL

Page 67

1  that didn't change at all.

2         Q.     Throughout the entire month

3  of May 2025, did you know that you were

4  going to be calculating teacher time loss

5  based on the results of a survey conducted

6  by Robert Klein?

7         A.     I did.

8         Q.     During the entire month of

9  May 2025, did you know that you were going

10  to be calculating non-teacher time loss

11  based on employee affidavits or

12  declarations?

13         A.     I did.

14         Q.     And, similarly, throughout

15  the entire month of April 2025, did you

16  know that you were going to be calculating

17  teacher time loss based on the results of a

18  survey conducted by Robert Klein?

19         A.     No.

20         Q.     When did you learn that you

21  would be calculating teacher time loss

22  based on the results of a survey conducted

23  by Robert Klein?

24         A.     I don't remember exactly when

25  they told me that Mr. Klein was who was

CONFIDENTIAL

Page 68

1  doing the survey, but it would have been

2  sometime in April.

3          Q.      And throughout the entire

4  month of April 2025, did you know that you

5  were going to be calculating non-teacher

6  time loss based on the results or

7  information contained in employee

8  affidavits or declarations?

9          A.      I don't remember exactly what

10 I knew on the employee affidavits, but when

11 I was restarted in early April, I was

12 reminded of that, if I didn't know it

13 already.  If I had forgotten between

14 September and April, like, I don't remember

15 if we talked about this in September

16 specifically or not, but it was pointed out

17 when I was kind of restarted in April that

18 we are also getting time loss estimates

19 from affidavits.

20         Q.      Do you know why you did not

21 receive the affidavits that you were using

22 for purposes of your damages calculations

23 until just a few days before your report

24 was submitted?

25                 MR. GRADEN:   Objection.

CONFIDENTIAL

Page 69

1                    THE WITNESS:  I do not.
2    BY MR. SANDOVAL-BUSHUR:
3           Q.     What did you do to prepare
4    for your deposition?
5           A.     I reviewed all of my reports
6    and the footnotes in them and the programs
7    and spreadsheets that did the calculations.
8    I met with the attorneys.
9           Q.     How many meetings did you
10   have with attorneys to prepare for your
11   deposition today?
12          A.     I met with them on Wednesday
13   and Thursday.
14          Q.     Who did you meet with?
15          A.     Tyler, Mr. Graden,
16   Ms. Jacobson.  Who else was in the room?
17   Justin Swofford, Melissa Yeates, but only
18   yesterday, and there were a couple of
19   attorneys from the Irvington district,
20   Michael, and I can't remember the other
21   guy's name.
22          Q.     So you met with approximately
23   six attorneys to prepare for your
24   deposition today?
25          A.     At various points, yeah.

CONFIDENTIAL

Page 70

1          Q.      How much time total did you
2     spend meeting with attorneys to prepare for
3     your deposition today?
4          A.      Twelve hours maybe.
5     Although, not all of that time was actually
6     meeting about the deposition, some of that
7     was, like, eating lunch or whatever, but I
8     was here for about six hours each day.
9          Q.      You are a cofounder of a firm
10    called ABMJ Consulting, correct?
11         A.      That is correct.
12         Q.      What is ABMJ Consulting?
13         A.      That's the firm that I work
14    at.  We do economic analysis, policy
15    analysis, and management consulting.
16         Q.      Is the other cofounder of
17    ABMJ Consulting your wife?
18         A.      That is correct.
19         Q.      Are there any other
20    cofounders of ABMJ?
21         A.      No.
22         Q.      Do you own 100 percent of
23    ABMJ Consulting?
24         A.      My wife and I do.
25         Q.      Are you an employee of ABMJ

CONFIDENTIAL

Page 71

1    Consulting?

2            A.      Yes.

3            Q.      Is your wife an employee of

4    ABMJ Consulting?

5            A.      Only occasionally.

6            Q.      Does ABMJ Consulting have any

7    employees other than you and occasionally

8    your wife?

9            A.      Nope.

10           Q.      Since July 2021, have you

11   been employed by any entity other than ABMJ

12   Consulting?

13           A.      I don't think so.

14           Q.      You were previously employed

15   by the University of Montana, correct?

16           A.      That is correct.

17           Q.      But you have not been

18   employed by the University of Montana since

19   July 2021, correct?

20           A.      No -- correct, yes.  No, I

21   have not been employed by the University of

22   Montana.

23           Q.      Before July 2021, were you a

24   part-time employee at the University of

25   Montana?

CONFIDENTIAL

Page 72

1          A.      Between, I think, July of
2    2018 and July of 2021, yes, I was a
3    part-time employee.
4          Q.      From July 2018 to July 2021,
5    you were a research associate at the Rural
6    Institute for Inclusive Communities at the
7    University of Montana, correct?
8          A.      That is correct.
9          Q.      Why did that position end?
10         A.      Oh, I just -- post-COVID, I
11   didn't want to keep doing it, so I said
12   I've got other things to do with my time.
13         Q.      Were you ever a tenure track
14   professor at the University of Montana?
15         A.      No, I was a research
16   professor.
17         Q.      Have you ever been a tenure
18   track professor at any university?
19         A.      No.
20         Q.      Since July 2021, have you
21   received any compensation other than from
22   the work you do for ABMJ Consulting?
23         A.      Oh, I have no idea.
24         Q.      You have no idea if you have
25   received any compensation over the past

CONFIDENTIAL

Page 73

1  four years from any entity other than from

2  your work at ABMJ Consulting?

3          A.    I don't recall any, but, you

4  know, sometimes I get paid through other

5  things for whatever it is.  I don't

6  remember.  I don't think so, but I'm not

7  going so say for sure, because I definitely

8  don't remember how I got paid for anything

9  that I do, for everything that I've ever

10  done in the past three years or four years.

11          Q.    Are there any sources of

12  income other than your work through ABMJ

13  Consulting that you think you might have

14  received over the past four years?

15          A.    Listen, here's the issue.

16  Sometimes when people have me give speeches

17  or whatever it is, they will just issue me

18  a check and they won't actually issue it to

19  the firm and so I'm, like, okay, whatever,

20  that's a 1099 kind of thing.  I don't

21  recall doing that in the past few years,

22  but I know that has come up at some point

23  in the past where somebody gave me a check

24  for something that wasn't specifically

25  ABMJ, so I had to do a separate thing in

CONFIDENTIAL

Page 74

1   taxes.  I don't recall that happening, but

2   I know that I vaguely remember that

3   happening at some point in the past.

4   Typically, I just run it through the firm,

5   if I can.

6          Q.     Other than paying you in

7   connection with giving a speech, are there

8   any other sources of income that you think

9   you might have received over the past four

10  years?

11         A.     I mean, there's things like

12  interest and dividends and things like

13  that, but I'm assuming you're not asking

14  about that.

15         Q.     Right.

16         A.     Not that I recall.

17         Q.     Since July 2021, how much of

18  the work that you do at ABMJ Consulting has

19  been work relating to litigation or other

20  legal disputes?

21         A.     It's typically about 50/50.

22  Other legal disputes, you mean?

23         Q.     Right.

24         A.     Sorry, litigation, it's about

25  50 percent.

CONFIDENTIAL

Page 75

1          Q.      And for that 50 percent, is
2    that all work in which you are hired to
3    serve as an expert witness or consultant?
4          A.      Yes.
5          Q.      What type of work do you do
6    in the 50 percent of your work for ABMJ
7    Consulting that is not work relating to
8    litigation?
9          A.      Typically, it's, like, policy
10   work.  You know, I mean, I've done a lot of
11   stuff on Medicaid expansion or kind of in
12   Montana, if there's a policy question about
13   labor markets or, you know, we want to do,
14   you know, so there's just a mix of, you
15   know, I'm known around the state and people
16   will call me up and ask me to help them
17   analyze something, write a report on
18   something, give a presentation on
19   something.  So it's, yeah, but it's a mix
20   of that type of work.
21         Q.      Who are your clients for work
22   relating to policy questions?
23         A.      I mean, it's a big mix, but
24   it's a lot of Montana Healthcare
25   Foundation, the Missoula Economic

Page 76

1   Partnership.  Sometimes they're just
2   private individuals who are wanting to have
3   a report done for something they're trying
4   to understand or lobby for.  It's mostly
5   just, yeah, local foundations, local
6   economic development entities or other
7   random people.
8           Q.      In how many cases have you
9   been hired to serve as an expert witness?
10          A.      I have no idea.
11          Q.      Can you offer any estimate of
12  the number of cases in which you have been
13  hired to serve as an expert witness?
14          A.      Hundreds.
15          Q.      And when you say, "hundreds,"
16  do you mean more than 200?
17          A.      I have no idea.  I have been
18  engaged in this work for some level for
19  nearly 20 years.  I kind of assume that
20  it's kind of averaged out at maybe eight
21  cases a year, so -- but it could be more,
22  it could be less, I don't actually know.
23          Q.      In how many cases in which
24  you have been hired as an expert witness
25  have you testified?

CONFIDENTIAL

Page 77

1          A.        Define testified.

2          Q.        Let's start with testified at

3     trial.

4          A.        I don't know off the top of

5     my head.  I can remember maybe five or six.

6          Q.        What percentage of your work

7     as an expert witness is on behalf of

8     Plaintiffs?

9          A.        It's about 50/50.

10         Q.        You have never been employed

11    in a K-12 educational setting; is that

12    correct?

13         A.        That is correct.

14         Q.        And you have never been

15    employed by a K-12 school district,

16    correct?

17         A.        That is correct.

18         Q.        And you have never worked at

19    all in a K-12 school district setting,

20    correct?

21         A.        That is correct.

22         Q.        Prior to your work in this

23    case, have you ever calculated damages

24    incurred by a school district?

25         A.        I don't recall.

CONFIDENTIAL

Page 78

1          Q.      Sitting here today, you
2    cannot think of any prior case in which you
3    have calculated damages incurred by a
4    school district; is that right?
5          A.      I don't remember, no.
6          Q.      Prior to your work in this
7    case, you have never calculated opportunity
8    costs for a school district; is that
9    correct?
10         A.      I've calculated it in things
11   related to education, I don't think I have
12   ever been hired by a school district to do
13   it.
14         Q.      In what setting related to
15   education have you previously calculated
16   opportunity costs?
17         A.      So I've done evaluations of
18   different programs in educational settings
19   and when you do evaluations, typically,
20   something that goes along with that
21   evaluation at least in terms of when you're
22   presenting it to clients is here's the
23   impact, but here's what it costs.  And so
24   the cost estimate that I would have
25   discussed with people would have been

CONFIDENTIAL

Page 79

1   equivalent to what I'm doing here.

2          Q.      When you have previously

3   calculated opportunity costs in relation

4   with projects relating to education, did

5   you label what you calculated opportunity

6   costs?

7          A.      I don't know if I would have

8   done that.  That's a more technical jargony

9   term.  We would have just called it costs.

10         Q.      And in any of those prior

11  times that you calculated opportunity costs

12  in an education-related setting, did you

13  rely on time estimates provided by school

14  employees?

15         A.      Yes.  Or either the person

16  doing the intervention who would have then

17  drawn it from school employees, or -- I

18  think that was always the -- yeah, I was

19  doing it, I'm working with the person

20  running the intervention, so they're

21  telling it to me, but they're taking it

22  from school employees.

23         Q.      In any of these other prior

24  times that you calculated opportunity costs

25  in an education-related setting, are there

Page 80

1    any publicly available reports or materials

2    relating to those?

3        A.    I don't remember if it's in

4    the reports or not.  You know, I mean, I

5    know we talk about it and it would have

6    been in presentations, but I don't know if

7    it made it into any of the final reports

8    that would have been public, but I

9    certainly recall doing it.

10       Q.    And did any of these prior

11   instances in which you calculated

12   opportunity costs in an education-related

13   setting relate to a K-12 educational

14   setting?

15       A.    Yes, they were all K-12

16   settings, at least the ones that I

17   remember.

18       Q.    Were they all in the state of

19   Montana?

20       A.    No, the one was in Oregon and

21   one was -- I was evaluating a program

22   that's done nationally.  So, you know, I

23   had data to draw from from, you know, this

24   program that had been implemented in

25   dozens, if not hundreds of school

Page 81

1    districts, and so we were just trying to

2    have some way of talking about, here you've

3    got -- these are the effects of this

4    intervention, so but what does it take, so

5    you have this, you know, if you're going to

6    implement our little program, what are the

7    resources involved, that kind of stuff.

8         Q.    Prior to this case, have you

9    previously calculated litigation damages

10   using an opportunity cost methodology?

11        A.    I mean, almost all damages I

12   calculate are ultimately some form of

13   opportunity costs.

14        Q.    What is social media?

15        A.    What is social media?  I

16   don't have any formal definition of social

17   media.  When I think of social media, I'm

18   going to think of Instagram and Facebook

19   and SnapChat, TikTok.

20        Q.    What are -- are there any

21   other platforms that you consider to be

22   social media?

23        A.    YouTube.  Those are the big

24   ones to me.

25        Q.    Do you consider Twitter or X

CONFIDENTIAL

Page 82

1    to be social media?

2         A.    Oh, Twitter and X, yeah,

3    that's social media.

4         Q.    Do you consider Reddit to be

5    social media?

6         A.    I don't, but I don't, you

7    know, I don't really use Reddit.

8         Q.    Do you think other people

9    might consider Reddit to be social media?

10        A.    I have no --

11             MR. GRADEN:  Objection.

12             THE WITNESS:  I have no idea.

13   BY MR. SANDOVAL-BUSHUR:

14        Q.    What would make Twitter

15   social media but Reddit not social media?

16        A.    I don't -- when people say

17   social media companies, I think they

18   include Twitter in it, but I have no -- I

19   have no opinions about what the definition

20   of social media is.  And I have no basis to

21   demarcate it.  I have no -- yeah, I don't

22   have any opinions about what is or is not

23   social media or what the lines around what

24   is or is not social media are.

25        Q.    Do you think everyone has the

CONFIDENTIAL

Page 83

1    same understanding of what is and is not

2    social media?

3                    MR. GRADEN:  Objection.

4                    THE WITNESS:  I have no idea

5              what other people think.

6    BY MR. SANDOVAL-BUSHUR:

7        Q.    Do you consider Pinterest to

8    be social media?

9        A.    I have no idea whether

10   Pinterest is social media or not.

11       Q.    Do you consider Tumblr to be

12   social media?

13       A.    I have no idea whether Tumblr

14   is social media or not.

15       Q.    Do you consider Twitch to be

16   social media?

17       A.    I have no idea whether Twitch

18   is social media.

19       Q.    Do you consider Discord to be

20   social media?

21       A.    I have no idea whether

22   Discord is social media.

23       Q.    Do you consider Roblox to be

24   social media?

25       A.    I have no idea whether Roblox

Page 84

1  is social media.

2       Q.    Do you consider WhatsApp to

3  be social media?

4       A.    I have no idea whether

5  WhatsApp is social media.

6       Q.    Do you consider Netflix to be

7  social media?

8       A.    I don't know whether Netflix

9  is social media.

10       Q.    Are there any other platforms

11  you can think of that you consider to be

12  social media?

13       A.    No, I don't -- again, I don't

14  have any definition of social media that

15  I'm operating from.

16       Q.    You are not offering any

17  opinions in this case about the conduct of

18  any Defendant, correct?

19       A.    That is correct.

20       Q.    You are not offering an

21  opinion in this case on causation, correct?

22       A.    That is correct.

23       Q.    You are not offering the

24  opinion that Defendants' conduct caused

25  harms, correct?

CONFIDENTIAL

Page 85

1           A.      That is correct.

2           Q.      And you are not offering the

3    opinion that Defendant -- any Defendant

4    caused any student to film or share videos

5    of fights, correct?

6                        MR. GRADEN:  Objection.

7                        THE WITNESS:  That is correct.

8    BY MR. SANDOVAL-BUSHUR:

9           Q.      You are not offering the

10   opinion that any Defendant caused any

11   student to bully another student, correct?

12          A.      That is correct.

13          Q.      You are not offering the

14   opinion that Defendants' conduct caused

15   damages, correct?

16          A.      That is correct.

17          Q.      You rely on others to make

18   the determination that social media caused

19   a loss of time, but you yourself did not

20   make the determination of causation,

21   correct?

22          A.      That is correct.

23          Q.      You are not offering the

24   opinion that Defendants' conduct caused any

25   bellwether district to experience worse

Page 86

1  educational outcomes, correct?

2         A.     That is correct.

3         Q.     You are not offering the

4  opinion that any Defendants' conduct caused

5  any mental illness, correct?

6         A.     That is correct.

7                Are you at a pausing point?

8  I would like to take a break.  It's getting

9  hot in here and I need to just stretch my

10 legs.

11                MR. SANDOVAL-BUSHUR:  Sure.

12         Let's go off the record.

13                THE VIDEOGRAPHER:  Going off

14         video record 10:24 a.m.

15                - - - - -

16     (A recess was taken at this time.)

17                - - - - -

18                THE VIDEOGRAPHER:  Back on

19         video record, 10:42 a.m.

20 BY MR. SANDOVAL-BUSHUR:

21         Q.     Dr. Ward, the damages that

22 you calculate in this case are what you

23 characterize as the amount of money that

24 each school district lost while teachers,

25 counselors, and/or administrators diverted

Page 87

1    time to address issues caused by social

2    media in the school environment, correct?

3            A.      Is that a quote from

4    somewhere?

5            Q.      If you want to take a look at

6    Exhibit 2F, page 1, paragraph 2.

7            A.      Okay.  I see that.

8            Q.      So you agree that the damages

9    that you calculate in this case are what

10   you characterize as the amount of money

11   that each school district lost while

12   teachers, counselors, and/or administrators

13   diverted time to address issues caused by

14   social media in the school environment,

15   correct?

16           A.      Correct.

17           Q.      You are not offering an

18   opinion on the amount of money any school

19   district lost while teachers, counselors,

20   and/or administrators diverted time to

21   address issues caused by YouTube, correct?

22                   MR. GRADEN:  Objection.  Form.

23                   THE WITNESS:  YouTube

24           specifically?

25

CONFIDENTIAL

Page 88

1  BY MR. SANDOVAL-BUSHUR:

2          Q.      Correct.

3          A.      No, I'm not doing anything

4  for a specific company like YouTube.

5          Q.      And you are not offering an

6  opinion on the amount of damages that

7  YouTube caused any school district to

8  incur, correct?

9                  MR. GRADEN:  Objection.

10                 THE WITNESS:  Not as a

11             specific company, no.

12 BY MR. SANDOVAL-BUSHUR:

13         Q.      You are not offering an

14 opinion on the amount of money any school

15 district lost while teachers, counselors,

16 and/or administrators diverted time to

17 address issues caused by SnapChat, TikTok,

18 Instagram, or Facebook, correct?

19                 MR. GRADEN:  Objection to

20             form.

21                 THE WITNESS:  I am not doing

22             any calculations for any specific

23             companies.

24 BY MR. SANDOVAL-BUSHUR:

25         Q.      You are not offering an

CONFIDENTIAL

Page 89

1    opinion on the amount of damages that

2    SnapChat, TikTok, Instagram, or Facebook

3    caused any school district to incur,

4    correct?

5                    MR. GRADEN:  Objection.  Form.

6                    THE WITNESS:  Correct.  Not as

7            an individual -- not as individual

8            companies.

9    BY MR. SANDOVAL-BUSHUR:

10        Q.    If someone wanted to know how

11   much in damages a school district incurred

12   because of student use of YouTube

13   specifically, the damages estimates that

14   you have offered in this case would not

15   answer that question, correct?

16        A.    Not unless somebody broke the

17   time loss estimates into specifics for each

18   company.

19        Q.    You have not --

20        A.    I have not.

21        Q.    -- broke the time loss

22   estimates into specifics for each company,

23   correct?

24        A.    That is correct.

25        Q.    Are you aware of anyone who

Page 90

1   has broken the time loss estimates into

2   specifics for each company?

3           A.      I am not.

4           Q.      If someone wanted to know how

5   much in damages a school district incurred

6   because of student use of SnapChat or

7   TikTok or Instagram or Facebook, the

8   damages estimates that you have offered in

9   this case would not answer that question,

10  correct?

11                  MR. GRADEN:  Object to form.

12                  THE WITNESS:  They don't

13          provide estimates for each company,

14          no.

15  BY MR. SANDOVAL-BUSHUR:

16          Q.      The inputs for your damages

17  estimates can be put into two categories,

18  first, the amount of money that school

19  districts spend on salaries and benefits

20  for certain employee positions, and, two,

21  the amount of time that employees in those

22  positions spent addressing issues relating

23  to student use of social media; is that

24  correct?

25          A.      Yes.

CONFIDENTIAL

Page 91

1         Q.      I want to start by asking
2    about the information that you rely on in
3    your damages calculations for the amount of
4    time that employees spent addressing issues
5    relating to student use of social media.
6              For your calculation of
7    damages relating to teachers, you rely on
8    the results of a teacher time survey that
9    was conducted by Robert Klein, correct?
10        A.      That is correct.
11        Q.      The results of Klein's
12   teacher time survey are an essential and
13   necessary input to your estimate of damages
14   relating to teacher salaries and benefits,
15   correct?
16              MR. GRADEN:  Objection.  Form.
17              THE WITNESS:  That is correct.
18   BY MR. SANDOVAL-BUSHUR:
19        Q.      You did not play any role in
20   designing the Klein teacher time survey,
21   correct?
22        A.      That is correct.
23        Q.      You did not decide what
24   questions would be asked in the Klein
25   teacher time survey, correct?

CONFIDENTIAL

Page 92

1          A.      That is correct.

2          Q.      You did not offer any input

3    on what questions would be asked in the

4    Klein teacher time survey, correct?

5          A.      That is correct.

6          Q.      You relied on Mr. Klein to

7    design the teacher time survey

8    appropriately, correct?

9          A.      That is correct.

10         Q.      You did not play any role in

11   conducting the Klein teacher time survey,

12   correct?

13         A.      That is correct.

14         Q.      You relied on Mr. Klein to

15   conduct the teacher time survey

16   appropriately, correct?

17         A.      That is correct.

18         Q.      You are not able to say

19   whether the people who responded to the

20   Klein teacher time survey provided accurate

21   responses, correct?

22                 MR. GRADEN:   Objection.

23                 THE WITNESS:   I have no

24            opinion about the -- what -- just

25            restate your question, I can't

CONFIDENTIAL

Page 93

1            remember exactly.

2    BY MR. SANDOVAL-BUSHUR:

3            Q.      Sure.  You were not

4    personally able to say whether the people

5    who responded to the Klein teacher time

6    survey provided accurate responses,

7    correct?

8            A.      I am not.

9            Q.      You are not personally able

10   to say whether the survey results that Mr.

11   Klein reports accurately reflect the

12   answers that teachers actually gave,

13   correct?

14           A.      I'm sorry, say that again.

15           Q.      You are not personally able

16   to say whether Mr. Klein accurately

17   reported the answers that teachers gave to

18   the teacher time survey, correct?

19                   MR. GRADEN:  Objection.

20                   THE WITNESS:  No, I have the

21           raw data from the survey.

22   BY MR. SANDOVAL-BUSHUR:

23           Q.      Where did you get the raw

24   data from the Klein teacher time survey

25   from?

CONFIDENTIAL

Page 94

1              A.       It was provided to me by
2      Mr. Klein.
3              Q.       And you relied on Mr. Klein
4      to provide you accurate raw data from the
5      survey, correct?
6              A.       That is correct.
7              Q.       Did you recalculate the
8      results of the Klein teacher time survey
9      using the raw data that Mr. Klein provided
10     you?
11             A.       I replicated his means, yeah.
12             Q.       Did you do anything else
13     to -- let me ask the question again.
14                     Other than looking at the raw
15     data that Mr. Klein provided you to
16     recalculate the mean, did you do anything
17     else with that raw data?
18             A.       I also calculated the
19     confidence interval around the mean.  But
20     other than that, no, that's all I did.
21             Q.       For purposes of your damages
22     estimates, you assume that the results of
23     the Klein teacher time survey are reliable
24     and accurate, correct?
25                     MR. GRADEN:  Objection.

CONFIDENTIAL

Page 95

1                    THE WITNESS:  That is correct.
2                    MR. SANDOVAL-BUSHUR:  And,
3            Counsel, what is the basis for your
4            objection?
5                    MR. GRADEN:  Foundation.
6    BY MR. SANDOVAL-BUSHUR:
7            Q.      You are not offering the
8    opinion that the results of the Klein
9    teacher time survey are in fact reliable
10   and accurate, correct?
11           A.      That is correct.
12           Q.      So if, for example, the Klein
13   survey reported that high school teachers
14   in one district in a particular year spent
15   an average of 30 minutes per day addressing
16   issues related to student use of social
17   media, you are not offering the opinion
18   that teachers in fact spent an average of
19   30 minutes per day addressing issues
20   related to student use of social media,
21   correct?
22           A.      Correct, I'm relying on Mr.
23   Klein's estimates in his survey.
24           Q.      When you offer an estimate of
25   damages relating to teacher salaries and

CONFIDENTIAL

Page 96

1   benefits, your opinion is that your damages
2   estimate is reliable if you assume that the
3   results of the Klein survey are reliable
4   and accurate, correct?
5           A.      That is correct.
6           Q.      If the Klein survey
7   overstates the amount of time that teachers
8   spend addressing issues related to student
9   use of social media, then your damages
10  estimate would overstate the amount of
11  damages, correct?
12          A.      That's how multiplication
13  works, yeah.
14          Q.      If the court or jury
15  concludes that the Klein teacher time
16  survey included time spent on activities
17  for which a school district cannot seek
18  damages in this case, then your damages
19  estimate relating to teacher salaries and
20  benefits would not be accurate, correct?
21                  MR. GRADEN:  Objection.
22                  THE WITNESS:  Not without
23          adjustment to whatever the jury
24          found.
25

CONFIDENTIAL

Page 97

1  BY MR. SANDOVAL-BUSHUR:

2         Q.      But that is -- the statement

3  I just made is correct?

4         A.      Yes.

5         Q.      Okay.

6         A.      I'm saying that if they found

7  a different number, you can use the numbers

8  in my report to calculate for whatever, you

9  know, the jury ultimately found, assuming

10  they have found a number.

11        Q.      If the court or jury were to

12  conclude that the Klein survey is not

13  reliable and accurate, then you would agree

14  that they could not rely on your damages

15  estimates relating to teacher salaries and

16  benefits, correct?

17                MR. GRADEN:  Objection form.

18                THE WITNESS:  They could not

19           rely on the numbers as is.  They

20           could rely on the -- they could

21           make adjustments to those numbers

22           based on whatever they found, if

23           they found a different number.

24  BY MR. SANDOVAL-BUSHUR:

25        Q.      Did you ever communicate with

CONFIDENTIAL

Page 98

1   Mr. Klein about the survey?

2          A.      We had some phone calls, yes.

3          Q.      Did you communicate with Mr.

4   Klein about the survey before the survey

5   was given?

6          A.      No, I did not.

7          Q.      Are you relying in any way in

8   offering your opinions on any of your

9   communications with Mr. Klein?

10         A.      Sorry, say that again.

11         Q.      Are you, in offering your

12  opinions in this case, relying in any way

13  on your communications with Mr. Klein?

14         A.      No, everything ultimately is

15  in his report that I'm relying on.

16         Q.      For your calculation of

17  damages relating to non-teacher positions

18  such as counselors and school

19  administrators, you rely for most districts

20  on time estimates and affidavits of

21  district employees, correct?

22         A.      That is correct.

23         Q.      And just a wording

24  clarification, in some of your reports, you

25  refer to affidavits and in some reports,

CONFIDENTIAL

Page 99

1   you refer to declarations.  Can we agree

2   that if I refer to either affidavits or

3   declarations, we'll both understand that

4   that encompasses both affidavits and

5   declarations?

6           A.      Absolutely.  In my mind,

7   they're all affidavits, but if something

8   was labeled a declaration, in my brain,

9   it's an affidavit.  So we're on the same

10  page there.

11          Q.      Great.  For your calculation

12  of damages relating to non-teacher

13  positions for Breathitt, Charleston,

14  Irvington, and Tucson, you rely on time

15  estimates and affidavits of district

16  employees, correct?

17          A.      Can you list the districts

18  again?

19          Q.      Breathitt, Charleston,

20  Irvington, and Tucson.

21          A.      Yes, that's correct.

22          Q.      You consider the time

23  estimates from the affidavits of district

24  employees to be an essential and necessary

25  input to your estimate of damages relating

CONFIDENTIAL

Page 100

1  to non-teacher salaries and benefits,

2  correct?

3                    MR. GRADEN:  Objection.  Form.

4                    THE WITNESS:  Correct.

5  BY MR. SANDOVAL-BUSHUR:

6          Q.      You are not able to say

7  whether the time estimates provided in the

8  employee affidavits are accurate, correct?

9          A.      That's correct.

10         Q.      You did not take any steps to

11 validate the accuracy of the time estimates

12 provided in the employee affidavits,

13 correct?

14         A.      I trusted that the employees

15 reported their information correctly.

16         Q.      And you did not take any

17 steps to validate the accuracy of the time

18 estimates provided in the employee

19 affidavits, correct?

20         A.      Other than reading what they

21 said, correct.  And their depositions of

22 those who have been deposed.

23         Q.      When you initially issued

24 your damages estimates for the bellwether

25 districts, you had not reviewed any of the

CONFIDENTIAL

1    deposition testimony of any of the

2    witnesses who provided affidavits, correct?

3            A.      I don't think I had.

4            Q.      If you had reviewed the

5    deposition testimony of any of the

6    employees who provided affidavits at the

7    time that you issued your initial reports,

8    you would have included a citation to that

9    deposition testimony in your report,

10   correct?

11           A.      That's correct.

12           Q.      You relied on the employees

13   who provided affidavits to accurately

14   estimate time, correct?

15           A.      That's correct.

16           Q.      For purposes of your damages

17   estimates, you assume that the time

18   estimates in employee affidavits are

19   reliable and accurate, correct?

20           A.      That's correct.

21           Q.      So if, for example, an

22   employee affidavit estimated that employees

23   in a particular position spent 25 percent

24   of their time addressing issues related to

25   student use of social media, you are not

CONFIDENTIAL

Page 102

1  offering the opinion that employees in that

2  position in fact spent 25 percent of their

3  time addressing issues related to student

4  use of social media, correct?

5      A.    That's correct.

6      Q.    That is the same for all

7  estimates for all positions, correct?

8      A.    That's correct.

9      Q.    When you offer an estimate of

10  damages relating to non-teacher salaries

11  and benefits, your opinion is that your

12  damages estimate is reliable if you assume

13  that the employee affidavits are reliable

14  and accurate, correct?

15              MR. GRADEN:  Objection.

16              THE WITNESS:  That's correct.

17  BY MR. SANDOVAL-BUSHUR:

18      Q.    If employee affidavits

19  overstate the amount of time that employees

20  in a particular position spend addressing

21  issues related to student use of social

22  media, then your damages estimate would

23  overstate the amount of damages, correct?

24      A.    That's correct.

25      Q.    If the court or jury

CONFIDENTIAL

Page 103

1    concludes that the employee affidavits
2    included time spent on activities for which
3    a school district cannot seek damages in
4    this case, then your damages estimate
5    relating to the non-teacher salaries and
6    benefits would not be accurate, correct?
7                    MR. GRADEN:  Objection.
8                    THE WITNESS:  Not without
9            adjustments for whatever the court
10           found.
11   BY MR. SANDOVAL-BUSHUR:
12           Q.    If the court or jury were to
13   conclude that the employee affidavits are
14   not reliable and accurate, then you would
15   agree that they could not rely on your
16   damages estimates relating to non-teacher
17   salaries and benefits, correct?
18                    MR. GRADEN:  Objection.  Form.
19                    THE WITNESS:  Not without
20           making adjustments.
21   BY MR. SANDOVAL-BUSHUR:
22           Q.    For the Harford School
23   District for your calculation of damages
24   relating to non-teacher positions, you rely
25   on time estimates provided in an

Page 104

1    interrogatory response and depositions of

2    three district employees, correct?

3              A.      That is correct.

4              Q.      The time estimates from the

5    interrogatory response and the three

6    district employee depositions are an

7    essential and necessary input to your

8    estimate of damages relating to non-teacher

9    salaries and benefits for Harford, right?

10                      MR. GRADEN:  Objection.  Form.

11                      THE WITNESS:  That is correct.

12   BY MR. SANDOVAL-BUSHUR:

13             Q.      You are not able to say

14   whether the time estimates provided in the

15   interrogatory responses or the three

16   Harford employee depositions are accurate,

17   correct?

18                      MR. GRADEN:  Objection.  Form.

19                      THE WITNESS:  That is correct.

20   BY MR. SANDOVAL-BUSHUR:

21             Q.      And you did not take any

22   steps to validate the accuracy of the time

23   estimates provided in the interrogatory

24   responses, correct?

25             A.      Beyond just reviewing what

CONFIDENTIAL

Page 105

1  was in the depositions.

2          Q.      And you did not take any

3  steps to validate the accuracy of any time

4  estimates that were provided in any

5  employee depositions for any district,

6  correct?

7          A.      Other than the context of the

8  deposition itself or the affidavit or

9  interrogatory.

10          Q.      You relied on the employees

11  to accurately estimate time in their

12  deposition testimony, correct?

13          A.      That is correct.

14          Q.      For purposes of your damages

15  estimates for Harford, you assume that the

16  time estimates and interrogatory responses

17  and employee depositions are reliable and

18  accurate, correct?

19                  MR. GRADEN:  Objection.

20                  THE WITNESS:  That is correct.

21  BY MR. SANDOVAL-BUSHUR:

22          Q.      If an employee estimated that

23  school counselors spent 10 percent of their

24  time addressing issues related to student

25  use of social media, you are not offering

Page 106

1  the opinion that employees in that position

2  in fact spent 10 percent of their time

3  addressing issues relating to student use

4  of social media, correct?

5         A.      That is correct.

6         Q.      And that's the same for all

7  estimates for all positions, correct?

8         A.      That is correct.

9         Q.      When you offer an estimate of

10  damages relating to non-teacher salaries

11  and benefits, your opinion is that your

12  damages estimate is reliable if you assume

13  that the interrogatory responses and

14  employee deposition testimony is reliable

15  and accurate, correct?

16        A.      That is correct.

17        Q.      If an interrogatory response

18  or employee deposition overstated the

19  amount of time that employees in a

20  particular position spent addressing issues

21  relating to student use of social media,

22  then your damages estimate would overstate

23  the amount of damages, correct?

24        A.      That's correct.

25        Q.      If the court or jury

Page 107

1   concludes that the interrogatory response

2   or employee deposition testimony included

3   time spent on activities for which a school

4   district cannot seek damages in this case,

5   then your damages estimates relating to

6   non-teacher salaries and benefits would not

7   be accurate, correct?

8           A.      Not without adjustment to

9   whatever the court found.

10          Q.      If the court or jury were to

11  conclude that the interrogatory responses

12  or employee deposition testimony is not

13  reliable or accurate, then you would agree

14  that they could not rely on your damages

15  estimates for non-teacher salaries and

16  benefits, correct?

17          A.      Not --

18                  MR. GRADEN:  Objection.  Form.

19                  THE WITNESS:  Not without

20          adjustment to whatever they found

21          for the loss time.

22  BY MR. SANDOVAL-BUSHUR:

23          Q.      It was not part of your

24  assignment in this case to determine

25  whether any data from the bellwether school

Page 108

1  districts corroborated the employee

2  estimates of time spent addressing student

3  use of social media, correct?

4        A.    I take the time loss

5  estimates as given by those who provided it

6  to me.

7        Q.    Was it part of your

8  assignment in this case to determine

9  whether any data from the bellwether

10  districts corroborated the employee

11  estimates of time spent addressing student

12  use of social media?

13        A.    No, it was not part of my

14  assignment.

15        Q.    You are not opining about

16  whether any data from any bellwether school

17  district in fact corroborates the employee

18  estimates of time spent addressing student

19  use of social media, correct?

20        A.    Yes, I'm not opining on

21  whether or not there's data that

22  corroborates it.

23        Q.    You relied on the time

24  estimates from the Klein teacher time

25  survey because that is what Plaintiffs'

Page 109

1    counsel assigned you to do, correct?

2                    MR. GRADEN:  Objection.

3                    THE WITNESS:  I relied on it

4            because it's the estimate of time

5            loss that was provided to me by an

6            expert witness.

7    BY MR. SANDOVAL-BUSHUR:

8         Q.     Did Plaintiffs' attorneys

9    assign you to estimate damages using the

10   results of the Klein teacher time survey?

11        A.     I mean, I was provided the

12   Klein survey to estimate damages, so that's

13   the information that I was provided.  I

14   don't think it was assigned to me that I

15   had to use it.  It's the information that I

16   was provided and I have no reason to doubt

17   its, you know, usefulness for my purposes.

18        Q.     Did you ask for the Klein

19   teacher time survey to be conducted?

20        A.     I did not.

21        Q.     Plaintiffs' attorneys told

22   you that the Klein teacher time survey was

23   being conducted, correct?

24        A.     Yes.

25        Q.     And Plaintiffs' attorneys

Page 110

1    asked you to estimate damages using the

2    results of the Klein teacher time survey,

3    correct?

4                   MR. GRADEN:  Objection.

5             Foundation.

6                   THE WITNESS:  They asked me to

7             calculate damages and I was

8             provided the Klein survey.  I don't

9             think it was explicit that my

10            assignment was you have to use

11            this, but that's what was available

12            to me.

13    BY MR. SANDOVAL-BUSHUR:

14         Q.    Was there any other data that

15    you considered using other than the Klein

16    teacher time survey to estimate the time

17    spent by teachers for purposes of your

18    damages estimates?

19         A.    No.

20         Q.    Did you rely on the time

21    estimates and employee affidavits because

22    Plaintiffs' counsel asked you to do so in

23    estimating damages for non-teacher

24    positions?

25         A.    I mean, I was asked to

CONFIDENTIAL

Page 111

1    calculate damages using estimates of lost

2    times and those are what I was provided to

3    do those calculations.

4         Q.    Did you ask for Plaintiffs'

5    counsel to collect affidavits of employees

6    estimating the amount of time that they

7    spent for purposes of your damages

8    calculations?

9         A.    I did not ask them that, no.

10        Q.    Plaintiffs' attorneys

11   provided you with the employee affidavits

12   that you relied on in this case, correct?

13        A.    That is correct.

14        Q.    And did you ask Plaintiffs'

15   attorneys for interrogatory responses or

16   employee depositions identifying the amount

17   of time they spent addressing issues

18   relating to social media for purposes of

19   your damages estimates?

20              MR. GRADEN:  Objection.

21              MR. LANDS:  Objection.

22              MR. GRADEN:  Objection.  Form.

23   BY MR. SANDOVAL-BUSHUR:

24        Q.    Did you ask Plaintiffs'

25   attorney for interrogatory responses

                                    Page 112

1   estimating the amount of time that

2   employees spent for purposes of your

3   damages calculations?

4          A.     I mean, I asked for anything

5   that provided an estimate of time loss.  I

6   don't know if I specifically asked for that

7   one, but I said, hey, is there anything for

8   this district and that's what I was

9   provided.

10         Q.     It was not part of your

11  assignment in this case to determine

12  whether any employee's time estimates

13  distinguished between time spent on issues

14  relating to phones and time spent on issues

15  relating to social media specifically,

16  correct?

17         A.     No, that was not part of my

18  assignment.

19         Q.     You are not opining that any

20  employee's time estimates in fact

21  distinguish between time spent on issues

22  relating to phones and time spent on issues

23  relating to social media specifically,

24  correct?

25         A.     I'm trusting that they've

CONFIDENTIAL

Page 113

1  provided me with the correct time estimate

2  for use in this case.

3          Q.      But you are not opining that

4  any employee's time estimates in fact

5  distinguish between time spent on issues

6  relating to phones and time spent on issues

7  spent on social media specifically,

8  correct?

9          A.      I am not offering that

10  opinion.

11          Q.      I want to ask now about the

12  other category of inputs in your damages

13  estimate calculations.  That is the amount

14  of money that school districts spent on

15  salaries and benefits for certain employee

16  positions; is that right that that's the

17  other category?

18          A.      That's a fair

19  characterization, yes.

20          Q.      You used different sources of

21  information, depending on the district, to

22  estimate the amount of money that each

23  district spent on salaries and benefits for

24  the relevant employee positions, correct?

25          A.      That is correct.

CONFIDENTIAL

Page 114

1          Q.      For each district, you relied
2    on data that was provided by the district
3    for your calculation of employee salaries,
4    correct?
5          A.      With the exception of DeKalb,
6    and then I also incorporate some federal
7    data for Breathitt as well.
8          Q.      Okay.  So let me ask the
9    question then for Charleston, Harford,
10   Irvington, and Tucson.  For Charleston,
11   Harford, Irvington, and Tucson, you relied
12   on data that was provided by the district
13   for your calculation of employee salaries,
14   correct?
15         A.      That is correct.
16         Q.      You relied on each district
17   to provide you with reliable and accurate
18   information on employee salaries, correct?
19         A.      That is correct.
20         Q.      You assumed that the
21   information on employee salaries that each
22   district provided you was accurate,
23   correct?
24         A.      That is correct.
25         Q.      You do not know whether the

Page 115

1   information that each district provided on
2   employee salaries was in fact reliable and
3   accurate, correct?
4               MR. GRADEN:  Objection.  Form.
5               THE WITNESS:  I trusted that
6           the district provided the
7           information requested, which I then
8           assumed was accurate.
9   BY MR. SANDOVAL-BUSHUR:
10      Q.      But you personally do not
11  know whether the information that each
12  district provided on employee salaries was
13  reliable and accurate, correct?
14              MR. GRADEN:  Objection.  Form.
15              THE WITNESS:  That is correct.
16  BY MR. SANDOVAL-BUSHUR:
17      Q.      Your opinion is that your
18  damages estimate is reliable if you assume
19  that the information that the district
20  provided about employee salaries was
21  accurate, correct?
22      A.      That is correct.
23      Q.      For the Breathitt and DeKalb
24  cases, you relied, in part, on data that
25  was provided via the common core of data;

CONFIDENTIAL

Page 116

1    is that correct?

2         A.    That's correct.

3         Q.    And you relied on the data

4    for purposes of your calculation of

5    employee salaries, right?  Correct?

6         A.    It's a little bit different

7    for each of them, but, yes, I was using

8    employee salary data from -- for purposes

9    of the wage and benefit part of the

10   calculation, I was using it for wages.

11        Q.    The common core data that you

12   relied on is information that is reported

13   by the school district; is that correct?

14        A.    That is correct.

15        Q.    And so for both Breathitt and

16   DeKalb, you relied on each of those

17   districts to provide reliable and accurate

18   information on employee wages, correct?

19        A.    That's correct.

20        Q.    You assume that the

21   information on employee wages that each

22   district provided was accurate, correct?

23        A.    That is correct.

24        Q.    You do not personally know

25   whether the information that each district

CONFIDENTIAL

Page 117

1   provided on employee wages was in fact
2   reliable and accurate, correct?
3           A.      I assume what they report to
4   the federal government is accurate.
5           Q.      But you do not know
6   personally whether the information that the
7   districts provided on employee wages is in
8   fact reliable and accurate, correct?
9           A.      That's correct.
10          Q.      And your opinion is that your
11  damages estimate is reliable if you assume
12  that the information that the district has
13  provided about employee wages was accurate,
14  correct?
15          A.      That's correct.
16          Q.      For your damages
17  calculations, you also relied on data that
18  was provided by the district for your
19  calculation of employee benefits, correct?
20          A.      Sorry, say that again.
21          Q.      For purposes of your damages
22  calculations, you relied on data that was
23  reported by the district for your
24  calculation of employee benefits, correct?
25          A.      That's correct.

Page 118

1          Q.      And you relied on each
2    district to provide reliable and accurate
3    information that you then relied on for
4    your calculations of employee benefits,
5    correct?
6          A.      That's correct.
7          Q.      And your opinion is that your
8    damages estimate is reliable if you assume
9    that the information on which you relied
10   provides accurate information relating to
11   employee benefits, correct?
12                    MR. GRADEN:  Objection.
13                    THE WITNESS:  That's correct.
14   BY MR. SANDOVAL-BUSHUR:
15         Q.      To estimate damages, you had
16   to determine which employee positions from
17   the employee salary data that you received
18   should be multiplied by which time
19   estimates, correct?
20         A.      That's correct.
21         Q.      And sometimes, the titles of
22   employee positions in the employee salary
23   data that you received did not match the
24   titles of the positions that were used by
25   the employees that provided time estimates

Page 119

1    in affidavits or depositions, correct?

2          A.     I don't recall there being a

3    lot of mismatch, typically, they were

4    matched almost identically if not exactly.

5    In the affidavits, it's, you know, usually

6    I'm providing information for vice

7    principals or assistant principals and

8    there was something called assistant

9    principal in the data.

10          Q.     For example, an employee

11    affidavit may have estimated time spent by

12    counselors, but the employee salary data

13    that you relied on identified people with

14    the job title guidance?

15          A.     Oh.

16          Q.     Is that right?

17          A.     Fair, but, you know, the

18    guidance counselor is the typical

19    abbreviation for guidance counselor or

20    counselor.

21          Q.     What methodology did you use

22    to determine which employee positions from

23    the employee salary data should be

24    multiplied by which time estimates?

25          A.     I looked through the, you

Page 120

1    know, the job position descriptions to find
2    the positions that would reasonably match
3    the positions that were being listed.
4           Q.     How did you determine that
5    the position descriptions reasonably
6    matched the positions that were listed in
7    an employee affidavit or described in an
8    employee declaration?
9           A.     Because usually they matched
10   identically and if not, it's something like
11   guidance for guidance counselor, which is a
12   pretty common and intuitive way of
13   identifying positions in a database.
14          Q.     When the job title used in an
15   employee affidavit estimating time did not
16   exactly match the job title in the employee
17   salary data, you looked at the titles and
18   made your own judgments about whether you
19   thought the job title used in the employee
20   affidavit applied to the job title in the
21   employee salary data, correct?
22          A.     Yes.
23          Q.     And you did not validate with
24   any of the employees who submitted
25   affidavits estimating time whether the job

CONFIDENTIAL

Page 121

1    titles provided in their affidavits matched
2    the job titles that you were using in the
3    employee salary data, correct?
4          A.    I mean, it all seemed pretty
5    straightforward to me.
6          Q.    But you did not validate with
7    any of the employees who submitted
8    affidavits whether the job titles provided
9    in their affidavits matched or applied to
10   the job titles that you used in the
11   employee salary data, correct?
12         A.    Not that I recall.
13         Q.    Do you think it's possible
14   that you did that?
15         A.    I'm going to say maybe in one
16   case, there was some ambiguity, but I don't
17   remember off the top of my head.
18         Q.    In that case, would you have
19   spoken to the -- a district employee or
20   would you have asked a question of the
21   Plaintiffs' counsel?
22         A.    I would have asked the
23   question of the attorneys.
24         Q.    You are not an offering an
25   opinion on the amount of damages that

CONFIDENTIAL

Page 122

1    Defendants' platforms as distinct from all

2    social media caused any school district to

3    incur, correct?

4           A.      Say that again.

5           Q.      You are not offering an

6    opinion on the amount of damages that

7    Defendants' platforms as distinct from all

8    social media caused any school district to

9    incur, correct?

10          A.      My understanding is that the

11   affidavits and the survey, that that was

12   part of how they were constructed was it's

13   supposed to be time loss related to

14   Defendants' conduct.

15          Q.      And can you explain to me the

16   basis of that understanding?

17          A.      Well, I mean, A, it's being

18   done in the context of litigation, so

19   presumably, that's how it's being done,

20   but, you know, I have asked that to make

21   sure that, that's my understanding is that

22   that's what people are asking.  It's also,

23   I think, in some of the depositions that

24   have since been taken place, I think they

25   asked them those types of questions.

CONFIDENTIAL

Page 123

1          Q.     Did you in the course of your
2    work in this case read the questions that
3    Klein -- the Klein teacher time survey
4    asked teachers?
5          A.     I did.
6          Q.     And so you know that the
7    Klein teacher time survey in its questions
8    about social media is not limited to the
9    Defendants, correct?
10                MR. GRADEN:  Objection.
11                THE WITNESS:  I don't know.
12          That's a question for him, whether
13          or not he thinks it's limited to
14          them or not.
15   BY MR. SANDOVAL-BUSHUR:
16        Q.     Well, I mean you can read the
17   questions, right?
18        A.     That's a question for Klein.
19        Q.     Sorry, the question -- it's
20   respectfully not.  My question to you is
21   you can read the questions in Mr. Klein's
22   survey, correct?
23        A.     Yeah.
24        Q.     And you have read them,
25   correct?

CONFIDENTIAL

Page 124

1          A.      I have.

2          Q.      And you know that his

3    questions about social media are not

4    limited to Defendants' platforms, correct?

5                      MR. GRADEN:  Objection.

6                      THE WITNESS:  I do not know

7           that.

8    BY MR. SANDOVAL-BUSHUR:

9          Q.      Okay.  Well, let's take a

10   look at it.  Let's mark tab 6A as

11   Exhibit 7.

12                      - - - - -

13                 (Robert L. Klein Breathitt

14            Expert Report dated 5/18/25

15            marked Ward Exhibit 7 for

16            identification.)

17                      - - - - -

18   BY MR. SANDOVAL-BUSHUR:

19         Q.      And, Dr. Ward, Exhibit 6A --

20   I'm sorry, Exhibit 7 is Mr. Klein's report

21   for the Breathitt case, correct?  If you

22   turn to the page 3, paragraph 11, you'll

23   see the identification of the Plaintiff.

24         A.      Okay.  I see that.

25         Q.      And you understand that

CONFIDENTIAL

Page 125

1    Exhibit 7 is Mr. Klein's expert report for

2    the Breathitt case, correct?

3            A.      That's what it appears to be.

4            Q.      Have you seen this before?

5            A.      I've seen one of his -- I

6    mean, yes, I've seen this report, yes.

7            Q.      And you understand that Mr.

8    Klein asked the same survey questions in

9    all of the districts, right?

10           A.      That is my understanding,

11   yes.

12           Q.      Okay.  Let's turn to page 8

13   of Mr. Klein's report.  And you see here

14   question three, which is one of the

15   questions that was asked as part of the

16   Klein teacher time survey, correct?

17           A.      Uh-huh.

18           Q.      Okay.  And you see that Mr.

19   Klein in the survey asked teachers about

20   which of the following factors diverted

21   time away from teaching during scheduled

22   instruction time, correct?

23           A.      Yup.

24           Q.      And the first option that

25   teachers could select is, "Unauthorized

CONFIDENTIAL

Page 126

1  student use of social media (e.g.,

2  Facebook, Instagram, SnapChat, TikTok,

3  YouTube, etc.) during class," correct?

4          A.      Okay.

5          Q.      Do you see that?

6          A.      Yes.

7          Q.      And you understand that

8  teachers then estimated the amount of time

9  that they spent relating to unauthorized

10 use of social media, e.g., Facebook,

11 Instagram, SnapChat, YouTube, et cetera,

12 during class, and you relied on the results

13 of teachers answering that question in

14 providing the damages calculations in your

15 report, correct?

16         A.      Correct.

17         Q.      Now, you would agree with me

18 that the Klein survey when it asked

19 teachers about social media, it did not

20 limit the platforms included in the

21 definition of social media to Defendants'

22 platforms, correct?

23         A.      I mean, those are the ones it

24 lists.

25         Q.      Well, it lists Defendants'

Page 127

1    platforms, but it also says, "e.g." and
2    that means, for example, correct?
3         A.    I think that's what it means,
4    yeah.
5         Q.    And it also includes et
6    cetera, correct?
7         A.    Okay.
8         Q.    So if I give -- if someone is
9    provided with a list that says, for
10   example, give some examples, and then says
11   et cetera at the end, the category being
12   described includes more than just the
13   examples that are provided, correct?
14        A.    It doesn't have to, it could,
15   but it doesn't have to.
16        Q.    Well, you know that there are
17   other social media platforms besides just
18   Defendants' platforms, correct?
19        A.    Again, I don't know what
20   qualifies as social media personally, but
21   if you're asking me, I would be thinking of
22   these ones probably.
23        Q.    You would also be thinking of
24   Twitter, right?
25        A.    Potentially, yeah.

CONFIDENTIAL

Page 128

1          Q.     Other people may be thinking

2    of other platforms as well, correct?

3                     MR. GRADEN:  Objection.

4                     THE WITNESS:  I don't know

5               what other people are thinking.  I

6               have no opinion about what other

7               people are thinking.

8    BY MR. SANDOVAL-BUSHUR:

9          Q.     Well, Mr. Ward, you are aware

10   that your damages estimate relating to

11   teacher time is an estimate that relates to

12   time spent relating to all social media,

13   not just the Defendants' platforms,

14   correct?

15                     MR. GRADEN:  Objection.

16                     THE WITNESS:  No, that's not

17               my understanding.  My understanding

18               is Mr. Klein and the affiants were

19               tasked with estimating time loss

20               related to this lawsuit.  I'm

21               taking what they're giving and I'm

22               saying, great, as we just went

23               through, I assume that they have

24               provided me with the -- a reliable

25               estimate of time loss that is

Page 129

1              appropriate for use in this
2              calculation.  That is all I'm
3              doing.  I have no opinions about
4              exactly what Mr. Klein's wording
5              and what it means, I haven't
6              thought about this.  I don't know
7              what it means.  I'm not the survey
8              expert.
9   BY MR. SANDOVAL-BUSHUR:
10         Q.     So then, Dr. Ward, you have
11  no idea whether your damages estimates are
12  relating to all social media or just the
13  Defendants' platforms, correct?
14              MR. GRADEN:  Objection.
15              THE WITNESS:  I have -- my
16              estimates take the time loss
17              estimates of the affiants and Mr.
18              Klein, take them as given, whatever
19              they've included I trust them to
20              have included whatever is
21              appropriate.
22  BY MR. SANDOVAL-BUSHUR:
23         Q.     No one told you that Mr.
24  Klein's survey includes only time spent
25  relating to Defendants' platforms, correct?

CONFIDENTIAL

Page 130

1          A.      I don't think I ever really

2    thought about it.  I assume that it -- it's

3    appropriate for use in this case, because

4    he's an expert witness in this case,

5    presumably, you know, he's thought about

6    how to do this.  I'm just going to trust

7    him to do his job.

8          Q.      Do you think that Mr. Klein

9    told the teachers who participated in this

10   survey, look, I know that the survey says

11   social media, e.g., Facebook, Instagram,

12   SnapChat, TikTok, YouTube, et cetera,

13   however, when you provide your estimate,

14   you should limit your response only to

15   Facebook, Instagram, SnapChat, TikTok, or

16   YouTube and include no other platforms?

17                  MR. GRADEN:  Objection.

18                  THE WITNESS:  I don't know

19          what --

20   BY MR. SANDOVAL-BUSHUR:

21          Q.      So it's possible that Mr.

22   Klein did that in administering his survey?

23          A.      I doubt it, but, again,

24   that's not -- I have no opinions about --

25   or I have no knowledge about what he

CONFIDENTIAL

Page 131

1   precisely did or didn't do.  I've read his

2   survey.  I've read his report.  I took

3   those results as given.  They are input

4   into my report.  So beyond that, like, as

5   far as I'm concerned, he's got a report.

6   He will be deposed.  He will make all of

7   the defense of his survey that is

8   necessary.  I'm not here to make it -- to

9   offer an opinion about what his survey

10  means, because I don't know what his survey

11  means, because I didn't write it.  I've

12  spent almost no time really thinking about

13  it.  I'm just, like, okay, this has

14  questions that I need for my report, great.

15          Q.     So you are not offering the

16  opinion that the results of Mr. Klein's

17  survey are limited to time spent addressing

18  issues relating to Defendants' platforms as

19  distinct from all social media, correct?

20                  MR. GRADEN:  Objection.

21                  THE WITNESS:  Yeah, I'm making

22          no opinions, I'm offering no

23          opinions about what is or is not

24          included in Mr. Klein's survey.

25

CONFIDENTIAL

Page 132

1    BY MR. SANDOVAL-BUSHUR:
2         Q.    And so you are offering no
3    opinions about whether your damages
4    estimates are -- let me ask the question
5    again.
6              You are offering no opinions
7    about whether your damages estimates relate
8    to all social media or relate just to
9    Defendants' platforms --
10                   MR. GRADEN:  Objection.  Form.
11                   MR. SANDOVAL-BUSHUR:  --
12              right?
13                   MR. GRADEN:  Objection.  Form.
14                   THE WITNESS:  I'm -- as we
15              talked about at length a little
16              while ago, right, I take the time
17              loss estimates as given.  I assume
18              they are accurate and reliable for
19              purposes of calculating damages in
20              this lawsuit.
21    BY MR. SANDOVAL-BUSHUR:
22         Q.    Do you know what you
23    calculated time loss relating to?
24         A.    I don't understand your
25    question.

CONFIDENTIAL

Page 133

1          Q.     What did you calculate time
2    loss relating to in this case?  Or you're
3    not sure because you're just -- you don't
4    know?
5                   MR. GRADEN:  I'll note for the
6              record that Mr. -- that Dr. Ward
7              was attempting to answer your
8              question before you asked the
9              second question.
10                   THE WITNESS:  You know, so I'm
11             using the affiants and Mr. Klein to
12             answer the question of how much or
13             what share of staff time was lost
14             due to student social media use.
15   BY MR. SANDOVAL-BUSHUR:
16         Q.     In answering that question,
17   you did not distinguish between time loss
18   to student use of Defendants' platforms as
19   distinct from time loss due to student use
20   of all social media, correct?
21         A.     As we discussed, I make no
22   distinctions.  I rely on them for the time
23   loss estimates.  We just went through a
24   very long series of questions about that.
25         Q.     And the answer is no, you did

CONFIDENTIAL

Page 134

1   not distinguish, correct?
2                   MR. GRADEN:  Objection.
3                   THE WITNESS:  I've --
4                   MR. GRADEN:  Asked and
5           answered.
6                   THE WITNESS:  Yes, we've
7           covered that.  I make no
8           distinctions for that.
9   BY MR. SANDOVAL-BUSHUR:
10          Q.     And you have not offered an
11  opinion on how your damages estimates would
12  change if they were limited only to time
13  spent addressing issues caused by
14  Defendants' platforms specifically as
15  distinct from all social media, correct?
16                  MR. GRADEN:  Objection.
17                  THE WITNESS:  I offer the one
18          calculation I have based on the
19          time loss estimates that I relied
20          on.
21  BY MR. SANDOVAL-BUSHUR:
22          Q.     Have you offered any opinion
23  on how your damages estimates would change
24  if they were limited only to time spent
25  addressing issues caused by Defendants'

CONFIDENTIAL

                                          Page 135

1  platforms as distinct from all social

2  media?

3                    MR. GRADEN:  Objection.

4                    THE WITNESS:  The math is very

5            straightforward.  If there's some

6            sort of share, it's just you

7            multiply the numbers by whatever

8            share reduction.

9  BY MR. SANDOVAL-BUSHUR:

10        Q.    Well, Mr. Ward -- Dr. Ward,

11  sorry, you're not answering my question.

12  Can you point me to anywhere in your expert

13  reports in which you have offered an

14  opinion on how your damages estimates would

15  change if they were limited only to time

16  spent addressing issues caused by

17  Defendants' platforms as distinct from all

18  social media?

19                    MR. GRADEN:  Objection.

20            Foundation.

21                    THE WITNESS:  As I understand

22            it, that's what I've already done.

23  BY MR. SANDOVAL-BUSHUR:

24        Q.    How -- what is your basis

25  for -- for that opinion?

CONFIDENTIAL

Page 136

1          A.      As I understand it, the
2     affiants and Mr. Klein have estimated the
3     time loss for Defendants' social media
4     platforms.
5          Q.      And what is the basis of that
6     understanding?
7          A.      We covered that.  Like, A,
8     they were tasked to provide me time loss
9     estimates in the context of this
10    litigation.  I would be stunned if they
11    provided me an estimate that wasn't germane
12    to the litigation.
13         Q.      I don't think you would be
14    stunned, Dr. Ward, because I think you know
15    exactly what questions Dr. Klein asked --
16              MR. GRADEN:  Objection.
17          That's not a question.
18    BY MR. SANDOVAL-BUSHUR:
19         Q.      Dr. Ward, if Mr. Klein
20    performed a survey that asked teachers to
21    estimate time spent addressing issues
22    relating to all social media, not limited
23    just to Defendants, if that's what Mr.
24    Klein did, then your damages estimates are
25    estimates relating to time spent addressing

Page 137

1    issues relating to all social media, not
2    limited just to Defendants, correct?
3                    MR. GRADEN:  Objection.  Form.
4            Incomplete hypothetical.
5                    THE WITNESS:  If you assume
6            that Mr. Klein's estimates are the
7            estimates for all social media,
8            then, yes, that's an input in my
9            calculation and that's what my
10           calculation would reflect.
11   BY MR. SANDOVAL-BUSHUR:
12           Q.      And in order for the court or
13   jury to decide whether that assumption is
14   correct, whether the Klein estimates are
15   estimates for all social media, you would
16   agree that they can look at the Klein
17   questions themselves and decide whether
18   those estimates include all social media or
19   are limited just to Defendants, correct?
20           A.      I have no opinion about how
21   the court or jury makes its decisions.
22           Q.      Well, if you wanted to know
23   whether the Klein estimates are estimates
24   for all social media or just for
25   Defendants, how would you answer the

CONFIDENTIAL

Page 138

1   question?

2          A.      I don't know, I would have to

3   think about it.

4          Q.      Your job in this case that

5   you were paid over $300,000 to do was to

6   multiply the results of the Klein survey

7   and the percentages in employee affidavits

8   by employee salary and benefit information,

9   correct?

10         A.      Yes.

11         Q.      And your testimony is that,

12  sitting here today, you do not know how you

13  would figure out what question exactly the

14  Klein survey was attempting to answer; is

15  that right?

16                 MR. GRADEN:  Objection.

17                 THE WITNESS:  Sorry, I don't

18         understand the question.

19  BY MR. SANDOVAL-BUSHUR:

20         Q.      Well, I'll move on.  The

21  district employee affidavits and deposition

22  testimony that you relied on for estimates

23  of non-teacher damages included time spent

24  addressing student use of all social media,

25  not just Defendants' platforms, correct?

Page 139

```
 1              MR. GRADEN:  Objection.
 2         Foundation.
 3              THE WITNESS:  I don't have any
 4         basis to -- no, I don't know
 5         exactly what they included.  Again,
 6         I've assumed and relied upon that
 7         they provided me with the
 8         appropriate information to use for
 9         my calculations in the context of
10         this lawsuit.
11  BY MR. SANDOVAL-BUSHUR:
12         Q.    Did the district employee
13  affidavits and deposition testimony that
14  you relied on for your estimates of
15  non-teacher damages include time spent
16  addressing student use of all social media,
17  not just Defendants' platforms?
18              MR. GRADEN:  Objection.  Asked
19         and answered.
20              THE WITNESS:  Yeah, I feel
21         like I just answered that.
22  BY MR. SANDOVAL-BUSHUR:
23         Q.    Well, it's a different
24  question.
25         A.    I don't interpret it as a
```

CONFIDENTIAL

Page 140

1    different question.

2         Q.    Well --

3         A.    You've asked me what I am

4    essentially -- what I am assuming about

5    what they know?  I'm saying I am assuming

6    they provided me the information that I

7    need for this calculation.

8         Q.    You do not know whether the

9    employee affidavits and deposition

10   testimony that you relied on provided

11   estimates relating to all social media or

12   just Defendants' platforms, correct?

13                MR. GRADEN:  Objection.

14                THE WITNESS:  I don't know

15           what each person included.  I'm not

16           them.

17   BY MR. SANDOVAL-BUSHUR:

18        Q.    Did you see in any employee

19   affidavit a statement of this is the amount

20   of time that was spent addressing issues

21   relating specifically to Defendants'

22   platforms?

23        A.    I have no recollection of

24   this precise language of all the

25   affidavits.

CONFIDENTIAL

Page 141

1          Q.      You have not offered an
2    opinion on how your estimates of
3    non-teacher time damages would change if
4    they were limited only to time spent
5    addressing issues caused by Defendants'
6    platforms as distinct from all social
7    media, correct?
8                    MR. GRADEN:  Objection to
9              form.  Foundation.
10                   THE WITNESS:  I've provided an
11             estimate based on the information
12             that was provided to me under the
13             assumption that what was provided
14             is limited to Defendants'
15             platforms.
16   BY MR. SANDOVAL-BUSHUR:
17         Q.      And did you do anything at
18   all to see if your assumption that the
19   information that was provided to you that
20   was limited to Defendants' platforms was an
21   accurate assumption?
22         A.      I trusted the people who
23   provided me with the affidavits.  They are
24   knowledgeable staff.  They are doing this
25   in the context of the lawsuit.  They are

CONFIDENTIAL

Page 142

1    signing it.  This is sworn testimony.
2    That's good enough for me.
3            Q.      Well, but, Dr. Ward, my
4    question is not did the people who signed
5    the affidavits think they were giving
6    truthful information.  The question is what
7    information those people who signed the
8    affidavits were giving.
9                    So did you do anything at all
10   to see if your assumption that the
11   information that was provided to you in the
12   employee affidavits that was limited to
13   Defendants' platforms was an accurate
14   assumption?
15                    MR. GRADEN:  Objection.  Asked
16           and answered.
17                    THE WITNESS:  It may have come
18           up in some of the depositions, but
19           other than what's in their
20           testimony, no, I'm relying on them.
21           I'm relying on them to -- these are
22           questions that you are welcome to
23           ask them, but I have no basis or
24           concern that they haven't provided
25           me with the appropriate thing to

CONFIDENTIAL

Page 143

1           use for calculating damages in this
2           lawsuit.
3    BY MR. SANDOVAL-BUSHUR:
4           Q.     Is it your understanding that
5    the people who provided the affidavits that
6    you rely on for purposes of your damages
7    calculations understood that they were
8    giving estimates that would be used for the
9    purposes of calculating damages?
10          A.     Sorry, say that again.
11          Q.     Is it your understanding that
12   the people, the school employees, who
13   provided the affidavits that you rely on
14   understood that they were giving estimates
15   that would be used for purposes of
16   calculating damages?
17          A.     I don't know what they
18   understood.
19          Q.     So you have no idea of what
20   the people who provided the employee
21   affidavits under that they were doing when
22   they provided the affidavits, correct?
23                 MR. GRADEN:  Objection.
24                 THE WITNESS:  I'm not them.  I
25          don't know what they understood or

CONFIDENTIAL

Page 144

```
 1            didn't understand.  I understand
 2            how I used it.
 3   BY MR. SANDOVAL-BUSHUR:
 4        Q.    Yeah.  Okay.  Your estimated
 5   damages include damages relating to time
 6   spent by teachers and other school staff
 7   addressing the effects of content, text,
 8   photos, videos that are posted by third
 9   parties on social media platforms, correct?
10                MR. GRADEN:  Objection to
11            form.  Foundation.
12                THE WITNESS:  What was the
13            question, I'm sorry?
14   BY MR. SANDOVAL-BUSHUR:
15        Q.    Do your damages estimates
16   include damages relating to time spent by
17   teachers and other school staff addressing
18   the effects of content, that is, text,
19   photos or videos posted by third parties on
20   social media platforms?
21                MR. GRADEN:  Objection.  Form.
22            Foundation.
23                THE WITNESS:  I have no
24            opinion about that.  I don't --
25            again, that's a time loss question,
```

CONFIDENTIAL

                                                    Page 145

```
 1                right, so that's -- I'm taking the
 2                affiant affidavits and Mr. Klein's
 3                survey and I'm applying value to
 4                it.  I don't have any opinion about
 5                what exactly they included or
 6                didn't include.  I assume that it
 7                is appropriate for my purposes.
 8     BY MR. SANDOVAL-BUSHUR:
 9           Q.      And what does that mean for
10     something to be appropriate for your
11     purposes?
12           A.      It provides the time loss to
13     be used to calculate damages in this
14     lawsuit.
15           Q.      So for your purposes, if it
16     provided a time loss, it provided you a
17     percentage, that was sufficient?
18           A.      Again, I'm relying on them to
19     provide the appropriate loss of time for
20     this lawsuit.  I don't -- I have no basis
21     to evaluate what they did and didn't
22     include, whether or not it's accurate or
23     not, right, they're the experts.  They're
24     the people in the positions.  As we talked
25     about, I assume that it is accurate and
```

CONFIDENTIAL

Page 146

1    reliable for my purposes.

2          Q.      If teachers and non-teachers

3    included in their time estimates time spent

4    addressing the effects of content, that is,

5    texts, photos, or videos that were posted

6    by third parties on social media platforms,

7    that time would be included in your damages

8    estimate, correct?

9                    MR. GRADEN:  Objection.  Form.

10                   THE WITNESS:  I mean, if

11              people include something in their

12              time loss estimate that the time

13              loss estimate that I relied on, by

14              definition, yes, my time loss -- my

15              calculation includes it.

16    BY MR. SANDOVAL-BUSHUR:

17          Q.      And you did not take any

18    steps on your own to attempt to eliminate

19    from any time estimates time spent

20    addressing content posted on social media

21    by third parties when you were calculating

22    your damages estimates, correct?

23          A.      It was not part of --

24                   MR. GRADEN:  Objection.

25              Foundation.

CONFIDENTIAL

Page 147

1                     THE WITNESS:   That was not
2            part of my assignment.
3    BY MR. SANDOVAL-BUSHUR:
4            Q.     And you are not aware of any
5    data that would allow you to quantify what
6    portion of damages you estimated relate to
7    time spent by teachers and other school
8    staff addressing the effects of content
9    posted by third parties on social media
10   platforms?
11                   MR. GRADEN:   Objection to
12           form.   Foundation.
13                   THE WITNESS:   Not part of my
14           assignment.
15   BY MR. SANDOVAL-BUSHUR:
16           Q.     And you're not aware of any
17   such data?
18           A.     I'm not aware of any such
19   data.
20           Q.     If two students are using a
21   social media platform during class to
22   message each other about plans to hang out
23   after school and the teacher takes time to
24   reprimand the students for messaging one
25   another during class, is that teacher time

Page 148

1    included in your damages estimate?

2            A.      Again, I take the estimates

3    from others.  I don't know any specific

4    examples.  I assume that the others provide

5    me with whatever is appropriate.

6            Q.      If teachers and non-teachers

7    included in their time estimates time spent

8    addressing students' use of social media

9    platforms during class to message each

10   other, that time is included in your

11   damages estimate, correct?

12                    MR. GRADEN:  Objection.

13                    THE WITNESS:  So if you assume

14            that it's included then, yes, it's

15            included.

16   BY MR. SANDOVAL-BUSHUR:

17           Q.      And you did not attempt to

18   eliminate from your damages calculations

19   time spent addressing student use of social

20   media platforms during class to send

21   messages, correct?

22                    MR. GRADEN:  Objection.

23            Foundation.

24                    THE WITNESS:  That was not

25            part of my assignment.

CONFIDENTIAL

Page 149

1    BY MR. SANDOVAL-BUSHUR:

2          Q.     If teachers and non-teachers

3    included in their time estimates time spent

4    addressing students who post videos of

5    physical fights on social media platforms,

6    is that time included in your damages

7    estimate?

8                      MR. GRADEN:  Objection.

9              Foundation.

10                     THE WITNESS:  Sorry, what was

11             the first part of that question, if

12             you assume it?

13   BY MR. SANDOVAL-BUSHUR:

14         Q.     If teachers and non-teachers

15   included in their time estimates time spent

16   addressing students who post videos of

17   physical fights on social media, is that

18   included in your damage estimate?

19                     MR. GRADEN:  Same objection.

20                     THE WITNESS:  If you assume

21             that it's in there, it's in there.

22   BY MR. SANDOVAL-BUSHUR:

23         Q.     And you did not attempt to

24   eliminate from your damages calculations

25   time spent addressing students who post

Page 150

1  videos of physical fights on social media,
2  correct?
3                    MR. GRADEN:  Objection.
4           Foundation.
5                    THE WITNESS:  That was not
6           part of my assignment.
7  BY MR. SANDOVAL-BUSHUR:
8       Q.    Your estimated damages
9  include damages relating to time spent by
10 teachers and other school staff addressing
11 the effects of all features of social media
12 platforms, correct?
13                   MR. GRADEN:  Objection.
14                   THE WITNESS:  Sorry, say that
15          again.
16 BY MR. SANDOVAL-BUSHUR:
17      Q.    Your estimated damages
18 include damages relating to time spent by
19 teachers and other school staff addressing
20 the effects of all features of social media
21 platforms, correct?
22                   MR. GRADEN:  Objection.  Form.
23          Foundation.
24                   THE WITNESS:  Again, I
25          don't -- that was not part of my

CONFIDENTIAL

Page 151

1              assignment.  That's part of the

2              time loss estimate.  I don't know

3              what they include or did not

4              include.

5    BY MR. SANDOVAL-BUSHUR:

6          Q.     If the autoplay feature --

7    are you familiar with autoplay as a feature

8    on social media?

9          A.     Is that when it just starts

10   playing, like --

11         Q.     If one video ends, another

12   video begins playing.

13         A.     Okay.  Okay.  Sure.

14         Q.     If the autoplay feature of a

15   Defendants' platform is the reason why a

16   teacher or non-teacher reports spending

17   time addressing student use of social

18   media, your damages estimate includes that

19   time, correct?

20              MR. GRADEN:  Objection.

21              THE WITNESS:  If you assume

22         that it's included in the time loss

23         estimate, then my damage includes

24         it.

25

Page 152

1   BY MR. SANDOVAL-BUSHUR:

2        Q.     And you have not taken any

3   steps to exclude from your damages

4   estimates time spent by teachers or

5   non-teachers that is caused by the autoplay

6   feature of any social media platform,

7   correct?

8                MR. GRADEN:  Objection.

9          Foundation.

10               THE WITNESS:  That was not

11          part of my assignment.

12  BY MR. SANDOVAL-BUSHUR:

13       Q.     And you didn't do that?

14       A.     Didn't do it, it wasn't my

15  assignment.

16       Q.     If the algorithms on social

17  media were the reason that teachers or

18  non-teachers reported spending time

19  addressing student use of social media,

20  that time is included in your damages

21  estimate, correct?

22       A.     If you assume that it's

23  included, then it's included.

24       Q.     You have not taken any steps

25  to exclude from your damages estimates time

CONFIDENTIAL

Page 153

1    spent by teachers or non-teachers that was

2    caused by the algorithms of social media,

3    correct?

4                   MR. GRADEN:  Objection.  Form.

5            Foundation.

6                   THE WITNESS:  It was not part

7            of my assignment, so I didn't do

8            it.

9    BY MR. SANDOVAL-BUSHUR:

10        Q.      And you have not taken any

11   steps to exclude from your damages

12   estimates any time spent by teachers or

13   non-teachers that was caused by any feature

14   of any social media platform, correct?

15                  MR. GRADEN:  Objection.  Form.

16           Foundation.

17                  THE WITNESS:  No, I have not.

18           Not part of my assignment.

19   BY MR. SANDOVAL-BUSHUR:

20        Q.      And you have not estimated

21   damages specifically attributable to any

22   Defendants' facilitation, promotion,

23   development or participation in any

24   particular online challenge, correct?

25                  MR. GRADEN:  Objection.  Form.

CONFIDENTIAL

Page 154

1              Foundation.
2                   THE WITNESS:  Not part of my
3              assignment.
4   BY MR. SANDOVAL-BUSHUR:
5         Q.     And you didn't do it?
6         A.     So I didn't do it.
7         Q.     And you have not estimated
8   damages specifically attributable to any
9   Defendants' facilitation, promotion,
10  development, or participation in any
11  particular filter or overlay, correct?
12                  MR. GRADEN:  Objection.  Form.
13             Foundation.
14                  THE WITNESS:  It was not part
15             of my assignment, so I didn't do
16             it.
17  BY MR. SANDOVAL-BUSHUR:
18        Q.     If teachers and non-teachers
19  included in their time estimates time spent
20  addressing the effects of use of social
21  media platforms on school-issued devices,
22  then that time is included in your damages
23  estimates, correct?
24        A.     If you assume it's included,
25  it's included.

CONFIDENTIAL

Page 155

1          Q.     And you did not take any
2     steps to eliminate from your damages
3     calculations any time that was spent
4     addressing the effects of the use of social
5     media platforms on school-issued devices,
6     correct?
7                    MR. GRADEN:  Objection.
8          Foundation.
9                    THE WITNESS:  Not part of my
10         assignment, so I didn't do it.
11    BY MR. SANDOVAL-BUSHUR:
12         Q.     And the fact that a school
13    district could have used but did not use
14    software to block students from accessing
15    social media platforms on their
16    school-issued devices does not affect your
17    damages calculations, correct?
18                    MR. GRADEN:  Objection.
19         Foundation.
20                    THE WITNESS:  What is that?
21    BY MR. SANDOVAL-BUSHUR:
22         Q.     The possibility that a school
23    district could have but did not use
24    software to block students from assessing
25    social media platforms on their

CONFIDENTIAL

Page 156

```
 1    school-issued devices does not affect your
 2    damages calculations, correct?
 3                    MR. GRADEN:   Objection.
 4            Foundation.
 5                    THE WITNESS:   That's not
 6            included in my assignment of my
 7            calculations.
 8    BY MR. SANDOVAL-BUSHUR:
 9        Q.      Are your estimated damages
10    limited to time spent by teachers and other
11    school staff addressing issues relating to
12    students who are addicted to social media?
13        A.      Sorry, say that again.
14        Q.      Are your estimated damages
15    limited to time spent by teachers and other
16    school staff addressing issues relating to
17    students who are addicted to social media?
18        A.      My calculations include only
19    what the people who calculated time loss
20    include.  I don't know if it includes that
21    or not.
22                    MR. GRADEN:  We have been
23            going about over an hour, are you
24            about ready to break or --
25                    MR. SANDOVAL-BUSHUR:  We can
```

CONFIDENTIAL

Page 157

1          go about another five minutes.

2                    MR. GRADEN:  That's fine.  As

3          long as it's fine.

4                    THE WITNESS:  Yeah, no, five

5          minutes is great.

6    BY MR. SANDOVAL-BUSHUR:

7          Q.      If teachers and non-teachers

8    included in their time estimates time spent

9    addressing issues relating to students who

10   are not addicted to social media, that time

11   is included in your damages calculations,

12   correct?

13                   MR. GRADEN:  Objection.

14         Foundation.

15                   THE WITNESS:  If you assume

16         they included it, it's included.

17   BY MR. SANDOVAL-BUSHUR:

18         Q.      And you did not attempt to

19   eliminate time spent addressing issues

20   relating to students who are not addicted

21   to social media from your damages

22   estimates, correct?

23                   MR. GRADEN:  Objection.

24         Foundation.

25                   THE WITNESS:  Not part of my

CONFIDENTIAL

Page 158

1         assignment, didn't do it.
2    BY MR. SANDOVAL-BUSHUR:
3         Q.    And you did not attempt to
4    eliminate time spent addressing issues
5    relating to students who are not addicted
6    to any of Defendants' platforms
7    specifically from your damages estimates,
8    correct?
9              MR. GRADEN:  Objection.
10             THE WITNESS:  Sorry, say it
11         again.
12   BY MR. SANDOVAL-BUSHUR:
13        Q.    You did not attempt to
14   eliminate time spent addressing issues
15   relating to students who are not addicted
16   to any of Defendants' platforms from your
17   damages estimates, correct?
18        A.    Not part of my --
19             MR. GRADEN:  Objection.
20        Foundation.
21             THE WITNESS:  Not part of my
22        assignment, didn't do it.
23   BY MR. SANDOVAL-BUSHUR:
24        Q.    And you are not aware of any
25   data that would allow you to quantify what

CONFIDENTIAL

Page 159

1   portion of the damages you estimate relate

2   to time spent addressing issues for

3   students who are not addicted to social

4   media, correct?

5          A.     I have spent zero time

6   looking for such data, so I have no idea if

7   it exists.

8          Q.     If someone wanted to know how

9   much in damages a school district incurred

10  because of students who were addicted to

11  social media only, the damages estimates

12  that you have offered in this case would

13  not answer that question, correct?

14                  MR. GRADEN:  Objection.

15            Foundation.

16                  THE WITNESS:  Only if the time

17            loss estimates are specific to

18            addicted only.

19  BY MR. SANDOVAL-BUSHUR:

20         Q.     And they're not, correct?

21                  MR. GRADEN:  Objection.

22                  THE WITNESS:  Again, I don't

23            know exactly what they include,

24            because you would have to ask them,

25            but --

CONFIDENTIAL

Page 160

1   BY MR. SANDOVAL-BUSHUR:

2        Q.      I mean, again, you've read

3   the Klein teacher time survey, right?

4        A.      And I don't -- again, I

5   don't -- I can't speak to what is exactly

6   included or not.  You're throwing out a

7   million different buckets of things, but I

8   think that one you tried to limit in some

9   way and I'm, like, well, I don't know, so I

10  don't know.  But I don't think -- it's not

11  part of, whatever it is, it's ultimately

12  not part of my assignment.

13       Q.      Did you see anything in the

14  Klein survey that limited the information

15  sought from teachers to time spent in

16  connection with students who are addicted

17  to social media?

18       A.      Nothing that I know of that

19  limited it to that, but it doesn't mean it

20  could not only reflect that.

21       Q.      Did you see anything in any

22  of the affidavits or deposition testimony

23  that you reviewed of non-teachers provided

24  time estimates that limited their time

25  estimates to time spent in connection with

CONFIDENTIAL

Page 161

1    students who are addicted to social media?

2          A.      Not that I'm aware of.

3          Q.      And, similarly, if any of the

4    estimates that you relied on included time

5    spent addressing use of social media by

6    students who do not compulsively use social

7    media, that time is included in your

8    damages estimates, correct?

9          A.      I think that's an if you

10   assume it, it's in there.

11         Q.      So the answer is, if you

12   assume that the estimates that you relied

13   on were not limited to addressing use of

14   social media by students who compulsively

15   use social media, then your damages

16   estimates are not limited to addressing use

17   of social media by students who

18   compulsively use social media, correct?

19         A.      Sorry, we've got too many --

20         Q.      Yeah, I know it's

21   complicated --

22         A.      -- moving parts here.

23         Q.      -- I apologize.  I want you

24   to assume that the time estimates that you

25   rely on are not limited to addressing use

Page 162

1    of social media by students who
2    compulsively use social media, okay?
3            A.    So they are not limited to
4    just compulsive use?
5            Q.    Correct.
6            A.    Okay.
7            Q.    If that's the case, then your
8    damages estimates are similarly not limited
9    to just compulsive use, correct?
10           A.    Correct, if you assume it,
11   that's what it is.
12           Q.    And if someone wanted to know
13   how much in damages a school district
14   incurred because of only compulsive use of
15   social media by students, the damages
16   estimates that you have offered in this
17   case would not answer that question,
18   correct?
19           A.    If you assume that, yes.
20                 MR. SANDOVAL-BUSHUR:  We can
21          take a break.
22                 THE VIDEOGRAPHER:  Going off
23          video record 11:57 a.m.
24                 - - - - -
25      (A recess was taken at this time.)

CONFIDENTIAL

Page 163

```
 1                    - - - - -
 2                THE VIDEOGRAPHER:  Back on
 3           video record 12:46 p.m.
 4  BY MR. SANDOVAL-BUSHUR:
 5        Q.     Dr. Ward, your estimated
 6  damages are not limited to time spent by
 7  teachers and other school staff addressing
 8  issues relating to students who have mental
 9  health problems, correct?
10                MR. GRADEN:  Objection.
11           Foundation.
12                THE WITNESS:  No, as we've
13           discussed, they include all of the
14           things that were included by the
15           affiants and Mr. Klein's survey.
16  BY MR. SANDOVAL-BUSHUR:
17        Q.     And so if the employees who
18  submitted affidavits and the teachers
19  responding to the survey did not limit
20  their time estimates to time spent
21  addressing issues relating to students with
22  mental health problems, then your damages
23  estimates in turn are not limited to time
24  spent relating to students with mental
25  health problems, correct?
```

CONFIDENTIAL

```
                                        Page 164
 1              MR. GRADEN:  Objection.  Form.
 2              THE WITNESS:  Yes, if you
 3          assume that they did not limit it,
 4          which I don't believe they did,
 5          then my damages would only reflect
 6          I think that's where -- if they did
 7          or didn't limit it, I can't
 8          remember if you have a negative in
 9          there or not, my damages either do
10          or do not include it.
11   BY MR. SANDOVAL-BUSHUR:
12          Q.    And you, as part of your work
13   in this case, have not reviewed any data
14   about how many students in any school
15   district have mental health problems,
16   correct?
17          A.    Not that I recall, no.
18          Q.    And you have not, as part of
19   your work in this case, reviewed any data
20   on how many students in any school district
21   have mental health problems specifically
22   allegedly caused by social media, correct?
23          A.    No, I have reviewed such
24   data.
25          Q.    And you did not attempt to
```

CONFIDENTIAL

Page 165

1  eliminate from your damages estimates time

2  spent addressing issues relating to

3  students who do not have mental health

4  problems, correct?

5          A.     I did -- I'm sorry.

6          Q.     I can ask it differently.

7  Did you attempt to eliminate from your

8  damages estimates time spent addressing

9  issues relating to students who do not have

10  mental health problems?

11          A.     No, I did not.

12          Q.     Teachers are salaried

13  workers, not hourly workers, correct?

14          A.     Generally, yes.

15          Q.     In the six bellwether

16  districts, teachers are salaried workers,

17  not hourly workers, correct?

18          A.     I believe so, there may be a

19  handful that were paid hourly, but,

20  typically, no, they are salaried.

21          Q.     The amount of time that

22  teachers spend addressing school -- student

23  use of social media does not affect how

24  much the school district pays the teacher,

25  correct?

CONFIDENTIAL

Page 166

1          A.      I don't assume that it does,
2    no.
3          Q.      And you're not aware of any
4    information that would suggest that the
5    amount of time that teachers spend
6    addressing student use of social media
7    affects how much the school district pays
8    the teacher, correct?
9          A.      Yes.  Well, I assume that it
10   doesn't change the contracted number of
11   hours or the contracted wages.
12         Q.      The non-teacher employees for
13   whom you calculated damages are salaried
14   workers, not hourly workers, correct?
15         A.      Generally, as far as I can
16   recall, yeah.
17         Q.      The amount of time that a
18   non-teacher employee spends addressing
19   student use of social media does not affect
20   how much the school district pays that
21   employee, correct?
22         A.      As far as I know, yes.
23         Q.      If all social media platforms
24   disappeared tomorrow, school district
25   employee salaries in the bellwether school

Page 167

1  districts presumably would not be affected,

2  correct?

3              MR. GRADEN:  Objection.

4        Foundation.

5              THE WITNESS:  I assume so, but

6        I don't know that for sure.

7  BY MR. SANDOVAL-BUSHUR:

8        Q.      You are not opining that

9  because of social media a school district

10 had to pay teachers more than the school

11 district would have paid teachers if social

12 media did not exist, correct?

13       A.      Correct.  I'm not assuming

14 that salaries went up by some amount

15 because of social media.

16       Q.      You are not opining that

17 because of Defendants' platforms

18 specifically a school district had to pay

19 teachers more than the school district

20 would have paid teachers if Defendants'

21 platforms did not exist, correct?

22       A.      Yeah, no, I'm not assuming

23 anything changed with respect to

24 Defendants' platforms causing wages to go

25 up.

CONFIDENTIAL

Page 168

1          Q.      And just so that I'm sure we
2   have a clean answer for the record, are you
3   opining that because of Defendants'
4   platforms specifically any school district
5   had to pay teachers more than they would
6   have paid teachers if Defendants' platforms
7   did not exist?
8          A.      It's the same answer, so, no,
9   there is -- I'm making no assumptions about
10   the conduct at issue in this matter
11   impacting the level of wages paid.
12          Q.      To any employee in any
13   district?
14          A.      To any employee in any
15   district.
16          Q.      You are not opining that any
17   school district hired more teacher or
18   non-teacher staff because of social media,
19   correct?
20          A.      That's not part of my
21   opinion, no.
22          Q.      You are not opining that any
23   school district hired more teachers or
24   non-teacher staff because of Defendants'
25   platforms, correct?

CONFIDENTIAL

Page 169

1              A.       It's the same answer.

2              Q.       So that answer is no?

3              A.       No, I'm not making any

4    assumptions that the at-issue conduct

5    impacted the number of staff in my

6    calculations.

7              Q.       You are not opining that

8    student use of social media caused school

9    districts to spend more on any

10   out-of-pocket costs, correct?

11             A.       That's not part of my

12   opinion, no.

13             Q.       Your damages estimates are an

14   estimate of opportunity costs, not

15   out-of-pocket costs, correct?

16             A.       Yes, I'm -- yes.

17             Q.       And what is the difference

18   between opportunity costs and out-of-pocket

19   costs?

20             A.       Well, I think you just went

21   through it, right?  So out-of-pocket costs

22   would be, oh, we spent money that we

23   otherwise wouldn't have spent, right?  So

24   we're, you know, now if you're saying, oh,

25   we spent more than we would have otherwise,

Page 170

1    and then in my conception, I'm saying,
2    well, look, you know, with opportunity
3    costs, yeah, you're paying the teacher what
4    you would have paid them anyway, but you're
5    diverting their time from what it would
6    have been used for something else and we
7    have to put a value on that time and we
8    call that value the opportunity cost.
9            Q.      One of the job
10   responsibilities of a teacher is to address
11   student misbehavior in class, correct?
12           A.      I assume so.
13           Q.      And you were at one point in
14   your life a student in a class, correct?
15           A.      I went to many years of
16   school.
17           Q.      And I'm sure you experienced
18   that something that teachers do is to
19   address student misbehavior in class,
20   correct?
21           A.      Sometimes, yes.
22           Q.      And addressing student
23   misbehavior in class has been a job
24   responsibility of teachers for decades,
25   correct?

CONFIDENTIAL

Page 171

```
 1                 MR. GRADEN:  Objection.
 2          Scope.
 3                 THE WITNESS:  I assume so.
 4  BY MR. SANDOVAL-BUSHUR:
 5       Q.      For decades, part of a
 6  teacher's job responsibility has included
 7  addressing students who were misbehaving in
 8  class by talking to each other when they
 9  were not supposed to, correct?
10       A.      I mean, I don't know the
11  specifics of exactly, but, you know,
12  presumably teachers do that and they have
13  done so for some time.
14       Q.      For decades, part of a
15  teacher's job responsibility has included
16  addressing students who were misbehaving by
17  passing notes to one another, correct?
18                 MR. GRADEN:  Objection.
19          Scope.
20                 THE WITNESS:  Again, you know,
21          I don't know the specifics of
22          exactly what teachers do, but to
23          the extent passing notes was a
24          problem for a teacher, they may
25          have used it.
```

CONFIDENTIAL

Page 172

1  BY MR. SANDOVAL-BUSHUR:

2        Q.      So, I mean, do you just know

3  as a person who is in the world, went to

4  school, that part of what teachers do is

5  address students who are misbehaving in

6  class by passing notes and that's something

7  teachers have done for decades?

8                  MR. GRADEN:  Objection.  Form.

9                  THE WITNESS:  Yeah, to the

10            extent that it happened while I was

11            in school, sure, maybe that

12            happened.  I think that probably

13            happened at some point.

14  BY MR. SANDOVAL-BUSHUR:

15        Q.      For decades, part of a

16  teacher's job responsibility has included

17  addressing students who are misbehaving in

18  class by reading material that they're not

19  supposed to be reading in class, correct?

20                  MR. GRADEN:  Objection.

21            Scope.

22                  THE WITNESS:  Again, you know,

23            I can only base it on what I know

24            from my own experience and, yeah,

25            maybe they would have done that.

CONFIDENTIAL

Page 173

1  BY MR. SANDOVAL-BUSHUR:

2        Q.      Do you not have any

3  understanding of what a teacher's job

4  responsibilities do and do not entail

5  outside of your own personal experience as

6  a student?

7        A.      I don't know to this level of

8  specificity.  So, yes, when you talked

9  about does it include addressing student

10 misbehavior, sure, you know, part of job

11 responsibilities is maintaining classroom

12 order.  The specifics of what a particular

13 teacher chooses to include in that or a

14 what a teacher -- that I don't know.  I can

15 only speak as to what I saw and, you know,

16 experienced, right?  So I can speak at a

17 high level, but I probably can't speak at a

18 very specific level.

19       Q.      And so for purposes of

20 offering opinions in this case, you have

21 not studied at any specific level how

22 teachers spend their time in the course of

23 a school day; is that right?

24                MR. GRADEN:  Objection.

25       Vague.

CONFIDENTIAL

Page 174

```
 1                    THE WITNESS:  Yeah, not beyond
 2            just a basic understanding of what
 3            teachers do.  I do not have some
 4            sort of granular database of every
 5            action that teachers may or may not
 6            take.
 7  BY MR. SANDOVAL-BUSHUR:
 8       Q.      For decades, part of a
 9  teacher's job responsibility has included
10  addressing students who are misbehaving by
11  making fun of other students, correct?
12                    MR. GRADEN:  Another objection
13            to scope here.
14                    THE WITNESS:  It's the same
15            answer.  Like, to the extent that
16            it's part of what they consider as
17            part of maintaining classroom order
18            or whatever bucket you want to
19            label it in, I would assume that
20            it's included, but I don't know for
21            decades or whether it's explicitly
22            included or implicitly included, I
23            just don't know.
24  BY MR. SANDOVAL-BUSHUR:
25       Q.      For decades, part of a
```

CONFIDENTIAL

Page 175

1    teacher's job responsibility has included

2    addressing students who were misbehaving by

3    bullying other students, correct?

4                    MR. GRADEN:  Objection.  Asked

5              and answered.

6                    THE WITNESS:  It's the same

7              basic thing, yes, I assume that

8              there's probably some degree of

9              addressing bullying, but I don't

10             know any specifics.

11   BY MR. SANDOVAL-BUSHUR:

12             Q.     For decades, part of a

13   teacher's job responsibility has included

14   addressing students who brought distracting

15   items to school and used them in class,

16   like toys, a gun, et cetera?

17                   MR. GRADEN:  Objection.  Asked

18             and answered multiple times.

19                   THE WITNESS:  Same exact

20             answer, I don't know the specifics,

21             but I assume that teachers have

22             some part of their job, which is

23             maintaining classroom order,

24             protecting the learning

25             environment, whatever you want to

CONFIDENTIAL

1                call it.
2      BY MR. SANDOVAL-BUSHUR:
3            Q.        Including by addressing
4      students who are misbehaving in connection
5      with bringing distracting items to school,
6      correct?
7            A.        That could be included.
8            Q.        When a school makes a
9      decision to hire a teacher to teach a
10     class, the school understands that some of
11     the time that the teacher is teaching class
12     will be spent addressing student
13     misbehavior, correct?
14                     MR. GRADEN:  Objection.
15            Foundation.
16                     THE WITNESS:  Perhaps.
17     BY MR. SANDOVAL-BUSHUR:
18            Q.     Do you know?
19            A.        I don't know the specifics
20     of, you know, what percentage or whether
21     they do -- what they exactly include or do
22     not include.  Yeah, that's not -- again, I
23     have a general understanding, but if you're
24     asking me if when they specifically hire
25     them do they have some, like, will you do

CONFIDENTIAL

1  this exact thing, I don't know that.

2          Q.      Do you think it's possible

3  that a -- do you think it's possible that

4  when a school makes the decision to hire a

5  teacher to teach a class, the school does

6  not understand that some of the time that

7  the teacher is teaching the class will be

8  spent addressing student misbehavior?

9                  MR. GRADEN:  Again, scope.

10                 THE WITNESS:  Do I think that

11            it's possible that they think that

12            no time would be spent addressing

13            student misbehavior?  I don't know

14            for sure, but there's probably at

15            least some assumption that there

16            would be addressing of student

17            misbehavior, but I don't know, you

18            know, that's not -- it's not

19            something I'm here to opine on.

20  BY MR. SANDOVAL-BUSHUR:

21          Q.      A school does not lose the

22  time that a teacher spends addressing

23  student misbehavior, the school receives

24  exactly what it paid the teacher to do,

25  correct?

```
                                        Page 178
 1              MR. GRADEN:  Objection.
 2         Foundation.  Calls for a legal
 3         conclusion.
 4              THE WITNESS:  What do you mean
 5         the school doesn't lose time?
 6  BY MR. SANDOVAL-BUSHUR:
 7         Q.     Does a school lose the value
 8  of the time that a teacher spends
 9  addressing student misbehavior?
10         A.     I mean, it's forgone for some
11  other purpose.
12         Q.     Does the school --
13         A.     There's an opportunity cost
14  associated with it.
15         Q.     Sure.  And there's
16  opportunity costs associated with literally
17  any activity that a teacher does in the
18  course of a school day, correct?
19         A.     That is correct.
20         Q.     Does a school lose the value
21  of the time that a teacher spends
22  addressing student misbehavior?
23         A.     It incurs an opportunity
24  cost.
25         Q.     Does the school still receive
```

CONFIDENTIAL

Page 179

1    the value of the time that the teacher
2    spends addressing student misbehavior?
3                    MR. GRADEN:  Objection.
4            Vague.
5                    THE WITNESS:  Does the school
6            still receive the value of the
7            time?  I mean, they receive the --
8            I mean, the teacher spent their
9            time doing that, so they get
10           whatever comes out of them doing
11           that.
12   BY MR. SANDOVAL-BUSHUR:
13        Q.    The school gets the value of
14   the teacher spending time addressing
15   student misbehavior, correct?
16                   MR. GRADEN:  Objection.
17           Vague.
18                   THE WITNESS:  Does the
19           school -- who gets the -- I'm not
20           sure what the value of -- you know,
21           there's, there is a -- to the
22           extent that there's output
23           associated with the input of time,
24           they -- I'm sure the school
25           receives -- I'm not sure who

CONFIDENTIAL

Page 180

1          receives the output, but there is
2          output that is produced.
3  BY MR. SANDOVAL-BUSHUR:
4          Q.     For purposes of your damages
5  opinions, you did not consider the value of
6  any teacher time that a school district
7  receives from that teacher time; is that
8  correct?
9               MR. GRADEN:  Objection.  You
10          can answer, if you understand.
11              THE WITNESS:  Yeah, I'm not
12          focused on output.  I'm focused on
13          inputs.
14  BY MR. SANDOVAL-BUSHUR:
15         Q.     So is it -- or let me ask
16  that question differently.  In calculating
17  opportunity costs, did you consider the
18  value of the time that a teacher spends on
19  any activity to the school district?
20         A.     Sorry, say that again.
21         Q.     Does the school district
22  receive value when a teacher spends time
23  doing something in the course of the school
24  day?
25         A.     Yeah, you know, school

CONFIDENTIAL

Page 181

```
 1   districts are just kind of weird, right?
 2   You know, because they produce output, but
 3   it's not clear that the school district
 4   receives the value of that output.  It's
 5   not a business that's selling that output
 6   for profit.  So it doesn't make sense to me
 7   the way you're phrasing it.
 8        Q.     So if a school district
 9   employee's time during the workday is
10   diverted from one activity to another, the
11   school district is not the entity that
12   loses any value associated with that
13   diversion; is that correct?
14                MR. GRADEN:  Objection.
15                THE WITNESS:  It incurs a
16           cost.  Right, so the school
17           district incurs the opportunity
18           cost of the time being diverted.
19           Now, how do you value that time,
20           right?  In this case, we value it
21           on the input side and we say, well,
22           the school district paid for that
23           time, it paid this amount for it,
24           right, so what was the cost of
25           diverting from one thing to another
```

CONFIDENTIAL

                                                    Page 182

1              was the value of that time.  Right?
2              So it's the cost to the district
3              that's ultimately at issue for me.
4    BY MR. SANDOVAL-BUSHUR:
5         Q.      For your methodology of
6    calculating opportunity costs, you did not
7    consider and it was not part of your
8    methodology to consider what the value was
9    of any time that was lost because school
10   staff was addressing social media-related
11   issues?
12        A.      Are you trying to say output
13   instead of value or the value of output?
14   No, my understanding is that the school
15   districts are not seeking to recover the
16   value of lost output.  They're seeking to
17   recover the cost of the diverted input.
18        Q.      So when you refer to
19   opportunity costs, what you are referring
20   to is simply the amount that the district
21   paid an employee proportional to the amount
22   of time that the employee spent addressing
23   issues relating to social media; is that
24   right?
25        A.      I think that's correct, yes.

CONFIDENTIAL

Page 183

1        Q.        And you have not as part of
2   your work in this case attempted to
3   calculate the value of any activity by any
4   school district staff that was forgone
5   because the school district staff instead
6   spent time addressing student use of social
7   media, correct?
8        A.        I value the time at the wage,
9   I'm not trying to figure out what the
10  output loss and put a value on that.
11  That's the standard approach in costing
12  things in education.
13       Q.        When a teacher spends time
14  during the day addressing student
15  misbehavior, the school receives from the
16  teacher what the school paid the teacher to
17  do, correct?
18                 MR. GRADEN:  Objection.
19          Foundation.
20                 THE WITNESS:  Sorry, say that
21          again.
22  BY MR. SANDOVAL-BUSHUR:
23       Q.        One of the things that
24  schools pay teachers to do is to address
25  student misbehavior, correct?

CONFIDENTIAL

Page 184

1          A.        Okay.   We've been over that,

2     yeah, to some degree.

3          Q.        And so when a teacher spends

4     time addressing student misbehavior, the

5     school is receiving, in exchange for paying

6     the teacher, the labor of the teacher doing

7     what the school district paid the teacher

8     to do, correct?

9                    MR. GRADEN:   Objection.

10                   THE WITNESS:   I mean, they

11              paid the teacher for that time, so,

12              like, but again, this -- the school

13              district recovering the value,

14              that's where I'm losing you.   I

15              said that because school districts

16              produce output, but they don't

17              recover the value of that output.

18              So, yes, the school district paid

19              the teacher for that time, right?

20              So it incurred a cost associated

21              with that time.   All of the

22              activities that the teachers do,

23              the school district is incurring

24              costs.

25                   The question for this matter

Page 185

1          is, okay, well, there's some
2          share of that time that could
3          have been put to some other use
4          had the at-issue conduct not been
5          present.  And in that case, so
6          it's what the cost of dealing
7          with this thing and so the way
8          you do that in education is you
9          say, look, these are the inputs,
10         this is the price of those
11         inputs, in our case, the wages
12         and benefits, so you say, okay,
13         well, here's how much time,
14         here's the wages and benefits,
15         here is the cost and that is my
16         understanding of what is at issue
17         in this case.  That's what the
18         Plaintiffs are seeking to recover
19         is the cost of the time, what
20         they essentially expended during
21         the period where their time was
22         diverted, because there was an
23         opportunity, there was a cost to
24         doing this stuff to the district
25         that they wouldn't have otherwise

Page 186

1          have had to incur.
2     BY MR. SANDOVAL-BUSHUR:
3          Q.     Calculating the value of any
4     opportunity that was forgone was not part
5     of your methodology in this case, correct?
6          A.     The opportunity, yeah,
7     that's -- my methodology is, this is an
8     opportunity cost methodology, right?  It's
9     just in education specifically, right, and
10    it can be applied in other places, but in
11    education specifically, the methodology is
12    what's called the ingredients approach.
13    You say that you want to understand what
14    the cost of something is, right, this
15    intervention, that, you know, issue, you
16    would say, okay, well, what is the time or
17    other resources involved in it, what are
18    the ingredients, right, and then what are
19    the values of those ingredients?  And when
20    it comes to personnel time, you know, you
21    say what's the value of teacher time?
22    Well, the standard is, okay, we're going to
23    use wages and benefits.  We're not going to
24    try and figure out -- oh, they produce too
25    many things, too many things we don't even

Page 187

1    know the value of, to be honest.  So the
2    standard is, the practical approach to
3    doing this is to say, in practice, we find
4    the time, whatever the intervention is, and
5    we multiply that time by the wages and
6    benefits and that's when we go to the
7    district and say, well, what does this
8    cost?  This is what this is costing you,
9    this intervention, right?  What is it going
10   to cost you?  It's going to cost this
11   amount.  And what we're doing is here just
12   directly analogous to that and the issue is
13   at the time in the bucket of addressing
14   at-issue conduct in this matter.
15           Q.      Was calculating the value of
16   any opportunity that was forgone part of
17   your methodology in this case?
18           A.      I don't --
19                   MR. GRADEN:  Objection.  Asked
20           and answered.
21                   THE WITNESS:  We're not
22           communicating on value, right?
23           Like, I'm valuing the time, so the
24           opportunity of that time, the
25           opportunity cost of that time, yes,

CONFIDENTIAL

Page 188

1          I'm valuing that time.  I'm valuing
2          it at the wage.  If you're asking
3          did I value the forgone output of
4          that time, no, I'm not doing that.
5          That's not the standard approach
6          when it comes to doing costing in
7          education.
8  BY MR. SANDOVAL-BUSHUR:
9          Q.     You are not offering the
10 opinion that teachers spent more time
11 addressing student misbehavior in a world
12 with social media than they would in a
13 world without social media, correct?
14         A.     No, I'm making -- I'm only
15 offering opinions about the estimates of
16 time loss that I was provided related to
17 at-issue conduct by the affiants and/or the
18 survey.
19         Q.     You are not offering the
20 opinion that teachers spent more time
21 addressing student misbehavior because of
22 social media, correct?
23         A.     I'm doing nothing related to
24 causality in my analysis.
25         Q.     So the answer is, correct?

CONFIDENTIAL

Page 189

1          A.     Yes, correct, I'm not doing
2    anything related to causality.
3          Q.     You are not offering the
4    opinion that teachers spent more time
5    addressing bullying because of social
6    media, correct?
7                    MR. GRADEN:  Objection.  Asked
8             and answered.
9                    THE WITNESS:  No, I am not
10            offering any kind of causal opinion
11            related to any output.
12   BY MR. SANDOVAL-BUSHUR:
13         Q.     For decades, teachers have
14   had to deal with students who were tired in
15   class because they stayed up too late,
16   correct?
17                   MR. GRADEN:  Objection.
18            Scope.
19                   THE WITNESS:  I have no idea.
20            Certainly, there are probably kids
21            who show up to school tired
22            sometimes, but for decades, I have
23            no idea.  The frequency, I have no
24            idea.
25

CONFIDENTIAL

Page 190

1  BY MR. SANDOVAL-BUSHUR:
2        Q.      For decades, students have
3  been tired in class because they stayed up
4  too late watching TV or playing video
5  games, correct?
6                  MR. GRADEN:  Objection.  Form.
7                  THE WITNESS:  I have done no
8            analysis of the sources of student
9            tiredness over time.
10 BY MR. SANDOVAL-BUSHUR:
11       Q.      When a school makes the
12 decision to hire a teacher to teach a
13 class, the school understands that some of
14 the time that the teacher is teaching the
15 class will be spent dealing with students
16 who are tired because they stayed up too
17 late, correct?
18                 MR. GRADEN:  Objection.
19          Scope.
20                 THE WITNESS:  Again, I don't
21          know what teachers or schools are
22          assuming about whether or not
23          teachers are spending time dealing
24          with tiredness in class.
25

CONFIDENTIAL

Page 191

1  BY MR. SANDOVAL-BUSHUR:

2          Q.      You just don't know?

3          A.      No, I don't know.

4          Q.      You are not offering the

5  opinion that teachers spend more time

6  dealing with students who are tired in

7  class because they stayed up too late in a

8  world with social media than they would

9  have spent in a world without social media,

10  correct?

11                  MR. GRADEN:  Objection.  Asked

12          and answered.

13                  THE WITNESS:  I'm offering no

14          opinions related to the causality

15          of social media on any outcome or a

16          task of teacher time in schools.

17  BY MR. SANDOVAL-BUSHUR:

18          Q.      So, correct?

19          A.      Correct.

20          Q.      You are not offering the

21  opinion that teachers spent more time

22  dealing with students who are tired in

23  class because they stayed up late because

24  of social media, correct?

25                  MR. GRADEN:  Again, asked and

CONFIDENTIAL

Page 192

1            answered.

2                    THE  WITNESS:   This is not the

3            same question I just answered?

4     BY MR. SANDOVAL-BUSHUR:

5            Q.     If you think it's a simple

6     correct, you're free to say it.

7            A.     Okay.  Correct, again, that's

8     a causal question.  I did no causal

9     analysis.

10           Q.     For decades, teachers have

11    had to deal with student conflicts because

12    of things that happened outside of class,

13    correct?

14                    MR.  GRADEN:   Objection.

15            Scope.

16                    THE  WITNESS:   I don't know

17            exactly what teachers have had to

18            deal with for decades.  Yeah, I

19            don't know.

20     BY MR. SANDOVAL-BUSHUR:

21            Q.     You don't know if part of

22     what teachers have had to do for many years

23     is dealing with student conflicts because

24     of things that happen outside of class?

25                    MR.  GRADEN:   Objection.

Page 193

1            Scope.  Asked and answered.
2                  THE WITNESS:  Perhaps they
3            have.
4    BY MR. SANDOVAL-BUSHUR:
5            Q.      When a school makes a
6    decision to hire a teacher to teach a
7    class, the school understands that some of
8    the time that the teacher is teaching will
9    be spent dealing with student conflicts
10   because of things that happen outside of
11   class, correct?
12                  MR. GRADEN:  Objection.
13            Foundation.  Asked and answered.
14            Scope.
15                  THE WITNESS:  I don't know the
16            specifics of what school districts
17            hire teachers to do and I don't
18            know the time frame over which
19            they've hired them to do it.  I've
20            done no analysis of anything
21            related to the specifics of each
22            teacher's actions during or what
23            school districts assume each
24            teacher will do over the course of
25            their employment.

CONFIDENTIAL

Page 194

1   BY MR. SANDOVAL-BUSHUR:

2        Q.    You are not offering the

3   opinion that teachers spend more time

4   dealing with student conflicts because of

5   the things that happen outside of class in

6   a world with social media than they would

7   have spent in a world without social media,

8   correct?

9                MR. GRADEN:  Objection.  Form.

10           Vague.

11               THE WITNESS:  I am offering no

12           opinions on the causal -- of causal

13           links between social media and

14           whatever the specifics of this

15           particular example are.

16   BY MR. SANDOVAL-BUSHUR:

17        Q.    So the answer is, correct?

18        A.    Correct.

19        Q.    You are not offering the

20   opinion that teachers spend more time

21   dealing with student conflicts relating to

22   things that happen outside of class because

23   of social media, correct?

24               MR. GRADEN:  Objection.  Asked

25           and answered.

CONFIDENTIAL

```
                                      Page 195
 1              THE  WITNESS:   I'm offering no
 2         opinions on causality, so correct.
 3  BY MR. SANDOVAL-BUSHUR:
 4       Q.      One of the job
 5  responsibilities of a teacher is to provide
 6  instruction and support relating to
 7  students' social and emotional needs,
 8  correct?
 9              MR. GRADEN:  Objection.
10         Scope.
11              THE  WITNESS:  Again, I do not
12         know the specifics for which all --
13         what is included and exactly what
14         schools expect from teachers.
15  BY MR. SANDOVAL-BUSHUR:
16       Q.      You don't know that part of
17  what teachers do and, actually, a very
18  important part of what teachers do, is to
19  provide instruction and support relating to
20  students' social and emotional needs?
21              MR. GRADEN:  Objection.
22         Foundation testimony.
23              THE  WITNESS:  Sorry, so it's
24         social and emotional --
25
```

Page 196

1   BY MR. SANDOVAL-BUSHUR:

2        Q.      Needs.

3        A.      Instruction related to social

4   and emotional needs?

5        Q.      Yes.

6        A.      I mean, certainly, they

7   address social and emotional things.  I

8   don't know to what extent they're providing

9   instruction related to them, but,

10  certainly, yeah, teachers are concerned

11  about students and making sure that they

12  can learn.

13       Q.      One of the things that

14  teachers do is to provide instruction and

15  support relating to student social and

16  emotional issues, correct?

17       A.      They could, they may.  I

18  don't know if they all do.

19       Q.      Many -- that's commonplace,

20  right?

21                 MR. GRADEN:  Objection.

22                 THE WITNESS:  I do not know

23           the commonality of it.

24  BY MR. SANDOVAL-BUSHUR:

25       Q.      Okay.  When a school makes a

Page 197

1    decision to hire a teacher to teach a

2    class, the school understands that some of

3    the teacher's time will be spent providing

4    instruction and support relating to

5    students' social and emotional needs,

6    correct?

7                    MR. GRADEN:  Objection.

8                    THE WITNESS:  Again, I don't

9            know if they assume that for every

10           teacher they hire, I do not know

11           that.

12   BY MR. SANDOVAL-BUSHUR:

13        Q.      And it was not part of your

14   methodology in any way to compare what

15   school districts expected teachers to do

16   during a school day with what teachers

17   actually did during a school day, correct?

18        A.      No, that's not my part of

19   my -- what I needed to do to calculate the

20   losses in my assignment.

21        Q.      And so if, from a school's

22   perspective, teachers are spending their

23   days doing exactly what the school expects

24   and wants the teacher to be doing, that

25   fact is immaterial to your damages

CONFIDENTIAL

Page 198

1  calculations in this case, correct?
2                MR. GRADEN:  Objection.  Form.
3                THE WITNESS:  I don't think we
4            would be sitting here in a lawsuit
5            if they weren't concerned about any
6            changes in what teachers were
7            doing.
8  BY MR. SANDOVAL-BUSHUR:
9        Q.    That doesn't answer my
10  question, Dr. Ward.  If from a school's
11  perspective, teachers are spending their
12  days doing exactly what the school expects
13  and wants the teacher to be doing, that
14  fact is immaterial to your damages
15  calculations in this case, correct?
16                MR. GRADEN:  Objection.  Asked
17            and answered.
18                THE WITNESS:  You're making an
19            assumption which is directly
20            contradicted by the existence of
21            the lawsuit, so I don't know how to
22            answer that.  You're asking me to
23            assume something which I know to be
24            false.  So if you assume something
25            that is obviously false, then I

CONFIDENTIAL

Page 199

1          guess you get a different answer,
2          but --
3  BY MR. SANDOVAL-BUSHUR:
4          Q.    You don't have any
5  information about how any school district
6  expects teachers to spend their workdays,
7  correct?
8               MR. GRADEN:  Objection.
9          Vague.
10              THE WITNESS:  I do not have
11          any information about the time
12          allocations that school districts
13          expect for each teacher in their
14          districts, no.
15  BY MR. SANDOVAL-BUSHUR:
16          Q.    Or for teachers generally in
17  the districts, correct?
18          A.    Yes.  No, I do not know
19  the -- you know, I'm not sure that exists,
20  but I don't -- to the extent that it does
21  exist, I certainly don't know it.
22          Q.    You are not offering the
23  opinion that teachers spend more time
24  providing instruction and support relating
25  to students' social and emotional needs in

                                    Page 200

1    a world with social media than they would

2    have spent in a world without social media,

3    correct?

4                    MR. GRADEN:  Objection.

5            Vague.

6                    THE WITNESS:  I'm making no

7            opinions about causal links, so,

8            no -- so, correct, I'm not doing

9            that.

10   BY MR. SANDOVAL-BUSHUR:

11       Q.    You're not offering the

12   opinion that teachers spent more time

13   providing instructional support regarding

14   students' social and emotional needs

15   because of social media, correct?

16       A.    That's almost the same

17   question, but, correct, I am not doing

18   anything related to causality.

19       Q.    For decades, teachers have

20   had to provide support to students with

21   mental health challenges, correct?

22                   MR. GRADEN:  Objection.

23           Scope.

24                   THE WITNESS:  Again, I don't

25           know the time period over which

CONFIDENTIAL

Page 201

```
 1              they've done it.  I don't know, you
 2              know, what you mean exactly by
 3              support, but I do know that they do
 4              deal with mental health issues, at
 5              least some people on staff do.
 6  BY MR. SANDOVAL-BUSHUR:
 7       Q.     And school districts
 8  understand when they hire a teacher that
 9  some of that teacher's time is going to be
10  spent dealing with mental health issues,
11  correct?
12                   MR. GRADEN:  Objection.
13              Scope.
14                   THE WITNESS:  That, I don't
15              know.  I don't know if, you know,
16              they assume every teacher has it.
17              I don't know if they're going to,
18              you know, assume that that's mostly
19              with others.  I don't know.
20              Specialists, counselors, I don't
21              know.
22  BY MR. SANDOVAL-BUSHUR:
23       Q.     Does a school district lose
24  the time that a teacher spends dealing with
25  students' mental health issues?
```

Page 202

1              MR. GRADEN:  Objection.
2          Vague.
3              THE WITNESS:  There's an
4          opportunity cost associated with
5          it.
6  BY MR. SANDOVAL-BUSHUR:
7      Q.      But schools -- well, I'll
8  move on.
9              You're not offering the
10 opinion that teachers spend more time
11 providing support to students with mental
12 health issues in a world with social media
13 than they would have spent in a world
14 without social media, correct?
15     A.      I'm offering no opinions
16 related to causality, so correct.
17     Q.      You are not offering the
18 opinions that teachers spent more time
19 providing support to students with mental
20 health challenges because of social media,
21 correct?
22     A.      Correct, I'm offering no
23 opinions related to causality.
24     Q.      One of the job
25 responsibilities of many non-teacher school

CONFIDENTIAL

Page 203

1   employees is to address student

2   misbehavior, correct?

3                MR. GRADEN:  Objection.

4                THE WITNESS:  Sorry, say it

5         again.

6   BY MR. SANDOVAL-BUSHUR:

7         Q.    One of the job

8   responsibilities of many non-teacher school

9   employees is to address student

10  misbehavior, correct?

11        A.     I don't know if it's many, I

12  know that it is certainly, you know, within

13  the general purview of school district

14  staff.

15        Q.     Addressing student

16  misbehavior has been a job function of many

17  school district staff for decades, correct?

18                MR. GRADEN:  Objection.

19         Scope.

20                THE WITNESS:  Again, I do not

21         know the, you know, precise timing

22         in here, but certainly it's, you

23         know, part of the purview,

24         generally speaking, of school

25         district staff.

Page 204

1  BY MR. SANDOVAL-BUSHUR:

2        Q.    You are not offering the

3  opinion that school employees spend more

4  time dealing with student misbehavior in a

5  world with social media than they would

6  have spent in a world without social media,

7  correct?

8        A.    Correct, I'm offering no

9  opinions related to causality.

10        Q.    You are not offering the

11  opinion that school employees spent more

12  time dealing with student misbehavior

13  because of social media, correct?

14        A.    Correct.  I'm making --

15  offering no opinions related to causality.

16        Q.    One of the job

17  responsibilities of some non-teacher school

18  employees is to provide support relating to

19  student social and emotional needs,

20  correct?

21              MR. GRADEN:  Objection.

22        Foundation.

23              THE WITNESS:  That is true.

24  BY MR. SANDOVAL-BUSHUR:

25        Q.    Providing support relating to

```
                                            Page 205
 1   students' social and emotional needs has
 2   been a responsibility of certain
 3   non-teacher school employees for decades,
 4   correct?
 5               MR. GRADEN:  Objection.
 6           Scope.
 7               THE WITNESS:  I think so.
 8   BY MR. SANDOVAL-BUSHUR:
 9        Q.     When a school district makes
10   the decision to hire an employee like a
11   counselor or psychologist, social worker,
12   the school understands that some of the
13   employee's time will be spent providing
14   support relating to students' social and
15   emotional needs, correct?
16               MR. GRADEN:  Objection.
17           Scope.  Asked and answered.
18               THE WITNESS:  They may assume
19           that some of their employees deal
20           with it.  I do not know if they
21           assume that all of them will.
22   BY MR. SANDOVAL-BUSHUR:
23        Q.     You are not offering the
24   opinion that school employees spend more
25   time providing support relating to
```

Page 206

1  students' social and emotional needs in a
2  world with social media than they would
3  have spent in a world without social media,
4  correct?
5       A.    Correct, I'm offering no
6  opinions related to causality.
7       Q.    You are not offering the
8  opinion that school employees spent more
9  time providing instruction and support to
10 students -- relating to students' social
11 and emotional needs because of social
12 media, correct?
13      A.    Correct.  I'm offering no
14 opinions related to causality.
15      Q.    And you are not offering the
16 opinion that school employees spend more
17 time providing support to students with
18 mental health challenges in a world with
19 social media than they would have spent in
20 a world without social media, correct?
21      A.    Correct.  I'm offering no
22 opinions related to causality.
23      Q.    You are not offering the
24 opinion that school employees spent more
25 time providing support to students with

Page 207

1    mental health challenges because of social

2    media, correct?

3         A.    Correct.  I'm offering no

4    opinions related to causality.

5         Q.    One way that a teacher may

6    spend the time they are scheduled to be

7    teaching a class is by proctoring a test,

8    correct?

9              MR. GRADEN:  Objection.

10         Foundation.

11              THE WITNESS:  Sorry, they may

12         spend their time --

13    BY MR. SANDOVAL-BUSHUR:

14         Q.    Proctoring a test.

15         A.    That is one thing that a

16    teacher could do during the school day.

17         Q.    If while proctoring a test a

18    teacher sees a student engaging in

19    unauthorized use of social media and spends

20    time addressing that student's unauthorized

21    use of social media, that time would be

22    included in your damages estimate, correct?

23              MR. GRADEN:  Objection.

24         Vague.

25              THE WITNESS:  I mean, I'm not

CONFIDENTIAL

Page 208

```
 1              sure on, again, the specific
 2              details.  I'm relying on the
 3              affiants or the teachers in the
 4              survey to report time for at-issue
 5              conduct that's appropriate for me
 6              to use.
 7   BY MR. SANDOVAL-BUSHUR:
 8         Q.      If teachers responding to the
 9   Klein teacher time survey included in their
10   estimates the following example:  The
11   teacher is proctoring a test, the teacher
12   sees a student engaging in unauthorized use
13   of social media and spends time addressing
14   that student's use of social media, that
15   time would be included in your damages
16   estimate, correct?
17              MR. GRADEN:  Objection.  Asked
18              and answered.
19              THE WITNESS:  Again, you know,
20              I have no opinions or knowledge of
21              specifics.  I am saying, look, the
22              affiants or the teachers in the
23              survey or Mr. Klein in his opinions
24              regarding his survey, the time that
25              they've provided to me is the time
```

CONFIDENTIAL

Page 209

1          at issue in this case.  The details
2          of it, that's not part of my
3          assignment.  I don't have opinions
4          about the precise breakdowns or
5          exactly what is or isn't included.
6              To me, it is reasonable to
7          assume that we are part of a
8          lawsuit, the affiants were
9          instructed to, you know, provide
10         sworn testimony under oath
11         related as part of this lawsuit.
12             Mr. Klein, I don't know for
13         sure, but I will assume he
14         understood his assignment was to
15         measure time at issue related to
16         this lawsuit, so I'm assuming
17         that what's in there is the stuff
18         at issue.  I do not have opinions
19         about specifics.
20    BY MR. SANDOVAL-BUSHUR:
21         Q.    Okay.  That was not
22    responsive to my question.
23             MR. GRADEN:  I disagree.
24    BY MR. SANDOVAL-BUSHUR:
25         Q.    I'm really trying to

CONFIDENTIAL

Page 210

1  understand how your opportunity cost

2  methodology applies in particular

3  scenarios, so that is the import of my

4  question.  I have to ask about the specific

5  examples of how teachers may spend their

6  time in the school day in order to

7  understand how your damages methodology

8  applies to those examples.  So when I'm

9  asking this question, I am just asking you

10 to assume that this time that is included

11 in the estimates that you received.

12                MR. GRADEN:  And Dr. Ward

13        answered your question.

14                THE WITNESS:  Okay.  So you're

15        assuming that this is at-issue

16        conduct?

17 BY MR. SANDOVAL-BUSHUR:

18        Q.    We are assuming that it is

19 time for which you are -- you are using in

20 your calculation, in your damages

21 calculation.  So if we assume that time --

22        A.    Okay.  So --

23        Q.    -- included in your damages

24 calculations includes a teacher who is

25 proctoring a test, sees a student engaging

CONFIDENTIAL

Page 211

1   in unauthorized use of social media, and

2   spends time addressing that student's

3   unauthorized use of social media.

4           A.      Okay.

5                   MR. GRADEN:  Is there a

6           question?

7   BY MR. SANDOVAL-BUSHUR:

8           Q.      When the -- for purposes of

9   your methodology, that time would be

10  included in your damages calculation even

11  though the teacher was spending that time

12  proctoring the test doing exactly what the

13  teacher was meant to be doing during that

14  time; is that correct?

15                  MR. GRADEN:  Objection.

16          Vague.

17                  THE WITNESS:  I mean, we

18          stipulated that it's at-issue

19          conduct, it's time at issue and is

20          included in the time loss

21          estimates.  So if it's included in

22          the time loss estimate, then, yes,

23          it's included in my estimate.

24  BY MR. SANDOVAL-BUSHUR:

25          Q.      Your opinion is that a school

CONFIDENTIAL

Page 212

1   district should be able to recover damages
2   for the amount of time a teacher spends
3   addressing student social media-related
4   misbehavior, even if in the absence of
5   social media, the teacher would have still
6   spent that time looking out for and
7   addressing students' behavior, correct?
8                   MR. GRADEN:  Objection.
9           Misstates opinion.
10                  THE WITNESS:  If it's time
11          that was spent addressing at-issue
12          conduct, it is relevant time for my
13          calculation.
14  BY MR. SANDOVAL-BUSHUR:
15          Q.    And so if it's an hour while
16  a teacher is proctoring a test, they're
17  going to spend that entire hour looking out
18  for students who are cheating or
19  misbehaving in some way, any portion of in
20  time that is spent specifically on social
21  media-related misbehavior is included in
22  your damages calculation, correct?
23                  MR. GRADEN:  Objection.  Form.
24                  THE WITNESS:  They have
25          opportunity costs associated with

CONFIDENTIAL

Page 213

```
 1              every choice that they make
 2              throughout the day.  So there's an
 3              opportunity cost associated with
 4              dealing with this as opposed to
 5              paying attention to somebody else
 6              or whatever it might be, whatever
 7              else they may have been doing at
 8              the time.  All choices of scarce
 9              resources impose opportunity costs.
10              So, in this case, yeah, there is an
11              opportunity cost associated with
12              that particular example.
13  BY MR. SANDOVAL-BUSHUR:
14      Q.     So if there's an hour while a
15  teacher is proctoring a test, they're going
16  to spend that entire hour looking out for
17  students who are cheating or misbehaving in
18  some way, any portion of that time that the
19  teacher spends specifically addressing a
20  student's social media-related misbehavior
21  is included in your damages calculation,
22  correct?
23              MR. GRADEN:   Objection.
24          Form.
25              THE WITNESS:  Assuming it's
```

CONFIDENTIAL

Page 214

1            included in the time loss
2            calculations, yeah, there's an
3            opportunity cost associated with
4            that time and effort.
5    BY MR. SANDOVAL-BUSHUR:
6            Q.    If the time that a district
7    employee spends disciplining a student for
8    posting a video of a fight on social media
9    is included in the time estimates that you
10   rely on for your damages calculations, you
11   would include that time in your damages
12   estimate regardless of how the district
13   employee would have spent his or her time
14   if he or she was not addressing the student
15   posting the video of the fight on social
16   media, correct?
17           MR. GRADEN:  Object.  Form.
18           Vague.
19           THE WITNESS:  Yes, all choices
20           to allocate scarce time and effort
21           impose opportunity costs.  So
22           there's an opportunity cost here,
23           assuming it's included in the time
24           loss estimates, it is -- there's an
25           opportunity cost.

CONFIDENTIAL

Page 215

1    BY MR. SANDOVAL-BUSHUR:

2           Q.     And from your perspective,

3    that is true even if had the district

4    employee not spent that time disciplining

5    the student, the district employee spent

6    that time socializing with coworkers,

7    correct?

8                    MR. GRADEN:  Objection.

9              Vague.

10                    THE WITNESS:  Yup.  There's an

11              opportunity cost.  You know, what

12              matters is there's time at issue

13              and when you go through the process

14              of valuing or costing out

15              initiatives or programs in

16              education, you just say what's the

17              time at issue?  What's the value of

18              that time?  It's what they got

19              paid.  They got paid their wage and

20              salary for that time, so there's an

21              opportunity cost and it's valued at

22              their wage and benefits.

23    BY MR. SANDOVAL-BUSHUR:

24           Q.     Your opinion is that time

25    that district employees spend addressing

CONFIDENTIAL

Page 216

1    issues relating to student use of social

2    media is an opportunity cost and properly

3    included in your damages estimates, even if

4    in the absence of addressing that student

5    social media issue, the teacher instead

6    surfed the internet --

7              MR. GRADEN:  Objection.

8         Vague.

9              MR. SANDOVAL-BUSHUR:  --

10        correct?

11             THE WITNESS:  Whatever the

12        teacher does, right, during, while

13        they're getting paid, that's what

14        they get paid to do.  And so when

15        you shift it from one thing to

16        another like you incurred a cost as

17        the district, right?  And, you

18        know, I think there's something

19        lurking in your -- in these

20        examples that somehow they're

21        valueless.  Well, surfing the

22        internet could be quite valuable.

23        Maybe I'm learning about a new

24        assignment or a new way to teach or

25        how to deal with some issue, right?

CONFIDENTIAL

Page 217

1              So, you know, you're trying to

2              posit that there's some way to

3              judge or value each action that

4              teachers do and that should change

5              how I value the time.  That's not

6              how we do it in education when

7              we're costing things.  We just say

8              how much time, what are wages and

9              benefits.

10   BY MR. SANDOVAL-BUSHUR:

11        Q.     Even if the time that a

12   school district employee spends addresses

13   student use of social media is more

14   valuable than the time that the school

15   district employee would have spent in the

16   absence of dealing with the student social

17   media use, your opinion is that the time

18   spent addressing the student's social media

19   use is an opportunity cost and properly

20   considered part of damages, correct?

21              MR. GRADEN:  Objection.  Form.

22              THE WITNESS:  I'm sorry, what

23              do you mean by, "time more

24              valuable?"  I'm confused.

25

CONFIDENTIAL

Page 218

1    BY MR. SANDOVAL-BUSHUR:

2         Q.    Where you were just talking

3    about -- you said surfing the internet can

4    be quite valuable.

5         A.    Okay.

6         Q.    So you have an understanding

7    that time that teachers spend can be

8    valuable and talked about in terms of

9    value, correct?

10        A.    Sure, I mean, you know,

11   again, in terms of social output, we're

12   talking about value, right?  Again, this is

13   back to that discussion earlier, right,

14   like, we're not measuring output of each

15   action that teachers do.  Pretty much,

16   actually, it's impossible to do that.  All

17   right?  So we can't sit there and say,

18   well, here's the output and here's the

19   value of that output for every possible

20   choice that teachers do.  It's just not

21   feasible, even if we wanted to, right?

22   Because to be honest, we don't know the

23   value of what teachers do, in fact, we

24   don't know it for decades until we see what

25   the kids that they're teaching grow up to

CONFIDENTIAL

Page 219

1    be, right?  So we don't worry about output
2    or specific value of that output when we're
3    trying to cost education programs.  It's
4    simply not feasible.
5                    All right.  So what we do
6    instead, which is also perfectly reasonable
7    and a fair understanding of opportunity
8    costs, is to say what's the value of the
9    resource at issue, the time the teacher
10    spends.  And each unit of teacher time,
11    they don't get paid differently for each
12    unit of teacher time, right?  There's not,
13    like, oh, you did this, here's this amount
14    of money, here's this, you get that amount
15    of money.  No, they get paid their wage and
16    salary for all of the minutes that they
17    spend, right?  So the value of the resource
18    at issue, teacher time, is their wages and
19    benefits.
20                    So that's what we're doing.
21    We're just saying, look, there is time and
22    effort that were diverted due to social
23    media, whatever it is, whatever it amounts
24    to, it doesn't matter what they would have
25    done in the absence of it, right, they

Page 220

1    would have done something.  And what would

2    we have paid them for that something, their

3    wages and benefits.

4        Q.    If a principal spends 20

5    minutes disciplining a student for posting

6    something mean about another student on a

7    social media platform and that time was

8    included in the damages estimates or the

9    time estimates that you rely on, that 20

10   minutes would be included in your damages

11   estimates, correct?

12             MR. GRADEN:  Objection.

13        Foundation.

14             THE WITNESS:  I think we've

15        done so by definition.

16   BY MR. SANDOVAL-BUSHUR:

17        Q.    I want you to assume that if

18   the principal had not spent that 20 minutes

19   disciplining the student, the principal

20   would have instead done required paperwork

21   during that period.  Because the principal

22   spent the 20 minutes on student discipline,

23   however, the principal works an extra 20

24   minutes at the end of the day to finish the

25   paperwork.  The principal does not earn any

```
                                    Page 221
 1   overtime, he just works 20 more minutes
 2   than he otherwise would have.  In your
 3   opinion, is there an opportunity cost in
 4   that scenario?
 5               MR. GRADEN:  Objection.  Form.
 6               THE WITNESS:  Yes.
 7   BY MR. SANDOVAL-BUSHUR:
 8        Q.      And what is the proper
 9   measure of that opportunity cost?
10        A.      Look, again, there was time
11   and effort expended, right, and we value
12   that time at the hourly wage.
13        Q.      Even if the time and effort
14   expended addressing the social
15   media-related issue does not reduce the
16   total amount of work that the school
17   employee does in the course of the day --
18               MR. GRADEN:  Objection.
19          Foundation.
20               MR. SANDOVAL-BUSHUR:  -- is
21          that correct?
22               THE WITNESS:  I mean,
23          resources are scarce, when you put
24          something to something, there's by
25          definition something doesn't get
```

CONFIDENTIAL

                                                    Page 222

1           done and it's valued at the wage.
2    BY MR. SANDOVAL-BUSHUR:
3           Q.      I want you -- I mean, you're
4    kind of fighting my hypothetical, because
5    in my hypothetical, there is not something
6    that does not get done, right?  Do you want
7    me to read it again?
8           A.      There's always something that
9    doesn't get done, so I can't agree to the
10   construct of your hypothetical --
11          Q.      Well, my --
12          A.      -- because it's, you know,
13   yeah, maybe today they put the extra 20
14   minutes in and got it done because there
15   was a deadline, but tomorrow they were
16   tired, so they got 20 minutes less work
17   done.  So on net, it's going to show up
18   somewhere, right?  So, you know, it's not,
19   like, you can just say, oh, well, the
20   only -- the parameters of understanding
21   opportunity costs are only like some sort
22   of immediate linkage, right?  Time and
23   effort are finite, right?  And anything
24   that takes from one use means something
25   else doesn't get done.  And, cumulatively,

Page 223

1  over the course of whatever amount of time,

2  it's going to balance out, unless somehow

3  social media makes teachers and principals

4  somehow more productive that they get more

5  done, but that's, you know, again, that

6  doesn't seem relevant to this particular

7  calculation, right?  Again, the way we

8  calculate it is to say, look, there's time

9  and effort that was spent on something that

10 imposes a cost.  And there's a value on

11 that cost.  It's the wages and benefits.

12        Q.     Your opinion is that a school

13 district may seek damages for time that an

14 employee spends addressing an issue

15 relating to social media even if the

16 employee spending time addressing that

17 issue does not negatively affect the

18 employee's ability to complete all of their

19 responsibilities of their job?

20              MR. GRADEN:  Objection.

21         Misstates opinion.

22              THE WITNESS:  My opinion is is

23         that people don't like to work for

24         free, right?  So your hypothetical

25         essentially is requiring that the

CONFIDENTIAL

Page 224

1              principal is going to fully absorb
2              the costs of this social media
3              thing and do so in perpetuity,
4              right?  So they'll just keep
5              absorbing, they'll keep working,
6              staying late, they'll keep working
7              extra hours, right, and at no point
8              will they go to their manager and
9              say, I'm working too many hours, I
10             want more money or I'm just going
11             to stop working the same amount.
12             There's always a push and pull,
13             right?  Like, again, you can try
14             and construct an unrealistic
15             hypothetical that imagines that
16             somehow there's no cost, but
17             there's always a cost.  Economists,
18             there's always a cost.  It's, like,
19             literally day one of principles of
20             economics.  Anything that has
21             scarce resources imposes costs.
22     BY MR. SANDOVAL-BUSHUR:
23          Q.     The cost may not be imposed
24     on the school district though?
25                    MR. GRADEN:  Objection.

Page 225

1           Vague.
2               THE WITNESS:  No, I'm saying
3           it eventually, it will -- it shows
4           up somewhere in the school
5           district, right?  Like, the
6           employee is essentially part of the
7           district.  If they're absorbing
8           those costs, the district is
9           absorbing those costs, because that
10          employee is going to be more tired
11          or maybe they're going to be more
12          angry, maybe they'll ask for more
13          money eventually.  Like, it's all
14          part of the system of the district,
15          right?  Like, the district isn't
16          some other entity, right?  They're
17          incurring those 20 minutes of cost.
18          It's part of the district.
19   BY MR. SANDOVAL-BUSHUR:
20       Q.     It was not part of your
21   assignment in this case to determine how
22   school employees would have spent time
23   differently in the absence of social media,
24   correct?
25       A.     That was not my assignment.

Page 226

1          Q.      It was not part of your
2    assignment in this case to determine how
3    school employees would have spent time
4    differently in the absence of the conduct
5    for which Plaintiffs seek to hold
6    Defendants liable, correct?
7                    MR. GRADEN:  Objection.  Form.
8                    THE WITNESS:  That's the same
9              question, but, no, that was not
10             part of my assignment.
11   BY MR. SANDOVAL-BUSHUR:
12         Q.      It was not part of your
13   assignment to identify what specific
14   opportunities school employees gave up when
15   they spent time addressing social media,
16   correct?
17                    MR. GRADEN:  Objection.
18             Vague.
19                    THE WITNESS:  As we've
20             discussed, I don't even think
21             that's possible.
22   BY MR. SANDOVAL-BUSHUR:
23         Q.      For purposes of your
24   opinions, it did not matter what school
25   employees would have been doing if they had

CONFIDENTIAL

Page 227

1  not been addressing student use of social

2  media, you calculate damages for all of the

3  time that employees reported addressing

4  student use of social media, correct?

5        A.    I'm not using an output

6  standard.  I am measuring the value of the

7  input.

8        Q.    And so the answer to my

9  question is, correct?

10       A.    I interpret that to be an

11  output standard and I'm not doing that, so

12  correct.

13       Q.    And for purposes of your

14  opinion, it did not matter if some of the

15  time that school district employees spent

16  addressing social media issues would

17  otherwise have been spent on tasks that did

18  not benefit the students, correct?

19              MR. GRADEN:  Objection.  Asked

20         and answered.

21              THE WITNESS:  Sorry, say it

22         again.

23  BY MR. SANDOVAL-BUSHUR:

24       Q.    For purposes of your opinion,

25  it did not matter if some of the time that

CONFIDENTIAL

Page 228

1  school district employees spent addressing

2  social media issues would otherwise have

3  been spent on tasks that did not benefit

4  students, correct?

5          A.       Correct.  Just because it's

6  not spent benefiting students doesn't mean

7  that it's not part of their job or some

8  part of what they do during the day.

9          Q.       And it is entirely possible

10  that in a world without social media, all

11  of the time that teachers have spent

12  addressing unauthorized student use of

13  social media would have been spent instead

14  addressing other student misbehavior,

15  correct?

16                  MR. GRADEN:  Objection.

17          Vague.  Scope.

18                  THE WITNESS:  I have no idea

19          what would have happened in the

20          world without social media.  Again,

21          that's a causal question that I

22          have not been asked to address.

23  BY MR. SANDOVAL-BUSHUR:

24          Q.       It is entirely possible that

25  in a world without social media, the time

CONFIDENTIAL

```
                                    Page 229
 1   that school employees spent addressing
 2   students who bully each other on social
 3   media would have instead been spent
 4   addressing students who bullied each other
 5   by text message or face to face, correct?
 6                   MR. GRADEN:  Objection.  Asked
 7             and answered.
 8                   THE WITNESS:  Again, this is
 9             the same question.  You're asking
10             me about, like, what would have
11             happened in the world without
12             social media, I have no sense of
13             what that would be.  I have not
14             done any analysis of that.  So I do
15             not know whether or not it's
16             possible, probable, anything of
17             that sort.
18   BY MR. SANDOVAL-BUSHUR:
19        Q.      Some of the time that school
20   employees spent addressing social media
21   issues might have been used to teach
22   students about digital citizenship, online
23   safety, social emotional skills, or
24   responsible technology use, correct?
25                   MR. GRADEN:  Objection.  Form.
```

CONFIDENTIAL

                                        Page 230

1            Foundation.

2                    THE WITNESS:  Sorry, what was

3            the first part of the question?

4    BY MR. SANDOVAL-BUSHUR:

5         Q.      Some of the time that school

6    employees spent addressing social media

7    issues might have been used to teach

8    students about digital citizenship, online

9    safety, social emotional skills, or

10   responsible technology use, correct?

11                   MR. GRADEN:  Same objection.

12                   THE WITNESS:  It's possible, I

13           don't know what they would have --

14           what they would have done with the

15           time.  Again, that's not -- we just

16           talked about that's not part of

17           what my assignment was.

18   BY MR. SANDOVAL-BUSHUR:

19        Q.      You would agree that time

20   spent by school employees teaching students

21   about digital citizenship, online safety,

22   social emotional skills, or responsible

23   technology use can be beneficial to

24   students, correct?

25                   MR. GRADEN:  Objection.

CONFIDENTIAL

Page 231

1          Scope.

2                THE WITNESS:  Assuming it's

3                beneficial to students, yeah, it

4                could be.

5    BY MR. SANDOVAL-BUSHUR:

6          Q.      In estimating damages, you

7    did not attempt to distinguish between

8    social media-related disciplinary time

9    spent by school employees and time spent by

10   employees teaching students about digital

11   citizenship, online safety, social

12   emotional skills, or responsible technology

13   use, correct?

14                MR. GRADEN:  Objection.  Form.

15                Foundation.

16                THE WITNESS:  Again, this

17                seems to be an estimate of time

18                loss question, which as we've

19                discussed an ad nauseam was not

20                part of my assignment.  I believe

21                that, you know, the affiants and

22                the survey include the relevant

23                time for the -- for calculating

24                damages in this matter.

25

CONFIDENTIAL

Page 232

1    BY MR. SANDOVAL-BUSHUR:
2          Q.      And so the answer is,
3    correct?
4                  MR. GRADEN:  Asked and
5              answered.
6                  THE WITNESS:  Correct.
7    BY MR. SANDOVAL-BUSHUR:
8          Q.      What benefits do school
9    districts offer their employees?
10          A.      Like employee benefits?
11          Q.      Correct.
12          A.      Typically, you're going to
13    get health insurance, retirement, and then
14    it becomes a real hodgepodge of district by
15    district what kind of additional kind of
16    benefits and perks you get.
17          Q.      Why do school districts offer
18    benefits to their employees?
19                  MR. GRADEN:  Objection, scope.
20                  THE WITNESS:  It's part of
21              compensation.  It's a different way
22              of providing compensation.  Some of
23              it has to do with their tax
24              treatment benefits.  Some of it has
25              to do with employee preferences.

CONFIDENTIAL

Page 233

1   BY MR. SANDOVAL-BUSHUR:
2        Q.    Do the benefits that school
3   districts offer employees depend on how the
4   employees spend their time during the
5   workday?
6        A.    Not that I'm aware of, I
7   think they're, like, salary, right, you get
8   them based on whatever your position is.
9        Q.    If a school district employee
10  spends time during the workday addressing
11  student use of social media, does that in
12  any way change the amount of money that a
13  school district spends on providing
14  benefits to that employee?
15              MR. GRADEN:  Objection.
16         Vague.
17              THE WITNESS:  Not that I'm
18         aware of, no.
19  BY MR. SANDOVAL-BUSHUR:
20       Q.    You're not offering the
21  opinion that any school district spent more
22  money on employee benefits because of
23  social media, correct?
24              MR. GRADEN:  Objection.
25         Vague.

CONFIDENTIAL

Page 234

1                THE WITNESS:  No, that's a

2            causal question.  I'm not answering

3            any causal questions.

4    BY MR. SANDOVAL-BUSHUR:

5        Q.      You are not offering the

6    opinion that any school district lost the

7    value of any employee benefits because of

8    social media, correct?

9                MR. GRADEN:  Objection.

10           Vague.

11               THE WITNESS:  Well, it's a

12           causal question.  No, I'm offering

13           no opinions that relate to

14           causality.

15           Since we're starting a new

16           topic, can I pause for just one

17           minute, I have got to go to the

18           bathroom?

19               MR. SANDOVAL-BUSHUR:  Sure.

20               THE VIDEOGRAPHER:  Going off

21           video record 1:54 p.m.

22                  - - - - -

23       (A recess was taken at this time.)

24                  - - - - -

25               THE VIDEOGRAPHER:  Back on

CONFIDENTIAL

Page 235

1          video record 2:10 p.m.

2   BY MR. SANDOVAL-BUSHUR:

3          Q.      Dr. Ward, you present your

4   damages estimates separately for salaries

5   and for salaries plus benefits, correct?

6          A.      That's correct.

7          Q.      Why do you do that?

8          A.      That's a good question.  I

9   think it's a habit that comes from other

10  times of calculations when I do salaries, I

11  usually just have salaries and salaries

12  plus benefits.

13         Q.      Are you aware of any reason

14  why benefits should not be included in an

15  opportunity cost calculation?

16         A.      No, the literature that I

17  cite is pretty clear that it's wages and

18  benefits that are relevant.

19         Q.      Literally ever activity that

20  a teacher spends time on has an opportunity

21  cost, correct?

22         A.      That is true.

23         Q.      So time that a teacher spends

24  grading papers has an opportunity cost,

25  right?

Page 236

1          A.      Yup.

2          Q.      And if you were going to

3    calculate the opportunity cost of teachers

4    grading papers, would you do the same thing

5    essentially that you have done in this

6    case, which is, you would calculate

7    teachers' salaries and benefits, then

8    identify using a survey or other data what

9    portion of a teacher's time is spent

10   grading papers and then multiply the

11   salaries and benefits by that portion of

12   time spent grading papers to arrive at the

13   opportunity cost?

14         A.      That's correct.

15         Q.      So the fact that something

16   has an opportunity cost does not mean that

17   it is damages, correct?

18              MR. GRADEN:  Objection.

19              THE WITNESS:  Not necessarily,

20         no.

21   BY MR. SANDOVAL-BUSHUR:

22         Q.      You understand that it is a

23   question for the court or the jury to

24   decide whether the opportunity costs that

25   you have calculated in this case are

Page 237

1    actually damages, correct?
2           A.     I think that's what they're
3    for.
4           Q.     Are there any limitations
5    associated with relying on the Klein
6    teacher time survey for purposes of your
7    damages estimates?
8                   MR. GRADEN:  Objection.
9            Vague.
10                  THE WITNESS:  Mr. Klein
11           provided time estimates that were
12           use useful for me in my
13           calculation.  I can't think of any
14           specific limitation off the top of
15           my head.
16   BY MR. SANDOVAL-BUSHUR:
17          Q.     If you were going to publish
18   your damages estimates in a peer-reviewed
19   journal, would you identify any limitations
20   relating to your reliance on the Klein
21   teacher time survey?
22          A.     I'm not sure I would ever
23   publish this in a peer-reviewed journal,
24   it's not that interesting.  I mean, you
25   would probably put in the standard

Page 238

1  discussion of limitations of any survey.

2          Q.      And what are those

3  limitations?

4          A.      Oh, you know, just how -- how

5  precise is the data, so how large is the

6  sample.  You would -- might talk about the,

7  you know, whatever validity of the survey

8  or the survey methodology, you know,

9  whatever the usual things are that you do

10  when you put in -- publish some form of

11  survey estimate.

12          Q.      Any other limitations you

13  would identify?

14          A.      I mean, I don't -- I'm not

15  usually the one who is doing published

16  estimates of original surveys, so I can

17  only kind of speak generally.

18          Q.      Do you hold yourself out as

19  an expert in survey design?

20          A.      No.

21          Q.      There are downsides to

22  relying on self-reported data, correct?

23                  MR. GRADEN:  Objection.

24          Vague.

25                  THE WITNESS:  I guess there

Page 239

1            can be, there's --
2   BY MR. SANDOVAL-BUSHUR:
3        Q.      Self-reported data can be
4   inaccurate, correct?
5        A.      All data can be inaccurate.
6        Q.      What are some of the reasons
7   why self-reported data specifically can be
8   inaccurate?
9                MR. GRADEN:  Objection.
10           Foundation.  Vague.
11                THE WITNESS:  I mean, if you
12           don't report whatever you're being
13           asked accurately.
14   BY MR. SANDOVAL-BUSHUR:
15        Q.      And are you familiar with the
16   term, "response bias"?
17        A.      I think I've heard the term.
18   I couldn't define it for you.
19        Q.      Are you familiar with the
20   idea that a potential limitation of
21   self-reported data is that the respondents
22   may provide responses that are in line with
23   what they think they are expected to say in
24   responding to the questions?
25                MR. GRADEN:  Objection.

Page 240

1          Foundation.
2                    THE WITNESS:  I know that's
3               some issue that survey expert-type
4               people like to worry about.
5     BY MR. SANDOVAL-BUSHUR:
6          Q.     Did you consider that issue
7     in forming your opinions in this case?
8          A.     No, that's the type of
9     technical thing that I'm relying on Mr.
10    Klein to deal with.
11         Q.     Is your reliance on
12    self-reported data for your damages
13    estimate a limitation on your reliability
14    of your damages estimates?
15                    MR. GRADEN:  Objection.
16              Vague.
17                    THE WITNESS:  I mean, any data
18              you rely on likely have some form
19              of limitation.  So what exactly
20              what was the limitation you're
21              worrying about here?
22    BY MR. SANDOVAL-BUSHUR:
23         Q.     Lack of reliability of
24    self-reported data.
25         A.     I have no basis to assume

CONFIDENTIAL

Page 241

1   that this data is unreliable.

2         Q.      And you have no reason to

3   think that it's reliable either?

4                 MR. GRADEN:  Objection.

5                 THE WITNESS:  I'm assuming

6            that Mr. Klein, because he has been

7            doing surveys for a long time,

8            understands how to do a survey that

9            should produce reliable data.

10  BY MR. SANDOVAL-BUSHUR:

11        Q.      But that's your assumption,

12  it's not something that you did or could

13  validate, correct?

14        A.      I have --

15                MR. GRADEN:  Objection.  Form.

16                THE WITNESS:  Yeah, I have no

17            ability to validate, no expertise

18            to even offer an opinion on the

19            precise questions that Mr. Klein

20            has used here.

21  BY MR. SANDOVAL-BUSHUR:

22        Q.      When relying on the results

23  of a survey of a population, are there any

24  guidelines regarding how many survey

25  responses are necessary in order for the

                                        Page 242

1   results to be reliable?

2              MR. GRADEN:   Objection.

3        Scope.

4              THE WITNESS:   No.

5   BY MR. SANDOVAL-BUSHUR:

6        Q.      So if a survey has one

7   response, is that enough to be reliable?

8        A.      I mean, the size of the

9   survey affects the precision of the

10  estimate.  But it doesn't inherently

11  suggest that the information provided is

12  unreliable.  It just means that it's drawn

13  from a smaller sample, so you should think

14  of it as likely less precise.

15       Q.      If a survey has a small

16  number of responses, does that limit your

17  ability to draw conclusions about the

18  application of that small number of

19  responses across a broader population?

20       A.      It limits the precision of

21  the estimate, but it doesn't limit the --

22  it doesn't suggest that it's biased

23  inherently.  Small samples aren't

24  inherently biased, right?  So the average

25  in a small sample isn't inherently

CONFIDENTIAL

Page 243

1   different from, you know, from the true
2   average than the average in a large sample.
3              The difference between small
4   and large samples is just with a large
5   sample, I can trust the estimate, you know,
6   is more precise, right, the confidence
7   interval around it is narrower, because I
8   have more observations.
9              With a small sample, there's
10  no reason to think that the small sample is
11  providing you a biased answer, but you
12  should assume that the precision of the
13  estimate is -- is smaller or is less
14  precise.  That's what small samples do and
15  that's why I put confidence intervals in my
16  calculations so that I'm accounting for
17  sample size in those ways.
18        Q.     In your professional work
19  outside of litigation, have you ever
20  determined that a survey question had too
21  few responses to be reliable?
22        A.     Never had occasion to.
23        Q.     Are there any particular
24  downsides associated with relying on a
25  small sample size when you are ultimately

CONFIDENTIAL

                                              Page 244

1    relying on the mean of the responses?

2                    MR. GRADEN:  Objection.

3                    THE WITNESS:  Just for the,

4           you know, the precision issue that

5           I discussed earlier, but that's why

6           you use a confidence interval

7           because that helps you convey that

8           precision.

9    BY MR. SANDOVAL-BUSHUR:

10         Q.    When you rely on a small

11   sample size, there is a greater risk that

12   the mean of the results could be biased by

13   outlier responses, correct?

14                   MR. GRADEN:  Objection.

15          Foundation.

16                   THE WITNESS:  It's -- that's

17          what we mean by that precision

18          being wider.

19   BY MR. SANDOVAL-BUSHUR:

20         Q.    But that's correct?

21         A.    Say it again.

22         Q.    When you rely on a small

23   sample size, there is a greater risk that

24   the mean of the results could be biased by

25   outlier responses, correct?

CONFIDENTIAL

Page 245

1        A.     Yeah, they're influencing the
2   mean by more, so you may end up further
3   from the true mean than if you had a larger
4   sample.
5        Q.     You did not take any steps to
6   determine that the mean of the responses to
7   Klein's teacher time survey was not biased
8   by outlier responses, correct?
9        A.     If there's outliers in the
10  data, I, actually, I have no problem with
11  them being there, because it's part of the
12  distribution which is relevant for
13  calculating damages.
14       Q.     You did not take any steps to
15  determine that the mean of the responses to
16  the Klein teacher time survey was not
17  biased by outlier responses, correct?
18                  MR. GRADEN:  Objection.  Asked
19            and answered.
20                  THE WITNESS:  If there -- you
21            know, I am not concerned about
22            outliers in the data, because there
23            can be true outliers in the real
24            world, right?  And so to the extent
25            that there are people who deal

CONFIDENTIAL

Page 246

1              with -- spend more time dealing
2              with social media, I'm fine with
3              that information being included.
4              You know, unless it's an obvious
5              outlier, it's an error, just
6              because somebody is seven foot four
7              doesn't mean that they are not part
8              of something that I would want to
9              include if I calculated the mean
10             height of the people in the room.
11   BY MR. SANDOVAL-BUSHUR:
12         Q.     When relying on the results
13   of a survey of a population, are there any
14   guidelines regarding what response rate is
15   necessary in order for the results to be
16   reliable?
17         A.     I have no idea.
18         Q.     In your professional work
19   outside of litigation, have you ever
20   determined that a survey question had too
21   low of a response rate to be reliable?
22         A.     Never been part of what I do.
23         Q.     You did not calculate the
24   response rate for any of the Klein teacher
25   time surveys, correct?

Page 247

1          A.      That is correct.

2          Q.      And offering your damages

3    estimates based on the Klein teacher time

4    survey responses, you did not consider what

5    the response rate was, correct?

6          A.      Correct.  I'm assuming that

7    Mr. Klein has provided me with data that's

8    sufficient for what I'm trying to do.

9          Q.      Is it your understanding that

10   it was part of Mr. Klein's assignment in

11   this case to determine that the results of

12   his survey had an appropriate response

13   rate?

14         A.      I don't know what

15   specifically, but I assumed that Mr.

16   Klein -- part of Mr. Klein's assignment was

17   to provide me with information that

18   satisfied, you know, his opinion as an

19   expert in survey design that it would

20   provide me, the person downstream from him,

21   with a usable estimate for the purposes of

22   my calculation.

23         Q.      And so if Mr. Klein had given

24   you a survey that had results for --

25   results based on only one teacher response,

CONFIDENTIAL

Page 248

1   you would have still relied on that; is

2   that right?

3                    MR. GRADEN:  Objection.

4           Foundation.

5                    THE WITNESS:  I mean, again,

6           you know, assuming that he's okay

7           with that, if he says that, yup,

8           one is appropriate.  I don't know

9           about one, but if he's, like, yeah,

10          this is -- for this population, one

11          is a reasonable estimate, then,

12          yeah, I'm going to trust him,

13          because that's his role, right?

14          I'm downstream and I'm, like,

15          great, if you -- if you believe

16          that this is an appropriate

17          estimate for me to use, I'm going

18          to use it.  And if he said -- felt

19          that some of his results were not

20          sufficiently reliable for me, I

21          assume he would have made some note

22          in his report that I don't think

23          these are sufficiently reliable to

24          be used.

25

CONFIDENTIAL

Page 249

1    BY MR. SANDOVAL-BUSHUR:
2          Q.     Do you know that Mr. Klein,
3    in fact, believes that the results of his
4    survey are sufficient for your use in a
5    damages calculation?
6                    MR. GRADEN:  Objection.
7             Foundation.
8                    THE WITNESS:  Again, I'm
9             assuming that based on the fact
10            that that's what was provided to me
11            and there was no indication that he
12            had any hesitation about providing
13            these results to me.
14   BY MR. SANDOVAL-BUSHUR:
15         Q.     I understand what you say
16   you're assuming, but do you personally
17   actually know that Mr. Klein in fact
18   believes that the results of his survey are
19   sufficient for your use in a damages
20   calculation?
21                   MR. GRADEN:  Objection.  Asked
22            and answered.
23                   THE WITNESS:  I have not
24            specifically asked him that
25            question.

CONFIDENTIAL

Page 250

1    BY MR. SANDOVAL-BUSHUR:

2         Q.      Nor has he provided you with

3    that specific information, correct?

4                   MR. GRADEN:  Objection.

5              Foundation.

6                   THE WITNESS:  Well, you know,

7              I mean, he has provided a report,

8              all of the means that are in -- I

9              used in my report are reported in

10             his report.  I recall no indication

11             of him saying you shouldn't use

12             this for the purposes of the

13             damages calculation that I was

14             hired to do this assignment for as

15             part of.

16   BY MR. SANDOVAL-BUSHUR:

17        Q.      That's an assumption that you

18   are reaching in connection with reading Mr.

19   Klein's report, correct?

20                  MR. GRADEN:  Objection.

21             Foundation.

22                  THE WITNESS:  It's an

23             assumption that I'm making based on

24             all of the reasons that I've laid

25             out over the last several

Page 251

1              questions.
2    BY MR. SANDOVAL-BUSHUR:
3         Q.      And so you personally in
4    offering your damages estimates, based on
5    the Klein teacher time survey responses,
6    did not consider whether the response rate
7    was sufficiently high to make the results
8    reliable?
9                   MR. GRADEN:  Objection.
10                  MR. SANDOVAL-BUSHUR:  Correct?
11                  MR. GRADEN:  Objection.
12              Misstates testimony.
13                  THE WITNESS:  I assumed that
14              the information that Mr. Klein
15              provided me was sufficient for my
16              use.  I did not make any
17              determination based on response
18              rates or any other technical survey
19              matter.
20    BY MR. SANDOVAL-BUSHUR:
21         Q.      What is nonresponse bias?
22         A.      I couldn't give you a
23    definition off the top of my head.
24         Q.      Are you aware that
25    nonresponse bias is when people who decline

CONFIDENTIAL

Page 252

1  to complete a survey are systematically

2  different from those who participate in the

3  survey?

4          A.    Sure.  That sounds like

5  nonresponse bias.

6          Q.    And you did not do anything

7  to determine whether there was nonresponse

8  bias in Klein's survey, correct?

9                  MR. GRADEN:  Objection.

10                 THE WITNESS:  Again, I trusted

11             Mr. Klein to address all of the

12             potential biases that the survey

13             expert-type people, you know,

14             usually like to consider when they

15             go through and design and implement

16             a survey.

17  BY MR. SANDOVAL-BUSHUR:

18          Q.    You personally did not do

19  anything to determine whether there was

20  nonresponse bias in Klein's survey,

21  correct?

22                 MR. GRADEN:  Objection.

23             Foundation.

24                 THE WITNESS:  It was not part

25             of my assignment.

CONFIDENTIAL

Page 253

1    BY MR. SANDOVAL-BUSHUR:

2         Q.      And you didn't do that?

3         A.      I didn't do it.

4         Q.      You do not -- let me ask the

5    question again, sorry.

6                 You did not do anything to

7    determine whether the teachers who

8    completed Klein's survey are in any way

9    systematically different from the teachers

10   who did not participate in his survey,

11   correct?

12                MR. GRADEN:  Objection.

13           Foundation.

14                THE WITNESS:  I did not do

15           that.

16   BY MR. SANDOVAL-BUSHUR:

17        Q.      For the results of the Klein

18   teacher time survey, you present the upper

19   and lower bounds of the 95 percent

20   confidence interval for each of the time

21   estimates that you rely on, correct?

22        A.      Correct.

23        Q.      The confidence interval can

24   also be called the margin of error; is that

25   right?

Page 254

1        A.      Yeah.   Yeah, it's the same
2    basic idea.
3        Q.      The confidence interval or
4    margin of error does not account for all of
5    the potential sources of inaccuracy or bias
6    in survey results, correct?
7                    MR. GRADEN:  Objection.  Form.
8                    THE WITNESS:  No, it's a
9            measure of precision, as opposed to
10           bias is a measure of accuracy.
11   BY MR. SANDOVAL-BUSHUR:
12       Q.      The confidence interval or
13   margin of error does not account for
14   inaccuracy that results from questions
15   being poorly worded, correct?
16       A.      You're giving me a little bit
17   of a problem there, right, because, you
18   know, you have to -- we have to make some
19   assumptions about what are we talking about
20   when we're saying inaccuracy?  What are we
21   measuring and why is it inaccurate?
22       Q.      Well, the Klein teacher time
23   survey is attempting to measure the amount
24   of time that teachers spend addressing
25   issues relating to student use of social

CONFIDENTIAL

Page 255

1    media, correct?

2         A.    Yes.

3         Q.    So if we use as the measure

4    of accuracy the actual mean time that

5    teachers spend addressing student use of

6    social media, is that acceptable?

7         A.    Yes.  So there's some true

8    measure and then we have some agreed-upon

9    thing that we're measuring and we have some

10   notion of, we don't observe it, but this is

11   the truth.

12        Q.    Correct.

13        A.    Okay.

14        Q.    The confidence interval or

15   margin of error does not account for

16   inaccuracy that results from questions

17   being poorly worded, correct?

18             MR. GRADEN:  Objection.  Asked

19        and answered.

20             THE WITNESS:  Okay.  So if you

21        assume that there is inaccuracy

22        in -- or poorly worded questions

23        have caused inaccuracy, right, so

24        that the measure that you're

25        getting from the survey is

CONFIDENTIAL

Page 256

1          systematically different than the

2          true measure that we postulated,

3          no, the confidence interval does

4          not, you know, tell you anything

5          about that bias.

6    BY MR. SANDOVAL-BUSHUR:

7          Q.     The confidence interval or

8    margin of error does not account for

9    inaccuracy that results from respondents

10   providing responses that are inaccurate

11   because, for example, they misremember the

12   information they are reporting, correct?

13                MR. GRADEN:  Objection.  Form.

14                THE WITNESS:  Sorry, say it

15          again.

16   BY MR. SANDOVAL-BUSHUR:

17         Q.     Yeah.  The confidence

18   interval or margin of error does not

19   account for inaccuracy that results from

20   respondents providing responses that are

21   inaccurate because, for example, the

22   respondents misremember the information

23   they are providing, correct?

24         A.     Okay.  So in this case, the

25   last time it was, you know, you think the

CONFIDENTIAL

Page 257

1    question was poorly worded and that's
2    what's introducing bias. And now you're
3    saying that the respondent is just
4    answering inaccurately. No, it's not --
5    it's not, again, it's a measure, it's about
6    precision, it's sample size and, you know,
7    how much variance is there in the data, you
8    know. So that's, like, the way you teach
9    it, right, is think of a bow and arrow and
10   a target, right? So confidence interval
11   speaks to how many -- how big is the target
12   and, you know, oh, we're really hitting the
13   bull's-eye, and, you know, we're all
14   clustered right around the bull's-eye,
15   right? But we may be, you know, above or
16   below or whatever it is, right?
17             Accuracy is about how close
18   are we hitting the bull's-eye, right? And
19   so the confidence interval helps us
20   understand distribution based on mostly
21   sample size, but also variation that we
22   observe in the data, right, known as a
23   standard deviation.
24             Whereas bias, things that
25   could bias, right, those are biases and the

Page 258

1  confidence interval doesn't magically make
2  bias go away.  That doesn't mean that the
3  bias answer might not lay within the
4  confidence interval, it could, right, but
5  there's nothing that's inherent in the
6  confidence interval that is speaking to
7  bias.
8         Q.     One thing that can bias
9  survey results is people providing
10 inaccurate responses because they
11 misremember the truth of the information
12 they're providing, correct?
13        A.     If people don't answer the
14 survey accuracy -- and it's systematic,
15 right, you know, it doesn't have to be
16 biased.  It could just be noise, right, if
17 I misremember high and you misremember low,
18 it doesn't mean that the mean is now
19 inaccurate.  We have to -- what we have to
20 measure is bias, right?  We have to say
21 people systematically over or
22 underrepresent for the mean to be wrong.
23        Q.     Okay.  If there is bias in a
24 survey because the survey respondents
25 systematically in the same direction

```
                                      Page 259
 1   misremember, misreport information on the
 2   survey, that bias is not accounted for or
 3   included in the confidence interval or
 4   margin of error, correct?
 5                 MR. GRADEN:  Objection.  Form.
 6                 THE WITNESS:  No, again,
 7             that's speaking to the accuracy of
 8             the mean.  You know, again, it
 9             doesn't mean it's outside the
10             confidence interval, but, you know,
11             it's not -- it's a bias.
12   BY MR. SANDOVAL-BUSHUR:
13       Q.     And just so that the record
14   is clear, the confidence interval or margin
15   of error does not include or account for
16   that type of bias we were just talking
17   about?
18                 MR. GRADEN:  Objection.  Form.
19                 THE WITNESS:  It does correct
20             bias.
21   BY MR. SANDOVAL-BUSHUR:
22       Q.     Okay.  And you understand
23   that survey respondents often misremember
24   and misreport information in response to
25   surveys, correct?
```

CONFIDENTIAL

Page 260

```
 1                    MR. GRADEN:  Objection.
 2           Foundation.
 3                    THE WITNESS:  I mean, it can
 4           happen.
 5   BY MR. SANDOVAL-BUSHUR:
 6           Q.    Yeah.  So, for example --
 7           A.    I don't know how often it
 8   happens.
 9           Q.    For example, it's a
10   well-known phenomenon that in election
11   surveys, people often misremember who they
12   voted for in the prior presidential
13   election, correct?
14                    MR. GRADEN:  Objection.
15           Foundation.
16                    THE WITNESS:  I mean, what do
17           you mean by, "often"?
18   BY MR. SANDOVAL-BUSHUR:
19           Q.    Are you aware that in
20   election surveys people misremember who
21   they voted for in the previous presidential
22   election?
23           A.    Yeah, there's some evidence
24   of that.
25           Q.    And people tend to report
```

CONFIDENTIAL

Page 261

1   that they voted for the person who actually

2   won the election more so than people

3   actually who voted for that person in

4   reality, correct?

5                    MR. GRADEN:  Objection.

6          Foundation.

7                    THE WITNESS:  I don't know

8          which direction the misremembering

9          goes.

10  BY MR. SANDOVAL-BUSHUR:

11        Q.    And are you also aware that

12  in election surveys, people misremember

13  whether they voted at all in previous

14  elections?

15        A.    I'm sure, you know, there's a

16  potential margin of error of that nature in

17  all election surveys, yeah.  Yeah, I think

18  that happens.

19        Q.    The confidence interval or

20  margin of error does not account for

21  inaccuracy that results from nonresponse

22  bias, correct?

23        A.    Again, to the extent that

24  you're talking about something that

25  introduces true bias, you know, so it

CONFIDENTIAL

Page 262

1   causes a deviation in the measurement from

2   the true, no, there's no -- confidence

3   interval does not correct for bias.

4          Q.    And the confidence interval

5   is not designed to nor could it correct for

6   bias, correct?

7          A.    No, that's not what it's used

8   for.

9          Q.    You write in your reports, "I

10  assume that Mr. Klein's results for the

11  typical day provide a reasonable

12  approximation of time lost during the

13  average instructional day;" is that right?

14         A.    Yup.

15         Q.    What do you mean when you say

16  you, "assume that Mr. Klein's results for

17  the typical day provide a reasonable

18  approximation of time lost during the

19  average instructional day"?

20         A.    So when you see questions

21  that are asking about time, right, like,

22  they don't use mathematical terms, like,

23  what do you do on the average day, right?

24  They typically use something like usual or

25  typical, right?  And so the assumption is

CONFIDENTIAL

Page 263

1   is that the person is summarizing, you

2   know, the center of their time

3   distribution, right, or something, you

4   know, approximating, you know, the, you

5   know, the common middle or whatever, if you

6   think about a distribution of potential

7   days.  And so I assumed that when we see

8   typical, that we're going to assume that

9   that means average.

10          Q.     Is it possible that that

11  assumption is not correct, that -- and that

12  in fact, the information provided about a

13  typical day does not represent the average

14  instructional day?

15          A.     It should be pretty close.

16  You know, again, I don't have any basis to

17  evaluate and so I don't have -- I can't go

18  to some, you know, complete measure of each

19  person's actual time use and then say, when

20  we ask you about your typical day in the

21  context, does it match the true

22  distribution of your observed actual time?

23  I can't do that.  But it's pretty common in

24  my world when you see usual or typical to

25  make the inference that when somebody says

CONFIDENTIAL

Page 264

1    they usually work 40 hours a week, they're

2    meaning that they work 40 hours a week on

3    average.

4            Q.       And so I understand this

5    distinction between typical and average.

6    In the example you just gave, someone may

7    say in the typical week, I work 40 hours a

8    week, because that's what I work 80 percent

9    of weeks.  But if you actually drill down

10   and accounted for holidays and vacations,

11   the person's average workweek is in fact

12   less than 40 hours?

13           A.       Or more.  You know, usually

14   we don't put holidays and vacations in,

15   because we ask you about non-holiday weeks,

16   but, like, if you're saying, yeah, if we

17   wanted to include that in the measure,

18   then, yeah, you want some sense of the full

19   distribution, right?  Sometimes I work 43,

20   sometimes I work 37, right, but, typically,

21   I say 40, right.

22           Q.       And so in this case, when Mr.

23   Klein asked teachers how much time they

24   spend in their typical day, your hypothesis

25   is that the teacher is probably responding

CONFIDENTIAL

Page 265

1    in relation to the usual school day where

2    they're just teaching classes and it is not

3    relating to something like a day where

4    there's a field trip, for example?

5                    MR. GRADEN:  Objection.  Form.

6                    THE WITNESS:  Yeah, they're

7            trying to get to some, you know,

8            the measure of central tendency,

9            right?  Like, you know, the thing

10           that, you know, if you imagine a

11           distribution of time, right, you

12           know, probably looks something like

13           a bell curve, right, my assumption

14           is that they're getting somewhere

15           in the middle of that.

16   BY MR. SANDOVAL-BUSHUR:

17        Q.      And you are not offering the

18   opinion that Klein's survey results for the

19   typical day in fact provide a correct

20   approximation of the time lost in the

21   average instructional day, correct?

22                   MR. GRADEN:  Objection.

23                   THE WITNESS:  I mean, we don't

24           have the data to, in fact, prove

25           that.  I'm just doing what's

CONFIDENTIAL

Page 266

```
 1              typical and common when you have
 2              questions about typical or usual
 3              time to assume that it's a
 4              reasonable approximation for the
 5              average.
 6    BY MR. SANDOVAL-BUSHUR:
 7         Q.      Are you offering the opinion
 8    that Klein's survey results for the typical
 9    day in fact provide a correct approximation
10    of the time lost in the average
11    instructional day?
12         A.      Say that again.
13         Q.      Are you in fact -- sorry, let
14    me start that again.
15              Are you offering the opinion
16    that Klein's survey results for the typical
17    day in fact provide a correct approximation
18    of the time lost in the average
19    instructional day?
20         A.      That's what I'm assuming,
21    yes.
22         Q.      It's an assumption you're
23    offering?
24         A.      Yes.
25         Q.      The Klein teacher time survey
```

Page 267

1    required teachers to estimate how much time

2    they spent in a typical day addressing

3    student use of social media going back one

4    year, four years, five years, and ten

5    years, correct?

6                    MR. GRADEN:  Objection.  Form.

7                    THE WITNESS:  Correct.

8    BY MR. SANDOVAL-BUSHUR:

9           Q.      You are not offering an

10   opinion on whether it's possible for survey

11   respondents to accurately estimate how much

12   time they spent addressing student use of

13   social media in a typical day going back

14   years before taking the survey, correct?

15          A.      That's Mr. Klein's opinion.

16   I'm relying on him to -- I'm relying on his

17   expertise to have designed the survey so

18   that those are accurate, reliable data

19   points.

20          Q.      And you yourself are not

21   offering the opinion that it is possible

22   for survey respondents to accurately

23   estimate how much time they spent

24   addressing student use of social media in a

25   typical day going back years before taking

CONFIDENTIAL

Page 268

1  the survey, correct?

2          A.      I am not offering that

3  specific opinion as part of my reports.

4          Q.      Have you ever previously used

5  someone's estimate of how much time they

6  spent on an activity years before providing

7  the estimate?

8          A.      Yes.

9          Q.      In what context?

10         A.      So kind of graduate school to

11  my post-doc, I worked on this thing called

12  the Harvard and Beyond study and we asked

13  questions retrospectively to people who

14  graduated from Harvard or Radcliffe from,

15  like, four-year increments from 1969 to

16  maybe 2000 -- or maybe 1992, I can't

17  remember.  All right.  And in that survey

18  we asked people questions about what they

19  did while they were in college.  We asked

20  questions about how many hours they worked

21  when they first got out of college.  So,

22  yeah, I've certainly used questions that

23  ask people about time use over very long

24  periods.

25         Q.      So you asked people to report

CONFIDENTIAL

Page 269

1    how many -- you asked people at one point

2    in time to report based on how much time

3    they spent working years before taking the

4    survey?

5          A.    Yes, so taking a survey in

6    2006, we were asking them at the oldest

7    cohorts to effectively describe things that

8    were happening in 1969 or '70.

9          Q.    And what specific time

10   estimates were you asking people to

11   provide?

12         A.    Oh, so I know that we asked

13   them about how many hours they worked and

14   what jobs they had.  If you had kids at

15   some point, like, we would ask what year

16   did you have a kid, and we would ask

17   similar questions about work and change in

18   work.  But I also think we asked questions

19   about, if not the precise value, the

20   distribution of housework in the household

21   at that time.  We asked questions about

22   activity participation while in college.

23   You know, I can't remember everything that

24   we asked in that survey, but --

25         Q.    When you asked about work

CONFIDENTIAL

Page 270

1   time, you asked for a total number of hours
2   worked per week?
3           A.     Usual hours worked per week.
4           Q.     Did you ask for any more
5   granular information about how people spent
6   their workdays?
7           A.     Not in that survey that I
8   recall.  Maybe it's in there, I don't
9   remember.
10          Q.     Did you do anything to
11  validate in your work on this Harvard and
12  Beyond survey that the recalled estimates
13  of time spent years prior were in fact
14  accurate?
15          A.     I don't remember.  I was
16  there largely through data collection.  I
17  then moved on for most of data analysis.
18          Q.     But sitting here today,
19  you're not aware of anything that was done
20  in your work on the Harvard and Beyond
21  survey to validate that the recalled
22  estimates of time spent years prior were in
23  fact accurate, correct?
24          A.     Not that I recall, but --
25          Q.     Are the results of that

Page 271

1  survey published?

2        A.      Yeah, I think there's a

3  journal -- an article in the American

4  Economic Review.

5        Q.      Are you an author on that?

6        A.      No, no, I was just kind of a

7  grunt helping put the data together.

8        Q.      And for what purpose was that

9  information, specifically estimates of time

10 spent working years prior used?

11       A.      So the principals on that

12 project are Nobel Prize winner Claudia

13 Goldin and Larry Katz and the motivation

14 for the project was, they were interested

15 in understanding long-term labor dynamics

16 of people who attended elite institutions,

17 right?  So we were at Harvard, so we did

18 Harvard.  And so part of what they were

19 trying to understand is how does the

20 trajectory of work-life change over time,

21 in particular, comparing men to women both

22 across cohorts, but then also as you span

23 ages.  And so the reason for asking about

24 usual hours worked is to understand, well,

25 when they first got out of college, did men

CONFIDENTIAL

Page 272

1  and women pursue different jobs?  Did they
2  pursue jobs that had different hours?  And
3  that is what essentially they find, right,
4  is that there's some differences in -- I
5  guess the term they eventually landed on
6  is, you know, pursuit of greedy jobs that
7  are, you know, very time intensive and time
8  inflexible.  And so that was, that is one
9  of the purposes for which we used the
10  survey or they used the survey.
11        Q.     In the Harvard and Beyond
12  survey, the estimates of hours worked years
13  prior to taking the survey were not used as
14  part of a damages calculation, correct?
15        A.     No, that was an academic
16  endeavor.
17        Q.     And have you ever previously
18  used someone's estimate of time spent years
19  before taking a survey as part of a damages
20  estimate?
21        A.     I don't think I've ever had
22  occasion to.
23        Q.     When a student is using a
24  cell phone in class, a teacher would not
25  necessarily know what the student is doing

Page 273

1   on the cell phone, correct?
2                   MR. GRADEN:  Objection.
3           Foundation.
4                   THE WITNESS:  I have no idea.
5   BY MR. SANDOVAL-BUSHUR:
6       Q.     You just don't know at all?
7       A.     No, I don't know what
8   teachers do with -- I did not go to school
9   with cell phones, so I don't know how the
10  process goes down.
11      Q.     Do you think it's possible
12  that every time a student is using a cell
13  phone in class, the teacher knows exactly
14  what the student is doing on the cell
15  phone?
16                  MR. GRADEN:  Objection.
17          Foundation.
18                  THE WITNESS:  It's possible
19          that they wouldn't know, but I
20          don't know the level or frequency.
21  BY MR. SANDOVAL-BUSHUR:
22      Q.     There is a risk that if
23  teachers are asked to estimate how much
24  they spend addressing unauthorized use of
25  social media during class that they may

CONFIDENTIAL

Page 274

1  speculate about how much of the time they
2  spent addressing student use of cell phones
3  during class is related to social media,
4  correct?
5                    MR. GRADEN:  Objection.
6              Vague.  Foundation.  Form.
7                    THE WITNESS:  Say it again.
8  BY MR. SANDOVAL-BUSHUR:
9          Q.        There is a risk that if
10  teachers are asked to estimate how much
11  time they spend addressing unauthorized use
12  of social media during class, that they may
13  speculate about how much of the time that
14  they spend addressing student use of cell
15  phones is related to social media, correct?
16                    MR. GRADEN:  Objection stands.
17                    THE WITNESS:  I mean, lots of
18               things are possible.  I have no
19               idea of the likelihood.  You know,
20               as we went through, there's lots of
21               ways that you can, you know,
22               introduce inaccuracies into
23               surveys.  I'm going to trust that
24               Mr. Klein has at least thought of
25               these issues as part of his

CONFIDENTIAL

Page 275

1          assignment.
2    BY MR. SANDOVAL-BUSHUR:
3          Q.     But you're not aware of
4    either yourself or Dr. Klein doing anything
5    to address the possibility of speculation
6    in that context, correct?
7                    MR. GRADEN:  Objection.  Form.
8                    THE WITNESS:  I was not
9              involved in the discussions that
10             led to the creation of the survey
11             with Mr. Klein.  I certainly didn't
12             do anything with it, because it's
13             not part of my assignment.
14   BY MR. SANDOVAL-BUSHUR:
15         Q.     There are a large number of
16   factors that can cause a student to suffer
17   from mental health issues like anxiety or
18   depression, correct?
19                   MR. GRADEN:  Objection.
20             Scope.
21                   THE WITNESS:  Again, I don't
22             know what the exact sources of
23             anxiety and depression are, but I
24             assume that there are not one
25             cause.

CONFIDENTIAL

Page 276

1    BY MR. SANDOVAL-BUSHUR:
2         Q.    A school teacher is not
3    qualified to diagnose mental health issues,
4    correct?
5                    MR. GRADEN:  Objection.
6           Vague.
7                    THE WITNESS:  I have no idea
8           whether or not that's part of
9           teacher training.
10   BY MR. SANDOVAL-BUSHUR:
11        Q.    You think it's possible that
12   a middle school teacher is qualified to
13   diagnose mental health issues in students?
14        A.    What's the definition of a
15   mental health issue?
16        Q.    Let's say clinical
17   depression.  Is a middle school teacher
18   qualified to diagnose clinical depression
19   in a student?
20        A.    I don't know.  But once you
21   move into some sort of specific clinical
22   diagnosis, I don't know.  I would assume
23   they are not trained clinically, but who
24   knows where education is these days.  I
25   haven't been in school for a while.

CONFIDENTIAL

Page 277

```
 1          Q.      Is a school teacher qualified
 2   to diagnose addiction?
 3                  MR. GRADEN:  Objection.  Asked
 4          and answered.
 5                  THE WITNESS:  It's the same
 6          answer.  I don't know whether or
 7          not they're qualified or not.
 8   BY MR. SANDOVAL-BUSHUR:
 9          Q.      There are a number of
10   different factors that could cause a
11   student to suffer from sleep deprivation,
12   correct?
13          A.      Again, I don't know what the
14   causes of sleep deprivation are, I would be
15   willing to accept that there's probably
16   more than one.
17          Q.      Can a teacher, a school
18   teacher, accurately and reliably diagnose
19   the cause of a student suffering from sleep
20   deprivation?
21                  MR. GRADEN:  Objection.
22          Vague.
23                  THE WITNESS:  Again, I don't
24          know how accurate a school teacher
25          can be in diagnosing this type of
```

CONFIDENTIAL

Page 278

1            thing, because, yeah, I don't know,
2            never studied it.
3   BY MR. SANDOVAL-BUSHUR:
4        Q.    For purposes of your work in
5   this case, you have not reviewed any data
6   or information relating to whether school
7   teachers can accurately diagnose the causes
8   of any mental health issues or disorders,
9   correct?
10                 MR. GRADEN:  Object to form.
11                 THE WITNESS:  Yes, I have not
12            reviewed any information on school
13            teacher powers when it comes to
14            assessing mental health issues.
15   BY MR. SANDOVAL-BUSHUR:
16        Q.    Did the Klein teacher time
17   survey suggest time amounts to the school
18   district employees and then ask the
19   employees to provide time estimates?
20                 MR. GRADEN:  Objection.
21                 THE WITNESS:  I have no
22            recollection of that.
23   BY MR. SANDOVAL-BUSHUR:
24        Q.    When you are conducting
25   research in which you ask someone to

CONFIDENTIAL

Page 279

1    estimate how much time they spend on an

2    activity, is it best practice to present

3    that person with suggestions of time and

4    then ask the person to estimate how much

5    time they spent on the activity?

6                    MR. GRADEN:  Objection.

7            Scope.  Form.

8                    THE WITNESS:  Again, I'm not

9            an expert in survey design.  I do

10           not know what the best practices

11           are when it comes to asking people

12           time questions.

13   BY MR. SANDOVAL-BUSHUR:

14        Q.    If, in your academic work,

15   you were presented with the results of a

16   survey that was conducted by presenting

17   someone with suggested time estimates for

18   an activity and then asking the person to

19   estimate the amount of time they spend on

20   that activity, would you have any concern

21   that the results of that survey might be

22   biased?

23                   MR. GRADEN:  Objection to

24           form.

25                   THE WITNESS:  I would need to

CONFIDENTIAL

Page 280

1              see the actual survey as well as
2              the data.
3    BY MR. SANDOVAL-BUSHUR:
4         Q.    Are you familiar with the
5    concept of anchoring?
6         A.    I mean, I could not define it
7    precisely, but I am familiar with the idea.
8         Q.    And the idea of anchoring is
9    that if you provide somebody with a
10   suggested answer and then ask them to give
11   their own answer to a question, the answer
12   that the person gives may be anchored to
13   the suggestion that was provided to them,
14   correct?
15        A.    I believe that's the concept
16   that it's measuring.
17        Q.    And that's a real phenomenon
18   in social sciences, correct?
19                  MR. GRADEN:  Objection.
20             Foundation.
21                  THE WITNESS:  I do not -- I
22             mean, presumably, it exists
23             somewhere because there's a term
24             for it.  I don't know the extent to
25             which it happens.

CONFIDENTIAL

Page 281

1   BY MR. SANDOVAL-BUSHUR:

2        Q.      I mean, it's also kind of

3   common sense, right, that if you provide

4   someone with a suggested answer to a

5   question and then ask them to provide the

6   answer that their response may be

7   influenced in some way by the suggested

8   answer that was provided?

9                   MR. GRADEN:  Objection.

10                  THE WITNESS:  I'm sorry, what

11            do you mean by, "suggested answer"?

12  BY MR. SANDOVAL-BUSHUR:

13       Q.      So if someone were to suggest

14  to a school employee, you maybe spend

15  50 percent of your day addressing issues

16  relating to social media and then asked the

17  employee to estimate what percentage of

18  their day they spend addressing issues

19  relating to social media, do you think that

20  providing the estimate, the suggested

21  estimate, may influence the response that

22  they provide?

23                  MR. GRADEN:  Objection to

24            form.  Foundation.

25                  THE WITNESS:  I have no idea.

CONFIDENTIAL

Page 282

1    BY MR. SANDOVAL-BUSHUR:

2          Q.      You don't know?

3          A.      I mean, the way you phrased

4    it, I can't imagine anybody would actually

5    phrase it that way.  You know, so, but,

6    yeah, I don't -- I don't know.

7          Q.      Why can you not imagine that

8    someone would phrase it that way?

9          A.      Why would you say you may

10   spend 50 percent of your time on social

11   media, how much time do you spend on social

12   media?

13         Q.      Well, you wouldn't do it

14   because it wouldn't be a good way of

15   gathering accurate information, correct?

16         A.      Typically, when you see some

17   sort of suggestion, you know, it might be

18   helping you understand units, right?  So

19   that's -- you know, so I don't, you know,

20   it's -- I have never encountered a question

21   that was phrased the way that you just

22   phrased that to me.  So it just rang in my

23   ears as I don't even -- that would never,

24   in my opinion, seem like something that I

25   would read in a survey.  So, but no, I

CONFIDENTIAL

Page 283

1  don't have any opinion.  I mean,
2  ultimately, when you want to understand
3  anchoring, I'm sure you go to a literature
4  and you would, you know, say, okay, let me,
5  you know -- or if you're a student and you
6  want to understand this, you would go to
7  literature and would say, okay, help me
8  understand these things and now I'm going
9  to go off and, you know, do surveys.  I'm
10 assuming that Mr. Klein understands these
11 issues and has addressed them.
12        Q.     Are there any limitations
13 associated with relying on employee
14 affidavits or declarations for the purposes
15 of your damages estimates?
16              MR. GRADEN:  Objection.
17              THE WITNESS:  I'm comfortable
18          relying on the information that I
19          was provided by sworn testimony
20          under oath by people who may or may
21          not have been deposed to further
22          evaluate the veracity of their
23          testimony.
24 BY MR. SANDOVAL-BUSHUR:
25        Q.     If you were going to publish

CONFIDENTIAL

Page 284

1   your damages estimates in a peer-reviewed

2   journal, would you identify any limitations

3   relating to your reliance on employee

4   affidavits?

5                    MR. GRADEN:  Objection.

6            Vague.

7                    THE WITNESS:  Sworn

8            affidavits, I can't think of

9            anything that I would, you know,

10           say, oh, we have to talk about this

11           necessarily, no.

12  BY MR. SANDOVAL-BUSHUR:

13       Q.       You relied on affidavits that

14  were provided by employees from Breathitt,

15  Charleston, DeKalb -- actually, let me ask

16  that question a little differently.

17                You relied on the affidavits

18  that were provided by employees from

19  Breathitt, Charleston, Irvington, and

20  Tucson without speaking with any of those

21  employees, correct?

22       A.       That's correct.

23       Q.       You relied on the affidavits

24  that were provided by employees from

25  Breathitt, Charleston, Irvington, and

CONFIDENTIAL

Page 285

1    Tucson without first having read or seen
2    any deposition testimony from those
3    employees, correct?
4           A.      I think all the depositions
5    came afterwards.
6           Q.      You relied on the deposition
7    testimony that was provided by employees
8    from Harford without speaking with any of
9    those employees, correct?
10          A.      That's correct.
11          Q.      Do you know what process any
12   of the school employees who issued
13   affidavits used to arrive at their
14   estimates?
15          A.      Certainly the ones that are
16   described in the depositions that have
17   taken place since.  I feel like some, if
18   not all, of those do describe the methods
19   that they went through.  Sometimes I feel
20   like it might actually have been included
21   in the affidavits.  I don't recall all of
22   the specifics, but I felt comfortable that
23   these were the people that have the
24   knowledge and that certainly after reading
25   the depositions, that they had gone through

CONFIDENTIAL

Page 286

1    a reasonable process to elicit the relevant

2    information for my testimony.

3              Q.    To the extent you were

4    relying on -- you're relying now on what

5    was said in depositions, you did not deem

6    that information necessary to rely on the

7    affidavits for Breathitt, Charleston,

8    Irvington, and Tucson when you initially

9    issued your reports in this case, correct?

10             A.    Sorry, say that again.

11             Q.    Yeah, I'll move on.  It was

12   not part of your assignment in this case to

13   determine whether the employees who issued

14   affidavits in this case used a reasonable

15   process to arrive at their time estimates,

16   correct?

17                   MR. GRADEN:  Objection.

18                   THE WITNESS:  State it again.

19   BY MR. SANDOVAL-BUSHUR:

20             Q.    It was not part of your

21   assignment in this case to determine

22   whether the employees who issued affidavits

23   used a reasonable process to arrive at

24   their time estimates, correct?

25             A.    No, I did not set out some

CONFIDENTIAL

Page 287

1    standard of, you know, these are the
2    details of their process and it's
3    reasonable.  I trusted that they engaged in
4    a reasonable process because they are
5    providing sworn testimony.
6              Q.      You trusted that the
7    employees who issued affidavits engaged in
8    a reasonable process, but you didn't
9    actually verify that they, in fact, used a
10   reasonable process, correct?
11                  MR. GRADEN:  Objection.
12                  THE WITNESS:  I don't know
13             what I have -- I don't have a
14             definition of, quote, "reasonable
15             process" that I would require them
16             to go through.  My assumption is I
17             believe it's reasonable for me to
18             rely on their data because they are
19             people with the right -- in the
20             positions where they would have
21             knowledge or have access to people
22             with knowledge.  They were
23             providing testimony as part of this
24             litigation, sworn testimony, that I
25             understood that you all would have

CONFIDENTIAL

Page 288

1              the opportunity to depose them, if
2              I hadn't already read those
3              depositions under which, you know,
4              their testimony would receive
5              additional scrutiny.  So I felt
6              comfortable that it was reasonable
7              for me to rely upon.
8    BY MR. SANDOVAL-BUSHUR:
9         Q.    Are you aware that the
10   employees who issued affidavits did not
11   review data to ensure that their time
12   estimates were accurate?
13                 MR. GRADEN:  Objection,
14              foundation.
15                 THE WITNESS:  What do you mean
16              they didn't review data?
17   BY MR. SANDOVAL-BUSHUR:
18        Q.    I'm not sure how much more I
19   can be clear than to say reviewed any data.
20   Are you aware that the employees who issued
21   affidavits did not review any data to
22   ensure that their time estimates were
23   accurate, correct?
24                 MR. GRADEN:  Objection.
25              Foundation.

Page 289

1                    THE WITNESS:  What data are
2               they not reviewing or reviewing?
3    BY MR. SANDOVAL-BUSHUR:
4        Q.      To your knowledge, did any of
5    the employees who issued affidavits review
6    any data to ensure that their time
7    estimates were accurate?
8        A.      I feel like I recall them in
9    depositions talking about, you know, they
10   spoke with other people, that's data,
11   right?  Like, when I'm talking to you,
12   that's data, you're providing me data,
13   right?  They also may have looked at
14   incident reports, that's data.  Or other
15   systems that they're tracking, I can't
16   remember everything that's all across it,
17   but I do recall some of the depositions
18   where I feel like they said, yeah, we
19   looked at some things, we got together, we
20   talked about stuff.  So that's what I mean
21   by what's data, right?  Like, you know,
22   what is your definition of data?  Like,
23   certainly, they assembled information, and
24   a different word for assembling information
25   is assembling data.

Page 290

1        Q.    Okay.  I'll define data to

2    mean some sort of documentary records,

3    okay?  Using that definition of data, are

4    you aware that many of the employees who

5    issued affidavits did not consult any data

6    to ensure that their time estimates were

7    accurate?

8                    MR. GRADEN:  Objection.

9            Foundation.

10                   THE WITNESS:  I have not read

11           the deposition of everybody who has

12           provided affidavits, so I certainly

13           couldn't agree to anything about

14           many.  But -- and I don't recall

15           all of the details of each

16           deposition off the top of my head,

17           so I don't know to what extent any

18           of them looked at quantitative

19           records.  I just know that I feel

20           like something of that nature came

21           up in some of them.

22    BY MR. SANDOVAL-BUSHUR:

23        Q.    For your purposes for you to

24    rely on the employee affidavits and

25    deposition testimony, you did not require

Page 291

1    that the employee have reviewed any sort of
2    documentary data records before providing
3    their estimate, correct?
4            A.      No, I don't think that's a
5    requirement for being able to provide an
6    estimate of time.
7            Q.      And for your purposes for you
8    to rely on the employee affidavits and
9    deposition testimony, you did not require
10   that the employees have relied on any
11   particular form of information at all in
12   reaching their estimates, correct?
13               MR. GRADEN:  Objection.  Asked
14           and answered.
15               THE WITNESS:  I required no
16           specific information.  I trusted
17           that, again, that they were people
18           in positions where they would be
19           able to directly or access the
20           knowledge and information to
21           provide an estimate under oath in
22           this case.
23   BY MR. SANDOVAL-BUSHUR:
24           Q.      And what is your basis for
25   trusting that the people who provided

```
                                        Page 292
```

1    affidavits provided accurate information?

2                    MR. GRADEN:  Objection.  Asked

3             and answered.

4                    THE WITNESS:  Again, they're

5             providing sworn testimony as part

6             of a lawsuit.

7    BY MR. SANDOVAL-BUSHUR:

8         Q.     So because they sign sworn

9    affidavits, it's your opinion that the

10   information provided in those affidavits is

11   therefore trustworthy?

12        A.     You know, particularly once

13   they've gone through a deposition and, you

14   know, presumably provided a defense of

15   their approach.  Now, look, you know, I'm

16   relying on them.  I have no basis to

17   believe that they provided me inaccurate

18   data.

19        Q.     You are not vouching for the

20   accuracy of the time estimates provided in

21   any employee affidavit or deposition,

22   correct?

23        A.     No, I'm vouching for the

24   reasonableness of me relying on it because

25   of all of the things we've just discussed.

CONFIDENTIAL

Page 293

1          Q.     Is it your understanding that
2     Plaintiffs' attorneys suggested time
3     estimates to employees who ultimately
4     issued affidavits and then asked the
5     employees to estimate time?
6                    MR. GRADEN:  Objection.  Lacks
7               foundation.
8                    THE WITNESS:  I have no idea.
9     BY MR. SANDOVAL-BUSHUR:
10         Q.     It doesn't lack foundation,
11    but that's okay.
12                 Suggesting time estimates to
13    an employee and then asking the employee to
14    estimate time could create a risk of
15    biasing the employees' estimates towards
16    the suggestions, correct?
17         A.     Maybe, I don't know.
18         Q.     For time estimates for
19    non-teacher employees, you relied on
20    estimates provided by just a few people per
21    district, correct?
22         A.     Typically, yeah.
23         Q.     I think between two and six,
24    depending on the district; is that right?
25         A.     I think that's right.

CONFIDENTIAL

1          Q.     The people whose time
2     estimates you relied on for non-teacher
3     employee time were selected by Plaintiffs'
4     attorneys, correct?
5          A.     I don't know who selected
6     them.
7          Q.     You did not identify the
8     people who you thought should provide time
9     estimates and then ask Plaintiffs'
10    attorneys to get time estimates from those
11    people, correct?
12         A.     No, I did not identify the
13    specific people.
14         Q.     Plaintiffs' attorneys just
15    presented you with affidavits saying here
16    are the people who we have time estimates
17    from from each of the districts, correct?
18                    MR. GRADEN:  Objection.
19                    THE WITNESS:  Yeah, I didn't
20              select them.  I received the
21              affidavits from whoever was
22              selected by whoever.
23    BY MR. SANDOVAL-BUSHUR:
24         Q.     But the affidavits were
25    provided to you by Plaintiffs' attorneys,

CONFIDENTIAL

Page 295

1    correct?

2              A.       That is correct.

3              Q.       You do not know why

4    Plaintiffs' attorneys selected which

5    employees would provide affidavits and

6    which would not, correct?

7                       MR. GRADEN:  Objection.

8              Foundation.

9                       THE WITNESS:  No, I don't know

10             why, other than that the people

11             that ultimately provided them,

12             frequently, they're supervisors or

13             people who have reasonable

14             knowledge, but that's my inference,

15             not based on somebody telling me

16             this is why we selected this

17             person.

18   BY MR. SANDOVAL-BUSHUR:

19             Q.       And you do not know how your

20   damages estimates may have changed if

21   Plaintiffs' attorneys had selected

22   additional employees to provide affidavits,

23   correct?

24                      MR. GRADEN:  Objection.

25             Vague.

Page 296

```
 1              THE WITNESS:  I don't know
 2         what other data would have changed,
 3         because we don't have that data.
 4  BY MR. SANDOVAL-BUSHUR:
 5       Q.      And you do not know how your
 6  damages estimates would have changed if
 7  Plaintiffs' attorneys had selected
 8  different employees to provide affidavits,
 9  correct?
10              MR. GRADEN:  Objection.  Asked
11         and answered.
12              THE WITNESS:  I can't -- you
13         know, no, I cannot describe what
14         exists in data that we don't have.
15  BY MR. SANDOVAL-BUSHUR:
16       Q.      It is entirely possible that
17  if Plaintiffs' attorneys had provided you
18  with affidavits from additional or
19  different employees, then your damages
20  estimates would be lower, correct?
21              MR. GRADEN:  Objection.
22              THE WITNESS:  Or they could be
23         higher or they could be the same.
24  BY MR. SANDOVAL-BUSHUR:
25       Q.      It's pretty unlikely that if
```

Case 4:22-md-03047-YGR    Document 2536-46    Filed 12/11/25    Page 298 of 515


CONFIDENTIAL

Page 297

1  the Plaintiffs' attorneys had gotten more
2  declarations from more employees that they
3  all would have contained the exact same
4  estimates, correct?
5                    MR. GRADEN:  Objection.
6           Foundation.
7                    THE WITNESS:  I don't know.
8           Maybe.
9  BY MR. SANDOVAL-BUSHUR:
10         Q.      The job roles of the
11 employees submitting the affidavits were
12 not identical across the six bellwether
13 districts in which you're offering
14 opinions, correct?
15         A.      No, I feel like there's
16 variation in the positions that are in
17 there.
18         Q.      Do you know why the positions
19 of the employees submitting affidavits were
20 not consistent across all of the districts
21 in which you are offering opinions?
22         A.      I don't.  I'm just assuming
23 it has to do with differences in how they
24 organize work across positions in a
25 district.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

Page 298

1          Q.      Do you know, for example, why
2     in some districts you got estimates of how
3     much time principals spent addressing
4     social media issues and in other districts,
5     you did not get such estimates?
6          A.      No, I took what was provided
7     to me, most of them were principals,
8     though.
9          Q.      But you didn't ask why you
10    got some positions for some districts and
11    different positions for other districts?
12         A.      No, you know, I took what --
13    I assumed that they got the affidavits from
14    the people that were the relevant parties
15    for -- from the perspective of that
16    district.
17         Q.      In forming your opinions, did
18    you consider the possibility that
19    Plaintiffs' attorneys may have provided you
20    with affidavits only from employees who
21    estimated larger amounts of time spent
22    addressing student use of social media and
23    did not provide you with affidavits from
24    employees who estimated lower amounts of
25    time spent addressing student use of social

CONFIDENTIAL

Page 299

1  media?

2              MR. GRADEN:  Objection.

3          Foundation.

4              THE WITNESS:  I got the

5          affidavits that I got.  I don't

6          know -- I don't know anything about

7          any non -- you know, any affidavit

8          that I did not see.

9  BY MR. SANDOVAL-BUSHUR:

10      Q.    The estimates of non-teacher

11 employee time would have been more accurate

12 if you had received estimates from more

13 than just a few people per district,

14 correct?

15             MR. GRADEN:  Objection.

16         Foundation.

17             THE WITNESS:  Not necessarily,

18         no.

19 BY MR. SANDOVAL-BUSHUR:

20      Q.    The estimates of non-teacher

21 time that you used in your calculations

22 could have been more accurate if you had

23 received estimates from more than just a

24 few people per district, correct?

25      A.    Maybe.  I mean, again, you

```
                                      Page 300
 1   know, sample size speaks to precision, not
 2   necessarily accuracy.
 3            Q.      The employees offering
 4   estimates of non-teacher employee time
 5   spent addressing social media issues did
 6   not limit their estimates to just their own
 7   time, correct?
 8            A.      That's correct.
 9            Q.      The employees who provided
10   estimates of non-teacher employee time
11   offered estimates of the amount of time
12   that other employees spent addressing
13   social media-related issues, correct?
14                   MR. GRADEN:  Objection.
15                   THE WITNESS:  That's correct.
16   BY MR. SANDOVAL-BUSHUR:
17            Q.      And you relied on the
18   estimates that employees offered of the
19   amount of time that other employees spent
20   addressing social media-related issues,
21   correct?
22                   MR. GRADEN:  Objection.
23                   THE WITNESS:  That's correct.
24              Their assignment was to summarize
25              the time spent by not just
```

CONFIDENTIAL

Page 301

1           themselves, but whatever employees
2           they were tasked with covering.
3   BY MR. SANDOVAL-BUSHUR:
4           Q.    The employees who provided
5   estimates of non-teacher employee time
6   offered estimates of the amount of time
7   that other employees who worked in
8   different buildings from themselves spent
9   addressing social media-related issues,
10  correct?
11                  MR. GRADEN:  Objection.
12          Foundation.
13                    THE WITNESS:  Potentially.
14  BY MR. SANDOVAL-BUSHUR:
15          Q.    The employees who provided
16  estimates of non-teacher employee time
17  offered estimates of the amount of time
18  that other employees who they did not
19  directly or indirectly supervise spent
20  addressing social media-related issues,
21  correct?
22                  MR. GRADEN:  Objection.
23          Foundation.
24                    THE WITNESS:  Potentially.
25

CONFIDENTIAL

Page 302

1    BY MR. SANDOVAL-BUSHUR:

2         Q.      And for purposes of your

3    opinions in this case, it didn't matter

4    whether the employees who provided

5    estimates of non-teacher employee time

6    offered estimates of the amount of time

7    that employees who they did not directly or

8    indirectly supervise spent addressing

9    social media-related issues, correct?

10        A.      No.  I mean, it's perfectly

11   reasonable to assume that somebody can

12   assemble the information.  I don't have to

13   be directly supervising you to be able to

14   kind of learn about how much time is being

15   spent.  I mean, this is what, you know, we

16   learn all sorts of things about our

17   colleagues.  I don't have to directly

18   supervise or work in the same building with

19   you to know things about you.

20        Q.      Is it your understanding that

21   the time estimates in the employee

22   affidavits are not based on the affiant's

23   personal historical experience, but instead

24   based on information specifically gathered

25   by the affiant for the purpose of

CONFIDENTIAL

Page 303

1    submitting the affidavit?

2                    MR. GRADEN:  Objection to

3            form.

4                    THE WITNESS:  I believe in

5            some cases, that is true.

6    BY MR. SANDOVAL-BUSHUR:

7        Q.    The employees who provided

8    estimates of non-teacher employee time

9    spent addressing social media issues

10   offered estimates of the amount of time

11   that other employees who they had never

12   spoken to spent addressing social

13   media-related issues, correct?

14                   MR. GRADEN:  Objection.

15           Foundation.

16                   THE WITNESS:  Possibly, I

17           don't know.

18   BY MR. SANDOVAL-BUSHUR:

19       Q.    And whether or not the

20   employees providing the affidavits

21   estimated the amount of time that employees

22   who they had never spoken to spent

23   addressing social media-related issues did

24   not affect one way or the other your

25   reliance on those estimates, correct?

CONFIDENTIAL

Page 304

1          A.       It's perfectly reasonable to

2    assume that you can collect information

3    from a broad swath of the population

4    without ever directly speaking to

5    everybody.

6          Q.       You are not offering the

7    opinion that the estimates that employees

8    provided in affidavits or deposition

9    testimony of how much time other employees

10   spent addressing social media-related

11   issues are reliable or accurate, correct?

12         A.       I am not testifying to their

13   reliability or accuracy.  I am assuming

14   their reliability and accuracy as a

15   reasonable part -- thing for me to use as

16   part of my calculation.

17         Q.       In your academic work outside

18   of litigation, have you ever drawn

19   conclusions based on one employee's

20   estimate of how another employee who worked

21   in a different building spent their day?

22                   MR. GRADEN:  Objection.  Form.

23                   THE WITNESS:  I don't think

24            I've ever had any occasion to make

25            that specific --

CONFIDENTIAL

Page 305

1    BY MR. SANDOVAL-BUSHUR:

2         Q.    Did you ever ask why the

3    Klein survey was not simply administered to

4    all of the categories of non-teacher

5    employees who were ultimately covered by

6    the affidavits?

7         A.    I don't remember if that ever

8    came up.

9         Q.    For the employees whose

10   estimates of nonemployee time spent

11   addressing social media-related issues you

12   relied on, you do not know how those

13   employees defined social media, correct?

14              MR. GRADEN:  Objection.

15         Foundation.

16              THE WITNESS:  To the extent

17         that they define it in their

18         affidavits or in their depositions,

19         then presumably, I have it.  I also

20         assume, again, because they're

21         providing an affidavit specific to

22         this litigation that they have

23         defined it consistent with the

24         definition that is appropriate for

25         this case.

Page 306

1  BY MR. SANDOVAL-BUSHUR:

2      Q.    That's an assumption you

3  can't -- you're not saying that's in fact

4  true, correct?

5              MR. GRADEN:  Objection.

6              THE WITNESS:  Sorry, what is

7          not in fact true?

8  BY MR. SANDOVAL-BUSHUR:

9      Q.    You are not saying it is in

10  fact true that the employees who issued the

11  affidavits defined social media consistent

12  with the definition that is appropriate for

13  this case, correct?

14      A.    To the extent that they

15  describe that in their affidavits or in

16  their depositions, then if they have

17  described it there, then, yes, I can tell

18  you that it is.  To the ones that I have --

19  that they don't expressly state it in their

20  affidavit or they have not been deposed, I

21  can only assume based on the fact that it

22  is an affidavit in a particular lawsuit

23  that they have defined it in a way that is

24  consistent with the lawsuit.

25      Q.    What is the definition of

Page 307

1    social media that is appropriate for this

2    case?

3                    MR. GRADEN:  Objection.

4            Scope.

5                    THE WITNESS:  I couldn't tell

6            you off the top of my head.  I

7            believe that there's YouTube,

8            Facebook, Instagram, TikTok, and

9            SnapChat.  I believe those are the

10           companies at issue.  But I don't --

11           you know, but all the conduct, so

12           there's the Defendants and their

13           conduct, I couldn't tell you all

14           the conduct off the top of my head.

15   BY MR. SANDOVAL-BUSHUR:

16           Q.    So you have assumed that the

17   employees who issued affidavits define

18   social media in a way that was consistent

19   with the lawsuit, but you personally are

20   not sure of what definition exactly would

21   be consistent with the lawsuit; is that

22   right?

23                    MR. GRADEN:  Objection.

24                    THE WITNESS:  I mean, you

25           know, like I said, there are

CONFIDENTIAL

Page 308

1           details of this definition that I
2           certainly cannot provide you right
3           here right now, because, honestly,
4           it's pretty far removed from what
5           I'm doing in my part of the
6           calculation.  So it's not something
7           that I have been reviewing on a
8           regular basis.
9    BY MR. SANDOVAL-BUSHUR:
10          Q.     You have spent somewhere on
11   the order of four to 500 hours working on
12   this case, correct?
13          A.     We can sit here and try and
14   calculate it.
15          Q.     Well, you have worked several
16   hundred hours on this case, correct?  I
17   mean, we talked about earlier you worked 20
18   hours a day for ten days straight?
19          A.     Yeah, okay.  Yeah.
20          Q.     So you have worked several
21   hundred hours on this case, correct?
22          A.     Yup.
23          Q.     But you do not have a
24   definition for what is social media that is
25   consistent with the lawsuit sitting here

CONFIDENTIAL

Page 309

1  today, correct?

2              MR. GRADEN:  Objection.

3          Misstates testimony.

4              THE WITNESS:  Not off the top

5          of my head, as I sit here right

6          now.  Like, you know, I can only

7          speak in pretty broad general terms

8          because, again, as I mentioned,

9          it's not a particularly relevant

10         thing for the part of the

11         calculation that I am doing.

12  BY MR. SANDOVAL-BUSHUR:

13         Q.    But you are assuming that

14  every single employee who issued an

15  affidavit did in fact both have a

16  definition of social media that was -- and

17  had a definition that was appropriate for

18  this lawsuit, correct?

19             MR. GRADEN:  Objection.  Form.

20             THE WITNESS:  I mean, that's

21         part of their assignment, right?

22         Like, I mean, I don't need to walk

23         around with that in my head,

24         because I'm, again, I'm assuming

25         that they have done their

CONFIDENTIAL

Page 310

1              assignment in a manner that is
2              appropriate for my calculation.  My
3              calculation says, great, there's
4              time loss.  That's all a time loss
5              question.  My job is to say what's
6              the value of that time?  I don't
7              need a definition of social media
8              or at-issue conduct to be able to
9              do that and perform that
10             calculation.
11   BY MR. SANDOVAL-BUSHUR:
12        Q.      And what is your source of
13   belief that the employees who issued
14   affidavits had as part of their assignment
15   understanding what the appropriate
16   definition of social media was for this
17   lawsuit?
18        A.      Logic.
19        Q.      Okay.  But you haven't seen,
20   you're not aware of actual facts that the
21   employees who issued affidavits had as part
22   of their assignment, understanding and
23   applying an appropriate definition of
24   social media for purposes of this lawsuit,
25   correct?

CONFIDENTIAL

Page 311

```
 1              MR. GRADEN:  Objection.
 2              THE WITNESS:  Again, to the
 3         extent that it's covered in their
 4         affidavit or in their depositions,
 5         then I have basis for that.  But,
 6         like, I'm answering the same
 7         question again, right?  But no, I
 8         did not sit down with them and say,
 9         please describe the definition of
10         what you're using in this term.
11         That's not for me to do, right?
12         Like, the fact that I was provided
13         it, it's perfectly reasonable for
14         me to believe that that is true.
15  BY MR. SANDOVAL-BUSHUR:
16         Q.     And you are not able to
17  assess whether based on what is in an
18  affidavit or in a deposition the employee
19  used the appropriate definition of social
20  media for purposes of this lawsuit, because
21  you are not sure what that definition is
22  yourself, correct?
23              MR. GRADEN:  Objection.
24         Misstates testimony.  Form.
25         Foundation.
```

Page 312

1                THE WITNESS:  I'm not sure of
2           it as I sit here right now.  At
3           some point, I was aware of it.
4    BY MR. SANDOVAL-BUSHUR:
5           Q.     You don't say what that
6    definition is in your reports, correct?
7           A.     No, again, it's not something
8    that is integral to my portion of this
9    calculation.
10          Q.     So it was not integral for
11   your portion of the calculation to know
12   what exactly was supposed to be being
13   measured, correct?
14                MR. GRADEN:  Objection.
15           Misstates testimony.
16                THE WITNESS:  Again, that's
17           time loss.  I'm doing value of
18           time, right?  As we talked about
19           earlier, I make no claim that
20           social media use or social media
21           has changed the value of time
22           relative to its but-for world,
23           right?  I'm here assembling data,
24           right, and applying it to time loss
25           estimates that I was provided by a

CONFIDENTIAL

Page 313

1          survey expert and by a bunch of
2          affiants who are in positions where
3          they should have knowledge of these
4          issues and to the extent that
5          they've described them in their
6          affidavits or their depositions, I
7          found it perfectly reasonable the
8          way they approached it.  Like, I
9          don't need to know at all points in
10         time the ins and outs of the
11         definitions that are relevant for
12         them to do their calculations,
13         right, to be able to say I can
14         trust that they should have done
15         that.  It's reasonable for me to
16         assume that.
17  BY MR. SANDOVAL-BUSHUR:
18         Q.      It was not part of your
19  assignment in this case to determine that
20  the Klein teacher time survey, the employee
21  affidavits, or the employee testimony
22  measured the right thing, correct?
23              MR. GRADEN:  Objection.  Form.
24         Foundation.
25              THE WITNESS:  I am taking

CONFIDENTIAL

                                          Page 314

1              their statements.  They are

2              witnesses.  They can speak for

3              themselves.

4    BY MR. SANDOVAL-BUSHUR:

5         Q.      Was it part of your

6    assignment in this case to determine that

7    the Klein teacher time survey, the employee

8    affidavits, and the employee testimony

9    measured the right thing?

10                   MR. GRADEN:  Objection.

11                   THE WITNESS:  No, my

12              assignment was to take those things

13              as given and apply the value of

14              time to them.

15   BY MR. SANDOVAL-BUSHUR:

16        Q.      Is it possible that when

17   employees referred to social media in their

18   affidavits that they included websites and

19   apps other than Defendants' websites and

20   apps?

21                   MR. GRADEN:  Objection.

22              Foundation.

23                   THE WITNESS:  You asked this

24              before, but is it possible,

25              anything is possible.  Does it seem

Page 315

1              likely or reasonable, probably
2              unlikely.
3    BY MR. SANDOVAL-BUSHUR:
4         Q.      For the employees --
5         A.      Can we actually pause?  It
6    has been, like, an hour and a half.  I
7    would like to stretch out.
8                 MR. SANDOVAL-BUSHUR:  Sure.
9              We can take a break.  Go off the
10             record.
11                THE VIDEOGRAPHER:  Going off
12             video record 3:28 p.m.
13                - - - - -
14       (A recess was taken at this time.)
15                - - - - -
16                THE VIDEOGRAPHER:  Back on
17             video record 3:45 p.m.
18   BY MR. SANDOVAL-BUSHUR:
19        Q.      For the employees whose
20   estimates of nonemployee time you relied
21   on, you do not know how those employees
22   determined which issues were related to
23   social media, correct?
24        A.      Sorry, say it again.
25        Q.      For the employees whose

CONFIDENTIAL

Page 316

1    estimates of nonemployee time -- sorry,

2    non-teacher time -- yeah, so I'll start

3    that over, because, yeah, I messed that up.

4              For the employees whose

5    estimates of non-teacher time spent

6    addressing social media-related issues you

7    relied on, you do not know how those

8    employees determined which issues were

9    related to social media, correct?

10        A.    No, again, I'm relying on

11   them to provide me the time loss estimate

12   that's relevant for this case.

13        Q.    No definition related to

14   social media was provided to the client

15   survey respondents or by the affidavit --

16   employees who issued affidavits, correct?

17              MR. GRADEN:  Objection.  Form.

18              THE WITNESS:  I don't know

19         what the affiants, you know, any

20         discussions they had about

21         definitions and I can't recall

22         what's in the client survey.

23   BY MR. SANDOVAL-BUSHUR:

24        Q.    If an employee provided an

25   estimate of the amount of time spent on

CONFIDENTIAL

Page 317

1    behavior concerns, that time estimate would

2    not be a reliable input for a calculation

3    of damages relating to social media

4    specifically, correct?

5                    MR. GRADEN:  Objection.

6            Foundation.

7                    THE WITNESS:  If they're

8            providing an estimate of something

9            different than what's relevant

10           here, then, no, it's not the

11           relevant thing.

12   BY MR. SANDOVAL-BUSHUR:

13       Q.      And based on your

14   understanding, is an estimate of all time

15   spent on behavior concerns relevant to the

16   damages that you are calculating?

17       A.      Say it again.

18       Q.      Based on your understanding,

19   is an estimate of all time spent on

20   behavior concerns relevant to the damages

21   that you are calculating?

22       A.      It's not part of what I'm

23   calculating.  I am not calculating losses

24   related to all behavioral concerns.  I'm

25   calculating damages associated with social

CONFIDENTIAL

Page 318

1    media-related issues.

2          Q.      If an employee provided an

3    estimate of the time spent addressing all

4    health impairments that have a connection

5    to a mental health component, that time

6    estimate would not be a reliable input for

7    a calculation of damages relating to social

8    media specifically, correct?

9                    MR. GRADEN:  Objection.

10                   THE WITNESS:  If they provided

11              an estimate of something that's not

12              social media-related damages, it's,

13              you know, it's not the thing that

14              you should use to calculate

15              damages.

16   BY MR. SANDOVAL-BUSHUR:

17          Q.      And all time spent addressing

18   health impairments that have a connection

19   to a mental health component is a different

20   question than time spent addressing social

21   media, correct?

22                   MR. GRADEN:  Objection.  Asked

23              and answered.

24                   THE WITNESS:  Yeah, I mean,

25              it's the same thing, if it's not

Page 319

1          the social media, I mean, those

2          things can be related, obviously,

3          right, like, they may be related to

4          social media, but if it's just,

5          like, all this, unless it all is

6          from social media, no, it's not the

7          same thing.

8   BY MR. SANDOVAL-BUSHUR:

9          Q.      If an employee provided an

10  estimate of the amount of time spent

11  addressing all mental health issues in

12  students who engaged in some use of social

13  media, that time estimate would not be a

14  reliable input for a calculation of damages

15  relating to social media specifically,

16  correct?

17              MR. GRADEN:  Objection.  Form.

18              THE WITNESS:  Not unless all

19          the mental health issues were

20          related to their some use of social

21          media.

22  BY MR. SANDOVAL-BUSHUR:

23          Q.      If an employee's estimate of

24  time spent addressing social media-related

25  concerns included all time spent addressing

                                        Page 320

1    issues faced by students who were dealing

2    with homelessness, that time estimate would

3    not be a reliable input for a calculation

4    of damages relating to social media

5    specifically, correct?

6          A.    Unless all of the

7    homelessness was attributable to social

8    media.

9          Q.    And it's not plausible that

10   all homelessness would be attributable to

11   social media, correct?

12               MR. GRADEN:  Objection to the

13          testimony.

14               THE WITNESS:  That, I don't

15          know, but, you know, I'm just

16          trying to make sure the math works

17          in your question, right?  So if all

18          the homelessness was attributable

19          to social media, then it would be,

20          but if it's not, if there are some

21          parts of homelessness that are not

22          attributable to social media, then,

23          again, the estimate of time loss is

24          not measuring at-issue conduct that

25          is appropriate for the damages

Page 321

1         calculation.

2    BY MR. SANDOVAL-BUSHUR:

3         Q.    If an employee estimated that

4    100 percent of her time is spent addressing

5    social media-related issues because all

6    students have been impacted with social

7    media at some point, that time estimate

8    would not be a reliable input for a

9    calculation of damages relating to social

10   media specifically, correct?

11        A.    I mean, it would depend on

12   that employee's job, right?  If they're

13   fundamentally just dealing with issues

14   related to social media, then it's not

15   unreasonable to assume that they would

16   report 100 percent of their time.

17        Q.    If the employee deals with

18   some issues that are not directly related

19   to social media, but estimated that

20   100 percent of their time is spent

21   addressing social media-related issues

22   because all students have been impacted

23   with social media at some point, that time

24   estimate would not be a reliable input for

25   a calculation of damages relating to social

CONFIDENTIAL

                                              Page 322

1   media specifically, correct?

2                   MR. GRADEN:  Objection to

3           form.

4                   THE WITNESS:  I mean, if by

5           construction they're not spending

6           some of their time on stuff that's

7           stemming from social media, then

8           you shouldn't assume 100 percent of

9           the time.

10  BY MR. SANDOVAL-BUSHUR:

11      Q.      Who is able to more reliably

12  estimate how many minutes an employee

13  spends his or her workday on a particular

14  issue, the employee or the employee's boss?

15                  MR. GRADEN:  Objection to

16          form.

17                  THE WITNESS:  I mean, I'm not

18          sure there's a definitive answer to

19          that.  Either can be.

20  BY MR. SANDOVAL-BUSHUR:

21      Q.      Who is able to more reliably

22  estimate how many minutes an employee

23  spends in his or her workday on a

24  particular issue, the employee or the

25  employee's boss's boss?

CONFIDENTIAL

Page 323

1              MR. GRADEN:  Objection to

2          form.

3              THE WITNESS:  Again, it

4          depends on what kind of monitoring

5          we're doing, but, you know, you

6          would presume that the employee

7          would know more, but that doesn't

8          mean that the boss doesn't know or

9          the boss's boss doesn't have a

10          reliable estimate.

11  BY MR. SANDOVAL-BUSHUR:

12      Q.      The estimates that you rely

13  on -- or let me ask the question a little

14  bit differently.

15          Estimates of employee time

16  spent on issues relating to social media

17  would be more reliable if you got estimates

18  from all of the employees who are addressed

19  in the affidavits, correct?

20              MR. GRADEN:  Objection.  Asked

21          and answered.

22              THE WITNESS:  It's not

23          necessarily -- you wouldn't

24          necessarily get the different

25          answer.  But to the extent that,

CONFIDENTIAL

Page 324

1          you know, again, if you got
2          accurate reports from every single
3          employee, obviously, that is -- you
4          know, now you're at truth, whereas
5          when you're summarizing, there's
6          always going to be some potential
7          for a margin of error.  So you'll
8          have a more precise, accurate
9          estimate.  It doesn't mean it would
10          be a different estimate.
11 BY MR. SANDOVAL-BUSHUR:
12          Q.    In your reports, you provide
13 mean low and high damages estimates,
14 correct?
15          A.    That's correct.
16          Q.    For the high damages
17 estimate, you take the high end of the
18 confidence interval or margin of error for
19 the Klein teacher time survey and multiply
20 the teacher salaries and benefits by that,
21 correct?
22          A.    By the share constructed from
23 that, yes.
24          Q.    The high damages estimate
25 would only be accurate if the mean average

CONFIDENTIAL

Page 325

1    time reported by the Klein teacher time

2    survey underestimated the time that

3    teachers spent addressing social

4    media-related issues, correct?

5            A.      Yes.

6            Q.      Which of the damages

7    estimates mean, low, and high do you think

8    is the most accurate?

9            A.      Well, the mean is the mean of

10   the sample.  The confidence interval is

11   just gives you some sense of understanding,

12   because of sample size issues and just

13   issues with, you know, the fact that -- you

14   know, there's variance in the data, you

15   know, we're just now speaking about we know

16   that we're pretty confident that, assuming

17   that the survey is accurate, that the mean,

18   the true value lies within this range.  But

19   the mean is still the middle, right?  It's

20   still the estimate that we have.  So the

21   mean is the estimate that actually comes

22   from the survey.  The high and low come --

23   describe the margin of error around the

24   survey.  So you have some sense of, okay,

25   well, you could also be in here, just given

CONFIDENTIAL

```
                                     Page 326
 1   sampling variance.
 2         Q.     You think the mean estimate
 3   is a better estimate than the high
 4   estimate, correct?
 5         A.     Yes, the high is the
 6   extension of the confidence interval.  It's
 7   the highest thing that we're -- you know,
 8   we're still within that range is
 9   95 percent, but the odds of it lying right
10   at that edge are low.  The odds are much
11   higher for the middle.
12         Q.     In your reports you say that
13   "Existing studies confirm that, across the
14   nation, public school teachers are losing
15   time in dealing with disruption from social
16   media in their classrooms," correct?
17         A.     That's --
18         Q.     Look at tab, Exhibit 1F,
19   which is your Tucson report at
20   paragraph 23.
21         A.     Paragraph?
22         Q.     Twenty-three.
23         A.     Okay.  Yes, there you go.
24         Q.     So and that says, "Existing
25   studies confirm that, across the nation,
```

CONFIDENTIAL

Page 327

1  public school teachers are losing time to
2  dealing with disruptions from social media
3  in their classrooms," correct?
4         A.    That's what it says, yes.
5         Q.    Did you perform a literature
6  review to identify all studies that
7  examined whether public school teachers are
8  losing time to dealing with disruptions
9  from social media in their classrooms?
10         A.    I looked, yeah, I mean, I
11  didn't do a -- you know, there's a formal
12  literature review process, I did not do a
13  formal literature review process, but I did
14  search for literature and I reported on the
15  things that I found that seemed most
16  relevant here.
17         Q.    And to search for literature
18  relating to your statement that, "Existing
19  studies confirm that, across the nation,
20  public school teachers are losing time to
21  dealing with disruptions from social media
22  in their classrooms," one thing that you
23  did was ask ChatGPT for articles, correct?
24         A.    I don't remember if I did
25  this in ChatGPT.  I think I started with

Page 328

1    Google Scholar and maybe then just Google.
2    I don't remember if I did this with ChatGPT
3    or not.
4         Q.    Well, if you look down at, in
5    paragraph 25 -- let me take a step back.
6              You identify and discuss in
7    your report a total of three existing
8    studies in support of your opinion that
9    existing studies confirm that, "across the
10   nation, public school teachers are losing
11   time to dealing with disruptions from
12   social media in their classrooms," correct?
13        A.    I think that's right.
14        Q.    If you look at paragraph 25,
15   you discuss one of those three surveys,
16   correct?
17        A.    Uh-huh.
18        Q.    And if you look at footnote
19   17, that is one of the -- that is your
20   citation --
21        A.    Yup.
22        Q.    -- correct, to the -- to that
23   article?
24        A.    Yup.
25        Q.    And if you look at the end of

Page 329

1     the URL, it says source equals ChatGPT.com,

2     correct?

3            A.     Okay.  So that suggests that

4     this was linked to from ChatGPT.

5            Q.     And so you understand that it

6     says source equals ChatGPT.com at the end

7     of the URL because ChatGPT provided you

8     with that source in response to a question

9     you posed to ChatGPT, and then you accessed

10    that source by clicking that link, correct?

11           A.     That seems to be what it was,

12    yes.

13           Q.     And if you look at

14    paragraph 27, you describe another one of

15    the three articles that you relied on to

16    support your statement that, "Existing

17    studies confirm that, across the nation,

18    public school teachers are losing time to

19    dealing with disruptions from social media

20    in the classroom," correct?

21           A.     Uh-huh.

22           Q.     And if you look at footnote

23    18, you are citing another study and,

24    again, the URL for that source ends source

25    equals ChatGPT.com, correct?

Page 330

1        A.      Yes.

2        Q.      And so this is the second

3   article in support of this proposition that

4   you obtained via ChatGPT, correct?

5        A.      I mean, the link is, yes.

6        Q.      Okay.  The article was

7   brought to your attention by ChatGPT?

8        A.      I actually think it's the

9   other way around.  I actually think I found

10  it and I then I forgot where it was, so

11  then I asked ChatGPT to find them.  So I

12  found them at some point doing a regular

13  search, that's my recollection.  And then

14  time passed and I forgot where they were,

15  but so I used ChatGPT to refind them.

16       Q.      Okay.  Earlier today, you

17  couldn't remember if you had used ChatGPT

18  at all, correct?

19       A.      This is jogging my memory

20  that I did that for this purpose.

21       Q.      Did you use ChatGPT to find

22  the third article?

23       A.      It doesn't have that same

24  link, so probably not.

25       Q.      Okay.  Aside from these three

Page 331

1    studies, you have not cited any other
2    studies that confirm that across the nation
3    public school teachers are losing time to
4    dealing with disruptions from social media
5    in their classrooms, correct?
6                    MR. GRADEN:  Objection to
7         form.
8                    THE WITNESS:  Those are the
9         three studies that I cite, yes.
10   BY MR. SANDOVAL-BUSHUR:
11        Q.      And sitting here today,
12   you're not aware of any other studies,
13   correct?
14        A.      Not that I was aware of, no.
15        Q.      After you found these three
16   studies, did you continue searching further
17   for additional studies that either
18   supported or contraindicated them?
19        A.      I don't know which way the
20   order is.  I did do other searches, you
21   know, I did a Google Scholar search trying
22   to find, you know, more peer-reviewed
23   academic literature that might actually
24   have measured this.  I did not find
25   anything.  Which came first, I don't

CONFIDENTIAL

Page 332

1  remember.

2          Q.       You are not aware of any

3  peer-reviewed literature that studies the

4  question of whether public school teachers

5  are losing time to dealing with disruptions

6  from social media in classrooms, correct?

7          A.       Nothing that quantified the

8  time, no.

9          Q.       And, in fact, you ultimately

10  found only one study that quantified the

11  time that teachers spend addressing

12  disruptions from social media in their

13  classrooms or that you characterize as

14  supporting that opinion, correct?

15          A.       That's correct.

16          Q.       In forming your opinions in

17  this case, did you look for any studies

18  examining how the total level of classroom

19  disruptions has changed over time?

20          A.       No, I wasn't looking for

21  studies on classroom disruption levels

22  specifically.

23          Q.       And you did not cite any

24  studies examining how the total level of

25  classroom disruptions has changed over

CONFIDENTIAL

Page 333

1   time, correct?

2          A.      Nope.

3          Q.      Is it possible that the total

4   level of classroom disruptions remains

5   stable, even if classroom disruptions

6   specifically relating to social media

7   increased?

8          A.      It's possible.  I don't know.

9          Q.      Is it possible that the total

10  level of classroom disruptions remained

11  stable even if classroom disruptions

12  specifically related to social media

13  increased because students may have

14  replaced distractions like talking or

15  passing notes with social media-related

16  distractions?

17                 MR. GRADEN:  Objection to

18         form.

19                 THE WITNESS:  It's possible, I

20         have no idea.

21  BY MR. SANDOVAL-BUSHUR:

22         Q.      Okay.  Let's take a look at

23  one of the three articles that you cite

24  relating to your opinion about public

25  school teachers across the nation losing

CONFIDENTIAL

Page 334

1   time to dealing with disruptions from
2   social media in their classrooms.  And look
3   specifically at the article that you
4   identified from Nominet.UK?
5           A.      Okay.
6           Q.      This is one of the studies
7   that you relied on, one of the three
8   studies you relied on, correct?
9           A.      It's one of the three studies
10  I cite, yes.
11          Q.      And this study is not from
12  this nation, it's from the UK, correct?
13          A.      That's correct.
14          Q.      And this study from the UK
15  purported to find teachers losing time to a
16  combination of smartphone use and social
17  media, correct?
18          A.      That's what it says here.
19          Q.      That's what you wrote,
20  correct?
21          A.      Yeah.
22          Q.      And that's accurate, correct?
23          A.      I assume so, I haven't looked
24  at this particular study in a while, but I
25  assume I quoted it correctly.

Page 335

1      Q.     Okay.  The Nominet study did

2   not measure or report the amount of time

3   that teachers lost to social media

4   specifically, correct?

5      A.     It doesn't appear to separate

6   it.  It's just reporting social media and

7   smartphones.

8      Q.     Would you have included that

9   information in your report if the Nominet

10  article had studied social media

11  specifically?

12     A.     Presumably, but I don't

13  remember what's actually in there.

14     Q.     Okay.  Let's take a look at

15  the Nominet article, which is tab 12, we'll

16  mark as Exhibit 8.

17                  - - - - -

18              (Nominet Article marked Ward

19           Exhibit 8 for identification.)

20                  - - - - -

21  BY MR. SANDOVAL-BUSHUR:

22     Q.     Dr. Ward, this Exhibit 8 is

23  an article from Nominet that you relied on

24  for your opinions that you cite in your

25  expert report, correct?

CONFIDENTIAL

Page 336

1          A.     This is the article, yes.

2          Q.     And there is nothing in this

3    Nominet article that measures or reports

4    the amount of time being lost to social

5    media specifically, correct?

6          A.     No, I mean, you know, it just

7    describes the high level average that

8    combines both.

9          Q.     It combines both social media

10   and smart devices --

11         A.     And smart devices.

12         Q.     -- correct?  Is that correct?

13         A.     That's what it says.

14         Q.     And the Nominet article did

15   not report any amount of time loss by

16   teachers in connection with Defendants'

17   social media platforms specifically,

18   correct?

19         A.     I mean, you know, this

20   article doesn't include all of the

21   methodological details of the survey, it

22   just summarizes the results of the survey,

23   so I can't say that one way or the other

24   what it included in its definition of

25   social media.

CONFIDENTIAL

Page 337

1          Q.      Well, your only knowledge

2    about this Nominet study that took place is

3    what is included in the article, right?

4          A.      That's correct.

5          Q.      And my question was, this

6    Nominet article did not report any amount

7    of time loss by teachers in connection with

8    Defendants' platforms specifically,

9    correct?

10         A.      It does not define -- you

11   know, in what I -- you know, in the

12   article, it does not include its definition

13   of social media.

14         Q.      Okay.  And this article is

15   not peer reviewed, correct?

16         A.      Not that I'm aware of.

17         Q.      This article comes from a

18   company called Nominet, correct?

19         A.      That's who is publishing this

20   article, yes.

21         Q.      What is Nominet?

22         A.      I would -- what does it say,

23   it says something about -- does it say who

24   they are here?  They don't describe who

25   they are.

CONFIDENTIAL

Page 338

1          Q.     Okay.  Had you ever heard of

2     Nominet before you reviewed this Nominet

3     article that you cited in your expert

4     report?

5          A.     No.

6          Q.     Do you know whether Nominet

7     is a reliable source of information?

8          A.     I mean, you know, they

9     commissioned somebody else to do a survey,

10    right, that's where this comes from.  So

11    this is just somebody -- them reporting on

12    a survey that they commissioned.

13         Q.     Who did they commission to do

14    a survey?

15         A.     A group called Opinium.

16         Q.     Is Opinium a reliable source

17    of information?

18         A.     I'm assuming they're a survey

19    research firm, so, you know, I assume that

20    they can conduct a survey.

21         Q.     But you have no knowledge of

22    anything about Opinium other than that

23    Nominet commissioned them to conduct a

24    survey, right?

25         A.     Sure.

CONFIDENTIAL

Page 339

```
 1        Q.     So you are not able to say
 2  one way or the other whether Opinium is a
 3  reliable source of information, correct?
 4        A.     I found this somewhat
 5  informative for the purposes that it's
 6  being used for in my report.
 7        Q.     That's not my question, Dr.
 8  Ward.  You are not able to say one way or
 9  the other whether Opinium is a reliable
10  source of information, correct?
11               MR. GRADEN:  Asked and
12          answered.
13               THE WITNESS:  I'm not sure I
14          have that opinion about much of
15          anything, but somebody is paying
16          them to do a survey, I'll give them
17          at least a starting benefit of the
18          doubt.
19  BY MR. SANDOVAL-BUSHUR:
20        Q.     So if somebody pays somebody
21  to do a survey, you give them the benefit
22  of the doubt that they're a reliable source
23  of information?
24        A.     Yeah, because, you know, if
25  you're in the business of providing surveys
```

CONFIDENTIAL

Page 340

1  that you generally are in the business of
2  trying to provide accurate surveys.  Now,
3  if there's some evidence to the contrary
4  that they're not a reliable source, I'm
5  happy to consider it, but, you know,
6  generally, when people say that they've
7  done, you know, a survey, you know, and
8  they describe what, you know, that they
9  retained somebody to do it, I don't dismiss
10  it immediately.
11        Q.    I'm not asking whether you
12  dismiss it immediately, Dr. Ward.  I am
13  asking a question, which is, you do not
14  have any basis to say one way or the other
15  whether Opinium is a reliable source of
16  information, correct?
17        A.    I found it sufficiently
18  reliable to include it in the report for
19  the purposes that I do.
20        Q.    That's not my question, Dr.
21  Ward.  My question is, please tell me all
22  information that you have that supports
23  your belief that Opinium is a sufficiently
24  reliable source of information for you to
25  rely on it for purposes of your report?

Page 341

1          A.     I've already provided that.

2          Q.     Which is, the only basis that

3    you have for believing that Opinium is a

4    reliable source of information is that an

5    entity called Nominet that you have never

6    heard them paid them to conduct a survey;

7    is that right?

8               MR. GRADEN:  Objection.

9          Misstates testimony.

10              THE WITNESS:  Well, I have the

11          information that's included here

12          that they are a company, that they

13          were commissioned to provide a

14          survey, and that they did so, a

15          survey with 500 respondents.  That

16          is, you know, that's what I'm

17          relying on.

18    BY MR. SANDOVAL-BUSHUR:

19         Q.     So the fact that it's on a

20    website and the website says that somebody

21    paid Opinium to conduct the survey, that's

22    what you're relying on to rely on it --

23         A.     Well, the results are also

24    consistent with the other two surveys.

25         Q.     Well, actually, this is the

CONFIDENTIAL

Page 342

1  only survey you rely on that provides an
2  estimate of time, right?
3         A.     Yes, but it also has other
4  questions that are also similar to the ones
5  in the other survey.  So, you know, I mean,
6  again, it's also UK data and it's from old.
7  I'm not relying on this information in any
8  way in my calculations.  This is just
9  background information.
10        Q.     You do not have any basis for
11 relying on information provided by Nominet,
12 correct?
13        A.     I've already provided my
14 answer to that question.
15        Q.     I didn't hear any basis for
16 you believing that Nominet is a reliable
17 source of information.
18        A.     Okay.
19        Q.     Can you please tell me what
20 information or basis you have for believing
21 that Nominet is a reliable source of
22 information?
23              MR. GRADEN:  Objection to
24         testimony by counsel.
25              THE WITNESS:  I've already

Page 343

1               answered that question.
2     BY MR. SANDOVAL-BUSHUR:
3          Q.    Well, I don't believe that's
4     correct, so I'm asking you to answer it.
5               Can you please tell me what
6     information or basis you have for believing
7     that Nominet is a reliable source of
8     information?
9               MR. GRADEN:  Objection.
10               THE WITNESS:  They
11          commissioned a survey.  That survey
12          does not have facially invalid
13          results and they retained a company
14          who they published who they are.
15          Presumably, we could look them up
16          and see if they're biased or not.
17          As a general rule, when I see
18          survey data that's a survey-based
19          data done by private entities, I do
20          not dismiss it.  I do not think
21          it's somehow inherently unreliable.
22          If you have evidence that it is
23          inherently unreliable, I'm happy to
24          consider it.
25

Page 344

1    BY MR. SANDOVAL-BUSHUR:
2            Q.        In fact, when you see a
3    survey that somebody has paid to do, you
4    don't just not assume that it's unreliable,
5    you presume that it is reliable, correct?
6                         MR. GRADEN:  Objection.
7            Misstates testimony.
8                         THE WITNESS:  Again, if
9            there's some evidence that this
10           company is of ill repute or that
11           there's something methodologically
12           or, you know, the questions are
13           somehow irrelevant, but, no, again,
14           it depends on what weight we're
15           putting on it, right?  So, again,
16           all I'm doing here is I'm just
17           saying just describing a little bit
18           of background that I used and I
19           found helpful for trying to
20           understand this issue.  Whether
21           this is completely reliable or only
22           marginally reliable has no bearing
23           on my opinions that I ultimately
24           offer in this case.
25

Page 345

1    BY MR. SANDOVAL-BUSHUR:

2         Q.    Okay.  Let's look at another

3    source that you rely on and and that is an

4    article that comes from the NEA.

5         A.    Okay.

6         Q.    And the NEA article that you

7    rely on is a press release from the NEA; is

8    that right?

9         A.    I mean, I think that's what I

10   cite that summarizes it.

11        Q.    The NEA is a labor union

12   representing teachers, correct?

13        A.    That's correct.

14        Q.    The NEA press release that

15   you rely on is not peer reviewed, correct?

16        A.    I don't know what they did to

17   put it out, but, typically, probably not.

18        Q.    Nothing in the NEA press

19   release reports an estimate of how much

20   time teachers are losing to dealing with

21   disruptions from social media in their

22   classrooms, correct?

23        A.    No, there is no time

24   estimate.

25        Q.    There's no time estimate of

CONFIDENTIAL

Page 346

1  any kind relating to social media in the
2  NEA press release that you rely on,
3  correct?
4          A.      That's correct.
5          Q.      And nothing in the NEA press
6  release reports any information relating to
7  student use of Defendants' platforms
8  specifically, correct?
9          A.      I would have to review the
10 survey again.
11         Q.      Okay.  Let's look at tab ten,
12 which we will mark as Exhibit 9.
13                      - - - - -
14              (NEA Article marked Ward
15         Exhibit 9 for identification.)
16                      - - - - -
17 BY MR. SANDOVAL-BUSHUR:
18         Q.      And Exhibit 9 is the NEA
19 document that you relied on, correct?
20         A.      Yes.
21         Q.      And nothing in Exhibit 9, the
22 NEA document that you relied on, reports
23 information relating to Defendants -- to
24 student use of Defendants' platforms
25 specifically, correct?

CONFIDENTIAL

Page 347

1       A.      This document does not
2  describe any particular languages on how to
3  define social media use.
4       Q.      You are also cite a -- well,
5  I guess one more question, the NEA, do you
6  know if the NEA is a reliable source of
7  information?
8       A.      Yeah, frequently, yeah.  I
9  mean, they produce a lot of useful
10  information.
11       Q.      And what's your basis for
12  saying that the NEA is a reliable --
13       A.      I have used other things from
14  the NEA.  I mean, they're, you know, they
15  represent teachers.  They have a strong
16  vested interest in trying to make sure that
17  certain issues around teaching are brought
18  to light.  Again, they've hired a firm, the
19  firm has done a really large actual survey
20  of members.  They've got the -- all the
21  margin of error, everything reported here.
22  This all seems pretty reliable to me.
23       Q.      The NEA is an advocacy
24  organization, correct?
25       A.      Yeah.

CONFIDENTIAL

Page 348

1          Q.      And this article that you are
2    relying on is framed as being an advocacy
3    piece, correct?
4          A.      Yeah, but the poll results
5    are on the back, right, and so you can look
6    at the poll results themselves.
7          Q.      You also rely on an article
8    from Pew, correct?
9          A.      That's correct.
10         Q.      And the Pew survey of
11   teachers that you rely on asks teachers
12   only about student distraction on cell
13   phones.  It did not report any information
14   about social media at all, correct?
15         A.      I would have to review it, I
16   don't remember.
17         Q.      Okay.  Let's take a look at
18   it, it's tab 11, which we'll mark as
19   Exhibit 10.
20                      - - - - -
21              (Pew Article marked Ward
22          Exhibit 10 for identification.)
23                      - - - - -
24   BY MR. SANDOVAL-BUSHUR:
25         Q.      Unfortunately, this printed

CONFIDENTIAL

Page 349

1  pretty small, so --

2         A.      Can we blow it up here on the

3  screen?

4         Q.      Yeah, it's impossible to --

5         A.      My eyes are good, but they

6  are fading as I get older.

7         Q.      Yeah, sorry?

8         A.      Can I scroll on here or do

9  you have to scroll?

10                Okay.

11        Q.      The Pew survey of teachers

12  that you relied on asks teachers only about

13  student distraction on cell phones, it did

14  not report any information about social

15  media at all, correct?

16        A.      Not specifically, no.

17        Q.      One thing a school district

18  can do to reduce the amount of time that

19  teachers and other employees spend

20  addressing issues relating to cell phones

21  or social media is to ban student cell

22  phone use during class or during a school

23  day, correct?

24                MR. GRADEN:  Objection.

25         Foundation.

Page 350

1                  THE WITNESS:  Potentially.  I
2             don't know how much evidence we
3             have yet for that, but I think
4             that's a hypothesis that we're
5             currently trying to test.
6    BY MR. SANDOVAL-BUSHUR:
7         Q.      You did not calculate how
8    much lower your estimated damages would
9    have been if school districts had banned
10   student cell phone use during class,
11   correct?
12        A.      I have no basis to make those
13   adjustments because that's a causal
14   question that I didn't answer.
15        Q.      For districts that have not
16   implemented cell phone bans, you did not
17   calculate how much lower your estimated
18   damages would have been if the school
19   districts had banned student cell phone use
20   during the entire school day, correct?
21        A.      No, I did not calculate any
22   impact of hypothetical policies that I
23   don't know the impact for, because I have
24   not studied it.
25        Q.      And for districts that

CONFIDENTIAL

Page 351

1   implemented cell phone bans in the 24-25

2   school year, you did not calculate how much

3   lower your estimated damages would have

4   been if the school districts had banned

5   student cell phone use during the entire

6   school day sooner, correct?

7            MR. GRADEN:  Objection.

8            THE WITNESS:  I have no

9        evidence -- that, you know, of the

10       effects of the cell phone bans to

11       use to make a basis of that -- to

12       use as a basis for that.

13  BY MR. SANDOVAL-BUSHUR:

14       Q.    In response to

15  Dr. Lakdawalla, you point to declines in

16  NAEP scores at the national level in U.S.

17  history, civics, and geography, correct?

18       A.    That's correct.

19       Q.    It was not part of your

20  assignment to evaluate what caused declines

21  in scores in U.S. history, civics, or

22  geography, correct?

23       A.    No, I'm just -- he was

24  claiming that somehow the lack of declines

25  in other areas suggested that there's no

CONFIDENTIAL

Page 352

1  harm for social media and I'm saying, well,

2  look, with the other things, there are

3  declines, so you can't make inferences just

4  based on what trends we see in particular

5  test score data.

6          Q.     And you are not offering the

7  opinion that Defendants' conduct caused

8  declines in scores in U.S. history, civics,

9  or geography, correct?

10          A.     I am not.

11          Q.     And you did not look at any

12  data specific to any of the six bellwether

13  districts relating to how they performed on

14  tests relating to U.S. history, civics, or

15  geography, correct?

16          A.     No.

17          Q.     It was not part of your

18  assignment to determine whether any school

19  output in any of the six bellwether

20  districts has been adversely impacted by

21  social media, correct?

22          A.     No, I'm not doing anything

23  that's trying to establish causal links.

24          Q.     And you are not offering any

25  opinion that any Defendants' conduct

CONFIDENTIAL

                                              Page 353

1   adversely impacted any school outputs,

2   correct?

3          A.     That's not part of my

4   assignment.

5          Q.     Separate from your work in

6   this case, you do hold the opinion that

7   conservative culture wars have contributed

8   to declines in history and civics test

9   scores, correct?

10                MR. GRADEN:  Objection.

11         Scope.

12                THE WITNESS:  I have no idea.

13  BY MR. SANDOVAL-BUSHUR:

14         Q.     You've never -- you don't

15  have any opinions outside of your work in

16  this case on what has contributed to

17  declines in history and civics test scores?

18         A.     Perhaps, you know, I'm not --

19  I'm certainly not thinking about that right

20  now.

21         Q.     Okay.  And separate from your

22  work in this case, do you hold the opinion

23  that school disinvestment in teaching

24  history and civics has contributed to

25  declines in history and civics test scores?

CONFIDENTIAL

                                        Page 354

1              MR. GRADEN:  Objection.
2         Scope.
3              THE WITNESS:  It certainly
4         could.
5    BY MR. SANDOVAL-BUSHUR:
6         Q.     And that's something you are
7    aware has happened, right?
8         A.     I don't recall, as I'm
9    sitting here.  I may have seen some study
10   about that at some point, but I, you know,
11   right now, it's not top of mind.
12        Q.     You did not calculate your
13   damages at an incident-by-incident level,
14   by which I mean you did not break out each
15   incident requiring a school employee to
16   spend time addressing a social
17   media-related issue, correct?
18        A.     Sorry, say that again.
19        Q.     You did not calculate your
20   damages at an incident-by-incident level,
21   by which I mean you did not break out each
22   incident requiring a school employee to
23   spend time addressing a social
24   media-related issue, correct?
25        A.     No, I did not.

Page 355

1          Q.      You do not have any data
2    identifying each school incident allegedly
3    related to Defendants' platforms, correct?
4          A.      No, I do not.
5          Q.      You do not have data
6    identifying each school incident allegedly
7    related to social media more broadly,
8    correct?
9          A.      No, I have the aggregate
10   summaries of the time loss that we've
11   discussed before.
12         Q.      If you had that, identifying
13   each incident requiring a school employee
14   to spend time addressing a social
15   media-related issues and the amount of time
16   that the employee spent on that incident,
17   you could have calculated damages on an
18   incident-by-incident level, correct?
19                 MR. GRADEN:  Objection.
20            Foundation.
21                 THE WITNESS:  I mean, if you
22            had a complete record of all
23            incidents, including the relevant
24            measure of time, that's accurate.
25            I guess, yeah, I think you could

CONFIDENTIAL

Page 356

1                 calculate it.  Again, that's a big
2                 assumption in terms of what data
3                 exists, but if the data are
4                 sufficient to do it, then, yeah.
5     BY MR. SANDOVAL-BUSHUR:
6          Q.      The total damages that you
7     estimate are comprised of many different
8     incidents, correct?
9          A.      Yes, I think it's the
10    accumulation of them, yes.
11         Q.      You don't know which
12    incidents, if any, involved YouTube,
13    correct?
14         A.      No, as we discussed earlier,
15    I don't have any kind of breakout of time
16    loss by YouTube.
17         Q.      You don't know which
18    incidents, if any, involved SnapChat,
19    correct?
20         A.      As we discussed earlier, no,
21    I do not have any breakdown of time loss
22    particular to SnapChat.
23         Q.      You don't know which
24    incidents, if any, involved TikTok,
25    correct?

Page 357

1          A.      No, as we discussed earlier,
2    I don't have any breakdown of time loss
3    associated to TikTok.
4          Q.      You don't know which
5    incidents, if any, involved Instagram,
6    correct?
7          A.      No, I don't have any
8    breakdown of time loss associated with
9    Instagram.
10         Q.      You don't know which
11   incidents, if any, involved Facebook,
12   correct?
13         A.      I don't have any breakdown of
14   time loss associated with Facebook
15   specifically.
16         Q.      You have not calculated what
17   your damages estimate would be if you
18   limited your estimate to incidents, if any,
19   that involved YouTube, correct?
20         A.      No, I mean, if I don't have a
21   breakdown of time, I don't have a breakdown
22   of total damages.
23         Q.      And you have not calculated
24   what your damages estimate would be if you
25   limited your estimate to incidents, if any,

CONFIDENTIAL

Page 358

1  that involved SnapChat, correct?

2        A.      I don't have a specific time

3  estimate for SnapChat.  I don't have a

4  specific damages estimate for SnapChat.

5        Q.      So the answer is you have

6  not --

7        A.      No, I have not done that.

8        Q.      You have not calculated what

9  your damages estimate would be if you

10 limited your estimate to incidents, if any,

11 that involved TikTok, correct?

12       A.      No.

13       Q.      You have not calculated what

14 your damages estimate would be if you

15 limited your estimate to incidents, if any,

16 that involved Instagram, correct?

17       A.      No --

18              MR. GRADEN:  Objection.  Asked

19          and answered.

20              THE WITNESS:  -- I have not

21          provided a broken-out estimate for

22          Facebook specifically.

23 BY MR. SANDOVAL-BUSHUR:

24       Q.      You have not calculated what

25 your damages estimate would be if you

CONFIDENTIAL

Page 359

1    limited your estimate to incidents that

2    involved Facebook, correct?

3            A.     No, I have not.  I think we

4    just answered that one.

5            Q.     I actually just asked about

6    Instagram.  So I'll reask that --

7            A.     Oh, sorry, I thought we just

8    did Facebook.

9            Q.     You have not calculated what

10   your damages estimate would be if you

11   limited your estimate to incidents, if any,

12   that involved Instagram, correct?

13           A.     No, I have not.

14           Q.     If a teacher reports spending

15   15 minutes in a typical day addressing

16   student use of social media, that teacher

17   is likely addressing multiple different

18   incidents throughout the day, each of which

19   lasts less than 15 minutes, correct?

20                  MR. GRADEN:  Objection.

21           Foundation.

22                  THE WITNESS:  Potentially, I

23           don't know that for specifically.

24   BY MR. SANDOVAL-BUSHUR:

25           Q.     For example, a teacher who

CONFIDENTIAL

```
                                    Page 360
 1   reports spending 15 minutes in a typical
 2   day addressing student use of social media
 3   may spend three minutes one day
 4   disciplining for a student using Twitter
 5   during class, correct?
 6                    MR. GRADEN:  Objection.
 7              Foundation.
 8                    THE WITNESS:  Again, you know,
 9              I do not know the breakdown of each
10              teacher's report.  It could be
11              anything, as long as it's relevant
12              to this case.
13   BY MR. SANDOVAL-BUSHUR:
14         Q.     But it's possible that a
15   teacher who reports spending 15 minutes in
16   a typical day addressing student use of
17   social media spends three minutes one day
18   disciplining a student for using Twitter,
19   correct?
20                    MR. GRADEN:  Objection.  Asked
21              and answered.
22                    THE WITNESS:  I don't believe
23              Twitter is part of this, so I don't
24              know if Twitter would be a relevant
25              one.  So that goes back to all
```

Page 361

1           these other issues we've had about

2           what people are including or not.

3           But, you know, if you want to pick

4           any particular social media

5           company, it could be three minutes

6           for Facebook or two minutes for

7           Instagram, none of that is broken

8           down in my data.

9   BY MR. SANDOVAL-BUSHUR:

10       Q.      And it's possible that the

11  student who the teacher disciplines for

12  using one social media platform is not

13  using any other social media platform,

14  correct?

15               MR. GRADEN:  Objection.

16           Foundation.

17               THE WITNESS:  Anything is

18           possible.  I don't know --

19           correlations and student's social

20           media use is not something I have

21           knowledge of.

22  BY MR. SANDOVAL-BUSHUR:

23       Q.      So in an example where a

24  teacher spends three minutes on a

25  particular incident disciplining a student

CONFIDENTIAL

Page 362

1   for using one platform during class, those

2   three minutes would be attributable to one

3   platform, correct?

4          A.     I don't know if that, that --

5   the attribution of it, I would have to

6   think about exactly how we were trying to

7   attribute time to platform and how much

8   potential interaction there is or overlap

9   or accumulation of the facts.  I have no --

10  I have not spent any time thinking about

11  how you would break down time estimates to

12  allocate them to particular companies.

13         Q.     Part of your assignment was

14  to identify and calculate the salaries and

15  benefits paid to the employees who comprise

16  the population subgroups included in the

17  survey data and the affidavits with time

18  estimates, correct?

19         A.     That's correct.

20         Q.     For Tucson, to identify and

21  calculate the salaries and benefits to be

22  paid to the employees who comprise the

23  population subgroups included in the survey

24  data and affidavits, you relied on Excel

25  files that were provided to you, correct?

CONFIDENTIAL

Page 363

1          A.      That's correct.

2          Q.      And you received those Excel

3    files from Plaintiffs' attorneys, correct?

4          A.      That's correct.

5          Q.      And we can look at

6    Exhibit 1F, which is your Tucson report at

7    page 4 and footnote four.  And you see that

8    those Excel files are titled, Fiscal Year

9    2017 Social Media Litigation Positions,

10   with a date following that, through fiscal

11   year 2024 Social Media Litigation Positions

12   with numbers after that, correct?

13         A.      That's correct.

14         Q.      The titles of the Excel files

15   you relied on indicate that they were

16   created for this litigation shortly before

17   you issued your report, correct?

18         A.      If we think of those as

19   dates, that would be what is suggested, but

20   I don't know specifically.

21         Q.      Okay.  Do the titles of the

22   Excel files you relied on to identify and

23   calculate salaries and benefits paid to

24   Tucson employees indicate that those files

25   were created for this litigation?

Page 364

1            MR. GRADEN: Objection.

2            THE WITNESS: It includes the

3        language social media litigation

4        positions.

5    BY MR. SANDOVAL-BUSHUR:

6        Q.    You do not know who created

7    the Excel files that you relied on to

8    identify and calculate the salaries and

9    benefits paid to Tucson employees, correct?

10           MR. GRADEN: Objection.

11       Foundation.

12           THE WITNESS: I don't recall

13       that information, no.

14   BY MR. SANDOVAL-BUSHUR:

15       Q.    Is it possible that

16   Plaintiffs' attorneys created those Excel

17   files?

18       A.    I highly doubt it, because I

19   did -- I did confirm some questions where I

20   then got feedback through attorneys that

21   were being confirmed by district people.

22       Q.    The Excel files that were

23   provided to you by Plaintiffs' attorneys

24   identified for you the employees who

25   comprised the population subgroups included

CONFIDENTIAL

Page 365

1    in the survey data and affidavits with --
2    correct?  I can ask that again because that
3    was a mess, I'm sorry.
4            A.    Yeah.
5            Q.    So the files that you were
6    provided by Plaintiffs' attorneys for the
7    Tucson case identified for you the
8    employees who comprised the population
9    subgroups that were included in the survey
10   data and affidavits, correct?
11           A.    It included -- I think it
12   includes all positions and I used it to
13   identify those populations.
14           Q.    The Excel file that you were
15   provided by Plaintiffs' attorneys told you,
16   for example, which employees were
17   counselors, correct?
18           A.    Yes.
19           Q.    And you relied solely on the
20   Excel files that were provided to you by
21   Plaintiffs' attorneys to identify the
22   employees who comprised the population
23   subgroups included in the survey data and
24   affidavits for purposes of your damages
25   calculation, correct?

CONFIDENTIAL

Page 366

1          A.      Say that again, I got lost.

2          Q.      Sure.  You relied solely on

3    the Excel files that were provided to you

4    by Plaintiffs' attorneys to identify the

5    employees who comprised the population

6    subgroups used in your damages estimates,

7    correct?

8                    MR. GRADEN:  Objection.

9            Foundation.

10                   THE WITNESS:  Yes, I used

11           these data, these are the data that

12           I used to calculate those

13           populations.

14   BY MR. SANDOVAL-BUSHUR:

15          Q.      And to calculate employee

16   benefits, you rely on a statement in the

17   Excel file that Plaintiffs' attorneys gave

18   you that states that benefits are

19   30 percent of salaries, correct?

20                   MR. GRADEN:  Objection.

21           Foundation.  Form.

22                   THE WITNESS:  That's what, you

23           know, they -- the number that they

24           provided me, yes.

25

Page 367

1    BY MR. SANDOVAL-BUSHUR:
2        Q.      For your estimate of damages
3    relating to teacher salaries and benefits
4    for Tucson, you rely on the results of
5    Klein's teacher time survey, correct?
6        A.      Sorry, say that again.
7        Q.      For your estimate of damages
8    relating to teacher salaries and benefits
9    for Tucson, you rely on the results of
10   Klein's teacher time survey, correct?
11       A.      That's correct.
12       Q.      And you do not know what
13   percentage of teachers in Tucson responded
14   to the Klein teacher time survey, correct?
15       A.      No, I do not.
16       Q.      For purposes of your opinion,
17   it does not matter how few teachers in
18   Tucson responded to the Klein teacher time
19   survey, correct?
20       A.      I'm relying on the estimates
21   that Dr. -- or Mr. Klein provides are
22   reasonable for my purposes.
23       Q.      Even if only 1 percent of
24   teachers responded to the Klein teacher
25   time survey, your job was to apply the

Page 368

1    average response of that 1 percent of

2    teachers who responded to calculate today

3    damages, correct?

4                   MR. GRADEN:  Objection.

5           Foundation.

6                   THE WITNESS:  I applied the

7           estimates from the survey.

8    BY MR. SANDOVAL-BUSHUR:

9           Q.     Even if only 1 percent of

10   teachers responded to the Klein teacher

11   time survey, correct?

12                  MR. GRADEN:  Objection.

13                  THE WITNESS:  Whatever is in

14          there.

15   BY MR. SANDOVAL-BUSHUR:

16          Q.     So whatever is in the Klein

17   teacher time survey, you applied for

18   purposes of calculating your damages, it

19   didn't matter what the response rate was,

20   correct?

21          A.     That's correct.

22                  MR. GRADEN:  Objection.

23   BY MR. SANDOVAL-BUSHUR:

24          Q.     And it was not part of your

25   assignment to evaluate whether the teachers

Page 369

1  who responded to the Klein teacher time

2  survey were different in any way from the

3  teachers who did not respond to the Klein

4  teacher time survey, correct?

5          A.      That's correct, that's not my

6  part of my assignment.

7          Q.      For the time inputs for your

8  Tucson damages estimates for non-teacher

9  time, you relied on the declarations of

10  Brian Lambert, Holly Hammel, Sabrina

11  Salmon, and Julie Shivanonda, correct?  If

12  you would like to look at paragraph 29 of

13  your expert report.

14          A.      I don't know, is that the

15  list, Lambert, Hammel, Salmon, Shivanonda,

16  yes, correct.

17          Q.      And for the time inputs for

18  your Tucson damages for non-teacher time,

19  you do not rely on any source other than

20  the declarations of Mr. Lambert,

21  Ms. Hammel, Ms. Salmon, and Ms. Shivanonda,

22  correct?

23          A.      That's correct.

24          Q.      For the time estimates for

25  Tucson elementary, middle, and high school

CONFIDENTIAL

Page 370

1    principals and assistant principals, you

2    relied on the affidavits of two district

3    employees and took the average of their

4    estimates, correct?

5                    MR. GRADEN:  Objection to

6            form.

7                    THE WITNESS:  If there were

8            two estimates, I averaged them.  I

9            don't remember in this specific

10           case whether there were two

11           estimates or not.

12   BY MR. SANDOVAL-BUSHUR:

13       Q.    Okay.  Does it -- is it

14   familiar to you that you received estimates

15   for elementary, middle, and high school

16   principals and assistant principals from

17   both Brian Lambert and Holly Hammel?

18       A.    The matching of who provided

19   what, I cannot tell you off the top of my

20   head, but -- so I don't know.

21       Q.    Do you understand that

22   Mr. Lambert and Ms. Hammel are both

23   regional superintendents for Tucson?

24       A.    I don't remember everybody's

25   position.

CONFIDENTIAL

Page 371

1          Q.      Did it matter to you what
2    anyone's position was for purposes of your
3    calculation of damages?
4          A.      No, I assumed that the people
5    who were providing it were people who had
6    been identified because they had the
7    relevant knowledge.
8          Q.      Do you know how many regions
9    there are in the Tucson School District?
10         A.      Not off the top of my head,
11   no.
12         Q.      Okay.  I'll represent to you
13   that there are five.
14         A.      Okay.
15         Q.      And so you took the average
16   of the estimates that Mr. Lambert and
17   Ms. Hammel provided in their declarations
18   and applied that average to calculate
19   damages for Tucson elementary, middle, and
20   high school principals and assistant
21   principals for all five regions, does that
22   sound correct?
23         A.      I applied those estimates to
24   the whole district, that's correct.
25         Q.      You understand that

Page 372

1  Mr. Lambert and Ms. Hammel offered
2  different estimates of the percentages of
3  time that principals and assistant
4  principals spent addressing social
5  media-related issues, correct?
6          A.      Potentially, I don't know
7  exactly what they put in.
8          Q.      When two employees offered
9  different estimates as part of your
10 methodology, you did not attempt to
11 understand why their estimates were
12 different, correct?
13         A.      No, I didn't.
14         Q.      When two employees offered
15 different estimates, you did not consider
16 the possibility that the employee offering
17 the higher estimate offered an inaccurate
18 estimate, correct?
19                 MR. GRADEN:  Objection.
20         Foundation.
21                 THE WITNESS:  I assumed that
22         they provided me their best
23         estimate of what the time loss was.
24 BY MR. SANDOVAL-BUSHUR:
25         Q.      When you received estimates

CONFIDENTIAL

Page 373

1    from two employees covering the same time
2    period and same position, you took a simple
3    average of their estimates, correct?
4         A.    That's correct.
5         Q.    You did not consider the
6    possibility that one of the two estimates
7    that you put in that simple average might
8    have been an inaccurate estimate, correct?
9              MR. GRADEN:  Objection.  Asked
10             and answered.  Foundation.
11             THE WITNESS:  I assumed they
12             provided me accurate information.
13   BY MR. SANDOVAL-BUSHUR:
14        Q.    Well, but when you have two
15   employees giving different estimates for
16   the same position and the same time period,
17   it is not possible that those two different
18   estimates are both accurate, correct?
19             MR. GRADEN:  Objection to
20             form.
21             THE WITNESS:  I mean, they're
22             not precisely the same and so if
23             you're saying, you know, if one
24             is -- if there's a precise number
25             and one is the precise number and

CONFIDENTIAL

Page 374

1            the other isn't, then, yeah, one is
2            by construction not accurate.  But
3            it doesn't mean that the average of
4            them is not the accurate answer.
5    BY MR. SANDOVAL-BUSHUR:
6            Q.    But you would have no way of
7    knowing whether the true answer of how much
8    time employees in a position spend on
9    social media is the low estimate, the high
10    estimate, the average of the two estimates
11    or something else entirely, right?
12                    MR. GRADEN:  Object to form.
13                    THE WITNESS:  Say it again.
14    BY MR. SANDOVAL-BUSHUR:
15            Q.    Okay.  We are talking about a
16    situation where you have two employees who
17    gave different estimates for the same
18    position and same time period, correct?
19            A.    Yes.
20            Q.    When that occurs, you have no
21    way of knowing whether the true answer of
22    how much time employees in the position
23    spend on social media is the lower estimate
24    of the two, the higher estimate of the two,
25    the average of the two, or some completely

Page 375

1    different number, correct?

2              MR. GRADEN:  Objection to

3         form.

4              THE WITNESS:  I mean, the

5         whole point is that the true answer

6         is unknown.  So, no, no one can

7         tell me that one is accurate or

8         not, because the truth by

9         construction here is unknown,

10        right, we don't know it.  So we're

11        eliciting information to try and

12        uncover that truth.

13   BY MR. SANDOVAL-BUSHUR:

14        Q.    Neither Mr. Lambert nor

15   Ms. Hammel worked in the majority of the

16   regions in the Tucson School District, they

17   did not work in three of the five regions,

18   correct?

19              MR. GRADEN:  Objection.

20        Foundation.

21              THE WITNESS:  I mean, I don't

22        remember what they worked in or

23        whether they've worked in other

24        ones in at points in time or if

25        we're just restricting this to the

Page 376

1          current point in time or whatnot.
2    BY MR. SANDOVAL-BUSHUR:
3          Q.      Let's assume that throughout
4    the relevant time Mr. Lambert and
5    Ms. Hammel worked in only one each out of
6    the five regions, so neither of them worked
7    in the three remaining regions.  Okay?
8          A.      Okay.
9          Q.      If that is true, it is
10   entirely possible that Mr. Lambert and
11   Ms. Hammel's estimates are higher, both
12   higher than the estimates would have been
13   from the regional superintendents,
14   superintendents for the other three
15   regions, correct?
16              MR. GRADEN:  Objection to
17          form.
18              THE WITNESS:  I don't recall
19          them offering estimates only for
20          their region.  I believe they were
21          attempting to describe the whole
22          district.  And, presumably, they
23          have information on the whole
24          district for the reasons that we've
25          talked about previously, which is I

CONFIDENTIAL

Page 377

1              can elicit information or I can
2              learn information about people in
3              other regions.  These aren't, like,
4              you know, they're not living in
5              hermetically sealed bubbles where
6              they have no information about the
7              rest of the district.
8    BY MR. SANDOVAL-BUSHUR:
9         Q.     If Mr. Lambert and Ms. Hammel
10   in fact stated that their estimates were
11   only for their own regions, what would your
12   basis be for assuming that the other three
13   regions -- that those estimates could be
14   applied to the other three regions?
15             MR. GRADEN:  Objection.
16             Foundation.  And we're about at an
17             hour too, so if we can take a break
18             at the next convenient time.
19             THE WITNESS:  Well, I mean
20             I've got 40 percent of the
21             population, you know, or 40 percent
22             of the regions directly covered and
23             I don't recall there being a large
24             difference between the two
25             estimates, so it is not

CONFIDENTIAL

Page 378

1        unreasonable to assume that they
2        would apply in the other areas.
3    BY MR. SANDOVAL-BUSHUR:
4        Q.    And what is your basis for
5    saying it is not unreasonable to assume
6    that the estimates of superintendents
7    overseeing two regions would be a reliable
8    metric for the three regions that they did
9    not oversee?
10       A.    Because nothing that I've
11   reviewed, either in the survey or any of
12   the affidavits in any of the districts, you
13   know, is suggesting that somehow that
14   there's enormous variation across
15   geography, particularly, and I don't even
16   know what the regions are in Tucson, I
17   don't know what regions they are
18   representing, but it seems perfectly
19   reasonable to say, look, this is the
20   information that I have, this is what I was
21   provided, it speaks to these positions, I'm
22   going to apply it.
23       Q.    There is in fact very
24   significant variation across geography of
25   the amount of time that was provided to you

Page 379

1  in estimates of how school employees in

2  different positions spent their time,

3  correct?

4            MR. GRADEN:  Objection to the

5       testimony by counsel.

6            THE WITNESS:  In what sense?

7  BY MR. SANDOVAL-BUSHUR:

8       Q.     There are districts whose

9  estimate of the amount of time that

10 counselors spend addressing social media

11 issues are five times higher than the

12 estimates for other districts, correct?

13      A.     Oh, across districts, yes.

14 You know, but I'm saying within Tucson,

15 right, so Tucson is a particular area,

16 right, and I'm certainly willing to

17 acknowledge that there may be regional

18 effects or district effects, you know, at

19 the larger region, but I don't know why

20 there would be -- you know, I see no

21 evidence that would suggest that within a

22 single district, there should be enormous

23 variation in these estimates.

24      Q.     But you just haven't actually

25 studied that question of if there is in

CONFIDENTIAL

Page 380

1    fact within district variation of the

2    amount of time that is spent addressing

3    social media issues, correct?

4              MR. GRADEN:  Objection.

5              THE WITNESS:  Nobody made any

6         reference to that in any of the

7         materials that I reviewed for

8         people describing time estimates.

9    BY MR. SANDOVAL-BUSHUR:

10        Q.    You haven't actually studied

11   the question of if there is in fact within

12   district variation of the amount of time

13   that is spent addressing social media

14   issues, correct?

15             MR. GRADEN:  Objection.  Asked

16         and answered.

17             THE WITNESS:  I've seen no

18         evidence of that.

19   BY MR. SANDOVAL-BUSHUR:

20        Q.    Have you actually studied

21   that question?

22        A.    I mean, I would have seen it

23   in the evidence if it was there, but I

24   haven't -- I didn't see any.

25        Q.    You didn't look for

                                    Page 381

1    information for it either, correct?

2                  MR. GRADEN:  Objection.

3          Misstates.

4                  THE WITNESS:  I don't recall

5          any of the affidavits describing

6          that, that issue.

7    BY MR. SANDOVAL-BUSHUR:

8          Q.     For the time estimates for

9    the other Tucson non-teacher employees, you

10   relied on affidavits from Sabrina Salmon

11   and Julie Shivanonda, correct?

12         A.     That's correct.

13         Q.     And if you look at page 10 of

14   your Tucson report, Table 4, those

15   positions are listed in the right-hand

16   column, correct?

17         A.     I don't -- again, I don't

18   remember who did what.  But there are

19   positions listed in the right-hand column.

20         Q.     One of the positions listed

21   in Table 4 of your Tucson report is

22   director, social emotional learning,

23   correct?

24         A.     Correct.

25         Q.     And that position has an

CONFIDENTIAL

Page 382

1  estimate of 100 percent, correct?

2          A.      That's what's here.

3          Q.      Do you think it's possible

4  that literally 100 percent of the director

5  of social emotional learning's time was

6  spent addressing student use of social

7  media?

8          A.      It's certainly possible.

9          Q.      Did you see any information

10 that corroborated that that in fact

11 happened?

12               MR. GRADEN:  Objection.

13               THE WITNESS:  Again, I'm

14          taking the information provided to

15          me by the affiant as sworn

16          testimony and as a reliable

17          estimate of the time for the

18          positions that they give me.

19 BY MR. SANDOVAL-BUSHUR:

20         Q.      You do not know what the

21 director of social emotional learning's job

22 entails, correct?

23         A.      It may have been described in

24 the affidavit, I don't remember.

25         Q.      For purposes of your opinion,

CONFIDENTIAL

Page 383

1   you did not need to know what the director
2   of social emotional learning's job
3   entailed, correct?
4                   MR. GRADEN:  Objection.
5                   THE WITNESS:  No, I was -- I'm
6           taking time estimates and I needed
7           to be able to identify how much
8           they got paid.
9   BY MR. SANDOVAL-BUSHUR:
10       Q.      Do you think it's possible
11  that whoever provided that 100 percent
12  estimate may have misunderstood what they
13  were supposed to be estimating?
14                  MR. GRADEN:  Objection.
15                  THE WITNESS:  I have -- I
16          mean, anything is possible.  I have
17          no reason to believe that's the
18          case.
19                  MR. SANDOVAL-BUSHUR:  So we
20          can take a break.
21                  THE VIDEOGRAPHER:  Going off
22          video record 4:53 p.m.
23                  - - - - -
24      (A recess was taken at this time.)
25                  - - - - -

CONFIDENTIAL

Page 384

1              THE VIDEOGRAPHER:  Back on
2         video record 5:10 p.m.
3    BY MR. SANDOVAL-BUSHUR:
4         Q.      Dr. Ward, could you please
5    turn to Exhibit 1E, which is your amended
6    Irvington report?
7         A.      Okay.
8         Q.      And go to paragraph 29.  For
9    the time inputs to your Irvington damages
10   estimate for non-teacher time, you relied
11   on the declarations of Dr. April Vauss and
12   Sandra Lopez, correct?
13        A.      That's correct.
14        Q.      For the time inputs to your
15   Irvington damages estimates for non-teacher
16   time, you did not rely on any sources other
17   than the declarations of Dr. April Vauss
18   and Sandra Lopez?
19        A.      That's correct.
20        Q.      I would like you to take a
21   look at Exhibit 2E, which is your Irvington
22   rebuttal report.  And if you turn to
23   page 6, this is a list of materials
24   considered, correct?
25        A.      Yes.

CONFIDENTIAL

Page 385

1          Q.      And if you look under the
2    heading Irvington documents, there is a set
3    of documents that have the heading Bates
4    and you list a series of documents there,
5    correct?
6          A.      Correct.
7          Q.      Including documents that
8    start with the Bates stamp BW__Irvington
9    and a series of numbers, correct?
10         A.      That's correct.
11         Q.      You do not cite in your
12   report -- you do not cite these documents
13   in your report, correct?
14                 MR. GRADEN:  Objection.
15                 THE WITNESS:  I have no idea.
16   BY MR. SANDOVAL-BUSHUR:
17         Q.      Well, you could just --
18         A.      In the reply report here?
19         Q.      Correct.
20         A.      I don't see them in a
21   footnote anywhere.
22         Q.      So you do not say in your
23   report how these documents support or are
24   related to your opinions, correct?
25         A.      No, I do not.

Page 386

1          Q.      Do these documents that start
2    with the BW__Irvington Bates number support
3    or relate to your opinions?
4          A.      I have no idea what they are.
5          Q.      Do you know how they wound up
6    on your materials considered list?
7          A.      Well, presumably, they're
8    part of the materials I've considered at
9    some point for Irvington, but I don't know
10   what Bates numbers, I don't recall
11   documents based on Bates numbers, so I
12   don't know what these -- I literally don't
13   know what they are.
14         Q.      And so sitting here today,
15   you are not able to tell me whether or how
16   these documents support or are related to
17   your opinions, correct?
18         A.      I do not.
19         Q.      Okay.  If you turn to tab 1B,
20   Exhibit 1B, what is your amended Charleston
21   report and go to paragraph 32.  For the
22   time inputs for your Charleston damages
23   estimates for non-teacher time, you relied
24   on the declarations of Anita Huggins and
25   Lisa Allison, correct?

Page 387

1          A.     That's correct.

2          Q.     For the time inputs to your

3    Charleston damages estimate for non-teacher

4    times, you do not rely on any other

5    declarations other than the declarations of

6    Anita Huggins and Lisa Allison, correct?

7          A.     That is correct.

8          Q.     Are you aware that Anita

9    Huggins is the person who provided the

10   estimate for principal time for the

11   Charleston district?

12         A.     I don't remember who applies

13   to what.

14              MR. SANDOVAL-BUSHUR:  Okay.

15         Let's mark tab 21 as Exhibit 11.

16              - - - - -

17         (Affidavit of Lisa Kathryn

18         Allison marked Ward Exhibit 11

19         for identification.)

20              - - - - -

21   BY MR. SANDOVAL-BUSHUR:

22         Q.     And, Dr. Ward, this is the

23   declaration of Lisa Allison, who is one of

24   the two people who you relied on for your

25   non-teacher time estimates for Charleston,

CONFIDENTIAL

Page 388

1    correct?

2           A.      It's the affidavit, but yes.

3           Q.      And Ms. Allison does not

4    provide an estimate for principals,

5    correct?

6           A.      Sorry, what was your question

7    again?

8           Q.      Ms. Allison's affidavit does

9    not provide any estimate of time for

10   principals or assistant principals,

11   correct?

12          A.      She appears to do school

13   psychologists, counselors, and social

14   workers, so no principals.

15          Q.      Okay.  Great.  Let's mark tab

16   20, which is the affidavit of Anita Huggins

17   as Exhibit 12.  And Ms. Huggins is the

18   other of the two people who you rely on for

19   Charleston for estimates of non-teacher

20   time, correct?

21          A.      That's correct.

22                       - - - - -

23               (Affidavit of Anita Huggins

24            marked Ward Exhibit 12 for

25            identification.)

CONFIDENTIAL

Page 389

```
 1                    - - - - -
 2   BY MR. SANDOVAL-BUSHUR:
 3        Q.      And you see that Ms. Huggins
 4   does in paragraph 12 of her affidavit
 5   provide a time estimate for principals,
 6   correct?
 7        A.      It's also, it's 11 and 12,
 8   but, yeah.
 9        Q.      So for high school
10   principals, Ms. Huggins provides her
11   estimate of time for high school principals
12   and high school assistant principals in
13   paragraph 12, correct?
14        A.      That's correct.
15        Q.      And if you look at what
16   Ms. Huggins says, she writes that in the
17   Charleston School District, high school
18   principals and assistant principals
19   currently spend 15 percent of their time
20   dealing with social media issues, correct?
21        A.      Correct.
22        Q.      And she says, "This
23   represents, on average, an increase of more
24   than 150 percent of time spent on these
25   issues since 2017," correct?
```

CONFIDENTIAL

Page 390

1          A.     Correct.

2          Q.     And so that means that in

3    2017, according to Huggins' estimate, high

4    school principals and assistant principals

5    spent 6 percent of their time addressing

6    social media-related issues, correct?

7          A.     Correct.

8          Q.     Okay.  Let's now look back at

9    your Charleston report, Exhibit 1B, and

10   look at page 9, Table 4.

11         A.     All right.

12         Q.     Here for high school

13   principals and high school assistant

14   principals for the year 2017, you have put

15   a share of 9 percent, correct?

16         A.     That's what's listed there.

17         Q.     And we just agreed that

18   Ms. Huggins' affidavit said that teachers

19   spent 6 percent of their -- sorry, not

20   teachers, we just agreed that Ms. Huggins

21   affidavit said high school principals and

22   assistant principals spent 6 percent of

23   their time in 2017 on social media-related

24   issues, correct?

25         A.     Correct.

Page 391

1        Q.    So this 9 percent figure in
2  your Charleston report for high school
3  principals and high school principals for
4  2017 is erroneous, correct?
5        A.    It appears to be, yes.
6        Q.    And because that percentage
7  for 2017 is erroneously high, your damages
8  estimates for Charleston relating to high
9  school principals and assistant principals
10 is erroneously high for 2017-2018,
11 2019-2020, 2021-2022, 2023, and 2024,
12 correct?
13       A.    Assuming it was applied in
14 the calculation, and it's not just a typo
15 in the table, that would be correct.
16       Q.    Okay.  But if what you said
17 in your Charleston expert report is
18 accurate -- accurately reflects the inputs
19 that you used for your calculation,
20 correct --
21       A.    If it does, yes.
22       Q.    -- then your damages
23 estimates for Charleston relating to high
24 school principals and assistant principals
25 would be erroneously high from 2017 through

CONFIDENTIAL

Page 392

1    2024, correct?

2                    MR. GRADEN:  Objection.

3            Compound.

4                    THE WITNESS:  If I've used the

5            wrong percentage, then yes, it's

6            improperly calculated.

7    BY MR. SANDOVAL-BUSHUR:

8        Q.    And if your high school

9    principals and high school assistant

10   principal damages are erroneous for

11   Charleston, then your total damages

12   estimates for Charleston are also

13   incorrect, correct?

14                   MR. GRADEN:  Objection.  Form.

15                   THE WITNESS:  Yeah, they'll be

16           pretty slight, but yeah.

17   BY MR. SANDOVAL-BUSHUR:

18       Q.    Okay.  I would like to turn

19   to tab or Exhibit 1D, which is your Harford

20   amended report and turn to paragraph 41.

21       A.    So 1D.

22       Q.    1D as in dog, in

23   paragraph 41.

24       A.    Okay.

25       Q.    You describe here a mismatch

CONFIDENTIAL

Page 393

1   in the data you used to calculate Harford's
2   damages related to counselors and school
3   psychologists, correct?
4           A.      Okay.
5           Q.      That is correct, that you
6   describe a mismatch in the data you used to
7   calculate Harford's damages related to
8   counselors and school psychologists?
9           A.      Yeah, a year mismatch, yeah.
10          Q.      Okay.  You calculated
11  Harford's damages relating to counselors
12  and school psychologists using an estimate
13  of time spent addressing social media that
14  covered 2017 to 2024 and applied that to
15  the amount of salary and benefits paid to
16  counselors and school psychologists in
17  2025, right?
18          A.      And assumed that applied to
19  2024.
20          Q.      What do you mean when you
21  say, "and assumed that applied to 2024"?
22          A.      I only actually calculated
23  losses for 2024 for this population, so I'm
24  only applying the percentage to a wage
25  estimate for one year.

Page 394

1          Q.     You acknowledge that because
2     there is a mismatch between the time period
3     covered by the time estimate and the time
4     period for which you had data on counselor
5     and psychologists' salaries and benefits,
6     your Harford damages related to counselors
7     and school psychologists may be inaccurate,
8     correct?
9                    MR. GRADEN:  Objection.
10                   THE WITNESS:  Well, I note
11             that there's a slight mismatch and
12             because the movement between wages
13             is mostly just inflation anyway and
14             I've adjusted for that, it's
15             unlikely to have much of an effect,
16             but there's a slight technical
17             mismatch of what I'm applying in
18             the wage column and what I'm
19             applying in the shared estimate
20             time.
21     BY MR. SANDOVAL-BUSHUR:
22          Q.     Why did you have to calculate
23     damages for Harford using mismatched data?
24          A.     The only data that I had for
25     wages was 24-25.

CONFIDENTIAL

Page 395

1          Q.     Did you ask Harford for data
2    for in the 2024 year?
3          A.     I asked all the districts for
4    data for all of the years.
5          Q.     And Harford just didn't
6    provide you with data for salaries for the
7    years that you requested it?
8          A.     This is the only data I
9    received.
10         Q.     Do you think that there's
11   some reason why Harford was unable to
12   provide you with salary data for 2024?
13         A.     I don't know why.  I used
14   what I had.
15         Q.     Let's look at Exhibit 1A,
16   which is your Breathitt report.  If you
17   look at paragraph 36, for your estimates of
18   time for non-teachers, you rely on the
19   affidavits of Will Noble, Daphne Noble,
20   Jeremy Hall, Phil Watts, and Kera Howard,
21   correct?
22         A.     That's 34.
23         Q.     Oh, I apologize.
24         A.     Will Noble, Daphne Noble,
25   Jeremy Hall, Phil Watts, Kera Howard.

CONFIDENTIAL

Page 396

1          Q.      For the time inputs for your
2     Breathitt damages estimates for
3     non-teachers, you did not rely on any
4     source other than the affidavits of Will
5     Noble, Daphne Noble, Jeremy Hall, Phil
6     Watts, and Kera Howard, correct?
7          A.      That's correct.
8          Q.      An essential part of your
9     damages calculation for Breathitt was your
10    calculation of the dollar amount of
11    employee benefits paid to the relevant
12    categories of employees, correct?
13         A.      That's part of the
14    calculation, yes.
15         Q.      To calculate the amount of
16    employee benefits, you used what you called
17    a benefits multiplier, correct?
18         A.      That's correct.
19         Q.      And what is a benefits
20    multiplier?
21         A.      Essentially, it's what you
22    would multiply wages by to obtain total
23    compensation that includes both wages and
24    benefits, the value of benefits.
25         Q.      If you look at paragraph 22

Page 397

1    of your Breathitt report, Exhibit 1A, you

2    say I used a benefit multiplier provided by

3    the district to add benefits, correct?

4           A.     Correct.

5           Q.     You do not say what, in the

6    text of your report, what that benefits

7    multiplier is, correct?

8           A.     It doesn't appear to be

9    there.

10          Q.     And you do not provide a

11   source for what that benefit multiplier is,

12   correct?

13                 MR. GRADEN:  Objection.

14                 THE WITNESS:  It doesn't

15          appear to be here.  I received it

16          from the district via counsel.

17   BY MR. SANDOVAL-BUSHUR:

18          Q.     So counsel provided you with

19   the benefit multiplier for Breathitt?

20          A.     That's correct.

21          Q.     Did you do anything other

22   than rely on the multiplier that counsel

23   provided you to verify that that benefit

24   multiplier was accurate?

25          A.     I actually did investigate it

CONFIDENTIAL

Page 398

1  and it actually appears to be low, so it

2  was the most conservative number.  In the

3  common core of data data, there's a

4  benefits and wages calculation, so I could

5  compare that.  And it suggested a higher

6  number than what I got from the district,

7  but when I was told the number by the

8  district, I just said I'm going to trust --

9  trust what they tell me.

10         Q.      You do not know who from the

11  district provided the benefit multiplier

12  that you received from counsel?

13         A.      I may have been told at the

14  time, but I don't remember right now.

15         Q.      And you didn't speak to

16  anyone from Breathitt about what the

17  benefit multiplier should be?

18         A.      I did not.

19         Q.      If you turn to Table 6 of

20  your Breathitt report, Table 6 summarizes

21  your calculation of damages for the 2016 to

22  2020 time period for Breathitt, correct?

23         A.      That's correct.

24         Q.      And, actually, let's -- and

25  let's take a look at Table 5.  Table 5 of

CONFIDENTIAL

Page 399

1  your Breathitt report summarizes your

2  calculation of damages for the 2021 to 2024

3  time period, correct?

4         A.     Correct.

5         Q.        And there's, like, two tables

6  that sort of work together here.  You've

7  got survey-related damages,

8  affidavit-related damages and then combined

9  survey plus affidavit total, correct?

10         A.     Correct.

11         Q.        And so for the 2021 to 2024

12  time period, you add together for base pay,

13  the total mean share from the survey,

14  323,000, plus the total base pay for the

15  affidavits, 1.133 million, and get a total

16  of 1.457 million, correct?

17         A.     Correct.

18         Q.        Okay.  Let's look at Table 6.

19  Now, if one were to attempt to perform that

20  same mathematical equation on Table 6, the

21  math doesn't add up, right?  You've got a

22  mean share for survey based time loss of

23  428,000, a base pay for affidavit base

24  damages of 323,000, though the number that

25  is listed on the combined survey plus

CONFIDENTIAL

Page 400

1    affidavit total should reflect the sum of

2    428,000 plus 323,000, correct?

3            A.      It should.  But these

4    numbers, it's like we didn't get the

5    corrected table in here.

6            Q.      I will -- and there's also a

7    mathematical error when you look at base

8    pay plus benefits for this Table 5, 2016 to

9    2020 time period, correct?

10           A.      Yeah.

11           Q.      And I will represent to you

12   that the totals in the combined survey plus

13   affidavit total line are calculated by

14   taking two times the survey mean share plus

15   the affidavit total.

16           A.      Sorry, say that again.

17           Q.      So the way that the combined

18   survey plus affidavit total is equal to, if

19   you multiply by two, the mean share in the

20   survey section and add that to --

21           A.      So it doubled it somehow?

22           Q.      Correct.

23           A.      Okay.  So these are, yeah, so

24   I think that the combined total somehow got

25   subgrown [sic].

CONFIDENTIAL

Page 401

1          Q.      Okay.  So that's an error in
2    your Breathitt report, correct?
3          A.      Yes, in comparing the old
4    report to the corrected report, the top
5    part of the table is correct, but the sum,
6    sum, yeah, must have been gotten doubled.
7          Q.      And every other damages
8    estimate in your report that relies on the
9    erroneously calculated total in Table 6 is
10   also erroneous, correct?
11         A.      Yeah, any time it's citing
12   that number.
13         Q.      And so sitting here today,
14   you're not confident that all of the
15   damages estimates reported in your
16   Breathitt report are accurate, correct?
17                 MR. GRADEN:  Objection.
18            Foundation.
19                 THE WITNESS:  It appears to be
20            the error that you're calculating
21            now that I've compared it to the
22            other one, the top line number is
23            the correct number, it's just the
24            summing.
25

                                          Page 402

1   BY MR. SANDOVAL-BUSHUR:

2        Q.      Will you issue second amended

3   reports for each of Charleston and

4   Breathitt to address the issues we have

5   discussed today?

6        A.      Sure, assuming the Charleston

7   one is an actual issue in the calculation

8   and not just an issue in the table, but I

9   will maybe issue that too just to correct

10  the table.

11       Q.      For DeKalb, you are not

12  offering any opinions on non-teacher

13  damages, correct?

14       A.      That's correct.

15       Q.      And let's turn to your DeKalb

16  report, which is Exhibit 1C, if you look at

17  paragraph 17, to calculate your damages for

18  DeKalb, you relied on common core data for

19  information about teacher salaries and

20  benefits, correct?

21       A.      For salaries.

22       Q.      How did you calculate

23  benefits for DeKalb?

24       A.      For DeKalb, I had a separate

25  document that actually provided a very good

CONFIDENTIAL

Page 403

1    estimate for the benefit multiplier for

2    teachers.

3             Q.       And is that document from

4    DeKalb for a benefits multiplier for

5    teachers something you received through

6    counsel?

7             A.       Yes.

8             Q.       And do you know where in the

9    DeKalb School District that estimate came

10   from?

11            A.       Not off the top of my head,

12   no.

13            Q.       If you look at paragraph 18

14   you say that you -- that because the common

15   core data includes all payments to teachers

16   including overtime, additional pay, summer,

17   you reduced the estimated salary for DeKalb

18   teachers by 25 percent for purposes of your

19   calculations, correct?

20            A.       That's correct.

21            Q.       Why was it appropriate to

22   exclude teacher overtime, additional pay,

23   and summer payments when calculating

24   damages for DeKalb?

25            A.       Mr. Klein's survey asked

CONFIDENTIAL

Page 404

1   about instructional time on a typical day.
2   So I interpret that to find, quote,
3   unquote, "a normal day."  It's not
4   measuring time spent while coaching soccer
5   or some sort of extra duty thing.  You
6   know, it doesn't specifically speak to
7   summer, so I chose to be conservative and
8   say I'm just using base pay, normal salary,
9   regular school year.
10          Q.     What is additional pay?
11          A.     That would be kind of, you
12   know, extra duty pay.
13          Q.     Did you confirm that the
14   teacher salary data that you used for
15   Breathitt, Charleston, Harford, Irvington,
16   and Tucson excluded teacher overtime,
17   additional pay, and summer payments?
18          A.     Yes.
19          Q.     What did you do to confirm
20   that?
21          A.     I asked specifically --
22   Charleston actually sent us data that was
23   gross pay and I was, like, this says gross
24   pay, is this gross pay or base pay and
25   they're, like, that's gross pay, it's

CONFIDENTIAL

Page 405

1   everything.  So then I got a new file that

2   said base pay.

3              And then for Irvington, the

4   data had it all broken down, so I was able

5   to breakdown extra duty payments, et

6   cetera, it's in the data.

7              I also confirmed at Tucson

8   that was the appropriate interpretation of

9   their data.

10        Q.    What about for Harford?

11        A.    I think, yeah, I think I

12   asked the same question for Harford.

13        Q.    And what about for Breathitt?

14        A.    Same, yes, I confirmed that

15   that was what I was provided.

16        Q.    And when you confirmed for

17   Breathitt, Harford, and Tucson that the

18   salary data you received did not include

19   overtime, additional pay, and summer

20   payments, that is confirmation that you

21   received from Plaintiffs' attorneys,

22   correct?

23              MR. GRADEN:  Objection to

24         form.

25              THE WITNESS:  That I received

CONFIDENTIAL

Page 406

1            via Plaintiffs' attorneys, yes.
2    BY MR. SANDOVAL-BUSHUR:
3            Q.    And you do not know who from
4    any of those districts provided that
5    confirmation, correct?
6            A.    No.
7            Q.    If you look at Exhibit 1F,
8    which is your Tucson report, paragraph 21,
9    for purposes of your damages calculations
10   in Tucson, you include additional
11   supplemental pay to each teacher, correct?
12           A.    That's correct.
13           Q.    Why was it appropriate to
14   include the supplemental pay for Tucson but
15   necessary to exclude overtime, additional
16   pay, and summer pay for DeKalb?
17           A.    As I understand it, the
18   supplement pay is something that everyone
19   on the contract gets.  It's not like -- I
20   don't really understand why they have it
21   broken out supplementally, but my
22   understanding was that, you know, and then
23   there's the footnote 14 where it's all
24   teachers that are in this particular
25   contract receive this amount, so it's

CONFIDENTIAL

Page 407

1  essentially just part of their salary.  I
2  don't know why they label it as
3  supplemental pay.
4       Q.     But the district does break
5  out the supplemental pay from the base
6  salary, correct?
7       A.     They do, and I reported both.
8       Q.     In performing your damages
9  estimates, you did not consider whether
10 there were any confounding factors that
11 affected the amount of time that school
12 employees spent addressing social
13 media-related issues, correct?
14               MR. GRADEN:  Objection.
15               THE WITNESS:  Sorry, what do
16       you mean?
17 BY MR. SANDOVAL-BUSHUR:
18       Q.     In performing your damages
19 estimate, you did not consider whether
20 COVID-19 affected how much time school
21 employees spent addressing social
22 media-related issues, correct?
23       A.     I took the time loss
24 estimates that I was provided as reliable.
25       Q.     And you, in performing your

CONFIDENTIAL

Page 408

1  damages estimates, did not consider whether

2  COVID-19 affected how much time school

3  employees spent addressing social

4  media-related issues, correct?

5          A.      No.

6          Q.      That is correct?

7          A.      Oh, sorry, that is correct.

8          Q.      And in performing your

9  damages estimates, you did not consider

10  whether there were any other confounding

11  factors other than COVID-19 that affected

12  the amount of time that school employees

13  spent addressing social media-related

14  issues, correct?

15                  MR. GRADEN:  Object to form.

16                  THE WITNESS:  I took the time

17            estimates that I was provided.

18  BY MR. SANDOVAL-BUSHUR:

19          Q.      Do you use any social media

20  platforms?

21          A.      Again, we're into the

22  definition of what is a social media

23  platform.  Of the list that you started

24  with that included all things like

25  Pinterest and Twitch and everything, so the

CONFIDENTIAL

Page 409

1  exhaustive list that you provided, the only

2  one that I use at all is Twitter.

3          Q.     Okay.  How long have you used

4  Twitter for?

5          A.     I have no idea.

6          Q.     What do you use Twitter for?

7          A.     Basically to learn what

8  journal articles have been published.

9          Q.     Do you use YouTube?

10          A.     Oh, I mean, I've seen videos

11  on YouTube, so I guess I also use YouTube.

12          Q.     What do you use YouTube for?

13          A.     Oh, I mean, when people post

14  videos and wherever it might be, it's often

15  on YouTube.  Perhaps if I want to, like,

16  show my kids a music video, I'll search for

17  it on YouTube.

18          Q.     Do you use Instagram?

19          A.     No.

20          Q.     Do you use Facebook?

21          A.     No.

22          Q.     Do you use SnapChat?

23          A.     No.

24          Q.     Do you use TikTok?

25          A.     No.

CONFIDENTIAL

Page 410

```
 1          Q.     Have you ever used any of
 2    Facebook, Instagram, SnapChat, or TikTok?
 3          A.     I mean, I was at Harvard in
 4    2004, so I have a very low user number on
 5    the Facebook, but no, I have not used it in
 6    a long time.
 7          Q.     Congratulations.  Do you have
 8    children?
 9          A.     I do.
10          Q.     And how old are they?
11          A.     Ten, 12, 14.
12          Q.     Do any of your children use
13    social media?
14          A.     My 14-year-old recently was
15    able to persuade me to allow her to have
16    SnapChat to text with her friends.
17          Q.     Okay.  Do any of your other
18    children have any other social media
19    accounts?
20          A.     No.
21          Q.     And you have shown at least
22    one of your children a YouTube video at
23    some point?
24          A.     Oh, I'm sure they've seen
25    YouTube videos, but they're not like --
```

CONFIDENTIAL

1  well, in my house, they're not supposed to

2  be just going on and looking at videos on

3  YouTube.

4         Q.     Do you know if any of your

5  children have ever used YouTube in

6  connection with school?

7         A.     Oh, I have no idea what they

8  do at school.

9         Q.     You spoke earlier about prior

10 experience you have relating to calculating

11 opportunity costs in educational settings

12 and you mentioned in an Oregon program.

13 What program is that?

14        A.     It's called the ASPIRE

15 program.

16        Q.     And what was the ASPIRE

17 program?

18        A.     The ASPIRE program was

19 effectively a program where school

20 districts working through their counseling

21 departments would recruit volunteers to

22 come help kids fill out college

23 applications and FAFSAs.

24        Q.     And what specifically did you

25 do in connection with calculating

Page 412

1    opportunity costs in connection with the

2    ASPIRE program?

3              A.    You know, I mean, the program

4    was described to us in terms of it requires

5    a room in the counseling center, you've got

6    to recruit a certain number of volunteers.

7    It takes a little bit of counselor time to

8    kind of recruit the volunteers and manage

9    the program.  I think that was the extent

10   of it, but I don't remember.  This was a

11   long time ago.

12             Q.    When did this take place?

13             A.    2008.

14             Q.    Okay.  And you also referred

15   to prior experience calculating opportunity

16   costs in an educational setting in

17   connection with a national program?

18             A.    That's correct.

19             Q.    What program was that?

20             A.    It's called the Safe & Civil

21   Schools program.

22             Q.    And what specifically did you

23   do in connection with calculating

24   opportunity costs relating to the Safe &

25   Civil Schools program?

CONFIDENTIAL

Page 413

1          A.      So Safe & Civil Schools,

2     that's a consultant program, right, so,

3     like, the consultant comes in, they have

4     trainers, they provide materials, so when

5     you're trying to describe what the cost of

6     this is going to be, so you're going to go

7     to a district and say, okay, this is

8     useful.  You know, we put together a little

9     bit of a cost model that had the cost of

10    the program, right, because you have to pay

11    for the trainer, included the amount of

12    time that teachers have to spend in the

13    training, so that's the most directly

14    relevant thing here.  And then whatever

15    other materials, there's, like, posters and

16    stuff like that.  Again, that was also, I

17    think, roughly 2008, so I don't remember

18    all of the details, but I do remember

19    sitting in a meeting talking about what

20    went into -- the ingredients that went into

21    the program.

22          Q.      Is there any published

23    document relating to your calculation of

24    opportunity costs with the Safe & Civil

25    Schools program?

Page 414

1          A.      So I published articles in
2     there, I don't know if we did the cost
3     piece for that or if that was just for
4     discussions with the client.  You know, it
5     may be in there, it may not be, I don't
6     remember.
7          Q.      When did your work in
8     connection with the Safe & Civil Schools
9     program take place?
10          A.      You have to look at when the
11     last publication was, but kind of roughly
12     2007 to maybe 2010, although my part was
13     mostly 2008, I think.  You know,
14     publication lags are long, so there was a
15     lot of waiting to get it published, but,
16     you know, I think the actual -- it was a
17     randomized control study thing, the actual
18     period where we were in the field
19     collecting data, yeah, I want to say 2007,
20     2008.
21          Q.      Were there any documents,
22     studies, et cetera published in connection
23     with the Oregon ASPIRE program?
24          A.      I don't know.  I mean, we
25     presented, you know, the funder is who paid

CONFIDENTIAL

Page 415

1  for the evaluation.  I don't know if it was
2  ever publicly disseminated.
3          Q.      You don't have a specific
4  memory of an article or anything like that
5  relating to your work?
6          A.      No, nothing that -- I mean, I
7  don't remember if we just provided a
8  presentation to the funder or if we
9  actually wrote an article or what we did
10  but I, you know, I don't remember.
11                  MR. SANDOVAL-BUSHUR:  Okay.
12              Let's go off the record.
13                  THE VIDEOGRAPHER:  Going off
14              video record 5:48 p.m.
15                      - - - - -
16      (A recess was taken at this time.)
17                      - - - - -
18                  THE VIDEOGRAPHER:  Back on
19              video record, 5:57 p.m.
20                  MR. SANDOVAL-BUSHUR:  Dr.
21              Ward, thank you very much for your
22              time today.  YouTube is going to
23              pass the witness.  I will give any
24              other Defendants on by Zoom or in
25              person to -- an opportunity to say

Page 416

1       if they want to ask any questions.

2           MR. LANDS:  No questions on

3       behalf of Meta.  I don't have a

4       mic, but.

5           MS. REAVES:  And no questions

6       for Snap.

7           THE VIDEOGRAPHER:  Counsel on

8       Zoom, anything for the record?

9           MR. GREEN:  No questions on

10      behalf of the TikTok Defendants.

11          THE VIDEOGRAPHER:  Thank you.

12      Please stand by.  This is the

13      videographer stating total run time

14      by party for the record.  Joseph

15      Sandoval-Bushur for YouTube is at

16      six hours 45 minutes.  This

17      concludes today's video deposition.

18      Going off video record 5:58 p.m.

19              - - - - -

20          (Whereupon, the deposition

21      was concluded at 5:58 p.m.)

22              - - - - -

23

24

25

CONFIDENTIAL

Page 417

1          C E R T I F I C A T I O N

2

3

4          I HEREBY CERTIFY that the proceedings and

5  evidence are contained fully and accurately in the

6  stenographic notes taken by me upon the foregoing

7  matter on August 15, 2025, and that this is a

8  correct transcript of same.

9

10

11

12

13

14  _____

15          Robin L. Clark

   Registered Professional Reporter

16

17

18

19

20

21          (The foregoing certification of this

22  transcript does not apply to any reproduction of the

23  same by any means unless under the direct control

24  and/or supervision of the certifying reporter.)

25

CONFIDENTIAL

Page 418

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8              After doing so, please sign the errata

9    sheet and date it.

10             You are signing same subject to the

11   changes you have noted on the errata sheet,

12   which will be attached to your deposition.

13             It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the deposition

16   transcript by you.  If you fail to do so, the

17   deposition transcript may be deemed to be accurate

18   and may be used in court.

19

20

21

22

23

24

25

CONFIDENTIAL

Page 419

```
1                     -  -  -  -
2                  E  R  R  A  T  A
3                     -  -  -  -
4     PAGE      LINE      CHANGE
5
6     ____      ____      _____
7     ____      ____      _____
8     ____      ____      _____
9     ____      ____      _____
10    ____      ____      _____
11    ____      ____      _____
12    ____      ____      _____
13    ____      ____      _____
14    ____      ____      _____
15    ____      ____      _____
16    ____      ____      _____
17    ____      ____      _____
18    ____      ____      _____
19    ____      ____      _____
20    ____      ____      _____
21    ____      ____      _____
22    ____      ____      _____
23    ____      ____      _____
24    ____      ____      _____
25
```

CONFIDENTIAL

Page 420

1              ACKNOWLEDGMENT OF DEPONENT

2              I, BRYCE WARD, PhD, do hereby

3    certify that I have read the foregoing pages

4    and that the same is a correct

5    transcription of the answers given by me to

6    the questions therein propounded, except for

7    the corrections or changes in form or

8    substance, if any, noted in the attached

9    Errata Sheet.

10

11   DATE                      SIGNATURE

12   Subscribed and sworn to before me this

13         day of                    ,

14   2025.

15

16   My commission expires:

17

18

19

20   Notary Public

21

22

23

24

25

CONFIDENTIAL

**[& - 2018]**    Page 1

| & | | | |
| --- | --- | --- | --- |
| **&**  1:17 2:2,10 | 348:18 387:15 | **19103**  2:18 | 220:18,22,23 |
| 2:16 3:2,13 4:2 | 387:18 389:7 | **1969**  268:15 | 221:1 222:13 |
| 4:8 412:20,24 | **1180**  4:9 | 269:8 | 222:16 225:17 |
| 413:1,24 414:8 | **11:57**  162:23 | **1992**  268:16 | 308:17 388:16 |

| 0 | | | |
| --- | --- | --- | --- |
| **000005**  6:21 | **12**  5:11 7:3 | **19th**  63:14,16 | **200**  76:16 |
| 60:17 | 77:11,15,19 | 63:21 | **2000**  268:16 |
| **03047**  1:5 | 80:13,15 | **1:54**  234:21 | **20001**  3:4 |
| **07068**  3:15 | 335:15 388:17 | **1a**  5:8 10:23,23 | **2001**  2:18 |
| **08002**  3:20 | 388:24 389:4,7 | 11:5 16:23 | **20024**  2:12 |
| | 389:13 410:11 | 17:10,17,21 | **2004**  410:4 |
| 1 | | | |
| **124**  6:22 | 18:1 22:24 | **2006**  269:6 |
| **1**  49:8 87:6 | **12:46**  163:3 | 41:8,16 395:15 | **2007**  414:12,19 |
| 367:23 368:1,9 | **13**  5:12,14 | 397:1 | 413:17 414:13 |
| **1.133**  399:15 | 27:25 | **1b**  5:9 11:15,16 | 414:20 |
| **1.457**  399:16 | **14**  5:15,17 | 11:20,24 | **2010**  414:12 |
| **10**  5:3 7:1 | 406:23 410:11 | 386:19,20 | **2014**  23:10 |
| 105:23 106:2 | 410:14 | 390:9 | **2015**  23:10 |
| 348:19,22 | **15**  1:12 5:18,20 | **1c**  5:11 12:15 | 25:24 32:8,19 |
| 381:13 | 5:21 9:5 | 12:22 402:16 | 32:24 33:5,7 |
| **100**  64:16 | 359:15,19 | **1d**  5:12 13:3,10 | **2016**  398:21 |
| 70:22 321:4,16 | 360:1,15 | 392:19,21,22 | 400:8 |
| 321:20 322:8 | 389:19 417:7 | **1e**  5:14 13:16 | **2016-17**  28:9 |
| 382:1,4 383:11 | **150**  389:24 | 13:22 384:5 | **2017**  28:11 |
| **101**  3:19 | **16**  5:23,24 | **1f**  5:15 10:23 | 363:9 389:25 |
| **1099**  73:20 | **1600**  4:9 | 14:3,9 16:23 | 390:3,14,23 |
| **10:24**  86:14 | **17**  18:2 64:2 | 17:10,17 41:8 | 391:4,7,25 |
| **10:42**  86:19 | 328:19 402:17 | 41:17 326:18 | 393:14 |
| **10th**  63:13,16 | **18**  329:23 | 363:6 406:7 | **2017-18**  28:6 |
| 63:21 66:2 | 403:13 | | **2017-2018** |
| **11**  5:8,9 7:1 | **19**  28:6 66:3 | 2 | 28:11 391:10 |
| 31:2 124:22 | 407:20 408:2 | **2**  14:17 87:6 | **2018**  25:22,23 |
| | 408:11 | **20**  6:1 23:10 | 25:24 72:2,4 |
| | **19087**  2:5 | 25:7 28:6 64:1 | |
| | | 76:19 220:4,9 | |

**[2019-2020 - 5]**                                           Page 2

**2019-2020**
391:11
**202-220-1126**
3:5
**202-434-5013**
2:12
**2020**  23:10
398:22 400:9
**2021**  23:20
71:10,19,23
72:2,4,20
74:17 399:2,11
**2021-2022**
391:11
**2023**  391:11
**2024**  23:20
27:14 363:11
391:11 392:1
393:14,19,21
393:23 395:2
395:12 399:2
399:11
**2025**  1:12 9:6
27:11,13 32:7
32:19,24 59:16
60:7 61:8
62:15,19 65:20
66:3,22 67:3,9
67:15 68:4
393:17 417:7
420:14
**21**  6:2,4 28:7
387:15 406:8

**210**  3:19
**215-278-2555**
2:19
**22**  6:5,7 28:7
396:25
**2200**  4:4
**23**  28:7 326:20
**23-24**  28:10
**24**  28:7
**24-25**  28:16
351:1 394:25
**25**  101:23
102:2 328:5,14
403:18
**250**  59:12 62:1
**27**  329:14
**280**  1:18 2:5
9:10
**29**  369:12
384:8
**2:10**  235:1
**2a**  5:17 14:18
14:19,24 16:24
17:10,18 41:8
41:17
**2b**  5:18 11:11
15:3,8
**2c**  5:20 15:12
15:17
**2d**  5:21 15:21
16:1
**2e**  5:23 16:5,10
384:21

**2f**  5:24 14:18
16:14,19,24
17:10,18 41:9
41:17 87:6

**3**
**3**  18:4 124:22
**30**  6:8 23:1
95:15,19
366:19 418:15
**300,000**  138:5
**3000**  2:18
**30309**  4:10
**3047**  1:6
**31st**  31:19 63:2
**32**  386:21
**323,000**  399:14
399:24 400:2
**335**  6:23
**335,000**  62:6,6
62:11
**34**  26:17
395:22
**346**  6:24
**36**  395:17
**37**  6:9 264:20
**38**  6:11
**387**  7:1
**388**  7:3
**39**  6:13,15
**3:28**  315:12
**3:45**  315:17
**3a**  6:1 20:14,20
20:25 22:19

**3b**  6:2 21:4,10
**3c**  6:4 21:14,20
**3d**  6:5 21:24
22:4
**3e**  6:7 20:14,15
20:18 22:8,14
22:19

**4**
**4**  6:8 30:9,12
363:7 381:14
381:21 390:10
**4/11/25**  6:8
30:11
**40**  6:17,19 23:1
25:7 59:22
60:6 63:10,11
264:1,2,7,12,21
377:20,21
**404-572-2728**
4:10
**409-763-3260**
4:5
**41**  392:20,23
**428,000**  399:23
400:2
**43**  264:19
**45**  416:16
**4:22**  1:5
**4:53**  383:22

**5**
**5**  3:14 23:19
24:8 61:11
398:25,25

**[5 - accuracy]**                                                              Page 3

400:8
**5/18/25**  6:22
124:14
**50**  60:6 74:25
75:1,6 281:15
282:10
**50/50**  74:21
77:9
**500**  308:11
341:15
**500e**  3:4
**501**  4:4
**5:10**  384:2
**5:48**  415:14
**5:57**  415:19
**5:58**  416:18,21
**5a**  6:9 37:17,23
41:2,10,17
**5b**  6:11 38:20
39:2
**5c**  6:13 39:6,13
**5d**  6:15 39:17
39:24
**5e**  6:17 40:3,10
**5f**  6:19 40:14
40:21 41:2,10
41:18

---

**6**

**6**  6:20 24:6
60:14,18,21
61:6,21,25
384:23 390:5
390:19,22

---

398:19,20
399:18,20
401:9
**60**  6:20
**601**  3:3
**610-667-7706**
2:6
**665**  58:7,24,25
59:3 61:11,22
**680**  2:11
**6a**  124:10,19

---

**7**

**7**  6:22 124:11
124:15,20
125:1
**70**  269:8
**77550**  4:4

---

**8**

**8**  6:23 19:17
125:12 335:16
335:19,22
**80**  264:8
**856-667-0500**
3:20

---

**9**

**9**  6:24 346:12
346:15,18,21
390:10,15
391:1
**908**  417:13
**95**  253:19
326:9

---

**973-994-1700**
3:15
**9:06**  1:19 9:6

---

**a**

**a.m.**  1:19 9:6
86:14,19
162:23
**abbreviation**
119:19
**ability**  223:18
241:17 242:17
**able**  42:15 54:1
92:18 93:4,9
93:15 100:6
104:13 212:1
291:5,19
302:13 310:8
311:16 313:13
322:11,21
339:1,8 383:7
386:15 405:4
410:15
**abmj**  70:10,12
70:17,20,23,25
71:4,6,11
72:22 73:2,12
73:25 74:18
75:6
**above**  1:20
23:19 257:15
**absence**  212:4
216:4 217:16
219:25 225:23

---

226:4
**absolutely**  99:6
**absorb**  224:1
**absorbing**
224:5 225:7,9
**academic**  46:17
53:21 272:15
279:14 304:17
331:23
**accept**  277:15
**acceptable**
255:6
**access**  42:9
287:21 291:19
**accessed**  329:9
**accessing**
155:14
**account**  254:4
254:13 255:15
256:8,19
259:15 261:20
**accounted**
259:2 264:10
**accounting**
243:16
**accounts**
410:19
**accumulation**
356:10 362:9
**accuracy**
100:11,17
104:22 105:3
254:10 255:4
257:17 258:14

**[accuracy - addressing]**                                        Page 4

| | | | |
|---|---|---|---|
| 259:7 292:20 | 418:17 | 93:12 195:17 | **address**  87:1,13 |
| 300:2 304:13 | **accurately** | 197:17 218:16 | 87:21 88:17 |
| 304:14 | 33:15 93:11,16 | 237:1 245:10 | 170:10,19 |
| **accurate**  31:9 | 101:13 105:11 | 249:17 261:1,3 | 172:5 183:24 |
| 64:5 92:20 | 239:13 267:11 | 264:9 282:4 | 196:7 203:1,9 |
| 93:6 94:4,24 | 267:22 277:18 | 284:15 285:20 | 228:22 252:11 |
| 95:10 96:4,20 | 278:7 391:18 | 287:9 315:5 | 275:5 402:4 |
| 97:13 100:8 | 417:5 | 325:21 330:8,9 | **addressed** |
| 101:19 102:14 | **acknowledge** | 331:23 335:13 | 283:11 323:18 |
| 103:6,14 | 379:17 394:1 | 341:25 359:5 | **addresses** |
| 104:16 105:18 | **acknowledg...** | 379:24 380:10 | 217:12 |
| 106:15 107:7 | 420:1 | 380:20 393:22 | **addressing** |
| 107:13 114:17 | **action**  174:5 | 397:25 398:1 | 90:22 91:4 |
| 114:22 115:3,8 | 217:3 218:15 | 398:24 402:25 | 95:15,19 96:8 |
| 115:13,21 | **actions**  1:10 | 404:22 415:9 | 101:24 102:3 |
| 116:17,22 | 193:22 | **ad**  231:19 | 102:20 105:24 |
| 117:2,4,8,13 | **activities**  96:16 | **add**  34:24 | 106:3,20 108:2 |
| 118:2,10 | 103:2 107:3 | 397:3 399:12 | 108:11,18 |
| 132:18 141:21 | 184:22 | 399:21 400:20 | 111:17 131:17 |
| 142:13 145:22 | **activity**  178:17 | **addicted** | 134:13,25 |
| 145:25 267:18 | 180:19 181:10 | 156:12,17 | 135:16 136:21 |
| 270:14,23 | 183:3 235:19 | 157:10,20 | 136:25 138:24 |
| 277:24 282:15 | 268:6 269:22 | 158:5,15 159:3 | 139:16 140:20 |
| 288:12,23 | 279:2,5,18,20 | 159:10,18 | 141:5 144:7,17 |
| 289:7 290:7 | **actual**  255:4 | 160:16 161:1 | 146:4,20 147:8 |
| 292:1 299:11 | 263:19,22 | **addiction**  1:5 | 148:8,19 149:4 |
| 299:22 304:11 | 280:1 310:20 | 9:12 277:2 | 149:16,25 |
| 324:2,8,25 | 347:19 402:7 | **additional** | 150:10,19 |
| 325:8,17 | 414:16,17 | 232:15 288:5 | 151:17 152:19 |
| 334:22 340:2 | **actually**  12:1 | 295:22 296:18 | 154:20 155:4 |
| 355:24 373:12 | 28:11 29:9 | 331:17 403:16 | 156:11,16 |
| 373:18 374:2,4 | 32:13 54:11 | 403:22 404:10 | 157:9,19 158:4 |
| 375:7 391:18 | 64:6 70:5 | 404:17 405:19 | 158:14 159:2 |
| 397:24 401:16 | 73:18 76:22 | 406:10,15 | 161:5,13,16,25 |

**[addressing - affidavits]**                                      Page 5

| | | | |
|---|---|---|---|
| 163:7,21 165:2 | 301:9,20 302:8 | **adversely** | 387:17 388:2,8 |
| 165:8,22 166:6 | 303:9,12,23 | 352:20 353:1 | 388:16,23 |
| 166:18 170:22 | 304:10 305:11 | **advocacy** | 389:4 390:18 |
| 171:7,16 | 316:6 318:3,17 | 347:23 348:2 | 390:21 399:8,9 |
| 172:17 173:9 | 318:20 319:11 | **affect** 155:16 | 399:23 400:1 |
| 174:10 175:2,9 | 319:24,25 | 156:1 165:23 | 400:13,15,18 |
| 175:14 176:3 | 321:4,21 325:3 | 166:19 223:17 | **affidavits** 32:5 |
| 176:12 177:8 | 332:11 349:20 | 303:24 | 52:23,24 67:11 |
| 177:12,16,22 | 354:16,23 | **affected** 167:1 | 68:8,10,19,21 |
| 178:9,22 179:2 | 355:14 359:15 | 407:11,20 | 98:20,25 99:2 |
| 179:14 182:10 | 359:17 360:2 | 408:2,11 | 99:4,7,15,23 |
| 182:22 183:6 | 360:16 372:4 | **affects** 166:7 | 100:8,12,19 |
| 183:14 184:4 | 379:10 380:2 | 242:9 | 101:2,6,13,18 |
| 187:13 188:11 | 380:13 382:6 | **affiant** 145:2 | 102:13,18 |
| 188:21 189:5 | 390:5 393:13 | 302:25 382:15 | 103:1,13 |
| 203:15 207:20 | 407:12,21 | **affiant's** 302:22 | 110:21 111:5 |
| 208:13 211:2 | 408:3,13 | **affiants** 128:18 | 111:11 119:1,5 |
| 212:3,7,11 | **adjusted** | 129:17 133:11 | 120:25 121:1,8 |
| 213:19 214:14 | 394:14 | 136:2 163:15 | 121:9 122:11 |
| 215:25 216:4 | **adjustment** | 188:17 208:3 | 138:7,21 |
| 217:18 221:14 | 96:23 107:8,20 | 208:22 209:8 | 139:13 140:9 |
| 223:14,16 | **adjustments** | 231:21 313:2 | 140:25 141:23 |
| 226:15 227:1,3 | 36:11 97:21 | 316:19 | 142:5,8,12 |
| 227:16 228:1 | 103:9,20 | **affidavit** 7:1,3 | 143:5,13,21,22 |
| 228:12,14 | 350:13 | 32:18 99:9 | 145:2 160:22 |
| 229:1,4,20 | **administered** | 101:22 105:8 | 163:18 283:14 |
| 230:6 233:10 | 305:3 | 119:11 120:7 | 284:4,8,13,17 |
| 254:24 255:5 | **administering** | 120:15,20 | 284:23 285:13 |
| 267:2,12,24 | 130:22 | 140:19 292:21 | 285:21 286:7 |
| 273:24 274:2 | **administrators** | 299:7 303:1 | 286:14,22 |
| 274:11,14 | 86:25 87:12,20 | 305:21 306:20 | 287:7 288:10 |
| 281:15,18 | 88:16 98:19 | 306:22 309:15 | 288:21 289:5 |
| 298:3,22,25 | **adolescent** 1:5 | 311:4,18 | 290:5,12,24 |
| 300:5,12,20 | 9:12 | 316:15 382:24 | 291:8 292:1,9 |

**[affidavits - answer]**                                    Page 6

| | | | |
|---|---|---|---|
| 292:10 293:4 | **agreed**   255:8 | 386:20 392:20 | 413:11 |
| 294:15,21,24 | 390:17,20 | 402:2 | **amounts** |
| 295:5,22 296:8 | **ahead**   14:16 | **american**  271:3 | 219:23 278:17 |
| 296:18 297:11 | 37:14 | **amount**   65:11 | 298:21,24 |
| 297:19 298:13 | **algorithms** | 86:23 87:10,18 | **analogous** |
| 298:20,23 | 152:16 153:2 | 88:6,14 89:1 | 187:12 |
| 299:5 302:22 | **allegedly** | 90:18,21 91:3 | **analysis**   53:7 |
| 303:20 304:8 | 164:22 355:2,6 | 96:7,10 102:19 | 70:14,15 |
| 305:6,18 | **allison**   7:2 | 102:23 106:19 | 188:24 190:8 |
| 306:11,15 | 386:25 387:6 | 106:23 111:6 | 192:9 193:20 |
| 307:17 310:14 | 387:18,23 | 111:16 112:1 | 229:14 270:17 |
| 310:21 313:6 | 388:3 | 113:13,22 | **analyze**   75:17 |
| 313:21 314:8 | **allison's**   388:8 | 121:25 122:6 | **anchored** |
| 314:18 316:16 | **allocate**   214:20 | 126:8 140:19 | 280:12 |
| 323:19 362:17 | 362:12 | 165:21 166:5 | **anchoring** |
| 362:24 365:1 | **allocations** | 166:17 167:14 | 280:5,8 283:3 |
| 365:10,24 | 199:12 | 181:23 182:20 | **anders**   56:6,11 |
| 370:2 378:12 | **allow**   147:5 | 182:21 187:11 | 56:17,23,24 |
| 381:5,10 | 158:25 410:15 | 212:2 219:13 | **angry**   225:12 |
| 395:19 396:4 | **alphabet**   2:14 | 219:14 221:16 | **anita**   7:3 |
| 399:15 | **ambiguity** | 223:1 224:11 | 386:24 387:6,8 |
| **affiliated**   47:5 | 121:16 | 233:12 254:23 | 388:16,23 |
| **ages**   271:23 | **amended**   5:8,9 | 279:19 300:11 | **answer**   8:4 |
| **aggregate** | 5:11,12,14,15 | 300:19 301:6 | 26:5 34:13 |
| 355:9 | 10:24 11:3,11 | 301:17 302:6 | 89:15 90:9 |
| **agnello**   3:13 | 11:12,18 12:16 | 303:10,21 | 133:7,12,25 |
| **ago**   36:25 | 12:20 13:3,8 | 316:25 319:10 | 137:25 138:14 |
| 132:16 412:11 | 13:16,20 14:7 | 335:2 336:4,15 | 159:13 161:11 |
| **agree**   10:19 | 19:15,21 20:5 | 337:6 349:18 | 162:17 168:2,8 |
| 87:8 97:13 | 20:9 22:24 | 355:15 378:25 | 169:1,2 174:15 |
| 99:1 103:15 | 24:2 27:9 | 379:9 380:2,12 | 175:20 180:10 |
| 107:13 126:17 | 29:15 31:15,18 | 393:15 396:10 | 188:25 194:17 |
| 137:16 222:9 | 31:21 32:1 | 396:15 406:25 | 198:9,22 199:1 |
| 230:19 290:13 | 63:5 384:5 | 407:11 408:12 | 227:8 232:2 |

CONFIDENTIAL

**[answer - article]**                                                      Page 7

243:11 258:3
258:13 277:6
280:10,11,11
281:4,6,8,11
322:18 323:25
342:14 343:4
350:14 358:5
374:4,7,21
375:5
**answered**
134:5 139:19
139:21 142:16
175:5,18
187:20 189:8
191:12 192:1,3
193:1,13
194:25 198:17
205:17 208:18
210:13 227:20
229:7 232:5
245:19 249:22
255:19 277:4
291:14 292:3
296:11 318:23
323:21 339:12
343:1 358:19
359:4 360:21
373:10 380:16
**answering**
10:15 126:13
133:16 135:11
234:2 257:4
311:6

**answers**   93:12
93:17 420:5
**anxiety**   275:17
275:23
**anybody**   282:4
**anyone's**   371:2
**anyway**   170:4
394:13
**apologize**
161:23 395:23
**appear**   18:24
335:5 397:8,15
**appearances**
2:1 3:1,11 4:1
**appears**   125:3
388:12 391:5
398:1 401:19
**appendix**   6:9
6:11,13,15,17
6:19 37:4,8,15
37:21 38:20,25
39:6,11,17,22
40:3,8,15,19
**application**
242:18
**applications**
411:23
**applied**   23:16
23:19 26:23
27:1,13 32:7
120:20 121:9
186:10 368:6
368:17 371:18
371:23 377:14

391:13 393:14
393:18,21
**applies**   210:2,8
387:12
**apply**   29:23
32:10 58:4
314:13 367:25
378:2,22
417:22
**applying**   145:3
310:23 312:24
393:24 394:17
394:19
**approach**
183:11 186:12
187:2 188:5
292:15
**approached**
313:8
**appropriate**
27:1 53:21
129:1,21 130:3
139:8 142:25
145:7,10,19
148:5 208:5
247:12 248:8
248:16 305:24
306:12 307:1
309:17 310:2
310:15,23
311:19 320:25
403:21 405:8
406:13 418:5

**appropriately**
92:8,16
**approximately**
22:25 25:6
26:16 27:24
69:22
**approximating**
263:4
**approximation**
262:12,18
265:20 266:4,9
266:17
**apps**   314:19,20
**april**   67:15
68:2,4,11,14,17
384:11,17
**area**   379:15
**areas**   351:25
378:2
**arrive**   236:12
285:13 286:15
286:23
**arrow**   257:9
**article**   6:23,24
271:3 328:23
330:3,6,22
334:3 335:10
335:15,18,23
336:1,3,14,20
337:3,6,12,14
337:17,20
338:3 345:4,6
346:14 348:1,7
348:21 415:4,9

[articles - assume]                                                Page 8

| | | | |
|---|---|---|---|
| **articles** 46:17 | 269:24,25 | **assembling** | 313:19 314:6 |
| 54:13,15 55:3 | 270:1 273:23 | 289:24,25 | 314:12 351:20 |
| 55:6 327:23 | 274:10 277:3 | 312:23 | 352:18 353:4 |
| 329:15 333:23 | 281:16 291:13 | **assess** 311:17 | 362:13 368:25 |
| 409:8 414:1 | 292:2 293:4 | **assessing** | 369:6 |
| **aside** 46:11 | 296:10 314:23 | 155:24 278:14 | **assist** 52:20 |
| 330:25 | 318:22 323:20 | **assign** 109:9 | **assistance** |
| **asked** 36:7 | 330:11 339:11 | **assigned** 28:9 | 51:19,23 53:3 |
| 42:13,16 48:4 | 358:18 359:5 | 28:12 57:23 | **assistant** 119:7 |
| 53:13 91:24 | 360:20 373:9 | 109:1,14 | 119:8 370:1,16 |
| 92:3 110:1,6 | 380:15 395:3 | **assignment** | 371:20 372:3 |
| 110:22,25 | 403:25 404:21 | 57:2,7,14,16 | 388:10 389:12 |
| 112:4,6 121:20 | 405:12 | 58:5 107:24 | 389:18 390:4 |
| 121:22 122:20 | **asking** 10:7,15 | 108:8,14 | 390:13,22 |
| 122:25 123:4 | 74:13 91:1 | 110:10 112:11 | 391:9,24 392:9 |
| 125:8,15,19 | 122:22 127:21 | 112:18 147:2 | **assisted** 51:25 |
| 126:18 133:8 | 176:24 188:2 | 147:14 148:25 | 52:5,12 |
| 134:4 136:15 | 198:22 210:9,9 | 150:6 151:1 | **associate** 72:5 |
| 136:20 139:18 | 229:9 262:21 | 152:11,15 | **associated** |
| 140:3 142:15 | 269:6,10 | 153:7,18 154:3 | 32:18 178:14 |
| 175:4,17 | 271:23 279:11 | 154:15 155:10 | 178:16 179:23 |
| 187:19 189:7 | 279:18 293:13 | 156:6 158:1,22 | 181:12 184:20 |
| 191:11,25 | 340:11,13 | 160:12 197:20 | 202:4 212:25 |
| 193:1,13 | 343:4 | 209:3,14 | 213:3,11 214:3 |
| 194:24 198:16 | **asks** 348:11 | 216:24 225:21 | 237:5 243:24 |
| 205:17 208:17 | 349:12 | 225:25 226:2 | 283:13 317:25 |
| 227:19 228:22 | **aspire** 411:14 | 226:10,13 | 357:3,8,14 |
| 229:6 232:4 | 411:16,18 | 230:17 231:20 | **assume** 35:13 |
| 239:13 245:18 | 412:2 414:23 | 247:10,16 | 76:19 94:22 |
| 249:21,24 | **assemble** 58:3 | 250:14 252:25 | 96:2 101:17 |
| 255:18 264:23 | 302:12 | 275:1,13 | 102:12 105:15 |
| 268:12,18,19 | **assembled** | 286:12,21 | 106:12 115:18 |
| 268:25 269:1 | 289:23 | 300:24 309:21 | 116:20 117:3 |
| 269:12,18,21 | | 310:1,14,22 | 117:11 118:8 |

**[assume - average]**                                                    Page 9

| | | | |
|---|---|---|---|
| 128:23 130:2 | 251:13 263:7 | **atlanta** 4:10 | 294:4,10,14,25 |
| 132:17 137:5 | 298:13 307:16 | **attach** 12:3 | 295:4,21 296:7 |
| 145:6,25 148:4 | 371:4 372:21 | **attached** | 296:17 297:1 |
| 148:13 149:12 | 373:11 393:18 | 418:12 420:8 | 298:19 363:3 |
| 149:20 151:21 | 393:21 | **attempt** 146:18 | 364:16,20,23 |
| 152:22 154:24 | **assuming** 62:10 | 148:17 149:23 | 365:6,15,21 |
| 157:15 161:10 | 74:13 97:9 | 157:18 158:3 | 366:4,17 |
| 161:12,24 | 140:4,5 167:13 | 158:13 164:25 | 405:21 406:1 |
| 162:10,19 | 167:22 190:22 | 165:7 231:7 | **attributable** |
| 164:3 166:1,9 | 209:16 210:15 | 372:10 399:19 | 153:21 154:8 |
| 167:5 170:12 | 210:18 213:25 | **attempted** | 320:7,10,18,22 |
| 171:3 174:19 | 214:23 231:2 | 183:2 | 362:2 |
| 175:7,21 | 241:5 247:6 | **attempting** | **attribute** 362:7 |
| 193:23 197:9 | 248:6 249:9,16 | 133:7 138:14 | **attribution** |
| 198:23,24 | 266:20 283:10 | 254:23 376:21 | 362:5 |
| 201:16,18 | 297:22 304:13 | **attended** | **august** 1:12 9:5 |
| 205:18,21 | 309:13,24 | 271:16 | 19:17 31:2 |
| 209:7,13 | 325:16 338:18 | **attention** 25:3 | 62:19,21 63:1 |
| 210:10,21 | 377:12 391:13 | 29:9 213:5 | 417:7 |
| 220:17 240:25 | 402:6 | 330:7 | **author** 271:5 |
| 243:12 248:21 | **assumption** | **attorney** 50:7 | **autoplay** 151:6 |
| 255:21 262:10 | 137:13 141:13 | 56:1 111:25 | 151:7,14 152:5 |
| 262:16 263:8 | 141:18,21 | 418:14 | **available** 46:16 |
| 266:3 275:24 | 142:10,14 | **attorneys** 1:13 | 80:1 110:11 |
| 276:22 302:11 | 177:15 198:19 | 33:3 44:1,10 | **avenue** 2:11 3:3 |
| 304:2 305:20 | 241:11 250:17 | 45:6 46:6,7,14 | **average** 45:23 |
| 306:21 313:16 | 250:23 262:25 | 46:21 47:14 | 95:15,18 |
| 321:15 322:8 | 263:11 265:13 | 50:2,2,13,25 | 242:24 243:2,2 |
| 334:23,25 | 266:22 287:16 | 51:20 56:8 | 262:13,19,23 |
| 338:19 344:4 | 306:2 356:2 | 57:23 69:8,10 | 263:9,13 264:3 |
| 376:3 378:1,5 | **assumptions** | 69:19,23 70:2 | 264:5,11 |
| **assumed** | 168:9 169:4 | 109:8,21,25 | 265:21 266:5 |
| 114:20 115:8 | 254:19 | 111:10,15 | 266:10,18 |
| 139:6 247:15 | | 121:23 293:2 | 324:25 336:7 |

CONFIDENTIAL

**[average - benefit]**                                          Page 10

368:1 370:3
371:15,18
373:3,7 374:3
374:10,25
389:23
**averaged**  23:13
76:20 370:8
**aware**  25:12
89:25 128:9
147:4,16,18
158:24 161:2
166:3 233:6,18
235:13 251:24
260:19 261:11
270:19 275:3
288:9,20 290:4
310:20 312:3
331:12,14
332:2 337:16
354:7 387:8

**b**

**b**  5:5 6:9,11,13
6:15,17,19
12:3,13 37:4,8
37:16,21 38:20
38:25 39:6,11
39:17,22 40:3
40:8,15,19
**back**  19:24
34:2 37:17,19
50:4 86:18
163:2 218:13
234:25 267:3

267:13,25
315:16 328:5
348:5 360:25
384:1 390:8
415:18
**background**
342:9 344:18
**bacon**  2:16
**balance**  223:2
**ban**  349:21
**banana**  65:6
**banned**  350:9
350:19 351:4
**bans**  350:16
351:1,10
**base**  29:24 30:3
45:20 49:9
172:23 399:12
399:14,23,23
400:7 404:8,24
405:2 407:5
**based**  67:5,11
67:17,22 68:6
97:22 134:18
141:11 233:8
247:3,25 249:9
250:23 251:4
251:17 257:20
269:2 295:15
302:22,24
304:19 306:21
311:17 317:13
317:18 343:18
352:4 386:11

399:22
**basic**  56:3
174:2 175:7
254:2
**basically**  409:7
**basis**  17:13
82:20 95:3
122:16 135:24
136:5 139:4
142:23 145:20
240:25 263:16
291:24 292:16
308:8 311:5
340:14 341:2
342:10,15,20
343:6 347:11
350:12 351:11
351:12 377:12
378:4
**bates**  6:20
60:16 385:3,8
386:2,10,11
**bathroom**
234:18
**bearing**  344:22
**beat**  38:12
**becker**  3:14
**beginning**  57:9
60:1
**begins**  151:12
**behalf**  10:8
77:7 416:3,10
**behavior**  212:7
317:1,15,20

**behavioral**
317:24
**belief**  310:13
340:23
**believe**  17:18
25:16 31:20
38:5 47:11
53:14,20 164:4
165:18 231:20
248:15 280:15
287:17 292:17
303:4 307:7,9
311:14 343:3
360:22 376:20
383:17
**believes**  249:3
249:18
**believing**  341:3
342:16,20
343:6
**bell**  265:13
**bellwether**  17:4
17:13 41:5
42:22 47:6
85:25 100:24
107:25 108:9
108:16 165:15
166:25 297:12
352:12,19
**beneficial**
230:23 231:3
**benefit**  24:12
24:18 116:9
138:8 227:18

Golkow Technologies,
A Veritext Division

[benefit - breathitt]                                          Page 11

228:3 339:17
339:21 397:2
397:11,19,23
398:11,17
403:1
**benefiting**
  228:6
**benefits**  23:15
  23:16,23 45:23
  48:5,7,11 49:2
  49:4,14 90:19
  91:14 96:1,20
  97:16 100:1
  102:11 103:6
  103:17 104:9
  106:11 107:6
  107:16 113:15
  113:23 117:19
  117:24 118:4
  118:11 185:12
  185:14 186:23
  187:6 215:22
  217:9 219:19
  220:3 223:11
  232:8,10,16,18
  232:24 233:2
  233:14,22
  234:7 235:5,12
  235:14,18
  236:7,11
  324:20 362:15
  362:21 363:23
  364:9 366:16
  366:18 367:3,8

393:15 394:5
396:11,16,17
396:19,24,24
397:3,6 398:4
400:8 402:20
402:23 403:4
**berezofsky**
  3:19
**best**  60:5 279:2
  279:10 372:22
**better**  326:3
**beyond**  104:25
  131:4 174:1
  268:12 270:12
  270:20 272:11
**bias**  239:16
  251:21,25
  252:5,8,20
  254:5,10 256:5
  257:2,24,25
  258:2,3,7,8,20
  258:23 259:2
  259:11,16,20
  261:22,25
  262:3,6
**biased**  242:22
  242:24 243:11
  244:12,24
  245:7,17
  258:16 279:22
  343:16
**biases**  252:12
  257:25

**biasing**  293:15
**big**  60:1 75:23
  81:23 257:11
  356:1
**bill**  59:2,5,9,12
**billed**  58:22
  59:24 61:11,22
  62:1,5,11,20
  63:13,20,25
  64:2
**binder**  10:22
  10:22 14:16,17
  20:13
**bit**  35:1 36:13
  116:6 254:16
  323:14 344:17
  412:7 413:9
**blands**  2:19
**block**  155:14
  155:24
**blow**  349:2
**bonnin**  4:2,3
**boss**  322:14,25
  323:8,9
**boss's**  322:25
  323:9
**bounds**  253:19
**bow**  257:9
**bower**  3:14
**brain**  99:8
**break**  10:16
  38:14,16 86:8
  156:24 162:21
  315:9 354:14

354:21 362:11
377:17 383:20
407:4
**breakdown**
  356:21 357:2,8
  357:13,21,21
  360:9 405:5
**breakdowns**
  209:4
**breakout**
  356:15
**breathitt**  5:8,17
  6:1,10,22
  10:25 11:4,9
  14:20,23 17:5
  17:21,25 18:6
  19:16,21 20:16
  20:21,24 22:23
  23:2,7,24
  24:11,19,22
  25:2 37:16,22
  99:13,19 114:7
  115:23 116:15
  124:13,21
  125:2 284:14
  284:19,25
  286:7 395:16
  396:2,9 397:1
  397:19 398:16
  398:20,22
  399:1 401:2,16
  402:4 404:15
  405:13,17

**[brian - bushur]**                                                        Page 12

| | | | |
|---|---|---|---|
| **brian** 2:17 | **bunch** 313:1 | 124:18 128:8 | 188:8 189:12 |
| 369:10 370:17 | **burrell** 2:11 | 129:9,22 | 190:1,10 191:1 |
| **brief** 47:10 | **bushur** 2:10,13 | 130:20 132:1 | 191:17 192:4 |
| **briefly** 30:22 | 5:3 10:2,6 11:7 | 132:11,21 | 192:20 193:4 |
| **bring** 25:3 50:4 | 11:16,22 12:24 | 133:15 134:9 | 194:1,16 195:3 |
| **bringing** 176:5 | 13:12,24 14:11 | 134:21 135:9 | 195:15 196:1 |
| **broad** 304:3 | 15:2,11,20 | 135:23 136:18 | 196:24 197:12 |
| 309:7 | 16:4,13,22 | 137:11 138:19 | 198:8 199:3,15 |
| **broader** 242:19 | 21:3,13,23 | 139:11,22 | 200:10 201:6 |
| **broadly** 355:7 | 22:7,17 30:15 | 140:17 141:16 | 201:22 202:6 |
| **brody** 3:12 | 35:18 36:3 | 143:3 144:3,14 | 203:6 204:1,24 |
| **broke** 89:16,21 | 38:1,7,15,19 | 145:8 146:16 | 205:8,22 |
| **broken** 90:1 | 39:5,16 40:2 | 147:3,15 | 207:13 208:7 |
| 358:21 361:7 | 40:13,24 44:6 | 148:16 149:1 | 209:20,24 |
| 405:4 406:21 | 46:2 47:15 | 149:13,22 | 210:17 211:7 |
| **brought** 12:5 | 48:23 50:21 | 150:7,16 151:5 | 211:24 212:14 |
| 175:14 330:7 | 51:6,17 55:1 | 152:1,12 153:9 | 213:13 214:5 |
| 347:17 | 55:14 60:4,12 | 153:19 154:4 | 215:1,23 216:9 |
| **bryce** 1:16 5:3 | 60:20 61:18 | 154:17 155:11 | 217:10 218:1 |
| 9:17,23 420:2 | 66:19 69:2 | 155:21 156:8 | 220:16 221:7 |
| **bubbles** 377:5 | 82:13 83:6 | 156:25 157:6 | 221:20 222:2 |
| **bucket** 174:18 | 85:8 86:11,20 | 157:17 158:2 | 224:22 225:19 |
| 187:13 | 88:1,12,24 | 158:12,23 | 226:11,22 |
| **buckets** 160:7 | 89:9 90:15 | 159:19 160:1 | 227:23 228:23 |
| **building** | 91:18 93:2,22 | 162:20 163:4 | 229:18 230:4 |
| 302:18 304:21 | 95:2,6 97:1,24 | 163:16 164:11 | 230:18 231:5 |
| **buildings** 301:8 | 100:5 102:17 | 167:7 171:4 | 232:1,7 233:1 |
| **bull's** 257:13 | 103:11,21 | 172:1,14 173:1 | 233:19 234:4 |
| 257:14,18 | 104:12,20 | 174:7,24 | 234:19 235:2 |
| **bullied** 229:4 | 105:21 107:22 | 175:11 176:2 | 236:21 237:16 |
| **bully** 85:11 | 109:7 110:13 | 176:17 177:20 | 239:2,14 240:5 |
| 229:2 | 111:23 115:9 | 178:6 179:12 | 240:22 241:10 |
| **bullying** 175:3 | 115:16 118:14 | 180:3,14 182:4 | 241:21 242:5 |
| 175:9 189:5 | 123:15 124:8 | 183:22 186:2 | 244:9,19 |

**[bushur - calculation]** Page 13

| | | | |
|---|---|---|---|
| 246:11 249:1 | 316:23 317:12 | **business** 181:5 | 156:19 166:13 |
| 249:14 250:1 | 318:16 319:8 | 339:25 340:1 | 236:25 246:9 |
| 250:16 251:2 | 319:22 321:2 | **bw** 385:8 386:2 | 355:17 357:16 |
| 251:10,20 | 322:10,20 | **byrne** 3:12 | 357:23 358:8 |
| 252:17 253:1 | 323:11 324:11 | **bytedance** 4:12 | 358:13,24 |
| 253:16 254:11 | 331:10 333:21 | 4:13 | 359:9 392:6 |
| 256:6,16 | 335:21 339:19 | | 393:10,22 |
| 259:12,21 | 341:18 343:2 | **c** | 400:13 401:9 |
| 260:5,18 | 344:1 345:1 | **c** 417:1,1 | **calculating** |
| 261:10 265:16 | 346:17 348:24 | **calculate** 81:12 | 57:21 66:21 |
| 266:6 267:8 | 350:6 351:13 | 86:22 87:9 | 67:4,10,16,21 |
| 273:5,21 274:8 | 353:13 354:5 | 97:8 110:7 | 68:5 132:19 |
| 275:2,14 276:1 | 356:5 358:23 | 111:1 133:1 | 143:1,9,16 |
| 276:10 277:8 | 359:24 360:13 | 145:13 183:3 | 146:21 180:16 |
| 278:3,15,23 | 361:9,22 364:5 | 197:19 223:8 | 182:6 186:3 |
| 279:13 280:3 | 364:14 366:14 | 227:2 236:3,6 | 187:15 231:23 |
| 281:1,12 282:1 | 367:1 368:8,15 | 246:23 308:14 | 245:13 317:16 |
| 283:24 284:12 | 368:23 370:12 | 318:14 350:7 | 317:21,23,23 |
| 286:19 288:8 | 372:24 373:13 | 350:17,21 | 317:25 368:18 |
| 288:17 289:3 | 374:5,14 | 351:2 354:12 | 401:20 403:23 |
| 290:22 291:23 | 375:13 376:2 | 354:19 356:1 | 411:10,25 |
| 292:7 293:9 | 377:8 378:3 | 362:14,21 | 412:15,23 |
| 294:23 295:18 | 379:7 380:9,19 | 363:23 364:8 | **calculation** |
| 296:4,15,24 | 381:7 382:19 | 366:12,15 | 20:1 23:4,11 |
| 297:9 299:9,19 | 383:9,19 384:3 | 368:2 371:18 | 23:18,21 24:15 |
| 300:16 301:3 | 385:16 387:14 | 393:1,7 394:22 | 26:3 28:17,20 |
| 301:14 302:1 | 387:21 389:2 | 396:15 402:17 | 36:2 46:1 91:6 |
| 303:6,18 305:1 | 392:7,17 | 402:22 | 98:16 99:11 |
| 306:1,8 307:15 | 394:21 397:17 | **calculated** | 103:23 114:3 |
| 308:9 309:12 | 402:1 406:2 | 33:15 77:23 | 114:13 116:4 |
| 310:11 311:15 | 407:17 408:18 | 78:3,7,10,15 | 116:10 117:19 |
| 312:4 313:17 | 415:11,20 | 79:3,5,11,24 | 117:24 129:2 |
| 314:4,15 315:3 | 416:15 | 80:11 81:9 | 134:18 137:9 |
| 315:8,18 | | 94:18 132:23 | 137:10 140:7 |

CONFIDENTIAL

**[calculation - cases]**                                                   Page 14

| | | | |
|---|---|---|---|
| 146:15 210:20 | 148:18 149:24 | 5:23,25 10:7 | 96:18 98:12 |
| 210:21 211:10 | 155:3,17 156:2 | 10:25 11:4,9 | 103:4 107:4,24 |
| 212:13,22 | 156:7,18 | 11:13,19,25 | 108:8 111:12 |
| 213:21 223:7 | 157:11 169:6 | 12:16,21 13:1 | 112:11 113:2 |
| 235:15 237:13 | 198:1,15 | 13:4,9,14,17,21 | 121:16,18 |
| 247:22 249:5 | 210:24 214:2 | 14:1,4,8,13,20 | 123:2 124:21 |
| 249:20 250:13 | 214:10 235:10 | 14:24 15:4,8 | 125:2 130:3,4 |
| 272:14 304:16 | 243:16 299:21 | 15:13,17,22 | 133:2 138:4 |
| 308:6 309:11 | 313:12 342:8 | 16:1,6,10,15,19 | 159:12 162:7 |
| 310:2,3,10 | 403:19 406:9 | 17:1,21 20:16 | 162:17 164:13 |
| 312:9,11 317:2 | **calendar**  59:16 | 20:21 21:5,15 | 164:19 173:20 |
| 318:7 319:14 | 60:7 62:15 | 21:25 22:9,10 | 181:20 183:2 |
| 320:3 321:1,9 | **california**  1:1 | 23:24 30:20 | 185:5,11,17 |
| 321:25 365:25 | 9:16 | 34:9 35:21 | 186:5 187:17 |
| 371:3 391:14 | **call**  45:5 48:6,7 | 38:22 39:7,18 | 198:1,15 209:1 |
| 391:19 396:9 | 48:25 65:24 | 40:5,16 41:21 | 213:10 225:21 |
| 396:10,14 | 75:16 170:8 | 42:1,8,14 | 226:2 236:6,25 |
| 398:4,21 399:2 | 176:1 | 43:20 44:9 | 240:7 247:11 |
| 402:7 413:23 | **called**  34:21 | 49:22 52:2,9 | 256:24 264:22 |
| **calculations** | 70:10 79:9 | 52:13,21 53:4 | 278:5 286:9,12 |
| 19:25 24:19,23 | 119:8 186:12 | 53:8,11 54:3 | 286:14,21 |
| 25:2 26:8,23 | 253:24 268:11 | 54:15,21 55:4 | 291:22 302:3 |
| 27:17 29:21,25 | 337:18 338:15 | 55:16 56:21 | 305:25 306:13 |
| 30:6 32:9 34:7 | 341:5 396:16 | 57:4,15,16 | 307:2 308:12 |
| 35:3 36:20 | 411:14 412:20 | 58:8,13,22,23 | 308:16,21 |
| 43:17 48:22 | **calls**  98:2 178:2 | 59:7,19 60:9 | 313:19 314:6 |
| 52:6 53:7 | **carefully**  418:3 | 60:23 61:2,8 | 316:12 332:17 |
| 65:17 68:22 | **carella**  3:12 | 62:2,7,12,16,20 | 344:24 353:6 |
| 69:7 88:22 | **carellabyrne....** | 64:18,22 65:3 | 353:16,22 |
| 91:3 111:3,8 | 3:16,16 | 65:19 66:10 | 360:12 365:7 |
| 112:3 113:13 | **carried**  25:25 | 77:23 78:2,7 | 370:10 383:18 |
| 117:17,22 | **case**  1:4 5:8,10 | 81:8 84:17,21 | **cases**  17:4,7,13 |
| 118:4 126:14 | 5:11,13,14,16 | 86:22 87:9 | 37:11 76:8,12 |
| 139:9 143:7 | 5:17,19,20,22 | 89:14 90:9 | 76:21,23 |

| | | | |
|---|---|---|---|
| 115:24 303:5 | 141:5 152:5 | 353:19 354:3 | **changed** 24:5 |
| **categories** | 153:2,13 | 379:16 382:8 | 32:16,19 57:11 |
| 90:17 305:4 | 164:22 169:8 | **certification** | 167:23 295:20 |
| 396:12 | 255:23 351:20 | 417:21 | 296:2,6 312:21 |
| **category** 46:20 | 352:7 | **certify** 417:4 | 332:19,25 |
| 113:12,17 | **causes** 262:1 | 420:3 | **changes** 29:12 |
| 127:11 | 277:14 278:7 | **certifying** | 30:24 31:7 |
| **caught** 35:17 | **causing** 167:24 | 417:24 | 198:6 418:11 |
| **causal** 189:10 | **cecchi** 3:12 | **cetera** 126:11 | 420:7 |
| 192:8,8 194:12 | **ceiland** 4:6 | 127:6,11 | **characterizati...** |
| 194:12 200:7 | **cell** 272:24 | 130:12 175:16 | 113:19 |
| 228:21 234:2,3 | 273:1,9,12,14 | 405:6 414:22 | **characterize** |
| 234:12 350:13 | 274:2,14 | **cfo** 47:12,17,22 | 86:23 87:10 |
| 352:23 | 348:12 349:13 | 47:25 48:3,10 | 332:13 |
| **causality** | 349:20,21 | 48:18,25 49:14 | **charleston** 5:10 |
| 188:24 189:2 | 350:10,16,19 | 49:21 51:21 | 5:18 6:2,12 |
| 191:14 195:2 | 351:1,5,10 | **challenge** | 11:13,19,25 |
| 200:18 202:16 | **cells** 25:21 27:3 | 153:24 | 12:14 15:4,7 |
| 202:23 204:9 | 36:15,16 | **challenges** | 17:6 19:16,22 |
| 204:15 206:6 | **center** 263:2 | 200:21 202:20 | 21:5,9 27:23 |
| 206:14,22 | 412:5 | 206:18 207:1 | 29:13 30:2,6 |
| 207:4 234:14 | **central** 265:8 | **chan** 3:8 9:3 | 35:9 38:21 |
| **causation** | **certain** 29:19 | **chance** 51:7 | 39:1 47:12,17 |
| 84:21 85:20 | 36:18 90:20 | **change** 20:3,6,7 | 47:24 48:3,10 |
| **cause** 275:16 | 113:15 205:2 | 23:9,15,22,25 | 48:18,25 49:14 |
| 275:25 277:10 | 347:17 412:6 | 24:5 29:18 | 49:15,21 51:20 |
| 277:19 | **certainly** 54:10 | 57:7 62:13 | 99:13,19 114:9 |
| **caused** 84:24 | 80:9 189:20 | 66:20 67:1 | 114:10 284:15 |
| 85:4,10,14,18 | 196:6,10 | 134:12,23 | 284:19,25 |
| 85:24 86:4 | 199:21 203:12 | 135:15 141:3 | 286:7 386:20 |
| 87:1,13,21 | 203:22 268:22 | 166:10 217:4 | 386:22 387:3 |
| 88:7,17 89:3 | 275:11 285:15 | 233:12 269:17 | 387:11,25 |
| 122:2,8 134:13 | 285:24 289:23 | 271:20 419:4 | 388:19 389:17 |
| 134:25 135:16 | 290:12 308:2 | | 390:9 391:2,8 |

[charleston - column]                                         Page 16

391:17,23
392:11,12
402:3,6 404:15
404:22
**chatgpt**  53:10
53:14,21 54:2
54:5,9,14 55:2
327:23,25
328:2 329:4,7
329:9 330:4,7
330:11,15,17
330:21
**chatgpt.com**
329:1,6,25
**cheating**
212:18 213:17
**check**  1:18 2:2
9:9 52:22
73:18,23
**checked**  35:16
**checks**  33:22
**cherry**  3:20
**children**  410:8
410:12,18,22
411:5
**choice**  36:5
213:1 218:20
**choices**  213:8
214:19
**chooses**  173:13
**chose**  404:7
**chunk**  60:1
**citation**  101:8
328:20

**citations**  18:14
18:15,24
**cite**  235:17
331:9 332:23
333:23 334:10
335:24 345:10
347:4 385:11
385:12
**cited**  18:10
331:1 338:3
**citing**  329:23
401:11
**citizenship**
229:22 230:8
230:21 231:11
**civics**  351:17
351:21 352:8
352:14 353:8
353:17,24,25
**civil**  412:20,25
413:1,24 414:8
**claim**  312:19
**claiming**
351:24
**clarification**
34:19 98:24
**clarity**  61:16
**clark**  1:20 9:20
417:15
**class**  126:3,12
147:21,25
148:9,20
170:11,14,19
170:23 171:8

172:6,18,19
175:15 176:10
176:11 177:5,7
189:15 190:3
190:13,15,24
191:7,23
192:12,24
193:7,11 194:5
194:22 197:2
207:7 272:24
273:13,25
274:3,12
349:22 350:10
360:5 362:1
**classes**  265:2
**classroom**
173:11 174:17
175:23 329:20
332:18,21,25
333:4,5,10,11
**classrooms**
326:16 327:3,9
327:22 328:12
331:5 332:6,13
334:2 345:22
**claudia**  271:12
**clean**  37:14
41:1 168:2
**clear**  181:3
235:17 259:14
288:19
**clicking**  329:10
**client**  316:14
316:22 414:4

**clients**  58:18
75:21 78:22
**clinical**  276:16
276:18,21
**clinically**
276:23
**close**  29:9
257:17 263:15
**clustered**
257:14
**coaching**  404:4
**code**  29:6,7
33:20 34:7,16
35:20 49:3
**cofounder**  70:9
70:16
**cofounders**
70:20
**cohorts**  269:7
271:22
**colleagues**
302:17
**collect**  111:5
304:2
**collecting**
414:19
**collection**
270:16
**college**  268:19
268:21 269:22
271:25 411:22
**column**  381:16
381:19 394:18

**[combination - conduct]**                                    Page 17

combination
  334:16
combined
  399:8,25
  400:12,17,24
combines   336:8
  336:9
come   28:25
  59:18 60:8
  73:22 142:17
  325:22 411:22
comes   179:10
  186:20 188:6
  235:9 278:13
  279:11 325:21
  337:17 338:10
  345:4 413:3
comfortable
  283:17 285:22
  288:6
commencing
  1:19
commerce   2:17
commission
  338:13 420:16
commissioned
  338:9,12,23
  341:13 343:11
common
  115:25 116:11
  120:12 263:5
  263:23 266:1
  281:3 398:3
  402:18 403:14

commonality
  196:23
commonplace
  196:19
commonwealth
  1:22
communicate
  47:1 49:19
  97:25 98:3
communicating
  187:22
communicati...
  98:9,13
communities
  72:6
companies
  82:17 88:23
  89:8 307:10
  362:12
company   88:4
  88:11 89:18,22
  90:2,13 337:18
  341:12 343:13
  344:10 361:5
compare
  197:14 398:5
compared
  34:10 401:21
comparing
  271:21 401:3
compensated
  58:12
compensation
  59:18 60:8

  62:14 72:21,25
  232:21,22
  396:23
complete   16:24
  17:11 31:10
  60:25 61:6
  223:18 252:1
  263:18 355:22
completed
  253:8
completely
  344:21 374:25
complicated
  161:21
component
  318:5,19
compound   44:4
  47:9 48:20
  392:3
comprise
  362:15,22
comprised
  356:7 364:25
  365:8,22 366:5
compulsive
  162:4,9,14
compulsively
  161:6,14,18
  162:2
concept   280:5
  280:15
conception
  170:1

concern   142:24
  279:20
concerned
  131:5 196:10
  198:5 245:21
concerns   317:1
  317:15,20,24
  319:25
conclude   97:12
  103:13 107:11
concluded
  416:21
concludes
  96:15 103:1
  107:1 416:17
conclusion
  178:3
conclusions
  33:25 242:17
  304:19
conduct   84:17
  84:24 85:14,24
  86:4 92:15
  122:14 168:10
  169:4 185:4
  187:14 188:17
  208:5 210:16
  211:19 212:12
  226:4 307:11
  307:13,14
  310:8 320:24
  338:20,23
  341:6,21 352:7
  352:25

**[conducted - contributed]**                    Page 18

conducted   67:5
67:18,22 91:9
109:19,23
279:16
conducting
92:11 278:24
confidence
94:19 243:6,15
244:6 253:20
253:23 254:3
254:12 255:14
256:3,7,17
257:10,19
258:1,4,6
259:3,10,14
261:19 262:2,4
324:18 325:10
326:6
confident
325:16 401:14
confidential
1:13
confirm   326:13
326:25 327:19
328:9 329:17
331:2 364:19
404:13,19
confirmation
405:20 406:5
confirmed
364:21 405:7
405:14,16
conflicts
192:11,23

193:9 194:4,21
confounding
407:10 408:10
confused   44:21
217:24
congratulations
410:7
connection
52:13,20 53:4
58:13 59:6
74:7 160:16,25
176:4 250:18
318:4,18
336:16 337:7
411:6,25 412:1
412:17,23
414:8,22
connolly   2:10
conservative
353:7 398:2
404:7
consider   41:21
42:1 81:21,25
82:4,9 83:7,11
83:15,19,23
84:2,6,11
99:22 174:16
180:5,17 182:7
182:8 240:6
247:4 251:6
252:14 298:18
340:5 343:24
372:15 373:5
407:9,19 408:1

408:9
considered
6:10,12,14,15
6:17,19 12:4
37:4,7,10,16,22
38:21 39:1,7
39:12,18,23
40:4,9,15,20
41:2,4,11,15
43:20 44:9
110:15 217:20
384:24 386:6,8
consistent
297:20 305:23
306:11,24
307:18,21
308:25 341:24
construct
222:10 224:14
constructed
122:12 324:22
construction
322:5 374:2
375:9
consult   290:5
consultant   75:3
413:2,3
consulting
70:10,12,15,17
70:23 71:1,4,6
71:12 72:22
73:2,13 74:18
75:7

contacted
56:22
contain   17:11
18:14 37:3
contained
41:16 68:7
297:3 417:5
contains   10:22
14:17 20:14
content   144:7
144:18 146:4
146:20 147:8
context   105:7
122:18 136:9
139:9 141:25
263:21 268:9
275:6
continue
331:16
continued   3:1
4:1
contract   45:7
406:19,25
contracted
166:10,11
contradicted
198:20
contraindicated
331:18
contrary   340:3
contributed
65:15 353:7,16
353:24

**[control - correct]**                                                    Page 19

| | | | |
|---|---|---|---|
| **control**  33:13 | 31:17,19,23 | 92:13,16,17,21 | 118:5,6,11,13 |
| 33:22,24 34:10 | 32:11 33:11 | 93:7,13,18 | 118:19,20 |
| 414:17 417:23 | 36:24 37:4,5 | 94:5,6,24 95:1 | 119:1 120:21 |
| **convenient** | 37:11,12 38:22 | 95:10,11,21,22 | 121:3,11 122:3 |
| 377:18 | 38:23 39:8,9 | 96:4,5,11,20 | 122:9 123:9,22 |
| **conversation** | 39:19,20 40:5 | 97:3,16 98:21 | 123:25 124:4 |
| 47:11 48:18 | 40:6,16,17 | 98:22 99:16,21 | 124:21 125:2 |
| **convey**  244:7 | 41:5,6,18,19,23 | 100:2,4,8,9,13 | 125:16,22 |
| **copies**  12:6 | 41:24 42:4,5 | 100:19,21 | 126:3,15,16,22 |
| 38:6,13 | 43:1,12,13,22 | 101:2,10,11,14 | 127:2,6,13,18 |
| **copy**  10:24 | 45:13 47:17,18 | 101:15,19,20 | 128:2,14 |
| 20:15,20 21:4 | 50:16 51:1,10 | 102:4,5,7,8,14 | 129:13,25 |
| 21:14,24 22:8 | 51:13 58:9,10 | 102:16,23,24 | 131:19 133:20 |
| 38:2,8 | 60:9,23 61:8,9 | 103:6,17 104:2 | 134:1,15 137:2 |
| **core**  115:25 | 61:13,15,23,24 | 104:3,11,17,19 | 137:14,19 |
| 116:11 398:3 | 62:3,4 63:18 | 104:24 105:6 | 138:9,25 |
| 402:18 403:15 | 63:19,22 64:4 | 105:12,13,18 | 140:12 141:7 |
| **correct**  10:10 | 70:10,11,18 | 105:20 106:4,5 | 143:22 144:9 |
| 10:11 11:9,10 | 71:15,16,19,20 | 106:7,8,15,16 | 146:8,22 |
| 11:25 12:14,17 | 72:7,8 77:12 | 106:23,24 | 148:11,21 |
| 13:1,5 14:1,2,4 | 77:13,16,17,20 | 107:7,16 108:3 | 150:2,12,21 |
| 14:5,20,21 | 77:21 78:9 | 108:19 109:1 | 151:19 152:7 |
| 15:4,5,13,14,23 | 84:18,19,21,22 | 109:23 110:3 | 152:21 153:3 |
| 16:7,15,16 | 84:25 85:1,5,7 | 111:12,13 | 153:14,24 |
| 17:1,2,8,14,15 | 85:11,12,15,16 | 112:16,24 | 154:11,23 |
| 18:14 19:18,19 | 85:21,22 86:1 | 113:1,8,24,25 | 155:6,17 156:2 |
| 20:17,21,22 | 86:2,5,6 87:2 | 114:4,14,15,18 | 157:12,22 |
| 21:6,7,16,17 | 87:15,16,21 | 114:19,23,24 | 158:8,17 159:4 |
| 22:1,10,11,21 | 88:2,8,18 89:4 | 115:3,13,15,21 | 159:13,20 |
| 22:22 23:2 | 89:6,15,23,24 | 115:22 116:1,2 | 161:8,18 162:5 |
| 24:16,18 25:8 | 90:10,24 91:9 | 116:5,13,14,18 | 162:9,10,18 |
| 25:15,16 26:4 | 91:10,15,17,21 | 116:19,22,23 | 163:9,25 |
| 26:5,18,19 | 91:22,25 92:1 | 117:2,8,9,14,15 | 164:16,22 |
| 28:1,2 31:16 | 92:4,5,8,9,12 | 117:19,24,25 | 165:4,13,17,25 |

CONFIDENTIAL

**[correct - correct]**                                                      Page 20

| | | | |
|---|---|---|---|
| 166:8,14,21 | 206:21 207:2,3 | 261:22 262:3,5 | 316:9,16 317:4 |
| 167:2,12,13,21 | 207:8,22 | 262:6 263:11 | 318:8,21 |
| 168:19,25 | 208:16 211:14 | 265:19,21 | 319:16 320:5 |
| 169:10,15 | 212:7,22 | 266:9,17 267:5 | 320:11 321:10 |
| 170:11,14,20 | 213:22 214:16 | 267:7,14 268:1 | 322:1 323:19 |
| 170:25 171:9 | 215:7 216:10 | 270:23 272:14 | 324:14,15,21 |
| 171:17 172:19 | 217:20 218:9 | 273:1 274:4,15 | 325:4 326:4,16 |
| 174:11 175:3 | 220:11 221:21 | 275:6,18 276:4 | 327:3,23 |
| 176:6,13 | 225:24 226:6 | 277:12 278:9 | 328:12,16,22 |
| 177:25 178:18 | 226:16 227:4,9 | 280:14,18 | 329:2,10,20,25 |
| 178:19 179:15 | 227:12,18 | 282:15 284:21 | 330:4,18 331:5 |
| 180:8 181:13 | 228:4,5,15 | 284:22 285:3,9 | 331:13 332:6 |
| 182:25 183:7 | 229:5,24 | 285:10 286:9 | 332:14,15 |
| 183:17,25 | 230:10,24 | 286:16,24 | 333:1 334:8,12 |
| 184:8 186:5 | 231:13 232:3,6 | 287:10 288:23 | 334:13,17,20 |
| 188:13,22,25 | 232:11 233:23 | 291:3,12 | 334:22 335:4 |
| 189:1,6,16 | 234:8 235:5,6 | 292:22 293:16 | 335:25 336:5 |
| 190:5,17 | 235:21 236:14 | 293:21 294:4 | 336:12,12,18 |
| 191:10,18,19 | 236:17 237:1 | 294:11,17 | 337:4,9,15,18 |
| 191:24 192:6,7 | 238:22 239:4 | 295:1,2,6,23 | 339:3,10 |
| 192:13 193:11 | 241:13 244:13 | 296:9,20 297:4 | 340:16 342:12 |
| 194:8,17,18,23 | 244:20,25 | 297:14 299:14 | 343:4 344:5 |
| 195:2,8 196:16 | 245:8,17 | 299:24 300:7,8 | 345:12,13,15 |
| 197:6,17 198:1 | 246:25 247:1,5 | 300:13,15,21 | 345:22 346:3,4 |
| 198:15 199:7 | 247:6 250:3,19 | 300:23 301:10 | 346:8,19,25 |
| 199:17 200:3,8 | 251:10 252:8 | 301:21 302:9 | 347:24 348:3,8 |
| 200:15,17,21 | 252:21 253:11 | 303:13,25 | 348:9,14 |
| 201:11 202:14 | 253:21,22 | 304:11 305:13 | 349:15,23 |
| 202:16,21,22 | 254:6,15 255:1 | 306:4,13 | 350:11,20 |
| 203:2,10,17 | 255:12,17 | 308:12,16,21 | 351:6,17,18,22 |
| 204:7,8,13,14 | 256:12,23 | 309:1,18 | 352:9,15,21 |
| 204:20 205:4 | 258:12 259:4 | 310:25 311:22 | 353:2,9 354:17 |
| 205:15 206:4,5 | 259:19,25 | 312:6,13 | 354:24 355:3,8 |
| 206:12,13,20 | 260:13 261:4 | 313:22 315:23 | 355:18 356:8 |

**[correct - counselors]**                                                      Page 21

| | | | |
|---|---|---|---|
| 356:13,19,25 | 389:6,13,14,20 | **corresponding** | **costs**   78:8,16 |
| 357:6,12,19 | 389:21,25 | 47:3 | 78:23 79:3,6,9 |
| 358:1,11,16 | 390:1,6,7,15,24 | **corroborated** | 79:11,24 80:12 |
| 359:2,12,19 | 390:25 391:4 | 108:1,10 | 81:13 169:10 |
| 360:5,19 | 391:12,15,20 | 382:10 | 169:14,15,18 |
| 361:14 362:3 | 392:1,13 393:3 | **corroborates** | 169:19,21 |
| 362:18,19,25 | 393:5 394:8 | 108:17,22 | 170:3 178:16 |
| 363:1,3,4,12,13 | 395:21 396:6,7 | **cost**   78:24 | 180:17 182:6 |
| 363:17 364:9 | 396:12,17,18 | 81:10 170:8 | 182:19 184:24 |
| 365:2,10,17,25 | 397:3,4,7,12,20 | 178:13,24 | 212:25 213:9 |
| 366:7,19 367:5 | 398:22,23 | 181:16,18,24 | 214:21 219:8 |
| 367:10,11,14 | 399:3,4,9,10,16 | 182:2,17 | 222:21 224:2 |
| 367:19 368:3 | 399:17 400:2,9 | 184:20 185:6 | 224:21 225:8,9 |
| 368:11,20,21 | 400:22 401:2,5 | 185:15,19,23 | 236:24 411:11 |
| 369:4,5,11,16 | 401:10,16,23 | 186:8,14 187:8 | 412:1,16,24 |
| 369:22,23 | 402:9,13,14,20 | 187:10,10,25 | 413:24 |
| 370:4 371:22 | 403:19,20 | 202:4 210:1 | **counsel**   9:18 |
| 371:24 372:5 | 405:22 406:5 | 213:3,11 214:3 | 30:18 38:1 |
| 372:12,18 | 406:11,12 | 214:22,25 | 95:3 109:1 |
| 373:3,4,8,18 | 407:6,13,22 | 215:11,21 | 110:22 111:5 |
| 374:18 375:1 | 408:4,6,7,14 | 216:2,16 | 121:21 342:24 |
| 375:18 376:15 | 412:18 417:8 | 217:19 219:3 | 379:5 397:16 |
| 379:3,12 380:3 | 420:4 | 221:3,9 223:10 | 397:18,22 |
| 380:14 381:1 | **corrected**   17:19 | 223:11 224:16 | 398:12 403:6 |
| 381:11,12,16 | 32:12 400:5 | 224:17,18,23 | 416:7 |
| 381:23,24 | 401:4 | 225:17 235:15 | **counseling** |
| 382:1,22 383:3 | **corrections** | 235:21,24 | 411:20 412:5 |
| 384:12,13,19 | 27:5,8 418:4,6 | 236:3,13,16 | **counselor** |
| 384:24 385:5,6 | 420:7 | 413:5,9,9 | 119:18,19,20 |
| 385:9,10,13,19 | **correctly** | 414:2 | 120:11 205:11 |
| 385:24 386:17 | 100:15 334:25 | **costing**   183:11 | 394:4 412:7 |
| 386:25 387:1,6 | **correlations** | 187:8 188:6 | **counselors**   43:6 |
| 387:7 388:1,5 | 361:19 | 215:14 217:7 | 86:25 87:12,19 |
| 388:11,20,21 | | | 88:15 98:18 |

CONFIDENTIAL

**[counselors - damages]**                                    Page 22

105:23 119:12
201:20 365:17
379:10 388:13
393:2,8,11,16
394:6
**couple**  69:18
**course**  52:8
57:8 123:1
173:22 178:18
180:23 193:24
221:17 223:1
**court**  1:1 9:15
9:20 96:14
97:11 102:25
103:9,12
106:25 107:9
107:10 137:12
137:21 236:23
418:18
**covered**  134:7
136:7 305:5
311:3 377:22
393:14 394:3
**covering**  301:2
373:1
**covid**  72:10
407:20 408:2
408:11
**coworkers**
215:6
**craig**  4:3
**cram**  66:8
**create**  293:14

**created**  363:16
363:25 364:6
364:16
**creation**  275:10
**culture**  353:7
**cumulatively**
222:25
**current**  42:3
376:1
**currently**  22:19
350:5 389:19
**curve**  265:13

**d**

**d**  5:1
**d.c.**  2:12 3:4
**damage**  149:18
151:23
**damages**  20:3
22:25 23:7
24:8,13,23
25:2,6,13,18
26:8,16 27:9
27:17,24 28:17
29:13 30:6
31:22 32:2
33:16 36:19
43:17 57:4,22
66:21 68:22
77:23 78:3
81:9,11 85:15
86:21 87:8
88:6 89:1,11
89:13 90:5,8

90:16 91:3,7
91:13 94:21
95:25 96:1,9
96:11,18,18
97:14 98:17
99:12,25
100:24 101:16
102:10,12,22
102:23 103:3,4
103:16,23
104:8 105:14
106:10,12,22
106:23 107:4,5
107:14 109:9
109:12 110:1,7
110:18,23
111:1,7,19
112:3 113:12
115:18 117:11
117:16,21
118:8,15
121:25 122:6
126:14 128:10
129:11 132:3,7
132:19 134:11
134:23 135:14
136:24 138:23
139:15 141:3
143:1,6,9,16
144:5,5,15,16
145:13 146:7
146:22 147:6
148:1,11,18
149:6,24 150:8

150:9,17,18
151:18 152:3
152:20,25
153:11,21
154:8,22 155:2
155:17 156:2,9
156:14 157:11
157:21 158:7
158:17 159:1,9
159:11 161:8
161:15 162:8
162:13,15
163:6,22 164:5
164:9 165:1,8
166:13 169:13
180:4 197:25
198:14 207:22
208:15 210:7
210:20,23
211:10 212:1
212:22 213:21
214:10,11
216:3 217:20
220:8,10
223:13 227:2
231:6,24 235:4
236:17 237:1,7
237:18 240:12
240:14 245:13
247:2 249:5,19
250:13 251:4
272:14,19
283:15 284:1
295:20 296:6

**[damages - deadline]**                                              Page 23

| | | | |
|---|---|---|---|
| 296:19 317:3 | 30:2,3 32:6 | 288:21 289:1,6 | 65:4 70:8 |
| 317:16,20,25 | 35:11,16 42:17 | 289:10,12,12 | 95:15,19 |
| 318:7,12,15 | 42:18,24 43:3 | 289:14,21,22 | 173:23 178:18 |
| 319:14 320:4 | 43:8,11,15 | 289:25 290:1,3 | 180:24 183:14 |
| 320:25 321:9 | 45:18,25 52:12 | 290:5 291:2 | 197:16,17 |
| 321:25 324:13 | 52:23 53:7 | 292:18 296:2,3 | 207:16 210:6 |
| 324:16,24 | 58:3 80:23 | 296:14 312:23 | 213:2 220:24 |
| 325:6 350:8,18 | 93:21,24 94:4 | 325:14 342:6 | 221:17 224:19 |
| 351:3 354:13 | 94:9,15,17 | 343:18,19 | 228:8 262:11 |
| 354:20 355:17 | 107:25 108:9 | 352:5,12 355:1 | 262:13,17,19 |
| 356:6 357:17 | 108:16,21 | 355:5 356:2,3 | 262:23 263:13 |
| 357:22,24 | 110:14 114:2,7 | 361:8 362:17 | 263:14,20 |
| 358:4,9,14,25 | 114:12 115:24 | 362:24 365:1 | 264:24 265:1,3 |
| 359:10 365:24 | 115:25 116:3,8 | 365:10,23 | 265:19,21 |
| 366:6 367:2,7 | 116:11 117:17 | 366:11,11 | 266:9,11,17,19 |
| 368:3,18 369:8 | 117:22 118:17 | 393:1,6 394:4 | 267:2,13,25 |
| 369:18 371:3 | 118:23 119:9 | 394:23,24 | 281:15,18 |
| 371:19 384:9 | 119:12,23 | 395:1,4,6,8,12 | 304:21 308:18 |
| 384:15 386:22 | 120:17,21 | 398:3,3 402:18 | 349:23 350:20 |
| 387:3 391:7,22 | 121:3,11 147:5 | 403:15 404:14 | 351:6 359:15 |
| 392:10,11 | 147:17,19 | 404:22 405:4,6 | 359:18 360:2,3 |
| 393:2,7,11 | 158:25 159:6 | 405:9,18 | 360:16,17 |
| 394:6,23 396:2 | 164:13,19,24 | 414:19 | 404:1,3 420:13 |
| 396:9 398:21 | 236:8 238:5,22 | **database** | **days**  63:17 64:1 |
| 399:2,7,8,24 | 239:3,5,7,21 | 120:13 174:4 | 64:2,7,11,21 |
| 401:7,15 | 240:12,17,24 | **date**  1:20 9:5 | 65:1,11 66:1,8 |
| 402:13,17 | 241:1,9 245:10 | 31:20 363:10 | 68:23 197:23 |
| 403:24 406:9 | 245:22 247:7 | 418:9 420:11 | 198:12 263:7 |
| 407:8,18 408:1 | 257:7,22 | **dated**  6:8,22 | 276:24 308:18 |
| 408:9 | 265:24 267:18 | 30:11 124:14 | 418:15 |
| **daphne**  395:19 | 270:16,17 | **dates**  363:19 | **dbonnin**  4:5 |
| 395:24 396:5 | 271:7 278:5 | **david**  4:3 | **deadline** |
| **data**  18:5 28:5 | 280:2 287:18 | **day**  10:13 | 222:15 |
| 28:12,16,19 | 288:11,16,19 | 64:13,14,25 | |

CONFIDENTIAL

**[deal - dekalb]**                                                    Page 24

| | | | |
|---|---|---|---|
| **deal** 12:11 | **decision** 176:9 | 124:4 126:21 | **definitely** 73:7 |
| 189:14 192:11 | 177:4 190:12 | 126:25 127:18 | **definition** |
| 192:18 201:4 | 193:6 197:1 | 128:13 129:13 | 81:16 82:19 |
| 205:19 216:25 | 205:10 | 129:25 131:18 | 84:14 126:21 |
| 240:10 245:25 | **decisions** | 132:9 133:18 | 146:14 220:15 |
| **dealing** 185:6 | 137:21 | 134:14,25 | 221:25 251:23 |
| 190:15,23 | **declaration** | 135:17 136:3 | 276:14 287:14 |
| 191:6,22 | 99:8 120:8 | 136:23 137:2 | 289:22 290:3 |
| 192:23 193:9 | 387:23 | 137:19,25 | 305:24 306:12 |
| 194:4,21 | **declarations** | 138:25 139:17 | 306:25 307:20 |
| 201:10,24 | 67:12 68:8 | 140:12,21 | 308:1,24 |
| 204:4,12 213:4 | 99:1,3,5 | 141:5,14,20 | 309:16,17 |
| 217:16 246:1 | 283:14 297:2 | 142:13 151:15 | 310:7,16,23 |
| 320:1 321:13 | 369:9,20 | 153:22 154:9 | 311:9,19,21 |
| 326:15 327:2,8 | 371:17 384:11 | 158:6,16 | 312:6 316:13 |
| 327:21 328:11 | 384:17 386:24 | 167:17,20,24 | 336:24 337:12 |
| 329:19 331:4 | 387:5,5 | 168:3,6,24 | 408:22 |
| 332:5 334:1 | **decline** 251:25 | 226:6 307:12 | **definitions** |
| 345:20 389:20 | **declines** 351:15 | 314:19 336:16 | 313:11 316:21 |
| **deals** 321:17 | 351:20,24 | 337:8 346:7,23 | **definitive** |
| **decades** 170:24 | 352:3,8 353:8 | 346:24 352:7 | 322:18 |
| 171:5,14 172:7 | 353:17,25 | 352:25 355:3 | **degree** 175:8 |
| 172:15 174:8 | **decrease** 28:19 | 415:24 416:10 | 184:2 |
| 174:21,25 | **deem** 286:5 | **defense** 131:7 | **dekalb** 5:11,20 |
| 175:12 189:13 | **deemed** 418:17 | 292:14 | 6:4,14 12:16 |
| 189:22 190:2 | **defendant** 3:6 | **define** 77:1 | 12:21 13:1 |
| 192:10,18 | 42:4 84:18 | 239:18 280:6 | 15:13,16 17:6 |
| 200:19 203:17 | 85:3,3,10 | 290:1 305:17 | 19:17,22 21:15 |
| 205:3 218:24 | **defendants** | 307:17 337:10 | 21:19 25:5,13 |
| **decide** 91:23 | 2:14,20 4:11 | 347:3 | 25:18 26:7 |
| 137:13,17 | 10:9 41:22 | **defined** 305:13 | 39:7,12 42:17 |
| 236:24 | 84:24 85:14,24 | 305:23 306:11 | 42:23 43:10,14 |
| **decided** 44:18 | 86:4 122:1,7 | 306:23 | 114:5 115:23 |
| | 122:14 123:9 | | 116:16 284:15 |

**[dekalb - different]**                                                              Page 25

402:11,15,18
402:23,24
403:4,9,17,24
406:16
**demarcate**
82:21
**demarcation**
19:14
**departments**
411:21
**depend**  233:3
321:11
**depending**
113:21 293:24
**depends**  323:4
344:14
**depo**  63:3,8
**deponent**  9:16
420:1
**depose**  288:1
**deposed**  10:9
100:22 131:6
283:21 306:20
**deposing**
418:14
**deposition**  1:16
8:1 9:7 19:24
26:13,14 27:22
28:24 42:2
69:4,11,24
70:3,6 101:1,5
101:9 105:8,12
106:14,18
107:2,12

138:21 139:13
140:9 160:22
285:2,6 290:11
290:16,25
291:9 292:13
292:21 304:8
311:18 416:17
416:20 418:3
418:12,15,17
**depositions**
100:21 104:1,6
104:16 105:1,5
105:17 111:16
119:1 122:23
142:18 285:4
285:16,25
286:5 288:3
289:9,17
305:18 306:16
311:4 313:6
**depression**
275:18,23
276:17,18
**deprivation**
277:11,14,20
**describe**  58:1
269:7 285:18
296:13 306:15
311:9 325:23
329:14 337:24
340:8 347:2
376:21 392:25
393:6 413:5

**described**
48:11 50:8
120:7 127:12
285:16 306:17
313:5 382:23
412:4
**describes**  336:7
**describing**
344:17 380:8
381:5
**description**  5:6
48:8
**descriptions**
120:1,5
**design**  92:7
238:19 247:19
252:15 279:9
**designed**  262:5
267:17
**designing**
91:20
**desk**  18:12 19:2
**detailed**  57:14
**details**  208:2
209:1 287:2
290:15 308:1
336:21 413:18
**determination**
85:18,20
251:17
**determine**
107:24 108:8
112:11 118:16
119:22 120:4

225:21 226:2
245:6,15
247:11 252:7
252:19 253:7
286:13,21
313:19 314:6
352:18
**determined**
29:19 243:20
246:20 315:22
316:8
**development**
76:6 153:23
154:10
**deviation**
257:23 262:1
**devices**  154:21
155:5,16 156:1
336:10,11
**diagnose**  276:3
276:13,18
277:2,18 278:7
**diagnosing**
277:25
**diagnosis**
276:22
**difference**
169:17 243:3
377:24
**differences**
272:4 297:23
**different**  18:19
23:18 28:5
34:8 43:5

**[different - district]** Page 26

58:12,18 78:18
97:7,23 113:20
116:6 139:23
140:1 160:7
199:1 232:21
243:1 252:2
253:9 256:1
272:1,2 277:10
289:24 296:8
296:19 298:11
301:8 304:21
317:9 318:19
323:24 324:10
356:7 359:17
369:2 372:2,9
372:12,15
373:15,17
374:17 375:1
379:2
**differently**
49:18 165:6
180:16 219:11
225:23 226:4
284:16 323:14
**digital**  229:22
230:8,21
231:10
**diligent**  35:1
**direct**  417:23
**direction**  8:4
258:25 261:8
**directly**  47:16
49:23,25
187:12 198:19

291:19 301:19
302:7,13,17
304:4 321:18
377:22 413:13
**director**  381:22
382:4,21 383:1
**disagree**
209:23
**disappeared**
166:24
**disciplinary**
231:8
**discipline**
220:22
**disciplines**
361:11
**disciplining**
214:7 215:4
220:5,19 360:4
360:18 361:25
**discord**  83:19
83:22
**discount**  29:23
**discover**  24:21
24:25 26:6
27:15 28:21
30:4
**discovered**
36:21
**discovery**
26:11 27:20
32:25
**discuss**  328:6
328:15

**discussed**  78:25
133:21 163:13
226:20 231:19
244:5 292:25
355:11 356:14
356:20 357:1
402:5
**discussion**
218:13 238:1
**discussions**
275:9 316:20
414:4
**disinvestment**
353:23
**dismiss**  340:9
340:12 343:20
**disorders**  278:8
**disputes**  74:20
74:22
**disruption**
326:15 332:21
**disruptions**
327:2,8,21
328:11 329:19
331:4 332:5,12
332:19,25
333:4,5,10,11
334:1 345:21
**disseminated**
415:2
**distinct**  122:1,7
131:19 133:19
134:15 135:1
135:17 141:6

**distinction**
264:5
**distinctions**
133:22 134:8
**distinguish**
112:21 113:5
133:17 134:1
231:7
**distinguished**
112:13
**distracting**
175:14 176:5
**distraction**
348:12 349:13
**distractions**
333:14,16
**distribution**
245:12 257:20
263:3,6,22
264:19 265:11
269:20
**district**  1:1,1
9:15,15 20:10
29:19 37:2
43:21 45:4,12
50:16,23 69:19
77:15,19,24
78:4,8,12
85:25 86:24
87:11,19 88:7
88:15 89:3,11
90:5 95:14
96:17 98:21
99:15,23 103:3

**[district - doing]** Page 27

| | | | |
|---|---|---|---|
| 103:23 104:2,6 | 227:15 228:1 | 201:7 232:9,17 | 10:22 37:22 |
| 105:5 107:4 | 232:14,15 | 233:3 294:17 | 39:1,12,23 |
| 108:17 112:8 | 233:9,13,21 | 297:13,20 | 40:9,20 41:22 |
| 113:21,23 | 234:6 278:18 | 298:2,4,10,11 | 42:12 43:20,24 |
| 114:1,2,12,16 | 293:21,24 | 350:9,15,19,25 | 44:7 45:11 |
| 114:22 115:1,6 | 297:25 298:16 | 351:4 352:13 | 46:3,11,13,17 |
| 115:12,19 | 299:13,24 | 352:20 378:12 | 46:19,24 385:2 |
| 116:13,22,25 | 349:17 364:21 | 379:8,12,13 | 385:3,4,7,12,23 |
| 117:12,18,23 | 370:2 371:9,24 | 395:3 406:4 | 386:1,11,16 |
| 118:2 121:19 | 375:16 376:22 | 411:20 | 414:21 |
| 122:2,8 138:21 | 376:24 377:7 | **diversion** | **dog**  392:22 |
| 139:12 155:13 | 379:18,22 | 181:13 | **doing**  26:21,25 |
| 155:23 159:9 | 380:1,12 | **diverted**  86:25 | 32:8 33:18 |
| 162:13 164:15 | 387:11 389:17 | 87:13,20 88:16 | 35:2 36:14 |
| 164:20 165:24 | 397:3,16 398:6 | 125:20 181:10 | 65:25 68:1 |
| 166:7,20,24 | 398:8,11 403:9 | 181:18 182:17 | 72:11 73:21 |
| 167:9,11,18,19 | 407:4 413:7 | 185:22 219:22 | 79:1,16,19 |
| 168:4,13,15,17 | **districts**  19:16 | **diverting**  170:5 | 80:9 88:3,21 |
| 168:23 180:6 | 22:21 37:8 | 181:25 | 129:3 141:24 |
| 180:19,21 | 41:5 42:19,23 | **dividends** | 143:21 179:9 |
| 181:3,8,11,17 | 43:25 44:8,25 | 74:12 | 179:10 180:23 |
| 181:22 182:2 | 47:6 49:21 | **division**  9:4 | 184:6 185:24 |
| 182:20 183:4,5 | 50:7,15 57:5 | **doc**  268:11 | 187:3,11 188:4 |
| 184:7,13,18,23 | 81:1 90:19 | **document**  1:9 | 188:6,23 189:1 |
| 185:24 187:7 | 98:19 99:17 | 37:3 346:19,22 | 197:23,24 |
| 199:5 201:23 | 100:25 108:1 | 347:1 402:25 | 198:7,12,13 |
| 203:13,17,25 | 108:10 113:14 | 403:3 413:23 | 200:8,17 |
| 205:9 212:1 | 116:17 117:7 | **documentary** | 211:12,13 |
| 214:6,12 215:3 | 125:9 165:16 | 290:2 291:2 | 213:7 219:20 |
| 215:5,25 | 167:1 169:9 | **documentation** | 226:25 227:11 |
| 216:17 217:12 | 181:1 182:15 | 49:13 | 238:15 241:7 |
| 217:15 223:13 | 184:15 193:16 | **documents** | 265:25 272:25 |
| 224:24 225:5,7 | 193:23 197:15 | 6:10,12,14,16 | 273:14 275:4 |
| 225:8,14,15,18 | 199:12,14,17 | 6:18,19 8:7 | 308:5 309:11 |

CONFIDENTIAL

**[doing - emails]**                                      Page 28

312:17 323:5
330:12 344:16
352:22 418:8
**dollar**  396:10
**doubled**  400:21
401:6
**doubt**  109:16
130:23 339:18
339:22 364:18
**downsides**
238:21 243:24
**downstream**
66:13 247:20
248:14
**dozens**  80:25
**dr**  10:3 60:21
86:21 124:19
129:10 133:6
135:10 136:14
136:15,19
142:3 163:5
198:10 210:12
235:3 275:4
335:22 339:7
340:12,20
351:15 367:21
384:4,11,17
387:22 415:20
**draw**  80:23
242:17
**drawn**  79:17
242:12 304:18
**drill**  10:13
264:9

**drive**  3:19
**drives**  28:19
**driving**  23:13
**due**  133:14,19
219:22
**duly**  9:24
**duty**  404:5,12
405:5
**dynamics**
271:15

_____e_____

**e**  3:19 5:1,5
19:8 417:1
419:2
**e.g.**  126:1,10
127:1 130:11
**earlier**  23:19
65:16 218:13
244:5 308:17
312:19 330:16
356:14,20
357:1 411:9
**early**  68:11
**earn**  220:25
**ears**  282:23
**easier**  35:25
36:13
**east**  3:19
**eastern**  1:19
9:7
**eat**  64:20,24
**eating**  64:25
65:3 70:7

**eberezofsky**
3:21
**economic**  70:14
75:25 76:6
271:4
**economics**
224:20
**economists**
224:17
**edge**  326:10
**education**
78:11,15 79:4
79:12,25 80:12
183:12 185:8
186:9,11 188:7
215:16 217:6
219:3 276:24
**educational**
77:11 78:18
80:13 86:1
411:11 412:16
**effect**  49:6
394:15
**effectively**
28:15,18 269:7
411:19
**effects**  81:3
144:7,18 146:4
147:8 150:11
150:20 154:20
155:4 351:10
379:18,18
**effort**  214:4,20
219:22 221:11

221:13 222:23
223:9
**eight**  64:1
76:20
**eiland**  4:2,3
**eilandlaw.com**
4:5,6
**either**  79:15
99:2 164:9
241:3 275:4
322:19 331:17
378:11 381:1
**election**  260:10
260:13,20,22
261:2,12,17
**elections**
261:14
**elementary**
369:25 370:15
371:19
**elicit**  286:1
377:1
**eliciting**  375:11
**eliminate**
146:18 148:18
149:24 155:2
157:19 158:4
158:14 165:1,7
**elite**  271:16
**email**  6:8 30:11
30:17 31:8
47:3
**emails**  41:23

CONFIDENTIAL

**[emotional - employees]**                                            Page 29

| | | | |
|---|---|---|---|
| **emotional** | 117:24 118:4 | 313:21 314:7,8 | 204:3,11,18 |
| 195:7,20,24 | 118:11,16,17 | 316:24 318:2 | 205:3,19,24 |
| 196:4,7,16 | 118:22,22 | 319:9 321:3,17 | 206:8,16,24 |
| 197:5 199:25 | 119:10,12,22 | 322:12,14,22 | 215:25 225:22 |
| 200:14 204:19 | 119:23 120:7,8 | 322:24 323:6 | 226:3,14,25 |
| 205:1,15 206:1 | 120:15,16,19 | 323:15 324:3 | 227:3,15 228:1 |
| 206:11 229:23 | 120:21 121:3 | 354:15,22 | 229:1,20 230:6 |
| 230:9,22 | 121:11,19 | 355:13,16 | 230:20 231:9 |
| 231:12 381:22 | 138:7,8,21 | 366:15 372:16 | 231:10 232:9 |
| 382:5,21 383:2 | 139:12 140:9 | 396:11,16 | 232:18 233:3,4 |
| **employed** | 140:18 142:12 | **employee's** | 278:18,19 |
| 71:11,14,18,21 | 143:20 166:18 | 112:12,20 | 284:14,18,21 |
| 77:10,15 | 166:21,25 | 113:4 181:9 | 284:24 285:3,7 |
| **employee**   32:17 | 168:12,14 | 205:13 223:18 | 285:9,12 |
| 42:3,25 43:1,9 | 182:21,22 | 304:19 319:23 | 286:13,22 |
| 67:11 68:7,10 | 205:10 214:7 | 321:12 322:14 | 287:7 288:10 |
| 70:25 71:3,24 | 214:13 215:4,5 | 322:25 | 288:20 289:5 |
| 72:3 90:20 | 217:12,15 | **employees** | 290:4 291:10 |
| 100:8,12,18 | 221:17 223:14 | 29:20 43:12,16 | 293:3,5,15,19 |
| 101:18,22 | 223:16 225:6 | 47:4 49:20 | 295:5,22 296:8 |
| 102:13,18 | 225:10 232:10 | 50:14,16,23 | 296:19 297:2 |
| 103:1,13 104:6 | 232:25 233:9 | 51:1 71:7 | 297:11,19 |
| 104:16 105:5 | 233:14,22 | 79:14,17,22 | 298:20,24 |
| 105:17,22 | 234:7 281:14 | 90:21 91:4 | 300:3,9,12,18 |
| 106:14,18 | 281:17 283:13 | 98:21 99:16,24 | 300:19 301:1,4 |
| 107:2,12 108:1 | 284:3 290:24 | 100:14 101:6 | 301:7,15,18 |
| 108:10,17 | 291:1,8 292:21 | 101:12,22 | 302:4,7 303:7 |
| 110:21 111:11 | 293:13,13 | 102:1,19 104:2 | 303:11,20,21 |
| 111:16 113:15 | 294:3 299:11 | 105:10 106:1 | 304:7,9 305:5 |
| 113:24 114:3 | 300:4,10 301:5 | 106:19 111:5 | 305:9,13 |
| 114:13,18,21 | 301:16 302:5 | 112:2 118:25 | 306:10 307:17 |
| 115:2,12,20 | 302:21 303:8 | 120:24 121:7 | 310:13,21 |
| 116:5,8,18,21 | 304:20 309:14 | 143:12 163:17 | 314:17 315:4 |
| 117:1,7,13,19 | 311:18 313:20 | 166:12 203:1,9 | 315:19,21,25 |

| | | | |
|---|---|---|---|
| 316:4,8,16 | **ensure** 33:14 | **erroneous** | **establish** |
| 323:18 349:19 | 288:11,22 | 391:4 392:10 | 352:23 |
| 362:15,22 | 289:6 290:6 | 401:10 | **esther** 3:19 |
| 363:24 364:9 | **entail** 173:4 | **erroneously** | **estimate** 32:17 |
| 364:24 365:8 | **entailed** 383:3 | 391:7,10,25 | 32:19 57:18 |
| 365:16,22 | **entails** 382:22 | 401:9 | 60:5 62:13,24 |
| 366:5 370:3 | **enter** 52:25 | **error** 24:22 | 76:11 78:24 |
| 372:8,14 373:1 | **entered** 32:7 | 25:1 26:7 | 91:13 95:24 |
| 373:15 374:8 | 36:16 | 27:16 28:22 | 96:2,10,19 |
| 374:16,22 | **entering** 32:5 | 30:5 33:1,9,11 | 99:25 101:14 |
| 379:1 381:9 | **entire** 65:21 | 246:5 253:24 | 102:9,12,22 |
| 396:12 407:12 | 67:2,8,15 68:3 | 254:4,13 | 103:4 104:8 |
| 407:21 408:3 | 212:17 213:16 | 255:15 256:8 | 105:11 106:9 |
| 408:12 | 350:20 351:5 | 256:18 259:4 | 106:12,22 |
| **employment** | **entirely** 228:9 | 259:15 261:16 | 109:4,9,12 |
| 193:25 | 228:24 296:16 | 261:20 324:7 | 110:1,16 112:5 |
| **encompasses** | 374:11 376:10 | 324:18 325:23 | 113:1,13,22 |
| 99:4 | **entities** 76:6 | 347:21 400:7 | 115:18 117:11 |
| **encountered** | 343:19 | 401:1,20 | 118:8,15 |
| 282:20 | **entity** 71:11 | **errors** 20:1 | 128:10,11,25 |
| **endeavor** | 73:1 181:11 | 34:15 36:19 | 130:13 136:11 |
| 272:16 | 225:16 341:5 | 65:15 | 136:21 141:11 |
| **ended** 49:7 | **entry** 52:12,23 | **esq** 2:3,3,4,4,10 | 146:8,12,13 |
| **ends** 151:11 | **environment** | 2:11,17 3:3,13 | 148:1,11 149:7 |
| 329:24 | 87:2,14 175:25 | 3:14,19 4:3,3,8 | 149:18 151:2 |
| **engaged** 76:18 | **equal** 400:18 | **essential** 91:12 | 151:18,23 |
| 287:3,7 319:12 | **equals** 329:1,6 | 99:24 104:7 | 152:21 159:1 |
| **engaging** | 329:25 | 396:8 | 169:14 207:22 |
| 207:18 208:12 | **equation** | **essentially** 26:2 | 208:16 211:22 |
| 210:25 | 399:20 | 45:24 140:4 | 211:23 214:12 |
| **engine** 53:17,24 | **equivalent** 79:1 | 185:20 223:25 | 231:17 238:11 |
| 55:5 | **errata** 418:6,8 | 225:6 236:5 | 240:13 242:10 |
| **enormous** | 418:11,14 | 272:3 396:21 | 242:21 243:5 |
| 378:14 379:22 | 420:9 | 407:1 | 243:13 247:21 |

**[estimate - estimates]**                                Page 31

| | | | |
|---|---|---|---|
| 248:11,17 | 388:9 389:5,11 | 105:4,15,16 | 188:15 208:10 |
| 267:1,11,23 | 390:3 393:12 | 106:7 107:5,15 | 210:11 211:21 |
| 268:5,7 272:18 | 393:25 394:3 | 108:2,5,11,18 | 214:9,24 216:3 |
| 272:20 273:23 | 394:19 401:8 | 108:24 110:18 | 220:8,9,11 |
| 274:10 279:1,4 | 403:1,9 407:19 | 110:21 111:1 | 235:4 237:7,11 |
| 279:19 281:17 | **estimated** 23:1 | 111:19 112:12 | 237:18 238:16 |
| 281:20,21 | 23:8 25:7,14 | 112:20 113:4 | 240:14 247:3 |
| 291:3,6,21 | 25:19 26:17 | 118:19,25 | 251:4 253:21 |
| 293:5,14 | 27:25 31:23 | 119:24 129:11 | 269:10 270:12 |
| 304:20 316:11 | 32:3 101:22 | 129:16,17 | 270:22 271:9 |
| 316:25 317:1,8 | 105:22 119:11 | 132:4,7,17 | 272:12 278:19 |
| 317:14,19 | 126:8 136:2 | 133:23 134:11 | 279:17 283:15 |
| 318:3,6,11 | 144:4 147:6 | 134:19,23 | 284:1 285:14 |
| 319:10,13,23 | 150:8,17 | 135:14 136:9 | 286:15,24 |
| 320:2,23 321:7 | 153:20 154:7 | 136:24,25 | 288:12,22 |
| 321:24 322:12 | 156:9,14 163:5 | 137:6,7,14,15 | 289:7 290:6 |
| 322:22 323:10 | 298:21,24 | 137:18,23,23 | 291:12 292:20 |
| 324:9,10,17,24 | 303:21 321:3 | 138:22 139:14 | 293:3,12,15,18 |
| 325:20,21 | 321:19 350:8 | 140:11 141:2 | 293:20 294:2,9 |
| 326:2,3,4 | 350:17 351:3 | 143:8,14 | 294:10,16 |
| 342:2 345:19 | 403:17 | 144:15 146:3 | 295:20 296:6 |
| 345:24,25 | **estimates** 24:14 | 146:19,22 | 296:20 297:4 |
| 356:7 357:17 | 29:13 33:16 | 148:2,7 149:3 | 298:2,5 299:10 |
| 357:18,24,25 | 58:1 68:18 | 149:15 152:4 | 299:12,20,23 |
| 358:3,4,9,10,14 | 79:13 89:13,17 | 152:25 153:12 | 300:4,6,10,11 |
| 358:15,21,25 | 89:22 90:1,8 | 154:19,23 | 300:18 301:5,6 |
| 359:1,10,11 | 90:13,17 94:22 | 157:8,22 158:7 | 301:16,17 |
| 367:2,7 372:17 | 95:23 97:15 | 158:17 159:11 | 302:5,6,21 |
| 372:18,23 | 98:20 99:15,23 | 159:17 160:24 | 303:8,10,25 |
| 373:8 374:9,10 | 100:7,11,18,24 | 160:25 161:4,8 | 304:7 305:10 |
| 374:23,24 | 101:17,18 | 161:12,16,24 | 312:25 315:20 |
| 379:9 382:1,17 | 102:7 103:16 | 162:8,16 | 316:1,5 323:12 |
| 383:12 384:10 | 103:25 104:4 | 163:20,23 | 323:15,17 |
| 387:3,10 388:4 | 104:14,23 | 165:1,8 169:13 | 324:13 325:7 |

**[estimates - exhibit]**                                                    Page 32

362:11,18
366:6 367:20
368:7 369:8,24
370:4,8,11,14
371:16,23
372:2,9,11,15
372:25 373:3,6
373:15,18
374:10,17
376:11,12,19
377:10,13,25
378:6 379:1,12
379:23 380:8
381:8 383:6
384:15 386:23
387:25 388:19
391:8,23
392:12 395:17
396:2 401:15
407:9,24 408:1
408:9,17
**estimating** 20:3
22:25 23:6
25:6,13,17
26:16 27:24
57:20 110:23
111:6 112:1
120:15,25
128:19 231:6
383:13
**et** 126:11 127:5
127:11 130:12
175:16 405:5
414:22

**evaluate**
145:21 263:17
283:22 351:20
368:25
**evaluating**
80:21
**evaluation**
78:21 415:1
**evaluations**
78:17,19
**eventually**
225:3,13 272:5
**everybody**
66:14,16
290:11 304:5
**everybody's**
370:24
**evidence**
260:23 340:3
343:22 344:9
350:2 351:9
379:21 380:18
380:23 417:5
**exact** 23:3
175:19 177:1
275:22 297:3
**exactly** 57:17
67:24 68:9
93:1 119:4
120:16 129:4
136:15 138:13
139:5 145:5
159:23 160:5
171:11,22

176:21 177:24
192:17 195:13
197:23 198:12
201:2 209:5
211:12 240:19
273:13 307:20
312:12 362:6
372:7
**examined** 9:24
327:7
**examining**
332:18,24
**example** 95:12
101:21 119:10
127:2,10
194:15 208:10
213:12 256:11
256:21 260:6,9
264:6 265:4
298:1 359:25
361:23 365:16
**examples**
127:10,13
148:4 210:5,8
216:20
**excel** 29:1 35:5
36:1,4,8,14
362:24 363:2,8
363:14,22
364:7,16,22
365:14,20
366:3,17
**except** 42:23
420:6

**exception**
114:5
**exchange** 30:17
184:5
**exclude** 152:3
152:25 153:11
403:22 406:15
**excluded**
404:16
**exhaustive**
409:1
**exhibit** 3:9 5:8
5:9,11,12,14,15
5:17,18,20,21
5:23,24 6:1,2,4
6:5,7,8,9,11,13
6:15,17,19,20
6:22,23,24 7:1
7:1,3 10:23
11:5,11,20,24
12:3,15,21
13:3,9,16,22
14:3,8,19,24
15:3,8,12,17,21
16:1,5,10,14,19
18:1 20:15,20
20:25 21:4,10
21:14,20,24
22:4,8,14,24
30:9,12 37:17
37:23 38:20
39:2,6,13,17,24
40:3,10,14,21
60:14,18,21

61:6,11,17,21
61:25 87:6
124:11,15,19
124:20 125:1
326:18 335:16
335:19,22
346:12,15,18
346:21 348:19
348:22 363:6
384:5,21
386:20 387:15
387:18 388:17
388:24 390:9
392:19 395:15
397:1 402:16
406:7
**exhibits**   10:23
14:17,18 16:23
16:24 17:10,17
20:14 22:19
41:2,8,8,10
**exist**   167:12,21
168:7 199:21
**existence**
198:20
**existing**   326:13
326:24 327:18
328:7,9 329:16
**exists**   159:7
199:19 280:22
296:14 356:3
**expansion**
75:11

**expect**   10:12
195:14 199:13
**expected**
197:15 239:23
**expects**   197:23
198:12 199:6
**expended**
185:20 221:11
221:14
**experience**
85:25 172:24
173:5 302:23
411:10 412:15
**experienced**
170:17 173:16
**expert**   5:8,9,11
5:12,14,15 6:1
6:2,4,5,7,22
10:24 11:3,12
11:12,18,24
12:20 13:4,8
13:20 14:3,7
17:9,17 20:16
20:24 21:9,19
22:3,13 30:19
30:24 41:7
56:9,16,19
63:18 75:3
76:9,13,24
77:7 109:6
124:14 125:1
129:8 130:4
135:12 238:19
240:3 247:19

252:13 279:9
313:1 335:25
338:3 369:13
391:17
**expertise**
241:17 267:17
**experts**   56:13
145:23
**expires**   420:16
**explain**   48:24
122:15
**explicit**   110:9
**explicitly**
174:21
**express**   17:12
**expressly**
306:19
**extension**   326:6
**extent**   50:12
53:17 54:22
171:23 172:10
174:15 179:22
196:8 199:20
245:24 261:23
280:24 286:3
290:17 305:16
306:14 311:3
313:4 323:25
412:9
**extra**   28:15
220:23 222:13
224:7 404:5,12
405:5

**eye**   257:13,14
257:18
**eyes**   1:13 349:5

**f**

**f**   2:20 417:1
**face**   229:5,5
**facebook**   2:20
2:21,21,21,22
81:18 88:18
89:2 90:7
126:2,10
130:11,15
307:8 357:11
357:14 358:22
359:2,8 361:6
409:20 410:2,5
**faced**   320:1
**facially**   343:12
**facilitation**
153:22 154:9
**fact**   95:9,18
102:2 106:2
108:17 112:20
113:4 115:2
117:1,8 155:12
197:25 198:14
218:23 236:15
249:3,9,17
263:12 264:11
265:19,24
266:9,13,17
270:13,23
287:9 306:3,7

[fact - form]                                                    Page 34

306:10,21
309:15 311:12
325:13 332:9
341:19 344:2
377:10 378:23
380:1,11
382:10
**factors** 125:20
275:16 277:10
407:10 408:11
**facts** 310:20
362:9
**fading** 349:6
**fafsas** 411:23
**fail** 418:16
**fair** 113:18
119:17 219:7
**fall** 55:17
**false** 198:24,25
**familiar** 151:7
239:15,19
280:4,7 370:14
**far** 131:5
166:15,22
308:4
**farm** 3:14
**feasible** 218:21
219:4
**feature** 151:6,7
151:14 152:6
153:13
**features** 150:11
150:20

**federal** 114:6
117:4
**feedback**
364:20
**feel** 36:18,23
56:2,18 139:20
285:17,19
289:8,18
290:19 297:15
**felt** 248:18
285:22 288:5
**field** 265:4
414:18
**fight** 214:8,15
**fighting** 222:4
**fights** 85:5
149:5,17 150:1
**figure** 58:3
138:13 183:9
186:24 391:1
**figuring** 32:9
54:6
**file** 28:4 29:5,7
365:14 366:17
405:1
**files** 18:6,18
27:21 29:4,10
362:25 363:3,8
363:14,22,24
364:7,17,22
365:5,20 366:3
**fill** 411:22
**film** 85:4

**filter** 154:11
**final** 80:7
**find** 54:13,15
55:3 120:1
187:3 272:3
330:11,21
331:22,24
334:15 404:2
**fine** 38:18
157:2,3 246:2
**finish** 10:14
220:24
**finite** 222:23
**firm** 55:20,22
70:9,13 73:19
74:4 338:19
347:18,19
**firms** 56:16,19
**first** 52:22
90:18 125:24
149:11 230:3
268:21 271:25
285:1 331:25
**fiscal** 28:8
363:8,10
**five** 18:7,10,13
18:22 19:5
43:3,7 60:13
77:5 157:1,4
267:4 371:13
371:21 375:17
376:6 379:11
**focused** 180:12
180:12

**folder** 38:8
**folders** 37:1
**follow** 35:19
53:18
**followed** 33:13
**following**
125:20 208:10
363:10
**follows** 9:25
**food** 64:24
**foot** 246:6
**footnote** 18:4,8
18:25 19:4,4
19:10,10
328:18 329:22
363:7 385:21
406:23
**footnotes** 18:4
18:7,10,13
69:6
**forces** 34:25
**foregoing**
417:6,21 420:3
**forget** 31:11
**forgone** 178:10
183:4 186:4
187:16 188:3
**forgot** 12:3
330:10,14
**forgotten** 68:13
**form** 42:13
45:13 55:9
81:12 87:22
88:20 89:5

**[form - funder]**                                                              Page 35

| | | | |
|---|---|---|---|
| 90:11 91:16 | 375:3 376:17 | 148:23 149:9 | 375:20 377:16 |
| 97:17 100:3 | 392:14 405:24 | 150:4,23 152:9 | 401:18 |
| 103:18 104:10 | 408:15 420:7 | 153:5,16 154:1 | **foundations** |
| 104:18 107:18 | **formal**  81:16 | 154:13 155:8 | 76:5 |
| 111:22 115:4 | 327:11,13 | 155:19 156:4 | **four**  18:7,10,13 |
| 115:14 132:10 | **format**  53:1 | 157:14,24 | 18:22,25 19:16 |
| 132:13 137:3 | **formation**  52:1 | 158:20 159:15 | 30:9 64:12,13 |
| 141:9 144:11 | **former**  42:3 | 163:11 167:4 | 73:1,10,14 |
| 144:21 146:9 | **forming**  41:12 | 176:15 178:2 | 74:9 246:6 |
| 147:12 150:22 | 41:15,20,25 | 183:19 193:13 | 267:4 268:15 |
| 153:4,15,25 | 42:7 43:19 | 195:22 204:22 | 308:11 363:7 |
| 154:12 164:1 | 44:9 47:6 | 207:10 220:13 | **frame**  193:18 |
| 172:8 190:6 | 48:14 49:22 | 221:19 230:1 | **framed**  348:2 |
| 194:9 198:2 | 240:7 298:17 | 231:15 239:10 | **free**  192:6 |
| 212:23 213:24 | 332:16 | 240:1 244:15 | 223:24 |
| 214:17 217:21 | **formulating** | 248:4 249:7 | **frequency** |
| 221:5 226:7 | 45:9 | 250:5,21 | 189:23 273:20 |
| 229:25 231:14 | **forty**  59:21 | 252:23 253:13 | **frequently** |
| 238:10 240:18 | **found**  25:4 | 260:2,15 261:6 | 295:12 347:8 |
| 241:15 254:7 | 46:23,25 96:24 | 273:3,17 274:6 | **friday**  1:12 9:5 |
| 256:13 259:5 | 97:6,9,10,22,23 | 280:20 281:24 | 19:17 |
| 259:18 265:5 | 103:10 107:9 | 288:14,25 | **friends**  410:16 |
| 267:6 274:6 | 107:20 313:7 | 290:9 293:7,10 | **ftes**  45:22 |
| 275:7 278:10 | 327:15 330:9 | 295:8 297:6 | **full**  33:21 |
| 279:7,24 | 330:12 331:15 | 299:3,16 | 264:18 |
| 281:24 291:11 | 332:10 339:4 | 301:12,23 | **fully**  224:1 |
| 303:3 304:22 | 340:17 344:19 | 303:15 305:15 | 417:5 |
| 309:19 311:24 | **foundation** | 311:25 313:24 | **fun**  174:11 |
| 313:23 316:17 | 51:3 55:9 | 314:22 317:6 | **function** |
| 319:17 322:3 | 75:25 95:5 | 349:25 355:20 | 203:16 |
| 322:16 323:2 | 110:5 135:20 | 359:21 360:7 | **fundamentally** |
| 331:7 333:18 | 139:2 141:9 | 361:16 364:11 | 321:13 |
| 366:21 370:6 | 144:11,22 | 366:9,21 368:5 | **funder**  414:25 |
| 373:20 374:12 | 146:25 147:12 | 372:20 373:10 | 415:8 |

CONFIDENTIAL

**[further - graden]**                                        Page 36

| | | | |
|---|---|---|---|
| **further** 245:2 | 251:22 280:10 | 48:5 57:3,18 | **gotten** 297:1 |
| 283:21 331:16 | 339:16,21 | 60:13 67:4,9 | 401:6 |
| **fy** 29:5 | 382:18 415:23 | 67:16 68:5 | **government** |
| **g** | **given** 98:5 | 73:7 81:5,18 | 117:4 |
| **galveston** 4:4 | 108:5 129:18 | 86:13 121:15 | **grabbed** 65:6 |
| **games** 190:5 | 131:3 132:17 | 130:6 156:23 | **graden** 2:3 |
| **gathered** | 247:23 314:13 | 162:22 186:22 | 11:14 30:18,23 |
| 302:24 | 325:25 420:5 | 186:23 187:9 | 31:5 34:12 |
| **gathering** | **gives** 280:12 | 187:10 201:9 | 35:22 38:5,11 |
| 282:15 | 325:11 | 201:17 212:17 | 38:17 44:3 |
| **general** 176:23 | **giving** 74:7 | 213:15 222:17 | 45:14 47:8 |
| 203:13 309:7 | 128:21 142:5,8 | 223:2 224:1,10 | 48:19 50:17 |
| 343:17 | 143:8,14 | 225:10,11 | 51:2,15 54:17 |
| **generally** | 254:16 373:15 | 232:12 234:20 | 55:8 59:20 |
| 165:14 166:15 | **go** 14:16 34:2 | 236:2 237:17 | 60:10 61:14,16 |
| 199:16 203:24 | 37:14 49:11 | 248:12,17 | 66:11 68:25 |
| 238:17 340:1,6 | 50:2 58:2 | 263:8 267:3,13 | 69:15 82:11 |
| **genesis** 44:23 | 86:12 157:1 | 267:25 274:23 | 83:3 85:6 |
| **geography** | 167:24 187:6 | 283:8,25 | 87:22 88:9,19 |
| 351:17,22 | 215:13 224:8 | 315:11 324:6 | 89:5 90:11 |
| 352:9,15 | 234:17 252:15 | 378:22 383:21 | 91:16 92:22 |
| 378:15,24 | 258:2 263:17 | 398:8 411:2 | 93:19 94:25 |
| **georgia** 4:10 | 273:8 283:3,6 | 413:6,6 415:13 | 95:5 96:21 |
| **germane** | 283:9 287:16 | 415:22 416:18 | 97:17 100:3 |
| 136:11 | 315:9 326:23 | **goldin** 271:13 | 102:15 103:7 |
| **getting** 49:2 | 384:8 386:21 | **golkow** 9:4 | 103:18 104:10 |
| 65:10,17 68:18 | 413:6 415:12 | **good** 10:3,4 | 104:18 105:19 |
| 86:8 216:13 | **goes** 53:19 | 36:23 53:24 | 107:18 109:2 |
| 255:25 265:14 | 78:20 261:9 | 142:2 235:8 | 110:4 111:20 |
| **give** 14:16 | 273:10 360:25 | 282:14 349:5 | 111:22 115:4 |
| 20:12 44:19 | **going** 10:21 | 402:25 | 115:14 118:12 |
| 73:16 75:18 | 14:15 19:24 | **google** 2:14 | 123:10 124:5 |
| 127:8,10 | 20:12 29:3 | 10:7 55:11,12 | 128:3,15 |
| | 35:12,12 37:15 | 328:1,1 331:21 | 129:14 130:17 |

**[graden - granular]**                                          Page 37

| | | | |
|---|---|---|---|
| 131:20 132:10 | 191:25 192:14 | 251:11 252:9 | 322:2,15 323:1 |
| 132:13 133:5 | 192:25 193:12 | 252:22 253:12 | 323:20 331:6 |
| 134:2,4,16 | 194:9,24 195:9 | 254:7 255:18 | 333:17 339:11 |
| 135:3,19 | 195:21 196:21 | 256:13 259:5 | 341:8 342:23 |
| 136:16 137:3 | 197:7 198:2,16 | 259:18 260:1 | 343:9 344:6 |
| 138:16 139:1 | 199:8 200:4,22 | 260:14 261:5 | 349:24 351:7 |
| 139:18 140:13 | 201:12 202:1 | 265:5,22 267:6 | 353:10 354:1 |
| 141:8 142:15 | 203:3,18 | 273:2,16 274:5 | 355:19 358:18 |
| 143:23 144:10 | 204:21 205:5 | 274:16 275:7 | 359:20 360:6 |
| 144:21 146:9 | 205:16 207:9 | 275:19 276:5 | 360:20 361:15 |
| 146:24 147:11 | 207:23 208:17 | 277:3,21 | 364:1,10 366:8 |
| 148:12,22 | 209:23 210:12 | 278:10,20 | 366:20 368:4 |
| 149:8,19 150:3 | 211:5,15 212:8 | 279:6,23 | 368:12,22 |
| 150:13,22 | 212:23 213:23 | 280:19 281:9 | 370:5 372:19 |
| 151:20 152:8 | 214:17 215:8 | 281:23 283:16 | 373:9,19 |
| 153:4,15,25 | 216:7 217:21 | 284:5 286:17 | 374:12 375:2 |
| 154:12 155:7 | 220:12 221:5 | 287:11 288:13 | 375:19 376:16 |
| 155:18 156:3 | 221:18 223:20 | 288:24 290:8 | 377:15 379:4 |
| 156:22 157:2 | 224:25 226:7 | 291:13 292:2 | 380:4,15 381:2 |
| 157:13,23 | 226:17 227:19 | 293:6 294:18 | 382:12 383:4 |
| 158:9,19 | 228:16 229:6 | 295:7,24 | 383:14 385:14 |
| 159:14,21 | 229:25 230:11 | 296:10,21 | 392:2,14 394:9 |
| 163:10 164:1 | 230:25 231:14 | 297:5 299:2,15 | 397:13 401:17 |
| 167:3 171:1,18 | 232:4,19 | 300:14,22 | 405:23 407:14 |
| 172:8,20 | 233:15,24 | 301:11,22 | 408:15 |
| 173:24 174:12 | 234:9 236:18 | 303:2,14 | **graden's** 31:8 |
| 175:4,17 | 237:8 238:23 | 304:22 305:14 | **grading** 235:24 |
| 176:14 177:9 | 239:9,25 | 306:5 307:3,23 | 236:4,10,12 |
| 178:1 179:3,16 | 240:15 241:4 | 309:2,19 311:1 | **graduate** |
| 180:9 181:14 | 241:15 242:2 | 311:23 312:14 | 268:10 |
| 183:18 184:9 | 244:2,14 | 313:23 314:10 | **graduated** |
| 187:19 189:7 | 245:18 248:3 | 314:21 316:17 | 268:14 |
| 189:17 190:6 | 249:6,21 250:4 | 317:5 318:9,22 | **granular** 174:4 |
| 190:18 191:11 | 250:20 251:9 | 319:17 320:12 | 270:5 |

CONFIDENTIAL

**[great - hesitation]** Page 38

| | | | |
|---|---|---|---|
| **great** 99:11 | **hall** 395:20,25 | 15:22,25 19:17 | **health** 163:9,22 |
| 128:22 131:14 | 396:5 | 19:22 21:25 | 163:25 164:15 |
| 157:5 248:15 | **hammel** 369:10 | 22:3 26:15 | 164:21 165:3 |
| 310:3 388:15 | 369:15,21 | 27:5,9,16 | 165:10 200:21 |
| **greater** 244:11 | 370:17,22 | 31:12 39:18,23 | 201:4,10,25 |
| 244:23 | 371:17 372:1 | 43:4 103:22 | 202:12,20 |
| **greedy** 272:6 | 375:15 376:5 | 104:9,16 | 206:18 207:1 |
| **green** 4:8 416:9 | 377:9 | 105:15 114:9 | 232:13 275:17 |
| **gross** 19:12 | **hammel's** | 114:11 285:8 | 276:3,13,15 |
| 404:23,23,24 | 376:11 | 392:19 394:6 | 278:8,14 318:4 |
| 404:25 | **hand** 10:21 | 394:23 395:1,5 | 318:5,18,19 |
| **group** 42:19 | 12:8 37:17,19 | 395:11 404:15 | 319:11,19 |
| 56:3 338:15 | 381:15,19 | 405:10,12,17 | **healthcare** |
| **grow** 218:25 | **handed** 36:25 | **harford's** 393:1 | 75:24 |
| **grunt** 271:7 | **handful** 165:19 | 393:7,11 | **hear** 342:15 |
| **guess** 23:10 | **hang** 147:22 | **harm** 352:1 | **heard** 239:17 |
| 37:17 55:12 | **happen** 192:24 | **harms** 84:25 | 338:1 341:6 |
| 199:1 238:25 | 193:10 194:5 | **harvard** 268:12 | **height** 246:10 |
| 272:5 347:5 | 194:22 260:4 | 268:14 270:11 | **held** 1:17 9:8 |
| 355:25 409:11 | **happened** | 270:20 271:17 | **help** 42:13 |
| **guidance** | 172:10,12,13 | 271:18 272:11 | 54:15,20 55:2 |
| 119:14,18,19 | 192:12 228:19 | 410:3 | 56:8 75:16 |
| 120:11,11 | 229:11 354:7 | **head** 19:11 | 283:7 411:22 |
| **guidelines** | 382:11 | 23:4 25:10 | **helped** 52:25 |
| 241:24 246:14 | **happening** 74:1 | 50:11 51:5 | **helpful** 42:7 |
| **gun** 175:16 | 74:3 269:8 | 77:5 121:17 | 344:19 |
| **guy's** 69:21 | **happens** 260:8 | 237:15 251:23 | **helping** 271:7 |
| | 261:18 280:25 | 290:16 307:6 | 282:18 |
| **h** | **happy** 53:18 | 307:14 309:5 | **helps** 244:7 |
| | 340:5 343:23 | 309:23 370:20 | 257:19 |
| **h** 5:5 | **hardy** 2:16 | 371:10 403:11 | **hermetically** |
| **habit** 235:9 | **harford** 5:13 | **heading** 385:2 | 377:5 |
| **half** 59:22 | 5:21 6:5,15 | 385:3 | **hesitation** |
| 315:6 | 13:4,9,14 | | 249:12 |

[hey - identification]                                                      Page 39

| | | | |
|---|---|---|---|
| **hey**  44:19 45:6 | **hired**  75:2 76:9 | 156:23 212:15 | **hundreds** |
| 45:17 48:6 | 76:13,24 78:12 | 212:17 213:14 | 76:14,15 80:25 |
| 112:7 | 168:17,23 | 213:16 315:6 | **hypothesis** |
| **high**  25:23 | 193:19 250:14 | 377:17 | 264:24 350:4 |
| 26:22,25 27:1 | 347:18 | **hourly**  165:13 | **hypothetical** |
| 27:2 43:5 | **historical** | 165:17,19 | 137:4 222:4,5 |
| 95:13 173:17 | 302:23 | 166:14 221:12 | 222:10 223:24 |
| 251:7 258:17 | **history**  351:17 | **hours**  63:10,11 | 224:15 350:22 |
| 324:13,16,17 | 351:21 352:8 | 64:1,2,6,12,13 | |
| 324:24 325:7 | 352:14 353:8 | 65:22 70:4,8 | **i** |
| 325:22 326:3,5 | 353:17,24,25 | 166:11 224:7,9 | **idea**  62:22 |
| 336:7 369:25 | **hitting**  257:12 | 264:1,2,7,12 | 72:23,24 76:10 |
| 370:15 371:20 | 257:18 | 268:20 269:13 | 76:17 82:12 |
| 374:9 389:9,11 | **hodgepodge** | 270:1,3 271:24 | 83:4,9,13,17,21 |
| 389:12,17 | 232:14 | 272:2,12 | 83:25 84:4 |
| 390:3,12,13,21 | **hold**  226:5 | 308:11,16,18 | 129:11 143:19 |
| 391:2,3,7,8,10 | 238:18 353:6 | 308:21 416:16 | 159:6 189:19 |
| 391:23,25 | 353:22 | **house**  411:1 | 189:23,24 |
| 392:8,9 | **holdings**  2:21 | **household** | 228:18 239:20 |
| **higher**  23:1,5,7 | **holiday**  264:15 | 269:20 | 246:17 254:2 |
| 25:7,14,18 | **holidays** | **housework** | 273:4 274:19 |
| 26:17 296:23 | 264:10,14 | 269:20 | 276:7 280:7,8 |
| 326:11 372:17 | **holly**  369:10 | **howard**  395:20 | 281:25 293:8 |
| 374:24 376:11 | 370:17 | 395:25 396:6 | 333:20 353:12 |
| 376:12 379:11 | **homelessness** | **huggins**  7:3 | 385:15 386:4 |
| 398:5 | 320:2,7,10,18 | 386:24 387:6,9 | 409:5 411:7 |
| **highest**  326:7 | 320:21 | 388:16,17,23 | **identical**  37:9 |
| **highly**  364:18 | **honest**  187:1 | 389:3,10,16 | 41:3 297:12 |
| **hill**  3:20 | 218:22 | 390:3,18,20 | **identically** |
| **hire**  176:9,24 | **honestly**  308:3 | **huh**  19:3 | 119:4 120:10 |
| 177:4 190:12 | **hot**  86:9 | 125:17 328:17 | **identification** |
| 193:6,17 197:1 | **hour**  58:7,24 | 329:21 | 11:5,20 12:22 |
| 197:10 201:8 | 58:25 59:3,13 | **hundred** | 13:10,22 14:9 |
| 205:10 | 61:12,22 62:1 | 308:16,21 | 14:25 15:9,18 |

**[identification - included]**                                    Page 40

16:2,11,20
21:1,11,21
22:5,15 30:13
37:24 39:3,14
39:25 40:11,22
60:18 124:16
124:23 335:19
346:15 348:22
387:19 388:25
**identified**
42:24 43:11,15
45:10 119:13
334:4 364:24
365:7 371:6
**identifies** 45:19
**identify** 17:22
41:10 44:1,11
55:5 226:13
236:8 237:19
238:13 284:2
294:7,12 327:6
328:6 362:14
362:20 363:22
364:8 365:13
365:21 366:4
383:7
**identifying**
111:16 120:13
355:2,6,12
**identities** 50:15
**illness** 86:5
**imagine** 265:10
282:4,7

**imagines**
224:15
**immaterial**
197:25 198:14
**immediate**
222:22
**immediately**
340:10,12
**impact** 65:13
78:23 350:22
350:23
**impacted** 169:5
321:6,22
352:20 353:1
**impacting**
168:11
**impairments**
318:4,18
**imperative**
418:13
**implement** 81:6
252:15
**implemented**
80:24 350:16
351:1
**implicitly**
174:22
**import** 29:8
210:3
**important**
195:18
**importing**
29:10

**impose** 213:9
214:21
**imposed**
224:23
**imposes** 223:10
224:21
**impossible**
218:16 349:4
**improperly**
392:6
**inaccuracies**
274:22
**inaccuracy**
254:5,14,20
255:16,21,23
256:9,19
261:21
**inaccurate**
239:4,5,8
254:21 256:10
256:21 258:10
258:19 292:17
372:17 373:8
394:7
**inaccurately**
257:4
**incident** 289:14
354:13,13,15
354:20,20,22
355:2,6,13,16
355:18,18
361:25
**incidents**
355:23 356:8

356:12,18,24
357:5,11,18,25
358:10,15
359:1,11,18
**include** 82:18
130:16 137:18
139:15 144:5
144:16 145:6
145:22 146:11
150:9,18 151:3
151:4 156:18
156:20 159:23
163:13 164:10
173:9,13
176:21,22
214:11 231:22
246:9 259:15
264:17 336:20
337:12 340:18
405:18 406:10
406:14
**included** 28:15
29:20 43:17
96:16 101:8
103:2 107:2
126:20 129:19
129:20 131:24
138:23 139:5
140:15 145:5
146:3,7 148:1
148:7,10,14,15
149:3,6,15,18
151:22 152:20
152:23,23

154:19,22,24
154:25 156:6
157:8,11,16,16
160:6 161:4,7
163:14 171:6
171:15 172:16
174:9,20,22,22
175:1,13 176:7
195:13 207:22
208:9,15 209:5
210:10,23
211:10,20,21
211:23 212:21
213:21 214:1,9
214:23 216:3
220:8,10
235:14 246:3
259:3 285:20
314:18 319:25
335:8 336:24
337:3 341:11
362:16,23
364:25 365:9
365:11,23
408:24 413:11
**includes**  43:5,9
127:5,12
129:24 146:15
151:18,23
156:20 210:24
364:2 365:12
396:23 403:15
**including**  41:9
176:3 355:23

361:2 385:7
403:16
**inclusive**  72:6
**income**  59:17
60:7 73:12
74:8
**incomplete**
137:4
**inconsistent**
24:3
**incorporate**
114:6
**incorrect**  23:16
24:12 392:13
**increase**  23:14
32:2 389:23
**increased**
31:22 49:7
333:7,13
**increments**
268:15
**incur**  88:8 89:3
122:3,9 186:1
**incurred**  77:24
78:3 89:11
90:5 159:9
162:14 184:20
216:16
**incurring**
184:23 225:17
**incurs**  178:23
181:15,17
**index**  8:1

**indicate**  363:15
363:24
**indication**
249:11 250:10
**indirectly**
301:19 302:8
**individual**
42:18,25 43:12
43:16 47:20
89:7,7
**individuals**
45:18 76:2
**inference**
263:25 295:14
**inferences**
352:3
**inflation**
394:13
**inflexible**  272:8
**influence**
281:21
**influenced**
281:7
**influencing**
245:1
**inform**  54:19
55:3
**information**
31:5 42:10
44:25 45:3,7
45:11,22 48:4
48:9,14 50:3,6
50:13,24 53:15
53:25 54:12

66:17 68:7
91:2 100:15
109:13,15
113:21 114:18
114:21 115:1,7
115:11,19
116:12,18,21
116:25 117:6
117:12 118:3,9
118:10 119:6
138:8 139:8
140:6 141:11
141:19 142:6,7
142:11 160:14
166:4 199:5,11
242:11 246:3
247:17 250:3
251:14 256:12
256:22 258:11
259:1,24
263:12 270:5
271:9 278:6,12
282:15 283:18
286:2,6 289:23
289:24 291:11
291:16,20
292:1,10
302:12,24
304:2 335:9
338:7,17 339:3
339:10,23
340:16,22,24
341:4,11 342:7
342:9,11,17,20

CONFIDENTIAL

**[information - involved]**                                          Page 42

342:22 343:6,8
346:6,23 347:7
347:10 348:13
349:14 364:13
373:12 375:11
376:23 377:1,2
377:6 378:20
381:1 382:9,14
402:19
**informative**
339:5
**ingredients**
186:12,18,19
413:20
**inherent** 258:5
**inherently**
242:10,23,24
242:25 343:21
343:23
**initial** 101:7
**initially** 56:22
100:23 286:8
**initiatives**
215:15
**injury** 1:6 9:13
**innes** 3:13
**input** 28:12
91:13 92:2
99:25 104:7
131:3 137:8
179:23 181:21
182:17 227:7
317:2 318:6
319:14 320:3

321:8,24
**inputs** 20:8
90:16 113:12
180:13 185:9
185:11 369:7
369:17 384:9
384:14 386:22
387:2 391:18
396:1
**ins** 313:10
**instagram** 2:22
81:18 88:18
89:2 90:7
126:2,11
130:11,15
307:8 357:5,9
358:16 359:6
359:12 361:7
409:18 410:2
**instances** 80:11
**institute** 72:6
**institutions**
271:16
**instructed**
209:9
**instruction**
125:22 195:6
195:19 196:3,9
196:14 197:4
199:24 206:9
**instructional**
200:13 262:13
262:19 263:14
265:21 266:11

266:19 404:1
**instructions**
418:1
**insurance**
232:13
**integral** 312:8
312:10
**intended** 23:12
24:9 25:20
**intensive** 272:7
**interaction**
362:8
**interest** 74:12
347:16
**interested**
271:14
**interesting**
237:24
**internal** 41:22
41:23
**internet** 54:23
216:6,22 218:3
**interpolating**
32:9
**interpret**
139:25 227:10
404:2
**interpretation**
405:8
**interrogatory**
104:1,5,15,23
105:9,16
106:13,17
107:1,11

111:15,25
**interval** 94:19
243:7 244:6
253:20,23
254:3,12
255:14 256:3,7
256:18 257:10
257:19 258:1,4
258:6 259:3,10
259:14 261:19
262:3,4 324:18
325:10 326:6
**intervals**
243:15
**intervention**
79:16,20 81:4
186:15 187:4,9
**introduce**
274:22
**introduces**
261:25
**introducing**
257:2
**intuitive**
120:12
**invalid** 343:12
**investigate**
397:25
**invoice** 62:18
**invoices** 6:20
59:15 60:16,22
61:1,7
**involved** 81:7
186:17 275:9

CONFIDENTIAL

**[involved - job]**                                                     Page 43

356:12,18,24
357:5,11,19
358:1,11,16
359:2,12
**involving**  57:4
**irrelevant**
  344:13
**irvington**  3:17
  5:14,23 6:7,17
  13:17,21 14:1
  16:6,9 17:6
  22:10,13 31:16
  31:22,23 32:2
  32:3,4,16 33:2
  33:4 40:4,9
  69:19 99:14,20
  114:10,11
  284:19,25
  286:8 384:6,9
  384:15,21
  385:2,8 386:2
  386:9 404:15
  405:3
**isd**  4:6
**issue**  19:20
  31:12 32:4,24
  73:15,17,18
  168:10 169:4
  182:3 185:4,16
  186:15 187:12
  187:14 188:17
  208:4 209:1,15
  209:18 210:15
  211:18,19

212:11 215:12
215:17 216:5
216:25 219:9
219:18 221:15
223:14,17
240:3,6 244:4
276:15 307:10
310:8 320:24
322:14,24
344:20 354:17
354:24 381:6
402:2,7,8,9
**issued**  19:15
  31:15,18 33:14
  100:23 101:7
  154:21 155:5
  155:16 156:1
  285:12 286:9
  286:13,22
  287:7 288:10
  288:20 289:5
  290:5 293:4
  306:10 307:17
  309:14 310:13
  310:21 316:16
  363:17
**issues**  87:1,13
  87:21 88:17
  90:22 91:4
  95:16,19 96:8
  101:24 102:3
  102:21 105:24
  106:3,20
  111:17 112:13

112:14,21,22
113:5,6 131:18
134:13,25
135:16 136:21
137:1 140:20
141:5 156:11
156:16 157:9
157:19 158:4
158:14 159:2
163:8,21 165:2
165:9 182:11
182:23 196:16
201:4,10,25
202:12 216:1
227:16 228:2
229:21 230:7
254:25 274:25
275:17 276:3
276:13 278:8
278:14 281:15
281:18 283:11
298:4 300:5,13
300:20 301:9
301:20 302:9
303:9,13,23
304:11 305:11
313:4 315:22
316:6,8 318:1
319:11,19
320:1 321:5,13
321:18,21
323:16 325:4
325:12,13
347:17 349:20

355:15 361:1
372:5 379:11
380:3,14
389:20,25
390:6,24 402:4
407:13,22
408:4,14
**items**  175:15
  176:5

**j**

**jacobson**  2:3
  69:16
**jargony**  79:8
**jeremy**  395:20
  395:25 396:5
**jersey**  3:15,20
**jjacobson**  2:7
**job**  18:12 19:1
  119:14 120:1
  120:14,16,19
  120:20,25
  121:2,8,10
  130:7 138:4
  170:9,23 171:6
  171:15 172:16
  173:3,10 174:9
  175:1,13,22
  195:4 202:24
  203:7,16
  204:16 223:19
  228:7 297:10
  310:5 321:12
  367:25 382:21

[job - know]                                                                 Page 44

| | | | |
|---|---|---|---|
| 383:2 | **kathryn** 7:1 | 91:9,20,24 | 313:20 314:7 |
| **jobs** 269:14 | 387:17 | 92:4,6,11,14,20 | 324:19 325:1 |
| 272:1,2,6 | **katz** 271:13 | 93:5,11,16,24 | 367:14,18,21 |
| **jogging** 330:19 | **kburrell** 2:13 | 94:2,3,8,9,15 | 367:24 368:10 |
| **join** 48:6 | **keep** 12:9 72:11 | 94:23 95:8,12 | 368:16 369:1,3 |
| **jordan** 2:3 | 224:4,5,6 | 96:3,6,15 | **klein's** 91:11 |
| **joseph** 2:10 | **kera** 395:20,25 | 97:12 98:1,4,9 | 95:23 123:21 |
| 10:5 416:14 | 396:6 | 98:13 108:24 | 124:20 125:1 |
| **journal** 237:19 | **kessler** 1:17 2:2 | 109:10,12,18 | 125:13 129:4 |
| 237:23 271:3 | 9:9 55:21,23 | 109:22 110:2,8 | 129:24 131:16 |
| 284:2 409:8 | 56:1 | 110:15 123:3,3 | 131:24 137:6 |
| **jsandoval** 2:13 | **key'toya** 2:11 | 123:7,18 | 145:2 163:15 |
| **jswofford** 2:8 | **kid** 269:16 | 124:13 125:8 | 245:7 247:10 |
| **judge** 217:3 | **kids** 189:20 | 125:16,19 | 247:16 250:19 |
| **judgments** | 218:25 269:14 | 126:18 128:18 | 252:8,20 253:8 |
| 120:18 | 409:16 411:22 | 129:18 130:8 | 262:10,16 |
| **julie** 369:11 | **kind** 33:19 | 130:22 133:11 | 265:18 266:8 |
| 381:11 | 34:25 36:11 | 136:2,15,19,24 | 266:16 267:15 |
| **july** 61:4,8 | 45:25 54:6 | 137:14,16,23 | 367:5,10 |
| 62:12 63:2 | 68:17 73:20 | 138:6,14 160:3 | 403:25 |
| 71:10,19,23 | 75:11 76:19,20 | 160:14 208:9 | **knew** 68:10 |
| 72:1,2,4,4,20 | 81:7 181:1 | 208:23 209:12 | **know** 10:12,17 |
| 74:17 | 189:10 222:4 | 237:5,10,20 | 19:13 23:3 |
| **jury** 96:14,23 | 232:15,15 | 240:10 241:6 | 25:10,21 26:1 |
| 97:9,11 102:25 | 238:17 268:10 | 241:19 245:16 | 29:8 33:19 |
| 103:12 106:25 | 271:6 281:2 | 246:24 247:3,7 | 34:1,5,6,14 |
| 107:10 137:13 | 302:14 323:4 | 247:16,23 | 35:6,10,14 |
| 137:21 236:23 | 346:1 356:15 | 249:2,17 251:5 | 36:14 42:16 |
| **justin** 2:4 69:17 | 404:11 412:8 | 251:14 252:11 | 43:4,14 45:24 |
| **k** | 414:11 | 253:17 254:22 | 47:21 49:1 |
| **k** 2:20 77:11,15 | **king** 1:18 2:5 | 264:23 266:25 | 50:15 54:6,20 |
| 77:19 80:13,15 | 4:8 9:10 | 274:24 275:4 | 54:22 56:12 |
| | **klein** 6:22 67:6 | 275:11 278:16 | 63:8 65:6,8 |
| | 67:18,23,25 | 283:10 305:3 | 66:17 67:3,9 |

CONFIDENTIAL

**[know - know]**                                               Page 45

| | | | |
|---|---|---|---|
| 67:16 68:4,12 | 173:7,10,14,15 | 247:18 248:6,8 | 303:17 305:12 |
| 68:20 73:4,22 | 174:20,23 | 249:2,17 250:6 | 307:11,25 |
| 74:2 75:10,13 | 175:10,20 | 252:13 254:18 | 309:6 312:11 |
| 75:14,15 76:22 | 176:18,19,20 | 256:4,25 257:6 | 313:9 315:21 |
| 77:4 79:7 80:4 | 177:1,13,17,18 | 257:8,12,13,15 | 316:7,18,19 |
| 80:5,6,22,23 | 179:20 180:25 | 258:15 259:8 | 318:13 320:15 |
| 81:5 82:7 84:8 | 181:2 186:15 | 259:10 260:7 | 320:15 323:5,7 |
| 89:10 90:4 | 186:20 187:1 | 261:7,15,25 | 323:8 324:1,4 |
| 97:9 109:17 | 190:21 191:2,3 | 263:2,4,4,5,16 | 325:13,14,15 |
| 112:6 114:25 | 192:16,19,21 | 263:18 264:13 | 325:15 326:7 |
| 115:11 116:24 | 193:15,18 | 265:7,9,10,12 | 327:11 331:19 |
| 117:5 119:5,17 | 195:12,16 | 269:12,23 | 331:21,22 |
| 120:1 122:20 | 196:8,18,22 | 272:6,7,25 | 333:8 336:6,19 |
| 123:6,11 124:2 | 197:9,10 | 273:6,7,9,19,20 | 337:11,11 |
| 124:6 127:16 | 198:21,23 | 274:19,21 | 338:6,8,19 |
| 127:19 128:4 | 199:18,19,21 | 275:22 276:20 | 339:24 340:5,7 |
| 129:6 130:5,10 | 200:25 201:1,2 | 276:22 277:6 | 340:7,8 341:16 |
| 130:18 131:10 | 201:3,15,15,15 | 277:13,24 | 342:5 344:12 |
| 132:22 133:4 | 201:17,18,19 | 278:1 279:10 | 345:16 347:6 |
| 133:10 136:14 | 201:21 203:11 | 280:24 282:2,5 | 347:14 350:2 |
| 137:22 138:2 | 203:12,12,21 | 282:6,17,19,19 | 350:23 351:9 |
| 138:12 139:4 | 203:21,23 | 283:4,5,9 | 353:18 354:10 |
| 140:5,8,14 | 205:20 208:19 | 284:9 285:11 | 356:11,17,23 |
| 143:17,25 | 209:9,12 | 287:1,12 288:3 | 357:4,10 |
| 148:3 151:2 | 215:11 216:18 | 289:9,21 | 359:23 360:8,9 |
| 156:20 159:8 | 217:1 218:10 | 290:17,19 | 360:24 361:3 |
| 159:23 160:9 | 218:22,24 | 292:12,14,15 | 361:18 362:4 |
| 160:10,18 | 222:12,18 | 293:17 294:5 | 363:20 364:6 |
| 161:20 162:12 | 223:5 229:15 | 295:3,9,19 | 366:23 367:12 |
| 166:22 167:6 | 230:13 231:21 | 296:1,5,13 | 369:14 370:20 |
| 169:24 170:2 | 238:4,7,8 | 297:7,18 298:1 | 371:8 372:6 |
| 171:10,11,20 | 240:2 243:1,5 | 298:12 299:6,6 | 373:23 375:10 |
| 171:21 172:2 | 244:4 245:21 | 299:7 300:1 | 377:4,21 |
| 172:22,23 | 246:4 247:14 | 302:15,19 | 378:13,16,17 |

**[know - limit]**                                        Page 46

379:14,18,19
379:20 382:20
383:1 386:5,9
386:12,13
395:13 398:10
403:8 404:6,12
406:3,22 407:2
411:4 412:3
413:8 414:2,4
414:13,16,24
414:25 415:1
415:10
**knowing**   374:7
374:21
**knowledge**
130:25 208:20
285:24 287:21
287:22 289:4
291:20 295:14
313:3 337:1
338:21 361:21
371:7
**knowledgeable**
141:24
**known**   75:15
257:22 260:10
**knows**   49:16
273:13 276:24
**kslaw.com**   4:11
**ktmc.com**   2:6,7
2:7,8

**l**

**l**   1:20 6:22
124:13 417:15
**l.l.p.**   2:16
**label**   79:5
174:19 407:2
**labeled**   28:6,11
99:8
**labor**   75:13
184:6 271:15
345:11
**lack**   240:23
293:10 351:24
**lacks**   293:6
**lags**   414:14
**laid**   250:24
**lakdawalla**
351:15
**lake**   3:19
**lambert**   369:10
369:15,20
370:17,22
371:16 372:1
375:14 376:4
376:10 377:9
**landed**   272:5
**lands**   2:17
111:21 416:2
**language**
140:24 364:3
**languages**
347:2

**large**   238:5
243:2,4,4
275:15 347:19
377:23
**largely**   270:16
**larger**   245:3
298:21 379:19
**larry**   271:13
**lasts**   359:19
**late**   189:15
190:4,17 191:7
191:23 224:6
**lawsuit**   128:20
132:20 139:10
141:25 143:2
145:14,20
198:4,21 209:8
209:11,16
292:6 306:22
306:24 307:19
307:21 308:25
309:18 310:17
310:24 311:20
**lay**   258:3
**leading**   63:17
64:7,21 65:1
65:11 66:1,9
**learn**   67:20
196:12 302:14
302:16 377:2
409:7
**learning**
175:24 216:23
381:22

**learning's**
382:5,21 383:2
**led**   275:10
**legal**   74:20,22
178:2
**legs**   86:10
**length**   132:15
**level**   42:18,25
43:9 76:18
168:11 173:7
173:17,18,21
273:20 332:18
332:24 333:4
333:10 336:7
351:16 354:13
354:20 355:18
**levels**   332:21
**liability**   1:6
9:13
**liable**   226:6
**lies**   325:18
**life**   170:14
271:20
**light**   347:18
**likelihood**
274:19
**likely**   240:18
242:14 315:1
359:17
**limit**   126:20
130:14 160:8
163:19 164:3,7
242:16,21
300:6

**[limitation - lose]** Page 47

**limitation**
237:14 239:20
240:13,19,20
**limitations**
237:4,19 238:1
238:3,12
283:12 284:2
**limited** 123:8
123:13 124:4
131:17 134:12
134:24 135:15
136:22 137:2
137:19 141:4
141:14,20
142:12 156:10
156:15 160:14
160:19,24
161:13,16,25
162:3,8 163:6
163:23 357:18
357:25 358:10
358:15 359:1
359:11
**limits** 242:20
**line** 8:5,8,11
18:20 239:22
400:13 401:22
419:4
**lines** 19:13
82:23
**link** 53:18,19
329:10 330:5
330:24

**linkage** 222:22
**linked** 329:4
**links** 194:13
200:7 352:23
**lisa** 7:1 386:25
387:6,17,23
**list** 12:4 31:7
37:7,9 41:1,3,9
45:2,10,16,17
99:17 127:9
369:15 384:23
385:4 386:6
408:23 409:1
**listed** 18:8,11
18:21 120:3,6
381:15,19,20
390:16 399:25
**listen** 73:15
**lists** 126:24,25
**literally** 29:3
36:9 54:8 65:8
178:16 224:19
235:19 382:4
386:12
**literature**
235:16 283:3,7
327:5,12,13,14
327:17 331:23
332:3
**litigation** 1:7
9:14 74:19,24
75:8 81:9
122:18 136:10
136:12 243:19

246:19 287:24
304:18 305:22
363:9,11,16,25
364:3
**little** 35:1 36:13
49:3,18 56:13
62:6,11 81:6
116:6 132:15
254:16 284:16
323:13 344:17
412:7 413:8
**living** 377:4
**llc** 2:14,14,21
2:21,22,22
3:18 4:12
**llp** 1:18 2:2,10
3:2 4:8
**lobby** 76:4
**local** 76:5,5
**located** 18:1
**logic** 310:18
**long** 133:24
157:3 241:7
268:23 271:15
360:11 409:3
410:6 412:11
414:14
**look** 87:5
124:10 130:10
137:16 170:2
185:9 208:21
219:21 221:10
223:8 292:15
326:18 328:4

328:14,18,25
329:13,22
332:17 333:22
334:2 335:14
343:15 345:2
346:11 348:5
348:17 352:2
352:11 363:5
369:12 378:19
380:25 381:13
384:21 385:1
389:15 390:8
390:10 395:15
395:17 396:25
398:25 399:18
400:7 402:16
403:13 406:7
414:10
**looked** 119:25
120:17 289:13
289:19 290:18
327:10 334:23
**looking** 34:3
94:14 159:6
212:6,17
213:16 332:20
411:2
**looks** 34:6
63:25 265:12
**lopez** 384:12,18
**lose** 177:21
178:5,7,20
201:23

**[loses - marked]**                                                    Page 48

| | | | |
|---|---|---|---|
| **loses** 181:12 | 399:22 407:23 | 27:16 28:14,22 | **making** 103:20 |
| **losing** 184:14 | **losses** 197:20 | 30:5 33:1 36:5 | 131:21 168:9 |
| 326:14 327:1,8 | 317:23 393:23 | 80:7 97:3 | 169:3 174:11 |
| 327:20 328:10 | **lost** 86:24 | 120:18 248:21 | 188:14 196:11 |
| 329:18 331:3 | 87:11,19 88:15 | 380:5 418:7 | 198:18 200:6 |
| 332:5 333:25 | 111:1 133:13 | **magically** | 204:14 250:23 |
| 334:15 345:20 | 182:9,16 234:6 | 258:1 | **manage** 412:8 |
| **loss** 26:24 58:2 | 262:12,18 | **main** 55:13 | **management** |
| 58:5 66:25 | 265:20 266:10 | **maine** 2:11 | 70:15 |
| 67:4,10,17,21 | 266:18 335:3 | **maintaining** | **manager** 224:8 |
| 68:6,18 85:19 | 336:4 366:1 | 173:11 174:17 | **manner** 35:5 |
| 89:17,21 90:1 | **lot** 63:20 75:10 | 175:23 | 310:1 |
| 107:21 108:4 | 75:24 119:3 | **majority** | **margaret** 52:16 |
| 109:5 112:5 | 347:9 414:15 | 375:15 | 52:17,20 53:3 |
| 122:13 128:19 | **lots** 46:10 | **make** 18:23 | 53:6 |
| 128:25 129:16 | 274:17,20 | 27:8 29:18 | **margin** 253:24 |
| 132:17,23 | **low** 246:21 | 33:6 34:3,4,17 | 254:4,13 |
| 133:2,17,19,23 | 258:17 324:13 | 36:10 82:14 | 255:15 256:8 |
| 134:19 136:3,8 | 325:7,22 | 85:17,20 97:21 | 256:18 259:4 |
| 144:25 145:12 | 326:10 374:9 | 122:20 131:6,8 | 259:14 261:16 |
| 145:16,19 | 398:1 410:4 | 133:21 134:7 | 261:20 324:7 |
| 146:12,13,14 | **lower** 26:1 | 181:6 213:1 | 324:18 325:23 |
| 151:2,22 | 27:25 253:19 | 251:7,16 | 347:21 |
| 156:19 159:17 | 296:20 298:24 | 254:18 258:1 | **marginally** |
| 183:10 188:16 | 350:8,17 351:3 | 263:25 304:24 | 344:22 |
| 211:20,22 | 374:23 | 312:19 320:16 | **mark** 30:8 |
| 214:1,24 | **lunch** 70:7 | 347:16 350:12 | 37:14,15 60:13 |
| 231:18 310:4,4 | **lurking** 216:19 | 351:11 352:3 | 124:10 335:16 |
| 312:17,24 | **lying** 326:9 | 418:4 | 346:12 348:18 |
| 316:11 320:23 | | **makes** 137:21 | 387:15 388:15 |
| 336:15 337:7 | **m** | 176:8 177:4 | **marked** 5:6 |
| 355:10 356:16 | **m** 2:17 | 190:11 193:5 | 8:10 10:23 |
| 356:21 357:2,8 | **made** 24:22 | 196:25 205:9 | 11:4,19 12:21 |
| 357:14 372:23 | 25:1 26:7 27:5 | 223:3 | 13:9,21 14:8 |

**[marked - measure]**                                                            Page 49

| | | | |
|---|---|---|---|
| 14:16,18,24 | 42:6 80:1 | 94:16,19 | 309:22 318:24 |
| 15:8,17 16:1 | 380:7 384:23 | 109:11 110:25 | 319:1 321:11 |
| 16:10,19 20:25 | 386:6,8 413:4 | 112:4 121:4 | 322:4,17 323:8 |
| 21:10,20 22:4 | 413:15 | 122:17 123:16 | 324:9,13,25 |
| 22:14 30:11 | **math**  25:10,11 | 125:6 126:23 | 325:7,9,9,17,19 |
| 37:23 39:2,13 | 135:4 320:16 | 145:9 146:10 | 325:21 326:2 |
| 39:24 40:10,21 | 399:21 | 160:2,19 | 327:10 330:5 |
| 60:17 124:15 | **mathematical** | 171:10 172:2 | 336:6,19 338:8 |
| 335:18 346:14 | 262:22 399:20 | 178:4,10 179:7 | 342:5 345:9 |
| 348:21 387:18 | 400:7 | 179:8 184:10 | 347:9,14 |
| 388:24 | **matter**  57:8 | 196:6 201:2 | 354:14,21 |
| **market**  2:18 | 168:10 184:25 | 207:25 211:17 | 355:21 357:20 |
| 4:4 | 187:14 219:24 | 217:23 218:10 | 373:21 374:3 |
| **markets**  75:13 | 226:24 227:14 | 220:6 221:22 | 375:4,21 |
| **massachusetts** | 227:25 231:24 | 222:3 228:6 | 377:19 380:22 |
| 3:3 | 251:19 302:3 | 236:16 237:24 | 383:16 393:20 |
| **match**  56:8 | 367:17 368:19 | 238:14 239:11 | 399:13,22 |
| 118:23 120:2 | 371:1 417:7 | 240:17 242:8 | 400:14,19 |
| 120:16 263:21 | **matters**  65:19 | 244:1,12,17,24 | 407:16 409:10 |
| **matched**  24:8 | 66:4 215:12 | 245:2,3,6,15 | 409:13 410:3 |
| 119:4 120:6,9 | **md**  1:5 | 246:7,9 248:5 | 412:3 414:24 |
| 121:1,9 | **mdl**  1:6 | 250:7 255:4 | 415:6 |
| **matching** | **meal**  65:3,5 | 258:2,18,18,22 | **meaning**  264:2 |
| 370:18 | **meals**  64:20 | 259:8,9 260:3 | **means**  94:11 |
| **material** | **mean**  45:15 | 260:16,17 | 127:2,3 129:5 |
| 172:18 | 46:9 49:24 | 262:15 265:23 | 129:7 131:10 |
| **materials**  6:9 | 51:12,22 53:23 | 274:17 280:6 | 131:11 222:24 |
| 6:11,13,15,17 | 56:2,12 57:9 | 280:22 281:2 | 242:12 250:8 |
| 6:19 12:4 37:4 | 58:16 59:25 | 281:11 282:3 | 263:9 390:2 |
| 37:7,9,16,21 | 61:3 63:9 | 283:1 288:15 | 417:23 |
| 38:21,25 39:7 | 64:23 65:14,16 | 289:20 290:2 | **meant**  211:13 |
| 39:11,18,22 | 66:23 74:11,22 | 299:25 302:10 | **measure** |
| 40:4,8,15,19 | 75:10,23 76:16 | 302:15 307:24 | 209:15 221:9 |
| 41:1,3,9,11,15 | 80:4 81:11 | 308:17 309:20 | 254:9,10,23 |

**[measure - media]**                                                    Page 50

| | | | |
|---|---|---|---|
| 255:3,8,24 | 112:23 113:7 | 167:9,12,15 | 274:12,15 |
| 256:2 257:5 | 122:2,8 123:8 | 168:18 169:8 | 281:16,19 |
| 258:20 263:18 | 124:3 126:1,10 | 182:10,23 | 282:11,12 |
| 264:17 265:8 | 126:19,21 | 183:7 188:12 | 298:4,22 299:1 |
| 335:2 355:24 | 127:17,20 | 188:13,22 | 300:5,13,20 |
| **measured** | 128:12 129:12 | 189:6 191:8,9 | 301:9,20 302:9 |
| 312:13 313:22 | 130:11 131:19 | 191:15,24 | 303:9,13,23 |
| 314:9 331:24 | 132:8 133:14 | 194:6,7,13,23 | 304:10 305:11 |
| **measurement** | 133:20 134:15 | 200:1,2,15 | 305:13 306:11 |
| 262:1 | 135:2,18 136:3 | 202:12,14,20 | 307:1,18 |
| **measures**   336:3 | 136:22 137:1,7 | 204:5,6,13 | 308:24 309:16 |
| **measuring** | 137:15,18,24 | 206:2,3,12,19 | 310:7,16,24 |
| 218:14 227:6 | 138:24 139:16 | 206:20 207:2 | 311:20 312:20 |
| 254:21 255:9 | 140:11 141:7 | 207:19,21 | 312:20 314:17 |
| 280:16 320:24 | 144:9,20 146:6 | 208:13,14 | 315:23 316:6,9 |
| 404:4 | 146:20 147:9 | 211:1,3 212:3 | 316:14 317:3 |
| **media**   1:4 9:11 | 147:21 148:8 | 212:5,21 | 318:1,8,12,21 |
| 57:5 81:14,15 | 148:20 149:5 | 213:20 214:8 | 319:1,4,6,13,15 |
| 81:17,17,22 | 149:17 150:1 | 214:16 216:2,5 | 319:21,24 |
| 82:1,3,5,9,15 | 150:11,20 | 217:13,17,18 | 320:4,8,11,19 |
| 82:15,17,20,23 | 151:8,18 152:6 | 219:23 220:7 | 320:22 321:5,7 |
| 82:24 83:2,8 | 152:17,19 | 221:15 223:3 | 321:10,14,19 |
| 83:10,12,14,16 | 153:2,14 | 223:15 224:2 | 321:21,23 |
| 83:18,20,22,24 | 154:21 155:5 | 225:23 226:15 | 322:1,7 323:16 |
| 84:1,3,5,7,9,12 | 155:15,25 | 227:2,4,16 | 325:4 326:16 |
| 84:14 85:18 | 156:12,17 | 228:2,10,13,20 | 327:2,9,21 |
| 87:2,14 90:23 | 157:10,21 | 228:25 229:3 | 328:12 329:19 |
| 91:5 95:17,20 | 159:4,11 | 229:12,20 | 331:4 332:6,12 |
| 96:9 101:25 | 160:17 161:1,5 | 230:6 231:8 | 333:6,12,15 |
| 102:4,22 | 161:7,14,15,17 | 233:11,23 | 334:2,17 335:3 |
| 105:25 106:4 | 161:18 162:1,2 | 234:8 246:2 | 335:6,10 336:5 |
| 106:21 108:3 | 162:15 164:22 | 255:1,6 267:3 | 336:9,17,25 |
| 108:12,19 | 165:23 166:6 | 267:13,24 | 337:13 345:21 |
| 111:18 112:15 | 166:19,23 | 273:25 274:3 | 346:1 347:3 |

CONFIDENTIAL

**[media - misremember]**                                    Page 51

| | | | |
|---|---|---|---|
| 348:14 349:15 | **mental**  86:5 | 186:5,7,8,11 | 361:5,6,24 |
| 349:21 352:1 | 163:8,22,24 | 187:17 197:14 | 362:2 416:16 |
| 352:21 354:17 | 164:15,21 | 210:2,7 211:9 | **misbehaving** |
| 354:24 355:7 | 165:3,10 | 238:8 372:10 | 171:7,16 172:5 |
| 355:15 359:16 | 200:21 201:4 | **methods** | 172:17 174:10 |
| 360:2,17 361:4 | 201:10,25 | 285:18 | 175:2 176:4 |
| 361:12,13,20 | 202:11,19 | **metric**  378:8 | 212:19 213:17 |
| 363:9,11 364:3 | 206:18 207:1 | **mic**  416:4 | **misbehavior** |
| 372:5 374:9,23 | 275:17 276:3 | **michael**  3:13 | 170:11,19,23 |
| 379:10 380:3 | 276:13,15 | 69:20 | 173:10 176:13 |
| 380:13 382:7 | 278:8,14 318:5 | **middle**  25:22 | 177:8,13,17,23 |
| 389:20 390:6 | 318:19 319:11 | 26:22,24,24 | 178:9,22 179:2 |
| 390:23 393:13 | 319:19 | 27:10 31:11 | 179:15 183:15 |
| 407:13,22 | **mentioned** | 43:5 263:5 | 183:25 184:4 |
| 408:4,13,19,22 | 309:8 411:12 | 265:15 276:12 | 188:11,21 |
| 410:13,18 | **mess**  365:3 | 276:17 325:19 | 203:2,10,16 |
| **mediated**  47:13 | **message**  147:22 | 326:11 369:25 | 204:4,12 212:4 |
| **medicaid**  75:11 | 148:9 229:5 | 370:15 371:19 | 212:21 213:20 |
| **meet**  69:14 | **messages** | **million**  160:7 | 228:14 |
| **meeting**  70:2,6 | 148:21 | 399:15,16 | **miserable** |
| 413:19 | **messaging** | **mind**  99:6 | 63:23 |
| **meetings**  69:9 | 147:24 | 354:11 | **misinterpreted** |
| **melissa**  2:4 | **messed**  316:3 | **minnes**  3:16 | 29:1 |
| 69:17 | **met**  69:8,12,22 | **minute**  234:17 | **mismatch** |
| **meltzer**  1:17 | **meta**  2:20 | **minutes**  36:25 | 119:3 392:25 |
| 2:2 9:9 55:23 | 416:3 | 95:15,19 157:1 | 393:6,9 394:2 |
| **members** | **methodologi...** | 157:5 219:16 | 394:11,17 |
| 347:20 | 336:21 | 220:5,10,18,22 | **mismatched** |
| **memorialize** | **methodologi...** | 220:24 221:1 | 394:23 |
| 48:17 | 344:11 | 222:14,16 | **misremember** |
| **memory**  330:19 | **methodology** | 225:17 322:12 | 256:11,22 |
| 415:4 | 20:3,6 66:21 | 322:22 359:15 | 258:11,17,17 |
| **men**  271:21,25 | 66:23 81:10 | 359:19 360:1,3 | 259:1,23 |
| | 119:21 182:5,8 | 360:15,17 | 260:11,20 |

261:12
**misremember...**
261:8
**misreport**
259:1,24
**missed** 25:21
**missoula** 75:25
**misstated**
20:19
**misstates** 212:9
223:21 251:12
309:3 311:24
312:15 341:9
344:7 381:3
**misunderstood**
44:13 383:12
**mix** 75:14,19
75:23
**model** 413:9
**money** 86:23
87:10,18 88:14
90:18 113:14
113:22 169:22
219:14,15
224:10 225:13
233:12,22
**monitoring**
323:4
**montana** 71:15
71:18,22,25
72:7,14 75:12
75:24 80:19
**month** 61:4
62:19,21 65:20

65:21 66:22
67:2,8,15 68:4
**morning** 10:3,4
**motivation**
271:13
**motley** 3:18
**motleyrice.com**
3:21
**move** 138:20
202:8 276:21
286:11
**moved** 270:17
**movement**
394:12
**moving** 161:22
**mto.com** 3:5
**multiple** 38:6
175:18 359:17
**multiplication**
96:12
**multiplied** 27:3
118:18 119:24
**multiplier**
23:16,17,23
24:13,18 48:12
49:2,5,15
396:17,20
397:2,7,11,19
397:22,24
398:11,17
403:1,4
**multiply** 34:23
66:24 135:7
138:6 187:5

236:10 324:19
396:22 400:19
**munger** 3:2
**music** 409:16
**myeates** 2:7

**n**

**n** 5:1 417:1
**naep** 351:16
**name** 9:2 10:5
19:2 37:1
47:19,24 55:24
69:21
**names** 18:9,21
50:25 51:10
**narrower**
243:7
**nation** 326:14
326:25 327:19
328:10 329:17
331:2 333:25
334:12
**national** 351:16
412:17
**nationally**
80:22
**nature** 261:16
290:20
**nauseam**
231:19
**ne** 4:9
**nea** 6:24 345:4
345:6,7,11,14
345:18 346:2,5

346:14,18,22
347:5,6,12,14
347:23
**nearly** 76:19
**necessarily**
236:19 272:25
284:11 299:17
300:2 323:23
323:24
**necessary**
91:13 99:24
104:7 131:8
241:25 246:15
286:6 406:15
418:4
**need** 10:16
36:10 58:2
86:9 131:14
140:7 279:25
309:22 310:7
313:9 383:1
**needed** 45:11
197:19 383:6
**needs** 195:7,20
196:2,4 197:5
199:25 200:14
204:19 205:1
205:15 206:1
206:11
**negative** 164:8
**negatively**
65:13 223:17
**neither** 375:14
376:6

**[net - objection]**                                                    Page 53

| | | | |
|---|---|---|---|
| **net**  222:17 | 110:23 138:23 | **nope**  51:11 | 410:4 412:6 |
| **netflix**  84:6,8 | 139:15 141:3 | 71:9 333:2 | **numbers**  23:12 |
| **never**  42:17 | 146:2 148:6 | **normal**  33:19 | 49:11 97:7,19 |
| 77:10,14,18 | 149:2,14 | 33:23 34:10,16 | 97:21 135:7 |
| 78:7 243:22 | 151:16 152:5 | 35:20 404:3,8 | 363:12 385:9 |
| 246:22 278:2 | 152:18 153:1 | **northern**  1:1 | 386:10,11 |
| 282:20,23 | 153:13 154:18 | 9:15 | 400:4 |
| 303:11,22 | 157:7 160:23 | **notary**  1:21 | **nw**  3:3 |
| 341:5 353:14 | 166:12,18 | 420:20 | |
| **new**  3:15,20 | 168:18,24 | **note**  133:5 | **o** |
| 216:23,24 | 202:25 203:8 | 248:21 394:10 | |
| 234:15 405:1 | 204:17 205:3 | **noted**  9:18 | **o**  417:1 |
| **nobel**  271:12 | 264:15 293:19 | 418:11 420:8 | **oath**  209:10 |
| **noble**  395:19 | 294:2 299:7,10 | **notes**  48:16 | 283:20 291:21 |
| 395:19,24,24 | 299:20 300:4 | 171:17,23 | **object**  90:11 |
| 396:5,5 | 300:10 301:5 | 172:6 333:15 | 214:17 278:10 |
| **noise**  258:16 | 301:16 302:5 | 417:6 | 374:12 408:15 |
| **nominet**  6:23 | 303:8 305:4 | **notice**  17:20 | **objection**  34:12 |
| 335:1,9,15,18 | 316:2,5 369:8 | **noticed**  19:25 | 35:22 44:3 |
| 335:23 336:3 | 369:18 381:9 | 33:4 | 45:14 47:8 |
| 336:14 337:2,6 | 384:10,15 | **noticing**  12:2 | 48:19 50:17 |
| 337:18,21 | 386:23 387:3 | **notion**  255:10 | 51:2,15 54:17 |
| 338:2,2,6,23 | 387:25 388:19 | **number**  5:6 | 55:8 59:20 |
| 341:5 342:11 | 395:18 396:3 | 10:9 33:7 | 60:10 61:14 |
| 342:16,21 | 402:12 | 76:12 97:7,10 | 66:11 68:25 |
| 343:7 | **nonemployee** | 97:23 166:10 | 82:11 83:3 |
| **nominet.uk** | 305:10 315:20 | 169:5 242:16 | 85:6 87:22 |
| 334:4 | 316:1 | 242:18 270:1 | 88:9,19 89:5 |
| **non**  67:10 68:5 | **nonintuitive** | 275:15 277:9 | 91:16 92:22 |
| 98:17 99:12 | 34:5 | 366:23 373:24 | 93:19 94:25 |
| 100:1 102:10 | **nonresponse** | 373:25 375:1 | 95:4 96:21 |
| 103:5,16,24 | 251:21,25 | 386:2 398:2,6 | 97:17 100:3 |
| 104:8 106:10 | 252:5,7,20 | 398:7 399:24 | 102:15 103:7 |
| 107:6,15 | 261:21 | 401:12,22,23 | 103:18 104:10 |
| | | | 104:18 105:19 |

**[objection - obtain]**                                    Page 54

| | | | |
|---|---|---|---|
| 107:18 109:2 | 179:3,16 180:9 | 245:18 248:3 | 314:21 316:17 |
| 110:4 111:20 | 181:14 183:18 | 249:6,21 250:4 | 317:5 318:9,22 |
| 111:21,22 | 184:9 187:19 | 250:20 251:9 | 319:17 320:12 |
| 115:4,14 | 189:7,17 190:6 | 251:11 252:9 | 322:2,15 323:1 |
| 118:12 123:10 | 190:18 191:11 | 252:22 253:12 | 323:20 331:6 |
| 124:5 128:3,15 | 192:14,25 | 254:7 255:18 | 333:17 341:8 |
| 129:14 130:17 | 193:12 194:9 | 256:13 259:5 | 342:23 343:9 |
| 131:20 132:10 | 194:24 195:9 | 259:18 260:1 | 344:6 349:24 |
| 132:13 134:2 | 195:21 196:21 | 260:14 261:5 | 351:7 353:10 |
| 134:16 135:3 | 197:7 198:2,16 | 265:5,22 267:6 | 354:1 355:19 |
| 135:19 136:16 | 199:8 200:4,22 | 273:2,16 274:5 | 358:18 359:20 |
| 137:3 138:16 | 201:12 202:1 | 274:16 275:7 | 360:6,20 |
| 139:1,18 | 203:3,18 | 275:19 276:5 | 361:15 364:1 |
| 140:13 141:8 | 204:21 205:5 | 277:3,21 | 364:10 366:8 |
| 142:15 143:23 | 205:16 207:9 | 278:20 279:6 | 366:20 368:4 |
| 144:10,21 | 207:23 208:17 | 279:23 280:19 | 368:12,22 |
| 146:9,24 | 211:15 212:8 | 281:9,23 | 370:5 372:19 |
| 147:11 148:12 | 212:23 213:23 | 283:16 284:5 | 373:9,19 375:2 |
| 148:22 149:8 | 215:8 216:7 | 286:17 287:11 | 375:19 376:16 |
| 149:19 150:3 | 217:21 220:12 | 288:13,24 | 377:15 379:4 |
| 150:13,22 | 221:5,18 | 290:8 291:13 | 380:4,15 381:2 |
| 151:20 152:8 | 223:20 224:25 | 292:2 293:6 | 382:12 383:4 |
| 153:4,15,25 | 226:7,17 | 294:18 295:7 | 383:14 385:14 |
| 154:12 155:7 | 227:19 228:16 | 295:24 296:10 | 392:2,14 394:9 |
| 155:18 156:3 | 229:6,25 | 296:21 297:5 | 397:13 401:17 |
| 157:13,23 | 230:11,25 | 299:2,15 | 405:23 407:14 |
| 158:9,19 | 231:14 232:19 | 300:14,22 | **observations** |
| 159:14,21 | 233:15,24 | 301:11,22 | 243:8 |
| 163:10 164:1 | 234:9 236:18 | 303:2,14 | **observe**   255:10 |
| 167:3 171:1,18 | 237:8 238:23 | 304:22 305:14 | 257:22 |
| 172:8,20 | 239:9,25 | 306:5 307:3,23 | **observed** |
| 173:24 174:12 | 240:15 241:4 | 309:2,19 311:1 | 263:22 |
| 175:4,17 | 241:15 242:2 | 311:23 312:14 | **obtain**   42:15 |
| 176:14 178:1 | 244:2,14 | 313:23 314:10 | 396:22 |

| | | | |
|---|---|---|---|
| **obtained** 330:4 | 98:11 102:1 | 169:22,24 | 308:19 310:19 |
| **obvious** 246:4 | 105:25 113:9 | 186:24 219:13 | 325:24 326:23 |
| **obviously** | 121:24 122:5 | 222:19 238:4 | 329:3 330:6,16 |
| 33:21 198:25 | 131:15,22 | 257:12 269:12 | 330:25 333:22 |
| 319:2 324:3 | 132:2,6 173:20 | 284:10 359:7 | 334:5 335:1,14 |
| **occasion** | 188:9,15,19 | 379:13 395:23 | 337:14 338:1 |
| 243:22 272:22 | 189:3,10 191:4 | 408:7 409:10 | 342:18 345:2,5 |
| 304:24 | 191:13,20 | 409:13 410:24 | 346:11 348:17 |
| **occasionally** | 194:2,11,19 | 411:7 | 349:10 353:21 |
| 71:5,7 | 195:1 199:22 | **okay** 10:21 | 363:21 370:13 |
| **occurred** 66:22 | 200:11 202:9 | 12:7,10,13,15 | 371:12,14 |
| **occurs** 374:20 | 202:15,17,22 | 18:5 19:3,3,9 | 374:15 376:7,8 |
| **odds** 326:9,10 | 204:2,8,10,15 | 20:12 31:13,13 | 384:7 386:19 |
| **offer** 62:23 | 205:23 206:5,7 | 37:13 38:11 | 387:14 388:15 |
| 76:11 92:2 | 206:13,15,21 | 44:22 50:22 | 390:8 391:16 |
| 95:24 102:9 | 206:23 207:3 | 59:16 63:15 | 392:18,24 |
| 106:9 131:9 | 233:20 234:5 | 73:19 87:7 | 393:4,10 |
| 134:17 232:9 | 234:12 247:2 | 97:5 114:8 | 399:18 400:23 |
| 232:17 233:3 | 251:4 265:17 | 124:9,24 | 401:1 409:3 |
| 241:18 344:24 | 266:7,15,23 | 125:12,18 | 410:17 412:14 |
| **offered** 89:14 | 267:9,21 268:2 | 126:4 127:7 | 413:7 415:11 |
| 90:8 134:10,22 | 297:13,21 | 131:13 144:4 | **old** 342:6 401:3 |
| 135:13 141:1 | 300:3 304:6 | 151:13,13 | 410:10,14 |
| 159:12 162:16 | 352:6,24 | 162:2,6 184:1 | **older** 26:2 |
| 300:11,18 | 372:16 376:19 | 185:1,12 | 349:6 |
| 301:6,17 302:6 | 402:12 | 186:16,22 | **oldest** 269:6 |
| 303:10 372:1,8 | **offices** 1:17 9:8 | 192:7 196:25 | **olson** 3:2 |
| 372:14,17 | **oh** 27:12 29:3 | 209:21 210:14 | **once** 12:12 |
| **offering** 84:16 | 36:10 44:12 | 210:22 211:4 | 57:13 64:25 |
| 84:20,23 85:2 | 45:15 46:18 | 218:5 248:6 | 276:20 292:12 |
| 85:9,13,23 | 47:21 49:1 | 255:13,20 | **ones** 32:22 |
| 86:3 87:17 | 50:18 58:23 | 256:24 258:23 | 80:16 81:24 |
| 88:5,13,25 | 61:19 72:10,23 | 259:22 283:4,7 | 126:23 127:22 |
| 95:7,17 98:8 | 82:2 119:15 | 290:1,3 293:11 | 285:15 306:18 |

**[ones - oregon]**                                    Page 56

| | | | |
|---|---|---|---|
| 342:4 375:24 | 137:20 141:2 | 47:7 49:22 | 169:14,18 |
| **online** 153:24 | 144:24 145:4 | 52:1 54:16,19 | 170:2,8 178:13 |
| 229:22 230:8 | 168:21 169:12 | 55:4 82:19,22 | 178:16,23 |
| 230:21 231:11 | 188:10,20 | 84:17 98:8,12 | 180:17 181:17 |
| **opened** 29:7 | 189:4,10 191:5 | 129:3 130:24 | 182:6,19 |
| **opening** 33:14 | 191:21 194:3 | 131:22,23 | 185:23 186:4,6 |
| 37:10 41:4 | 194:20 199:23 | 132:3,6 173:20 | 186:8 187:16 |
| **operating** | 200:12 202:10 | 180:5 188:15 | 187:24,25 |
| 84:15 | 204:3,11 | 191:14 194:12 | 202:4 210:1 |
| **operations** 2:21 | 205:24 206:8 | 195:2 200:7 | 212:25 213:3,9 |
| **operative** 11:8 | 206:16,24 | 202:15,18,23 | 213:11 214:3 |
| 12:25 13:13,25 | 211:25 212:9 | 204:9,15 206:6 | 214:21,22,25 |
| 14:12,14 16:25 | 215:24 217:17 | 206:14,22 | 215:11,21 |
| 22:20 | 221:3 223:12 | 207:4 208:20 | 216:2 217:19 |
| **opine** 177:19 | 223:21,22 | 208:23 209:3 | 219:7 221:3,9 |
| **opining** 108:15 | 227:14,24 | 209:18 226:24 | 222:21 235:15 |
| 108:20 112:19 | 233:21 234:6 | 234:13 240:7 | 235:20,24 |
| 113:3 167:8,16 | 241:18 247:18 | 297:14,21 | 236:3,13,16,24 |
| 168:3,16,22 | 265:18 266:7 | 298:17 302:3 | 288:1 411:11 |
| 169:7 | 266:15 267:10 | 332:16 335:24 | 412:1,15,24 |
| **opinion** 48:14 | 267:15,21 | 344:23 353:15 | 413:24 415:25 |
| 84:21,24 85:3 | 268:3 282:24 | 385:24 386:3 | **opposed** 18:19 |
| 85:10,14,24 | 283:1 292:9 | 386:17 402:12 | 44:19 213:4 |
| 86:4 87:18 | 304:7 328:8 | **opinium** | 254:9 |
| 88:6,14 89:1 | 332:14 333:24 | 338:15,16,22 | **option** 125:24 |
| 92:24 95:8,17 | 339:14 352:7 | 339:2,9 340:15 | **order** 1:14 |
| 96:1 102:1,11 | 352:25 353:6 | 340:23 341:3 | 42:13 45:12 |
| 106:1,11 | 353:22 367:16 | 341:21 | 137:12 173:12 |
| 113:10 115:17 | 382:25 | **opportunities** | 174:17 175:23 |
| 117:10 118:7 | **opinions** 17:12 | 226:14 | 210:6 241:25 |
| 121:25 122:6 | 41:12,16,20,25 | **opportunity** | 246:15 308:11 |
| 128:6 131:9,16 | 42:8,11,14 | 78:7,16 79:3,5 | 331:20 |
| 134:11,22 | 43:19 44:10 | 79:11,24 80:12 | **oregon** 80:20 |
| 135:14,25 | 45:9,13 46:5 | 81:10,13 | 411:12 414:23 |

CONFIDENTIAL

**[organization - part]**                                          Page 57

**organization**
  347:24
**organize**
  297:24
**original**   6:1,2,4
  6:5,7 12:5 20:4
  20:8,15,20,24
  21:5,9,15,19,25
  22:3,9,9,13
  23:2,8,11 24:2
  24:11 25:8,15
  25:19 26:18
  28:1 29:14
  35:14 238:16
  418:14
**outcome**
  191:15
**outcomes**   86:1
**outlier**   244:13
  244:25 245:8
  245:17 246:5
**outliers**   245:9
  245:22,23
**output**   179:22
  180:1,2,12
  181:2,4,5
  182:12,13,16
  183:10 184:16
  184:17 188:3
  189:11 218:11
  218:14,18,19
  219:1,2 227:5
  227:11 352:19

**outputs**   353:1
**outs**   313:10
**outside**   28:17
  33:19 173:5
  192:12,24
  193:10 194:5
  194:22 243:19
  246:19 259:9
  304:17 353:15
**overlap**   362:8
**overlay**   154:11
**oversee**   378:9
**overseeing**
  378:7
**overstate**   96:10
  102:19,23
  106:22
**overstated**
  106:18
**overstates**   96:7
**overtime**   221:1
  403:16,22
  404:16 405:19
  406:15
**own**   46:24
  70:22 120:18
  146:18 172:24
  173:5 280:11
  300:6 377:11

**p**

**p.c.**   3:13 4:2
**p.m.**   163:3
  234:21 235:1

  315:12,17
  383:22 384:2
  415:14,19
  416:18,21
**paced**   65:7
**page**   5:2 8:5,8
  8:11 87:6
  99:10 124:22
  125:12 363:7
  381:13 384:23
  390:10 419:4
**pages**   420:3
**paid**   29:8 43:1
  58:7 73:4,8
  138:5 165:19
  167:11,20
  168:6,11 170:4
  177:24 181:22
  181:23 182:21
  183:16 184:7
  184:11,18
  215:19,19
  216:13,14
  219:11,15
  220:2 341:6,21
  344:3 362:15
  362:22 363:23
  364:9 383:8
  393:15 396:11
  414:25
**papers**   235:24
  236:4,10,12
**paperwork**
  220:20,25

**paragraph**
  17:23 18:2
  87:6 124:22
  326:20,21
  328:5,14
  329:14 369:12
  384:8 386:21
  389:4,13
  392:20,23
  395:17 396:25
  402:17 403:13
  406:8
**parameters**
  222:20
**part**   23:14,20
  23:20 24:6,15
  26:3,13 27:21
  49:3 71:24
  72:3 107:23
  108:7,13
  112:10,17
  115:24 116:9
  122:12 125:15
  146:23 147:2
  147:13 148:25
  149:11 150:6
  150:25 151:1
  152:11 153:6
  153:18 154:2
  154:14 155:9
  157:25 158:18
  158:21 160:11
  160:12 164:12
  164:18 168:20

**[part - people]**                                                    Page 58

169:11 171:5
171:14 172:4
172:15 173:10
174:8,16,17,25
175:12,22
182:7 183:1
186:4 187:16
192:21 195:16
195:18 197:13
197:18 203:23
209:2,7,11
217:20 225:6
225:14,18,20
226:1,10,12
228:7,8 230:3
230:16 231:20
232:20 245:11
246:7,22
247:10,16
250:15 252:24
268:3 271:18
272:14,19
274:25 275:13
276:8 286:12
286:20 287:23
292:5 304:15
304:16 308:5
309:10,21
310:14,21
313:18 314:5
317:22 351:19
352:17 353:3
360:23 362:13
368:24 369:6

372:9 386:8
396:8,13 401:5
407:1 414:12
**participate**
252:2 253:10
**participated**
130:9
**participation**
153:23 154:10
269:22
**particular**
23:17 55:25
95:14 101:23
102:20 106:20
153:24 154:11
173:12 194:15
210:2 213:12
223:6 243:23
271:21 291:11
306:22 322:13
322:24 334:24
347:2 352:4
356:22 361:4
361:25 362:12
379:15 406:24
**particularly**
292:12 309:9
378:15
**parties**   144:9
144:19 146:6
146:21 147:9
298:14
**partnership**
76:1

**parts**   161:22
320:21
**party**   416:14
**pass**   415:23
**passed**   330:14
**passing**   171:17
171:23 172:6
333:15
**past**   72:25
73:10,14,21,23
74:3,9
**pause**   234:16
315:5
**pausing**   86:7
**pay**   29:24 30:3
167:10,18
168:5 183:24
399:12,14,23
400:8 403:16
403:22 404:8
404:10,12,17
404:23,24,24
404:24,25
405:2,19
406:11,14,16
406:16,18
407:3,5 413:10
**paying**   74:6
170:3 184:5
213:5 339:15
**payments**   2:22
403:15,23
404:17 405:5
405:20

**pays**   165:24
166:7,20
339:20
**peachtree**   4:9
**peer**   237:18,23
284:1 331:22
332:3 337:15
345:15
**pennsylvania**
1:19,22 2:5,18
9:11
**people**   47:4
51:8 56:9
73:16 75:15
76:7 78:25
82:8,16 83:5
92:19 93:4
119:13 122:22
128:1,5,7
141:22 142:4,7
143:5,12,20
145:24 146:11
156:19 201:5
223:23 240:4
245:25 246:10
251:25 252:13
258:9,13,21
260:11,20,25
261:2,12
268:13,18,23
268:25 269:1
269:10 270:5
271:16 279:11
283:20 285:23

CONFIDENTIAL

**[people - place]**                                                      Page 59

287:19,21
289:10 291:17
291:25 293:20
294:1,8,11,13
294:16 295:10
295:13 298:14
299:13,24
340:6 361:2
364:21 371:4,5
377:2 380:8
387:24 388:18
409:13
**percent** 23:1
25:7 26:17
27:25 59:21
60:6 64:16
70:22 74:25
75:1,6 101:23
102:2 105:23
106:2 253:19
264:8 281:15
282:10 321:4
321:16,20
322:8 326:9
366:19 367:23
368:1,9 377:20
377:21 382:1,4
383:11 389:19
389:24 390:5
390:15,19,22
391:1 403:18
**percentage**
32:6,10 49:8
59:17 62:14

77:6 145:17
176:20 281:17
367:13 391:6
392:5 393:24
**percentages**
33:6 138:7
372:2
**perfectly** 219:6
302:10 304:1
311:13 313:7
378:18
**perform** 53:7
58:11 310:9
327:5 399:19
**performed** 59:6
136:20 352:13
**performing**
51:25 52:5
407:8,18,25
408:8
**period** 23:11
54:7 63:13,21
63:24 185:21
200:25 220:21
373:2,16
374:18 394:2,4
398:22 399:3
399:12 400:9
414:18
**periods** 58:17
268:24
**perks** 232:16
**perpetuity**
224:3

**person** 32:23
47:2 79:15,19
140:15 172:3
247:20 261:1,3
263:1 279:3,4
279:18 280:12
295:17 387:9
415:25
**person's**
263:19 264:11
**personal** 1:5
9:12 173:5
302:23
**personally**
61:12,23 93:4
93:9,15 115:10
116:24 117:6
127:20 249:16
251:3 252:18
307:19
**personnel**
186:20
**perspective**
197:22 198:11
215:2 298:15
**persuade**
410:15
**pew** 348:8,10
348:21 349:11
**pgreen** 4:11
**phd** 1:16 9:17
9:23 420:2
**phenomenon**
260:10 280:17

**phil** 395:20,25
396:5
**philadelphia**
2:18
**philip** 4:8
**phone** 65:23
98:2 272:24
273:1,13,15
349:22 350:10
350:16,19
351:1,5,10
**phones** 112:14
112:22 113:6
273:9 274:2,15
348:13 349:13
349:20
**photos** 144:8
144:19 146:5
**phrase** 282:5,8
**phrased** 282:3
282:21,22
**phrasing** 181:7
**physical** 149:5
149:17 150:1
**pick** 361:3
**piece** 348:3
414:3
**pinterest** 83:7
83:10 408:25
**place** 34:6
122:24 285:17
337:2 412:12
414:9

[places - positions]                                                    Page 60

| places 186:10 | 122:1,7 124:4 | 342:19 343:5 | 304:3 362:16 |
|---|---|---|---|
| plaintiff 124:23 | 126:20,22 | 384:4 416:12 | 362:23 364:25 |
| plaintiff's | 127:1,17,18 | 418:3,8 | 365:8,22 366:5 |
| 30:18 | 128:2,13 | plus 235:5,12 | 377:21 393:23 |
| plaintiffs 2:8 | 129:13,25 | 399:9,14,25 | populations |
| 3:17,21 4:6 | 130:16 131:18 | 400:2,8,12,14 | 365:13 366:13 |
| 43:22 44:1,10 | 132:9 133:18 | 400:18 | portion 23:17 |
| 46:6,7,12,14,21 | 134:14 135:1 | pocket 169:10 | 147:6 159:1 |
| 50:13,24 51:20 | 135:17 136:4 | 169:15,18,21 | 212:19 213:18 |
| 55:16 56:22 | 138:25 139:17 | point 49:8 | 236:9,11 312:8 |
| 57:23 77:8 | 140:12,22 | 53:13 57:7 | 312:11 |
| 108:25 109:8 | 141:6,15,20 | 73:22 74:3 | posed 329:9 |
| 109:21,25 | 142:13 144:9 | 86:7 135:12 | posit 217:2 |
| 110:22 111:4 | 144:20 146:6 | 170:13 172:13 | position 45:19 |
| 111:10,14,24 | 147:10 148:9 | 224:7 269:1,15 | 72:9 101:23 |
| 121:21 185:18 | 148:20 149:5 | 312:3 321:7,23 | 102:2,20 106:1 |
| 226:5 293:2 | 150:12,21 | 330:12 351:15 | 106:20 120:1,5 |
| 294:3,9,14,25 | 154:21 155:5 | 354:10 375:5 | 233:8 370:25 |
| 295:4,21 296:7 | 155:15,25 | 376:1 386:9 | 371:2 373:2,16 |
| 296:17 297:1 | 158:6,16 | 410:23 | 374:8,18,22 |
| 298:19 363:3 | 166:23 167:17 | pointed 68:16 | 381:25 |
| 364:16,23 | 167:21,24 | points 69:25 | positions 90:20 |
| 365:6,15,21 | 168:4,6,25 | 267:19 313:9 | 90:22 98:17 |
| 366:4,17 | 336:17 337:8 | 375:24 | 99:13 102:7 |
| 405:21 406:1 | 346:7,24 355:3 | policies 350:22 | 103:24 106:7 |
| plans 147:22 | 408:20 | policy 70:14 | 110:24 113:16 |
| platform | plausible 320:9 | 75:9,12,22 | 113:24 118:16 |
| 147:21 151:15 | play 91:19 | poll 348:4,6 | 118:22,24 |
| 152:6 153:14 | 92:10 | poorly 254:15 | 119:22 120:2,3 |
| 220:7 361:12 | playing 151:10 | 255:17,22 | 120:6,13 |
| 361:13 362:1,3 | 151:12 190:4 | 257:1 | 145:24 287:20 |
| 362:7 408:23 | please 10:14,17 | population | 291:18 297:16 |
| platforms 2:20 | 17:22 54:13 | 241:23 242:19 | 297:18,24 |
| 81:21 84:10 | 311:9 340:21 | 246:13 248:10 | 298:10,11 |

**[positions - principals]**                                                    Page 61

313:2 363:9,11
364:4 365:12
378:21 379:2
381:15,19,20
382:18
**possibility**
155:22 275:5
298:18 372:16
373:6
**possible**   121:13
130:21 177:2,3
177:11 218:19
226:21 228:9
228:24 229:16
230:12 263:10
267:10,21
273:11,18
274:18 276:11
296:16 314:16
314:24,25
333:3,8,9,19
360:14 361:10
361:18 364:15
373:17 376:10
382:3,8 383:10
383:16
**possibly**   303:16
**post**   72:10
149:4,16,25
268:11 409:13
**posted**   144:8
144:19 146:5
146:20 147:9

**posters**   413:15
**posting**   214:8
214:15 220:5
**postulated**
256:2
**potential**
239:20 252:12
254:5 261:16
263:6 324:6
362:8
**potentially**
127:25 301:13
301:24 350:1
359:22 372:6
**powers**   278:13
**practical**   187:2
**practice**   187:3
279:2
**practices**
279:10
**precise**   140:24
203:21 209:4
238:5 241:19
242:14 243:6
243:14 269:19
324:8 373:24
373:25
**precisely**   131:1
280:7 373:22
**precision**   242:9
242:20 243:12
244:4,8,17
254:9 257:6
300:1

**prefer**   38:18
**preferences**
232:25
**prep**   63:3,8
**preparation**
27:22 28:24
**prepare**   69:3
69:10,23 70:2
**preparing**
26:13 51:21
**present**   3:7
185:5 235:3
253:18 279:2
**presentation**
75:18 415:8
**presentations**
41:23 80:6
**presented**
279:15 294:15
414:25
**presenting**
78:22 279:16
**presidential**
260:12,21
**press**   345:7,14
345:18 346:2,5
**presumably**
122:19 130:5
167:1 171:12
280:22 292:14
305:19 335:12
343:15 376:22
386:7

**presume**   323:6
344:5
**pretty**   35:7
36:23 53:24
65:24 66:14,24
120:12 121:4
218:15 235:17
263:15,23
296:25 308:4
309:7 325:16
347:22 349:1
392:16
**previous**
260:21 261:13
**previously**
71:14 78:15
79:2 81:9
268:4 272:17
376:25
**price**   185:10
**principal**   119:9
220:4,18,19,21
220:23,25
224:1 387:10
392:10
**principals**
32:21,21 119:7
119:7 223:3
271:11 298:3,7
370:1,1,16,16
371:20,21
372:3,4 388:4
388:10,10,14
389:5,10,11,12

**[principals - provided]**                                      Page 62

389:18,18
390:4,4,13,14
390:21,22
391:3,3,9,9,24
391:24 392:9
**principles**
224:19
**printed** 348:25
**prior** 77:22
78:2,6 79:10
79:23 80:10
81:8 260:12
270:13,22
271:10 272:13
411:9 412:15
**private** 76:2
343:19
**prize** 271:12
**probable**
229:16
**probably** 53:12
59:15 63:10
127:22 172:12
173:17 175:8
177:14 189:20
237:25 264:25
265:12 277:15
315:1 330:24
345:17
**problem**
171:24 245:10
254:17
**problems** 163:9
163:22,25

164:15,21
165:4,10
**proceedings**
417:4
**process** 33:13
33:19,24 34:10
34:11,16 35:20
45:9 215:13
273:10 285:11
286:1,15,23
287:2,4,8,10,15
327:12,13
**proctoring**
207:7,14,17
208:11 210:25
211:12 212:16
213:15
**produce** 181:2
184:16 186:24
241:9 347:9
**produced**
43:21,25 44:8
46:12 180:2
**production** 8:7
**productive**
223:4
**products** 1:6
9:13
**professional**
1:20 243:18
246:18 417:15
**professor** 72:14
72:16,18

**profile** 56:13
**profit** 181:6
**program** 29:11
49:4 80:21,24
81:6 411:12,13
411:15,17,18
411:19 412:2,3
412:9,17,19,21
412:25 413:2
413:10,21,25
414:9,23
**programs** 69:6
78:18 215:15
219:3
**project** 271:12
271:14
**projects** 65:19
66:4 79:4
**promotion**
153:22 154:9
**prompted**
19:20 26:10
27:19 32:25
**proper** 221:8
**properly** 216:2
217:19
**proportional**
182:21
**proposition**
330:3
**propounded**
420:6
**protecting**
175:24

**protection**
36:12
**protective** 1:14
**prove** 265:24
**provide** 31:4
43:15 44:1,11
48:10 50:25
53:3 58:1
66:16 90:13
94:4 114:17
116:17 118:2
130:13 136:8
145:19 148:4
195:5,19
196:14 200:20
204:18 209:9
239:22 247:17
247:20 262:11
262:17 265:19
266:9,17
269:11 278:19
280:9 281:3,5
281:22 291:5
291:21 294:8
295:5,22 296:8
298:23 308:2
316:11 324:12
340:2 341:13
388:4,9 389:5
395:6,12
397:10 413:4
**provided** 18:5
30:2,23 33:8
35:12 44:14

**[provided - purposes]**                                      Page 63

| | | | |
|---|---|---|---|
| 46:7,13,20 | 292:10,14,17 | 202:11,19 | 283:25 |
| 79:13 92:20 | 292:20 293:20 | 204:25 205:13 | **published** |
| 93:6 94:1,9,15 | 294:25 295:11 | 205:25 206:9 | 238:15 271:1 |
| 100:7,12,18 | 296:17 298:6 | 206:17,25 | 343:14 409:8 |
| 101:2,6,13 | 298:19 300:9 | 232:22 233:13 | 413:22 414:1 |
| 103:25 104:14 | 301:4,15 302:4 | 243:11 249:12 | 414:15,22 |
| 104:23 105:4 | 303:7 304:8 | 256:10,20,23 | **publishing** |
| 108:5 109:5,11 | 311:12 312:25 | 258:9,12 268:6 | 337:19 |
| 109:13,16 | 316:14,24 | 281:20 287:5 | **pull**  224:12 |
| 110:8 111:2,11 | 318:2,10 319:9 | 287:23 289:12 | **purported** |
| 112:5,9 113:1 | 329:7 341:1 | 291:2 292:5 | 334:15 |
| 114:2,12,22 | 342:11,13 | 303:20 305:21 | **purpose**  178:11 |
| 115:1,6,12,20 | 358:21 362:25 | 317:8 339:25 | 271:8 302:25 |
| 115:25 116:22 | 364:23 365:6 | 371:5 | 330:20 |
| 117:1,7,13,18 | 365:15,20 | **prussia**  1:18 | **purposes**  68:22 |
| 118:25 121:1,8 | 366:3,24 | 2:5 9:10 | 94:21 101:16 |
| 127:9,13 | 370:18 371:17 | **psychologist** | 105:14 109:17 |
| 128:24 136:11 | 372:22 373:12 | 205:11 | 110:17 111:7 |
| 139:7 140:6,10 | 378:21,25 | **psychologists** | 111:18 112:2 |
| 141:10,12,13 | 382:14 383:11 | 43:7 388:13 | 116:4,8 117:21 |
| 141:19,23 | 387:9 397:2,18 | 393:3,8,12,16 | 132:19 143:6,9 |
| 142:11,24 | 397:23 398:11 | 394:5,7 | 143:15 145:7 |
| 143:5,13,20,22 | 402:25 405:15 | **public**  1:21 | 145:11,15 |
| 145:16,16 | 406:4 407:24 | 80:8 326:14 | 146:1 173:19 |
| 160:23 188:16 | 408:17 409:1 | 327:1,7,20 | 180:4 211:8 |
| 208:25 237:11 | 415:7 | 328:10 329:18 | 226:23 227:13 |
| 242:11 247:7 | **provides**  53:18 | 331:3 332:4 | 227:24 237:6 |
| 249:10 250:2,7 | 118:10 145:12 | 333:24 420:20 | 247:21 250:12 |
| 251:15 263:12 | 342:1 367:21 | **publication** | 272:9 278:4 |
| 280:13 281:8 | 389:10 | 414:11,14 | 283:14 290:23 |
| 283:19 284:14 | **providing** | **publicly**  46:16 | 291:7 302:2 |
| 284:18,24 | 119:6 126:14 | 80:1 415:2 | 310:24 311:20 |
| 285:7 290:12 | 196:8 197:3 | **publish**  237:17 | 339:5 340:19 |
| 291:25 292:1 | 199:24 200:13 | 237:23 238:10 | 340:25 365:24 |

[purposes - read]                                                    Page 64

367:16,22
368:18 371:2
382:25 403:18
406:9
**pursuant**  1:14
**pursue**  272:1,2
**pursuit**  272:6
**purview**  203:13
203:23
**push**  224:12
**put**  90:17 170:7
183:10 185:3
221:23 222:13
237:25 238:10
243:15 264:14
271:7 345:17
372:7 373:7
390:14 413:8
**putting**  344:15

**q**

**qualified**  276:3
276:12,18
277:1,7
**qualifies**
127:20
**quality**  33:12
33:22,24 34:9
**quantified**
332:7,10
**quantify**  147:5
158:25
**quantitative**
290:18

**question**  8:10
10:15,16 44:16
53:13 58:20
61:20 75:12
89:15 90:9
92:25 94:13
114:9 121:20
121:23 123:12
123:18,19,20
125:14 126:13
132:4,25 133:8
133:9,12,16
135:11 136:17
138:1,13,18
139:24 140:1
142:4,6 144:13
144:25 149:11
159:13 162:17
180:16 184:25
192:3,8 198:10
200:17 209:22
210:4,9,13
211:6 226:9
227:9 228:21
229:9 230:3
231:18 234:2
234:12 235:8
236:23 243:20
246:20 249:25
253:5 257:1
280:11 281:5
282:20 284:16
310:5 311:7
318:20 320:17

323:13 329:8
332:4 337:5
339:7 340:13
340:20,21
342:14 343:1
347:5 350:14
379:25 380:11
380:21 388:6
405:12
**questions**  10:8
50:1 75:22
91:24 92:3
122:25 123:2,7
123:17,21
124:3 125:8,15
131:14 133:24
136:15 137:17
142:22 234:3
239:24 241:19
251:1 254:14
255:16,22
262:20 266:2
268:13,18,20
268:22 269:17
269:18,21
279:12 342:4
344:12 364:19
416:1,2,5,9
420:6
**quicker**  35:5,25
**quite**  31:9
216:22 218:4
**quote**  87:3
287:14 404:2

**quoted**  334:25

**r**

**r**  417:1 419:2,2
**radcliffe**
268:14
**radnor**  1:18 2:5
9:10
**random**  76:7
**randomized**
414:17
**rang**  282:22
**range**  325:18
326:8
**rate**  58:12 59:3
59:9 61:12
62:1 246:14,21
246:24 247:5
247:13 251:6
368:19
**rates**  58:16
251:18
**raw**  29:4,5
93:21,23 94:4
94:9,14,17
**reached**  56:24
**reaching**  33:24
46:4 250:18
291:12
**read**  123:2,16
123:21,24
131:1,2 160:2
222:7 282:25
285:1 288:2

290:10 418:3
420:3
**reading**  100:20
172:18,19
250:18 285:24
**ready**  156:24
**real**  66:18
232:14 245:23
280:17
**reality**  261:4
**realize**  28:25
**really**  54:8
57:10 82:7
130:1 131:12
209:25 257:12
347:19 406:20
**reask**  58:19
61:20 359:6
**reason**  66:7
109:16 151:15
152:17 235:13
241:2 243:10
271:23 383:17
395:11 418:5
**reasonable**
209:6 219:6
248:11 262:11
262:17 266:4
286:1,14,23
287:3,4,8,10,14
287:17 288:6
295:13 302:11
304:1,15
311:13 313:7

313:15 315:1
367:22 378:19
**reasonableness**
292:24
**reasonably**
120:2,5
**reasons**  17:13
30:24 239:6
250:24 376:24
**reaves**  3:3
416:5
**rebuttal**  384:22
**recalculate**
94:7,16
**recall**  31:24
42:19 46:22
50:11 54:4,10
66:6 73:3,21
74:1,16 77:25
80:9 119:2
121:12 164:17
166:16 250:10
270:8,24
285:21 289:8
289:17 290:14
316:21 354:8
364:12 376:18
377:23 381:4
386:10
**recalled**  270:12
270:21
**receipt**  418:15
**receive**  50:5
51:18 68:21

178:25 179:6,7
180:22 288:4
406:25
**received**  42:23
50:12,24 57:13
72:21,25 73:14
74:9 118:17,23
210:11 294:20
299:12,23
363:2 370:14
372:25 395:9
397:15 398:12
403:5 405:18
405:21,25
**receives**  177:23
179:25 180:1,7
181:4 183:15
**receiving**  184:5
**recently**  410:14
**recess**  86:16
162:25 234:23
315:14 383:24
415:16
**recheck**  34:6
**recollection**
140:23 278:22
330:13
**record**  9:2,19
37:14 41:1
48:17 86:12,14
86:19 133:6
162:23 163:3
168:2 234:21
235:1 259:13

315:10,12,17
355:22 383:22
384:2 415:12
415:14,19
416:8,14,18
**records**  290:2
290:19 291:2
**recover**  182:15
182:17 184:17
185:18 212:1
**recovering**
184:13
**recruit**  411:21
412:6,8
**reddit**  82:4,7,9
82:15
**reduce**  221:15
349:18
**reduced**  403:17
**reduction**
135:8
**refer**  17:3
98:25 99:1,2
182:18
**reference**  380:6
**referred**  47:22
314:17 412:14
**referring**  17:5
18:3 182:19
**refind**  330:15
**reflect**  93:11
137:10 160:20
164:5 400:1

CONFIDENTIAL

**[reflects - relevant]**                                                    Page 66

| | | | |
|---|---|---|---|
| **reflects** 391:18 | 188:23 189:2 | **relating** 27:10 | 204:18,25 |
| **regarding** | 189:11 191:14 | 30:19 52:1 | 205:14,25 |
| 30:23 34:9 | 193:21 196:3,9 | 58:8 59:2 | 206:10 216:1 |
| 200:13 208:24 | 200:18 202:16 | 60:22 61:1 | 223:15 237:20 |
| 241:24 246:14 | 202:23 204:9 | 74:19 75:7,22 | 254:25 265:3 |
| **regardless** | 204:15 206:6 | 79:4 80:2 | 278:6 281:16 |
| 214:12 | 206:14,22 | 90:22 91:5,7 | 281:19 284:3 |
| **region** 376:20 | 207:4 209:11 | 91:14 95:25 | 317:3 318:7 |
| 379:19 | 209:15 212:3 | 96:19 97:15 | 319:15 320:4 |
| **regional** 370:23 | 212:21 213:20 | 98:17 99:12,25 | 321:9,25 |
| 376:13 379:17 | 221:15 231:8 | 102:10 103:5 | 323:16 327:18 |
| **regions** 371:8 | 274:3,15 | 103:16,24 | 333:6,24 346:1 |
| 371:21 375:16 | 300:13,20 | 104:8 106:3,10 | 346:6,23 |
| 375:17 376:6,7 | 301:9,20 302:9 | 106:21 107:5 | 349:20 352:13 |
| 376:15 377:3 | 303:13,23 | 111:18 112:14 | 352:14 367:3,8 |
| 377:11,13,14 | 304:10 305:11 | 112:15,22,23 | 391:8,23 |
| 377:22 378:7,8 | 315:22 316:6,9 | 113:6 118:10 | 393:11 411:10 |
| 378:16,17 | 316:13 317:24 | 126:9 128:10 | 412:24 413:23 |
| **registered** | 318:1,12 319:2 | 128:12 129:12 | 415:5 |
| 417:15 | 319:3,20,24 | 129:25 131:18 | **relation** 79:3 |
| **regular** 308:8 | 321:5,14,18,21 | 132:23 133:2 | 265:1 |
| 330:12 404:9 | 325:4 333:12 | 136:22,25 | **relationship** |
| **relate** 80:13 | 333:15 354:17 | 137:1 140:11 | 56:11,15 |
| 132:7,8 147:6 | 354:24 355:3,7 | 140:21 144:5 | **relative** 312:22 |
| 159:1 234:13 | 355:15 372:5 | 144:16 150:9 | **relatively** 35:3 |
| 386:3 | 385:24 386:16 | 150:18 156:11 | 36:1 |
| **related** 57:4 | 390:6,23 393:2 | 156:16 157:9 | **release** 345:7 |
| 78:11,14 79:12 | 393:7 394:6 | 157:20 158:5 | 345:14,19 |
| 79:25 80:12 | 399:7,8 407:13 | 158:15 163:8 | 346:2,6 |
| 95:16,20 96:8 | 407:22 408:4 | 163:21,24 | **relevant** 113:24 |
| 101:24 102:3 | 408:13 | 165:2,9 182:23 | 212:12 223:6 |
| 102:21 105:24 | **relates** 1:9 | 194:21 195:6 | 231:22 235:18 |
| 122:13 128:20 | 62:15 128:11 | 195:19 196:15 | 245:12 286:1 |
| 182:10 188:16 | | 197:4 199:24 | 298:14 309:9 |

**[relevant - remember]**                                                                 Page 67

313:11 316:12
317:9,11,15,20
327:16 355:23
360:11,24
371:7 376:4
396:11 413:14
**reliability**
240:13,23
304:13,14
**reliable**   53:15
94:23 95:9
96:2,3 97:13
101:19 102:12
102:13 103:14
105:17 106:12
106:14 107:13
114:17 115:2
115:13,18
116:17 117:2,8
117:11 118:2,8
128:24 132:18
146:1 241:3,9
242:1,7 243:21
246:16,21
248:20,23
251:8 267:18
304:11 317:2
318:6 319:14
320:3 321:8,24
323:10,17
338:7,16 339:3
339:9,22 340:4
340:15,18,24
341:4 342:16

342:21 343:7
344:5,21,22
347:6,12,22
378:7 382:16
407:24
**reliably**   277:18
322:11,21
**reliance**   237:20
240:11 284:3
303:25
**relied**   18:5 46:4
92:6,14 94:3
101:12 105:10
108:23 109:3
111:12 114:1
114:11,16
115:24 116:3
116:12,16
117:17,22
118:1,3,9
119:13 126:12
134:19 138:22
139:6,14
140:10 146:13
161:4,12 248:1
284:13,17,23
285:6 291:10
293:19 294:2
300:17 305:12
315:20 316:7
329:15 334:7,8
335:23 346:19
346:22 349:12
362:24 363:15

363:22 364:7
365:19 366:2
369:9 370:2
381:10 384:10
386:23 387:24
402:18
**relies**   401:8
**rely**   48:13
79:13 85:17
91:2,7 97:14
97:19,20 98:19
99:14 103:15
103:24 107:14
110:20 133:22
143:6,13
161:25 214:10
220:9 240:18
244:10,22
253:21 286:6
287:18 288:7
290:24 291:8
323:12 340:25
341:22 342:1
345:3,7,15
346:2 348:7,11
366:16 367:4,9
369:19 384:16
387:4 388:18
395:18 396:3
397:22
**relying**   95:22
98:7,12,15
142:20,21
145:18 208:2

237:5 238:22
240:9 241:22
243:24 244:1
246:12 267:16
267:16 283:13
283:18 286:4,4
292:16,24
316:10 341:17
341:22 342:7
342:11 348:2
367:20
**remained**
333:10
**remaining**   64:2
376:7
**remains**   333:4
**remember**   25:9
32:13,14,23
50:10,19 59:11
67:24 68:9,14
69:20 73:6,8
74:2 77:5 78:5
80:3,17 93:1
121:17 164:8
268:17 269:23
270:9,15
289:16 305:7
327:24 328:2
330:17 332:1
335:13 348:16
370:9,24
375:22 381:18
382:24 387:12
398:14 412:10

**[remember - requirement]**                                         Page 68

413:17,18
414:6 415:7,10
**reminded**
68:12
**reminder**   10:14
**remote**   3:11 4:1
**removal**   28:18
**removed**   308:4
**replaced**
333:14
**replicated**
94:11
**reply**   5:17,18
5:20,21,23,24
14:19,23 15:3
15:7,12,16,21
15:25 16:5,9
16:14,18 62:25
385:18
**report**   5:8,9,11
5:12,14,15,17
5:18,20,21,23
5:24 6:1,3,4,6,7
6:22 10:24
11:3,9,12,12,18
11:25 12:5,16
12:20 13:1,4,8
13:14,17,20
14:1,4,7,13,14
14:19,23 15:4
15:7,13,16,22
15:25 16:6,9
16:15,18 17:9
17:21 18:1

20:4,5,9,9,16
20:21,25 21:5
21:10,15,20,25
22:4,10,14,24
23:2,8 24:2,2,4
24:12 25:8,15
25:19 26:18
27:6,9 28:1
29:14,15 31:16
31:19,21 32:1
33:2 63:18
65:12 66:2
68:23 75:17
76:3 97:8
98:15 101:9
117:3 124:14
124:20 125:1,6
125:13 126:15
131:2,4,5,14
208:4 239:12
248:22 250:7,9
250:10,19
260:25 268:25
269:2 321:16
326:19 328:7
335:2,9,25
336:15 337:6
338:4 339:6
340:18,25
348:13 349:14
360:10 363:6
363:17 369:13
381:14,21
384:6,22

385:12,13,18
385:23 386:21
390:9 391:2,17
392:20 395:16
397:1,6 398:20
399:1 401:2,4
401:4,8,16
402:16 406:8
**reported**   93:17
95:13 100:15
116:12 117:23
152:18 227:3
238:22 239:3,7
239:21 240:12
240:24 250:9
325:1 327:14
347:21 401:15
407:7
**reporter**   1:21
9:20 417:15,24
**reporting**
256:12 335:6
338:11
**reports**   16:25
17:1,17 19:15
19:21 22:18,20
30:19,25 33:14
37:10 41:4,7
51:21 57:18
58:6 59:3
62:25 63:6
64:8,18,22
65:2 66:10,13
69:5 80:1,4,7

93:11 98:24,25
101:7 135:13
151:16 262:9
268:3 286:9
289:14 312:6
324:2,12
326:12 336:3
345:19 346:6
346:22 359:14
360:1,15 402:3
**represent**   10:6
263:13 347:15
371:12 400:11
**representing**
345:12 378:18
**represents**
389:23
**reprimand**
147:24
**reproduction**
417:22
**repute**   344:10
**request**   8:7
44:23,24 46:6
**requested**
42:21 45:3
115:7 395:7
**require**   287:15
290:25 291:9
**required**
220:20 267:1
291:15
**requirement**
291:5

CONFIDENTIAL

**[requires - right]**                                                Page 69

| | | | |
|---|---|---|---|
| **requires**  412:4 | 239:16 242:7 | **responsive** | 367:9 |
| **requiring** | 246:14,21,24 | 209:22 | **retained**  55:15 |
| 223:25 354:15 | 247:5,12,25 | **rest**  64:14 | 55:19 56:1 |
| 354:22 355:13 | 251:6,17 | 377:7 | 57:2 340:9 |
| **research**  51:25 | 259:24 281:6 | **restarted**  68:11 | 343:13 |
| 53:22 72:5,15 | 281:21 329:8 | 68:17 | **retirement** |
| 278:25 338:19 | 351:14 368:1 | **restate**  92:25 | 232:13 |
| **resource**  219:9 | 368:19 | **restricting** | **retrospectively** |
| 219:17 | **responses** | 375:25 | 268:13 |
| **resources**  81:7 | 92:21 93:6 | **results**  34:4 | **return**  418:13 |
| 186:17 213:9 | 104:15,24 | 67:5,17,22 | **review**  271:4 |
| 221:23 224:21 | 105:16 106:13 | 68:6 91:8,11 | 288:11,16,21 |
| **respect**  167:23 | 107:11 111:15 | 93:10 94:8,22 | 289:5 327:6,12 |
| **respectfully** | 111:25 239:22 | 95:8 96:3 | 327:13 346:9 |
| 123:20 | 241:25 242:16 | 109:10 110:2 | 348:15 |
| **respond**  369:3 | 242:19 243:21 | 126:12 131:3 | **reviewed**  69:5 |
| **responded** | 244:1,13,25 | 131:16 138:6 | 100:25 101:4 |
| 92:19 93:5 | 245:6,8,15,17 | 241:22 242:1 | 160:23 164:13 |
| 367:13,18,24 | 247:4 251:5 | 244:12,24 | 164:19,23 |
| 368:2,10 369:1 | 256:10,20 | 246:12,15 | 237:18,23 |
| **respondent** | 258:10 | 247:11,24,25 | 278:5,12 284:1 |
| 257:3 | **responsibilities** | 248:19 249:3 | 288:19 291:1 |
| **respondents** | 170:10 173:4 | 249:13,18 | 331:22 332:3 |
| 239:21 256:9 | 173:11 195:5 | 251:7 253:17 | 337:15 338:2 |
| 256:20,22 | 202:25 203:8 | 254:6,14 | 345:15 378:11 |
| 258:24 259:23 | 204:17 223:19 | 255:16 256:9 | 380:7 |
| 267:11,22 | **responsibility** | 256:19 258:9 | **reviewing** |
| 316:15 341:15 | 170:24 171:6 | 261:21 262:10 | 19:23 26:12 |
| **responding** | 171:15 172:16 | 262:16 265:18 | 27:21 28:23 |
| 163:19 208:8 | 174:9 175:1,13 | 266:8,16 | 33:4 104:25 |
| 239:24 264:25 | 205:2 | 270:25 279:15 | 289:2,2 308:7 |
| **response**  30:23 | **responsible** | 279:21 336:22 | **rice**  3:18 |
| 104:1,5 106:17 | 229:24 230:10 | 341:23 343:13 | **right**  10:25 |
| 107:1 130:14 | 230:22 231:12 | 348:4,6 367:4 | 13:17 14:15 |

**[right - salaries]**                                                          Page 70

| | | | s |
|---|---|---|---|
| 18:16,19 24:4 | 245:24 248:2 | 398:14 399:21 | **s**  2:10 3:14 5:5 |
| 30:8 31:10 | 248:13 253:25 | 413:2,10 | 19:8 34:22 |
| 34:22,24 44:20 | 254:17 255:23 | **risk**  244:11,23 | **sabrina**  369:10 |
| 46:8 48:22 | 257:9,10,14,15 | 273:22 274:9 | 381:10 |
| 54:16 57:24 | 257:16,18,22 | 293:14 | **safe**  412:20,24 |
| 60:3 62:7,10 | 257:25 258:4 | **road**  1:18 2:5 | 413:1,24 414:8 |
| 63:1,11 64:3 | 258:15,16,20 | 3:14 9:10 | **safety**  229:23 |
| 66:15,24,25 | 262:13,21,23 | **robert**  6:22 | 230:9,21 |
| 74:15,23 78:4 | 262:25 263:3 | 67:6,18,23 | 231:11 |
| 104:9 113:16 | 264:19,20,21 | 91:9 124:13 | **salaried**  165:12 |
| 116:5 119:16 | 265:9,11,13 | **robin**  1:20 9:20 | 165:16,20 |
| 123:17 125:9 | 268:17 271:17 | 417:15 | 166:13 |
| 127:24 132:12 | 272:3 281:3 | **roblox**  83:23 | **salaries**  43:3 |
| 132:16 138:15 | 282:18 287:19 | 83:25 | 45:7,23 90:19 |
| 145:1,23 160:3 | 289:11,13,21 | **role**  91:19 | 91:14 95:25 |
| 169:21,23 | 293:24,25 | 92:10 248:13 | 96:19 97:15 |
| 173:16,23 | 307:22 308:2,3 | **roles**  297:10 | 100:1 102:10 |
| 181:1,16,20,24 | 309:5,21 311:7 | **room**  69:16 | 103:5,17 104:9 |
| 182:1,24 | 311:11 312:2 | 246:10 412:5 | 106:10 107:6 |
| 184:19 186:8,9 | 312:18,23,24 | **rose**  63:7 | 107:15 113:15 |
| 186:14,18 | 313:13,22 | **roseland**  3:15 | 113:23 114:3 |
| 187:9,22 | 314:9 319:3 | **rosica**  3:9 | 114:13,18,21 |
| 196:20 216:12 | 320:17 321:12 | **roughly**  413:17 | 115:2,12,20 |
| 216:17,25 | 325:19 326:9 | 414:11 | 116:5 166:25 |
| 218:12,13,17 | 328:13 337:3 | **rubin**  56:6,11 | 167:14 235:4,5 |
| 218:21 219:1,5 | 338:10,24 | 56:16,23,24 | 235:10,11,11 |
| 219:12,17,25 | 341:7 342:2 | **rule**  343:17 | 236:7,11 |
| 221:11 222:6 | 344:15 345:8 | **rules**  10:13 | 324:20 362:14 |
| 222:18,22,23 | 348:5 353:19 | **run**  74:4 | 362:21 363:23 |
| 223:7,24 224:4 | 354:7,11 | 416:13 | 364:8 366:19 |
| 224:7,13 225:5 | 374:11 375:10 | **running**  29:11 | 367:3,8 394:5 |
| 225:15,16 | 379:15,16 | 59:23 79:20 | 395:6 402:19 |
| 233:7 235:25 | 381:15,19 | **rural**  72:5 | |
| 242:24 243:6 | 390:11 393:17 | | |

CONFIDENTIAL

**[salaries - sandoval]**                                    Page 71

| | | | |
|---|---|---|---|
| 402:21 | 22:7,17 30:15 | 140:17 141:16 | 201:22 202:6 |
| **salary** 19:12,12 | 35:18 36:3 | 143:3 144:3,14 | 203:6 204:1,24 |
| 42:24,25 43:9 | 38:1,7,15,19 | 145:8 146:16 | 205:8,22 |
| 43:11,16 45:20 | 39:5,16 40:2 | 147:3,15 | 207:13 208:7 |
| 116:8 118:17 | 40:13,24 44:6 | 148:16 149:1 | 209:20,24 |
| 118:22 119:12 | 46:2 47:15 | 149:13,22 | 210:17 211:7 |
| 119:23 120:17 | 48:23 50:21 | 150:7,16 151:5 | 211:24 212:14 |
| 120:21 121:3 | 51:6,17 55:1 | 152:1,12 153:9 | 213:13 214:5 |
| 121:11 138:8 | 55:14 60:4,12 | 153:19 154:4 | 215:1,23 216:9 |
| 215:20 219:16 | 60:20 61:18 | 154:17 155:11 | 217:10 218:1 |
| 233:7 393:15 | 66:19 69:2 | 155:21 156:8 | 220:16 221:7 |
| 395:12 403:17 | 82:13 83:6 | 156:25 157:6 | 221:20 222:2 |
| 404:8,14 | 85:8 86:11,20 | 157:17 158:2 | 224:22 225:19 |
| 405:18 407:1,6 | 88:1,12,24 | 158:12,23 | 226:11,22 |
| **salmon** 369:11 | 89:9 90:15 | 159:19 160:1 | 227:23 228:23 |
| 369:15,21 | 91:18 93:2,22 | 162:20 163:4 | 229:18 230:4 |
| 381:10 | 95:2,6 97:1,24 | 163:16 164:11 | 230:18 231:5 |
| **sample** 238:6 | 100:5 102:17 | 167:7 171:4 | 232:1,7 233:1 |
| 242:13,25 | 103:11,21 | 172:1,14 173:1 | 233:19 234:4 |
| 243:2,5,9,10,17 | 104:12,20 | 174:7,24 | 234:19 235:2 |
| 243:25 244:11 | 105:21 107:22 | 175:11 176:2 | 236:21 237:16 |
| 244:23 245:4 | 109:7 110:13 | 176:17 177:20 | 239:2,14 240:5 |
| 257:6,21 300:1 | 111:23 115:9 | 178:6 179:12 | 240:22 241:10 |
| 325:10,12 | 115:16 118:14 | 180:3,14 182:4 | 241:21 242:5 |
| **samples** 242:23 | 123:15 124:8 | 183:22 186:2 | 244:9,19 |
| 243:4,14 | 124:18 128:8 | 188:8 189:12 | 246:11 249:1 |
| **sampling** 326:1 | 129:9,22 | 190:1,10 191:1 | 249:14 250:1 |
| **sandoval** 2:10 | 130:20 132:1 | 191:17 192:4 | 250:16 251:2 |
| 5:3 10:2,6 11:7 | 132:11,21 | 192:20 193:4 | 251:10,20 |
| 11:16,22 12:24 | 133:15 134:9 | 194:1,16 195:3 | 252:17 253:1 |
| 13:12,24 14:11 | 134:21 135:9 | 195:15 196:1 | 253:16 254:11 |
| 15:2,11,20 | 135:23 136:18 | 196:24 197:12 | 256:6,16 |
| 16:4,13,22 | 137:11 138:19 | 198:8 199:3,15 | 259:12,21 |
| 21:3,13,23 | 139:11,22 | 200:10 201:6 | 260:5,18 |

**[sandoval - school]**                                    Page 72

| | | | |
|---|---|---|---|
| 261:10 265:16 | 346:17 348:24 | 250:11 254:20 | 79:22 80:25 |
| 266:6 267:8 | 350:6 351:13 | 257:3 264:16 | 86:24 87:2,11 |
| 273:5,21 274:8 | 353:13 354:5 | 294:15 306:3,9 | 87:14,18 88:7 |
| 275:2,14 276:1 | 356:5 358:23 | 344:17 347:12 | 88:14 89:3,11 |
| 276:10 277:8 | 359:24 360:13 | 352:1 373:23 | 90:5,18 95:13 |
| 278:3,15,23 | 361:9,22 364:5 | 378:5 379:14 | 96:17 98:18 |
| 279:13 280:3 | 364:14 366:14 | **says**  29:5 127:1 | 103:3,22 |
| 281:1,12 282:1 | 367:1 368:8,15 | 127:9,10 | 105:23 107:3 |
| 283:24 284:12 | 368:23 370:12 | 130:10 248:7 | 107:25 108:16 |
| 286:19 288:8 | 372:24 373:13 | 263:25 310:3 | 113:14 116:13 |
| 288:17 289:3 | 374:5,14 | 326:24 327:4 | 122:2,8 143:12 |
| 290:22 291:23 | 375:13 376:2 | 329:1,6 334:18 | 144:6,17 147:7 |
| 292:7 293:9 | 377:8 378:3 | 336:13 337:23 | 147:23 150:10 |
| 294:23 295:18 | 379:7 380:9,19 | 341:20 389:16 | 150:19 154:21 |
| 296:4,15,24 | 381:7 382:19 | 389:22 404:23 | 155:5,12,16,22 |
| 297:9 299:9,19 | 383:9,19 384:3 | **scarce**  213:8 | 156:1,11,16 |
| 300:16 301:3 | 385:16 387:14 | 214:20 221:23 | 159:9 162:13 |
| 301:14 302:1 | 387:21 389:2 | 224:21 | 163:7 164:14 |
| 303:6,18 305:1 | 392:7,17 | **scenario**  221:4 | 164:20 165:22 |
| 306:1,8 307:15 | 394:21 397:17 | **scenarios**  210:3 | 165:24 166:7 |
| 308:9 309:12 | 402:1 406:2 | **scheduled** | 166:20,24,25 |
| 310:11 311:15 | 407:17 408:18 | 125:21 207:6 | 167:9,10,18,19 |
| 312:4 313:17 | 415:11,20 | **scholar**  328:1 | 168:4,17,23 |
| 314:4,15 315:3 | 416:15 | 331:21 | 169:8 170:16 |
| 315:8,18 | **sandra**  384:12 | **school**  26:22,22 | 172:4,11 |
| 316:23 317:12 | 384:18 | 26:24,25 27:1 | 173:23 175:15 |
| 318:16 319:8 | **satisfied**  247:18 | 27:2,10,11 | 176:5,8,10 |
| 319:22 321:2 | **saw**  173:15 | 31:12 37:2 | 177:4,5,21,23 |
| 322:10,20 | **saying**  44:18 | 43:6,21,25 | 178:5,7,12,18 |
| 323:11 324:11 | 45:25 61:19 | 44:8,25 45:4 | 178:20,25 |
| 331:10 333:21 | 97:6 128:22 | 49:21 50:6,14 | 179:5,13,19,24 |
| 335:21 339:19 | 140:5 169:24 | 57:5 77:15,19 | 180:6,19,21,23 |
| 341:18 343:2 | 170:1 208:21 | 77:24 78:4,8 | 180:25 181:3,8 |
| 344:1 345:1 | 219:21 225:2 | 78:12 79:13,17 | 181:11,16,22 |

CONFIDENTIAL

**[school - seen]**                                                        Page 73

| | | | |
|---|---|---|---|
| 182:9,14 183:4 | 327:20 328:10 | **sciences** 280:18 | 330:2 402:2 |
| 183:5,15,16 | 329:18 331:3 | **scientific** 56:7 | **section** 400:20 |
| 184:5,7,12,15 | 332:4 333:25 | 56:11 | **see** 28:8 30:16 |
| 184:18,23 | 349:17,22 | **scope** 171:2,19 | 38:8 53:19 |
| 189:21 190:11 | 350:9,18,20 | 172:21 174:13 | 87:7 124:23,24 |
| 190:13 193:5,7 | 351:2,4,6 | 177:9 189:18 | 125:13,18 |
| 193:16,23 | 352:18 353:1 | 190:19 192:15 | 126:5 140:18 |
| 196:25 197:2 | 353:23 354:15 | 193:1,14 | 141:18 142:10 |
| 197:15,16,17 | 354:22 355:2,6 | 195:10 200:23 | 160:13,21 |
| 197:23 198:12 | 355:13 369:25 | 201:13 203:19 | 218:24 262:20 |
| 199:5,12 201:7 | 370:15 371:9 | 205:6,17 | 263:7,24 280:1 |
| 201:23 202:25 | 371:20 375:16 | 228:17 231:1 | 282:16 299:8 |
| 203:8,13,17,24 | 379:1 388:12 | 232:19 242:3 | 343:16,17 |
| 204:3,11,17 | 389:9,11,12,17 | 275:20 279:7 | 344:2 352:4 |
| 205:3,9,12,24 | 389:17 390:4 | 307:4 353:11 | 363:7 379:20 |
| 206:8,16,24 | 390:12,13,21 | 354:2 | 380:24 382:9 |
| 207:16 210:6 | 391:2,3,9,24 | **score** 352:5 | 385:20 389:3 |
| 211:25 217:12 | 392:8,9 393:2 | **scores** 351:16 | **seek** 96:17 |
| 217:14 221:16 | 393:8,12,16 | 351:21 352:8 | 103:3 107:4 |
| 223:12 224:24 | 394:7 403:9 | 353:9,17,25 | 223:13 226:5 |
| 225:4,22 226:3 | 404:9 407:11 | **screen** 349:3 | **seeking** 182:15 |
| 226:14,24 | 407:20 408:2 | **scroll** 349:8,9 | 182:16 185:18 |
| 227:15 228:1 | 408:12 411:6,8 | **scrutiny** 288:5 | **seem** 35:24 |
| 229:1,19 230:5 | 411:19 | **sealed** 377:5 | 223:6 282:24 |
| 230:20 231:9 | **school's** 197:21 | **search** 53:16,24 | 314:25 |
| 232:8,17 233:2 | 198:10 | 55:5 327:14,17 | **seemed** 121:4 |
| 233:9,13,21 | **schoolers** 25:23 | 330:13 331:21 | 327:15 |
| 234:6 265:1 | 25:23 | 409:16 | **seems** 33:9 |
| 268:10 273:8 | **schools** 183:24 | **searches** 54:5 | 59:25 60:2 |
| 276:2,12,17,25 | 190:21 191:16 | 54:23 331:20 | 231:17 329:11 |
| 277:1,17,24 | 195:14 202:7 | **searching** | 347:22 378:18 |
| 278:6,12,17 | 412:21,25 | 331:16 | **seen** 30:22 |
| 281:14 285:12 | 413:1,25 414:8 | **second** 12:11 | 125:4,5,6 |
| 326:14 327:1,7 | | 24:6,7 133:9 | 285:1 310:19 |

**[seen - slightly]**                                                    Page 74

354:9 380:17
380:22 409:10
410:24
**sees** 207:18
208:12 210:25
**select** 125:25
294:20
**selected** 294:3
294:5,22 295:4
295:16,21
296:7
**self** 238:22
239:3,7,21
240:12,24
**selling** 181:5
**send** 45:16
148:20
**sense** 33:6 34:4
181:6 229:12
264:18 281:3
325:11,24
379:6
**sent** 28:4 46:9
404:22
**separate** 18:17
73:25 335:5
353:5,21
402:24
**separately**
235:4
**september**
68:14,15
**series** 133:24
385:4,9

**serve** 75:3 76:9
76:13
**set** 16:25 37:1
60:21,25 61:7
286:25 385:2
**setting** 77:11
77:19 78:14
79:12,25 80:13
80:14 412:16
**settings** 78:18
80:16 411:11
**seven** 246:6
**several** 250:25
308:15,20
**share** 26:23
27:1 85:4
133:13 135:6,8
185:2 324:22
390:15 399:13
399:22 400:14
400:19
**shared** 394:19
**shb.com** 2:19
**sheet** 418:6,9
418:11,14
420:9
**shift** 216:15
**shifted** 28:13
**shifting** 29:17
**shivanonda**
369:11,15,21
381:11
**shook** 2:16

**shortly** 363:16
**show** 189:21
222:17 409:16
**shown** 410:21
**shows** 225:3
**sic** 400:25
**siculus** 2:22
**side** 181:21
**sign** 292:8
418:8
**signature**
417:13 420:11
**signed** 142:4,7
**significant**
378:24
**signing** 142:1
418:10
**similar** 269:17
342:4
**similarly** 67:14
161:3 162:8
**simple** 35:3
192:5 373:2,7
**simpler** 35:4
**simply** 182:20
219:4 305:3
**single** 32:17
309:14 324:2
379:22
**sit** 218:17
308:13 309:5
311:8 312:2
**site** 19:6

**sites** 45:20
**sitting** 47:23
50:20,22 51:9
78:1 138:12
198:4 270:18
308:25 331:11
354:9 386:14
401:13 413:19
**situation**
374:16
**six** 18:7,11,14
18:22 19:10
41:5 69:23
70:8 77:5
165:15 293:23
297:12 352:12
352:19 416:16
**size** 242:8
243:17,25
244:11,23
257:6,21 300:1
325:12
**skills** 229:23
230:9,22
231:12
**sleep** 64:10,13
65:11 277:11
277:14,19
**sleeping** 64:17
**slight** 23:15
392:16 394:11
394:16
**slightly** 43:4

CONFIDENTIAL

**[small - social]** Page 75

| | | | |
|---|---|---|---|
| **small** 65:10 | 87:1,14 90:23 | 157:10,21 | 223:3,15 224:2 |
| 242:15,18,23 | 91:5 95:16,20 | 159:3,11 | 225:23 226:15 |
| 242:25 243:3,9 | 96:9 101:25 | 160:17 161:1,5 | 227:1,4,16 |
| 243:10,14,25 | 102:4,21 | 161:6,14,15,17 | 228:2,10,13,20 |
| 244:10,22 | 105:25 106:4 | 161:18 162:1,2 | 228:25 229:2 |
| 349:1 | 106:21 108:3 | 162:15 164:22 | 229:12,20,23 |
| **smaller** 242:13 | 108:12,19 | 165:23 166:6 | 230:6,9,22 |
| 243:13 | 111:18 112:15 | 166:19,23 | 231:8,11 |
| **smart** 336:10 | 112:23 113:7 | 167:9,11,15 | 233:11,23 |
| 336:11 | 122:2,8 123:8 | 168:18 169:8 | 234:8 246:2 |
| **smartphone** | 124:3 126:1,10 | 182:10,23 | 254:25 255:6 |
| 334:16 | 126:19,21 | 183:6 188:12 | 267:3,13,24 |
| **smartphones** | 127:17,20 | 188:13,22 | 273:25 274:3 |
| 335:7 | 128:12 129:12 | 189:5 191:8,9 | 274:12,15 |
| **snap** 3:6 416:6 | 130:11 131:19 | 191:15,24 | 280:18 281:16 |
| **snapchat** 81:19 | 132:8 133:14 | 194:6,7,13,23 | 281:19 282:10 |
| 88:17 89:2 | 133:20 134:15 | 195:7,20,24 | 282:11 298:4 |
| 90:6 126:2,11 | 135:1,18 136:3 | 196:3,7,15 | 298:22,25 |
| 130:12,15 | 136:22 137:1,7 | 197:5 199:25 | 300:5,13,20 |
| 307:9 356:18 | 137:15,18,24 | 200:1,2,14,15 | 301:9,20 302:9 |
| 356:22 358:1,3 | 138:24 139:16 | 202:12,14,20 | 303:9,12,23 |
| 358:4 409:22 | 140:11 141:6 | 204:5,6,13,19 | 304:10 305:11 |
| 410:2,16 | 144:9,20 146:6 | 205:1,11,14 | 305:13 306:11 |
| **soccer** 404:4 | 146:20 147:9 | 206:1,2,3,10,11 | 307:1,18 |
| **social** 1:4 9:11 | 147:21 148:8 | 206:19,20 | 308:24 309:16 |
| 57:5 81:14,15 | 148:19 149:5 | 207:1,19,21 | 310:7,16,24 |
| 81:16,17,22 | 149:17 150:1 | 208:13,14 | 311:19 312:20 |
| 82:1,3,5,9,15 | 150:11,20 | 211:1,3 212:3 | 312:20 314:17 |
| 82:15,17,20,23 | 151:8,17 152:6 | 212:5,20 | 315:23 316:6,9 |
| 82:24 83:2,8 | 152:16,19 | 213:20 214:8 | 316:14 317:3 |
| 83:10,12,14,16 | 153:2,14 | 214:15 216:1,5 | 317:25 318:7 |
| 83:18,20,22,24 | 154:20 155:4 | 217:13,16,18 | 318:12,20 |
| 84:1,3,5,7,9,12 | 155:15,25 | 218:11 219:22 | 319:1,4,6,12,15 |
| 84:14 85:18 | 156:12,17 | 220:7 221:14 | 319:20,24 |

**[social - specific]**                                                    Page 76

| | | | |
|---|---|---|---|
| 320:4,7,11,19 | **socializing** | 180:20 183:20 | 369:19 396:4 |
| 320:22 321:5,6 | 215:6 | 195:23 203:4 | 397:11 |
| 321:9,14,19,21 | **software** | 207:11 217:22 | **sources** 73:11 |
| 321:23,25 | 155:14,24 | 227:21 230:2 | 74:8 113:20 |
| 322:7 323:16 | **solely** 365:19 | 253:5 256:14 | 190:8 254:5 |
| 325:3 326:15 | 366:2 | 266:13 281:10 | 275:22 384:16 |
| 327:2,9,21 | **somebody** 58:2 | 286:10 306:6 | **space** 418:6 |
| 328:12 329:19 | 73:23 89:16 | 315:24 316:1 | **spalding** 4:8 |
| 331:4 332:6,12 | 213:5 246:6 | 349:7 354:18 | **span** 271:22 |
| 333:6,12,15 | 263:25 280:9 | 359:7 365:3 | **speak** 48:2 |
| 334:2,16 335:3 | 295:15 302:11 | 367:6 388:6 | 49:17 160:5 |
| 335:6,10 336:4 | 338:9,11 | 390:19 400:16 | 173:15,16,17 |
| 336:9,17,25 | 339:15,20,20 | 407:15 408:7 | 238:17 309:7 |
| 337:13 345:21 | 340:9 341:20 | **sort** 62:23 | 314:2 398:15 |
| 346:1 347:3 | 344:3 | 135:6 174:4 | 404:6 |
| 348:14 349:14 | **someone's** | 222:21 229:17 | **speaking** 47:2 |
| 349:21 352:1 | 268:5 272:18 | 276:21 282:17 | 203:24 258:6 |
| 352:21 354:16 | **somewhat** | 290:2 291:1 | 259:7 284:20 |
| 354:23 355:7 | 339:4 | 399:6 404:5 | 285:8 304:4 |
| 355:14 359:16 | **sooner** 351:6 | **sorts** 58:17 | 325:15 |
| 360:2,17 361:4 | **sorry** 10:20 | 302:16 | **speaks** 43:3 |
| 361:12,13,19 | 11:14,23 18:23 | **sought** 160:15 | 257:11 300:1 |
| 363:9,11 364:3 | 20:19 23:25 | **sound** 371:22 | 378:21 |
| 372:4 374:9,23 | 24:1 31:3 | **sounds** 51:9 | **specialists** |
| 379:10 380:3 | 44:12,14 46:15 | 252:4 | 201:20 |
| 380:13 381:22 | 51:14 58:19 | **source** 53:15 | **specific** 88:4,11 |
| 382:5,6,21 | 74:24 93:14 | 310:12 329:1,6 | 88:22 148:3 |
| 383:2 388:13 | 98:10 117:20 | 329:8,10,24,24 | 159:17 173:18 |
| 389:20 390:6 | 123:19 124:20 | 338:7,16 339:3 | 173:21 208:1 |
| 390:23 393:13 | 135:11 138:17 | 339:10,22 | 210:4 219:2 |
| 407:12,21 | 143:10 144:13 | 340:4,15,24 | 226:13 237:14 |
| 408:3,13,19,22 | 149:10 150:14 | 341:4 342:17 | 250:3 268:3 |
| 410:13,18 | 156:13 158:10 | 342:21 343:7 | 269:9 276:21 |
| | 161:19 165:5 | 345:3 347:6 | 291:16 294:13 |

**[specific - spent]**                                    Page 77

| | | | |
|---|---|---|---|
| 304:25 305:21 | **specifics** 89:17 | 281:18 282:10 | 105:23 106:2 |
| 352:12 358:2,4 | 89:22 90:2 | 282:11 332:11 | 106:20 107:3 |
| 370:9 415:3 | 171:11,21 | 349:19 354:16 | 108:2,11,18 |
| **specifically** | 173:12 175:10 | 354:23 355:14 | 110:17 111:7 |
| 46:5 52:19 | 175:20 176:19 | 360:3 374:8,23 | 111:17 112:2 |
| 56:5 68:16 | 193:16,21 | 379:10 389:19 | 112:13,14,21 |
| 73:24 87:24 | 194:14 195:12 | 413:12 | 112:22 113:5,6 |
| 89:13 112:6,15 | 208:21 209:19 | **spending** | 113:7,14,23 |
| 112:23 113:7 | 285:22 | 151:16 152:18 | 119:11 126:9 |
| 134:14 140:21 | **speculate** 274:1 | 179:14 190:23 | 128:12 129:24 |
| 153:21 154:8 | 274:13 | 197:22 198:11 | 131:12,17 |
| 158:7 164:21 | **speculation** | 211:11 223:16 | 134:13,24 |
| 167:18 168:4 | 275:5 | 322:5 359:14 | 135:16 136:21 |
| 176:24 186:9 | **speech** 74:7 | 360:1,15 | 136:25 138:23 |
| 186:11 212:20 | **speeches** 73:16 | **spends** 166:18 | 139:15 140:20 |
| 213:19 239:7 | **spell** 19:7 | 177:22 178:8 | 141:4 144:6,16 |
| 247:15 249:24 | **spend** 70:2 | 178:21 179:2 | 146:3,19 147:7 |
| 271:9 302:24 | 90:19 96:8 | 180:18,22 | 148:7,19 149:3 |
| 317:4 318:8 | 102:20 165:22 | 183:13 184:3 | 149:15,25 |
| 319:15 320:5 | 166:5 169:9 | 201:24 207:19 | 150:9,18 152:4 |
| 321:10 322:1 | 173:22 191:5 | 208:13 211:2 | 153:1,12 |
| 332:22 333:6 | 194:3,20 199:6 | 212:2 213:19 | 154:19 155:3 |
| 333:12 334:3 | 199:23 202:10 | 214:7 217:12 | 156:10,15 |
| 335:4,11 336:5 | 204:3 205:24 | 219:10 220:4 | 157:8,19 158:4 |
| 336:17 337:8 | 206:16 207:6 | 223:14 233:10 | 158:14 159:2,5 |
| 346:8,25 | 207:12 210:5 | 233:13 235:20 | 160:15,25 |
| 349:16 357:15 | 212:17 213:16 | 235:23 322:13 | 161:5 163:6,20 |
| 358:22 359:23 | 215:25 218:7 | 322:23 360:17 | 163:24 165:2,8 |
| 363:20 404:6 | 219:17 233:4 | 361:24 | 169:22,23,25 |
| 404:21 411:24 | 246:1 254:24 | **spent** 62:2 | 176:12 177:8 |
| 412:22 | 255:5 264:24 | 64:16,17 90:22 | 177:12 179:8 |
| **specificity** | 273:24 274:11 | 91:4 95:14,18 | 182:22 183:6 |
| 173:8 | 274:14 279:1 | 96:16 101:23 | 188:10,20 |
| | 279:19 281:14 | 102:2 103:2 | 189:4 190:15 |

**[spent - student]**                                                        Page 78

| | | | |
|---|---|---|---|
| 191:9,21 193:9 | 319:10,24,25 | **stamp** 385:8 | **stayed** 189:15 |
| 194:7 197:3 | 321:4,20 | **stand** 416:12 | 190:3,16 191:7 |
| 200:2,12 | 323:16 325:3 | **standard** | 191:23 |
| 201:10 202:13 | 355:16 362:10 | 183:11 186:22 | **staying** 224:6 |
| 202:18 204:6 | 372:4 379:2 | 187:2 188:5 | **stemming** |
| 204:11 205:13 | 380:2,13 382:6 | 227:6,11 | 322:7 |
| 206:3,8,19,24 | 389:24 390:5 | 237:25 257:23 | **stems** 29:16 |
| 212:6,11,20 | 390:19,22 | 287:1 | **stenographer** |
| 214:13 215:4,5 | 393:13 404:4 | **stands** 274:16 | 34:19 |
| 217:15,18 | 407:12,21 | **start** 77:2 91:1 | **stenographic** |
| 220:18,22 | 408:3,13 | 266:14 316:2 | 9:19 417:6 |
| 223:9 225:22 | **spoke** 47:16,25 | 385:8 386:1 | **step** 45:8 328:5 |
| 226:3,15 | 289:10 411:9 | **started** 49:6 | **stephany** 3:3 |
| 227:15,17 | **spoken** 121:19 | 327:25 408:23 | **stephany.rea...** |
| 228:1,3,6,11,13 | 303:12,22 | **starting** 54:8 | 3:5 |
| 229:1,3,20 | **spreadsheet** | 234:15 339:17 | **steps** 100:10,17 |
| 230:6,20 231:9 | 25:21 29:2 | **starts** 151:9 | 104:22 105:3 |
| 231:9 233:21 | 34:15 | **stata** 33:20 | 146:18 152:3 |
| 236:9,12 267:2 | **spreadsheets** | 34:16,22 35:20 | 152:24 153:11 |
| 267:12,23 | 69:7 | 36:5 | 155:2 245:5,14 |
| 268:6 269:3 | **sprint** 66:18 | **state** 75:15 | **stipulated** |
| 270:5,13,22 | **square** 2:17 | 80:18 286:18 | 211:18 |
| 271:10 272:18 | **stable** 333:5,11 | 306:19 418:5 | **stop** 224:11 |
| 274:2 279:5 | **staff** 57:19,21 | **stated** 377:10 | **straight** 308:18 |
| 298:3,21,25 | 133:13 141:24 | **statement** | **straightforward** |
| 300:5,12,19,25 | 144:6,17 147:8 | 17:11 97:2 | 36:2 66:24 |
| 301:8,19 302:8 | 150:10,19 | 140:19 327:18 | 121:5 135:5 |
| 302:15 303:9 | 156:11,16 | 329:16 366:16 | **street** 2:18 4:4 |
| 303:12,22 | 163:7 168:18 | **statements** | 4:9 |
| 304:10,21 | 168:24 169:5 | 314:1 | **stretch** 86:9 |
| 305:10 308:10 | 182:10 183:4,5 | **states** 1:1 9:14 | 315:7 |
| 316:5,25 | 201:5 203:14 | 366:18 | **strong** 347:15 |
| 317:15,19 | 203:17,25 | **stating** 416:13 | **student** 85:4,11 |
| 318:3,17,20 | | | 85:11 89:12 |

CONFIDENTIAL

**[student - subscribed]**                                        Page 79

| | | | |
|---|---|---|---|
| 90:6,23 91:5 | 254:25 255:5 | 171:16 172:5 | 414:22 |
| 95:16,20 96:8 | 267:3,12,24 | 172:17 174:10 | **study**   268:12 |
| 101:25 102:3 | 272:23,25 | 174:11 175:2,3 | 329:23 332:10 |
| 102:21 105:24 | 273:12,14 | 175:14 176:4 | 334:11,14,24 |
| 106:3,21 108:2 | 274:2,14 | 189:14 190:2 | 335:1 337:2 |
| 108:11,18 | 275:16 276:19 | 190:15 191:6 | 354:9 414:17 |
| 126:1 133:14 | 277:11,19 | 191:22 195:7 | **stuff**   18:12 |
| 133:18,19 | 283:5 298:22 | 195:20 196:11 | 26:13 33:18 |
| 138:24 139:16 | 298:25 346:7 | 197:5 199:25 | 46:10 61:3 |
| 148:19 151:17 | 346:24 348:12 | 200:14,20 | 65:7 75:11 |
| 152:19 165:22 | 349:13,21 | 201:25 202:11 | 81:7 185:24 |
| 166:6,19 169:8 | 350:10,19 | 202:19 205:1 | 209:17 289:20 |
| 170:11,14,19 | 351:5 359:16 | 205:14 206:1 | 322:6 413:16 |
| 170:22 173:6,9 | 360:2,4,16,18 | 206:10,10,17 | **stunned**   136:10 |
| 176:12 177:8 | 361:11,25 | 206:25 212:7 | 136:14 |
| 177:13,16,23 | 382:6 | 212:18 213:17 | **subgroups** |
| 178:9,22 179:2 | **student's** | 227:18 228:4,6 | 362:16,23 |
| 179:15 183:6 | 207:20 208:14 | 229:2,4,22 | 364:25 365:9 |
| 183:14,25 | 211:2 213:20 | 230:8,20,24 | 365:23 366:6 |
| 184:4 188:11 | 217:18 361:19 | 231:3,10 | **subgrown** |
| 188:21 190:8 | **students** | 276:13 319:12 | 400:25 |
| 192:11,23 | 147:20,24 | 320:1 321:6,22 | **subject**   418:10 |
| 193:9 194:4,21 | 148:8 149:4,16 | 333:13 | **submission** |
| 196:15 203:1,9 | 149:25 155:14 | **studied**   173:21 | 63:17 64:7,22 |
| 203:15 204:4 | 155:24 156:12 | 278:2 335:10 | 65:2,12 66:2,9 |
| 204:12,19 | 156:17 157:9 | 350:24 379:25 | **submitted**   12:2 |
| 207:18 208:12 | 157:20 158:5 | 380:10,20 | 63:1,5 68:24 |
| 210:25 212:3 | 158:15 159:3 | **studies**   326:13 | 120:24 121:7 |
| 214:7,14 215:5 | 159:10 160:16 | 326:25 327:6 | 163:18 |
| 216:1,4 217:13 | 161:1,6,14,17 | 327:19 328:8,9 | **submitting** |
| 217:16 220:5,6 | 162:1,15 163:8 | 329:17 331:1,2 | 297:11,19 |
| 220:19,22 | 163:21,24 | 331:9,12,16,17 | 303:1 |
| 227:1,4 228:12 | 164:14,20 | 332:3,17,21,24 | **subscribed** |
| 228:14 233:11 | 165:3,9 171:7 | 334:6,8,9 | 420:12 |

**[substance - survey]**                                    Page 80

| | | | |
|---|---|---|---|
| **substance** | **summaries** | **supplemental** | 172:11 173:10 |
| 420:8 | 355:10 | 406:11,14 | 177:14 178:15 |
| **suffer**  275:16 | **summarize** | 407:3,5 | 179:20,24,25 |
| 277:11 | 54:11 300:24 | **supplementally** | 196:11 199:19 |
| **suffering** | **summarizes** | 406:21 | 208:1 209:13 |
| 277:19 | 336:22 345:10 | **support**  8:1 | 218:10 234:19 |
| **sufficient**  42:11 | 398:20 399:1 | 42:11 49:13 | 237:22 252:4 |
| 145:17 247:8 | **summarizing** | 195:6,19 | 261:15 283:3 |
| 249:4,19 | 263:1 324:5 | 196:15 197:4 | 288:18 307:20 |
| 251:15 356:4 | **summary**  24:7 | 199:24 200:13 | 311:21 312:1 |
| **sufficiently** | **summed**  62:8 | 200:20 201:3 | 315:8 320:16 |
| 248:20,23 | **summer**  55:17 | 202:11,19 | 322:18 338:25 |
| 251:7 340:17 | 403:16,23 | 204:18,25 | 339:13 347:16 |
| 340:23 | 404:7,17 | 205:14,25 | 366:2 402:6 |
| **suggest**  166:4 | 405:19 406:16 | 206:9,17,25 | 410:24 |
| 242:11,22 | **summing**  25:22 | 328:8 329:16 | **surfacing**  53:25 |
| 278:17 281:13 | 401:24 | 330:3 385:23 | **surfed**  216:6 |
| 379:21 | **superintende...** | 386:2,16 | **surfing**  216:21 |
| **suggested** | 370:23 376:13 | **supported** | 218:3 |
| 279:17 280:10 | 376:14 378:6 | 54:16 331:18 | **survey**  67:5,18 |
| 281:4,7,11,20 | **supervise** | **supporting** | 67:22 68:1 |
| 293:2 351:25 | 301:19 302:8 | 332:14 | 91:8,12,20,25 |
| 363:19 398:5 | 302:18 | **supports** | 92:4,7,11,15,20 |
| **suggesting** | **supervising** | 340:22 | 93:6,10,18,21 |
| 293:12 378:13 | 302:13 | **supposed**  18:21 | 93:24 94:5,8 |
| **suggestion** | **supervision** | 122:13 171:9 | 94:23 95:9,13 |
| 280:13 282:17 | 417:24 | 172:19 312:12 | 95:23 96:3,6 |
| **suggestions** | **supervisors** | 383:13 411:1 | 96:16 97:12 |
| 279:3 293:16 | 295:12 | **sure**  18:23 34:3 | 98:1,4,4 |
| **suggests**  329:3 | **supplanted** | 54:20 73:7 | 108:25 109:10 |
| **suite**  2:18 3:4 | 18:20 | 86:11 93:3 | 109:12,19,22 |
| 3:19 4:4,9 | **supplement** | 122:21 133:3 | 110:2,8,16 |
| **sum**  23:12 | 406:18 | 151:13 167:6 | 122:11 123:3,7 |
| 400:1 401:5,6 | | 168:1 170:17 | 123:22 125:8 |

**[survey - take]**                                              Page 81

125:16,19
126:18 129:7
129:24 130:10
130:10,22
131:2,7,9,10,17
131:24 136:20
138:6,14 145:3
160:3,14
163:15,19
188:18 208:4,9
208:23,24
231:22 236:8
237:6,21 238:1
238:7,8,11,19
240:3 241:8,23
241:24 242:6,9
242:15 243:20
245:7,16
246:13,20
247:4,12,19,24
249:4,18 251:5
251:18 252:1,3
252:8,12,16,20
253:8,10,18
254:6,23
255:25 258:9
258:14,24,24
259:2,23
265:18 266:8
266:16,25
267:10,14,17
267:22 268:1
268:17 269:4,5
269:24 270:7

270:12,21
271:1 272:10
272:10,12,13
272:19 275:10
278:17 279:9
279:16,21
280:1 282:25
305:3 313:1,20
314:7 316:15
316:22 324:19
325:2,17,22,24
336:21,22
338:9,12,14,18
338:20,24
339:16,21
340:7 341:6,14
341:15,21
342:1,5 343:11
343:11,18,18
344:3 346:10
347:19 348:10
349:11 362:17
362:23 365:1,9
365:23 367:5
367:10,14,19
367:25 368:7
368:11,17
369:2,4 378:11
399:7,9,13,22
399:25 400:12
400:14,18,20
403:25
**surveys** 238:16
241:7 246:25

259:25 260:11
260:20 261:12
261:17 274:23
283:9 328:15
339:25 340:2
341:24
**sw** 2:11
**swath** 304:3
**swear** 9:21
**swofford** 2:4
69:17
**sworn** 9:24
142:1 209:10
283:19 284:7
287:5,24 292:5
292:8 382:15
420:12
**system** 225:14
**systematic**
258:14
**systematically**
252:1 253:9
256:1 258:21
258:25
**systems** 289:15

**t**

**t** 5:5 19:8 34:22
34:22 417:1,1
419:2
**tab** 14:16 20:13
30:8 37:2
60:13 124:10
326:18 335:15

346:11 348:18
386:19 387:15
388:15 392:19
**table** 23:19
24:6,7,7,8 33:5
33:6 381:14,21
390:10 391:15
398:19,20,25
398:25 399:18
399:20 400:5,8
401:5,9 402:8
402:10
**tables** 24:4
53:1 399:5
**tabs** 28:6
**take** 12:10
38:12 48:16
65:23 81:4
86:8 87:5
100:10,16
104:21 105:2
108:4 124:9
129:16,18
132:16 146:17
148:2 155:1
162:21 174:6
245:5,14
314:12 315:9
324:17 328:5
333:22 335:14
348:17 377:17
383:20 384:20
398:25 412:12
414:9

| | | | |
|---|---|---|---|
| **taken**  86:16 | **taxes**  74:1 | 176:11 177:5,7 | 293:19 294:2 |
| 122:24 152:2 | **teach**  176:9 | 177:22,24 | 299:10,20 |
| 152:24 153:10 | 177:5 190:12 | 178:8,17,21 | 300:4,10 301:5 |
| 162:25 234:23 | 193:6 197:1 | 179:1,8,14 | 301:16 302:5 |
| 285:17 315:14 | 216:24 229:21 | 180:6,7,18,22 | 303:8 305:4 |
| 383:24 415:16 | 230:7 257:8 | 183:13,16,16 | 313:20 314:7 |
| 417:6 | **teacher**  26:22 | 184:3,6,6,7,11 | 316:2,5 324:19 |
| **takes**  147:23 | 67:4,10,17,21 | 184:19 186:21 | 324:20 325:1 |
| 222:24 412:7 | 68:5 91:8,12 | 190:12,14 | 359:14,16,25 |
| **talk**  80:5 238:6 | 91:14,20,25 | 191:16 193:6,8 | 360:15 361:11 |
| 284:10 | 92:4,7,11,15,20 | 193:24 195:5 | 361:24 367:3,5 |
| **talked**  50:10 | 93:5,18,24 | 197:1,10,24 | 367:8,10,14,18 |
| 65:15 68:15 | 94:8,23 95:9 | 198:13 199:13 | 367:24 368:10 |
| 132:15 145:24 | 95:25 96:15,19 | 201:8,16,24 | 368:17 369:1,4 |
| 173:8 218:8 | 97:15 98:17 | 202:25 203:8 | 369:8,18 381:9 |
| 230:16 289:20 | 99:12 100:1 | 204:17 205:3 | 384:10,15 |
| 308:17 312:18 | 102:10 103:5 | 207:5,16,18 | 386:23 387:3 |
| 376:25 | 103:16,24 | 208:9,11,11 | 387:25 388:19 |
| **talking**  50:9 | 104:8 106:10 | 210:24 211:11 | 402:12,19 |
| 81:2 171:8 | 107:6,15 | 211:13 212:2,5 | 403:22 404:14 |
| 218:2,12 | 108:24 109:10 | 212:16 213:15 | 404:16 406:11 |
| 254:19 259:16 | 109:19,22 | 213:19 216:5 | **teacher's**  171:6 |
| 261:24 289:9 | 110:2,16,23 | 216:12 219:9 | 171:15 172:16 |
| 289:11 333:14 | 123:3,7 125:16 | 219:10,12,18 | 173:3 174:9 |
| 374:15 413:19 | 128:11 138:23 | 235:20,23 | 175:1,13 |
| **target**  257:10 | 139:15 141:3 | 237:6,21 245:7 | 193:22 197:3 |
| 257:11 | 147:23,25 | 245:16 246:24 | 201:9 236:9 |
| **task**  191:16 | 151:16,16 | 247:3,25 251:5 | 360:10 |
| **tasked**  128:19 | 160:3 165:24 | 253:18 254:22 | **teachers**  27:10 |
| 136:8 301:2 | 166:8,12,18 | 264:25 266:25 | 29:20 43:6 |
| **tasks**  227:17 | 168:17,18,24 | 272:24 273:13 | 57:19,21 86:24 |
| 228:3 | 170:3,10 | 276:2,9,12,17 | 87:12,19 88:15 |
| **tax**  232:23 | 171:24 173:13 | 277:1,17,18,24 | 91:7 93:12,17 |
| | 173:14 176:9 | 278:13,16 | 95:13,18 96:7 |

**[teachers - testimony]**                                        Page 83

| | | | |
|---|---|---|---|
| 110:17 123:4 | 197:15,16,22 | 193:8 207:7 | 271:15 272:5 |
| 125:19,25 | 198:6,11 199:6 | 218:25 230:20 | 280:23 311:10 |
| 126:8,13,19 | 199:16,23 | 231:10 265:2 | **terms** 78:21 |
| 130:9 136:20 | 200:12,19 | 347:17 353:23 | 218:8,11 |
| 144:6,17 146:2 | 202:10,18 | **tech** 3:9 | 262:22 309:7 |
| 146:2 147:7 | 208:3,8,22 | **technical** 79:8 | 356:2 412:4 |
| 148:6,6 149:2 | 210:5 217:4 | 240:9 251:18 | **test** 207:7,14,17 |
| 149:2,14,14 | 218:7,15,20,23 | 394:16 | 208:11 210:25 |
| 150:10,19 | 223:3 228:11 | **technologies** | 211:12 212:16 |
| 152:4,5,17,18 | 236:3,7 253:7 | 2:22 | 213:15 350:5 |
| 153:1,1,12,13 | 253:9 254:24 | **technology** | 352:5 353:8,17 |
| 154:18,18 | 255:5 264:23 | 229:24 230:10 | 353:25 |
| 156:10,15 | 267:1 273:8,23 | 230:23 231:12 | **testified** 9:25 |
| 157:7,7 160:15 | 274:10 278:7 | **telephone** 47:3 | 76:25 77:1,2 |
| 160:23 163:7 | 325:3 326:14 | **tell** 47:24 51:10 | **testifying** |
| 163:18 165:12 | 327:1,7,20 | 54:1 56:4,20 | 304:12 |
| 165:16,22 | 328:10 329:18 | 256:4 306:17 | **testimony** |
| 166:5 167:10 | 331:3 332:4,11 | 307:5,13 | 32:15 37:6 |
| 167:11,19,20 | 333:25 334:15 | 340:21 342:19 | 42:2 56:9 |
| 168:5,6,23 | 335:3 336:16 | 343:5 370:19 | 64:15 101:1,5 |
| 170:18,24 | 337:7 345:12 | 375:7 386:15 | 101:9 105:12 |
| 171:12,22 | 345:20 347:15 | 398:9 | 106:14 107:2 |
| 172:4,7 173:22 | 348:11,11 | **telling** 79:21 | 107:12 138:11 |
| 174:3,5 175:21 | 349:11,12,19 | 295:15 | 138:22 139:13 |
| 183:24 184:22 | 367:13,17,24 | **ten** 63:17 64:1 | 140:10 142:1 |
| 188:10,20 | 368:2,10,25 | 64:6,11,21 | 142:20 160:22 |
| 189:4,13 | 369:3 390:18 | 65:1,11 66:1,8 | 195:22 209:10 |
| 190:21,23 | 390:20 395:18 | 267:4 308:18 | 251:12 283:19 |
| 191:5,21 | 396:3 403:2,5 | 346:11 410:11 | 283:23 285:2,7 |
| 192:10,17,22 | 403:15,18 | **tend** 260:25 | 286:2 287:5,23 |
| 193:17 194:3 | 406:24 413:12 | **tendency** 265:8 | 287:24 288:4 |
| 194:20 195:14 | **teaching** | **tenure** 72:13,17 | 290:25 291:9 |
| 195:17,18 | 125:21 176:11 | **term** 79:9 | 292:5 304:9 |
| 196:10,14 | 177:7 190:14 | 239:16,17 | 309:3 311:24 |

CONFIDENTIAL

**[testimony - tiktok]**                                                    Page 84

| | | | |
|---|---|---|---|
| 312:15 313:21 | 73:5 74:11,12 | 169:20 172:12 | 362:10 |
| 314:8 320:13 | 78:10 160:7 | 177:2,3,10,11 | **thinks**   123:13 |
| 341:9 342:24 | 163:14 183:12 | 182:25 192:5 | **third**   144:8,19 |
| 344:7 379:5 | 183:23 186:25 | 198:3 205:7 | 146:6,21 147:9 |
| 382:16 | 186:25 192:12 | 216:18 220:14 | 330:22 |
| **tests**   352:14 | 192:24 193:10 | 226:20 233:7 | **thirty**   418:15 |
| **texas**   4:4,6 | 194:5,22 196:7 | 235:9 237:2,13 | **thought**   35:2 |
| **text**   144:7,18 | 196:13 217:7 | 239:17,23 | 35:24 44:17 |
| 229:5 397:6 | 238:9 257:24 | 241:3 242:13 | 65:7 120:19 |
| 410:16 | 269:7 274:18 | 243:10 248:22 | 129:6 130:2,5 |
| **texts**   146:5 | 283:8 289:19 | 256:25 257:9 | 274:24 294:8 |
| **tgraden**   2:6 | 292:25 302:16 | 261:17 263:6 | 359:7 |
| **thank**   11:24 | 302:19 314:12 | 269:18 271:2 | **three**   18:7,9,16 |
| 61:19 415:21 | 319:2 327:15 | 272:21 273:11 | 18:17 20:13 |
| 416:11 | 347:13 352:2 | 276:11 281:19 | 73:10 104:2,5 |
| **thing**   32:16 | 408:24 | 284:8 285:4 | 104:15 125:14 |
| 35:9 73:20,25 | **think**   18:2 19:6 | 291:4 293:23 | 326:22 328:7 |
| 142:25 175:7 | 19:12 27:7 | 293:25 304:23 | 328:15 329:15 |
| 177:1 181:25 | 32:20,21 33:3 | 325:7 326:2 | 330:25 331:9 |
| 185:7 207:15 | 53:17,23,24 | 327:25 328:13 | 331:15 333:23 |
| 216:15 224:3 | 60:11 65:22 | 330:8,9 343:20 | 334:7,9 360:3 |
| 236:4 240:9 | 71:13 72:1 | 345:9 350:3 | 360:17 361:5 |
| 255:9 258:8 | 73:6,13 74:8 | 355:25 356:9 | 361:24 362:2 |
| 265:9 268:11 | 78:2,11 79:18 | 359:3 362:6 | 375:17 376:7 |
| 278:1 304:15 | 81:17,18 82:8 | 363:18 365:11 | 376:14 377:12 |
| 309:10 313:22 | 82:17,25 83:5 | 382:3 383:10 | 377:14 378:8 |
| 314:9 317:11 | 84:11 101:3 | 395:10 400:24 | **throwing**   160:6 |
| 318:13,25 | 109:14 110:9 | 405:11,11 | **thursday**   26:9 |
| 319:7 326:7 | 121:13 122:23 | 412:9 413:17 | 27:18 69:13 |
| 327:22 349:17 | 122:24 127:3 | 414:13,16 | **tiktok**   4:12,12 |
| 404:5 413:14 | 130:1,8 136:13 | **thinking**   35:11 | 4:12 81:19 |
| 414:17 | 136:14 138:3 | 127:21,23 | 88:17 89:2 |
| **things**   18:19 | 142:5 160:8,10 | 128:1,5,7 | 90:7 126:2 |
| 36:12 72:12 | 161:9 164:6 | 131:12 353:19 | 130:12,15 |

CONFIDENTIAL

**[tiktok - time]**                                          Page 85

| | | | |
|---|---|---|---|
| 307:8 356:24 | 106:2,19 107:3 | 149:25 150:9 | 191:5,16,21 |
| 357:3 358:11 | 107:21 108:2,4 | 150:18 151:2 | 193:8,18 194:3 |
| 409:24 410:2 | 108:11,18,23 | 151:17,19,22 | 194:20 197:3 |
| 416:10 | 108:24 109:4 | 152:4,18,20,25 | 199:11,23 |
| **time** 9:6 10:17 | 109:10,19,22 | 153:12 154:19 | 200:12,25 |
| 26:23 32:17 | 110:2,16,16,20 | 154:19,22 | 201:9,24 |
| 48:12 54:7 | 111:6,17 112:1 | 155:3 156:10 | 202:10,18 |
| 56:3,14 57:19 | 112:5,12,13,14 | 156:15,19 | 204:4,12 |
| 57:21 58:2,4,5 | 112:20,21,22 | 157:8,8,10,19 | 205:13,25 |
| 58:17,21 61:10 | 113:1,4,5,6 | 158:4,14 159:2 | 206:9,17,25 |
| 61:12,21,22,25 | 118:18,25 | 159:5,16 160:3 | 207:6,12,20,21 |
| 62:2,19 63:3,4 | 119:11,24 | 160:15,24,24 | 208:4,9,13,15 |
| 63:9,13,20 | 120:15,25 | 160:25 161:4,7 | 208:24,25 |
| 64:16 66:25,25 | 122:13 123:3,7 | 161:24 162:25 | 209:15 210:6 |
| 67:4,10,17,21 | 125:16,21,22 | 163:6,20,20,23 | 210:10,19,21 |
| 68:6,18 70:1,5 | 126:8 128:11 | 165:1,8,21 | 211:2,9,11,14 |
| 71:24 72:3,12 | 128:12,19,25 | 166:5,17 170:5 | 211:19,20,22 |
| 79:13 85:19 | 129:16,24 | 170:7 171:13 | 212:2,6,10,12 |
| 86:16 87:1,13 | 131:12,17 | 173:22 176:11 | 212:20 213:8 |
| 87:20 88:16 | 132:16,23 | 177:6,12,22 | 213:18 214:1,4 |
| 89:17,21 90:1 | 133:1,13,17,19 | 178:5,8,21 | 214:6,9,11,13 |
| 90:21 91:4,8 | 133:22 134:12 | 179:1,7,9,14,23 | 214:20,23 |
| 91:12,20,25 | 134:19,24 | 180:6,7,18,22 | 215:4,6,12,17 |
| 92:4,7,11,15,20 | 135:15 136:3,8 | 181:9,18,19,23 | 215:18,20,24 |
| 93:5,18,24 | 136:21,25 | 182:1,9,22 | 217:5,8,11,14 |
| 94:8,23 95:9 | 138:23 139:15 | 183:6,8,13 | 217:17,23 |
| 96:7,15,16 | 140:20 141:3,4 | 184:4,11,19,21 | 218:7 219:9,10 |
| 98:20 99:14,22 | 144:5,16,25 | 185:2,13,19,21 | 219:12,18,21 |
| 100:7,11,17 | 145:12,16,19 | 186:16,20,21 | 220:7,9 221:10 |
| 101:7,14,17,24 | 146:3,3,7,12,12 | 187:4,5,13,23 | 221:12,13 |
| 102:3,19 103:2 | 146:14,19,19 | 187:24,25 | 222:22 223:1,8 |
| 103:25 104:4 | 147:7,23,25 | 188:1,4,10,16 | 223:13,16 |
| 104:14,22 | 148:7,7,10,19 | 188:20 189:4 | 225:22 226:3 |
| 105:3,11,16,24 | 149:3,3,6,15,15 | 190:9,14,23 | 226:15 227:3 |

**[time - today]**                                                                 Page 86

| | | | |
|---|---|---|---|
| 227:15,25 | 288:22 289:6 | 335:2 336:4,15 | 399:3,12,22 |
| 228:11,25 | 290:6 291:6 | 337:7 342:2 | 400:9 401:11 |
| 229:19 230:5 | 292:20 293:2,5 | 345:20,23,25 | 404:1,4 407:11 |
| 230:15,19 | 293:12,14,18 | 349:18 354:16 | 407:20,23 |
| 231:8,9,17,23 | 294:1,3,8,10,16 | 354:23 355:10 | 408:2,12,16 |
| 233:4,10 | 298:3,21,25 | 355:14,15,24 | 410:6 412:7,11 |
| 234:23 235:20 | 299:11,21 | 356:15,21 | 413:12 415:16 |
| 235:23 236:9 | 300:4,7,10,11 | 357:2,8,14,21 | 415:22 416:13 |
| 236:12 237:6 | 300:19,25 | 358:2 362:7,10 | **times**   10:10 |
| 237:11,21 | 301:5,6,16,17 | 362:11,17 | 79:11,24 111:2 |
| 241:7 245:7,16 | 302:5,6,14,21 | 367:5,10,14,18 | 175:18 235:10 |
| 246:1,25 247:3 | 303:8,10,21 | 367:25 368:11 | 379:11 387:4 |
| 251:5 253:18 | 304:9 305:10 | 368:17 369:1,4 | 400:14 |
| 253:20 254:22 | 310:4,4,6 | 369:7,9,17,18 | **timing**  203:21 |
| 254:24 255:4 | 312:17,18,21 | 369:24 372:3 | **tired**  189:14,21 |
| 256:25 262:12 | 312:24 313:10 | 372:23 373:1 | 190:3,16 191:6 |
| 262:18,21 | 313:20 314:7 | 373:16 374:8 | 191:22 222:16 |
| 263:2,19,22 | 314:14 315:14 | 374:18,22 | 225:10 |
| 264:23 265:11 | 315:20 316:1,2 | 375:24 376:1,4 | **tiredness**  190:9 |
| 265:20 266:3 | 316:5,11,25 | 377:18 378:25 | 190:24 |
| 266:10,18,25 | 317:1,14,19 | 379:2,9 380:2 | **title**  119:14 |
| 267:1,12,23 | 318:3,5,17,20 | 380:8,12 381:8 | 120:14,16,19 |
| 268:5,23 269:2 | 319:10,13,24 | 382:5,17 383:6 | 120:20 |
| 269:2,9,21 | 319:25 320:2 | 383:24 384:9 | **titled**  20:13 |
| 270:1,13,22 | 320:23 321:4,7 | 384:10,14,16 | 37:3 363:8 |
| 271:9,20 272:7 | 321:16,20,23 | 386:22,23 | **titles**  118:21,24 |
| 272:7,18 | 322:6,9 323:15 | 387:2,10,25 | 120:17 121:1,2 |
| 273:12 274:1 | 324:19 325:1,1 | 388:9,20 389:5 | 121:8,10 |
| 274:11,13 | 325:2 326:15 | 389:11,19,24 | 363:14,21 |
| 278:16,17,19 | 327:1,8,20 | 390:5,23 | **today**  10:8 12:6 |
| 279:1,3,5,12,17 | 328:11 329:18 | 393:13 394:2,3 | 47:23 50:22 |
| 279:19 282:10 | 330:14 331:3 | 394:3,20 | 51:9 69:11,24 |
| 282:11 286:15 | 332:5,8,11,19 | 395:18 396:1 | 70:3 78:1 |
| 286:24 288:11 | 333:1 334:1,15 | 398:14,22 | 138:12 222:13 |

**[today - tucson]**                                                                         Page 87

| | | | |
|---|---|---|---|
| 270:18 309:1 | **topaz**  1:17 2:2 | **treatment** | **truthful**  142:6 |
| 330:16 331:11 | 9:9 55:21,23 | 232:24 | **try**  186:24 |
| 368:2 386:14 | 56:1 | **trends**  352:4 | 224:13 308:13 |
| 401:13 402:5 | **topic**  234:16 | **trial**  77:3 | 375:11 |
| 415:22 | **total**  27:13 | **tried**  160:8 | **trying**  76:3 |
| **today's**  9:5 | 59:17,23 60:7 | **trip**  265:4 | 81:1 182:12 |
| 416:17 | 62:5,14 70:1 | **true**  204:23 | 183:9 209:25 |
| **together**  27:3 | 221:16 270:1 | 215:3 235:22 | 217:1 219:3 |
| 271:7 289:19 | 328:7 332:18 | 243:1 245:3,23 | 247:8 265:7 |
| 399:6,12 413:8 | 332:24 333:3,9 | 255:7 256:2 | 271:19 320:16 |
| **told**  49:14 | 356:6 357:22 | 261:25 262:2 | 331:21 340:2 |
| 50:19 67:25 | 392:11 396:22 | 263:21 303:5 | 344:19 347:16 |
| 109:21 129:23 | 399:9,13,14,15 | 306:4,7,10 | 350:5 352:23 |
| 130:9 365:15 | 400:1,13,15,18 | 311:14 325:18 | 362:6 413:5 |
| 398:7,13 | 400:24 401:9 | 374:7,21 375:5 | **tucson**  5:16,24 |
| **tolles**  3:2 | 416:13 | 376:9 | 6:19 14:4,8,13 |
| **tomorrow** | **totals**  400:12 | **trust**  25:11 | 16:15,18 17:6 |
| 166:24 222:15 | **towards**  293:15 | 31:25 62:9 | 40:16,20 99:14 |
| **ton**  63:8 | **toys**  175:16 | 129:19 130:6 | 99:20 114:10 |
| **took**  131:2 | **track**  72:13,18 | 243:5 248:12 | 114:11 284:20 |
| 298:6,12 337:2 | **tracking** | 274:23 313:14 | 285:1 286:8 |
| 370:3 371:15 | 289:15 | 398:8,9 | 326:19 362:20 |
| 373:2 407:23 | **trained**  276:23 | **trusted**  49:16 | 363:6,24 364:9 |
| 408:16 | **trainer**  413:11 | 100:14 115:5 | 365:7 367:4,9 |
| **tool**  54:24 | **trainers**  413:4 | 141:22 252:10 | 367:13,18 |
| **top**  19:11 23:4 | **training**  276:9 | 287:3,6 291:16 | 369:8,18,25 |
| 25:10 50:11 | 413:13 | **trusting**  112:25 | 370:23 371:9 |
| 51:4 77:4 | **trajectory** | 291:25 | 371:19 375:16 |
| 121:17 237:14 | 271:20 | **trustworthy** | 378:16 379:14 |
| 251:23 290:16 | **transcript** | 292:11 | 379:15 381:9 |
| 307:6,14 309:4 | 417:8,22 | **truth**  255:11 | 381:14,21 |
| 354:11 370:19 | 418:16,17 | 258:11 324:4 | 404:16 405:7 |
| 371:10 401:4 | **transcription** | 375:8,12 | 405:17 406:8 |
| 401:22 403:11 | 420:5 | | 406:10,14 |

CONFIDENTIAL

**[tumblr - understood]**                                              Page 88

| | | | |
|---|---|---|---|
| **tumblr** 83:11 | **tyler** 2:3 30:18 | **uk** 334:12,14 | 144:1,1 177:6 |
| 83:13 | 69:15 | 342:6 | 180:10 186:13 |
| **turn** 124:22 | **type** 75:5,20 | **ultimately** | 201:8 210:1,7 |
| 125:12 163:23 | 240:3,8 252:13 | 81:12 97:9 | 236:22 249:15 |
| 384:5,22 | 259:16 277:25 | 98:14 160:11 | 257:20 259:22 |
| 386:19 392:18 | **typed** 48:21 | 182:3 243:25 | 264:4 271:19 |
| 392:20 398:19 | 49:9,9,10 | 283:2 293:3 | 271:24 282:18 |
| 402:15 | **types** 58:18 | 295:11 305:5 | 283:2,6,8 |
| **turns** 28:10 | 122:25 | 332:9 344:23 | 329:5 344:20 |
| **tv** 190:4 | **typical** 119:18 | **unable** 395:11 | 370:21 371:25 |
| **twelve** 70:4 | 262:11,17,25 | **unauthorized** | 372:11 406:17 |
| **twenty** 326:22 | 263:8,13,20,24 | 125:25 126:9 | 406:20 |
| **twitch** 83:15,17 | 264:5,7,24 | 207:19,20 | **understanding** |
| 408:25 | 265:19 266:1,2 | 208:12 211:1,3 | 30:1 57:6 83:1 |
| **twitter** 81:25 | 266:8,16 267:2 | 228:12 273:24 | 122:10,16,21 |
| 82:2,14,18 | 267:13,25 | 274:11 | 125:10 128:17 |
| 127:24 360:4 | 359:15 360:1 | **uncover** 375:12 | 128:17 136:6 |
| 360:18,23,24 | 360:16 404:1 | **under** 18:8,16 | 143:4,11 173:3 |
| 409:2,4,6 | **typically** 64:24 | 141:12 143:21 | 174:2 176:23 |
| **two** 2:17 23:12 | 74:4,21 75:9 | 209:10 283:20 | 182:14 185:16 |
| 24:4 64:2 | 78:19 119:3 | 288:3 291:21 | 218:6 219:7 |
| 90:17,20 | 165:20 232:12 | 385:1 417:23 | 222:20 247:9 |
| 147:20 293:23 | 262:24 264:20 | **underestimated** | 271:15 293:1 |
| 341:24 361:6 | 282:16 293:22 | 325:2 | 302:20 310:15 |
| 370:2,8,10 | 345:17 | **underrepresent** | 310:22 317:14 |
| 372:8,14 373:1 | **typo** 17:20,25 | 258:22 | 317:18 325:11 |
| 373:6,14,17 | 35:15 391:14 | **understand** | 406:22 |
| 374:10,16,24 | **typos** 35:6 | 10:18,19 17:4 | **understands** |
| 374:24,25 | | 18:24 57:1,10 | 176:10 190:13 |
| 377:24 378:7 | **u** | 57:15 76:4 | 193:7 197:2 |
| 387:24 388:18 | | 99:3 124:25 | 205:12 241:8 |
| 399:5 400:14 | **u.s.** 351:16,21 | 125:7 126:7 | 283:10 |
| 400:19 | 352:8,14 | 132:24 135:21 | **understood** |
| | **uh** 19:3 125:17 | 136:1 138:18 | 143:7,14,18,25 |
| | 328:17 329:21 | | |

CONFIDENTIAL

**[understood - using]**                                    Page 89

| | | | |
|---|---|---|---|
| 209:14 287:25 | 108:12,19 | 267:12,24 | 286:23 287:9 |
| **unfortunately** | 109:15 110:10 | 268:23 273:24 | 299:21 311:19 |
| 348:25 | 113:2 119:21 | 274:2,11,14 | 330:15,17 |
| **union** 345:11 | 126:1,10 129:1 | 298:22,25 | 339:6 344:18 |
| **unit** 219:10,12 | 130:3 133:14 | 304:15 312:20 | 347:13 365:12 |
| **united** 1:1 9:14 | 133:18,19 | 318:14 319:12 | 366:6,10,12 |
| **units** 282:18 | 138:24 139:8 | 319:20 330:21 | 391:19 392:4 |
| **university** | 139:16 143:1 | 334:16 346:7 | 393:1,6 395:13 |
| 71:15,18,21,24 | 148:8,19 | 346:24 347:3 | 396:16 397:2 |
| 72:7,14,18 | 151:17 152:19 | 349:22 350:10 | 404:14 409:3 |
| **unknown** 375:6 | 154:20 155:4 | 350:19 351:5 | 410:1,5 411:5 |
| 375:9 | 155:13,23 | 351:11,12 | 418:18 |
| **unquote** 404:3 | 161:5,6,13,15 | 359:16 360:2 | **useful** 53:25 |
| **unrealistic** | 161:16,18,25 | 360:16 361:20 | 237:12 347:9 |
| 224:14 | 162:2,4,9,14 | 382:6 408:19 | 413:8 |
| **unreasonable** | 165:23 166:6 | 409:2,6,9,11,12 | **usefulness** |
| 321:15 378:1,5 | 166:19 169:8 | 409:18,20,22 | 109:17 |
| **unreliable** | 183:6 185:3 | 409:24 410:12 | **user** 410:4 |
| 241:1 242:12 | 186:23 207:19 | **used** 20:8 23:23 | **using** 24:17 |
| 343:21,23 | 207:21 208:6 | 24:12 29:24 | 35:20 36:4 |
| 344:4 | 208:12,14 | 54:2,14 55:2,5 | 54:5,7 55:11 |
| **upper** 253:18 | 211:1,3 216:1 | 113:20 118:24 | 68:21 81:10 |
| **url** 329:1,7,24 | 217:13,17,19 | 120:14,19 | 94:9 109:9 |
| **usable** 247:21 | 222:24 227:1,4 | 121:10 143:8 | 110:1,15 111:1 |
| **use** 24:10 53:10 | 228:12 229:24 | 143:15 144:2 | 116:7,10 121:2 |
| 53:16,21 54:9 | 230:10,23 | 145:13 155:13 | 133:11 147:20 |
| 54:11,24 55:13 | 231:13 233:11 | 170:6 171:25 | 210:19 227:5 |
| 82:7 89:12 | 237:12 244:6 | 175:15 229:21 | 236:8 272:23 |
| 90:6,23 91:5 | 248:17,18 | 230:7 241:20 | 273:12 290:3 |
| 95:16,20 96:9 | 249:4,19 | 248:24 250:9 | 311:10 360:4 |
| 97:7 101:25 | 250:11 251:16 | 262:7 268:4,22 | 360:18 361:12 |
| 102:4,21 | 254:25 255:3,5 | 271:10 272:9 | 361:13 362:1 |
| 105:25 106:3 | 262:22,24 | 272:10,13,18 | 393:12 394:23 |
| 106:21 108:3 | 263:19 267:3 | 285:13 286:14 | 404:8 |

CONFIDENTIAL

**[usual - wages]**                                      Page 90

**usual**   238:9
   262:24 263:24
   265:1 266:2
   270:3 271:24
**usually**   119:5
   120:9 235:11
   238:15 252:14
   264:1,13

**v**

**vacations**
   264:10,14
**vague**   51:3,16
   173:25 179:4
   179:17 194:10
   199:9 200:5
   202:2 207:24
   211:16 214:18
   215:9 216:8
   225:1 226:18
   228:17 233:16
   233:25 234:10
   237:9 238:24
   239:10 240:16
   274:6 276:6
   277:22 284:6
   295:25
**vaguely**   74:2
**validate**   100:11
   100:17 104:22
   105:3 120:23
   121:6 241:13
   241:17 270:11
   270:21

**validity**   238:7
**valuable**
   216:22 217:14
   217:24 218:4,8
**value**   27:2,13
   57:18,20 58:4
   66:25 145:3
   170:7,8 178:7
   178:20 179:1,6
   179:13,20
   180:5,18,22
   181:4,12,19,20
   182:1,8,13,13
   182:16 183:3,8
   183:10 184:13
   184:17 186:3
   186:21 187:1
   187:15,22
   188:3 215:17
   217:3,5 218:9
   218:12,19,23
   219:2,8,17
   221:11 223:10
   227:6 234:7
   269:19 310:6
   312:17,21
   314:13 325:18
   396:24
**valued**   215:21
   222:1
**valueless**
   216:21
**values**   29:24
   186:19

**valuing**   187:23
   188:1,1 215:14
**variable**   18:9
   18:20 19:2
**variance**   257:7
   325:14 326:1
**variation**
   257:21 297:16
   378:14,24
   379:23 380:1
   380:12
**various**   58:18
   69:25
**vauss**   384:11
   384:17
**veracity**   283:22
**verify**   287:9
   397:23
**veritext**   9:4
**vested**   347:16
**vice**   32:21
   119:6
**video**   9:7 86:14
   86:19 151:11
   151:12 162:23
   163:3 190:4
   214:8,15
   234:21 235:1
   315:12,17
   383:22 384:2
   409:16 410:22
   415:14,19
   416:17,18

**videographer**
   3:8 9:1,3 86:13
   86:18 162:22
   163:2 234:20
   234:25 315:11
   315:16 383:21
   384:1 415:13
   415:18 416:7
   416:11,13
**videos**   85:4
   144:8,19 146:5
   149:4,16 150:1
   409:10,14
   410:25 411:2
**videotaped**
   1:16
**vince**   3:9
**volunteers**
   411:21 412:6,8
**voted**   260:12
   260:21 261:1,3
   261:13
**vouching**
   292:19,23

**w**

**wage**   116:9
   183:8 188:2
   215:19,22
   219:15 221:12
   222:1 393:24
   394:18
**wages**   19:14
   116:10,18,21

**[wages - witness]**                                        Page 91

| | | | |
|---|---|---|---|
| 117:1,7,13 | **ward**  1:16 5:3,7 | **watching**  190:4 | **websites** |
| 166:11 167:24 | 6:21 9:17,23 | **watts**  395:20 | 314:18,19 |
| 168:11 185:11 | 10:3 11:4,19 | 395:25 396:6 | **wednesday** |
| 185:14 186:23 | 12:21 13:9,21 | **way**  47:2 49:20 | 24:24 30:7 |
| 187:5 217:8 | 14:8,24 15:8 | 50:7 57:22 | 69:12 |
| 219:18 220:3 | 15:17 16:1,10 | 81:2 98:7,12 | **week**  264:1,2,7 |
| 223:11 235:17 | 16:19 20:25 | 120:12 160:9 | 264:8 270:2,3 |
| 394:12,25 | 21:10,20 22:4 | 181:7 185:7 | **weeks**  264:9,15 |
| 396:22,23 | 22:14 30:12,16 | 197:14 207:5 | **weight**  344:14 |
| 398:4 | 37:23 39:2,13 | 212:19 213:18 | **weird**  181:1 |
| **wait**  10:14 | 39:24 40:10,21 | 216:24 217:2 | **welcome** |
| 66:15 | 52:16,17,20 | 223:7 232:21 | 142:22 |
| **waiting**  414:15 | 53:3,6 60:17 | 233:12 253:8 | **went**  32:14 |
| **walk**  309:22 | 60:17,21 86:21 | 257:8 281:7 | 33:10 46:23 |
| **want**  34:23 | 124:15,19 | 282:3,5,8,14,21 | 128:22 133:23 |
| 38:12 57:11,12 | 128:9 129:10 | 303:24 306:23 | 167:14 169:20 |
| 72:11 75:13 | 133:6 135:10 | 307:18 313:8 | 170:15 172:3 |
| 87:5 91:1 | 135:10 136:14 | 330:9 331:19 | 274:20 285:19 |
| 113:11 161:23 | 136:19 142:3 | 336:23 339:2,8 | 413:20,20 |
| 174:18 175:25 | 163:5 198:10 | 340:14 342:8 | **whatnot**  376:1 |
| 186:13 220:17 | 210:12 235:3 | 369:2 374:6,21 | **whatsapp**  84:2 |
| 222:3,6 224:10 | 335:18,22 | 400:17 | 84:5 |
| 246:8 264:18 | 339:8 340:12 | **ways**  243:17 | **wider**  244:18 |
| 283:2,6 361:3 | 340:21 346:14 | 274:21 | **wife**  52:18 53:6 |
| 409:15 414:19 | 348:21 384:4 | **wc.com**  2:13,13 | 59:5,12 62:2 |
| 416:1 | 387:18,22 | **we've**  31:8 | 70:17,24 71:3 |
| **wanted**  45:12 | 388:24 415:21 | 134:6 161:19 | 71:8 |
| 89:10 90:4 | 420:2 | 163:12 184:1 | **william**  3:8 9:2 |
| 137:22 159:8 | **ward000001** | 220:14 226:19 | **williams**  2:10 |
| 162:12 218:21 | 6:20 60:16 | 231:18 292:25 | **willing**  277:15 |
| 264:17 | **wars**  353:7 | 355:10 361:1 | 379:16 |
| **wanting**  76:2 | **washington** | 376:24 | **winner**  271:12 |
| **wants**  197:24 | 2:12 3:4 | **website**  341:20 | **witness**  5:2 8:4 |
| 198:13 | | 341:20 | 9:21 34:14,21 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| 35:23 38:3,9 | 147:1,13 | 210:14 211:17 | 281:25 283:17 |
| 44:5 45:15 | 148:13,24 | 212:10,24 | 284:7 286:18 |
| 47:10 48:21 | 149:10,20 | 213:25 214:19 | 287:12 288:15 |
| 50:18 51:4 | 150:5,14,24 | 215:10 216:11 | 289:1 290:10 |
| 54:18 55:10 | 151:21 152:10 | 217:22 220:14 | 291:15 292:4 |
| 56:9 59:21 | 153:6,17 154:2 | 221:6,22 | 293:8 294:19 |
| 60:11 61:15 | 154:14 155:9 | 223:22 225:2 | 295:9 296:1,12 |
| 66:12 69:1 | 155:20 156:5 | 226:8,19 | 296:22 297:7 |
| 75:3 76:9,13 | 157:4,15,25 | 227:21 228:18 | 299:4,17 |
| 76:24 77:7 | 158:10,21 | 229:8 230:2,12 | 300:15,23 |
| 82:12 83:4 | 159:16,22 | 231:2,16 232:6 | 301:13,24 |
| 85:7 87:23 | 163:12 164:2 | 232:20 233:17 | 303:4,16 |
| 88:10,21 89:6 | 167:5 171:3,20 | 234:1,11 | 304:23 305:16 |
| 90:12 91:17 | 172:9,22 174:1 | 236:19 237:10 | 306:6 307:5,24 |
| 92:23 93:20 | 174:14 175:6 | 238:25 239:11 | 309:4,20 311:2 |
| 95:1 96:22 | 175:19 176:16 | 240:2,17 241:5 | 312:1,16 |
| 97:18 100:4 | 177:10 178:4 | 241:16 242:4 | 313:25 314:11 |
| 102:16 103:8 | 179:5,18 | 244:3,16 | 314:23 316:18 |
| 103:19 104:11 | 180:11 181:15 | 245:20 248:5 | 317:7 318:10 |
| 104:19 105:20 | 183:20 184:10 | 249:8,23 250:6 | 318:24 319:18 |
| 107:19 109:3,6 | 187:21 189:9 | 250:22 251:13 | 320:14 322:4 |
| 110:6 115:5,15 | 189:19 190:7 | 252:10,24 | 322:17 323:3 |
| 118:13 123:11 | 190:20 191:13 | 253:14 254:8 | 323:22 331:8 |
| 124:6 128:4,16 | 192:2,16 193:2 | 255:20 256:14 | 333:19 339:13 |
| 129:15 130:4 | 193:15 194:11 | 259:6,19 260:3 | 341:10 342:25 |
| 130:18 131:21 | 195:1,11,23 | 260:16 261:7 | 343:10 344:8 |
| 132:14 133:10 | 196:22 197:8 | 265:6,23 267:7 | 350:1 351:8 |
| 134:3,6,17 | 198:3,18 | 273:4,18 274:7 | 353:12 354:3 |
| 135:4,21 137:5 | 199:10 200:6 | 274:17 275:8 | 355:21 358:20 |
| 138:17 139:3 | 200:24 201:14 | 275:21 276:7 | 359:22 360:8 |
| 139:20 140:14 | 202:3 203:4,20 | 277:5,23 | 360:22 361:17 |
| 141:10 142:17 | 204:23 205:7 | 278:11,21 | 364:2,12 |
| 143:24 144:12 | 205:18 207:11 | 279:8,25 | 366:10,22 |
| 144:23 146:10 | 207:25 208:19 | 280:21 281:10 | 368:6,13 370:7 |

**[witness - yeah]**                                              Page 93

| | | | |
|---|---|---|---|
| 372:21 373:11 | 70:13 72:22 | 376:5,6 | **write** 45:16 |
| 373:21 374:13 | 73:2,12 74:18 | **worker** 205:11 | 66:12 75:17 |
| 375:4,21 | 74:19 75:2,5,6 | **workers** 165:13 | 131:11 262:9 |
| 376:18 377:19 | 75:7,10,20,21 | 165:13,16,17 | **writes** 389:16 |
| 379:6 380:5,17 | 76:18 77:6,22 | 166:14,14 | **writing** 34:23 |
| 381:4 382:13 | 78:6 123:2 | 388:14 | **written** 29:6,7 |
| 383:5,15 | 164:12,19 | **working** 62:20 | **wrong** 27:3 |
| 385:15 392:4 | 183:2 221:16 | 64:17 65:18 | 28:13 32:11 |
| 392:15 394:10 | 222:16 223:23 | 66:3 79:19 | 36:15,16 |
| 397:14 401:19 | 243:18 246:18 | 224:5,6,9,11 | 258:22 392:5 |
| 405:25 407:15 | 264:1,2,7,8,19 | 269:3 271:10 | **wrote** 334:19 |
| 408:16 415:23 | 264:20 269:17 | 308:11 411:20 | 415:9 |
| 418:1 | 269:18,25 | **works** 96:13 | **x** |
| **witnesses** 101:2 | 270:11,20 | 220:23 221:1 | |
| 314:2 | 271:20 278:4 | 320:16 | **x** 5:1,5 54:13 |
| **women** 271:21 | 279:14 297:24 | **workweek** | 81:25 82:2 |
| 272:1 | 302:18 304:17 | 264:11 | **xlsx** 18:6 |
| **won** 261:2 | 353:5,15,22 | **world** 28:7 | **y** |
| **word** 289:24 | 375:17 399:6 | 172:3 188:11 | |
| **worded** 254:15 | 414:7 415:5 | 188:13 191:8,9 | **yeah** 12:10,13 |
| 255:17,22 | **workday** 181:9 | 194:6,7 200:1 | 27:12 32:20,23 |
| 257:1 | 233:5,10 | 200:2 202:12 | 36:6 37:19 |
| **wording** 98:23 | 322:13,23 | 202:13 204:5,6 | 38:9 43:2 |
| 129:4 | **workdays** | 206:2,3,18,20 | 44:13,17 46:9 |
| **work** 34:2,2,9 | 199:6 270:6 | 228:10,20,25 | 49:1 55:12 |
| 35:21 36:7 | **worked** 61:13 | 229:11 245:24 | 56:18,24 57:11 |
| 52:9 53:11 | 61:23 64:6 | 263:24 312:22 | 57:25 58:15,16 |
| 54:3 55:16 | 77:18 268:11 | **worry** 219:1 | 58:25 63:7 |
| 56:21 57:8,14 | 268:20 269:13 | 240:4 | 66:17 69:25 |
| 58:8,11 59:2,6 | 270:2,3 271:24 | **worrying** | 75:19 76:5 |
| 59:18 60:8,22 | 272:12 301:7 | 240:21 | 79:18 82:2,21 |
| 61:1,7 62:7,12 | 304:20 308:15 | **worse** 85:25 | 94:11 96:13 |
| 62:15 64:13,23 | 308:17,20 | **wound** 386:5 | 123:23 127:4 |
| 65:9,13 66:8 | 375:15,22,23 | | 127:25 131:21 |
| | | | 139:20 144:4 |

CONFIDENTIAL

**[yeah - zoom]**                                                    Page 94

| | | |
|---|---|---|
| 157:4 161:20 | 28:9,13,14,15 | 307:7 356:12 |
| 166:16 167:22 | 28:18 31:12 | 356:16 357:19 |
| 170:3 172:9,24 | 32:10,18 49:5 | 409:9,11,11,12 |
| 174:1 176:22 | 49:9,10 59:16 | 409:15,17 |
| 180:11,25 | 59:24 60:2,7 | 410:22,25 |
| 184:2 186:6 | 62:15 76:21 | 411:3,5 415:22 |
| 192:18 196:10 | 95:14 267:4 | 416:15 |
| 213:10 214:2 | 268:15 269:15 | **yup**  12:18 13:6 |
| 222:13 231:3 | 351:2 363:8,11 | 13:15,18 64:19 |
| 241:16 245:1 | 390:14 393:9 | 125:23 215:10 |
| 248:9,12 254:1 | 393:25 395:2 | 236:1 248:7 |
| 254:1 256:17 | 404:9 410:14 | 262:14 308:22 |
| 260:6,23 | **years**  25:25 | 328:21,24 |
| 261:17,17 | 26:1,2 28:5 | **z** |
| 264:16,18 | 29:17 73:1,10 | **zachary**  3:14 |
| 265:6 268:22 | 73:10,14,21 | **zbower**  3:16 |
| 271:2 278:1 | 74:10 76:19 | **zero**  159:5 |
| 282:6 286:11 | 170:15 192:22 | **zoom**  2:4,4 |
| 289:18 293:22 | 267:4,4,5,14,25 | 415:24 416:8 |
| 294:19 308:19 | 268:6 269:3 | |
| 308:19 316:2,3 | 270:13,22 | |
| 318:24 327:10 | 271:10 272:12 | |
| 334:21 339:24 | 272:18 395:4,7 | |
| 347:8,8,25 | **yeates**  2:4 | |
| 348:4 349:4,7 | 69:17 | |
| 355:25 356:4 | **yesterday** | |
| 365:4 374:1 | 69:18 | |
| 389:8 392:15 | **ygr**  1:5 | |
| 392:16 393:9,9 | **youtube**  2:14 | |
| 400:10,23 | 10:6 81:23 | |
| 401:6,11 | 87:21,23 88:4 | |
| 405:11 414:19 | 88:7 89:12 | |
| **year**  18:17 | 126:3,11 | |
| 27:14 28:8,8,8 | 130:12,16 | |