**Exhibit 62**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3    IN RE: SOCIAL MEDIA ADOLESCENT    )
     ADDICTION/PERSONAL INJURY         ) MDL No.
4    PRODUCTS LIABILITY LITIGATION     ) 4:22-md-3047-YGR
     _____  )

5

     THIS DOCUMENT RELATES TO:         )
6                                      )
     BOARD OF EDUCATION OF HARFORD     )
7    COUNTY V. META PLATFORMS INC.,    )
     ET AL.                            )
8                                      )
     CASE NO.: 4:23-CV-03065           )

9

10

11      Confidential - Pursuant to Protective Order
12        VIDEOTAPED DEPOSITION DONOVEN BROOKS
13         Harford County Public Schools Central
14              Administration Building
15            102 South Hickory Avenue,
16                Bel Air, Maryland
17          Thursday, May 8, 2025, 10:28 a.m.
18
19
20
21
22
23
24
25

CONFIDENTIAL

```
                                            Page 2

1    APPEARANCES:
2    For Plaintiff Harford County Public Schools:
3              BY:  MATTHEW P. LEGG, ESQ.
                   Brockstedt Mandalas Federico LLC
4                  2850 Quarry Lake Drive - Suite 220
                   Baltimore, Maryland 21209
5                  410.421.7777
                   mlegg@lawbmf.com
6
7    For the Defendants Meta Platforms, Inc., f/k/a
     Facebook, Inc.; Facebook Holdings, LLC; Facebook
8    Operations, LLC; Facebook Payments, Inc.; Facebook
     Technologies, LLC; Instagram, LLC; Siculus, Inc.;
9    and Mark Elliot Zuckerberg:
10             BY:  EBEN S. FLASTER, ESQ.
                   BY:  WILLIAM S. WALBERG (VIA ZOOM)
11                 Shook, Hardy & Bacon LLP
                   Two Commerce Square
12                 2001 Market Street, Suite 3000
                   Philadelphia, Pennsylvania 19103-7014
13                 215.278.2555
                   eflaster@shb.com
14                 wwalberg@shb.com
15
     For the Defendant Snap:
16
               BY:  ALEX INGOGLIA, ESQ. (VIA ZOOM)
17                 Kirkland & Ellis LLP
                   333 West Wolf Point Plaza
18                 Chicago, Illinois 60654
                   312.862.1083
19                 alex.ingoglia@kirkland.com
20
21         (Appearance continued on next page.)
22
23
24
25
```

CONFIDENTIAL

```
                                          Page 3

 1               APPEARANCES CONTINUED:
 2
     For the Defendants Alphabet Inc., Google LLC, and
 3   YouTube LLC:
 4               BY:  J. ANDREW KEYES, ESQ.
                 BY:  LYDIA WEIANT, ESQ.
 5               Williams & Connolly LLP
                 680 Maine Street SW
 6               Washington, DC 20024
                 202.434.5584
 7               akeyes@wc.com
                 lweiant@wc.com
 8
 9   For the Defendants TikTok, Ltd.; TikTok, LLC;
     TikTok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
10
                 BY:  KATRINA JACKSON, ESQ. (VIA ZOOM)
11               King & Spalding LLP
                 1700 Pennsylvania Avenue, NW
12               Suite 900
                 Washington, D.C. 20006
13               202.626.2640
                 kjackson@KSLAW.com
14
15   Also Present:  Ryan Sohmer, Videographer
                    Jacob Arndt, Exhibit Technician
16                  Lauren R. Drive, Deputy General Counsel
                    Harford County Public Schools
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 4

1                        I N D E X
2                                                    PAGE
3   EXAMINATION BY MS. WEIANT                           5
4
5                    E X H I B I T S
6
7   NUMBER                DESCRIPTION              PAGE
8   EXHIBIT 1    Curriculum Vitae of Donoven         8
                 Brooks
9
    EXHIBIT 2    News article dated 1/8/19          66
10               titled Harford Schools Include
                 Mental Health Component in
11               Active Assailant Training
12  EXHIBIT 3    Emails, top one dated              82
                 10/30/18, Subject:  Gang
13               member placements, Bates
                 HCPS_00226861-62
14
    EXHIBIT 4    Article dated 8/24/18 titled      122
15               Harford Students Returning
                 Sept. 4 Should Feel Safer in
16               School, HCPS Security Chief
                 Says
17
    EXHIBIT 5    Plaintiff Board of Education       129
18               of Harford County's Amended
                 Objections and Responses to
19               Defendants' Interrogatories
                 (Set 3)
20
    EXHIBIT 6    Email dated 1/15/18, Subject:      143
21               MCFSS Conference Call Notes -
                 Call Reminder Tuesday January
22               16, 2018 @ 10 am EST, Bates
                 HCPS_00553865-70
23
24
25

CONFIDENTIAL

Page 5

```
 1                   P R O C E E D I N G S

 2                          * * *

 3             THE VIDEOGRAPHER:  We are now on the

 4   record.  My name is Ryan Sohmer.  I'm a

 5   videographer for Golkow, a Veritext division.

 6   Today's date is May 8th, 2025.  The time now is

 7   10:28 a.m.

 8             This video deposition is being held at

 9   102 South Hickory Avenue, Bel Air, Maryland.  We're

10   here in the matter of Social Media CA MDL 3047,

11   Board of Education of Harford County versus Meta,

12   for the United States District Court, Northern

13   District of California.  Our deponent is Donoven

14   Brooks.

15             Counsel will be noted on the

16   stenographic record.  Our court reporter is

17   Cindy Hayden and will reswear the witness.

18                          * * *

19                     DONOVEN BROOKS,

20     having been first duly sworn, was examined and

21                   testified as follows:

22                          * * *

23                       EXAMINATION

24   BY MS. WEIANT:

25        Q.   Good morning, Mr. Brooks.
```

CONFIDENTIAL

```
                                        Page 6

 1          A.   Good morning.

 2          Q.   We met earlier, but my name is

 3   Lydia Weiant.  I'm with the firm Williams &

 4   Connolly.  I'm joined by -- with my colleague

 5   Andy Keyes, and we represent Google and YouTube in

 6   this case.

 7               Can you please state your name for the

 8   record?

 9          A.   Donoven Ray Brooks.

10          Q.   And you're aware that you are under

11   oath today?

12          A.   I am.

13          Q.   You gave testimony earlier this morning

14   as a corporate representative of Harford County

15   Public Schools, right?

16          A.   Yes.

17          Q.   Other than your testimony this morning,

18   have you ever given testimony under oath before?

19          A.   Yes.

20          Q.   When?

21          A.   Over my 23 years as a law enforcement

22   officer.

23          Q.   Have you ever been deposed before?

24          A.   Yes.

25          Q.   Were those depositions in connection
```

CONFIDENTIAL

```
                                           Page 7
 1   with your work as a law enforcement officer?
 2         A.   Yes.
 3         Q.   Can you estimate how many depositions?
 4         A.   One.
 5         Q.   You've given one.
 6              Do you recall what matter that was for?
 7         A.   Yes.
 8         Q.   What was it for?
 9         A.   It's for a police officer that I
10   terminated from the police department when I was a
11   chief of police who brought about a tortious
12   lawsuit and named me and the town and the -- the
13   mayor in -- in the suit.
14         Q.   And that's the -- is that the only
15   testimony you've given under oath before at
16   deposition?
17         A.   Yes.
18         Q.   Did you do anything to prepare for this
19   deposition?
20         A.   Just had brief conversations with the
21   two attorneys here at the table.
22         Q.   Did you review any documents?
23         A.   No.
24         Q.   Did you speak to anyone other than your
25   lawyers about your deposition today?
```

Page 8

1          A.    No.

2          Q.    Okay.

3              (BROOKS EXHIBIT 1, Curriculum Vitae of

4     Donoven Brooks, was marked for identification.)

5     BY MS. WEIANT:

6          Q.    I'm going to show you what has been

7     marked Brooks Exhibit 1.  This is a copy of your

8     CV, right?

9          A.    Yes.

10         Q.    Did you prepare this?

11         A.    Yes.

12         Q.    When did you prepare this?

13         A.    2017 and updated it in 2024.

14         Q.    Okay.  So is it up to date with your

15    most recent information?

16         A.    Yes.

17         Q.    So on the third page, it lists your

18    educational background.  You received an associate

19    of applied science in law enforcement

20    administration from Baltimore City Community

21    College in 2009; is that right?

22         A.    Yes.

23         Q.    And a bachelor in management and

24    leadership from Johns Hopkins?

25         A.    Yes.

CONFIDENTIAL

Page 9

1           Q.    And a master of science in public

2   safety management from Johns Hopkins?

3           A.    Yes.

4           Q.    What -- what was your job coming out of

5   school, first job coming out of school?

6           A.    What level of school are you talking?

7           Q.    I guess, what job did you begin your

8   career with?

9           A.    Oh, as -- out of high school or -- I

10  mean, I'm just trying to -- did I begin my career

11  with?

12          Q.    Okay.  Sorry.  Strike that.

13                The first employment history you have

14  listed on your CV is United States Air Force.

15          A.    Yes.

16          Q.    Okay.  And you spent nine years in the

17  Air Force?

18          A.    Yeah.  Just under ten years, yeah.

19  Like nine years, ten months, yes.

20          Q.    What was your position?

21          A.    I held a few.  Do you want the last

22  one?

23          Q.    Can you just give me a quick list of

24  your various positions in the Air Force?

25          A.    My first position was presidential

CONFIDENTIAL

Page 10

```
 1   support.  I was in the Air Force Presidential Honor
 2   Guard.  I had top secret clearance.  Did work at
 3   the White House, the Pentagon.
 4              From there, I left and went to a NATO
 5   international police unit in Naples, Italy, where I
 6   spent time working in a top secret capacity there.
 7              And then I came back to the U.S. and
 8   worked at Central Command and Special Operations
 9   Command.  And closed out my career finally doing
10   what I first got trained to do, which was law
11   enforcement, which I didn't really do the first six
12   or seven years of my career.
13       Q.   So what did you do after leaving the
14   Air Force?
15       A.   Came home and joined the police
16   department.  Went to the Baltimore City Police
17   Academy and started my career in civilian law
18   enforcement.
19       Q.   And your first position in civilian law
20   enforcement, you said was with the Baltimore City
21   Police --
22       A.   Yeah.  I went through the Baltimore
23   City Police Academy and started with the Baltimore
24   City School Police in '97.
25       Q.   Okay.  How long were you with the
```

CONFIDENTIAL

Page 11

1    Baltimore City School Police?

2          A.    20 years.

3          Q.    Did you attend school during that time

4    as well?

5          A.    Yes.

6          Q.    Some of the degrees you've listed

7    earlier?

8          A.    All of those happened -- yeah, all

9    those happened well into my career with

10   Baltimore City School Police.

11         Q.    And so those were degrees that you

12   received while --

13         A.    Yeah, while --

14         Q.    -- working at Baltimore City Police?

15         A.    Yeah, while I was with the department,

16   yes.

17         Q.    And you -- during that time, you also

18   served part-time as the chief of police at

19   Fairmount Heights Police Department --

20         A.    Yes.

21         Q.    -- right?

22                What did you do in that position?

23         A.    I was the chief of police.  So I

24   oversaw the police department.  Primarily, what I

25   really spent my time doing was saving the -- the

CONFIDENTIAL

Page 12

1    commission and the accreditation of the department

2    because it was about to lose its Maryland state

3    commission and accreditation as a police

4    department.

5         Q.   Why was it about to lose its

6    accreditation?

7         A.   A lot of mismanagement with the

8    previous chief who was there and just a lot of

9    administrative and operational things.

10             And primarily, at that time, we code --

11   uniform code reporting to the FBI had not been

12   reported for several years, so -- and, also,

13   mandated statistics that should have been reported

14   to the Maryland State Police.  So when I was hired,

15   that was one of the things I was asked to focus on

16   so that they would not lose commission.

17        Q.   And you said your time was spent saving

18   the commission.  Do you think you saved the

19   commission?

20        A.   Oh, I know I did.  The department is

21   thriving.

22        Q.   So over the course of your 20 years

23   with the Baltimore City School Police Force, what

24   were your various positions throughout that time?

25   Did they change?

CONFIDENTIAL

Page 13

1          A.    They did.  I started off as a
2     school-based officer, which I refer to as "school
3     resource officers."  And I operated in that
4     capacity for a number of years.
5               And I pretty much worked in every
6     academic environment during that time period from
7     pre-K through 12, special programs.  Yeah, I
8     touched -- during that time period, I touched every
9     type of population in our school district in
10    Baltimore City that we had -- student population we
11    had.
12         Q.    Were you stationed at different
13    schools, or were you stationed at a central office
14    and then would travel for work to the --
15         A.    No.  In the very beginning, I was --
16    yeah, when -- when the school year would start,
17    officers would get their assignment, so...
18              And there were schools that I was the
19    officer there for two years.  There were schools I
20    was there for three years.
21         Q.    And that was all within your capacity
22    as a school resource officer?  You --
23         A.    Yes.
24         Q.    Okay.  What was your next position
25    after-school resource officer?

CONFIDENTIAL

Page 14

1          A.    The next position, I was promoted to --

2     well, I -- I was placed -- I was still a school

3     resource officer.  I -- it wasn't a promotion, but

4     I was placed in patrol.

5          Q.    And what is patrol?

6          A.    So patrol units are responsible for

7     responding -- we call them "sectors."  So there

8     were 18 schools in a sector.  When calls for

9     service came out, if that school did not have its

10    own full-time SRO, I would respond to that call for

11    service as a patrol unit.

12         Q.    How many schools in that district did

13    not have SROs; do you recall?

14         A.    That fluctuated.  I mean, you got -- at

15    any given time actually deployed inside of a

16    school, we might have had -- like, actually in a

17    school, maybe 70, something like that, at that

18    time, when I first joined, 180-something schools.

19         Q.    So you would go out when you received

20    calls for service.  What types of calls for service

21    would you respond to?

22         A.    When I first went on patrol -- I mean,

23    it varied.  Theft, assaults, vandalism, disorderly,

24    a lot of -- lots and lots of disorderly, and lots

25    of emergency petitions for mental health situations

CONFIDENTIAL

Page 15

1    because we were the transport.  If a student was

2    declared needing any of mental health intervention,

3    we did the transport to the hospital.

4         Q.    How often would you say you did that?

5         A.    The --

6         Q.    The transportation for mental health?

7         A.    Frequently.

8         Q.    So you started as an SRO stationed at

9    schools -- at the various schools, and then you

10   went to SRO patrol?

11        A.    Yes.

12        Q.    What position did you hold after that?

13        A.    I was promoted to corporal.

14        Q.    And what is that?

15        A.    That is first-line supervisory duties,

16   working under the guidance of the sector sergeant,

17   sector corporal.

18              So now it's a little bit different

19   because -- responsible for other officers,

20   scheduling, reviewing reports; constantly in the

21   car all day now, you know, except, you know, riding

22   around, checking on officers; stopping in, speaking

23   with administrators; collecting reports at the end

24   of every day; checking in with officers to see what

25   their needs are; delivering items out in the field

CONFIDENTIAL

Page 16

1    to officers and responding to calls for service on

2    a radio.

3            So even if a patrol unit gets a call,

4    depending on what that call is, probably as a

5    corporal will show up to back up and support the

6    patrol officer.

7        Q.    Did you hold any other positions after

8    corporal?

9        A.    Yes.

10       Q.    What position did you hold after that?

11       A.    Sergeant, or as we -- as we refer to

12   it, area commander sergeant.

13       Q.    And what were your responsibilities as

14   sergeant, area commander?

15       A.    Responsible for all of the schools in

16   my sector, all of the police officers; writing

17   evaluations on the officers, biannual evaluation,

18   evaluating corporal; determining what resources

19   were needed for my officers in the field; reviewing

20   reports; scheduling training; assigning, directing

21   and scheduling both regular duty-hour assignments

22   and after-hour assignments for officers.

23       Q.    Any positions after sergeant?

24       A.    Not with the Baltimore City School

25   Force.

CONFIDENTIAL

Page 17

1          Q.    When did you leave the Baltimore City
2    School Force?
3          A.    January of 2018.
4          Q.    And in your time with Baltimore City,
5    you mentioned you would respond to calls for
6    service.  Did you respond to violent incidents at
7    the schools?
8          A.    Yes.
9          Q.    What types of violent incidents?
10         A.    Primarily, fights.
11         Q.    Did you ever respond to incidents of
12   gun violence?
13         A.    Yes.
14         Q.    Do you know how many?
15         A.    I do not.
16         Q.    Would you say less than five, more than
17   five?
18         A.    More than five.
19         Q.    More than ten?
20         A.    Yes.
21         Q.    25?
22         A.    So I need to clarify, because you're
23   asking me about gun violence proximity.  So because
24   schools in Baltimore City are like -- community
25   school, like, sit right in the middle of

Page 18

1    communities, you know, you can have the front door

2    to school, and then you can have Ms. Ethel's house

3    like 20 feet away, right?

4        Q.    Yeah.

5        A.    So, oftentimes, because of proximity,

6    yeah, I would respond to gun violence because, you

7    know, if there was a run and gun battle at 11:00 in

8    the morning and we're locking the school down and

9    we're responding, yeah, that -- you know, you got

10   two people shooting at each other, which was not

11   infrequent -- which was pretty frequent in

12   proximity of a school, then it impacted the school,

13   even if it wasn't somebody bringing the gun in the

14   school or whatever.

15            So there were lots of situations where

16   there was gun violence that surrounded school that

17   I had to respond to.

18       Q.    Would you -- throughout your 20-year

19   career with Baltimore City, did you -- Baltimore

20   City Schools Police, did you respond to violent

21   incidents in all of the positions you listed

22   earlier, or was that at certain points in your

23   career?

24       A.    All of them.

25            MR. LEGG:   Objection to form.

Page 19

1                THE WITNESS:  I'm sorry?

2                MR. LEGG:  It's okay.

3                THE WITNESS:  All of them.

4    BY MS. WEIANT:

5         Q.    What was your next position after

6    Baltimore City School Police?

7         A.    The position here at Harford County.

8         Q.    And you said you left --

9         A.    Supervisor.

10        Q.    -- in January of 2018.  Is that also

11   when you started with Harford County Public

12   Schools?

13        A.    Yes.

14        Q.    And what was your title when you

15   started with Harford County Public Schools?

16        A.    Coordinator of safety and security.

17        Q.    Is that your current title as well?

18        A.    Supervisor of safety and security.

19        Q.    When did you switch from coordinator of

20   safety and security to supervisor?

21        A.    When I wrote a proposal to the

22   superintendent of the board to expand the -- the

23   department.  So manpower increased and subsequently

24   aligned with a different title based on the growth

25   of the department.

CONFIDENTIAL

Page 20

1          Q.    Do you remember what year that was?
2          A.    That was 2023.
3          Q.    When you began as coordinator of safety
4    and security, what were your primary job
5    responsibilities?
6          A.    To respond to situations inside of --
7    at our schools; support the schools; to, you
8    know -- everything safety and security.
9               When I started this job, it was
10   literally a two-person office.  Safety and security
11   for the district was handled by myself, and my
12   support person was my assistant, my office
13   assistant.
14         Q.    Was that their title, "office
15   assistant"?
16         A.    Yeah, she was my -- yeah, she was my --
17   "administrative assistant" was her title.
18         Q.    And what was her name?
19         A.    Susan Cuomo.
20         Q.    Is she still with --
21         A.    No.  She retired.
22         Q.    What year did she retire?
23         A.    She retired in 2022.  I want to say
24   2022.
25         Q.    So between the time -- while serving as

Page 21

1  coordinator of safety and security until 2023, did

2  you have staff under you before you took the

3  position of supervisor?

4       A.   Yes.  I had my assistant and seven --

5  it started with seven.  We piloted an expansion of

6  the office.  We piloted a program, and we hired

7  seven people.

8       Q.   What year was that?

9       A.   That was 2021 when we started the

10  pilot.

11       Q.   So until 2021, was there any other --

12  were there any other staff members in the safety

13  and security department other than you and

14  Ms. Cuomo?

15       A.   No.  That was pretty much it.  2020 is

16  when we started to -- well, I'm sorry.  2020 is

17  when we -- when we started to expand, right around

18  the time of COVID, when we were just getting into

19  bringing on our school safe liaisons.

20       Q.   Who do you report to?

21       A.   Now I report to Ms. Cathy Bendis and

22  Dr. Eric Davis.  Those are two -- my two reports.

23       Q.   Who is Cathy Bendis?

24       A.   She is the assistant superintendent of

25  operations.

CONFIDENTIAL

Page 22

1          Q.    And who is Eric Davis?

2          A.    He is the chief of administration,

3     second in command of the school district.

4          Q.    Over the course of your career, have

5     you ever worked as a teacher?

6          A.    I've worked as an instructor but not as

7     a teacher.

8          Q.    What do you mean by "instructor"?

9          A.    I was a certified law enforcement

10    instructor for ten years, both firearms and

11    academic classroom instructor, certified through

12    the Maryland State Police.

13         Q.    And who were you instructing?

14         A.    Well, in classroom instruction, law

15    enforcement.  Firearms instruction, I'm a certified

16    firearms instructor for both civilian and law

17    enforcement.

18         Q.    Have you ever taught in a public school

19    setting?

20         A.    Yes.  I've trained in a public school

21    setting but not classroom teacher, no.

22         Q.    Okay.  Have you ever taught in any

23    other school setting in K through 12 classrooms?

24         A.    No.

25         Q.    Have you ever worked as a principal?

CONFIDENTIAL

Page 23

1           A.    Never.   No.

2           Q.    Have you ever worked as a mental health

3    counselor?

4           A.    I don't know.   If being a police

5    officer in Baltimore City for 25, 20 years counts,

6    yeah.   But other than that, no.

7           Q.    Your formal titles have not involved --

8           A.    No.

9           Q.    -- mental health counseling

10   responsibilities?

11          A.    No.

12          Q.    And have you ever worked as a nurse?

13          A.    No.

14          Q.    Or other healthcare provider?

15          A.    No.

16          Q.    Have you ever worked as a school

17   counselor?

18          A.    No.

19          Q.    Have you ever worked in a school's IT

20   department?

21          A.    No.

22          Q.    Can you tell me more about how the

23   department developed and changed between when you

24   joined in 2018 and today?

25                MR. LEGG:   Objection to form.

CONFIDENTIAL

Page 24

```
 1              THE WITNESS:  Yeah.  So, in 2018, when
 2    I -- when I came, it was -- I stepped into the role
 3    that my -- my, you know, predecessor was in, in the
 4    same position as coordinator and any office.
 5    Oversaw -- excuse me -- safety and security
 6    throughout the district.  Supported schools with
 7    their safety and security measures and emergency
 8    incident plans.  Responded for really significant
 9    events that schools needed support for.
10              And coming from where I came from,
11    both -- both my military and police background, I
12    just did not see how it was going to be possible
13    to -- for one person to, you know, continue doing
14    those duties.  So started changing first in my mind
15    and then, you know, putting it on paper and what --
16    what that vision looked like to be able to support
17    the schools with more than just me.
18              So we piloted a program, the school
19    safe liaison, where we started with seven school
20    safety liaisons who were deployed to schools.
21              And the way I deployed those particular
22    seven was based on data and information I collected
23    on support, looking at what schools I had provided
24    the most support to when it was just myself.  So
25    those were schools I said would probably benefit
```

Page 25

1    most.  And the program, you know, met with success

2    over the next couple of years.

3              And then, you know, I made requests to

4    increase our manpower there and also made requests

5    to provide supervisory positions as we grew the

6    department, so...

7              So from then to now, yeah, we went from

8    a 2-person operation to now just under a 40-person

9    operation.

10   BY MS. WEIANT:

11        Q.   Okay.  So you said between 2018 and

12   roughly 2020, it was just you and Ms. Cuomo in the

13   department?

14        A.   Yes.

15        Q.   Around 2020, you added seven school

16   safety liaisons?

17        A.   Yeah.  We started that process in '19,

18   but, yeah, we started adding them -- like, started

19   the process of creating the title, the -- working

20   all the HR stuff and then started adding folks.

21        Q.    And it was your idea to add these

22   positions?

23        A.    Yeah.  We talked -- I talked that over

24   with -- at that time, my direct report was

25   Dr. Eric Davis.  So we had numerous conversations

Page 26

1    of what that would look like.

2        Q.    And the -- part of that you mentioned

3    with your military and law enforcement background,

4    you did not see how it was going to be possible for

5    one person to continue fulfilling your duties in

6    the safety and security department.  What do you

7    mean by that?

8        A.    What I mean by that is that, when you

9    have multiple schools that need various levels of

10   support, it's just not going to be possible for one

11   person to be heading -- heading to Darlington

12   Elementary for a school that's 2 miles from the

13   Pennsylvania line and get a phone call from

14   Joppatowne High School, which is right on the

15   Baltimore County -- on Harford County line, almost

16   an hour away, to say, "Could you come support

17   this?" or what -- you're one person.

18            And so -- also knowing that there were

19   incidents -- one of the things that I saw were,

20   there were incidents that arise to the level of

21   intervention but not necessarily law enforcement

22   intervention.

23            So just based on my background, I

24   started to become a little concerned about things

25   that SROs were being asked to get involved in

CONFIDENTIAL

Page 27

1    where, yeah, although it needed intervention to

2    support the principals a little bit higher than

3    where they were, I didn't necessarily think we

4    needed law enforcement involved in those things.

5    That was part of what I saw as well.

6              And so from a support role and a

7    problem-solving role, I just felt we needed to grow

8    the -- the department and have that type of

9    personnel available to support our schools.

10         Q.   When you joined in 2018, were there

11   school resource officers at every school in

12   Harford County Public Schools?

13         A.   No.

14         Q.   How many were there?

15         A.   There were resource officers in every

16   high school and almost every middle.  But shortly

17   thereafter -- within a year of me joining, we had

18   them at every high school and every middle school

19   within a year of me joining.

20         Q.   As of today are there school resource

21   officers in every high school and every middle

22   school?

23         A.   Yes.

24         Q.   Do you have any supervisory role over

25   school resource officers?

CONFIDENTIAL

Page 28

1          A.    No.

2          Q.    So you said you -- there were too many

3    incidents to respond to -- for one person to

4    respond to each incident in the school district on

5    a given day or week?

6          A.    Yeah.  Not just too many incidents, but

7    there's too much responsibility and safety and

8    security for one person to be responsible for 55

9    schools, 40,000 -- roughly 40,000 students, 6,000

10   employees for one person to be able to support the

11   needs.

12          So not just necessarily incidents, but

13   just the needs, you know, reviewing critical

14   incident reports, emergency plans.  You're just one

15   person.  You know, you're just not -- you're not --

16   you're just not going to be able to provide

17   adequate support to that many schools and that many

18   communities.

19          Q.    And you mentioned situations that might

20   need intervention but not law enforcement

21   intervention and, therefore, maybe not an SRO

22   intervention.  What types of interventions are you

23   talking about?

24          (Discussion off the record.)

25          MS. WEIANT:  Can we take a break real

CONFIDENTIAL

Page 29

1   quick?

2            MR. LEGG:  Looks like we're having some

3   technical difficulties.

4            THE WITNESS:  Oh, okay.

5            MR. LEGG:  So we're going to take a --

6            MR. KEYES:  The Zoom participants got

7   disconnected.

8            THE WITNESS:  Uh-huh.

9            THE VIDEOGRAPHER:  We are now going off

10  the record at 10:58 a.m.

11                         * * *

12            (Whereupon, there was a recess in the

13  proceedings from 10:58 a.m. to 12:21 p.m.)

14                         * * *

15            THE VIDEOGRAPHER:  We're now going back

16  on the record at 12:21 p.m.

17  BY MS. WEIANT:

18       Q.   Welcome back, Mr. Brooks.  We just took

19  a short break to address some technical issues.

20  Before we left, we were discussing the structure

21  and changes to the safety and security department

22  since you've joined.  We actually had a question

23  pending before we left.  So I'm going to reask that

24  question for you.

25            Earlier in your testimony, you

Page 30

1    mentioned that there were situations that might

2    need intervention but not law enforcement

3    intervention; and, therefore, they may not need SRO

4    intervention.  What types of interventions were you

5    talking about?

6           A.    I was talking more about situations

7    where students may have an incident that's a

8    safety-and-security-related incident but more in

9    alignment with breaking a policy or procedure,

10   school policy or procedure, and not necessarily

11   rising to the level of law enforcement, which for

12   me, coming from where I came from, really only

13   wanted law enforcement involved when there was

14   infractions or -- or breaking the law, and, you

15   know, you need that expertise to determine the

16   elements of an incident and whether or not it rises

17   to law enforcement.

18                And I started seeing, you know, fights,

19   minor frays, minor vandalism, de-escalation of

20   students that might be escalated due to agitation,

21   irritation.

22                When teachers aren't necessarily in a

23   place to de-escalate and deal with that because

24   they've got 20 other students in the class, I

25   don't -- I didn't really want them calling SROs to

CONFIDENTIAL

Page 31

```
 1   the class to deal with that, even if the
 2   administrator shows up and the person refuses.  I'd
 3   rather have another layer of safety and security.
 4            So that's what I mean by "rise to a
 5   level of intervention" but not necessarily wanting
 6   a police officer to show up.
 7        Q.   So that was one of the reasons you
 8   adopted safety -- school safety liaisons?
 9        A.   Yes.
10        Q.   You also mentioned that at some point
11   you requested supervisory positions.  When was
12   that?
13        A.   That would have been the 2022-2023
14   school year.
15        Q.   And what position did you think needed
16   to be created?
17            MR. LEGG:  Objection to form.
18            THE WITNESS:  Regional supervisors.
19   Because with the addition of and the growth of the
20   school safe liaison position, now I just went right
21   back to a situation I had previously.
22            Because now I have the folks, but then
23   if it's all reliant on me to supervise every one of
24   them and address the needs of everyone, then at
25   some point we're going to reach, you know, law of
```

CONFIDENTIAL

Page 32

1   diminishing returns in terms of what support I can

2   give.  So I needed other people to be able to do

3   that.

4   BY MS. WEIANT:

5        Q.   And how many -- how many regional

6   supervisors did you request?

7        A.   I think initially I requested like

8   five.

9        Q.   How many did you -- well, did you get

10  any regional supervisors?

11       A.   Three.

12       Q.   And that -- those positions began in

13  2022 to 2023 school year?

14       A.   Yeah.

15       Q.   So as of today, the safety and security

16  department includes yourself, three regional

17  security or three regional supervisors, and then

18  the school safety liaisons below them?

19       A.   Yes.

20       Q.   How many school safety liaisons are

21  there?

22       A.   We have, right now, approximately 30.

23  We've had some to leave and get other positions.

24  Just brought some on recently.  But slots, about 30

25  slots.

Page 33

1        Q.    Are they assigned to specific schools?

2        A.    Some.   The majority of them are.

3        Q.    How do you determine which schools get

4    assigned a specific school safety liaison?

5        A.    So what we've done heretofore is we

6    post the position when we have -- so we have two

7    types of SSLs, just to be clear.  We have floaters,

8    and then we have those SSLs who are, for all

9    intents and purposes, permanently assigned to a

10   school or fixed to a school.

11           If there's a vacancy at a school where

12   the individual will be assigned to that particular

13   school, the position will be posted.  We will say,

14   this school is hiring for an SSL.  Once we look at

15   the pool of candidates, we interview with the

16   principal, some other member of their staff and a

17   member of my team, sometimes myself.  And that's

18   pretty much --

19           So it's not like I hire ten people and

20   say, "You're going to go here"; "you're going to go

21   there"; "you're going to go there."  The school is

22   involved in the hiring process when there's an

23   opening at their school for the SSL.  And that's

24   how we did it from its inception.

25       Q.    Okay.   Are there any other positions

CONFIDENTIAL

Page 34

1   within your department that we have not discussed?

2          A.    Just my assistant.  That's it.

3          Q.    Yeah.

4                And when you are -- when Ms. Cuomo

5   retired, did you hire a new assistant?

6          A.    Yes.

7          Q.    What -- what's their name?

8          A.    Christina Paquette.

9          Q.    Outside of your department, who within

10  Harford Public -- Harford County Public Schools do

11  you work most closely with?

12                MR. LEGG:  Objection to form.

13                THE WITNESS:  I work very closely with

14  technology department.  I work very closely with

15  our PIO, our communications office.  And I work

16  very closely with Mr. Hennigan's office,

17  Buck Hennigan.

18  BY MS. WEIANT:

19          Q.    And which department is that,

20  Mr. Hennigan's department?

21          A.    Yeah.  The pupil services office,

22  student services.

23                I work with -- I work with the

24  suspension services folks for long term for

25  students that are referred.  So I work with Buzz's

Page 35

1   office, which is -- all falls under Buck's office.

2   And then I work collaboratively with the office to

3   get my folks trained in CPI training.

4       Q.   When you joined Harford County Public

5   Schools and initially hired that first round of

6   school safety liaisons, what prompted you to create

7   that position and hire those employees?

8       A.   The fact that I felt there should be a

9   stopgap of support between principals, teachers and

10  law enforcement and that there should be someone to

11  be able to liaise in between there, again, for

12  things that I saw.

13           Like, coming from where I had come

14  from, you know, we had that.  There was nothing

15  like that that existed here.  So as I saw things

16  happening and got a better grasp of the lay of the

17  land, I felt like we could use this position, you

18  know, to help in our schools.

19      Q.   Was anyone else asking to increase

20  safety and security measures at the school around

21  that time?

22           MR. LEGG:  Objection to form.

23           THE WITNESS:  Safety and security

24  measures?  Yeah, safety and security measures.

25  Personnel?  At that time, when I first started?  I

CONFIDENTIAL

Page 36

1    mean, because I immediately started assessing a

2    need in 2018 shortly after I was here.

3             But security measures, yeah.  Because

4    shortly after I was here, we had the tragedy in

5    Parkland.  So whenever you have those type of

6    tragedies, you know, security measures and focus on

7    security measures become a lot more magnified.

8    BY MS. WEIANT:

9        Q.   At some point, did legislators become

10   more interested in safety and security on school

11   campuses, that you're aware of?

12       A.   Absolutely.

13       Q.   When was that?

14       A.   Is your question, when -- when do I

15   think they became more interested?  Is that --

16       Q.   Yes.

17       A.   -- what you're asking me?

18            Definitely in the aftermath of the

19   Stoneman Douglas shooting, I saw what I would

20   consider an escalation of interest surrounding

21   security measures.

22       Q.   And are you familiar with the

23   Maryland Safe to Learn Act?

24       A.   Absolutely.

25       Q.   Did that play a role in how you hired

CONFIDENTIAL

Page 37

1   new positions for your department?

2           A.   I wouldn't say that played a role in

3   the hiring of new positions.  I think for -- for me

4   here in the immediate aftermath, that played a role

5   in some security upgrades --

6           Q.   What security upgrades?

7           A.   -- throughout the district.

8                Some refreshing of cameras and

9   purchasing more radios, things of that nature.

10  But, yeah, here in -- yeah, because I worked very

11  closely with the county executive's office in the

12  aftermath -- in the immediate aftermath of that.

13  And we had conversation about some additional

14  funding for physical security resources,

15  technology -- mostly surrounding technology.

16               But there was no conversation about

17  increasing manpower in the -- in the immediate

18  aftermath of the Stoneman Douglas shooting as it

19  relates to, you know, conversations that was being

20  had with me.

21          Q.   Aside from cameras, refreshing cameras

22  and purchasing radios, were the -- were there other

23  safety measures you implemented in response to the

24  Safe to Learn Act?

25          A.   Yeah.  So we -- yeah, we implemented

CONFIDENTIAL

Page 38

1    every measure that was -- that was passed in the
2    bill.  We hired a mental health coordinator.  We --
3    we had to either contract or develop an active
4    shooter, active assailant program.  We had to
5    create drills and training surrounding active
6    shooter programs.
7              We had to look at threat assessment,
8    threat assessment -- look at our processes, our
9    threat assessment teams, training surrounding
10   threat assessment.
11             So, yeah, we -- we -- yeah, we carried
12   out the mandates based on Maryland Safe to Learn
13   Act.
14        Q.   The mental health coordinators you
15   mentioned, are those employees that sit in your
16   department?
17        A.   No.
18        Q.   Do you have any role in supervising
19   them?
20        A.   No.
21        Q.   In 2022 to 2023, that school year when
22   you hired regional security coordinators, did you
23   make any other changes to the size of the
24   department?
25        A.   Yeah.  We hired more school safe

CONFIDENTIAL

Page 39

1  liaisons.

2        Q.    Why did you hire more in that 2022 to

3  2023 school year?

4        A.    Because we were just having an

5  escalation of, again, those situations that rise to

6  the level of intervention where we -- we -- one,

7  the success of the pilot program; and, two, just

8  the need to support schools with that position.

9        Q.    So there was a greater need to support

10 schools at that time?

11        A.    There was a need to -- to provide the

12 same services that we were providing at the

13 other -- that the -- that the other schools were

14 not previously getting, that we were only getting

15 that service at seven schools.  So we wanted to

16 expand it to other schools.

17        Q.    You've mentioned security cameras.

18 When did Harford County Public Schools first

19 install security cameras?

20        A.    I have no idea.

21        Q.    They were in the buildings when you

22 joined --

23        A.    Absolutely.

24        Q.    -- in 2018?

25        A.    Yeah.

Page 40

