**Exhibit 75**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2                    -   -   -
3    IN RE: SOCIAL MEDIA      : Case No.
     ADOLESCENT               : 4:22-MD-03047-YGR
4    ADDICTION/PERSONAL       : MDL No. 3047
     INJURY PRODUCTS          :
5    LIABILITY LITIGATION,    :
                              :
6    This Document Relates to:
     All Actions              :

7

8
                         -   -   -
9
                   AUGUST 22, 2025
10
                         -   -   -
11

12            Videotaped deposition of
13   JEFFREY MEYERS, taken pursuant to notice,
14   was held at the law offices of Kessler
15   Topaz Meltzer & Check, LLP, 280 King of
16   Prussia Road, Radnor, Pennsylvania 19087,
17   commencing at 9:05 a.m., on the above
18   date, before Amanda Dee Maslynsky-Miller,
19   a Certified Realtime Reporter and Notary
20   Public in and for the Commonwealth of
21   Pennsylvania.

22

23                       -   -   -
          GOLKOW, A VERITEXT COMPANY
24      877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

```
                                         Page 2
1    APPEARANCES:
2
3         KESSLER TOPAZ MELTZER & CHECK, LLP
          BY: TYLER S. GRADEN, ESQUIRE
4         280 King of Prussia Road
          Radnor, Pennsylvania 19087
5         (610) 667-7706
          tgraden@ktmc.com
6         Representing the Plaintiff
7
8
9         WILLIAMS & CONNOLLY LLP
          BY: JOSEPH S. SANDOVAL-BUSHUR, ESQUIRE
10        BY: SYDNEY J. VIGRAN, ESQUIRE
          680 Maine Avenue SW
11        Washington, DC 20024
          (202) 434-5000
12        jsandoval-bushur@wc.com
          Representing the Defendants,
13        YouTube, LLC, and Google LLC
14
15
16        SHOOK, HARDY & BACON L.L.P.
          BY: MATT DEPAZ, ESQUIRE
17        2555 Grand Boulevard
          Kansas City, Missouri 64108
18        (816) 474-6550
          mdepaz@shb.com
19        Representing the Defendants,
          Meta Platforms, Instagram, Siculus
20
21
22
23
24
```

CONFIDENTIAL

Page 3

```
 1    APPEARANCES: (Continued)
 2    VIA ZOOM:
 3
 4            KESSLER TOPAZ MELTZER & CHECK, LLP
              BY: JUSTIN J. SWOFFORD, ESQUIRE
 5            280 King of Prussia Road
              Radnor, Pennsylvania 19087
 6            (610) 667-7706
              jswofford@ktmc.com
 7            Representing the Plaintiffs
 8
 9
              CARELLA, BYRNE, CECCHI, BRODY &
10            AGNELLO, P.C.
              BY: DAVID G. GILFILLAN, ESQUIRE
11            5 Becker Farm Road
              Roseland, New Jersey 07068
12            (973) 994-1700
              dgilfillan@carellabyrne.com
13            Representing the Plaintiff,
              Irvington Public Schools
14
15
16            EILAND & BONNIN LAW FIRM
              BY: DAVID BONNIN, ESQUIRE
17            2200 Market Street
              Suite 501
18            Galveston, Texas 77550
              (409) 763-3260
19            dbonnin@eilandlaw.com
              Representing the Plaintiffs
20
21
22
23
24
```

CONFIDENTIAL

```
                                              Page 4
 1    APPEARANCES: (Continued)
 2    VIA ZOOM:
 3
 4            SEEGER WEISS LLP
              BY: CARLOS F. RIVERA, ESQUIRE
 5            55 Challenger Road
              Ridgefield Park, New Jersey 07660
 6            (973) 639-9100
              crivera@seegerweiss.com
 7            Representing the Plaintiffs
 8
 9
              BUCHANAN INGERSOLL & ROONEY PC
10            BY: JORDYNN E. JACKSON, ESQUIRE
              550 Broad Street
11            Newark, New Jersey 07102
              (973) 273-9800
12            jordynn.jackson@bipc.com
              Representing the Plaintiffs
13
14
15            MUNGER, TOLLES & OLSON LLP
              BY: STEPHANY REAVES, ESQUIRE
16            601 Massachusetts Avenue NW
              Suite 500 E
17            Washington, D.C. 20001
              (202) 220-1100
18            stephany.reaves@mto.com
              Representing the Defendant,
19            Snap, Inc.
20
21
22
23
24
```

CONFIDENTIAL

Page 5

```
1    APPEARANCES: (Continued)
2    VIA ZOOM:
3
         KING & SPALDING LLP
4        BY: KEVIN DONOVAN BOYCE, ESQUIRE
         Southeast Financial Center
5        200 South Biscayne Boulevard
         Suite 4700
6        Miami, Florida 33131
         (305) 462-6000
7        kboyce@kslaw.com
         Representing the Defendants,
8        TikTok Inc., ByteDance Inc.,
         ByteDance Ltd., TikTok Ltd., and
9        TikTok, LLC
10
11
12
13   ALSO PRESENT:
     William Chan, Videographer
14   Will Davis, Trial Technician
15
                    -   -   -
16
17
18
19
20
21
22
23
24
```

CONFIDENTIAL

```
                                              Page 6

 1                     -   -   -
 2                  I N D E X
 3                     -   -   -
 4
     Testimony of:  JEFFREY MEYERS
 5
 6      By Attorney Sandoval-Bushur            12
 7
 8                     -   -   -
 9                E X H I B I T S
10                     -   -   -
11
     NO.             DESCRIPTION                PAGE
12
     Meyers-1A       No Bates
13                   5/19/25 Expert Report,
                     Breathitt County School
14                   District                   13
15   Meyers-1B       No Bates
                     5/19/25 Expert Report,
16                   Charleston County School
                     District                   14
17
     Meyers-1C       No Bates
18                   5/19/25 Expert Report,
                     DeKalb County School
19                   District                   14
20   Meyers-1D       No Bates
                     5/19/25 Expert Report,
21                   Board of Education of
                     Harford County             15
22
23
24
```

CONFIDENTIAL

Page 7

```
 1                        -  -  -
 2                   E X H I B I T S
 3                        -  -  -
 4
    NO.            DESCRIPTION                 PAGE
 5
    Meyers-1E     No Bates
 6                5/19/25 Expert Report,
                  Irvington Public Schools    16
 7
    Meyers-1F     No Bates
 8                5/19/25 Expert Report,
                  Tucson Unified School
 9                District                     16
10  Meyers-2A     No Bates
                  7/25/25 Expert Reply Report,
11                Breathitt County School
                  District                     17
12
    Meyers-2B     No Bates
13                7/25/25 Expert Reply Report,
                  Charleston County School
14                District                     17
15  Meyers-2C     No Bates
                  7/25/25 Expert Reply Report,
16                DeKalb County School
                  District                     18
17
    Meyers-2D     No Bates
18                7/25/25 Expert Reply Report,
                  Board of Education of
19                Harford County               19
20  Meyers-2E     No Bates
                  7/25/25 Expert Reply Report,
21                Irvington Public Schools     19
22  Meyers-2F     No Bates
                  7/25/25 Expert Reply Report,
23                Tucson Unified School
                  District                     20
24
```

CONFIDENTIAL

```
                                              Page 8

 1                      -   -   -
 2                    E X H I B I T S
 3                      -   -   -
 4
     NO.              DESCRIPTION                    PAGE
 5
     Meyers-3         Meyers000011-0018
 6                    Asher-Meyers Invoices          43
 7   Meyers-4         Meyers000001-0010
                      Curriculum Vitae of
 8                    Jeffrey Meyers                 51
 9   Meyers-5         No Bates
                      Affidavit of Lisa Kathryn
10                    Allison                        124
11   Meyers-6         No Bates
                      Affidavit of Phil Watts        287
12
     Meyers-7         No Bates
13                    Affidavit of Will Noble        304
14   Meyers-8         No Bates
                      Affidavit of Daniel
15                    Prentice                       309
16   Meyers-9         No Bates
                      Plaintiff's First Supplemental
17                    Answers to Defendants'
                      Interrogatories to Charleston
18                    County School District,
                      Set 3                          329
19
     Meyers-10        No Bates
20                    Affidavit of Monika Davis      349
21   Meyers-11        No Bates
                      Plaintiff's Amended Objections
22                    and Responses to Defendants'
                      Interrogatories to Dekalb
23                    County School District,
                      Set 3                          364
24
```

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

```
                                              Page 9

 1                      -   -   -
 2                 E X H I B I T S
 3                      -   -   -
 4
    NO.            DESCRIPTION                  PAGE
 5
    Meyers-12      No Bates
 6                 Cost Estimates               368
 7  Meyers-13      No Bates
                   Video-Recorded Rule 30(b)(6)
 8                 Deposition of DeKalb County
                   School District By
 9                 Byron Schueneman             371
10  Meyers-14      No Bates
                   Plaintiff Board of Education
11                 of Harford County's Amended
                   Objections and Responses
12                 to Defendants'
                   Interrogatories, Set 3      386
13
    Meyers-15      No Bates
14                 Plaintiff's Third Amended
                   Answers to Defendants'
15                 Interrogatories To
                   Irvington Public Schools,
16                 Set 3                        400
17  Meyers-16      SM_TUSD_00185554
                   Reactive Work Order          438
18
    Meyers-17      SM_TUSD_00185580
19                 10/27/21 Letter,
                   Tucson Unified School
20                 District                     441
21
22
23
24
```

CONFIDENTIAL

Page 10

1                      -    -    -

2              D E P O S I T I O N   S U P P O R T   I N D E X

3                      -    -    -

4

5    Direction to Witness Not to Answer

6    Page Line     Page Line      Page Line

7    None

8

9

10   Request for Production of Documents

11   Page Line     Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line     Page Line      Page Line

17   11     1

18

19

20   Question Marked

21   Page Line     Page Line      Page Line

22   None

23

24

CONFIDENTIAL

Page 11

1                    -  -  -

2              (It is hereby stipulated and

3         agreed by and among counsel that

4         sealing, filing and certification

5         are waived; and that all

6         objections, except as to the form

7         of the question, will be reserved

8         until the time of trial.)

9                    -  -  -

10             VIDEO TECHNICIAN:   We are

11        now on the record.  My name is

12        William Chan.  I'm a videographer

13        for Golkow, a Veritext division.

14        Today's date is Friday, August

15        22nd, 2025.  The time is 9:05 a.m.

16        Eastern.

17             This video deposition is

18        being held at the offices of

19        Kessler Topaz Meltzer & Check, 280

20        King of Prussia Road, Radnor,

21        Pennsylvania, In Re:  Social Media

22        Adolescent Addiction Personal

23        Injury Products Liability

24        Litigation for the United States

CONFIDENTIAL

Page 12

1         District Court, Northern District

2         of California.  The deponent is

3         Jeffrey Meyers.

4              All counsel will be noted on

5         the stenographic record.  The

6         court reporter is Amanda Miller,

7         who will now swear in the witness.

8                   -  -  -

9              JEFFREY MEYERS, after having

10        been duly sworn, was examined and

11        testified as follows:

12                  -  -  -

13                 EXAMINATION

14                  -  -  -

15   BY ATTORNEY SANDOVAL-BUSHUR:

16        Q.    Good morning, Mr. Meyers.

17        A.    Good morning.

18        Q.    Could you please state your

19   name for the record?

20        A.    Jeffrey Meyers.

21        Q.    You've been deposed a number

22   of times before, correct?

23        A.    Yes, sir.

24        Q.    I expect that you know the

CONFIDENTIAL

Page 13

1    drill.  But just as a reminder, please
2    wait until I finish asking a question
3    before you begin giving your answer.
4              And if at any point today
5    you need a break, please just let me
6    know.
7         A.    I'll do my best.
8         Q.    Thank you.
9              ATTORNEY SANDOVAL-BUSHUR:
10        Let's go ahead and mark
11        Exhibits-1A through 1F.  I'll give
12        you a binder with all of those in
13        them.
14                   -   -   -
15             (Whereupon, Exhibit
16        Meyers-1A, No Bates, 5/19/25
17        Expert Report, Breathitt County
18        School District, was marked for
19        identification.)
20                   -   -   -
21             TRIAL TECHNICIAN:  Do you
22        want that Exhibit-1A and from
23        there?
24             ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 14

```
 1          Yes, correct.  1A will be 1A.
 2    BY ATTORNEY SANDOVAL-BUSHUR:
 3          Q.    Mr. Meyers, do you recognize
 4    Exhibit-1A as your expert report in the
 5    Breathitt case?
 6          A.    I do.  This is the report
 7    that I issued on May 19th, 2025, this
 8    year on behalf of Breathitt.
 9                    -  -  -
10             (Whereupon, Exhibit
11          Meyers-1B, No Bates, 5/19/25
12          Expert Report, Charleston County
13          School District, was marked for
14          identification.)
15                    -  -  -
16    BY ATTORNEY SANDOVAL-BUSHUR:
17          Q.    Do you recognize Exhibit-1B
18    as your expert report in the Charleston
19    case?
20          A.    I do.  This is the expert
21    report that I issued on May 19th, 2025,
22    on behalf of Charleston.
23                    -  -  -
24             (Whereupon, Exhibit
```

CONFIDENTIAL

Page 15

```
 1          Meyers-1C, No Bates, 5/19/25
 2          Expert Report, DeKalb County
 3          School District, was marked for
 4          identification.)
 5                    -   -   -
 6   BY ATTORNEY SANDOVAL-BUSHUR:
 7          Q.    Do you recognize Exhibit-1C
 8   as your expert report in the DeKalb case?
 9          A.    I do.  This is a copy of my
10   report, dated May 19th, 2025, on behalf
11   of DeKalb.
12                    -   -   -
13          (Whereupon, Exhibit
14          Meyers-1D, No Bates, 5/19/25
15          Expert Report, Board of Education
16          of Harford County, was marked for
17          identification.)
18                    -   -   -
19   BY ATTORNEY SANDOVAL-BUSHUR:
20          Q.    Do you recognize Exhibit-1D
21   as your expert report in the Harford
22   case?
23          A.    That is correct.  This is
24   the expert that I issued on May 19th,
```

CONFIDENTIAL

Page 16

1    2025, on behalf of the Board of Education

2    of Harford.

3                         -    -    -

4              (Whereupon, Exhibit

5         Meyers-1E, No Bates, 5/19/25

6         Expert Report, Irvington Public

7         Schools, was marked for

8         identification.)

9                         -    -    -

10   BY ATTORNEY SANDOVAL-BUSHUR:

11        Q.    Do you recognize Exhibit-1E

12   as your expert report in the Irvington

13   case?

14        A.    That's correct.  This is a

15   copy, on Tab 1E to the record, of my

16   report dated May 19th, 2025, on behalf of

17   Irvington Public Schools.

18                        -    -    -

19             (Whereupon, Exhibit

20        Meyers-1F, No Bates, 5/19/25

21        Expert Report, Tucson Unified

22        School District, was marked for

23        identification.)

24                        -    -    -

CONFIDENTIAL

Page 17

1   BY ATTORNEY SANDOVAL-BUSHUR:
2        Q.    Do you recognize Exhibit 1-F
3   as your expert report in the Tucson case?
4        A.    That is correct.  This is my
5   expert report, dated May 19th, 2025, on
6   behalf of Tucson.
7        Q.    And I will hand you a second
8   binder labeled Exhibits-2A through 2F.
9        A.    Thank you.
10                 -  -  -
11             (Whereupon, Exhibit
12             Meyers-2A, No Bates, 7/25/25
13             Expert Reply Report, Breathitt
14             County School District, was marked
15             for identification.)
16                 -  -  -
17   BY ATTORNEY SANDOVAL-BUSHUR:
18        Q.    Mr. Meyers, do you recognize
19   Exhibit-2A as your reply report in the
20   Breathitt case?
21        A.    I do.  This is the reply
22   report that I issued on May 20 -- sorry,
23   July 25th, 2025, on behalf of Breathitt.
24                 -  -  -

Page 18

 1              (Whereupon, Exhibit

 2          Meyers-2B, No Bates, 7/25/25

 3          Expert Reply Report, Charleston

 4          County School District, was marked

 5          for identification.)

 6                    -   -   -

 7   BY ATTORNEY SANDOVAL-BUSHUR:

 8          Q.    Do you recognize Exhibit-2B

 9   as your reply report in the Charleston

10   case?

11          A.    I do.   This is the expert

12   reply report that I issued on July 25th,

13   2025, on behalf of Charleston.

14                    -   -   -

15              (Whereupon, Exhibit

16          Meyers-2C, No Bates, 7/25/25

17          Expert Reply Report, DeKalb County

18          School District, was marked for

19          identification.)

20                    -   -   -

21   BY ATTORNEY SANDOVAL-BUSHUR:

22          Q.    Do you recognize Exhibit-2C

23   as the reply report in the DeKalb case?

24          A.    I do.   This is my expert

CONFIDENTIAL

Page 19

```
 1   report -- reply report, dated July 25th,
 2   2025, on behalf of DeKalb.
 3                     -   -   -
 4              (Whereupon, Exhibit
 5         Meyers-2D, No Bates, 7/25/25
 6         Expert Reply Report, Board of
 7         Education of Harford County, was
 8         marked for identification.)
 9                     -   -   -
10   BY ATTORNEY SANDOVAL-BUSHUR:
11         Q.    Do you recognize Exhibit-2D
12   as your reply report in the Harford case?
13         A.    I do.  This is the expert
14   reply report, dated July 25th, 2025, for
15   the Board of Education of Harford.
16                     -   -   -
17              (Whereupon, Exhibit
18         Meyers-2E, No Bates, 7/25/25
19         Expert Reply Report, Irvington
20         Public Schools, was marked for
21         identification.)
22                     -   -   -
23   BY ATTORNEY SANDOVAL-BUSHUR:
24         Q.    Do you recognize Exhibit-2E
```

CONFIDENTIAL

Page 20

1  as your reply report in the Irvington

2  case?

3          A.    I do.  This is the expert

4  reply report, dated July 25th, 2025, that

5  I issued on behalf of Irvington.

6                    -   -   -

7          (Whereupon, Exhibit

8          Meyers-2F, No Bates, 7/25/25

9          Expert Reply Report, Tucson

10          Unified School District, was

11          marked for identification.)

12                    -   -   -

13  BY ATTORNEY SANDOVAL-BUSHUR:

14          Q.    Do you recognize Exhibit-2F

15  as your reply report in the Tucson case?

16          A.    I do.  This is the expert

17  reply report, dated July 25th, 2025, that

18  I issued on behalf of Tucson.

19          Q.    Exhibits-1A through 1F and

20  2A through 2F are the complete set of

21  expert reports that you submitted for the

22  six bellwether school district cases,

23  which are Breathitt, Charleston, DeKalb,

24  Harford, Irvington and Tucson, correct?

CONFIDENTIAL

Page 21

1          A.    I believe that's correct.

2                And I've had an opportunity,

3    as we went through these, to go in and

4    check to make sure that these appear to

5    be complete copies of all of the six

6    original reports dated May 19th and all

7    of the complete reports of the reply

8    reports dated July 25th.

9          Q.    If I refer to the bellwether

10   cases, will you understand that I am

11   referring to the Breathitt, Charleston,

12   DeKalb, Harford, Irvington and Tucson

13   cases?

14         A.    I will.  Yes, sir.

15         Q.    Your expert reports,

16   Exhibits-1A through 1F and 2A through 2F,

17   contain a complete statement of all

18   opinions you may express in the

19   bellwether cases and the bases and

20   reasons for them, correct?

21         A.    At this time, correct, yes,

22   sir.

23         Q.    Is there anything in your

24   expert reports, Exhibits-1A through 1F

CONFIDENTIAL

Page 22

1    and 2A through 2F, that you believe

2    should be corrected?

3          A.    No, sir, not at this time as

4    I sit here.

5          Q.    Do you feel certain, sitting

6    here today, that there are no errors in

7    your damages calculations?

8          A.    I do.

9          Q.    Is there any opinion or

10   basis for any opinion that is not

11   contained in Exhibits-1A through 1F or 2A

12   through 2F that you intend to add between

13   now and trial?

14         A.    Could you ask that again,

15   please?

16         Q.    Are there any opinions that

17   you intend to offer at trial that are not

18   contained within Exhibits-1A through 1F

19   and 2A through 2F?

20         A.    At this time, the

21   accumulation of the 12 reports that we

22   went over contain all of my opinions as

23   of today's date for this deposition.

24               To the extent that

CONFIDENTIAL

Page 23

1   additional information would come to my

2   attention that would cause me to edit or

3   amend my report, those additional

4   opinions would be contained therein.

5              But as of today these

6   reports do contain all of the opinions I

7   intend to give and expect to give in

8   these bellwether trials, if you don't

9   mind me referring to them as such.

10       Q.   Your expert reports,

11  Exhibits-1A through 1F and 2A through 2F,

12  identify all the materials that you

13  considered in forming your opinions,

14  correct?

15       A.   At the time that those

16  reports were issued, they do.  Yes, sir.

17              And the reply reports

18  contain additional documents that were

19  reviewed in connection with the actual

20  reply to the rebuttal reports, as well as

21  confirming any opinions that were given

22  at the original reports.

23       Q.   There are no materials that

24  you considered in forming your opinions

CONFIDENTIAL

Page 24

1    that are not contained in Exhibits-1A

2    through 1F and 2A through 2F, correct?

3          A.    I agree with that, with the

4    caveat that there were things that were

5    received in connection with the reply

6    report, such as depositions that were

7    given after the date of the original

8    reports, that just further confirm or

9    bolster the opinions in the reports.

10              So if you take them

11   collectively as a whole, I agree with

12   you, yes, sir.

13         Q.    In forming your opinions in

14   these cases, you did not consider any

15   internal documents of any defendant, like

16   internal e-mails or presentations,

17   correct?

18         A.    You would have to be more

19   specific on that.

20              As you can go through the

21   materials reviewed, and perhaps we'll do

22   that today, there were a lot of range of

23   information.  Some of those vendor

24   expense reports had information that may

CONFIDENTIAL

Page 25

1    have contained e-mails or internal
2    documents attached to invoices, attached
3    to purchase orders.
4              So I cannot agree with you
5    on that.  I do believe that that
6    information is contained in the materials
7    reviewed for these six bellwethers and
8    the other reports, as well, that we're
9    not talking about today.
10        Q.    And I was asking about any
11    internal documents of any defendant, not
12    of the plaintiffs but of the defendants.
13              In forming your opinions in
14    these cases, did you consider any
15    internal documents of any defendant?
16        A.    I guess I'm confused that --
17    internal documents of the defendant.
18              So any e-mails or
19    correspondence or documents among the
20    defendants not produced in this case?
21        Q.    Did you -- you did not
22    review any documents in forming your
23    opinions in this case that were produced
24    by the defendants, correct?

CONFIDENTIAL

Page 26

1          A.    That's not correct.

2          Q.    What documents did you

3   review in this case that were produced by

4   the defendants?

5          A.    All of the rebuttal reports

6   that I cite in my materials reviewed,

7   including -- I believe there were four

8   reports prepared by Dr. Lakdawalla in

9   connection with a rebuttal analysis that

10  he performed on -- it was, Breathitt.  He

11  prepared a report on behalf of

12  Charleston.  He prepared a report on

13  behalf of Harford.  He prepared a report

14  on behalf of Tucson.

15         Q.    Yes.

16         A.    Matthew Springer prepared a

17  report on behalf of Tucson.  And

18  Mr. Hyman prepared a report on behalf of

19  DeKalb and --

20         Q.    Irvington, correct?

21         A.    I believe that's correct.

22  I'm just trying to find it to confirm.

23         Q.    Mr. Meyers, I'm not --

24         A.    Irvington.  Correct.

CONFIDENTIAL

Page 27

1          Q.     I'm not asking about expert
2    reports.  I'm asking about, setting aside
3    expert reports, documents produced by the
4    defendants in this litigation.
5               You did not --
6          A.     So you're asking me to
7    assume that documents produced by the
8    defendants do not include the expert
9    reports that were produced by the
10   defendants?  I got it.
11         Q.     You did not review any
12   documents, in forming your opinions in
13   this case, that were produced by the
14   defendants, correct?
15         A.     Other than the ones we just
16   discussed.
17         Q.     Other than the expert
18   reports?
19         A.     Yes, sir.
20         Q.     In forming your opinions in
21   this case, you did not consider any
22   deposition or other testimony of any
23   current or former employees of any
24   defendant, correct?

CONFIDENTIAL

Page 28

```
 1        A.    Any defendant?   I think
 2   that's fair.
 3        Q.    Were there any materials
 4   that you -- that would have been helpful
 5   to you in forming your opinions in this
 6   case that you were not able to review?
 7        A.    No, sir, not that I'm aware
 8   of today.
 9        Q.    In forming your opinions in
10   this case, you relied on documents that
11   were provided to you by plaintiffs'
12   attorneys, correct?
13        A.    Could you ask it again,
14   please?
15        Q.    In forming your opinions in
16   this case, you relied on documents that
17   were provided to you by plaintiffs'
18   attorneys, correct?
19        A.    Either directly or
20   indirectly.  All the documents went
21   through counsel in this particular case.
22              But the documents are what
23   was relied upon, not the information from
24   counsel.
```

CONFIDENTIAL

Page 29

1          So they did act as the
2   medium to provide documents to me.
3          Q.    And when you say "directly
4   or indirectly," do you mean that some of
5   the documents you relied on were provided
6   directly to you, Jeffrey Meyers, by
7   plaintiffs' attorneys and other documents
8   that you relied on were provided to your
9   support staff at Ashley -- at
10  Ascher-Meyers by plaintiffs' attorneys?
11         A.    No, that's not what I'm
12  saying.  Some of these were documents
13  that were requested by me through the
14  plaintiffs; so let me see the invoices,
15  let's see the general ledgers, please
16  provide those.
17              Other documents were
18  directly requested by me, such as
19  interview Byron Scheuneman of DeKalb,
20  looking at the documents.  And then he
21  produced them to counsel to produce to
22  me.
23              So some of them were me
24  asking for the documents generally and

CONFIDENTIAL

Page 30

1    not necessarily speaking to a
2    representative.  And in other cases, as
3    detailed in the report, it was me
4    directly speaking to the CFO or the head
5    of the financial department to request
6    information that would be utilized in
7    connection with my report.
8           Q.    There were no documents that
9    you relied on in this case that you
10   received directly from an employee of one
11   of the plaintiffs, correct?
12          A.    I know that happened in one
13   or two cases.  But I don't think it's on
14   any of these six bellwethers.
15          Q.    Okay.
16          A.    But it would have been to
17   counsel, and me copied on the e-mail, as
18   a result of a phone call.  So it all went
19   through counsel, I guess I would say, but
20   may have come directly from an individual
21   at one of the schools.
22          Q.    All of the documents that
23   you relied on in calculating damages in
24   these six bellwether cases were provided

CONFIDENTIAL

Page 31

1    to you by plaintiffs' attorneys, correct?

2              A.    Directly or indirectly, as

3    we just discussed.

4              Q.    Did you receive any

5    assistance from anyone other than

6    plaintiffs' attorneys in preparing your

7    reports?

8              A.    I do want to go back and

9    clarify one of my answers.

10              Some of the documents were

11   actually pulled by myself.  They are in

12   the materials reviewed.  I'm just

13   thinking about this now and, perhaps, we

14   should go through these one by one, while

15   I answer these questions.

16              But, for instance -- let's

17   see.  So a good example would be in

18   Charleston.  There were publicly

19   available information on Charleston, such

20   as the budget reports.  They were

21   provided by counsel.  But they were also

22   downloaded by me directly as publicly

23   available at my review.

24              So if you'd like to go

CONFIDENTIAL

Page 32

1    through that, I'm happy to go through all

2    the materials reviewed and tell you which

3    ones were not given by counsel.

4              But anything that would have

5    an e-mail -- not an e-mail but have a

6    website address, such as Number 3, budget

7    reports, or Number 2, audited financial

8    statements for Charleston, those were

9    actually downloaded by me or my firm

10   directly.

11             So there is a third bucket.

12   It's either plaintiffs' counsel directly

13   or indirectly or downloaded by me

14   directly in connection with my analysis

15   on publicly available information.

16             Thank you for allowing me to

17   clarify.

18        Q.    Did you receive any

19   assistance from anyone other than

20   plaintiffs' attorneys in preparing your

21   reports?

22        A.    Assistance --

23             ATTORNEY GRADEN:  Object to

24        form.

CONFIDENTIAL

Page 33

1              THE WITNESS:   Outside of my
2         firm?
3  BY ATTORNEY SANDOVAL-BUSHUR:
4         Q.    Let's start with assistance
5  from within your firm.
6              And your firm is called
7  Asher-Meyers, correct?
8         A.    It is.
9         Q.    What assistance did you
10  receive from individuals from within your
11  firm, Asher-Meyers, in preparing your
12  reports?
13         A.    Sure.  So at my direction, I
14  had a number of associates who assisted
15  me in this case.  Generally, their role
16  was in connection with accumulating data,
17  organizing the files, preparing
18  spreadsheets such as have been
19  incorporated with this report, to
20  organize the documents for me to analyze.
21              So it was largely a
22  data-gathering exercise, as I'm sure
23  we'll talk about today.
24              This forensic accounting was

CONFIDENTIAL

Page 34

1    millions of invoices and general ledger
2    reports, hundreds of thousands of pages
3    of documents that were having to be
4    culled down to the exhibits as they are
5    here.
6              Vendors of all sorts over
7    all different mechanisms.  When you're
8    looking at the general ledgers or vendor
9    expense reports for these schools, it's a
10   lot of information and data.
11             So they helped organize the
12   data and get the data in a form that I
13   could analyze it.  And so that was their
14   role generally.
15        Q.    In this case, you received
16   assistance from Harold Asher, David
17   Curtin, Chris Johnson, Taylor Jones?
18        A.    Jobs.
19        Q.    Jobs?
20        A.    Jobs.
21        Q.    Jobs.  And Caroline Marks,
22   who changed her name?
23        A.    She did.  She got married in
24   May -- well, first week of June.  I

CONFIDENTIAL

Page 35

1    should put that on the record accurately.

2         Q.    So Caroline Marks and

3    Caroline Towns are the same person?

4         A.    That is correct.  She is.

5         Q.    So I'll just ask the

6    question so it's a little bit clearer.

7              In this case, you received

8    assistance from Harold Asher, David

9    Curtin, Chris Johnson, Taylor Jones --

10         A.    Jobs.

11         Q.    -- Jobs, sorry, thank you --

12    and Caroline Towns, correct?

13         A.    Town, not with an S.

14         Q.    Town.

15              What did -- what assistance

16    did you receive from Harold Asher?

17         A.    Harold Asher and I spoke

18    largely about the theoretical components

19    on the lost-profits calculation that's

20    been done here in the forensic

21    accounting.

22              So our discussions were more

23    about the formulation of how to prepare

24    and finalize the actual lost profits

Page 36

1  calculations as you see on Exhibit-1.

2      Q.    What assistance did you

3  receive from David Curtin?

4      A.    Administrative, kind of

5  clerical information, as far as

6  organizing documents, putting them in

7  buckets, identifying what we had and

8  preparing the spreadsheets that take the

9  information from those PDFs and put them

10  into a more usable format.

11      Q.    What are Mr. Curtin's

12  qualifications?

13      A.    Mr. Curtin has a Master's

14  Degree in accounting.  I think he has an

15  MBA -- no, it's an MBA not a -- an MBA.

16  He's a certified valuation analyst with

17  the NACVA, the National Association of

18  Certified Valuation Analysts.

19          And he's been working in

20  this role with me as an associate for

21  almost four years now.

22      Q.    What assistance did you

23  receive from Chris Johnson?

24      A.    Chris Johnson was data

CONFIDENTIAL

Page 37

1    entry.

2            Q.    What assistance did you

3    receive from Taylor Jobs?

4            A.    Taylor Jobs acts mostly as

5    my assistant.  It would be mostly data

6    entry or organizing the documents and

7    putting them into folders as I request.

8            Q.    What assistance did you

9    receive from Caroline Town?

10           A.    Caroline would have assisted

11   with preparing spreadsheets and working

12   through some of the forensic accounting

13   with me in this matter.

14           Q.    Did you receive any

15   assistance from anyone outside of the

16   Asher-Meyers law firm?

17           A.    Not a law firm.

18           Q.    Sorry.  Thank you for that.

19   I apologize.

20           A.    I just want the record to be

21   clear.  We are not a law firm.

22           Q.    No, I -- yes.

23                 Did you receive any

24   assistance from anyone other than

CONFIDENTIAL

Page 38

1    individuals at the Asher-Meyers firm and

2    plaintiffs' attorneys in preparing your

3    reports?

4            A.     Excluding the interviews

5    that I had directly with either plaintiff

6    witnesses or plaintiff personnel as

7    detailed in my report or including them?

8            Because I did have those

9    discussions as well, which that would be

10   outside of my firm or outside of

11   plaintiffs' counsel.

12           But those would be the three

13   buckets, the people inside my firm,

14   plaintiff counsel and documents that have

15   been received by them, and then the

16   interviews that were done by me as

17   detailed in all of the six reports.

18           Q.     The plaintiffs' attorneys in

19   this case hired you to serve as an expert

20   witness, correct?

21           A.     I believe that's correct.

22           Q.     Which of plaintiffs'

23   attorneys specifically hired you?

24           A.     I don't know the answer to

CONFIDENTIAL

Page 39

1    that question.  There's a lot of
2    attorneys in this case.  I do not know
3    who specifically hired me.
4            I think that the invoices go
5    to a number of firms.  So I guess you
6    would have to ask them specifically who
7    hired me.
8        Q.    Which plaintiffs' attorneys
9    first contacted you to serve as an expert
10   witness in this case?
11       A.    It would have been attorneys
12   at this firm here, Kessler Topaz.
13       Q.    And who specifically from
14   Kessler Topaz?
15       A.    I don't recall directly if
16   it was Melissa Yeates or Tyler Graden,
17   but it would have been one of the two of
18   them.
19       Q.    Were you given an assignment
20   when you were hired?
21       A.    I don't know that I was
22   given an assignment, necessarily, at the
23   time of my hiring.
24            We were talking about

CONFIDENTIAL

Page 40

1  calculating damages, and that's an expert

2  role that I have done throughout my

3  career.

4        Q.    Did your understanding of

5  your assignment in this case change at

6  any point during the course of your work?

7        A.    I don't think so.  I mean,

8  it was always contemplated that I was

9  going to do past lost damages, basically,

10  a calculation, and a forensic accounting,

11  which is why I was hired, to do a

12  forensic accounting of costs.

13              And that's effectively what

14  the reports that I've issued have done.

15              You'd have to ask them if

16  they had any other thoughts in mind of

17  things other than what I did that I could

18  have done.

19              But this was the role that I

20  was asked to prepare in this, and I did

21  do it.

22        Q.    Was it always your

23  assignment to use allocation percentages

24  in your damages calculations that were

Page 41

1    derived from either employee affidavits
2    or interrogatory responses?
3            A.    Could you ask that again?
4            Q.    Was it always your
5    assignment to use allocation percentages
6    in your damages calculations that were
7    derived from either employee affidavits
8    or interrogatory responses?
9            A.    I don't know that it was or
10   wasn't.  The original scope was to
11   analyze hundreds if not thousands of
12   vendors, organize them, basically do a
13   forensic accounting on what the costs
14   were by vendor and be in a position to
15   work with counsel as to what the damages
16   would be in any particular case.
17            And so the allocation
18   percentages which are derived directly
19   from the persons most knowledgeable in
20   this case, either through verified
21   interrogatory responses or affidavits,
22   declarations, provided a component of
23   what went into that damages calculation.
24            Q.    You get paid for your work

Page 42

1  as an expert witness, correct?

2          A.    I do.

3          Q.    How much are you getting

4  paid for your work in this case?

5          A.    I'm getting paid on an

6  hourly basis.

7          Q.    You are getting paid $475 an

8  hour for your work in this case, correct?

9          A.    I believe that's correct.

10         Q.    And you are compensated for

11  the first hour of a deposition at $950 an

12  hour; is that correct?

13         A.    That is correct.  For

14  depositions and trials.

15         Q.    All work other than the

16  first hour of any deposition or trial

17  testimony that you do in this case is

18  billed at $475 an hour; is that correct?

19         A.    That's what it is for this

20  year.  It's subject to go up in 2026.

21  But that is correct as of this point in

22  time.

23              ATTORNEY SANDOVAL-BUSHUR:

24         Let's mark Tab 3 as Exhibit-3.

CONFIDENTIAL

Page 43

```
 1                    -   -   -
 2               (Whereupon, Exhibit
 3          Meyers-3, Meyers000011-0018,
 4          Asher-Meyers Invoices, was marked
 5          for identification.)
 6                    -   -   -
 7   BY ATTORNEY SANDOVAL-BUSHUR:
 8          Q.    Mr. Meyers, do you recognize
 9   Exhibit-3 as a copy of the invoices for
10   Asher-Meyers' work on this case?
11          A.    I do.
12          Q.    And the invoices in
13   Exhibit-3 contain the billings for you as
14   well as other people affiliated with
15   Asher-Meyers, correct?
16          A.    That is fair, sir.
17          Q.    You have billed a little
18   over $185,000 for your time between
19   December 2024 and July 2025.
20               Does that sound right to
21   you?
22          A.    I have no idea.  I can -- if
23   you want to give me a pad or let me pull
24   up my phone and do a calculation, I can
```

CONFIDENTIAL

Page 44

1  do it very quickly for you.

2              But I have not done that

3  math.

4      Q.    Would it surprise you if you

5  have been paid $185,000 for your work so

6  far on this case?

7      A.    Let me go ahead and check

8  it, because I don't know that it would

9  surprise me or not.

10             But I'm just going to take

11  out my phone and pull out a calculator

12  real quick.

13             So a couple of things.  One,

14  to clarify, I don't get paid, my firm

15  gets paid.

16             But subject to that

17  clarification, for the time that

18  Jeffrey E. Meyers has worked, Jeffrey E.

19  Meyers's time has been compensated to

20  Harold -- to Asher-Meyers at $159,255.

21             That's what has been paid,

22  which is your question.

23      Q.    Okay.

24      A.    There's additional time that

CONFIDENTIAL

Page 45

1    has been billed that has not been paid as
2    of the date of this deposition.  So if
3    you'd like me to add up the rest of that
4    and see how much has been billed through
5    the end of July, I'm happy to -- I still
6    have the number up, I'm happy to make
7    that clarification.
8            Q.    Please do.
9            A.    Sure.
10            So through July, the biller
11    at Asher-Meyers, Jeffrey E. Meyers, which
12    is me, has billed time totaling $181,075.
13            I did that slow for you.
14            Q.    Okay.
15            A.    Okay.
16            Q.    So there is a little over
17    $20,000 of your time that you have billed
18    but you have not yet been paid?
19            A.    That's fair.
20            And I say that as of the
21    date this invoice went out, it had not
22    been paid.  I don't do the billing at my
23    firm.  So it may have been paid between
24    when this July bill went out, which

CONFIDENTIAL

Page 46

1    probably would have been, my guess is ten

2    days ago and today.

3              So I don't know that it

4    hasn't been paid.  But as I sit here

5    right now, I'm not aware of whether it

6    is -- has or has not.  But according to

7    these bills, it had not at the time it

8    went out.

9         Q.    Between December 2024 and

10   July 2025, the biller at Asher-Meyers,

11   Jeffrey E. Meyers, which is you, has

12   billed time totalling $181,075, correct?

13        A.    That's what I calculated as

14   well, yes, sir.

15        Q.    Are you a co-owner of the

16   Asher-Meyers firm?

17        A.    I am, yes, sir.

18        Q.    What percentage of

19   Asher-Meyers do you own?

20        A.    I don't know how that's

21   relevant here today.

22        Q.    Are you refusing to answer

23   my question?

24        A.    I'm just saying I don't

CONFIDENTIAL

Page 47

1    think it's relevant here today.

2              I'm a co-owner with Harold

3    Asher.  We are the two owners of

4    Asher-Meyers.

5         Q.    What percentage of

6    Asher-Meyers do you own?

7         A.    I'm not going to answer that

8    today.

9         Q.    Okay.  Do you receive any

10   portion of the profits of Asher-Meyers?

11        A.    I would say indirectly; not

12   directly, but indirectly.

13        Q.    What do you mean?

14        A.    Well, Asher-Meyers -- I'll

15   give you a little bit of leeway on this.

16             Asher-Meyers is owned by two

17   entities, Jeffrey E.  Meyers, Consulting,

18   and Harold A. Asher, CPA, LLC.  And those

19   entities do not share profit-sharing,

20   because we get consulting fees based on

21   our ownership in the business and the way

22   that we provide our work.

23        Q.    Are you a 100 percent owner

24   of Jeffrey E. Meyers Consulting?

Page 48

1           A.    I don't know how that's
2     relevant.  But I'll tell you that I am.
3           Q.    And so the more money that
4     Asher-Meyers earns, the more money that
5     Jeffrey E. Meyers Consulting earns and
6     the more money you earn, correct?
7           A.    That may or may not be the
8     case.
9           Q.    Why would that not be the
10    case?
11          A.    Because sometimes Jeffrey E.
12    Meyers may not have an interest in
13    something that Asher-Meyers owns or
14    earns.
15          Q.    Okay.  Do you receive any
16    portion of the time that is billed by
17    people other than you who worked on this
18    matter at Asher-Meyers?
19          A.    I would say indirectly,
20    perhaps, yes.
21          Q.    How do you receive money
22    relating to the time billed by people
23    other than you who worked on this matter
24    at Asher-Meyers?

CONFIDENTIAL

Page 49

1          A.     Well, Asher-Meyers is an
2    entity and a firm, and it has overhead.
3    Overhead has to be paid.
4               And to the extent that there
5    are additional amounts throughout the
6    course of a year that are in my excess of
7    what that overhead would otherwise be,
8    the two owners of Asher-Meyers would
9    participate in a percentage of that
10   additional earning, if you will, or that
11   profit.
12         Q.     Do you have -- your invoices
13   that we received do not include the time
14   that you spent working on this case in
15   the month of August 2025, correct?
16         A.     That's correct.
17         Q.     How much time have you spent
18   working on this case in the month of
19   August 2025?
20         A.     I do not know.
21         Q.     And do you anticipate
22   billing for additional work in this case
23   between now and trial?
24         A.     If there's additional work

CONFIDENTIAL

Page 50

```
 1   performed by me on an hourly basis for me
 2   or anyone at my firm, then it will be
 3   billed in connection with my engagement
 4   with this firm on an hourly basis, yes,
 5   sir.
 6            Q.    Looking at calendar year
 7   2025, what percentage of your total
 8   compensation has come from your work on
 9   this case?
10            A.    I wouldn't be able to tell
11   you.
12            Q.    To prepare for this
13   deposition, did you meet with plaintiffs'
14   attorneys?
15            A.    I did.
16            Q.    How many meetings did you
17   have with plaintiffs' attorneys?
18            A.    Two.
19            Q.    How long were each of those
20   meetings?
21            A.    I don't know exactly.  I met
22   on Wednesday afternoon for a few hours
23   and then intermittently throughout the
24   day yesterday.  So there was time we were
```

CONFIDENTIAL

Page 51

1    meeting and time we weren't meeting.

2                   So, you know, over the last

3    two days I would say I've been at this

4    office maybe 11 or 12 hours.  So some

5    period less than that.

6          Q.    And did you meet with

7    attorneys from the Kessler Topaz firm to

8    prepare for your deposition today?

9          A.    I did.

10          Q.    Did you meet with any

11    attorneys who are not affiliated with the

12    Kessler Topaz firm to prepare for your

13    deposition?

14          A.    I believe there was one

15    other attorney yesterday who was not

16    affiliated with Kessler Topaz.

17                   I don't know that he's not,

18    but I do not believe that he was.

19          Q.    Who was that?

20          A.    I believe it was Mr. Carlos

21    Rivera.

22                   ATTORNEY SANDOVAL-BUSHUR:

23          Let's mark Tab 4 as Exhibit-4.

24                        -   -   -

CONFIDENTIAL

Page 52

```
 1              (Whereupon, Exhibit
 2         Meyers-4, Meyers000001-0010,
 3         Curriculum Vitae of Jeffrey
 4         Meyers, was marked for
 5         identification.)
 6                   -   -   -
 7    BY ATTORNEY SANDOVAL-BUSHUR:
 8         Q.    And, Mr. Meyers, I will
 9    represent to you that this is the copy of
10    your CV that your counsel provided to us
11    earlier this week.
12              Is Exhibit-4 the current
13    version of your CV?
14         A.    I believe it is.  That's
15    correct.
16         Q.    You live and work in
17    Louisiana; is that correct?
18         A.    Well, I live in Louisiana.
19    I work all throughout the country.  But
20    my office is located in Louisiana.
21         Q.    You are a professional
22    expert witness, correct?
23         A.    That -- I perform expert
24    witness work as one of the things that I
```

CONFIDENTIAL

Page 53

1   do.  I don't particularly say a
2   professional expert witness.  I'm a
3   litigation consulting expert who
4   testifies in trials.
5              But other than that
6   distinction, that is one of the hats that
7   I wear.
8        Q.   Do you professionally offer
9   your services as an expert witness in
10  litigation and other legal disputes?
11       A.   Well, I offer my services in
12  the fields that I'm qualified, whether
13  it's lost profits or business valuation,
14  forensic accounting.
15             And depending on whether or
16  not, you know, it goes to trial and they
17  need somebody to testify, that's the only
18  time you become the witness.
19             Otherwise, I do expert work
20  on all those fields.  I would say the
21  vast majority of cases don't go to
22  deposition or trial; and there's no
23  expert witness work that's being
24  performed in those cases.

CONFIDENTIAL

Page 54

1          Q.     Do you professionally offer

2    your services as an expert witness or

3    expert consultant in litigation and other

4    legal matters?

5          A.     I would say expert

6    consultant.  I'm comfortable answering

7    that question that I do offer my services

8    as a consulting expert in the fields in

9    which I've been, you know, qualified or

10   are within my scope of range.

11         Q.     Is serving as a paid expert

12   a major part of your professional work?

13         A.     As opposed to serving as an

14   unpaid expert?

15         Q.     Sure.

16         A.     I would say that both of

17   them are a part.  There's oftentimes that

18   I serve as an expert in my capacity and

19   don't get paid.

20                So it's within the role of

21   what I do to both do expert work or

22   additional business consulting that's not

23   in the firm of expert consulting, if you

24   will.  And some of those cases involve

CONFIDENTIAL

Page 55

1   being paid and some of them don't.

2        Q.    How much of your

3   professional time is spent serving as an

4   expert in legal matters?

5        A.    We didn't go through all of

6   the initial formalities.  So I'm going to

7   make a statement.

8             I'm asking you to

9   re-clarify.  Are we -- I'm going to say

10  litigation consulting.  Are you okay with

11  that clarification on litigation

12  consulting?

13            Because you want to say

14  legal matters, and I don't want to get

15  into a bag that I know what a legal

16  matter is or not.

17            I might help with a business

18  consulting engagement that talks about

19  leases that you may say is a -- is a

20  legal matter, but I would not consider it

21  a litigation consulting if it has no

22  dispute involved between two parties.

23            So either please re-clarify

24  your question or define the terms,

CONFIDENTIAL

Page 56

1   because I don't want to misstate the
2   testimony that I'm giving.
3          Q.    How much of your
4   professional time is spent serving as an
5   expert in connection with litigation?
6          A.    I would say somewhere -- and
7   it ranges from year to year -- between 85
8   and 95 percent.
9          Q.    What percentage of your
10  income comes from serving as an expert in
11  connection with litigation?
12         A.    I wouldn't know the answer
13  to that.
14         Q.    What do you hold yourself
15  out as an expert in?
16         A.    Okay.  Let's see if I can do
17  it.
18               I am an expert in forensic
19  accounting.  I am an expert in lost
20  profits.  I'm an expert in business
21  valuation.  I've been qualified and
22  tendered and accepted without exception
23  as an expert economist, statistician,
24  fraud examiner.

CONFIDENTIAL

Page 57

1          I have -- and some of these
2    are on my CV.  I have been qualified in
3    the calculation of income,
4    determinations, securities, damages, lost
5    value.
6               I'm trying to think.
7               Community property partition
8    issues, I'll just say generally.
9               I guess that's the vast
10   majority.  If you'd like me to read back
11   what I said and see if I think of
12   anything else.
13              But it's -- I've been
14   qualified and tendered in quite a number
15   of different fields.
16        Q.    How many times have you been
17   hired by attorneys to serve as an expert
18   in connection with litigation?
19        A.    I would not know the answer
20   to that question over my 21-year career.
21        Q.    Have you been hired by
22   attorneys to serve as an expert in
23   connection with hundreds of litigation
24   matters?

CONFIDENTIAL

Page 58

1          A.    Sure.

2          Q.    I believe I counted on your

3    CV that there were 60 cases in which you

4    served as an expert in the past four

5    years.

6                Does that sound

7    approximately right to you?

8          A.    Would you like me to count

9    them?

10         Q.    No.

11               Are you able to say whether

12   that would be in the ballpark?

13         A.    Again, this is -- our CV --

14   my CV is updated.  Harold's CV is updated

15   every time we testify in a case.

16               So I haven't counted it

17   recently.  It normally ranges, over a

18   four-year period, in the average -- sixty

19   sounds okay without me going through and

20   counting these seven pages.

21               But I'm taking your word for

22   that.

23         Q.    And you are not able to say

24   how many cases, over the course of your

Page 59

1    career, you have served as an expert in;
2    is that correct?
3          A.    Okay.  Well, so that's a
4    different question.
5              The answer is no, I cannot.
6    But these cases, these 60, are only cases
7    in which I provided deposition or trial
8    testimony.  So these do not represent the
9    cases that I've served in in the last
10   four years.
11         Q.    In a majority of the cases
12   where you've served as an expert were you
13   an expert for plaintiffs?
14         A.    Absolutely not.
15         Q.    In a majority of the cases
16   where you served as an expert, you were
17   an expert for defendants?
18         A.    Absolutely not.  So we have
19   to go break it down.  So if you'd like, I
20   will try to give you an explanation of
21   how it's broken down.  Because my
22   particular side of Asher-Meyers is
23   different than Mr. Asher's.
24              So I'm going to assume,

CONFIDENTIAL

Page 60

1    first of all, that you're asking me about
2    Jeffrey Meyers and not Asher-Meyers.
3            Q.    Correct.
4            A.    Okay.  Jeffrey Meyers
5    normally performs consulting services in
6    three different buckets in the litigation
7    category.
8                 One, I'll call them economic
9    loss calculations.  You may call them
10   personal injury, wrongful death, wrongful
11   termination, medical malpractice, present
12   values of future life care plans.
13                In those cases, I have a
14   very different kind of split, okay.  So
15   my plaintiff work on cases in that, and I
16   don't have it measured exactly, but
17   generally, if it's cases in the door,
18   like, just hired and not time spent, it's
19   probably 70 to 80 percent plaintiff on
20   just that bucket.
21                And then as it relates to
22   time actually spent, closer to 50/50.
23   One of the larger clients that I have is
24   the Department of Justice.  I represent

CONFIDENTIAL

Page 61

1    the Department of Justice in calculating

2    economic damages for military hospitals

3    throughout the United States as one of

4    the things that I do.

5                      So when I get involved in

6    those cases, whether it's a wrongful

7    death case or present value of a future

8    life care plan on a catastrophic injury,

9    the time spent on that dwarfs the amount

10   of time spent on a car accident case

11   where I'm calculating somebody's three

12   weeks of lost earnings.

13                     So 50/50 if you're looking

14   at it on hours spent; 70 or 80/20 --

15   20/30 on plaintiff in and out the door.

16                     The other bucket, which

17   is probably where about 30 to 40 percent

18   of the work I do is, divorce cases.

19                     Would you like to skip that

20   bucket?  Because it really doesn't matter

21   if you're a plaintiff or defendant in

22   that case.

23          Q.    We can skip that bucket.

24          A.    But a lot of those cases, I

CONFIDENTIAL

Page 62

1    am the defendant.  So I just -- that's
2    why I can't give you a number.
3                The other bucket that I have
4    is everything else.  It could be white
5    collar crime, fraud cases in federal
6    court, criminal stuff.  It could be for
7    lost profits.  It could be business
8    interruption.
9                That's another one I've been
10   qualified as an expert in, a lot of
11   business interruption.
12               It could be business
13   interruption cases.  It could be lost
14   profits cases.  It could be securities
15   arbitration work.  And in those cases,
16   some years it's almost 100 percent
17   defendants; some years it's almost
18   100 percent plaintiff.
19               Hurricane Ida came through
20   Louisiana in 2021.  I represented a
21   number of insurance companies during
22   Hurricane Ida that a lot of them went to
23   trial or deposition.  You'll see some of
24   them on here.  That was all defense work.

CONFIDENTIAL

Page 63

1          So the work that we perform

2   at Asher-Meyers, plaintiff work, defense

3   work, I would generally say it's about

4   50/50 over the period of time I've been

5   doing this.

6          But at any particular time,

7   the measurement may be different.  I've

8   never done that measurement, though.

9      Q.    Mr. Meyers, do you have a

10  degree in accounting?

11     A.    I do not, no, sir.

12     Q.    Are you a certified public

13  accountant, or CPA?

14     A.    I am not.

15     Q.    Are you an accountant?

16     A.    I am.

17     Q.    You are not a teacher,

18  correct?

19     A.    I am.

20     Q.    Sorry.  You are not a K -- a

21  teacher in a K-12 educational setting,

22  correct?

23     A.    I have.

24     Q.    When were you a teacher in a

CONFIDENTIAL

Page 64

1   K-12 educational setting?

2          A.    What was the year of that?

3   2001, '02, I taught summer school for a

4   local high school in New Orleans while I

5   was in grad school.

6          Q.    Okay.  Since teaching summer

7   school at a local high school in New

8   Orleans in approximately 2001 to 2002 --

9          A.    It was probably a little

10  later than that, now that I'm thinking

11  about it.  It was probably '04, '05.

12         Q.    Since teaching summer school

13  at a local high school in New Orleans in

14  approximately 2004 to 2005 have you

15  worked in any K-12 educational setting?

16         A.    Can you define "work"?  Do

17  you mean teach?

18         Q.    Well, let's start there.

19               Since teaching summer school

20  at a local high school in New Orleans

21  from approximately 2005 -- let me start

22  that over.

23               Since teaching summer school

24  at a local high school in New Orleans

CONFIDENTIAL

Page 65

1  from approximately 2004 to 2005, have you

2  taught in any K-12 educational setting?

3          A.    I have not taught in any

4  K-12 setting during that period

5  subsequent to the period in which I

6  taught summer school at a local high

7  school in New Orleans.

8          Q.    Since teaching summer school

9  at a local high school in New Orleans

10  from approximately 2004 to 2005, have you

11  been employed in any K-12 educational

12  setting?

13          A.    I do not believe I have been

14  employed in any K-12 educational setting

15  subsequent to that period.  I think

16  that's fair.

17          Q.    Since teaching summer school

18  at a local high school in New Orleans

19  from approximately 2004 to 2005, have you

20  worked at all in a K-12 educational

21  setting?

22          A.    I have.

23          Q.    How so?

24          A.    I've served on a number of

CONFIDENTIAL

Page 66

```
 1   boards at schools in New Orleans.  That
 2   would be, you know, in connection with --
 3   some of it was fundraising, some of it
 4   was legacy donation, some of it is simply
 5   sitting on the board now as a parent.  As
 6   a high school student I've served on
 7   volunteer boards.
 8              So I have served on a number
 9   of boards, if you will, for local high
10   schools in the K-12 setting over the
11   last -- I guess we'll call it 20 years,
12   if you will.
13        Q.    Have you served on a school
14   board?
15        A.    I guess you'll have to
16   define -- I've served on -- I don't know
17   the answer to the question as you're
18   defining it.
19              I have served formally on
20   certain boards.  There was a legacy
21   fundraising board for a local high school
22   that I sat on for a number of years.
23              I don't know how you would
24   define school board.  I mean, it was a
```

CONFIDENTIAL

Page 67

1   formal board for the school, but it

2   wasn't in connection with, necessarily,

3   that Board of Education, if that helps.

4          Q.    So you understand that

5   school districts are generally governed

6   by a school board?

7          A.    Boy.  That's a very loaded

8   question.

9                I understand in the cases

10  that we're talking about here that is

11  generally the case.  In New Orleans, I

12  would say that you're probably not

13  correct.  A lot of the schools in New

14  Orleans are governed by the Archdiocese,

15  which is not a school board, it's a

16  religious organization.

17               So I think that that

18  generalization is not necessarily true on

19  all places.  But for the purposes of what

20  we're talking about, I will accept that

21  hypothet, that school boards in a public

22  setting are generally served by a board

23  where people will sit on that.

24               And I have not sat on one of

Page 68

1  those, if that's the question you're
2  trying to ask me.
3        Q.    So have you ever served on
4  the school board whose responsibility it
5  is to govern a school district?
6        A.    I have not.
7        Q.    And have you ever served on
8  a school board whose responsibility it is
9  to govern a school?
10       A.    I would say a qualified no.
11             Only to the extent that when
12  you're doing actual legacy donation
13  fundraising, which is part of the
14  endowment committee, that money does
15  govern the school in some capacity.
16             So I would say probably not.
17  But they may distinctly disagree with me,
18  that by me serving on that board, which
19  was part of the endowment committee, that
20  that does, in fact, serve the school's
21  purposes.
22       Q.    You served on a fundraising
23  board for a school, correct?
24       A.    It was partly fundraising

CONFIDENTIAL

Page 69

1    but also part endowment stuff.  But yes,

2    that's fair.

3              Q.    What was that school?

4              (Reporter clarification.)

5              THE WITNESS:  Brother Martin

6         High School.

7    BY ATTORNEY SANDOVAL-BUSHUR:

8              Q.    Is that a private school?

9              A.    It's a private parochial

10   school, Catholic school, down in New

11   Orleans.

12             Q.    Other than serving on the

13   fundraising and endowment board for

14   Brother Martin High School, have you

15   served on a board for any other school?

16             A.    I have served on a

17   fundraising board for Metairie Park

18   Country Day School in New Orleans.  I

19   have served on the board for a local

20   organization called Son of a Saint that

21   directs students; it's kind of a Big

22   Brother program, and they deal with a

23   bunch of schools.  So I've assisted with

24   dealing with the other schools and trying

Page 70

1    to get admission for students and working
2    through admission process for students
3    going into the high school process at
4    Brother Martin.
5            But subject to those other
6    two caveats, no.
7        Q.    And is Metairie Park Country
8    Day School a private school?
9        A.    It is.
10       Q.    You are not a mental health
11   professional, correct?
12       A.    That's fair to say.  I'm not
13   an expert in mental health.
14       Q.    Prior to your work in this
15   case, had you ever calculated damages for
16   a school district?
17       A.    I think the answer to that
18   is yes.
19       Q.    In what case, prior to this
20   case, did you calculate damages for a
21   school district?
22       A.    I don't -- there were at
23   least three schools.  Newman was one, and
24   there were other -- I'd have to go back.

CONFIDENTIAL

Page 71

1           I mean, that's a long time
2   ago.  During Hurricane Katrina -- you may
3   know about Hurricane Katrina, but for
4   those of us who lived it know that the
5   entire community was shut down.
6           So one of the things that I
7   was intimately involved in during
8   Hurricane Katrina, for the years
9   subsequent to it, was business
10  interruption calculations.  And we
11  represented a number of schools and
12  school districts in calculating their
13  business interruption losses with their
14  insurance companies, because their
15  physical plants were down and they were
16  not able to attend school or host school
17  anymore.  And so that was one of the
18  things that we were very much involved
19  on.
20          So during my career, I've
21  had the opportunity to calculate damages
22  for business interruption losses for
23  schools a number of times.
24              And I couldn't tell you the

CONFIDENTIAL

Page 72

1    other schools.  Newman would have been

2    one, which is one of the independent

3    private schools down in New Orleans.

4                But as I sit here right now,

5    I can't recall the others.

6          Q.    Prior to your work in this

7    case, have you ever calculated damages

8    incurred by a school district other than

9    cases relating to Hurricane Katrina?

10          A.    I believe that we also

11    represented school districts as it

12    related to BP losses.  There was the

13    British Petroleum oil spill in 2010.  It

14    was a pretty big thing.

15                And so we had the

16    opportunity to assist with the

17    calculation of their either contractual

18    losses under the settlement agreement or

19    lost profits during the period that, you

20    know, they had issues during that.

21          Q.    Prior to your work in this

22    case, have you ever calculated damages

23    incurred by a school district other than

24    in cases relating to Hurricane Katrina

CONFIDENTIAL

Page 73

1    and the BP oil spill?

2         A.    I may have.  But as I sit

3    here right now, other than those two

4    buckets, I can't recall.

5         Q.    School districts do not have

6    profits, correct?

7         A.    It depends on the school

8    districts.  But generally, they are

9    not-for-profit organizations.

10        Q.    A school district cannot

11   have lost profits, correct?

12        A.    Please define "school

13   district" for me.  Because I think you

14   and I are defining them in very different

15   ways.

16        Q.    Well, this -- you understand

17   this case is about public school

18   districts, correct?

19        A.    I do.

20              I also understand you didn't

21   ask me about public school districts.

22        Q.    Well, when I refer to school

23   districts, I'm referring to public school

24   districts, okay?

CONFIDENTIAL

Page 74

1           A.      Okay.

2           Q.      Public school districts

3    cannot have lost profits, correct?

4           A.      If they are not-for-profit

5    organizations, then they do not have

6    profits in the traditional sense as a

7    business would.

8           Q.      In this case, it was not

9    part of your assignment to look for

10   evidence of fraud in any school

11   district's financial records, correct?

12          A.      That's fair.

13          Q.      In this case, it was not

14   part of your assignment to look for

15   evidence of financial misconduct in any

16   school district's records, correct?

17          A.      That's fair.  That was not

18   within my scope.

19          Q.      And you, in fact, did not

20   look for any evidence of fraud or

21   financial misconduct in any school

22   district's records, correct?

23          A.      I did not look at it in any

24   particular way.

CONFIDENTIAL

Page 75

1              But during the course of my
2    forensic accounting, I certainly did not
3    see anything that didn't reconcile or was
4    not consistent with the previous
5    auditor's findings and the financial
6    statements.
7              But I was not asked to
8    conduct a fraud analysis, if that's what
9    you're trying to ask.
10         Q.    Is the field of forensic
11   accounting concerned with identification
12   of financial misconduct?
13         A.    Not on its face, no, sir.
14         Q.    Okay.  You have not
15   calculated lost profits in this case,
16   correct?
17         A.    I would disagree with you.
18         Q.    Can you please explain how
19   you have calculated lost profits in this
20   case?
21         A.    Sure.  So lost profits, as a
22   general theory, comprises of a few
23   different things.
24              I'll try to give you the

CONFIDENTIAL

Page 76

1    high-level theory, and you can walk down.

2              When you're dealing with a

3    lost profits case, you're generally

4    trying to figure out what the but-for

5    profits would be, which can be defined as

6    revenues less expenses.  And then you're

7    trying to compare that to what the actual

8    were, revenue less expenses.

9              Another component of a lost

10   profits case is extra expenses.  So you

11   deal with both saved expenses and extra

12   expenses.

13             So even though you're

14   dealing with a company, say a

15   not-for-profit, not-for-profits can still

16   have a lost-profits calculation.  The

17   fact that the word is "lost profits"

18   doesn't mean that not-for-profits can't

19   have a diminution of their revenues or an

20   overage on their expenditures and still

21   have a differential between the but-for

22   world and the actual world.  That's just

23   not simply the case.

24             But an additional component

CONFIDENTIAL

Page 77

1   of lost profits is those extra expenses.
2   So if an expense was incurred that
3   otherwise would not have been incurred
4   but for the allegedly improper actions of
5   the defendants, that is a compensable
6   component of a lost-profits calculation,
7   so.
8        Q.    When a school district
9   spends money, it has no expectation that
10  it will earn a profitable monetary return
11  on that spending, correct?
12       A.    Would you please ask it
13  again?
14       Q.    When a school district
15  spends money, it has no expectation that
16  it will earn a profitable monetary return
17  on that spending, correct?
18       A.    I don't think I can answer
19  that question.
20            You're generalizing school
21  districts.  And monetary return could
22  mean different things to other people.
23            I've done a lot of time
24  dealing with non-profits over my career,

CONFIDENTIAL

Page 78

1  and the ability to generate revenues and

2  minimize expenses is part of the business

3  model.

4          You may not call that

5  profits, but they would call that

6  profits.  Because what goes into their

7  fund, general fund, specific special

8  funds, allow them to continue to do

9  additional programatic stuff.  So if the

10  amount of reserve they have -- or deficit

11  they have is increased, the reserve is

12  lessened, then it provides that they

13  cannot do additional things into the

14  future.

15          So not-for-profits sustain

16  lost profits like any other entity.  Just

17  because they're not distributing profits

18  to shareholders does not mean that they

19  do not have the opportunity to use

20  surplus or savings from reduced expenses

21  for other components of what their

22  general mission is to serve.

23          I would call that a monetary

24  gain, if you will.  I'm not going to

Page 79

1  quibble over the word "profit."  But if
2  they have more money, they can do more
3  things and that does have a monetary
4  return to the mission of the
5  not-for-profit.
6          Q.    When a school district
7  spends money, it may expect to receive a
8  non-monetary benefit in exchange for
9  spending that money, correct?
10         A.    It may.  Or it may -- it may
11  consider that it's receiving a monetary
12  benefit in exchange for that.
13              I can't generalize what any
14  particular school district would think or
15  say.  I think if you got 100 boards in
16  here, half of them may agree with you and
17  the other half would say you're dead
18  wrong on that question.
19         Q.    You are not opining on what
20  any school district expected to receive
21  in exchange for spending any money,
22  correct?
23         A.    Could you repeat it, please?
24         Q.    You are not opining on what

CONFIDENTIAL

Page 80

1    any school district expected to receive

2    in exchange for spending any money,

3    correct?

4         A.    I'm -- I don't understand

5    what you mean expended -- "expected to

6    receive."

7         Q.    Well, you just told me that

8    you can't say what -- whether a school

9    district expected to receive a

10   non-monetary benefit in exchange for

11   spending money, correct?

12        A.    Okay.  Yes.

13        Q.    So can you -- are you

14   opining on what any school district

15   expected to receive in exchange for

16   spending any money?

17        A.    I don't believe that's

18   within the scope of what my expert report

19   is here.

20             But I certainly could not

21   tell you whether or not or what they

22   expected to receive, if anything, for

23   spending money.  They spend money

24   contemporaneously based on the people and

CONFIDENTIAL

Page 81

1    place who are doing their best to put the

2    programs in place, whether it's a

3    not-for-profit for a charity fundraiser

4    or public school district.

5                    So I wouldn't purport to go

6    in and supercede the actualities with

7    speculation.

8            Q.    It was not part of your

9    assignment in this case to determine

10   whether any school district received any

11   non-monetary value in exchange for

12   spending any money, correct?

13           A.    Could you say it again?

14                   It's a very long, compound

15   question.  So I'm trying to get all the

16   pieces and many ill-defined -- or

17   undefined terms at this point.  So I'm

18   trying my best.

19           Q.    It was not part of your

20   assignment in this case to determine

21   whether any school district received

22   value in the form of improved educational

23   achievement in exchange for spending any

24   money, correct?

CONFIDENTIAL

Page 82

1          A.     That, I think, is a fair

2     statement.  That I was not asked or

3     tasked with whether or not spending

4     increased or led to any additional

5     educational achievement within the school

6     district for the students.

7          Q.     And you, in fact, have not

8     determined whether any school district

9     received value in the form of improved

10    educational achievement in exchange for

11    spending any money, correct?

12         A.     I have done no analysis in

13    this case to determine anything related

14    to educational achievement, as I believe

15    it's defined, I'm defining it as student

16    achievement, in any of these particular

17    cases.

18         Q.     It was not part of your

19    assignment in this case to determine

20    whether any school district received

21    value in the form of improved student

22    social-emotional outcomes, correct?

23         A.     I don't know that I agree

24    with you on that.

CONFIDENTIAL

Page 83

1              To the extent that the
2    damages that I've quantified include a
3    loss related to -- whether it would be an
4    SEL-type program or mental health-type
5    program, those out-of-pocket or, you
6    know, lost costs could have impacted, one
7    way or another, the health of the
8    children, as you stated it.
9         Q.    But it was not part of your
10   assignment to determine whether, in fact,
11   any school district received value in the
12   form of improved social-emotional student
13   outcomes in exchange for spending money,
14   correct?
15        A.    It was my role to quantify
16   the damages related to costs that were
17   expended for which the benefit had not
18   been received as a result of certain
19   programs that may overlap your definition
20   right now, which they would not have
21   received the benefit of those.
22        Q.    I'm not sure I understand
23   your answer.
24              Was it part of your

CONFIDENTIAL

Page 84

1    assignment to determine whether, in fact,
2    any school district received value in the
3    form of improved social-emotional student
4    outcomes in exchange for spending money?
5         A.    I guess let's go back to the
6    beginning.
7                Define student
8    social-emotional outcomes.
9         Q.    Did you examine student
10   social-emotional outcomes in this case?
11        A.    I would ask you to define
12   student social and emotional outcomes.
13        Q.    Well, you discuss
14   social-emotional learning in your
15   reports, correct?
16        A.    No.  I said that that was
17   one of the things that we looked at, were
18   programs related to social-emotional
19   learning and/or mental health.
20                You're asking me a question.
21   And I don't know how you define
22   social-emotional outcomes, which was not
23   a term that was used in my report.
24                So I'm asking you to define

CONFIDENTIAL

Page 85

1   it, please.

2          Q.     In your report, you look at

3   programs related to social-emotional

4   learning, correct?

5          A.     That is correct.

6          Q.     You did not examine what

7   value, if any, any school district

8   received in exchange for spending money

9   on programs relating to social-emotional

10  learning, correct?

11         A.     And I'm saying I don't

12  necessarily agree with you on that.

13         Q.     Well, can you please explain

14  to me how you examined what value any

15  school district received in exchange for

16  spending money on programs relating to

17  social-emotional learning?

18         A.     Well, to the extent -- let's

19  just take an example.  Let's go to one.

20                Let's look at Irvington.  As

21  part of the Irvington report -- and this

22  is E -- Exhibit-1E attached to the

23  deposition that we went over earlier.

24                There were a number of

Page 86

1    vendors in Irvington in which I

2    quantified damages.  Those vendors are

3    identified on Page 5 of the report.  One

4    of those vendors that I'm talking about

5    specifically is CarePlus New Jersey, Inc.

6                     $3,124,586 was incurred with

7    CarePlus NJ, Inc. during the period

8    fiscal school year ending June 30th,

9    2016, through fiscal school year ending

10   June 30th, 2024.  The damages that were

11   quantified in that particular case for

12   that 3.1, approximate, million dollars

13   was $624,917.

14                     Based on the persons most

15   knowledgeable about that program, who are

16   going to testify at trial and have

17   already attested to in verified

18   interrogatories or in affidavit -- I

19   guess I would have to go look for

20   Irvington -- that the portion of damages

21   related in this case to the alleged

22   improper actions of the defendants was

23   20 percent.

24                     So by nature of that,

Page 87

1    80 percent of those costs went to the

2    benefit of the students, to the mission

3    that the school had.

4                    That's how I understand it.

5            Q.    Okay.

6                    THE WITNESS:  I don't know

7            when a good time to take a break

8            is.

9                    ATTORNEY SANDOVAL-BUSHUR:

10           We can take a break now.

11                   THE WITNESS:  Great.

12                   VIDEO TECHNICIAN:  Going off

13           video record.  The time is

14           10:11 a.m.

15                          -  -  -

16                   (Whereupon, a brief recess

17           was taken.)

18                          -  -  -

19                   VIDEO TECHNICIAN:  Back on

20           video record.  10:29 a.m.

21    BY ATTORNEY SANDOVAL-BUSHUR:

22           Q.    Mr. Meyers, what is social

23    media?

24           A.    I don't know that I have a

CONFIDENTIAL

Page 88

1    distinct definition.  In this particular

2    case, I would define social media to be

3    the defendants in this particular matter.

4           Q.    Is Twitter social media?

5           A.    Again, I don't have a

6    definition of social media.

7                 So I would define social

8    media, in this case, for the purpose of

9    my expert report, to be Facebook,

10   Instagram, Snapchat, TikTok and YouTube.

11          Q.    When a person out in the

12   world refers to social media, do you know

13   what platforms that person is including

14   in that phrase "social media"?

15          A.    I don't know what any

16   hypothetical person making a hypothetical

17   statement is referring to in their

18   hypothet.  I do not.

19          Q.    And when any employee of any

20   school district in this case refers to

21   social media and does not define the

22   platforms that they are including in that

23   definition of social media, you do not

24   know which platforms they are referring

CONFIDENTIAL

Page 89

1   to, correct?

2          A.    I guess it would depend on

3   who the people are and what the

4   statements are.

5                For the purposes of the

6   sworn testimony that I'm relying upon and

7   the affidavits that I'm relying upon, my

8   understanding is that the definition of

9   social media, for those people, are the

10  defendants in this matter as it relates

11  specifically to the alleged improper

12  actions of those defendants, when they

13  define social media in that way.

14         Q.    What is your basis for that

15  understanding?

16         A.    The interrogatory response,

17  which asked the questions about the

18  defendants in this matter, the

19  affidavits, or declarations, as they may

20  be.  Those are the reasons.

21         Q.    If you wanted to know how an

22  employee who submitted an affidavit

23  defined social media for purposes of

24  their affidavit, how would you go about

CONFIDENTIAL

Page 90

1   answering that question?

2          A.    You'd have to be more

3   specific.

4                I think what we should do is

5   go through the affidavits and answer them

6   one at a time.  Because it would be

7   different for each and every person.

8          Q.    We'll come back to that.

9          A.    Sure.

10         Q.    You have no data on how many

11  students in any school district used

12  YouTube, correct?

13         A.    I don't have any data

14  relating to any student information at

15  all.

16         Q.    And so you do not have any

17  data on how many students in any school

18  district used TikTok, Snapchat, Facebook

19  or Instagram, correct?

20         A.    I don't have any information

21  as to any student information at all in

22  this matter.

23         Q.    Do you use social media?

24         A.    I do not.  As I'm defining

CONFIDENTIAL

Page 91

```
 1   it the way you've defined it, which is
 2   the way I defined it, which is the five
 3   defendants in this case.
 4           Q.    If we use a broader
 5   definition of social media to include all
 6   social media platforms, do you use social
 7   media?
 8           A.    I don't have a definition of
 9   social media.  So if you want to talk
10   about specific platforms, I might be
11   better able to answer your question.
12           Q.    Sorry.  Just to be clear, is
13   Twitter social media?
14           A.    For the purpose of this
15   case, I'm not defining it as social
16   media.
17                 I would generally say not in
18   the matter of this case.  That I would
19   probably generally say, as someone who
20   has never used Twitter, that I would
21   consider it social media.  But not social
22   media as defined in this matter.
23           Q.    Is Reddit social media?
24           A.    I would not define that as
```

CONFIDENTIAL

Page 92

1  social media inside or outside of this

2  case.

3          Q.    Is Pinterest social media?

4          A.    What is Pinterest?

5          Q.    Is Tumblr social media?

6          A.    I don't know Tumblr.

7          Q.    Is Twitch social media?

8          A.    I would not say Twitch is

9  social media.

10         Q.    Why not?

11         A.    It's a platform that people

12  play video games.  I wouldn't define that

13  as social media.

14              I don't define it in this

15  case as social media.  And I wouldn't

16  define it outside of social media.

17         Q.    Is Netflix social media?

18         A.    I do not believe so, no.

19         Q.    Why not?

20         A.    Watching videos.

21         Q.    So a platform on which

22  people watch videos is not, in your view,

23  social media?

24         A.    It may be or it may not be.

CONFIDENTIAL

Page 93

1            You're asking for my lay
2    opinion right now.  I do not believe that
3    entertainment platforms such as Netflix
4    would be considered social media in my
5    lay non-expert opinion.
6            As an expert, the social
7    media platforms that I've defined herein
8    are the five that I mentioned and the
9    actions related to them in this
10   particular matter.
11       Q.    For the definition of social
12   media to mean the five defendant
13   platforms in this case, are you relying
14   on a definition that was provided to you
15   by plaintiffs' counsel?
16       A.    No.  That's my understanding
17   of how the pleadings are and who is at
18   issue in this case and the answers to the
19   interrogatory questions and disclosures.
20       Q.    You are not offering any
21   opinions about the conduct of any
22   defendant in this case, correct?
23       A.    I think it's fair.  As you
24   know, in my reply reports I'm not

CONFIDENTIAL

Page 94

1   offering an opinion on causation.  And I
2   would think that a question regarding
3   conduct would go to a causal issue or
4   causation issue.
5              So I'm not offering an
6   opinion as to the conduct of any of the
7   defendants in this matter.
8        Q.    You are not offering the
9   opinion that defendants' conduct caused
10  harms, correct?
11       A.    Again, that's specifically a
12  causation issue, in that you used the
13  word "cause" in it.
14             So I'm not offering an
15  opinion of causation in this matter.
16       Q.    You are not offering the
17  opinion that the defendants' conduct
18  caused damages, correct?
19       A.    As it relates to a causation
20  issue, I am not offering an opinion of
21  causation in this matter.
22       Q.    You rely on others to make
23  the determination that school districts
24  incurred certain expenses because of

CONFIDENTIAL

1   social media, correct?

2          A.     Ask it again, please.

3          Q.     You rely on others to make

4   the determination that school districts

5   incurred expenses because of social

6   media, correct?

7          A.     In part or in whole; not

8   necessarily that they in whole incurred

9   expenses, but that a portion of those

10  expenses relates to the alleged improper

11  actions of the defendants in this matter,

12  defined as social media as I previously

13  defined it for you.

14         Q.     You are not offering an

15  opinion on how much of any school

16  district's damages are attributable to

17  each individual defendant, correct?

18         A.     That's fair.

19         Q.     Your damages calculations do

20  not differentiate between individual

21  defendants, correct?

22         A.     I believe that's correct.

23         Q.     You are not offering an

24  opinion on the amount of damages that

Page 96

1   YouTube caused any school district to
2   incur, correct?
3        A.    I am not.  In these cases,
4   just like a personal injury case where
5   you would have two different defendants,
6   you've got the trucking company and you
7   have the insurance company and you have
8   the other driver and then the third-party
9   driver, when calculating damages, the
10  expert calculating a lost profits or an
11  economic loss claim is not giving opinion
12  on the apportionment of how those would
13  go.
14            So I've given no weight to
15  any particular defendant.  The damages
16  calculated by me herein relate to the
17  damages caused by the alleged improper
18  actions of the defendants in this matter
19  as a whole.
20       Q.    Okay.  Respectfully,
21  Mr. Meyers, a lot of that response was
22  not responsive to my question.  And just
23  to get through the day, I'd ask that you
24  limit your responses to responding to my

CONFIDENTIAL

Page 97

1    question.

2              ATTORNEY GRADEN:  He did

3         answer your question, counsel.

4    BY ATTORNEY SANDOVAL-BUSHUR:

5         Q.    You are not offering an

6    opinion on the amount of damages that

7    Snapchat caused any school district to

8    incur, correct?

9         A.    As I just told you, the

10   damages calculations that I've done apply

11   the damages to all the defendants without

12   any apportionment to any particular

13   defendant or platform.

14        Q.    So the answer is correct,

15   you are not offering an opinion on the

16   amount of damages that Snapchat caused

17   any school district to incur?

18        A.    As I said, I am not offering

19   an opinion on any particular defendant in

20   this matter and have calculated the

21   damages for the entirety of the alleged

22   improper actions of the defendants in

23   this matter.

24        Q.    Can you answer the question

CONFIDENTIAL

Page 98

1  yes or no?

2            Are you offering an opinion

3  on the amount of damages that Snapchat

4  specifically caused any school district

5  to incur?

6        A.    I cannot.  Because the

7  damages may be utilized by the trial

8  court or somebody else to determine how

9  that gets apportioned.

10            So how my damages are used

11  after I testify with them -- I'm not

12  opining on causation, but without,

13  apportionment may be as a result of

14  testimony or the damages as they've been

15  defined.

16            So I don't know what's going

17  to happen yet.  I am only giving the

18  opinion that the damages in this case

19  that I've calculated are as a result of

20  the alleged improper actions of the

21  defendants, plural, the defendants,

22  without any apportionment to any specific

23  defendant.

24            I don't know how -- a better

CONFIDENTIAL

Page 99

1  way to answer it for you.

2        Q.    Well, if I wanted to know

3  what your opinion is on the amount of

4  damages that Snapchat specifically caused

5  any school district to incur, can I find

6  that anywhere in your expert reports in

7  this case?

8        A.    I do not have an opinion

9  specifically to Snapchat, because the

10  damages that I've calculated are for the

11  alleged improper actions of the

12  defendants, plural, as a whole.

13        Q.    You are not offering an

14  opinion on the amount of damages that

15  TikTok specifically caused any school

16  district to incur, correct?

17        A.    I don't know that I agree

18  with you on that.

19              I have not calculated or

20  quantified specifically what -- which one

21  were you on?  TikTok?

22        Q.    TikTok.

23        A.    -- TikTok has.  But the

24  damages have been calculated as a result

CONFIDENTIAL

```
                                        Page 100

 1   of the alleged improper actions of the

 2   defendants in this matter.

 3          Q.    If I wanted to know what

 4   your opinion is on the amount of damages

 5   that TikTok specifically caused any

 6   school district, can I find that anywhere

 7   in your expert reports?

 8                ATTORNEY GRADEN:  Objection.

 9          Asked and answered.

10                THE WITNESS:  As I've told

11          you before, and I'm happy to tell

12          you again, I've calculated the

13          damages as it relates to the

14          alleged improper actions of the

15          defendants as a whole, plural.

16                I have not itemized them for

17          any particular defendant.

18   BY ATTORNEY SANDOVAL-BUSHUR:

19          Q.    And that is also true for

20   Instagram and Facebook, correct?

21          A.    Same answer.

22                VIDEO TECHNICIAN:  Mr.

23          Graden, could you grab your mike?

24   BY ATTORNEY SANDOVAL-BUSHUR:
```

CONFIDENTIAL

Page 101

1           Q.    If someone wanted to know
2    how much in damages a school district
3    incurred because of student use of
4    YouTube specifically, the damages
5    estimates that you offered in this case
6    would not answer that question, correct?
7           A.    They may or may not, based
8    on the testimony that's given by the
9    plaintiffs in this matter.
10          Q.    If someone wanted to know
11   how much in damages a school district
12   incurred because student use of Snapchat
13   specifically, the damages estimates that
14   you offered in this case would not answer
15   that question, correct?
16          A.    They may or may not,
17   depending on the testimony of the
18   plaintiff in this matter.
19          Q.    If someone wanted to know
20   how much in damages a school district
21   incurred because of student use of TikTok
22   specifically, the damages estimates that
23   you offered in this case would not answer
24   that question, correct?

CONFIDENTIAL

Page 102

1        A.      They may or may not, based

2    on the testimony of the plaintiffs in

3    this matter.

4        Q.      If someone wanted to know

5    how much in damages a school district

6    incurred because of student use of

7    Instagram or Facebook specifically, the

8    damages estimates that you offered in

9    this case would not answer that question,

10   correct?

11       A.      They may or may not, based

12   on the testimony of plaintiffs in this

13   matter.

14       Q.      The inputs to your damages

15   calculations can be put into two

16   categories; one, the out-of-pocket costs

17   incurred by the school districts and,

18   two, the percentage of those

19   out-of-pocket costs allegedly incurred

20   due to social media; is that fair?

21       A.      Could you ask it again?

22       Q.      The inputs to your damages

23   calculations can be put into two

24   categories; first, out-of-pocket costs

CONFIDENTIAL

Page 103

1    incurred by school districts, and,

2    second, the percentage of those

3    out-of-pocket costs allegedly incurred

4    due to social media; is that correct?

5              A.    It's correct in part.

6                    Let me go ahead and clarify

7    and see if I can do it better for you.

8                    The -- what has been

9    utilized in this particular case was the

10   sustained past damages related to certain

11   out-of-pocket costs for select vendors,

12   and then it's multiplied by the

13   allocation percentages.

14                   So there's two components.

15   You put it into two buckets.  There may

16   be two columns that yield the damages,

17   one being the total cost of the vendor

18   and one being the allocation percentages.

19                   But those are only two

20   assumptions of various assumptions that

21   go into the overall damages calculation.

22                   So if all you're asking me

23   is does Exhibit-1 have a column for

24   vendor cost multiplied by a column for

CONFIDENTIAL

Page 104

1  allocation percent to get the total, I

2  would agree with you, yes.

3           But to get to the vendor

4  cost itself was the tremendous amount of

5  work doing forensic accounting to

6  determine all of these invoices as they

7  are.

8           But starting with the fact

9  that that has been done and those are the

10  numbers, A times B equals C, I would

11  agree with you on those two buckets.

12      Q.    The out-of-pocket costs that

13  you include in your damages calculations

14  are all payments that a school district

15  made to a third-party vendor, correct?

16      A.    The select out-of-pocket

17  costs are all costs that have been paid

18  to a third-party vendor, that's correct.

19           Well, I take -- with the

20  exception of, I believe, one of the

21  bellwethers has some property damage

22  cases, and some of the property damage

23  costs were -- they may have been an

24  independent contractor who is affiliated

CONFIDENTIAL

Page 105

1    with the school.

2                So I don't know if they were

3    technically a third party or not.  But

4    that would be the only exception to

5    that -- to that, yes.

6        Q.    You estimate damages by

7    adding up the total vendor costs for each

8    identified vendor and multiply that total

9    by the corresponding allocation percent,

10   correct?

11       A.    I guess conclusory that's

12   correct.  That marginalizes hundreds of

13   hours of work preparing the forensic

14   accounting to get the numbers to do the

15   addition.

16                But if we're starting with

17   the end game, yes, it's the math of the

18   sum of the vendor costs by the selected

19   vendors for the costs that have been

20   verified, confirmed and accurately

21   reliable, times the allocation percentage

22   that was used based on the sworn

23   testimony of the plaintiffs in this

24   matter as a result of the direct alleged

CONFIDENTIAL

Page 106

1    actions of the defendants.

2         Q.    I want to start by asking

3    about the information that you rely on

4    for the allocation percents that you use

5    in your damages calculations.

6              You had no role in

7    determining what any allocation percent

8    should be for any vendor for any school

9    district, correct?

10        A.    I think that's fair to say.

11        Q.    You do not have the

12   knowledge you would need to determine

13   what any allocation percent should be for

14   any vendor for any district, correct?

15        A.    I haven't performed any

16   analysis, in my role as an expert in this

17   case, to try to determine an allocation

18   percentage for any particular vendor.

19              So it's not -- it's outside

20   the scope of what I've been asked to do

21   in this case.

22        Q.    And you do not personally

23   have the knowledge, sitting here today,

24   that you would need to determine what any

CONFIDENTIAL

Page 107

1   allocation percent should be for any

2   vendor for any bellwether school

3   district --

4           A.     I'm not --

5           Q.     -- correct?

6           A.     I'm not prepared to give a

7   lay, fact or expert opinion in this trial

8   on the allocation percentage.

9                  What we relied upon is the

10  persons most knowledgeable for each of

11  the bellwether school districts as it

12  relates to the allocation percentages

13  that they have determined, because of

14  their inherent and internal knowledge, as

15  a direct result of the alleged improper

16  actions of the defendants in this case.

17          Q.     You did not offer input on

18  what the allocation percents should be

19  for any vendor for any district, correct?

20          A.     That's correct.  That's

21  fair.

22          Q.     Did you receive any

23  allocation percents directly from any

24  school districts or did you receive all

Page 108

1    of the allocation percents directly from

2    plaintiffs' attorneys?

3            A.    I didn't receive any from

4    plaintiffs' attorneys.  They all came

5    from the plaintiffs directly.

6            Q.    And when you say they "came

7    from the plaintiffs directly," do you

8    mean that you received them on employee

9    affidavits or in interrogatory responses?

10           A.    I do.

11           Q.    And did you receive those

12   employee affidavits or interrogatory

13   responses directly from an employee of

14   one of the school districts?

15           A.    Oh, you're asking me

16   mechanically if the attorneys e-mailed me

17   the sworn statements of the parties most

18   knowledgeable?  Yes, they did.

19           Q.    Okay.  When you offer an

20   amount of damages for a district, your

21   opinion is that your damage estimate is

22   reliable and accurate if you assume that

23   the allocation percents are reliable and

24   accurate, correct?

CONFIDENTIAL

Page 109

1          A.    The calculations are

2    reliable and accurate on their face.  And

3    I have absolutely assumed that the

4    allocation percentages are accurate and

5    reliable in this particular matter.

6          Q.    Your calculations are only

7    as accurate as the information you relied

8    on, correct?

9          A.    I disagree with that.

10              The calculation -- again,

11   there's two parts to the calculations

12   here.  I know you want to start with the

13   latter, and maybe we'll get back to the

14   former.

15              But this -- the work that I

16   performed as a forensic accountant, which

17   is the large role of what I played here,

18   involved hundreds of hours doing the

19   forensic accounting.

20              So what I will tell you is I

21   believe that it's inaccurate for you to

22   say that an allocation percentage would

23   change the accuracy or correctness or

24   reliability of any number, considering

CONFIDENTIAL

Page 110

1  that the costs in here are costs that

2  have all been confirmed, audited and, you

3  know, accurate and reliable.

4           If what you're trying to ask

5  me, if the math changes if you use a

6  another multiple in a different column,

7  sure, math can change.

8           But the calculations are

9  reliable regardless of the allocation

10 percentage.

11      Q.    So, Mr. Meyers, your opinion

12 is that your damages calculations are

13 accurate and reliable even if the

14 allocation percentages that you relied on

15 are inaccurate?

16      A.    You're asking me to assume

17 something is inaccurate.  Fine.

18           What I'm telling you is the

19 calculations themselves of the

20 multiplication is accurate, and that

21 input that goes into the select vendor

22 cost is accurate.

23           If what you're trying to ask

24 me is if a different allocation

CONFIDENTIAL

Page 111

1   percentage would be used or determined to
2   be used, if a judge would ask me to use a
3   different one, if it would change the
4   resulting Column C for damages, it would.
5   It could go up or it could go down.
6               But it doesn't change the
7   accuracy or reliability of the work that
8   I've performed herein.
9        Q.    If the allocation
10  percentages that you relied on are too
11  high, then your calculated damages would
12  be too high as well, correct?
13       A.    I have no reason to believe
14  that the allocation percentages are too
15  high.
16              But mechanically,
17  mathematically speaking, if the
18  allocation percentages, Column B on
19  Exhibit-1 to these six bellwether
20  reports, were to be reduced by a percent,
21  then the damages would be produced --
22  reduced.  And if the allocation percent
23  would be increased, then the damages
24  would be increased.

CONFIDENTIAL

Page 112

1                 That's the way the math
2    works.
3          Q.    If the court or jury were to
4    conclude that the allocation percentages
5    that you relied on are not reliable or
6    accurate, then you would agree that they
7    should also conclude that your damages
8    estimates are unreliable, correct?
9          A.    Absolutely not.  I think
10   that's where we're talking over each
11   other.
12               I think that to the extent
13   that the judge or the jury, as you
14   determined it, would determine a
15   different allocation percentage, they
16   would have every ability to use the
17   report that I did, which is correct,
18   accurate and reliable, make those changes
19   and get the resulting calculations.
20               That's why the report is
21   accurate and reliable.  The calculations
22   are done correctly.
23               So to the extent that they
24   believe a different percentage would be

CONFIDENTIAL

Page 113

1    used, they would take the report, my
2    exact report, multiply it by the
3    forensically accounted-for select vendor
4    cost and multiply it by whatever
5    percentage they would choose to see fit
6    as a result of the alleged improper
7    actions of the defendants.
8                    They can assume that all of
9    these are 100, and the math would just be
10   done like that.
11          Q.    Mr. Meyers, I'm not asking
12   about the mechanics of your calculation.
13          A.    You are.
14          Q.    I'm asking about the output
15   of your damages calculation, okay?
16                    Is there -- is there a term
17   that you would like me to use to refer to
18   that final output number from your
19   calculations?
20          A.    You're asking me to assume
21   that the output of a calculation --
22          Q.    Mr. Meyers, you're not
23   answering my question.  I'm not asking
24   you --

CONFIDENTIAL

Page 114

1          A.      I am.

2          Q.      -- to assume anything.

3                  I asked you, is there a term

4    that you would like me to use to refer to

5    the final output number from your

6    calculations?

7          A.      Call it total damages.

8    That's --

9          Q.      Total damages.

10         A.      -- what it is on Exhibit-1.

11         Q.      Okay.  If the court or jury

12   were to conclude that the allocation

13   percentages that you relied on are not

14   reliable or accurate, then you would

15   agree that they should also conclude that

16   your total damages are unreliable,

17   correct?

18                 ATTORNEY GRADEN:  Objection.

19                 THE WITNESS:  I disagree.  I

20         disagree with you.

21                 They would determine that

22         the total damages should be

23         recalculated by a percentage that

24         they determined, in their own role

CONFIDENTIAL

Page 115

1          in this case, and that the new
2          resulting math would be the total
3          damages.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5          Q.    For your calculation of
6    damages related to costs incurred by
7    Breathitt, Charleston and DeKalb, you
8    relied on affidavits of district
9    employees for the allocation percents,
10   correct?
11         A.    Give me a moment, please.
12   Breathitt?
13               That's correct.  On
14   Breathitt I relied on the affidavit of
15   Phillip Watts and Will Noble.
16               What was the second one?
17         Q.    Just, we'll go through them
18   and ask I'll a question and make sure we
19   have a clean record.
20               For Charleston, did you rely
21   on the affidavit of a district employee
22   for allocation percents?
23         A.    I did.  I relied on the
24   affidavit of Allison -- I think it was

CONFIDENTIAL

Page 116

1    Lisa Allison, executive director of

2    student support.

3          Q.    For DeKalb, you relied on

4    the affidavit of a district employee for

5    allocation percents, correct?

6          A.    That is correct.  It was the

7    affidavit of Monika Davis.

8          Q.    For your calculations of

9    damages relating to costs incurred by

10   Breathitt, Charleston and DeKalb, you

11   rely on affidavits of district employees

12   for the allocation percents, correct?

13         A.    That is correct, yes, sir.

14         Q.    You consider the allocation

15   percents from the affidavits of the

16   district employees to be an essential and

17   necessary input to your total damages

18   number, correct?

19         A.    I agree that it's one of the

20   two inputs that calculate damages, based

21   on the testimony -- the sworn testimony

22   of the persons most knowledgeable related

23   to the damages caused by the alleged

24   improper actions of the defendants in

Page 117

1  this matter.

2        Q.    You are not able to say

3  whether the allocation percents provided

4  in the employee affidavits are accurate,

5  correct?

6        A.    I believe that they are

7  accurate.  They're sworn testimony of

8  individuals.

9        Q.    What have you done to

10  validate that the allocation percents

11  provided in the employee affidavits are

12  accurate?

13        A.    I've relied upon the sworn

14  written statements of the persons most

15  knowledgeable, testifying under oath,

16  that the damages in this case for these

17  select particular vendors were caused as

18  a direct result of the alleged actions of

19  the defendants in this matter.

20        Q.    Your testimony is that the

21  allocation percents in the employee

22  affidavits are accurate because they are

23  sworn statements; is that correct?

24        A.    They are sworn statements by

CONFIDENTIAL

Page 118

1    the persons most knowledgeable to testify

2    as to the harm caused by the alleged

3    improper actions of the defendants in

4    this matter.

5          Q.    What did you do to determine

6    that each of the employees whose

7    affidavits you relied on is the person

8    most knowledgeable?

9          A.    They are the ones providing

10   the affidavits and are going to provide

11   testimony at trial, is my understanding,

12   related to the allocation percentages.

13         Q.    Okay.  So your testimony is

14   that you believe the allocation percents

15   provided in the employee affidavits are

16   accurate because they are sworn

17   statements from the people most

18   knowledgeable; and they are the people

19   most knowledgeable, in your belief,

20   because they submitted affidavits,

21   correct?

22         A.    No.  Because they are the

23   people most knowledgeable about the

24   impact of the damages caused as a result

CONFIDENTIAL

Page 119

1  of the alleged improper actions of the
2  defendants.
3          Q.    What did you do to determine
4  that each of the employees who submitted
5  an affidavit is the person most
6  knowledgeable about the impact of the
7  damages caused as a result of the alleged
8  improper actions of the defendants?
9          A.    If you'd like, we can go
10  through the affidavits.
11              The affidavits speak for
12  themselves of the sworn testimony, where
13  they go through the reasons why they are
14  the people most knowledgeable.  They go
15  over their history with the school.  They
16  go over all the reasons.
17              I have no reason to assume
18  or believe that the testimony that
19  they're giving is anything other than the
20  truthful testimony of those people.
21              And the fact that they are
22  standing in a position to testify at
23  trial as the persons most knowledgeable
24  is the reasons that they are the persons

Page 120

1    most knowledgeable.

2          Q.    Mr. Meyers, you assume that

3    the allocation percents provided in the

4    employee affidavits are accurate,

5    correct?

6          A.    I do.

7          Q.    You assume that the

8    allocation percents provided in the

9    employee affidavits are provided by the

10   persons most knowledgeable, correct?

11         A.    Who are going to provide

12   testimony at trial related to the alleged

13   improper actions of the defendants in

14   this matter.

15         Q.    Mr. Meyers, you did not

16   answer my question.

17               Do you assume that the

18   allocation percents provided in the

19   employee affidavits are provided by the

20   persons most knowledgeable?

21         A.    The persons most

22   knowledgeable who are going to provide

23   testimony at the trial relating to the

24   alleged improper actions of the

Page 121

1  defendants in this matter.

2           I don't know why you want to

3  keep taking off the result of my answer.

4      Q.    Well, you're not -- you're

5  not giving an answer.  You're just adding

6  words to the end of my question.

7           So I guess maybe I'll try a

8  different way of asking the question.

9           ATTORNEY GRADEN:  Objection

10      to the misstatement by counsel.

11  BY ATTORNEY SANDOVAL-BUSHUR:

12      Q.    Do you assume that the

13  allocation percents are provided by --

14  sorry.  Let me start that again.

15           Do you assume that the

16  allocation percents provided in the

17  employee affidavits are provided by the

18  persons most knowledgeable who you

19  understand are going to provide testimony

20  at trial relating to those percentages?

21      A.    As a result of the damages

22  of the alleged improper actions of the

23  defendants, yes.

24      Q.    And what is the basis of

CONFIDENTIAL

Page 122

1   your understanding that the employees
2   whose affidavits you rely on will testify
3   relating to the alleged improper actions
4   of defendants?
5           A.    Because of the -- the
6   statements themselves.
7                 Again, let's -- let's look
8   at the declarations or affidavits
9   together.
10          Q.    Well --
11          A.    They speak for themselves.
12          Q.    The affidavits do speak for
13  themselves.
14                And so if the affidavits
15  that you relied on do not mention
16  defendants, then the -- you have no basis
17  for saying that the affidavits refer to
18  defendants; is that fair?
19                ATTORNEY GRADEN:  Objection.
20                THE WITNESS:  Are you asking
21      me a legal conclusion -- for a
22      legal conclusion?
23  BY ATTORNEY SANDOVAL-BUSHUR:
24          Q.    In no way, shape or form am

CONFIDENTIAL

Page 123

1    I asking for a legal conclusion.

2              If an affidavit does not

3    mention defendants, you have no basis for

4    saying that the affidavit relates to the

5    defendants, correct?

6         A.    Let's go through the

7    affidavits.  Please give me a copy.

8         Q.    Can you --

9         A.    Without looking at the

10   affidavits, I'm not going to answer that

11   question.

12        Q.    Okay.

13        A.    So let's please look at

14   them.

15             Because you're making an

16   implicit representation that their

17   affidavits do not relate to the

18   defendants.  And I don't, as I sit here

19   right now, agree with that or believe

20   that to be the case.

21        Q.    Okay.

22             ATTORNEY SANDOVAL-BUSHUR:

23        We're on 5.

24             THE WITNESS:  We were on --

CONFIDENTIAL

Page 124

```
 1        yes.  Exhibit-5.  We had the
 2        invoices as 3 and 4, respectively.
 3                   -   -   -
 4             (Whereupon, Exhibit
 5        Meyers-5, No Bates, Affidavit of
 6        Lisa Kathryn Allison, was marked
 7        for identification.)
 8                   -   -   -
 9   BY ATTORNEY SANDOVAL-BUSHUR:
10        Q.    Mr. Meyers, I'm handing you
11   what has been marked as Exhibit-5, which
12   is the affidavit of Lisa Kathryn Allison.
13             Do you see that?
14        A.    I do.
15        Q.    And this is the affidavit
16   that you relied on for your damages
17   calculations relating to Charleston,
18   correct?
19        A.    That is correct.
20        Q.    Okay.  Ms. Allison's
21   affidavit does not mention any of the
22   defendants, correct?
23        A.    I guess let me take a minute
24   to read it.
```

Page 125

1            Okay.  Could you ask the
2    question again?
3            Q.    Exhibit-5, Ms. Allison's
4    affidavit, does not mention any of the
5    defendants, correct?
6            A.    I disagree.
7            Q.    Please show me where
8    Ms. Allison's affidavit mentions any of
9    the defendants.
10           A.    Everywhere that it mentions
11   social media or social media-related
12   relates to the defendants.
13           My understanding is that the
14   persons most knowledgeable, including
15   Ms. Allison, who are going to testify are
16   very well aware and understand this case.
17           And when they define social
18   media in this case, they are defining it,
19   for the purposes of the allocation
20   percentages, to define social media to be
21   the five platforms that we talked about
22   earlier, and specifically defendants in
23   this matter, and the alleged improper
24   actions as a result of it.

CONFIDENTIAL

Page 126

1          Q.     Mr. Meyers, what is the

2    basis of your understanding that when an

3    affidavit refers to social media it is

4    referring specifically to defendants?

5          A.     I just gave you my reason.

6    Would you like me to restate it?

7          Q.     I didn't hear any factual

8    basis.

9                 Do you have any factual

10   basis for your understanding?

11         A.     My understanding is that in

12   the affidavits that were provided to me,

13   the social media related to the persons

14   most knowledgeable who are offering this

15   opinion understand that social media in

16   this case relates to the defendants in

17   this matter and the platforms at issue

18   specifically in all these cases.

19                 And we can go through each

20   one where she says social media.

21                 But the representation that

22   because she doesn't mention a specific

23   platform, that her use of social media

24   does not relate to the defendants in this

Page 127

1  matter is not my understanding.

2          Q.    You assume that when an

3  affidavit refers to social media that the

4  affidavit is referring only to

5  defendants, correct?

6          A.    My understanding is that the

7  definition of social media that's being

8  used by the persons who are involved in

9  this case, who are going to provide

10  testimony at this trial, are utilizing

11  social media to define the defendants in

12  this matter and the impact of their

13  alleged improper actions on these

14  particular vendors, to the extent that

15  we're talking just about my role in the

16  affidavit component.

17          Q.    Nothing in Ms. Allison's

18  affidavit says that social media is

19  limited to defendants, correct?

20              ATTORNEY GRADEN:   Objection.

21          Asked and answered.

22              THE WITNESS:   I don't know

23          that I agree with that.   But there

24          is not a definition of social

CONFIDENTIAL

Page 128

1          media in this affidavit.
2     BY ATTORNEY SANDOVAL-BUSHUR:
3          Q.    And you cannot --
4          A.    That's my understanding.
5          Q.    You cannot point me to
6     anywhere in Ms. Allison's affidavit where
7     she refers to defendants or refers to
8     YouTube or refers to Snapchat or refers
9     to TikTok or refers to Instagram or
10    refers to Facebook, correct?
11                ATTORNEY GRADEN:  Objection
12         to form.
13                THE WITNESS:  Can you ask
14         them one at a time, it's a
15         compound question, please?
16    BY ATTORNEY SANDOVAL-BUSHUR:
17         Q.    You can't -- really can't
18    answer that question, Mr. Meyers?
19         A.    Well, the whole affidavit
20    starts with that this case is in re:
21    social media adolescent.  It's defined in
22    the pleadings that this affidavit is on.
23                So your expectation --
24    respectfully, it's unprofessional for you

CONFIDENTIAL

Page 129

1    to roll your eyes at the answer I'm
2    giving.  I'm doing my best here, and
3    whether you like or dislike my answers,
4    it's not professional.  So I'd please ask
5    you to stop.
6              Is there a question pending?
7         Q.   No.
8              You are not able to say
9    whether the allocation percents provided
10   in the employee affidavits are reliable,
11   correct?
12        A.   I am not giving any fact
13   testimony as to the allocation
14   percentages.  I have assumed that the
15   testimony given in the sworn statements
16   of the persons most knowledgeable is
17   correct and accurate and reliable as it
18   relates specifically to the alleged
19   improper actions caused by the defendants
20   in this matter.
21        Q.   You relied on the employees
22   who provided the affidavits to provide
23   accurate allocation percentages, correct?
24        A.   I assumed that their

Page 130

1  allegation percentages are accurate based

2  on the testimony that they will give as

3  to the impact of the alleged improper

4  actions of the defendants in this matter.

5       Q.    You did not take any steps

6  to validate the accuracy of the

7  allocation percentages provided in the

8  employee affidavits, correct?

9       A.    I have no reason to believe

10  they are not accurate.  But I did not

11  take any additional steps to validate or

12  not validate anything in them, other than

13  to accept that the sworn written

14  statements of the persons most

15  knowledgeable are going to -- and who are

16  going to testify in this matter have

17  accurately, correctly and properly

18  represented how they will testify as it

19  relates to the direct impact of the

20  alleged improper actions of the

21  defendants in this matter.

22       Q.    For purposes of -- well,

23  I'll move on.

24            If, for example, an employee

Page 131

1    affidavit estimated that 50 percent of a
2    vendor's cost was attributable to social
3    media, you are not offering the opinion
4    that 50 percent of that vendor's cost
5    was, in fact, attributable to social
6    media, correct?
7         A.    I am not giving an expert
8    opinion as to the validation of an
9    allocation percentage, other than it's
10   reliable to -- sorry -- it's acceptable
11   and reliable to utilize the affidavit or
12   sworn testimony of the person most
13   knowledgeable who is going to testify as
14   to that percentage, that 50 percent
15   hypothet that you've given me, as it
16   impacts those select vendors as a direct
17   result of the alleged impact -- the
18   impact of the alleged improper actions of
19   the defendants.
20        Q.    And that is the same for all
21   percentages for all vendors in all of the
22   employee affidavits, correct?
23             You are not offering the
24   opinion that any percentage is, in fact,

CONFIDENTIAL

Page 132

1  attributable to social media, correct?

2          A.    Other than in each and every

3  one of the affidavits and sworn

4  interrogatories -- verified interrogatory

5  responses that the testimony is and will

6  be accurately given as it relates hereto

7  that these are as a direct result of the

8  alleged improper actions of the

9  defendants.

10          It's -- it was -- maybe to

11  help that along, it's the same for each

12  and every one of the assumptions in the

13  bellwethers as we talked about here in

14  Charleston.

15      Q.   So for all of the

16  percentages for all the vendors for all

17  the employee affidavits, you are not

18  offering the opinion that any percentage

19  is, in fact, attributable to social

20  media, correct?

21          A.    I am not offering an expert

22  opinion as to the allocation.  I have

23  relied upon the sworn testimony of the

24  persons most knowledgeable to provide the

CONFIDENTIAL

                                                    Page 133

1    percentage or allocation percentage as to

2    the alleged improper actions of the

3    defendants and the damages that they have

4    caused.

5            Q.    When you offer a damages

6    amount for a district, your opinion is

7    that your total damages are reliable if

8    you assume that the percentages provided

9    in the employee affidavits are reliable

10   and accurate, correct?

11                 ATTORNEY GRADEN:  Objection.

12                 THE WITNESS:  We've gone

13          through this.  Asked and answered.

14                 I do not assume that.  The

15          calculations are accurate and

16          reliable.  The math is accurate

17          and reliable.

18                 To the extent that the

19          allocation percentages would

20          change, the math may change.  But

21          it has nothing to do with the

22          reliability or accuracy of the

23          report as calculated and provided

24          herein.

Page 134

1    BY ATTORNEY SANDOVAL-BUSHUR:

2           Q.     If the court or jury

3    concludes that the employee affidavits

4    included costs attributable to issues for

5    which a school district cannot seek

6    damages in their allocation percentages,

7    you would agree that the total damages

8    that you present in your expert reports

9    would need to be recalculated, correct?

10          A.     I would agree with that.

11          Q.     For your calculation of

12   damages related to costs incurred by

13   Harford, Irvington and Tucson, you relied

14   on responses to interrogatories for each

15   of the allocation percentages, correct?

16          A.     That's correct for Harford.

17   That is correct for Irvington.  And that

18   is correct for Tucson.  Yes, sir.

19          Q.     You consider the allocation

20   percents from the responses to the

21   interrogatories to be an essential and

22   necessary input to your damages

23   calculations, correct?

24          A.     It's one of the inputs that

Page 135

1    goes into the damages calculation.

2         Q.    And it's an essential and

3    necessary input to reaching the total

4    damages that you present in your reports,

5    correct?

6         A.    It's one of the two, as we

7    talked about, buckets of information;

8    Column A times Column B.

9              So, yes, it is a -- I guess

10   I'll agree with you that it is a

11   necessary component of multiplying A and

12   B to get C.

13        Q.    You are not able to say

14   whether the allocation percents provided

15   in the interrogatory responses are

16   accurate, correct?

17             ATTORNEY GRADEN:  Objection.

18             THE WITNESS:  It's the same

19        question.

20             I believe that they are

21        accurate.  I have no reason to

22        believe that they are not

23        accurate.  And it's sworn

24        testimony from the plaintiff in

CONFIDENTIAL

```
 1          the verified interrogatory related
 2          specifically to the damages of the
 3          out-of-pocket hard costs by the
 4          persons most knowledgeable.
 5               My understanding is that
 6          there will be testimony that goes
 7          with the interrogatory sworn
 8          responses for the allocation
 9          percentages as it relates
10          specifically to the alleged
11          improper actions of the defendants
12          in this matter.
13   BY ATTORNEY SANDOVAL-BUSHUR:
14          Q.    You did not take any steps
15   to validate the accuracy of the
16   allocation percents provided in any
17   interrogatory responses, correct?
18               ATTORNEY GRADEN:  Objection.
19               THE WITNESS:  Same as the
20          affidavits.  I have no reason to
21          believe that they are inaccurate.
22          They're sworn testimony from the
23          plaintiffs specifically in these
24          matters.
```

CONFIDENTIAL

Page 137

1           But I have not done any
2       additional investigation as to the
3       percentages themselves.
4   BY ATTORNEY SANDOVAL-BUSHUR:
5           Q.    You relied on the district
6   to provide, in the interrogatory
7   responses, accurate allocation
8   percentages, correct?
9           A.    I've relied upon the sworn
10  statements of the plaintiffs in these
11  three particular matters, who have
12  provided an answer to the damages caused,
13  and the allocation of those damages
14  caused, due to the alleged improper
15  actions of the defendants in this matter
16  as one of the inputs into the
17  calculations that I have done for this
18  court.
19          Q.    Are you personally vouching
20  for the accuracy of any of the allocation
21  percentages provided in any of the
22  interrogatory responses?
23          A.    I am vouching for the fact
24  that it is reasonable, it's expected,

CONFIDENTIAL

Page 138

1    it's peer accepted to utilize sworn

2    testimony, a fact witness and/or expert

3    witnesses as an assumption into a

4    calculation of a lost profits damage

5    component.

6            Q.    But I'm asking about the

7    accuracy of the input to that

8    calculation.

9                  You are not personally

10   vouching for the accuracy of the

11   allocation percentages provided in any of

12   the interrogatory responses, correct?

13           A.    I am assuming that the sworn

14   statement of the persons most

15   knowledgeable who will testify at trial

16   have accurately represented what their

17   testimony will be related to the damages

18   that have been caused as a result of the

19   alleged improper actions of the

20   defendants in this matter.

21           Q.    Are you vouching for the

22   accuracy of the allocation percentages

23   provided in any of the interrogatory

24   responses?

CONFIDENTIAL

Page 139

1                    ATTORNEY GRADEN:  Objection.
2                    THE WITNESS:  I think I just
3            answered your question.
4                    I'm vouching that the
5            information that was provided in
6            the interrogatory response is an
7            accurate response for me to rely
8            upon as it relates to the
9            allocation percentage of the
10           damages caused for those select
11           vendors as a result of the direct
12           actions and -- alleged improper
13           actions of the defendants in this
14           matter.
15   BY ATTORNEY SANDOVAL-BUSHUR:
16           Q.    I understand that you
17   believe that it is appropriate for you to
18   rely, for your calculations, on the
19   percentages in the interrogatory
20   responses.
21           A.    Thank you.
22           Q.    I am asking about the actual
23   percentages provided in the interrogatory
24   responses and whether those are accurate

CONFIDENTIAL

Page 140

1    or inaccurate estimations of the

2    percentage of any of these vendor costs

3    that are, in fact, attributable to

4    defendants' conduct.

5            A.    Okay.  So -- are you still

6    going?

7            Q.    You are not vouching that

8    the percentages provided in the

9    interrogatory responses that you rely on

10   are accurate estimations of the

11   percentage of any vendor costs that are,

12   in fact, attributable to defendants'

13   conduct, correct?

14               ATTORNEY GRADEN:  Objection.

15               THE WITNESS:  I think where

16        I'm getting hung up, counselor, is

17        the determination of the

18        percentages may be a fact that is

19        in dispute in this case.

20               So I'll make the record

21        clear that I am vouching for the

22        accuracy of the people who are

23        going to testify as to that.

24               How that allocation

Page 141

1          percentage gets determined at
2          trial doesn't make it accurate or
3          inaccurate.
4              So you keep using the term
5          "accuracy" or "accurately."  It is
6          accurate.  The interrogatory
7          response is accurate as to the
8          percentage that is being assigned
9          to the alleged improper actions of
10         the defendants in this matter.
11    BY ATTORNEY SANDOVAL-BUSHUR:
12         Q.    You understand that if, in
13    an interrogatory response, a district
14    said that 20 percent of a vendor cost was
15    attributable to the conduct of
16    defendants, that may be true or it may
17    not be true, correct?
18              ATTORNEY GRADEN:  Objection.
19              THE WITNESS:  I disagree
20         with you.  It is true that they
21         have allocated it.
22              Whether or not that -- it's
23         like a personal injury case,
24         right.  A doctor on one side comes

CONFIDENTIAL

Page 142

1          in and says, you know, I believe
2          that this person needs injections
3          for the rest of their life,
4          epidural injections, at the cost
5          of $5,500, bilateral, on the
6          lumbar, twice a year for the
7          remainder of their life
8          expectancy.  And another doctor
9          comes by and says, I disagree with
10         that.  I don't believe that to be
11         the case.
12              I don't believe that the
13         doctor on either side that I'm on
14         is wrong.  Their representation is
15         accurate.  It's subject to the
16         reasons we're here, going to
17         trial.
18              So it is accurate and it is
19         reliable what the interrogatory
20         percentage says.
21              Now, whether or not the
22         trier determines something
23         differently, I just don't
24         understand why -- I don't

CONFIDENTIAL

Page 143

1     understand your question, I guess.

2  BY ATTORNEY SANDOVAL-BUSHUR:

3          Q.     And I'm not sure I

4  understand the confusion.  Because your

5  response seems to indicate that you

6  understand that there can be a disputed

7  fact as to whether any of these

8  allocation percentages provided in the

9  interrogatory and affidavits that you

10  rely on are perfectly correct, are too

11  low or too high; is that right?

12          A.     And I guess what I don't

13  understand is how you can understand that

14  there can be a disputed fact and then

15  call it untruthful or inaccurate.

16                  It's accurate to the person

17  who is going to testify that that is the

18  percentage as a direct result of the

19  alleged improper actions of the

20  defendant.

21                  I am not vetting the

22  percentage.  It is going to be provided

23  at trial.  And it has been provided in

24  sworn written responses in this matter.

```
                                    Page 144
```

1        Q.    Mr. Meyers, you have not

2   vetted any of the percentages in any of

3   the employee affidavits or

4   interrogatories responses, correct?

5        A.    That is correct.

6        Q.    Okay.  And the percentages

7   that I am referring to, you understand,

8   are the allocation percentages, correct?

9        A.    I agree.  Yes, that is my

10  assumption, too, that you're speaking

11  about specifically the allocation

12  percentage that is different for each

13  vendor as detailed on Exhibits-1 to my

14  six reports.

15       Q.    It was not part of your

16  assignment in this case to determine

17  whether any data from any of the

18  bellwether districts corroborated the

19  allocation percentages that you relied on

20  in your damages calculations, correct?

21       A.    I think that's fair to say.

22       Q.    And you are not opining

23  about whether any data from the

24  bellwether school districts corroborated

CONFIDENTIAL

Page 145

1   the allocation percents that you use in
2   your damages calculations, correct?
3                ATTORNEY GRADEN:  Objection.
4                THE WITNESS:  I think that's
5        fair to say.
6   BY ATTORNEY SANDOVAL-BUSHUR:
7        Q.    You relied on the allocation
8   percents from the employee affidavits and
9   interrogatory responses, correct?
10       A.    That is one of the inputs in
11  calculating my report, as the persons
12  most knowledgeable providing testimony as
13  to the damages caused as a result of the
14  alleged improper actions of the
15  defendants in this matter.
16       Q.    And it was not part of your
17  assignment in this case to determine
18  whether any data from any bellwether
19  school district corroborated that any
20  vendor costs were attributable to any
21  defendants' platforms, correct?
22       A.    I think that's fair.
23       Q.    And you are not opining
24  about whether data from the bellwether

Page 146

1    school districts corroborated that any

2    vendor costs were attributable to any

3    defendants' platform, correct?

4            A.    Ask it again, please.

5            Q.    You are not opining about

6    whether data from the bellwether school

7    districts corroborated that any vendor

8    costs were attributable to any

9    defendants' platform?

10                ATTORNEY GRADEN:  Objection.

11                THE WITNESS:  So long --

12            we're both talking about the data

13            to compile the actual cost of the

14            invoices, which I don't believe

15            you are, but I just want to make

16            the record clear, then I agree.

17    BY ATTORNEY SANDOVAL-BUSHUR:

18            Q.    I want to pivot now to

19    asking you about the information about

20    the out-of-pocket vendor costs that you

21    rely on for your damages calculations.

22            A.    Sure.

23            Q.    For each district, you

24    relied on data or documents that were

CONFIDENTIAL

Page 147

1  provided by the district for your

2  calculation of vendor costs, correct?

3        A.    Either by the district or,

4  as we talked about before, my

5  clarification earlier, through the

6  district on publicly available websites.

7              Sometimes it was easier to

8  just go grab the audit myself as opposed

9  to waiting for discovery.  And you'll see

10  in some cases, I went and pulled the

11  audit myself and then they produced it in

12  discovery.  So as an abundance of

13  caution, I put the Bates stamps numbers

14  as well.

15              But from those two buckets,

16  that's correct.

17        Q.    And you relied on the

18  districts to provide you with reliable

19  and accurate information on vendor costs,

20  correct?

21        A.    I don't know that I would

22  agree with that.  I relied on the

23  information and confirmed that the costs

24  that were expended were actually expended

Page 148

1   and were accurate and reliable.
2              I relied upon the audits,
3   which were there.  I relied upon the
4   general ledgers.
5              But one of the things within
6   my scope of doing the forensic accounting
7   was to not necessarily rely on anything
8   that was given to me but to test
9   everything that was given to me.
10             There were costs that are
11  not included in this report because I did
12  not have verification that that cost was
13  necessarily expended.
14             So I don't know that I agree
15  with that, because I tested the
16  reliability of it as part of the scope of
17  my course in this case.
18        Q.    Is it your testimony that
19  you know that the -- each district
20  actually paid the money to each of the
21  vendors that are included in your damages
22  calculations?
23        A.    Yes.  That's what I'm
24  telling you.

CONFIDENTIAL

Page 149

1          Q.     And what did you do to
2    determine that each district actually
3    paid money to each of the vendors
4    included in your damages calculation?
5          A.      Reconciled the purchase
6    orders with the general ledgers with the
7    vendor cost; in some cases cancelled
8    checks; confirmed that the actual costs
9    that were being put forth in that first
10   column were actually expended by the
11   vendors -- to the vendors by the school
12   districts.
13              That was the forensic
14   accounting.  That was the hundreds and
15   hundreds of hours that were spent making
16   sure that every cost that's on here had a
17   reliable basis that it was actually paid;
18   not necessarily incurred but not paid,
19   but actually paid.
20              So -- and we have reference
21   numbers on everything.  I'm happy to go
22   through each and every one of these
23   invoices, general ledgers, vendor reports
24   with you today.

CONFIDENTIAL

Page 150

1          Q.    Did you receive from
2    plaintiffs' attorneys information
3    about -- let me ask that question a
4    little differently.
5                Did you receive from
6    plaintiffs' attorneys information
7    identifying which vendors should be
8    included in your damages calculations?
9                ATTORNEY GRADEN:  Objection
10          to form.
11                THE WITNESS:  Not at the
12          start, no.  Everything that I had
13          asked for originally was all the
14          vendor costs.
15                So when you go look at -- we
16          can go look at any one of them --
17          the entirety of the general
18          ledger, so all vendors.  All
19          vendors.
20                Some of them call them
21          vendor reports.  Some of them call
22          them general ledgers.  Some of
23          them call them expense reports.
24          Some of them call them purchase

CONFIDENTIAL

Page 151

1    order reports.  Every school
2    district has their own accounting
3    system and what they do.  But that
4    was the start.
5         So when you go look at
6    DeKalb, for instance, they have
7    purchase order ledger reports and
8    vendor spend reports.  All of
9    those include all the vendors for
10   all the years, all the spend.  And
11   then from there, you can go
12   identify.
13        So then to the extent that
14   they identified Yondr and
15   Lightspeed, I further asked for
16   additional information to confirm
17   that the general ledgers, even on
18   their face which are reliable
19   because it's audited financial
20   statements, also had additional
21   proof, in which they gave us
22   additional cost information
23   related specifically there to
24   those vendors.

CONFIDENTIAL

Page 152

```
1              So that was part of the
2         interactive projections, if you
3         will, of looking at the financial
4         statements and confirming that the
5         costs were actually incurred and
6         paid at each of these school
7         districts for these six, and the
8         other five.
9    BY ATTORNEY SANDOVAL-BUSHUR:
10             Q.    Who identified to you which
11   vendors should be included in your
12   damages calculations?
13             A.    It would have been either
14   the representatives themselves or through
15   counsel or through the affidavits and
16   declarations.
17             Q.    For some of the districts,
18   the identification of vendors that should
19   be included in your damages calculations
20   was provided through counsel; is that
21   correct?
22             A.    It would have been from the
23   districts and through counsel.  It would
24   be better to go through -- we only have
```

CONFIDENTIAL

Page 153

1    six of them, it may be better to go

2    through all six of them individually

3    because it may be different for each one.

4            Q.    Mr. Meyers, do you agree

5    that there are social media platforms

6    other than defendants' platforms?

7                    ATTORNEY GRADEN:  Objection.

8                    THE WITNESS:  It depends on

9            whose definition it is.  But I

10           think you've already heard my

11           testimony that generally, as a lay

12           person, without a real definition,

13           I would agree that Twitter was a

14           social media platform.  And that's

15           not one of the five defendants in

16           this matter.

17   BY ATTORNEY SANDOVAL-BUSHUR:

18           Q.    And if you wanted to know

19   whether any employee whose affidavit you

20   relied on included Twitter, or any other

21   social media platform, in their

22   allocation percents, what would you do?

23                   ATTORNEY GRADEN:  Objection.

24                   THE WITNESS:  Read the

CONFIDENTIAL

Page 154

1          affidavit in connection with this
2          case.  The interrogatory responses
3          clearly respond to damages caused
4          by the defendants in this case.
5          So those three are specifically
6          related to the defendants.
7                And the affidavits all speak
8          to the social media as the
9          defendants in this matter, is my
10          understanding.
11     BY ATTORNEY SANDOVAL-BUSHUR:
12          Q.    If you wanted to know
13     whether an employee whose affidavit you
14     relied on included Twitter, or any other
15     non-defendant social media platform in
16     their allocation percents, would you look
17     to the deposition testimony of the
18     employee who provided the affidavit?
19                ATTORNEY GRADEN:  Objection.
20                THE WITNESS:  I may.  That's
21          something that could be
22          considered.
23                In some of these cases, I
24          had done that.  Mr. Scheuneman was

CONFIDENTIAL

Page 155

1          somebody who didn't provide an
2          affidavit but had a deposition
3          that spoke about the two vendors
4          that are included in the report,
5          and that was considered.
6               Mr. Watts provided an
7          affidavit in this case.  And I had
8          an interview with him where he
9          identified each and every one of
10         the vendors that were being
11         included.  And then his affidavit
12         was issued sometime after that
13         meeting and confirmed all of the
14         things that he told me personally
15         that were caused directly as a
16         result of the alleged improper
17         actions of the defendants.
18               So it depends on the
19         individual school district, if you
20         will.
21    BY ATTORNEY SANDOVAL-BUSHUR:
22          Q.    You mentioned Mr. Watts,
23    correct?
24          A.    I did.

Page 156

1          Q.     And Mr. Watts is a
2   superintendent of the Breathitt School
3   District, correct?
4          A.     I have his title.
5                 He is the superintendent of
6   the Breathitt School District, that's
7   correct.
8          Q.     And you relied on his
9   affidavit for allocation percents for
10  Breathitt, correct?
11         A.     I did, yes, sir.
12         Q.     And --
13         A.     And Mr. Noble as well.
14         Q.     And your understanding is
15  that Mr. Watts' allocation percents in
16  his affidavit are limited to the
17  defendants in this case; is that correct?
18         A.     That's my understanding,
19  yes, sir.
20         Q.     And what is the basis for
21  that understanding?
22         A.     Both my discussions with him
23  and having read and reviewed the
24  affidavit.

CONFIDENTIAL

Page 157

1          Q.    Did you review Mr. Watts'
2    deposition testimony in this case?
3          A.    I'd have to go look.
4                I don't believe that I have,
5    no, sir.
6          Q.    Okay.  I want you to assume
7    that the allocation percents that you
8    rely on for your damages calculations
9    include costs attributable to all social
10   media, not just defendants' platforms,
11   okay?
12               ATTORNEY GRADEN:  Objection.
13               THE WITNESS:  Okay.  You
14        want me to assume -- let's take
15        one at a time.
16               You want to do Phillip
17        Watts?
18   BY ATTORNEY SANDOVAL-BUSHUR:
19         Q.    No.  I want to just ask this
20   question generally about your
21   methodology, okay?
22               I want you to assume that
23   the allocation percents that you rely on
24   for your damages calculations include

CONFIDENTIAL

Page 158

1  costs attributable to all social media,
2  not just defendants' platforms, okay?
3        A.    Okay.  I will see what I
4  can -- I don't know that that's a
5  complete hypothet.  But I guess it
6  depends on what your next question is.
7        Q.    If it is true that the
8  allocation percents that you rely on for
9  your damages calculations include costs
10 attributable to all social media, not
11 just defendants' platforms, then you are
12 not offering an opinion on the amount of
13 damages that defendants' platforms, as
14 distinct from all social media, caused
15 any school district to incur, correct?
16              ATTORNEY GRADEN:  Objection.
17              THE WITNESS:  Ask it again,
18       please.
19 BY ATTORNEY SANDOVAL-BUSHUR:
20        Q.    If it is true that the
21 allocation percents that you rely on for
22 your damages calculations include costs
23 attributable to all social media, not
24 just defendants' platforms, then the

CONFIDENTIAL

Page 159

1    total damages numbers that you present in

2    your reports are not the amount of

3    damages that defendants' platforms

4    specifically, as distinct from all social

5    media, caused any school district to

6    incur, correct?

7              ATTORNEY GRADEN:  Objection.

8              THE WITNESS:  I don't know

9         that that's correct or incorrect.

10             It could be that the

11        determination by the trier in this

12        case determines that 100 percent

13        of the damages are still caused in

14        this case -- I think that's beyond

15        my expertise or scope, that

16        hypothet.  And it assumes a

17        result.

18             So I don't think I can

19        answer that question as posed.

20   BY ATTORNEY SANDOVAL-BUSHUR:

21        Q.   Your damages calculations

22   include damages that relate to the

23   effects of content, that is, text, photos

24   or videos that were posted by third

CONFIDENTIAL

Page 160

1   parties on social media platforms,
2   correct?
3                    ATTORNEY GRADEN:  Objection.
4                    THE WITNESS:  Say that
5          again, please.
6   BY ATTORNEY SANDOVAL-BUSHUR:
7          Q.    Your damages calculations
8   include damages relating to the effects
9   of content, that is, text, photos or
10  videos that were posted by third parties
11  on social media platforms, correct?
12                   ATTORNEY GRADEN:  Objection.
13                   THE WITNESS:  Absolutely
14         not.
15  BY ATTORNEY SANDOVAL-BUSHUR:
16         Q.    How not?
17         A.    Because that's not one of
18  the alleged improper actions of the
19  defendants in this matter.
20         Q.    And what have you done to
21  determine that the allocation percents
22  that you have relied on have excluded the
23  effects of content that was posted by
24  third parties on social media platforms?

CONFIDENTIAL

Page 161

1          A.    Because the persons most

2     knowledgeable who are providing testimony

3     and have already provided testimony in an

4     interrogatory or a sworn affidavit are

5     directly relating the causes of the

6     percentages to the alleged improper

7     actions of the defendants in this matter.

8               They are not allocating it

9     to non-issues in this case.  They have

10    limited their damages, as is stated in

11    the allocation percentage, to those

12    issues at issue in this matter.

13          Q.    If someone wanted to know if

14    the damages -- let me ask that different.

15    Well, I'll start that question over.

16               If someone wanted to know if

17    the allocation percentages from the

18    employee affidavits that you rely on

19    include the effects of content posted by

20    third parties on social media platforms,

21    do you agree that that person could look

22    to the employee's deposition to find that

23    out?

24          A.    Maybe in part.

CONFIDENTIAL

```
                                          Page 162

 1              ATTORNEY GRADEN:   Objection.

 2              THE WITNESS:   It depends on

 3         the deposition.   It depends on

 4         what questions were asked.   It

 5         depends on whether or not the

 6         person taking the deposition asked

 7         questions to solicit this

 8         testimony or how the question was

 9         asked.

10              It may or may not.   You'd

11         have to look to the deposition to

12         see if it's in any way indicative

13         of answering the question you're

14         trying to answer -- or posing

15         before me, rather.

16    BY ATTORNEY SANDOVAL-BUSHUR:

17         Q.    If the district employee

18    affidavits and interrogatory responses

19    included, in their allocation percents,

20    costs related to the effects of content

21    posted by third parties on social media

22    platforms, then those costs would be

23    included in your damages estimates,

24    correct?
```

CONFIDENTIAL

Page 163

1          A.    They may or may --

2              ATTORNEY GRADEN:  Objection.

3       Asked and answered.

4              THE WITNESS:  They may or

5       may not be.

6              Again, my understanding is

7       that all of the sworn testimony

8       that's given here is related

9       specifically to the defendants as

10      social media and the alleged

11      improper actions in this matter,

12      not actions outside of the course

13      of the scope of this litigation,

14      when they are providing

15      deposition -- I mean, affidavits

16      or declarations in the course of

17      this case or answering a direct

18      response to an interrogatory as

19      to, what are your damages as a

20      result of the defendants in this

21      matter?  It's even more clear.

22              But even still, under your

23      hypothet, that somebody did want

24      to include content, that doesn't

Page 164

1         necessarily change the reliability
2         or accuracy of the calculations or
3         how a trier would determine the
4         accuracy and reliability of those
5         calculations.  It may be that
6         those damages are all still
7         100 percent recoverable as a
8         result of the defendants under
9         that hypothet.
10              It's just I have no way of
11        knowing the result, again, as to
12        how the issues of material fact in
13        this case will result.
14  BY ATTORNEY SANDOVAL-BUSHUR:
15        Q.    Mr. Meyers, your
16  understanding is that all of the employee
17  affidavits that you relied on, the
18  percentages in those affidavits are
19  related specifically to the defendants,
20  correct?
21        A.    The alleged improper actions
22  of the defendants.
23        Q.    Is it --
24        A.    I feel -- I feel like -- I'm

CONFIDENTIAL

Page 165

1    going to continue to say it.  And you

2    don't want to ask the question with it.

3                    But my damages calculations

4    on every single one where I make an

5    assumption or an opinion talk about the

6    alleged improper actions of the

7    defendants.

8                    So to call them the

9    defendants does not seek what I have

10   calculated here.  It's the alleged

11   improper actions of the defendants.

12                   The defendants may do a lot

13   of other things that are not improper or

14   not alleged in this case.

15           Q.    Okay.

16           A.    And so you continue --

17           Q.    Mr. Meyers, your

18   understanding is that all of the sworn

19   testimony in the employee affidavits that

20   you rely on, the percentages in those

21   affidavits are related specifically to

22   the defendants' alleged improper actions,

23   correct?

24           A.    As a result of the

CONFIDENTIAL

Page 166

1  defendants' alleged improper actions,
2  yes.  As a result of the defendants'
3  alleged improper actions.
4          Q.    Can you point me to any
5  language in any affidavit of any employee
6  that states that they limited the
7  percentages that they provided to costs
8  that were the result of defendants'
9  alleged improper actions?
10                 ATTORNEY GRADEN:  Objection.
11          Asked and answered.
12                 THE WITNESS:  If you would
13          like, let's go through all the
14          affidavits.
15  BY ATTORNEY SANDOVAL-BUSHUR:
16          Q.    Well, let's look at
17  Exhibit-5, the Allison -- you have that
18  already -- the Allison affidavit which
19  you relied on for Charleston.
20          A.    Sure.
21          Q.    Can you point me to any text
22  in Exhibit-5, the Allison affidavit, that
23  states that any of the percentages she
24  provided are limited to costs that were

Page 167

1  the result of defendants' alleged

2  improper actions?

3          A.    Are you asking for those

4  specific words?  Because I don't see

5  those specific words.

6                  However, Number 13 directly

7  addresses it.  Number 14 addresses it.

8  Number 15 addresses it.  Number 17

9  addresses it.  Number 18 --

10          Q.    Okay.  Mr. Meyers --

11                ATTORNEY GRADEN:  Let him

12          finish.

13                THE WITNESS:  Number 18

14          addresses it.  Number 24 addresses

15          it.  Number 27 addresses it.

16          Number 26 addresses it.  Number 25

17          addresses it.  Number 28 addresses

18          it.  Number 29 addresses it.

19          Number 31 addresses it.  Number 32

20          addresses it.

21  BY ATTORNEY SANDOVAL-BUSHUR:

22          Q.    Mr. Meyers, your testimony

23  is that Paragraph 13 of the Allison

24  affidavit, Exhibit-5, contains language

CONFIDENTIAL

Page 168

1    that states that Ms. Allison has limited

2    the percentages that she provided to

3    costs that were the result of defendants'

4    alleged improper actions; is that

5    correct?

6            A.    Yes, sir.

7                  And I had previously

8    identified how I defined social media in

9    her affidavit to be the defendants in

10   this matter.

11           Q.    I'm not asking how you

12   define --

13           A.    You are.

14           Q.    -- Ms. Allison -- please let

15   me finish my question.

16                 I'm not asking how you

17   define a term in Ms. Allison's statement.

18   I'm asking for the factual basis you have

19   for -- in the text of Ms. Allison's

20   affidavit -- for your belief that her

21   affidavit contains language that her

22   percentages are limited to costs that

23   were the result of defendants' alleged

24   improper actions.

CONFIDENTIAL

Page 169

1          A.     And I gave you the specific
2     numbers that I believe say that.
3          Q.     And you believe that
4     Paragraph 13 says that because it refers
5     to problems arising out of students' use
6     of social media platforms, correct?
7          A.     That's correct.
8          Q.     And so you believe that when
9     Ms. Allison says, Problems arising out of
10    students' use of social media platforms,
11    she is referring only to defendants'
12    social media platforms, and she is
13    referring only to certain aspects of
14    defendants' social media platforms;
15    that's your testimony?
16         A.     In connection with providing
17    allocation percentages for distinct
18    vendors as a result of those social media
19    usages, yes, sir.
20         Q.     Other than the fact that her
21    affidavit refers to social media, can you
22    point me to any text in the Allison
23    affidavit that supports your belief that
24    that affidavit's estimates are limited to

CONFIDENTIAL

Page 170

1    only certain aspects of defendants'
2    social media platforms?
3           A.    Other than the numbers that
4    I previously read into the record, no,
5    sir.
6           Q.    Do you think that it would
7    be illogical if, in one of the employee
8    affidavits, the employee had included in
9    any of the percentages that they provided
10   costs that related to social media
11   platforms other than defendants'
12   platforms?
13                ATTORNEY GRADEN:  Objection.
14                THE WITNESS:  We're talking
15         specifically about Lisa Allison or
16         generally?  I can't answer it --
17   BY ATTORNEY SANDOVAL-BUSHUR:
18         Q.    I'm talking about --
19         A.    I can't answer it generally
20   because everybody says different things.
21                So it may be that Phillip
22   Watts' affidavit says, my definition of
23   social media is as a direct result of the
24   allegations of the defendants in this

CONFIDENTIAL

Page 171

1   matter.

2              So I'm not going to answer

3   it generally.  But if you want to ask it

4   specifically, I can.  I can't answer it

5   generally.  It's too general.  It's an

6   incomplete hypothet.

7              Do I think it's illogical

8   that some person whose affidavit I don't

9   know and haven't read or maybe have read

10  may or may not have said something?  I --

11       Q.    Well, your understanding,

12  Mr. Meyers, is that all of the employee

13  affidavits and all the interrogatory

14  responses that you relied on for all the

15  districts, when they refer to social

16  media, they are referring to certain

17  aspects of defendants' platforms,

18  correct?

19       A.    That is not what I said.

20       Q.    Okay.

21       A.    And let me clarify.  No, I'm

22  going to finish.

23              You said refer to social

24  media.  You haven't shown me another

CONFIDENTIAL

Page 172

1    affidavit that refers to social media.
2    You haven't shown me any of the
3    interrogatory responses.
4              So my testimony is, and will
5    remain, that I'm relying on the sworn
6    testimony, either via affidavit or
7    verified interrogatory responses, that
8    those answers relate to the actions --
9    the direct alleged improper actions of
10   the defendants in this matter.
11             The interrogatory responses
12   for Interrogatory Number 5 specifically
13   asked what damages the defendants have
14   caused in this matter.  So the
15   representation that the use of social
16   media is even in there, I cannot tell you
17   unless you want to provide me a copy.
18   And I'm happy to look over them and go
19   over them.
20             But in the generality, I'm
21   relying on the sworn testimony of the
22   persons most knowledgeable who are aware
23   of this case and will provide testimony
24   that the percentages they provided relate

```
                                        Page 173
1    to the direct actions of -- the alleged
2    improper actions of the defendants in
3    this matter.
4              THE WITNESS:  When you get
5         to a breaking point.
6              ATTORNEY SANDOVAL-BUSHUR:
7         We can take a break.
8              VIDEO TECHNICIAN:  Going off
9         video record.  11:40 a.m.
10                  -  -  -
11             (Whereupon, a brief recess
12        was taken.)
13                  -  -  -
14             VIDEO TECHNICIAN:  Back on
15        video record.  11:55 a.m.
16   BY ATTORNEY SANDOVAL-BUSHUR:
17        Q.    Mr. Meyers, is a bullying
18   page on a social media platform content?
19        A.    Is a what?
20        Q.    Bullying page.
21        A.    I wouldn't know one way or
22   the other.
23        Q.    Is a page on social media
24   where students post videos of fights
```

CONFIDENTIAL

Page 174

1    content?

2            A.    I wouldn't have an opinion

3    on that.

4            Q.    Is a gossip page content?

5            A.    I wouldn't have an opinion

6    on that.

7            Q.    If one student sends a meme

8    message to another, is that meme message

9    content?

10           A.    I don't know the answer to

11   that.  I don't have an opinion on that.

12           Q.    You do not have an opinion

13   on what is and is not content on social

14   media; is that correct?

15           A.    That's fair.

16           Q.    And is it fair that you

17   would not be able, then, to determine

18   whether a cost was related to content on

19   social media?

20                 ATTORNEY GRADEN:  Objection.

21                 THE WITNESS:  I think

22          generally that's fair, that I'm

23          not giving an opinion related to

24          the cause -- any causation related

CONFIDENTIAL

Page 175

1      in this issue.

2            So whether it's content or

3      something else, the damages, as

4      calculated herein, are as a result

5      of the alleged improper actions of

6      the defendants.

7            So what I can tell you is

8      the two buckets, kind of how you

9      defined them earlier this morning,

10     the cost bucket, which is the

11     first bucket, I can tell you with

12     certainty that all those costs

13     were actually incurred and paid at

14     the time and during the periods.

15           And then as it relates to

16     the allocation percentage, which

17     is the other bucket, we're relying

18     on the sworn written statement of

19     the persons most knowledgeable who

20     will provide testimony at trial as

21     it relates to the direct actions

22     of -- the alleged improper actions

23     of the defendants in this matter.

24  BY ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

1          Q.     Mr. Meyers, what are the
2    alleged improper actions of the
3    defendants in this matter?
4          A.     You'd have to show me the
5    pleadings.  I generally know what they
6    are.  But I couldn't sit here and recite
7    them to you.
8                 I know it has to do with the
9    platforms and certain -- I guess you all
10   may call them features.  I don't know
11   what they call them.
12                But there's a number of
13   alleged improper actions.  The people
14   most knowledgeable are the ones who know
15   those better than I do.
16         Q.     So your understanding is
17   that the district employees who provided
18   affidavits understood what the at-issue
19   improper actions of the defendants were
20   in this matter?
21         A.     That's my understanding,
22   yes, sir.
23         Q.     And is it your understanding
24   that the district employees who provided

CONFIDENTIAL

Page 177

1   affidavits understood who the defendants

2   were in this matter?

3           A.    That's my understanding,

4   yes.

5           Q.    And have you done anything

6   to vet your understanding that the

7   district employees who provided

8   affidavits understood what the at-issue

9   improper actions of the defendants were

10  in this matter?

11                ATTORNEY GRADEN:  Objection.

12          Asked and answered.

13                THE WITNESS:  I think the

14          only one that I would say I had

15          any direct involvement with having

16          a conversation was Phillip Watts,

17          who I had spoken to prior to the

18          issuance of his affidavit.

19                And he clearly, when he

20          provided that information to me,

21          before he put it in an affidavit,

22          could not have been more crystal

23          clear that these were as a result

24          of the actions at issue in this

CONFIDENTIAL

Page 178

1          trial.
2    BY ATTORNEY SANDOVAL-BUSHUR:
3          Q.    Did he tell you what the
4    actions were that were at issue and which
5    were not at issue?
6          A.    He did not.
7          Q.    But aside from Mr. Watts,
8    have you done anything -- let me ask the
9    question a little differently.
10               Aside from your conversation
11   with Mr. Watts, have you done anything to
12   vet your understanding that the district
13   employees who provided affidavits
14   understood what the at-issue improper
15   actions of the defendants are in this
16   matter?
17         A.    Other than the affidavits
18   and the interrogatory responses as they
19   are written, no, sir.
20         Q.    And other than a
21   conversation with Phillip Watts, have you
22   done anything to vet your understanding
23   that the district employees who provided
24   affidavits understood who the defendants

CONFIDENTIAL

Page 179

1    were in this matter?

2          A.    Nothing directly with the

3    people other than Phillip Watts, no, sir.

4          Q.    Have all of the employees

5    who provided affidavits that you relied

6    on been deposed?

7          A.    I don't know the answer to

8    that question.

9          Q.    Did you ask for the

10   deposition testimony of the employees who

11   provided the affidavits that you relied

12   on?

13         A.    I don't recall if I did or

14   didn't.  We can go through the affidavits

15   or the depositions that I have reviewed

16   and look at the dates on them.

17               I know a number of

18   depositions were still continuing

19   subsequent to the issuance of the

20   original reports on May 19th, 2025.  Some

21   of that has been provided to me

22   subsequent and is in my possession and

23   itemized in the reply reports.

24               But the reports that I have

CONFIDENTIAL

Page 180

1    speak to the depositions that I've

2    reviewed in this matter and at what

3    points in time -- or at least between

4    what points in time I've reviewed them.

5            Q.    It was not part of your

6    methodology in this case to attempt to

7    eliminate from your damages estimate

8    costs that related to the effects of

9    content on social media platforms,

10   correct?

11                   ATTORNEY GRADEN:  Objection.

12                   THE WITNESS:  Not one way or

13            the other.  The only cost that I

14            have eliminated in my regard were

15            the ones that could not be

16            verified.  To the extent that they

17            were a select vendor that I

18            couldn't verify the cost, they are

19            not included in my report.

20                   But my analysis does not

21            speak to the causation or the

22            content versus anything

23            non-content.  It is -- that is not

24            within the four corners of my

CONFIDENTIAL

Page 181

1          report.
2     BY ATTORNEY SANDOVAL-BUSHUR:
3          Q.    It was not part of your
4     methodology in this case to attempt to
5     eliminate from your damages estimate
6     costs that related to the effects of any
7     particular features of any social media
8     platforms, correct?
9               ATTORNEY GRADEN:   Objection.
10              THE WITNESS:   My
11          understanding is that the features
12          are one of the things that are at
13          issue.  So the features that are
14          at issue are directly as a result
15          of what the report is written, and
16          any features not at issue are not
17          covered by the report.
18    BY ATTORNEY SANDOVAL-BUSHUR:
19         Q.    If each plaintiff had told
20    you how much in damages it believed was
21    attributable to each individual
22    defendant, you could have separately
23    calculated damages for each individual
24    defendant, correct?

CONFIDENTIAL

                                        Page 182

1                    ATTORNEY GRADEN:  Objection.
2                    THE WITNESS:  Walk me back
3            through your hypothet.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5            Q.    If each plaintiff had told
6    you how much in damages it believed was
7    attributable to each individual
8    defendant, you could have separately
9    calculated damages for each individual
10   defendant, correct?
11                   ATTORNEY GRADEN:  Objection.
12                   THE WITNESS:  Well, the
13           plaintiffs never gave me anything
14           related to damages.
15                   So when you say they give me
16           damages, I'm confused of what my
17           role is if they're giving me the
18           damages --
19   BY ATTORNEY SANDOVAL-BUSHUR:
20           Q.    Let me ask that question
21   differently.
22           A.    -- in this hypothet.
23           Q.    If each plaintiff had told
24   you what percentage of vendor costs it

CONFIDENTIAL

Page 183

1    believed were attributable to each

2    individual defendant, you could have

3    separately calculated damages for each

4    individual defendant, correct?

5           A.    I guess theoretically if

6    there were different charts attributable

7    to different people, we may or may not

8    have done it differently.

9                 I mean, we talked about my

10   litigation experience in providing cases

11   for plaintiffs and defendants.  It is not

12   routine, and it actually would be very,

13   very rare that, as a damage expert, you

14   would apportion damages specifically to

15   defendants in that manner, because that

16   issue is something that is kind of going

17   to be decided along the way.

18                So we talked about my

19   example about the truck driver and

20   multiple defendants.  I don't know that

21   if a doctor would try to apportion it I

22   would use that.

23                So I don't know what I would

24   have done in that circumstance.  It was

CONFIDENTIAL

Page 184

1    not presented to me here.  But I think

2    it's just as equally likely that I would

3    have aggregated them, and they would have

4    had to break it back out then as if I

5    would have done them separately.  It's an

6    interesting question.

7            Q.    It would have been possible

8    for you to have calculated damages

9    separately for each individual defendant

10   if the plaintiffs had provided you with

11   allocation percentages specific to each

12   defendant, correct?

13               ATTORNEY GRADEN:  Objection.

14          Asked and answered.

15               THE WITNESS:  Let me try it.

16               Mathematically I could have

17          done a mathematical calculation to

18          demonstrate what the impact of

19          that is.  I don't know that I

20          would or would not have.  But I

21          could have certainly done an -- a

22          percentage.

23   BY ATTORNEY SANDOVAL-BUSHUR:

24           Q.    Your damages are not limited

CONFIDENTIAL

Page 185

1  to issues relating to students who are

2  addicted to social media, correct?

3            A.    As I sit here right now, I

4  don't know if they are or not.  Because I

5  don't know that that's one of the alleged

6  harms.  I'd have to go back and

7  refamiliarize myself with whether or not

8  that is.

9            If you want to ask me to

10  assume that it's in or out as a matter of

11  what's still being tried in this case,

12  but without knowing that here.

13            To the extent that addicted

14  harm -- or I don't know exactly the

15  terminology you used -- is a material

16  issue of fact in this case still and it's

17  one of the alleged improper actions, then

18  it's in; to the extent that it's not,

19  then it's out.

20            Q.    You do not know whether any

21  of the affidavits that you relied on

22  limited the allocation percents that they

23  provided to issues relating to students

24  who are addicted to social media,

CONFIDENTIAL

Page 186

1   correct?

2          A.    I don't know specifically

3   one way or the other on the affidavits,

4   because the affidavits -- my

5   understanding and assumption is that they

6   are based on the alleged improper

7   actions.

8               And as I just told you, I

9   don't know if that's one of the alleged

10  improper actions.  So I can't answer that

11  question.

12         Q.    You do not know whether the

13  interrogatory responses that you relied

14  on for allocation percentages are limited

15  to issues relating to students who are

16  addicted to social media, correct?

17         A.    My understanding is that the

18  interrogatory responses are limited to

19  the damages in this case as a result of

20  the alleged improper actions of the

21  defendants.

22              And I don't know whether

23  that is one of the alleged improper

24  actions.  So I can't answer that

```
                                        Page 187
 1   question.
 2          Q.    If someone wanted to know
 3   how much in damages a school district
 4   incurred because of students who are
 5   addicted to social media, the damages
 6   estimates that you have offered in this
 7   case would not answer that question,
 8   correct?
 9              ATTORNEY GRADEN:  Objection.
10        Asked and answered.
11              THE WITNESS:  I don't know
12        if they do or if they don't, for
13        the reasons I just told you.
14   BY ATTORNEY SANDOVAL-BUSHUR:
15          Q.    If someone wanted to know
16   how much in damages a school district
17   incurred because of students who were
18   addicted to defendants' platforms, would
19   the damages estimates that you have
20   offered in this case answer that
21   question?
22          A.    I don't know if they do or
23   if they don't.
24          Q.    If someone wanted to know
```

CONFIDENTIAL

1  how much in damages a school district

2  incurred because of only compulsive use

3  of social media by students, would the

4  damages estimates that you have offered

5  in this case answer that question?

6            ATTORNEY GRADEN:  Objection.

7            THE WITNESS:  To the extent

8       that compulsive use is one of the

9       alleged improper actions of the

10      defendants that's being tried in

11      this case, yes; to the extent that

12      it's not, no.

13           I don't know and can't

14      answer that question without

15      further understanding.

16 BY ATTORNEY SANDOVAL-BUSHUR:

17      Q.    Your estimated damages are

18 not limited to addressing issues relating

19 to students who have mental health

20 problems, correct?

21      A.    May I ask you a question?  I

22 know you're not going to answer it.

23           But you call it estimated

24 damages.  I call them damages.  So are

Page 189

1  we -- are we having a difference here
2  on -- because I don't want the answer to
3  reflect the word "estimated."  So I just
4  ask you to clarify.
5       Q.    Your damages are not limited
6  to addressing issues relating to students
7  who have mental health problems, correct?
8       A.    To the extent it's one of
9  the alleged improper actions, it would;
10 to the extent that it's not, it would
11 not.
12      Q.    You don't know, sitting here
13 today, if your estimated damages are
14 limited to addressing issues relating to
15 students who have mental health problems,
16 correct?
17           ATTORNEY GRADEN:  Objection.
18           THE WITNESS:  That's
19       correct.  I do not know one way or
20       the other.
21 BY ATTORNEY SANDOVAL-BUSHUR:
22      Q.    And you did not yourself
23 make any attempt to limit your damages to
24 costs relating to students who have

CONFIDENTIAL

Page 190

1  mental health problems, correct?

2          A.    No.   That -- first of all,

3  that question would be outside of the

4  field of expertise of me.  I'm not a

5  mental health expert.  So I wouldn't be

6  able to make that determination anyway.

7              But for the purposes of the

8  calculations, they are only including the

9  damages that result -- as a -- stemming

10  from the alleged improper actions of the

11  defendants in this case.

12              So to the extent that they

13  do, yes; to the extent that they don't,

14  no.  And otherwise, I can't answer it

15  more distinctly than that.

16          Q.    You do not have any data

17  that would allow you to quantify what

18  portion of your damages relate to

19  students who have mental health problems

20  versus students who do not have mental

21  health problems, correct?

22              ATTORNEY GRADEN:  Objection.

23              THE WITNESS:  I don't have

24      any data related to student mental

CONFIDENTIAL

1      health.
2  BY ATTORNEY SANDOVAL-BUSHUR:
3          Q.    Schools have long had to
4  address student behavioral issues,
5  correct?
6          A.    You're asking me to assume
7  that?  Or as a lay -- you want a lay
8  opinion?  I don't have an expert opinion
9  on that one.
10                I guess it depends on the
11  school.  But I would generally agree with
12  you that behavioral issues are one of the
13  things that schools deal with.
14          Q.    In a world without
15  defendants' platforms, school districts
16  would still have had to address student
17  behavioral issues, correct?
18                ATTORNEY GRADEN:  Objection.
19                THE WITNESS:  They may.
20  BY ATTORNEY SANDOVAL-BUSHUR:
21          Q.    You are not opining that in
22  a world without social media any school
23  district would have spent less money
24  addressing student behavioral issues than

CONFIDENTIAL

Page 192

1  it spent in a world with social media,
2  correct?
3        A.    I'm not opining at all about
4  a world without social media.  That's not
5  the but-for scenario here.  The but-for
6  scenario for the lost profits is the
7  world that includes social media but does
8  not include the alleged improper actions
9  of the defendants.
10            This hypothet that social
11  media ceases to exist is certainly not
12  something that's been considered by me in
13  the course of this analysis.
14        Q.    You are not opining that in
15  a world without the alleged improper
16  actions of defendants any school district
17  would have spent less money addressing
18  student behavioral issues than it spent
19  in the world that included defendants'
20  alleged improper actions, correct?
21                ATTORNEY GRADEN:  Objection.
22                THE WITNESS:  To the extent
23          that behavioral issues is not
24          defined to include SEL curriculum

CONFIDENTIAL

Page 193

1          and/or mental health third-party
2          programs, I would agree with you.
3                    But to the extent that
4          behavioral issues may include SEL
5          curriculum and/or mental health
6          platforms, then I would disagree
7          with you.
8                    Because my damages do
9          quantify a reduction in cost or
10         damages, if you will,
11         out-of-pocket cost related to
12         various SEL curriculum and/or
13         mental health platforms as a
14         result of the alleged improper
15         actions of the defendants in this
16         matter.
17                   So I guess the answer to
18         that question depends on how we
19         were to define behavioral issues.
20    BY ATTORNEY SANDOVAL-BUSHUR:
21         Q.    If a plaintiff was required
22    by law, since before the existence of
23    social media -- let me ask that question
24    again.

CONFIDENTIAL

Page 194

1                    If a -- the plaintiff was
2      required by law, since before the
3      existence of any of defendants'
4      platforms, to pay a cost, then that cost
5      is not attributable to defendants,
6      correct?
7                    ATTORNEY GRADEN:  Objection.
8                    THE WITNESS:  Absolutely not
9            correct.
10     BY ATTORNEY SANDOVAL-BUSHUR:
11           Q.    Why is that not correct?
12           A.    Because costs change and
13     costs may be incurred in different ways.
14                    So to the extent that
15     additional costs were made or additional
16     considerations were made but the cost was
17     still incurred, that doesn't in any way
18     negate the fact that the defendants have
19     caused harm as a result of the alleged
20     improper actions.
21                    So fixed costs can still be
22     considered extra costs just because
23     they're fixed.  They don't have to be --
24     they don't have to be variable.

Page 195

1          Q.    Your opinion is that a
2    school district's fixed costs can be
3    considered extra costs?
4          A.    Absolutely.
5                Extra costs for the purposes
6    of quantifying damages under a lost
7    profits model, which I've done here, yes,
8    sir.
9          Q.    You rely on allocation
10   percents in your damages calculations,
11   correct?
12         A.    Yes.  Subject to my prior
13   answers without reiterating them.
14         Q.    The allocation percent does
15   not reflect the amount by which a cost
16   would change in the absence of
17   defendants' conduct, correct?
18         A.    It may or may not.  That is,
19   the affiant or the verified interrogatory
20   response, it could include a couple of
21   things.  It could be the cost that would
22   change or not have been incurred.  It
23   could be a reduction by which the cost
24   could change.  Or it could be an

Page 196

1    additional cost that was spent that would

2    not have been spent but-for.  It could

3    also include an allocation of the

4    apportionment of a cost related to the

5    issues.

6                   So those particular

7    determinations are made by the actual

8    person who is most knowledgeable who is

9    going to talk about it.  And maybe we

10   should talk about each one of the vendors

11   one at a time, because maybe that would

12   give a better understanding.

13                   But in general, the

14   allocation percentages could relate to a

15   number of things.

16        Q.    Okay.  Well, I would like to

17   understand what you -- you use the word

18   "allocation percent" in your report --

19        A.    I do.

20        Q.    -- correct?

21                   What do you understand

22   allocation percent to represent?

23        A.    The amount of harm caused

24   and the incurrence of that expense as a

CONFIDENTIAL

Page 197

1    result of the alleged improper actions of

2    the defendants, as testified to by the

3    persons most knowledgeable and who will

4    give testimony in this trial related to

5    those particular costs.

6          Q.    The allocation percent does

7    not necessarily reflect the amount by

8    which a cost would change in the absence

9    of defendants' at-issue conduct, correct?

10         A.    It may or may not.

11         Q.    If the allocation percent

12   does not reflect the amount by which a

13   cost would change in the absence of

14   defendants' at-issue conduct, what does

15   it represent?

16         A.    So now we're going into the

17   hypothetical world where we're trying to

18   identify what a cost would have been in

19   the world where the defendants had not

20   performed these alleged improper actions.

21              And that world,

22   unfortunately, doesn't exist.  So when

23   you're negotiating a contract with a

24   vendor, if one of the things that they

CONFIDENTIAL

Page 198

1  are going to do in the course of the
2  contract of that vendor they do not have
3  to do any longer, it could change the
4  cost, it could change the term, it could
5  change the pricing.
6             So unfortunately, we live in
7  this world where we don't have a
8  retroactive crystal ball to know what
9  would have happened in the absence of the
10  alleged improper actions of the
11  defendants.  So you use the best
12  evidence.
13             So, again, to go vendor by
14  vendor may be important.  But, for
15  instance, if you had a web content
16  filter, maybe you're required to have a
17  web content filter, there are a lot of
18  additional add-ons that go on that.
19  Perhaps you would spend less money on
20  that content filter if you were not
21  trying to deal with the impact
22  contemporaneously of the alleged improper
23  actions of the defendants.
24             But because all of the

CONFIDENTIAL

Page 199

1    decisions related to the hard cost that
2    I've calculated here are
3    contemporaneous, they're retro, they're
4    not into the future, they're not
5    prospective, it's in the -- you know, the
6    school at the time they made the decision
7    is in the position, and in the best
8    position to determine what portion of
9    those costs was incurred as a direct
10   result of the alleged improper actions of
11   the defendants.
12           Q.    Is it -- you are not
13   yourself --
14           A.    Wow.
15           Q.    -- opining --
16           A.    Sorry.
17           Q.    What?
18           A.    You just said you are not
19   yourself and stopped.  I didn't know -- I
20   didn't know what the question was.  I am.
21           Q.    You are not yourself opining
22   that any vendor cost would be less in a
23   world in which there is no defendant
24   at-issue conduct, correct?

CONFIDENTIAL

Page 200

1        A.      That is not my opinion.
2    They may or may not be, depending on the
3    vendor.
4        Q.      And nothing in the text of
5    your reports identifies whether, for any
6    given vendor, your opinion is that the
7    vendor cost would be less in a world in
8    which there was no defendant at-issue
9    conduct, correct?
10        A.      I don't know that I agree
11    with that.  It depends on the report.
12            I think some of them are
13    very clear in the report.  Let's go, for
14    instance, with the first cost on
15    Breathitt, which is the Yondr pads -- the
16    Yondr pouches.
17            Not only is the affidavit of
18    Phillip Watts in there, but my
19    discussions with Phillip Watts were that
20    the alleged improper actions at issue in
21    this case were the catalyst to get them.
22            Cell phones have been around
23    since the '90s.  He told me he had been
24    dealing with that for a very long time.

Page 201

1  People had beepers.  People had cell
2  phones.  People had other issues, they
3  text messaged, they played phones.
4            But it wasn't until the
5  alleged improper actions of the
6  defendants in this case that we decided
7  we needed to try something different,
8  because the things they had tried were
9  not.
10            And in the world where the
11  improper actions of the defendants do not
12  exist, that cost may not be incurred at
13  all.
14            You know, I liken it to a
15  business interruption claim, for
16  instance, where your building gets
17  flooded and you go out immediately,
18  because you're trying to save the carpet,
19  you think it's the best thing to do, and
20  you go buy ten box fans.  It's a real
21  example, for what it's worth.  And you go
22  buy ten box fans and you put them on
23  contemporaneously thinking you're doing
24  the best you can to get the carpet dried

Page 202

1  out, prevent the mold from growing so you

2  can get back into business.

3              And the insurance company

4  goes in and says, we're not going to pay

5  for those.  Well, 100 percent of the fan

6  cost were borne as a result of the

7  actions, in that case, of the hurricane.

8  And that's a recoverable loss.

9              So to the extent that the

10  fans may have use beyond what they were

11  purchased for doesn't mean that the cost

12  is not 100 percent recoverable.

13              So the Yondr pouches or the

14  cell phone lockers are an example, at

15  100 percent, of a cost that the

16  testimony, I understand it to be, would

17  not have been incurred but for the

18  alleged improper actions of the

19  defendants.  And that's very clear in the

20  report.

21        Q.    Okay.  Let's set aside the

22  Yondr pouches and cell phone lockers.

23              For other vendor costs,

24  is -- are you opining that those vendor

CONFIDENTIAL

Page 203

1  costs would be less in a world in which
2  there is no defendant at-issue conduct?
3          A.    They may or may not be less
4  in the but-for world where there is no
5  alleged improper actions of the
6  defendants during the time periods for
7  which the report calculates damages.
8          Q.    Let's look at the Breathitt
9  report, Exhibit-1A, Appendix C,
10  Exhibit-1.
11              And the first two costs
12  there are for cell phone caddies and cell
13  phone lockers, correct?
14          A.    They are, yes.
15          Q.    And then the third cost that
16  you include in your damages calculation
17  is costs relating to the vendor Kids
18  First, correct?
19          A.    That's what it says.
20          Q.    And you have an allocation
21  percent of 50 percent, correct?
22          A.    Correct.
23          Q.    Would the Breathitt vendor
24  costs for Kids First be 50 percent lower

Page 204

1    in a world without defendants' at-issue

2    conduct?

3            A.    They may have been

4    50 percent less or they may have been

5    zero.

6            The allocation that Phillip

7    Watts and Will Noble assigned to them was

8    50 percent as a result of the direct

9    alleged improper actions of the

10   defendants.

11           Q.    And I'm trying to understand

12   what you understand 50 percent to mean.

13           A.    Fifty percent is the damage

14   component -- it is the portion of the

15   cost that is allocated to the alleged

16   improper actions of the defendants.

17           So these contemporaneously

18   paid costs at this time to combat the

19   alleged improper actions of the

20   defendants were -- were, in part,

21   incurred for that purpose.  And at this

22   point, it was 50 percent in part incurred

23   with that purpose.

24           So I can't go into the

CONFIDENTIAL

Page 205

1   hypothetical world and have their actions

2   not be there.  It may be that the cost

3   wouldn't have been incurred at all for

4   Kids First particularly.

5              But that Phillip Watts has

6   determined in his affidavit that he is

7   only willing to assign 50 percent of

8   whether it's the benefit or the

9   utilization of Kids First toward the

10  actions of the defendants, that's a

11  question for Phillip Watts to answer.

12       Q.    Looking at Kids First, the

13  first vendor cost that you list is $400,

14  correct?

15       A.    It is.

16       Q.    In a world without

17  defendants' at-issue conduct, the vendor

18  cost for Kids First may have still been

19  $400, correct?

20             ATTORNEY GRADEN:  Objection.

21             THE WITNESS:  It may have

22       been $400.  It may not have

23       existed at all.  That's a question

24       for Phillip Watts as it relates to

Page 206

1          his determination of what
2          percentage of the cost incurred
3          for Kids First contemporaneously
4          as a result of the alleged
5          improper actions of the
6          defendants.
7   BY ATTORNEY SANDOVAL-BUSHUR:
8          Q.    And for every vendor cost
9   that does not have an allocation percent
10  of 100 percent --
11         A.    Okay.
12         Q.    -- is it your understanding
13  that in a world without defendants'
14  at-issue conduct each of those vendor
15  costs may have been exactly the same as
16  what you present in your report?
17                ATTORNEY GRADEN:  Objection.
18                THE WITNESS:  I don't have a
19         way of knowing in that but-for
20         hypothetical world if they are the
21         same or if they're zero.  They may
22         not have been incurred at all or
23         they may have been incurred at the
24         same.

CONFIDENTIAL

Page 207

```
 1            But the percentage allocable
 2       to the alleged improper actions of
 3       the defendants, as determined in
 4       these particular cases, and I
 5       don't know if it's Phil Watts for
 6       some of these or Will Noble for
 7       some of these, are the people who
 8       are going to testify as to the
 9       impact of those harms on these
10       costs.
11            And, like I said before,
12       those costs could go into a couple
13       of buckets, which we talked about.
14  BY ATTORNEY SANDOVAL-BUSHUR:
15       Q.    So looking at the Kids First
16  example, the vendor cost is $400.  You
17  apply an allocation percent of
18  50 percent, and result in a damages total
19  of $200, right?
20       A.    That is the math, yes, sir.
21       Q.    And your understanding is
22  that $200 does not necessarily reflect
23  the difference between what Breathitt
24  actually paid Kids First and what
```

CONFIDENTIAL

Page 208

1   Breathitt would have paid Kids First in a
2   world without defendants' conduct,
3   correct?
4           A.      It may or may not.  Like I
5   said, it could be that it was still $400
6   and that none was assigned to it; it
7   could have been that the cost would have
8   been $200, which would be your hypothet
9   that you're asking, or it could have been
10  that the cost would have been zero and
11  Phillip Watts determined that even though
12  that cost would not have been incurred,
13  he was more comfortable assigning a
14  50 percent weighting to it.
15          But those questions would be
16  asked of those persons most knowledgeable
17  who are going to provide the foundation
18  at trial for the allocation percentages
19  by vendor.
20          Q.      And your understanding is
21  the same for all of the vendor costs that
22  have an allocation percent of less than
23  100 percent, that the damages total does
24  not necessarily reflect the difference

Page 209

1  between what the school district actually
2  paid the vendor and what the school
3  district would have paid the vendor in a
4  world without defendants' conduct,
5  correct?
6              ATTORNEY GRADEN:  Objection.
7              THE WITNESS:  I will agree
8          with it does not necessarily
9          reflect.  It could reflect a
10          number of things.
11              So, yes, I will agree with
12          the question as worded.
13  BY ATTORNEY SANDOVAL-BUSHUR:
14      Q.    Is a cost properly
15  considered damages even if a plaintiff
16  would have paid the exact same cost in
17  the absence of defendants' at-issue
18  conduct?
19              ATTORNEY GRADEN:  Objection.
20              THE WITNESS:  My answer is
21          yes.  But I do believe that that's
22          a legal determination whether or
23          not a cost is recoverable under
24          whatever law.  So I'm not going to

CONFIDENTIAL

Page 210

1           certainly step in the purview of
2           the trier in this case.
3                  But over the course of my
4           career, whether it's representing
5           plaintiffs or defendants, this
6           methodology has been employed by
7           me without exception and utilized
8           in federal and state courts all
9           over the country.
10                 So I have not had anyone
11          take exception with that.  But I
12          certainly don't want to make a
13          legal determination of what is or
14          not recoverable.  I'm only
15          calculating the damages here.
16  BY ATTORNEY SANDOVAL-BUSHUR:
17          Q.    And your damages totals
18  include amounts that plaintiffs might
19  have paid in the absence of defendants'
20  conduct, correct?
21                 ATTORNEY GRADEN:  Objection.
22                 THE WITNESS:  They may have
23          paid or they may not have paid or
24          they may have paid at a lesser

CONFIDENTIAL

Page 211

1          amount.
2                  And that's assuming not the
3          100 percents, or they may not have
4          paid at all because it's
5          100 percent related to.
6   BY ATTORNEY SANDOVAL-BUSHUR:
7          Q.    You relied on the affidavits
8   that were provided by employees from
9   Breathitt, Charleston and DeKalb,
10  correct?
11         A.    Yes.
12         Q.    And you spoke with Mr. Watts
13  who provided an affidavit for Breathitt,
14  correct?
15         A.    I spoke with Mr. Watts.  And
16  I also spoke with Stacy -- Stacy
17  McKnight, the CFO, just for clarity of
18  the record.
19         Q.    For those individuals whose
20  affidavits you relied on for your damages
21  calculations, the only one who you spoke
22  with was Mr. Watts, correct?
23         A.    Related to the six
24  bellwether cases herein.

CONFIDENTIAL

Page 212

1          Q.     Correct.

2          A.     I don't know that that's

3    accurate for all of the cases.  But for

4    the six that we're talking about and the

5    three with affidavits, Phillip Watts was

6    the only one of the three -- or one of

7    the four deponents -- well, not deponents

8    but affiants that I spoke with.

9          Q.     And at the time that you

10   issued your expert reports, your initial

11   expert reports with your damages

12   calculations, you had not reviewed the

13   deposition testimony of any of the

14   employees from Breathitt, Charleston or

15   DeKalb who issued affidavits, correct?

16         A.     That's correct.  Who issued

17   affidavits.  That's fair.

18                I don't know that they had

19   given depositions prior to the issuance

20   of my report.  So with that caveat, I had

21   not -- obviously, I couldn't have

22   reviewed something that didn't exist at

23   the time.

24                But for the ones who may

CONFIDENTIAL

Page 213

1  have given depositions prior to, I did

2  not review them if they're not in my

3  materials reviewed.

4          Q.    You relied on the

5  interrogatory responses that were

6  provided by Harford, Irvington and Tucson

7  for your damages calculations, correct?

8          A.    In part.

9          Q.    Did you know, when you

10  issued your reports for Harford,

11  Irvington or Tucson, who from the

12  districts provided the information that

13  was included in the interrogatory

14  responses that you relied upon?

15          A.    I don't know which

16  individuals would have given that sworn

17  testimony.  I know that they were all

18  verified, which was something that we

19  checked.

20              But that sworn testimony

21  could have been from one person or a

22  consolidation of a number of people who

23  will provide testimony.

24          Q.    When you relied on the

CONFIDENTIAL

Page 214

1    interrogatory responses from Harford,
2    Irvington and Tucson, did you know
3    whether it was the school district's
4    attorneys who had provided the
5    information in the responses?
6                    ATTORNEY GRADEN:  Objection.
7                    THE WITNESS:  I have been
8          dealing with litigation work for a
9          long time.  The general
10          representation that the attorneys
11          are providing sworn statements is
12          not my understanding.
13               The people who are giving
14          the answers are the ones who are
15          swearing that the answers are
16          true, correct and reliable under
17          penalty of perjury.
18               So I don't believe or accept
19          any acknowledgment that the
20          attorneys are the ones who are
21          drafting the answers in any way.
22               They may have physically
23          written them.  But it's the people
24          who are going to swear at trial

CONFIDENTIAL

Page 215

1          that this is the true and

2          accurate -- who are giving them

3          those answers.

4    BY ATTORNEY SANDOVAL-BUSHUR:

5          Q.    And it's your understanding

6    that the people who signed the

7    interrogatory responses for Harford,

8    Irvington and Tucson are not attorneys;

9    is that correct?

10          A.    I don't know if they're

11    attorneys or not.  But they're not

12    counsel of record in this case.

13               They were verified by the

14    actual representatives of those

15    districts --

16          Q.    In your --

17          A.    -- that's my understanding.

18          Q.    In your experience, it would

19    be unusual if an interrogatory was

20    verified by an attorney, correct?

21          A.    I don't know if that's

22    unusual or not.  I've worked a lot on

23    discovery in many matters.  I do a lot of

24    discovery working with the attorneys on

CONFIDENTIAL

Page 216

1  behalf of divorce clients.  One of the
2  things I do in my domestic practice is
3  assist with discovery a lot.
4            And it may not be unusual
5  for an attorney to verify an
6  interrogatory that's attested to by the
7  client.
8            So I think that's a legal
9  conclusion.  I don't recall any attorneys
10 signing those verifications.  I think
11 they were all signed by the
12 representatives.
13           But I don't know that that
14 changes my opinion at all that their
15 sworn testimony as an interrogatory in an
16 answer to a direct question on damages
17 from the defendants in this matter.
18      Q.    Is it your understanding
19 that the individuals who signed the
20 interrogatory responses will be the ones
21 who will testify to the validity of those
22 percentages?
23      A.    I don't know that they
24 necessarily will be the ones.  It could

Page 217

1    be multiple people.

2             But they are the ones who

3    have gathered up the information to make

4    sure that it's correct, reliable and

5    accurate as representatives of those

6    districts to give truthful testimony in

7    an interrogatory response.  That's my

8    understanding.

9         Q.    For Harford, Irvington and

10   Tucson, you do not know who will testify

11   to the accuracy, validity or reliability

12   of the percentages provided in those

13   interrogatory responses, correct?

14        A.    That's fair.  I do not know

15   at this time.

16        Q.    It was not part of your

17   assignment in this case to vet the

18   process that any school district

19   employees used to arrive at the

20   allocation percents in their affidavits,

21   correct?

22             ATTORNEY GRADEN:  Objection.

23             THE WITNESS:  Could you ask

24        it again, please?

CONFIDENTIAL

Page 218

1   BY ATTORNEY SANDOVAL-BUSHUR:

2          Q.     It was not part of your

3   assignment in this case to vet the

4   process that any school district

5   employees used to arrive at the

6   allocation percents in their affidavits,

7   correct?

8          A.     I think that's fair.

9          Q.     And you did not, in fact,

10  vet the process that any school district

11  employee used to arrive at the allocation

12  percents in their affidavits, correct?

13         A.     That's fair.

14         Q.     And you do not know, one way

15  or the other, whether the employees whose

16  affidavits you relied on used a

17  reasonable or unreasonable process to

18  arrive at their allocation percents,

19  correct?

20                ATTORNEY GRADEN:  Objection.

21                THE WITNESS:  I can't speak

22         to their process.  I don't believe

23         they used an unreasonable one.

24         But I have no way of knowing one

CONFIDENTIAL

Page 219

1          way or the other, only that the
2          testimony that they're going to
3          give and that they have already
4          given is sworn to under penalty of
5          perjury.
6   BY ATTORNEY SANDOVAL-BUSHUR:
7          Q.     And you do not know, one way
8   or the other, what process, if any, any
9   school district employee whose affidavit
10  you relied on used to determine whether
11  or to what extent a vendor's costs were
12  related to defendants' at-issue conduct,
13  correct?
14               ATTORNEY GRADEN:  Objection.
15               THE WITNESS:  Could you read
16          it back?  It had a few different
17          pieces to it.
18  BY ATTORNEY SANDOVAL-BUSHUR:
19          Q.     Yeah.
20               You do not know, one way or
21  the other, what process any school
22  district employee whose affidavit you
23  relied on used to determine whether or to
24  what extent a vendor's costs were related

CONFIDENTIAL

Page 220

1    to defendants' at-issue conduct, correct?
2                    ATTORNEY GRADEN:  Objection.
3                    THE WITNESS:  I think that's
4            right.  I mean, I certainly
5            couldn't speak for somebody like
6            Phillip Watts or Byron
7            Scheuneman's involvement with
8            DeKalb, for instance, or any of
9            the other people I talked to's
10           discussions with me and what role
11           it had.
12               So I was not involved with
13           that process and do not speak to
14           the process itself, because I have
15           no knowledge of it.  So I think
16           that's accurate.
17   BY ATTORNEY SANDOVAL-BUSHUR:
18           Q.    And you do not know whether
19   any of the employees who issued
20   affidavits reviewed any data before
21   arriving at the allocation percents that
22   they put in their affidavits, correct?
23                    ATTORNEY GRADEN:  Objection.
24                    THE WITNESS:  Define data.

CONFIDENTIAL

Page 221

```
 1          Many of the allocation percentages
 2          have a chart of the costs, and
 3          some of those costs may have come
 4          from me as having been verified
 5          and forensically analyzed in the
 6          cost chart.
 7                  The percentages, no.  But
 8          you just said in their affidavit
 9          generally.
10  BY ATTORNEY SANDOVAL-BUSHUR:
11          Q.    Okay.
12          A.    So I'm not certain that the
13  fact that I had already reconciled the
14  cost of the Yondr pouches for Phillip
15  Watts and he put the number of the
16  dollar, that he didn't get that from me.
17                  He may or may not have
18  gotten it from me.  And they didn't
19  always reconcile with what I said.  But
20  some of them did.  And to the extent that
21  they did, it may have been as a result of
22  the work I had performed in advance of
23  declaration or affidavit they provided or
24  interrogatory responses provided.
```

CONFIDENTIAL

Page 222

1          Q.    Yeah.  And my question was
2    actually limited to the allocation
3    percents.
4          A.    That was --
5          Q.    Understood.  I'll just
6    re-ask the question.
7          A.    Yeah.  Please.
8          Q.    You do not know whether any
9    of the employees who issued affidavits
10   reviewed any data before arriving at the
11   allocation percents that they put in
12   their affidavits, correct?
13         A.    Subject to the fact that
14   they may have reviewed the data on the
15   costs and that may have had some impact,
16   I do not know otherwise.
17              I don't know what data they
18   reviewed, I guess, is the right answer.
19         Q.    You do not know whether or
20   to whom any of the employees who issued
21   affidavits interviewed before arriving at
22   the allocation percents presented in the
23   affidavit, correct?
24              ATTORNEY GRADEN:  Objection.

CONFIDENTIAL

Page 223

1              THE WITNESS:  I'm not aware
2         of the process that any of the
3         people who will provide the sworn
4         testimony went through in order to
5         get their sworn testimony before
6         the court, whether in a
7         declaration or in a response to a
8         verified interrogatory, as it
9         relates to calculating damages as
10        a result of the alleged improper
11        actions of the defendants in this
12        matter.
13   BY ATTORNEY SANDOVAL-BUSHUR:
14        Q.    For the districts whose
15   interrogatory responses you relied on for
16   allocation percentages, you do not know
17   what process was used to arrive at the
18   allocation percents, correct?
19        A.    Same answer, if you'd like
20   me to read it back.
21              I'll put them both together.
22              I don't know either for the
23   affidavits or for the interrogatory
24   response what portion they went through

CONFIDENTIAL

```
                                    Page 224

 1  to determine that the damages allegedly
 2  caused by the defendants in this matter
 3  relate to the allocation percentages,
 4  neither for the interrogatory responses
 5  or the declarations, affidavits.
 6          Q.   Do you know whether the
 7  plaintiffs' attorneys suggested
 8  allocation percents to the employees who
 9  ultimately issued affidavits and then
10  asked the employees to estimate
11  allocation percents?
12              ATTORNEY GRADEN:  Objection.
13              THE WITNESS:  I don't know
14          one way or the other.  I have no
15          reason to believe that the
16          attorneys are suggesting the
17          answer to the plaintiffs.
18              But I have no way of knowing
19          one way or the other.
20  BY ATTORNEY SANDOVAL-BUSHUR:
21          Q.   Would you be surprised if
22  plaintiffs' attorneys suggested
23  allocation percents to the employees who
24  ultimately issued affidavits and then
```

CONFIDENTIAL

Page 225

1  asked the employees to estimate the

2  percents?

3                    ATTORNEY GRADEN:  Objection.

4                    THE WITNESS:  I would be

5          very surprised if people who were

6          prepared to offer and have already

7          offered sworn testimony under

8          penalty of perjury are given an

9          opinion that's not their own.

10                   Yes, that would surprise me.

11 BY ATTORNEY SANDOVAL-BUSHUR:

12         Q.    For the allocation percents,

13 you relied, for Breathitt, on two

14 employee affidavits, correct?

15         A.    That is correct, yes, sir.

16         Q.    For the allocation percents,

17 you relied, for Charleston, on one

18 employee affidavit, correct?

19         A.    Yes.  That's Allison,

20 correct.

21         Q.    And for DeKalb for

22 allocation percents, you relied on one

23 employee affidavit, correct?

24         A.    That's correct.

Page 226

1          Q.     The employees whose
2    allocation percents you relied on were
3    selected by plaintiffs' attorneys,
4    correct?
5                    ATTORNEY GRADEN:  Objection.
6                    THE WITNESS:  I don't know
7          that to be the case.
8    BY ATTORNEY SANDOVAL-BUSHUR:
9          Q.     You did not identify the
10   people who you thought should provide
11   allocation percents and then ask
12   plaintiffs' attorneys to get information
13   from those people, correct?
14         A.     I didn't identify anybody to
15   provide sworn testimony in this case one
16   way or the other.  I was not involved in
17   any process.
18         Q.     You did not have any say in
19   who provided affidavits in this case?
20         A.     I think that's fair to say
21   that I could not cause an affidavit to be
22   made.
23         Q.     And you did not ask
24   plaintiffs' attorneys to obtain or seek

CONFIDENTIAL

Page 227

1   to obtain affidavits from any particular

2   individuals from any particular school

3   district, correct?

4           A.    I think that's fair to say.

5               ATTORNEY GRADEN:  Objection.

6               THE WITNESS:  That was not a

7           process I was involved in in any

8           way.

9   BY ATTORNEY SANDOVAL-BUSHUR:

10          Q.    And you do not know why

11  plaintiffs' attorneys selected which

12  employees would provide affidavits and

13  which would not, correct?

14              ATTORNEY GRADEN:  Objection.

15              THE WITNESS:  I don't know

16          other than to know that the people

17          who are providing sworn testimony

18          in this case as a result of the

19          alleged improper actions of the

20          defendants are the persons

21          knowledgeable to say what they've

22          said in their affidavits.  It

23          wouldn't be in their affidavit if

24          it wasn't within the scope of

CONFIDENTIAL

Page 228

1          their personal knowledge during
2          this period.
3                 So other than that, no.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5          Q.    You did not receive any
6    affidavits from Harford, Irvington or
7    Tucson, correct?
8          A.    I think that's correct, yes,
9    sir.
10          Q.    What is your understanding
11    of why you received affidavits from some
12    districts but not from others?
13          A.    I have no idea.  My
14    speculation is that some attorneys like
15    affidavits and some attorneys like
16    response to interrogatories.  Perhaps
17    just a preference of the local counsels
18    that are representing those particular
19    school districts.
20                 But I would simply be
21    guessing like I just did in that answer.
22          Q.    For the employees whose
23    affidavits you rely on, do you understand
24    that those employees do not personally

CONFIDENTIAL

Page 229

1  make the decision to pay each and every

2  one of the vendors identified in their

3  affidavits?

4             ATTORNEY GRADEN:  Objection.

5             THE WITNESS:  I have no way

6        of knowing that.  I don't know

7        that I agree with that on its

8        face.

9             I think Phillip Watts has

10       been there a long time.  He may

11       have been the cause for single --

12       every single cost on Breathitt.

13            I think if I remember

14       correctly, Monika Davis was in the

15       school system long before the

16       allegations here.

17            And I'm looking at Lisa

18       Allison at Charleston, and she's

19       been the executive director and

20       working with these programs maybe

21       since 2001.

22            So I don't know the answer

23       to that.  I'm not the right person

24       to ask on who caused any expense

CONFIDENTIAL

Page 230

1          to be incurred.

2                  I'm the right person to ask

3          on was it incurred and was it

4          paid.  And they were.

5    BY ATTORNEY SANDOVAL-BUSHUR:

6          Q.    So you do not know, one way

7    or the other, which of the vendor costs

8    in the employee affidavits the employee

9    who issued the affidavit was personally

10   involved in; is that fair?

11         A.    I think it's fair that I

12   don't have direct knowledge on that.

13                I mean, we could take them

14   one at a time.  Phillip Watts was the

15   superintendent.  And I believe Will Noble

16   was the CFO.  The CFO is going to have

17   direct knowledge of any expense that goes

18   through his, you know, payment system

19   while he's the CFO for as long as he is

20   the CFO.

21                Then Monika Davis, I

22   believe, was perhaps also the CFO or

23   filled that role as a CFO.

24                So I don't know the answer.

CONFIDENTIAL

Page 231

1          But the people who have
2    given those affidavits certainly were in
3    the role and were in positions that would
4    have been intimately familiar with the
5    knowledge of the costs incurred during
6    the periods we're talking about.
7          Q.    You did not require that an
8    employee have personal knowledge about a
9    vendor or payments to a vendor in order
10   for you to rely on the percentages in the
11   employee's affidavit, correct?
12              ATTORNEY GRADEN:   Objection.
13              THE WITNESS:   That's fair.
14         So long as the employee is
15         standing ready to testify that
16         they are the person most
17         knowledgeable and have the
18         information to provide to the
19         court that's truthful and accurate
20         as to the -- what the affidavits
21         say resulting from the damages of
22         the alleged improper actions of
23         the defendants, they are the
24         people who are the ones to rely

CONFIDENTIAL

Page 232

1          upon.

2     BY ATTORNEY SANDOVAL-BUSHUR:

3          Q.    And you did not require that

4     the information in an interrogatory

5     response be provided by someone with

6     knowledge of the vendors or payments to

7     the vendors in order for you to rely on

8     the interrogatory response; is that fair?

9               ATTORNEY GRADEN:  Objection.

10              THE WITNESS:  I didn't

11         require anything in any

12         interrogatory response.  I didn't

13         have anything to do with discovery

14         in this matter.

15              ATTORNEY GRADEN:  Joseph,

16         it's almost 1:00.  If you want to

17         take a lunch break.

18              ATTORNEY SANDOVAL-BUSHUR:

19         Yeah.  We can take a break.

20              VIDEO TECHNICIAN:  Going off

21         the video record, 12:44 p.m.

22                    -   -   -

23              (Whereupon, a luncheon

24         recess was taken.)

CONFIDENTIAL

Page 233

```
1                    -   -   -
2              VIDEO TECHNICIAN:   Back on
3          video record, 1:18 p.m.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5              Q.     Mr. Meyers, it was not part
6    of your assignment in this case to
7    determine whether any school district
8    paid any of the costs included in your
9    damages calculations using external
10   funds, such as federal funds, correct?
11             A.     I don't know that I agree
12   with that.  To the extent that the
13   federal funds are part of the general
14   budget, I confirmed that all the costs
15   came from the school funding itself.
16                  So whether or not the
17   original source of the funding, call it
18   revenues, if you will -- I know we talked
19   about not-for-profits, but they can still
20   have revenues -- call it revenues of the
21   not-for-profit school districts, those
22   would include federal grants, state
23   grants, private grants, all of these
24   other different funding sources.
```

CONFIDENTIAL

Page 234

1                    So my focus was on making

2    sure that the school expended the funds

3    to pay for the costs that are in there,

4    this is, not a third-party grant paying

5    it directly.

6                    But that does not

7    necessarily mean that the original source

8    of the funding or a portion of the source

9    of the funding may have originated from

10   the general budget having federal or

11   state funds as a part of its revenue

12   stream, if that makes sense.

13        Q.    It was not part of your

14   assignment to determine what funds any

15   school district used to pay any of the

16   costs included in your damages

17   calculations, correct?

18        A.    I think that's fair.  The

19   source of the funds at the school

20   district level were not part of what I

21   was asked to do.

22                    But I did confirm that the

23   costs were borne at the school level, if

24   that makes sense.

CONFIDENTIAL

Page 235

1          Q.    And you're not opining on

2     what the source of any of the funds are

3     for any of the costs included in your

4     damages calculations, correct?

5          A.    That is fair.  The source is

6     not a concern for me in the report that

7     I've done.  This is on the expenditures,

8     not what funded those.

9          Q.    It was not part of your

10    assignment to determine whether any

11    school district paid for any of the costs

12    included in your damages calculations

13    using grant funding, correct?

14         A.    That's fair.  Grant funding,

15    federal funding, any source of revenue

16    that would come into the school district

17    was outside of the scope of what I did.

18              I did not start with the

19    revenue.  I made sure that the

20    expenditures that are calculated for the

21    select vendors in my Exhibit-1 to the six

22    reports were all borne at the school

23    level.  But whether or not it was from

24    the general fund or a specific specially

Page 236

1  allocated fund or what funded those
2  particular funds, if you will, was not
3  part of what I was asked to do in this
4  case.
5          Q.    It was not part of your
6  assignment to determine whether any
7  school district was reimbursed using any
8  third-party funds for any of the costs
9  included in your damages calculations,
10  correct?
11          A.    I think that's fair.
12  It's -- the reimbursements would still
13  come in as regular revenues under that
14  business model generally.  So that would
15  go back into the inputs on those
16  particular sources.
17          Q.    And you did not -- and you
18  were not opining that any school district
19  was or was not reimbursed using any
20  third-party funds for any of the costs
21  included in your damages calculations,
22  correct?
23          A.    Again, yes, that's correct.
24  I don't have an opinion on the source of

CONFIDENTIAL

Page 237

1    any of the funds, whether it was

2    reimbursed and booked as revenues.

3                    I can tell you that none of

4    the costs that I have included have

5    contra offsets.  So if in the general

6    ledger it was a cost that was borne by

7    the school but then it was paid back and

8    netted out as if it were not paid by the

9    school, that cost would not have been

10   incurred -- or included in this report,

11   which could be indicative of a

12   reimbursement to pay for it so that it

13   did not come from the source of the funds

14   from the school.

15                    But to the extent that the

16   funds all go into different pots for a

17   school that has to go, whether it's a

18   teacher fund or general fund or specific

19   allocated fund or capital campaign,

20   whatever those pots were, I didn't touch

21   those buckets at all.

22                    It was all in the

23   expenditure -- the use side, not the

24   source side.

CONFIDENTIAL

Page 238

1          Q.    It was not part of your
2     assignment to determine whether any
3     school district spent money on a
4     particular vendor cost specifically
5     because the district received external
6     funding to pay that cost; is that
7     correct?
8          A.    No, that was not within the
9     scope, for the reasons we just talked
10    about.
11         Q.    And you did not, in fact --
12    well, let me ask my question a little
13    differently.
14              You are not opining on
15    whether any school district spent money
16    on a particular vendor cost specifically
17    because the district received external
18    funding to pay that cost, correct?
19         A.    That's fair.  I'm actually
20    specifically opining that the
21    expenditures in my report are as a direct
22    result of the alleged improper actions of
23    the defendants, not as a result of some
24    other external force, which would include

CONFIDENTIAL

Page 239

1    some direct grant funding.

2              So I'm opining specifically

3    that they were incurred as a result of

4    the alleged actions of the defendants.

5         Q.    It was not part of your

6    assignment in this case to study what

7    specific services or products any school

8    district purchased or received from any

9    vendor; is that correct?

10         A.    I think that's fair, with

11   the one caveat that, as is detailed in my

12   report, there are certain buckets of

13   information I've been asked to opine on;

14   capital cost, such as the Yondr pouches

15   or the lockers, SEL curriculum, mental

16   health, technology, and, in a couple of

17   cases, property damage.

18              But other than those

19   buckets -- I mean, I had to make sure

20   that it wasn't put on a new roof.  But it

21   was one of those five buckets that I was

22   asked to opine on.

23              So once I was satisfied that

24   those vendors met one of those

CONFIDENTIAL

Page 240

1  definitions that I was asked to review,

2  because there may be other damages in

3  this case that I'm not aware of or

4  opining on related to other vendor costs

5  that are not the select vendor costs that

6  I'm doing, that it fell into one of those

7  four buckets or five buckets, if you

8  will.

9            But outside of that, no

10  additional work.

11            Q.    You just testified that you

12  were asked to opine on costs in certain

13  buckets, including capital costs,

14  social-emotional learning curriculum,

15  mental health, technology and property

16  damage, correct?

17            A.    That's correct.

18            Q.    Who came up with those

19  buckets?

20            A.    I don't know the answer to

21  that.  I know there's multiple experts in

22  this case.  Some are dealing with payroll

23  costs.  Some are dealing with the past

24  costs.  Some are dealing with future

CONFIDENTIAL

Page 241

1  costs.  I'm not involved with the role of

2  any of the other experts.

3              But for my role in this

4  case, I was asked to, I guess, only focus

5  on the costs in those five buckets for

6  these particular schools related to the

7  past.  So only past -- certain select

8  vendor out-of-pocket past damages in

9  those four or five buckets, as you just

10  identified.

11              But I don't know --

12       Q.    You -- let me start that

13  again.

14              Did plaintiffs' attorneys

15  tell you that your damages analysis

16  should relate to past costs in the

17  buckets of capital costs, social --

18  social-emotional learning curriculum,

19  mental health, technology and property

20  damage?

21              ATTORNEY GRADEN:  Objection.

22              THE WITNESS:  I think

23       it's -- that's fair to say.

24              Originally when we got all

CONFIDENTIAL

Page 242

1    the general ledgers and started
2    having to go through vendors, the
3    focus was that I was not dealing
4    with any employee costs.  I was
5    not dealing with any purchase cost
6    of things outside of these.
7         So in an initial scope to
8    narrow -- and as you can see
9    through these reports, some of
10   them don't have all of those five
11   buckets.  They -- only costs were
12   identified in sometimes two or
13   three of those buckets for me to
14   quantify in this particular case.
15        But that was the initial
16   part of the narrowing of my scope.
17   When I got every vendor that's
18   ever been paid over a period of
19   eight years for a school that's
20   got 92 different schools inside of
21   it, it's a lot of costs to go
22   through.
23        So that was the first
24   narrowing of the forensic

CONFIDENTIAL

Page 243

1          accounting to get those buckets.

2                And then it was further

3          narrowed, as you can see, to just

4          select vendors that are being

5          identified by the persons most

6          knowledgeable as to the alleged

7          improper actions of the defendants

8          where damages were caused.

9                So it's not all the

10         technology.  And it's not all the

11         mental health.  And it's not all

12         the SEL.  And it's not all the

13         capital cost.  It's very small in

14         comparison to the general budgets

15         of these schools, costs that were

16         eventually finally identified for

17         me.

18   BY ATTORNEY SANDOVAL-BUSHUR:

19         Q.    If you take, for example,

20   the social-emotional learning curriculum

21   costs.

22         A.    Okay.

23         Q.    You are not opining on the

24   details of any of the social-emotional

CONFIDENTIAL

Page 244

1    curriculum that any district purchased

2    from any vendor, correct?

3            A.    When you say "details," you

4    mean what services are provided under

5    that particular vendor?

6            Q.    Correct.

7            A.    That's fair.  My work is not

8    concerned with, if you will, what the

9    services were provided.  The vendors were

10    identified by the people who are going to

11    testify as to how those vendor costs were

12    impacted as a result of the alleged

13    improper actions.

14                So, I mean, I can see what

15    they are by the invoices and the purchase

16    orders.  But what services they provided

17    or what technology -- technology they

18    provided or what type of mental health

19    they provided is irrelevant to the

20    quantification of damages in my report.

21    That's an assumption that I'm making in

22    those buckets.

23            Q.    So for all of the vendor

24    costs, you are not opining on what

CONFIDENTIAL

Page 245

1  services were provided by each particular

2  vendor?

3          A.    That's fair.  I will not

4  give an expert opinion at trial that some

5  particular vendor was directly

6  attributable to some particular function

7  of that.  Not at that level, no, sir.

8          Q.    And you are not opining that

9  any particular service received from any

10  vendor was, in fact, connected to social

11  media or to defendants' at-issue conduct,

12  correct?

13          A.    Well, I don't believe that's

14  correct.  I'm opining on that as a result

15  of the affidavit and sworn testimony of

16  the persons that these are the vendors

17  that were impacted and whose costs were

18  impacted as a direct result.

19              So I am opining that it's a

20  direct result of the impact of the

21  alleged improper actions of the

22  defendants as a result of the sworn

23  testimony of the persons most

24  knowledgeable.

CONFIDENTIAL

Page 246

1          Q.     And you are opining that a
2    particular vendor cost was -- let me ask
3    my question differently.
4               Is it fair to say that you
5    are opining that, based on the
6    information provided in the affidavits or
7    the interrogatory responses, certain
8    vendor costs were connected to
9    defendants' at-issue conduct?
10         A.     Yes.
11         Q.     And you have not, as part of
12   your work in this case, vetted whether
13   the information provided in the
14   affidavits or interrogatory responses is
15   accurate, correct?
16         A.     Except as far as it relates
17   to the quantification of cost that may be
18   in those interrogatory responses or that
19   may be in those affidavits that had
20   already been performed forensically by me
21   and were utilized at that point in time.
22               So as it relates to the
23   selection of the vendors, that was not a
24   determination that I made or an opinion

CONFIDENTIAL

Page 247

1    that I'm giving in this particular

2    matter.

3              And as it relates to the

4    allocation percentage as a result of the

5    alleged improper actions of the

6    defendants, that is going to be borne

7    with the same testimony as those persons

8    most knowledgeable.

9              As it relates to the number

10   that they're using to go with the

11   allocation percentage, that may, in fact,

12   have come from me or the work I had done

13   prior to the issuance of my report and

14   the forensic accounting related to those

15   select vendors, if that makes sense.

16        Q.    You are not opining on

17   whether any school district needed to

18   purchase any particular service or

19   product from any vendor; is that correct?

20        A.    I'm not opining to the need

21   of any school district at any particular

22   point in time one way or the other.

23        Q.    And you are not opining that

24   the amount of money that any school

Page 248

1  district paid to any vendor was

2  reasonable, correct?

3          A.    I'm opining that the amount

4  of money that they paid to any particular

5  vendor is accurate and reliable, that

6  that was the amount they paid for the

7  time period they paid it.

8              Whether or not it's

9  reasonable is outside the scope of my

10  report.  That's going to be for the

11  people who purchased it and their

12  contemporaneous reasons for purchasing it

13  and its relationship to why it was

14  purchased at that time.  And the impact

15  is why it was harmed as a result of the

16  alleged actions of the defendants.

17          Q.    You are not opining on

18  whether any school district got a good

19  deal or a bad deal from any vendor; is

20  that fair?

21          A.    That's fair.  I'm not going

22  beneath the surface on what the costs

23  were and whether or not they were fair

24  market value price at the time for which

CONFIDENTIAL

Page 249

1    they were purchased, I guess would be one
2    way I would say it.
3                    Now I understand what you
4    mean by "reasonable."
5                    But they were incurred at
6    that rate.  And it stands to reason that
7    the persons, you know, who purchased it
8    at that time would not have overpaid for
9    any type of software, technology or
10   property.
11                   But it is not an opinion I'm
12   giving.
13        Q.    Would you agree that
14   smartphones have many different uses?
15                   ATTORNEY GRADEN:  Objection.
16                   THE WITNESS:  As a lay
17        person?
18   BY ATTORNEY SANDOVAL-BUSHUR:
19        Q.    Yes.
20        A.    Sure.
21        Q.    You can use a cell phone to
22   place calls, correct?
23        A.    Most cell phones, yes.
24        Q.    You can use a cell phone to

CONFIDENTIAL

Page 250

1    text, correct?

2          A.    Most cell phones, yes.

3          Q.    You can use a cell phone to

4    play games on your phone?

5          A.    Some people do.

6          Q.    You can use a smartphone to

7    shop on your phone?

8          A.    Some people do.

9          Q.    You can use a smartphone to

10   stream entertainment?

11         A.    Some people do, yes, sir.

12         Q.    And people use smartphones

13   for things other than accessing

14   defendants' social media platforms,

15   correct?

16         A.    I think that's fair.

17               Different people use cell

18   phones for different purposes.

19         Q.    And students who use

20   smartphones during the school day use

21   them for purposes other than only

22   accessing defendants' platforms, correct?

23               ATTORNEY GRADEN:  Objection.

24               THE WITNESS:  I couldn't

CONFIDENTIAL

Page 251

1          tell you what students use them
2          for.  I'd be speculating to what
3          they use them for.
4                  So I don't have any
5          knowledge, one way or the other,
6          to what they use them for, whether
7          they're students or other people.
8    BY ATTORNEY SANDOVAL-BUSHUR:
9          Q.    You do not know how any
10   school district determined that the need
11   for any physical repairs was attributable
12   to either social media generally or to
13   any defendants' at-issue conduct
14   specifically, correct?
15         A.    Define physical repairs.
16         Q.    You have calculated damages
17   relating to physical repairs, correct?
18         A.    I believe in two of the six
19   bellwethers there are quantifications for
20   the damages as a result of the alleged
21   improper actions of the defendants
22   related to the cost associated with
23   property repair damage, I think -- I
24   don't know exactly what I called it --

CONFIDENTIAL

Page 252

1   property damage.

2          Q.    You calculated property

3   damage -- damages for both Breathitt and

4   Tucson; is that correct?

5          A.    I know it is yes for

6   Breathitt.  I'll just check real quick.

7                Yes, that's correct.

8          Q.    Did you ask for information

9   on any property damage costs that were

10  attributable to defendants' at-issue

11  conduct from Charleston, Harford, DeKalb

12  or Irvington?

13         A.    I don't recall if I had

14  asked or not.  I know that during the

15  course of the information that was

16  provided, property damage was given to me

17  on a number of cases in regards to, as

18  you can see on Exhibit-1 for Tucson and

19  Breathitt.  I don't recall if I had

20  received anything on the others.

21                But I don't -- I didn't

22  request anything of them specifically.

23         Q.    Okay.  How were the vendor

24  costs that were allegedly related to

CONFIDENTIAL

Page 253

1  defendants' at-issue conduct identified
2  to you?
3          A.    I think there's two ways
4  that they were identified.  I'd have to
5  go back and look at the pleadings filed.
6              But if I remember correctly,
7  there was an additional verified
8  interrogatory that I had for a number of
9  them.  It might have been Interrogatory
10 Number 3 -- I'd have to go back and
11 look -- where they were asked
12 specifically about property damage.  And
13 those were outlined in a number of the
14 interrogatory responses related to that
15 property damage.
16             And in addition to that, it
17 was information that was provided related
18 to the cost of select property damage
19 that the persons most knowledgeable had
20 identified was as a direct result of the
21 alleged actions of the defendants in this
22 matter.
23         Q.    You have not done anything
24 to vet any plaintiffs' allocation

CONFIDENTIAL

Page 254

1    percentage relating to property damage,

2    correct?

3                    ATTORNEY GRADEN:  Objection.

4                    THE WITNESS:  My

5            understanding is that the property

6            damage, that is the same as the

7            Yondr pouches we talked about

8            before, it's 100 percent related

9            to the alleged improper actions,

10           that the allocation percentages

11           that the property damage would not

12           have needed to have been repaired

13           but for the alleged improper

14           actions of the defendants, which

15           is -- the 100 percent is

16           allocated.

17   BY ATTORNEY SANDOVAL-BUSHUR:

18           Q.    You did not do anything to

19   vet whether, in fact, any property damage

20   was due to the alleged improper actions

21   of the defendants, correct?

22                   ATTORNEY GRADEN:  Objection.

23                   THE WITNESS:  I did not

24           personally do any additional

Page 255

1          information -- ask for any
2          additional information other than
3          the sworn testimony of the persons
4          who will speak to the property
5          damage.
6     BY ATTORNEY SANDOVAL-BUSHUR:
7          Q.    And you do not know what the
8     persons who either signed the affidavits
9     or provided the interrogatory responses
10    did to determine that any property damage
11    would not have needed to have happened
12    but for the alleged improper actions of
13    the defendants, correct?
14         A.    I'm not personally aware of
15    the rationale that they used to determine
16    that the property damage that needed to
17    be repaired was as a result of the
18    alleged improper actions of the
19    defendants, only that it was.
20         Q.    The alleged -- let me ask
21    that a little differently.
22              You do not know which of
23    defendants' platforms or at-issue conduct
24    any school district believes is linked to

Page 256

1    the need for any physical repairs,
2    correct?
3                    ATTORNEY GRADEN:  Objection.
4                    THE WITNESS:  That's fair.
5            I don't know the source of the
6            determination that this was caused
7            by the alleged improper actions of
8            the defendants.
9    BY ATTORNEY SANDOVAL-BUSHUR:
10           Q.    Property damage would not
11   have happened if students had not engaged
12   in destructive behavior, correct?
13           A.    It may or may not have.
14           Q.    Well, each of the -- this is
15   the property damage that you include in
16   your damages calculations.
17                 Those instances of property
18   damage would not have incurred if
19   students had not engaged in destructive
20   behavior, correct?
21           A.    I think that's fair.  I
22   don't know that it was just students.
23   But I know it was as a result of the
24   alleged improper actions.

Page 257

1          But I think the -- I don't
2    know what you would call it -- the term
3    is vandalism, but with it being
4    100 percent, it would not have happened
5    but for the persons who did it.
6          And the reasons they did it,
7    I guess, will be a determination for
8    someone else other than me.
9        Q.    So for the instances of
10   property damage, there would be an
11   allocation percent of 100 percent to the
12   individual person who actually engaged in
13   the property damage, correct?
14            ATTORNEY GRADEN:  Objection.
15            THE WITNESS:  No, I don't
16        know that I agree with -- that's
17        certainly a legal determination or
18        maybe an issue of fact of some
19        kind of, you know -- to say that
20        because somebody did it, it's not
21        the fault of somebody else is a
22        legal determination.
23            And that's not been my
24        experience in a lot of personal

CONFIDENTIAL

Page 258

1            injury cases.  Sometimes it's not
2            the fault of the person who did it
3            or the cause of the fault of the
4            person who did it.  But that's
5            certainly beyond my scope and
6            expertise.
7                  And I'm not giving an
8            opinion on causation either.  So I
9            don't know who caused it or for --
10           who is responsible for the damage.
11                 I can only tell you what the
12           costs were to repair the damages
13           caused by the alleged improper
14           actions of the defendants.
15   BY ATTORNEY SANDOVAL-BUSHUR:
16           Q.    The fact that there is a
17   100 percent allocation percent for a
18   particular vendor cost does not mean that
19   there is no one else in the world who
20   contributed to the cost being incurred
21   other than defendants; is that correct?
22                 ATTORNEY GRADEN:  Objection.
23                 THE WITNESS:  The
24           100 percent assumes that but for

CONFIDENTIAL

Page 259

1          the improper actions of the

2          defendants, the cost would not

3          have been incurred to repair the

4          damage.

5    BY ATTORNEY SANDOVAL-BUSHUR:

6          Q.    Does the fact that there is

7    a 100 percent allocation percent for a

8    particular vendor cost mean that there is

9    no one else in the world who contributed

10   to the costs being incurred other than

11   the defendants?

12         A.    It doesn't necessarily mean

13   that at all.  But that doesn't mean that

14   one person may not be liable or

15   responsible for 100 percent of it.

16              You know, take a person who

17   gets in an automobile accident, which I

18   see all the time, who had bad knees and

19   needed surgery, but he got smashed on his

20   knees and had to have both knees replaced

21   as a result of the injury.

22              In those cases, I've seen

23   the trial court routinely award

24   100 percent of the cost of the knee

CONFIDENTIAL

Page 260

1    surgery, even though he may have had a

2    preexisting condition that would have

3    required him to have surgery later on in

4    life.

5              So the fact that there could

6    be other factors in it does not in any

7    way obviate 100 percent could be the

8    cause -- the catalyst which caused it

9    could be 100 percent recoverable as a

10   damage.  And that's pretty consistent

11   over my career.

12       Q.    You include vendor costs

13   relating to something called E-hall

14   passes; is that correct?

15       A.    Do you want to tell me who

16   that's on?

17       Q.    If you look at Exhibit-1A,

18   your Breathitt report.

19       A.    I don't see E-hall passes on

20   that report.

21              But I do think that Eduspire

22   and Securly may have been technology

23   platforms that had that type of

24   technology.

CONFIDENTIAL

Page 261

1          Q.    Do you know how any district
2    determined that E-hall pass costs were
3    attributable to social media or to
4    defendants' at-issue conduct?
5          A.    I do not.  For the same
6    reasons we've talked about before on the
7    allocation percentages that were placed
8    on by the persons most knowledgeable.
9          Q.    And you are not offering the
10   opinion that using E-hall passes is a
11   necessary expense for a school district,
12   correct?
13         A.    I'm not giving an opinion
14   one way or the other on that.
15         Q.    You include in your damages
16   calculations vendor costs relating to
17   Internet filters, correct?
18         A.    I do.
19         Q.    You do not know how any
20   district determined that Internet filter
21   costs were attributable to social media
22   generally or to defendants' at-issue
23   conduct, correct?
24         A.    That's fair.  For the same

Page 262

1   reasons we talked about before, that the
2   persons most knowledgeable will speak to
3   the allocation percentage utilized by
4   them for those select vendors related to
5   web filters as a result of the alleged
6   improper actions of the defendants.
7           Q.    Are you aware that school
8   districts are required under law to
9   provide Internet content filters
10  regardless of whether students use social
11  media or not?
12              ATTORNEY GRADEN:  Objection.
13              THE WITNESS:  I'm not aware,
14          because I'm not a lawyer, to be
15          able to tell you if they are
16          required by law.
17              I've seen that allegation by
18          some of the rebuttal experts, that
19          that's in there.  And I know there
20          may be deposition testimony.
21              That alone doesn't
22          necessarily have any impact on the
23          fact that those web filters may
24          have been at a lesser rate or

CONFIDENTIAL

Page 263

1        might not have been incurred at
2        the same cost.
3              And it certainly doesn't
4        give any consideration to what the
5        but-for world would look like if
6        the defendants' platforms had not
7        performed the alleged improper
8        actions as far as back as '16 and
9        '17.  It's a whole different
10       hypothetical world.
11              So I'm certainly not giving
12       any opinions on what the law
13       requires.  But the fact alone that
14       you may be required,
15       hypothetically, in some states or
16       federally to have web filters
17       doesn't necessarily mean that they
18       all have the same web filter.
19              We've done 11 of these, and
20       they don't all have the same web
21       filter.  And they are just 11
22       schools from 11 different
23       districts.
24              So surely if that law is as

CONFIDENTIAL

Page 264

1        you purport it to be, there's a
2        whole lot more to it than the one
3        sentence that we're talking about
4        here and goes into what defines a
5        web filter and what's required
6        federally or statewide.
7               So -- and I haven't
8        researched any of that.
9               But in no way does that mean
10       that a damage cannot be associated
11       with a web filter just because it
12       may be required by state or
13       federal law.
14   BY ATTORNEY SANDOVAL-BUSHUR:
15       Q.    You have not undertaken any
16   analysis to determine whether or not, in
17   the absence of social media or
18   defendants' at-issue conduct, any school
19   district would have paid a lesser rate
20   for an Internet content filter, correct?
21       A.    I don't think that's
22   correct.  The affidavits in and of
23   themselves are the people most
24   knowledgeable.  The contemporaneous folks

CONFIDENTIAL

Page 265

1  who have determined what web filters to

2  put in there have attested, under oath

3  and will testify at trial under penalty

4  of perjury, the percentage that they

5  attribute to the alleged improper actions

6  of the defendants.

7           So to the extent that, you

8  know, there are a lot of web filters out

9  there, vendor costs on a lot of these had

10  Microsoft Defender, that may qualify as a

11  web filter.  You don't see that on any of

12  them.

13           So the fact that any

14  individual plaintiff has reduced the

15  number of web filters to the ones that

16  are listed in here, those are the ones

17  that caused the harm.

18           I am aware of many other web

19  filters that these other school

20  districts, the six bellwethers and the

21  other five, have and pay for and have

22  paid for for a very long time that are

23  not being claimed as damages.

24           So I believe that the people

CONFIDENTIAL

Page 266

```
 1   who are most knowledgeable about the laws
 2   and regulations that govern their schools
 3   in their districts have considered that
 4   duly when they put forth their affidavit
 5   as to what the reduction would be or what
 6   the allocation percentage should be as a
 7   result of the defendants' alleged
 8   improper actions.
 9        Q.    Mr. Meyers, I'm asking about
10   what you personally have undertaken.
11             Have you -- have you
12   undertaken any analysis to determine
13   whether or not, in the absence of social
14   media or defendants' at-issue conduct,
15   any school district would have paid a
16   lesser rate for an Internet content
17   filter?
18        A.    And I said but for the
19   affidavit, no.
20             But those affidavits and
21   those interrogatory responses indicate
22   that they would have been at a lesser
23   rate or at a lower cost.
24        Q.    And it's your testimony that
```

CONFIDENTIAL

Page 267

1  the affidavits and the interrogatory

2  responses state that each school district

3  would have paid less for Internet content

4  filter in the absence of defendants'

5  conduct?

6          A.     Remember, we went through

7  the three buckets earlier.

8                  It could have been that they

9  paid less.  It could have been that they

10  paid the same and negotiated a different

11  contract.  It could have been in the

12  but-for world that these ten contracts

13  didn't exist because the web content

14  filter didn't require as many of the

15  add-ons or platforms as it is.  It could

16  have been that they were less add-ons.

17                  So I can't speak to what any

18  of the individual fact witnesses will

19  testify as to the basis of the 20 percent

20  or 30 percent, or whatever percent they

21  attribute to it, only that they have

22  deliberately included it at an allocation

23  percentage and only those web filters

24  that they have determined have sustained

CONFIDENTIAL

                                        Page 268

1   damages as a result of the alleged

2   improper actions.

3              What I can tell you is that

4   I looked at all of the school districts,

5   and all of them have more than one,

6   multiple web filters throughout their

7   system that are being paid by their

8   technology department.  Because as a

9   technology expense, it was something that

10  we forensically analyzed before the

11  selected vendors were provided to us.

12             So this in no way

13  constitutes the entirety of that

14  particular web filter comment as we're

15  talking about herein.

16             But I am relying upon the

17  affidavits.

18        Q.    It is possible that in the

19  absence of social media or defendants'

20  at-issue conduct, each school district

21  may have paid the same amount for

22  Internet content filters, correct?

23             ATTORNEY GRADEN:  Objection.

24             THE WITNESS:  It is possible

Page 269

1           they may have paid the same.  But
2           that doesn't mean that there's not
3           a damage associated with the
4           platforms or the alleged improper
5           actions of the defendants as the
6           web filter would relate to those
7           actions.  That's a legal
8           determination.
9    BY ATTORNEY SANDOVAL-BUSHUR:
10          Q.   And just so my prior
11   question was clear, because I think maybe
12   it was -- I'll just re-ask it a little
13   bit differently.
14               Is it possible that in the
15   absence of social media or defendants'
16   at-issue conduct, each school district
17   may have paid the same amount for
18   Internet content filters as they actually
19   paid?
20               ATTORNEY GRADEN:  Objection.
21               THE WITNESS:  I don't know
22          the answer to that.  We're back
23          now to the hypothet of no social
24          media, not social media, not

Page 270

1          impacted as a result of the
2          alleged improper actions of the
3          defendants.
4               So in the world of no social
5          media, who knows what web filters
6          could look like.  I don't know.
7    BY ATTORNEY SANDOVAL-BUSHUR:
8          Q.     Is it possible that in the
9    absence of defendants' at-issue conduct,
10   each district may have paid the same
11   amount for Internet content filters as
12   each school district actually paid?
13              ATTORNEY GRADEN:  Objection.
14              THE WITNESS:  I have no way
15         of knowing, in the hypothetical
16         world, whether it would have been
17         the same or less or more.
18   BY ATTORNEY SANDOVAL-BUSHUR:
19         Q.     But it's possible it would
20   have been the same?
21         A.     It's -- anything is
22   possible.
23         Q.     For the social-emotional
24   learning curriculum and training costs,

CONFIDENTIAL

Page 271

1  you do not know how any district
2  determined what costs were attributable
3  to social media or to defendants'
4  at-issue conduct, correct?
5        A.    That is correct, considering
6  the same caveats that I've given you
7  before on the others.
8        Q.    Are you aware that school
9  districts are required under law to
10 provide instruction on social-emotional
11 learning regardless of whether students
12 use social media or not?
13             ATTORNEY GRADEN:  Objection.
14             THE WITNESS:  I'm not aware
15        one way or the other.  It has no
16        impact on the conclusions in this
17        report.
18             Just like the technology,
19        the social and emotional
20        component, this is far -- the
21        number of select vendors that are
22        included herein are a small
23        fraction of the total SEL
24        curriculum that these schools have

CONFIDENTIAL

Page 272

1          imparted to their students during

2          the period of time for which

3          damages were measured.

4               And, specifically, the ones

5          that were included herein include

6          only those that caused damage as a

7          result of the alleged improper

8          actions of the defendants pursuant

9          to the persons most knowledgeable

10         who have given sworn testimony and

11         will testify in this trial.

12   BY ATTORNEY SANDOVAL-BUSHUR:

13         Q.    If a school district

14   implemented social-emotional learning

15   curriculum in response to the COVID-19

16   pandemic, would it be appropriate to

17   attribute those curriculum costs to

18   defendants?

19              ATTORNEY GRADEN:  Objection.

20              THE WITNESS:  It may.

21   BY ATTORNEY SANDOVAL-BUSHUR:

22         Q.    And why would it be

23   appropriate for a school district to

24   attribute curriculum costs that were

CONFIDENTIAL

Page 273

1  implemented in response to the COVID-19
2  pandemic to defendants?
3       A.    Because COVID-19 may have
4  had reasons to attribute those to the
5  direct actions of the defendants in this
6  matter.
7            I mean, COVID-19 is
8  obviously not part of this case as a
9  plaintiff or a defendant.  But I don't
10 know the motivations on why any COVID-19
11 restrictions or allocations would not
12 necessarily be caused by the actions of
13 the defendants in this matter.
14           The people who have given
15 the sworn testimony who are going to
16 testify have all been through COVID-19.
17 They were boots on the ground while the
18 pandemic was going on and have continued
19 to include these costs as allocable to
20 the alleged improper actions of
21 defendants and would have considered,
22 surely, COVID-19 as part of their
23 consideration.
24       Q.    I would like to ask you some

Page 274

1   questions relating to Breathitt.

2        A.    Sure.

3        Q.    Did you communicate in any

4   way, whether by speaking in person, by

5   telephone, corresponding by e-mail or

6   otherwise, with any employees or people

7   otherwise affiliated with Breathitt in

8   forming your opinion?

9        A.    The only two people would

10  have been discussions with Phillip Watts

11  and Stacy McKnight, as detailed in my

12  report on Footnote 2 of Page 4.

13       Q.    Why did you communicate with

14  Phillip Watts?

15       A.    I don't recall why we had

16  that conversation.  I believe that the

17  call initially took place because Stacy

18  McKnight, as chief financial officer, was

19  going to provide some additional

20  information related to reconciliation of

21  these expenses.

22              Phillip Watts participated

23  on that, and I was able to ask him

24  questions.

CONFIDENTIAL

Page 275

```
 1          Q.     So you had a single
 2    conversation with both Mr. Watts and
 3    Ms. McKnight together?
 4          A.     It was, yes, sir.
 5          Q.     Other than having that
 6    single conversation with Mr. Watts and
 7    Ms. McKnight, did you have any other form
 8    of communication with Mr. Watts --
 9          A.     No, sir.
10          Q.     -- or Ms. McKnight?
11          A.     I did not.
12          Q.     What information did
13    Ms. McKnight provide you in your
14    conversation with her?
15          A.     I don't know the answer to
16    that right now.  I'd have to go back and
17    look at the file and when the documents
18    were produced.
19                 But it would have been
20    additional information related to either
21    vendor costs, invoices or purchase
22    orders.
23          Q.     Did you take notes on your
24    conversation with Ms. McKnight?
```

CONFIDENTIAL

Page 276

1          A.    The only notes that I had on

2     that was I was drafting the report at the

3     time and the materials reviewed, and I

4     had missing places.

5                    So once those were filled

6     in, they're incorporated into the

7     reports.  I didn't take any handwritten

8     notes.

9          Q.    Did you take any notes on

10    your conversation with Mr. Watts?

11         A.    I did not, no, sir.

12         Q.    So it sounds like

13    Ms. McKnight provided you with missing

14    invoice information; is that correct?

15         A.    Yes.  The chief financial

16    officer provided me financial information

17    in connection with my analysis and

18    reconciliation of costs for select

19    vendors.

20         Q.    Did Ms. McKnight provide you

21    with anything other than missing invoice

22    information?

23         A.    No, not that I recall.

24         Q.    Did plaintiffs' counsel

CONFIDENTIAL

Page 277

1    suggest that you communicate with
2    Ms. McKnight?
3            A.    I don't recall.  Normally,
4    when I was talking to the CFO, it was at
5    my direction.
6                 I had an opportunity to
7    speak, on these six cases, to
8    Ms. McKnight.  I spoke -- that was on
9    Breathitt, to be specific for the record.
10                I know on DeKalb I initiated
11   the request to speak with Byron
12   Scheuneman, who is the chief financial
13   officer.
14                And I initiated the
15   conversation with, I believe, Daniel
16   Prentice.  I forget which district he's
17   from.
18           Q.    Mr. Meyers, I'm just asking
19   you now about Breathitt.  I'll get to the
20   others.
21           A.    Okay.  So, yes, for
22   Breathitt, those are the only ones.  And
23   I initiated the conversation with
24   Ms. McKnight.

CONFIDENTIAL

Page 278

1          Q.    Did plaintiffs' counsel
2    suggest what questions you should ask
3    Ms. McKnight?
4          A.    Absolutely not.
5          Q.    What information did
6    Mr. Watts provide you during your
7    conversation with him?
8          A.    At that time, we talked
9    through all of the vendors that are in
10   the report.  And he was very wanting to
11   give me context as to how they related to
12   the alleged improper damages.
13              Specifically one of the
14   questions I had was the same question you
15   had was about the Yondr pouches at
16   100 percent.  And he gave the testimony
17   that they had tried so many things at
18   that point in time that it was the, you
19   know, straw that broke the camel's back.
20   That they were willing to try something
21   else directly as a result of the improper
22   actions.
23              And that but for the alleged
24   improper actions, they would not have

CONFIDENTIAL

Page 279

1   gone through that process to incur those

2   costs, which is why he did 100 percent.

3          Q.    Which specific improper

4   actions of defendants did Mr. Watts tell

5   you were the cause of Breathitt's

6   purchase of the Yondr pouches?

7          A.    As we talked about earlier,

8   I didn't ask him specifically what those

9   improper actions were.

10          Q.    So how did Mr. Watts

11   characterize what you were referring to

12   as the defendants' improper actions that

13   caused the districts to purchase -- the

14   district to purchase Yondr pouches?

15          A.    Because that was the

16   questions that I posed to him.

17               All of my questions, as you

18   can see in my report, are directly

19   related to the alleged improper actions

20   of defendants.

21          Q.    You did not take any notes

22   on this conversation with Mr. Watts?

23          A.    No.  The notes are

24   incorporated into the body of the report.

Page 280

1          Q.     And your conversation with

2     Mr. Watts and Ms. McKnight were not

3     recorded in any way?

4          A.     No, sir.

5          Q.     It was not part of your

6     assignment to determine what value, if

7     any, Breathitt received in exchange for

8     paying any vendor, correct?

9          A.     I think that's fair to say.

10    I'm not looking at the -- I'm trying to

11    define value in my terms.

12               I'm not looking at the

13    results of having incurred the costs,

14    whether they were beneficial or

15    detrimental.  It's the timing of when the

16    cost was incurred and the reason for

17    which the cost was incurred that is

18    relevant to the analysis and the

19    testimony that I'll give in this trial.

20         Q.     For the allocation percents

21    that you use for your Breathitt damages

22    calculations, you relied on the

23    affidavits of Phillip Watts and Will

24    Noble, correct?

CONFIDENTIAL

Page 281

1           A.    That's correct.

2           Q.    For the allocation percents

3    you used for your Breathitt damages

4    calculations, you did not rely on any

5    source other than the affidavits of

6    Phillip Watts --

7           A.    As it relates --

8           Q.    -- and Will Noble, correct?

9           A.    Correct.  As it relates to

10   the allocation percentages, yes, sir.

11          Q.    Do you know whether

12   Mr. Noble reviewed any documents or data

13   in preparing his affidavit?

14          A.    I don't know what Mr. Noble

15   did in preparation for his sworn

16   testimony, no, sir.

17          Q.    If it is true that Mr. Noble

18   did not review any documents or data in

19   preparing his affidavit, would that

20   affect your decision to rely on any

21   allocation percent in his affidavit?

22               ATTORNEY GRADEN:  Objection.

23               THE WITNESS:  It absolutely

24          would not.

Page 282

1    BY ATTORNEY SANDOVAL-BUSHUR:
2         Q.    Are you aware that Mr. Watts
3    assigned the percentages in his affidavit
4    in discussion with plaintiffs' attorneys?
5              ATTORNEY GRADEN:  Objection.
6              THE WITNESS:  I wouldn't
7         know one way or the other.
8    BY ATTORNEY SANDOVAL-BUSHUR:
9         Q.    If it is true that Mr. Watts
10   assigned the percentages in his affidavit
11   in discussion with the plaintiffs'
12   attorneys, would that affect your
13   decision to rely on the allocation
14   percents in his affidavit?
15             ATTORNEY GRADEN:  Objection.
16             THE WITNESS:  As I said
17        before, it absolutely would not.
18             These are the people who are
19        going to get up on the stand and
20        testify as to the alleged improper
21        actions of defendants and assign a
22        number.
23             They are the ones on the
24        stand under oath under penalty of

CONFIDENTIAL

Page 283

1              perjury.  The discussions that

2              they may have had and the impact

3              that it may or may not have had on

4              what eventually went into the

5              affidavit has nothing to do to me

6              to what's in the affidavit that

7              they are going to attest to under

8              oath.

9    BY ATTORNEY SANDOVAL-BUSHUR:

10         Q.    For all of the affidavits

11   that you relied on, if it is true that

12   the employee who assigned the percentages

13   in the affidavits did so in discussion

14   with the plaintiffs' attorneys, that

15   would not affect your decision to rely on

16   the allocation percents in those

17   affidavits, correct?

18         A.    It would not impact me in

19   the slightest, no, sir, for the reasons I

20   just testified to.

21         Q.    Are you aware that Mr. Watts

22   testified that he believes the allocation

23   percents in his affidavit are subjective?

24              ATTORNEY GRADEN:  Objection.

CONFIDENTIAL

Page 284

1              THE WITNESS:  I have no
2         reason to believe he believes or
3         doesn't believe that.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5         Q.    If it is true that the
6    allocation percents in Mr. Watts's
7    affidavit are subjective, would that
8    affect your decision to rely on the
9    allocation percents in his affidavit?
10             ATTORNEY GRADEN:  Objection.
11             THE WITNESS:  Absolutely
12        not.  He's the one who is going to
13        testify as to the basis for it.
14        Whether or not he believes that
15        number could be a lot higher and
16        just decided to use 20 percent,
17        when he really thinks it could be
18        as high as 50 percent, this is
19        what he's attested to.
20             So whether -- however he
21        assigns subjectivity or not, this
22        is what I understand he's going to
23        testify as to and has already
24        testified as to as the damage

CONFIDENTIAL

Page 285

1          caused as a result of the alleged
2          improper actions of the
3          defendants.
4    BY ATTORNEY SANDOVAL-BUSHUR:
5          Q.    For all of the affidavits
6    that you relied on, if it is true that
7    the employee who assigned the percentages
8    in the affidavits believes that the
9    percentages are subjective, that would
10   not affect your decision to rely on the
11   allocation percents in those affidavits,
12   correct?
13               ATTORNEY GRADEN:  Objection.
14               THE WITNESS:  It would not,
15         for the same reasons.
16   BY ATTORNEY SANDOVAL-BUSHUR:
17         Q.    Do you know whether
18   Mr. Watts discussed any of the allocation
19   percentages in his affidavit with any
20   teachers?
21         A.    I have no idea what
22   Mr. Watts did in preparation for his
23   affidavit, as I previously told you, or
24   any of the affiants.

CONFIDENTIAL

Page 286

1          Q.    If it is true that Mr. Watts
2    did not discuss any of the allocation
3    percentages in his affidavit with
4    teachers, that would not affect your
5    decision to rely on the allocation
6    percents in his affidavit, correct?
7          A.    It would have absolutely no
8    impact on my reliance on his sworn
9    testimony.
10         Q.    And that's true for all the
11   affidavits that you relied on; if it is
12   true that the employee who assigned the
13   percentages in the affidavits did not
14   discuss any of those percentages with
15   teachers, that would not affect your
16   decision to rely on the allocation
17   percents, correct?
18         A.    It would have no impact,
19   insofar as they are the people most
20   knowledgeable to get up and testify as to
21   it.  They are the ones who are carrying
22   the ball on that.
23              ATTORNEY SANDOVAL-BUSHUR:
24         Let's mark Tab 10 as Exhibit-6.

Page 287

```
 1                    -  -  -
 2              (Whereupon, Exhibit
 3         Meyers-6, No Bates, Affidavit of
 4         Phil Watts, was marked for
 5         identification.)
 6                    -  -  -
 7              THE WITNESS:  Thank you.
 8    BY ATTORNEY SANDOVAL-BUSHUR:
 9         Q.    Mr. Meyers, Exhibit-6 is the
10    affidavit of Phillip Watts, which you
11    relied on for allocation percents for
12    your Breathitt damages calculations,
13    correct?
14         A.    Correct, in part.
15         Q.    And if -- in particular, you
16    rely on the percentages in the table on
17    Page 2 of Mr. Watts' affidavit, correct?
18         A.    In part, but not in whole.
19         Q.    For some of the allocation
20    percents in your Breathitt damages
21    calculations, you rely on percentages
22    that were provided by Mr. Watts in his
23    affidavit, correct?
24         A.    In part.
```

CONFIDENTIAL

Page 288

1          Q.     And you rely, for some of
2     the Breathitt allocation percents, on the
3     percentages in the table on Page 2 of
4     Mr. Watts' affidavit, correct?
5          A.     In part, yes.
6          Q.     Mr. Watts says in his
7     affidavit that he is providing for each
8     vendor a percentage attributable to
9     social media, correct?
10          A.     Where -- is there something
11     you're looking at specifically?
12          Q.     In the table on Page 2.
13          A.     Oh, the table itself?
14          Q.     Correct.
15          A.     Sure.
16          Q.     Just so the record is clear,
17     Mr. Watts says in his affidavit, in the
18     table on Page 2, that he is providing for
19     each vendor a percentage attributable to
20     social media, correct?
21          A.     That's correct.
22          Q.     And for some of the vendors,
23     you use the percentages that are under
24     that column heading, Percentage

CONFIDENTIAL

Page 289

1    Attributable to Social Media, for your

2    damages calculations, correct?

3            A.    Some of the percentages I

4    use are from Mr. Noble and from

5    Mr. Watts, some are from Mr. Noble and

6    some are from Mr. Watts.

7            Q.    Mr. Watts does not, anywhere

8    in his affidavit, define social media,

9    correct?

10           A.    You're asking for him --

11   just like we talked about for

12   Ms. Allison, there is not a definition of

13   social media in his affidavit that I can

14   see.

15           Q.    Mr. Watts does not say, in

16   any of the text in his affidavit, that

17   the term "social media" is limited to

18   defendants, correct?

19           A.    I don't see him say it one

20   way or the other.

21                My understanding of his

22   affidavit in relation to the damages that

23   are incurred as a result of the alleged

24   improper actions of the defendants is

Page 290

1  that social media is defined as the

2  defendants in this matter by Mr. Watts.

3          Q.    So this is based on --

4          A.    This is Mr. Watts you gave

5  me?

6                Hold on.  Am I looking at

7  the wrong one?

8          Q.    Correct.

9          A.    I'm sorry.  I thought you

10  had Noble in front of me.

11                All right.  Watts, yes.

12          Q.    And Mr. Watts does not say,

13  in any of the text in his affidavit, that

14  the term "social media" is limited to the

15  alleged improper actions of defendants,

16  correct?

17          A.    I don't see those words in

18  having reviewed this affidavit.

19          Q.    Mr. Watts' affidavit does

20  not mention YouTube, correct?

21          A.    Let me read it more

22  carefully.

23                I do not see a reference to

24  the words "YouTube."

CONFIDENTIAL

Page 291

1          Q.    Mr. Watts' affidavit does

2     not mention Snapchat or Instagram or

3     Facebook, correct?

4          A.    That is correct.  I did not

5     see mentions to either of those three.

6          Q.    It's your understanding that

7     even though Mr. Watts does not state this

8     in the text of his affidavit that when he

9     refers to social media, he's referring

10    only to the defendants' at-issue conduct?

11         A.    He does capitalize it in the

12    text of the chart.

13         Q.    Well, he capitalizes every

14    word in the text of the chart, right?

15         A.    He does not.  He doesn't

16    capitalize "or" or "to."

17              But I understand your point.

18    I don't know.  My understanding is -- as

19    I've told you before, is that when he's

20    relating to social media in this case, as

21    the person most knowledgeable about the

22    damages, he is referring to social media

23    as the defendants in this matter and the

24    alleged improper actions of those

CONFIDENTIAL

```
                                          Page 292
 1   defendants.
 2         Q.     And if Mr. Watts understood
 3   the defendants in this case to include
 4   Twitter, Mr. Watts' percentage
 5   allocations would have included Twitter,
 6   correct?
 7                ATTORNEY GRADEN:  Objection.
 8                THE WITNESS:  It may or it
 9         may not.  You'd have to ask
10         Mr. Watts.
11   BY ATTORNEY SANDOVAL-BUSHUR:
12         Q.     Well, you said that you
13   understood his allocations to be his
14   understanding of the -- what he
15   understood the at-issue conduct of
16   defendants to be, correct?
17         A.     Okay.  Yes.
18         Q.     So if --
19         A.     But I don't know when he
20   understood or believed Twitter was in
21   there.
22                Was this a year ago?  Was it
23   six years ago?  Is it as of today?  Is it
24   as of the date of his affidavit?
```

CONFIDENTIAL

Page 293

1          Q.    So you think that it's
2    possible that when Mr. Watts issued his
3    affidavit on May 5th, he understood that
4    the defendants did not include Twitter,
5    but at some point prior to the affidavit
6    he believed that the defendants did
7    include Twitter?
8          A.    He may have, yes.
9          Q.    Do you think it's possible
10   that when Mr. Watts issued his affidavit
11   on May 4th he understood the defendants
12   did not include Twitter, but at some
13   point after he signed the affidavit he
14   believed that the defendants included
15   Twitter?
16         A.    He may have.  I can't speak
17   to the testimony that Mr. Watts may or
18   may not have given, only the sworn
19   affidavit that he's provided herein.
20         Q.    And the sworn affidavit does
21   not define social media?
22         A.    As we talked about, it does
23   not have a definition in the affidavit.
24         Q.    Okay.  Are you aware that

Page 294

1    Mr. Watts, in fact, testified about this
2    affidavit after he issued it?
3              A.    Let me see.
4                    No, I am not.  I don't have
5    a copy of his deposition nor have I read
6    that, if a deposition was given before or
7    after the affidavit.
8              Q.    Did you ask plaintiffs'
9    attorneys to provide you with the
10   depositions of any of the employees who
11   testified about the affidavits that you
12   relied on?
13             A.    I did not, no, sir.
14             Q.    Why not?
15             A.    Not relevant to the sworn
16   testimony that they're going to give
17   here.
18             Q.    So the sworn testimony in
19   deposition that Mr. Watts provided about
20   what he meant when he wrote this
21   affidavit was not relevant to your
22   damages calculations?
23             A.    It may or may not be.
24                   You're asking me to assume

CONFIDENTIAL

Page 295

1  something that I haven't seen and look it

2  over as something I don't have.

3              If you want me to look at

4  something and review it and see if it's

5  consistent or inconsistent, I'm happy to

6  do that.

7          Q.    Okay.

8          A.    But you're asking me to

9  assume something that I have no knowledge

10 of.  And to the extent that any testimony

11 he may have given that would edit or

12 amend the testimony he intends to give

13 pursuant to his affidavit, should a new

14 affidavit be issued that would change in

15 any way what he's relying upon or what he

16 has stated, it may cause my report to be

17 amended.

18              But until such time as the

19 sworn statement is amended, my report

20 stands.

21              You asked me today if I

22 thought Twitter was social media, and I

23 said yes.  But I've also, at least 100

24 times, defined them as the five

CONFIDENTIAL

Page 296

1  platforms.
2              So I can read the whole
3  deposition if you'd like.  But short of
4  that, I don't know how I could take it
5  out of context.
6         Q.    So short of you sitting down
7  and reading the entire deposition of
8  Phillip Watts, which you've never seen
9  before, you would not be prepared to say
10  that anything that you saw in the
11  deposition undermined your belief that
12  Mr. Watts' reference to social media --
13  undefined reference to social media was
14  limited only to the at-issue conduct of
15  the defendants?
16         A.    Without having an
17  opportunity to read it in its full
18  context, I would not.
19              You could provide an excerpt
20  of our deposition today and say that Jeff
21  Meyers said Twitter is social media.  And
22  I don't know what you would represent it
23  to say.  But that would be incorrect as
24  it defined social media as the defendants

Page 297

1   no less than 100 times during this
2   deposition.
3              So as much as I do want to
4   trust you, without verifying it for
5   myself, I'm not going to sit here and
6   take your word for it.
7              ATTORNEY SANDOVAL-BUSHUR:
8         Well, counsel, I mean, are we
9         going to agree -- are we going to
10        agree to unlimited time for this
11        deposition?
12             ATTORNEY GRADEN:  Absolutely
13        not.  If you want him to read a
14        document or a transcript, it's on
15        you.
16             ATTORNEY SANDOVAL-BUSHUR:
17        And the witness is representing
18        that he is not going to agree to
19        read a deposition unless he has
20        the opportunity to read the entire
21        deposition.
22             ATTORNEY GRADEN:  That's his
23        testimony.
24             ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 298

1        Okay.

2    BY ATTORNEY SANDOVAL-BUSHUR:

3        Q.    How did you determine which

4    vendors should be included in your

5    Breathitt damages calculation?

6        A.    Those vendors were provided

7    to me in the form of the affidavit or

8    interrogatory responses, as we've

9    previously talked about.

10        Q.    Once you determined which

11    vendors should be included in your

12    Breathitt damages calculation, how did

13    you determine which costs relating to

14    each vendor should be included in your

15    damages calculation?

16        A.    All costs that were able to

17    be reconciled are included for those

18    particular vendors.

19        Q.    So if a vendor was

20    identified to you as being a vendor

21    associated with an allocation

22    percentage -- is that --

23        A.    I would say if a vendor has

24    been identified as a select vendor in

CONFIDENTIAL

Page 299

1   this case such that costs associated with

2   those select vendors are the subject of

3   an allegation of damages as a result of

4   the actions of the defendants in this

5   matter, then all of the costs that were

6   able to be reconciled and confirmed

7   related to those vendors has been

8   included in those costs.

9        Q.    You assume that if a vendor

10  was identified by a district as a select

11  vendor, then every single payment that

12  the district made to that vendor should

13  be included in your damages calculations,

14  correct?

15       A.    Before the allocation

16  percentage is applied.  That is correct.

17            That the total cost is the

18  total cost paid for each and every one of

19  those select vendors during the period

20  for which damages are calculated.  And

21  then the allocation percentage is applied

22  to the entirety of the cost incurred by

23  the school district respectively during

24  the damage period as a result of the

CONFIDENTIAL

Page 300

1  alleged improper actions of the

2  defendants.

3          Q.    You did not confirm with

4  anyone from Breathitt that, in fact,

5  every single district that the district

6  made to each select vendor should be

7  included in your damages calculations,

8  correct?

9              ATTORNEY GRADEN:  Objection.

10             THE WITNESS:  Could you ask

11      it again?  You said district twice

12      and it threw me off.

13  BY ATTORNEY SANDOVAL-BUSHUR:

14          Q.    Did you confirm with anyone

15  from Breathitt that, in fact, every

16  single payment that the district made to

17  each select vendor should be included in

18  your damages calculations?

19          A.    For the purposes of

20  Breathitt, the answer is absolutely yes.

21  Because I had discussions with Phillip

22  Watts as to the total cost that existed

23  at that time.  And we're including all

24  the costs.

CONFIDENTIAL

Page 301

1                  So for Breathitt,
2    absolutely.
3            Q.    Did you confirm with anyone
4    from Charleston that, in fact, every
5    single payment that the district made to
6    each select vendor should be included in
7    your damages calculations?
8                  ATTORNEY GRADEN:  When
9            you're ready, Joseph, we're at
10           about an hour.
11                 THE WITNESS:  For
12           Charleston, it's based on the
13           affidavit of Ms. Allison, who goes
14           through the vendors as to what
15           they do and the percentage of the
16           total expenditures identified.
17                 She is the one who
18           identified that it's based -- the
19           percentage is based on total
20           expenditures for those particular
21           select vendors.
22                 So she has made that
23           determination on behalf of
24           Charleston.

CONFIDENTIAL

Page 302

1   BY ATTORNEY SANDOVAL-BUSHUR:

2        Q.    For DeKalb, did you confirm

3   with anyone from DeKalb that, in fact,

4   every single payment that the district

5   made to each select vendor should be

6   included in your damages calculation?

7        A.    I had that discussion with

8   Byron Scheuneman, and I believe it's also

9   in the Monika Davis affidavit, that it's

10  on total costs.

11       Q.    Did you confirm with anyone

12  from Harford that, in fact, every single

13  payment that the district made to each

14  select vendor should be included in your

15  damages calculations?

16       A.    I don't have it in front of

17  me.  But if you would put it in front of

18  me, I could confirm.  I believe Harford,

19  in their interrogatory responses,

20  included the total cost as part of the

21  chart for the damages associated in that

22  particular case.

23       Q.    Did you confirm with anyone

24  from Irvington that, in fact, every

CONFIDENTIAL

Page 303

1  single payment that the district made to

2  each select vendor should be included in

3  your damages calculations?

4        A.    I believe Irvington, just

5  like Harford, in its interrogatory

6  responses, list the quantum of the

7  damages and the percentage for each one

8  in the chart as part of the verified

9  interrogatory response.

10        Q.    Did you confirm with anyone

11  from Tucson that, in fact, every single

12  payment that the district made to each

13  select vendor should be included in your

14  damages calculations?

15        A.    Same answer for Tucson; I

16  believe their interrogatory response has

17  a chart that includes the total damages

18  and the percentage, yes, sir.

19        Q.    And when we refer to select

20  vendors, you understand that we are

21  referring to the vendors that -- well,

22  what is your -- what is your -- let me

23  re-ask --

24        A.    A better question.

CONFIDENTIAL

Page 304

1          Q.      -- my question.

2               Can you -- can you define

3    select vendors?

4          A.      I define select vendors as I

5    have defined it in each and every one of

6    my reports, as a defined term in my

7    report.

8          Q.      Okay.

9               ATTORNEY SANDOVAL-BUSHUR:

10        We can take a break.

11               VIDEO TECHNICIAN:  Going off

12        video record, 2:23 p.m.

13                    -  -  -

14               (Whereupon, a brief recess

15        was taken.)

16                    -  -  -

17               VIDEO TECHNICIAN:  Back on

18        video record, 2:41 p.m.

19    BY ATTORNEY SANDOVAL-BUSHUR:

20        Q.      Mr. Meyers, I am marking

21    Tab 9 as Exhibit-7.

22                    -  -  -

23               (Whereupon, Exhibit

24        Meyers-7, No Bates, Affidavit of

CONFIDENTIAL

Page 305

1          Will Noble, was marked for

2          identification.)

3                    -    -    -

4    BY ATTORNEY SANDOVAL-BUSHUR:

5          Q.    This is the affidavit of

6    Will Noble, correct?

7          A.    That appears to be correct,

8    yes, sir.

9          Q.    And this is the second of

10   the two affidavits that you relied on for

11   allocation percentages for Breathitt,

12   correct?

13         A.    That's correct.

14         Q.    Along with the Phillip Watts

15   affidavit, correct?

16         A.    That's fair.

17         Q.    There actually is no

18   allocation percentage in the Will Noble

19   affidavit that you relied on; is that

20   right?

21         A.    I believe that's correct,

22   yes, sir.

23         Q.    Okay.  You testified earlier

24   that for the allocation percentages for

Page 306

1  Breathitt you relied, in part, on the

2  Watts affidavit.

3            Do you recall that

4  testimony?

5       A.    Yeah, that's correct.

6       Q.    What is the other part of

7  what you relied on for the allocation

8  percentages for Breathitt?

9       A.    It would have been these

10 two.  It would have been in connection

11 with the Will Noble affidavit as well.

12      Q.    So there is nothing aside

13 from the Phillip Watts affidavit,

14 Exhibit-6, and the Will Noble affidavit,

15 Exhibit-7, that you relied upon for your

16 Breathitt allocation percents, correct?

17      A.    And discussions with Phillip

18 Watts that we talked about before.  But

19 that's correct.

20      Q.    So you're testifying now

21 that you relied additionally on

22 conversations with Phillip Watts?

23      A.    No.  It's on the two

24 affidavits.  But I can't take out the

Page 307

1    fact that I had conversations with
2    Phillip Watts.
3            Q.    Okay.  But you did not
4    change any of the allocations percentages
5    that you used for Breathitt based on a
6    conversation with Phillip Watts, did you?
7            A.    No, I would not have.
8            Q.    You would have relied on
9    Mr. Watts' affidavit, correct?
10           A.    I would have, yes.
11           Q.    Okay.  Did you communicate
12   in any way, whether by speaking in
13   person, by phone, corresponding by e-mail
14   or otherwise, with any employees or
15   people otherwise affiliated with
16   Charleston in forming your opinions?
17           A.    Daniel Prentice.
18           Q.    Did you speak with -- let me
19   ask it differently.
20                 Did you communicate in any
21   way with any employees or people
22   otherwise affiliated with Charleston
23   other than Daniel Prentice?
24           A.    Not that I recall, no, sir.

CONFIDENTIAL

Page 308

1          Q.     Mr. Prentice was or is the
2     CFO for Charleston, correct?
3          A.     He is.
4          Q.     Why did you communicate with
5     Mr. Prentice?
6          A.     To receive additional
7     information related to the reconciliation
8     of certain costs for select vendors
9     included in the damage analysis for
10    Charleston.
11         Q.     And what information did
12    Mr. Prentice provide you?
13         A.     He provided me -- in
14    addition to the discussions we had about
15    the select vendors at that time, he
16    actually provided me an affidavit as
17    well, that's in the documents that I --
18    have been produced in this case,
19    confirming questions that I had for him
20    as sworn testimony.
21         Q.     Are you relying on any
22    information that Mr. Prentice provided to
23    you for your opinions in this case that
24    is not contained in his affidavit?

CONFIDENTIAL

Page 309

1          A.    Can you give me a copy of
2    his affidavit, please?
3          Q.    Yes.  We can do that.
4                ATTORNEY SANDOVAL-BUSHUR:
5          I'm marking Tab 11 as Exhibit-8.
6                     -  -  -
7                (Whereupon, Exhibit
8          Meyers-8, No Bates, Affidavit of
9          Daniel Prentice, was marked for
10         identification.)
11                    -  -  -
12               THE WITNESS:  Thank you.
13   BY ATTORNEY SANDOVAL-BUSHUR:
14         Q.    This is the affidavit of
15   Daniel Prentice, correct?
16         A.    That is correct, yes, sir.
17         Q.    Okay.  Are you relying on
18   any information that Mr. Prentice
19   provided to you for your opinions in this
20   case that is not contained in his
21   affidavit?
22         A.    No, sir.
23         Q.    How did you decide that you
24   should communicate with Mr. Prentice?

Page 310

1        A.    So Charleston had a strange

2   accounting software.  When you have a

3   general ledger, you can see both sides of

4   the entries.

5            Their form of a ledger was

6   provided, I believe it's Bates stamped,

7   it's called something a little different

8   than a general ledger.  It was called a

9   monthly expenditure report.  And then he

10  also provided a vendor expense ledger

11  report.

12           And on the vendor expense

13  ledger report, some of the information

14  showed whether there was a balance or not

15  a balance.  And there was no way to

16  reconcile both sides of the entries.

17           So I needed to have a

18  conversation with him while I'm

19  reconciling both sides of the entries to

20  close the loop, if you will, to make sure

21  that all of these costs that are

22  identified are not just invoiced costs

23  but are actually from the ledger of

24  actual amounts paid.

CONFIDENTIAL

Page 311

1           And so I had a conversation
2    with him.  They did not have a system
3    that would go back and allow him to
4    provide the type of report I was asking
5    for.
6           And I said, well, please, I
7    need you, as the CFO, to prepare an
8    affidavit attesting that the schedule
9    you've given me does reflect the amounts
10   actually paid to those vendors, not any
11   amounts outstanding, not any amounts
12   invoiced but not paid, but actual checks
13   written and expenses incurred and paid as
14   represented on the dates in the
15   schedules.  And he verified that orally.
16           I asked him if he would
17   follow up with an affidavit so I could
18   have it for my file.  Because their
19   system did not allow or provide for them
20   to give additional ledger information
21   that would allow me to do the
22   reconciliation on my own.
23        Q.    For districts other than
24   Charleston, you and your team at

CONFIDENTIAL

Page 312

1  Asher-Meyers actually validated

2  yourselves that the vendor costs included

3  in your damages calculations were paid by

4  the districts, correct?

5          A.     We were able to do, on the

6  face of the documents, the

7  reconciliation, without having to talk to

8  the CFO, from those general ledgers.

9                 And in some cases, as we

10 talked about earlier, we would talk to

11 somebody like Stacy McKnight and say,

12 hey, do you have any additional invoices

13 that go with these costs?

14                And they oftentimes did, and

15 those have all been provided and are part

16 of my materials reviewed and considered.

17                Charleston did not have that

18 capability at the time.

19         Q.     For Charleston, you and your

20 team at Asher-Meyers were not able to

21 yourselves validate that the vendor costs

22 included in your damages calculations

23 were actually paid by Charleston,

24 correct?

CONFIDENTIAL

Page 313

1          A.    I don't agree with that.  I
2    think that part of a normal forensic
3    accounting, and even audit, part of an
4    audit process, would include taking the
5    representation of the person who is in
6    control of the ledger.
7               And in this case, he even
8    went so far as to -- and perhaps didn't
9    even need to, but at my request did --
10   prepare an affidavit to show me that what
11   the report showed was what it was.
12              Had I been able to be on
13   site for Charleston at some point in
14   time, maybe I could have confirmed it for
15   myself.
16              But this, to me, is as good
17   a gold standard as having reconciled it
18   myself.
19              All of the costs showed all
20   of the expenses.  And it did have a
21   column for paid and unpaid.  So we knew
22   which ones weren't paid.  I just needed
23   him to further close the loop that this
24   was all of the expenditures that he had.

CONFIDENTIAL

Page 314

1    And that's what he did.

2                    So I -- I consider this to

3    be part of the forensic accounting

4    reconciliation process just as much as

5    anything else.

6            Q.    For Charleston, you relied

7    on Mr. Prentice to validate that

8    Charleston actually paid the vendor costs

9    that were included in your damages

10   calculations for Charleston, correct?

11           A.    For Charleston, I relied on

12   Mr. Prentice to confirm that the report

13   he had previously given me demonstrated

14   what I thought it demonstrated, that it

15   was costs actually paid.

16                    It was an Excel spreadsheet.

17   It didn't have headers.  It didn't have

18   all these other things.  So I confirmed

19   that the report as it was represented

20   what it was.

21           Q.    And aside from the

22   information provided to you by

23   Mr. Prentice, for Charleston you were not

24   able to confirm with Charleston's own

CONFIDENTIAL

Page 315

1   documents that the vendor costs included

2   in your damages calculation were actually

3   paid --

4           A.    That is --

5                 ATTORNEY GRADEN:  Objection.

6                 THE WITNESS:  Sorry.

7   BY ATTORNEY SANDOVAL-BUSHUR:

8           Q.    -- by Charleston, correct?

9           A.    That is incorrect.

10                There are multiple vendors

11  that fall -- fell into different buckets.

12                So some of the vendors were

13  sub-vendors.  Because Charleston has an

14  expenditure report that they put forth

15  every month, publicly available, which is

16  part of my materials reviewed that I

17  pulled.

18                So there were costs that

19  were direct vendor pay costs that I was

20  able to actually go in.  And you can see

21  them on here.  If they do not say

22  Prentice affidavit as one of the

23  reference sources, then they were

24  reconciled; Committee for Children,

CONFIDENTIAL

Page 316

1  Second Step, for instance, both the

2  expenditure report and was able to

3  reconcile it, all of those costs.  Costs

4  related to -- so that's what it was.

5              So to the extent that some

6  of them were part of the spreadsheet

7  779236, Bates stamp, MR_CCSD_779236,

8  those were included as part of the

9  Prentice affidavit.  But other of these

10  charges in here were reconciled without

11  the need.

12             The other thing that's

13  important to note, that in addition to

14  the Prentice affidavit, we also had the

15  expenditure reports that are publicly

16  available that also reconciled these

17  costs as well.

18             So this was an additional

19  check by me to get Mr. Prentice to

20  confirm that the Excel spreadsheet

21  without headers provided what I

22  understood it to provide.

23        Q.    For Breathitt, DeKalb,

24  Harford, Irvington and Tucson, you did

CONFIDENTIAL

Page 317

1  not receive an affidavit from the school
2  district confirming that the documents
3  that you relied on for your vendor costs
4  accurately reflected the districts'
5  vendor costs, correct?
6          A.    That's correct.
7                And I just -- accurately
8  reflected is not the word; that the
9  report purports to be what the report is.
10               But the other ones, the
11  general ledgers on their face showed the
12  reconciliation.  So I could look at both
13  sides of the entry.
14               But, no, I do not have any
15  other affidavits relating to financial
16  statements, other than in Charleston, for
17  the six bellwethers.
18      Q.    How did -- in what format
19  did you communicate with Mr. Prentice?
20          A.    A telephone conference.
21      Q.    Did you take any notes or
22  otherwise record or memorialize your
23  communication with Mr. Prentice?
24          A.    I did not.  It was a very

CONFIDENTIAL

Page 318

1    quick conversation.

2        Q.    It was not part of your

3    assignment to determine what value, if

4    any, Charleston received in exchange for

5    paying any vendor, correct?

6        A.    Could you ask it again,

7    please?

8        Q.    It was not part of your

9    assignment to determine what value, if

10   any, Charleston received in exchange for

11   paying any vendor, correct?

12       A.    That's correct.

13             Going back to the definition

14   of value that I had defined for Breathitt

15   for that same question.  That was not

16   within my scope.

17       Q.    For the allocation percents

18   you used for your Charleston damages

19   calculations, you relied on the affidavit

20   of Lisa Allison, correct?

21       A.    I believe that's correct,

22   yes.

23       Q.    If you want to take a look

24   at Exhibit-1B, Paragraphs 21 to 22.

CONFIDENTIAL

Page 319

```
 1          A.    That's correct.
 2          Q.    For the allocation percents
 3   you used for your Charleston damages
 4   calculations, you did not rely on any
 5   source other than the affidavit of Lisa
 6   Allison, correct?
 7          A.    That's fair to say.
 8          Q.    You have not reviewed the
 9   deposition testimony of Ms. Allison,
10   correct?
11          A.    That's correct.
12          Q.    Why not?
13          A.    I had no need to review her
14   deposition testimony.  I have her
15   affidavit, sworn as to what she's going
16   to attest to at trial.  And I have
17   received no indication that that
18   affidavit has been amended in any way.
19          Q.    If Ms. Allison provided any
20   testimony in a deposition that clarified
21   what she meant in her affidavit, you
22   would have no basis to disagree with what
23   Ms. Allison said in her testimony,
24   correct?
```

CONFIDENTIAL

Page 320

```
 1              ATTORNEY GRADEN:  Objection.
 2              THE WITNESS:  You're asking
 3         me to assume she made it or you're
 4         hypothetically asking me if she
 5         made it?
 6   BY ATTORNEY SANDOVAL-BUSHUR:
 7         Q.    I'm asking you, if
 8   Ms. Allison provided any testimony in a
 9   deposition that clarified what she meant
10   in her affidavit, you would have no basis
11   to disagree with what Ms. Allison said in
12   her testimony, correct?
13              ATTORNEY GRADEN:  Objection.
14              THE WITNESS:  I would have
15         to take a look at it.  To the
16         extent that she has amended her
17         testimony in her affidavit through
18         her testimony in a deposition, I
19         would have to see what weight it
20         gave, if any, to make changes to
21         my report, so.
22   BY ATTORNEY SANDOVAL-BUSHUR:
23         Q.    So it's possible that you
24   would determine that you disagreed with
```

Page 321

1    what Ms. Allison said in her deposition
2    testimony and -- is that what you're
3    saying?
4            A.    No.  It's possible that it
5    would have no impact on my report is what
6    I'm saying.
7            Q.    Okay.  How did you determine
8    which vendors should be included in your
9    Charleston damages calculations?
10           A.    Provided to me by the
11   persons most knowledgeable who will
12   testify at this trial related to select
13   vendors impacted as a result of the
14   alleged improper actions of the
15   defendants in this matter.
16           Q.    And who specifically told
17   you which vendors should be included in
18   your Charleston damages calculations?
19           A.    Those are found in the Lisa
20   Allison affidavit.
21           Q.    Once you determined which
22   vendors should be included in your
23   Charleston damages calculation, how did
24   you determine which costs relating to

CONFIDENTIAL

Page 322

1  each vendor should be included in your
2  damages calculation?
3          A.    As we talked about before
4  for Breathitt, the entirety of the cost
5  for those select vendors has been
6  included before the application of the
7  allocation percentages.
8              And we -- I mentioned a
9  little bit before, and then we went back
10  to Breathitt, but Ms. Allison very
11  specifically says that the total cost
12  expenditures for those particular select
13  vendors.
14          Q.    Mr. Prentice's affidavit,
15  Exhibit-8, does not cover the vendor
16  costs for one of the vendors that you
17  include in your Charleston damages
18  calculation, correct?
19          A.    I think that's right.  I
20  think that's Second Step.
21              That was the one I was
22  talking to you about just a moment ago
23  that we were able to look at the
24  expenditure report and then tie it back

CONFIDENTIAL

Page 323

1    to additional reference materials.

2         Q.    Who provided you with the

3    invoice data for the vendor Committee for

4    Children (Second Step)?

5         A.    Well, I believe that the

6    expenditure reports is a defined term

7    that I put together, which was provided

8    in various Bates stamps.

9              If you go to materials

10   reviewed, which is Appendix D to my

11   report, it's Number 5, for 2014 through

12   2024.  It was Bates stamped pages

13   MR_CCSD_749128 through MR_CCSD_777609,

14   plus discovery.  I don't know when it had

15   closed, but there were additional

16   reports.

17              This is that monthly report

18   that I said goes out for all the charges

19   that Charleston has on a contemporaneous

20   basis that's published publicly on

21   their -- on the district's website.

22              So I was able to supplement

23   what had been produced in this case.  And

24   going forward from May 2024 through April

Page 324

1    2025 at the website listed therein.  And

2    then that information was then

3    coordinated with the additional reference

4    Bates stamps that are identified herein.

5              So that was information

6    directly related to what costs were

7    expended in those months.

8         Q.    Did plaintiffs' attorneys

9    provide you with the Charleston trial

10   balance ledger reports that you relied on

11   for your damages calculations?

12        A.    I think everything would

13   have been provided directly or indirectly

14   through counsel.  And it's Bates stamped,

15   so yes.

16        Q.    And similarly, did

17   plaintiffs' attorneys provide you with

18   the Charleston monthly expenditure

19   reports that you relied on for your

20   damages calculations?

21        A.    They did, up through April

22   2024, as has been produced in discovery

23   in this matter.

24        Q.    Were you granted complete

CONFIDENTIAL

Page 325

1    access to all of Charleston's financial
2    records?
3                ATTORNEY GRADEN:  Objection.
4                THE WITNESS:  I don't know
5          what you mean by "complete
6          access."
7    BY ATTORNEY SANDOVAL-BUSHUR:
8          Q.    Did you rely on Charleston's
9    attorneys to provide you with the set of
10   financial records that you used for your
11   damages calculations?
12         A.    In part, but not in whole.
13                As you can see here on
14   Charleston, on Number 2, as we talked
15   about earlier in this deposition, I had
16   gone and pulled all the financial
17   statements from fiscal year ending 2016
18   through fiscal year ending 2024 from the
19   website.
20                These are all school
21   districts that all the information is
22   publicly available on these.
23   Charleston's budget reports, went and
24   pulled all of those.

CONFIDENTIAL

Page 326

1            As I said, as discovery
2    continued to come in or was produced,
3    additional information was provided to me
4    with Bates stamps.
5            But all of the transparency
6    reports for the monthly expenditures, we
7    had initially gone in and downloaded all
8    of those off the website before we went
9    in and got the Bates-stamped version.  So
10   everything comes from the website
11   originally.
12           I don't know the answer to
13   your question.  I couldn't have gotten
14   more information.  They gave all the
15   information that they had.
16   Unfortunately, the report that they had
17   just needed somebody to, you know, ask
18   the question to confirm that it was what
19   it purported to be.  And it was.
20       Q.    Can you please take a look
21   at Exhibit-5, which you already have, the
22   affidavit of Lisa Allison.
23       A.    I have it.
24       Q.    And this is the affidavit of

CONFIDENTIAL

Page 327

1    Lisa Allison which you relied on for

2    allocation percents for your Charleston

3    damages calculations, correct?

4            A.    That's correct.

5            Q.    Ms. Allison's affidavit does

6    not mention Yondr, correct?

7            A.    That's correct.

8            Q.    You had no information from

9    Charleston informing you of what the

10   allocation percent should be for Yondr,

11   correct?

12           A.    I think that's fair.  It did

13   not come from Ms. Allison.

14           Q.    You had no information from

15   Charleston informing you of how much of

16   its Yondr costs were attributable to

17   defendants' at-issue conduct, correct?

18           A.    Ask it again, please.

19           Q.    You had no information from

20   Charleston informing you of how much of

21   Charleston's Yondr costs were

22   attributable to defendants' at-issue

23   conduct, correct?

24           A.    I don't know that that's the

CONFIDENTIAL

Page 328

1    case.  But it certainly is not in
2    Ms. Allison's affidavit.
3              I guess what I would ask for
4    is a copy of the initial disclosures and
5    the supplemental disclosures and the
6    answers to interrogatory set Number 3,
7    dated April 23rd, 2025.
8         Q.    You -- you testified that
9    you relied exclusively on Ms. Allison's
10   affidavit for allocation percentages for
11   Charleston, correct?
12        A.    I did.
13        Q.    And that's what you say in
14   your report, correct?
15        A.    It is.
16              And I'm asking you to
17   provide me a copy of the discovery,
18   because the Yondr pouches may have been
19   in there and this may be a typo in the
20   report, that it may have also come from
21   the interrogatory responses.
22        Q.    Sitting here right now, do
23   you know what, if any, basis you had for
24   using a 100 percent allocation percentage

CONFIDENTIAL

Page 329

1  for Yondr pouches for the Charleston

2  School District?

3          A.    Sitting here right now,

4  without my materials reviewed in front of

5  me, and you not giving it to me as I'm

6  asking for them, I do not know.

7                ATTORNEY SANDOVAL-BUSHUR: I

8          am marking as Exhibit-9

9          Charleston's First Supplemental

10         Answers to Defendants'

11         Interrogatories to Charleston

12         County School District, Set 3,

13         dated April 23rd, 2025.

14                    -   -   -

15              (Whereupon, Exhibit

16         Meyers-9, No Bates, Plaintiff's

17         First Supplemental Answers to

18         Defendants' Interrogatories to

19         Charleston County School District,

20         Set 3, was marked for

21         identification.)

22                    -   -   -

23

24                TRIAL TECHNICIAN:  Counsel,

CONFIDENTIAL

Page 330

1           is there a tab number?

2                    ATTORNEY SANDOVAL-BUSHUR:

3           Yes.   It's Tab 16.

4                    TRIAL TECHNICIAN:   Thank

5           you.

6    BY ATTORNEY SANDOVAL-BUSHUR:

7           Q.    Mr. Meyers --

8           A.    Just one second, counsel.

9                Okay.

10          Q.    Exhibit-9, Charleston's

11   First Supplemental Answers to Defendants'

12   Interrogatories to Charleston County

13   School District, Set 3, does not provide

14   an allocation percentage for Yondr

15   pouches, correct?

16          A.    I disagree with you.

17          Q.    Please identify to me where

18   the interrogatory response provides an

19   allocation percent for Yondr pouches?

20          A.    It includes technology,

21   software, and then Yondr pouches as a

22   separate line item as part of the damages

23   that are being alleged.

24          Q.    What is your basis for your

CONFIDENTIAL

Page 331

1    statement that there -- can you point me

2    to where the text in Exhibit-9, the

3    interrogatory responses for Charleston,

4    that identifies a 100 percent allocation

5    percent for Yondr pouches?

6            A.    I'm pointing you right now

7    to the actual fact that the only one that

8    has a single vendor of all the things was

9    Yondr pouches, and it was what I relied

10   upon at 100 percent.

11            And in my report, as I will

12   correct right now on the record, should

13   say -- Number 21, it should say, based on

14   the Allison affidavit and it should

15   include the updated interrogatory

16   responses.

17            That was inadvertently left

18   out by me.  And that should be included

19   like it is on all the other reports on

20   Number 21 and 22.

21            Yondr pouches is included as

22   a single line item in -- separately from

23   all the technology and all the software.

24   So I've included it at 100 percent.

CONFIDENTIAL

Page 332

1          Q.    Sorry, Mr. Meyers, where are

2    you seeing Yondr pouches included as a

3    separate line item, separate from all the

4    technology and software?

5          A.    In the category chart.

6                Are you looking at the same

7    chart as me?

8          Q.    Yes.

9          A.    Okay.  Everything in the

10   category of damages are all categories of

11   buckets of things with the exception of

12   one, Yondr pouches.

13               Yondr pouches is the only

14   actual specific cost identified herein.

15   So the technology that's been included in

16   the Allison affidavit, she identified the

17   select vendors that went in, and those

18   select vendors, she put a percentage to.

19               This identifies Yondr

20   pouches at its full value, which is why

21   it's included at 100 percent.

22         Q.    I'm sorry, Mr. Meyers, but

23   this says, Technology/software/Yondr

24   pouches.

CONFIDENTIAL

Page 333

1              That -- we're looking at the
2    same thing, right?
3         A.    We are.
4              We're looking at --
5         Q.    And is it your --
6         A.    -- technology, which is a
7    category of expenses; we're looking at
8    software, which is a category of
9    expenses; and we're looking at Yondr
10   pouches, which is a single vendor.
11        Q.    So is it your -- you do not
12   know, in the interrogatory responses in
13   Exhibit-9, what percentage of Yondr pouch
14   costs are included in the approximate
15   damages amount, correct?
16        A.    I do.
17              ATTORNEY GRADEN:  Objection.
18              THE WITNESS:  They have
19         included all of the expenditures
20         for those categories in all of
21         these.
22              Ms. Allison's affidavit
23         takes the select vendors that are
24         being included for technology and

CONFIDENTIAL

Page 334

1        software, which is one of the
2        buckets, and further reduces those
3        by what's been caused by the
4        defendants in this matter.
5    BY ATTORNEY SANDOVAL-BUSHUR:
6        Q.    So I'm having a hard time
7    understanding your testimony.
8        A.    I think we're both having a
9    hard time understanding each other.
10       Q.    Ms. Allison does not say
11   100 percent of Yondr costs are
12   attributable to social media or to
13   defendants' at-issue conduct, correct?
14       A.    You and I can agree on that.
15       Q.    Okay.  Okay.  Ms. Allison
16   does not say 100 percent of technology
17   costs are attributable to defendants
18   except for certain vendors that I have
19   specifically called out in my affidavit,
20   correct?
21       A.    No.  Ms. Anita Huggins,
22   superintendent of schools for Charleston
23   School District, who verified the answer
24   to Interrogatory Number 5, which is, For

CONFIDENTIAL

Page 335

1    each category of damages you are seeking

2    explain them and itemize them, itemizes

3    Yondr pouches as their full cost.

4              I'm confused at the

5    confusion.

6         Q.    Mr. Meyers, how much, in the

7    year -- 2023/2024 school year, did the

8    Charleston School District spend on

9    technology?

10        A.    I would have -- that's not a

11   cost that I've reconciled.

12        Q.    Mr. Meyers, in the -- for

13   the 2023/2024 school year, how much did

14   the Charleston School District spend on

15   software?

16        A.    It's not a cost that I've

17   reconciled.

18        Q.    So please explain to me how

19   you know that in the category

20   technology/software/Yondr pouches the

21   total amount of $6,984,000 is inclusive

22   of all Yondr pouch costs?

23        A.    That's my understanding of

24   what the interrogatory says.

CONFIDENTIAL

Page 336

1          Q.    And can you point me to any
2    text in the interrogatory that supports
3    that understanding?
4          A.    I've just pointed you to the
5    chart and the verification that supports
6    that understanding.
7          Q.    So is your.  Your opinion or
8    your understanding, rather -- let me ask
9    that differently.
10              Your understanding is that
11   Charleston is asserting that -- in this
12   interrogatory response that 100 percent
13   of its technology costs, 100 percent of
14   its software costs and 100 percent of its
15   Yondr pouch costs are damages
16   attributable to defendants' at-issue
17   conduct?
18              ATTORNEY GRADEN:  Objection.
19              THE WITNESS:  That's what I
20         understand the interrogatory to
21         say.
22              And as I have been asked to
23         do was to identify the select
24         vendors for certain categories.

Page 337

1      And one of those vendors is Yondr
2      bag.
3              So of the $6,984,000 of
4      costs in those buckets, Yondr
5      pouches, for that fiscal year,
6      appear to have totaled $2,601.
7      And that's what's been included.
8              Now, I don't know and can't
9      tell you whether or not Charleston
10     is continuing to assert damages on
11     these other components that were
12     outside of the scope of what I'm
13     asking for.  I don't know the
14     answer to that.
15             But what I can tell you is
16     when they have incurred all of the
17     Yondr pouch cost and included it
18     as a separate line item, where
19     everything else is a category of
20     information, and they have picked
21     a direct vendor, my understanding,
22     whether you like it or not, is
23     that that is 100 percent for the
24     Yondr pouches and is included in

CONFIDENTIAL

Page 338

1    that cost.

2         So I have reconciled the

3    Yondr pouch costs and included

4    that as a damage at 100 percent.

5  BY ATTORNEY SANDOVAL-BUSHUR:

6         Q.    You know that, in fact,

7  Charleston is not claiming 100 percent of

8  its technology and 100 percent of its

9  software costs as damages, correct?

10         ATTORNEY GRADEN:   Objection.

11         THE WITNESS:   I know as it

12    relates to the select vendors that

13    I have calculated damages for, as

14    a result of the superceding

15    affidavit of Lisa Allison, a month

16    after this was verified.

17         I have reduced at least

18    those technology costs to the

19    amounts identified herein.  That I

20    can agree with you on.

21         So to the extent that these

22    technology costs for Panorama

23    Education are at 100 percent in

24    there, and they are now at

Page 339

1     20 percent, I do believe that that
2     supercedes that interrogatory
3     response as a result of the
4     affidavit.
5          But I do not read
6     Ms. Allison's affidavit to
7     be silent on Yondr pouches to mean
8     they're not making a claim on
9     Yondr pouches.  They have a
10    verified affidavit -- affidavit or
11    interrogatory response where
12    they're making a claim for Yondr
13    pouches at no reduction, which is
14    what I've calculated here.
15         And, you know, I apologize.
16    And on the record, I will amend
17    the report to include the verified
18    interrogatories.
19         But that's what the basis of
20    it is from.
21  BY ATTORNEY SANDOVAL-BUSHUR:
22         Q.   Did you consider the
23  possibility that Ms. Allison did not
24  include the Yondr pouches in her

CONFIDENTIAL

Page 340

1  affidavit because she did not believe

2  that she had a basis for asserting any

3  damages relating to Yondr pouches?

4        A.    Absolutely not.  That's

5  actually quite contrary to what I

6  understand this case to be.

7             Because under your premise,

8  then Charleston has walked away from

9  teacher costs, which I know there's other

10 experts dealing with, property damage

11 costs, mental health costs.  These are

12 all things that other experts are dealing

13 with.

14            So the absence of it in an

15 affidavit she provided is in no way

16 indicative of those costs being somehow

17 withdrawn as damages in this matter.

18 That's just simply incorrect.

19       Q.    Other than the existence in

20 this interrogatory response of a category

21 titled, Technology/software/Yondr pouches

22 and corresponding dollar amounts for each

23 school year for 2016 through 2024, do you

24 have any other basis for using a

Page 341

1  100 percent allocation percent for Yondr
2  pouches for Charleston?
3          A.    Not that I can recall
4  sitting here right now.
5          Q.    Did you ask anyone at
6  Charleston if the Yondr -- let me ask my
7  question a little differently.
8                Did you consider asking
9  Ms. Allison why her affidavit did not
10  address Yondr pouches?
11          A.    I did not, no, sir.
12          Q.    Did you ask anyone at the --
13  from any of the plaintiffs' law firms if
14  they could get you information on what
15  the allocation percent was for Yondr?
16          A.    It wouldn't -- ask the
17  question again --
18                ATTORNEY GRADEN:  Objection.
19                THE WITNESS:  -- please.
20  BY ATTORNEY SANDOVAL-BUSHUR:
21          Q.    Did you ask any of the
22  plaintiffs' attorneys if they could
23  obtain from you information on what the
24  allocation percent should be for Yondr

CONFIDENTIAL

Page 342

1    for the Charleston School District?
2            ATTORNEY GRADEN:  Objection.
3            THE WITNESS:  I don't recall
4        that I did or that I didn't.
5            What I do recall, as I'm
6        sitting here right now, is that
7        the schedule that was provided by
8        Daniel Prentice actually had a
9        specific tab for the costs related
10       to Yondr, which was one of the
11       things that I was asked to
12       reconcile.
13   BY ATTORNEY SANDOVAL-BUSHUR:
14       Q.    Mr. Yondr's affidavit --
15       A.    Mr. Yondr?
16       Q.    Sorry.
17            Mr. Prentice's affidavit
18   included the full cost for all of the
19   vendors that were included in his
20   spreadsheet, correct?
21       A.    That is not correct.  There
22   were many costs that were associated in
23   that spreadsheet that are not included in
24   these damages.

```
                                    Page 343
1          Q.    Mr. Prentice did not purport
2     to provide an allocation percentage for
3     any vendor, correct?
4               ATTORNEY GRADEN:  Objection.
5               THE WITNESS:  He did not
6          purport to provide an allocation
7          percentage, but he did limit the
8          vendors to select vendors, which
9          happen to be some of the select
10         vendors that Ms. Allison included
11         and some that she did not, that I
12         did not include in my report.
13              But the Yondr pouches were
14         one that was already verified in
15         the interrogatory response and was
16         included in the report.
17    BY ATTORNEY SANDOVAL-BUSHUR:
18         Q.    Just so the record is clear.
19              Did Mr. Prentice provide or
20    purport to provide any allocation
21    percentages for any vendor?
22         A.    I do not believe that he
23    did, no, sir.
24         Q.    And you're not relying on
```

Page 344

1    Mr. Prentice to provide any allocation
2    percentages in this matter, correct?
3             A.    I don't know that he's going
4    to provide allocation percentages or not.
5    I don't know who is going to verify the
6    interrogatory responses related to Yondr
7    pouches.  It may be him.  I don't know.
8             Q.    Sitting here today --
9             A.    Sitting here today --
10            Q.    -- you are not relying on --
11   can I -- just so the record is clear.
12            A.    Please.
13            Q.    Sitting here today, you're
14   not relying on Mr. Prentice for any
15   allocation percentages, correct?
16            A.    That's fair.
17            Q.    Turning to DeKalb.
18                  Did you communicate in any
19   way with any employees or people
20   otherwise affiliated with DeKalb?
21            A.    I had a meeting with Byron
22   Scheuneman.
23            Q.    Did you communicate in any
24   way, whether by person -- in person, by

CONFIDENTIAL

Page 345

1    telephone, corresponding by e-mail or

2    otherwise, with any employees or people

3    otherwise affiliated with DeKalb other

4    than Byron Scheuneman?

5          A.    Just to be complete in the

6    answer, only the people that I may have

7    introduced myself to when I was at

8    DeKalb's site when I went and met with

9    Mr. Scheuneman personally.

10         Q.    You met with Mr. Scheuneman

11   in person?

12         A.    I did.

13         Q.    Is that the only way in

14   which you communicated with

15   Mr. Scheuneman was in person?

16         A.    I don't -- we may have had a

17   phone call before, but -- no, I think

18   that was the only time we had actually

19   met was in person.

20         Q.    Why did you meet with

21   Mr. Scheuneman in person?

22         A.    To help get additional

23   information out of his general ledger

24   system, which was pretty complex.

CONFIDENTIAL

Page 346

1           DeKalb's system is unique
2    insofar as they not only run their own
3    school district, but they also run their
4    own all district; they run their own
5    police force, they run all these
6    different things.
7           So they have this
8    proprietary software.  And when I kept
9    requesting information, he said, it would
10   be a whole lot easier if you came and sat
11   in the conference room and told me
12   exactly what you need out of this because
13   it would be quicker for my people and for
14   me to get it for you.
15          So I was able to get on site
16   and meet with him.  And after a very
17   short period of time, he realized exactly
18   what it is I was looking for and was able
19   to provide it without further incident.
20      Q.    So have you described all of
21   the information that Mr. Scheuneman
22   provided?
23      A.    It's all in the materials
24   reviewed.  All of it has been produced in

Page 347

1    discovery and Bates stamped, I believe,
2    yes, sir.
3          Q.    Other than the documents
4    that Mr. Scheuneman provided to you, are
5    you relying on any of the oral
6    communication that you had with
7    Mr. Scheuneman for purposes of your
8    opinions in this case?
9          A.    No, that's fair.
10                But, again, just to clarify
11   the record, Mr. Scheuneman didn't provide
12   anything to me.  I met with him, he
13   understood what he needed to provide.  He
14   provided it to counsel, and counsel got
15   it to me at my request.
16         Q.    How did you decide that you
17   should communicate with Mr. Scheuneman?
18         A.    I had requested the general
19   ledgers.  And I was told it would be much
20   more easy to get on site and ask for
21   those in person so that we didn't go run
22   20,000 pages of reports that weren't
23   exactly what you wanted.
24         Q.    Did you take any notes or

CONFIDENTIAL

Page 348

1   otherwise record or memorialize your

2   communications with Mr. Scheuneman?

3           A.    I did not, no, sir.

4           Q.    And you are not relying on

5   Mr. Scheuneman for any of the allocation

6   percent information for DeKalb, correct?

7           A.    That's fair.  I -- well, I

8   don't know -- I think that's fair to say,

9   yes.

10          Q.    Okay.  It was not part of

11  your assignment to determine what value,

12  if any, DeKalb received in exchange for

13  paying any vendor, correct?

14          A.    That's correct.

15          Q.    For the allocation percents

16  you use for your DeKalb damages

17  calculations, you relied on the affidavit

18  of Monika Davis, correct?

19          A.    I believe that's correct.

20          Q.    For the allocation percents

21  you used for your DeKalb damages

22  calculations, you did not rely on any

23  source other than the affidavit of Monika

24  Davis, correct?

CONFIDENTIAL

Page 349

1          A.    I believe that's correct.  I
2     don't have a copy of Ms. Davis's
3     affidavit in front of me.
4          Q.    Do you know whether
5     Ms. Davis has ever testified about how
6     she prepared her affidavit?
7          A.    I don't know.  Subsequent to
8     the issuance of my report, I received a
9     copy of Ms. Davis's deposition.  But that
10    was -- that predated -- and the exhibits
11    thereto, but that predated the affidavit.
12              So anything that she would
13    have said in that would have been
14    superceded by the affidavit at that point
15    in time.
16              ATTORNEY SANDOVAL-BUSHUR: I
17         am going to mark as Exhibit-10 the
18         affidavit of Monika Davis.  This
19         is Tab 17.
20                   -  -  -
21         (Whereupon, Exhibit
22         Meyers-10, No Bates, Affidavit of
23         Monika Davis, was marked for
24         identification.)

CONFIDENTIAL

Page 350

```
 1                    -   -   -
 2   BY ATTORNEY SANDOVAL-BUSHUR:
 3         Q.    Mr. Meyers, Exhibit-10 is
 4   the affidavit of Monika Davis that you
 5   relied upon for the allocation
 6   percentages for the DeKalb case, correct?
 7         A.    I believe that's correct.
 8         Q.    You rely on Ms. Davis's
 9   affidavit for the percentages of -- or
10   the allocation percent for costs relating
11   to Lightspeed, correct?
12         A.    That's correct.
13         Q.    And if you look at Page
14   15 -- I'm sorry, not Page 15, Paragraph
15   15.  Apologies.
16              If you look at Paragraph 15,
17   Ms. Allison says that 30 percent of
18   Lightspeed costs are related to the
19   district's attempts to block and/or limit
20   social media, correct?
21         A.    I see that, yes, sir.
22         Q.    Ms. Davis does not provide,
23   in her affidavit, a definition of social
24   media, correct?
```

CONFIDENTIAL

Page 351

1          A.    I do not see a definition
2    for social media in the traditional
3    sense, other than my understanding of
4    this affidavit, which we've talked about
5    before.
6          Q.    Okay.  And Ms. Davis does
7    not, in her affidavit, refer to
8    defendants, correct?
9               ATTORNEY GRADEN:  Objection.
10              THE WITNESS:  I do not see a
11          reference to Facebook, Instagram,
12          Snapchat, TikTok or YouTube.
13              But I do believe when she
14          refers to social media, she is
15          absolutely referring to defendants
16          in this particular matter.
17    BY ATTORNEY SANDOVAL-BUSHUR:
18          Q.    And you also do not see in
19    her affidavit a reference to the word
20    "defendants," correct?
21          A.    I do not think I see the
22    word "defendants" in here.  I did not
23    read it.
24          Q.    And you cannot point me to

Page 352

1   any language in the affidavit of Monika
2   Davis, Exhibit-10, stating that when she
3   refers to social media that is limited to
4   the defendants' at-issue conduct,
5   correct?
6           A.    I don't see a definition, if
7   that's what you're asking for.
8                 But I've given you what my
9   understanding of her acknowledgment of
10  social media refers to in this particular
11  case.
12          Q.    You've never spoken to
13  Monika Davis, correct?
14          A.    I don't believe so, no, sir.
15          Q.    And you've never
16  communicated in any way with Monika
17  Davis?
18          A.    Not that I'm aware of.
19          Q.    How did you determine which
20  vendors should be included in your DeKalb
21  damages calculations?
22          A.    They were from two different
23  things.  One was the affidavit of Monika
24  Davis.  The second for select vendors was

CONFIDENTIAL

Page 353

1  in connection with the deposition and

2  attachments thereto of Mr. Scheuneman,

3  which I believe are also part of the

4  interrogatory responses, wherein he

5  identified select vendors at that point

6  in time.

7        Q.    Once you determined which

8  vendors should be included in your DeKalb

9  damages calculation, how did you

10 determine which costs relating to each

11 vendor should be included in your damages

12 calculation?

13       A.    Part of that would have been

14 through the Scheuneman deposition.

15 Expense -- I think there were only two or

16 three costs for this.  One was Lightspeed

17 and the other two were the Yondr and the

18 cell phone locker; so the pouches and the

19 lockers, which came directly out of

20 Scheuneman and, I believe, was part of an

21 interrogatory response as well at

22 100 percent.

23             So a total of the cost -- I

24 believe this was a trial in just a

CONFIDENTIAL

Page 354

1  portion of the school for which they were

2  doing the Yondr pouches which is included

3  herein.

4        Q.    You assumed that if a vendor

5  was identified by DeKalb as a select

6  vendor, then every single payment that

7  DeKalb made to that vendor should be

8  included in your damages calculations,

9  correct?

10        A.    Only on the ones that's

11  included.  There were other select

12  vendors that Mr. Scheuneman had that were

13  no longer included in my report, either

14  as a result of the forensic accounting or

15  because they weren't considered to be

16  included for the purposes of damages as

17  it relates to the alleged improper

18  actions of the defendants.

19        Q.    Were there some vendors who

20  Mr. Scheuneman identified as a select

21  vendor for DeKalb that, in the process of

22  your forensic accounting, you determined

23  should not be part of the damages

24  calculation?

CONFIDENTIAL

Page 355

1          A.     If you have a copy --
2                 ATTORNEY GRADEN:   Objection.
3                 THE WITNESS:   If you have a
4          copy of the exhibit, that would
5          help me refresh my recollection.
6                 The answer is I believe that
7          there were a couple that were not
8          included.  And as I sit here right
9          now, I can't recall, certainly
10         without seeing their names,
11         whether it was that I couldn't
12         reconcile the costs in a way that
13         was satisfactory to me or if no
14         one was going to attest that those
15         were continuing to be claimed as
16         losses as a result of the alleged
17         improper actions of the
18         defendants.
19    BY ATTORNEY SANDOVAL-BUSHUR:
20         Q.     Did you confirm with anyone
21    from DeKalb that every payment that the
22    district made to each individual vendor
23    should be included in your damages
24    calculations?

```
                                          Page 356
 1              ATTORNEY GRADEN:  Objection.
 2              THE WITNESS:  Could you ask
 3         again?
 4    BY ATTORNEY SANDOVAL-BUSHUR:
 5         Q.    Did you confirm with anyone
 6    from DeKalb that every payment that the
 7    district made to each select vendor
 8    should be included in your damages
 9    calculations?
10         A.    I don't know who, at the end
11    of the day, confirmed.  I know that
12    originally the list of select vendors was
13    longer than this.  And this is the only
14    ones that DeKalb is setting forth as
15    damages, from these particular select
16    vendors, through my report.
17         Q.    Did you confirm with anyone
18    from DeKalb that this set of invoices
19    that you used for any of the select
20    vendors was the right set of invoices to
21    use for your damages calculation?
22         A.    Oh, no, definitely the
23    invoices that were used were confirmed.
24    I got all of that information directly
```

CONFIDENTIAL

Page 357

1    from the CFO.

2              So the costs as actually

3    incurred are absolutely reconciled

4    therein.

5         Q.    What do you mean when you

6    say that "the invoices that you used were

7    confirmed.  I got all that information

8    directly from the CFO"?

9         A.    Sure.  So we're talking

10   about three vendors here.  So for Yondr,

11   I had the invoice, I had the check number

12   and I had a reference, which I would have

13   to go look up, too, which I think is a

14   purchase order.

15             For the cell phone lockers,

16   we had a PO and a proof of evidence of

17   purchase.

18             And for the Lightspeed, we

19   had the invoice, we had the PO and we had

20   the evidence of the payment in the

21   ledger.

22             So I was able to confirm all

23   the costs for those particular select

24   vendors.

CONFIDENTIAL

Page 358

1          Q.    If you'd turn back to
2     Exhibit-10, the affidavit of Monika
3     Davis, and turn to Paragraph 7 on the
4     first page.
5               You see that Ms. Davis says,
6     DeKalb County School District uses the
7     Lightspeed system to filter content on
8     its network and district-issued laptops.
9               Do you see that?
10         A.    I do.
11         Q.    You have no reason to
12     disagree with Ms. Davis that DeKalb
13     County School District uses the
14     Lightspeed system to filter content on
15     its network and district-issued laptops,
16     correct?
17         A.    I have no reason to suggest
18     that what she's saying is incorrect, no,
19     sir.
20         Q.    And we talked a little bit
21     earlier, but if you turn to Paragraph 15,
22     do you see that in Paragraph 15 Ms. Davis
23     says, 30 percent of Lightspeed costs are
24     related to the district's attempts to

CONFIDENTIAL

Page 359

1   block and/or limit social media?

2           A.     I definitely do.

3           Q.     You do not know how

4   Ms. Davis came to that 30 percent number,

5   correct?

6           A.     I do not know how she came

7   to the 30 percent number.

8                  But when she's -- it goes

9   back to Paragraph 7, she also says in the

10  following sentence that you read on the

11  record, This system blocks access to

12  social media platforms on the networks

13  and servers.

14                 So it speaks to Lightspeed,

15  which does a lot of things.  She has

16  limited Lightspeed to 30 percent related

17  to the alleged improper actions of the

18  defendants.

19                 This supercedes the original

20  testimony of Mr. Scheuneman that had it

21  at 100 percent.  So in this particular

22  case, Ms. Davis, who is the person who is

23  going to be most knowledgeable and

24  testify as it relates to Lightspeed and

Page 360

1  has provided an affidavit, has stated
2  that it's not 100 percent of Lightspeed
3  that should be included as a result of
4  the alleged improper actions of the
5  defendants in this matter, but only 30
6  percent relating to the alleged improper
7  actions of the defendants in this matter.
8         Q.    Which vendor cost is
9  Mr. Scheuneman the person most
10 knowledgeable about?
11        A.    Vendor cost?
12        Q.    Uh-huh.
13        A.    I don't know the answer to
14 that.  You'd have to ask Mr. Scheuneman.
15 I don't know what he's going to give
16 testimony in at the trial.
17        Q.    You believe that Ms. Davis
18 is more knowledgeable about the
19 Lightspeed vendor costs than
20 Mr. Scheuneman, correct?
21        A.    I'm not going to say one of
22 them is more knowledgeable than anything.
23 One of them is the CFO and one of them is
24 the CIO, the chief information officer.

Page 361

1                And I would think that
2    Ms. Davis is absolutely in a position to
3    say that only 30 percent of the
4    Lightspeed costs are attributable -- the
5    damages are only 30 percent of the
6    Lightspeed costs attributable to the
7    damages.
8            Q.    Okay.
9            A.    I certainly used the lower
10   of the two percentages.
11           Q.    Your damages estimate for
12   DeKalb includes costs relating to Yondr,
13   correct?
14           A.    As we just talked about,
15   yes, sir.
16           Q.    Ms. Davis's affidavit does
17   not mention Yondr, correct?
18           A.    That is correct.
19           Q.    In calculating damages for
20   DeKalb, you did not rely on information
21   from DeKalb informing you of what the
22   allocation percent should be for Yondr,
23   correct?
24                ATTORNEY GRADEN:  Objection.

CONFIDENTIAL

1            THE  WITNESS:   I think I just
2       testified that that information is
3       in their interrogatory responses.
4            And part of the sworn
5       testimony of Byron Scheuneman and
6       attached to his deposition related
7       to 100 percent for the Yondr pouch
8       and the cell phone lockers.
9  BY ATTORNEY SANDOVAL-BUSHUR:
10       Q.    Okay.  So is that another
11  omitted citation in your report that you
12  believe needs to be corrected?
13       A.    Let's take a look.
14            I think that's fair.
15  Because that's where that number comes
16  from, is the Scheuneman affidavit, where
17  he has a schedule of select vendors as
18  well as, I believe, there's an amended
19  interrogatory response as well on
20  March 24, 2025.
21            But I don't have a copy of
22  that in front of me.
23       Q.    You received the Monika
24  Davis -- well, the Monika Davis

Page 363

1  affidavit, Exhibit-10, is dated May 16th,
2  2025, correct?
3          A.    It is, yes.
4          Q.    And your report for DeKalb
5  is dated May 19th, 2025, correct?
6          A.    That's correct, yes, sir.
7          Q.    You received it only three
8  days, at most, before you finalized your
9  DeKalb report, correct?
10          A.    I think that's right, yes,
11  sir.
12          Q.    Were you anticipating, in
13  drafting your DeKalb report, that you
14  were going to receive from Ms. Davis an
15  affidavit that would provide an
16  allocation percent for Yondr?
17          A.    I do not believe that I was
18  waiting on anything from anybody.
19                At this point in time, we
20  had determined the select vendors and we
21  were including at 100 percent Lightspeed,
22  Yondr pouches and cell phone lockers,
23  based on Mr. Scheuneman.
24                And then Ms. Davis, who has

CONFIDENTIAL

Page 364

1  been identified as a person who is most

2  knowledgeable about the impact of the

3  alleged improper damages of the

4  defendants, as it relates to Lightspeed,

5  has prepared an affidavit saying that

6  it's not 100 percent and it should only

7  be 30 percent, which certainly gave me

8  the consideration which I gave it, to

9  reduce that percentage from 100 percent

10  to 30 percent on the eve of the issuance

11  of this report.

12          Q.     Okay.

13                 ATTORNEY SANDOVAL-BUSHUR:

14          Let's take a look at Tab 20, which

15          we will mark as Exhibit-11.

16                        -   -   -

17                 (Whereupon, Exhibit

18          Meyers-11, No Bates, Plaintiff's

19          Amended Objections and Responses

20          to Defendants' Interrogatories to

21          Dekalb County School District, Set

22          3, was marked for identification.)

23                        -   -   -

24                 ATTORNEY GRADEN:  Just note

CONFIDENTIAL

```
                                        Page 365
 1          we're at about an hour.
 2     BY ATTORNEY SANDOVAL-BUSHUR:
 3          Q.     Exhibit-11 is DeKalb's
 4     Amended Objections and Responses to
 5     Defendants' Interrogatories to DeKalb
 6     County School District, Set 3, correct?
 7          A.     Yes, sir.
 8          Q.     And I believe you testified
 9     that there is information in this
10     interrogatory response that you may have
11     relied on in connection with the decision
12     to use a 100 percent allocation percent
13     for Yondr; is that correct?
14          A.     And the initial decision to
15     use 100 percent for the Lightspeed
16     filters, yes, sir.
17          Q.     Okay.
18          A.     In connection with both of
19     them.
20          Q.     And can you point me to what
21     language in the --
22          A.     Sure.  It's Page 6.
23          Q.     Sorry.  Can I just -- so we
24     have a clean record, I just want to
```

Page 366

1  ask -- finish asking the question.

2         A.    My apologies.

3         Q.    Can you point me to what

4  language in Exhibit-11, DeKalb's

5  interrogatory responses, you are relying

6  on for the use of 100 percent allocation

7  percent for Yondr?

8         A.    Sure.  It's the last

9  paragraph on the bottom of Page 6, in

10 connection with the rest of the answer

11 where it goes through how they reached

12 the numbers, as detailed on Exhibit-2 to

13 Byron Scheuneman's deposition, which is

14 incorporated herein but not attached to

15 what you handed me -- maybe it is

16 attached to what you handed me.

17              I don't want to speak too

18 soon.

19              It is not attached to what

20 you handed me, even though it's

21 incorporated herein as part of the

22 interrogatory response.

23              But on the bottom of Page 6,

24 it says, For student services, DeKalb

CONFIDENTIAL

Page 367

1  identified three categories of cost to
2  date, cell phone lockers, Yondr pouches
3  and safe rooms.  As to cell phone
4  lockers, they have expended $35,000 --
5           (Reporter clarification.)
6           THE WITNESS:  As to cell
7       phone lockers, DeKalb has expended
8       $35,000 to date purchasing and
9       implementing these products in
10      approximately eight school
11      campuses.  As to Yondr pouches,
12      DeKalb has expended $390,000 to
13      date purchasing and implementing
14      these products in approximately
15      ten school campuses.
16 BY ATTORNEY SANDOVAL-BUSHUR:
17      Q.    As you noted, the
18 interrogatory response from DeKalb refers
19 to and incorporates the deposition
20 testimony of Byron Scheuneman and
21 Exhibit-2 to Mr. Scheuneman's deposition,
22 correct?
23      A.    It does, yes, sir.
24      Q.    And you are relying, in

CONFIDENTIAL

Page 368

1    part, on Mr. Scheuneman's testimony in

2    Exhibit-2 to his deposition for the

3    100 percent allocation to Yondr?

4          A.    Well, in addition to the

5    interrogatory response for which it's

6    made a part thereof.

7                ATTORNEY SANDOVAL-BUSHUR:

8          Let's mark Tab 21 as Exhibit-12.

9                    -   -   -

10               (Whereupon, Exhibit

11         Meyers-12, No Bates, Cost

12         Estimates, was marked for

13         identification.)

14                   -   -   -

15   BY ATTORNEY SANDOVAL-BUSHUR:

16         Q.    Mr. Meyers, do you recognize

17   Exhibit-12 as Exhibit-2 to

18   Mr. Scheuneman's deposition?

19         A.    I very much do, yes, sir.

20         Q.    Okay.  And you see that in

21   the table labeled, Hard Costs -- do you

22   see that table?

23         A.    I do, yes, sir.

24         Q.    You see the fourth line down

```
                                        Page 369
 1   states, Student services, cell phone
 2   locker, correct?
 3          A.    Yes, sir.
 4          Q.    And you see that there is a
 5   100 percent weight assigned to student
 6   services, cell phone locker, correct?
 7          A.    I do, yes, sir.
 8          Q.    And do you also see that
 9   there is a line titled, Student Services,
10   Yondr Pouches?
11          A.    Yes, sir, I do.
12          Q.    And there is a 100 percent
13   weight assigned to Yondr pouches?
14          A.    Yes, sir, there is.
15          Q.    Do you know what
16   Mr. Scheuneman testified was the basis
17   for that 100 percent weight for cell
18   phone lockers and Yondr pouches?
19          A.    As I sit here right now, I
20   don't recall.  His deposition was
21   certainly one I had read in advance of
22   the issuance, because his Exhibit-2
23   became the subject of an interrogatory
24   response.
```

CONFIDENTIAL

Page 370

1          It even says, at the bottom,

2    that in accordance with Rule 26, they

3    effectively supplemented their discovery

4    with this exhibit as to his testimony.

5          Q.    And you understand that

6    Mr. Scheuneman was testifying as DeKalb's

7    corporate representative, correct?

8              ATTORNEY GRADEN:  Objection.

9              THE WITNESS:  I don't --

10   BY ATTORNEY SANDOVAL-BUSHUR:

11         Q.    If you want to take a look

12   back at the interrogatory responses for

13   DeKalb, Exhibit-11, and look at Page 4.

14             Do you see that it refers to

15   the deposition testimony of DeKalb

16   30(b)(6) witness Byron Scheuneman and

17   Exhibit-2 as introduced in the DeKalb

18   30(b)(6) deposition of Mr. Scheuneman?

19         A.    Then, yes, I would agree

20   with you he was testifying in this

21   capacity as corporate rep.

22             ATTORNEY SANDOVAL-BUSHUR:

23        Let's take a look at Tab 22, which

24        we will mark as Exhibit-13.

CONFIDENTIAL

Page 371

```
 1                        -  -  -
 2              (Whereupon, Exhibit
 3          Meyers-13, No Bates,
 4          Video-Recorded Rule 30(b)(6)
 5          Deposition of DeKalb County School
 6          District By Byron Schueneman, was
 7          marked for identification.)
 8                        -  -  -
 9   BY ATTORNEY SANDOVAL-BUSHUR:
10          Q.    And, Mr. Meyers, this is the
11   30(b)(6) deposition of Mr. Scheuneman,
12   correct?
13          A.    It appears to be.
14          Q.    Have you ever seen this
15   before today?
16          A.    I have seen the deposition
17   of Mr. Scheuneman.  I have read, reviewed
18   and considered it as material reviewed
19   dated March 11th, 2025.
20              So if you're purporting to
21   tell me this is the same one, because I
22   didn't bring a copy of that, then that's
23   what this is.
24          Q.    If you could please turn to
```

CONFIDENTIAL

Page 372

1    Page 53 of the transcript.

2            A.    Sure.

3            Q.    And I really should say

4    Page 52, starting at Line 24.

5                  Do you see the question:

6    Okay.  Now, each of the hard cost items,

7    with the exception of the first line on

8    this bottom chart, are weighted at

9    100 percent?

10           A.    I do see that.

11           Q.    And do you understand that

12   that is referring to the hard cost items

13   from Exhibit-2 to Mr. Scheuneman's

14   deposition which we were just looking at?

15           A.    That's what it appears to

16   be, yes, sir.

17           Q.    Okay.  And do you see that

18   Mr. Scheuneman was asked if that

19   indicates that the 100 percent weight --

20   let me start the question over.

21                 Do you see that

22   Mr. Scheuneman was asked if the

23   100 percent weight indicated that DeKalb

24   is attributing 100 percent of each of the

CONFIDENTIAL

Page 373

1   costs to social media?
2          A.    I see the question on Line 3
3   and the answer on Line 6.
4          Q.    And Mr. Scheuneman said:
5   That's correct.
6          A.    That is what he says.
7          Q.    Do you see, then, that
8   Mr. Scheuneman was asked:  Other than
9   DeKalb's lawyers, are you aware of
10  anybody who decided to assign 100 percent
11  to those categories?
12         A.    I see the question.
13         Q.    And do you see that
14  Mr. Scheuneman's answer was:  No, sir?
15              ATTORNEY GRADEN:  Objection.
16         There's an objection on the record
17         in this transcript that you
18         skipped over.
19              THE WITNESS:  I do see his
20         answer, yes, sir.
21  BY ATTORNEY SANDOVAL-BUSHUR:
22         Q.    Okay.  Do you have any
23  reason to doubt Mr. Scheuneman's
24  testimony that the 100 percent weight for

Page 374

1    the hard costs in his Exhibit-2,

2    including the Yondr pouches and cell

3    phone lockers, was a weight that was

4    assigned by DeKalb's lawyers?

5              ATTORNEY GRADEN:  Objection.

6              THE WITNESS:  I don't know

7         the context of his answer here.

8              What I can tell you is that

9         when you look at the verified

10        interrogatories, which are

11        directly in response to the

12        question at issue about damages in

13        this case, as amended -- they are

14        amended subsequent to the date of

15        this deposition on March 24th and

16        they're verified by Kishia Towns,

17        who is the chief of Wrap Around

18        Services for DeKalb.

19             My understanding is that

20        this verified interrogatory

21        identifies that these costs are

22        going to be put forth at trial by

23        somebody most knowledgeable to

24        identify that these costs were

CONFIDENTIAL

Page 375

1            incurred as a direct result of the

2            alleged improper actions of

3            defendants.

4    BY ATTORNEY SANDOVAL-BUSHUR:

5            Q.    If the 100 percent

6    allocation percent for cell phone lockers

7    and Yondr pouches for DeKalb was a

8    percent that was assigned by DeKalb's

9    lawyers, would that affect your opinion

10    that a 100 percent allocation for Yondr

11    pouches is appropriate in your damages

12    calculation?

13            ATTORNEY GRADEN:  Objection.

14            THE WITNESS:  It absolutely

15            would not.  I'm not aware of any

16            of DeKalb's lawyers who are going

17            to get on the stand and testify

18            under oath as to damages.

19            And this verified

20            interrogatory not only adds up at,

21            100 percent, the Yondr pouches and

22            the cell phone lockers on a date

23            later than this deposition but

24            incorporates the exhibit from the

CONFIDENTIAL

Page 376

1           deposition as the proof of the
2           testimony that's going to be given
3           at trial for the damages as it
4           relates to the alleged improper
5           actions of the defendants.
6                If anything, this confirms
7           that, regardless of where
8           Mr. Scheuneman believed it came
9           from, that 100 percent is what's
10          going to be represented at trial.
11               And I've seen no document
12          that supercedes or amends that
13          those would be at 100 percent by
14          the witnesses most knowledgeable.
15 BY ATTORNEY SANDOVAL-BUSHUR:
16          Q.    Are you aware of any factual
17 basis for DeKalb for a 100 percent
18 allocation percent for Yondr pouches and
19 cell phone lockers, other than the
20 testimony of Mr. Scheuneman?
21               ATTORNEY GRADEN:  Objection.
22               THE WITNESS:  I don't -- I'm
23          not here to give any factual
24          opinions.  I'm giving expert

CONFIDENTIAL

Page 377

1           opinions and relying on the sworn

2           testimony of the persons most

3           knowledgeable to give those

4           opinions as to what percentage of

5           all the select vendor costs are

6           attributable to damages as a

7           result of the alleged improper

8           actions of the defendants.

9                   ATTORNEY SANDOVAL-BUSHUR:

10          We can take a break.

11                  VIDEO TECHNICIAN:  Going off

12          video record, 3:51 p.m.

13                       -  -  -

14                  (Whereupon, a brief recess

15          was taken.)

16                       -  -  -

17                  VIDEO TECHNICIAN:  Back on

18          video record, 4:05 p.m.

19   BY ATTORNEY SANDOVAL-BUSHUR:

20          Q.    Mr. Meyers, did you

21   communicate in any way with any employees

22   or people otherwise affiliated with

23   Harford in forming your opinions?

24          A.    I had a conversation with

CONFIDENTIAL

Page 378

1  Deborah Judd.

2          Q.     Who is Deborah Judd?

3          A.     She's Harford's assistant

4  superintendent for business services.

5          Q.     Why did you communicate with

6  Ms. Judd?

7          A.     It was in connection with

8  confirming the cost on Skyline Network

9  and CDW-Government, Inc., the two vendors

10 that are included in the damages

11 calculation for Harford as a result of

12 the alleged improper actions of the

13 defendants in this matter.

14         Q.     What information did

15 Ms. Judd provide you?

16         A.     As I sit here right now, I

17 can't recall if it was Number 3 on the

18 materials reviewed, the expenditure

19 detail activity report, or if it was the

20 spending freeze data collection report.

21                I can't recall which of

22 those that it was.

23         Q.     How did you decide that you

24 should communicate with Ms. Judd?

Page 379

1          A.    Well, based on the vendors
2    that wanted to be included.  I had one
3    side of the transaction but needed the
4    other side of the transaction, which I
5    was able to get in communications by
6    asking for it directly, just to be very
7    clear what I needed.
8                I believe that conversation
9    was pretty close, if I remember, to the
10   expert report deadline.
11               Yeah.  May 14th.  So I was
12   trying to get that additional
13   information, which I received.
14          Q.    What form did your
15   communication with Ms. Judd take?
16          A.    I think it was just a
17   telephone call.
18          Q.    Did you communicate in any
19   way with any employees or people
20   otherwise affiliated with Harford other
21   than Ms. Judd?
22          A.    Not that I recall as I sit
23   here right now.
24          Q.    Did you take any notes or

Page 380

1  otherwise record or memorialize your
2  communication with Ms. Judd?
3          A.    I did not, no, sir.
4          Q.    It was not part of your
5  assignment to determine what value, if
6  any, Harford received in exchange for
7  paying any vendor, correct?
8          A.    That's fair, subject to the
9  same qualifications I previously gave you
10  regarding that answer.
11         Q.    For the allocation percents
12  you used for your Harford damages
13  calculations, you relied on Harford's
14  Amended Objections and Responses to
15  Defendants' Interrogatories, Set 3, dated
16  April 14th, 2025, correct?
17         A.    That's correct, yes, sir.
18         Q.    For the allocation percents
19  you used for your Harford damages
20  calculations, you did not rely on any
21  source other than Harford's Amended
22  Objections and Responses to Defendants'
23  Interrogatories, Set 3, dated April 14th,
24  2025, correct?

Page 381

1          A.    Could you either ask it
2     again or confirm that you said allocation
3     percents in that question?
4          Q.    I did say allocation
5     percents.
6          A.    Then that is correct.
7          Q.    You do not know how Harford
8     arrived at the allocation percents that
9     you relied on from the Harford
10    interrogatory responses, correct?
11         A.    That's fair.  I had no
12    involvement in the drafting of their
13    interrogatory responses or what went into
14    the determination to answer them the way
15    that they had.
16         Q.    How did you determine which
17    vendors should be included in your
18    Harford damages calculation?
19         A.    I believe those vendors were
20    identified in the interrogatory
21    responses, and those were the ones that
22    specifically related to the work that I
23    was doing relating to the past hard cost
24    damages for select vendors during the

Page 382

1    damage period in this matter.

2              Q.    So for Harford, you

3    calculate damages relating to the vendors

4    Skyline Network, or Palo Alto,

5    CDW-Government, Inc., or Cisco umbrella,

6    correct?

7              A.    That's correct, yes, sir.

8              Q.    And it's your belief that

9    the vendor Skyline Networks, or Palo

10   Alto, and CDW-Government, Inc., or Cisco

11   umbrella, are identified in the Harford

12   interrogatory responses?

13             A.    I don't have a copy in front

14   of me.  But that was the basis for the

15   allocation percentages.

16             Q.    Once you determined which

17   vendors should be included in your

18   Harford damages calculation, how did you

19   determine which costs relating to each

20   vendor should be included in your damages

21   calculation?

22             A.    Based on the materials

23   reviewed, we knew both of these were for

24   direct costs.

Page 383

1          So for the Palo Alto, it was
2    two years of Palo Alto costs through
3    another third-party vendor called Skyline
4    Networks.
5          As you may or may not know,
6    CDW-Government Inc. is a big vendor that
7    sells a lot of stuff.  So we had to make
8    sure on those invoices and those costs
9    that this was just related to the Cisco
10   umbrella for the web filtering for those
11   years.
12          And those were the years for
13   which we had the information related to
14   these web filtering costs, which were the
15   select vendors identified for Harford.
16      Q.    In order to determine that
17   the CDW-Government, Inc., costs were the
18   Cisco umbrella costs that you believe
19   should be included in your damages
20   calculation, did you rely on anything
21   other than the face of the invoices
22   themselves?
23      A.    I think there was another
24   report, too.  There was two things; one

Page 384

1   was the invoice report, and I think there

2   was also, if I remember correctly

3   additional expenditure reports for the

4   years '21, '22 and '23 which were

5   effectively the general ledgers for those

6   years that also identified those costs.

7              They had the vendor, but

8   they also had the purpose for the cost.

9   So web filtering and how it was coded.

10  And I believe it actually said Cisco

11  umbrella as well on the expenditure

12  reports.

13             So it was in connection with

14  the detail activity reports, as well as

15  the expenditure reports as it relates to

16  Cisco.

17             And for the spending freeze

18  data, that would have been for Palo Alto.

19       Q.    What is spending freeze

20  data?

21       A.    It was an Excel spreadsheet

22  that they had put together in 2018.  I

23  don't know what all the other tabs

24  related to.

CONFIDENTIAL

Page 385

1              But one of the tabs were the
2     historical costs for the periods leading
3     up to it and the reference on what the
4     costs were and how they were made and
5     itemized.
6              So it was a
7     contemporaneously prepared historical
8     document that matched back to the detail
9     activity report that identified the costs
10    for those two Palo Altos at that period
11    of time.
12             The expenditure reports did
13    not go back further.  So we had the
14    expenditure detail activity reports going
15    back to '15.  But the spending freeze
16    data collection reports is how we
17    reconciled the two earlier charges for
18    the Palo Alto.
19        Q.   Are you aware that the
20    Harford interrogatory responses that you
21    relied on do not mention Skyline
22    Network/Palo Alto or CDW-Government,
23    Inc./Cisco umbrella?
24        A.   As I sit here, I don't

CONFIDENTIAL

Page 386

1    recall.  They may have just referenced
2    web filtering in general.  And those were
3    the two web filtering vendors that I was
4    provided.
5                   But I'm happy to look at it.
6         Q.    Sure.
7                   ATTORNEY SANDOVAL-BUSHUR:  I
8         will hand you Tab 23, which we are
9         marking as Exhibit-14.
10                        -   -   -
11                   (Whereupon, Exhibit
12         Meyers-14, No Bates, Plaintiff
13         Board of Education of Harford
14         County's Amended Objections and
15         Responses to Defendants'
16         Interrogatories, Set 3, was marked
17         for identification.)
18                        -   -   -
19    BY ATTORNEY SANDOVAL-BUSHUR:
20         Q.    And this is plaintiff Board
21    of Education of Harford County's Amended
22    Objections and Responses to Defendants'
23    Interrogatories, Set 3, correct?
24         A.    That's correct.

CONFIDENTIAL

Page 387

1           Q.    And this is what you relied
2    on for your allocation percents for
3    Harford, correct?
4           A.    Correct.  And that's found
5    on Page 2 of the program department
6    worksheet, which was the percentage
7    weight allocated for the Office of
8    Technology and Information.
9           Q.    So you would agree that
10   nothing in the Harford interrogatory
11   response that you relied on specifically
12   refers to Skyline Network/Palo Alto or
13   CDW-Government, Inc./Cisco umbrella,
14   correct?
15               ATTORNEY GRADEN:  Objection.
16               THE WITNESS:  Yeah, I don't
17          see those words here.  Those were
18          the vendors that we were analyzing
19          for the purposes of this in the
20          Office of Technology and
21          Information.
22   BY ATTORNEY SANDOVAL-BUSHUR:
23          Q.    What is your basis for
24   applying a 20 percent allocation

CONFIDENTIAL

Page 388

1    percentage to costs relating to Skyline
2    Network/Palo Alto and CDW-Government
3    Inc./Cisco umbrella?
4          A.    It's just what we talked
5    about, the verified interrogatory
6    response that the person most
7    knowledgeable who is going to speak to
8    the damages for Harford, as it relates to
9    the alleged improper actions of the
10   defendants in this matter, has assigned a
11   weight for the costs associated with the
12   Office of Technology at 20 percent, which
13   is what these costs fall under.
14         Q.    How did you determine that
15   the Skyline Network/Palo Alto and
16   CDW-Government Inc./Cisco umbrella costs
17   should be included within the Office of
18   Technology and Information?
19         A.    They're in the general
20   ledger.  They have a subcategory coding.
21   That's how that -- it was set forth.
22               So it's identified on the
23   expense that it's from the Office of
24   Technology, because they're paid by

Page 389

1   different vendor departments.

2           Q.    Did anyone at Harford County

3   Public Schools tell you that a 20 percent

4   allocation percentage should apply to

5   Skyline Network/Palo Alto or

6   CDW-Government Inc./Cisco umbrella?

7                 ATTORNEY GRADEN:  Objection.

8                 THE WITNESS:  The

9           interrogatory responses is the

10          basis I have for the application

11          of the 20 percent for the cost for

12          those select vendors included in

13          the Office of Technology.

14  BY ATTORNEY SANDOVAL-BUSHUR:

15          Q.    Did you ask anyone from

16  Harford if 20 percent was an appropriate

17  allocation percentage to use for costs

18  relating to Skyline Network/Palo Alto and

19  CDW-Government Inc./Cisco umbrella?

20          A.    I don't recall having that

21  conversation.  And I relied upon these

22  interrogatory responses.

23          Q.    Do you know whether anyone

24  from Harford testified about what was

CONFIDENTIAL

Page 390

1    meant by the 20 percent weight in

2    Exhibit-14, the interrogatory response

3    that you relied upon?

4              A.    I don't recall.

5              Q.    For your purpose, the --

6    just the 20 percent statement in the

7    interrogatory response was sufficient in

8    order to apply a 20 percent allocation

9    percent to Skyline Network/Palo Alto and

10   CDW-Government Inc./Cisco umbrella; is

11   that correct?

12             A.    That's correct.

13                   And subsequent to the

14   issuance of my report, I received a

15   deposition of Andrew Moore, later in May,

16   that further supported that assumption

17   and conclusion in my report.

18             Q.    Okay.  Are you aware that

19   Mr. Moore, in his deposition, did not

20   testify that 20 percent of the costs for

21   Skyline Network/Palo Alto or

22   CDW-Government Inc./Cisco umbrella were

23   related to social media?

24                   ATTORNEY GRADEN:  Objection.

Page 391

1            THE WITNESS:  As I sit here
2        right now, I can't recall
3        everything that he said.
4   BY ATTORNEY SANDOVAL-BUSHUR:
5        Q.    Okay.  Well, you just said
6   that Mr. Moore had a deposition in May
7   that further supported your assumption
8   and conclusion that 20 percent was an
9   appropriate allocation percent, correct?
10        A.    That's correct.
11        Q.    What specifically in
12   Mr. Moore's deposition further supported
13   your assumption and conclusion that
14   20 percent was an appropriate allocation
15   percent?
16        A.    I'd be happy to look at it
17   and try to point you to it.
18            As I sit here right now, I
19   can't tell you from memory exactly what
20   that was.
21        Q.    You believe and understand
22   that Mr. Moore's testimony is reliable
23   on -- let me ask my question a little
24   differently.

CONFIDENTIAL

Page 392

1           Do you believe that

2     Mr. Moore's testimony is reliable in

3     explaining what the 20 percent allocation

4     weight in the Harford interrogatory

5     responses represents?

6                ATTORNEY GRADEN:  Objection.

7                THE WITNESS:  As I sit here

8          right now, I can't recall the

9          detail.

10               I know that I read it and

11         it's supported, the interrogatory

12         responses.  But that level of

13         specificity that you're asking for

14         without it in front of me, I can't

15         answer that question with

16         specificity.

17               So -- but I do believe that

18         his testimony is reliable.  So I

19         can answer the first part of that

20         question.

21               But I don't know either

22         whether Mr. Moore is going to be

23         the person who is going to be

24         testifying related specifically to

CONFIDENTIAL

Page 393

1           all these questions.

2                 So I don't know if he was

3           the person specifically referenced

4           in the interrogatory responses or

5           the person who is most

6           knowledgeable.

7                 He is not the person that I

8           relied upon necessarily at the

9           time I issued my report.  I just

10          saw his testimony after that was

11          supportive of the inclusion of

12          those two vendors for damage

13          purposes.

14  BY ATTORNEY SANDOVAL-BUSHUR:

15          Q.    You do not know how Harford

16  arrived at the 20 percent allocation

17  percents that you relied on from the

18  interrogatory responses, correct?

19          A.    That's fair.  I do not know

20  what went into their -- the plaintiffs'

21  determination and decision-making that

22  that would be the amount that would be

23  testified as to at trial related to the

24  damages in this matter.

CONFIDENTIAL

Page 394

1          Q.    Do you understand that
2    Harford purchases both Palo Alto and
3    Cisco umbrella for the purpose of
4    complying with the Children's Internet
5    Protection Act?
6               A.    They --
7                    ATTORNEY GRADEN:  Objection.
8                    THE WITNESS:  They may.
9    BY ATTORNEY SANDOVAL-BUSHUR:
10          Q.    Are you aware that Harford
11    has purchased an Internet content filter
12    every year since 2000 in order to comply
13    with the Internet -- the Children's
14    Internet Protection Act?
15                    ATTORNEY GRADEN:  Objection.
16                    THE WITNESS:  They may have.
17          I'm not aware one way or the
18          other.
19               I haven't reviewed financial
20          statements that far back.
21    BY ATTORNEY SANDOVAL-BUSHUR:
22          Q.    And if it were, in fact,
23    true that Harford has purchased an
24    Internet content filter every year since

CONFIDENTIAL

Page 395

1  the year 2000 in order to comply with the

2  Children's Internet Protection Act, that

3  would not affect your opinion that

4  Harford has incurred damages in

5  connection with purchasing the Internet

6  content filters, correct?

7          A.    It would have no impact on

8  my calculation, insofar as the people

9  most knowledgeable are surely aware of

10 any state, federal or whatever regulatory

11 organization you just named and would

12 have considered that in connection with

13 their allocation percentage.

14          Q.    Did you communicate in any

15 way with any employees or people

16 otherwise affiliated with Irvington in

17 forming your opinions?

18          A.    Not that I recall, no, sir.

19          Q.    Was there a reason why you

20 did not communicate with any employees or

21 people otherwise affiliated with

22 Irvington in forming your opinions?

23          A.    No reason specifically one

24 way or the other.

CONFIDENTIAL

Page 396

1            Irvington's financial
2    statements were extremely comprehensive
3    and good.  So I didn't need to ask for
4    any additional information to do any of
5    the reconciliations with Irvington.
6            Q.    It was --
7            A.    Which is primarily why I had
8    communications with any of the plaintiffs
9    directly, as we previously discussed.
10           Q.    It was not part of your
11   assignment to determine what value, if
12   any, Irvington received in exchange for
13   paying any vendor, correct?
14           A.    That's fair, for the same
15   reasons I've qualified before on the
16   other four plaintiffs in this matter.
17           Q.    For the allocation percents
18   you used for your Irvington damages
19   calculations, you relied on Irvington's
20   Third Amended Answers to defendants'
21   interrogatories, Set 3, dated May 14th,
22   2025, correct?
23           A.    In part, yes.
24           Q.    What else did you rely on?

CONFIDENTIAL

Page 397

1          A.    I relied on the financial
2    accounting that I had done in this case.
3              If I remember correctly,
4    hopefully you'll put it in front of me,
5    Irvington's third set had different total
6    costs than I had.
7              So you may have said
8    allocation percentages.  And if I missed
9    it, then the answer is yes.
10             But if you didn't, I used
11   the reconciled numbers that I had used,
12   multiplied by those allocation
13   percentages.  So there was a difference
14   between the total costs that were
15   calculated by Irvington and those that I
16   could actually reconcile for the purposes
17   of damages in this matter.
18        Q.    Okay.  I did ask about
19   allocation percentages so let me just
20   re-ask --
21        A.    Please.
22        Q.    -- the question so we have a
23   clean record.
24        A.    Please.  Sorry.

Page 398

```
 1          Q.    For the allocation percents
 2    you used for your Irvington damages
 3    calculations, you relied on Irvington's
 4    Third Amended Answers to Defendants'
 5    Interrogatories, Set 3, dated May 14th,
 6    2025, correct?
 7          A.    That is correct, yes, sir.
 8          Q.    For the allocation percents
 9    you used for your Irvington damages
10    calculations, you did not rely on any
11    source other than Irvington's Third
12    Amended Answers to Defendants'
13    Interrogatories, Set 3, dated May 14th,
14    2025, correct?
15          A.    That's correct, I did not.
16          Q.    You do not know how
17    Irvington arrived at the allocation
18    percents that you relied on from
19    Irvington's interrogatory responses,
20    correct?
21          A.    I do not know what process
22    any of the representatives of Irvington
23    who are those people most knowledgeable
24    who will testify at trial relating to the
```

CONFIDENTIAL

Page 399

1  allocation percentages as it relates to

2  damages as a result of the alleged

3  improper actions of the defendants in

4  this matter, what went into that process

5  or the basis for their determinations.

6       Q.    How did you determine which

7  vendors should be included in your

8  Irvington damages calculations?

9       A.    I believe that they are

10  included in the interrogatory responses,

11  the third set.

12       Q.    Once you determined which

13  vendors should be included in your

14  Irvington's damages calculations, how did

15  you determine which costs relating to

16  each vendor should be included in your

17  damages calculation?

18       A.    So all of the costs for each

19  and every one of those vendors is

20  included and all the costs that I can

21  confirm for those vendors.

22       Q.    And what was your basis for

23  determining that all of the costs for

24  each vendor should be included in your

CONFIDENTIAL

```
                                    Page 400
 1   damages calculation?
 2          A.    The interrogatory response
 3   speaks to that.  They put total cost and
 4   then they did a percentage and they
 5   quantified the damages.  It's part of the
 6   interrogatory response.
 7          Q.    If the interrogatory
 8   response -- well, let's just take a look
 9   at the interrogatory response.
10          A.    Sure.
11                ATTORNEY SANDOVAL-BUSHUR:
12          I'm marking Tab 25 as Exhibit-15.
13                    -  -  -
14                (Whereupon, Exhibit
15          Meyers-15, No Bates, Plaintiff's
16          Third Amended Answers to
17          Defendants' Interrogatories To
18          Irvington Public Schools, Set 3,
19          was marked for identification.)
20                    -  -  -
21                THE WITNESS:  Thank you.
22   BY ATTORNEY SANDOVAL-BUSHUR:
23          Q.    Exhibit-15 is Plaintiffs'
24   Third Amended Answers to Defendants'
```

CONFIDENTIAL

Page 401

1    Interrogatories to Irvington -- let me
2    start that over.
3                    Exhibit-15 is Plaintiffs'
4    Third Amended Answers to Defendants'
5    Interrogatories to Irvington Public
6    Schools, Set 3, correct?
7          A.    That's correct.
8          Q.    You relied on the
9    information in Exhibit-15, the Irvington
10   interrogatory responses, for your
11   allocation percents, correct?
12         A.    Yes, sir.
13         Q.    And you relied on the
14   information in Exhibit-15, the Irvington
15   interrogatory responses, to determine
16   which costs relating to each vendor
17   should be included in your damages
18   calculation, correct?
19         A.    I utilized the Exhibit B to
20   the Exhibit-15 deposition to determine
21   the select vendors which would be
22   included with alleged harms alleged in
23   the complaint for expenditures on
24   external programs and services.

CONFIDENTIAL

Page 402

1          They have a column called,
2    Proximate total spend, total spend.
3    Their approximates were not always right.
4    Some of these are round numbers.  They
5    were not doing the forensic accounting, I
6    was.
7          So I did use the actual
8    total spend, multiplied it by the percent
9    allocation to harms, which is their third
10   column, which gives you the damages in my
11   report.
12         But they are representing
13   very clearly herein that it is the total
14   spend for the vendors that is inclusive
15   of the damages.
16   Q.    For example, and we are
17   looking at Exhibit B to Exhibit-15, which
18   is the Irvington interrogatory responses,
19   correct?
20   A.    That's correct.
21   Q.    Okay.  There is a table here
22   titled, Costs Associated With the Harms
23   Alleged in the Complaint for Expenditures
24   on External Programs and Services,

CONFIDENTIAL

Page 403

1    correct?

2         A.    You read that correctly.

3         Q.    And there is then a column

4    titled, Vendor, correct?

5         A.    There is.

6         Q.    A column titled, Approximate

7    Total Spend, correct?

8         A.    Correct.

9         Q.    And a column titled, Percent

10   Allocation to Harms, correct?

11        A.    Correct.

12        Q.    And the first vendor listed

13   is New Jersey Coalition for Inclusive

14   Education, correct?

15        A.    Correct.

16        Q.    And this lists an

17   approximate total spend of $1,043,432,

18   correct?

19        A.    That is what it says.

20        Q.    And then the interrogatory

21   response that you relied on says that

22   there should be a 20 percent allocation

23   to harms relating to the identified

24   approximate total spend, correct?

Page 404

1          A.    Relating to the approximate
2     total spend, which in my report is
3     relating to the total spend.  I got rid
4     of the approximate.
5          Q.    So even though the Irvington
6     interrogatory response that you refer --
7     relied on included a dollar amount for
8     the approximate total spend that the --
9     according to the interrogatory response
10    was associated with harms, you
11    essentially disregarded the approximation
12    that was provided and calculated your own
13    total spend for each vendor, correct?
14              ATTORNEY GRADEN:  Objection.
15              THE WITNESS:  I wouldn't say
16         I disregarded it at all.  The
17         entire purpose of my engagement
18         here, as we talked about earlier
19         on, but haven't talked about a lot
20         throughout the day, was to perform
21         a forensic accounting on select
22         vendors.  This is what they asked
23         me to do.
24              This was issued before my

CONFIDENTIAL

Page 405

1        report was finalized.  They are
2        not the experts in reconciling and
3        analyzing and performing a
4        forensic accounting.  That's why
5        I'm involved.  That's one of the
6        major and primary roles of what
7        I've been asked to do.
8                So if you look at these,
9        some of mine are higher, some of
10       mine are lower.  And it's based on
11       the actual costs that we were able
12       to verify during the period of
13       damages.
14               So I don't know how they
15       prepared their numbers.  I can
16       only tell you that my role, as I
17       was hired by Irvington, was to
18       perform a forensic accounting to
19       figure out what the total spend
20       was for select vendors, which I
21       did, and multiply it by the column
22       identified as percent allocation
23       to harms times total spend.
24               I'm here to remove that

Page 406

1          approximate.  I'm telling you what
2          the actual costs were.  And that's
3          why they call it total spend.
4               If they didn't want to call
5          it approximate, they would have
6          just used their numbers.  It's
7          approximate because they had hired
8          an expert, in me, to perform, as
9          you point out, a lot of time spent
10         to reconcile hundreds if not
11         thousands of invoices, costs, to
12         be able to remove that approximate
13         and tell you what the total spend
14         was, which is what I've done.
15    BY ATTORNEY SANDOVAL-BUSHUR:
16         Q.    Mr. Meyers, is it possible
17    that when Irvington took the trouble of
18    putting together a response to the
19    interrogatory and identified an
20    approximate total spend for the vendor
21    New Jersey Coalition for Inclusive
22    Education that it determined that there
23    were some costs connected with the New
24    Jersey Coalition for Inclusive Education

CONFIDENTIAL

Page 407

1   that should be allocated to harms and
2   some that should not?
3              ATTORNEY GRADEN:   Objection.
4              THE WITNESS:   I do not
5         believe that is possible or
6         probable.
7   BY ATTORNEY SANDOVAL-BUSHUR:
8         Q.    Why is that not possible?
9         A.    Because the exercise that I
10  was asked to perform was to do the
11  analysis of the forensic accounting.  And
12  to the extent that -- if that were the
13  case, they would disregard the use of
14  approximate.
15             The word "approximate" is in
16  connection with knowing that those
17  numbers will be amended, as they have
18  been, by the report that I would be --
19  issued in this matter.
20        Q.    Mr. Meyers, you do not know
21  who came up with any of the numbers that
22  were included in the Irvington
23  interrogatory response, correct?
24        A.    That's fair to say.

CONFIDENTIAL

Page 408

1          Q.     You do not know what -- you

2     do not know who wrote the phrase,

3     "approximate total spend," correct?

4          A.     Also fair to say.

5          Q.     You do not know what was in

6     the mind of the person who wrote the

7     phrase "approximate total spend,"

8     correct?

9                 ATTORNEY GRADEN:  Objection.

10                THE WITNESS:  I know that

11          they believed it to be approximate

12          when they wrote the word

13          "approximate."

14     BY ATTORNEY SANDOVAL-BUSHUR:

15          Q.     You don't know --

16          A.     Which means it wasn't exact

17     and it wasn't necessarily complete.

18          Q.     Mr. Meyers, you said earlier

19     that you were asked to perform an

20     analysis of forensic accounting, correct?

21          A.     That was a primary role in

22     my -- in this case.

23          Q.     Did anyone from Irvington

24     ask you to calculate all costs that

CONFIDENTIAL

Page 409

1   Irvington paid to the New Jersey
2   Coalition for Inclusive Education?
3         A.    The total costs for all
4   select vendors was my assignment as given
5   to me in this matter.
6         Q.    Plaintiffs' attorneys asked
7   you to calculate all costs that Irvington
8   paid to the New Jersey Coalition for
9   Inclusive Education, correct?
10        A.    My --
11              ATTORNEY GRADEN:  Objection.
12              THE WITNESS:  My role was to
13        calculate the total costs for
14        select vendors in this matter
15        during the period as it relates to
16        those vendors identified by the
17        parties at issue who will testify
18        as to the percentages in order to
19        calculate damages.  Yes, sir, that
20        was my objective in calculating
21        this.
22   BY ATTORNEY SANDOVAL-BUSHUR:
23        Q.    Okay.  I'm asking -- what
24   I -- I genuinely think -- I don't think

CONFIDENTIAL

Page 410

1    I've done this yet today, but I would ask
2    you to give me a yes-or-no answer.
3            A.      You did it once.
4            Q.      Maybe the second time, okay.
5                    Yes or no, did plaintiffs'
6    attorneys ask you to calculate all costs
7    that Irvington paid to the New Jersey
8    Coalition for Inclusive Education?
9                    ATTORNEY GRADEN:  Objection.
10                   THE WITNESS:  I don't recall
11           necessarily that they said all
12           costs.  I was to calculate,
13           initially, all vendor costs for
14           everybody.  And then those select
15           vendors were determined, as you
16           can see, as a result of the
17           interrogatory responses and the
18           sworn testimony.  And in this
19           case, it was the total cost.
20                   What I can tell you is I
21           received the total invoices for
22           all of the New Jersey Coalition
23           and Inclusive and the CarePlus NJ,
24           Inc., which are the two that are

CONFIDENTIAL

Page 411

1          above.  And the ones that are
2          below I received all the invoices
3          on those.
4               So to the extent that in the
5          continuation of asking for
6          documents they provided the
7          documents for those costs, it goes
8          with the assignment that I
9          understand that I have, which was
10         to calculate the total costs for
11         the select vendors and apply the
12         percentage applicable to harms, as
13         they say, to come up with the
14         damages.
15              And that's consistent with
16         what the interrogatory says, which
17         is approximate total spend.  It
18         could just say approximate spend.
19         But I can't read total spend to
20         mean anything other than total
21         expense.
22              If it was a portion,
23         approximate spend, maybe.  A
24         portion of cost allocable to New

CONFIDENTIAL

Page 412

```
 1          Jersey, maybe.  But maybe total
 2          spend means something different to
 3          you than it means to me as a
 4          forensic accountant.
 5   BY ATTORNEY SANDOVAL-BUSHUR:
 6          Q.    Mr. Meyers, did anyone from
 7   the Irvington School District who is not
 8   a lawyer ask you to calculate the total
 9   spend on all invoices that Irvington paid
10   to the New Jersey Coalition for Inclusive
11   Education?
12          A.    As we've talked --
13              ATTORNEY GRADEN:  Objection.
14              THE WITNESS:  -- about
15          before, I haven't talked to
16          anybody at the Irvington School
17          District as a plaintiff, whether
18          they are an attorney or not.
19   BY ATTORNEY SANDOVAL-BUSHUR:
20          Q.    Okay.  What did Irvington
21   pay the New Jersey Coalition for
22   Inclusive Education for?
23          A.    What did they pay it for?
24          Q.    Yes.
```

CONFIDENTIAL

Page 413

1          A.    I would have to see the
2    invoices.  But that was certainly not
3    part of the assignment that I had.
4              I was here to calculate the
5    cost and then apply the sworn testimony
6    percentages that will be testified to at
7    trial as the damages as it relates to the
8    alleged improper actions of the
9    defendants.
10             So as I sit here right now,
11   I don't recall exactly what the Coalition
12   of Inclusive Education was for.
13         Q.    And do you believe it is
14   possible that there are some costs
15   relating to the New Jersey Coalition for
16   Inclusive Education that whoever provided
17   the information for the interrogatory
18   responses believed should be allocated to
19   harms at a 20 percent allocation
20   percentage and some costs relating to the
21   New Jersey Coalition for Inclusive
22   Education that should not be allocated to
23   harms at all?
24             ATTORNEY GRADEN:   Objection.

CONFIDENTIAL

Page 414

1              THE WITNESS:  No, sir, I do

2         not believe it's possible.

3              In connection with the

4         assignment, in connection with the

5         plaintiffs having an opportunity

6         to review the chart in advance of

7         the issuance of the report, if

8         there was a distinction that

9         needed to be made, it would have

10        been relayed to me either directly

11        or indirectly through counsel, and

12        it would be contrary to what I

13        believe the interrogatory

14        responses very clearly say, which

15        is the total cost for the New

16        Jersey Coalition For Inclusion in

17        Education, so.

18   BY ATTORNEY SANDOVAL-BUSHUR:

19        Q.    The interrogatory response

20   from Irvington in Exhibit-15 says that

21   there was an approximate total spend of

22   $1,043,432 on the vendor New Jersey

23   Coalition for Inclusive Education,

24   correct?

CONFIDENTIAL

Page 415

1           A.      It does say that.

2           Q.      If you'd turn to Paragraph

3    20 of your Irvington report, which is

4    Exhibit-1E.

5           A.      Yes, sir.

6           Q.      You calculate a total vendor

7    cost relating to the New Jersey Coalition

8    for Inclusive Education in the amount of

9    $1,625,737, correct?

10          A.      I would say that I verified

11   costs totaling $1,625,737.

12                  But I guess I can agree with

13   calculate and verify as similar.

14          Q.      The difference between the

15   amount of spend that Irvington identified

16   in its interrogatory response relating to

17   the New Jersey Coalition for Inclusive

18   Education and the amount that you

19   calculated in your expert report is over

20   $500,000, correct?

21          A.      I think that's fair.  The

22   math is the math.  The difference between

23   1 million 625 and 1 million 43 is

24   approximately $580,000.

CONFIDENTIAL

Page 416

1        Q.    Did you realize, when you

2    were forming your opinions on Irvington's

3    damages, that there was a difference

4    between what Irvington had calculated as

5    the approximate total spend on the New

6    Jersey Coalition for Inclusive Education

7    and what you had calculated as the total

8    spend for that vendor?

9        A.    Absolutely.  And I believe

10   that the plaintiff also knew as well,

11   because some of the numbers were much

12   less or less than as calculated on the

13   approximate.

14             I had to be in a position to

15   explain why those numbers were less,

16   because the costs did not total what the

17   approximate spend was.

18             So I was aware.  Plaintiffs'

19   counsel was aware.  And my expectation

20   and understanding is that the plaintiffs

21   themselves was aware, prior to the

22   issuance of my report, that those numbers

23   were different.

24        Q.    What is the basis for your

CONFIDENTIAL

Page 417

1    expectation and understanding that the
2    plaintiff was aware, prior to the
3    issuance of your report, that there was a
4    difference between the amount that the
5    plaintiff put in its interrogatory
6    response and the amount that you had in
7    your expert report?
8            A.    Just based on discussions
9    with counsel at that time saying there's
10   a difference between these numbers.  This
11   is the verified cost as total.  Have any
12   changes or comments related to it?  And
13   there were none.
14           Q.    Did you -- sorry.  I'm not
15   sure I understand the end of your answer
16   there.
17                 You said, have any changes
18   or comments related to it?  And there
19   were none.
20           A.    Sure.  It's part of the
21   report writing process, right, you
22   provide what you have.  This is the
23   results of my forensic accounting.  It's
24   different than the numbers in your chart.

CONFIDENTIAL

Page 418

1    Are there any other questions you have
2    about why there's any differences?  Mine
3    relates to the total cost.  Yours are
4    approximate.
5              There were no changes or
6    questions related to the use of the total
7    costs.
8         Q.    You are describing a
9    conversation that you had with
10   plaintiffs' attorneys; is that right?
11        A.    Part of the report writing
12   process, yes.
13        Q.    Okay.  Are you relying on a
14   conversation you had with plaintiffs'
15   attorneys to support the notion that you
16   correctly calculated the vendor costs for
17   the New Jersey Coalition for Inclusive
18   Education?
19        A.    No.  I'm relying on the
20   interrogatory responses and the clear
21   language there in them and the fact that
22   it's approximate.  And I'm telling you
23   that I verified that there was a
24   difference, made known there was a

CONFIDENTIAL

Page 419

1  difference, because I calculated total

2  cost, and there was no comments back to

3  me.

4            So, to me, that's an

5  additional verification that my

6  understanding of the interrogatory

7  responses was correct and reliable and

8  accurate.

9        Q.    Your opinion is that you

10  received additional verification that

11  your understanding of the interrogatory

12  responses was correct and reliable and

13  accurate because you pointed out the

14  difference between the interrogatory

15  response calculation and your calculation

16  and plaintiffs' attorneys seemed okay

17  with it --

18            ATTORNEY GRADEN:  Objection.

19  BY ATTORNEY SANDOVAL-BUSHUR:

20        Q.    -- is that right?

21        A.    I don't know if they seemed

22  okay with it or not.  That's not what I

23  said at all.

24            I said I have gotten no

Page 420

1    further indication to review, edit or
2    revise those calculations in addition --
3    in connection with the issuance of the
4    report.
5          Q.    Did you ask to speak with
6    anyone at Irvington to discuss what the
7    reasons might be for the approximately
8    $582,000 difference between what
9    Irvington had identified as the
10   approximate total spend for the New
11   Jersey Coalition for Inclusive Education
12   and what you had identified as the total
13   spend for that vendor?
14         A.    Absolutely not.  Just like I
15   didn't talk to any of the other
16   bellwethers when a cost that they had put
17   forth turned out not to be the verified
18   cost.
19              That was the role of my
20   assignment here was to perform a forensic
21   accounting on the total cost for select
22   vendors, which I've done, and to multiply
23   it by the allocation percentages on that
24   total spend to come up with the damages

Page 421

1   herein.

2              That was the assignment.

3        Q.    That came from the

4   attorneys?

5              ATTORNEY GRADEN:  Objection.

6              THE WITNESS:  That's part of

7        what my scope and engagement was.

8   BY ATTORNEY SANDOVAL-BUSHUR:

9        Q.    From the attorneys?

10             ATTORNEY GRADEN:  Objection.

11             THE WITNESS:  I guess it was

12       relayed to me from the attorneys,

13       but I don't know that it was not

14       from the clients.  I don't speak

15       for who the attorneys speak for.

16  BY ATTORNEY SANDOVAL-BUSHUR:

17       Q.    What steps did you take to

18  ensure that you did not include, in your

19  calculation for Irvington, invoices paid

20  to the New Jersey Coalition for Inclusive

21  Education that Irvington believed had

22  nothing to do with social media or

23  defendants' at-issue conduct?

24       A.    I have no basis to believe

CONFIDENTIAL

Page 422

1   that Irvington believed anything should
2   be excluded from what they called total
3   spend to New Jersey Coalition for
4   Inclusion in Education and the chart that
5   they prepared that details the
6   methodology which they undertook for them
7   to approximate cost of harm in connection
8   with any analysis of calculating damages
9   in this case as it relates to the alleged
10  improper actions of the defendants.
11          Q.    So you assumed that you
12  should use -- well, I'll move on to the
13  next question.
14              For the -- let's look again
15  at the Irvington interrogatory responses,
16  which are marked as Exhibit-15.  I'm
17  looking at Exhibit B thereto.
18              The second vendor listed is
19  CarePlus New Jersey, Inc., Correct?
20          A.    It is, yes, sir.
21          Q.    And there is identified in
22  the interrogatory response from Irvington
23  an approximate total spend relating to
24  CarePlus New Jersey, Inc. of $2,513,686,

Page 423

1    correct?

2           A.    There is.

3           Q.    And if you look at your

4    report for Irvington, Exhibit-1E, and

5    look at Paragraph 20, you calculated a

6    total spend by Irvington relating to

7    CarePlus New Jersey of $3,124,586,

8    correct?

9           A.    I did, yes, sir.

10          Q.    That is a difference of

11   approximately $610,000, correct?

12          A.    That's fair.

13          Q.    Did you realize, in the

14   course of forming your opinions on

15   damages, that there was a difference

16   between Irvington's calculation of its

17   approximate total spend on CarePlus New

18   Jersey in its interrogatory response and

19   your calculation of Irvington's total

20   spend on CarePlus New Jersey?

21          A.    I think I answered that

22   before.  But I'll answer it globally for

23   you now.

24                I'm aware, at the time I

CONFIDENTIAL

Page 424

1  issued my report and at the time that I
2  received this document prior to issuing
3  my report, that there was a difference,
4  either up or down, on any one that there
5  is a difference up or down.
6               I was aware, yes, sir,
7  absolutely.
8       Q.    What steps did you take to
9  ensure that you did not include, in your
10 calculation of Irvington's damages,
11 invoices that were paid to CarePlus New
12 Jersey that Irvington believed had
13 nothing to do with social media or
14 defendants' at-issue conduct?
15      A.    For the same reason that we
16 talked about New Jersey Coalition, I was
17 asked to calculate the total spend, which
18 I did, which is what they're attempting
19 to do here in their calculation.  Their
20 approximate did not include all of the
21 spend.  I've reconciled, through my
22 forensic accounting, that the total spend
23 was $3,124,586 to which we multiplied it
24 by the 20 percent assigned by those

CONFIDENTIAL

Page 425

1    representatives most knowledgeable who

2    will testify at trial as to the alleged

3    harm caused by the alleged actions of the

4    defendants in this matter resulting from

5    the use of this vendor, or any of the

6    vendors on this chart, as you will.

7                And the answer is the same

8    for each and every one of them,

9    counselor.

10        Q.    For districts other than

11   Irvington, you testified earlier, I

12   believe, that you provided affiants with

13   information on total spend on vendors

14   that, then, you believe the affiants

15   considered in determining their

16   allocation percentages; is that right?

17        A.    I don't believe I gave that

18   testimony.

19        Q.    Okay.  I maybe

20   misunderstood.

21                I would like to take a look

22   at your Irvington report, Exhibit-1E, and

23   turning to Appendix C and look at Page 6.

24        A.    I'm there.

Page 426

1          Q.    Okay.  And you see that one
2     of the vendors identified here in your
3     damages summary is Live Breathe Calm?
4          A.    I do, yes, sir.
5          Q.    You have a total of four
6     purchase orders relating to Live Breathe
7     Calm listed here, correct?
8          A.    I do, yes, sir.
9          Q.    And if you look at the
10    second and third invoices for Live
11    Breathe Calm -- do you see what I'm
12    looking at?
13         A.    I do.
14         Q.    Do you see that both of
15    those invoices have the same date, the
16    same purchase order number, the same
17    exact vendor cost, correct?
18         A.    And a different reference in
19    the reference column.  Sometimes purchase
20    orders are for multiple years.  And if it
21    was multiple years and I could split it
22    up, I did my best to do so.
23         Q.    Okay.  So just so I'm sure
24    that we have a clean record.

Page 427

1            You do see that both the
2    second and third invoices for Live
3    Breathe Calm --
4            A.    I do.
5            Q.    -- have the same date, the
6    same purchase order number and the same
7    exact vendor cost, correct?
8            A.    I do, yes, sir.
9            Q.    And you cite two different
10   references for those two different
11   invoices, correct?
12           A.    I do.
13           Q.    What did you do to determine
14   that you were not double-counting the
15   same invoice when you had the same vendor
16   with the same purchase order and the same
17   vendor cost?
18           A.    If you want to ask me about
19   it, I would ask you to put the references
20   in front of me, because sometimes
21   purchase orders -- or put a copy of the
22   purchase order in front of me to confirm.
23           Obviously, when we're doing
24   our forensic accounting, we do our best

CONFIDENTIAL

Page 428

1  to make sure we've confirmed all the

2  costs.  So -- and they have, as you can

3  see, different years.

4              Do you see that?  The date

5  may be the same.  But the year is not the

6  same for which it is.

7              So the purchase order being

8  double is not indicative of anything,

9  actually.  That's not uncommon at all

10 that a lot of these schools pay $80,000

11 for a two-year contract, and I would have

12 allocated it 40 and 40.

13             So without the documents in

14 front of me that I've referenced in my

15 report, I would have a very hard time

16 commenting on any -- I don't want to say

17 that you're implying -- but implication

18 that it is a double-dip.

19        Q.    I'm just -- I'm asking about

20 as a matter of your methodology.

21             What did you do to determine

22 that you were not double-counting the

23 same invoice when you had the same

24 vendor, the same purchase order for the

CONFIDENTIAL

Page 429

1    same amount?

2          A.    Look at the invoice.  Look

3    at the purchase order.  Look at the

4    general ledger.  Make sure that there's

5    two separate entries for them.  All the

6    things that go into the forensic

7    accounting, so.

8          Q.    Okay.

9          A.    I mean, if you look up above

10   for Sinewave Inc. for Palo Alto, there's

11   two with the same date, different years,

12   same purchase order, different reference

13   numbers and different vendor cost

14   amounts.

15                And if you were to turn to

16   Page 7, you can see for Center for

17   Partnership Services there's two with the

18   same date, same year, same purchase order

19   and different reference numbers and

20   different vendor cost.

21                So, you know, it's a little

22   frustrating you won't just put the

23   documents in front of me.  But it's not

24   uncommon to have a purchase order that

CONFIDENTIAL

Page 430

1  would have multiple years and multiple

2  charges on it, and that would not be

3  indicative of double-counting just

4  because the amount on the vendor cost is

5  duplicative.

6        Q.    Mr. Meyers, these are

7  extremely voluminous documents that would

8  take a long time to --

9        A.    It's --

10       Q.    -- orient to, so I'm not --

11       A.    -- your deposition.  I

12  understand.

13       Q.    If a school district's

14  payments to a -- well, actually, I will

15  move on.

16            If a school district's

17  spending on a vendor would have been

18  exactly the same in a world in which

19  there was no defendant at-issue conduct,

20  did the school district incur any damages

21  in connection with spending on that

22  vendor?

23            ATTORNEY GRADEN:  Objection.

24            THE WITNESS:  It may have.

CONFIDENTIAL

Page 431

1          We've talked about this, that the

2          fact that an expense is fixed does

3          not mean that there's not a damage

4          associated with it.

5    BY ATTORNEY SANDOVAL-BUSHUR:

6          Q.    Did you communicate in any

7    way, whether by speaking in person, by

8    telephone, corresponding by e-mail, or

9    otherwise with any employees or people

10   otherwise affiliated with Irvington in

11   forming -- sorry, Tucson in forming your

12   opinions?

13         A.    I do not believe so, no,

14   sir.

15         Q.    So since I sort of messed up

16   that question.

17               You did not communicate in

18   any way with any employees or people

19   otherwise affiliated with Tucson,

20   correct?

21         A.    I did not.

22         Q.    It was not part of your

23   assignment to determine what value, if

24   any, Tucson received in exchange for

CONFIDENTIAL

Page 432

1   paying any vendor, correct?
2           A.    It was not, as I've
3   previously stated and is qualified in all
4   of my previous answers related to the
5   other five districts herein for that
6   question.
7           Q.    For the allocation percents
8   you used for your Tucson damages
9   calculations, you relied on Tucson's
10  Second Amended Answers to Defendants'
11  Interrogatories, Set 3, correct?
12          A.    That's correct, yes, sir.
13          Q.    For your allocation percents
14  you used for your Tucson damages
15  calculations, you did not rely on any
16  source other than Tucson's Second Amended
17  Answers to Defendants' Interrogatories,
18  Set 3, correct?
19          A.    I believe that's correct,
20  yes, sir.
21          Q.    You do not know how Tucson
22  arrived at the allocation percents that
23  you relied on from its interrogatory
24  responses, correct?

CONFIDENTIAL

Page 433

1          A.     I did not have any

2     involvement in any way related to

3     Tucson's drafting or the testimony that

4     they provided in their second amended

5     answers to interrogatory responses

6     related to the damages caused to them by

7     the alleged improper actions of

8     defendants in this matter.

9          Q.     You do not know how Tucson

10    arrived at the allocation percents that

11    you relied on from its interrogatory

12    responses, correct?

13         A.     As I just stated, I didn't

14    have any involvement, one way or the

15    other, with the drafting of them,

16    including but not limited to how they

17    came to any particular allocation

18    percentages in that sworn testimony that

19    they provided relating to the damages

20    caused by the alleged improper actions of

21    defendants.

22         Q.     How did you determine which

23    vendors should be included in your Tucson

24    damages calculation?

CONFIDENTIAL

Page 434

1          A.    I believe it's from the

2    third response to Interrogatory Number 5,

3    as I sit here right now.

4          Q.    Once you determined which

5    vendors should be included in your Tucson

6    damages calculation, how did you

7    determine which costs relating to each

8    vendor should be included in your damages

9    calculation?

10          A.    I included the total cost as

11    I was able to reconcile for each of the

12    vendors that were identified as select

13    vendors in our report related to the

14    alleged improper actions of the

15    defendants before applying the allocation

16    percentage thereto.

17          Q.    You assumed that if a vendor

18    was identified by Tucson as a select

19    vendor, then every single payment that

20    the district made to that vendor should

21    be included in your damages calculation,

22    correct?

23          A.    That's correct.  The total

24    costs for each select vendor multiplied

CONFIDENTIAL

Page 435

1    by the applicable allocation percentage

2    to quantify damage in this matter.

3           Q.    Did you confirm with anyone

4    from Tucson that, in fact, every single

5    payment that the district made to each

6    select vendor should be included in your

7    damages calculations?

8           A.    As I sit here right now, I

9    don't have the interrogatories in front

10   of me.  They may have a chart in there

11   that reconciled the numbers that I had

12   already reconciled.

13              But I have not spoken to

14   anybody specifically at Tucson related to

15   that, no, sir.

16          Q.    What would be the relevance

17   of a chart in the interrogatories

18   reconciling the numbers that you had

19   already reconciled?

20          A.    To the extent that the

21   interrogatory specifically states the

22   numbers and you're asking me if it

23   includes the total and the number is the

24   total, then the chart answers the

Page 436

1    question.

2         Q.    But you did not believe that

3    the -- well, I'll move on.

4              Your Tucson damages

5    calculations include work orders relating

6    to property damage, correct?

7         A.    They do, yes, sir.

8         Q.    You do not know how Tucson

9    determined that any invoice relating to

10   property damage is related to any

11   defendant, correct?

12        A.    As I stated before, I don't

13   have any knowledge as to how Tucson

14   prepared any of its responses in

15   discovery related to their allocation of

16   alleged harms as a cause -- as it relates

17   to the alleged improper action of

18   defendants, so neither what the actions

19   were or how the harm was caused.  It's

20   not within my scope.

21        Q.    You assigned a 100 percent

22   allocation to every work order relating

23   to property damage for Tucson, correct?

24        A.    My recollection is that

CONFIDENTIAL

Page 437

1    Tucson assigned 100 percent to every work

2    order for Tucson, which is what I rely

3    upon -- relying upon in my calculation

4    herein.

5           Q.    Do you believe it would be

6    reasonable to say that a student who

7    decides to engage in property damage

8    bears zero responsibility for the

9    property damage?

10                ATTORNEY GRADEN:  Objection.

11                THE WITNESS:  I don't know

12           what responsibility they would

13           bear at all.  I couldn't give you

14           an opinion on that one way or the

15           other.

16    BY ATTORNEY SANDOVAL-BUSHUR:

17           Q.    You are aware that when a

18    student commits property damage, Tucson

19    takes steps to recover repair costs from

20    the parents of the student, correct?

21                ATTORNEY GRADEN:  Objection.

22                THE WITNESS:  I'm not aware

23           of that one way or the other.

24    BY ATTORNEY SANDOVAL-BUSHUR:

CONFIDENTIAL

Page 438

1          Q.    Your reports cite multiple
2     documents showing that when a student
3     commits property damage, Tucson takes
4     steps to recover repair costs from the
5     parents, are you aware of that?
6          A.    They may.  I don't have them
7     in front of me.  If you'd like to show
8     them to me, I'm happy to look at them.
9          Q.    Sure.
10              ATTORNEY SANDOVAL-BUSHUR:
11          Let's take a look at Tab 29, we'll
12          mark as Exhibit-17 -- sorry,
13          Exhibit -- we'll mark it as
14          Exhibit-16.
15                    -   -   -
16              (Whereupon, Exhibit
17          Meyers-16, SM_TUSD_00185554,
18          Reactive Work Order, was marked
19          for identification.)
20                    -   -   -
21     BY ATTORNEY SANDOVAL-BUSHUR:
22          Q.    And this is a document with
23     the Bates stamp SM_TUSD_00185554.
24              Do you see this document,

CONFIDENTIAL

Page 439

1    Mr. Meyers?

2            A.    I do.

3            Q.    Do you recognize it as a

4    type of document that you relied on in

5    forming your opinions relating to

6    Tucson's damages?

7            A.    I can recognize the Bates

8    stamp number.

9                  I don't believe that this

10   number is part of my report, sir.  As I

11   sit here right now, I do not see that

12   Bates stamp number referenced at all in

13   the documents that I've reviewed in

14   connection with the property damage

15   vendor costs.

16           Q.    Mr. Meyers, if you look at

17   Appendix B to your Tucson report, which

18   is Exhibit-1F, and look at Page 4 of

19   Appendix B to that report.

20           A.    Okay.

21           Q.    Do you see an entry for

22   Tucson reactive work orders?

23           A.    I do.

24           Q.    Okay.

CONFIDENTIAL

Page 440

1          A.     And I see that on Exhibit-1
2    I've identified probably no less than 25
3    costs that fall into that Bates range.
4                And you handed me an example
5    of one that is not one that I used that
6    makes a reference.  Would you -- can you
7    hand me an example of one that I used
8    that has a reference, a cost to charge
9    for restitution?
10               Because I don't know how the
11   restitution would work.  I don't know
12   that it's a collateral source or not as
13   it relates to a damage theory or a legal
14   theory.  I'm not here to give that
15   opinion.
16               But I find it a little
17   strange that one that was not included
18   herein you have handed me.  Maybe it was
19   not included herein because the plaintiff
20   had said that they did get restitution
21   and it should not be included.  I don't
22   know.
23               But I did not include this
24   cost in any way.

CONFIDENTIAL

Page 441

1              ATTORNEY SANDOVAL-BUSHUR:

2         Mr. Meyers, I am handing you Tab

3         30, which we're marking as

4         Exhibit-17.

5                    -   -   -

6              (Whereupon, Exhibit

7         Meyers-17, SM_TUSD_00185580,

8         10/27/21 Letter, Tucson Unified

9         School District, was marked for

10        identification.)

11                   -   -   -

12   BY ATTORNEY SANDOVAL-BUSHUR:

13        Q.    Why don't you take a look at

14   that?

15             This is a document with a

16   Bates number SM_TUSD_00185580, correct?

17        A.    It appears to be.

18        Q.    And if you look at your

19   damages summary in your Tucson expert

20   report, Exhibit-1F, do you see that this

21   was included in your damages calculation?

22        A.    It certainly falls inside

23   the Bates range.  There's no doubt about

24   that.

CONFIDENTIAL

Page 442

1          Q.     And, in fact, this
2    specific -- I'm talking about in
3    Appendix C to your report.
4               Are you there?  On Page 3,
5    under the property damage vendors
6    section, you include in your damages
7    calculation the costs that are reflected
8    in the document that we just marked as
9    Exhibit-17.
10         A.     You're going to have to
11   point me to it.
12         Q.     Okay.
13         A.     I don't see where --
14         Q.     Yeah.  I mean, do you see
15   the entry that has the -- that has the
16   invoice/purchase order NA?
17         A.     I do.
18         Q.     And do you see that that
19   is -- refers to the document that we have
20   marked as Exhibit-17?
21         A.     It appears that it does,
22   yes, because of the date.
23         Q.     It has the same Bates
24   number, right?

CONFIDENTIAL

Page 443

1          A.    It has the same Bates number
2     and it has the same date.  So yes.
3          Q.    Okay.  And this is the only
4     property damage vendor cost that does not
5     have an invoice or purchase order,
6     correct?
7          A.    I think that's correct.
8          Q.    Do you know why that's the
9     case?
10          A.    I do not know, sir.
11          Q.    And this document -- and
12     just so the record is clear, it was
13     produced to us with the markings out
14     of -- of components and the SII blocks,
15     that is not something that we have added.
16          A.    We can agree it's neither
17     your redactions nor mine.
18          Q.    Okay.  And you see that this
19     is a letter from the Tucson Unified
20     School District to the parents of a
21     student, correct?
22          A.    You're asking me to make
23     those assumptions.  There's redactions on
24     here.

CONFIDENTIAL

Page 444

1              It appears to be a letter.
2    It appears to go to the parents.  There's
3    no indication that this letter was sent,
4    nor does it say anything else in the body
5    of the letter.  It cites a statute.  No
6    evidence that this amount was restored or
7    not.
8              But it's not -- I have not
9    considered any reimbursements to any of
10   the property damage in connection with
11   the analysis that I have performed.
12        Q.    Okay.
13        A.    Nor have I seen any
14   indication that any of them were
15   reimbursed.
16        Q.    You did not, in the course
17   of calculating your damages for Tucson,
18   consider any reimbursement that the
19   school district received for any property
20   damage, correct?
21              ATTORNEY GRADEN:  Objection.
22              THE WITNESS:  As I just
23        said, I have not considered any
24        reimbursements that they may or

CONFIDENTIAL

Page 445

1          may not have received as it
2          relates to the specific reactive
3          work orders identified in my
4          report herein.
5   BY ATTORNEY SANDOVAL-BUSHUR:
6          Q.    So when you look at the
7   total, $6,444, that you calculate for
8   property damage costs for Tucson, you do
9   not know how much of that $6,444 Tucson
10  may have already collected from students
11  or students' parents, correct?
12         A.    I'm not aware that they have
13  or have not collected any, nor am I aware
14  that it would -- that the collection of
15  said receipts would reduce the damages in
16  this matter at hand.
17         Q.    Okay.  You have not -- did
18  you ever ask Tucson if any of the
19  property damage costs that they provided
20  to you were costs that had been
21  reimbursed by any students or student's
22  parents?
23         A.    I have not.
24         Q.    Did you take any steps to

CONFIDENTIAL

Page 446

1  exclude from your damages calculation any

2  costs that any school district recovered

3  from students or from a student's

4  parents?

5          A.    I have not, no, sir.

6          Q.    Looking at Exhibit-17, you

7  relied on this document for your

8  calculation of damages for Tucson,

9  correct?

10         A.    In part.

11         Q.    It is one of the invoices

12 you relied on in the category of property

13 damage vendors, correct?

14         A.    It is.

15         Q.    Okay.

16         A.    But it's not the only thing

17 that was utilized for the reactive work

18 orders.

19              If I remember correctly --

20 and you see I don't list any of the

21 interrogatories in the exhibits, it goes

22 back to the Bates stamp pages -- I

23 believe that this is addressed in the

24 interrogatory responses for Interrogatory

CONFIDENTIAL

Page 447

1    Question Number 5.
2                 And it may also be
3    included -- I believe we talked about
4    property damage also having a different
5    interrogatory response.  I think this may
6    also be addressed in Tucson's Third
7    Amended Answers to Defendants'
8    Interrogatory, Set 1, which I believe is
9    Interrogatory Response Number 3 that
10   relates to property damage, where these
11   costs may have been itemized distinctly
12   in -- explicitly in that interrogatory
13   response.
14                 So without both of those, I
15   cannot necessarily agree with you that
16   this is the only piece of information.
17   It is the only one referenced on
18   Exhibit-1.  But it's also referenced on
19   Appendix B to the extent that it is
20   indicative of those costs having been
21   incurred in damages.
22        Q.    If you had an actual work
23   order relating to this alleged property
24   damage cost, would you have cited the

CONFIDENTIAL

Page 448

1   actual work order or would you have cited
2   this letter to the student's parents?
3           A.    I probably would have cited
4   both.
5           Q.    Okay.  And so since you
6   didn't cite an actual work order, it's
7   your belief that you do not have an
8   actual work order relating to this
9   property damage?
10          A.    That's fair.  I don't
11  believe that I've seen that, based on the
12  references within the report.
13              But I'd have to go back and
14  look at the materials reviewed as
15  detailed in Appendix B just to confirm.
16          Q.    This letter states, Tucson
17  Unified School District, TUSD, is seeking
18  restitution for district property that
19  was damaged by student -- the student's
20  name is redacted -- on October 27th --
21  and it says 1021, but I believe it's
22  probably supposed to say 2021.
23              Do you see that?
24          A.    I don't know what it's

CONFIDENTIAL

Page 449

1    supposed to say.  This could have been a
2    long time ago.
3            Q.    Well, the date on the letter
4    at the top is October 27th, 2021,
5    correct?
6            A.    I will agree with you that I
7    do believe that also to be a typo.
8            Q.    Okay.  So you understand
9    this is a letter in which Tucson Unified
10   School District is seeking restitution
11   for district property damage that was
12   instituted by a student, correct?
13           A.    I see that this letter was
14   drafted.  And it says what it says.
15                I have no indication that
16   this letter was ever sent to parents of
17   SII redacted.  I'm not aware.
18                This is not a transmittal
19   letter.  There's no transmission to it.
20   I don't know that it was sent.  I don't
21   know if anything was received.
22                But we've talked about that
23   already.
24           Q.    Do you know that the amount

CONFIDENTIAL

Page 450

1    of $50.69 that is identified in this
2    letter is accurate?
3           A.    This is the basis for the
4    $50.69.
5           Q.    You do not know, though, if
6    that is the correct -- that that's an
7    actual amount that Tucson incurred
8    though, correct?
9           A.    I believe it to be an actual
10   amount.  But as we talked about before, I
11   don't have a work order for this one.  So
12   I am relying on the letter to indicate
13   the cost for the reimbursement.
14          Q.    How do you perform a
15   forensic accounting on this letter,
16   Exhibit-17, to determine that the school
17   actually spent the $50.69?
18          A.    I think you have to go back
19   and look at the interrogatories that I
20   told you.
21               The work orders are a little
22   different under a forensic accounting
23   insofar as they are internal costs to the
24   school.  So they're not the same as an

CONFIDENTIAL

Page 451

1    invoice to a third-party vendor.

2              For Breathitt, they are,

3    because they had to purchase supplies.

4    So it was a Home Depot charge, as you may

5    or may not remember, and Jackson Electric

6    charge, as you may or may not remember.

7              But for Tucson they're

8    handled internally.  So this is the

9    internal costs that are paid.  So there's

10   not necessarily going to be a check to

11   verify that this amount was paid.  This

12   is the amount that was incurred as a

13   result of the costs.

14        Q.    The letter, Exhibit-17,

15   states, This behavior is unacceptable and

16   the district is required to seek

17   reimbursement for damages caused by this

18   student -- and then it cites an Arizona

19   statute, correct?

20        A.    That's what it says.

21        Q.    And you do not have any

22   reason to doubt that the Tucson Unified

23   School District is required to seek

24   reimbursement for property damages caused

CONFIDENTIAL

Page 452

1    by students, correct?

2                   ATTORNEY GRADEN:   Objection.

3                   THE WITNESS:   I don't

4            know -- I'm not an expert in this,

5            but the statute that it cites

6            doesn't say that they're required

7            to seek reimbursement.   It says

8            that the parents shall be liable.

9                So I don't know whose legal

10           determination this is that the

11           district is required to seek a

12           reimbursement because of a statute

13           that doesn't say that they're --

14           that the school is required to

15           request reimbursement.

16               It says that the property --

17           the minor who has injured the

18           school shall be liable for all

19           damages caused by their children

20           or wards.

21               So I cannot agree with you

22           that it says what you think it

23           says or have represented it says,

24           because it does not.

CONFIDENTIAL

Page 453

1  BY ATTORNEY SANDOVAL-BUSHUR:

2        Q.    Mr. Meyers, I was just

3  asking about this letter, which is a

4  letter that was produced by the Tucson

5  Unified School District that has the

6  Tucson Unified School District's heading

7  at the top and that you relied on for

8  your damages calculations.

9              Are we on board?

10       A.    I relied on for the amount

11  of $50.69 for a school chair.  That is

12  what I relied upon.

13       Q.    So you think that perhaps

14  this letter from the Tucson Unified

15  School District is inaccurate when it

16  says that the school district is required

17  to seek reimbursement for damages caused

18  by the student but was accurate when it

19  reported the amount of damages?

20              ATTORNEY GRADEN:  Objection.

21              THE WITNESS:  I'm not saying

22       it's accurate or inaccurate.  Your

23       previous question was that because

24       of the statute it was required to

CONFIDENTIAL

Page 454

1          seek reimbursement.  You said it
2          was required to seek reimbursement
3          and then it cites the statute.
4               Those two things are very
5          separate.  So if you want to read
6          it in, I'm happy to read it all
7          into the record.
8               This letter, whether sent or
9          not sent, says what it says.
10  BY ATTORNEY SANDOVAL-BUSHUR:
11          Q.    Do you think that the Tucson
12  Unified School District might be lying to
13  parents?
14               ATTORNEY GRADEN:  Objection.
15               THE WITNESS:  No, I don't
16          believe that they're lying.  And I
17          didn't indicate as much.
18               I'm just not going to agree
19          that a letter that doesn't, on its
20          face, say what you represented it
21          to say, says that.
22  BY ATTORNEY SANDOVAL-BUSHUR:
23          Q.    Okay.  Would you agree that
24  one thing a school district can do to

CONFIDENTIAL

Page 455

1    reduce the amount of issues that it faces

2    relating to cell phones is to ban student

3    cell phone use in class?

4                    ATTORNEY GRADEN:  Objection.

5                    THE WITNESS:  I don't know

6            that I'm qualified to give you

7            that opinion.  I don't know that

8            that's one thing it can or cannot

9            do.

10                    That may call for a legal

11           conclusion.  It may be, you know,

12           subject to state and federal

13           requirements.  I don't know that

14           some school districts are even

15           allowed to take students' cell

16           phones away from them.

17                    So I can't give you an

18           opinion on that.  And it's outside

19           my scope as an expert for what I'm

20           being offered here.

21    BY ATTORNEY SANDOVAL-BUSHUR:

22           Q.    You did not calculate how

23    your damages estimates or -- sorry.

24                    You do not calculate how

CONFIDENTIAL

Page 456

1  your damages would have changed if school
2  districts had banned student cell phone
3  use during the school day, correct?
4        A.    I don't agree with that at
5  all, because some of the depositions that
6  we've seen, and I believe some of the
7  testimony in this case is that certain
8  schools or district -- schools inside of
9  districts did attempt to ban cell phones.
10             So to the extent that your
11  predicate is that it has not happened, I
12  don't believe that to be accurate.
13             But to the extent that I'm
14  relying on the people who were the boots
15  on the ground, that whatever did happen
16  during the periods that they're
17  representing damages, have considered the
18  impact of school bans -- school cell
19  phone bans, whether they were or not
20  instituted, in determining, through their
21  sworn testimony and written affidavit and
22  interrogatory responses, that the
23  applicable damages apply, as we've talked
24  about before, as a result of the alleged

Page 457

1   improper actions of the defendants.
2         Q.    Mr. Meyers, for districts
3   that have not implemented cell phone
4   bans, did you calculate how your damages
5   would have changed if the school
6   districts had banned student cell phone
7   use during the entire school day?
8               ATTORNEY GRADEN:  Objection.
9               THE WITNESS:  I'm not aware
10         of cell phone bans one way or the
11         other.  And whether or not a
12         school district has or has not
13         done it has not had any impact on
14         my opinion in relying on the
15         persons who are aware and have
16         been giving their opinion, which
17         is what my opinion is based upon.
18   BY ATTORNEY SANDOVAL-BUSHUR:
19         Q.    Is there anywhere in any of
20   your expert reports, Exhibits-1A through
21   1F or 2A through 2F, where I can find a
22   calculation of how any school district's
23   damages would have changed if it had
24   banned student cell phone use during the

CONFIDENTIAL

Page 458

1    school day?

2         A.     Ask it again.

3         Q.     Is there anywhere in any of

4    your expert reports, Exhibits-1A through

5    1F and 2A through 2F, where I can find a

6    calculation of how any school district's

7    damages would have changed if it had

8    banned student cell phone use during the

9    school day?

10        A.     That's what I thought you

11   said.  I'll ask it -- I'll answer it

12   again for you.

13             I have not considered in any

14   way, one way or the other, whether cell

15   phone bans have or have not been

16   instituted for any of the school

17   districts herein.  And it is not an

18   opinion that I am giving anywhere.  Any

19   opinion on the impact of school cell

20   phone bans would already be contained in

21   the sworn testimony provided by the

22   people most knowledgeable who will

23   provide testimony at trial related to the

24   alleged improper actions of the

CONFIDENTIAL

Page 459

1   defendants in this matter.

2               I personally have not given

3   any weight to a cell phone ban, whether

4   it exists or doesn't exist, or the impact

5   it would or would not have on any schools

6   that may or may not have instituted one

7   at any point in time during which the

8   damages have been calculated.

9               ATTORNEY SANDOVAL-BUSHUR:

10       Let's take a break.

11               VIDEO TECHNICIAN:  Going off

12       video record, 5:21 p.m.

13                   -   -   -

14               (Whereupon, a brief recess

15       was taken.)

16                   -   -   -

17               VIDEO TECHNICIAN:  Back on

18       video record, 5:35 p.m.

19   BY ATTORNEY SANDOVAL-BUSHUR:

20       Q.    Mr. Meyers, I just had one

21   more question about Exhibit-17, which we

22   had just been looking at, the --

23       A.    Yes, sir.

24       Q.    -- letter relating to a

CONFIDENTIAL

Page 460

1    property damage incident.

2              Do you know why the $59.69

3    for a school chair has been

4    struck-through on this document?

5         A.    I do not.

6         Q.    Okay.  And did you ask

7    anyone from Tucson what that meant?

8         A.    I don't recall asking anyone

9    from Tucson what that meant.

10             It may be explained in the

11   interrogatory responses that I talked

12   about that I think itemized these.  But I

13   did not talk to anybody at Tucson about

14   that.

15        Q.    Mr. Meyers, do you use

16   YouTube?

17        A.    I would say very

18   occasionally I will use YouTube.

19        Q.    What do you use YouTube for?

20        A.    Usually just to watch

21   YouTube TV or watch a video.

22        Q.    Do you ever use YouTube to

23   watch videos about how to do something?

24        A.    I don't.

CONFIDENTIAL

Page 461

1          Q.     Okay.  Have you ever used
2    Snapchat?
3          A.     I have never used Snapchat.
4          Q.     Have you ever used TikTok?
5          A.     I have never used TikTok.
6          Q.     Have you ever used Facebook?
7          A.     I have never used Facebook.
8          Q.     Have you ever used
9    Instagram?
10          A.     I have an Instagram account.
11    I've never used Instagram.  I've never
12    posted or done anything.
13               But I have an account,
14    mostly to be able to monitor in case
15    something would come up.  I do have young
16    kids.
17          Q.     Do you have children?
18          A.     I do.
19          Q.     How old are your children?
20          A.     15 and almost 13.
21          Q.     Do either of your children
22    have any social media accounts or use
23    social media apps?
24          A.     They do not.

CONFIDENTIAL

Page 462

1          Q.     Okay.  All right.

2                 ATTORNEY SANDOVAL-BUSHUR:

3          No further questions from YouTube.

4                 ATTORNEY DEPAZ:   I have no

5          questions.

6                 VIDEO TECHNICIAN:   Please

7          stand by.  This is the

8          videographer stating total run

9          time by party for the record.

10                Joseph Sandoval-Bushur, for

11         YouTube, is six hours, 37 minutes.

12                This concludes today's video

13         deposition.  Going off video

14         record, 5:37 p.m.

15                        -   -   -

16                (Whereupon, the deposition

17         concluded at 5:37 p.m.)

18                        -   -   -

19

20

21

22

23

24

CONFIDENTIAL

Page 463

1                    CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10             *Amanda Miller*

               Amanda Maslynsky-Miller

11             Certified Realtime Reporter

               Dated:  August 25, 2025

12

13

14

15

16

17             (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

CONFIDENTIAL

Page 464

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                    After doing so, please sign

9    the errata sheet and date it.

10                    You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14                    It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 465

1                      - - - - - -

                     E R R A T A

2                      - - - - - -

3    PAGE    LINE    CHANGE

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

CONFIDENTIAL

Page 466

1          ACKNOWLEDGMENT OF DEPONENT
2
               I,_____, do
3    hereby certify that I have read the
     foregoing pages,  1 - 462, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.

7
8    _____
     JEFFREY MEYERS                   DATE
9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

CONFIDENTIAL

Page 467

1                        L A W Y E R ' S   N O T E S

2    PAGE    LINE

3    ____    ____    _____

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

CONFIDENTIAL

**[& - 19th]**                                                                 Page 1

| & |
|---|

**&**   1:15 2:3,9,16
3:4,9,16 4:9,15
5:3 11:19

| 0 |
|---|

**00185554**   9:17
438:17,23
**00185580**   9:18
441:7,16
**02**   64:3
**03047**   1:3
**04**   64:11
**05**   64:11
**07068**   3:11
**07102**   4:11
**07660**   4:5

| 1 |
|---|

**1**   10:17 17:2
36:1 103:23
111:19 114:10
144:13 203:10
235:21 252:18
415:23,23
440:1 447:8,18
466:3
**1,043,432**
403:17 414:22
**1,625,737**   415:9
415:11
**10**   8:19 286:24
349:17,22
350:3 352:2

358:2 363:1
**10/27/21**   9:19
441:8
**100**   47:23
62:16,18 79:15
113:9 159:12
164:7 202:5,12
202:15 206:10
208:23 211:3,5
254:8,15 257:4
257:11 258:17
258:24 259:7
259:15,24
260:7,9 278:16
279:2 295:23
297:1 328:24
331:4,10,24
332:21 334:11
334:16 336:12
336:13,14
337:23 338:4,7
338:8,23 341:1
353:22 359:21
360:2 362:7
363:21 364:6,9
365:12,15
366:6 368:3
369:5,12,17
372:9,19,23,24
373:10,24
375:5,10,21
376:9,13,17
436:21 437:1

**1021**   448:21
**10:11**   87:14
**10:29**   87:20
**11**   8:21 10:17
51:4 263:19,21
263:22 309:5
364:15,18
365:3 366:4
370:13
**11:40**   173:9
**11:55**   173:15
**11th**   371:19
**12**   6:6 9:5
22:21 51:4
63:21 64:1,15
65:2,4,11,14,20
66:10 368:8,11
368:17
**124**   8:10
**12:44**   232:21
**13**   6:14 9:7
167:6,23 169:4
370:24 371:3
461:20
**14**   6:16,19 9:10
167:7 386:9,12
390:2
**14th**   379:11
380:16,23
396:21 398:5
398:13
**15**   6:21 9:13
167:8 350:14
350:14,15,16

358:21,22
385:15 400:12
400:15,23
401:3,9,14,20
402:17 414:20
422:16 461:20
**159,255**   44:20
**16**   7:6,9 9:17
263:8 330:3
438:14,17
**16th**   363:1
**17**   7:11,14 9:18
167:8 263:9
349:19 438:12
441:4,7 442:9
442:20 446:6
450:16 451:14
459:21
**18**   7:16 167:9
167:13
**181,075**   45:12
46:12
**185,000**   43:18
44:5
**19**   7:19,21
272:15 273:1,3
273:7,10,16,22
**19087**   1:16 2:4
3:5
**19th**   14:7,21
15:10,24 16:16
17:5 21:6
179:20 363:5

CONFIDENTIAL

**[1:00 - 2:41]**                                                      Page 2

| | | | |
|---|---|---|---|
| **1:00**  232:16 | 370:17 372:13 | **2010**  72:13 | **22**  1:9 318:24 |
| **1:18**  233:3 | 374:1 387:5 | **2014**  323:11 | 331:20 370:23 |
| **1a**  6:12 13:11 | **2,513,686** | **2016**  86:9 | 384:4 |
| 13:16,22 14:1 | 422:24 | 325:17 340:23 | **220-1100**  4:17 |
| 14:1,4 20:19 | **2,601**  337:6 | **2018**  384:22 | **2200**  3:17 |
| 21:16,24 22:11 | **20**  7:23 17:22 | **202**  2:11 4:17 | **22nd**  11:15 |
| 22:18 23:11 | 66:11 86:23 | **2021**  62:20 | **23**  384:4 386:8 |
| 24:1 203:9 | 141:14 267:19 | 448:22 449:4 | **23rd**  328:7 |
| 260:17 457:20 | 284:16 339:1 | **2023/2024** | 329:13 |
| 458:4 | 364:14 387:24 | 335:7,13 | **24**  167:14 |
| **1b**  6:15 14:11 | 388:12 389:3 | **2024**  43:19 | 362:20 372:4 |
| 14:17 318:24 | 389:11,16 | 46:9 86:10 | **24th**  374:15 |
| **1c**  6:17 15:1,7 | 390:1,6,8,20 | 323:12,24 | **25**  167:16 |
| **1d**  6:20 15:14 | 391:8,14 392:3 | 324:22 325:18 | 400:12 440:2 |
| 15:20 | 393:16 403:22 | 340:23 | 463:11 |
| **1e**  7:5 16:5,11 | 413:19 415:3 | **2025**  1:9 11:15 | **2555**  2:17 |
| 16:15 85:22 | 423:5 424:24 | 14:7,21 15:10 | **25th**  17:23 |
| 415:4 423:4 | 466:11 | 16:1,16 17:5 | 18:12 19:1,14 |
| 425:22 | **20,000**  45:17 | 17:23 18:13 | 20:4,17 21:8 |
| **1f**  7:7 13:11 | 347:22 | 19:2,14 20:4 | **26**  167:16 |
| 16:20 20:19 | **20/30**  61:15 | 20:17 43:19 | 370:2 |
| 21:16,24 22:11 | **200**  5:5 207:19 | 46:10 49:15,19 | **27**  167:15 |
| 22:18 23:11 | 207:22 208:8 | 50:7 179:20 | **273-9800**  4:11 |
| 24:2 439:18 | **2000**  394:12 | 324:1 328:7 | **27th**  448:20 |
| 441:20 457:21 | 395:1 | 329:13 362:20 | 449:4 |
| 458:5 | **20001**  4:17 | 363:2,5 371:19 | **28**  167:17 |
| **2** | **2001**  64:3,8 | 380:16,24 | **280**  1:15 2:4 |
| | 229:21 | 396:22 398:6 | 3:5 11:19 |
| **2**  32:7 274:12 | **2002**  64:8 | 398:14 463:11 | **287**  8:11 |
| 287:17 288:3 | **20024**  2:11 | **2026**  42:20 | **29**  167:18 |
| 288:12,18 | **2004**  64:14 | **21**  57:20 | 438:11 |
| 325:14 366:12 | 65:1,10,19 | 318:24 331:13 | **2:23**  304:12 |
| 367:21 368:2 | **2005**  64:14,21 | 331:20 368:8 | **2:41**  304:18 |
| 368:17 369:22 | 65:1,10,19 | 384:4 | |

CONFIDENTIAL

**[2a - 5th]**                                                                    Page 3

| | | | |
|---|---|---|---|
| **2a** 7:10 17:8,12 | 442:4 447:9 | **4** | **5,500** 142:5 |
| 17:19 20:20 | **3,124,586** 86:6 | | **5/19/25** 6:13,15 |
| 21:16 22:1,11 | 423:7 424:23 | **4** 8:7 51:23,23 | 6:18,20 7:6,8 |
| 22:19 23:11 | **3.1** 86:12 | 52:2,12 124:2 | 13:16 14:11 |
| 24:2 457:21 | **30** 9:7 61:17 | 274:12 370:13 | 15:1,14 16:5 |
| 458:5 | 267:20 350:17 | 439:18 | 16:20 |
| **2b** 7:12 18:2,8 | 358:23 359:4,7 | **40** 61:17 | **50** 131:1,4,14 |
| **2c** 7:15 18:16 | 359:16 360:5 | 428:12,12 | 203:21,24 |
| 18:22 | 361:3,5 364:7 | **400** 9:16 | 204:4,8,12,22 |
| **2d** 7:17 19:5,11 | 364:10 370:16 | 205:13,19,22 | 205:7 207:18 |
| **2e** 7:20 19:18 | 370:18 371:4 | 207:16 208:5 | 208:14 284:18 |
| 19:24 | 371:11 441:3 | **409** 3:18 | **50.69** 450:1,17 |
| **2f** 7:22 17:8 | 464:16 | **43** 8:6 415:23 | 453:11 |
| 20:8,14,20 | **304** 8:13 | **434-5000** 2:11 | **50.69.** 450:4 |
| 21:16 22:1,12 | **3047** 1:4 | **438** 9:17 | **50/50** 60:22 |
| 22:19 23:11 | **305** 5:6 | **441** 9:20 | 61:13 63:4 |
| 24:2 457:21 | **309** 8:15 | **462** 466:3 | **500** 4:16 |
| 458:5 | **30th** 86:8,10 | **462-6000** 5:6 | **500,000** 415:20 |
| **3** | **31** 167:19 | **4700** 5:5 | **501** 3:17 |
| | **31605** 463:10 | **474-6550** 2:18 | **51** 8:8 |
| **3** 8:5,18,23 | **32** 167:19 | **475** 42:7,18 | **52** 372:4 |
| 9:12,16 32:6 | **329** 8:18 | **4:05** 377:18 | **53** 372:1 |
| 42:24,24 43:3 | **33131** 5:6 | **4:22** 1:3 | **55** 4:5 |
| 43:9,13 124:2 | **349** 8:20 | **4th** 293:11 | **550** 4:10 |
| 253:10 328:6 | **35,000** 367:4,8 | **5** | **580,000** 415:24 |
| 329:12,20 | **364** 8:23 | | **582,000** 420:8 |
| 330:13 364:22 | **368** 9:6 | **5** 3:11 8:9 86:3 | **59.69** 460:2 |
| 365:6 373:2 | **37** 462:11 | 123:23 124:1,5 | **5:21** 459:12 |
| 378:17 380:15 | **371** 9:9 | 124:11 125:3 | **5:35** 459:18 |
| 380:23 386:16 | **386** 9:12 | 166:17,22 | **5:37** 462:14,17 |
| 386:23 396:21 | **390,000** 367:12 | 167:24 172:12 | **5th** 293:3 |
| 398:5,13 | **3:51** 377:12 | 323:11 326:21 | |
| 400:18 401:6 | | 334:24 434:2 | |
| 432:11,18 | | 447:1 | |

**[6 - accounting]**                                                    Page 4

| | | | |
|---|---|---|---|
| **6** | **749128**  323:13 | 173:15 | 300:20 301:2 |

**6**

**6**  8:11 9:7
286:24 287:3,9
306:14 365:22
366:9,23
370:16,18
371:4,11 373:3
425:23
**6,444**  445:7,9
**6,984,000**
335:21 337:3
**60**  58:3 59:6
**601**  4:16
**610**  2:5 3:6
**610,000**  423:11
**624,917**  86:13
**625**  415:23
**639-9100**  4:6
**64108**  2:17
**667-7706**  2:5
3:6
**680**  2:10

**7**

**7**  8:12 304:21
304:24 306:15
358:3 359:9
429:16
**7/25/25**  7:10,13
7:15,18,20,22
17:12 18:2,16
19:5,18 20:8
**70**  60:19 61:14

**749128**  323:13
**763-3260**  3:18
**77550**  3:18
**777609**  323:13
**779236**  316:7,7

**8**

**8**  8:14 309:5,8
322:15
**80**  60:19 87:1
**80,000**  428:10
**80/20**  61:14
**816**  2:18
**85**  56:7
**877.370.3377**
1:24

**9**

**9**  8:16 304:21
329:8,16
330:10 331:2
333:13
**90s**  200:23
**917.591.5672**
1:24
**92**  242:20
**95**  56:8
**950**  42:11
**973**  3:12 4:6,11
**994-1700**  3:12
**9:05**  1:17 11:15

**a**

**a.m.**  1:17 11:15
87:14,20 173:9

173:15
**ability**  78:1
112:16
**able**  28:6 50:10
58:11,23 71:16
91:11 117:2
129:8 135:13
174:17 190:6
262:15 274:23
298:16 299:6
312:5,20
313:12 314:24
315:20 316:2
322:23 323:22
346:15,18
357:22 379:5
405:11 406:12
434:11 461:14
**above**  1:17
411:1 429:9
**absence**  195:16
197:8,13 198:9
209:17 210:19
264:17 266:13
267:4 268:19
269:15 270:9
340:14
**absolutely**
59:14,18 109:3
112:9 160:13
194:8 195:4
278:4 281:23
282:17 284:11
286:7 297:12

300:20 301:2
340:4 351:15
357:3 361:2
375:14 416:9
420:14 424:7
**abundance**
147:12
**accept**  67:20
130:13 214:18
**acceptable**
131:10
**accepted**  56:22
138:1
**access**  325:1,6
359:11
**accessing**
250:13,22
**accident**  61:10
259:17
**accordance**
370:2
**account**  461:10
461:13
**accountant**
63:13,15
109:16 412:4
**accounted**
113:3
**accounting**
33:24 35:21
36:14 37:12
40:10,12 41:13
53:14 56:19
63:10 75:2,11

**[accounting - actions]**                                                                Page 5

| | | | |
|---|---|---|---|
| 104:5 105:14 | 118:16 120:4 | 97:22 98:20 | 198:10,23 |
| 109:19 148:6 | 129:17,23 | 99:11 100:1,14 | 199:10 200:20 |
| 149:14 151:2 | 130:1,10 | 106:1 107:16 | 201:5,11 202:7 |
| 243:1 247:14 | 133:10,15,16 | 113:7 116:24 | 202:18 203:5 |
| 310:2 313:3 | 135:16,21,23 | 117:18 118:3 | 204:9,16,19 |
| 314:3 354:14 | 137:7 139:7,24 | 119:1,8 120:13 | 205:1,10 206:5 |
| 354:22 397:2 | 140:10 141:2,6 | 120:24 121:22 | 207:2 223:11 |
| 402:5 404:21 | 141:7 142:15 | 122:3 125:24 | 227:19 231:22 |
| 405:4,18 | 142:18 143:16 | 127:13 129:19 | 238:22 239:4 |
| 407:11 408:20 | 147:19 148:1 | 130:4,20 | 243:7 244:13 |
| 417:23 420:21 | 212:3 215:2 | 131:18 132:8 | 245:21 247:5 |
| 424:22 427:24 | 217:5 220:16 | 133:2 136:11 | 248:16 251:21 |
| 429:7 450:15 | 231:19 246:15 | 137:15 138:19 | 253:21 254:9 |
| 450:22 | 248:5 419:8,13 | 139:12,13 | 254:14,20 |
| **accounts** | 450:2 453:18 | 141:9 143:19 | 255:12,18 |
| 461:22 | 453:22 456:12 | 145:14 155:17 | 256:7,24 |
| **accumulating** | 464:20 | 160:18 161:7 | 258:14 259:1 |
| 33:16 | **accurately**   35:1 | 163:11,12 | 262:6 263:8 |
| **accumulation** | 105:20 130:17 | 164:21 165:6 | 265:5 266:8 |
| 22:21 | 132:6 138:16 | 165:11,22 | 268:2 269:5,7 |
| **accuracy** | 141:5 317:4,7 | 166:1,3,9 | 270:2 272:8 |
| 109:23 111:7 | **achievement** | 167:2 168:4,24 | 273:5,12,20 |
| 130:6 133:22 | 81:23 82:5,10 | 172:8,9 173:1 | 278:22,24 |
| 136:15 137:20 | 82:14,16 | 173:2 175:5,21 | 279:4,9,12,19 |
| 138:7,10,22 | **acknowledg...** | 175:22 176:2 | 282:21 285:2 |
| 140:22 141:5 | 214:19 352:9 | 176:13,19 | 289:24 290:15 |
| 164:2,4 217:11 | 466:1 | 177:9,24 178:4 | 291:24 299:4 |
| **accurate** | **act**   29:1 394:5 | 178:15 185:17 | 300:1 321:14 |
| 108:22,24 | 394:14 395:2 | 186:7,10,20,24 | 354:18 355:17 |
| 109:2,4,7 | **action**   436:17 | 188:9 189:9 | 359:17 360:4,7 |
| 110:3,13,20,22 | **actions**   1:6 | 190:10 192:8 | 375:2 376:5 |
| 112:6,18,21 | 77:4 86:22 | 192:16,20 | 377:8 378:12 |
| 114:14 117:4,7 | 89:12 93:9 | 193:15 194:20 | 388:9 399:3 |
| 117:12,22 | 95:11 96:18 | 197:1,20 | 413:8 422:10 |

CONFIDENTIAL

## [actions - affidavit]

425:3 433:7,20
434:14 436:18
457:1 458:24
**activity** 378:19
384:14 385:9
385:14
**acts** 37:4
**actual** 23:19
35:24 68:12
76:7,22 139:22
146:13 149:8
196:7 215:14
310:24 311:12
331:7 332:14
402:7 405:11
406:2 447:22
448:1,6,8
450:7,9
**actualities** 81:6
**actually** 31:11
32:9 60:22
147:24 148:20
149:2,10,17,19
152:5 175:13
183:12 207:24
209:1 222:2
238:19 257:12
269:18 270:12
305:17 308:16
310:23 311:10
312:1,23 314:8
314:15 315:2
315:20 340:5
342:8 345:18

357:2 384:10
397:16 428:9
430:14 450:17
**add** 22:12 45:3
198:18 267:15
267:16
**added** 443:15
**addicted** 185:2
185:13,24
186:16 187:5
187:18
**addiction** 1:4
11:22
**adding** 105:7
121:5
**addition**
105:15 253:16
308:14 316:13
368:4 420:2
**additional** 23:1
23:3,18 44:24
49:5,10,22,24
54:22 76:24
78:9,13 82:4
130:11 137:2
151:16,20,22
194:15,15
196:1 198:18
240:10 253:7
254:24 255:2
274:19 275:20
308:6 311:20
312:12 316:18
323:1,15 324:3

326:3 345:22
379:12 384:3
396:4 419:5,10
**additionally**
306:21
**address** 32:6
191:4,16
341:10
**addressed**
446:23 447:6
**addresses**
167:7,7,8,9,14
167:14,15,16
167:17,17,18
167:19,20
**addressing**
188:18 189:6
189:14 191:24
192:17
**adds** 375:20
**administrative**
36:4
**admission** 70:1
70:2
**adolescent** 1:3
11:22 128:21
**advance** 221:22
369:21 414:6
**affect** 281:20
282:12 283:15
284:8 285:10
286:4,15 375:9
395:3

**affiant** 195:19
**affiants** 212:8
285:24 425:12
425:14
**affidavit** 8:9,11
8:13,14,20
86:18 89:22,24
115:14,21,24
116:4,7 119:5
123:2,4 124:5
124:12,15,21
125:4,8 126:3
127:3,4,16,18
128:1,6,19,22
131:1,11
153:19 154:1
154:13,18
155:2,7,11
156:9,16,24
161:4 166:5,18
166:22 167:24
168:9,20,21
169:21,23
170:22 171:8
172:1,6 177:18
177:21 200:17
205:6 211:13
219:9,22 221:8
221:23 222:23
225:18,23
226:21 227:23
230:9 231:11
245:15 266:4
266:19 281:13

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[affidavit - agree]**                                                        Page 7

| | | | |
|---|---|---|---|
| 281:19,21 | 340:1,15 341:9 | 162:18 163:15 | 104:24 274:7 |
| 282:3,10,14 | 342:14,17 | 164:17,18 | 307:15,22 |
| 283:5,6,23 | 348:17,23 | 165:19,21 | 344:20 345:3 |
| 284:7,9 285:19 | 349:3,6,11,14 | 166:14 170:8 | 377:22 379:20 |
| 285:23 286:3,6 | 349:18,22 | 171:13 176:18 | 395:16,21 |
| 287:3,10,17,23 | 350:4,9,23 | 177:1,8 178:13 | 431:10,19 |
| 288:4,7,17 | 351:4,7,19 | 178:17,24 | **afternoon** |
| 289:8,13,16,22 | 352:1,23 358:2 | 179:5,11,14 | 50:22 |
| 290:13,18,19 | 360:1 361:16 | 185:21 186:3,4 | **aggregated** |
| 291:1,8 292:24 | 362:16 363:1 | 211:7,20 212:5 | 184:3 |
| 293:3,5,10,13 | 363:15 364:5 | 212:15,17 | **agnello**   3:10 |
| 293:19,20,23 | 456:21 | 217:20 218:6 | **ago**   46:2 71:2 |
| 294:2,7,21 | **affidavit's** | 218:12,16 | 292:22,23 |
| 295:13,14 | 169:24 | 220:20,22 | 322:22 449:2 |
| 298:7 301:13 | **affidavits**   41:1 | 222:9,12,21 | **agree**   24:3,11 |
| 302:9 304:24 | 41:7,21 89:7 | 223:23 224:5,9 | 25:4 79:16 |
| 305:5,15,19 | 89:19 90:5 | 224:24 225:14 | 82:23 85:12 |
| 306:2,11,13,14 | 108:9,12 115:8 | 226:19 227:1 | 99:17 104:2,11 |
| 307:9 308:16 | 116:11,15 | 227:12,22 | 112:6 114:15 |
| 308:24 309:2,8 | 117:4,11,22 | 228:6,11,15,23 | 116:19 123:19 |
| 309:14,21 | 118:7,10,15,20 | 229:3 230:8 | 127:23 134:7 |
| 311:8,17 | 119:10,11 | 231:2,20 246:6 | 134:10 135:10 |
| 313:10 315:22 | 120:4,9,19 | 246:14,19 | 144:9 146:16 |
| 316:9,14 317:1 | 121:17 122:2,8 | 255:8 264:22 | 147:22 148:14 |
| 318:19 319:5 | 122:12,14,17 | 266:20 267:1 | 153:4,13 |
| 319:15,18,21 | 123:7,10,17 | 268:17 280:23 | 161:21 191:11 |
| 320:10,17 | 126:12 129:10 | 281:5 283:10 | 193:2 200:10 |
| 321:20 322:14 | 129:22 130:8 | 283:13,17 | 209:7,11 229:7 |
| 326:22,24 | 131:22 132:3 | 285:5,8,11 | 233:11 249:13 |
| 327:5 328:2,10 | 132:17 133:9 | 286:11,13 | 257:16 297:9 |
| 331:14 332:16 | 134:3 136:20 | 294:11 305:10 | 297:10,18 |
| 333:22 334:19 | 143:9 144:3 | 306:24 317:15 | 313:1 334:14 |
| 338:15 339:4,6 | 145:8 152:15 | **affiliated**   43:14 | 338:20 370:19 |
| 339:10,10 | 154:7 161:18 | 51:11,16 | 387:9 415:12 |

[agree - allocation]                                        Page 8

| | | | |
|---|---|---|---|
| 443:16 447:15 | 163:10 164:21 | 278:12,23 | 321:20 322:10 |
| 449:6 452:21 | 165:6,10,14,22 | 279:19 282:20 | 326:22 327:1 |
| 454:18,23 | 166:1,3,9 | 285:1 289:23 | 327:13 331:14 |
| 456:4 | 167:1 168:4,23 | 290:15 291:24 | 332:16 334:10 |
| **agreed**   11:3 | 172:9 173:1 | 300:1 321:14 | 334:15 338:15 |
| **agreement** | 175:5,22 176:2 | 330:23 354:17 | 339:23 341:9 |
| 72:18 | 176:13 185:5 | 355:16 359:17 | 343:10 350:17 |
| **ahead**   13:10 | 185:17 186:6,9 | 360:4,6 364:3 | **allison's**   124:20 |
| 44:7 103:6 | 186:20,23 | 375:2 376:4 | 125:3,8 127:17 |
| **allegation** | 188:9 189:9 | 377:7 378:12 | 128:6 168:17 |
| 130:1 262:17 | 190:10 192:8 | 388:9 399:2 | 168:19 327:5 |
| 299:3 | 192:15,20 | 401:22,22 | 328:2,9 333:22 |
| **allegations** | 193:14 194:19 | 402:23 413:8 | 339:6 |
| 170:24 229:16 | 197:1,20 | 422:9 425:2,3 | **allocable**   207:1 |
| **alleged**   86:21 | 198:10,22 | 433:7,20 | 273:19 411:24 |
| 89:11 95:10 | 199:10 200:20 | 434:14 436:16 | **allocated** |
| 96:17 97:21 | 201:5 202:18 | 436:17 447:23 | 141:21 204:15 |
| 98:20 99:11 | 203:5 204:9,15 | 456:24 458:24 | 236:1 237:19 |
| 100:1,14 | 204:19 206:4 | **allegedly**   77:4 | 254:16 387:7 |
| 105:24 107:15 | 207:2 223:10 | 102:19 103:3 | 407:1 413:18 |
| 113:6 116:23 | 227:19 231:22 | 224:1 252:24 | 413:22 428:12 |
| 117:18 118:2 | 238:22 239:4 | **allison**   8:10 | **allocating** |
| 119:1,7 120:12 | 243:6 244:12 | 115:24 116:1 | 161:8 |
| 120:24 121:22 | 245:21 247:5 | 124:6,12 | **allocation** |
| 122:3 125:23 | 248:16 251:20 | 125:15 166:17 | 40:23 41:5,17 |
| 127:13 129:18 | 253:21 254:9 | 166:18,22 | 103:13,18 |
| 130:3,20 | 254:13,20 | 167:23 168:1 | 104:1 105:9,21 |
| 131:17,18 | 255:12,18,20 | 168:14 169:9 | 106:4,7,13,17 |
| 132:8 133:2 | 256:7,24 | 169:22 170:15 | 107:1,8,12,18 |
| 136:10 137:14 | 258:13 262:5 | 225:19 229:18 | 107:23 108:1 |
| 138:19 139:12 | 263:7 265:5 | 289:12 301:13 | 108:23 109:4 |
| 141:9 143:19 | 266:7 268:1 | 318:20 319:6,9 | 109:22 110:9 |
| 145:14 155:16 | 269:4 270:2 | 319:19,23 | 110:14,24 |
| 160:18 161:6 | 272:7 273:20 | 320:8,11 321:1 | 111:9,14,18,22 |

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[allocation - amount]**                                                    Page 9

| | | | |
|---|---|---|---|
| 112:4,15 | 208:18,22 | 350:5,10 | 387:12 388:2 |
| 114:12 115:9 | 217:20 218:6 | 361:22 363:16 | 388:15 389:5 |
| 115:22 116:5 | 218:11,18 | 365:12 366:6 | 389:18 390:9 |
| 116:12,14 | 220:21 221:1 | 368:3 375:6,10 | 390:21 394:2 |
| 117:3,10,21 | 222:2,11,22 | 376:18 380:11 | 429:10 |
| 118:12,14 | 223:16,18 | 380:18 381:2,4 | **altos** 385:10 |
| 120:3,8,18 | 224:3,8,11,23 | 381:8 382:15 | **amanda** 1:18 |
| 121:13,16 | 225:12,16,22 | 387:2,24 389:4 | 12:6 463:10 |
| 125:19 129:9 | 226:2,11 247:4 | 389:17 390:8 | **amend** 23:3 |
| 129:13,23 | 247:11 253:24 | 391:9,14 392:3 | 295:12 339:16 |
| 130:7 131:9 | 254:10 257:11 | 393:16 395:13 | **amended** 8:21 |
| 132:22 133:1 | 258:17 259:7 | 396:17 397:8 | 9:11,14 295:17 |
| 133:19 134:6 | 261:7 262:3 | 397:12,19 | 295:19 319:18 |
| 134:15,19 | 266:6 267:22 | 398:1,8,17 | 320:16 362:18 |
| 135:14 136:8 | 280:20 281:2 | 399:1 401:11 | 364:19 365:4 |
| 136:16 137:7 | 281:10,21 | 402:9 403:10 | 374:13,14 |
| 137:13,20 | 282:13 283:16 | 403:22 405:22 | 380:14,21 |
| 138:11,22 | 283:22 284:6,9 | 413:19 420:23 | 386:14,21 |
| 139:9 140:24 | 285:11,18 | 425:16 432:7 | 396:20 398:4 |
| 143:8 144:8,11 | 286:2,5,16 | 432:13,22 | 398:12 400:16 |
| 144:19 145:1,7 | 287:11,19 | 433:10,17 | 400:24 401:4 |
| 153:22 154:16 | 288:2 298:21 | 434:15 435:1 | 407:17 432:10 |
| 156:9,15 157:7 | 299:15,21 | 436:15,22 | 432:16 433:4 |
| 157:23 158:8 | 305:11,18,24 | **allocations** | 447:7 |
| 158:21 160:21 | 306:7,16 | 273:11 292:5 | **amends** 376:12 |
| 161:11,17 | 318:17 319:2 | 292:13 307:4 | **amount** 61:9 |
| 162:19 169:17 | 322:7 327:2,10 | **allow** 78:8 | 78:10 95:24 |
| 175:16 184:11 | 328:10,24 | 190:17 311:3 | 97:6,16 98:3 |
| 185:22 186:14 | 330:14,19 | 311:19,21 | 99:3,14 100:4 |
| 195:9,14 196:3 | 331:4 341:1,15 | **allowed** 455:15 | 104:4 108:20 |
| 196:14,18,22 | 341:24 343:2,6 | **allowing** 32:16 | 133:6 158:12 |
| 197:6,11 | 343:20 344:1,4 | **alto** 382:4,10 | 159:2 195:15 |
| 203:20 204:6 | 344:15 348:5 | 383:1,2 384:18 | 196:23 197:7 |
| 206:9 207:17 | 348:15,20 | 385:18,22 | 197:12 211:1 |

CONFIDENTIAL

247:24 248:3,6
268:21 269:17
270:11 333:15
335:21 393:22
404:7 415:8,15
415:18 417:4,6
429:1 430:4
444:6 449:24
450:7,10
451:11,12
453:10,19
455:1
**amounts**   49:5
210:18 310:24
311:9,11,11
338:19 340:22
429:14
**analysis**   26:9
32:14 75:8
82:12 106:16
180:20 192:13
241:15 264:16
266:12 276:17
280:18 308:9
407:11 408:20
422:8 444:11
**analyst**   36:16
**analysts**   36:18
**analyze**   33:20
34:13 41:11
**analyzed**   221:5
268:10
**analyzing**
387:18 405:3

**andrew**   390:15
**anita**   334:21
**answer**   10:5
13:3 31:15
38:24 46:22
47:7 56:12
57:19 59:5
66:17 70:17
77:18 83:23
90:5 91:11
97:3,14,24
99:1 100:21
101:6,14,23
102:9 120:16
121:3,5 123:10
128:18 129:1
137:12 159:19
162:14 170:16
170:19 171:2,4
174:10 179:7
186:10,24
187:7,20 188:5
188:14,22
189:2 190:14
193:17 205:11
209:20 216:16
222:18 223:19
224:17 228:21
229:22 230:24
240:20 269:22
275:15 300:20
303:15 326:12
334:23 337:14
345:6 355:6

360:13 366:10
373:3,14,20
374:7 380:10
381:14 392:15
392:19 397:9
410:2 417:15
423:22 425:7
458:11
**answered**
100:9 127:21
133:13 139:3
163:3 166:11
177:12 184:14
187:10 423:21
**answering**   54:6
90:1 113:23
162:13 163:17
**answers**   8:17
9:14 31:9
93:18 129:3
172:8 195:13
214:14,15,21
215:3 328:6
329:10,17
330:11 396:20
398:4,12
400:16,24
401:4 432:4,10
432:17 433:5
435:24 447:7
466:4
**anticipate**
49:21

**anticipating**
363:12
**anybody**
226:14 363:18
373:10 412:16
435:14 460:13
**anymore**   71:17
**anyway**   190:6
**apologies**
350:15 366:2
**apologize**   37:19
339:15
**appear**   21:4
337:6
**appearances**
2:1 3:1 4:1 5:1
**appears**   305:7
371:13 372:15
441:17 442:21
444:1,2
**appendix**   203:9
323:10 425:23
439:17,19
442:3 447:19
448:15
**applicable**
411:12 435:1
456:23
**application**
322:6 389:10
**applied**   299:16
299:21
**apply**   97:10
207:17 389:4

**[apply - assign]**                                                        Page 11

390:8 411:11
413:5 456:23
463:18
**applying**
387:24 434:15
**apportion**
183:14,21
**apportioned**
98:9
**apportionment**
96:12 97:12
98:13,22 196:4
**appropriate**
139:17 272:16
272:23 375:11
389:16 391:9
391:14 464:6
**approximate**
86:12 333:14
403:6,17,24
404:1,4,8
406:1,5,7,12,20
407:14,15
408:3,7,11,13
411:17,18,23
414:21 416:5
416:13,17
418:4,22
420:10 422:7
422:23 423:17
424:20
**approximately**
58:7 64:8,14
64:21 65:1,10

65:19 367:10
367:14 415:24
420:7 423:11
**approximates**
402:3
**approximation**
404:11
**apps** 461:23
**april** 323:24
324:21 328:7
329:13 380:16
380:23
**arbitration**
62:15
**archdiocese**
67:14
**arising** 169:5,9
**arizona** 451:18
**arrive** 217:19
218:5,11,18
223:17
**arrived** 381:8
393:16 398:17
432:22 433:10
**arriving** 220:21
222:10,21
**ascher** 29:10
**asher** 8:6 33:7
33:11 34:16
35:8,16,17
37:16 38:1
43:4,10,15
44:20 45:11
46:10,16,19

47:3,4,6,10,14
47:16,18 48:4
48:13,18,24
49:1,8 59:22
60:2 63:2
312:1,20
**asher's** 59:23
**ashley** 29:9
**aside** 27:2
178:7,10
202:21 306:12
314:21
**asked** 40:20
75:7 82:2
89:17 100:9
106:20 114:3
127:21 133:13
150:13 151:15
162:4,6,9
163:3 166:11
172:13 177:12
184:14 187:10
208:16 224:10
225:1 234:21
236:3 239:13
239:22 240:1
240:12 241:4
252:14 253:11
295:21 311:16
336:22 342:11
372:18,22
373:8 404:22
405:7 407:10
408:19 409:6

424:17
**asking** 13:2
25:10 27:1,2,6
29:24 55:8
60:1 84:20,24
93:1 103:22
106:2 108:15
110:16 113:11
113:14,20,23
121:8 122:20
123:1 138:6
139:22 146:19
167:3 168:11
168:16,18
191:6 208:9
266:9 277:18
289:10 294:24
295:8 311:4
320:2,4,7
328:16 329:6
337:13 341:8
352:7 366:1
379:6 392:13
409:23 411:5
428:19 435:22
443:22 453:3
460:8
**aspects** 169:13
170:1 171:17
**assert** 337:10
**asserting**
336:11 340:2
**assign** 205:7
282:21 373:10

**[assigned - attorney]**                                        Page 12

| | | | |
|---|---|---|---|
| **assigned** 141:8 | 35:8,15 36:2 | 434:17 | **attesting** 311:8 |
| 204:7 208:6 | 36:22 37:2,8 | **assumes** 159:16 | **attorney** 6:6 |
| 282:3,10 | 37:15,24 | 258:24 | 12:15 13:9,24 |
| 283:12 285:7 | **assistant** 37:5 | **assuming** | 14:2,16 15:6 |
| 286:12 369:5 | 378:3 | 138:13 211:2 | 15:19 16:10 |
| 369:13 374:4 | **assisted** 33:14 | **assumption** | 17:1,17 18:7 |
| 375:8 388:10 | 37:10 69:23 | 138:3 144:10 | 18:21 19:10,23 |
| 424:24 436:21 | **associate** 36:20 | 165:5 186:5 | 20:13 32:23 |
| 437:1 | **associated** | 244:21 390:16 | 33:3 42:23 |
| **assigning** | 251:22 264:10 | 391:7,13 | 43:7 51:15,22 |
| 208:13 | 269:3 298:21 | **assumptions** | 52:7 69:7 87:9 |
| **assignment** | 299:1 302:21 | 103:20,20 | 87:21 97:2,4 |
| 39:19,22 40:5 | 342:22 388:11 | 132:12 443:23 | 100:8,18,24 |
| 40:23 41:5 | 402:22 404:10 | **attached** 25:2,2 | 114:18 115:4 |
| 74:9,14 81:9 | 431:4 | 85:22 362:6 | 121:9,11 |
| 81:20 82:19 | **associates** | 366:14,16,19 | 122:19,23 |
| 83:10 84:1 | 33:14 | 464:12 466:6 | 123:22 124:9 |
| 144:16 145:17 | **association** | **attachments** | 127:20 128:2 |
| 217:17 218:3 | 36:17 | 353:2 | 128:11,16 |
| 233:6 234:14 | **assume** 27:7 | **attempt** 180:6 | 133:11 134:1 |
| 235:10 236:6 | 59:24 108:22 | 181:4 189:23 | 135:17 136:13 |
| 238:2 239:6 | 110:16 113:8 | 456:9 | 136:18 137:4 |
| 280:6 318:3,9 | 113:20 114:2 | **attempting** | 139:1,15 |
| 348:11 380:5 | 119:17 120:2,7 | 424:18 | 140:14 141:11 |
| 396:11 409:4 | 120:17 121:12 | **attempts** | 141:18 143:2 |
| 411:8 413:3 | 121:15 127:2 | 350:19 358:24 | 145:3,6 146:10 |
| 414:4 420:20 | 133:8,14 157:6 | **attend** 71:16 | 146:17 150:9 |
| 421:2 431:23 | 157:14,22 | **attention** 23:2 | 152:9 153:7,17 |
| **assigns** 284:21 | 185:10 191:6 | **attest** 283:7 | 153:23 154:11 |
| **assist** 72:16 | 294:24 295:9 | 319:16 355:14 | 154:19 155:21 |
| 216:3 | 299:9 320:3 | **attested** 86:17 | 157:12,18 |
| **assistance** 31:5 | **assumed** 109:3 | 216:6 265:2 | 158:16,19 |
| 32:19,22 33:4 | 129:14,24 | 284:19 | 159:7,20 160:3 |
| 33:9 34:16 | 354:4 422:11 | | 160:6,12,15 |

CONFIDENTIAL

**[attorney - attributable]**                                        Page 13

| | | | |
|---|---|---|---|
| 162:1,16 163:2 | 232:2,9,15,18 | 342:13 343:4 | 441:12 444:21 |
| 164:14 166:10 | 233:4 241:21 | 343:17 349:16 | 445:5 452:2 |
| 166:15 167:11 | 243:18 249:15 | 350:2 351:9,17 | 453:1,20 |
| 167:21 170:13 | 249:18 250:23 | 355:2,19 356:1 | 454:10,14,22 |
| 170:17 173:6 | 251:8 254:3,17 | 356:4 361:24 | 455:4,21 457:8 |
| 173:16 174:20 | 254:22 255:6 | 362:9 364:13 | 457:18 459:9 |
| 175:24 177:11 | 256:3,9 257:14 | 364:24 365:2 | 459:19 462:2,4 |
| 178:2 180:11 | 258:15,22 | 367:16 368:7 | 464:16 |
| 181:2,9,18 | 259:5 262:12 | 368:15 370:8 | **attorneys**   28:12 |
| 182:1,4,11,19 | 264:14 268:23 | 370:10,22 | 28:18 29:7,10 |
| 184:13,23 | 269:9,20 270:7 | 371:9 373:15 | 31:1,6 32:20 |
| 187:9,14 188:6 | 270:13,18 | 373:21 374:5 | 38:2,18,23 |
| 188:16 189:17 | 271:13 272:12 | 375:4,13 | 39:2,8,11 |
| 189:21 190:22 | 272:19,21 | 376:15,21 | 50:14,17 51:7 |
| 191:2,18,20 | 281:22 282:1,5 | 377:9,19 386:7 | 51:11 57:17,22 |
| 192:21 193:20 | 282:8,15 283:9 | 386:19 387:15 | 108:2,4,16 |
| 194:7,10 | 283:24 284:4 | 387:22 389:7 | 150:2,6 214:4 |
| 205:20 206:7 | 284:10 285:4 | 389:14 390:24 | 214:10,20 |
| 206:17 207:14 | 285:13,16 | 391:4 392:6 | 215:8,11,24 |
| 209:6,13,19 | 286:23 287:8 | 393:14 394:7,9 | 216:9 224:7,16 |
| 210:16,21 | 292:7,11 297:7 | 394:15,21 | 224:22 226:3 |
| 211:6 214:6 | 297:12,16,22 | 400:11,22 | 226:12,24 |
| 215:4,20 216:5 | 297:24 298:2 | 404:14 406:15 | 227:11 228:14 |
| 217:22 218:1 | 300:9,13 301:8 | 407:3,7 408:9 | 228:15 241:14 |
| 218:20 219:6 | 302:1 304:9,19 | 408:14 409:11 | 282:4,12 |
| 219:14,18 | 305:4 309:4,13 | 409:22 410:9 | 283:14 294:9 |
| 220:2,17,23 | 315:5,7 320:1 | 412:5,13,18,19 | 324:8,17 325:9 |
| 221:10 222:24 | 320:6,13,22 | 413:24 414:18 | 341:22 409:6 |
| 223:13 224:12 | 325:3,7 329:7 | 419:18,19 | 410:6 418:10 |
| 224:20 225:3 | 330:2,6 333:17 | 421:5,8,10,16 | 418:15 419:16 |
| 225:11 226:5,8 | 334:5 336:18 | 430:23 431:5 | 421:4,9,12,15 |
| 227:5,9,14 | 338:5,10 | 437:10,16,21 | **attributable** |
| 228:4 229:4 | 339:21 341:18 | 437:24 438:10 | 95:16 131:2,5 |
| 230:5 231:12 | 341:20 342:2 | 438:21 441:1 | 132:1,19 134:4 |

**[attributable - basis]**                                    Page 14

| | | | |
|---|---|---|---|
| 140:3,12 | **avenue** 2:10 | 447:19 448:15 | **banned** 456:2 |
| 141:15 145:20 | 4:16 | **back** 31:8 | 457:6,24 458:8 |
| 146:2,8 157:9 | **average** 58:18 | 57:10 70:24 | **bans** 456:18,19 |
| 158:1,10,23 | **award** 259:23 | 84:5 87:19 | 457:4,10 |
| 181:21 182:7 | **aware** 28:7 | 90:8 109:13 | 458:15,20 |
| 183:1,6 194:5 | 46:5 125:16 | 173:14 182:2 | **based** 47:20 |
| 245:6 251:11 | 172:22 223:1 | 184:4 185:6 | 80:24 86:14 |
| 252:10 261:3 | 240:3 255:14 | 202:2 219:16 | 101:7 102:1,11 |
| 261:21 271:2 | 262:7,13 | 223:20 233:2 | 105:22 116:20 |
| 288:8,19 289:1 | 265:18 271:8 | 236:15 237:7 | 130:1 186:6 |
| 327:16,22 | 271:14 282:2 | 253:5,10 263:8 | 246:5 290:3 |
| 334:12,17 | 283:21 293:24 | 269:22 275:16 | 301:12,18,19 |
| 336:16 361:4,6 | 352:18 373:9 | 278:19 304:17 | 307:5 331:13 |
| 377:6 | 375:15 376:16 | 311:3 318:13 | 363:23 379:1 |
| **attribute** 265:5 | 385:19 390:18 | 322:9,24 358:1 | 382:22 405:10 |
| 267:21 272:17 | 394:10,17 | 359:9 370:12 | 417:8 448:11 |
| 272:24 273:4 | 395:9 416:18 | 377:17 385:8 | 457:17 |
| **attributing** | 416:19,21 | 385:13,15 | **bases** 21:19 |
| 372:24 | 417:2 423:24 | 394:20 419:2 | **basically** 40:9 |
| **audit** 147:8,11 | 424:6 437:17 | 446:22 448:13 | 41:12 |
| 313:3,4 | 437:22 438:5 | 450:18 459:17 | **basis** 22:10 |
| **audited** 32:7 | 445:12,13 | **bacon** 2:16 | 42:6 50:1,4 |
| 110:2 151:19 | 449:17 457:9 | **bad** 248:19 | 89:14 121:24 |
| **auditor's** 75:5 | 457:15 | 259:18 | 122:16 123:3 |
| **audits** 148:2 | **b** | **bag** 55:15 | 126:2,8,10 |
| **august** 1:9 | **b** 6:9 7:2 8:2 | 337:2 | 149:17 156:20 |
| 11:14 49:15,19 | 9:2,7 104:10 | **balance** 310:14 | 168:18 267:19 |
| 463:11 | 111:18 135:8 | 310:15 324:10 | 284:13 319:22 |
| **automobile** | 135:12 370:16 | **ball** 198:8 | 320:10 323:20 |
| 259:17 | 370:18 371:4 | 286:22 | 328:23 330:24 |
| **available** 31:19 | 371:11 401:19 | **ballpark** 58:12 | 339:19 340:2 |
| 31:23 32:15 | 402:17 422:17 | **ban** 455:2 | 340:24 369:16 |
| 147:6 315:15 | 439:17,19 | 456:9 459:3 | 376:17 382:14 |
| 316:16 325:22 | | | 387:23 389:10 |

**[basis - best]**                                              Page 15

| | | | |
|---|---|---|---|
| 399:5,22 | **behalf** 14:8,22 | 142:10,12 | 449:7 450:9 |
| 416:24 421:24 | 15:10 16:1,16 | 146:14 157:4 | 454:16 456:6 |
| 450:3 | 17:6,23 18:13 | 169:2,3,8 | 456:12 |
| **bates** 6:12,15 | 19:2 20:5,18 | 209:21 214:18 | **believed** 181:20 |
| 6:17,20 7:5,7 | 26:11,13,14,17 | 218:22 224:15 | 182:6 183:1 |
| 7:10,12,15,17 | 26:18 216:1 | 230:15,22 | 292:20 293:6 |
| 7:20,22 8:9,11 | 301:23 | 245:13 251:18 | 293:14 376:8 |
| 8:12,14,16,19 | **behavior** | 265:24 274:16 | 408:11 413:18 |
| 8:21 9:5,7,10 | 256:12,20 | 277:15 284:2,3 | 421:21 422:1 |
| 9:13 13:16 | 451:15 | 302:8,18 303:4 | 424:12 |
| 14:11 15:1,14 | **behavioral** | 303:16 305:21 | **believes** 255:24 |
| 16:5,20 17:12 | 191:4,12,17,24 | 310:6 318:21 | 283:22 284:2 |
| 18:2,16 19:5 | 192:18,23 | 323:5 339:1 | 284:14 285:8 |
| 19:18 20:8 | 193:4,19 | 340:1 343:22 | **bellwether** |
| 124:5 147:13 | **belief** 118:19 | 347:1 348:19 | 20:22 21:9,19 |
| 287:3 304:24 | 168:20 169:23 | 349:1 350:7 | 23:8 30:24 |
| 309:8 310:6 | 296:11 382:8 | 351:13 352:14 | 107:2,11 |
| 316:7 323:8,12 | 448:7 | 353:3,20,24 | 111:19 144:18 |
| 324:4,14 326:4 | **believe** 21:1 | 355:6 360:17 | 144:24 145:18 |
| 326:9 329:16 | 22:1 25:5 26:7 | 362:12,18 | 145:24 146:6 |
| 347:1 349:22 | 26:21 38:21 | 363:17 365:8 | 211:24 |
| 364:18 368:11 | 42:9 51:14,18 | 379:8 381:19 | **bellwethers** |
| 371:3 386:12 | 51:20 52:14 | 383:18 384:10 | 25:7 30:14 |
| 400:15 438:23 | 58:2 65:13 | 391:21 392:1 | 104:21 132:13 |
| 439:7,12 440:3 | 72:10 80:17 | 392:17 399:9 | 251:19 265:20 |
| 441:16,23 | 82:14 92:18 | 407:5 413:13 | 317:17 420:16 |
| 442:23 443:1 | 93:2 95:22 | 414:2,13 416:9 | **beneath** 248:22 |
| 446:22 | 104:20 109:21 | 421:24 425:12 | **beneficial** |
| **bear** 437:13 | 111:13 112:24 | 425:14,17 | 280:14 |
| **bears** 437:8 | 117:6 118:14 | 431:13 432:19 | **benefit** 79:8,12 |
| **becker** 3:11 | 119:18 123:19 | 434:1 436:2 | 80:10 83:17,21 |
| **beepers** 201:1 | 130:9 135:20 | 437:5 439:9 | 87:2 205:8 |
| **beginning** 84:6 | 135:22 136:21 | 446:23 447:3,8 | **best** 13:7 81:1 |
| | 139:17 142:1 | 448:11,21 | 81:18 129:2 |

CONFIDENTIAL

**[best - buckets]**                                                    Page 16

| | | | |
|---|---|---|---|
| 198:11 199:7 | **blocks** 359:11 | **bp** 72:12 73:1 | 322:10 451:2 |
| 201:19,24 | 443:14 | **break** 13:5 | **breathitt's** |
| 426:22 427:24 | **board** 6:21 | 59:19 87:7,10 | 279:5 |
| **better** 91:11 | 7:18 9:10 | 173:7 184:4 | **brief** 87:16 |
| 98:24 103:7 | 15:15 16:1 | 232:17,19 | 173:11 304:14 |
| 152:24 153:1 | 19:6,15 66:5 | 304:10 377:10 | 377:14 459:14 |
| 176:15 196:12 | 66:14,21,24 | 459:10 | **bring** 371:22 |
| 303:24 | 67:1,3,6,15,22 | **breaking** 173:5 | **british** 72:13 |
| **beyond** 159:14 | 68:4,8,18,23 | **breathe** 426:3,6 | **broad** 4:10 |
| 202:10 258:5 | 69:13,15,17,19 | 426:11 427:3 | **broader** 91:4 |
| **big** 69:21 72:14 | 386:13,20 | **breathitt** 6:13 | **brody** 3:9 |
| 383:6 | 453:9 | 7:11 13:17 | **broke** 278:19 |
| **bilateral** 142:5 | **boards** 66:1,7,9 | 14:5,8 17:13 | **broken** 59:21 |
| **bill** 45:24 | 66:20 67:21 | 17:20,23 20:23 | **brother** 69:5,14 |
| **billed** 42:18 | 79:15 | 21:11 26:10 | 69:22 70:4 |
| 43:17 45:1,4 | **body** 279:24 | 115:7,12,14 | **buchanan** 4:9 |
| 45:12,17 46:12 | 444:4 | 116:10 156:2,6 | **bucket** 32:11 |
| 48:16,22 50:3 | **bolster** 24:9 | 156:10 200:15 | 60:20 61:16,20 |
| **biller** 45:10 | **bonnin** 3:16,16 | 203:8,23 | 61:23 62:3 |
| 46:10 | **booked** 237:2 | 207:23 208:1 | 175:10,11,17 |
| **billing** 45:22 | **boots** 273:17 | 211:9,13 | **buckets** 36:7 |
| 49:22 | 456:14 | 212:14 225:13 | 38:13 60:6 |
| **billings** 43:13 | **borne** 202:6 | 229:12 252:3,6 | 73:4 103:15 |
| **bills** 46:7 | 234:23 235:22 | 252:19 260:18 | 104:11 135:7 |
| **binder** 13:12 | 237:6 247:6 | 274:1,7 277:9 | 147:15 175:8 |
| 17:8 | **bottom** 366:9 | 277:19,22 | 207:13 237:21 |
| **bipc.com** 4:12 | 366:23 370:1 | 280:7,21 281:3 | 239:12,19,21 |
| **biscayne** 5:5 | 372:8 | 287:12,20 | 240:7,7,13,19 |
| **bit** 35:6 47:15 | **boulevard** 2:17 | 288:2 298:5,12 | 241:5,9,17 |
| 269:13 322:9 | 5:5 | 300:4,15,20 | 242:11,13 |
| 358:20 | **box** 201:20,22 | 301:1 305:11 | 243:1 244:22 |
| **block** 350:19 | **boy** 67:7 | 306:1,8,16 | 267:7 315:11 |
| 359:1 | **boyce** 5:4 | 307:5 316:23 | 332:11 334:2 |
| | | 318:14 322:4 | 337:4 |

CONFIDENTIAL

**[budget - calculated]**                                    Page 17

| | | | |
|---|---|---|---|
| **budget** 31:20 | 173:6,16 | 330:2,6 334:5 | 62:7,11,12 |
| 32:6 233:14 | 175:24 178:2 | 338:5 339:21 | 71:9,13,22 |
| 234:10 325:23 | 181:2,18 182:4 | 341:20 342:13 | 74:7 78:2 |
| **budgets** 243:14 | 182:19 184:23 | 343:17 349:16 | 201:15 202:2 |
| **building** | 187:14 188:16 | 350:2 351:17 | 236:14 378:4 |
| 201:16 | 189:21 191:2 | 355:19 356:4 | **buy** 201:20,22 |
| **bullying** 173:17 | 191:20 193:20 | 362:9 364:13 | **byrne** 3:9 |
| 173:20 | 194:10 206:7 | 365:2 367:16 | **byron** 9:9 |
| **bunch** 69:23 | 207:14 209:13 | 368:7,15 | 29:19 220:6 |
| **bushur** 2:9,12 | 210:16 211:6 | 370:10,22 | 277:11 302:8 |
| 6:6 12:15 13:9 | 215:4 218:1 | 371:9 373:21 | 344:21 345:4 |
| 13:24 14:2,16 | 219:6,18 | 375:4 376:15 | 362:5 366:13 |
| 15:6,19 16:10 | 220:17 221:10 | 377:9,19 386:7 | 367:20 370:16 |
| 17:1,17 18:7 | 223:13 224:20 | 386:19 387:22 | 371:6 |
| 18:21 19:10,23 | 225:11 226:8 | 389:14 391:4 | **bytedance** 5:8 |
| 20:13 33:3 | 227:9 228:4 | 393:14 394:9 | 5:8 |
| 42:23 43:7 | 230:5 232:2,18 | 394:21 400:11 | **c** |
| 51:22 52:7 | 233:4 243:18 | 400:22 406:15 | **c** 104:10 111:4 |
| 69:7 87:9,21 | 249:18 251:8 | 407:7 408:14 | 135:12 203:9 |
| 97:4 100:18,24 | 254:17 255:6 | 409:22 412:5 | 425:23 442:3 |
| 115:4 121:11 | 256:9 258:15 | 412:19 414:18 | **caddies** 203:12 |
| 122:23 123:22 | 259:5 264:14 | 419:19 421:8 | **calculate** 70:20 |
| 124:9 128:2,16 | 269:9 270:7,18 | 421:16 431:5 | 71:21 116:20 |
| 134:1 136:13 | 272:12,21 | 437:16,24 | 382:3 408:24 |
| 137:4 139:15 | 282:1,8 283:9 | 438:10,21 | 409:7,13,19 |
| 141:11 143:2 | 284:4 285:4,16 | 441:1,12 445:5 | 410:6,12 |
| 145:6 146:17 | 286:23 287:8 | 453:1 454:10 | 411:10 412:8 |
| 152:9 153:17 | 292:11 297:7 | 454:22 455:21 | 413:4 415:6,13 |
| 154:11 155:21 | 297:16,24 | 457:18 459:9 | 424:17 445:7 |
| 157:18 158:19 | 298:2 300:13 | 459:19 462:2 | 455:22,24 |
| 159:20 160:6 | 302:1 304:9,19 | 462:10 | 457:4 |
| 160:15 162:16 | 305:4 309:4,13 | **business** 47:21 | **calculated** |
| 164:14 166:15 | 315:7 320:6,22 | 53:13 54:22 | 46:13 70:15 |
| 167:21 170:17 | 325:7 329:7 | 55:17 56:20 | |

CONFIDENTIAL

**[calculated - cancelled]**                                        Page 18

| | | | |
|---|---|---|---|
| 72:7,22 75:15 | 135:1 138:4,8 | 133:15 134:23 | 432:9,15 435:7 |
| 75:19 96:16 | 147:2 149:4 | 137:17 139:18 | 436:5 453:8 |
| 97:20 98:19 | 184:17 203:16 | 144:20 145:2 | **calculator** |
| 99:10,19,24 | 298:5,12,15 | 146:21 148:22 | 44:11 |
| 100:12 111:11 | 302:6 315:2 | 150:8 152:12 | **calendar** 50:6 |
| 133:23 165:10 | 321:23 322:2 | 152:19 157:8 | **california** 1:1 |
| 175:4 181:23 | 322:18 353:9 | 157:24 158:9 | 12:2 |
| 182:9 183:3 | 353:12 354:24 | 158:22 159:21 | **call** 30:18 60:8 |
| 184:8 199:2 | 356:21 375:12 | 160:7 164:2,5 | 60:9 66:11 |
| 235:20 251:16 | 378:11 381:18 | 165:3 190:8 | 78:4,5,23 |
| 252:2 299:20 | 382:18,21 | 195:10 211:21 | 114:7 143:15 |
| 338:13 339:14 | 383:20 395:8 | 212:12 213:7 | 150:20,21,23 |
| 397:15 404:12 | 399:17 400:1 | 233:9 234:17 | 150:24 165:8 |
| 415:19 416:4,7 | 401:18 419:15 | 235:4,12 236:9 | 176:10,11 |
| 416:12 418:16 | 419:15 421:19 | 236:21 256:16 | 188:23,24 |
| 419:1 423:5 | 423:16,19 | 261:16 280:22 | 233:17,20 |
| 459:8 | 424:10,19 | 281:4 287:12 | 257:2 274:17 |
| **calculates** | 433:24 434:6,9 | 287:21 289:2 | 345:17 379:17 |
| 203:7 | 434:21 437:3 | 294:22 299:13 | 406:3,4 455:10 |
| **calculating** | 441:21 442:7 | 300:7,18 301:7 | **called** 33:6 |
| 30:23 40:1 | 446:1,8 457:22 | 302:15 303:3 | 69:20 251:24 |
| 61:1,11 71:12 | 458:6 | 303:14 312:3 | 260:13 310:7,8 |
| 96:9,10 145:11 | **calculations** | 312:22 314:10 | 334:19 383:3 |
| 210:15 223:9 | 22:7 36:1 | 318:19 319:4 | 402:1 422:2 |
| 361:19 409:20 | 40:24 41:6 | 321:9,18 | **calls** 249:22 |
| 422:8 444:17 | 60:9 71:10 | 324:11,20 | **calm** 426:3,7 |
| **calculation** | 95:19 97:10 | 325:11 327:3 | 426:11 427:3 |
| 35:19 40:10 | 102:15,23 | 348:17,22 | **camel's** 278:19 |
| 41:23 43:24 | 104:13 106:5 | 352:21 354:8 | **campaign** |
| 57:3 72:17 | 109:1,6,11 | 355:24 356:9 | 237:19 |
| 76:16 77:6 | 110:8,12,19 | 380:13,20 | **campuses** |
| 103:21 109:10 | 112:19,21 | 396:19 398:3 | 367:11,15 |
| 113:12,15,21 | 113:19 114:6 | 398:10 399:8 | **cancelled** 149:7 |
| 115:5 134:11 | 116:8 124:17 | 399:14 420:2 | |

| | | | |
|---|---|---|---|
| **capability** | **carrying** | 106:17,21 | 350:6 352:11 |
| 312:18 | 286:21 | 107:16 115:1 | 359:22 374:13 |
| **capacity** 54:18 | **case** 1:3 14:5 | 117:16 123:20 | 397:2 407:13 |
| 68:15 370:21 | 14:19 15:8,22 | 125:16,18 | 408:22 410:19 |
| **capital** 237:19 | 16:13 17:3,20 | 126:16 127:9 | 422:9 443:9 |
| 239:14 240:13 | 18:10,23 19:12 | 128:20 140:19 | 456:7 461:14 |
| 241:17 243:13 | 20:2,15 25:20 | 141:23 142:11 | **cases** 20:22 |
| **capitalize** | 25:23 26:3 | 144:16 145:17 | 21:10,13,19 |
| 291:11,16 | 27:13,21 28:6 | 148:17 154:2,4 | 24:14 25:14 |
| **capitalizes** | 28:10,16,21 | 155:7 156:17 | 30:2,13,24 |
| 291:13 | 30:9 33:15 | 157:2 159:12 | 53:21,24 54:24 |
| **car** 61:10 | 34:15 35:7 | 159:14 161:9 | 58:3,24 59:6,6 |
| **care** 60:12 61:8 | 38:19 39:2,10 | 163:17 164:13 | 59:9,11,15 |
| **career** 40:3 | 40:5 41:16,20 | 165:14 172:23 | 60:13,15,17 |
| 57:20 59:1 | 42:4,8,17 | 180:6 181:4 | 61:6,18,24 |
| 71:20 77:24 | 43:10 44:6 | 185:11,16 | 62:5,13,14,15 |
| 210:4 260:11 | 48:8,10 49:14 | 186:19 187:7 | 67:9 72:9,24 |
| **carefully** | 49:18,22 50:9 | 187:20 188:5 | 82:17 96:3 |
| 290:22 464:4 | 58:15 61:7,10 | 188:11 190:11 | 104:22 126:18 |
| **carella** 3:9 | 61:22 67:11 | 200:21 201:6 | 147:10 149:7 |
| **carellabyrne....** | 70:15,19,20 | 202:7 210:2 | 154:23 183:10 |
| 3:12 | 72:7,22 73:17 | 215:12 217:17 | 207:4 211:24 |
| **careplus** 86:5,7 | 74:8,13 75:15 | 218:3 226:7,15 | 212:3 239:17 |
| 410:23 422:19 | 75:20 76:3,10 | 226:19 227:18 | 252:17 258:1 |
| 422:24 423:7 | 76:23 81:9,20 | 233:6 236:4 | 259:22 277:7 |
| 423:17,20 | 82:13,19 84:10 | 239:6 240:3,22 | 312:9 |
| 424:11 | 86:11,21 88:2 | 241:4 242:14 | **catalyst** 200:21 |
| **carlos** 4:4 | 88:8,20 91:3 | 246:12 273:8 | 260:8 |
| 51:20 | 91:15,18 92:2 | 291:20 292:3 | **catastrophic** |
| **caroline** 34:21 | 92:15 93:13,18 | 299:1 302:22 | 61:8 |
| 35:2,3,12 37:9 | 93:22 96:4 | 308:18,23 | **categories** |
| 37:10 | 98:18 99:7 | 309:20 313:7 | 102:16,24 |
| **carpet** 201:18 | 101:5,14,23 | 323:23 328:1 | 332:10 333:20 |
| 201:24 | 102:9 103:9 | 340:6 347:8 | 336:24 367:1 |

**[categories - changed]**                                           Page 20

373:11
**category**  60:7
  332:5,10 333:7
  333:8 335:1,19
  337:19 340:20
  446:12
**catholic**  69:10
**causal**  94:3
**causation**  94:1
  94:4,12,15,19
  94:21 98:12
  174:24 180:21
  258:8
**cause**  23:2
  94:13 174:24
  226:21 229:11
  258:3 260:8
  279:5 295:16
  436:16
**caused**  94:9,18
  96:1,17 97:7
  97:16 98:4
  99:4,15 100:5
  116:23 117:17
  118:2,24 119:7
  129:19 133:4
  137:12,14
  138:18 139:10
  145:13 154:3
  155:15 158:14
  159:5,13
  172:14 194:19
  196:23 224:2
  229:24 243:8

256:6 258:9,13
260:8 265:17
272:6 273:12
279:13 285:1
334:3 425:3
433:6,20
436:19 451:17
451:24 452:19
453:17
**causes**  161:5
**caution**  147:13
**caveat**  24:4
  212:20 239:11
**caveats**  70:6
  271:6
**ccsd**  316:7
  323:13,13
**cdw**  378:9
  382:5,10 383:6
  383:17 385:22
  387:13 388:2
  388:16 389:6
  389:19 390:10
  390:22
**ceases**  192:11
**cecchi**  3:9
**cell**  200:22
  201:1 202:14
  202:22 203:12
  203:12 249:21
  249:23,24
  250:2,3,17
  353:18 357:15
  362:8 363:22

367:2,3,6
369:1,6,17
374:2 375:6,22
376:19 455:2,3
455:15 456:2,9
456:18 457:3,6
457:10,24
458:8,14,19
459:3
**center**  5:4
  429:16
**certain**  22:5
  66:20 83:18
  94:24 103:10
  169:13 170:1
  171:16 176:9
  221:12 239:12
  240:12 241:7
  246:7 308:8
  334:18 336:24
  456:7
**certainly**  75:2
  80:20 184:21
  192:11 210:1
  210:12 220:4
  231:2 257:17
  258:5 263:3,11
  328:1 355:9
  361:9 364:7
  369:21 413:2
  441:22
**certainty**
  175:12

**certificate**
  463:1
**certification**
  11:4 463:17
**certified**  1:19
  36:16,18 63:12
  463:11
**certify**  463:4
  466:3
**certifying**
  463:21
**cfo**  30:4 211:17
  230:16,16,19
  230:20,22,23
  277:4 308:2
  311:7 312:8
  357:1,8 360:23
**chair**  453:11
  460:3
**challenger**  4:5
**chan**  5:13
  11:12
**change**  40:5
  109:23 110:7
  111:3,6 133:20
  133:20 164:1
  194:12 195:16
  195:22,24
  197:8,13 198:3
  198:4,5 295:14
  307:4 465:3
**changed**  34:22
  456:1 457:5,23
  458:7

CONFIDENTIAL

**[changes - clearly]**                                                       Page 21

changes   110:5
   112:18 216:14
   320:20 417:12
   417:17 418:5
   464:11 466:5
characterize
   279:11
charge   440:8
   451:4,6
charges   316:10
   323:18 385:17
   430:2
charity   81:3
charleston   6:16
   7:13 8:17
   14:12,18,22
   18:3,9,13
   20:23 21:11
   26:12 31:18,19
   32:8 115:7,20
   116:10 124:17
   132:14 166:19
   211:9 212:14
   225:17 229:18
   252:11 301:4
   301:12,24
   307:16,22
   308:2,10 310:1
   311:24 312:17
   312:19,23
   313:13 314:6,8
   314:10,11,23
   315:8,13
   317:16 318:4

318:10,18
   319:3 321:9,18
   321:23 322:17
   323:19 324:9
   324:18 325:14
   327:2,9,15,20
   328:11 329:1
   329:11,19
   330:12 331:3
   334:22 335:8
   335:14 336:11
   337:9 338:7
   340:8 341:2,6
   342:1
charleston's
   314:24 325:1,8
   325:23 327:21
   329:9 330:10
chart   221:2,6
   291:12,14
   302:21 303:8
   303:17 332:5,7
   336:5 372:8
   414:6 417:24
   422:4 425:6
   435:10,17,24
charts   183:6
check   1:15 2:3
   3:4 11:19 21:4
   44:7 252:6
   316:19 357:11
   451:10
checked   213:19

checks   149:8
   311:12
chief   274:18
   276:15 277:12
   360:24 374:17
children   83:8
   315:24 323:4
   452:19 461:17
   461:19,21
children's
   394:4,13 395:2
choose   113:5
chris   34:17
   35:9 36:23,24
cio   360:24
circumstance
   183:24
cisco   382:5,10
   383:9,18
   384:10,16
   385:23 387:13
   388:3,16 389:6
   389:19 390:10
   390:22 394:3
citation   362:11
cite   26:6 427:9
   438:1 448:6
cited   447:24
   448:1,3
cites   444:5
   451:18 452:5
   454:3
city   2:17

claim   96:11
   201:15 339:8
   339:12
claimed   265:23
   355:15
claiming   338:7
clarification
   44:17 45:7
   55:11 69:4
   147:5 367:5
clarified
   319:20 320:9
clarify   31:9
   32:17 44:14
   55:9,23 103:6
   171:21 189:4
   347:10
clarity   211:17
class   455:3
clean   115:19
   365:24 397:23
   426:24
clear   37:21
   91:12 140:21
   146:16 163:21
   177:23 200:13
   202:19 269:11
   288:16 343:18
   344:11 379:7
   418:20 443:12
clearer   35:6
clearly   154:3
   177:19 402:13
   414:14

CONFIDENTIAL

**[clerical - comprehensive]**                                    Page 22

| | | | |
|---|---|---|---|
| **clerical** 36:5 | 135:8 149:10 | **committee** | **compensable** |
| **client** 216:7 | 288:24 313:21 | 68:14,19 | 77:5 |
| **clients** 60:23 | 402:1,10 403:3 | 315:24 323:3 | **compensated** |
| 216:1 421:14 | 403:6,9 405:21 | **commonwealth** | 42:10 44:19 |
| **close** 310:20 | 426:19 | 1:20 | **compensation** |
| 313:23 379:9 | **columns** | **communicate** | 50:8 |
| **closed** 323:15 | 103:16 | 274:3,13 277:1 | **compile** 146:13 |
| **closer** 60:22 | **combat** 204:18 | 307:11,20 | **complaint** |
| **coalition** | **come** 23:1 | 308:4 309:24 | 401:23 402:23 |
| 403:13 406:21 | 30:20 50:8 | 317:19 344:18 | **complete** 20:20 |
| 406:24 409:2,8 | 90:8 221:3 | 344:23 347:17 | 21:5,7,17 |
| 410:8,22 | 235:16 236:13 | 377:21 378:5 | 158:5 324:24 |
| 412:10,21 | 237:13 247:12 | 378:24 379:18 | 325:5 345:5 |
| 413:11,15,21 | 326:2 327:13 | 395:14,20 | 408:17 |
| 414:16,23 | 328:20 411:13 | 431:6,17 | **complex** |
| 415:7,17 416:6 | 420:24 461:15 | **communicated** | 345:24 |
| 418:17 420:11 | **comes** 56:10 | 345:14 352:16 | **comply** 394:12 |
| 421:20 422:3 | 141:24 142:9 | **communication** | 395:1 |
| 424:16 | 326:10 362:15 | 275:8 317:23 | **complying** |
| **coded** 384:9 | **comfortable** | 347:6 379:15 | 394:4 |
| **coding** 388:20 | 54:6 208:13 | 380:2 | **component** |
| **collar** 62:5 | **commencing** | **communicati...** | 41:22 76:9,24 |
| **collateral** | 1:17 | 348:2 379:5 | 77:6 127:16 |
| 440:12 | **comment** | 396:8 | 135:11 138:5 |
| **collected** | 268:14 | **community** | 204:14 271:20 |
| 445:10,13 | **commenting** | 57:7 71:5 | **components** |
| **collection** | 428:16 | **companies** | 35:18 78:21 |
| 378:20 385:16 | **comments** | 62:21 71:14 | 103:14 337:11 |
| 445:14 | 417:12,18 | **company** 1:23 | 443:14 |
| **collectively** | 419:2 | 76:14 96:6,7 | **compound** |
| 24:11 | **commission** | 202:3 | 81:14 128:15 |
| **column** 103:23 | 466:12 | **compare** 76:7 | **comprehensive** |
| 103:24 110:6 | **commits** | **comparison** | 396:2 |
| 111:4,18 135:8 | 437:18 438:3 | 243:14 | |

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[comprises - consulting]**                                      Page 23

**comprises**
  75:22
**compulsive**
  188:2,8
**concern**   235:6
**concerned**
  75:11 244:8
**conclude**   112:4
  112:7 114:12
  114:15
**concluded**
  462:17
**concludes**
  134:3 462:12
**conclusion**
  122:21,22
  123:1 216:9
  390:17 391:8
  391:13 455:11
**conclusions**
  271:16
**conclusory**
  105:11
**condition**   260:2
**conduct**   75:8
  93:21 94:3,6,9
  94:17 140:4,13
  141:15 195:17
  197:9,14
  199:24 200:9
  203:2 204:2
  205:17 206:14
  208:2 209:4,18
  210:20 219:12

220:1 245:11
246:9 251:13
252:11 253:1
255:23 261:4
261:23 264:18
266:14 267:5
268:20 269:16
270:9 271:4
291:10 292:15
296:14 327:17
327:23 334:13
336:17 352:4
421:23 424:14
430:19
**conference**
  317:20 346:11
**confirm**   24:8
  26:22 151:16
  234:22 300:3
  300:14 301:3
  302:2,11,18,23
  303:10 314:12
  314:24 316:20
  326:18 355:20
  356:5,17
  357:22 381:2
  399:21 427:22
  435:3 448:15
**confirmed**
  105:20 110:2
  147:23 149:8
  155:13 233:14
  299:6 313:14
  314:18 356:11

356:23 357:7
428:1
**confirming**
  23:21 152:4
  308:19 317:2
  378:8
**confirms**   376:6
**confused**   25:16
  182:16 335:4
**confusion**
  143:4 335:5
**connected**
  245:10 246:8
  406:23
**connection**
  23:19 24:5
  26:9 30:7
  32:14 33:16
  50:3 56:5,11
  57:18,23 66:2
  67:2 154:1
  169:16 276:17
  306:10 353:1
  365:11,18
  366:10 378:7
  384:13 395:5
  395:12 407:16
  414:3,4 420:3
  422:7 430:21
  439:14 444:10
**connolly**   2:9
**consider**   24:14
  25:14 27:21
  55:20 79:11

91:21 116:14
134:19 314:2
339:22 341:8
444:18
**consideration**
  263:4 273:23
  364:8
**considerations**
  194:16
**considered**
  23:13,24 93:4
  154:22 155:5
  192:12 194:22
  195:3 209:15
  266:3 273:21
  312:16 354:15
  371:18 395:12
  425:15 444:9
  444:23 456:17
  458:13
**considering**
  109:24 271:5
**consistent**   75:4
  260:10 295:5
  411:15
**consolidation**
  213:22
**constitutes**
  268:13
**consultant**   54:3
  54:6
**consulting**
  47:17,20,24
  48:5 53:3 54:8

**[consulting - correct]**                                           Page 24

54:22,23 55:10
55:12,18,21
60:5
**contacted** 39:9
**contain** 21:17
22:22 23:6,18
43:13
**contained**
22:11,18 23:4
24:1 25:1,6
308:24 309:20
458:20
**contains**
167:24 168:21
**contemplated**
40:8
**contemporan...**
199:3 248:12
264:24 323:19
**contemporan...**
80:24 198:22
201:23 204:17
206:3 385:7
**content** 159:23
160:9,23
161:19 162:20
163:24 173:18
174:1,4,9,13,18
175:2 180:9,22
180:23 198:15
198:17,20
262:9 264:20
266:16 267:3
267:13 268:22

269:18 270:11
358:7,14
394:11,24
395:6
**context** 278:11
296:5,18 374:7
**continuation**
411:5
**continue** 78:8
165:1,16
**continued** 3:1
4:1 5:1 273:18
326:2
**continuing**
179:18 337:10
355:15
**contra** 237:5
**contract**
197:23 198:2
267:11 428:11
**contractor**
104:24
**contracts**
267:12
**contractual**
72:17
**contrary** 340:5
414:12
**contributed**
258:20 259:9
**control** 313:6
463:20
**conversation**
177:16 178:10

178:21 274:16
275:2,6,14,24
276:10 277:15
277:23 278:7
279:22 280:1
307:6 310:18
311:1 318:1
377:24 379:8
389:21 418:9
418:14
**conversations**
306:22 307:1
**coordinated**
324:3
**copied** 30:17
**copies** 21:5
**copy** 15:9
16:15 43:9
52:9 123:7
172:17 294:5
309:1 328:4,17
349:2,9 355:1
355:4 362:21
371:22 382:13
427:21
**corners** 180:24
**corporate**
370:7,21
**correct** 12:22
14:1 15:23
16:14 17:4
20:24 21:1,20
21:21 23:14
24:2,17 25:24

26:1,20,21,24
27:14,24 28:12
28:18 30:11
31:1 33:7 35:4
35:12 38:20,21
42:1,8,9,12,13
42:18,21 43:15
46:12 48:6
49:15,16 52:15
52:17,22 59:2
60:3 63:18,22
67:13 68:23
70:11 73:6,11
73:18 74:3,11
74:16,22 75:16
77:11,17 79:9
79:22 80:3,11
81:12,24 82:11
82:22 83:14
84:15 85:4,5
85:10 89:1
90:12,19 93:22
94:10,18 95:1
95:6,17,21,22
96:2 97:8,14
99:16 100:20
101:6,15,24
102:10 103:4,5
104:15,18
105:10,12
106:9,14 107:5
107:19,20
108:24 109:8
111:12 112:8

CONFIDENTIAL

**[correct - correct]**                                                              Page 25

| | | | |
|---|---|---|---|
| 112:17 114:17 | 186:1,16 187:8 | 245:14 246:15 | 318:11,12,20 |
| 115:10,13 | 188:20 189:7 | 247:19 248:2 | 318:21 319:1,6 |
| 116:5,6,12,13 | 189:16,19 | 249:22 250:1 | 319:10,11,24 |
| 116:18 117:5 | 190:1,21 191:5 | 250:15,22 | 320:12 322:18 |
| 117:23 118:21 | 191:17 192:2 | 251:14,17 | 327:3,4,6,7,11 |
| 120:5,10 123:5 | 192:20 194:6,9 | 252:4,7 254:2 | 327:17,23 |
| 124:18,19,22 | 194:11 195:11 | 254:21 255:13 | 328:11,14 |
| 125:5 127:5,19 | 195:17 196:20 | 256:2,12,20 | 330:15 331:12 |
| 128:10 129:11 | 197:9 199:24 | 257:13 258:21 | 333:15 334:13 |
| 129:17,23 | 200:9 203:13 | 260:14 261:12 | 334:20 338:9 |
| 130:8 131:6,22 | 203:18,21,22 | 261:17,23 | 342:20,21 |
| 132:1,20 | 205:14,19 | 264:20,22 | 343:3 344:2,15 |
| 133:10 134:9 | 208:3 209:5 | 268:22 271:4,5 | 348:6,13,14,18 |
| 134:15,16,17 | 210:20 211:10 | 276:14 280:8 | 348:19,24 |
| 134:18,23 | 211:14,22 | 280:24 281:1,8 | 349:1 350:6,7 |
| 135:5,16 | 212:1,15,16 | 281:9 283:17 | 350:11,12,20 |
| 136:17 137:8 | 213:7 214:16 | 285:12 286:6 | 350:24 351:8 |
| 138:12 140:13 | 215:9,20 217:4 | 286:17 287:13 | 351:20 352:5 |
| 141:17 143:10 | 217:13,21 | 287:14,17,23 | 352:13 354:9 |
| 144:4,5,8,20 | 218:7,12,19 | 288:4,9,14,20 | 358:16 359:5 |
| 145:2,9,21 | 219:13 220:1 | 288:21 289:2,9 | 360:20 361:13 |
| 146:3 147:2,16 | 220:22 222:12 | 289:18 290:8 | 361:17,18,23 |
| 147:20 152:21 | 222:23 223:18 | 290:16,20 | 363:2,5,6,9 |
| 155:23 156:3,7 | 225:14,15,18 | 291:3,4 292:6 | 365:6,13 |
| 156:10,17 | 225:20,23,24 | 292:16 299:14 | 367:22 369:2,6 |
| 158:15 159:6,9 | 226:4,13 227:3 | 299:16 300:8 | 370:7 371:12 |
| 160:2,11 | 227:13 228:7,8 | 305:6,7,12,13 | 373:5 380:7,16 |
| 162:24 164:20 | 231:11 233:10 | 305:15,21 | 380:17,24 |
| 165:23 168:5 | 234:17 235:4 | 306:5,16,19 | 381:6,10 382:6 |
| 169:6,7 171:18 | 235:13 236:10 | 307:9 308:2 | 382:7 386:23 |
| 174:14 180:10 | 236:22,23 | 309:15,16 | 386:24 387:3,4 |
| 181:8,24 | 238:7,18 239:9 | 312:4,24 | 387:14 390:11 |
| 182:10 183:4 | 240:16,17 | 314:10 315:8 | 390:12 391:9 |
| 184:12 185:2 | 244:2,6 245:12 | 317:5,6 318:5 | 391:10 393:18 |

395:6 396:13
396:22 398:6,7
398:14,15,20
401:6,7,11,18
402:19,20
403:1,4,7,8,10
403:11,14,15
403:18,24
404:13 407:23
408:3,8,20
409:9 414:24
415:9,20 419:7
419:12 422:19
423:1,8,11
426:7,17 427:7
427:11 431:20
432:1,11,12,18
432:19,24
433:12 434:22
434:23 436:6
436:11,23
437:20 441:16
443:6,7,21
444:20 445:11
446:9,13 449:5
449:12 450:6,8
451:19 452:1
456:3 466:4
**corrected** 22:2
362:12
**corrections**
464:5,7 466:5
**correctly**
112:22 130:17

229:14 253:6
384:2 397:3
403:2 418:16
446:19
**correctness**
109:23
**corresponden...**
25:19
**corresponding**
105:9 274:5
307:13 340:22
345:1 431:8
**corroborated**
144:18,24
145:19 146:1,7
**cost** 9:6 103:17
103:24 104:4
110:22 113:4
131:2,4 141:14
142:4 146:13
148:12 149:7
149:16 151:22
174:18 175:10
180:13,18
193:9,11 194:4
194:4,16
195:15,21,23
196:1,4 197:8
197:13,18
198:4 199:1,22
200:7,14
201:12 202:6
202:11,15
203:15 204:15

205:2,13,18
206:2,8 207:16
208:7,10,12
209:14,16,23
221:6,14
229:12 237:6,9
238:4,6,16,18
239:14 242:5
243:13 246:2
246:17 251:22
253:18 258:18
258:20 259:2,8
259:24 263:2
266:23 280:16
280:17 299:17
299:18,22
300:22 302:20
322:4,11
332:14 335:3
335:11,16
337:17 338:1
342:18 353:23
360:8,11 367:1
368:11 372:6
372:12 378:8
381:23 384:8
389:11 400:3
410:19 411:24
413:5 414:15
415:7 417:11
418:3 419:2
420:16,18,21
422:7 426:17
427:7,17

429:13,20
430:4 434:10
440:8,24 443:4
447:24 450:13
**costs** 40:12
41:13 83:6,16
87:1 102:16,19
102:24 103:3
103:11 104:12
104:17,17,23
105:7,18,19
110:1,1 115:6
116:9 134:4,12
136:3 140:2,11
145:20 146:2,8
146:20 147:2
147:19,23
148:10 149:8
150:14 152:5
157:9 158:1,9
158:22 162:20
162:22 166:7
166:24 168:3
168:22 170:10
175:12 180:8
181:6 182:24
189:24 194:12
194:13,15,21
194:22 195:2,3
195:5 197:5
199:9 202:23
203:1,11,17,24
204:18 206:15
207:10,12

CONFIDENTIAL

**[costs - court]**                                                    Page 27

| | | | |
|---|---|---|---|
| 208:21 219:11 | 322:16 324:6 | 418:7,16 428:2 | **country** 52:19 |
| 219:24 221:2,3 | 327:16,21 | 434:7,24 | 69:18 70:7 |
| 222:15 230:7 | 333:14 334:11 | 437:19 438:4 | 210:9 |
| 231:5 233:8,14 | 334:17 335:22 | 439:15 440:3 | **county** 6:13,16 |
| 234:3,16,23 | 336:13,14,15 | 442:7 445:8,19 | 6:18,21 7:11 |
| 235:3,11 236:8 | 337:4 338:3,9 | 445:20 446:2 | 7:13,16,19 |
| 236:20 237:4 | 338:18,22 | 447:11,20 | 8:18,23 9:8 |
| 240:4,5,12,13 | 340:9,11,11,16 | 450:23 451:9 | 13:17 14:12 |
| 240:23,24 | 342:9,22 | 451:13 | 15:2,16 17:14 |
| 241:1,5,16,17 | 350:10,18 | **counsel** 11:3 | 18:4,17 19:7 |
| 242:4,11,21 | 353:10,16 | 12:4 28:21,24 | 329:12,19 |
| 243:15,21 | 355:12 357:2 | 29:21 30:17,19 | 330:12 358:6 |
| 244:11,24 | 357:23 358:23 | 31:21 32:3,12 | 358:13 364:21 |
| 245:17 246:8 | 360:19 361:4,6 | 38:11,14 41:15 | 365:6 371:5 |
| 248:22 252:9 | 361:12 368:21 | 52:10 93:15 | 389:2 |
| 252:24 258:12 | 373:1 374:1,21 | 97:3 121:10 | **county's** |
| 259:10 260:12 | 374:24 377:5 | 152:15,20,23 | 386:21 |
| 261:2,16,21 | 382:19,24 | 215:12 276:24 | **county's** 9:11 |
| 265:9 270:24 | 383:2,8,14,17 | 278:1 297:8 | 386:14 |
| 271:2 272:17 | 383:18 384:6 | 324:14 329:24 | **couple** 44:13 |
| 272:24 273:19 | 385:2,4,9 | 330:8 347:14 | 195:20 207:12 |
| 275:21 276:18 | 388:1,11,13,16 | 347:14 414:11 | 239:16 355:7 |
| 279:2 280:13 | 389:17 390:20 | 416:19 417:9 | **course** 40:6 |
| 298:13,16 | 397:6,14 | **counselor** | 49:6 58:24 |
| 299:1,5,8 | 399:15,18,20 | 140:16 425:9 | 75:1 148:17 |
| 300:24 302:10 | 399:23 401:16 | **counsels** | 163:12,16 |
| 308:8 310:21 | 402:22 405:11 | 228:17 | 192:13 198:1 |
| 310:22 312:2 | 406:2,11,23 | **count** 58:8 | 210:3 252:15 |
| 312:13,21 | 408:24 409:3,7 | **counted** 58:2 | 423:14 444:16 |
| 313:19 314:8 | 409:13 410:6 | 58:16 | **court** 1:1 12:1 |
| 314:15 315:1 | 410:12,13 | **counting** 58:20 | 12:6 62:6 98:8 |
| 315:18,19 | 411:7,10 | 427:14 428:22 | 112:3 114:11 |
| 316:3,3,17 | 413:14,20 | 430:3 | 134:2 137:18 |
| 317:3,5 321:24 | 415:11 416:16 | | 223:6 231:19 |

CONFIDENTIAL

**[court - damages]**                                                              Page 28

| | d | damaged | 135:1,4 136:2 |
|---|---|---|---|
| 259:23 464:20 | **d** 6:2 323:10 | 448:19 | 137:12,13 |
| **courts** 210:8 | **d.c.** 4:17 | **damages** 22:7 | 138:17 139:10 |
| **cover** 322:15 | **damage** 104:21 | 30:23 40:1,9 | 144:20 145:2 |
| **covered** 181:17 | 104:22 108:21 | 40:24 41:6,15 | 145:13 146:21 |
| **covid** 272:15 | 138:4 183:13 | 41:23 57:4 | 148:21 149:4 |
| 273:1,3,7,10,16 | 204:13 239:17 | 61:2 70:15,20 | 150:8 152:12 |
| 273:22 | 240:16 241:20 | 71:21 72:7,22 | 152:19 154:3 |
| **cpa** 47:18 | 251:23 252:1,3 | 83:2,16 86:2 | 157:8,24 158:9 |
| 63:13 | 252:9,16 | 86:10,20 94:18 | 158:13,22 |
| **crime** 62:5 | 253:12,15,18 | 95:16,19,24 | 159:1,3,13,21 |
| **criminal** 62:6 | 254:1,6,11,19 | 96:9,15,17 | 159:22 160:7,8 |
| **crivera** 4:6 | 255:5,10,16 | 97:6,10,11,16 | 161:10,14 |
| **crystal** 177:22 | 256:10,15,18 | 97:21 98:3,7 | 162:23 163:19 |
| 198:8 | 257:10,13 | 98:10,14,18 | 164:6 165:3 |
| **culled** 34:4 | 258:10 259:4 | 99:4,10,14,24 | 172:13 175:3 |
| **current** 27:23 | 260:10 264:10 | 100:4,13 101:2 | 180:7 181:5,20 |
| 52:12 | 269:3 272:6 | 101:4,11,13,20 | 181:23 182:6,9 |
| **curriculum** 8:7 | 284:24 299:24 | 101:22 102:5,8 | 182:14,16,18 |
| 52:3 192:24 | 308:9 338:4 | 102:14,22 | 183:3,14 184:8 |
| 193:5,12 | 340:10 382:1 | 103:10,16,21 | 184:24 186:19 |
| 239:15 240:14 | 393:12 431:3 | 104:13 105:6 | 187:3,5,16,19 |
| 241:18 243:20 | 435:2 436:6,10 | 106:5 108:20 | 188:1,4,17,24 |
| 244:1 270:24 | 436:23 437:7,9 | 110:12 111:4 | 188:24 189:5 |
| 271:24 272:15 | 437:18 438:3 | 111:11,21,23 | 189:13,23 |
| 272:17,24 | 439:14 440:13 | 112:7 113:15 | 190:9,18 193:8 |
| **curtin** 34:17 | 442:5 443:4 | 114:7,9,16,22 | 193:10 195:6 |
| 35:9 36:3,13 | 444:10,20 | 115:3,6 116:9 | 195:10 203:7 |
| **curtin's** 36:11 | 445:8,19 | 116:17,20,23 | 203:16 207:18 |
| **cv** 52:10,13 | 446:13 447:4 | 117:16 118:24 | 208:23 209:15 |
| 57:2 58:3,13 | 447:10,24 | 119:7 121:21 | 210:15,17 |
| 58:14,14 | 448:9 449:11 | 124:16 133:3,5 | 211:20 212:11 |
| | 460:1 | 133:7 134:6,7 | 213:7 216:16 |
| | | 134:12,22 | 223:9 224:1 |

**[damages - day]**                                                        Page 29

| | | | |
|---|---|---|---|
| 231:21 233:9 | 353:11 354:8 | 452:19 453:8 | **dated**  15:10 |
| 234:16 235:4 | 354:16,23 | 453:17,19 | 16:16 17:5 |
| 235:12 236:9 | 355:23 356:8 | 455:23 456:1 | 19:1,14 20:4 |
| 236:21 240:2 | 356:15,21 | 456:17,23 | 20:17 21:6,8 |
| 241:8,15 243:8 | 361:5,7,11,19 | 457:4,23 458:7 | 328:7 329:13 |
| 244:20 251:16 | 364:3 374:12 | 459:8 | 363:1,5 371:19 |
| 251:20 252:3 | 375:11,18 | **daniel**  8:14 | 380:15,23 |
| 256:16 258:12 | 376:3 377:6 | 277:15 307:17 | 396:21 398:5 |
| 261:15 265:23 | 378:10 380:12 | 307:23 309:9 | 398:13 463:11 |
| 268:1 272:3 | 380:19 381:18 | 309:15 342:8 | **dates**  179:16 |
| 278:12 280:21 | 381:24 382:3 | **data**  33:16,22 | 311:14 |
| 281:3 287:12 | 382:18,20 | 34:10,12,12 | **david**  3:10,16 |
| 287:20 289:2 | 383:19 388:8 | 36:24 37:5 | 34:16 35:8 |
| 289:22 291:22 | 393:24 395:4 | 90:10,13,17 | 36:3 |
| 294:22 298:5 | 396:18 397:17 | 144:17,23 | **davis**  5:14 8:20 |
| 298:12,15 | 398:2,9 399:2 | 145:18,24 | 116:7 229:14 |
| 299:3,13,20 | 399:8,14,17 | 146:6,12,24 | 230:21 302:9 |
| 300:7,18 301:7 | 400:1,5 401:17 | 190:16,24 | 348:18,24 |
| 302:6,15,21 | 402:10,15 | 220:20,24 | 349:5,18,23 |
| 303:3,7,14,17 | 405:13 409:19 | 222:10,14,17 | 350:4,22 351:6 |
| 312:3,22 314:9 | 411:14 413:7 | 281:12,18 | 352:2,13,17,24 |
| 315:2 318:18 | 416:3 420:24 | 323:3 378:20 | 358:3,5,12,22 |
| 319:3 321:9,18 | 422:8 423:15 | 384:18,20 | 359:4,22 |
| 321:23 322:2 | 424:10 426:3 | 385:16 | 360:17 361:2 |
| 322:17 324:11 | 430:20 432:8 | **date**  1:18 11:14 | 362:24,24 |
| 324:20 325:11 | 432:14 433:6 | 22:23 24:7 | 363:14,24 |
| 327:3 330:22 | 433:19,24 | 45:2,21 292:24 | **davis's**  349:2,9 |
| 332:10 333:15 | 434:6,8,21 | 367:2,8,13 | 350:8 361:16 |
| 335:1 336:15 | 435:7 436:4 | 374:14 375:22 | **day**  50:24 |
| 337:10 338:9 | 439:6 441:19 | 426:15 427:5 | 69:18 70:8 |
| 338:13 340:3 | 441:21 442:6 | 428:4 429:11 | 96:23 250:20 |
| 340:17 342:24 | 444:17 445:15 | 429:18 442:22 | 356:11 404:20 |
| 348:16,21 | 446:1,8 447:21 | 443:2 449:3 | 456:3 457:7 |
| 352:21 353:9 | 451:17,24 | 464:9 466:8 | 458:1,9 466:11 |

[days - defendants]                                              Page 30

| | | | |
|---|---|---|---|
| **days** 46:2 51:3 | 365:11,14 | 91:3 94:7,9,17 | 166:8 167:1 |
| 363:8 464:16 | 393:21 | 95:11,21 96:5 | 168:3,9,23 |
| **dbonnin** 3:19 | **decisions** 199:1 | 96:18 97:11,22 | 169:11,14 |
| **dc** 2:11 | **declaration** | 98:21,21 99:12 | 170:1,11,24 |
| **dead** 79:17 | 221:23 223:7 | 100:2,15 106:1 | 171:17 172:10 |
| **deadline** | **declarations** | 107:16 113:7 | 172:13 173:2 |
| 379:10 | 41:22 89:19 | 116:24 117:19 | 175:6,23 176:3 |
| **deal** 69:22 | 122:8 152:16 | 118:3 119:2,8 | 176:19 177:1,9 |
| 76:11 191:13 | 163:16 224:5 | 120:13 121:1 | 178:15,24 |
| 198:21 248:19 | **dee** 1:18 | 121:23 122:4 | 183:11,15,20 |
| 248:19 | **deemed** 464:19 | 122:16,18 | 186:21 187:18 |
| **dealing** 69:24 | **defendant** 4:18 | 123:3,5,18 | 188:10 190:11 |
| 76:2,14 77:24 | 24:15 25:11,15 | 124:22 125:5,9 | 191:15 192:9 |
| 200:24 214:8 | 25:17 27:24 | 125:12,22 | 192:16,19 |
| 240:22,23,24 | 28:1 61:21 | 126:4,16,24 | 193:15 194:3,5 |
| 242:3,5 340:10 | 62:1 93:12,22 | 127:5,11,19 | 194:18 195:17 |
| 340:12 | 95:17 96:15 | 128:7 129:19 | 197:2,9,14,19 |
| **death** 60:10 | 97:13,19 98:23 | 130:4,21 | 198:11,23 |
| 61:7 | 100:17 143:20 | 131:19 132:9 | 199:11 201:6 |
| **deborah** 378:1 | 154:15 181:22 | 133:3 136:11 | 201:11 202:19 |
| 378:2 | 181:24 182:8 | 137:15 138:20 | 203:6 204:1,10 |
| **december** | 182:10 183:2,4 | 139:13 140:4 | 204:16,20 |
| 43:19 46:9 | 184:9,12 | 140:12 141:10 | 205:10,17 |
| **decide** 309:23 | 199:23 200:8 | 141:16 145:15 | 206:6,13 207:3 |
| 347:16 378:23 | 203:2 273:9 | 145:21 146:3,9 | 208:2 209:4,17 |
| **decided** 183:17 | 430:19 436:11 | 153:6,15 154:4 | 210:5,19 |
| 201:6 284:16 | **defendants** | 154:6,9 155:17 | 216:17 219:12 |
| 373:10 | 2:12,19 5:7 | 156:17 157:10 | 220:1 223:11 |
| **decides** 437:7 | 25:12,20,24 | 158:2,11,13,24 | 224:2 227:20 |
| **decision** 199:6 | 26:4 27:4,8,10 | 159:3 160:19 | 231:23 238:23 |
| 229:1 281:20 | 27:14 59:17 | 161:7 163:9,20 | 239:4 243:7 |
| 282:13 283:15 | 62:17 77:5 | 164:8,19,22 | 245:11,22 |
| 284:8 285:10 | 86:22 88:3 | 165:7,9,11,12 | 246:9 247:6 |
| 286:5,16 | 89:10,12,18 | 165:22 166:1,2 | 248:16 250:14 |

| | | | |
|---|---|---|---|
| 250:22 251:13 | 365:5 375:3 | 251:15 280:11 | **dekalb**   6:18 |
| 251:21 252:10 | 376:5 377:8 | 289:8 293:21 | 7:16 8:22 9:8 |
| 253:1,21 | 378:13 380:15 | 304:2,4 | 15:2,8,11 |
| 254:14,21 | 380:22 386:22 | **defined**   76:5 | 18:17,23 19:2 |
| 255:13,19,23 | 388:10 396:20 | 81:16 82:15 | 20:23 21:12 |
| 256:8 258:14 | 398:4,12 399:3 | 89:23 91:1,2 | 26:19 29:19 |
| 258:21 259:2 | 400:24 401:4 | 91:22 93:7 | 115:7 116:3,10 |
| 259:11 261:4 | 413:9 421:23 | 95:12,13 98:15 | 151:6 211:9 |
| 261:22 262:6 | 422:10 424:14 | 128:21 168:8 | 212:15 220:8 |
| 263:6 264:18 | 425:4 432:10 | 175:9 192:24 | 225:21 252:11 |
| 265:6 266:7,14 | 432:17 433:8 | 290:1 295:24 | 277:10 302:2,3 |
| 267:4 268:19 | 433:21 434:15 | 296:24 304:5,6 | 316:23 344:17 |
| 269:5,15 270:3 | 436:18 447:7 | 318:14 323:6 | 344:20 345:3 |
| 270:9 271:3 | 457:1 459:1 | **defines**   264:4 | 348:6,12,16,21 |
| 272:8,18 273:2 | **defendants'** | **defining**   66:18 | 350:6 352:20 |
| 273:5,13,21 | 8:17,22 9:12 | 73:14 82:15 | 353:8 354:5,7 |
| 279:4,12,20 | 9:14 329:18 | 90:24 91:15 | 354:21 355:21 |
| 282:21 285:3 | 364:20 386:15 | 125:18 | 356:6,14,18 |
| 289:18,24 | 400:17 | **definitely** | 358:6,12 |
| 290:2,15 | **defender** | 356:22 359:2 | 361:12,20,21 |
| 291:10,23 | 265:10 | **definition** | 363:4,9,13 |
| 292:1,3,16 | **defense**   62:24 | 83:19 88:1,6 | 364:21 365:5 |
| 293:4,6,11,14 | 63:2 | 88:23 89:8 | 366:24 367:7 |
| 296:15,24 | **deficit**   78:10 | 91:5,8 93:11 | 367:12,18 |
| 299:4 300:2 | **define**   55:24 | 93:14 127:7,24 | 370:13,15,17 |
| 321:15 327:17 | 64:16 66:16,24 | 153:9,12 | 371:5 372:23 |
| 327:22 329:10 | 73:12 84:7,11 | 170:22 289:12 | 374:18 375:7 |
| 330:11 334:4 | 84:21,24 88:2 | 293:23 318:13 | 376:17 |
| 334:13,17 | 88:7,21 89:13 | 350:23 351:1 | **dekalb's**   345:8 |
| 336:16 351:8 | 91:24 92:12,14 | 352:6 | 346:1 365:3 |
| 351:15,20,22 | 92:16 125:17 | **definitions** | 366:4 370:6 |
| 352:4 354:18 | 125:20 127:11 | 240:1 | 373:9 374:4 |
| 355:18 359:18 | 168:12,17 | **degree**   36:14 | 375:8,16 |
| 360:5,7 364:4 | 193:19 220:24 | 63:10 | |

**[deliberately - determined]**                                   Page 32

| | | | |
|---|---|---|---|
| **deliberately** | 42:11,16 45:2 | 456:5 | 399:5 |
| 267:22 | 50:13 51:8,13 | **depot** 451:4 | **determine** 81:9 |
| **demonstrate** | 53:22 59:7 | **derived** 41:1,7 | 81:20 82:13,19 |
| 184:18 | 62:23 85:23 | 41:18 | 83:10 84:1 |
| **demonstrated** | 154:17 155:2 | **described** | 98:8 104:6 |
| 314:13,14 | 157:2 161:22 | 346:20 | 106:12,17,24 |
| **department** | 162:3,6,11 | **describing** | 112:14 114:21 |
| 30:5 60:24 | 163:15 179:10 | 418:8 | 118:5 119:3 |
| 61:1 268:8 | 212:13 262:20 | **description** | 144:16 145:17 |
| 387:5 | 294:5,6,19 | 6:11 7:4 8:4 | 149:2 160:21 |
| **departments** | 296:3,7,11,20 | 9:4 | 164:3 174:17 |
| 389:1 | 297:2,11,19,21 | **destructive** | 199:8 219:10 |
| **depaz** 2:16 | 319:9,14,20 | 256:12,19 | 219:23 224:1 |
| 462:4 | 320:9,18 321:1 | **detail** 378:19 | 233:7 234:14 |
| **depend** 89:2 | 325:15 349:9 | 384:14 385:8 | 235:10 236:6 |
| **depending** | 353:1,14 362:6 | 385:14 392:9 | 238:2 255:10 |
| 53:15 101:17 | 366:13 367:19 | **detailed** 30:3 | 255:15 264:16 |
| 200:2 | 367:21 368:2 | 38:7,17 144:13 | 266:12 280:6 |
| **depends** 73:7 | 368:18 369:20 | 239:11 274:11 | 298:3,13 318:3 |
| 153:8 155:18 | 370:15,18 | 366:12 448:15 | 318:9 320:24 |
| 158:6 162:2,3 | 371:5,11,16 | **details** 243:24 | 321:7,24 |
| 162:5 191:10 | 372:14 374:15 | 244:3 422:5 | 348:11 352:19 |
| 193:18 200:11 | 375:23 376:1 | **determination** | 353:10 380:5 |
| **deponent** 12:2 | 390:15,19 | 94:23 95:4 | 381:16 382:19 |
| 466:1 | 391:6,12 | 140:17 159:11 | 383:16 388:14 |
| **deponents** | 401:20 430:11 | 190:6 206:1 | 396:11 399:6 |
| 212:7,7 | 462:13,16 | 209:22 210:13 | 399:15 401:15 |
| **deposed** 12:21 | 463:6 464:3,13 | 246:24 256:6 | 401:20 427:13 |
| 179:6 | 464:17,19 | 257:7,17,22 | 428:21 431:23 |
| **deposing** | **depositions** | 269:8 301:23 | 433:22 434:7 |
| 464:16 | 24:6 42:14 | 381:14 393:21 | 450:16 |
| **deposition** 1:12 | 179:15,18 | 452:10 | **determined** |
| 9:8 10:2 11:17 | 180:1 212:19 | **determinations** | 82:8 107:13 |
| 22:23 27:22 | 213:1 294:10 | 57:4 196:7 | 111:1 112:14 |

**[determined - discussion]**                                    Page 33

| | | | |
|---|---|---|---|
| 114:24 141:1 | 77:22 90:7 | **diminution** | 324:13 353:19 |
| 205:6 207:3 | 96:5 110:6,24 | 76:19 | 356:24 357:8 |
| 208:11 251:10 | 111:3 112:15 | **dip**   428:18 | 374:11 379:6 |
| 261:2,20 265:1 | 112:24 121:8 | **direct**   105:24 | 396:9 414:10 |
| 267:24 271:2 | 144:12 153:3 | 107:15 117:18 | **director**   116:1 |
| 298:10 321:21 | 161:14 170:20 | 130:19 131:16 | 229:19 |
| 353:7 354:22 | 183:6,7 194:13 | 132:7 139:11 | **directs**   69:21 |
| 363:20 382:16 | 201:7 219:16 | 143:18 163:17 | **disagree**   68:17 |
| 399:12 406:22 | 233:24 237:16 | 170:23 172:9 | 75:17 109:9 |
| 410:15 434:4 | 242:20 249:14 | 173:1 175:21 | 114:19,20 |
| 436:9 | 250:17,18 | 177:15 199:9 | 125:6 141:19 |
| **determines** | 263:9,22 | 204:8 216:16 | 142:9 193:6 |
| 142:22 159:12 | 267:10 310:7 | 230:12,17 | 319:22 320:11 |
| **determining** | 315:11 346:6 | 238:21 239:1 | 330:16 358:12 |
| 106:7 399:23 | 352:22 389:1 | 245:18,20 | **disagreed** |
| 425:15 456:20 | 397:5 412:2 | 253:20 273:5 | 320:24 |
| **detrimental** | 416:23 417:24 | 315:19 337:21 | **disclosures** |
| 280:15 | 426:18 427:9 | 375:1 382:24 | 93:19 328:4,5 |
| **dgilfillan**   3:12 | 427:10 428:3 | 463:20 | **discovery** |
| **difference** | 429:11,12,13 | **direction**   10:5 | 147:9,12 |
| 189:1 207:23 | 429:19,20 | 33:13 277:5 | 215:23,24 |
| 208:24 397:13 | 447:4 450:22 | **directly**   28:19 | 216:3 232:13 |
| 415:14,22 | **differential** | 29:3,6,18 30:4 | 323:14 324:22 |
| 416:3 417:4,10 | 76:21 | 30:10,20 31:2 | 326:1 328:17 |
| 418:24 419:1 | **differentiate** | 31:22 32:10,12 | 347:1 370:3 |
| 419:14 420:8 | 95:20 | 32:14 38:5 | 436:15 |
| 423:10,15 | **differently** | 39:15 41:18 | **discuss**   84:13 |
| 424:3,5 | 142:23 150:4 | 47:12 107:23 | 286:2,14 420:6 |
| **differences** | 178:9 182:21 | 108:1,5,7,13 | **discussed**   27:16 |
| 418:2 | 183:8 238:13 | 155:15 161:5 | 31:3 285:18 |
| **different**   34:7 | 246:3 255:21 | 167:6 179:2 | 396:9 |
| 57:15 59:4,23 | 269:13 307:19 | 181:14 234:5 | **discussion** |
| 60:6,14 63:7 | 336:9 341:7 | 245:5 278:21 | 282:4,11 |
| 73:14 75:23 | 391:24 | 279:18 324:6 | 283:13 302:7 |

CONFIDENTIAL

**[discussions - districts]**                                Page 34

| | | | |
|---|---|---|---|
| **discussions** | 20:22 68:5 | 219:22 227:3 | 449:11 451:16 |
| 35:22 38:9 | 70:16,21 72:8 | 233:7 234:15 | 451:23 452:11 |
| 156:22 200:19 | 72:23 73:10,13 | 234:20 235:11 | 453:5,15,16 |
| 220:10 274:10 | 77:8,14 79:6 | 235:16 236:7 | 454:12,24 |
| 283:1 300:21 | 79:14,20 80:1 | 236:18 238:3,5 | 456:8 457:12 |
| 306:17 308:14 | 80:9,14 81:4 | 238:15,17 | **district's**  74:11 |
| 417:8 | 81:10,21 82:6 | 239:8 244:1 | 74:16,22 95:16 |
| **dislike**   129:3 | 82:8,20 83:11 | 247:17,21 | 195:2 214:3 |
| **dispute**   55:22 | 84:2 85:7,15 | 248:1,18 | 323:21 350:19 |
| 140:19 | 88:20 90:11,18 | 251:10 255:24 | 358:24 430:13 |
| **disputed**   143:6 | 96:1 97:7,17 | 261:1,11,20 | 430:16 453:6 |
| 143:14 | 98:4 99:5,16 | 264:19 266:15 | 457:22 458:6 |
| **disputes**   53:10 | 100:6 101:2,11 | 267:2 268:20 | **districts**   67:5 |
| **disregard** | 101:20 102:5 | 269:16 270:10 | 71:12 72:11 |
| 407:13 | 104:14 106:9 | 270:12 271:1 | 73:5,8,18,21,23 |
| **disregarded** | 106:14 107:3 | 272:13,23 | 73:24 74:2 |
| 404:11,16 | 107:19 108:20 | 277:16 279:14 | 77:21 94:23 |
| **distinct**   88:1 | 115:8,21 116:4 | 299:10,12,23 | 95:4 102:17 |
| 158:14 159:4 | 116:11,16 | 300:5,5,11,16 | 103:1 107:11 |
| 169:17 | 133:6 134:5 | 301:5 302:4,13 | 107:24 108:14 |
| **distinction**   53:6 | 137:5 141:13 | 303:1,12 317:2 | 144:18,24 |
| 414:8 | 145:19 146:23 | 329:2,12,19 | 146:1,7 147:18 |
| **distinctly**   68:17 | 147:1,3,6 | 330:13 334:23 | 149:12 152:7 |
| 190:15 447:11 | 148:19 149:2 | 335:8,14 342:1 | 152:17,23 |
| **distributing** | 151:2 155:19 | 346:3,4 355:22 | 171:15 191:15 |
| 78:17 | 156:3,6 158:15 | 356:7 358:6,8 | 213:12 215:15 |
| **district**   1:1,1 | 159:5 162:17 | 358:13,15 | 217:6 223:14 |
| 6:14,16,19 7:9 | 176:17,24 | 364:21 365:6 | 228:12,19 |
| 7:11,14,16,23 | 177:7 178:12 | 371:6 412:7,17 | 233:21 262:8 |
| 8:18,23 9:8,20 | 178:23 187:3 | 430:20 434:20 | 263:23 265:20 |
| 12:1,1 13:18 | 187:16 188:1 | 435:5 441:9 | 266:3 268:4 |
| 14:13 15:3 | 191:23 192:16 | 443:20 444:19 | 271:9 279:13 |
| 16:22 17:14 | 209:1,3 217:18 | 446:2 448:17 | 311:23 312:4 |
| 18:4,18 20:10 | 218:4,10 219:9 | 448:18 449:10 | 317:4 325:21 |

Golkow Technologies,
A Veritext Division

425:10 432:5
455:14 456:2,9
457:2,6 458:17
**division**  11:13
**divorce**  61:18
216:1
**doctor**  141:24
142:8,13
183:21
**document**  1:6
297:14 376:11
385:8 424:2
438:22,24
439:4 441:15
442:8,19
443:11 446:7
460:4
**documents**
10:10 23:18
24:15 25:2,11
25:15,17,19,22
26:2 27:3,7,12
28:10,16,20,22
29:2,5,7,12,17
29:20,24 30:8
30:22 31:10
33:20 34:3
36:6 37:6
38:14 146:24
275:17 281:12
281:18 308:17
312:6 315:1
317:2 347:3
411:6,7 428:13

429:23 430:7
438:2 439:13
**doing**  63:5
68:12 81:1
104:5 109:18
129:2 148:6
201:23 240:6
354:2 381:23
402:5 427:23
464:8
**dollar**  221:16
340:22 404:7
**dollars**  86:12
**domestic**  216:2
**donation**  66:4
68:12
**donovan**  5:4
**door**  60:17
61:15
**double**  427:14
428:8,18,22
430:3
**doubt**  373:23
441:23 451:22
**downloaded**
31:22 32:9,13
326:7
**dr**  26:8
**drafted**  449:14
**drafting**  214:21
276:2 363:13
381:12 433:3
433:15

**dried**  201:24
**drill**  13:1
**driver**  96:8,9
183:19
**due**  102:20
103:4 137:14
254:20
**duly**  12:10
266:4 463:5
**duplicative**
430:5
**dwarfs**  61:9

**e**

**e**  4:10,16 6:2,9
7:2 8:2 9:2
24:16 25:1,18
30:17 32:5,5
44:18,18 45:11
46:11 47:17,24
48:5,11 85:22
108:16 260:13
260:19 261:2
261:10 274:5
307:13 345:1
431:8 465:1
**earlier**  52:11
85:23 125:22
147:5 175:9
267:7 279:7
305:23 312:10
325:15 358:21
385:17 404:18
408:18 425:11

**earn**  48:6 77:10
77:16
**earning**  49:10
**earnings**  61:12
**earns**  48:4,5,14
**easier**  147:7
346:10
**eastern**  11:16
**easy**  347:20
**economic**  60:8
61:2 96:11
**economist**
56:23
**edit**  23:2
295:11 420:1
**education**  6:21
7:18 9:10
15:15 16:1
19:7,15 67:3
338:23 386:13
386:21 403:14
406:22,24
409:2,9 410:8
412:11,22
413:12,16,22
414:17,23
415:8,18 416:6
418:18 420:11
421:21 422:4
**educational**
63:21 64:1,15
65:2,11,14,20
81:22 82:5,10
82:14

[eduspire - essentially]                                    Page 36

| | | | |
|---|---|---|---|
| **eduspire** | 84:18,22 85:3 | **employees** | **entertainment** |
| 260:21 | 85:9,17 240:14 | 27:23 115:9 | 93:3 250:10 |
| **effectively** | 241:18 243:20 | 116:11,16 | **entire** 71:5 |
| 40:13 370:3 | 243:24 270:23 | 118:6 119:4 | 296:7 297:20 |
| 384:5 | 271:10,19 | 122:1 129:21 | 404:17 457:7 |
| **effects** 159:23 | 272:14 | 176:17,24 | **entirety** 97:21 |
| 160:8,23 | **employed** | 177:7 178:13 | 150:17 268:13 |
| 161:19 162:20 | 65:11,14 210:6 | 178:23 179:4 | 299:22 322:4 |
| 180:8 181:6 | **employee** 30:10 | 179:10 211:8 | **entities** 47:17 |
| **eight** 242:19 | 41:1,7 88:19 | 212:14 217:19 | 47:19 |
| 367:10 | 89:22 108:8,12 | 218:5,15 | **entity** 49:2 |
| **eiland** 3:16 | 108:13 115:21 | 220:19 222:9 | 78:16 |
| **eilandlaw.com** | 116:4 117:4,11 | 222:20 224:8 | **entries** 310:4 |
| 3:19 | 117:21 118:15 | 224:10,23 | 310:16,19 |
| **either** 28:19 | 120:4,9,19 | 225:1 226:1 | 429:5 |
| 32:12 38:5 | 121:17 129:10 | 227:12 228:22 | **entry** 37:1,6 |
| 41:1,7,20 | 130:8,24 | 228:24 274:6 | 317:13 439:21 |
| 55:23 72:17 | 131:22 132:17 | 294:10 307:14 | 442:15 |
| 142:13 147:3 | 133:9 134:3 | 307:21 344:19 | **epidural** 142:4 |
| 152:13 172:6 | 144:3 145:8 | 345:2 377:21 | **equally** 184:2 |
| 223:22 251:12 | 153:19 154:13 | 379:19 395:15 | **equals** 104:10 |
| 255:8 258:8 | 154:18 161:18 | 395:20 431:9 | **errata** 464:6,9 |
| 275:20 291:5 | 162:17 164:16 | 431:18 | 464:12,15 |
| 354:13 381:1 | 165:19 166:5 | **endowment** | 466:6 |
| 392:21 414:10 | 170:7,8 171:12 | 68:14,19 69:1 | **errors** 22:6 |
| 424:4 461:21 | 218:11 219:9 | 69:13 | **esquire** 2:3,9 |
| **electric** 451:5 | 219:22 225:14 | **engage** 437:7 | 2:10,16 3:4,10 |
| **eliminate** 180:7 | 225:18,23 | **engaged** 256:11 | 3:16 4:4,10,15 |
| 181:5 | 230:8,8 231:8 | 256:19 257:12 | 5:4 |
| **eliminated** | 231:14 242:4 | **engagement** | **essential** |
| 180:14 | 283:12 285:7 | 50:3 55:18 | 116:16 134:21 |
| **emotional** | 286:12 | 404:17 421:7 | 135:2 |
| 82:22 83:12 | **employee's** | **ensure** 421:18 | **essentially** |
| 84:3,8,10,12,14 | 161:22 231:11 | 424:9 | 404:11 |

| estimate 105:6 | examination | exclude 446:1 | 329:8,15 |
|---|---|---|---|
| 108:21 180:7 | 12:13 | excluded | 330:10 331:2 |
| 181:5 224:10 | examine 84:9 | 160:22 422:2 | 333:13 349:17 |
| 225:1 361:11 | 85:6 | excluding 38:4 | 349:21 350:3 |
| estimated | examined | exclusively | 352:2 355:4 |
| 131:1 188:17 | 12:10 85:14 | 328:9 | 358:2 363:1 |
| 188:23 189:3 | examiner 56:24 | executive 116:1 | 364:15,17 |
| 189:13 | example 31:17 | 229:19 | 365:3 366:4,12 |
| estimates 9:6 | 85:19 130:24 | exercise 33:22 | 367:21 368:2,8 |
| 101:5,13,22 | 183:19 201:21 | 407:9 | 368:10,17,17 |
| 102:8 112:8 | 202:14 207:16 | exhibit 13:15 | 369:22 370:4 |
| 162:23 169:24 | 243:19 402:16 | 13:22 14:4,10 | 370:13,17,24 |
| 187:6,19 188:4 | 440:4,7 | 14:17,24 15:7 | 371:2 372:13 |
| 368:12 455:23 | excel 314:16 | 15:13,20 16:4 | 374:1 375:24 |
| estimations | 316:20 384:21 | 16:11,19 17:2 | 386:9,11 390:2 |
| 140:1,10 | except 11:6 | 17:11,19 18:1 | 400:12,14,23 |
| eve 364:10 | 246:16 334:18 | 18:8,15,22 | 401:3,9,14,19 |
| eventually | 466:5 | 19:4,11,17,24 | 401:20 402:17 |
| 243:16 283:4 | exception | 20:7,14 36:1 | 402:17 414:20 |
| everybody | 56:22 104:20 | 42:24 43:2,9 | 415:4 422:16 |
| 170:20 410:14 | 105:4 210:7,11 | 43:13 51:23 | 422:17 423:4 |
| evidence 74:10 | 332:11 372:7 | 52:1,12 85:22 | 425:22 438:12 |
| 74:15,20 | excerpt 296:19 | 103:23 111:19 | 438:13,14,16 |
| 198:12 357:16 | excess 49:6 | 114:10 124:1,4 | 439:18 440:1 |
| 357:20 444:6 | exchange 79:8 | 124:11 125:3 | 441:4,6,20 |
| exact 113:2 | 79:12,21 80:2 | 166:17,22 | 442:9,20 446:6 |
| 209:16 408:16 | 80:10,15 81:11 | 167:24 203:9 | 447:18 450:16 |
| 426:17 427:7 | 81:23 82:10 | 203:10 235:21 | 451:14 459:21 |
| exactly 50:21 | 83:13 84:4 | 252:18 260:17 | exhibits 13:11 |
| 60:16 185:14 | 85:8,15 280:7 | 286:24 287:2,9 | 17:8 20:19 |
| 206:15 251:24 | 318:4,10 | 304:21,23 | 21:16,24 22:11 |
| 346:12,17 | 348:12 380:6 | 306:14,15 | 22:18 23:11 |
| 347:23 391:19 | 396:12 431:24 | 309:5,7 318:24 | 24:1 34:4 |
| 413:11 430:18 | | 322:15 326:21 | 144:13 349:10 |

**[exhibits - extent]**                                                    Page 38

| | | | |
|---|---|---|---|
| 446:21 457:20 | 384:11,15 | 17:3,5,13 18:3 | 258:6 |
| 458:4 | 385:12,14 | 18:11,17,24 | **experts** 240:21 |
| **exist** 192:11 | **expenditures** | 19:6,13,19 | 241:2 262:18 |
| 197:22 201:12 | 76:20 235:7,20 | 20:3,9,16,21 | 340:10,12 |
| 212:22 267:13 | 238:21 301:16 | 21:15,24 23:10 | 405:2 |
| 459:4 | 301:20 313:24 | 27:1,3,8,17 | **expires** 466:12 |
| **existed** 205:23 | 322:12 326:6 | 38:19 39:9 | **explain** 75:18 |
| 300:22 | 333:19 401:23 | 40:1 42:1 | 85:13 335:2,18 |
| **existence** | 402:23 | 52:22,23 53:2 | 416:15 |
| 193:22 194:3 | **expense** 24:24 | 53:3,9,19,23 | **explained** |
| 340:19 | 34:9 77:2 | 54:2,3,5,8,11 | 460:10 |
| **exists** 459:4 | 150:23 196:24 | 54:14,18,21,23 | **explaining** |
| **expect** 12:24 | 229:24 230:17 | 55:4 56:5,10 | 392:3 |
| 23:7 79:7 | 261:11 268:9 | 56:15,18,19,20 | **explanation** |
| **expectancy** | 310:10,12 | 56:23 57:17,22 | 59:20 |
| 142:8 | 353:15 388:23 | 58:4 59:1,12 | **explicitly** |
| **expectation** | 411:21 431:2 | 59:13,16,17 | 447:12 |
| 77:9,15 128:23 | **expenses** 76:6,8 | 62:10 70:13 | **express** 21:18 |
| 416:19 417:1 | 76:10,11,12 | 80:18 88:9 | **extent** 22:24 |
| **expected** 79:20 | 77:1 78:2,20 | 93:5,6 96:10 | 49:4 68:11 |
| 80:1,5,9,15,22 | 94:24 95:5,9 | 99:6 100:7 | 83:1 85:18 |
| 137:24 | 95:10 274:21 | 106:16 107:7 | 112:12,23 |
| **expended** 80:5 | 311:13 313:20 | 131:7 132:21 | 127:14 133:18 |
| 83:17 147:24 | 333:7,9 | 134:8 138:2 | 151:13 180:16 |
| 147:24 148:13 | **experience** | 183:13 190:5 | 185:13,18 |
| 149:10 234:2 | 183:10 215:18 | 191:8 212:10 | 188:7,11 189:8 |
| 324:7 367:4,7 | 257:24 | 212:11 245:4 | 189:10 190:12 |
| 367:12 | **expert** 6:13,15 | 376:24 379:10 | 190:13 192:22 |
| **expenditure** | 6:18,20 7:6,8 | 406:8 415:19 | 193:3 194:14 |
| 237:23 310:9 | 7:10,13,15,18 | 417:7 441:19 | 202:9 219:11 |
| 315:14 316:2 | 7:20,22 13:17 | 452:4 455:19 | 219:24 221:20 |
| 316:15 322:24 | 14:4,12,18,20 | 457:20 458:4 | 233:12 237:15 |
| 323:6 324:18 | 15:2,8,15,21,24 | **expertise** | 265:7 295:10 |
| 378:18 384:3 | 16:6,12,21 | 159:15 190:4 | 316:5 320:16 |

CONFIDENTIAL

**[extent - filled]**                                                                 Page 39

| | | | |
|---|---|---|---|
| 338:21 407:12 | 137:23 138:2 | 174:16,22 | **farm**  3:11 |
| 411:4 435:20 | 140:3,12,18 | 212:17 217:14 | **fault**  257:21 |
| 447:19 456:10 | 143:7,14 | 218:8,13 | 258:2,3 |
| 456:13 | 164:12 169:20 | 226:20 227:4 | **fax**  1:24 |
| **external**  233:9 | 185:16 194:18 | 230:10,11 | **features**  176:10 |
| 238:5,17,24 | 218:9 221:13 | 231:13 232:8 | 181:7,11,13,16 |
| 401:24 402:24 | 222:13 238:11 | 234:18 235:5 | **federal**  62:5 |
| **extra**  76:10,11 | 245:10 247:11 | 235:14 236:11 | 210:8 233:10 |
| 77:1 194:22 | 254:19 257:18 | 238:19 239:10 | 233:13,22 |
| 195:3,5 | 258:16 259:6 | 241:23 244:7 | 234:10 235:15 |
| **extremely** | 260:5 262:23 | 245:3 246:4 | 264:13 395:10 |
| 396:2 430:7 | 263:13 265:13 | 248:20,21,23 | 455:12 |
| **eyes**  129:1 | 267:18 294:1 | 250:16 256:4 | **federally** |
| **f** | 300:4,15 301:4 | 256:21 261:24 | 263:16 264:6 |
| | 302:3,12,24 | 280:9 305:16 | **feel**  22:5 164:24 |
| **f**  4:4 17:2 | 303:11 307:1 | 319:7 327:12 | 164:24 |
| **face**  75:13 | 331:7 338:6 | 344:16 347:9 | **fees**  47:20 |
| 109:2 151:18 | 394:22 418:21 | 348:7,8 362:14 | **fell**  240:6 |
| 229:8 312:6 | 431:2 435:4 | 380:8 381:11 | 315:11 |
| 317:11 383:21 | 442:1 | 393:19 396:14 | **field**  75:10 |
| 454:20 | **factors**  260:6 | 407:24 408:4 | 190:4 |
| **facebook**  88:9 | **factual**  126:7,9 | 415:21 423:12 | **fields**  53:12,20 |
| 90:18 100:20 | 168:18 376:16 | 448:10 | 54:8 57:15 |
| 102:7 128:10 | 376:23 | **fall**  315:11 | **fifty**  204:13 |
| 291:3 351:11 | **fail**  464:18 | 388:13 440:3 | **fights**  173:24 |
| 461:6,7 | **fair**  28:2 43:16 | **falls**  441:22 | **figure**  76:4 |
| **faces**  455:1 | 45:19 65:16 | **familiar**  231:4 | 405:19 |
| **fact**  68:20 | 69:2 70:12 | **fan**  202:5 | **file**  275:17 |
| 74:19 76:17 | 74:12,17 82:1 | **fans**  201:20,22 | 311:18 |
| 82:7 83:10 | 93:23 95:18 | 202:10 | **filed**  253:5 |
| 84:1 104:8 | 102:20 106:10 | **far**  36:5 44:6 | **files**  33:17 |
| 107:7 119:21 | 107:21 122:18 | 246:16 263:8 | **filing**  11:4 |
| 129:12 131:5 | 144:21 145:5 | 271:20 313:8 | **filled**  230:23 |
| 131:24 132:19 | 145:22 174:15 | 394:20 | 276:5 |

Golkow Technologies,
A Veritext Division

**[filter - former]**                                                     Page 40

**filter** 198:16,17
198:20 261:20
263:18,21
264:5,11,20
265:11 266:17
267:4,14
268:14 269:6
358:7,14
394:11,24
**filtering** 383:10
383:14 384:9
386:2,3
**filters** 261:17
262:5,9,23
263:16 265:1,8
265:15,19
267:23 268:6
268:22 269:18
270:5,11
365:16 395:6
**final** 113:18
114:5
**finalize** 35:24
**finalized** 363:8
405:1
**finally** 243:16
**financial** 5:4
30:5 32:7
74:11,15,21
75:5,12 151:19
152:3 274:18
276:15,16
277:12 317:15
325:1,10,16

394:19 396:1
397:1
**find** 26:22 99:5
100:6 161:22
440:16 457:21
458:5
**findings** 75:5
**fine** 110:17
**finish** 13:2
167:12 168:15
171:22 366:1
**firm** 3:16 32:9
33:2,5,6,11
37:16,17,21
38:1,10,13
39:12 44:14
45:23 46:16
49:2 50:2,4
51:7,12 54:23
**firms** 39:5
341:13
**first** 8:16 34:24
39:9 42:11,16
60:1 102:24
149:9 175:11
190:2 200:14
203:11,18,24
205:4,9,12,13
205:18 206:3
207:15,24
208:1 242:23
329:9,17
330:11 358:4
372:7 392:19

403:12
**fiscal** 86:8,9
325:17,18
337:5
**fit** 113:5
**five** 91:2 93:8
93:12 125:21
152:8 153:15
239:21 240:7
241:5,9 242:10
265:21 295:24
432:5
**fixed** 194:21,23
195:2 431:2
**flooded** 201:17
**florida** 5:6
**focus** 234:1
241:4 242:3
**folders** 37:7
**folks** 264:24
**follow** 311:17
**following**
359:10
**follows** 12:11
**footnote** 274:12
**force** 238:24
346:5
**foregoing**
463:17 466:3
**forensic** 33:24
35:20 37:12
40:10,12 41:13
53:14 56:18
75:2,10 104:5

105:13 109:16
109:19 148:6
149:13 242:24
247:14 313:2
314:3 354:14
354:22 402:5
404:21 405:4
405:18 407:11
408:20 412:4
417:23 420:20
424:22 427:24
429:6 450:15
450:22
**forensically**
113:3 221:5
246:20 268:10
**forget** 277:16
**form** 11:6
32:24 34:12
81:22 82:9,21
83:12 84:3
122:24 128:12
150:10 275:7
298:7 310:5
379:14 466:5
**formal** 67:1
**formalities**
55:6
**formally** 66:19
**format** 36:10
317:18
**former** 27:23
109:14

CONFIDENTIAL

**[forming - give]**                                                    Page 41

**forming** 23:13
23:24 24:13
25:13,22 27:12
27:20 28:5,9
28:15 274:8
307:16 377:23
395:17,22
416:2 423:14
431:11,11
439:5
**formulation**
35:23
**forth** 149:9
266:4 315:14
356:14 374:22
388:21 420:17
**forward** 323:24
**found** 321:19
387:4
**foundation**
208:17
**four** 26:7 36:21
58:4,18 59:10
180:24 212:7
240:7 241:9
396:16 426:5
**fourth** 368:24
**fraction** 271:23
**fraud** 56:24
62:5 74:10,20
75:8
**freeze** 378:20
384:17,19
385:15

**friday** 11:14
**front** 290:10
302:16,17
329:4 349:3
362:22 382:13
392:14 397:4
427:20,22
428:14 429:23
435:9 438:7
**frustrating**
429:22
**full** 296:17
332:20 335:3
342:18
**function** 245:6
**fund** 78:7,7
235:24 236:1
237:18,18,19
**funded** 235:8
236:1
**funding** 233:15
233:17,24
234:8,9 235:13
235:14,15
238:6,18 239:1
**fundraiser** 81:3
**fundraising**
66:3,21 68:13
68:22,24 69:13
69:17
**funds** 78:8
233:10,10,13
234:2,11,14,19
235:2 236:2,8

236:20 237:1
237:13,16
**further** 24:8
151:15 188:15
243:2 313:23
334:2 346:19
385:13 390:16
391:7,12 420:1
462:3
**future** 60:12
61:7 78:14
199:4 240:24

**g**

**g** 3:10
**gain** 78:24
**galveston** 3:18
**game** 105:17
**games** 92:12
250:4
**gathered** 217:3
**gathering**
33:22
**general** 29:15
34:1,8 75:22
78:7,22 148:4
149:6,23
150:17,22
151:17 171:5
196:13 214:9
233:13 234:10
235:24 237:5
237:18 242:1
243:14 310:3,8

312:8 317:11
345:23 347:18
384:5 386:2
388:19 429:4
**generality**
172:20
**generalization**
67:18
**generalize**
79:13
**generalizing**
77:20
**generally** 29:24
33:15 34:14
57:8 60:17
63:3 67:5,11
67:22 73:8
76:3 91:17,19
153:11 157:20
170:16,19
171:3,5 174:22
176:5 191:11
221:9 236:14
251:12 261:22
**generate** 78:1
**genuinely**
409:24
**getting** 42:3,5,7
140:16
**gilfillan** 3:10
**give** 13:11 23:7
23:7 43:23
47:15 59:20
62:2 75:24

**[give - gossip]** Page 42

| | | | |
|---|---|---|---|
| 107:6 115:11 | 121:5 129:2,12 | 237:17 242:2 | 207:8 208:17 |
| 123:7 130:2 | 131:7 174:23 | 242:21 247:10 | 209:24 214:24 |
| 182:15 196:12 | 182:17 214:13 | 253:5,10 | 219:2 230:16 |
| 197:4 217:6 | 215:2 247:1 | 275:16 311:3 | 232:20 244:10 |
| 219:3 245:4 | 249:12 258:7 | 312:13 315:20 | 247:6 248:10 |
| 263:4 278:11 | 261:13 263:11 | 323:9 347:21 | 248:21 273:15 |
| 280:19 294:16 | 329:5 376:24 | 357:13 385:13 | 273:18 274:19 |
| 295:12 309:1 | 457:16 458:18 | 429:6 444:2 | 282:19 283:7 |
| 311:20 360:15 | **globally** 423:22 | 448:13 450:18 | 284:12,22 |
| 376:23 377:3 | **go** 13:10 21:3 | **goes** 53:16 78:6 | 294:16 297:5,9 |
| 410:2 437:13 | 24:20 31:8,14 | 110:21 135:1 | 297:9,18 |
| 440:14 455:6 | 31:24 32:1 | 136:6 202:4 | 304:11 318:13 |
| 455:17 | 39:4 42:20 | 230:17 264:4 | 319:15 323:24 |
| **given** 23:21 | 44:7 53:21 | 301:13 323:18 | 344:3,5 349:17 |
| 24:7 32:3 | 55:5 59:19 | 359:8 366:11 | 355:14 359:23 |
| 39:19,22 96:14 | 70:24 81:5 | 411:7 446:21 | 360:15,21 |
| 101:8 129:15 | 84:5 85:19 | **going** 40:9 | 363:14 374:22 |
| 131:15 132:6 | 86:19 89:24 | 44:10 47:7 | 375:16 376:2 |
| 148:8,9 163:8 | 90:5 94:3 | 55:6,9 58:19 | 376:10 377:11 |
| 200:6 212:19 | 96:13 103:6,21 | 59:24 70:3 | 385:14 388:7 |
| 213:1,16 219:4 | 111:5,5 115:17 | 78:24 86:16 | 392:22,23 |
| 225:8 231:2 | 119:9,13,14,16 | 87:12 98:16 | 442:10 451:10 |
| 252:16 271:6 | 123:6 126:19 | 118:10 120:11 | 454:18 459:11 |
| 272:10 273:14 | 147:8 149:21 | 120:22 121:19 | 462:13 |
| 293:18 294:6 | 150:15,16 | 123:10 125:15 | **gold** 313:17 |
| 295:11 311:9 | 151:5,11 | 127:9 130:15 | **golkow** 1:23 |
| 314:13 352:8 | 152:24 153:1 | 130:16 131:13 | 11:13 |
| 376:2 409:4 | 157:3 166:13 | 140:6,23 | **good** 12:16,17 |
| 459:2 463:7 | 172:18 179:14 | 142:16 143:17 | 31:17 87:7 |
| 466:4 | 185:6 198:13 | 143:22 165:1 | 248:18 313:16 |
| **gives** 402:10 | 198:18 200:13 | 171:2,22 173:8 | 396:3 |
| **giving** 13:3 | 201:17,20,21 | 183:16 188:22 | **google** 2:13 |
| 56:2 96:11 | 204:24 207:12 | 196:9 197:16 | **gossip** 174:4 |
| 98:17 119:19 | 236:15 237:16 | 198:1 202:4 | |

CONFIDENTIAL

**[gotten - happened]**　　　　　　　　　　　　　　　　　　Page 43

**gotten** 221:18
　326:13 419:24
**govern** 68:5,9
　68:15 266:2
**governed** 67:5
　67:14
**government**
　378:9 382:5,10
　383:6,17
　385:22 387:13
　388:2,16 389:6
　389:19 390:10
　390:22
**grab** 100:23
　147:8
**grad** 64:5
**graden** 2:3
　32:23 39:16
　97:2 100:8,23
　114:18 121:9
　122:19 127:20
　128:11 133:11
　135:17 136:18
　139:1 140:14
　141:18 145:3
　146:10 150:9
　153:7,23
　154:19 157:12
　158:16 159:7
　160:3,12 162:1
　163:2 166:10
　167:11 170:13
　174:20 177:11
　180:11 181:9

182:1,11
184:13 187:9
188:6 189:17
190:22 191:18
192:21 194:7
205:20 206:17
209:6,19
210:21 214:6
217:22 218:20
219:14 220:2
220:23 222:24
224:12 225:3
226:5 227:5,14
229:4 231:12
232:9,15
241:21 249:15
250:23 254:3
254:22 256:3
257:14 258:22
262:12 268:23
269:20 270:13
271:13 272:19
281:22 282:5
282:15 283:24
284:10 285:13
292:7 297:12
297:22 300:9
301:8 315:5
320:1,13 325:3
333:17 336:18
338:10 341:18
342:2 343:4
351:9 355:2
356:1 361:24

364:24 370:8
373:15 374:5
375:13 376:21
387:15 389:7
390:24 392:6
394:7,15
404:14 407:3
408:9 409:11
410:9 412:13
413:24 419:18
421:5,10
430:23 437:10
437:21 444:21
452:2 453:20
454:14 455:4
457:8
**grand** 2:17
**grant** 234:4
　235:13,14
　239:1
**granted** 324:24
**grants** 233:22
　233:23,23
**great** 87:11
**ground** 273:17
　456:15
**growing** 202:1
**guess** 25:16
　30:19 39:5
　46:1 57:9
　66:11,15 84:5
　86:19 89:2
　105:11 121:7
　124:23 135:9

143:1,12 158:5
176:9 183:5
191:10 193:17
222:18 241:4
249:1 257:7
328:3 415:12
421:11
**guessing**
　228:21

**h**

**h** 6:9 7:2 8:2
　9:2
**half** 79:16,17
**hall** 260:13,19
　261:2,10
**hand** 17:7
　386:8 440:7
　445:16
**handed** 366:15
　366:16,20
　440:4,18
**handing** 124:10
　441:2
**handled** 451:8
**handwritten**
　276:7
**happen** 98:17
　343:9 456:15
**happened**
　30:12 198:9
　255:11 256:11
　257:4 456:11

CONFIDENTIAL

**[happy - hypothet]**                                                                Page 44

**happy**  32:1
  45:5,6 100:11
  149:21 172:18
  295:5 386:5
  391:16 438:8
  454:6
**hard**  136:3
  199:1 334:6,9
  368:21 372:6
  372:12 374:1
  381:23 428:15
**hardy**  2:16
**harford**  6:21
  7:19 9:11
  15:16,21 16:2
  19:7,12,15
  20:24 21:12
  26:13 134:13
  134:16 213:6
  213:10 214:1
  215:7 217:9
  228:6 252:11
  302:12,18
  303:5 316:24
  377:23 378:11
  379:20 380:6
  380:12,19
  381:7,9,18
  382:2,11,18
  383:15 385:20
  386:13,21
  387:3,10 388:8
  389:2,16,24
  392:4 393:15

  394:2,10,23
  395:4
**harford's**  378:3
  380:13,21
**harm**  118:2
  185:14 194:19
  196:23 265:17
  422:7 425:3
  436:19
**harmed**  248:15
**harms**  94:10
  185:6 207:9
  401:22 402:9
  402:22 403:10
  403:23 404:10
  405:23 407:1
  411:12 413:19
  413:23 436:16
**harold**  34:16
  35:8,16,17
  44:20 47:2,18
**harold's**  58:14
**hats**  53:6
**head**  30:4
**headers**  314:17
  316:21
**heading**  288:24
  453:6
**health**  70:10,13
  83:4,7 84:19
  188:19 189:7
  189:15 190:1,5
  190:19,21
  191:1 193:1,5

  193:13 239:16
  240:15 241:19
  243:11 244:18
  340:11
**hear**  126:7
**heard**  153:10
**held**  1:14 11:18
**help**  55:17
  132:11 345:22
  355:5
**helped**  34:11
**helpful**  28:4
**helps**  67:3
**hereto**  132:6
**hey**  312:12
**high**  64:4,7,13
  64:20,24 65:6
  65:9,18 66:6,9
  66:21 69:6,14
  70:3 76:1
  111:11,12,15
  143:11 284:18
**higher**  284:15
  405:9
**hired**  38:19,23
  39:3,7,20
  40:11 57:17,21
  60:18 405:17
  406:7
**hiring**  39:23
**historical**  385:2
  385:7
**history**  119:15

**hold**  56:14
  290:6
**home**  451:4
**hopefully**  397:4
**hospitals**  61:2
**host**  71:16
**hour**  42:8,11
  42:12,16,18
  301:10 365:1
**hourly**  42:6
  50:1,4
**hours**  50:22
  51:4 61:14
  105:13 109:18
  149:15 462:11
**huggins**  334:21
**huh**  360:12
**hundreds**  34:2
  41:11 57:23
  105:12 109:18
  149:14,15
  406:10
**hung**  140:16
**hurricane**
  62:19,22 71:2
  71:3,8 72:9,24
  202:7
**hyman**  26:18
**hypothet**  67:21
  88:18 131:15
  158:5 159:16
  163:23 164:9
  171:6 182:3,22
  192:10 208:8

CONFIDENTIAL

**[hypothet - improper]**                                    Page 45

| | | | |
|---|---|---|---|
| 269:23 | 244:10 253:1,4 | **impact** 118:24 | **improper** 77:4 |
| **hypothetical** | 253:20 298:20 | 119:6 127:12 | 86:22 89:11 |
| 88:16,16 | 298:24 299:10 | 130:3,19 | 95:10 96:17 |
| 197:17 205:1 | 301:16,18 | 131:17,18 | 97:22 98:20 |
| 206:20 263:10 | 310:22 324:4 | 184:18 198:21 | 99:11 100:1,14 |
| 270:15 | 332:14,16 | 207:9 222:15 | 107:15 113:6 |
| **hypothetically** | 338:19 353:5 | 245:20 248:14 | 116:24 118:3 |
| 263:15 320:4 | 354:5,20 364:1 | 262:22 271:16 | 119:1,8 120:13 |
| **i** | 367:1 381:20 | 283:2,18 286:8 | 120:24 121:22 |
| **ida** 62:19,22 | 382:11 383:15 | 286:18 321:5 | 122:3 125:23 |
| **idea** 43:22 | 384:6 385:9 | 364:2 395:7 | 127:13 129:19 |
| 228:13 285:21 | 388:22 403:23 | 456:18 457:13 | 130:3,20 |
| **identification** | 405:22 406:19 | 458:19 459:4 | 131:18 132:8 |
| 13:19 14:14 | 409:16 415:15 | **impacted** 83:6 | 133:2 136:11 |
| 15:4,17 16:8 | 420:9,12 | 244:12 245:17 | 137:14 138:19 |
| 16:23 17:15 | 422:21 426:2 | 245:18 270:1 | 139:12 141:9 |
| 18:5,19 19:8 | 434:12,18 | 321:13 | 143:19 145:14 |
| 19:21 20:11 | 440:2 445:3 | **impacts** 131:16 | 155:16 160:18 |
| 43:5 52:5 | 450:1 | **imparted** 272:1 | 161:6 163:11 |
| 75:11 124:7 | **identifies** 200:5 | **imperative** | 164:21 165:6 |
| 152:18 287:5 | 331:4 332:19 | 464:14 | 165:11,13,22 |
| 305:2 309:10 | 374:21 | **implemented** | 166:1,3,9 |
| 329:21 349:24 | **identify** 23:12 | 272:14 273:1 | 167:2 168:4,24 |
| 364:22 368:13 | 151:12 197:18 | 457:3 | 172:9 173:2 |
| 371:7 386:17 | 226:9,14 | **implementing** | 175:5,22 176:2 |
| 400:19 438:19 | 330:17 336:23 | 367:9,13 | 176:13,19 |
| 441:10 | 374:24 | **implication** | 177:9 178:14 |
| **identified** 86:3 | **identifying** | 428:17 | 185:17 186:6 |
| 105:8 151:14 | 36:7 150:7 | **implicit** 123:16 | 186:10,20,23 |
| 152:10 155:9 | **illogical** 170:7 | **implying** | 188:9 189:9 |
| 168:8 229:2 | 171:7 | 428:17 | 190:10 192:8 |
| 241:10 242:12 | **immediately** | **important** | 192:15,20 |
| 243:5,16 | 201:17 | 198:14 316:13 | 193:14 194:20 |
| | | | 197:1,20 |

Golkow Technologies,
A Veritext Division

877-370-3377                                    www.veritext.com

**[improper - inclusive]**                                                  Page 46

| | | | |
|---|---|---|---|
| 198:10,22 | 457:1 458:24 | 440:23 442:6 | 354:11,13,16 |
| 199:10 200:20 | **improved** | **included**   134:4 | 355:8,23 356:8 |
| 201:5,11 | 81:22 82:9,21 | 148:11,21 | 360:3 378:10 |
| 202:18 203:5 | 83:12 84:3 | 149:4 150:8 | 379:2 381:17 |
| 204:9,16,19 | **inaccurate** | 152:11,19 | 382:17,20 |
| 206:5 207:2 | 109:21 110:15 | 153:20 154:14 | 383:19 388:17 |
| 223:10 227:19 | 110:17 136:21 | 155:4,11 | 389:12 399:7 |
| 231:22 238:22 | 140:1 141:3 | 162:19,23 | 399:10,13,16 |
| 243:7 244:13 | 143:15 453:15 | 170:8 180:19 | 399:20,24 |
| 245:21 247:5 | 453:22 | 192:19 213:13 | 401:17,22 |
| 251:21 254:9 | **inadvertently** | 233:8 234:16 | 404:7 407:22 |
| 254:13,20 | 331:17 | 235:3,12 236:9 | 433:23 434:5,8 |
| 255:12,18 | **incident**   346:19 | 236:21 237:4 | 434:10,21 |
| 256:7,24 | 460:1 | 237:10 267:22 | 435:6 440:17 |
| 258:13 259:1 | **include**   27:8 | 271:22 272:5 | 440:19,21 |
| 262:6 263:7 | 49:13 83:2 | 292:5 293:14 | 441:21 447:3 |
| 265:5 266:8 | 91:5 104:13 | 298:4,11,14,17 | **includes**   192:7 |
| 268:2 269:4 | 151:9 157:9,24 | 299:8,13 300:7 | 303:17 330:20 |
| 270:2 272:7 | 158:9,22 | 300:17 301:6 | 361:12 435:23 |
| 273:20 278:12 | 159:22 160:8 | 302:6,14,20 | **including**   26:7 |
| 278:21,24 | 161:19 163:24 | 303:2,13 308:9 | 38:7 88:13,22 |
| 279:3,9,12,19 | 192:8,24 193:4 | 312:2,22 314:9 | 125:14 190:8 |
| 282:20 285:2 | 195:20 196:3 | 315:1 316:8 | 240:13 300:23 |
| 289:24 290:15 | 203:16 210:18 | 321:8,17,22 | 363:21 374:2 |
| 291:24 300:1 | 233:22 238:24 | 322:1,6 331:18 | 433:16 |
| 321:14 354:17 | 256:15 260:12 | 331:21,24 | **inclusion** |
| 355:17 359:17 | 261:15 272:5 | 332:2,15,21 | 393:11 414:16 |
| 360:4,6 364:3 | 273:19 292:3 | 333:14,19,24 | 422:4 |
| 375:2 376:4 | 293:4,7,12 | 337:7,17,24 | **inclusive** |
| 377:7 378:12 | 313:4 322:17 | 338:3 342:18 | 335:21 402:14 |
| 388:9 399:3 | 331:15 339:17 | 342:19,23 | 403:13 406:21 |
| 413:8 422:10 | 339:24 343:12 | 343:10,16 | 406:24 409:2,9 |
| 433:7,20 | 421:18 424:9 | 352:20 353:8 | 410:8,23 |
| 434:14 436:17 | 424:20 436:5 | 353:11 354:2,8 | 412:10,22 |

[inclusive - information]                                              Page 47

413:12,16,21
414:23 415:8
415:17 416:6
418:17 420:11
421:20
**income**   56:10
57:3
**incomplete**
171:6
**inconsistent**
295:5
**incorporated**
33:19 276:6
279:24 366:14
366:21
**incorporates**
367:19 375:24
**incorrect**   159:9
296:23 315:9
340:18 358:18
**increased**
78:11 82:4
111:23,24
**incur**   96:2 97:8
97:17 98:5
99:5,16 158:15
159:6 279:1
430:20
**incurred**   72:8
72:23 77:2,3
86:6 94:24
95:5,8 101:3
101:12,21
102:6,17,19

103:1,3 115:6
116:9 134:12
149:18 152:5
175:13 187:4
187:17 188:2
194:13,17
195:22 199:9
201:12 202:17
204:21,22
205:3 206:2,22
206:23 208:12
230:1,3 231:5
237:10 239:3
249:5 256:18
258:20 259:3
259:10 263:1
280:13,16,17
289:23 299:22
311:13 337:16
357:3 375:1
395:4 447:21
450:7 451:12
**incurrence**
196:24
**independent**
72:2 104:24
**index**   10:2
**indicate**   143:5
266:21 450:12
454:17
**indicated**
372:23
**indicates**
372:19

**indication**
319:17 420:1
444:3,14
449:15
**indicative**
162:12 237:11
340:16 428:8
430:3 447:20
**indirectly**
28:20 29:4
31:2 32:13
47:11,12 48:19
324:13 414:11
**individual**
30:20 95:17,20
155:19 181:21
181:23 182:7,9
183:2,4 184:9
257:12 265:14
267:18 355:22
**individually**
153:2
**individuals**
33:10 38:1
117:8 211:19
213:16 216:19
227:2
**information**
23:1 24:23,24
25:6 28:23
30:6 31:19
32:15 34:10
36:5,9 90:14
90:20,21 106:3

109:7 135:7
139:5 146:19
147:19,23
150:2,6 151:16
151:22 177:20
213:12 214:5
217:3 226:12
231:18 232:4
239:13 246:6
246:13 252:8
252:15 253:17
255:1,2 274:20
275:12,20
276:14,16,22
278:5 308:7,11
308:22 309:18
310:13 311:20
314:22 324:2,5
325:21 326:3
326:14,15
327:8,14,19
337:20 341:14
341:23 345:23
346:9,21 348:6
356:24 357:7
360:24 361:20
362:2 365:9
378:14 379:13
383:13 387:8
387:21 388:18
396:4 401:9,14
413:17 425:13
447:16

**[informing - interrogatory]**                                    Page 48

| informing | insofar  286:19 | intermittently | interrogatory |
|---|---|---|---|
| 327:9,15,20 | 346:2 395:8 | 50:23 | 41:2,8,21 |
| 361:21 | 450:23 | **internal**  24:15 | 89:16 93:19 |
| **ingersoll**  4:9 | **instagram**  2:19 | 24:16 25:1,11 | 108:9,12 132:4 |
| **inherent** | 88:10 90:19 | 25:15,17 | 135:15 136:1,7 |
| 107:14 | 100:20 102:7 | 107:14 450:23 | 136:17 137:6 |
| **initial**  55:6 | 128:9 291:2 | 451:9 | 137:22 138:12 |
| 212:10 242:7 | 351:11 461:9 | **internally** | 138:23 139:6 |
| 242:15 328:4 | 461:10,11 | 451:8 | 139:19,23 |
| 365:14 | **instance**  31:16 | **internet**  261:17 | 140:9 141:6,13 |
| **initially**  274:17 | 151:6 198:15 | 261:20 262:9 | 142:19 143:9 |
| 326:7 410:13 | 200:14 201:16 | 264:20 266:16 | 145:9 154:2 |
| **initiated** | 220:8 316:1 | 267:3 268:22 | 161:4 162:18 |
| 277:10,14,23 | **instances** | 269:18 270:11 | 163:18 171:13 |
| **injections** | 256:17 257:9 | 394:4,11,13,14 | 172:3,7,11,12 |
| 142:2,4 | **instituted** | 394:24 395:2,5 | 178:18 186:13 |
| **injured**  452:17 | 449:12 456:20 | **interrogatories** | 186:18 195:19 |
| **injury**  1:4 | 458:16 459:6 | 8:17,22 9:12 | 213:5,13 214:1 |
| 11:23 60:10 | **instruction** | 9:15 86:18 | 215:7,19 216:6 |
| 61:8 96:4 | 271:10 | 132:4 134:14 | 216:15,20 |
| 141:23 258:1 | **instructions** | 134:21 144:4 | 217:7,13 |
| 259:21 | 464:1 | 228:16 329:11 | 221:24 223:8 |
| **input**  107:17 | **insurance** | 329:18 330:12 | 223:15,23 |
| 110:21 116:17 | 62:21 71:14 | 339:18 364:20 | 224:4 232:4,8 |
| 134:22 135:3 | 96:7 202:3 | 365:5 374:10 | 232:12 246:7 |
| 138:7 | **intend**  22:12,17 | 380:15,23 | 246:14,18 |
| **inputs**  102:14 | 23:7 | 386:16,23 | 253:8,9,14 |
| 102:22 116:20 | **intends**  295:12 | 396:21 398:5 | 255:9 266:21 |
| 134:24 137:16 | **interactive** | 398:13 400:17 | 267:1 298:8 |
| 145:10 236:15 | 152:2 | 401:1,5 432:11 | 302:19 303:5,9 |
| **inside**  38:13 | **interest**  48:12 | 432:17 435:9 | 303:16 328:6 |
| 92:1 242:20 | **interesting** | 435:17 446:21 | 328:21 330:18 |
| 441:22 456:8 | 184:6 | 450:19 | 331:3,15 |
| | | | 333:12 334:24 |

**[interrogatory - issuance]**                                      Page 49

| | | | |
|---|---|---|---|
| 335:24 336:2 | 456:22 460:11 | 312:12 356:18 | 316:24 395:16 |
| 336:12,20 | **interruption** | 356:20,23 | 395:22 396:5 |
| 339:2,11 | 62:8,11,13 | 357:6 383:8,21 | 396:12,18 |
| 340:20 343:15 | 71:10,13,22 | 406:11 410:21 | 397:15 398:2,9 |
| 344:6 353:4,21 | 201:15 | 411:2 412:9 | 398:17,22 |
| 362:3,19 | **interview**  29:19 | 413:2 421:19 | 399:8 400:18 |
| 365:10 366:5 | 155:8 | 424:11 426:10 | 401:1,5,9,14 |
| 366:22 367:18 | **interviewed** | 426:15 427:2 | 402:18 404:5 |
| 368:5 369:23 | 222:21 | 427:11 446:11 | 405:17 406:17 |
| 370:12 374:20 | **interviews**  38:4 | **involve**  54:24 | 407:22 408:23 |
| 375:20 381:10 | 38:16 | **involved**  55:22 | 409:1,7 410:7 |
| 381:13,20 | **intimately**  71:7 | 61:5 71:7,18 | 412:7,9,16,20 |
| 382:12 385:20 | 231:4 | 109:18 127:8 | 414:20 415:3 |
| 387:10 388:5 | **introduced** | 220:12 226:16 | 415:15 416:4 |
| 389:9,22 390:2 | 345:7 370:17 | 227:7 230:10 | 420:6,9 421:19 |
| 390:7 392:4,11 | **investigation** | 241:1 405:5 | 421:21 422:1 |
| 393:4,18 | 137:2 | **involvement** | 422:15,22 |
| 398:19 399:10 | **invoice**  45:21 | 177:15 220:7 | 423:4,6 424:12 |
| 400:2,6,7,9 | 276:14,21 | 381:12 433:2 | 425:11,22 |
| 401:10,15 | 323:3 357:11 | 433:14 | 431:10 |
| 402:18 403:20 | 357:19 384:1 | **irrelevant** | **irvington's** |
| 404:6,9 406:19 | 427:15 428:23 | 244:19 | 396:1,19 397:5 |
| 407:23 410:17 | 429:2 436:9 | **irvington**  3:13 | 398:3,11,19 |
| 411:16 413:17 | 442:16 443:5 | 7:6,21 9:15 | 399:14 416:2 |
| 414:13,19 | 451:1 | 16:6,12,17 | 423:16,19 |
| 415:16 417:5 | **invoiced** | 19:19 20:1,5 | 424:10 |
| 418:20 419:6 | 310:22 311:12 | 20:24 21:12 | **issuance** |
| 419:11,14 | **invoices**  8:6 | 26:20,24 85:20 | 177:18 179:19 |
| 422:15,22 | 25:2 29:14 | 85:21 86:1,20 | 212:19 247:13 |
| 423:18 432:23 | 34:1 39:4 43:4 | 134:13,17 | 349:8 364:10 |
| 433:5,11 434:2 | 43:9,12 49:12 | 213:6,11 214:2 | 369:22 390:14 |
| 435:21 446:24 | 104:6 124:2 | 215:8 217:9 | 414:7 416:22 |
| 446:24 447:5,8 | 146:14 149:23 | 228:6 252:12 | 417:3 420:3 |
| 447:9,12 | 244:15 275:21 | 302:24 303:4 | |

| issue 93:18 | 213:10 220:19 | jackson 4:10 | joseph 2:9 |
|---|---|---|---|
| 94:3,4,12,20 | 222:9,20 224:9 | 451:5 | 232:15 301:9 |
| 126:17 161:12 | 224:24 230:9 | jeff 296:20 | 462:10 |
| 175:1 176:18 | 293:2,10 294:2 | jeffrey 1:13 6:4 | jsandoval 2:12 |
| 177:8,24 178:4 | 295:14 358:8 | 8:8 12:3,9,20 | jswofford 3:6 |
| 178:5,14 | 358:15 393:9 | 29:6 44:18,18 | judd 378:1,2,6 |
| 181:13,14,16 | 404:24 407:19 | 45:11 46:11 | 378:15,24 |
| 183:16 185:16 | 424:1 | 47:17,24 48:5 | 379:15,21 |
| 197:9,14 | issues 57:8 | 48:11 52:3 | 380:2 |
| 199:24 200:8 | 72:20 134:4 | 60:2,4 466:8 | judge 111:2 |
| 200:20 203:2 | 161:9,12 | jersey 3:11 4:5 | 112:13 |
| 204:1 205:17 | 164:12 185:1 | 4:11 86:5 | july 17:23 |
| 206:14 209:17 | 185:23 186:15 | 403:13 406:21 | 18:12 19:1,14 |
| 219:12 220:1 | 188:18 189:6 | 406:24 409:1,8 | 20:4,17 21:8 |
| 245:11 246:9 | 189:14 191:4 | 410:7,22 412:1 | 43:19 45:5,10 |
| 251:13 252:10 | 191:12,17,24 | 412:10,21 | 45:24 46:10 |
| 253:1 255:23 | 192:18,23 | 413:15,21 | june 34:24 86:8 |
| 257:18 261:4 | 193:4,19 196:5 | 414:16,22 | 86:10 |
| 261:22 264:18 | 201:2 455:1 | 415:7,17 416:6 | jury 112:3,13 |
| 266:14 268:20 | issuing 424:2 | 418:17 420:11 | 114:11 134:2 |
| 269:16 270:9 | item 330:22 | 421:20 422:3 | justice 60:24 |
| 271:4 291:10 | 331:22 332:3 | 422:19,24 | 61:1 |
| 292:15 296:14 | 337:18 | 423:7,18,20 | justin 3:4 |
| 327:17,22 | itemize 335:2 | 424:12,16 | **k** |
| 334:13 336:16 | itemized | jobs 34:18,19 | k 63:20,21 64:1 |
| 352:4 374:12 | 100:16 179:23 | 34:20,21 35:10 | 64:15 65:2,4 |
| 409:17 421:23 | 385:5 447:11 | 35:11 37:3,4 | 65:11,14,20 |
| 424:14 430:19 | 460:12 | johnson 34:17 | 66:10 |
| issued 14:7,21 | itemizes 335:2 | 35:9 36:23,24 | kansas 2:17 |
| 15:24 17:22 | items 372:6,12 | jones 34:17 | kathryn 8:9 |
| 18:12 20:5,18 | **j** | 35:9 | 124:6,12 |
| 23:16 40:14 | j 2:10 3:4 | jordynn 4:10 | katrina 71:2,3 |
| 155:12 212:10 | | jordynn.jacks... | 71:8 72:9,24 |
| 212:15,16 | | 4:12 | |

CONFIDENTIAL

**[kboyce - knowledge]**                                                    Page 51

| | | | |
|---|---|---|---|
| **kboyce**  5:7 | 66:2,16,23 | 215:21 216:13 | 337:8,13 338:6 |
| **keep**  121:3 | 71:3,4 72:20 | 216:23 217:10 | 338:11 339:15 |
| 141:4 | 82:23 83:6 | 217:14 218:14 | 340:9 344:3,5 |
| **kept**  346:8 | 84:21 87:6,24 | 219:7,20 | 344:7 348:8 |
| **kessler**  1:14 2:3 | 88:12,15,24 | 220:18 222:8 | 349:4,7 356:10 |
| 3:4 11:19 | 89:21 92:6 | 222:16,17,19 | 356:11 359:3,6 |
| 39:12,14 51:7 | 93:24 98:16,24 | 223:16,22 | 360:13,15 |
| 51:12,16 | 99:2,17 100:3 | 224:6,13 226:6 | 369:15 374:6 |
| **kevin**  5:4 | 101:1,10,19 | 227:10,15,16 | 381:7 383:5 |
| **kids**  203:17,24 | 102:4 105:2 | 229:6,22 230:6 | 384:23 389:23 |
| 205:4,9,12,18 | 109:12 110:3 | 230:18,24 | 392:10,21 |
| 206:3 207:15 | 121:2 127:22 | 233:11,18 | 393:2,15,19 |
| 207:24 208:1 | 142:1 147:21 | 240:20,21 | 398:16,21 |
| 461:16 | 148:14,19 | 241:11 249:7 | 405:14 407:20 |
| **kind**  36:4 60:14 | 153:18 154:12 | 251:9,24 252:5 | 408:1,2,5,10,15 |
| 69:21 175:8 | 158:4 159:8 | 252:14 255:7 | 419:21 421:13 |
| 183:16 257:19 | 161:13,16 | 255:22 256:5 | 429:21 432:21 |
| **king**  1:15 2:4 | 171:9 173:21 | 256:22,23 | 433:9 436:8 |
| 3:5 5:3 11:20 | 174:10 176:5,8 | 257:2,16,19 | 437:11 440:10 |
| **kishia**  374:16 | 176:10,14 | 258:9 259:16 | 440:11,22 |
| **knee**  259:24 | 179:7,17 | 261:1,19 | 443:8,10 445:9 |
| **knees**  259:18 | 183:20,23 | 262:19 265:8 | 448:24 449:20 |
| 259:20,20 | 184:19 185:4,5 | 269:21 270:6 | 449:21,24 |
| **knew**  313:21 | 185:14,20 | 271:1 273:10 | 450:5 452:4,9 |
| 382:23 416:10 | 186:2,9,12,22 | 275:15 277:10 | 455:5,7,11,13 |
| **know**  12:24 | 187:2,11,15,22 | 278:19 281:11 | 460:2 |
| 13:6 30:12 | 187:24 188:13 | 281:14 282:7 | **knowing** |
| 38:24 39:2,21 | 188:22 189:12 | 285:17 291:18 | 164:11 185:12 |
| 41:9 44:8 46:3 | 189:19 198:8 | 292:19 296:4 | 206:19 218:24 |
| 46:20 48:1 | 199:5,19,20 | 296:22 323:14 | 224:18 229:6 |
| 49:20 50:21 | 200:10 201:14 | 325:4 326:12 | 270:15 407:16 |
| 51:2,17 53:16 | 207:5 212:2,18 | 326:17 327:24 | **knowledge** |
| 54:9 55:15 | 213:9,15,17 | 328:23 329:6 | 106:12,23 |
| 56:12 57:19 | 214:2 215:10 | 333:12 335:19 | 107:14 220:15 |

**[knowledge - lightspeed]**                                                    Page 52

228:1 230:12
230:17 231:5,8
232:6 251:5
295:9 436:13
**knowledgeable**
41:19 86:15
107:10 108:18
116:22 117:15
118:1,8,18,19
118:23 119:6
119:14,23
120:1,10,20,22
121:18 125:14
126:14 129:16
130:15 131:13
132:24 136:4
138:15 145:12
161:2 172:22
175:19 176:14
196:8 197:3
208:16 227:21
231:17 243:6
245:24 247:8
253:19 261:8
262:2 264:24
266:1 272:9
286:20 291:21
321:11 359:23
360:10,18,22
364:2 374:23
376:14 377:3
388:7 393:6
395:9 398:23
425:1 458:22

**known**   418:24
**knows**   270:5
**kslaw.com**   5:7
**ktmc.com**   2:5
3:6

**l**

**l.l.p.**   2:16
**labeled**   17:8
368:21
**lakdawalla**
26:8
**language**   166:5
167:24 168:21
352:1 365:21
366:4 418:21
**laptops**   358:8
358:15
**large**   109:17
**largely**   33:21
35:18
**larger**   60:23
**law**   1:14 3:16
37:16,17,21
193:22 194:2
209:24 262:8
262:16 263:12
263:24 264:13
271:9 341:13
**laws**   266:1
**lawyer**   262:14
412:8
**lawyer's**   467:1

**lawyers**   373:9
374:4 375:9,16
**lay**   93:1,5
107:7 153:11
191:7,7 249:16
**leading**   385:2
**learning**   84:14
84:19 85:4,10
85:17 240:14
241:18 243:20
270:24 271:11
272:14
**leases**   55:19
**led**   82:4
**ledger**   34:1
150:18 151:7
237:6 310:3,5
310:8,10,13,23
311:20 313:6
324:10 345:23
357:21 388:20
429:4
**ledgers**   29:15
34:8 148:4
149:6,23
150:22 151:17
242:1 312:8
317:11 347:19
384:5
**leeway**   47:15
**left**   331:17
**legacy**   66:4,20
68:12

**legal**   53:10
54:4 55:4,14
55:15,20
122:21,22
123:1 209:22
210:13 216:8
257:17,22
269:7 440:13
452:9 455:10
**lessened**   78:12
**lesser**   210:24
262:24 264:19
266:16,22
**letter**   9:19
441:8 443:19
444:1,3,5
448:2,16 449:3
449:9,13,16,19
450:2,12,15
451:14 453:3,4
453:14 454:8
454:19 459:24
**level**   76:1
234:20,23
235:23 245:7
392:12
**liability**   1:5
11:23
**liable**   259:14
452:8,18
**life**   60:12 61:8
142:3,7 260:4
**lightspeed**
151:15 350:11

CONFIDENTIAL

**[lightspeed - looking]**                                    Page 53

| | | | |
|---|---|---|---|
| 350:18 353:16 | **lisa** 8:9 116:1 | **lived** 71:4 | 123:13 150:15 |
| 357:18 358:7 | 124:6,12 | **llc** 2:13,13 5:9 | 150:16 151:5 |
| 358:14,23 | 170:15 229:17 | 47:18 | 154:16 157:3 |
| 359:14,16,24 | 318:20 319:5 | **llp** 1:15 2:3,9 | 161:21 162:11 |
| 360:2,19 361:4 | 321:19 326:22 | 3:4 4:4,15 5:3 | 166:16 172:18 |
| 361:6 363:21 | 327:1 338:15 | **loaded** 67:7 | 179:16 203:8 |
| 364:4 365:15 | **list** 205:13 | **local** 64:4,7,13 | 253:5,11 |
| **likely** 184:2 | 303:6 356:12 | 64:20,24 65:6 | 260:17 263:5 |
| **liken** 201:14 | 446:20 | 65:9,18 66:9 | 270:6 275:17 |
| **limit** 96:24 | **listed** 265:16 | 66:21 69:19 | 295:1,3 317:12 |
| 189:23 343:7 | 324:1 403:12 | 228:17 | 318:23 320:15 |
| 350:19 359:1 | 422:18 426:7 | **located** 52:20 | 322:23 326:20 |
| **limited** 127:19 | **lists** 403:16 | **locker** 353:18 | 350:13,16 |
| 156:16 161:10 | **litigation** 1:5 | 369:2,6 | 357:13 362:13 |
| 166:6,24 168:1 | 11:24 27:4 | **lockers** 202:14 | 364:14 370:11 |
| 168:22 169:24 | 53:3,10 54:3 | 202:22 203:13 | 370:13,23 |
| 184:24 185:22 | 55:10,11,21 | 239:15 353:19 | 374:9 386:5 |
| 186:14,18 | 56:5,11 57:18 | 357:15 362:8 | 391:16 400:8 |
| 188:18 189:5 | 57:23 60:6 | 363:22 367:2,4 | 405:8 422:14 |
| 189:14 222:2 | 163:13 183:10 | 367:7 369:18 | 423:3,5 425:21 |
| 289:17 290:14 | 214:8 | 374:3 375:6,22 | 425:23 426:9 |
| 296:14 352:3 | **little** 35:6 43:17 | 376:19 | 429:2,2,3,9 |
| 359:16 433:16 | 45:16 47:15 | **long** 50:19 71:1 | 438:8,11 |
| **line** 10:6,6,6,11 | 64:9 150:4 | 81:14 146:11 | 439:16,18 |
| 10:11,11,16,16 | 178:9 238:12 | 191:3 200:24 | 441:13,18 |
| 10:16,21,21,21 | 255:21 269:12 | 214:9 229:10 | 445:6 448:14 |
| 330:22 331:22 | 310:7 322:9 | 229:15 230:19 | 450:19 |
| 332:3 337:18 | 341:7 358:20 | 231:14 265:22 | **looked** 84:17 |
| 368:24 369:9 | 391:23 429:21 | 430:8 449:2 | 268:4 |
| 372:4,7 373:2 | 440:16 450:21 | **longer** 198:3 | **looking** 29:20 |
| 373:3 465:3 | **live** 52:16,18 | 354:13 356:13 | 34:8 50:6 |
| 467:2 | 198:6 426:3,6 | **look** 74:9,14,20 | 61:13 123:9 |
| **linked** 255:24 | 426:10 427:2 | 74:23 85:2,20 | 152:3 205:12 |
| | | 86:19 122:7 | 207:15 229:17 |

**[looking - marks]**                                                Page 54

280:10,12
288:11 290:6
332:6 333:1,4
333:7,9 346:18
372:14 402:17
422:17 426:12
446:6 459:22
**loop**   310:20
313:23
**loss**   60:9 83:3
96:11 202:8
**losses**   71:13,22
72:12,18
355:16
**lost**   35:19,24
40:9 53:13
56:19 57:4
61:12 62:7,13
72:19 73:11
74:3 75:15,19
75:21 76:3,9
76:16,17 77:1
77:6 78:16
83:6 96:10
138:4 192:6
195:6
**lot**   24:22 34:10
39:1 61:24
62:10,22 67:13
77:23 96:21
165:12 198:17
215:22,23
216:3 242:21
257:24 264:2

265:8,9 284:15
346:10 359:15
383:7 404:19
406:9 428:10
**louisiana**   52:17
52:18,20 62:20
**low**   143:11
**lower**   203:24
266:23 361:9
405:10
**lumbar**   142:6
**lunch**   232:17
**luncheon**
232:23
**lying**   454:12,16

**m**

**made**   104:15
194:15,16
196:7 199:6
226:22 235:19
246:24 299:12
300:6,16 301:5
301:22 302:5
302:13 303:1
303:12 320:3,5
354:7 355:22
356:7 368:6
385:4 414:9
418:24 434:20
435:5 464:7
**mail**   30:17 32:5
32:5 274:5
307:13 345:1

431:8
**mailed**   108:16
**mails**   24:16
25:1,18
**maine**   2:10
**major**   54:12
405:6
**majority**   53:21
57:10 59:11,15
**make**   21:4 45:6
55:7 94:22
95:3 112:18
115:18 140:20
141:2 146:15
165:4 189:23
190:6 210:12
217:3 229:1
239:19 310:20
320:20 383:7
428:1 429:4
443:22 464:4
**makes**   234:12
234:24 247:15
440:6
**making**   88:16
123:15 149:15
234:1 244:21
339:8,12
393:21
**malpractice**
60:11
**manner**   183:15
**march**   362:20
371:19 374:15

**marginalizes**
105:12
**mark**   13:10
42:24 51:23
286:24 349:17
364:15 368:8
370:24 438:12
438:13
**marked**   10:20
13:18 14:13
15:3,16 16:7
16:22 17:14
18:4,18 19:8
19:20 20:11
43:4 52:4
124:6,11 287:4
305:1 309:9
329:20 349:23
364:22 368:12
371:7 386:16
400:19 422:16
438:18 441:9
442:8,20
**market**   3:17
248:24
**marking**
304:20 309:5
329:8 386:9
400:12 441:3
**markings**
443:13
**marks**   34:21
35:2

**[married - media]**                                                                          Page 55

| | | | |
|---|---|---|---|
| **married**  34:23 | 55:20 61:20 | 321:15 324:23 | 78:18 80:5 |
| **martin**  69:5,14 | 88:3 89:10,18 | 334:4 340:17 | 93:12 108:8 |
| 70:4 | 90:22 91:18,22 | 344:2 351:16 | 163:15 183:9 |
| **maslynsky**  1:18 | 93:10 94:7,15 | 360:5,7 378:13 | 202:11 204:12 |
| 463:10 | 94:21 95:11 | 382:1 388:10 | 220:4 230:13 |
| **massachusetts** | 96:18 97:20,23 | 393:24 396:16 | 234:7 239:19 |
| 4:16 | 100:2 101:9,18 | 397:17 399:4 | 244:4,14 249:4 |
| **master's**  36:13 | 102:3,13 | 407:19 409:5 | 258:18 259:8 |
| **matched**  385:8 | 105:24 109:5 | 409:14 425:4 | 259:12,13 |
| **material** | 117:1,19 118:4 | 428:20 433:8 | 263:17 264:9 |
| 164:12 185:15 | 120:14 121:1 | 435:2 445:16 | 269:2 273:7 |
| 371:18 | 125:23 126:17 | 459:1 | 297:8 325:5 |
| **materials**  23:12 | 127:1,12 | **matters**  54:4 | 339:7 357:5 |
| 23:23 24:21 | 129:20 130:4 | 55:4,14 57:24 | 411:20 429:9 |
| 25:6 26:6 28:3 | 130:16,21 | 136:24 137:11 | 431:3 442:14 |
| 31:12 32:2 | 136:12 137:15 | 215:23 | **means**  408:16 |
| 213:3 276:3 | 138:20 139:14 | **matthew**  26:16 | 412:2,3 463:19 |
| 312:16 315:16 | 141:10 143:24 | **mba**  36:15,15 | **meant**  294:20 |
| 323:1,9 329:4 | 145:15 153:16 | 36:15 | 319:21 320:9 |
| 346:23 378:18 | 154:9 160:19 | **mcknight** | 390:1 460:7,9 |
| 382:22 448:14 | 161:7,12 | 211:17 274:11 | **measured** |
| **math**  44:3 | 163:11,21 | 274:18 275:3,7 | 60:16 272:3 |
| 105:17 110:5,7 | 168:10 171:1 | 275:10,13,24 | **measurement** |
| 112:1 113:9 | 172:10,14 | 276:13,20 | 63:7,8 |
| 115:2 133:16 | 173:3 175:23 | 277:2,8,24 | **mechanically** |
| 133:20 207:20 | 176:3,20 177:2 | 278:3 280:2 | 108:16 111:16 |
| 415:22,22 | 177:10 178:16 | 312:11 | **mechanics** |
| **mathematical** | 179:1 180:2 | **md**  1:3 | 113:12 |
| 184:17 | 185:10 193:16 | **mdepaz**  2:18 | **mechanisms** |
| **mathematically** | 216:17 223:12 | **mdl**  1:4 | 34:7 |
| 111:17 184:16 | 224:2 232:14 | **mean**  29:4 40:7 | **media**  1:3 |
| **matt**  2:16 | 247:2 253:22 | 47:13 64:17 | 11:21 87:23 |
| **matter**  37:13 | 273:6,13 290:2 | 66:24 71:1 | 88:2,4,6,8,12 |
| 48:18,23 55:16 | 291:23 299:5 | 76:18 77:22 | 88:14,21,23 |

**[media - meyers]** Page 56

| | | | |
|---|---|---|---|
| 89:9,13,23 | 192:1,4,7,11 | **meme** 174:7,8 | **meta** 2:19 |
| 90:23 91:5,6,7 | 193:23 245:11 | **memorialize** | **metairie** 69:17 |
| 91:9,13,16,21 | 250:14 251:12 | 317:22 348:1 | 70:7 |
| 91:22,23 92:1 | 261:3,21 | 380:1 | **methodology** |
| 92:3,5,7,9,13 | 262:11 264:17 | **memory** 391:19 | 157:21 180:6 |
| 92:15,16,17,23 | 266:14 268:19 | **mental** 70:10 | 181:4 210:6 |
| 93:4,7,12 95:1 | 269:15,24,24 | 70:13 83:4 | 422:6 428:20 |
| 95:6,12 102:20 | 270:5 271:3,12 | 84:19 188:19 | **meyers** 1:13 |
| 103:4 125:11 | 288:9,20 289:1 | 189:7,15 190:1 | 6:4,12,15,17,20 |
| 125:11,18,20 | 289:8,13,17 | 190:5,19,20,24 | 7:5,7,10,12,15 |
| 126:3,13,15,20 | 290:1,14 291:9 | 193:1,5,13 | 7:17,20,22 8:5 |
| 126:23 127:3,7 | 291:20,22 | 239:15 240:15 | 8:6,7,8,9,11,12 |
| 127:11,18 | 293:21 295:22 | 241:19 243:11 | 8:14,16,19,21 |
| 128:1,21 131:3 | 296:12,13,21 | 244:18 340:11 | 9:5,7,10,13,17 |
| 131:6 132:1,20 | 296:24 334:12 | **mention** 122:15 | 9:18 12:3,9,16 |
| 153:5,14,21 | 350:20,24 | 123:3 124:21 | 12:20 13:16 |
| 154:8,15 | 351:2,14 352:3 | 125:4 126:22 | 14:3,11 15:1 |
| 157:10 158:1 | 352:10 359:1 | 290:20 291:2 | 15:14 16:5,20 |
| 158:10,14,23 | 359:12 373:1 | 327:6 361:17 | 17:12,18 18:2 |
| 159:5 160:1,11 | 390:23 421:22 | 385:21 | 18:16 19:5,18 |
| 160:24 161:20 | 424:13 461:22 | **mentioned** 93:8 | 20:8 26:23 |
| 162:21 163:10 | 461:23 | 155:22 322:8 | 29:6,10 33:7 |
| 168:8 169:6,10 | **medical** 60:11 | **mentions** 125:8 | 33:11 37:16 |
| 169:12,14,18 | **medium** 29:2 | 125:10 291:5 | 38:1 43:3,4,8 |
| 169:21 170:2 | **meet** 50:13 | **message** 174:8 | 43:10,15 44:18 |
| 170:10,23 | 51:6,10 345:20 | 174:8 | 44:20 45:11,11 |
| 171:16,24 | 346:16 | **messaged** | 46:10,11,16,19 |
| 172:1,16 | **meeting** 51:1,1 | 201:3 | 47:4,6,10,14,16 |
| 173:18,23 | 155:13 344:21 | **messed** 431:15 | 47:17,24 48:4 |
| 174:14,19 | **meetings** 50:16 | **met** 50:21 | 48:5,12,13,18 |
| 180:9 181:7 | 50:20 | 239:24 345:8 | 48:24 49:1,8 |
| 185:2,24 | **melissa** 39:16 | 345:10,19 | 52:2,4,8 59:22 |
| 186:16 187:5 | **meltzer** 1:15 | 347:12 | 60:2,2,4 63:2,9 |
| 188:3 191:22 | 2:3 3:4 11:19 | | 87:22 96:21 |

**[meyers - munger]**                                    Page 57

| | | | |
|---|---|---|---|
| 110:11 113:11 | **miami** 5:6 | **mold** 202:1 | 326:6 |
| 113:22 120:2 | **microsoft** | **moment** 115:11 | **months** 324:7 |
| 120:15 124:5 | 265:10 | 322:22 | **moore** 390:15 |
| 124:10 126:1 | **mike** 100:23 | **monetary** | 390:19 391:6 |
| 128:18 144:1 | **military** 61:2 | 77:10,16,21 | 392:22 |
| 153:4 164:15 | **miller** 1:18 | 78:23 79:3,8 | **moore's** 391:12 |
| 165:17 167:10 | 12:6 463:10 | 79:11 80:10 | 391:22 392:2 |
| 167:22 171:12 | **million** 86:12 | 81:11 | **morning** 12:16 |
| 173:17 176:1 | 415:23,23 | **money** 48:3,4,6 | 12:17 175:9 |
| 233:5 266:9 | **millions** 34:1 | 48:21 68:14 | **motivations** |
| 277:18 287:3,9 | **mind** 23:9 | 77:9,15 79:2,7 | 273:10 |
| 296:21 304:20 | 40:16 408:6 | 79:9,21 80:2 | **move** 130:23 |
| 304:24 309:8 | **mine** 405:9,10 | 80:11,16,23,23 | 422:12 430:15 |
| 312:1,20 | 418:2 443:17 | 81:12,24 82:11 | 436:3 |
| 329:16 330:7 | **minimize** 78:2 | 83:13 84:4 | **mto.com** 4:18 |
| 332:1,22 335:6 | **minor** 452:17 | 85:8,16 148:20 | **multiple** 110:6 |
| 335:12 349:22 | **minute** 124:23 | 149:3 191:23 | 183:20 217:1 |
| 350:3 364:18 | **minutes** 462:11 | 192:17 198:19 | 240:21 268:6 |
| 368:11,16 | **misconduct** | 238:3,15 | 315:10 426:20 |
| 371:3,10 | 74:15,21 75:12 | 247:24 248:4 | 426:21 430:1,1 |
| 377:20 386:12 | **missed** 397:8 | **monika** 8:20 | 438:1 |
| 400:15 406:16 | **missing** 276:4 | 116:7 229:14 | **multiplication** |
| 407:20 408:18 | 276:13,21 | 230:21 302:9 | 110:20 |
| 412:6 430:6 | **mission** 78:22 | 348:18,23 | **multiplied** |
| 438:17 439:1 | 79:4 87:2 | 349:18,23 | 103:12,24 |
| 439:16 441:2,7 | **missouri** 2:17 | 350:4 352:1,13 | 397:12 402:8 |
| 453:2 457:2 | **misstate** 56:1 | 352:16,23 | 424:23 434:24 |
| 459:20 460:15 | **misstatement** | 358:2 362:23 | **multiply** 105:8 |
| 466:8 | 121:10 | 362:24 | 113:2,4 405:21 |
| **meyers's** 44:19 | **misunderstood** | **monitor** 461:14 | 420:22 |
| **meyers00000...** | 425:20 | **month** 49:15,18 | **multiplying** |
| 8:7 52:2 | **model** 78:3 | 315:15 338:15 | 135:11 |
| **meyers00001...** | 195:7 236:14 | **monthly** 310:9 | **munger** 4:15 |
| 8:5 43:3 | | 323:17 324:18 | |

**[n - number]** Page 58

| n | need 13:5 53:17 | networks | 204:7 207:6 |
| --- | --- | --- | --- |

**n** 6:2
**nacva** 36:17
**name** 11:11
  12:19 34:22
  448:20
**named** 395:11
**names** 355:10
**narrow** 242:8
**narrowed**
  243:3
**narrowing**
  242:16,24
**national** 36:17
**nature** 86:24
**necessarily**
  30:1 39:22
  67:2,18 85:12
  95:8 148:7,13
  149:18 164:1
  197:7 207:22
  208:24 209:8
  216:24 234:7
  259:12 262:22
  263:17 273:12
  393:8 408:17
  410:11 447:15
  451:10
**necessary**
  116:17 134:22
  135:3,11
  261:11 464:4

**need** 13:5 53:17
  106:12,24
  134:9 247:20
  251:10 256:1
  311:7 313:9
  316:11 319:13
  346:12 396:3
**needed** 201:7
  247:17 254:12
  255:11,16
  259:19 310:17
  313:22 326:17
  347:13 379:3,7
  414:9
**needs** 142:2
  362:12
**negate** 194:18
**negotiated**
  267:10
**negotiating**
  197:23
**neither** 224:4
  436:18 443:16
**netflix** 92:17
  93:3
**netted** 237:8
**network** 358:8
  358:15 378:8
  382:4 385:22
  387:12 388:2
  388:15 389:5
  389:18 390:9
  390:21

**networks**
  359:12 382:9
  383:4
**never** 63:8
  91:20 182:13
  296:8 352:12
  352:15 461:3,5
  461:7,11,11
**new** 3:11 4:5,11
  64:4,7,13,20,24
  65:7,9,18 66:1
  67:11,13 69:10
  69:18 72:3
  86:5 115:1
  239:20 295:13
  403:13 406:21
  406:23 409:1,8
  410:7,22
  411:24 412:10
  412:21 413:15
  413:21 414:15
  414:22 415:7
  415:17 416:5
  418:17 420:10
  421:20 422:3
  422:19,24
  423:7,17,20
  424:11,16
**newark** 4:11
**newman** 70:23
  72:1
**nj** 86:7 410:23
**noble** 8:13
  115:15 156:13

  204:7 207:6
  230:15 280:24
  281:8,12,14,17
  289:4,5 290:10
  305:1,6,18
  306:11,14
**non** 77:24 79:8
  80:10 81:11
  93:5 154:15
  161:9 180:23
**normal** 313:2
**normally** 58:17
  60:5 277:3
**northern** 1:1
  12:1
**notary** 1:19
  466:14
**note** 316:13
  364:24
**noted** 12:4
  367:17 464:11
  466:6
**notes** 275:23
  276:1,8,9
  279:21,23
  317:21 347:24
  379:24 467:1
**notice** 1:13
**notion** 418:15
**number** 12:21
  32:6,7 33:14
  39:5 45:6
  57:14 62:2,21
  65:24 66:8,22

**[number - offering]**                                          Page 59

71:11,23 85:24
109:24 113:18
114:5 116:18
167:6,7,8,8,9
167:13,14,15
167:16,16,17
167:18,19,19
172:12 176:12
179:17 196:15
209:10 213:22
221:15 247:9
252:17 253:8
253:10,13
265:15 271:21
282:22 284:15
323:11 325:14
328:6 330:1
331:13,20
334:24 357:11
359:4,7 362:15
378:17 426:16
427:6 434:2
435:23 439:8
439:10,12
441:16 442:24
443:1 447:1,9
**numbers**
104:10 105:14
147:13 149:21
159:1 169:2
170:3 366:12
397:11 402:4
405:15 406:6
407:17,21

416:11,15,22
417:10,24
429:13,19
435:11,18,22
**nw**   4:16

**o**

**oath**   117:15
265:2 282:24
283:8 375:18
**object**   32:23
**objection**   100:8
114:18 121:9
122:19 127:20
128:11 133:11
135:17 136:18
139:1 140:14
141:18 145:3
146:10 150:9
153:7,23
154:19 157:12
158:16 159:7
160:3,12 162:1
163:2 166:10
170:13 174:20
177:11 180:11
181:9 182:1,11
184:13 187:9
188:6 189:17
190:22 191:18
192:21 194:7
205:20 206:17
209:6,19
210:21 214:6

217:22 218:20
219:14 220:2
220:23 222:24
224:12 225:3
226:5 227:5,14
229:4 231:12
232:9 241:21
249:15 250:23
254:3,22 256:3
257:14 258:22
262:12 268:23
269:20 270:13
271:13 272:19
281:22 282:5
282:15 283:24
284:10 285:13
292:7 300:9
315:5 320:1,13
325:3 333:17
336:18 338:10
341:18 342:2
343:4 351:9
355:2 356:1
361:24 370:8
373:15,16
374:5 375:13
376:21 387:15
389:7 390:24
392:6 394:7,15
404:14 407:3
408:9 409:11
410:9 412:13
413:24 419:18
421:5,10

430:23 437:10
437:21 444:21
452:2 453:20
454:14 455:4
457:8
**objections**   8:21
9:11 11:6
364:19 365:4
380:14,22
386:14,22
**objective**
409:20
**obtain**   226:24
227:1 341:23
**obviate**   260:7
**obviously**
212:21 273:8
427:23
**occasionally**
460:18
**october**   448:20
449:4
**offer**   22:17
53:8,11 54:1,7
107:17 108:19
133:5 225:6
**offered**   101:5
101:14,23
102:8 187:6,20
188:4 225:7
455:20
**offering**   93:20
94:1,5,8,14,16
94:20 95:14,23

**[offering - opinions]**                    Page 60

| | | | |
|---|---|---|---|
| 97:5,15,18 | 140:5 144:6 | **old** 461:19 | 243:23 244:24 |
| 98:2 99:13 | 157:6,11,13,21 | **olson** 4:15 | 245:8,14,19 |
| 126:14 131:3 | 158:2,3 165:15 | **omitted** 362:11 | 246:1,5 247:16 |
| 131:23 132:18 | 167:10 171:20 | **once** 239:23 | 247:20,23 |
| 132:21 158:12 | 196:16 202:21 | 276:5 298:10 | 248:3,17 |
| 261:9 | 206:11 221:11 | 321:21 353:7 | **opinion** 22:9,10 |
| **office** 51:4 | 243:22 252:23 | 382:16 399:12 | 93:2,5 94:1,6,9 |
| 52:20 387:7,20 | 277:21 292:17 | 410:3 434:4 | 94:15,17,20 |
| 388:12,17,23 | 293:24 295:7 | **ones** 27:15 32:3 | 95:15,24 96:11 |
| 389:13 | 298:1 304:8 | 118:9 176:14 | 97:6,15,19 |
| **officer** 274:18 | 305:23 307:3 | 180:15 212:24 | 98:2,18 99:3,8 |
| 276:16 277:13 | 307:11 309:17 | 214:14,20 | 99:14 100:4 |
| 360:24 | 321:7 330:9 | 216:20,24 | 107:7 108:21 |
| **offices** 1:14 | 332:9 334:15 | 217:2 231:24 | 110:11 126:15 |
| 11:18 | 334:15 348:10 | 265:15,16 | 131:3,8,24 |
| **offsets** 237:5 | 351:6 361:8 | 272:4 277:22 | 132:18,22 |
| **oftentimes** | 362:10 364:12 | 282:23 286:21 | 133:6 158:12 |
| 54:17 312:14 | 365:17 368:20 | 313:22 317:10 | 165:5 174:2,5 |
| **oh** 108:15 | 372:6,17 | 354:10 356:14 | 174:11,12,23 |
| 288:13 356:22 | 373:22 390:18 | 381:21 411:1 | 191:8,8 195:1 |
| **oil** 72:13 73:1 | 391:5 397:18 | **ons** 198:18 | 200:1,6 216:14 |
| **okay** 30:15 | 402:21 409:23 | 267:15,16 | 225:9 236:24 |
| 44:23 45:14,15 | 410:4 412:20 | **opine** 239:13 | 245:4 246:24 |
| 47:9 48:15 | 418:13 419:16 | 239:22 240:12 | 249:11 258:8 |
| 55:10 56:16 | 419:22 425:19 | **opining** 79:19 | 261:10,13 |
| 58:19 59:3 | 426:1,23 429:8 | 79:24 80:14 | 274:8 336:7 |
| 60:4,14 64:6 | 439:20,24 | 98:12 144:22 | 375:9 395:3 |
| 73:24 74:1 | 442:12 443:3 | 145:23 146:5 | 419:9 437:14 |
| 75:14 80:12 | 443:18 444:12 | 191:21 192:3 | 440:15 455:7 |
| 87:5 96:20 | 445:17 446:15 | 192:14 199:15 | 455:18 457:14 |
| 108:19 113:15 | 448:5 449:8 | 199:21 202:24 | 457:16,17 |
| 114:11 118:13 | 454:23 460:6 | 235:1 236:18 | 458:18,19 |
| 123:12,21 | 461:1 462:1 | 238:14,20 | **opinions** 21:18 |
| 124:20 125:1 | | 239:2 240:4 | 22:16,22 23:4 |

[opinions - pages]                                                Page 61

23:6,13,21,24
24:9,13 25:13
25:23 27:12,20
28:5,9,15
93:21 263:12
307:16 308:23
309:19 347:8
376:24 377:1,4
377:23 395:17
395:22 416:2
423:14 431:12
439:5
**opportunity**
21:2 71:21
72:16 78:19
277:6 296:17
297:20 414:5
**opposed**   54:13
147:8
**oral**   347:5
**orally**   311:15
**order**   9:17
151:1,7 223:4
231:9 232:7
357:14 383:16
390:8 394:12
395:1 409:18
426:16 427:6
427:16,22
428:7,24 429:3
429:12,18,24
436:22 437:2
438:18 442:16
443:5 447:23

448:1,6,8
450:11
**orders**   25:3
149:6 244:16
275:22 426:6
426:20 427:21
436:5 439:22
445:3 446:18
450:21
**organization**
67:16 69:20
395:11
**organizations**
73:9 74:5
**organize**   33:20
34:11 41:12
**organizing**
33:17 36:6
37:6
**orient**   430:10
**original**   21:6
23:22 24:7
41:10 179:20
233:17 234:7
359:19 464:15
**originally**
150:13 241:24
326:11 356:12
**originated**
234:9
**orleans**   64:4,8
64:13,20,24
65:7,9,18 66:1
67:11,14 69:11

69:18 72:3
**outcomes**   82:22
83:13 84:4,8
84:10,12,22
**outlined**   253:13
**output**   113:14
113:18,21
114:5
**outside**   33:1
37:15 38:10,10
92:1,16 106:19
163:12 190:3
235:17 240:9
242:6 248:9
337:12 455:18
**outstanding**
311:11
**overage**   76:20
**overall**   103:21
**overhead**   49:2
49:3,7
**overlap**   83:19
**overpaid**   249:8
**own**   46:19 47:6
114:24 151:2
225:9 311:22
314:24 346:2,4
346:4 404:12
**owned**   47:16
**owner**   46:15
47:2,23
**owners**   47:3
49:8

**ownership**
47:21
**owns**   48:13

**p**

**p.c.**   3:10
**p.m.**   232:21
233:3 304:12
304:18 377:12
377:18 459:12
459:18 462:14
462:17
**pad**   43:23
**pads**   200:15
**page**   6:11 7:4
8:4 9:4 10:6,6
10:6,11,11,11
10:16,16,16,21
10:21,21 86:3
173:18,20,23
174:4 274:12
287:17 288:3
288:12,18
350:13,14
358:4 365:22
366:9,23
370:13 372:1,4
387:5 425:23
429:16 439:18
442:4 465:3
467:2
**pages**   34:2
58:20 323:12
347:22 446:22

**[pages - parties]**                                                    Page 62

| | | | |
|---|---|---|---|
| 466:3 | **palo** 382:4,9 | 81:8,19 82:18 | **participated** |
| **paid** 41:24 42:4 | 383:1,2 384:18 | 83:9,24 85:21 | 274:22 |
| 42:5,7 44:5,14 | 385:10,18,22 | 95:7 103:5 | **particular** |
| 44:15,21 45:1 | 387:12 388:2 | 144:15 145:16 | 28:21 41:16 |
| 45:18,22,23 | 388:15 389:5 | 148:16 152:1 | 59:22 63:6 |
| 46:4 49:3 | 389:18 390:9 | 161:24 180:5 | 74:24 79:14 |
| 54:11,19 55:1 | 390:21 394:2 | 181:3 204:20 | 82:16 86:11 |
| 104:17 148:20 | 429:10 | 204:22 213:8 | 88:1,3 93:10 |
| 149:3,17,18,19 | **pandemic** | 217:16 218:2 | 96:15 97:12,19 |
| 152:6 175:13 | 272:16 273:2 | 233:5,13 | 100:17 103:9 |
| 204:18 207:24 | 273:18 | 234:11,13,20 | 106:18 109:5 |
| 208:1 209:2,3 | **panorama** | 235:9 236:3,5 | 117:17 127:14 |
| 209:16 210:19 | 338:22 | 238:1 239:5 | 137:11 181:7 |
| 210:23,23,24 | **paragraph** | 242:16 246:11 | 196:6 197:5 |
| 211:4 230:4 | 167:23 169:4 | 273:8,22 280:5 | 207:4 227:1,2 |
| 233:8 235:11 | 350:14,16 | 287:14,18,24 | 228:18 236:2 |
| 237:7,8 242:18 | 358:3,21,22 | 288:5 302:20 | 236:16 238:4 |
| 248:1,4,6,7 | 359:9 366:9 | 303:8 306:1,6 | 238:16 241:6 |
| 264:19 265:22 | 415:2 423:5 | 312:15 313:2,3 | 242:14 244:5 |
| 266:15 267:3,9 | **paragraphs** | 314:3 315:16 | 245:1,5,6,9 |
| 267:10 268:7 | 318:24 | 316:6,8 318:2 | 246:2 247:1,18 |
| 268:21 269:1 | **parent** 66:5 | 318:8 325:12 | 247:21 248:4 |
| 269:17,19 | **parents** 437:20 | 330:22 348:10 | 258:18 259:8 |
| 270:10,12 | 438:5 443:20 | 353:3,13,20 | 268:14 287:15 |
| 299:18 310:24 | 444:2 445:11 | 354:23 362:4 | 298:18 301:20 |
| 311:10,12,13 | 445:22 446:4 | 366:21 368:1,6 | 302:22 322:12 |
| 312:3,23 | 448:2 449:16 | 380:4 392:19 | 351:16 352:10 |
| 313:21,22 | 452:8 454:13 | 396:10,23 | 356:15 357:23 |
| 314:8,15 315:3 | **park** 4:5 69:17 | 400:5 413:3 | 359:21 433:17 |
| 388:24 409:1,8 | 70:7 | 417:20 418:11 | **particularly** |
| 410:7 412:9 | **parochial** 69:9 | 421:6 431:22 | 53:1 205:4 |
| 421:19 424:11 | **part** 54:12,17 | 439:10 446:10 | **parties** 55:22 |
| 451:9,11 | 68:13,19 69:1 | **participate** | 108:17 160:1 |
| | 74:9,14 78:2 | 49:9 | 160:10,24 |

[parties - percent]                                                    Page 63

161:20 162:21
409:17
**partition**  57:7
**partly**  68:24
**partnership**
429:17
**parts**  109:11
**party**  96:8
104:15,18
105:3 193:1
234:4 236:8,20
383:3 451:1
462:9
**pass**  261:2
**passes**  260:14
260:19 261:10
**past**  40:9 58:4
103:10 240:23
241:7,7,8,16
381:23
**pay**  194:4
202:4 229:1
234:3,15
237:12 238:6
238:18 265:21
315:19 412:21
412:23 428:10
**paying**  234:4
280:8 318:5,11
348:13 380:7
396:13 432:1
**payment**
230:18 299:11
300:16 301:5

302:4,13 303:1
303:12 354:6
355:21 356:6
357:20 434:19
435:5
**payments**
104:14 231:9
232:6 430:14
**payroll**  240:22
**pc**  4:9
**pdfs**  36:9
**peer**  138:1
**penalty**  214:17
219:4 225:8
265:3 282:24
**pending**  129:6
**pennsylvania**
1:16,21 2:4 3:5
11:21
**people**  38:13
43:14 48:17,22
67:23 77:22
80:24 89:3,9
92:11,22
118:17,18,23
119:14,20
140:22 176:13
179:3 183:7
201:1,1,2
207:7 213:22
214:13,23
215:6 217:1
220:9 223:3
225:5 226:10

226:13 227:16
231:1,24
244:10 248:11
250:5,8,11,12
250:17 251:7
264:23 265:24
273:14 274:6,9
282:18 286:19
307:15,21
344:19 345:2,6
346:13 377:22
379:19 395:8
395:15,21
398:23 431:9
431:18 456:14
458:22
**percent**  47:23
56:8 60:19
61:17 62:16,18
86:23 87:1
104:1 105:9
106:7,13 107:1
111:20,22
131:1,4,14
141:14 159:12
164:7 195:14
196:18,22
197:6,11 202:5
202:12,15
203:21,21,24
204:4,8,12,13
204:22 205:7
206:9,10
207:17,18

208:14,22,23
211:5 254:8,15
257:4,11,11
258:17,17,24
259:7,7,15,24
260:7,9 267:19
267:20,20
278:16 279:2
281:21 284:16
284:18 327:10
328:24 330:19
331:4,5,10,24
332:21 334:11
334:16 336:12
336:13,14
337:23 338:4,7
338:8,23 339:1
341:1,1,15,24
348:6 350:10
350:17 353:22
358:23 359:4,7
359:16,21
360:2,6 361:3
361:5,22 362:7
363:16,21
364:6,7,9,10
365:12,12,15
366:6,7 368:3
369:5,12,17
372:9,19,23,24
373:10,24
375:5,6,8,10,21
376:9,13,17,18
387:24 388:12

CONFIDENTIAL

**[percent - perform]**                                                   Page 64

389:3,11,16
390:1,6,8,9,20
391:8,9,14,15
392:3 393:16
402:8 403:9,22
405:22 413:19
424:24 436:21
437:1
**percentage**
46:18 47:5
49:9 50:7 56:9
102:18 103:2
105:21 106:18
107:8 109:22
110:10 111:1
112:15,24
113:5 114:23
131:9,14,24
132:18 133:1,1
139:9 140:2,11
141:1,8 142:20
143:18,22
144:12 161:11
175:16 182:24
184:22 206:2
207:1 247:4,11
254:1 262:3
265:4 266:6
267:23 288:8
288:19,24
292:4 298:22
299:16,21
301:15,19
303:7,18

305:18 328:24
330:14 332:18
333:13 343:2,7
364:9 377:4
387:6 388:1
389:4,17
395:13 400:4
411:12 413:20
434:16 435:1
**percentages**
40:23 41:5,18
103:13,18
107:12 109:4
110:14 111:10
111:14,18
112:4 114:13
118:12 121:20
125:20 129:14
129:23 130:1,7
131:21 132:16
133:8,19 134:6
134:15 136:9
137:3,8,21
138:11,22
139:19,23
140:8,18 143:8
144:2,6,8,19
161:6,17
164:18 165:20
166:7,23 168:2
168:22 169:17
170:9 172:24
184:11 186:14
196:14 208:18

216:22 217:12
221:1,7 223:16
224:3 231:10
254:10 261:7
281:10 282:3
282:10 283:12
285:7,9,19
286:3,13,14
287:16,21
288:3,23 289:3
305:11,24
306:8 307:4
322:7 328:10
343:21 344:2,4
344:15 350:6,9
361:10 382:15
397:8,13,19
399:1 409:18
413:6 420:23
425:16 433:18
**percents** 106:4
107:18,23
108:1,23 115:9
115:22 116:5
116:12,15
117:3,10,21
118:14 120:3,8
120:18 121:13
121:16 129:9
134:20 135:14
136:16 145:1,8
153:22 154:16
156:9,15 157:7
157:23 158:8

158:21 160:21
162:19 185:22
195:10 211:3
217:20 218:6
218:12,18
220:21 222:3
222:11,22
223:18 224:8
224:11,23
225:2,12,16,22
226:2,11
280:20 281:2
282:14 283:16
283:23 284:6,9
285:11 286:6
286:17 287:11
287:20 288:2
306:16 318:17
319:2 327:2
348:15,20
380:11,18
381:3,5,8
387:2 393:17
396:17 398:1,8
398:18 401:11
432:7,13,22
433:10
**perfectly**
143:10
**perform** 52:23
63:1 404:20
405:18 406:8
407:10 408:19
420:20 450:14

[performed - pieces]                                        Page 65

**performed**
26:10 50:1
53:24 106:15
109:16 111:8
197:20 221:22
246:20 263:7
444:11
**performing**
405:3
**performs**  60:5
**period**  51:5
58:18 63:4
65:4,5,15
72:19 86:7
228:2 242:18
248:7 272:2
299:19,24
346:17 382:1
385:10 405:12
409:15
**periods**  175:14
203:6 231:6
385:2 456:16
**perjury**  214:17
219:5 225:8
265:4 283:1
**person**  35:3
88:11,13,16
90:7 118:7
119:5 131:12
142:2 143:16
153:12 161:21
162:6 171:8
196:8 213:21

229:23 230:2
231:16 249:17
257:12 258:2,4
259:14,16
274:4 291:21
307:13 313:5
344:24,24
345:11,15,19
345:21 347:21
359:22 360:9
364:1 388:6
392:23 393:3,5
393:7 408:6
431:7
**personal**  1:4
11:22 60:10
96:4 141:23
228:1 231:8
257:24
**personally**
106:22 137:19
138:9 155:14
228:24 230:9
254:24 255:14
266:10 345:9
459:2
**personnel**  38:6
**persons**  41:19
86:14 107:10
116:22 117:14
118:1 119:23
119:24 120:10
120:20,21
121:18 125:14

126:13 127:8
129:16 130:14
132:24 136:4
138:14 145:11
161:1 172:22
175:19 197:3
208:16 227:20
243:5 245:16
245:23 247:7
249:7 253:19
255:3,8 257:5
261:8 262:2
272:9 321:11
377:2 457:15
**petroleum**
72:13
**ph**  1:24
**phil**  8:11 207:5
287:4
**phillip**  115:15
157:16 170:21
177:16 178:21
179:3 200:18
200:19 204:6
205:5,11,24
208:11 212:5
220:6 221:14
229:9 230:14
274:10,14,22
280:23 281:6
287:10 296:8
300:21 305:14
306:13,17,22
307:2,6

**phone**  30:18
43:24 44:11
202:14,22
203:12,13
249:21,24
250:3,4,7
307:13 345:17
353:18 357:15
362:8 363:22
367:2,3,7
369:1,6,18
374:3 375:6,22
376:19 455:3
456:2,19 457:3
457:6,10,24
458:8,15,20
459:3
**phones**  200:22
201:2,3 249:23
250:2,18 455:2
455:16 456:9
**photos**  159:23
160:9
**phrase**  88:14
408:2,7
**physical**  71:15
251:11,15,17
256:1
**physically**
214:22
**picked**  337:20
**piece**  447:16
**pieces**  81:16
219:17

CONFIDENTIAL

## [pinterest - point]

Page 66

| | | | |
|---|---|---|---|
| **pinterest** 92:3,4 | 184:10 210:5 | 153:5,6 157:10 | 160:5 168:14 |
| **pivot** 146:18 | 210:18 224:7 | 158:2,11,13,24 | 217:24 222:7 |
| **place** 81:1,2 | 224:17,22 | 159:3 160:1,11 | 309:2 311:6 |
| 249:22 274:17 | 226:3,12,24 | 160:24 161:20 | 318:7 326:20 |
| **placed** 261:7 | 227:11 241:14 | 162:22 169:6 | 327:18 330:17 |
| **places** 67:19 | 253:24 276:24 | 169:10,12,14 | 335:18 341:19 |
| 276:4 | 278:1 282:4,11 | 170:2,11,12 | 344:12 371:24 |
| **plaintiff** 2:6 | 283:14 294:8 | 171:17 176:9 | 397:21,24 |
| 3:13 9:10 38:5 | 324:8,17 | 180:9 181:8 | 462:6 464:3,8 |
| 38:6,14 60:15 | 341:13,22 | 187:18 191:15 | **plural** 98:21 |
| 60:19 61:15,21 | 393:20 396:8 | 193:6,13 194:4 | 99:12 100:15 |
| 62:18 63:2 | 396:16 400:23 | 250:14,22 | **plus** 323:14 |
| 101:18 135:24 | 401:3 409:6 | 255:23 260:23 | **po** 357:16,19 |
| 181:19 182:5 | 410:5 414:5 | 263:6 267:15 | **pocket** 83:5 |
| 182:23 193:21 | 416:18,20 | 269:4 296:1 | 102:16,19,24 |
| 194:1 209:15 | 418:10,14 | 359:12 | 103:3,11 |
| 265:14 273:9 | 419:16 | **play** 92:12 | 104:12,16 |
| 386:12,20 | **plaintiff's** 8:16 | 250:4 | 136:3 146:20 |
| 412:17 416:10 | 8:21 9:14 | **played** 109:17 | 193:11 241:8 |
| 417:2,5 440:19 | 329:16 364:18 | 201:3 | **point** 13:4 40:6 |
| **plaintiffs** 3:7 | 400:15 | **pleadings** | 42:21 81:17 |
| 3:19 4:7,12 | **plan** 61:8 | 93:17 128:22 | 128:5 166:4,21 |
| 25:12 28:11,17 | **plans** 60:12 | 176:5 253:5 | 169:22 173:5 |
| 29:7,10,14 | **plants** 71:15 | **please** 12:18 | 204:22 246:21 |
| 30:11 31:1,6 | **platform** 92:11 | 13:1,5 22:15 | 247:22 278:18 |
| 32:12,20 38:2 | 92:21 97:13 | 28:14 29:15 | 291:17 293:5 |
| 38:11,18,22 | 126:23 146:3,9 | 45:8 55:23 | 293:13 313:13 |
| 39:8 50:13,17 | 153:14,21 | 73:12 75:18 | 331:1 336:1 |
| 59:13 93:15 | 154:15 173:18 | 77:12 79:23 | 349:14 351:24 |
| 101:9 102:2,12 | **platforms** 2:19 | 85:1,13 95:2 | 353:5 363:19 |
| 105:23 108:2,4 | 88:13,22,24 | 115:11 123:7 | 365:20 366:3 |
| 108:5,7 136:23 | 91:6,10 93:3,7 | 123:13 125:7 | 391:17 406:9 |
| 137:10 150:2,6 | 93:13 125:21 | 128:15 129:4 | 442:11 459:7 |
| 182:13 183:11 | 126:17 145:21 | 146:4 158:18 | |

[pointed - prior]                                                    Page 67

| | | | |
|---|---|---|---|
| **pointed** 336:4 | 161:19 162:21 | **preexisting** | 38:2 105:13 |
| 419:13 | 461:12 | 260:2 | 281:13,19 |
| **pointing** 331:6 | **pots** 237:16,20 | **preference** | **present** 5:13 |
| **points** 180:3,4 | **pouch** 333:13 | 228:17 | 60:11 61:7 |
| **police** 346:5 | 335:22 336:15 | **premise** 340:7 | 134:8 135:4 |
| **portion** 47:10 | 337:17 338:3 | **prentice** 8:15 | 159:1 206:16 |
| 48:16 86:20 | 362:7 | 277:16 307:17 | **presentations** |
| 95:9 190:18 | **pouches** 200:16 | 307:23 308:1,5 | 24:16 |
| 199:8 204:14 | 202:13,22 | 308:12,22 | **presented** |
| 223:24 234:8 | 221:14 239:14 | 309:9,15,18,24 | 184:1 222:22 |
| 354:1 411:22 | 254:7 278:15 | 314:7,12,23 | **pretty** 72:14 |
| 411:24 | 279:6,14 | 315:22 316:9 | 260:10 345:24 |
| **posed** 159:19 | 328:18 329:1 | 316:14,19 | 379:9 |
| 279:16 | 330:15,19,21 | 317:19,23 | **prevent** 202:1 |
| **posing** 162:14 | 331:5,9,21 | 342:8 343:1,19 | **previous** 75:4 |
| **position** 41:14 | 332:2,12,13,20 | 344:1,14 | 432:4 453:23 |
| 119:22 199:7,8 | 332:24 333:10 | **prentice's** | **previously** |
| 361:2 416:14 | 335:3,20 337:5 | 322:14 342:17 | 95:12 168:7 |
| **positions** 231:3 | 337:24 339:7,9 | **preparation** | 170:4 285:23 |
| **possession** | 339:13,24 | 281:15 285:22 | 298:9 314:13 |
| 179:22 | 340:3,21 341:2 | **prepare** 35:23 | 380:9 396:9 |
| **possibility** | 341:10 343:13 | 40:20 50:12 | 432:3 |
| 339:23 | 344:7 353:18 | 51:8,12 311:7 | **price** 248:24 |
| **possible** 184:7 | 354:2 363:22 | 313:10 | **pricing** 198:5 |
| 268:18,24 | 367:2,11 | **prepared** 26:8 | **primarily** |
| 269:14 270:8 | 369:10,13,18 | 26:11,12,13,16 | 396:7 |
| 270:19,22 | 374:2 375:7,11 | 26:18 107:6 | **primary** 405:6 |
| 293:2,9 320:23 | 375:21 376:18 | 225:6 296:9 | 408:21 |
| 321:4 406:16 | **practice** 216:2 | 349:6 364:5 | **prior** 70:14,19 |
| 407:5,8 413:14 | **predated** | 385:7 405:15 | 72:6,21 177:17 |
| 414:2 | 349:10,11 | 422:5 436:14 | 195:12 212:19 |
| **post** 173:24 | **predicate** | **preparing** 31:6 | 213:1 247:13 |
| **posted** 159:24 | 456:11 | 32:20 33:11,17 | 269:10 293:5 |
| 160:10,23 | | 36:8 37:11 | 416:21 417:2 |

**[prior - provide]** Page 68

| | | | |
|---|---|---|---|
| 424:2 | 453:4 | **program** 69:22 | 446:12 447:4 |
| **private** 69:8,9 | **product** 247:19 | 83:4,5 86:15 | 447:10,23 |
| 70:8 72:3 | **production** | 387:5 | 448:9,18 |
| 233:23 | 10:10 | **programatic** | 449:11 451:24 |
| **probable** 407:6 | **products** 1:4 | 78:9 | 452:16 460:1 |
| **probably** 46:1 | 11:23 239:7 | **programs** 81:2 | **propounded** |
| 60:19 61:17 | 367:9,14 | 83:19 84:18 | 466:5 |
| 64:9,11 67:12 | **professional** | 85:3,9,16 | **proprietary** |
| 68:16 91:19 | 52:21 53:2 | 193:2 229:20 | 346:8 |
| 440:2 448:3,22 | 54:12 55:3 | 401:24 402:24 | **prospective** |
| **problems** 169:5 | 56:4 70:11 | **projections** | 199:5 |
| 169:9 188:20 | 129:4 | 152:2 | **protection** |
| 189:7,15 190:1 | **professionally** | **proof** 151:21 | 394:5,14 395:2 |
| 190:19,21 | 53:8 54:1 | 357:16 376:1 | **provide** 29:2,16 |
| **process** 70:2,3 | **profit** 47:19 | **properly** | 47:22 118:10 |
| 217:18 218:4 | 49:11 73:9 | 130:17 209:14 | 120:11,22 |
| 218:10,17,22 | 74:4 76:15 | **property** 57:7 | 121:19 127:9 |
| 219:8,21 | 79:1,5 81:3 | 104:21,22 | 129:22 132:24 |
| 220:13,14 | 233:21 | 239:17 240:15 | 137:6 147:18 |
| 223:2,17 | **profitable** | 241:19 249:10 | 155:1 172:17 |
| 226:17 227:7 | 77:10,16 | 251:23 252:1,2 | 172:23 175:20 |
| 279:1 313:4 | **profits** 35:19 | 252:9,16 | 208:17 213:23 |
| 314:4 354:21 | 35:24 47:10 | 253:12,15,18 | 223:3 226:10 |
| 398:21 399:4 | 53:13 56:20 | 254:1,5,11,19 | 226:15 227:12 |
| 417:21 418:12 | 62:7,14 72:19 | 255:4,10,16 | 231:18 262:9 |
| **produce** 29:21 | 73:6,11 74:3,6 | 256:10,15,17 | 271:10 274:19 |
| **produced** | 75:15,19,21 | 257:10,13 | 275:13 276:20 |
| 25:20,23 26:3 | 76:3,5,10,15,16 | 340:10 436:6 | 278:6 294:9 |
| 27:3,7,9,13 | 76:17,18 77:1 | 436:10,23 | 296:19 308:12 |
| 29:21 111:21 | 77:6,24 78:5,6 | 437:7,9,18 | 311:4,19 |
| 147:11 275:18 | 78:15,16,17 | 438:3 439:14 | 316:22 324:9 |
| 308:18 323:23 | 96:10 138:4 | 442:5 443:4 | 324:17 325:9 |
| 324:22 326:2 | 192:6 195:7 | 444:10,19 | 328:17 330:13 |
| 346:24 443:13 | 233:19 | 445:8,19 | 343:2,6,19,20 |

**[provide - purposes]**                                    Page 69

| | | | |
|---|---|---|---|
| 344:1,4 346:19 | 217:12 221:23 | **proximate** | 428:7,24 429:3 |
| 347:11,13 | 221:24 226:19 | 402:2 | 429:12,18,24 |
| 350:22 363:15 | 232:5 244:4,9 | **prussia** 1:16 | 442:16 443:5 |
| 378:15 417:22 | 244:16,18,19 | 2:4 3:5 11:20 | 451:3 |
| 458:23 | 245:1 246:6,13 | **public** 1:20 | **purchased** |
| **provided** 28:11 | 252:16 253:17 | 3:13 7:6,21 | 202:11 239:8 |
| 28:17 29:5,8 | 255:9 268:11 | 9:15 16:6,17 | 244:1 248:11 |
| 30:24 31:21 | 276:13,16 | 19:20 63:12 | 248:14 249:1,7 |
| 41:22 52:10 | 287:22 293:19 | 67:21 73:17,21 | 394:11,23 |
| 59:7 93:14 | 294:19 298:6 | 73:23 74:2 | **purchases** |
| 117:3,11 | 308:13,16,22 | 81:4 389:3 | 394:2 |
| 118:15 120:3,8 | 309:19 310:6 | 400:18 401:5 | **purchasing** |
| 120:9,18,19 | 310:10 312:15 | 466:14 | 248:12 367:8 |
| 121:13,16,17 | 314:22 316:21 | **publicly** 31:18 | 367:13 395:5 |
| 126:12 129:9 | 319:19 320:8 | 31:22 32:15 | **purport** 81:5 |
| 129:22 130:7 | 321:10 323:2,7 | 147:6 315:15 | 264:1 343:1,6 |
| 133:8,23 | 324:13 326:3 | 316:15 323:20 | 343:20 |
| 135:14 136:16 | 340:15 342:7 | 325:22 | **purported** |
| 137:12,21 | 346:22 347:4 | **published** | 326:19 |
| 138:11,23 | 347:14 360:1 | 323:20 | **purporting** |
| 139:5,23 140:8 | 386:4 404:12 | **pull** 43:23 | 371:20 |
| 143:8,22,23 | 411:6 413:16 | 44:11 | **purports** 317:9 |
| 147:1 152:20 | 425:12 433:4 | **pulled** 31:11 | **purpose** 88:8 |
| 154:18 155:6 | 433:19 445:19 | 147:10 315:17 | 91:14 204:21 |
| 161:3 166:7,24 | 458:21 | 325:16,24 | 204:23 384:8 |
| 168:2 170:9 | **provides** 78:12 | **purchase** 25:3 | 390:5 394:3 |
| 172:24 176:17 | 330:18 | 149:5 150:24 | 404:17 |
| 176:24 177:7 | **providing** | 151:7 242:5 | **purposes** 67:19 |
| 177:20 178:13 | 118:9 145:12 | 244:15 247:18 | 68:21 89:5,23 |
| 178:23 179:5 | 161:2 163:14 | 275:21 279:6 | 125:19 130:22 |
| 179:11,21 | 169:16 183:10 | 279:13,14 | 190:7 195:5 |
| 184:10 185:23 | 214:11 227:17 | 357:14,17 | 250:18,21 |
| 211:8,13 213:6 | 288:7,18 | 426:6,16,19 | 300:19 347:7 |
| 213:12 214:4 | | 427:6,16,21,22 | 354:16 387:19 |

CONFIDENTIAL

**[purposes - read]**                                           Page 70

393:13 397:16
**pursuant**  1:13
272:8 295:13
**purview**  210:1
**put**  35:1 36:9
81:1 102:15,23
103:15 147:13
149:9 177:21
201:22 220:22
221:15 222:11
223:21 239:20
265:2 266:4
302:17 315:14
323:7 332:18
374:22 384:22
397:4 400:3
417:5 420:16
427:19,21
429:22
**putting**  36:6
37:7 406:18

**q**

**qualifications**
36:12 380:9
**qualified**  53:12
54:9 56:21
57:2,14 62:10
68:10 396:15
432:3 455:6
**qualify**  265:10
**quantification**
244:20 246:17

**quantifications**
251:19
**quantified**  83:2
86:2,11 99:20
400:5
**quantify**  83:15
190:17 193:9
242:14 435:2
**quantifying**
195:6
**quantum**  303:6
**question**  10:20
11:7 13:2 35:6
39:1 44:22
46:23 54:7
55:24 57:20
59:4 66:17
67:8 68:1
77:19 79:18
81:15 84:20
90:1 91:11
94:2 96:22
97:1,3,24
101:6,15,24
102:9 113:23
115:18 120:16
121:6,8 123:11
125:2 128:15
128:18 129:6
135:19 139:3
143:1 150:3
157:20 158:6
159:19 161:15
162:8,13 165:2

168:15 178:9
179:8 182:20
184:6 186:11
187:1,7,21
188:5,14,21
190:3 193:18
193:23 199:20
205:11,23
209:12 216:16
222:1,6 238:12
246:3 269:11
278:14 303:24
304:1 318:15
326:13,18
341:7,17 366:1
372:5,20 373:2
373:12 374:12
381:3 391:23
392:15,20
397:22 422:13
431:16 432:6
436:1 447:1
453:23 459:21
**questions**  31:15
89:17 93:19
162:4,7 208:15
274:1,24 278:2
278:14 279:16
279:17 308:19
393:1 418:1,6
462:3,5 466:4
**quibble**  79:1
**quick**  44:12
252:6 318:1

**quicker**  346:13
**quickly**  44:1
**quite**  57:14
340:5

**r**

**r**  465:1,1
**radnor**  1:16 2:4
3:5 11:20
**range**  24:22
54:10 440:3
441:23
**ranges**  56:7
58:17
**rare**  183:13
**rate**  249:6
262:24 264:19
266:16,23
**rather**  162:15
336:8
**rationale**
255:15
**reached**  366:11
**reaching**  135:3
**reactive**  9:17
438:18 439:22
445:2 446:17
**read**  57:10
124:24 153:24
156:23 170:4
171:9,9 219:15
223:20 290:21
294:5 296:2,17
297:13,19,20

CONFIDENTIAL

**[read - reconciliations]**                                            Page 71

339:5 351:23
359:10 369:21
371:17 392:10
403:2 411:19
454:5,6 464:3
466:3
**reading**  296:7
**ready**  231:15
301:9
**real**  44:12
153:12 201:20
252:6
**realize**  416:1
423:13
**realized**  346:17
**really**  61:20
128:17 284:17
372:3
**realtime**  1:19
463:11
**reason**  111:13
119:17 126:5
130:9 135:21
136:20 224:15
249:6 280:16
284:2 358:11
358:17 373:23
395:19,23
424:15 451:22
464:5
**reasonable**
137:24 218:17
248:2,9 249:4
437:6

**reasons**  21:20
89:20 119:13
119:16,24
142:16 187:13
238:9 248:12
257:6 261:6
262:1 273:4
283:19 285:15
396:15 420:7
**reaves**  4:15
**rebuttal**  23:20
26:5,9 262:18
**recalculated**
114:23 134:9
**recall**  39:15
72:5 73:4
179:13 216:9
252:13,19
274:15 276:23
277:3 306:3
307:24 341:3
342:3,5 355:9
369:20 378:17
378:21 379:22
386:1 389:20
390:4 391:2
392:8 395:18
410:10 413:11
460:8
**receipt**  464:17
**receipts**  445:15
**receive**  31:4
32:18 33:10
35:16 36:3,23

37:3,9,14,23
47:9 48:15,21
79:7,20 80:1,6
80:9,15,22
107:22,24
108:3,11 150:1
150:5 228:5
308:6 317:1
363:14
**received**  24:5
30:10 34:15
35:7 38:15
49:13 81:10,21
82:9,20 83:11
83:18,21 84:2
85:8,15 108:8
228:11 238:5
238:17 239:8
245:9 252:20
280:7 318:4,10
319:17 348:12
349:8 362:23
363:7 379:13
380:6 390:14
396:12 410:21
411:2 419:10
424:2 431:24
444:19 445:1
449:21
**receiving**  79:11
**recently**  58:17
**recess**  87:16
173:11 232:24
304:14 377:14

459:14
**recite**  176:6
**recognize**  14:3
14:17 15:7,20
16:11 17:2,18
18:8,22 19:11
19:24 20:14
43:8 368:16
439:3,7
**recollection**
355:5 436:24
**reconcile**  75:3
221:19 310:16
316:3 342:12
355:12 397:16
406:10 434:11
**reconciled**
149:5 221:13
298:17 299:6
313:17 315:24
316:10,16
335:11,17
338:2 357:3
385:17 397:11
424:21 435:11
435:12,19
**reconciliation**
274:20 276:18
308:7 311:22
312:7 314:4
317:12
**reconciliations**
396:5

[reconciling - relate]                                    Page 72

**reconciling**
310:19 405:2
435:18
**record** 11:11
12:5,19 16:15
35:1 37:20
87:13,20
115:19 140:20
146:16 170:4
173:9,15
211:18 215:12
232:21 233:3
277:9 288:16
304:12,18
317:22 331:12
339:16 343:18
344:11 347:11
348:1 359:11
365:24 373:16
377:12,18
380:1 397:23
426:24 443:12
454:7 459:12
459:18 462:9
462:14 463:6
**recorded** 9:7
280:3 371:4
**records** 74:11
74:16,22 325:2
325:10
**recover** 437:19
438:4
**recoverable**
164:7 202:8,12

209:23 210:14
260:9
**recovered**
446:2
**redacted**
448:20 449:17
**redactions**
443:17,23
**reddit** 91:23
**reduce** 364:9
445:15 455:1
**reduced** 78:20
111:20,22
265:14 338:17
**reduces** 334:2
**reduction**
193:9 195:23
266:5 339:13
**refamiliarize**
185:7
**refer** 21:9
73:22 113:17
114:4 122:17
171:15,23
303:19 351:7
404:6
**reference**
149:20 290:23
296:12,13
315:23 323:1
324:3 351:11
351:19 357:12
385:3 426:18
426:19 429:12

429:19 440:6,8
**referenced**
386:1 393:3
428:14 439:12
447:17,18
**references**
427:10,19
448:12
**referring** 21:11
23:9 73:23
88:17,24 126:4
127:4 144:7
169:11,13
171:16 279:11
291:9,22
303:21 351:15
372:12
**refers** 88:12,20
126:3 127:3
128:7,7,8,8,9
128:10 169:4
169:21 172:1
291:9 351:14
352:3,10
367:18 370:14
387:12 442:19
**reflect** 189:3
195:15 197:7
197:12 207:22
208:24 209:9,9
311:9
**reflected** 317:4
317:8 442:7

**refresh** 355:5
**refusing** 46:22
**regard** 180:14
**regarding** 94:2
380:10
**regardless**
110:9 262:10
271:11 376:7
**regards** 252:17
**regular** 236:13
**regulations**
266:2
**regulatory**
395:10
**reimbursed**
236:7,19 237:2
444:15 445:21
**reimbursement**
237:12 444:18
450:13 451:17
451:24 452:7
452:12,15
453:17 454:1,2
**reimburseme...**
236:12 444:9
444:24
**reiterating**
195:13
**relate** 96:16
123:17 126:24
159:22 172:8
172:24 190:18
196:14 224:3
241:16 269:6

**[related - relied]**                                                     Page 73

| related | 390:23 392:24 | 161:5 185:1,23 | reliability |
| --- | --- | --- | --- |
| 82:13 83:3,16 | 393:23 417:12 | 186:15 188:18 | 109:24 111:7 |
| 84:18 85:3 | 417:18 418:6 | 189:6,14,24 | 133:22 148:16 |
| 86:21 93:9 | 432:4 433:2,6 | 203:17 251:17 | 164:1,4 217:11 |
| 103:10 115:6 | 434:13 435:14 | 254:1 260:13 | reliable   105:21 |
| 116:22 118:12 | 436:10,15 | 261:16 274:1 | 108:22,23 |
| 120:12 125:11 | 458:23 | 291:20 298:13 | 109:2,5 110:3 |
| 126:13 134:12 | relates   1:6 | 317:15 321:24 | 110:9,13 112:5 |
| 136:1 138:17 | 60:21 89:10 | 340:3 350:10 | 112:18,21 |
| 151:23 154:6 | 94:19 95:10 | 353:10 360:6 | 114:14 129:10 |
| 162:20 163:8 | 100:13 107:12 | 361:12 381:23 | 129:17 131:10 |
| 164:19 165:21 | 123:4 125:12 | 382:3,19 388:1 | 131:11 133:7,9 |
| 170:10 174:18 | 126:16 129:18 | 389:18 398:24 | 133:16,17 |
| 174:23,24 | 130:19 132:6 | 399:15 401:16 | 142:19 147:18 |
| 180:8 181:6 | 136:9 139:8 | 403:23 404:1,3 | 148:1 149:17 |
| 182:14 190:24 | 175:15,21 | 413:15,20 | 151:18 214:16 |
| 193:11 196:4 | 205:24 223:9 | 415:7,16 | 217:4 248:5 |
| 197:4 199:1 | 246:16,22 | 422:23 423:6 | 391:22 392:2 |
| 211:5,23 | 247:3,9 281:7 | 426:6 433:19 | 392:18 419:7 |
| 219:12,24 | 281:9 338:12 | 434:7 436:5,9 | 419:12 |
| 240:4 241:6 | 354:17 359:24 | 436:22 439:5 | reliance   286:8 |
| 247:14 251:22 | 364:4 376:4 | 447:23 448:8 | relied   28:10,16 |
| 252:24 253:14 | 384:15 388:8 | 455:2 459:24 | 28:23 29:5,8 |
| 253:17 254:8 | 399:1 409:15 | relation   289:22 | 30:9,23 107:9 |
| 262:4 274:20 | 413:7 418:3 | relationship | 109:7 110:14 |
| 275:20 278:11 | 422:9 436:16 | 248:13 | 111:10 112:5 |
| 279:19 299:7 | 440:13 445:2 | relayed   414:10 | 114:13 115:8 |
| 308:7 316:4 | 447:10 | 421:12 | 115:14,23 |
| 321:12 324:6 | relating   48:22 | relevance | 116:3 117:13 |
| 342:9 344:6 | 72:9,24 85:9 | 435:16 | 118:7 122:15 |
| 350:18 358:24 | 85:16 90:14 | relevant   46:21 | 124:16 129:21 |
| 359:16 362:6 | 116:9 120:23 | 47:1 48:2 | 132:23 134:13 |
| 381:22 383:9 | 121:20 122:3 | 280:18 294:15 | 137:5,9 144:19 |
| 383:13 384:24 | 124:17 160:8 | 294:21 | 145:7 146:24 |

CONFIDENTIAL

**[relied - report]**                                                Page 74

| | | | |
|---|---|---|---|
| 147:17,22 | 453:10,12 | 457:14 | **report**  6:13,15 |
| 148:2,3 153:20 | **religious**  67:16 | **remain**  172:5 | 6:18,20 7:6,8 |
| 154:14 156:8 | **rely**  94:22 95:3 | **remainder** | 7:10,13,15,18 |
| 160:22 164:17 | 106:3 115:20 | 142:7 | 7:20,22 13:17 |
| 166:19 171:14 | 116:11 122:2 | **remember** | 14:4,6,12,18,21 |
| 179:5,11 | 139:7,18 140:9 | 229:13 253:6 | 15:2,8,10,15,21 |
| 185:21 186:13 | 143:10 146:21 | 267:6 379:9 | 16:6,12,16,21 |
| 211:7,20 213:4 | 148:7 157:8,23 | 384:2 397:3 | 17:3,5,13,19,22 |
| 213:14,24 | 158:8,21 | 446:19 451:5,6 | 18:3,9,12,17,23 |
| 218:16 219:10 | 161:18 165:20 | **reminder**  13:1 | 19:1,1,6,12,14 |
| 219:23 223:15 | 195:9 228:23 | **remove**  405:24 | 19:19 20:1,4,9 |
| 225:13,17,22 | 231:10,24 | 406:12 | 20:15,17 23:3 |
| 226:2 280:22 | 232:7 281:4,20 | **rep**  370:21 | 24:6 26:11,12 |
| 283:11 285:6 | 282:13 283:15 | **repair**  251:23 | 26:13,17,18 |
| 286:11 287:11 | 284:8 285:10 | 258:12 259:3 | 30:3,7 33:19 |
| 294:12 305:10 | 286:5,16 | 437:19 438:4 | 38:7 80:18 |
| 305:19 306:1,7 | 287:16,21 | **repaired** | 84:23 85:2,21 |
| 306:15,21 | 288:1 319:4 | 254:12 255:17 | 86:3 88:9 |
| 307:8 314:6,11 | 325:8 348:22 | **repairs**  251:11 | 112:17,20 |
| 317:3 318:19 | 350:8 361:20 | 251:15,17 | 113:1,2 133:23 |
| 324:10,19 | 380:20 383:20 | 256:1 | 145:11 148:11 |
| 327:1 328:9 | 396:24 398:10 | **repeat**  79:23 | 155:4 180:19 |
| 331:9 348:17 | 432:15 437:2 | **replaced** | 181:1,15,17 |
| 350:5 365:11 | **relying**  89:6,7 | 259:20 | 196:18 200:11 |
| 380:13 381:9 | 93:13 172:5,21 | **reply**  7:10,13 | 200:13 202:20 |
| 385:21 387:1 | 175:17 268:16 | 7:15,18,20,22 | 203:7,9 206:16 |
| 387:11 389:21 | 295:15 308:21 | 17:13,19,21 | 212:20 235:6 |
| 390:3 393:8,17 | 309:17 343:24 | 18:3,9,12,17,23 | 237:10 238:21 |
| 396:19 397:1 | 344:10,14 | 19:1,6,12,14,19 | 239:12 244:20 |
| 398:3,18 401:8 | 347:5 348:4 | 20:1,4,9,15,17 | 247:13 248:10 |
| 401:13 403:21 | 366:5 367:24 | 21:7 23:17,20 | 260:18,20 |
| 404:7 432:9,23 | 377:1 418:13 | 24:5 93:24 | 271:17 274:12 |
| 433:11 439:4 | 418:19 437:3 | 179:23 | 276:2 278:10 |
| 446:7,12 453:7 | 450:12 456:14 | | 279:18,24 |

CONFIDENTIAL

**[report - respectively]**                                                         Page 75

| | | | |
|---|---|---|---|
| 295:16,19 | **reporter** 1:19 | 458:4 | 313:9 347:15 |
| 304:7 310:9,11 | 12:6 69:4 | **represent** 52:9 | 452:15 |
| 310:13 311:4 | 367:5 463:11 | 59:8 60:24 | **requested** |
| 313:11 314:12 | 463:21 | 196:22 197:15 | 29:13,18 |
| 314:19 315:14 | **reports** 20:21 | 296:22 | 347:18 |
| 316:2 317:9,9 | 21:6,7,8,15,24 | **representation** | **requesting** |
| 320:21 321:5 | 22:21 23:6,10 | 123:16 126:21 | 346:9 |
| 322:24 323:11 | 23:16,17,20,22 | 142:14 172:15 | **require** 231:7 |
| 323:17 326:16 | 24:8,9,24 25:8 | 214:10 313:5 | 232:3,11 |
| 328:14,20 | 26:5,8 27:2,3,9 | **representative** | 267:14 |
| 331:11 339:17 | 27:18 31:7,20 | 30:2 370:7 | **required** |
| 343:12,16 | 32:7,21 33:12 | **representatives** | 193:21 194:2 |
| 349:8 354:13 | 34:2,9 38:3,17 | 152:14 215:14 | 198:16 260:3 |
| 356:16 362:11 | 40:14 84:15 | 216:12 217:5 | 262:8,16 |
| 363:4,9,13 | 93:24 99:6 | 398:22 425:1 | 263:14 264:5 |
| 364:11 378:19 | 100:7 111:20 | **represented** | 264:12 271:9 |
| 378:20 379:10 | 134:8 135:4 | 62:20 71:11 | 451:16,23 |
| 383:24 384:1 | 144:14 149:23 | 72:11 130:18 | 452:6,11,14 |
| 385:9 390:14 | 150:21,23 | 138:16 311:14 | 453:16,24 |
| 390:17 393:9 | 151:1,7,8 | 314:19 376:10 | 454:2 |
| 402:11 404:2 | 159:2 179:20 | 452:23 454:20 | **requirements** |
| 405:1 407:18 | 179:23,24 | **representing** | 455:13 |
| 414:7 415:3,19 | 200:5 212:10 | 2:6,12,19 3:7 | **requires** |
| 416:22 417:3,7 | 212:11 213:10 | 3:13,19 4:7,12 | 263:13 |
| 417:21 418:11 | 235:22 242:9 | 4:18 5:7 210:4 | **researched** |
| 420:4 423:4 | 276:7 304:6 | 228:18 297:17 | 264:8 |
| 424:1,3 425:22 | 316:15 323:6 | 402:12 456:17 | **reserve** 78:10 |
| 428:15 434:13 | 323:16 324:10 | **represents** | 78:11 |
| 439:10,17,19 | 324:19 325:23 | 392:5 | **reserved** 11:7 |
| 441:20 442:3 | 326:6 331:19 | **reproduction** | **respectfully** |
| 445:4 448:12 | 347:22 384:3 | 463:19 | 96:20 128:24 |
| **reported** | 384:12,14,15 | **request** 10:10 | **respectively** |
| 453:19 | 385:12,14,16 | 30:5 37:7 | 124:2 299:23 |
| | 438:1 457:20 | 252:22 277:11 | |

CONFIDENTIAL

**[respond - results]**                                        Page 76

| | | | |
|---|---|---|---|
| **respond** 154:3 | 137:22 138:12 | 419:7,12 | 167:1 168:3,23 |
| **responding** | 138:24 139:20 | 422:15 432:24 | 169:18 170:23 |
| 96:24 | 139:24 140:9 | 433:5,12 | 175:4 177:23 |
| **response** 89:16 | 143:24 144:4 | 436:14 446:24 | 181:14 186:19 |
| 96:21 139:6,7 | 145:9 154:2 | 456:22 460:11 | 190:9 193:14 |
| 141:7,13 143:5 | 162:18 171:14 | **responsibility** | 194:19 197:1 |
| 163:18 195:20 | 172:3,7,11 | 68:4,8 437:8 | 199:10 202:6 |
| 217:7 223:7,24 | 178:18 186:13 | 437:12 | 204:8 206:4 |
| 228:16 232:5,8 | 186:18 213:5 | **responsible** | 207:18 221:21 |
| 232:12 272:15 | 213:14 214:1,5 | 258:10 259:15 | 223:10 227:18 |
| 273:1 303:9,16 | 215:7 216:20 | **responsive** | 238:22,23 |
| 330:18 336:12 | 217:13 221:24 | 96:22 | 239:3 244:12 |
| 339:3,11 | 223:15 224:4 | **rest** 45:3 142:3 | 245:14,18,20 |
| 340:20 343:15 | 246:7,14,18 | 366:10 | 245:22 247:4 |
| 353:21 362:19 | 253:14 255:9 | **restate** 126:6 | 248:15 251:20 |
| 365:10 366:22 | 266:21 267:2 | **restitution** | 253:20 255:17 |
| 367:18 368:5 | 298:8 302:19 | 440:9,11,20 | 256:23 259:21 |
| 369:24 374:11 | 303:6 328:21 | 448:18 449:10 | 262:5 266:7 |
| 387:11 388:6 | 331:3,16 | **restored** 444:6 | 268:1 270:1 |
| 390:2,7 400:2 | 333:12 344:6 | **restrictions** | 272:7 278:21 |
| 400:6,8,9 | 353:4 362:3 | 273:11 | 285:1 289:23 |
| 403:21 404:6,9 | 364:19 365:4 | **result** 30:18 | 299:3,24 |
| 406:18 407:23 | 366:5 370:12 | 83:18 98:13,19 | 321:13 338:14 |
| 414:19 415:16 | 380:14,22 | 99:24 105:24 | 339:3 354:14 |
| 417:6 419:15 | 381:10,13,21 | 107:15 113:6 | 355:16 360:3 |
| 422:22 423:18 | 382:12 385:20 | 117:18 118:24 | 375:1 377:7 |
| 434:2 447:5,9 | 386:15,22 | 119:7 121:3,21 | 378:11 399:2 |
| 447:13 | 389:9,22 392:5 | 125:24 131:17 | 410:16 451:13 |
| **responses** 8:22 | 392:12 393:4 | 132:7 138:18 | 456:24 |
| 9:11 41:2,8,21 | 393:18 398:19 | 139:11 143:18 | **resulting** 111:4 |
| 96:24 108:9,13 | 399:10 401:10 | 145:13 155:16 | 112:19 115:2 |
| 132:5 134:14 | 401:15 402:18 | 159:17 163:20 | 231:21 425:4 |
| 134:20 135:15 | 410:17 413:18 | 164:8,11,13 | **results** 280:13 |
| 136:8,17 137:7 | 414:14 418:20 | 165:24 166:2,8 | 417:23 |

**[retro - sandoval]**                                           Page 77

**retro** 199:3
**retroactive**
  198:8
**return** 77:10,16
  77:21 79:4
  464:15
**revenue** 76:8
  234:11 235:15
  235:19
**revenues** 76:6
  76:19 78:1
  233:18,20,20
  236:13 237:2
**review** 25:22
  26:3 27:11
  28:6 31:23
  157:1 213:2
  240:1 281:18
  295:4 319:13
  414:6 420:1
**reviewed** 23:19
  24:21 25:7
  26:6 31:12
  32:2 156:23
  179:15 180:2,4
  212:12,22
  213:3 220:20
  222:10,14,18
  276:3 281:12
  290:18 312:16
  315:16 319:8
  323:10 329:4
  346:24 371:17
  371:18 378:18

382:23 394:19
  439:13 448:14
**revise** 420:2
**rid** 404:3
**ridgefield** 4:5
**right** 43:20
  46:5 58:7 72:4
  73:3 83:20
  93:2 123:19
  141:24 143:11
  185:3 207:19
  220:4 222:18
  229:23 230:2
  275:16 290:11
  291:14 305:20
  322:19 328:22
  329:3 331:6,12
  333:2 341:4
  342:6 355:8
  356:20 363:10
  369:19 378:16
  379:23 391:2
  391:18 392:8
  402:3 413:10
  417:21 418:10
  419:20 425:16
  434:3 435:8
  439:11 442:24
  462:1
**rivera** 4:4
  51:21
**road** 1:16 2:4
  3:5,11 4:5
  11:20

**role** 33:15
  34:14 36:20
  40:2,19 54:20
  83:15 106:6,16
  109:17 114:24
  127:15 182:17
  220:10 230:23
  231:3 241:1,3
  405:16 408:21
  409:12 420:19
**roles** 405:6
**roll** 129:1
**roof** 239:20
**room** 346:11
**rooms** 367:3
**rooney** 4:9
**roseland** 3:11
**round** 402:4
**routine** 183:12
**routinely**
  259:23
**rule** 9:7 370:2
  371:4
**run** 346:2,3,4,5
  347:21 462:8

| s |
| --- |

**s** 2:3,9 6:9 7:2
  8:2 9:2 35:13
**safe** 367:3
**saint** 69:20
**sandoval** 2:9
  6:6 12:15 13:9
  13:24 14:2,16

15:6,19 16:10
  17:1,17 18:7
  18:21 19:10,23
  20:13 33:3
  42:23 43:7
  51:22 52:7
  69:7 87:9,21
  97:4 100:18,24
  115:4 121:11
  122:23 123:22
  124:9 128:2,16
  134:1 136:13
  137:4 139:15
  141:11 143:2
  145:6 146:17
  152:9 153:17
  154:11 155:21
  157:18 158:19
  159:20 160:6
  160:15 162:16
  164:14 166:15
  167:21 170:17
  173:6,16
  175:24 178:2
  181:2,18 182:4
  182:19 184:23
  187:14 188:16
  189:21 191:2
  191:20 193:20
  194:10 206:7
  207:14 209:13
  210:16 211:6
  215:4 218:1
  219:6,18

CONFIDENTIAL

**[sandoval - school]**                                          Page 78

| | | | |
|---|---|---|---|
| 220:17 221:10 | 377:9,19 386:7 | 453:21 | 354:12,20 |
| 223:13 224:20 | 386:19 387:22 | **says** 126:20 | 359:20 360:9 |
| 225:11 226:8 | 389:14 391:4 | 127:18 142:1,9 | 360:14,20 |
| 227:9 228:4 | 393:14 394:9 | 142:20 169:4,9 | 362:5,16 |
| 230:5 232:2,18 | 394:21 400:11 | 170:20,22 | 363:23 367:20 |
| 233:4 243:18 | 400:22 406:15 | 202:4 203:19 | 369:16 370:6 |
| 249:18 251:8 | 407:7 408:14 | 288:6,17 | 370:16,18 |
| 254:17 255:6 | 409:22 412:5 | 322:11 332:23 | 371:11,17 |
| 256:9 258:15 | 412:19 414:18 | 335:24 350:17 | 372:18,22 |
| 259:5 264:14 | 419:19 421:8 | 358:5,23 359:9 | 373:4,8 376:8 |
| 269:9 270:7,18 | 421:16 431:5 | 366:24 370:1 | 376:20 |
| 272:12,21 | 437:16,24 | 373:6 403:19 | **scheuneman's** |
| 282:1,8 283:9 | 438:10,21 | 403:21 411:16 | 220:7 366:13 |
| 284:4 285:4,16 | 441:1,12 445:5 | 414:20 448:21 | 367:21 368:1 |
| 286:23 287:8 | 453:1 454:10 | 449:14,14 | 368:18 372:13 |
| 292:11 297:7 | 454:22 455:21 | 451:20 452:7 | 373:14,23 |
| 297:16,24 | 457:18 459:9 | 452:16,22,23 | **school** 6:13,16 |
| 298:2 300:13 | 459:19 462:2 | 452:23 453:16 | 6:18 7:8,11,13 |
| 302:1 304:9,19 | 462:10 | 454:9,9,21 | 7:16,23 8:18 |
| 305:4 309:4,13 | **sat** 66:22 67:24 | **scenario** 192:5 | 8:23 9:8,19 |
| 315:7 320:6,22 | 346:10 | 192:6 | 13:18 14:13 |
| 325:7 329:7 | **satisfactory** | **schedule** 311:8 | 15:3 16:22 |
| 330:2,6 334:5 | 355:13 | 342:7 362:17 | 17:14 18:4,18 |
| 338:5 339:21 | **satisfied** 239:23 | **schedules** | 20:10,22 64:3 |
| 341:20 342:13 | **save** 201:18 | 311:15 | 64:4,5,7,7,12 |
| 343:17 349:16 | **saved** 76:11 | **scheuneman** | 64:13,19,20,23 |
| 350:2 351:17 | **savings** 78:20 | 29:19 154:24 | 64:24 65:6,7,8 |
| 355:19 356:4 | **saw** 296:10 | 277:12 302:8 | 65:9,17,18 |
| 362:9 364:13 | 393:10 | 344:22 345:4,9 | 66:6,13,21,24 |
| 365:2 367:16 | **saying** 29:12 | 345:10,15,21 | 67:1,5,6,15,21 |
| 368:7,15 | 46:24 85:11 | 346:21 347:4,7 | 68:4,5,8,9,15 |
| 370:10,22 | 122:17 123:4 | 347:11,17 | 68:23 69:3,6,8 |
| 371:9 373:21 | 321:3,6 358:18 | 348:2,5 353:2 | 69:10,10,14,15 |
| 375:4 376:15 | 364:5 417:9 | 353:14,20 | 69:18 70:3,8,8 |

**[school - see]** Page 79

| | | | |
|---|---|---|---|
| 70:16,21 71:12 | 218:4,10 219:9 | 450:16,24 | 238:9 242:7,16 |
| 71:16,16 72:8 | 219:21 227:2 | 451:23 452:14 | 248:9 258:5 |
| 72:11,23 73:5 | 228:19 229:15 | 452:18 453:5,6 | 318:16 337:12 |
| 73:7,10,12,17 | 233:7,15,21 | 453:11,15,16 | 421:7 436:20 |
| 73:21,22,23 | 234:2,15,19,23 | 454:12,24 | 455:19 |
| 74:2,10,16,21 | 235:11,16,22 | 455:14 456:1,3 | **sealing**  11:4 |
| 77:8,14,20 | 236:7,18 237:7 | 456:18,18 | **second**  17:7 |
| 79:6,14,20 | 237:9,14,17 | 457:5,7,12,22 | 103:2 115:16 |
| 80:1,8,14 81:4 | 238:3,15 239:7 | 458:1,6,9,16,19 | 305:9 316:1 |
| 81:10,21 82:5 | 242:19 247:17 | 460:3 | 322:20 323:4 |
| 82:8,20 83:11 | 247:21,24 | **school's**  68:20 | 330:8 352:24 |
| 84:2 85:7,15 | 248:18 250:20 | **schools**  3:13 | 410:4 422:18 |
| 86:8,9 87:3 | 251:10 255:24 | 7:6,21 9:15 | 426:10 427:2 |
| 88:20 90:11,17 | 261:11 262:7 | 16:7,17 19:20 | 432:10,16 |
| 94:23 95:4,15 | 264:18 265:19 | 30:21 34:9 | 433:4 |
| 96:1 97:7,17 | 266:15 267:2 | 66:1,10 67:13 | **section**  442:6 |
| 98:4 99:5,15 | 268:4,20 | 69:23,24 70:23 | **securities**  57:4 |
| 100:6 101:2,11 | 269:16 270:12 | 71:11,23 72:1 | 62:14 |
| 101:20 102:5 | 271:8 272:13 | 72:3 191:3,13 | **securly**  260:22 |
| 102:17 103:1 | 272:23 299:23 | 241:6 242:20 | **see**  29:14,15 |
| 104:14 105:1 | 317:1 325:20 | 243:15 263:22 | 31:17 36:1 |
| 106:8 107:2,11 | 329:2,12,19 | 266:2 271:24 | 45:4 56:16 |
| 107:24 108:14 | 330:13 334:23 | 334:22 389:3 | 57:11 62:23 |
| 119:15 134:5 | 335:7,8,13,14 | 400:18 401:6 | 75:3 103:7 |
| 144:24 145:19 | 340:23 342:1 | 428:10 456:8,8 | 113:5 124:13 |
| 146:1,6 149:11 | 346:3 354:1 | 459:5 | 147:9 158:3 |
| 151:1 152:6 | 358:6,13 | **schueneman** | 162:12 167:4 |
| 155:19 156:2,6 | 364:21 365:6 | 9:9 371:6 | 242:8 243:3 |
| 158:15 159:5 | 367:10,15 | **scope**  41:10 | 244:14 252:18 |
| 187:3,16 188:1 | 371:5 412:7,16 | 54:10 74:18 | 259:18 260:19 |
| 191:11,15,22 | 430:13,16,20 | 80:18 106:20 | 265:11 279:18 |
| 192:16 195:2 | 441:9 443:20 | 148:6,16 | 289:14,19 |
| 199:6 209:1,2 | 444:19 446:2 | 159:15 163:13 | 290:17,23 |
| 214:3 217:18 | 448:17 449:10 | 227:24 235:17 | 291:5 294:3 |

CONFIDENTIAL

**[see - set]** Page 80

295:4 310:3
315:20 320:19
325:13 350:21
351:1,10,18,21
352:6 358:5,9
358:22 368:20
368:22,24
369:4,8 370:14
372:5,10,17,21
373:2,7,12,13
373:19 387:17
410:16 413:1
426:1,11,14
427:1 428:3,4
429:16 438:24
439:11,21
440:1 441:20
442:13,14,18
443:18 446:20
448:23 449:13
**seeger** 4:4
**seegerweiss.c...**
4:6
**seeing** 332:2
355:10
**seek** 134:5
165:9 226:24
451:16,23
452:7,11
453:17 454:1,2
**seeking** 335:1
448:17 449:10
**seemed** 419:16
419:21

**seems** 143:5
**seen** 259:22
262:17 295:1
296:8 371:14
371:16 376:11
444:13 448:11
456:6
**sel** 83:4 192:24
193:4,12
239:15 243:12
271:23
**select** 103:11
104:16 110:21
113:3 117:17
131:16 139:10
180:17 235:21
240:5 241:7
243:4 247:15
253:18 262:4
271:21 276:18
298:24 299:2
299:10,19
300:6,17 301:6
301:21 302:5
302:14 303:2
303:13,19
304:3,4 308:8
308:15 321:12
322:5,12
332:17,18
333:23 336:23
338:12 343:8,9
352:24 353:5
354:5,11,20

356:7,12,15,19
357:23 362:17
363:20 377:5
381:24 383:15
389:12 401:21
404:21 405:20
409:4,14
410:14 411:11
420:21 434:12
434:18,24
435:6
**selected** 105:18
226:3 227:11
268:11
**selection**
246:23
**sells** 383:7
**sends** 174:7
**sense** 74:6
234:12,24
247:15 351:3
**sent** 444:3
449:16,20
454:8,9
**sentence** 264:3
359:10
**separate**
330:22 332:3,3
337:18 429:5
454:5
**separately**
181:22 182:8
183:3 184:5,9
331:22

**serve** 38:19
39:9 54:18
57:17,22 68:20
78:22
**served** 58:4
59:1,9,12,16
65:24 66:6,8
66:13,16,19
67:22 68:3,7
68:22 69:15,16
69:19
**servers** 359:13
**service** 245:9
247:18
**services** 53:9
53:11 54:2,7
60:5 239:7
244:4,9,16
245:1 366:24
369:1,6,9
374:18 378:4
401:24 402:24
429:17
**serving** 54:11
54:13 55:3
56:4,10 68:18
69:12
**set** 8:18,23 9:12
9:16 20:20
202:21 325:9
328:6 329:12
329:20 330:13
356:18,20
364:21 365:6

**[set - sitting]**                                                    Page 81

| | | | |
|---|---|---|---|
| 380:15,23 | **showing** 438:2 | 302:4,12 303:1 | 369:3,7,11,14 |
| 386:16,23 | **shown** 171:24 | 303:11 331:8 | 372:16 373:14 |
| 388:21 396:21 | 172:2 | 331:22 333:10 | 373:20 380:3 |
| 397:5 398:5,13 | **shut** 71:5 | 354:6 434:19 | 380:17 382:7 |
| 399:11 400:18 | **siculus** 2:19 | 435:4 | 395:18 398:7 |
| 401:6 432:11 | **side** 59:22 | **sir** 12:23 21:14 | 401:12 409:19 |
| 432:18 447:8 | 141:24 142:13 | 21:22 22:3 | 414:1 415:5 |
| **setting** 27:2 | 237:23,24 | 23:16 24:12 | 422:20 423:9 |
| 63:21 64:1,15 | 379:3,4 | 27:19 28:7 | 424:6 426:4,8 |
| 65:2,4,12,14,21 | **sides** 310:3,16 | 43:16 46:14,17 | 427:8 431:14 |
| 66:10 67:22 | 310:19 317:13 | 50:5 63:11 | 432:12,20 |
| 356:14 | **sign** 464:8 | 75:13 116:13 | 435:15 436:7 |
| **settlement** | **signature** | 134:18 156:11 | 439:10 443:10 |
| 72:18 | 463:10 | 156:19 157:5 | 446:5 459:23 |
| **seven** 58:20 | **signed** 215:6 | 168:6 169:19 | **sit** 22:4 46:4 |
| **shape** 122:24 | 216:11,19 | 170:5 176:22 | 67:23 72:4 |
| **share** 47:19 | 255:8 293:13 | 178:19 179:3 | 73:2 123:18 |
| **shareholders** | **signing** 216:10 | 195:8 207:20 | 176:6 185:3 |
| 78:18 | 464:10 | 225:15 228:9 | 297:5 355:8 |
| **sharing** 47:19 | **sii** 443:14 | 245:7 250:11 | 369:19 378:16 |
| **shb.com** 2:18 | 449:17 | 275:4,9 276:11 | 379:22 385:24 |
| **sheet** 464:7,9 | **silent** 339:7 | 280:4 281:10 | 391:1,18 392:7 |
| 464:12,15 | **similar** 415:13 | 281:16 283:19 | 413:10 434:3 |
| 466:6 | **similarly** | 294:13 303:18 | 435:8 439:11 |
| **shook** 2:16 | 324:16 | 305:8,22 | **site** 313:13 |
| **shop** 250:7 | **simply** 66:4 | 307:24 309:16 | 345:8 346:15 |
| **short** 296:3,6 | 76:23 228:20 | 309:22 341:11 | 347:20 |
| 346:17 | 340:18 | 343:23 347:2 | **sitting** 22:5 |
| **show** 125:7 | **sinewave** | 348:3 350:21 | 66:5 106:23 |
| 176:4 313:10 | 429:10 | 352:14 358:19 | 189:12 296:6 |
| 438:7 | **single** 165:4 | 361:15 363:6 | 328:22 329:3 |
| **showed** 310:14 | 229:11,12 | 363:11 365:7 | 341:4 342:6 |
| 313:11,19 | 275:1,6 299:11 | 365:16 367:23 | 344:8,9,13 |
| 317:11 | 300:5,16 301:5 | 368:19,23 | |

CONFIDENTIAL

**[six - sorry]**                                                    Page 82

| | | | |
|---|---|---|---|
| **six**  20:22 21:5 | **snapchat**  88:10 | 168:8 169:6,10 | 352:10 359:1 |
| 25:7 30:14,24 | 90:18 97:7,16 | 169:12,14,18 | 359:12 373:1 |
| 38:17 111:19 | 98:3 99:4,9 | 169:21 170:2 | 390:23 421:22 |
| 144:14 152:7 | 101:12 128:8 | 170:10,23 | 424:13 461:22 |
| 153:1,2 211:23 | 291:2 351:12 | 171:15,23 | 461:23 |
| 212:4 235:21 | 461:2,3 | 172:1,15 | **software**  249:9 |
| 251:18 265:20 | **social**  1:3 11:21 | 173:18,23 | 310:2 330:21 |
| 277:7 292:23 | 82:22 83:12 | 174:13,19 | 331:23 332:4 |
| 317:17 462:11 | 84:3,8,10,12,14 | 180:9 181:7 | 332:23 333:8 |
| **sixty**  58:18 | 84:18,22 85:3 | 185:2,24 | 334:1 335:15 |
| **skip**  61:19,23 | 85:9,17 87:22 | 186:16 187:5 | 335:20 336:14 |
| **skipped**  373:18 | 88:2,4,6,7,12 | 188:3 191:22 | 338:9 340:21 |
| **skyline**  378:8 | 88:14,21,23 | 192:1,4,7,10 | 346:8 |
| 382:4,9 383:3 | 89:9,13,23 | 193:23 240:14 | **solicit**  162:7 |
| 385:21 387:12 | 90:23 91:5,6,6 | 241:17,18 | **somebody** |
| 388:1,15 389:5 | 91:9,13,15,21 | 243:20,24 | 53:17 98:8 |
| 389:18 390:9 | 91:21,23 92:1 | 245:10 250:14 | 155:1 163:23 |
| 390:21 | 92:3,5,7,9,13 | 251:12 261:3 | 220:5 257:20 |
| **slightest**  283:19 | 92:15,16,17,23 | 261:21 262:10 | 257:21 312:11 |
| **slow**  45:13 | 93:4,6,11 95:1 | 264:17 266:13 | 326:17 374:23 |
| **sm**  9:17,18 | 95:5,12 102:20 | 268:19 269:15 | **somebody's** |
| 438:17,23 | 103:4 125:11 | 269:23,24 | 61:11 |
| 441:7,16 | 125:11,17,20 | 270:4,23 271:3 | **son**  69:20 |
| **small**  243:13 | 126:3,13,15,20 | 271:10,12,19 | **soon**  366:18 |
| 271:22 | 126:23 127:3,7 | 272:14 288:9 | **sorry**  17:22 |
| **smartphone** | 127:11,18,24 | 288:20 289:1,8 | 35:11 37:18 |
| 250:6,9 | 128:21 131:2,5 | 289:13,17 | 63:20 91:12 |
| **smartphones** | 132:1,19 153:5 | 290:1,14 291:9 | 121:14 131:10 |
| 249:14 250:12 | 153:14,21 | 291:20,22 | 199:16 290:9 |
| 250:20 | 154:8,15 157:9 | 293:21 295:22 | 315:6 332:1,22 |
| **smashed** | 158:1,10,14,23 | 296:12,13,21 | 342:16 350:14 |
| 259:19 | 159:4 160:1,11 | 296:24 334:12 | 365:23 397:24 |
| **snap**  4:19 | 160:24 161:20 | 350:20,23 | 417:14 431:11 |
| | 162:21 163:10 | 351:2,14 352:3 | 438:12 455:23 |

CONFIDENTIAL

**[sort - spreadsheet]**                                           Page 83

| | | | |
|---|---|---|---|
| **sort** 431:15 | 274:4 307:12 | 238:4,16,20 | 424:17,21,22 |
| **sorts** 34:6 | 431:7 | 239:2 251:14 | 425:13 |
| **sound** 43:20 | **speaks** 359:14 | 252:22 253:12 | **spending** 77:11 |
| 58:6 | 400:3 | 272:4 278:13 | 77:17 79:9,21 |
| **sounds** 58:19 | **special** 78:7 | 279:8 288:11 | 80:2,11,16,23 |
| 276:12 | **specially** | 321:16 322:11 | 81:12,23 82:3 |
| **source** 233:17 | 235:24 | 334:19 381:22 | 82:11 83:13 |
| 234:7,8,19 | **specific** 24:19 | 387:11 391:11 | 84:4 85:8,16 |
| 235:2,5,15 | 78:7 90:3 | 392:24 393:3 | 378:20 384:17 |
| 236:24 237:13 | 91:10 98:22 | 395:23 435:14 | 384:19 385:15 |
| 237:24 256:5 | 126:22 167:4,5 | 435:21 | 430:17,21 |
| 281:5 319:5 | 169:1 184:11 | **specificity** | **spends** 77:9,15 |
| 348:23 380:21 | 235:24 237:18 | 392:13,16 | 79:7 |
| 398:11 432:16 | 239:7 277:9 | **speculating** | **spent** 49:14,17 |
| 440:12 | 279:3 332:14 | 251:2 | 55:3 56:4 |
| **sources** 233:24 | 342:9 442:2 | **speculation** | 60:18,22 61:9 |
| 236:16 315:23 | 445:2 | 81:7 228:14 | 61:10,14 |
| **south** 5:5 | **specifically** | **spend** 80:23 | 149:15 191:23 |
| **southeast** 5:4 | 38:23 39:3,6 | 151:8,10 | 192:1,17,18 |
| **space** 464:6 | 39:13 86:5 | 198:19 335:8 | 196:1,2 238:3 |
| **spalding** 5:3 | 89:11 94:11 | 335:14 402:2,2 | 238:15 406:9 |
| **speak** 119:11 | 98:4 99:4,9,15 | 402:8,14 403:7 | 450:17 |
| 122:11,12 | 99:20 100:5 | 403:17,24 | **spill** 72:13 73:1 |
| 154:7 180:1,21 | 101:4,13,22 | 404:2,3,8,13 | **split** 60:14 |
| 218:21 220:5 | 102:7 125:22 | 405:19,23 | 426:21 |
| 220:13 255:4 | 126:4,18 | 406:3,13,20 | **spoke** 35:17 |
| 262:2 267:17 | 129:18 136:2 | 408:3,7 411:17 | 155:3 211:12 |
| 277:7,11 | 136:10,23 | 411:18,19,23 | 211:15,16,21 |
| 293:16 307:18 | 144:11 151:23 | 412:2,9 414:21 | 212:8 277:8 |
| 366:17 388:7 | 154:5 159:4 | 415:15 416:5,8 | **spoken** 177:17 |
| 420:5 421:14 | 163:9 164:19 | 416:17 420:10 | 352:12 435:13 |
| 421:15 | 165:21 170:15 | 420:13,24 | **spreadsheet** |
| **speaking** 30:1,4 | 171:4 172:12 | 422:3,23 423:6 | 314:16 316:6 |
| 111:17 144:10 | 183:14 186:2 | 423:17,20 | 316:20 342:20 |

CONFIDENTIAL

**[spreadsheet - students]**                                    Page 84

342:23 384:21
**spreadsheets**
33:18 36:8
37:11
**springer** 26:16
**stacy** 211:16,16
274:11,17
312:11
**staff** 29:9
**stamp** 316:7
438:23 439:8
439:12 446:22
**stamped** 310:6
323:12 324:14
326:9 347:1
**stamps** 147:13
323:8 324:4
326:4
**stand** 282:19
282:24 375:17
462:7
**standard**
313:17
**standing**
119:22 231:15
**stands** 249:6
295:20
**start** 33:4
64:18,21 106:2
109:12 121:14
150:12 151:4
161:15 235:18
241:12 372:20
401:2

**started** 242:1
**starting** 104:8
105:16 372:4
**starts** 128:20
**state** 12:18
210:8 233:22
234:11 264:12
267:2 291:7
395:10 455:12
464:5
**stated** 83:8
161:10 295:16
360:1 432:3
433:13 436:12
**statement**
21:17 55:7
82:2 88:17
138:14 168:17
175:18 295:19
331:1 390:6
**statements**
32:8 75:6 89:4
108:17 117:14
117:23,24
118:17 122:6
129:15 130:14
137:10 151:20
152:4 214:11
317:16 325:17
394:20 396:2
**states** 1:1 11:24
61:3 166:6,23
168:1 263:15
369:1 435:21

448:16 451:15
**statewide** 264:6
**stating** 352:2
462:8
**statistician**
56:23
**statute** 444:5
451:19 452:5
452:12 453:24
454:3
**stemming**
190:9
**stenographic**
12:5
**step** 210:1
316:1 322:20
323:4
**stephany** 4:15
**stephany.rea...**
4:18
**steps** 130:5,11
136:14 421:17
424:8 437:19
438:4 445:24
**stipulated** 11:2
**stipulations**
10:15
**stop** 129:5
**stopped** 199:19
**strange** 310:1
440:17
**straw** 278:19
**stream** 234:12
250:10

**street** 3:17 4:10
**struck** 460:4
**student** 66:6
82:15,21 83:12
84:3,7,9,12
90:14,21 101:3
101:12,21
102:6 116:2
174:7 190:24
191:4,16,24
192:18 366:24
369:1,5,9
437:6,18,20
438:2 443:21
448:19 449:12
451:18 453:18
455:2 456:2
457:6,24 458:8
**student's**
445:21 446:3
448:2,19
**students** 69:21
70:1,2 82:6
87:2 90:11,17
169:5,10
173:24 185:1
185:23 186:15
187:4,17 188:3
188:19 189:6
189:15,24
190:19,20
250:19 251:1,7
256:11,19,22
262:10 271:11

CONFIDENTIAL

**[students - sworn]**                                          Page 85

272:1 445:10
445:11,21
446:3 452:1
455:15
**study**   239:6
**stuff**   62:6 69:1
78:9 383:7
**sub**   315:13
**subcategory**
388:20
**subject**   42:20
44:16 70:5
142:15 195:12
222:13 299:2
369:23 380:8
455:12 464:10
**subjective**
283:23 284:7
285:9
**subjectivity**
284:21
**submitted**
20:21 89:22
118:20 119:4
**subscribed**
466:10
**subsequent**
65:5,15 71:9
179:19,22
349:7 374:14
390:13
**substance**
466:6

**sufficient**   390:7
**suggest**   277:1
278:2 358:17
**suggested**
224:7,22
**suggesting**
224:16
**suite**   3:17 4:16
5:5
**sum**   105:18
**summary**   426:3
441:19
**summer**   64:3,6
64:12,19,23
65:6,8,17
**supercede**   81:6
**superceded**
349:14
**supercedes**
339:2 359:19
376:12
**superceding**
338:14
**superintendent**
156:2,5 230:15
334:22 378:4
**supervision**
463:21
**supplement**
323:22
**supplemental**
8:16 328:5
329:9,17
330:11

**supplemented**
370:3
**supplies**   451:3
**support**   10:2
29:9 116:2
418:15
**supported**
390:16 391:7
391:12 392:11
**supportive**
393:11
**supports**
169:23 336:2,5
**supposed**
448:22 449:1
**sure**   21:4 33:13
33:22 45:9
54:15 58:1
75:21 83:22
90:9 110:7
115:18 143:3
146:22 149:16
166:20 217:4
234:2 235:19
239:19 249:20
274:2 288:15
310:20 357:9
365:22 366:8
372:2 383:8
386:6 400:10
417:15,20
426:23 428:1
429:4 438:9

**surely**   263:24
273:22 395:9
**surface**   248:22
**surgery**   259:19
260:1,3
**surplus**   78:20
**surprise**   44:4,9
225:10
**surprised**
224:21 225:5
**sustain**   78:15
**sustained**
103:10 267:24
**sw**   2:10
**swear**   12:7
214:24
**swearing**
214:15
**swofford**   3:4
**sworn**   12:10
89:6 105:22
108:17 116:21
117:7,13,23,24
118:16 119:12
129:15 130:13
131:12 132:3
132:23 135:23
136:7,22 137:9
138:1,13
143:24 161:4
163:7 165:18
172:5,21
175:18 213:16
213:20 214:11

CONFIDENTIAL

**[sworn - technology]**                                    Page 86

| | | | |
|---|---|---|---|
| 216:15 219:4 | **table** 287:16 | **takes** 333:23 | **talks** 55:18 |
| 223:3,5 225:7 | 288:3,12,13,18 | 437:19 438:3 | **tasked** 82:3 |
| 226:15 227:17 | 368:21,22 | **talk** 33:23 91:9 | **taught** 64:3 |
| 245:15,22 | 402:21 | 165:5 196:9,10 | 65:2,3,6 |
| 255:3 272:10 | **tabs** 384:23 | 312:7,10 | **taylor** 34:17 |
| 273:15 281:15 | 385:1 | 420:15 460:13 | 35:9 37:3,4 |
| 286:8 293:18 | **take** 24:10 36:8 | **talked** 125:21 | **teach** 64:17 |
| 293:20 294:15 | 44:10 85:19 | 132:13 135:7 | **teacher** 63:17 |
| 294:18 295:19 | 87:7,10 104:19 | 147:4 183:9,18 | 63:21,24 |
| 308:20 319:15 | 113:1 124:23 | 207:13 220:9 | 237:18 340:9 |
| 362:4 377:1 | 130:5,11 | 233:18 238:9 | **teachers** |
| 410:18 413:5 | 136:14 157:14 | 254:7 261:6 | 285:20 286:4 |
| 433:18 456:21 | 173:7 210:11 | 262:1 278:8 | 286:15 |
| 458:21 463:5 | 230:13 232:17 | 279:7 289:11 | **teaching** 64:6 |
| 466:10 | 232:19 243:19 | 293:22 298:9 | 64:12,19,23 |
| **sydney** 2:10 | 259:16 275:23 | 306:18 312:10 | 65:8,17 |
| **system** 151:3 | 276:7,9 279:21 | 322:3 325:14 | **team** 311:24 |
| 229:15 230:18 | 296:4 297:6 | 351:4 358:20 | 312:20 |
| 268:7 311:2,19 | 304:10 306:24 | 361:14 388:4 | **technically** |
| 345:24 346:1 | 317:21 318:23 | 404:18,19 | 105:3 |
| 358:7,14 | 320:15 326:20 | 412:12,15 | **technician** 5:14 |
| 359:11 | 347:24 362:13 | 424:16 431:1 | 11:10 13:21 |
| **t** | 364:14 370:11 | 447:3 449:22 | 87:12,19 |
| **t** 6:9 7:2 8:2 9:2 | 370:23 377:10 | 450:10 456:23 | 100:22 173:8 |
| 465:1 | 379:15,24 | 460:11 | 173:14 232:20 |
| **tab** 16:15 42:24 | 400:8 421:17 | **talking** 25:9 | 233:2 304:11 |
| 51:23 286:24 | 424:8 425:21 | 39:24 67:10,20 | 304:17 329:24 |
| 304:21 309:5 | 430:8 438:11 | 86:4 112:10 | 330:4 377:11 |
| 330:1,3 342:9 | 441:13 445:24 | 127:15 146:12 | 377:17 459:11 |
| 349:19 364:14 | 455:15 459:10 | 170:14,18 | 459:17 462:6 |
| 368:8 370:23 | **taken** 1:13 | 212:4 231:6 | **technology** |
| 386:8 400:12 | 87:17 173:12 | 264:3 268:15 | 239:16 240:15 |
| 438:11 441:2 | 232:24 304:15 | 277:4 322:22 | 241:19 243:10 |
| | 377:15 459:15 | 357:9 442:2 | 244:17,17 |

**[technology - testimony]** Page 87

249:9 260:22
260:24 268:8,9
271:18 330:20
331:23 332:4
332:15,23
333:6,24
334:16 335:9
335:20 336:13
338:8,18,22
340:21 387:8
387:20 388:12
388:18,24
389:13
**telephone**
274:5 317:20
345:1 379:17
431:8
**tell** 32:2 48:2
50:10 71:24
80:21 100:11
109:20 172:16
175:7,11 178:3
237:3 241:15
251:1 258:11
260:15 262:15
268:3 279:4
337:9,15
371:21 374:8
389:3 391:19
405:16 406:13
410:20
**telling** 110:18
148:24 406:1
418:22

**ten** 46:1 201:20
201:22 267:12
367:15
**tendered** 56:22
57:14
**term** 84:23
113:16 114:3
141:4 168:17
198:4 257:2
289:17 290:14
304:6 323:6
**termination**
60:11
**terminology**
185:15
**terms** 55:24
81:17 280:11
**test** 148:8
**tested** 148:15
**testified** 12:11
197:2 240:11
283:20,22
284:24 294:1
294:11 305:23
328:8 349:5
362:2 365:8
369:16 389:24
393:23 413:6
425:11
**testifies** 53:4
**testify** 53:17
58:15 86:16
98:11 118:1
119:22 122:2

125:15 130:16
130:18 131:13
138:15 140:23
143:17 207:8
216:21 217:10
231:15 244:11
265:3 267:19
272:11 273:16
282:20 284:13
284:23 286:20
321:12 359:24
375:17 390:20
398:24 409:17
425:2
**testifying**
117:15 306:20
370:6,20
392:24
**testimony** 6:4
27:22 42:17
56:2 59:8 89:6
98:14 101:8,17
102:2,12
105:23 116:21
116:21 117:7
117:20 118:11
118:13 119:12
119:18,20
120:12,23
121:19 127:10
129:13,15
130:2 131:12
132:5,23
135:24 136:6

136:22 138:2
138:17 145:12
148:18 153:11
154:17 157:2
161:2,3 162:8
163:7 165:19
167:22 169:15
172:4,6,21,23
175:20 179:10
197:4 202:16
212:13 213:17
213:20,23
216:15 217:6
219:2 223:4,5
225:7 226:15
227:17 245:15
245:23 247:7
255:3 262:20
266:24 272:10
273:15 278:16
280:19 281:16
286:9 293:17
294:16,18
295:10,12
297:23 306:4
308:20 319:9
319:14,20,23
320:8,12,17,18
321:2 334:7
359:20 360:16
362:5 367:20
368:1 370:4,15
373:24 376:2
376:20 377:2

**[testimony - tie]**                                                    Page 88

| | | | |
|---|---|---|---|
| 391:22 392:2 | 333:2 446:16 | 153:10 159:14 | **thinks**   284:17 |
| 392:18 393:10 | 454:24 455:8 | 159:18 170:6 | **third**   9:14 |
| 410:18 413:5 | **things**   24:4 | 171:7 174:21 | 32:11 96:8 |
| 425:18 433:3 | 40:17 44:13 | 177:13 184:1 | 104:15,18 |
| 433:18 456:7 | 52:24 61:4 | 200:12 201:19 | 105:3 159:24 |
| 456:21 458:21 | 71:6,18 75:23 | 216:8,10 218:8 | 160:10,24 |
| 458:23 463:7 | 77:22 78:13 | 220:3,15 | 161:20 162:21 |
| **texas**   3:18 | 79:3 84:17 | 226:20 227:4 | 193:1 203:15 |
| **text**   159:23 | 148:5 155:14 | 228:8 229:9,13 | 234:4 236:8,20 |
| 160:9 166:21 | 165:13 170:20 | 230:11 234:18 | 383:3 396:20 |
| 168:19 169:22 | 181:12 191:13 | 236:11 239:10 | 397:5 398:4,11 |
| 200:4 201:3 | 195:21 196:15 | 241:22 250:16 | 399:11 400:16 |
| 250:1 289:16 | 197:24 201:8 | 251:23 253:3 | 400:24 401:4 |
| 290:13 291:8 | 209:10 216:2 | 256:21 257:1 | 402:9 426:10 |
| 291:12,14 | 242:6 250:13 | 260:21 264:21 | 427:2 434:2 |
| 331:2 336:2 | 278:17 314:18 | 269:11 280:9 | 447:6 451:1 |
| **tgraden**   2:5 | 331:8 332:11 | 293:1,9 313:2 | **thirty**   464:16 |
| **thank**   13:8 17:9 | 340:12 342:11 | 322:19,20 | **thought**   226:10 |
| 32:16 35:11 | 346:6 352:23 | 324:12 327:12 | 290:9 295:22 |
| 37:18 139:21 | 359:15 383:24 | 334:8 345:17 | 314:14 458:10 |
| 287:7 309:12 | 429:6 454:4 | 348:8 351:21 | **thoughts**   40:16 |
| 330:4 400:21 | **think**   28:1 | 353:15 357:13 | **thousands**   34:2 |
| **theoretical** | 30:13 36:14 | 361:1 362:1,14 | 41:11 406:11 |
| 35:18 | 39:4 40:7 47:1 | 363:10 379:16 | **three**   38:12 |
| **theoretically** | 57:6,11 65:15 | 383:23 384:1 | 60:6 61:11 |
| 183:5 | 67:17 70:17 | 409:24,24 | 70:23 137:11 |
| **theory**   75:22 | 73:13 77:18 | 415:21 423:21 | 154:5 212:5,6 |
| 76:1 440:13,14 | 79:14,15 82:1 | 443:7 447:5 | 242:13 267:7 |
| **thereof**   368:6 | 90:4 93:23 | 450:18 452:22 | 291:5 353:16 |
| **thereto**   349:11 | 94:2 106:10 | 453:13 454:11 | 357:10 363:7 |
| 353:2 422:17 | 112:9,12 | 460:12 | 367:1 |
| 434:16 | 115:24 139:2 | **thinking**   31:13 | **threw**   300:12 |
| **thing**   72:14 | 140:15 144:21 | 64:10 201:23 | **tie**   322:24 |
| 201:19 316:12 | 145:4,22 | | |

Golkow Technologies,
A Veritext Division

[tiktok - towns]                                                  Page 89

| | | | |
|---|---|---|---|
| **tiktok** 5:8,8,9 | 300:23 308:15 | **together** 122:9 | 397:5,14 400:3 |
| 88:10 90:18 | 312:18 313:14 | 223:21 275:3 | 402:2,2,8,13 |
| 99:15,21,22,23 | 334:6,9 345:18 | 323:7 384:22 | 403:7,17,24 |
| 100:5 101:21 | 346:17 349:15 | 406:18 | 404:2,3,8,13 |
| 128:9 351:12 | 353:6 363:19 | **told** 80:7 97:9 | 405:19,23 |
| 461:4,5 | 385:11 393:9 | 100:10 155:14 | 406:3,13,20 |
| **time** 11:8,15 | 406:9 410:4 | 181:19 182:5 | 408:3,7 409:3 |
| 21:21 22:3,20 | 417:9 423:24 | 182:23 186:8 | 409:13 410:19 |
| 23:15 39:23 | 424:1 428:15 | 187:13 200:23 | 410:21 411:10 |
| 42:22 43:18 | 430:8 449:2 | 285:23 291:19 | 411:17,19,20 |
| 44:17,19,24 | 459:7 462:9 | 321:16 346:11 | 412:1,8 414:15 |
| 45:12,17 46:7 | **times** 12:22 | 347:19 450:20 | 414:21 415:6 |
| 46:12 48:16,22 | 57:16 71:23 | **tolles** 4:15 | 416:5,7,16 |
| 49:13,17 50:24 | 104:10 105:21 | **took** 274:17 | 417:11 418:3,6 |
| 51:1 53:18 | 135:8 295:24 | 406:17 | 419:1 420:10 |
| 55:3 56:4 | 297:1 405:23 | **top** 449:4 453:7 | 420:12,21,24 |
| 58:15 60:18,22 | **timing** 280:15 | **topaz** 1:15 2:3 | 422:2,23 423:6 |
| 61:9,10 63:4,6 | **title** 156:4 | 3:4 11:19 | 423:17,19 |
| 71:1 77:23 | **titled** 340:21 | 39:12,14 51:7 | 424:17,22 |
| 87:7,13 90:6 | 369:9 402:22 | 51:12,16 | 425:13 426:5 |
| 128:14 157:15 | 403:4,6,9 | **total** 50:7 | 434:10,23 |
| 175:14 180:3,4 | **to's** 220:9 | 103:17 104:1 | 435:23,24 |
| 196:11 199:6 | **today** 13:4 22:6 | 105:7,8 114:7 | 445:7 462:8 |
| 200:24 203:6 | 23:5 24:22 | 114:9,16,22 | **totaled** 337:6 |
| 204:18 212:9 | 25:9 28:8 | 115:2 116:17 | **totaling** 45:12 |
| 212:23 214:9 | 33:23 46:2,21 | 133:7 134:7 | 415:11 |
| 217:15 229:10 | 47:1,8 51:8 | 135:3 159:1 | **totalling** 46:12 |
| 230:14 246:21 | 106:23 149:24 | 207:18 208:23 | **totals** 210:17 |
| 247:22 248:7 | 189:13 292:23 | 271:23 299:17 | **touch** 237:20 |
| 248:14,24 | 295:21 296:20 | 299:18 300:22 | **toward** 205:9 |
| 249:8 259:18 | 344:8,9,13 | 301:16,19 | **town** 35:13,14 |
| 265:22 272:2 | 371:15 410:1 | 302:10,20 | 37:9 |
| 276:3 278:8,18 | **today's** 11:14 | 303:17 322:11 | **towns** 35:3,12 |
| 295:18 297:10 | 22:23 462:12 | 335:21 353:23 | 374:16 |

CONFIDENTIAL

**[traditional - twitter]**                                                    Page 90

**traditional**
   74:6 351:2
**training**   270:24
**transaction**
   379:3,4
**transcript**
   297:14 372:1
   373:17 463:18
   464:17,19
**transcription**
   466:4
**transmission**
   449:19
**transmittal**
   449:18
**transparency**
   326:5
**tremendous**
   104:4
**trial**   5:14 11:8
   13:21 22:13,17
   42:16 49:23
   53:16,22 59:7
   62:23 86:16
   98:7 107:7
   118:11 119:23
   120:12,23
   121:20 127:10
   138:15 141:2
   142:17 143:23
   175:20 178:1
   197:4 208:18
   214:24 245:4
   259:23 265:3

   272:11 280:19
   319:16 321:12
   324:9 329:24
   330:4 353:24
   360:16 374:22
   376:3,10
   393:23 398:24
   413:7 425:2
   458:23
**trials**   23:8
   42:14 53:4
**tried**   185:11
   188:10 201:8
   278:17
**trier**   142:22
   159:11 164:3
   210:2
**trouble**   406:17
**truck**   183:19
**trucking**   96:6
**true**   67:18
   100:19 141:16
   141:17,20
   158:7,20
   214:16 215:1
   281:17 282:9
   283:11 284:5
   285:6 286:1,10
   286:12 394:23
   463:6
**trust**   297:4
**truthful**   119:20
   217:6 231:19

**try**   59:20 75:24
   106:17 121:7
   183:21 184:15
   201:7 278:20
   391:17
**trying**   26:22
   57:6 68:2
   69:24 75:9
   76:4,7 81:15
   81:18 110:4,23
   162:14 197:17
   198:21 201:18
   204:11 280:10
   379:12
**tucson**   7:8,23
   9:19 16:21
   17:3,6 20:9,15
   20:18,24 21:12
   26:14,17
   134:13,18
   213:6,11 214:2
   215:8 217:10
   228:7 252:4,18
   303:11,15
   316:24 431:11
   431:19,24
   432:8,14,21
   433:9,23 434:5
   434:18 435:4
   435:14 436:4,8
   436:13,23
   437:1,2,18
   438:3 439:17
   439:22 441:8

   441:19 443:19
   444:17 445:8,9
   445:18 446:8
   448:16 449:9
   450:7 451:7,22
   453:4,6,14
   454:11 460:7,9
   460:13
**tucson's**   432:9
   432:16 433:3
   439:6 447:6
**tumblr**   92:5,6
**turn**   358:1,3,21
   371:24 415:2
   429:15
**turned**   420:17
**turning**   344:17
   425:23
**tusd**   9:17,18
   438:17,23
   441:7,16
   448:17
**tv**   460:21
**twice**   142:6
   300:11
**twitch**   92:7,8
**twitter**   88:4
   91:13,20
   153:13,20
   154:14 292:4,5
   292:20 293:4,7
   293:12,15
   295:22 296:21

**[two - unified]**                                              Page 91

**two** 30:13
39:17 47:3,16
49:8 50:18
51:3 55:22
70:6 73:3 96:5
102:15,18,23
103:14,15,16
103:19 104:11
109:11 116:20
135:6 147:15
155:3 175:8
203:11 225:13
242:12 251:18
253:3 274:9
305:10 306:10
306:23 352:22
353:15,17
361:10 378:9
383:2,24
385:10,17
386:3 393:12
410:24 427:9
427:10 428:11
429:5,11,17
454:4
**tyler** 2:3 39:16
**type** 83:4,4
244:18 249:9
260:23 311:4
439:4
**typo** 328:19
449:7

**u**

**uh** 360:12
**ultimately**
224:9,24
**umbrella** 382:5
382:11 383:10
383:18 384:11
385:23 387:13
388:3,16 389:6
389:19 390:10
390:22 394:3
**unacceptable**
451:15
**uncommon**
428:9 429:24
**undefined**
81:17 296:13
**under** 72:18
117:15 163:22
164:8 195:6
209:23 214:16
219:4 225:7
236:13 244:4
262:8 265:2,3
271:9 282:24
282:24 283:7
288:23 340:7
375:18 388:13
442:5 450:22
463:20
**undermined**
296:11

**understand**
21:10 67:4,9
73:16,20 80:4
83:22 87:4
121:19 125:16
126:15 139:16
141:12 142:24
143:1,4,6,13,13
144:7 196:17
196:21 202:16
204:11,12
228:23 249:3
284:22 291:17
303:20 336:20
340:6 370:5
372:11 391:21
394:1 411:9
417:15 430:12
449:8
**understanding**
40:4 89:8,15
93:16 118:11
122:1 125:13
126:2,10,11
127:1,6 128:4
136:5 154:10
156:14,18,21
163:6 164:16
165:18 171:11
176:16,21,23
177:3,6 178:12
178:22 181:11
186:5,17
188:15 196:12

206:12 207:21
208:20 214:12
215:5,17
216:18 217:8
228:10 254:5
289:21 291:6
291:18 292:14
334:7,9 335:23
336:3,6,8,10
337:21 351:3
352:9 374:19
416:20 417:1
419:6,11
**understood**
176:18 177:1,8
178:14,24
222:5 292:2,13
292:15,20
293:3,11
316:22 347:13
**undertaken**
264:15 266:10
266:12
**undertook**
422:6
**unfortunately**
197:22 198:6
326:16
**unified** 7:8,23
9:19 16:21
20:10 441:8
443:19 448:17
449:9 451:22
453:5,6,14

CONFIDENTIAL

**[unified - vendor]**                                          Page 92

454:12
**unique** 346:1
**united** 1:1
11:24 61:3
**unlimited**
297:10
**unpaid** 54:14
313:21
**unprofessional**
128:24
**unreasonable**
218:17,23
**unreliable**
112:8 114:16
**untruthful**
143:15
**unusual** 215:19
215:22 216:4
**updated** 58:14
58:14 331:15
**usable** 36:10
**usages** 169:19
**use** 40:23 41:5
78:19 90:23
91:4,6 101:3
101:12,21
102:6 106:4
110:5 111:2
112:16 113:17
114:4 126:23
145:1 169:5,10
172:15 183:22
188:2,8 196:17
198:11 202:10

237:23 249:21
249:24 250:3,6
250:9,12,17,19
250:20 251:1,3
251:6 262:10
271:12 280:21
284:16 288:23
289:4 348:16
356:21 365:12
365:15 366:6
389:17 402:7
407:13 418:6
422:12 425:5
455:3 456:3
457:7,24 458:8
460:15,18,19
460:22 461:22
**used** 84:23
90:11,18 91:20
94:12 98:10
105:22 111:1,2
113:1 127:8
185:15 217:19
218:5,11,16,23
219:10,23
223:17 234:15
255:15 281:3
307:5 318:18
319:3 325:10
348:21 356:19
356:23 357:6
361:9 380:12
380:19 396:18
397:10,11

398:2,9 406:6
432:8,14 440:5
440:7 461:1,3
461:4,5,6,7,8
461:11 464:20
**uses** 249:14
358:6,13
**using** 141:4
233:9 235:13
236:7,19
247:10 261:10
328:24 340:24
**usually** 460:20
**utilization**
205:9
**utilize** 131:11
138:1
**utilized** 30:6
98:7 103:9
210:7 246:21
262:3 401:19
446:17
**utilizing** 127:10

**v**

**validate** 117:10
130:6,11,12
136:15 312:21
314:7
**validated** 312:1
**validation**
131:8
**validity** 216:21
217:11

**valuation** 36:16
36:18 53:13
56:21
**value** 57:5 61:7
81:11,22 82:9
82:21 83:11
84:2 85:7,14
248:24 280:6
280:11 318:3,9
318:14 332:20
348:11 380:5
396:11 431:23
**values** 60:12
**vandalism**
257:3
**variable** 194:24
**various** 103:20
193:12 323:8
**vast** 53:21 57:9
**vendor** 24:23
34:8 41:14
103:17,24
104:3,15,18
105:7,8,18
106:8,14,18
107:2,19
110:21 113:3
140:2,11
141:14 144:13
145:20 146:2,7
146:20 147:2
147:19 149:7
149:23 150:14
150:21 151:8

**[vendor - verified]**                                    Page 93

| | | | |
|---|---|---|---|
| 180:17 182:24 | 322:1,15 323:3 | 117:17 127:14 | 354:19 356:12 |
| 197:24 198:2 | 331:8 333:10 | 131:16,21 | 356:16,20 |
| 198:13,14 | 337:21 343:3 | 132:16 139:11 | 357:10,24 |
| 199:22 200:3,6 | 343:21 348:13 | 148:21 149:3 | 362:17 363:20 |
| 200:7 202:23 | 353:11 354:4,6 | 149:11,11 | 378:9 379:1 |
| 202:24 203:17 | 354:7,21 | 150:7,18,19 | 381:17,19,24 |
| 203:23 205:13 | 355:22 356:7 | 151:9,24 | 382:3,17 |
| 205:17 206:8 | 360:8,11,19 | 152:11,18 | 383:15 386:3 |
| 206:14 207:16 | 377:5 380:7 | 155:3,10 | 387:18 389:12 |
| 208:19,21 | 382:9,20 383:3 | 169:18 196:10 | 393:12 399:7 |
| 209:2,3 230:7 | 383:6 384:7 | 229:2 232:6,7 | 399:13,19,21 |
| 231:9,9 238:4 | 389:1 396:13 | 235:21 239:24 | 401:21 402:14 |
| 238:16 239:9 | 399:16,24 | 242:2 243:4 | 404:22 405:20 |
| 240:4,5 241:8 | 401:16 403:4 | 244:9 245:16 | 409:4,14,16 |
| 242:17 244:2,5 | 403:12 404:13 | 246:23 247:15 | 410:15 411:11 |
| 244:11,23 | 406:20 410:13 | 262:4 268:11 | 420:22 425:6 |
| 245:2,5,10 | 414:22 415:6 | 271:21 276:19 | 425:13 426:2 |
| 246:2,8 247:19 | 416:8 418:16 | 278:9 288:22 | 433:23 434:5 |
| 248:1,5,19 | 420:13 422:18 | 298:4,6,11,18 | 434:12,13 |
| 252:23 258:18 | 425:5 426:17 | 299:2,7,19 | 442:5 446:13 |
| 259:8 260:12 | 427:7,15,17 | 301:14,21 | **verification** |
| 261:16 265:9 | 428:24 429:13 | 303:20,21 | 148:12 336:5 |
| 275:21 280:8 | 429:20 430:4 | 304:3,4 308:8 | 419:5,10 |
| 288:8,19 | 430:17,22 | 308:15 311:10 | **verifications** |
| 298:14,19,20 | 432:1 434:8,17 | 315:10,12,13 | 216:10 |
| 298:23,24 | 434:19,20,24 | 321:8,13,17,22 | **verified**   41:20 |
| 299:9,11,12 | 435:6 439:15 | 322:5,13,16 | 86:17 105:20 |
| 300:6,17 301:6 | 443:4 451:1 | 332:17,18 | 132:4 136:1 |
| 302:5,14 303:2 | **vendor's**   131:2 | 333:23 334:18 | 172:7 180:16 |
| 303:13 310:10 | 131:4 219:11 | 336:24 337:1 | 195:19 213:18 |
| 310:12 312:2 | 219:24 | 338:12 342:19 | 215:13,20 |
| 312:21 314:8 | **vendors**   34:6 | 343:8,8,10 | 221:4 223:8 |
| 315:1,19 317:3 | 41:12 86:1,2,4 | 352:20,24 | 253:7 303:8 |
| 317:5 318:5,11 | 103:11 105:19 | 353:5,8 354:12 | 311:15 334:23 |

CONFIDENTIAL

**[verified - watts's]**                                              Page 94

338:16 339:10
339:17 343:14
374:9,16,20
375:19 388:5
415:10 417:11
418:23 420:17
**verify** 180:18
216:5 344:5
405:12 415:13
451:11
**verifying** 297:4
**veritext** 1:23
11:13
**version** 52:13
326:9
**versus** 180:22
190:20
**vet** 177:6
178:12,22
217:17 218:3
218:10 253:24
254:19
**vetted** 144:2
246:12
**vetting** 143:21
**video** 9:7 11:10
11:17 87:12,13
87:19,20 92:12
100:22 173:8,9
173:14,15
232:20,21
233:2,3 304:11
304:12,17,18
371:4 377:11

377:12,17,18
459:11,12,17
459:18 460:21
462:6,12,13
**videographer**
5:13 11:12
462:8
**videos** 92:20,22
159:24 160:10
173:24 460:23
**videotaped**
1:12
**view** 92:22
**vigran** 2:10
**vitae** 8:7 52:3
**voluminous**
430:7
**volunteer** 66:7
**vouching**
137:19,23
138:10,21
139:4 140:7,21

| **w** |
|---|

**wait** 13:2
**waiting** 147:9
363:18
**waived** 11:5
**walk** 76:1
182:2
**walked** 340:8
**want** 13:22
31:8 37:20
43:23 55:13,14

56:1 91:9
106:2 109:12
121:2 146:15
146:18 157:6
157:14,16,19
157:22 163:23
165:2 171:3
172:17 185:9
189:2 191:7
210:12 232:16
260:15 295:3
297:3,13
318:23 365:24
366:17 370:11
406:4 427:18
428:16 454:5
**wanted** 89:21
99:2 100:3
101:1,10,19
102:4 153:18
154:12 161:13
161:16 187:2
187:15,24
347:23 379:2
**wanting** 278:10
**wards** 452:20
**washington**
2:11 4:17
**watch** 92:22
460:20,21,23
**watching** 92:20
**watts** 8:11
115:15 155:6
155:22 156:1

156:15 157:1
157:17 170:22
177:16 178:7
178:11,21
179:3 200:18
200:19 204:7
205:5,11,24
207:5 208:11
211:12,15,22
212:5 220:6
221:15 229:9
230:14 274:10
274:14,22
275:2,6,8
276:10 278:6
279:4,10,22
280:2,23 281:6
282:2,9 283:21
285:18,22
286:1 287:4,10
287:17,22
288:4,6,17
289:5,6,7,15
290:2,4,11,12
290:19 291:1,7
292:2,4,10
293:2,10,17
294:1,19 296:8
296:12 300:22
305:14 306:2
306:13,18,22
307:2,6,9
**watts's** 284:6

**[way - witness]**                                             Page 95

| | | | |
|---|---|---|---|
| **way**  47:21 | 458:14 | 372:19,23 | 54:2 69:5 87:6 |
| 74:24 83:7 | **ways**  73:15 | 373:24 374:3 | 87:11 100:10 |
| 89:13 91:1,2 | 194:13 253:3 | 387:7 388:11 | 114:19 122:20 |
| 99:1 112:1 | **wc.com**  2:12 | 390:1 392:4 | 123:24 127:22 |
| 121:8 122:24 | **we've**  133:12 | 459:3 | 128:13 133:12 |
| 162:12 164:10 | 261:6 263:19 | **weighted**  372:8 | 135:18 136:19 |
| 173:21 180:12 | 298:8 351:4 | **weighting** | 138:2 139:2 |
| 183:17 186:3 | 412:12 428:1 | 208:14 | 140:15 141:19 |
| 189:19 194:17 | 431:1 449:22 | **weiss**  4:4 | 145:4 146:11 |
| 206:19 214:21 | 456:6,23 | **went**  21:3 | 150:11 153:8 |
| 218:14,24 | **wear**  53:7 | 22:22 28:20 | 153:24 154:20 |
| 219:1,7,20 | **web**  198:15,17 | 30:18 41:23 | 157:13 158:17 |
| 224:14,18,19 | 262:5,23 | 45:21,24 46:8 | 159:8 160:4,13 |
| 226:16 227:8 | 263:16,18,20 | 62:22 85:23 | 162:2 163:4 |
| 229:5 230:6 | 264:5,11 265:1 | 87:1 147:10 | 166:12 167:13 |
| 247:22 249:2 | 265:8,11,15,18 | 223:4,24 267:6 | 170:14 173:4 |
| 251:5 260:7 | 267:13,23 | 283:4 313:8 | 174:21 177:13 |
| 261:14 264:9 | 268:6,14 269:6 | 322:9 325:23 | 180:12 181:10 |
| 268:12 270:14 | 270:5 383:10 | 326:8 332:17 | 182:2,12 |
| 271:15 274:4 | 383:14 384:9 | 345:8 381:13 | 184:15 187:11 |
| 280:3 282:7 | 386:2,3 | 393:20 399:4 | 188:7 189:18 |
| 289:20 295:15 | **website**  32:6 | **white**  62:4 | 190:23 191:19 |
| 307:12,21 | 323:21 324:1 | **william**  5:13 | 192:22 194:8 |
| 310:15 319:18 | 325:19 326:8 | 11:12 | 205:21 206:18 |
| 340:15 344:19 | 326:10 | **williams**  2:9 | 209:7,20 |
| 344:24 345:13 | **websites**  147:6 | **willing**  205:7 | 210:22 214:7 |
| 352:16 355:12 | **wednesday** | 278:20 | 217:23 218:21 |
| 377:21 379:19 | 50:22 | **withdrawn** | 219:15 220:3 |
| 381:14 394:17 | **week**  34:24 | 340:17 | 220:24 223:1 |
| 395:15,24 | 52:11 | **witness**  10:5 | 224:13 225:4 |
| 431:7,18 433:2 | **weeks**  61:12 | 12:7 33:1 | 226:6 227:6,15 |
| 433:14 437:14 | **weight**  96:14 | 38:20 39:10 | 229:5 231:13 |
| 437:23 440:24 | 320:19 369:5 | 42:1 52:22,24 | 232:10 241:22 |
| 457:10 458:14 | 369:13,17 | 53:2,9,18,23 | 249:16 250:24 |

**[witness - years]**                                                    Page 96

| | | | |
|---|---|---|---|
| 254:4,23 256:4 | 464:1 | 440:11 445:3 | **written**  117:14 |
| 257:15 258:23 | **witnesses**  38:6 | 446:17 447:22 | 130:13 143:24 |
| 262:13 268:24 | 138:3 267:18 | 448:1,6,8 | 175:18 178:19 |
| 269:21 270:14 | 376:14 | 450:11,21 | 181:15 214:23 |
| 271:14 272:20 | **word**  58:21 | **worked**  44:18 | 311:13 456:21 |
| 281:23 282:6 | 76:17 79:1 | 48:17,23 64:15 | **wrong**  79:18 |
| 282:16 284:1 | 94:13 189:3 | 65:20 215:22 | 142:14 290:7 |
| 284:11 285:14 | 196:17 291:14 | **working**  36:19 | **wrongful**  60:10 |
| 287:7 292:8 | 297:6 317:8 | 37:11 49:14,18 | 60:10 61:6 |
| 297:17 300:10 | 351:19,22 | 70:1 215:24 | **wrote**  294:20 |
| 301:11 309:12 | 407:15 408:12 | 229:20 | 408:2,6,12 |
| 315:6 320:2,14 | **worded**  209:12 | **works**  112:2 | **x** |
| 325:4 333:18 | **words**  121:6 | **worksheet** | **x**  6:2,9 7:2 8:2 |
| 336:19 338:11 | 167:4,5 290:17 | 387:6 | 9:2 |
| 341:19 342:3 | 290:24 387:17 | **world**  76:22,22 | **y** |
| 343:5 351:10 | **work**  9:17 40:6 | 88:12 191:14 | **yeah**  219:19 |
| 355:3 356:2 | 41:15,24 42:4 | 191:22 192:1,4 | 222:1,7 232:19 |
| 362:1 367:6 | 42:8,15 43:10 | 192:7,15,19 | 306:5 379:11 |
| 370:9,16 | 44:5 47:22 | 197:17,19,21 | 387:16 442:14 |
| 373:19 374:6 | 49:22,24 50:8 | 198:7 199:23 | **year**  14:8 42:20 |
| 375:14 376:22 | 52:16,19,24 | 200:7 201:10 | 49:6 50:6 56:7 |
| 387:16 389:8 | 53:19,23 54:12 | 203:1,4 204:1 | 56:7 57:20 |
| 391:1 392:7 | 54:21 60:15 | 205:1,16 | 58:18 64:2 |
| 394:8,16 | 61:18 62:15,24 | 206:13,20 | 86:8,9 142:6 |
| 400:21 404:15 | 63:1,2,3 64:16 | 208:2 209:4 | 292:22 325:17 |
| 407:4 408:10 | 70:14 72:6,21 | 258:19 259:9 | 325:18 335:7,7 |
| 409:12 410:10 | 104:5 105:13 | 263:5,10 | 335:13 337:5 |
| 412:14 414:1 | 109:15 111:7 | 267:12 270:4 | 340:23 394:12 |
| 421:6,11 | 214:8 221:22 | 270:16 430:18 | 394:24 395:1 |
| 430:24 437:11 | 240:10 244:7 | **worth**  201:21 | 428:5,11 |
| 437:22 444:22 | 246:12 247:12 | **wow**  199:14 | 429:18 |
| 452:3 453:21 | 381:22 436:5 | **wrap**  374:17 | **years**  36:21 |
| 454:15 455:5 | 436:22 437:1 | **writing**  417:21 | 58:5 59:10 |
| 457:9 463:5,7 | 438:18 439:22 | 418:11 | |

CONFIDENTIAL

**[years - zoom]**                                                      Page 97

62:16,17 66:11
66:22 71:8
151:10 242:19
292:23 383:2
383:11,12
384:4,6 426:20
426:21 428:3
429:11 430:1
**yeates**  39:16
**yesterday**
  50:24 51:15
**ygr**  1:3
**yield**  103:16
**yondr**  151:14
  200:15,16
  202:13,22
  221:14 239:14
  254:7 278:15
  279:6,14 327:6
  327:10,16,21
  328:18 329:1
  330:14,19,21
  331:5,9,21
  332:2,12,13,19
  332:23 333:9
  333:13 334:11
  335:3,20,22
  336:15 337:1,4
  337:17,24
  338:3 339:7,9
  339:12,24
  340:3,21 341:1
  341:6,10,15,24
  342:10,15

343:13 344:6
353:17 354:2
357:10 361:12
361:17,22
362:7 363:16
363:22 365:13
366:7 367:2,11
368:3 369:10
369:13,18
374:2 375:7,10
375:21 376:18
**yondr's**  342:14
**young**  461:15
**youtube**  2:13
  88:10 90:12
  96:1 101:4
  128:8 290:20
  290:24 351:12
  460:16,18,19
  460:21,22
  462:3,11

---
**z**
---

**zero**  204:5
  206:21 208:10
  437:8
**zoom**  3:2 4:2
  5:2

Golkow Technologies,
A Veritext Division

www.veritext.com