**Exhibit 86**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

**Rebuttal Report of**

**Dr. Sharon A. Hoover, PhD**

**July 30, 2025**

**CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.    Executive Summary of Expert Opinions ........................................................... 1

II.   Response to Dr. Wildermuth Report............................................................... 2

    A.    Response to Wildermuth Opinion 1................................................ 2

    B.    Response to Wildermuth Opinion 2................................................ 13

    C.    Response to Wildermuth Opinion 3................................................ 18

    D.    Response to Wildermuth Opinion 4................................................ 21

    E.    Additional Responses to Wildermuth ............................................ 25

        1.    School-based Therapist and Crisis Interventionist staffing ..................... 25

        2.    Plan "ignores" cell phones ........................................................ 26

        3.    Appropriate monitoring ............................................................ 28

        4.    Conflation of social media and ignoring positive impacts...................... 30

        5.    Ignoring COVID-19 and other factors ........................................... 31

        6.    Staffing............................................................................. 32

        7.    Professional Development Plan .................................................... 33

III.  Response to Hutt Report ....................................................................... 34

    A.    Response to Hutt Opinions 1 and 2............................................... 34

    B.    Response to Hutt Opinion 3 ....................................................... 37

    C.    Additional Responses to Hutt ..................................................... 40

        1.    Digital Literacy .................................................................... 40

IV.   Response to Aguilar Report .................................................................... 41

    A.    Response to Aguilar Opinions 1-5................................................ 41

    B.    Response to Aguilar Opinion 6.................................................... 42

V.    Response to Auerbach, Gotlib, Hampton, and Platt Reports ........................... 45

VI.   Conclusion .................................................................................... 46

## I.    Executive Summary of Expert Opinions

1.    As a licensed clinical psychologist and national leader in school mental health, I submit this rebuttal report in response to the reports submitted by Drs. Wildermuth, Hutt, Aguilar, Auerbach, Gotlib, Hampton, and Platt on July 9, 2025 (the "Defense Reports"). These opinions are informed by my review of each expert's report and the broader scientific literature on youth mental health and school-based supports. They are grounded in my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems. My strategic plan outlined in my initial report[1] proposes a 15-year, multi-tiered public health framework to mitigate the substantial harms to school districts caused by students' social media use. The following opinions summarize and reaffirm the scientific rationale, feasibility, and appropriateness of that plan in light of the Defense Reports:

2.    **Opinion 1: Social media has created a novel and intensifying public health burden on schools that warrants a dedicated, systems-level response**.
The harms linked to social media platforms, including student distraction, negative impact on social skills, anxiety, depression, and self-harm, negative body image, sleep disruption, cyberbullying, compulsive use, emotional dysregulation, peer conflict, and school disengagement, are distinct from historical concerns and require targeted intervention. While some strategies in my strategic plan have historical roots, they are recalibrated to directly address the unprecedented scale and design features inherent in social media platforms, which are harming school districts and the school environment

3.    **Opinion 2: Comprehensive school mental health interventions grounded in evidence-based frameworks (e.g., MTSS) are necessary and appropriate for mitigating social media harms.**
The multi-tiered supports proposed in my plan, including digital literacy, family engagement, wellness promotion, and intensive intervention, are not generic or duplicative. Rather, they are tailored to the distinct behavioral, emotional, and cognitive risks introduced by social media and the harm to school districts and the school environment. My plan is supported by empirical evidence and national implementation science standards.

4.    **Opinion 3: Staffing recommendations reflect what is required, not merely what has been feasible historically based on limited public funding, to meet the escalating needs due to social media-related harm.**
Nationally recognized staffing ratios are used as a benchmark to model necessary additional capacity, not as mandates. These recommendations do not ignore existing shortages; they respond to the additive demands placed on school staff by social media harms, and they explicitly call for sustainable investment from the Defendants responsible for the harms.

---

[1] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025.

5. **Opinion 4: Professional development and district staffing infrastructure must be adapted to reflect the realities of the social media landscape.**
Contrary to critiques that training recommendations are excessive or redundant, most school systems lack targeted professional learning on social media harms. The proposed training hours are conservative and aligned with national models of effective systems change.

6. **Opinion 5: A 15-year implementation plan is justified and critical to achieve meaningful and sustainable systems transformation.**
Like past public health efforts (e.g., tobacco control and anti-obesity initiatives), addressing a pervasive, socially embedded harm such as social media requires long-term investment, staged implementation, and ongoing evaluation. My plan is grounded in implementation science and designed for local adaptation and sustainability.

7. **Opinion 6: The potential benefits of social media use in schools do not negate the urgent need to mitigate widespread, evidence-based harms.**
While social media may support civic engagement or learning in specific contexts, these outcomes are not typical of unmoderated youth personal social media use. The documented harms call for proactive institutional safeguards.

8. **Opinion 7: The critiques raised by Drs. Wildermuth, Hutt, and Aguilar reflect disciplinary limitations and do not adequately account for public health, clinical, or implementation science perspectives.**
The Defense Reports mischaracterize the intent and evidence base of my recommendations, conflate long-standing educational tools with repurposed public health responses, and underestimate the urgency of addressing the widespread and escalating mental health and learning harms caused by students' personal use of social media platforms.

## II.    Response to Dr. Wildermuth Report

### A.    Response to Wildermuth Opinion 1

9. I appreciate Dr. Wildermuth's recognition that the interventions and programming I propose align with longstanding calls from the educational community to better support students' mental, emotional, and academic development.[2] However, her assertion that the rationale for these supports is unrelated to social media and that the strategies I recommend are generic educational improvements mischaracterizes both the purpose and the evidence base underlying my recommendations.

10. Historical presence of supports does not mean that they are disconnected from new drivers of harm (e.g., mental health clinicians in schools are not new, but the volume and nature of their referrals has shifted in the past decade). The relevance of a strategy to social media harms does not depend on whether it was invented after social media but whether it is necessary to mitigate the harms those platforms now create or worsen. While the general rationale for comprehensive school supports predates social media, the

---

[2] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 3).

current urgency, scale, and framing of my recommendations directly respond to the specific, preventable harms introduced by social media platforms.

11.    While many of the individual components of a comprehensive school mental health system (e.g., life skills, digital literacy, family engagement) have indeed been recommended over time, my strategic plan does not present them as general best practices in isolation. Rather, I present them as part of a cohesive, multi-tiered, and targeted response to the distinct and measurable harms associated with student social media use.[3] These harms are thoroughly documented in my report and supported by a robust body of scientific literature as well as the expert reports of Drs. Christakis, Twenge, Telzer, and others.[4]

12.    Notably, the multi-tiered systems of support (MTSS) framework anchors my recommendations. While Dr. Wildermuth offers critiques of this structure, her report does not indicate that she has MTSS design and implementation experience, systems-level consultation, or publication in MTSS design or evaluation. Her experience appears more aligned with comprehensive school counseling programs, which are distinct from the systems architecture proposed. While Dr. Wildermuth's experience as a direct service provider and as a trainer of future school counselors is valuable within the context of individual and small-group student support, it differs meaningfully from the expertise required to design, implement, and evaluate districtwide school mental health infrastructure. Her background does not reflect experience in aligning staffing models, funding streams, data systems, and multi-tiered service delivery across an entire school district, core competencies that underpin the MTSS-based recommendations I have offered. Dr. Wildermuth's lack of experience in MTSS design, implementation, consultation and evaluation is apparent in her opinions, which do not exhibit an understanding of how strategic planning works in public systems.

13.    Importantly, my strategic plan is not based on an assumption that schools have never needed these supports; it is based on the escalating burden that schools now face due to the pervasive and disruptive influence of social media on students' mental health, behavior, and concentration. My recommendations are *additive*, not duplicative. They are designed to address emerging social media harms that were not the focus of school districts' current or prior programing. As detailed in my May 16, 2025 report, use of these platforms is associated with sleep disruption, inattention, cyberbullying, emotional dysregulation, and school climate and functioning, which are issues that did not exist in

---

[3] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[4] 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P; 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.; 2025.05.16 Expert Report of Eva Telzer, Ph.D.

the same way prior to the widespread adoption of social media.[5] Schools are required to respond to these challenges daily, often without adequate preparation or resources.[6]

14. To suggest that the timing and focus of my recommendations are untethered to social media's impact is inaccurate**.** The strategic plan I offer is intentionally responsive to current conditions, grounded in extensive consultation with school leaders across the country, and crafted specifically to prevent and mitigate the harms arising from students' use of Defendants' platforms. The fact that many of the proposed interventions are familiar does not make them any less critical or timely in addressing this specific crisis.

15. Dr. Wildermuth contends that the core elements of my strategic plan are long-standing, generic recommendations unrelated to the harms of social media. This fundamentally mischaracterizes both the rationale and the targeting of my proposed plan. Below, I outline examples of this mischaracterization and present a more accurate reflection of how my set of recommendations is directly related to the impacts of social media.

---

[5] Siebers, T., Beyens, I., Pouwels, J., & Valkenburg, P. (2021). Social media and distraction: an experience sampling study among adolescents. Media Psychology, 25(3), 343-366; Dontre, A. (2020). The influence of technology on academic distraction: a review. Human Behavior and Emerging Technologies, 3(3), 379-390; Van Den Eijnden, R., Koning, I., Doornwaard, S., Van Gurp, F., & Ter Bogt, T. (2018). The impact of heavy and disordered use of games and social media on adolescents' psychological, social, and school functioning. *Journal of behavioral addictions*, 7(3), 697-706; Maqableh, M., Rajab, L., Quteshat, W., Masa'deh, R., Khatib, T., & Karajeh, H. (2015). The impact of social media networks websites usage on students' academic performance. Communications and Network, 07(04), 159-171; Kolhar, M., Kazi, R., & Alameen, A. (2021). Effect of social media use on learning, social interactions, and sleep duration among university students. Saudi Journal of Biological Sciences, 28(4), 2216-2222; 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 86-87, 126-27, 138, 142-43, 148, 149, 156, 160; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P. at 92, 278-81; Marciano, L., Ostroumova, M., Schulz, P., & Camerini, A. (2022). Digital media use and adolescents' mental health during the covid-19 pandemic: a systematic review and meta-analysis. Frontiers in Public Health, 9; Twenge, J., Spitzberg, B., & Campbell, W. (2019). Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness. Journal of Social and Personal Relationships, 36(6), 1892-1913; Heubeck, E. (June 10, 2024). Cellphones Turned My Teaching Career From 'Awesome' to Exhausting: How educators' No. 1 nemesis caused this teacher to quit. Education Week; National Education Association (2024). Impact of Social Media and Personal Devices on Mental Health; Pew Research Center. (April 2025), Teens, Social Media and Mental Health; Riehm, K. E., Feder, K. A., Tormohlen, K. N., Crum, R. M., Young, A. S., Green, K. M., Pacek, L. R., La Flair, L. N., & Mojtabai, R. (2019). Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth. *JAMA psychiatry*, 76(12), 1266-1273.

[6] National Association of School Psychologists. (2023). Responding to Social Media Trends: Guidance for Caregivers; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P. at 281; 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 150.

16.     With regard to the suggestion that my recommendations regarding Social Media Policies and Staff Professional Development may be duplicative of existing district actions,[7] many school districts do not have comprehensive, holistic, and evidence-informed policies that directly address the harms caused by social media platforms (e.g., student distraction, negative impact on social skills, self-harm contagion, persistent cyberbullying). The policies I propose go far beyond basic digital citizenship lessons or acceptable use policies. They call for an institutional response to the structural and design-driven harms of these platforms, grounded in what the research and student experiences now demand. As for professional development, while staff may receive training on general behavioral management or technology integration, they are rarely trained to identify and respond to social media-specific harms such as chronic social media use and related sleep deprivation. My recommendations are tailored to the realities of students' experiences with social media, not just general student well-being.[8]

17.     With regard to the claim that Screen Time Management recommendations are unremarkable and reflect issues addressed by schools for decades (e.g., TV watching) and that students' own self-regulation is more important than formal school efforts,[9] this criticism fails to distinguish between passive screen consumption (like watching television) and the active, compulsive use of today's social media platforms, which are engineered to undermine self-regulation. Time management today must address not just the number of sessions and time-on-device, but how social media affects children emotionally, and what capacity they have to disengage. My proposed screen time management recommendations are grounded in behavioral science and support schoolwide norms and classroom-level practices that help students understand and moderate their social media use. The rise of this persuasive technology has necessitated the need for greater institutional support.[8]

18.     With regard to the assertion that Digital Literacy is a longstanding educational goal,[10] Dr. Wildermuth critiques my recommendations for digital literacy as if they are simply rebranded 1990s-era media education efforts. While media literacy has indeed existed for decades, its content and purpose have evolved, and must continue to evolve, with the technologies students use. My proposal focuses on social media-specific literacy (e.g., helping students critically navigate platforms that employ persuasive design features absent from early media). Failing to adapt these curricula to the current social media environment does a disservice to students, many of whom now receive their primary social feedback, identity cues, and mental health stressors through these platforms.[11]

---

[7] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 22-24, ¶¶ 69-71).

[8] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[9] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 24-26, ¶¶ 72-75).

[10] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 26-28, ¶¶ 76-79).

[11] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

19. With regard to the claim that Life Skills Programming predates social media,[12] Dr. Wildermuth argues that life skills (also referred to as social-emotional learning [SEL]), have been promoted since the 1960s and are not unique to addressing social media harms. I do not dispute the historical roots of SEL. In fact, I explicitly reference these foundations in my own work. However, my strategic plan elevates life skills programming in response to specific and exacerbated challenges created by social media platforms, such as increased social comparison, cyberbullying, and emotional dysregulation, that undermine in-person relationships and coping strategies among youth. My recommendations do not reflect a generic SEL proposal; rather, they reflect a calibrated enhancement to help students counteract harms created and *amplified* by social media's pervasiveness and design, as supported by the science cited in my report and echoed in expert reports from Drs. Twenge and Telzer.[13]

20. With regard to the claim regarding Mental Health Literacy as general support, not social media specific,[14] Dr. Wildermuth again misses the point when she argues that mental health literacy is a long-standing concept unrelated to social media. I fully agree that mental health literacy has broad value. My plan adapts this concept to include awareness of how social media affects mental health, equips students with skills to recognize unhealthy social media behaviors, and helps them know when and how to seek support for social media-related anxiety, sleep disruption, or self-image issues, all of which are rising in direct connection with social media use.[15]

21. Dr. Wildermuth's criticism of the recommended mental health literacy programming mischaracterizes my recommendation regarding the need for educators and school staff to be trained in recognizing signs of problematic or potentially addictive social media use. To be clear: I am not advocating that school personnel who are not clinically trained diagnose "social media addiction," nor does my strategic plan propose that they operate outside the boundaries of accepted medical or clinical practice. Rather, my recommendation is rooted in a widely accepted approach used across school mental health and student support systems, training educators and staff to recognize observable behaviors that may indicate a student is struggling, and to respond appropriately within their role. Just as teachers are trained to notice signs of anxiety, depression, bullying, trauma exposure, or substance misuse without being asked to diagnose, they can be trained to identify behavioral patterns consistent with problematic or compulsive social media use. These may include significant changes in mood, attention, sleep, peer interactions, or academic focus that appear linked to social media engagement.

