**Exhibit 89**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

**Amended Rebuttal Report of**

**Dr. Sharon A. Hoover, PhD**

**for DeKalb County School District**

**August 7, 2025**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**Table of Contents**

I.      Executive Summary of Expert Opinions.................................................................... 1

II.     Response to Expert Opinions ................................................................................... 3

      A.      Response to Wildermuth ................................................................................. 3

            1.      Response to Wildermuth Opinion 1: My Reliance on Sources f DeKalb-
                 Specific Data is Well-Founded and Consistent with Standard Employed
                 in My Field ...........................................................................................................3

            2.      Wildermuth Opinion 2: The Existence of Mental Health Resources and
                 Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement
                 Those Resources and Initiatives...................................................................... 6

            3.      Wildermuth Opinion 3: DeKalb's Prior Staffing and Resource Levels Do
                 Not Dispel Need for Improvement ................................................................. 9

            4.      Wildermuth Opinion 4: Every School District Faces Unique Challenges, But
                 These Do Not Reduce the Significant Harm Cause by Social Media................ 10

            5.      Wildermuth Opinion 5: My Strategic Plan for DeKalb Makes Appropriate
                 Recommendations that Would be Effective and Feasible............................... 12

      B.      Response to Hutt ........................................................................................... 12

            1.      Summary of Response to Hutt Opinions 1-3 .................................................. 13

            2.      Response to DeKalb-Specific Claims in Hutt's Report ................................... 13

            3.      Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods........... 15

            4.      Clarifying My Use of Evidence ..................................................................... 16

            5.      Conclusion regarding Dr.  Hutt's DeKalb Opinions ..................................... 17

      C.      Response to Aguilar........................................................................................ 17

            1.      General Response to Opinions 1–6 ................................................................ 17

            2.      Rebuttal to District-Specific Opinions in Exhibit A (DeKalb County) ............. 18

            3.      Conclusion regarding Dr. Aguilar's DeKalb Opinions.................................... 19

      D.      Response to Dr. Adams................................................................................... 20

            1.      Adams Opinion 1-4 ...................................................................................... 20

            2.      Adams Opinion 5 ......................................................................................... 24

            3.      Adams Opinion 7 ......................................................................................... 25

      E.      Response to Hyman ........................................................................................ 37

            1.      Hyman Opinion 1 ......................................................................................... 37

            2.      Hyman Opinion 2 ......................................................................................... 37

            3.      Hyman Opinion 3 ......................................................................................... 37

            4.      Hyman Opinion 4 ......................................................................................... 38

            5.      Hyman Opinion 5 ......................................................................................... 38

6. Hyman Opinion 6 ........................................................................................... 38

7. Hyman Opinion 7 ........................................................................................... 38

8. Hyman Opinion 8 ........................................................................................... 40

III. Conclusion ........................................................................................................... 40

## I.     Executive Summary of Expert Opinions

1. The opinions summarized below are offered in response to the district-specific rebuttal reports submitted by Dr. Diana Wildermuth, Dr. Ethan Hutt, Dr. Stephen Aguilar, Dr. Kelvin Adams, and Dr. Joshua Hyman. These opinions are informed by my review of each expert's report, relevant DeKalb County School District documentation, structured interviews with district personnel, and the broader scientific literature on youth mental health and school-based supports. They are grounded in my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems.

2. **Opinion 1: Limitations in DeKalb's existing data systems do not indicate absence of harm.**
While DeKalb collects aggregate data on attendance, discipline, and graduation rates, these metrics fail to capture the harms introduced by student social media use. I reviewed available data and found it insufficiently aligned with the daily disruptions and emotional dysregulation described by DeKalb key informants. My mixed-methods approach, which is consistent with my standard practice employed in my decades of experience in this field, including structured interviews with key district staff, revealed consistent patterns of student distraction, peer conflict, and staff overwhelm. While these harms may not be reflected in districtwide metrics, they are deeply felt in classrooms, counseling offices, and the school environment across the district.

3. **Opinion 2: Existing programs in DeKalb do not obviate the need for a strategic response to social media harms.**
DeKalb has implemented valuable initiatives such as PBIS, Second Step, and general anti-bullying campaigns. However, these programs were not designed to address the specific, emerging harms associated with modern social media platforms in a comprehensive and systemic fashion. My recommendations build upon, rather than duplicate, current efforts. They are specifically tailored to fill critical gaps related to peer comparison, identity distortion, compulsive checking, and social media–related emotional distress.

4. **Opinion 3: DeKalb's current staffing cannot address new, externally imposed social media harms.**
My staffing recommendations, based on the need for the district to address new, significant distinct and compounding social media harms, reflect widely accepted professional ratios. They are additive and forward-looking, including mechanisms for phased implementation, community partnerships, and role specialization to ensure feasibility even in the face of any potential staffing challenges.

5. **Opinion 4: When developing my plan, I considered and understood DeKalb's broader structural challenges.**
My strategic plan does not neglect other factors that contribute to student mental health and learning such as poverty and trauma. The plan recognizes that social media does not displace traditional risk factors, it creates new harms and compounds existing issues. Students experiencing housing instability, caregiver strain, or academic stress are more vulnerable to the harms of platform-driven peer conflict, sleep disruption, and online

1

comparison, among other social media harms. A social media-specific response is not a distraction from whole-child approaches; it is an essential part of them.

6. **Opinion 5: The social media caused harms documented in DeKalb are credible and consequential, even if not captured in test scores.**
The absence of quantitative evidence of academic decline does not undermine the rationale for my plan. This is a fundamental misunderstanding. Educator-reported harms, such as classroom disruption, attention dysregulation, emotional volatility, harms to school functioning, and social media-fueled conflict, are real and demand a coordinated district response, regardless of whether aggregate proficiency scores or graduation rates decline.

7. **Opinion 6: My strategic recommendations align with public health and implementation science principles and are aligned with established frameworks for addressing large-scale behavioral health harms.**
The 15-year plan mirrors the type of sustained, multi-tiered responses school systems have used to address other complex external challenges, such as tobacco, childhood obesity, and trauma. The recommendations include district leadership roles, school-level supports, staff training, family education, and data infrastructure improvements, all of which are standard in large-scale behavioral health system reform. Short-term or fragmented responses will be insufficient.

8. **Opinion 7: The MTSS-based plan I propose is feasible and tailored to DeKalb's context.**
My strategic plan incorporates local stakeholder input, structured professional development, and phased implementation. The recommendations are tied directly to educator-observed harms from student social media use, not generalized student stress or academic difficulty. Dr. Hyman's claim that the plan is "implicitly ineffective" because it does not model harm reduction over time reflects a flawed assumption. Public health interventions require sustained investment even as harms are reduced.

9. **Opinion 8: My recommendations for professional development and evaluation are necessary and non-duplicative.**
Current professional learning offerings do not address the specific behavioral health risks posed by social media, nor do they equip staff with classroom strategies for managing social media compulsion, distraction and peer conflict. My proposed PD sequence is based on national frameworks and tailored to the challenges described by DeKalb educators. Evaluation metrics focus on implementation fidelity and early outcomes, not high-stakes testing.

10. **Opinion 9: My plan addresses the dual realities of educational uses of media and the harms of student social media use.**
Aguilar and others cite DeKalb's positive use of social media for communication and student campaigns. These uses are not in conflict with my plan. Rather, they underscore the importance of scaffolding safe and developmentally appropriate use of social media platforms. My plan intends to mitigate the harms of persistent student personal engagement.

11. **Opinion 10: The proposed strategic plan is an urgent and proportionate response to a new, significant and escalating threat to student well-being.**

2

Social media harms are not hypothetical. They are visible in compulsion, peer dynamics, mental health challenges, behavioral escalations, harms to school functioning, and staff burnout. The absence of a preexisting line-item in DeKalb's budget does not mean the harm is absent. My strategic plan provides the ability for the district to respond decisively with a comprehensive, holistic and feasible plan that leverages public health science to protect student learning and well-being and school functioning.

## II.    Response to Expert Opinions

### A.    Response to Wildermuth

#### 1.    Response to Wildermuth Opinion 1: My Reliance on Sources of DeKalb-Specific Data is Well-Founded and Consistent with Standard Employed in My Field

12.    Dr. Wildermuth wrongly asserts that my recommendations for DeKalb County School District are not data-driven and rely exclusively on characterizations from "anonymous informants," despite the district's access to discipline, attendance, academic, and mental health data.[1] This mischaracterizes both my methodology and the appropriate use of data in applied school mental health consultation.

13.    Contrary to Dr. Wildermuth's assertion, I did review DeKalb-specific data in forming my opinions, including discipline, mental health service delivery, and school staffing ratios. I also reviewed district documents and survey responses collected through the School Mental Health Profile. My report discusses DeKalb's current data capacity and highlights gaps in how that data is collected and utilized.[2]

14.    My standard practice when consulting with school districts includes reviewing available school- and district-level data, while recognizing that such data often misrepresents or only scratches the surface of, what is actually happening with respect to student mental health, service delivery gaps, school climate disruption, and school functioning and fails to capture the scope of emerging harms, including those caused by social media platform use.[3] Especially in large, under-resourced districts like DeKalb, existing systems often do not track the types of internal service referrals, behavioral disruptions, or emotional dysregulation commonly tied to social media use. DeKalb does not systematically log or disaggregate student incidents, mental health referrals, or academic disengagement related to social media use.

15.    As noted in Dr. Wildermuth's own report, DeKalb tracked only 49 disciplinary incidents referencing social media between August 2023 and March 2024, representing 0.19% of

---

[1] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (pp. 6-7, ¶¶ 34-37).

[2] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (p. 9; ¶¶ 45-46).

[3] Hoagwood, K., Atkins, M., & Ialongo, N. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. *Administration and Policy in Mental Health and Mental Health Services Research*, *40*(6), 451-455.

total incidents.[4] This limited figure is not evidence of a lack of harm, but rather reflects the absence of reliable mechanisms to detect and code incidents driven by compulsive use, social media conflict, online peer pressure, or exposure to social media harms. District administrators and student support staff consistently report that students do not always disclose social media-related stressors and that discipline systems lack fields or processes to consistently capture them.

16. Dr. Wildermuth also cites consistently high attendance and improving graduation rates as indicators that social media is not negatively impacting DeKalb students.[5] These metrics do not address the outcomes at issue in my report. My recommendations are not based on declining test scores or graduation rates. I am not asserting that social media has caused a drop in graduation rates; rather, I assert that social media platforms are disrupting student attention, classroom engagement, emotional regulation, and interpersonal functioning, none of which are captured in graduation statistics. In fact, students may graduate while still experiencing serious social-emotional distress and digital dysregulation.

17. Key informant interviews are a standard, valid source of ground-level insight.[6] These interviews are a widely accepted and scientifically valid method for assessing district needs, particularly in contexts where formal data systems lag behind practice-based observations. This approach is used consistently in every district for which I have been asked to develop a strategic plan for comprehensive school mental health improvement. In my standard practice across dozens of school districts nationwide, I speak directly with district and school leaders, educators, and student support professionals to understand local strengths and identify service and infrastructure gaps in order to inform and support quality improvement. In DeKalb, I conducted interviews with several district personnel. These key informants' firsthand insights helped identify patterns of student dysregulation, staff burnout, peer conflict escalation, and sleep disruption, harms consistent with national data on social media's impact on child and adolescent functioning. These insights, which were consistent across informants and converge with national data on social media harms, provided part of the foundation for my district-specific plan. In implementation science, such practice-based evidence is a necessary complement to traditional data sources.[7]

18. Consistent with the standard practices in my field, I do not attribute specific quotations to named individuals. This is intentional and standard practice in school consultation and

---

[4] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (p. 9, ¶ 43).

[5] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (pp. 9-10, ¶¶ 44-46).

[6] Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. *School Mental Health*, *1*(1), 26-36.

[7] Hoagwood, K. E., Atkins, M. S., & Ialongo, N. S. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. Administration and Policy in Mental Health and Mental Health Services Research, 40(6), 451-455.

qualitative research. Anonymity helps ensure candor and protects respondents from fear of potential repercussions, especially when they are discussing district challenges. In any event, I did provide the list of informants for each district upon defense counsel's request, including DeKalb, and the names were therefore available for Defendants' experts to review. Still, Defendants' experts refer to the interviewees as "unnamed" in an attempt to discredit my approach. As apparent from the list I submitted, DeKalb interviewees included administrators and student support professionals, individuals with direct knowledge of social media impacts on DeKalb students' mental health and learning and district support service gaps. Dr. Wildermuth's repeated references to "unnamed" sources appears to imply methodological opacity or even deceit.[8] In fact, I consistently use this approach as my standard practice when working with school districts across the country, and it reflects longstanding norms for psychological consultation in school systems, including practices used in federally-funded needs assessments, such as SAMHSA-funded school district mental health evaluations.[9]

19. It is standard practice in school mental health consultation to protect the confidentiality of direct quotations or qualitative summaries from informants, especially when they may be commenting on district challenges This confidentiality enables candor and is consistent with my SAMHSA-funded school mental health evaluation protocols. Attribution of generalized findings to credible informants, is both appropriate and transparent.

20. Notably, Dr. Wildermuth critiques my report for not relying on DeKalb-specific data[10], while also acknowledging that the district does not collect quantitative data on students' social media use or the impact of such use on school engagement, peer conflict, emotional well-being, or mental health referrals.[11] It is logically inconsistent to demand data-informed planning while failing to acknowledge the district's current inability to collect or interpret data on the precise harms at issue.

21. My recommendations explicitly call for *improving* DeKalb's data infrastructure to enable better tracking of social media harms and the effectiveness of related interventions. The 15-year strategic plan includes phased development and implementation of a secure, interoperable system capable of linking academic, behavioral, and mental health data and allowing for disaggregation by presenting problem, including harms stemming from social media use.[12]

---

[8] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (p. 10, ¶¶ 45-46).

[9] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (p. 5, ¶¶ 27-28).

[10] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (p. 6, ¶¶ 34-35).

[11] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (p. 7, ¶ 36).

[12] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 39-42, ¶¶ 136-152).

22. My process reflects a best-practice, mixed-methods approach: I reviewed available DeKalb data, identified critical gaps in that data's alignment with social media harms, and triangulated findings from credible informants. My recommendations are grounded in over two decades of experience designing, implementing, and evaluating school mental health systems, and they directly address both observed needs and systemic barriers to documenting and responding to those needs.

> ### 2. Wildermuth Opinion 2: The Existence of Mental Health Resources and Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement Those Resources and Initiatives

23. Dr. Wildermuth claims that my proposed strategic plan for DeKalb County School District duplicates existing programs, staff, and services already in place to support students' educational, social, and emotional well-being. She wrongly asserts that I fail to account for these existing initiatives or justify why additional investments are necessary.[13]

24. I did review and consider DeKalb's existing services and supports, including those described in Dr. Wildermuth's report and in the district's responses to the School Mental Health Profile (SHAPE). These include universal prevention programs like PBIS and Second Step, specialized behavioral intervention efforts such as the GRIP program, and professional development offerings in trauma-informed care.[14] My analysis also incorporated DeKalb's staffing levels, data systems, and district-wide initiatives like the "Bullying Stops Here!" campaign and curricular revisions addressing internet use and social media etiquette.[15]

25. The current programs may provide a foundation, but they lack the depth, continuity, and social media-specific focus needed to meet the challenges school districts are facing due to social media platforms.[16] My recommendations are intentionally additive, not duplicative. They address gaps that existing programs were not designed to fill, particularly those related to compulsive social media use, peer comparison stress, online identity pressure, and platform-related behavioral dysregulation.[17]

26. For example, while DeKalb has implemented general anti-bullying campaigns and internet safety curricula, these efforts:

---

[13] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (pp. 10-18, ¶¶ 47-65).

[14] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 6-9, ¶¶ 30-44).

[15] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 6-9, ¶¶ 30-44).

[16] Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent development in the digital media context. *Psychological Inquiry*, *31*(3), 229-234.

[17] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, ¶ 39).

- Do not explicitly address the emotionally activating design features of major social media platforms;

- Do not provide sustained, developmentally responsive content on social media self-regulation, social comparison, or online identity distortion;

- Do not equip staff with tools to identify and respond to social media–related mental health concerns, such as sleep disruption, platform-driven anxiety, or viral self-harm challenges.

DeKalb has made good-faith efforts to respond to student mental health and engagement concerns using its available resources, and district staff are clearly committed to student well-being and proper school functioning. However, the scale and intensity of the harms introduced by social media are beyond what existing systems, many of which were designed for different challenges, can address in a sustained or comprehensive way.

27. Dr. Wildermuth's framing of my plan as ignoring DeKalb's current staffing is inaccurate.[18] In fact, I reviewed DeKalb's mental health workforce in detail as described in my opening report.

I recommend additional personnel to address the new, significant and growing harms due to social media. Importantly, the staffing recommendations in my report are *additive*. They are not intended to replace existing personnel but rather to build upon them in a strategic and targeted manner. The national professional ratios were not designed with the harms of social media platform-driven digital engagement in mind. My staffing recommendations are both responsive to DeKalb's unique needs (e.g., enrollment size, existing service array, community partnerships), and rooted in established professional guidance, as provided by leading organizations in school mental health and student services.

28. Likewise, DeKalb's current data systems do not comprehensively and systemically capture social media–related disruptions or student mental health trends with the precision or integration needed for responsive intervention. My plan includes a phased buildout of a secure, interoperable data system tailored to track emotional, behavioral, and academic outcomes related to student use of social media, something existing infrastructure is not equipped to do. As noted in my DeKalb report, these improvements are critical to coordinating services and informing targeted prevention strategies.[19]

29. Existing staff development efforts, such as optional trauma-informed care trainings, are commendable but not specific to social media caused harms. My plan proposes sustained, mandatory professional development that includes specific attention to social media-

---

[18] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District, (pp. 14-15, ¶ 57).

[19] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 41-42, ¶¶ 150-152).

related stressors, their impact on classroom dynamics and the school environment, and strategies for promoting digital wellness in a school context.[20]

30.    Dr. Wildermuth's concern that my plan does not reflect DeKalb's operational reality fails to acknowledge that the interventions I recommend are not intended to replace current programs, but to extend and refine them. For example:

- SEL programs like Second Step are valuable, but should be expanded to include modules that address social media–related emotion regulation and online relational aggression.

- Assemblies or awareness events (e.g., the "Bridge Show") should be supplemented with embedded, curriculum-based instruction and ongoing classroom integration.

- Parent liaisons and community engagement personnel can be leveraged more effectively with targeted family education campaigns focused on healthy social media use and school-home coordination around social media use.

31.    To suggest that DeKalb's existing resources are sufficient is to overlook the district's own documentation of service limitations, lack of staffing capacity to address social media harms, and rising student mental health concerns due to social media. The need for additional investment is not a critique of what exists, it is a recognition that what exists was not designed to address the scope and nature of the social media crisis now unfolding in schools.

32.    In sum, I did consider DeKalb's existing services and supports. These services provide important groundwork, but do not and were never designed to address the rapidly evolving harms introduced by today's social media platforms. My recommendations are not duplicative, they are necessary and proportionate responses to a growing external threat to student mental health, learning and proper school functioning. This strategic plan is additive and tailored and reflects public health frameworks that justify additive responses to new risk environments.[21] It leverages the district's strengths while addressing its vulnerabilities, particularly its current gaps in social media harm prevention and social media–related mental health response. To suggest that DeKalb can adequately respond to these challenges without expanded, social media-specific investments is to underestimate the nature of the threat and to speculate DeKalb cannot implement my plan with fidelity (as Dr. Wildermuth does) underestimates the resilience of the district to meet these challenges, if given the appropriate tools, resources and support.

---

[20] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 23-37, ¶¶ 98-134).

[21] Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172.

           3.       Wildermuth Opinion 3: DeKalb's Prior Staffing and Resource Levels Do Not Dispel Need for Improvement

33.      Dr. Wildermuth wrongly asserts that my recommendation for DeKalb County School District to hire additional student support professionals is inappropriate given the district's ongoing challenges with recruitment and workforce shortages.[22] She further claims that these shortages are not due to lack of funding, but due to a lack of available professionals, implying that my proposed staffing plan is infeasible.[23]

34.      Workforce shortages both nationally and in Georgia, are not insurmountable. Lack of staffing often reflects funding constraints rather than a lack of qualified professionals. A growing body of evidence supports effective strategies to recruit and retain school-based mental health personnel, including competitive compensation, professional development opportunities, supportive supervision, differentiated roles, and sustainable caseloads. While specific hiring, recruitment, and retention decisions may be tailored to district context, the recommended staffing levels represent the full capacity needed to address the harms of social media. Moreover, as discussed in my general rebuttal report, contrary to claims that the proposed staffing levels are unattainable, current data reflect a steady flow of qualified school mental health professionals entering the field.[24]

35.      While workforce shortages may be a reality across many districts, including DeKalb, these challenges do not eliminate the need for investment, they underscore it. And any staffing shortages do not negate the fact that my recommendations can and should be implemented. Critically, Dr. Wildermuth has not actually conducted any analysis to determine whether there are actual staffing shortages in DeKalb. Regardless, new and intensifying harms from student social media use require a strategic and sustained workforce development plan. It would be a mistake to forgo essential supports simply because they present challenges. School districts have faced similar dilemmas before, such as during the COVID-19 pandemic and in response to rising youth suicide risk. In these cases, systems responded with workforce expansion, training pipelines, and role specialization, not retreat.

36.      As noted in my general report[25] and reiterated in my DeKalb report,[26] my role is to provide an evidence-informed benchmark for the level of capacity required to address social media-related harms. Districts may phase implementation over time, but that does not change the standard of care that students need to address the harms the district has sustained from social media.

---

[22] 2025.07.11 Expert Report of Wildermuth, Ph.D. for DeKalb County School District, (pp. 18-22, ¶¶ 66-75).

[23] 2025.07.11 Expert Report of Wildermuth, Ph.D. for DeKalb County School District, (p. 21, ¶ 74).

[24] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (p. 13-14, ¶¶ 47-50).

[25] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 1, ¶ 1).

[26] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (p. 1, ¶ 2).

37.  The staffing recommendations for DeKalb are tailored to the district's size and needs and reflect nationally recognized benchmarks. The new significant harms presented by social media require strategic investment, pipeline development, and competitive recruitment.

38.  As previously noted, the staff I propose are not replacements for existing personnel. They are additive, designed to fill current gaps and provide the specialized focus necessary to respond to social media harms. These roles include, but are not limited to:

   - Staff trained to identify and manage compulsive social media use and platform-related mental health distress;

   - Coordinators of digital wellness, tasked with aligning school policies and classroom practices with a strategic response to online behaviors;

   - Family engagement specialists and peer support facilitators trained in social media risk navigation.

39.  Any workforce shortages do not negate the responsibility to plan for tomorrow. My 15-year strategic plan includes not only role recommendations but also timelines that allow for training, recruitment, and systems building. Just as schools did not forgo hiring nurses during the rise of childhood asthma or health aides during the COVID-19 pandemic, new harms like the persistent impacts of social media use require new staffing solutions. Schools cannot ignore new challenges simply because staffing them will require investment and prioritization.

40.  Finally, role dilution, where highly trained professionals such as counselors are diverted other tasks, is a common symptom of systemic understaffing and a widespread issue nationally.[27] Role dilution prevents highly trained professionals from delivering the full range of supports they are qualified to provide. The solution is not to further delay needed hiring, but to expand capacity so that existing professionals can fully perform their intended roles and new staff can be hired to meet emerging needs.

41.  The staffing recommendations I make for DeKalb are realistic, proportionate, and responsive to the nature and scope of the challenges posed by persistent student social media use. Any workforce shortages are a reason to act strategically and invest in long-term solutions, not a justification for inaction.

    **4.  Wildermuth Opinion 4: Every School District Faces Unique Challenges, But These Do Not Reduce the Significant Harm Cause by Social Media**

42.  Dr. Wildermuth wrongly asserts that my proposed strategic plan fails to consider DeKalb's longstanding challenges, such as poverty, trauma exposure, and structural inequities, and that, by focusing on social media harms, the plan risks diverting resources from more pressing student needs.[28] These conditions were explicitly considered in developing the DeKalb-specific strategic plan.

---

[27] Reback, R. (2010). Schools' mental health services and young children's emotions, behavior, and learning. *Journal of Policy Analysis and Management*, *29*(4), 698-725.

[28] 2025.07.11 Expert Report of Wildermuth, Ph.D. for DeKalb County School District, (pp. 22-24, ¶¶ 76-81).

43.     My plan was developed with awareness of the complex ecosystem in which DeKalb operates. Like many large, urban districts, DeKalb contends with high student mobility, persistent poverty, disparities in access to care, and other social determinants of health. These factors are not ignored. I considered and understood them when crafting my plan.

44.     Dr. Wildermuth's claim that social media harms are "less documented" than other concerns is misleading. As outlined in my general and DeKalb-specific reports,[29] DeKalb lacks systems to track platform-related impacts on student behavior, attention, and emotional well-being. The absence of data is a reflection of limited infrastructure, not an indication that these harms are minor or hypothetical. In fact, improving DeKalb's documentation of these harms is one of the critical gaps that my plan is designed to address.[30]

45.     Social media harms are not isolated or secondary, they are pervasive, cross-cutting, and interact with other adversities. Compulsive platform use, peer comparison pressure, online conflict, and sleep disruption intensify emotional and behavioral difficulties already exacerbated by poverty, trauma, or family instability. Ignoring the role of social media in this ecosystem is a failure to understand the compounding nature of risk in child and adolescent development.

46.     The suggestion that my plan would draw attention or resources away from other district priorities[31] reflects a false choice. My recommendations are designed to integrate with and enhance existing systems, including MTSS, SEL programming, and family engagement efforts.[32] The plan includes strategies to address challenges with student engagement, classroom regulation, peer relationships, and attention, all of which are due to social media use, according to both national data and DeKalb staff accounts.

47.     Dr. Wildermuth contends that DeKalb must focus on the "whole child,"[33] but then dismisses the very factor, social media use, that now permeates students' social, emotional, and academic lives. To omit a focused response to social media harms under the guise of whole-child planning is to overlook one of the most urgent and unaddressed drivers of distress in the district today.

48.     The plan I propose includes dedicated leadership roles, structured professional development, and data system enhancements to build capacity in areas where DeKalb is

---

[29] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025 (p. 3, ¶ 9); Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (p. 9, ¶ 45).

[30] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 39-42, ¶¶ 136-152).

[31] 2025.07.11 Expert Report of Wildermuth, Ph.D. for DeKalb County School District, (p. 22, ¶ 76).

[32] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (p. 2, ¶ 6).

[33] 2025.07.11 Expert Report of Wildermuth, Ph.D. for DeKalb County School District, (p. 2, ¶ 10).

currently under-resourced. My strategic plan does not attempt to solve every systemic barrier facing DeKalb. It does, however, offer a targeted response to a clearly defined and newly imposed significant category of harm, grounded in public health frameworks and informed by best practices in school mental health. This type of layered, domain-specific planning is standard in addressing complex youth health and education challenges, including tobacco use, obesity, trauma exposure, and now, social media-driven mental health risks.[34]

49. These interventions are not distractions from the district's core mission, they are essential supports for executing it in today's environment. The notion that social media harms should be subordinated to older challenges because they are newer is flawed. The disruptive effects of platform-driven student behavior, social media peer conflict, and classroom disengagement are not theoretical, they are observable realities that educators across DeKalb described during structured interviews. These harms have not replaced historical challenges; they have created new challenges and have *magnified* previous challenges.

50. Dr. Wildermuth's assertion that my strategic plan overlooks DeKalb's broader challenges is simply wrong. The plan directly acknowledges these challenges and proposes concrete supports that address them in tandem with social media harms. To treat these issues as mutually exclusive is to misunderstand the realities facing schools and students today.

### 5. Wildermuth Opinion 5: My Strategic Plan for DeKalb Makes Appropriate Recommendations that Would be Effective and Feasible

51. As discussed above and in my May 16 and May 18 reports,[35] my strategic plan for DeKalb is properly grounded in scientific literature on youth mental health and school-based supports and is based on my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems. My strategic plan outlined in my initial report, appropriately proposes a 15-year, multi-tiered public health framework that is necessary to address the substantial harms caused by students' use of social media platforms. For all of the reasons discussed above, none of Dr. Wildermuth's criticisms undermine the foundation and basis for my plan and her opinion that the strategic plan for DeKalb is unnecessary, unlikely to be effective, and/or, in some cases, infeasible is unsupported.

### B. Response to Hutt

52. Dr. Hutt's report for DeKalb County School District is substantively identical to his general report and those submitted for other bellwether districts, except for a small

---

[34] Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172.

[35] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025; Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025).

number of paragraphs where he references data specific to DeKalb.[36] These district-specific claims do not reflect meaningfully engage with the context or analysis in my DeKalb strategic plan and are based on cherry-picked observations that lack methodological rigor. Below, I summarize my general response to Dr. Hutt's core opinions and respond directly to the additional points he raises in the DeKalb context.

### 1. Summary of Response to Hutt Opinions 1-3

53. As described in my July 30, 2025 general rebuttal report,[37] I offered the following responses to Dr. Hutt's general claims:

54. On the charge of "educationalization":[38] My strategic plan is a public health response to a new, external harm, not an attempt to shift societal burdens onto schools. Schools have long adapted to emerging threats to student well-being and proper school functioning. The harms from social media platform use, including attention dysregulation, peer conflict, sleep disruption, and emotional distress, are discrete, observable challenges occurring during the school day and undermining the learning environment and school functioning. School systems are not being asked to "solve" social media; they are being equipped to respond to its impact on their school districts.

55. On contextualizing achievement and behavioral trends:[39] I understand and considered that student mental health and academic engagement are shaped by multiple factors, including poverty, trauma, family functioning, and COVID-19. I considered and understood these issues and my strategic plan accounts for them. None of these challenges negate the significant role of social media, which constitutes a distinct and increasingly dominant challenge to the school environment and school functioning. My analysis reflects this broader context, as does the layered, multi-tiered approach I propose.

56. On interpreting test scores and academic data:[40] Unlike Dr. Hutt, I do not rely on academic achievement scores as the primary indicator of social media harm. As explained in my general and district-specific reports, harms manifest in ways that are often under-documented in test scores, such as student dysregulation, classroom disruption, strained peer and adult relationships, and increased need for counseling and behavioral support.

### 2. Response to DeKalb-Specific Claims in Hutt's Report

57. While much of Dr. Hutt's report is general in nature, some of his claims relate specifically to DeKalb County School District. Each is addressed below:

---

[36] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District, (pp. 75-77, 81-84, 95-97, ¶¶ 139-140, 146-149, 166-167).

[37] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 34-41, ¶¶ 127-155).

[38] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 32-33, ¶ 70).

[39] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 80-85, ¶¶ 145-152).

[40] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 73-84, ¶¶ 136-151).

58.     Dr. Hutt contends that Georgia's adoption of Common Core (2010) and the transition from PARCC to the Georgia Milestones Assessment System (beginning in 2014-2015) provide a plausible alternative explanation for academic trends that coincide with the rise of social media.[41] This assertion is speculative and unsupported by any concrete analysis demonstrating a causal relationship between these policy changes and achievement in DeKalb. Dr. Hutt offers no evidence that the introduction of Georgia Milestones produced significant, district-specific changes in outcomes, nor does he provide any analysis of how these systemic changes might explain the well-documented disruptions to classroom engagement, student emotional regulation, and educator burden described in my report. Shifts in assessment platforms do not account for the cognitive, behavioral, and mental health challenges reported by educators and support personnel in DeKalb, nor do they negate the need for districtwide responses to those observed harms.

59.     Dr. Hutt asserts that DeKalb's 8th grade proficiency rates in English Language Arts and Math from 2015 to 2022 remained stable or improved, contradicting any link between social media use and academic harm[42] This interpretation reflects a narrow and incomplete understanding of educational impact. My report does not claim that social media use has caused a universal drop in test scores. Rather, it documents a pattern of classroom-level disruptions, compulsive checking, distraction, dysregulation, interpersonal conflict, harm to school functioning, among other social media caused harms, that interfere with learning and require staff time and attention.[43] Academic proficiency scores, particularly in high-stakes assessments like Georgia Milestones, are lagging indicators and often do not reflect subclinical or informal learning disruptions. Educators across DeKalb described diminished attention spans, increased anxiety, and social-emotional dysregulation directly linked to social media use. These issues are not always captured in aggregate testing data but are deeply consequential for daily instruction, school climate, and proper school functioning.

60.     Dr. Hutt compares DeKalb's graduation rate to national trends and claims that rising graduation rates undermine assertions of widespread social media-related harm.[44] This is a mischaracterization of both the purpose of my analysis and the interpretation of graduation metrics. I do not contend that social media use has depressed graduation rates. Graduation outcomes are influenced by a wide range of policies, supports, and interventions, many of which are specifically designed to keep students on track to graduate, even when they are experiencing distress or academic disengagement. The central concern is not whether students are graduating, but the cognitive, emotional, and behavioral cost at which that graduation is being achieved. Students can cross the

---

[41] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District, (pp. 76-78, ¶¶ 140-141).

[42] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District, (pp. 81-82, ¶¶ 146-148).

[43] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-10, ¶¶ 47-52).

[44] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District, (pp. 82-84, ¶ 149).

graduation stage while struggling with severe anxiety, sleep deprivation, peer conflict, and social media dependence, all documented in DeKalb schools and consistent with national trends in social media-related youth mental health harm.

61.    Dr. Hutt cites DeKalb's chronic absenteeism rate, which rose from 20% in 2018 to 30% in 2023, and asserts this trend reflects a "broader cultural shift," not social media use.[45] This claim is unsupported and contradicted by the very trends Dr. Hutt claims to highlight. He offers no grade-level breakdown or analysis of social media access patterns, peer dynamics, or social media use that would be required to rule out social media as a contributing factor. By contrast, school staff in DeKalb repeatedly identified digital fatigue, sleep disruption, and emotional dysregulation linked to platform use as key drivers of both attendance challenges and in-school disengagement.[46] The rise in chronic absenteeism is not inconsistent with my conclusions; it is further evidence of a system struggling to engage students in the context of pervasive student use of social media.

62.    Dr. Hutt's own data comparisons are internally inconsistent. He suggests that there is no need for concern about academic decline because proficiency scores are stable, yet also implies that absenteeism may explain the very declines he denies are occurring. This contradiction undermines the reliability of his argument. Moreover, his entire critique centers on a limited set of quantitative metrics while ignoring the central premise of my strategic plan: that social media is producing novel disruptions in youth attention, peer relationships, and mental health that cannot be fully captured by test scores or graduation rates alone.

63.    In sum, Dr. Hutt's DeKalb-specific claims fail to address the core concerns of my report and overlook the multidimensional ways in which social media harms manifest in schools. His narrow interpretation of student success, and his speculative alternative explanations, do not negate the compelling and consistent evidence of distress and disruption linked to social media platform use in DeKalb schools. My recommendations are grounded in implementation science and public health frameworks that acknowledge the complexity of student well-being and provide proportionate, feasible responses to newly imposed harms.

### 3.    Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods

64.    Dr. Hutt's rebuttal does not reflect a strong grounding in the social science methods necessary for causal inference or implementation-focused evaluation.[47] His analysis lacks the methodological rigor typically required in public health and implementation science, which limits the applicability of his critique to the type of strategic, systems-level planning at the core of my report.[48] Specifically:

---

[45] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District, (pp. 95-97, ¶¶ 166-167).

[46] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-10, ¶¶ 47-52).

[47] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 3-4, ¶¶ 13-15).

[48] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 2-3, ¶¶ 6-12).

- His "analysis" consists of plotting raw data on a line chart and visually interpreting trends.

- He conducts no statistical testing or control for confounding variables, yet draws sweeping conclusions

- His use of 8th grade standardized test scores is unsupported by any empirical rationale. He suggests that students "may" be using social media by then, but offers no age-based data to substantiate this choice. It appears the 8th grade was selected simply because it was the latest grade available.

- Dr. Hutt references the Return to Learn absenteeism estimates despite the creators' own warnings that (1) the data are inconsistent across states, and (2) the rates are generated by combining distinct and methodologically incompatible data sources.[49] Further, the data is reported only at the district level. As such, these estimates are inadequate to support the fine-grained claims he makes about DeKalb's school-specific outcomes or subgroup-level effects.

65.    Ultimately, none of Dr. Hutt's analysis changes my opinions which are grounded in:

- Over 25 years of experience in school mental health, prevention science, policy evaluation and implementation frameworks;

- Review of publicly available and district-specific data;

- Direct interviews with school personnel familiar with local trends;

- Application of public health and multi-tiered systems of support (MTSS) frameworks tailored to the unique demands posed by social media-related harm;

- Triangulation of quantitative trends with qualitative data from DeKalb staff, peer-reviewed literature, and evidence from national surveys.

- Together, these elements provide a far more methodologically sound and contextually grounded basis for the recommendations I offer. Dr. Hutt's reliance on partial data and unsupported inferences does not meet the evidentiary standard required for district-level causal assessment or strategic planning.

### 4.    Clarifying My Use of Evidence

66.    Dr. Hutt mischaracterizes my analytic approach. My conclusions are not based on trends in test scores or academic performance metrics. Those are his chosen metrics, the use of which is not justified as described above. Instead, they are grounded in:

- Consistent educator reports of student dysregulation, inattention, and peer conflict across DeKalb schools;

- Observable behavioral shifts linked to increased student engagement with digital devices and social media platforms;

- Documented gaps in mental health staffing, disruptions to school function and climate, and the diversion of educator time and attention toward managing

---

[49] *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods").

technology-related challenges, none of which are captured in standardized testing data.

67. The harms I identify are immediate and impactful in their own right. Whether or not certain academic achievement trends reflect these harms, they are clearly documented by staff and supported by national research.

### 5.    Conclusion regarding Dr. Hutt's DeKalb Opinions

68. Dr. Hutt's DeKalb report is largely derivative of his general report and demonstrates limited engagement with DeKalb specific context, student needs, or reported school-based challenges. His district-specific assertions rely on speculative interpretations of limited data and untested assumptions, offered without rigorous analysis or methodological transparency. In contrast, my recommendations are rooted in direct input from DeKalb educators, aligned with established public health and school mental health frameworks, and guided by implementation science. DeKalb requires a response that addresses the real and documented challenges facing its students, not a generalized dismissal unsupported by meaningful local analysis.

### C.    Response to Aguilar

### 1.    General Response to Opinions 1-6

69. Dr. Aguilar's rebuttal for DeKalb is identical to his general rebuttal report, with no reference to DeKalb-specific evidence with the exception of Exhibit A. Therefore, I refer to my July 30, 2025,[50] General Rebuttal Report, in which I respond in detail to each of Dr. Aguilar's core opinions. My response to his general opinions are summarized as follows.

70. Opinion 1: While some regulated social media use may have limited educational uses, these uses are typically teacher-directed and scaffolded. My report does not dispute this; in fact, my strategic plan incorporates digital literacy training that helps students and staff distinguish helpful from harmful social media use. Indeed, the primary concern is not educator-directed social media use, but rather students' personal and pervasive use, which research and school personnel identify as a driver of attention and mental health problems and disrupted peer interactions and classroom environments.

71. Opinion 2-3: The fact that civic engagement and peer connection may occur through social media in some contexts does not negate the substantial and growing body of evidence documenting increased mental health and learning problems caused by social media platforms. My report acknowledges that social media use is not monolithic. Yet, because of the significant harms caused by Defendants' platforms, a structured, district wide approach is needed.

72. Opinion 4: The fact that some educators use social media for professional development is neither relevant to, nor addresses the harms in this case. The existence of teacher learning networks on social media does not offset the harms that Defendants' social media platforms are causing school districts, school environment and school functioning.

---

[50] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 41-45, ¶¶ 156-172).

73. Opinion 5: My plan does not advocate blanket bans as the only approach. To the contrary, my plan promotes thoughtful use policies and enhanced educator training to address harms that stem from Defendants' social media platforms and social media use.

74. Opinion 6: Dr. Aguilar critiques my comparison to tobacco control. As I have noted in my general rebuttal,[51] the comparison is not one of mechanism but of scale and public health response. I state clearly that my strategic plan is modeled on past public health challenges that required system-wide and sustained action, not because social media is identical to tobacco, but because the public health infrastructure needed to respond is similarly complex and underdeveloped. With respect to the critique that the 15-year plan lacks iteration, to the contrary, my plan is explicitly designed for staged rollout and iterative refinement.

### 2.    Rebuttal to District-Specific Opinions in Exhibit A (DeKalb County)

75. In *Exhibit A* of his report for DeKalb, Dr. Aguilar presents three additional opinions (OP7-OP9) specific to the district. Each is addressed below:

76. Opinion 7: Dr. Aguilar states that DeKalb educators recognize that social media platforms such as YouTube can be beneficial for instructional goals. The existence of educational uses for social media does not negate or diminish the urgent need to address the harms associated with compulsive student use of the same platforms outside of instructional contexts. As to Dr. Aguilar's references to certain DeKalb documents, he fails to acknowledge the full context of those documents. For instance, DEKALB1182168 specifically addresses the implementing of the Lightspeed Filter solution in an attempt to curtail non-educational uses of the internet, including social media, during instructional periods. Moreover, DeKalb undertook efforts to restrict access to Virtual Private Networks (VPNs) for students. As to DEKALB1381292, this document relates to creating student and staff videos for a Stop the Violence campaign for DeKalb County School District Schools.  Other than the format of the videos, this document is not a recognition that social medial platforms are beneficial educational tools in the classroom and further instructional goals as Dr. Aguilar claims These discrete uses of social media in the district are simply irrelevant to the harms social media has caused to the district.

77. Dr. Aguilar seizes on an email from a single teacher to assert that "teachers have even advocated for the use of these platforms in their curriculum." (*See* DEKALB1778815). This document involved addressing social-emotional learning lessons for elementary students that were returning to in-school instruction after COVID. Contrary to Dr. Aguilar's statement concerning "the use these platforms", the email only addresses some selected YouTube videos and not all social media. Moreover, the email only addressed using the videos for the specific instruction related to social-emotional learning lessons and not to the widespread usage of social media platforms by any students.

78. Indeed, the presence of classroom-embedded uses of YouTube or teacher-curated content is irrelevant to the primary focus of my report: the impact of persistent engagement with social media platforms on youth mental health, attention, school climate, and proper

---

[51] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 21-25, ¶¶ 74-89).

school functioning. My plan does not propose banning classroom uses of YouTube or other educational content. Rather, it offers a systems-level response to address the growing body of evidence and educator concern around student distraction, emotional dysregulation, peer conflict, and social media overuse, harms which often occur in parallel to, but separate from, educator-guided uses of these platforms.

79.   Opinion 8: Dr. Aguilar documents that DeKalb runs social media campaigns and maintains district-level social media accounts to engage with families and students. These efforts are not at odds with my recommendations. It is entirely appropriate and increasingly common for school districts to use social media for community outreach, public service announcements, and promoting positive behavior. The "Stop the Violence" campaign and partnerships with vendors such as DadCypher and Equity for All are commendable examples of proactive engagement.

However, these uses are fundamentally different from the student-driven platform engagement that gives rise to the harms I document. The existence of district-led campaigns or curated public messaging does not mitigate the effects of platform design features, such as infinite scroll, social comparison mechanics, and reward-based engagement loops, that operate outside of school control and disproportionately impact youth. Furthermore, the fact that students are being recruited as "influencers" and provided social media toolkits reflects a recognition of the platforms' influence on youth behavior, but it does not replace the need for a comprehensive support system to help students navigate these platforms safely and preserve instructional time and classroom focus.

80.   Opinion 9: Dr. Aguilar notes that DeKalb has issued staff guidelines that acknowledge the educational benefits of social media while encouraging professionalism and safe use. The presence of general staff guidance documents does not equate to a district-wide, multi-tiered plan for addressing the mounting harms caused by youth-facing platform use. Moreover, the use of social media sites by teachers, for educational purposes, is vastly different than the unrestricted use of social media by students during school hours. My strategic plan does not replace professional standards for educators; it augments existing efforts with infrastructure for prevention, early identification, and coordinated response to student challenges linked to social media use.

### 3.   Conclusion regarding Dr. Aguilar's DeKalb Opinions

81.   Dr. Aguilar's DeKalb-specific observations largely reiterate his general arguments and reflect only surface-level engagement with the district's needs and realities. His opinions:

-   Do not contradict the core findings of my report;

-   Do not acknowledge the behavioral health impacts of social media on DeKalb's students;

-   And do not offer a viable or evidence-informed plan for how the district can respond to these harms in a coordinated, sustainable, and developmentally appropriate way.

82.   In contrast, my recommendations:

-   Are grounded in direct educator interviews and DeKalb-specific data;

-   Align with national public health and MTSS frameworks;

- Support, rather than replace, existing educational technology efforts;

- And offer a feasible and phased approach to building school capacity to meet the challenges caused by social media use.

### D.     Response to Dr. Adams

83.     Dr. Adams purports to offer seven opinions in his report. However, it is unclear where in the substantive portions of his report Dr. Adams is offering Opinions 1-5. Therefore, I have grouped my response to the opinions Dr. Adams listed on pages 5 and 6 of his report in the manner found below, first addressing Dr. Adams' Opinions 1-4 and Dr. Adams' Opinion 5 based on pages 19-31 of his report, followed by Dr. Adams' Opinion 7 found on pages 46-71.[52]

#### 1.     Adams Opinion 1-4

84.     In Opinions 1-4, Dr. Adams misleadingly claims that: (1) social media problems would be reflected in the available documentation; (2) DeKalb documentation and testimony show problems independent of social media that are alternative drives of cost; (3) social media should have, but does not, surface as a critical problem or cost driver for DeKalb in the available documentation and testimony from the district, and (4) DeKalb has employed social media in a manner that benefits their students and the district. None of these opinions alter my conclusions. These opinions fail to recognize realities at DeKalb.

85.     First, in Section 5A, Dr. Adams claims that issues like poverty, homelessness, lack of medical care, and effects from the COVID-19 pandemic are the true drivers of mental health issues in DeKalb.[53] These separate issues do not negate the role of social media, which constitutes a distinct, significant and increasingly dominant harm to the school environment in the district. My analysis reflects this broader context, as does the layered, multi-tiered approach I propose.

86.     Next, in 5A and later in Section 6 of his report, as purported proof of the lack of DeKalb's "documentation" of social media problems, Dr. Adams wrongly claims that DeKalb's grant and need-based applications should have referenced social media if it was a true problem. For example, Dr. Adams faults DeKalb for not *explicitly* listing "social media" (rather than mental health generally) in grant applications for COVID-19 or in aid for student mental health.[54] Setting aside that I am unaware of federal and state grants that were or are available specifically for social media related issues (and Dr. Adams does not offer any), grants applications are often highly specific, competitive, and for limited time periods. The lack of an explicit mention of "social media" in grant or aid

---

[52] In pages 6 through 19 of his report, Dr. Adams provides a general, generic narrative of his understanding of school district operations and administrative processes and does not respond directly to any of my opinions.

[53] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 20, ¶ 50).

[54] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 20-21, ¶ 51).

applications, rather than using the term "mental health" broadly, does not mean DeKalb is not suffering harms caused by social media.

87.    In Section 5B, Dr. Adams provides a "financial narrative" of DeKalb's budget process, finances, and expenditures.[55] Generally, he discusses other costs that DeKalb expends and repeatedly states that lack of budgetary documentation referring to social media equals lack of a problem. Notably, however, DeKalb's CFO, Byron Schueneman, testified that the Georgia Department of Education prescribes the charge codes and specific categories to be tracked in public schools' budget processes.[56] Those systems do not provide codes or categories to track social media-related expenses;[57] accordingly, it is unremarkable that categories tracking social media-related expenses are not found in this documentation.

88.    Dr. Adams also argues that purported past mismanagement of funds potentially infers future mismanagement.[58] I offer no opinions as to past management of funds. However, I caution against conflating legacy administrative issues with the current need for strategic investment in student services. Most districts, including Dekalb, operate under constrained fiscal conditions. When resources are limited, leaders are often forced to make difficult trade-offs, for example, whether to hire an English teacher or a school psychologist. Such choices do not reflect mismanagement; they reflect the absence of sufficient public funding to fully meet students' academic and mental health needs.

89.    In Section 6A, Dr. Adams again argues that: "This lack of social media mentions in the documentation is completely at odds with the notion that there is a pervasive social media crisis negatively affecting the district."[59] This rigid type of thinking is both incomplete and illogical. The fact that a district has not fully incorporated a new and emerging harm into its formal systems does not mean the harm does not exist or is not substantial. Key informants I interviewed and DeKalb witnesses testified that social media is a constant problem in school, disrupting classroom time and creating new behavioral challenges to which teachers and administrators must respond.[60] For example, Monika Davis, former IT director, testified that social media is a problem that is frequent, not occasional. In

---

[55] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 21, ¶ 53).

[56] 30(b)(6) Deposition of Byron Schueneman, 41:12-42:13 (Mar. 11, 2025).

[57] 30(b)(6) Deposition of Byron Schueneman, 41:12-42:13 (Mar. 11, 2025).

[58] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 22-24, ¶¶ 57-58).

[59] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 25, ¶ 63).

[60] 30(b)(6) Deposition of Kishia Towns, 195:21-196:4, 330:19-331:7 (Mar. 17, 2025); 30(b)(6) Deposition of Denise Revels, 218:13-25 (Apr. 18, 2025); 30 (b)(6) Deposition of Darnell Logan, 27:25-28:23 (Apr. 16, 2025).

21

fact, it increased noticeably during her tenure.[61] Ms. Davis also testified that students downloading inappropriate or blocked material was "an ongoing challenge."[62] The alleged lack of documents in no way indicates that social media was only "occasionally blocked".[63] I disagree with the proposition that because social media is not formally listed in documents, the problem does not exist.

90.    Dr. Adams employs the same flawed logic with CAFRs. He states: "In [the CAFRs], social media does not appear as a material or emerging risk; instead, auditors [when identifying spending strains] point to federal mandates, state funding formulas, and macroeconomic trends."[64] He also states that, "Each successive year's documentation reinforces that social media is, at best, tangential."[65] As discussed above in the context of budgets, and as DeKalb's CFO, Byron Schueneman, testified, DeKalb is mandated to use the Georgia Department of Education's categories and charge codes when outlining its budget and financial systems.[66] Dr. Adams' assertion that social media cannot significantly harm DeKalb simply because it is not yet codified in district plans or budgets is inconsistent with how new challenges typically unfold in school systems.[67] The notion that no mention of social media in a CAFR as an "emerging risk" equates to a lack of compulsive use of social media in the classroom is unsupported.

91.    Dr. Adams includes a myriad of school district costs, such as unfunded mandates, inadequate state aid, pandemic remediation, custodial staffing, transportation costs, inflation shocks, and pension obligations as drivers of DeKalb's costs.[68] While I do not dispute that these costs exist, I do dispute that they are unique to DeKalb. Virtually all public-school districts in the country have such costs. Indeed, social media-related harms, including compulsive use, emotional dysregulation, classroom disruption, and mental health decline, represent a relatively new external stressor, one that many school systems are only beginning to fully understand and address. Again, a lack of full documentation

---

[61] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 25, ¶ 63); See also 30(b)(6) Deposition of Monika Davis, 92:15-94:10; 206:24-207:3; 209:10-210:4 (Apr. 14, 2025).

[62] 30(b)(6) Deposition of Monika Davis, 93:14-25 (Apr. 14, 2025).

[63] 30(b)(6) Deposition of Monika Davis, 106:4-107:20; 110:5-18; 155:2-8 (Apr. 14, 2025).

[64] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 25-26, ¶ 64).

[65] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 27, ¶ 67).

[66] 30(b)(6) Deposition of Byron Schueneman, 41:12-42:13 (Mar. 11, 2025).

[67] 30(b)(6) Deposition of Kishia Towns, 330:19-331:7 (Mar. 17, 2025); 30(b)(6) Deposition of Denise Revels, 219:1-4 (Apr. 18, 2025); 30(b)(6) Deposition of Byron Schueneman, 118:19-119:3 (Mar. 11, 2025).

[68] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 27, ¶ 68; *see also* pp. 23-24, ¶¶ 58-60).

or formal budgetary response should not be conflated with lack of real, significant and ongoing impact.[69]

92.     Dr. Adams claims that in 600 pages of FY16-FY24 budget material, social media surfaces only as a regulated communication conduit: "blocked on student devices, referenced in minor licensing contracts, or used for emergency notifications", "not as a driver of surplus or deficit … social media is not, and never has been, a factor for [DeKalb's] costs."[70] Whether social media addiction is a "driver of surplus or deficit" is an irrelevant question for purposes of whether it causes the district experience harms and to expend time and resources. Additionally, Dr. Adams directly ignores evidence from DeKalb educators, individuals with firsthand knowledge of the problem, and misrepresents how the effects of social media manifest in schools. DeKalb's witnesses testified about the district's unique needs to address the mental health problems posed by social media, including more social workers, more Yondr bags/cell phone lockers, and more SAFE Centers.[71] Byron Schueneman's testimony makes it clear that although DeKalb cannot categorize expenses under a social media heading, the district does its best to collect damages to harms caused by social media.[72] This testimony is consistent with the information I gathered during my interviews with key informants from the district. I disagree with Dr. Adams' conclusion that social media's exclusion from the list of "driver[s] of surplus or deficit" means it is not a continuous, significant problem in the district.[73]

93.     In Section 6B, Dr. Adams incorrectly claims that DeKalb did not "implement social-emotional programming" to address the social media harms or create initiatives to address mental health problems caused by Defendants.[74] First, Dr. Adams appears to offer the opinion that, because certain programs (i.e., Second Step, GRIP, PREPARE, My Brother's Keeper, etc.) were not designed to "specifically address social media,"[75] such programs did not address social media at all. This is contradicted by the testimony of Dr.

---

[69] 30(b)(6) Deposition of Kishia Towns, 75:2-77:6; 191:24-192:21 (Mar. 17, 2025); 30(b)(1) Deposition of Deborah Moore-Sanders, 181:21-182:3 (April 9, 2025); 30(b)(6) Deposition of Denise Revels, 194:11-197:14; 219:9-23 (Apr. 18, 2025); 30 (b)(6) Deposition of Darnell Logan, 100:23-103:6 (Apr. 16, 2025).

[70] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 27, ¶ 68).

[71] 30(b)(6) Deposition of Denise Revels, 218:7-219:4 (Apr. 18, 2025); 30(b)(6) Deposition of Kishia Towns, 328:2-20, 330:1-7, 15-18 (Mar. 17, 2025).

[72] 30(b)(6) Deposition of Byron Schueneman, 121:3-18 (Mar. 11, 2025).

[73] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 27, ¶ 68).

[74] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 28, ¶ 69).

[75] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 28-29, ¶ 70).

Kishia Towns.[76] Second, Dr. Adams does not mention several programs DeKalb implemented to *specifically* address social media, including the Disconnect to Reconnect Initiative, and drafting and publishing social media guidelines for students and families.[77] DeKalb also started the Stop the Violence Campaign to mitigate the negative impact social media was having on students' behavioral health.[78]

94.     Dr. Adams also wrongly argues that because (1) DeKalb has noted that social media can serve certain purposes (like communication) and (2) DeKalb uses social media to communicate with parents, community stakeholders, etc., there must not be a problem with social media in DeKalb.[79] The use of social media accounts by DeKalb to communicate with families and the public has no bearing on the issues at hand. While it may be appropriate, and common, for school districts like DeKalb to maintain social media accounts for announcements, community engagement, and celebrating school events or achievements,[80] this does not equate to an endorsement of personal student use, nor does it address the school-based harms caused by those Defendants. My report does not call for eliminating public-facing school accounts. Rather, it recommends developing comprehensive systems of support to address the mental health challenges students experience because of social media use and the disruptions to classroom climate, attention and proper school functioning. Dr. Adams' report does not account for this difference (i.e., professional use of social media by DeKalb's adult employees vs. personal use of social media by adolescent students while in school and outside of school).

### 2.     Adams Opinion 5

95.     In Opinion 5, which he addresses in just two paragraphs in Section 6C, Dr. Adams argues that the evidence supporting harm to school districts almost always involves phone use (which he argues cannot reliably be attributed to social media), and purportedly derives from the content shared on the platforms, as opposed to students, as alleged, "compulsively" using the devices.[81]

96.     Contrary to Dr. Adams' argument, the record is replete with DeKalb attempting to expend resources to deal with students' addiction and other problems caused by Defendants' platforms that has nothing to do with general phone use or content. For

---

[76] 30(b)(6) Deposition of Kishia Towns, 168:20-169:13; 172:1-21 (Mar. 17, 2025).

[77] Not only does Dr. Adams ignore these initiatives, the only support he offers for this conclusion is that the 2019-2020 District Mental Health Awareness Action Plan (DEKALB615900) does not mention social media. Dr. Adams should not isolate his conclusion to one document (from five years ago) while ignoring other documents or testimony that have developed since.

[78] 30(b)(6) Deposition of Kishia Towns, 224:9-25 (Mar. 17, 2025).

[79] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 29-30, ¶ 72)

[80] 30(b)(6) Deposition of Kishia Towns, 214:14-21; 226:13-227:13 (Mar. 17, 2025).

[81] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 5-6, 46-70, ¶¶ 16, 118-172)

example, the Disconnect to Reconnect Initiative (where DeKalb expended substantial dollars to implement Yondr bags and cell phone lockers) was not started to address content, but was instead focused on addressing student distraction because of social media.[82] I disagree with Dr. Adams' dismissal of this evidence as "anecdotal" and "insignificant." Regardless, as discussed in my initial DeKalb report and herein, my review of existing resources and interview with key informants demonstrate that while there is such evidence of DeKalb attempting to take actions to address the negative impacts of social media in the district, it lacked the necessary, comprehensive and holistic approach my strategic plan provides, which is required to fully address the ongoing harms to the district from social media.

### 3.    Adams Opinion 7

97.    In Opinion 7, discussed in Section 8 of his report, Dr. Adams wrongly claims that my strategic plan to address harms caused by social media rests on faulty assumptions and methodological errors, misunderstands the role and function of public education, and misunderstands how to effectively implement a complex, district-wide program.[83] However, Dr. Adams' opinion mischaracterizes both the intent and the substance of my strategic plan. Dr. Adams wrongly contends that my approach misunderstands the role of public education and how to implement complex, district-wide initiatives. In fact, my entire career has been dedicated to strengthening the public education system's ability to address barriers to learning and support the whole child. I have worked for decades with federal and state education leaders, as well as with local district and school leadership teams across the country, to design and implement strategic plans that integrate academic, behavioral, and mental health supports. The model I propose is deeply aligned with the longstanding role of public schools in supporting students' social-emotional development and addressing non-academic factors that directly impact learning.

98.    Contrary to Dr. Adams' assertion, my strategic plan is not based on faulty assumptions or methodological flaws; rather, it is rooted in well-established implementation science, public health research, and evidence-based practices. The use of a Multi-Tiered System of Supports (MTSS) to address school-wide, targeted, and individualized needs is a widely endorsed and research-supported framework for addressing complex school climate and student well-being challenges. The plan I propose builds on this foundation and offers a comprehensive, actionable roadmap to help DCPS manage the real and documented harms caused by student social media use.

99.    Dr. Adams also fails to recognize the iterative, data-informed structure of my plan, which includes mechanisms for continuous quality improvement, stakeholder input, capacity-building, and ongoing evaluation. His claim that I misunderstand how to implement large-scale initiatives ignores both the extensive practical experience that informs my recommendations and the system-level design features embedded in the plan. Moreover, Dr. Adams does not appear to have the clinical, behavioral health, or implementation science expertise necessary  to credibly evaluate the public health planning framework on

---

[82] 30 (b)(6) Deposition of Darnell Logan, 103:22-105:10 (Apr. 16, 2025).

[83] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 5-6, 31, ¶¶ 15, 76-77).

which my recommendations are based. His narrow and outdated interpretation of the school's role in student development stands in stark contrast to decades of federal and state guidance, best practice models, and real-world efforts to equip schools to respond to complex, externally driven harms, including youth suicide risk, trauma, bullying, and now, social media-driven mental health and learning challenges.

### a.    Adams' Criticism of My General Report

100. Although Dr. Adams submitted his report as a rebuttal to my case specific DeKalb Report, in Section 8A-C of his report, Dr. Adams starts by criticizing my general report, claiming that in Section 8A that my opinions 1-2, 3-4, 5, 7 and 8 in my general expert report are wrong,[84] then in a single paragraph in Section 8B claiming that I am incorrect about the role of schools in addressing social media,[85] and then in Section 8C criticizing my MTSS-based framework. I address each of these criticisms in turn below.

101. First, with respect to Opinions 1 and 2 in my General Report, Dr. Adams does not dispute that there is in fact evidence supporting my conclusions that: (1) the use of social media presents several real and observable harms to students' functioning, including negative impacts on their ability to effectively learn and succeed in school and on their mental health and overall well-being, and (2) that there are various harms associated with students' social media use. Instead, Dr. Adams argues that such evidence is "insufficient" and that psychiatric and epidemiological questions remain "unsettled."[86] However, Dr. Adams neither explains why he believes he is qualified to opine on the sufficiency of the mental health outcomes, nor why the evidence in his view is "insufficient." Instead, Dr. Adams selectively quotes from my November 2023 interview with *Education Week* (Prothero, 2023) to imply I do not believe social media harms are significant.[87] But, Dr. Adams' selective quotation misrepresents my views and omits essential context. Importantly, in the same interview, I explicitly stated: *"The data does suggest that, yes, there are harms that come with exposure to social media."*[88] The purpose of my comments was not to minimize social media's impact but to caution against overly narrow, one-dimensional responses.

102. Without offering anything of his own, Dr. Adams also only claims to "agree and share the skepticism" of Dr. Aguilar with respect to my assertion that increased distraction from instruction and decreased academic focus and learning have eroded in-person social

---

[84] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 47-52, ¶¶ 119-130).

[85] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 52-53, ¶ 131).

[86] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp.47-48, ¶ 119).

[87] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 47-48, ¶ 119).

[88] Prothero, A. (2023, Nov. 29). What Is Driving Youth Mental Health Problems? It's Not Just About Social Media, Education Week (available at https://www.edweek.org/leadership/what-is-driving-youth-mental-health-problems-its-not-just-about-social-media/2023/11).

skills development, and diminished teaching effectiveness.[89] Dr. Adams' assertions that teachers have long dealt with distractions in the classroom are also immaterial to my opinions.[90] As discussed in my general report and above, there is support both from external sources and, most importantly from discussions and testimony of DeKalb educators, that student use of social media platforms has caused persistent and unprecedented disruption to the school environment.

103. Dr. Adams' assertion that teacher morale is not impacted by the harms of social media, because he claims that social media is not reported as a primary or secondary concern in a single national survey,[91] is similarly irrelevant. My opinion on this issue is supported by the materials cited in my reports, and most critically, by my interviews and review of deposition testimony from DeKalb educators.

104. With respect to Opinions 3 and 4 in my general report, Dr. Adams claims that my 15 year plan is purportedly "manifestly unreasonable and unworkable," as he then claims to describe in more detail in Sections 8E and 8F of his report.[92] Dr. Adams is wrong, as I detail below in response to Sections 8E and 8F of his report.

105. With respect to Opinion 5 in my general report, Dr. Adams also claims in a single paragraph that I am incorrect that existing staffing and programming are insufficient to address the complex impacts of social media on students' mental health, learning, and the school environment, purportedly because, as Dr. Adams believes, school districts budgets in recent years have been focused on other priorities.[93] However, for the same reasons discussed above in my response to Dr. Adams' Opinions 1-4, simply because social media has not been called out explicitly in district budgets or other documents does not undermine my opinion that DeKalb requires resources to combat the harms social media has caused the district. In fact, that lack of current funding only supports my claim that resources are needed to handle these issues in the district.

106. With respect to Opinion 7 in my general report, Dr. Adams takes issue with my opinion that a secure data system is essential for districts to effectively identify, triage and monitor students with mental health concerns across school and community settings, claiming in a single paragraph that it is "technologically and fiscally impractical."[94] ,

---

[89] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 48, ¶ 121).

[90] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 48, ¶¶ 121-122).

[91] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p .49, ¶¶ 123-125).

[92] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 49-50, ¶ 126).

[93] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 50, ¶ 127).

[94] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 51, ¶ 129).

But, as Dr. Adams acknowledges, current data systems within the district do not allow student social media behavior to be captured by a separate data category.[95] Dr. Adams's assertion that my recommendation for such a data system is unsupported is entirely inaccurate. In fact, as explained in my report, this system is a critical piece of my strategic plan which is meant to address harms caused by social media.[96] Moreover, Dr. Adams assertion that such systems are usually implemented within 3-5 years is immaterial.[97] For reasons discussed in my general report, DeKalb report and herein, my recommendation for a 15 year plan is grounded in evidence and based on my substantial experience.[98] Accordingly, it is necessary to have the proposed data system in place for the duration of my 15 year strategic plan.

107.    With respect to Opinion 8 in my General Report, Dr. Adams does not dispute that such "program evaluation is best practice."[99] Instead, Dr. Adams' primary argument appears to be that schools lack resources for such monitoring. However, that would not be an issue if, as DeKalb seeks here, my strategic plan would be resourced by Defendants who have caused the social media harms to the district. Moreover, Dr. Adams' wrongly asserts that my recommendation for ongoing, real-time evaluation of MTSS systems "exceeds both the operational bandwidth and regulatory expectations for most schools."[100] Adams presents a false dichotomy between structured, routine evaluation and ongoing monitoring, as though they are mutually exclusive. In fact, they are complementary and necessary. The field of school mental health has evolved beyond reliance on quarterly or annual data snapshots, particularly when addressing complex, dynamic issues like the impacts of social media on student well-being. Research consistently supports the need for frequent, low-burden progress monitoring to identify early signs of emotional distress, peer conflict, or social withdrawal, issues that often emerge subtly and escalate rapidly if unaddressed.[101] Contrary to Adams' suggestion, federal guidance from the U.S. Department of Education does not discourage ongoing data use; it encourages schools to implement continuous progress monitoring and responsive decision-making to ensure

---

[95] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 51, ¶ 129).

[96] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 3, 28, 35, ¶¶ 9, 103, 121).

[97] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 51, ¶ 129).

[98] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 31-35, ¶¶ 106-119).

[99] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 51-52, ¶ 130).

[100] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 52, ¶ 130).

[101] Dowdy, E., Ritchey, K., & Kamphaus, R. W. (2010). School-based screening: A population-based approach to inform and monitor children's mental health needs. School mental health, 2(4), 166-176; Von der Embse, N., Eklund, K., & Kilgus, S. (2022). Conducting behavioral and social-emotional assessments in MTSS: screen to Intervene. Routledge.

supports are matched to evolving student needs. Interpreting this as a call for rigid, quarterly-only reviews contradicts the core purpose of MTSS: to catch and address problems early, before they escalate into crises. Moreover, the data infrastructure I propose is designed to enhance, not burden, existing MTSS practices. The system includes tools such as brief climate surveys, indicators of social media engagement risk, and behavior tracking dashboards that can be integrated into MTSS team protocols and school-based workflows. Rather than detract from educator focus, these systems support timely, actionable decision-making and align with national quality improvement standards for school mental health.[102]

108. In Section 8B of his report, Dr. Adams claims that my general report misunderstands the role of schools in mental health and social-emotional development, arguing that schools are not the appropriate site to address social media harms.[103] This assertion is inconsistent with decades of public health precedent and contradicts established MTSS frameworks that are widely used to address youth substance use, bullying, trauma, and suicide risk, none of which originate in schools but all of which affect students' functioning at school and require a coordinated response.

109. Educators in DeKalb report that social media is fueling emotional dysregulation, peer conflict, classroom distraction, harms to school functioning, and mental health referrals.[104] These effects are observable, actionable, and disrupt the instructional environment. Schools are not being asked to "solve" social media, my plan offers a proportionate, feasible approach to manage the significant, negative impacts of social media.

110. In Section 8C of his report, in two paragraphs, Dr. Adams claims the proposed MTSS framework is unrealistic, unnecessary, or redundant with existing programs,[105] incorrectly asserting that my proposal lacks stakeholder input and fails to assess staff readiness.[106] To the contrary, the DeKalb plan incorporates:

- Structured stakeholder engagement in Phase 1, including district and school-based personnel;

---

[102] Weist, M. D., Lever, N. A., Bradshaw, C. P., & Owens, J. S. (Eds.). (2014). Handbook of school mental health: Research, training, practice, and policy; Connors, E. H., Smith-Millman, M., Bohnenkamp, J. H., Carter, T., Lever, N., & Hoover, S. A. (2020). Can we move the needle on school mental health quality through systematic quality improvement collaboratives?. School Mental Health, 12(3), 478-492.

[103] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 52-53, ¶¶ 130-131).

[104] Expert Report of Dr. Sharon A. Hoover, PhD for DeKalb County School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-10, ¶¶ 47-52).

[105] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 53-54, ¶¶ 132-133).

[106] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 53-54, ¶¶ 132-133).

- Data from interviews with key informants already conducted within DeKalb;

- A phased professional development sequence designed to assess, build, and monitor staff capacity.

111. Moreover, Dr. Adams lacks the qualifications to critique the design of a mental health or implementation science framework. His background as a superintendent does not include clinical or public health training, and he does not demonstrate familiarity with the MTSS model or its application to behavioral health and school climate interventions.

112. Dr. Adams also misrepresents the purpose of the MTSS plan. This is not a regulatory checklist, it is a systems-level response to real harms described by DeKalb educators. It is structured, and grounded in evidence-based practices.

### b.     Adams' Criticism of My Strategic Plan

113. In Sections 8D-F of his report, Dr. Adams criticizes my strategic plan, first in Section 8D describing purported problems with each of my nine Tier 1 recommendations, then in Section 8E critiquing my implementation strategy and recommendations, and then in Section 8F arguing that there are methodological errors and faulty assumptions in my strategic plans.  Dr. Adams is wrong on all counts.

114. First, as described below, none of the purported problems that Dr. Adams identifies with my Tier 1 recommendations in Section 8D of his report invalidates my strategic plan:

- Recommendation 1: Social Media Policies and Staff Professional Development: Dr. Adams wrongly claims the recommendations are duplicative of existing guidelines. However, Dr. Adams' criticism fails to engage with the need for targeted professional development. Existing training does not prepare staff to properly manage or mitigate the specific harms of social media. In fact, multiple DeKalb informants emphasized that current Professional Development offerings do not adequately address these challenges.

- Recommendation 2: Screen Time Management Initiatives: Dr. Adams wrongly suggests such efforts are either unnecessary or already in place. In fact, the current DeKalb district guidance does not provide structured curricula or Tier 1 behavioral supports to help students manage compulsive engagement or regulate time on the Defendants' platforms across settings. The proposed initiatives build on current efforts and fill that gap.

- Recommendation 3: Digital Literacy: Generic digital citizenship or internet safety programs are insufficient to address the sophisticated design features of modern platforms.[107] My plan focuses specifically on social media literacy, including platform design awareness, social media self-regulation, and identity formation online, areas not covered by standard digital literacy instruction.

- Recommendations 4-5: Life Skills Programming and Mental Health Literacy: My recommendations are not generic SEL add-ons. They address the cognitive and

---

[107] Durlak, J. A., Weissberg, R. P., Dymnicki, A. B., Taylor, R. D., & Schellinger, K. B. (2011). The impact of enhancing students' social and emotional learning: A meta-analysis of school-based universal interventions. *Child development*, *82*(1), 405-432.

emotional demands placed on youth by constant social media use (e.g., comparison stress, online exclusion) in the form of structured, developmentally responsive curriculum modules. Existing programs do not sufficiently address these dimensions.

- Recommendation 6: Anti-Cyberbullying Programming: While DeKalb has general bullying prevention campaigns, it lacks a systematized, school-wide anti-cyberbullying protocol that integrates social media behavior trends and peer dynamics unique to social media. The proposed programming builds staff capacity and provides consistent messaging, surveillance, and response tools.

- Recommendation 7: Digital Detox Challenges and Wellness Programs: Dr. Adams frames these as redundant. However, DeKalb does not currently offer structured Tier 1 wellness initiatives designed to address compulsive platform use. The proposed "detox" activities are informed by public health models and reinforce community-wide digital balance.

- Recommendation 8: Positive School Culture and Community Building: Existing culture-building efforts are important, but educators report that classroom climate continues to be undermined by the impacts of social media platforms (e.g., distraction, sleep deprivation). My recommendations align with these observations and build on DeKalb's foundation.

- Recommendation 9: Family Engagement and Education: Dr. Adams fails to note that while DeKalb uses social media to communicate with families, it does not consistently educate parents about managing their child's social media use, sleep hygiene, or digital mental health. My plan fills that critical gap through structured family modules and community engagement.

115.    In Section 8E of his report, Dr. Adams then criticizes my implementation strategy for these recommendations. However, each of these criticisms merely reiterate the same, flawed reasoning and conclusions drawn by other experts retained by Defendants and responded to above.

116.    For example, with respect to my staffing recommendations, like Dr. Wildermuth, Dr. Adams suggests that the district may struggle to obtain staffing for my strategic plan.[108] However, just as with Dr. Wildermuth, Dr. Adams has not actually engaged in any analysis to demonstrate that DeKalb would, in fact, be unable to obtain the staffing recommended as part of my strategic plan. Accordingly, this criticism is entirely speculative and unsupported. As described above, my staffing proposals are achievable. To the extent Dr. Adams is opining that because the district does not currently meet recommended ratios for certain mental health professionals the district will be unable to obtain such staff, this is entirely unsupported. Districts may lack such staffing for numerous reasons including turnover and lack of resources which would be accounted for in my strategic plan which would be funded by Defendants.

---

[108] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 59-61, 64-65, ¶¶ 145, 147, 150, 158).

117. Dr. Adams is also incorrect that I have ignored the fact that the District has implemented programs meant to address youth mental health.[109] As discussed throughout my initial DeKalb report and herein, while I took into consideration existing programing, the district requires a holistic and comprehensive plan for addressing the numerous harms caused by social media. With respect to professional development recommendations, Dr. Adams similarly asserts that proposed training is duplicative and burdensome.[110] Staff report the opposite: that current training does not prepare them for the unique behavioral health and classroom challenges related to social media. The professional development I recommend is not simply a general refresher on wellness topics, as Dr. Adams contends.[111] It is specifically designed to address the new behavioral, emotional, and safety-related issues arising from students' engagement with social media platforms. The training modules are tailored to different tiers within the Multi-Tiered System of Supports (MTSS) framework and include platform-specific examples and response strategies.

118. For instance, *digital literacy* training currently offered in many districts typically focuses on broad internet safety or responsible use. However, educators must be equipped to help students understand and manage their engagement with social media platforms, including the design features that promote compulsive use and interfere with attention, emotional regulation, and real-world relationships. Without this targeted preparation, students are left without tools to reflect on and manage their social media habits, and educators are unable to intervene effectively when classroom learning is disrupted by such behaviors.

119. Similarly, *mental health literacy* and *life skills* programs often focus on generalized stress management and emotion regulation strategies, without accounting for how peer dynamics, social comparison, and identity development are now shaped by students' near-constant connection to social media. Educators and school mental health professionals must be trained to recognize when students' distress is tied to social media and be equipped with tools to respond within classroom, counseling, and small group settings.

120. Further, *professional development for mental health services and crisis supports* must be updated to reflect the ways in which social media contributes to school-based crises. This includes training school-based clinicians and crisis response teams to recognize and respond to escalation patterns due to anxiety, compulsion, and negative interactions that originate online, such as peer conflict, reputational damage, or relational aggression, and manifest at school in the form of emotional outbursts, absences, or safety threats. It also includes equipping school resource officers and safety personnel with strategies to address in-school incidents that are rooted in or amplified by social media use.

---

[109] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 59, ¶ 146).

[110] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 60-66, ¶ 149, 153-157, 160).

[111] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 60, ¶ 148).

121. The professional development I propose is not duplicative, it fills a critical and widening gap in educator and staff capacity. It is necessary to align existing wellness, behavioral health, and safety efforts with the reality of how social media is affecting students and school environments. Without this targeted training, DeKalb staff will continue to feel ill-prepared to manage the real-time classroom disruptions, emotional escalations, and long-term mental health impacts caused by social media. Dr. Adams' assertion that the proposed training is redundant fails to engage with the substance of my recommendations and disregards the clear and repeated concerns voiced by DeKalb educators.

122. While Dr. Adams claims my training recommendations are excessive, he fails to explain how, as a former superintendent, he is qualified to offer an opinion on mental health needs and other problems specifically caused by social media.[112]

Additionally, with respect to evaluation recommendations, my plan includes standard implementation science metrics (e.g., service utilization, Tier 2/3 referrals, platform-related behavioral trends), not generic outcome metrics.[113] Dr. Adams misrepresents these as vague or unfeasible when they are essential to any high-fidelity rollout.

123. In Section 8F of his report, Dr. Adams critiques the report's foundation without engaging with the substance of educator-reported harms from the district which are discussed in my DeKalb report and above in response to Dr. Adams' Opinions 1-4.[114] He dismisses the findings of key informant interviews, substitutes speculative interpretations of absenteeism and achievement data for frontline insight, and fails to consider the specific mechanisms by which social media platforms disrupt learning environments.

124. Dr. Adams' criticism of my "findings" section[115] overlooks both the evolving nature of social media-related harms and the practical constraints of school-based data and documentation systems. His assertion that my descriptions of increased mental health referrals, professional development activities, and school-based initiatives fail to prove causation or demonstrate new and unmanageable trends reflects a misunderstanding of how emerging public health challenges are identified and addressed in educational settings.

125. The absence of explicit references to social media in annual budgets, strategic plans, or mental health databases should not be interpreted as evidence of its irrelevance or insignificance. In fact, such documentation gaps are expected when systems have not yet been adapted to track or categorize harms from a relatively recent and rapidly evolving problem. For example, referral data may reflect increased anxiety, depression, peer

---

[112] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 61-62, 65, ¶¶ 151-152, 159).

[113] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 66, ¶ 161).

[114] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 66-70, ¶¶ 162-172).

[115] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 66-67, ¶¶ 163-164).

conflict, or behavioral outbursts, without identifying social media as the precipitating factor, even when educators and school-based clinicians report a clear connection.

126. Moreover, my findings are grounded in direct input from educators and leaders within DeKalb, who consistently report that social media has added a distinct layer of complexity to their work with students. They describe the impact as persistent and intensifying, leading to classroom distraction, emotional dysregulation, and increased demand for mental health support. These patterns are observable and actionable, even if not yet codified in formal district records.

127. While DeKalb's strategic plans understandably prioritizes broad goals like academic improvement and student wellness, this does not mean that social media-related harms are absent or insignificant, it means that districts are still in the early stages of fully recognizing and responding to these harms within the constraints of existing systems. That recognition is precisely the purpose of the strategic plan I propose. It is designed not only to respond to the current strain caused by student social media use, but also to ensure that DeKalb builds the infrastructure to monitor and manage those harms going forward.

128. Dr. Adams' conclusions reflect a narrow administrative lens and do not meet the standards of public health, implementation science, or behavioral health system design. My plan, grounded in direct educator input, national frameworks, and current scientific consensus, remains the most coherent and scalable path forward for DeKalb.

129. Dr. Adams' assertions that I failed to provide a cost analysis mischaracterize my opinions.[116] My opinions are supported by the standard practice in my field of assessing a districts' available resources, interviewing key informants and determining the district's needs based on the information gathered. Based on my application of this standard methodology I identified a need within the district for the strategic plan I proposed. As discussed above, Dr. Adams' suggestion that because these issues are not specifically found in DeKalb's budget does not support the assertion that my strategic plan is not needed by the district.

130. Dr. Adams' criticisms of my use of the School Mental Health profile are also wrong.[117] My use of the School Mental Health profile is to assess the existing service array and capacity of the district to meet student needs, an essential step in designing a strategic response to any new or compounding challenge, including social media harms.

131. Dr. Adams wrongly implies that I conflate causation with capacity. I do not suggest that current staffing shortages are caused by social media; instead, I demonstrate that DeKalb operates with insufficient capacity to meet the additional burdens created by students' social media use, such as increased emotional dysregulation, peer conflict, and classroom disruption, further strain these limited resources. The additional staffing I recommend is therefore *additive*: it is meant to equip the district to manage the significant, escalating

---

[116] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 67, ¶ 165).

[117] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 67-68, ¶ 166).

and distinct challenges tied to social media, not to solve pre-existing shortages or structural workforce issues.

132.    Dr. Adams also wrongly contends the plan's staffing recommendations are infeasible and possibly prohibited by an FTE cap.[118] However, he offers no evidence of such a cap in DeKalb. His claim is entirely speculative and unsupported. Even if such constraints exist, staffing can be addressed through

- Partnerships with community mental health providers;

- Contracted or part-time roles;

- Regional service agency support;

- Braided funding and strategic hiring over time.

The roles I propose are evidence-based, aligned with national benchmarks, and essential for responding to the disruptions described by DeKalb educators.

133.    Dr. Adams underestimates both the scope of social media's impact on students and the substantial need for structured, ongoing family education and engagement to address it. His claim that my recommendations are excessive overlooks the fact that most existing district family engagement efforts, including in DeKalb, are fragmented, under-resourced, and often reliant on volunteers or staff juggling multiple responsibilities. These efforts are typically focused on academic support, school events, or compliance-related communication and are not designed to address the urgent and growing need to equip families with knowledge and strategies related to digital wellness and social media use.

134.    The School Family Engagement Specialist is a new and necessary role precisely because this area of concern cannot be adequately addressed through the existing infrastructure. As educators and administrators across DeKalb have shared, families are actively seeking guidance on how to support their children's mental health and behavior in the context of social media, issues that intersect with school climate, discipline, classroom engagement, and emotional wellbeing. These concerns require trained staff who can deliver structured programming, collaborate with school counselors and mental health professionals, and provide sustained outreach, not simply send a flyer home or hold a one-time evening event.

135.    Similarly, the recommendation to train a District Director of Family Engagement in digital wellness is not about adding an administrative burden but about ensuring leadership and coordination for a district-wide strategy on a rapidly evolving challenge. Without dedicated capacity, family engagement in this domain remains piecemeal and inequitable, reaching only the most connected or resource-advantaged families. The plan I propose ensures that all caregivers, regardless of time, language, or access barriers, can benefit from high-quality information and school-supported guidance on managing their child's social media use.

---

[118] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 68, ¶ 167).

136. Dr. Adams' suggestion that curated newsletters or community partnerships alone are sufficient misjudges the complexity of the issue. The mental health and relational consequences of student social media use demand more than passive or voluntary touchpoints. They require a coordinated system of supports that includes professional development for staff, dedicated family engagement roles, and a sustainable structure for ongoing education and collaboration.

137. Regarding Dr. Adams' claims about the "diversity of modern service models,"[119] I am well aware of contractor models and multi-agency collaboration, having led a national school mental health technical assistance center for over 15 years. Contractors may be appropriate in early stages of implementation, especially when internal staff are not yet available; however, long-term reliance on contractors is less cost-effective and less sustainable than building district-owned, embedded capacity. Contractors also vary in quality and continuity. My plan reflects best practices: initial capacity-building may include partnerships, but districts need their own staff to sustain effective, high-fidelity services.

138. Dr. Adams' claims that I do not consider the funding picture for DeKalb, specifically that in "some years" the district has "excess funding."[120] First, Dr. Adams identifies a single year in which the excess funds were sufficient to purchase "charging equipment and headphones."[121] This falls far short of demonstrating that the district has the funding necessary to implement a comprehensive strategy for mitigating the school-based negative impacts of social media platform use. Moreover, school districts operate under constrained fiscal conditions, and must make difficult funding decisions and trade-offs. That DeKalb made certain choices within these constraints does not suggest that other funding priorities do not exist.

139. Finally, Dr. Adams' belief that my use of Key Informant Interviews is purportedly "methodologically weak and unconvincing,"[122] fails to recognize that these interviews are a well-established method in public health and education research, particularly for identifying emerging issues not yet reflected in formal documentation. The insights gained from DeKalb educators, administrators, and staff offer credible, firsthand evidence of the pervasive and disruptive impact of social media on student behavior, mental health, school climate and school functioning. These interviews are one source of data among many and are considered in the context of other information from the district, as well as my comprehensive understanding of the peer-reviewed literature and the broader national education landscape.

---

[119] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (p. 68, ¶ 168).

[120] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 68-69, ¶ 169).

[121] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 68-69, ¶ 169).

[122] 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District, (pp. 69-70, ¶¶ 170-172).

### E.    Response to Hyman

140.    Many of the critiques raised by Dr. Joshua Hyman in his DeKalb report, particularly those related to causality, confounding factors, and the scope of my strategic plan, echo arguments addressed in detail in prior sections of this rebuttal. As such, several of my responses below refer back to those in earlier sections. Where appropriate, I briefly restate key points to ensure a complete response to Dr. Hyman's specific framing. Dr. Hyman's analysis frequently applies inappropriate standards for strategic planning in public health and education and mischaracterizes both the purpose and methodology of my work.

#### 1.    Hyman Opinion 1

141.    Dr. Hyman claims that Plaintiffs' experts, including myself, fail to demonstrate that Defendants' conduct caused past financial harm or future costs for DeKalb or districts nationally.[123] This assertion misrepresents the purpose and methodology of my report. I was retained to assess whether there is a credible, evidence-informed need for a coordinated, school-based response to social media harms. The harms I document, based on structured interviews with DeKalb staff, national research, and observed patterns in school environments, are real and actionable.

#### 2.    Hyman Opinion 2

142.    Dr. Hyman contends that my conclusions conflate correlation with causation and fail to account for confounding variables.[124] This critique misunderstands my methodological approach, which follows standard public health practice by triangulating educator observations, available district data, and peer-reviewed research to guide strategic planning. This approach is routine in systems improvement efforts where randomized control trials are neither feasible nor ethically required. Furthermore, several of the studies I cite, including Drs. Telzer, Twenge, and Christakis, use methods that approach causal inference and are widely cited in policy guidance.

143.    The suggestion that my plan should isolate the effects of each social media platform or feature, separating Instagram from TikTok, "likes" from infinite scroll, is unrealistic and contrary to how public health assessments are conducted in complex social systems. These platforms are not used in isolation by students, nor are their effects experienced discretely. My report responds to the overall impact of compulsive, and disruptive use of social media as experienced by students and educators in DeKalb.

#### 3.    Hyman Opinion 3

144.    Dr. Hyman criticizes my report for not using test scores or graduation rates as primary evidence of harm[125]. This interpretation rests on an overly narrow view of harm.

---

[123] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 72-92, ¶¶ 116-146).

[124] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 9-20, ¶¶ 23-41).

[125] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 20-43, ¶¶ 42-80).

Disruptions to student attention, emotional regulation, and peer dynamics are often the earliest manifestations of harm, and may not be captured by standardized academic metrics. Moreover, districts have long faced pressure to maintain graduation rates regardless of underlying challenges, rendering these metrics poor proxies for student well-being.

### 4.    Hyman Opinion 4

145.    Dr. Hyman repeats the above logic regarding school climate, suggesting that the lack of rising disciplinary incidents undermines my conclusions.[126] This ignores the reality that discipline codes often lack categories specific to social media-related behaviors and that staff may not attribute classroom disruptions to social media causes even when they are the source. My interviews with DeKalb personnel and national findings confirm that peer conflict, anxiety, and online bullying frequently occur under the radar of formal discipline systems.

### 5.    Hyman Opinion 5

146.    Dr. Hyman claims I fail to show that expenditures were reallocated or increased due to social media harms.[127] This is a mischaracterization. Districts, including DeKalb, have not formally tracked social media-related expenditures because until recently, they did not fully recognize the need or have the resources to do so. As I note in the report above, DeKalb's staff already spend significant time addressing student distress and classroom disruption tied to social media, even if budget lines don't explicitly label those costs. My plan aims to make this implicit diversion of effort explicit and coordinated.

### 6.    Hyman Opinion 6

147.    Dr. Hyman contends that no link is drawn between the at-issue features of social media and harms in DeKalb.[128] Again, my charge was to review evidence of social media-related school impacts and propose a systems-level response tailored to the district. I did so by integrating direct interviews with DeKalb leaders and educators who described platform-driven distress, distraction, harms to school functioning, and peer conflict. These reports are credible, consistent, and actionable.

### 7.    Hyman Opinion 7

148.    Dr. Hyman claims that I fail to show that the plan addresses "only" harms allegedly caused by Defendants' at-issue conduct.[129] This misstates the nature of both the harm and the appropriate response. My report, like those of other experts in this litigation, is

---

[126] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 43-72, ¶¶ 81-114).

[127] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 72-92, ¶¶ 116-146).

[128] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 12-18, ¶¶ 32-38).

[129] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 94-97, ¶¶ 152-156).

predicated on the extensive documentation both in academic literature and evidence from the district that social media negatively impacts student mental health and school functioning and environment.

149. These harms include compulsive checking, attention dysregulation, online peer aggression, identity stress, sleep loss, emotional volatility, and widespread diversion of educator time. The interventions I propose are carefully aligned with these harms and are not generic expansions of preexisting mental health programming. They are tailored to address disruptions that educators specifically linked to student social media use during structured interviews, consistent with national patterns.

150. Moreover, school districts do not operate on a forensic model of harm mitigation. In public health and education, interventions often target clusters of interrelated harms, particularly when they interact or cascade across developmental and systemic levels. My plan is intentionally designed to be integrated, efficient, and tiered. It is entirely reasonable that supports developed in response to social media harms may also strengthen broader student wellness and school climate.

151. Dr. Hyman asserts that I fail to demonstrate the plan is a "sensible use of funds" because I do not conduct a formal cost-benefit analysis.[130] This expectation is inappropriate in the context of systems-level public health planning. Cost-benefit analysis is a tool often used by governmental bodies for discretionary programming, not a standard requirement for planning a response to an externally imposed, harmful disruption such as the one caused by social media platforms. Further, my task in this litigation was not to determine how school districts should allocate limited budgets under current constraints, but to describe what is *needed* to respond adequately to the harms identified. That schools currently lack the resources to implement my plan independently only strengthens the case for external investment; it is not a justification for dismissing the proposed interventions.

152. Regarding the 15-year horizon: large-scale public health challenges require sustained responses. Tobacco cessation, childhood obesity, suicide prevention, and trauma-informed care in schools all unfolded over similar multi-year trajectories. My plan includes early-phase action steps, mid-course evaluation, and long-term sustainability components, all of which align with best practices in implementation science.

153. Dr. Hyman contends that because my plan does not demonstrate a predicted decrease in social media harms, it must be implicitly ineffective.[131] This logic is both circular and unfounded. I outline an evidence-informed strategy for DeKalb to implement, with embedded evaluation steps to track progress and adjust as needed. In implementation science, plans are not assumed to be ineffective simply because the outcomes they are designed to address are ongoing. Harm mitigation requires ongoing capacity, not one-time fixes. A school-based mental health team does not disappear once anxiety drops; it is needed to maintain gains and address fluctuations over time. Similarly, digital wellness

---

[130] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 110-115, ¶¶ 179-183).

[131] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (pp. 98-99, ¶ 158).

supports must evolve as social media platforms, and student behavior, change. My plan is structured to be iterative, not static.

154. Finally, Dr. Hyman asserts that my plan overstates the level of need.[132] This claim rests on a narrow reading of existing services and an undervaluing of educator-reported gaps in ability to address social media harms with current resources. DeKalb has existing programs in place, but as detailed in my report, these are inconsistently implemented, and not designed to address the specific dynamics of social media-related harm.

### 8.    Hyman Opinion 8

155. Dr. Hyman claims that Dr. Leslie overstated incremental costs associated with my strategic plan for DeKalb. This critique fails to account for the fact, which I took into consideration when creating my strategic plan for the district, that existing PD related to social media has been limited and piecemeal due to several factors: the district lacks specialty personnel and coordinated strategies to adequately address the distinct and evolving harms associated with student social media use; professional development time is limited; and, there are other issues on which school staff must be trained during existing professional development time. Dr. Hyman also wrongly asserts that the costs of training are "double-counted" for new staff in Dr. Leslie's economic modeling. He fails to recognize that in school systems, professional development costs are often incurred in addition to salary and benefits, particularly when training occurs outside of regular contract hours; collective bargaining agreements or union rules require compensation for training time; substitute teachers must be hired to cover classes during in-service days; and/or external trainers, materials, or certifications are needed. As a result, it is not uncommon, or incorrect, for school districts to incur training expenses in addition to staff salaries and benefits, and any attempt to eliminate these costs as redundant ignores how school systems actually operate.

156. Dr. Hyman also criticizes the plan for not accounting for existing federal, state, and local funding streams for mental health. While I am familiar with many of these (e.g., ESSER, Medicaid, Title IV, state mental health block grants), these streams are not dedicated to mitigating social media–specific harms; are often short-term, competitive, or uncertain in duration; cannot reasonably be assumed to replace new funding responsibilities for harms caused by Defendants' platforms; and, are already being used to address a wide array of pre-existing needs. It would be inappropriate and irresponsible to assume that DeKalb should reallocate existing funds, intended for general student support, to absorb new harms stemming from social media platform use.

## III.    Conclusion

157. The opinions and recommendations presented in this report reflect a comprehensive review of the rebuttal reports submitted by Defense experts, as well as the specific conditions, capacities, and educator-reported challenges within DeKalb County School District. The defense expert critiques mischaracterize the intent of my recommendations, overlook the harms of social media platforms on student mental health and school

---

[132] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District, (p. 99, ¶ 159).

disruption, or fail to meaningfully engage with the direct accounts provided by DeKalb staff.

158. DeKalb, like many large and diverse school districts, is experiencing the new, significant and distinct harms as well as compounding harms of widespread student engagement with social media platforms. These consequences include increased student distress, attention disruption, digital peer conflict, disruptions to school functioning, harms to school climate and diversion of educator time and school resources. My recommendations are tailored to DeKalb's context and are designed to address these harms through sustainable, evidence-informed strategies that complement and extend the district's current efforts.

159. My recommendations offer a structured, sustainable, and evidence-informed path forward. The plan builds on existing efforts while filling urgent gaps in digital wellness, staff training, Tier 2 and Tier 3 supports, and leadership infrastructure. I do not contend that social media is the sole cause of student mental health challenges, but it is a distinct, significant externally imposed, and modifiable contributor.

160. The proposed MTSS-based plan is not speculative or excessive. It is grounded in implementation science, informed by direct practitioner input, and aligned with best practices in public health and school mental health. By implementing my proposed plan, DeKalb County School District can respond strategically to emerging social media harms with the tools, resources and investments necessary to protect student learning and well-being and proper school functioning.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

_Sharon Hoover_
Sharon A. Hoover, Ph.D.

41

**Exhibit A**

**Additional Materials Considered**

Prior Opening Report dated May 18, 2025 and all documents cited therein, including Exhibit B.

**DeKalb County Documents**

| Bates |
|---|
| DEKALB615900 |
| DEKALB1182168 |
| DEKALB1381292 |
| DEKALB1778815 |

**Articles and Studies**

| |
|---|
| *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods") |
| Connors, E. H., Smith-Millman, M., Bohnenkamp, J. H., Carter, T., Lever, N., & Hoover, S. A. (2020). Can we move the needle on school mental health quality through systematic quality improvement collaboratives?. School Mental Health, 12(3), 478-492 |
| Dowdy, E., Ritchey, K., & Kamphaus, R. W. (2010). School-based screening: A population-based approach to inform and monitor children's mental health needs. School mental health, 2(4), 166-176 |
| Durlak, J. A., Weissberg, R. P., Dymnicki, A. B., Taylor, R. D., & Schellinger, K. B. (2011). The impact of enhancing students' social and emotional learning: A meta-analysis of school-based universal interventions. *Child development*, *82*(1), 405-432. |
| Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. *School Mental Health*, *1*(1), 26-36 |
| Hoagwood, K., Atkins, M., & Ialongo, N. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. *Administration and Policy in Mental Health and Mental Health Services Research*, *40*(6), 451-455 |
| Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. BMC pediatrics, 13(1), 172 |
| Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent development in the digital media context. Psychological Inquiry, 31(3), 229-234 |
| Prothero, A. (2023, Nov. 29). What Is Driving Youth Mental Health Problems? It's Not Just About Social Media, Education Week (available at https://www.edweek.org/leadership/what-is-driving-youth-mental-health-problems-its-not-just-about-social-media/2023/11) |
| Reback, R. (2010). Schools' mental health services and young children's emotions, behavior, and learning. Journal of Policy Analysis and Management, 29(4), 698-725 |
| Von der Embse, N., Eklund, K., & Kilgus, S. (2022). Conducting behavioral and social-emotional assessments in MTSS: screen to Intervene. Routledge. |

| Weist, M. D., Lever, N. A., Bradshaw, C. P., & Owens, J. S. (Eds.). (2014). Handbook of school mental health: Research, training, practice, and policy |
| --- |

**Litigation Documents**

| 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D. |
| --- |
| 2025.07.11 Expert Report of Dr. Stephen J. Aguilar for DeKalb County School District |
| 2025.07.11 Expert Report of Diana Wildermuth, Ph.D., for DeKalb County School District |
| 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for DeKalb County School District |
| 2025.07.11 Expert Report of Kelvin Adams, Ph.D. for DeKalb County School District |
| 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for DeKalb County School District |
| 2025.07.30 Rebuttal Report of Dimitri Christakis, M.D., M.P.H. |
| 2025.07.30 Rebuttal Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH |
| 2025.07.30 Rebuttal Report of Eva Telzer, Ph.D. |
| 2025.07.30 Rebuttal Report of Anna Lembke, M.D. |
| 2025.07.30 Rebuttal Report of Dr. Jean M. Twenge, Ph.D. |
| 2025.07.30 Rebuttal Report of Gary Goldfield, Ph.D. |
| 2025.05.19 Expert Report of Douglas L. Leslie, Ph.D. for DeKalb County School District |
| 2025.06.20 Amended Expert Report of Douglas L. Leslie, Ph.D. for DeKalb County School District |