**Exhibit 90**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

**Rebuttal Report of**

**Dr. Sharon A. Hoover, PhD**

**for Harford County Public Schools**

**August 1, 2025**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**Table of Contents**

I.    Executive Summary of Expert Opinions ........................................................................ 1

II.   Response to Expert Opinions......................................................................................... 3

    A.    Response to Wildermuth.................................................................................... 3

        1.    Response to Wildermuth Opinion 1: My Reliance on Sources of Harford-Specific Data is Well-Founded and Consistent with the Standards Employed In My Field...........................................................................3

        2.    Response to Wildermuth Opinion 2: The Existence of Mental Health Resources and Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement Those Resources and Initiatives...................................6

        3.    Response to Wildermuth Opinion 3: Harford County's Prior Staffing and Resource Levels Do Not Dispel Need for Improvement ......................................8

        4.    Response to Wildermuth Opinion 4: Every School District Faces Unique Challenges, But These Do Not Reduce the Significant Harm Caused by Social Media ...................................................................................... 10

        5.    Response to Wildermuth Opinion 5: Strategic Plan for Harford Makes Appropriate Recommendations that Would be Effective and Feasible ............... 11

    B.    Response to Hutt ............................................................................................. 12

        1.    Summary of Response to Hutt Opinions 1-3 ....................................................12

        2.    Response to Harford County-Specific Claims in Hutt's Report .......................... 13

        3.    Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods.............. 14

        4.    Clarifying My Use of Evidence ........................................................................ 16

        5.    Conclusion Regarding Dr. Hutt's Harford Opinions .......................................... 16

    C.    Response to Aguilar ........................................................................................ 16

        1.    General Response to Opinions 1–6.................................................................... 16

        2.    Rebuttal to District-Specific Opinions in Exhibit A (Harford County) ............... 17

        3.    Conclusion Regarding Dr. Aguilar's Harford Opinions ..................................... 18

    D.    Response to Lakdawalla .................................................................................. 19

        1.    Lakdawalla Opinion 1...................................................................................... 19

        2.    Lakdawalla Opinion 2...................................................................................... 21

        3.    Lakdawalla Opinion 3...................................................................................... 24

        4.    Lakdawalla Opinion 4...................................................................................... 25

        5.    Lakdawalla Opinion 5...................................................................................... 27

    E.    Response to Smith............................................................................................ 29

        1.    Smith Opinion 1.............................................................................................. 29

2.    Smith Opinion 2 .................................................................................................. 30

3.    Smith Opinion 3 .................................................................................................. 31

4.    Smith Opinion 4 .................................................................................................. 32

5.    Smith Opinion 5 .................................................................................................. 33

III.    Conclusion ................................................................................................................... 34

## I.    Executive Summary of Expert Opinions

1.    The opinions summarized below are offered in response to the district-specific rebuttal reports submitted by Dr. Diana Wildermuth, Dr. Ethan Hutt, Dr. Stephen Aguilar, Dr. Darius Lakdawalla, and Dr. Jack Smith (the "Defense Reports"). These opinions are informed by my review of each expert's report, relevant documentation from Harford County Public Schools (HCPS), structured interviews with district personnel, and the broader scientific literature on youth mental health and school-based supports. They are grounded in my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems.

2.    **Opinion 1: Data limitations in Harford County should not be interpreted as absence of harm.**
Current limitations in Harford County's data systems should not be interpreted as absence of harm and do not negate the need for action. It is not surprising that the data systems that are in place were not specifically designed to address the unprecedented and new harms caused by social media. Instead, it underscores the importance of building systems to assess and address harms that educators and families consistently report, namely, student distraction, dysregulation, conflict, and mental health concerns linked to social media.

3.    **Opinion 2: Existing resources in Harford County are insufficient to address the scale and nature of social media-caused harms.**
Harford County's existing resources are insufficient to meet the scale and urgency of social media caused harms to HCPS. While HCPS has implemented some digital citizenship efforts and expanded student support services, these efforts are not as comprehensive and holistic as called for here, and are not designed for the unique and unprecedented challenges to HCPS caused by social media platforms. My recommendations are designed to build capacity and respond to platform-caused mental health and school climate disruptions.

4.    **Opinion 3: Harford County's current staffing is inadequate to meet new, externally imposed mental health demands caused by social media.**
HCPS student support staffing is inadequate to meet increasing student mental health needs, particularly in light of new harms and increased staffing needs caused by pervasive social media use. My staffing recommendations reflect recognized professional standards and the real, growing burden placed on schools by social media-fueled mental health challenges. The plan proposes reasonable increases in staffing to address these harms.

5.    **Opinion 4: My strategic plan is responsive to Harford's operational realities and student needs.**
My strategic plan is not divorced from academic priorities, but rather the recommendations are designed to enhance learning by addressing barriers to attention, engagement, and emotional regulation. The idea that school mental health systems are "at odds" with academic missions is outdated and contradicted by decades of research

1

showing that these mental health systems are critical to education and child development.[1]

6. **Opinion 5: My recommendations follow public health and implementation science models and are aligned with established frameworks for addressing large-scale behavioral health harms.**

   My recommendations reflect best practices in implementation science and public health response. A 15-year timeline is consistent with precedent in addressing systemic harms like tobacco use, and allows for system implementation, evaluation, and sustainability. The timeline is not arbitrary but rooted in successful models for district-wide change.

7. **Opinion 6: My report is focused on strategic planning, not economic causality or statistical modeling.**

   My role in this matter is not to quantify damages but to design a strategic plan to mitigate ongoing harms and strengthen HCPS's response capacity. My strategic plan is informed by implementation frameworks widely accepted in the education and behavioral health fields.

8. **Opinion 7: My proposed interventions are targeted, scalable, and consistent with national school mental health guidance.**

   My proposed interventions, digital wellness curriculum, staff training, targeted Tier 2/3 supports, and data infrastructure, are standard components of modern school mental health frameworks. They are proportionate to the widespread and growing disruptions caused by social media, and consistent with Maryland's statewide Blueprint for education reform.

9. **Opinion 8: The plan I propose reflects Harford's unique context, while aligning with principles that apply across districts facing similar harms. Social media harms are widespread and consistent in form, regardless of geography.**

   While my plan reflects core components shared across districts, it is tailored to Harford's size, current staffing, and needs. HCPS staff interviews were conducted and HCPS-specific materials, including budgets, planning documents, and needs assessments, were reviewed to ensure contextual alignment. Therefore, while some leadership roles and plan components are common across districts, their implementation for HCPS is tailored to HCPS' size, staffing, needs, and community partnerships.

10. **Opinion 9: Claims that social media has not harmed HCPS because the district has not budgeted for it are misguided.**

    Assertions that the lack of explicit budget line items for social media means it has not caused harm are misguided. Schools often fail to document, much less budget for, novel harms, especially when those harms cut across many existing departments (such as instruction, mental health, and technology) that have separate budgets that make it difficult to quantify. In addition, these departments have budgets for *all* of their activities, not just related to one issue or another, however important that issue may be. Educator

---

[1] 2025.07.11 Expert Report of Jack R. Smith, Ph.D. for Harford County Schools, (p. 73, ¶ 244).

observations, policy adaptations, stakeholder surveys, and increases in behavioral and mental health concerns, all of which Harford has experienced, are well-recognized indicators of need. The absence of a distinct formal budget line is not evidence of no impact; rather, it reflects the novel and widespread nature of the difficulty many districts face in tracking harms of student social media use that manifest in instructional time and staff workload.

## II.    Response to Expert Opinions

### A.    Response to Wildermuth

#### 1.    Response to Wildermuth Opinion 1: My Reliance on Sources of Harford-Specific Data is Well-Founded and Consistent with the Standards Employed in My Field

11. Dr. Wildermuth is wrong to assert that my strategic recommendations for Harford County Public Schools are unsupported because they rely primarily on interviews of key informants rather than quantitative data.[2] This assertion misrepresents both my methodology and the appropriate use of data in school mental health consultation.

12. Contrary to Dr. Wildermuth's claim, I reviewed and incorporated Harford-specific data in developing my recommendations.[3] This includes staffing ratios, mental health referral volumes, district initiatives, and the results of the School Mental Health Profile survey completed by district leadership. My interpretation of this data, and of its gaps, reinforces the need for a proactive, multi-tiered strategy to address the impacts of social media on student mental health, learning and the school environment.

13. It is standard practice in school mental health planning to supplement quantitative data with qualitative insights from school staff. In Harford, data on the mental health impacts of social media are limited in scope and not systematically collected. A lack of resources will often preclude school districts from collecting such specific data. While the district has made commendable investments in mental health services, and sought to study student mental health on several occasions in the past few years, the available data do not fully capture social media–caused challenges such as compulsive use, emotional dysregulation, peer conflict, or negative impacts on social emotional learning, and severe negative impacts on mental health. Nor are any standalone studies capable of showing trends over time.  All of these issues were raised consistently by Harford staff in interviews; to dispute these premises is to deny their first-hand experiences in the district.

14. Dr. Wildermuth references district-level indicators, such as graduation rates, behavioral incidents, and mental health service referrals, to argue that no intervention is warranted. As a preliminary matter, graduation rates are not the metric at issue. I am not asserting that social media has caused a drop in GPA or graduation rates; rather, I assert that social media platforms are disrupting student attention, classroom engagement, emotional

---

[2] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 6-10, ¶¶ 33-42).

[3] *See, e.g.*, Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, ¶¶ 40-41).

regulation, and interpersonal functioning, which are not necessarily captured in graduation statistics. In fact, students may graduate while still experiencing serious social-emotional distress and digital dysregulation. Moreover, these indicators do not measure the phenomena at issue. For example:

– Behavioral incident data in Harford do not differentiate between in-person and digital conflicts and likely underreport cyberbullying, rumor spreading, and group chat-fueled disruptions. This is reflective of the novelty of these metrics in the district and the need for resources to train staff on how to properly record these metrics.

– Referral counts reflect only formal requests for care, not the many students struggling silently or those receiving informal or preventive supports from overwhelmed staff.

15. Key informant interviews are a standard, valid source of ground-level insight.[4] My opinions are not based *only* on interviews, but these interviews are a critical, intentionally weighted component of my standard school mental health evaluation process. Particularly where the quantitative data systems currently used in Harford are still developing, this qualitative data from the teachers and administrators is valuable. In Harford, these interviews were conducted with selected district leaders and staff who possess deep knowledge of the district's service array, staffing capacity, and the day-to-day experiences and needs of students and educators. These interviewees also have first-hand knowledge of how these needs have changed as a result of the harms of social media use.

16. Conducting structured interviews with such key informants is standard practice in school mental health and public health research, particularly when assessing system capacity and emergent risk factors. Especially in the context of limited or lagging district data systems, key informants provide essential insight into emerging problems that may not yet be formally tracked. This approach is used consistently in every district for which I have been asked to develop a strategic plan for comprehensive school mental health improvement. Across dozens of school districts nationwide, I speak directly with district and school leaders, educators, and student support professionals to understand local strengths and identify service and infrastructure gaps in order to inform and support quality improvement. Harford informants' insights provided site-specific accounts of:

– Educators are increasingly managing student dysregulation, inattention, and conflict caused by social media use.

– Administrators described escalating classroom management challenges

17. These insights, which were consistent across informants and align with nationally reported data on social media harms, provided part of the foundation for my district-

---

[4] Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. *School Mental Health*, *1*(1), 26-36.

specific plan. In implementation science, such practice-based evidence is a necessary complement to traditional data sources.[5]

18. Consistent with the standard practices in my field, I do not attribute specific quotations to named individuals. This is intentional and standard practice in school consultation and qualitative research. Anonymity helps ensure candor and protects respondents from fear of potential repercussions, especially when they are discussing district challenges. In any event, I did provide the list of informants for each district, including Harford, upon defense counsel's request, and the names were therefore available for Defendants' experts to review. Still, Dr. Wildermuth refers to the interviewees as "unnamed" in an attempt to discredit my approach. As apparent from the list I submitted Harford interviewees included administrators and student support professionals, individuals with direct knowledge of social media impacts on Harford students' mental health and learning and district support service gaps. Wildermuth's repeated references to "unnamed" sources appears to imply methodological opacity or even deceit. In fact I consistently use this approach as my standard practice when working with school districts across the country and it reflects longstanding norms for psychological consultation in school systems, including practices used in federally-funded needs assessments, such as SAMHSA-funded district school mental health evaluations.

19. Notably, a core aspect of Dr. Wildermuth' criticism is that Harford does not collect comprehensive and systematic social media-specific data.[6] She criticizes my plan for not relying on data that she claims the district does not collect, while also failing to acknowledge that my recommendations include building the data infrastructure necessary to fill these gaps.

20. Harford has taken important first steps in mental health service expansion and community engagement. But its lack of a dedicated, districtwide comprehensive and holistic infrastructure for assessing and responding to social media- harms limits its ability to proactively identify and address these challenges. My plan recommends building that capacity through staffing, professional development, multi-tiered programming, and a strengthened data system.

21. Dr. Wildermuth also points to Wellness Needs Assessment Analysis, 2023-2024 School Year, Final Research Report[7] and suggests that I should have considered this document in my report.[8] As a preliminary matter, I did consider this document when crafting my

---

[5] Hoagwood, K. E., Atkins, M. S., & Ialongo, N. S. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. Administration and Policy in Mental Health and Mental Health Services Research, 40(6), 451-455.

[6] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 7-8, ¶ 36).

[7] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (p. 8, ¶ 38).

[8] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (p. 8, ¶ 38).

strategic plan for Harford.[9] In addition, in contrast to Dr. Wildermuth's statement that the Analysis found students have "developed largely positive social networks" and that they have "strong, positive relationships with family and friends," the report also shows that more than one in ten students in the district have issues with mental health, bolstering my opinions that there are substantial challenges in the district related to student mental health.[10]

22.     The Wellness Needs report also supports my opinion. It reports high levels of screen time, which includes social media use. "Over forty percent of student respondents indicate spending between *two hours and six hours* looking at a screen outside the school day. Nearly one-quarter of students report spending *more than six hours* outside the school day looking at screens (23%). Only 14 percent of students look at screens for *less than two hours* outside the school day."[11] It goes on to report that "more than half of the student respondents (57%) look at screens *30 minutes or fewer* prior to trying to fall asleep, with over one-quarter of these respondents reporting '*less than 10 minutes*.'"[12] The report notes this key finding as "many students frequently stay up past their designated bedtime and report high levels of screen time outside the school day, indicating potential areas for improvement in sleep habits and screen time management."[13] It is well-established that lack of sleep can impact mental health and well-being.

23.     In sum, my analysis of Harford is grounded in both quantitative data and qualitative data in the form of firsthand accounts from staff. It reflects a mixed-methods, implementation science-informed approach that balances what the district can measure now to meet unprecedented harms with what it urgently needs to monitor in the future. Suggesting that no action is needed simply because current datasets do not yet capture the full scope of the problem risks perpetuating harm.

   2. Response to Wildermuth Opinion 2: The Existence of Mental Health Resources and Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement Those Resources and Initiatives

24.     Dr. Wildermuth asserts that my proposed strategic plan for Harford County Public Schools fails to account for the district's existing Tier 1, Tier 2, and Tier 3 supports, and that many of my recommendations are duplicative or unnecessary.[14] But the additional resources and initiatives I recommend are additive to existing resources and initiatives,

---

[9] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[10] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[11] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[12] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[13] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[14] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 10-19, ¶¶ 43-67).

not contradictory. My strategic plan is additive and tailored and reflects public health frameworks that justify additive responses to new risk environments.[15]

25. I carefully reviewed the services and supports currently in place in Harford County, including those described in Dr. Wildermuth's rebuttal and those outlined in Harford's completed School Mental Health Profile and implementation planning documents. These include school-based mental health clinicians, wellness initiatives, digital citizenship efforts, and existing social-emotional learning (SEL) and bullying prevention programming. None of these existing services negate or reduce the need for the interventions I propose. Rather, they serve as a foundation on which the district must build to meet the emerging and intensifying challenges introduced by youth use of social media platforms.

26. The assertion that my recommendations ignore or duplicate existing programs misunderstands both their design and intent. My recommendations are additive and tailored to address harms that current efforts, many of which pre-date the escalation of social media–caused distress, were not designed to confront.[16] For example, many of the programs cited by Dr. Wildermuth (e.g., general wellness efforts, one-time digital awareness events, basic digital citizenship curricula) do not explicitly or systematically address the harms caused by:

   – Compulsive and dysregulated use of the social media platforms;

   – Sleep disruption and inattention tied to constant social media engagement;

   – Escalated peer conflict and cyberaggression initiated or amplified on social media.

27. Harford's current programming reflects sincere and meaningful efforts to promote student well-being. However, these initiatives are not currently tailored to the specific harms caused by social media. For example, while Harford has implemented digital literacy lessons and assemblies, these are often delivered in single sessions or focused on generalized internet safety rather than the distinct design of social media platforms. These well-intentioned, but under-implemented supports cannot properly address the harm caused by social media use among HCPS students. My plan builds on these efforts by introducing:

   – Sustained, developmentally tailored digital wellness instruction that addresses the harms of social media specifically;

   – Professional development for educators on identifying and responding to platform-caused student distress;

   – Leadership infrastructure to coordinate a districtwide response to social media harm;

---

[15] Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172.

[16] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, ¶¶ 40-41).

- Integration of Tier 2 and Tier 3 supports that explicitly track and respond to social media–caused mental health concerns.

Importantly, the interventions I recommend are not a generic expansion of student support. They are a strategic, systems-level response to externally imposed, social media-caused harms that have fundamentally changed student behavior, attention, and emotional regulation. The need for this social media-specific response is well-documented in both scientific literature and educator testimony, including interviews I conducted with Harford County personnel.[17]

28. My strategic plan does not propose dismantling or replacing existing services. Rather, it seeks to augment this existing services. For example:

- Harford's SEL programming provides an important starting point, but must be expanded to address the relational and emotional impacts of online comparison, cyberbullying, and social media-induced anxiety;

- Existing partnerships with mental health providers are valuable but must include training on digital mental health trends and tracking of social media–linked referrals;

- Digital citizenship content must be modernized to reflect the persuasive design and addictive nature of the most widely used platforms. To suggest that Harford does not need expanded programming because some baseline services are in place minimize the urgency and scope of the social media harms reported by district educators and observed nationwide.

### 3. Response to Wildermuth Opinion 3: Harford County's Prior Staffing and Resource Levels Do Not Dispel Need for Improvement

29. Dr. Wildermuth is wrong when she asserts that my staffing recommendations for Harford County Public Schools are excessive, infeasible, and insufficiently responsive to Harford's specific context.[18] Her critique conflates historical underinvestment in student support services with the assumption that significant improvement cannot be achieved. Moreover, that is precisely the point of this report; Harford has not been able to fully meet its students' needs with the ever-increasing proportion of its resources that it must dedicate to dealing with social media harms. The role of expert strategic planning exists to help districts build and implement better student support systems, which is a goal that every school should have the resources to undertake.

30. While I recommend common role types across districts (e.g., school counselors, social workers, digital wellness coordinators), the specific staffing levels I propose for Harford County are tailored to the district's enrollment size (approximately 37,000 students) and school configuration. Harford has fewer than half the school-employed mental health

---

[17] Twenge, J. M., & Campbell, W. K. (2019). Media use is linked to lower psychological well-being: Evidence from three datasets. *Psychiatric Quarterly*, *90*(2), 311-331.

[18] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 19-24, ¶¶ 68-78).

professionals recommended by national professional associations. My plan lays out a strategic staffing plan based on implementation science and public health precedent.

31. Dr. Wildermuth's critique overlooks the central premise of my plan: the existing workforce in Harford cannot address the new and externally imposed demands created by student social media use.[19]

These capacity limitations make it difficult for the district to fully meet existing student mental health needs in additional to the demands created by the growing impacts of social media use.

32. Dr. Wildermuth suggests that because Harford has historically had insufficient student support staffing, it cannot or should not pursue expansion of those supports now. But the fact that the district has not had the means to provide sufficient student mental health infrastructure does not mean it cannot or should not do so moving forward. This is especially so when the district is faced with a social media mental health crisis that was caused by external forces outside of its control. My recommendations reflect what is *needed now*, not what is *historically typical*. Public health responses must be responsive to emerging threats, not constrained by legacy systems.

33. Dr. Wildermuth also cites implementation concerns tied to Harford's history of "mismanagement."[20] My opinion focuses not on purported past administrative issues, but rather on how to resolve the issues Harford is facing today. It is inappropriate to suggest that a school district facing historical challenges is disqualified from receiving expert recommendations about how to become better. On the contrary, the implementation science literature strongly supports the importance of pairing ambitious reforms with structured technical assistance and monitoring, elements that I specifically built directly into my strategic plan.

34. Workforce shortages, both nationally and in Maryland, are not insurmountable merely because they exist right now. Lack of staffing can be due to numerous reasons other than a lack of qualified professionals. Critically, Dr. Wildermuth has not actually conducted any analysis to determine whether there are actual staffing shortages in Harford. The breath of student mental health needs has only grown with the external pressures cause by rampant social media use. A growing body of evidence supports effective strategies to recruit and retain school-based mental health personnel, including competitive compensation, professional development opportunities, supportive supervision, differentiated roles, and sustainable caseloads. While specific hiring, recruitment, and retention decisions may be tailored to district context, these nationally recommended staffing levels represent the full capacity needed to address the harms of social media. Moreover, as discussed in my general rebuttal report, contrary to claims that the proposed

---

[19] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, ¶ 41).

[20] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 22-24, ¶¶ 77-78).

staffing levels are unattainable, current data reflect a steady flow of qualified school mental health professionals entering the field.[21]

35. Dr. Wildermuth's suggestion that Harford's school counselors are already stretched thin and unable to fulfill their primary roles (e.g., due to coverage of non-counseling duties) is not an argument *against* staffing expansion. It is evidence *for* it. As in many districts, Harford's current staffing does not allow student support professionals to operate at the in an optimal way or address emerging harms. Adding targeted, trained personnel would:

   – Relieve overloaded existing staff;

   – Increase access to preventative and responsive mental health supports;

   – Enable more consistent fidelity to district MTSS practices.

   ### 4. Response to Wildermuth Opinion 4: Every School District Faces Unique Challenges, But These Do Not Reduce the Significant Harm Caused by Social Media

36. Dr. Wildermuth incorrectly asserts that my recommendations fail to account for the complex, multifaceted issues facing Harford County Public Schools, including community capacity, student engagement challenges, and past leadership decisions.[22] I understood and considered these issues when developing the Harford-specific strategic plan.

37. All school districts operate within layered and often constrained environments. Harford is not alone in facing economic disparities, community stressors, or historical fluctuations in leadership priorities. The district's current configuration and educator-reported needs were carefully considered as part of my planning process and are reflected throughout the proposed interventions.

38. My strategic plan is built on a foundational assumption: that new harms, such as those introduced by social media platforms, do not arise in isolation. Instead, they interact with and amplify existing stressors, including poverty and community violence. Social media–harms are therefore not only additive but new and exacerbating. Planning that ignores this intersection would be insufficient.

39. While I acknowledge that student mental health is influenced by a range of factors, the harms caused by social media use are distinct in origin and mechanism. These social media harms include:

   – Excessive and compulsive use driven by design features engineered for engagement;

   – Peer dynamics that heighten social comparison and cyberbullying;

   – Emotional volatility and classroom distraction linked to persistent social media use.

---

[21] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 13-14, ¶¶ 47-50).

[22] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools, (pp. 24-27, ¶¶ 79-88).

These unique dynamics interact with Harford's existing challenges to deepen student distress and disrupt learning environments. As such, a targeted, social media-specific response to these unique dynamics can be devised and is both warranted and urgent.

40. Dr. Wildermuth's suggestion that poverty or community capacity constraints should limit or delay implementation of these interventions, is misplaced as Harford is not a low socio-economic status district. Moreover, even if was, such constraints are why external investments and system-level planning are essential. Students in communities facing economic hardship are:

– More likely to lack access to mental health services outside school;

– More likely to engage with social media;

– More vulnerable to social media behaviors that intensify isolation and aggression.

41. The strategic plan I developed for Harford is explicitly designed to fill internal capacity gaps, especially where community infrastructure may be limited. It includes:

– Role-specific training for educators on how to recognize and respond to platform-driven distress;

– Life skills and digital wellness curricula that enhance student resilience and coping strategies;

– District-level leadership roles to ensure coordination, sustainability, and fidelity.

42. Student disengagement, absenteeism, and behavioral dysregulation are harms caused by social media and are therefore not only acknowledged in my plan, they are central targets for my intervention. Social media's impacts on sleep, attention, and social-emotional functioning are well-documented contributors to these challenges. My proposed interventions, including Tier 1 digital literacy and life skills programs and expanded Tier 2 and Tier 3 services, directly address these issues.

43. Dr. Wildermuth references Harford's past budgetary or administrative priorities to question the feasibility of implementation. I offer no opinion on the effectiveness of past governance decisions. However, I caution against using historical choices as a rationale to dismiss forward-looking planning. My recommendations introduce leadership roles, professional development, staffing, and evaluation designed to build institutional resilience and accountability, precisely what is needed when districts face shifting leadership or operational instability.

### 5. Response to Wildermuth Opinion 5: Strategic Plan for Harford Makes Appropriate Recommendations that Would be Effective and Feasible

44. As discussed above and in my May 16 and May 18 reports,[23] my strategic plan for Harford is properly grounded in scientific literature on youth mental health and school-based supports and my strategic plan is grounded in my expertise as a national leader in

---

[23] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025; Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025).

school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems. My strategic plan outlined in my initial report, appropriately proposes a 15-year, multi-tiered public health framework that is necessary to mitigate the substantial harms caused by students' use of social media platforms. For all of the reasons discussed above, none of Dr. Wildermuth's criticisms undermine the foundation and basis for my plan and her opinion that the strategic plan for Harford is unnecessary, unlikely to be effective, and/or, in some cases, infeasible is unsupported.

### B.    Response to Hutt

45.    Dr. Hutt's report for Harford County is substantively identical to his general report and those submitted for other bellwether districts, except for a small number of paragraphs where he references data specific to Harford County Public Schools. These district-specific claims do not reflect meaningfully engage with the context or analysis in my Harford County strategic plan and are based on cherry-picked observations that lack methodological rigor. Below, I summarize my general response to Dr. Hutt's core opinions and respond directly to the additional points he raises in the Harford County context.

### 1.    Summary of Response to Hutt Opinions 1-3

46.    As described in my July 30, 2025 general rebuttal report,[24] I offered the following responses to Dr. Hutt's general claims:

47.    On the charge of "educationalization":[25] My strategic plan is a public health response to a new, external harm, not an attempt to shift societal burdens onto schools. Schools have long adapted to emerging threats to student well-being and proper school functioning. The harms from social media platform use, including attention dysregulation, peer conflict, sleep disruption, and emotional distress, are discrete, observable challenges occurring during the school day and undermining the learning environment and school functioning. School systems are not being asked to "solve" social media; they are being equipped to respond to its impact on their school districts.

48.    On contextualizing achievement and behavioral trends:[26] I understand and considered that student mental health and academic engagement are shaped by multiple factors, including poverty, trauma, family functioning, and COVID-19. I considered and understood these issues and my strategic plan accounts for them. None of these challenges negate the significant role of social media, which constitutes a distinct and increasingly significant, challenge to the school environment and school functioning. My analysis reflects this broader context, as does the layered, multi-tiered approach I propose.

---

[24] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 34-41, ¶¶ 127-155).

[25] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 32-33, ¶ 70).

[26] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 80-84, ¶¶ 145-152).

49. On interpreting test scores and academic data:[27] Unlike Dr. Hutt, I do not rely on academic achievement scores as the primary indicator of social media harm. As explained in my general and district-specific reports, harms manifest in ways that are often under-documented in test scores, such as student dysregulation, classroom disruption, strained peer and adult relationships, and increased need for counseling and behavioral support.

### 2. Response to Harford County-Specific Claims in Hutt's Report

50. While most of Dr. Hutt's analysis does not relate to any particular district, he raises several points specific to Harford County in paragraphs 139-140, 146-150, and 167-168. Each is addressed below:

51. Dr. Hutt contends that shifts in HCPS' relatively favorable test scores, absenteeism, and graduation rates undermine the plausibility of social media–related harm, suggesting that other systemic factors, including accountability systems or cultural changes, are more likely explanations.[28] These claims lack empirical support and fail to engage meaningfully with the full range of harms caused by social media that I identify in my Harford-specific strategic plan.

52. Dr. Hutt attributes academic fluctuations in part to policy and system-level reforms but does not analyze or present data showing any causal link between such reforms and the student outcomes in question. He points to the general complexity of educational change without conducting any rigorous analysis of Harford's specific trends or how they may relate to shifts in student emotional regulation, sleep hygiene, peer interactions, or instructional engagement, social media-caused issues that were consistently highlighted by HCPS staff and administrators and are central to my report. In other words, his critiques have no bearing on Harford specifically.

53. Dr. Hutt cites HCPS's high graduation rate, rising from 80% in 2012 to 87% in 2021-22[29] as a reason to doubt that social media has significantly harmed students. However, graduation rates are a limited and insufficient proxy for student well-being or school climate. Students may graduate despite experiencing significant mental health distress, attention challenges, or school disengagement. These harms can and do occur beneath the surface of high-level outcome metrics like graduation. Harford educators reported growing difficulties with student focus, peer conflict, and behavioral volatility, none of which are captured by graduation data but all of which compromise classroom learning environments.

---

[27] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 73-85, ¶¶ 136-151).

[28] *See, e.g.*, 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 78-79, 95-96, ¶¶ 142, 167).

[29] *See, e.g.*, 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 82-83, ¶ 150).

54. Dr. Hutt further argues that the rise in chronic absenteeism, from 17% in 2019 to 24% in 2023, is too broad and complex to be linked to social media harms.[30] Yet he provides no analysis by grade band, device access, or social media use, nor does he offer any empirical data to support his suggestion that this trend is primarily the result of "cultural shift[s]." In contrast, my strategic plan is informed by interviews with HCPS personnel who explicitly described how persistent social media engagement has increased emotional volatility and interfered with classroom learning and school functioning. These observations are consistent with national research and directly implicate platform design features that encourage compulsive, round-the-clock engagement.

55. By overlooking staff-reported observations and failing to propose an alternative explanatory framework grounded in Harford's local data, Dr. Hutt misses the primary thrust of my analysis. My report does not rely on test scores or graduation rates as sole indicators of harm. Rather, it documents educator-reported experiences of:

   – Increased inattention and classroom disruption linked to social media use;

   – A surge in anxiety and emotional dysregulation tied to platform-based comparison and cyberconflict;

   – Escalated demands on school mental health staff who are stretched thin in responding to student crises amplified online.

   These harms are evident in qualitative and operational data from HCPS and are not captured by broad accountability metrics alone.

56. Dr. Hutt's Harford-specific critique falls short by relying on cherry-picked macro-level outcome data while disregarding the nuanced, daily challenges described by HCPS educators at detailed in my report. His suggestions of policy or cultural shifts as alternative explanations are unsubstantiated and fail to account for social media-specific harms. My strategic plan, by contrast, is rooted in the lived realities of HCPS educators and provides targeted, developmentally responsive, evidence-informed recommendations that directly address the ways in which social media has transformed the student experience and compromised school climate.

### 3.    Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods

57. Dr. Hutt's rebuttal does not reflect a strong grounding in the social science methods necessary for causal inference or implementation focused evaluation.[31] His analysis lacks the methodological rigor typically required in public health and implementation science, which limits the applicability of his critique to the type of strategic, systems-level planning at the core of my report.[32]

58. Specifically:

---

[30] *See, e.g.*, 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 95-96, ¶ 167).

[28] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 3-4, ¶¶ 13-15).

[32] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 2-3, ¶¶ 6-12).

- His approach relies primarily on visual inspection of raw data trends, without conducting statistical tests or accounting for confounding variables, yet he draws broad and definitive conclusions about causality and program relevance.[33]

- In the Harford context, he focuses on changes in 8th grade MCAP math proficiency from 2018 to 2023, suggesting this data is probative of whether social media has impacted learning. However, he provides no empirical rationale for selecting 8th grade math scores specifically, and he offers no evidence that these outcomes are the most sensitive or valid indicators of social media-caused disruption.[34]

- He suggests that students "could plausibly" be using social media by 8th grade, but provides no grade-level usage data or developmental rationale to support this assertion regarding a starting age. The choice appears to be driven more by data availability than conceptual relevance.[35]

- Dr. Hutt references the Return to Learn absenteeism estimates despite the creators' own warnings that (1) the data are inconsistent across states, and (2) the rates are generated by combining distinct and methodologically incompatible data sources.[36] Further, the data is reported only at the district level. As such, these estimates are inadequate to support the fine-grained claims he makes about Harford's school-specific outcomes or subgroup-level effects.[37]

59.    Ultimately, none of Dr. Hutt's analysis changes my opinioned which are grounded in:

- Over 25 years of experience in school mental health science, policy evaluation, and implementation framework;

- Review of publicly available and district-supplied Harford-specific data;

- Application of public health and multi-tiered systems of support (MTSS) frameworks tailored to the unique demands posed by social media-related harm;

- Triangulation of quantitative trends with qualitative data from Harford staff, peer-reviewed literature, and evidence from national surveys.

- Together, these elements provide a far more methodologically sound and contextually grounded basis for the recommendations I offer. Dr. Hutt's reliance on partial data

---

[33] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 86-87, ¶ 155).

[34] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 81-82, ¶¶ 148-149).

[35] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (p. 81, ¶ 147).

[36] *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods").

[37] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools, (pp. 95-96, ¶ 167).

and unsupported inferences does not meet the evidentiary standard required for district-level causal assessment or strategic planning.

### 4. Clarifying My Use of Evidence

60. Dr. Hutt mischaracterizes my analytic approach. My conclusions are not based on trends in test scores or academic performance metrics. Those are his chosen metrics, the use of which is not justified as described above. Instead, they are grounded in:

– Consistent educator reports of student dysregulation, inattention, and peer conflict across Harford schools;

– Observable behavioral shifts linked to increased student engagement with digital devices and social media platforms;

– Documented gaps in mental health staffing, disruptions to school function and climate, and the diversion of educator time and attention toward managing technology-related challenges, none of which are captured in standardized testing data.

The harms I identify are immediate and impactful in their own right. Whether or not certain academic achievement trends reflect these harms, they are clearly documented by staff and supported by national research.

### 5. Conclusion Regarding Dr. Hutt's Harford Opinions

61. Dr. Hutt's Harford County report is largely derivative of his general report and demonstrates limited engagement with Harford's specific context, student needs, or reported school-based challenges. His district-specific assertions rely on speculative interpretations of limited data and untested assumptions, offered without rigorous analysis or methodological transparency. In contrast, my recommendations are rooted in direct input from Harford educators, aligned with established public health and school mental health frameworks, and guided by implementation science. Harford County requires a response that addresses the real and documented challenges facing its students, not a generalized dismissal unsupported by meaningful local analysis.

### C. Response to Aguilar

### 1. General Response to Opinions 1–6

62. Dr. Aguilar's rebuttal for Harford County is identical to his general rebuttal report, with no reference to Harford County-specific evidence with the exception of *Exhibit A*. Therefore, I refer to my July 30, 2025, General Rebuttal Report,[38] in which I respond in detail to each of Dr. Aguilar's core opinions. My response to his general opinions are summarized as follows:

63. Opinion 1: While some regulated social media use may have limited educational uses, these uses are typically teacher-directed and scaffolded. My report does not dispute this; in fact, my strategic plan incorporates digital literacy training that helps students and staff distinguish helpful from harmful social media use. Indeed, the primary concern is not educator-directed social media use, but rather students' personal and pervasive use,

---

[38] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 41-45, ¶¶ 156-172).

which research and school personnel identify as a driver of attention and mental health problems and disrupted peer interactions and classroom environments.

64.    Opinions 2-3: The fact that civic engagement and peer connection may occur through social media in some contexts does not negate the substantial and growing body of evidence documenting increased mental health and learning problems tied to social media platforms. My report acknowledges that social media use is not monolithic. Yet, because of the significant harms caused by Defendants' platforms, a structured, district-wide approach is needed.

65.    Opinion 4: The fact that some educators use social media for professional development is neither relevant to, nor addresses the harms in this case. The existence of teacher learning networks on social media does not offset the harms that Defendants' social media platforms are causing to school districts, the school environment and school functioning.

66.    Opinion 5: My plan does not advocate blanket bans as the only approach. To the contrary, my plan promotes thoughtful use policies and enhanced educator training to address harms that stem from Defendants' social media platforms and social media use.

67.    Opinion 6: Dr. Aguilar critiques my comparison to tobacco control. As I have noted in my general rebuttal,[39] the comparison is not one of mechanism but of scale and public health response. I state clearly that my strategic plan is modeled on past public health challenges that required system-wide and sustained action, not because social media is identical to tobacco, but because the public health infrastructure needed to respond is similarly complex and underdeveloped. With respect to the critique that the 15-year plan lacks iteration, to the contrary, my plan is explicitly designed for staged rollout and iterative refinement.[40]

### 2.    Rebuttal to District-Specific Opinions in Exhibit A (Harford County)

68.    In *Exhibit A* of his report for Harford County, Dr. Aguilar presents three additional opinions (OP7-OP9) specific to the district. Each is addressed below:

69.    Opinion 7: That Harford County Public Schools (HCPS) has resources in place related to technology, including providing students with Chromebooks and internet access is not disputed. My report does not contend that HCPS lacks technology infrastructure. Rather, the harms I document stem from *personal use* of social media platforms by students, use that occurs outside of the structured, curriculum-aligned use of devices provided by the district. My report focused on the harms of widespread student use of social media platforms, including distracted students, disrupted classroom dynamics, and harm to school functioning and youth mental health, regardless of whether the device is district-issued or personal.

70.    Opinion 8: I do not dispute that Harford uses social media for school communication and promotion. It is appropriate, and commonplace, for school districts to maintain public-facing social media accounts for announcements, celebration of student success,

---

[39] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 21-25, ¶¶ 74-89).

[40] *See, e.g.*, Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 42-43, 47, ¶¶ 153, 171).

emergency notifications, and family engagement. However, the use of social media by HCPS staff for official communication should not be conflated with:

– Endorsement of student-level, unsupervised engagement with social media platforms;

– Mitigation of the school-based harms caused by compulsive platform use, cyberbullying, or emotional dysregulation.

My report does not recommend eliminating HCPS's institutional social media presence. Rather, it calls for comprehensive systems of mental health supports that help schools address the behavioral and emotional challenges stemming from student use of platforms designed to maximize engagement.

71.    Opinion 9: While HCPS has implemented various technology initiatives, including digital citizenship modules and educator training in technology use, these efforts are limited in scope and not sufficient to address the scale or complexity of harms caused by student social media use. As noted in my Harford strategic plan, the district's current efforts:

– Are fragmented and reactive due to resource constraints;

– Do not address the full range of harms, including compulsive use, sleep disruption, and emotional dysregulation;

– Lack the infrastructure, staffing, and professional development necessary for a comprehensive, multi-tiered public health response.

– Moreover, existing trainings and curriculum modules tend to focus on general digital literacy or responsible use, which, while valuable, are insufficient to mitigate the psychological and educational toll of students' constant social media use documented by educators and researchers.

### 3.    Conclusion Regarding Dr. Aguilar's Harford Opinions

72.    Dr. Aguilar's Harford-specific observations largely reiterate his general arguments and reflect only surface-level engagement with the district's needs and realities. His opinions:

– Do not contradict the core findings of my report;

– Do not acknowledge the behavioral health impacts of social media on Harford County's students;

– And do not offer a viable or evidence-informed plan for how the district can respond to these harms in a coordinated, sustainable, and developmentally appropriate way.

73.    In contrast, my recommendations:

– Are grounded in direct educator interviews and HCPS-specific data;

– Align with national public health and MTSS frameworks;

– Support, rather than replace, existing educational technology efforts;

– And offer a feasible and phased approach to building school capacity to meet the challenges caused by social media use.

18

### D.    Response to Lakdawalla

#### 1.    Lakdawalla Opinion 1

74. Dr. Lakdawalla asserts that my report, and the broader set of Plaintiff expert reports, fails to meet the standards of a "reliable economic analysis" because it does not independently establish each step in a causal chain from the "at-issue conduct" to the district-level harms alleged.[41] He suggests that my work must do the following:

- (a) demonstrate that the at-issue conduct increases adolescent usage of Defendants' platforms;

- (b) show that this increased usage causes measurable harm to adolescent mental health and behavior;

- (c) isolate that harm from other confounding factors; and

- (d) quantify how those effects translate into discrete and attributable burdens on school districts like Harford.[42]

75. While this framework might be appropriate in other fields, it mischaracterizes the purpose and scope of my work as a school mental health and implementation science expert. My role was not to perform an economic damages analysis, but rather:

- To synthesize existing evidence (including literature and empirical reports from other Plaintiff experts);

- To consider school- and district-level reports of impacts;

- And to design a strategic, evidence-informed plan to address the harms caused by social media platforms already observed and documented by school systems.

76. The economic quantification he demands is not part of my expertise or part of my recommendations in my Harford report.[43]

77.  Moreover, as discussed in my opening reports, I have opined, based on my experience as a psychologist with 25 years of experience in school mental health policy, research, training, and technical assistance, corroborated by the opinions offered in the expert reports of Drs. Twenge, Christakis, Mojtabai, Lembke, Goldfield, and Telzer, that there are numerous harms to the district associated with student social media use.[44]

---

[41] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 16, ¶ 41).

[42] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 44-45, ¶¶ 93-94).

[43] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025).

[44] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1-2, 6-21, ¶¶ 3-5, 30-84); Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 52-54).

19

78. As a national expert in school mental health and implementation science, my assignment was not to isolate causal variance through econometric modeling. Rather, I was retained to:

- Determine whether there are negative impacts from student social media use on the district;

- Assess school and district operations impacted by youth social media use;

- Review the relevant literature and expert findings on social media's effects;

- Integrate qualitative and quantitative evidence from educators and administrators;

- And develop a scalable strategic plan that addresses observed harms, promotes resilience, and builds sustainable capacity.

79. This is aligned with public health precedent. For example, in school-based asthma interventions, the causal pathways linking pollution to asthma exacerbations are established by epidemiologists, but the actual plans for nursing care, building ventilation, and parent education are developed by school health experts, as I have done here.[45]

80. Dr. Lakdawalla argues that I must isolate the effects of social media platform design from all other variables.[46] I acknowledge that multiple contributing factors affect student mental health. However, this does not mean the contribution of social media platforms is negligible or irrelevant; rather, social media is a significant factor. Nor does it preclude an urgent, systems-level response to mitigate the school-based impacts of social media platforms. In public health, causation is rarely singular, but that has never been the standard for actionable prevention.

81. Dr. Lakdawalla suggests that my failure to create a fully specified counterfactual ("but-for world") invalidates my plan. This again confuses economic damage quantification with implementation science planning. My recommendations are not based on counterfactual modeling, but on:

- Real-world observations from district staff and administrators;

- Emerging literature on digital behavior and mental health;

- Case studies of other public health responses;

- And a strategic prevention model designed to support Tier 1-3 school mental health capacity.

It is both appropriate in my field and standard for system response planning to begin with a synthesis of reported harms and public health indicators in this fashion, not wait for econometric or quasi-legal analysis of exclusive causality. It is equally appropriate to draw upon well-established recommendations grounded in comprehensive school mental

---

[45] Bryant-Stephens, T. (2009). Asthma disparities in urban environments. *Journal of Allergy and Clinical Immunology*, *123*(6), 1199-1206.

[46] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 22-24, ¶¶ 53-58).

health system planning, an approach that has been applied for decades across hundreds of districts and thousands of schools to guide effective and sustainable supports for student well-being and proper school functioning.

82. In Harford County specifically, I reviewed staffing documents and scientific literature, interviews with key informants from the school districts, and direct interactions with state and local education leaders. These stakeholders consistently described escalating emotional dysregulation and peer conflict; classroom attention problems linked to compulsive device use; and insufficient capacity to respond to social media-related mental health needs. It is neither speculative nor novel to respond to educator-observed patterns of harm, especially when those patterns align with national survey trends and platform design research.

83. Dr. Lakdawalla's Opinion 1 sets an inappropriate bar for my role as an implementation science and school mental health expert. My task was to assess need, review the evidence, and offer a research-informed, multi-tiered plan that reflects the lived experiences of schools facing the effects of social media platform use by their students. I stand by my recommendations as appropriate, proportionate, and urgently needed, based on a combination of cross-disciplinary evidence and frontline educator input.

### 2. Lakdawalla Opinion 2

84. Dr. Lakdawalla asserts that Plaintiffs' experts, including myself, have failed to demonstrate the causal impact of Defendants' specific conduct on adolescent mental health and school district harm, and that we offer only "correlational or anecdotal" evidence.[47] He critiques the absence of a modeled counterfactual world and raises alternate explanations, such as declines in television use and increased reporting rates for mental health symptoms.[48]

85. Once again, my role in this litigation is not to develop econometric estimates or simulate counterfactual worlds. Rather, as a national expert in school mental health and implementation science, I was tasked with:

  – Determining the impact of social media on the district;

  – Evaluating school-based impacts of adolescent social media use, particularly those reported by educators and documented in public data;

  – And developing a comprehensive, evidence-informed strategic plan to help Harford mitigate and manage these harms.

86. I reviewed and relied upon numerous peer-reviewed studies and the expert reports of Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary Goldfield, Ph.D., that address the causal links in question. These experts have extensively reviewed and

---

[47] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 5, ¶ 6).

[48] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 25-39, ¶¶ 62-83).

published on the causal relationship between social media use and adolescent mental health outcomes, including anxiety, depression, sleep disruption, and emotional dysregulation. These findings are consistent with real-world observations from school systems across the country, including those voiced by school leaders and staff in Harford County. The scientific literature includes a substantial body of evidence that meets or exceeds standards of plausibility, temporal association, dose-response relationship, and coherence with other known data, hallmarks of causal inference in public health. Based on this body of evidence, these experts' reports, and my own expertise, I concluded that there are numerous harms to school districts, including Harford, associated with student social media use.[49]

87.  Dr. Lakdawalla faults me and other Plaintiff experts for failing to construct a counterfactual world.[50] As previously stated in my response to Lakdawalla's Opinion 1, my assignment was to develop a strategic plan responsive to the real, observed harms that educators and mental health staff are already experiencing in the district. As discussed in my opening reports, schools, including the district, are not responding to abstract trends. Rather, among other things, they are responding to:

– Increasing student dysregulation, inattention, and conflict caused by social media use.

– Escalating classroom management challenges.

– Referral trends and caseload burdens related to social media distress and peer harassment via social media.[51]

My recommendation for a strategic plan to address these harms caused by social media relies not on anecdote, but on direct evidence from Harford bolstered by patterns that are consistent across educators, schools, and districts, and which converge with the broader evidence base discussed in peer reviewed literature and the expert reports of Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary Goldfield, Ph.D. This is a standard and appropriate method that I regularly use in my filed of implementation science and school-based systems planning.

---

[49] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1-2, 6-21, ¶¶ 3-5, 30-84); Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 52-54).

[50] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 25-39, ¶¶ 62-83).

[51] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1-2, 6-21, ¶¶ 3-5, 30-84); Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 52-54).

88.    Dr. Lakdawalla's assertion that increased social media use may have substituted for television use,[52] and that reporting rates for mental health issues have changed over time, reflects selective skepticism, not balanced scientific inquiry:

- Unlike passive television consumption, social media platforms are interactive and designed to maximize user engagement, features that are distinct from prior screen-time modalities and have transformed the classroom environment;[53]

- Increases in adolescent mental health concerns are evident not just in self-reported data but in hospital admissions for self-harm among adolescents which Dr. Twenge has linked to trends in social media,[54] which are far less likely to be explained by "greater willingness to report" alone and;

- Dismissing these harms due to uncertainty in measurement trends runs contrary to the precautionary principle of public health, which calls for timely intervention even in the face of incomplete information, especially when the risks of inaction are high as they are here.

89.    Harford educators are not reacting to trends in survey response rates. They are managing the daily consequences of widespread student dysregulation and distress: students arriving to school exhausted after late-night scrolling, peer conflicts initiated or escalated online, and classroom learning time diverted by the behavioral and emotional issues caused by social media use. These observations are echoed across schools in Harford and are consistent with national research.

90.    While Dr. Lakdawalla critiques my report for not quantifying Harford's financial losses using econometric tools,[55] I again emphasize that my charge was not to assess financial cost, it was to design a strategic plan to address harms already reported by educators and supported by peer reviewed academic literature and expert testimony. The plan I propose is based on observable gaps in Tier 1–3 mental health supports in the district; documented challenges related to student mental health and classroom learning; and, system-level prevention frameworks that have been used to address other large-scale youth health challenges (e.g., tobacco, obesity, trauma).[56]

91.    Implementation science does not wait for comprehensive quantitative data before acting, particularly when the harms are real, observable, and growing. My recommendations are grounded in Harford-specific needs, informed by educator experience, and supported by a

---

[52] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 5, ¶ 5).

[53] *E.g.*, 2025.05.16 Expert Report of Eva Telzer, Ph.D., at 86-87; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P.H., at 278-281.

[54] 2025.05.16 Expert Report of Jean M. Twenge, Ph.D., at 7, 14-22.

[55] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 44, 54-57, ¶¶ 93, 112, 116-118).

[56] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 32, ¶¶ 107-109).

national body of research and expert consensus. They are not speculative, they are proportionate and urgently needed.

### 3. Lakdawalla Opinion 3

92. Dr. Lakdawalla argues that national, state, and Harford County data do not support the theory that social media use has harmed students or school districts through increased behavioral issues, reduced academic performance, or greater staffing needs.[57] He concludes that available data are inconsistent with Plaintiffs' experts' conclusions. This critique reflects a narrow and incomplete interpretation of how school harms are experienced and documented.

93. Dr. Lakdawalla appears to assume that the only valid evidence of harm to school districts must take the form of quantifiable declines in test scores, elevated suspension or expulsion rates, or formal changes in staffing counts. These cherry-picked data points are similar to those espoused by Dr. Hutt; but, as explained in my prior responses above and my expert reports,[58] these are not the primary metrics I used to assess or describe the impact of social media on school functioning. Nor do I think that these metrics are the most relevant data points collected relative to the issues at hand. Rather, as is standard practice in my field, I focused on:

- Student mental health concerns that interfere with learning, even if not reflected in grades or test scores;

- Disruptions to classroom climate and educator workload, often managed informally and undocumented in discipline logs;

- Underreported and subclinical student distress, which educators and mental health professionals consistently identify as growing in frequency and severity.[59]

This approach is consistent with school mental health best practices, where decision-making is based on a combination of data, educator input, and implementation frameworks, not test scores alone.

94. As I detail in both my general and Harford-specific reports,[60] most schools, including Harford, lack comprehensive systems for tracking digital harms, such as time spent on social media during the school day, social media use contributing to distress, emotional dysregulation stemming from social media activity, or the reasons students are referred to

---

[57] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 44-57, ¶¶ 93-118).

[58] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (p. 5, ¶ 27).

[59] Green, J. G., McLaughlin, K. A., Alegría, M., Costello, E. J., Gruber, M. J., Hoagwood, K., ... & Kessler, R. C. (2013). School mental health resources and adolescent mental health service use. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(5), 501-510.

[60] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 3, 28, ¶¶ 9, 103); Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 2, 44, ¶¶ 6, 163).

counseling. When school counselors or teachers informally address these issues without formal referral or disciplinary action, they are often absent from district-level datasets, but not absent from reality. This is precisely why administrator and educator interviews are essential in understanding the scope of harm.

95.    In Harford County specifically, educators and administrators described:

   –   Significant increases in anxiety, attention difficulties, and emotional volatility among students;

   –   Frequent classroom disruptions related to social media conflict, distraction, and compulsion;

   –   A growing strain on school-based mental health providers and counselors;

   –   A widespread concern that social media is "consuming" students' time, energy, and emotional focus.

These reports align with national survey data, published literature, and other expert findings.[61] That some of these impacts are not reflected in large-scale datasets reveals a limitation of those datasets, none of which are directly correlated to the issue at hand, and is not representative of the underlying reality.

96.    Finally, on the critique related to not demonstrating a statistical relationship between Harford's administrative data and the at-issue conduct:[62] My charge was to develop a strategy based on observed needs and school mental health best practices consistent with standard practices in my field. The strategic plan I offer for Harford County reflects that mission and stands on solid scientific, experiential, and practical footing.

97.    Dr. Lakdawalla's Opinion 3 rests on a narrow reading of what constitutes evidence of harm and again misapplies economic standards to a public health and school systems planning task. While school district administrative data are one piece of the puzzle, they are insufficient on their own, and often incomplete, especially when assessing harms as complex and evolving as those introduced by widespread student use of social media platforms. My approach integrates multiple data sources, including educator interviews, implementation science frameworks, and the broader research literature, to offer an actionable response to harms that Harford is confronting daily.

### 4.    Lakdawalla Opinion 4

98.    In Opinion 4, Dr. Lakdawalla is wrong when he argues that my strategic plan is "overly broad," not tailored to the harms allegedly caused by Defendants' conduct, and duplicative of existing programs in Harford County. He further incorrectly contends that I have failed to justify the need for new programming or quantify the extent to which the

---

[61] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-19, ¶¶ 30-57, 63-76).

[62] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 57-84, ¶¶ 119-159).

proposed plan addresses incremental harms attributable specifically to Defendants' conduct.[63]

99.    As I have stated in prior responses (see rebuttals to Dr. Wildermuth at ¶¶ 11-41 above), my strategic plan is not a standalone damages calculation or narrow treatment protocol. It is an evidence-informed, system-level response to the substantial and well-documented harms that social media platform use has caused within school environments. My recommendations are consistent with the findings of other Plaintiff experts, who have demonstrated that the design and deployment of social media platforms have had a measurable negative effect on student mental health and learning.  These harms are being absorbed by school systems, including Harford County, through increased behavioral incidents, heightened student distress, disruptions in instruction, and the expenditure and redirection of staff time and resources.

100.    Dr. Lakdawalla suggests that my planning must isolate only those "incremental" harms caused by Defendants' conduct.[64] That is not how public health response or school-based prevention planning is conducted. When faced with an externally introduced, population-wide risk, schools and public agencies must develop system-level responses that are comprehensive, multi-tiered, and resilient. That is what my strategic plan offers.

101.    Dr. Lakdawalla also repeats a critique raised by other Defense experts: that my plan overlaps with current programming and fails to explain how it is additive rather than duplicative.[65]

102.    I refer the reader to my detailed response to Dr. Wildermuth's Opinion 2 at ¶¶ 21-25, where I explain that:

–    I explicitly reviewed Harford's current programs, including digital literacy education, partnerships with mental health providers, and targeted interventions at Tier 2;[66]

–    My plan does not call for duplicating or replacing these services, but rather expanding and enhancing them to meet new challenges introduced by social media-specific harms;[67]

–    For example, Harford's existing resources are not sufficiently staffed or structured to manage the volume, complexity, or urgency of issues now emerging from social media-related sleep disruption, compulsive platform use, peer harassment, or

---

[63] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 5-6, ¶¶ 8-9).

[64] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 84, ¶ 161).

[65] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 91-94, ¶¶ 179-186).

[66] *See* Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 18-19, ¶ 84).

[67] *See* Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 19-20, ¶¶ 86-88).

emotional volatility, issues that are distinct in nature and scale from those addressed by legacy mental health programs.

- Moreover, Harford's workforce and service infrastructure, as currently configured, are not adequate to address the full scale of need. My recommendations reflect carefully planned enhancements organized within a Multi-Tiered System of Supports (MTSS), ensuring that new programming builds on rather than replaces existing systems.[68]

103. Dr. Lakdawalla faults me for not quantifying the reach of current programs or the exact proportion of harm attributable to Defendants. But as an implementation science expert, this was not my assignment. I was retained to synthesize available evidence and develop a strategic plan to address the harms to Harford caused by Defendants' social media platforms based on my analysis of the district's needs and extensive experience in school mental health policy, research, training, and technical assistance. I used standard planning tools from my experience with from public health and school mental health to design a feasible and proportionate response. I did so in collaboration with known best practices for district-level systems development, not abstract economic modeling.

104. Dr. Lakdawalla's credentials do not include training or experience in child and adolescent mental health, school-based service delivery, or educational implementation science. It is therefore unclear on what basis he assesses the adequacy of existing district programs; the necessary scale or design of Tier 1-3 mental health supports; or the appropriateness of expanding school-based prevention efforts in response to platform-related harms. His critiques appear to stem from a misapplication of economic logic to a public health and education planning process, and from a lack of familiarity with how school systems implement multi-tiered mental health supports in practice.

### 5.    Lakdawalla Opinion 5

105. In Opinion 5, Dr. Lakdawalla incorrectly contends that the costs of my proposed strategic plan, as calculated by Dr. Leslie, are inflated, unsupported, and insufficiently justified in duration, staffing, and design. He also wrongly suggests that I fail to consider existing staff, alternative implementation strategies such as contractors, or the availability of other public funding sources.[69]

106. My role was not to estimate damages or calculate line-item costs, but to design an evidence-informed, scalable strategic plan aligned with school mental health best practices. That said, I strongly disagree with the suggestion that the design and duration of the plan are "unsupported."[70] My recommendations reflect decades of precedent in school systems reform and behavioral health, informed by my 25+ years of experience in

---

[68] *See* Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 18-19, ¶¶ 84-85).

[69] *See* 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 96-110, ¶¶ 187-222).

[70] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 97-100, ¶¶ 191-200).

building sustainable school mental health infrastructure across the country, using well-accepted methods common in my field.

107. My plan outlines a 15-year timeline for planning, implementation, evaluation, and sustainability. Dr. Lakdawalla critiques this duration and challenges my analogy to tobacco control efforts. It is important to note:

– The comparison to tobacco is not one of identical mechanism, but one of scale, complexity, and sustained exposure to an external harm;

– Tobacco control, childhood obesity, and other large-scale behavioral health efforts routinely require 10-20 year investments in education and system capacity building;

– Social media use, like tobacco use, involves persistent behavioral patterns shaped by external corporate design and incentives, requiring multi-tiered, intergenerational interventions to mitigate its impact.

This timeline is not arbitrary, it is based on the well-documented need for new workforce capacity, development and integration of Tier 1-3 supports, family and community partnership building, ongoing outcome evaluation and fidelity monitoring.

108. Dr. Lakdawalla incorrectly asserts that the costs of training are "double-count[ed]" in Dr. Leslie's economic modeling.[71] He fails to recognize that in school systems, professional development costs are often incurred in addition to salary and benefits, particularly when training occurs outside of regular contract hours; collective bargaining agreements or union rules require compensation for training time; substitute teachers must be hired to cover classes during in-service days; and/or external trainers, materials, or certifications are needed. As a result, it is not uncommon, or incorrect, for school districts to incur training expenses in addition to staff salaries and benefits, and any attempt to eliminate these costs as redundant ignores how school systems actually operate.

109. Dr. Lakdawalla argues that I ignored existing school-based mental health professionals when calculating staffing needs.[72] In fact, my Harford County report explicitly includes current staffing figures.[73] The suggestion that the district's current staffing is adequate ignores the new and additive burden caused by social media platforms. The proposed staff are not meant to replace existing professionals, but to fill capacity gaps and address new challenges stemming from platform-driven harms.

110. Dr. Lakdawalla critiques my plan for not recommending outside contractors.[74] I am knowledgeable about and experienced with contractor models, having led a national

---

[71] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 96, ¶¶ 187-189).

[72] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 103, ¶ 208).

[73] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, ¶¶ 40-41).

[74] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (p. 106, ¶ 214).

school mental health technical assistance center for over 15 years. Contractors may be appropriate in early stages of implementation, especially when internal staff are not yet available; however, long-term reliance on contractors is less cost-effective and less sustainable than building district-owned, embedded capacity. Contractors also vary in quality and continuity. My plan reflects best practices: initial capacity-building may include partnerships, but districts need their own staff to sustain effective, high-fidelity services.

111. Finally, Dr. Lakdawalla criticizes me for not accounting for existing federal, state, and local funding streams for mental health.[75] While I am familiar with many of these (e.g., ESSER, Medicaid, Title IV, state mental health block grants), these streams are not dedicated to mitigating social media–specific harms; are often short-term, competitive, or uncertain in duration; cannot reasonably be assumed to meet new funding responsibilities for harms caused by Defendants' platforms; and, are already being used to address a wide array of pre-existing needs. It would be inappropriate to assume that Harford should reallocate existing funds from these programs, intended for general student support that are already complicated to meet, to absorb new harms stemming from social media platform use.

### E.   Response to Smith

112. Dr. Smith's critiques are largely derivative of other defense experts' reports and repeat several flawed assumptions already addressed in my prior rebuttals to Drs. Wildermuth, Hutt, Lakdawalla, and Aguilar. I refer the reader to those sections for more detailed responses. Below, I respond to Dr. Smith's Harford-specific claims.

#### 1.   Smith Opinion 1

113. Dr. Smith's assertion that Harford's formal processes for budgeting and reporting disprove the existence of social media–related harms is flawed. His logic assumes that if social media harms were real, they would be explicitly and frequently named in district budget lines or policies. This argument misrepresents both the nature of school-based response and the practical realities of educational systems. Moreover, the negative impacts of social media may not always appear in formal budget documents or staffing charts, but they are consistently reported by district and school leaders and support professionals.[76]

114. Dr. Smith's assertions also appear to be based on cherry-picking documents that support his argument instead of considering all relevant Harford documents. For instance, as documented in Harford's own Crisis Preparedness Report (2022),[77] social media is explicitly referenced as a driver of school safety threats, student mental health concerns, and stakeholder demands for training and intervention. These statements, based on

---

[75] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools, (pp. 109-110, ¶¶ 219-222).

[76] Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121.

[77] HCPS_00188448.

stakeholder input, are evidence that the district recognized social media as an emergent concern, even if it has not yet been able to dedicate budget lines or stand-alone programs to address it.

115. Further, as noted in my initial Harford report, Harford's mental health budget nearly doubled between FY2018 and FY2024, growing from $4.19M to $7.01M and supporting 15 new positions.[78] These investments reflect a system under pressure that is striving to expand capacity to meet growing needs, including those related to students' use of social media. Even if these costs are not broken out by their individual costs in accounting systems, this does not mean that those costs are not increasingly borne by the district.

### 2. Smith Opinion 2

116. Dr. Smith repeats claims made by other Defendant experts that the evidence linking social media to youth mental health harms is inconclusive. However, he fails to address that there is substantial evidence both in academic literature and in the reports submitted by experts Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary Goldfield, Ph.D. in this case (on which I rely) demonstrating substantial harms associated with students' social media use.[79]

117. Dr. Smith's reliance on the National Academies of Sciences, Engineering, and Medicine (NASEM) report to claim a lack of conclusive evidence is both selective and misleading.[80] While the NASEM report refrains from declaring universal causality, it clearly identifies significant and growing concern about the negative impacts of social media on youth mental health—particularly in relation to excessive use  and the disproportionate effects on vulnerable populations.[81] Notably, the report calls for urgent public health action despite acknowledging some gaps in longitudinal evidence.[82] Dr. Smith mischaracterizes this caution as a dismissal of harm. More importantly, he fails to engage with the core concern raised by the NASEM authors and by my own report: that social media platform features are designed in ways that exacerbate compulsive use, social comparison, cyberbullying, and emotional dysregulation in young people. These design features are not accidental or incidental; they are intentional design choices that contribute directly to the school-based impacts I document. That the NASEM report

---

[78] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶ 31).

[79] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 1, 7-19, ¶¶ 4, 34-76).

[80] *See* 2025.07.11 Expert Report of Jack R. Smith, Ph.D. for Harford County Schools, (pp. 33-34, ¶¶ 125-127).

[81] *See* Committee on the Impact of Social Media on Adolescent Health, et al., pp. 95, 107-08, 201 (2024). Social Media and Adolescent Health. National Academies Press, nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health.

[82] *See* Committee on the Impact of Social Media on Adolescent Health, et al., pp. 155-68 (2024). Social Media and Adolescent Health. National Academies Press, nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health.

acknowledges the need for further study does not negate the extensive body of existing research, educator-reported effects, or public health precedent for proactive systems-level responses in the face of emerging behavioral health risks.

118.   Dr. Smith conflates two fundamentally distinct uses of social media in the school setting: structured, educator-directed educational applications and student-driven personal use. The fact that Harford County Public Schools may use social media platforms for official communication, community engagement, or instructional enrichment does not contradict or diminish the serious harms caused by students' unsupervised and compulsive personal use of these same platforms. Educator-directed use of social media is typically confined, purpose-driven, and embedded within a controlled pedagogical framework. In contrast, students' independent use of social media—often occurring during class time, transitions, or late at night—is driven by platform designs that, among other things, encourage compulsive engagement, constant checking, and social comparison, resulting in patterns of use that negatively and significantly impact students and schools. It is these personal uses by students that are associated with increased emotional dysregulation, peer conflict, attention fragmentation, and self-harm risk, as described extensively in my report and reflected in educator interviews from Harford. Dr. Smith's failure to distinguish between these two domains of use obscures the actual mechanisms of harm and misrepresents the scope and nature of the challenges HCPS faces. Leveraging social media in an educational context does not imply endorsement of its broader influence, nor does it mitigate the urgent need for system-level responses to its use by students and the harms to schools.

### 3.    Smith Opinion 3

119.   Dr. Smith suggests that longstanding challenges such as staffing mandates, inflation, and poverty negate or supersede the harms associated with student social media use. This presents a false choice. Harford's obligation to address multiple stressors does not diminish the significance of the distinct and growing harms caused by social media, which have been explicitly acknowledged in the district's own safety and preparedness documents, student handbooks, and stakeholder feedback.

120.   Dr. Smith repeatedly claims that social media is not a "significant problem" because it is not frequently named in budget justifications or public-facing documents. This assertion is not only unsupported but demonstrably false. Harford's Crisis Preparedness Report (2022) includes various references to social media threats, cyberbullying, and online content contributing to unsafe conditions and student distress (e.g., pages 6-11, 17, 29).[83]

121.   Critically, Dr. Smith appears to either not have access to or chose to ignore critical records disclosed with the Plaintiff Fact Sheet in this litigation and the deposition of Bernard Hennigan, Director of Student Support Services.[84] This raises serious questions about the completeness of his review and undermines his conclusions about the absence of documentation.

---

[83] HCPS_00188448.

[84] 30(b)(6) Deposition of Bernard Hennigan, (May 7, 2025).

122. Dr. Smith also confusingly points to the Wellness Needs Assessment Analysis, 2023-2024 School Year, Final Research Report[85] and suggests that I should have considered this document in my report.[86] As a preliminary matter, I did consider this document when crafting my strategic plan for Harford. Notably, as Smith himself points out, this report shows that 14% of respondents said they "ha[d] concerns regarding your experiences with mental health or emotional well-being."[87] Accordingly, this report shows that more than one in ten students in the district have issues with mental health only bolstering my opinions that there are substantial challenges in the district related to student mental health.

123. Dr. Smith also omits that this report also reports high levels of screen time, which includes social media use. "Over forty percent of student respondents indicate spending between *two hours and six hours* looking at a screen outside the school day. Nearly one-quarter of students report spending *more than six hours* outside the school day looking at screens (23%). Only 14 percent of students look at screens for *less than two hours* outside the school day."[88] It goes on to report that "more than half of the student respondents (57%) look at screens *30 minutes or fewer* prior to trying to fall asleep, with over one-quarter of these respondents reporting '*less than 10 minutes.*'"[89] The report notes this key finding as "many students frequently stay up past their designated bedtime and report high levels of screen time outside the school day, indicating potential areas for improvement in sleep habits and screen time management."[90]

### 4. Smith Opinion 4

124. Dr. Smith contends that I fail to demonstrate any connection between social media harms and school system expenditures. This assertion ignores both the structure and purpose of my report and the extensive evidence provided by Harford County Public Schools themselves.

125. Dr. Smith also ignores critical documentation in Harford's Crisis Preparedness Report (2022), which explicitly identifies social media misuse as a school safety threat and contributor to student mental distress. The report includes direct references to:

- "[T]hreatening or aggressive student behavior, social media misuse, and bullying" as top concerns expressed by students, staff, and families (p. 6).

- "Cyberbullying and social media usage/misuse" contributing to perceptions of unsafety (p. 7).

---

[85] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[86] 2025.07.11 Expert Report of Jack R. Smith, Ph.D. for Harford County Schools, (p. 79, ¶ 260).

[87] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[88] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[89] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

[90] CTRL_HCPS_SMV000014301 corresponds to HCPS_00027780.

– 47 documented incidents of "Social Media Threats of Violence to School Community" in the 2021-2022 school year (p. 29).

These harms prompted calls for parent and staff training, changes in emergency communication strategy, and expanded threat assessment procedures, all requiring time, personnel, and financial investment.

126. Dr. Smith's blanket dismissal of this evidence as irrelevant because it is not "explicitly labeled" as related to social media in budget line items or handbooks shows a misunderstanding of how schools operate. Schools rarely label expenditures by causal origin. Instead, staff time, interventions, and policies often span multiple behavioral health issues, including those caused by social media.

127. Dr. Smith's rejection of qualitative evidence, including interviews with Harford school leaders, as "anecdotal" is both inaccurate and inconsistent. Qualitative data are a foundational component of implementation science, community needs assessment, and public health planning. Dismissing these sources while relying on isolated policy documents, handbook quotes, and budget summary references, often absent context, is methodologically unsound.

### 5. Smith Opinion 5

128. Dr. Smith's critique mischaracterizes both the intent and the content of my strategic plan. He claims that I propose a "vast, costly bureaucracy focused on therapy work," that my recommendations are not specific to social media, and that my plan would disrupt Harford's educational mission.[91]

129. To the contrary, my recommendations for Harford County are consistent with nationally recognized models of Comprehensive School Mental Health Systems, as endorsed by the National Center for School Mental Health, the CDC, and SAMHSA. The plan is not therapy-focused; rather, it emphasizes a tiered continuum of supports, including schoolwide promotion of well-being (Tier 1), early intervention (Tier 2), and access to targeted clinical services (Tier 3). This is precisely the model recommended by public health experts to address widespread, platform-driven harms that present across an entire student body.

130. I do not claim that all of the proposed supports are currently absent from Harford's system. In fact, I note that Harford has implemented several foundational programs to support student mental health, including some that are directed towards social media related issues.[92] However, current efforts have not been comprehensive, and the district requires a holistic plan and funding necessary to execute the plan like the one I propose to address the new and evolving challenges posed by compulsive and disruptive patterns of social media use, digitally mediated peer conflict, and escalating student dysregulation

---

[91] 2025.07.11 Expert Report of Jack R. Smith, Ph.D. for Harford County Schools, (p. 83, ¶ 270).

[92] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (p. 11, ¶¶ 55-59).

caused by social media use, patterns that are clearly reflected in interviews with Harford's key informants.[93]

131. Dr. Smith's criticism of the 15-year timeline also reflects a fundamental misunderstanding of systems reform. Complex behavioral health challenges, like those posed by youth exposure to addictive technologies, require long-term investments in workforce and data infrastructure. The plan's duration allows for initial capacity building, systematic implementation, ongoing fidelity monitoring, and sustainability planning. This is consistent with timelines for prior public health efforts (e.g., tobacco control, school nutrition reform) and is not "unnecessary" or "inappropriate," as Dr. Smith contends.

132. Lastly, Dr. Smith argues that the use of mental health professionals is excessive, failing to acknowledge that Harford's current staffing levels already fall below national recommendations. His criticism that the plan fails to consider other causes of student distress (e.g., poverty, COVID) misses the point: schools like Harford are now contending with substantial harms caused by social media. The question is not whether social media is the only source of distress, but whether platform-caused harms are placing new, significant burdens on systems already stretched by historic challenges. The evidence shows that they are, and that those harms are sufficiently serious to require dedicated planning and response.

## III. Conclusion

133. The opinions and recommendations presented in this report reflect a comprehensive review of the district-specific rebuttal reports submitted by Defense experts Drs. Diana Wildermuth, Ethan Hutt, Stephen Aguilar, Darius Lakdawalla, and Jack Smith, as well as the unique needs, data, and lived experiences of Harford County Public Schools. Many of the defense expert critiques either misrepresent the scope and purpose of my report, overlook the day-to-day realities of school system operations, or fail to substantively engage with the direct evidence provided by Harford educators and mental health professionals.

134. Harford County, like many large and diverse school districts, is experiencing the new, significant and distinct harms as well as compounding harms of widespread student engagement with social media platforms. These consequences include increased student distress, attention disruption, digital peer conflict, disruptions to school functioning, harms to school climate and diversion of educator time and school resources. My recommendations are tailored to Harford County context and are designed to address these harms through sustainable, evidence-informed strategies that complement and extend the district's current efforts. The evidence clearly demonstrates that social media is a novel, pervasive, significant and external factor that is contributing to student dysregulation, peer conflict, attention problems, and increased strain on school personnel, function, and systems. My plan reflects the type of strategic, coordinated, and developmentally appropriate response that Harford County needs. Inaction or piecemeal

---

[93] Expert Report of Dr. Sharon A. Hoover, PhD for Board of Education Harford County dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 52-54).

efforts will not suffice. What is required is an aligned, sustainable plan to restore learning conditions and support student well-being in the face of an unprecedented external threat.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Sharon A. Hoover, Ph.D.

35

**Exhibit A**

**Additional Materials Considered**

Prior Opening Report dated May 18, 2025 and all documents cited therein, including Exhibit B.


**Harford Documents**

| Bates |
| --- |
| HCPS_00188448 |
| HCPS_00027780 (CTRL_HCPS_SMV000014301) |
| HCPS_00027805 (CTRL_HCPS_SMV000014302) |
| HCPS_00140592 (CTRL_HCPS_SMV000076478) |


**Articles and Studies**

| |
| --- |
| Bryant-Stephens, T. (2009). Asthma disparities in urban environments. *Journal of Allergy and Clinical Immunology*, *123*(6), 1199-1206. |
| *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods"). |
| Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. School Mental Health, 1(1), |
| Green, J. G., McLaughlin, K. A., Alegría, M., Costello, E. J., Gruber, M. J., Hoagwood, K., ... & Kessler, R. C. (2013). School mental health resources and adolescent mental health service use. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(5) |
| Hoagwood, K., Atkins, M., & Ialongo, N. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. *Administration and Policy in Mental Health and Mental Health Services Research*, *40*(6) |
| Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172. |
| Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121. |
| Twenge, J. M., & Campbell, W. K. (2019). Media use is linked to lower psychological well-being: Evidence from three datasets. *Psychiatric Quarterly*, *90*(2), 311-331. |


**Litigation Documents**

| |
| --- |
| 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D. |
| 2025.07.11 Expert Report of Dr. Stephen J. Aguilar, Ph.D. for Harford County Schools |
| 2025.07.11 Expert Report of Jack R. Smith, Ph.D. for Harford County Schools |
| 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Harford County Schools |
| 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Harford County Schools |

| |
|---|
| 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Harford County Schools |
| 2025.07.30 Rebuttal Report of Dimitri Christakis, M.D., M.P.H. |
| 2025.07.30 Rebuttal Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH |
| 2025.07.30 Rebuttal Report of Eva Telzer, Ph.D. |
| 2025.07.30 Rebuttal Report of Anna Lembke, M.D. |
| 2025.07.30 Rebuttal Report of Dr. Jean M. Twenge, Ph.D. |
| 2025.07.30 Rebuttal Report of Gary Goldfield, Ph.D. |
| 2025.05.19 Expert Report of Douglas L. Leslie, Ph.D. for Harford County Schools |
| 2025.06.20 Amended Expert Report of Douglas L. Leslie, Ph.D. for Harford County Schools |