**Exhibit 91**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Amended Rebuttal Report of

Dr. Sharon A. Hoover, PhD

for Irvington Public Schools

August 7, 2025

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**Table of Contents**

I.      Executive Summary of Expert Opinions ........................................................................... 1

II.     Response to Expert Opinions........................................................................................... 3

        A.      Response to Wildermuth.................................................................................... 3

                1.      Response to Wildermuth Opinion 1: My Reliance on Source of IPS-
                        Specific Data is Well-Founded and Consistent with Standard Employed
                        in my Field ............................................................................................... 3

                2.      Response to Wildermuth Opinion 2: The Existence of Mental Health
                        Resources and Initiatives Does Not Preclude Strategic Planning to
                        Enhance and Supplement Those Resources and Initiatives........................ 5

                3.      Response to Wildermuth Opinion 3: IPS's Prior Staffing and
                        Management of Funds Does Not Dispel Need for Improvement .............. 7

                4.      Response to Wildermuth Opinion 4: Every School District Faces Unique
                        Challenges, but These do not Reduce the Significant Harms Caused
                        by Social Media ....................................................................................... 8

                5.      Response to Wildermuth Opinion 5: My Strategic Plan for IPS
                        Makes Appropriate Recommendations that Would be Effective
                        and Feasible ............................................................................................. 9

        B.      Response to Hutt............................................................................................. 10

                1.      Summary of Response to Hutt Opinions 1-3 ........................................... 10

                2.      Response to IPS -Specific Claims in Hutt's Report................................. 11

                3.      Concerns Regarding Dr. Hutt's Analytical Qualifications
                        and Methods........................................................................................... 12

                4.      Clarifying My Use of Evidence ............................................................... 13

                5.      Conclusion Regarding Dr. Hutt's IPS Opinions..................................... 13

        C.      Response to Aguilar........................................................................................ 13

                1.      General Response to Opinions 1–6.......................................................... 13

                2.      Rebuttal to District-Specific Opinions in Exhibit A (IPS)....................... 14

                3.      Conclusion Regarding Dr. Aguilar's IPS Opinions:................................ 16

        D.      Response to Hyman ........................................................................................ 17

                1.      Hyman Opinion 1.................................................................................... 17

                2.      Hyman Opinion 2.................................................................................... 17

                3.      Hyman Opinion 3.................................................................................... 18

                4.      Hyman Opinion 4.................................................................................... 18

                5.      Hyman Opinion 5.................................................................................... 18

                6.      Hyman Opinion 6.................................................................................... 19

                7.      Hyman Opinion 7.................................................................................... 19

8.    Hyman Opinion 8 ........................................................................... 20

E.    **Response to Jennings** ........................................................................... 21

    1.    Jennings Opinion 1 ........................................................................... 21

    2.    Jennings Opinion 2 ........................................................................... 22

    3.    Jennings Opinion 3 ........................................................................... 22

    4.    Jennings Opinion 4 ........................................................................... 23

    5.    Jennings Opinion 5 ........................................................................... 23

    6.    Jennings Opinion 6 ........................................................................... 23

    7.    Jennings Opinion 7 ........................................................................... 24

    8.    Jennings Opinion 8 ........................................................................... 24

    9.    Jennings Opinion 9 ........................................................................... 24

    10.    Jennings Opinion 11 ........................................................................... 25

    11.    Jennings Rebuttal to Hoover General Report Opinion 2 ........................... 25

    12.    Jennings Rebuttal to Hoover General Report Opinion 3 ........................... 27

    13.    Jennings Rebuttal to Hoover IPS Report ........................................... 29

    14.    Jennings Rebuttal 1 to Hoover IPS Report ........................................... 30

    15.    Jennings Rebuttal 2 to Hoover IPS Report ........................................... 31

    16.    Jennings Rebuttal 3 to Hoover IPS Report ........................................... 33

    17.    Jennings Rebuttal 4 to Hoover IPS Report ........................................... 34

III.    Conclusion ........................................................................... 37

## I.    Executive Summary of Expert Opinions

1. The following opinions respond to rebuttal reports submitted by Dr. Diana Wildermuth, Dr. Ethan Hutt, Dr. Stephen Aguilar, Dr. Joshua Hyman, and Dr. Michael Jennings in the matter involving Irvington Public Schools (IPS). My opinions are grounded in structured interviews with IPS leadership and educators, review of district-specific documents and deposition testimony, and the broader research literature on youth mental health, implementation science, and school systems. I draw upon over 25 years of experience advising school districts on the design and delivery of comprehensive school mental health supports across a multi-tiered system of support (MTSS) framework.

2. **Opinion 1: Absence of formal documentation is not evidence of absence of harm.** As documented through structured interviews with and depositions of IPS administrators, educators, and principals, the impacts of student social media use are visible in disruptions of classrooms and school functioning, peer aggression, staff burnout, and diverted instructional time and resources. These harms are independently consequential and not meaningfully captured in aggregate metrics such as test scores or discipline dashboards. District leaders described a growing and urgent need for a systemic response to social media-related harms even if those harms are not explicitly named in budget lines or already-implemented strategic plans.

3. **Opinion 2: IPS's challenges are compounded by social media harms, not unrelated to them.** Any suggestion that IPS's struggles stem solely from longstanding socioeconomic factors such as poverty, absenteeism, and school violence is a false binary. IPS leaders and staff consistently reported that social media has both created distinct, significant harms as well as intensified other issues by exacerbating peer conflict, disrupting student sleep and focus, and diminishing positive social interactions. Social media does not replace traditional risk factors; it compounds them and causes additional, new harms. A strategic plan that addresses social media-related challenges complements, not distracts from, the district's broader equity mission.

4. **Opinion 3: Aggregate achievement and climate data do not negate educator-observed harms.** An absence of declining graduation rates and/or test scores does not mean that the harms I document cannot be real or significant. Any suggestion otherwise reflects a misunderstanding of school functioning. In fact, educators described how viral trends (e.g., "fake fights"), compulsive platform checking, and social media-fueled drama disrupted standardized testing environments, interfered with learning, and increased disciplinary incidents. These harms are not captured in longitudinal trend lines but are well known to IPS educators. A strategic public health response is warranted even in the presence of academic progress.

5. **Opinion 4: The proposed plan builds on, not duplicates, existing IPS programs.** While IPS has implemented valuable efforts related to digital literacy, counseling, and mental health, those programs were not designed to address the unique compulsive, psychological, and social harms created by social media platforms. IPS leaders report that current programming does not meet the scale or specificity of the social media-driven

1

challenges they are now facing. My recommendations augment existing supports with developmentally targeted strategies for safe and healthy digital engagement.

6. **Opinion 5: The MTSS-based plan I propose is feasible and tailored to IPS.**
My proposed 15-year plan is responsive to local needs and aligned with best practices in implementation science. It incorporates educator voice, builds on existing systems, and proposes staffing and training investments that are proportional to the scope of harm described by IPS staff.

7. **Opinion 6: Social media harms are distinct from general distraction or technology misuse.**
Unique, compulsive design features of social media platforms, which IPS educators describe as driving addictive patterns of use, compulsive posting, peer comparison, and sleep loss represent distinct harms different from previous student distractions. Administrators and student support staff described a shift from occasional distraction to persistent dysregulation. The emotional volatility and classroom distractions linked to social media use demand a strategic response that goes beyond device management or generic digital literacy.

8. **Opinion 7: The proposed staffing and PD investments are necessary, not excessive.**
My staffing and professional development recommendations are aligned with national benchmarks and address specific IPS-reported gaps, which need to be addressed to properly meet the challenges of social media. IPS's current student-to-mental health professional ratios fall far short of recommended levels. My recommendations are not intended to replace existing staff but to supplement them in response to the new, external challenge of students' social media platform use. Moreover, IPS leaders described a need for comprehensive training that directly addresses social media's psychological and behavioral impacts, training not currently available to their staff.

9. **Opinion 8: IPS already reallocates resources in response to social media-related disruptions.**
IPS educators reports describe how educator time and district capacity are diverted to address social media-related disruptions. From investigating social media conflicts to mitigating schoolwide viral challenges, IPS educators described a redirection of resources away from instruction and wellness promotion. Even if these reallocations are not formally budgeted, they are real and place strain on existing systems. The strategic plan I propose formalizes and supports this emerging work with appropriate staffing and training.

10. **Opinion 9: My report reflects both lived experience and emerging scientific consensus.**
There is substantial evidence to justify targeted investments related to social media harms. This includes the weight of emerging research as well as the consistent, credible reports from IPS educators who described lived experiences of student distraction and dysregulation, classroom dysfunction, and staff burnout caused by social media. These accounts are consistent with national research and reflect a convergence of observation, professional expertise, and growing scientific understanding. The recommendations in my plan are proportionate and evidence-informed.

**II.     Response to Expert Opinions**

    A.     Response to Wildermuth

        1.     Response to Wildermuth Opinion 1: My Reliance on Source of IPS-Specific Data is Well-Founded and Consistent with Standard Employed in my Field

11.    Dr. Wildermuth wrongly asserts that my recommendations for IPS are not data-driven and rely solely on characterizations from "anonymous informants," despite the district's documentation of school mental health needs and its clear acknowledgment of growing demands caused by student social media use. This mischaracterization overlooks both my methodology and the evidence base supporting my conclusions.

12.    Contrary to Dr. Wildermuth's claim, I did review IPS-specific data in forming my expert opinions. These included staffing and service data gathered through the School Mental Health Profile, internal documentation about student supports, professional development offerings, and descriptions of current programs and policies aimed at mitigating the harms of student social media use.[1] These documents consistently identify both increased need and resource limitations, patterns directly relevant to my recommendations.

13.    As outlined in my May 2025 IPS-specific report, the district has experienced a growing need for mental health services over the past decade, prompting the hiring of additional school-based professionals, the expansion of special education services, and the diversion of general education resources toward behavioral and emotional support.[2] These reallocations, documented by the district itself, reflect the cumulative burden posed by student engagement with social media platforms.

14.    My standard practice in district consultation includes reviewing available data alongside structured key informant interviews with educators, support staff, and administrators.[3] This mixed-methods approach is consistent with best practices in implementation science, particularly when data systems are not yet designed to capture emerging stressors like social media-related disruptions, dysregulation, and impacts on instruction and services. In IPS, existing student information systems do not systematically disaggregate incidents by root cause, making qualitative methods essential to identifying emerging trends.[4]

---

[1] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 5-12, ¶¶ 27, 30-54).

[2] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶ 30).

[3] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 5, ¶¶ 27-28).

[4] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 43-44).

15.    Key informant interviews are a standard, valid source of ground-level insight.[5] These interviews are a widely accepted and scientifically valid method for assessing district needs, particularly in contexts where formal data systems lag behind practice-based observations. This approach is used consistently in every district for which I have been asked to develop a strategic plan for comprehensive school mental health improvement. In my standard practice across dozens of school districts nationwide, I speak directly with district and school leaders, educators, and student support professionals to understand local strengths and identify service and infrastructure gaps in order to inform and support quality improvement. In IPS, I conducted interviews with several district personnel. These key informants' firsthand insights helped identify patterns of student dysregulation, staff burnout, peer conflict escalation, and sleep disruption, harms consistent with national data on social media's impact on child and adolescent functioning. These insights, which were consistent across informants and converge with national data on social media harms, provided part of the foundation for my district-specific plan. In implementation science, such practice-based evidence is a necessary complement to traditional data sources.[6]

16.    Dr. Wildermuth also cites a relatively low number of referrals to outside providers as evidence that student social media use is not generating school-based challenges.[7] However, IPS staff report that referrals are often constrained by provider shortages, insurance barriers, and family hesitance, not by a lack of need.[8] Additionally, many students present with subclinical concerns that nevertheless disrupt learning environments and require school-based response.

17.    Importantly, IPS has already implemented measures to mitigate social media-related disruption, including teacher training and curriculum adjustments to accommodate reduced attention spans.[9] These district-reported actions contradict Dr. Wildermuth's assertion that social media harms are absent or improving, they instead reflect recognition by school personnel that the harms are real, persistent, and requiring response.

18.    Consistent with the standard practices in my field, I do not attribute specific quotations to named individuals. This is intentional and standard practice in school consultation and qualitative research. Anonymity helps ensure candor and protects respondents from fear

---

[5] Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. *School Mental Health*, *1*(1), 26-36.

[6] Hoagwood, K. E., Atkins, M. S., & Ialongo, N. S. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. Administration and Policy in Mental Health and Mental Health Services Research, 40(6), 451-455.

[7] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (pp. 11-12, ¶¶ 50-52).

[8] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 11, ¶ 53).

[9] [9] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶ 31).

of potential repercussions, especially when they are discussing district challenges. In any event, I did provide the list of informants for each district upon defense counsel's request, including IPS, and the names were therefore available for Defendants' experts to review. Still, Defendants' experts refer to the interviewees as "unnamed" in an attempt to discredit my approach. As apparent from the list I submitted, IPS interviewees included administrators and student support professionals, individuals with direct knowledge of social media impacts on IPS students' mental health and learning and district support service gaps. Dr. Wildermuth's repeated references to "unnamed" sources appears to imply methodological opacity or even deceit. In fact, I consistently use this approach as my standard practice when working with school districts across the country and it reflects longstanding norms for psychological consultation in school systems, including practices used in federally-funded needs assessments, such as SAMHSA-funded school district mental health evaluations.[10]

19. Dr. Wildermuth's argument is internally inconsistent: she critiques the absence of quantitative local data to support my conclusions while simultaneously acknowledging the well-documented limitations of existing district data systems to capture the specific, novel harms posed by social media platforms.[11] Her reliance on graduation and academic performance trends as evidence of "improvement" ignores the different domains of functioning at issue in my report, including emotional regulation, peer relationships, school climate, and proper school functioning.

20. My recommendations explicitly call for building IPS's data infrastructure over the course of the 15-year strategic plan, enabling the district to better capture and respond to the harms associated with social media.[12] The plan includes phased development of interoperable data systems and continuous evaluation, ensuring future decisions are based on increasingly refined local evidence.[13]

> ### 2. Response to Wildermuth Opinion 2: The Existence of Mental Health Resources and Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement Those Resources and Initiatives

21. Dr. Wildermuth asserts that my proposed strategic plan for IPS duplicates existing programs and services without justification.[14] This misrepresents both my process and the purpose of my recommendations.

---

[10] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (p. 8, ¶ 38).

[11] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (pp. 6-7, ¶¶ 33, 35).

[12] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 39-42, ¶¶ 135-151).

[13] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 39-42, ¶¶ 135-151).

[14] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (p. 13, ¶ 53).

22.    I did review and consider IPS's existing resources and programming, including school-based mental health supports and staffing levels noted in both the district's documentation and Dr. Wildermuth's own report. These include hiring additional mental health professionals, staff training in Crisis Prevention Institute techniques, revised teaching plans to accommodate altered learning habits, and training teachers to recognize mental health symptoms.[15] I explicitly acknowledged these in my report and used them to inform my recommendations.

23.    These programs are commendable and form a vital foundation, but they were not designed to address the specific, emerging harms introduced by social media platforms. The strategic plan I propose is additive, not duplicative, and tailored and reflects public health frameworks that justify additive responses to new risk environments.[16] It identifies and targets gaps in current programming, such as the need for:

–    Expanded Tier 2 and Tier 3 mental health supports to meet increasing student distress;

–    Sustained and specific digital wellness curricula that go beyond existing digital literacy and general SEL;

–    Improved data infrastructure to track social media-related behavioral and emotional impacts;

–    Professional development that helps educators identify and respond to social media-induced dysregulation, sleep disruption, online peer aggression, and instruction disruptions.

24.    Dr. Wildermuth's criticism also overlooks the reality that IPS, like many districts, lacks the staffing capacity needed to absorb growing student support needs due to social media. Current ratios for school psychologists and social workers remain below recommended benchmarks, and informal supports, while meaningful, are strained under the weight of challenges introduced by social media.[17] My plan responds directly to these capacity limitations.

25.    It is neither accurate nor constructive to suggest that IPS's existing resources are sufficient to manage the scale and complexity of these harms. The need for additional investment is not a reflection of district failure, but of the significant external pressure social media platforms have placed on school systems. My recommendations are designed to enhance IPS's current efforts with scalable, developmentally appropriate, and evidence-informed supports tailored to the realities of today's student experience.

---

[15] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶¶ 30-31).

[16] Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172.

[17] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 6-9, ¶¶ 30-42).

### 3.    Response to Wildermuth Opinion 3: IPS's Prior Staffing and Management of Funds Does Not Dispel Need for Improvement

26.    Dr. Wildermuth wrongly asserts that my recommendation for IPS to expand its student support workforce is infeasible due to workforce shortages and the district's past management and funding choices.[18] She claims that these factors prevent successful implementation of the proposed strategic plan and further contends that I fail to offer solutions to these challenges. These claims reflect a misunderstanding of both my role and the design of the plan I propose.

27.    While workforce shortages are a reality across many school districts, including IPS, they do not eliminate the need for investment, they make it more urgent. Critically, Dr. Wildermuth has not actually conducted any analysis to determine whether there are actual staffing shortages in IPS. The social media-related harms facing students today demand a strategic, multi-year response to build workforce capacity. History has shown that districts can and do respond to rising health and mental health needs, such as during the COVID-19 pandemic or in response to increases in suicide risk, by expanding training pipelines, investing in role specialization, and partnering with higher education institutions. The presence of staffing challenges should be met with investment, not retreat. My role is not to budget based on current constraints, but to provide an evidence-informed benchmark for the staffing levels necessary to meet the scale and specificity of social media-related student distress.

28.    IPS's current staffing falls short of best-practice national benchmarks. While the district maintains some in-house counseling capacity and contracts with external mental health providers, it does not meet recommended student-to-staff ratios for key roles such as school psychologists and social workers.[19] As noted in my report, this limited capacity has contributed to fragmented service delivery and insufficient internal capacity to respond to school-based social media harms.[20] My recommendations are tailored to IPS's size, student population, and current resource levels, and are intended to build layered supports over time.

29.    The staff I recommend are not intended to replace existing personnel. They are additive, designed to address gaps in core infrastructure and to provide specialized expertise in digital wellness, social media-related mental health concerns, and social media-driven peer conflict.[21] These roles include:

---

[18] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (pp. 23-28, ¶¶ 79-91).

[19] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 7-9, ¶¶ 35, 40-42).

[20] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 18-19, ¶ 78).

[21] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 18-19, ¶¶ 77-78).

7

- Professionals trained to recognize and respond to compulsive social media use, self-comparison, and online identity disruption;

- Coordinators of digital wellness responsible for aligning schoolwide practices with healthy technology use;

- Family and community engagement specialists to improve parent-school partnerships around social media monitoring and guidance.

30. Dr. Wildermuth contends that workforce shortages render these recommendations unrealistic. However, her own report acknowledges that certain roles in IPS have gone unfilled or are inconsistently used, and that existing staff are diverted to other tasks.[22] This reflects resource constraints. Rather than normalize these constraints, my plan seeks to interrupt the cycle through sustained investment in recruitment, training, and support structures so that social media harms can be adequately addressed.

31. Workforce shortages, both nationally and in New Jersey, are not insurmountable. This often reflects funding constraints rather than a lack of qualified professionals. A growing body of evidence supports effective strategies to recruit and retain school-based mental health personnel, including competitive compensation, professional development opportunities, supportive supervision, differentiated roles, and sustainable caseloads. While specific hiring, recruitment, and retention decisions may be tailored to district context, the recommended staffing levels represent the full capacity needed to address the harms of social media. Moreover, as discussed in my general rebuttal report, contrary to claims that the proposed staffing levels are unattainable, current data reflect a steady flow of qualified school mental health professionals entering the field.[23]

32. Additionally, role dilution, where counselors or other mental health professionals are tasked with administrative or supervisory duties, reflects systemic understaffing, not excess capacity. My recommendations are explicitly designed to ensure that existing professionals can focus on their core responsibilities while new hires address unmet and emerging needs related to social media harms. The staffing recommendations I make for IPS are realistic and proportionate to respond to the challenges of widespread student engagement with social media platforms.

    4.    Response to Wildermuth Opinion 4: Every School District Faces Unique Challenges, but These do not Reduce the Significant Harms Caused by Social Media

33. Dr. Wildermuth wrongly asserts that my proposed strategic plan for IPS fails to consider longstanding challenges facing the district, such as poverty, community violence, and systemic barriers to service access, and that, by focusing on social media harms, the plan risks diverting resources from more pressing concerns.[24] This is a fundamental

---

[22] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (pp. 26-27, ¶ 89).

[23] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 13-14, ¶¶ 47-50).

[24] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools, (pp. 28-29, ¶¶ 92-96).

mischaracterization of both the scope of my recommendations and the nature of the harms.

34. First, my plan was developed with full awareness of the complex ecological context in which IPS students live and learn. I understood and considered that IPS is a high-needs district facing a dense concentration of risk factors that disproportionately affect children and youth, including socioeconomic stress, exposure to community violence, family disruption, and barriers to health care access. These conditions are not dismissed or neglected in my plan, I considered and understood these challenges.

35. Dr. Wildermuth's claim that social media-related harms are less significant or "less documented" than other challenges IPS faces is misleading. While IPS's data systems do not disaggregate social media-related incidents, that absence reflects a lack of infrastructure, not a lack of impact. As I note in my report, IPS educators described sharp increases in student attention difficulties, classroom conflict, anxiety, peer aggression, and social withdrawal, patterns they directly associate with student social media use.[25] These observations are consistent with national data and with themes reported by other districts across the country.

36. It is partly because IPS students face such compounded vulnerabilities that a system-level response to social media harms is warranted. Social media does not replace existing adversity; it magnifies it. The design features of today's platforms intensify the emotional dysregulation and academic disengagement that many IPS students already struggle to manage.

37. Dr. Wildermuth's suggestion that my plan draws resources away from broader district priorities reflects a false dichotomy. My recommendations are designed to be integrated with existing frameworks such as Multi-Tiered Systems of Support (MTSS and student support team structures. I do not call for a siloed or one-dimensional response, but rather a coordinated expansion of services that respond to today's unique drivers of distress, chief among them, the immersive nature of social media platforms.

38. Finally, Dr. Wildermuth mischaracterizes my plan as inattentive to fidelity and feasibility. As I make clear throughout my report, my approach follows public health implementation science principles and is explicitly designed to be grounded in real-world school operations. The goal is not to replace IPS's current efforts, but to build capacity for targeted, sustainable interventions that meet the scope and urgency of the current challenge.

   5.   Response to Wildermuth Opinion 5: My Strategic Plan for IPS Makes Appropriate Recommendations that Would be Effective and Feasible

39. As discussed above and in my May 16 and May 18 reports,[26] my strategic plan for IPS is properly grounded in scientific literature on youth mental health and school-based

---

[25] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 6, 9-10, ¶¶ 30, 45-50).

[26] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025; Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025).

supports and is based on my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems. My strategic plan outlined in my initial report, appropriately proposes a 15-year, multi-tiered public health framework that is necessary to address the substantial harms caused by students' use of social media platforms. For all of the reasons discussed above, none of Dr. Wildermuth's criticisms undermine the foundation and basis for my plan and her opinion that the strategic plan for IPS is unnecessary, unlikely to be effective, and/or, in some cases, infeasible is unsupported.

### B. Response to Hutt

40. Dr. Hutt's report for IPS is substantively identical to his general report and those submitted for other bellwether districts, except for a small number of paragraphs where he references data specific to IPS.[27] These district-specific claims do not meaningfully engage with the context or analysis in my IPS strategic plan and are based on cherry-picked observations that lack methodological rigor. Below, I summarize my general response to Dr. Hutt's core opinions and respond directly to the additional points he raises in the IPS context.

#### 1. Summary of Response to Hutt Opinions 1-3

41. As described in my June 30, 2025 general rebuttal report,[28] I offered the following responses to Dr. Hutt's general claims:

42. On the charge of "educationalization":[29] My strategic plan is a public health response to a new, external harm, not an attempt to shift societal burdens onto schools. Schools have long adapted to emerging threats to student well-being and proper school functioning. The harms from social media platform use, including attention dysregulation, peer conflict, sleep disruption, and emotional distress, are discrete, observable challenges occurring during the school day and undermining the learning environment and school functioning. School systems are not being asked to "solve" social media; they are being equipped to respond to its impact on their school districts.

43. On contextualizing achievement and behavioral trends:[30] I fully understand and considered that student mental health and academic engagement are shaped by multiple factors, including poverty, trauma, family functioning, and COVID-19. I considered and understood these issues and my strategic plan accounts for them. None of these challenges negate the significant role of social media, which constitutes a distinct and increasingly dominant challenge to the school environment and school functioning. My analysis reflects this broader context, as does the layered, multi-tiered approach I propose.

---

[27] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Irvington Public Schools, (pp. 75-77, 81, 94-96, ¶¶ 139-140, 146, 163-164).

[28] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 34-41, ¶¶ 127-155).

[29] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 32, ¶ 70).

[30] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 80-83, ¶¶ 145-148).

44.    On interpreting test scores and academic data:[31] Unlike Dr. Hutt, I do not rely on academic achievement scores as the primary indicator of social media harm. As explained in my general and district-specific reports, harms manifest in ways that are often under-documented in test scores, such as student dysregulation, classroom disruption, strained peer and adult relationships, and increased need for counseling and behavioral support.

### 2.    Response to IPS -Specific Claims in Hutt's Report

45.    While much of Dr. Hutt's report is general in nature, some of his claims relate specifically to IPS. Each is addressed below:

46.    My analysis does not attribute IPS's academic struggles *solely* to social media, nor does it require a wholesale decline in academic performance to warrant intervention. Instead, my conclusions draw from educator and administrator accounts of deteriorating classroom climate, student attention dysregulation, escalating peer conflict, and increasing emotional distress, all of which have been linked by national research and local informants to students' compulsive and emotionally fraught use of social media platforms.[32] These harms frequently manifest as subclinical disruptions that are not captured by traditional academic indicators such as proficiency scores or graduation rates.

47.    Dr. Hutt references modest gains in IPS's graduation rate as evidence that social media has not impaired student outcomes. However, graduation and testing data are blunt instruments for detecting shifts in student well-being. Students can meet basic academic benchmarks while suffering from significant emotional dysregulation, sleep disruption, online harassment, or diminished executive functioning, issues repeatedly flagged by IPS educators and staff. These internal burdens not only affect students' current learning experience but also pose risks to their long-term mental health and postsecondary functioning. Moreover, the gains in graduation and assessment outcomes reflect the dedication and hard work of IPS's educators, not the absence of harm.

48.    With respect to chronic absenteeism, Dr. Hutt highlights a slight improvement in overall attendance rates over time.[33] Yet attendance averages do not reflect in-school disengagement, nor do they capture the grade-level or subgroup variation necessary to assess the nuanced impact of social media use. Educators in IPS describe students being physically present but cognitively and emotionally withdrawn, often due to overnight platform use, online conflict spillover, or constant preoccupation with social media.[34] These are disruptions to instructional time, even if they do not show up in traditional absenteeism metrics.

---

[31] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 73-84, ¶¶ 136-151).

[32] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 9-10, ¶¶ 45-50).

[33] 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Irvington Public Schools, (pp. 94-95, ¶¶ 163-164).

[34] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46, 48, 50).

49.	Finally, Dr. Hutt's criticism overlooks the fact that IPS lacks disaggregated, real-time data systems to track social media–related incidents or their effects on academic and emotional functioning.[35] The absence of granular data on social media harm does not confirm the absence of harm; it underscores a core rationale for my recommendations. My plan calls for building the district's capacity to detect and respond to these harms, through staffing, ongoing professional development, data-informed decision making, and iterative evaluation.[36]

### 3.	Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods

50.	Dr. Hutt's rebuttal does not reflect a strong grounding in the social science methods necessary for causal inference or implementation focused evaluation.[37] His analysis lacks the methodological rigor typically required in public health and implementation science, which limits the applicability of his critique to the type of strategic, systems-level planning at the core of my report.[38] Specifically:

-	His "analysis" consists of plotting raw data on a line chart and visually interpreting trends.

-	He conducts no statistical testing or control for confounding variables, yet draws sweeping conclusions.

-	Dr. Hutt references the Return to Learn absenteeism estimates despite the creators' own warnings that (1) the data are inconsistent across states, and (2) the rates are generated by combining distinct and methodologically incompatible data sources.[39] Further, the data is reported only at the district level. As such, these estimates are inadequate to support the fine-grained claims he makes about IPS school-specific outcomes or subgroup-level effects.

51.	Ultimately, none of Dr. Hutt's analysis changes my opinions, which are grounded in:

-	Over 25 years of experience in school mental health, prevention science, policy evaluation, and implementation frameworks;

-	Review of publicly available and district-supplied IPS-specific data;

-	Direct interviews with school personnel familiar with local trends;

-	Established public health and MTSS frameworks;

---

[35] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 9, ¶¶ 43-44).

[36] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 39-42, ¶¶ 135-151).

[37] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 3-4, ¶¶ 13-15).

[38] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 2-3, ¶¶ 6-12).

[39] *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods").

- Triangulation of quantitative trends with qualitative data from IPS staff, peer-reviewed literature, and evidence from national surveys;

- Together, these elements provide a far more methodologically sound and contextually grounded basis for the recommendations I offer. Dr. Hutt's reliance on partial data and unsupported inferences does not meet the evidentiary standard required for district-level causal assessment or strategic planning.

### 4. Clarifying My Use of Evidence

52. Dr. Hutt mischaracterizes my analytic approach. My conclusions are not based on trends in test scores or academic performance metrics. Those are his chosen metrics, the use of which is not justified as described above. Instead, they are grounded in:

- Consistent educator reports of student dysregulation, inattention, and peer conflict across IPS schools;

- Observable behavioral shifts linked to increased student engagement with digital devices and social media platforms;

- Documented gaps in mental health staffing, disruptions to school function and climate, and the diversion of educator time and attention toward managing technology-related challenges, none of which are captured in standardized testing data.

The harms I identify are immediate and impactful in their own right. Whether or not certain academic achievement trends reflect these harms, they are clearly documented by staff and supported by national research.

### 5. Conclusion Regarding Dr. Hutt's IPS Opinions

53. Dr. Hutt's IPS report is largely derivative of his general report and demonstrates limited engagement with IPS's specific context, student needs, or reported school-based challenges. His district-specific assertions rely on speculative interpretations of limited data and untested assumptions, offered without rigorous analysis or methodological transparency. In contrast, my recommendations are rooted in direct input from IPS administrators and student support professionals, aligned with established public health and school mental health frameworks, and guided by implementation science. IPS requires a response that addresses the real and documented challenges facing its students, not a generalized dismissal unsupported by meaningful local analysis.

### C. Response to Aguilar

#### 1. General Response to Opinions 1–6

54. Dr. Aguilar's rebuttal for IPS is identical to his general rebuttal report, with no reference to IPS-specific evidence with the exception of *Exhibit A*. Therefore, I refer to my July 30, 2025, General Rebuttal Report,[40] in which I respond in detail to each of Dr. Aguilar's core opinions. My response to his general opinions are summarized as follows:

---

[40] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 41-45, ¶¶ 156-172).

55. Opinion 1: While some regulated social media use may have limited educational uses, these uses are typically teacher-directed and scaffolded. My report does not dispute this; in fact, my strategic plan incorporates digital literacy training that helps students and staff distinguish helpful from harmful social media use. Indeed, the primary concern is not educator-directed social media use, but rather students' personal and pervasive use, which research and school personnel identify as a driver of attention and mental health problems and disrupted peer interactions and classroom environments.

56. Opinion 2–3: The fact that civic engagement and peer connection may occur through social media in some contexts does not negate the substantial and growing body of evidence documenting increased mental health and learning problems caused by social media platforms. My report acknowledges that social media use is not monolithic. Yet, because of the significant harms caused by Defendants' platforms, a structured, district wide approach is needed.

57. Opinion 4: The fact that some educators use social media for professional development is neither relevant to, nor addresses the harms in this case. The existence of teacher learning networks on social media does not offset the harms that Defendants' social media platforms are causing to school districts, the school environment and school functioning.

58. Opinion 5: My plan does not advocate blanket bans as the only approach. To the contrary, my plan promotes thoughtful use policies and enhanced educator training to address harms that stem from Defendants' social media platforms and social media use.

59. Opinion 6: Dr. Aguilar critiques my comparison to tobacco control. As I have noted in my general rebuttal,[41] the comparison is not one of mechanism but of scale and public health response. I state clearly that my strategic plan is modeled on past public health challenges that required system-wide and sustained action, not because social media is identical to tobacco, but because the public health infrastructure needed to respond is similarly complex and underdeveloped. With respect to the critique that the 15-year plan lacks iteration, to the contrary, my plan is explicitly designed for staged rollout and iterative refinement.

### 2. Rebuttal to District-Specific Opinions in Exhibit A (IPS)

60. In *Exhibit A* of his report for IPS, Dr. Aguilar presents three additional opinions (OP7-OP9) specific to the district. Each is addressed below:

**Opinion 7:** Dr. Aguilar proffers that IPS policies and goals, consistent with New Jersey State Standards, reflect a commitment to using technology, including social media.[42] He also points out that IPS's 2022-2027 Technology Plan ["the Plan"], calls out a variety of technology platforms, including social media.[43] These facts are not in dispute. In fact, Dr. Aguilar misses the point entirely. My report documents that the harms stemming from

---

[41] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 21-25, ¶¶ 74-89).

[42] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (pp. 47-48, ¶¶ 3-6).

[43] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (p. 48, ¶ 5).

students' personal use of social media platforms occur despite IPS's adherence to, and expansion upon, the integration of state-mandated technology curricula.

61.    Indeed, the Plan, as Dr. Aguilar highlights, specifically references the District's desire to "[p]rovide training sessions to all interested teachers in district policies and safe use of social media."[44] Additionally, the Plan outlines IPS's goal of "Provid[ing] Instruction on safety and ethical issues and information literacy skills" as it relates to the "use of social media."[45] Yet, IPS's expansion upon State requirements has not sufficiently mitigated the harms stemming from students' personal use of social media platforms.

62.    As I noted in my IPS-specific report:

> Existing staffing and programming at Irvington Public Schools are insufficient to address the complex impacts of social media on students' mental health, learning, and the school environment. A comprehensive and sustainable plan requires new, dedicated staffing and professional development to ensure high-quality, consistent implementation and to avoid further strain on core educational and mental health efforts. Without these investments, Irvington Public Schools risks perpetuating ineffective approaches and sustained challenges to their mission to provide a safe, supportive learning and school environment.[46]

Thus, the fact that IPS expands upon New Jersey State Standards in its efforts to educate students about safe internet use, including social media, is immaterial to the opinions in my report, which focus on the public health impacts of social media platform use among students and the consequences for schools.

63.    **Opinion 8:** Dr. Aguilar notes that IPS "has embraced" the use of technology and social media both in and out of the classroom.[47] Again, Dr. Aguilar misses the point entirely as the opinions contained in my IPS-specific report does not relate to the use of technology or social media in an instructional context. It is worth noting that Dr. Aguilar cites two limited examples to support his view that IPS educators and staff "readily acknowledge" that social media can be an "educational tool."[48] Indeed, the email referenced by Dr. Aguilar includes the comments of two Visual and Performing Arts ("VAPA") teachers (and zero administrators) who requested access to YouTube so that students can complete

---

[44] Technology Plan 2022-2027, Irvington Public Schools Department of Media Services and Technology at 22.

[45] Technology Plan 2022-2027, Irvington Public Schools Department of Media Services and Technology at 32.

[46] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 2, ¶ 7).

[47] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (pp. 48-49, ¶¶ 7-9).

[48] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (pp. 48-49, ¶¶ 7-9).

their assignments and fulfill state mandated viewing standards.[49] Deceptively, Dr. Aguilar fails to note that such standards make no mention of social media platforms and are, instead, focused on requiring students to integrate and evaluate information presented in diverse media formats.

64.  Additionally, Dr. Aguilar points to the fact that IPS uses social media for public communication with "parents, students, staff, and the broader community."[50] Again, this is not in dispute. The use of social media accounts by IPS to communicate with families and the public has no bearing on the issues at hand. Indeed, it is abundantly clear that Dr. Aguilar did not investigate IPS's use of "X, LinkedIn, [or] YouTube".[51] If he had, he would be aware that: (1) IPS created the X account in 2015 and has posted zero times; (2) the IPS LinkedIn account is titled "IPSNJ Recruiting" and has not posted in over two years; and (3) the IPS YouTube account has posted seventeen videos in seven years, all of which involve parent information, videos of graduation/school events, or Covid-era instructional videos on how to set up home internet devices.

65.  It is entirely appropriate, and common, for school districts to maintain social media accounts for announcements and community engagement, emergency closures, and celebrating school events or achievements. This does not equate to an endorsement of student use, nor does it address the school-based harms caused by those platforms. My report does not call for eliminating public-facing school accounts, or the use of technology in an educational setting entirely. Rather, it recommends developing comprehensive systems of support to address the mental health challenges students experience as a result of social media use and the disruptions to schools, classroom climate and attention.

66.  **Opinion 9:** Dr. Aguilar also highlights the fact that IPS's technology plan includes provisions for teacher training on technology, along with the internet and social media.[52] Seemingly a regurgitation of OP7, Dr. Aguilar, again, completely misses the point. As previously stated, my report documents that the harms stemming from students' personal use of social media platforms occur despite IPS's adherence to, and expansion upon, the integration of state-mandated technology curricula. The fact that IPS adheres to New Jersey Standards as it relates to teacher training on technology is immaterial to the opinions in my report, which focus the public health impacts of social media platform use among students and the consequences for schools.

### 3.   Conclusion Regarding Dr. Aguilar's IPS Opinions:

67.  Dr. Aguilar's IPS-specific observations largely reiterate his general arguments and reflect only surface-level engagement with the district's needs and realities. His opinions:

-        Do not contradict the core findings of my report;

---

[49] BW_Irvington00037958.

[50] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (p. 49, ¶ 9).

[51] Neither X (formerly Twitter) or LinkedIn are subject to this litigation.

[52] 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools, (p. 49-50, ¶¶ 10-11).

- Do not acknowledge the behavioral health impacts of social media on IPS's students;

- And do not offer a viable or evidence-informed plan for how the district can respond to these harms in a coordinated, sustainable, and developmentally appropriate way.

68. In contrast, my recommendations:

- Are grounded in direct administrator and student support staff interviews and IPS-specific data;

- Align with national public health and MTSS frameworks;

- Support, rather than replace, existing educational technology efforts;

- And offer a feasible and phased approach to building school capacity to meet the challenges caused by social media use.

### D.    Response to Hyman

69. Many of the critiques raised by Dr. Joshua Hyman in his IPS report, particularly those concerning causality, confounding factors, and the scope of my strategic plan, echo arguments addressed in detail in prior sections of this rebuttal. As such, several of my responses below refer back to those in earlier sections. Where appropriate, I briefly restate key points to ensure a complete response to Dr. Hyman's specific framing. Dr. Hyman's analysis frequently applies inappropriate standards for strategic planning in public health and education and mischaracterizes both the purpose and methodology of my work.

#### 1.    Hyman Opinion 1

70. Dr. Hyman claims that Plaintiffs' experts, including myself, fail to demonstrate that Defendants' conduct caused past financial harm or future costs for IPS or districts nationally.[53] This assertion misrepresents the purpose and methodology of my report. I was retained to assess whether there is a credible, evidence-informed need for a coordinated, school-based response to social media harms. The harms I document, based on structured interviews with IPS staff, national research, and observed patterns in school environments, are real and actionable.

#### 2.    Hyman Opinion 2

71. Dr. Hyman contends that my conclusions conflate correlation with causation and fail to account for confounding variables.[54] This critique misunderstands my methodological approach, which follows standard public health practice by triangulating educator observations, available district data, and peer-reviewed research to guide strategic planning. This approach is routine in systems improvement efforts where randomized control trials are neither feasible nor ethically required. Furthermore, several of the

---

[53] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 5-6, ¶ 13).

[54] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (p. 6, ¶ 14).

studies I cite, including Dr. Telzer, Dr. Twenge, and Dr. Christakis, use methods that approach causal inference and are widely cited in policy guidance.

72. The suggestion that my plan should isolate the effects of each social media platform or feature, separating Instagram from TikTok, "likes" from infinite scroll, is unrealistic and contrary to how public health assessments are conducted in complex social systems. These platforms are not used in isolation by students, nor are their effects experienced discretely. My report responds to the overall impact of compulsive, and disruptive use of social media as experienced by students and educators in IPS.

### 3. Hyman Opinion 3

73. Dr. Hyman criticizes my report for not using test scores or graduation rates as primary evidence of harm[55]. This interpretation rests on an overly narrow view of harm. Disruptions to student attention, emotional regulation, and peer dynamics are often the earliest manifestations of harm, and may not be captured by standardized academic metrics. Moreover, districts have long faced pressure to maintain graduation rates regardless of underlying challenges, rendering these metrics poor proxies for student well-being.

### 4. Hyman Opinion 4

74. Dr. Hyman repeats the above logic regarding school climate, suggesting that the lack of rising disciplinary incidents undermines my conclusions.[56] This ignores the reality that discipline codes often lack categories specific to social media-related behaviors and that staff may not attribute classroom disruptions to social media causes even when they are the source. My interviews with IPS personnel and national findings confirm that peer conflict, anxiety, and online bullying frequently occur under the radar of formal discipline systems.

### 5. Hyman Opinion 5

75. Dr. Hyman claims I fail to show that expenditures were reallocated or increased due to social media harms.[57] This is a mischaracterization. Districts, including IPS, have not formally tracked social media-related expenditures because until recently, they did not recognize the need to do so. As I note in the report above, IPS's staff already spend significant time addressing student distress and classroom disruption tied to social media, even if budget lines don't explicitly label those costs. My plan aims to make this implicit diversion of effort explicit and coordinated.

---

[55] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 36-41, ¶¶ 73-79).

[56] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 66-72, ¶¶ 109-116).

[57] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 84-90, ¶¶ 138-148).

### 6.    Hyman Opinion 6

76.    Dr. Hyman contends that no link is drawn between the at-issue features of social media and harms in IPS.[58] Again, my charge was to review evidence of social media-related school impacts and propose a systems-level response tailored to the district. I did so by integrating direct interviews with IPS leaders and educators who described social media-driven distress, distraction, harms to school functioning, and peer conflict. These reports are credible, consistent, and actionable.

### 7.    Hyman Opinion 7

77.    Dr. Hyman claims that I fail to show that the plan addresses "only" harms allegedly caused by Defendants' at-issue conduct.[59] This misstates the nature of both the harm and the appropriate response. My report, like those of other experts in this litigation, is predicated on the extensive documentation both in academic literature and evidence from the district that social media negatively impacts student mental health and school functioning and environment.

78.    These harms include compulsive checking, attention dysregulation, online peer aggression, identity stress, sleep loss, emotional volatility, and widespread diversion of educator time. The interventions I propose are carefully aligned with these harms and are not generic expansions of preexisting mental health programming. They are tailored to address disruptions that educators specifically linked to student social media use during structured interviews, consistent with national patterns.[60]

79.    Moreover, school districts do not operate on a forensic model of harm mitigation. In public health and education, interventions often target clusters of interrelated harms, particularly when they interact or cascade across developmental and systemic levels. My plan is intentionally designed to be integrated, efficient, and tiered. It is entirely reasonable that supports developed in response to social media harms may also strengthen broader student wellness and school climate.

80.    Dr. Hyman asserts that I fail to demonstrate the plan is a "sensible use of funds" because I do not conduct a formal cost-benefit analysis.[61] This expectation is inappropriate in the context of systems-level public health planning. Cost-benefit analysis is a tool often used by governmental bodies for discretionary programming, not a standard requirement for planning a response to an externally imposed, harmful disruption such as the one caused by social media platforms. Further, my task in this litigation was not to determine how school districts should allocate limited budgets under current constraints, but to describe what is *needed* to respond adequately to the harms identified. That schools currently lack

---

[58] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (p. 8, ¶ 18).

[59] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (p. 8, ¶ 19).

[60] Twenge, J. M., & Campbell, W. K. (2019). Media use is linked to lower psychological well-being: Evidence from three datasets. *Psychiatric Quarterly*, *90*(2), 311-331.

[61] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 109-112, ¶¶ 181-185).

the resources to implement my plan independently only strengthens the case for external investment, not a justification for dismissing the proposed interventions.

81. Regarding the 15-year horizon: large-scale public health challenges require sustained responses. Tobacco cessation, childhood obesity, suicide prevention, and trauma-informed care in schools all unfolded over similar multi-year trajectories. My plan includes early-phase action steps, mid-course evaluation, and long-term sustainability components, all of which align with best practices in implementation science.

82. Dr. Hyman contends that because my plan does not demonstrate a predicted decrease in social media harms, it must be implicitly ineffective.[62] This logic is both circular and unfounded. I outline an evidence-informed strategy for IPS to implement, with embedded evaluation steps to track progress and adjust as needed. In implementation science, plans are not assumed to be ineffective simply because the outcomes they are designed to address are ongoing. Harm mitigation requires ongoing capacity, not one-time fixes. A school-based mental health team does not disappear once anxiety drops; it is needed to maintain gains and address fluctuations over time. Similarly, digital wellness supports must evolve as technology, and student behavior, change. My plan is structured to be iterative, not static.

83. Finally, Dr. Hyman asserts that my plan overstates the level of need.[63] This claim rests on a narrow reading of existing services and an undervaluing of educator-reported gaps. IPS has existing programs in place, but as detailed in my report, these are inconsistently implemented, and not designed to address the specific dynamics of social media-related harm.

### 8.    Hyman Opinion 8

84. Dr. Hyman claims that Dr. Leslie overstated incremental costs associated with my strategic plan for IPS. This critique fails to account for the fact, which I took into consideration when creating my strategic plan for the district, that existing PD related to social media has been limited and piecemeal due to several factors: the district lacks specialty personnel and coordinated strategies to adequately address the distinct and evolving harms associated with student social media use; professional development time is limited; and, there are other issues on which school staff must be trained during existing professional development time. Dr. Hyman also wrongly asserts that the costs of training are "double-counted" for new staff in Dr. Leslie's economic modeling. He fails to recognize that in school systems, professional development costs are often incurred in addition to salary and benefits, particularly when training occurs outside of regular contract hours; collective bargaining agreements or union rules require compensation for training time; substitute teachers must be hired to cover classes during in-service days; and/or external trainers, materials, or certifications are needed. As a result, it is not uncommon, or incorrect, for school districts to incur training expenses in addition to staff

---

[62] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 96-98, ¶¶ 159-161).

[63] 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools, (pp. 98-103, ¶¶ 162-167).

salaries and benefits, and any attempt to eliminate these costs as redundant ignores how school systems actually operate.

85.     Dr. Hyman also criticizes the plan for not accounting for existing federal, state, and local funding streams for mental health. While I am familiar with many of these (e.g., ESSER, Medicaid, Title IV, state mental health block grants), these streams are not dedicated to mitigating social media–specific harms; are often short-term, competitive, or uncertain in duration; cannot reasonably be assumed to replace new funding responsibilities for harms caused by Defendants' platforms; and, are already being used to address a wide array of pre-existing needs. It would be inappropriate and irresponsible to assume that IPS should reallocate existing funds, intended for general student support, to absorb new harms stemming from social media platform use.

### E.      Response to Jennings

86.     While many of the themes raised in Dr. Jennings' report echo those previously rebutted in response to other experts, I provide a complete response to each of Dr. Jennings' IPS - specific opinions and to the rebuttals of my opinions below. Where appropriate, I refer to firsthand accounts from IPS leadership and staff, who consistently describe the harmful and disruptive role of social media in their schools. My findings are grounded in these direct interviews, district documentation, and public health frameworks, rather than speculative assumptions about how school systems "should" document or prioritize harms.

#### 1.      Jennings Opinion 1

87.     Dr. Jennings asserts that if social media use were a significant issue of concern for IPS, it would be reflected in the district's formal documentation, planning records, or budgeting processes.[64] This opinion misinterprets the nature of emergent public health challenges and the ways school systems often respond in real time to crisis-driven disruptions. Many social media-related harms, ranging from attention dysregulation and cyber-conflict to viral behavior trends and compulsive platform use, have emerged rapidly and unpredictably, often bypassing traditional budget planning cycles. These impacts may not always appear in formal budget documents or staffing charts, but they are consistently reported by district and school leaders and support professionals.[65]

88.     Critically, IPS leaders *have* identified social media as a driver of behavioral disruption, academic disengagement, and mental health strain. Superintendent Dr. April Vauss and Principals Bussacco, Zahir and Mangan each testified that social media harms, including compulsive student behaviors, viral fights, attention problems, and peer conflict, are prevalent and disruptive in their schools. These problems often draw time and attention

---

[64] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 38-43, 53, ¶¶ 137-146, 190).

[65] Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121.

away from core academic activities and require administrative intervention, even if not yet documented in budgetary line items or district-wide planning templates.[66]

### 2.    Jennings Opinion 2

89.    Dr. Jennings further contends that the absence of a structured problem-solving protocol means IPS is not truly concerned about social media harms.[67] This imposes an unrealistic and rigid expectation that all emerging challenges must first be codified in district-wide strategic plans before they are acknowledged as serious. In reality, the administrative staff at IPS have actively responded to social media-driven crises by modifying daily practices, adjusting supervision, and reallocating staff attention.[68]

90.    Examples include Principal Mangan's directive to teachers not to confiscate phones personally, but to refer disruptive students to administration for handling, a strategy explicitly designed to reduce classroom interruption while still maintaining accountability.[69] These real-time adaptations reflect a high level of concern and resource redirection, even if they are not formally labeled as part of a "social media mitigation strategy."

### 3.    Jennings Opinion 3

91.    Dr. Jennings argues that IPS's core challenges, poverty, absenteeism, crime, poor facilities, overshadow any effect social media may have.[70] This is a false dichotomy. Social media harms do not occur in a vacuum, nor do they displace historic inequities. Instead, they compound them. Principals Bussacco and Mangan testified that students struggling with community-level stressors are further destabilized by social media-fueled anxiety, online bullying, and compulsive engagement.[71]

92.    Superintendent Vauss explained how online fights escalate into real-world altercations, driving absenteeism and school safety concerns.[72] These accounts show that social media is not a peripheral issue, it intensifies preexisting vulnerabilities in a population already at risk.

---

[66] 30(b)(1) Deposition of Michael Bussacco, 283:15-285:03 (May 1, 2025); 30(b)(1) Deposition of April Vauss, 188:20-189:16 (May 6, 2025).

[66] 30(b)(1) Deposition of Darnel Mangan, 165:11-167:7 (May 21, 2025).

[67] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 16-17, ¶¶ 59-63).

[68] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶¶ 30-33).

[69] 30(b)(1) Deposition of Darnel Mangan, 107:20-108:10 (May 21, 2025).

[70] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 17-31, ¶¶ 64-117).

[71] 30(b)(1) Deposition of Michael Bussacco, 98:17-101:04 (May 1, 2025); 30(b)(1) Deposition of Darnel Mangan, 164:3-167:7 (May 21, 2025).

[72] 30(b)(6) Deposition of April Vauss, 395:03-397:14 (May 16, 2025).

### 4.    Jennings Opinion 4

93.    Dr. Jennings claims that IPS's main cost drivers are traditional line items such as bilingual education, transportation, and benefits.[73] While those are certainly major budget categories, this does not refute the fact that social media harms have required staff and administrators to divert time and attention away from academic priorities and toward crisis response.

94.    IPS personnel described how they have been forced to investigate social media conflicts, triage digital bullying, and respond to TikTok-inspired challenges that damage facilities or disrupt learning.[74] These hidden costs, while not always reflected in budget line items, still impact the district's ability to carry out its core educational mission.

### 5.    Jennings Opinion 5

95.    Dr. Jennings suggests that it is "premature" for school systems to respond to social media harms because the research is not yet conclusive.[75] This reflects a fundamental misunderstanding of both public health practice and district-level decision-making. Education leaders often act based on observed patterns and plausible associations, not just randomized controlled trials.

96.    Moreover, the lived experience of IPS administrators provides compelling, real-world evidence. Principal Zahir testified that data exists in his observations, and that no one needs a clinical study to confirm that the disruption he sees daily is real.[76] Waiting for absolute scientific certainty before acting would leave vulnerable students without protection or support.

### 6.    Jennings Opinion 6

97.    Dr. Jennings fails to distinguish between structured, educator-curated uses of social media and the compulsive use driving the harms described in my report.[77] The testimony of IPS educators makes this distinction clear. Students are not simply using social media for collaborative learning, they are seeking likes, performing for peers, and prioritizing online validation over in-class engagement.[78] The existence of positive applications does not negate the harms caused by social media.

---

[73] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 31-33, ¶¶ 118-120).

[74] 30(b)(1) Deposition of Kcyied Zahir, 356:20-359:5 (May 20, 2025); 30(b)(1) Deposition of Darnel Mangan, 169:12-172:14 (May 21, 2025); 30(b)(1) Deposition of John Amberg, 275:3-276:4 (May 14, 2025).

[75] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 14-16, ¶¶ 48-58).

[76] 30(b)(1) Deposition of Kcyied Zahir, 379:17-387:18 (May 20, 2025).

[77] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 14-16, ¶¶ 13, 48-58).

[78] 30(b)(1) Deposition of Michael Bussacco, 285:09-286:02 (May 1, 2025); 30(b)(1) Deposition of Kcyied Zahir, 350:16-351:24 (May 20, 2025).

### 7. Jennings Opinion 7

98. This opinion dramatically understates the psychological and behavioral hold that social media has on many students.[79] As Principal Mangan testified, some students are so compelled by fear of missing a notification that they violate state testing procedures just to keep their phones active.[80] Principal Zahir testified that unlike earlier generations, today's students are driven by a desire to be seen online, to respond instantly, and to maintain a constant digital presence, behaviors rooted in compulsive platform engagement, not mere distraction.[81] This is not a minor annoyance; it is a pervasive influence that undermines sustained attention and emotional regulation.

### 8. Jennings Opinion 8

99. Dr. Jennings claims that IPS is not implementing required digital literacy and safety content.[82] This claim is factually incorrect. IPS's Executive Director of Technology and Media Services, John Amberg, explained that the district does include digital literacy and safety content in its curriculum.[83] Dr. Jennings' conclusion here directly contradicts this primary-source testimony.

### 9. Jennings Opinion 9

100. Even if many social media harms manifest in disciplinary issues such as fights or bullying, Dr. Jennings misses the deeper dynamic—platform design itself fosters compulsive use and conflict escalation.[84] Principal Zahir described how platform features such as likes, shares, and comments encourage students to record and post fights, often provoking offline conflict and spreading harmful content schoolwide.[85] Superintendent Vauss and Principal Mangan similarly described how digital fights often precede or replace traditional altercations, disrupting the school climate in new and insidious ways.[86] IPS staff have described how social media features which foster compulsive use promote

---

[79] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 52, ¶¶ 13, 186-187).

[80] 30(b)(1) Deposition of Darnel Mangan, 160:5-163:9 (May 21, 2025).

[81] 30(b)(1) Deposition of Kcyied Zahir, 350:16-352:2-10 (May 20, 2025).

[82] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 35, 38, ¶¶ 13, 128-136).

[83] 30(b)(1) Deposition of John Amberg, 224:16-226:10 (May 14, 2025).

[84] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 33-34, ¶¶ 13, 121-122).

[85] 30(b)(1) Deposition of Kcyied Zahir, 352:2-10, 371:21-375:3 (May 20, 2025).

[86] 30(b)(6) Deposition of April Vauss, 401:15-402:07 (May 16, 2025); 30(b)(1) Deposition of Darnel Mangan, 142:21-143:16 (May 21, 2025).

the types of disciplinary issues Dr. Jennings identified.[87] These harms are *driven* by platform mechanics, not merely mirrored by student behavior.

### 10. Jennings Opinion 11

101. This summary opinion repeats several earlier flawed assumptions.[88] My IPS plan is based on structured interviews with district leaders, analysis of district documents, and alignment with implementation science. It does not duplicate existing services, it *builds upon them* in response to a new, intensifying source of disruption. For example, state mandates for health or digital literacy provide minimum expectations. They do not address compulsive checking, notification anxiety, social media-driven peer aggression, or the daily classroom disruptions described by Zahir, Mangan, and others. The plan's 15-year horizon is consistent with other public health response models (e.g., suicide prevention, obesity). Its scope reflects the scale of the problem, not an exaggeration of need.

### 11. Jennings Rebuttal to Hoover General Report Opinion 2

102. Dr. Jennings' contention that classroom distractions are not new, and that student disengagement has always existed in some form, is a reductive dismissal of the qualitatively and quantitatively different challenges posed by students' personal use of social media during the school day.[89] While distractions have always been part of classroom dynamics, the scale and impact of current disruptions tied to social media are unprecedented. Unlike passing notes or reading comic books, today's platforms are deliberately engineered to capture and hold attention through continuous, unpredictable engagement features that undermine students' capacity for sustained academic focus.

103. Dr. Jennings claims that I do not cite research demonstrating increased distraction since the rise of social media,[90] but this is inaccurate. In my May 16 report, I reference multiple sources, including Telzer et al., Lembke, Twenge, and Christakis, all of whom document how social media design features (e.g., intermittent feedback loops, social comparison triggers, and compulsive scrolling) contribute to diminished executive functioning, increased impulsivity, and disrupted classroom behavior.[91] In particular:

   – Dr. Telzer's report underscores teachers' growing frustration with managing compulsive screen use in class and its corrosive effects on the learning climate

---

[87] 30(b)(1) Deposition of Kcyied Zahir, 352:2-10, 358:7-359:24, 371:21-375:3 (May 20, 2025); 30(b)(1) Deposition of Darnel Mangan, 142:21-143:16, 160:5-163:9 (May 21, 2025).

[88] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 52-54, ¶¶ 13, 186-194).

[89] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 3-4, 52, ¶¶ 13, 186-187).

[90] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 52-53, ¶ 188).

[91] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025 (pp. 8-11, ¶¶ 35-46).

&ndash; Dr. Twenge and colleagues cite longitudinal survey data indicating a rise in attentional problems and academic disengagement corresponding with increased smartphone and social media use.

&ndash; Dr. Christakis highlights how multitasking with social media during academic tasks impairs working memory, reduces comprehension, and increases cognitive load, all of which interfere with learning.

104. Dr. Jennings selectively critiques the Pew statistic that 72% of high school teachers view phone distraction as a major classroom problem, suggesting that cell phones are used for many purposes beyond social media.[92] However, the dominant uses among adolescents are indeed social media apps, and numerous behavioral studies and youth self-reports affirm that compulsive platform checking, rather than benign device use, is the source of most engagement loss.[93] Educator anecdotes and administrative observations consistently confirm that social media is the predominant driver of distraction, even if not explicitly recorded in incident logs.[94] Moreover, as discussed above, Dr. Jennings is wrong to suggest that IPS enforces its device policy inconsistently.[95]

105. Dr. Jennings also argues that because IPS disciplinary data do not show a rise in referrals, there is no evidence of increased disruption.[96] This conflates formal disciplinary action with the broader spectrum of learning disruption. The impacts I reference, reduced attention, fractured teacher-student rapport, constant redirection, and emotional dysregulation, are often not recorded as disciplinary infractions. Educators report managing low-level but frequent disruptions that are rarely logged formally but cumulatively erode classroom climate and instructional effectiveness.[97]

106. Similarly, his claim that I offer no metrics for teacher time spent managing online-related behavior overlooks the qualitative data provided in educator interviews across multiple districts, including IPS. These professionals repeatedly describe the burden of monitoring digital behavior, resolving peer conflict that originates online, and mitigating the emotional fallout of digital harassment, all of which detract from instructional time.[98]

---

[92] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 52-53, ¶ 188).

[93] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025 (pp. 8-11, ¶¶ 39-46).

[94] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50).

[95] 30(b)(1) Deposition of Darnel Mangan, 107:20-108:10 (May 21, 2025).

[96] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 38-42, 53, ¶¶ 141-145, 190).

[97] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50); 30(b)(1) Deposition of Kcyied Zahir, 391:21-395:17 (May 20, 2025).

[98] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50).

107.    Regarding teacher burnout and morale, Dr. Jennings dismisses my citation of National Education Association (NEA) findings, noting that the causes of burnout are multifaceted.[99] His assertion that social media is irrelevant to morale is incorrect. While low pay and policy constraints are longstanding concerns, social media–related classroom challenges, especially cyberbullying spillover, constant behavioral management, and emotionally dysregulated students, have intensified the stress of teaching. This is consistently reflected in educator surveys and key informant interviews, including those conducted in IPS.

### 12.    Jennings Rebuttal to Hoover General Report Opinion 3

108.    Dr. Jennings disputes my conclusion that the cumulative impacts of student social media use have compelled school districts to redirect time and financial resources, particularly around student mental health and behavioral supports, classroom management, family-school communication, and safety monitoring.[100] However, his rebuttal narrowly interprets resource diversion as requiring explicit budget line items or formal board action, while disregarding the well-documented and widespread shifts in staff responsibilities, instructional time, professional priorities, and crisis management that have emerged in the wake of increased student social media use.[101]

109.    Dr. Jennings asserts there is no record that IPS hired school mental health staff specifically to address "social media-induced distress."[102] But this criticism misunderstands both my methodology and the reality of school mental health practice. School systems rarely designate hires by causal attribution (e.g., "hired due to social media harms"). Rather, districts respond to rising student need, much of which is fueled by social media, by expanding their support capacity. As documented in my interviews with IPS staff and supported by peer-reviewed research (e.g., Telzer, Twenge, Lembke, Goldfield), students' escalating emotional dysregulation, anxiety, peer conflict, and attentional impairments are consistently attributed by educators to social media pressures, cyberbullying, and compulsive engagement.[103] These mental health burdens inevitably increase referral volume and counseling intensity, regardless of whether a new staff member is explicitly labeled as a "social media counselor."

---

[99] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 54, ¶ 194).

[100] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 54-56, ¶¶ 195-201).

[101] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶ 30).

[102] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 54, ¶ 196).

[103] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50).

110. Dr. Jennings minimizes the resource impact of managing social media-related distraction, emotional dysregulation, and conflict by analogizing them to pre-digital distractions.[104] This framing ignores the uniquely addictive, immersive, and conflict-generating nature of modern platforms. Educators in IPS, and nationally, report frequent disruptions tied to digital peer interactions, inappropriate posting, and students checking devices mid-instruction, and compulsive use.[105] These disruptions, while not always reflected in disciplinary referrals, consume instructional minutes and place an additional burden on teachers, administrators, and support staff. Dismissing this reality because it is not captured in a narrow set of data systems is methodologically flawed and contrary to educator-reported experience.

111. Dr. Jennings contends that digital literacy education is a core responsibility of schools and thus cannot be seen as a resource burden.[106] While it is true that curricula must evolve with societal changes, this does not negate the fact that schools must allocate time, staff, and training resources to develop, deliver, and adapt such instruction. Further, while New Jersey mandates digital citizenship education, the frequency, depth, and content of these lessons have been influenced by the rise of social media harms, forcing schools to engage with new curricula on self-image, online risk, cyberbullying, and platform design, often without dedicated staffing or funding. The claim that statutory compliance nullifies cost or time burdens is unconvincing and not aligned with implementation science.

112. Dr. Jennings asserts that use of monitoring software like GoGuardian cannot be attributed to social media, citing E-Rate compliance and CIPA provisions.[107] However, while content filtering is indeed a long-standing requirement, the expansion of active threat monitoring and real-time alerts (e.g., for suicidal ideation or violent threats expressed on social media) is a newer phenomenon driven specifically by concerns about platform use. As social media becomes the vehicle through which distress is expressed or magnified, schools are expected to respond immediately to these alerts, stretching the capacity of IT teams, administrators, and mental health staff. The scope and urgency of monitoring demands have grown, not due to generic internet safety, but because of the nature and volume of student engagement on social media platforms.

---

[104] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 52, ¶ 187).

[105] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 11, ¶ 45); Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50); 30(b)(1) Deposition of Michael Bussacco, 283:15-285:03 (May 1, 2025); 30(b)(6) Deposition of April Vauss, 401:15-402:07 (May 16, 2025); 30(b)(1) Deposition of Kcyied Zahir, 356:20-359:5, 367:23-371:19 (May 20, 2025); 30(b)(1) Deposition of Darnel Mangan, 164:3-167:7, 169:12-172:14 (May 21, 2025).

[106] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 54-55, ¶ 197).

[107] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 64, ¶ 228).

113.  Dr. Jennings points to general parent disengagement as the more likely cause of strained family-school partnerships.[108] This is a false dichotomy. In reality, social media has created new tensions between parents and schools, particularly around cyberbullying incidents, digital conflicts between students, concerns about surveillance or privacy, and disagreements about disciplinary responses to compulsive use and online behavior. Educators report spending significant time communicating with families about these issues, often at the expense of academic collaboration.[109] That 79% of teachers believe parents fail to hold students accountable for school misbehavior does not contradict the assertion that social media is altering the content and tone of parent-school interactions.

114.  Finally, Dr. Jennings argues that IPS's continued investment in extracurriculars and enrichment disproves my point about resource diversion.[110] But the existence of extracurricular offerings does not preclude trade-offs or delays in other initiatives. My report notes that administrators have cited the need to triage resources toward crisis management, mental health response, and student safety, areas exacerbated by social media use.[111] The expansion of one set of programs does not mean others were not delayed or deprioritized due to staffing or financial limits.

### 13.    Jennings Rebuttal to Hoover IPS Report

115.  Dr. Jennings questions the validity of the key informant interviews I conducted for my IPS report, suggesting that I failed to disclose sufficient detail about who was interviewed, how interviews were conducted, what questions were asked, or how responses were selected and interpreted.[112] His concerns reflect a misunderstanding of both standard qualitative data collection practices and the established procedures I use when consulting with school districts on comprehensive school mental health system assessment and improvement.

116.  As stated in my report, I conducted structured interviews with key district and school personnel using a standardized consultation protocol that I have developed and used for decades in my work with school systems nationwide.[113] This protocol includes core questions designed to assess the strengths and challenges across several domains, including workforce, service array, implementation structures, and emerging contextual challenges, such as social media-related impacts on student functioning and instructional

---

[108] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 55-56, ¶ 200).

[109] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 20, ¶ 82).

[110] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 56, ¶ 201).

[111] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶ 30).

[112] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 56, ¶ 203).

[113] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 5, 9-10, ¶¶ 27, 45).

29

climate. My interview protocol aligns with national school mental health quality frameworks, including those developed by the National Center for School Mental Health and adopted by state agencies across the country.

117. Responses were documented contemporaneously and immediately synthesized to ensure accuracy and thematic consistency. As is standard in qualitative research and consultation, I identified themes that were reported independently by multiple respondents or that aligned with documented national trends. Where appropriate, I used direct quotes to illustrate these themes, without misrepresentation or exaggeration.

118. Contrary to Dr. Jennings' implication, I did not selectively include only responses that supported my conclusions. Rather, I reported what was emphasized by educators themselves.

119. Qualitative interview data is a recognized and essential component of implementation science and systems-level planning, particularly in education contexts where real-time challenges (such as those related to social media harms) often outpace formal data systems. My methodology, triangulating interview findings with national research and educator-reported observations, is appropriate and reflective of best practices in applied public health and education systems consultation. Dr. Jennings' suggestion that these methods lack scientific rigor is unfounded and contrary to established norms in the field.

### 14. Jennings Rebuttal 1 to Hoover IPS Report

120. Dr. Jennings questions the evidence supporting my findings on IPS's existing efforts to support student mental health and address social media impacts.[114] My conclusions were informed by multiple sources, including observations of publicly available staffing data and reports from district leaders who noted that, while IPS employs school mental health professionals and implements mental health programming, current staffing levels are insufficient to meet the growing needs related to student distress and dysregulation associated with social media.

121. In response to Dr. Jennings' claim that IPS's mental health curriculum cannot be considered a "burden" because it is mandated by the state,[115] I agree that health education standards include mental health content. However, IPS staff reported that they have also developed or adapted materials and classroom guidance specifically related to students' social media behavior and related emotional well-being and attention challenges, topics that go beyond compliance and reflect local efforts to respond to new student needs.[116]

122. Regarding professional development (PD), I did not suggest that IPS has failed to conduct PD, but rather that social media-related content remains limited and

---

[114] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 56-59, ¶¶ 204-213).

[115] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 58, ¶ 208).

[116] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 6, ¶¶ 30-33).

piecemeal.[117] This is not a critique of the district's intent but an observation about its current capacity. The limited PD content on social media reflects a broader reality: many districts lack specialty personnel and coordinated strategies to adequately address the distinct and evolving harms associated with student social media use. This gap supports the need for a strategic and well-resourced response.

123. Finally, Dr. Jennings describes IPS's sharing of external resources like tip sheets and online guides as evidence that no new investment is needed.[118] While helpful, such resources are not a substitute for a districtwide, integrated framework that aligns staff training, student education, family engagement, and school climate initiatives. Social media-related challenges, such as compulsive use, online conflict, and digital risk-taking, require more than informational outreach. They require a comprehensive system of support embedded into school infrastructure.

### 15. Jennings Rebuttal 2 to Hoover IPS Report

124. Dr. Jennings contends that I incorrectly calculated the student-to-counselor ratio at IPS, asserting that I excluded 25 school "guidance counselors" from the calculation and thereby overstated the student-to-counselor ratio.[119] He claims that combining the 9 "school counselors" and 25 "school guidance counselors" yields a total of 34 counselors serving approximately 8,000 students, which would result in a ratio of approximately 235:1, better than the 1:250 ratio recommended by the American School Counselor Association (ASCA).[120] He also notes that if only 25 counselors were used, the ratio would be 312:1, and that the district reported a 347:1 ratio to the New Jersey Department of Education.[121] He contrasts all of these figures with the 868:1 ratio cited in my report and asserts that my methodology is inconsistent.[122]

125. In fact, the 868:1 ratio I reported was not a clerical error, but the result of a deliberate and transparent methodological decision. IPS reported 9 staff in the category of "School Counselor" and a separate 25 in the category of "School Guidance Counselor." To align with ASCA's recommended ratio of 250:1, which specifically applies to school counselors who provide direct student support services in alignment with a

---

[117] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 18-19, ¶¶ 77-78).

[118] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 61, ¶ 217).

[119] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 61-62, ¶¶ 219-221).

[120] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 61-62, ¶¶ 219-221).

[121] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 61-62, ¶¶ 219-221).

[122] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 61-62, ¶¶ 219-221).

comprehensive school counseling model, I used the 9 "school counselors" as the basis for calculating the student-to-counselor ratio.

126. However, my conclusions do not rest solely on whether the district meets a numerical target. As is clearly stated throughout my report, my staffing recommendations are *additive*, they build upon existing personnel to meet rising and often unprecedented demand linked to the impacts of social media on student mental health, school climate,[123] and proper school functioning. Benchmarks like those set by ASCA or NASP are important for establishing baseline adequacy, but they were developed for typical operating conditions, not for addressing acute, externally driven stressors such as the widespread emotional dysregulation, peer conflict, and attention challenges caused by social media use.

127. Dr. Jennings also challenges my reference to school psychologist ratios, relying on New Jersey's reported data on members of Child Study Teams (CST) despite conceding that this data does not separately identify school psychologists.[124] By contrast, I relied on data reported directly by IPS which specifies the number of school psychologists employed by the district.[125] The 976:1 ratio I referenced was a conservative estimate, based on available staffing documents and observed practice, and it aligns with broader national trends showing that school psychologists remain in short supply relative to need.

128. Dr. Jennings also references a public statement I made in 2021 acknowledging workforce shortages in school mental health fields.[126] While workforce shortages have constrained the ability of school districts to meet recommended staffing levels, that does not mean that existing ratios are sufficient to meet the evolving demands on school mental health infrastructure. Moreover, staffing shortages are not the sole reason districts fall short, funding limitations and competing district priorities also play a major role in limiting staff capacity. And importantly, the workforce landscape has changed since 2021. Federal and state investments have significantly increased to expand workforce pipelines for school-based mental health professionals, including through the Bipartisan Safer Communities Act, state grant programs, and targeted recruitment and retention initiatives. These improvements offer a foundation for districts like IPS to make additional investments in mental health staffing to address social media harms.

129. Finally, Dr. Jennings points to examples from counselor logs showing that IPS counselors are routinely pulled from core duties to support activities such as Chromebook

---

[123] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 17-18, ¶¶ 74, 76).

[124] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 62-63, ¶¶ 222-224).

[125] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 7, ¶ 34).

[126] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 63, ¶ 225).

distribution, lunch supervision, and pep rallies.[127] Rather than suggesting a lack of need, these examples reinforce my conclusion: that existing staff are overextended and unable to fully meet the growing emotional and behavioral needs of students due to social media harms. Even if reported ratios meet national guidelines, the functional availability of counselors for mental health support is compromised when they are tasked with duties unrelated to their professional role.

### 16.    Jennings Rebuttal 3 to Hoover IPS Report

130.    Dr. Jennings incorrectly contends that there is no evidence IPS has "diverted funds" to mitigate the harms of social media, and that I inaccurately cite the district's investment in filtering software like GoGuardian as an example of such diversion.[128] He also disputes my assertion that resources are strained in part due to the demands of responding to social media impacts, stating instead that IPS's fiscal challenges stem from broader structural funding issues.[129] Dr. Jennings' critique mischaracterizes my statements and overlooks both the intent and broader context of my findings. First, my report does not claim that the purchase of GoGuardian or similar software violates federal mandates or is inherently problematic. Rather, I note that districts like IPS have had to allocate limited resources, including pandemic relief funds and federal E-rate-supported technologies, toward efforts intended, at least in part, to manage the increasingly disruptive effects of social media on student behavior and attention.[130] Whether a given investment is legally required or reimbursable does not negate the fact that these tools represent real costs and staff capacity that could otherwise be directed to instructional or mental health services.

131.    The point is not that such spending is inappropriate, but that the social media-related challenges schools face have created new cost burdens and operational needs, many of which did not exist a decade ago. These include investments in monitoring software, instructional redesign, digital literacy programming, school safety protocols, staff time spent addressing online conflicts, and the emotional fallout from social media-fueled mental health challenges and peer dynamics. These are not hypothetical concerns, they were raised repeatedly in interviews with IPS district personnel, noted in student handbooks and safety documents, and reflected in broader national trends that show rising time and fiscal demands related to managing student social media use.

132.    With respect to my statement that resources are strained and that IPS "will have to cut education funds to get the needed supports," Dr. Jennings takes issue with the attribution

---

[127] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 63, ¶ 227).

[128] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 64, ¶ 228).

[129] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 64, ¶ 229).

[130] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶ 51).

of this strain to social media-related impacts.[131] My report does not suggest that social media is the sole or even primary cause of IPS's financial strain. Rather, I document that in the context of already stretched budgets, the additional burdens introduced by social media, such as increased needs for mental health intervention and classroom management, exacerbate existing resource challenges and necessitate strategic reallocation. The fact that schools face longstanding structural funding constraints does not invalidate the claim that social media harms are contributing new pressures.

### 17.     Jennings Rebuttal 4 to Hoover IPS Report

133.    Dr. Jennings wrongly claims that a 15-year strategic plan is "too long a length of time to remain responsive and flexible" in educational settings.[132] In fact, the 15-year horizon reflects the scale and urgency of the challenge, not an arbitrary or static timeline. It is intentionally designed to match the scope of long-term public health initiatives that have successfully addressed complex, population-level harms, such as efforts to reduce tobacco use or improve child and adolescent mental health.[133] The plan provides a realistic timeframe for building and sustaining the infrastructure needed to address the persistent and evolving impacts of social media on student well-being and school environments.

134.    While the plan lays out what is required to meet these needs, it also anticipates that districts like IPS will engage in ongoing data review and decision-making to ensure responsiveness to local conditions and emerging challenges.[134] Rather than prescribing every detail across 15 years, it offers a strategic roadmap, grounded in implementation science and public health precedent, for building durable systems of support that can withstand leadership transitions, funding shifts, and shifting demands.

135.    While Dr. Jennings notes superintendent and board turnover as a rationale for short-term planning, it is precisely because of this turnover that longer-term strategic frameworks are essential.[135] Without them, school systems remain vulnerable to fragmented, short-lived initiatives. A well-structured long-term plan promotes continuity amid leadership changes by anchoring reforms in multi-year investment, policy, and community consensus.

---

[131] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶ 51); 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 64, ¶ 229).

[132] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 64-65, ¶¶ 230-234).

[133] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 31-35, ¶¶ 106-119).

[134] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 42, ¶¶ 149-151).

[135] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 64-65, ¶ 232).

136.    Dr. Jennings' suggestion that social media evolves too quickly to warrant long-term planning reflects a misunderstanding of my proposal.[136] The plan is warranted precisely because the platforms at issue are anticipated to continue exerting deleterious effects on students in both the near and long term. The strategic plan targets the harms resulting from compulsive social media use. These harms stem from persistent design features (e.g., intermittent variable reinforcement, infinite scroll, social comparison triggers) that have remained consistent across platforms for more than a decade and continue to undermine student mental health, attention, and behavior in school settings.

137.    Lastly, I reject the premise that the plan "narrow[s]" the district's attention solely to social media.[137] It specifically integrates responses to social media within a multi-tiered system of supports (MTSS), a framework already used by IPS and districts nationwide to address the full spectrum of academic, behavioral, and mental health needs. My plan does not displace other district priorities; it adds necessary infrastructure to address a powerful and increasingly disruptive driver of distress that cuts across those priorities.

138.    Dr. Jennings incorrectly asserts that my recommendations duplicate existing state mandates and district policies, and he mischaracterizes them as substituting my judgment for that of the IPS Board of Education.[138] In reality, my recommendations were developed to augment and deepen existing efforts, not replace them, by offering specific implementation strategies for addressing social media harms through IPS's existing MTSS framework.

139.    While New Jersey's learning standards and policies do include content on cyberbullying, digital literacy, and mental health, my analysis revealed that IPS would benefit from integrating comprehensive and universal education on social media use, online safety, and digital literacy into its curriculum.[139] My recommendations help address this implementation gap and bring IPS into closer alignment with its state mandates.

140.    Moreover, these are not generic best practices applied blindly to IPS. My plan is tailored to the district's context and developed in response to IPS educator reports of widespread student dysregulation, peer conflict, executive functioning struggles, and classroom disruption, due to social media use.[140] These harms require coordinated Tier 1 prevention strategies that go beyond compliance with state minimums and instead focus on effective delivery, integration, and sustainability.

---

[136] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 65, ¶ 235).

[137] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 66, ¶ 236).

[138] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 66-67, ¶¶ 237-240).

[139] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 11, ¶ 53).

[140] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 46-50).

141.    Dr. Jennings improperly minimizes the scale and impact of student social media use and wrongly characterizes my staffing model as duplicative of existing roles.[141] His assertion that directors of guidance or technology can simply absorb all of the functions of the proposed new positions does not reflect the feedback I received from district staff, nor does it acknowledge the specialized expertise required to coordinate districtwide efforts in areas such as mental health literacy and family engagement around social media harms.[142]

142.    My staffing recommendations are additive. They are not intended to replace or duplicate existing personnel but to fill current gaps and build capacity to address new, unrelenting challenges.[143] IPS already acknowledges staff strain in areas such as family engagement, classroom behavior management, and student mental health.[144] Moreover, existing staff are often stretched thin by multiple responsibilities, including 504 coordination, standardized testing, and administrative coverage, as Dr. Jennings himself documents.[145] It is unrealistic to expect existing personnel to simultaneously assume additional responsibilities related to social media harms without meaningful investment in new roles.

143.    As for the proposed staffing numbers, the scale matches the scope of the identified challenge. A student population of close to 8,000 experiencing high rates of dysregulation, cyberbullying, and screen-related disruption warrants a strategic investment. These positions are phased in over time and aligned with real-world workforce pipeline expansion efforts already underway nationally, including state and federal initiatives to build the school mental health workforce.

144.    Dr. Jennings calls my recommended 5,700 hours of training "excessive," but this reflects a misreading of the proposal.[146] The training is distributed across multiple years, buildings, and staff roles and is entirely aligned with national guidance on implementing MTSS, trauma-informed care, digital wellness, and mental health literacy.

---

[141] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 68-69, ¶¶ 248-250).

[142] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 10-12, ¶¶ 46-54).

[143] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 17-18, ¶¶ 74, 76).

[144] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (p. 11, ¶ 53).

[145] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 63, ¶¶ 226-227).

[146] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 69, ¶ 251).

36

145. Dr. Jennings argues that professional development time is limited.[147] That is precisely why my plan does not rely heavily on existing staff or existing PD time to carry out intensive training related to the harms of social media.[148] The majority of professional development activities outlined in the plan are designed for new staff hired specifically to support student mental health, digital wellness, and instructional adaptation in response to the impacts of social media. For existing staff, my recommendations prioritize high-quality, targeted, and job-embedded training that aligns with and enhances IPS's academic mission. The intent is not to replace content-area PD, but to ensure that all educators are equipped with practical strategies to manage the very real and escalating challenges that interfere with student attention, behavior, and readiness to learn.

146. Dr. Jennings mischaracterizes my evaluation plan as narrowly focused on social media to the exclusion of broader challenges.[149] In fact, the plan proposes a comprehensive MTSS-based evaluation framework to track outcomes across mental health, school climate, academic engagement, and staff well-being. Social media is a significant driver of these outcomes, and the plan accounts for overlapping and intersecting contributors such as absenteeism, trauma, and socioeconomic stress.

147. A systems-level response must be evaluated systematically. The proposed 15-year plan builds in iterative assessment, not just summative analysis, allowing IPS to monitor progress, adjust course, and ensure resources are aligned with emerging needs. The choice to evaluate the specific contribution of social media is not exclusionary, it is a responsible attempt to track the impact of a novel, significant disruptive force that educators repeatedly identified as compromising their ability to teach and support students.

## III.    Conclusion

148. The opinions and recommendations presented in this report reflect a comprehensive review of the rebuttal reports submitted by Defense experts, Dr. Diana Wildermuth, Dr. Ethan Hutt, Dr. Stephen Aguilar, Dr. Joshua Hyman, and Dr. Michael Jennings, as well as detailed consideration of the lived realities, structural conditions, and educator-reported challenges within IPS. The defense expert critiques mischaracterize the scope and purpose of my recommendations, minimize the documented harms associated with student social media use, or fail to meaningfully engage with the direct observations of IPS administrators and school personnel.

149. IPS, like many large and diverse school districts, is experiencing the new, significant and distinct harms as well as compounding harms of widespread student engagement with social media platforms. These consequences include increased student distress, attention disruption, digital peer conflict, disruptions to school functioning, harms to school

---

[147] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (p. 69, ¶ 251).

[148] Expert Report of Dr. Sharon A. Hoover, PhD for Irvington Public Schools dated May 18, 2025 (amended June 20, 2025) (pp. 17-18, ¶¶ 74-77).

[149] 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools, (pp. 69-70, ¶ 253).

climate and diversion of educator time and school resources. My recommendations are tailored to IPS's context and are designed to address these harms through sustainable, evidence-informed strategies that complement and extend the district's current efforts.

150. The strategic plan I propose offers a structured and evidence-informed approach to address these escalating harms. It builds on existing IPS programming while filling critical gaps in digital wellness education, staff professional development, student mental health services, and leadership infrastructure. I do not suggest that social media is the sole source of distress for students, but it is a unique, significant externally imposed, and modifiable driver that requires a targeted and sustained response.

151. This MTSS-based plan is not speculative or duplicative, it shaped by practitioner insight and aligned with national best practices in school mental health and implementation science. By adopting this plan, IPS can respond decisively to the significant evolving social media risks confronting its students and schools, while strengthening the supports necessary to safeguard learning, school functioning and student well-being.


The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.


_____
Sharon A. Hoover, Ph.D.

**Exhibit A**

**Additional Materials Considered**

Prior Opening Report dated May 18, 2025 and all documents cited therein, including Exhibit B.

**Irvington Documents**

| Bates |
|---|
| BW_Irvington00037958 |
| Technology Plan 2022-2027, Irvington Public Schools Department of Media Services and Technology |

**Articles and Studies**

| |
|---|
| *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods") |
| Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. School Mental Health, 1(1), 26-36 |
| Hoagwood, K. E., Atkins, M. S., & Ialongo, N. S. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. Administration and Policy in Mental Health and Mental Health Services Research, 40(6), 451-455 |
| Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172. |
| Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121. |
| Twenge, J. M., & Campbell, W. K. (2019). Media use is linked to lower psychological well-being: Evidence from three datasets. *Psychiatric Quarterly*, *90*(2), 311-331. |

**Litigation Documents**

| |
|---|
| 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D. |
| 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Irvington Public Schools |
| 2025.07.11 Expert Report of Ethan L. Hutt, Ph.D. for Irvington Public Schools |
| 2025.07.11 Expert Report of Stephen Aguilar, Ph.D. for Irvington Public Schools |
| 2025.07.11 Expert Report of Joshua Hyman, Ph.D. for Irvington Public Schools |
| 2025.07.11 Expert Report of Matthew Jennings, Ph.D. for Irvington Public Schools |
| 2025.07.30 Rebuttal Report of Dimitri Christakis, M.D., M.P.H. |
| 2025.07.30 Rebuttal Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH |
| 2025.07.30 Rebuttal Report of Eva Telzer, Ph.D. |
| 2025.07.30 Rebuttal Report of Anna Lembke, M.D. |
| 2025.07.30 Rebuttal Report of Dr. Jean M. Twenge, Ph.D. |
| 2025.07.30 Rebuttal Report of Gary Goldfield, Ph.D. |
| 2025.05.19 Expert Report of Douglas L. Leslie, Ph.D. for Irvington Public Schools |

| |
|---|
| 2025.06.20 Amended Expert Report of Douglas L. Leslie, Ph.D. for Irvington Public Schools |
| Deposition of Michael Bussacco 30(b)(1), May 1, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of April Vauss 30(b)(1), May 6, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of April Vauss 30(b)(1), May 9, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of April Vauss 30(b)(6), May 16, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of John Amberg 30(b)(1), May 14, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Kcyied Zahir 30(b)(1), May 20, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Darnel Mangan 30(b)(1), May 21, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |