**Exhibit 92**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

**Amended Rebuttal Report of**

**Dr. Sharon A. Hoover, PhD**

**for Tucson Unified School District**

**August 7, 2025**

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**Table of Contents**

I.      Executive Summary of Expert Opinions ................................................................. 1

II.     Response to Expert Opinions.................................................................................. 3

        A.      Response to Wildermuth.............................................................................. 3

                1.      Response to Wildermuth Opinion 1: My Reliance on Sources of
                        TUSD-Specific Data is Well-Founded and Consistent with the
                        Standards Employed In My Field ..................................................... 3

                2.      Response to Wildermuth Opinion 2: The Existence of Mental Health
                        Resources and Initiatives Does Not Preclude Strategic Planning to
                        Enhance and Supplement Those Resources and Initiatives....................... 6

                3.      Response to Wildermuth Opinion 3: TUSD's Prior Staffing and
                        Resource Levels Do Not Dispel Need for Improvement ........................... 8

                4.      Response to Wildermuth Opinion 4: Every School District Faces
                        Unique Challenges, But These Do Not Reduce the Unique Challenges
                        of Social Media ........................................................................ 11

                5.      Response to Wildermuth Opinion 5: Strategic Plan for TUSD is
                        Properly Designed..................................................................... 13

        B.      Response to Hutt ...................................................................................... 13

                1.      Summary of Response to Hutt Opinions 1-3 ........................................ 13

                2.      Response to Tucson-Specific Claims in Hutt's Report........................... 14

                3.      Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods . 16

                4.      Clarifying My Use of Evidence .................................................... 17

                5.      Conclusion Regarding Dr. Hutt's TUSD Opinions ............................... 18

        C.      Response to Aguilar................................................................................. 18

                1.      General Response to Opinions 1–6.................................................. 18

                2.      Rebuttal to District-Specific Opinions in Exhibit A (Tucson Unified
                        School District) ....................................................................... 19

                3.      Conclusion Regarding Dr. Aguilar's TUSD Opinions ............................ 20

        D.      Response to Lakdawalla .......................................................................... 21

                1.      Lakdawalla Opinion 1................................................................ 21

                2.      Lakdawalla Opinion 2................................................................ 23

                3.      Lakdawalla Opinion 3................................................................ 25

                4.      Lakdawalla Opinion 4................................................................ 27

                5.      Lakdawalla Opinion 5................................................................ 28

E.    Response to Springer ........................................................................................... 30

    1.    Springer Opinion 1.................................................................................. 30

    2.    Springer Opinion 2.................................................................................. 32

    3.    Springer Opinion 3.................................................................................. 33

    4.    Springer Opinion 4.................................................................................. 36

F.    Response to Moore .............................................................................................. 38

    1.    Moore Opinion 1..................................................................................... 38

    2.    Moore Opinions 2 and 4 ......................................................................... 40

    3.    Moore Opinions 3 and 5 ......................................................................... 41

    4.    Moore Opinion 6..................................................................................... 41

    5.    Moore Opinion 7..................................................................................... 42

III.    Conclusion ....................................................................................................................... 43

## I.    Executive Summary of Expert Opinions

1.    The opinions summarized below respond to the district-specific rebuttal reports submitted by Dr. Diana Wildermuth, Dr. Ethan Hutt, Dr. Stephen Aguilar, Dr. Darius Lakdawalla, Dr. Robert Springer, and Dr. Michele Moore. These responses are based on my comprehensive review of each expert's report, Tucson Unified School District (TUSD) data and documentation, structured interviews with school personnel, and the broader evidence base in school mental health, adolescent development, and implementation science. My recommendations for Tucson reflect over two decades of experience designing and evaluating school-based responses to emerging public health challenges.

2.    **Opinion 1: The absence of Tucson-specific quantitative data on social media harm should not be interpreted as absence of harm.**
TUSD lacks systems to track how student use of social media platforms affects attention, behavior, or mental health outcomes. However, this data vacuum reflects infrastructure limitations, not a lack of impact. Educators and mental health staff consistently report social media-related harms including inattention, emotional dysregulation, body image distress, and suicidal ideation. These findings, consistent with national research, justify a proactive district-wide plan.

3.    **Opinion 2: Existing services in Tucson are insufficient to address the unique and escalating harms of social media.**
TUSD has made commendable investments in general wellness initiatives such as Youth Mental Health First Aid and suicide prevention protocols. However, these are not specifically designed to address compulsive engagement, social media-driven emotional distress, and peer conflict emerging from student social media use. My recommendations are additive, aligned with MTSS frameworks, and tailored to the specific harms caused by social media that current systems are not equipped to manage.

4.    **Opinion 3: Tucson's student support staffing levels fall well below national benchmarks and cannot meet current or emerging demand.**
Ratios for school psychologists, social workers, counselors, and nurses in TUSD fall below recommended standards. My staffing recommendations are proportionate to TUSD's size and needs and are designed to expand capacity, not replace or duplicate existing roles. Any workforce shortages are not a reason to delay action; they underscore the need for strategic investment and pipeline development.

5.    **Opinion 4: The strategic plan appropriately accounts for Tucson's broader challenges.**
Rather than overlooking issues like poverty, absenteeism, trauma, and staff burnout, my plan explicitly addresses how these factors compound the harms introduced by social media platforms. Social media acts as an accelerant to existing stressors, making coordinated and comprehensive supports even more urgent for vulnerable student populations.

6.    **Opinion 5: Tucson educators report concrete, daily impacts of social media in classrooms.**
Key informant interviews with TUSD staff revealed widespread concerns about student sleep deprivation, classroom disruption, harms to school functioning, digital peer conflict, and emotional fragility, all tied to student social media use. These school-based

1

observations are credible, consistent, and align with national findings. They provide essential context for a strategic response, especially in the absence of centralized surveillance data.

7.      **Opinion 6: The 15-year strategic plan reflects public health and implementation science models used in past successful responses to entrenched youth harms**. The 15-year approach I propose allows for staged implementation, iterative refinement, and sustained professional development. It mirrors the timeline of other large-scale efforts (e.g., tobacco control, obesity prevention) and reflects the systemic nature of the social media harm affecting students.

8.      **Opinion 7: My report is focused on strategic planning, not economic causality.** I was not tasked with quantifying damages or performing econometric modeling. My role was to develop a district-specific response to the harms caused to schools, school districts and the classroom environment by social media that educators are already encountering—harms corroborated by behavioral health science and implementation research.

9.      **Opinion 8: My recommendations are developmentally appropriate, scalable, and aligned with national school mental health frameworks**. The plan includes digital wellness curriculum, embedded staff roles, enhanced Tier 2/3 services, and improved data systems, all of which are consistent with evidence-based best practices for MTSS and Comprehensive School Mental Health Systems (CSMHS).

10.     **Opinion 9: Tucson's prior efforts are acknowledged and integrated into the strategic plan, which is designed to enhance, not replace, them**. Programs such as SEL curricula and general digital citizenship materials serve as important groundwork. However, none are comprehensive, sustained, or specific to the distinctive harms posed by social media platforms. My plan reinforces existing efforts while introducing the necessary infrastructure to address new, externally driven social media harms.

11.     **Opinion 10: Claims that social media has not harmed TUSD because it has not budgeted for such harms are misguided.** The absence of formal documentation or budget lines should not be mistaken for absence of harm. Requiring a formal documented response to new challenges misunderstands how school districts operate in real time responding to crises, particularly when such challenges are evolving rapidly or difficult to quantify. Lack of formal documentation does not negate the real harms TUSD is facing due to social media or the need for a systemic, holistic approach to address those harms.

12.     **Opinion 11: Critiques of my plan as inefficient or duplicative mischaracterize its structure and goals.** The staffing, training, and structural supports I recommend are responsive to documented capacity gaps and are justified by the scope and scale of student mental health needs. Assertions that these recommendations divert attention from academic goals reflect an outdated view of education. Addressing emotional regulation, attention, and well-being, as well as proper school functioning, is essential to supporting learning.

13. **Opinion 12: It is inappropriate to demand econometric proof or sole causation before initiating a school-based public health response.**
Implementation science relies on observed need, triangulated data, and educator experience to inform action. The social media harms described in TUSD are real, observable, and growing, and require system-level interventions grounded in public health and educational equity principles.

## II.   Response to Expert Opinions

### A.   Response to Wildermuth

#### 1.   Response to Wildermuth Opinion 1: My Reliance on Sources of TUSD-Specific Data is Well-Founded and Consistent with the Standards Employed in My Field

14. Dr. Wildermuth is wrong to assert that my strategic recommendations for Tucson Unified School District are invalid because they are not based on quantitative data and rely too heavily on anonymous informants.[1] This assertion misrepresents both my process and the appropriate use of data in applied school mental health consultation.

15. Contrary to Dr. Wildermuth's claims, I did review and consider Tucson-specific data where available, including documentation on Tier 2 and Tier 3 referrals, chronic mental/behavioral health conditions, staffing patterns, school climate, and community partnerships. These data are discussed throughout my Tucson report and provide context for the structural gaps that must be addressed. However, as Dr. Wildermuth herself acknowledges, TUSD has *not* collected or analyzed data needed to assess the specific impact of social media on student mental health, learning, or behavior. This data vacuum reinforces, rather than weakens, the need for a proactive strategic response.

16. My standard practice when working with school districts is to review available district- and school-level data, but also to recognize that such data often misrepresents or only scratches the surface of what is actually happening with respect to student mental health, service delivery gaps, and school climate disruption.[2] Data systems often fail to capture the social media harms, such as emotional dysregulation, compulsive use, peer contagion, and cyberbullying.

17. The absence of formal data on social media harms in TUSD should not be conflated with the absence of harm. Dr. Wildermuth notes that TUSD has not undertaken any formal study regarding which platforms students use, how often they use them, or how usage relates to behavior, attendance, or mental health outcomes. Without baseline data collection systems, it is unreasonable to criticize proposed interventions for being based on information collected from educators lived experience and peer review literature. Yet this is exactly the logic used by Dr. Wildermuth to dismiss the need for intervention. Her critique reflects a limited understanding of how public school systems operate,

---

[1] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 6-11, ¶¶ 32-42).

[2] Hoagwood, K., Atkins, M., & Ialongo, N. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. *Administration and Policy in Mental Health and Mental Health Services Research*, *40*(6), 451-455.

particularly those facing resource constraints. Most districts do not yet have dedicated funding, technical infrastructure, or personnel to conduct complex data linkage analyses in response to the emerging, externally driven challenge of social media harms. These are not yet standard practices, and expecting their presence as a precondition for action reveals a misalignment with the real-world constraints and decision-making processes of school systems.

18. Wildermuth's own report underscores the limitations of Tucson's data systems. She concedes that TUSD has no quantitative data on what platforms students are using or how often; no comprehensive set of records on whether social media use is related to behavioral infractions; and no systematic tracking of social media-related distress in student mental health referrals.[3] She also confirms that when Tucson increased mental health referrals in recent years, it had *no data* on the reasons for those referrals.[4] These are precisely the gaps my strategic plan seeks to address while mitigating the harms caused by social media, by building infrastructure for data collection, triaging, and monitoring.

19. Wildermuth points to declining rates of documented chronic behavioral health conditions (from 4,558 in 2017–18 to 3,656 in 2023–24) as evidence of improvement, but offers no indication that this decline reflects actual mental health improvements rather than changes in documentation practices, access, or referral procedures.[5] In fact, as Wildermuth herself states, TUSD leaders attributed the rise in referrals to *expanded partnerships*, not increased incidence,[6] a point that highlights unmet need in prior years and the difficulty of interpreting trends without disaggregated or cause-specific data.

20. Academic and behavioral metrics cited by Dr. Wildermuth, such as improved school ratings and reduced D/F scores,[7] are not sensitive indicators of the kinds of harms social media can cause. My report does not claim that social media causes grade-point average declines or lower graduation rates. Rather, it asserts that social media contributes to attention deficits, classroom disruption, peer conflict, anxiety, other mental health issues and other barriers to learning, challenges not captured in school letter grades or broad behavior categories like "fighting" or "tobacco use." Instead of undermining the need for district-wide intervention, these examples underscore the limitations of isolated site-level policies and supports the need for a coordinated, comprehensive strategy to address the

---

[3] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 6, ¶ 33).

[4] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 8, ¶ 37).

[5] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 8, ¶ 37).

[6] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 8, ¶ 37).

[7] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 9, ¶¶ 38-39).

broader impacts of social media on student well-being and school functioning and climate.

21. The suggestion that I "conflate screen time with social media" reflects a misunderstanding of how these issues manifest in real-world student experiences. The social media platforms at the heart of this litigation are overwhelmingly accessed via personal devices, primarily smartphones, and therefore constitute a significant share of overall screen time among youth. While not all screen time is social media use, a substantial portion of the time students spend on screens is, in fact, devoted to engaging with social media. This includes scrolling, posting, messaging, and consuming videos and peer commentary, activities directly tied to the design features of social media that contribute to dysregulation, sleep disruption, and mental health strain. Attempts to draw rigid distinctions between general screen use and social media use downplay the extent to which these platforms dominate adolescents' digital environments and obscure the practical challenges schools face in addressing their impacts.

22. My plan directly addresses the limitations Dr. Wildermuth critiques: it includes investments in professional development, data system design, referral protocols, and MTSS-aligned supports that allow TUSD to monitor and respond to the impacts of social media over time. These investments are not based on "anonymous anecdotes" as Dr. Wildermuth incorrectly asserts but on a converging body of national science, local testimony, and implementation science best practices. It is precisely because Tucson lacks social media-specific data that a deliberate, district-led strategy is necessary to track and mitigate these harms.

23. Moreover, key informant interviews are a standard, valid source of ground-level insight.[8] My opinions are not based only on interviews, but these interviews are a critical, intentionally weighted component of my standard school mental health evaluation process. Especially in the context of limited or lagging district data systems, key informants provide essential insight into emerging problems that may not yet be formally tracked. This approach is used consistently in every district for which I have been asked to develop a strategic plan for comprehensive school mental health improvement. Across dozens of school districts nationwide, I speak directly with district and school leaders, educators, and student support professionals to understand local strengths and identify service and infrastructure gaps in order to inform and support quality improvement. TUSD informants' insights provided site-specific accounts of:

- Escalating challenges in student self-regulation due to compulsive platform engagement,

- Disrupted classroom environments;

- Severe mental health concerns stemming from social media use, and

---

[8] Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. *School Mental Health*, *1*(1), 26-36.

- Student disengagement tied to sleep loss and digital distraction.[9]

These insights, which were consistent across informants and converge with national data on social media harms, provided part of the foundation for my district-specific plan. In implementation science, such practice-based evidence is a necessary complement to traditional data sources.[10]

24. Consistent with the standard practices in my field. I do not attribute specific quotations to named individuals. This is intentional and standard practice in school consultation and qualitative research. Anonymity helps ensure candor and protects respondents from potential repercussions, especially when they are discussing district challenges. That said, I did provide the list of informants for each district, including TUSD, upon defense counsel's request, and the names were therefore available for Defendants' experts to review. Thus, it is unclear why Dr. Wildermuth refers to the interviewees as "unnamed" in a misguided attempt to discredit my approach. The TUSD interviewees included student support professionals, individuals with direct knowledge of social media impacts on TUSD students' mental health and learning and district support service gaps. Dr. Wildermuth's repeated references to "unnamed" sources imply methodological opacity, when in fact my approach, which I use consistently as my standard practice when working with school districts across the country, reflects longstanding norms for psychological consultation in school systems, including practices used in federally-funded needs assessments, including SAMHSA-funded district school mental health evaluations.

25. In sum, Dr. Wildermuth's argument relies on the logical fallacy that absence of comprehensive quantitative data is evidence of absence of harm. My strategic plan for TUSD reflects a scientifically grounded and contextually informed response to well-documented harms caused by social media platforms and addresses gaps in infrastructure, staffing, and system capacity that need to be remediated in order to properly address the harms caused by Defendants' social media platforms.

> 2. Response to Wildermuth Opinion 2: The Existence of Mental Health Resources and Initiatives Does Not Preclude Strategic Planning to Enhance and Supplement Those Resources and Initiatives

26. Dr. Wildermuth wrongly contends that my proposed strategic plan for Tucson Unified School District fails to account for TUSD's existing Tier 1, Tier 2, and Tier 3 supports, and that many of my recommendations are duplicative or unnecessary.[11]

27. I carefully reviewed existing mental health and student support services in TUSD, including those highlighted in Dr. Wildermuth's report. These include Youth Mental

---

[9] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 51-55).

[10] Hoagwood, K. E., Atkins, M. S., & Ialongo, N. S. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. Administration and Policy in Mental Health and Mental Health Services Research, 40(6), 451-455.

[11] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 11-21, ¶¶ 43-70).

Health First Aid (YMHFA) training, suicide prevention protocols, digital citizenship materials embedded in broader SEL efforts, and general student support staffing across counseling, psychology, social work, and health services. These initiatives are valuable, but none of them meaningfully address the distinct and escalating harms caused by student engagement with Defendants' social media platforms.

28. The assertion that my recommendations ignore or duplicate existing services misunderstands their intent and scope. My recommendations are *additive*, not duplicative. My strategic plan is additive and tailored and reflects public health frameworks that justify additive responses to new risk environments.[12] They are designed to address emerging social media harms that were not the focus of TUSD's current or prior programming. For example, while TUSD implements general suicide prevention and SEL training (e.g., "Act on Facts," YMHFA, QPR), none of these are tailored to the mental health stressors and compulsive usage patterns engineered by social media platforms.

29. Moreover, TUSD lacks a formal, districtwide digital wellness curriculum; has not conducted widespread student or family education on social media-specific risks; and does not provide staff with the training needed to identify or respond to social media-specific distress. Current professional development efforts touch only lightly on digital impacts, and only some materials, such as those from the National Council for Mental Wellbeing, include any social media content at all.

30. TUSD's past efforts, while commendable, are not holistic and its systems are not tailored to the specific harms caused by social media. Initiatives like the Substance Abuse and Disorder Task Force and YMHFA rollout address adjacent concerns, but none directly target the psychosocial, academic, and behavioral impacts of student social media use. District representatives themselves confirmed that social media is not a formal component of their strategic planning, and that they do not track usage or impact metrics related to social media platform engagement. These are precisely the harms and needs my strategic plan is designed to address.

31. My proposed interventions are also differentiated by their structure, duration, and purpose. They include sustained, multi-year investments across all three MTSS tiers, not just temporary campaigns or resource handouts. They emphasize embedded staff roles (e.g., digital wellness leads), curricular integration of digital literacy and life skills, structured professional development tied to implementation science, and robust family engagement strategies. These are not "nice-to-have" additions; they are evidence-based public health responses to the pervasive and externally imposed harms caused by social media.

32. Dr. Wildermuth's concern that my plan overlooks TUSD's size and complexity is also misplaced. The plan directly considers the district's enrollment size and provides a detailed, locally tailored roadmap with the districts' existing MTSS framework. Rather, than offering a generic or one-size-fits-all model, the recommendations are calibrated to augment current staffing and programming in a manner that reflects the scale and needs

---

[12] Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172.

of TUSD. The 15-year timeline reflects a realistic and evidence-informed structure consistent with successful public health responses such as tobacco use prevention and youth mental health.

33. Nowhere in my report do I suggest dismantling TUSD's existing services. Rather, my recommendations build upon them. For example:

- TUSD's existing SEL programming should be expanded to address social media-related emotional regulation and digital peer conflict;

- Current digital citizenship content should be strengthened to include social media-specific education on design manipulation, self-comparison, and safety;

- YMHFA and suicide prevention protocols should integrate modules on social media harms associated with compulsive use, mental health issues, and the exacerbation of suicidality via online trends.

34. Treating social media harm as merely a subset of existing concerns, as Dr, Wildermuth implies, minimizes the scale and systemic nature of what school staff are reporting. This is not just another wellness topic. It is a cross-cutting, often invisible influence that amplifies risk and compromises learning environments. My plan is designed to recognize and respond to this new threat using comprehensive and sustained strategies rooted in implementation science.

35. In sum, I did consider the existing resources and initiatives in Tucson Unified School District and tailored my opinions to Tucson's specific needs. While Tucson's existing resources and initiatives provide important groundwork, they were not developed to address the unique and evolving risks posed by social media platforms. My strategic plan is not duplicative, it is proportionate and specifically tailored to the gaps that TUSD has yet to fill.

   3. Response to Wildermuth Opinion 3: TUSD's Prior Staffing and Resource Levels Do Not Dispel Need for Improvement

36. Dr. Wildermuth wrongly asserts that my staffing recommendations for Tucson Unified School District (TUSD) are excessive, insufficiently individualized, and infeasible due to historical implementation challenges and broader national shortages of school-based mental health professionals.[13]

37. Dr. Wildermuth mischaracterizes my approach as offering a one-size-fits-all model. While the *types* of roles I recommend, such as digital literacy specialists, life skills specialists, and district-level school health coordinators, are consistent across districts, the *numbers* of staff are tailored to district-specific student enrollment and school configuration. For Tucson, my recommendations reflect a large, urban district with nearly 40,000 students and pronounced disparities between existing capacity and growing mental health need.

38. Dr. Wildermuth's critique overlooks the central premise of my plan: the existing workforce in TUSD cannot address the new and externally imposed demands created by

---

[13] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 22-26, ¶¶ 71-87).

student social media use. TUSD data, indicate a challenge in maintaining adequate numbers of core student support professionals, an issue often shaped by external factors such as funding constraints. These capacity limitations make it difficult for the district to fully meet existing student mental health needs and present barriers to addressing the additional demands created by the new and growing significant negative impacts of social media use.

39. Dr. Wildermuth notes that shortages exist for certain student support roles.[14] Critically, Dr. Wildermuth has not actually conducted any analysis to determine whether there are actual staffing shortages in Tucson. However, any shortages are not a reason to avoid goal-setting. Rather, bold, intentional investment in workforce development to extend service capacity is required to address a new and evolving harm like social media. Ignoring new challenges because the existing system is strained would be akin to failing to respond to an infectious disease outbreak because there are not enough nurses. My plan reflects a public health response to a significant new harm, not a luxury proposal.

40. Moreover, while workforce shortages, both nationally and in Arizona, are not insurmountable. This often reflects funding constraints rather than a lack of qualified professionals. A growing body of evidence supports effective strategies to recruit and retain school-based mental health personnel, including competitive compensation, professional development opportunities, supportive supervision, differentiated roles, and sustainable caseloads. While specific hiring, recruitment, and retention decisions may be tailored to district context, the recommended staffing levels represent the full capacity needed to address the harms of social media. Moreover, as discussed in my general rebuttal report, contrary to claims that the proposed staffing levels are unattainable, current data reflect a steady flow of qualified school mental health professionals entering the field.[15]

41. Importantly, the staffing recommendations I propose are additive.[16] They are not a critique of existing staff performance, but an acknowledgment of role overload. For example, Dr. Wildermuth notes that TUSD counselors perform a range of administrative and non-counseling tasks.[17] This role dilution is a symptom of structural understaffing, not inefficiency. My recommendations would relieve such pressures by introducing complementary roles and restructuring task allocation to improve school functioning, service reach, and staff well-being while addressing the significant harms caused by social media.

---

[14] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 22, ¶ 72).

[15] Rebuttal Repot of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 13-15, ¶¶ 47-50).

[16] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025).

[17] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 24-25, ¶ 82).

42.     Dr. Wildermuth's emphasis on "historical mismanagement" of staffing and implementation,[18] aside from being subjective and a point many TUSD stakeholders would disagree with, distracts from the central issue: TUSD, like many urban districts, is operating with insufficient human capital to meet rising and complex student needs as a result of social media use. These implementation challenges should not be used to dismiss or defer investment, but rather to guide how that investment is rolled out. For example, workforce pipelines in partnership with local universities can address feasibility concerns while preserving the integrity of the recommendations.

43.     My recommendations for TUSD were informed not just by enrollment figures and service ratios, but also by direct interviews with student support staff, a standard component of my consultation approach with districts across the country. These interviews consistently pointed to capacity gaps in addressing the mental health and learning disruptions linked to social media use. TUSD staff expressed a need for clearer district-level leadership on digital wellness, more embedded site-based mental health supports, and better coordination between schools and community providers. These locally sourced insights shaped the structure and sequencing of my staffing plan.

44.     The national professional benchmarks were developed to ensure baseline access to mental health services in schools. But even those standards do not account for the novel, social media-specific challenges. As such, even *meeting* these ratios is insufficient; failing to meet them makes it impossible for schools to sufficiently respond to these new and evolving harms.

45.     Dr. Wildermuth suggests that implementation challenges in TUSD make the plan unrealistic.[19] I disagree. My recommendations are focused on clearly identifying what resources, including staffing, are necessary to address the growing burden that social media platforms have placed on school systems. I fully acknowledge the realities school systems face in attracting and retaining qualified personnel. These constraints are real, but they do not negate the responsibility to define what adequate staffing should look like. Without a deliberate plan to increase staffing capacity, TUSD risks burnout and unmet student need.

46.     In sum, my staffing recommendations are not excessive, they are proportional to the magnitude and novelty of the harms social media is inflicting on school environments and student well-being. They are not cookie-cutter; they are aligned to Tucson's enrollment size and specific needs. And they are not infeasible, they are structured for locally tailored implementation. To argue that we should defer or dilute these investments because of past implementation barriers or national workforce trends is to accept preventable harms to students as the status quo.

---

[18] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 24-26, ¶¶ 81-87).

[19] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (p. 26, ¶ 86).

4.        Response to Wildermuth Opinion 4: Every School District Faces Unique Challenges, But These Do Not Reduce the Unique Challenges of Social Media

47.      Dr. Wildermuth wrongly asserts that my recommendations fail to account for the multifaceted challenges Tucson Unified School District (TUSD) faces, including poverty, homelessness, the aftereffects of the COVID-19 pandemic, staff turnover, absenteeism, and academic recovery needs.[20] I understood and considered these issues when developing the Tucson-specific strategic plan.

48.      Every district I have evaluated, including TUSD, operates within a complex ecosystem of structural and contextual barriers. Tucson's challenges, including elevated rates of poverty, English language learner needs, strained family-school engagement, and behavioral volatility, are deeply concerning. However, these conditions are neither new nor unique. They are emblematic of many under-resourced urban districts, particularly those serving historically marginalized populations.

49.      My approach to evaluation and planning presumes the presence of overlapping adversities and is designed to address the way *new* harms, specifically, those stemming from social media platforms, interact with and compound existing vulnerabilities. In Tucson, the strategic plan directly addresses how the pervasive and psychologically manipulative design of social media exacerbates mental health concerns and disrupts classroom environments.

50.      As discussed in my general report, the influence of social media is distinct from other adversity exposures in three critical ways:

- It is *pervasive*, affecting students during and outside of school hours;

- It is *amplifying*, intensifying existing risks such as trauma, identity stress, and academic disengagement;

- It is *externally imposed*, emerging from platform design choices that capitalize on adolescent neurodevelopmental vulnerabilities, not from school policies or student behaviors.[21]

This emergent harm requires a correspondingly tailored and systemic response. My plan is not a generic school mental health blueprint, it is specifically designed to address social media harms that are deeply embedded in students' daily lives and which current systems are ill-equipped to manage.

51.      Dr. Wildermuth points to significant challenges in Tucson related to absenteeism, attention, emotional regulation, and social-behavioral needs, but implies that these issues exist independently of student use of social media.[22] This framing is misleading. My plan

---

[20] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 26-29, ¶¶ 88-93).

[21] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-19, ¶¶ 30-76).

[22] 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District, (pp. 26-29, ¶¶ 88-93).

identifies the direct and compounding role of social media in each of these domains. For example:

- Sleep disruption from late-night platform use contributes to chronic absenteeism and classroom disengagement;

- Cyberbullying and social comparison increase anxiety, peer conflict, and somatic complaints;

- Social media engagement intensifies disordered eating, self-harm, and identity-based harassment.[23]

These effects are not theoretical. They were described consistently by TUSD informants across student services roles and align with national empirical data.[24]

52. Far from overlooking Tucson's broader challenges, my plan addresses them at their intersection with social media harms. For instance:

- The Tier 1 recommendations include schoolwide digital wellness education and life skills programming to strengthen student self-regulation and resilience;

- The Tier 2 and 3 supports include additional clinical capacity to serve students with escalating internalizing symptoms and behavioral dysregulation related to students' social media use;

- Family engagement efforts are designed to bridge the digital divide and provide parents with tools to manage technology use at home, particularly in households where supervision is limited due to economic stress.

53. Dr. Wildermuth presents a false dichotomy: that Tucson must choose between addressing poverty, trauma, and academic gaps *or* addressing social media harms. The reality is that these issues are deeply intertwined. Social media platforms act as new harms and accelerants of existing stressors. Any serious attempt to support student mental health and academic success in TUSD must include a targeted strategy to mitigate the harms created by those platforms.

54. My strategic plan does not attempt to solve every systemic challenge in Tucson. It offers a precise, evidence-based response to a newly imposed category of social media harm that current systems were not designed to manage. This layered approach, focused on digital wellness and social media–related risk, is grounded in public health principles and consistent with national best practices in school mental health.

55. In sum, my recommendations do not ignore Tucson's structural and contextual barriers. Students in TUSD face overlapping risk factors, poverty, exposure to trauma, linguistic isolation, academic disruption, that make them especially vulnerable to the negative effects of social media. These factors do not weaken the case for intervention.

---

[23] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-19, ¶¶ 30-76).

[24] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-19, ¶¶ 30-76); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (p. 10, ¶¶ 51-55).

### 5. Response to Wildermuth Opinion 5: Strategic Plan for TUSD is Properly Designed

56.     As discussed above and in my May 16 and May 18 reports, my strategic plan for TUSD is properly grounded in scientific literature on youth mental health and school-based supports and my strategic plan is grounded in my expertise as a national leader in school mental health and implementation science, with over 25 years of experience advising state and local education agencies on the development, expansion, and evaluation of comprehensive school mental health systems. My strategic plan outlined in my initial report, appropriately proposes a 15-year, multi-tiered public health framework that is necessary to mitigate the substantial harms caused by students' use of social media platforms. For all of the reasons discussed above, none of Dr. Wildermuth's criticism undermine the foundation and basis for my plan and her opinion that the strategic plan for TUSD is unnecessary, unlikely to be effective, and/or, in some cases, infeasible is unsupported.

### B. Response to Hutt

57.     Dr. Hutt's report for Tucson Unified School District is substantively identical to his general report and those submitted for other bellwether districts, except for a section where he references data specific to TUSD.[25] These district-specific claims do not meaningfully engage with the context or analysis in my TUSD strategic plan and are based on cherry-picked observations that lack methodological rigor. Below, I summarize my general response to Dr. Hutt's core opinions and respond directly to the additional points he raises in the TUSD context.

### 1. Summary of Response to Hutt Opinions 1-3

58.     As described in my August 1, 2025 general rebuttal report,[26] I offered the following responses to Dr. Hutt's general claims:

59.     On the charge of "educationalization":[27] My strategic plan is a public health response to a new, external harm, not an attempt to shift societal burdens onto schools. Schools have long adapted to emerging threats to student well-being and proper school functioning. The harms from social media platform use, including attention dysregulation, peer conflict, sleep disruption, and emotional distress, are discrete, observable challenges occurring during the school day and undermining the learning environment and school functioning. School systems are not being asked to "solve" social media; they are being equipped to respond to its impact on their school districts.

60.     On contextualizing achievement and behavioral trends:[28] I fully understand and considered that student mental health and academic engagement are shaped by multiple factors, including poverty, trauma, family functioning, and COVID-19. I considered and

---

[25] 2025.07.11 Expert Report of Ethan L. Hutt for Tucson Unified School District, (pp. 76-96, ¶¶ 140-150, 166).

[26] Rebuttal Repot of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 34-41, ¶¶ 127-155).

[27] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (p. 32, ¶ 70).

[28] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 80-84, ¶¶ 145-152).

understood these issues and my strategic plan accounts for them. None of these challenges negate the significant role of social media, which constitutes a distinct and increasingly dominant challenge to the school environment and school functioning. My analysis reflects this broader context, as does the layered, multi-tiered approach I propose.

61. On interpreting test scores and academic data:[29] Unlike Dr. Hutt, I do not rely on academic achievement scores as the primary indicator of social media harm. As explained in my general and district-specific reports, harms manifest in ways that are often under-documented in test scores, such as student dysregulation, classroom disruption, strained peer and adult relationships, and increased need for counseling and behavioral support.[30]

### 2.    Response to Tucson-Specific Claims in Hutt's Report

62. While much of Dr. Hutt's report offers a generalized historical perspective on American education, he raises several Tucson-specific arguments in paragraphs 140-150 and 166. I address those below:

63. Dr. Hutt argues that Arizona's transition from the Common Core State Standards (CCSS) to Arizona's College and Career Ready Standards (2013), and eventually to distinct state standards (2016), along with changes in standardized testing (from AIMS to AzMERIT and then AASA), offer a plausible alternative explanation for observed changes in student academic outcomes.[31] However:

   - Dr. Hutt provides no direct evidence linking these standards transitions to measurable declines in Tucson Unified School District's student mental health, attention, or school functioning and climate.

   - While shifts in standards can cause temporary disruptions in test performance, they do not account for the *daily, school-reported* impacts of student dysregulation, sleep deprivation, and conflict, all of which were described by Tucson educators and linked directly to social media use.

   - Standards transitions are administrative and instructional in nature. By contrast, the pervasive and psychologically manipulative design of social media platforms exerts a daily and persistent influence on students' functioning, as observed by TUSD staff.

64. Dr. Hutt uses data from the State Assessment Data Repository (SADR) to chart 8th grade proficiency rates in Math and English in TUSD, asserting that the patterns (decline after standards change, uptick, and further decline post-pandemic) align more with test

---

[29] 2025.07.09 Expert Report of Ethan L. Hutt, Ph.D., (pp. 73-84, ¶¶ 136-151).

[30] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 8-19, ¶¶ 35-76); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025), (p. 10, ¶¶ 51-55).

[31] 2025.07.11 Expert Report of Ethan L. Hutt for Tucson Unified School District, (pp. 76-80, ¶¶ 140-144).

transition effects than with social media harms.[32] This claim is narrow and does not address several key points:

- Proficiency rates in two subject areas for one grade level cannot capture the multifaceted impacts of social media on school environments. My report and TUSD key informants describe observable effects on student behavior, attention, sleep, and mental health that affect *all* grade levels, not just 8th grade, and which are not reflected in standardized test data alone.

- The focus on test scores overlooks the broader impacts of social media that interfere with student functioning and educator capacity. For example, educators in TUSD reported increased peer conflict tied to digital rumors, compulsive checking of notifications, emotional volatility linked to online interactions, and student disengagement, none of which would be detected in aggregated test score trends.

- Even if academic scores temporarily rebounded after a testing transition, that does not invalidate the presence of social media harms. These phenomena coexist and interact. Social media impacts may manifest not in raw proficiency rates but in increased Tier 2 referrals, crisis responses, absenteeism, and classroom management burdens, all of which have risen in TUSD and are acknowledged in district feedback.

65.  Dr. Hutt cites 4-year graduation rate trends in TUSD,[33] claiming they follow national trends and thus do not support allegations of social media harm. This argument is misplaced:

- My report never claims that students' use of social media reduces graduation rates. Graduation is a lagging indicator and does not capture the nuances of classroom-level harm.

- TUSD educators consistently described student disengagement, emotional fragility, and school avoidance linked to online experiences. These harms can persist even as graduation rates remain stable due to the extensive scaffolding that educators provide to help students reach completion.

- The goal is not merely to graduate students but to ensure they do so with the academic, emotional, and behavioral readiness to thrive. Social media harms undermine this readiness, something not captured in surface-level graduation metrics.

66.  Dr. Hutt notes that TUSD had chronic absenteeism rates of 41% (2018) and 43% (2019), and that more recent media reports frame the district as experiencing a "chronic absenteeism crisis."[34] He suggests that these data reflect a broader cultural shift rather than implicating social media. However:

---

[32] 2025.07.11 Expert Report of Ethan L. Hutt for Tucson Unified School District, (pp. 81-84, ¶¶ 149-150).

[33] 2025.07.11 Expert Report of Ethan L. Hutt for Tucson Unified School District, (p. 83, ¶ 150).

[34] 2025.07.11 Expert Report of Ethan L. Hutt for Tucson Unified School District, (pp. 95-96, ¶ 166).

- No evidence is provided to support the cultural shift hypothesis or to rule out the contributing role of social media. By contrast, TUSD staff report direct links between late-night social media use, disrupted sleep cycles, school refusal, and disengagement.

- Dr. Hutt does not analyze absenteeism patterns by age, grade, device access, or time of day. Without such disaggregation, he cannot credibly dismiss the influence of social media.

- Local media characterizations of a "crisis" underscore the magnitude of the issue, but not its cause. My strategic plan includes specific Tier 1-3 strategies to address absenteeism linked to digital overload, anxiety, and disengagement. These include embedded digital wellness roles, life skills curricula, and increased behavioral health staffing.

67. Dr. Hutt's Tucson-specific arguments rely heavily on retrospective academic indicators and state-level test transitions but do not meaningfully engage with the core focus of my report: the school-disruptive and emotionally dysregulating effects of compulsive social media use on Tucson students. His assertions are speculative and insufficient to rebut the extensive, district-level evidence I present. My recommendations are grounded in the lived realities of Tucson educators and students and are responsive to the specific, emergent harms of social media that state standards and test transitions do not, and cannot, explain.

### 3.    Concerns Regarding Dr. Hutt's Analytical Qualifications and Methods

68. Dr. Hutt's rebuttal does not reflect a strong grounding in the social science methods necessary for causal inference or implementation-focused evaluation. His analysis lacks the methodological rigor typically required in public health and implementation science, which limits the applicability of his critique to the type of strategic, systems-level planning at the core of my report. Specifically:

- His Tucson-specific "analysis" consists of plotting 8th grade proficiency rates in Math and English on a line graph and visually interpreting those trends. This descriptive visualization is not accompanied by any statistical testing, modeling, or attempt to control for confounding variables.

- He selects 8th grade proficiency scores from the State Assessment Data Repository (SADR) based on the assumption that students "could plausibly" be affected by social media by that grade. However, he provides no empirical basis, developmental, behavioral, or usage-based, for this selection. He does not justify why other grade levels were excluded, nor does he examine differences by subgroup or time-of-day use that might affect attribution.

- His interpretation of TUSD's proficiency trends as aligning with standards and assessment changes is speculative and does not engage with the growing body of research linking social media to student attention, anxiety, peer conflict, or emotional dysregulation, all of which were reported directly by Tucson school staff and which extend beyond what can be seen in academic test scores.

- Dr. Hutt references the Return to Learn absenteeism estimates despite the creators' own warnings that (1) the data are inconsistent across states, and (2) the rates are

generated by combining distinct and methodologically incompatible data sources.[35] Further, the data is reported only at the district level. As such, these estimates are inadequate to support the fine-grained claims he makes about TUSD's school-specific outcomes or subgroup-level effects.

- His reference to TUSD's high chronic absenteeism rates is further based on district-level media reports rather than systematically collected or disaggregated data. He draws broad conclusions without accounting for grade-specific absenteeism patterns or known contributing factors such as sleep deprivation, anxiety, or social avoidance related to digital peer dynamics.

69. Ultimately, none of Dr. Hutt's analysis changes my opinions which are grounded in:

- Over 25 years of experience in school mental health, prevention science, policy evaluation, and implementation frameworks;

- Review of publicly available and district-supplied TUSD-specific data;

- Direct interviews with school personnel familiar with local trends;

- Established public health and MTSS frameworks;

- Triangulation of quantitative trends with qualitative data from TUSD staff, peer-reviewed literature, and evidence from national surveys

- Together, these elements provide a far more methodologically sound and contextually grounded basis for the recommendations I offer. Dr. Hutt's reliance on partial data and unsupported inferences does not meet the evidentiary standard required for district-level causal assessment or strategic planning.

### 4.    Clarifying My Use of Evidence

70. Dr. Hutt mischaracterizes my analytic approach. My conclusions are not based on trends in test scores or academic performance metrics. Those are his chosen metrics, the use of which is not justified as described above. Instead, they are grounded in:

- Consistent educator reports of student dysregulation, inattention, and peer conflict across TUSD schools;

- Observable behavioral shifts linked to increased student engagement with digital devices and social media platforms;

- Documented gaps in mental health staffing, disruptions to school function and climate, and the diversion of educator time and attention toward managing technology-related challenges, none of which are captured in standardized testing data.

The harms I identify are immediate and impactful in their own right. Whether or not certain academic achievement trends reflect these harms, they are clearly documented by staff and supported by national research.

---

[35] *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods").

17

### 5. Conclusion Regarding Dr. Hutt's TUSD Opinions

71. Dr. Hutt's TUSD report is largely derivative of his general report and demonstrates limited engagement with TUSD's specific context, student needs, or reported school-based challenges. His district-specific assertions rely on speculative interpretations of limited data and untested assumptions, offered without rigorous analysis or methodological transparency. In contrast, my recommendations are rooted in direct input from TUSD educators, aligned with established public health and school mental health frameworks, and guided by implementation science. TUSD requires a response that addresses the real and documented challenges facing its students, not a generalized dismissal unsupported by meaningful local analysis.

### C. Response to Aguilar

#### 1. General Response to Opinions 1-6

72. Dr. Aguilar's rebuttal for TUSD is identical to his general rebuttal report, with no reference to TUSD-specific evidence with the exception of *Exhibit A*. Therefore, I refer the reader to my July 30, 2025, General Rebuttal Report,[36] in which I respond in detail to each of Dr. Aguilar's core opinions. My response to his general opinions are summarized as follows:

73. Opinion 1: While some regulated social media use may have limited educational uses, these uses are typically teacher-directed and scaffolded. My report does not dispute this; in fact, my strategic plan incorporates digital literacy training that helps students and staff distinguish helpful from harmful social media use. Indeed, the primary concern is not educator-directed social media use, but rather students' personal and pervasive use, which research and school personnel identify as a driver of attention and mental health problems and disrupted peer interactions and classroom environments.

74. Opinion 2-3: The fact that civic engagement and peer connection may occur through social media in some contexts does not negate the substantial and growing body of evidence documenting increased mental health and learning problems caused by social media platforms. My report acknowledges that social media use is not monolithic. Yet, because of the significant harms caused by Defendants' platforms, a structured, district wide approach is needed.

75. Opinion 4: The fact that some educators use social media for professional development is neither relevant to, nor addresses the harms in this case. The existence of teacher learning networks on social media does not offset the harms that Defendants' social media platforms are causing to school districts, the school environment and school functioning.

76. Opinion 5: My plan does not advocate blanket bans as the only approach. To the contrary, my plan promotes thoughtful use policies and enhanced educator training to address harms that stem from Defendants' social media platforms and social media use.

77. Opinion 6: Dr. Aguilar critiques my comparison to tobacco control. As I have noted in my general rebuttal,[37] the comparison is not one of mechanism but of scale and public

---

[36] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 41-45, ¶¶ 156-172).

[37] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 21-25, ¶¶ 74-89).

health response. I state clearly that my strategic plan is modeled on past public health challenges that required system-wide and sustained action, not because social media is identical to tobacco, but because the public health infrastructure needed to respond is similarly complex and underdeveloped. With respect to the critique that the 15-year plan lacks iteration, to the contrary, my plan is explicitly designed for staged rollout and iterative refinement.

      2.      Rebuttal to District-Specific Opinions in Exhibit A (Tucson Unified School District)

78. In *Exhibit A* of his report for Tucson, Dr. Aguilar presents three additional opinions (OP7-OP9) specific to the district. Each is addressed below:

79. **Opinion 7: Tucson has technology resources.** Dr. Aguilar states that Tucson Unified School District provides students and teachers with access to laptops, iPads, and internet hotspots and suggests that these existing resources undercut the need for the interventions I propose. This is a mischaracterization of the core issues addressed in my report.

80. My report does not argue that Tucson lacks hardware or infrastructure. The presence of educational technology, when curated and directed by educators, is not in dispute. Nor do I dispute that classroom technologies can, under certain conditions, support student learning. However, the harms addressed in my report arise not from structured, teacher-facilitated use of technology, but from students' widespread personal use of social media platforms during and outside of school hours.

81. I acknowledge that:

- Technology can enhance instruction when its use is scaffolded, supervised, and intentional.

- However, the public health-level impacts under review here, distraction, compulsive engagement, emotional dysregulation, sleep deprivation, and digital peer conflict, stem from pervasive personal social media use, which is fundamentally different from educational device use. These impacts occur despite the availability of educational technology, not because of its absence.

- Accordingly, the availability of devices or high-speed internet in classrooms is immaterial to the central claims of my report. My recommendations are designed to address the distinct and growing harms created by students' persistent use of social media platforms in ways that elude educator oversight and undermine the school environment.

82. **Opinion 8:** Dr. Aguilar notes that TUSD has social media accounts used for public communication and that teachers may incorporate platforms like YouTube or permit limited in-class social media use. None of this is in dispute, nor does it conflict with my recommendations.

83. It is entirely appropriate, and common, for school districts to use social media to share announcements, recognize student achievements, or communicate with families. These public-facing accounts are not the subject of my report. Similarly, the fact that a teacher may incorporate curated videos or allow phones for specific instructional purposes is not evidence against the social media harms I document. My report is focused on *personal*

19

*use* of social media platforms by students, not on educator-facilitated or curriculum-aligned media use.

84. A district policy that permits teachers or coaches to determine when phones may be used does not in any way negate the need for comprehensive supports to address the much broader and deeper harms associated with student-initiated social media use, harms that staff across TUSD report encountering regularly and for which current measures are insufficient.

85. **Opinion 9:** Dr. Aguilar states that Tucson provides training and instruction to students and staff about safe technology and social media use. I acknowledge these efforts explicitly in my Tucson-specific report (see ¶¶ 38, 40). These efforts include Youth Mental Health First Aid, suicide prevention trainings, and limited awareness-building activities around digital risks. These reflect the district's commendable attempt to address a growing challenge using its current capacity.

86. However, the existence of these efforts does not reduce the need for the comprehensive and sustained response I have outlined. TUSD's current programming is important, but insufficient to meet the scale and complexity of the harms the district is facing due to student use of social media and described by district personnel. For example:

   - Existing efforts are fragmented across departments and heavily reliant on non-district-developed materials;

   - There is no district-wide educational campaign focused specifically on digital wellness or the psychological effects of social media;

   - Current staff training lacks consistent depth on social media-specific risks such as peer contagion, sleep disruption, and digital self-harm trends.

   - My strategic plan for Tucson builds upon and extends these existing efforts by integrating digital literacy, life skills programming, and educator training into a unified and sustained framework. This includes new roles, such as a Director of Digital Wellness, and sustained programming across all tiers of support.

87. The fact that TUSD has initiated digital literacy efforts and training reflects the district's recognition of a serious and growing problem. My plan provides the structure and staffing systems needed to fully meet that challenge at scale. It does not duplicate existing work, it reinforces and systematizes it, addressing the harm profile that has emerged from widespread personal social media use among youth.

### 3.    Conclusion Regarding Dr. Aguilar's TUSD Opinions

88. Dr. Aguilar's TUSD-specific observations largely reiterate his general arguments and reflect only surface-level engagement with the district's needs and realities. His opinions:

   - Do not contradict the core findings of my report;

   - Do not acknowledge the behavioral health impacts of social media on TUSD's students;

   - And do not offer a viable or evidence-informed plan for how the district can respond to these harms in a coordinated, sustainable, and developmentally appropriate way.

89.    In contrast, my recommendations.

- Are grounded in direct educator interviews and TUSD-specific data;

- Align with national public health and MTSS frameworks;

- Support, rather than replace, existing educational technology efforts;

- And offer a feasible and phased approach to building school capacity to meet the challenges caused by social media use.

D.    Response to Lakdawalla

1.    Lakdawalla Opinion 1

90.    Dr. Lakdawalla wrongly contends that my Tucson report, and those of other Plaintiff experts, fails to meet the standards of a "reliable economic analysis" because it does not independently establish each link in a narrow econometric causal chain from Defendants' conduct to Tucson Unified School District's harms. Specifically, he argues that my work must:

- Demonstrate that the at-issue conduct increases adolescent usage of Defendants' platforms;

- Show that this increased usage causes measurable harm to adolescent mental health and behavior;

- Isolate that harm from other contributing factors; and

- Quantify how those effects result in discrete, attributable burdens on Tucson.[38].

91.    This framing mischaracterizes both my assignment and the appropriate evidentiary standards for public health planning and implementation science. I was not retained to conduct an economic damages analysis. Rather, I was asked to:

- Review and synthesize the existing scientific literature, as well as empirical findings presented by Plaintiff experts;

- Gather and analyze district-specific information regarding observed student mental health and behavioral concerns; and,

- Develop a strategic plan tailored to Tucson Unified School District to address the well-documented and escalating harms associated with student social media use.

92.    I did not, and do not claim to, quantify economic damages. My report does not attempt to isolate a specific marginal dollar impact of Defendants' conduct. It provides a detailed, needs-responsive roadmap to help Tucson address a growing and well-acknowledged crisis impacting its classrooms, students, and staff.

---

[38] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 4-5, 20-21, ¶¶ 2-4, 49-50).

93.    The economic quantification he demands is not part of my expertise or part of my recommendations in my Tucson report.[39]

94.    The causal link between Defendants' social media platforms and adolescent mental health harms has already been extensively established by Plaintiff experts in psychology, psychiatry, neuroscience, and communication science (e.g., Drs. Twenge, Telzer, Christakis). These experts have synthesized a robust and converging body of peer-reviewed literature to demonstrate that these harms are real, widespread, and disproportionately borne by adolescents in school settings. My work builds upon that foundation, just as school-based asthma interventions build upon the epidemiological literature on air pollution or tobacco prevention efforts build on clinical research showing risk from secondhand smoke.[40]

95.    Dr. Lakdawalla incorrectly demands econometric proof of exclusive causation before endorsing any district-level response. But in school mental health and public health broadly, the existence of multiple contributing factors does not preclude intervention. As detailed in my Tucson report, the harms attributed to students' use of social media, emotional dysregulation, disrupted sleep, social comparison, compulsive checking, inattention, are real and consequential, even if not the sole contributors to student impairment.[41]

96.    My strategic plan does not rely on a speculative counterfactual model. It is built on:

- District-level information about service gaps, staffing constraints, and educator-observed impacts;

- Qualitative insights from school- and district-level informants with deep knowledge of Tucson's student population; and,

- Evidence-based school mental health frameworks that have been validated and successfully implemented in hundreds of districts nationwide.

97.    It is both appropriate in my field and standard for system response planning to begin with a synthesis of reported harms and public health indicators in this fashion, not wait for econometric analysis of exclusive causality. It is equally appropriate to draw upon well-established recommendations grounded in comprehensive school mental health system planning, an approach that has been used for decades across hundreds of districts and thousands of schools to guide effective and sustainable supports for student well-being and proper school functioning.

---

[39] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025).

[40] Bryant-Stephens, T. (2009). Asthma disparities in urban environments. *Journal of Allergy and Clinical Immunology*, *123*(6), 1199-1206.

[41] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 51-57).

98. In Tucson specifically, I reviewed district-provided documents, staffing and referral data, existing professional development and curricula, and conducted interviews with key personnel. These sources described:

- Increasing student distress and emotional volatility tied to digital use,

- Classroom disruptions fueled by online conflict and inattention, and

- Mounting strain on mental health and behavioral support systems.[42]

These are the conditions that prompted my recommendations, not hypothetical projections, but observed challenges that Tucson educators and administrators are already struggling to manage.

99. Dr. Lakdawalla improperly contends that, absent a fully specified econometric counterfactual, no strategic plan can be justified.[43] This is an unreasonable and misplaced standard. My report does not purport to quantify Tucson's economic losses. It provides a comprehensive, systems-level response plan grounded in real-time school needs and decades of applied implementation science. The harms at issue are not theoretical. They are happening now, in Tucson's schools.

### 2. Lakdawalla Opinion 2

100. Dr. Lakdawalla improperly contends that Plaintiff experts, including myself, have failed to demonstrate the causal impact of Defendants' conduct on adolescent mental health and school district harms, and that our work relies only on "correlational or anecdotal" evidence.[44] He criticizes the absence of a modeled counterfactual and suggests alternative explanations such as declining television use and increased reporting rates for adolescent mental health conditions.

101. These criticisms fall outside the scope of my assignment. I was not retained to generate econometric models. Rather, as a national expert in school mental health and implementation science, I was tasked with:

- Determining the impact of social media on the district;

- Assessing the observable, school-based impacts of student social media use in Tucson; and,

- Developing a comprehensive, evidence-informed strategic plan tailored to the harms reported by educators and documented in Tucson Unified School District.

102. My analysis draws upon extensive peer-reviewed research and the findings of other Plaintiff experts of Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary

---

[42] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 51-57).

[43] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 22-24, ¶¶ 53-58).

[44] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (p. 5, ¶ 5).

Goldfield, Ph.D. that addressed the causal relationship between adolescent social media use and mental health impacts including anxiety, depression, sleep disruption, inattention, and peer conflict. These findings are consistent with what Tucson educators have reported: increased student emotional dysregulation, behavioral volatility, disengagement, and classroom disruption linked directly to students' use of social media.[45]

103. The claim that my analysis is anecdotal is wrong. My conclusions are based on:

- Consistent patterns of concern voiced by educators and mental health professionals in Tucson;

- Convergence with national survey data and empirical research;

- And implementation science practices that prioritize real-world observation and multi-source triangulation as part of system-level planning.[46]

104. Dr. Lakdawalla wrongly suggests that increased social media use may simply be a substitute for reduced television viewing. This argument reflects a fundamental misunderstanding of both the platforms at issue and the nature of the school-based harms being addressed:

- Unlike passive television consumption, social media platforms are interactive and designed to maximize user engagement, features that are distinct from prior screen-time modalities and have transformed the classroom environment;[47]

- Increases in adolescent mental health concerns are evident not just in self-report data but in hospital admissions for self-harm among adolescents which Dr. Twenge has linked to o trends in social media,[48] which are far less likely to be explained by "greater willingness to report" alone and;

- Dismissing these harms due to uncertainty in measurement trends runs contrary to the precautionary principle of public health, which calls for timely intervention even in the face of incomplete information, especially when the risks of inaction are high as they are here.

105. Tucson educators are not reacting to trends in survey response rates. They are managing the daily consequences of widespread student dysregulation and distress: students arriving to school exhausted after late-night scrolling, peer conflicts initiated or escalated online, and classroom learning time diverted by the behavioral and emotional issues

---

[45] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 51-57).

[46] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 51-57).

[47] E.g., 2025.05.16 Expert Report of Eva Telzer, Ph.D. at 86-87; 2025.05.16 Expert Report of Dimitri Christakis, M.D., M.P. at 278-281.

[48] 2025.05.16 Expert Report of Jean M. Twenge, Ph.D. at 7, 14-22.

caused by social media use. These observations are echoed across schools in Tucson and are consistent with national research.

106. Dr. Lakdawalla's argument that I failed to calculate Tucson's financial losses using economic modeling misstates my purpose. My assignment was to design a strategic plan responsive to educator-reported harms and structural service gaps, especially in Tier 1-3 mental health supports, digital literacy infrastructure, and system capacity. The plan I offer reflects applied public health strategies used to address other population-level youth harms, including substance use, trauma, and obesity.[49]

107. Implementation science does not wait for comprehensive quantitative data before acting, particularly when the harms are real, observable, and growing. My recommendations are grounded in Tucson-specific needs, informed by educator experience, and supported by a national body of research and expert consensus. They are not speculative, they are proportionate and urgently needed.

### 3.    Lakdawalla Opinion 3

108. Dr. Lakdawalla improperly contends that national, state, and Tucson Unified School District data do not support the conclusion that social media use has harmed students or school systems through increased behavioral challenges, reduced academic performance, or increased staffing needs.[50] He concludes that the available data are inconsistent with Plaintiffs' expert findings. This argument reflects a narrow, outdated, and incomplete understanding of how school-based harms are identified and addressed.

109. Dr. Lakdawalla appears to assume that unless harms are visible in metrics like standardized test scores, suspension rates, or documented staff increases, they do not exist. This assumption ignores the operational realities of schools and the standard methodologies used in school mental health evaluation and planning. As detailed in both my general and Tucson-specific reports, my assessment focuses on:

- Mental health concerns that interfere with attention, peer relationships, and classroom engagement, even when not reflected in academic outcomes;

- School climate disruption, educator burnout, and student behavioral volatility that are managed informally or in decentralized ways, and thus are not reliably captured in administrative datasets;

- Subclinical or underreported emotional distress, described consistently by Tucson educators as increasing in frequency, intensity, and complexity.[51]

---

[49] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 32, ¶¶ 107-109)

[50] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 57-82, ¶¶ 119-160).

[51] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (p. 32, ¶¶ 107-09); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 10-11, ¶¶ 51-57); Green, J. G., McLaughlin, K. A., Alegría, M., Costello, E. J., Gruber, M. J., Hoagwood, K., ... & Kessler, R. C. (2013). School mental health

These indicators, though less visible in system-level reports, are well within the standard purview of school mental health practitioners and implementation scientists. Comprehensive evaluation in this field depends on triangulation of educator input, public health frameworks, and emerging patterns in student behavior, not on aggregate test score trends or formal staffing tables alone.

110. As noted in my Tucson report, the district lacks systems for tracking:

- Time spent by students on social media during the school day;

- Emotional or behavioral incidents tied to social media use;

- Referral trends specifically linked to social media distress;

- Informal supports or educator interventions undertaken in response to student social media harms.[52]

111. Tucson student support professionals reported persistent and growing concerns related to:

- Escalating peer conflict and emotional volatility stemming from digital interactions;

- Increasing classroom disruptions related to social media-fueled drama, distractions, or distress;

- Insufficient internal mental health staffing to respond to rising student needs caused by social media.[53]

These reports, captured through key informant interviews, align with both national research and observations from other school districts facing similar challenges.

112. The fact that many of these harms are not reflected in Tucson's formal datasets is not surprising. As is common in large school systems, many impacts of student social media behavior are addressed at the classroom or school level, with no centralized coding mechanism for attribution to students' use of social media. The absence of such data should not be confused with the absence of harm. It reflects a gap in infrastructure, one that my plan is explicitly designed to address.

113. Dr. Lakdawalla wrongly asserts that I fail to demonstrate a statistical relationship between Tucson's administrative data and Defendants' conduct. This critique misapplies economic standards to an implementation science task. My charge was not to conduct a regression-based attribution analysis but to assess the scope of observed harms and propose a systems-level response that aligns with best practices in school mental health.

114. Dr. Lakdawalla's Opinion 3 rests on an unduly restrictive view of what counts as valid evidence. While large-scale administrative datasets can be useful, they are rarely sufficient to capture fast-evolving, behaviorally embedded phenomena like those

___

resources and adolescent mental health service use. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(5), 501-510.

[52] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (p. 11, ¶ 57).

[53] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025), (pp. 10-11, ¶¶ 51-57).

associated with social media use. My approach integrates educator testimony, district capacity assessments, national mental health research, and implementation frameworks to provide a plan that responds to what Tucson schools are actually experiencing, not what a narrow dataset might reflect.

### 4.    Lakdawalla Opinion 4

115.    In Opinion 4, Dr. Lakdawalla wrongly argues that my proposed strategic plan is "overly broad," not tailored to the harms allegedly caused by Defendants' conduct, and duplicative of existing programs in Tucson Unified School District (TUSD).[54] He further improperly contends that I failed to justify the need for new programming or to quantify the portion of harms specifically attributable to Defendants' conduct.[55]

116.    As explained in my prior responses, including those to Drs. Wildermuth at ¶¶ 26-46 above, my plan is not a damages calculation or a narrowly defined treatment intervention. It is a strategic, evidence-informed framework designed to help Tucson respond to the widespread and observable disruptions that social media platform use has caused in school environments. My recommendations are consistent with the findings of other Plaintiff experts, who have documented how social media platforms contribute to youth distress, behavioral volatility, classroom disruption, and increased demands on school staff time, mental health resources, and climate management, all of which have been reported by Tucson educators.

117.    Dr. Lakdawalla improperly insists that I isolate only those harms "incrementally" caused by Defendants' platforms. That demand is inconsistent with standard practice in public health and school systems planning. When a district faces a widespread, externally introduced risk, such as compulsive and distressing social media use among students, it is both necessary and appropriate to implement a comprehensive, system-level response that strengthens Tier 1–3 capacity. That is the approach my plan offers for Tucson.

118.    Dr. Lakdawalla repeats a common defense critique: that my plan overlaps with existing district efforts and fails to demonstrate that it is additive. I refer to my response to Dr. Wildermuth's Opinion 2 at ¶¶ 26-35, where I explain:

- I reviewed existing supports in TUSD, including Youth Mental Health First Aid, the "Act on Facts" suicide prevention protocol, and limited digital literacy training as part of broader SEL and behavioral health initiatives;[56]

- My plan builds on these supports, but addresses a distinct and intensifying set of harms caused by widespread student social media use that current initiatives were not designed to manage;

---

[54] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 5-6, ¶¶ 8-9).

[55] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 5-6, ¶¶ 8-9).

[56] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (p. 7, ¶¶ 38-40).

- The proposed additions are structured within a Multi-Tiered System of Supports (MTSS) and are aligned with implementation science best practices to enhance fidelity, sustainability, and impact.

119. TUSD's existing staffing and infrastructure are insufficient to address the scale and complexity of social media harm described by its own staff. For example:

- Student-to-mental health provider ratios in Tucson fall below national recommendations across all core roles (counselors, social workers, psychologists, and nurses);

- There is no centralized leadership role focused on digital wellness or social media-related harms;

- And professional development offerings do not yet include deep, social media-specific training to help educators recognize, prevent, and respond to social media-caused distress.

120. Dr. Lakdawalla wrongly faults me for not quantifying the exact reach of every current program or isolating the proportion of mental health harms attributable solely to Defendants. That was not my charge. I was asked to assess need, review existing systems, and develop a strategic, actionable plan grounded in school mental health best practices. I used well-established planning tools from my experience with public health and education, including gap analysis, stakeholder feedback, and MTSS design principles. The resulting plan is both proportionate and feasible, aligned with Tucson's scale and designed to support its educators and students in addressing a crisis they are already facing.

121. Dr. Lakdawalla does not have training or experience in child and adolescent mental health, school-based service delivery, or the development of multi-tiered supports in educational settings. His criticisms reflect a fundamental misunderstanding of how implementation science guides school system planning and how real-world student support systems operate. His application of econometric logic to the strategic planning work I conducted in Tucson is misplaced and unsupported by the standards of my field.

### 5. Lakdawalla Opinion 5

122. In Opinion 5, Dr. Lakdawalla incorrectly contends that the costs of my proposed strategic plan for Tucson Unified School District, as modeled by Dr. Leslie, are inflated, unsupported, and unjustified in terms of duration, staffing, and structure. He further claims that I failed to account for existing district personnel, alternative implementation models such as contractors, and the potential use of other public funding sources (¶¶ 10-13).[57]

123. The cost modeling and financial quantification of my strategic plan were conducted by Dr. Leslie, not by me. My role was not to estimate damages or develop a line-item cost breakdown. Rather, I was tasked with designing an evidence-informed, district-aligned strategic plan to address the observed and escalating impacts of student social media use

---

[57] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (pp. 6-7, ¶¶ 10-13).

on Tucson schools. That said, I strongly reject the notion that the structure, duration, or staffing design of my plan is unsupported. It reflects over 25 years of experience in school mental health implementation science and is consistent with well-accepted methods common in my field and best practices in sustainable, systems-level public health intervention.

124. My plan includes a 15-year timeline encompassing staged implementation, professional development, systems change, evaluation, and sustainability. Dr. Lakdawalla challenges this duration and criticizes my comparison to long-term initiatives such as tobacco control. However:

   - The comparison is not based on mechanistic similarity but on the scale, entrenchment, and persistence of an externally introduced harm;

   - Like tobacco use and childhood obesity, social media use reflects behavioral patterns reinforced by powerful external influences and requires multi-generational, multi-tiered interventions to shift;

   - The duration I propose reflects the time needed to build internal capacity, address mental health workforce shortages, and implement a comprehensive MTSS-aligned system that is resilient to future challenges.

   - This is not an arbitrary horizon, it is consistent with precedent in large-scale behavioral health and school systems reform.

125. Dr. Lakdawalla wrongly asserts that training costs are "double-counted."[58] Dr. Lakdawalla fails to recognize that in school systems, professional development costs are often incurred in addition to salary and benefits, particularly when training occurs outside of regular contract hours; collective bargaining agreements or union rules require compensation for training time, substitute teachers must be hired to cover classes during in-service days; and/or external trainers, materials, or certifications are needed. As a result, it is not uncommon, or incorrect, for school districts to incur training expenses in addition to staff salaries and benefits, and any attempt to eliminate these costs as redundant ignores how school systems actually operate.

126. Dr. Lakdawalla wrongly asserts that I ignored existing staffing. In fact, my Tucson report clearly includes current mental health staffing levels.[59]

127. The proposed staff are not replacements, they are additions, designed to meet unmet social media need and address new harms created by student engagement with social media platforms. Tucson's current staff cannot absorb the social media impacts described by district key informants.

128. Dr. Lakdawalla suggests I should have recommended broader use of contractors. I am knowledgeable about and experienced with contractor-based implementation models, having led a national technical assistance center that supported hundreds of districts in

---

[58] 2025.07.11 Expert Report of Darius Lakdawalla, Ph.D. for Tucson Unified School District, (p. 97, ¶ 197).

[59] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025), (p. 8, ¶ 42).

such approaches. While contractors may be useful during initial capacity-building phases, long-term reliance on them is costly, often less effective, and undermines sustainability. Contractors may also lack continuity, pose training challenges, and in some cases be difficult to recruit, particularly in under-resourced or geographically large districts like Tucson. My plan reflects the recognized best practice: invest in internal infrastructure and school-embedded professionals to ensure fidelity, accessibility, and continuity of care.

129. Dr. Lakdawalla also criticizes me for not assuming the use of existing federal, state, or local funding streams. While I am familiar with many of these (e.g., ESSER, Medicaid, Title IV, state mental health block grants), these streams are not dedicated to mitigating social media–specific harms; are often short-term, competitive, or uncertain in duration; cannot reasonably be assumed to replace new funding responsibilities for harms caused by Defendants' platforms; and, are already being used to address a wide array of pre-existing needs. It would be inappropriate and irresponsible to assume that TUSD should reallocate existing funds, intended for general student support, to absorb new harms stemming from social media platform use. The plan I developed is not a luxury, it is a proportionate response to real, present harms caused by Defendants' platforms and designed to help educators do what they are already struggling to do: support students in an increasingly destabilized learning environment as a result of student social media use.

### E. Response to Springer

#### 1. Springer Opinion 1

130. Dr. Springer improperly asserts that my expert report is invalidated by his descriptive analyses of trends in academic performance, school climate perceptions, graduation rates, and staff satisfaction in Tucson Unified School District (TUSD).[60] He concludes that because his selected datasets do not show sharp declines in these domains, the causal claims and recommendations offered by Plaintiff experts should be dismissed. This interpretation is both methodologically and conceptually flawed.

131. First, my report does not claim that student learning has declined in aggregate, nor does it rely on changes in standardized test scores to establish the need for action. My strategic plan focuses on the *school-based impacts of social media on student mental health, behavioral regulation, and classroom functioning*, harms that are often observed by frontline educators but not consistently reflected in large-scale outcome metrics such as proficiency rates or graduation data. These metrics are useful in some contexts but are known to lag behind and often fail to capture emerging psychological or environmental harms, particularly those related to attention, anxiety, sleep disruption, and peer dynamics, which are the types of harms school districts, including, TUSD are experiencing due to social media.[61]

---

[60] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (p. 8, ¶ 22)

[61] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-20, ¶¶ 30-82); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-10, ¶¶ 50-55).

132. Second, graduation rates are widely recognized in education and mental health as a *blunt instrument* for assessing student well-being or daily functioning. Many students who graduate do so while experiencing serious emotional distress, classroom disengagement, or persistent behavioral struggles, often due to the concerted efforts of educators and school counselors who compensate for these challenges. My report does not claim that students' use of social media reduces graduation rates. Rather, it identifies how social media harms undermine student regulation, mental health, peer relationships, instructional time, and the overall learning climate in schools.

133. Third, Dr. Springer's reliance on aggregated perception data from surveys to evaluate classroom environment and bullying prevalence[62] is methodologically limited. As I note in my Tucson report, much of the harm tied to social media platform use is:

- Underreported by students, due to normalization or fear of retaliation;

- Managed informally by teachers and counselors, without formal documentation;

- Observed in specific settings or developmental windows that are masked when data are averaged across grades or years.

134. In addition, questions about bullying or classroom behavior in district surveys may not explicitly reference *digital or social media-related incidents*, making them an unreliable proxy for assessing the harms at issue. Staff job satisfaction, while relevant to workforce retention, is not a valid or sufficient indicator of whether mental health systems are equipped to meet rising student needs tied to social media use.

135. My conclusions are based on implementation science principles and educator-reported patterns that align with national research, not on retrospective mining of datasets designed for other administrative or accountability purposes. As is standard practice in public health and school mental health planning, I triangulated multiple forms of evidence: student support professional interviews, staffing ratios, professional development gaps, and behavioral support trends. These sources consistently pointed to:

- Disruption in the classroom environment and alternated attention spans;

- Escalating mental health concerns and girls suffering from eating disorders;

- Overburdened mental health personnel unable to meet demand given the growing harms caused by social media use.[63]

136. Springer's assertion that the absence of a drop in graduation rates or changes in aggregate satisfaction survey responses invalidates the need for strategic investment in mental health infrastructure is a misapplication of educational data norms. My recommendations are not predicated on academic collapse, they are driven by the real and growing strain that student social media use places on Tucson educators, student support staff, and

---

[62] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 20-26, ¶¶ 39-49).

[63] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 6-20, ¶¶ 30-82); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-11, ¶¶ 50-55, 57).

learning environments. His analysis fails to engage with the scope of these harms or the professional standards that govern strategic planning in school mental health.

### 2.    Springer Opinion 2

137.    Dr. Springer wrongly contends that my May 16 and May 18, 2025 reports fail to consider the range of factors associated with student mental health and instead attribute all observed harms solely to social media platform use.[64] This is an inaccurate and overly reductive reading of my work.

138.    My reports focus on a significant and increasingly disruptive contributor to school-based mental health and learning challenges: the widespread use of social media platforms by students. Nowhere do I claim that social media is the exclusive or singular cause of all youth mental health concerns. Rather, my strategic plan is specifically designed to address a *distinct and emergent* set of harms that school systems, including Tucson Unified School District, are experiencing on top of other long-standing challenges such as trauma, poverty, and structural inequities, due to social media.

139.    My general and district-specific reports are built on a multi-faceted foundation of evidence, including:

- A review of national research and existing expert reports on the behavioral, emotional, and cognitive effects of social media use among adolescents;

- Interviews with student support professionals in Tucson who consistently described observable impacts on students tied directly to social media use;

- An assessment of TUSD data, including district infrastructure, staffing, and service capacity in response to those reported harms.

140.    My strategic plan for Tucson does not suggest dismantling other mental health or academic interventions. Rather, it is intended to augment existing supports and address a category of harm that current programming is not fully equipped to manage. The district's own documentation, including descriptions of fragmented digital wellness efforts and significant staffing shortfalls, makes clear that additional system-level interventions are both appropriate and necessary.

141.    Dr. Springer improperly claims that I ignore key contextual variables such as poverty, housing insecurity, and community violence in Tucson. On the contrary, I am fully aware of the layered and intersecting risks facing students in high-poverty districts like TUSD. These concerns were raised directly by school and district staff during key informant interviews and are well understood to interact with student well-being and proper school functioning and harms caused by social media use.

142.    My reports do not claim that social media is the *sole* cause of all youth distress. Rather, I identify social media use, particularly in the form of compulsive engagement, digital peer aggression, and sleep-disruptive and attention-fragmenting patterns of social media use, as a *factor* that compounds existing vulnerabilities. As I explain in multiple sections of my Tucson report, the district is already contending with numerous challenges, and its

---

[64] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 28-32, ¶¶ 51-59).

existing support systems are overstretched. The goal of my strategic plan is to help the district respond to a new and externally driven harm layered on top of those already present.

143. Dr. Springer's argument that I should have controlled for every contextual factor before making any strategic recommendations is inconsistent with how real-world school mental health planning is conducted. Public health response models do not demand elimination of all confounding variables before initiating action. When harms are observed consistently across sites and align with broader scientific findings, as they do in this case, strategic planning proceeds using the best available evidence.

144. Dr. Springer's assertion fails to engage with the scope of the evidence I reviewed or the structure of the strategic plan I proposed. His claim rests on the false premise that school-based response planning must either focus on social media harms or consider broader mental health factors, but not both. In reality, school systems routinely respond to overlapping risks using layered, multi-tiered frameworks, which is exactly what my plan proposes.

### 3. Springer Opinion 3

145. Dr. Springer wrongly asserts that my expert reports lack scientific rigor and do not conform to established methodological standards.[65] He takes particular issue with my approach to literature review, the limited number of studies cited for specific claims, and my focus on social media harms without full consideration of socioeconomic or contextual confounding factors present in Tucson. These criticisms reflect a fundamental misunderstanding of the purpose and design of my work, and they misrepresent the professional standards that guide strategic planning in school mental health and implementation science.

146. My role in this litigation was not to conduct a comprehensive systematic review of the literature related to adolescent social media use and its impact. That work was undertaken by other Plaintiff experts, specifically, Drs. Dimitri Christakis, M.D., M.P.H, Dr. Ramin Mojtabai, M.D., Ph.D., MPH, Eva Telzer, Ph.D., Anna Lembke, M.D., Dr. Jean M. Twenge, Ph.D., and Gary Goldfield, Ph.D. on whom I rely. These expert's reports provide extensive, peer-reviewed summaries of the available scientific literature regarding the mental health impacts of social media and the design features of Defendants' platforms.

147. My assignment was to evaluate the impact of these harms on schools and school districts as observed and reported by key informants at the district level, particularly in Tucson Unified School District (TUSD), and to design a strategic plan for mitigation and response. The literature review sections of my reports were not intended to stand alone as exhaustive reviews of every relevant study, but to highlight representative findings that align with educator observations and reinforce the public health rationale for a system-level intervention.

---

[65] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 32-41, ¶¶ 60-76).

148. It is standard in implementation science and school mental health system design to integrate research with practice-based evidence, especially in cases where harms are rapidly evolving and underreported in traditional administrative datasets. My work synthesizes decades of experience supporting hundreds of school districts nationwide in developing and adapting mental health infrastructure to emerging youth risk environments, including those introduced by digital technology.

149. Dr. Springer criticizes the number and origin of two cherry picked citations in my reports, including a study involving Chinese college students used to illustrate reduced academic engagement.[66] This critique again mischaracterizes the purpose of my report. I did not cite this study to quantify a precise effect size or to generalize its findings across all student populations. Rather, I included it as *one of several illustrations* of a broader, well-documented pattern, namely, that excessive social media use can displace time spent on sleep, academics, and social-emotional learning. This point is supported across many peer-reviewed sources and national surveys referenced more thoroughly in other Plaintiff expert reports.

150. In public health-informed implementation science, it is common to use a curated sample of representative findings in conjunction with qualitative data from practitioners to inform system-level recommendations. My report reflects that standard. It is also worth noting that my recommendations are based not solely on academic citations, but on:

   - First-hand interviews with TUSD student support professionals;

   - A needs assessment informed by district data and staffing patterns;

   - Decades of practice-based evidence on how districts successfully respond to public health crises affecting student mental health.

151. To claim that my entire report is invalidated because I did not perform a systematic review or control for all possible contextual variables is to misapply academic research standards to an implementation task. My report follows long-established practices in applied school mental health, where the goal is not experimental precision but strategic responsiveness to real, emergent harms.

152. Springer's assertions that my report lacks adequate transparency are unfounded.[67] Springer asserts that I should provide more transparency about the selection of key informants selected for my interviews with TUSD student support professionals asserting that this would not be standard practice for a "study" by a "researcher."[68] This critique completely mischaracterizes my task which was, again, not to develop a research study, but rather, to gather information from key individuals within the school district to gain insights necessary to access circumstances on the ground in TUSD and resources

---

[66] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 35-37, ¶¶ 65-69).

[67] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 38-41, ¶¶ 71-76).

[68] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 38-39, ¶ 72).

necessary to address harms to the district caused by social media. Moreover, the identity of the key informants I spoke with was disclosed to Defendants, yet, Springer does not actually raise any concerns with the individuals selected for my interviews. Ultimately, the key informants were selected using standard practices in my field that I have employed when assisting numerous school districts across the country during by 25+ year career.

153. Next, without any citation or support, Springer asserts that I should have provided information about my interview protocol with key informants.[69] My interview protocol followed the standard practice I employ for these types of interviews with key informants which is reputable and the appropriate methodology in my field.

154. Springer also makes baseless arguments regarding the ratios I use to demonstrate that TUSD lacks adequate staffing to respond to the harms caused by social media.[70] Springer asserts that these ratios have existed for a long time and that there is no "rigorous research supporting optimal ratios." However, the ratios used in my report are nationally recognized staffing ratios that reflect years of research and field experience regarding caseloads, workload balance, prevention effectiveness, and student access to timely, meaningful mental health and counseling services in schools.[71] Moreover, Springer's assertion that there are no documents within TUSD indicating that their counselor under-staffing is caused by social media misses the point. First, my report demonstrates that TUSD staffing is negatively impacted by social media as a staff already stretched thin must also attempt to address the numerous harms caused by social media.[72] Second, social media has introduced a persistent and preventable driver of mental health and behavioral disruptions, which manifest daily in school environments. These challenges have increased demand for school-based support, often overwhelming staff even in well-resourced districts. In this context, the existing ratios are not outdated; they are essential reference points for understanding how much new capacity must be added to address an additional category of need layered on top of existing demands. In my report, I do not use these ratios to suggest that all districts must reach them universally for general support. Instead, I apply them specifically to estimate the level of additional staffing that would be necessary to respond to the mental health and learning impacts of social media. This is a common and accepted approach in workforce planning: using established standards to model how new challenges impact overall service demand. Just as public health systems use hospital bed capacity metrics to prepare for emerging epidemics, or emergency services use response time benchmarks to scale for population growth, I use staffing

---

[69] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (p. 39, ¶ 73).

[70] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 39-41, ¶¶ 74-75).

[71] 2025.07.09 Expert Report of Diana Wildermuth, Ph.D., (pp. 7-11, ¶¶ 33-42).

[72] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 9-11, ¶¶ 50-57).

ratios to model the scope of additional investment needed to address a new, clearly identifiable stressor.

155. Springer also makes an entirely speculative and unsupported assertion that I have not demonstrated a need for the number of counselors I opine need to be hired to implement by strategic plan.[73] This is demonstrably false. To the contrary, both my May 16 and May 18 report discuss in detail why additional counselors are needed to implement my strategic plan to address the harms to TUSD caused by social media.[74] As detailed therein, school counselors are critical to key components of the strategic plan including, among other things, (1) facilitating evidence-based programs that focus on reducing compulsive social media use, building self-esteem, and fostering in-person social connections; (2) overseeing peer support programs where trained students provide mentorship and guidance to peers struggling with online pressures; (3) providing individualized therapy, crisis interventions and case management to students facing severe mental health challenges, social isolation, or academic decline due to social media.[75]

156. Ultimately, Dr. Springer critiques my report using a framework that is inappropriate for its purpose. I was not retained to conduct a randomized controlled trial or to isolate marginal treatment effects. I was asked to provide an actionable, school-anchored plan for helping Tucson to address the mental health harms they are already witnessing, harms that have been caused by, according to multiple expert reports and substantial scientific research, the design and deployment of social media platforms.

157. My recommendations for Tucson are proportionate to the scope of the problem, aligned with national frameworks (including MTSS and the Comprehensive School Mental Health Systems model), and grounded in observed need. Rather than engaging with those recommendations, Dr. Springer simply dismisses them based on a mischaracterization of my methodology and a misunderstanding of implementation science as a discipline.

### 4. Springer Opinion 4

158. Dr. Springer wrongly contends that my proposed strategic plan for Tucson Unified School District reflects inefficient funding, unnecessary staffing, and a failure to consider existing personnel and responsibilities.[76] He further suggests that adding new mental health staff may compromise core educational objectives. These critiques are inaccurate, unsupported by implementation science standards, and fail to engage with the actual structure, purpose, and rationale of my recommendations.

---

[73] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (p. 41, ¶ 76).

[74] E.g., Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 26-27, ¶¶ 97-99); Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 21-22, 24, ¶¶ 93, 95, 103).

[75] Expert Report of Dr. Sharon A. Hoover, PhD dated May 16, 2025, (pp. 26-27, ¶¶ 97-99).

[76] 2025.07.11 Expert Report of Matthew G. Springer, Ph.D. for Tucson Unified School District, (pp. 49-50, ¶ 90).

159. Contrary to Dr. Springer's claim, I did consider existing staffing levels and district personnel responsibilities when designing the Tucson strategic plan. As detailed in my May 18, 2025 report, I reviewed district-provided staffing ratios and noted that TUSD falls short of nationally recommended benchmarks across all major categories of school-based mental health professionals.[77]

These ratios reflect pre-existing gaps that hinder the district's ability to meet mental health and wellness needs caused by the rising impacts of social media use. The new positions I recommend are not duplicative, they are necessary additions designed to close long-standing access gaps and to address a new, widespread, and externally imposed source of harm: student social media engagement.

160. The National Association of School Psychologists (NASP) does not oppose staffing expansion to address new mental health demands. On the contrary, NASP supports comprehensive school mental health systems that include multidisciplinary roles beyond psychologists and endorses expanding services to meet evolving student needs. My recommendations are aligned with this systems-oriented approach.

161. Dr. Springer improperly argues that I neglect to consider whether new staff roles could be absorbed by existing employees. This assertion misrepresents how school-based service delivery operates. In under-resourced districts like Tucson, current staff are already stretched beyond capacity. Educators and mental health professionals routinely report being unable to meet student needs due to high caseloads, limited time, and diffuse responsibilities.

162. Reallocating or "redeploying" existing staff is not a viable solution when:

- Those staff are already assigned to core duties (e.g., IEP compliance, mandated crisis response, academic guidance);

- The district falls below professional capacity thresholds;

- And the nature of the challenge, daily digital spillover into classrooms, identity-driven distress, peer contagion, and social media-fueled anxiety, requires specialized training and time allocation.

163. Dr. Springer's claim that "the apparatus is largely in place" ignores the structural and personnel limitations reported by TUSD staff and documented in my needs assessment. His suggestion that Tucson's mental health system is adequately equipped to absorb the harms created by social media platforms is contradicted by direct accounts from school-based professionals.

164. Dr. Springer cites the estimated cost of the plan as evidence of excess. But these projected investments are proportionate to the scale of harm being addressed. As noted throughout my report, schools are absorbing the costs of social media use in the form of:

- Lost instructional time;

- Increased behavioral management;

---

[77] Expert Report of Dr. Sharon A. Hoover, PhD for Tucson Unified School District dated May 18, 2025 (amended June 20, 2025) (pp. 7-8, 41-42).

- Mental health crises; and,

- Staff burnout due to unrelenting student needs.

165. My recommendations do not ignore costs, they reflect a structured, systems-based investment designed to build sustainable internal capacity over time. It is inappropriate to suggest that the district should simply rely on professional development or internal flexibility to address what is, at its core, a population-level crisis with classroom-level consequences.

166. Dr. Springer's most troubling claim is that investing in mental health infrastructure to address social media-related harms risks compromising the "long-standing purpose of education." This assertion reflects a narrow and outdated view of schooling. Promoting student mental health and emotional regulation is not ancillary to academic achievement, it is foundational to it.

167. Research and practice consistently show that students cannot engage productively with academic material when they are distracted, dysregulated, anxious, or socially disengaged. The harms stemming from social media use, sleep deprivation, peer conflict, distraction, and digital self-comparison, directly impair students' ability to learn, participate, and thrive. Addressing these harms through structured, school-based supports is essential to preserving and advancing educational outcomes. Far from displacing the mission of education, my plan reinforces it by ensuring that students are emotionally and behaviorally prepared to learn, and that educators are supported in creating safe, productive classroom environments.

168. In sum, my staffing recommendations for Tucson are:

- Grounded in current staffing realities and district-level data;

- Aligned with national professional standards and MTSS frameworks;

- Designed to fill clear capacity gaps, not duplicate existing roles;

- Structured to support, not detract from, Tucson's core academic mission.

Dr. Springer's critique fails to engage with the layered demands Tucson educators face and the realities of implementing large-scale, school-based public health responses to emerging youth challenges.

### F.     Response to Moore

#### 1.     Moore Opinion 1

169. Dr. Moore's assertion that TUSD, like many districts, faces longstanding challenges, including fragmented leadership, poverty, high student mobility, and inconsistent implementation of district-wide policy [78] *reinforces* the need for a well-resourced and coordinated system to address the growing harms associated with social media use in schools. Dr. Moore's report does not negate the existence or urgency of social media

---

[78] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 8-10, ¶¶ 42-46).

harms. Rather, it highlights a critical systems-level capacity gap that my proposed strategic plan is designed to address.

170. Dr. Moore's central example, the district's failure to expand the 2019-20 Yondr pouch pilot,[79] actually underscores a core tenet of my testimony: that schools often lack the infrastructure and funding to implement promising interventions at scale. The problem is not simply a failure of will; it is a failure of system capacity. Indeed, as discussed in my response to Dr. Springer's Opinion 4 above at ¶¶ 158-168, Tucson's fragmented response to social media disruption is precisely why an integrated, district-wide plan is required.

171. Moore's assertion that classroom distractions are nothing new and that note-passing in the 1990s[80] serves as an adequate analogy to social media vastly understates the design and neurological effects of current platforms. Social media's immersive design features (such as infinite scroll, push notifications, and public social ranking), and persistent access to peer evaluation create a fundamentally different category of classroom distraction, one that educators and students alike report as significantly more disruptive and addictive than past analog behaviors.

172. Moore's suggestion that the harms alleged in this litigation could have been avoided had Tucson leadership simply scaled up a pilot is reductive. The pilot addressed cell phone *storage*, one of many strategies needed. It did not include district-wide data collection, multi-tiered mental health supports, digital literacy instruction, or professional development on managing social media-driven student behavior. These components, which are included in my plan, are necessary for a comprehensive response to social media-related harms.

173. Moore also asserts that TUSD has dysfunctional leadership.[81] I strongly caution against conflating legacy administrative issues with the current need for strategic investment in student services. Most districts, including TUSD, operate under constrained fiscal conditions. When resources are limited, leaders are often forced to make difficult trade-offs, for example, whether to hire an English teacher or a school psychologist. Such choices do not reflect mismanagement; they reflect the absence of sufficient public funding to fully meet students' academic and mental health needs.

174. In short, TUSD's challenges scaling even promising low-cost interventions like Yondr pouches illustrate, not undermine, the need for external support and long-term systems planning. The absence of district-wide implementation is not proof that the harms do not exist; it is evidence that the district requires a coordinated, adequately funded strategic response to address them.

---

[79] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 8-9, ¶ 43).

[80] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (p. 10, ¶ 46).

[81] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 8-10, ¶¶ 42-46).

### 2.    Moore Opinions 2 and 4

175.    The funding constraints described by Dr. Moore, including enrollment-based revenue loss and the sunset of COVID-relief funding[82] do not negate the urgent need for a comprehensive, sustained response to the escalating harms that social media platforms are causing in schools. In fact, they illustrate one of the core arguments in my report: TUSD and similarly situated districts lack the resources and infrastructure to address the modern, external threat to student well-being and school functioning due to student social media use within the confines of their standard operating budgets. Moreover, the negative impacts of social media may not always appear in formal budget documents or staffing charts, but they are consistently reported by district and school leaders and support professionals.[83]

176.    Dr. Moore faults TUSD for using one-time ESSER funds to support temporary staffing increases, including counselors, social workers, and MTSS personnel. But this is precisely the kind of staffing necessary to respond to the observable rise in attention problems, emotional dysregulation, peer conflict, and school avoidance, many of which educators attribute to student social media use. The fact that these positions were supported through time-limited funding reinforces the unsustainability of the district's current approach and the need for a long-term, strategic plan such as the one I propose.

177.    Importantly, my recommendations were developed with awareness of the broader budgetary constraints faced by districts like Tucson. The 15-year plan allows for staged implementation, workforce development, and alignment with existing personnel where feasible. It is not a luxury proposal, it is a public health-informed blueprint for managing a widespread disruption to youth functioning that cannot be ignored simply because budgets are tight.

178.    Dr. Moore's broader commentary about instructional vs. administrative spending, desegregation expenses, and decisions about nursing models fall outside the scope of my analysis. What I can say is this: Even under conditions of scarcity, school systems must confront new harms with appropriately scaled responses. The magnitude of social media's impact, reported consistently by educators, school mental health staff, and administrators, requires action, not deferral.

179.    Finally, the social-emotional and behavioral impacts of the COVID-19 pandemic, cited by Dr. Moore,[84] do not displace the role of social media as a parallel and significant harm. As discussed in my response to Dr. Hutt and others in my general rebuttal report,[85] social media use among youth surged during the pandemic and persisted as a source of

---

[82] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (p. 10, ¶ 46).

[83] Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121.

[84] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 25-29, ¶¶ 84-92).

[85] Rebuttal Report of Sharon A. Hoover, PhD dated July 30, 2025, (pp. 31-32, 37-40, ¶¶ 111-116, 139-149).

distress and distraction as schools reopened. My recommendations are not about choosing between responses to COVID or social media; they are about addressing the impacts of social media on students' mental health, learning and school functioning.

### 3. Moore Opinions 3 and 5

180. Dr. Moore states that TUSD students face a wide array of challenges (e.g., poverty, ACEs, community violence, immigration-related stress, chronic health conditions) that contribute to behavioral and mental health difficulties and that these factors, not social media, should be the focus of concern.[86] The existence of long-standing adversities does not preclude the emergence of new harms. Social media does not replace these stressors; it creates new harms and compounds preexisting harms. As I detail in my report and in responses to Dr. Wildermuth and Dr. Hutt above at ¶¶ 45-54, 57, platforms widely used by students are designed in ways that promote compulsive engagement, fuel peer comparison and conflict, and disrupt attention, sleep, and emotional regulation. These effects are especially concerning in districts like Tucson, where students may already be coping with food insecurity, housing instability, or exposure to violence. Of note, students exposed to high rates of trauma or instability are more susceptible to the negative impacts of unchecked social media use, particularly when schools lack the staff or infrastructure to proactively identify and support struggling students.

181. Internal district documents and staff interviews reveal that educators are not forced to choose between addressing poverty or social media, they are managing both, often without the necessary tools. Social media is now one of the dominant ways students interact with peers, shape their identities, and experience emotional distress. That reality demands a focused and sustained response within school systems, not dismissal because other challenges also exist.

182. Dr. Moore's argument that social media harms are not prominently featured in older internal documents or district budgets further supports my conclusion that districts have not had the systems, staffing, or awareness to adequately monitor or address these harms. My strategic plan is intended to fill this gap, not by supplanting existing efforts to address trauma or inequality, but by layering in the supports necessary to meet a major, social media-driven disruption to adolescent development and school functioning.

### 4. Moore Opinion 6

183. Dr. Moore's assertion that the absence of certain quantitative metrics undermines the validity of TUSD's claims reflects a limited understanding of how emerging harms are identified and addressed within school systems.[87] While TUSD, like many districts, lacks a centralized mechanism to quantify student screen time or track staff hours spent managing social media-related disruption, this is precisely the type of systems gap my strategic plan is intended to address.

---

[86] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 17-25, ¶¶ 66-83).

[87] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 26-27, ¶¶ 87-90).

184.    Moreover, public health and implementation science approaches do not rely exclusively on retrospective documentation to identify patterns of harm. My conclusions are grounded in a multi-method process that includes review of available data *and* structured key informant interviews with district personnel, methods that are especially critical in under-resourced systems where formal tracking mechanisms often lag behind lived realities. Educators and school-based mental health professionals consistently reported an observable increase in student distress, distraction, peer conflict, and emotional dysregulation linked to compulsive social media use. These reports are credible, consistent with national trends, and provide a valid basis to inform a systemic response.

185.    Dr. Moore also points to flat rates of mental health *diagnosis* over time in TUSD's internal records. However, diagnosis data in schools is an unreliable indicator of student need, as it reflects access to healthcare and documentation practices, not necessarily the prevalence or severity of student mental health challenges. School-based personnel routinely observe mental and behavioral health concerns (e.g., anxiety, dysregulation, peer conflict) that never result in formal diagnosis but nonetheless interfere with learning and school climate.

186.    Dr. Moore references the District's use of social media for outreach and communication.[88] This is not inconsistent with my findings. Schools use digital platforms to connect with students and families because that is where students already are. A teacher setting up an Instagram account and finding students more responsive there simply reflects the pervasiveness of social media, not its neutrality. In fact, these examples reinforce the argument that social media has become the dominant context for youth communication and identity development, further emphasizing the need for school systems to develop the capacity to respond to the associated harms.

### 5.    Moore Opinion 7

187.    Dr. Moore argues that the plan I propose is unrealistic for a district like TUSD, citing leadership turnover and uncertainty about the longevity of current technologies.[89] However, the harms addressed in my plan, attention disruption, emotional dysregulation, peer conflict, and compulsive digital engagement, are not speculative or transient. They are real and already affecting classrooms across the district. While the specific features and business practices of Defendants' social media platforms are central to the current crisis, their impact on adolescent development and school functioning is likely to persist well beyond the current year, regardless of the precise form those platforms take. The need for a structured, multi-year district response is based not on the permanence of individual tools, but on the persistence of their effects.

188.    Dr. Moore's claim that my plan creates "unnecessary bureaucracy" by proposing six district-level directors mischaracterizes both the intent and function of these roles. These new positions are not duplicative of existing leadership; rather, they are designed to fill

---

[88] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 27-28, ¶ 91).

[89] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (pp. 29-32, ¶¶ 93-102).

critical gaps in coordination, staff support, digital wellness oversight, and behavioral health service delivery. As noted in earlier responses, TUSD's existing administrative infrastructure does not include the capacity to design, implement, and sustain a comprehensive mental health and digital wellness response at the scale required to address social media harms. These directors would support building-level staff and ensure the integration of a system-wide plan.

189. Dr. Moore also references school counselor ratios, arguing that TUSD fares better than the Arizona average and that the national average itself exceeds professional recommendations. This line of argument mistakes descriptive norms for prescriptive standards. As outlined in my original report and reinforced here, the recommended 250:1 ratio for school counselors is not aspirational; it is grounded in evidence of what is needed to meet the behavioral and mental health needs of students. Falling short of that recommendation, whether locally or nationally, does not make it acceptable. The student support workforce I recommend is proportional to TUSD's needs and is designed to be additive, not duplicative, as noted in earlier responses.

190. Dr. Moore's concern about data systems being redundant because Plaintiff expert Jeffrey Meyers notes the district already has a virtual mental health service and school safety reporting platform[90] also misses the mark. While TUSD has general student information and data platforms in place, they do not currently track social media-related disruptions, staff response burden, or targeted behavioral health trends tied to social media. As noted in earlier responses, my recommendations involve enhancements to ensure that key metrics relevant to digital wellness and behavioral risk are monitored and integrated into decision-making, functions that existing systems do not support.

191. While Dr. Moore notes that TUSD already uses an MTSS framework, my plan calls for targeted expansion within that framework to address the specific and novel harms linked to social media use. A generic MTSS model is insufficient to address social media—a challenge that is rapidly evolving and deeply embedded in youth peer dynamics, identity formation, and emotional regulation.

192. Overall, Dr. Moore's objections fall outside her area of expertise. She does not demonstrate training or experience in child and adolescent mental health, social media behavior and impact, or public health strategy. My recommendations are aligned with national implementation science principles and reflect both the current needs reported by TUSD staff and the infrastructure necessary to address them.

## III.    Conclusion

193. The opinions and recommendations presented in this report reflect a thorough review of the district-specific rebuttal reports submitted by Defense experts, as well as Tucson Unified School District's staffing patterns, student support infrastructure, and the firsthand accounts of educators and student services staff. The defense expert critiques mischaracterize the purpose of my work, apply inappropriate evidentiary standards, or

---

[90] 2025.07.11 Expert Report of Dr. Michelle Moore for Tucson Unified School District, (p. 31, ¶ 100).

ignore the realities of school system operations in the face of emergent harms caused by social media.

194. TUSD like many large and diverse school districts, is experiencing the new, significant and distinct harms as well as compounding harms of widespread student engagement with social media platforms. These consequences include increased student distress, attention disruption, digital peer conflict, disruptions to school functioning, harms to school climate and diversion of educator time and school resources. My recommendations are tailored to TUSD's context and are designed to address these harms through sustainable, evidence-informed strategies that complement and extend the district's current efforts.

195. Social media is a distinct, significant, externally introduced, and modifiable source of harm that is challenging schools in ways that current systems are not equipped to address. The strategic plan I have developed for Tucson is proportionate to this challenge, anchored in implementation science, aligned with national school mental health frameworks, and responsive to what Tucson educators and students are already experiencing. My strategic plan provides Tucson with the tools and resources necessary to respond.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Sharon A. Hoover, Ph.D.

**Exhibit A**

**Additional Materials Considered**

Prior Opening Report dated May 18, 2025 and all documents cited therein, including Exhibit B.

**Articles and Studies**

| |
|---|
| Bryant-Stephens, T. (2009). Asthma disparities in urban environments. Journal of Allergy and Clinical Immunology, 123(6), 1199-1206 |
| *Chronic Absenteeism: 2017-2024*, Return 2 Learn (last visited August 1, 2025), https://www.returntolearntracker.net/ (click "R2L's methods") |
| Forman, S. G., Olin, S. S., Hoagwood, K. E., Crowe, M., & Saka, N. (2009). Evidence-based interventions in schools: Developers' views of implementation barriers and facilitators. School Mental Health, 1(1) |
| Green, J. G., McLaughlin, K. A., Alegría, M., Costello, E. J., Gruber, M. J., Hoagwood, K., ... & Kessler, R. C. (2013). School mental health resources and adolescent mental health service use. *Journal of the American Academy of Child & Adolescent Psychiatry*, *52*(5), 501-510. |
| Hoagwood, K., Atkins, M., & Ialongo, N. (2013). Unpacking the black box of implementation: The next generation for policy, research and practice. *Administration and Policy in Mental Health and Mental Health Services Research*, *40*(6) |
| Komro, K. A., Tobler, A. L., Delisle, A. L., O'Mara, R. J., & Wagenaar, A. C. (2013). Beyond the clinic: improving child health through evidence-based community development. *BMC pediatrics*, *13*(1), 172. |
| Nesi, J. (2020). The impact of social media on youth mental health: challenges and opportunities. *North Carolina medical journal*, *81*(2), 116-121. |

**Litigation Documents**

| |
|---|
| 2025.07.09 Tucson Expert Report of Ethan L. Hutt |
| 2025.07.09 Expert Report of Diana Wildermuth, Ph.D. |
| 2025.07.11 Expert Report of Diana Wildermuth, Ph.D. for Tucson Unified School District |
| 2025.07.11 Tucson Expert Report of Ethan L. Hutt for Tucson Unified School District |
| 2025.07.11 Tucson Expert Report of Dr. Michele Moore for Tucson Unified School District |
| 2025.07.11 Tucson Expert Report of Matthew D. Springer for Tucson Unified School District |
| 2025.07.11 Tucson Expert Report of Dr. Stephen J. Aguilar for Tucson Unified School District |
| 2025.07.11 Tucson Expert Report of Darius Lakdawalla for Tucson Unified School District |
| 2025.07.30 Rebuttal Report of Dimitri Christakis, M.D., M.P.H. |
| 2025.07.30 Rebuttal Report of Dr. Ramin Mojtabai, M.D., Ph.D., MPH |
| 2025.07.30 Rebuttal Report of Eva Telzer, Ph.D. |
| 2025.07.30 Rebuttal Report of Anna Lembke, M.D. |
| 2025.07.30 Rebuttal Report of Dr. Jean M. Twenge, Ph.D. |
| 2025.07.30 Rebuttal Report of Gary Goldfield, Ph.D. |
| 2025.05.19 Expert Report of Douglas L. Leslie, Ph.D. for Tucson Unified School District |

| |
|---|
| 2025.06.20 Amended Expert Report of Douglas L. Leslie, Ph.D. for Tucson Unified School District |
| Deposition of Mark Alvarez 30(b)(1), May 15, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Sabrina M. Salmon, Ph.D. 30(b)(1), May 23, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Anna Schwartz-Warmbrand 30(b)(1), May 13, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Brian Lambert 30(b)(1), May 14, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |
| Deposition of Brian Lambert 30(b)(6), July 1, 2025, In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation (MDL 3047), Transcript and Exhibits |