**Exhibit 93**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

Page 1

1          UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3   IN RE: SOCIAL MEDIA        : MDL No.
    ADOLESCENT                 : 4:22-md-3047-YGR

4   ADDICTION/PERSONAL INJURY  :
    PRODUCTS LIABILITY         : MDL No. 3047

5   LITIGATION                 :
    ——————————————————————————————————————————

6

    THIS DOCUMENT RELATES TO:  :

7   ALL CASES                  :

8

9                    -   -   -

10               AUGUST 12, 2025

11                   -   -   -

12

13             Videotape deposition of

14   SHARON A. HOOVER, Ph.D., taken pursuant

15   to notice, was held at the law offices of

16   Kessler Topaz Meltzer & Check LLP, 280

17   King of Prussia Road, Radnor,

18   Pennsylvania 19087, commencing at 9:05

19   a.m, on the above date, before Amanda Dee

20   Maslynsky-Miller, a Court Reporter and

21   Certified Realtime Reporter.

22

23                    -   -   -

            GOLKOW, A Veritext Company

24      877.370.3377 ph| 917.591.5672 fax

```
                                              Page 2

 1    APPEARANCES:
 2
 3
          KESSLER TOPAZ MELTZER & CHECK, LLP
 4        BY: MELISSA L. YEATES, ESQUIRE
          BY: JORDAN E. JACOBSON, ESQUIRE
 5        280 King of Prussia Road
          Radnor, Pennsylvania 19087
 6        (610) 667-7706
          myeates@ktmc.com
 7        jjacobson@ktmc.com
          Representing the Plaintiff
 8
 9
10
          KING & SPALDING LLP
11        BY: KATHRYN S. LEHMAN, ESQUIRE
          Southeast Financial Center
12        200 S Biscayne Boulevard
          Suite 4700
13        Miami, Florida 33131
          (305) 462-6000
14        Klehman@kslaw.com
15        - and -
16        BY: YELENA KOTLARSKY, ESQUIRE
          1185 Avenue of the Americas
17        34th Floor
          New York, New York 10036
18        (212) 556-2100
          ykotlarsky@kslaw.com
19        Representing the Defendants,
          TikTok Inc., ByteDance Inc.,
20        ByteDance Ltd., TikTok Ltd., and
          TikTok, LLC
21
22
23
24
```

CONFIDENTIAL

```
                                             Page 3

 1    APPEARANCES: (Continued)
 2
 3
              WILLIAMS & CONNOLLY LLP
 4            BY: J. ANDREW KEYES, ESQUIRE
              BY: DANIEL WHITELEY, ESQUIRE
 5            680 Maine Avenue SW
              Washington, DC 20024
 6            (202) 434-5000
              akeyes@wc.com
 7            dwhiteley@wc.com
              Representing the Defendants,
 8            YouTube, LLC, Google LLC, and
              Alphabet Inc.
 9
10
              COVINGTON & BURLING LLP
11            BY: MICHAEL N. KENNEDY, ESQUIRE
              One CityCenter
12            850 Tenth Street, NW
              Washington, DC 20001
13            (202) 662-6000
              mkennedy@cov.com
14            Representing the Defendants,
              Meta Platforms, Inc. f/k/a
15            Facebook, Inc.; Facebook Holdings, LLC;
              Facebook Operations, LLC; Facebook
16            Payments, Inc.; Facebook
              Technologies, LLC; Instagram, LLC
17            Siculus, Inc.; and Mark Elliot
              Zuckerberg
18
19
20            KIRKLAND & ELLIS LLP
              BY: JACK NOLAN, ESQUIRE
21            601 Lexington Avenue
              New York, New York 10022
22            (212) 446-4800
              jack.nolan@kirkland.com
23            Representing the Defendants,
              Snap Inc.
24
```

```
                                                Page 4
 1    APPEARANCES: (Continued)
 2    VIA ZOOM:
 3
 4          BEASLEY ALLEN LAW FIRM
            BY: SLADE METHVIN, ESQUIRE
 5          301 St Louis Street
            Mobile, Alabama 36602
 6          (251) 308-1515
            slade.methvin@beasleyallen.com
 7          Representing the Plaintiff,
            DeKalb County School District
 8
 9
10
11          CARELLA, BYRNE, CECCHI, BRODY &
            AGNELLO, P.C.
12          BY: MICHAEL A. INNES, ESQUIRE
            BY: DAVID G. GILFILLAN, ESQUIRE
13          5 Becker Farm Road
            Roseland, New Jersey 07068
14          (973) 994-1700
            minnes@carellabyrne.com
15          dgilfillan@carellabyrne.com
16          - and -
17          BY: ZACHARY S. BOWER, ESQUIRE
            2222 Ponce De Leon Boulevard
18          Miami, Florida 33134
            (973) 994-1700
19          zbower@carellabyrne.com
            Representing the Plaintiff,
20          Irvington Public Schools
21
22
23
24
```

CONFIDENTIAL

```
                                          Page 5
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
 4           EILAND & BONNIN LAW FIRM
             BY: CRAIG EILAND, ESQUIRE
 5           BY: DAVID BONNIN, ESQUIRE
             2200 Market Street
 6           Suite 501
             Galveston, Texas 77550
 7           (409) 763-3260
             ceiland@eilandlaw.com
 8           dbonnin@eilandlaw.com
             Representing the Plaintiffs
 9
10
11           WAGSTAFF & CARTMELL
             BY: JONATHAN P. KIEFFER, ESQUIRE
12           4740 Grand Avenue
             Suite 300
13           Kansas City, Missouri 64112
             (816) 701-1100
14           jpkieffer@wcllp.com
             Representing the Plaintiffs
15
16
17
             BROCKSTEDT MANDALAS FEDERICO, LLC
18           BY: MATTHEW P. LEGG, ESQUIRE
             BY: ERIKA SNEERINGER, PARALEGAL
19           2850 Quarry Lake Drive
             Suite 220
20           Baltimore, Maryland 21209
             (410) 421-7777
21           mlegg@lawbmf.com
             Representing the Plaintiff's
22           Steering Committee
23
24
```

CONFIDENTIAL

```
                                              Page 6

 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
 4           GURSKI LAW FIRM
             BY: PATRICK H. GURSKI, ESQUIRE
 5           2200 Market Street
             Suite 502
 6           Galveston, Texas 77550
             (409) 331-5956
 7           Representing the Plaintiffs
 8
 9
10           LEVIN SEDRAN & BERMAN LLP
             BY: MICHAEL M. WEINKOWITZ, ESQUIRE
11           510 Walnut Street
             Suite 500
12           Philadelphia, Pennsylvania 19106
             (877) 882-1011
13           mweinkowitz@lfsblaw.com
             Representing the Plaintiffs
14
15
16
             O'HANLON, DEMERATH & CASTILLO
17           BY: KAYLIE MORGAN, ESQUIRE
             117 West Craig Place
18           San Antonio, Texas 78212
             (210) 310-3030
19           kmorgan@808west.com
             Representing the Plaintiff,
20           Texas School Districts
21
22   ALSO PRESENT:
     Brian McGee, Videographer
23   Vince Rosica, Trial Technician
24
```

CONFIDENTIAL

Page 7

1                          -  -  -
2                      I  N  D  E  X
3                          -  -  -
4

  Testimony of:   SHARON A.  HOOVER,  PhD
5
6       By Attorney Lehman                        13
7
8                          -  -  -
9                      E  X  H  I  B  I  T  S
10                         -  -  -
11

   NO.              DESCRIPTION                    PAGE
12

   Hoover-1    No Bates
13             Interviewee List                 25
14   Hoover-2    No Bates
               No Bates, 5/16/25 Expert
15             Report                           33
16   Hoover-3    No Bates
               5/10/25 Curriculum Vitae of
17             Sharon A. Hoover, Ph.D.    34
18   Hoover-4    No Bates
               8/1/25 Curriculum Vitae of
19             Sharon A. Hoover, Ph.D.    34
20   Hoover-5    No Bates
               Materials Considered List   37
21
   Hoover-6    No Bates
22             7/30/25 Rebuttal Report     38
23   Hoover-7    No Bates
               6/20/25 Amended Expert Report
24             for Breathitt County Board

CONFIDENTIAL

```
                                          Page 8

 1                       -   -   -
 2                   E  H  I  B  I  T  S
 3                       -   -   -
 4
    NO.             DESCRIPTION                    PAGE
 5
    Hoover-8        No Bates
 6                  8/7/25 Rebuttal Report
                    for Breathitt County Board
 7                  of Education                    39
 8  Hoover-9        No Bates
                    6/20/25 Case-Specific Report
 9                  for  Charleston County School
                    District                        40
10
    Hoover-10       No Bates
11                  8/1/25 Case-Specific Rebuttal
                    Report for Charleston
12                  County School District    41
13  Hoover-11       No Bates
                    6/20/25 Case-Specific Amended
14                  Report for DeKalb County
                    Schools                         41
15
    Hoover-12       8/7/25 Case-Specific Rebuttal
16                  Report for DeKalb County
                    Schools                         42
17
    Hoover-13       No Bates
18                  6/20/25 Case-Specific Report
                    for Board of Education for
19                  Harford County                  43
20  Hoover-14       No Bates
                    8/1/25 Case-Specific Rebuttal
21                  Report Harford County
                    Public Schools                  43
22
    Hoover-15       No Bates
23                  6/20/25 Case-Specific Amended
                    Expert Report for Irvington
24                  Public Schools                  44
```

CONFIDENTIAL

Page 9

1                        -   -   -
2                 E X H I B I T S
3                        -   -   -
4
   NO.              DESCRIPTION                    PAGE
5
   Hoover-16        No Bates
6                   8/7/25 Case-Specific Rebuttal
                    Report for Irvington
7                   Public Schools                 45
8  Hoover-17        No Bates
                    6/20/25 Case-Specific Report
9                   for Tucson Unified School
                    District                       45
10
   Hoover-18        No Bates
11                  8/7/25 Case-Specific
                    Rebuttal Report for Tucson
12                  Unified School District        46
13 Hoover-19        No Bates
                    Notice of Deposition           55
14
   Hoover-20        HOOVER000081-0087
15                  Hoover Behavioral Health
                    Invoices                       67
16
   Hoover-21        No Bates
17                  University of Maryland
                    School of Medicine Web Page,
18                  Sharon A. Hoover, Ph.D.        97
19 Hoover-22        No Bates
                    Hoover Behavioral Health
20                  Invoice                        121
21 Hoover-23        No Bates
                    American Psychological
22                  Association Health Advisory
                    on Social Media Use in
23                  Adolescence                    173
24

```
                                                 Page 10

 1                        -   -   -
 2                    E X H I B I T S
 3                        -   -   -
 4
     NO.              DESCRIPTION                    PAGE
 5
     Hoover-24        No Bates
 6                    What Is Driving Youth Mental
                      Health Problems? It's Not Just
 7                    About Social Media,
                      Prothero                          202
 8
     Hoover-25        No Bates
 9                    Written Testimony Submitted
                      to the United States Senate
10                    Committee on Finance For the
                      Full Committee Hearing            207
11
     Hoover-26        No Bates
12                    Written Testimony Submitted
                      to the United States Senate
13                    Committee on Health, Education,
                      Labor, and Pensions (HELP)
14                    For the Subcommittee on
                      Children and Families             208
15                    Hearing
16   Hoover-27        No Bates
                      Burnout in Urban Teachers:
17                    The Predictive Role of
                      Supports and Situational
18                    Responses                         334
19   Hoover-28        No Bates
                      Schools As a Vital Component
20                    of the Child and Adolescent
                      Mental Health System             338
21
     Hoover-29        No Bates
22                    Healthy Students and Thriving
                      Schools: A Comprehensive
23                    Approach for Addressing
                      Students' Trauma and
24                    Mental Health Needs              376
```

CONFIDENTIAL

Page 11

```
 1                      -   -   -

 2            DEPOSITION  SUPPORT  INDEX

 3                      -   -   -

 4

 5   Direction  to  Witness  Not  to  Answer

 6   Page  Line      Page  Line      Page  Line

 7   None

 8

 9

10   Request  for  Production  of  Documents

11   Page  Line      Page  Line      Page  Line

12   31        7

13

14

15   Stipulations

16   Page  Line      Page  Line      Page  Line

17   12        1

18

19

20   Question  Marked

21   Page  Line      Page  Line      Page  Line

22   171       16

23

24
```

CONFIDENTIAL

Page 12

1                    -   -   -

2              (It is hereby stipulated and

3        agreed by and among counsel that

4        sealing, filing and certification

5        are waived; and that all

6        objections, except as to the form

7        of the question, will be reserved

8        until the time of trial.)

9                    -   -   -

10             VIDEO TECHNICIAN:   We are

11       now on the record.  My name is

12       Brian McGee.  I'm a videographer

13       for Golkow, a Veritext division.

14       Today's date is August 12th, 2025,

15       and the time is 9:05 a.m.

16             This video deposition is

17       being held in Radnor, PA, in the

18       matter of In Re: Social Media

19       Adolescence Addiction/Personal

20       Injury Products Liability

21       Litigation for the United States

22       District Court, Northern District

23       of California.  The deponent is

24       Sharon A. Hoover, Ph.D.

CONFIDENTIAL

Page 13

1          Counsel will be noted on the
2      stenographic record.
3          The court reporter is Amanda
4      Miller and will now swear in the
5      witness.
6                  -  -  -
7          SHARON HOOVER, Ph.D., after
8      having been duly sworn, was
9      examined and testified as follows:
10                 -  -  -
11                EXAMINATION
12                 -  -  -
13  BY ATTORNEY LEHMAN:
14      Q.    Good morning.
15      A.    Good morning.
16      Q.    How are you today?
17      A.    I'm doing well.  Thank you.
18      Q.    What is your full name,
19  please?
20      A.    Sharon Ann Hoover.
21      Q.    Dr. Hoover, as I said when
22  we met a few moments ago, my name is
23  Kathryn Lehman.  I'm going to be taking
24  the first part of your deposition today.

CONFIDENTIAL

Page 14

1          A.    Okay.

2          Q.    What is your professional

3    address?

4          A.    So my professional address

5    is 737 West Lombard Street in Baltimore,

6    Maryland.

7                And that's where the

8    National Center for School Mental Health

9    is located.

10         Q.    And do you currently work

11   for any entity other than the National

12   Center for School Mental Health?

13         A.    So I work, actually,

14   technically, for the University of

15   Maryland School of Medicine.  And I do

16   not currently work for another entity.

17                I do some consulting,

18   though, so.

19         Q.    And do you do your

20   consulting through any consulting firm?

21         A.    So I have my own S Corp,

22   which is Hoover Behavioral Health

23   Incorporated, and most of it goes through

24   that.

CONFIDENTIAL

Page 15

1          Q.     And is all of your

2     consulting through the Hoover Behavioral

3     Health Incorporated?

4          A.     I would say most of it.  So

5     I -- any speaking engagement that I might

6     do, for example, would go through that.

7     Yeah.

8          Q.     When you say "most of it,"

9     the lawyer in me wants to ask, well, what

10    about the rest of it?

11         A.     Okay.  Well, I think as far

12    as I know, all of it would go through

13    Hoover Behavioral Health.

14               I'm just thinking that

15    sometimes, erroneously, someone might

16    pay, like, a stipend for a talk that I

17    would do to my personal name; you know,

18    they would write something to Sharon

19    Hoover, but then I would transfer it over

20    to my corporation.  If that makes sense.

21         Q.     And what is your current

22    position at the University of Maryland

23    School of Health?

24         A.     So, actually, as of

CONFIDENTIAL

Page 16

1    June 1st, I retired as a professor.  But

2    I still retained status as professor.

3    They granted me emeritus professor

4    status, then.

5            So I've been on faculty

6    there since 2004 and am currently

7    emeritus professor tenured in the

8    division of child and adolescent

9    psychology.

10        Q.    As a professor emeritus, do

11   you have any ongoing obligations to the

12   university in terms of teaching,

13   administration or anything else?

14        A.    So we have an understanding,

15   when you become an emeritus professor,

16   that you do still have a partnership and

17   a role with the university.

18            And so my role would be to

19   continue to mentor faculty and to

20   continue to contribute to their -- their

21   mission, which includes teaching and

22   research work.

23        Q.    Are you currently teaching

24   any classes at the University of

CONFIDENTIAL

Page 17

1  Maryland?

2          A.     I'm not currently teaching

3  classes.  And that, honestly, was never a

4  large part of my role, since my role was

5  really primarily around clinical work and

6  research work.

7                 So teaching was something I

8  did, but it wasn't in the traditional

9  sense of teaching coursework.

10          Q.     Are you currently engaged in

11  clinical work at the University of

12  Maryland?

13          A.     I'm not currently engaged in

14  clinical work at the University of

15  Maryland.

16          Q.     When was the last time that

17  you were actively engaged in clinical

18  work at the University of Maryland?

19          A.     I would probably want you to

20  define what you mean by "clinical work."

21  Because the term is a bit broad.

22                 So there's kind of direct

23  clinical work with patients, there's

24  other -- there's supervisory work,

CONFIDENTIAL

1   there's clinical programming work.

2               So when you say "clinical

3   work" --

4         Q.    Sure.

5         A.    -- I want to understand.

6         Q.    That was your term, but

7   let's use direct patient care.

8               Do you provide direct

9   patient care at the University of

10  Maryland?

11        A.    I have.  Not currently, no.

12        Q.    When is the last time that

13  you provided direct patient care at the

14  University of Maryland?

15        A.    I'd probably have to look at

16  my CV to know the exact date.

17        Q.    Okay.  Well, I'm happy for

18  you to look at your CV.

19               Do you have a copy of it?

20        A.    I do.

21        Q.    Okay.

22        A.    Yeah.  I think it's in here.

23  So I can do that.

24               Sorry.  My CV is about

CONFIDENTIAL

Page 19

1   70 pages long, so it may take just a

2   moment.

3           I'm looking for where it

4   says the actual clinical work in the

5   schools.  My teaching service.

6   International.  Okay.

7           Yeah.  So according to this,

8   the last direct clinical work I would

9   have done in the schools would have been

10  through 2008.  I provided direct clinical

11  supervision to trainees, psychology

12  interns, postdoctoral fellows up until

13  probably about a year or two ago.

14          So I'm involved in the

15  direct patient care in that way.  So when

16  cases come up, I'll work with them on

17  that.

18      Q.   Okay.  But in terms of you

19  personally, not in a supervisory role or

20  a teaching role, but providing direct

21  patient care, the last time was

22  approximately 17 years ago?

23          ATTORNEY YEATES:  Object to

24      the form.

Page 20

1           THE WITNESS:  So as I
2      stated, the last time that I
3      worked directly in patient care
4      was about 2008.
5           And we consider clinical
6      supervision still related to
7      direct patient care so.  So -- and
8      I've done that up until probably
9      about a year or two ago.
10 BY ATTORNEY LEHMAN:
11      Q.    And are you currently
12 working anywhere other than your
13 consulting work and any work that you do
14 as a professor emeritus at the University
15 of Maryland?
16      A.    No.
17      Q.    Okay.  Are you prepared
18 today to express your final opinions in
19 this case?
20      A.    Am I prepared to express my
21 opinions?  Yes.
22      Q.    Your final opinions.
23      A.    Yes.
24           ATTORNEY YEATES:  Object to

Page 21

1          the form.
2     BY ATTORNEY LEHMAN:
3          Q.    Do you need to perform any
4     additional work in order to reach your
5     final opinions?
6          A.    No.
7          Q.    Do you anticipate conducting
8     any work between now and any testimony at
9     trial?
10          A.    When you say do I
11     "anticipate conducting any work," tell me
12     what you mean by that.
13          Q.    Right.  So I mean do you
14     anticipate doing anything other than
15     maybe re-reviewing in order to prepare
16     for trial?
17          A.    So what I'll say is that in
18     the course of my work as a professor,
19     and, you know, I'm an editor for school
20     mental health journals, for example, I
21     would anticipate reviewing articles that
22     come my way for that.
23               But, no, I don't anticipate
24     doing additional work specific to this

CONFIDENTIAL

Page 22

```
 1    litigation, unless, you know, instructed
 2    to do otherwise.
 3              But, I'm -- you know, again,
 4    that's probably a legal process that I'm
 5    less familiar with.
 6         Q.    So we're going to be here
 7    for, I suspect, the day today.  So I
 8    usually take a break about every 60 to 90
 9    minutes.  But if you need a break before
10    then, please let me know.
11         A.    Will do.
12         Q.    My only request will be we
13    sort of finish maybe the question or
14    whatever topic we're talking about and
15    then happy to take a break, all right?
16         A.    That sounds good.
17         Q.    If at any point I ask a
18    question and you don't understand, please
19    let me know.  I'm happy to talk about
20    that; that way you and I are -- are
21    effectively communicating.
22         A.    Uh-huh.
23         Q.    All right.  Now,
24    unfortunately -- so I'm just going to use
```

CONFIDENTIAL

Page 23

1    this as an example.

2              So our court reporter is

3    taking down everything you and I say.  So

4    if you can try to give verbal answers

5    instead of uh-huh or uh-uh, that makes

6    her job much harder, and you and I will

7    get a talking to at a break.

8              So if you can answer yes or

9    no, that would make her job easier, okay?

10         A.    Will do.

11         Q.    I will do my best to remind

12   you.  Please don't think I'm being rude

13   if I do that; just trying to making sure

14   we have a clear transcript, okay?

15         A.    Understood.

16         Q.    Now, the final thing I'll

17   say, this is just normal human

18   conversation.  There's going to come a

19   time when you know where I'm going with a

20   question or I think you're done with an

21   answer, and we sort of talk over each

22   other.

23              Again, let's both -- we can

24   both remind each other.  If I start a

CONFIDENTIAL

Page 24

1    question before you're done, let me know

2    and I'm happy to let you finish; and vice

3    versa, if you sort of start before I

4    finish my question, I'll remind you.

5              Again, just making sure we

6    have a clean transcript, okay?

7         A.    Will do.

8         Q.    All right.  Are you taking

9    any medications or suffering from any

10   illnesses that would interfere with your

11   ability to accurately and truthfully

12   testify today?

13        A.    No.

14        Q.    Is there any health reason

15   or any other reason why you would not be

16   able to provide your best and most

17   complete opinions today?

18        A.    No.

19        Q.    Now, I see that you have

20   brought a notebook with you.

21              What do you have in your

22   notebook?

23        A.    So these are just the

24   binders of my reports.  So -- and my CV

CONFIDENTIAL

Page 25

1    copies.

2          Q.    All right.  So let's -- in

3    the front flap of the notebook, I think

4    you have a page which your counsel

5    reminder -- handed us and described as a

6    reminder.

7                ATTORNEY LEHMAN:  We'll mark

8          that as Exhibit-1.

9                    -   -   -

10               (Whereupon, Exhibit

11         Hoover-1, No Bates, Interviewee

12         List, was marked for

13         identification.)

14                   -   -   -

15   BY ATTORNEY LEHMAN:

16         Q.    Did you prepare this

17   document?

18         A.    I did.

19         Q.    All right.  And what is it?

20         A.    So it's just a document of

21   the dates and the names and titles of the

22   folks that I spoke with for the key

23   informant interviews as part of this

24   process.

CONFIDENTIAL

Page 26

1              And I generated it, really,

2    just as a reminder for myself as to, kind

3    of, the names and titles of who I spoke

4    with, in case asked about it today.

5          Q.     And are the dates listed in

6    the left column, are those the dates that

7    you spoke to these individuals?

8          A.     Yes.

9          Q.     Who selected the individuals

10   that you would interview?

11         A.     So I provided guidance to

12   counsel, based on the typical methodology

13   that I would use when talking with school

14   districts to get key informant

15   interviews, about the types of folks in a

16   district that I need to speak with.

17              So it would be people, for

18   example, who are knowledgeable about the

19   impact of social media on students and

20   the school environment.  It would include

21   people who are familiar with the

22   comprehensive school mental health

23   system.

24              And they took that

CONFIDENTIAL

Page 27

1    information and provided it, I believe,

2    to the school district, to select those

3    folks.  So it was the typical methodology

4    that I would use here.

5            Q.    And is this list that we've

6    marked as Exhibit-1, is this a complete

7    list of the key informant interviews that

8    you conducted?

9            A.    Yes.

10           Q.    All right.  And it reflects

11   individuals from all six of the school

12   districts?

13           A.    It reflects individuals from

14   twelve school districts, including the

15   six school districts, yes.

16           Q.    All right.  Is there anyone

17   that you interviewed who was not listed

18   on Exhibit-1?

19           A.    I don't believe so, no.

20           Q.    All right.  Is there anyone

21   that you asked to interview or a type of

22   person that you asked to interview that

23   you were not allowed to interview?

24           A.    No.

CONFIDENTIAL

Page 28

1          Q.     Did you personally interview

2     each of these individuals listed on

3     Exhibit-1?

4          A.     I did.

5          Q.     Did anyone else participate

6     in the interviews other than you and the

7     interviewee?

8          A.     Nobody participated in the

9     interviews.  Counsel was present but did

10     not participate in the interviews, if

11     that's what you mean.

12          Q.     All right.  So when you say

13     "counsel was present," you're referring

14     to counsel representing the plaintiff in

15     this matter?

16          A.     Yes.

17          Q.     All right.  And how many

18     attorneys were present on behalf of the

19     plaintiffs in these interviews?

20                ATTORNEY YEATES:  Object to

21          the form.

22                THE WITNESS:  Typically, one

23          was present, to my recollection.

24                I mean, I -- again, I was

CONFIDENTIAL

Page 29

1          more focused on the people I was
2          interviewing, so.
3    BY ATTORNEY LEHMAN:
4          Q.    Were the interviews
5    conducted in person or using a remote
6    medium?
7          A.    They were conducted using a
8    remote medium.
9          Q.    All right.  So were they
10   video or phone?
11         A.    They were over video.
12         Q.    All right.  How long was
13   each interview?
14         A.    I was going to see if I
15   listed it there, but I didn't.
16              So the interviews were
17   anywhere from one to two hours.
18         Q.    Was there anyone that you
19   spoke to on more than one occasion?
20         A.    No.
21         Q.    Was there a script that you
22   used for the interviews?
23         A.    No.  I have kind of a
24   standard set of, you know, kind of topics

CONFIDENTIAL

Page 30

1    that I cover when I'm doing the

2    interviews.  And those are what

3    contributes to the report.  So it's

4    outlined that way in my report.

5          Q.    And so is there a written

6    set of topics that you use to guide these

7    conversations?

8          A.    No.  I mean, I had the

9    report outline and then followed

10   according to that, so.

11              Yeah.  I can point you to,

12   you know, the outline in the report if

13   needed.

14         Q.    Sure.  We'll talk about that

15   in a moment.

16              Would those -- when you say

17   the "outline" from the report, is that

18   just the major topic headings from your

19   report?

20         A.    Exactly.

21         Q.    Did you record the

22   interviews in any way?

23         A.    No -- well, let me -- let me

24   clarify.

CONFIDENTIAL

Page 31

1            So I took contemporaneous

2    notes, which is what I would typically do

3    when I'm interviewing folks for my

4    district.  So I took notes that were

5    essentially part of the report.  Yeah.

6         Q.    Okay.  So I don't believe we

7    have received those notes.

8            So we are going to ask to

9    receive those, okay?

10        A.    There's no notes beyond

11   what's in the actual report.  So when I

12   say I took notes, they, then, were

13   iteratively developed into the report.

14           So it's not a separate set

15   of notes.  So that's why I was

16   clarifying.

17        Q.    Okay.  And so, then, are all

18   of the comments made by each of these

19   interviewees reflected in the individual

20   district reports?

21        A.    So as you'll see in the

22   reports, what I did, which, again, would

23   be typical of what I would do when I'm

24   interviewing any district -- and I

CONFIDENTIAL

Page 32

1  interview districts all the time -- is I
2  take notes through the interview and then
3  I synthesize the information and pull in
4  illustrative quotes, for example.
5              And that's what's in the
6  report.
7        Q.    And so are there any -- is
8  there any remaining documentation of the
9  entirety of what these interviewees have
10  said other than the illustrative quotes
11  that have remained in your reports?
12        A.    No.
13              ATTORNEY YEATES:  Object to
14        the form.  Misstates testimony.
15  BY ATTORNEY LEHMAN:
16        Q.    Did you invite any counsel
17  from the defense to attend any of the
18  interviews that you conducted?
19        A.    I don't think that would
20  have been my role.  So if you're asking
21  if I did, no.
22        Q.    Do you anticipate conducting
23  any other key informant interviews beyond
24  what's reflected in Exhibit-1?

Page 33

1          A.     No.

2          Q.     All right.  I think we were

3    going through what's in your notebook.

4                 You said the second thing

5    was -- was your report.

6                 Which report is that?

7    What's the date of it?

8          A.     Let me take a look.

9                 So the first thing that's in

10   here, other than the cover page, is the

11   expert report from May 16th, 2025.

12         Q.     Okay.  What's next?

13                ATTORNEY LEHMAN:  We'll mark

14         that as Exhibit Number 2.

15                        -   -   -

16                (Whereupon, Exhibit

17         Hoover-2, No Bates, 5/16/25 Expert

18         Report, was marked for

19         identification.)

20                        -   -   -

21                THE WITNESS:  So what's next

22         is a copy of my CV, dated May

23         10th, 2025.

24                ATTORNEY LEHMAN:  All right.

CONFIDENTIAL

Page 34

1            So we'll mark that as Exhibit-3.

2                    -   -   -

3                (Whereupon, Exhibit

4        Hoover-3, No Bates, 5/10/25

5        Curriculum Vitae of Sharon A.

6        Hoover, Ph.D., was marked for

7        identification.)

8                    -   -   -

9    BY ATTORNEY LEHMAN:

10           Q.    We received, within the last

11   week, an updated CV.

12                Is that the same as the CV

13   that you have in front of you?

14           A.    The next part that's in

15   here, behind this blue sheet, is the

16   updated CV.

17           Q.    All right.  And what's the

18   date of the updated CV?

19           A.    August 1st, 2025.

20                ATTORNEY LEHMAN:  We'll mark

21        that as Exhibit Number 4.

22                    -   -   -

23                (Whereupon, Exhibit

24        Hoover-4, No Bates, 8/1/25

CONFIDENTIAL

Page 35

1          Curriculum Vitae of Sharon A.
2          Hoover, Ph.D., was marked for
3          identification.)
4                    -   -   -
5     BY ATTORNEY LEHMAN:
6          Q.    And what was the change or
7     changes that were made between the
8     May 10th and August 1st CVs?
9          A.    I'd have to go through line
10    by line to actually recall.
11               But it would have -- to my
12    recollection, it would have been the
13    date, it would have been any changes in
14    positions or if -- you know, for example,
15    in a standard academic CV, if you have a
16    funding -- a grant that has ended, you
17    move it to the completed grant.  So I
18    would have indicated that.
19               I added several
20    publications, because I'm continuously
21    publishing.  So I try to keep those
22    updated.  So those would have been added
23    in.
24               And any other speaking

CONFIDENTIAL

Page 36

1    engagements I would have added in as

2    well.

3              And that's just part --

4    typically what we do when we're updating

5    our CVs.

6         Q.    Do you have any active

7    grants at present?

8         A.    So because I retired

9    June 1st, I'm not currently on the

10   grants.  So I transferred those to

11   colleagues within our National Center for

12   School Mental Health.

13        Q.    And do you have any updates

14   that would need to be made to your

15   August 10th -- I'm sorry.

16              Do you have any updates that

17   would need to be made to the August 1st,

18   2025, CV in order to bring it fully up to

19   date?

20        A.    I'm trying to think if I've

21   published anything in the last week.

22              I don't think so.

23        Q.    Okay.  Do you have any

24   publications that have been accepted for

CONFIDENTIAL

Page 37

1  publication but not yet been published?

2          A.    I -- yes.  And that's

3  indicated in there.  So I included that.

4          Q.    All right.  What else is in

5  your notebook?

6          A.    Let's see.  So there's

7  Exhibit-B, materials considered.  And

8  this would have been materials considered

9  for that May 16th report.

10                ATTORNEY LEHMAN:  We'll mark

11          that as Exhibit-5.

12                    -   -   -

13              (Whereupon, Exhibit

14          Hoover-5, No Bates, Materials

15          Considered List, was marked for

16          identification.)

17                    -   -   -

18  BY ATTORNEY LEHMAN:

19          Q.    What else is in your

20  notebook?

21          A.    So this is the rebuttal

22  report -- my rebuttal report that was

23  submitted -- or that's dated July 30th,

24  2025.

Page 38

```
 1                    -  -  -
 2              (Whereupon, Exhibit
 3         Hoover-6, No Bates, 7/30/25
 4         Rebuttal Report, was marked for
 5         identification.)
 6                    -  -  -
 7   BY ATTORNEY LEHMAN:
 8         Q.    All right.  So both the
 9   report from May 16th, 2025, and the
10   rebuttal report from July 30th, 2025,
11   those are both your general reports that
12   are not specific to any individual school
13   district; is that correct?
14         A.    That's correct.
15         Q.    Okay.  Is there anything
16   else in your notebook?
17         A.    Not this first notebook, no.
18         Q.    Do you have a second
19   notebook in front of you or is that a
20   copy of the same notebook?
21         A.    I have a second and a third.
22         Q.    Okay.  What's in your second
23   notebook?
24         A.    So the first thing that's in
```

CONFIDENTIAL

Page 39

1   here is an amended expert report for

2   Breathitt.  So this was the expert

3   report.  It's dated June 20th, 2025.

4                ATTORNEY LEHMAN:  All right.

5           We'll mark that as Exhibit

6           Number 7.

7                      -   -   -

8                (Whereupon, Exhibit

9           Hoover-7, No Bates, 6/20/25 Expert

10          Report for Breathitt County Board

11          of Education, was marked for

12          identification.)

13                     -   -   -

14   BY ATTORNEY LEHMAN:

15          Q.    What else is in the

16   notebook?

17          A.    The rebuttal -- amended

18   rebuttal report for Breathitt dated

19   August 7th.

20                ATTORNEY LEHMAN:  We'll mark

21          that as Exhibit Number 8.

22                     -   -   -

23                (Whereupon, Exhibit

24          Hoover-8, No Bates, 8/7/25

CONFIDENTIAL

Page 40

1          Rebuttal Report for Breathitt

2          County Board of Education, was

3          marked for identification.)

4                    -   -   -

5    BY ATTORNEY LEHMAN:

6          Q.    What else is in that book?

7          A.    The next thing that's in

8    here is the amended expert report for

9    Charleston County School District, dated

10   June 20th, 2025.

11               ATTORNEY LEHMAN:  All right.

12         We'll mark that as Exhibit-9.

13                    -   -   -

14               (Whereupon, Exhibit

15         Hoover-9, No Bates, 6/20/25

16         Case-Specific Report for

17         Charleston County School

18         District, was marked for

19         identification.)

20                    -   -   -

21   BY ATTORNEY LEHMAN:

22         Q.    What else is in the

23   notebook?

24         A.    Rebuttal report for

CONFIDENTIAL

Page 41

1  Charleston County School District, August

2  1st, 2025.

3           ATTORNEY LEHMAN:  We'll mark

4      that as Exhibit-10.

5               -   -   -

6           (Whereupon, Exhibit

7      Hoover-10, No Bates, 8/1/25

8      Case-Specific Rebuttal Report for

9      Charleston County School District,

10     was marked for identification.)

11              -   -   -

12  BY ATTORNEY LEHMAN:

13      Q.    What else is in the

14  notebook?

15      A.    The amended expert report

16  for DeKalb County schools, June 20th,

17  2025.

18           ATTORNEY LEHMAN:  We'll mark

19     that as Exhibit Number 11.

20              -   -   -

21          (Whereupon, Exhibit

22     Hoover-11, No Bates, 6/20/25

23     Case-Specific Amended Report for

24     DeKalb County Schools, was marked

CONFIDENTIAL

Page 42

1          for identification.)

2                    -   -   -

3    BY ATTORNEY LEHMAN:

4          Q.    What else is in the

5    notebook?

6          A.    The rebuttal report for

7    DeKalb County School District, amended,

8    and it's dated August 7th, 2025.

9                ATTORNEY LEHMAN:  We'll mark

10          that as Exhibit-12.

11                    -   -   -

12          (Whereupon, Exhibit

13          Hoover-12, 8/7/25 Case-Specific

14          Rebuttal, Report for DeKalb County

15          Schools, was marked for

16          identification.)

17                    -   -   -

18    BY ATTORNEY LEHMAN:

19          Q.    Does that complete the

20    second notebook?

21          A.    That is Binder 2.

22          Q.    All right.  And what is in

23    Binder 3?

24          A.    Binder 3, we've got our

CONFIDENTIAL

Page 43

1    cover page, just like in the other ones.

2                    And the first thing that's

3    in here is the amended expert report --

4    my amended expert report for the Board of

5    Education for Harford County, and that's

6    June 20th, 2025.

7                    ATTORNEY LEHMAN:  We'll mark

8         that as Exhibit-13.

9                    -   -   -

10                   (Whereupon, Exhibit

11        Hoover-13, No Bates, 6/20/25

12        Case-Specific Report for Board of

13        Education for Harford County, was

14        marked for identification.)

15                   -   -   -

16   BY ATTORNEY LEHMAN:

17        Q.    What else is in the

18   notebook?

19        A.    The next thing is the

20   rebuttal -- my rebuttal report for

21   Harford County Public Schools, August

22   1st, 2025.

23                   ATTORNEY LEHMAN:  We'll mark

24        that as Exhibit-14.

CONFIDENTIAL

Page 44

```
 1                    -   -   -
 2              (Whereupon, Exhibit
 3         Hoover-14, No Bates, 8/1/25
 4         Case-Specific Rebuttal Report
 5         Harford County Public Schools, was
 6         marked for identification.)
 7                    -   -   -
 8   BY ATTORNEY LEHMAN:
 9         Q.    What else is in your
10   notebook?
11         A.    So it's the amended expert
12   report for Irvington Public Schools,
13   dated June 20th, 2025.
14              ATTORNEY LEHMAN:  We'll mark
15         that as Exhibit-15.
16                    -   -   -
17              (Whereupon, Exhibit
18         Hoover-15, No Bates, 6/20/25
19         Case-Specific Amended Expert
20         Report for Irvington Public
21         Schools, was marked for
22         identification.)
23                    -   -   -
24   BY ATTORNEY LEHMAN:
```

CONFIDENTIAL

Page 45

1        Q.    And what's -- what's next in
2    your notebook?
3        A.    The amended rebuttal report
4    for Irvington Public Schools, dated
5    August 7th, 2025.
6              ATTORNEY LEHMAN:  We'll mark
7        that as Exhibit-16.
8                    -   -   -
9              (Whereupon, Exhibit
10             Hoover-16, No Bates, 8/7/25
11             Case-Specific Rebuttal Report for
12             Irvington Public Schools, was
13             marked for identification.)
14                  -   -   -
15    BY ATTORNEY LEHMAN:
16        Q.    All right.  What else is in
17    the notebook?
18        A.    The amended expert report --
19    my amended expert report for Tucson
20    Unified School District, dated June 20th,
21    2025.
22             ATTORNEY LEHMAN:  We'll mark
23        that as Exhibit-17.
24                  -   -   -

CONFIDENTIAL

Page 46

1           (Whereupon, Exhibit
2      Hoover-17, No Bates, 6/20/25
3      Case-Specific Report for Tucson
4      Unified School District, was
5      marked for identification.)
6                - - -
7  BY ATTORNEY LEHMAN:
8      Q.    And anything else in your
9  notebook?
10     A.    One more thing.
11     Q.    Okay.
12     A.    The amended rebuttal report
13  for Tucson Unified School District, dated
14  August 7th, 2025.
15           ATTORNEY LEHMAN:  All right.
16                - - -
17           (Whereupon, Exhibit
18      Hoover-18, No Bates, 8/7/25
19      Case-Specific Rebuttal Report for
20      Tucson Unified School District,
21      was marked for identification.)
22                - - -
23  BY ATTORNEY LEHMAN:
24     Q.    And does that complete all

CONFIDENTIAL

Page 47

1    of the materials that you've brought with

2    you?

3          A.    It does.

4          Q.    All right.  Based on my

5    math, given -- if we count for the

6    amendments -- so you initially -- you

7    have the general report dated May 16th,

8    2025, and then you have the rebuttal

9    general report dated August -- or, sorry,

10   July 30th, 2025.

11              So that's two reports,

12   correct?

13              And then you issued a report

14   in each of the six districts, which was

15   subsequently amended, and those

16   amendments were dated June 20th, 2025,

17   correct?

18              ATTORNEY YEATES:  Object to

19        the form.

20              THE WITNESS:  I think I just

21        stated the -- all of them.  Do you

22        want me to go back and look

23        through --

24   BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 48

1      Q.    No, no, no.

2      A.    Oh, okay.

3      Q.    I'm just trying to make

4  sure.  Right.  So by my count --

5      A.    Okay.

6      Q.    -- we have -- for each

7  school district individually there was a

8  report that was amended and then there

9  was a rebuttal report which was also

10  amended; is that correct?

11          ATTORNEY YEATES:  Object to

12      the form.

13          THE WITNESS:  Yes.  I mean,

14      to my understanding, that --

15      that's correct.

16          So for each district I've

17      got the expert report and then the

18      rebuttal report and -- yes.

19  BY ATTORNEY LEHMAN:

20      Q.    Right.  And the ones that

21  you have are actually the amended reports

22  of the dates that you've just indicated

23  when we went through them?

24          ATTORNEY YEATES:  Object to

Page 49

1          the form.  Misstates facts.
2                 THE WITNESS:  So they are
3          the reports that were submitted on
4          the dates that I stated.
5    BY ATTORNEY LEHMAN:
6          Q.    Okay.  Is that a complete
7    set -- meaning the three notebooks that
8    we've just walked through, is that a
9    complete set of your operative reports,
10   both general reports and for the school
11   districts?
12         A.    Yes.
13         Q.    Okay.  Is there another
14   report that you have prepared that is not
15   included in those notebooks?
16         A.    No.
17         Q.    Is there anything in --
18   contained in the reports that we have
19   just marked as Exhibits-2, 6 and 7
20   through 18, that is inaccurate?
21         A.    Not to my knowledge, no.
22         Q.    Do you have any opinions
23   that are not included in the reports that
24   we have just marked in Exhibits-2 and 6

CONFIDENTIAL

Page 50

1    through 18?

2          A.    Do I have any opinions with

3    respect to this litigation --

4          Q.    Yes.

5          A.    -- that are not in there?

6          Q.    Yes.

7          A.    No.

8          Q.    Did anyone help you prepare

9    your reports?

10          A.    No.  I drafted the reports,

11    wrote the reports myself.

12          Q.    Now, as we -- as we talk

13    today and -- if I refer to social media,

14    I'm going to refer to either the platform

15    or the associated app, okay?

16          A.    Okay.

17          Q.    Is that acceptable to you?

18                ATTORNEY YEATES:  Object to

19          the form.

20                THE WITNESS:  I'm not sure

21          what you mean by "acceptable."

22    BY ATTORNEY LEHMAN:

23          Q.    Okay.  Well, I guess I just

24    want to clarify for you that that's how

Page 51

1   we're going to use the terms.

2              And if, for some reason, you

3   would need to clarify your answer --

4        A.    Okay.

5        Q.    -- based on a distinction,

6   please go ahead and do so, okay?

7        A.    Okay.  Will do.

8        Q.    All right.  And I would also

9   tell you that I will use psychiatric

10  disorders and mental health disorders to

11  mean the same thing, okay?

12       A.    Okay.

13       Q.    All right.  What is your

14  definition of adolescence?

15       A.    So typically when we think

16  about adolescence, as a clinical

17  psychologist, I would think about roughly

18  the age range of about 11 to 18.

19              But often that age range we

20  also extend beyond that if we're talking

21  about kind of young adulthood.

22              So adolescence, though, can

23  be anywhere, again, from about 11 to 18.

24  We use different age ranges sometimes as

Page 52

1   we're thinking about adolescence.  But
2   it's in the period beyond, you know,
3   elementary school, childhood and we're
4   really thinking about -- you know, I work
5   in schools a lot, so we often are
6   thinking about middle and high school
7   students.
8          Q.    Have you been deposed
9   before?
10         A.    So I -- I want to say it was
11  about eight or nine years ago, I think, I
12  was deposed for a -- and I know that
13  might sound strange to an attorney, but
14  I'm not typically involved in legal
15  proceedings.  And so I think I was
16  deposed for a small case.
17         Q.    What kind of case was that?
18         A.    It was a case where I was
19  brought in as an expert around promotion.
20  It was somebody who was challenging a
21  university about being promoted -- or,
22  excuse me, about being denied promotion.
23              And so because I have
24  experience in academic promotion and

CONFIDENTIAL

Page 53

1   tenure, I was brought on for that.

2        Q.    Is that the only time that

3   you've been deposed?

4        A.    Yes.

5        Q.    Have you previously

6   testified before any legislatures?

7        A.    Yes.

8        Q.    Tell me about that.

9        A.    So most recently it would

10  have been -- again, I'm happy to look at

11  my CV if you need dates.

12            But most recently I've

13  testified a couple of times for the

14  United States Senate.

15       Q.    Other than testifying before

16  the United States Senate, have you ever

17  testified in front of any other

18  legislative body?

19       A.    To my recollection, I would

20  have testified for the Maryland Congress

21  as well.  So Maryland State Senate and

22  House of Representatives.

23       Q.    And what did you testify

24  before the U.S. Senate about?

CONFIDENTIAL

Page 54

1          A.     So I testified -- two

2     different hearings.  And in one hearing,

3     I was testifying about the transition

4     supports from high school to college and

5     kind of what supports need to be put in

6     place in terms of comprehensive school

7     mental health supports for young people,

8     again, particularly with a focus on

9     transitioning from high school to

10    college.

11             And in the other hearing,

12    which would have been for the Senate

13    Finance Committee, it was really looking

14    at kind of how school mental health

15    services are financed and what some of

16    the, you know, mechanisms are that need

17    to be improved, really, including better

18    leveraging Medicaid for school mental

19    health services.

20         Q.     What was the topic of your

21    testimony before the Maryland Congress?

22         A.     Oh, honestly, it's been a

23    few years.  I'd have to -- I might have

24    to go back to my CV to recall what the

CONFIDENTIAL

Page 55

1  topic was.

2              We -- you know, working at

3  the state university, we often get called

4  on to provide knowledge translation.  And

5  so I would have been asked probably to go

6  in and speak to school mental health.

7              But the exact testimony, I'd

8  have to retrieve.

9        Q.    And have there been any

10  occasions where you have submitted an

11  affidavit or other sworn statement in any

12  other setting?

13        A.    Not to my knowledge.

14        Q.    Now I want to look at your

15  notice of deposition.

16              ATTORNEY LEHMAN:  We'll mark

17         this as Exhibit Number 19.

18                    -  -  -

19              (Whereupon, Exhibit

20         Hoover-19, No Bates, Notice of

21         Deposition, was marked for

22         identification.)

23                    -  -  -

24              ATTORNEY LEHMAN:  This is

Page 56

```
 1        Tab Number 1.
 2   BY ATTORNEY LEHMAN:
 3        Q.    All right.  Can you confirm
 4   that what I've handed you is defendants'
 5   notice of videotaped deposition of
 6   plaintiffs' retained expert witness,
 7   Dr. Sharon A. Hoover and request for
 8   production of documents at time of
 9   deposition?
10        A.    Are you asking me to confirm
11   that?
12        Q.    Yes.  I'm just asking you to
13   confirm --
14        A.    Yes.
15        Q.    -- that that's actually --
16        A.    I confirm that's what it
17   says here.  Yes.
18        Q.    Have you seen this document
19   before today?
20        A.    I have.
21        Q.    All right.  And I know we've
22   already gone through what you've brought
23   with you.
24              Have you either provided to
```

CONFIDENTIAL

Page 57

1  us in advance or brought with you all of

2  the documents responsive to Exhibit A?

3            ATTORNEY YEATES:  Object to

4       the form.  Subject to objections

5       that were served.

6            THE WITNESS:  Yeah, I'm not

7       sure.  I'd have to --

8  BY ATTORNEY LEHMAN:

9       Q.    Sure.  And if you look -- if

10 you look on Page 6, there's Exhibit A,

11 which is appended to what we have now

12 marked --

13      A.    Right.

14      Q.    -- as Exhibit Number 19.

15      A.    I remember that, yeah.

16      Q.    All right.  And so have you

17 provided all of the documents or

18 materials that are in your file for this

19 litigation?

20      A.    Yes, I believe so.

21      Q.    And are the materials

22 considered lists that were previously

23 provided, are they full and complete

24 lists of the materials that you

CONFIDENTIAL

Page 58

1   considered in developing your opinions in

2   this matter?

3           A.    Sorry, can you repeat the

4   question?  I was also just reviewing

5   this.

6                 And I note here that

7   compensation, I don't think I've provided

8   a list of all of the compensation

9   received.

10                ATTORNEY YEATES:  We

11          objected to that.

12                THE WITNESS:  Okay.  So.

13                So if you don't mind

14          restating your -- your most recent

15          question.

16  BY ATTORNEY LEHMAN:

17          Q.    No problem.

18                Are the materials considered

19  lists that were previously provided full

20  and complete lists of the materials that

21  you considered in developing your

22  opinions in this matter?

23          A.    Yes.

24          Q.    Now, in your materials

CONFIDENTIAL

Page 59

1  considered lists, there are -- are a list

2  of expert reports that you reviewed.

3                Is that a complete and

4  accurate list of the expert reports that

5  you reviewed?

6        A.    I'm happy to look in the

7  report at the materials considered.  It

8  was at the end of the reports.

9                Yes.

10       Q.    Who selected which expert

11 reports you would review?

12       A.    I asked for expert reports

13 that would be relevant, and these were

14 the ones provided to me by counsel.

15       Q.    Did you ask to review any

16 other expert reports --

17       A.    I did --

18       Q.    -- aside from the witnesses

19 listed?

20       A.    I did not.

21       Q.    Have you spoken to anyone

22 who has been named as an expert witness

23 in this case?

24       A.    No.

CONFIDENTIAL

Page 60

```
 1          Q.    Have you ever worked with
 2    anyone else who has been named as an
 3    expert witness in this case?
 4          A.    I don't know all of the
 5    experts that have been named.
 6                But I've never worked with
 7    the ones that are on the documents that I
 8    reviewed.
 9          Q.    Have you ever met any of the
10    expert witnesses who are listed in the
11    reports that you reviewed?
12          A.    I have not.
13          Q.    When were you first
14    contacted in connection with this
15    litigation?
16          A.    I'd have to go back to my
17    e-mail, to be honest with you.
18                But I want to say it was
19    roughly spring of last year.  So maybe
20    April, May.
21          Q.    So spring of 2024?
22          A.    Spring or summer.  I
23    can't -- yeah.  I -- I'd have to go back
24    if you need an exact date, because I
```

Page 61

1    don't have that in my memory.

2         Q.    Who first contacted you?

3         A.    That's, again -- jog -- I'd

4    have to jog my memory.

5              I don't remember the name of

6    the person who first contacted me.

7         Q.    Was it someone that you had

8    worked with previously?

9         A.    No.

10        Q.    Did they -- did -- whoever

11   contacted you, did they -- did they tell

12   you how they had found you?

13        A.    To my recollection, it was

14   they were seeking someone with expertise

15   in comprehensive school mental health,

16   and my name had been recommended to them

17   by most people they had talked with,

18   given my experience in the field.

19        Q.    When did you first agree to

20   serve as an expert for the plaintiffs in

21   this litigation?

22        A.    Again, that's challenging my

23   memory a bit.

24              It would have been after

Page 62

1   that conversation and after

2   consideration, you know.  So it would

3   have been sometime within that kind of

4   spring to summer of 2024.

5          Q.     Before you were retained as

6   an expert in this litigation, before

7   you -- before that -- you made the

8   agreement, did counsel provide you with

9   any materials to review?

10         A.     I don't think so, no.

11         Q.     Have you previously worked

12  with any of the plaintiffs' counsel in

13  this litigation on other matters?

14         A.     No.

15         Q.     What were you asked to do as

16  an expert?

17         A.     So I was asked to consider

18  the impact of social media on young

19  people with respect to their mental

20  health, but also the impact on schools,

21  and to develop a strategic plan, if

22  warranted, for school districts,

23  bellwether school districts, to both

24  prevent and mitigate the -- the harms

CONFIDENTIAL

Page 63

```
 1   discovered on young people and on
 2   schools.
 3          Q.    And is the -- are the plans
 4   that you developed, are those isolated to
 5   dealing solely with the impacts of social
 6   media or are those broader comprehensive
 7   plans intended to address all caused
 8   student mental health?
 9              ATTORNEY YEATES:  Object to
10          the form.
11              THE WITNESS:  So the plans I
12          developed are very specific to the
13          impacts of social media.  And to
14          the extent that social media might
15          intersect with other mental health
16          factors, it -- you know, you could
17          argue that it would be part of
18          those reports.
19              But the reports that I
20          developed are really specific to
21          the impacts of social media.
22   BY ATTORNEY LEHMAN:
23          Q.    For any district, do you
24   have quantitative information about how
```

CONFIDENTIAL

Page 64

1   much time district students spend on

2   social media during the school day?

3              ATTORNEY YEATES:  Object to

4        the form.

5              THE WITNESS:  So for the

6        specific bellwether districts, to

7        my knowledge, I do not have

8        specific time that students spend.

9              And, frankly, you know, in

10       working with hundreds of

11       districts, they don't have the

12       capacity to gather that data on

13       their students.  It's just not

14       something that there -- that we

15       would have been able to even

16       retrieve in terms of the number of

17       minutes that students spend.

18   BY ATTORNEY LEHMAN:

19       Q.    For any district, do you

20   have quantitative information about how

21   much time students spend on screen time

22   that is not social media?

23              ATTORNEY YEATES:  Object to

24       the form.

CONFIDENTIAL

Page 65

1              THE WITNESS:  So for the
2         bellwether districts, I do not
3         have the number of minutes that
4         students were on screens.
5              But I relied on the
6         extensive data that does exist for
7         the amount of time that teenagers
8         and children spend on screens to
9         inform some of my opinions.
10   BY ATTORNEY LEHMAN:
11         Q.    What -- is it correct that
12   your fee is $625 an hour for reviewing
13   materials and writing your report?
14         A.    That's correct.  For this
15   litigation, yes.
16         Q.    And are you also charging
17   $625 an hour when consulting with
18   counsel?
19         A.    When I have calls with
20   counsel, yes.
21         Q.    And do you charge $625 an
22   hour for testifying in deposition and
23   trial?
24         A.    Yes.

CONFIDENTIAL

Page 66

1          Q.    Are there any other
2    activities where you charge a different
3    hourly rate for your work in this case?
4          A.    No.
5          Q.    Do you charge for travel
6    time?
7          A.    You know, I don't think
8    we've discussed that, to be honest with
9    you.  So that's something I'd have to
10   talk with counsel about.
11               But I don't know that that's
12   actually -- that that's been discussed
13   yet.
14         Q.    All right.  Well, so we're
15   sitting here today in Radnor,
16   Pennsylvania, outside Philadelphia.
17               And you do not live within a
18   few miles of this location, correct?
19         A.    That's correct.
20         Q.    All right.
21         A.    Yeah.
22         Q.    So you had to travel here
23   from your home in Maryland?
24         A.    I did.  I don't live in

CONFIDENTIAL

Page 67

1  Radnor.

2      Q.    Okay.  And do you -- do you

3  plan to submit an expense -- or bill for

4  the time it took you to travel here?

5      A.    Again, that's something I'd

6  have to discuss with counsel.  We

7  haven't, I don't think, actually

8  discussed that yet.

9            ATTORNEY LEHMAN:  Let's mark

10        Tab 3, your invoices, as Exhibit

11        Number 20.

12                  -   -   -

13        (Whereupon, Exhibit

14        Hoover-20, HOOVER000081-0087,

15        Hoover Behavioral Health Invoices,

16        was marked for identification.)

17                  -   -   -

18  BY ATTORNEY LEHMAN:

19      Q.    And those will be displayed

20  on the screen.

21            And I apologize, I don't

22  have a written copy because we received

23  those after I was already in transit.

24  But we received these from counsel.

Page 68

1           ATTORNEY LEHMAN:  Can you
2       just scroll through quickly, just
3       at the page level?
4           ATTORNEY YEATES:  Do any of
5       defense counsel have a copy
6       printed?
7           ATTORNEY KEYES:  Excuse me?
8           ATTORNEY YEATES:  Do any
9       defense counsel have a copy of the
10      invoices printed?  It's hard for
11      me to see on the screen here.
12          ATTORNEY KEYES:  I do not.
13          ATTORNEY LEHMAN:  These are
14      the ones we received from your
15      office within the last two days.
16          ATTORNEY YEATES:  I know
17      where they came from.
18  BY ATTORNEY LEHMAN:
19      Q.    All right.  So how many
20  invoices have you submitted in this case,
21  Dr. Hoover?
22      A.    I don't know if I recall the
23  number.  And you just went through them
24  pretty quickly, so I didn't count as you

CONFIDENTIAL

Page 69

1    were doing it.

2              But I'd have to go back to

3    my own records, which these appear to

4    reflect.

5         Q.    All right.  So looking at

6    Page 1, down at the bottom, do you see

7    that there's a page number or a Bates

8    number that's Hoover and ends in 81?

9         A.    Yes, I do.

10        Q.    Okay.  And do you see up at

11   the top, the date on this is January

12   16th, 2025?

13        A.    I do.

14        Q.    All right.  And along the

15   left column, there's a date and then

16   there's a description of service, the

17   number of hours and the fee, correct?

18        A.    I see.

19        Q.    And the earliest date that I

20   see on this invoice is July 10th, 2024.

21        A.    Correct.

22        Q.    All right.  And would that

23   be consistent with your memory of

24   approximately when you agreed to serve as

Page 70

1    an expert in this matter?

2              ATTORNEY YEATES:  Object to

3         the form.

4              THE WITNESS:  As I said, I

5         don't recall the exact date that I

6         agreed to serve as an expert.

7    BY ATTORNEY LEHMAN:

8         Q.    Okay.  Well, are you -- do

9    you have any invoices reflecting time

10   that you spent on this matter before

11   July 10th, 2024?

12        A.    This is the first invoice I

13   would have submitted.  So this is the

14   time that -- the first time that I would

15   have invoiced for.  And this is the time

16   that I would have spent on the

17   litigation.

18        Q.    Okay.

19              ATTORNEY LEHMAN:  Now, if we

20        can go to the last page, please.

21   BY ATTORNEY LEHMAN:

22        Q.    And do you see the date at

23   the top here is May 24th, 2025?

24        A.    I see that, yes.

CONFIDENTIAL

Page 71

1              Q.    Have you submitted any
2    invoices in this matter for work since
3    May 24th, 2025?
4              A.    I'm not sure.  I'd have to
5    go back to my records, honestly.
6              Q.    How much additional time, if
7    any, have you spent working on this
8    matter since May 19th, 2025?
9              A.    Do you mean May 24th?
10             Oh, I see, the 19th.
11             Q.    I don't.
12             A.    I didn't see -- it hadn't
13   scrolled yet.  May 19th.
14             I don't know the exact
15   number of hours.  Again, I'd have to go
16   back to my own, you know, records or my
17   invoice draft, if I haven't submitted an
18   invoice yet.
19             Q.    Do you have an invoice
20   drafted for time spent since May 19th,
21   2025?
22             A.    Perhaps.  I'd have to
23   look -- I'd have to look at my records.
24             Q.    Okay.

CONFIDENTIAL

Page 72

1          A.    Yeah.

2          Q.    Do you believe that you've

3    spent more than 20 hours working on this

4    matter since May 19th, 2025?

5          A.    Yes.

6          Q.    Do you think that you spent

7    more than 50 hours since that time?

8          A.    It's hard for me to estimate

9    beyond the 20 hours.  I know it's been at

10   least 20.

11         Q.    Now, by my count, the

12   invoices submitted reflect $152,343.75

13   that you have billed on this matter.

14               Is that accurate?

15               ATTORNEY YEATES:  Object to

16        the form.

17               THE WITNESS:  I don't know.

18               Sorry.

19               I'd have to go and add it

20        all up again.

21   BY ATTORNEY LEHMAN:

22         Q.    Well, if -- if I have

23   correctly added up the amounts reflected

24   in these invoices, would that reflect the

CONFIDENTIAL

Page 73

1    full amount that you have billed in this

2    matter?

3            A.    I don't know.  Are you

4    asking me to assume that the math is

5    correct?

6            Q.    No, actually, I'm not.

7    That's --

8            A.    Okay.

9            Q.    That's why I phrased --

10           A.    I may have a

11   misunderstanding.

12           Q.    -- the question as I did.

13                 If I correctly add up the

14   amounts reflected in the invoices

15   received from counsel, is that the full

16   amount that you have submitted for

17   payment in this matter?

18           A.    I don't know.

19           Q.    Okay.  All right.  So I want

20   to make sure.

21                 We're not sure if we have

22   all of the invoices and we're not sure

23   how much time has not been invoiced.

24                 Is that -- is that the sum

CONFIDENTIAL

Page 74

1    and substance of where we are on this?

2            A.    I --

3                  ATTORNEY YEATES:  Object to

4            the form.

5                  THE WITNESS:  I can't speak

6            to whether you're not sure about

7            it.

8                  I can tell you that what I'm

9            seeing are invoices that I have

10           submitted.

11   BY ATTORNEY LEHMAN:

12           Q.    Okay.  Well, I don't -- I

13   don't -- let's not quibble.

14                 This is my question: I have

15   received these invoices from your

16   counsel.  I need to know if there are

17   more that exist.

18                 And so what would you need

19   to look at in order to tell me the dates

20   of the invoices that you have submitted?

21           A.    I would need to look at my

22   invoices.

23           Q.    Okay.  And where are they?

24           A.    They would be -- well,

CONFIDENTIAL

Page 75

1   counsel would have ones that I've
2   submitted, I assume.  Or I would have
3   them in my invoice record.
4          Q.    Okay.  And where is your
5   invoice record kept?
6          A.    That would be in my invoice
7   folder of, you know, my --
8          Q.    Is that on your computer?
9          A.    Yes.
10         Q.    Is that something that you
11  have with you?
12         A.    No.
13         Q.    All right.  Is that
14  something that you have with you in
15  Pennsylvania?
16         A.    It's on a drive that I could
17  access from there, yes.
18         Q.    Okay.  All right.  We are
19  going to need confirmation about the
20  invoices.
21              So is that something that
22  you could look at tonight and let us know
23  tomorrow?
24         A.    I could.  I could let you

CONFIDENTIAL

Page 76

1    know, yes.

2            Q.    Okay.  Did you prepare your

3    materials considered list?

4            A.    Yes.

5            Q.    Did anyone help you prepare

6    those lists?

7            A.    I reviewed it with counsel.

8    So I'm not sure what you mean by "did

9    anyone help" me.

10                 But I generated the

11   materials reviewed list that went along

12   with the reports.

13           Q.    Did anyone suggest to you

14   materials that should be added or deleted

15   to the materials considered list?

16           A.    No.

17           Q.    Were there any materials

18   that you reviewed that are not reflected

19   in your materials considered list?

20           A.    Were there any materials

21   reviewed?

22           Q.    Yes.

23           A.    No.

24                 The only qualification I

Page 77

1    would make is that, you know, as an

2    academic professional, I'm, you know,

3    consistently reading articles as part of

4    my work.  And, you know, I edit journals.

5    I review for journals.

6                So -- but as far as

7    materials considered for this, it's --

8    the list is inclusive of all that's been

9    considered to inform the opinions, yeah.

10        Q.    Now, putting aside for a

11    moment the -- the depositions that you

12    received from counsel.

13                Did you receive any of the

14    articles or other materials in your

15    materials considered list from

16    plaintiffs' counsel?

17                ATTORNEY YEATES:  Object to

18        the form.

19                THE WITNESS:  No.

20    BY ATTORNEY LEHMAN:

21        Q.    For the articles and

22    depositions that are identified in your

23    materials considered list, did you review

24    every page of those?

Page 78

1        A.     I reviewed the articles

2   thoroughly.  You know, I've -- over 25

3   years in academia, I've gotten to be a

4   pretty fast reader.  So yeah.

5        Q.     And for the depositions, did

6   you review every page or did you review

7   selectively?

8              ATTORNEY YEATES:  Object to

9        the form.

10              THE WITNESS:  So I don't

11        know what you mean by "review

12        selectively."  I looked at all of

13        the depositions that were

14        included.  If I included them in

15        my list of materials considered, I

16        would have reviewed them all.

17   BY ATTORNEY LEHMAN:

18        Q.     When you say you "reviewed"

19   them, does that mean that you reviewed

20   every page?

21        A.     So I probably looked at

22   every page.  Did I -- did I memorize each

23   word in the deposition?  No.  And did I

24   read word for word?  No.

Page 79

1          I mean, I -- there's a
2    difference, I would say, between skimming
3    and reading quickly and then, you know,
4    noting every word.
5               But did I read the
6    depositions?  Yes.  Did I review them?
7    Yes.
8          Q.    Did you take any notes while
9    you reviewed the depositions?
10         A.    Nothing that -- that wasn't
11    part of my report.
12         Q.    Did you take any notes while
13    you reviewed the articles included in
14    your materials considered list?
15         A.    No.
16         Q.    Now, there is a heading on
17    your materials considered list called,
18    TikTok Documents, and it lists four
19    documents.
20         A.    Correct.
21         Q.    Did you select those four
22    documents?
23         A.    I did not.
24         Q.    Who selected those four

Page 80

1    documents?

2            A.    When you say "who selected"

3    them, they were sent to me, I believe, by

4    counsel.

5            Q.    Are those -- is it correct

6    that you have only reviewed, in total,

7    four internal TikTok documents?

8            A.    Yes.

9            Q.    Have you reviewed any

10   documents internal to any other defendant

11   in this case?

12           A.    No.

13           Q.    Do you know who the

14   defendants in this litigation are?

15           A.    Yes.

16           Q.    Who are they?

17           A.    So they are the defendants'

18   platforms.  Let's see if I can -- so

19   Snapchat, TikTok, Instagram, Meta or

20   Facebook.

21                 Which one am I leaving out

22   here?  Snapchat, TikTok, Instagram,

23   Meta -- YouTube.

24           Q.    In your review, did you

CONFIDENTIAL

Page 81

1  review the Steinsbekk article from 2023
2  titled Social Media Behavior and Symptoms
3  of Depression and Anxiety, a Four-Year
4  Cohort Study From Ages 10 to 16?
5          A.    I'd have to look through
6  my -- I reviewed a lot of studies.  So I
7  can go --
8          Q.    And please do look at your
9  materials considered list.
10         A.    I will, yeah.
11               So I don't see that listed
12  here in this first list.  And I don't see
13  it in this rebuttal report.
14         Q.    In your review, did you
15  review the 2024 article by Maheux titled,
16  Longitudinal Change in Appearance-Related
17  to Social Media Consciousness and
18  Depressive Symptoms, a Within Person
19  Analysis During Middle and Early
20  Adolescence?
21               ATTORNEY YEATES:  Can you
22         spell the name of that author.
23               ATTORNEY LEHMAN:  Yes.  It's
24         M-A-H-E-U-X.

CONFIDENTIAL

Page 82

1                ATTORNEY YEATES:  Thank you.

2                THE WITNESS:  It's not in

3          this list considered.

4                No.

5    BY ATTORNEY LEHMAN:

6          Q.    In your review of materials,

7    did you consider the 2021 article by Boer

8    entitled, Social Media Use Intensity,

9    Social Media Problems, and Mental Health

10   Among Adolescents in Investigating

11   Directionality and Mediating Processes?

12         A.    Not that I see here.  Let me

13   look here just to confirm.

14                No.

15         Q.    In your review, did you

16   review the 2021 article by Beeres titled,

17   Social Media and Mental Health Among

18   Early Adolescents in Sweden, a

19   Longitudinal Study With Two-Year

20   Follow-Up?

21                ATTORNEY YEATES:  What is

22          that author's name.

23                ATTORNEY LEHMAN:  Beeres,

24          B-E-E-R-E-S.

Page 83

1              THE WITNESS:  No.

2    BY ATTORNEY LEHMAN:

3         Q.    Did you -- in your review,

4    did you review the 2020 article by

5    Puukko -- that's spelled P-U-U-K-K-O,

6    entitled, Social Media Use and Depressive

7    Symptoms, a Longitudinal Study From Early

8    to Late Adolescence?

9         A.    No.

10        Q.    In your review, did you

11   review the 2018 article by George titled,

12   Concurrent and Subsequent Associations

13   Between Daily Digital Technology Use and

14   High-Risk Adolescents' Neuro Health

15   Symptoms?

16        A.    George spelled G-E-O-R-G-E?

17        Q.    Correct.

18        A.    Okay.  No.

19        Q.    In your review, did you

20   review the 2019 article by Jensen

21   entitled, Youth Adolescence Digital

22   Technology Use and Media Health Symptoms,

23   Little Evidence of Longitudinal or Daily

24   Linkages?

Page 84

1          A.     No.

2          Q.     In your review, did you

3    review the 2018 article by Houghton

4    entitled, Reciprocal Relationships

5    Between Trajectories of Depressive

6    Symptoms and Screen Media Use During

7    Adolescence?

8          A.     No.

9          Q.     In your review, did you

10   review the 2023 article by Leggett-James

11   entitled, The Consequences of Social

12   Media Use Across the Transition Into

13   Adolescence, Body Image and Physical

14   Activity?

15         A.     No.

16         Q.     In your review, did you

17   review the 2022 article by Maes --

18   spelled M-A-E-S -- entitled, Adolescent

19   Girls' Instagram and TikTok Use Examining

20   Relations With Body-Image Related

21   Constructs Over Time Using Random

22   Interpretation Cross-Lagged Models?

23         A.     No.

24         Q.     In your review, did you

CONFIDENTIAL

Page 85

1    review the 2017 article by Russo

2    entitled, The Reciprocal and Indirect

3    Relationship Between Facebook Use

4    Comparison on Facebook and Adolescents'

5    Body Dissatisfaction?

6            A.    No.

7            Q.    In your review, did you

8    review the 2023 article by Chu entitled,

9    Screen Time and Suicidal Behavior Among

10   U.S. Children 9 to 11 Years of Age, a

11   Prospective Cohort Study?

12           A.    Chu, C-H-U?

13           Q.    Correct.

14           A.    I just want to make sure I'm

15   looking in the right place on the list.

16                 No.

17           Q.    In your review, did you

18   review the 2022 article by Achterberg --

19   spelled A-C-H-T-E-R-B-E-R-G -- entitled,

20   Longitudinal Associations Between Social

21   Media Use, Mental Health Well-Being and

22   Structural Brain Development Across

23   Adolescence?

24           A.    No.

CONFIDENTIAL

Page 86

```
 1          Q.     In your review, did you
 2    review the 2020 article by Odgers --
 3    O-D-G-E-R-S -- entitled, Screen Time
 4    Social Media Use and Adolescent
 5    Development?
 6          A.     No.
 7          Q.     Did you review any
 8    deposition of someone employed by any
 9    defendant?
10          A.     Not to my knowledge, no.
11          Q.     Looking at your report, and
12    this is in Paragraph 25, you reference,
13    quote, Direct interactions with state and
14    local education leaders, including
15    district and school administrators,
16    teachers and school mental health and
17    health professionals.
18               ATTORNEY YEATES:  Which
19          report?
20               THE WITNESS:  I was just
21          going to ask that.
22               ATTORNEY LEHMAN:  It's the
23          May 16th report.
24               THE WITNESS:  You said it
```

Page 87

1        was Paragraph 25?

2   BY ATTORNEY LEHMAN:

3        Q.    Yes.  Under methodology.

4        A.    Yes.

5        Q.    Okay.  Who are the education

6   leaders that you're referring to?

7        A.    Yeah.  So -- so I've worked

8   at the National Center for School Mental

9   Health for 25 years.  And in that role --

10  or in that capacity, I served as director

11  of research for a few years and then

12  co-director for 15 years of the National

13  Center.

14              And as part of that role,

15  we -- and I specifically -- have spoken

16  with education leaders from state

17  departments of education, districts and

18  schools.

19              So when I speak about -- did

20  you ask about education administrators or

21  educators?

22        Q.    Yeah.

23              I asked, who were the

24  education leaders referred to in

CONFIDENTIAL

Page 88

1  Paragraph 25?

2          A.    Yeah.  So that would include

3  state superintendents.  It would include

4  district leaders of student support,

5  district superintendents.  It would

6  include school principals from hundreds

7  of school districts across the country.

8          Q.    And so is the reference in

9  Paragraph 25, is that a general reference

10 to the interactions that you have had

11 over the years in your profession as

12 opposed to specific conversations that

13 you had for purposes of developing

14 opinions in this litigation?

15                  ATTORNEY YEATES:  Object to

16          the form.

17                  THE WITNESS:  Let me look as

18          to how I phrased it.

19                  So in Paragraph 25 that you

20          referenced, I spoke about

21          interviews with people from the

22          specific bellwether districts, and

23          I spoke about interactions with

24          state and local education leaders,

Page 89

1          including district and school
2          administrators, teachers and
3          school mental health and health
4          professionals.
5                So that's really -- that
6          last part that you quoted is
7          really speaking to my years of
8          experience in the field broadly,
9          which did inform my opinions.
10   BY ATTORNEY LEHMAN:
11          Q.    Okay.  And just to be clear,
12   that's the last part.
13                And the previous section,
14   those are the key informants from the
15   school districts, and those are the
16   individuals who were listed in the list
17   that you provided and that we've marked
18   as Exhibit-1, correct?
19          A.    That's correct.
20          Q.    All right.  When you were
21   hired to testify in this case, were you
22   hired as an individual consultant as
23   opposed to the National Center being
24   hired?

CONFIDENTIAL

Page 90

1          A.    I was hired as an
2    independent expert, yeah.
3          Q.    And so when you speak,
4    you're not speaking on behalf of the
5    National Center, you're speaking on
6    behalf of Dr. Sharon Hoover?
7          A.    I'm speaking based on my
8    experience working at the National Center
9    for 25 years.
10          Q.    Understanding that.  I
11    can't -- you're not divorced from your
12    experience --
13          A.    Right.
14          Q.    -- your background is your
15    background.
16          A.    Right.
17          Q.    I just want to make sure
18    that you're sitting here today speaking
19    on your behalf as a consultant.
20              You're not actually speaking
21    on behalf of the National Center,
22    correct?
23              ATTORNEY YEATES:  Object to
24        the form.

Page 91

1              THE WITNESS:  Yeah, I'm
2         not -- I'm not sure, you know, if
3         the legal term "speaking on behalf
4         of," kind of what that means.
5              The university was aware
6         that I was participating in this,
7         and I had approval to do so.
8         So -- and I'm still employed
9         there.
10             So I'm speaking as
11        Dr. Sharon Hoover, who, again, was
12        co-director of the National Center
13        and remains an emeritus professor
14        there.
15             So it's hard to divorce
16        those two, I would say.
17   BY ATTORNEY LEHMAN:
18        Q.    But your retention
19   agreement, or whatever agreement you
20   have, that's on behalf of Dr. Sharon
21   Hoover, correct?
22        A.    That's -- it's in my name.
23        Q.    Did you do anything to
24   prepare for your deposition?

Page 92

```
 1          A.    Yes.
 2          Q.    What did you do to prepare
 3  for your deposition?
 4          A.    I reviewed all of my
 5  reports, and I met with counsel.
 6          Q.    Anything else?
 7          A.    I reviewed -- I went and
 8  reviewed some of the literature and
 9  documents cited.
10               So that's -- yeah.
11          Q.    How much time did you spend
12  reviewing your reports in preparation for
13  your deposition?
14          A.    I don't -- I didn't add the
15  hours up.  So I'm not sure.
16          Q.    How many times did you meet
17  with counsel in order to prepare for your
18  deposition?
19          A.    How many times?  I would say
20  three specific to preparing for
21  deposition.
22          Q.    How much time did you spend
23  meeting with counsel in order to prepare
24  for your deposition?
```

Page 93

1          A.     Maybe 15 hours.
2          Q.     Over what -- how long ago
3    was the first meeting that you had to
4    prepare for your deposition?
5          A.     Four days ago.
6          Q.     So 15 hours over the last
7    four days?
8          A.     Yes.
9          Q.     All right.  What literature
10   or documents did you re-review for
11   preparation for your deposition?
12              ATTORNEY YEATES:  And I'll
13         just counsel you, Dr. Hoover, not
14         to talk about anything that you
15         discussed with counsel during the
16         course of your preparation.
17              THE WITNESS:  Yeah, so I
18         don't know that your question is
19         different than the one you asked
20         before.
21              But I reviewed my reports
22         and the source documents.
23              Maybe I misunderstood.
24   BY ATTORNEY LEHMAN:

Page 94

1          Q.    So when I asked you before
2    what you did, you told me you reviewed
3    reports, you met with counsel.  And then
4    you separately said you reviewed
5    literature and documents cited in the
6    report.
7                So I'm just asking what
8    literature and documents cited in the
9    report you re-reviewed for purposes of
10   preparing for your deposition?
11                ATTORNEY YEATES:  And,
12          again, I'll just counsel you not
13          to disclose which documents you
14          reviewed with counsel.
15                THE WITNESS:  Okay.  So I
16          reviewed the reports that are in
17          my binders.
18   BY ATTORNEY LEHMAN:
19          Q.    All right.  So let me -- let
20   me ask it differently.
21                Did you -- outside of
22   conversations and documents that you
23   reviewed with plaintiffs' counsel, did
24   you review any other literature and

CONFIDENTIAL

Page 95

1   documents cited in the reports to prepare

2   for your deposition?

3           A.    I did my own review of my

4   reports, just to review, right, just to

5   look at them, yeah.

6               Is that what you're asking?

7           Q.    I'm asking -- putting

8   aside -- I know you reviewed the reports,

9   and I know you reviewed documents with

10  counsel.

11              Did you review anything else

12  to prepare for your deposition?

13          A.    Just looked at some of the

14  source materials that are in my report.

15  So articles, for example, I may have

16  looked at, you know.

17              So, no, there's nothing else

18  outside of that.

19          Q.    And are there -- what

20  articles did you look at, other than

21  articles that you reviewed with

22  plaintiffs' counsel, in order to prepare

23  for your deposition?

24          A.    So I looked at -- I don't

CONFIDENTIAL

Page 96

1    know the specific articles.  But I went
2    back through my article list just to
3    review what was in my reports.
4            Q.    How much time, on a monthly
5    basis, do you spend in your professor
6    emeritus capacity serving the University
7    of Maryland?
8            A.    Well, this is new, since
9    I've worked, you know, full time about 60
10   to 80 hours a week, probably, prior to --
11   prior to June 1st.
12                  So in emeritus capacity, I
13   would say a few hours a week.
14            Q.    Less than five?
15            A.    It depends.  It depends.
16                  You know, again, as I
17   mentioned, the role involves supervising,
18   you know, faculty that are there.  Given
19   that I've worked there for so long,
20   there's a lot of questions that folks
21   still have about taking over the Center
22   and how to engage with school districts,
23   et cetera.
24                  So there's a lot of

CONFIDENTIAL

Page 97

1  communication and engagement.

2          Q.    How much time did you spend

3  on behalf of the University of Maryland

4  last week?

5          A.    I don't know.  I don't know

6  the number of hours.

7          Q.    All right.

8                ATTORNEY LEHMAN:  If we can

9          look at Tab Number 6, and we'll

10         mark this as Exhibit Number 21.

11                     -   -   -

12         (Whereupon, Exhibit

13         Hoover-21, No Bates, University of

14         Maryland School of Medicine Web

15         Page, Sharon A. Hoover, Ph.D., was

16         marked for identification.)

17                     -   -   -

18  BY ATTORNEY LEHMAN:

19         Q.    Can you confirm that this is

20  a printout of your biography from the

21  University of Maryland web page?

22         A.    I haven't visited the web

23  page in a -- in a little while, so I'm

24  not sure if this is -- you know, when

CONFIDENTIAL

Page 98

1    this was dated.

2              But this looks like

3    something that I've seen on the web page

4    before.

5         Q.    All right.

6              ATTORNEY LEHMAN:  Just

7         scroll down to the bottom.

8    BY ATTORNEY LEHMAN:

9         Q.    All right.  Do you maintain

10   the biography on the web page?

11        A.    So the -- it's kind of

12   multi-pronged.

13             But when I say that

14   basically they have us, to my

15   recollection -- I'm trying to remember

16   how this website -- this particular

17   website, because I'm on a few different

18   websites for the university.

19             So this particular one, I

20   think that we are able to go in and

21   update certain things on the website.

22             And I can't -- this must be

23   for the School of Medicine website.  It's

24   a pretty cumbersome interface.  So I

Page 99

1    think I've -- you know, the last time I
2    went in here, I'm not certain.
3         Q.    Have you ever recommended to
4    the University of Maryland that it
5    discontinue using social media?
6         A.    I have not recommended to
7    the university that they discontinue
8    using social media.
9         Q.    Does the University of
10   Maryland have any warnings about social
11   media use in its student handbook?
12        A.    I have no idea.
13        Q.    Have you ever recommended to
14   the University of Maryland that it add
15   warnings about social media use to its
16   student handbook?
17        A.    I have never recommended
18   that they add warnings to their student
19   handbook.
20        Q.    Does the University of
21   Maryland School of Medicine have classes
22   that teach medical students about
23   diagnosing and treating addiction?
24        A.    So let me clarify, because

CONFIDENTIAL

Page 100

1   I'm at the School of Medicine.

2              So the University of

3   Maryland is a very big system.  So are

4   you talking about within the whole system

5   of the University of Maryland, within the

6   University of Maryland School of

7   Medicine?

8         Q.    My question is confined to

9   the University of Maryland School of

10  Medicine.

11        A.    Right.  And so you're asking

12  about whether they teach courses about

13  addiction?

14        Q.    About diagnosing and

15  treating addiction in patients.

16        A.    They teach their medical

17  residents about diagnosing and treating.

18             Do they teach a full course?

19  I'm not familiar with the entire course

20  handbook at the University of Maryland

21  School of Medicine.

22        Q.    Have you ever taught any

23  class to a med student at the University

24  of Maryland School of Medicine about

Page 101

1    diagnosing or treating addiction?

2          A.    I have not.   We have

3    addiction departments at the university.

4          Q.    And have you ever been a

5    member of an addiction department at the

6    University of Maryland School of

7    Medicine?

8          A.    I've worked on grants

9    related to addiction.   I've never been a

10   member of the division of addiction.

11   It's a part of the department that I'm a

12   part of.

13         Q.    And what is the name of that

14   department?

15         A.    I'd have to look.

16         Q.    Is it the department of

17   psychiatry?

18         A.    Oh, of the department?

19   Sorry.   I thought you were asking

20   specifically about the division related

21   to addiction.

22               Our department is the

23   department of psychiatry, yes.

24         Q.    So let me --

CONFIDENTIAL

1          A.     I know that.

2          Q.     Let me -- let me make sure.

3                 You were talking -- the

4    department of psychiatry is the one that

5    you're in.  But there's a separate

6    division for addiction, and you're not

7    sure of the name of that division,

8    correct?

9          A.     That's correct.

10                And it's not -- let me, if I

11   may.

12                The -- it's not a separate

13   division from the department.  It falls

14   under the umbrella of the department.

15         Q.     Sure.  It's sort of a

16   subspecialty within the department of

17   psychiatry?

18         A.     Correct.

19         Q.     So you've never been a part

20   of that addiction subspecialty?

21         A.     I've never been faculty

22   within the addiction division.

23         Q.     Do you continue to receive

24   compensation from the University of

CONFIDENTIAL

Page 103

1   Maryland as a professor emeritus?

2          A.     I do not.

3          Q.     By education, are you a

4   psychologist?

5          A.     I'm a clinical psychologist.

6          Q.     Are you a psychiatrist?

7          A.     No.  I'm a clinical

8   psychologist.

9          Q.     Are you an educational

10  psychologist?

11         A.     No.  I'm a clinical

12  psychologist.

13         Q.     All right.  And so when you

14  make that distinction, when you -- when

15  you point out, well, no, I'm a clinical

16  psychologist, what is -- what is the

17  importance of that clinical distinction

18  to you?

19         A.     So it's just the degree that

20  we receive.  And clinical psychology,

21  really, you are trained to be a scientist

22  practitioner who can work in a variety of

23  settings, including in schools.

24         Q.     Do you have any degrees in

CONFIDENTIAL

Page 104

1    epidemiology?

2         A.    I do not.

3         Q.    Do you have any degrees in

4    public health?

5         A.    I do not have a degree in

6    public health.  But I work in the area of

7    public health and have for over 20 years.

8         Q.    Since 2008 -- well, strike

9    that.

10              For those patients that you

11   either directly treated or supervised

12   those who were providing direct patient

13   care, what were the types of conditions

14   that they were receiving treatment for?

15        A.    So that's a wide range of

16   issues that they were receiving treatment

17   for.

18              Do you want me to provide a

19   list?  I can give some examples.

20        Q.    Give some examples, please.

21        A.    Yeah.  So it would include

22   mood disorders, depressive disorders,

23   anxiety disorders.  It would include

24   behavioral disorders, including, for

CONFIDENTIAL

Page 105

1    example, attention deficit hyperactivity

2    disorder, ADHD.  It would include

3    substance use disorders, comorbid

4    disorders, certainly, between substance

5    use and mental health disorders.  It

6    would include post-traumatic stress

7    disorders.

8              So there's a number of

9    different disorders that we would have

10   treated and supervised -- I would have

11   treated and supervised.

12        Q.    It sounds like it ran the

13   gamut of mental health conditions?

14        A.    Correct.

15        Q.    Okay.

16        A.    Well, let me -- let me

17   actually clarify my answer, if I may.

18              There are some conditions

19   that are specific to adulthood.  And so I

20   was treating in the capacity of the

21   university primarily the child and

22   adolescent population.

23        Q.    And so is that age zero to

24   18?

Page 106

1          A.    Typically, my -- the
2     students I'm serving are K through 12.
3     So that's more roughly age 5 to 18 or 19.
4               We do have an early
5     childhood center as well that's a part of
6     our division.
7          Q.    Did you -- did you
8     personally make mental health diagnoses
9     in that -- in your role at the University
10    of Maryland?
11         A.    I did.
12         Q.    Okay.  And during your work
13    as a clinician, that was before the
14    advent of many of defendants' social
15    media platforms, correct?
16               ATTORNEY YEATES:  Object to
17         the form.
18               THE WITNESS:  So I don't
19         know the start date of all of the
20         social media platforms, the
21         defendants' platforms.
22               During my supervision of
23         many clinicians in the last, you
24         know, decade plus, that would not

CONFIDENTIAL

Page 107

1          have been before that time.  So
2          that would have overlapped with
3          the defendants' platforms.
4    BY ATTORNEY LEHMAN:
5          Q.    Okay.  Is it correct that
6    you started providing patient care at the
7    University of Maryland in 2001?
8          A.    That sounds right, yes.
9    2001.
10         Q.    Okay.  And from the period
11   from -- the first decade, so from 2001 to
12   2011, did you diagnose and treat children
13   and adolescents with psychological and
14   behavioral problems?
15         A.    Yes.
16         Q.    Including all of those
17   examples that you just gave, mood
18   disorder, depression, behavioral, et
19   cetera?
20         A.    Generally speaking, yes.
21   I'd have to go back to patient charts,
22   which I don't have access to, to actually
23   know all of the different diagnoses.
24                But I would have treated

CONFIDENTIAL

Page 108

1    children and adolescents with that range,

2    yes.

3           Q.     Have you ever diagnosed

4    anyone with social media addiction

5    disorder?

6           A.     No, I have not.

7           Q.     And is it correct that from

8    2006 to 2008 you served as the director

9    at the Maryland Psychological Assessment

10   and Consultation Center?

11          A.     That's right.

12          Q.     And what is the Maryland

13   Psychological Assessment and Consultation

14   Center?

15          A.     So it's within the division

16   of child and adolescent psychiatry.  And

17   it is an assessment clinic for children

18   and adolescents where we do -- you know,

19   we get referrals to assess mental health

20   issues in children.

21                 And it's, again -- well, it

22   actually includes early childhood as

23   well, so that goes a bit below the

24   kindergarten level.

CONFIDENTIAL

Page 109

1            And so that operates once a
2    week.  We do assessments on children.  We
3    do a wide variety of assessments, and
4    then generate reports, meet with schools
5    and students and families about them.
6            Q.    Are those assessments that
7    you're talking about through the Maryland
8    Psychological Assessment and Consultation
9    Center, are those different from
10   diagnoses that you would have reached
11   while you were providing patient care?
12           A.    So the process is different.
13   We do -- to my recollection, within the
14   reporting for the assessment clinic, we
15   may offer diagnoses, if those are things
16   either that we retrieve from the history
17   of the patient files or that come out as
18   part of the assessment process.
19                 So when you say is it
20   different, some of the diagnoses that I
21   would have offered as a clinician
22   treater, you know, may overlap with
23   diagnoses that are in reports from the
24   assessment center.

CONFIDENTIAL

Page 110

1          Q.    Did you continue to either

2    perform or oversee those types of

3    assessments even after 2018, once you

4    were no longer the director?

5          A.    There may have been an

6    overlap time.  But no, I don't think I

7    would have overseen them after that.

8          Q.    During the time -- up until

9    you stopped overseeing patient care by

10   others, was there a standard set of

11   questions that were asked to collect

12   medical history from patients to make a

13   diagnosis?

14         A.    Well, are you asking within

15   the context of the assessment clinic or

16   as a clinician?

17         Q.    As a clinician.

18         A.    Oh, as a clinician.

19               So there are always

20   questions that we ask, as a clinician, to

21   understand diagnoses.  But does the

22   process look the same for every student

23   that I would have met with?  No.

24         Q.    Okay.  Did you have, at any

Page 111

1  point during your clinical practice, a
2  written set of questions that you would
3  either give to patients or their parents
4  or guardians?
5         A.    There may have been surveys.
6  I don't recall.
7               Yeah.  I don't recall.
8         Q.    When you were making an
9  initial -- well, strike that.  Let me
10 start again.
11              When you were collecting a
12 patient's history in your clinical
13 practice or when you were overseeing
14 someone who was doing that, was it
15 standard practice to ask about their
16 digital usage?
17        A.    I'd have to think back.
18              ATTORNEY YEATES:  Object to
19        the form.
20              THE WITNESS:  So I'd have to
21        think back.
22              And you're -- you're talking
23        about my clinical practice or the
24        practice I supervise?

Page 112

1    BY ATTORNEY LEHMAN:

2            Q.      Both.

3            A.      Both.

4                    I would say as technology

5    and the use of social media has become

6    more prevalent for children and

7    adolescents it's become more typical,

8    probably, to ask about it in the context

9    of clinical settings.

10           Q.      At any time when you were

11   personally practicing, so distinct from

12   when you were overseeing others, did you

13   ever ask a patient about their social

14   media use?

15                   ATTORNEY YEATES:  Object to

16       the form.

17                   THE WITNESS:  I may have.

18   BY ATTORNEY LEHMAN:

19           Q.      You don't -- as you sit here

20   today --

21           A.      It's been -- it's been a

22   while, so it's hard to say.

23           Q.      When you were overseeing

24   others who were providing patient care,

CONFIDENTIAL

Page 113

1  did you ever recommend or encourage them

2  to ask about a patient's social media

3  use?

4        A.    Absolutely.  The topic of

5  social media and student use, because

6  it's now so related to student mental

7  health challenges, this would be

8  something that comes up in the context of

9  the interviews that my supervisees would

10 ask about.

11       Q.    Would they also ask about

12 other digital usage, such as gaming or

13 television watching?

14       A.    Well, television watching, I

15 think we might get laughed at if we ask

16 adolescents that question these days.

17             But gaming may be asked

18 about.

19       Q.    Okay.  What about -- so

20 maybe not watching on TV, but streaming

21 Netflix or Hulu or --

22       A.    YouTube.

23       Q.    -- Apple TV?

24       A.    I don't know that they're

CONFIDENTIAL

Page 114

1    asking that question specifically.  I

2    just don't know.

3            Q.    Would you ever make -- or

4    strike that.

5                  During your practice, did

6    you assess the cause of adolescents'

7    mental health problems?

8            A.    Did I assess the cause?  We

9    certainly inquired about the causes of

10   mental health issues of our adolescents,

11   yeah.

12           Q.    When you say you "inquired,"

13   what does that mean?

14           A.    Well, when you're in a

15   clinical setting and you're meeting with

16   a patient, in this case, a student, often

17   if I was in the context of a school, we

18   would try to understand the factors that

19   might contribute to their mental health

20   issues.  And so we would ask about

21   that -- we would ask about those.

22           Q.    Would you ever make an

23   assumption about the cause of an

24   individual's mental health problem?

Page 115

1           A.     I try not to make
2    assumptions.  So I'm not sure what you
3    mean by that.
4                 So we -- I try to -- I would
5    have tried to really understand what was
6    happening with the students that I work
7    with to understand or certainly to inform
8    a diagnosis.
9           Q.     Do you agree that the cause
10   of a person's mental health issues can be
11   a complex multifactorial question?
12                 ATTORNEY YEATES:  Object to
13          the form.
14                 THE WITNESS:  So do I agree
15          that there might be multiple
16          factors that contribute to a
17          mental health challenge?  Yes.  I
18          think most people in the field
19          would understand that.
20   BY ATTORNEY LEHMAN:
21          Q.     In your clinical practice,
22   did you use the DSM?
23          A.     Yes.
24          Q.     How did you use the DSM?

CONFIDENTIAL

Page 116

1          A.    So the DSM is one tool in
2    the field that is used as a way to
3    establish criteria for making diagnose --
4    mental health diagnoses.
5               So I would have used it as a
6    reference for -- it's often used,
7    frankly, in the context of insurance
8    billing.  So if you're making a diagnosis
9    and you're billing, then you would use
10   that diagnosis.  So that's one way that
11   it's used.
12              But, certainly, just in the
13   context of working with students and
14   families, if we make a diagnosis, that
15   would be one reference that I would use.
16        Q.    Did you use the diagnostic
17   criteria from the DSM throughout your
18   clinical practice and then into the
19   period when you were overseeing others in
20   their clinical practice?
21        A.    It's one of the --
22              ATTORNEY YEATES:  Object to
23        the form.
24              THE WITNESS:  It's one of

CONFIDENTIAL

Page 117

1          the references that I would have
2          used, yes.
3   BY ATTORNEY LEHMAN:
4          Q.    What are the other
5   references that you used?
6          A.    So, you know, there's -- so
7   the DSM is -- is one reference that's
8   commonly used in the U.S.
9               The ICD-10 is another
10  reference that's more globally accepted.
11              I typically would have
12  referred to the DSM if I was using, like,
13  a manual.  But I also would have relied
14  on my graduate training, which was -- you
15  know, informed me about diagnoses and
16  mental health conditions of young people.
17         Q.    Now, in addition to listing
18  specific diagnostic criteria, the DSM
19  also lists risk factors for various
20  mental health conditions, correct?
21         A.    It does.
22         Q.    And so, for example, some of
23  the risk factors listed for major
24  depressive disorder are adverse childhood

Page 118

1   experiences and genetics, correct?

2           A.    I'd have --

3                 ATTORNEY YEATES:  Object to

4           the form.  Foundation.

5                 THE WITNESS:  I'd have to

6           look at the most recent version of

7           the DSM to see what is

8           specifically listed.  I'm happy to

9           look at it if you want me to look.

10  BY ATTORNEY LEHMAN:

11          Q.    Well, what is your

12  understanding about the risk factors for

13  major depressive disorder?

14          A.    So there are potentially a

15  number of risk factors for major

16  depressive disorder.  And that might

17  include adverse childhood experiences.

18          Q.    Okay.  What others would

19  be -- would that include?

20          A.    I don't know that I could

21  give you an exhaustive list of risk

22  factors.

23                It might include -- I mean,

24  adverse childhood conditions or

CONFIDENTIAL

Page 119

1    experiences, or what we would call ACES

2    in the field, come to mind.

3                    There may be other

4    predisposing factors -- you know,

5    biological factors in a young person, for

6    example.

7         Q.    And in the field, when you

8    talk about ACES, what are some examples

9    of ACES?

10        A.    So the field has evolved

11   over time.  When it was first established

12   in the late '90s, ACES was really just

13   based on a research questionnaire of

14   about ten questions that looked at

15   things, you know, that included having a

16   substance-using family member, being

17   exposed to violence.

18                    It's expanded over the years

19   conceptually to include things like

20   poverty, for example, as a social

21   determinant of how there's a social

22   factor that can contribute to health.

23                    ATTORNEY YEATES:  Counsel,

24        can we take a break soon?  It's

Page 120

1      been about an hour, 15.

2              ATTORNEY LEHMAN:  Sure.  We

3      can take a break now.

4              THE WITNESS:  Great.  I need

5      some tea.

6              VIDEO TECHNICIAN:  The time

7      is 10:29 a.m.  We are off the

8      record.

9                      -   -   -

10              (Whereupon, a brief recess

11      was taken.)

12                      -   -   -

13              VIDEO TECHNICIAN:  The time

14      is 10:45 a.m.  We are on the

15      record.

16              ATTORNEY YEATES:  Counsel, I

17      wanted to note for the record that

18      Dr. Hoover did produce all of her

19      invoices to counsel.  And we went

20      back and looked, and there was a

21      mistake with the production, which

22      was a technical mistake on our

23      part; the last invoice was left

24      off of the production from this

CONFIDENTIAL

Page 121

1          weekend.

2                    And so the June and July

3          invoice is here.

4                    ATTORNEY LEHMAN:  All right.

5          So this is -- this is an

6          additional invoice beyond what was

7          produced to us previously?

8                    ATTORNEY YEATES:  Correct.

9                    ATTORNEY LEHMAN:  Okay.  And

10         so we'll mark this as Exhibit

11         Number 22.

12                         -   -   -

13                    (Whereupon, Exhibit

14         Hoover-22, No Bates, Hoover

15         Behavioral Health Invoice, was

16         marked for identification.)

17                         -   -   -

18    BY ATTORNEY LEHMAN:

19         Q.    And so do you have a copy of

20    this in front of you, Dr. Hoover?

21         A.    I don't.

22         Q.    All right.

23         A.    Now I do.

24         Q.    Now you do.  Okay.

CONFIDENTIAL

Page 122

1              Can you confirm this is
2    dated August 6th, 2025?
3         A.    Let me grab my glasses.
4              Yes.
5         Q.    And this reflects time
6    between June 4th and July 30th?
7         A.    Correct.
8         Q.    All right.  Between July
9    30th and August 12th, have you billed any
10   additional time on this matter?
11        A.    Have I billed any additional
12   time yet?  And invoiced?  Or what do you
13   mean?
14        Q.    Let me ask a better
15   question.
16              Have you worked any
17   additional time on this matter between
18   July 30th and August 12th that is not yet
19   invoiced?
20        A.    Yes.
21        Q.    How much time have you
22   worked on this matter since July 30th?
23        A.    I would roughly say about --
24   somewhere, roughly, 20, 25 hours.  I'd

CONFIDENTIAL

Page 123

1   have to -- I'd have to --

2         Q.    Okay.  When you conducted

3   the key informant interviews that we

4   looked at previously, did you record all

5   of that time on your invoices?

6         A.    I'm happy to go back to the

7   invoices to look at them.  But to my

8   knowledge, I would have recorded that

9   time, yes.

10        Q.    That -- that would have been

11  your standard practice, to record --

12        A.    That would --

13        Q.    -- that time on your

14  invoices?

15        A.    That would be my standard

16  practice.

17        Q.    All right.  Would you agree

18  that social media use is not a diagnostic

19  criteria for any mental health condition

20  listed in the DSM?

21              ATTORNEY YEATES:  Object to

22        the form.

23              THE WITNESS:  Sorry, can you

24        state that one more time?

Page 124

1  BY ATTORNEY LEHMAN:

2      Q.    Would you agree that social

3  media use is not a diagnostic criteria

4  for any mental health condition listed in

5  the DSM?

6          ATTORNEY YEATES:  Object to

7      the form.

8          THE WITNESS:  I'd have to

9      look through the DSM to see if

10      it's listed or not as a criteria.

11  BY ATTORNEY LEHMAN:

12      Q.    Are you aware of social

13  media use being listed -- well, strike

14  that.

15          Based on your clinical

16  practice, was social media use a

17  diagnostic criteria for any mental health

18  diagnosis?

19      A.    When you're talking about

20  clinical practice, are we talking about

21  my direct patient care?

22      Q.    Well, I am including both

23  your direct patient care and when you

24  were overseeing others in their direct

CONFIDENTIAL

Page 125

1    patient care.

2         A.    Okay.  So you're saying

3    within the clinical practice.

4              And the question was?

5         Q.    Are you aware of social

6    media use being a diagnostic criteria for

7    any mental health diagnosis?

8         A.    So it depends how you define

9    "diagnostic criteria."  We think about --

10   when we're making a diagnosis, we do

11   think about the factors that are a part

12   of, you know, what contributes to a

13   diagnosis.

14             So in my supervision of

15   clinicians, oftentimes the impact of

16   social media would be something, for

17   example, that may contribute to the

18   diagnosis of depression or anxiety.

19        Q.    Okay.  And is -- when you

20   say it "may contribute to the diagnosis,"

21   it is correct that someone is not

22   diagnosed with depression based on

23   whether or not they use social media,

24   correct?

CONFIDENTIAL

Page 126

1           ATTORNEY YEATES:  Object to
2       the form.
3           THE WITNESS:  I don't think
4       I would agree with how the
5       question -- how you put it in the
6       question, that they would not be
7       diagnosed based on their use of
8       social media.
9           Somebody is diagnosed with
10      depression.  And the cause of that
11      depression or the things that
12      influence that would be a part of
13      that diagnostic process, if that
14      makes sense.
15          And social media has been a
16      part of that diagnose --
17      diagnostic process, if that makes
18      sense.
19  BY ATTORNEY LEHMAN:
20      Q.   All right.  So my question
21  is a little bit different.
22          So if you have two patients
23  that come into a clinical practice and
24  they have the exact same clinical

Page 127

1    presentation, one uses social media and
2    the other does not use social media, they
3    would receive the same diagnoses
4    irrespective of their social media use,
5    correct?
6                    ATTORNEY YEATES:  Object to
7           the form.
8                    THE WITNESS:  So I never had
9           two patients come in with the
10          exact presentation, first of all.
11                   And so it's a -- it's a
12          hypothetical that would be hard to
13          answer.  So I don't know that I
14          can actually answer it as asked.
15   BY ATTORNEY LEHMAN:
16          Q.    Okay.  So are you telling me
17   that if someone has all -- meets all of
18   the diagnostic criteria for depression,
19   whether they are actually diagnosed as
20   depressed depends on whether or not they
21   use social media?
22                   ATTORNEY YEATES:  Object to
23          the form.
24                   THE WITNESS:  I don't think

Page 128

1          I stated that, no.
2     BY ATTORNEY LEHMAN:
3          Q.    Okay.  Do you agree that
4     social media addiction is not a
5     recognized clinical disorder in the DSM?
6          A.    So my understanding of the
7     DSM -- again, I'm happy to take a look at
8     the DSM in its most recent version -- but
9     is that social media -- did you use the
10    term "social media addiction"?
11         Q.    Yes, I did.
12         A.    That that's not currently in
13    the DSM.
14              But it -- there is general
15    consensus that it is something that
16    contributes to mental health diagnoses.
17              And, frankly, it doesn't
18    surprise me that something may not be in
19    the DSM that is a relatively novel issue
20    for young people.
21              It takes a long time for
22    things to actually get into the DSM.
23              ATTORNEY LEHMAN:  And I'm
24         going to respectfully move to

Page 129

1          strike as nonresponsive starting
2          with "but there is."
3    BY ATTORNEY LEHMAN:
4          Q.    When you say there is
5    "general consensus," general consensus
6    among whom?
7          A.    So I would say that mental
8    health practitioners, and many experts in
9    the field of child and adolescent mental
10   health, would agree that there is a
11   significant problem with social media use
12   among adolescents and children that's
13   impacting their mental health, certainly
14   in the work that I do in schools.
15              This is something that we
16   see daily.  So if you want to think about
17   who I'm talking about with general
18   consensus, it's not just experts and
19   practitioners, it's also all of the
20   schools that we work with.
21              There's not a school that I
22   would go into that doesn't speak to how
23   social media is impacting their schooling
24   and the mental health of their students.

CONFIDENTIAL

Page 130

1          Q.    Do you agree that

2    self-reported symptoms do not provide

3    objective evidence of a psychiatric

4    disorder?

5               ATTORNEY YEATES:  Object to

6          the form.

7               THE WITNESS:  No, I don't

8          agree with that, actually.

9    BY ATTORNEY LEHMAN:

10         Q.    Do you agree that

11   self-reports of symptoms of anxiety or

12   depression are not the same as a

13   diagnosis of a psychiatric disorder?

14         A.    Actually, we rely on

15   self-reported symptoms all the time when

16   informing diagnoses.

17         Q.    Well, and my question is a

18   little bit different.

19               Because do you not -- in

20   reaching a diagnosis, do you not also

21   apply your training and education and

22   other information that you collect in

23   order to reach a diagnosis rather than

24   simply asking the patients, do you have,

Page 131

1    you know, insert diagnosis?

2              ATTORNEY YEATES:   Object to

3         the form.

4              THE WITNESS:   I don't -- I

5         can't imagine any practitioner

6         that would just simply ask, do you

7         have X diagnosis.

8              So we rely on self-reported

9         information all the time to inform

10        our diagnoses.  I mean, that is

11        part of how you determine a

12        diagnosis is to understand what a

13        student or patient is

14        experiencing.

15   BY ATTORNEY LEHMAN:

16        Q.    Would you agree that the

17   self-report is only one source of

18   information, one data point that you rely

19   on in reaching a diagnosis?

20        A.    It depends on the clinical

21   situation we're talking about.

22              So, you know, when I think

23   about patients that I've interacted with,

24   sometimes the self -- their self-reported

CONFIDENTIAL

Page 132

1    symptoms and experiences are what is used
2    to inform that diagnosis.
3              Q.    Conversely, have you had
4    situations where a patient has come in
5    and told you that they are depressed but
6    you find that they -- they do not meet
7    the criteria for a clinical diagnosis of
8    depression?
9              A.    Again, that's -- that's a
10   hypothetical situation.  I'd have to go
11   back if, you know, we're really talking
12   about specific cases of people that I've
13   seen.
14             So it's hard -- it's hard
15   for me to answer that.
16             Q.    Okay.  So, just, I want to
17   make sure I understand.
18             Is it correct that, sitting
19   here today, you can't tell me if you ever
20   had -- I'm going to start again.
21             Is it correct that, sitting
22   here today, that you can't tell us that
23   you ever had a situation where a patient
24   came in and reported something that they

CONFIDENTIAL

Page 133

1    were having, for example, depression and,

2    in fact, you did not diagnose them as

3    clinically depressed?

4                    ATTORNEY YEATES:  Object to

5            the form.

6                    THE WITNESS:  I can't tell

7            you whether that has happened or

8            not, no.

9    BY ATTORNEY LEHMAN:

10           Q.    Well, if that's the case,

11   Doctor, is it correct that you are still

12   collecting a history and doing your own

13   assessment or did there come a time when

14   you would just ask patients what they

15   thought that their diagnosis should be?

16                   ATTORNEY YEATES:  Object to

17           the form.

18                   THE WITNESS:  Are you asking

19           if I asked my patients what they

20           thought their diagnosis should be?

21   BY ATTORNEY LEHMAN:

22           Q.    Yes.

23           A.    Not that I recall, no.

24           Q.    It would be almost laughable

CONFIDENTIAL

Page 134

1    to do that, wouldn't it?

2              ATTORNEY YEATES:  Object to

3         the form.

4              THE WITNESS:  I don't think

5         it would be laughable, actually,

6         to ask an opinion of a patient

7         about their experiences, no.

8    BY ATTORNEY LEHMAN:

9         Q.    Well, but I'm not asking --

10   that's not the question that I'm

11   positing.

12             I'm asking, do you think it

13   would be an appropriate thing for a

14   clinician to do, to simply ask a patient,

15   what do you think your diagnosis should

16   be and allow that to, in fact, be the

17   diagnosis --

18             ATTORNEY YEATES:  Object

19        to --

20   BY ATTORNEY LEHMAN:

21        Q.    -- just based on their

22   self-report?

23             ATTORNEY YEATES:  Object to

24        the form.

CONFIDENTIAL

Page 135

1            THE WITNESS:  I mean, that's
2       a hypothetical that I don't --
3       again, I'd go back to what I said,
4       which is I -- I would think it
5       would be appropriate, in certain
6       circumstances, to ask a patient
7       their perspective on their
8       diagnosis and to allow that to
9       inform your, you know, clinical
10      work.
11 BY ATTORNEY LEHMAN:
12      Q.    And would it ever be
13 appropriate for a clinician to simply
14 accept that diagnosis, to do -- to
15 exercise no discretion or experience or
16 knowledge, but to simply accept what the
17 patient has said and allow that to be the
18 diagnosis?
19            ATTORNEY YEATES:  Object to
20      the form.
21            THE WITNESS:  So you're
22      asking, I believe, if -- if you
23      asked one question of a patient,
24      what is -- what do you think your

Page 136

1           diagnosis is, would you then make
2           that diagnosis with having no
3           other conversation with a student?
4    BY ATTORNEY LEHMAN:
5           Q.     That's precisely what I'm
6    asking.
7           A.     I can't think of a
8    circumstance where that would have
9    happened in terms of a diagnosis.
10           Q.     Is it accurate to say that
11    adolescents' mental health is affected by
12    a variety of factors?
13           A.     Yes, it would be accurate.
14           Q.     Do you agree that societal
15    issues such as racial discrimination or
16    community violence can -- can contribute
17    to an adolescents' stress or anxiety?
18               ATTORNEY YEATES:  Object to
19           the form.
20               THE WITNESS:  So there are
21           certain circumstances where things
22           like racism or -- what was the
23           other example that you used?
24    BY ATTORNEY LEHMAN:

CONFIDENTIAL

```
                                    Page 137
  1          Q.     Community violence.
  2          A.      -- or community violence may
  3     impact adolescents' mental health.
  4          Q.     Would you agree that a
  5     student's home life plays a significant
  6     role in their emotional and psychological
  7     development?
  8              ATTORNEY YEATES:  Object to
  9          the form.
 10              THE WITNESS:  So there are,
 11          as I've said, a number of factors
 12          that may contribute to young
 13          people's mental health, children
 14          and adolescents' mental health,
 15          including their home life; it may
 16          contribute.
 17     BY ATTORNEY LEHMAN:
 18          Q.     Do you agree that students
 19     living in households with financial
 20     hardship are at greater risk of mental
 21     health illness?
 22          A.     So I would say that
 23     financial hardship can present adversity
 24     to some children that could influence
```

CONFIDENTIAL

Page 138

1   their mental health.

2          Q.    Do you agree that students

3   living in households with domestic

4   conflict or abuse may be at greater risk

5   for mental health illness?

6          A.    They may be.

7          Q.    Have you ever served as a

8   school psychologist?

9          A.    I've served as a clinical

10  psychologist in schools.

11         Q.    And was there ever a time

12  that you were employed in a high school

13  or middle school?

14         A.    Yes.

15         Q.    When was that?

16         A.    So -- well, let me clarify.

17               So oftentimes in school

18  mental health, you have community mental

19  health partners who work in high schools.

20  And so I did that throughout my 20-plus

21  years.

22               So -- where I would have

23  been an employee of the University of

24  Maryland, for example, but then was based

CONFIDENTIAL

Page 139

1   primarily in schools, in -- in high

2   schools.  I also worked in other levels

3   of schooling.

4          Q.    When was the last time that

5   you were based primarily in a high school

6   or middle school?

7          A.    So that would have been my

8   last direct clinical role.  And I believe

9   that would have been, as we talked about

10  earlier, in 2008, where I was primarily

11  based in a high school.

12         Q.    Have you ever served as a

13  school superintendent or school board

14  member?

15         A.    I have not served as a

16  school board member or superintendent.

17  I've just worked with them throughout my

18  practice.

19         Q.    Now, in 2002 to 2004, you

20  developed a program called Healthy

21  Choices?

22         A.    I'd have to look to my CV

23  for the exact dates.  But --

24         Q.    Well, I'll represent to you

CONFIDENTIAL

Page 140

```
 1   that I actually got the dates from --
 2   from your CV.
 3           A.     Uh-huh.
 4           Q.     What was Healthy Choices?
 5           A.     It's been a while, so I'm
 6   going to refer back to my CV.
 7                  From what I can recall, it
 8   was a program that we developed for
 9   adolescents in high schools to help them
10   make healthy relationship choices.
11           Q.     What kind of relationships?
12           A.     It's been a while, again.
13   So I'd have to go back.
14                  I don't know that we have
15   the documentation at this point for it.
16   But it would have been relationships
17   with -- you know, their dating
18   relationships and their friendships, to
19   my recollection.
20           Q.     And do you agree that dating
21   and friendship relationships can impact
22   an adolescent's mental health?
23           A.     Do I think that, you know,
24   relationships in general are part of the
```

CONFIDENTIAL

Page 141

1   composition of young people's mental

2   health?  Yeah, I do.

3           Q.    From 2004 to 2006, you

4   developed modules related to family

5   engagement wellness and other program

6   development?

7                ATTORNEY YEATES:  Object to

8           the form.

9   BY ATTORNEY LEHMAN:

10          Q.    What kind of modules -- can

11  you tell us more about those modules?

12          A.    You're jogging my memory

13  here, because it's been over 20 years

14  since that particular set of modules.

15                But it -- do I have it in my

16  CV?  It likely would have been, at that

17  time period, part of some of our

18  NIMH-funded work on bolstering school

19  mental health through better engaging

20  families, promoting wellness and program

21  development.

22                I believe it would have been

23  kind of evidence-based interventions

24  for -- for young people in schools.

CONFIDENTIAL

Page 142

1          Q.     Have you ever worked for a
2     technology company?
3          A.     No.
4          Q.     Have you ever developed a
5     technology product?
6          A.     So I've partnered with
7     technology companies to develop online
8     systems, for example, that help schools
9     and districts assess their comprehensive
10    school mental health programming.
11              So am I the tech person on
12    that?  No.  I'm the -- the mental health
13    expert.
14         Q.     What are the names of those
15    technology products that you worked with?
16         A.     So the one that comes to
17    mind -- well, there's a couple that come
18    to mind.  And they are clearly detailed
19    in my CV.
20              But one of them is the
21    School Health Assessment and Performance
22    Evaluation System, or the SHAPE system.
23    And that is essentially a quality
24    improvement platform that school

CONFIDENTIAL

Page 143

1  districts and schools can use to improve
2  their quality.
3              There's also Maryland
4  Behavioral Health, or MD Behavioral
5  Health, which is an online learning
6  system for mental health practitioners to
7  engage in professional development.
8              So those are two of the more
9  kind of prominent technology products
10 that I've been a part of working with.
11      Q.    Have you ever worked for or
12 consulted with a social media company?
13      A.    No.
14      Q.    Have you ever published a
15 peer-reviewed article about social media?
16      A.    Let me look at my list of
17 publications, more recent years.
18              So I'm just looking through
19 my list of publications.  And can you
20 just restate the question so I make sure
21 I'm answering it?
22      Q.    Yes.
23              Have you ever published a
24 peer-reviewed article about social media?

CONFIDENTIAL

Page 144

1          A.    So it depends how you think
2    about it.  You know, I've published about
3    100 peer-reviewed articles about school
4    mental health.  And I would say that when
5    we're talking about mental health in
6    schools, that social media contributes to
7    that.
8                So it depends how you think
9    about the question.
10         Q.    Have you ever published a
11   peer-reviewed article that talks about
12   social media?
13                  ATTORNEY YEATES:  Object to
14          the form.  Asked and answered.
15                  THE WITNESS:  I don't know
16          if I've -- I don't know if I've
17          specifically talked about social
18          media in these articles.  I'd have
19          to go back to each of the articles
20          to look at the language.
21                  Again, we're talking 100
22          publications and multiple pages
23          within those.  So I would -- it
24          wouldn't surprise me if I had

CONFIDENTIAL

Page 145

1          spoken about social media as part
2          of the publications.
3    BY ATTORNEY LEHMAN:
4          Q.    As we sit here today, do you
5    recall any peer-reviewed article that you
6    published that speaks about social media?
7          A.    Well, again, when I think
8    about speaking about social media, I
9    think about it as a contributing factor
10   to student mental health.
11              So I would say, in that
12   sense, yes.
13         Q.    Okay.  Can you, as you sit
14   here today, recall any peer-reviewed
15   article that you published that
16   specifically and explicitly names any
17   social media platform from the -- of any
18   defendant?
19         A.    As I sit here today, no.  My
20   research and publications typically focus
21   on comprehensive school mental health
22   systems.
23         Q.    Now, the majority of your
24   articles listed in your CV -- and this is

CONFIDENTIAL

Page 146

1    Page 33 to 65.

2         A.    Yes.

3         Q.    -- those are described as

4    web-based articles.

5              Are --

6         A.    The majority of my articles

7    are not web-based articles.

8         Q.    Okay.  Well, so this is a

9    question that I have for you.

10             Because looking at your CV,

11   and we can start on Page 33, the title

12   there is, Web-Based Articles.

13             Do you see that?

14        A.    I see that on Page 33.

15        Q.    Right.  And that list, by my

16   count, goes through Page 61, Number 426.

17        A.    Can I ask a clarifying

18   question?

19             Are you looking at the

20   August 1st copy of this or the --

21        Q.    I don't -- no.  The one I

22   have is May 10th.

23        A.    Okay.  So I'm there.

24             So the list of web-based

CONFIDENTIAL

Page 147

1  articles in what I'm looking at goes from

2  Page 33 to 34.  And then it moves to

3  major invited speeches.

4        Q.    Okay.  So, then -- all

5  right.  Thank you.

6              So the major invited

7  speeches start on Page 35?

8        A.    Correct.

9        Q.    All right.  And when you say

10  a "major invited speech," what

11  constitutes major?

12        A.    It's -- it's a term that's

13  used in academia where you -- essentially

14  if you're invited to give a talk or a

15  speech, then it's listed here.

16              And so then it's broken

17  down, as you can see, by local, national,

18  international.

19        Q.    Is there such a thing as a

20  minor invited speech?

21        A.    Well, I would say that I've

22  done, you know, several informal

23  discussions with school districts, for

24  example, quality improvement,

CONFIDENTIAL

Page 148

1  consultation, that kind of thing, that
2  may not be listed as a major invited
3  speech.
4           So there is kind of a -- you
5  know, in academia, an understanding of a
6  major speech under this category would be
7  something that you're invited to present.
8       Q.    And are -- the web-based
9  articles listed in your CV, are those
10 peer-reviewed?
11      A.    So let me -- let me answer
12 kind of in two ways.
13          So I do have a section on
14 peer-reviewed journal articles.
15      Q.    Correct.
16          And my question is based on
17 the articles that are listed under the
18 subheading web-based articles.
19      A.    Okay.  All right.  So I'd
20 have to look at these to see if these are
21 peer reviewed or not.
22          So what I can say is that
23 most of these would have gone through
24 a -- in fact, all of them would have gone

CONFIDENTIAL

Page 149

1   through a review process within the

2   organization with which they were

3   designed for the web-based articles.

4              The 100 or so peer-reviewed

5   articles are listed elsewhere.

6        Q.    And so the web-based

7   articles, although they may have gone

8   through an internal review process within

9   the organization, they are not, in fact,

10  peer reviewed, correct?

11       A.    It depends what you mean by

12  "peer reviewed."

13       Q.    Well, you have peer-reviewed

14  articles separated out.

15             So what is the definition

16  that you were using of "peer reviewed" in

17  your CV?

18       A.    So the definition for these

19  peer-reviewed articles are typically

20  within a journal -- an academic journal

21  that you submit for formal peer review.

22             And there's a peer-review

23  process that's under an editorial board.

24       Q.    And so is it correct that

CONFIDENTIAL

Page 150

1    the web-based articles were not subject
2    to that formal peer-reviewed process that
3    you have just outlined?
4            A.    That's correct.  That would
5    be typical in academic work, that you
6    list your web-based articles that are not
7    part of an editorial process in a
8    separate section.
9            Q.    Okay.  What is your
10   definition of social media?
11           A.    So for the purpose of the
12   opinions that I generated in the reports,
13   I was -- under the umbrella of social
14   media were the defendants' platforms; so
15   the ones that we spoke about earlier.
16           Q.    And so do you have a working
17   definition of what constitutes social
18   media other than the specific defense
19   platforms?
20           A.    Do I have a working
21   definition?  No.  I considered social
22   media in this case to be the defendants'
23   platforms.
24           Q.    Okay.  Would you consider

CONFIDENTIAL

Page 151

1  Twitter, or X, to be social media?

2          A.    So for the purpose of this

3  litigation, when I'm using the term

4  "social media," I'm talking about the

5  defendants' platforms.

6          Q.    Okay.  Do you see a

7  distinction between the defendants'

8  platforms and Twitter or X?

9              ATTORNEY YEATES:  Object to

10         the form.

11             THE WITNESS:  I'm not

12         offering an opinion on the

13         distinction between Twitter and

14         the defendants' platforms.

15  BY ATTORNEY LEHMAN:

16         Q.    Okay.

17         A.    My understanding -- if I may

18  just -- my understanding is they may, you

19  know, share features.  But I don't really

20  have an opinion on the distinction

21  between them.

22         Q.    Okay.  Do you see a

23  distinction between defendants' platforms

24  and Pinterest?

CONFIDENTIAL

Page 152

1            ATTORNEY YEATES:  Object to
2       the form.
3            THE WITNESS:  Again, I'm not
4       offering an opinion on the
5       distinction between the
6       defendants' platforms and
7       Pinterest.
8  BY ATTORNEY LEHMAN:
9       Q.   Do you know whether or not
10  Pinterest shares features with the
11  defendants' platforms?
12       A.   I do not know.
13       Q.   Do you consider Discord to
14  be social media?
15       A.   Again, I'm not offering an
16  opinion on that.
17       Q.   Do you know if Discord
18  shares features with defendants'
19  platforms?
20       A.   I don't know.
21       Q.   Do you consider Substack to
22  be social media?
23       A.   I'm not offering an opinion
24  on that.

CONFIDENTIAL

Page 153

1          Q.    Do you know whether Substack

2    shares features with any of the defense

3    platforms?

4          A.    I don't -- I don't know.

5          Q.    In your opinion, is there a

6    difference between the defense social

7    media platforms?

8          A.    Is there a difference

9    between the defense social media

10   platforms?  Sure.  There are differences

11   between the platforms.

12         Q.    And what are the differences

13   that are significant for your opinions?

14         A.    So I didn't see my role as,

15   you know, really looking at all of the

16   specific features across every platform

17   and the distinctions between them.  But I

18   did rely on other expert reports who

19   really did do a deeper dive into some of

20   the design features of the different

21   platforms.

22              But if you're asking me, you

23   know, for the details of each of the

24   different platforms' features, that's not

CONFIDENTIAL

Page 154

1    something I offered an opinion on.

2         Q.    Do your opinions apply

3    equally to all of the defense social

4    media platforms?

5         A.    I'm not sure I know how to

6    answer that question.

7              Do my opinions apply

8    equally?  I didn't necessarily think

9    about them as -- I didn't parse out an

10   opinion and it's, you know, 20 percent

11   YouTube and 30 percent, you know, Meta,

12   et cetera.  So I didn't think about it

13   that way.

14             So it applies to the

15   defendants' platforms -- the opinions

16   that I offer apply to the defendants'

17   platforms.

18        Q.    Have you ever used any of

19   the defendants' social media platforms or

20   apps?

21        A.    I have.

22        Q.    Which ones?

23        A.    Sorry.  Hold on.  Mike fell

24   off, if you couldn't see.

CONFIDENTIAL

Page 155

1          So I would have used
2     YouTube, Instagram.  I would have used
3     Facebook, under Meta.  I have very
4     lightly used Snapchat.
5               So -- and then which did I
6     not say?
7          Q.    Have you ever used TikTok?
8          A.    Again, very lightly.  Yeah.
9          Q.    When you say that you have
10    "lightly" used TikTok, what does that
11    mean?
12         A.    So I think that I may have
13    downloaded an app and looked at videos on
14    it.  And I've seen -- you know, so I've
15    seen kind of that interface, the
16    platform.
17               But it's not something that
18    I use regularly.  And I honestly can't
19    think of the last time I would have
20    looked at it.
21         Q.    Have you ever signed up for
22    an account on TikTok?
23         A.    Probably.  But honestly, I
24    don't know.

CONFIDENTIAL

Page 156

1          Q.    Can you say that you spent
2     more than an hour looking at TikTok?
3          A.    Maybe.  I think it has that
4     continuous thing where you just -- it
5     kind of keeps you engaged.
6          Q.    So when you say "maybe,"
7     does that mean you're not sure how much
8     time you've spent on TikTok?
9          A.    Yeah, I'm not sure.  If
10    you're asking me the number of minutes
11    I've spent on TikTok, I absolutely could
12    not tell you that.
13         Q.    Have you looked at the
14    interface from TikTok more than once?
15         A.    I would think so, yeah.
16    Yes.
17         Q.    When was the last time you
18    looked at TikTok?
19         A.    As I said, I'm not sure the
20    last time I looked at it.
21         Q.    When you said that you have
22    used Snapchat lightly, what does that
23    mean?
24         A.    So I believe I may have

CONFIDENTIAL

Page 157

1    downloaded it.  And I'm not sure if I

2    have an account.  I think, actually, yes,

3    I do have an account, because I was

4    engaging with it at one point.  So I

5    remember seeing some of the features of

6    Snapchat.

7              But when I say use it

8    lightly, I haven't used it in a long

9    time, as far as I know.

10        Q.    Has it been more than a year

11   since you used Snapchat?

12        A.    I don't know.

13        Q.    How often do you use

14   YouTube?

15        A.    I would say that I use more

16   regularly.  So that may be something I

17   use, you know, at least during the course

18   of a week.

19        Q.    And during a week, how much

20   time, on average, would you spend on

21   YouTube?

22        A.    I have no idea.  I think

23   oftentimes we underestimate the amount of

24   time that we spend on social media.

CONFIDENTIAL

Page 158

```
 1        Q.    When was the last time you
 2   were on YouTube?
 3        A.    I don't know.  It may have
 4   been as recently as yesterday, but I'm
 5   not sure.
 6        Q.    What did you look at if --
 7   the last time you were on YouTube?
 8        A.    I'm not sure, to be honest
 9   with you.  I can't recall the exact
10   content that I looked at.  Maybe a
11   newscast.
12        Q.    When you -- when you go on
13   YouTube, is that what you usually look
14   at, newscasts?
15        A.    No, not necessarily.
16        Q.    Is there any particular type
17   of video that you like to watch on
18   YouTube?
19        A.    I think I've watched
20   different things on YouTube.  So it's not
21   that I like a particular thing or not.
22   I've viewed different things on YouTube.
23        Q.    And when was the last time
24   you were on Instagram?
```

CONFIDENTIAL

Page 159

1        A.    Probably within the last
2    week.  I often have used it, really, as a
3    way to attempt to monitor kids' -- my
4    kids' own use.
5        Q.    Meaning your offspring?
6        A.    My off -- well, my children,
7    yes.
8        Q.    Okay.  I just wanted to
9    clarify that it wasn't --
10       A.    Not my students?
11       Q.    Correct.
12             And do you have an Instagram
13    account?
14       A.    Yes, yes.
15       Q.    How often do you go on
16    Instagram?
17       A.    I don't know.
18       Q.    When was the last time?
19             Oh, you already told me
20    that.
21       A.    Didn't you just ask me that?
22       Q.    I did.  Sorry.
23       A.    That's okay.
24       Q.    When was the last time you

CONFIDENTIAL

```
                                            Page 160
 1   were on Facebook?
 2           A.     It would have been within
 3   the last week, probably.
 4           Q.     How often do you use
 5   Facebook?
 6           A.     I've tried to limit my use,
 7   so -- but I would say it varies over
 8   time.
 9                  So it may be regularly.
10   Over the course of a day or week, I
11   might, you know, open it on occasion
12   because I have it on my phone.  So it's
13   there and it's easy to open.
14           Q.     When you go on Facebook, how
15   much time do you usually spend?
16           A.     I've set limits on myself
17   because of some of the features on it
18   that are, you know, perpetually engaged.
19                  So I spend, I think my --
20   the limit I set on there is no more than
21   20 or 25 minutes in a day.  You know,
22   they have -- so.
23           Q.     And what do you typically
24   look at when you go on Facebook?
```

CONFIDENTIAL

Page 161

```
 1          A.    It depends.  I mean, it's --
 2   you know, the feed kind of feeds you
 3   certain things and so there's -- I
 4   certainly, you know, see advertisements
 5   or things that are fed to me on a feed.
 6                I also will look at, you
 7   know, pictures of friends and colleagues.
 8          Q.    Are there any other social
 9   media platforms that you use other than
10   the defense platforms that we just
11   discussed?
12          A.    Can you identify which
13   platforms you're talking about?
14          Q.    Sure.
15          A.    That's hard for me to --
16          Q.    Do you use any programs such
17   as Twitter, or X, LinkedIn?
18          A.    So I don't necessarily -- so
19   do I use Twitter and X?  I have used
20   Twitter and X before.  I used it more
21   frequently at one point, and then,
22   really, I can't think of the last time
23   I've been on it.
24                And then what was the other
```

Page 162

1   one you asked about?

2          Q.     LinkedIn.

3          A.     Oh, I have a LinkedIn

4   account.

5          Q.     How often do you use

6   LinkedIn?

7          A.     I would say maybe every

8   couple of weeks or so.

9          Q.     Do you have a Substack

10  account?

11         A.     I think I did create a

12  Substack account, yes.

13         Q.     When was the last time you

14  used Substack?

15         A.     In fact, I think I used it

16  yesterday, because I had -- for the first

17  time in I don't even know how long, I

18  don't know that I had used it before

19  that -- but I had a friend who -- yes, I

20  had somebody who engaged me in a Substack

21  account, and I opened it.

22                So I recall that.

23         Q.     When you say they "engaged"

24  you in a Substack account, what does that

Page 163

1  mean?

2          A.     It means their husband had

3  an accident.  So they were informing me

4  about it.  They were creating a blog

5  about that.

6          Q.     Have you conducted any

7  research specific to any of the defense

8  platforms?

9          A.     No.  That's not my role

10  is -- to conduct research on the defense

11  platforms.

12                 What I do conduct research

13  on is school mental health.

14          Q.     Have you examined the extent

15  to which the harms you describe in your

16  report result from students' use of

17  defendants' platforms as opposed to other

18  digital media?

19                 ATTORNEY YEATES:  Object to

20          the form.

21                 THE WITNESS:  So, you know,

22          in forming the opinions for this

23          report, I relied on a number of

24          sources, including the

Page 164

1          peer-reviewed literature and
2          including expert reports.
3                And within the expert
4          reports specifically, and within
5          the peer-reviewed literature,
6          those did look specifically at the
7          defendants' platforms, yes.
8   BY ATTORNEY LEHMAN:
9          Q.    And so when you say "they
10  looked specifically at the defendants'
11  platforms," what article or articles
12  would you refer me to as you -- that are
13  unique to TikTok that you relied on?
14         A.    I'd have -- I mean, you
15  would have to present -- I'd have to go
16  back to all the articles again.  I cited
17  probably well over 100 in review articles
18  consistently.  So I don't know that I
19  could point you to a specific article.
20                But if you'd like me to look
21  at all my articles --
22         Q.    Well --
23         A.    -- and go back through, I'm
24  happy to.

CONFIDENTIAL

Page 165

1          Q.     Well, we're certainly --
2    we're certainly going to look at specific
3    articles.
4               But would it be accurate,
5    then, that as we sit here, without me
6    walking you through each individual
7    article, that you're not able to identify
8    specific articles that relate to your
9    opinions that are specific to any
10   individual defense platform?
11                    ATTORNEY YEATES:  Object to
12          the form.
13                    THE WITNESS:  I think that's
14          a really, frankly, confusing way
15          to ask it.  Because the majority,
16          I would say, of -- or most -- many
17          of the articles that I looked at
18          and that -- that I looked at or
19          that -- excuse me, the plaintiff
20          experts that I reviewed -- looked
21          at were specifically referring to
22          the defendants' platforms.
23               And so, you know, when I
24          think about the -- the Telzer's

CONFIDENTIAL

Page 166

1           report, for example, and some of
2           the other information I looked at,
3           the defendants' platforms were
4           clearly the most predominantly
5           used social media platforms of
6           young people.
7                So the research that I
8           looked at on the social media
9           platforms very consistently were
10          specific to the defendants'
11          platforms, if that makes sense.
12  BY ATTORNEY LEHMAN:
13          Q.    Okay.  And so my question is
14  just a little bit different, right.
15                So I'm not talking about
16  research that looks globally at the
17  defense platforms.  I'm looking at any
18  effort to individually examine a single
19  defense platform.
20                And so my question is, as
21  you sit here today, for any individual
22  defense platform, can you identify a
23  peer-reviewed study that identifies the
24  harms unique to that platform as opposed

CONFIDENTIAL

Page 167

1    to social media writ large?

2                    ATTORNEY YEATES:  Object to

3            the form.

4                    THE WITNESS:  So I believe

5            I've already answered that, that

6            I'd have to go back to every

7            specific article to look through

8            to see if they actually looked at

9            specific, you know, distinct

10           platforms.

11                   But, again, the literature

12           that I looked at did look at --

13           and some of them looked at one

14           platform or two platforms, to my

15           recollection.

16                   But, again, I'd have to go

17           back to the articles to see which

18           platforms they were specifically

19           looking at.

20   BY ATTORNEY LEHMAN:

21           Q.    All right.  You mentioned

22   before that you have children.

23                   How many children do you

24   have?

CONFIDENTIAL

Page 168

1          A.    I have three children.

2          Q.    How old are your children?

3          A.    They are 17, 19 and 21.

4          Q.    Do any of your children use

5    social media, the defense platforms?

6          A.    They do.

7          Q.    Which children?

8          A.    All three of my children.

9          Q.    All right.  Have you ever

10   forbidden any of your children from using

11   social media?

12         A.    Yes.

13         Q.    Tell me about that.

14         A.    Tell you about forbidding my

15   children to use social media?

16         Q.    Yes.

17         A.    Do you mean what the process

18   was or --

19         Q.    When did it happen?  Why did

20   it happen?

21         A.    So --

22               ATTORNEY YEATES:  I would

23         just sort of object to this line

24         of questioning to the extent that

CONFIDENTIAL

Page 169

1     you're uncomfortable.
2          If you're comfortable
3     talking generally.  But I don't
4     think you need to go into the
5     specifics of, you know, each of
6     your children and the
7     conversations you've had with
8     them.
9          THE WITNESS:  Yeah, that's
10    helpful.  Because I don't, you
11    know, tend to talk about my
12    children in, you know -- so I can
13    tell you generally that we have
14    put in place different mechanisms,
15    whether it's the plastic phone box
16    where we keep it out of their
17    bedrooms at night or the, you
18    know, disallowing it at the dinner
19    table or when they have friends
20    over, or waiting until certain
21    ages for them to be able to use
22    the defendants' platforms.
23          So in -- so we've done
24    several things to limit their use.

Page 170

1    BY ATTORNEY LEHMAN:

2          Q.    At what age did you allow

3    your children to use the defense

4    platforms?

5          A.    I can't give you a specific

6    age.

7          Q.    Have any of your children

8    ever received a mental health diagnosis

9    that you attributed to social media use?

10          A.    So is this the point that I

11    can say that I would prefer to --

12          Q.    Well, I -- I would tell you,

13    as -- as the defense lawyer who is asking

14    these questions, I think -- I think it's

15    a fair question.

16                So I would ask that you

17    answer it.

18                ATTORNEY YEATES:  My

19          position is that any mental health

20          diagnoses of her children are not

21          relevant to this litigation.

22                ATTORNEY LEHMAN:  They go

23          directly to bias.  So if you want

24          to take that to the judge, we can

CONFIDENTIAL

```
                                        Page 171
 1          argue it.
 2    BY ATTORNEY LEHMAN:
 3          Q.    Or you can just answer the
 4    question.
 5              ATTORNEY YEATES:  If you're
 6          not comfortable talking about your
 7          children's mental health, then I
 8          think we can take that to the
 9          judge.
10              THE WITNESS:  Yeah, I mean,
11          I just think it's -- it feels like
12          it goes beyond what I'm typically
13          comfortable speaking about in a
14          public forum.
15              ATTORNEY LEHMAN:  All right.
16          Then we will make a note about
17          that and address that with the
18          court.
19    BY ATTORNEY LEHMAN:
20          Q.    Do you agree that there is a
21    difference between the amount of time
22    that a user spends on social media
23    depending on the content that they're
24    looking at?
```

CONFIDENTIAL

Page 172

1          A.    Sorry, can you rephrase the
2     question?
3          Q.    Yes.
4               Do you agree there's a
5     difference between -- do you agree there
6     is a difference in the nature of a user's
7     experience on social media depending on
8     the content that they are reviewing?
9               ATTORNEY YEATES:  Object to
10          the form.
11               THE WITNESS:  I'd have to
12          understand what you mean by
13          "nature."
14               I mean, if they're looking
15          at one thing versus another, might
16          their experience be different?
17          Yes.
18               So it's a general -- it's a
19          pretty broad question, so.
20     BY ATTORNEY LEHMAN:
21          Q.    Do you agree that every
22     individual has a unique and personal
23     experience on social media?
24               ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 173

1          the form.

2                  THE WITNESS:  I would agree,

3          in general, people's experiences

4          are unique and individual, whether

5          they are walking in the park or

6          looking at social media, so.

7    BY ATTORNEY LEHMAN:

8          Q.    Are you offering an opinion

9    about any single individual's experience

10   on social media in this case?

11         A.    So I'm offering an opinion

12   about the impact of social media on

13   students and on schools.  So I'm not

14   focusing on one specific individual.

15                 ATTORNEY LEHMAN:  Can we

16          look at Tab 7, please?  And we

17          will mark this as Exhibit Number

18          23.

19                     -   -   -

20                 (Whereupon, Exhibit

21          Hoover-23, No Bates, American

22          Psychological Association Health

23          Advisory on Social Media Use in

24          Adolescence, was marked for

CONFIDENTIAL

Page 174

1          identification.)

2                    -   -   -

3     BY ATTORNEY LEHMAN:

4          Q.    Can you confirm that I've

5     handed you, and that we're showing on the

6     screen, the publication from the American

7     Psychological Association entitled,

8     Health Advisory on Social Media Use in

9     Adolescence?

10         A.    Yes.

11         Q.    Are you a member of the

12    American Psychological Association?

13         A.    Yes.

14         Q.    How long have you been a

15    member?

16         A.    I'd have to look at my CV,

17    if you want the exact dates.

18               So 1996.

19         Q.    Have you been a member of

20    the American Psychological Association

21    continuously since 1996?

22         A.    It's hard to say.  I mean, I

23    believe so.  Did I let membership lapse

24    and have to renew it?  Possibly.  But

CONFIDENTIAL

Page 175

1    yes, essentially.

2         Q.    Have you ever served as an

3    officer in the American Psychological

4    Association?

5         A.    No.

6         Q.    Have you ever been asked to

7    serve on a committee?

8         A.    Have I been asked to serve

9    on a committee?  I don't recall being

10   asked, but I get asked to serve on a lot

11   of committees, so.

12        Q.    Have you ever, in fact,

13   served on a committee for the American

14   Psychological Association that related to

15   social media?

16        A.    I don't think so, no.

17        Q.    Do you agree that the

18   American Psychological Association is a

19   well-respected organization?

20        A.    I would say that there are

21   many in the field who respect the

22   American Psychological Association.

23   Yeah, that's reasonable.

24        Q.    All right.  If you will turn

CONFIDENTIAL

```
                                        Page 176
 1   to Page 3.
 2               And looking under Section A,
 3   do you see that it says, Social media is
 4   not inherently beneficial or harmful to
 5   young people?
 6         A.    I see that.
 7         Q.    And do you agree with the
 8   American Psychological Association that
 9   social media is not inherently beneficial
10   or harmful to young people?
11         A.    I would not --
12               ATTORNEY YEATES:  Dr.
13         Hoover, I would just let you know
14         this is a long document, so if you
15         need to take a chance to take a
16         look through it, you're welcome to
17         do so.
18               THE WITNESS:  So I'm happy
19         to look through the document.
20               But with respect to that one
21         statement, are you asking do I
22         agree with the American
23         Psychological Association that
24         it's not inherently beneficial or
```

CONFIDENTIAL

Page 177

1          harmful?  I wouldn't agree with
2          that statement outright in the --
3          you know, absent the context --
4          absent the context of actually
5          reviewing this entire document.
6    BY ATTORNEY LEHMAN:
7          Q.    Okay.  Why would you
8    disagree with the statement that social
9    media is not inherently beneficial or
10   harmful?
11         A.    Because what I would say is
12   that based on my review of the literature
13   and based on my review of expert reports
14   who really looked into the impacts of
15   social media, there is overwhelming
16   evidence of the harms of social media to
17   young people's mental health and -- and
18   to the school environment.
19              So, no, I think that this
20   statement itself, taken kind of outside
21   of -- out of context is -- you know,
22   could be misleading.
23              It would suggest that -- it
24   could suggest, oh, it's not -- it's not

CONFIDENTIAL

Page 178

1   harmful to young people.  And I would
2   wholeheartedly disagree with that, based
3   on the literature and the science at this
4   point.
5           Q.      And do you agree that for
6   some adolescents that social media use is
7   beneficial?
8           A.      So, you know, frankly, it's
9   not what I hear on a regular basis when
10  I'm working with schools.  I'm not
11  hearing about the benefits.  I'm hearing
12  about the harms of social media.
13              And when you look to, you
14  know, again, the literature what you're
15  typically seeing are the harms and the,
16  again, overwhelming evidence around
17  those.
18              Is there some discussion in
19  the field about potential benefits of
20  social media?  Yes.  You know, just --
21  yes, there's some discussion in the field
22  about that, that there's, you know,
23  potential benefits of social media.
24              Do they negate or outweigh

CONFIDENTIAL

Page 179

1  the harms and risks of social media?
2  Absolutely not.
3          Q.    Well, let's keep looking
4  at -- and I want to look at some specific
5  statements in this document.  But let's
6  stay in Paragraph A.
7              All right.  Do you see there
8  it says, quote, In most cases, the
9  effects of social media are dependent on
10  adolescents' own personal and
11  psychological characteristics and social
12  circumstances, intersecting with the
13  specific content, features or functions
14  that are afforded within many social
15  media platforms?
16          A.    I see that, yes.
17          Q.    And do you agree that the
18  impact of social media is dependent on
19  the adolescent's own personal
20  psychological characteristics, including
21  the content that they view on social
22  media?
23              ATTORNEY YEATES:  Object to
24      the form.

Page 180

1              THE WITNESS:  So, you know,
2        again, based on my review of the
3        literature, my review of expert
4        reports, my interactions with
5        adolescents and families and with
6        schools, I would say that, first
7        of all, it's very hard to divorce
8        the content from the features.
9              And, actually, I'd say what
10       I've seen more of is that the
11       features themselves are actually
12       what are really kind of
13       interfering with young people's
14       mental health and with the school
15       environment.
16             So I think your question was
17       asking specifically about content
18       and if that's what's involved
19       here.  And I would tend to
20       actually agree with the later part
21       of this statement, which is that
22       the features or functions that are
23       afforded on social media platforms
24       are problematic.

CONFIDENTIAL

Page 181

1   BY ATTORNEY LEHMAN:

2        Q.    Okay.  Would you agree with

3   the American Psychological Association

4   where it says, The effects of social

5   media likely depend on what teens can do

6   and see online, teen's pre-existing --

7        A.    I'm sorry, we're at the next

8   sentence?

9        Q.    The next sentence.

10            -- the teen's pre-existing

11  strengths or vulnerabilities and the

12  contexts in which they grow up?

13            ATTORNEY YEATES:  Object to

14       the form.

15            THE WITNESS:  So just give

16       me a minute to look at this.

17            So the effects of social

18       media -- so I wouldn't agree with

19       it as it's stated.  Because I

20       think it's saying it likely

21       depends on this.

22            But, actually, I think that

23       there's significant research that

24       says that -- that demonstrates

CONFIDENTIAL

Page 182

1          that actually independent of
2          content, young people's mental
3          health is harmed and the school
4          environment is harmed.
5                    So, actually, I don't agree
6          with how it's stated here, no.
7   BY ATTORNEY LEHMAN:
8          Q.     What research is that, that
9   you're referencing, that demonstrates
10  that harm is independent of content?
11         A.     So, again, if you are asking
12  me to cite specific studies, which I did
13  in my report, I'm happy to go back and
14  look through the specific studies.
15                But I did cite studies that
16  speak specifically to -- and I looked at
17  the expert reports who actually dove into
18  this much more deeply, where they look
19  at, in the absence of contact -- content,
20  rather, that it's actually the features
21  that are driving some of the harm.
22                And what I can tell you is
23  that regardless -- when I think about the
24  work that I do in school environments,

CONFIDENTIAL

```
                                    Page 183

 1   for example, regardless of the content,

 2   it is that compulsive checking of the

 3   phones, the social media platforms.  It

 4   is the -- kind of the need to know,

 5   whether content, whatever that content

 6   is, is, you know, engaged in by peers, et

 7   cetera.

 8              So I derive that kind of

 9   response, really, more from the research

10   and from my experience in the field.

11        Q.    Okay.  And so separating

12   other expert reports that you have

13   reviewed, right.  So we will depose them

14   about their opinions.

15              My question to you is, as we

16   sit here today, can you identify any

17   peer-reviewed article that separates

18   content from features to identify what

19   caused the harm?

20              ATTORNEY YEATES:  Object to

21        the form.

22              THE WITNESS:  So a couple of

23        things.

24              First of all, my opinions
```

Page 184

1          are informed, in part, by the
2          other expert reports.  So if
3          you're asking me to, you know,
4          kind of forget what I, you know,
5          read and understood from those
6          reports, it's going to be hard to
7          do.
8                 And I would have to go back
9          to the -- each specific article to
10         know which ones it was that
11         actually -- you know, which ones
12         referenced content in the absence
13         of the features, or that separated
14         it out, as you put it, I think.
15    BY ATTORNEY LEHMAN:
16         Q.    Let's go down to -- stay on
17    the same page, let's look at F.
18         A.    Okay.
19         Q.    And we're going to look in
20    the middle of the paragraph, about
21    roughly eight lines up.  It says, Second.
22    All right.
23                 Do you see where it says,
24    Second, long-term, i.e., multi-year

CONFIDENTIAL

Page 185

1  longitudinal research often is

2  unavailable; thus, the associations

3  between adolescents' social media use and

4  long-term outcomes, i.e., into adulthood,

5  are largely unknown.

6              Did I read that correctly?

7        A.    I don't know if you read it

8  correctly.  But I see the sentence, yes.

9        Q.    Well, do you agree with the

10  American Psychological Association that

11  associations between adolescents' social

12  media use and long-term outcomes are

13  largely unknown?

14              ATTORNEY YEATES:  Object to

15        the form.

16              THE WITNESS:  So I don't

17        agree with that statement.  I

18        think that there has been research

19        that has looked, longitudinally,

20        at young people's experience over

21        time.  You know, have the

22        platforms been around long enough

23        to look longitudinally at all

24        adolescents' experiences over time

CONFIDENTIAL

Page 186

1        into adulthood, as its referencing
2        in this?  Perhaps not.
3               But I don't agree with this
4        statement that longitudinal
5        research is often unavailable.  I
6        think it's, actually, an odd
7        statement.
8               There is available
9        longitudinal research.  So I think
10       we do have information about the
11       impacts on adolescents beyond
12       their first use of social media,
13       if that makes sense.
14  BY ATTORNEY LEHMAN:
15       Q.    Okay.  Let's turn to Page 4.
16  And I want to look at the fourth bullet
17  here.
18               And do you see here that the
19  APA says, quote, Social media may be
20  psychologically beneficial, particularly
21  among those experiencing mental health
22  crises or members of marginalized groups
23  that have been disproportionately harmed
24  in online contexts?

CONFIDENTIAL

Page 187

1                    Do you see that?

2         A.    I do see that.

3         Q.    And do you agree that social

4    media may be psychologically beneficial,

5    particularly among those who are

6    experiencing mental health crises?

7         A.    I don't have evidence to

8    suggest that that's the case.

9               In fact, I think it can be

10   very risky for those who are experiencing

11   mental health challenges.

12        Q.    So you actually think that

13   what the APA is recommending here is, in

14   your words, risky?

15              ATTORNEY YEATES:  Object to

16        the form.

17              THE WITNESS:  So I was

18        referring to this specific

19        sentence.  You're talking about

20        recommendations.  I think I would

21        have to review the whole document.

22              But if you're asking me

23        about this specific sentence, I

24        think I stated the answer.

CONFIDENTIAL

Page 188

1  BY ATTORNEY LEHMAN:

2        Q.    Let's look at the top of the

3  page.

4              Do you see where it has the

5  word "recommendations"?

6        A.    So this is the top of

7  Page 4?

8        Q.    Yes.  This is the page we're

9  looking at, Page 4.

10        A.    Okay.  Yes.  I see that.

11        Q.    All right.  And then do you

12  see the recommendation underneath that,

13  where it says, quote, Youth using social

14  media should be encouraged to use

15  functions that create opportunities for

16  social support, online companionship and

17  emotional intimacy that can promote

18  healthy socialization.

19              Do you see that?

20        A.    I do see that.

21        Q.    Now, do you agree that one

22  of the potential benefits of social media

23  use is that active use on social media

24  can allow adolescents to actually

Page 189

1   communicate with others and build social

2   networks?

3               ATTORNEY YEATES:  Object to

4         the form.

5               THE WITNESS:  So what I

6         would say is that may be something

7         that adolescents attempt to use

8         social media for.  And while they

9         do that, they are being exposed to

10        risk.

11              I mean, it's just -- you

12        know, it's like adolescents may

13        attempt to form, you know,

14        connectedness by joining a group

15        where they're smoking tobacco,

16        right.  And that doesn't mean that

17        it's not inherent with risks, so.

18              ATTORNEY LEHMAN:  Let's look

19        at Tab Number 19.

20   BY ATTORNEY LEHMAN:

21        Q.    All right.  Can you confirm

22   this is an article entitled, What is

23   Driving Youth Mental Health Problems?

24   It's Not Just About Social Media, from

CONFIDENTIAL

Page 190

1    Education Week?

2           A.    Yes.

3           Q.    And this is an article by

4    Arianna Prothero, dated November 29th,

5    2023?

6           A.    Yes.

7           Q.    And do you remember being

8    interviewed by Ms. Prothero for this

9    article?

10          A.    So I get interviewed for a

11   lot of things.

12                Do I remember this specific

13   interview?  Not necessarily.  But I

14   believe I was interviewed for this.

15          Q.    All right.  And if you -- if

16   you turn to Page 3 of 7, do you see it

17   says, In a recent conversation with

18   Education Week, Hoover, who is also a

19   co-director of the National Center for

20   School Mental Health, explained why

21   adults tend to focus on social

22   media-related causes of mental health

23   problems and what other factors educators

24   should be attuned to?

CONFIDENTIAL

Page 191

1          A.    I do see that, yes.

2          Q.    And do you remember that

3     that was part of your conversation with

4     Ms. Prothero for this article?

5               ATTORNEY YEATES:  Object to

6          the form.

7               THE WITNESS:  So what I

8          recall is that Ms. Prothero was

9          trying to understand kind of how

10         adults and young people attribute

11         mental health -- what -- what, you

12         know, young people and adults

13         attribute youth mental health

14         issues to.

15    BY ATTORNEY LEHMAN:

16         Q.    So let's -- let's look at

17    the first paragraph on this page -- or,

18    sorry, we'll start with, But it's

19    oversimplifying.

20         A.    Uh-huh.

21         Q.    Do you see here you're

22    reported as saying, But it's

23    oversimplifying the issue to say that

24    social media is the root cause of youth

CONFIDENTIAL

Page 192

1    mental health problems, say experts such

2    as Sharon Hoover, a professor of child

3    and adolescent psychiatry at the

4    University of Maryland School of

5    Medicine.  Hoover and others argue that

6    fixating on just one variable such as

7    social media as the cause of mental

8    health problems is counterproductive.

9              Do you see that?

10        A.    I do see that.

11        Q.    And do you agree with the

12   statement that you previously made in

13   2023 that focusing on just one variable,

14   such as social media as the cause of

15   mental health problems, is

16   counterproductive?

17              ATTORNEY YEATES:  Object to

18        the form.

19              THE WITNESS:  So I don't

20        think this is a direct quote,

21        first of all.  It's not stated as

22        a quote.

23              But do I think that -- you

24        know, I stand by the statement or

CONFIDENTIAL

Page 193

1          the concept that if one were to
2          only focus on one factor as being
3          the only cause of mental health
4          issues in young people, that that
5          may be an oversimplification.
6               That's consistent with what
7          I've said, that there are other
8          factors that may contribute to
9          youth mental health problems.
10               I believe also later in that
11          article I speak about the negative
12          impacts of social media on youth
13          mental health.
14     BY ATTORNEY LEHMAN:
15          Q.    Well, you do talk about
16     social media.  And so I want to turn to
17     Page 5.  So this is 5 of 7.
18               And we're going to look at
19     the second paragraph starting, I don't.
20               And there you do acknowledge
21     that there can be harms from exposure to
22     social media.
23               But what I want to focus on
24     is I want to look at the last sentence.

Page 194

1  There it says, Versus what teens may be

2  more attuned to, which is active use of

3  social media where they are actually

4  finding the benefits, like communicating

5  with others, building social networks.

6           Do you see that?

7      A.    Yes.

8      Q.    Okay.  And you agree that in

9  your interactions with teenagers that

10 they report actually finding benefits to

11 social media, such as communicating with

12 others and building social networks,

13 correct?

14           ATTORNEY YEATES:  Object to

15      the form.

16           THE WITNESS:  Actually, I

17      think what I'm speaking to here

18      was what Ms. Prothero was asking

19      about specifically.

20           So this was not me reporting

21      that I identified these benefits.

22      I think she was saying, if teens,

23      you know -- and, again, I'm --

24      you're asking me to remember an

CONFIDENTIAL

Page 195

```
 1          interview that was a couple of
 2          years ago.
 3               But I think she was pointing
 4          out that teens may have identified
 5          these.  And I was saying -- peers
 6          versus what teens may be more
 7          attuned to, which is the -- what
 8          they may be perceiving as
 9          benefits.
10               So I'm just -- sorry.  I'm
11          just trying to reread this
12          statement here.
13               Yeah.  So I think I was
14          acknowledging that teens may be
15          looking at other -- other factors
16          of social media use.  So I don't
17          think, again, that it's contrary
18          to what I said.
19   BY ATTORNEY LEHMAN:
20          Q.   Okay.  Well, and we can --
21   why don't we turn back to Page 3 of 7,
22   because I just want to be clear.
23               This is not just an article
24   where you're quoted once.  This is
```

CONFIDENTIAL

Page 196

1    actually an interview.  And we can see
2    down at the bottom of what's on the
3    screen, it says, The interview has been
4    edited for length and clarity, correct?
5              So this isn't just an
6    article where you're quoted once.  This
7    is actually an article summarizing an
8    interview with you, correct?
9         A.    Let me just look through.
10             ATTORNEY YEATES:  Object to
11        the form.
12             THE WITNESS:  Yeah, it
13        appears to be, based on that
14        statement.  Yep.
15   BY ATTORNEY LEHMAN:
16        Q.    Okay.  All right.  And if we
17   turn back to Page 5, and I want to look
18   at the last paragraph here -- I'm
19   sorry -- yeah.  The last paragraph.
20             And it says, quote, The
21   other piece is that sometimes when we do
22   this, when we look to blame one thing,
23   social media or homework, we end up with
24   and all -- with all-or-none solutions

CONFIDENTIAL

Page 197

1    that don't recognize the complexity of

2    each of these issues.  So, for social

3    media, there is harm caused by certain

4    types of exposure, but there's also

5    benefits.

6                Did I read that correctly?

7         A.    I think that's what's stated

8    here, yes.

9         Q.    Okay.  And as we sit here

10   today in 2025, do you agree with the

11   statements that you made in this

12   interview in November 2023, that looking

13   to blame one thing, whether it's social

14   media or homework, that you end up with

15   solutions that don't really recognize the

16   complexity of mental health issues?

17              ATTORNEY YEATES:  Object to

18        the form.

19              THE WITNESS:  So what I

20        would say is that I don't think

21        any mental health professional,

22        including me, would only blame one

23        thing for child mental health

24        issues.

CONFIDENTIAL

Page 198

```
 1              So I think that what I said
 2         here makes sense.  That if you
 3         only blame one thing, whether it's
 4         homework or something else, or
 5         social media in this case, that
 6         you would not recognize the
 7         complexity of youth mental health.
 8              And I do, again, in this
 9         article, speak about the harms of
10         social media as one of the
11         significant contributing factors
12         to youth mental health.
13  BY ATTORNEY LEHMAN:
14         Q.    And do you agree in 2025
15  with the statement that you made in 2023
16  that social media, although there may be
17  harm, there are also benefits?
18         A.    So what I would say, which
19  is what I've said before, is that some
20  young people and, you know, some people
21  in the field may say that there's
22  benefits of -- you know, that I've
23  found -- I think I've said here, you
24  know, that there are certain types of
```

CONFIDENTIAL

Page 199

1  exposure where they may be trying to
2  identify a connection, for example.
3              I think when there's
4  benefits of something in the context of
5  significant public health harm, you focus
6  on the harm.  And it's not to suggest
7  that there may not be some benefits.
8              But, again, you know, I
9  think about the analogy of smoking, where
10 if you asked adolescents, do I feel, you
11 know, more comfortable or more included
12 in a group where they're vaping or
13 smoking, just because they recognize it
14 as a benefit doesn't mean that it's not
15 something that's incredibly harmful to
16 them.
17      Q.    Just so we don't lose my
18 question.
19              You agree that there can be
20 benefits to social media, correct?
21              ATTORNEY YEATES:  Object to
22      the form.  Asked and answered.
23              THE WITNESS:  I was just
24      about to say, I think I've already

CONFIDENTIAL

```
                                        Page 200
 1          answered that.
 2                  That I think that some
 3          adolescents, for example, might,
 4          you know, identify that they are
 5          feeling, you know, a benefit of
 6          engaging with social media.  And
 7          that in no way negates the harms
 8          that they may be exposed to.
 9   BY ATTORNEY LEHMAN:
10          Q.    Are you offering the opinion
11   that all adolescents are harmed by social
12   media?
13          A.    No.  I mean, we have a lot
14   of adolescents -- well, not so many these
15   days, but some that don't use social
16   media.  So I think it would be unfair to
17   say that all adolescents.
18                  But what I will say is that,
19   you know, again, I'm working in schools
20   and with schools.  And so even those who
21   aren't using, unfortunately, are now
22   impacted by their peers who are using
23   social media.
24                  So, you know, it's --
```

CONFIDENTIAL

Page 201

1    it's -- the argument can certainly be

2    made that if peer -- if adolescents are

3    engaging with peers who are using social

4    media, even if they're not using it, they

5    are impacted by the classroom disruptions

6    and by the -- you know, the kind of viral

7    things that are happening in their school

8    context that are, you know, fed by these

9    platforms.

10            Q.    All right.  Do you agree

11   that content on social media can be

12   educational?

13            A.    So you'd have to give me a

14   specific example.

15            But can content that is on a

16   platform -- on a social media, on one of

17   the defendants' platforms, could it be

18   educational?

19            Q.    Yes.

20            A.    Could be.

21            Q.    Do you agree that material

22   that is on social media platforms can be

23   motivational?

24            A.    I'm not sure.

Page 202

1        Q.    And I want to -- I apologize
2   that I didn't ask this before.
3             ATTORNEY LEHMAN:  I want to
4        go back to the article that we
5        were just looking at from
6        Education Week, and I need to mark
7        this as Exhibit Number 24.
8                      -   -   -
9             (Whereupon, Exhibit
10       Hoover-24, No Bates, What Is
11       Driving Youth Mental Health
12       Problems? It's Not Just About
13       Social Media, Prothero, was marked
14       for identification.)
15                      -   -   -
16  BY ATTORNEY LEHMAN:
17       Q.    And my other question for
18  you is, in this article, when you were
19  talking to the reporter, Ms. Prothero,
20  how did you define social media?
21       A.    I'm not sure.  I'd have to
22  go back and look through the whole
23  article.
24       Q.    Okay.  Well, at that point

Page 203

1    when you were talking to Ms. Prothero,

2    you didn't confine or make your

3    definition consistent with just the four

4    defense platforms, correct?

5              ATTORNEY YEATES:  Object to

6         the form.

7              THE WITNESS:  So it doesn't

8         look like I offered a definition

9         of social media.

10              What I can tell you is that

11         the -- since you've asked about

12         the four defendants' platforms,

13         those are, you know, by the work

14         that I do with students and

15         schools, the ones that are most

16         often brought up and used.

17              So can I speak to, you know,

18         the exact definition?  No, because

19         there wasn't one offered here.

20         When I speak about social media,

21         it's talking about the platforms

22         that young people are using, and

23         those happen to be the defendants'

24         platforms.

CONFIDENTIAL

Page 204

1    BY ATTORNEY LEHMAN:

2         Q.    Are you aware that there is

3    material on the defense social media

4    platforms that actually supports mental

5    health?

6                   ATTORNEY YEATES:  Object to

7         the form.

8                   THE WITNESS:  You'd have to

9         point me to specific information

10        that you're speaking about.

11   BY ATTORNEY LEHMAN:

12        Q.    Okay.  Are you aware that

13   content can be delivered in different

14   ways depending on the specific platform?

15        A.    I don't claim to be expert

16   in all the delivery mechanisms of the

17   defendants' platforms.  So it's hard for

18   me to answer that.

19                   I imagine that they might be

20   delivered differently.

21        Q.    When did you personally form

22   the belief that social media can harm

23   adolescents?

24        A.    When did I personally form

Page 205

1  that belief?  That's an interesting
2  question.
3              I mean, I think, you know,
4  frankly, it would be impossible for me to
5  put a date on it, right.  But I would say
6  that it's -- it's been pretty clear, as
7  we've seen more and more young people
8  engaging with social media, that it's
9  harmful.
10             So it's a hard question to
11 answer because I think you're asking for
12 a specific date or time period that I
13 established an opinion on this or -- and
14 I couldn't do that.  If that's what
15 you're asking for.
16       Q.    Can you recall the first
17 time that you publicly expressed concern
18 about social media's impact on mental
19 health?
20       A.    Oh, well, when you say
21 publicly, I mean, again, I'm working in
22 public with schools all the time.
23             So if you're saying if it's
24 something, you know, on the record

CONFIDENTIAL

Page 206

1   versus -- I mean, publicly, I would have

2   been talking about this with schools for

3   at least a decade.

4        Q.   And was that -- was that

5   belief influenced by any specific event

6   or study or personal experience?

7              ATTORNEY YEATES:  Object to

8         the form.

9              THE WITNESS:  Event, study

10        or personal experience?  I mean,

11        as you would imagine, as director

12        of the National Center for School

13        Mental Health, who's worked with

14        about every state and hundreds of

15        school districts, there are lots

16        of events that -- you know, where

17        social media comes up.

18              So is it one specific event

19        that informed that opinion?  No.

20        It's lots of information and

21        interactions that I have with

22        schools and districts.

23              ATTORNEY LEHMAN:  I am

24        turning to a new topic, I just

CONFIDENTIAL

Page 207

1          wanted to check in.  Do you need a
2          break?  I didn't know what the
3          plan was for lunch, because it's
4          noon.
5                  ATTORNEY YEATES:  Okay.
6          Let's take a break, and I'll check
7          on the lunch.
8                  VIDEO TECHNICIAN:  The time
9          is 12 o'clock p.m., and we are off
10         the record.
11                       -   -   -
12                  (Whereupon, a brief recess
13         was taken.)
14                       -   -   -
15                  VIDEO TECHNICIAN:  The time
16         is 12:16 p.m., and we are on the
17         record.
18   BY ATTORNEY LEHMAN:
19         Q.    We spoke earlier about your
20   testimony before Congress.
21                  ATTORNEY LEHMAN:  So I want
22         to look at that.  And we'll mark
23         these next two exhibits as 25 and
24         26.

CONFIDENTIAL

Page 208

```
 1                    -   -   -
 2              (Whereupon, Exhibit
 3          Hoover-25, No Bates, Written
 4          Testimony Submitted to the United
 5          States Senate Committee on Finance
 6          For the Full Committee Hearing,
 7          was marked for identification.)
 8                    -   -   -
 9              (Whereupon, Exhibit
10          Hoover-26, No Bates, Written
11          Testimony Submitted to the United
12          States Senate Committee on Health,
13          Education, Labor, and Pensions
14          (HELP) For the Subcommittee on
15          Children and Families Hearing, was
16          marked for identification.)
17                    -   -   -
18              ATTORNEY LEHMAN:  So if we
19          can start with Tab Number 21.
20    BY ATTORNEY LEHMAN:
21          Q.    And can you confirm this is
22    your written testimony submitted to the
23    United States Senate Committee on Finance
24    for the full committee hearing?
```

CONFIDENTIAL

Page 209

1          A.     Yes.   It appears to be my
2    written testimony.
3                 Yes.   There it is at the
4    top.  Sorry, I was making sure it wasn't
5    my oral testimony.  So, yes, I can see it
6    was my written testimony.
7          Q.     And this was testimony you
8    gave on February 15th, 2022?
9          A.     Yes.
10         Q.     And the topic here is
11   protecting youth mental health?
12         A.     Yes.
13         Q.     All right.  And you
14   testified about rising youth mental
15   health needs, correct?
16              ATTORNEY YEATES:  Object to
17         the form.
18              THE WITNESS:  I'd want to
19         refresh my memory on exactly what
20         I spoke to.
21              So it looks like the topic
22         was protecting youth mental health
23         and identifying and addressing
24         barriers to care.  So this was for

Page 210

1    the finance committee.

2         And I'm just looking.

3         So I was speaking

4    specifically to barriers to care.

5    So if you're speaking about

6    something specific, let me know.

7  BY ATTORNEY LEHMAN:

8         Q.    Well, certainly, you were

9  talking about factors that impact student

10 mental health and the care that is

11 available to those students, correct?

12        A.    I have to go through to see

13 where I spoke about factors that

14 contribute to mental health.

15        Q.    Well, let me ask you this:

16 In this testimony before Congress on

17 February 15th, 2022, did you mention

18 social media at all?

19             ATTORNEY YEATES:    Object to

20        the form.

21             THE WITNESS:    I'll have to

22        read through the testimony to see

23        if I mention social media.

24             It looks like I was speaking

Page 211

1          more about what systems need to
2          have and what policies need to be
3          in place, not about -- I wasn't --
4          I wasn't really speaking about the
5          contributing factors to youth
6          mental health, upon my quick read
7          of this.
8    BY ATTORNEY LEHMAN:
9          Q.    Okay.  You did not take the
10   opportunity of your February 15th, 2022,
11   testimony to the Senate committee on
12   finance to at all address social media,
13   correct?
14              ATTORNEY YEATES:  Object to
15          the form.
16              THE WITNESS:  So let me just
17          be clear about what happens when
18          you go testify.
19              So, for example, for this
20          committee, I was being asked to
21          speak specifically about the topic
22          at hand, which looks like
23          identifying and addressing
24          barriers to care.  And I would

CONFIDENTIAL

1          have been, probably, asked to

2          speak specific to comprehensive

3          school mental health systems and

4          what needs to be put in place for

5          that, which it looks like I did,

6          as well as what are some of the

7          policies that need to be put in

8          place to increase access to school

9          mental health services.

10               So -- and then, you know, we

11          spoke about, because it's a

12          finance committee, what are some

13          of the financing mechanisms to do

14          that.

15  BY ATTORNEY LEHMAN:

16          Q.   Okay.  And none of the

17  policies that you recommended during your

18  testimony in February 2022 related to

19  social media, correct?

20               ATTORNEY YEATES:  Object to

21          the form.

22               THE WITNESS:  I can go back

23          to the policies.

24               So what I would say, just in

Page 213

1          my view of looking at the

2          policies, is that I'm talking

3          about different aspects of school

4          mental health promotion and

5          prevention policies, as well as

6          intervention and treatment

7          policies.

8               It wasn't really specific to

9          factors that contribute to mental

10         health.

11   BY ATTORNEY LEHMAN:

12         Q.    Okay.  And just so we're

13   clear, when you talked about the

14   different aspects of school mental

15   health, including promotion, prevention

16   policies, none of those policies related

17   to social media, correct?

18         A.    I disagree with that,

19   actually, I think.

20         Q.    Okay.  Then tell me -- tell

21   me where -- what page -- we're looking at

22   a five-page written testimony, where

23   does -- where is social media referenced?

24         A.    So --

CONFIDENTIAL

```
                                                 Page 214
 1            ATTORNEY YEATES:  Object to
 2       the form.
 3            THE WITNESS:  So the
 4       question you asked, I believe,
 5       was -- and maybe we need to go
 6       back to the question.
 7            But as I understood your
 8       original question, it was, do the
 9       policies that you recommended
10       relate to social media?  And I
11       would say -- in fact, I probably
12       want to look at -- through each
13       and every one of them, but just
14       even the first few here, I would
15       say, absolutely do.
16  BY ATTORNEY LEHMAN:
17       Q.   Okay.  So let's, as a
18  starting point, point me to where the
19  phrase "social media" or the name of any
20  social media platform appears in this
21  testimony.
22       A.   So I can go word by word.
23  But I don't think that the term "social
24  media" or the platforms need to be named
```

CONFIDENTIAL

Page 215

1    for the policies to be related to social

2    media or the defendants' platforms.

3              So, for example, if I'm

4    suggesting the requirement of indicators

5    for student mental health and well-being,

6    and we know, from the body of literature

7    and from our experiences working in and

8    with schools, that social media is

9    related to student mental health and

10   well-being, then when we're requiring a

11   selection of indicators, or recommending

12   that, it would be related to social

13   media.

14             So when you're speaking in

15   front of a Senate finance hearing

16   committee you have limited time.  And so

17   you also know that they're going to read,

18   you know, the precise recommendations.

19             And so the absence of naming

20   a single platform, for example, does not

21   suggest that it's not related to the

22   platforms or to the policies recommended.

23        Q.   As you crafted your policy

24   recommendations that you submitted to the

CONFIDENTIAL

Page 216

1   Senate, both orally and in writing, were

2   you careful to specifically address the

3   most important policies that you wanted

4   the Senate to adopt?

5              ATTORNEY YEATES:   Object to

6         the form.

7              THE WITNESS:   So when

8         crafting the policies, I would

9         have likely considered the

10        policies that I thought were most

11        pertinent to the Senate Finance

12        Committee with respect to

13        identifying barriers and

14        facilitators to school mental

15        health.

16  BY ATTORNEY LEHMAN:

17        Q.   So that would -- that

18  included, for example, to require a

19  selection -- require the selection of

20  indicators of student mental health and

21  well-being, incentivize teacher education

22  programs, establish mental health as a

23  required component of the curriculum;

24  those were the types of recommendations

CONFIDENTIAL

Page 217

1    that you made, correct?

2             A.      Those are three of the list

3    of recommendations that I made, that's

4    correct.

5             Q.      Okay.

6                     ATTORNEY LEHMAN:   Let's turn

7             now to Tab Number 22, and we'll

8             mark this as Exhibit Number 26.

9    BY ATTORNEY LEHMAN:

10            Q.      All right.  And can you

11   confirm that this is your written

12   testimony submitted to the United States

13   Senate Committee on Health, Education,

14   Labor and Pensions for the Subcommittee

15   on Children and Families hearing on

16   November 27th, 2022?

17            A.      Yes.

18            Q.      And here the topic was,

19   Caring for Our Kids:   Supporting Mental

20   Health in the Transition From High School

21   to College?

22            A.      That's correct.

23            Q.      And your testimony here is a

24   little bit lengthier.

Page 218

1              Do you know how much time
2    you had to testify?
3         A.    Well, so let me be clear.
4              This is the written
5    testimony.  So that doesn't suggest that
6    my time to testify is actually lengthier
7    than the time I had to testify for the
8    other document you referenced, because
9    that was written testimony.
10        Q.    How much time did you have
11   for oral testimony in November of 2022?
12        A.    I don't recall the exact
13   number of minutes.
14        Q.    And how much time did you
15   have to testify when you testified in
16   February of 2022?
17        A.    I don't recall the exact
18   number of minutes.
19        Q.    Okay.  Is any social media
20   platform, or even social media generally,
21   referenced in your testimony from
22   November 27th, 2022, to Congress?
23        A.    I'd have to read through the
24   document.  It's multi -- multiple pages.

CONFIDENTIAL

Page 219

1    So I'm happy to read through it.
2              So I've seen one so far on
3    the second page.
4         Q.    Second page?
5         A.    Uh-huh.
6         Q.    Where does -- tell me where.
7         A.    Tell you where it
8    references -- so it says, Make
9    environments more nurturing in three of
10   four ways.  And one of those is,
11   Monitoring and setting limits on
12   influences and opportunities to engage in
13   problem behavior.
14        Q.    All right.  Where does it
15   call out either social media generally or
16   one of the platforms?
17        A.    Well, when -- it doesn't
18   call out one of the platforms.
19              And as I said earlier, you
20   wouldn't necessarily -- the absence of
21   naming a platform in this context would
22   not suggest that it's not pertinent here.
23              So when I'm talking about
24   monitoring and setting limits on

CONFIDENTIAL

Page 220

1    influences and opportunities to engage in

2    problem behavior, I -- most people who

3    are working with young people and who are

4    working in schools would recognize that

5    social media is a part of that.

6            Q.    Well, if you look at the

7    bullet point above that, you specifically

8    call out -- in what you describe as

9    socially and biologically toxic

10   conditions, you call out poor nutrition

11   and housing insecurity.

12              Do you see that?

13       A.    I do see that.

14       Q.    So there you call out two

15   specific instances.

16              Can we agree that not all

17   adolescents suffer from poor nutrition or

18   housing insecurity?

19       A.    So not all adolescents

20   suffer from poor nutrition and housing

21   insecurity.

22       Q.    Okay.  So given that not all

23   adolescents suffer from poor nutrition

24   and housing security.  But I understand

CONFIDENTIAL

Page 221

1   you to have told me that social media is

2   harming every adolescent.

3              There is no place in this

4   testimony where you actually call out,

5   like you do poor nutrition and housing

6   insecurity, a social media platform, do

7   you?

8              ATTORNEY YEATES:  Object to

9         the form.

10             THE WITNESS:  So to be

11        clear, I think it's well

12        understood by -- by the readers of

13        this and by the Senate hearing

14        that I was speaking to that social

15        media is causing harms.

16             In the case of providing the

17        context of poor nutrition and

18        housing insecurity, it was likely

19        because I thought they might not

20        understand what biologically toxic

21        conditions would be, so I was

22        giving an illustrative example.

23             I think the third,

24        Monitoring and setting limits on

CONFIDENTIAL

Page 222

1           influences and opportunities to

2           engage in problem behavior -- you

3           asked if I referenced social

4           media; to me, that's a clear

5           reference.

6    BY ATTORNEY LEHMAN:

7           Q.    So are there any other --

8    any other references where the actual

9    phrase "social media" or the name of a

10   platform is used?

11          A.    I'd have to read through the

12   document.

13              So, again, on Pages 3 and 4,

14   we're referencing -- I'm referencing

15   policies that are certainly relevant in

16   the context of the impact and harms of

17   social media.

18          Q.    Okay.  Point me to where it

19   specifically either identifies a

20   defendant's platform or talks about

21   social media.

22              ATTORNEY YEATES:  Object to

23          the form.

24              THE WITNESS:  Again, it

Page 223

1          doesn't specifically identify one
2          of the defendants' platforms.  And
3          there's no need to in this context
4          when I'm talking about policies
5          here to support the mental health
6          of young people in schools.
7               That's what I'm speaking to,
8          the policies themselves.  And I
9          don't specifically use the term
10         that you're asking about.
11              But if you're asking am I
12         referring to the harms that are
13         caused by social media in
14         recommending these policies, the
15         answer would be yes.
16    BY ATTORNEY LEHMAN:
17         Q.   Okay.  Let me just make sure
18    I understand.
19              So you had the opportunity
20    to submit written testimony to the
21    Senate.  These are literally the
22    decision-makers of our country.
23              And you are making policy
24    recommendations about how to support the

CONFIDENTIAL

Page 224

1    mental health of adolescents.  And you do

2    not take the time to call out social

3    media, even though, according to your own

4    words today, it is harming every

5    adolescent in our country; am I

6    understanding that correctly?

7                ATTORNEY YEATES:  Object to

8           the form.

9                THE WITNESS:  So to provide

10          some context, this was also on the

11          heels of the testimony of the

12          Surgeon General, Dr. Vivek Murthy.

13          And I had carefully reviewed

14          Dr. Murthy's testimony as well,

15          and there was ample information

16          around social media.

17                My role in this was to speak

18          specifically to policies that

19          should be implemented in schools

20          and in comprehensive school mental

21          health systems.  And that's what I

22          did.

23                So there's already an

24          understanding -- I think there's a

Page 225

1          general understanding in the field
2          and the world around the impacts
3          of social media on young people.
4              But my job here was to lay
5          out policies specific to
6          comprehensive school mental health
7          and specific, you know,
8          recommendations, for example, that
9          could be taken legislatively to
10         build and sustain comprehensive
11         school mental health systems.
12    BY ATTORNEY LEHMAN:
13         Q.    Have you ever written to any
14    government official asking that there be
15    changes in access to social media for
16    adolescents?
17         A.    That wouldn't be part of my
18    role.
19         Q.    Have you ever, in any of the
20    presentations that you've given -- so we
21    just looked at two, but we talked earlier
22    about the many -- I think you called them
23    major invited presentations.
24              In any of those major

CONFIDENTIAL

Page 226

1    invited presentations, have you ever

2    taken the opportunity to encourage that

3    social media be banned?

4            A.    I'd have to go back through.

5                  I mean, again, I've had over

6    600 invited presentations at conferences.

7    So to ask me to remember the specific

8    content may be hard.  So I'm not sure if

9    I can answer that.

10                 I don't know that my role,

11   typically though in those presentations,

12   is to talk about whether -- you know, the

13   banning of certain things or not.  I'm

14   usually speaking to, you know, the

15   science and what's happening in schools

16   and school mental health.

17                 So I don't know that I would

18   have, but I may have.  I may have spoken

19   about, you know, cell phone bans for --

20   in particular, to limit the use of the

21   defendants' platforms.

22           Q.    And are you supportive of

23   cell phone bans within schools to limit

24   students' access to cell phones during

CONFIDENTIAL

Page 227

1  the instructional day?

2          A.    You know, what I can say is

3  that we've seen some very well-intended

4  attempts at cell phone bans in schools to

5  try to mitigate some of the risk caused

6  by social media engagement.

7                And I think that they are

8  very hard to implement.  We've seen

9  schools struggle to actually implement

10  them.  So -- and for a variety of

11  reasons, you know, families may want

12  their children to have phones.  They

13  don't necessarily want them to be on

14  social media.  But there are a variety of

15  reasons.

16                The engagement features of

17  social media make it really tempting and

18  almost impossible for schools to not have

19  students on phones during the day.

20                So it's a tough question.

21  Am I supportive of them?  You know, I

22  would say that they're hard to implement.

23  So I'm supportive of measures that

24  attempt to limit social media engagement

Page 228

1   by young people because it's inherently

2   risky.

3          Q.    And what are the measures

4   that you support that attempt to limit

5   social media engagement by young people?

6          A.    You know, again, I wouldn't

7   say that I'm savvy with every measure

8   that could be taken.  You know, I think a

9   lot of measures that could be taken are,

10  really, in the hands and control of the

11  defendants' platforms themselves, whether

12  it's, you know, parental control features

13  or age verification.  And those, you

14  know, I think can actually, you know,

15  potentially really limit some of the

16  engagement.

17             So there are a variety of,

18  you know, actions that possibly could be

19  taken to limit control -- excuse me, to

20  limit exposure to social media.

21             The things that I'm most

22  familiar with are what, you know, schools

23  can do to, you know, prevent and mitigate

24  the harms of social media.  And that's

CONFIDENTIAL

Page 229

1  really what I laid out in my report.

2                 So that would be things like

3  educating young people, educators,

4  families about the harms of social media

5  and educating them about navigating a

6  landscape in which social media is

7  consistently grabbing for their

8  attention.

9                 There's a lot of other

10 things that we can do in schools in terms

11 of mitigating.  And those are, I think,

12 pretty well laid out in my report.

13        Q.    Have you studied the

14 parental control abilities of any of the

15 defense platforms?

16        A.    So I know that they were

17 discussed in some of the depositions that

18 I reviewed.

19                 But have I studied them in

20 particular?  No.  That would not be

21 something I had spent my time studying.

22        Q.    Have you studied the age

23 verifications mechanisms for any of the

24 defense platforms?

CONFIDENTIAL

Page 230

1          A.    So the -- when you say have
2    I "studied them," first of all, I would
3    think the technology involved in that is
4    not really at the fingertips of most
5    people that are outside of the
6    defendants' platforms' kind of knowledge
7    base.
8               But I don't study that as
9    part of my typical day-to-day work.
10              Am I familiar with, you
11   know, the idea that there are age --
12   attempts at age verification, I should
13   say, perhaps.  But my interactions with
14   young people, with families, with
15   teachers is that they're really
16   ineffective.  They're not well known
17   about.  They're not well understood.
18   They're hard to access.
19              So that's my understanding
20   of the age verification features.
21          Q.    Okay.  Other than talking to
22   people in your -- in your work and sort
23   of anecdotally discussing with them their
24   experience with age verification on the

Page 231

1    defendants' platforms, have you

2    undertaken any other effort to understand

3    or learn about the age verification on

4    the defense platforms?

5              ATTORNEY YEATES:  Object to

6         the form.

7              THE WITNESS:  So, again, I

8         mean, I'll restate that I looked

9         to the depositions where they --

10        it was spoken about, the

11        specific -- some of the specific,

12        I imagine, attempts at age

13        verification.

14             But, you know, is it

15        something that I study?  No.  I

16        mean, you know, the experts in the

17        reports that I relied on in part

18        for my opinions, they went more

19        deeply into looking at the actual

20        features of the defendants'

21        platforms.  So that's not -- that

22        doesn't really fall specifically

23        within my wheelhouse.

24             And, you know, you

CONFIDENTIAL

Page 232

1           characterize the discussions I
2           have with people as anecdotes.
3           But, you know, when you're hearing
4           the same thing over and over and
5           over from, again, parents,
6           administrators, school districts,
7           there does tend to be conclusions
8           that you can draw, in part from
9           that information, about the age
10          verification quality, for example,
11          and the ability to keep young
12          people off of the platforms.
13  BY ATTORNEY LEHMAN:
14          Q.    Do you agree that you're not
15  an expert in the actual design of
16  defendants' social media platforms?
17          A.    I am not expert in the
18  design.  I would think that the experts
19  in the design of the defendants'
20  platforms are in-house in the defendants'
21  platforms companies themselves.
22                So they are the folks who
23  have that know-how.
24          Q.    And is it correct that

CONFIDENTIAL

```
                                        Page 233
 1   you're not offering an opinion about the
 2   actual design of defendants' social media
 3   platforms?
 4              ATTORNEY YEATES:  Object to
 5         the form.
 6              THE WITNESS:  So, yeah, I
 7         probably would want to understand
 8         what you mean a little bit more by
 9         that question, because I certainly
10         offer -- my opinions have to do
11         with the design -- or at least
12         some of the opinions that I offer
13         have to do with the design
14         features.
15              But I'm not offering
16         specific opinions about specific
17         features, as I believe maybe some
18         of the other experts may have
19         done.
20              So when I talk about social
21         media and I detail this in my
22         report, the design features
23         themselves do certainly play a
24         role in the harms that I'm
```

Page 234

1          speaking to and in the harms that
2          I'm proposing to prevent and
3          mitigate in the strategic plan.
4   BY ATTORNEY LEHMAN:
5          Q.    And do you have an opinion
6   as to the specific harms caused by any
7   one specific feature on a -- on a defense
8   platform?
9          A.    So, again, I would rely more
10  on the experts who dove more deeply into
11  that, right, who looked at each specific
12  feature.
13              What I can say is that, you
14  know, some of the features that I'm aware
15  of and that I've, you know, certainly
16  spoken, during the key informant
17  interviews and during discussions with
18  school districts and school leaders and
19  families in my work, speak about specific
20  features, whether it's the auto play and
21  scrolling or the -- again, I've already
22  spoken to some, the lack of parental
23  controls, the age verification; those
24  things certainly get our young people on

CONFIDENTIAL

Page 235

1    social media.

2              The features that keep them

3    engaged and kind of amplify things that

4    happen and then cause disruptions in the

5    schools, those are the things that we

6    hear about.

7              Am I expert in the

8    technology that drives that?  No.  Am

9    I -- do I consider myself expert in kind

10   of the -- what happens as a consequence

11   of some of the design features in our

12   school settings and in terms of the young

13   people's mental health?  Yes.

14        Q.    Do you agree that you're not

15   an expert in how algorithms work?

16        A.    Well, algorithms is a broad

17   statement -- or a broad term, I should

18   say.

19              So I know what an algorithm

20   is, I believe.  But it's probably -- that

21   term is probably used differently in

22   different contexts.

23              So maybe you can specify a

24   little bit.

Page 236

1          Q.    Well, when you think about

2     an algorithm, what does it mean to you?

3          A.    Kind of -- let me think

4     about how I would define algorithm.

5               So kind of a sequencing

6     where if one thing happens -- this is not

7     going to be an eloquent definition -- but

8     if one thing occurs and it takes -- you

9     know, there could be two pathways, right,

10    after that thing occurs, if it's a

11    yes/no -- I mean, I'm imagining a visual

12    algorithm -- and if it goes one way, it

13    would lead to one set of outcomes; if it

14    goes another way, it would lead to

15    another set of outcomes.

16         Q.    Have you ever reviewed the

17    source code for an algorithm?

18         A.    I don't believe so.  That's

19    not something I would necessarily do.

20               I certainly have done, you

21    know, coding and work in statistics.  But

22    I don't think I've looked at coding for

23    algorithms for social media platforms.

24               My guess is a lot of that

CONFIDENTIAL

Page 237

1    nobody has reviewed, other than those

2    folks who are working within the platform

3    organizations.

4            Q.    Do you have a degree in

5    computer science?

6            A.    No, I do not.

7            Q.    Have you ever taken a class

8    in computer science?

9            A.    I have to think about that.

10           I don't think I've taken a

11   class in computer science, but I'm not

12   sure.

13           Q.    Do you have a degree in data

14   science?

15           A.    Well, my -- part of my role

16   as a clinical psychologist is to be able

17   to understand data.  And we're -- as I

18   said earlier we're trained as scientist

19   practitioners.  So I can certainly

20   understand data when I look at, you know,

21   an academic article, for example.

22           But I think if you're

23   talking about a data science degree, the

24   answer would be no.  A specific degree,

CONFIDENTIAL

Page 238

1  no.

2        Q.    Do you hold yourself out as

3  an expert in warnings?

4        A.    I do not hold myself as an

5  expert in warnings.

6        Q.    Do you intend to offer any

7  opinion about whether any of the

8  defendants' social media platforms did or

9  did not meet industry standards?

10       A.    I don't see that as my role

11 in terms of the opinions.

12             I'm thinking through all the

13 opinions that I offer.  They were not

14 about industry standards, no.

15       Q.    Do you intend to offer any

16 opinions about a safer alternative design

17 for social media platforms?

18       A.    I'm trying to -- my opinions

19 don't get at the -- no.  The answer would

20 be no to that.

21       Q.    Are you offering any

22 opinions about how the defendants

23 responded to any concerns that have been

24 expressed about their platforms?

CONFIDENTIAL

Page 239

1          A.    Can you say that one more
2     time?
3          Q.    Yes.
4                Are you offering any
5     opinions about how the defendants
6     responded to any concerns that have been
7     expressed about their platforms?
8          A.    No, that's not part of my
9     opinions.
10          Q.    Are you offering any opinion
11     about the motive for any of defendants'
12     actions or conduct?
13          A.    I can't speak to the motives
14     of -- no, I'm not offering an opinion on
15     that.
16          Q.    Are you offering any opinion
17     about whether any of defendants'
18     platforms should be banned?
19          A.    That's not in my opinions,
20     no.
21          Q.    Are you offering any opinion
22     about whether -- or strike that.
23                Are you offering any opinion
24     about any of defendants' conduct or their

                                    Page 240

1    business practices?

2              ATTORNEY YEATES:  Object to

3         the form.

4              THE WITNESS:  Yeah, it's an

5         interesting -- I mean, so I

6         certainly offer opinions about how

7         the design of these -- of the

8         defendants' platforms impact

9         student mental health in schools.

10             So I don't know if that fits

11        with -- under -- under the

12        umbrella of what you're asking

13        about in that question.

14   BY ATTORNEY LEHMAN:

15        Q.   Okay.  Understanding the

16   opinion that you have just carved out.

17             Other than that, do you

18   intend to offer any opinion about

19   defendants' conduct or business

20   practices?

21             ATTORNEY YEATES:  Object to

22        the form.

23             THE WITNESS:  I mean, it's

24        hard to say.  I don't -- I am

Page 241

1          speaking, in my opinions, about
2          the -- you know, how these
3          defendants' platforms have
4          impacted young people.
5               Whether that gets at their
6          conduct?  I mean, arguably their
7          conduct is the development and
8          design of these platforms.  And so
9          if I'm offering opinions about how
10         those have negatively impacted our
11         children and adolescents, I
12         suppose it's -- I suppose the
13         answer could be yes.
14               It's a little hard for me to
15         understand, because the term
16         "conduct" is quite broad.  So if
17         it's about all of the behaviors
18         that have led to the design and
19         development of these, perhaps.
20  BY ATTORNEY LEHMAN:
21         Q.    Are you offering an opinion
22  about who should pay for the 15-year
23  comprehensive plan outlined in your
24  report?

CONFIDENTIAL

Page 242

1          A.    That's not part of the
2    opinions that I offered.  I may have
3    spoken to that in the context of the
4    report.  It wasn't part of the opinions.
5          Q.    Do you hold yourself out to
6    your colleagues an expert in digital
7    technology?
8          A.    So what I would say is that
9    under my expertise as, you know, director
10   of the National Center for School Mental
11   Health, part of that is looking at
12   programming that is offered in schools.
13              And part of that is
14   sometimes things that have to do with
15   digital technology or digital literacy.
16   So in that respect, yes.
17          Q.    Have you performed a
18   Bradford Hill analysis in reaching your
19   opinions in this case?
20          A.    Well, it depends how you
21   would define how I've done a Bradford
22   Hill analysis.
23              I mean, my understanding of
24   the Bradford Hill -- I don't know if

CONFIDENTIAL

Page 243

1    you'd like to define it, but I'm happy to
2    answer the question based on my
3    understanding of that concept.
4            Q.    Sure.  What do you
5    understand the Bradford Hill to be?
6            A.    So it's essentially a set of
7    criteria that you use to determine or
8    infer causality.  Often it's used in the
9    absence of a, you know, randomized
10   controlled trial, for example.
11              And it's a set of criteria
12   that's, as I understand it, really widely
13   accepted in the field in the absence of
14   RCTs, for example, randomized controlled
15   trials, which are often not feasible to
16   do, right, and -- whether there's ethics
17   considerations or logistics
18   considerations.
19              So the criteria for Bradford
20   Hill is really thinking about kind of
21   what would need to exist or what are some
22   of the things that would be in place for
23   you to be able to infer or determine
24   causality.

CONFIDENTIAL

Page 244

1          Q.    And have you performed a
2    Bradford Hill analysis in reaching your
3    opinions in this case?
4          A.    So I've certainly used some
5    of the criteria in the Bradford Hill kind
6    of mechanism for determining, you know,
7    whether something is causal or not, yes.
8                I mean, because, you know,
9    as I mentioned, there are certain things
10   that align with the research that I
11   reviewed and the expert reports that show
12   that there is data to suggest things like
13   temporal sequencing, like multiple
14   studies that show correlation, for
15   example.
16         Q.    And what study do you
17   believe shows temporal sequencing?
18         A.    Again, just like I answered
19   before, given all of the studies I looked
20   at, I would probably need to go back and
21   review each of the studies to see which
22   one actually looks -- one or more look at
23   temporal sequencing.
24                And also, as I said, I also

CONFIDENTIAL

Page 245

1  relied on the expert reports that also

2  used, you know, different articles.

3              So there's a lot of

4  articles.  So I can't name a specific

5  article.

6        Q.    Your report does not include

7  a Bradford Hill analysis, correct?

8        A.    I wouldn't say that.  I

9  mean, it's -- a Bradford Hill analysis,

10 as you're calling it, is really using

11 that criteria to determine whether there

12 is causality or whether there's reason to

13 believe that one variable might cause

14 another.

15             And so actually I would

16 argue that I did, I used that criteria.

17       Q.    Okay.  And do you set out

18 anywhere in your report the Bradford Hill

19 analysis, the evaluation of the nine

20 criteria?

21             ATTORNEY YEATES:  Object to

22        the form.

23             THE WITNESS:  It's, I would

24        say, throughout my report.  If you

Page 246

```
 1          look at the background where I
 2          spoke through kind of the -- and
 3          referenced many different studies
 4          that look at the impact of social
 5          media on young people's mental
 6          health or on schooling, the --
 7          many of those really fit with
 8          under -- fit under, rather, the
 9          criteria.
10               So, yeah, it's throughout
11          the report.
12 BY ATTORNEY LEHMAN:
13      Q.    But we can -- we can agree
14 that there's nowhere in any of your
15 reports where you identify each of the
16 nine factors and go through an analysis
17 with respect to each individual factor,
18 correct?
19      A.    You don't need to --
20          ATTORNEY YEATES:  Object to
21      the form.
22          THE WITNESS:  That's not
23      typically something I would do in
24      practice, nor would many folks.
```

Page 247

```
 1              They wouldn't necessarily
 2         always say, I'm using the Bradford
 3         Hill criteria.  It's kind of a
 4         well established set of criteria
 5         in the field.
 6              So I think, you know, when
 7         you're publishing, for example, in
 8         peer-reviewed literature, or when
 9         you're speaking to it amongst
10         academics, you wouldn't
11         necessarily always say, and here
12         are the specific criteria that
13         fall under this, because it's a
14         well understood set of criteria.
15   BY ATTORNEY LEHMAN:
16         Q.    Do you agree that
17   correlation is not the same as causation?
18         A.    Of course.
19         Q.    So do you agree that two
20   things can be associated with each other
21   but there might not be a causal
22   relationship between the two?
23         A.    Yes.  There's certainly
24   instances where there is a correlation or
```

CONFIDENTIAL

Page 248

1  association but not causation.

2        Q.    So, for example, a

3  correlation might reflect bidirectional

4  influences?

5        A.    Bidirectional influences,

6  certainly.  Or reverse, yes; one way that

7  you're anticipating it's not, yes.

8        Q.    And other factors commonly

9  known as confounders or confounding

10  factors can also come into play?

11        A.    When you say they can "come

12  into play," you mean that that could --

13  tell me what you mean by that.

14        Q.    What I mean is a third

15  factor could actually be causing the

16  effect that you're attempting to

17  evaluate.

18              ATTORNEY YEATES:  Object to

19          the form.

20              THE WITNESS:  I don't know

21          if you're talking about a specific

22          study or a specific -- because I'm

23          not attempting to evaluate

24          anything in the context of that.

CONFIDENTIAL

Page 249

1              But in terms of -- yeah, so
2        I -- you probably have to restate
3        it.
4    BY ATTORNEY LEHMAN:
5        Q.    Sure.
6              Do you agree that -- well,
7    what is your understanding of what a
8    confounder is?
9        A.    So in the context of a
10   study --
11       Q.    In the context of a study.
12       A.    -- a confounder might be a
13   variable that is influencing one or more
14   of the variables that you're looking at
15   that may not have been a hypothesized
16   variable that you're directly studying.
17       Q.    Okay.  Do you agree that
18   saying that there is an increased risk
19   does not mean that there is a causal
20   relationship?
21             ATTORNEY YEATES:  Object to
22        the form.
23             THE WITNESS:  Can you
24        provide context for that?

CONFIDENTIAL

Page 250

```
 1   BY ATTORNEY LEHMAN:
 2           Q.     Sure.
 3                  So would you agree that, for
 4   example, if you're looking at risk
 5   factors for a mental health illness, that
 6   just because someone has a risk factor
 7   doesn't necessarily mean that that risk
 8   factor has caused their mental health
 9   illness?
10                  ATTORNEY YEATES:  Object to
11           the form.
12                  THE WITNESS:  So if someone
13           has a risk factor, does that mean
14           that it has caused their mental
15           health challenge or illness?
16   BY ATTORNEY LEHMAN:
17           Q.     Yes.
18           A.     Not necessarily.  But that
19   may be hard to -- it may be hard to
20   determine.
21           Q.     Okay.  When you use impact
22   or association in your expert report, you
23   do not mean causation, do you?
24                  ATTORNEY YEATES:  Object to
```

CONFIDENTIAL

Page 251

1          the form.

2                   THE WITNESS:  So, you know,

3          you'd have to point -- point me to

4          a specific place in the report.

5          But I certainly speak about

6          causation in the report.

7                   And, actually, when I'm

8          talking about impact in many

9          instances in the report, and

10         certainly in my opinions, I'm

11         speaking about social media

12         causing the harms that we're

13         talking about here.

14                  So that one variable, social

15         media, leading to the outcomes

16         that we're talking about, whether

17         it's school outcomes or student

18         mental health and well-being, yes.

19     BY ATTORNEY LEHMAN:

20         Q.    Do you agree that in order

21     to determine whether or not an

22     association is valid or true that bias

23     and confounding must be ruled out?

24         A.    So what I would say is that,

CONFIDENTIAL

Page 252

1    you know, there's a lot of -- a lot of

2    ways that we might come to the

3    determination, in the public health field

4    or in the mental health field, about

5    causation.

6              And it's certainly important

7    to look at confounding factors.  Can you

8    rule out every single confounding factor

9    in a study?  Most studies don't have

10   every possible confounder.  Do we attempt

11   to look at confounders?  Certainly.

12             And you talked about -- I

13   think you said -- it was kind of a double

14   question.  You also --

15        Q.    I also asked bias.

16        A.    So about bias.

17             ATTORNEY YEATES:  Object to

18        the form.

19   BY ATTORNEY LEHMAN:

20        Q.    So let -- I'll --

21        A.    If you want to restate that.

22        Q.    Sure.

23             Do you agree that in order

24   to determine whether an association is

Page 253

1  true or valid, bias must be ruled out?

2        A.    I don't even know that I

3  know what you mean by that, when you say

4  "bias must be ruled out."

5              What kind of bias are we

6  talking about?

7        Q.    Well, you're aware that

8  there are multiple different kinds of

9  bias, correct?

10       A.    There's -- yes.  That's, I

11  think, why I'm asking the question.

12             What do you mean by bias?

13       Q.    So, then, my question to you

14  is this:  What are the types of bias that

15  you're aware of?

16       A.    In terms of, I mean,

17  there's -- I can name some.

18             There's implicit bias.  I

19  mean, I often think about bias when

20  we're -- when we're talking about the

21  school context.

22             So in teaching, for example,

23  you might have implicit bias or explicit

24  bias.  You may have bias -- you know,

Page 254

1    someone might be biased against someone

2    because of their prior experiences, which

3    is related to the implicit and explicit

4    bias that we're talking about.

5              So if you're talking about a

6    specific bias, I'm happy to know what

7    you're talking about.

8         Q.    Well, let's -- let's walk

9    through them.

10             Do you agree that bias can

11   produce error in the outcome of a study?

12             ATTORNEY YEATES:  Object to

13        the form.

14             THE WITNESS:  Can you just

15        tell me what you mean by "bias"?

16        Since you said there's many forms

17        of bias.

18   BY ATTORNEY LEHMAN:

19        Q.    Sure.

20        A.    What kind of bias are you

21   speaking about?

22        Q.    So I'm speaking largely

23   about selection bias, dropout bias,

24   information bias, recall bias and

CONFIDENTIAL

Page 255

1   confirmation bias.

2          A.    So those are all things that

3   we may want to consider in the context of

4   a study, certainly.

5          Q.    And so do you agree that

6   bias, including the biases I've just set

7   out, can produce error in the outcome of

8   a study?

9          A.    They can produce error.  And

10  that's why we are rigorous in our studies

11  about trying to rule those things out.

12              You know, there are

13  certainly other things, you know, that we

14  just talked about that could introduce

15  potential error.

16              Just because there are

17  things that can cause error, though,

18  certainly does not mean that you can't

19  draw conclusions, even if there is the

20  potential for error in a study.

21              I mean, that's why you do

22  multiple studies, it's why you have

23  peer-reviewed processes, so that you can

24  look at the rigor of the study and the

CONFIDENTIAL

Page 256

1    potential for error to actually influence

2    the outcomes.

3            Q.    Do you agree that causation

4    cannot be determined based on a

5    correlational study?

6            A.    No, I disagree with that,

7    actually.

8                  So, first of all, I would

9    never necessarily draw a conclusion just

10   from one study.  But, you know,

11   there's -- it's well established, and I

12   think we just talked about some of the

13   criteria that's used to draw conclusions

14   about causation.

15                 And one of those is, if you

16   have multiple correlational studies, now

17   that's just one criteria, but if you do

18   have multiple correlational studies, that

19   certainly can contribute to our

20   understanding of whether something is

21   causal.

22                 There are other things you

23   might want to consider as well.

24           Q.    Okay.  Do you agree that it

CONFIDENTIAL

Page 257

1    is not appropriate to make a causation

2    determination based solely on

3    correlational studies?

4          A.    So I wouldn't agree with it

5    how you said it.

6                I think that correlational

7    studies is one of the things that you can

8    use to draw conclusions about causation.

9                And cross-sectional studies

10   can actually offer a lot of good

11   information about causation, right.

12   Especially if you have, I mentioned

13   already, temporal sequencing within it or

14   if you have multiple correlational

15   studies and if those studies have been

16   conducted, you know, with different

17   populations or in different settings.

18                Again, we're kind of going

19   back to the Bradford Hill criteria.  But

20   yeah.

21          Q.    And you said that you offer

22   opinions about causation in your report.

23                And are you able to reach

24   those causation opinions without relying

Page 258

1    on correlational studies?

2         A.    Well, that would be a

3    hypothetical, I think, because there are

4    correlational studies that demonstrate

5    the social -- the impact of social media.

6         Q.    And let me -- let me just be

7    clear.  I'm not asking you at all a

8    hypothetical question.

9              I am asking you in your

10   analysis of causation, are you able to

11   reach that causation opinion irrespective

12   of the correlational studies?

13        A.    I don't have to.

14             ATTORNEY YEATES:  Object to

15        the form.

16             THE WITNESS:  I don't have

17        to.  I mean, again, it is a

18        hypothetical, because the

19        correlational studies exist.

20             So I don't have to -- I

21        wasn't asked to draw a conclusion

22        without the wealth of studies that

23        do exist looking at association,

24        for example.

CONFIDENTIAL

Page 259

1    BY ATTORNEY LEHMAN:

2         Q.    All right.  So that's not an

3    analysis that you have performed, i.e.,

4    determining if social media causes the

5    harms outlined in your report without

6    relying on the correlational studies?

7              A.    That would be very --

8                    ATTORNEY YEATES:  Object to

9              the form.

10                   THE WITNESS:  That would be

11             very atypical, that somebody would

12             then just disregard the

13             correlational studies that exist

14             and say, well, could I just

15             determine this without those?

16                   That's just not -- I

17             wasn't -- that wouldn't be

18             something that I would do.  And I

19             think you use the studies that you

20             have -- in this case that you're

21             speaking about, the hypothetical

22             case, you know, correlational

23             studies, you would use those to

24             contribute as one piece of

CONFIDENTIAL

Page 260

1         information towards your

2         conclusions, which is what I did.

3    BY ATTORNEY LEHMAN:

4         Q.    Okay.  All right.

5              ATTORNEY LEHMAN:  It's

6         shortly after 1:00, and I think

7         our lunch has been sitting around

8         for maybe an hour.  So I don't

9         know if there's mayonnaise on

10        those sandwiches.  But perhaps now

11        is a good time to take a lunch

12        break.

13             THE WITNESS:  Sounds good.

14             VIDEO TECHNICIAN:  The time

15        is 1:02 p.m., and we are off the

16        record.

17                  -   -   -

18             (Whereupon, a luncheon

19        recess was taken.)

20                  -   -   -

21             VIDEO TECHNICIAN:  The time

22        is 1:52 p.m., and we are on the

23        record.

24   BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 261

1          Q.    What are the Bradford Hill
2    criteria, like, what are the specific
3    factors?
4          A.    I don't know that I can name
5    every one of them offhand.  But I can
6    speak to some of them.
7                So they include things like
8    having multiple correlational studies.  I
9    know one of them is having kind of
10   temporal sequencing.  I believe one is
11   having multiple studies across -- or,
12   rather, let me rephrase that, having
13   studies across various populations or
14   areas.
15               So those are a few of the
16   criteria.
17         Q.    Can you remember any other
18   of the specific factors in Bradford Hill?
19         A.    I'm not sure if I can
20   offhand.
21         Q.    Okay.  In your analysis that
22   you performed, how did you weight each of
23   the Bradford Hill criteria against each
24   other?

CONFIDENTIAL

```
                                    Page 262
 1              ATTORNEY YEATES:  Object to
 2         the form.
 3              THE WITNESS:  I took all of
 4         the information I had to inform my
 5         opinion.  Generally, when I'm
 6         forming an opinion, I don't think
 7         about it like that, like, I don't
 8         think, you know, this criteria was
 9         3 percent of my decision and this
10         criteria was 10 percent of my
11         decision.
12              So I don't -- I don't think
13         about it like that.  I don't think
14         that's typical as kind of how I
15         would form opinions or
16         conclusions.
17    BY ATTORNEY LEHMAN:
18         Q.    Did you perform a Bradford
19    Hill analysis for any individual social
20    media platform?
21         A.    So I didn't distinguish --
22    the answer would be no to that.  Did I
23    conduct a Bradford Hill analysis for any
24    individual platform?  No.
```

CONFIDENTIAL

Page 263

1        Q.    Did you perform a Bradford
2   Hill analysis for any specific feature on
3   a social media platform?
4        A.    Well, I mean, so it's an
5   interesting question, I guess, even
6   thinking about the last question you're
7   asking, did I form a Bradford Hill
8   analysis.
9              We think about -- or at
10  least when I think about Bradford Hill,
11  you're using a set of criteria, and the
12  idea is that if you have some of these
13  criteria, it helps you to make a
14  determination about causation, especially
15  in the absence of other, you know, types
16  of evidence.
17             And so did I use -- I think
18  the question was -- you can restate the
19  question.  But I believe -- go ahead.
20       Q.    So my specific question was,
21  did you perform a Bradford Hill analysis
22  for any specific feature on a social
23  media platform?
24       A.    So, again, I mean, I think

CONFIDENTIAL

Page 264

1    as I thought about and as I formed the

2    opinions, it's really -- you know, I

3    wasn't thinking or pulling -- teasing

4    apart each specific feature.

5                    And, frankly, you know, when

6    I look to the reports of some of the

7    other experts, they, as I mentioned

8    earlier, dove much more deeply into the

9    kind of distinctions between features.

10                    So I wouldn't say that I was

11    performing an analysis.  But did I

12    consider kind of the studies, as I was

13    reading different studies, which elements

14    of Bradford Hill may be relevant for that

15    particular study?  Yes.  And did some of

16    the studies that I looked at possibly

17    focus on specific features?  Yes.

18                    But, again, if you're asking

19    about did you look at this specific study

20    and consider it, I would have to go back

21    to each of the studies.

22         Q.    And as we sit here, are you

23    able to identify any specific study that

24    is relevant to any specific element of

Page 265

1   the Bradford Hill analysis that you

2   performed?

3              ATTORNEY YEATES:  Object to

4         the form.

5              THE WITNESS:  So as we sit

6         here, I would have to go back and

7         look at every one of the studies.

8              But what I can say is that

9         the Bradford Hill criteria is

10        something that you -- that you and

11        that I would consider, that I

12        considered generally in looking at

13        the information that I get.

14             It's just something that you

15        do as part of your practice.

16        You're thinking about -- I mean,

17        it really is a way of thinking

18        about all of the evidence that you

19        have.  And so you're thinking

20        about, you know, each of these

21        different things and how does it

22        inform your conclusions.

23             So I'm not sure that I would

24        be able to say, this study, you

CONFIDENTIAL

Page 266

1          know, just sitting here, because I
2          don't have the studies in front of
3          me, and I don't -- you know, I
4          can't infer just from the list of
5          studies.
6    BY ATTORNEY LEHMAN:
7          Q.    What conditions do you
8    intend to testify are caused by social
9    media?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  It's hard for
13         me to predict what would be asked.
14         So I don't know that I'm intending
15         to testify to anything specific,
16         because I can't necessarily
17         predict what would come up in the
18         context of testimony.
19   BY ATTORNEY LEHMAN:
20         Q.    I understood your testimony
21   before lunch to state that you had
22   made -- reached an opinion that social
23   media caused harms.
24              And so what I'm -- what I'm

CONFIDENTIAL

Page 267

1  asking for is when we say -- when you

2  talk about what harms are caused by

3  social media, what harms is it your

4  opinion are caused by social media?

5      A.    Okay.  I mean, I'm happy to

6  go back to my report and lay out what

7  I've described in my opinions as far as

8  the specific harms.

9          So in Opinion 1 in the May

10  16th report, I spoke about negative

11  impacts on their ability to effectively

12  learn and succeed in school and on their

13  mental health and overall well-being.

14          And in Opinion 2, I went on

15  to describe impacts or harms specifically

16  associated with students' social media

17  use, including increased distraction from

18  instruction and decreased academic focus

19  and learning; erosion of in-person social

20  skills development; diminished teaching

21  effectiveness; and detrimental effects on

22  student mental health.

23          And I named a few here,

24  including disruptive sleep pattern --

CONFIDENTIAL

Page 268

1  disrupted sleep patterns, increased

2  symptoms of anxiety, depression and

3  self-harm and greater levels of body

4  dissatisfaction and negative

5  self-comparison.

6              In Opinion 3, I then went on

7  to talk about how schools have then been

8  required to expend and redirect already

9  limited resources.  So I would consider

10  that a harm.

11             And districts and schools, I

12  spoke about what they've been

13  increasingly tasked with doing, so

14  addressing mental health challenges

15  arising from students' social media use,

16  educating students on the risk and

17  responsible use of social media, managing

18  behaviors such as distraction during

19  instruction, peer conflict, emotional

20  disregulation and addiction as a result

21  of social media, and navigating strained

22  family-school partnerships, with social

23  media-related concerns dominating time

24  meant for educational engagement.

CONFIDENTIAL

Page 269

1             So those are the opinions
2    that I offered in my general report.
3             Q.    And have you performed a
4    Bradford Hill analysis for each
5    individual condition that you outlined,
6    including negative impacts on learning,
7    mental health, distraction, decreased
8    academic focus, decreased social skills,
9    disrupted sleep patterns, body -- body
10   dissatisfaction?
11            A.    I mean --
12                 ATTORNEY YEATES:  Object to
13            the form.
14                 THE WITNESS:  So arguably,
15            yes, in the sense that did I
16            consider the -- all of the factors
17            that would lead me to infer
18            causation?  Yes.
19                 And that's really what
20            Bradford Hill is about.  It's
21            about looking at different
22            criteria that you can use to infer
23            causation.
24                 And so part of my opinion

CONFIDENTIAL

Page 270

```
 1        development was using that
 2        criteria.  Part of it, as I laid
 3        out in the report, was also
 4        relying on the information from
 5        the expert reports.  And part of
 6        it is relying on my work with
 7        school districts for decades.
 8 BY ATTORNEY LEHMAN:
 9        Q.   Okay.  Is there any place in
10 your report where you specifically set
11 out each of the Bradford Hill criteria
12 and address them uniquely for each of
13 these individual harms that we've just
14 talked about, including mental health,
15 negative impacts on learning,
16 distractions and so on?
17             ATTORNEY YEATES:  Object to
18        the form.
19             THE WITNESS:  Doubtful,
20        because that would be very
21        atypical to do in this type of
22        report.  That would not be how I
23        typically would write a report, is
24        to go through every harm and then
```

CONFIDENTIAL

Page 271

```
 1          write out every single Bradford
 2          Hill criteria and think about it
 3          in -- I shouldn't say think about
 4          it -- but write about it in a
 5          report like this.
 6                  So that would be very
 7          atypical.
 8   BY ATTORNEY LEHMAN:
 9          Q.    And other than in the social
10   media litigation, how many other times
11   have you submitted an expert report?
12          A.    I haven't.
13          Q.    When you say -- you've
14   referred me back to your report and the
15   specific opinions about harms and you've
16   just outlined them for individual
17   opinions.
18                  In your report, you have, in
19   a number of locations, footnoted support
20   for a specific sentence or statement.
21                  In those footnotes, are you
22   citing all of the support that you rely
23   on for that individual statement?
24          A.    I'd have to go through
```

CONFIDENTIAL

Page 272

1  statement by statement.  I'm happy to

2  look at specific statements.

3            But I can tell you,

4  generally, that, as I stated in the

5  methodology in the report at the outset

6  of the report, that the opinions are

7  informed not just by the literature cited

8  but also by expert reports, which I did

9  cite, but also by my extensive experience

10  working with schools and families.

11        Q.    And appreciating that this

12  is all informed by your experience with

13  schools and families, as you wrote the

14  report and you included footnotes with

15  either references to other expert reports

16  and/or studies, were you including the

17  best support that you had for your

18  assertions in the footnotes?

19            ATTORNEY YEATES:  Object to

20        the form.

21            THE WITNESS:  I think the

22        term "the best" is a bit

23        subjective.  Because I would argue

24        in many cases some of -- some good

Page 273

1      information that you can get -- I
2      don't know that I'll restate the
3      term "the best," because, again, I
4      think that's subjective -- but
5      there's a lot of really valuable
6      ways that you can gather
7      information to draw conclusions,
8      part of which really is based on
9      working directly in the field with
10     families and schools.
11          So I think that's often some
12     of the most realtime information
13     that I can get, you know.  When
14     I'm hearing daily from teachers,
15     administrators, school board
16     professionals, school
17     administrators, superintendents
18     that social media is harming their
19     children, to me, that is a piece
20     of very good information.
21          So is that the best -- are
22     you asking if one citation is the
23     best information I can get?  I'd
24     have to say no.  And that the term

Page 274

1        "best" is pretty subjective.

2    BY ATTORNEY LEHMAN:

3        Q.    Okay.  Well, let's just --

4    let's take an example.

5            So in Paragraph 63 of your

6    report --

7        A.    The May 16th report?

8        Q.    The May 16th report.

9            Paragraph 63.  You make the

10   assertion, that quote, Many students

11   engage with social media late into the

12   night, disrupting their sleep and

13   negatively affecting their academic

14   performance.

15           And immediately following

16   that is Footnote 44.

17           Do you see that?

18       A.    I do.

19       Q.    Okay.  And Footnote 44 cites

20   to a study published in 2024 by Nafisah.

21           Do you see that?

22       A.    I see that.

23       Q.    And I apologize, how do you

24   say that, the lead author's last name?

Page 275

1          A.    Your guess would be as good
2    as mine.
3                Nafisah would be my guess.
4          Q.    Okay.  So, just, I want to
5    make sure, in circumstances like this,
6    you didn't -- you didn't hold back
7    citations to studies that supported your
8    point, you included them in the
9    footnotes, didn't you?
10               ATTORNEY YEATES:  Object to
11          the form.
12               THE WITNESS:  If I
13          understand your question, you're
14          asking did I include a footnote
15          that supported the sentence?
16    BY ATTORNEY LEHMAN:
17          Q.    Well, it's a little bit
18    different.
19          A.    Okay.  So restate it.
20          Q.    In the footnotes that you
21    include, you include the references that
22    support your point, don't you?
23          A.    So we're talking about one
24    specific sentence.  So here I include one

CONFIDENTIAL

Page 276

1    reference that supports my point.

2              This particular sentence,

3    since you've called it out, is also

4    completely aligned with my experience

5    from the key informant interviews for all

6    of the bellwether districts and from

7    speaking with school personnel and

8    district personnel for years about the

9    impact of social media.

10         Q.    Okay.  So I understand.

11              It would be impossible for

12   you to put in your 20 years of

13   experience, right?  Hard to -- hard to

14   footnote that.

15              But my question is this:

16   Does your report accurately reflect what

17   you believe is the scientific

18   peer-reviewed literature that supports

19   these opinions?

20              And, yes, I've called out

21   this one example with the sentence in

22   Paragraph 63 and Footnote 44.

23              And so my question is, have

24   you -- have you documented what you

Page 277

1    believe is the science that supports the

2    opinions that you have included in your

3    reports?

4              ATTORNEY YEATES:  Object to

5         the form.

6              THE WITNESS:  So I've

7         absolutely documented science that

8         I think speaks to the statement in

9         this particular sentence related

10        to social media disrupting

11        students because they're engaging

12        with it late into their night and

13        disrupting their sleep.

14              And I don't think it's hard

15        to document my level of

16        experience.  In fact, I start the

17        report out with that, with 25

18        years of experience.  And I'm very

19        clear that a number of the

20        conclusions really are also formed

21        based on that extensive

22        experience.

23    BY ATTORNEY LEHMAN:

24        Q.    Okay.  And so is it correct

CONFIDENTIAL

Page 278

1  that throughout your report you have
2  included footnotes with the peer-reviewed
3  scientific literature that supports your
4  statements, or is it that you have failed
5  to do that?
6            ATTORNEY YEATES:  Object.
7  BY ATTORNEY LEHMAN:
8       Q.    I just want to make sure.
9            I -- I feel like -- to me,
10 I'm asking a very clear question.  And I
11 feel like we're talking past each other.
12 So I just want to make sure.
13           Have you included footnotes
14 with the literature that you believe
15 supports your assertions in your report?
16      A.    I think I've already
17 answered that.
18           I've put citations in my
19 report that I do believe support the
20 statements that they are directly coming
21 after.
22      Q.    Okay.  So yes.  All right.
23 Understood.  All right.
24           Are you able to separate out

Page 279

1   what percentage of the harms that you

2   have outlined for us were caused by any

3   specific platform?

4        A.    So I would not be able to,

5   sitting here at this moment, be able to

6   say, for example, TikTok contributed

7   30 percent to sleep disruption and, you

8   know, Meta contributed 20 percent.

9             I'm making an -- you know,

10  coming up with a hypothetical example

11  here.

12            So, you know, the -- as I

13  mentioned earlier, the experts who looked

14  more specifically into the plat --

15  distinctions between platform use may

16  have, you know, gotten into that a little

17  bit more, in terms of the distinctions.

18            But I could not tell you nor

19  would it be typical for me to be able to

20  say, you know, that this platform

21  contributed this and this platform

22  contributed this.

23        Q.    Are you able to separate out

24  what percentage of the harms you have

CONFIDENTIAL

Page 280

1    outlined were caused by features of
2    social media versus the content on social
3    media?
4            ATTORNEY YEATES:  Object to
5        the form.
6            THE WITNESS:  Yeah, I mean,
7        you know, what I can tell you is I
8        think it's quite difficult, first
9        of all, to separate the two, to
10       separate content from features.
11           I think there's this kind of
12       false notion that, you know,
13       it's -- there's positive content
14       and negative content and the
15       negative content harms our young
16       people, our children, adolescents,
17       when in fact it's often just the
18       process of engagement of our young
19       people, right.  They are engaging
20       compulsively.
21           So I think about -- when I
22       think about kind of what's harming
23       schools, we see students who are
24       checking their phones, you know,

CONFIDENTIAL

Page 281

1          hundreds of times, right, during
2          the school day.
3              I think it was during the
4          school hours, you know, the Telzer
5          report looked at an average of
6          six -- I think -- I think, I'd
7          have to reference my report -- but
8          an average of 65 times in a day.
9              So you can imagine in a
10         school day that that's directly
11         impacting what's happening with,
12         you know, classroom instruction,
13         students' ability to learn, et
14         cetera.
15             So I would say that, you
16         know, the design features that
17         you're talking about, regardless
18         of the content, are absolutely
19         contributing to the disruptions
20         and the harm.
21             And I find it -- I would
22         find it very hard to divorce the
23         two.
24    BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 282

1      Q.    All right.  Can you name any

2  study that looked at features and

3  controlled for the content?

4      A.    I'd have to go back to all

5  the studies to look through them.

6      Q.    For what population are you

7  analyzing potential cause and effect in

8  your Bradford Hill analysis?

9      A.    I'm sorry, can you just say

10  that one more time.  I got distracted.

11      Q.    No problem.

12      A.    I just looked away.

13      Q.    For what population are you

14  analyzing the potential cause and effect

15  in your Bradford Hill analysis?

16            ATTORNEY YEATES:  Object to

17        the form.

18            THE WITNESS:  For what

19        population?  So my report is

20        specifically, you know, looking

21        at -- well, it looked at studies

22        that had different age ranges.  So

23        it's a bit of a difficult question

24        to answer in that sense.  Because

CONFIDENTIAL

Page 283

```
 1          the different studies I looked at
 2          had different age ranges.
 3                 The recommendations in the
 4          strategic plan are specific to K
 5          through 12, which is typically
 6          about age 5 to age 18.
 7  BY ATTORNEY LEHMAN:
 8          Q.    Do you agree that studies
 9  performed on social media use for, say,
10  college students in another country, such
11  as China or Pakistan, would not be
12  generalizable to high school or middle
13  school students in the United States?
14                 ATTORNEY YEATES:  Object to
15          the form.
16                 THE WITNESS:  So I would not
17          agree that you would not use that
18          information in drawing opinions.
19          It doesn't mean that you would use
20          that information from one study --
21          I wouldn't use any information
22          from one study from a sample in
23          the United States.
24                 But generally, you know, we
```

CONFIDENTIAL

Page 284

1          are -- we're -- we think about
2          studies that come from across the
3          globe.  Like, we don't just
4          restrict ourselves to thinking
5          about students in the U.S.
6               Do we think about students
7          in the U.S. in some of the
8          studies?  Certainly.  But would I
9          discard a study because it was
10         about, you know, students from
11         another country?  No.
12              And with respect to college
13         students versus high school
14         students, I think you can gather,
15         actually, some information about
16         what's happening with students at
17         the college level and consider
18         what the experience might be for
19         high school students as well.
20              Again, would that be the
21         only piece of data that's used?
22         Not necessarily.
23    BY ATTORNEY LEHMAN:
24         Q.    If an author wrote in their

CONFIDENTIAL

Page 285

1  paper that it's not generalizable to

2  students in the United States, would you

3  disagree with the author?

4       A.    Well, what I can say is that

5  very often, you know, it's standard

6  practice for authors to list out their

7  limitations.  And I would say it's pretty

8  common for authors to say this

9  information is not generalizable, because

10 they don't want to suggest that this is

11 going to apply to every single student

12 that was not within the study.

13          That does not mean, though,

14 that you can't actually use the

15 information.  If -- I mean, if a study

16 was only relevant to the students that

17 were in that study, there's no reason to

18 publish it, right.

19          The reason that things get

20 put into the peer-reviewed literature is

21 because it can have implications and

22 application to other populations.

23       Q.    Well, but the reason that

24 authors put limitations in their paper is

CONFIDENTIAL

Page 286

1   to ensure that the study is not used

2   inappropriately by other people, correct?

3         A.    I -- I don't know that I

4   would agree with that, actually.

5         Q.    Then is it your -- do you

6   believe that papers should contain

7   limitations at all?

8         A.    Do I believe that papers

9   should contain limitations?

10        Q.    Yes.

11        A.    Yes.  I think that's pretty

12  standard practice, for people to include

13  limitations as part of their, you know,

14  submitted peer-reviewed literature, yes.

15        Q.    And don't you agree that the

16  limitations are beneficial to allowing

17  other people who are reading the paper to

18  understand how that information can be

19  interpreted and applied?

20              ATTORNEY YEATES:  Object to

21        the form.

22              THE WITNESS:  It depends.  I

23        mean, you know, there are hundreds

24        of thousands of research articles

CONFIDENTIAL

Page 287

1        that are published, right.  And so
2        people put -- I can't speak to the
3        intention of why people are
4        putting limitations in.
5              Generally, as a scientist,
6        we might read the limitation
7        section and use that information
8        to kind of think through how we
9        might interpret the data.
10             But I have to say, many
11       authors don't list out the
12       limitations of their studies or
13       they might list some limitations
14       and not others.
15             So I wouldn't, you know,
16       rely exclusively on what an author
17       says about their own limitations.
18             I would also, as a
19       scientist, think about what do I
20       see the limitations of this study
21       being?
22   BY ATTORNEY LEHMAN:
23        Q.   When was the first -- when
24   was there first a statistically

Page 288

1    significant association between social

2    media and the harms outlined in your

3    report?

4                ATTORNEY YEATES:  Object to

5          the form.

6                THE WITNESS:  I don't know

7          that I can answer that.  I'm not

8          sure the specific date that an

9          association was determined.

10   BY ATTORNEY LEHMAN:

11         Q.    Is it correct that

12   correlational studies assess both

13   exposure, so in this case, social media,

14   and the outcome, in this case, the harms

15   in your report, at the same point in

16   time?

17         A.    It completely depends on the

18   study.  So it depends, is the answer.

19         Q.    What is your definition of a

20   correlational study?

21         A.    So a correlational study is

22   a study that looks at the association

23   between variables.  It could be two

24   variables.  It could be more than two

Page 289

1  variables.

2          Q.    Do you agree that

3  correlational studies cannot establish

4  temporality, namely which event came

5  first?

6          A.    No, not necessarily, if a

7  study actually has a temporal sequencing.

8              So, for example, if somebody

9  is studying the -- you know, exposure to

10 social media platforms, and then within

11 that study they look at its association

12 to sleep disruption, and they're looking

13 at use of social media during the day and

14 then sleep disruption that night, that

15 could be considered a correlational

16 study, but it has temporal sequencing in

17 it.  And so it can be used to consider

18 causal -- causal inference.

19         Q.    Okay.  So you would

20 disagree, then, with all of the

21 literature that states that correlational

22 studies cannot establish temporality; is

23 that correct?

24             ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 290

1          the form.
2                   THE WITNESS:  So you're
3          asking me to know every study,
4          then, that's ever been written
5          about that?
6     BY ATTORNEY LEHMAN:
7          Q.     No, not all.
8          A.     Maybe rephrase the question.
9     Okay.
10         Q.     Not at all.
11         A.     Because you said would I
12    disagree with all of the studies.
13         Q.     Would you disagree with the
14    textbooks and other statistical manuals
15    that state that correlational studies
16    cannot establish temporality?
17                 ATTORNEY YEATES:  Object to
18         the form.
19                 THE WITNESS:  I -- that's
20         not something that I would agree
21         with in general, that correlation
22         cannot include temporal
23         sequencing.
24    BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 291

1          Q.     You mentioned, when we were
2    talking before lunch, that correlational
3    studies were part of the material that
4    you reviewed.
5                So in addition to
6    correlational studies, what are the other
7    types of studies that you reviewed?
8          A.     Oh, well, I'd have to go
9    back and look at all the studies to know
10   the specific designs of each of the
11   different studies.
12         Q.     And did you -- in making
13   your analysis and reaching your
14   conclusions, how did you weight the
15   different types of studies that you
16   reviewed?
17         A.     Well, again, I weighted -- I
18   weighed the studies that I was looking at
19   along with other sources of information.
20               So I looked at studies.  And
21   usually we think about the scientific
22   rigor of studies as we're looking at
23   them.  The studies I included were
24   largely, for the most part -- I would

CONFIDENTIAL

Page 292

1    say, the studies specifically were from
2    peer-reviewed articles.  And so with
3    that, once they're in a peer-reviewed
4    journal, there's some level of scientific
5    rigor.
6              But, you know, in terms of
7    how I looked at the different articles, I
8    don't know that I, then, looked at them
9    relative to each other with respect to
10   strength of the science.
11             So I'm not sure if I
12   answered your question specifically,
13   but --
14        Q.    When you were performing
15   your analysis and reaching your
16   conclusions, how did you weight different
17   study designs?
18        A.    I don't know that I thought
19   about it in that sense, weighting the
20   different study designs.
21             I mean, I certainly
22   considered the study designs as I was
23   reading through the articles.  That's
24   something I would do as a scientist.

CONFIDENTIAL

Page 293

1          But, you know, you weight --
2     you weigh a lot of things as you're
3     drawing opinions, not just kind of the
4     study design.  That might be a piece of
5     it.
6          Q.    What is the relative risk of
7     an adolescent who uses social media for
8     one hour a day to experience mental
9     health impacts compared to a student who
10    does not use social media?
11               ATTORNEY YEATES:  Object to
12          the form.
13               THE WITNESS:  I don't know.
14          That's not my area of study.
15    BY ATTORNEY LEHMAN:
16          Q.    Okay.  What is the magnitude
17    of the association between student social
18    media use and mental health harms?
19          A.    Can you repeat the question?
20    I'm not sure that I know what you mean by
21    that.
22          Q.    What is the magnitude of the
23    association -- I'm speaking of
24    quantification of the association --

CONFIDENTIAL

Page 294

1   between student social media use and

2   mental health harms?

3           A.    I don't think I can answer

4   that specifically.

5                 Different studies have

6   determined different magnitudes of

7   association.  So I don't know that there

8   is an agreed-upon specific magnitude, a

9   number, if you're looking for a specific

10  number.  I don't know that I can say

11  there is one number.

12                There is consensus that

13  there is harm.  And, again, my role was

14  to think about the harm that's being

15  caused to children and adolescents.  And

16  as a public health issue, then, what

17  should be put in place, what could be put

18  in place to prevent and mitigate that

19  harm.

20          Q.    So I want to follow up on

21  something you just said.

22                You said, quote/unquote,

23  there is consensus that there is harm.

24                So are you telling me that

CONFIDENTIAL

Page 295

1  you did not review any peer-reviewed

2  studies that found that there was no

3  causation between social media and mental

4  health harms?

5          ATTORNEY YEATES:  Object to

6      the form.

7          THE WITNESS:  So I would not

8      say that that's accurate.  I

9      reviewed literature that included

10     information about association, as

11     I've already said.

12         And from the information,

13     the articles that I reviewed, it

14     certainly pointed to the

15     conclusions that I came to in the

16     opinions, which had to do with

17     causation.

18 BY ATTORNEY LEHMAN:

19     Q.   Okay.  Did you analyze dose

20 response?

21     A.   If I recall correctly --

22 again, I'd have to look to the specific

23 studies -- but I know that there were

24 certain studies that do look at dose

CONFIDENTIAL

Page 296

1    response in terms of kind of the -- the
2    time spent and the relative impact.
3         Q.    Can you identify any of the
4    studies that you rely on in your personal
5    analysis of dose response?
6         A.    Not offhand.  Again, there's
7    so many articles that it would be
8    something I'd have to go back and look at
9    them all again.
10        Q.    In a school where students
11   do not use social media, would you still
12   recommend the same comprehensive plan
13   that you outlined in your report?
14        A.    I have yet to be in a school
15   where students are not using social
16   media, so that would be really hard to
17   imagine.
18             It's a hypothetical that's,
19   frankly, almost impossible to imagine at
20   this point.
21        Q.    Okay.  But I'm asking, if
22   you -- if you were asked to consult --
23   you're hired as a consultant for a school
24   and they say -- you know, you get there

CONFIDENTIAL

Page 297

1    on day one, they're informing you about

2    their student population, what's going

3    on, and they say, our students do not use

4    social media.

5              Would you still want to

6    implement the same plan?

7              ATTORNEY YEATES:  Object to

8         the form.

9              THE WITNESS:  It's a

10        hypothetical that just doesn't

11        exist.

12             If they said that, I would

13        say, then you don't have an

14        understanding, probably, of your

15        students.

16             I mean, because, you know,

17        again, the number of schools I've

18        worked with over the years, the

19        number of districts, it certainly

20        would be completely out of step

21        with any school that I've

22        encountered.

23             So it's -- it's -- you

24        know -- and I wouldn't even know

Page 298

1          what is meant by that, they don't
2          use social media during the day,
3          which I've also not seen, they
4          don't use social media at night.
5              It doesn't exist.  I mean,
6          that would be a world in which the
7          defendants' platforms didn't
8          exist, frankly.
9              And so I just -- I don't
10         know how to answer that question.
11   BY ATTORNEY LEHMAN:
12         Q.   Do you attempt to quantify
13   how much students in a school or school
14   district are using social media before
15   you develop a plan?
16         A.   Are you talking about this
17   specific plan?
18         Q.   No.  I'm talking about in
19   your consulting practice, outside of
20   litigation, when you -- when you're going
21   to help a school district and you've put
22   together a plan -- have you done that
23   situation, where outside of this
24   litigation, you go and develop a

CONFIDENTIAL

Page 299

1   comprehensive multiyear plan for a school

2   district?

3          A.    So I worked with many school

4   districts, and I've developed plans for

5   them.  I've worked with them on

6   developing their own continuous quality

7   improvement plan.

8                Yes.  So the answer is yes.

9                I think you asked a

10  different question before, but I've

11  forgotten it already.

12         Q.    My question is, when you do

13  that, when you go to a school -- this is

14  outside of litigation and you're going to

15  help them develop a plan -- do you

16  attempt to quantify how much their

17  students are using social media?

18         A.    What I've done before in the

19  context of many of those consultations is

20  talked with them about their perspective

21  on the impact of social media on young

22  people, which, to me, would be important

23  to understand versus necessarily the

24  number of minutes that each student -- I

CONFIDENTIAL

Page 300

1   mean, frankly, I know from working with

2   school systems that they likely don't

3   have the data infrastructure yet to

4   capture the data that you're even asking

5   me about.

6            So, instead, what I would

7   ask is -- what I would typically ask,

8   what do you imagine the harm -- not what

9   do you imagine -- what do you experience

10  the harms to be of the students in your

11  schools?

12           Or the "impact" is usually

13  the term I would use.  So that they could

14  give their perspective on their

15  perception and their experience of the

16  impact of social media.

17       Q.    A student who does not use

18  social media -- let me start again.

19           Do you agree that a student

20  who does not use social media should

21  still have access to a school counselor?

22       A.    Yes.  I would agree that a

23  student who does not use social media

24  should have access to a school counselor.

Page 301

1          Q.    Do you agree that a student
2    who does not use social media should
3    still receive digital literacy education?
4          A.    Yes.  I would argue that
5    students should receive digital literacy
6    education.
7          Q.    Do you agree that a student
8    who does not use social media should
9    still receive mental health literacy
10   education?
11         A.    Yes.  I would argue that
12   they should.  The content of the mental
13   health -- mental health literacy may, you
14   know, be impacted by their behaviors,
15   including whether they're engaging with
16   social media.
17              But, yes, I think that
18   student should receive social media --
19   excuse me, mental health literacy.
20         Q.    Do you agree that a student
21   who does not use social media should
22   still receive training and education
23   about life skills?
24         A.    I do.  And if we're talking

CONFIDENTIAL

Page 302

1   about life skills specific to social

2   media -- I mean, again, there's so few

3   students at this point who are not

4   exposed to social media, or at least the

5   harms associated with social media, that

6   it would be, I think, irresponsible to

7   suggest that people not get educated

8   about social media when there is

9   certainly a likelihood that they will be

10  exposed and that they will be, then,

11  exposed to the risks.

12          Q.    Do you agree that a student

13  who does not use social media should

14  still receive education about screen time

15  management for uses of digital devices

16  other than social media?

17          A.    Sure.  I mean, there's no

18  reason that student shouldn't receive

19  education about screen time management.

20              And they should also receive

21  information about screen time management

22  that is specific to social media, because

23  we know from the data that most screen

24  time for children and adolescents is

CONFIDENTIAL

Page 303

1  social media.

2        Q.    When you use the term

3  "cyberbullying," what is your definition

4  of cyberbullying?

5        A.    So in the context of this

6  report, when I'm speaking about

7  cyberbullying, I'm talking about bullying

8  that is occurring in the context of the

9  defendants' platforms.

10        Q.    Do you agree that

11  cyberbullying can occur via text message?

12        A.    I think that

13  cyberbullying -- that's interesting.  I

14  mean, I wouldn't have used that term

15  necessarily to describe bullying behavior

16  that happens over texting.

17              And certainly in the context

18  of this report when I spoke about

19  cyberbullying, it was really with respect

20  to what's happening on the defendants'

21  platforms.

22        Q.    Do you agree that

23  cyberbullying -- let me ask it this way:

24  Do you agree that bullying can occur via

CONFIDENTIAL

Page 304

1    text message?
2           A.    I agree that bullying could
3    occur via text message.
4           Q.    Do you agree that bullying
5    could occur via e-mail?
6           A.    I -- so bullying could occur
7    in a variety of different forms,
8    including on e-mail, yes.
9           Q.    Do you agree that bullying
10   could occur via other digital
11   communications where there's a messaging
12   component, whether that's a gaming
13   platform or some other social application
14   that's not one of the defendants' social
15   media platforms?
16                ATTORNEY YEATES:  Object to
17           the form.
18                THE WITNESS:  So bullying
19           could occur on a different
20           mechanism.  I think you mentioned
21           gaming as one example.  It could
22           occur on that platform.
23   BY ATTORNEY LEHMAN:
24           Q.    Do you agree that a student

CONFIDENTIAL

Page 305

1    who does not use social media should

2    still receive anti-bullying, including

3    cyberbullying, support?

4         A.    So when you say

5    anti-cyberbullying support, what I would

6    say is that I think it's incumbent upon

7    schools, given, you know, the exposure to

8    cyberbullying, that there is -- when I

9    say "incumbent upon schools," it --

10   schools are a good place for this to

11   happen, because we know that schools are

12   where kids can get educated about things.

13            So do I think that students

14   who are not using social media should be

15   educated about cyberbullying that occurs

16   on social media?  Yes.  Because they are

17   at risk for engaging with social media.

18            And they also -- whether

19   they're a bystander or whether they're a

20   peer of somebody who is getting bullied,

21   let's say on social media platforms, it's

22   pretty important for them to understand

23   that and what that's like.

24            So I do think that it's

CONFIDENTIAL

Page 306

1    important, yeah.

2            Q.    Do you agree that a student

3    who does not use social media should

4    still experience a positive school

5    culture?

6            ATTORNEY YEATES:  Object to

7            the form.

8            THE WITNESS:  I would hope

9            that all students would experience

10           a positive school culture.

11   BY ATTORNEY LEHMAN:

12           Q.    Do you agree that a student

13   who does not use social media should

14   still receive targeted mental health

15   support if needed?

16           A.    Yes.  I would agree that

17   students who need social media -- excuse

18   me, who need mental health services

19   should get it -- should get them.

20           Q.    Do you agree that a student

21   who does not use social media should

22   still receive a referral to

23   community-based wellness programs, if

24   needed?

Page 307

1          A.      Students who need mental

2     health services should receive the

3     supports that they need, whether it's a

4     referral to a community provider or an

5     on-site provider, yes.

6          Q.      Do you agree that technology

7     has changed over the last 15 years?

8          A.      Certainly technology has

9     changed over the last 15 years.

10          Q.      In the plan that you outline

11     in your report, do you address the

12     development and spread of artificial

13     intelligence?

14              ATTORNEY YEATES:  Object to

15          the form.

16              THE WITNESS:  That was

17          outside of the scope of my report.

18     BY ATTORNEY LEHMAN:

19          Q.      Do you agree that social

20     media platforms have changed in the last

21     five years?

22          A.      Again, I don't consider

23     myself expert in all of the features of

24     the defendants' platforms, for example,

CONFIDENTIAL

Page 308

1  but I would imagine that they have

2  increased ways of engaging students and

3  that there are ways that it's likely

4  changed over time.

5          Q.    Do you know whether social

6  media platforms have been created or

7  disappeared over the last five years?

8          A.    I can't speak to that

9  specifically, no.  I imagine possibly

10  yes.

11          Q.    Have you studied, in any

12  way, the changes in the last 15 years on

13  any social media platform?

14          A.    Have I studied specifically

15  the changes on the social media

16  platforms?

17          Q.    Yes.

18          A.    No, not -- not

19  systematically, I haven't studied the

20  changes on the social media platforms.

21          Q.    Have you looked at any data

22  about how content changes on social media

23  platforms?

24                  ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 309

```
 1        the form.
 2             THE WITNESS:  I don't even
 3        know that I understand what you're
 4        asking with that question.
 5   BY ATTORNEY LEHMAN:
 6        Q.    Sure.  Sure.
 7             Are you aware, based on your
 8   use of social media and conversations
 9   that you've had, that the form of content
10   on social media platforms is constantly
11   changing?
12             ATTORNEY YEATES:  Object to
13        the form.
14             THE WITNESS:  I don't know.
15        I'm not sure what you mean by the
16        "form of content."
17   BY ATTORNEY LEHMAN:
18        Q.    Well, are you aware that the
19   content that is popular is constantly
20   changing?
21        A.    I mean, would it surprise me
22   that content might change over time?  No.
23        Q.    Does your -- does the
24   program that you outline in your report
```

Page 310

1  have any mechanism to keep up with

2  changes in social media, whether it's

3  features or content or even broad

4  platforms?

5          ATTORNEY YEATES:  Object to

6      the form.

7          THE WITNESS:  So first of

8      all, it's -- you mention a

9      program.  So what I've recommended

10     is a comprehensive set of

11     recommendations.  And it's laid

12     out over a number of years to

13     address changes -- and I speak

14     specifically to this in my

15     report -- to address changes that

16     might occur, but also to really

17     address the harms that have

18     already occurred for young people

19     and that may continue to occur

20     with exposure to social media.

21  BY ATTORNEY LEHMAN:

22      Q.    Now, you state in your

23  report that the 15-year timeline mirrors

24  other successful public health responses

Page 311

1   to youth risk behaviors.  And you used

2   tobacco as an example.

3                  Is there any other

4   peer-reviewed article that you would cite

5   supporting the analogy that you are

6   making between addressing social media

7   and tobacco?

8         A.    So can you point to where it

9   is in my report so I can just look to the

10  citation that I did use?

11                 Because you're asking me

12  about other citations, so I want to make

13  sure that I --

14        Q.    Sure.  It's Paragraph 107.

15        A.    Right.  So here I cited the

16  Office of the Surgeon General report,

17  which, to my understanding, is really the

18  most kind of comprehensive look at the

19  study.  So I didn't see a need to cite a

20  different reference here.

21                 Are there other reports and

22  studies on this?  Perhaps.  That was not

23  necessarily what I needed to cite to

24  demonstrate what I was indicating in this

Page 312

1    particular paragraph.

2         Q.    Okay.  Well, the citation

3    here is to the 2012 Surgeon General's

4    report on smoking and health, correct?

5         A.    It's to the 2012 public

6    health service, Office of the Surgeon

7    General, a National Center for Chronic

8    Disease Prevention and Health Promotion,

9    Preventing Tobacco Use Among Youth and

10   Young Adults:  A Report of the Surgeon

11   General.

12        Q.    And this 2012 report of the

13   Surgeon General, it doesn't outline a

14   15-year plan with the same types of

15   components that your plan does, correct?

16        A.    So there are actually some

17   overlapping components.

18             I mean, first of all, you

19   wouldn't expect it to be identical,

20   right.  We're talking about two different

21   things.  We're talking about smoking

22   cessation and the harms caused by tobacco

23   and we're talking about social media.

24             So it's not identical.  But

CONFIDENTIAL

Page 313

1  there are certainly overlapping

2  components.

3          So health education, as I've

4  outlined here; capacity building in

5  schools; and the integration of behavior

6  change supports through students'

7  developmental years.

8          So there are certainly

9  overlapping components, as there would be

10  with public health kind of interventions

11  around this type of harm caused to young

12  people.

13      Q.   What is your understanding

14  of the school-based prevention of

15  efforts -- hold on.  Let me start again.

16          What is your understanding

17  of the school-based prevention efforts

18  related to tobacco?

19      A.   Yeah, so I don't come here

20  pretending to be an expert on tobacco

21  prevention.

22          But I do know and have

23  reviewed the particular public health

24  efforts that showed this massive decrease

CONFIDENTIAL

Page 314

1    in harm -- or in use, in this case, of

2    73 percent over this time period from

3    1997 to 2015.

4              As far as the school-based

5    efforts, I'd have to go deeper at this

6    point or refresh into the report to

7    really understand all of the specific

8    school-based components.

9         Q.   Okay.  Well, certainly there

10   is a difference between social media and

11   tobacco in the sense that social media

12   use is behavior and tobacco is a

13   substance that is ingested, correct?

14              ATTORNEY YEATES:  Object to

15         the form.

16              THE WITNESS:  I think both

17         tobacco and social media involve

18         behaviors.  And, I mean, you're

19         ingesting -- you're ingesting --

20         well, I won't -- I won't expand

21         upon that.

22              They both involve behavior.

23   BY ATTORNEY LEHMAN:

24         Q.   Okay.  You understand that

CONFIDENTIAL

Page 315

1   the DSM has recognized tobacco use

2   disorder as a substance addiction not as

3   a behavioral addiction, correct?

4          A.    So I think that's actually

5   an artificial distinction, that we

6   wouldn't describe it that way in the

7   mental health field.

8                Because substance use is

9   behavioral, right.  In fact, we've

10  changed the term, often in the context of

11  talking about mental health, to

12  behavioral health specifically to

13  describe substance use disorder.

14               So the term "behavioral

15  health disorders" very commonly is used

16  as an umbrella term to talk about

17  substance use disorders.

18         Q.    So would you disagree with

19  the DSM characterization of tobacco use

20  disorder as a substance use disorder?

21               ATTORNEY YEATES:  Object to

22         the form.

23               THE WITNESS:  It's

24         classified within the DSM as a

Page 316

1           substance use disorder, which is a
2           behavioral health disorder.
3    BY ATTORNEY LEHMAN:
4           Q.    What behavioral addictions
5    does the DSM recognize?
6           A.    I'd have to have a copy of
7    the DSM to make sure that I'm giving a
8    list of those.
9           Q.    What evidence do you have,
10   other than the 2012 report from the
11   Surgeon General that you cite in Footnote
12   117 of your report, that school-based
13   prevention efforts actually caused youth
14   tobacco use to decline?
15          A.    So, again, this was part of
16   a -- as I understand it, again, not being
17   a tobacco expert, but as I understand it,
18   schools were a part of the public health
19   effort to decrease this, including
20   building capacity in schools and behavior
21   change, intervention programming at
22   schools.
23              Do I know all the details of
24   it?  No.  Again, that's not my area.

CONFIDENTIAL

Page 317

1   Tobacco prevention is not my area.  So

2   I'd have to go back and look at all the

3   specific components.

4          Q.    And do you have an

5   understanding about when the public

6   health effort to decrease youth tobacco

7   use began?

8          A.    Do I have an understanding

9   of when it began --

10         Q.    Yes.

11         A.    -- in general?

12              I suppose it depends on what

13   you mean by when did the public health

14   effort begin.  This particular report

15   talks about the change from '97 to 2015.

16         Q.    And do you have any

17   information about what efforts were

18   underway to curb youth tobacco use prior

19   to 1997?

20         A.    I don't have that at my

21   disposal, no.

22         Q.    In your rebuttal report, you

23   referenced the anti-obesity initiatives

24   in Opinion 5.

CONFIDENTIAL

Page 318

1          What anti-obesity
2    initiatives are you referencing?
3          A.    Let me just turn to my
4    rebuttal report.
5               Okay.  So here I don't know
6    that I'm referring to -- and I haven't
7    cited a specific obesity initiative or
8    anti-obesity initiative, but I'm talking
9    about the public health effort to reduce
10   childhood obesity.
11         Q.    And is it your opinion that
12   that has been successful?
13         A.    So, again, I don't come as
14   an obesity expert.  So I'm not offering
15   an opinion on that.
16         Q.    Okay.  And then what is --
17   what are the parts of the plan that you
18   are proposing that are also part of the
19   anti-obesity initiative that you
20   reference in Opinion 5?
21              ATTORNEY YEATES:  Object to
22         the form.
23              THE WITNESS:  What are the
24         parts of the plan that I developed

Page 319

```
 1          that are part of the anti-obesity
 2          initiative?
 3   BY ATTORNEY LEHMAN:
 4          Q.    Yes.
 5                Is there overlap between the
 6   two plans?
 7          A.    So to go back to Opinion 5,
 8   I was referencing anti-obesity efforts to
 9   describe that, often, pervasive public
10   health issues take long-term investment,
11   stage implementation and ongoing
12   evaluation.
13                So to the question of what
14   parts of my program are related to
15   anti-obesity, my strategic plan is very
16   specific to the harms of social media.
17          Q.    How did you select the
18   15-year duration of your proposed plan?
19          A.    Yeah.  I mean, you know, the
20   15 years, I would say, is really grounded
21   in kind of three different pillars of,
22   you know, input.  And I go into detail on
23   that in my report.  But I can describe
24   those.
```

CONFIDENTIAL

Page 320

1          So the first is really, you

2    know, basing it on other public health

3    frameworks.  So we've talked a little bit

4    about that.  We've talked about the

5    tobacco exemplar of a large public health

6    effort that was harming our youth that

7    took a multi-component effort to actually

8    cause deep and sustained change in young

9    people's behavior.

10          So I look to those public

11   health examples as one part of really

12   thinking through, you know, what would

13   best practice be in the length of this

14   type of plan.

15          And we are talking about a

16   highly complex issue, social media

17   impact, with multiple harms in a system,

18   education, that is pretty complex.  So I

19   thought the -- you know, the corollary

20   there is important.

21          The second piece, you know,

22   is I thought about -- we're talking about

23   K-through-12 education, where we know

24   that, first of all, most young people who

Page 321

1   receive mental health services receive
2   those in schools. And it offers the
3   opportunity for multi-tiered systems of
4   support, as I go into pretty great detail
5   in my report.
6           So that often happens in a
7   K-through-12 setting, right, young people
8   spend about 15,000 hours, between
9   kindergarten and 12th grade, in schools.
10  And so it does offer an opportunity for
11  this type of public health intervention.
12          And so the second pillar was
13  really around that K-through-12 cohort
14  that in order to really be able to look
15  at a cohort over time from kindergarten,
16  age 5, up until 18, that you would want
17  to have a multi-year -- in this case, I
18  propose 15 years because it covers that
19  full cohort with enough time, as I laid
20  out in the plan, a little bit of planning
21  and hiring time, and a bit of time for
22  sustaining the implementation.
23          So that cohort, the
24  K-through-12 cohort is kind of that

CONFIDENTIAL

Page 322

1  second pillar, right.

2           So we've talked about the

3  public health frameworks and the K

4  through 12 pillar -- cohort, rather.

5           And the third piece is

6  really, as I detailed in here, I looked

7  to the implementation science literature.

8  So, in particular, I know I referenced

9  the National Implementation Research

10  Network, amongst others, who really have

11  looked at, what does it look like to

12  implement programming?

13           Now, in that report, they do

14  look at what does it look like to

15  implement a single program in a single

16  setting.  What I'm talking about is a

17  multi-component plan.  So I looked within

18  the implementation literature to what

19  does it take to actually implement

20  multi-component interventions in a

21  complex system like education.

22           And that very clearly lays

23  out that it's often multiple years.  In

24  fact, they cite over ten years in that

CONFIDENTIAL

Page 323

1    particular monograph.
2                So those three things
3    combined really informed the decision for
4    laying out a 15-year plan that I think is
5    not only reasonable in this case but
6    really necessary to address the harm over
7    time, to be able to study it, evaluate
8    it, and adjust it as needed over time.
9    And I talk about that in the evaluation
10   component.
11               And also just to be able to
12   implement something with fidelity over
13   time, you need the time to do that.  And
14   that's what is really -- when I talk
15   about a third pillar, you know, the
16   NIRNians, the National Implementation
17   Research Network folks, who really are
18   considered kind of the -- they're --
19   they're leading in this area of
20   implementation science, that's what
21   they've suggested.
22               So those were the factors.
23        Q.    Just to be clear, the
24   NIRNians, they didn't actually suggest 15

Page 324

1    years, do they?

2            A.    So I'd have to go back to

3    the report that I cited.

4                 But what I can tell you is

5    that they very specifically talk about

6    different kind of types of interventions

7    and different lengths of years depending

8    on that.

9                 And I think I've -- I mean,

10   I'm happy to go back to the report to

11   pull out specific things that I used to

12   draw my conclusions from their

13   information.

14                So they do talk about, I

15   believe -- but, again, it would probably

16   be more helpful if I just looked at the

17   report.  So I can do that.

18           Q.    You mentioned things in sort

19   of Bucket 1, in response to my question,

20   other public health frameworks.

21                Did you look at other public

22   health frameworks other than tobacco and

23   anti-obesity?

24           A.    So I think in my report I

Page 325

1  probably also referenced trauma-informed

2  school efforts.  And certainly in my own

3  experience when I've looked at -- you

4  know, so I was referencing my own

5  experience in the field of working in

6  implementation science in schools for

7  years.

8              And so, for example, one of

9  the -- one of the efforts and frameworks

10  that comes to mind for me is positive

11  behavior interventions and supports or

12  multi-tiered systems of support.

13              And what we do see in the

14  field is that it can take a very long

15  time, in this case, over a decade, to

16  actually implement those things with

17  fidelity.

18       Q.    What is the longest program

19  that one of your consultant clients has

20  ever implemented at your recommendation?

21       A.    When you say "the longest

22  program," I'm not entirely sure what you

23  mean by that.

24       Q.    Sure.  What was the

CONFIDENTIAL

Page 326

1  duration -- the longest duration of a

2  plan that one of your consulting clients

3  implemented at your recommendation?

4          A.    Well, so when you think

5  about the length of time that I've been a

6  part of the National Center, we've worked

7  with some of our school districts --

8  again, I've been there for 25 years -- I

9  would say many of them are still doing

10 continuous quality improvement on

11 multi-tiered systems of support, for

12 example.  So that would be roughly two

13 decades that they are implementing that.

14          I mean, it often is a

15 continuous quality-improvement effort.

16          Q.    Well -- and my question is

17 different.

18          When you started -- when

19 those school districts started

20 implementing that multi-tiered system,

21 did they say at the outset, I intend to

22 implement this for 20 or 25 years, or did

23 they say, we intend to implement a

24 multi-tiered system and they've been

CONFIDENTIAL

Page 327

1  changing it ever since they implemented

2  it?

3              ATTORNEY YEATES:  Object to

4        the form.

5              THE WITNESS:  Yeah, I

6        don't -- I don't know what a

7        district would have said.  I mean,

8        we're talking about multiple

9        districts, first of all.

10             But would they have said, I

11       intend to implement and then stop

12       this in five years, for example?

13       No, not necessarily.

14  BY ATTORNEY LEHMAN:

15       Q.    What is the average tenure

16  of school superintendents across the

17  country?

18       A.    I don't know the actual

19  answer to the number of years.  I know

20  that it's highly variable, having worked

21  with a lot of school districts.  Some

22  stay for shorter terms, some stay for

23  longer terms.

24       Q.    Do you know what the average

CONFIDENTIAL

Page 328

1    turnover is amongst school
2    superintendents in a given year?
3          A.    Do I know the exact number?
4    Not off the top of my head.
5          Q.    Can you approximate?
6          A.    No.  I wouldn't feel
7    comfortable approximating.  It's not
8    necessary.
9          Q.    Do you agree that
10   implementing a multi-tiered program, such
11   as the program that you have suggested,
12   that it requires consistency and
13   sustained implementation?
14         A.    So what I would suggest is
15   that it requires -- consistency is an
16   interesting word, because what I would
17   say is that it requires continuous
18   quality improvement.  And I speak to that
19   in the report.
20               And the second term you used
21   was sustainment -- or sustainability,
22   does it require --
23         Q.    I said sustained
24   implementation.

CONFIDENTIAL

Page 329

1          A.    Sustained implementation.
2                It's ideal if there is
3    sustained implementation.
4          Q.    Do you agree that
5    superintendents often bring their own
6    agendas when they are hired by a school
7    district?
8                ATTORNEY YEATES:  Object to
9          the form.
10               THE WITNESS:  So I think
11          superintendents, you know, are
12          very different in every district
13          I've worked in.
14               So many superintendents
15          build on what's already there and
16          they, you know, leverage the
17          programming that already exists.
18               But part of the reason, I
19          mean, I have to say, that you want
20          to implement a longer-term plan is
21          so that you're not kind of driven
22          by the whims of somebody who might
23          come in and have a specific
24          agenda.

CONFIDENTIAL

Page 330

1              And usually when there is
2         kind of a longer-term
3         comprehensive plan that is well
4         resourced, a superintendent is not
5         going to just shut that down,
6         typically, overnight.
7    BY ATTORNEY LEHMAN:
8         Q.    Well, I mean, isn't the
9    reason that new superintendents are
10   hired, in many circumstances, is so that
11   the school district can change and
12   evolve?
13        A.    There are so many reasons
14   that new superintendents are hired.  I
15   think that calls for some speculation
16   that, you know -- I think oftentimes
17   superintendents are hired, you know, for
18   various reasons.  I'll just say that.
19        Q.    Okay.  In your -- within
20   your consulting clients, have you seen
21   school districts who stop following a
22   program when a new superintendent is
23   hired?
24        A.    I don't know if I can think

CONFIDENTIAL

Page 331

1   of a specific example of that.  I mean,
2   what I can say is that, based on my
3   experience, most programming that is in
4   place when a new superintendent is -- you
5   know, comes into a district remains in
6   place.
7                    I mean, there's not
8   typically an entire upheaval of all
9   programming when a new superintendent
10  comes in.  That's not been my experience.
11          Q.    Do you know how long the
12  average tenure is of school board
13  members?
14          A.    Again, it does vary across
15  districts.  So if you're talking about a
16  national average and a specific number, I
17  don't have that off the top of my head.
18          Q.    In general, do you agree
19  that schools face -- face persistent
20  recruitment challenges?
21                    ATTORNEY YEATES:  Object to
22          the form.
23                    THE WITNESS:  Yeah, that's a
24          broad question.  So can you be

Page 332

1        more specific?
2                Are you -- recruitment of --
3    BY ATTORNEY LEHMAN:
4        Q.    Sure.
5                Let's -- let's start with in
6    general.  Do you agree that schools face
7    challenges hiring qualified, certified
8    teachers?
9        A.    Again, I'm not a hiring
10   expert.  So I don't know that I can
11   answer that question in good faith.
12               I know that, you know,
13   there's attrition in the field, just like
14   any other field.  And that they put
15   hiring practices in place to hire
16   educators.
17       Q.    Have you ever looked at --
18   let me start again.
19               Have you ever studied or
20   attempted to quantify the impact of
21   teacher turnover on the implementation of
22   educational programs?
23       A.    Have I ever looked at it or
24   studied it?

CONFIDENTIAL

Page 333

1          Q.    Yes.

2          A.    So I've certainly in my

3   editorial role at the School of Mental

4   Health Journal, and in reading hundreds

5   if not thousands of school mental health

6   articles, I'm sure that I have looked at

7   implementation science that speaks to the

8   role of educator turnover on, you know,

9   the fidelity with which interventions are

10  implemented.

11         Q.    And in your review of that

12  literature, have you seen that urban

13  teachers are particularly at risk for

14  burnout?

15         A.    So I recall -- again, I'm

16  not going to be able to cite a specific

17  study right now because, you know, we're

18  talking about a general area.

19              But I do recall reviewing

20  information that speaks to and maybe even

21  written about and spoken about burnout.

22  You know, I've worked in Baltimore city

23  schools, for example, for 30 years.

24              So I'm familiar with an

CONFIDENTIAL

Page 334

1   urban context, as well as other school

2   district contexts.  And I know that there

3   is some literature looking specifically

4   at burnout of educators in urban school

5   settings.

6           Q.    All right.

7                 ATTORNEY LEHMAN:  I'm going

8           to hand you what -- this is going

9           to be Tab 47.  We've marked it as

10          Exhibit Number 27.

11                         -   -   -

12                 (Whereupon, Exhibit

13          Hoover-27, No Bates, Burnout in

14          Urban Teachers: The Predictive

15          Role of Supports and Situational

16          Responses, was marked for

17          identification.)

18                         -   -   -

19  BY ATTORNEY LEHMAN:

20          Q.    All right.  Can you confirm

21  that this is an article that you co-wrote

22  entitled, Burnout in Urban Teachers:  The

23  Predictive Role of Supports and

24  Situational Responses?

CONFIDENTIAL

Page 335

1          A.    I can.  See, I was right.  I
2   thought I may have written about
3   something in this area.
4          Q.    And this was -- it looks
5   like it was accepted for publication on
6   April 28th, 2021.
7          A.    Correct.
8          Q.    All right.  And I want to
9   turn to the second page, Page 817.
10               And looking at the paragraph
11  directly above the header for 1.1.  Do
12  you see that it says, Urban teachers are
13  particularly at risk for burnout and
14  leaving the profession early, with
15  certain urban districts exhibiting yearly
16  turnover rates which exceed 40 percent.
17               Did I read that correctly?
18         A.    Yes.  I see that here.
19         Q.    All right.  And so was it
20  your understanding, at the time you
21  published this article in 2021, that some
22  urban districts were experiencing yearly
23  turnover rates in excess of 40 percent?
24         A.    So it looks like I'm citing

Page 336

1    a specific study, Barnes, et al, 2007.

2    So I would have to go back to that study

3    to understand.

4              Because I use a bit of a

5    general term there, with certain urban

6    districts.  So that could be, you know,

7    .01 percent of urban districts, it could

8    be more than that.  I just don't know,

9    so.

10         Q.    Well, would it -- it would

11   have been your practice, when you were

12   drafting and editing this article, that

13   if that information was no longer

14   accurate, you would not have included it

15   in your article, correct?

16         A.    So I wouldn't have used it

17   if it weren't accurate.

18              And what I'm saying is that

19   when I use the term "certain urban

20   districts exhibiting yearly turnover

21   rates," it's certainly not implying that

22   that's the average or that that's even

23   common.

24         Q.    What is the average turnover

Page 337

1  rate in urban districts?

2          A.    I don't know that offhand.

3          Q.    Okay.  And do you agree that

4  there is a tight labor market for

5  specialized professionals who work in the

6  educational system?

7          A.    You know, I don't know.

8  Again, I would come back to that I'm --

9  as someone who is not a hiring

10  specialist, I don't know that I know --

11  the term you just used was "a tight labor

12  market for specialized professionals."  I

13  don't -- I don't know the answer to that.

14          Q.    Does your plan include any

15  information about how the districts are

16  to go about retaining the numbers of

17  individuals that you propose that they

18  hire?

19          A.    So what I would say is that

20  the plan, first of all, accounts for some

21  attrition.  And -- and I speak about --

22  I'm trying to think, in my -- I have to

23  go reference my rebuttal reports.  So I'm

24  happy to do that, if that's useful.

CONFIDENTIAL

Page 338

1          But I do -- I do speak to

2   this topic, about recruiting and

3   retaining staff.

4          So I'm happy to look to that

5   if that would be helpful.

6       Q.    Well, I guess I'm not -- I'm

7   not asking to just repeat the rebuttal

8   report.

9       A.    Okay.

10       Q.    So let's look at something

11   else that you published in.

12          ATTORNEY LEHMAN:  Let's look

13       at Tab 48.

14          THE WITNESS:  Okay.

15          ATTORNEY LEHMAN:  And we'll

16       mark this as Exhibit Number 28.

17                 -   -   -

18          (Whereupon, Exhibit

19       Hoover-28, No Bates, Schools As a

20       Vital Component of the Child and

21       Adolescent Mental Health System,

22       was marked for identification.)

23                 -   -   -

24   BY ATTORNEY LEHMAN:

CONFIDENTIAL

Page 339

1          Q.    And we're going to turn to

2    Page 39, under persistent obstacles.

3               But just -- just to be

4    clear, can you confirm that I've handed

5    you an article entitled, Schools As a

6    Vital Component of the Child and

7    Adolescent Mental Health System?

8          A.    Yes.

9          Q.    And this is an article that

10   you co-wrote and published in January of

11   2021?

12         A.    Yes.

13         Q.    So, then, if you'll turn to

14   Page 39, under persistent obstacles.

15              And you wrote here, quote,

16   Several challenges impede the integration

17   of mental health supports and services

18   into schools.  First, schools are driven

19   by competing and frequently changing

20   priorities, often not informed by data.

21   Despite evidence that school mental

22   health positively influences students'

23   academic and psychosocial functioning,

24   competing interests sometimes make it

CONFIDENTIAL

                                            Page 340

1    difficult to sustain resources and

2    momentum for school mental health.

3              Did I read that correctly?

4         A.    Yes.

5         Q.    And do you agree today, in

6    2025, that there are a number of

7    challenges that impede the integration of

8    mental health supports and services into

9    school, including competing and

10   frequently changing priorities?

11        A.    So I think what I would say

12   there is that the context for the

13   competing interests and priorities often

14   has much more to do with resource

15   constraints.

16              So if there are not the

17   resources, for example, to fund a school

18   psychologist or to -- you know, let's say

19   there's enough resources to hire either a

20   school psychologist or an English

21   teacher, a school might have to make a

22   tough decision there.

23              So -- and the priorities of

24   one school board member versus another

CONFIDENTIAL

Page 341

1   may have to speak to that.

2               So often these competing

3   priorities are in the context of limited

4   resources to address specific areas.

5        Q.    Other than limited

6   resources, what are the other challenges

7   that you see in terms of implementing

8   mental health supports and services into

9   schools?

10       A.    Yeah, I mean, I would say

11  that, frankly, resources is a big one.

12  Because, oftentimes, resources will

13  dictate whether you can get appropriate

14  staffing or professional development to

15  implement something that's important to

16  do, whether it's, you know, English

17  literacy or mental health literacy.

18              And so you could say, well,

19  there's a challenge of limited

20  professional development.  But, frankly,

21  when you kind of dig down into what's

22  driving that, it's often limited

23  resources to do what's needed, to support

24  kids, whether it's in their academics or

CONFIDENTIAL

Page 342

1    their social-emotional development.

2               So those are some of the

3    issues that come along with that resource

4    constraint.

5          Q.    Does your plan take into

6    account leveraging existing resources

7    that the school districts already have in

8    place?

9          A.    So what I would say is this:

10   The -- I did take a look at the services

11   and staffing, as I always do, in my

12   methodology when I'm working with school

13   districts.  I look at who their staff is,

14   what their service array is, what

15   resources they might have in place and

16   how to best leverage it.

17              And in this report, I was

18   really addressing the impacts of social

19   media, which, as I outline in the report,

20   are a novel and unique set of new

21   circumstances for young people that are

22   causing new harms that are laid out in my

23   report and the reports of other experts.

24              And so what we found, and,

CONFIDENTIAL

Page 343

1  again, this is not inconsistent -- what
2  we found in the bellwether districts is
3  not inconsistent with other districts, is
4  that their current programming was often
5  piecemeal, patchwork, limited, and that
6  their staffing would not have been
7  adequate to address -- the current
8  staffing would not have been adequate to
9  address the new needs.
10          So did I consider it?  Yes.
11      Q.    Okay.
12      A.    But would it -- you know,
13  their -- their current folks are being
14  pulled into social media, that's causing
15  a lot of fragmenting of current systems,
16  if that makes -- if that's
17  understandable.
18      Q.    And so, then, when you wrote
19  out your plans, did you make adjustments
20  for each district based on the resources
21  they already have?
22      A.    So because we're talking
23  about a new set of harms to young people
24  and a new set of concerns, let's say,

CONFIDENTIAL

Page 344

1  that our young people are experiencing

2  with respect to mental health, and a new

3  set of concerns that the schools are

4  experiencing with classroom disruption

5  and impacts on teaching, the

6  interventions that I -- or the

7  programming that I offered is really

8  additive to what's there.

9            Did I consider in every

10  district that I spoke with and that I

11  looked at the data from kind of how their

12  current resources would intersect with

13  the plan?  Yes.  And I laid that out in

14  each of the district reports.

15       Q.    In your previous answer, you

16  said -- and I'm just going to read it

17  from the transcript that's in front of

18  me -- And so what we found -- and, again,

19  this is not inconsistent, what we found

20  in the bellwether districts is not

21  inconsistent with other districts.  And

22  then you went on.

23            But my question is, who is

24  "we"?

CONFIDENTIAL

Page 345

1         A.    Oh, I'm probably using the
2    term -- I often use that colloquially to
3    mean me, I; what I found.
4         Q.    Okay.  All right.  So when
5    you said "we" --
6         A.    I meant me.
7         Q.    -- what -- what Dr. Hoover
8    found?
9         A.    What I found, yes.  What I
10   found.
11              I mean, I'd have to go back
12   to the exact statement I was making.  But
13   I imagine that if I was talking about
14   what I found in the bellwether districts,
15   it would be me.
16        Q.    Okay.
17        A.    Yeah.
18              ATTORNEY YEATES:  Counsel,
19        can we take a break soon?
20              ATTORNEY LEHMAN:  Sure.  We
21        can take a break now.
22              VIDEO TECHNICIAN:  The time
23        is 3:07 p.m., and we are off the
24        record.

Page 346

```
 1                    -   -   -
 2              (Whereupon, a brief recess
 3         was taken.)
 4                    -   -   -
 5              VIDEO TECHNICIAN:  The time
 6         is 3:29 p.m., and we are on the
 7         record.
 8   BY ATTORNEY LEHMAN:
 9         Q.    Dr. Hoover, do you have any
10   quantitative data about how adolescents
11   use their time when they are on social
12   media?
13         A.    So I recall in my report --
14   and if I need to, you know, cite specific
15   numbers, I'm happy to go through the
16   report.
17              But I recall in the report
18   speaking to the expert reports and their
19   kind of deeper dive into how time was
20   spent, as well as referencing the
21   peer-reviewed literature that the
22   predominance of time was spent on the
23   defendants' platforms.
24         Q.    And my question was a little
```

Page 347

1    bit different.  So I'm not -- I'm not

2    asking about how much time is spent on

3    platforms.

4              What I'm asking is, do you

5    have any information about how the users

6    spend their time while they are on the

7    defendants' platforms?

8              So to use an example,

9    whether they're posting versus reading

10   something versus watching movies or doing

11   something else?

12             ATTORNEY YEATES:  Object to

13        the form.

14             THE WITNESS:  So I want to

15        go back to the actual studies,

16        because I seem to recall there

17        being information about, you

18        know -- at least in some studies,

19        looking at how they spent time.

20             I don't have it at my

21        fingertips at the moment, no.

22   BY ATTORNEY LEHMAN:

23        Q.   Have you ever, prior to this

24   litigation, created a plan for a school

CONFIDENTIAL

Page 348

1  district that is intended to address only

2  impacts of social media?

3          A.    So outside of the context of

4  this litigation, I have not created a

5  plan only to address social media for a

6  school district.

7              Social media has been

8  something that's been considered in the

9  context of creating other plans.  But no,

10  not specifically outside of this

11  litigation.

12          Q.    And when you say that in

13  prior plans that you've created outside

14  of litigation social media is something

15  that has been "considered," what do you

16  mean?

17          A.    So what I would say is that

18  in -- you know, when I'm meeting with

19  districts, it would be rare these days

20  for social media not to come up as a

21  concern for students and the harms to the

22  schools, the harms to students.

23              I don't know how much depth

24  you want me to go into there, but that's

Page 349

1    what I mean by that.  That it's something

2    that would have been considered.

3                Because when I meet with

4    schools, they're consistently talking

5    about this.

6         Q.    In the last five years, have

7    you created any plans for school

8    districts intended to be a comprehensive

9    plan to address the social emotional,

10   mental health needs of their students?

11        A.    In the last five years, yes,

12   I would have come up with plans and also

13   just supported districts in developing

14   their social, emotional and mental health

15   needs, yes.

16        Q.    How many -- in the last five

17   years, how many of those plans have you

18   come up with?

19        A.    It would be hard for me to

20   quantify, to be honest with you.

21                Again, as co-director of the

22   National Center for School of Mental

23   Health, it's a large part of our job to

24   actually, you know, run learning

CONFIDENTIAL

Page 350

1  collaboratives with school districts and
2  help them develop quality improvement
3  plans for mental health services.
4           So the nature of the plans
5  can be different as well.  So to say, you
6  know, X number of plans would be
7  virtually impossible, because I've worked
8  with so many districts over five years,
9  much less 20-something years.
10          Q.    For those plans that you
11  have created in the last five years that
12  are intended to be a comprehensive plan
13  to address the social, emotional, mental
14  health needs of the students, what is the
15  planned duration of those plans?
16          A.    What I would say is that
17  it's variable.  And, you know, some plans
18  have a specific time period that may be,
19  for example, shaped by the inquiry -- or
20  by the request, rather.
21          So if a school district
22  says, we need a five-year plan, we'll
23  say, to, you know, really put into place
24  health education programming.

CONFIDENTIAL

Page 351

1              And so I do want to be
2    clear, you're talking about comprehensive
3    plans.  Oftentimes, school districts do
4    come and say, like, we really want to
5    focus on a specific area, you know, and
6    that could be resource constrained,
7    right.  So it could be, we need to focus
8    on school mental health screening.
9              And so sometimes they'll put
10   a request in that says, you know, we
11   need -- we have five years within which
12   we can do this.  Sometimes that may be
13   because they have a certain, you know,
14   set of grant funds that shape a time
15   period and the topics that they can focus
16   on.
17              There are other times, and
18   this is not infrequent, this is actually
19   pretty frequent, that we work with school
20   districts where they are wanting to, you
21   know, improve their mental health
22   systems -- and it may be a specific part
23   of their mental health system -- and we
24   give them guidance on that without

Page 352

1    specifying X number of years.  So it
2    would be, here is a continuous quality
3    improvement plan.
4         Q.    Has any school district ever
5    come to you and asked you to develop a
6    plan solely to address social media?
7         A.    Not that I can recall.  Not
8    that I can recall, no.
9         Q.    Has any school district ever
10   come to you and asked you to develop a
11   plan with a 15-year duration?
12        A.    I would guess that many
13   school districts wish that they could
14   come with that.
15             But, you know, frankly, as
16   I've already alluded to, a lot of school
17   districts may, you know, say, we have a
18   grant that's three years long, and so we
19   need to establish a plan that we can be
20   funded for, for three years, to do X.
21             And what I will say is that,
22   you know, it's -- we have school
23   districts, as I've already kind of
24   indicated, that will come to us knowing

CONFIDENTIAL

Page 353

1    that they -- that, you know, supporting

2    student mental health, for example, is

3    part of, you know, what they do.

4            And so they may not come

5    with X number of years, but that doesn't

6    mean that they don't intend to carry

7    something out for several years.

8        Q.    And so is it correct, then,

9    you don't recall any district ever coming

10   to you and asking for a 5-year plan --

11   I'm sorry, asking for a 15-year plan?

12           ATTORNEY YEATES:  Object to

13       the form.

14           THE WITNESS:  So do I recall

15       a district coming to me and

16       saying, we need a 15-year plan for

17       X?  No.

18   BY ATTORNEY LEHMAN:

19       Q.    In the plans that you

20   developed in this litigation, did you

21   adjust the plan based on prior

22   professional development that had already

23   been provided to teachers and staff?

24       A.    So in the bell -- in the

CONFIDENTIAL

Page 354

1    districts for these specific plans?  All
2    the specific district reports --
3           Q.     Yes.
4           A.     -- you're talking about now?
5           Q.     Yes.  Yes.
6           A.     So I did inquire about and
7    take a look at the professional
8    development, for example, in the key
9    informant interviews and in documents
10   reviewed.
11          It was something I
12   considered in terms of then developing a
13   strategic plan.
14          Q.     And did you make any
15   adjustments based on their prior
16   professional development that had been
17   provided?
18          A.     So what I found, really,
19   across the districts, was that even if
20   they were implementing, let's say,
21   components of social emotional learning
22   or components of, you know, teacher
23   training on social media policies, they
24   were -- they might have looked different

CONFIDENTIAL

Page 355

```
 1   in the districts, but there was a

 2   consistency in that they were not

 3   adequate to address the social media as

 4   it currently is and in terms of the harms

 5   that we're seeing in young people.

 6              And, also, the staffing

 7   is -- well, we were talking about

 8   professional development.  So I'll stop

 9   there.

10       Q.    Okay.  Is it correct, then,

11   that you found the prior professional

12   development in all of the districts that

13   you evaluated to have been inadequate?

14              ATTORNEY YEATES:  Object to

15         the form.

16              THE WITNESS:  I think that's

17         probably a bit too broad of a

18         question for me to be able to

19         answer.

20              Certainly, you know, the

21         districts are putting in effort.

22         And I think I note that in my

23         reports.  They're putting in

24         effort to try to -- with respect
```

Page 356

```
 1          to social media professional
 2          development, they are trying their
 3          best.
 4                But, frankly, you know, it's
 5          a whole new layer of issues that
 6          are being introduced to their
 7          students and to their schools.
 8                So, you know, I don't want
 9          to say that everything they're
10          doing is inadequate.  That
11          wouldn't be fair.  But, you know,
12          they're just not equipped or
13          resourced to actually address
14          what's happening with respect to
15          the schools and students in terms
16          of the impact of social media.
17     BY ATTORNEY LEHMAN:
18          Q.    You mentioned earlier that
19     you had done work with Baltimore.
20                How long have you been
21     working with the Baltimore School
22     District?
23          A.    Well, so I've -- I've lived
24     in, you know, that area and been -- you
```

CONFIDENTIAL

Page 357

1  know, the School of Medicine is located
2  in Baltimore.  Some of my first clinical
3  experiences were in the Baltimore
4  schools.
5              So I would say almost 30
6  years now.
7         Q.    Outside of litigation, have
8  you ever provided Baltimore with a plan
9  to address social media?
10         A.    With a plan only to address
11  social media?
12         Q.    Yes.
13         A.    No, not that I'm aware of.
14         Q.    Outside of litigation, have
15  you provided Baltimore with a plan that
16  would address social media?
17         A.    I'm trying to remember if I
18  personally have provided a specific plan.
19  I mean, I don't know that that would have
20  fallen within my role.
21              You know, has our center
22  provided guidance to Baltimore city
23  schools on mental health services?  Yes.
24  And would mental health services

CONFIDENTIAL

Page 358

1    inevitably, in this day and age, be

2    addressing social media?  Likely so.

3            Q.    How would you describe your

4    role with Baltimore schools?

5            A.    So it's evolved over the

6    years.  So I'm going to have to look to

7    my CV for exact dates.  But roughly

8    speaking, I was a clinician in the

9    schools.  And I've been in at least a

10   couple of schools as a clinician in the

11   schools.  And then I was a direct

12   supervisor for clinicians who were in the

13   schools.

14           And then, you know, again,

15   as co-director of a National Center, we

16   work with lots of districts.  So how I

17   work with Baltimore city may be quite

18   similar to how I would work with other

19   districts in that capacity, in that we

20   provide best practices, we provide

21   guidance, we provide updated research to

22   school districts.

23           And if they reach out to us

24   with inquiries about mental health

CONFIDENTIAL

Page 359

1    supports and services, we'll often

2    respond to those.

3            Q.    And have Baltimore city

4    schools implemented the plans that the

5    National Center put together to address

6    the mental health issues within their

7    district?

8                    ATTORNEY YEATES:  Object to

9            the form.

10                    THE WITNESS:  Yeah, I mean,

11           I -- to be honest, I feel like

12           that question is probably a little

13           bit too broad for me to answer.

14                    Like, their -- the plans

15           is -- is -- I'm not sure what you

16           mean by "the plans," because we

17           provide, as I mentioned, general

18           technical assistance.  They may

19           have attended a Webinar from our

20           National Center.  We may have

21           talked with them about continuous

22           quality improvement.  We may have

23           provided a specific training for

24           Baltimore city school clinicians.

Page 360

```
1              So have they implemented
2         some of the things that we have
3         offered to them?  Perhaps.  I
4         would think so.
5              But, you know, have they
6         implemented everything?  I
7         couldn't say.
8  BY ATTORNEY LEHMAN:
9         Q.    Okay.  Are you able to
10 specifically identify any of the guidance
11 that the center provided to Baltimore
12 city schools that have been implemented?
13        A.    I know -- and, again, I'm
14 speaking now more broadly for the
15 National Center.
16             I believe that there was
17 guidance around measurement-based care,
18 for example, that was offered to
19 Baltimore city clinicians that was
20 implemented over the course of the last
21 several years.
22             So that's one example.
23        Q.    How did you decide which
24 studies to review in forming your
```

CONFIDENTIAL

Page 361

1    opinions in this case?

2          A.    So we're moving away from

3    Baltimore city now?

4          Q.    Yes.

5          A.    Okay.  All right.  I just

6    want to make sure I understand where

7    you're going here.

8                So can you repeat the

9    question?

10         Q.    How did you decide which

11   studies to review in forming your

12   opinions in this case?

13         A.    So, you know, I used my

14   typical process, the methodology, which

15   is to really look to the databases, or

16   what we might think of as repositories,

17   that might include PsycInfo or PubMed,

18   those are some of the databases that I

19   use.

20                I also, in my role, you

21   know, as an editor in school mental

22   health, often come across studies.  So I

23   looked to the literature using, you know,

24   within those repositories, certain search

CONFIDENTIAL

Page 362

1    terms, for example, school mental health,
2    those kinds of things.
3                    That's how you would
4    typically do a search for articles.  So I
5    drew upon that, looked at impact, social
6    media, school mental health, that kind of
7    thing.
8                    And then, also, if I
9    happened to have an article that came
10   across my desk as an editor or in my work
11   as the director of the -- or co-director
12   of the National Center for School Mental
13   Health, that may have been an article
14   that was included for consideration.
15                    I also did consider
16   articles -- some of the articles that
17   some of the expert witnesses, the other
18   experts, the other plaintiff experts, may
19   have included in their reports.  But I
20   generally, in that case, would rely on
21   the opinions of those experts.
22           Q.    On circumstances when you
23   reviewed the expert reports of defense
24   experts, did you go and look at any of

Page 363

1    the articles that they had cited that you

2    had not already reviewed?

3                    ATTORNEY YEATES:   Object to

4          the form.

5                    THE WITNESS:   So just so I

6          can clarify, because all the legal

7          language is new to me.

8                    So the defense experts,

9          you're talking about the rebuttal

10         reports that they would have sent?

11   BY ATTORNEY LEHMAN:

12         Q.    Well, so I saw in your list,

13   you had a number of defense experts that

14   were listed as people that you had

15   reviewed their reports.

16         A.    I assume those are the

17   rebuttal reports.

18         Q.    When you reviewed the

19   reports of the defense experts, and so --

20         A.    Do you want to specify who?

21         Q.    Sure.

22         A.    Okay.

23         Q.    By that I'm referring to

24   Diana Wildermuth, Ethan Hutt, Stephen

Page 364

1   Aguilar and so on.

2              When you reviewed those

3   reports, did you go and look at any of

4   the articles that they cited you had not

5   previously reviewed?

6              ATTORNEY YEATES:  Object to

7         the form.

8              THE WITNESS:  Honestly, I

9         can't recall.  I mean, I'm -- if I

10        did, I likely would have -- they

11        would have been in the articles

12        considered in my response to their

13        rebuttals, so.

14  BY ATTORNEY LEHMAN:

15        Q.   Okay.  So you don't remember

16  doing it.  But it would be reflected in

17  those materials --

18        A.   That's what I'm saying --

19        Q.   -- considered list?

20        A.    -- if I did, it would be in

21  the -- in the documents considered.

22              And I think there were a few

23  new things that were included in the

24  response to the rebuttals.

CONFIDENTIAL

Page 365

1          Q.    When you looked in the
2    databases and you said that you ran
3    search terms, did you review all of the
4    articles that came back in response to
5    the search terms or did you cull them
6    down in some way?
7          A.    So I'm trying to recall.  I
8    mean, oftentimes we cull it down.
9               And I may have looked for
10   articles that seemed particularly
11   pertinent to the question at hand, right,
12   looking at social media and its impacts
13   on students, mental health and on
14   schooling.
15              So that's how -- when I
16   think about how I would have culled it
17   down, that would be -- you know, if I'm
18   thinking about broad impacts, that's how
19   I would have culled it down.
20         Q.    Okay.  How would you have
21   made that cut?  Would you have done that
22   based on the abstract or would you have
23   read the entire article?  How would you
24   go about that?

CONFIDENTIAL

Page 366

1          A.    It depends.  I mean, as a --
2    as a scientist who's reviewed and read
3    articles, again, for over 30 years at
4    this point, including graduate training,
5    you get kind of pretty savvy about being
6    able to determine -- I would never make a
7    conclusion from one abstract, but you can
8    determine whether it's going to be
9    relevant to, you know, your task at hand.
10              So I may have looked at an
11   abstract, for example, and determined
12   this is really kind of outside of the
13   scope of what we're thinking about here,
14   what I'm thinking about.
15              But, yeah, oftentimes it was
16   doing a skim or a review of a full
17   article to determine whether to consider
18   it.
19         Q.    Did any studies in your
20   materials considered list not find
21   correlation?
22         A.    Oh, I'd have to go back to
23   all the studies to really determine that.
24         Q.    Do you agree that sexual

Page 367

1    identity or sexual orientation is a
2    potential cause of mental health issues
3    in adolescents?
4        A.    I think that's quite
5    complicated.  I know that certainly some
6    young people do struggle with their
7    sexual identity.
8            Did you include sexual
9    identity and sexual orientation --
10       Q.    I did.
11       A.    -- were those the two terms?
12           So I know that, certainly,
13   those can be issues that young people
14   struggle with in terms of their
15   experience and that can impact their
16   mental health functioning.
17       Q.    Do you agree that neglect or
18   abuse in the home is a potential cause of
19   mental health issues in adolescents?
20       A.    So I do -- I certainly would
21   say that neglect in the home can be a
22   factor for mental health in adolescents.
23       Q.    Do you agree that the death
24   of a loved one or a chronic illness in a

CONFIDENTIAL

Page 368

1  loved one can be a cause of mental health
2  issues in adolescents?
3        A.    Yes.
4        Q.    Do you agree that COVID was
5  a potential cause of mental health issues
6  in adolescents?
7        A.    I would say that one is a
8  little bit different.  Because, I mean,
9  COVID caused -- you know, it's a virus,
10 right.
11           So it's really kind of what
12 happened in the context of the pandemic
13 that we may look to to understand how it
14 may have impacted young people's mental
15 health.
16           So I'll give you an example.
17           So young people, we know,
18 not all, but many, were engaged in
19 distance learning or they were at least
20 isolated.  And in that context, many of
21 them were using social media platforms,
22 including the defendants' platforms, at a
23 greater degree than prior to.
24              So if they're home, they are

Page 369

1    isolated, they're distance learning, they

2    may have been exposed to more social

3    media.

4                    So it's the factors that

5    occurred in the context of the pandemic.

6    So the question is a little tough, you

7    know.

8                    Does the pandemic itself

9    cause mental health challenges?  It's

10   really kind of the circumstances around

11   that that I need more specificity around,

12   if that makes sense.

13          Q.    All right.  Well, do you

14   agree with this statement --

15          A.    Okay.

16          Q.    -- the Covid-19 pandemic and

17   the resulting impact of social isolation,

18   economic hardship, grief and trauma is

19   related to mental health concerns for

20   children and adolescents?

21          A.    It sounds like something

22   that I would have said, because I think

23   that the resulting hardships that may

24   occur -- and that's really aligned with

CONFIDENTIAL

Page 370

1   what I had just said, that it's really

2   not the virus itself, it may be some

3   other contextual factors around the

4   pandemic that may have contributed to

5   mental health challenges in our young

6   people.

7          Q.    Do you agree that school

8   shootings can be a cause of mental health

9   issues in adolescents?

10         A.    So, again, having worked

11  with a number of school districts that

12  have experienced school shootings, what I

13  would say is that there's kind of a

14  concentric circle of impact when there's,

15  you know, an incident of violence.

16              So do I think that a school

17  shooting could have an impact on young

18  people and their mental health?  Sure.

19  Yes, of course that could be the case.

20              Is it, you know, to the same

21  degree as other mental health challenges

22  that we're seeing that are more pervasive

23  or other influencers or factors like

24  social media platforms?  Probably not.

CONFIDENTIAL

1          Q.     Have you seen any studies
2     that compare the pervasiveness or
3     influence of social media as compared to
4     school shootings on adolescent mental
5     health?
6          A.     So, you know, I can't think
7     of particular studies that look at that
8     directly.
9               What I can tell you is that,
10    you know, I've worked with lots of
11    schools and students who -- and, you
12    know, the amount that I hear about school
13    shootings is often really quite
14    constrained to the schools where that has
15    occurred.  And social media comes up as
16    harmful in about every school if not
17    every school that I engage with.
18               So it's not necessarily a
19    study that would inform that, because I
20    don't know that the study has been done.
21    If there is, it doesn't come to mind at
22    this moment.
23          Q.     Do you agree that the
24    impacts of a school shooting are not

CONFIDENTIAL

Page 372

1    confined to only the school where the
2    shooting happened, but, in fact, spread
3    out across the school district and,
4    indeed, across the state?
5            A.    Yeah.
6                  ATTORNEY YEATES:  Object to
7            the form.
8                  THE WITNESS:  Well,
9            actually, let me -- I didn't hear
10           the -- I answered you before you
11           finished.  So I broke the rules
12           here.
13                 So you said indeed across
14           the state.  So that was kind of
15           added on at the end.
16                 So what I would -- what I
17           would say is that the impacts of a
18           school shooting are not
19           constrained to just the people in
20           the school.
21                 And, frankly, even within a
22           school where a school shooting
23           happens, there's, you know,
24           variability in terms of the

CONFIDENTIAL

Page 373

1          impacts of an incident like that
2          on the people in the school.
3     BY ATTORNEY LEHMAN:
4          Q.   Do you agree that having a
5     school shooting incident within a school
6     district can impact the mental health of
7     students across the district, not just
8     those who are physically present in the
9     building where the shooting happened?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  You know,
13         again, I mean, does an incident of
14         community violence -- you're
15         talking about a school shooting
16         here, does it impact people in the
17         district?  Maybe.  Could it?
18         Maybe.
19    BY ATTORNEY LEHMAN:
20         Q.   Do you agree that when there
21    is an incident, within a school district,
22    of sexual abuse between either a teacher
23    or staff member with a student, that that
24    can impact the mental health of students

Page 374

1  throughout the district?

2            ATTORNEY YEATES:  Object to

3       the form.

4            THE WITNESS:  It depends

5       what you mean by "impact" students

6       throughout the district.  Impact

7       their mental health?

8  BY ATTORNEY LEHMAN:

9       Q.    Yes.

10      A.    Impact -- perhaps.

11      Q.    Do you agree that if a

12 student experiences personal trauma, that

13 that can cause a mental health issue?

14      A.    If a student experiences

15 personal trauma, can that cause a mental

16 health issue in that student?

17      Q.    Yes.

18      A.    It could.  We know that

19 about 80 percent -- 80 to 90 percent of

20 people -- actually, of children, don't go

21 on to develop post-traumatic stress after

22 an incident of trauma.

23            So there's often kind of an

24 overestimate as to how many people will

CONFIDENTIAL

Page 375

1    go on to experience that.  But could they

2    be impacted?  Sure.

3            Q.    Okay.  Are you also aware

4    that at least 50 percent of American

5    youth have experienced a potentially

6    traumatic event?

7                    ATTORNEY YEATES:  Object to

8            the form.  Foundation.

9                    THE WITNESS:  I mean,

10           there's -- frankly, you know, I'm

11           aware of the data looking at the

12           prevalence of traumatic incidents

13           and adverse child experiences we

14           talked about earlier.

15                   The numbers look different

16           depending on, you know, the data

17           that you're looking at.  But am I

18           aware that it is a large number of

19           children, adolescents, perhaps

20           over 50 percent, that have been

21           exposed to what we would call a

22           potentially traumatic event, it

23           doesn't mean that it's traumatic,

24           but to -- I don't know the term

Page 376

1          that you used -- did you use a
2          traumatic event?
3     BY ATTORNEY LEHMAN:
4          Q.    The term that I used was a
5     potentially traumatic event.
6          A.    Yeah.  So may have been
7     exposed to a potentially traumatic event.
8               So what -- just to kind of
9     clarify what that means, that's an event
10    that may or may not be experienced as
11    traumatic, right.  It's something that
12    could happen to a student that may lead
13    to traumatic stress or may not.
14         Q.    Okay.
15              ATTORNEY LEHMAN: I want to
16         look at an article, and we'll mark
17         this as Exhibit Number 28.
18                   -   -   -
19              (Whereupon, Exhibit
20         Hoover-29, No Bates, Healthy
21         Students and Thriving Schools: A
22         Comprehensive Approach for
23         Addressing Students' Trauma and
24         Mental Health Needs, was marked

Page 377

```
 1          for identification.)
 2                    -   -   -
 3               ATTORNEY LEHMAN:  This is
 4          Tab 17.  Oh, we're on 29.  All
 5          right.  Then I correct myself.
 6          We'll mark this as Exhibit-29.
 7     BY ATTORNEY LEHMAN:
 8          Q.    All right.  Can you confirm
 9     that I have handed you a document titled,
10     Healthy Students and Thriving Schools:  A
11     Comprehensive Approach for Addressing
12     Students' Trauma and Mental Health Needs?
13          A.    Yes.
14          Q.    And you were one of the
15     co-authors of this document?
16          A.    Correct.
17          Q.    All right.  And what was the
18     purpose behind preparing this report?
19          A.    Well, it may be stated
20     differently in the executive summary.
21               But I can tell you the
22     context for developing this -- well,
23     actually, if you don't mind, I just want
24     to make sure, because it's been a few
```

CONFIDENTIAL

1  years.  So I want to make sure that I'm

2  refreshing my memory for a moment when

3  you ask about the purpose of it.

4        Q.    All right.  Why don't we --

5  let's go to Page 6.

6        A.    Okay.

7        Q.    And do you see Page 6 is the

8  introduction?

9        A.    Yes.

10        Q.    All right.  And here it

11  talks about, Highlighting the connection

12  between mental health and educational

13  outcomes?

14        A.    Where is here?  Oh, right in

15  the beginning.

16        Q.    Right at the beginning.

17        A.    In recent decades, research

18  highlighting the connection between

19  mental health and educational outcomes --

20  okay.

21        Q.    All right.  And then if

22  you -- if you look at the second

23  paragraph in that left column, it says,

24  Federal, state and local interest in

CONFIDENTIAL

Page 379

1  school-based health services accelerated
2  following the tragic school shooting in
3  Newtown, Connecticut, in 2012 and has
4  continued to accelerate following
5  additional school shootings and
6  high-profile cases of youth suicide
7  associated with bullying over the past
8  several years.
9             Did I read that correctly?
10        A.    Yes.
11        Q.    And so was -- was interest
12  in health services, that renewed or that
13  increased interest following the school
14  shooting in Newtown and additional
15  shootings and youth suicide, was that
16  what drove the creation of this report?
17             ATTORNEY YEATES:  Object to
18        the form.
19             THE WITNESS:  So not to my
20        recollection, in terms of, you
21        know, the purpose of this report.
22        And -- no.  I mean, that's not
23        what -- what drove the writing of
24        this specific report, if that's

Page 380

1          what you're asking me.

2                    Not to my recollection, at

3          least.

4    BY ATTORNEY LEHMAN:

5          Q.    All right.  And was this

6    report issued on behalf of For the Child

7    Health and Development Institute of

8    Connecticut?

9          A.    Yes.

10         Q.    Do you agree with the

11   statement that interest, at the federal,

12   state and local interest in health

13   services, accelerated following the

14   school shooting in Newtown, Connecticut,

15   in 2012?

16         A.    So what we often see, not

17   surprisingly, is after a well-publicized

18   incident in a school or school community,

19   there is a rush to invest in or to, you

20   know, intervene around an incident.  Not

21   always, but sometimes that's the case.

22                    And so in this instance, you

23   know, we're talking about a school

24   shooting in Newtown, Connecticut.  I

CONFIDENTIAL

Page 381

1   certainly recall that at that time there
2   was increased interest and attention.
3   And we see that sometimes after school
4   shootings, that there's --
5                   And that's for a variety of
6   reasons.  You have, you know, lawmakers
7   who may be interested in -- I don't want
8   to say leveraging, because that sounds
9   opportunistic, but in kind of addressing
10  something when it occurs like that.
11          Q.    If you'll turn to the next
12  page, Page 7.
13                  And we're going to look in
14  that first paragraph, about midway down
15  it starts, Exposure.
16                  All right.  Do you see it
17  says, Exposure to adverse experiences and
18  potentially traumatic events also
19  significantly contributes to children's
20  mental health concerns and increases risk
21  for academic difficulties.  It is
22  estimated that at least 50 percent of
23  American youth have experienced a
24  potentially traumatic event, with rates

CONFIDENTIAL

Page 382

1   of exposure being even higher in urban

2   communities.

3           A.      Yeah.

4           Q.      Do you see that?

5           A.      I do.

6           Q.      And do you -- do you agree

7   that rates of exposure to potentially

8   traumatic events are even higher in urban

9   communities?

10          A.      So there is data to suggest

11  that rates of exposure to potentially

12  traumatic events, and, in particular,

13  traumatic events like community violence,

14  are higher in some urban communities,

15  yes.

16          Q.      Do you agree that children

17  suffer when a close family member has a

18  substance abuse problem?

19          A.      So certainly sometimes, in

20  the context of substance use disorders in

21  the family, children may struggle.

22          Q.      And can that struggle, as a

23  result of a family member's substance use

24  or abuse, can that be the cause of a

CONFIDENTIAL

Page 383

1   mental health concern?

2          A.    It could contribute to a

3   mental health concern for a young person.

4          Q.    Do you agree that political

5   divisiveness or the tenor of the

6   community can contribute to an overall

7   decrease in well-being?

8                ATTORNEY YEATES:  Object to

9          the form.

10               THE WITNESS:  That's a very

11         broad statement.  So decrease in

12         well-being, is that -- is there a

13         context for that?  Because that --

14         I'm not sure what you're asking me

15         to agree to.

16               If it's something I said, it

17         would be helpful to have the

18         context for it.

19   BY ATTORNEY LEHMAN:

20         Q.    Sure.  Sure.  And I'll tell

21   you this is actually something that you

22   said in the interview that I believe

23   we've marked as Exhibit Number 24.

24         A.    Okay.

CONFIDENTIAL

Page 384

1           ATTORNEY LEHMAN:  So if we
2     can just go back to 24.  I say
3     24 --
4           ATTORNEY YEATES:  Counsel,
5     I've given you some leeway here,
6     but you were limited to five hours
7     on the general report.
8           Are you planning on
9     switching to the case-specific
10    reports soon?
11          ATTORNEY LEHMAN:  We are
12    going to switch soon.  I'm just
13    wrapping up a few things, since we
14    did have to spend a few minutes
15    on -- on sort of case-specific
16    issues in the earlier section.
17          So just wrapping up a few
18    issues.
19          ATTORNEY YEATES:  Okay.
20    You're about 30 -- 30 or so
21    minutes over, so.
22          ATTORNEY LEHMAN:  I don't
23    think that's right, because we
24    started --

Page 385

```
 1              ATTORNEY YEATES:  How much
 2         time is on the record?
 3              VIDEO TECHNICIAN:  Five
 4         hours and 13 minutes.
 5              ATTORNEY YEATES:  You're 13
 6         minutes over.  So you can take a
 7         minute or two, but then let's move
 8         on.
 9              ATTORNEY LEHMAN:  Okay.
10         Well, I don't know I agree we need
11         to move on that quickly.  But we
12         can take a break in a minute or
13         two.
14    BY ATTORNEY LEHMAN:
15         Q.    All right.  So if you'll go
16    to Page 6.
17              And I want to look at the
18    paragraph that starts, Not to ignore.
19              And just for context, do you
20    see we're talking about other issues that
21    can impact mental health, such as
22    poverty, food insecurity, housing
23    insecurity?
24         A.    Where are you referring to
```

CONFIDENTIAL

Page 386

1  right now?

2         Q.    Well, right now, I'm looking

3  at the top of what's on the screen.

4         A.    Okay.  I see what's on the

5  top of the screen.

6         Q.    Right.  And then -- then you

7  go through and talk about how grief and

8  loss can also impact adolescents' mental

9  health.

10               Do you see that?

11        A.    I see that.

12        Q.    And then just looking at the

13  last paragraph, do you see it says, Not

14  to ignore some of the more systemic

15  issues -- what do you want to call it,

16  political divisiveness or just the tenor

17  of the nation right now, a lot of people

18  will say that's contributing to an

19  overall decrease in well-being among the

20  general population.

21        A.    Okay.

22        Q.    So do you agree with the

23  statement that you made during your

24  interview in 2023 that political

Page 387

1    divisiveness or just the tenor of the

2    nation can contribute to an overall

3    decrease in well-being?

4                ATTORNEY YEATES:  Object to

5         the form.

6                THE WITNESS:  I think

7         actually I would agree with the

8         statement as it's said here, not

9         as you kind of changed it.

10               So the way it's said here is

11        that a lot of people will say that

12        it's contributing to an overall

13        decrease in well-being among the

14        general population.

15   BY ATTORNEY LEHMAN:

16        Q.    And do you agree that that

17   would be true for adolescents as well?

18               ATTORNEY YEATES:  Object to

19        the form.

20               THE WITNESS:  That a lot of

21        people are talking about it?

22   BY ATTORNEY LEHMAN:

23        Q.    Yes.

24        A.    I don't know, actually.  I

Page 388

1  mean, I talked about the general
2  population here.
3         Q.    Do you agree that not all
4  body dissatisfaction is part of an eating
5  disorder?
6         A.    So if I understand the
7  question correctly, could people have
8  body dissatisfaction and not meet
9  criteria for an eating disorder?
10        Q.    Yes.
11        A.    Yes.  We have a lot of
12 instances of, you know, subthreshold, you
13 might want to think about it, that still
14 impact functioning.
15        Q.    Do you agree that
16 poor-quality sleep does not necessarily
17 rise to the level of a diagnosable sleep
18 disorder?
19        A.    What I would say is that
20 there's a lot of sleep disruption that
21 may not rise to the criteria of a sleep
22 disorder but that still may cause
23 significant impairment in one's
24 functioning, especially when we're

CONFIDENTIAL

Page 389

1    talking about child and adolescent
2    development and brain functioning and
3    their ability to engage in the school
4    environment.
5                    So just because an
6    adolescent, for example, doesn't meet
7    criteria for a sleep disorder would in no
8    way suggest that it doesn't impede their
9    ability to get school work done, to sleep
10   at night, or to -- excuse me, to engage
11   in the classroom, et cetera.
12           Q.    Okay.
13                 ATTORNEY LEHMAN: And I would
14           move to strike, respectfully,
15           starting with "but that still."
16   BY ATTORNEY LEHMAN:
17           Q.    In your clinical practice --
18   and I refer to your direct patient care
19   clinical practice -- did you treat eating
20   disorders?
21           A.    So I'm trying to -- yes, I
22   mean, I would have treated eating
23   disorders in that context.  Yes.
24           Q.    In your clinical practice --

CONFIDENTIAL

Page 390

1    what percentage of your clinical practice
2    was eating disorders?
3              A.    I was just going to say, it
4    was a relatively small percentage of
5    my -- the students and patients that I
6    saw, which is consistent with the
7    prevalence in the population.
8                   But it's -- it was
9    relatively small, I would say.
10             Q.    Are you able to estimate or
11   quantify?
12             A.    I don't know that I can,
13   because it's been some time now.
14             Q.    In your clinical practice --
15   and here I'm referring, again, to your
16   direct patient care clinical practice --
17             A.    Okay.
18             Q.    -- did you treat sleep
19   disorders?
20             A.    So I saw a lot of young
21   people who had sleep issues.  It was not
22   often a primary diagnosis that I was
23   treating.
24             Q.    Okay.

CONFIDENTIAL

Page 391

1          ATTORNEY LEHMAN:  All right.
2     Why don't we -- let's call a
3     break, and we can go off the
4     record and talk about next steps.
5          VIDEO TECHNICIAN:  The time
6     is 4:07 p.m.  We are off the
7     record.
8               -   -   -
9          (Whereupon, a brief recess
10    was taken.)
11              -   -   -
12         VIDEO TECHNICIAN:  The time
13    is 4:10 p.m., and we are on the
14    record.
15         ATTORNEY LEHMAN:  Okay.  At
16    this point, I'm going to pass the
17    questioning to counsel to start
18    talking about the case or
19    district-specific questioning.
20         Mr. Keyes is going to handle
21    that questioning.  And since this
22    is a natural break and we are near
23    the end of the day, we will resume
24    that in the morning.

CONFIDENTIAL

Page 392

1              ATTORNEY YEATES:  And I
2      would just like to note there's
3      been a conversation among counsel
4      off the record where we have asked
5      defense counsel to continue the
6      deposition today over the normal
7      course of a seven-hour deposition
8      day.
9              I let them know at 9 o'clock
10     this morning that Dr. Hoover has a
11     hard stop tomorrow at 4 o'clock so
12     that she can catch a flight.  And
13     so we expected this to be a full
14     seven-hour deposition day.
15             Defense counsel is
16     indicating they do not want to
17     continue today.  They need to take
18     a break and start tomorrow
19     morning.
20             And as a result, I have told
21     them that is their choice, our
22     preference is to continue, seven
23     hours on the record today.
24     They're refusing to do that.  And

Page 393

1    so they are taking the choice to

2    start again tomorrow at 9 o'clock.

3         We will conclude the

4    deposition at 4:00 p.m., along

5    with a 45-minute lunch break, as

6    we took today, and the same number

7    and length of breaks that we took

8    today, which we can calculate and

9    put on the record tomorrow

10   morning.

11        And if they do not meet

12   their 11 hours that they have been

13   granted by the court, the

14   deposition will not remain open.

15   And we will not bring Dr. Hoover

16   back.

17        ATTORNEY LEHMAN:  And we

18   would respectfully disagree with

19   all of that, including the

20   characterization of the

21   conversation.

22        What counsel has said is

23   correct, that we were first

24   informed for the first time this

CONFIDENTIAL

Page 394

1    morning that there would be a hard

2    stop tomorrow, despite the fact

3    that these dates were agreed to,

4    the deposition was properly

5    noticed well in advance for both

6    today and tomorrow.

7          We have, however, in an

8    accommodation, agreed that we will

9    respect the 4 o'clock hard stop

10   but that we have plenty of time

11   tomorrow to accommodate the rest

12   of the balance of questioning in

13   the time that has been allotted by

14   the court.

15         We do, however, note that if

16   counsel intends to filibuster or

17   otherwise delay the deposition,

18   that we may not be able to

19   accommodate the hard stop and

20   would need to either continue

21   after 4 o'clock or on another

22   date.

23         As we have already told

24   counsel, we do not anticipate that

CONFIDENTIAL

Page 395

1          that will be a problem, because
2          there is plenty of time for the
3          allotted seven hours between the
4          start time of 9 o'clock and the
5          hard stop that we have been
6          informed of.
7                  ATTORNEY YEATES:  And I'll
8          just further clarify for the
9          record that defense counsel has
10         given no reason as to why they
11         cannot continue this deposition
12         for a seven-hour typical
13         deposition day, other than a
14         natural stopping point.
15                 ATTORNEY LEHMAN:  And I will
16         just let the record reflect that
17         it's 4:15.  And once we take a
18         break, it will be 4:40.  And
19         that's why we're not starting.
20         Thank you.
21                 ATTORNEY KEYES:  See you
22         tomorrow.
23                 VIDEO TECHNICIAN:  I'll now
24         be stating the on the record times

CONFIDENTIAL

Page 396

1          for each party.

2                  Katie Lehman, representing

3          TikTok, went five hours and 18

4          minutes.

5                  The time is 4:13 p.m.  We

6          are off the record.

7                          -   -   -

8                  (Whereupon, the deposition

9          was adjourned at 4:13 p.m.)

10                         -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 397

                    CERTIFICATE

 1

 2

 3

 4          I HEREBY CERTIFY that the

 5   witness was duly sworn by me and that the

 6   deposition is a true record of the

 7   testimony given by the witness.

 8

 9

10

         Amanda Maslynsky-Miller

11       Certified Realtime Reporter

         Dated:  August 14, 2025

12

13

14

15

16

17          (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

CONFIDENTIAL

Page 398

1                  INSTRUCTIONS TO WITNESS

2

3               Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8               After doing so, please sign

9    the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 399

```
1                  - - - - - -

                   E R R A T A

2                  - - - - - -

3       PAGE    LINE    CHANGE

4       ____    ____    _____

5       ____    ____    _____

6       ____    ____    _____

7       ____    ____    _____

8       ____    ____    _____

9       ____    ____    _____

10      ____    ____    _____

11      ____    ____    _____

12      ____    ____    _____

13      ____    ____    _____

14      ____    ____    _____

15      ____    ____    _____

16      ____    ____    _____

17      ____    ____    _____

18      ____    ____    _____

19      ____    ____    _____

20      ____    ____    _____

21      ____    ____    _____

22      ____    ____    _____

23      ____    ____    _____

24      ____    ____    _____
```

Page 400

1              ACKNOWLEDGMENT OF DEPONENT
2

            I,_____, do
3   hereby certify that I have read the
    foregoing pages, 1 - 396, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.

7
8   _____
    SHARON A. HOOVER, Ph.D.            DATE
9
10

    Subscribed and sworn
11  to before me this
    _____ day of _____, 20_____.
12
    My commission expires:_____
13
14  _____
    Notary Public
15
16
17
18
19
20
21
22
23
24

CONFIDENTIAL

Page 401

1                    LAWYER'S NOTES

2     PAGE    LINE

3     ____    ____    _____

4     ____    ____    _____

5     ____    ____    _____

6     ____    ____    _____

7     ____    ____    _____

8     ____    ____    _____

9     ____    ____    _____

10    ____    ____    _____

11    ____    ____    _____

12    ____    ____    _____

13    ____    ____    _____

14    ____    ____    _____

15    ____    ____    _____

16    ____    ____    _____

17    ____    ____    _____

18    ____    ____    _____

19    ____    ____    _____

20    ____    ____    _____

21    ____    ____    _____

22    ____    ____    _____

23    ____    ____    _____

24    ____    ____    _____

CONFIDENTIAL

**[& - 2015]**                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**  1:16 2:3,10 3:3,10,20 4:11 5:4,11 6:10,16 | **117**  6:17 316:12 | **16**  9:5 11:22 45:7,10 81:4 | 96:11 146:20 |

**&**  1:16 2:3,10
3:3,10,20 4:11
5:4,11 6:10,16

**0**

**01**  336:7
**07068**  4:13

**1**

**1**  7:12 11:17
25:8,11 27:6
27:18 28:3
32:24 56:1
69:6 89:18
267:9 324:19
400:3
**1.1.**  335:11
**10**  8:10 41:4,7
81:4 117:9
262:10
**100**  144:3,21
149:4 164:17
**10022**  3:21
**10036**  2:17
**107**  311:14
**10:29**  120:7
**10:45**  120:14
**10th**  33:23 35:8
36:15 69:20
70:11 146:22
**11**  8:13 41:19
41:22 51:18,23
85:10 393:12

**117**  6:17
316:12
**1185**  2:16
**12**  1:10 8:15
11:17 42:10,13
106:2 207:9
283:5 320:23
321:7,13,24
322:4
**121**  9:20
**12:16**  207:16
**12th**  12:14
122:9,18 321:9
**13**  7:6 8:17
43:8,11 385:4
385:5
**14**  8:20 43:24
44:3 397:11
**15**  8:22 44:15
44:18 87:12
93:1,6 120:1
241:22 307:7,9
308:12 310:23
312:14 319:18
319:20 321:18
323:4,24
352:11 353:11
353:16
**15,000**  321:8
**152,343.75**
72:12
**15th**  209:8
210:17 211:10

**16**  9:5 11:22
45:7,10 81:4
**16th**  33:11 37:9
38:9 47:7
69:12 86:23
267:10 274:7,8
**17**  9:8 19:22
45:23 46:2
168:3 377:4
**171**  11:22
**173**  9:23
**18**  9:10 46:18
49:20 50:1
51:18,23
105:24 106:3
283:6 321:16
396:3
**19**  9:13 55:17
55:20 57:14
106:3 168:3
189:19 369:16
**19087**  1:18 2:5
**19106**  6:12
**1996**  174:18,21
**1997**  314:3
317:19
**19th**  71:8,10,13
71:20 72:4
**1:00**  260:6
**1:02**  260:15
**1:52**  260:22
**1st**  16:1 34:19
35:8 36:9,17
41:2 43:22

96:11 146:20

**2**

**2**  7:14 33:14,17
42:21 49:19,24
267:14
**20**  9:14 67:11
67:14 72:3,9
72:10 104:7
122:24 138:20
141:13 154:10
160:21 276:12
279:8 326:22
350:9 400:11
**200**  2:12
**20001**  3:12
**2001**  107:7,9,11
**2002**  139:19
**20024**  3:5
**2004**  16:6
139:19 141:3
**2006**  108:8
141:3
**2007**  336:1
**2008**  19:10
20:4 104:8
108:8 139:10
**2011**  107:12
**2012**  312:3,5,12
316:10 379:3
380:15
**2015**  314:3
317:15

**[2017 - 4]**                                                    Page 2

**2017**   85:1
**2018**   83:11
    84:3 110:3
**2019**   83:20
**202**   3:6,13 10:7
**2020**   83:4 86:2
**2021**   82:7,16
    335:6,21
    339:11
**2022**   84:17
    85:18 209:8
    210:17 211:10
    212:18 217:16
    218:11,16,22
**2023**   81:1
    84:10 85:8
    190:5 192:13
    197:12 198:15
    386:24
**2024**   60:21
    62:4 69:20
    70:11 81:15
    274:20
**2025**   1:10
    12:14 33:11,23
    34:19 36:18
    37:24 38:9,10
    39:3 40:10
    41:2,17 42:8
    43:6,22 44:13
    45:5,21 46:14
    47:8,10,16
    69:12 70:23
    71:3,8,21 72:4

122:2 197:10
    198:14 340:6
    397:11
**207**   10:10
**208**   10:14
**20th**   39:3 40:10
    41:16 43:6
    44:13 45:20
    47:16
**21**   9:16 97:10
    97:13 168:3
    208:19
**210**   6:18
**212**   2:18 3:22
**21209**   5:20
**22**   9:19 121:11
    121:14 217:7
**220**   5:19
**2200**   5:5 6:5
**2222**   4:17
**23**   9:21 173:18
    173:21
**24**   10:5 202:7
    202:10 383:23
    384:2,3
**24th**   70:23 71:3
    71:9
**25**   7:13 10:8
    78:2 86:12
    87:1,9 88:1,9
    88:19 90:9
    122:24 160:21
    207:23 208:3
    277:17 326:8

326:22
**251**   4:6
**26**   10:11
    207:24 208:10
    217:8
**27**   10:16
    334:10,13
**27th**   217:16
    218:22
**28**   10:19
    338:16,19
    376:17
**280**   1:16 2:5
**2850**   5:19
**28th**   335:6
**29**   10:21
    376:20 377:4,6
**29th**   190:4

**3**

**3**   7:16 34:1,4
    42:23,24 67:10
    176:1 190:16
    195:21 222:13
    262:9 268:6
**30**   154:11
    279:7 333:23
    357:5 366:3
    384:20,20
    398:16
**300**   5:12
**301**   4:5
**3047**   1:3,4

**305**   2:13
**308-1515**   4:6
**30th**   37:23
    38:10 47:10
    122:6,9,18,22
**31**   11:12
**310-3030**   6:18
**31605**   397:10
**33**   7:15 146:1
    146:11,14
    147:2
**331-5956**   6:6
**33131**   2:13
**33134**   4:18
**334**   10:18
**338**   10:20
**34**   7:17,19
    147:2
**34th**   2:17
**35**   147:7
**36602**   4:5
**37**   7:20
**376**   10:24
**38**   7:22
**39**   8:7 339:2,14
**396**   400:3
**3:07**   345:23
**3:29**   346:6

**4**

**4**   7:18 34:21,24
    186:15 188:7,9
    222:13 392:11
    394:9,21

[40 - ability]                                              Page 3

**40**   8:9 335:16
  335:23
**409**   5:7 6:6
**41**   8:12,14
**410**   5:20
**42**   8:16
**421-7777**   5:20
**426**   146:16
**43**   8:19,21
**434-5000**   3:6
**44**   8:24 274:16
  274:19 276:22
**446-4800**   3:22
**45**   9:7,9 393:5
**46**   9:12
**462-6000**   2:13
**47**   334:9
**4700**   2:12
**4740**   5:12
**48**   338:13
**4:00**   393:4
**4:07**   391:6
**4:10**   391:13
**4:13**   396:5,9
**4:15**   395:17
**4:22**   1:3
**4:40**   395:18
**4th**   122:6

**5**

**5**   4:13 7:20
  37:11,14 106:3
  193:17,17
  196:17 283:6

317:24 318:20
  319:7 321:16
  353:10
**5/10/25**   7:16
  34:4
**5/16/25**   7:14
  33:17
**50**   72:7 375:4
  375:20 381:22
**500**   6:11
**501**   5:6
**502**   6:5
**510**   6:11
**55**   9:13
**556-2100**   2:18

**6**

**6**   7:21 38:3
  49:19,24 57:10
  97:9 378:5,7
  385:16
**6/20/25**   7:23
  8:8,13,18,23
  9:8 39:9 40:15
  41:22 43:11
  44:18 46:2
**60**   22:8 96:9
**600**   226:6
**601**   3:21
**61**   146:16
**610**   2:6
**625**   65:12,17,21
**63**   274:5,9
  276:22

**64112**   5:13
**65**   146:1 281:8
**662-6000**   3:13
**667-7706**   2:6
**67**   9:15
**680**   3:5
**6th**   122:2

**7**

**7**   7:23 11:12
  39:6,9 49:19
  173:16 190:16
  193:17 195:21
  381:12
**7/30/25**   7:22
  38:3
**70**   19:1
**701-1100**   5:13
**73**   314:2
**737**   14:5
**763-3260**   5:7
**77550**   5:6 6:6
**78212**   6:18
**7th**   39:19 42:8
  45:5 46:14

**8**

**8**   8:5 39:21,24
**8/1/25**   7:18
  8:11,20 34:24
  41:7 44:3
**8/7/25**   8:6,15
  9:6,11 39:24
  42:13 45:10
  46:18

**80**   96:10
  374:19,19
**808west.com**
  6:19
**81**   69:8
**816**   5:13
**817**   335:9
**850**   3:12
**877**   6:12
**877.370.3377**
  1:24
**882-1011**   6:12

**9**

**9**   8:8 40:12,15
  85:10 392:9
  393:2 395:4
**90**   22:8 374:19
**90s**   119:12
**917.591.5672**
  1:24
**97**   9:18 317:15
**973**   4:14,18
**994-1700**   4:14
  4:18

**a**

**a.m**   1:19
**a.m.**   12:15
  120:7,14
**abilities**   229:14
**ability**   24:11
  232:11 267:11
  281:13 389:3,9

**[able - added]** Page 4

**able** 24:16
64:15 98:20
165:7 169:21
237:16 243:23
257:23 258:10
264:23 265:24
278:24 279:4,5
279:19,23
321:14 323:7
323:11 333:16
355:18 360:9
366:6 390:10
394:18
**above** 1:19
220:7 335:11
**absence** 182:19
184:12 215:19
219:20 243:9
243:13 263:15
**absent** 177:3,4
**absolutely**
113:4 156:11
179:2 214:15
277:7 281:18
**abstract** 365:22
366:7,11
**abuse** 138:4
367:18 373:22
382:18,24
**academia** 78:3
147:13 148:5
**academic** 35:15
52:24 77:2
149:20 150:5

237:21 267:18
269:8 274:13
339:23 381:21
**academics**
247:10 341:24
**accelerate**
379:4
**accelerated**
379:1 380:13
**accept** 135:14
135:16
**acceptable**
50:17,21
**accepted** 36:24
117:10 243:13
335:5
**access** 75:17
107:22 212:8
225:15 226:24
230:18 300:21
300:24
**accident** 163:3
**accommodate**
394:11,19
**accommodati...**
394:8
**account** 155:22
157:2,3 159:13
162:4,10,12,21
162:24 342:6
**accounts**
337:20
**accurate** 59:4
72:14 136:10

136:13 165:4
295:8 336:14
336:17 398:20
**accurately**
24:11 276:16
**aces** 119:1,8,9
119:12
**achterberg**
85:18
**acknowledge**
193:20
**acknowledging**
195:14
**acknowledg...**
400:1
**actions** 228:18
239:12
**active** 36:6
188:23 194:2
**actively** 17:17
**activities** 66:2
**activity** 84:14
**actual** 19:4
31:11 222:8
231:19 232:15
233:2 327:18
347:15
**actually** 14:13
15:24 35:10
48:21 56:15
66:12 67:7
73:6 90:20
105:17 107:22
108:22 127:14

127:19 128:22
130:8,14 134:5
140:1 157:2
167:8 177:4
180:9,11,20
181:22 182:1,5
182:17,20
184:11 186:6
187:12 188:24
194:3,10,16
196:1,7 204:4
213:19 218:6
221:4 227:9
228:14 244:22
245:15 248:15
251:7 256:1,7
257:10 284:15
285:14 286:4
289:7 312:16
315:4 316:13
320:7 322:19
323:24 325:16
349:24 351:18
356:13 372:9
374:20 377:23
383:21 387:7
387:24
**add** 72:19
73:13 92:14
99:14,18
**added** 35:19,22
36:1 72:23
76:14 372:15

CONFIDENTIAL

**[addiction - agnello]** Page 5

**addiction** 1:4
12:19 99:23
100:13,15
101:1,3,5,9,10
101:21 102:6
102:20,22
108:4 128:4,10
268:20 315:2,3
**addictions**
316:4
**addition**
117:17 291:5
**additional** 21:4
21:24 71:6
121:6 122:10
122:11,17
379:5,14
**additive** 344:8
**address** 14:3,4
63:7 171:17
211:12 216:2
270:12 307:11
310:13,15,17
323:6 341:4
343:7,9 348:1
348:5 349:9
350:13 352:6
355:3 356:13
357:9,10,16
359:5
**addressing**
10:23 209:23
211:23 268:14
311:6 342:18

358:2 376:23
377:11 381:9
**adequate** 343:7
343:8 355:3
**adhd** 105:2
**adjourned**
396:9
**adjust** 323:8
353:21
**adjustments**
343:19 354:15
**administration**
16:13
**administrators**
86:15 87:20
89:2 232:6
273:15,17
**adolescence**
9:23 12:19
51:14,16,22
52:1 81:20
83:8,21 84:7
84:13 85:23
173:24 174:9
**adolescent** 1:3
10:20 16:8
84:18 86:4
105:22 108:16
129:9 192:3
221:2 224:5
293:7 338:21
339:7 371:4
389:1,6

**adolescent's**
140:22 179:19
**adolescents**
82:10,18 83:14
85:4 107:13
108:1,18 112:7
113:16 114:6
114:10 129:12
136:11,17
137:3,14 140:9
178:6 179:10
180:5 185:3,11
185:24 186:11
188:24 189:7
189:12 199:10
200:3,11,14,17
201:2 204:23
220:17,19,23
224:1 225:16
241:11 280:16
294:15 302:24
346:10 367:3
367:19,22
368:2,6 369:20
370:9 375:19
386:8 387:17
**adopt** 216:4
**adulthood**
51:21 105:19
185:4 186:1
**adults** 190:21
191:10,12
312:10

**advance** 57:1
394:5
**advent** 106:14
**adverse** 117:24
118:17,24
375:13 381:17
**adversity**
137:23
**advertisements**
161:4
**advisory** 9:22
173:23 174:8
**affected** 136:11
**affecting**
274:13
**affidavit** 55:11
**afforded**
179:14 180:23
**age** 51:18,19,24
85:10 105:23
106:3 170:2,6
228:13 229:22
230:11,12,20
230:24 231:3
231:12 232:9
234:23 282:22
283:2,6,6
321:16 358:1
**agenda** 329:24
**agendas** 329:6
**ages** 81:4
169:21
**agnello** 4:11

CONFIDENTIAL

**[ago - anecdotally]**                                                    Page 6

**ago**  13:22
  19:13,22 20:9
  52:11 93:2,5
  195:2
**agree**  61:19
  115:9,14
  123:17 124:2
  126:4 128:3
  129:10 130:1,8
  130:10 131:16
  136:14 137:4
  137:18 138:2
  140:20 171:20
  172:4,5,21
  173:2 175:17
  176:7,22 177:1
  178:5 179:17
  180:20 181:2
  181:18 182:5
  185:9,17 186:3
  187:3 188:21
  192:11 194:8
  197:10 198:14
  199:19 201:10
  201:21 220:16
  232:14 235:14
  246:13 247:16
  247:19 249:6
  249:17 250:3
  251:20 252:23
  254:10 255:5
  256:3,24 257:4
  283:8,17 286:4
  286:15 289:2

  290:20 300:19
  300:22 301:1,7
  301:20 302:12
  303:10,22,24
  304:2,4,9,24
  306:2,12,16,20
  307:6,19 328:9
  329:4 331:18
  332:6 337:3
  340:5 366:24
  367:17,23
  368:4 369:14
  370:7 371:23
  373:4,20
  374:11 380:10
  382:6,16 383:4
  383:15 385:10
  386:22 387:7
  387:16 388:3
  388:15
**agreed**  12:3
  69:24 70:6
  294:8 394:3,8
**agreement**  62:8
  91:19,19
**aguilar**  364:1
**ahead**  51:6
  263:19
**akeyes**  3:6
**al**  336:1
**alabama**  4:5
**algorithm**
  235:19 236:2,4
  236:12,17

**algorithms**
  235:15,16
  236:23
**align**  244:10
**aligned**  276:4
  369:24
**allen**  4:4
**allotted**  394:13
  395:3
**allow**  134:16
  135:8,17 170:2
  188:24
**allowed**  27:23
**allowing**
  286:16
**alluded**  352:16
**alphabet**  3:8
**alternative**
  238:16
**amanda**  1:19
  13:3 397:10
**amended**  7:23
  8:13,23 39:1
  39:17 40:8
  41:15,23 42:7
  43:3,4 44:11
  44:19 45:3,18
  45:19 46:12
  47:15 48:8,10
  48:21
**amendments**
  47:6,16
**american**  9:21
  173:21 174:6

  174:12,20
  175:3,13,18,22
  176:8,22 181:3
  185:10 375:4
  381:23
**americas**  2:16
**amount**  65:7
  73:1,16 157:23
  171:21 371:12
**amounts**  72:23
  73:14
**ample**  224:15
**amplify**  235:3
**analogy**  199:9
  311:5
**analysis**  81:19
  242:18,22
  244:2 245:7,9
  245:19 246:16
  258:10 259:3
  261:21 262:19
  262:23 263:2,8
  263:21 264:11
  265:1 269:4
  282:8,15
  291:13 292:15
  296:5
**analyze**  295:19
**analyzing**
  282:7,14
**andrew**  3:4
**anecdotally**
  230:23

CONFIDENTIAL

**[anecdotes - articles]**                                                      Page 7

| | | | |
|---|---|---|---|
| **anecdotes** | **anticipate** 21:7 | 285:11 397:18 | **argument** |
| 232:2 | 21:11,14,21,23 | **appreciating** | 201:1 |
| **ann** 13:20 | 32:22 394:24 | 272:11 | **arianna** 190:4 |
| **answer** 11:5 | **anticipating** | **approach** | **arising** 268:15 |
| 23:8,21 51:3 | 248:7 | 10:23 376:22 | **array** 342:14 |
| 105:17 127:13 | **antonio** 6:18 | 377:11 | **article** 81:1,15 |
| 127:14 132:15 | **anxiety** 81:3 | **appropriate** | 82:7,16 83:4 |
| 148:11 154:6 | 104:23 125:18 | 134:13 135:5 | 83:11,20 84:3 |
| 170:17 171:3 | 130:11 136:17 | 135:13 257:1 | 84:10,17 85:1 |
| 187:24 204:18 | 268:2 | 341:13 398:6 | 85:8,18 86:2 |
| 205:11 223:15 | **apa** 186:19 | **approval** 91:7 | 96:2 143:15,24 |
| 226:9 237:24 | 187:13 | **approximate** | 144:11 145:5 |
| 238:19 241:13 | **apart** 264:4 | 328:5 | 145:15 164:11 |
| 243:2 262:22 | **apologize** 67:21 | **approximately** | 164:19 165:7 |
| 282:24 288:7 | 202:1 274:23 | 19:22 69:24 | 167:7 183:17 |
| 288:18 294:3 | **app** 50:15 | **approximating** | 184:9 189:22 |
| 298:10 299:8 | 155:13 | 328:7 | 190:3,9 191:4 |
| 327:19 332:11 | **appear** 69:3 | **apps** 154:20 | 193:11 195:23 |
| 337:13 344:15 | **appearance** | **april** 60:20 | 196:6,7 198:9 |
| 355:19 359:13 | 81:16 | 335:6 | 202:4,18,23 |
| **answered** | **appearances** | **area** 104:6 | 237:21 245:5 |
| 144:14 167:5 | 2:1 3:1 4:1 5:1 | 293:14 316:24 | 311:4 334:21 |
| 199:22 200:1 | 6:1 | 317:1 323:19 | 335:21 336:12 |
| 244:18 278:17 | **appears** 196:13 | 333:18 335:3 | 336:15 339:5,9 |
| 292:12 372:10 | 209:1 214:20 | 351:5 356:24 | 362:9,13 |
| **answering** | **appended** | **areas** 261:14 | 365:23 366:17 |
| 143:21 | 57:11 | 341:4 | 376:16 |
| **answers** 23:4 | **apple** 113:23 | **arguably** 241:6 | **articles** 21:21 |
| 400:4 | **application** | 269:14 | 77:3,14,21 |
| **anti** 305:2,5 | 285:22 304:13 | **argue** 63:17 | 78:1 79:13 |
| 317:23 318:1,8 | **applied** 286:19 | 171:1 192:5 | 95:15,20,21 |
| 318:19 319:1,8 | **applies** 154:14 | 245:16 272:23 | 96:1 144:3,18 |
| 319:15 324:23 | **apply** 130:21 | 301:4,11 | 144:19 145:24 |
| | 154:2,7,16 | | 146:4,6,7,12 |

**[articles - attorney]**                                          Page 8

| | | | |
|---|---|---|---|
| 147:1 148:9,14 | **asking** 32:20 | 288:12 | **assumptions** |
| 148:17,18 | 56:10,12 73:4 | **assessment** | 115:2 |
| 149:3,5,7,14,19 | 94:7 95:6,7 | 108:9,13,17 | **attached** |
| 150:1,6 164:11 | 100:11 101:19 | 109:8,14,18,24 | 398:12 400:6 |
| 164:16,17,21 | 110:14 114:1 | 110:15 133:13 | **attempt** 159:3 |
| 165:3,8,17 | 130:24 133:18 | 142:21 | 189:7,13 |
| 167:17 245:2,4 | 134:9,12 | **assessments** | 227:24 228:4 |
| 286:24 292:2,7 | 135:22 136:6 | 109:2,3,6 | 252:10 298:12 |
| 292:23 295:13 | 153:22 156:10 | 110:3 | 299:16 |
| 296:7 333:6 | 170:13 176:21 | **assistance** | **attempted** |
| 362:4,16,16 | 180:17 182:11 | 359:18 | 332:20 |
| 363:1 364:4,11 | 184:3 187:22 | **associated** | **attempting** |
| 365:4,10 366:3 | 194:18,24 | 50:15 247:20 | 248:16,23 |
| **artificial** | 205:11,15 | 267:16 302:5 | **attempts** 227:4 |
| 307:12 315:5 | 223:10,11 | 379:7 | 230:12 231:12 |
| **aside** 59:18 | 225:14 240:12 | **association** | **attend** 32:17 |
| 77:10 95:8 | 253:11 258:7,9 | 9:22 173:22 | **attended** |
| **asked** 26:4 | 263:7 264:18 | 174:7,12,20 | 359:19 |
| 27:21,22 55:5 | 267:1 273:22 | 175:4,14,18,22 | **attention** 105:1 |
| 59:12 62:15,17 | 275:14 278:10 | 176:8,23 181:3 | 229:8 381:2 |
| 87:23 93:19 | 290:3 296:21 | 185:10 248:1 | **attorney** 7:6 |
| 94:1 110:11 | 300:4 309:4 | 250:22 251:22 | 13:13 19:23 |
| 113:17 127:14 | 311:11 338:7 | 252:24 258:23 | 20:10,24 21:2 |
| 133:19 135:23 | 347:2,4 353:10 | 288:1,9,22 | 25:7,15 28:20 |
| 144:14 162:1 | 353:11 380:1 | 289:11 293:17 | 29:3 32:13,15 |
| 175:6,8,10,10 | 383:14 | 293:23,24 | 33:13,24 34:9 |
| 199:10,22 | **aspects** 213:3 | 294:7 295:10 | 34:20 35:5 |
| 203:11 211:20 | 213:14 | **associations** | 37:10,18 38:7 |
| 212:1 214:4 | **assertion** | 83:12 85:20 | 39:4,14,20 |
| 222:3 252:15 | 274:10 | 185:2,11 | 40:5,11,21 |
| 258:21 266:13 | **assertions** | **assume** 73:4 | 41:3,12,18 |
| 296:22 299:9 | 272:18 278:15 | 75:2 363:16 | 42:3,9,18 43:7 |
| 352:5,10 392:4 | **assess** 108:19 | **assumption** | 43:16,23 44:8 |
| | 114:6,8 142:9 | 114:23 | 44:14,24 45:6 |

CONFIDENTIAL

**[attorney - attorney]**                                                      Page 9

| | | | |
|---|---|---|---|
| 45:15,22 46:7 | 126:19 127:6 | 202:3,16 203:5 | 278:7 280:4 |
| 46:15,23 47:18 | 127:15,22 | 204:1,6,11 | 281:24 282:16 |
| 47:24 48:11,19 | 128:2,23 129:3 | 206:7,23 207:5 | 283:7,14 |
| 48:24 49:5 | 130:5,9 131:2 | 207:18,21 | 284:23 286:20 |
| 50:18,22 52:13 | 131:15 133:4,9 | 208:18,20 | 287:22 288:4 |
| 55:16,24 56:2 | 133:16,21 | 209:16 210:7 | 288:10 289:24 |
| 57:3,8 58:10 | 134:2,8,18,20 | 210:19 211:8 | 290:6,17,24 |
| 58:16 63:9,22 | 134:23 135:11 | 211:14 212:15 | 293:11,15 |
| 64:3,18,23 | 135:19 136:4 | 212:20 213:11 | 295:5,18 297:7 |
| 65:10 67:9,18 | 136:18,24 | 214:1,16 216:5 | 298:11 304:16 |
| 68:1,4,7,8,12 | 137:8,17 141:7 | 216:16 217:6,9 | 304:23 306:6 |
| 68:13,16,18 | 141:9 144:13 | 221:8 222:6,22 | 306:11 307:14 |
| 70:2,7,19,21 | 145:3 151:9,15 | 223:16 224:7 | 307:18 308:24 |
| 72:15,21 74:3 | 152:1,8 163:19 | 225:12 231:5 | 309:5,12,17 |
| 74:11 77:17,20 | 164:8 165:11 | 232:13 233:4 | 310:5,21 |
| 78:8,17 81:21 | 166:12 167:2 | 234:4 240:2,14 | 314:14,23 |
| 81:23 82:1,5 | 167:20 168:22 | 240:21 241:20 | 315:21 316:3 |
| 82:21,23 83:2 | 170:1,18,22 | 245:21 246:12 | 318:21 319:3 |
| 86:18,22 87:2 | 171:2,5,15,19 | 246:20 247:15 | 327:3,14 329:8 |
| 88:15 89:10 | 172:9,20,24 | 248:18 249:4 | 330:7 331:21 |
| 90:23 91:17 | 173:7,15 174:3 | 249:21 250:1 | 332:3 334:7,19 |
| 93:12,24 94:11 | 176:12 177:6 | 250:10,16,24 | 338:12,15,24 |
| 94:18 97:8,18 | 179:23 181:1 | 251:19 252:17 | 345:18,20 |
| 98:6,8 106:16 | 181:13 182:7 | 252:19 254:12 | 346:8 347:12 |
| 107:4 111:18 | 183:20 184:15 | 254:18 258:14 | 347:22 353:12 |
| 112:1,15,18 | 185:14 186:14 | 259:1,8 260:3 | 353:18 355:14 |
| 115:12,20 | 187:15 188:1 | 260:5,24 262:1 | 356:17 359:8 |
| 116:22 117:3 | 189:3,18,20 | 262:17 265:3 | 360:8 363:3,11 |
| 118:3,10 | 191:5,15 | 266:6,10,19 | 364:6,14 372:6 |
| 119:23 120:2 | 192:17 193:14 | 269:12 270:8 | 373:3,10,19 |
| 120:16 121:4,8 | 194:14 195:19 | 270:17 271:8 | 374:2,8 375:7 |
| 121:9,18 | 196:10,15 | 272:19 274:2 | 376:3,15 377:3 |
| 123:21 124:1,6 | 197:17 198:13 | 275:10,16 | 377:7 379:17 |
| 124:11 126:1 | 199:21 200:9 | 277:4,23 278:6 | 380:4 383:8,19 |

**[attorney - bates]**                                              Page 10

| | | | |
|---|---|---|---|
| 384:1,4,11,19 | **authors** 285:6 | 164:23 167:6 | **barriers** 209:24 |
| 384:22 385:1,5 | 285:8,24 | 167:17 182:13 | 210:4 211:24 |
| 385:9,14 387:4 | 287:11 377:15 | 184:8 195:21 | 216:13 |
| 387:15,18,22 | **auto** 234:20 | 196:17 202:4 | **base** 230:7 |
| 389:13,16 | **available** 186:8 | 202:22 212:22 | **based** 26:12 |
| 391:1,15 392:1 | 210:11 | 214:6 226:4 | 47:4 51:5 90:7 |
| 393:17 395:7 | **avenue** 2:16 3:5 | 244:20 257:19 | 119:13 124:15 |
| 395:15,21 | 3:21 5:12 | 264:20 265:6 | 125:22 126:7 |
| 398:16 | **average** 157:20 | 267:6 271:14 | 134:21 138:24 |
| **attorneys** 28:18 | 281:5,8 327:15 | 275:6 282:4 | 139:5,11 |
| **attribute** | 327:24 331:12 | 291:9 296:8 | 141:23 146:4,7 |
| 191:10,13 | 331:16 336:22 | 317:2 319:7 | 146:12,24 |
| **attributed** | 336:24 | 324:2,10 336:2 | 148:8,16,18 |
| 170:9 | **aware** 91:5 | 337:8 345:11 | 149:3,6 150:1 |
| **attrition** | 124:12 125:5 | 347:15 365:4 | 150:6 177:12 |
| 332:13 337:21 | 204:2,12 | 366:22 384:2 | 177:13 178:2 |
| **attuned** 190:24 | 234:14 253:7 | 393:16 | 180:2 196:13 |
| 194:2 195:7 | 253:15 309:7 | **background** | 243:2 256:4 |
| **atypical** 259:11 | 309:18 357:13 | 90:14,15 246:1 | 257:2 273:8 |
| 270:21 271:7 | 375:3,11,18 | **balance** 394:12 | 277:21 306:23 |
| **august** 1:10 | | **baltimore** 5:20 | 309:7 313:14 |
| 12:14 34:19 | **b** | 14:5 333:22 | 313:17 314:4,8 |
| 35:8 36:15,17 | **b** 7:9 8:2 9:2 | 356:19,21 | 316:12 331:2 |
| 39:19 41:1 | 10:2 37:7 | 357:2,3,8,15,22 | 343:20 353:21 |
| 42:8 43:21 | 82:24 85:19 | 358:4,17 359:3 | 354:15 360:17 |
| 45:5 46:14 | **back** 47:22 | 359:24 360:11 | 365:22 379:1 |
| 47:9 122:2,9 | 54:24 60:16,23 | 360:19 361:3 | **basically** 98:14 |
| 122:18 146:20 | 69:2 71:5,16 | **banned** 226:3 | **basing** 320:2 |
| 397:11 | 96:2 107:21 | 239:18 | **basis** 96:5 |
| **author** 81:22 | 111:17,21 | **banning** 226:13 | 178:9 |
| 284:24 285:3 | 120:20 123:6 | **bans** 226:19,23 | **bates** 7:12,14 |
| 287:16 | 132:11 135:3 | 227:4 | 7:14,16,18,20 |
| **author's** 82:22 | 140:6,13 | **barnes** 336:1 | 7:21,23 8:5,8 |
| 274:24 | 144:19 164:16 | | 8:10,13,17,20 |

**[bates - bit]**                                                    Page 11

8:22 9:5,8,10
9:13,16,19,21
10:5,8,11,16,19
10:21 25:11
33:17 34:4,24
37:14 38:3
39:9,24 40:15
41:7,22 43:11
44:3,18 45:10
46:2,18 55:20
69:7 97:13
121:14 173:21
202:10 208:3
208:10 334:13
338:19 376:20
**beasley** 4:4
**beasleyallen....**
4:6
**becker** 4:13
**bedrooms**
169:17
**beeres** 82:16,23
**began** 317:7,9
**beginning**
378:15,16
**behalf** 28:18
90:4,6,19,21
91:3,20 97:3
380:6
**behavior** 81:2
85:9 219:13
220:2 222:2
303:15 313:5
314:12,22

316:20 320:9
325:11
**behavioral**
9:15,19 14:22
15:2,13 67:15
104:24 107:14
107:18 121:15
143:4,4 315:3
315:9,12,14
316:2,4
**behaviors**
241:17 268:18
301:14 311:1
314:18
**belief** 204:22
205:1 206:5
**believe** 27:1,19
31:6 57:20
72:2 80:3
135:22 139:8
141:22 156:24
167:4 174:23
190:14 193:10
214:4 233:17
235:20 236:18
244:17 245:13
261:10 263:19
276:17 277:1
278:14,19
286:6,8 324:15
360:16 383:22
**bell** 353:24
**bellwether**
62:23 64:6

65:2 88:22
276:6 343:2
344:20 345:14
**beneficial**
176:4,9,24
177:9 178:7
186:20 187:4
286:16
**benefit** 199:14
200:5
**benefits** 178:11
178:19,23
188:22 194:4
194:10,21
195:9 197:5
198:17,22
199:4,7,20
**berman** 6:10
**best** 23:11
24:16 272:17
272:22 273:3
273:21,23
274:1 320:13
342:16 356:3
358:20
**better** 54:17
122:14 141:19
**beyond** 31:10
32:23 51:20
52:2 72:9
121:6 171:12
186:11
**bias** 170:23
251:22 252:15

252:16 253:1,4
253:5,9,12,14
253:18,19,23
253:24,24
254:4,6,10,15
254:17,20,23
254:23,24,24
255:1,6
**biased** 254:1
**biases** 255:6
**bidirectional**
248:3,5
**big** 100:3
341:11
**bill** 67:3
**billed** 72:13
73:1 122:9,11
**billing** 116:8,9
**binder** 42:21
42:23,24
**binders** 24:24
94:17
**biography**
97:20 98:10
**biological**
119:5
**biologically**
220:9 221:20
**biscayne** 2:12
**bit** 17:21 61:23
108:23 126:21
130:18 166:14
217:24 233:8
235:24 272:22

275:17 279:17
282:23 320:3
321:20,21
336:4 347:1
355:17 359:13
368:8
**blame**   196:22
197:13,22
198:3
**blog**   163:4
**blue**   34:15
**board**   7:24 8:6
8:18 39:10
40:2 43:4,12
139:13,16
149:23 273:15
331:12 340:24
**body**   53:18
84:13,20 85:5
215:6 268:3
269:9,9 388:4
388:8
**boer**   82:7
**bolstering**
141:18
**bonnin**   5:4,5
**book**   40:6
**bottom**   69:6
98:7 196:2
**boulevard**   2:12
4:17
**bower**   4:17
**box**   169:15

**bradford**
242:18,21,24
243:5,19 244:2
244:5 245:7,9
245:18 247:2
257:19 261:1
261:18,23
262:18,23
263:1,7,10,21
264:14 265:1,9
269:4,20
270:11 271:1
282:8,15
**brain**   85:22
389:2
**break**   22:8,9,15
23:7 119:24
120:3 207:2,6
260:12 345:19
345:21 385:12
391:3,22
392:18 393:5
395:18
**breaks**   393:7
**breathitt**   7:24
8:6 39:2,10,18
40:1
**brian**   6:22
12:12
**brief**   120:10
207:12 346:2
391:9
**bring**   36:18
329:5 393:15

**broad**   17:21
172:19 235:16
235:17 241:16
310:3 331:24
355:17 359:13
365:18 383:11
**broader**   63:6
**broadly**   89:8
360:14
**brockstedt**
5:17
**brody**   4:11
**broke**   372:11
**broken**   147:16
**brought**   24:20
47:1 52:19
53:1 56:22
57:1 203:16
**bucket**   324:19
**build**   189:1
225:10 329:15
**building**   194:5
194:12 313:4
316:20 373:9
**bullet**   186:16
220:7
**bullied**   305:20
**bullying**   303:7
303:15,24
304:2,4,6,9,18
305:2 379:7
**burling**   3:10
**burnout**   10:16
333:14,21

334:4,13,22
335:13
**business**   240:1
240:19
**byrne**   4:11
**bystander**
305:19
**bytedance**   2:19
2:20

**c**

**c**  85:12,19
**calculate**   393:8
**california**   1:1
12:23
**call**   119:1
219:15,18
220:8,10,14
221:4 224:2
375:21 386:15
391:2
**called**   55:3
79:17 139:20
225:22 276:3
276:20
**calling**   245:10
**calls**   65:19
330:15
**capacity**   64:12
87:10 96:6,12
105:20 313:4
316:20 358:19
**capture**   300:4

[care - certainly]                                          Page 13

care  18:7,9,13
19:15,21 20:3
20:7 104:13
107:6 109:11
110:9 112:24
124:21,23
125:1 209:24
210:4,10
211:24 360:17
389:18 390:16
careful  216:2
carefully
224:13 398:4
carella  4:11
carellabyrne....
4:14,15,19
caring  217:19
carry  353:6
cartmell  5:11
carved  240:16
case  8:8,11,13
8:15,18,20,23
9:6,8,11 20:19
26:4 40:16
41:8,23 42:13
43:12 44:4,19
45:11 46:3,19
52:16,17,18
59:23 60:3
66:3 68:20
80:11 89:21
114:16 133:10
150:22 173:10
187:8 198:5

221:16 242:19
244:3 259:20
259:22 288:13
288:14 314:1
321:17 323:5
325:15 361:1
361:12 362:20
370:19 380:21
384:9,15
391:18
cases  1:7 19:16
132:12 179:8
272:24 379:6
castillo  6:16
catch  392:12
category  148:6
causal  244:7
247:21 249:19
256:21 289:18
289:18
causality  243:8
243:24 245:12
causation
247:17 248:1
250:23 251:6
252:5 256:3,14
257:1,8,11,22
257:24 258:10
258:11 263:14
269:18,23
295:3,17
cause  114:6,8
114:23 115:9
126:10 191:24

192:7,14 193:3
235:4 245:13
255:17 282:7
282:14 320:8
367:2,18 368:1
368:5 369:9
370:8 374:13
374:15 382:24
388:22
caused  63:7
183:19 197:3
223:13 227:5
234:6 250:8,14
266:8,23 267:2
267:4 279:2
280:1 294:15
312:22 313:11
316:13 368:9
causes  114:9
190:22 259:4
causing  221:15
248:15 251:12
342:22 343:14
cecchi  4:11
ceiland  5:7
cell  226:19,23
226:24 227:4
center  2:11
14:8,12 36:11
87:8,13 89:23
90:5,8,21
91:12 96:21
106:5 108:10
108:14 109:9

109:24 190:19
206:12 242:10
312:7 326:6
349:22 357:21
358:15 359:5
359:20 360:11
360:15 362:12
certain  98:21
99:2 135:5
136:21 161:3
169:20 197:3
198:24 226:13
244:9 295:24
335:15 336:5
336:19 351:13
361:24
certainly  105:4
114:9 115:7
116:12 129:13
161:4 165:1,2
201:1 210:8
222:15 233:9
233:23 234:15
234:24 236:20
237:19 240:6
244:4 247:23
248:6 251:5,10
252:6,11 255:4
255:13,18
256:19 284:8
292:21 295:14
297:19 302:9
303:17 307:8
313:1,8 314:9

[certainly - citing]                                          Page 14

325:2 333:2
336:21 355:20
367:5,12,20
381:1 382:19
**certificate**
397:1
**certification**
12:4 397:17
**certified** 1:21
332:7 397:11
**certify** 397:4
400:3
**certifying**
397:21
**cessation**
312:22
**cetera** 96:23
107:19 154:12
183:7 281:14
389:11
**challenge**
115:17 250:15
341:19
**challenges**
113:7 187:11
268:14 331:20
332:7 339:16
340:7 341:6
369:9 370:5,21
**challenging**
52:20 61:22
**chance** 176:15
**change** 35:6
81:16 309:22

313:6 316:21
317:15 320:8
330:11 399:3
**changed** 307:7
307:9,20 308:4
315:10 387:9
**changes** 35:7
35:13 225:15
308:12,15,20
308:22 310:2
310:13,15
398:11 400:5
**changing**
309:11,20
327:1 339:19
340:10
**characteristics**
179:11,20
**characterizati...**
315:19 393:20
**characterize**
232:1
**charge** 65:21
66:2,5
**charging** 65:16
**charleston** 8:9
8:11 40:9,17
41:1,9
**charts** 107:21
**check** 1:16 2:3
207:1,6
**checking** 183:2
280:24

**child** 10:20
16:8 105:21
108:16 129:9
192:2 197:23
338:20 339:6
375:13 380:6
389:1
**childhood** 52:3
106:5 108:22
117:24 118:17
118:24 318:10
**children** 10:14
65:8 85:10
107:12 108:1
108:17,20
109:2 112:6
129:12 137:13
137:24 159:6
167:22,23
168:1,2,4,7,8
168:10,15
169:6,12 170:3
170:7,20
208:15 217:15
227:12 241:11
273:19 280:16
294:15 302:24
369:20 374:20
375:19 382:16
382:21
**children's**
171:7 381:19
**china** 283:11

**choice** 392:21
393:1
**choices** 139:21
140:4,10
**chronic** 312:7
367:24
**chu** 85:8,12
**circle** 370:14
**circumstance**
136:8
**circumstances**
135:6 136:21
179:12 275:5
330:10 342:21
362:22 369:10
**citation** 273:22
311:10 312:2
**citations** 275:7
278:18 311:12
**cite** 182:12,15
272:9 311:4,19
311:23 316:11
322:24 333:16
346:14
**cited** 92:9 94:5
94:8 95:1
164:16 272:7
311:15 318:7
324:3 363:1
364:4
**cites** 274:19
**citing** 271:22
335:24

city  5:13
  333:22 357:22
  358:17 359:3
  359:24 360:12
  360:19 361:3
citycenter  3:11
claim  204:15
clarify  30:24
  50:24 51:3
  99:24 105:17
  138:16 159:9
  363:6 376:9
  395:8
clarifying
  31:16 146:17
clarity  196:4
class  100:23
  237:7,11
classes  16:24
  17:3 99:21
classified
  315:24
classroom
  201:5 281:12
  344:4 389:11
clean  24:6
clear  23:14
  89:11 195:22
  205:6 211:17
  213:13 218:3
  221:11 222:4
  258:7 277:19
  278:10 323:23
  339:4 351:2

clearly  142:18
  166:4 322:22
clients  325:19
  326:2 330:20
clinic  108:17
  109:14 110:15
clinical  17:5,11
  17:14,17,20,23
  18:1,2 19:4,8
  19:10 20:5
  51:16 103:5,7
  103:11,15,17
  103:20 111:1
  111:12,23
  112:9 114:15
  115:21 116:18
  116:20 124:15
  124:20 125:3
  126:23,24
  128:5 131:20
  132:7 135:9
  138:9 139:8
  237:16 357:2
  389:17,19,24
  390:1,14,16
clinically  133:3
clinician
  106:13 109:21
  110:16,17,18
  110:20 134:14
  135:13 358:8
  358:10
clinicians
  106:23 125:15

358:12 359:24
  360:19
close  382:17
code  236:17
coding  236:21
  236:22
cohort  81:4
  85:11 321:13
  321:15,19,23
  321:24 322:4
collaboratives
  350:1
colleagues
  36:11 161:7
  242:6
collect  110:11
  130:22
collecting
  111:11 133:12
college  54:4,10
  217:21 283:10
  284:12,17
colloquially
  345:2
column  26:6
  69:15 378:23
combined
  323:3
come  19:16
  21:22 23:18
  109:17 119:2
  126:23 127:9
  132:4 133:13
  142:17 248:10

248:11 252:2
  266:17 284:2
  313:19 318:13
  329:23 337:8
  342:3 348:20
  349:12,18
  351:4 352:5,10
  352:14,24
  353:4 361:22
  371:21
comes  113:8
  142:16 206:17
  325:10 331:5
  331:10 371:15
comfortable
  169:2 171:6,13
  199:11 328:7
coming  278:20
  279:10 353:9
  353:15
commencing
  1:18
comments
  31:18
commission
  400:12
committee  5:22
  10:10,10,13
  54:13 175:7,9
  175:13 208:5,6
  208:12,23,24
  210:1 211:11
  211:20 212:12
  215:16 216:12

CONFIDENTIAL

**[committee - conducted]**                                    Page 16

217:13
**committees**
175:11
**common** 285:8
336:23
**commonly**
117:8 248:8
315:15
**communicate**
189:1
**communicating**
22:21 194:4,11
**communication**
97:1
**communicati...**
304:11
**communities**
382:2,9,14
**community**
136:16 137:1,2
138:18 306:23
307:4 373:14
380:18 382:13
383:6
**comorbid**
105:3
**companies**
142:7 232:21
**companionship**
188:16
**company** 1:23
142:2 143:12
**compare** 371:2

**compared**
293:9 371:3
**comparison**
85:4 268:5
**compensation**
58:7,8 102:24
**competing**
339:19,24
340:9,13 341:2
**complete** 24:17
27:6 42:19
46:24 49:6,9
57:23 58:20
59:3
**completed**
35:17
**completely**
276:4 288:17
297:20
**complex**
115:11 320:16
320:18 322:21
**complexity**
197:1,16 198:7
**complicated**
367:5
**component**
10:19 216:23
304:12 320:7
322:17,20
323:10 338:20
339:6
**components**
312:15,17

313:2,9 314:8
317:3 354:21
354:22
**composition**
141:1
**comprehensive**
10:22 26:22
54:6 61:15
63:6 142:9
145:21 212:2
224:20 225:6
225:10 241:23
296:12 299:1
310:10 311:18
330:3 349:8
350:12 351:2
376:22 377:11
**compulsive**
183:2
**compulsively**
280:20
**computer** 75:8
237:5,8,11
**concentric**
370:14
**concept** 193:1
243:3
**conceptually**
119:19
**concern** 205:17
348:21 383:1,3
**concerns**
238:23 239:6
268:23 343:24

344:3 369:19
381:20
**conclude** 393:3
**conclusion**
256:9 258:21
366:7
**conclusions**
232:7 255:19
256:13 257:8
260:2 262:16
265:22 273:7
277:20 291:14
292:16 295:15
324:12
**concurrent**
83:12
**condition**
123:19 124:4
269:5
**conditions**
104:13 105:13
105:18 117:16
117:20 118:24
220:10 221:21
266:7
**conduct** 163:10
163:12 239:12
239:24 240:19
241:6,7,16
262:23
**conducted** 27:8
29:5,7 32:18
123:2 163:6
257:16

Golkow Technologies,
A Veritext Division

**[conducting - content]**                                    Page 17

**conducting**
21:7,11 32:22
**conferences**
226:6
**confine** 203:2
**confined** 100:8
372:1
**confirm** 56:3
56:10,13,16
82:13 97:19
122:1 174:4
189:21 208:21
217:11 334:20
339:4 377:8
**confirmation**
75:19 255:1
**conflict** 138:4
268:19
**confounder**
249:8,12
252:10
**confounders**
248:9 252:11
**confounding**
248:9 251:23
252:7,8
**confusing**
165:14
**congress** 53:20
54:21 207:20
210:16 218:22
**connectedness**
189:14

**connecticut**
379:3 380:8,14
380:24
**connection**
60:14 199:2
378:11,18
**connolly** 3:3
**consciousness**
81:17
**consensus**
128:15 129:5,5
129:18 294:12
294:23
**consequence**
235:10
**consequences**
84:11
**consider** 20:5
62:17 82:7
150:24 152:13
152:21 235:9
255:3 256:23
264:12,20
265:11 268:9
269:16 284:17
289:17 307:22
343:10 344:9
362:15 366:17
**consideration**
62:2 362:14
**considerations**
243:17,18
**considered**
7:20 37:7,8,15

57:22 58:1,18
58:21 59:1,7
76:3,15,19
77:7,9,15,23
78:15 79:14,17
81:9 82:3
150:21 216:9
265:12 289:15
292:22 323:18
348:8,15 349:2
354:12 364:12
364:19,21
366:20
**consistency**
328:12,15
355:2
**consistent**
69:23 193:6
203:3 390:6
**consistently**
77:3 164:18
166:9 229:7
349:4
**constantly**
309:10,19
**constitutes**
147:11 150:17
**constrained**
351:6 371:14
372:19
**constraint**
342:4
**constraints**
340:15

**constructs**
84:21
**consult** 296:22
**consultant**
89:22 90:19
296:23 325:19
**consultation**
108:10,13
109:8 148:1
**consultations**
299:19
**consulted**
143:12
**consulting**
14:17,20,20
15:2 20:13
65:17 298:19
326:2 330:20
**contact** 182:19
**contacted**
60:14 61:2,6
61:11
**contain** 286:6,9
**contained**
49:18
**contemporan...**
31:1
**content** 158:10
171:23 172:8
179:13,21
180:8,17 182:2
182:10,19
183:1,5,5,18
184:12 201:11

**[content - corrections]**                                             Page 18

| | | | |
|---|---|---|---|
| 201:15 204:13 | 110:1 310:19 | 386:18 387:12 | 69:17,21 73:5 |
| 226:8 280:2,10 | 392:5,17,22 | **control**   228:10 | 79:20 80:5 |
| 280:13,14,15 | 394:20 395:11 | 228:12,19 | 83:17 85:13 |
| 281:18 282:3 | **continued**   3:1 | 229:14 397:20 | 89:18,19 90:22 |
| 301:12 308:22 | 4:1 5:1 6:1 | **controlled** | 91:21 102:8,9 |
| 309:9,16,19,22 | 379:4 | 243:10,14 | 102:18 105:14 |
| 310:3 | **continuous** | 282:3 | 106:15 107:5 |
| **context**   110:15 | 156:4 299:6 | **controls**   234:23 | 108:7 117:20 |
| 112:8 113:8 | 326:10,15 | **conversation** | 118:1 121:8 |
| 114:17 116:7 | 328:17 352:2 | 23:18 62:1 | 122:7 125:21 |
| 116:13 177:3,4 | 359:21 | 136:3 190:17 | 125:24 127:5 |
| 177:21 199:4 | **continuously** | 191:3 392:3 | 132:18,21 |
| 201:8 219:21 | 35:20 174:21 | 393:21 | 133:11 147:8 |
| 221:17 222:16 | **contrary** | **conversations** | 148:15 149:10 |
| 223:3 224:10 | 195:17 | 30:7 88:12 | 149:24 150:4 |
| 242:3 248:24 | **contribute** | 94:22 169:7 | 159:11 194:13 |
| 249:9,11,24 | 16:20 114:19 | 309:8 | 196:4,8 199:20 |
| 253:21 255:3 | 115:16 119:22 | **conversely** | 203:4 209:15 |
| 266:18 299:19 | 125:17,20 | 132:3 | 210:11 211:13 |
| 303:5,8,17 | 136:16 137:12 | **copies**   25:1 | 212:19 213:17 |
| 315:10 334:1 | 137:16 193:8 | **copy**   18:19 | 217:1,4,22 |
| 340:12 341:3 | 210:14 213:9 | 33:22 38:20 | 232:24 245:7 |
| 348:3,9 368:12 | 256:19 259:24 | 67:22 68:5,9 | 246:18 253:9 |
| 368:20 369:5 | 383:2,6 387:2 | 121:19 146:20 | 277:24 286:2 |
| 377:22 382:20 | **contributed** | 316:6 | 288:11 289:23 |
| 383:13,18 | 279:6,8,21,22 | **corollary** | 312:4,15 |
| 385:19 389:23 | 370:4 | 320:19 | 314:13 315:3 |
| **contexts**   181:12 | **contributes** | **corp**   14:21 | 335:7 336:15 |
| 186:24 235:22 | 30:3 125:12 | **corporation** | 353:8 355:10 |
| 334:2 | 128:16 144:6 | 15:20 | 377:5,16 |
| **contextual** | 381:19 | **correct**   38:13 | 393:23 400:4 |
| 370:3 | **contributing** | 38:14 47:12,17 | **corrections** |
| **continue**   16:19 | 145:9 198:11 | 48:10,15 65:11 | 398:5,7 400:5 |
| 16:20 102:23 | 211:5 281:19 | 65:14 66:18,19 | |

**[correctly - curriculum]**                          Page 19

**correctly**  72:23
  73:13 185:6,8
  197:6 224:6
  295:21 335:17
  340:3 379:9
  388:7
**correlation**
  244:14 247:17
  247:24 248:3
  290:21 366:21
**correlational**
  256:5,16,18
  257:3,6,14
  258:1,4,12,19
  259:6,13,22
  261:8 288:12
  288:20,21
  289:3,15,21
  290:15 291:2,6
**counsel**  12:3
  13:1 25:4
  26:12 28:9,13
  28:14 32:16
  59:14 62:8,12
  65:18,20 66:10
  67:6,24 68:5,9
  73:15 74:16
  75:1 76:7
  77:12,16 80:4
  92:5,17,23
  93:13,15 94:3
  94:12,14,23
  95:10,22
  119:23 120:16

120:19 345:18
384:4 391:17
392:3,5,15
393:22 394:16
394:24 395:9
**counselor**
  300:21,24
**count**  47:5 48:4
  68:24 72:11
  146:16
**counterprodu...**
  192:8,16
**country**  88:7
  223:22 224:5
  283:10 284:11
  327:17
**county**  4:7 7:24
  8:6,9,12,14,16
  8:19,21 39:10
  40:2,9,17 41:1
  41:9,16,24
  42:7,14 43:5
  43:13,21 44:5
**couple**  53:13
  142:17 162:8
  183:22 195:1
  358:10
**course**  21:18
  93:16 100:18
  100:19 157:17
  160:10 247:18
  360:20 370:19
  392:7

**courses**  100:12
**coursework**
  17:9
**court**  1:1,20
  12:22 13:3
  23:2 171:18
  393:13 394:14
  398:20
**cov.com**  3:13
**cover**  30:1
  33:10 43:1
**covers**  321:18
**covid**  368:4,9
  369:16
**covington**  3:10
**crafted**  215:23
**crafting**  216:8
**craig**  5:4 6:17
**create**  162:11
  188:15
**created**  308:6
  347:24 348:4
  348:13 349:7
  350:11
**creating**  163:4
  348:9
**creation**  379:16
**crises**  186:22
  187:6
**criteria**  116:3
  116:17 117:18
  123:19 124:3
  124:10,17
  125:6,9 127:18

132:7 243:7,11
243:19 244:5
245:11,16,20
246:9 247:3,4
247:12,14
256:13,17
257:19 261:2
261:16,23
262:8,10
263:11,13
265:9 269:22
270:2,11 271:2
388:9,21 389:7
**cross**  84:22
  257:9
**cull**  365:5,8
**culled**  365:16
  365:19
**culture**  306:5
  306:10
**cumbersome**
  98:24
**curb**  317:18
**current**  15:21
  343:4,7,13,15
  344:12
**currently**  14:10
  14:16 16:6,23
  17:2,10,13
  18:11 20:11
  36:9 128:12
  355:4
**curriculum**
  7:16,18 34:5

**[curriculum - defendants]**                                         Page 20

35:1 216:23
**cut**   365:21
**cv**   18:16,18,24
   24:24 33:22
   34:11,12,16,18
   35:15 36:18
   53:11 54:24
   139:22 140:2,6
   141:16 142:19
   145:24 146:10
   148:9 149:17
   174:16 358:7
**cvs**   35:8 36:5
**cyberbullying**
   303:3,4,7,11,13
   303:19,23
   305:3,5,8,15

**d**

**d**   7:2 86:3
**daily**   83:13,23
   129:16 273:14
**daniel**   3:4
**data**   64:12 65:6
   131:18 237:13
   237:17,20,23
   244:12 284:21
   287:9 300:3,4
   302:23 308:21
   339:20 344:11
   346:10 375:11
   375:16 382:10
**databases**
   361:15,18

365:2
**date**   1:19 12:14
   18:16 33:7
   34:18 35:13
   36:19 60:24
   69:11,15,19
   70:5,22 106:19
   205:5,12 288:8
   394:22 398:9
   400:8
**dated**   33:22
   37:23 39:3,18
   40:9 42:8
   44:13 45:4,20
   46:13 47:7,9
   47:16 98:1
   122:2 190:4
   397:11
**dates**   25:21
   26:5,6 48:22
   49:4 53:11
   74:19 139:23
   140:1 174:17
   358:7 394:3
**dating**   140:17
   140:20
**david**   4:12 5:5
**day**   22:7 64:2
   160:10,21
   227:1,19 230:9
   230:9 281:2,8
   281:10 289:13
   293:8 297:1
   298:2 358:1

391:23 392:8
   392:14 395:13
   400:11
**days**   68:15 93:5
   93:7 113:16
   200:15 348:19
   398:16
**dbonnin**   5:8
**dc**   3:5,12
**de**   4:17
**dealing**   63:5
**death**   367:23
**decade**   106:24
   107:11 206:3
   325:15
**decades**   270:7
   326:13 378:17
**decide**   360:23
   361:10
**decision**   223:22
   262:9,11 323:3
   340:22
**decline**   316:14
**decrease**
   313:24 316:19
   317:6 383:7,11
   386:19 387:3
   387:13
**decreased**
   267:18 269:7,8
**dee**   1:19
**deemed**   398:19
**deep**   320:8

**deeper**   153:19
   314:5 346:19
**deeply**   182:18
   231:19 234:10
   264:8
**defendant**
   80:10 86:9
   145:18
**defendant's**
   222:20
**defendants**
   2:19 3:7,14,23
   56:4 80:14,17
   106:14,21
   107:3 150:14
   150:22 151:5,7
   151:14,23
   152:6,11,18
   154:15,16,19
   163:17 164:7
   164:10 165:22
   166:3,10
   169:22 201:17
   203:12,23
   204:17 215:2
   223:2 226:21
   228:11 230:6
   231:1,20
   232:16,19,20
   233:2 238:8,22
   239:5,11,17,24
   240:8,19 241:3
   298:7 303:9,20
   304:14 307:24

**[defendants - despite]**                                                Page 21

| | | | |
|---|---|---|---|
| 346:23 347:7 | **dekalb** 4:7 8:14 | 317:12 366:1 | 125:18,22 |
| 368:22 | 8:16 41:16,24 | 374:4 | 126:10,11 |
| **defense** 32:17 | 42:7,14 | **deponent** 12:23 | 127:18 130:12 |
| 68:5,9 150:18 | **delay** 394:17 | 400:1 | 132:8 133:1 |
| 153:2,6,9 | **deleted** 76:14 | **depose** 183:13 | 268:2 |
| 154:3 161:10 | **delivered** | **deposed** 52:8 | **depressive** |
| 163:7,10 | 204:13,20 | 52:12,16 53:3 | 81:18 83:6 |
| 165:10 166:17 | **delivery** 204:16 | **deposing** | 84:5 104:22 |
| 166:19,22 | **demerath** 6:16 | 398:16 | 117:24 118:13 |
| 168:5 170:3,13 | **demonstrate** | **deposition** 1:13 | 118:16 |
| 203:4 204:3 | 258:4 311:24 | 9:13 11:2 | **depth** 348:23 |
| 229:15,24 | **demonstrates** | 12:16 13:24 | **derive** 183:8 |
| 231:4 234:7 | 181:24 182:9 | 55:15,21 56:5 | **describe** |
| 362:23 363:8 | **denied** 52:22 | 56:9 65:22 | 163:15 220:8 |
| 363:13,19 | **department** | 78:23 86:8 | 267:15 303:15 |
| 392:5,15 395:9 | 101:5,11,14,16 | 91:24 92:3,13 | 315:6,13 319:9 |
| **deficit** 105:1 | 101:18,22,23 | 92:18,21,24 | 319:23 358:3 |
| **define** 17:20 | 102:4,13,14,16 | 93:4,11 94:10 | **described** 25:5 |
| 125:8 202:20 | **departments** | 95:2,12,23 | 146:3 267:7 |
| 236:4 242:21 | 87:17 101:3 | 392:6,7,14 | **description** |
| 243:1 | **depend** 181:5 | 393:4,14 394:4 | 7:11 8:4 9:4 |
| **definition** | **dependent** | 394:17 395:11 | 10:4 69:16 |
| 51:14 149:15 | 179:9,18 | 395:13 396:8 | **design** 153:20 |
| 149:18 150:10 | **depending** | 397:6 398:3,13 | 232:15,18,19 |
| 150:17,21 | 171:23 172:7 | 398:17,19 | 233:2,11,13,22 |
| 203:3,8,18 | 204:14 324:7 | **depositions** | 235:11 238:16 |
| 236:7 288:19 | 375:16 | 77:11,22 78:5 | 240:7 241:8,18 |
| 303:3 | **depends** 96:15 | 78:13 79:6,9 | 281:16 293:4 |
| **degree** 103:19 | 96:15 125:8 | 229:17 231:9 | **designed** 149:3 |
| 104:5 237:4,13 | 127:20 131:20 | **depressed** | **designs** 291:10 |
| 237:23,24 | 144:1,8 149:11 | 127:20 132:5 | 292:17,20,22 |
| 368:23 370:21 | 161:1 181:21 | 133:3 | **desk** 362:10 |
| **degrees** 103:24 | 242:20 286:22 | **depression** | **despite** 339:21 |
| 104:3 | 288:17,18 | 81:3 107:18 | 394:2 |

CONFIDENTIAL

**[detail - dig]**                                                                 Page 22

| | | | |
|---|---|---|---|
| **detail** 233:21 | 318:24 353:20 | 130:16 131:10 | 93:19 98:17 |
| 319:22 321:4 | **developing** | 170:20 | 105:9 107:23 |
| **detailed** 142:18 | 58:1,21 88:13 | **diagnosing** | 109:9,12,20 |
| 322:6 | 299:6 349:13 | 99:23 100:14 | 126:21 130:18 |
| **details** 153:23 | 354:12 377:22 | 100:17 101:1 | 153:20,24 |
| 316:23 | **development** | **diagnosis** | 158:20,22 |
| **determinant** | 85:22 86:5 | 110:13 115:8 | 166:14 169:14 |
| 119:21 | 137:7 141:6,21 | 116:8,10,14 | 172:16 204:13 |
| **determination** | 143:7 241:7,19 | 124:18 125:7 | 213:3,14 |
| 252:3 257:2 | 267:20 270:1 | 125:10,13,18 | 235:22 245:2 |
| 263:14 | 307:12 341:14 | 125:20 130:13 | 246:3 253:8 |
| **determine** | 341:20 342:1 | 130:20,23 | 257:16,17 |
| 131:11 243:7 | 353:22 354:8 | 131:1,7,12,19 | 264:13 265:21 |
| 243:23 245:11 | 354:16 355:8 | 132:2,7 133:15 | 269:21 275:18 |
| 250:20 251:21 | 355:12 356:2 | 133:20 134:15 | 282:22 283:1,2 |
| 252:24 259:15 | 380:7 389:2 | 134:17 135:8 | 291:11,15 |
| 366:6,8,17,23 | **developmental** | 135:14,18 | 292:7,16,20 |
| **determined** | 313:7 | 136:1,2,9 | 294:5,6 299:10 |
| 256:4 288:9 | **devices** 302:15 | 170:8 390:22 | 304:7,19 |
| 294:6 366:11 | **dgilfillan** 4:15 | **diagnostic** | 311:20 312:20 |
| **determining** | **diagnosable** | 116:16 117:18 | 319:21 324:6,7 |
| 244:6 259:4 | 388:17 | 123:18 124:3 | 326:17 329:12 |
| **detrimental** | **diagnose** | 124:17 125:6,9 | 347:1 350:5 |
| 267:21 | 107:12 116:3 | 126:13,17 | 354:24 368:8 |
| **develop** 62:21 | 126:16 133:2 | 127:18 | 375:15 |
| 142:7 298:15 | **diagnosed** | **diana** 363:24 | **differently** |
| 298:24 299:15 | 108:3 125:22 | **dictate** 341:13 | 94:20 204:20 |
| 350:2 352:5,10 | 126:7,9 127:19 | **difference** 79:2 | 235:21 377:20 |
| 374:21 | **diagnoses** | 153:6,8 171:21 | **difficult** 280:8 |
| **developed** | 106:8 107:23 | 172:5,6 314:10 | 282:23 340:1 |
| 31:13 63:4,12 | 109:10,15,20 | **differences** | **difficulties** |
| 63:20 139:20 | 109:23 110:21 | 153:10,12 | 381:21 |
| 140:8 141:4 | 116:4 117:15 | **different** 51:24 | **dig** 341:21 |
| 142:4 299:4 | 127:3 128:16 | 54:2 66:2 | |

**[digital - district]** Page 23

**digital** 83:13,21
111:16 113:12
163:18 242:6
242:15,15
301:3,5 302:15
304:10
**diminished**
267:20
**dinner** 169:18
**direct** 17:22
18:7,8,13 19:8
19:10,15,20
20:7 86:13
104:12 124:21
124:23,24
139:8 192:20
358:11 389:18
390:16 397:20
**direction** 11:5
**directionality**
82:11
**directly** 20:3
104:11 170:23
249:16 273:9
278:20 281:10
335:11 371:8
**director** 87:10
87:12 91:12
108:8 110:4
190:19 206:11
242:9 349:21
358:15 362:11
362:11

**disagree** 177:8
178:2 213:18
256:6 285:3
289:20 290:12
290:13 315:18
393:18
**disallowing**
169:18
**disappeared**
308:7
**discard** 284:9
**disclose** 94:13
**discontinue**
99:5,7
**discord** 152:13
152:17
**discovered**
63:1
**discretion**
135:15
**discrimination**
136:15
**discuss** 67:6
**discussed** 66:8
66:12 67:8
93:15 161:11
229:17
**discussing**
230:23
**discussion**
178:18,21
**discussions**
147:23 232:1
234:17

**disease** 312:8
**disorder** 105:2
107:18 108:5
117:24 118:13
118:16 128:5
130:4,13 315:2
315:13,20,20
316:1,2 388:5
388:9,18,22
389:7
**disorders** 51:10
51:10 104:22
104:22,23,24
105:3,4,5,7,9
315:15,17
382:20 389:20
389:23 390:2
390:19
**displayed**
67:19
**disposal** 317:21
**disproportion...**
186:23
**disregard**
259:12
**disregulation**
268:20
**disrupted**
268:1 269:9
**disrupting**
274:12 277:10
277:13
**disruption**
279:7 289:12

289:14 344:4
388:20
**disruptions**
201:5 235:4
281:19
**disruptive**
267:24
**dissatisfaction**
85:5 268:4
269:10 388:4,8
**distance** 368:19
369:1
**distinct** 112:11
167:9
**distinction** 51:5
103:14,17
151:7,13,20,23
152:5 315:5
**distinctions**
153:17 264:9
279:15,17
**distinguish**
262:21
**distracted**
282:10
**distraction**
267:17 268:18
269:7
**distractions**
270:16
**district** 1:1,1
4:7 8:9,12 9:9
9:12 12:22,22
26:16 27:2

31:4,20,24
38:13 40:9,18
41:1,9 42:7
45:20 46:4,13
46:20 48:7,16
63:23 64:1,19
86:15 88:4,5
89:1 276:8
298:14,21
299:2 327:7
329:7,12
330:11 331:5
334:2 343:20
344:10,14
348:1,6 350:21
352:4,9 353:9
353:15 354:2
356:22 359:7
372:3 373:6,7
373:17,21
374:1,6 391:19
**districts**   6:20
26:14 27:12,14
27:15 32:1
47:14 49:11
62:22,23 64:6
64:11 65:2
87:17 88:7,22
89:15 96:22
142:9 143:1
147:23 206:15
206:22 232:6
234:18 268:11
270:7 276:6

297:19 299:4
326:7,19 327:9
327:21 330:21
331:15 335:15
335:22 336:6,7
336:20 337:1
337:15 342:7
342:13 343:2,3
344:20,21
345:14 348:19
349:8,13 350:1
350:8 351:3,20
352:13,17,23
354:1,19 355:1
355:12,21
358:16,19,22
370:11
**dive**   153:19
346:19
**division**   12:13
16:8 101:10,20
102:6,7,13,22
106:6 108:15
**divisiveness**
383:5 386:16
387:1
**divorce**   91:15
180:7 281:22
**divorced**   90:11
**doctor**   133:11
**document**   1:6
25:17,20 56:18
176:14,19
177:5 179:5

187:21 218:8
218:24 222:12
277:15 377:9
377:15
**documentation**
32:8 140:15
**documented**
276:24 277:7
**documents**
11:10 56:8
57:2,17 60:7
79:18,19,22
80:1,7,10 92:9
93:10,22 94:5
94:8,13,22
95:1,9 354:9
364:21
**doing**   13:17
21:14,24 30:1
69:1 111:14
133:12 268:13
326:9 347:10
356:10 364:16
366:16 398:8
**domestic**   138:3
**dominating**
268:23
**dose**   295:19,24
296:5
**double**   252:13
**doubtful**
270:19
**dove**   182:17
234:10 264:8

**downloaded**
155:13 157:1
**dr**   13:21 56:7
68:21 90:6
91:11,20 93:13
120:18 121:20
176:12 224:12
224:14 345:7
346:9 392:10
393:15
**draft**   71:17
**drafted**   50:10
71:20
**drafting**   336:12
**draw**   232:8
255:19 256:9
256:13 257:8
258:21 273:7
324:12
**drawing**
283:18 293:3
**drew**   362:5
**drive**   5:19
75:16
**driven**   329:21
339:18
**drives**   235:8
**driving**   10:6
182:21 189:23
202:11 341:22
**dropout**   254:23
**drove**   379:16
379:23

**[dsm - encouraged]**                                        Page 25

**dsm**  115:22,24
  116:1,17 117:7
  117:12,18
  118:7 123:20
  124:5,9 128:5
  128:7,8,13,19
  128:22 315:1
  315:19,24
  316:5,7
**duly**  13:8 397:5
**duration**
  319:18 326:1,1
  350:15 352:11
**dwhiteley**  3:7

**e**

**e**  2:4 7:2,9 8:2
  9:2 10:2 60:17
  81:24 82:24,24
  82:24 83:16,16
  84:18 85:19,19
  86:3 304:5,8
  399:1
**earlier**  139:10
  150:15 207:19
  219:19 225:21
  237:18 264:8
  279:13 356:18
  375:14 384:16
**earliest**  69:19
**early**  81:19
  82:18 83:7
  106:4 108:22
  335:14

**easier**  23:9
**easy**  160:13
**eating**  388:4,9
  389:19,22
  390:2
**economic**
  369:18
**edit**  77:4
**edited**  196:4
**editing**  336:12
**editor**  21:19
  361:21 362:10
**editorial**
  149:23 150:7
  333:3
**educated**  302:7
  305:12,15
**educating**
  229:3,5 268:16
**education**  8:7
  8:18 10:13
  39:11 40:2
  43:5,13 86:14
  87:5,16,17,20
  87:24 88:24
  103:3 130:21
  190:1,18 202:6
  208:13 216:21
  217:13 301:3,6
  301:10,22
  302:14,19
  313:3 320:18
  320:23 322:21
  350:24

**educational**
  103:9 201:12
  201:18 268:24
  332:22 337:6
  378:12,19
**educator**  333:8
**educators**
  87:21 190:23
  229:3 332:16
  334:4
**effect**  248:16
  282:7,14
**effectively**
  22:21 267:11
**effectiveness**
  267:21
**effects**  179:9
  181:4,17
  267:21
**effort**  166:18
  231:2 316:19
  317:6,14 318:9
  320:6,7 326:15
  355:21,24
**efforts**  313:15
  313:17,24
  314:5 316:13
  317:17 319:8
  325:2,9
**eight**  52:11
  184:21
**eiland**  5:4,4
**eilandlaw.com**
  5:7,8

**either**  50:14
  56:24 104:11
  109:16 110:1
  111:3 219:15
  222:19 272:15
  340:19 373:22
  394:20
**element**  264:24
**elementary**
  52:3
**elements**
  264:13
**elliot**  3:17
**ellis**  3:20
**eloquent**  236:7
**emeritus**  16:3,7
  16:10,15 20:14
  91:13 96:6,12
  103:1
**emotional**
  137:6 188:17
  268:19 342:1
  349:9,14
  350:13 354:21
**employed**  86:8
  91:8 138:12
**employee**
  138:23
**encountered**
  297:22
**encourage**
  113:1 226:2
**encouraged**
  188:14

**[ended - examining]**                                     Page 26

ended  35:16
ends  69:8
engage  96:22
  143:7 219:12
  220:1 222:2
  274:11 371:17
  389:3,10
engaged  17:10
  17:13,17 156:5
  160:18 162:20
  162:23 183:6
  235:3 368:18
engagement
  15:5 97:1
  141:5 227:6,16
  227:24 228:5
  228:16 268:24
  280:18
engagements
  36:1
engaging
  141:19 157:4
  200:6 201:3
  205:8 277:11
  280:19 301:15
  305:17 308:2
english  340:20
  341:16
ensure  286:1
entire  100:19
  177:5 331:8
  365:23
entirely  325:22

entirety  32:9
entitled  82:8
  83:6,21 84:4
  84:11,18 85:2
  85:8,19 86:3
  174:7 189:22
  334:22 339:5
entity  14:11,16
environment
  26:20 177:18
  180:15 182:4
  389:4
environments
  182:24 219:9
epidemiology
  104:1
equally  154:3,8
equipped
  356:12
erika  5:18
erosion  267:19
errata  398:6,9
  398:12,15
  400:6
erroneously
  15:15
error  254:11
  255:7,9,15,17
  255:20 256:1
especially
  257:12 263:14
  388:24
esquire  2:4,4
  2:11,16 3:4,4

3:11,20 4:4,12
  4:12,17 5:4,5
  5:11,18 6:4,10
  6:17
essentially  31:5
  142:23 147:13
  175:1 243:6
establish  116:3
  216:22 289:3
  289:22 290:16
  352:19
established
  119:11 205:13
  247:4 256:11
estimate  72:8
  390:10
estimated
  381:22
et  96:23 107:18
  154:12 183:6
  281:13 336:1
  389:11
ethan  363:24
ethics  243:16
evaluate
  248:17,23
  323:7
evaluated
  355:13
evaluation
  142:22 245:19
  319:12 323:9
event  206:5,9
  206:18 289:4

375:6,22 376:2
  376:5,7,9
  381:24
events  206:16
  381:18 382:8
  382:12,13
evidence  83:23
  130:3 141:23
  177:16 178:16
  187:7 263:16
  265:18 316:9
  339:21
evolve  330:12
evolved  119:10
  358:5
exact  18:16
  55:7 60:24
  70:5 71:14
  126:24 127:10
  139:23 158:9
  174:17 203:18
  218:12,17
  328:3 345:12
  358:7
exactly  30:20
  209:19
examination
  13:11
examine
  166:18
examined  13:9
  163:14
examining
  84:19

[example - expert]                                                              Page 27

| | | | |
|---|---|---|---|
| **example** 15:6 | 107:17 119:8 | 121:10,13 | 206:10 230:24 |
| 21:20 23:1 | 320:11 | 173:17,20 | 272:9,12 276:4 |
| 26:18 32:4 | **exceed** 335:16 | 202:7,9 208:2 | 276:13 277:16 |
| 35:14 95:15 | **except** 12:6 | 208:9 217:8 | 277:18,22 |
| 105:1 117:22 | 400:5 | 334:10,12 | 284:18 293:8 |
| 119:6,20 | **excess** 335:23 | 338:16,18 | 300:9,15 306:4 |
| 125:17 133:1 | **exclusively** | 376:17,19 | 306:9 325:3,5 |
| 136:23 138:24 | 287:16 | 377:6 383:23 | 331:3,10 |
| 142:8 147:24 | **excuse** 52:22 | **exhibiting** | 367:15 375:1 |
| 166:1 183:1 | 68:7 165:19 | 335:15 336:20 | **experienced** |
| 199:2 200:3 | 228:19 301:19 | **exhibits** 49:19 | 370:12 375:5 |
| 201:14 211:19 | 306:17 389:10 | 49:24 207:23 | 376:10 381:23 |
| 215:3,20 | **executive** | **exist** 65:6 74:17 | **experiences** |
| 216:18 221:22 | 377:20 | 243:21 258:19 | 118:1,17 119:1 |
| 225:8 232:10 | **exemplar** 320:5 | 258:23 259:13 | 132:1 134:7 |
| 237:21 243:10 | **exercise** 135:15 | 297:11 298:5,8 | 173:3 185:24 |
| 243:14 244:15 | **exhaustive** | **existing** 181:6 | 215:7 254:2 |
| 247:7 248:2 | 118:21 | 181:10 342:6 | 357:3 374:12 |
| 250:4 253:22 | **exhibit** 25:8,10 | **exists** 329:17 | 374:14 375:13 |
| 258:24 274:4 | 27:6,18 28:3 | **expand** 314:20 | 381:17 |
| 276:21 279:6 | 32:24 33:14,16 | **expanded** | **experiencing** |
| 279:10 289:8 | 34:1,3,21,23 | 119:18 | 131:14 186:21 |
| 304:21 307:24 | 37:7,11,13 | **expect** 312:19 | 187:6,10 |
| 311:2 325:8 | 38:2 39:5,8,21 | **expected** | 335:22 344:1,4 |
| 326:12 327:12 | 39:23 40:12,14 | 392:13 | **expert** 7:14,23 |
| 331:1 333:23 | 41:4,6,19,21 | **expend** 268:8 | 8:23 33:11,17 |
| 340:17 347:8 | 42:10,12 43:8 | **expense** 67:3 | 39:1,2,9 40:8 |
| 350:19 353:2 | 43:10,24 44:2 | **experience** | 41:15 43:3,4 |
| 354:8 360:18 | 44:15,17 45:7 | 52:24 61:18 | 44:11,19 45:18 |
| 360:22 362:1 | 45:9,23 46:1 | 89:8 90:8,12 | 45:19 48:17 |
| 366:11 368:16 | 46:17 55:17,19 | 135:15 172:7 | 52:19 56:6 |
| 389:6 | 57:2,10,14 | 172:16,23 | 59:2,4,10,12,16 |
| **examples** | 67:10,13 89:18 | 173:9 183:10 | 59:22 60:3,10 |
| 104:19,20 | 97:10,12 | 185:20 206:6 | 61:20 62:6,16 |

CONFIDENTIAL

70:1,6 90:2
142:13 153:18
164:2,3 177:13
180:3 182:17
183:12 184:2
204:15 232:15
232:17 235:7,9
235:15 238:3,5
242:6 244:11
245:1 250:22
270:5 271:11
272:8,15
307:23 313:20
316:17 318:14
332:10 346:18
362:17,23
**expertise**  61:14
242:9
**experts**  60:5
129:8,18
165:20 192:1
231:16 232:18
233:18 234:10
264:7 279:13
342:23 362:18
362:18,21,24
363:8,13,19
**expires**  400:12
**explained**
190:20
**explicit**  253:23
254:3
**explicitly**
145:16

**exposed**  119:17
189:9 200:8
302:4,10,11
369:2 375:21
376:7
**exposure**
193:21 197:4
199:1 228:20
288:13 289:9
305:7 310:20
381:15,17
382:1,7,11
**express**  20:18
20:20
**expressed**
205:17 238:24
239:7
**extend**  51:20
**extensive**  65:6
272:9 277:21
**extent**  63:14
163:14 168:24

**f**

**f**  3:14 184:17
**face**  331:19,19
332:6
**facebook**  3:15
3:15,15,15,16
80:20 85:3,4
155:3 160:1,5
160:14,24
**facilitators**
216:14

**fact**  133:2
134:16 148:24
149:9 162:15
175:12 187:9
214:11 277:16
280:17 315:9
322:24 372:2
394:2
**factor**  119:22
145:9 193:2
246:17 248:15
250:6,8,13
252:8 367:22
**factors**  63:16
114:18 115:16
117:19,23
118:12,15,22
119:4,5 125:11
136:12 137:11
190:23 193:8
195:15 198:11
210:9,13 211:5
213:9 246:16
248:8,10 250:5
252:7 261:3,18
269:16 323:22
369:4 370:3,23
**facts**  49:1
**faculty**  16:5,19
96:18 102:21
**fail**  398:18
**failed**  278:4
**fair**  170:15
356:11

**faith**  332:11
**fall**  231:22
247:13
**fallen**  357:20
**falls**  102:13
**false**  280:12
**familiar**  22:5
26:21 100:19
228:22 230:10
333:24
**families**  10:14
109:5 116:14
141:20 180:5
208:15 217:15
227:11 229:4
230:14 234:19
272:10,13
273:10
**family**  119:16
141:4 268:22
382:17,21,23
**far**  15:11 77:6
157:9 219:2
267:7 314:4
**farm**  4:13
**fast**  78:4
**fax**  1:24
**feasible**  243:15
**feature**  234:7
234:12 263:2
263:22 264:4
**features**  151:19
152:10,18
153:2,16,20,24

**[features - footnote]**                                                    Page 29

157:5 160:17
179:13 180:8
180:11,22
182:20 183:18
184:13 227:16
228:12 230:20
231:20 233:14
233:17,22
234:14,20
235:2,11 264:9
264:17 280:1
280:10 281:16
282:2 307:23
310:3
**february** 209:8
210:17 211:10
212:18 218:16
**fed** 161:5 201:8
**federal** 378:24
380:11
**federico** 5:17
**fee** 65:12 69:17
**feed** 161:2,5
**feeds** 161:2
**feel** 199:10
278:9,11 328:6
359:11
**feeling** 200:5
**feels** 171:11
**fell** 154:23
**fellows** 19:12
**fidelity** 323:12
325:17 333:9

**field** 61:18 89:8
115:18 116:2
119:2,7,10
129:9 175:21
178:19,21
183:10 198:21
225:1 243:13
247:5 252:3,4
273:9 315:7
325:5,14
332:13,14
**file** 57:18
**files** 109:17
**filibuster**
394:16
**filing** 12:4
**final** 20:18,22
21:5 23:16
**finance** 10:10
54:13 208:5,23
210:1 211:12
212:12 215:15
216:11
**financed** 54:15
**financial** 2:11
137:19,23
**financing**
212:13
**find** 132:6
281:21,22
366:20
**finding** 194:4
194:10

**fingertips**
230:4 347:21
**finish** 22:13
24:2,4
**finished** 372:11
**firm** 4:4 5:4 6:4
14:20
**first** 13:24 33:9
38:17,24 43:2
60:13 61:2,6
61:19 70:12,14
81:12 93:3
107:11 119:11
127:10 162:16
180:6 183:24
186:12 191:17
192:21 205:16
214:14 230:2
256:8 280:8
287:23,24
289:5 310:7
312:18 320:1
320:24 327:9
337:20 339:18
357:2 381:14
393:23,24
**fit** 246:7,8
**fits** 240:10
**five** 96:14
213:22 307:21
308:7 327:12
349:6,11,16
350:8,11,22
351:11 384:6

385:3 396:3
**fixating** 192:6
**flap** 25:3
**flight** 392:12
**floor** 2:17
**florida** 2:13
4:18
**focus** 54:8
145:20 190:21
193:2,23 199:5
264:17 267:18
269:8 351:5,7
351:15
**focused** 29:1
**focusing**
173:14 192:13
**folder** 75:7
**folks** 25:22
26:15 27:3
31:3 96:20
232:22 237:2
246:24 323:17
343:13
**follow** 82:20
294:20
**followed** 30:9
**following**
274:15 330:21
379:2,4,13
380:13
**follows** 13:9
**food** 385:22
**footnote** 274:16
274:19 275:14

**[footnote - friendships]**                                    Page 30

| | | | |
|---|---|---|---|
| 276:14,22 | 133:5,17 134:3 | 290:1,18 | **four** 79:18,21 |
| 316:11 | 134:24 135:20 | 293:12 295:6 | 79:24 80:7 |
| **footnoted** | 136:19 137:9 | 297:8 304:17 | 81:3 93:5,7 |
| 271:19 | 141:8 144:14 | 306:7 307:15 | 203:3,12 |
| **footnotes** | 151:10 152:2 | 309:1,9,13,16 | 219:10 |
| 271:21 272:14 | 163:20 165:12 | 310:6 314:15 | **fourth** 186:16 |
| 272:18 275:9 | 167:3 172:10 | 315:22 318:22 | **fragmenting** |
| 275:20 278:2 | 173:1 179:24 | 327:4 329:9 | 343:15 |
| 278:13 | 181:14 183:21 | 331:22 347:13 | **frameworks** |
| **forbidden** | 185:15 187:16 | 353:13 355:15 | 320:3 322:3 |
| 168:10 | 189:4,13 191:6 | 359:9 363:4 | 324:20,22 |
| **forbidding** | 192:18 194:15 | 364:7 372:7 | 325:9 |
| 168:14 | 196:11 197:18 | 373:11 374:3 | **frankly** 64:9 |
| **foregoing** | 199:22 203:6 | 375:8 379:18 | 116:7 128:17 |
| 397:17 400:3 | 204:7,21,24 | 383:9 387:5,19 | 165:14 178:8 |
| **forget** 184:4 | 206:8 209:17 | 400:5 | 205:4 264:5 |
| **forgotten** | 210:20 211:15 | **formal** 149:21 | 296:19 298:8 |
| 299:11 | 212:21 214:2 | 150:2 | 300:1 341:11 |
| **form** 12:6 | 216:6 221:9 | **formed** 264:1 | 341:20 352:15 |
| 19:24 21:1 | 222:23 224:8 | 277:20 | 356:4 372:21 |
| 28:21 32:14 | 231:6 233:5 | **forming** 163:22 | 375:10 |
| 47:19 48:12 | 240:3,22 | 262:6 360:24 | **frequent** |
| 49:1 50:19 | 245:22 246:21 | 361:11 | 351:19 |
| 57:4 63:10 | 248:19 249:22 | **forms** 254:16 | **frequently** |
| 64:4,24 70:3 | 250:11 251:1 | 304:7 | 161:21 339:19 |
| 72:16 74:4 | 252:18 254:13 | **forum** 171:14 | 340:10 |
| 77:18 78:9 | 258:15 259:9 | **found** 61:12 | **friend** 162:19 |
| 88:16 90:24 | 262:2,15 263:7 | 198:23 295:2 | **friends** 161:7 |
| 106:17 111:19 | 265:4 266:11 | 342:24 343:2 | 169:19 |
| 112:16 115:13 | 269:13 270:18 | 344:18,19 | **friendship** |
| 116:23 118:4 | 272:20 275:11 | 345:3,8,9,10,14 | 140:21 |
| 123:22 124:7 | 277:5 280:5 | 354:18 355:11 | **friendships** |
| 126:2 127:7,23 | 282:17 283:15 | **foundation** | 140:18 |
| 130:6 131:3 | 286:21 288:5 | 118:4 375:8 | |

**[front - going]** Page 31

**front** 25:3
  34:13 38:19
  53:17 121:20
  215:15 266:2
  344:17
**full** 10:10 13:18
  57:23 58:19
  73:1,15 96:9
  100:18 208:6
  208:24 321:19
  366:16 392:13
**fully** 36:18
**functioning**
  339:23 367:16
  388:14,24
  389:2
**functions**
  179:13 180:22
  188:15
**fund** 340:17
**funded** 141:18
  352:20
**funding** 35:16
**funds** 351:14
**further** 395:8

**g**

**g** 4:12 83:16,16
  85:19 86:3
**galveston** 5:6
  6:6
**gaming** 113:12
  113:17 304:12
  304:21

**gamut** 105:13
**gather** 64:12
  273:6 284:14
**general** 38:11
  47:7,9 49:10
  88:9 128:14
  129:5,5,17
  140:24 172:18
  173:3 224:12
  225:1 269:2
  290:21 311:16
  312:7,11,13
  316:11 317:11
  331:18 332:6
  333:18 336:5
  359:17 384:7
  386:20 387:14
  388:1
**general's** 312:3
**generalizable**
  283:12 285:1,9
**generally**
  107:20 169:3
  169:13 218:20
  219:15 262:5
  265:12 272:4
  283:24 287:5
  362:20
**generate** 109:4
**generated** 26:1
  76:10 150:12
**genetics** 118:1
**george** 83:11
  83:16

**getting** 305:20
**gilfillan** 4:12
**girls** 84:19
**give** 23:4
  104:19,20
  111:3 118:21
  147:14 170:5
  181:15 201:13
  300:14 351:24
  368:16
**given** 47:5
  61:18 96:18
  220:22 225:20
  244:19 305:7
  328:2 384:5
  395:10 397:7
  400:4
**giving** 221:22
  316:7
**glasses** 122:3
**globally** 117:10
  166:16
**globe** 284:3
**go** 15:6,12 35:9
  47:22 51:6
  54:24 55:5
  60:16,23 69:2
  70:20 71:5,15
  72:19 81:7
  98:20 107:21
  123:6 129:22
  132:10 135:3
  140:13 144:19
  158:12 159:15

  160:14,24
  164:15,23
  167:6,16 169:4
  170:22 182:13
  184:8,16 202:4
  202:22 210:12
  211:18 212:22
  214:5,22 226:4
  244:20 246:16
  263:19 264:20
  265:6 267:6
  270:24 271:24
  282:4 291:8
  296:8 298:24
  299:13 314:5
  317:2 319:7,22
  321:4 324:2,10
  336:2 337:16
  337:23 345:11
  346:15 347:15
  348:24 362:24
  364:3 365:24
  366:22 374:20
  375:1 378:5
  384:2 385:15
  386:7 391:3
**goes** 14:23
  108:23 146:16
  147:1 171:12
  236:12,14
**going** 13:23
  22:6,24 23:18
  23:19 29:14
  31:8 33:3

CONFIDENTIAL

**[going - hardships]**                                      Page 32

| | | **h** | **happy**  18:17 |
|---|---|---|---|
| 50:14 51:1 | **grand**  5:12 | **h**  6:4 7:9 8:2 | 22:15,19 24:2 |
| 75:19 86:21 | **grant**  35:16,17 | 9:2 10:2 81:24 | 53:10 59:6 |
| 128:24 132:20 | 351:14 352:18 | 85:12,19 | 118:8 123:6 |
| 140:6 165:2 | **granted**  16:3 | **hand**  211:22 | 128:7 164:24 |
| 184:6,19 | 393:13 | 334:8 365:11 | 176:18 182:13 |
| 193:18 215:17 | **grants**  36:7,10 | 366:9 | 219:1 243:1 |
| 236:7 257:18 | 101:8 | **handbook** | 254:6 267:5 |
| 285:11 297:2 | **great**  120:4 | 99:11,16,19 | 272:1 324:10 |
| 298:20 299:14 | 321:4 | 100:20 | 337:24 338:4 |
| 330:5 333:16 | **greater**  137:20 | **handed**  25:5 | 346:15 |
| 334:7,8 339:1 | 138:4 268:3 | 56:4 174:5 | **hard**  68:10 |
| 344:16 358:6 | 368:23 | 339:4 377:9 | 72:8 91:15 |
| 361:7 366:8 | **grief**  369:18 | **handle**  391:20 | 112:22 127:12 |
| 381:13 384:12 | 386:7 | **hands**  228:10 | 132:14,14 |
| 390:3 391:16 | **grounded** | **happen**  168:19 | 161:15 174:22 |
| 391:20 | 319:20 | 168:20 203:23 | 180:7 184:6 |
| **golkow**  1:23 | **group**  189:14 | 235:4 305:11 | 204:17 205:10 |
| 12:13 | 199:12 | 376:12 | 226:8 227:8,22 |
| **good**  13:14,15 | **groups**  186:22 | **happened** | 230:18 240:24 |
| 22:16 257:10 | **grow**  181:12 | 133:7 136:9 | 241:14 250:19 |
| 260:11,13 | **guardians** | 362:9 368:12 | 250:19 266:12 |
| 272:24 273:20 | 111:4 | 372:2 373:9 | 276:13,13 |
| 275:1 305:10 | **guess**  50:23 | **happening** | 277:14 281:22 |
| 332:11 | 236:24 263:5 | 115:6 201:7 | 296:16 349:19 |
| **google**  3:8 | 275:1,3 338:6 | 226:15 281:11 | 392:11 394:1,9 |
| **gotten**  78:3 | 352:12 | 284:16 303:20 | 394:19 395:5 |
| 279:16 | **guidance**  26:11 | 356:14 | **harder**  23:6 |
| **government** | 351:24 357:22 | **happens** | **hardship** |
| 225:14 | 358:21 360:10 | 211:17 235:10 | 137:20,23 |
| **grab**  122:3 | 360:17 | 236:6 303:16 | 369:18 |
| **grabbing**  229:7 | **guide**  30:6 | 321:6 372:23 | **hardships** |
| **grade**  321:9 | **gurski**  6:4,4 | | 369:23 |
| **graduate** | | | |
| 117:14 366:4 | | | |

**[harford - health]** Page 33

| | | | |
|---|---|---|---|
| **harford** 8:19 | 266:23 267:2,3 | 113:7 114:7,10 | 210:10,14 |
| 8:21 43:5,13 | 267:8,15 | 114:19,24 | 211:6 212:3,9 |
| 43:21 44:5 | 270:13 271:15 | 115:10,17 | 213:4,10,15 |
| **harm** 182:10 | 279:1,24 | 116:4 117:16 | 215:5,9 216:15 |
| 182:21 183:19 | 280:15 288:2 | 117:20 119:22 | 216:20,22 |
| 197:3 198:17 | 288:14 293:18 | 121:15 123:19 | 217:13,20 |
| 199:5,6 204:22 | 294:2 295:4 | 124:4,17 125:7 | 223:5 224:1,21 |
| 268:3,10 | 300:10 302:5 | 128:16 129:8 | 225:6,11 |
| 270:24 281:20 | 310:17 312:22 | 129:10,13,24 | 226:16 235:13 |
| 294:13,14,19 | 319:16 320:17 | 136:11 137:3 | 240:9 242:11 |
| 294:23 300:8 | 342:22 343:23 | 137:13,14,21 | 246:6 250:5,8 |
| 313:11 314:1 | 348:21,22 | 138:1,5,18,19 | 250:15 251:18 |
| 323:6 | 355:4 | 140:22 141:2 | 252:3,4 267:13 |
| **harmed** 182:3 | **head** 328:4 | 141:19 142:10 | 267:22 268:14 |
| 182:4 186:23 | 331:17 | 142:12,21 | 269:7 270:14 |
| 200:11 | **header** 335:11 | 143:4,5,6 | 293:9,18 294:2 |
| **harmful** 176:4 | **heading** 79:16 | 144:4,5 145:10 | 294:16 295:4 |
| 176:10 177:1 | **headings** 30:18 | 145:21 163:13 | 301:9,13,13,19 |
| 177:10 178:1 | **health** 9:15,19 | 170:8,19 171:7 | 306:14,18 |
| 199:15 205:9 | 9:22 10:6,13 | 173:22 174:8 | 307:2 310:24 |
| 371:16 | 10:20,24 14:8 | 177:17 180:14 | 312:4,6,8 |
| **harming** 221:2 | 14:12,22 15:3 | 182:3 186:21 | 313:3,10,23 |
| 224:4 273:18 | 15:13,23 21:20 | 187:6,11 | 315:7,11,12,15 |
| 280:22 320:6 | 24:14 26:22 | 189:23 190:20 | 316:2,18 317:6 |
| **harms** 62:24 | 36:12 51:10 | 190:22 191:11 | 317:13 318:9 |
| 163:15 166:24 | 54:7,14,19 | 191:13 192:1,8 | 319:10 320:2,5 |
| 177:16 178:12 | 55:6 61:15 | 192:15 193:3,9 | 320:11 321:1 |
| 178:15 179:1 | 62:20 63:8,15 | 193:13 197:16 | 321:11 322:3 |
| 193:21 198:9 | 67:15 82:9,17 | 197:21,23 | 324:20,22 |
| 200:7 221:15 | 83:14,22 85:21 | 198:7,12 199:5 | 333:4,5 338:21 |
| 222:16 223:12 | 86:16,17 87:9 | 202:11 204:5 | 339:7,17,22 |
| 228:24 229:4 | 89:3,3 104:4,6 | 205:19 206:13 | 340:2,8 341:8 |
| 233:24 234:1,6 | 104:7 105:5,13 | 208:12 209:11 | 341:17 344:2 |
| 251:12 259:5 | 106:8 108:19 | 209:15,22 | 349:10,14,23 |

**[health - hoover]** Page 34

350:3,14,24
351:8,21,23
353:2 357:23
357:24 358:24
359:6 361:22
362:1,6,13
365:13 367:2
367:16,19,22
368:1,5,15
369:9,19 370:5
370:8,18,21
371:5 373:6,24
374:7,13,16
376:24 377:12
378:12,19
379:1,12 380:7
380:12 381:20
383:1,3 385:21
386:9
**healthy** 10:22
139:20 140:4
140:10 188:18
376:20 377:10
**hear** 178:9
235:6 371:12
372:9
**hearing** 10:10
10:15 54:2,11
178:11,11
208:6,15,24
215:15 217:15
221:13 232:3
273:14

**hearings** 54:2
**heels** 224:11
**held** 1:15 12:17
**help** 10:13 50:8
76:5,9 140:9
142:8 208:14
298:21 299:15
350:2
**helpful** 169:10
324:16 338:5
383:17
**helps** 263:13
**high** 52:6 54:4
54:9 83:14
138:12,19
139:1,5,11
140:9 217:20
283:12 284:13
284:19 379:6
**higher** 382:1,8
382:14
**highlighting**
378:11,18
**highly** 320:16
327:20
**hill** 242:18,22
242:24 243:5
243:20 244:2,5
245:7,9,18
247:3 257:19
261:1,18,23
262:19,23
263:2,7,10,21
264:14 265:1,9

269:4,20
270:11 271:2
282:8,15
**hire** 332:15
337:18 340:19
**hired** 89:21,22
89:24 90:1
296:23 329:6
330:10,14,17
330:23
**hiring** 321:21
332:7,9,15
337:9
**history** 109:16
110:12 111:12
133:12
**hold** 154:23
238:2,4 242:5
275:6 313:15
**holdings** 3:15
**home** 66:23
137:5,15
367:18,21
368:24
**homework**
196:23 197:14
198:4
**honest** 60:17
66:8 158:8
349:20 359:11
**honestly** 17:3
54:22 71:5
155:18,23
364:8

**hoover** 1:14 7:4
7:12,14,16,17
7:18,19,20,21
7:23 8:5,8,10
8:13,15,17,20
8:22 9:5,8,10
9:13,14,15,16
9:18,19,19,21
10:5,8,11,16,19
10:21 12:24
13:7,20,21
14:22 15:2,13
15:19 25:11
33:17 34:4,6
34:24 35:2
37:14 38:3
39:9,24 40:15
41:7,22 42:13
43:11 44:3,18
45:10 46:2,18
55:20 56:7
67:14,15 68:21
69:8 90:6
91:11,21 93:13
97:13,15
120:18 121:14
121:14,20
173:21 176:13
190:18 192:2,5
202:10 208:3
208:10 334:13
338:19 345:7
346:9 376:20
392:10 393:15

**[hoover - impacted]**                                                Page 35

400:8
**hoover00008...**
  9:14 67:14
**hope**  306:8
**houghton**  84:3
**hour**  65:12,17
  65:22 120:1
  156:2 260:8
  293:8 392:7,14
  395:12
**hourly**  66:3
**hours**  29:17
  69:17 71:15
  72:3,7,9 92:15
  93:1,6 96:10
  96:13 97:6
  122:24 281:4
  321:8 384:6
  385:4 392:23
  393:12 395:3
  396:3
**house**  53:22
  232:20
**households**
  137:19 138:3
**housing**  220:11
  220:18,20,24
  221:5,18
  385:22
**huh**  22:22 23:5
  140:3 191:20
  219:5
**hulu**  113:21

**human**  23:17
**hundreds**
  64:10 88:6
  206:14 281:1
  286:23 333:4
**husband**  163:2
**hutt**  363:24
**hyperactivity**
  105:1
**hypothesized**
  249:15
**hypothetical**
  127:12 132:10
  135:2 258:3,8
  258:18 259:21
  279:10 296:18
  297:10

---
                 **i**
---

**i.e.**  184:24
  185:4 259:3
**icd**  117:9
**idea**  99:12
  157:22 230:11
  263:12
**ideal**  329:2
**identical**
  312:19,24
**identification**
  25:13 33:19
  34:7 35:3
  37:16 38:5
  39:12 40:3,19
  41:10 42:1,16

43:14 44:6,22
  45:13 46:5,21
  55:22 67:16
  97:16 121:16
  174:1 202:14
  208:7,16
  334:17 338:22
  377:1
**identified**
  77:22 194:21
  195:4
**identifies**
  166:23 222:19
**identify**  161:12
  165:7 166:22
  183:16,18
  199:2 200:4
  223:1 246:15
  264:23 296:3
  360:10
**identifying**
  209:23 211:23
  216:13
**identity**  367:1
  367:7,9
**ignore**  385:18
  386:14
**illness**  137:21
  138:5 250:5,9
  250:15 367:24
**illnesses**  24:10
**illustrative**
  32:4,10 221:22

**image**  84:13,20
**imagine**  131:5
  204:19 206:11
  231:12 281:9
  296:17,19
  300:8,9 308:1
  308:9 345:13
**imagining**
  236:11
**immediately**
  274:15
**impact**  26:19
  62:18,20
  125:15 137:3
  140:21 173:12
  179:18 205:18
  210:9 222:16
  240:8 246:4
  250:21 251:8
  258:5 276:9
  296:2 299:21
  300:12,16
  320:17 332:20
  356:16 362:5
  367:15 369:17
  370:14,17
  373:6,16,24
  374:5,6,10
  385:21 386:8
  388:14
**impacted**
  200:22 201:5
  241:4,10
  301:14 368:14

375:2
**impacting**
129:13,23
281:11
**impacts** 63:5
63:13,21
177:14 186:11
193:12 225:2
267:11,15
269:6 270:15
293:9 342:18
344:5 348:2
365:12,18
371:24 372:17
373:1
**impairment**
388:23
**impede** 339:16
340:7 389:8
**imperative**
398:14
**implement**
227:8,9,22
297:6 322:12
322:15,19
323:12 325:16
326:22,23
327:11 329:20
341:15
**implementati...**
319:11 321:22
322:7,9,18
323:16,20
325:6 328:13

328:24 329:1,3
332:21 333:7
**implemented**
224:19 325:20
326:3 327:1
333:10 359:4
360:1,6,12,20
**implementing**
326:13,20
328:10 341:7
354:20
**implications**
285:21
**implicit** 253:18
253:23 254:3
**implying**
336:21
**importance**
103:17
**important**
216:3 252:6
299:22 305:22
306:1 320:20
341:15
**impossible**
205:4 227:18
276:11 296:19
350:7
**improve** 143:1
351:21
**improved**
54:17
**improvement**
142:24 147:24

299:7 326:10
326:15 328:18
350:2 352:3
359:22
**inaccurate**
49:20
**inadequate**
355:13 356:10
**inappropriately**
286:2
**incentivize**
216:21
**incident** 370:15
373:1,5,13,21
374:22 380:18
380:20
**incidents**
375:12
**include** 26:20
88:2,3,6
104:21,23
105:2,6 118:17
118:19,23
119:19 245:6
261:7 275:14
275:21,21,24
286:12 290:22
337:14 361:17
367:8
**included** 37:3
49:15,23 78:14
78:14 79:13
119:15 199:11
216:18 272:14

275:8 277:2
278:2,13
291:23 295:9
336:14 362:14
362:19 364:23
**includes** 16:21
108:22
**including** 27:14
54:17 86:14
89:1 103:23
104:24 107:16
124:22 137:15
163:24 164:2
179:20 197:22
213:15 255:6
267:17,24
269:6 270:14
272:16 301:15
304:8 305:2
316:19 340:9
366:4 368:22
393:19
**inclusive** 77:8
**inconsistent**
343:1,3 344:19
344:21
**incorporated**
14:23 15:3
**increase** 212:8
**increased**
249:18 267:17
268:1 308:2
379:13 381:2

CONFIDENTIAL

**increases**
381:20
**increasingly**
268:13
**incredibly**
199:15
**incumbent**
305:6,9
**independent**
90:2 182:1,10
**index** 11:2
**indicated** 35:18
37:3 48:22
352:24
**indicating**
311:24 392:16
**indicators**
215:4,11
216:20
**indirect** 85:2
**individual**
31:19 38:12
89:22 165:6,10
166:21 172:22
173:4,14
246:17 262:19
262:24 269:5
270:13 271:16
271:23
**individual's**
114:24 173:9
**individually**
48:7 166:18

**individuals**
26:7,9 27:11
27:13 28:2
89:16 337:17
**industry** 238:9
238:14
**ineffective**
230:16
**inevitably**
358:1
**infer** 243:8,23
266:4 269:17
269:22
**inference**
289:18
**influence**
126:12 137:24
256:1 371:3
**influenced**
206:5
**influencers**
370:23
**influences**
219:12 220:1
222:1 248:4,5
339:22
**influencing**
249:13
**inform** 65:9
77:9 89:9
115:7 131:9
132:2 135:9
262:4 265:22
371:19

**informal**
147:22
**informant**
25:23 26:14
27:7 32:23
123:3 234:16
276:5 354:9
**informants**
89:14
**information**
27:1 32:3
63:24 64:20
130:22 131:9
131:18 166:2
186:10 204:9
206:20 224:15
232:9 254:24
257:11 260:1
262:4 265:13
270:4 273:1,7
273:12,20,23
283:18,20,21
284:15 285:9
285:15 286:18
287:7 291:19
295:10,12
302:21 317:17
324:13 333:20
336:13 337:15
347:5,17
**informed**
117:15 184:1
206:19 272:7
272:12 323:3

325:1 339:20
393:24 395:6
**informing**
130:16 163:3
297:1
**infrastructure**
300:3
**infrequent**
351:18
**ingested** 314:13
**ingesting**
314:19,19
**inherent**
189:17
**inherently**
176:4,9,24
177:9 228:1
**initial** 111:9
**initially** 47:6
**initiative** 318:7
318:8,19 319:2
**initiatives**
317:23 318:2
**injury** 1:4
12:20
**innes** 4:12
**input** 319:22
**inquire** 354:6
**inquired** 114:9
114:12
**inquiries**
358:24
**inquiry** 350:19

**[insecurity - invoice]** Page 38

**insecurity**
220:11,18,21
221:6,18
385:22,23
**insert** 131:1
**instagram** 3:16
80:19,22 84:19
155:2 158:24
159:12,16
**instance** 380:22
**instances**
220:15 247:24
251:9 388:12
**institute** 380:7
**instructed** 22:1
**instruction**
267:18 268:19
281:12
**instructional**
227:1
**instructions**
398:1
**insurance**
116:7
**integration**
313:5 339:16
340:7
**intelligence**
307:13
**intend** 238:6,15
240:18 266:8
326:21,23
327:11 353:6

**intended** 63:7
227:3 348:1
349:8 350:12
**intending**
266:14
**intends** 394:16
**intensity** 82:8
**intention** 287:3
**interacted**
131:23
**interactions**
86:13 88:10,23
180:4 194:9
206:21 230:13
**interest** 378:24
379:11,13
380:11,12
381:2
**interested**
381:7
**interesting**
205:1 240:5
263:5 303:13
328:16
**interests**
339:24 340:13
**interface** 98:24
155:15 156:14
**interfere** 24:10
**interfering**
180:13
**internal** 80:7
80:10 149:8

**international**
19:6 147:18
**interns** 19:12
**interpret** 287:9
**interpretation**
84:22
**interpreted**
286:19
**intersect** 63:15
344:12
**intersecting**
179:12
**intervene**
380:20
**intervention**
213:6 316:21
321:11
**interventions**
141:23 313:10
322:20 324:6
325:11 333:9
344:6
**interview** 26:10
27:21,22,23
28:1 29:13
32:1,2 190:13
195:1 196:1,3
196:8 197:12
383:22 386:24
**interviewed**
27:17 190:8,10
190:14
**interviewee**
7:13 25:11

28:7
**interviewees**
31:19 32:9
**interviewing**
29:2 31:3,24
**interviews**
25:23 26:15
27:7 28:6,9,10
28:19 29:4,16
29:22 30:2,22
32:18,23 88:21
113:9 123:3
234:17 276:5
354:9
**intimacy**
188:17
**introduce**
255:14
**introduced**
356:6
**introduction**
378:8
**invest** 380:19
**investigating**
82:10
**investment**
319:10
**invite** 32:16
**invited** 147:3,6
147:10,14,20
148:2,7 225:23
226:1,6
**invoice** 9:20
69:20 70:12

**[invoice - kind]**                                                    Page 39

71:17,18,19
75:3,5,6
120:23 121:3,6
121:15
**invoiced** 70:15
73:23 122:12
122:19
**invoices** 9:15
67:10,15 68:10
68:20 70:9
71:2 72:12,24
73:14,22 74:9
74:15,20,22
75:20 120:19
123:5,7,14
**involve** 314:17
314:22
**involved** 19:14
52:14 180:18
230:3
**involves** 96:17
**irrespective**
127:4 258:11
**irresponsible**
302:6
**irvington** 4:20
8:23 9:6 44:12
44:20 45:4,12
**isolated** 63:4
368:20 369:1
**isolation**
369:17
**issue** 128:19
191:23 294:16

320:16 374:13
374:16
**issued** 47:13
380:6
**issues** 104:16
108:20 114:10
114:20 115:10
136:15 191:14
193:4 197:2,16
197:24 319:10
342:3 356:5
359:6 367:2,13
367:19 368:2,5
370:9 384:16
384:18 385:20
386:15 390:21
**iteratively**
31:13
**it's** 10:6 202:12

**j**

**j** 3:4
**jack** 3:20
**jack.nolan** 3:22
**jacobson** 2:4
**james** 84:10
**january** 69:11
339:10
**jensen** 83:20
**jersey** 4:13
**jjacobson** 2:7
**job** 23:6,9
225:4 349:23

**jog** 61:3,4
**jogging** 141:12
**joining** 189:14
**jonathan** 5:11
**jordan** 2:4
**journal** 148:14
149:20,20
292:4 333:4
**journals** 21:20
77:4,5
**jpkieffer** 5:14
**judge** 170:24
171:9
**july** 37:23
38:10 47:10
69:20 70:11
121:2 122:6,8
122:18,22
**june** 16:1 36:9
39:3 40:10
41:16 43:6
44:13 45:20
47:16 96:11
121:2 122:6

**k**

**k** 3:14 83:5,5
106:2 283:4
320:23 321:7
321:13,24
322:3
**kansas** 5:13
**kathryn** 2:11
13:23

**katie** 396:2
**kaylie** 6:17
**keep** 35:21
169:16 179:3
232:11 235:2
310:1
**keeps** 156:5
**kennedy** 3:11
**kept** 75:5
**kessler** 1:16 2:3
**key** 25:22 26:14
27:7 32:23
89:14 123:3
234:16 276:5
354:8
**keyes** 3:4 68:7
68:12 391:20
395:21
**kids** 159:3,4
217:19 305:12
341:24
**kieffer** 5:11
**kind** 17:22 26:2
29:23,24 51:21
52:17 54:5,14
62:3 91:4
98:11 140:11
141:10,23
143:9 148:1,4
148:12 155:15
156:5 161:2
177:20 180:12
183:4,8 184:4
191:9 201:6

**[kind - know]**                                                      Page 40

| | | | |
|---|---|---|---|
| 230:6 235:3,9 | **know**   15:12,17 | 147:22 148:5 | 226:17,19 |
| 236:3,5 243:20 | 18:16 21:19 | 151:19 152:9 | 227:2,11,21 |
| 244:5 246:2 | 22:1,3,10,19 | 152:12,17,20 | 228:6,8,12,14 |
| 247:3 252:13 | 23:19 24:1 | 153:1,4,15,23 | 228:14,18,22 |
| 253:5 254:20 | 29:24 30:12 | 154:5,10,11 | 228:23 229:16 |
| 257:18 261:9 | 35:14 52:2,4 | 155:14,24 | 230:11 231:14 |
| 262:14 264:9 | 52:12 54:16 | 157:9,12,17 | 231:16,24 |
| 264:12 280:11 | 55:2 56:21 | 158:3 159:17 | 232:3,23 |
| 280:22 287:8 | 60:4 62:2 | 160:11,18,21 | 234:14,15 |
| 293:3 296:1 | 63:16 64:9 | 161:2,4,7 | 235:19 236:9 |
| 311:18 313:10 | 66:7,11 68:16 | 162:17,18 | 236:21 237:20 |
| 319:21 321:24 | 68:22 71:14,16 | 163:21 164:18 | 240:10 241:2 |
| 323:18 324:6 | 72:9,17 73:3 | 165:23 167:9 | 242:9,24 243:9 |
| 329:21 330:2 | 73:18 74:16 | 169:5,11,12,18 | 244:6,8 245:2 |
| 341:21 344:11 | 75:7,22 76:1 | 176:13 177:3 | 247:6 248:20 |
| 346:19 352:23 | 77:1,2,4 78:2 | 177:21 178:8 | 251:2 252:1 |
| 362:6 366:5,12 | 78:11 79:3 | 178:14,20,22 | 253:2,3,24 |
| 368:11 369:10 | 80:13 91:2 | 180:1 183:4,6 | 254:6 255:12 |
| 370:13 372:14 | 93:18 95:8,9 | 184:3,4,10,11 | 255:13 256:10 |
| 374:23 376:8 | 95:16 96:1,9 | 185:7,21 | 257:16 259:22 |
| 381:9 387:9 | 96:16,18 97:5 | 189:12,13 | 260:9 261:4,9 |
| **kindergarten** | 97:5,24 99:1 | 191:12 192:24 | 262:8 263:15 |
| 108:24 321:9 | 102:1 106:19 | 194:23 198:20 | 264:2,5 265:20 |
| 321:15 | 106:24 107:23 | 198:22,24 | 266:1,3,14 |
| **kinds**   253:8 | 108:18 109:22 | 199:8,11 200:4 | 273:2,13 279:8 |
| 362:2 | 113:24 114:2 | 200:5,19,24 | 279:9,12,16,20 |
| **king**   1:17 2:5 | 117:6,15 | 201:6,8 203:13 | 280:7,12,24 |
| 2:10 | 118:20 119:4 | 203:17 205:3 | 281:4,12,16 |
| **kirkland**   3:20 | 119:15 125:12 | 205:24 206:16 | 282:20 283:24 |
| **kirkland.com** | 127:13 131:1 | 207:2 210:6 | 284:10 285:5 |
| 3:22 | 131:22 132:11 | 212:10 215:6 | 286:3,13,23 |
| **klehman**   2:14 | 135:9 140:14 | 215:17,18 | 287:15 288:6 |
| **kmorgan**   6:19 | 140:17,23 | 218:1 225:7 | 289:9 290:3 |
| | 144:2,15,16 | 226:10,12,14 | 291:9 292:6,8 |

**[know - legal]**                                                    Page 41

292:18 293:1
293:13,20
294:7,10
295:23 296:24
297:16,24,24
298:10 300:1
301:14 302:23
305:7,11 308:5
309:3,14
313:22 316:23
318:5 319:19
319:22 320:2
320:12,19,21
320:23 322:8
323:15 325:4
327:6,18,19,24
328:3 329:11
329:16 330:16
330:17,24
331:5,11
332:10,12,12
333:8,17,22
334:2 336:6,8
337:2,7,7,10,10
337:13 340:18
341:16 343:12
346:14 347:18
348:18,23
349:24 350:6
350:17,23
351:5,10,13,21
352:15,17,22
353:1,3 354:22
355:20 356:4,8

356:11,24
357:1,19,21
358:14 360:5
360:13 361:13
361:21,23
365:17 366:9
367:5,12 368:9
368:17 369:7
370:15,20
371:6,10,12,20
372:23 373:12
374:18 375:10
375:16,24
379:21 380:20
380:23 381:6
385:10 387:24
388:12 390:12
392:9
**knowing**
352:24
**knowledge**
49:21 55:4,13
64:7 86:10
123:8 135:16
230:6
**knowledgeable**
26:18
**known**   230:16
248:9
**kotlarsky**   2:16
**kslaw.com**   2:14
2:18
**ktmc.com**   2:6,7

**l**

**l**   2:4
**labor**   10:13
208:13 217:14
337:4,11
**lack**   234:22
**lagged**   84:22
**laid**   229:1,12
270:2 310:11
321:19 342:22
344:13
**lake**   5:19
**landscape**
229:6
**language**
144:20 363:7
**lapse**   174:23
**large**   17:4
167:1 320:5
349:23 375:18
**largely**   185:5
185:13 254:22
291:24
**late**   83:8
119:12 274:11
277:12
**laughable**
133:24 134:5
**laughed**   113:15
**law**   1:15 4:4
5:4 6:4
**lawbmf.com**
5:21

**lawmakers**
381:6
**lawyer**   15:9
170:13
**lawyer's**   401:1
**lay**   225:4 267:6
**layer**   356:5
**laying**   323:4
**lays**   322:22
**lead**   236:13,14
269:17 274:24
376:12
**leaders**   86:14
87:6,16,24
88:4,24 234:18
**leading**   251:15
323:19
**learn**   231:3
267:12 281:13
**learning**   143:5
267:19 269:6
270:15 349:24
354:21 368:19
369:1
**leaving**   80:21
335:14
**led**   241:18
**leeway**   384:5
**left**   26:6 69:15
120:23 378:23
**legal**   22:4
52:14 91:3
363:6

CONFIDENTIAL

**[legg - liability]**                                    Page 42

| | | | |
|---|---|---|---|
| **legg** 5:18 | 86:22 87:2 | 210:7 211:8 | 376:3,15 377:3 |
| **leggett** 84:10 | 89:10 91:17 | 212:15 213:11 | 377:7 380:4 |
| **legislative** | 93:24 94:18 | 214:16 216:16 | 383:19 384:1 |
| 53:18 | 97:8,18 98:6,8 | 217:6,9 222:6 | 384:11,22 |
| **legislatively** | 107:4 112:1,18 | 223:16 225:12 | 385:9,14 |
| 225:9 | 115:20 117:3 | 232:13 234:4 | 387:15,22 |
| **legislatures** | 118:10 120:2 | 240:14 241:20 | 389:13,16 |
| 53:6 | 121:4,9,18 | 246:12 247:15 | 391:1,15 |
| **lehman** 2:11 | 124:1,11 | 249:4 250:1,16 | 393:17 395:15 |
| 7:6 13:13,23 | 126:19 127:15 | 251:19 252:19 | 396:2 |
| 20:10 21:2 | 128:2,23 129:3 | 254:18 259:1 | **length** 196:4 |
| 25:7,15 29:3 | 130:9 131:15 | 260:3,5,24 | 320:13 326:5 |
| 32:15 33:13,24 | 133:9,21 134:8 | 262:17 266:6 | 393:7 |
| 34:9,20 35:5 | 134:20 135:11 | 266:19 270:8 | **lengthier** |
| 37:10,18 38:7 | 136:4,24 | 271:8 274:2 | 217:24 218:6 |
| 39:4,14,20 | 137:17 141:9 | 275:16 277:23 | **lengths** 324:7 |
| 40:5,11,21 | 145:3 151:15 | 278:7 281:24 | **leon** 4:17 |
| 41:3,12,18 | 152:8 164:8 | 283:7 284:23 | **level** 68:3 |
| 42:3,9,18 43:7 | 166:12 167:20 | 287:22 288:10 | 108:24 277:15 |
| 43:16,23 44:8 | 170:1,22 171:2 | 290:6,24 | 284:17 292:4 |
| 44:14,24 45:6 | 171:15,19 | 293:15 295:18 | 388:17 |
| 45:15,22 46:7 | 172:20 173:7 | 298:11 304:23 | **levels** 139:2 |
| 46:15,23 47:24 | 173:15 174:3 | 306:11 307:18 | 268:3 |
| 48:19 49:5 | 177:6 181:1 | 309:5,17 | **leverage** |
| 50:22 55:16,24 | 182:7 184:15 | 310:21 314:23 | 329:16 342:16 |
| 56:2 57:8 | 186:14 188:1 | 316:3 319:3 | **leveraging** |
| 58:16 63:22 | 189:18,20 | 327:14 330:7 | 54:18 342:6 |
| 64:18 65:10 | 191:15 193:14 | 332:3 334:7,19 | 381:8 |
| 67:9,18 68:1 | 195:19 196:15 | 338:12,15,24 | **levin** 6:10 |
| 68:13,18 70:7 | 198:13 200:9 | 345:20 346:8 | **lexington** 3:21 |
| 70:19,21 72:21 | 202:3,16 204:1 | 347:22 353:18 | **lfsblaw.com** |
| 74:11 77:20 | 204:11 206:23 | 356:17 360:8 | 6:13 |
| 78:17 81:23 | 207:18,21 | 363:11 364:14 | **liability** 1:4 |
| 82:5,23 83:2 | 208:18,20 | 373:3,19 374:8 | 12:20 |

**life** 137:5,15
  301:23 302:1
**lightly** 155:4,8
  155:10 156:22
  157:8
**likelihood**
  302:9
**likely** 141:16
  181:5,20 216:9
  221:18 300:2
  308:3 358:2
  364:10
**limit** 160:6,20
  169:24 226:20
  226:23 227:24
  228:4,15,19,20
**limitation**
  287:6
**limitations**
  285:7,24 286:7
  286:9,13,16
  287:4,12,13,17
  287:20
**limited** 215:16
  268:9 341:3,5
  341:19,22
  343:5 384:6
**limits** 160:16
  219:11,24
  221:24
**line** 11:6,6,6,11
  11:11,11,16,16
  11:16,21,21,21
  35:9,10 168:23

399:3 401:2
**lines** 184:21
**linkages** 83:24
**linkedin** 161:17
  162:2,3,6
**list** 7:13,20
  25:12 27:5,7
  37:15 58:8
  59:1,4 76:3,11
  76:15,19 77:8
  77:15,23 78:15
  79:14,17 81:9
  81:12 82:3
  85:15 89:16
  96:2 104:19
  118:21 143:16
  143:19 146:15
  146:24 150:6
  217:2 266:4
  285:6 287:11
  287:13 316:8
  363:12 364:19
  366:20
**listed** 26:5
  27:17 28:2
  29:15 59:19
  60:10 81:11
  89:16 117:23
  118:8 123:20
  124:4,10,13
  145:24 147:15
  148:2,9,17
  149:5 363:14

**listing** 117:17
**lists** 57:22,24
  58:19,20 59:1
  76:6 79:18
  117:19
**literacy** 242:15
  301:3,5,9,13,19
  341:17,17
**literally** 223:21
**literature** 92:8
  93:9 94:5,8,24
  164:1,5 167:11
  177:12 178:3
  178:14 180:3
  215:6 247:8
  272:7 276:18
  278:3,14
  285:20 286:14
  289:21 295:9
  322:7,18
  333:12 334:3
  346:21 361:23
**litigation** 1:5
  12:21 22:1
  50:3 57:19
  60:15 61:21
  62:6,13 65:15
  70:17 80:14
  88:14 151:3
  170:21 271:10
  298:20,24
  299:14 347:24
  348:4,11,14
  353:20 357:7

357:14
**little** 83:23
  97:23 126:21
  130:18 166:14
  217:24 233:8
  235:24 241:14
  275:17 279:16
  320:3 321:20
  346:24 359:12
  368:8 369:6
**live** 66:17,24
**lived** 356:23
**living** 137:19
  138:3
**llc** 2:20 3:8,8,15
  3:15,16,16
  5:17
**llp** 1:16 2:3,10
  3:3,10,20 6:10
**local** 86:14
  88:24 147:17
  378:24 380:12
**located** 14:9
  357:1
**location** 66:18
**locations**
  271:19
**logistics** 243:17
**lombard** 14:5
**long** 19:1 29:12
  93:2 96:19
  128:21 157:8
  162:17 174:14
  176:14 184:24

**[long - lot]** Page 44

185:4,12,22
319:10 325:14
331:11 352:18
356:20
**longer** 110:4
327:23 329:20
330:2 336:13
**longest** 325:18
325:21 326:1
**longitudinal**
81:16 82:19
83:7,23 85:20
185:1 186:4,9
**longitudinally**
185:19,23
**look** 18:15,18
33:8 47:22
53:10 55:14
57:9,10 59:6
71:23,23 74:19
74:21 75:22
81:5,8 82:13
88:17 95:5,20
97:9 101:15
110:22 118:6,9
118:9 123:7
124:9 128:7
139:22 143:16
144:20 148:20
158:6,13
160:24 161:6
164:6,20 165:2
167:7,12
173:16 174:16

176:16,19
178:13 179:4
181:16 182:14
182:18 184:17
184:19 185:23
186:16 188:2
189:18 191:16
193:18,24
196:9,17,22
202:22 203:8
207:22 214:12
220:6 237:20
244:22 246:1,4
252:7,11
255:24 264:6
264:19 265:7
272:2 282:5
289:11 291:9
295:22,24
296:8 311:9,18
317:2 320:10
321:14 322:11
322:14,14
324:21 338:4
338:10,12
342:10,13
354:7 358:6
361:15 362:24
364:3 368:13
371:7 375:15
376:16 378:22
381:13 385:17
**looked** 78:12
78:21 95:13,16

95:24 119:14
120:20 123:4
155:13,20
156:13,18,20
158:10 164:10
165:17,18,20
166:2,8 167:8
167:12,13
177:14 182:16
185:19 225:21
231:8 234:11
236:22 244:19
264:16 279:13
281:5 282:2,12
282:21 283:1
291:20 292:7,8
308:21 322:6
322:11,17
324:16 325:3
332:17,23
333:6 344:11
354:24 361:23
362:5 365:1,9
366:10
**looking** 19:3
54:13 69:5
85:15 86:11
143:18 146:10
146:19 147:1
153:15 156:2
166:17 167:19
171:24 172:14
173:6 176:2
179:3 188:9

195:15 197:12
202:5 210:2
213:1,21
231:19 242:11
249:14 250:4
258:23 265:12
269:21 282:20
289:12 291:18
291:22 294:9
334:3 335:10
347:19 365:12
375:11,17
386:2,12
**looks** 98:2
166:16 209:21
210:24 211:22
212:5 244:22
288:22 335:4
335:24
**lose** 199:17
**loss** 386:8
**lot** 52:5 81:6
96:20,24
175:10 190:11
200:13 228:9
229:9 236:24
245:3 252:1,1
257:10 273:5
293:2 327:21
343:15 352:16
386:17 387:11
387:20 388:11
388:20 390:20

CONFIDENTIAL

**[lots - material]**                                            Page 45

| | | | |
|---|---|---|---|
| **lots** 206:15,20 | **major** 30:18 | 369:12 | 40:3,18 41:10 |
| 358:16 371:10 | 117:23 118:13 | **making** 23:13 | 41:24 42:15 |
| **louis** 4:5 | 118:15 147:3,6 | 24:5 111:8 | 43:14 44:6,21 |
| **loved** 367:24 | 147:10,11 | 116:3,8 125:10 | 45:13 46:5,21 |
| 368:1 | 148:2,6 225:23 | 209:4 223:23 | 49:19,24 55:21 |
| **lunch** 207:3,7 | 225:24 | 279:9 291:12 | 57:12 67:16 |
| 260:7,11 | **majority** | 311:6 345:12 | 89:17 97:16 |
| 266:21 291:2 | 145:23 146:6 | **management** | 121:16 173:24 |
| 393:5 | 165:15 | 302:15,19,21 | 202:13 208:7 |
| **luncheon** | **make** 23:9 48:3 | **managing** | 208:16 334:9 |
| 260:18 | 73:20 77:1 | 268:17 | 334:16 338:22 |
| | 85:14 90:17 | **mandalas** 5:17 | 376:24 383:23 |
| **m** | 102:2 103:14 | **manual** 117:13 | **market** 5:5 6:5 |
| **m** 6:10 81:24 | 106:8 110:12 | **manuals** | 337:4,12 |
| 84:18 | 114:3,22 115:1 | 290:14 | **maryland** 5:20 |
| **made** 31:18 | 116:14 132:17 | **marginalized** | 9:17 14:6,15 |
| 35:7 36:14,17 | 136:1 140:10 | 186:22 | 15:22 17:1,12 |
| 62:7 192:12 | 143:20 171:16 | **mark** 3:17 25:7 | 17:15,18 18:10 |
| 197:11 198:15 | 203:2 219:8 | 33:13 34:1,20 | 18:14 20:15 |
| 201:2 217:1,3 | 223:17 227:17 | 37:10 39:5,20 | 53:20,21 54:21 |
| 266:22 365:21 | 257:1 263:13 | 40:12 41:3,18 | 66:23 96:7 |
| 386:23 398:7 | 274:9 275:5 | 42:9 43:7,23 | 97:3,14,21 |
| **maes** 84:17 | 278:8,12 | 44:14 45:6,22 | 99:4,10,14,21 |
| **magnitude** | 311:12 316:7 | 55:16 67:9 | 100:3,5,6,9,20 |
| 293:16,22 | 339:24 340:21 | 97:10 121:10 | 100:24 101:6 |
| 294:8 | 343:19 354:14 | 173:17 202:6 | 103:1 106:10 |
| **magnitudes** | 361:6 366:6 | 207:22 217:8 | 107:7 108:9,12 |
| 294:6 | 377:24 378:1 | 338:16 376:16 | 109:7 138:24 |
| **maheux** 81:15 | 398:4 | 377:6 | 143:3 192:4 |
| **mail** 60:17 | **makers** 223:22 | **marked** 11:20 | **maslynsky** 1:20 |
| 304:5,8 | **makes** 15:20 | 25:12 27:6 | 397:10 |
| **maine** 3:5 | 23:5 126:14,17 | 33:18 34:6 | **massive** 313:24 |
| **maintain** 98:9 | 166:11 186:13 | 35:2 37:15 | **material** |
| | 198:2 343:16 | 38:4 39:11 | 201:21 204:3 |

**[material - media]**                                    Page 46

291:3
**materials** 7:20
37:7,8,14 47:1
57:18,21,24
58:18,20,24
59:7 62:9
65:13 76:3,11
76:14,15,17,19
76:20 77:7,14
77:15,23 78:15
79:14,17 81:9
82:6 95:14
364:17 366:20
**math** 47:5 73:4
**matter** 12:18
28:15 58:2,22
70:1,10 71:2,8
72:4,13 73:2
73:17 122:10
122:17,22
**matters** 62:13
**matthew** 5:18
**mayonnaise**
260:9
**mcgee** 6:22
12:12
**md** 1:3 143:4
**mdl** 1:3,4
**mean** 17:20
21:12,13 28:11
28:24 30:8
48:13 50:21
51:11 71:9
76:8 78:11,19

79:1 114:13
115:3 118:23
122:13 131:10
135:1 149:11
155:11 156:7
156:23 161:1
163:1 164:14
168:17 171:10
172:12,14
174:22 189:11
189:16 199:14
200:13 205:3
205:21 206:1
206:10 226:5
231:8,16 233:8
236:2,11 240:5
240:23 241:6
242:23 244:8
245:9 248:12
248:13,14
249:19 250:7
250:13,23
253:3,12,16,19
254:15 255:18
255:21 258:17
263:4,24
265:16 267:5
269:11 280:6
283:19 285:13
285:15 286:23
292:21 293:20
297:16 298:5
300:1 302:2,17
303:14 309:15

309:21 312:18
314:18 317:13
319:19 324:9
325:23 326:14
327:7 329:19
330:8 331:1,7
341:10 345:3
345:11 348:16
349:1 353:6
357:19 359:10
359:16 364:9
365:8 366:1
368:8 373:13
374:5 375:9,23
379:22 388:1
389:22
**meaning** 49:7
159:5
**means** 91:4
163:2 376:9
397:19
**meant** 268:24
298:1 345:6
**measure** 228:7
**measurement**
360:17
**measures**
227:23 228:3,9
**mechanism**
244:6 304:20
310:1
**mechanisms**
54:16 169:14
204:16 212:13

229:23
**med** 100:23
**media** 1:3 9:22
10:7 12:18
26:19 50:13
62:18 63:6,13
63:14,21 64:2
64:22 81:2,17
82:8,9,17 83:6
83:22 84:6,12
85:21 86:4
99:5,8,11,15
106:15,20
108:4 112:5,14
113:2,5 123:18
124:3,13,16
125:6,16,23
126:8,15 127:1
127:2,4,21
128:4,9,10
129:11,23
143:12,15,24
144:6,12,18
145:1,6,8,17
150:10,14,18
150:22 151:1,4
152:14,22
153:7,9 154:4
154:19 157:24
161:9 163:18
166:5,8 167:1
168:5,11,15
170:9 171:22
172:7,23 173:6

CONFIDENTIAL

**[media - memory]**                                                    Page 47

| | | | |
|---|---|---|---|
| 173:10,12,23 | 221:1,6,15 | 304:15 305:1 | 100:24 101:7 |
| 174:8 175:15 | 222:4,9,17,21 | 305:14,16,17 | 192:5 357:1 |
| 176:3,9 177:9 | 223:13 224:3 | 305:21 306:3 | **medium**  29:6,8 |
| 177:15,16 | 224:16 225:3 | 306:13,17,21 | **meet**  92:16 |
| 178:6,12,20,23 | 225:15 226:3 | 307:20 308:6 | 109:4 132:6 |
| 179:1,9,15,18 | 227:6,14,17,24 | 308:13,15,20 | 238:9 349:3 |
| 179:22 180:23 | 228:5,20,24 | 308:22 309:8 | 388:8 389:6 |
| 181:5,18 183:3 | 229:4,6 232:16 | 309:10 310:2 | 393:11 |
| 185:3,12 | 233:2,21 235:1 | 310:20 311:6 | **meeting**  92:23 |
| 186:12,19 | 236:23 238:8 | 312:23 314:10 | 93:3 114:15 |
| 187:4 188:14 | 238:17 246:5 | 314:11,17 | 348:18 |
| 188:22,23 | 251:11,15 | 319:16 320:16 | **meets**  127:17 |
| 189:8,24 | 258:5 259:4 | 342:19 343:14 | **melissa**  2:4 |
| 190:22 191:24 | 262:20 263:3 | 346:12 348:2,5 | **meltzer**  1:16 |
| 192:7,14 | 263:23 266:9 | 348:7,14,20 | 2:3 |
| 193:12,16,22 | 266:23 267:3,4 | 352:6 354:23 | **member**  101:5 |
| 194:3,11 | 267:16 268:15 | 355:3 356:1,16 | 101:10 119:16 |
| 195:16 196:23 | 268:17,21,23 | 357:9,11,16 | 139:14,16 |
| 197:3,14 198:5 | 271:10 273:18 | 358:2 362:6 | 174:11,15,19 |
| 198:10,16 | 274:11 276:9 | 365:12 368:21 | 340:24 373:23 |
| 199:20 200:6 | 277:10 280:2,3 | 369:3 370:24 | 382:17 |
| 200:12,16,23 | 283:9 288:2,13 | 371:3,15 | **member's** |
| 201:4,11,16,22 | 289:10,13 | **media's**  205:18 | 382:23 |
| 202:13,20 | 293:7,10,18 | **mediating** | **members** |
| 203:9,20 204:3 | 294:1 295:3 | 82:11 | 186:22 331:13 |
| 204:22 205:8 | 296:11,16 | **medicaid**  54:18 | **membership** |
| 206:17 210:18 | 297:4 298:2,4 | **medical**  99:22 | 174:23 |
| 210:23 211:12 | 298:14 299:17 | 100:16 110:12 | **memorize** |
| 212:19 213:17 | 299:21 300:16 | **medications** | 78:22 |
| 213:23 214:10 | 300:18,20,23 | 24:9 | **memory**  61:1,4 |
| 214:19,20,24 | 301:2,8,16,18 | **medicine**  9:17 | 61:23 69:23 |
| 215:2,8,13 | 301:21 302:2,4 | 14:15 97:14 | 141:12 209:19 |
| 218:19,20 | 302:5,8,13,16 | 98:23 99:21 | 378:2 |
| 219:15 220:5 | 302:22 303:1 | 100:1,7,10,21 | |

CONFIDENTIAL

**[mental - minutes]**                                          Page 48

| | | | |
|---|---|---|---|
| **mental**  10:6,20 | 192:15 193:3,9 | 351:21,23 | **meta**  3:14 |
| 10:24 14:8,12 | 193:13 197:16 | 353:2 357:23 | 80:19,23 |
| 21:20 26:22 | 197:21,23 | 357:24 358:24 | 154:11 155:3 |
| 36:12 51:10 | 198:7,12 | 359:6 361:21 | 279:8 |
| 54:7,14,18 | 202:11 204:4 | 362:1,6,12 | **methodology** |
| 55:6 61:15 | 205:18 206:13 | 365:13 367:2 | 26:12 27:3 |
| 62:19 63:8,15 | 209:11,14,22 | 367:16,19,22 | 87:3 272:5 |
| 82:9,17 85:21 | 210:10,14 | 368:1,5,14 | 342:12 361:14 |
| 86:16 87:8 | 211:6 212:3,9 | 369:9,19 370:5 | **methvin**  4:4 |
| 89:3 105:5,13 | 213:4,9,14 | 370:8,18,21 | **miami**  2:13 |
| 106:8 108:19 | 215:5,9 216:14 | 371:4 373:6,24 | 4:18 |
| 113:6 114:7,10 | 216:20,22 | 374:7,13,15 | **michael**  3:11 |
| 114:19,24 | 217:19 223:5 | 376:24 377:12 | 4:12 6:10 |
| 115:10,17 | 224:1,20 225:6 | 378:12,19 | **middle**  52:6 |
| 116:4 117:16 | 225:11 226:16 | 381:20 383:1,3 | 81:19 138:13 |
| 117:20 123:19 | 235:13 240:9 | 385:21 386:8 | 139:6 184:20 |
| 124:4,17 125:7 | 242:10 246:5 | **mention**  210:17 | 283:12 |
| 128:16 129:7,9 | 250:5,8,14 | 210:23 310:8 | **midway**  381:14 |
| 129:13,24 | 251:18 252:4 | **mentioned** | **mike**  154:23 |
| 136:11 137:3 | 267:13,22 | 96:17 167:21 | **miles**  66:18 |
| 137:13,14,20 | 268:14 269:7 | 244:9 257:12 | **miller**  1:20 |
| 138:1,5,18,18 | 270:14 293:8 | 264:7 279:13 | 13:4 397:10 |
| 140:22 141:1 | 293:18 294:2 | 291:1 304:20 | **mind**  58:13 |
| 141:19 142:10 | 295:3 301:9,12 | 324:18 356:18 | 119:2 142:17 |
| 142:12 143:6 | 301:13,19 | 359:17 | 142:18 325:10 |
| 144:4,5 145:10 | 306:14,18 | **mentor**  16:19 | 371:21 377:23 |
| 145:21 163:13 | 307:1 315:7,11 | **message**  303:11 | **mine**  275:2 |
| 170:8,19 171:7 | 321:1 333:3,5 | 304:1,3 | **minnes**  4:14 |
| 177:17 180:14 | 338:21 339:7 | **messaging** | **minor**  147:20 |
| 182:2 186:21 | 339:17,21 | 304:11 | **minute**  181:16 |
| 187:6,11 | 340:2,8 341:8 | **met**  13:22 60:9 | 385:7,12 393:5 |
| 189:23 190:20 | 341:17 344:2 | 92:5 94:3 | **minutes**  22:9 |
| 190:22 191:11 | 349:10,14,22 | 110:23 | 64:17 65:3 |
| 191:13 192:1,7 | 350:3,13 351:8 | | 156:10 160:21 |

**[minutes - necessarily]**                                    Page 49

218:13,18
299:24 384:14
384:21 385:4,6
396:4
**mirrors**   310:23
**misleading**
177:22
**mission**   16:21
**missouri**   5:13
**misstates**   32:14
49:1
**mistake**   120:21
120:22
**misunderstan...**
73:11
**misunderstood**
93:23
**mitigate**   62:24
227:5 228:23
234:3 294:18
**mitigating**
229:11
**mkennedy**   3:13
**mlegg**   5:21
**mobile**   4:5
**models**   84:22
**modules**   141:4
141:10,11,14
**moment**   19:2
30:15 77:11
279:5 347:21
371:22 378:2
**moments**   13:22

**momentum**
340:2
**monitor**   159:3
**monitoring**
219:11,24
221:24
**monograph**
323:1
**monthly**   96:4
**mood**   104:22
107:17
**morgan**   6:17
**morning**   13:14
13:15 391:24
392:10,19
393:10 394:1
**motivational**
201:23
**motive**   239:11
**motives**   239:13
**move**   35:17
128:24 385:7
385:11 389:14
**moves**   147:2
**movies**   347:10
**moving**   361:2
**multi**   98:12
184:24 218:24
320:7 321:3,17
322:17,20
325:12 326:11
326:20,24
328:10

**multifactorial**
115:11
**multiple**
115:15 144:22
218:24 244:13
253:8 255:22
256:16,18
257:14 261:8
261:11 320:17
322:23 327:8
**multiyear**
299:1
**murthy**   224:12
**murthy's**
224:14
**mweinkowitz**
6:13
**myeates**   2:6

**n**

**n**   3:11 7:2
**nafisah**   274:20
275:3
**name**   12:11
13:18,22 15:17
61:5,16 81:22
82:22 91:22
101:13 102:7
214:19 222:9
245:4 253:17
261:4 274:24
282:1
**named**   59:22
60:2,5 214:24

267:23
**names**   25:21
26:3 142:14
145:16
**naming**   215:19
219:21
**nation**   386:17
387:2
**national**   14:8
14:11 36:11
87:8,12 89:23
90:5,8,21
91:12 147:17
190:19 206:12
242:10 312:7
322:9 323:16
326:6 331:16
349:22 358:15
359:5,20
360:15 362:12
**natural**   391:22
395:14
**nature**   172:6
172:13 350:4
**navigating**
229:5 268:21
**near**   391:22
**necessarily**
154:8 158:15
161:18 190:13
219:20 227:13
236:19 247:1
247:11 250:7
250:18 256:9

**[necessarily - number]**                                        Page 50

266:16 284:22
289:6 299:23
303:15 311:23
327:13 371:18
388:16
**necessary**
323:6 328:8
398:4
**need**  21:3 22:9
26:16 36:14,17
51:3 53:11
54:5,16 60:24
74:16,18,21
75:19 120:4
169:4 176:15
183:4 202:6
207:1 211:1,2
212:7 214:5,24
223:3 243:21
244:20 246:19
306:17,18
307:1,3 311:19
323:13 346:14
350:22 351:7
351:11 352:19
353:16 369:11
385:10 392:17
394:20
**needed**  30:13
306:15,24
311:23 323:8
341:23
**needs**  10:24
209:15 212:4

343:9 349:10
349:15 350:14
376:24 377:12
**negate**  178:24
**negates**  200:7
**negative**
193:11 267:10
268:4 269:6
270:15 280:14
280:15
**negatively**
241:10 274:13
**neglect**  367:17
367:21
**netflix**  113:21
**network**
322:10 323:17
**networks**  189:2
194:5,12
**neuro**  83:14
**never**  17:3 60:6
99:17 101:9
102:19,21
127:8 256:9
366:6
**new**  2:17,17
3:21,21 4:13
96:8 206:24
330:9,14,22
331:4,9 342:20
342:22 343:9
343:23,24
344:2 356:5
363:7 364:23

**newscast**
158:11
**newscasts**
158:14
**newtown**  379:3
379:14 380:14
380:24
**night**  169:17
274:12 277:12
289:14 298:4
389:10
**nimh**  141:18
**nine**  52:11
245:19 246:16
**nirnians**
323:16,24
**nolan**  3:20
**nonresponsive**
129:1
**noon**  207:4
**normal**  23:17
392:6
**northern**  1:1
12:22
**notary**  400:14
**note**  58:6
120:17 171:16
355:22 392:2
394:15
**notebook**  24:20
24:22 25:3
33:3 37:5,20
38:16,17,19,20
38:23 39:16

40:23 41:14
42:5,20 43:18
44:10 45:2,17
46:9
**notebooks**  49:7
49:15
**noted**  13:1
398:11 400:6
**notes**  31:2,4,7
31:10,12,15
32:2 79:8,12
401:1
**notice**  1:15
9:13 55:15,20
56:5
**noticed**  394:5
**noting**  79:4
**notion**  280:12
**novel**  128:19
342:20
**november**
190:4 197:12
217:16 218:11
218:22
**number**  33:14
34:21 39:6,21
41:19 55:17
56:1 57:14
64:16 65:3
67:11 68:23
69:7,8,17
71:15 97:6,9
97:10 105:8
118:15 121:11

[number - offer]                                                                                Page 51

| | | | |
|---|---|---|---|
| 137:11 146:16 | o'hanlon   6:16 | 199:21 203:5 | 383:8 387:4,18 |
| 156:10 163:23 | **obesity**   317:23 | 204:6 206:7 | **objected**   58:11 |
| 173:17 189:19 | 318:1,7,8,10,14 | 209:16 210:19 | **objections**   12:6 |
| 202:7 208:19 | 318:19 319:1,8 | 211:14 212:20 | 57:4 |
| 217:7,8 218:13 | 319:15 324:23 | 214:1 216:5 | **objective**   130:3 |
| 218:18 271:19 | **object**   19:23 | 221:8 222:22 | **obligations** |
| 277:19 294:9 | 20:24 28:20 | 224:7 231:5 | 16:11 |
| 294:10,11 | 32:13 47:18 | 233:4 240:2,21 | **obstacles**   339:2 |
| 297:17,19 | 48:11,24 50:18 | 245:21 246:20 | 339:14 |
| 299:24 310:12 | 57:3 63:9 64:3 | 248:18 249:21 | **occasion**   29:19 |
| 327:19 328:3 | 64:23 70:2 | 250:10,24 | 160:11 |
| 331:16 334:10 | 72:15 74:3 | 252:17 254:12 | **occasions**   55:10 |
| 338:16 340:6 | 77:17 78:8 | 258:14 259:8 | **occur**   303:11 |
| 350:6 352:1 | 88:15 90:23 | 262:1 265:3 | 303:24 304:3,5 |
| 353:5 363:13 | 106:16 111:18 | 266:10 269:12 | 304:6,10,19,22 |
| 370:11 375:18 | 112:15 115:12 | 270:17 272:19 | 310:16,19 |
| 376:17 383:23 | 116:22 118:3 | 275:10 277:4 | 369:24 |
| 393:6 | 123:21 124:6 | 278:6 280:4 | **occurred** |
| **numbers** | 126:1 127:6,22 | 282:16 283:14 | 310:18 369:5 |
| 337:16 346:15 | 130:5 131:2 | 286:20 288:4 | 371:15 |
| 375:15 | 133:4,16 134:2 | 289:24 290:17 | **occurring** |
| **nurturing** | 134:18,23 | 293:11 295:5 | 303:8 |
| 219:9 | 135:19 136:18 | 297:7 304:16 | **occurs**   236:8,10 |
| **nutrition** | 137:8 141:7 | 306:6 307:14 | 305:15 381:10 |
| 220:10,17,20 | 144:13 151:9 | 308:24 309:12 | **odd**   186:6 |
| 220:23 221:5 | 152:1 163:19 | 310:5 314:14 | **odgers**   86:2 |
| 221:17 | 165:11 167:2 | 315:21 318:21 | **offer**   109:15 |
| **nw**   3:12 | 168:23 172:9 | 327:3 329:8 | 154:16 233:10 |
|  | 172:24 179:23 | 331:21 347:12 | 233:12 238:6 |
| **o** | 181:13 183:20 | 353:12 355:14 | 238:13,15 |
|  | 185:14 187:15 | 359:8 363:3 | 240:6,18 |
| **o**   83:5,16 86:3 | 189:3 191:5 | 364:6 372:6 | 257:10,21 |
| **o'clock**   207:9 | 192:17 194:14 | 373:10 374:2 | 321:10 |
| 392:9,11 393:2 | 196:10 197:17 | 375:7 379:17 |  |
| 394:9,21 395:4 |  |  |  |

| | | | |
|---|---|---|---|
| **offered** 109:21 | 377:4 378:14 | 188:10 194:8 | **old** 168:2 |
| 154:1 203:8,19 | **okay** 14:1 | 195:20 196:16 | **once** 109:1 |
| 242:2,12 269:2 | 15:11 18:17,21 | 197:9 202:24 | 110:3 156:14 |
| 344:7 360:3,18 | 19:6,18 20:17 | 204:12 207:5 | 195:24 196:6 |
| **offering** 151:12 | 23:9,14 24:6 | 211:9 212:16 | 292:3 395:17 |
| 152:4,15,23 | 31:6,9,17 | 213:12,20 | **one's** 388:23 |
| 173:8,11 | 33:12 36:23 | 214:17 217:5 | **ones** 43:1 48:20 |
| 200:10 233:1 | 38:15,22 46:11 | 218:19 220:22 | 59:14 60:7 |
| 233:15 238:21 | 48:2,5 49:6,13 | 222:18 223:17 | 68:14 75:1 |
| 239:4,10,14,16 | 50:15,16,23 | 230:21 240:15 | 150:15 154:22 |
| 239:21,23 | 51:4,6,7,11,12 | 245:17 249:17 | 184:10,11 |
| 241:9,21 | 58:12 67:2 | 250:21 256:24 | 203:15 |
| 318:14 | 69:10 70:8,18 | 260:4 261:21 | **ongoing** 16:11 |
| **offers** 321:2 | 71:24 73:8,19 | 267:5 270:9 | 319:11 |
| **offhand** 261:5 | 74:12,23 75:4 | 274:3,19 275:4 | **online** 142:7 |
| 261:20 296:6 | 75:18 76:2 | 275:19 276:10 | 143:5 181:6 |
| 337:2 | 83:18 87:5 | 277:24 278:22 | 186:24 188:16 |
| **office** 68:15 | 89:11 94:15 | 289:19 290:9 | **open** 160:11,13 |
| 311:16 312:6 | 105:15 106:12 | 293:16 295:19 | 393:14 |
| **officer** 175:3 | 107:5,10 | 296:21 312:2 | **opened** 162:21 |
| **offices** 1:15 | 110:24 113:19 | 314:9,24 318:5 | **operates** 109:1 |
| **official** 225:14 | 118:18 121:9 | 318:16 330:19 | **operations** 3:15 |
| **offspring** 159:5 | 121:24 123:2 | 337:3 338:9,14 | **operative** 49:9 |
| **oftentimes** | 125:2,19 | 343:11 345:4 | **opinion** 134:6 |
| 125:15 138:17 | 127:16 128:3 | 345:16 355:10 | 151:12,20 |
| 157:23 330:16 | 132:16 145:13 | 360:9 361:5 | 152:4,16,23 |
| 341:12 351:3 | 146:8,23 147:4 | 363:22 364:15 | 153:5 154:1,10 |
| 365:8 366:15 | 148:19 150:9 | 365:20 369:15 | 173:8,11 |
| **oh** 48:2 54:22 | 150:24 151:6 | 375:3 376:14 | 200:10 205:13 |
| 71:10 101:18 | 151:16,22 | 378:6,20 | 206:19 233:1 |
| 110:18 159:19 | 159:8,23 | 383:24 384:19 | 234:5 238:7 |
| 162:3 177:24 | 166:13 177:7 | 385:9 386:4,21 | 239:10,14,16 |
| 205:20 291:8 | 181:2 183:11 | 389:12 390:17 | 239:21,23 |
| 345:1 366:22 | 184:18 186:15 | 390:24 391:15 | 240:16,18 |

241:21 258:11
262:5,6 266:22
267:4,9,14
268:6 269:24
317:24 318:11
318:15,20
319:7
**opinions**  20:18
20:21,22 21:5
24:17 49:22
50:2 58:1,22
65:9 77:9
88:14 89:9
150:12 153:13
154:2,7,15
163:22 165:9
183:14,24
231:18 233:10
233:12,16
238:11,13,16
238:18,22
239:5,9,19
240:6 241:1,9
242:2,4,19
244:3 251:10
257:22,24
262:15 264:2
267:7 269:1
271:15,17
272:6 276:19
277:2 283:18
293:3 295:16
361:1,12
362:21

**opportunistic**
381:9
**opportunities**
188:15 219:12
220:1 222:1
**opportunity**
211:10 223:19
226:2 321:3,10
**opposed**  88:12
89:23 163:17
166:24
**oral**  209:5
218:11
**orally**  216:1
**order**  21:4,15
36:18 74:19
92:17,23 95:22
130:23 251:20
252:23 321:14
**organization**
149:2,9 175:19
**organizations**
237:3
**orientation**
367:1,9
**original**  214:8
398:15
**outcome**
254:11 255:7
288:14
**outcomes**  185:4
185:12 236:13
236:15 251:15
251:17 256:2

378:13,19
**outline**  30:9,12
30:17 307:10
309:24 312:13
342:19
**outlined**  30:4
150:3 241:23
259:5 269:5
271:16 279:2
280:1 288:2
296:13 313:4
**outright**  177:2
**outset**  272:5
326:21
**outside**  66:16
94:21 95:18
177:20 230:5
298:19,23
299:14 307:17
348:3,10,13
357:7,14
366:12
**outweigh**
178:24
**overall**  267:13
383:6 386:19
387:2,12
**overestimate**
374:24
**overlap**  109:22
110:6 319:5
**overlapped**
107:2

**overlapping**
312:17 313:1,9
**overnight**
330:6
**oversee**  110:2
**overseeing**
110:9 111:13
112:12,23
116:19 124:24
**overseen**  110:7
**oversimplific...**
193:5
**oversimplifyi...**
191:19,23
**overwhelming**
177:15 178:16
**own**  14:21 69:3
71:16 95:3
133:12 159:4
179:10,19
224:3 287:17
299:6 325:2,4
329:5

| **p** |
| --- |

**p**  5:11,18 83:5
**p.c.**  4:11
**p.m.**  207:9,16
260:15,22
345:23 346:6
391:6,13 393:4
396:5,9
**pa**  12:17

[page - patient]                                                    Page 54

**page** 7:11 8:4
9:4,17 10:4
11:6,6,6,11,11
11:11,16,16,16
11:21,21,21
25:4 33:10
43:1 57:10
68:3 69:6,7
70:20 77:24
78:6,20,22
97:15,21,23
98:3,10 146:1
146:11,14,16
147:2,7 176:1
184:17 186:15
188:3,7,8,9
190:16 191:17
193:17 195:21
196:17 213:21
213:22 219:3,4
335:9,9 339:2
339:14 378:5,7
381:12,12
385:16 399:3
401:2
**pages** 19:1
144:22 218:24
222:13 400:3
**pakistan**
283:11
**pandemic**
368:12 369:5,8
369:16 370:4

**paper** 285:1,24
286:17
**papers** 286:6,8
**paragraph**
86:12 87:1
88:1,9,19
179:6 184:20
191:17 193:19
196:18,19
274:5,9 276:22
311:14 312:1
335:10 378:23
381:14 385:18
386:13
**paralegal** 5:18
**parental**
228:12 229:14
234:22
**parents** 111:3
232:5
**park** 173:5
**parse** 154:9
**part** 13:24 17:4
25:23 31:5
34:14 36:3
63:17 77:3
79:11 87:14
89:6,12 101:11
101:12 102:19
106:5 109:18
120:23 125:11
126:12,16
131:11 140:24
141:17 143:10

145:1 150:7
180:20 184:1
191:3 220:5
225:17 230:9
231:17 232:8
237:15 239:8
242:1,4,11,13
265:15 269:24
270:2,5 273:8
286:13 291:3
291:24 316:15
316:18 318:18
319:1 320:11
326:6 329:18
349:23 351:22
353:3 388:4
**participate**
28:5,10
**participated**
28:8
**participating**
91:6
**particular**
98:16,19
141:14 158:16
158:21 226:20
229:20 264:15
276:2 277:9
312:1 313:23
317:14 322:8
323:1 371:7
382:12
**particularly**
54:8 186:20

187:5 333:13
335:13 365:10
**partnered**
142:6
**partners**
138:19
**partnership**
16:16
**partnerships**
268:22
**parts** 318:17,24
319:14
**party** 396:1
**pass** 391:16
**past** 278:11
379:7
**patchwork**
343:5
**pathways**
236:9
**patient** 18:7,9
18:13 19:15,21
20:3,7 104:12
107:6,21
109:11,17
110:9 112:13
112:24 114:16
124:21,23
125:1 131:13
132:4,23 134:6
134:14 135:6
135:17,23
389:18 390:16

**[patient's - personnel]**                                          Page 55

patient's
  111:12 113:2
patients   17:23
  100:15 104:10
  110:12 111:3
  126:22 127:9
  130:24 131:23
  133:14,19
  390:5
patrick   6:4
pattern   267:24
patterns   268:1
  269:9
pay   15:16
  241:22
payment   73:17
payments   3:16
peer   143:15,24
  144:3,11 145:5
  145:14 148:10
  148:14,21
  149:4,10,12,13
  149:16,19,21
  149:22 150:2
  164:1,5 166:23
  183:17 201:2
  247:8 255:23
  268:19 276:18
  278:2 285:20
  286:14 292:2,3
  295:1 305:20
  311:4 346:21
peers   183:6
  195:5 200:22

  201:3
pennsylvania
  1:18 2:5 6:12
  66:16 75:15
pensions   10:13
  208:13 217:14
people   26:17,21
  29:1 54:7
  61:17 62:19
  63:1 88:21
  115:18 117:16
  128:20 132:12
  141:24 166:6
  176:5,10 178:1
  191:10,12
  193:4 198:20
  198:20 203:22
  205:7 220:2,3
  223:6 225:3
  228:1,5 229:3
  230:5,14,22
  232:2,12
  234:24 241:4
  280:16,19
  286:2,12,17
  287:2,3 299:22
  302:7 310:18
  313:12 320:24
  321:7 342:21
  343:23 344:1
  355:5 363:14
  367:6,13
  368:17 370:6
  370:18 372:19

  373:2,16
  374:20,24
  386:17 387:11
  387:21 388:7
  390:21
people's   137:13
  141:1 173:3
  177:17 180:13
  182:2 185:20
  235:13 246:5
  320:9 368:14
perceiving
  195:8
percent   154:10
  154:11 262:9
  262:10 279:7,8
  314:2 335:16
  335:23 336:7
  374:19,19
  375:4,20
  381:22
percentage
  279:1,24 390:1
  390:4
perception
  300:15
perform   21:3
  110:2 262:18
  263:1,21
performance
  142:21 274:14
performed
  242:17 244:1
  259:3 261:22

  265:2 269:3
  283:9
performing
  264:11 292:14
period   52:2
  107:10 116:19
  141:17 205:12
  314:2 350:18
  351:15
perpetually
  160:18
persistent
  331:19 339:2
  339:14
person   27:22
  29:5 61:6
  81:18 119:5
  142:11 267:19
  383:3
person's
  115:10
personal   1:4
  12:19 15:17
  172:22 179:10
  179:19 206:6
  206:10 296:4
  374:12,15
personally
  19:19 28:1
  106:8 112:11
  204:21,24
  357:18
personnel
  276:7,8

**[perspective - platforms]**                                      Page 56

| | | | |
|---|---|---|---|
| **perspective** | **pictures** 161:7 | **plan** 62:21 67:3 | **plastic** 169:15 |
| 135:7 299:20 | **piece** 196:21 | 207:3 234:3 | **plat** 279:14 |
| 300:14 | 259:24 273:19 | 241:23 283:4 | **platform** 50:14 |
| **pertinent** | 284:21 293:4 | 296:12 297:6 | 142:24 145:17 |
| 216:11 219:22 | 320:21 322:5 | 298:15,17,22 | 153:16 155:16 |
| 365:11 | **piecemeal** | 299:1,7,15 | 165:10 166:19 |
| **pervasive** | 343:5 | 307:10 312:14 | 166:22,24 |
| 319:9 370:22 | **pillar** 321:12 | 312:15 318:17 | 167:14 201:16 |
| **pervasiveness** | 322:1,4 323:15 | 318:24 319:15 | 204:14 214:20 |
| 371:2 | **pillars** 319:21 | 319:18 320:14 | 215:20 218:20 |
| **ph** 1:24 | **pinterest** | 321:20 322:17 | 219:21 221:6 |
| **ph.d.** 1:14 7:17 | 151:24 152:7 | 323:4 326:2 | 222:10,20 |
| 7:19 9:18 | 152:10 | 329:20 330:3 | 234:8 237:2 |
| 12:24 13:7 | **place** 6:17 54:6 | 337:14,20 | 262:20,24 |
| 34:6 35:2 | 85:15 169:14 | 342:5 344:13 | 263:3,23 279:3 |
| 97:15 400:8 | 211:3 212:4,8 | 347:24 348:5 | 279:15,20,21 |
| **phd** 7:4 | 221:3 243:22 | 349:9 350:12 | 304:13,22 |
| **philadelphia** | 251:4 270:9 | 350:22 352:3,6 | 308:13 |
| 6:12 66:16 | 294:17,18 | 352:11,19 | **platforms** 3:14 |
| **phone** 29:10 | 305:10 331:4,6 | 353:10,11,16 | 80:18 106:15 |
| 160:12 169:15 | 332:15 342:8 | 353:21 354:13 | 106:20,21 |
| 226:19,23 | 342:15 350:23 | 357:8,10,15,18 | 107:3 150:14 |
| 227:4 | **plaintiff** 2:7 4:7 | **planned** 350:15 | 150:19,23 |
| **phones** 183:3 | 4:19 6:19 | **planning** | 151:5,8,14,23 |
| 226:24 227:12 | 28:14 165:19 | 321:20 384:8 | 152:6,11,19 |
| 227:19 280:24 | 362:18 | **plans** 63:3,7,11 | 153:3,7,10,11 |
| **phrase** 214:19 | **plaintiff's** 5:21 | 299:4 319:6 | 153:21,24 |
| 222:9 | **plaintiffs** 5:8 | 343:19 348:9 | 154:4,15,17,19 |
| **phrased** 73:9 | 5:14 6:7,13 | 348:13 349:7 | 161:9,10,13 |
| 88:18 | 28:19 56:6 | 349:12,17 | 163:8,11,17 |
| **physical** 84:13 | 61:20 62:12 | 350:3,4,6,10,15 | 164:7,11 |
| **physically** | 77:16 94:23 | 350:17 351:3 | 165:22 166:3,5 |
| 373:8 | 95:22 | 353:19 354:1 | 166:9,11,17 |
| | | 359:4,14,16 | 167:10,14,18 |

**[platforms - practicing]**                                    Page 57

168:5 169:22
170:4 179:15
180:23 183:3
185:22 201:9
201:17,22
203:4,12,21,24
204:4,17
214:24 215:2
215:22 219:16
219:18 223:2
226:21 228:11
229:15,24
230:6 231:1,4
231:21 232:12
232:16,20,21
233:3 236:23
238:8,17,24
239:7,18 240:8
241:3,8 289:10
298:7 303:9,21
304:15 305:21
307:20,24
308:6,16,20,23
309:10 310:4
346:23 347:3,7
368:21,22
370:24
**play**   233:23
234:20 248:10
248:12
**plays**   137:5
**please**   13:19
22:10,18 23:12
51:6 70:20

81:8 104:20
173:16 398:3,8
**plenty**   394:10
395:2
**plus**   106:24
138:20
**point**   22:17
30:11 103:15
111:1 131:18
140:15 157:4
161:21 164:19
170:10 178:4
202:24 204:9
214:18,18
220:7 222:18
251:3,3 275:8
275:22 276:1
288:15 296:20
302:3 311:8
314:6 366:4
391:16 395:14
**pointed**   295:14
**pointing**   195:3
**policies**   211:2
212:7,17,23
213:2,5,7,16,16
214:9 215:1,22
216:3,8,10
222:15 223:4,8
223:14 224:18
225:5 354:23
**policy**   215:23
223:23

**political**   383:4
386:16,24
**ponce**   4:17
**poor**   220:10,17
220:20,23
221:5,17
388:16
**popular**   309:19
**population**
105:22 282:6
282:13,19
297:2 386:20
387:14 388:2
390:7
**populations**
257:17 261:13
285:22
**positing**   134:11
**position**   15:22
170:19
**positions**   35:14
**positive**   280:13
306:4,10
325:10
**positively**
339:22
**possible**   252:10
**possibly**   174:24
228:18 264:16
308:9
**post**   105:6
374:21
**postdoctoral**
19:12

**posting**   347:9
**potential**
178:19,23
188:22 255:15
255:20 256:1
282:7,14 367:2
367:18 368:5
**potentially**
118:14 228:15
375:5,22 376:5
376:7 381:18
381:24 382:7
382:11
**poverty**   119:20
385:22
**practice**   111:1
111:13,15,23
111:24 114:5
115:21 116:18
116:20 123:11
123:16 124:16
124:20 125:3
126:23 139:18
246:24 265:15
285:6 286:12
298:19 320:13
336:11 389:17
389:19,24
390:1,14,16
**practices**   240:1
240:20 332:15
358:20
**practicing**
112:11

**[practitioner - product]** Page 58

**practitioner**
103:22 131:5
**practitioners**
129:8,19 143:6
237:19
**pre** 181:6,10
**precise** 215:18
**precisely** 136:5
**predict** 266:13
266:17
**predictive**
10:17 334:14
334:23
**predisposing**
119:4
**predominance**
346:22
**predominantly**
166:4
**prefer** 170:11
**preference**
392:22
**preparation**
92:12 93:11,16
**prepare** 21:15
25:16 50:8
76:2,5 91:24
92:2,17,23
93:4 95:1,12
95:22
**prepared** 20:17
20:20 49:14
**preparing**
92:20 94:10

377:18
**present** 6:22
28:9,13,18,23
36:7 137:23
148:7 164:15
373:8
**presentation**
127:1,10
**presentations**
225:20,23
226:1,6,11
**pretending**
313:20
**pretty** 68:24
78:4 98:24
172:19 205:6
229:12 274:1
285:7 286:11
305:22 320:18
321:4 351:19
366:5
**prevalence**
375:12 390:7
**prevalent**
112:6
**prevent** 62:24
228:23 234:2
294:18
**preventing**
312:9
**prevention**
213:5,15 312:8
313:14,17,21
316:13 317:1

**previous** 89:13
344:15
**previously** 53:5
57:22 58:19
61:8 62:11
121:7 123:4
192:12 364:5
**primarily** 17:5
105:21 139:1,5
139:10
**primary**
390:22
**principals** 88:6
**printed** 68:6,10
**printout** 97:20
**prior** 96:10,11
254:2 317:18
347:23 348:13
353:21 354:15
355:11 368:23
**priorities**
339:20 340:10
340:13,23
341:3
**probably** 17:19
18:15 19:13
20:8 22:4 55:5
78:21 96:10
112:8 155:23
159:1 160:3
164:17 212:1
214:11 233:7
235:20,21
244:20 249:2

297:14 324:15
325:1 345:1
355:17 359:12
370:24
**problem** 58:17
114:24 129:11
219:13 220:2
222:2 282:11
382:18 395:1
**problematic**
180:24
**problems** 10:6
82:9 107:14
114:7 189:23
190:23 192:1,8
192:15 193:9
202:12
**proceedings**
52:15
**process** 22:4
25:24 109:12
109:18 110:22
126:13,17
149:1,8,23
150:2,7 168:17
280:18 361:14
**processes** 82:11
255:23
**produce** 120:18
254:11 255:7,9
**produced**
121:7
**product** 142:5

**[production - public]**                                                 Page 59

production
  11:10 56:8
  120:21,24
**products**   1:4
  12:20 142:15
  143:9
**profession**
  88:11 335:14
**professional**
  14:2,4 77:2
  143:7 197:21
  341:14,20
  353:22 354:7
  354:16 355:8
  355:11 356:1
**professionals**
  86:17 89:4
  273:16 337:5
  337:12
**professor**   16:1
  16:2,3,7,10,15
  20:14 21:18
  91:13 96:5
  103:1 192:2
**profile**   379:6
**program**
  139:20 140:8
  141:5,20
  309:24 310:9
  319:14 322:15
  325:18,22
  328:10,11
  330:22

**programming**
  18:1 142:10
  242:12 316:21
  322:12 329:17
  331:3,9 343:4
  344:7 350:24
**programs**
  161:16 216:22
  306:23 332:22
**prominent**
  143:9
**promote**
  188:17
**promoted**
  52:21
**promoting**
  141:20
**promotion**
  52:19,22,24
  213:4,15 312:8
**pronged**   98:12
**properly**   394:4
**propose**   321:18
  337:17
**proposed**
  319:18
**proposing**
  234:2 318:18
**propounded**
  400:5
**prospective**
  85:11
**protecting**
  209:11,22

**prothero**   10:7
  190:4,8 191:4
  191:8 194:18
  202:13,19
  203:1
**provide**   18:8
  24:16 55:4
  62:8 104:18
  130:2 224:9
  249:24 358:20
  358:20,21
  359:17
**provided**   18:13
  19:10 26:11
  27:1 56:24
  57:17,23 58:7
  58:19 59:14
  89:17 353:23
  354:17 357:8
  357:15,18,22
  359:23 360:11
**provider**   307:4
  307:5
**providing**
  19:20 104:12
  107:6 109:11
  112:24 221:16
**prussia**   1:17
  2:5
**psychiatric**
  51:9 130:3,13
**psychiatrist**
  103:6

**psychiatry**
  101:17,23
  102:4,17
  108:16 192:3
**psychological**
  9:21 107:13
  108:9,13 109:8
  137:6 173:22
  174:7,12,20
  175:3,14,18,22
  176:8,23
  179:11,20
  181:3 185:10
**psychologica...**
  186:20 187:4
**psychologist**
  51:17 103:4,5
  103:8,10,12,16
  138:8,10
  237:16 340:18
  340:20
**psychology**
  16:9 19:11
  103:20
**psychosocial**
  339:23
**psycinfo**
  361:17
**public**   4:20
  8:21,24 9:7
  43:21 44:5,12
  44:20 45:4,12
  104:4,6,7
  171:14 199:5

**[public - quote]**                                                  Page 60

205:22 252:3
294:16 310:24
312:5 313:10
313:23 316:18
317:5,13 318:9
319:9 320:2,5
320:10 321:11
322:3 324:20
324:21 400:14
**publication**
37:1 174:6
335:5
**publications**
35:20 36:24
143:17,19
144:22 145:2
145:20
**publicized**
380:17
**publicly**  205:17
205:21 206:1
**publish**  285:18
**published**
36:21 37:1
143:14,23
144:2,10 145:6
145:15 274:20
287:1 335:21
338:11 339:10
**publishing**
35:21 247:7
**pubmed**  361:17
**pull**  32:3
324:11

**pulled**  343:14
**pulling**  264:3
**purpose**  150:11
151:2 377:18
378:3 379:21
**purposes**  88:13
94:9
**pursuant**  1:14
**put**  54:5 126:5
169:14 184:14
205:5 212:4,7
276:12 278:18
285:20,24
287:2 294:17
294:17 298:21
332:14 350:23
351:9 359:5
393:9
**putting**  77:10
95:7 287:4
355:21,23
**puukko**  83:5

**q**

**qualification**
76:24
**qualified**  332:7
**quality**  142:23
143:2 147:24
232:10 299:6
326:10,15
328:18 350:2
352:2 359:22
388:16

**quantification**
293:24
**quantify**
298:12 299:16
332:20 349:20
390:11
**quantitative**
63:24 64:20
346:10
**quarry**  5:19
**question**  11:20
12:7 22:13,18
23:20 24:1,4
58:4,15 73:12
74:14 93:18
100:8 113:16
114:1 115:11
122:15 125:4
126:5,6,20
130:17 134:10
135:23 143:20
144:9 146:9,18
148:16 154:6
166:13,20
170:15 171:4
172:2,19
180:16 183:15
199:18 202:17
205:2,10 214:4
214:6,8 227:20
233:9 240:13
243:2 252:14
253:11,13
258:8 263:5,6

263:18,19,20
275:13 276:15
276:23 278:10
282:23 290:8
292:12 293:19
298:10 299:10
299:12 309:4
319:13 324:19
326:16 331:24
332:11 344:23
346:24 355:18
359:12 361:9
365:11 369:6
388:7
**questioning**
168:24 391:17
391:19,21
394:12
**questionnaire**
119:13
**questions**  96:20
110:11,20
111:2 119:14
170:14 400:4
**quibble**  74:13
**quick**  211:6
**quickly**  68:2,24
79:3 385:11
**quite**  241:16
280:8 358:17
367:4 371:13
**quote**  86:13
179:8 186:19
188:13 192:20

CONFIDENTIAL

**[quote - recall]**                                                    Page 61

192:22 196:20
274:10 294:22
339:15
**quoted**  89:6
195:24 196:6
**quotes**  32:4,10

**r**

**r**  82:24 83:16
85:19,19 86:3
399:1,1
**racial**  136:15
**racism**  136:22
**radnor**  1:17 2:5
12:17 66:15
67:1
**ran**  105:12
365:2
**random**  84:21
**randomized**
243:9,14
**range**  51:18,19
104:15 108:1
**ranges**  51:24
282:22 283:2
**rare**  348:19
**rate**  66:3 337:1
**rates**  335:16,23
336:21 381:24
382:7,11
**rather**  130:23
182:20 246:8
261:12 322:4
350:20

**rcts**  243:14
**reach**  21:4
130:23 257:23
258:11 358:23
**reached**  109:10
266:22
**reaching**
130:20 131:19
242:18 244:2
291:13 292:15
**read**  78:24 79:5
184:5 185:6,7
197:6 210:22
211:6 215:17
218:23 219:1
222:11 287:6
335:17 340:3
344:16 365:23
366:2 379:9
398:3 400:3
**reader**  78:4
**readers**  221:12
**reading**  77:3
79:3 264:13
286:17 292:23
333:4 347:9
**really**  17:5 26:1
52:4 54:13,17
63:20 89:5,7
103:21 115:5
119:12 132:11
151:19 153:15
153:19 159:2
161:22 165:14

177:14 180:12
183:9 197:15
211:4 213:8
227:17 228:10
228:15 229:1
230:4,15
231:22 243:12
243:20 245:10
246:7 264:2
265:17 269:19
273:5,8 277:20
296:16 303:19
310:16 311:17
314:7 319:20
320:1,11
321:13,14
322:6,10 323:3
323:6,14,17
342:18 344:7
350:23 351:4
354:18 361:15
366:12,23
368:11 369:10
369:24 370:1
371:13
**realtime**  1:21
273:12 397:11
**reason**  24:14
24:15 51:2
245:12 285:17
285:19,23
302:18 329:18
330:9 395:10
398:5

**reasonable**
175:23 323:5
**reasons**  227:11
227:15 330:13
330:18 381:6
**rebuttal**  7:22
8:6,11,15,20
9:6,11 37:21
37:22 38:4,10
39:17,18 40:1
40:24 41:8
42:6,14 43:20
43:20 44:4
45:3,11 46:12
46:19 47:8
48:9,18 81:13
317:22 318:4
337:23 338:7
363:9,17
**rebuttals**
364:13,24
**recall**  35:10
54:24 68:22
70:5 111:6,7
133:23 140:7
145:5,14 158:9
162:22 175:9
191:8 205:16
218:12,17
254:24 295:21
333:15,19
346:13,17
347:16 352:7,8
353:9,14 364:9

**[recall - regardless]**                                        Page 62

365:7 381:1
**receipt** 398:17
**receive** 31:9
  77:13 102:23
  103:20 127:3
  301:3,5,9,18,22
  302:14,18,20
  305:2 306:14
  306:22 307:2
  321:1,1
**received** 31:7
  34:10 58:9
  67:22,24 68:14
  73:15 74:15
  77:12 170:8
**receiving**
  104:14,16
**recent** 58:14
  118:6 128:8
  143:17 190:17
  378:17
**recently** 53:9
  53:12 158:4
**recess** 120:10
  207:12 260:19
  346:2 391:9
**reciprocal** 84:4
  85:2
**recognize**
  197:1,15 198:6
  199:13 220:4
  316:5
**recognized**
  128:5 315:1

**recollection**
  28:23 35:12
  53:19 61:13
  98:15 109:13
  140:19 167:15
  379:20 380:2
**recommend**
  113:1 296:12
**recommendat...**
  188:12 325:20
  326:3
**recommendat...**
  187:20 188:5
  215:18,24
  216:24 217:3
  223:24 225:8
  283:3 310:11
**recommended**
  61:16 99:3,6
  99:13,17
  212:17 214:9
  215:22 310:9
**recommending**
  187:13 215:11
  223:14
**record** 12:11
  13:2 30:21
  75:3,5 120:8
  120:15,17
  123:4,11
  205:24 207:10
  207:17 260:16
  260:23 345:24
  346:7 385:2

391:4,7,14
  392:4,23 393:9
  395:9,16,24
  396:6 397:6
**recorded** 123:8
**records** 69:3
  71:5,16,23
**recruiting**
  338:2
**recruitment**
  331:20 332:2
**redirect** 268:8
**reduce** 318:9
**refer** 50:13,14
  140:6 164:12
  389:18
**reference** 86:12
  88:8,9 116:6
  116:15 117:7
  117:10 222:5
  276:1 281:7
  311:20 318:20
  337:23
**referenced**
  88:20 184:12
  213:23 218:8
  218:21 222:3
  246:3 317:23
  322:8 325:1
**references**
  117:1,5 219:8
  222:8 272:15
  275:21

**referencing**
  182:9 186:1
  222:14,14
  318:2 319:8
  325:4 346:20
**referral** 306:22
  307:4
**referrals**
  108:19
**referred** 87:24
  117:12 271:14
**referring** 28:13
  87:6 165:21
  187:18 223:12
  318:6 363:23
  385:24 390:15
**reflect** 69:4
  72:12,24 248:3
  276:16 395:16
**reflected** 31:19
  32:24 72:23
  73:14 76:18
  364:16
**reflecting** 70:9
**reflects** 27:10
  27:13 122:5
**refresh** 209:19
  314:6
**refreshing**
  378:2
**refusing** 392:24
**regardless**
  182:23 183:1
  281:17

[regular - reporter]                                                    Page 63

| | | | |
|---|---|---|---|
| **regular**   178:9 | 164:13 231:17 | **report**   7:15,22 | 259:5 267:6,10 |
| **regularly** | 245:1 | 7:23 8:6,8,11 | 269:2 270:3,10 |
| 155:18 157:16 | **rely**   130:14 | 8:14,16,18,21 | 270:22,23 |
| 160:9 | 131:8,18 | 8:23 9:6,8,11 | 271:5,11,14,18 |
| **relate**   165:8 | 153:18 234:9 | 30:3,4,9,12,17 | 272:5,6,14 |
| 214:10 | 271:22 287:16 | 30:19 31:5,11 | 274:6,7,8 |
| **related**   20:6 | 296:4 362:20 | 31:13 32:6 | 276:16 277:17 |
| 81:16 84:20 | **relying**   257:24 | 33:5,6,11,18 | 278:1,15,19 |
| 101:9,20 113:6 | 259:6 270:4,6 | 37:9,22,22 | 281:5,7 282:19 |
| 141:4 175:14 | **remain**   393:14 | 38:4,9,10 39:1 | 288:3,15 |
| 190:22 212:18 | **remained**   32:11 | 39:3,10,18 | 296:13 303:6 |
| 213:16 215:1,9 | **remaining**   32:8 | 40:1,8,16,24 | 303:18 307:11 |
| 215:12,21 | **remains**   91:13 | 41:8,15,23 | 307:17 309:24 |
| 254:3 268:23 | 331:5 | 42:6,14 43:3,4 | 310:15,23 |
| 277:9 313:18 | **remember** | 43:12,20 44:4 | 311:9,16 312:4 |
| 319:14 369:19 | 57:15 61:5 | 44:12,20 45:3 | 312:10,12 |
| **relates**   1:6 | 98:15 157:5 | 45:11,18,19 | 314:6 316:10 |
| **relations**   84:20 | 190:7,12 191:2 | 46:3,12,19 | 316:12 317:14 |
| **relationship** | 194:24 226:7 | 47:7,9,13 48:8 | 317:22 318:4 |
| 85:3 140:10 | 261:17 357:17 | 48:9,17,18 | 319:23 321:5 |
| 247:22 249:20 | 364:15 | 49:14 59:7 | 322:13 324:3 |
| **relationships** | **remind**   23:11 | 65:13 79:11 | 324:10,17,24 |
| 84:4 140:11,16 | 23:24 24:4 | 81:13 86:11,19 | 328:19 338:8 |
| 140:18,21,24 | **reminder**   25:5 | 86:23 94:6,9 | 342:17,19,23 |
| **relative**   292:9 | 25:6 26:2 | 95:14 131:17 | 346:13,16,17 |
| 293:6 296:2 | **remote**   29:5,8 | 134:22 163:16 | 377:18 379:16 |
| **relatively** | **renew**   174:24 | 163:23 166:1 | 379:21,24 |
| 128:19 390:4,9 | **renewed** | 182:13 194:10 | 380:6 384:7 |
| **relevant**   59:13 | 379:12 | 229:1,12 | **reported**   130:2 |
| 170:21 222:15 | **repeat**   58:3 | 233:22 241:24 | 130:15 131:8 |
| 264:14,24 | 293:19 338:7 | 242:4 245:6,18 | 131:24 132:24 |
| 285:16 366:9 | 361:8 | 245:24 246:11 | 191:22 |
| **relied**   65:5 | **rephrase**   172:1 | 250:22 251:4,6 | **reporter**   1:20 |
| 117:13 163:23 | 261:12 290:8 | 251:9 257:22 | 1:21 13:3 23:2 |

CONFIDENTIAL

**[reporter - retired]**                                                 Page 64

202:19 397:11
397:21
**reporting**
109:14 194:20
**reports**  24:24
31:20,22 32:11
38:11 47:11
48:21 49:3,9
49:10,18,23
50:9,10,11
59:2,4,8,11,12
59:16 60:11
63:18,19 76:12
92:5,12 93:21
94:3,16 95:1,4
95:8 96:3
109:4,23
130:11 150:12
153:18 164:2,4
177:13 180:4
182:17 183:12
184:2,6 231:17
244:11 245:1
246:15 264:6
270:5 272:8,15
277:3 311:21
337:23 342:23
344:14 346:18
354:2 355:23
362:19,23
363:10,15,17
363:19 364:3
384:10

**repositories**
361:16,24
**represent**
139:24
**representatives**
53:22
**representing**
2:7,19 3:7,14
3:23 4:7,19 5:8
5:14,21 6:7,13
6:19 28:14
396:2
**reproduction**
397:19
**request**  11:10
22:12 56:7
350:20 351:10
**require**  216:18
216:19 328:22
**required**
216:23 268:8
**requirement**
215:4
**requires**
328:12,15,17
**requiring**
215:10
**reread**  195:11
**research**  16:22
17:6 87:11
119:13 145:20
163:7,10,12
166:7,16
181:23 182:8

183:9 185:1,18
186:5,9 244:10
286:24 322:9
323:17 358:21
378:17
**reserved**  12:7
**residents**
100:17
**resource**
340:14 342:3
351:6
**resourced**
330:4 356:13
**resources**
268:9 340:1,17
340:19 341:4,6
341:11,12,23
342:6,15
343:20 344:12
**respect**  50:3
62:19 175:21
176:20 216:12
242:16 246:17
284:12 292:9
303:19 344:2
355:24 356:14
394:9
**respected**
175:19
**respectfully**
128:24 389:14
393:18
**respond**  359:2

**responded**
238:23 239:6
**response**  183:9
295:20 296:1,5
324:19 364:12
364:24 365:4
**responses**
10:18 310:24
334:16,24
**responsible**
268:17
**responsive**  57:2
**rest**  15:10
394:11
**restate**  143:20
231:8 249:2
252:21 263:18
273:2 275:19
**restating**  58:14
**restrict**  284:4
**result**  163:16
268:20 382:23
392:20
**resulting**
369:17,23
**resume**  391:23
**retained**  16:2
56:6 62:5
**retaining**
337:16 338:3
**retention**  91:18
**retired**  16:1
36:8

CONFIDENTIAL

**[retrieve - risks]**                                           Page 65

| | | | |
|---|---|---|---|
| **retrieve** 55:8 | 143:15,24 | 40:11 42:22 | 312:20 315:9 |
| 64:16 109:16 | 144:3,11 145:5 | 45:16 46:15 | 321:7 322:1 |
| **return** 398:15 | 145:14 148:10 | 47:4 48:4,20 | 333:17 334:6 |
| **reverse** 248:6 | 148:14,21 | 51:8,13 56:3 | 334:20 335:1,8 |
| **review** 59:11 | 149:4,10,12,13 | 56:21 57:13,16 | 335:19 345:4 |
| 59:15 62:9 | 149:16,19 | 66:14,20 68:19 | 351:7 361:5 |
| 77:5,23 78:6,6 | 150:2 164:1,5 | 69:5,14,22 | 365:11 368:10 |
| 78:11 79:6 | 165:20 166:23 | 73:19 75:13,18 | 369:13 376:11 |
| 80:24 81:1,14 | 183:13,17 | 85:15 89:20 | 377:5,8,17 |
| 81:15 82:6,15 | 224:13 229:18 | 90:13,16 93:9 | 378:4,10,14,16 |
| 82:16 83:3,4 | 236:16 237:1 | 94:19 95:4 | 378:21 380:5 |
| 83:10,11,19,20 | 244:11 247:8 | 97:7 98:5,9 | 381:16 384:23 |
| 84:2,3,9,10,16 | 255:23 276:18 | 100:11 103:13 | 385:15 386:1,2 |
| 84:17,24 85:1 | 278:2 285:20 | 107:8 108:11 | 386:6,17 391:1 |
| 85:7,8,17,18 | 286:14 291:4,7 | 121:4,22 122:8 | **rigor** 255:24 |
| 86:1,2,7 93:10 | 291:16 292:2,3 | 123:17 126:20 | 291:22 292:5 |
| 94:24 95:3,4 | 295:1,9,13 | 146:15 147:5,9 | **rigorous** |
| 95:11 96:3 | 311:4 313:23 | 148:19 166:14 | 255:10 |
| 149:1,8,21,22 | 346:21 354:10 | 167:21 168:9 | **rise** 388:17,21 |
| 164:17 177:12 | 362:23 363:2 | 171:15 175:24 | **rising** 209:14 |
| 177:13 180:2,3 | 363:15,18 | 179:7 183:13 | **risk** 83:14 |
| 187:21 244:21 | 364:2,5 366:2 | 184:22 188:11 | 117:19,23 |
| 295:1 333:11 | **reviewing** | 189:16,21 | 118:12,15,21 |
| 360:24 361:11 | 21:15,21 58:4 | 190:15 196:16 | 137:20 138:4 |
| 365:3 366:16 | 65:12 92:12 | 201:10 205:5 | 189:10 227:5 |
| **reviewed** 59:2 | 172:8 177:5 | 209:13 217:10 | 249:18 250:4,6 |
| 59:5 60:8,11 | 333:19 | 219:14 234:11 | 250:7,13 |
| 76:7,11,18,21 | **right** 21:13 | 236:9 243:16 | 268:16 293:6 |
| 78:1,16,18,19 | 22:15,23 24:8 | 257:11 259:2 | 305:17 311:1 |
| 79:9,13 80:6,9 | 25:2,19 27:10 | 260:4 276:13 | 333:13 335:13 |
| 81:6 92:4,7,8 | 27:16,20 28:12 | 278:22,23 | 381:20 |
| 93:21 94:2,4,9 | 28:17 29:9,12 | 280:19 281:1 | **risks** 179:1 |
| 94:14,16,23 | 33:2,24 34:17 | 282:1 285:18 | 189:17 302:11 |
| 95:8,9,21 | 37:4 38:8 39:4 | 287:1 311:15 | |

[risky - school]                                                    Page 66

| | | | |
|---|---|---|---|
| **risky** 187:10,14 228:2 | **rush** 380:19 | 386:13 | 201:7 206:12 |
| **road** 1:17 2:5 4:13 | **russo** 85:1 | **school** 4:7 6:20 8:9,12 9:9,12 | 206:15 212:3,8 213:3,14 |
| **role** 10:17 | **s** | 9:17 14:8,12 | 216:14 217:20 |
| 16:17,18 17:4 | **s** 2:11,12 4:17 | 14:15 15:23 | 224:20 225:6 |
| 17:4 19:19,20 | 7:9 8:2 9:2 | 21:19 26:13,20 | 225:11 226:16 |
| 32:20 87:9,14 | 10:2 14:21 | 26:22 27:2,11 | 232:6 234:18 |
| 96:17 106:9 | 82:24 84:18 | 27:14,15 36:12 | 234:18 235:12 |
| 137:6 139:8 | 86:3 | 38:12 40:9,17 | 242:10 251:17 |
| 153:14 163:9 | **safer** 238:16 | 41:1,9 42:7 | 253:21 267:12 |
| 224:17 225:18 | **sample** 283:22 | 45:20 46:4,13 | 268:22 270:7 |
| 226:10 233:24 | **san** 6:18 | 46:20 48:7 | 273:15,16 |
| 237:15 238:10 | **sandwiches** | 49:10 52:3,6 | 276:7 281:2,4 |
| 294:13 333:3,8 | 260:10 | 54:4,6,9,14,18 | 281:10 283:12 |
| 334:15,23 | **savvy** 228:7 | 55:6 61:15 | 283:13 284:13 |
| 357:20 358:4 | 366:5 | 62:22,23 64:2 | 284:19 296:10 |
| 361:20 | **saw** 363:12 | 86:15,16 87:8 | 296:14,23 |
| **root** 191:24 | 390:6,20 | 88:6,7 89:1,3 | 297:21 298:13 |
| **roseland** 4:13 | **saying** 125:2 | 89:15 96:22 | 298:13,21 |
| **rosica** 6:23 | 181:20 191:22 | 97:14 98:23 | 299:1,3,13 |
| **roughly** 51:17 | 194:22 195:5 | 99:21 100:1,6 | 300:2,21,24 |
| 60:19 106:3 | 205:23 249:18 | 100:9,21,24 | 306:4,10 |
| 122:23,24 | 336:18 353:16 | 101:6 114:17 | 313:14,17 |
| 184:21 326:12 | 364:18 | 129:21 138:8 | 314:4,8 316:12 |
| 358:7 | **says** 19:4 56:17 | 138:12,13,17 | 325:2 326:7,19 |
| **rude** 23:12 | 176:3 179:8 | 139:5,6,11,13 | 327:16,21 |
| **rule** 252:8 | 181:4,24 | 139:13,16 | 328:1 329:6 |
| 255:11 | 184:21,23 | 141:18 142:10 | 330:11,21 |
| **ruled** 251:23 | 186:19 188:13 | 142:21,24 | 331:12 333:3,5 |
| 253:1,4 | 190:17 194:1 | 144:3 145:21 | 334:1,4 339:21 |
| **rules** 372:11 | 196:3,20 219:8 | 147:23 163:13 | 340:2,9,17,20 |
| **run** 349:24 | 287:17 335:12 | 177:18 180:14 | 340:21,24 |
| | 350:22 351:10 | 182:3,24 | 342:7,12 |
| | 378:23 381:17 | 190:20 192:4 | 347:24 348:6 |

**[school - see]**

349:7,22 350:1
350:21 351:3,8
351:19 352:4,9
352:13,16,22
356:21 357:1
358:22 359:24
361:21 362:1,6
362:12 370:7
370:11,12,16
371:4,12,16,17
371:24 372:1,3
372:18,20,22
372:22 373:2,5
373:5,15,21
379:1,2,5,13
380:14,18,18
380:23 381:3
389:3,9
**schooling**
129:23 139:3
246:6 365:14
**schools**  4:20
8:14,16,21,24
9:7 10:19,22
19:5,9 41:16
41:24 42:15
43:21 44:5,12
44:21 45:4,12
52:5 62:20
63:2 87:18
103:23 109:4
129:14,20
138:10,19
139:1,2 140:9

141:24 142:8
143:1 144:6
173:13 178:10
180:6 200:19
200:20 203:15
205:22 206:2
206:22 215:8
220:4 223:6
224:19 226:15
226:23 227:4,9
227:18 228:22
229:10 235:5
240:9 242:12
268:7,11
272:10,13
273:10 280:23
297:17 300:11
305:7,9,10,11
313:5 316:18
316:20,22
321:2,9 325:6
331:19 332:6
333:23 338:19
339:5,18,18
341:9 344:3
348:22 349:4
356:7,15 357:4
357:23 358:4,9
358:10,11,13
359:4 360:12
371:11,14
376:21 377:10
**science**  178:3
226:15 237:5,8

237:11,14,23
277:1,7 292:10
322:7 323:20
325:6 333:7
**scientific**
276:17 278:3
291:21 292:4
**scientist**  103:21
237:18 287:5
287:19 292:24
366:2
**scope**  307:17
366:13
**screen**  64:21
67:20 68:11
84:6 85:9 86:3
174:6 196:3
302:14,19,21
302:23 386:3,5
**screening**
351:8
**screens**  65:4,8
**script**  29:21
**scroll**  68:2 98:7
**scrolled**  71:13
**scrolling**
234:21
**sealing**  12:4
**search**  361:24
362:4 365:3,5
**second**  33:4
38:18,21,22
42:20 184:21
184:24 193:19

219:3,4 320:21
321:12 322:1
328:20 335:9
378:22
**section**  89:13
148:13 150:8
176:2 287:7
384:16
**sectional**  257:9
**security**  220:24
**sedran**  6:10
**see**  24:19 29:14
31:21 37:6
68:11 69:6,10
69:18,20 70:22
70:24 71:10,12
80:18 81:11,12
82:12 118:7
124:9 129:16
146:13,14
147:17 148:20
151:6,22
153:14 154:24
161:4 167:8,17
176:3,6 179:7
179:16 181:6
184:23 185:8
186:18 187:1,2
188:4,10,12,19
188:20 190:16
191:1,21 192:9
192:10 194:6
196:1 209:5
210:12,22

**[see - share]** Page 68

220:12,13
238:10 244:21
274:17,21,22
280:23 287:20
311:19 325:13
335:1,12,18
341:7 378:7
380:16 381:3
381:16 382:4
385:20 386:4
386:10,11,13
395:21
**seeing** 74:9
157:5 178:15
355:5 370:22
**seeking** 61:14
**seem** 347:16
**seemed** 365:10
**seen** 56:18 98:3
132:13 155:14
155:15 180:10
205:7 219:2
227:3,8 298:3
330:20 333:12
371:1
**select** 27:2
79:21 319:17
**selected** 26:9
59:10 79:24
80:2
**selection**
215:11 216:19
216:19 254:23

**selectively** 78:7
78:12
**self** 130:2,11,15
131:8,17,24,24
134:22 268:3,5
**senate** 10:9,12
53:14,16,21,24
54:12 208:5,12
208:23 211:11
215:15 216:1,4
216:11 217:13
221:13 223:21
**sense** 15:20
17:9 126:14,18
145:12 166:11
186:13 198:2
269:15 282:24
292:19 314:11
369:12
**sent** 80:3
363:10
**sentence** 181:8
181:9 185:8
187:19,23
193:24 271:20
275:15,24
276:2,21 277:9
**separate** 31:14
102:5,12 150:8
278:24 279:23
280:9,10
**separated**
149:14 184:13

**separately** 94:4
**separates**
183:17
**separating**
183:11
**sequencing**
236:5 244:13
244:17,23
257:13 261:10
289:7,16
290:23
**serve** 61:20
69:24 70:6
175:7,8,10
**served** 57:5
87:10 108:8
138:7,9 139:12
139:15 175:2
175:13
**service** 19:5
69:16 312:6
342:14
**services** 54:15
54:19 212:9
306:18 307:2
321:1 339:17
340:8 341:8
342:10 350:3
357:23,24
359:1 379:1,12
380:13
**serving** 96:6
106:2

**set** 29:24 30:6
31:14 49:7,9
110:10 111:2
141:14 160:16
160:20 236:13
236:15 243:6
243:11 245:17
247:4,14 255:6
263:11 270:10
310:10 342:20
343:23,24
344:3 351:14
**setting** 55:12
114:15 219:11
219:24 221:24
321:7 322:16
**settings** 103:23
112:9 235:12
257:17 334:5
**seven** 392:7,14
392:22 395:3
395:12
**several** 35:19
147:22 169:24
339:16 353:7
360:21 379:8
**sexual** 366:24
367:1,7,8,9
373:22
**shape** 142:22
351:14
**shaped** 350:19
**share** 151:19

CONFIDENTIAL

**[shares - social]**                                                      Page 69

| | | | |
|---|---|---|---|
| **shares** 152:10 | **signed** 155:21 | **situations** | 26:19 50:13 |
| 152:18 153:2 | **significant** | 132:4 | 62:18 63:5,13 |
| **sharon** 1:14 7:4 | 129:11 137:5 | **six** 27:11,15 | 63:14,21 64:2 |
| 7:17,19 9:18 | 153:13 181:23 | 47:14 281:6 | 64:22 81:2,17 |
| 12:24 13:7,20 | 198:11 199:5 | **skills** 267:20 | 82:8,9,17 83:6 |
| 15:18 34:5 | 288:1 388:23 | 269:8 301:23 | 84:11 85:20 |
| 35:1 56:7 90:6 | **significantly** | 302:1 | 86:4 99:5,8,10 |
| 91:11,20 97:15 | 381:19 | **skim** 366:16 | 99:15 106:14 |
| 192:2 400:8 | **signing** 398:10 | **skimming** 79:2 | 106:20 108:4 |
| **sheet** 34:15 | **similar** 358:18 | **slade** 4:4 | 112:5,13 113:2 |
| 398:7,9,12,15 | **simply** 130:24 | **slade.methvin** | 113:5 119:20 |
| 400:6 | 131:6 134:14 | 4:6 | 119:21 123:18 |
| **shooting** | 135:13,16 | **sleep** 267:24 | 124:2,12,16 |
| 370:17 371:24 | **single** 166:18 | 268:1 269:9 | 125:5,16,23 |
| 372:2,18,22 | 173:9 215:20 | 274:12 277:13 | 126:8,15 127:1 |
| 373:5,9,15 | 252:8 271:1 | 279:7 289:12 | 127:2,4,21 |
| 379:2,14 | 285:11 322:15 | 289:14 388:16 | 128:4,9,10 |
| 380:14,24 | 322:15 | 388:17,20,21 | 129:11,23 |
| **shootings** 370:8 | **sit** 112:19 | 389:7,9 390:18 | 143:12,15,24 |
| 370:12 371:4 | 145:4,13,19 | 390:21 | 144:6,12,17 |
| 371:13 379:5 | 165:5 166:21 | **small** 52:16 | 145:1,6,8,17 |
| 379:15 381:4 | 183:16 197:9 | 390:4,9 | 150:10,13,17 |
| **shorter** 327:22 | 264:22 265:5 | **smoking** | 150:21 151:1,4 |
| **shortly** 260:6 | **site** 307:5 | 189:15 199:9 | 152:14,22 |
| **show** 244:11,14 | **sitting** 66:15 | 199:13 312:4 | 153:6,9 154:3 |
| **showed** 313:24 | 90:18 132:18 | 312:21 | 154:19 157:24 |
| **showing** 174:5 | 132:21 260:7 | **snap** 3:23 | 161:8 166:5,8 |
| **shows** 244:17 | 266:1 279:5 | **snapchat** 80:19 | 167:1 168:5,11 |
| **shut** 330:5 | **situation** | 80:22 155:4 | 168:15 170:9 |
| **siculus** 3:17 | 131:21 132:10 | 156:22 157:6 | 171:22 172:7 |
| **sign** 398:8 | 132:23 298:23 | 157:11 | 172:23 173:6 |
| **signature** | **situational** | **sneeringer** 5:18 | 173:10,12,23 |
| 397:10 | 10:17 334:15 | **social** 1:3 9:22 | 174:8 175:15 |
| | 334:24 | 10:7 12:18 | 176:3,9 177:8 |

**[social - southeast]**                                                    Page 70

| | | | |
|---|---|---|---|
| 177:15,16 | 222:17,21 | 304:13,14 | **somebody** |
| 178:6,12,20,23 | 223:13 224:2 | 305:1,14,16,17 | 52:20 126:9 |
| 179:1,9,11,14 | 224:16 225:3 | 305:21 306:3 | 162:20 259:11 |
| 179:18,21 | 225:15 226:3 | 306:13,17,21 | 289:8 305:20 |
| 180:23 181:4 | 227:6,14,17,24 | 307:19 308:5 | 329:22 |
| 181:17 183:3 | 228:5,20,24 | 308:13,15,20 | **soon** 119:24 |
| 185:3,11 | 229:4,6 232:16 | 308:22 309:8 | 345:19 384:10 |
| 186:12,19 | 233:2,20 235:1 | 309:10 310:2 | 384:12 |
| 187:3 188:13 | 236:23 238:8 | 310:20 311:6 | **sorry** 18:24 |
| 188:16,22,23 | 238:17 246:4 | 312:23 314:10 | 36:15 47:9 |
| 189:1,8,24 | 251:11,14 | 314:11,17 | 58:3 72:18 |
| 190:21 191:24 | 258:5,5 259:4 | 319:16 320:16 | 101:19 123:23 |
| 192:7,14 | 262:19 263:3 | 342:1,18 | 154:23 159:22 |
| 193:12,16,22 | 263:22 266:8 | 343:14 346:11 | 172:1 181:7 |
| 194:3,5,11,12 | 266:22 267:3,4 | 348:2,5,7,14,20 | 191:18 195:10 |
| 195:16 196:23 | 267:16,19 | 349:9,14 | 196:19 209:4 |
| 197:2,13 198:5 | 268:15,17,21 | 350:13 352:6 | 282:9 353:11 |
| 198:10,16 | 268:22 269:8 | 354:21,23 | **sort** 22:13 |
| 199:20 200:6 | 271:9 273:18 | 355:3 356:1,16 | 23:21 24:3 |
| 200:11,15,23 | 274:11 276:9 | 357:9,11,16 | 102:15 168:23 |
| 201:3,11,16,22 | 277:10 280:2,2 | 358:2 362:5 | 230:22 324:18 |
| 202:13,20 | 283:9 288:1,13 | 365:12 368:21 | 384:15 |
| 203:9,20 204:3 | 289:10,13 | 369:2,17 | **sound** 52:13 |
| 204:22 205:8 | 293:7,10,17 | 370:24 371:3 | **sounds** 22:16 |
| 205:18 206:17 | 294:1 295:3 | 371:15 | 105:12 107:8 |
| 210:18,23 | 296:11,15 | **socialization** | 260:13 369:21 |
| 211:12 212:19 | 297:4 298:2,4 | 188:18 | 381:8 |
| 213:17,23 | 298:14 299:17 | **socially** 220:9 | **source** 93:22 |
| 214:10,19,20 | 299:21 300:16 | **societal** 136:14 | 95:14 131:17 |
| 214:23 215:1,8 | 300:18,20,23 | **solely** 63:5 | 236:17 |
| 215:12 218:19 | 301:2,8,16,18 | 257:2 352:6 | **sources** 163:24 |
| 218:20 219:15 | 301:21 302:1,4 | **solutions** | 291:19 |
| 220:5 221:1,6 | 302:5,8,13,16 | 196:24 197:15 | **southeast** 2:11 |
| 221:14 222:3,9 | 302:22 303:1 | | |

**[space - spend]**                                                  Page 71

| | | | |
|---|---|---|---|
| **space**  398:6 | **specialist** | 237:24 245:4 | 220:7 222:19 |
| **spalding**  2:10 | 337:10 | 247:12 248:21 | 223:1,9 224:18 |
| **speak**  26:16 | **specialized** | 248:22 251:4 | 231:22 267:15 |
| 55:6 74:5 | 337:5,12 | 254:6 261:2,18 | 270:10 279:14 |
| 87:19 90:3 | **specific**  8:8,11 | 263:2,20,22 | 282:20 292:1 |
| 129:22 182:16 | 8:13,15,18,20 | 264:4,17,19,23 | 292:12 294:4 |
| 193:11 198:9 | 8:23 9:6,8,11 | 264:24 266:15 | 308:9,14 |
| 203:17,20 | 21:24 38:12 | 267:8 271:15 | 310:14 315:12 |
| 211:21 212:2 | 40:16 41:8,23 | 271:20 272:2 | 324:5 334:3 |
| 224:17 234:19 | 42:13 43:12 | 275:24 279:3 | 348:10 360:10 |
| 239:13 251:5 | 44:4,19 45:11 | 283:4 288:8 | **specificity** |
| 261:6 287:2 | 46:3,19 63:12 | 291:10 294:8,9 | 369:11 |
| 308:8 310:13 | 63:20 64:6,8 | 295:22 298:17 | **specifics**  169:5 |
| 328:18 337:21 | 88:12,22 92:20 | 302:1,22 314:7 | **specify**  235:23 |
| 338:1 341:1 | 96:1 105:19 | 317:3 318:7 | 363:20 |
| **speaking**  15:5 | 117:18 132:12 | 319:16 324:11 | **specifying** |
| 35:24 89:7 | 150:18 153:16 | 329:23 331:1 | 352:1 |
| 90:4,5,7,18,20 | 163:7 164:19 | 331:16 332:1 | **speculation** |
| 91:3,10 107:20 | 165:2,8,9 | 333:16 336:1 | 330:15 |
| 145:8 171:13 | 166:10 167:7,9 | 341:4 346:14 | **speech**  147:10 |
| 194:17 204:10 | 170:5 173:14 | 350:18 351:5 | 147:15,20 |
| 210:3,5,24 | 179:4,13 | 351:22 354:1,2 | 148:3,6 |
| 211:4 215:14 | 182:12,14 | 357:18 359:23 | **speeches**  147:3 |
| 221:14 223:7 | 184:9 187:18 | 379:24 384:9 | 147:7 |
| 226:14 234:1 | 187:23 190:12 | 384:15 391:19 | **spell**  81:22 |
| 241:1 247:9 | 201:14 204:9 | **specifically** | **spelled**  83:5,16 |
| 251:11 254:21 | 204:14 205:12 | 87:15 101:20 | 84:18 85:19 |
| 254:22 259:21 | 206:5,18 210:6 | 114:1 118:8 | **spend**  64:1,8,17 |
| 276:7 293:23 | 212:2 213:8 | 144:17 145:16 | 64:21 65:8 |
| 303:6 346:18 | 220:15 225:5,7 | 164:4,6,10 | 92:11,22 96:5 |
| 358:8 360:14 | 226:7 231:11 | 165:21 167:18 | 97:2 157:20,24 |
| **speaks**  145:6 | 231:11 233:16 | 180:17 182:16 | 160:15,19 |
| 277:8 333:7,20 | 233:16 234:6,7 | 194:19 210:4 | 321:8 347:6 |
| | 234:11,19 | 211:21 216:2 | 384:14 |

CONFIDENTIAL

**[spends - street]**                                                      Page 72

| | | | |
|---|---|---|---|
| **spends**  171:22 | **standard**  29:24 | **stated**  20:2 | **statistics** |
| **spent**  70:10,16 | 35:15 110:10 | 47:21 49:4 | 236:21 |
| 71:7,20 72:3,6 | 111:15 123:11 | 128:1 181:19 | **status**  16:2,4 |
| 156:1,8,11 | 123:15 285:5 | 182:6 187:24 | **stay**  179:6 |
| 229:21 296:2 | 286:12 | 192:21 197:7 | 184:16 327:22 |
| 346:20,22 | **standards** | 272:4 377:19 | 327:22 |
| 347:2,19 | 238:9,14 | **statement** | **steering**  5:22 |
| **spoke**  25:22 | **start**  23:24 | 55:11 176:21 | **steinsbekk**  81:1 |
| 26:3,7 29:19 | 24:3 106:19 | 177:2,8,20 | **stenographic** |
| 88:20,23 | 111:10 132:20 | 180:21 185:17 | 13:2 |
| 150:15 207:19 | 146:11 147:7 | 186:4,7 192:12 | **step**  297:20 |
| 209:20 210:13 | 191:18 208:19 | 192:24 195:12 | **stephen**  363:24 |
| 212:11 246:2 | 277:16 300:18 | 196:14 198:15 | **steps**  391:4 |
| 267:10 268:12 | 313:15 332:5 | 235:17 271:20 | **stipend**  15:16 |
| 303:18 344:10 | 332:18 391:17 | 271:23 272:1,1 | **stipulated**  12:2 |
| **spoken**  59:21 | 392:18 393:2 | 277:8 345:12 | **stipulations** |
| 87:15 145:1 | 395:4 | 369:14 380:11 | 11:15 |
| 226:18 231:10 | **started**  107:6 | 383:11 386:23 | **stop**  327:11 |
| 234:16,22 | 326:18,19 | 387:8 | 330:21 355:8 |
| 242:3 333:21 | 384:24 | **statements** | 392:11 394:2,9 |
| **spread**  307:12 | **starting**  129:1 | 179:5 197:11 | 394:19 395:5 |
| 372:2 | 193:19 214:18 | 272:2 278:4,20 | **stopped**  110:9 |
| **spring**  60:19,21 | 389:15 395:19 | **states**  1:1 10:9 | **stopping** |
| 60:22 62:4 | **starts**  381:15 | 10:12 12:21 | 395:14 |
| **st**  4:5 | 385:18 | 53:14,16 208:5 | **strained**  268:21 |
| **staff**  338:3 | **state**  53:21 | 208:12,23 | **strange**  52:13 |
| 342:13 353:23 | 55:3 86:13 | 217:12 283:13 | **strategic**  62:21 |
| 373:23 | 87:16 88:3,24 | 283:23 285:2 | 234:3 283:4 |
| **staffing**  341:14 | 123:24 206:14 | 289:21 | 319:15 354:13 |
| 342:11 343:6,8 | 266:21 290:15 | **stating**  395:24 | **streaming** |
| 355:6 | 310:22 372:4 | **statistical** | 113:20 |
| **stage**  319:11 | 372:14 378:24 | 290:14 | **street**  3:12 4:5 |
| **stand**  192:24 | 380:12 398:5 | **statistically** | 5:5 6:5,11 14:5 |
| | | 287:24 | |

**[strength - studying]**                                    Page 73

| | | | |
|---|---|---|---|
| **strength** | 374:12,14,16 | 373:24 374:5 | 295:24 296:4 |
| 292:10 | 376:12 | 376:21 377:10 | 311:22 347:15 |
| **strengths** | **student's**  137:5 | 377:12 390:5 | 347:18 360:24 |
| 181:11 | **students**  10:22 | **students'**  10:23 | 361:11,22 |
| **stress**  105:6 | 26:19 52:7 | 376:23 | 366:19,23 |
| 136:17 374:21 | 64:1,8,13,17,21 | **studied**  229:13 | 371:1,7 |
| 376:13 | 65:4 99:22 | 229:19,22 | **study**  81:4 |
| **strike**  104:8 | 106:2 109:5 | 230:2 308:11 | 82:19 83:7 |
| 111:9 114:4 | 115:6 116:13 | 308:14,19 | 85:11 166:23 |
| 124:13 129:1 | 129:24 137:18 | 332:19,24 | 206:6,9 230:8 |
| 239:22 389:14 | 138:2 159:10 | **studies**  81:6 | 231:15 244:16 |
| **structural** | 163:16 173:13 | 182:12,14,15 | 248:22 249:10 |
| 85:22 | 203:14 210:11 | 244:14,19,21 | 249:11 252:9 |
| **struggle**  227:9 | 226:24 227:19 | 246:3 252:9 | 254:11 255:4,8 |
| 367:6,14 | 267:16 268:15 | 255:10,22 | 255:20,24 |
| 382:21,22 | 268:16 274:10 | 256:16,18 | 256:5,10 |
| **student**  63:8 | 277:11 280:23 | 257:3,7,9,15,15 | 264:15,19,23 |
| 88:4 99:11,16 | 281:13 283:10 | 258:1,4,12,19 | 265:24 274:20 |
| 99:18 100:23 | 283:13 284:5,6 | 258:22 259:6 | 282:2 283:20 |
| 110:22 113:5,6 | 284:10,13,14 | 259:13,19,23 | 283:22 284:9 |
| 114:16 131:13 | 284:16,19 | 261:8,11,13 | 285:12,15,17 |
| 136:3 145:10 | 285:2,16 | 264:12,13,16 | 286:1 287:20 |
| 210:9 215:5,9 | 296:10,15 | 264:21 265:7 | 288:18,20,21 |
| 216:20 240:9 | 297:3,15 | 266:2,5 272:16 | 288:22 289:7 |
| 251:17 267:22 | 298:13 299:17 | 275:7 282:5,21 | 289:11,16 |
| 285:11 293:9 | 300:10 301:5 | 283:1,8 284:2 | 290:3 292:17 |
| 293:17 294:1 | 302:3 305:13 | 284:8 287:12 | 292:20,22 |
| 297:2 299:24 | 306:9,17 307:1 | 288:12 289:3 | 293:4,14 |
| 300:17,19,23 | 308:2 313:6 | 289:22 290:12 | 311:19 323:7 |
| 301:1,7,18,20 | 339:22 348:21 | 290:15 291:3,6 | 333:17 336:1,2 |
| 302:12,18 | 348:22 349:10 | 291:7,9,11,15 | 371:19,20 |
| 304:24 306:2 | 350:14 356:7 | 291:18,20,22 | **studying** |
| 306:12,20 | 356:15 365:13 | 291:23 292:1 | 229:21 249:16 |
| 353:2 373:23 | 371:11 373:7 | 294:5 295:2,23 | 289:9 |

**[subcommittee - sure]**                                                     Page 74

**subcommittee**
10:14 208:14
217:14
**subheading**
148:18
**subject** 57:4
150:1 398:10
**subjective**
272:23 273:4
274:1
**submit** 67:3
149:21 223:20
**submitted** 10:9
10:12 37:23
49:3 55:10
68:20 70:13
71:1,17 72:12
73:16 74:10,20
75:2 208:4,11
208:22 215:24
217:12 271:11
286:14
**subscribed**
400:10
**subsequent**
83:12
**subsequently**
47:15
**subspecialty**
102:16,20
**substack**
152:21 153:1
162:9,12,14,20
162:24

**substance** 74:1
105:3,4 119:16
314:13 315:2,8
315:13,17,20
316:1 382:18
382:20,23
400:6
**subthreshold**
388:12
**succeed** 267:12
**successful**
310:24 318:12
**suffer** 220:17
220:20,23
382:17
**suffering** 24:9
**suggest** 76:13
177:23,24
187:8 199:6
215:21 218:5
219:22 244:12
285:10 302:7
323:24 328:14
382:10 389:8
**suggested**
323:21 328:11
**suggesting**
215:4
**suicidal** 85:9
**suicide** 379:6
379:15
**suite** 2:12 5:6
5:12,19 6:5,11

**sum** 73:24
**summarizing**
196:7
**summary**
377:20
**summer** 60:22
62:4
**superintendent**
139:13,16
330:4,22 331:4
331:9
**superintende...**
88:3,5 273:17
327:16 328:2
329:5,11,14
330:9,14,17
**supervise**
111:24
**supervised**
104:11 105:10
105:11
**supervisees**
113:9
**supervising**
96:17
**supervision**
19:11 20:6
106:22 125:14
397:21
**supervisor**
358:12
**supervisory**
17:24 19:19

**support** 11:2
88:4 188:16
223:5,24 228:4
271:19,22
272:17 275:22
278:19 305:3,5
306:15 321:4
325:12 326:11
341:23
**supported**
275:7,15
349:13
**supporting**
217:19 311:5
353:1
**supportive**
226:22 227:21
227:23
**supports** 10:17
54:4,5,7 204:4
276:1,18 277:1
278:3,15 307:3
313:6 325:11
334:15,23
339:17 340:8
341:8 359:1
**suppose** 241:12
241:12 317:12
**sure** 18:4 23:13
24:5 30:14
48:4 50:20
57:7,9 71:4
73:20,21,22
74:6 76:8

**[sure - talked]**                                          Page 75

85:14 90:17
91:2 92:15
97:24 102:2,7
102:15 115:2
120:2 132:17
143:20 153:10
154:5 156:7,9
156:19 157:1
158:5,8 161:14
201:24 202:21
209:4 223:17
226:8 237:12
243:4 249:5
250:2 252:22
254:19 261:19
265:23 275:5
278:8,12 288:8
292:11 293:20
302:17 309:6,6
309:15 311:13
311:14 316:7
325:22,24
332:4 333:6
345:20 359:15
361:6 363:21
370:18 375:2
377:24 378:1
383:14,20,20
**surgeon**   224:12
312:10,13
311:16 312:3,6
316:11
**surprise**   128:18
144:24 309:21

**surprisingly**
380:17
**surveys**   111:5
**suspect**   22:7
**sustain**   225:10
340:1
**sustainability**
328:21
**sustained**   320:8
328:13,23
329:1,3
**sustaining**
321:22
**sustainment**
328:21
**sw**   3:5
**swear**   13:4
**sweden**   82:18
**switch**   384:12
**switching**
384:9
**sworn**   13:8
55:11 397:5
400:10
**symptoms**   81:2
81:18 83:7,15
83:22 84:6
130:2,11,15
132:1 268:2
**synthesize**   32:3
**system**   10:20
26:23 100:3,4
142:22,22
143:6 320:17

322:21 326:20
326:24 337:6
338:21 339:7
351:23
**systematically**
308:19
**systemic**
386:14
**systems**   142:8
145:22 211:1
212:3 224:21
225:11 300:2
321:3 325:12
326:11 343:15
351:22

**t**

**t**   7:9 8:2 9:2
10:2 85:19
399:1
**tab**   56:1 67:10
97:9 173:16
189:19 208:19
217:7 334:9
338:13 377:4
**table**   169:19
**take**   19:1 22:8
22:15 32:2
33:8 79:8,12
119:24 120:3
128:7 170:24
171:8 176:15
176:15 207:6
211:9 224:2

260:11 274:4
319:10 322:19
325:14 342:5
342:10 345:19
345:21 354:7
385:6,12
392:17 395:17
**taken**   1:14
120:11 177:20
207:13 225:9
226:2 228:8,9
228:19 237:7
237:10 260:19
346:3 391:10
**takes**   128:21
236:8
**talk**   15:16
22:19 23:21
30:14 50:12
66:10 93:14
119:8 147:14
169:11 193:15
226:12 233:20
267:2 268:7
315:16 323:9
323:14 324:5
324:14 386:7
391:4
**talked**   61:17
139:9 144:17
213:13 225:21
252:12 255:14
256:12 270:14
299:20 320:3,4

**[talked - term]**                                              Page 76

322:2 359:21
375:14 388:1
**talking**   22:14
23:7 26:13
51:20 100:4
102:3 109:7
111:22 124:19
124:20 129:17
131:21 132:11
144:5,21 151:4
161:13 166:15
169:3 171:6
187:19 202:19
203:1,21 206:2
210:9 213:2
219:23 223:4
230:21 237:23
248:21 251:8
251:13,16
253:6,20 254:4
254:5,7 275:23
278:11 281:17
291:2 298:16
298:18 301:24
303:7 312:20
312:21,23
315:11 318:8
320:15,22
322:16 327:8
331:15 333:18
343:22 345:13
349:4 351:2
354:4 355:7
363:9 373:15

380:23 385:20
387:21 389:1
391:18
**talks**   144:11
222:20 317:15
378:11
**targeted**
306:14
**task**   366:9
**tasked**   268:13
**taught**   100:22
**tea**   120:5
**teach**   99:22
100:12,16,18
**teacher**   216:21
332:21 340:21
354:22 373:22
**teachers**   10:16
86:16 89:2
230:15 273:14
332:8 333:13
334:14,22
335:12 353:23
**teaching**   16:12
16:21,23 17:2
17:7,9 19:5,20
253:22 267:20
344:5
**teasing**   264:3
**tech**   142:11
**technical**
120:22 359:18
**technically**
14:14

**technician**   6:23
12:10 120:6,13
207:8,15
260:14,21
345:22 346:5
385:3 391:5,12
395:23
**technologies**
3:16
**technology**
83:13,22 112:4
142:2,5,7,15
143:9 230:3
235:8 242:7,15
307:6,8
**teen's**   181:6,10
**teenagers**   65:7
194:9
**teens**   181:5
194:1,22 195:4
195:6,14
**television**
113:13,14
**tell**   21:11 51:9
53:8 61:11
74:8,19 132:19
132:22 133:6
141:11 156:12
168:13,14
169:13 170:12
182:22 203:10
213:20,20
219:6,7 248:13
254:15 272:3

279:18 280:7
324:4 371:9
377:21 383:20
**telling**   127:16
294:24
**telzer**   281:4
**telzer's**   165:24
**temporal**
244:13,17,23
257:13 261:10
289:7,16
290:22
**temporality**
289:4,22
290:16
**tempting**
227:17
**ten**   119:14
322:24
**tend**   169:11
180:19 190:21
232:7
**tenor**   383:5
386:16 387:1
**tenth**   3:12
**tenure**   53:1
327:15 331:12
**tenured**   16:7
**term**   17:21
18:6 91:3
128:10 147:12
151:3 184:24
185:4,12
214:23 223:9

**[term - think]**                                      Page 77

| | | | |
|---|---|---|---|
| 235:17,21 | **testifying** 53:15 | 196:22 197:13 | 98:20 99:1 |
| 241:15 272:22 | 54:3 65:22 | 197:23 198:3 | 110:6 111:17 |
| 273:3,24 | **testimony** 7:4 | 232:4 236:6,8 | 111:21 113:15 |
| 300:13 303:2 | 10:9,12 21:8 | 236:10 362:7 | 115:18 125:9 |
| 303:14 315:10 | 32:14 54:21 | **things** 98:21 | 125:11 126:3 |
| 315:14,16 | 55:7 207:20 | 109:15 119:15 | 127:24 129:16 |
| 319:10 328:20 | 208:4,11,22 | 119:19 126:11 | 131:22 134:4 |
| 329:20 330:2 | 209:2,5,6,7 | 128:22 136:21 | 134:12,15 |
| 336:5,19 | 210:16,22 | 158:20,22 | 135:4,24 136:7 |
| 337:11 345:2 | 211:11 212:18 | 161:3,5 169:24 | 140:23 144:1,8 |
| 375:24 376:4 | 213:22 214:21 | 183:23 190:11 | 145:7,9 154:8 |
| **terms** 16:12 | 217:12,23 | 201:7 226:13 | 154:12 155:12 |
| 19:18 51:1 | 218:5,9,11,21 | 228:21 229:2 | 155:19 156:3 |
| 54:6 64:16 | 221:4 223:20 | 229:10 234:24 | 156:15 157:2 |
| 136:9 229:10 | 224:11,14 | 235:3,5 242:14 | 157:22 158:19 |
| 235:12 238:11 | 266:18,20 | 243:22 244:9 | 160:19 161:22 |
| 249:1 253:16 | 397:7 | 244:12 247:20 | 162:11,15 |
| 279:17 292:6 | **texas** 5:6 6:6,18 | 255:2,11,13,17 | 165:13,24 |
| 296:1 327:22 | 6:20 | 256:22 257:7 | 169:4 170:14 |
| 327:23 341:7 | **text** 303:11 | 261:7 265:21 | 170:14 171:8 |
| 354:12 355:4 | 304:1,3 | 285:19 293:2 | 171:11 175:16 |
| 356:15 362:1 | **textbooks** | 305:12 312:21 | 177:19 180:16 |
| 365:3,5 367:11 | 290:14 | 323:2 324:11 | 181:20,22 |
| 367:14 372:24 | **texting** 303:16 | 324:18 325:16 | 182:23 184:14 |
| 379:20 | **thank** 13:17 | 360:2 362:2 | 185:18 186:6,9 |
| **testified** 13:9 | 82:1 147:5 | 364:23 384:13 | 187:9,12,20,24 |
| 53:6,13,17,20 | 395:20 | **think** 15:11 | 192:20,23 |
| 54:1 209:14 | **thing** 23:16 | 18:22 23:12,20 | 194:17,22 |
| 218:15 | 33:4,9 38:24 | 25:3 32:19 | 195:3,13,17 |
| **testify** 24:12 | 40:7 43:2,19 | 33:2 36:20,22 | 197:7,20 198:1 |
| 53:23 89:21 | 46:10 51:11 | 47:20 51:15,17 | 198:23 199:3,9 |
| 211:18 218:2,6 | 134:13 147:19 | 52:11,15 58:7 | 199:24 200:2 |
| 218:7,15 266:8 | 148:1 156:4 | 62:10 66:7 | 200:16 205:3 |
| 266:15 | 158:21 172:15 | 67:7 72:6 | 205:11 213:19 |

**[think - time]**                                                    Page 78

| | | | |
|---|---|---|---|
| 214:23 221:11 | 364:22 365:16 | **tiered** 321:3 | 138:11 139:4 |
| 221:23 224:24 | 367:4 369:22 | 325:12 326:11 | 141:17 155:19 |
| 225:22 227:7 | 370:16 371:6 | 326:20,24 | 156:8,17,20 |
| 228:8,14 | 384:23 387:6 | 328:10 | 157:9,20,24 |
| 229:11 230:3 | 388:13 | **tight** 337:4,11 | 158:1,7,23 |
| 232:18 236:1,3 | **thinking** 15:14 | **tiktok** 2:19,20 | 159:18,24 |
| 236:22 237:9 | 52:1,4,6 | 2:20 79:18 | 160:8,15 |
| 237:10,22 | 238:12 243:20 | 80:7,19,22 | 161:22 162:13 |
| 247:6 252:13 | 263:6 264:3 | 84:19 155:7,10 | 162:17 171:21 |
| 253:11,19 | 265:16,17,19 | 155:22 156:2,8 | 185:21,24 |
| 256:12 257:6 | 284:4 320:12 | 156:11,14,18 | 205:12,17,22 |
| 258:3 259:19 | 365:18 366:13 | 164:13 279:6 | 207:8,15 |
| 260:6 262:6,8 | 366:14 | 396:3 | 215:16 218:1,6 |
| 262:12,13 | **third** 38:21 | **time** 12:8,15 | 218:7,10,14 |
| 263:9,10,17,24 | 221:23 248:14 | 17:16 18:12 | 224:2 229:21 |
| 271:2,3 272:21 | 322:5 323:15 | 19:21 20:2 | 239:2 260:11 |
| 273:4,11 277:8 | **thirty** 398:16 | 23:19 32:1 | 260:14,21 |
| 277:14 278:16 | **thoroughly** | 53:2 56:8 64:1 | 268:23 282:10 |
| 280:8,11,21,22 | 78:2 | 64:8,21,21 | 288:16 296:2 |
| 281:3,6,6 | **thought** 101:19 | 65:7 66:6 67:4 | 302:14,19,21 |
| 284:1,6,14 | 133:15,20 | 70:9,14,14,15 | 302:24 308:4 |
| 286:11 287:8 | 216:10 221:19 | 71:6,20 72:7 | 309:22 314:2 |
| 287:19 291:21 | 264:1 292:18 | 73:23 84:21 | 321:15,19,21 |
| 294:3,14 299:9 | 320:19,22 | 85:9 86:3 | 321:21 323:7,8 |
| 301:17 302:6 | 335:2 | 92:11,22 96:4 | 323:13,13 |
| 303:12 304:20 | **thousands** | 96:9 97:2 99:1 | 325:15 326:5 |
| 305:6,13,24 | 286:24 333:5 | 107:1 110:6,8 | 335:20 345:22 |
| 314:16 315:4 | **three** 49:7 | 112:10 119:11 | 346:5,11,19,22 |
| 323:4 324:9,24 | 92:20 168:1,8 | 120:6,13 122:5 | 347:2,6,19 |
| 326:4 329:10 | 217:2 219:9 | 122:10,12,17 | 350:18 351:14 |
| 330:15,16,24 | 319:21 323:2 | 122:21 123:5,9 | 381:1 385:2 |
| 337:22 340:11 | 352:18,20 | 123:13,24 | 390:13 391:5 |
| 355:16,22 | **thriving** 10:22 | 128:21 130:15 | 391:12 393:24 |
| 360:4 361:16 | 376:21 377:10 | 131:9 133:13 | 394:10,13 |

CONFIDENTIAL

**[time - truthfully]**                                    Page 79

395:2,4 396:5
**timeline** 310:23
**times** 53:13
  92:16,19
  271:10 281:1,8
  351:17 395:24
**title** 146:11
**titled** 81:2,15
  82:16 83:11
  377:9
**titles** 25:21
  26:3
**tobacco** 189:15
  311:2,7 312:9
  312:22 313:18
  313:20 314:11
  314:12,17
  315:1,19
  316:14,17
  317:1,6,18
  320:5 324:22
**today** 13:16,24
  20:18 22:7
  24:12,17 26:4
  50:13 56:19
  66:15 90:18
  112:20 132:19
  132:22 145:4
  145:14,19
  166:21 183:16
  197:10 224:4
  340:5 392:6,17
  392:23 393:6,8
  394:6

**today's** 12:14
**together**
  298:22 359:5
**told** 94:2 132:5
  159:19 221:1
  392:20 394:23
**tomorrow**
  75:23 392:11
  392:18 393:2,9
  394:2,6,11
  395:22
**tonight** 75:22
**took** 26:24 31:1
  31:4,12 67:4
  262:3 320:7
  393:6,7
**tool** 116:1
**top** 69:11 70:23
  188:2,6 209:4
  328:4 331:17
  386:3,5
**topaz** 1:16 2:3
**topic** 22:14
  30:18 54:20
  55:1 113:4
  206:24 209:10
  209:21 211:21
  217:18 338:2
**topics** 29:24
  30:6 351:15
**total** 80:6
**tough** 227:20
  340:22 369:6

**towards** 260:1
**toxic** 220:9
  221:20
**traditional**
  17:8
**tragic** 379:2
**trained** 103:21
  237:18
**trainees** 19:11
**training** 117:14
  130:21 301:22
  354:23 359:23
  366:4
**trajectories**
  84:5
**transcript**
  23:14 24:6
  344:17 397:18
  398:17,19
**transcription**
  400:4
**transfer** 15:19
**transferred**
  36:10
**transit** 67:23
**transition** 54:3
  84:12 217:20
**transitioning**
  54:9
**translation**
  55:4
**trauma** 10:23
  325:1 369:18
  374:12,15,22

376:23 377:12
**traumatic**
  105:6 374:21
  375:6,12,22,23
  376:2,5,7,11,13
  381:18,24
  382:8,12,13
**travel** 66:5,22
  67:4
**treat** 107:12
  389:19 390:18
**treated** 104:11
  105:10,11
  107:24 389:22
**treater** 109:22
**treating** 99:23
  100:15,17
  101:1 105:20
  390:23
**treatment**
  104:14,16
  213:6
**trial** 6:23 12:8
  21:9,16 65:23
  243:10
**trials** 243:15
**tried** 115:5
  160:6
**true** 251:22
  253:1 387:17
  397:6
**truthfully**
  24:11

**[try - understanding]**                                                                 Page 80

try  23:4 35:21
  114:18 115:1,4
  227:5 355:24
trying  23:13
  36:20 48:3
  98:15 191:9
  195:11 199:1
  238:18 255:11
  337:22 356:2
  357:17 365:7
  389:21
tucson  9:9,11
  45:19 46:3,13
  46:20
turn  175:24
  186:15 190:16
  193:16 195:21
  196:17 217:6
  318:3 335:9
  339:1,13
  381:11
turning  206:24
turnover  328:1
  332:21 333:8
  335:16,23
  336:20,24
tv  113:20,23
twelve  27:14
twitter  151:1,8
  151:13 161:17
  161:19,20
two  19:13 20:9
  29:17 47:11
  54:1 68:15

82:19 91:16
  126:22 127:9
  143:8 148:12
  167:14 207:23
  220:14 225:21
  236:9 247:19
  247:22 280:9
  281:23 288:23
  288:24 312:20
  319:6 326:12
  367:11 385:7
  385:13
type  27:21
  158:16 270:21
  313:11 320:14
  321:11
types  26:15
  104:13 110:2
  197:4 198:24
  216:24 253:14
  263:15 291:7
  291:15 312:14
  324:6
typical  26:12
  27:3 31:23
  112:7 150:5
  230:9 262:14
  279:19 361:14
  395:12
typically  28:22
  31:2 36:4
  51:15 52:14
  106:1 117:11
  145:20 149:19

160:23 171:12
  178:15 226:11
  246:23 270:23
  283:5 300:7
  330:6 331:8
  362:4

|   u   |
| --- |

u  81:24 83:5,5
  85:12
u.s.  53:24 85:10
  117:8 284:5,7
uh  22:22 23:5,5
  23:5 140:3
  191:20 219:5
umbrella
  102:14 150:13
  240:12 315:16
unavailable
  185:2 186:5
uncomfortable
  169:1
under  87:3
  102:14 148:6
  148:17 149:23
  150:13 155:3
  176:2 240:11
  240:11 242:9
  246:8,8 247:13
  339:2,14
  397:20
underestimate
  157:23

underneath
  188:12
understand
  18:5 22:18
  110:21 114:18
  115:5,7,19
  131:12 132:17
  172:12 191:9
  220:24 221:20
  223:18 231:2
  233:7 237:17
  237:20 241:15
  243:5,12
  275:13 276:10
  286:18 299:23
  305:22 309:3
  314:7,24
  316:16,17
  336:3 361:6
  368:13 388:6
understandable
  343:17
understanding
  16:14 48:14
  90:10 118:12
  128:6 148:5
  151:17,18
  224:6,24 225:1
  230:19 240:15
  242:23 243:3
  249:7 256:20
  297:14 311:17
  313:13,16
  317:5,8 335:20

**[understood - used]**                                    Page 81

| | | | |
|---|---|---|---|
| **understood** | 99:4,7,9,14,20 | 105:5 112:5,14 | 296:11 297:3 |
| 23:15 184:5 | 100:2,5,6,9,20 | 113:3,5 115:22 | 298:2,4 300:13 |
| 214:7 221:12 | 100:23 101:3,6 | 115:24 116:9 | 300:17,20,23 |
| 230:17 247:14 | 102:24 105:21 | 116:15,16 | 301:2,8,21 |
| 266:20 278:23 | 106:9 107:7 | 123:18 124:3 | 302:13 303:2 |
| **undertaken** | 138:23 192:4 | 124:13,16 | 305:1 306:3,13 |
| 231:2 | **unknown**  185:5 | 125:6,23 126:7 | 306:21 309:8 |
| **underway** | 185:13 | 127:2,4,21 | 311:10 312:9 |
| 317:18 | **unquote**  294:22 | 128:9 129:11 | 314:1,12 315:1 |
| **unfair**  200:16 | **update**  98:21 | 143:1 155:18 | 315:8,13,17,19 |
| **unfortunately** | **updated**  34:11 | 157:7,13,15,17 | 315:20 316:1 |
| 22:24 200:21 | 34:16,18 35:22 | 159:4 160:4,6 | 316:14 317:7 |
| **unified**  9:9,12 | 358:21 | 161:9,16,19 | 317:18 336:4 |
| 45:20 46:4,13 | **updates**  36:13 | 162:5 163:16 | 336:19 345:2 |
| 46:20 | 36:16 | 168:4,15 | 346:11 347:8 |
| **unique**  164:13 | **updating**  36:4 | 169:21,24 | 361:19 376:1 |
| 166:24 172:22 | **upheaval**  331:8 | 170:3,9 173:23 | 382:20,23 |
| 173:4 342:20 | **urban**  10:16 | 174:8 178:6 | **used**  29:22 |
| **uniquely** | 333:12 334:1,4 | 185:3,12 | 116:2,5,6,11 |
| 270:12 | 334:14,22 | 186:12 188:14 | 117:2,5,8 |
| **united**  1:1 10:9 | 335:12,15,22 | 188:23,23 | 132:1 136:23 |
| 10:12 12:21 | 336:5,7,19 | 189:7 194:2 | 147:13 154:18 |
| 53:14,16 208:4 | 337:1 382:1,8 | 195:16 200:15 | 155:1,2,4,7,10 |
| 208:11,23 | 382:14 | 223:9 226:20 | 156:22 157:8 |
| 217:12 283:13 | **usage**  111:16 | 243:7 250:21 | 157:11 159:2 |
| 283:23 285:2 | 113:12 | 257:8 259:19 | 161:19,20 |
| **university**  9:17 | **use**  9:22 18:7 | 259:23 263:17 | 162:14,15,18 |
| 14:14 15:22 | 22:24 26:13 | 267:17 268:15 | 166:5 203:16 |
| 16:12,17,24 | 27:4 30:6 51:1 | 268:17 269:22 | 222:10 235:21 |
| 17:11,14,18 | 51:9,24 82:8 | 279:15 283:9 | 243:8 244:4 |
| 18:9,14 20:14 | 83:6,13,22 | 283:17,19,21 | 245:2,16 |
| 52:21 55:3 | 84:6,12,19 | 285:14 287:7 | 256:13 284:21 |
| 91:5 96:6 97:3 | 85:3,21 86:4 | 289:13 293:10 | 286:1 289:17 |
| 97:13,21 98:18 | 99:11,15 105:3 | 293:18 294:1 | 303:14 311:1 |

**[used - want]**                                                   Page 82

315:15 324:11
328:20 336:16
337:11 361:13
376:1,4 398:20
**useful**  337:24
**user**  171:22
**user's**  172:6
**users**  347:5
**uses**  127:1
293:7 302:15
**using**  29:5,7
84:21 99:5,8
117:12 119:16
149:16 151:3
168:10 188:13
200:21,22
201:3,4 203:22
245:10 247:2
263:11 270:1
296:15 298:14
299:17 305:14
345:1 361:23
368:21
**usually**  22:8
158:13 160:15
226:14 291:21
300:12 330:1

**v**

**valid**  251:22
253:1
**valuable**  273:5
**vaping**  199:12

**variability**
372:24
**variable**  192:6
192:13 245:13
249:13,16
251:14 327:20
350:17
**variables**
249:14 288:23
288:24 289:1
**varies**  160:7
**variety**  103:22
109:3 136:12
227:10,14
228:17 304:7
381:5
**various**  117:19
261:13 330:18
**vary**  331:14
**verbal**  23:4
**verification**
228:13 230:12
230:20,24
231:3,13
232:10 234:23
**verifications**
229:23
**veritext**  1:23
12:13
**versa**  24:3
**version**  118:6
128:8
**versus**  172:15
194:1 195:6

206:1 280:2
284:13 299:23
340:24 347:9
347:10
**vice**  24:2
**video**  12:10,16
29:10,11 120:6
120:13 158:17
207:8,15
260:14,21
345:22 346:5
385:3 391:5,12
395:23
**videographer**
6:22 12:12
**videos**  155:13
**videotape**  1:13
**videotaped**
56:5
**view**  179:21
213:1
**viewed**  158:22
**vince**  6:23
**violence**  119:17
136:16 137:1,2
370:15 373:14
382:13
**viral**  201:6
**virtually**  350:7
**virus**  368:9
370:2
**visited**  97:22
**visual**  236:11

**vitae**  7:16,18
34:5 35:1
**vital**  10:19
338:20 339:6
**vivek**  224:12
**vulnerabilities**
181:11

**w**

**wagstaff**  5:11
**waiting**  169:20
**waived**  12:5
**walk**  254:8
**walked**  49:8
**walking**  165:6
173:5
**walnut**  6:11
**want**  17:19
18:5 47:22
50:24 52:10
55:14 60:18
73:19 85:14
90:17 104:18
118:9 129:16
132:16 170:23
174:17 179:4
186:16 193:16
193:23,24
195:22 196:17
202:1,3 207:21
209:18 214:12
227:11,13
233:7 252:21
255:3 256:23

**[want - witness]**                                                   Page 83

275:4 278:8,12
285:10 294:20
297:5 311:12
321:16 329:19
335:8 347:14
348:24 351:1,4
356:8 361:6
363:20 376:15
377:23 378:1
381:7 385:17
386:15 388:13
392:16
**wanted**   120:17
159:8 207:1
216:3
**wanting**   351:20
**wants**   15:9
**warnings**   99:10
99:15,18 238:3
238:5
**warranted**
62:22
**washington**   3:5
3:12
**watch**   158:17
**watched**
158:19
**watching**
113:13,14,20
347:10
**way**   19:15
21:22 22:20
30:4,22 116:2
116:10 154:13

159:3 165:14
200:7 236:12
236:14 248:6
265:17 303:23
308:12 315:6
365:6 387:10
389:8
**ways**   148:12
204:14 219:10
252:2 273:6
308:2,3
**wc.com**   3:6,7
**wcllp.com**   5:14
**we've**   27:5
42:24 49:8
56:21 66:8
89:17 169:23
205:7 227:3,8
270:13 315:9
320:3,4 322:2
326:6 334:9
383:23
**wealth**   258:22
**web**   9:17 97:14
97:21,22 98:3
98:10 146:4,7
146:12,24
148:8,18 149:3
149:6 150:1,6
**webinar**   359:19
**website**   98:16
98:17,21,23
**websites**   98:18

**week**   34:11
36:21 96:10,13
97:4 109:2
157:18,19
159:2 160:3,10
190:1,18 202:6
**weekend**   121:1
**weeks**   162:8
**weigh**   293:2
**weighed**   291:18
**weight**   261:22
291:14 292:16
293:1
**weighted**
291:17
**weighting**
292:19
**weinkowitz**
6:10
**welcome**
176:16
**wellness**   141:5
141:20 306:23
**went**   48:23
68:23 76:11
92:7 96:1 99:2
120:19 231:18
267:14 268:6
344:22 396:3
**west**   6:17 14:5
**wheelhouse**
231:23
**whims**   329:22

**whiteley**   3:4
**wholeheartedly**
178:2
**wide**   104:15
109:3
**widely**   243:12
**wildermuth**
363:24
**williams**   3:3
**wish**   352:13
**witness**   11:5
13:5 20:1
28:22 33:21
47:20 48:13
49:2 50:20
56:6 57:6
58:12 59:22
60:3 63:11
64:5 65:1 70:4
72:17 74:5
77:19 78:10
82:2 83:1
86:20,24 88:17
91:1 93:17
94:15 106:18
111:20 112:17
115:14 116:24
118:5 120:4
123:23 124:8
126:3 127:8,24
130:7 131:4
133:6,18 134:4
135:1,21
136:20 137:10

**[witness - yeah]**                                                    Page 84

| | | | |
|---|---|---|---|
| 144:15 151:11 | 309:2,14 310:7 | 150:5 182:24 | **wrapping** |
| 152:3 163:21 | 314:16 315:23 | 203:13 230:9 | 384:13,17 |
| 165:13 167:4 | 318:23 327:5 | 230:22 234:19 | **writ**  167:1 |
| 169:9 171:10 | 329:10 331:23 | 235:15 236:21 | **write**  15:18 |
| 172:11 173:2 | 338:14 347:14 | 270:6 337:5 | 270:23 271:1,4 |
| 176:18 180:1 | 353:14 355:16 | 351:19 356:19 | **writing**  65:13 |
| 181:15 183:22 | 359:10 363:5 | 358:16,17,18 | 216:1 379:23 |
| 185:16 187:17 | 364:8 372:8 | 362:10 389:9 | **written**  10:9,12 |
| 189:5 191:7 | 373:12 374:4 | **worked**  20:3 | 30:5 67:22 |
| 192:19 194:16 | 375:9 379:19 | 60:1,6 61:8 | 111:2 208:3,10 |
| 196:12 197:19 | 383:10 387:6 | 62:11 87:7 | 208:22 209:2,6 |
| 199:23 203:7 | 387:20 397:5,7 | 96:9,19 101:8 | 213:22 217:11 |
| 204:8 206:9 | 398:1 | 122:16,22 | 218:4,9 223:20 |
| 209:18 210:21 | **witnesses**  59:18 | 139:2,17 142:1 | 225:13 290:4 |
| 211:16 212:22 | 60:10 362:17 | 142:15 143:11 | 333:21 335:2 |
| 214:3 216:7 | **word**  78:23,24 | 206:13 297:18 | **wrote**  50:11 |
| 221:10 222:24 | 78:24 79:4 | 299:3,5 326:6 | 272:13 284:24 |
| 224:9 231:7 | 188:5 214:22 | 327:20 329:13 | 334:21 339:10 |
| 233:6 240:4,23 | 214:22 328:16 | 333:22 350:7 | 339:15 343:18 |
| 245:23 246:22 | **words**  187:14 | 370:10 371:10 | **x** |
| 248:20 249:23 | 224:4 | **working**  20:12 | **x**  7:2,9 8:2 9:2 |
| 250:12 251:2 | **work**  14:10,13 | 55:2 64:10 | 10:2 81:24 |
| 254:14 258:16 | 14:16 16:22 | 71:7 72:3 90:8 | 131:7 151:1,8 |
| 259:10 260:13 | 17:5,6,11,14,18 | 116:13 143:10 | 161:17,19,20 |
| 262:3 265:5 | 17:20,23,24 | 150:16,20 | 350:6 352:1,20 |
| 266:12 269:14 | 18:1,3 19:4,8 | 178:10 200:19 | 353:5,17 |
| 270:19 272:21 | 19:16 20:13,13 | 205:21 215:7 | **y** |
| 275:12 277:6 | 21:4,8,11,18,24 | 220:3,4 237:2 | **yeah**  15:7 |
| 280:6 282:18 | 52:4 66:3 71:2 | 272:10 273:9 | 18:22 19:7 |
| 283:16 286:22 | 77:4 103:22 | 300:1 325:5 | 30:11 31:5 |
| 288:6 290:2,19 | 104:6 106:12 | 342:12 356:21 | 57:6,15 60:23 |
| 293:13 295:7 | 115:6 129:14 | **world**  225:2 | 66:21 72:1 |
| 297:9 304:18 | 129:20 135:10 | 298:6 | 77:9 78:4 |
| 306:8 307:16 | 138:19 141:18 | | |

**[yeah - yesterday]**                                                                    Page 85

| | | | |
|---|---|---|---|
| 81:10 87:7,22 | 88:11 89:7 | 86:18 88:15 | 245:21 246:20 |
| 88:2 90:2 91:1 | 90:9 104:7 | 90:23 93:12 | 248:18 249:21 |
| 92:10 93:17 | 119:18 138:21 | 94:11 106:16 | 250:10,24 |
| 95:5 104:21 | 141:13 143:17 | 111:18 112:15 | 252:17 254:12 |
| 111:7 114:11 | 195:2 276:8,12 | 115:12 116:22 | 258:14 259:8 |
| 141:2 155:8 | 277:18 297:18 | 118:3 119:23 | 262:1 265:3 |
| 156:9,15 169:9 | 307:7,9,21 | 120:16 121:8 | 266:10 269:12 |
| 171:10 175:23 | 308:7,12 | 123:21 124:6 | 270:17 272:19 |
| 195:13 196:12 | 310:12 313:7 | 126:1 127:6,22 | 275:10 277:4 |
| 196:19 233:6 | 319:20 321:18 | 130:5 131:2 | 278:6 280:4 |
| 240:4 246:10 | 322:23,24 | 133:4,16 134:2 | 282:16 283:14 |
| 249:1 257:20 | 324:1,7 325:7 | 134:18,23 | 286:20 288:4 |
| 280:6 306:1 | 326:8,22 | 135:19 136:18 | 289:24 290:17 |
| 313:19 319:19 | 327:12,19 | 137:8 141:7 | 293:11 295:5 |
| 327:5 331:23 | 333:23 349:6 | 144:13 151:9 | 297:7 304:16 |
| 341:10 345:17 | 349:11,17 | 152:1 163:19 | 306:6 307:14 |
| 359:10 366:15 | 350:8,9,11 | 165:11 167:2 | 308:24 309:12 |
| 372:5 376:6 | 351:11 352:1 | 168:22 170:18 | 310:5 314:14 |
| 382:3 | 352:18,20 | 171:5 172:9,24 | 315:21 318:21 |
| **year**   19:13 20:9 | 353:5,7 357:6 | 176:12 179:23 | 327:3 329:8 |
| 60:19 81:3 | 358:6 360:21 | 181:13 183:20 | 331:21 345:18 |
| 82:19 157:10 | 366:3 378:1 | 185:14 187:15 | 347:12 353:12 |
| 184:24 241:22 | 379:8 | 189:3 191:5 | 355:14 359:8 |
| 310:23 312:14 | **yeates**   2:4 | 192:17 194:14 | 363:3 364:6 |
| 319:18 321:17 | 19:23 20:24 | 196:10 197:17 | 372:6 373:10 |
| 323:4 328:2 | 28:20 32:13 | 199:21 203:5 | 374:2 375:7 |
| 350:22 352:11 | 47:18 48:11,24 | 204:6 206:7 | 379:17 383:8 |
| 353:10,11,16 | 50:18 57:3 | 207:5 209:16 | 384:4,19 385:1 |
| **yearly**   335:15 | 58:10 63:9 | 210:19 211:14 | 385:5 387:4,18 |
| 335:22 336:20 | 64:3,23 68:4,8 | 212:20 214:1 | 392:1 395:7 |
| **years**   19:22 | 68:16 70:2 | 216:5 221:8 | **yelena**   2:16 |
| 52:11 54:23 | 72:15 74:3 | 222:22 224:7 | **yep**   196:14 |
| 78:3 85:10 | 77:17 78:8 | 231:5 233:4 | **yesterday** |
| 87:9,11,12 | 81:21 82:1,21 | 240:2,21 | 158:4 162:16 |

CONFIDENTIAL

**[ygr - zuckerberg]**                                                   Page 86

| | |
|---|---|
| **ygr**   1:3 | **youth**   10:6 |
| **ykotlarsky** | 83:21 188:13 |
| 2:18 | 189:23 191:13 |
| **york**   2:17,17 | 191:24 193:9 |
| 3:21,21 | 193:12 198:7 |
| **young**   51:21 | 198:12 202:11 |
| 54:7 62:18 | 209:11,14,22 |
| 63:1 117:16 | 211:5 311:1 |
| 119:5 128:20 | 312:9 316:13 |
| 137:12 141:1 | 317:6,18 320:6 |
| 141:24 166:6 | 375:5 379:6,15 |
| 176:5,10 | 381:23 |
| 177:17 178:1 | **youtube**   3:8 |
| 180:13 182:2 | 80:23 113:22 |
| 185:20 191:10 | 154:11 155:2 |
| 191:12 193:4 | 157:14,21 |
| 198:20 203:22 | 158:2,7,13,18 |
| 205:7 220:3 | 158:20,22 |
| 223:6 225:3 | |
| 228:1,5 229:3 | **z** |
| 230:14 232:11 | **zachary**   4:17 |
| 234:24 235:12 | **zbower**   4:19 |
| 241:4 246:5 | **zero**   105:23 |
| 280:15,18 | **zoom**   4:2 5:2 |
| 299:21 310:18 | 6:2 |
| 312:10 313:11 | **zuckerberg** |
| 320:8,24 321:7 | 3:17 |
| 342:21 343:23 | |
| 344:1 355:5 | |
| 367:6,13 | |
| 368:14,17 | |
| 370:5,17 383:3 | |
| 390:20 | |

Golkow Technologies,
A Veritext Division                                www.veritext.com