```
 1          Q.    Are -- does Harford County Public
 2    Schools have live feed cameras?
 3          A.    Yes.
 4          Q.    Where?
 5          A.    In all of our school buildings.
 6          Q.    All of the cameras in the school
 7    buildings are live feed?
 8          A.    Yes.
 9          Q.    Do you have cameras in every classroom?
10          A.    We have cameras in no classrooms.
11          Q.    Do you have cameras in hallways?
12          A.    Yes.
13          Q.    In every hallway?
14          A.    That, I don't know if we have them in
15    every hallway.  But if I had to -- if I had to
16    estimate, we've probably got them in 99 percent of
17    our hallways.  But I'm sure there's a hallway here
18    or there that probably could use a camera, maybe.
19          Q.    So there are cameras in every school
20    within the school district?
21          A.    Yes.
22          Q.    Do you have cameras at every entrance
23    of the schools?
24          A.    Yes.
25          Q.    Do you have cameras on buses?
```

Page 41

1        A.    Yes.

2        Q.    How does Harford County Public Schools

3   use the footage from these security cameras, if at

4   all?

5        A.    How do we use the footage?  Sometimes

6   we use it to fulfill subpoena requests when it's

7   requested.  And we use it to view incidents,

8   accidents.

9             Yeah, that's pretty much how -- we --

10   we use it to review anything that comes up that we

11   need to, you know, take a look and see if we can

12   get -- if footage even exists on it.  So we use it

13   as an investigative tool.  Yes.

14        Q.    During your time at -- in your

15   position, has anyone requested an upgrade in

16   security cameras?

17        A.    Has anyone requested an upgrade?  I

18   don't know if I understand your question.

19        Q.    Have any teachers or administrators

20   requested that Harford County Public School buy new

21   security cameras to increase their quality or their

22   effectiveness?

23        A.    I'm going to say no, because I think

24   our folks understand that we have what are called

25   "camera refreshes."  So if a school did reach out

Page 42

1  and say, you know, "I want a newer camera over

2  here," we're going to look at where that school

3  falls in the refresh and -- because, you know,

4  those cameras only have a certain lifecycle.

5          So if your school is scheduled for a

6  refresh the 2027-2028 school year and you want

7  newer cameras and that's where your refresh cycle

8  is, then we'll let you know, like, "Hey, 2027-2028

9  you're going to get better cameras than you have

10  now because these cameras are coming to the end of

11  their lifecycle."  So these cameras will be

12  whatever it is in 2027 -- you'll have the newer

13  stuff.

14          Q.   Does Harford County Public Schools

15  utilize any weapons detection devices?

16          A.   Yes.

17          Q.   How?

18          A.   We utilize -- right now, we utilize it

19  on a -- we utilize one weapons detection system

20  right now that we're try- -- that we're looking at

21  at Joppatowne High School.  We use that for entry

22  of students in the morning.

23          We are in a piloting phase of using

24  another weapons detection, which is called

25  OPENGATE.  And we are using those weapons

CONFIDENTIAL

Page 43

1   detections to -- we're -- we're using this time to

2   collect data so we can determine how we're going to

3   drive our policy in the future with using these

4   weapons detection devices.  So we're using them on

5   a random basis for some after-school events.

6           Q.    So Joppatowne High School is the only

7   one that uses weapon detection devices on a daily

8   basis?

9           A.    On a daily basis, yes.

10          Q.    When did that begin?

11          A.    That began, I want to say -- we went go

12  live on that end of October-November time frame.  I

13  can't remember exact.

14          Q.    Why did you add a weapons -- weapons

15  detection device at Joppatowne High School?

16          A.    That weapons detection device was added

17  in the aftermath of the shooting that occurred in

18  September.

19          Q.    And before the fall of 2024, Harford

20  County Public Schools did not use any weapons

21  detection devices at any other school?

22          A.    No.

23          Q.    Did it use it at any events prior to

24  that time?

25          A.    No.

Page 44

1          Q.    Does Harford County Public Schools
2     search its students' property?
3                MR. LEGG:  Objection to form.
4                THE WITNESS:  When -- are you saying
5     just in general or -- I mean, I'm trying to
6     understand the question.
7     BY MS. WEIANT:
8          Q.    Has there ever been a time when school
9     officials have searched students' property?
10         A.    Yes.
11         Q.    Why would you search students'
12    property?
13         A.    You would search a student's property
14    if you have reason to believe or cause to believe
15    that the student may be in possession of
16    contraband, if they may be in possession of a
17    weapon.
18                And based on Maryland law, you would
19    search a student if an administrator determines
20    that the locker or personal belongings of a student
21    should be searched for any of those items as well.
22         Q.    Who performs those searches?
23         A.    Those searches are typically performed
24    by an administrator or a school safe liaison or
25    school security person.

CONFIDENTIAL

Page 45

1          Q.    Do you do any random searches?

2          A.    Of student -- no, no random searches of

3    students.  If you mean like when they're coming in

4    the door, every fifth student we're going to pull

5    to the side and search their book bag, no, we don't

6    just do random searches like that.

7          Q.    Do you do random property searches?  So

8    when students are not present, searching their

9    lockers?

10         A.    We used to.  We suspended that during

11   COVID, and we have not -- we have not resumed that

12   yet.

13         Q.    Why haven't you?

14         A.    Well, because a lot of the law

15   enforcement agencies have gotten away from the

16   marijuana-sniffing dogs, and that's pretty much

17   what we were doing.  We were doing drug dog scans.

18              And so a lot of them are -- I mean, you

19   know, because of the laws changing, a lot of

20   agencies are not spending money to have canines

21   trained on a substance that has either been

22   decriminalized in -- in some cases.  You know, the

23   laws have just become more lenient.  And -- and I

24   don't think you want to train a dog to sniff

25   fentanyl because it might be the last sniff.

CONFIDENTIAL

Page 46

1          Q.    Do you ever go to a student's home and
2     search their home --
3                MR. LEGG:  Objection to form.
4     BY MS. WEIANT:
5          Q.    -- for any reason?
6                MR. LEGG:  Objection to form.
7                THE WITNESS:  Do I, or does anybody
8     representing my office?
9     BY MS. WEIANT:
10         Q.    Does anyone at Harford County Public
11    Schools go to a student's home to search their home
12    at any time?
13               MR. LEGG:  Objection to form.
14               THE WITNESS:  No.
15    BY MS. WEIANT:
16         Q.    If you received information that led
17    you to believe a student possessed a weapon at
18    home, would you do anything to investigate --
19         A.    Can you ask --
20         Q.    -- that information?
21         A.    Can you ask the question again?
22         Q.    If you received information that led
23    you to believe that a student possessed a weapon or
24    had access to a weapon at home, would you do
25    anything to investigate that allegation?

Page 47

```
 1          A.   Just merely that they might have a
 2    weapon in their home?
 3          Q.   If --
 4          A.   No.
 5          Q.   If they also made a threat?
 6          A.   Yes.
 7          Q.   How would you investigate their access
 8    to a weapon?
 9          A.   We would notify law enforcement
10    partners and give -- provide them the information
11    that we've been given, especially if there's a
12    nexus to a threat.  And then from there, our law
13    enforcement partners would deal with any search
14    that took place at the home.
15          Q.   Would that be school resource officers
16    or separate law enforcement partners?
17          A.   It could be --
18               MR. LEGG:  Object to the scope.
19               THE WITNESS:  It could be both or
20    either.  If the threat comes in at 10:00 at night,
21    and the nature of the threat dictates that
22    immediate investigation needs to start, that could
23    be a patrol deputy who receives the call.  Because,
24    you know, SROs are typically off at 4:00, you know.
25    BY MS. WEIANT:
```

Page 48

1        Q.    Does Harford County Public Schools do

2    any searches specifically to find weapons that

3    might be in the schools?

4                MR. LEGG:  Objection to the extent this

5    goes beyond the scope.

6                THE WITNESS:  If you're talking about

7    weapons detection that you walk through, yes.

8    BY MS. WEIANT:

9        Q.    Yes.

10               Aside from the weapons detection

11   devices we've discussed, are there any other

12   measures in place to identify when the student

13   brings a weapon to school?

14               MR. LEGG:  Object to the extent it goes

15   beyond the scope.

16               You may answer if you have personal

17   knowledge.

18               THE WITNESS:  Do we at this time?  No.

19   Other than the weapons detection, do we at this

20   time?  No.

21   BY MS. WEIANT:

22       Q.    So beyond weapons detection devices,

23   security cameras and searches in certain

24   circumstances, what other technology or devices

25   does Harford -- Harford County Public Schools use

CONFIDENTIAL

Page 49

1    to identify threats?

2              MR. LEGG:  Object again to the extent

3    it goes beyond the scope of this deposition.

4              To the extent you can answer

5    personally, you may go ahead.

6              MS. WEIANT:  Counsel, just to clarify,

7    this is his fact witness portion of the

8    deposition --

9              MR. LEGG:  I understand.

10             MS. WEIANT:  -- correct?

11             MR. LEGG:  Yeah.  You're asking

12   questions on behalf of Harford County Public

13   Schools.  So I'm just objecting to the extent that

14   you're asking him to seek testimony on behalf of

15   the school district rather than himself.

16             But you may answer.

17             THE WITNESS:  I just need you to read

18   the question again.

19   BY MS. WEIANT:

20        Q.   Yes, of course.

21             So beyond weapons detection devices,

22   security cameras and searches, are you aware of any

23   other technology or device that the schools use to

24   identify threats?

25        A.   That we're currently using to identify

CONFIDENTIAL

Page 50

1    threats, no.

2         Q.   All of the safety and security

3    measures, including staffing and the various

4    technologies and devices we've discussed, require

5    funding, right?

6         A.   Correct.

7         Q.   Since you've joined Harford County

8    Public Schools, how has the safety and security

9    budget changed?

10        A.   Safety has been increased in terms of

11   being able to cover the hiring of our school safe

12   liaisons as well as our regional security

13   coordinators, allocation of funding now for the

14   weapons detection systems and, you know, increased

15   line items to help procure more radios and cover

16   some more of the camera -- camera needs.

17        Q.   Do you know how much the budget has

18   grown since you joined in 2018?

19        A.   Without having it in front of me, no.

20        Q.   Would you be able to estimate a

21   percentage amount of growth?

22        A.   No.

23        Q.   When the school is making the budget

24   every year, do you put in requests for new projects

25   or positions that you would like to fund?

CONFIDENTIAL

Page 51

1          A.    Yes.
2          Q.    Have you ever been denied funds for
3    safety and security initiatives?
4          A.    Yes.
5          Q.    What initiatives have you been denied
6    funding for?
7          A.    There have been a number of them.
8    Without having it in front of me, I can't -- I
9    don't -- wouldn't recall off the top of my head.
10         Q.    Can you recall any specific things that
11   have -- you've been denied funding for?
12         A.    No, I can't think of anything specific.
13         Q.    Does your department receive any grant
14   funding?
15         A.    Yes.
16         Q.    How much of your budget would you say
17   is from grants?
18         A.    I wouldn't know that information off
19   the top of my head.
20         Q.    Who would?
21         A.    Who would know it off the top of their
22   head?  I don't know.
23         Q.    Would you be able to find that
24   information?
25         A.    Oh, I'll be able to find the

CONFIDENTIAL

Page 52

1    information, yes.

2         Q.    Is there one place where you could

3    identify all of that information, or would you have

4    to look at specific grant proposals?

5         A.    I would have to look at, at least, at a

6    minimum, three places, because safety and security

7    touches other offices.   There are other things that

8    are safety and security related but are not

9    necessarily managed by my office.

10        Q.    You said you would have to look at

11   three things.   What are those three things?

12        A.    I said a minimum of three.

13        Q.    Oh, a minimum.

14        A.    So I would -- I would have to -- I

15   would have to get some information from

16   Mr. Hennigan's office, the threat assessment and

17   all of the things encapsulated in it, our safety

18   and security measures.   That's not managed by my

19   office.   I don't manage those teams.   Those teams

20   are academic folks that are on the ground, inside

21   of the school.

22             So any funding that would go to that,

23   you know, I would have to collaborate, you know,

24   with that office.

25             I definitely would have to collaborate

CONFIDENTIAL

Page 53

1   with the office of technology, because there's so

2   much that we do that is in collaboration with the

3   office of technology.  And then our grants office

4   itself.

5          Q.   Earlier, we discussed the Maryland Safe

6   to Learn Act, correct?

7          A.   Yes.

8          Q.   And that legislation requires active

9   shooter training, right?

10         A.   It did.  That law has changed.

11         Q.   How has it changed?

12         A.   So when that -- when that law was first

13  passed, the way we conducted our training, we

14  could, you know, freely do simulations as close to

15  real world as possible.  But with most recent

16  legislation, there's been pretty much a 180 on how

17  those trainings should look, how they should be

18  conducted and things that are now expressly

19  prohibited.

20         Q.   What things are now expressly

21  prohibited?

22         A.   Loud noises, loud bangs, any simulation

23  of a weapon, any simulation of a person being

24  injured or harmed by a weapon, you know,

25  full-scale -- no full-scale drills with

CONFIDENTIAL

Page 54

1    role-playing of someone being an assailant or

2    someone being a victim.  None of those things were

3    precluded in the initial law, but they -- we -- we

4    can't do those things now.

5           Q.   Do you have an understanding of why you

6    can't do those things anymore?

7           A.   No, I don't really have an

8    understanding of -- I don't necessarily know of an

9    understanding of why.  But I know that this became

10   a very divided issue on what's needed to prepare

11   students and staff and what's not needed, so...

12              I understand that there became this

13   divide where it was very polarizing in '18 where

14   everybody was saying.  But I can't say I fully

15   understand it.

16              And the reason I can't fully understand

17   is because when these events around the country

18   occurred, the biggest question was:  Why aren't you

19   doing more to protect my children?  Why aren't you

20   doing more to protect, you know, our students?  Why

21   aren't you doing more to protect our staff?  What

22   more are you going to do?  Those were the questions

23   in '18.

24              And so the legislature said, "Okay.

25   These are the things that we're going to do.  We

CONFIDENTIAL

Page 55

1  weren't doing this.  This is what we're going to

2  do."

3                So we checked those boxes that the

4  community was asking, that the legislature --

5  because the legislators were even asking.  And if

6  we -- if you don't do this, how come you don't do

7  this?  If -- if students don't know how to respond

8  to this, why don't they know how to respond to

9  this?

10                So when you asked me, do I understand

11  why all of a sudden those questions aren't still

12  being asked, why we don't still want our students

13  prepared in the same way, why we don't want our

14  staff prepared in the same way as we wanted them

15  prepared in April of 2018, I don't fully understand

16  why that changed.

17        Q.    When did it change?

18        A.    Over the past couple of years, it

19  started changing when new legislation was coming

20  out that was changing the way that we approached

21  training and drills for our students.  Though these

22  events have not changed, our approach to preparing

23  for them has definitely changed.

24        Q.    And when you say "these events," what

25  are you referring to?

CONFIDENTIAL

Page 56

1           A.   I'm referring to escalating violent

2      events that still occur in schools.

3           Q.   What would that include?

4           A.   Excuse me.  That would include events

5      where schools have still experienced violence, gun

6      violence.

7           Q.   What did your critical response

8      training look like beginning in 2018?

9           A.   Critical response training in 2018

10     looked like mainly lockdown.  Like, we locked down

11     for everything.  That's -- in 2018, critical

12     response, the way you responded to most critical

13     incidents was locking down.  And really didn't

14     matter what it -- what it was; it was pretty much

15     lockdown.

16              That was one of the things that the

17     legislature was concerned about.  That was one of

18     the questions.  Why is that the only thing we know

19     how to do?  Why don't we know how to do other

20     things?  Those were the questions.

21           Q.   And lockdown, is that also referred to

22     as shelter in place?  Are they similar?

23           A.   They're similar, yeah.  Slight --

24     slight differences.  I mean, if I --

25           Q.   Slight differences?

CONFIDENTIAL

Page 57

1           A.    Yeah.  If I got a hurricane outside, I
2    might want to shelter in place, but I might not
3    want to lock people out who are trying to get
4    inside the building.
5                 If I got a shooter outside, I'm
6    sheltering in place, but I also don't want anybody
7    getting in the building because I don't know if
8    you're the assailant.  So there are some slight
9    nuances.
10          Q.    Did that change in -- sorry.  Strike
11   that.
12                Did the critical response training
13   change in 2019?
14          A.    Critical response training had some
15   additions to it after the Maryland Safe to Learn
16   Act.
17          Q.    What were those additions?
18          A.    Well, the active shooter training.
19          Q.    And what did the active shooter
20   training look like?
21          A.    Our active shooter training looked like
22   about an hour and a half -- like 90 minutes of
23   presentation and then in preparation for practical
24   exercises.
25                And our training -- I mean, we had --

CONFIDENTIAL

Page 58

1  we had Nerf guns.  We had -- you know, we had

2  vests.  You know, we had simulation equipment.  We

3  collaborated with our law enforcement partners.

4           And we -- after we did our presentation

5  portion, we broke down, and we put our staff

6  members in situations that would allow them to

7  understand response mechanisms and options.  It

8  was -- it was really rooted in options.

9           Because when all you've done in a

10 school system -- not just our school system.  When

11 all you've done since the '70s is this thing called

12 "lockdown," that doesn't necessarily give way to

13 options.  And that was one of the biggest questions

14 that the community and the legislator asked, "How

15 come our folks don't have options?"  And so our

16 training was options-based.

17      Q.   And to clarify what you just described,

18 that training was for staff and teachers?

19      A.   The initial training is for staff and

20 teachers and to be able to conduct drills with our

21 students.

22      Q.   And what do the student drills look

23 like?

24      A.   So our student drills were scaled down

25 some.  More of a talk-through, walk-through type of

Page 59

1    situation.  We didn't use Nerf -- so we didn't use

2    Nerf guns.  We didn't use any of those type of

3    equipment or apparatus with our students.

4              However, we did go through the

5    continuum of optional response.  Like, you do have

6    the option to run if you hear gunfire on the west

7    side of the building and you're on the east side.

8              You do have the option to not wait for

9    the gunman to get to the west side of the building

10   from the east side.  You have an option to run and

11   evacuate.

12             You do have the option other than just,

13   yeah, lock the door, but you've got an option if

14   you've got file cabinets and desks and whatever

15   else you can pile, and explaining the mindset

16   behind that, explaining the mindset based on data,

17   that people who commit these offenses want to do

18   the most amount of damage in the shortest period of

19   time.  They're not going to spend five minutes

20   trying to get through a door that you barricaded.

21             But if nobody's ever talked to you

22   about that, nobody ever shown you what that looks

23   like, then you don't necessarily think about that.

24   You don't necessarily develop that motor memory or

25   sensory skill when these things happen.

CONFIDENTIAL

Page 60

1          And then, ultimately, to talk about the

2   option of fighting back.  You don't just have to be

3   a willing participant in your own demise.  So

4   that's what those things look like.

5          Q.   Can you give examples of how you help

6   students develop sensory skills that would allow

7   them to respond to an active shooter situation?

8          A.   More of motor -- more of a motor

9   skills.  Showing them, from their classroom, exits,

10  you know, exit areas or whatever.  And not just for

11  a fire drill, right?  Because you do these fire

12  drills or whatever, we're pretty much taking, you

13  know, kids to the nearest exit/entry or whatever.

14          Getting students in the mindset, again,

15  of following instruction, taking direction when you

16  get a critical life-threatening event where there's

17  someone trying to create harm by violence.

18          And so just practicing and training

19  what that response looks like as opposed to having

20  a situation in the aftermath and saying, "Oh, I

21  never knew I could do that."  "I never knew that

22  exit was right there."  "Nobody ever walked us

23  through here."  "Nobody ever told me if I hit the

24  corner of a window, even on a 21st century

25  building, that I can spiderweb that window instead

CONFIDENTIAL

Page 61

1  of throwing a chair in the middle of it and

2  wondering why the chair keeps bouncing back."

3           So if you don't -- if no one tells you

4  these things, then you don't know these things.

5  And so that's what we worked on training our

6  students on.

7           Q.   Is one of your goals in these student

8  drills to help students understand how serious the

9  situation could be?

10          A.   Yes.

11          Q.   How do you do that?

12          A.   Well, in terms of showing them how

13  serious the situation can be, the biggest thing

14  we're teaching them is the preservation of -- of

15  life, you know, of their own life when we start to

16  talk about these specific drills.

17          We see these drills -- or we saw these

18  drills as having been meant to help our students

19  understand that these can be life-saving measures.

20          But I think it's also important to note

21  that we've also let our staff and our students know

22  that these are transferable skills.  So it doesn't

23  matter.  If you're with your parents somewhere and

24  something like this happens, you can utilize these

25  same skills.  You can utilize this thinking.

CONFIDENTIAL

Page 62

1           And so we also help them by letting
2    them know that it's not just response.  It's also
3    about thinking.  It's not just about immediately
4    reacting or responding, but it's always -- it's
5    also about thinking your way through the situation.
6           Q.   So when you were doing drills, what did
7    a full talk-through, walk-through drill look like
8    with students?
9           A.   So if we -- at a particular school, if
10   the active assailant drill -- well, first of all, I
11   didn't -- the state said active shooter.  When I
12   wrote the program, I decided to call it "active
13   assailant," because not every assailant has a gun
14   that can do damage.
15           So in our active assailant drills, we
16   would determine whether or not we were going to do
17   a run, hide or fight portion of that drill based on
18   that particular classroom.
19           And so let's just say it was a
20   barricade situation.  What we did is we talked
21   through.  We didn't necessarily have our students
22   take desks or whatever.
23           So to really tell you what it looks
24   like, if everyone here were students and I was the
25   teacher, I would say, "Can you point out three

CONFIDENTIAL

Page 63

1   things that you would use to block that door if we

2   knew somebody was down the hallway and making their

3   way down here?"  And then the teacher can shut it

4   down, and students can start talking.

5              Me and Mike would grab your desk,

6   Ms. Jones, because it's the heaviest, and we will

7   push it in front of the door.  That projector cart

8   right there, we'll try to put it on top of the

9   desk.  We would make sure we get out of the sight

10  of the window if -- if it has a window, you know.

11  And they would talk through it.

12             When it comes to the evacuation piece,

13  we actually would walk out into the hallway and

14  talk about what that evacuation would look like

15  from that particular classroom.

16             If it was the last resort of having to

17  defend -- fight and defend your life, then, again,

18  the teacher would say, "I want you all to think

19  about, when you look around this classroom, what

20  are some things that we might be able to use to

21  neutralize and defend ourselves from someone if

22  they were to breach the barricade we put up, if

23  they were to get in.  What are some things that we

24  would do?" you know.

25             You know, me and John Doe would stand,

CONFIDENTIAL

Page 64

1   you know, next to the door with, you know, a chair.
2   We'd be prepared to throw the stapler.  We'd be
3   prepared to throw things at -- and this is what we
4   were training the students.
5          So that's what our drills looked like.
6   Did we have a kid throw, you know, a stapler at the
7   door?  No.  Did we get up and move stuff physically
8   in front of the door?  No.
9          We -- we decided to take the route of
10  talking these things through with our students and
11  having them paint pictures in their mind of what it
12  would look like if they were confronted with these
13  situations.
14      Q.   You mentioned that there might be a
15  run, hide or fight portion of these drills.  In any
16  given drill, would you cover all three of those
17  options?
18      A.   Typically, no.  We wouldn't -- we would
19  just do -- we would pick a time to really focus on
20  one and then do another one at another time.
21  Although, schools were not prohibited from touching
22  on all three if a teacher wanted to touch on all
23  three of those things.
24      Q.   How often would students participate in
25  these drills?

CONFIDENTIAL

Page 65

1        A.    When we first started, at least once,
2    maybe twice a year they would participate in those
3    drills.
4        Q.    After the laws changed, did you
5    continue to do any type of active assailant drills
6    with students?
7        A.    Instruction.
8        Q.    What does that look like?
9        A.    Just talking about what the response
10   would look like if someone comes in, but pointing
11   stuff out and all that --
12            Anything that could, I don't know,
13   incite or invoke -- evoke some type of emotional
14   type of response, with actually describing or what
15   does it look like, somebody is coming through the
16   door with a gun and all that, got away from -- from
17   that stuff.  Because the law pretty much says you
18   really can't go into all that type of stuff,
19   anything that might be considered creating trauma
20   to a student.
21            So now we can do an evacuation drill
22   like -- because you can evacuate for any number of
23   reasons.  And we can cite that as a part of our
24   evacuation drill, that our students would know how
25   to evacuate in the case of an active assailant.

CONFIDENTIAL

Page 66

1          We can still do lockdown drills.  We

2     don't have to give a reason.  We can just say,

3     "Hey, if we get the notice from the office that

4     we're going into lockdown, this is what lockdown

5     means.  We're going to lock the door.  We're going

6     to shut off the lights.  We're not going to leave

7     out until we're given the clear."

8          Well, we don't necessarily have to say

9     that was for because it's an active -- as I say, it

10    could be for any reason.  It could be for a medical

11    emergency.  And we've got emergency services people

12    coming in.  We don't want anybody in the hallway.

13         So we go in and say we're in a lockdown

14    because we've got, you know, somebody that just had

15    a medical emergency, and we're going to have some

16    emergency apparatus moving through the hallways.

17    And we don't need anybody out here, so we're locked

18    down until further notice.

19         So when we do a lockdown drill now, we

20    don't specifically have to put the reason.  We just

21    need to know our kids know how to do a lockdown

22    drill.

23              (BROOKS EXHIBIT 2, News article dated

24    1/8/19 titled Harford Schools Include Mental Health

25    Component in Active Assailant Training, was marked

CONFIDENTIAL

Page 67

1    for identification.)

2    BY MS. WEIANT:

3          Q.    I'm going to show you what has been

4    marked Brooks Exhibit 2.

5                MS. WEIANT:    This is Tab 13.

6    BY MS. WEIANT:

7          Q.    Go ahead and take a moment to review

8    this document.

9                Have you had time to review?

10         A.    Yes.

11         Q.    So this is a news article dated

12   January 8th, 2019, titled "Harford Schools Include

13   Mental Health Component in Active Assailant

14   Training."  Do you see that?

15         A.    Yes.

16         Q.    Are you familiar with this article?

17         A.    Yes.

18         Q.    Did you provide comments for this

19   article?

20         A.    Yes.

21         Q.    And this -- in 2019, Harford County

22   Public Schools was still doing active assailant

23   drills with their students, right?

24         A.    In 2019?

25         Q.    Yes.

CONFIDENTIAL

Page 68

1          A.    Yes.

2          Q.    Can you turn to the second page, the

3    first full paragraph --

4          A.    I'm sorry.  I'm sorry.  Say that again.

5          Q.    The first full paragraph.

6          A.    Okay.  Where it starts with "reunify"?

7          Q.    No.  So it's the one right below that.

8    Sorry.  It says:  Some students and adults.

9          A.    Uh-huh.

10         Q.    So, some students and adults,

11   especially those who suffer from anxiety, could

12   have reactions to the training, and Board Vice

13   President Laura Runy -- Runyeon asked how trainers

14   would handle that.

15              The first part there, "Some students

16   and adults, especially those who suffer from

17   anxiety, could have reactions to the training" --

18         A.    Uh-huh.

19         Q.    -- do you agree with that?

20         A.    Yes.

21         Q.    A few lines down, there's a quote that

22   says:  Students and even adults who take the

23   training are impacted by it, he said.  Past trauma

24   could impact how people receive training.

25         A.    Uh-huh.

Page 69

1          Q.    Is that your view?

2          A.    Yes.

3          Q.    Do you believe that students and adults

4    might be impacted by the training?

5          A.    Yes.

6          Q.    And that people who have experienced

7    trauma in their past might be impacted more

8    heavily?

9          A.    I don't know about more heavily, but

10   they could be, depending on what that trauma is.

11   But, yeah, it could be.

12         Q.    But -- so -- sorry.  Strike that.

13                Experiencing past trauma could change

14   the way that you experience the training?

15         A.    Yes.  Could change the way you receive

16   it, yeah.

17         Q.    Was it your understanding that these

18   drills might be traumatic for students?

19         A.    No, not our drills.  No.  Not the way

20   we conducted ours.

21         Q.    But it was your understanding that they

22   might -- it might -- they might cause anxiety?

23         A.    Yes.

24         Q.    They might cause stress?

25         A.    Well, yeah, I guess they could,

CONFIDENTIAL

Page 70

1    depending on the -- the child.  But, yes, it could

2    cause stress.

3          Q.   But you believed it was still important

4    to do it?

5          A.   Yes.

6          Q.   Why?

7          A.   Because it's what our community asked

8    for.  And it is -- it's also a part of the changing

9    landscape of our society when we started looking at

10   the increase in these incidents.

11              So either you're going to be -- you're

12   going to take steps to be prepared and prepare your

13   people to be able to respond, or you just don't

14   prepare and you don't take steps.

15         Q.   You believe that helping students and

16   teachers prepare might ultimately save their life,

17   right?

18         A.   Might ultimately, yes.

19         Q.   You can set that document aside.

20              MS. WEIANT:  Let's take a quick break.

21              MR. LEGG:  How long do you want?

22              MS. WEIANT:  Five minutes?

23              MR. LEGG:  Cool.

24              THE VIDEOGRAPHER:  We are now going off

25   the record at 1:15 p.m.

Page 71

1                          * * *

2              (Whereupon, there was a recess in the

3     proceedings from 1:15 p.m. to 1:38 p.m.)

4                          * * *

5              THE VIDEOGRAPHER:  We are now going

6     back on the record at 1:38 p.m.

7     BY MS. WEIANT:

8         Q.   As supervisor of safety and security,

9     what types of threats or incidents do you -- are

10    you responsible for?  Strike that.

11             As supervisor of safety and security,

12    what types of threats or incidents does your team

13    respond to?

14        A.   Excuse me.  A wide variety of threats

15    and incidents.  My team responds to threats of --

16    all threats of violence we're going to, you know,

17    be involved in, sometimes threats -- threats of

18    self-harm.  But pretty much any type of threat to

19    the safety, security and well-being of our students

20    and staff, we're going to respond to those threats.

21        Q.   Does that include things like fires or

22    natural disasters?

23        A.   Yes.

24        Q.   It includes fights?

25        A.   Yes.

CONFIDENTIAL

Page 72

1          Q.    Does it include abuse?

2          A.    The threat of abuse?  Because you asked

3      me about threats.  Are you talking about somebody

4      threatening to abuse somebody?

5          Q.    So -- either incidents or threats,

6      would you respond to reports of abuse or threats of

7      abuse?

8                Let's start with reports.  Would your

9      team respond to reports of abuse involving

10     students?

11         A.    In some cases, yes, because it might be

12     reported -- they might be the first person it's

13     reported to.

14         Q.    What types of incidents have you seen

15     involving abuse?

16         A.    I can't recall off the top of my head.

17         Q.    Would it include abuse occurring

18     outside of school?

19         A.    If it's reported to -- to one of our

20     people.

21         Q.    And how would you respond to a report

22     of abuse outside of school?

23         A.    Determine what -- what the elements of

24     the report is.  So, I mean, we're going to notify

25     any other respective parties that should be

Page 73

1  involved.  It just depends on what type of abuse it

2  is.

3        Q.   Could it include reports of domestic

4  abuse?

5        A.   If it's reported to us, yeah, we're

6  going to report it.

7        Q.   Could it include reports of sexual

8  abuse and assault?

9        A.   Yes.

10       Q.   Are you aware of any incidents

11  involving sexual abuse and assault that have been

12  reported to you or your team?

13       A.   Not specifically.  I mean, no.

14       Q.   Would you or your team respond to

15  incidents involving human trafficking?

16       A.   When you say "respond," I need you to

17  explain what you mean by "respond."

18       Q.   If someone reports a violent incident

19  or activity, abuse, any of these things that we've

20  discussed --

21       A.   Uh-huh.

22       Q.   -- what does your team do with that

23  information?

24       A.   We'll make notifications to law -- if

25  it's abuse involved in those type of situations,

CONFIDENTIAL

Page 74

1   we're immediately getting law enforcement involved,

2   immediately.

3       Q.   Okay.  So one response would be passing

4   that information along to law enforcement?

5       A.   No, that's going to be a response.  If

6   it's the things that you outline, we're calling law

7   enforcement.

8       Q.   So one response includes sharing

9   information.  Who else would you share information

10  with once you receive a report?

11      A.   It just depends on what it is.  Not

12  everybody is on the same notification list for

13  different incidents.  But it just depends on what

14  it is.

15          I mean, if it's something of a sexual

16  nature involving our -- our student, or you say

17  sexual abuse or something like that or human

18  trafficking, then, yeah, we're going to notify law

19  enforcement.  Because now you're talking about, you

20  know, something that's illegal, against the law.

21  But then if it's involving our student, we've got

22  to notify people because we've got to be able to

23  support the student.

24          So, you know, we're going to be

25  notifying some folks from Mr. Hennigan's office,

Page 75

1   you know, so that they are aware.

2              And then to a lesser extent, if it --

3   if it involves harassment type of stuff, then we're

4   going to notify our person that handles our

5   Title -- Title IX complaints.  We're going to

6   notify them.

7              But everything is on a case-by-case,

8   but we're going to make notifications.

9        Q.    What types of incidents would you

10  respond to in person or send somebody to respond to

11  in person?

12       A.    I don't understand what you mean.  What

13  type of incidents?  I don't -- I mean, that's so

14  broad.

15       Q.    If there is a fight at school --

16       A.    Uh-huh.

17       Q.    -- would you or one of your school

18  safety liaisons go to the location where that fight

19  happened to intervene in any way?

20       A.    That's on a case-by-case basis.  If two

21  eight-year-olds get into a fight in a cafeteria in

22  a school that doesn't have a school safe liaison,

23  I'm not calling the school safe liaison to go over

24  there to do anything about those two

25  eight-year-olds who fought in the cafeteria.  I'm

Page 76

1  going to let the school administrator and the

2  teachers mediate that situation.

3          If there's no school safe liaison

4  assigned there, I'm not sending my regional there

5  because those two students fought.  We don't have

6  the -- the manpower.  Fights happen every single

7  day across the school district.

8          So we wouldn't necessarily send them to

9  every single situation in the event of a fight.

10      Q.   Okay.  So help me understand a little

11  bit.  If you get a report of some kind of violent

12  incident or threat of violence, what is your team's

13  primary responsibility with that information?

14      A.   To triage it, to see whether or not it

15  needs to go to, one, law enforcement; and then,

16  two, when we triage that report of violence that we

17  receive, determine what other notifications should

18  be made and to determine whether or not we need to

19  respond to the location.  But we do all that

20  through triaging of the information when we get it.

21      Q.   Okay.  Do you generate any reports

22  about specific incidents or threats?

23      A.   Do I generate any?  I generate -- for

24  major critical incidents, I will generate a

25  after-action report if it falls under the matrix

CONFIDENTIAL

Page 77

1   requirement for the Maryland Center for School
2   Safety.
3           Q.    You've mentioned threat assessments
4   earlier.
5           A.    Uh-huh.
6           Q.    Is that something that you and your
7   team are responsible for?
8           A.    No.
9           Q.    Are there any other documents or forms
10  that are primarily your team's responsibility to
11  complete?
12          A.    No.
13          Q.    How do you track -- sorry.  Strike
14  that.
15               Do you track every violent incident or
16  threat that you learn about?
17          A.    Every violent incident or threat that
18  we learn about?  Yeah, those are -- if we learn
19  about it, yeah, because, I mean, that information
20  has been distributed.  So, yeah, we -- we're able
21  to track that.
22          Q.    Do you have a system for tracking it?
23          A.    We have a communication process we
24  track it.  And that's our SOS.  So if something
25  violent or a threat comes out, I'll receive that

CONFIDENTIAL

Page 78

1    information from my SOS.

2          Q.    Do you draft and send out the SOS, or

3    do you receive them?

4          A.    I receive them.

5          Q.    If I wanted to know how many fights

6    occurred at a specific school in a given year, how

7    would I find that information?

8          A.    I don't know.

9          Q.    If I wanted to know what caused those

10   fights at a given school in a given year, how would

11   I find that information?

12         A.    That could be in -- well, if you're

13   asking about every single fight, I don't know.  But

14   for fights that are documented, you can get that

15   information based on a number of ways, I would

16   imagine.  We don't deal with that.

17              But student disciplinary record if any

18   sanctions were doled out.  If threats were made,

19   then, of course, there would be an assessment.  You

20   could capture some of that information through

21   threat assessments.

22              And if a police report was written, you

23   can caption it through -- if there's an assault

24   that created a police report, you can capture that

25   information as to why.

CONFIDENTIAL

Page 79

1          Q.    So the documents you just mentioned, a

2     threat assessment, disciplinary reports and

3     potentially a police report, none of those are

4     documents that you are responsible for drafting,

5     are they?

6          A.    No.

7          Q.    Do you receive every threat assessment,

8     disciplinary report or police report that is

9     created?

10         A.    No.

11         Q.    Would you have access to every threat

12    assessment, disciplinary report or police report?

13         A.    No.

14         Q.    How do you keep track of the

15    circumstances surrounding any particular violent

16    incident at Harford County Public Schools?

17              MR. LEGG:  Objection to form.

18              THE WITNESS:  How do I keep track of

19    any violent incident?

20    BY MS. WEIANT:

21         Q.    So if you wanted to go back and look up

22    what happened in a given fight --

23         A.    Uh-huh.

24         Q.    -- where would you look?

25         A.    A fight that occurred inside of a

CONFIDENTIAL

Page 80

1   school building?

2       Q.   Yes.

3       A.   I would -- if I wanted to know

4   background information, if it was captured, then I

5   would talk to the administrator of the school.

6       Q.   So we talked about various threats or

7   safety threat -- safety and security threats,

8   including natural disasters, violence on school

9   property, threats of violence, potentially abuse,

10  human trafficking.  Do you ever receive reports of

11  gang activity at Harford County Public Schools?

12      A.   Yes.

13      Q.   How often would you say you've received

14  reports of gang activity?

15      A.   I don't have the measurement of the

16  frequency that I receive that information.

17      Q.   In a given school year, how many times

18  would you say you receive information about gang

19  activity at schools?

20      A.   I don't have that measurement.

21      Q.   Are you aware that some Harford County

22  Public School students are members of gangs?

23      A.   Yes.

24      Q.   Do you track student gang activity in

25  any way?

CONFIDENTIAL

Page 81

1          A.    No.

2          Q.    Would you agree that the risk of

3   violence is much -- sorry.  Strike that.

4                Do you agree that the risk of violence

5   increases in situations involving gang activity?

6                MR. LEGG:  Objection to form and

7   foundation.

8                THE WITNESS:  Does the risk of violence

9   increase based on gang activity?

10  BY MS. WEIANT:

11         Q.    Yes.  So would you agree that the risk

12  of violence increases --

13               MR. LEGG:  Same --

14  BY MS. WEIANT:

15         Q.    -- in situations involving gang

16  activity?

17               MR. LEGG:  Same objection.

18               THE WITNESS:  Yes.

19  BY MS. WEIANT:

20         Q.    Would you agree that the risk of gun

21  violence increases in situations involving gang

22  activity?

23               MR. LEGG:  Objection to form and

24  foundation.

25               THE WITNESS:  Yes.

Page 82

1    BY MS. WEIANT:

2          Q.    In your 20-plus years in school safety

3    and in law enforcement, have you encountered a lot

4    of gang activity in your career?

5          A.    No.

6          Q.    You said that you are aware that some

7    Harford County Public School students are members

8    of gangs.  How did you learn that information?

9          A.    The times I've learned that

10   information, I've learned it through law

11   enforcement partners sharing validated -- using

12   their validation process, students who were

13   validated as being gang members.

14               I don't know what their process is, but

15   they've shared that this particular individual we

16   validated.  But they've never shared with me their

17   whole process they go through to do that

18   validation.

19               (BROOKS EXHIBIT 3, Emails, top one

20   dated 10/30/18, Subject:  Gang member placements,

21   Bates HCPS_00226861-62, was marked for

22   identification.)

23   BY MS. WEIANT:

24          Q.    I'm going to show you what has been

25   marked as Brooks Exhibit 3.

Page 83

1              MS. WEIANT:  This is Tab 33.
2      BY MS. WEIANT:
3         Q.   There's a printing error.  The version
4      you have does not have the Bates stamp.  I will
5      represent to you that the Bates stamp on this
6      document is HCPS_00226861 through HCPS_00226862.
7      Go ahead and take a moment to look at that
8      document.
9              So in the first email in this thread,
10     which is the back -- the second page of the
11     document, it's an email from Buzz Williams, dated
12     October 26, 2018, to Bernard Hennigan, copying you.
13             And it starts:  Buck, Erica and I
14     discussed the risks associated with placing known
15     gang members in the -- the day school at Alt Ed.
16             Do you see that?
17        A.   Yes.
18        Q.   Do you know what the day school at
19     Alt Ed is?
20        A.   Yes.
21        Q.   What is that?
22        A.   It's a alternative education setting
23     for students who -- who have been placed there
24     either temporarily or long term.
25        Q.   What do you mean by an "alternative

CONFIDENTIAL

Page 84

1    education setting"?

2         A.   It is not necessarily their

3    comprehensive educational environment at the school

4    that they are zoned to attend.

5         Q.   And why might they be placed in

6    alternative education settings?

7         A.   Oh, wow.  I don't really get involved

8    in that.  So I don't know all the reasons that Ed

9    services or suspension services were placed in

10   there.  But I imagine there's a number of different

11   reasons, not the least of which is students request

12   to go there sometimes.

13        Q.   In the next paragraph, Buzz writes:

14   Unless I am directed otherwise, for the foreseeable

15   future, known gang members with violent histories

16   who received extended suspensions or expulsions

17   will be placed online for the duration of their

18   removals.

19             Do you see that?

20        A.   Yes.

21        Q.   Did you have any involvement with that

22   decision?

23        A.   No.

24        Q.   Were you -- strike that.

25             The next paragraph says:  I'm hoping

CONFIDENTIAL

Page 85

1    that Donoven may have some ideas about a gang
2    intervention to get increased commitment to truce
3    while in school.
4              Do you see that?
5        A.   Yes.
6        Q.   Do you know what this is referring to?
7        A.   Yeah.  I think it's referring to, like,
8    trying to figure out how we can get the people who
9    have been identified as gang members to really not
10   engage in those activities in or on school grounds.
11       Q.   Do you remember Mr. Williams asking you
12   for ideas about a gang intervention strategy?
13       A.   Yeah, I do.
14       Q.   What became of that request?
15       A.   I talked to -- I talked to a former
16   commander in Baltimore City, Rick Hite, after
17   this -- I pretty -- I pretty distinctively remember
18   it.  Because I remember when I was in Baltimore
19   City School Police, he was part of this program
20   called "Get Out of the Game."  "Get Out of the
21   Game."
22              So I reached out to him at the time he
23   was the chief of police in Indiana and just told
24   him I just got here to Harford County, and, you
25   know, I was now experiencing, you know, stuff that

Page 86

1    I hadn't previously experienced with being involved

2    with trying to find solutions.

3            And he was a busy guy, so he never

4    really followed up.  He gave me a lot of

5    information on Get Out of the Game.  We had a

6    conversation, but it was nothing that was useful to

7    me after we got off the -- the phone.  And I had no

8    background or expertise on mitigating conflict

9    between gang members.

10           Q.   Do you know if you responded to this

11   email?

12           A.   I don't recall.  I may have -- I may

13   have -- I -- I know there were follow-up in-person

14   conversations because I know I went around to

15   Buzz Williams' office, and we kind of had

16   conversations about some of these students.

17           Q.   Do you recall any of those

18   conversations?

19           A.   Yeah.  A few of those conversations, I

20   really needed him to kind of explain to me what it

21   was that, you know, Harford County had been

22   experiencing with some of this stuff.  Because even

23   though I was coming from Baltimore City, again, I

24   wasn't involved in, you know, some of the stuff

25   that I was seeing in the few short months that I

Page 87

1    had come here.

2              So he kind of had to brush me up on,

3    you know, what exactly all this stuff meant in

4    here.  Clearly, they didn't know if I had any ideas

5    since they said I was hoping that I might be able

6    to come up with some.  But that just wasn't my

7    background.

8         Q.   So you mentioned some of the stuff that

9    you were seeing when you came to Harford County

10   Public Schools.  What do you mean by that?

11        A.   These -- this type of, you know, email

12   stuff with these -- these young folks were getting

13   into conflicts in the community and then some of

14   that stuff spilling over when it got to school with

15   fights taking place.

16        Q.   Do you mean fights generally, or are

17   you talking specifically about students who have

18   involvement with gangs?

19        A.   Yeah, oppositional.  Students who are

20   oppositional, belonging to one side or the other of

21   the gang.

22        Q.   Do you know how many different gangs

23   are active amongst the students at Harford County

24   Public Schools?

25        A.   I don't.

CONFIDENTIAL

Page 88

1          Q.    Do you know the types of gangs that are

2    active amongst students at Harford County Public

3    Schools?

4          A.    I'm going to be -- from my -- I know

5    that I was dealing with this a lot more before

6    COVID.  The gang stuff was very much more pervasive

7    in terms of conversations that I was being included

8    in.

9               After COVID, I'm not -- I have not

10   received a lot of -- I have not had a lot of

11   conversations after COVID at the level about gangs

12   that was happening pre-COVID.  And pre-COVID, it

13   was a huge learning curve for me.

14              After we went into that lockdown,

15   schools were totally locked down, society was

16   locked down.  When we came back, some of these

17   students aged out; they graduated.  So...

18         Q.    And in the top email on this -- on the

19   first page, Erica Harris responds.  Who is Erica

20   Harris?

21         A.    So Erica Harris, when I first arrived

22   in the district, she was the principal at the

23   alternative ed school.

24         Q.    Okay.

25         A.    So she was probably my expert, really,

CONFIDENTIAL

Page 89

1    to be honest, even regarding the information that
2    Buzz gave me.  I think Erica was giving me more of
3    a lesson than anybody.  Because as the principal at
4    that school, she -- she was the one receiving
5    students.  So she was really giving me an
6    education.
7           Q.   What kind of lesson or education was
8    she giving you?
9           A.   About the particular students involved
10   in the gangs.  Like, she gave me background of some
11   of these students belonging to families where she
12   had the fathers as students in high school, and the
13   fathers now have 14- to 15-year-old sons who were
14   students.  So that type of background, trying to
15   help me understand, you know, 80 East.
16               But I guess the -- the question that
17   was never really answered for me is, if these kids
18   grew up playing in rec ball leagues and little
19   leagues, and you got pictures of these kids when
20   they were on the same baseball team, where was the
21   intersection when they turned 15 and 16 and all of
22   a sudden they don't like each other, or their --
23   one kid's --
24               Like, that's the stuff Erica would give
25   me.  Like, oh, yeah, believe it or not, when they

CONFIDENTIAL

Page 90

1    were 12, look at this picture.  This -- he

2    worked -- he played for his father.  They were both

3    on the same baseball team.

4              So I'm -- I'm trying to figure out,

5    well, where do we reach this impasse where now

6    they're 16 and they've chosen sides and they're

7    fighting each other?

8              So that's the kind of stuff that Erica

9    would give me, because I didn't understand the

10   dynamics of that.

11        Q.   And what insight did she provide on how

12   that happened?

13        A.   I don't know if she ever -- I don't

14   know if she knows how that particularly happened

15   except for, you know, these students getting

16   involved in a culture, I guess.

17        Q.   And in the first -- in her email, when

18   she responds, she copies you, and she says:

19   Currently, we have two nights of twilight school

20   for online students.

21             Do you know what twilight school is?

22        A.   Yeah.  I think twilight school, like,

23   starts after 5:00 up until like maybe like 8:00 or

24   something like that.

25        Q.   Okay.  She continues:  On those

Page 91

1    evenings, students separated in the following ways:

2    1), Different gangs on different nights, currently

3    400 Savage and KBE (both Bloods) are on Tuesday,

4    and Thug Entertainment, 80 East and Problem Kids

5    (Crips) are on Thursday nights.

6                    Do you see that?

7           A.   Yes.

8           Q.   Were you familiar with any of these

9    gangs being active -- sorry.  Strike that.

10                   Were you familiar with these gangs

11   prior to receiving this email?

12          A.   Yes.

13          Q.   Had you -- were you aware of their

14   activity on -- strike that.

15                   Were you aware that they were active at

16   Harford County Public Schools?

17          A.   No.

18          Q.   She goes on:  Number 2, For greater

19   separation, we will be opining -- I believe it's

20   supposed to be "opening" -- Wednesday nights in

21   November.

22                   And Number 3, she says:  The students

23   are placed in several different rooms, including

24   two with cameras that allow us to more closely

25   monitor behaviors and safety provisions.

CONFIDENTIAL

1           Do you see that?

2      A.   Yes.

3      Q.   Why might you put them in different

4  rooms with cameras to allow you to more closely

5  monitor behaviors and safety?

6      A.   I don't know.  You're talking about why

7  did she write that?

8      Q.   More generally, why might you put these

9  students in different rooms and use cameras to

10 monitor their behaviors?

11     A.   I don't know what the rationale was

12 behind that.

13     Q.   You don't know why you might want to

14 separate members of competing gangs when placed in

15 the same room or in the same vicinity?

16     A.   With cameras and all that other stuff?

17 No.  I mean, to be honest, no.  I -- again, this

18 was not my -- even coming from Baltimore City, this

19 was not my background.  This was a huge learning

20 curve for about the first 18 months I was here to

21 really kind of understand this whole gang dynamic.

22     Q.   Did it surprise you?

23     A.   It did.

24     Q.   So going back to the first email where

25 Buzz asks:  I'm hoping that Donoven may have some

Page 93

1    ideas about a gang intervention.
2              Did you ever implement a gang
3    intervention --
4         A.   No.
5         Q.   -- as discussed here?
6         A.   No.
7         Q.   Has there been much follow-up on that
8    since?
9         A.   No, because our law enforcement
10   partners really started to make a lot of arrests in
11   the community.  And since that time -- like, these
12   emails were probably a lot more frequent than we're
13   going to find emails like that over the past at
14   least two years.
15        Q.   In your experience, does law
16   enforcement usually notify you if they learn of a
17   Harford County Public School student that is
18   involved in gang activity?
19        A.   If they are charged with a reportable
20   offense.
21        Q.   What's a reportable offense?
22        A.   So the Maryland -- Maryland law
23   requires that if a student is arrested in the
24   community for a number of enumerated crimes that
25   fall under a category, that they have to notify the

CONFIDENTIAL

Page 94

1  school system that they made the arrest of the
2  student because it's a reportable offense, meaning
3  an offense that needs to be reported to the school
4  to let us know that this person was involved in a
5  carjacking Saturday night, and Baltimore County --
6  and was arrested by Baltimore County police.
7          That's a reportable offense, so that
8  they would notify us and let us know that.  Are
9  they going to say, "And they were also a member of
10 the Blood gangs"?  Not necessarily.  That may not
11 come up when they get arrested.
12     Q.    And if there was no reportable
13 offense -- let's say law enforcement has --
14 separately, without any incident, has intelligence
15 or a reason to believe that a student is involved
16 in gang activity.  Would they report that to you or
17 inform you of that?
18     A.    They may inform me of it.  It depends.
19 If they -- if they have an investigation going on
20 related to something else, they may not inform me
21 of it.
22     Q.    Have you ever received information like
23 that from law enforcement where there was no
24 reportable offense?
25     A.    Like what?  Specifically, what are you

Page 95

1    asking me?

2           Q.    Has law enforcement ever informed you

3    of a student's involvement in gang activity

4    separate from a reportable offense?

5           A.    Yeah.  When I first got here, yeah.

6    The first couple years I was here, yeah.  Once they

7    realized I didn't have a clue, yeah, they started

8    trying to build my capacity, understanding.

9           Q.    Has there been any effort to coordinate

10   more closely with law enforcement to identify

11   students who might be involved in gang activity?

12          A.    Since -- again, since COVID, I would

13   have to say, no, we haven't -- we haven't been

14   working or talking or having conversations about

15   working more closely to identify gang members.

16   Prior to that, yes, absolutely.

17          Q.    What conversations were you having

18   prior to COVID about?

19          A.    The groups that Ms. -- Ms. Harris

20   listed in here, because there was -- you know, we

21   were just constantly having, like, fights.  I was

22   constantly trying to figure out who was with who.

23                Because then you would have small --

24   smaller groups that would name themselves.  You

25   know, they come up with some name, and they would

Page 96

1  start off with four or five of these kids.  And

2  then you would have to determine, okay, you just

3  came up with the -- you know, I don't know -- the

4  Captain Crunch Group.  Who are they associated

5  with?  Are they -- are they Bloods?  Are they

6  Crips?

7            Then you would try to further dissect.

8  Or are they just like some independent group of

9  kids that just decided they're going to organize

10 what they -- what they call "a gang"?  So a lot

11 more information was shared during that time

12 period.

13       Q.   Earlier, you testified that there would

14 be -- there might be a higher risk of violence,

15 including gun violence, in situations involving

16 gang activity.  Do you recall that?

17       A.   Yes.

18       Q.   Are you aware of situations involving

19 violence, including gun violence, where the

20 students involved were members of gangs?

21       A.   Yes.

22       Q.   Can you tell me about those incidents?

23       A.   Yeah.  We had -- yeah.  Unfortunately,

24 we lost a student -- I think it was 20 -- 2022,

25 4th of July -- I think it was the 4th of

Page 97

1  July weekend.

2          There was cookout out in the community.

3  And a student who was alleged to have been -- I

4  think he was alleged to have been a member of the

5  Crip gang, was at a cookout in the community on

6  that Saturday night.  And some other members were

7  in the community, drove through, saw him or

8  something and double back and came back and shot at

9  him, and he was shot and killed.

10          Q.   Were you involved in that -- in

11  responding to that incident at all in your job at

12  Harford County Public Schools?

13          A.   I was involved in trying to determine

14  whether or not any of that was going to filter back

15  into the school building; whether or not there was

16  any connection to what had happened, the people who

17  were involved; whether or not, you know, we needed

18  to, you know, prepare for any of that to come back

19  into the school building.

20          Q.   Why might you need to prepare for some

21  of that to come back into the school building?

22          A.   Because when you lose students out in

23  the -- in the community like that and students are

24  grieving, it has an impact.  Students will be on

25  edge.  Say, a student that might ordinarily not be

CONFIDENTIAL

Page 98

1  aggressive or agitated easily, at the loss of, you

2  know, a friend or whatever, could be very easily

3  agitated.

4           So we just want to make sure we have

5  people and resources in places to be able to

6  address the -- the range of emotions that we might

7  deal with our students coming back into the

8  building.

9       Q.   So you agree that -- sorry.  Strike

10 that.

11           A student who is grieving in the wake

12 of a loss might be more agitated than they

13 ordinarily would?

14      A.   Yes.

15      Q.   Have you encountered other students who

16 have suffered from grief or loss in their time at

17 Harford County Public Schools?

18      A.   Have I encountered them?

19      Q.   Yes.

20      A.   I haven't encountered them personally,

21 no.  But I know that we've sent teams out to be

22 able to address that.  Have I sat down and talked

23 to any of them?  No.

24      Q.   You -- what teams have you sent out to

25 address that?

Page 99

1          A.    The district?  I think the district

2     sends out, like, grieving and counseling teams.

3     That's not from my office, though.

4          Q.    Are you aware of other situations where

5     the Harford County Public School community has lost

6     students?

7          A.    Yes.

8          Q.    How many?

9          A.    I don't know how many.

10         Q.    Can you tell me about those --

11         A.    Yeah.  We --

12         Q.    -- situations?

13         A.    Yeah.  We lost a kid that was -- we

14    lost a kid who was in the car with his mom, and a

15    tractor-trailer driver -- I don't know what

16    happened, but it was a very bad accident.  We lost

17    that kid.

18              We also lost a guy who owns the

19    Klein ShopRite Supermarket, because his car was --

20    was there, too.  But we lost one of our kids in

21    that.

22              We lost a couple of kids who got hit

23    crossing the street after getting off buses.  We

24    had one kid that was running to try to catch up,

25    and the -- and the car didn't see him and hit and

CONFIDENTIAL

Page 100

1   killed him.

2          Q.    In your experience, how has the

3   community responded to those losses?

4          A.    In my experience, the way they respond

5   to those losses is -- is, you know, grief and, you

6   know, trying to support students who were close to

7   the students who's lost their lives, you know,

8   trying to support the families.

9          Q.    Are you aware of any memorials or

10  vigils that were held for those students?

11         A.    Yeah, there have been memorials held

12  for some of the students.  I don't recall all of

13  them, but I do recall memorials or vigils being

14  held.

15         Q.    Are you familiar with the Maryland

16  Department of Health's Youth Risk Behavior Survey

17  results?

18         A.    No.

19         Q.    You've not heard of that before?

20         A.    I have -- I'm not familiar with the

21  results.

22         Q.    Are you familiar with the survey?

23         A.    Yes.

24         Q.    What is it, in your understanding?

25         A.    It's a survey that -- to my

Page 101

```
 1    recollection, that asks questions about the --

 2    basically, surrounding the -- feeling safe, the

 3    risk of incidents or events happening or risk of

 4    students being involved in incidents.

 5          Q.   Do you use any of the data that comes

 6    out of those surveys in your line of work?

 7          A.   Perhaps I do.  I may not be fully aware

 8    of how we are utilizing that data because we work

 9    with other offices.  So, perhaps.

10          Q.   Are there specific data points in there

11    that you would pay closer attention to?

12          A.   If I had it in front of me, the results

13    in front of me, I can determine that.

14          Q.   Do you remember any types of results in

15    there that you might --

16          A.   No.

17          Q.   -- pay attention to?

18          A.   Not off -- not offhand.

19          Q.   Are you aware that it includes data

20    about students that carry weapons, including

21    carrying weapons to school?

22          A.   I don't have a recollection.

23          Q.   So you don't recall reviewing data

24    about --

25          A.   I don't recall the information -- I --
```

CONFIDENTIAL

Page 102

1    I'm not recalling the information, no.

2        Q.    And if you're not recalling the

3    information, I imagine you're not recalling

4    reviewing that information or consulting those

5    numbers?

6        A.    Not consulting the numbers, no.

7        Q.    Okay.  Separate from the survey, do you

8    have any other data or statistics that tracks

9    whether students are carrying weapons to school?

10        A.    Do I have data that tracks whether

11    they're carrying weapons to school?  No.

12        Q.    Have you done any studies to determine

13    how often students at Harford County Public Schools

14    carry weapons?

15        A.    No.

16        Q.    Have you done any study to determine

17    how often students at Harford County Public Schools

18    are carrying weapons to school?

19        A.    No.

20        Q.    Have you done any study to determine

21    how often students at Harford County Public Schools

22    are the victims of violent crime?

23        A.    No.

24        Q.    Are you aware of any data that tracks

25    that number?

CONFIDENTIAL

Page 103

1          A.    No.

2          Q.    You testified earlier that your

3    department does not independently track reports of

4    fights or incidents of violence beyond reports that

5    are kept by other departments; is that right?

6          A.    Right.

7          Q.    So you don't independently keep track

8    of what might have led to those fights?

9          A.    No.

10          Q.    You don't independently keep any

11    data -- sorry.  Strike that.

12                Have you done any study into how often

13    social media plays a role in those fights?

14          A.    A study, no.

15          Q.    Do you have any data reflecting how

16    often social media plays a role in those fights?

17          A.    No.

18          Q.    Have you done any study to see how

19    often social media plays a role in other types of

20    violence other than fights?

21          A.    No study, no.

22          Q.    Do you have any data reflecting how

23    often social media plays a role in other types of

24    violence?

25          A.    No.

CONFIDENTIAL

Page 104

1          Q.    Are you familiar with the term "climate
2    response team"?
3          A.    Yes.
4          Q.    What is that?
5          A.    That's a team of school safe liaisons
6    that I put together two years ago, provided them
7    with some additional training, and designed that
8    team to be able to respond to schools to help them
9    restore and maintain climate in the aftermath of a
10   major situation.
11         Q.    When did you create -- or when did you
12   coordinate that team?
13         A.    2023.
14         Q.    Since they've existed, have they
15   responded to any major situations?
16         A.    Yes.
17         Q.    How many?
18         A.    Approximately, I would say six or
19   seven.
20         Q.    And what types of major situations
21   would you send out the climate response team?
22         A.    I would send out a climate response
23   team, once confirmed with the principal, if there's
24   a loss of life of a student or a staff member; if
25   there was a major incident inside of the school

Page 105

1    building -- excuse me -- a huge, major fight; if
2    there was an incident like the incident that we
3    experienced in September with the shooting and the
4    loss of life of a student.
5           And so any incident where -- when an
6    event occurs and I talk to the administrator and
7    say, "Do you need any" -- "do you feel you need any
8    additional safety and security support because
9    of" -- so I can deploy members of my climate
10   response team.
11          And my climate response team is
12   designed to be inside of the school building as it
13   tries to -- if it's something that has disrupted
14   the normal day-to-day climate of the school, the
15   team is designed to go in and just -- be just close
16   enough to step in and assist with things, if need
17   be, and just far enough back to let the school
18   proceed as it would typically proceed, but to help
19   them restore and maintain a positive culture and
20   climate in that school in the aftermath of whatever
21   that major situation might be.
22          Q.   So you're talking about helping and
23   restoring.   What does that look like?
24          A.   So when your climate has been disrupted
25   and you've had students that may have missed, you

CONFIDENTIAL

Page 106

1    know, time from school, if you have to make

2    modifications when students reenter a building, you

3    should have some support staff to help students

4    know, A, I know your cafeteria period might

5    typically be during this time period, or you might

6    typically have a change, here's what we're

7    temporarily doing, or what have you, to take that

8    load off of the hands of teachers and principals,

9    to have someone step in and kind of help facilitate

10   whatever temporary change is taking place and to

11   help the students feel safe.  Because when it's

12   members of our climate response team, it's either

13   there are safety -- school safe liaisons that are

14   assisting.

15           So that's what it kind of looks like

16   when you're helping to restore and maintain the

17   normal flow of things when they've been knocked off

18   track at a school.

19           Q.   How big is the team?

20           A.   Oh, it can be as big as 15 people.  We

21   have -- we train, extra training, 15 school safe

22   liaisons.  But it could be that we deploy 5; it

23   could be that we deploy 3, depending on what the

24   need is for the school.

25           Q.   And you mentioned six or seven

Page 107

1    instances in which you've deployed --

2        A.    Yeah.

3        Q.    -- the climate response team since it

4    was founded in 2023, one of which being the

5    shooting last fall?

6        A.    Yeah.

7        Q.    What were the other incidents?

8        A.    We've had students, unfortunately, take

9    their lives.  So when it comes to the climate of

10   schools, just keep an eye on -- putting people in

11   the school just to kind of keep an eye on students

12   that need support.  Just, you know, being there to

13   support and facilitate.  Students who have lost

14   their lives maybe.

15            We've had situations where we had

16   student protests at a school.  It was like a

17   national-scale issue.  However, our students -- we

18   had students that, one approach, had some -- some

19   issues at a school.

20            So the school couldn't just try to have

21   normal operations and -- and deal with the group --

22   the subset of students that wanted to engage in a

23   process -- protest.  So we deployed our climate

24   response team to help support the school --

25        Q.    Do you recall what they were

CONFIDENTIAL

Page 108

1   protesting?

2          A.   So we -- there was -- it was a national

3   walkout for some -- one of the many national

4   walkouts that students were organizing or what have

5   you.

6               And so if our students did, in fact,

7   walk out, we wanted to make sure they're safe, you

8   know.  We want to make sure, if they're walking,

9   they're protesting, whatever, they're not, you

10  know, in harm's way.  So I don't recall what the

11  specific issue was this time, but I know we

12  deployed students [sic].

13         Q.   Do you know recall other instances of

14  protest even if it didn't involve the climate

15  response team?

16         A.   Yes.  Before we ever had a climate

17  response team, yeah, we had a major protest one

18  time I recall.

19         Q.   What happened then?

20         A.   We had a -- when you say "what

21  happened," the incident?

22         Q.   I guess let's start with:  What were

23  they protesting; do you recall?

24         A.   They did -- they did not like the

25  outcome of the allegations that a student

CONFIDENTIAL

Page 109

```
 1   inappropriately touched another student.  It was
 2   investigated.  There were a group of students that
 3   didn't like the outcome, and so they staged a -- a
 4   walkout.
 5         Q.   Do you know if there was any change of
 6   policy or any response from administration in light
 7   of that protest?
 8         A.   A response, yeah.  I mean, they had to
 9   respond to it to make sure the students remained
10   safe.  But -- but, no.  It was -- no, no policy
11   change based on that.  It was -- it was truly a
12   groupthink situation.
13              There were some folks that really
14   seized on an opportunity and was able to create
15   this -- this polarizing groupthink situation with
16   some students, and so...
17         Q.   How was it polarizing?
18         A.   Because they added and injected things
19   that were just not true and, you know, invoked a
20   lot of internal emotion in people.
21              Like, they just -- they were really --
22   it ended up not even being a protest.  It ended up
23   being more of a -- I don't know.  It was a mess.
24   But it wasn't -- it wasn't really a -- it ended --
25   and in the final analysis, it ended up not really
```

                                        Page 110

1    being a protest.  It ended up being more of a
2    disorderly disruption.
3           Q.    To the extent it was organized in any
4    way, do you recall what they were demanding or
5    asking for?
6           A.    For things to happen to a specific
7    student, specific male student.
8           Q.    Disciplinary action?
9           A.    Yes.
10          Q.    Do you recall how large that disruption
11   or protest was at the time?
12          A.    Yeah.  It was -- it grew -- it grew
13   pretty large, yeah.  Because they did it, like,
14   near when -- probably maybe an hour before the
15   school day was going to end.
16               It was -- it was pretty disruptive
17   because we had -- we had to bring in law
18   enforcement.  You had parents that got involved
19   and, you know, kids walking and stepping on top of
20   people's cars and dancing on the rooftops, damaging
21   people's hoods on their cars.  It was -- it was a
22   mess.
23               And we had kids we asked, "Why are you
24   out here?"
25               "Well, because everybody else is."

CONFIDENTIAL

Page 111

1          "Okay.  Other than that, why?"

2          "Well, because everybody else is."

3          Q.   Do you recall when that was?

4          A.   Yeah.  That was 20 -- that was before

5     COVID.  So that was 2019, I think.

6          Q.   Do you recall any other similar

7     incidents involving protests?

8          A.   To that level, no.

9          Q.   Anything short of that level that you

10    can recall?

11         A.   Yeah.  We had a large protest outside

12    of this window right here because people didn't

13    want -- there were a subset of people in the

14    community that didn't believe people should have to

15    wear masks.  So there was a big protest.  We had to

16    have law enforcement involved in controlling that

17    situation.

18         Q.   Did that one involve students, or was

19    it community members?

20         A.   Both.  It was just -- everybody was out

21    there, students that didn't want to wear masks,

22    community members that didn't want them to wear

23    them, parents that didn't want -- and then probably

24    on the other side of the street, there was a bunch

25    of people with masks on, saying, "No, we need to

CONFIDENTIAL

Page 112

1    wear masks."  So it was -- it was pretty -- it was

2    a pretty big to-do.  I mean, it -- it was on news

3    media.

4        Q.   You mentioned law enforcement had to

5    get involved in that situation.  What was the

6    outcome of that situation?

7        A.   I think one -- one young lady was

8    charged.  One of my school safe liaisons had to go

9    to the hospital because he was elbowed in his side,

10   and he had had a kidney transplant.  He had

11   returned from a kidney transplant two months before

12   all that took place, and one of the people elbowed

13   him.  So he had to be taken to the hospital.

14            And -- and law enforcement gave a

15   couple of ultimatums.  Some people left.  And then

16   when we moved it inside of here, it continued.  So

17   what we had to do that night is finish the board

18   meeting by having law enforcement clear everybody

19   out of -- out of here.

20       Q.   Are there any other protests or

21   disorderly situations like that that you can

22   recall?

23       A.   No, not like that.

24       Q.   So we were discussing the climate

25   response team, and you mentioned some types of

CONFIDENTIAL

Page 113

1   situations that they might respond to, including

2   shooting incidents, suicides, large fights,

3   protests.  Anything else that they might respond to

4   or have responded to?

5       A.    For climate response?  No.

6       Q.    Are you familiar with the term

7   "school safety council"?

8       A.    "School safety council"?  I'm -- I'm

9   familiar with the term, yes.

10      Q.    Do you -- does Harford County Public

11  Schools have a school safety council, as far as

12  you're aware?

13      A.    A school safety council?  They should

14  have -- every school has a safety team, has a

15  school safety team.  And then on the

16  superintendent's student advisory council, we have

17  a student safety advisory.

18      Q.    What is that?

19      A.    That's a group of students from each

20  one of our three regions over the past couple of

21  years; that when the superintendent has his

22  meetings with his student advisory council, a

23  subgroup of those students participate to talk

24  about ways that we can improve safety in Harford

25  County Public Schools, ideas that they have from

Page 114

1    the lens of a student surrounding safety concerns

2    that they have, and they have an opportunity to

3    express those things during those meetings.

4         Q.    Do you recall any of the feedback they

5    provided in any of those meetings?

6         A.    Yes, I recall some of the feedback they

7    provided in some of those meetings.

8         Q.    What types of feedback did you receive

9    from them?

10        A.    Ideas that they have around the weapons

11   detection before we ever got weapons detection.

12   When we first started it, they had questions about,

13   you know, if we would get them, what their thoughts

14   were about them.

15             They discussed the active assailant

16   drills.  A lot of discussion about bullying would

17   come up.  That has always been a hot topic of our

18   student safety council, bullying.

19             They were really concerned that -- they

20   were really concerned that when bullying starts in

21   this day and age, it never really seems to end.

22   Because you can -- you know, you -- I remember one

23   young lady talking to me from -- I can't remember

24   what school.  But we were having one of our

25   sessions, and she says, "You know, there probably

CONFIDENTIAL

Page 115

1    used to be a time where the bullying stopped until

2    the next day when you started bullying in school

3    again, but now you can get bullied 24 hours a day

4    on social media.  People can create, you know,

5    accounts and target you.  And even if you think you

6    block them, they can keep sending stuff to you."

7              So there was never a session that we

8    had in that meeting -- even if we talked about

9    other things, bullying was a recurring theme with

10   that team and trying to figure out how we could

11   work around it.  And then we just realized in

12   some -- in some areas, there were impossibilities

13   because you can't stop a person from, you know,

14   making an account.

15             And then, you know, they would talk

16   about -- you know, some of them would talk about

17   friends that they had.  They were just forced to

18   not even be able to participate in social media

19   because of bullying; so, therefore, they don't have

20   any type of -- they don't have to worry about it.

21   The only thing they have to deal with is the

22   in-person stuff inside of the school.

23        Q.   Is your team responsible for responding

24   to reports of bullying?

25        A.   When you say "responding," what do you

CONFIDENTIAL

Page 116

1    mean?

2            Q.    In the -- sorry.  Strike that.

3                  Who at Harford County Public Schools is

4    primarily responsible for handling incidents of

5    bullying?

6            A.    Well, I would say, at the school level,

7    it will start with the administrator, with the --

8    with the principal.  If a person makes a report of

9    bullying and harassment, then that would go to a

10   separate -- I don't know the title of the office,

11   but I know Dr. Stanton, you know, helps to process

12   those forms or whatever of bullying and harassment.

13           Q.    Your team is not responsible for those

14   bullying and harassment forms?

15           A.    No, not at all.

16           Q.    Do you have access to them?

17           A.    No.  I mean, I could probably request

18   them.  But me having some portal that I go to and

19   just access the bullying reports, no.

20           Q.    Have you ever reviewed them?

21           A.    Yes.

22           Q.    Do you review them regularly?

23           A.    When they come through the Maryland

24   Center for School Safety.  Because what happens is,

25   now that we have the -- the safe schools hotline,

CONFIDENTIAL

Page 117

1    I'm the primary on that.  So if a tip comes in, it

2    comes to me, I review it, triage it to determine

3    where it needs to go.  And then I send it off

4    and -- to say, "Hey, this came through the Maryland

5    safe schools tip line.  John Doe's parent went on

6    and said this is happening to their child.  Here's

7    what it looks like.  Here's what's happening.

8    Here's how it's impacting their child, and it's

9    happening at this school."

10            It could be anonymous.  It could be a

11   student saying, "My friend is consistently being

12   bullied and harassed, and they attend this school,"

13   whatever.  So I get that, and then I forward that

14   on to the school and Dr. Stanton and so that they

15   can start to work through whatever that situation

16   is.

17        Q.    How long have you been responsible for

18   the school -- safe schools hotline?

19        A.    Since it started.

20        Q.    When did it start?

21        A.    20 -- with the Maryland Safe to --

22   Maryland Safe to Learn Act.

23        Q.    And what is the Maryland Center of

24   School Safety?

25        A.    What is it?

CONFIDENTIAL

Page 118

1          Q.   Yes.

2          A.   It's a -- it's a group that works under

3     the governor's office that really makes sure that

4     all the security directors in the school districts

5     around the state has and receives information and

6     shares information.

7               But it also ensures that the mandates

8     under the Maryland Safe to Learn Act, the reporting

9     mandates and all of that, Maryland Center for

10    School Safety makes sure that all that information

11    is sent to them and maintained by them.

12         Q.   So in operating the safe schools

13    hotline, when you get a report of bullying, you

14    said you forward it on to the school and

15    Dr. Stanton so they can start to work through

16    whatever that situation is --

17         A.   Yes.

18         Q.   -- right?

19         A.   Yes.

20         Q.   Who is Dr. Stanton?

21         A.   I don't know what her exact title is,

22    but she works with our students.  And she's

23    actually the student advisory -- all the particular

24    student advisory committees.  She heads that up for

25    the superintendent.

Page 119

1          Q.   Once forwarding that information along

2     to them, do you or your team do any further

3     investigation --

4          A.   No.  No.

5          Q.   -- in a bullying report?

6          A.   No, we don't do any further

7     investigation of a -- of a bullying report.

8          Q.   Do you document the report of bullying

9     in any way?

10          A.   When it comes to me through the

11     Maryland safe schools tip line, yeah, I maintain

12     documentation of that.

13          Q.   What is that documentation?

14          A.   Email.

15          Q.   And what would you include in an email

16     reporting that?

17          A.   I don't -- I don't include anything it.

18     When I get it -- when I get that --

19          Q.   Okay.

20          A.   -- it has all of the information in it.

21     All I do is save it.

22          Q.   So the safe schools hotline, is it a

23     telephone line or is it also online or email

24     communications?

25          A.   Yeah, I think they have three or four

Page 120

1    different modes that you can report.

2         Q.    What are those modes?

3         A.    I don't know them all.  But I know that

4    you can do it online.  I know that you can call.  I

5    think you can send a text to a number -- to a code

6    or whatever.  And they may have a couple more, but

7    those are what I'm familiar with.

8         Q.    And so whatever form that comes in as,

9    whether it's an email or another form, that would

10   be your documentation of the situation?

11        A.    I'm only -- I'm always going to get it

12   in one format.  So no matter how the center

13   receives it, they -- they -- they transcribe all

14   that information into what's called the "tip

15   manager."  And they fill it all out.

16             So every time I see it -- it doesn't

17   matter what -- what the tip is, every time I see

18   it, it looks the same on my end.

19        Q.    Do you know if there's a database or

20   software they use to manage that?

21        A.    I don't know.

22             MS. WEIANT:  Let's take a five-minute

23   break.

24             MR. LEGG:  Sounds good.

25             THE VIDEOGRAPHER:  We are now going off

CONFIDENTIAL

Page 121

1    the record at 2:41 p.m.

2                        * * *

3            (Whereupon, there was a recess in the

4    proceedings from 2:41 p.m. to 3:02 p.m.)

5                        * * *

6            THE VIDEOGRAPHER:  We're now going back

7    on the record at 3:02 p.m.

8    BY MS. WEIANT:

9        Q.    So we have talked about several

10   different ways that you and your team go about

11   protecting students' safety, including human

12   resources, so student resource officers, school

13   safety liaisons, regional safety supervisors,

14   climate response teams, and then resources or

15   services, including safe schools hotline.  You do

16   active assailant drills, or at least did in the

17   past; although, they might have changed.  Weapons

18   detection devices, security cameras.

19           Are there any other programs or

20   services that you would like to highlight?

21       A.    No.

22       Q.    And many of those have been implemented

23   since you joined Harford County Public Schools in

24   2018, right?

25       A.    Yes.

CONFIDENTIAL

Page 122

1          Q.   All with the goal of protecting staff

2     and students?

3          A.   Yes.

4          Q.   Keeping them safe at school?

5          A.   Yes.

6          Q.   And despite all of these efforts to

7     strengthen security, can you guarantee that

8     students will be safe at school?

9               MR. LEGG:   Objection to form.

10    Foundation.

11              THE WITNESS:   No.

12              (BROOKS EXHIBIT 4, Article dated

13    8/24/18 titled Harford Students Returning Sept. 4

14    Should Feel Safer in School, HCPS Security Chief

15    Says, was marked for identification.)

16    BY MS. WEIANT:

17         Q.   I'm going to show you what has been

18    marked as Brooks Exhibit 4.

19              MS. WEIANT:   This is Tab 42.

20    BY MS. WEIANT:

21         Q.   Go ahead and take a moment to review

22    this document.

23              Have you had time to review the

24    document?

25         A.   Yes.

CONFIDENTIAL

Page 123

1          Q.    And this is a news article dated
2     August 24th, 2018, titled "Harford students
3     returning September 4th should feel safer in
4     school, HCPS security chief says."
5                Do you see that?
6          A.    Yes.
7          Q.    Are you familiar with this article?
8          A.    Yes.
9          Q.    This article quotes you?
10         A.    Yes.
11         Q.    In the second paragraph, it says:
12    There have been a number of school shootings in
13    recent years, and local officials have acknowledged
14    that it's not if but, rather, when an incident
15    might happen in one of Harford's public or private
16    schools.
17                Do you see that?
18         A.    Yes.
19         Q.    Do you agree with that statement?
20         A.    Yes.
21                MR. LEGG:  Objection to form.
22                THE WITNESS:  I'm sorry.
23    BY MS. WEIANT:
24         Q.    And as we've discussed today, since
25    this article was published in 2018, unfortunately,

Page 124

1    there have been school shooting incidents at
2    Harford County Public Schools, correct?
3        A.    Correct.
4        Q.    About halfway down the page, there's a
5    paragraph starting with "Right now."  Do you see
6    that?
7        A.    Yes.
8        Q.    In quotes, it says:  Right now, when it
9    comes to your student walking through the doors of
10   Harford County Public Schools, you can know that we
11   do take our security protocol safety -- seriously,
12   end quote.
13           And it attributes that quote to you.
14   Do you see that?
15       A.    Yeah, I do.
16       Q.    Is that your view?
17       A.    Yes.
18       Q.    And that includes all of the various
19   measures that we've discussed today?
20       A.    Well, not during that time because some
21   of those weren't even in place, but yes.
22       Q.    And -- okay.  So at the time, in 2018,
23   when you were saying you were taking your security
24   protocol seriously, part of that was that in the
25   future you planned to strengthen your security

CONFIDENTIAL

Page 125

1   protocols?

2          A.   Yes.

3          Q.   And you have done so?

4          A.   Yes.

5          Q.   In the next paragraph, again, in

6   quotes, it says:  Are there any absolutes?  I tell

7   people there are no absolutes.

8               Again, it attributes that quote to you.

9   Do you see that?

10         A.   Yes.

11         Q.   Is that your view?

12         A.   Yes.

13         Q.   And is that what you tell people?

14         A.   Yes.

15         Q.   Do you make any promises that students

16  and staff will remain safe when at school?

17         A.   No.

18              MR. LEGG:  Object to the form.

19  BY MS. WEIANT:

20         Q.   Could you make any promises that

21  students and staff will remain safe --

22              MR. LEGG:  Objection to form.

23  BY MS. WEIANT:

24         Q.   -- while at school?

25         A.   No.

CONFIDENTIAL

Page 126

1          Q.   You can set that exhibit aside.

2               Do you agree that social media has its

3     benefits for young people?

4               MR. LEGG:  Objection to form and

5     foundation.

6               THE WITNESS:  Yes.

7     BY MS. WEIANT:

8          Q.   And you've said so publicly?

9          A.   I don't recall if I've ever said so

10    publicly, but I do agree with what you just asked

11    me.

12         Q.   Do you agree that they can find

13    opportunities to volunteer and get service learning

14    hours from social media?

15         A.   Yes.

16         Q.   Do you agree they can connect with

17    their peers on social media?

18         A.   Yes.

19         Q.   Do you agree that during the pandemic

20    it allowed students to connect with their teachers?

21              MR. LEGG:  Objection to form and

22    foundation.

23              THE WITNESS:  Yes.

24    BY MS. WEIANT:

25         Q.   And do you agree that social media is

Page 127

1    not all gloom and doom?

2              MR. LEGG:  Objection to form and

3    foundation.

4              THE WITNESS:  Yes, I do agree with

5    that.

6    BY MS. WEIANT:

7         Q.   You agree there are some positive

8    aspects?

9         A.   Yes.

10              MR. LEGG:  Objection to form and

11    foundation.

12    BY MS. WEIANT:

13         Q.   Do you believe that parents need to

14    monitor what their children are doing on the

15    Internet?

16         A.   Yes.

17         Q.   Do you know how much time staff in the

18    safety and security department devote to addressing

19    issues related to social media?

20         A.   Yes.  A large -- a great amount of

21    time.

22         Q.   How much?

23         A.   My staff?  Throughout their -- their

24    day, their week, I would say anywhere from 40 to 45

25    percent of their time is dealing with students and

CONFIDENTIAL

Page 128

1   situations where we're finding out conflicts either

2   originated on using social media, or if they

3   started in school, continue via the use of social

4   media in these conflicts.

5             There's almost nothing that we deal

6   with now when it comes to interpersonal conflict

7   between students that doesn't have a nexus to

8   social media.

9        Q.   So when you say "has a nexus to social

10  media," are you talking about students making

11  threats on social media?

12       A.   Making threats on social media; using

13  social media to bully, using social media to make

14  fake accounts and put out embarrassing pictures and

15  information about other students; going on social

16  media to discuss private and personal things about

17  students and their families.

18            I mean, the stuff -- the stuff I can

19  tell you is just the stuff that comes off the top

20  of my head because it's stuff that we're dealing

21  with on the regular.  And sometimes, unfortunately,

22  it escalates to the point that we have to try to

23  use some preventive measures to make sure the

24  students don't escalate to physical confrontation.

25  That doesn't always work, but -- because we might

Page 129

1   not always be able to stop that.

2          But we spend -- there's very little

3   that we spend time on when it comes to conflict

4   between students where it has not -- it doesn't

5   come up where somebody either posted something

6   about somebody, somebody invited somebody to meet

7   them in the bathroom at a certain period.  Things

8   are said, and it allows a layer of anonymity for

9   some students.

10          (BROOKS EXHIBIT 5, Plaintiff Board of

11   Education of Harford County's Amended Objections

12   and Responses to Defendants' Interrogatories

13   (Set 3), was marked for identification.)

14   BY MS. WEIANT:

15      Q.   I'm going to show you what has been

16   marked Brooks Exhibit 5.

17          MS. WEIANT:  Which is Tab 60.

18   BY MS. WEIANT:

19      Q.   I'll give you a moment to skim it.  You

20   don't have to read -- you're welcome to review, but

21   you don't have to read the whole thing.  I'll point

22   you to specific sections.

23      A.   Okay.

24      Q.   You've had time to review this

25   document?

CONFIDENTIAL

                                                    Page 130

1          A.    Yes.

2          Q.    And on the first page, it says this is

3    Plaintiff Board of Education of Harford County's

4    Amended Objections and Responses to Defendants'

5    Interrogatories (Set 3).

6               Have you seen this document before?

7          A.    No, I don't recall seeing this document

8    before.

9          Q.    On Page 3 and over on to Page 4, there

10   is a table.  Have you seen that table before?

11         A.    No.

12         Q.    If you go to Page 2, under

13   Interrogatory Number 5, this is a question that was

14   presented to plaintiffs.  It asks Plaintiff for --

15   Board of Education of Harford County for each

16   category of damages to calculate how much of that

17   was related to social media.

18               So on Page 4, starting on Line 23, it

19   says:  These assessments are plaintiff's estimate

20   of the proportion of staff time lost and the

21   proportion of costs and expenditures that are

22   attributable to defendants' conduct.

23               Do you see that?

24         A.    Yes.

25         Q.    Do you know what "defendants' conduct"

CONFIDENTIAL

Page 131

1    here is referring to?

2           A.    No.

3           Q.    Are you familiar with the allegations

4    in this lawsuit?

5           A.    Somewhat.

6           Q.    Do you know who the defendants are in

7    this lawsuit?

8           A.    Yeah, I think the people that

9    introduced themselves representing the companies

10   earlier.

11          Q.    Do you recall which companies those

12   are?

13          A.    Yeah.  YouTube, Facebook, Snapchat,

14   Instagram.  Yeah.  YouTube, Snapchat, Instagram,

15   Facebook.

16          Q.    Have you read the complaint in this

17   lawsuit?

18          A.    No.

19          Q.    What is your understanding of the

20   allegations against the defendants in this lawsuit?

21          A.    My understanding of the allegations for

22   the lawsuit is that there's a connection between

23   events that take place in the schools -- in our

24   schools and access to -- students have to social

25   media, to use those platforms to further any of

CONFIDENTIAL

Page 132

```
1   those agendas that they have for using social media
2   to engage in activities that we don't want to have
3   in -- in the schools.
4        Q.   So going back to Exhibit -- Exhibit 5,
5   on the -- towards the end --
6        A.   Uh-huh.
7        Q.   -- there's an Attachment A.
8        A.   Uh-huh.
9        Q.   And there is a chart titled
10  "Program/Department Worksheet."
11       A.   Uh-huh.
12       Q.   Do you see that?
13       A.   Yes.
14       Q.   Have you seen this chart before?
15       A.   No.
16       Q.   Roughly two-thirds of the way down in
17  that chart, there is an entry for safety and
18  security.
19       A.   Uh-huh.
20       Q.   Do you see that?
21       A.   Yes.
22       Q.   And in the column next to that, under
23  column titled "Subtotal Fiscal Year 2016 to
24  2024" --
25       A.   Uh-huh.
```

CONFIDENTIAL

Page 133

1          Q.    -- it says $12,055,311.  Do you see
2     that?
3          A.    Yes.
4          Q.    The column next to that is titled
5     "Weight in Percentage," and it lists 40 percent.
6     Do you see that?
7          A.    Yes.
8          Q.    Do you know what that 40 percent number
9     is referring to?
10         A.    Well, based on the top of the sheet,
11    this says "damages."  I would say the amount of
12    time -- measuring the amount of time that the
13    office of safety and security spends with issues
14    related to our students and social media.
15         Q.    And that is based on your review of
16    this document in the past few minutes?
17              MR. LEGG:  Objection to form.
18              THE WITNESS:  No.  That's based on me
19    being asked before we were ever here to talk about
20    how much time -- I was asked about how much time, I
21    think, my office -- our people spend on issues that
22    are related to our students and conflicts with
23    social media on investigating.  I was asked that
24    question before.
25    BY MS. WEIANT:

CONFIDENTIAL

Page 134

1         Q.    Are you referring to my question
2    earlier or somebody else's question?
3         A.    Somebody else's question earlier, yes.
4         Q.    Did you help generate -- did you help
5    create this document?
6         A.    No.
7         Q.    On Page 4, beginning on Line 25,
8    picking up where we left off earlier, it says:  The
9    proportion of time or money spent is expressed as a
10   percentage of the overall budget for each relevant
11   department/program, which is deemed a weight
12   percentage.
13        A.    Uh-huh.
14        Q.    The weight percentages assigned to each
15   department/program are stated in Attachment A.
16             Do you see that?
17        A.    Yes.
18        Q.    Did you select the weight percentage
19   that appears next to the safety and security
20   department in Attachment A?
21        A.    Yes.
22        Q.    How did you do that?
23        A.    Based on the amount of time that we
24   spend investigating, responding to or mitigating
25   conflicts with students that we have to go back and

Page 135

1   a lot of cases investigate and try to find the
2   social media posts, or a lot of times students will
3   have it.  They will have screenshots.  They will
4   have other things.
5           And so, again, I came up with looking
6   at what we do on a daily basis and how much of it
7   we do and what the connection is to social media
8   and our students avoiding conflict.
9       Q.   When selecting the 40 percent number,
10  did you talk to any of your staff members about how
11  much time they spend addressing issues related to
12  social media?
13      A.   Yeah, I did talk to my folks about
14  that, the amount of time, but not necessarily based
15  on this question alone.
16          I talked to them about -- before this
17  ever came along, we were talking about how we could
18  address those issues because we were spending so
19  much time chasing down and trying to sort these
20  things out and trying to figure out, you know, who
21  posted what, who said what, whether it's real,
22  whether we can connect it back to somebody.
23          So I already knew the amount of time
24  and effort we were putting into these situations
25  connected to social media.

CONFIDENTIAL

Page 136

1          Q.   When selecting the 40 percent number
2     more recently --
3          A.   Uh-huh.
4          Q.   -- did you talk to any of your staff
5     members about how much time they spend addressing
6     issues related to social media?
7          A.   No.
8          Q.   Did you ask any of them exactly how
9     much time they spend addressing issues related --
10         A.   Exactly, no.
11         Q.   -- to social media?
12         A.   No.
13         Q.   Did you look at any documents to
14    determine how much time you and your staff are
15    spending addressing issues related to social media?
16         A.   Just the reports that -- that come
17    across where -- well, I shouldn't say "reports."
18              Just information that comes across
19    where my people are working on trying to resolve
20    issues and trying to figure out where the -- the
21    beginning of the issue started or how the issue
22    continued to be carried on very often is social
23    media-related investigations that they're doing.
24         Q.   What reports?
25         A.   That's why I said not "reports," but --

CONFIDENTIAL

                                              Page 137

1        Q.    I'm sorry.

2        A.    -- information.  Yeah, information.

3        Q.    And what documents would those be in?

4        A.    Those would be in like the email

5   documents, documents that they might have where

6   they have captured copies of threats like you sent

7   me -- I'm sorry.  You showed me something earlier

8   that was written on a desk.  But way more

9   exponentially than that do we get shown stuff in

10  students' phones that was captured where they were

11  either harassed, bullied, threatened or whatever.

12       Q.    So in calculating this 40 percent

13  number, you looked at emails and reports of threats

14  often that came in via email or other means.  Did

15  you look at any other documents?

16       A.    No.

17       Q.    Do those emails say how much time was

18  spent addressing --

19       A.    I don't recall saying emails.  Did I

20  say emails, if I said I get that during emails?

21  I'm not sure if I said emails.

22       Q.    Yes.  So you said, "Those would be in

23  like the email documents, documents that they might

24  have where they have captured copies of threats

25  like you showed me earlier."

CONFIDENTIAL

Page 138

1          A.    That shouldn't be email documents,

2     then.   Those should be captured images on students'

3     phones.

4          Q.    How would you see those captured

5     images?

6          A.    Our people would see those, capture

7     them, and just when the students show it to them

8     when they're investigating and they're asking,

9     "Why did this occur?"

10                "Well, this was said about me on social

11    media, or this threat."

12                "Well, do you have it?"

13                "Yeah."   And students will have it.

14    They'll show it to our people.

15         Q.    And from your staff, would there be any

16    documents showing what your staff did after the

17    student reported that or after they saw it or had

18    that conversation --

19         A.    There wouldn't be any documents of what

20    they did because they're going to involve --

21    they're never going to -- they're never going to

22    take the full lead on something like that without

23    the administrators being involved in that

24    situation.

25                They don't have as much authority to

Page 139

1    determine where it's going to go in terms of

2    outcome, determine where it's going to go in terms

3    of discipline.  They don't have that type of

4    authority.

5              So they're always going to get the

6    administrator involved, even if they are the

7    primary person who it was shown to.

8         Q.    So when selecting this 40 percent

9    number, specifically this 40 percent number, you

10   did not have any renewed conversations with your

11   staff about how they spend their time and how that

12   might relate to social media?

13        A.    No.

14        Q.    And of documents you might have

15   reviewed, you may have reviewed emails, but

16   primarily most of the information that you were

17   relying on would not be documented in any form?

18        A.    Correct.

19        Q.    In the 40 percent of time that you

20   believe your staff -- you and your staff spend

21   addressing issues related to social media, what

22   exactly are you doing in that 40 percent of time?

23        A.    Determining who all is involved in the

24   content on social media; determining how long it's

25   been going on; trying to backtrack, you know, how

CONFIDENTIAL

Page 140

1    long it's been going on; specifically what's been

2    said in there; whether or not it's been a mutual

3    back-and-forth; whether it's not -- whether it's

4    been a bullying; whether threats have been

5    associated with it.

6            When it's anonymous, it's a little more

7    difficult, but sometimes we've been able to work

8    our way through those as well and determine who the

9    individual was.

10            And then trying to go on, if we can, go

11    on, ourselves, to the platforms to try to see if we

12    can see -- see if the content is still there.

13            And then from there, spending time, you

14    know, trying to mediate whatever the conflict was;

15    spending time with the parents; have the parents

16    come in for conferences so we can talk to them; you

17    know, see if we can get their support to get

18    students to cease and desist.

19            And then, you know, you've got to do

20    follow-up.  You know, have you gotten any more of

21    these types of messages?  Is this -- is this

22    continuing or whatever?  Because you only have so

23    much control when trying to work these things out

24    before somebody stops.  It's, like, difficult to

25    stop it.  So, you know, you just continue to work

                                        Page 141

1    through it the best way you can.

2         Q.   Earlier, you testified that there's

3    very little that we spend time on when it comes to

4    conflict between students where it has not come up

5    related to social media.

6              So you said there was very little time

7    spent that did not connect to that.  So why did you

8    select 40 percent?

9         A.   Because not every situation between the

10   students involves us necessarily having to go

11   deep -- do a deep scrub on.  Some of them do; some

12   of them don't.

13             So even though there's very few issues

14   of conflict, there are other issues.  There are

15   issues where students -- there's safety issues

16   where there's no other students involved.  There's

17   just -- we spend time doing a number of things when

18   it comes to students that -- outside of them having

19   a conflict with another student.

20             You know, we -- we deal with safety

21   issues where students are in conflict with adults

22   where they try to assault adults.  It has nothing

23   to do with the social media piece.

24             We have students who are in conflict

25   with, you know, people from the community who may

CONFIDENTIAL

Page 142

1   not even be other students inside of the school or

2   whatever.  So we have to deal with those issues as

3   well.

4            But when we get our students inside of

5   the school who got into a fight in the cafeteria

6   and we find out it's been an ongoing situation,

7   there's been some -- most of the time when we look

8   at that, there's been some portion of that conflict

9   that had some social -- something that was said on

10   social media.

11          Q.   In this conversation we have just had,

12   when you say "social media," what platforms are you

13   talking about?

14          A.   Facebook, Snapchat, YouTube -- some --

15   when I first got here, definitely YouTube when I

16   first got here.  These kids were making rap videos

17   and saying things -- sending subliminal messages to

18   each other in these rap videos in this -- in the

19   music.  Instagram.  And then you have so many

20   other, you know, platforms that these students

21   uses.

22          But, yeah, typically, those are the

23   platforms that they use to engage in the

24   back-and-forth or what have you.

25          Q.   You said there are many other

Page 143

1    platforms.  What platforms are those?

2          A.   I have no idea.  But I have a

3    17-year-old son, so I just know that there -- he

4    says stuff that I never even heard of before.

5          Q.   You can't name any of them?

6          A.   No.

7          Q.   But you know there are others --

8          A.   I know there are others.

9          Q.   -- they use?

10              Discord?

11         A.   I'm familiar with Discord.  More like

12   Patreon, is what you mean?

13         Q.   I have to check on that one.

14              Have you heard of BeReal?

15         A.   No.

16         Q.   GroupMe?

17         A.   Who?

18         Q.   GroupMe?

19         A.   GroupMe?  GroupMe?  Was it GroupMe?

20   No.  Not -- maybe.  Maybe I've heard of GroupMe.

21         Q.   What about X or Twitter?

22         A.   Yes.

23         Q.   Students use that?

24         A.   Yes.

25              (BROOKS EXHIBIT 6, Email dated 1/15/18,

Page 144

1    Subject:  MCFSS Conference Call Notes - Call

2    Reminder Tuesday January 16, 2018 @ 10 am EST,

3    Bates HCPS_00553865-70, was marked for

4    identification.)

5    BY MS. WEIANT:

6          Q.   I'm going to show you what has been

7    marked Brooks Exhibit 6.

8               MS. WEIANT:  This is Tab 34.

9    BY MS. WEIANT:

10         Q.   It's a email dated January 15th, 2018,

11   from Edward Clarke.  There's a very long list of

12   recipients before the email itself begins.

13              Do you know who Edward Clarke is?

14         A.   Yes.

15         Q.   Who is Edward Clarke?

16         A.   Retired -- I will forget what his title

17   was.  I think he might have been director of the

18   Maryland Center for School Safety.

19         Q.   And the subject of this email is

20   "MCFSS Conference Call Notes."  Do you know what

21   "MCFSS" stands for?

22         A.   No, but that might be -- no, I don't

23   know.  I just know Maryland Center for School

24   Safety.  I'm not sure of the other -- what the F or

25   whatever.

Page 145

1          Q.    Do you attend conference calls for the

2    Maryland Center for School Safety?

3          A.    Yes.

4          Q.    On the second page of the substantive

5    email, the page ending in 869 in the bottom right,

6    about halfway down, there's a -- a bullet point

7    that starts with "Donoven Brooks."  Do you see

8    that?

9          A.    Yes.  Yes.

10         Q.    It says:  Donoven Brooks, new Harford

11   County Public Schools Security Director, discussed

12   an anonymous social media app known as "Sarahah"

13   that students have been using to post threatening

14   messages without being detected.

15               Do you see that?

16         A.    Yes.

17         Q.    What is Sarahah?

18         A.    I don't really know.  It's -- it's an

19   app, but I'm not really sure.

20         Q.    Do you recall discussing this issue

21   with the Maryland Center for School Safety?

22         A.    I do.

23         Q.    So when it says you discussed an

24   anonymous social media app known as "Sarahah" where

25   students have been posting threatening messages,

CONFIDENTIAL

Page 146

1  did you report that to the Maryland Center for
2  School Safety?
3          A.   Yes.
4          Q.   Do you recall -- scratch that.  I'm
5  sorry.  Strike that.
6               Do you recall what happened during this
7  conversation when you raised this issue, anonymous
8  messages on Sarahah?
9          A.   Yeah.  So when we first started these
10 calls, the reason that this list is so long is
11 because it wasn't just the security directors on
12 the call.  It was every law enforcement agency as
13 well.  So my colleagues from the sheriff's office
14 and the other three jurisdictions were also on
15 these calls.
16              So we had our intel meeting for law
17 enforcement, which I would attend weekly.  I
18 learned about this app at the intel meeting from my
19 law enforcement partners.
20              So they -- when we did this -- your law
21 enforcement partners really didn't say anything.
22 They would -- anything they wanted to provide, they
23 would give to the directors of security for each
24 jurisdiction, because that would be the person that
25 would do, like, the talking.

CONFIDENTIAL

Page 147

1        And I remember very specifically that

2    our sheriff's office SRO supervisor had said,

3    "Hey, when you do the call, you want to share this

4    information with them, because we've been getting a

5    couple of situations that we've been investigating,

6    and it's coming back to this app."

7        Their CID department was investigating

8    some threats that were coming back to that app.  So

9    when it was time, the information that they gave

10   me, I shared it out so it could be shared with the

11   other jurisdictions, which was common, not just for

12   us, but other jurisdictions would share stuff, and

13   it would be coming from their law enforcement.

14       Q.   When you and your staff spend time

15   addressing issues related to social media, that

16   could include things like anonymous social media

17   posts on something like Sarahah, right?

18       A.   Yes.

19       Q.   When -- when responding to situations

20   or incidents or threats on social media, do you

21   document where each threat was made?

22       A.   Do we document where each threat was

23   made?

24       Q.   Sorry.  Yes.

25       When responding to situations or

CONFIDENTIAL

Page 148

1    incidents or threats on social media, do you

2    respond where students or other community members

3    made that threat?

4         A.    We provide that information to law

5    enforcement when we give them the information so it

6    can be included in their report.

7         Q.    So you would have a document of every

8    threat that was made on social media that you have

9    learned of?

10        A.    We wouldn't, no.  But anyone that was

11   reported to law enforcement, yes, they would have a

12   document, if they wrote a report on it.

13        Q.    And that specifically --

14        A.    But every single threat that's ever

15   been reported, I would say I don't -- we don't --

16   my office doesn't have a copy of every single

17   report, no.

18        Q.    Does Harford County Public Schools have

19   a YouTube channel?

20        A.    Yes.

21        Q.    Who runs that channel?

22        A.    Office of communications.

23        Q.    And who is in charge of the office of

24   communications?

25        A.    Ms. Jillian Lader.

CONFIDENTIAL

Page 149

1        Q.    Are you familiar with what content is
2   posted on the Harford County Public Schools'
3   YouTube page?
4        A.    Yes.
5        Q.    What type of content?
6        A.    Content to provide information to our
7   families and communities.  General information
8   about our school district from different various
9   offices and departments will provide information
10  that's useful to our students in the community.
11       Q.    Have you appeared in videos on the
12  Harford County Public Schools YouTube channel?
13       A.    Yes.
14       Q.    Do you know how many?
15       A.    I don't.
16       Q.    What were those videos about?
17       A.    Safety and security.
18       Q.    Do you know roughly when those videos
19  were posted on YouTube?
20       A.    Between -- probably -- the first video
21  I ever made?  I don't know.  Probably between 2020
22  and 2024.
23       Q.    And what was the purpose of making
24  videos about safety and security and posting them
25  on YouTube?

CONFIDENTIAL

Page 150

1        A.    The purpose is to give parents
2    strategies -- parents and students strategies,
3    things to look -- to be aware of, and strategies
4    for maintaining safety and security, and providing
5    useful information to parents.
6        Q.    Does Harford County Public Schools have
7    a Facebook page?
8        A.    Yes.
9        Q.    Do you know who runs that page?
10        A.    I believe it's Ms. Jillian Lader who
11    runs that page as well, office of communication.
12        Q.    Have you ever posted content to the
13    Harford County Public Schools Facebook page?
14        A.    Have I posted content?
15        Q.    Yes.
16        A.    No.  If I did, I don't remember.
17        Q.    Have you appeared in content posted to
18    that Facebook page?
19        A.    I don't know.  I don't know if they
20    posted the videos I've done to the -- I don't
21    really go to the HCPS Facebook page.
22        Q.    Does Harford County Public Schools have
23    a TikTok account?
24        A.    Oh, that, I don't know.
25        Q.    Does Harford County Public Schools have

CONFIDENTIAL

Page 151

1    an Instagram account?

2            A.    I don't know.

3            Q.    Does Harford County Public Schools have

4    a Snapchat account?

5            A.    I don't know.

6            Q.    Have you ever used YouTube?

7            A.    Yes.

8            Q.    Do you have a YouTube account?

9            A.    Yes.

10           Q.    Do you log in to YouTube when you use

11    YouTube?

12           A.    Do I log in?  Yeah.  Uh-huh.

13           Q.    Do you post content to your YouTube

14    account?

15           A.    Not now, no.

16           Q.    Have you ever?

17           A.    Yes.

18           Q.    When was that?

19           A.    2024.

20           Q.    So last year?

21           A.    Yes.

22           Q.    Did you post content -- how -- sorry.

23    Strike that.

24                How often did you post content to your

25    YouTube account?

CONFIDENTIAL

Page 152

1          A.   How often?  I don't know.  I might have

2     published -- when you say "content," can you

3     describe what "content" is, what you're -- what

4     you're meaning as context?

5          Q.   Have you uploaded videos to a YouTube

6     channel?

7          A.   Oh, yes.  How frequent have I done

8     that?  I don't know.  Every -- when I was doing it,

9     every couple of weeks or so.  Every week, every

10    couple of weeks.

11         Q.   And that was all in 2024?

12         A.   As far as uploading content, yeah,

13    2020 -- yeah, 2023, 2024.  I would say 2023, 2024.

14         Q.   What type of videos did you upload?

15         A.   I don't know.  Fun videos.

16         Q.   What would you consider fun videos?

17         A.   Talking about current events.  Yeah.

18         Q.   Who was your intended audience?

19         A.   I would say probably people between

20    like 35 and up.

21         Q.   Do you ever use YouTube to watch

22    videos?

23         A.   Yes, I do.

24         Q.   What types of videos do you watch?

25         A.   Primarily, investment videos.  So

Page 153

1    probably 95 percent, stock market videos.

2           Q.    What would you say the other 5 percent

3    is?

4           A.    Other 5 percent is sports training.

5    I'm a big boxing enthusiast.  So the other 5,

6    10 percent is probably boxing-related stuff.

7           Q.    Anything else that you can recall?

8           A.    On the regular, no, unless it's just

9    something I scroll past on a short or something.

10   But stuff that I actively seek out is investment

11   stuff and sports stuff.

12          Q.    Do you use YouTube to listen to music?

13          A.    Yes.  I have YouTube music.

14          Q.    Do you use YouTube as a streaming

15   service?

16          A.    Like -- for, like, my primary

17   television-type stuff and all that?

18          Q.    Do you use YouTube TV?

19          A.    No.  If it's included in a subscription

20   I have or something, maybe I'm not taking advantage

21   of it.

22          Q.    How often would you say you use

23   YouTube?

24          A.    Every day.

25          Q.    How much time do you spend on YouTube

CONFIDENTIAL

Page 154

1    every day?

2            A.    Probably anywhere from 45 minutes to

3    maybe an hour, like that.

4            Q.    And that's primarily on the investment

5    videos --

6            A.    Yes.

7            Q.    -- you talked about?

8            A.    I start -- that's how I start my day.

9    I'm brushing my teeth, and I'm listening to market

10   updates and, you know, why the market may be

11   trending up or down or whatever.  That's how I

12   start my day, so...

13               I'm doing other stuff, but it's playing

14   in the background.  I'm listening.

15           Q.    Do you also use -- strike that.

16               How often do you use YouTube to listen

17   to music?

18           A.    In my car.

19           Q.    And how frequently would you say you

20   listen to music from YouTube in your car?

21           A.    Maybe three or four times a week,

22   because, again, in my car I'm putting on investment

23   stuff.  I'm riding up the road listening to one of

24   my guys that I subscribe to.

25           Q.    When was the last time you used

CONFIDENTIAL

```
                                        Page 155

1   YouTube?
2          A.    Yesterday.
3          Q.    Do you have any children?
4          A.    I do.
5          Q.    How many children do you have?
6          A.    Why do you want to know that?  Four.
7          Q.    How old are your children?
8          A.    36, 32, 26, and 17.
9                THE REPORTER:  You dropped your mic.
10               THE WITNESS:  Oh, I'm sorry.
11  BY MS. WEIANT:
12         Q.    Is your 17-year-old still living at
13  home?
14         A.    Yes.
15         Q.    Are they in high school?
16         A.    He's a -- is a senior year at high
17  school.
18         Q.    Do you know if he has ever used
19  YouTube?
20         A.    Yes.
21         Q.    Do you know if he has a YouTube
22  account?
23         A.    Yes.
24         Q.    Do you know how he uses his YouTube
25  account?
```

                                        Page 156

1           A.    Yeah.  I've seen him load his
2    basketball and track videos.  He -- he's an
3    athlete, so he's loaded his videos.
4           Q.    How often does he upload to YouTube?
5           A.    Not often.
6           Q.    Did you help him set up his YouTube
7    account?
8                 MR. LEGG:  Objection to form and
9    foundation.
10                THE WITNESS:  No, I didn't help him set
11   up his -- I believe his mother did because he
12   wasn't with me when he set it up.
13   BY MS. WEIANT:
14          Q.    Do you know if he also uses YouTube to
15   watch videos or listen to music?
16          A.    Yes.  He does both.
17          Q.    Do you know if he has used YouTube in
18   the classroom?
19          A.    Yes, I know he has used it because he's
20   done a couple projects that we did together where
21   he had to interview people.  And it was uploaded to
22   YouTube, and it was part of his class project.
23   Those interviews were put on YouTube.
24          Q.    Do you know if they're still available
25   on YouTube?

CONFIDENTIAL

Page 157

1           A.    I don't know.

2           Q.    Did you ever complain to the school

3    about allowing him to use YouTube in connection

4    with a class project?

5           A.    Did I complain?  No.

6           Q.    Are you aware of any other instances

7    where he used YouTube for homework assignments or

8    in the classroom?

9           A.    Yes, I'm aware he's used YouTube for

10   homework assignments.  In fact, his YouTube links

11   have been included in homework assignments from the

12   teacher to be able to watch a video at a

13   specific -- connected to a specific link.

14          Q.    Is he a student at Harford County

15   Public Schools?

16          A.    He is not.

17          Q.    For your 26-year-old -- actually,

18   scratch that.

19                For your high school son, does he have

20   a cell phone?

21          A.    Yes, he does.

22          Q.    Is it a smartphone?

23          A.    Yes, it is.

24          Q.    When did he get his cell phone?

25          A.    He got that cell phone in -- the

CONFIDENTIAL

Page 158

1  particular one he has right now, he got it in
2  December for Christmas.
3          Q.    When did he first get a cell phone?
4          A.    That, I don't know.  I got custody of
5  him when he was 11, and he already had a cell phone
6  at that time.  So I don't know when his mom
7  provided his first cell phone to him.
8          Q.    Did he -- when he was 11 and had a
9  phone, was it a smartphone?
10         A.    Yeah.  When he came to me, he had a
11  smartphone, yeah.
12         Q.    And he has used a smartphone ever
13  since?
14         A.    Yes.
15         Q.    Before he started high school, did you
16  place any restrictions on how many hours a day he
17  could use his cell phone?
18         A.    Yes.
19         Q.    How many hours a day did you allow him
20  to use his phone?
21         A.    No more than like one or two hours for
22  recreational use.  And I had parental controls on
23  his phone.
24         Q.    How did you enforce the time limit?
25         A.    Because I could shut it down from my

Page 159

1    phone.

2         Q.    How would you do that?

3         A.    Going to -- going to the settings on my

4    phone because I had already set up the parental

5    controls.  First of all, I had already filtered

6    where he couldn't go to certain -- he could go to

7    YouTube.  In fact, up until about a year and a half

8    ago, he could go to YouTube, but there was certain

9    content he wouldn't be able to access because of

10   the way I set up the -- the permissions.

11              But in terms of how I controlled it, I

12   just go into the phone app into T-Mobile and go

13   into family controls, and I could just -- I can do

14   a number of things.  I can make his phone where he

15   can just get incoming calls, can't make outgoing.

16              And like I said, up until about a year

17   and a half ago, I still exercised those.  So I've

18   always had pretty good reins on his cell phone use.

19   It was never really an issue for him when it came

20   to school.  Like, that wasn't something I was

21   getting called from school about, his cell phone

22   use, because I can control it.

23         Q.    And those parental -- parental controls

24   that you were talking about, are they all through

25   the T-Mobile platform?

CONFIDENTIAL

Page 160

1          A.    Yes.

2          Q.    Did you -- using your family or

3    parental controls that were on his device, did you

4    control them through his device?

5          A.    No.  So once it's registered and I'm

6    the owner of the account, the fact that his -- when

7    I first set his phone up, it asked if -- it went

8    through a series of things about asking about

9    permissions.  And, you know, there were things that

10   I checked off.

11               And then I could control -- I could

12   even control his connections.  If he was trying to

13   connect to Wi-Fi, I could just shut the -- I --

14   I could, from my phone, shut his Wi-Fi down on his

15   phone.

16         Q.    So aside from those parental controls

17   from the T-Mobile phone setup, did you use any

18   other parental controls to monitor his screen time

19   or his use of his phone?

20         A.    Periodically, I would check to see,

21   because I could also see what sites he visit.  When

22   I went into my app, I could see what sites he went

23   to, what sites he visit.  So, yes, I would

24   periodically do that.

25         Q.    And you said you used these parental

Page 161

1    controls until about a year and half ago?

2         A.   Yeah.  When he was -- when he turned

3    16, I relaxed some of that stuff a little bit.  He

4    was a little older now and showed responsibility,

5    so -- for some of the stuff.  Some of the screening

6    I went on and took off.

7              Like, for instance, at 16 I wasn't

8    shutting his phone down at 9:00 where he couldn't

9    make phone calls and receive calls and all that,

10   not at 16.

11        Q.   Do you still exercise some control over

12   his phone?

13        A.   I absolutely do.

14        Q.   What do you -- what do those controls

15   look like now?

16        A.   On apps -- like, on the app that I have

17   on mine, I could -- if I want to shut down -- even

18   now, although he's 17, he's doing what he's

19   supposed to do, but if he wasn't, and I wanted to

20   shut down apps because I feel like he should be

21   focused on homework or a project or something, I

22   could go in.  And he'll call me.  He's like, "Did

23   you shut whatever down?"

24              "Yep, I sure did."

25              (Discussion off the record.)

```
                                        Page 162
 1   BY MS. WEIANT:
 2        Q.   For your older children -- let's start
 3   with your 26-year-old.  Did they have a phone in
 4   high school?
 5        A.   My 26-year-old, did Kai have a phone in
 6   high school?  I'm going to say, yeah, he had a
 7   phone in high school.
 8        Q.   Did you implement any controls over his
 9   phone when he was in high school?
10        A.   He didn't live with me.
11             THE REPORTER:  I'm sorry.  I didn't
12   hear you.
13             THE WITNESS:  He didn't live with me.
14   I didn't provide his phone.
15   BY MS. WEIANT:
16        Q.   What about your 32-year-old?
17        A.   He didn't have a cell phone.  She --
18   she -- I'm sorry.  My 32-year-old is my daughter.
19   No, she did not have a cell phone in high school.
20        Q.   And your 36-year-old, I assume, did not
21   have a cell phone --
22        A.   No.
23        Q.   -- in high school?
24        A.   No.  That was my 36 -- that was 18
25   years ago?  No, he didn't have -- he didn't have a
```

Page 163

1    cell phone in high school.

2         Q.   Have you ever asked YouTube to modify

3    any feature or function on YouTube?

4              MR. LEGG:  Objection to form and

5    foundation.

6              THE WITNESS:  I don't understand that

7    question.

8    BY MS. WEIANT:

9         Q.   Have you ever asked YouTube to change a

10   feature or change something about how the platform

11   works?

12             MR. LEGG:  Same objections.

13             THE WITNESS:  How -- no.

14   BY MS. WEIANT:

15        Q.   Have you ever asked YouTube to

16   discontinue any feature about how the -- or how the

17   platform works?

18             MR. LEGG:  Objection to form and

19   foundation.

20             THE WITNESS:  If I -- I want to

21   understand correctly.  Like, as a -- as a consumer,

22   have I reached out to YouTube and say, I want you

23   to change how you're doing something -- a

24   particular thing on your platform?  Is that what

25   you're asking me?

Page 164

1   BY MS. WEIANT:
2           Q.   In any capacity, not just as a
3   consumer.  But, yes, have you asked them?
4           A.   No.
5           Q.   Have you ever spoken with anyone at
6   Google or YouTube about YouTube?
7                MR. LEGG:  Objection to form and
8   foundation.
9                THE WITNESS:  No.
10               MS. WEIANT:  All right.  Let's take a
11  quick break.
12               THE VIDEOGRAPHER:  We are now going off
13  the record at 3:59 p.m.
14                         * * *
15               (Whereupon, there was a recess in the
16  proceedings from 3:59 p.m. to 4:15 p.m.)
17                         * * *
18               THE VIDEOGRAPHER:  We're now going back
19  on the record at 4:15 p.m.
20  BY MS. WEIANT:
21          Q.   Do you have a Facebook account?
22          A.   I do.
23          Q.   When did you create that account?
24          A.   2009.
25          Q.   How often do you use that account?

Page 165

1          A.    Probably about once a week.

2          Q.    How do you use that account?

3          A.    I'll go on.  If I don't post something,

4     I'll scroll.

5          Q.    When scrolling on Facebook, how much

6     time do you scroll -- spend scrolling?

7          A.    Not long.  15, 20 minutes just to

8     see -- just to see what the friends are doing or

9     family members or whatever, see if they posted

10    anything.

11         Q.    Do you ever post to Facebook?

12         A.    Yes.

13         Q.    How often do you post -- post to

14    Facebook?

15         A.    Whenever me and my wife take a

16    nice-looking picture together.

17         Q.    How often would you say that is?

18         A.    Oh, I think we're good-looking, so

19    pretty often.

20         Q.    Do you have a Instagram account?

21         A.    I do.

22         Q.    When did you create that account?

23         A.    I think about maybe a year or two ago.

24         Q.    How do you use your Instagram account?

25         A.    I really don't.

CONFIDENTIAL

```
                                            Page 166
 1          Q.   When was the last time you used your
 2    Instagram account?
 3          A.   I think I used it to help me get back
 4    into my Facebook account.  They got -- something
 5    happened with my Facebook, me forgetting my
 6    Facebook password.  I was reading something.
 7               So probably over the past month, I
 8    might have used it once or twice, but not using it
 9    to post anything or anything like that.
10          Q.   Have you ever posted anything to
11    Instagram?
12          A.   Yes.
13          Q.   When was the last time you posted
14    something to Instagram?
15          A.   I don't remember.
16          Q.   Do you use Instagram to keep up with
17    friends or family?
18          A.   No.
19          Q.   Do you have a TikTok account?
20          A.   No.
21          Q.   Do you have a Snapchat account?
22          A.   No.
23          Q.   Does your 17-year-old son have a
24    Facebook account?
25          A.   Yes.
```

CONFIDENTIAL

Page 167

1          Q.    Do you know when he got his Facebook
2     account?
3          A.    No, I don't know exactly when he got
4     it.
5          Q.    Do you know how he uses his Facebook
6     account?
7          A.    From what I've seen, mostly posts
8     basketball and track stuff, athletic stuff that
9     he's involved in.
10         Q.    Do you know how often he uses Facebook?
11         A.    I don't.
12         Q.    Do you monitor how he uses Facebook?
13         A.    Not at this point, no.
14         Q.    Have you ever monitored how he uses
15    Facebook?
16         A.    Yes.
17         Q.    Is that through the same controls,
18    through T-Mobile that we discussed earlier?
19         A.    That and by going to his account, his
20    Facebook account.
21         Q.    How often did you go into his Facebook
22    account to monitor it?
23         A.    Frequently when I was monitoring it.
24    Up until about the age of 15, pretty frequently.
25         Q.    So until about two years ago --

Page 168

1          A.    Yeah.

2          Q.    -- you monitored -- you went into his

3     account and monitor it --

4          A.    Yes.

5          Q.    -- monitored it?

6                When you went into his account, what

7     did you monitor?

8          A.    Who he was having communication with

9     and, you know, what he was posting, if he was

10    posting anything.  But he wasn't really a big

11    poster.  Even now, he's not a big poster if you go

12    to his page.  He's never really been a major

13    poster-type guy.

14         Q.    Does your 17-year-old son have an

15    Instagram account?

16         A.    I don't know.

17         Q.    Does your 17-year-old --

18         A.    No, wait a minute.  Instagram?

19         Q.    Yes.

20         A.    Yes, I'm pretty sure he has a Instagram

21    account.

22         Q.    Do you know when he created his

23    Instagram account?

24         A.    I don't.

25         Q.    Do you know how he uses his Instagram

CONFIDENTIAL

Page 169

1   account?

2          A.    I don't.

3          Q.    Do you know how often he uses his

4   Instagram account?

5          A.    I don't.

6          Q.    Do you place any time limits on how

7   often he uses his Instagram account?

8          A.    No.

9          Q.    Do you monitor his Instagram account?

10          A.    No.

11          Q.    Have you ever monitored his Instagram

12   account?

13          A.    No.

14          Q.    Does your 17-year-old son have a TikTok

15   account?

16          A.    That, I don't know.

17          Q.    Does your 17-year-old son have a

18   Snapchat account?

19          A.    That, I don't know either.

20          Q.    Have you ever asked Facebook to modify

21   any feature or function on its platform?

22              MR. LEGG:  Objection to form.

23   Foundation.

24              THE WITNESS:  Un-hun.  No.  I'm sorry.

25   No.

CONFIDENTIAL

```
                                        Page 170

 1   BY MS. WEIANT:

 2        Q.   Have you ever asked Instagram to modify

 3   any feature or function on its platform?

 4        A.   Ask who?

 5             MR. LEGG:  Objection to form and

 6   foundation.

 7   BY MS. WEIANT:

 8        Q.   Instagram.

 9        A.   No.

10        Q.   Have you ever asked TikTok to modify

11   any feature or function on its platform?

12        A.   No.

13             MR. LEGG:  Objection to form.

14   Foundation.

15   BY MS. WEIANT:

16        Q.   Have you ever asked Snapchat to modify

17   any feature or function on its platform?

18             MR. LEGG:  Objection to form and

19   foundation.

20             THE WITNESS:  No.

21   BY MS. WEIANT:

22        Q.   Have you ever asked any of those

23   platforms to discontinue any feature or function?

24             MR. LEGG:  Objection to form and

25   foundation.
```

CONFIDENTIAL

Page 171

1                  THE WITNESS:  No.

2       BY MS. WEIANT:

3            Q.    Have you ever spoken with anyone at any

4       of those platforms about -- about their platforms?

5            A.    No.

6                  MR. LEGG:  Objection to form and

7       foundation.

8                  THE WITNESS:  No.

9       BY MS. WEIANT:

10           Q.    Earlier today, you testified that you

11      have not been a schoolteacher; is that right?

12           A.    Correct.

13           Q.    So you are not in classrooms on a

14      regular basis?

15           A.    That's correct.

16           Q.    You can't speak to how students are

17      typically using their cell phones or electronic

18      devices in the classroom, can you?

19           A.    No.

20           Q.    You can't speak to what websites they

21      are looking at?

22           A.    No.

23           Q.    You can't speak to what apps they are

24      using?

25           A.    No.

CONFIDENTIAL

Page 172

1          Q.   You can't speak to how students are

2     using -- are typically using their cell phones or

3     electronic devices at school generally, can you?

4               MR. LEGG:   Objection to form and

5     foundation.

6               THE WITNESS:   How they are using it

7     generally?   How they are using it, no.

8     BY MS. WEIANT:

9          Q.   So the first questions were about how

10    they were using their devices in the classroom.

11         A.   Right.

12         Q.   The second one, you can't speak to how

13    they are typically using their cell phones at

14    school more generally, can you?

15              MR. LEGG:   Same objections.

16              THE WITNESS:   No.

17    BY MS. WEIANT:

18         Q.   You can't say what websites they are

19    looking at while using their phones at school?

20              MR. LEGG:   Objection to form --

21              THE WITNESS:   No.

22              MR. LEGG:   -- and foundation.

23    BY MS. WEIANT:

24         Q.   You can't say what apps they are using

25    while using their phones at school?

CONFIDENTIAL

```
                                            Page 173

 1              MR. LEGG:  Same objections.

 2              THE WITNESS:  No.

 3    BY MS. WEIANT:

 4         Q.   Do you have any data about how often

 5    students use cell phones or electronic devices?

 6         A.   No.

 7         Q.   Do you have any data about how much

 8    time students are spending on their cell phones or

 9    electronic devices?

10         A.   No.

11         Q.   Do you have any data about how often

12    students use social media?

13         A.   No.

14         Q.   Do you have any data about how much

15    time they spend on social media?

16         A.   No.

17         Q.   Do you have any data about how students

18    use social media?

19         A.   No.

20         Q.   Earlier today, you testified that you

21    were not a school counselor, right?

22         A.   Correct.

23         Q.   So have you counseled any Harford

24    County Public School students about social media

25    addiction?
```

CONFIDENTIAL

Page 174

1          A.    About addiction, no.

2          Q.    Have you counseled any Harford County

3    Public School students about problems resulting

4    from their use of social media?

5          A.    No.

6          Q.    Do you have any data on how many

7    Harford County Public School students are counseled

8    or treated for social media addiction?

9          A.    No.

10         Q.    Do you have any data on how many

11   Harford County Public School students are counseled

12   or treated for mental health issues?

13         A.    No.

14         Q.    Do you have any data on how many

15   Harford County Public School students are counseled

16   or treated for anything connected to their use of

17   cell phones?

18         A.    No.

19         Q.    Do you have any data on how many

20   Harford County Public School students are counseled

21   or treated for anything connected to their use of

22   social media?

23         A.    No.

24         Q.    So you can't speak to how many Harford

25   County Public School students have social media

CONFIDENTIAL

Page 175

1    addiction, can you?

2              MR. LEGG:  Objection to form and

3    foundation.

4              THE WITNESS:  No.

5    BY MS. WEIANT:

6         Q.   You can't speak to how many Harford

7    County Public School students have experienced any

8    kind of mental health problems because of their use

9    of social media?

10             MR. LEGG:  Objection to form and

11   foundation.

12             THE WITNESS:  No.

13   BY MS. WEIANT:

14        Q.   You would agree that students can make

15   threats in a variety of ways, correct?

16             MR. LEGG:  Objection to form and

17   foundation.

18             THE WITNESS:  I would agree.

19   BY MS. WEIANT:

20        Q.   Earlier today, we looked at a document

21   with an example of a threat written on a desk; is

22   that right?

23        A.   Yes.

24        Q.   Some threats are made by making a phone

25   call?

CONFIDENTIAL

Page 176

1          A.   Yes.

2          Q.   Some threats can be made by text

3     message?

4          A.   Yes.

5          Q.   Some threats occur in person without

6     the involvement of any devices?

7          A.   Yes.

8          Q.   And you have had experience acting on

9     some threats being made on social media, right?

10         A.   Yes.

11         Q.   Or with -- you've had some experience

12    with fights or other violence that was promoted on

13    social media?

14         A.   Yes.

15         Q.   Separate from responding to threats,

16    fights or violence that may have been promoted on

17    social media, your work doesn't involve issues

18    related to student use of social media, does it?

19              MR. LEGG:  Objection.  Form.

20    Foundation.

21              THE WITNESS:  My work doesn't relate to

22    students' use of social media?

23    BY MS. WEIANT:

24         Q.   Aside from --

25         A.   Oh, responding to the threat.  No.

Page 177

1        Q.   Your work is focused on addressing
2   these threats and incidents and keeping students
3   safe and not evaluating the specific role that
4   social media plays in the matters you're handling,
5   right?
6              MR. LEGG:  Objection to form and
7   foundation.
8              THE WITNESS:  Correct.
9              MS. WEIANT:  I have no further
10  questions at this time.
11             Does anybody on the Zoom have any
12  questions?
13             MR. COTLER:  No questions from Snap.
14             MR. FLASTER:  No questions from Meta.
15             MS. JACKSON:  Nothing from TikTok.
16             MR. LEGG:  I will reserve my questions
17  for trial.
18             THE VIDEOGRAPHER:  We are now going off
19  the record at 4:27 p.m.
20             This now concludes today's video
21  testimony given by Donoven Brooks.
22             Total time for Google/YouTube is 3
23  hours and 32 minutes.
24             (WHEREUPON, the deposition was
25  concluded at 4:27 p.m.)

CONFIDENTIAL

Page 178

1                    (Signature Reserved.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 179

1          DEPOSITION ERRATA SHEET

2

Case Caption:  In Re:  Social Media Adolescent

3    Addiction/Personal Injury Liability Litigation

4          DECLARATION UNDER PENALTY OF PERJURY

5

6          I declare under penalty of perjury that

7    I have read the entire transcript of my deposition

8    taken in the captioned matter or the same has been

9    read to me, and the same is true and accurate, save

10   and except for changes and/or corrections, if any,

11   as indicated by me on the DEPOSITION ERRATA SHEET

12   hereof, with the understanding that I offer these

13   changes as if still under oath.

14

15

16          Signed on the _____ day of

17          _____, 20___.

18

19

20          _____

21          DONOVEN BROOKS

22

23

24

25

CONFIDENTIAL

```
                                        Page 180

 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24              DONOVEN BROOKS

25
```

CONFIDENTIAL

Page 181

1                DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24                DONOVEN BROOKS

25

CONFIDENTIAL

Page 182

1                    CERTIFICATE OF REPORTER
2
          I, Cindy A. Hayden, Registered Merit
3    Reporter and Notary Public for the State of
     Maryland, do hereby certify:
4
          That the foregoing deposition was taken
5    before me on the date and at the time and location
     stated on Page 1 of this transcript; that the
6    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
7    testimony of the deponent and all objections made
     at the time of the examination were recorded
8    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
9    is a true, accurate and complete record of the
     testimony of the deponent and of all objections
10   made at the time of the examination to the best of
     my ability.
11
          I further certify that I am neither related
12   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
13   hand, this 9th of May, 2025.
14
15
16         _____
17         Cindy A. Hayden,
           Registered Merit Reporter
18         Notary Public
           State of Maryland
19         My Commission expires:
           April 26, 2029
20
21
22
23
24
25

**[& - 26]**                                                                                      Page 1

| & | | | |
|---|---|---|---|
| **&** 2:11,17 3:5 3:11 6:3 | **122** 4:14 | 67:4 91:18 130:12 | 149:21 152:13 |

**0**

**00226861** 83:6
**00226861-62**
  4:13 82:21
**00226862** 83:6
**00553865-70**
  4:22 144:3
**03065** 1:8

**1**

**1** 4:8 8:3,7 91:2
  182:5
**1/15/18** 4:20
  143:25
**1/8/19** 4:9
  66:24
**10** 4:22 144:2
  153:6
**10/30/18** 4:12
  82:20
**102** 1:15 5:9
**10:00** 47:20
**10:28** 1:17 5:7
**10:58** 29:10,13
**11** 158:5,8
**11:00** 18:7
**12** 13:7 22:23
  90:1
**12,055,311**
  133:1

**122** 4:14
**12466** 182:15
**129** 4:17
**12:21** 29:13,16
**13** 67:5
**14** 89:13
**143** 4:20
**15** 89:13,21
  106:20,21
  165:7 167:24
**15th** 144:10
**16** 4:22 89:21
  90:6 144:2
  161:3,7,10
**17** 143:3 155:8
  155:12 161:18
  166:23 168:14
  168:17 169:14
  169:17
**1700** 3:11
**18** 14:8 54:13
  54:23 92:20
  162:24
**180** 14:18
  53:16
**19** 25:17
**19103-7014**
  2:12
**1:15** 70:25 71:3
**1:38** 71:3,6

**2**

**2** 4:9 25:8
  26:12 66:23

67:4 91:18
130:12
**20** 11:2 12:22
  18:3,18 23:5
  30:24 82:2
  96:24 111:4
  117:21 165:7
  179:17
**20006** 3:12
**2001** 2:12
**20024** 3:6
**2009** 8:21
  164:24
**2016** 132:23
**2017** 8:13
**2018** 4:22 17:3
  19:10 23:24
  24:1 25:11
  27:10 36:2
  39:24 50:18
  55:15 56:8,9
  56:11 83:12
  121:24 123:2
  123:25 124:22
  144:2,10
**2019** 57:13
  67:12,21,24
  111:5
**202.434.5584**
  3:6
**202.626.2640**
  3:13
**2020** 21:15,16
  25:12,15

149:21 152:13
**2021** 21:9,11
**2022** 20:23,24
  32:13 38:21
  39:2 96:24
**2022-2023**
  31:13
**2023** 20:2 21:1
  32:13 38:21
  39:3 104:13
  107:4 152:13
  152:13
**2024** 8:13
  43:19 132:24
  149:22 151:19
  152:11,13,13
**2025** 1:17 5:6
  182:13
**2027** 42:12
**2027-2028** 42:6
  42:8
**2029** 182:19
**21209** 2:4
**215.278.2555**
  2:13
**21st** 60:24
**220** 2:4
**23** 6:21 130:18
**24** 115:3
**24th** 123:2
**25** 17:21 23:5
  134:7
**26** 83:12 155:8
  157:17 162:3,5

**[26 - account]**                                                                 Page 2

182:19
**2850**   2:4
**2:41**   121:1,4

**3**

**3**   4:12,19 82:19
   82:25 91:22
   106:23 129:13
   130:5,9 177:22
**30**   32:22,24
**3000**   2:12
**3047**   1:4 5:10
**312.862.1083**
   2:18
**32**   155:8
   162:16,18
   177:23
**33**   83:1
**333**   2:17
**34**   144:8
**35**   152:20
**36**   155:8
   162:20,24
**3:02**   121:4,7
**3:59**   164:13,16

**4**

**4**   4:14,15
   122:12,13,18
   130:9,18 134:7
**40**   25:8 127:24
   133:5,8 135:9
   136:1 137:12
   139:8,9,19,22
   141:8

**40,000**   28:9,9
**400**   91:3
**410.421.7777**
   2:5
**42**   122:19
**45**   127:24
   154:2
**4:00**   47:24
**4:15**   164:16,19
**4:22**   1:4
**4:23**   1:8
**4:27**   177:19,25
**4th**   96:25,25
   123:3

**5**

**5**   4:3,17 106:22
   129:10,16
   130:13 132:4
   153:2,4,5
**55**   28:8
**5:00**   90:23

**6**

**6**   4:20 143:25
   144:7
**6,000**   28:9
**60**   129:17
**60654**   2:18
**66**   4:9
**680**   3:5

**7**

**70**   14:17

**70s**   58:11

**8**

**8**   1:17 4:8
**8/24/18**   4:14
   122:13
**80**   89:15 91:4
**82**   4:12
**869**   145:5
**8:00**   90:23
**8th**   5:6 67:12

**9**

**90**   57:22
**900**   3:12
**95**   153:1
**97**   10:24
**99**   40:16
**9:00**   161:8
**9th**   182:13

**a**

**a.m.**   1:17 5:7
   29:10,13
**ability**   182:10
**able**   24:16
   28:10,16 32:2
   35:11 50:11,20
   51:23,25 58:20
   63:20 70:13
   74:22 77:20
   87:5 98:5,22
   104:8 109:14
   115:18 129:1
   140:7 157:12

159:9
**absolutely**
   36:12,24 39:23
   95:16 161:13
**absolutes**   125:6
   125:7
**abuse**   72:1,2,4
   72:6,7,9,15,17
   72:22 73:1,4,8
   73:11,19,25
   74:17 80:9
**academic**   13:6
   22:11 52:20
**academy**   10:17
   10:23
**access**   46:24
   47:7 79:11
   116:16,19
   131:24 159:9
**accident**   99:16
**accidents**   41:8
**account**   115:14
   150:23 151:1,4
   151:8,14,25
   155:22,25
   156:7 160:6
   164:21,23,25
   165:2,20,22,24
   166:2,4,19,21
   166:24 167:2,6
   167:19,20,22
   168:3,6,15,21
   168:23 169:1,4
   169:7,9,12,15

CONFIDENTIAL

**[account - allocation]**                                                   Page 3

169:18
**accounts**   115:5
128:14
**accreditation**
12:1,3,6
**accurate**   179:9
182:9
**acknowledged**
123:13
**act**   36:23 37:24
38:13 53:6
57:16 117:22
118:8
**acting**   176:8
**action**   76:25
110:8
**active**   4:11 38:3
38:4,5 53:8
57:18,19,21
60:7 62:10,11
62:12,15 65:5
65:25 66:9,25
67:13,22 87:23
88:2 91:9,15
114:15 121:16
**actively**   153:10
**activities**   85:10
132:2
**activity**   73:19
80:11,14,19,24
81:5,9,16,22
82:4 91:14
93:18 94:16
95:3,11 96:16

**actually**   14:15
14:16 29:22
63:13 65:14
118:23 157:17
**add**   25:21
43:14
**added**   25:15
43:16 109:18
**addiction**   1:3
173:25 174:1,8
175:1 179:3
**adding**   25:18
25:20
**addition**   31:19
**additional**
37:13 104:7
105:8
**additions**   57:15
57:17
**address**   29:19
31:24 98:6,22
98:25 135:18
**addressing**
127:18 135:11
136:5,9,15
137:18 139:21
147:15 177:1
**adequate**   28:17
**administration**
1:14 8:20 22:2
109:6
**administrative**
12:9 20:17

**administrator**
31:2 44:19,24
76:1 80:5
105:6 116:7
139:6
**administrators**
15:23 41:19
138:23
**adolescent**   1:3
179:2
**adopted**   31:8
**adults**   68:8,10
68:16,22 69:3
141:21,22
**advantage**
153:20
**advisory**
113:16,17,22
118:23,24
**aftermath**
36:18 37:4,12
37:12,18 43:17
60:20 104:9
105:20
**age**   114:21
167:24
**aged**   88:17
**agencies**   45:15
45:20
**agency**   146:12
**agendas**   132:1
**aggressive**   98:1
**agitated**   98:1,3
98:12

**agitation**   30:20
**ago**   104:6
159:8,17 161:1
162:25 165:23
167:25
**agree**   68:19
81:2,4,11,20
98:9 123:19
126:2,10,12,16
126:19,25
127:4,7 175:14
175:18
**ahead**   49:5
67:7 83:7
122:21
**air**   1:16 5:9
9:14,17,24
10:1,14
**akeyes**   3:7
**al**   1:7
**alex**   2:16
**alex.ingoglia**
2:19
**aligned**   19:24
**alignment**   30:9
**allegation**
46:25
**allegations**
108:25 131:3
131:20,21
**alleged**   97:3,4
**allocation**
50:13

**[allow - associated]**                                      Page 4

**allow** 58:6 60:6
  91:24 92:4
  158:19
**allowed** 126:20
**allowing** 157:3
**allows** 129:8
**alphabet** 3:2
**alt** 83:15,19
**alternative**
  83:22,25 84:6
  88:23
**amended** 4:18
  129:11 130:4
**amount** 50:21
  59:18 127:20
  133:11,12
  134:23 135:14
  135:23
**analysis** 109:25
**andrew** 3:4
**andy** 6:5
**anonymity**
  129:8
**anonymous**
  117:10 140:6
  145:12,24
  146:7 147:16
**answer** 48:16
  49:4,16
**answered**
  89:17
**anxiety** 68:11
  68:17 69:22

**anybody** 46:7
  57:6 66:12,17
  89:3 177:11
**anymore** 54:6
**app** 145:12,19
  145:24 146:18
  147:6,8 159:12
  160:22 161:16
**apparatus** 59:3
  66:16
**appearance**
  2:21
**appearances**
  2:1 3:1
**appeared**
  149:11 150:17
**appears** 134:19
**applied** 8:19
**approach**
  55:22 107:18
**approached**
  55:20
**approximately**
  32:22 104:18
**apps** 161:16,20
  171:23 172:24
**april** 55:15
  182:19
**area** 16:12,14
**areas** 60:10
  115:12
**arndt** 3:15
**arrest** 94:1

**arrested** 93:23
  94:6,11
**arrests** 93:10
**arrived** 88:21
**article** 4:9,14
  66:23 67:11,16
  67:19 122:12
  123:1,7,9,25
**aside** 37:21
  48:10 70:19
  126:1 160:16
  176:24
**asked** 12:15
  26:25 55:10,12
  58:14 68:13
  70:7 72:2
  110:23 126:10
  133:19,20,23
  160:7 163:2,9
  163:15 164:3
  169:20 170:2
  170:10,16,22
**asking** 17:23
  35:19 36:17
  49:11,14 55:4
  55:5 78:13
  85:11 95:1
  110:5 138:8
  160:8 163:25
**asks** 92:25
  101:1 130:14
**aspects** 127:8
**assailant** 4:11
  38:4 54:1 57:8

**62:10,13,13,15**
  65:5,25 66:25
  67:13,22
  114:15 121:16
**assault** 73:8,11
  78:23 141:22
**assaults** 14:23
**assessing** 36:1
**assessment**
  38:7,8,9,10
  52:16 78:19
  79:2,7,12
**assessments**
  77:3 78:21
  130:19
**assigned** 33:1,4
  33:9,12 76:4
  134:14
**assigning** 16:20
**assignment**
  13:17
**assignments**
  16:21,22 157:7
  157:10,11
**assist** 105:16
**assistant** 20:12
  20:13,15,17
  21:4,24 34:2,5
**assisting**
  106:14
**associate** 8:18
**associated**
  83:14 96:4
  140:5

**[assume - better]** Page 5

| | | | |
|---|---|---|---|
| **assume** 162:20 | 150:3 157:6,9 | 17:1,4,24 | **began** 20:3 |
| **athlete** 156:3 | **b** | 18:19,19 19:6 | 32:12 43:11 |
| **athletic** 167:8 | | 23:5 26:15 | **beginning** |
| **attachment** | **b** 4:5 | 85:16,18 86:23 | 13:15 56:8 |
| 132:7 134:15 | **bachelor** 8:23 | 92:18 94:5,6 | 134:7 136:21 |
| 134:20 | **back** 10:7 16:5 | **bangs** 53:22 | **begins** 144:12 |
| **attend** 11:3 | 29:15,18 31:21 | **barricade** | **behalf** 49:12,14 |
| 84:4 117:12 | 60:2 61:2 71:6 | 62:20 63:22 | **behavior** |
| 145:1 146:17 | 79:21 83:10 | **barricaded** | 100:16 |
| **attention** | 88:16 92:24 | 59:20 | **behaviors** |
| 101:11,17 | 97:8,8,14,18,21 | **baseball** 89:20 | 91:25 92:5,10 |
| **attorneys** 7:21 | 98:7 105:17 | 90:3 | **bel** 1:16 5:9 |
| **attributable** | 121:6 132:4 | **based** 13:2 | **believe** 44:14 |
| 130:22 | 134:25 135:22 | 19:24 24:22 | 44:14 46:17,23 |
| **attributes** | 140:3 142:24 | 26:23 38:12 | 69:3 70:15 |
| 124:13 125:8 | 147:6,8 164:18 | 44:18 58:16 | 89:25 91:19 |
| **audience** | 166:3 | 59:16 62:17 | 94:15 111:14 |
| 152:18 | **background** | 78:15 81:9 | 127:13 139:20 |
| **august** 123:2 | 8:18 24:11 | 109:11 133:10 | 150:10 156:11 |
| **authority** | 26:3,23 80:4 | 133:15,18 | **believed** 70:3 |
| 138:25 139:4 | 86:8 87:7 | 134:23 135:14 | **belonging** |
| **available** 27:9 | 89:10,14 92:19 | **basically** 101:2 | 87:20 89:11 |
| 156:24 | 154:14 | **basis** 43:5,8,9 | **belongings** |
| **avenue** 1:15 | **backtrack** | 75:20 135:6 | 44:20 |
| 3:11 5:9 | 139:25 | 171:14 | **bendis** 21:21 |
| **avoiding** 135:8 | **bacon** 2:11 | **basketball** | 21:23 |
| **aware** 6:10 | **bad** 99:16 | 156:2 167:8 | **benefit** 24:25 |
| 36:11 49:22 | **bag** 45:5 | **bates** 4:13,22 | **benefits** 126:3 |
| 73:10 75:1 | **ball** 89:18 | 82:21 83:4,5 | **bereal** 143:14 |
| 80:21 82:6 | **baltimore** 2:4 | 144:3 | **bernard** 83:12 |
| 91:13,15 96:18 | 8:20 10:16,20 | **bathroom** | **best** 141:1 |
| 99:4 100:9 | 10:22,23 11:1 | 129:7 | 182:10 |
| 101:7,19 | 11:10,14 12:23 | **battle** 18:7 | **better** 35:16 |
| 102:24 113:12 | 13:10 16:24 | | 42:9 |

**[beyond - cameras]**                                                                Page 6

| | | | |
|---|---|---|---|
| **beyond** 48:5,15 48:22 49:3,21 103:4 | **brief** 7:20 **bring** 110:17 **bringing** 18:13 21:19 | 98:8 105:1,12 106:2 **buildings** 39:21 40:5,7 | **calculate** 130:16 **calculating** 137:12 |
| **biannual** 16:17 **big** 106:19,20 111:15 112:2 153:5 168:10 168:11 | **brings** 48:13 **broad** 75:14 **brockstedt** 2:3 **broke** 58:5 | **bullet** 145:6 **bullied** 115:3 117:12 137:11 **bully** 128:13 | **california** 1:1 5:13 **call** 4:21,21 14:7,10 16:3,4 26:13 47:23 |
| **biggest** 54:18 58:13 61:13 **bill** 38:2 **bit** 15:18 27:2 | **brooks** 1:12 4:8 5:14,19,25 6:9 8:3,4,7 29:18 66:23 67:4 | **bullying** 114:16 114:18,20 115:1,2,9,19,24 116:5,9,12,14 116:19 118:13 | 62:12 96:10 120:4 144:1,1 144:20 146:12 147:3 161:22 175:25 |
| 76:11 161:3 **block** 63:1 115:6 **blood** 94:10 | 82:19,25 122:12,18 129:10,16 143:25 144:7 | 119:5,7,8 140:4 **bunch** 111:24 **buses** 40:25 | **called** 41:24 42:24 58:11 85:20 120:14 159:21 |
| **bloods** 91:3 96:5 **board** 1:6 4:17 5:11 19:22 | 145:7,10 177:21 179:21 180:24 181:24 **brought** 7:11 | 99:23 **busy** 86:3 **buy** 41:20 **buzz** 83:11 | **calling** 30:25 74:6 75:23 **calls** 14:8,20,20 16:1 17:5 |
| 68:12 112:17 129:10 130:3 130:15 | 32:24 **brush** 87:2 **brushing** 154:9 | 84:13 86:15 89:2 92:25 **buzz's** 34:25 | 145:1 146:10 146:15 159:15 161:9,9 |
| **book** 45:5 **bottom** 145:5 **bouncing** 61:2 **boxes** 55:3 | **buck** 34:17 83:13 **buck's** 35:1 **budget** 50:9,17 | **bytedance** 3:9 3:9 | **camera** 40:18 41:25 42:1 50:16,16 |
| **boxing** 153:5,6 **breach** 63:22 **break** 28:25 | 50:23 51:16 134:10 **build** 95:8 | **c** | **cameras** 37:8 37:21,21 39:17 39:19 40:2,6,9 |
| 29:19 70:20 120:23 164:11 **breaking** 30:9 30:14 | **building** 1:14 57:4,7 59:7,9 60:25 80:1 97:15,19,21 | **c** 5:1 **ca** 5:10 **cabinets** 59:14 **cafeteria** 75:21 75:25 106:4 142:5 | 40:10,11,19,22 40:25 41:3,16 41:21 42:4,7,9 |

**[cameras - cid]**                                                                                          Page 7

42:10,11 48:23
49:22 91:24
92:4,9,16
121:18
**campuses**
36:11
**candidates**
33:15
**canines** 45:20
**capacity** 10:6
13:4,21 95:8
164:2
**captain** 96:4
**caption** 78:23
179:2
**captioned**
179:8
**capture** 78:20
78:24 138:6
**captured** 80:4
137:6,10,24
138:2,4
**car** 15:21 99:14
99:19,25
154:18,20,22
**career** 9:8,10
10:9,12,17
11:9 18:19,23
22:4 82:4
**carjacking**
94:5
**carried** 38:11
136:22

**carry** 101:20
102:14
**carrying**
101:21 102:9
102:11,18
**cars** 110:20,21
**cart** 63:7
**case** 1:8 6:6
65:25 75:7,7
75:20,20 179:2
**cases** 45:22
72:11 135:1
**catch** 99:24
**category** 93:25
130:16
**cathy** 21:21,23
**cause** 44:14
69:22,24 70:2
182:12
**caused** 78:9
**cease** 140:18
**cell** 157:20,24
157:25 158:3,5
158:7,17
159:18,21
162:17,19,21
163:1 171:17
172:2,13 173:5
173:8 174:17
**center** 77:1
116:24 117:23
118:9 120:12
144:18,23
145:2,21 146:1

**central** 1:13
10:8 13:13
**century** 60:24
**certain** 18:22
42:4 48:23
129:7 159:6,8
**certificate**
182:1
**certified** 22:9
22:11,15
**certify** 182:3,11
**chair** 61:1,2
64:1
**change** 12:25
55:17 57:10,13
69:13,15 106:6
106:10 109:5
109:11 163:9
163:10,23
180:2,4,5,7,8
180:10,11,13
180:14,16,17
180:19,20,22
181:2,4,5,7,8
181:10,11,13
181:14,16,17
181:19,20,22
**changed** 23:23
50:9 53:10,11
55:16,22,23
65:4 121:17
**changes** 29:21
38:23 179:10
179:13

**changing** 24:14
45:19 55:19,20
70:8
**channel** 148:19
148:21 149:12
152:6
**charge** 148:23
**charged** 93:19
112:8
**chart** 132:9,14
132:17
**chasing** 135:19
**check** 143:13
160:20
**checked** 55:3
160:10
**checking** 15:22
15:24
**chicago** 2:18
**chief** 4:16 7:11
11:18,23 12:8
22:2 85:23
122:14 123:4
**child** 70:1
117:6,8
**children** 54:19
127:14 155:3,5
155:7 162:2
**chosen** 90:6
**christina** 34:8
**christmas**
158:2
**cid** 147:7

**[cindy - community]**                                                    Page 8

**cindy**  5:17
    182:2,17
**circumstances**
    48:24 79:15
**cite**  65:23
**city**  8:20 10:16
    10:20,23,24
    11:1,10,14
    12:23 13:10
    16:24 17:1,4
    17:24 18:19,20
    19:6 23:5
    85:16,19 86:23
    92:18
**civilian**  10:17
    10:19 22:16
**clarify**  17:22
    49:6 58:17
**clarke**  144:11
    144:13,15
**class**  30:24
    31:1 156:22
    157:4
**classroom**
    22:11,14,21
    40:9 60:9
    62:18 63:15,19
    156:18 157:8
    171:18 172:10
**classrooms**
    22:23 40:10
    171:13
**clear**  33:7 66:7
    112:18

**clearance**  10:2
**clearly**  87:4
**climate**  104:1,9
    104:21,22
    105:9,11,14,20
    105:24 106:12
    107:3,9,23
    108:14,16
    112:24 113:5
    121:14
**close**  53:14
    100:6 105:15
**closed**  10:9
**closely**  34:11
    34:13,14,16
    37:11 91:24
    92:4 95:10,15
**closer**  101:11
**clue**  95:7
**code**  12:10,11
    120:5
**collaborate**
    52:23,25
**collaborated**
    58:3
**collaboration**
    53:2
**collaboratively**
    35:2
**colleague**  6:4
**colleagues**
    146:13
**collect**  43:2

**collected**  24:22
**collecting**
    15:23
**college**  8:21
**column**  132:22
    132:23 133:4
**come**  26:16
    35:13 55:6
    58:15 87:1,6
    94:11 95:25
    97:18,21
    114:17 116:23
    129:5 136:16
    140:16 141:4
**comes**  41:10
    47:20 63:12
    65:10 77:25
    101:5 107:9
    117:1,2 119:10
    120:8 124:9
    128:6,19 129:3
    136:18 141:3
    141:18
**coming**  9:4,5
    24:10 30:12
    35:13 42:10
    45:3 55:19
    65:15 66:12
    86:23 92:18
    98:7 147:6,8
    147:13
**command**  10:8
    10:9 22:3

**commander**
    16:12,14 85:16
**comments**
    67:18
**commerce**  2:11
**commission**
    12:1,3,16,18,19
    182:19
**commit**  59:17
**commitment**
    85:2
**committees**
    118:24
**common**
    147:11
**communication**
    77:23 150:11
    168:8
**communicati...**
    34:15 119:24
    148:22,24
**communities**
    18:1 28:18
    149:7
**community**
    8:20 17:24
    55:4 58:14
    70:7 87:13
    93:11,24 97:2
    97:5,7,23 99:5
    100:3 111:14
    111:19,22
    141:25 148:2
    149:10

**[companies - copy]**                                                                          Page 9

| | | | |
|---|---|---|---|
| **companies** | **confidential** | **consistently** | 161:11 |
| 131:9,11 | 1:11 | 117:11 | **controlled** |
| **competing** | **confirmed** | **constantly** | 159:11 |
| 92:14 | 104:23 | 15:20 95:21,22 | **controlling** |
| **complain** 157:2 | **conflict** 86:8 | **consulting** | 111:16 |
| 157:5 | 128:6 129:3 | 102:4,6 | **controls** 158:22 |
| **complaint** | 135:8 140:14 | **consumer** | 159:5,13,23 |
| 131:16 | 141:4,14,19,21 | 163:21 164:3 | 160:3,16,18 |
| **complaints** | 141:24 142:8 | **content** 139:24 | 161:1,14 162:8 |
| 75:5 | **conflicts** 87:13 | 140:12 149:1,5 | 167:17 |
| **complete** 77:11 | 128:1,4 133:22 | 149:6 150:12 | **conversation** |
| 182:9 | 134:25 | 150:14,17 | 37:13,16 86:6 |
| **component** | **confrontation** | 151:13,22,24 | 138:18 142:11 |
| 4:10 66:25 | 128:24 | 152:2,3,12 | 146:7 |
| 67:13 | **confronted** | 159:9 | **conversations** |
| **comprehensive** | 64:12 | **context** 152:4 | 7:20 25:25 |
| 84:3 | **connect** 126:16 | **continue** 24:13 | 37:19 86:14,16 |
| **concerned** | 126:20 135:22 | 26:5 65:5 | 86:18,19 88:7 |
| 26:24 56:17 | 141:7 160:13 | 128:3 140:25 | 88:11 95:14,17 |
| 114:19,20 | **connected** | **continued** 2:21 | 139:10 |
| **concerns** 114:1 | 135:25 157:13 | 3:1 112:16 | **cookout** 97:2,5 |
| **concluded** | 174:16,21 | 136:22 | **cool** 70:23 |
| 177:25 | **connection** | **continues** | **coordinate** |
| **concludes** | 6:25 97:16 | 90:25 | 95:9 104:12 |
| 177:20 | 131:22 135:7 | **continuing** | **coordinator** |
| **conduct** 58:20 | 157:3 | 140:22 | 19:16,19 20:3 |
| 130:22,25 | **connections** | **continuum** | 21:1 24:4 38:2 |
| **conducted** | 160:12 | 59:5 | **coordinators** |
| 53:13,18 69:20 | **connolly** 3:5 | **contraband** | 38:14,22 50:13 |
| **conference** | 6:4 | 44:16 | **copies** 90:18 |
| 4:21 144:1,20 | **consider** 36:20 | **contract** 38:3 | 137:6,24 |
| 145:1 | 152:16 | **control** 140:23 | **copy** 8:7 |
| **conferences** | **considered** | 159:22 160:4 | 148:16 |
| 140:16 | 65:19 | 160:11,12 | |

CONFIDENTIAL

**[copying - darlington]** Page 10

copying 83:12
corner 60:24
corporal 15:13
  15:17 16:5,8
  16:18
corporate 6:14
correct 49:10
  50:6 53:6
  124:2,3 139:18
  171:12,15
  173:22 175:15
  177:8
corrections
  179:10
correctly
  163:21
costs 130:21
cotler 177:13
council 113:7,8
  113:11,13,16
  113:22 114:18
counsel 3:16
  5:15 49:6
  182:12
counseled
  173:23 174:2,7
  174:11,15,20
counseling 23:9
  99:2
counselor 23:3
  23:17 173:21
country 54:17
counts 23:5

county 1:7,13
  2:2 3:16 5:11
  6:14 19:7,11
  19:15 26:15,15
  27:12 34:10
  35:4 37:11
  39:18 40:1
  41:2,20 42:14
  43:20 44:1
  46:10 48:1,25
  49:12 50:7
  67:21 79:16
  80:11,21 82:7
  85:24 86:21
  87:9,23 88:2
  91:16 93:17
  94:5,6 97:12
  98:17 99:5
  102:13,17,21
  113:10,25
  116:3 121:23
  124:2,10
  130:15 145:11
  148:18 149:2
  149:12 150:6
  150:13,22,25
  151:3 157:14
  173:24 174:2,7
  174:11,15,20
  174:25 175:7
county's 4:18
  129:11 130:3
couple 25:2
  55:18 95:6

99:22 112:15
  113:20 120:6
  147:5 152:9,10
  156:20
course 12:22
  22:4 49:20
  78:19
court 1:1 5:12
  5:16
cover 50:11,15
  64:16
covid 21:18
  45:11 88:6,9
  88:11,12,12
  95:12,18 111:5
cpi 35:3
create 35:6
  38:5 60:17
  104:11 109:14
  115:4 134:5
  164:23 165:22
created 31:16
  78:24 79:9
  168:22
creating 25:19
  65:19
crime 102:22
crimes 93:24
crip 97:5
crips 91:5 96:6
critical 28:13
  56:7,9,11,12
  57:12,14 60:16
  76:24

crossing 99:23
crunch 96:4
culture 90:16
  105:19
cuomo 20:19
  21:14 25:12
  34:4
current 19:17
  152:17
currently 49:25
  90:19 91:2
curriculum 4:8
  8:3
curve 88:13
  92:20
custody 158:4
cv 1:8 8:8 9:14
cycle 42:7

**d**

d 4:1 5:1
d.c. 3:12
daily 43:7,9
  135:6
damage 59:18
  62:14
damages
  130:16 133:11
damaging
  110:20
dancing 110:20
darlington
  26:11

| | | | |
|---|---|---|---|
| **data**   24:22 43:2 | **de**   30:19,23 | **delivering** | 107:23 108:12 |
| 59:16 101:5,8 | **deal**   30:23 31:1 | 15:25 | **deponent**   5:13 |
| 101:10,19,23 | 47:13 78:16 | **demanding** | 182:6,7,9 |
| 102:8,10,24 | 98:7 107:21 | 110:4 | **deposed**   6:23 |
| 103:11,15,22 | 115:21 128:5 | **demise**   60:3 | **deposition**   1:12 |
| 173:4,7,11,14 | 141:20 142:2 | **denied**   51:2,5 | 5:8 7:16,19,25 |
| 173:17 174:6 | **dealing**   88:5 | 51:11 | 49:3,8 177:24 |
| 174:10,14,19 | 127:25 128:20 | **department** | 179:1,7,11 |
| **database** | **december** | 7:10 10:16 | 180:1 181:1 |
| 120:19 | 158:2 | 11:15,19,24 | 182:4,8 |
| **date**   5:6 8:14 | **decided**   62:12 | 12:1,4,20 | **depositions** |
| 180:23 181:23 | 64:9 96:9 | 19:23,25 21:13 | 6:25 7:3 |
| 182:5 | **decision**   84:22 | 23:20,23 25:6 | **deputy**   3:16 |
| **dated**   4:9,12,14 | **declaration** | 25:13 26:6 | 47:23 |
| 4:20 66:23 | 179:4 | 27:8 29:21 | **describe**   152:3 |
| 67:11 82:20 | **declare**   179:6 | 32:16 34:1,9 | **described** |
| 83:11 122:12 | **declared**   15:2 | 34:14,19,20 | 58:17 |
| 123:1 143:25 | **decriminalized** | 37:1 38:16,24 | **describing** |
| 144:10 | 45:22 | 51:13 100:16 | 65:14 |
| **daughter** | **deemed**   134:11 | 103:3 127:18 | **description**   4:7 |
| 162:18 | **deep**   141:11,11 | 132:10 134:11 | **designed**   104:7 |
| **davis**   21:22 | **defend**   63:17 | 134:15,20 | 105:12,15 |
| 22:1 25:25 | 63:17,21 | 147:7 | **desist**   140:18 |
| **day**   15:21,24 | **defendant**   2:15 | **departments** | **desk**   63:5,9 |
| 28:5 76:7 | **defendants**   2:7 | 103:5 149:9 | 137:8 175:21 |
| 83:15,18 | 3:2,9 4:19 | **depending**   16:4 | **desks**   59:14 |
| 105:14,14 | 129:12 130:4 | 69:10 70:1 | 62:22 |
| 110:15 114:21 | 130:22,25 | 106:23 | **despite**   122:6 |
| 115:2,3 127:24 | 131:6,20 | **depends**   73:1 | **detected** |
| 153:24 154:1,8 | **definitely**   36:18 | 74:11,13 94:18 | 145:14 |
| 154:12 158:16 | 52:25 55:23 | **deploy**   105:9 | **detection**   42:15 |
| 158:19 179:16 | 142:15 | 106:22,23 | 42:19,24 43:4 |
| **dc**   3:6 | **degrees**   11:6,11 | **deployed**   14:15 | 43:7,15,16,21 |
| | | 24:20,21 107:1 | 48:7,10,19,22 |

**[detection - doing]**                                        Page 12

49:21 50:14
114:11,11
121:18
**detections**  43:1
**determine**
30:15 33:3
43:2 62:16
72:23 76:17,18
96:2 97:13
101:13 102:12
102:16,20
117:2 136:14
139:1,2 140:8
**determines**
44:19
**determining**
16:18 139:23
139:24
**develop**  38:3
59:24 60:6
**developed**
23:23
**device**  43:15,16
49:23 160:3,4
**devices**  42:15
43:4,7,21
48:11,22,24
49:21 50:4
121:18 171:18
172:3,10 173:5
173:9 176:6
**devote**  127:18
**dictates**  47:21

**differences**
56:24,25
**different**  13:12
15:18 19:24
74:13 84:10
87:22 91:2,2
91:23 92:3,9
120:1 121:10
149:8
**difficult**  140:7
140:24
**difficulties**  29:3
**diminishing**
32:1
**direct**  25:24
**directed**  84:14
**directing**  16:20
**direction**  60:15
**director**  144:17
145:11
**directors**  118:4
146:11,23
**disasters**  71:22
80:8
**disciplinary**
78:17 79:2,8
79:12 110:8
**discipline**
139:3
**disconnected**
29:7
**discontinue**
163:16 170:23

**discord**  143:10
143:11
**discuss**  128:16
**discussed**  34:1
48:11 50:4
53:5 73:20
83:14 93:5
114:15 123:24
124:19 145:11
145:23 167:18
**discussing**
29:20 112:24
145:20
**discussion**
28:24 114:16
161:25
**disorderly**
14:23,24 110:2
112:21
**disrupted**
105:13,24
**disruption**
110:2,10
**disruptive**
110:16
**dissect**  96:7
**distinctively**
85:17
**distributed**
77:20
**district**  1:1,1
5:12,13 13:9
14:12 20:11
22:3 24:6 28:4

37:7 40:20
49:15 76:7
88:22 99:1,1
149:8
**districts**  118:4
**divide**  54:13
**divided**  54:10
**division**  5:5
**document**  1:5
67:8 70:19
83:6,8,11
119:8 122:22
122:24 129:25
130:6,7 133:16
134:5 147:21
147:22 148:7
148:12 175:20
**documentation**
119:12,13
120:10
**documented**
78:14 139:17
**documents**
7:22 77:9 79:1
79:4 136:13
137:3,5,5,15,23
137:23 138:1
138:16,19
139:14
**doe**  63:25
**dog**  45:17,24
**dogs**  45:16
**doing**  10:9
11:25 24:13

CONFIDENTIAL

**[doing - emotion]** Page 13

45:17,17 54:19
54:20,21 55:1
62:6 67:22
106:7 127:14
136:23 139:22
141:17 152:8
154:13 161:18
163:23 165:8
**doled** 78:18
**domestic** 73:3
**donoven** 1:12
4:8 5:13,19 6:9
8:4 85:1 92:25
145:7,10
177:21 179:21
180:24 181:24
**doom** 127:1
**door** 18:1 45:4
59:13,20 63:1
63:7 64:1,7,8
65:16 66:5
**doors** 124:9
**double** 97:8
**douglas** 36:19
37:18
**dr** 21:22 25:25
116:11 117:14
118:15,20
**draft** 78:2
**drafting** 79:4
**drill** 60:11 62:7
62:10,17 64:16
65:21,24 66:19
66:22

**drills** 38:5
53:25 55:21
58:20,22,24
60:12 61:8,16
61:17,18 62:6
62:15 64:5,15
64:25 65:3,5
66:1 67:23
69:18,19
114:16 121:16
**drive** 2:4 3:16
43:3
**driver** 99:15
**dropped** 155:9
**drove** 97:7
**drug** 45:17
**due** 30:20
**duly** 5:20 182:6
**duration** 84:17
**duties** 15:15
24:14 26:5
**duty** 16:21
**dynamic** 92:21
**dynamics**
90:10

**e**

**e** 4:1,5 5:1,1
**earlier** 6:2,13
11:7 18:22
29:25 53:5
77:4 96:13
103:2 131:10
134:2,3,8

137:7,25 141:2
167:18 171:10
173:20 175:20
**easily** 98:1,2
**east** 59:7,10
89:15 91:4
**eben** 2:10
**ed** 83:15,19
84:8 88:23
**edge** 97:25
**education** 1:6
4:17 5:11
83:22 84:1,6
89:6,7 129:11
130:3,15
**educational**
8:18 84:3
**edward** 144:11
144:13,15
**effectiveness**
41:22
**effort** 95:9
135:24
**efforts** 122:6
**eflaster** 2:13
**eight** 75:21,25
**either** 38:3
45:21 47:20
70:11 72:5
83:24 106:12
128:1 129:5
137:11 169:19
**elbowed** 112:9
112:12

**electronic**
171:17 172:3
173:5,9
**elementary**
26:12
**elements** 30:16
72:23
**elliot** 2:9
**ellis** 2:17
**else's** 134:2,3
**email** 4:20 83:9
83:11 86:11
87:11 88:18
90:17 91:11
92:24 119:14
119:15,23
120:9 137:4,14
137:23 138:1
143:25 144:10
144:12,19
145:5
**emails** 4:12
82:19 93:12,13
137:13,17,19
137:20,20,21
139:15
**embarrassing**
128:14
**emergency**
14:25 24:7
28:14 66:11,11
66:15,16
**emotion** 109:20

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[emotional - exhibit]**                                          Page 14

**emotional**
65:13
**emotions** 98:6
**employees**
28:10 35:7
38:15
**employment**
9:13
**encapsulated**
52:17
**encountered**
82:3 98:15,18
98:20
**ended** 109:22
109:22,24,25
110:1
**enforce** 158:24
**enforcement**
6:21 7:1 8:19
10:11,18,20
22:9,15,17
26:3,21 27:4
28:20 30:2,11
30:13,17 35:10
45:15 47:9,13
47:16 58:3
74:1,4,7,19
76:15 82:3,11
93:9,16 94:13
94:23 95:2,10
110:18 111:16
112:4,14,18
146:12,17,19
146:21 147:13

148:5,11
**engage** 85:10
107:22 132:2
142:23
**ensures** 118:7
**entertainment**
91:4
**enthusiast**
153:5
**entire** 179:7
**entrance** 40:22
**entry** 42:21
60:13 132:17
**enumerated**
93:24
**environment**
13:6 84:3
**equipment**
58:2 59:3
**eric** 21:22 22:1
25:25
**erica** 83:13
88:19,19,21
89:2,24 90:8
**errata** 179:1,11
180:1 181:1
**error** 83:3
**escalate** 30:23
128:24
**escalated** 30:20
**escalates**
128:22
**escalating** 56:1

**escalation**
30:19 36:20
39:5
**especially**
47:11 68:11,16
**esq** 2:3,10,16
3:4,4,10
**est** 4:22 144:2
**estimate** 7:3
40:16 50:20
130:19
**et** 1:7
**ethel's** 18:2
**evacuate** 59:11
65:22,25
**evacuation**
63:12,14 65:21
65:24
**evaluating**
16:18 177:3
**evaluation**
16:17
**evaluations**
16:17
**evenings** 91:1
**event** 60:16
76:9 105:6
**events** 24:9
43:5,23 54:17
55:22,24 56:2
56:4 101:3
131:23 152:17
182:12

**everybody**
54:14 74:12
110:25 111:2
111:20 112:18
**evoke** 65:13
**exact** 43:13
118:21
**exactly** 87:3
136:8,10
139:22 167:3
**examination**
4:3 5:23 182:7
182:10
**examined** 5:20
**example**
175:21
**examples** 60:5
**except** 15:21
90:15 179:10
**excuse** 24:5
56:4 71:14
105:1
**executive's**
37:11
**exercise** 161:11
**exercised**
159:17
**exercises** 57:24
**exhibit** 3:15 4:8
4:9,12,14,17,20
8:3,7 66:23
67:4 82:19,25
122:12,18
126:1 129:10

CONFIDENTIAL

**[exhibit - filter]**                                                          Page 15

129:16 132:4,4
143:25 144:7
**existed** 35:15
104:14
**exists** 41:12
**exit** 60:10,13
60:22
**exits** 60:9
**expand** 19:22
21:17 39:16
**expansion** 21:5
**expenditures**
130:21
**experience**
69:14 93:15
100:2,4 176:8
176:11
**experienced**
56:5 69:6 86:1
105:3 175:7
**experiencing**
69:13 85:25
86:22
**expert** 88:25
**expertise** 30:15
86:8
**expires** 182:19
**explain** 73:17
86:20
**explaining**
59:15,16
**exponentially**
137:9

**express** 114:3
**expressed**
134:9
**expressly** 53:18
53:20
**expulsions**
84:16
**extended** 84:16
**extent** 48:4,14
49:2,4,13 75:2
110:3
**extra** 106:21
**eye** 107:10,11

**f**

**f** 2:7 144:24
**facebook** 2:7,7
2:7,8,8 131:13
131:15 142:14
150:7,13,18,21
164:21 165:5
165:11,14
166:4,5,6,24
167:1,5,10,12
167:15,20,21
169:20
**facilitate** 106:9
107:13
**fact** 35:8 49:7
108:6 157:10
159:7 160:6
**fairmount**
11:19

**fake** 128:14
**fall** 43:19 93:25
107:5
**falls** 35:1 42:3
76:25
**familiar** 36:22
67:16 91:8,10
100:15,20,22
104:1 113:6,9
120:7 123:7
131:3 143:11
149:1
**families** 89:11
100:8 128:17
149:7
**family** 159:13
160:2 165:9
166:17
**far** 105:17
113:11 152:12
**father** 90:2
**fathers** 89:12
89:13
**fbi** 12:11
**feature** 163:3
163:10,16
169:21 170:3
170:11,17,23
**federico** 2:3
**feed** 40:2,7
**feedback** 114:4
114:6,8
**feel** 4:15 105:7
106:11 122:14

123:3 161:20
**feeling** 101:2
**feet** 18:3
**felt** 27:7 35:8
35:17
**fentanyl** 45:25
**fi** 160:13,14
**field** 15:25
16:19
**fifth** 45:4
**fight** 62:17
63:17 64:15
75:15,18,21
76:9 78:13
79:22,25 105:1
142:5
**fighting** 60:2
90:7
**fights** 17:10
30:18 71:24
76:6 78:5,10
78:14 87:15,16
95:21 103:4,8
103:13,16,20
113:2 176:12
176:16
**figure** 85:8
90:4 95:22
115:10 135:20
136:20
**file** 59:14
**fill** 120:15
**filter** 97:14

CONFIDENTIAL

**[filtered - front]**                                                Page 16

| | | | |
|---|---|---|---|
| **filtered** 159:5 | **five** 17:16,17 | **forced** 115:17 | **forwarding** |
| **final** 109:25 | 17:18 32:8 | **foregoing** | 119:1 |
| **finally** 10:9 | 59:19 70:22 | 182:4,8 | **fought** 75:25 |
| **find** 48:2 51:23 | 96:1 120:22 | **foreseeable** | 76:5 |
| 51:25 78:7,11 | **fixed** 33:10 | 84:14 | **foundation** |
| 86:2 93:13 | **flaster** 2:10 | **forget** 144:16 | 81:7,24 122:10 |
| 126:12 135:1 | 177:14 | **forgetting** | 126:5,22 127:3 |
| 142:6 | **floaters** 33:7 | 166:5 | 127:11 156:9 |
| **finding** 128:1 | **flow** 106:17 | **form** 18:25 | 163:5,19 164:8 |
| **finish** 112:17 | **fluctuated** | 23:25 31:17 | 169:23 170:6 |
| **fire** 60:11,11 | 14:14 | 34:12 35:22 | 170:14,19,25 |
| **firearms** 22:10 | **focus** 12:15 | 44:3 46:3,6,13 | 171:7 172:5,22 |
| 22:15,16 | 36:6 64:19 | 79:17 81:6,23 | 175:3,11,17 |
| **fires** 71:21 | **focused** 161:21 | 120:8,9 122:9 | 176:20 177:7 |
| **firm** 6:3 | 177:1 | 123:21 125:18 | **founded** 107:4 |
| **first** 5:20 9:5 | **folks** 25:20 | 125:22 126:4 | **four** 96:1 |
| 9:13,25 10:10 | 31:22 34:24 | 126:21 127:2 | 119:25 154:21 |
| 10:11,19 14:18 | 35:3 41:24 | 127:10 133:17 | 155:6 |
| 14:22 15:15 | 52:20 58:15 | 139:17 156:8 | **frame** 43:12 |
| 24:14 35:5,25 | 74:25 87:12 | 163:4,18 164:7 | **frays** 30:19 |
| 39:18 53:12 | 109:13 135:13 | 169:22 170:5 | **freely** 53:14 |
| 62:10 65:1 | **follow** 86:13 | 170:13,18,24 | **frequency** |
| 68:3,5,15 | 93:7 140:20 | 171:6 172:4,20 | 80:16 |
| 72:12 83:9 | **followed** 86:4 | 175:2,10,16 | **frequent** 18:11 |
| 88:19,21 90:17 | **following** 60:15 | 176:19 177:6 | 93:12 152:7 |
| 92:20,24 95:5 | 91:1 | **formal** 23:7 | **frequently** 15:7 |
| 95:6 114:12 | **follows** 5:21 | **format** 120:12 | 154:19 167:23 |
| 130:2 142:15 | **footage** 41:3,5 | **former** 85:15 | 167:24 |
| 142:16 146:9 | 41:12 | **forms** 77:9 | **friend** 98:2 |
| 149:20 158:3,7 | **force** 9:14,17 | 116:12,14 | 117:11 |
| 159:5 160:7 | 9:24 10:1,14 | **forth** 140:3 | **friends** 115:17 |
| 172:9 | 12:23 16:25 | 142:24 | 165:8 166:17 |
| **fiscal** 132:23 | 17:2 | **forward** 117:13 | **front** 18:1 |
| | | 118:14 | 50:19 51:8 |

63:7 64:8
101:12,13
**fulfill**   41:6
**fulfilling**   26:5
**full**   14:10 53:25
53:25 62:7
68:3,5 138:22
**fully**   54:14,16
55:15 101:7
**fun**   152:15,16
**function**   163:3
169:21 170:3
170:11,17,23
**fund**   50:25
**funding**   37:14
50:5,13 51:6
51:11,14 52:22
**funds**   51:2
**further**   66:18
96:7 119:2,6
131:25 177:9
182:11
**future**   43:3
84:15 124:25

**g**

**g**   5:1
**game**   85:20,21
86:5
**gang**   4:12
80:11,14,18,24
81:5,9,15,21
82:4,13,20
83:15 84:15

85:1,9,12 86:9
87:21 88:6
92:21 93:1,2
93:18 94:16
95:3,11,15
96:10,16 97:5
**gangs**   80:22
82:8 87:18,22
88:1,11 89:10
91:2,9,10
92:14 94:10
96:20
**general**   3:16
44:5 149:7
**generally**   87:16
92:8 172:3,7
172:14
**generate**   76:21
76:23,23,24
134:4
**getting**   21:18
39:14,14 57:7
60:14 74:1
87:12 90:15
99:23 147:4
159:21
**give**   9:23 32:2
47:10 58:12
60:5 66:2
89:24 90:9
129:19 146:23
148:5 150:1
**given**   6:18 7:5
7:15 14:15

28:5 47:11
64:16 66:7
78:6,10,10
79:22 80:17
177:21
**giving**   89:2,5,8
**gloom**   127:1
**go**   14:19 33:20
33:20,21 43:11
46:1,11 49:5
52:22 59:4
65:18 66:13
67:7 75:18,23
76:15 79:21
82:17 83:7
84:12 105:15
112:8 116:9,18
117:3 121:10
122:21 130:12
134:25 139:1,2
140:10,10
141:10 150:21
159:6,6,8,12,12
161:22 165:3
167:21 168:11
**goal**   122:1
**goals**   61:7
**goes**   48:5,14
49:3 91:18
**going**   8:6 24:12
26:4,10 28:16
29:5,9,15,23
31:25 33:20,20
33:21 41:23

42:2,9 43:2
45:4 54:22,25
55:1 59:19
62:16 66:4,5,5
66:6,15 67:3
70:11,12,24
71:5,16,20
72:24 73:6
74:5,18,24
75:4,5,8 76:1
82:24 88:4
92:24 93:13
94:9,19 96:9
97:14 110:15
120:11,25
121:6 122:17
128:15 129:15
132:4 138:20
138:21,21
139:1,2,5,25
140:1 144:6
159:3,3 162:6
164:12,18
167:19 177:18
**golkow**   5:5
**good**   5:25 6:1
120:24 159:18
165:18
**google**   3:2 6:5
164:6 177:22
**gotten**   45:15
140:20
**governor's**
118:3

**grab** 63:5
**graduated**
 88:17
**grant** 51:13
 52:4
**grants** 51:17
 53:3
**grasp** 35:16
**great** 127:20
**greater** 39:9
 91:18
**grew** 25:5
 89:18 110:12
 110:12
**grief** 98:16
 100:5
**grieving** 97:24
 98:11 99:2
**ground** 52:20
**grounds** 85:10
**group** 96:4,8
 107:21 109:2
 113:19 118:2
**groupme**
 143:16,18,19
 143:19,19,20
**groups** 95:19
 95:24
**groupthink**
 109:12,15
**grow** 27:7
**grown** 50:18
**growth** 19:24
 31:19 50:21

**guarantee**
 122:7
**guard** 10:2
**guess** 9:7 69:25
 89:16 90:16
 108:22
**guidance** 15:16
**gun** 17:12,23
 18:6,7,13,16
 56:5 62:13
 65:16 81:20
 96:15,19
**gunfire** 59:6
**gunman** 59:9
**guns** 58:1 59:2
**guy** 86:3 99:18
 168:13
**guys** 154:24

**h**

**h** 4:5
**half** 57:22
 159:7,17 161:1
**halfway** 124:4
 145:6
**hallway** 40:13
 40:15,17 63:2
 63:13 66:12
**hallways** 40:11
 40:17 66:16
**hand** 182:13
**handle** 68:14
**handled** 20:11

**handles** 75:4
**handling** 116:4
 177:4
**hands** 106:8
**happen** 59:25
 76:6 110:6
 123:15
**happened** 11:8
 11:9 75:19
 79:22 90:12,14
 97:16 99:16
 108:19,21
 146:6 166:5
**happening**
 35:16 88:12
 101:3 117:6,7
 117:9
**happens** 61:24
 116:24
**harassed**
 117:12 137:11
**harassment**
 75:3 116:9,12
 116:14
**hardy** 2:11
**harford** 1:6,13
 2:2 3:16 4:10
 4:15,18 5:11
 6:14 19:7,11
 19:15 26:15
 27:12 34:10,10
 35:4 39:18
 40:1 41:2,20
 42:14 43:19

44:1 46:10
48:1,25,25
49:12 50:7
66:24 67:12,21
79:16 80:11,21
82:7 85:24
86:21 87:9,23
88:2 91:16
93:17 97:12
98:17 99:5
102:13,17,21
113:10,24
116:3 121:23
122:13 123:2
124:2,10
129:11 130:3
130:15 145:10
148:18 149:2
149:12 150:6
150:13,22,25
151:3 157:14
173:23 174:2,7
174:11,15,20
174:24 175:6
**harford's**
 123:15
**harm** 60:17
 71:18
**harm's** 108:10
**harmed** 53:24
**harris** 88:19,20
 88:21 95:19
**hayden** 5:17
 182:2,17

**[hcps - identification]**                                   Page 19

**hcps**  4:13,16,22
  82:21 83:6,6
  122:14 123:4
  144:3 150:21
**he'll**  161:22
**head**  51:9,19
  51:22 72:16
  128:20
**heading**  26:11
  26:11
**heads**  118:24
**health**  4:10
  14:25 15:2,6
  23:2,9 38:2,14
  66:24 67:13
  174:12 175:8
**health's**  100:16
**healthcare**
  23:14
**hear**  59:6
  162:12
**heard**  100:19
  143:4,14,20
**heaviest**  63:6
**heavily**  69:8,9
**heights**  11:19
**held**  5:8 9:21
  100:10,11,14
**help**  35:18
  50:15 60:5
  61:8,18 62:1
  76:10 89:15
  104:8 105:18
  106:3,9,11

107:24 134:4,4
  156:6,10 166:3
**helping**  70:15
  105:22 106:16
**helps**  116:11
**hennigan**  34:17
  83:12
**hennigan's**
  34:16,20 52:16
  74:25
**hereof**  179:12
**heretofore**  33:5
**hey**  42:8 66:3
  117:4 147:3
**hickory**  1:15
  5:9
**hide**  62:17
  64:15
**high**  9:9 26:14
  27:16,18,21
  42:21 43:6,15
  89:12 155:15
  155:16 157:19
  158:15 162:4,6
  162:7,9,19,23
  163:1
**higher**  27:2
  96:14
**highlight**
  121:20
**hire**  33:19 34:5
  35:7 39:2
**hired**  12:14
  21:6 35:5

36:25 38:2,22
  38:25
**hiring**  33:14,22
  37:3 50:11
**histories**  84:15
**history**  9:13
**hit**  60:23 99:22
  99:25
**hite**  85:16
**hold**  15:12 16:7
  16:10
**holdings**  2:7
**home**  10:15
  46:1,2,11,11,18
  46:24 47:2,14
  155:13
**homework**
  157:7,10,11
  161:21
**honest**  89:1
  92:17
**honor**  10:1
**hoods**  110:21
**hoping**  84:25
  87:5 92:25
**hopkins**  8:24
  9:2
**hospital**  15:3
  112:9,13
**hot**  114:17
**hotline**  116:25
  117:18 118:13
  119:22 121:15

**hour**  16:21,22
  26:16 57:22
  110:14 154:3
**hours**  115:3
  126:14 158:16
  158:19,21
  177:23
**house**  10:3 18:2
**hr**  25:20
**huge**  88:13
  92:19 105:1
**huh**  29:8 68:9
  68:18,25 73:21
  75:16 77:5
  79:23 132:6,8
  132:11,19,25
  134:13 136:3
  151:12
**human**  73:15
  74:17 80:10
  121:11
**hun**  169:24
**hurricane**  57:1

**i**

**idea**  25:21
  39:20 143:2
**ideas**  85:1,12
  87:4 93:1
  113:25 114:10
**identification**
  8:4 67:1 82:22
  122:15 129:13
  144:4

**[identified - injured]**                                              Page 20

| | | | |
|---|---|---|---|
| **identified** 85:9 | **inception** 33:24 | **includes** 32:16 | 46:16,20,22 |
| **identify** 48:12 | **incident** 24:8 | 71:24 74:8 | 47:10 51:18,24 |
| 49:1,24,25 | 28:4,14 30:7,8 | 101:19 124:18 | 52:1,3,15 |
| 52:3 95:10,15 | 30:16 73:18 | **including** 50:3 | 73:23 74:4,9,9 |
| **illegal** 74:20 | 76:12 77:15,17 | 80:8 91:23 | 76:13,20 77:19 |
| **illinois** 2:18 | 79:16,19 94:14 | 96:15,19 | 78:1,7,11,15,20 |
| **images** 138:2,5 | 97:11 104:25 | 101:20 113:1 | 78:25 80:4,16 |
| **imagine** 78:16 | 105:2,2,5 | 121:11,15 | 80:18 82:8,10 |
| 84:10 102:3 | 108:21 123:14 | **incoming** | 86:5 89:1 |
| **immediate** 37:4 | **incidents** 17:6 | 159:15 | 94:22 96:11 |
| 37:12,17 47:22 | 17:9,11 18:21 | **increase** 25:4 | 101:25 102:1,3 |
| **immediately** | 26:19,20 28:3 | 35:19 41:21 | 102:4 118:5,6 |
| 36:1 62:3 74:1 | 28:6,12 41:7 | 70:10 81:9 | 118:10 119:1 |
| 74:2 | 56:13 70:10 | **increased** | 119:20 120:14 |
| **impact** 68:24 | 71:9,12,15 | 19:23 50:10,14 | 128:15 136:18 |
| 97:24 | 72:5,14 73:10 | 85:2 | 137:2,2 139:16 |
| **impacted** 18:12 | 73:15 74:13 | **increases** 81:5 | 147:4,9 148:4 |
| 68:23 69:4,7 | 75:9,13 76:22 | 81:12,21 | 148:5 149:6,7 |
| **impacting** | 76:24 96:22 | **increasing** | 149:9 150:5 |
| 117:8 | 101:3,4 103:4 | 37:17 | **informed** 95:2 |
| **impasse** 90:5 | 107:7 111:7 | **independent** | **infractions** |
| **implement** 93:2 | 113:2 116:4 | 96:8 | 30:14 |
| 162:8 | 124:1 147:20 | **independently** | **infrequent** |
| **implemented** | 148:1 177:2 | 103:3,7,10 | 18:11 |
| 37:23,25 | **incite** 65:13 | **indiana** 85:23 | **ingoglia** 2:16 |
| 121:22 | **include** 4:10 | **indicated** | **initial** 54:3 |
| **important** | 56:3,4 66:24 | 179:11 | 58:19 |
| 61:20 70:3 | 67:12 71:21 | **individual** | **initially** 32:7 |
| **impossibilities** | 72:1,17 73:3,7 | 33:12 82:15 | 35:5 |
| 115:12 | 119:15,17 | 140:9 | **initiatives** 51:3 |
| **improve** | 147:16 | **inform** 94:17 | 51:5 |
| 113:24 | **included** 88:7 | 94:18,20 | **injected** 109:18 |
| **inappropriately** | 148:6 153:19 | **information** | **injured** 53:24 |
| 109:1 | 157:11 | 8:15 24:22 | |

**[injury - items]** Page 21

**injury** 1:3
179:3
**inside** 14:15
20:6 52:20
57:4 79:25
104:25 105:12
112:16 115:22
142:1,4
**insight** 90:11
**instagram** 2:8
131:14,14
142:19 151:1
165:20,24
166:2,11,14,16
168:15,18,20
168:23,25
169:4,7,9,11
170:2,8
**install** 39:19
**instance** 161:7
**instances** 107:1
108:13 157:6
**instructing**
22:13
**instruction**
22:14,15 60:15
65:7
**instructor** 22:6
22:8,10,11,16
**intel** 146:16,18
**intelligence**
94:14
**intended**
152:18

**intents** 33:9
**interest** 36:20
**interested**
36:10,15
182:12
**internal** 109:20
**international**
10:5
**internet** 127:15
**interpersonal**
128:6
**interrogatories**
4:19 129:12
130:5
**interrogatory**
130:13
**intersection**
89:21
**intervene** 75:19
**intervention**
15:2 26:21,22
27:1 28:20,21
28:22 30:2,3,4
31:5 39:6 85:2
85:12 93:1,3
**interventions**
28:22 30:4
**interview** 33:15
156:21
**interviews**
156:23
**introduced**
131:9

**investigate**
46:18,25 47:7
135:1
**investigated**
109:2
**investigating**
133:23 134:24
138:8 147:5,7
**investigation**
47:22 94:19
119:3,7
**investigations**
136:23
**investigative**
41:13
**investment**
152:25 153:10
154:4,22
**invited** 129:6
**invoke** 65:13
**invoked** 109:19
**involve** 108:14
111:18 138:20
176:17
**involved** 23:7
26:25 27:4
30:13 33:22
71:17 73:1,25
74:1 84:7 86:1
86:24 89:9
90:16 93:18
94:4,15 95:11
96:20 97:10,13
97:17 101:4

110:18 111:16
112:5 138:23
139:6,23
141:16 167:9
**involvement**
84:21 87:18
95:3 176:6
**involves** 75:3
141:10
**involving** 72:9
72:15 73:11,15
74:16,21 81:5
81:15,21 96:15
96:18 111:7
**irritation** 30:21
**issue** 54:10
107:17 108:11
136:21,21
145:20 146:7
159:19
**issues** 29:19
107:19 127:19
133:13,21
135:11,18
136:6,9,15,20
139:21 141:13
141:14,15,15
141:21 142:2
147:15 174:12
176:17
**italy** 10:5
**items** 15:25
44:21 50:15

CONFIDENTIAL

**[ix - know]**

Page 22

| | | | |
|---|---|---|---|
| **ix**  75:5 | 147:12 | 92:21 106:9,15 | 65:24 66:14,21 |
| **j** | **k** | 107:11 175:8 | 66:21 69:9 |

**j**  3:4
**jackson**  3:10
  177:15
**jacob**  3:15
**january**  4:21
  17:3 19:10
  67:12 144:2,10
**jillian**  148:25
  150:10
**job**  9:4,5,7 20:4
  20:9 97:11
**john**  63:25
  117:5
**johns**  8:24 9:2
**joined**  6:4
  10:15 14:18
  23:24 27:10
  29:22 35:4
  39:22 50:7,18
  121:23
**joining**  27:17
  27:19
**jones**  63:6
**joppatowne**
  26:14 42:21
  43:6,15
**july**  96:25 97:1
**jurisdiction**
  146:24
**jurisdictions**
  146:14 147:11

**k**  2:7 13:7
  22:23
**kai**  162:5
**katrina**  3:10
**kbe**  91:3
**keep**  79:14,18
  103:7,10
  107:10,11
  115:6 166:16
**keeping**  122:4
  177:2
**keeps**  61:2
**kept**  103:5
**keyes**  3:4 6:5
  29:6
**kid**  64:6 99:13
  99:14,17,24
**kid's**  89:23
**kidney**  112:10
  112:11
**kids**  60:13
  66:21 89:17,19
  91:4 96:1,9
  99:20,22
  110:19,23
  142:16
**killed**  97:9
  100:1
**kind**  76:11
  86:15,20 87:2
  89:7 90:8

**king**  3:11
**kirkland**  2:17
**kirkland.com**
  2:19
**kjackson**  3:13
**klein**  99:19
**knew**  60:21,21
  63:2 135:23
**knocked**
  106:17
**know**  12:20
  15:21,21 17:14
  18:1,7,9 20:8
  23:4 24:3,13
  24:15 25:1,3
  28:13,15 30:15
  30:18 31:25
  35:14,18 36:6
  37:19 40:14
  41:11,18 42:1
  42:3,8 45:19
  45:22 47:24,24
  50:14,17 51:18
  51:21,22 52:23
  52:23 53:14,24
  54:8,9,20 55:7
  55:8 56:18,19
  57:7 58:1,2
  60:10,13 61:4
  61:15,21 62:2
  63:10,24,25
  64:1,1,6 65:12

71:16 74:20,24
75:1 78:5,8,9
78:13 80:3
82:14 83:18
84:8 85:6,25
85:25 86:10,13
86:14,21,24
87:3,4,11,22
88:1,4 89:15
90:13,14,15,21
92:6,11,13
94:4,8 95:20
95:25 96:3,3
97:17,18 98:2
98:21 99:9,15
100:5,6,7
106:1,4,4
107:12 108:8
108:10,11,13
109:5,19,23
110:19 114:13
114:22,25
115:4,13,15,16
116:10,11,11
118:21 120:3,3
120:4,19,21
124:10 127:17
130:25 131:6
133:8 135:20
139:25 140:14
140:17,19,20
140:25 141:20

**[know - levels]** Page 23

141:25 142:20
143:3,7,8
144:13,20,23
144:23 145:18
149:14,18,21
150:9,19,19,24
151:2,5 152:1
152:8,15
154:10 155:6
155:18,21,24
156:14,17,19
156:24 157:1
158:4,6 160:9
167:1,3,5,10
168:9,16,22,25
169:3,16,19
**knowing** 26:18
**knowledge**
48:17
**known** 83:14
84:15 145:12
145:24
**knows** 90:14
**kslaw.com** 3:13

**l**

**lader** 148:25
150:10
**lady** 112:7
114:23
**lake** 2:4
**land** 35:17
**landscape** 70:9

**large** 110:10,13
111:11 113:2
127:20
**laura** 68:13
**lauren** 3:16
**law** 6:21 7:1
8:19 10:10,17
10:19 22:9,14
22:16 26:3,21
27:4 28:20
30:2,11,13,14
30:17 31:25
35:10 44:18
45:14 47:9,12
47:16 53:10,12
54:3 58:3
65:17 73:24
74:1,4,6,18,20
76:15 82:3,10
93:9,15,22
94:13,23 95:2
95:10 110:17
111:16 112:4
112:14,18
146:12,16,19
146:20 147:13
148:4,11
**lawbmf.com**
2:5
**laws** 45:19,23
65:4
**lawsuit** 7:12
131:4,7,17,20
131:22

**lawyers** 7:25
**lay** 35:16
**layer** 31:3
129:8
**lead** 138:22
**leadership** 8:24
**leagues** 89:18
89:19
**learn** 36:23
37:24 38:12
53:6 57:15
77:16,18,18
82:8 93:16
117:22 118:8
**learned** 82:9,10
146:18 148:9
**learning** 88:13
92:19 126:13
**leave** 17:1
32:23 66:6
**leaving** 10:13
**led** 46:16,22
103:8
**left** 10:4 19:8
29:20,23
112:15 134:8
**legg** 2:3 18:25
19:2 23:25
29:2,5 31:17
34:12 35:22
44:3 46:3,6,13
47:18 48:4,14
49:2,9,11
70:21,23 79:17

81:6,13,17,23
120:24 122:9
123:21 125:18
125:22 126:4
126:21 127:2
127:10 133:17
156:8 163:4,12
163:18 164:7
169:22 170:5
170:13,18,24
171:6 172:4,15
172:20,22
173:1 175:2,10
175:16 176:19
177:6,16
**legislation** 53:8
53:16 55:19
**legislator** 58:14
**legislators** 36:9
55:5
**legislature**
54:24 55:4
56:17
**lenient** 45:23
**lens** 114:1
**lesser** 75:2
**lesson** 89:3,7
**letting** 62:1
**level** 9:6 26:20
30:11 31:5
39:6 88:11
111:8,9 116:6
**levels** 26:9

**[liability - lots]**                                                                Page 24

| | | | |
|---|---|---|---|
| **liability** 1:4 179:3 | **lines** 68:21 | **loaded** 156:3 | 136:13 137:15 142:7 150:3 |
| **liaise** 35:11 | **link** 157:13 | **local** 123:13 | 161:15 |
| **liaison** 24:19 31:20 33:4 44:24 75:22,23 76:3 | **links** 157:10 | **location** 75:18 76:19 182:5 | **looked** 24:16 56:10 57:21 64:5 137:13 175:20 |
| | **list** 9:23 74:12 144:11 146:10 | **lock** 57:3 59:13 66:5 | |
| | **listed** 9:14 11:6 18:21 95:20 | **lockdown** 56:10,15,21 | |
| **liaisons** 21:19 24:20 25:16 31:8 32:18,20 35:6 39:1 50:12 75:18 104:5 106:13 106:22 112:8 121:13 | **listen** 153:12 154:16,20 156:15 | 58:12 66:1,4,4 66:13,19,21 88:14 | **looking** 24:23 42:20 70:9 135:5 165:16 165:18 171:21 172:19 |
| | **listening** 154:9 154:14,23 | **locked** 56:10 66:17 88:15,16 | |
| | **lists** 8:17 133:5 | **locker** 44:20 | **looks** 29:2 59:22 60:19 62:23 106:15 117:7 120:18 |
| | **literally** 20:10 | **lockers** 45:9 | |
| | **litigation** 1:4 179:3 | **locking** 18:8 56:13 | |
| **life** 60:16 61:15 61:15,19 63:17 70:16 104:24 105:4 | **little** 15:18 26:24 27:2 76:10 89:18 129:2 140:6 141:3,6 161:3 161:4 | **log** 151:10,12 | **lose** 12:2,5,16 97:22 |
| | | **long** 10:25 34:24 70:21 83:24 117:17 139:24 140:1 144:11 146:10 165:7 | **loss** 98:1,12,16 104:24 105:4 |
| **lifecycle** 42:4 42:11 | | | **losses** 100:3,5 |
| **light** 109:6 | **live** 40:2,7 43:12 162:10 162:13 | | **lost** 96:24 99:5 99:13,14,16,18 99:20,22 100:7 107:13 130:20 |
| **lights** 66:6 | | | |
| **limit** 158:24 | | **look** 26:1 33:14 38:7,8 41:11 42:2 52:4,5,10 53:17 56:8 57:20 58:22 60:4 62:7 63:14,19 64:12 65:8,10,15 79:21,24 83:7 90:1 105:23 | |
| **limits** 169:6 | **lives** 100:7 107:9,14 | | **lot** 12:7,8 14:24 36:7 45:14,18 45:19 82:3 86:4 88:5,10 88:10 93:10,12 96:10 109:20 114:16 135:1,2 |
| **line** 15:15 26:13,15 50:15 101:6 117:5 119:11,23 130:18 134:7 180:2,5,8,11,14 180:17,20 181:2,5,8,11,14 181:17,20 | **living** 155:12 | | |
| | **llc** 2:3,7,8,8,8 3:2,3,9 | | |
| | **llp** 2:11,17 3:5 3:11 | | **lots** 14:24,24,24 18:15 |
| | **load** 106:8 156:1 | | |

**[loud - media]**                                          Page 25

| | | | |
|---|---|---|---|
| **loud** 53:22,22 | 159:14,15 | 144:3,7 | 36:1 44:5 45:3 |
| **lweiant** 3:7 | 161:9 175:14 | **market** 2:12 | 45:18 56:24 |
| **lydia** 3:4 6:3 | **makes** 116:8 | 153:1 154:9,10 | 57:25 72:24 |
| **m** | 118:3,10 | **maryland** 1:16 | 73:13,17 74:15 |
| **made** 25:3,4 | **making** 50:23 | 2:4 5:9 12:2,14 | 75:12,13 77:19 |
| 47:5 76:18 | 63:2 115:14 | 22:12 36:23 | 83:25 87:10,16 |
| 78:18 94:1 | 128:10,12 | 38:12 44:18 | 92:17 109:8 |
| 147:21,23 | 142:16 149:23 | 53:5 57:15 | 112:2 116:1,17 |
| 148:3,8 149:21 | 175:24 | 77:1 93:22,22 | 128:18 143:12 |
| 175:24 176:2,9 | **male** 110:7 | 100:15 116:23 | **meaning** 94:2 |
| 182:7,10 | **manage** 52:19 | 117:4,21,22,23 | 152:4 |
| **magnified** 36:7 | 120:20 | 118:8,9 119:11 | **means** 66:5 |
| **maine** 3:5 | **managed** 52:9 | 144:18,23 | 137:14 |
| **maintain** 104:9 | 52:18 | 145:2,21 146:1 | **meant** 61:18 |
| 105:19 106:16 | **management** | 182:3,18 | 87:3 |
| 119:11 | 8:23 9:2 | **masks** 111:15 | **measure** 38:1 |
| **maintained** | **manager** | 111:21,25 | **measurement** |
| 118:11 | 120:15 | 112:1 | 80:15,20 |
| **maintaining** | **mandalas** 2:3 | **master** 9:1 | **measures** 24:7 |
| 150:4 | **mandated** | **matrix** 76:25 | 35:20,24,24 |
| **major** 76:24 | 12:13 | **matter** 5:10 7:6 | 36:3,6,7,21 |
| 104:10,15,20 | **mandates** | 56:14 61:23 | 37:23 48:12 |
| 104:25 105:1 | 38:12 118:7,9 | 120:12,17 | 50:3 52:18 |
| 105:21 108:17 | **manpower** | 179:8 | 61:19 124:19 |
| 168:12 | 19:23 25:4 | **matters** 177:4 | 128:23 |
| **majority** 33:2 | 37:17 76:6 | **matthew** 2:3 | **measuring** |
| **make** 38:23 | **marijuana** | **mayor** 7:13 | 133:12 |
| 63:9 73:24 | 45:16 | **mcfss** 4:21 | **mechanisms** |
| 75:8 93:10 | **mark** 2:9 | 144:1,20,21 | 58:7 |
| 98:4 106:1 | **marked** 8:4,7 | **md** 1:4 | **media** 1:3 5:10 |
| 108:7,8 109:9 | 66:25 67:4 | **mdl** 1:3 5:10 | 103:13,16,19 |
| 125:15,20 | 82:21,25 | **mean** 9:10 | 103:23 112:3 |
| 128:13,23 | 122:15,18 | 14:14,22 22:8 | 115:4,18 126:2 |
| | 129:13,16 | 26:7,8 31:4 | 126:14,17,25 |

**[media - morning]** Page 26

127:19 128:2,4
128:8,10,11,12
128:13,13,16
130:17 131:25
132:1 133:14
133:23 135:2,7
135:12,25
136:6,11,15,23
138:11 139:12
139:21,24
141:5,23
142:10,12
145:12,24
147:15,16,20
148:1,8 173:12
173:15,18,24
174:4,8,22,25
175:9 176:9,13
176:17,18,22
177:4 179:2
**mediate** 76:2
140:14
**medical** 66:10
66:15
**meet** 129:6
**meeting** 112:18
115:8 146:16
146:18
**meetings**
113:22 114:3,5
114:7
**member** 4:13
33:16,17 82:20
94:9 97:4

104:24
**members** 21:12
58:6 80:22
82:7,13 83:15
84:15 85:9
86:9 92:14
95:15 96:20
97:6 105:9
106:12 111:19
111:22 135:10
136:5 148:2
165:9
**memorials**
100:9,11,13
**memory** 59:24
**mental** 4:10
14:25 15:2,6
23:2,9 38:2,14
66:24 67:13
174:12 175:8
**mentioned** 17:5
26:2 28:19
30:1 31:10
38:15 39:17
64:14 77:3
79:1 87:8
106:25 112:4
112:25
**merely** 47:1
**merit** 182:2,17
**mess** 109:23
110:22
**message** 176:3

**messages**
140:21 142:17
145:14,25
146:8
**met** 6:2 25:1
**meta** 1:7 2:7
5:11 177:14
**mic** 155:9
**middle** 17:25
27:16,18,21
61:1
**mike** 63:5
**miles** 26:12
**military** 24:11
26:3
**mind** 24:14
64:11
**mindset** 59:15
59:16 60:14
**mine** 161:17
**minimum** 52:6
52:12,13
**minor** 30:19,19
**minute** 120:22
168:18
**minutes** 57:22
59:19 70:22
133:16 154:2
165:7 177:23
**mismanagem...**
12:7
**missed** 105:25
**mitigating** 86:8
134:24

**mlegg** 2:5
**mobile** 159:12
159:25 160:17
167:18
**modes** 120:1,2
**modifications**
106:2
**modify** 163:2
169:20 170:2
170:10,16
**mom** 99:14
158:6
**moment** 67:7
83:7 122:21
129:19
**money** 45:20
134:9
**monitor** 91:25
92:5,10 127:14
160:18 167:12
167:22 168:3,7
169:9
**monitored**
167:14 168:2,5
169:11
**monitoring**
167:23
**month** 166:7
**months** 9:19
86:25 92:20
112:11
**morning** 5:25
6:1,13,17 18:8
42:22

CONFIDENTIAL

**[mother - oath]** Page 27

| | | | |
|---|---|---|---|
| **mother** 156:11 | 62:21 66:8 | 138:21,21 | **notification** |
| **motor** 59:24 | 76:8 84:2 | 143:4 159:19 | 74:12 |
| 60:8,8 | 94:10 135:14 | 168:12 | **notifications** |
| **move** 64:7 | 141:10 | **new** 34:5 37:1,3 | 73:24 75:8 |
| **moved** 112:16 | **need** 17:22 26:9 | 41:20 50:24 | 76:17 |
| **moving** 66:16 | 28:20 30:2,3 | 55:19 145:10 | **notify** 47:9 |
| **multiple** 26:9 | 30:15 36:2 | **newer** 42:1,7 | 72:24 74:18,22 |
| **music** 142:19 | 39:8,9,11 | 42:12 | 75:4,6 93:16 |
| 153:12,13 | 41:11 49:17 | **news** 4:9 66:23 | 93:25 94:8 |
| 154:17,20 | 66:17,21 73:16 | 67:11 112:2 | **notifying** 74:25 |
| 156:15 | 76:18 97:20 | 123:1 | **november** |
| **mutual** 140:2 | 105:7,7,16 | **nexus** 47:12 | 43:12 91:21 |

| **n** | 106:24 107:12 | 128:7,9 | **nuances** 57:9 |
|---|---|---|---|
| **n** 4:1 5:1 | 111:25 127:13 | **nice** 165:16 | **number** 4:7 |
| **name** 5:4 6:2,7 | **needed** 16:19 | **night** 47:20 | 13:4 51:7 |
| 20:18 34:7 | 24:9 27:1,4,7 | 94:5 97:6 | 65:22 78:15 |
| 95:24,25 143:5 | 31:15 32:2 | 112:17 | 84:10 91:18,22 |
| **named** 7:12 | 54:10,11 86:20 | **nights** 90:19 | 93:24 102:25 |
| **naples** 10:5 | 97:17 | 91:2,5,20 | 120:5 123:12 |
| **national** 107:17 | **needing** 15:2 | **nine** 9:16,19 | 130:13 133:8 |
| 108:2,3 | **needs** 15:25 | **nobody's** 59:21 | 135:9 136:1 |
| **nato** 10:4 | 28:11,13 31:24 | **noises** 53:22 | 137:13 139:9,9 |
| **natural** 71:22 | 47:22 50:16 | **normal** 105:14 | 141:17 159:14 |
| 80:8 | 76:15 94:3 | 106:17 107:21 | **numbers** 102:5 |
| **nature** 37:9 | 117:3 | **northern** 1:1 | 102:6 |
| 47:21 74:16 | **neither** 182:11 | 5:12 | **numerous** |
| **near** 110:14 | **nerf** 58:1 59:1 | **notary** 182:3 | 25:25 |
| **nearest** 60:13 | 59:2 | 182:18 | **nurse** 23:12 |
| **necessarily** | **neutralize** | **note** 61:20 | **nw** 3:11 |
| 26:21 27:3 | 63:21 | **noted** 5:15 | |

| 28:12 30:10,22 | **never** 23:1 | **notes** 4:21 | **o** |
|---|---|---|---|
| 31:5 52:9 54:8 | 60:21,21 82:16 | 144:1,20 | **o** 5:1 |
| 58:12 59:23,24 | 86:3 89:17 | **notice** 66:3,18 | **oath** 6:11,18 |
| | 114:21 115:7 | | 7:15 179:13 |

Golkow Technologies,
A Veritext Division

**[object - options]**                                               Page 28

**object** 47:18
48:14 49:2
125:18
**objecting** 49:13
**objection** 18:25
23:25 31:17
34:12 35:22
44:3 46:3,6,13
48:4 79:17
81:6,17,23
122:9 123:21
125:22 126:4
126:21 127:2
127:10 133:17
156:8 163:4,18
164:7 169:22
170:5,13,18,24
171:6 172:4,20
175:2,10,16
176:19 177:6
**objections** 4:18
129:11 130:4
163:12 172:15
173:1 182:7,9
**occur** 56:2
138:9 176:5
**occurred** 43:17
54:18 78:6
79:25
**occurring**
72:17
**occurs** 105:6
**october** 43:12
83:12

**offense** 93:20
93:21 94:2,3,7
94:13,24 95:4
**offenses** 59:17
**offer** 179:12
**offhand** 101:18
**office** 13:13
20:10,12,14
21:6 24:4
34:15,16,21
35:1,1,2 37:11
46:8 52:9,16
52:19,24 53:1
53:3,3 66:3
74:25 86:15
99:3 116:10
118:3 133:13
133:21 146:13
147:2 148:16
148:22,23
150:11
**officer** 6:22 7:1
7:9 13:2,19,22
13:25 14:3
16:6 23:5 31:6
**officers** 13:3,17
15:19,22,24
16:1,16,17,19
16:22 27:11,15
27:21,25 47:15
121:12
**offices** 52:7
101:9 149:9

**officials** 44:9
123:13
**oftentimes** 18:5
**oh** 9:9 12:20
29:4 51:25
52:13 60:20
84:7 89:25
106:20 150:24
152:7 155:10
165:18 176:25
**okay** 8:2,14
9:12,16 10:25
13:24 19:2
22:22 25:11
29:4 33:25
54:24 68:6
74:3 76:10,21
88:24 90:25
96:2 102:7
111:1 119:19
124:22 129:23
**old** 89:13 143:3
155:7,12
157:17 162:3,5
162:16,18,20
166:23 168:14
168:17 169:14
169:17
**older** 161:4
162:2
**olds** 75:21,25
**once** 33:14 65:1
74:10 95:6
104:23 119:1

160:5 165:1
166:8
**ongoing** 142:6
**online** 84:17
90:20 119:23
120:4
**opengate** 42:25
**opening** 33:23
91:20
**operated** 13:3
**operating**
118:12
**operation** 25:8
25:9
**operational**
12:9
**operations** 2:8
10:8 21:25
107:21
**opining** 91:19
**opportunities**
126:13
**opportunity**
109:14 114:2
**opposed** 60:19
**oppositional**
87:19,20
**option** 59:6,8
59:10,12,13
60:2
**optional** 59:5
**options** 58:7,8
58:13,15,16
64:17

**[order - people]** Page 29

| | | | |
|---|---|---|---|
| **order** 1:11 | 164:19 177:19 | 150:5 | **past** 55:18 |
| **ordinarily** | 177:25 | **parkland** 36:5 | 68:23 69:7,13 |
| 97:25 98:13 | **page** 2:21 4:2,7 | **part** 11:18 26:2 | 93:13 113:20 |
| **organize** 96:9 | 8:17 68:2 | 27:5 65:23 | 121:17 133:16 |
| **organized** | 83:10 88:19 | 68:15 70:8 | 153:9 166:7 |
| 110:3 | 124:4 130:2,9 | 85:19 124:24 | **patreon** 143:12 |
| **organizing** | 130:9,12,18 | 156:22 | **patrol** 14:4,5,6 |
| 108:4 | 134:7 145:4,5 | **participant** | 14:11,22 15:10 |
| **originated** | 149:3 150:7,9 | 60:3 | 16:3,6 47:23 |
| 128:2 | 150:11,13,18 | **participants** | **pay** 101:11,17 |
| **outcome** | 150:21 168:12 | 29:6 | **payments** 2:8 |
| 108:25 109:3 | 180:2,5,8,11,14 | **participate** | **peers** 126:17 |
| 112:6 139:2 | 180:17,20 | 64:24 65:2 | **penalty** 179:4,6 |
| **outgoing** | 181:2,5,8,11,14 | 113:23 115:18 | **pending** 29:23 |
| 159:15 | 181:17,20 | **particular** | 182:12 |
| **outline** 74:6 | 182:5 | 24:21 33:12 | **pennsylvania** |
| **outside** 34:9 | **paint** 64:11 | 62:9,18 63:15 | 2:12 3:11 |
| 57:1,5 72:18 | **pandemic** | 79:15 82:15 | 26:13 |
| 72:22 111:11 | 126:19 | 89:9 118:23 | **pentagon** 10:3 |
| 141:18 | **paper** 24:15 | 158:1 163:24 | **people** 18:10 |
| **overall** 134:10 | **paquette** 34:8 | **particularly** | 21:7 32:2 |
| **oversaw** 11:24 | **paragraph** | 90:14 | 33:19 57:3 |
| 24:5 | 68:3,5 84:13 | **parties** 72:25 | 59:17 66:11 |
| **own** 14:10 60:3 | 84:25 123:11 | **partners** 47:10 | 68:24 69:6 |
| 61:15 | 124:5 125:5 | 47:13,16 58:3 | 70:13 72:20 |
| **owner** 160:6 | **parent** 117:5 | 82:11 93:10 | 74:22 85:8 |
| **owns** 99:18 | **parental** | 146:19,21 | 97:16 98:5 |
| **p** | 158:22 159:4 | **party** 182:12 | 106:20 107:10 |
| **p** 2:3 5:1 | 159:23,23 | **passed** 38:1 | 109:20 111:12 |
| **p.m.** 29:13,16 | 160:3,16,18,25 | 53:13 | 111:13,14,25 |
| 70:25 71:3,3,6 | **parents** 61:23 | **passing** 74:3 | 112:12,15 |
| 121:1,4,4,7 | 110:18 111:23 | **password** | 115:4 125:7,13 |
| 164:13,16,16 | 127:13 140:15 | 166:6 | 126:3 131:8 |
| | 140:15 150:1,2 | | 133:21 136:19 |

**[people - plus]**                                                                                Page 30

138:6,14
141:25 152:19
156:21
**people's**  110:20
110:21
**percent**  40:16
127:25 133:5,8
135:9 136:1
137:12 139:8,9
139:19,22
141:8 153:1,2
153:4,6
**percentage**
50:21 133:5
134:10,12,18
**percentages**
134:14
**performed**
44:23
**performs**  44:22
**period**  13:6,8
59:18 96:12
106:4,5 129:7
**periodically**
160:20,24
**perjury**  179:4,6
**permanently**
33:9
**permissions**
159:10 160:9
**person**  20:10
20:12 24:13
25:8,8 26:5,11
26:17 28:3,8

28:10,15 31:2
44:25 53:23
72:12 75:4,10
75:11 86:13
94:4 115:13,22
116:8 139:7
146:24 176:5
**personal**  1:3
44:20 48:16
128:16 179:3
**personally**  49:5
98:20
**personnel**  27:9
35:25
**pervasive**  88:6
**petitions**  14:25
**phase**  42:23
**philadelphia**
2:12
**phone**  26:13
86:7 157:20,24
157:25 158:3,5
158:7,9,17,20
158:23 159:1,4
159:12,14,18
159:21 160:7
160:14,15,17
160:19 161:8,9
161:12 162:3,5
162:7,9,14,17
162:19,21
163:1 175:24
**phones**  137:10
138:3 171:17

172:2,13,19,25
173:5,8 174:17
**physical**  37:14
128:24
**physically**  64:7
**pick**  64:19
**picking**  134:8
**picture**  90:1
165:16
**pictures**  64:11
89:19 128:14
**piece**  63:12
141:23
**pile**  59:15
**pilot**  21:10 39:7
**piloted**  21:5,6
24:18
**piloting**  42:23
**pio**  34:15
**place**  30:23
47:14 48:12
52:2 56:22
57:2,6 87:15
106:10 112:12
124:21 131:23
158:16 169:6
**placed**  14:2,4
83:23 84:5,9
84:17 91:23
92:14
**placements**
4:13 82:20
**places**  52:6
98:5

**placing**  83:14
**plaintiff**  2:2
4:17 129:10
130:3,14
**plaintiff's**
130:19
**plaintiffs**
130:14
**planned**  124:25
**plans**  24:8
28:14
**platform**
159:25 163:10
163:17,24
169:21 170:3
170:11,17
**platforms**  1:7
2:7 131:25
140:11 142:12
142:20,23
143:1,1 170:23
171:4,4
**play**  36:25
**played**  37:2,4
90:2
**playing**  54:1
89:18 154:13
**plays**  103:13,16
103:19,23
177:4
**plaza**  2:17
**please**  6:7
**plus**  82:2

[point - principals]                                                      Page 31

| point  2:17 | 11:22 13:24 | posting  145:25 | president  68:13 |
|---|---|---|---|
| 31:10,25 36:9 | 14:1 15:12 | 149:24 168:9 | presidential |
| 62:25 128:22 | 16:10 19:5,7 | 168:10 | 9:25 10:1 |
| 129:21 145:6 | 21:3 24:4 | posts  135:2 | pretty  13:5 |
| 167:13 | 31:15,20 33:6 | 147:17 167:7 | 18:11 21:15 |
| pointing  65:10 | 33:13 35:7,17 | potentially | 33:18 41:9 |
| points  18:22 | 39:8 41:15 | 79:3 80:9 | 45:16 53:16 |
| 101:10 | positions  9:24 | practical  57:23 | 56:14 60:12 |
| polarizing | 12:24 16:7,23 | practicing | 65:17 71:18 |
| 54:13 109:15 | 18:21 25:5,22 | 60:18 | 85:17,17 |
| 109:17 | 31:11 32:12,23 | pre  13:7 88:12 | 110:13,16 |
| police  7:9,10,11 | 33:25 37:1,3 | 88:12 | 112:1,2 159:18 |
| 10:5,15,16,21 | 50:25 | precluded  54:3 | 165:19 167:24 |
| 10:23,24 11:1 | positive  105:19 | predecessor | 168:20 |
| 11:10,14,18,19 | 127:7 | 24:3 | preventive |
| 11:23,24 12:3 | possessed | preparation | 128:23 |
| 12:14,23 16:16 | 46:17,23 | 57:23 | previous  12:8 |
| 18:20 19:6 | possession | prepare  7:18 | previously |
| 22:12 23:4 | 44:15,16 | 8:10,12 54:10 | 31:21 39:14 |
| 24:11 31:6 | possible  24:12 | 70:12,14,16 | 86:1 |
| 78:22,24 79:3 | 26:4,10 53:15 | 97:18,20 | primarily |
| 79:8,12 85:19 | post  33:6 | prepared  55:13 | 11:24 12:10 |
| 85:23 94:6 | 145:13 151:13 | 55:14,15 64:2 | 17:10 77:10 |
| policy  30:9,10 | 151:22,24 | 64:3 70:12 | 116:4 139:16 |
| 43:3 109:6,10 | 165:3,11,13,13 | preparing | 152:25 154:4 |
| pool  33:15 | 166:9 | 55:22 | primary  20:4 |
| population | posted  33:13 | present  3:15 | 76:13 117:1 |
| 13:9,10 | 129:5 135:21 | 45:8 | 139:7 153:16 |
| portal  116:18 | 149:2,19 | presentation | principal  22:25 |
| portion  49:7 | 150:12,14,17 | 57:23 58:4 | 33:16 88:22 |
| 58:5 62:17 | 150:20 165:9 | presented | 89:3 104:23 |
| 64:15 142:8 | 166:10,13 | 130:14 | 116:8 |
| position  9:20 | poster  168:11 | preservation | principals  27:2 |
| 9:25 10:19 | 168:11,13 | 61:14 | 35:9 106:8 |

**[printing - purpose]**                                                Page 32

| | | | |
|---|---|---|---|
| **printing**  83:3 | **program**  21:6 | **protective**  1:11 | 34:10,10 35:4 |
| **prior**  43:23 | 24:18 25:1 | **protest**  107:23 | 39:18 40:1 |
| 91:11 95:16,18 | 38:4 39:7 | 108:14,17 | 41:2,20 42:14 |
| **private**  123:15 | 62:12 85:19 | 109:7,22 110:1 | 43:20 44:1 |
| 128:16 | 132:10 134:11 | 110:11 111:11 | 46:10 48:1,25 |
| **probably**  16:4 | 134:15 | 111:15 | 49:12 50:8 |
| 24:25 40:16,18 | **programs**  13:7 | **protesting** | 67:22 79:16 |
| 88:25 93:12 | 38:6 121:19 | 108:1,9,23 | 80:11,22 82:7 |
| 110:14 111:23 | **prohibited** | **protests**  107:16 | 87:10,24 88:2 |
| 114:25 116:17 | 53:19,21 64:21 | 111:7 112:20 | 91:16 93:17 |
| 149:20,21 | **project**  156:22 | 113:3 | 97:12 98:17 |
| 152:19 153:1,6 | 157:4 161:21 | **protocol** | 99:5 102:13,17 |
| 154:2 165:1 | **projector**  63:7 | 124:11,24 | 102:21 113:10 |
| 166:7 | **projects**  50:24 | **protocols**  125:1 | 113:25 116:3 |
| **problem**  27:7 | 156:20 | **provide**  25:5 | 121:23 123:15 |
| 91:4 | **promises** | 28:16 39:11 | 124:2,10 |
| **problems**  174:3 | 125:15,20 | 47:10 67:18 | 145:11 148:18 |
| 175:8 | **promoted**  14:1 | 90:11 146:22 | 149:2,12 150:6 |
| **procedure**  30:9 | 15:13 176:12 | 148:4 149:6,9 | 150:13,22,25 |
| 30:10 | 176:16 | 162:14 | 151:3 157:15 |
| **proceed**  105:18 | **promotion**  14:3 | **provided**  24:23 | 173:24 174:3,7 |
| 105:18 | **prompted**  35:6 | 104:6 114:5,7 | 174:11,15,20 |
| **proceedings** | **property**  44:2,9 | 158:7 | 174:25 175:7 |
| 29:13 71:3 | 44:12,13 45:7 | **provider**  23:14 | 182:3,18 |
| 121:4 164:16 | 80:9 | **providing** | **publicly**  126:8 |
| **process**  25:17 | **proportion** | 39:12 150:4 | 126:10 |
| 25:19 33:22 | 130:20,21 | **provisions** | **published** |
| 77:23 82:12,14 | 134:9 | 91:25 | 123:25 152:2 |
| 82:17 107:23 | **proposal**  19:21 | **proximity** | **pull**  45:4 |
| 116:11 | **proposals**  52:4 | 17:23 18:5,12 | **pupil**  34:21 |
| **processes**  38:8 | **protect**  54:19 | **public**  1:13 2:2 | **purchasing** |
| **procure**  50:15 | 54:20,21 | 3:16 6:15 9:1 | 37:9,22 |
| **products**  1:4 | **protecting** | 19:11,15 22:18 | **purpose**  149:23 |
| | 121:11 122:1 | 22:20 27:12 | 150:1 |

**[purposes - recipients]**                                           Page 33

| | | | |
|---|---|---|---|
| **purposes** 33:9 | **quotes** 123:9 | 30:12,25 54:7 | 110:4,10 111:3 |
| **pursuant** 1:11 | 124:8 125:6 | 56:13 58:8 | 111:6,10 |
| **push** 63:7 | **r** | 62:23 64:19 | 112:22 114:4,6 |
| **put** 50:24 58:5 | **r** 3:16 5:1 | 65:18 84:7 | 126:9 130:7 |
| 63:8,22 66:20 | **radio** 16:2 | 85:9 86:4,20 | 131:11 137:19 |
| 92:3,8 104:6 | **radios** 37:9,22 | 88:25 89:5,17 | 145:20 146:4,6 |
| 128:14 156:23 | 50:15 | 92:21 93:10 | 153:7 |
| **putting** 24:15 | **raised** 146:7 | 109:13,21,24 | **recalling** 102:1 |
| 107:10 135:24 | **random** 43:5 | 109:25 114:19 | 102:2,3 |
| 154:22 | 45:1,2,6,7 | 114:20,21 | **receive** 51:13 |
| **q** | **range** 98:6 | 118:3 145:18 | 68:24 69:15 |
| **quality** 41:21 | **rap** 142:16,18 | 145:19 146:21 | 74:10 76:17 |
| **quarry** 2:4 | **rather** 31:3 | 150:21 159:19 | 77:25 78:3,4 |
| **question** 29:22 | 49:15 123:14 | 165:25 168:10 | 79:7 80:10,16 |
| 29:24 36:14 | **rationale** 92:11 | 168:12 | 80:18 114:8 |
| 41:18 44:6 | **ray** 6:9 | **reask** 29:23 | 161:9 |
| 46:21 49:18 | **reach** 31:25 | **reason** 44:14 | **received** 8:18 |
| 54:18 89:16 | 41:25 90:5 | 46:5 54:16 | 11:12 14:19 |
| 130:13 133:24 | **reached** 85:22 | 66:2,10,20 | 46:16,22 80:13 |
| 134:1,2,3 | 163:22 | 94:15 146:10 | 84:16 88:10 |
| 135:15 163:7 | **reacting** 62:4 | 180:4,7,10,13 | 94:22 |
| **questions** 49:12 | **reactions** 68:12 | 180:16,19,22 | **receives** 47:23 |
| 54:22 55:11 | 68:17 | 181:4,7,10,13 | 118:5 120:13 |
| 56:18,20 58:13 | **read** 49:17 | 181:16,19,22 | **receiving** 89:4 |
| 101:1 114:12 | 129:20,21 | **reasons** 31:7 | 91:11 |
| 172:9 177:10 | 131:16 179:7,9 | 65:23 84:8,11 | **recent** 8:15 |
| 177:12,13,14 | **reading** 166:6 | **rec** 89:18 | 53:15 123:13 |
| 177:16 | **real** 28:25 | **recall** 7:6 14:13 | **recently** 32:24 |
| **quick** 9:23 29:1 | 53:15 135:21 | 51:9,10 72:16 | 136:2 |
| 70:20 164:11 | **realized** 95:7 | 86:12,17 96:16 | **recess** 29:12 |
| **quote** 68:21 | 115:11 | 100:12,13 | 71:2 121:3 |
| 124:12,13 | **really** 10:11 | 101:23,25 | 164:15 |
| 125:8 | 11:25 24:8 | 107:25 108:10 | **recipients** |
| | | 108:13,18,23 | 144:12 |

**[recollection - resort]**                                    Page 34

recollection
  101:1,22
record  5:4,16
  6:8 28:24
  29:10,16 70:25
  71:6 78:17
  121:1,7 161:25
  164:13,19
  177:19 182:9
recorded  182:7
recreational
  158:22
recurring
  115:9
reenter  106:2
refer  13:2
  16:11
referred  34:25
  56:21
referring  55:25
  56:1 85:6,7
  131:1 133:9
  134:1
reflecting
  103:15,22
refresh  42:3,6
  42:7
refreshes  41:25
refreshing  37:8
  37:21
refuses  31:2
regarding  89:1
regional  31:18
  32:5,10,16,17

38:22 50:12
  76:4 121:13
regions  113:20
registered
  160:5 182:2,17
regular  16:21
  128:21 153:8
  171:14
regularly
  116:22
reins  159:18
relate  139:12
  176:21
related  30:8
  52:8 94:20
  127:19 130:17
  133:14,22
  135:11 136:6,9
  136:15,23
  139:21 141:5
  147:15 153:6
  176:18 182:11
relates  1:5
  37:19
relaxed  161:3
relevant  134:10
reliant  31:23
relying  139:17
remain  125:16
  125:21
remained  109:9
remember  20:1
  43:13 85:11,17
  85:18 101:14

114:22,23
  147:1 150:16
  166:15
reminder  4:21
  144:2
removals  84:18
renewed
  139:10
report  21:20,21
  25:24 72:21,24
  73:6 74:10
  76:11,16,25
  78:22,24 79:3
  79:8,8,12,12
  94:16 116:8
  118:13 119:5,7
  119:8 120:1
  146:1 148:6,12
  148:17
reportable
  93:19,21 94:2
  94:7,12,24
  95:4
reported  12:12
  12:13 72:12,13
  72:19 73:5,12
  94:3 138:17
  148:11,15
reporter  5:16
  155:9 162:11
  182:1,3,17
reporting
  12:11 118:8
  119:16

reports  15:20
  15:23 16:20
  21:22 28:14
  72:6,8,9 73:3,7
  73:18 76:21
  79:2 80:10,14
  103:3,4 115:24
  116:19 136:16
  136:17,24,25
  137:13
represent  6:5
  83:5
representative
  6:14
representing
  46:8 131:9
request  32:6
  84:11 85:14
  116:17
requested
  31:11 32:7
  41:7,15,17,20
requests  25:3,4
  41:6 50:24
require  50:4
requirement
  77:1
requires  53:8
  93:23
reserve  177:16
reserved  178:1
resolve  136:19
resort  63:16

**[resource - rooftops]**                                                Page 35

| | | | |
|---|---|---|---|
| **resource** 13:3 | **responds** 71:15 | **restrictions** | **right** 6:15 8:8 |
| 13:22,25 14:3 | 88:19 90:18 | 158:16 | 8:21 11:21 |
| 27:11,15,20,25 | **response** 37:23 | **resulting** 174:3 | 17:25 18:3 |
| 47:15 121:12 | 56:7,9,12 | **results** 100:17 | 21:17 26:14 |
| **resources** | 57:12,14 58:7 | 100:21 101:12 | 31:20 32:22 |
| 16:18 37:14 | 59:5 60:19 | 101:14 | 42:18,20 50:5 |
| 98:5 121:12,14 | 62:2 65:9,14 | **resumed** 45:11 | 53:9 60:11,22 |
| **respective** | 74:3,5,8 104:2 | **reswear** 5:17 | 63:8 67:23 |
| 72:25 | 104:21,22 | **retire** 20:22 | 68:7 70:17 |
| **respond** 14:10 | 105:10,11 | **retired** 20:21 | 103:5,6 111:12 |
| 14:21 17:5,6 | 106:12 107:3 | 20:23 34:5 | 118:18 121:24 |
| 17:11 18:6,17 | 107:24 108:15 | 144:16 | 124:5,8 145:5 |
| 18:20 20:6 | 108:17 109:6,8 | **returned** | 147:17 158:1 |
| 28:3,4 55:7,8 | 112:25 113:5 | 112:11 | 164:10 171:11 |
| 60:7 70:13 | 121:14 | **returning** 4:15 | 172:11 173:21 |
| 71:13,20 72:6 | **responses** 4:18 | 122:13 123:3 | 175:22 176:9 |
| 72:9,21 73:14 | 129:12 130:4 | **returns** 32:1 | 177:5 |
| 73:16,17 75:10 | **responsibilities** | **reunify** 68:6 | **rise** 31:4 39:5 |
| 75:10 76:19 | 16:13 20:5 | **review** 7:22 | **rises** 30:16 |
| 100:4 104:8 | 23:10 | 41:10 67:7,9 | **rising** 30:11 |
| 109:9 113:1,3 | **responsibility** | 116:22 117:2 | **risk** 81:2,4,8,11 |
| 148:2 | 28:7 76:13 | 122:21,23 | 81:20 96:14 |
| **responded** 24:8 | 77:10 161:4 | 129:20,24 | 100:16 101:3,3 |
| 56:12 86:10 | **responsible** | 133:15 | **risks** 83:14 |
| 100:3 104:15 | 14:6 15:19 | **reviewed** | **road** 154:23 |
| 113:4 | 16:15 28:8 | 116:20 139:15 | **role** 24:2 27:6,7 |
| **responding** | 71:10 77:7 | 139:15 | 27:24 36:25 |
| 14:7 16:1 18:9 | 79:4 115:23 | **reviewing** | 37:2,4 38:18 |
| 62:4 97:11 | 116:4,13 | 15:20 16:19 | 54:1 103:13,16 |
| 115:23,25 | 117:17 | 28:13 101:23 | 103:19,23 |
| 134:24 147:19 | **restore** 104:9 | 102:4 | 177:3 |
| 147:25 176:15 | 105:19 106:16 | **rick** 85:16 | **rooftops** |
| 176:25 | **restoring** | **riding** 15:21 | 110:20 |
| | 105:23 | 154:23 | |

**[room - school]**                                          Page 36

**room**  92:15
**rooms**  91:23
  92:4,9
**rooted**  58:8
**roughly**  25:12
  28:9 132:16
  149:18
**round**  35:5
**route**  64:9
**run**  18:7 59:6
  59:10 62:17
  64:15
**running**  99:24
**runs**  148:21
  150:9,11
**runy**  68:13
**runyeon**  68:13
**ryan**  3:15 5:4

**s**

**s**  2:10,10 4:5
  5:1
**safe**  21:19
  24:19 31:20
  36:23 37:24
  38:12,25 44:24
  50:11 53:5
  57:15 75:22,23
  76:3 101:2
  104:5 106:11
  106:13,21
  108:7 109:10
  112:8 116:25
  117:5,18,21,22

118:8,12
119:11,22
121:15 122:4,8
125:16,21
177:3
**safer**  4:15
  122:14 123:3
**safety**  9:2
  19:16,18,20
  20:3,8,10 21:1
  21:12 24:5,7
  24:20 25:16
  26:6 28:7
  29:21 30:8
  31:3,8,8 32:15
  32:18,20 33:4
  35:6,20,23,24
  36:10 37:23
  50:2,8,10 51:3
  52:6,8,17 71:8
  71:11,19 75:18
  77:2 80:7,7
  82:2 91:25
  92:5 105:8
  106:13 113:7,8
  113:11,13,14
  113:15,17,24
  114:1,18
  116:24 117:24
  118:10 121:11
  121:13,13
  124:11 127:18
  132:17 133:13
  134:19 141:15

141:20 144:18
144:24 145:2
145:21 146:2
149:17,24
150:4
**sanctions**  78:18
**sarahah**  145:12
  145:17,24
  146:8 147:17
**sat**  98:22
**saturday**  94:5
  97:6
**savage**  91:3
**save**  70:16
  119:21 179:9
**saved**  12:18
**saving**  11:25
  12:17 61:19
**saw**  26:19 27:5
  35:12,15 36:19
  61:17 97:7
  138:17
**saying**  44:4
  54:14 60:20
  111:25 117:11
  124:23 137:19
  142:17
**says**  4:16 65:17
  68:8,22 84:25
  90:18 91:22
  114:25 122:15
  123:4,11 124:8
  125:6 130:2,19
  133:1,11 134:8

143:4 145:10
145:23
**scale**  53:25,25
  107:17
**scaled**  58:24
**scans**  45:17
**scheduled**  42:5
**scheduling**
  15:20 16:20,21
**school**  4:16 9:5
  9:5,6,9 10:24
  11:1,3,10
  12:23 13:2,2,9
  13:16,22,25
  14:2,9,16,17
  16:24 17:2,25
  18:2,8,12,12,14
  18:16 19:6
  21:19 22:3,18
  22:20,23 23:16
  24:18,19 25:15
  26:12,14 27:11
  27:11,16,18,18
  27:20,21,22,25
  28:4 30:10
  31:8,14,20
  32:13,18,20
  33:4,10,10,11
  33:13,14,21,23
  35:6,20 36:10
  38:21,25 39:3
  40:5,6,19,20
  41:20,25 42:2
  42:5,6,21 43:5

CONFIDENTIAL

**[school - security]**                                                    Page 37

| | | | |
|---|---|---|---|
| 43:6,15,21 | 118:10,14 | 40:23 41:2 | **screening** |
| 44:8,24,25 | 121:12 122:4,8 | 42:14 43:20 | 161:5 |
| 47:15 48:13 | 122:14 123:4 | 44:1 46:11 | **screenshots** |
| 49:15 50:11,23 | 123:12 124:1 | 48:1,3,25 | 135:3 |
| 52:21 58:10,10 | 125:16,24 | 49:13,23 50:8 | **scroll** 153:9 |
| 62:9 72:18,22 | 128:3 142:1,5 | 56:2,5 64:21 | 165:4,6 |
| 75:15,17,22,22 | 144:18,23 | 66:24 67:12,22 | **scrolling** 165:5 |
| 75:23 76:1,3,7 | 145:2,21 146:2 | 79:16 80:11,19 | 165:6 |
| 77:1 78:6,10 | 149:8 155:15 | 87:10,24 88:3 | **scrub** 141:11 |
| 80:1,5,8,17,22 | 155:17 157:2 | 88:15 91:16 | **search** 44:2,11 |
| 82:2,7 83:15 | 157:19 158:15 | 97:12 98:17 | 44:13,19 45:5 |
| 83:18 84:3 | 159:20,21 | 102:13,17,21 | 46:2,11 47:13 |
| 85:3,10,19 | 162:4,6,7,9,19 | 104:8 107:10 | **searched** 44:9 |
| 87:14 88:23 | 162:23 163:1 | 113:11,25 | 44:21 |
| 89:4,12 90:19 | 172:3,14,19,25 | 116:3,25 117:5 | **searches** 44:22 |
| 90:21,22 93:17 | 173:21,24 | 117:18 118:12 | 44:23 45:1,2,6 |
| 94:1,3 97:15 | 174:3,7,11,15 | 119:11,22 | 45:7 48:2,23 |
| 97:19,21 99:5 | 174:20,25 | 121:15,23 | 49:22 |
| 101:21 102:9 | 175:7 | 123:16 124:2 | **searching** 45:8 |
| 102:11,18 | **school's** 23:19 | 124:10 131:23 | **second** 22:3 |
| 104:5,25 | **schools** 1:13 | 131:24 132:3 | 68:2 83:10 |
| 105:12,14,17 | 2:2 3:16 4:10 | 145:11 148:18 | 123:11 145:4 |
| 105:20 106:1 | 6:15 13:13,18 | 149:2,12 150:6 | 172:12 |
| 106:13,18,21 | 13:19 14:8,12 | 150:13,22,25 | **secret** 10:2,6 |
| 106:24 107:11 | 14:18 15:9,9 | 151:3 157:15 | **sections** 129:22 |
| 107:16,19,20 | 16:15 17:7,24 | **schoolteacher** | **sector** 14:8 |
| 107:24 110:15 | 18:20 19:12,15 | 171:11 | 15:16,17 16:16 |
| 112:8 113:7,8 | 20:7,7 24:6,9 | **science** 8:19 9:1 | **sectors** 14:7 |
| 113:11,13,14 | 24:17,20,23,25 | **scope** 47:18 | **security** 4:16 |
| 113:15 114:24 | 26:9 27:9,12 | 48:5,15 49:3 | 19:16,18,20 |
| 115:2,22 116:6 | 28:9,17 33:1,3 | **scratch** 146:4 | 20:4,8,10 21:1 |
| 116:24 117:9 | 34:10 35:5,18 | 157:18 | 21:13 24:5,7 |
| 117:12,14,18 | 39:8,10,13,15 | **screen** 160:18 | 26:6 28:8 |
| 117:24 118:4 | 39:16,18 40:2 | | 29:21 30:8 |

[security - sheriff's]                                                    Page 38

31:3 32:15,17
35:20,23,24
36:3,6,7,10,21
37:5,6,14
38:22 39:17,19
41:3,16,21
44:25 48:23
49:22 50:2,8
50:12 51:3
52:6,8,18 71:8
71:11,19 80:7
105:8 118:4
121:18 122:7
122:14 123:4
124:11,23,25
127:18 132:18
133:13 134:19
145:11 146:11
146:23 149:17
149:24 150:4
**see** 15:24 24:12
26:4 41:11
61:17 67:14
76:14 83:16
84:19 85:4
91:6 92:1
99:25 103:18
120:16,17
123:5,17 124:5
124:14 125:9
130:23 132:12
132:20 133:1,6
134:16 138:4,6
140:11,12,12

140:17 145:7
145:15 160:20
160:21,22
165:8,8,9
**seeing** 30:18
86:25 87:9
130:7
**seek** 49:14
153:10
**seems** 114:21
**seen** 72:14
130:6,10
132:14 156:1
167:7
**seized** 109:14
**select** 134:18
141:8
**selecting** 135:9
136:1 139:8
**self** 71:18
**send** 75:10 76:8
78:2 104:21,22
117:3 120:5
**sending** 76:4
115:6 142:17
**sends** 99:2
**senior** 155:16
**sensory** 59:25
60:6
**sent** 98:21,24
118:11 137:6
**separate** 47:16
92:14 95:4
102:7 116:10

176:15
**separated** 91:1
**separately**
94:14
**separation**
91:19
**sept** 4:15
122:13
**september**
43:18 105:3
123:3
**sergeant** 15:16
16:11,12,14,23
**series** 160:8
**serious** 61:8,13
**seriously**
124:11,24
**served** 11:18
**service** 14:9,11
14:20,20 16:1
17:6 39:15
126:13 153:15
**services** 34:21
34:22,24 39:12
66:11 84:9,9
121:15,20
**serving** 20:25
**session** 115:7
**sessions** 114:25
**set** 4:19 70:19
126:1 129:13
130:5 156:6,10
156:12 159:4
159:10 160:7

**setting** 22:19
22:21,23 83:22
84:1
**settings** 84:6
159:3
**setup** 160:17
**seven** 10:12
21:4,5,7 24:19
24:22 25:15
39:15 104:19
106:25
**several** 12:12
91:23 121:9
**sexual** 73:7,11
74:15,17
**share** 74:9
147:3,12
**shared** 82:15
82:16 96:11
147:10,10
**shares** 118:6
**sharing** 74:8
82:11
**shb.com** 2:13
2:14
**sheet** 133:10
179:1,11 180:1
181:1
**shelter** 56:22
57:2
**sheltering** 57:6
**sheriff's** 146:13
147:2

CONFIDENTIAL

**[shook - software]**                                                                                    Page 39

| | | | |
|---|---|---|---|
| **shook**  2:11 | 160:14 161:17 | 117:15 118:16 | 142:14 151:4 |
| **shooter**  38:4,6 | 161:20,23 | 120:10 138:24 | 166:21 169:18 |
| 53:9 57:5,18 | **shutting**  161:8 | 141:9 142:6 | 170:16 |
| 57:19,21 60:7 | **sic**  108:12 | **situations** | **sniff**  45:24,25 |
| 62:11 | **siculus**  2:8 | 14:25 18:15 | **sniffing**  45:16 |
| **shooting**  18:10 | **side**  45:5 59:7,7 | 20:6 28:19 | **social**  1:3 5:10 |
| 36:19 37:18 | 59:9,10 87:20 | 30:1,6 39:5 | 103:13,16,19 |
| 43:17 105:3 | 111:24 112:9 | 58:6 64:13 | 103:23 115:4 |
| 107:5 113:2 | **sides**  90:6 | 73:25 81:5,15 | 115:18 126:2 |
| 124:1 | **sight**  63:9 | 81:21 96:15,18 | 126:14,17,25 |
| **shootings** | **signature**  178:1 | 99:4,12 104:15 | 127:19 128:2,3 |
| 123:12 | 180:23 181:23 | 104:20 107:15 | 128:8,9,11,12 |
| **shoprite**  99:19 | 182:15 | 112:21 113:1 | 128:13,13,15 |
| **short**  29:19 | **signed**  179:16 | 128:1 135:24 | 130:17 131:24 |
| 86:25 111:9 | **significant**  24:8 | 147:5,19,25 | 132:1 133:14 |
| 153:9 | **similar**  56:22 | **six**  10:11 | 133:23 135:2,7 |
| **shortest**  59:18 | 56:23 111:6 | 104:18 106:25 | 135:12,25 |
| **shortly**  27:16 | **simulation** | **size**  38:23 | 136:6,11,15,22 |
| 36:2,4 | 53:22,23 58:2 | **skill**  59:25 | 138:10 139:12 |
| **shot**  97:8,9 | **simulations** | **skills**  60:6,9 | 139:21,24 |
| **show**  8:6 16:5 | 53:14 | 61:22,25 | 141:5,23 142:9 |
| 31:6 67:3 | **single**  76:6,9 | **skim**  129:19 | 142:10,12 |
| 82:24 122:17 | 78:13 148:14 | **slight**  56:23,24 | 145:12,24 |
| 129:15 138:7 | 148:16 | 56:25 57:8 | 147:15,16,20 |
| 138:14 144:6 | **sit**  17:25 38:15 | **slots**  32:24,25 | 148:1,8 173:12 |
| **showed**  137:7 | **sites**  160:21,22 | **small**  95:23 | 173:15,18,24 |
| 137:25 161:4 | 160:23 | **smaller**  95:24 | 174:4,8,22,25 |
| **showing**  60:9 | **situation**  31:21 | **smartphone** | 175:9 176:9,13 |
| 61:12 138:16 | 59:1 60:7,20 | 157:22 158:9 | 176:17,18,22 |
| **shown**  59:22 | 61:9,13 62:5 | 158:11,12 | 177:4 179:2 |
| 137:9 139:7 | 62:20 76:2,9 | **snap**  2:15 | **society**  70:9 |
| **shows**  31:2 | 104:10 105:21 | 177:13 | 88:15 |
| **shut**  63:3 66:6 | 109:12,15 | **snapchat** | **software** |
| 158:25 160:13 | 111:17 112:5,6 | 131:13,14 | 120:20 |

CONFIDENTIAL

**[sohmer - starts]**                                        Page 40

| | | | |
|---|---|---|---|
| **sohmer** 3:15 5:4 | **south** 1:15 5:9 | **spends** 133:13 | **staffing** 50:3 |
| **solutions** 86:2 | **spalding** 3:11 | **spent** 9:16 10:6 11:25 12:17 134:9 137:18 141:7 | **staged** 109:3 |
| **solving** 27:7 | **speak** 7:24 171:16,20,23 172:1,12 174:24 175:6 | | **stamp** 83:4,5 |
| **somebody** 18:13 63:2 65:15 66:14 72:3,4 75:10 129:5,6,6,6 134:2,3 135:22 140:24 | | **spiderweb** 60:25 | **stand** 63:25 |
| | **speaking** 15:22 | **spilling** 87:14 | **stands** 144:21 |
| | **special** 10:8 13:7 | **spoken** 164:5 171:3 | **stanton** 116:11 117:14 118:15 118:20 |
| | **specific** 33:1,4 51:10,12 52:4 61:16 76:22 78:6 101:10 108:11 110:6,7 129:22 157:13 157:13 177:3 | **sports** 153:4,11 | **stapler** 64:2,6 |
| **somewhat** 131:5 | | **square** 2:11 | **start** 13:16 47:22 61:15 63:4 72:8 96:1 108:22 116:7 117:15,20 118:15 154:8,8 154:12 162:2 |
| **son** 143:3 157:19 166:23 168:14 169:14 169:17 | | **sro** 14:10 15:8 15:10 28:21 30:3 147:2 | |
| | | **sros** 14:13 26:25 30:25 47:24 | |
| **sons** 89:13 | **specifically** 48:2 66:20 73:13 87:17 94:25 139:9 140:1 147:1 148:13 | **ssl** 33:14,23 | **started** 10:17 10:23 13:1 15:8 19:11,15 20:9 21:5,9,16 21:17 24:14,19 25:17,18,18,20 26:24 30:18 35:25 36:1 55:19 65:1 70:9 93:10 95:7 114:12 115:2 117:19 128:3 136:21 146:9 158:15 |
| **sorry** 9:12 19:1 21:16 57:10 68:4,4,8 69:12 77:13 81:3 91:9 98:9 103:11 116:2 123:22 137:1,7 146:5 147:24 151:22 155:10 162:11,18 169:24 | | **ssls** 33:7,8 | |
| | | **staff** 21:2,12 33:16 54:11,21 55:14 58:5,18 58:19 61:21 71:20 104:24 106:3 122:1 125:16,21 127:17,23 130:20 135:10 136:4,14 138:15,16 139:11,20,20 147:14 | |
| | **spend** 59:19 129:2,3 133:21 134:24 135:11 136:5,9 139:11 139:20 141:3 141:17 147:14 153:25 165:6 173:15 | | |
| **sort** 135:19 | | | **starting** 124:5 130:18 |
| **sos** 77:24 78:1 78:2 | **spending** 45:20 135:18 136:15 140:13,15 173:8 | | **starts** 68:6 83:13 90:23 |
| **sounds** 120:24 | | | |

[starts - students]                                                        Page 41

| | | | |
|---|---|---|---|
| 114:20 145:7 | **stops** 140:24 | 109:1 110:7,7 | 95:11 96:20 |
| **state** 6:7 12:2 | **strategies** | 113:16,17,22 | 97:22,23,24 |
| 12:14 22:12 | 150:2,2,3 | 114:1,18 | 98:7,15 99:6 |
| 62:11 118:5 | **strategy** 85:12 | 117:11 118:23 | 100:6,7,10,12 |
| 182:3,18 | **streaming** | 118:24 121:12 | 101:4,20 102:9 |
| **stated** 134:15 | 153:14 | 124:9 138:17 | 102:13,17,21 |
| 182:5 | **street** 2:12 3:5 | 141:19 157:14 | 105:25 106:2,3 |
| **statement** | 99:23 111:24 | 176:18 | 106:11 107:8 |
| 123:19 | **strengthen** | **student's** 44:13 | 107:11,13,17 |
| **states** 1:1 5:12 | 122:7 124:25 | 46:1,11 95:3 | 107:18,22 |
| 9:14 | **stress** 69:24 | **students** 4:15 | 108:4,6,12 |
| **stationed** 13:12 | 70:2 | 28:9 30:7,20 | 109:2,9,16 |
| 13:13 15:8 | **strike** 9:12 | 30:24 34:25 | 111:18,21 |
| **statistics** 12:13 | 57:10 69:12 | 42:22 44:2,9 | 113:19,23 |
| 102:8 | 71:10 77:13 | 44:11 45:3,8 | 118:22 121:11 |
| **stenographic** | 81:3 84:24 | 54:11,20 55:7 | 122:2,8,13 |
| 5:16 | 91:9,14 98:9 | 55:12,21 58:21 | 123:2 125:15 |
| **stenographic...** | 103:11 116:2 | 59:3 60:6,14 | 125:21 126:20 |
| 182:8 | 146:5 151:23 | 61:6,8,18,21 | 127:25 128:7 |
| **step** 105:16 | 154:15 | 62:8,21,24 | 128:10,15,17 |
| 106:9 | **structure** 29:20 | 63:4 64:4,10 | 128:24 129:4,9 |
| **stepped** 24:2 | **student** 13:10 | 64:24 65:6,24 | 131:24 133:14 |
| **stepping** | 15:1 34:22 | 67:23 68:8,10 | 133:22 134:25 |
| 110:19 | 44:15,19,20 | 68:15,22 69:3 | 135:2,8 137:10 |
| **steps** 70:12,14 | 45:2,4 46:17 | 69:18 70:15 | 138:2,7,13 |
| **stock** 153:1 | 46:23 48:12 | 71:19 72:10 | 140:18 141:4 |
| **stoneman** | 58:22,24 61:7 | 76:5 80:22 | 141:10,15,16 |
| 36:19 37:18 | 65:20 74:16,21 | 82:7,12 83:23 | 141:18,21,24 |
| **stop** 115:13 | 74:23 78:17 | 84:11 86:16 | 142:1,4,20 |
| 129:1 140:25 | 80:24 93:17,23 | 87:17,19,23 | 143:23 145:13 |
| **stopgap** 35:9 | 94:2,15 96:24 | 88:2,17 89:5,9 | 145:25 148:2 |
| **stopped** 115:1 | 97:3,25 98:11 | 89:11,12,14 | 149:10 150:2 |
| **stopping** 15:22 | 104:24 105:4 | 90:15,20 91:1 | 171:16 172:1 |
| | 107:16 108:25 | 91:22 92:9 | 173:5,8,12,17 |

**[students - take]** Page 42

173:24 174:3,7
174:11,15,20
174:25 175:7
175:14 176:22
177:2
**studies** 102:12
**study** 102:16
102:20 103:12
103:14,18,21
**stuff** 25:20
42:13 64:7
65:11,17,18
75:3 85:25
86:22,24 87:3
87:8,12,14
88:6 89:24
90:8 92:16
115:6,22
128:18,18,19
128:20 137:9
143:4 147:12
153:6,10,11,11
153:17 154:13
154:23 161:3,5
167:8,8
**subgroup**
113:23
**subject** 4:12,20
82:20 144:1,19
**subliminal**
142:17
**subpoena** 41:6
**subscribe**
154:24

**subscription**
153:19
**subsequently**
19:23
**subset** 107:22
111:13
**substance**
45:21
**substantive**
145:4
**subtotal** 132:23
**success** 25:1
39:7
**sudden** 55:11
89:22
**suffer** 68:11,16
**suffered** 98:16
**suicides** 113:2
**suit** 7:13
**suite** 2:4,12
3:12
**superintendent**
19:22 21:24
113:21 118:25
**superintende...**
113:16
**supermarket**
99:19
**supervise** 31:23
**supervising**
38:18
**supervisor** 19:9
19:18,20 21:3
71:8,11 147:2

**supervisors**
31:18 32:6,10
32:17 121:13
**supervisory**
15:15 25:5
27:24 31:11
**support** 10:1
16:5 20:7,12
24:9,16,23,24
26:10,16 27:2
27:6,9 28:10
28:17 32:1
35:9 39:8,9
74:23 100:6,8
105:8 106:3
107:12,13,24
140:17
**supported** 24:6
**supposed** 91:20
161:19
**sure** 40:17 63:9
98:4 108:7,8
109:9 118:3,10
128:23 137:21
144:24 145:19
161:24 168:20
**surprise** 92:22
**surrounded**
18:16
**surrounding**
36:20 37:15
38:5,9 79:15
101:2 114:1

**survey** 100:16
100:22,25
102:7
**surveys** 101:6
**susan** 20:19
**suspended**
45:10
**suspension**
34:24 84:9
**suspensions**
84:16
**sw** 3:5
**switch** 19:19
**sworn** 5:20
182:6
**system** 42:19
58:10,10 77:22
94:1
**systems** 50:14

**t**

**t** 4:5 159:12,25
160:17 167:18
**tab** 67:5 83:1
122:19 129:17
144:8
**table** 7:21
130:10,10
**take** 28:25 29:5
41:11 62:22
64:9 67:7
68:22 70:12,14
70:20 83:7
106:7 107:8

**[take - things]**                                                    Page 43

120:22 122:21
124:11 131:23
138:22 164:10
165:15
**taken** 112:13
179:8 182:4
**talk** 58:25 60:1
61:16 62:7
63:11,14 80:5
105:6 113:23
115:15,16
133:19 135:10
135:13 136:4
140:16
**talked** 25:23,23
59:21 62:20
80:6 85:15,15
98:22 115:8
121:9 135:16
154:7
**talking** 9:6
28:23 30:5,6
48:6 63:4
64:10 65:9
72:3 74:19
87:17 92:6
95:14 105:22
114:23 128:10
135:17 142:13
146:25 152:17
159:24
**target** 115:5
**taught** 22:18
22:22

**teacher** 22:5,7
22:21 62:25
63:3,18 64:22
157:12
**teachers** 30:22
35:9 41:19
58:18,20 70:16
76:2 106:8
126:20
**teaching** 61:14
**team** 33:17
71:12,15 72:9
73:12,14,22
77:7 89:20
90:3 104:2,5,8
104:12,21,23
105:10,11,15
106:12,19
107:3,24
108:15,17
112:25 113:14
113:15 115:10
115:23 116:13
119:2 121:10
**team's** 76:12
77:10
**teams** 38:9
52:19,19 98:21
98:24 99:2
121:14
**technical** 29:3
29:19
**technician** 3:15

**technologies**
2:8 50:4
**technology**
34:14 37:15,15
48:24 49:23
53:1,3
**teeth** 154:9
**telephone**
119:23
**television**
153:17
**tell** 23:22 62:23
96:22 99:10
125:6,13
128:19
**tells** 61:3
**temporarily**
83:24 106:7
**temporary**
106:10
**ten** 9:18,19
17:19 22:10
33:19
**term** 34:24
83:24 104:1
113:6,9
**terminated**
7:10
**terms** 32:1
50:10 61:12
88:7 139:1,2
159:11
**testified** 5:21
96:13 103:2

141:2 171:10
173:20
**testify** 182:6
**testimony** 6:13
6:17,18 7:15
29:25 49:14
177:21 182:7,9
**text** 120:5
176:2
**theft** 14:23
**theme** 115:9
**thereof** 182:12
**thing** 56:18
58:11 61:13
115:21 129:21
163:24
**things** 12:9,15
26:19,24 27:4
35:12,15 37:9
51:10 52:7,11
52:11,17 53:18
53:20 54:2,4,6
54:25 56:16,20
59:25 60:4
61:4,4 63:1,20
63:23 64:3,10
64:23 71:21
73:19 74:6
105:16 106:17
109:18 110:6
114:3 115:9
128:16 129:7
135:4,20
140:23 141:17

CONFIDENTIAL

**[things - told]**                                                                              Page 44

142:17 147:16
150:3 159:14
160:8,9
**think** 12:18
27:3 31:15
32:7 36:15
37:3 41:23
45:24 51:12
59:23 61:20
63:18 85:7
89:2 90:22
96:24,25 97:4
99:1 111:5
112:7 115:5
119:25 120:5
131:8 133:21
144:17 165:18
165:23 166:3
**thinking** 61:25
62:3,5
**third** 8:17
**thirds** 132:16
**thoughts**
114:13
**thread** 83:9
**threat** 38:7,8,9
38:10 47:5,12
47:20,21 52:16
71:18 72:2
76:12 77:3,16
77:17,25 78:21
79:2,7,11 80:7
138:11 147:21
147:22 148:3,8

148:14 175:21
176:25
**threatened**
137:11
**threatening**
60:16 72:4
145:13,25
**threats** 49:1,24
50:1 71:9,12
71:14,15,16,17
71:17,20 72:3
72:5,6 76:22
78:18 80:6,7,9
128:11,12
137:6,13,24
140:4 147:8,20
148:1 175:15
175:24 176:2,5
176:9,15 177:2
**three** 13:20
32:11,16,17
52:6,11,11,12
62:25 64:16,22
64:23 113:20
119:25 146:14
154:21
**thriving** 12:21
**throw** 64:2,3,6
**throwing** 61:1
**thug** 91:4
**thursday** 1:17
91:5
**tiktok** 3:9,9,9
150:23 166:19

169:14 170:10
177:15
**time** 5:6 10:6
11:3,17,18,25
12:10,17,24
13:6,8 14:10
14:15,18 17:4
20:25 21:18
25:24 35:21,25
39:10 41:14
43:1,12,24
44:8 46:12
48:18,20 59:19
64:19,20 67:9
85:22 93:11
96:11 98:16
106:1,5 108:11
108:18 110:11
115:1 120:16
120:17 122:23
124:20,22
127:17,21,25
129:3,24
130:20 133:12
133:12,20,20
134:9,23
135:11,14,19
135:23 136:5,9
136:14 137:17
139:11,19,22
140:13,15
141:3,6,17
142:7 147:9,14
153:25 154:25

158:6,24
160:18 165:6
166:1,13 169:6
173:8,15
177:10,22
182:5,7,10
**times** 80:17
82:9 135:2
154:21
**tip** 117:1,5
119:11 120:14
120:17
**title** 19:14,17
19:24 20:14,17
25:19 75:5,5
116:10 118:21
144:16
**titled** 4:10,14
66:24 67:12
122:13 123:2
132:9,23 133:4
**titles** 23:7
**today** 6:11 7:25
23:24 27:20
32:15 123:24
124:19 171:10
173:20 175:20
**today's** 5:6
177:20
**together** 104:6
156:20 165:16
**told** 60:23
85:23

**[took - type]**                                                    Page 45

**took**   21:2 29:18
  47:14 112:12
  161:6
**tool**   41:13
**top**   4:12 10:2,6
  51:9,19,21
  63:8 72:16
  82:19 88:18
  110:19 128:19
  133:10
**topic**   114:17
**tortious**   7:11
**total**   177:22
**totally**   88:15
**touch**   64:22
**touched**   13:8,8
  109:1
**touches**   52:7
**touching**   64:21
**towards**   132:5
**town**   7:12
**track**   77:13,15
  77:21,24 79:14
  79:18 80:24
  103:3,7 106:18
  156:2 167:8
**tracking**   77:22
**tracks**   102:8,10
  102:24
**tractor**   99:15
**trafficking**
  73:15 74:18
  80:10

**tragedies**   36:6
**tragedy**   36:4
**trailer**   99:15
**train**   45:24
  106:21
**trained**   10:10
  22:20 35:3
  45:21
**trainers**   68:13
**training**   4:11
  16:20 35:3
  38:5,9 53:9,13
  55:21 56:8,9
  57:12,14,18,20
  57:21,25 58:16
  58:18,19 60:18
  61:5 64:4
  66:25 67:14
  68:12,17,23,24
  69:4,14 104:7
  106:21 153:4
**trainings**   53:17
**transcribe**
  120:13
**transcribed**
  182:8
**transcript**
  179:7 182:5
**transferable**
  61:22
**transplant**
  112:10,11
**transport**   15:1
  15:3

**transportation**
  15:6
**trauma**   65:19
  68:23 69:7,10
  69:13
**traumatic**
  69:18
**travel**   13:14
**treated**   174:8
  174:12,16,21
**trending**
  154:11
**triage**   76:14,16
  117:2
**triaging**   76:20
**trial**   177:17
**tries**   105:13
**truce**   85:2
**true**   109:19
  179:9 182:9
**truly**   109:11
**truth**   182:6,6,6
**try**   42:20 63:8
  96:7 99:24
  107:20 128:22
  135:1 140:11
  141:22
**trying**   9:10
  44:5 57:3
  59:20 60:17
  85:8 86:2
  89:14 90:4
  95:8,22 97:13
  100:6,8 115:10

  135:19,20
  136:19,20
  139:25 140:10
  140:14,23
  160:12
**tuesday**   4:21
  91:3 144:2
**turn**   68:2
**turned**   89:21
  161:2
**tv**   153:18
**twice**   65:2
  166:8
**twilight**   90:19
  90:21,22
**twitter**   143:21
**two**   2:11 7:21
  13:19 18:10
  20:10 21:22,22
  33:6 39:7
  75:20,24 76:5
  76:16 90:19
  91:24 93:14
  104:6 112:11
  132:16 158:21
  165:23 167:25
**type**   13:9 27:8
  36:5 58:25
  59:2 65:5,13
  65:14,18 71:18
  73:1,25 75:3
  75:13 87:11
  89:14 115:20
  139:3 149:5

[type - vandalism]                                    Page 46

152:14 153:17
168:13
**typed**  182:8
**types**  14:20
17:9 28:22
30:4 33:7 71:9
71:12 72:14
75:9 88:1
101:14 103:19
103:23 104:20
112:25 114:8
140:21 152:24
**typically**  44:23
47:24 64:18
105:18 106:5,6
142:22 171:17
172:2,13

**u**

**u.s.**  10:7
**uh**  29:8 68:9,18
68:25 73:21
75:16 77:5
79:23 132:6,8
132:11,19,25
134:13 136:3
151:12
**ultimately**  60:1
70:16,18
**ultimatums**
112:15
**un**  169:24
**under**  6:10,18
7:15 9:18

15:16 21:2
25:8 35:1
76:25 93:25
118:2,8 130:12
132:22 179:4,6
179:13
**understand**
41:18,24 44:6
49:9 54:12,15
54:16 55:10,15
58:7 61:8,19
75:12 76:10
89:15 90:9
92:21 163:6,21
**understanding**
54:5,8,9 69:17
69:21 95:8
100:24 131:19
131:21 179:12
**unfortunately**
96:23 107:8
123:25 128:21
**uniform**  12:11
**unit**  10:5 14:11
16:3
**united**  1:1 5:12
9:14
**units**  14:6
**updated**  8:13
**updates**  154:10
**upgrade**  41:15
41:17
**upgrades**  37:5
37:6

**upload**  152:14
156:4
**uploaded**  152:5
156:21
**uploading**
152:12
**use**  35:17 40:18
41:3,5,6,7,10
41:12 42:21
43:20,23 48:25
49:23 59:1,1,2
63:1,20 92:9
101:5 120:20
128:3,23
131:25 142:23
143:9,23
151:10 152:21
153:12,14,18
153:22 154:15
154:16 157:3
158:17,20,22
159:18,22
160:17,19
164:25 165:2
165:24 166:16
173:5,12,18
174:4,16,21
175:8 176:18
176:22
**used**  45:10
115:1 151:6
154:25 155:18
156:17,19
157:7,9 158:12

160:25 166:1,3
166:8
**useful**  86:6
149:10 150:5
**uses**  43:7
142:21 155:24
156:14 167:5
167:10,12,14
168:25 169:3,7
**using**  42:23,25
43:1,3,4 49:25
82:11 128:2,12
128:13 132:1
145:13 160:2
166:8 171:17
171:24 172:2,2
172:6,7,10,13
172:19,24,25
**usually**  93:16
**utilize**  42:15,18
42:18,19 61:24
61:25
**utilizing**  101:8

**v**

**v**  1:7
**vacancy**  33:11
**validated**  82:11
82:13,16
**validation**
82:12,18
**vandalism**
14:23 30:19

CONFIDENTIAL

**[varied - weapons]**                                    Page 47

| | | | |
|---|---|---|---|
| **varied** 14:23 | **view** 41:7 69:1 | **walking** 108:8 | 63:3 69:14,15 |
| **variety** 71:14 | 124:16 125:11 | 110:19 124:9 | 69:19 75:19 |
| 175:15 | **vigils** 100:10,13 | **walkout** 108:3 | 80:25 100:4 |
| **various** 9:24 | **violence** 17:12 | 109:4 | 108:10 110:4 |
| 12:24 15:9 | 17:23 18:6,16 | **walkouts** 108:4 | 119:9 132:16 |
| 26:9 50:3 80:6 | 56:5,6 60:17 | **want** 9:21 | 137:8 140:8 |
| 124:18 149:8 | 71:16 76:12,16 | 20:23 30:25 | 141:1 159:10 |
| **veritext** 5:5 | 80:8,9 81:3,4,8 | 42:1,6 43:11 | **ways** 78:15 |
| **version** 83:3 | 81:12,21 96:14 | 45:24 55:12,13 | 91:1 113:24 |
| **versus** 5:11 | 96:15,19,19 | 57:2,3,6 59:17 | 121:10 175:15 |
| **vests** 58:2 | 103:4,20,24 | 63:18 66:12 | **wc.com** 3:7,7 |
| **vice** 68:12 | 176:12,16 | 70:21 92:13 | **we've** 32:23 |
| **vicinity** 92:15 | **violent** 17:6,9 | 98:4 108:8 | 33:5 40:16 |
| **victim** 54:2 | 18:20 56:1 | 111:13,21,22 | 47:11 48:11 |
| **victims** 102:22 | 73:18 76:11 | 111:23 132:2 | 50:4 61:21 |
| **video** 5:8 | 77:15,17,25 | 147:3 155:6 | 66:11,14 73:19 |
| 149:20 157:12 | 79:15,19 84:15 | 161:17 163:20 | 74:21,22 98:21 |
| 177:20 | 102:22 | 163:22 | 107:8,15 |
| **videographer** | **vision** 24:16 | **wanted** 30:13 | 123:24 124:19 |
| 3:15 5:3,5 29:9 | **visit** 160:21,23 | 39:15 55:14 | 140:7 147:4,5 |
| 29:15 70:24 | **vitae** 4:8 8:3 | 64:22 78:5,9 | **weapon** 43:7 |
| 71:5 120:25 | **volunteer** | 79:21 80:3 | 44:17 46:17,23 |
| 121:6 164:12 | 126:13 | 107:22 108:7 | 46:24 47:2,8 |
| 164:18 177:18 | | 146:22 161:19 | 48:13 53:23,24 |
| **videos** 142:16 | **w** | **wanting** 31:5 | **weapons** 42:15 |
| 142:18 149:11 | | **washington** 3:6 | 42:19,24,25 |
| 149:16,18,24 | **wait** 59:8 | 3:12 | 43:4,14,14,16 |
| 150:20 152:5 | 168:18 | **watch** 152:21 | 43:20 48:2,7 |
| 152:14,15,16 | **wake** 98:11 | 152:24 156:15 | 48:10,19,22 |
| 152:22,24,25 | **walberg** 2:10 | 157:12 | 49:21 50:14 |
| 153:1 154:5 | **walk** 48:7 | **way** 24:21 | 101:20,21 |
| 156:2,3,15 | 58:25 62:7 | 53:13 55:13,14 | 102:9,11,14,18 |
| **videotaped** | 63:13 108:7 | 55:20 56:12 | 114:10,11 |
| 1:12 | **walked** 60:22 | 58:12 62:5 | 121:17 |

Golkow Technologies,
            A Veritext Division

**[wear - yeah]**                                                        Page 48

| | | | |
|---|---|---|---|
| **wear** 111:15,21 | 144:9 155:11 | **willing** 60:3 | 176:17,21 |
| 111:22 112:1 | 156:13 162:1 | **window** 60:24 | 177:1 |
| **websites** | 162:15 163:8 | 60:25 63:10,10 | **worked** 10:8 |
| 171:20 172:18 | 163:14 164:1 | 111:12 | 13:5 22:5,6,25 |
| **wednesday** | 164:10,20 | **witness** 5:17 | 23:2,12,16,19 |
| 91:20 | 170:1,7,15,21 | 19:1,3 24:1 | 37:10 61:5 |
| **week** 28:5 | 171:2,9 172:8 | 29:4,8 31:18 | 90:2 |
| 127:24 152:9 | 172:17,23 | 34:13 35:23 | **working** 10:6 |
| 154:21 165:1 | 173:3 175:5,13 | 44:4 46:7,14 | 11:14 15:16 |
| **weekend** 97:1 | 175:19 176:23 | 47:19 48:6,18 | 25:19 95:14,15 |
| **weekly** 146:17 | 177:9 | 49:7,17 79:18 | 136:19 |
| **weeks** 152:9,10 | **weight** 133:5 | 81:8,18,25 | **works** 118:2,22 |
| **weiant** 3:4 4:3 | 134:11,14,18 | 122:11 123:22 | 163:11,17 |
| 5:24 6:3 8:5 | **welcome** 29:18 | 126:6,23 127:4 | **worksheet** |
| 19:4 25:10 | 129:20 | 133:18 155:10 | 132:10 |
| 28:25 29:17 | **went** 10:4,16 | 156:10 162:13 | **world** 53:15 |
| 32:4 34:18 | 10:22 14:22 | 163:6,13,20 | **worry** 115:20 |
| 36:8 44:7 46:4 | 15:10 25:7 | 164:9 169:24 | **wow** 84:7 |
| 46:9,15 47:25 | 31:20 43:11 | 170:20 171:1,8 | **write** 92:7 |
| 48:8,21 49:6 | 86:14 88:14 | 172:6,16,21 | **writes** 84:13 |
| 49:10,19 67:2 | 117:5 160:7,22 | 173:2 175:4,12 | **writing** 16:16 |
| 67:5,6 70:20 | 160:22 161:6 | 175:18 176:21 | **written** 78:22 |
| 70:22 71:7 | 168:2,6 | 177:8 182:12 | 137:8 175:21 |
| 79:20 81:10,14 | **west** 2:17 59:6 | **wolf** 2:17 | **wrote** 19:21 |
| 81:19 82:1,23 | 59:9 | **wondering** | 62:12 148:12 |
| 83:1,2 120:22 | **white** 10:3 | 61:2 | **wwalberg** 2:14 |
| 121:8 122:16 | **wi** 160:13,14 | **work** 7:1 10:2 | **x** |
| 122:19,20 | **wide** 71:14 | 13:14 34:11,13 | **x** 4:1,5 143:21 |
| 123:23 125:19 | **wife** 165:15 | 34:14,15,23,23 | **y** |
| 125:23 126:7 | **william** 2:10 | 34:25 35:2 | **yeah** 9:18,18 |
| 126:24 127:6 | **williams** 3:5 | 101:6,8 115:11 | 10:22 11:8,13 |
| 127:12 129:14 | 6:3 83:11 | 117:15 118:15 | 11:15 13:7,16 |
| 129:17,18 | 85:11 86:15 | 128:25 140:7 | 18:4,6,9 20:16 |
| 133:25 144:5,8 | | 140:23,25 | |

CONFIDENTIAL

**[yeah - zuckerberg]**                                                   Page 49

| | | |
|---|---|---|
| 20:16 23:6 | 21:8 27:17,19 | **youth**   100:16 |
| 24:1 25:7,17 | 31:14 32:13 | **youtube**   3:3 6:5 |
| 25:18,23 27:1 | 38:21 39:3 | 131:13,14 |
| 28:6 32:14 | 42:6 50:24 | 142:14,15 |
| 34:3,21 35:24 | 65:2 75:21,25 | 148:19 149:3 |
| 36:3 37:10,10 | 78:6,10 80:17 | 149:12,19,25 |
| 37:25,25 38:11 | 89:13 132:23 | 151:6,8,10,11 |
| 38:11,25 39:25 | 143:3 151:20 | 151:13,25 |
| 41:9 49:11 | 155:12,16 | 152:5,21 |
| 56:23 57:1 | 157:17 159:7 | 153:12,13,14 |
| 59:13 69:11,16 | 159:16 161:1 | 153:18,23,25 |
| 69:25 73:5 | 162:3,5,16,18 | 154:16,20 |
| 74:18 77:18,19 | 162:20 165:23 | 155:1,19,21,24 |
| 77:20 85:7,13 | 166:23 168:14 | 156:4,6,14,17 |
| 86:19 87:19 | 168:17 169:14 | 156:22,23,25 |
| 89:25 90:22 | 169:17 | 157:3,7,9,10 |
| 95:5,5,6,7 | **years**   6:21 9:16 | 159:7,8 163:2 |
| 96:23,23 99:11 | 9:18,19 10:12 | 163:3,9,15,22 |
| 99:13 100:11 | 11:2 12:12,22 | 164:6,6 177:22 |
| 107:2,6 108:17 | 13:4,19,20 | **z** |
| 109:8 110:12 | 22:10 23:5 | **zoned**   84:4 |
| 110:13 111:4 | 25:2 55:18 | **zoom**   2:10,16 |
| 111:11 119:11 | 82:2 93:14 | 3:10 29:6 |
| 119:25 124:15 | 95:6 104:6 | 177:11 |
| 131:8,13,14 | 113:21 123:13 | **zuckerberg**   2:9 |
| 135:13 137:2 | 162:25 167:25 | |
| 138:13 142:22 | **yep**   161:24 | |
| 146:9 151:12 | **yesterday** | |
| 152:12,13,17 | 155:2 | |
| 156:1 158:10 | **ygr**   1:4 | |
| 158:11 161:2 | **young**   87:12 | |
| 162:6 168:1 | 112:7 114:23 | |
| **year**   13:16 | 126:3 | |
| 18:18 20:1,22 | | |