---

[12] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 28-29, ¶¶ 80-84).

[13] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105); 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.; 2025.05.16 Expert Report of Eva Telzer, Ph.D.

[14] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 29-32, ¶¶ 85-91)

[15] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

22.  It is disingenuous to suggest that because "social media addiction" is not a formal DSM-5-TR diagnosis at this time, we should dismiss or avoid responding to clear and growing concerns from educators, students, parents, and mental health professionals about excessive and dysregulated platform use. In fact, there is a robust and growing body of research that documents behavioral addiction-like symptoms associated with social media use (e.g., compulsive checking, withdrawal, tolerance, and interference with daily functioning) even in the absence of an official diagnostic label.

23.  The goal of training school staff in this area is not to pathologize students, but to build their awareness of the risks of social media and equip them to support students within appropriate boundaries. Recognizing problematic patterns allows staff to refer students to mental health professionals for further support, not to make clinical judgments themselves. This is no different from the referral pathways in place for other student concerns that may not meet clinical thresholds but still warrant support and monitoring. To claim that this recommendation is "impractical" or "dangerous" underestimates both the capacity of educators and the urgency of the problem. Teachers and school staff are often the first to notice when a student is struggling. Giving them tools to understand and respond to a rapidly evolving landscape of social media harms is not an overreach, it is a necessary, preventative step to protect student well-being.

24.  With regard to the assertion that Anti-Cyberbullying Programming has existed for nearly two decades and that there is insufficient evidence that my proposed recommendations are effective or specifically tied to the harms of social media platforms,[16] this criticism ignores that the nature, scale, and consequences of online harassment have evolved dramatically with the rise of student social media use. The platforms at issue have created high-speed, anonymous, and socially viral forms of harm that traditional anti-bullying curricula were never designed to address. My recommendations emphasize school responses that are platform-informed, restorative in nature, and integrated into a broader system of school climate supports and digital literacy. Further, the rise in cyberbullying-related suicide risk, peer harassment outside school hours, and online abuse calls for a strategic refresh of programs that were never built with TikTok, Snapchat, YouTube or Instagram in mind. My proposal centers on these realities. [13]

25.  With regard to the assertion that Digital Detox Challenges and Wellness Programs are non-novel and indistinguishable from standard wellness promotion strategies,[17] Dr. Wildermuth argues that promoting social activities, nature exposure, and creativity is nothing new and not inherently linked to social media harm reduction. But the necessity of such incentives has become urgent precisely because of how social media crowds out these behaviors. Today's students face engineered and addictive design that actively *discourage* offline engagement.[18] My recommendation to incentivize alternatives is thus

---

[16] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 33-35, ¶¶ 92-97).

[17] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 35-36, ¶¶ 98-101).

[18] Twenge, J., Spitzberg, B., & Campbell, W. (2019). Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness. Journal of Social and

a direct countermeasure to social media overexposure, not a generic wellness strategy.[19] For example, Digital Detox efforts are no longer about general wellness; rather, they are a corrective intervention for compulsive engagement, social media-induced anxiety, and comparison fatigue. Moreover, research supports the positive mental health outcomes of temporary and supported disengagement from social media platforms.[20]

26.     With regard to the assertion that Positive School Climate is not social media-specific,[21] a positive school culture has always been essential, but what undermines it has changed. Social media has introduced new dynamics such as isolation, viral humiliation, rapid rumor spreading, and polarization within peer groups. Promoting a strong, connected school culture is now an essential buffer against these harms, and my recommendations specifically target how to repair the erosion of the school community caused by harmful social media use.[22]

27.     Dr. Wildermuth suggests that my recommendations on school climate are flawed because I do not cite school climate survey data from each of the individual districts involved in this case. While I agree that local data collection can be useful, existing data has several limitations. Given that social media harms are emerging and evolving harms and given resource constraints, most school districts have not historically collected quantitative data on social media's impact on student mental health, learning, or behavior. This data vacuum reinforces, rather than weakens, the need for a proactive strategic response and I therefore explicitly recommend the use of targeted surveys, focus groups, and other tools that specifically collect data related to harms associated with social media as part of an ongoing needs assessment process. Accordingly, Dr, Wildermuth's critique overlooks several key points.

28.     First, the absence of publicly available or case-specific school climate data from each district does not eliminate the need for a system-level response to well-documented national trends. Numerous peer-reviewed studies, national surveys, and government reports have shown widespread deterioration in school climate and student well-being over the past decade, particularly in relation to increased exposure to social media.[23]

Personal Relationships, 36(6), 1892-1913; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P. at 279.

[19] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[20] Hunt, M. G., Marx, R., Lipson, C., & Young, J. (2018). No more FOMO: Limiting social media decreases loneliness and depression. *Journal of Social and Clinical Psychology, 37*(10), 751-768; Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review*, 110(3), 629-76. DOI: 10.1257/aer.20190658.

[21] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 36-37, ¶¶ 102-104).

[22] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[23] CDC. (2023). Youth Risk Behavior Survey Data Summary & Trends Report: 2011–2021; U.S. Department of Health and Human Services. (2021). Protecting Youth Mental Health: The U.S. Surgeon General's Advisory; Irwin, V., Wang, K., Cui, J., & Thompson, A. (2022). Report on Indicators of School Crime and Safety: 2021. NCES 2022-092/NCJ 304625. National Center for

These include rising reports of bullying (especially cyberbullying), social isolation, anxiety, and classroom distraction, all factors that affect school climate and are directly tied to social media platforms. My discussions with key informants from each bellwether school district and review of deposition testimony and other district documents reinforced the findings in these studies and reports.

29.    Second, my recommendations do not presume that every school currently lacks a positive climate or critical thinking instruction. Rather, I propose strategic investments to strengthen and sustain healthy, supportive environments in light of new and evolving challenges, including those created or intensified by social media. This includes promoting digital literacy, fostering inclusive community norms, and providing staff with tools to proactively address online conflict and distraction that spill over into the school day.

30.    Third, the call for multi-year, large-scale investment is not made in the absence of a needs assessment, it is based on existing evidence that many schools across the country are under-resourced in their efforts to respond to these harms. The strategic plan I offer explicitly includes continued local data collection as a cornerstone of implementation, so that supports can be tailored, adjusted, and improved over time based on school-specific strengths and needs. I do not argue that every school is failing in its climate or culture, but that the rise in social media-related harms poses a shared, systemic challenge that no school is fully immune from.

31.    On the assertion that the recommended Family Engagement and Education strategies lack novelty and may be rejected by families:[24] While schools have long recognized the importance of engaging families to address public health issues, including technology use, my recommendations regarding family engagement and education are specific to the current social media landscape which requires new and updated strategies to support families in navigating the complexities of rapidly evolving social media platforms and their associated risks. Recommendations include supporting families in detecting the mental issues associated with social media use, supporting their children in healthy social media use habits, and advocating for policy change related to protecting children from the harms of social media.[25]

32.    It is true that meaningful family engagement is often complicated by longstanding barriers such as language differences, socioeconomic disparities, and inflexible work schedules.[26] These are real and persistent challenges that school systems must contend with, and my report does not ignore them. In fact, my recommendations explicitly call for *local tailoring* of engagement strategies to ensure they are accessible and responsive to

---

Education Statistics; Vogels, E. A., & Gelles-Watnick, R. (2023). Teens and social media: Key findings from Pew Research Center surveys. Pew Research Center, 24.

[24] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 38-40, ¶¶ 105-110).

[25] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[26] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 40, ¶ 110).

the diverse needs of families. What Dr. Wildermuth overlooks is that these barriers, while not created by social media, can significantly compound the harms caused by it. When families face obstacles to engaging with schools, they are less likely to receive timely guidance or support related to their children's social media use or emerging mental health concerns. That makes strategic, culturally responsive family engagement even more essential, not less.

33.     With regard to Targeted and Intensive Interventions (Tiers 2 and 3) being non-specific to social media,[27] Dr. Wildermuth criticizes my Tier 2 and Tier 3 recommendations as overly broad and not tailored to social media-related needs. This overlooks clear language in my report specifying how interventions like solution-focused counseling and support groups are designed to specifically address cyberbullying, digital dependency, and negative social comparison.[28] The fact that these skills may also help in non-social media contexts does not invalidate their role in social media harm mitigation. Instead, it reinforces their utility and efficiency within the school mental health toolkit.

34.     Further, Dr. Wildermuth raises several unfounded concerns about the feasibility and appropriateness of providing intensive mental health services in school settings.[29] While I appreciate the importance of thoughtful implementation and respect for student and family rights, her arguments misrepresent both the intent and the evidence base supporting my recommendations.

35.     The assertion that schools are inappropriate sites for more intensive mental health services such as Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) or Dialectical Behavior Therapy (DBT)-informed interventions runs counter to a substantial body of research. Decades of empirical studies have demonstrated that when evidence-based treatments are delivered in schools, youth are significantly more likely to initiate care, engage consistently, and complete treatment compared to when those same services are offered in community mental health settings.[30] This is particularly true for students from

---

[27] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 40-43, ¶¶ 111-117).

[28] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 95-105).

[29] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 41-43, ¶¶ 114-116).

[30] Atkins, M. S., Hoagwood, K. E., Kutash, K., & Seidman, E. (2010). Toward the integration of education and mental health in schools. *Administration and policy in mental health and mental health services research*, *37*(1), 40-47. Jaycox, L. H., Cohen, J. A., Mannarino, A. P., Walker, D. W., Langley, A. K., Gegenheimer, K. L., ... & Schonlau, M. (2010). Children's mental health care following Hurricane Katrina: A field trial of trauma-focused psychotherapies. *Journal of Traumatic Stress: Official Publication of The International Society for Traumatic Stress Studies*, *23*(2), 223-231.

historically underserved communities, for whom school-based care reduces common barriers such as transportation, cost, stigma, and missed instructional time.[31]

36.   The claim that the school calendar undermines continuity of care ignores the reality that community-based mental health services face their own challenges with continuity (e.g., long waitlists, provider turnover, insurance limitations). Many school districts that offer more intensive supports use a blended care model, coordinating services between school and community providers and ensuring that students can maintain care over breaks. Summer bridge services, referral systems, and partnerships with community mental health centers are well-established mechanisms for promoting continuity even when school is not in session.

37.   Second, the concern that intensive school-based interventions displace academic or social development fails to acknowledge that untreated mental health needs often impede a student's ability to learn, connect with peers, or participate in enrichment activities. The minimal time investment for well-designed interventions (typically 30–45 minutes per session, often during elective periods or non-core classes) is far outweighed by the gains in attention, emotion regulation, and classroom engagement that evidence-based treatment can yield.

38.   Third, I must respectfully correct Dr. Wildermuth's assertion that my report ignores issues of student privacy and parental choice. As someone who has worked for decades in close partnership with districts to design and implement comprehensive school mental health systems, I am acutely aware of the legal and ethical obligations surrounding these issues. In fact, my work, alongside colleagues at the National Center for School Mental Health and in collaboration with the U.S. Departments of Education and Health and Human Services, has consistently emphasized the need for:

   -   Informed parental consent prior to the provision of any mental health services;

   -   Clear communication protocols regarding student confidentiality;

   -   FERPA and HIPAA compliance in all aspects of data handling and care coordination; and

   -   Family voice and choice as central pillars of school mental health systems.

39.   Finally, while Dr. Wildermuth is correct that TF-CBT and DBT were developed for specific clinical populations, both treatment models have since been adapted for broader use in school settings and have demonstrated effectiveness across a wide range of presenting concerns.[32] Moreover, my recommendation is not to universally implement

---

[31] Lyon, A. R., Ludwig, K. A., Stoep, A. V., Gudmundsen, G., & McCauley, E. (2013). Patterns and predictors of mental healthcare utilization in schools and other service sectors among adolescents at risk for depression. *School mental health*, *5*(3), 155-165.

[32] Connors, E. H., Prout, J., Vivrette, R., Padden, J., & Lever, N. (2021). Trauma-focused cognitive behavioral therapy in 13 urban public schools: Mixed methods results of barriers,

full clinical treatment protocols within schools, but to build partnerships with community providers so that these services can be accessed when needed, particularly for students with high levels of trauma or emotion dysregulation resulting from social media harms.

40.    Dr. Wildermuth's critique of my recommendation for crisis intervention in response to social media-related harms reflects a misunderstanding and oversimplification of both the recommendation itself and the current landscape of student safety in schools.[33] My recommendation for real-time crisis support is not a blanket directive for school counselors, psychologists, or social workers to be available "at all times," nor does it suggest that they must respond to every incident personally or outside the bounds of their job descriptions or contractual obligations. Rather, it reflects the practical and urgent need for school systems to be equipped with the capacity and protocols to respond rapidly and appropriately when safety concerns emerge that are connected to social media use.

41.    In many of the districts I've worked with, staff are already responding in real time to social media harms, often without sufficient training, resources, or backup. My recommendation is about formalizing and strengthening that response capacity, not overburdening individual providers.

42.    Crisis intervention for social media-related events would not be the sole responsibility of any one role but would be part of a schoolwide crisis response system, which may include:

-    Clearly defined referral and triage pathways,

-    Designated personnel trained in social media harm response,

-    Partnerships with community mental health providers or mobile crisis units, and

-    Protocols that protect both students and staff from reactive or ad hoc responses.

43.    Moreover, far from increasing burnout, the intention of this recommendation is to *reduce* burnout by ensuring that student services professionals are not left to handle social media crises alone, without support or infrastructure. It is the current lack of systemic planning and real-time capacity that contributes to burnout, not a well-resourced, shared-response model. Dr. Wildermuth questions the need for this kind of crisis response, suggesting there is no evidence of such needs in the districts involved. The absence of publicly documented incidents does not mean the need does not exist. Many social media-related crises are handled quietly by schools or go unreported due to stigma, fear, or privacy concerns. In addition, lapses in documentation of social-media crises often result from already overburdened school staff and limited data infrastructure. But as numerous

---

facilitators, and implementation outcomes. *School Mental Health*, *13*(4), 772-790; Mazza, J. J., Dexter-Mazza, E. T., Miller, A. L., Rathus, J. H., & Murphy, H. E. (2016). *DBT? Skills in schools: Skills training for emotional problem solving for adolescents Dbt Steps-a*. Guilford Publications.

[33] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 43, ¶ 117).

national surveys and school personnel testimonies have shown, social media is a substantial contributor to real-time threats to student safety and well-being.

44.    With regard to the claim that my recommendations are a "slight repackaging" of existing practice,[34] this claim ignores the context and intentional integration of my plan. Each recommendation is anchored in specific harms caused or exacerbated by Defendants' social media platforms, as documented in my report. My approach is also forward-looking, accounting for evolving technologies, surveillance risks, and implementation science over a 15-year arc.[35] Repackaging implies minimal revision; in contrast, my proposal retools these supports for an evolving landscape of social media use among children and adolescents.

45.    Dr. Wildermuth's effort to frame my recommendations as unrelated to social media overlooks the *core premise* of my report: schools must adapt existing evidence-based methods to meet the new and complex challenges introduced by social media. The historical existence of elements of the recommended programming does not negate the urgent need to scale and adapt them in light of the recognized impact of social media platforms on the current youth mental health crisis and the school environment.

**B.    Response to Wildermuth Opinion 2**

46.    Dr. Wildermuth argues that some of my staffing recommendations are infeasible due to longstanding shortages of school-based mental health professionals.[36] She argues that school districts already struggle to recruit and retain counselors, psychologists, and social workers, and that my recommendations fail to account for these constraints. Wildermuth's report also questions the need for new hires, suggesting that they may be duplicative, especially if districts already meet national recommended ratios. These criticisms are unfounded.

47.    With regard to the unfounded concern that my staffing recommendations are infeasible,[37] workforce shortages in school mental health are real, but recent developments demonstrate that these challenges are being actively addressed through policy changes, increased training capacity, and federal and state investment.

48.    Contrary to claims that the proposed staffing levels are unattainable, current data reflect a steady flow of qualified school mental health professionals entering the field. For example, during the 2021–2022 academic year, approximately 3,118 students entered their first year of graduate training in school psychology, and 2,796 completed their

---

[34] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 49, ¶ 138).

[35] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-35, ¶¶ 110-119).

[36] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 4).

[37] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 4).

degrees, most of whom pursued employment in school settings.[38] These figures are consistent with a multi-year trend of stable or modestly increasing graduate program output. These numbers do not suggest an absence of qualified personnel, but rather underscore the need for stronger recruitment and retention incentives at the district level.

49.     State legislatures have also taken meaningful action to address workforce barriers. According to the 2023 *School Mental Health State Policy Report Card* published by Inseparable and the National Center for School Mental Health, most U.S. states have adopted at least one major policy reform to improve school mental health staffing.[39] These reforms include funding initiatives to improve school psychologist, social worker, and counselor-to-student ratios; creating and funding school mental health workforce development programs, including "grow-your-own" pathways and higher education partnerships; and establishing loan forgiveness, scholarship, and tuition support programs to attract professionals to high-need districts. States have also begun to streamline licensure and credentialing processes to accelerate entry into the field without compromising quality, and several have increased the availability of technical assistance for schools on evidence-based youth mental health practices.[40]

50.     Taken together, these data and policy trends strongly support the feasibility of building a school mental health workforce at the scale required to respond to the social media harms described in this report. While workforce shortages remain a challenge, they are neither static nor insurmountable. The capacity to address them is already in motion, driven by sustained national attention and funding.

51.     With regard to the relevance of using nationally recognized staffing ratios to inform recommendations for addressing the harms of social media in schools,[41] as noted by Dr. Wildermuth, the nationally recognized staffing ratios, such as those recommended by NASP, ASCA, and SSWAA, reflect years of research and field experience regarding caseloads, workload balance, prevention effectiveness, and student access to timely, meaningful mental health and counseling services in schools. These staffing ratios were established to reflect *the minimum standards* to support a comprehensive, multi-tiered system of care under normal conditions. They were not developed to address the magnitude and complexity of the current youth mental health challenges arising from student social medial use. Rather, they offer a reasonable, professionally endorsed baseline for estimating how much staffing is needed when a new substantial source of harm, like social media platform use, begins placing additional strain on existing systems.

---

[38] Gadke, D. L., Valley-Gray, S., & Rossen, E. (2024). NASP Report of Graduate Education in School Psychology: 2021-2022. Research Reports. Volume 8, Number 1. *National Association of School Psychologists*.

[39] Inseparable. (2025). School Mental Health State Policy Report Card.

[40] Hopeful Futures Campaign. (2024). State Legislative Guide for Strengthening School Mental Health.

[41] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 7-11, ¶¶ 33-42).

52.    Social media has introduced a persistent and preventable driver of mental health and behavioral disruptions, which manifest daily in school environments. These challenges have increased demand for school-based support, often overwhelming staff even in well-resourced districts. In this context, the existing ratios are not outdated; they are essential reference points for understanding how much new capacity must be added to address an additional category of need layered on top of existing demands. In my report, I do not use these ratios to suggest that all districts must reach them universally for general support. Instead, I apply them specifically to estimate the level of additional staffing that would be necessary to respond to the mental health and learning impacts of social media. This is a common and accepted approach in workforce planning: using established standards to model how new challenges impact overall service demand. Just as public health systems use hospital bed capacity metrics to prepare for emerging epidemics, or emergency services use response time benchmarks to scale for population growth, I use staffing ratios to model the scope of additional investment needed to address a new, clearly identifiable stressor.

53.    With regard to the assertion that my calls for additional staffing are without regard for existing staffing or meeting of benchmarks,[42] my recommendations intentionally call for additional staffing, even where districts already meet benchmarks, because the burden created by social media is additive. The suggestion that I disregard existing staffing levels or propose duplicative hiring is a mischaracterization. My report is explicit in recognizing that the unique and growing harms tied to social media require new, dedicated capacity, even in districts that are currently staffed to meet general mental health needs.

54.    The mental health and behavioral challenges emerging from students' social media use have introduced a layer of distress that existing school professionals cannot absorb without compromising their other responsibilities. As noted by Dr. Wildermuth,[43] and throughout my own report,[44] counselors, school psychologists, and social workers are already stretched thin managing IEPs, suicide risk assessments, trauma support, academic planning, and crisis intervention. It is not reasonable to assume that this same workforce can simply take on yet another complex and fast-evolving area of student need, especially one with unique clinical and educational dimensions, without expanding the system itself.

55.    With regard to the concern that my recommendations do not acknowledge the hiring challenges schools face,[45] far from ignoring these constraints, I affirmatively state in my report that existing staffing and programming are insufficient to meet the social media-related mental health and learning challenges faced by schools.[46] I clearly acknowledge

---

[42] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 6-7, ¶ 32).

[43] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 12, ¶ 45, p. 13, ¶ 47, pp. 23-24, ¶ 71).

[44] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 3, ¶ 8, p. 23, ¶ 90).

[45] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 6-7, ¶ 32, pp. 11-13, ¶¶ 43-46).

[46] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 3, ¶ 8, pp. 28-31, ¶¶ 101-105).

that "school districts are already stretched too thin" and that their efforts to date have been "piecemeal, underfunded, and inconsistently implemented."

56.    Workforce shortages are not insurmountable. While many districts have historically fallen short of recommended staffing ratios, this often reflects funding constraints rather than a lack of qualified professionals. A growing body of evidence supports effective strategies to recruit and retain school-based mental health personnel, including competitive compensation, professional development opportunities, supportive supervision, differentiated roles, and sustainable caseloads. While specific hiring, recruitment, and retention decisions may be tailored to district context, my recommended staffing levels represent the full capacity needed to address the harms of social media. My recommendations are focused on clearly identifying what resources, including staffing, are necessary to address the growing burden that social media platforms have placed on school systems. I fully acknowledge the realities school systems face in attracting and retaining qualified personnel. These constraints are real, but they do not negate the responsibility to define what adequate staffing should look like. Public health planning and educational reform require that we first identify the true scale of need, followed by efforts to meet that need.

57.    With regard to the assertion that my staffing recommendations[47] are "overly simplistic", Dr. Wildermuth misunderstands how strategic planning works in public systems. Systems transformation must start with a clear picture of what is needed. Just as we would not scale back health care workforce recommendations during an epidemic because of clinician shortages, we should not minimize what schools need to respond to social media disruption simply because staffing up will take effort. What would be simplistic is to suggest that schools can manage the impacts of social media without additional support, or that the absence of easy solutions means we should stop trying to define the target.

58.    With regard to the claim that workforce shortages predate social media and therefore cannot be attributed to it,[48] I do not claim that the shortage itself is caused by social media. Rather, I assert that the burden on existing staff has dramatically increased due to social media-related impacts, creating an urgent and qualitatively new demand that exceeds historical norms. As detailed in my report, educators and school mental health professionals are now navigating additional demands (e.g., escalating anxiety, depression, and self-harm, sleep and attention deficits related to social media use).[49] These stressors have further strained already understaffed existing support systems and exposed the need for dedicated personnel to manage and mitigate these new harms. The fact that staff shortages existed prior to these developments does not negate the need to respond to new and intensifying risks.

---

[47] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 6-7, ¶ 32).

[48] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 4).

[49] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

59.   Dr. Wildermuth's assertion that staffing ratios alone do not guarantee the adequate provision of school mental health services is a non-sequitur.[50] The recommended staffing ratios are intended as minimum benchmarks to address the severe undersupply of school-based mental health personnel. However, these ratios are not presented in isolation. That is precisely why my strategic recommendations are accompanied by calls for robust professional development, interdisciplinary team functioning, and implementation infrastructure. For example, I explicitly recommend ongoing training and supervision to ensure that professionals are appropriately qualified and utilized, as well as technical assistance and systems-level coordination to help schools navigate policy constraints or administrative burdens that might hinder effective service delivery. The recommended staffing increases are part of a comprehensive strategy, not a standalone solution.

60.   Many districts, faced with limited budgets and competing demands, are forced to make difficult decisions regarding student support personnel. This is a well-documented and deeply troubling trend, and it underscores, rather than undermines, the appropriateness of my recommendations.

61.   The fact that schools have been forced to deprioritize or reduce mental health staffing due to resource constraints is *not* a reason to resist scaling up supports in the face of a new and intensifying threat; rather, it is a compelling argument for why new, dedicated investments are needed. The harmful impacts of social media on student well-being and academic functioning are not challenges that existing, under-resourced school systems can simply absorb. They represent an entirely new layer of risk, one that exacerbates preexisting needs and widens gaps in access to timely, developmentally appropriate support.

62.   My recommendations call not only for an expansion of school-based mental health staffing beyond current national ratios, but for this expansion to be funded and supported strategically, not by further stretching existing district budgets, but through new investments from the platforms causing the problem, to allow for a sustainable, system-wide response. In short, Dr. Wildermuth's concern about difficult resource decisions affirms my argument: schools are already overburdened, and the scale of social media-related harm demands new capacity, not a reshuffling of the same inadequate resources.

63.   It is a misunderstanding to frame my recommendations as an attempt to retroactively fix longstanding workforce shortages. Rather, I assert that:

   a.   The volume and complexity of mental health crises arising from social media platforms represents a novel, external burden on schools;

   b.   Existing staff, even where present in sufficient numbers by traditional standards, are not equipped or resourced to manage this additional layer of harm;

---

[50] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 6, ¶ 31).

c. Therefore, additional, dedicated capacity (modeled using national ratios) is warranted specifically to address the new social media landscape schools are being forced to navigate.

## C.    Response to Wildermuth Opinion 3

64. Dr. Wildermuth incorrectly argues that my strategic plan devotes disproportionate school resources to social media-related interventions and lacks evidence to support its recommendations.[51] She also expresses unfounded concern that such a focus could detract from addressing broader mental health issues and worsen staffing burdens.[52] These opinions reflect a misreading of both the intent and scientific foundation of my work.

65. On the concern that I offer no justification for the level of attention my plan gives to social media: My report details dozens of studies and expert reports demonstrating the harmful impact of social media on student mental health, attention, peer relationships, classroom dynamics, and family-school partnerships.[53] For example, among other things:

a. Students spend up to 2.7 hours during the school day on smartphones, with the majority of that time spent on social media.[54]

b. Teachers report that cellphones (primarily used for social media) are a "major problem" in over 70% of high school classrooms.[55]

c. Exposure to platforms like TikTok and Instagram is strongly associated with increased anxiety, depression, sleep disruption, and poor body image.[56]

These issues are not ancillary; they are central disruptions to teaching, learning, and school climate. My focus on social media is not ideological; it is a data-driven response to an evolving and dominant influence in students' lives.

---

[51] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 5).

[52] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 16, ¶ 52).

[53] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

[54] 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 149, ¶ 329.

[55] Hatfield, J. (June 12, 2024). 72% of U.S. high school teachers say cellphone distraction is a major problem in the classroom. Pew Research Center.

[56] *See generally* 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P.; 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 126-27, 138, 142-43; Riehm, K. E., Feder, K. A., Tormohlen, K. N., Crum, R. M., Young, A. S., Green, K. M., Pacek, L. R., La Flair, L. N., & Mojtabai, R. (2019). Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth. *JAMA psychiatry*, 76(12), 1266-1273.

66.     Dr. Wildermuth appears to simultaneously acknowledge the influence of social media on student well-being while critiquing my report for focusing too heavily on this area.[57] Her citations to my prior writings appear selective and do not reflect the evolving scientific consensus or my more recent data-informed conclusions.[58] In fact, Dr. Wildermuth selectively omits my statements in the article she references that clearly acknowledge that the focus on the negative mental health impacts of social media are not unfounded and that "yes, there are harms that come with exposure to social media."[59] Nor does she cite an earlier interview about the same EdWeek Research Center study, in which I further elaborate on why students in the original study may downplay the negative impacts of social media: "teens might be deemphasizing the negative impact social media use is having on their mental health. It is designed to be addictive. They might be incentivized to downplay how anything related to social media, like online bullying, is hurting their moods for fear that it might be taken away from them."[60] As research has evolved, so too has the strategic emphasis I place on addressing social media harms within a broader whole-child framework.

67.     Dr. Wildermuth's claim[61] that the recommended strategies lack evidence and are not backed by implementation science is inaccurate. The plan is rooted in decades of research on multi-tiered systems of support (MTSS), public health implementation science, and evidence-informed school mental health frameworks developed and endorsed by the U.S. Department of Education, SAMHSA, and the CDC.[62] Specific interventions (e.g., life

---

[57] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 17, ¶ 55).

[58] Peetz, C. (July 10, 2025). The online behaviors most harmful to kids' mental health, according to a new survey. Education Week.

[59] Prothero, A. (November 29, 2023). What Is Driving Youth Mental Health Problems? It's Not Just About Social Media. Education Week.

[60] Prothero, A. (October 24, 2023). How Educators and Teens Disagree on What's Harming Students' Mental Health, in Charts.

[61] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 5).

[62] Stephan, S. H., Sugai, G., Lever, N., & Connors, E. (2015). Strategies for integrating mental health into schools via a multitiered system of support. *Child and Adolescent Psychiatric Clinics*, *24*(2), 211-231; Wilk, A. S., Hu, J.-C., Wen, H., & Cummings, J. R. (2022). Recent Trends in School-Based Mental Health Services Among Low-Income and Racial and Ethnic Minority Adolescents. JAMA pediatrics; Jaycox, L. H., Cohen, J. A., Mannarino, A. P., Walker, D. W., Langley, A. K., Gegenheimer, K. L., ... & Schonlau, M. (2010). Children's mental health care following Hurricane Katrina: A field trial of trauma-focused psychotherapies. *Journal of Traumatic Stress: Official Publication of The International Society for Traumatic Stress Studies*, *23*(2), 223-231; Love, H. E., Schlitt, J., Soleimanpour, S., Panchal, N., & Behr, C. (2019). Twenty years of school-based health care growth and expansion. *Health Affairs*, *38*(5), 755-764; Hoover, S. A., Bostic, J. Q., & Nealis, L. K. (2020). What is the role of schools in the treatment of children's mental illness? *The Palgrave Handbook of American Mental Health Policy*, 409-447; Hoover S, Bostic J. (2021) Schools as a vital component of the child and adolescent mental health system. Psychiatric Services, 72:37-48, 2021; Connors, E. H., Stephan, S. H., Lever, N.,

skills training, brief school-based mental health interventions, family engagement) are supported by peer-reviewed studies demonstrating improvements in student well-being, emotional regulation, and behavior when properly implemented.[63] These same strategies are used nationally in trauma-informed school models, suicide prevention efforts, and school climate reforms. Moreover, the 15-year timeline proposed allows for continuous evaluation and local adaptation.[64]

68. On the concern that the plan could detract from addressing the "whole child":[65] A key misunderstanding in Dr. Wildermuth's critique is the false dichotomy between focusing on social media and supporting the "whole child." My report does not call for siloed or single-issue programming. Instead, it presents a comprehensive, integrated approach where social media is addressed within broader school mental health systems.[66] For example:

   a. Life skills instruction builds emotional awareness, decision-making, and interpersonal skills that support resilience in both social media and real-world interactions.

   b. Family engagement efforts help caregivers support healthy habits across all domains, including social media use, sleep hygiene, and peer dynamics.

   c. Screen time initiatives and wellness activities are aligned with broader youth development goals and health promotion strategies.

---

Ereshefsky, S., Mosby, A., & Bohnenkamp, J. (2016). A national initiative to advance school mental health performance measurement in the US. *Advances in School Mental Health Promotion*, *9*(1), 50-69; Hoover, S. A., Lever, N. A., Sachdev, N., Bravo, N., Schlitt, J. J., Price, O. A., ... & Cashman, J. (2019). *Advancing comprehensive school mental health systems: guidance from the field*. National Center for School Mental Health, University of Maryland School of Medicine; Barrett, S., Eber, L., & Weist, M. D. (2013). Advancing education effectiveness: An interconnected systems framework for Positive Behavioral Interventions and Supports (PBIS) and school mental health. *Center for Positive Behavioral Interventions and Supports (funded by the Office of Special Education Programs, US Department of Education). Eugene, Oregon: University of Oregon Press*.

[63] Lawson, G. M., McKenzie, M. E., Becker, K. D., Selby, L., & Hoover, S. A. (2019). The core components of evidence-based social emotional learning programs. *Prevention Science*, *20*, 457-467; Bruns, E. J., Lee, K., Davis, C., Pullmann, M. D., Ludwig, K., Sander, M., ... & McCauley, E. M. (2023). Effectiveness of a brief engagement, problem-solving, and triage strategy for high school students: Results of a randomized study. *Prevention Science*, *24*(4), 701-714; Becker, K. D., Buckingham, S. L., & Brandt, N. E. (2015). Engaging youth and families in school mental health services. *Child and Adolescent Psychiatric Clinics*, *24*(2), 385-398.

[64] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 31-35, ¶¶ 106-119).

[65] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 1, ¶ 5).

[66] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 28, ¶¶ 103-104).

69.    I agree with Dr. Wildermuth's assertion that student services professionals must be equipped to address the full range of academic, social, emotional, and behavioral needs that students bring with them to school.[67] However, her characterization of my strategic plan misrepresents both the intent and structure of my recommendations.

70.    My plan does not call for school-based mental health professionals to "dedicate themselves 100%" to addressing the effects of social media at the exclusion of other concerns. Rather, it calls for the addition of workforce capacity specifically designed to recognize, prevent, and mitigate the unique and increasingly pervasive challenges caused by social media.

71.    Just as schools and communities have been required to created targeted roles to address specific, emergent public health threats affecting schools (e.g., substance use counselors in response to the opioid epidemic, trauma specialists following mass violence or natural disasters), it is both reasonable and necessary to establish dedicated supports to address the well-documented effects of social media on students' mental health and learning that are also affecting schools. This does not reflect a narrowing of scope but a necessary, targeted, strategic expansion of it to specifically address the disruptions to schools caused by social media.

72.    On the concern that focusing on social media might worsen student mental health:[68] Dr. Wildermuth suggests that focusing on social media might worsen student mental health by pathologizing normal behavior or ignoring other contributing factors. I take this concern seriously, but I wholly disagree with its premise. My plan is not about stigmatizing social media use; it is about understanding its risks and teaching students to navigate it healthily, just as we do with nutrition, relationships, and substance use. I also take into consideration that social media is not the only factor impacting mental health, but it is a uniquely pervasive and rapidly evolving one that has and continues to strain and disrupt schools. Addressing it responsibly strengthens, not weakens, schools' ability to support student well-being and minimize the disruption that social media has caused in schools.

73.    My strategic plan is not a narrow or untested initiative. It is a multi-dimensional, evidence-based framework developed in response to a documented crisis in adolescent development and school functioning. It draws on research, public health precedent, and two decades of field-based experience helping schools adapt to new challenges.

    D.    Response to Wildermuth Opinion 4

74.    Dr. Wildermuth's assertion that a 15-year implementation timeline is "neither reasonable nor essential" misrepresents both the scientific foundation and pragmatic rationale for my recommendation. My strategic plan reflects a systematic, long-term implementation approach grounded in public health precedent and implementation science, and tailored to local context and capacity. Its duration and structure are intentional and necessary to

---

[67] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp.16-17, ¶ 54).

[68] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 40-51, ¶¶ 141-142).

address the complexity and scale of social media-related harms. On the concern that a 15-year timeline is not justified nor explained:[69] Contrary to Dr. Wildermuth's claim, I provide a detailed justification for the 15-year timeline.[70] Specifically:

    a.  Public health precedent: Long-term public health efforts, such as tobacco control, obesity prevention, and anti-bullying initiatives, have demonstrated that system-wide, sustained interventions often require 10-15 years to yield meaningful and enduring impact. I reference the U.S. Surgeon General's 15-year tobacco control campaign as a direct corollary.[71]

    b.  Developmental cohort logic: A 15-year span enables schools to track and support a full K–12 student cohort, offering continuity, developmental alignment, and the opportunity to assess longitudinal outcomes. This framing is critical given that students' exposure to social media, and its harms, starts early and evolves through adolescence.[72]

    c.  Implementation science: Leading frameworks in educational and health systems change consistently show that sustainable, high-fidelity implementation of comprehensive programs, especially across large and variable systems like school districts, requires 10-15 years, inclusive of exploration, installation, initial implementation, and full operation phases.[73]

75.    On the claim that my cited research does not support the recommendation of a 15-year timeline: Dr. Wildermuth's assertion that my citation of the NIRN monograph does not support my recommended timeline is incorrect.[74] She points to a reference in Chapter 3 that describes a "2-to-4-year" period to reach full implementation and suggests I ignore

---

[69] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 2, ¶ 6).

[70] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 31-35, ¶¶ 106-119).

[71] United States Public Health Service. Office of the Surgeon General, National Center for Chronic Disease Prevention, & Health Promotion (US). Office on Smoking. (2012). *Preventing tobacco use among youth and young adults: A report of the surgeon general*. US Government Printing Office.

[72] Proctor, E. K., Landsverk, J., Aarons, G., Chambers, D., Glisson, C., & Mittman, B. (2009). Implementation research in mental health services: an emerging science with conceptual, methodological, and training challenges. *Administration and Policy in Mental Health and Mental Health Services Research*, *36*, 24-34.

[73] Fixsen, D. L., S. F. Naoom, K. A. Blase, R. M. Friedman, and F. Wallace. "Implementation research." *A Synthesis of the Literature* (2005): 2005. Durlak, J. A., & DuPre, E. P. (2008). Implementation matters: A review of research on the influence of implementation on program outcomes and the factors affecting implementation. *American journal of community psychology*, *41*(3), 327-350.

[74] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 46, ¶ 130).

methods described in the same text to shorten that timeline. This critique fundamentally misinterprets both the content and application of the cited work.

76.     The 2-4 year timeline referenced in Chapter 3 (p.17) of the NIRN monograph is explicitly tied to implementing a single evidence-based practice or program in a single new setting, with appropriate supports in place.[75] It does not describe the process of building and sustaining a comprehensive, multi-tiered system of mental health promotion, prevention, and intervention across large numbers of schools and intersecting systems, as proposed in my strategic plan. In fact, the same monograph states:

77.     "The implementation site needs to be sustained in subsequent years. Skilled practitioners and other well-trained staff leave and must be replaced… External systems change with some frequency… Through it all the implementation site leaders and staff, together with the community, must be aware of the shifting ecology… The goal during this stage is the long-term survival and continued effectiveness of the implementation site in the context of a changing world."[76] (p. 17).

78.     This description highlights that sustainability, let alone full system transformation, requires ongoing effort well beyond the 2-4 years it might take to implement a single program in a stable, well-prepared site.

79.     My 15-year projection aligns with what NIRN describes as the multistage, iterative process of systems-level change, involving:

        a.   Exploration and adoption (e.g., stakeholder buy-in, assessment of community fit),

        b.   Program installation (e.g., training infrastructure, resource alignment),

        c.   Initial implementation (e.g., organizational shifts, practice adoption),

        d.   Full operation (e.g., integration into school routines and culture),

        e.   Sustainability (e.g., turnover-resistant infrastructure and continuous improvement; pp. 15-17).

80.     Each of these stages introduces risks of failure if rushed or under-resourced. The monograph emphasizes that successful implementation "takes 2 to 4 years in a single site under ideal conditions," and adds:

---

[75] Fixsen, D. L., S. F. Naoom, K. A. Blase, R. M. Friedman, and F. Wallace. "Implementation research." *A Synthesis of the Literature* (2005).

[76] Fixsen, D. L., S. F. Naoom, K. A. Blase, R. M. Friedman, and F. Wallace. "Implementation research." *A Synthesis of the Literature* (2005).

81. "Each attempted implementation… presents an opportunity to learn… [but] it often takes years to develop an implementation site and then see how well that site performs… and a few more years to adjust strategies… in an ongoing iterative process." (p. 14).

82. This supports my contention that in a national context, where school systems vary widely in readiness, capacity, and support, a decade or more is a realistic and research-aligned timeline for broad, sustainable change.

83. My strategic plan is modeled on public health implementation science, which, like NIRN, accounts for policy alignment, workforce development, training pipelines, fidelity assurance, community engagement, and sustainability mechanisms. These are not "delays" but essential ingredients of success. The NIRN monograph emphasizes: "Implementation is synonymous with coordinated change at system, organization, program, and practice levels." (p. vi).

84. It is precisely this multi-layered coordination that makes a longer time horizon necessary and appropriate. The monograph also acknowledges that initial implementation efforts are often underpowered, and that fidelity, scale-up, and adaptation typically require multiple iterative cycles, something I build into my 15-year framework.[77]

85. My use of the NIRN framework to justify a 15-year timeline for building a robust school mental health system responsive to social media harms is consistent with the scope, scale, and complexity of the change required. The timeline reflects a structured, evidence-informed implementation approach that ensures all system components (staffing, services, training, and evaluation) are developed, integrated, and sustained over time. It is intentionally designed to support continuous quality improvement and local contextualization, aligning with core principles of implementation science without sacrificing urgency or coherence. On the critique that the plan is inflexible and cannot expect to be maintained by schools:[78] Dr. Wildermuth characterizes the 15-year timeline as an inflexible commitment that schools cannot be expected to maintain. I disagree and again note that Dr. Wildermuth does not have the experience or understanding of MTSS design, implementation and evaluation to lodge this criticism. My report repeatedly emphasizes flexibility, including:

    a. Local adaptation to community needs and resources;

    b. Ongoing evaluation and course correction; and

    c. Integration into existing district priorities and frameworks.

86. The 15-year timeline is an essential, strategic horizon that accounts for the space and support required to scale effectively, as opposed to chasing short-term results with unsustainable investments. The 15-year timeline I propose is not only reasonable, it is essential. It reflects the real-world pace of sustainable change in complex school systems,

---

[77] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 31-35, ¶¶ 106-119).

[78] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 48-49, ¶¶ 135-137).

accounts for resource variation, and centers student development and public health precedent. It offers schools a structured approach to build what they have long lacked: a coordinated and evidence-informed strategy for addressing one of the most pervasive challenges disrupting schools today.

87.    On the claim that a shorter timeline would serve schools better: Dr. Wildermuth states that shorter timelines are more realistic in schools. But in practice, short-cycle initiatives are more likely to fail. School leaders are already overwhelmed by initiative fatigue and reactively shifting priorities. Without a clear, staged roadmap, most promising programs are abandoned before demonstrating outcomes. My 15-year approach explicitly builds in:

    a.    Time to build staff capacity and partnerships;

    b.    Infrastructure development (including data systems); and

    c.    Sustainability planning and institutionalization.

88.    These components are essential for lasting change, especially given that school districts are under-resourced.

89.    A major risk in school reform is reliance on short-term grants or leadership-dependent efforts. My 15-year plan is deliberately aligned with long-range sustainability goals, giving districts time to integrate supports into existing structures (e.g., MTSS); embed professional development in induction pipelines; and build internal evaluation capacity. This is fiscally and operationally responsible.

E.    Additional Responses to Wildermuth

90.    Dr. Wildermuth raised additional concerns in her rebuttal to which I respond below.

1.    School-based Therapist and Crisis Interventionist staffing

91.    Dr. Wildermuth suggests that I fail to define the qualifications for the roles of school-based therapist and crisis intervention specialist, and notes that there is no single national professional body governing these roles.[79] While it is true that "school-based therapist" is not the formal title associated with a singular professional credential, the term is widely used in school mental health literature and practice to describe licensed mental health professionals who are qualified to deliver therapeutic services within a school setting. These professionals may hold degrees and licenses in social work (LCSW), professional counseling (LCPC or LPC), marriage and family therapy (LMFT), or clinical psychology (PhD or PsyD), among others. While their titles may vary, they are all governed by established professional associations, such as the National Association of Social Workers (NASW), American Counseling Association (ACA), and American Psychological Association (APA), and are subject to their respective licensure boards, ethical standards, and evidence-based practice guidelines.

_____

[79] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 6, ¶ 30 fn3).

92. Similarly, the title of "crisis intervention specialist" is not tied to one fixed credential but reflects a specialized role that can be filled by a licensed clinician with training and experience in acute behavioral health response. While there is no singular credentialing body for this role, there are well-established, cross-disciplinary standards for crisis response, including guidelines from the Substance Abuse and Mental Health Services Administration (SAMHSA), the National Association of School Psychologists (NASP), and the National Child Traumatic Stress Network (NCTSN). These professionals may include social workers, psychologists, counselors, or psychiatric nurses trained in de-escalation, suicide risk assessment, trauma-informed care, and postvention.

93. Regarding ratios, my recommendations are guided by existing national benchmarks for Tier 3 service providers. The school-based therapist position is conservatively estimated at a ratio of 1:750 students, slightly higher than the NASP-recommended ratio of 1:500 for school psychologists. This higher ratio reflects the specialized and individualized nature of therapeutic service delivery, while recognizing that school psychologists often carry broader roles including assessment and consultation. The 1:750 ratio provides a feasible planning estimate that remains aligned with the intensity and Tier 3 focus of the role.

94. The crisis intervention specialist role is conservatively proposed at one per school, reflecting the need for a readily available, trained responder to manage high-acuity behavioral health crises in real time. This recommendation aligns with school mental health models used in high-need settings and supports the growing demand for in-building capacity to respond to students in crisis.

95. In short, while Dr. Wildermuth critiques the absence of a single credentialing body, this critique misunderstands the interdisciplinary and flexible nature of school-based mental health systems. The roles I propose are professionally anchored, widely used in the field, and aligned with best practices for addressing complex student needs in school environments.

### 2. Plan "ignores" cell phones

96. The claim that my proposal ignores the cell phone as a central vehicle for student social media use misrepresents both the substance and scope of my recommendations.[80] The social media platforms at the heart of this litigation are overwhelmingly accessed via personal devices, primarily smartphones. While not all screen time is social media use, a substantial portion of the time students spend on screens is, in fact, devoted to engaging with social media. This includes scrolling, posting, messaging, and consuming videos and peer commentary, activities directly tied to the design features of social media that contribute to dysregulation, sleep disruption, and mental health strain. Attempts to draw rigid distinctions between general screen use and social media use downplay the extent to which these platforms dominate adolescents' digital environments and obscure the practical challenges schools face in addressing their impacts. Far from ignoring mobile

---

[80] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 22-23, ¶ 69).

devices, my report directly and repeatedly addresses the pervasive impact of cell phone-based social media use on student learning, mental health, and school environments.

97.     I document how smartphones are the *primary conduit* through which students engage with social media during the school day.[81] I cite research demonstrating that students spend up to 2.7 hours per day on smartphones during instruction, with the majority of that time devoted to social media apps like.[82] This issue is further addressed in my strategic recommendations for:

-   Screen time management initiatives that help schools and families establish shared norms around in-school and out-of-school use of social media on mobile devices;

-   Digital literacy education that teaches students about persuasive design and promotes mindful engagement with social media, especially on smartphones;

-   Digital detox and wellness programs that provide structured opportunities for disconnection from social media platforms on phones;

-   Family engagement efforts that equip parents with tools to manage phone usage of social media at home, including device-free zones and usage contracts.[83]

98.     These are not abstract recommendations; they directly confront the behavioral, emotional, and cognitive impacts of mobile phone-driven social media use.

99.     The suggestion that my plan falls short because it does not center on a blanket cell phone ban fails to grasp the complexity of the problem.[84] While school-level cell phone policies can play a role in mitigation, research and implementation experience show that bans are often inconsistently enforced and do not address the underlying compulsive relationships students have with social media.[85] Moreover, many harmful social media interactions—that have direct negative effects on the school environment—take place outside of school

---

[81] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 8-11, ¶¶ 36-48).

[82] Christakis, D. A., Mathew, G. M., Reichenberger, D. A., Rodriguez, I. R., Ren, B., & Hale, L. (2025). Adolescent Smartphone Use During School Hours. *JAMA pediatrics*; 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 127, 150, 160; Hatfield, J. (June 12, 2024). 72% of U.S. high school teachers say cellphone distraction is a major problem in the classroom. Pew Research Center; Radesky, J., Weeks, H.M., Schaller, A., Robb, M., Mann, S., and Lenhart, A. (2023). *Constant Companion: A Week in the Life of a Young Person's Smartphone Use*. San Francisco, CA: Common Sense; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P. at 278-79.

[83] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

[84] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 22-23, ¶ 69).

[85] Hayes, I., & Prother, A. (June 5, 2024). To ban or not to ban? Educators, parents, and students weigh in on cellphones. Education Week.

hours (e.g., at night, in bedrooms, or over weekends) where school cell phone bans have no reach.[86] That is why my plan emphasizes not only school policy, but also:

- Student education to build social media self-regulation skills with respect to social media,

- Staff training to recognize phone-related distress from social media,

- Systems-level capacity to support students affected by social media overload or online victimization through social media.

100.    Cell phones are the delivery system, but social media is the engine. Addressing only the former without confronting the impacts of the design, incentives, and psychological manipulation embedded in the platforms themselves would be an incomplete and ultimately ineffective strategy.

101.    I intentionally avoid prescribing uniform device policies for all schools. Instead, I recommend that districts assess their unique contexts and adopt cell phone guidelines that align with their student populations and family needs. The strategic plan encourages community-informed policy development rather than top-down mandates, acknowledging that cell phones serve not only as risk vectors but also as tools for learning, accessibility, and safety.

### 3.    Appropriate monitoring

102.    Dr. Wildermuth's assertions regarding privacy, feasibility and professional role strain misconstrue my recommendation that schools establish policies outlining appropriate monitoring of social media use:[87]

103.    First, my recommendation does *not* advocate for indiscriminate or round-the-clock surveillance of students' personal accounts by school staff. Instead, I recommend that districts develop clear, developmentally appropriate policies regarding:

- The use of existing school-sponsored monitoring systems (e.g., alerts from school-managed devices or platforms such as GoGuardian or Bark),

- Guidelines for when and how concerning social media activity reported by students, staff, or families should be triaged and responded to, and

- Protocols for engaging families and students in conversations about online safety when risks are identified.

---

[86] 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 126-27, 138, 142-43.

[87] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 23-24, ¶ 71).

In other words, this is not about giving schools "24/7 access to a child's every thought or interaction," as Dr. Wildermuth suggests.[88] It is about responding to real harms that already enter the school environment through social media use, including threats of violence, cyberbullying, suicidality, and other mental health issues.

104.    I agree that privacy and consent are essential. That's why any monitoring must be explicitly communicated to families, built into district policies, and aligned with state and federal laws, including FERPA and COPPA. My recommendations encourage parental involvement and safeguards against overreach. Moreover, most schools already use digital tools that involve flagging of potentially harmful behavior on district-owned devices or networks.[89] These are not new intrusions, they are risk management strategies in an era where compulsive social media use interferes with the school environment. The ASCA guidance that Dr. Wildermuth cites does not oppose monitoring; it recognizes that if schools use it, they should ensure clear protocols for how flagged content is addressed, including timely parental notification.[90] That is precisely the type of structured process I recommend.

105.    Dr. Wildermuth is correct that students can create anonymous or undisclosed accounts.[91] This is why I do not propose that schools rely solely on account-level surveillance or that they attempt to track students across platforms. Instead, I advocate for a multi-tiered approach that includes:

- Education and digital literacy, so students understand the risks and responsibilities of their online behavior;

- Reporting systems, so students and staff can flag concerns seen in social media spaces;

- Family engagement, to support monitoring and communication at home; and

- Use of district-controlled monitoring tools limited to school-issued devices, with proper consent and policy guardrails.

---

[88] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 23-24, ¶ 71).

[89] Despite many schools already having some form of monitoring tools, my recommendation to include monitoring tools is not duplicative because current reporting mechanisms are often limited in scope, failing to capture the full range of student activity across personal devices and social media platforms, and schools are frequently under-resourced from a staffing perspective, lacking the dedicated personnel necessary to consistently monitor flagged activity, investigate incidents, and provide timely support or intervention.

[90] ASCA (2023). ASCA Position Statement, The School Counselor and Student Safety with Digital Technology. American School Counselor Association. Available at: https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Student-Safety-Digital.

[91] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 23-24, ¶ 71).

106.    I agree with Dr. Wildermuth that school jurisdiction has bounds.[92] However, it is also well established, both in law and in practice, that schools may take action when off-campus conduct materially disrupts the school environment.[93] My report documents how social media routinely affects student and school functioning during the school day.[94] Ignoring these impacts because they originate online would leave schools unprepared and unprotected. My plan does not ask schools to patrol every online interaction. It asks schools to be prepared and coordinated in their response when social media use inevitably affects the school climate and student safety.

107.    With regard to overburdened staff, my strategic plan includes increased staffing and dedicated roles to support social media-related prevention and intervention efforts. The goal is not to shift more work onto already stretched educators but to build capacity, including the potential for dedicated school-based social media safety specialists and partnerships with mental health professionals trained in social media risk assessment. Further, without protocols or designated supports, school staff are already overwhelmed by the fallout from online incidents. A structured, transparent approach, backed by policy and appropriate staffing, helps to manage this load, not exacerbate it.

### 4.    Conflation of social media and ignoring positive impacts

108.    Dr. Wildermuth wrongly claims that I conflate the effects of the Defendants' social media platforms with screen time, cell phone use, and social media more broadly.[95] In fact, my report explicitly references a range of peer-reviewed studies and expert analyses that distinguish between types of screen use and identify social media platforms specifically as particularly harmful to adolescent mental health and development. I am clear in citing harms that stem not from general screen time, but from design features and engagement patterns characteristic of the platforms developed by Defendants.[96]

109.    It is precisely because the evidence base allows us to differentiate passive screen consumption (like watching television) or educational screen use from the active, high-frequency or compulsive social media engagement that my strategic plan focuses on. Where my recommendations acknowledge phone and screen use more broadly (e.g., in digital literacy education or family engagement), it is to provide developmentally appropriate guardrails that account for the complexity of youth digital lives, not to generalize or misattribute harm.

---

[92] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 23-24, ¶ 71).

[93] *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038 (2021).

[94] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 6, ¶ 30, pp. 8-11, ¶¶ 35-46).

[95] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp.18-19, ¶ 58).

[96] 2025.05.16 Expert Report of Eva Telzer, Ph.D.; 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.

110. As for her assertion that I "ignore the positive effects" of technology and social media, I disagree. The presence of potential benefits does not negate the real and widespread harms being experienced at scale, nor should it prevent urgent intervention. It is not uncommon in public health to regulate or respond to a product or behavior that has both benefits and risks, and social media is no different.

### 5. Ignoring COVID-19 and other factors

111. Dr. Wildermuth argues that my report "operates as if Covid-19 never happened."[97] I must reject that claim outright. Throughout the pandemic, I worked directly with school districts, state agencies, and national partners to help schools navigate unprecedented disruptions to learning and well-being. I deeply understand and acknowledge the impact of COVID-19 on students, educators, and families, and I do not dismiss its role in the academic and mental health challenges facing youth.

112. However, recognizing the role of COVID-19 does not preclude an honest examination of other significant contributing factors. Several of the experts I cite in my report have examined the interplay between pandemic disruptions and technology use, including evidence that increased reliance on social media during periods of isolation may have compounded harm for many adolescents. My report does not "cast blame" solely on social media; rather, it highlights the body of research identifying the harm of social media on youth mental health and the learning environment.

113. Further, Dr. Wildermuth's claim that my strategic plan would lead Student Services Professionals to spend "100% of their time" executing my initiatives while ignoring the effects of COVID-19 is inaccurate and a mischaracterization of my recommendations.[98] Nowhere in my report do I prescribe or even suggest that school-based mental health professionals should dedicate *all* of their time to addressing the impacts of social media *at the exclusion* of other well-known and complex contributors to student distress, including the effects of the COVID-19 pandemic. On the contrary, I fully acknowledge that students' mental health and academic functioning are shaped by multiple, interacting factors, and my entire professional career has centered on helping schools build the capacity to address that full range of needs through a comprehensive, multi-tiered system of support (MTSS).

114. The strategic plan I put forth is designed to add workforce capacity, not redirect or repurpose all existing staff to focus exclusively on social media harms. It is my opinion that additional staffing is required, particularly in light of the fact that the current workforce is already stretched thin addressing COVID-related impacts, trauma, learning loss, family instability, and other challenges. The plan does not suggest removing attention from these issues, but rather enhancing schools' ability to address newly emergent effects of social media platform use alongside other pressing concerns.

---

[97] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 18-19, ¶ 58).

[98] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 20, ¶ 61).

115.   Furthermore, the professionals I recommend hiring would not operate in silos, nor would they be tasked with simplistic or one-dimensional interventions. My recommendations include workforce development, professional learning, interdisciplinary collaboration, and ongoing supervision to ensure that student support personnel can respond holistically to the diverse and evolving needs of today's students.

116.   To suggest that my strategic plan prescribes tunnel vision or clinical negligence is simply unfounded. The plan calls for *expanded* and *strategic* capacity, not singular focus to the exclusion of others, and it recognizes the complex ecosystem of influences on student development, including but not limited to the effects of COVID-19.

   6.   Staffing

117.   On the concern that staffing recommendations for district and school positions are made without regard to the size of the district/school:[99] Dr. Wildermuth's critique of my staffing recommendations overlooks the rationale for the strategic plan I propose. Far from ignoring district-specific context, my recommendations are informed by long-standing principles of implementation science and systems-level mental health planning, which recognize the need for clear leadership, role clarity, and distributed responsibility to ensure successful, sustainable change.

118.   The recommendation that each district create key leadership roles (e.g., Directors of Digital Safety, Digital Literacy, Family Engagement, and Student Mental Health) reflects the need for districts to have designated personnel who are accountable for coordinating responses to complex, cross-cutting challenges. These are not redundant or arbitrary roles. Rather, they align with clearly defined areas of work, some that are already occurring, often in fragmented or under-resourced ways, across schools. Having a point person for each domain facilitates interdepartmental coordination, strategic planning, cross-school implementation fidelity, professional learning and coaching, and evaluation and improvement cycles.

119.   It is quite common for districts, regardless of size, to have one individual lead workstreams that span the entire system. In fact, this is a conservative staffing approach. I did not recommend creating full departments or teams for each area. Instead, I proposed a single coordinator or director to serve as a catalyst and lead for each domain, allowing districts the flexibility to align these roles with existing structures where possible. For example, some districts may already have a Director of Family Engagement or a Digital Learning Specialist, in which case the proposed position may be adapted to reflect emerging needs related to social media impacts.

120.   At the school level, the recommendation to add positions such as a Life Skills Specialist, Peer Coordinator, or Crisis Intervention Specialist is rooted in a tiered approach to school mental health that balances prevention, early intervention, and responsive supports. These roles are not duplicative of existing staff but are intended to fill critical gaps in many schools that currently lack capacity to address social media-related harms. The

---

[99] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 43, ¶¶ 118-121).

recommendations explicitly account for the number of schools within each district to estimate workforce needs. However, I did not assume uniform implementation across every school in perpetuity. I anticipate that districts will tailor the day-to-day implementation of their strategic plan based on local needs, student demographics, and existing personnel. My proposed plan is intended to provide a structured, implementable framework, while allowing for continuous quality improvement and local tailoring with respect to day-to-day operations in a district. This structure offers necessary flexibility while maintaining fidelity to the core components of the plan, enabling districts to adapt implementation without compromising overall intent or effectiveness. Such flexibility is common in large-scale implementation efforts.

121.    While Dr. Wildermuth suggests there is no "demonstrable justification" for these roles, my report is grounded in a growing body of evidence showing that:[100]

    a.  Social media has created new and compounding risks for student mental health, academic functioning, and school safety;

    b.  Schools are under-resourced and underprepared to manage these challenges at scale; and

    c.  A proactive, coordinated response requires both infrastructure and staffing, not just training or policy change.

### 7.    Professional Development Plan

122.    Dr. Wildermuth's critique of my professional development recommendations reflects a misunderstanding of both the intent and flexibility of the proposed training structure.[101] While I understand the desire for specificity in implementation planning, it is important to clarify that my approach to professional development is both *conservative in time estimates* and *deliberately non-prescriptive in content*, to allow for local choice and adaptation and alignment with existing district programs and policies.

123.    I fully recognize that some districts may already have related professional development in place. In fact, my report encourages districts to build upon and integrate with existing training structures wherever feasible. However, the reality is that most professional development programs currently in use were not designed with the unique and far-reaching harms of social media in mind. A baseline investment in professional development on these emerging challenges is both reasonable and necessary, and my recommendations simply provide districts with a scalable, tiered framework for organizing that investment.

124.    The time allocations I propose (e.g., 40 hours for new district directors, 8 hours for school leaders, 4 hours for general personnel) are based on best practice estimates from successful professional development initiatives in areas such as trauma-informed care,

---

[100] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (p. 43, ¶ 119).

[101] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 44-45, ¶¶ 125-127).

suicide prevention, and school climate reform.[102] These are not arbitrary numbers, but rather conservative projections that reflect the level of learning and planning required to meaningfully change practices and improve outcomes in complex systems like schools. The numbers are meant to identify the minimal level of investment needed to support sustained culture and systems change.

125.    My decision not to specify a single program in most domains was intentional. In my decades of work helping states and districts build comprehensive school mental health systems, one lesson has been consistently reinforced: local relevance and ownership matter. Districts vary significantly in their demographics, available infrastructure, staffing patterns, and history of professional learning. By avoiding a one-size-fits-all programmatic prescription my plan allows districts to select or develop training content that best fits their context. That said, where there *is* a clearly recognized, high-quality, and evidence-informed set of resources, such as those found on StopBullying.gov, SchoolSafety.gov, or through the International Institute for Restorative Practices (IIRP), I do recommend their use. Dr. Wildermuth suggests these resources are insufficient because they were not created specifically to address the alleged harms of the Defendants' platforms. However, this argument misunderstands the nature of cross-platform harms. These resources provide gold-standard guidance on addressing cyberbullying, online harassment, and social media peer conflict, all of which are amplified by the design and functionality of the platforms in question. While no one training program can solve the problem alone, these resources offer foundational practices that are highly relevant and widely used by districts nationwide.

126.    It is worth noting that my report also recommends ongoing evaluation of professional development efforts, through feedback loops, implementation monitoring, and outcome measurement, to ensure that training is not only delivered but continuously improved for effectiveness.

## III.    Response to Hutt Report

### A.    Response to Hutt Opinions 1 and 2

127.    Dr. Hutt's Opinions 1 and 2 present a historical argument that, while intended to undermine the validity of my recommendations, actually provides important support for the positions outlined in my report.[103] Specifically, Dr. Hutt affirms that American public schools have long evolved in response to societal issues, and are now required to expand their mission beyond the "three Rs" to include a wide range of student needs, from physical health and vocational readiness to social-emotional well-being and life skills. My report builds directly on this history of educational adaptation and highlights how school districts are now required to address the current challenges posed by social media.

---

[102] Darling-Hammond, L., Hyler, M. E., & Gardner, M. (2017). Effective teacher professional development. *Learning policy institute*.

[103] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶¶ 2-4).

128.    Dr. Hutt acknowledges that schools have historically been called upon to respond to emerging concerns, and he provides a rich narrative throughout his report documenting the many ways in which public schools have evolved in response to industrialization, immigration, public health concerns, and cultural shifts.[104] As he states, "School responses to the rise of social media… reflect a predictable continuation of this historical trend."[105]

129.    Far from proposing a radical departure from historical precedent, my report identifies a modern manifestation of a longstanding dynamic: when a new factor emerges that materially affects students' learning, development, or school climate, schools are both expected, and required, to respond. The fact that the current challenge stems from social media platforms rather than factory labor conditions or physical health concerns does not alter this logic.

130.    In my report, I highlight how personal social media use affects academic performance, student mental health, teacher morale, and school safety.[106] These are not peripheral concerns, they cut to the core of a school's ability to provide a safe and effective learning environment. Thus, the case for schools addressing social media-related harms is both historically grounded and educationally necessary.

131.    Dr. Hutt criticizes my recommendations as a "classic case of educationalization", suggesting that such efforts historically lack clarity, overestimate the power of schools, and inappropriately extend school responsibility into areas that belong to families or religious institutions.[107] My recommendations are neither vague nor misaligned with the schools' role.

132.    The interventions I propose, such as mental health literacy, digital citizenship, and tiered school mental health supports, are not speculative or ideological. They are evidence-based strategies already implemented in thousands of schools across the country to support student safety, well-being, and academic success.[108] These programs reflect well-documented best practices and are consistent with federal and state guidance, including multi-tiered systems of support (MTSS) frameworks endorsed by the U.S. Department of Education and SAMHSA.[109] Dr. Hutt lacks an understanding of this likely because his

---

[104] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶ 2).

[105] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶ 2).

[106] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

[107] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶¶ 3-4).

[108] Hoover, S. A., Lever, N. A., Sachdev, N., Bravo, N., Schlitt, J. J., Price, O. A., ... & Cashman, J. (2019). *Advancing comprehensive school mental health systems: guidance from the field.* National Center for School Mental Health, University of Maryland School of Medicine.

[109] Barrett, S., Eber, L., & Weist, M. D. (2013). Advancing education effectiveness: An interconnected systems framework for Positive Behavioral Interventions and Supports (PBIS) and school mental health. *Center for Positive Behavioral Interventions and Supports (funded by the Office of Special Education Programs, US Department of Education). Eugene, Oregon:*

rebuttal does not reflect a strong grounding in the social science methods necessary for causal inference or implementation-focused evaluation. His analysis lacks the methodological rigor typically required in public health and implementation science, which limits the applicability of his critique to the type of strategic, systems-level planning at the core of my report.

133.    Moreover, many of the concerns raised by Dr. Hutt regarding "educationalization" were similarly voiced during past expansions of school responsibility (e.g., driver's education, anti-bullying programs). Yet over time, society has consistently affirmed that schools *must* take on new responsibilities when student health, learning and safety are at stake. What makes the rise of social media distinct is not that schools are responding, but that they are doing so in the absence of support from the industries driving the harm.

134.    Dr. Hutt concludes that this lawsuit is "entirely out of step with the long history of educationalization" because, historically, the public has borne the cost of new school responsibilities.[110] I disagree. While it is true that school funding has traditionally come from public sources, this does not mean the pattern is normatively ideal or must continue unchanged, especially when the source of harm is clearly identifiable as is true here because the harms the school districts are facing have been caused by the Defendant social media companies.

135.    We have precedent for this. For example, the Master Settlement Agreement with tobacco companies required industry actors to fund prevention and health education efforts when it became clear that public systems were shouldering the burden of corporate misconduct. Today, social media companies have designed platforms that actively undermine student focus, sleep, emotional regulation, and peer interactions, often in ways that exploit adolescent vulnerabilities.[111] Given the mounting social media harms and the resources required to address those harms, the suggestion that schools should continue absorbing these costs alone is untenable.

136.    Rather than dismissing educationalization, my plan provides a more strategic, better-supported version of it, one that:

    a.   Aligns with decades of public health and educational precedent;

    b.   Incorporates evidence-based models like MTSS;

---

*University of Oregon Press*; Orenstein, S., Connors, E., Fields, P., Cushing, K., Yarnell, J., Bohnenkamp, J., ... & Lever, N. (2023). Advancing school mental health quality through national learning communities. In *Handbook of School Mental Health: Innovations in Science and Practice* (pp. 215-231). Cham: Springer International Publishing.

[110] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶¶ 3-4).

[111] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

    c.  Addresses systemic under-resourcing by requiring the source of harm to contribute to the solution; and

    d.  Includes robust evaluation and infrastructure for sustainability.

137.  The 15-year strategic plan I propose mirrors the timeline and investment required in past efforts to address similarly large-scale societal harms, such as tobacco use and childhood obesity.[112] These initiatives, too, required persistent effort, cross-sector coordination, and sustained funding.

138.  Dr. Hutt's Opinions 1 and 2 describe an evolving American school system that has repeatedly been required to respond to societal shifts.[113] This is precisely why schools have been harmed, as they must now also respond to the negative impacts of social media in addition to their other responsibilities due to Defendants' platforms.

### B.   Response to Hutt Opinion 3

139.  Dr. Hutt's third opinion contends that my expert report, and those of other plaintiffs' experts, fail to adequately contextualize the alleged harms of social media, omitting discussion of alternative explanations, particularly the impact of the COVID-19 pandemic, on student academic and mental health outcomes.[114] While I agree that context matters, I disagree with Dr. Hutt's assertion that my report lacks such context or fails to consider plausible alternative explanations. In fact, my analysis is informed by decades of applied experience working with schools across diverse settings, including during and after the COVID-19 pandemic, and by engagement with the broader body of research that distinguishes pandemic-related impacts from those associated with youth social media use.

140.  Dr. Hutt states that I fail to consider "relevant school, policy, or social context," including the impact of COVID-19.[115]This is incorrect. I acknowledge that student mental health, learning, and school environments are shaped by multiple interacting factors, and contend in my report that social media is one of the most substantial and harmful among them.

---

[112] United States. Public Health Service. Office of the Surgeon General, National Center for Chronic Disease Prevention, & Health Promotion (US). Office on Smoking. (2012). *Preventing tobacco use among youth and young adults: A report of the surgeon general.* US Government Printing Office; Centers for Disease Control and Prevention (CDC). (2014). *Best Practices for Comprehensive Tobacco Control Programs, 2014.* Atlanta: U.S. Department of Health and Human Services, CDC, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health; Committee on Accelerating Progress in Obesity Prevention. (2012). *Accelerating progress in obesity prevention: solving the weight of the nation.* National Academies Press.

[113] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 1, ¶¶ 2-4).

[114] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 1-2, ¶ 5).

[115] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 1-2, ¶ 5).

141.   While COVID-19 certainly exacerbated existing student mental health concerns and disrupted learning routines, the patterns I document in my report, including chronic distraction, increased cyberbullying, emotional dysregulation, and body image issues, predate the pandemic, accelerated during remote schooling (when social media use surged), and have persisted or worsened even as schools returned to in-person instruction.[116]

142.   For example, data cited in my report show that students spend upwards of 1.5 to 2.7 hours per school day on social media platforms during classroom instruction.[117] These data reflect ongoing patterns in 2023–2025, long after pandemic school closures ended. Likewise, peer-reviewed literature and expert reports from Drs. Christakis, Twenge, Telzer, and others, which I draw upon in my analysis, use rigorous methodologies to isolate the effects of social media exposure from other contextual factors, including COVID-19.[118]

143.   Dr. Hutt treats COVID-19 and social media as competing explanations for student difficulties when, in fact, they are mutually reinforcing stressors. As a licensed clinical psychologist and national school mental health leader, I have worked directly with schools navigating both crises simultaneously. During the pandemic, students' reliance on social media increased dramatically, exposing them to addictive design features that worsened sleep, anxiety, and social isolation. These dynamics amplified the documented harms associated with social media.[119]

144.   It is precisely because I understand the layered and compounding effects of social, environmental, and technological stressors that my recommendations are grounded in a multi-tiered systems of support (MTSS) framework.[120] This approach is inherently designed to contextualize student needs, respond flexibly across settings, and integrate mental health and academic supports, including challenges arising from social media, without ignoring challenges from trauma, economic hardship, or pandemics.

145.   Dr. Hutt's criticisms regarding causation, public health impact, and psychological well-being fall outside his professional domain:

---

[116] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-11, ¶¶ 30-34, 39, 42, 44-45).

[117] Christakis, D. A., Mathew, G. M., Reichenberger, D. A., Rodriguez, I. R., Ren, B., & Hale, L. (2025). Adolescent Smartphone Use During School Hours. *JAMA pediatrics*; 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 127.

[118] 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P; 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.; 2025.05.16 Expert Report of Eva Telzer, Ph.D.

[119] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

[120] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 25-31, ¶¶ 94-105).

    a. Dr. Hutt holds a Ph.D. in Education with a concentration in historical methods. He is not trained in clinical psychology, psychiatry, public health, or developmental science.

    b. His conclusions about student well-being, absenteeism, and achievement trends are not based on original statistical analysis, nor does he present or engage with the peer-reviewed literature cited in my report.

    c. He does not reference implementation frameworks, such as MTSS or the Whole School, Whole Community, Whole Child (WSCC) model, which are nationally recognized standards in addressing school-based behavioral health needs.

    d. His interpretive expertise as a historian is not sufficient to adjudicate the scientific evidence base on which I, and other experts in medicine, psychology, and epidemiology, rely.

146.    Unlike Dr. Hutt, I do not speculate on causation based solely on historical analogies or descriptive narratives. My findings are supported by:

    a. Empirical evidence from longitudinal, cross-sectional, and experimental studies;[121]

    b. Clinical observations from 25+ years of school-based behavioral health practice;

    c. Ongoing consultation with hundreds of school districts navigating real-time impacts of student social media use; and

    d. Triangulation with the expert reports of Drs. Christakis, Twenge, Telzer, and Mojtabai, each of whom bring scientific expertise in adolescent neurodevelopment, public health, and behavioral outcomes.[122]

To suggest that my report lacks context or plausible alternative explanations is simply inaccurate.

147.    COVID-19 may have intensified many school-based challenges, but its impact was finite and event-based. Social media, in contrast, represents a persistent and evolving design-based harm affecting nearly every dimension of student functioning, including those that COVID did not trigger or sustain. In my Opinion 3, I document how these cumulative harms have forced schools to redirect already limited resources toward managing behaviors, attending to mental health crises, resolving social media conflicts, and educating families about online risks.[123] This is not speculative. It is based on systematic

---

[121] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-21, ¶¶ 30-84).

[122] 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P.; 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.; 2025.05.16 Expert Report of Eva Telzer, Ph.D.; 2025.05.16 Expert Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH.

[123] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1-2, ¶ 5).

conversations with leaders across multiple school districts, detailed implementation planning, and national surveys confirming that social media is now a top concern among educators and school mental health providers.

148.   I share Dr. Hutt's commitment to contextual rigor, but I reject the claim that my report lacks consideration of broader social and policy dynamics. My conclusions are based on clinical science, implementation experience, and lived realities in today's schools, not abstract historical patterns. Dr. Hutt's training does not include psychological, developmental, or public health expertise, and his criticisms, while framed as context, misrepresent and dismiss the robust empirical and practical foundation underlying my recommendations.

149.   Ultimately, my report does not exclude COVID-19 as a relevant factor, it recognizes it as one of many. But it also makes clear that social media poses a distinct and substantial burden on students and schools, a harm that warrants targeted and long-term intervention.

### C.   Additional Responses to Hutt

150.   Dr. Hutt raised additional concerns in his rebuttal to which I respond below.

#### 1.   Digital Literacy

151.   Dr. Hutt's critique that my report lacks specificity in its treatment of "digital literacy" overlooks both the established definitions of this construct in educational and public health literature, and the strategic rationale for incorporating it into a comprehensive school-based response to social media-related harms.

152.   While I agree that the term digital literacy has been variably defined across contexts, it is far from an "inchoate" or vague concept. In the context of my recommendations, digital literacy refers to the set of skills, knowledge, and critical thinking capacities that enable young people to navigate social media and broader digital environments safely, responsibly, and effectively. This includes, but is not limited to:

- Understanding persuasive design, and the addictive features built into social media platforms,

- Practicing digital civility and empathy in online interactions,

- Setting healthy boundaries for social media use, and

- Identifying when their own or others' social media behaviors may be compromising mental health, academic engagement, or personal safety.[124]

153.   These domains are grounded in well-established frameworks such as those from Common Sense Media, the International Society for Technology in Education (ISTE),

---

[124] American Library Association. (2013). Digital Literacy, Libraries, and Public Policy.

and UNESCO's Media and Information Literacy competencies.[125] The digital literacy components referenced in my report draw from this robust and growing body of work, much of which has evolved specifically to address the challenges of adolescent engagement with social media platforms. To suggest the concept is so vague as to be left "entirely to one's imagination" is to dismiss decades of policy and curriculum development, much of it sharpened in response to the evolving social media landscape.

154. The inclusion of digital literacy in my strategic plan is not arbitrary. It is a core prevention strategy, designed to equip students with the cognitive and behavioral tools to recognize, resist, and recover from the most harmful effects of social media. In this way, it directly addresses the harms by strengthening student awareness and regulation within the social media environments where harm is occurring.

155. The reason I do not prescribe a single digital literacy curriculum is intentional and consistent with my approach throughout the report: flexibility and local adaptation are essential. My goal is to ensure that digital literacy education, specifically as it relates to social media use, is elevated as a core protective strategy in the school ecosystem, not to mandate a one-size-fits-all curriculum. Digital literacy is not a vague add-on in my report, it is a well-defined, evidence-informed pillar of a prevention framework targeting the growing and well-documented harms of social media use among students. It is also a developmentally appropriate, non-clinical intervention that empowers students with critical skills in a digital world where they are increasingly at risk, and increasingly underserved by current school-based educational programming.

## IV.    Response to Aguilar Report

### A.    Response to Aguilar Opinions 1-5

156. As a licensed clinical psychologist and national leader in school mental health, I recognize that social media platforms *can* offer potential benefits under narrow, controlled, and *educator-facilitated* conditions. As Dr. Aguilar notes, these include promoting digital literacy, civic engagement, and professional collaboration among educators.[126] Indeed, my own report acknowledges the importance of digital literacy and media education, and I include both in the multi-tiered intervention model I propose.[127]

157. However, the limited and situational benefits that Dr. Aguilar highlights do not reflect the predominant patterns of youth social media use observed in school settings today. In practice, students' engagement with social media during school hours is characterized not

---

[125] Common Sense Media Digital Literacy and Citizenship, Accessed at https://www.commonsensemedia.org/what-we-stand-for/digital-literacy-and-citizenship; ISTE. (2016). *ISTE Standards for Students*; UNESCO. (2011). *Media and Information Literacy: Curriculum for Teachers.*

[126] 2025.07.09 Expert Report of Stephen Aguilar, Ph.D., (pp. 14-23, ¶¶ 43-56).

[127] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p .2, ¶ 6, p. 26, ¶ 95, p. 28, ¶¶ 101-104, pp. 29-31, ¶ 105).

by collaborative learning or civic engagement but by excessive use, distraction, emotional dysregulation, peer conflict, and poor mental health outcomes.

158.    My report, supported by data from Common Sense Media, Pew Research Center, and leading developmental scientists such as Telzer, Christakis, and Twenge, documents that:

    a.    Students spend 1.5 to 2.7 hours daily on phones during school, with the majority of that time dedicated to social media platforms.[128]

    b.    Social media use is a primary source of classroom distraction, reducing sustained attention and academic focus.[129]

    c.    Mental health harms, including anxiety, depression, body dissatisfaction, and self-harm, are significantly exacerbated by social media use, particularly unmoderated use during the school day.[130]

159.    Even if some curated content and scaffolded teacher use of social media might have limited educational benefit, this does not meaningfully mitigate the public health-level harms occurring from widespread and frequent student use. In essence, Dr. Aguilar's presentation of the possible upsides does not diminish the actual, pervasive harm currently borne out across school environments, or the importance of mitigating those harms.

160.    Thus, while I do not dispute that educational uses of social media exist, I emphasize that these examples are not representative of how students are engaging with these platforms at scale or in the context of the harms I analyze and provide mitigation strategy.

B.    Response to Aguilar Opinion 6

161.    On the claim that I mischaracterize social media as "uniformly harmful" and rely on "misinterpreted studies":[131] This is incorrect. In my report, I specifically acknowledge the complexity of the social media landscape and the potential for positive outcomes when social media is used responsibly and with guidance.[132] However, my conclusions, and the recommendations I make, are rooted in overwhelming empirical and field-based evidence demonstrating that in *real-world K-12 school environments*, the harms are significant and outweigh the benefits.

162.    I cite research with high methodological rigor, including longitudinal studies, nationally representative datasets, and converging evidence from neuroscience, developmental psychology, and epidemiology. My interpretation of these findings is informed by the

---

[128] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 8, ¶¶ 37-38).

[129] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 8-11, ¶¶ 35-46).

[130] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 15-19, ¶¶ 68-76).

[131] 2025.07.09 Expert Report of Stephen Aguilar, Ph.D., (p. 4, ¶ 8).

[132] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 26, ¶ 95).

reports and peer-reviewed research of experts cited in my report, including Dr. Eva Telzer and Dr. Dimitri Christakis, both of whom are leaders in developmental cognitive neuroscience and pediatrics, respectively. These experts provide causal and quasi-experimental evidence directly linking social media exposure to negative outcomes for learning and mental health. I also note that my report includes mechanisms for ongoing evaluation and refinement of the interventions proposed, contradicting the notion that my conclusions are static or unqualified.[133]

163.    On the critique of the 15-Year public health strategy as an inappropriate analogy: Dr. Aguilar criticizes the tobacco control analogy, calling it "inappropriate" given the "dynamic, multifaceted nature of social media."[134] However, my analogy is not based on equating the substances or platforms themselves, it is based on public health implementation principles, including:

    a.    The need for multi-tiered, longitudinal intervention across diverse systems (education, health, families);

    b.    The importance of policy, prevention, intervention, and cultural norm shifts; and

    c.    The value of evaluating impact across developmental cohorts over time.

    This analogy is not unique to my report; it has been used in public health and legal scholarship examining social media addiction and youth mental health.[135] As further detailed above, the 15-year model is a deliberate design to address a complex, evolving problem, not a static solution based on outdated precedent.

164.    With respect to the claim that my plan lacks an iterative "evaluation, stakeholder engagement, or platform-specific differentiation,"[136] Dr. Aguilar's assertion reflects either a misreading or oversimplification. My plan includes:

    a.    Stakeholder engagement: Family and youth partnerships, community involvement, and alignment with state and federal education leadership;

    b.    Iterative evaluation: A phased, longitudinal evaluation approach is embedded; and

    c.    Platform-specific guidance: While I do not offer app-by-app prescriptions, I call for policy and programming to be adaptive, iterative, and informed by real-time data and evolving platform features.[137]

---

[133] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 3, ¶ 10).

[134] 2025.07.09 Expert Report of Stephen Aguilar, Ph.D., (p. 4, ¶ 9).

[135] 2025.05.16 Expert Report of Jean M. Twenge, Ph.D.

[136] 2025.07.09 Expert Report of Stephen Aguilar, Ph.D., (p. 4, ¶ 10).

[137] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 34-35, ¶¶ 116-122).

165.    Dr. Aguilar contends that my 15-year strategic plan "confines planning to years 1-2," "reserves evaluation to years 14-15," and follows a "rigid block design" that undermines the iterative principles of the Institute of Education Sciences (IES) and the What Works Clearinghouse.[138] He further criticizes the plan for lacking a randomized or quasi-experimental design and claims it precludes mid-course corrections. These assertions grossly mischaracterize my evaluation approach, and reflect a misunderstanding of how large-scale public health and school systems interventions are designed and implemented.

166.    To clarify: my plan does not relegate evaluation to the final two years. Rather, it explicitly outlines a continuous evaluation strategy that is embedded throughout the life of the initiative, beginning in the planning phase and continuing through implementation, refinement, and sustainment. As detailed in my report, the evaluation framework includes formative assessments (e.g., needs assessments, fidelity tracking), short-term and intermediate outcome measurement, and annual impact reviews. These data are intended to inform ongoing improvement efforts each year, not to be held in reserve until the end of the plan's timeline. For example, mid-year and end-of-year reporting cycles are built into the proposed timeline to support real-time data use for leadership decision-making and school-level improvement planning.

167.    Dr. Aguilar also appears to conflate evaluation with experimental research. My strategic plan is not a randomized controlled trial (RCT), nor is it intended to function as one. Instead, it is a public health implementation plan with a corresponding program evaluation strategy grounded in continuous quality improvement (CQI), a widely accepted framework in public education and behavioral health implementation science. My recommendations are consistent with evaluation guidance provided by the Centers for Disease Control and Prevention (CDC), SAMHSA, and the National Implementation Research Network (NIRN). These frameworks emphasize feasibility, stakeholder engagement, real-time feedback loops, and the integration of data into system learning, principles that are reflected throughout my plan.

168.    Dr. Aguilar's critique also ignores the breadth and specificity of the evaluation design outlined in my report, which includes:

-    A recommendation to engage an external evaluator to ensure objectivity and alignment with professional evaluation standards;

-    Specific evaluation questions targeting implementation fidelity, engagement, short-term outcomes, and long-term impact;

-    Clearly defined methods and tools for evaluating Tier 1, Tier 2, and Tier 3 services;

-    A yearly data collection cycle and key metrics for tracking social media wellness, student mental health, school climate, and academic outcomes; and,

---

[138] 2025.07.09 Expert Report of Stephen Aguilar, Ph.D., (pp. 40-41, ¶¶ 105-107).

- Concrete reporting mechanisms to support transparency, accountability, and continuous refinement at the school and district levels.

169. The evaluation design in my plan is not only consistent with IES principles, it reflects best practice in school mental health systems development. It is iterative, improvement-oriented, and built to support adaptive implementation over time. The suggestion that evaluation is "sparse," "static," or delayed until the final years is simply inaccurate. Moreover, attempting to impose an RCT-style framework on a systems-level public health intervention reflects a fundamental misunderstanding of the distinct goals, methods, and constraints of large-scale educational planning.

170. Of note, Dr. Aguilar's professional background does not include clinical training in child or adolescent psychology, psychiatry, public health, or direct school mental health implementation. As such:

   a. His assertions regarding mental health impacts, statistical interpretations of clinical research, and system-wide intervention strategies fall outside his core areas of professional training and licensure.

   b. His disagreement with my report and those of Drs. Christakis and Telzer lacks the foundation of clinical or epidemiological expertise necessary to refute our evidence-based, public health-oriented conclusions.

171. In contrast, I bring over 25 years of clinical and policy experience working at the intersection of child mental health, education, and public health systems, including leading a federally funded national technical assistance center focused on school mental

172. Dr. Aguilar's arguments, particularly in Opinion 6, do not undermine the core conclusions of my report. The real-world evidence from schools across the U.S., as well as peer-reviewed literature from across disciplines, supports the urgent need for a comprehensive, public health-informed, strategy to mitigate the harms of social media on students' mental health and academic functioning and the school environment. The plan I propose is grounded in both science and decades of practical implementation experience.

## V.   Response to Auerbach, Gotlib, Hampton, and Platt Reports

173. Defendant experts Randy Auerbach, Ian Gotlib, and Robert Platt[139] all incorrectly assert that I lack adequate support for my opinions regarding the negative impact of student social media use on school districts. This is simply untrue. My report is replete with citations to academic literature supporting my opinions that social media harms students' functioning, including negative impacts on their ability to effectively learn and succeed in school and on their mental health and overall well-being and causes increased distraction, erosion of in-person social skills development, diminished teaching effectiveness, and

---

[139] 2025.07.09 Expert Report Expert Report of Randy Auerbach, Ph.D., (pp. 62-64, ¶¶ 129-132); 2025.07.09 Expert Report of Ian Gotlib, Ph.D., (pp. 88-89, ¶ 186); 2025.07.09 Expert Report of Robert Platt, Ph.D., (pp. 60-61, ¶ 139).

detrimental effects on student mental health.[140] Moreover, my opinions are also corroborated by the expert reports of Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary Goldfield, Ph.D., which I considered and relied on in reaching my conclusions.[141]

## VI.    Conclusion

174.    In summary, the critiques presented by Drs. Wildermuth, Hutt, and Aguilar do not undermine the validity, urgency, or evidentiary basis of my expert recommendations. They lack the experience and expertise to properly evaluate my recommendations and their analyses frequently mischaracterize my proposals as generic, infeasible, or disconnected from the specific harms caused by social media. On the contrary, my strategic plan is a focused, evidence-informed response to a rapidly evolving crisis that is affecting students' mental health, academic functioning, and school environments at scale. It builds on existing best practices but recalibrates them to address the unique risks introduced by the design and pervasiveness of Defendants' platforms.

175.    Schools are already bearing the burden of social media harms every day, through rising levels of anxiety, depression, classroom distraction, cyberbullying, crisis response and other disruptions. It is not only appropriate, but necessary that schools be equipped with the infrastructure, staffing, training, and policies needed to prevent and mitigate these harms. The recommendations I have put forward reflect what is required to meet this challenge, grounded in decades of implementation science and direct experience supporting schools nationwide. Without decisive, coordinated action, we will continue to leave schools under-resourced and students unprotected against an increasingly dominant and significant source of psychological and educational disruption.


The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.


_Sharon Hoover_
Sharon A. Hoover, Ph.D.

---

[140] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-20, ¶¶ 30-82).

[141] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1, 6-20, ¶¶ 4, 30-82);

## Exhibit A

### Materials Considered

Prior Opening Report dated May 16, 2025 and all documents cited therein, including Exhibit B.

### Articles and Studies

| |
|---|
| Allcott, H., Braghieri, L., Eichmeyer, S., & Gentzkow, M. (2020). The Welfare Effects of Social Media. *American Economic Review*, 110(3), 629-76. DOI: 10.1257/aer.20190658 |
| American Library Association. (2013). *Digital Literacy, Libraries, and Public Policy*. |
| ASCA (2023). ASCA Position Statement, The School Counselor and Student Safety with Digital Technology. American School Counselor Association. Available at: https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Student-Safety-Digital |
| Atkins, M. S., Hoagwood, K. E., Kutash, K., & Seidman, E. (2010). Toward the integration of education and mental health in schools. *Administration and policy in mental health and mental health services research*, 37(1), 40-47 |
| Barrett, S., Eber, L., & Weist, M. D. (2013). Advancing education effectiveness: An interconnected systems framework for Positive Behavioral Interventions and Supports (PBIS) and school mental health. *Center for Positive Behavioral Interventions and Supports (funded by the Office of Special Education Programs, US Department of Education). Eugene, Oregon: University of Oregon Press* |
| Becker, K. D., Buckingham, S. L., & Brandt, N. E. (2015). Engaging youth and families in school mental health services. *Child and Adolescent Psychiatric Clinics*, 24(2), 385-398 |
| Bruns, E. J., Lee, K., Davis, C., Pullmann, M. D., Ludwig, K., Sander, M., ... & McCauley, E. M. (2023). Effectiveness of a brief engagement, problem-solving, and triage strategy for high school students: Results of a randomized study. *Prevention Science*, 24(4), 701-714 |
| CDC. (2023). *Youth Risk Behavior Survey Data Summary & Trends Report: 2011–2021* |
| Centers for Disease Control and Prevention (CDC). (2014). *Best Practices for Comprehensive Tobacco Control Programs, 2014*. Atlanta: U.S. Department of Health and Human Services, CDC, National Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health |
| Christakis, D. A., Mathew, G. M., Reichenberger, D. A., Rodriguez, I. R., Ren, B., & Hale, L. (2025). Adolescent Smartphone Use During School Hours. *JAMA pediatrics* |
| Committee on Accelerating Progress in Obesity Prevention. (2012). *Accelerating progress in obesity prevention: solving the weight of the nation*. National Academies Press |
| Common Sense Media Digital Literacy and Citizenship, Accessed at https://www.commonsensemedia.org/what-we-stand-for/digital-literacy-and-citizenship |
| Connors, E. H., Prout, J., Vivrette, R., Padden, J., & Lever, N. (2021). Trauma-focused cognitive behavioral therapy in 13 urban public schools: Mixed methods results of barriers, facilitators, and implementation outcomes. *School Mental Health*, 13(4), 772-790 |
| Darling-Hammond, L., Hyler, M. E., & Gardner, M. (2017). Effective teacher professional development. *Learning policy institute* |

Dontre, A. (2020). The influence of technology on academic distraction: a review. Human Behavior and Emerging Technologies, 3(3), 379-390

Durlak, J. A., & DuPre, E. P. (2008). Implementation matters: A review of research on the influence of implementation on program outcomes and the factors affecting implementation. *American journal of community psychology*, *41*(3), 327-350

Fixsen, D. L., S. F. Naoom, K. A. Blase, R. M. Friedman, and F. Wallace. "Implementation research." *A Synthesis of the Literature* (2005): 2005

Gadke, D. L., Valley-Gray, S., & Rossen, E. (2024). NASP Report of Graduate Education in School Psychology: 2021-2022. Research Reports. Volume 8, Number 1. *National Association of School Psychologists*

Hatfield, J. (June 12, 2024). 72% of U.S. high school teachers say cellphone distraction is a major problem in the classroom. Pew Research Center

Hayes, I., & Prother, A. (June 5, 2024). *To ban or not to ban? Educators, parents, and students weigh in on cellphones*. Education Week

Heubeck, E. (June 10, 2024). Cellphones Turned My Teaching Career From 'Awesome' to Exhausting: How educators' No. 1 nemesis caused this teacher to quit. Education Week

Hoover S, Bostic J. (2021) Schools as a vital component of the child and adolescent mental health system. Psychiatric Services, 72:37-48, 2021

Hoover, S. A., Bostic, J. Q., & Nealis, L. K. (2020). What is the role of schools in the treatment of children's mental illness? *The Palgrave Handbook of American Mental Health Policy*, 409-447

Hoover, S. A., Lever, N. A., Sachdev, N., Bravo, N., Schlitt, J. J., Price, O. A., ... & Cashman, J. (2019). *Advancing comprehensive school mental health systems: guidance from the field*. National Center for School Mental Health, University of Maryland School of Medicine.

Hopeful Futures Campaign. (2024). *State Legislative Guide for Strengthening School Mental Health*

Hunt, M. G., Marx, R., Lipson, C., & Young, J. (2018). No more FOMO: Limiting social media decreases loneliness and depression. *Journal of Social and Clinical Psychology, 37*(10), 751-768

Inseparable. (2025). *School Mental Health State Policy Report Card*

Irwin, V., Wang, K., Cui, J., & Thompson, A. (2022). Report on Indicators of School Crime and Safety: 2021. NCES 2022-092/NCJ 304625. *National Center for Education Statistics*

ISTE. (2016). *ISTE Standards for Students*

Jaycox, L. H., Cohen, J. A., Mannarino, A. P., Walker, D. W., Langley, A. K., Gegenheimer, K. L., ... & Schonlau, M. (2010). Children's mental health care following Hurricane Katrina: A field trial of trauma-focused psychotherapies. *Journal of Traumatic Stress: Official Publication of The International Society for Traumatic Stress Studies*, *23*(2), 223-231

Kolhar, M., Kazi, R., & Alameen, A. (2021). Effect of social media use on learning, social interactions, and sleep duration among university students. Saudi Journal of Biological Sciences, 28(4), 2216-2222

Lawson, G. M., McKenzie, M. E., Becker, K. D., Selby, L., & Hoover, S. A. (2019). The core components of evidence-based social emotional learning programs. *Prevention Science*, *20*, 457-467

Love, H. E., Schlitt, J., Soleimanpour, S., Panchal, N., & Behr, C. (2019). Twenty years of school-based health care growth and expansion. *Health Affairs*, *38*(5), 755-764

Lyon, A. R., Ludwig, K. A., Stoep, A. V., Gudmundsen, G., & McCauley, E. (2013). Patterns and predictors of mental healthcare utilization in schools and other service sectors among adolescents at risk for depression. *School mental health*, *5*(3)

*Mahanoy Area Sch. Dist. V. B.L.*, 141 S. Ct. 2038 (2021)

Maqableh, M., Rajab, L., Quteshat, W., Masa'deh, R., Khatib, T., & Karajeh, H. (2015). The impact of social media networks websites usage on students' academic performance. Communications and Network, 07(04), 159-171.

Marciano, L., Ostroumova, M., Schulz, P., & Camerini, A. (2022). Digital media use and adolescents' mental health during the covid-19 pandemic: a systematic review and meta-analysis. Frontiers in Public Health, 9.

Mazza, J. J., Dexter-Mazza, E. T., Miller, A. L., Rathus, J. H., & Murphy, H. E. (2016). *DBT? Skills in schools: Skills training for emotional problem solving for adolescents Dbt Steps-a*. Guilford Publications

National Association of School Psychologists. (2023). Responding to Social Media Trends: Guidance for Caregivers

National Education Association (2024). Impact of Social Media and Personal Devices on Mental Health

Orenstein, S., Connors, E., Fields, P., Cushing, K., Yarnell, J., Bohnenkamp, J., & Lever, N. (2023). Advancing school mental health quality through national learning communities. In *Handbook of School Mental Health: Innovations in Science and Practice* (pp. 215-231). Cham: Springer International Publishing

Peetz, C. (July 10, 2025). The online behaviors most harmful to kids' mental health, according to a new survey. Education Week.

Pew Research Center. (April 2025), Teens, Social Media and Mental Health

Proctor, E. K., Landsverk, J., Aarons, G., Chambers, D., Glisson, C., & Mittman, B. (2009). Implementation research in mental health services: an emerging science with conceptual, methodological, and training challenges. *Administration and Policy in Mental Health and Mental Health Services Research*, *36*, 24-34

Prothero, A. (November 29, 2023). What Is Driving Youth Mental Health Problems? It's Not Just About Social Media. Education Week

Prothero, A. (October 24, 2023). How Educators and Teens Disagree on What's Harming Students' Mental Health, in Charts

Radesky, J., Weeks, H.M., Schaller, A., Robb, M., Mann, S., and Lenhart, A. (2023). *Constant Companion: A Week in the Life of a Young Person's Smartphone Use*. San Francisco, CA: Common Sense

Riehm, K. E., Feder, K. A., Tormohlen, K. N., Crum, R. M., Young, A. S., Green, K. M., Pacek, L. R., La Flair, L. N., & Mojtabai, R. (2019). Associations Between Time Spent Using Social Media and Internalizing and Externalizing Problems Among US Youth. *JAMA psychiatry*, 76(12), 1266-1273

Siebers, T., Beyens, I., Pouwels, J., & Valkenburg, P. (2021). Social media and distraction: an experience sampling study among adolescents. Media Psychology, 25(3)

Stephan, S. H., Sugai, G., Lever, N., & Connors, E. (2015). Strategies for integrating mental health into schools via a multitiered system of support. *Child and Adolescent Psychiatric Clinics*, *24*(2), 211-231

| |
|---|
| Twenge, J., Spitzberg, B., & Campbell, W. (2019). Less in-person social interaction with peers among U.S. adolescents in the 21st century and links to loneliness. Journal of Social and Personal Relationships, 36(6), 1892-1913 |
| U.S. Department of Health and Human Services. (2021). *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory* |
| UNESCO. (2011). *Media and Information Literacy: Curriculum for Teachers* |
| United States. Public Health Service. Office of the Surgeon General, National Center for Chronic Disease Prevention, & Health Promotion (US). Office on Smoking. (2012). *Preventing tobacco use among youth and young adults: A report of the surgeon general*. US Government Printing Office |
| Van Den Eijnden, R., Koning, I., Doornwaard, S., Van Gurp, F., & Ter Bogt, T. (2018). The impact of heavy and disordered use of games and social media on adolescents' psychological, social, and school functioning. *Journal of behavioral addictions*, *7*(3), 697-706 |
| Vogels, E. A., & Gelles-Watnick, R. (2023). Teens and social media: Key findings from Pew Research Center surveys. *Pew Research Center* |
| Wilk, A. S., Hu, J.-C., Wen, H., & Cummings, J. R. (2022). Recent Trends in School-Based Mental Health Services Among Low-Income and Racial and Ethnic Minority Adolescents. JAMA pediatrics |

### Litigation Documents

| |
|---|
| 2025.07.09 Expert Report of Diana Wildermuth, Ph.D. |
| 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D. |
| 2025.07.09 Expert Report of Stephen Aguilar, Ph.D. |
| 2025.07.09 Expert Report of Randy Auerbach, Ph.D. |
| 2025.07.09 Expert Report of Ian Gotlib, Ph.D. |
| 2025.07.09 Expert Report of Robert Platt, Ph.D. |
| 2025.07.09 Expert Report of Keith Hampton, Ph.D. |
| 2025.07.30 Rebuttal Report of Dimitri Christakis, M.D., M.P.H. |
| 2025.07.30 Rebuttal Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH |
| 2025.07.30 Rebuttal Report of Eva Telzer, Ph.D. |
| 2025.07.30 Rebuttal Report of Anna Lembke, M.D. |
| 2025.07.30 Rebuttal Report of Dr. Jean M. Twenge, Ph.D. |
| 2025.07.30 Rebuttal Report of Gary Goldfield, Ph.D. |
| Deposition of Hannah Watts 30(b)(1), March 12, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Hannah Watts 30(b)(6), March 12, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Phillip Watts 30(b)(6), April 22, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Phillip Watts 30(b)(1), April 22, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of April Vauss 30(b)(1), May 9, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |

| |
|---|
| Deposition of Anita Huggins, May 13, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of April Vauss 30(b)(6), May 16, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of John Amberg 30(b)(1), May 14, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Kcyied Zahir 30(b)(1), May 20, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Darnel Mangan 30(b)(1), May 21, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Anna Schwartz-Warmbrand 30(b)(1), May 13, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Brian Lambert 30(b)(1), May 14, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Mark Alvarez 30(b)(1), May 15, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Sabrina M. Salmon, Ph.D. 30(b)(1), May 23, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Brian Lambert 30(b)(6), July 1, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |