**Exhibit 94**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

CONFIDENTIAL

Page 402

1        UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF CALIFORNIA

2

3   IN RE: SOCIAL MEDIA          : MDL No.
    ADOLESCENT                   : 4:22-md-3047-YGR

4   ADDICTION/PERSONAL INJURY    :
    PRODUCTS LIABILITY           : MDL No. 3047

5   LITIGATION                   :
    ------------------------------------------

6

    THIS DOCUMENT RELATES TO:    :

7   ALL CASES                    :

8

9                  -   -   -
            AUGUST 13, 2025

10              VOLUME II
                   -   -   -

11

12

13          Videotape deposition of

14   SHARON A. HOOVER, Ph.D., taken pursuant

15   to notice, was held at the law offices of

16   Kessler Topaz Meltzer & Check LLP, 280

17   King of Prussia Road, Radnor,

18   Pennsylvania 19087, commencing at

19   8:59 a.m, on the above date, before

20   Amanda Dee Maslynsky-Miller, a Court

21   Reporter and Certified Realtime Reporter.

22

23                  -   -   -

        GOLKOW, A Veritext Company

24     877.370.3377 ph| 917.591.5672 fax

CONFIDENTIAL

Page 403

1    APPEARANCES:
2
3

        KESSLER TOPAZ MELTZER & CHECK, LLP
4       BY: MELISSA L. YEATES, ESQUIRE
        BY: MATTHEW T. MACKEN, ESQUIRE
5       280 King of Prussia Road
        Radnor, Pennsylvania 19087
6       (610) 667-7706
        myeates@ktmc.com
7       mmacken@ktmc.com
        Representing the Plaintiff
8
9
10

        KING & SPALDING LLP
11      BY: KATHRYN S. LEHMAN, ESQUIRE
        Southeast Financial Center
12      200 S Biscayne Boulevard
        Suite 4700
13      Miami, Florida 33131
        (305) 462-6000
14      Klehman@kslaw.com
        Representing the Defendants,
15      TikTok Inc., ByteDance Inc.,
        ByteDance Ltd., TikTok Ltd., and
16      TikTok, LLC
17
18
19
20
21
22
23
24

CONFIDENTIAL

```
                                                      Page 404

 1    APPEARANCES: (Continued)
 2
 3
             WILLIAMS & CONNOLLY LLP
 4           BY: J. ANDREW KEYES, ESQUIRE
             BY: DANIEL WHITELEY, ESQUIRE
 5           680 Maine Avenue SW
             Washington, DC 20024
 6           (202) 434-5000
             akeyes@wc.com
 7           dwhiteley@wc.com
             Representing the Defendants,
 8           YouTube, LLC, Google LLC, and
             Alphabet Inc.
 9
10
             COVINGTON & BURLING LLP
11           BY: MICHAEL N. KENNEDY, ESQUIRE
             One CityCenter
12           850 Tenth Street, NW
             Washington, DC 20001
13           (202) 662-6000
             mkennedy@cov.com
14           Representing the Defendants,
             Meta Platforms, Inc. f/k/a
15           Facebook, Inc.; Facebook Holdings, LLC;
             Facebook Operations, LLC; Facebook
16           Payments, Inc.; Facebook
             Technologies, LLC; Instagram, LLC
17           Siculus, Inc.; and Mark Elliot
             Zuckerberg
18
19
             KIRKLAND & ELLIS LLP
20           BY: JACK NOLAN, ESQUIRE
             601 Lexington Avenue
21           New York, New York 10022
             (212) 446-4800
22           jack.nolan@kirkland.com
             Representing the Defendants,
23           Snap Inc.
24
```

CONFIDENTIAL

Page 405

```
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
 4        BEASLEY ALLEN LAW FIRM
          BY: SLADE METHVIN, ESQUIRE
 5        301 St Louis Street
          Mobile, Alabama 36602
 6        (251) 308-1515
          slade.methvin@beasleyallen.com
 7        Representing the Plaintiff,
          DeKalb County School District
 8
 9
10
11        CARELLA, BYRNE, CECCHI, BRODY &
          AGNELLO, P.C.
12        BY: DAVID G. GILFILLAN, ESQUIRE
          5 Becker Farm Road
13        Roseland, New Jersey 07068
          (973) 994-1700
14        dgilfillan@carellabyrne.com
15        - and -
16        BY: ZACHARY S. BOWER, ESQUIRE
          2222 Ponce De Leon Boulevard
17        Miami, Florida 33134
          (973) 994-1700
18        zbower@carellabyrne.com
          Representing the Plaintiff,
19        Irvington Public Schools
20
21
22
23
24
```

CONFIDENTIAL

Page 406

```
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
          EILAND & BONNIN LAW FIRM
 4        BY: CRAIG EILAND, ESQUIRE
          BY: DAVID BONNIN, ESQUIRE
 5        2200 Market Street
          Suite 501
 6        Galveston, Texas 77550
          (409) 763-3260
 7        ceiland@eilandlaw.com
          dbonnin@eilandlaw.com
 8        Representing the Plaintiffs
 9
10
          O'HANLON, DEMERATH & CASTILLO
11        BY: KAYLIE MORGAN, ESQUIRE
          117 West Craig Place
12        San Antonio, Texas 78212
          (210) 310-3030
13        kmorgan@808west.com
          Representing the Plaintiff,
14        Texas School Districts
15
16
          KING & SPALDING LLP
17        BY: YELENA KOTLARSKY, ESQUIRE
          1185 Avenue of the Americas
18        34th Floor
          New York, New York 10036
19        (212) 556-2100
          ykotlarsky@kslaw.com
20        Representing the Defendants,
          TikTok Inc., ByteDance Inc.,
21        ByteDance Ltd., TikTok Ltd., and
          TikTok, LLC
22
23   ALSO PRESENT: Brian McGee, Videographer
     Vince Rosica, Trial Technician
24
```

CONFIDENTIAL

Page 407

```
 1                       -   -   -
 2                     I N D E X
 3                       -   -   -
 4
    Testimony of:   SHARON A. HOOVER, PhD
 5
 6       By Attorney Keyes                    410
         By Attorney Nolan                    808
 7
 8                       -   -   -
 9                     E X H I B I T S
10                       -   -   -
11
    NO.            DESCRIPTION                 PAGE
12
    Hoover-30      No Bates
13                 SHAPE District Profile,
                   School Mental Health
14                 Profile?District Version   564
15  Hoover-31      No Bates
                   The National Association of
16                 School Psychologists, Student
                   to School Psychologist Ratio
17                 2023?2024 Based on the U.S.
                   Department of Education
18                 Common Core of Data        642
19  Hoover-32      No Bates
                   American School Counselor
20                 Association
                   Student-to-School-Counselor
21                 Ratio 2023?2024            648
22
23
24
```

CONFIDENTIAL

Page 408

1                          -   -   -

2              DEPOSITION SUPPORT INDEX

3                          -   -   -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line       Page Line

7    None

8

9

10   Request for Production of Documents

11   Page Line      Page Line       Page Line

12   None

13

14

15   Stipulations

16   Page Line      Page Line       Page Line

17   409      1        1

18

19

20   Question Marked

21   Page Line      Page Line       Page Line

22   None

23

24

CONFIDENTIAL

Page 409

```
 1                    -   -   -
 2              (It is hereby stipulated and
 3         agreed by and among counsel that
 4         sealing, filing and certification
 5         are waived; and that all
 6         objections, except as to the form
 7         of the question, will be reserved
 8         until the time of trial.)
 9                    -   -   -
10              VIDEO TECHNICIAN:   We are
11         now on the record.  My name is
12         Brian McGee.  I'm a videographer
13         for Golkow, a Veritext division.
14         Today's date is August 13th, 2025,
15         and the time is 8:59 a.m.
16              This video deposition is
17         being held in Radnor, PA, in the
18         matter of In Re: Social Media,
19         Adolescent Addiction Personal
20         Injury Products Liability
21         Litigation for the United States
22         District Court, Northern District
23         of California.
24              The deponent is Sharon A.
```

CONFIDENTIAL

Page 410

1          Hoover, Ph.D.

2                   Counsel will be noted on the

3          stenographic record.  The court

4          reporter is Amanda Miller and will

5          now swear in the witness.

6                        -  -  -

7                   SHARON A. HOOVER, Ph.D.,

8          after having been duly sworn, was

9          examined and testified as follows:

10                       -  -  -

11                    EXAMINATION

12                       -  -  -

13   BY ATTORNEY KEYES:

14          Q.    Good morning, Dr. Hoover.

15   We met yesterday.

16          A.    Good morning.

17          Q.    As a reminder, my name is

18   Andrew Keyes.  I'm with the law firm of

19   Williams and Connolly, and we represent

20   the Google and YouTube defendants.

21          A.    Great.

22          Q.    Do you understand that you

23   are still under oath?

24          A.    I do.

CONFIDENTIAL

Page 411

1          Q.    And this is a continuation
2    of the deposition that began yesterday?
3          A.    I do.
4          Q.    Did you review anything in
5    connection with this matter since the end
6    of your deposition yesterday evening?
7          A.    I just reviewed my reports.
8          Q.    Which reports did you
9    review?
10          A.    Frankly, I looked through
11   kind of all of the reports; the expert
12   report from May, as well as the rebuttal
13   reports and the district-specific
14   reports.
15          Q.    Since the end of the first
16   day of your deposition yesterday, did you
17   review anything besides your reports?
18          A.    No.
19          Q.    Did you speak with counsel
20   about this matter?
21          A.    No.
22          Q.    Did you speak with anyone
23   else about this matter?
24          A.    No.

Page 412

1          Q.    You have submitted reports
2    that relate to six school districts in
3    particular, correct?
4          A.    Correct.
5          Q.    Tucson, Charleston,
6    Breathitt, Irvington, DeKalb and Harford.
7                Did I get that list correct?
8          A.    Yes.
9          Q.    Okay.  For any year from
10   2017 to the present, can you tell me what
11   percentage of Tucson High School students
12   had access to a cell phone or personal
13   electronic device outside of school?
14                ATTORNEY YEATES:  Object to
15          the form.
16                THE WITNESS:  I could not
17          give you that number off the top
18          of my head, no.
19   BY ATTORNEY KEYES:
20          Q.    Did you get that data from
21   Tucson or its counsel?
22                ATTORNEY YEATES:  Object to
23          the form.  Foundation.
24                THE WITNESS:  So ask the

CONFIDENTIAL

Page 413

1              question again, because the way I
2              heard it, as stated, that likely
3              it would be very difficult to get.
4                   But you're welcome to ask it
5              again.
6    BY ATTORNEY KEYES:
7              Q.    Sure.
8                   For any year from 2017 to
9    the present, can you tell me what
10   percentage of Tucson High School students
11   had access to a cell phone or personal
12   electronic device outside of school?
13                  ATTORNEY YEATES:  Object to
14             the form.
15                  THE WITNESS:  I cannot tell
16             you that.  And I think the data
17             would be very difficult to get.
18             Even if there was a metric of it,
19             I think it would be difficult to
20             interpret.
21   BY ATTORNEY KEYES:
22             Q.    For any year from 2017 to
23   the present, can you tell me what
24   percentage of Tucson Middle School

CONFIDENTIAL

Page 414

1  students had access to a cell phone or

2  personal electronic device outside of

3  school?

4          A.    No.

5                ATTORNEY YEATES:  Object to

6          the form.

7                THE WITNESS:  Sorry.

8  BY ATTORNEY KEYES:

9       Q.    For any year from 2017 to

10  the present, can you tell me what

11  percentage of Tucson High School students

12  spent time on defendants' platforms

13  outside of school?

14                ATTORNEY YEATES:  Object to

15          the form.

16                THE WITNESS:  So I can't

17          tell you specific to Tucson what

18          percentage, no.

19  BY ATTORNEY KEYES:

20       Q.    For any year from 2017 to

21  the present, can you tell me what

22  percentage of Tucson Middle School

23  students spent time on defendants'

24  platforms outside of school?

CONFIDENTIAL

Page 415

1           A.      No, not specific to Tucson.
2           Q.      For any year from 2017 to
3    the present, can you tell me what
4    percentage of Tucson High School students
5    spent time on social media outside of
6    school?
7           A.      Outside of school?
8           Q.      Yes.
9           A.      I couldn't tell you
10   specifically.
11              I could tell you what we
12   know based on national data.  But if
13   you're asking specifically for Tucson,
14   no.
15          Q.      For any year from 2017 to
16   the present, can you tell me what
17   percentage of Tucson Middle School
18   students spent time on social media
19   outside of school?
20          A.      I don't know that that data
21   exists.
22          Q.      For any year from 2017 to
23   the present, can you tell me what
24   percentage of Charleston High School

CONFIDENTIAL

Page 416

1    students had access to a cell phone or

2    personal electronic device outside of

3    school?

4         A.    So just so I understand,

5    we're moving to Charleston now?

6         Q.    We are.

7         A.    Okay.

8              No.

9         Q.    For any year from 2017 to

10   the present, can you tell me what

11   percentage of Charleston Middle School

12   students had access to a cell phone or

13   personal electronic device outside of

14   school?

15        A.    No.  Again, I think that

16   that data would be very hard to identify.

17        Q.    For any year from 2017 to

18   2025, can you tell me what percentage of

19   Charleston High School students spent

20   time on defendants' platforms outside of

21   school?

22              ATTORNEY YEATES:  Object to

23        the form.

24              THE WITNESS:  No.

CONFIDENTIAL

Page 417

1    BY ATTORNEY KEYES:

2         Q.    For any year from 2017 to

3    2025, can you tell me what percentage of

4    Charleston Middle School students spent

5    time on defendants' platforms outside of

6    school?

7                ATTORNEY YEATES:   Object to

8         the form.

9                THE WITNESS:   No.

10   BY ATTORNEY KEYES:

11        Q.    For any year from 2017 to

12   2025, can you tell me what percentage of

13   Charleston High School students spent

14   time on social media outside of school?

15        A.    No, not a specific amount of

16   time that they spent.

17        Q.    For any year from 2017 to

18   2025, can you tell me what percentage of

19   Charleston Middle School students spent

20   time on social media outside of school?

21        A.    The specific percentage in

22   Charleston, no.

23        Q.    Okay.  So let me broaden it

24   a bit, then.

Page 418

1          For Breathitt or Irvington

2   or DeKalb or Harford, can you tell me,

3   for any year from 2017 to -- to the

4   present, what percentage of either high

5   school students or middle school students

6   had access to a cell phone or a personal

7   electronic device outside of school?

8               ATTORNEY YEATES:  Object to

9          the form.

10              THE WITNESS:  So based on

11         national data, it would be a

12         significant number of the

13         students.

14              But do I have it

15         specifically for those districts?

16         No.

17  BY ATTORNEY KEYES:

18         Q.   For Breathitt or Irvington

19  or DeKalb or Harford, can you tell me,

20  for any year from 2017 to the present,

21  what percentage of either high school

22  students or middle school students spent

23  time on defendants' platforms outside of

24  school?

Page 419

1              ATTORNEY YEATES:  Object to
2         the form.
3              THE WITNESS:  I can't.  Nor
4         would it change the conclusions
5         that I came to or the opinions
6         that I offered.
7    BY ATTORNEY KEYES:
8         Q.    For Breathitt or Irvington
9    or DeKalb or Harford, can you tell me,
10   for any year from 2017 to the present,
11   what percentage of either high school
12   students or middle school students spent
13   time on social media outside of school?
14              ATTORNEY YEATES:  Object to
15        the form.
16              THE WITNESS:  I cannot, nor
17        would it change the opinions I
18        offered.
19   BY ATTORNEY KEYES:
20        Q.    I've asked you a number of
21   questions about whether you can tell me
22   what percentage of students in a
23   particular district had access to a cell
24   phone outside school, had access to a

CONFIDENTIAL

Page 420

1   personal electronic device outside of

2   school, or what percentage of those

3   students spent time on defendants'

4   platforms or social media outside school.

5              Did you ask any of those

6   plaintiffs or their counsel for that

7   data?

8              ATTORNEY YEATES:  Object to

9         the form.

10             THE WITNESS:  I didn't

11        specifically ask.  And part of

12        that is because in working with

13        schools for so long, I know that

14        their data systems don't typically

15        collect that information.  And

16        that's, in part, because the data

17        systems are still trying to catch

18        up to the information that you're

19        asking about.

20             So it wasn't something that

21        I would have needed to inform the

22        opinions that I made.

23  BY ATTORNEY KEYES:

24        Q.    Okay.  But to be clear, you

Page 421

1  didn't ask for that data, correct?

2          ATTORNEY YEATES:  Object to

3       the form.  Asked and answered.

4          THE WITNESS:  Not that I

5       recall.  I don't recall asking

6       specifically for the data that you

7       spoke about.

8  BY ATTORNEY KEYES:

9       Q.   Okay.  Can you tell me, for

10  any year from 2017 to the present, how

11  many Tucson students were diagnosed with

12  social media addiction?

13          ATTORNEY YEATES:  Object to

14       the form.

15          THE WITNESS:  I can't tell

16       you that.

17          And, frankly, it wouldn't be

18       something I would have access to,

19       given that that would be

20       confidential information.

21  BY ATTORNEY KEYES:

22       Q.   Can you tell me, for any

23  year from 2017 to the present, how many

24  Charleston students were diagnosed with

Page 422

1  social media addiction?

2          A.    Again --

3                ATTORNEY YEATES:  Object to

4          the form.

5                THE WITNESS:  -- that would

6          be confidential information that I

7          wouldn't have access to.

8  BY ATTORNEY KEYES:

9          Q.    For Breathitt or Irvington

10  or DeKalb or Harford, can you tell me,

11  for any year from 2017 to the present,

12  how many students were diagnosed with

13  social media addiction?

14                ATTORNEY YEATES:  Object to

15          the form.

16                THE WITNESS:  Again, that's

17          not something that I would have

18          access to.  It's confidential

19          information.

20  BY ATTORNEY KEYES:

21          Q.    Can you tell me, for any

22  year from 2017 to 2025, how many

23  Charleston students were identified as

24  needing an assessment for social media

                                        Page 423

1    addiction?

2              ATTORNEY YEATES:  Object to

3         the form.

4              THE WITNESS:  So what I can

5         say is that that's not something

6         that I can imagine a school

7         district collecting at this point.

8         And so I don't have that data.

9              But it's not because of any

10        reason other than I doubt that it

11        exists.

12   BY ATTORNEY KEYES:

13        Q.    Can you tell me, for any

14   year from 2017 to the present, how many

15   Tucson students were identified as

16   needing an assessment for social media

17   addiction?

18              ATTORNEY YEATES:  Object to

19        the form.

20              THE WITNESS:  Again, working

21        with schools, that's not something

22        that would be collected at this

23        point in time.

24   BY ATTORNEY KEYES:

Page 424

1       Q.    Can you tell me, for any

2  year from 2017 to the present, how many

3  Breathitt students, how many Irvington

4  students, how many DeKalb students or how

5  many Harford students were identified as

6  needing an assessment for social media

7  addiction?

8              ATTORNEY YEATES:  Object to

9       the form.

10             THE WITNESS:  I cannot tell

11       you, because that data likely

12       doesn't exist.

13  BY ATTORNEY KEYES:

14       Q.    For any year from 2017 to

15  the present, can you tell me how many

16  Tucson students were identified as being

17  distracted?

18             ATTORNEY YEATES:  Object to

19       the form.

20             THE WITNESS:  I can tell

21       you, based on the interviews that

22       I did with Tucson folks, that they

23       said that it was a constant --

24       that the defendants' platforms

CONFIDENTIAL

Page 425

1          were a constant, consistent form
2          of distraction in their
3          classrooms.
4    BY ATTORNEY KEYES:
5          Q.    Did the Tucson folks, as you
6    use the term, identify for you how many
7    Tucson students had been identified as
8    being distracted?
9          A.    So let me be clear.  I'm
10   talking about Tucson education leaders
11   and was using the term "folks"
12   colloquially.
13              But they didn't have a
14   percentage, if that's what you're asking
15   for.
16              Did they have a specific
17   number of students who were distracted?
18   That's not something that would be
19   collected.
20          Q.    Okay.  For any year from
21   2017 to the present, can you tell me how
22   many students in Breathitt or Irvington
23   or DeKalb or Harford were identified as
24   being distracted?

CONFIDENTIAL

Page 426

1                 ATTORNEY YEATES:  Object to
2          the form.
3                 THE WITNESS:  That's not
4          something that would typically be
5          collected, as far as a number of
6          students.  So it's not something
7          that I would have, no.
8    BY ATTORNEY KEYES:
9          Q.    For any year from 2017 to
10   the present, can you tell me how many
11   Tucson students were identified as having
12   diminished social skills?
13                ATTORNEY YEATES:  Object to
14         the form.
15                THE WITNESS:  So, again, as
16         I -- as I detailed in the report,
17         a number of district leaders
18         indicated that students had
19         deficits in social skills.  It's
20         also consistent with what we see
21         nationally.
22                As far as do I have the
23         exact number of students who have
24         deficit in social skills, no.

```
                                        Page 427

 1  BY ATTORNEY KEYES:

 2          Q.    I didn't ask for an exact

 3  number.

 4              I said, can you tell me,

 5  from 2017 to the present, how many Tucson

 6  students were identified as having

 7  diminished social skills?

 8              Are you able to quantify

 9  that in any way?

10              ATTORNEY YEATES:  Object to

11         the form.  And asked and answered.

12              THE WITNESS:  I'm happy to

13         quantify it.

14              It's a significant number of

15         students.  When you asked how

16         many, I assumed that that's an

17         exact number.  But certainly from

18         the reports of the educators and

19         the school administrators and the

20         district leaders, it's a large

21         number of students that are

22         distracted by defendants'

23         platforms during the school day.

24  BY ATTORNEY KEYES:
```

CONFIDENTIAL

Page 428

```
 1        Q.    And you say the number was
 2   significant, and you say the number was
 3   large.
 4            Did they give you a number,
 5   a number of Tucson students who were
 6   identified as having diminished social
 7   skills?
 8        A.    Okay.
 9            ATTORNEY YEATES:  Object to
10        the form.
11            THE WITNESS:  So you didn't
12        want a number, but you want a
13        number now.
14            They wouldn't have had that
15        data system in place to be able to
16        extract a specific number of
17        students.
18   BY ATTORNEY KEYES:
19        Q.    I do want numbers,
20   Dr. Hoover.  I'm asking about numbers.
21            So if you don't have the
22   numbers, that's fine.  But I am asking
23   for numbers, not adjectives that you
24   heard from interviews you had with
```

CONFIDENTIAL

Page 429

1    unspecified people in the district, okay.

2    So I am asking for numbers.

3          A.    I --

4               ATTORNEY YEATES:  I'm going

5          to --

6               THE WITNESS:  If I may.

7               ATTORNEY YEATES:  Sorry.

8          I'm going to object.  That's

9          argumentative.  And you did just

10         tell her you didn't want a

11         specific number.  So you're also

12         being a little confusing.

13               So now that you want numbers

14         that's fine.  But don't be

15         argumentative with the witness,

16         please.

17               ATTORNEY KEYES:  I'm not

18         being argumentative.  She said --

19         when I asked how many, she assumed

20         that I wanted an exact number.

21   BY ATTORNEY KEYES:

22         Q.    I want as precise a number

23   as you can give, if you can give a

24   number.

CONFIDENTIAL

Page 430

1          But I am asking you if you
2   have any data at all to quantify any of
3   the things that you've been talking
4   about, okay?
5          So, for the record, are you
6   able to tell me, for any year from 2017
7   to the present, how many Tucson students
8   were identified as having diminished
9   social skills?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  No.
13              And just, also, I want to be
14         clear that the people were not
15         unspecified.  You mentioned in
16         your last comment that this was
17         unspecified individuals.
18              And the -- I was not at all
19         unclear about who the people were
20         whose information -- it's all in
21         my sources reviewed.
22   BY ATTORNEY KEYES:
23         Q.   Are you able to tell me, for
24   any year from 2017 to the present, how

Page 431

1    many Charleston students were identified
2    as having diminished social skills?
3                    ATTORNEY YEATES:  Object to
4         the form.
5                    THE WITNESS:  No, I cannot
6         give you a number.
7                    What I can say is that
8         according to the administrators
9         and the frontline educators, it
10        was a significant amount.
11   BY ATTORNEY KEYES:
12        Q.    For any year from 2017 to
13   the present, can you tell me how many
14   Breathitt or Irvington or DeKalb or
15   Harford students were identified as
16   having diminished social skills?
17                    ATTORNEY YEATES:  Objection.
18        Form.
19                    THE WITNESS:  So, again, I
20        can tell you that it came up
21        consistently, across all of the
22        interviews that I did, that
23        students are consistently
24        distracted or have decreased

Page 432

1        social skills and that that's
2        increased over time in -- through
3        their engagement with social media
4        platforms.
5   BY ATTORNEY KEYES:
6        Q.   Could you tell me, for any
7   year from 2017 to the present, how many
8   Tucson students were identified as being
9   bullied?
10            ATTORNEY YEATES:  Object to
11       the form.
12            THE WITNESS:  I don't think
13       I have that specific data.  So no.
14   BY ATTORNEY KEYES:
15       Q.   Can you tell me, for any
16   year from 2017 to the present, how many
17   Charleston students were identified as
18   being bullied?
19            ATTORNEY YEATES:  Objection.
20       Form.
21            THE WITNESS:  No.  Again,
22       you know, you're asking me for
23       data that I think inadequate data
24       systems don't fully capture.

Page 433

1           So we know, for example,
2       that bullying goes underreported.
3       So if you're asking me how many
4       students are bullied, I just don't
5       think our data systems capture the
6       full scope of bullying at this
7       point.  So it would be hard to
8       say.
9   BY ATTORNEY KEYES:
10          Q.    Can you tell me, for any
11  year from 2017 to the present, how many
12  Breathitt, Irvington, DeKalb or Harford
13  students were identified as being
14  bullied?
15              ATTORNEY YEATES:  Objection.
16      Form.
17              THE WITNESS:  So what we
18      often do when we're estimating
19      numbers like this for a district
20      if the data doesn't exist, is we
21      would look to national data.  And
22      there's been enough study of
23      things like bullying, and even
24      distraction, to understand the

CONFIDENTIAL

Page 434

1          picture across districts.

2                    If you're asking for

3          specific numbers from those

4          districts, the data doesn't exist.

5    BY ATTORNEY KEYES:

6          Q.    Can you tell me, for any

7    year from 2017 to the present, how many

8    Tucson students were identified as being

9    disruptive in the classroom?

10                    ATTORNEY YEATES:   Objection.

11          Form.

12                    THE WITNESS:   So, again, the

13          data systems in Tucson, very

14          similar to many districts, do not

15          capture the full extent of

16          classroom disruption.

17                    So we often, in typical

18          practice, also speak to the people

19          who are experiencing disruption.

20          And from the reports of district

21          leaders and frontline educators in

22          Tucson, they were very clear that

23          there are a lot of disruptions in

24          the classroom and that they are

CONFIDENTIAL

Page 435

1          related to engagement with social

2          media platforms.

3   BY ATTORNEY KEYES:

4          Q.    Can you tell me, for any

5   year from 2017 to the present, how many

6   Tucson students were identified as being

7   disruptive in the classroom because of

8   their use of social media?

9               ATTORNEY YEATES:  Objection.

10          Form.

11               THE WITNESS:  So what I can

12          tell you is that the discussions

13          that I had with the leadership

14          from Tucson indicated that the

15          disruptions that were happening in

16          the classroom were largely related

17          to defendants' social media

18          platforms; that students were

19          consistently on the platforms

20          during classroom instruction,

21          which is consistent with the data

22          that was reported in the expert

23          reports where they noted that

24          students are spending, you know,

CONFIDENTIAL

Page 436

1             over two hours a day during

2             instructional time on social media

3             platforms.

4                   So all of the data

5             corroborates that this is a

6             significant disruption in the

7             classroom.

8    BY ATTORNEY KEYES:

9          Q.    Can you tell me, for any

10   year from 2017 to the present, how many

11   Tucson students were identified as being

12   disruptive in the classroom because of

13   their use of social media?

14         A.    That data doesn't exist,

15   because the data systems have not been

16   able to catch up to this new, evolving

17   harm to young people, so.

18         Q.    Can you tell me, for any

19   year --

20             ATTORNEY YEATES:  Can I

21         just -- just to remind you to give

22         me a moment to object.

23             THE WITNESS:  Yes.  Will do.

24             ATTORNEY YEATES:  So I have

CONFIDENTIAL

Page 437

1          an objection to the form to the
2          last one.  Thank you.  I
3          appreciate that.
4    BY ATTORNEY KEYES:
5          Q.   Can you tell me, for any
6    year from 2017 to the present, how many
7    Tucson students were identified as being
8    disruptive in the classroom because of
9    their use of defendants' platforms?
10              ATTORNEY YEATES:  Objection.
11         Form.
12              THE WITNESS:  So, what I
13         would say is that, again, the data
14         systems do not yet capture what
15         you're asking for in specific
16         detail.  So it would be impossible
17         to give you the exact number that
18         you're asking for.
19    BY ATTORNEY KEYES:
20         Q.   Could you tell me, for any
21    year from 2017 to 2025, the present, how
22    many students in Charleston or Breathitt
23    or Irvington or DeKalb or Harford were
24    identified as being disruptive in the

                                    Page 438

1   classroom?

2              ATTORNEY YEATES:  Object to

3        the form.

4              THE WITNESS:  So as you may

5        know, part of my plan is to help

6        the districts develop data systems

7        to capture the things that you're

8        asking about, because those data

9        systems have not had to exist in

10       the way that they do now, in light

11       of the defendants' social media

12       platforms and how they are

13       significantly disrupting the

14       classroom.

15  BY ATTORNEY KEYES:

16       Q.    All right.  But my question

17  was, can you tell me today, for any year

18  from 2017 to the present, how many

19  students in Charleston or Breathitt or

20  Irvington or DeKalb or Harford were

21  identified as being disruptive in the

22  classroom?

23       A.    It would be --

24              ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 439

1          the form.  Asked and answered.

2                    THE WITNESS:  It would be

3          hard to give you that information,

4          because, as I said, the data

5          systems have not been able to

6          catch up to the need to collect

7          disruptions in the classroom

8          related to social media platforms.

9    BY ATTORNEY KEYES:

10         Q.    For any year from 2017 to

11   the present, can you tell me how many

12   Charleston or Breathitt or Irvington or

13   DeKalb or Harford students were

14   identified as being disruptive in the

15   classroom because of their use of social

16   media?

17                    ATTORNEY YEATES:  Objection

18         to form.

19                    THE WITNESS:  So having

20         spoken with leadership from all of

21         those districts consistently, as I

22         noted in my report, the specific

23         statements from the individuals

24         that I listed as to who I

CONFIDENTIAL

Page 440

1          interviewed, and from the

2          deposition data, they were clear

3          that there is a significant number

4          of students who are disrupted in

5          the classroom due to social media

6          platform engagement.

7                They do not yet have the

8          data systems in place to be able

9          to capture what's happening in

10         terms of disruption to social

11         media -- disruption due to social

12         media engagement.

13               And that's part of why it's

14         included in my plan.

15    BY ATTORNEY KEYES:

16         Q.    So you -- it is true to say

17    that you cannot tell me, for any year

18    from 2017 to the present, how many

19    students in Charleston or Breathitt or

20    Irvington or DeKalb or Harford were

21    identified as being disruptive in the

22    classroom because of their use of social

23    media, correct?

24               ATTORNEY YEATES:   Objection.

CONFIDENTIAL

Page 441

1       Form.  Asked and answered.

2              THE WITNESS:  So as I

3       stated, the data systems within

4       the school districts have not been

5       able to keep up with the

6       increasing and rapid and evolving

7       issues that are being caused by

8       the defendants' social media

9       platforms, including significant

10      disruption in the class, which is

11      why we go to multiple sources of

12      data, including national data and

13      including speaking directly with

14      the people who are working in the

15      districts and in the schools, to

16      understand what's happening on the

17      ground.

18              And I detailed in the

19      reports that across those

20      districts, they are experiencing

21      significant disruption in the

22      classroom based on engagement with

23      social media platforms.

24  BY ATTORNEY KEYES:

Page 442

1          Q.     Can you tell me, for any
2     year from 2017 to the present, how many
3     students in Charleston or Breathitt or
4     Irvington or DeKalb or Harford were
5     identified as being disruptive in the
6     classroom because of their use of
7     defendants' platforms?
8               ATTORNEY YEATES:  Objection.
9          Form.
10              THE WITNESS:  So I thought I
11         just answered that.  But I can
12         answer again.
13              So the data systems do not
14         yet exist to be able to capture
15         specifically the disruptions in
16         classroom due to engagement with
17         social media.
18              And that's part of why it's
19         included in the plan.  So there is
20         other information that we have to
21         rely on, including speaking
22         directly with the district
23         leadership, which I did in every
24         district, as well as school

Page 443

```
 1          building-level leadership and
 2          educators.  And they all indicated
 3          that there is significant
 4          disruption in the classroom
 5          specific to the defendants' social
 6          media platforms.
 7               And those platforms were
 8          specifically identified by the
 9          individuals from the districts
10          that I spoke with.  And they've
11          been documented in the national
12          literature to be the primary
13          sources of disruption for
14          students.
15  BY ATTORNEY KEYES:
16          Q.   Okay.  So you, in your
17  answers, have said you don't have any
18  data specific to one of these six school
19  districts.  You have information that was
20  supplied by these key informants and you
21  have national data.
22               Did I get that right?
23               ATTORNEY YEATES:  Objection.
24          Form.  Misstates testimony.
```

CONFIDENTIAL

Page 444

1                  THE WITNESS:  So we consider
2          all data when we're doing work
3          with districts.  And it's actually
4          a very well-accepted form of data
5          to speak with the leadership who
6          are actually on the ground in
7          classrooms leading schools,
8          leading student support services
9          and leading districts.
10                 That is a part of our
11         inquiry process when we meet with
12         districts to understand what's
13         happening, because we understand
14         both that -- that quantitative
15         data doesn't always capture
16         especially new and evolving harms,
17         and that the data systems that
18         exist, as I detail in my report in
19         each district, have significant
20         limitations in terms of their
21         ability to capture some of the
22         information about the new,
23         evolving harms of the social media
24         platforms, the defendants'

Page 445

1          platforms.
2     BY ATTORNEY KEYES:
3          Q.    Okay.  And when you refer to
4     the qualitative descriptions you've
5     gotten from people in the district,
6     you're talking about the key informants
7     that you describe in your reports and
8     that you identified in what we previously
9     marked as Exhibit-1, correct?
10         A.    So that's a part of what I'm
11    talking about when I say "qualitative
12    information."  So it also includes
13    information from the depositions that
14    were gathered from people in the
15    district.
16               And I have a list of those,
17    if you'd like me to refer to it.  It's in
18    the list of documents reviewed.
19         Q.    So you've identified key
20    informant interviews.  You've identified
21    deposition testimony.  And you've
22    identified national data.
23               Can you point to anything
24    else that you are relying on to say that

Page 446

1  there is a problem with students either

2  being diagnosed with social media

3  addiction, being identified as needing an

4  assessment for social media addiction,

5  identified as being distracted or having

6  diminished social skills, identified as

7  being bullied or identified as being

8  disruptive in the classroom; all of the

9  things I've been asking you about?

10          ATTORNEY YEATES:  Object to

11      the form.

12          THE WITNESS:  So as I listed

13      in my report, there are several

14      sources of information.  So you

15      named some.

16          There's also the plaintiff

17      fact sheets that detailed the

18      experiences of district and school

19      leadership with respect to the

20      indicators that you just asked

21      about.

22          In some of the districts,

23      there is other data about, for

24      example, mental health referrals.

CONFIDENTIAL

Page 447

1        But some of the questions you
2        asked -- in fact, to my
3        recollection, most of them were
4        about social media assessments or
5        social media impact.
6            And, as I said, and it's
7        detailed in my report, the data
8        systems have not yet been able to
9        capture some of that, which is
10       precisely why it's included as a
11       necessary part of the strategic
12       plan for addressing the harms of
13       social media.
14           And when there is an absence
15       of data, typical in the field, as
16       a scientist, we would look to what
17       forms of data actually do exist.
18       And so as part of our scientific
19       inquiry, we would do qualitative
20       data, we would ask, as was done
21       from the plaintiff fact sheets,
22       what information do you have about
23       this issue?  And we would look to
24       national data.

CONFIDENTIAL

Page 448

1          I also, of course, as

2      someone who has worked with

3      districts across the country for

4      25 years, would lean on some of my

5      experience in working with school

6      administrators and district

7      administrators and families and

8      students regularly.

9  BY ATTORNEY KEYES:

10          Q.    Okay.  Is Tucson urban,

11  suburban or rural?

12          A.    So those -- just to -- to

13  clarify a little bit.

14              Districts sometimes will

15  classify themselves as urban, sometimes

16  urban-suburban, sometimes suburban-rural.

17  And when you look at different kind of

18  sources of that information, it's not

19  always the same.

20              So my understanding of

21  Tucson is that it's urban.  But in some

22  areas, it might be classified as

23  urban-suburban.

24          Q.    Based on what source?

Page 449

1        A.    I can't name the source
2   right now.  When I spoke with the school
3   district leaders and gained an
4   understanding of the school district, as
5   well as when I looked at the plaintiff
6   fact sheets, there's information about
7   the school districts.
8              So when you're asking about
9   a specific source, again, I've worked
10  with school districts for 25 years.  So
11  you start to get to know the school
12  districts as well and where they are
13  located, and you have an understanding of
14  them.
15       Q.    Can you tell me, for any
16  year from 2017 to the present, how many
17  Tucson students were diagnosed with
18  depression?
19              ATTORNEY YEATES:  Object to
20        the form.
21              THE WITNESS:  So that data
22        would not be at my disposal.  So,
23        no, it's not something I can tell
24        you.

CONFIDENTIAL

Page 450

1    BY ATTORNEY KEYES:

2          Q.    Okay.

3          A.    Usually -- sorry.  If I may

4    just finish.

5                The -- the mental health

6    records of students are usually kept

7    confidential.  So that's information that

8    I wouldn't have at my fingertips, no.

9          Q.    Can you tell me how many

10   Tucson students, for any year from 2017

11   to the present, were treated for

12   depression?

13               ATTORNEY YEATES:  Objection.

14          Form.

15               THE WITNESS:  What I can say

16          is that that information is both

17          confidential, but, also, across a

18          variety of providers, it would be

19          hard for me to know, at this

20          point, how many were treated.

21               But that information just

22          wouldn't be something I could

23          access, how many were treated for

24          depression.

CONFIDENTIAL

Page 451

1  BY ATTORNEY KEYES:

2       Q.    Are you telling me that the

3  number of Tucson students who were

4  treated for depression, at any year from

5  2017 to the present, would be

6  confidential?

7       A.    So very often in mental

8  health records, students' specific

9  diagnoses and the challenges that they

10  are facing are not something that's

11  accessible.

12            That's covered, often, under

13  FERPA or HIPAA privacy laws.  And so

14  those are not things that are typically

15  accessible to somebody who is just

16  engaging with a district to understand

17  what's happening with their mental health

18  services, for example.

19       Q.    Can you tell me, for any

20  year from 2017 to the present, how many

21  Tucson students were identified as being

22  depressed?

23            ATTORNEY YEATES:  Objection

24       to the form.

CONFIDENTIAL

Page 452

1                THE WITNESS:  Okay.  I

2        thought I had answered that,

3        but --

4   BY ATTORNEY KEYES:

5        Q.    Well, I asked you about

6   diagnosed.

7        A.    Oh, okay.

8        Q.    I asked about treated.

9              And now I'm asking you about

10  identified as being depressed.

11       A.    Got it.  Okay.

12             ATTORNEY YEATES:  Object to

13       the form.

14             THE WITNESS:  So, no, for

15       the same reasons, that that

16       information would be confidential,

17       unless, you know -- well, it would

18       be confidential, to my knowledge.

19       And I don't have that data.

20  BY ATTORNEY KEYES:

21       Q.    For any year from 2017 to

22  the present, are you able to tell me how

23  many students in Charleston or Breathitt

24  or Irvington or DeKalb or Harford were

CONFIDENTIAL

Page 453

1   treated for depression?

2            ATTORNEY YEATES:   Objection.

3        Form.

4            THE WITNESS:   Again, that

5        data is confidential and it would

6        not be something I have.  So no.

7   BY ATTORNEY KEYES:

8        Q.    Are you able to tell me, for

9   any year from 2017 to 2025, how many

10  Charleston, Breathitt, Irvington, DeKalb

11  or Harford students were treated for

12  depression?

13           ATTORNEY YEATES:   Objection

14       to form.

15           THE WITNESS:   So, again,

16       that data would not be something I

17       have, nor would it have changed

18       the opinions in any of my reports

19       or my strategic plan.

20  BY ATTORNEY KEYES:

21       Q.    Well, you say that data

22  wouldn't be something that you have.

23           So you're not able to tell

24  me, correct?

CONFIDENTIAL

Page 454

1              ATTORNEY YEATES:  Object to
2         the form.
3    BY ATTORNEY KEYES:
4         Q.    Are you -- my question was,
5    are you able to tell me, for any year
6    from 2017 to 2025, how many Charleston,
7    Breathitt, Irvington, DeKalb or Harford
8    students were treated for depression?
9              ATTORNEY YEATES:  Object to
10        the --
11   BY ATTORNEY KEYES:
12        Q.    Are you able to tell me?
13             ATTORNEY YEATES:  Object to
14        the form.  And asked and answered.
15             THE WITNESS:  Again, I
16        thought I answered that.
17             So I'm not able to tell you
18        that.  And that information, I
19        would assume -- well, that
20        information is typically
21        confidential within a treatment
22        situation or within a school
23        district, for example.
24   BY ATTORNEY KEYES:

CONFIDENTIAL

Page 455

1          Q.    Are you able to tell me, for

2    any year from 2017 to the present, how

3    many Charleston, Breathitt, Irvington,

4    DeKalb or Harford students were

5    identified as being depressed?

6                    ATTORNEY YEATES:  Object to

7            the form.

8                    THE WITNESS:  No.  That is

9            not something that would typically

10           be shared, as far as how many

11           students were identified as being

12           depressed.  That's not something

13           that I have, nor would it be

14           something that I would need or

15           would have needed to inform the

16           opinions in this case.

17   BY ATTORNEY KEYES:

18           Q.    Are you able to tell me, for

19   any year from 2017 to the present, how

20   many students in Tucson or Charleston or

21   Breathitt or Irvington or DeKalb or

22   Harford self-reported that they felt

23   depressed?

24                   ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 456

1        the form.
2                THE WITNESS:  So I don't
3        believe that I could tell you how
4        many students self-reported being
5        depressed, no.  Nor would it
6        change the opinions that I offered
7        in my reports nor my strategic
8        plan.
9                It's just not information,
10       necessarily, that I would have
11       needed to inform these opinions.
12   BY ATTORNEY KEYES:
13       Q.     Are you able to tell me how
14   many Tucson students, in any year from
15   2017 to the present, were diagnosed as
16   being suicidal?
17               ATTORNEY YEATES:  Object to
18       the form.
19               THE WITNESS:  No.  That's,
20       again, something that would be
21       confidential, typically, within a
22       school district.
23               It may be something -- I'd
24       have to look back specifically

CONFIDENTIAL

Page 457

```
 1          to -- because I know that some of
 2          the plaintiff fact sheets have
 3          information about some of the
 4          mental health supports or services
 5          offered.
 6                  So I would have to go
 7          back -- if you're asking me about
 8          every single district, I'd have to
 9          go back.  So I reviewed a lot of
10          documents for this.
11                  But if you're asking me as I
12          sit here, can I tell you exactly
13          the number?  No.  Is it something
14          that I may have reviewed if the
15          district had it?  If they -- I may
16          have looked at that data.  But I
17          can't tell you just sitting here
18          today.
19   BY ATTORNEY KEYES:
20          Q.    And you didn't put it in any
21   of your reports, correct?
22          A.    I would not have put --
23   well, I'd have to go back, honestly,
24   through all my reports to indicate -- to
```

CONFIDENTIAL

Page 458

1  indicate if I had listed specific -- if a

2  district supplied it, I may have put it

3  in the report.  But I don't know that I

4  did.

5            Again, it's not something

6  that -- the exact numbers of students who

7  may have been diagnosed with depression

8  is not something I would have put in to

9  inform the opinion.

10         Q.    Are you able to tell me, for

11  any year from 2017 to the present, how

12  many students in Charleston or Breathitt

13  or Irvington or DeKalb or Harford were

14  diagnosed as being suicidal?

15            ATTORNEY YEATES:  Object to

16         the form.

17            THE WITNESS:  I mean, I can

18         go to the reports to see if

19         there's anything in there that

20         would have indicated it.

21            But, again, I -- I don't

22         recall, sitting here, a specific

23         number of students who reported

24         being suicidal or expressing

CONFIDENTIAL

Page 459

```
 1        suicidal ideation.
 2   BY ATTORNEY KEYES:
 3        Q.    Do you have any data from
 4   any of those districts that show how many
 5   students were identified as being
 6   diagnosed as being suicidal?
 7              ATTORNEY YEATES:  Object to
 8         the form.
 9              THE WITNESS:  So there's a
10         lot of information I looked at
11         from the districts.  So I'm happy
12         to go back and look through it.
13              But I don't have it right at
14         my fingertips here.  So I would
15         have to go back.  If you want me
16         to look at a specific document or
17         something that I reviewed --
18         again, I was reviewing documents
19         from these six districts.  So I'd
20         have to go back and look.
21              And, you know, it may have
22         come up in testimony as well.  So
23         it's a lot of documents.
24              So if there's something
```

CONFIDENTIAL

Page 460

1          specific you would like me to look
2          at, I certainly could do that.
3     BY ATTORNEY KEYES:
4          Q.   Can you tell me, for any
5     year from 2017 to the present, how many
6     students in Tucson or Charleston or
7     Breathitt or Irvington or DeKalb or
8     Harford were identified as engaging in
9     self-harm?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  So, again,
13         it's something I probably have to
14         look to -- back through the data
15         and the depositions to see if
16         there was any information specific
17         to that.
18              Sitting here in this moment,
19         do I have the numbers in my head?
20         No.
21     BY ATTORNEY KEYES:
22          Q.   Can you tell me, for any
23     year from 2017 to the present, how many
24     students in Tucson or Charleston or

Page 461

1    Breathitt or Irvington or DeKalb or

2    Harford were identified as being

3    diagnosed with body dysmorphic disorder?

4                ATTORNEY YEATES:  Object to

5         the form.

6                THE WITNESS:  So, again, I

7         would have to go back through my

8         reports.  So if there's something

9         specific or a source of data that

10        you want me to -- that you want to

11        point to, I'm happy to look to it.

12               But I'd have to go back to

13        all of the source documents.

14               Sitting here in this moment,

15        do I know the exact number of

16        students who would have been

17        diagnosed with body dysmorphic

18        disorder from each of those

19        districts?  No.

20   BY ATTORNEY KEYES:

21        Q.    Can you tell me, for any

22   year from 2017 to the present, how many

23   students in Tucson or Charleston or

24   Breathitt or Irvington or DeKalb or

Page 462

1  Harford were identified as having issues

2  with negative body image?

3              ATTORNEY YEATES:  Object to

4       the form.

5              THE WITNESS:  So, again, you

6       know, if there's specific data

7       that you're referring to that

8       you'd like me to look at, I can.

9              Otherwise, to answer that

10      question as to whether that was

11      something that I have, I'd have to

12      go back through all of the source

13      documents.

14             But I can't sit here and

15      say, here is the specific number

16      of students who would have been

17      diagnosed with those things.

18  BY ATTORNEY KEYES:

19      Q.    Can you tell me, for any

20  year from 2017 to the present, how many

21  students in Tucson or Charleston or

22  Breathitt or Irvington or DeKalb or

23  Harford were identified as being sleep

24  deprived?

Page 463

1              ATTORNEY YEATES:  Object to

2         the form.

3              THE WITNESS:  What I would

4         say is that the -- it would be

5         very atypical of any data systems,

6         and certainly not something I

7         would typically ask in my typical

8         interactions with the school

9         district, because I know that that

10        data would be -- could be

11        difficult to produce.

12              Is there something in the

13        source documents I reviewed for

14        one of the districts or some of

15        the districts that spoke to sleep

16        deprivation, probably, but I would

17        have to go through all of the

18        source data to look at that.

19              So can I give you a specific

20        number about any of those

21        districts sitting here with you

22        today about the number of students

23        who are sleep deprived?  No.

24    BY ATTORNEY KEYES:

CONFIDENTIAL

Page 464

1           Q.    Can you tell me, for any
2     year from 2017 to the present, how many
3     students in Tucson or Charleston or
4     Breathitt or Irvington or DeKalb or
5     Harford were identified as being
6     diagnosed with anxiety disorder?
7                 ATTORNEY YEATES:  Object to
8           the form.
9                 THE WITNESS:  So, again, I'd
10          have to go back to all of the
11          information that I reviewed to see
12          if there was specific information
13          about anxiety disorders for any of
14          those districts.
15    BY ATTORNEY KEYES:
16          Q.    Can you tell me, from any
17    year from 2017 to the present, how many
18    students in Tucson or Charleston or
19    Breathitt or Irvington or DeKalb or
20    Harford were identified as being treated
21    for an anxiety disorder?
22                ATTORNEY YEATES:  Object to
23          the form.
24                THE WITNESS:  So I'd have to

CONFIDENTIAL

Page 465

1          go back to the source data to --
2          to -- to see whether that was
3          something, within each of those
4          districts, that they reported.
5                 But I don't have that number
6          off the top of my head for any of
7          those districts, no.
8   BY ATTORNEY KEYES:
9          Q.    Can you -- can you tell me,
10  for any year from 2017 to the present,
11  how many students in Tucson or Charleston
12  or Breathitt or Irvington or DeKalb or
13  Harford were identified as being anxious?
14                ATTORNEY YEATES:  Object to
15         the form.
16                THE WITNESS:  So, again,
17         could that information have been
18         in something I reviewed?
19         Possibly.  I'd have to go back to
20         every one of the source documents
21         to see.  So I don't want to guess
22         at that.
23                But if you're asking off the
24         top of my head sitting here with

Page 466

1          you today, do I know the numbers
2          of students who may have been
3          identified as being anxious?  No.
4               And, again, I'll just
5          restate that the data systems that
6          exist typically would not be an
7          accurate count of the number of
8          students who feel anxious.  That's
9          not something that's -- I mean,
10         sometimes you might have
11         surveillance data or something
12         along those lines.
13              But I would have to, again,
14         look in the source documents to
15         see if there was something
16         available with that information.
17    BY ATTORNEY KEYES:
18         Q.   Can you tell me, for any
19    year from 2017 to the present, how many
20    students in Tucson or Charleston or
21    Breathitt or Irvington or DeKalb or
22    Harford were identified as self-reporting
23    that they felt anxious?
24                   ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 467

1      the form.

2              THE WITNESS:  If you'd like

3      me to look at a specific piece of

4      data for a district, I'm happy to

5      do that.

6              But I'd have to go through

7      all the source information to see,

8      for each district, if that was

9      something that was within their

10     documents.

11  BY ATTORNEY KEYES:

12      Q.    Well, you're the expert and

13  you've offered opinions that these are

14  all, quote, significant problems.

15              And so I'm trying to probe

16  whether you have any data -- certainly

17  you didn't include any data in your

18  reports -- whether you have any data to

19  quantify any of these -- any of these

20  problems.

21              ATTORNEY YEATES:  Objection.

22  BY ATTORNEY KEYES:

23      Q.    So do you have any data to

24  quantify any of these problems that are

CONFIDENTIAL

Page 468

1  specific to one of these six school

2  districts?

3                ATTORNEY YEATES:  Objection

4         to form.  Argumentative.  And

5         misstates the reports.

6                THE WITNESS:  So I think I

7         actually provided significant data

8         around the mental health

9         challenges that young people are

10         experiencing.

11              And there's a variety of

12         forms of data, as we've already

13         gone over, including information

14         from the directors of student

15         supports and others who are

16         directly involved with mental

17         health supports for young people.

18              And they consistently

19         reported high numbers of mental

20         health concerns and, as we've

21         already talked through, the impact

22         of the defendants' social media

23         platforms on mental health as

24         providers of mental health

CONFIDENTIAL

Page 469

1          services in the schools.

2              I also indicated that we do

3          look to national data to

4          understand mental health

5          challenges, especially where data

6          systems are limited.

7              And I detailed that in my

8          reports.  And certainly in my

9          general report, I spoke to that

10         and drew on a lot of the national

11         data with respect to mental health

12         challenges in young people and

13         indicated that I relied on other

14         expert testimony or reports that

15         describe, at length, the mental

16         health challenges that young

17         people are experiencing and their

18         intersection with social media

19         platforms.

20             So I actually think it's not

21         accurate at all to suggest that I

22         didn't have specific data to

23         inform my opinions with respect to

24         the mental health challenges that

Page 470

1          are experienced in the districts
2          and their intersection with social
3          media platforms.
4  BY ATTORNEY KEYES:
5          Q.    Do you offer any opinion in
6  your reports on what the measurable
7  impact of your plan would be in any of
8  the six districts?
9                ATTORNEY YEATES:  Object to
10         the form.
11               THE WITNESS:  So -- so you
12         want me to summarize across all
13         six districts?
14 BY ATTORNEY KEYES:
15         Q.    Well, I'm happy to address
16 any one of the six districts.
17         A.    Okay.
18         Q.    But you have offered reports
19 for six districts.
20               And I want to know, in any
21 of your reports for any of those six
22 districts, have you offered an opinion on
23 what the measurable impact of your plan
24 will be if the strategic plan you're

CONFIDENTIAL

Page 471

1    recommending is implemented by the

2    district?

3                    ATTORNEY YEATES:  Object to

4          the form.

5                    THE WITNESS:  So, look, with

6          any long-term strategic plan that

7          addresses a complex public health

8          issue, it is -- it would be

9          challenging to say this is going

10         to be the exact percentage of

11         decrease of social media use, for

12         example, or, here is the specific

13         or exact impact on mental health

14         challenges.

15                  I don't have a crystal ball.

16         I can't look into the future and

17         determine exactly what that's

18         going to be.

19                  So what I did in the reports

20         is look at other public health

21         frameworks, including the tobacco

22         prevention effort, and I did note

23         that if a multi-pronged approach,

24         such as the tobacco effort, as

CONFIDENTIAL

Page 472

1              well as other types of public
2              health efforts were implemented,
3              we would anticipate a steep and
4              sustained decrease in the
5              challenges, not only in social
6              media use, but also in the
7              challenges and the harms that have
8              been experienced as a result of
9              that use.
10    BY ATTORNEY KEYES:
11              Q.    For any of the six school
12    districts for which you submitted
13    reports, do your reports include any
14    estimate of the extent to which the
15    number of students who are diagnosed with
16    depression would go down?
17                   ATTORNEY YEATES:  Object to
18              the form.
19                   THE WITNESS:  That wouldn't
20              be something that would be
21              standard practice when you're
22              proposing a strategic plan.
23                   What I did do was overall
24              indicate that we would expect a

CONFIDENTIAL

Page 473

1          steep and sustained decrease in
2          the mental health challenges and
3          in the harms to schools that are
4          being experienced.
5               So I'll leave it at that.
6  BY ATTORNEY KEYES:
7          Q.    And are you able to offer
8  any quantification of what this, quote,
9  deep and sustained decline, that you
10 project?
11         A.    Sure.  So the exemplar that
12 we use, which is probably one of the best
13 exemplars in the field of a concerted
14 public health effort for something that's
15 harming young people, was tobacco.
16              And over the 18-year period
17 in that particular effort, there was a
18 demonstrated 73 percent decrease.  It's
19 detailed in the report.
20              So oftentimes when you're
21 doing, you know, implementation of this
22 type of sustained effort over a long
23 period of time, you're not in a position
24 to predict it's going to be exactly this

CONFIDENTIAL

Page 474

1    number of students.

2                   I mean, I think it's -- it's

3    honestly -- well, I don't want to

4    criticize the question.

5                   I just -- it's not something

6    that would be typical to be able to say,

7    and you're going to see this specific

8    percentage of decrease in depressed

9    students because of an intervention.

10                  What you can say is that if

11   you put your public health framework

12   that's multi-component, based on

13   evidence-based practices and programming,

14   based on the best available science right

15   now, you can expect to see a significant

16   improvement and decrease of harm and risk

17   to young people.

18                  And that's very typical when

19   you're talking about any public health

20   approach to a significant harm for young

21   people.

22          Q.    For any of the six school

23   districts for which you submitted

24   reports, do your reports include any

CONFIDENTIAL

Page 475

1    estimate of the extent to which the

2    number of students who are diagnosed with

3    anxiety would go down if your plan were

4    implemented?

5              ATTORNEY YEATES:  Object to

6         the form.

7              THE WITNESS:  Again, that

8         would not be something that's

9         typical when you're laying out

10        this type of plan.

11             And, again, I don't have

12        a -- a crystal ball to look into

13        the future to say, here is exactly

14        the precise number, or estimate,

15        even, of students who would

16        decrease in their anxiety.

17             What we would predict is

18        that there would be a substantial

19        decrease.  And we draw on public

20        health frameworks that do exist

21        and have been tested, which is

22        what you would do in

23        implementation science, it's what

24        you would do in the public health

CONFIDENTIAL

Page 476

```
 1        field when you are dealing with a
 2        new -- new and evolving harm to
 3        young people.
 4              We just don't have the data
 5        for past testing of that, because
 6        it's a new and evolving harm.  So
 7        we draw on former public health
 8        frameworks.
 9              And, as I said, the
10        percentage decrease that we saw
11        within the best exemplar for that
12        was 73 percent decrease in use.
13   BY ATTORNEY KEYES:
14        Q.    For any of the six school
15   districts for which you submitted
16   reports, do your reports include any
17   estimate of the extent to which the
18   number of students who are identified as
19   being suicidal or engaging in self-harm
20   would go down if your plan were
21   implemented?
22              ATTORNEY YEATES:  Object to
23        the form.
24   BY ATTORNEY KEYES:
```

CONFIDENTIAL

1          Q.    Same answer?

2          A.    So I'm happy to restate it

3    again.

4                That we would not be able to

5    predict with specificity because this is

6    a new and evolving harm.  So what we

7    would do in implementation science is

8    rely on past implementation efforts that

9    have addressed, successfully, the

10   improvement in or the effectiveness of

11   this type of multi-factor or

12   multi-pronged approach to address a

13   complex issue, which is exactly what I

14   did in my reports.

15         Q.    For any of the six school

16   districts for which you submitted

17   reports, do your reports include any

18   estimate of the extent to which the

19   number of students who were diagnosed

20   with body dysmorphic disorder or

21   identified as having issues with negative

22   body image would go down if your plan

23   were implemented?

24                ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 478

1            the form.

2                 THE WITNESS:  Yes.  Again,

3            we -- I indicated in my reports

4            that there would be a steep and

5            sustained, akin to the 73 percent

6            decrease in the tobacco exemplar.

7                 So that's typical of what

8            you would do when you're proposing

9            a public health effort that is

10           relying on frameworks that have

11           been successful in the past for a

12           new and evolving harm.

13                 It's typical of what you

14           would do.  You would rely on the

15           data, including quantitative data,

16           which I did include in my report.

17           It's very difficult to predict

18           specifically for each specific

19           disorder for a new and evolving

20           harm how a new public health

21           approach would specifically alter

22           those diagnoses that you're asking

23           about.

24  BY ATTORNEY KEYES:

Page 479

1          Q.    For any of the six school
2    districts for which you submitted
3    reports, do your reports include any
4    estimate of the extent to which the
5    number of students who were identified as
6    being sleep deprived would go down if
7    your plan were implemented?
8                ATTORNEY YEATES:  Object to
9          the form.
10                THE WITNESS:  Again, yes.
11          So when you consider this type of
12          public health approach for a new
13          and evolving harm, you look to
14          existing successful public health
15          approaches, like the tobacco
16          effort, to reduce youth tobacco
17          use.  And we saw a 73 percent
18          decrease in that over time.
19                And so we pull from that
20          existing science to apply it to
21          the new approach for a new,
22          evolving harm.
23                Because this is a new,
24          evolving harm, you have to rely --

CONFIDENTIAL

Page 480

1          and it's typical in the field to
2          rely on existing public health
3          approaches that have been
4          successful.
5     BY ATTORNEY KEYES:
6          Q.    For any of the six school
7     districts for which you submitted
8     reports, do your reports include any
9     estimate of the extent to which the
10    number of students who were disruptive in
11    the classroom or were disciplined for
12    misconduct in connection with their use
13    of social media would go down if your
14    plan were implemented?
15              ATTORNEY YEATES:  Object to
16          the form.
17              THE WITNESS:  So I think I'm
18          very clear in the report that the
19          disruptions would be expected to
20          go down with the implementation of
21          this strategic plan.
22              And if you're asking about
23          specific estimates, what I include
24          in the report is based on existing

CONFIDENTIAL

Page 481

1          public health frameworks.  Because
2          that is typically what you would
3          use when you're predicting how a
4          new, evolving harm framework, a
5          public health framework to address
6          that, would improve outcomes.
7     BY ATTORNEY KEYES:
8          Q.     And you've used the tobacco
9     analogy, correct?
10               And you've said that there
11    was a 73 percent improvement there,
12    correct?
13          A.     I did say that.
14               If you want me to look to my
15    report, I certainly can do that.  But
16    that's the number that I recall sitting
17    here.
18          Q.     If your plan were
19    implemented by any of the six school
20    districts, it would be impossible to
21    quantify whether your plan is making a
22    difference; because we have no data
23    specific to any of these school districts
24    about any of these problems, you can't

Page 482

1    come up with a percentage, correct?

2              ATTORNEY YEATES:  Object to

3         the form.  Foundation.

4              THE WITNESS:  I totally

5         disagree, actually.  And it's part

6         of why we actually recommend a

7         long-term plan that includes data

8         infrastructure and a -- an

9         evaluation.  That's what you would

10        use to actually collect the data.

11             So as I've said, data are

12        limited, schools are strapped

13        right now to try to understand the

14        impact and even get baseline

15        information about the harms of

16        social media.

17             They have been attempting

18        their best to be able to measure

19        the harms of social media.  But

20        it's an external factor that has

21        really been put upon schools to

22        navigate, which is why it's

23        necessary to build an evaluation

24        structure, which I've laid out in

CONFIDENTIAL

Page 483

1          detail in the report, and to have

2          a data system that actually can

3          measure the outcomes that we're

4          talking about.

5                This is why you wouldn't do

6          this in a two-year effort.  You

7          have to have a long-term plan that

8          actually allows for measuring.

9                So what we do, when we don't

10         have -- or when we have limited

11         data systems, is you rely on the

12         sources of data that you do have,

13         which is what, as you know, I did

14         in my reports.

15               We relied on direct

16         information from leaders who are

17         actually contending with these

18         issues every day in their schools,

19         we relied on national data, we

20         relied on experts who spend

21         their -- have spent their careers,

22         in recent years, trying to study

23         and understand the impact of

24         social media.

CONFIDENTIAL

Page 484

1          That's the data that we've
2      relied on.
3  BY ATTORNEY KEYES:
4          Q.    Your plan that you are
5  recommending to each of the school
6  districts is intended, in part, to deal
7  with disruptions in the classroom in that
8  school from students' use of social media
9  in the classroom or at school, correct?
10              ATTORNEY YEATES:  Object to
11          the form.
12              THE WITNESS:  So the plan is
13          intended to address holistically
14          the harms of social media.  And I
15          have laid out that a part of those
16          harms that has been well
17          documented in the research
18          literature are disruptions to
19          classrooms.
20              And specific to the
21          districts, it's very clear from
22          the administrators, student
23          support personnel and educators
24          that disruptions are a significant

CONFIDENTIAL

Page 485

1          part of the harm in schools.

2          Students just are not able to

3          access the instructional material

4          because they're consistently being

5          disrupted by social media alerts

6          and notifications and engagement

7          and all of the features that keep

8          them engaged for hours during when

9          they're supposed to be learning in

10         the school system.

11   BY ATTORNEY KEYES:

12         Q.    And those disruptions would

13   be eliminated or significantly reduced if

14   students were not allowed access to their

15   cell phones or personal electronic

16   devices during the school day, correct?

17              ATTORNEY YEATES:  Object to

18         the form.

19              THE WITNESS:  I actually

20         would have to disagree with that.

21         Because, you know, we've seen some

22         attempts at reducing cell phone

23         use during the school day.  And

24         they are incredibly challenging to

CONFIDENTIAL

Page 486

1          implement, as I noted throughout

2          my reports.

3               We heard that from the

4          school district leaders, both

5          during my interviews with them and

6          also from deposition data that --

7          and we know this, having watched

8          this nationally at this point,

9          there are many reasons why

10         reducing cell phone time during

11         the day is quite difficult.

12              And, frankly, even if you

13         were to eliminate cell phone use

14         during the day, which we've seen

15         is virtually impossible for a

16         variety of reasons, students are

17         able to get around it with VPNs on

18         their Chromebooks, they are able

19         to bring burner phones, families

20         are insistent upon students having

21         a phone for safety reasons, et

22         cetera, et cetera, it would still

23         in no way suggest that if you were

24         to eliminate cell phone use during

CONFIDENTIAL

Page 487

1          the day that they would -- that
2          the disruptive behaviors would be
3          eliminated.  No.
4    BY ATTORNEY KEYES:
5          Q.    Well, my question was about
6    eliminated or significantly reduced.
7          A.    Okay.  I heard it.
8          Q.    Do you -- do you offer the
9    opinion that a cell phone ban implemented
10   by a school district would not
11   significantly reduce distractions and
12   disruptions from cell phone use in the --
13   in the school?
14              ATTORNEY YEATES:  Object to
15          the form.
16              THE WITNESS:  So I did not
17          offer an opinion on that.
18              Frankly, in the field, I can
19          tell you it's still an evolving
20          question.  We still don't know the
21          answer to that.  It is such a new
22          area, that districts are
23          attempting to implement cell phone
24          bans, states are attempting to.

CONFIDENTIAL

Page 488

1          But what I can tell you is
2       that there are a lot of
3       challenges.  And within the six
4       districts, we heard that over and
5       over for those that had attempted
6       to -- because of social media
7       engagement, right, because of the
8       platform use, they've tried with
9       the limited resources they've had.
10      So they've had to make very
11      difficult decisions.  And some of
12      those have had to be put towards
13      locking up cell phones, for
14      example.  And even with that, they
15      have consistently said that it
16      remains a challenge.
17          So would it significantly
18      reduce disruptions?  Not from what
19      I've heard to this point.  And I
20      think the data is still -- you
21      know, it's unclear.
22   BY ATTORNEY KEYES:
23      Q.   Have any of the six school
24   districts, Tucson, Charleston, Breathitt,

CONFIDENTIAL

Page 489

1    Irvington, DeKalb or Harford, instituted

2    a cell phone ban at any point from 2017

3    through the present?

4              ATTORNEY YEATES:  Object to

5         the form.

6              THE WITNESS:  So you're

7         asking me to consider whether

8         they've implemented one.  I know

9         that across the districts there

10        have been.  I'd have to go and

11        look specifically into each

12        district, just to make sure I'm

13        recalling the specific attempts

14        that they've had.

15             So I don't want to misstate

16        which district it was.

17   BY ATTORNEY KEYES:

18        Q.    Well, do you know, sitting

19   here, whether any of the six districts

20   instituted a cell phone ban at any point

21   since 2017?

22             ATTORNEY YEATES:  Object to

23        the form.  And asked and answered.

24             THE WITNESS:  Again, to my

CONFIDENTIAL

Page 490

1          recollection, at least one of the
2          districts has attempted --
3          eliminating cell phones during the
4          day.
5               I'd really have to go into
6          the reports to look at
7          specifically which district did
8          what with respect to eliminating
9          cell phones -- or attempting to
10         eliminate them, I should say,
11         during the day.
12    BY ATTORNEY KEYES:
13         Q.   Okay.  And for the school
14    district you have in mind, I realize you
15    don't know the name of the school
16    district, when was that cell phone ban
17    instituted?
18         A.   That's something I can't
19    answer.
20              ATTORNEY YEATES:  Object to
21         the form.
22    BY ATTORNEY KEYES:
23         Q.   And was there any testimony
24    by anyone from that school district about

CONFIDENTIAL

Page 491

1   the results of the cell phone ban?
2              ATTORNEY YEATES:   Object to
3         the form.
4              THE WITNESS:   Honestly, I'd
5         have to go back and look through
6         the testimony.  So if you have
7         something you'd like me to look
8         at, I'm happy to look at it.
9              But we're talking about six
10        districts, lots of people I've
11        spoken with, lots of depositions
12        I've read, lots of school district
13        documents.
14             So I wouldn't feel
15        comfortable stating, you know, a
16        specific from an arbitrary school
17        district at this point.  I would
18        need to look at the school
19        district data, which I did, but I
20        would have to look again.
21   BY ATTORNEY KEYES:
22        Q.   Well, did you undertake, in
23   preparing your opinions in this matter,
24   to see what school leaders said in their

CONFIDENTIAL

Page 492

1    deposition about the results of a cell

2    phone ban?

3                ATTORNEY YEATES:  Object to

4         the form.

5                THE WITNESS:  So I was, as

6         you know, not in control of what

7         was asked during the deposition.

8                So the question, I think, is

9         a little confusing.  Because it

10        suggested I attempt to understand,

11        I think.  So maybe I'm not

12        understanding your question.

13        Maybe you can restate it or ask it

14        again.

15   BY ATTORNEY KEYES:

16        Q.    Did you undertake, in

17   preparing your opinions in this matter,

18   to see what school leaders said in their

19   deposition about the results of a cell

20   phone ban?

21                ATTORNEY YEATES:  Object to

22        the form.

23                THE WITNESS:  So I looked

24        holistically at all of the

CONFIDENTIAL

Page 493

```
 1            deposition data that is listed in
 2            my source documents from district
 3            leaders and administrators and
 4            student support personnel across
 5            the districts to understand their
 6            experience of platform use, the
 7            defendants' platform use.
 8                    Some of the testimony
 9            included information about cell
10            phone bans.  So it would have been
11            something that I considered in
12            forming my opinions.
13                    ATTORNEY YEATES:  Counsel,
14            can we take a break?
15                    ATTORNEY KEYES:  Sure.  Let
16            me just try to finish up this
17            topic.
18    BY ATTORNEY KEYES:
19            Q.    Did you see any testimony
20    from anyone in any of the six districts
21    about the results, as they described
22    them, of instituting a cell phone ban?
23                    ATTORNEY YEATES:  Object to
24            the form.
```

CONFIDENTIAL

Page 494

1            THE WITNESS:  I'd have to go
2        back and look at the information.
3   BY ATTORNEY KEYES:
4        Q.    Did you discuss a cell phone
5   ban with any of the so-called key
6   informants you spoke with in any of the
7   six districts?
8            ATTORNEY YEATES:  Object to
9        the form.  And the use of
10       "so-called."
11           THE WITNESS:  I was just
12       going to say, that's an
13       interesting term "so-called."
14       They were key informants.  These
15       are the leaders of the school
16       districts that are at issue here.
17       So they're real people who are
18       experiencing this every day.
19           So can you restate the
20       question?  That term threw me off
21       also.
22   BY ATTORNEY KEYES:
23       Q.    Well, you've called them --
24   you've referred to them as key

CONFIDENTIAL

Page 495

1   informants, right?

2         A.    Correct.  It just --

3         Q.    Okay.  And the folks --

4         A.    -- felt like a dismissive

5   term.  That's all.

6         Q.    I'm not dismissing anything.

7   I'm trying to use your terminology.

8               You have referred to them as

9   so-called key informants.

10        A.    I've referred to them as key

11  informants.

12        Q.    Okay.  In any of your

13  conversations with any of these key

14  informants, did you discuss with them

15  cell phone bans?

16        A.    I'd have to go back to the

17  interviews.  But I do recall, in

18  discussion, that there was discussion of

19  cell phone -- attempts to remove cell

20  phones from students.

21              That's about as good as I'm

22  going to be able to give you without

23  actually going back to the specific data.

24  Because I don't want to misrepresent what

CONFIDENTIAL

Page 496

1    I spoke with them about.

2         Q.    And I asked you before about

3    any cell phone bans instituted by the

4    school districts.

5              Did you look for any

6    testimony from any school district

7    employees about cell phone bans

8    instituted at a school level?

9              ATTORNEY YEATES:  Object to

10        the form.

11             THE WITNESS:  So, again, I

12        mean, I think the question is

13        interesting.  I didn't look for

14        specific information, as you're

15        describing it.

16             I looked to the depositions

17        in -- in totality, right.  I

18        looked through the depositions to

19        understand the impact of the

20        defendants' platforms on a variety

21        of factors that I speak about in

22        my report.

23    BY ATTORNEY KEYES:

24        Q.    So you didn't say, hey, I'd

CONFIDENTIAL

Page 497

1  like to know what the -- what the school
2  districts did in terms of instituting a
3  cell phone ban or not; that isn't an area
4  of inquiry that you focused on?
5          ATTORNEY YEATES:  Object to
6      the form.
7          THE WITNESS:  I disagree
8      with the kind of underlying
9      suggestion that it's not something
10     I focused on.
11         What I asked about when I
12     spoke with interview --
13     interviewees, key informants
14     interviews, was the measures that
15     they were taking in their schools
16     to address the harms of the social
17     media platforms.
18 BY ATTORNEY KEYES:
19     Q.    Do you recall any testimony
20 from any school district employee about
21 the results of cell phone bans at the
22 school level?
23     A.    So, again, I would have to
24 go back to the actual testimony or

CONFIDENTIAL

Page 498

1  depositions to see if that information
2  was in there.
3          Q.    Did you discuss with any of
4  the key informants any cell phone bans
5  that have been instituted at the school
6  level?
7          A.    So, again, I would have to
8  go back.  Specifically, you're asking
9  across six districts, multiple people per
10 district.  So it would be something I
11 would have to go back.
12              I can go back through the
13 key informant information that's in the
14 reports.  But I'd have to go back to
15 that.
16          Q.    Well, you include in your
17 reports some quotes that you attribute to
18 key informants, not by name but by
19 category, right?
20          A.    As would be typical
21 practice, I included information that was
22 gathered during the key informants.  I
23 included some quotes, if they were
24 illustrative of the information I was

Page 499

1  sharing in the report.  That's correct.

2       Q.    So separate from whatever

3  you put in the reports, sitting here

4  today, do you have a recollection of

5  speaking with any of these key informants

6  about the results of any cell phone ban

7  instituted at the school level?

8       A.    I would have a hard time

9  recalling, because you're talking about

10 the distinction between a district level

11 and a school level.

12           So I don't think I can

13 answer that question to my recollection.

14           ATTORNEY KEYES:  Why don't

15      we take a ten-minute break?

16           THE WITNESS:  Okay.

17           VIDEO TECHNICIAN:  The time

18      is 10:05 a.m.  We are off the

19      record.

20               -  -  -

21           (Whereupon, a brief recess

22      was taken.)

23               -  -  -

24           VIDEO TECHNICIAN:  The time

CONFIDENTIAL

Page 500

1              is 10:18 a.m., and we are on the
2              record.
3     BY ATTORNEY KEYES:
4              Q.    Dr. Hoover, have you ever
5     made a request to any of the defendants
6     in this case to discontinue any feature
7     or function on its platform?
8                   ATTORNEY YEATES:  Object to
9              the form.  And not case specific.
10                  THE WITNESS:  Any -- that
11             would not be my role.
12    BY ATTORNEY KEYES:
13             Q.    Have you ever made a request
14    to any defendant in this case to modify
15    any feature or function on its platform?
16                  ATTORNEY YEATES:  Object to
17             the form.  And not case specific.
18             You've already used that time.
19                  THE WITNESS:  Not that I'm
20             aware of.
21    BY ATTORNEY KEYES:
22             Q.    Have you ever publicly
23    advocated, any speech or presentation or
24    article, that any of the defendants'

Page 501

1  platforms not be made available to middle

2  school students?

3                    ATTORNEY YEATES:  Object to

4          the form.  And not case specific.

5          You're over your time allotted by

6          Judge Kang.

7  BY ATTORNEY KEYES:

8          Q.    You can answer.

9          A.    So what I would say is I've

10 given, you know, over 600-plus

11 presentations.  So it's hard to recall

12 the specific details of every one of

13 those presentations.

14                   And I wouldn't see it in,

15 you know, my role to advocate in a way

16 that you're suggesting.

17         Q.    So can you think of any

18 instance where you've publicly advocated,

19 in any speech or presentation or article,

20 that any of the defendants' platforms not

21 be made available to middle school

22 students?

23                   ATTORNEY YEATES:  Are you

24         going to continue to ask

Page 502

1          non-case-specific questions today
2          during the case-specific part of
3          the deposition, which you reserved
4          for today?
5               ATTORNEY KEYES:  I am going
6          to ask my questions.  This is
7          consistent with the court's order.
8               ATTORNEY YEATES:  This is
9          not --
10               ATTORNEY KEYES:  She can
11          answer.
12               ATTORNEY YEATES:  This is
13          not consistent.  How is this a
14          case-specific question?
15               ATTORNEY KEYES:  It falls
16          squarely within lots of the
17          statements she's made in her
18          reports, if she's offering these
19          opinions as to these six school
20          districts.
21     BY ATTORNEY KEYES:
22          Q.    So you can answer.
23               ATTORNEY KEYES:  I'm not
24          going to argue with you.

CONFIDENTIAL

Page 503

1            ATTORNEY YEATES:  So today
2      you have six hours, one hour for
3      each of the districts.  So which
4      district does this question relate
5      to?
6            ATTORNEY KEYES:  Judge Kang
7      did not limit us to one-hour
8      blocks for each of the districts.
9      He gave us 11 hours and explained
10     his reasoning for how he arrived
11     at the 11 hours.
12          We're going to finish our
13     deposition within that 11 hours.
14     But we are going to ask our
15     questions.
16          ATTORNEY YEATES:  Which
17     case-specific report are you
18     asking about?
19          ATTORNEY KEYES:  I'm asking
20     about all six of the reports about
21     these school districts.
22          ATTORNEY YEATES:  What is
23     case specific about that question?
24          ATTORNEY KEYES:  Melissa,

Page 504

1          I'm not going to argue with you.

2          You can -- you can object.

3               If you want to instruct her

4          not to answer, you can do that.  I

5          don't think it's advisable.

6               But I am going to ask the

7          questions I have.

8               ATTORNEY YEATES:  Okay.  Why

9          don't we take a break and call the

10         judge, then?

11              ATTORNEY KEYES:  Sure.

12              VIDEO TECHNICIAN:  The time

13         is 10:21 a.m.  We are off the

14         record.

15                    -  -  -

16              (Whereupon, a brief recess

17         was taken.)

18                    -  -  -

19              VIDEO TECHNICIAN:  The time

20         is 10:26 a.m.  We are on the

21         record.

22    BY ATTORNEY KEYES:

23         Q.   Dr. Hoover, have you ever

24    publicly advocated, in any speech,

Page 505

1    presentation or article, that any of the

2    defendants' platforms not be made

3    available to middle school students?

4              ATTORNEY YEATES:  Object to

5         the form.  And not case specific.

6         You're over your time allotted by

7         Judge Kang.

8              THE WITNESS:  So, as I've

9         said, I've given hundreds of

10        presentations.  So it would be

11        virtually impossible for me to

12        remember every single thing that I

13        said in the presentations.

14             I likely -- well, I don't

15        want to make a guess at it.

16             But have I spoken, in my

17        work with school districts, about

18        the harms of social media?  Yes.

19        Would I necessarily consider it

20        within my role to advocate for

21        what you're talking about or have

22        I said that before?  I can't

23        recall that.

24    BY ATTORNEY KEYES:

CONFIDENTIAL

Page 506

1          Q.    Have you ever publicly

2    advocated, in a speech or presentation or

3    article, that any of defendants'

4    platforms not be made available to high

5    school students?

6                    ATTORNEY YEATES:  Object to

7          the form.  And not case specific.

8          You're over your time allotted by

9          Judge Kang.

10                    THE WITNESS:  I don't think

11         that that's -- I can't recall,

12         when thinking back to the hundreds

13         of presentations I've given,

14         whether that's something I've

15         specifically advocated for.

16   BY ATTORNEY KEYES:

17         Q.    Have you publicly advocated,

18   in any speech, presentation or article,

19   that social media not be made available

20   to middle school or high school students?

21                    ATTORNEY YEATES:  Object to

22         the form.  And not case specific.

23         You're over your time allotted by

24         Judge Kang.

CONFIDENTIAL

Page 507

1              THE WITNESS:  Again, I don't
2         recall everything I've said in the
3         hundreds of presentations that
4         I've given.
5              So I can't recall if I've
6         specifically advocated for what
7         you're asking about.
8    BY ATTORNEY KEYES:
9         Q.    Have you ever publicly
10   advocated, in any speech, presentation or
11   article, that any of the defendants'
12   platforms discontinue or modify any
13   feature or function?
14             ATTORNEY YEATES:  Object to
15        the form.  And not case specific.
16        You're over your time allotted by
17        Judge Kang.
18             THE WITNESS:  I'd be
19        reluctant to try to recall the
20        specific detail about a function
21        of a social media platform from
22        the hundreds of presentations that
23        I've given, because I don't want
24        to misspeak.

CONFIDENTIAL

Page 508

1    BY ATTORNEY KEYES:

2            Q.    During your work on this

3    matter, have you advocated to any of the

4    six school districts that they block

5    students' access to YouTube on their

6    network?

7                        ATTORNEY YEATES:  Object to

8            the form.

9                        THE WITNESS:  That would

10           have absolutely fallen outside of

11           my role in this -- in this

12           engagement.

13                   My role with these

14           districts, as I think you know,

15           was to get an understanding of

16           their experience with the

17           defendants' platforms in the

18           school environment and its impacts

19           there, as well as on their

20           students, and to develop an

21           aligned strategic plan according

22           to the harms.

23   BY ATTORNEY KEYES:

24           Q.    During your work on this

CONFIDENTIAL

Page 509

1    matter, have you advocated to any of the

2    six school districts that they block

3    students' access to YouTube on school

4    district-issued devices?

5           A.    Again, that would have

6    fallen outside of my responsibilities and

7    role on this, and I think would have

8    been, actually, quite inconsistent with

9    what I was intending to do here, which

10   was to get an understanding of the impact

11   of the defendants' platforms in their

12   schools and on their students, and then

13   develop a prevention and mitigation

14   strategic plan for them.

15          So that would have not been

16   a part of my role.

17          Q.    During your work on this

18   matter, have you advocated to any of the

19   school districts that they pull down

20   their YouTube channel for purposes of

21   communicating with students, families or

22   the community?

23          A.    So, again, that would not

24   have been part of my role in working with

CONFIDENTIAL

Page 510

1   these six districts to understand the

2   impact of social media platforms, the

3   defendants' platforms in their schools

4   and on their students and to develop a

5   strategic plan.

6          Q.    During your work in this

7   matter, have you advocated to any of the

8   school districts that they pull down

9   their social media accounts for purposes

10  of communicating with students, families

11  or the community?

12         A.    I want to clarify something,

13  because I actually -- I'm wondering.  I

14  want to make sure I'm interpreting your

15  question correctly.

16             When you say are you -- have

17  you advocated to the school districts,

18  I'm -- I've interpreted that, for maybe

19  the last three questions or so, however

20  often you asked that, was I doing that

21  actively when speaking with the school

22  districts.

23             Are you asking if that was

24  in my strategic plan and report or did I

Page 511

1   advocate to them in the course of

2   discussion with them?

3              Because I may have

4   misinterpreted your questions.

5         Q.    Well, let's take them one at

6   a time.

7         A.    Okay.

8         Q.    In any of your conversations

9   with any of the people you identify as

10  key informants for the six school

11  districts, did you urge them to block

12  students' access to YouTube on their

13  school district network?

14        A.    Okay.  So I understand that

15  you're asking that about the

16  conversations that I had during key

17  informant interviews, and did I urge them

18  to act during those, with respect to the

19  specifics that you mentioned across all

20  of the interviews.

21              My role -- that would have

22  been inconsistent with my role in

23  interviewing them to understand the

24  impacts of social media and to understand

CONFIDENTIAL

Page 512

1  their comprehensive school mental health

2  system.

3           When I go in to do key

4  informant interviews, I'm not there

5  serving to advocate for them to do A, B,

6  or C or to, you know, address -- I'm

7  going in to inquire about their

8  experiences.

9       Q.    In any of your conversations

10  with any of the people you identify as

11  key informants for the six school

12  districts, did you urge them to block

13  students' access to YouTube on school

14  district-issued devices?

15       A.    Again, that would have been

16  inconsistent with my typical process for

17  conducting key informant interviews,

18  which is to understand from them what the

19  impacts of social media are and the

20  platforms are on their schools and on

21  their students and to then go and develop

22  a report after that.

23           So my role would not have

24  been to urge them to do something with

CONFIDENTIAL

Page 513

1  their school district YouTube site, for

2  example.

3          I think it was a multi-part

4  question.  But, no, I did not urge them

5  to do something as part of my interview,

6  nor would that be consistent with my

7  practices doing key informant interviews.

8          That's just not what you do,

9  as a scientist, when you're going in to

10 research or understand a district.

11      Q.    So in any of your

12 conversations with any of the people you

13 identify as key informants for the six

14 school districts, did you urge them to

15 bring down their YouTube channel and not

16 use it to communicate with students,

17 parents or the community?

18          ATTORNEY YEATES:  Object to

19      the form.  And asked and answered.

20          THE WITNESS:  So when you're

21      going in as a consultant, as a

22      scientist to talk with school

23      districts, to inquire about their

24      experiences to inform a strategic

CONFIDENTIAL

Page 514

1        plan, my role would not have been

2        to urge them to take action in

3        that moment.  That was not my role

4        with these school districts.

5             My role was to do a process

6        of scientific inquiry with them,

7        which is what I did.

8   BY ATTORNEY KEYES:

9        Q.    And in any of those

10   conversations with any of the people you

11   say are key informants, did you encourage

12   them to stop having their school

13   districts use social media to communicate

14   with students or parents or the

15   community?

16             ATTORNEY YEATES:  Object to

17        the form.

18             THE WITNESS:  So, again, as

19        I spoke with the key informants,

20        through my typical process of

21        inquiry to understand the impact

22        of the platforms on students and

23        on their schools, my role would

24        not have been to urge them to do

Page 515

1           anything specific with the

2           platforms in their schools.

3                So that wouldn't have been

4           something that I typically would

5           have done in that type of

6           interview, no.

7    BY ATTORNEY KEYES:

8           Q.    So in any of your speeches

9    or any of your presentations or any of

10   your articles, have you ever advocated

11   that any school districts block students'

12   access to YouTube on its network, block

13   students' access to YouTube on school

14   district-issued devices, bring down its

15   YouTube channel and stop using it to

16   communicate with students, faculty,

17   parents or the community, or stop using

18   social media to communicate with

19   students; ever -- ever advocate for any

20   of those things?

21                ATTORNEY YEATES:  Object to

22           the form.  And not case specific.

23           You're over your time allotted by

24           Judge Kang.

CONFIDENTIAL

Page 516

1                THE WITNESS:  So, again,

2          you're asking me to remember the

3          details from over, you know, 25

4          years of hundreds of

5          presentations.

6                So I want to be, you know,

7          careful about saying I never said

8          something specific to a specific

9          platform with -- you know, with

10          districts.

11                What I can -- well, so the

12          answer is, I can't recall if I

13          said anything specific to what

14          you're asking about in the

15          hundreds of presentations that

16          I've done.

17  BY ATTORNEY KEYES:

18          Q.    Have you offered any

19  opinion, in any of the reports that

20  you've issued in this case, that

21  defendants' platforms not be made

22  available to middle school or high school

23  students?

24          A.    So the opinions that I

CONFIDENTIAL

Page 517

1    offered were related to the strategic

2    plan, which I can go through the

3    specific -- I'm happy to go -- is there a

4    specific district you'd like me to look

5    at to go through --

6             Q.    Well --

7             A.    -- the plan.

8             Q.    -- I assume you're familiar

9    with your reports.

10            A.    I am.

11            Q.    You prepared them and you

12   reviewed them last night.

13                 My question is, in any of

14   those reports, did you offer an opinion

15   that defendants' platforms not be made

16   available to middle school or high school

17   students?

18            A.    So I'm very familiar with my

19   report.  And I've written them.

20                 But there's also several

21   reports and there's six districts.  And I

22   was responding to multiple experts in the

23   rebuttal.

24                 So I just want to make sure

Page 518

1  that I'm stating -- I want to make sure,

2  because you're asking specifically

3  whether I spoke about this in my

4  opinions.

5              So did I ask them to limit

6  their use of a specific platform in --

7  for middle or high school students?  Did

8  I use that terminology?  Is that what

9  you're asking?

10        Q.    I'm not asking about

11 terminology.

12             I'm asking you, in any of

13 your reports --

14        A.    Okay.

15        Q.    -- that you've prepared in

16 this case, have you offered an opinion

17 that defendants' platforms should not be

18 made available to middle school or high

19 school students?

20        A.    So I'll answer -- because

21 the question is general, I can answer

22 generally that I don't think I made that

23 broad sweeping of a recommendation that

24 the platforms not be available to them.

CONFIDENTIAL

Page 519

1            What I think I've done is

2    clearly lay out the harms of students'

3    personal social media use and the harms,

4    then, that causes both for schools, in

5    terms of disruption, sleep deprivation

6    for students, et cetera, and for

7    students.

8            Q.    In any of the reports that

9    you've prepared in this case, have you

10   offered any opinion that any of

11   defendants' platforms discontinue or

12   modify any particular feature or

13   function?

14               ATTORNEY YEATES:  Object to

15        the form.

16               THE WITNESS:  So to be

17        clear, my role was to come up with

18        a strategic plan for schools and

19        for districts.

20            So if you're asking about

21        modifying the features of the

22        platforms, again, I'm not a tech

23        expert, but my understanding is

24        the ability to do that usually

Page 520

1           resides within the defendants'
2           organizations themselves.
3                So I don't know that I would
4           have made a recommendation to the
5           school districts to say, for
6           example, YouTube needs to change
7           their settings, their features,
8           their design.  That would be up to
9           the organizations.
10  BY ATTORNEY KEYES:
11          Q.    You said you don't know
12  whether you would have.  My question is
13  very specific about the reports that you
14  did prepare.
15               In any of the reports that
16  you prepared in this case, did you offer
17  an opinion that any of the defendants'
18  platforms should discontinue or modify
19  any particular feature or function?
20               ATTORNEY YEATES:  Object to
21          the form.
22               THE WITNESS:  That would not
23          have been something I would have
24          done, because I was offering

CONFIDENTIAL

Page 521

1           opinions for the school districts,
2           in terms of the strategic plan.
3                   So let me back up, because I
4           want to -- I want to look to the
5           opinions that were related to the
6           harms, because I want to just make
7           sure that I'm comprehensively --
8           hold on.  Let me go back to the
9           general report, which is in
10          Binder 1.
11                  And if you have a specific
12          opinion in mind, feel free to
13          point me to it.  But otherwise I'm
14          just going to look through, since
15          you're asking about my opinions,
16          which there were multiple across
17          multiple reports.
18  BY ATTORNEY KEYES:
19          Q.    Well, I've reviewed your
20  reports carefully, and there is no such
21  opinion.
22                  But I want to make sure
23  you're not disagreeing.  That's why I'm
24  asking the question.

Page 522

1              ATTORNEY YEATES:  Object to
2         the form.
3              THE WITNESS:  So what I can
4         say, I'm looking -- again, I'm
5         looking at my general report,
6         May 16, is that I offer opinions
7         that are related to the real and
8         observable harms.  And I do speak,
9         in those opinions, about the
10         design and the engagement of the
11         platforms themselves being harmful
12         to students.
13              So my opinions are related
14         to the facts that demonstrate the
15         harm, the cause of the harm  I
16         then speak about.  Because of the
17         harm, these are the opinions being
18         offered to develop a strategic
19         plan; this is what I think schools
20         need to do in response to that.
21  BY ATTORNEY KEYES:
22         Q.    Dr. Hoover, we have limited
23  time, and I need you to answer the
24  questions I ask.

Page 523

1          My question was not about,
2    hey, tell me what you said in your
3    reports.  And I don't need you to keep
4    telling me what you said in your reports.
5    I just want you to answer my question.
6          My question was, in any of
7    the reports that you prepared in this
8    case, did you offer an opinion that any
9    of the defendants' platforms should
10   discontinue or modify any particular
11   feature or function; yes or no?
12          ATTORNEY YEATES:  Object to
13        the form.  And the speech.
14        Dr. Hoover is doing her best to
15        answer your question.
16          THE WITNESS:  So I was about
17        to say, I'm doing my best to
18        answer the question.  And I didn't
19        see it as a yes-or-no question,
20        because I'm really thinking
21        through the opinions that I
22        offered and want to be really
23        precise about whether that's
24        something I offered in the context

CONFIDENTIAL

Page 524

1          of the opinions, which is why I've
2          gone through at least -- you know,
3          respecting time, just going
4          through one of, I don't know, 20
5          reports -- I don't know how many
6          exactly it is.  But it's a lot of
7          reports that I had to write.
8              So to the question did I
9          specifically recommend -- do you
10         want to rephrase -- or not
11         rephrase but just restate the --
12  BY ATTORNEY KEYES:
13         Q.    I'm not going to rephrase
14  it.
15         A.    Not rephrase --
16         Q.    I'm going to --
17         A.    -- that's why I said
18  restate.
19         Q.    I'll repeat to you again.
20  But, again, just please answer my
21  question.
22              My question is, in any of
23  the reports that you prepared in this
24  case, did you offer an opinion that any

CONFIDENTIAL

Page 525

1  of the defendants' platforms should

2  discontinue or modify any particular

3  feature or function?

4            ATTORNEY YEATES:  Object to

5       the form.  And argumentative.

6            THE WITNESS:  So, again, I'm

7       doing my best to answer the

8       questions.  And I just want to be

9       thorough with my response and make

10       sure I'm understanding your

11       question.

12  BY ATTORNEY KEYES:

13       Q.    I'll take that as a given

14  for every answer you give me.  So you

15  don't need to tell me that anymore.

16       A.    Okay.  Well, then, likewise,

17  I would say I know, when you suggest,

18  answer your question, I am just reminding

19  you that I am doing my best to answer the

20  question.

21            So I don't think in my

22  opinions that I have suggested that --

23  given that my role in the opinions here

24  was around strategic planning for

Page 526

1  schools, I don't think I'm offering an

2  opinion that the social media companies

3  change their design.

4           Do I speak to that in my

5  report about the design features and how

6  they harm children?  Yes.

7      Q.    In any of the reports that

8  you've issued in this case, have you

9  offered an opinion that the defendants in

10 this case should be required to do

11 something or should be prohibited from

12 doing something?

13     A.    So that's an interesting

14 question.

15           I mean, I would argue that

16 I've spoken to the design features of the

17 social media platforms and the harms that

18 they've caused.  And inherent in that,

19 I've indicated that the design features

20 are what are causing the harm.  And that

21 would include things like, you know,

22 parental monitoring not being in place

23 and age restrictions not being

24 verifiable, et cetera, which is what's

CONFIDENTIAL

Page 527

1   implied in the opinions here.

2              So I'm talking -- and then I

3   go into much greater detail in the report

4   about that.  So it's inherent in the

5   opinions that I've offered.

6              I don't know how to

7   answer --

8        Q.    When you say it's --

9        A.    -- beyond that.

10       Q.    -- inherent in your

11   opinions, please identify for me anything

12   specific that you said the defendants

13   should be required to do or should be

14   prohibited from doing.

15       A.    There's nothing that states

16   they should be required or prohibited,

17   because my role was to look at and

18   identify the harms, which I did, which

19   are specific to the features and the

20   design of the platforms and how they harm

21   young people.

22              So my opinions are specific

23   to the evidence for those harms related

24   to the features.

CONFIDENTIAL

Page 528

1              Look, I don't have, you

2    know, control over what the social media

3    companies are doing at this point.  So

4    my -- what I've offered is opinions about

5    the harm that they are causing to young

6    people and what school districts need to

7    do as a result of those harms.  That's --

8    that's my role.

9         Q.    When did you first become

10   the co-director of the National Center

11   for School Mental Health?

12             ATTORNEY YEATES:  Object.

13        Not case specific.  You're over

14        your time allotted by Judge Kang.

15        And we covered this yesterday.

16             THE WITNESS:  So I first

17        became the co-director of the

18        National Center in 2010.

19   BY ATTORNEY KEYES:

20        Q.    And you stopped serving as

21   the co-director of the National Center

22   for School Mental Health on June 1st,

23   2025.

24             Who, if anyone, succeeded

CONFIDENTIAL

Page 529

1  you or replaced you as co-director?

2          A.    So --

3                ATTORNEY YEATES:   Same

4          objections.

5                THE WITNESS:   So the

6          structure of the National Center

7          was modified slightly when I

8          retired, so that my co-director

9          for the last 15 years, Dr. Nancy

10         Lever, became executive director

11         of School Mental Health and then

12         we identified two new

13         co-directors, Dr. Jill Bohnenkamp

14         and Dr. Brittany Patterson.

15  BY ATTORNEY KEYES:

16         Q.    Did you show a draft of any

17  of your reports to Dr. Lever,

18  Dr. Bohnenkamp or Dr. Patterson?

19         A.    Absolutely not.

20         Q.    Did you show a draft of any

21  of your reports to anyone who was a

22  director or an officer or an employee of

23  the National Center of School Mental

24  Health?

CONFIDENTIAL

Page 530

1        A.     Absolutely not.

2        Q.     Has anyone at all at the

3  National Center of the School for Mental

4  Health seen your reports in this case?

5        A.     Nobody has seen my reports

6  in this case, as far as I'm aware, other

7  than me and counsel, and then who counsel

8  would have shared it with, you.

9        Q.     And why do you say

10  "absolutely not," you did not show it --

11  the drafts to anyone who was affiliated

12  with the National Center for School

13  Mental Health?

14        A.     Because it was part of my

15  agreement, in serving as an expert, that

16  I not share information about this with

17  my colleagues.  And so I adhered to that.

18        Q.     Does the National Center for

19  School Mental Health have a website?

20        A.     Yes.

21        Q.     Does the website have any

22  discussion about the impact of students'

23  use of social media on schools or the

24  school environment?

Page 531

1            ATTORNEY YEATES:  Object to
2       the form.  Not case specific.
3       You're over your time allotted by
4       Judge Kang.
5            THE WITNESS:  So does our
6       website, which has a lot of tabs
7       and a lot of resources on there,
8       does it have anything specific to
9       the impact of social media?
10  BY ATTORNEY KEYES:
11       Q.    Does the website have any
12  discussion about the impact of students'
13  use of social media on schools or the
14  school environment?
15            ATTORNEY YEATES:  Same
16       objections.
17            THE WITNESS:  I would
18       honestly have to go through all of
19       the -- you know, our website is
20       constantly updated -- I shouldn't
21       say constantly updated.  It's
22       updated regularly.  And I'd have
23       to go through to see what's on the
24       website and through the documents

CONFIDENTIAL

Page 532

1           on the website to be able to

2           answer that question.

3     BY ATTORNEY KEYES:

4           Q.    Does the National Center for

5     School Mental Health publish reports?

6               ATTORNEY YEATES:  Same

7           objection.

8               THE WITNESS:  So the

9           National Center is involved in

10          contributing to reports and we

11          contribute to peer-reviewed

12          literature.  So we've certainly

13          contributed to reports.

14    BY ATTORNEY KEYES:

15          Q.    Has the National Center for

16    School Mental Health published any

17    reports that discuss the impact of

18    students' use of social media on schools?

19              ATTORNEY YEATES:  Object to

20          the form.  Not case specific.

21          You're over your time allotted by

22          Judge Kang.

23              THE WITNESS:  So you have to

24          understand our National Center has

Page 533

1           been in existence for 30 years and

2           we've produced a lot of reports

3           and documents over time.

4                 So I can't say to you

5           whether any of those reports have

6           any mention of the impact of

7           social media, that you're asking

8           me to remember a whole series of

9           reports.

10   BY ATTORNEY KEYES:

11           Q.     Well, in preparing your

12   opinions and reports in this case, did

13   you go to any repository to see whether

14   the National Center for School Mental

15   Health has published any reports that

16   discuss the impact of students' use of

17   social media on schools?

18           A.     So as I laid out in the

19   report, my methodology was to do a

20   standard literature review.  And any of

21   the sources that I used in forming the

22   opinions were in the report.

23                 To my recollection, there

24   was not a National Center for School

CONFIDENTIAL

Page 534

1    Mental Health report that I included in

2    those source documents.

3         Q.    In your reports, you say

4    that the National Center for School

5    Mental Health has partnered with the U.S.

6    Department of Health and Human Services,

7    the Substance Abuse and Mental Health

8    Services Administration, the Centers for

9    Disease Control and Prevention and the

10   U.S. Department of Education on, quote,

11   multiple initiatives.

12             Did you discuss any of those

13   initiatives in any of your reports in

14   this case?

15        A.    If I need to answer

16   specifically, I'd have to go to the

17   report.

18             But what I can say is, to my

19   recollection, I recall speaking about

20   SAMHSA evaluation practices, as one

21   example, when drawing upon best practices

22   for school mental health evaluation.

23             So that would be an example

24   of where I would have referenced work

CONFIDENTIAL

Page 535

1    that we had done with the Substance Abuse

2    Mental Health Services Administration in

3    the report.

4              Frankly, I speak to my years

5    of experience throughout the report.  And

6    a lot of it is informed by those

7    partnerships with federal partners and

8    certainly state agencies, because this is

9    the work we do.

10             So it's hard to tease apart,

11   you know, did you mention a specific

12   initiative, because a lot of the work

13   that we do with the Department of

14   Education, with SAMHSA, with HHS, and

15   others, is really woven into, you know,

16   decades' worth of experience.  And that

17   did inform the entire report.  It is one

18   of the sources I drew upon.

19        Q.    Did any of the partnerships

20   that you mentioned as being between the

21   National Center for School Mental Health

22   and the U.S. Department of Health and

23   Human Services, the Substance Abuse and

24   Mental Health Services Administration,

Page 536

1    the Centers for Disease Control and

2    Prevention or the U.S. Department of

3    Education target the issue of the impact

4    of students using social media on

5    schools?

6                    ATTORNEY YEATES:  Object to

7            the form.

8                    THE WITNESS:  It's a very

9            broad question.  And I'll answer

10           kind of equally broadly.

11                   The -- the efforts that

12           we've done in partnership include

13           efforts to improve comprehensive

14           school mental health systems

15           across the United States.  And in

16           those efforts, when we are

17           improving mental health systems

18           over the last several years, there

19           is no doubt that social media

20           would have been a part of

21           something that school -- schools

22           and districts are attempting to

23           navigate and address and mitigate

24           the harms of.

CONFIDENTIAL

Page 537

1    BY ATTORNEY KEYES:

2        Q.    Can you identify any

3    initiative between the National Center

4    for School Mental Health and these

5    agencies that you've listed that targeted

6    the impact of students using social media

7    on schools?

8             ATTORNEY YEATES:  Object to

9        the form.

10            THE WITNESS:  So what I

11       would say is that when we're --

12       especially thinking about recent

13       years, when we've been gaining

14       more and more evidence about the

15       harms of the defendants' platforms

16       on young people's mental health in

17       schooling, when you look to -- I

18       mean, you're asking about specific

19       initiatives.

20            I can go into specific

21       initiatives that we've been

22       involved in, like Project AWARE,

23       you know, comprehensive school

24       safety initiatives with the

CONFIDENTIAL

Page 538

1          National Institute for Justice,

2          the school-based mental health

3          professionals, services across the

4          state, those are grants that are

5          awarded to states.

6               There are many initiatives

7          that we've been involved in

8          partnering around.  And inevitably

9          those address if they're looking

10         to enhance either the workforce

11         pipeline or school mental health

12         systems in states and districts.

13         Because social media has such an

14         impact on the mental health of

15         young people and on schooling,

16         school districts would have been

17         addressing those within the

18         context of those initiatives.

19    BY ATTORNEY KEYES:

20         Q.    Ma'am, my question was, can

21    you identify an initiative between the

22    National Center for School Mental Health

23    and these agencies that you've listed

24    that targeted the issue of the impact of

Page 539

1    students using social media on schools?

2              ATTORNEY YEATES:  Object to

3         the form.  And asked and answered.

4              THE WITNESS:  I think I just

5         did.

6    BY ATTORNEY KEYES:

7         Q.    The initiatives you just

8    described targeted the issue of the

9    impact of students' use of social media

10   on schools?

11             ATTORNEY YEATES:  Object to

12        the form.

13             THE WITNESS:  So I suppose

14        it's an interesting question,

15        because you'd have to define what

16        you mean by "targeted."

17             Targeted in -- you know, in

18        the way that I think about it as a

19        scientist working with schools, as

20        somebody who consults with schools

21        to improve their services, means

22        that the efforts that they are

23        being supported -- through

24        technical assistance, through

CONFIDENTIAL

Page 540

1          funding, some of the grants that I
2          mentioned, that part of what
3          they're targeting could include
4          social media.
5                So I answered and gave you
6          several specific examples.
7    BY ATTORNEY KEYES:
8          Q.    You say in your reports that
9    as the co-director of the National Center
10   of School Mental Health, you've co-hosted
11   the Annual Conference on Advancing School
12   Mental Health for 15 years.
13               Your report doesn't identify
14   any program or presentation or paper that
15   was made at this annual conference about
16   the issue of students using social media
17   or the impact of that use on schools.
18               Can you identify for me any
19   program or presentation or paper that
20   addressed that topic?
21               ATTORNEY YEATES:  Object to
22          the form.
23               THE WITNESS:  In the 30
24          years of our conference?  I'm

CONFIDENTIAL

Page 541

1            happy to go back and look through
2            the program booklets for each of
3            them.
4    BY ATTORNEY KEYES:
5            Q.    Well, can you -- can you
6    identify one for me now?
7                  ATTORNEY YEATES:  Object to
8            the form.
9                  THE WITNESS:  No.
10                 And just to be clear, we
11           usually have over 100 sessions in
12           each of our conferences.  So I'd
13           have to go back to the program
14           booklets to look at that.
15   BY ATTORNEY KEYES:
16           Q.    Did any program or
17   presentation or paper that was made at
18   any of these annual conferences discuss a
19   strategic plan for how schools should
20   address the consequences of students
21   using social media?
22                 ATTORNEY YEATES:  Object to
23           the form.  And not case specific.
24                 THE WITNESS:  I can't answer

Page 542

1          that.  I wouldn't know offhand,

2          from several years of conferences,

3          if a specific presentation

4          addressed that.

5    BY ATTORNEY KEYES:

6          Q.    You also say in your reports

7    that you co-hosted a pre-conference

8    school mental health summit.

9              And your reports doesn't

10   identify any program or presentation or

11   paper that was made in any of these

12   pre-conferences about the issue of

13   students using social media or the impact

14   of that use on schools.

15             Can you identify for me any

16   such program or presentation or paper

17   that touched on those topics?

18             ATTORNEY YEATES:  Object to

19         the form.

20             THE WITNESS:  I'd have to go

21         back to the research summit

22         information to know if those were

23         presented.

24             So the answer is no, can I,

Page 543

1           sitting here with you today, name
2           every paper or anything that was
3           presented specific to social
4           media?  No.
5   BY ATTORNEY KEYES:
6           Q.   Did any program or
7   presentation or paper that was made at
8   this pre-conference summit discuss a
9   strategic plan for how schools should
10  address the consequences of students
11  using social media?
12              ATTORNEY YEATES:  Object to
13          the form.  And not case specific.
14              THE WITNESS:  As I've said,
15          I cannot tell you the details of
16          the presentations from 12 years of
17          research summits and 30 years of
18          the conference.
19  BY ATTORNEY KEYES:
20          Q.   Did you yourself present, at
21  any of these conferences or
22  pre-conference summits, a strategic plan
23  for how schools should address the
24  consequences of students using social

Page 544

1    media?
2          A.    No, I would not have
3    presented that.  I've not presented that
4    at the conference or at the research
5    summit.
6               And that honestly -- if I
7    may finish -- I often was serving in a
8    host role with other people presenting
9    for the research summit.  So we try to
10   leave space for others in the field to
11   present as well.
12         Q.    Well, you say you've
13   delivered over 600 professional
14   presentations.
15              In any of those 600
16   professional presentations, have you
17   presented a strategic plan for how
18   schools should address the consequences
19   of students using social media?
20         A.    I think we talked about this
21   yesterday.  But I'm happy to revisit
22   that.
23              First of all, I want to
24   preface by saying it's hard to remember

CONFIDENTIAL

Page 545

1    the details from over 600 presentations.

2              Do I recall presenting a

3    comprehensive strategic plan to address

4    the impacts of social media in my public

5    presentations?  No.

6              Q.    In your reports, you

7    reference a few materials that you've

8    prepared over the course of your career.

9    And one of them that you refer to is the

10   National School Mental Health Best

11   Practices: Implementation Guidance

12   Modules For States, Districts, and

13   Schools.

14              That's a series of documents

15   that consists of two guides, one for

16   participants, one for trainers, and a

17   series of PowerPoint presentations.

18              Did I get that right?

19              ATTORNEY YEATES:  Object to

20         the form.  And not case specific.

21              THE WITNESS:  Essentially.

22         There's also -- yes, essentially.

23         That's a -- that's a reasonable

24         description of what that is.

CONFIDENTIAL

1    BY ATTORNEY KEYES:

2         Q.    Okay.  And did you

3    participate in drafting them?

4              ATTORNEY YEATES:  Same

5         objections.

6              THE WITNESS:  I did

7         participate in drafting them.

8    BY ATTORNEY KEYES:

9         Q.    Okay.  So focusing on the

10   training guide for trainers, does that

11   guide discuss the impact of teen use of

12   social media on schools?

13             ATTORNEY YEATES:  Object to

14        the form.  Not case specific.

15             THE WITNESS:  Do you have

16        the guide for me to read through?

17        Because it's been a few years

18        since it was developed.  So I

19        would not want to misspeak and say

20        that it doesn't -- you know, does

21        or doesn't contain specific

22        information.

23   BY ATTORNEY KEYES:

24        Q.    I have limited time.  And I

CONFIDENTIAL

Page 547

1  don't have the time to let you scroll
2  through long documents.
3              But sitting here today, can
4  you think of anything in that guide that
5  discusses the impact of teen use of
6  social media on schools?
7              ATTORNEY YEATES:  Object to
8          the form.  And not case specific.
9              THE WITNESS:  Again, those
10          are really quite comprehensive
11          modules.  So I wouldn't be
12          comfortable saying specifically
13          the content that's in them.
14              They are addressing the, you
15          know, different components of
16          comprehensive school mental health
17          systems.
18  BY ATTORNEY KEYES:
19      Q.    I had asked you about the
20  guide for trainers.  Now I want to turn
21  to the guide for participants.
22              Can you think of anything in
23  the guide for participants that discusses
24  the impact of teen use of social media on

CONFIDENTIAL

Page 548

1  schools?

2                ATTORNEY YEATES:  Object to

3           the form.  And not case specific.

4                THE WITNESS:  So, again, I'm

5           happy to look through the

6           documents, if you have them.  It

7           sounds like that would be beyond

8           the time limits you have.

9                But I want to be cautious

10          about trying to remember all of

11          the details of the content in

12          either the trainer's or the

13          participant's manuals.

14                And, you know, what I can

15          tell you is that these are manuals

16          that cover the broad core

17          components of quality school

18          mental health systems.  So I can

19          leave it at that.

20                But if you want me to get

21          into kind of the details of what's

22          actually in each of those set of

23          multiple modules that were

24          developed a few years back, I'd

Page 549

1              probably want to look to the
2              actual documents.
3    BY ATTORNEY KEYES:
4              Q.    And then turning to these
5    six PowerPoint presentations, do any of
6    those PowerPoint presentations that you
7    participated in drafting discuss the
8    impact of teen use of social media on
9    schools?
10                 ATTORNEY YEATES:  Object to
11            the form.  And not case specific.
12                 THE WITNESS:  Again, I'd
13            probably need to look through
14            them.  If you're asking me to
15            remember what we developed
16            specifically, you know, in several
17            modules and whether it contained
18            specific information about social
19            media, I'd have to look at the
20            documents.
21    BY ATTORNEY KEYES:
22              Q.    Can you think of anything,
23    sitting here right now, in any of those
24    Power -- PowerPoint presentations that

CONFIDENTIAL

Page 550

1    discusses the impact of teen use of

2    social media on schools?

3                    ATTORNEY YEATES:  Object to

4            the form.  And not case specific.

5                    THE WITNESS:  So I would

6            have difficulty recalling

7            specifically all of the details of

8            multiple modules that were

9            developed several years ago, given

10           that we develop many documents and

11           do many presentations.

12                   So I'm just cautious to

13           speak to the specifics of, you

14           know, a -- if I recall, it was

15           hundreds of slides for each

16           module.

17                   So it gets a little

18           complicated to jog my brain for a

19           specific topic within those.  I'm

20           happy to look through the

21           documents.

22    BY ATTORNEY KEYES:

23           Q.    In your reports, you

24    reference your scholarship, including

Page 551

1  three school mental health intervention
2  manuals.
3           Can you identify for me what
4  those manuals are?
5       A.    I can.  I can reference my
6  CV to get the exact titles.
7           But I'll give you -- so
8  there's the second edition of the
9  Cognitive Behavioral Intervention for
10 Trauma in Schools.  There's an adaptation
11 of that for Native American Alaska native
12 youth.  And there's also an intervention
13 called Supporting Transition Resilience
14 of Newcomer Groups, or STRONG, which is
15 to support the coping skills of newcomer
16 students.
17      Q.    Would you pull out your
18 August 1st, 2025, CV, which was
19 previously marked as Exhibit-4?
20      A.    Got it.
21      Q.    And can you identify for me
22 on your CV where those manuals are
23 listed?
24      A.    So they are listed under

CONFIDENTIAL

Page 552

1    books on Page 31 of the August 1st CV.

2         Q.    Okay.  And there are three

3    items listed under the books section?

4         A.    Correct.

5         Q.    Those are the three school

6    mental health intervention manuals you're

7    referring to in your reports?

8         A.    Correct.

9         Q.    Okay.  Do any of those three

10   mental health intervention manuals

11   discuss the impact of teen use of social

12   media on schools?

13            ATTORNEY YEATES:  Object to

14        the form.  And not case specific.

15            THE WITNESS:  So to be

16        clear, the intervention manuals

17        are specific to specific topic

18        areas.

19            So the Cognitive Behavioral

20        Intervention for Trauma in Schools

21        manual and its adaptation were

22        specific to addressing trauma in

23        students.

24            And the Supporting

Page 553

1    Transition Resilience of Newcomer
2    Groups was specific to addressing
3    their transition to new
4    communities, new countries, new
5    schools.
6            Whether we spoke in the
7    manuals about social media use, I
8    want to say it was probably
9    included as examples.  But, again,
10    these are, you know,
11    hundred-plus -- I think the STRONG
12    manual is about 200 pages.
13            So to my recollection, we
14    use social media -- we may use
15    social media as an example,
16    certainly when it's being trained
17    in.  It might be something that
18    comes up because it's a common
19    experience of the age range,
20    because we're talking about K
21    through 12 students in those.
22            So in those manuals and in
23    this type of cognitive behavioral
24    intervention, you're often

CONFIDENTIAL

Page 554

1          bringing in real-world examples,
2          including students' engagement
3          with social media.
4               I can tell you for the CBITS
5          manuals, the first edition of that
6          was in the early 2000s, likely
7          before we knew about, certainly to
8          the extent that we do today, the
9          harms of social media and likely
10         before students were engaging.
11              And one of the attempts in
12         the second edition -- iteration of
13         it was to not make too many
14         changes.  But we may have included
15         examples related to social media
16         in that.  I would have to go back
17         and look through the manual.
18    BY ATTORNEY KEYES:
19         Q.    My question was very
20    specific.  I didn't ask whether these
21    manuals discussed social media.
22         A.    Oh, I must have --
23         Q.    And I didn't ask whether
24    they discussed teens using social media.

CONFIDENTIAL

Page 555

1              My question was, do any of
2    those three manuals -- mental health
3    intervention manuals discuss the impact
4    of teen use of social media on schools?
5              ATTORNEY YEATES:  Object to
6         the form.  And not case specific.
7              THE WITNESS:  Not that I'm
8         aware of, because that would not
9         have been the intention of group
10        cognitive behavioral intervention
11        manuals.  That's not the purpose
12        of those manuals.
13   BY ATTORNEY KEYES:
14        Q.    You discuss in your reports
15   being an investigator and co-investigator
16   on various grants.
17              Did any of the grants for
18   which you are a principal investigator
19   study the impact of students' use of
20   social media on schools?
21              ATTORNEY YEATES:  Object to
22        the form.  And not case specific.
23              THE WITNESS:  So the grants
24        on which I was a principal

CONFIDENTIAL

Page 556

```
 1         investigator looked at
 2         comprehensive school mental health
 3         systems among other things.
 4              And as part of comprehensive
 5         school mental health systems, we
 6         do consider factors that impact
 7         young people.  So is social media
 8         a part of that?  Certainly.
 9    BY ATTORNEY KEYES:
10         Q.   Well, did any of the grants
11    for which you are a principal
12    investigator focus on the issue of the
13    impact of students' use of social media
14    on schools?
15         A.   Exclusively?
16              ATTORNEY YEATES:  Object --
17              THE WITNESS:  Go ahead.
18              ATTORNEY YEATES:  Object to
19         the form.  And not case specific.
20              THE WITNESS:  Did any of the
21         grants on which I'm a principal
22         investigator or co-investigator --
23         were you asking PI or co-I?
24    BY ATTORNEY KEYES:
```

CONFIDENTIAL

Page 557

1          Q.    I was asking about PI.
2          A.    PI.
3                So any of the grants that I
4    was a PI on, did they look at the impacts
5    of social media exclusive to all other
6    factors?
7          Q.    No.
8                Did they look at the impacts
9    of students' use of social media on
10   schools?
11               ATTORNEY YEATES:  Same
12         objections.
13               THE WITNESS:  So, arguably,
14         the grants that I was PI on that
15         were looking broadly at school
16         mental health systems would
17         have -- social media would have
18         fallen under that umbrella, so.
19   BY ATTORNEY KEYES:
20         Q.    How about the grants for
21   which you were a co-investigator as
22   opposed to a principal investigator?
23               ATTORNEY YEATES:  Object to
24         the form.  And not case specific.

CONFIDENTIAL

Page 558

1              THE WITNESS:  Again, there's
2         probably over 50 grants that I
3         spoke about or that I reference in
4         my CV.  So I can answer broadly,
5         because it's a broad question.
6         But I'm also happy to go through
7         different grants.
8              So because the grants -- I
9         mean, I'm not only a co-I on
10        grants related to school mental
11        health.  But the grants for which
12        I'm a co-I related to school
13        mental health, certainly in recent
14        years, if they are addressing
15        comprehensive school mental health
16        systems, social media would likely
17        have been something that came up
18        in the context of those grants.
19   BY ATTORNEY KEYES:
20        Q.    Something that came up, but
21   it wasn't the focus of the -- of the
22   grant investigation?
23             ATTORNEY YEATES:  Object to
24        the form.  Not case specific.  And

Page 559

1          misstates testimony.
2                    THE WITNESS:  I think
3          "focus" is a bit of a tricky word.
4                    Was it, you know, the one
5          independent variable exclusive to
6          other variables that were looked
7          at in terms of impact?  I mean,
8          none of the grants -- well, I'll
9          state it similar to how I stated
10          it before.
11                    Social media was something
12          that would have been considered or
13          looked at in the context of those
14          grants.  But was it the -- done
15          exclusive of other factors?  No, I
16          can't say that.
17  BY ATTORNEY KEYES:
18          Q.    You reference in your
19  reports the National Center for School
20  Mental Health's SHAPE profiles.
21                    What is a SHAPE profile?
22          A.    Sure.  So SHAPE stands for
23  the School Health Assessment and
24  Performance Evaluation System, which is a

CONFIDENTIAL

Page 560

1  platform that is intended for state

2  leaders and districts and schools and

3  individuals to assess different

4  components of their school mental health

5  system.

6            And the SHAPE profile is an

7  assessment that gets at -- that inquires

8  about the service array that's offered

9  within a comprehensive school mental

10  health system, the staffing and the data

11  infrastructure that exists in a school

12  mental health system.

13        Q.    When was the SHAPE profile

14  first released?

15        A.    I honestly don't know the

16  date.  I'd have to look.  I don't -- I

17  don't know the specific date and not even

18  the year.  I don't know that I can say

19  what year it was.

20            I'd have to go back to see

21  what the date was for it.

22        Q.    Has it been revised or

23  amended over time since it was first

24  released?

CONFIDENTIAL

Page 561

1          A.    The SHAPE profile, I
2    honestly would have to go back to look to
3    see if it's been revised since its --
4    since we first developed it.
5          Q.    What was your role in the
6    development of the SHAPE profile?
7          A.    I was one of the
8    contributors to it.  It was a team effort
9    at the National Center for School Mental
10   Health.
11         Q.    And who at the National
12   Center for School Mental Health had to
13   approve the SHAPE profile before it was
14   issued as a recommendation that school
15   districts or school administrators use it
16   as an assessment of their mental health
17   system?
18         A.    So I think I probably would
19   respond -- or phrase it a bit
20   differently.
21              It wasn't necessarily an
22   approval process.  It was, you know, a
23   collaborative development process of an
24   instrument that was used.  And I couldn't

Page 562

1  name for you every person at the center
2  who was involved in that co-development
3  process.
4        Q.    Your reports cite SHAPE
5  profiles for the six school districts in
6  this case, correct?
7        A.    Yes.
8        Q.    And are those SHAPE profiles
9  that the school districts had filled out
10 separate from this case or as part of
11 your engagement?
12        A.    As part of my engagement
13 with this case.
14        Q.    And do you know who at each
15 of the school districts filled out the
16 SHAPE profile?
17        A.    I do not know specifically
18 who filled out the SHAPE profile for each
19 of the districts.
20             What we recommend is that
21 it's filled out by leadership within the
22 school district that has the most
23 knowledge about the different dimensions
24 that are being asked about; so in this

CONFIDENTIAL

Page 563

1    case, staffing, services and the data

2    infrastructure.

3                   So sometimes it might be

4    filled out by one leader, if they have

5    the most knowledge about that; sometimes

6    it's a collective effort at the district.

7            Q.    Did you make any tweaks or

8    additions to the SHAPE profile that you

9    asked the school -- six school districts

10   to fill out?

11           A.    No, I don't recall doing

12   that.

13           Q.    Did you not make any changes

14   because you thought the SHAPE profile was

15   an appropriate vehicle for assessing the

16   school district's mental health system?

17           A.    I didn't make any changes,

18   in part, because I was asked to follow

19   standard practice, right. So I was -- I

20   know my understanding is that when

21   engaging with the school districts, I

22   would be following the standard practice

23   to understand their school mental health

24   system.

CONFIDENTIAL

Page 564

1              So it is a common tool that
2    we use.  It does get at many of the
3    domains that are -- that were important
4    to informing my opinions in this case.
5              So I thought it would be a
6    helpful tool to get a snapshot, a look at
7    what their service array, their staffing
8    and their data systems were.
9              ATTORNEY KEYES:  Vince, can
10        you display Tab 36, which we'll
11        mark as Exhibit-30?
12                  -   -   -
13         (Whereupon, Exhibit
14        Hoover-30, No Bates, SHAPE
15        District Profile, School Mental
16        Health Profile?District Version,
17        was marked for identification.)
18                  -   -   -
19    BY ATTORNEY KEYES:
20        Q.    Do you see that on your
21    screen --
22        A.    I do.
23        Q.    -- Dr. Hoover?
24              ATTORNEY KEYES:  And, Vince,

CONFIDENTIAL

1          if you can just scroll through so
2          she can see the document in its
3          entirety.
4     BY ATTORNEY KEYES:
5          Q.    Does that look like the
6     SHAPE profile that you've used in the
7     past and you used in this case?
8               ATTORNEY YEATES:  Object to
9          the form.
10              THE WITNESS:  It does.
11              ATTORNEY KEYES:  Can you go
12         to Section 2, Vince?
13    BY ATTORNEY KEYES:
14         Q.    Section 2 is on staffing,
15    correct?
16         A.    Yes, correct.
17         Q.    And it lists a variety of
18    team members and asks the school district
19    to identify whether someone holds that
20    position; if so, whether they are
21    employed by the school or employed by the
22    community, correct?
23         A.    Yes.
24         Q.    Okay.  Does this SHAPE

CONFIDENTIAL

Page 566

1  profile include a district director of

2  digital safety position?

3          A.    You have to scroll down

4  through the whole list for me to look at.

5  If you have a hard copy, I'm happy to

6  look at that also.

7                Sorry to make whoever is

8  scrolling go up and down.  But I just

9  want to -- I think there's a second page

10 here.

11               It includes a category for

12 other, but it does not specifically have

13 a category for that, no.

14         Q.    Does this SHAPE profile

15 include a district director of digital

16 literacy?

17         A.    No.

18         Q.    Does this SHAPE profile

19 include a district director of life

20 skills education?

21         A.    No, not that -- I'm trying

22 to remember what was on the first tab

23 now.

24               But no.

CONFIDENTIAL

Page 567

```
 1          Q.    Does this SHAPE profile
 2    include a district director of mental
 3    health literacy?
 4          A.    No, not in -- not in this
 5    profile.
 6                Thank you whoever did that.
 7    Now I can see both tabs.
 8          Q.    Does this SHAPE profile
 9    include a district director of student
10    mental health?
11          A.    No.
12                I mean, it doesn't surprise
13    me that it doesn't include any of these,
14    because there's often district-level
15    positions that are not reflected in -- in
16    this report.
17                This is -- you know, as I'm
18    looking at the staffing that's included
19    here, these are often school building
20    level staff.
21                But, no, to the last
22    question that you had.  No.
23          Q.    Does this SHAPE profile
24    include a district director of family
```

Page 568

1    engagement and education?

2         A.    No.   It includes what you

3    would see at the -- the school level,

4    possibly, which is family support partner

5    or family member.

6         Q.    Does this SHAPE profile

7    include an educational technology

8    specialist position?

9         A.    That would have been under

10   the other category, if included.   It's

11   not listed specifically on here.

12        Q.    Does this SHAPE profile

13   include a digital literacy specialist

14   position?

15        A.    No.

16        Q.    Does this SHAPE profile

17   include a life skills specialist

18   position?

19        A.    Sometimes school counselors

20   offer life skills or social/emotional

21   learning.   But it's not stated in that

22   way on this profile.

23        Q.    Does this SHAPE profile

24   include a mental health literacy

CONFIDENTIAL

Page 569

1    specialist?

2          A.     No.

3          Q.     Does this SHAPE profile

4    include a family engagement coordinator

5    position?

6          A.     It includes a family support

7    partner.  So it's a different title that

8    you're asking about.

9                 But, oftentimes, if you have

10   a family support partner, they would be a

11   person who is involved in family

12   engagement.

13         Q.     I've just gone through a

14   list of the positions that you are

15   recommending that each of the school

16   districts create.

17                Why doesn't the SHAPE

18   profile assessment form that the National

19   Center for School Mental Health uses

20   include any of those positions?

21         A.     Well, I think, as you're

22   well aware, the -- the harms of the

23   defendants' platforms to schools and

24   students is being increasingly understood

CONFIDENTIAL

Page 570

1    and it's a relatively, relatively, new
2    and evolving issue.
3                    So we know, having worked
4    with lots of districts and schools, who
5    they might typically have on staff.  And
6    the -- some of -- many of the positions
7    that you just spoke about that are more
8    specific to social media, which is what
9    my plan was intended to address, are
10   things that schools have not yet been
11   able to put in place because they don't
12   have the resources to do so or because
13   they're still just trying to understand
14   and navigate the impact of social media
15   on their schools and students.
16                    When we developed this
17   particular profile, our thinking would
18   have been to capture -- because you have
19   to be careful about trying to ask
20   everything under the sun of a school
21   district, right, we wanted to capture,
22   what are the typical employees or roles
23   that are part of your school mental
24   health system.

CONFIDENTIAL

Page 571

1              And, unfortunately, because
2    schools don't have the resources and
3    they're still trying to understand and
4    grapple with the impacts of social media,
5    the positions that I recommend in the
6    strategic plan are often not yet
7    available to schools because they don't
8    have the resources to actually support
9    the -- you know, address the harms that
10   they're seeing every day in their
11   schools.
12              So it doesn't surprise me
13   that those positions are not on a profile
14   that was developed a few years back,
15   because we would have been looking at,
16   what do schools typically have?
17        Q.    Did you make any
18   recommendation, at any point, to the
19   National Center for School Mental Health
20   that it revise the SHAPE profile to
21   include any of the positions that you are
22   recommending these six school districts
23   hire?
24        A.    So we have internal

CONFIDENTIAL

Page 572

1  discussions about iterations to

2  assessments.  And, again, there's kind of

3  a -- you have to be cautious about

4  constantly updating platforms, not only

5  because there's an expense, right, we

6  have limited funds, as well, to update

7  specific instruments.

8              So to my recollection, we

9  have -- we had not planned in the

10 immediate future, in part due to cost, to

11 update this.  And this was funded under a

12 specific, you know, set of funding, the

13 development of this would have been.

14             So to my knowledge, the

15 National Center doesn't have funding to

16 update.  So, again, it wouldn't surprise

17 me that we're not able to add specific

18 positions.

19             And, frankly, again, based

20 on the logic that I just talked about,

21 while I would, you know, hope that

22 schools were positioned to hire the folks

23 to address the impacts of social media,

24 the reality is they are not yet equipped

CONFIDENTIAL

Page 573

1    to do that.  They did not anticipate this

2    new external imposed harm on them.

3                So, you know, I wouldn't

4    anticipate that even if we did put that

5    there that there would be a lot of

6    response.

7                So, again, in the interest

8    of being parsimonious with the data you

9    collect from school districts, in the

10   interest of time and respecting their

11   time to fill things out, you typically

12   put the things that they're likely to

13   have.

14               If schools were somehow

15   equipped to start addressing social

16   media, then that could be something

17   that's added.  But, again, it makes sense

18   to me that the positions that are listed

19   here are the ones listed.

20          Q.    You have referenced key

21   informants and your interviews with them.

22               And you said yesterday that

23   you did not record those interviews and

24   you did not take notes of those

CONFIDENTIAL

Page 574

1    interviews, correct?

2         A.    That's incorrect.  I took

3    contemporaneous notes as I was conducting

4    the interviews, which then became part of

5    the body of each of the school district

6    reports.

7         Q.    Are you able to attribute

8    any specific quoted statement in one of

9    these reports to a particular, quote, key

10   informant?

11        A.    So part of my standard

12   practice is to take notes, including

13   direct statements made, and to not

14   attribute them to specific people, as we

15   talked about yesterday, in part, to

16   retain their individual confidentiality.

17             To balance that, I provided

18   a list of the names of the individuals

19   that were interviewed as part of the key

20   informant interviews.

21        Q.    Are you able to attribute

22   any specific quoted statement in one of

23   these reports to a particular key

24   informant?

CONFIDENTIAL

Page 575

1           ATTORNEY YEATES:  Object to
2        the form.  Asked and answered.
3           THE WITNESS:  Yes.  I think
4        in several of the reports I
5        actually cite specific statements
6        that are made as part of the
7        deposition testimony of
8        individuals who are, you know, in
9        leadership positions, of which
10        there was large overlap with the
11        people that I interviewed for the
12        key informant interviews.
13            And I used their direct
14        quotes and cited them within the
15        reports.
16  BY ATTORNEY KEYES:
17        Q.   I'm not asking about
18  deposition testimony.  I'm asking about
19  your interviews with these, quote, key
20  informants.
21            And in your reports, you
22  purport to quote key informants, based on
23  your interviews with them.
24            My question is, for those

CONFIDENTIAL

Page 576

1    quotes that purport to come from your

2    conversations with key informants, are

3    you able to attribute particular quotes

4    to particular people?

5              ATTORNEY YEATES:  Object to

6         the form.  And the use of air

7         quotes every time you say "key

8         informants."

9              THE WITNESS:  So the

10        question initially asked was

11        actually, was there anybody that

12        you had directly quoted in your

13        reports and identified them, which

14        is why I referenced the deposition

15        information.

16             But the question you just

17        asked, as I understand it, was

18        with respect to key informant

19        interviews.

20             So you're asking, I believe,

21        did I attribute those to

22        individuals?  And I think I've

23        already answered that.  But, no,

24        because it's part of my standard

CONFIDENTIAL

Page 577

1          practice not to do so.
2     BY ATTORNEY KEYES:
3          Q.    Well, you don't attribute
4     particular quotes to particular key
5     informants.
6               My question is, sitting here
7     today, are you able to attribute
8     particular quotes to particular
9     informants?
10          A.    No.   That wouldn't be part
11     of my standard practice, to go back to
12     key informant interviews where I
13     indicated that I wouldn't be tying their
14     direct statements to their names in the
15     interest of, you know, supporting a
16     comfortable key informant interview
17     process, which is very standard for
18     practice when you're conducting key
19     informant interviews.
20          Q.    When you spoke with each of
21     the key informants in these six school
22     districts, did you tell them, at the
23     beginning of the conversation, that you
24     would not be attributing particular

CONFIDENTIAL

1   statements to them?

2        A.    Yes, I believe I did.

3        Q.    And you assured them of that

4   confidentiality at the outset of these

5   interviews with key informants?

6        A.    I believe I let them know

7   that I wouldn't be tying their names to

8   specific quotes.  But yeah.

9        Q.    Okay.  And so you have no

10  record and no recollection that allows

11  you to go through, quote by quote that

12  you've attributed to key informants, and

13  identify the specific person who said

14  that --

15            ATTORNEY YEATES:  Object --

16  BY ATTORNEY KEYES:

17        Q.    -- is that fair?

18            ATTORNEY YEATES:  Object to

19        the form.

20            THE WITNESS:  I think I've

21        already answered that.

22            But I would not.  And,

23        again, this is very typical of key

24        informant practice, that you

CONFIDENTIAL

Page 579

1          interview the individuals and that

2          when you report it, you're doing

3          it in aggregate, which is exactly

4          what I did.

5               So I did it in aggregate,

6          it's not that quotes, outside of

7          the deposition testimony, are not

8          attributable to specific

9          individuals.

10              The specific individuals

11         are, however, named in terms of

12         who I interviewed.

13    BY ATTORNEY KEYES:

14              Q.    Did you estimate in any of

15    your reports how much, if your strategic

16    plan were implemented, students' use of

17    social media would decline?

18                   ATTORNEY YEATES:  Object to

19         the form.  And asked and answered.

20                   THE WITNESS:  I'm sorry, I

21         think I'm -- I was in the space of

22         key informant interviews.

23              So can you just ask that

24         again?

CONFIDENTIAL

Page 580

1    BY ATTORNEY KEYES:

2           Q.    Sure.

3           A.    Are we still talking about

4    key informant interviews?

5           Q.    No.

6           A.    Okay.

7           Q.    Did you estimate in any of

8    your reports how much, if your strategic

9    plan were implemented, students' use of

10   social media in that district would

11   decline?

12              ATTORNEY YEATES:  Object to

13         the form.

14              THE WITNESS:  So as we

15         talked about, because this is a

16         15-year plan that, you know, looks

17         into the future, of course, and

18         it's something that -- that

19         there's a built-in proposal for

20         evaluation into the future, it's

21         hard to predict exactly the extent

22         to which social media will

23         decline.

24              And so, what we did, which

CONFIDENTIAL

Page 581

1          is standard for public health
2          science, is you look to other
3          existing exemplars of similar
4          public health frameworks to
5          address issues that are harming
6          young people.
7               And within that context, I
8          describe a decrease, a substantial
9          decrease, the number, if I recall
10         correctly, over roughly a 15-year
11         period was a 73 percent decrease.
12              And so the way that, then, I
13         extrapolated that data was to say,
14         this is likely -- this is good
15         evidence that with this type of
16         public health multi-part
17         framework, you would expect a
18         steep and sustained decline.
19              Can I give you the exact
20         percentage that students' social
21         media use would decline over a
22         15-year period?  No.  That would
23         be virtually impossible in the
24         context of this type of public

CONFIDENTIAL

Page 582

1          health framework proposal.

2     BY ATTORNEY KEYES:

3          Q.    Would you turn to your June

4     20th amended expert report for Charleston

5     County School District, which we

6     previously marked as Hoover Exhibit-9.

7               ATTORNEY YEATES:  Counsel,

8          I'd like to take a break.  Is now

9          a good time?

10              ATTORNEY KEYES:  Sure.

11              ATTORNEY YEATES:  Okay.

12         Great.

13              VIDEO TECHNICIAN:  The time

14         is 11:31 a.m.  We are off the

15         record.

16                   -  -  -

17              (Whereupon, a brief recess

18         was taken.)

19                   -  -  -

20              VIDEO TECHNICIAN:  The time

21         is 11:45 a.m.  We are on the

22         record.

23    BY ATTORNEY KEYES:

24         Q.    Dr. Hoover, do you have

CONFIDENTIAL

Page 583

1  Hoover Exhibit-9 in front of you?

2          A.    I don't know that I have

3  them listed that way.  Could you just say

4  what it -- the document actually is?

5          Q.    Sure.  It's your amended

6  expert report for Charleston County

7  School District, dated June 20th, 2025.

8          A.    Yes, I have that.

9          Q.    And would you -- this is the

10 report you issued mapping out the

11 strategic plan that you recommend

12 Charleston County voluntarily implement,

13 yes?

14              ATTORNEY YEATES:  Object to

15          the form.

16              THE WITNESS:  So I just want

17          to clarify, because you're talking

18          about voluntarily implement.

19              This is a plan that I'm

20          recommending be implemented by

21          Charleston County in order to

22          address the harms of social media

23          platforms, the defendants'

24          platforms, yes.

Page 584

1             I don't know --

2     BY ATTORNEY KEYES:

3             Q.    Okay.

4             A.    I think what threw me is the

5     term "voluntarily."

6             Q.    Okay.  But the goal of the

7     strategic plan that you're recommending

8     is to address the harms of students' use

9     of social media on schools?

10            A.    So, again, part of the

11    purpose of the plan is to address the

12    broad impacts of the defendants'

13    platforms on the harms that they have

14    caused, which include schools.

15                But there are many harms

16    that I laid out in the opinions and in

17    the content of the report.

18            Q.    And what harms are you

19    attempting to mitigate through the plan,

20    separate from harms to schools?

21            A.    So as I detail in the

22    report, I'm speaking about harms to

23    students, including their mental health

24    and well-being, which intersect with

CONFIDENTIAL

Page 585

1    harms to schools, but also harms to
2    schools and the school environment.
3              So they all fall within kind
4    of what's happening in schools.  So if
5    students' mental health is harmed,
6    schools are having to deal with it.
7              So that's why I'm saying to
8    schools.  But, yes, it's kind of what's
9    also -- as students are experiencing it,
10   it's the schools who are having to
11   address it.  And that's why the plan is
12   targeting schools.
13        Q.    Okay.  If I understand you
14   correctly, you're saying that students'
15   use of social media causes them harms,
16   which harms then have a spillover effect
17   and cause harms to schools or the school
18   environment.
19              Did I get that right?
20              ATTORNEY YEATES:  Object to
21        the form.  Misstates testimony.
22   BY ATTORNEY KEYES:
23        Q.    How is that wrong?
24        A.    I don't think that's what I

CONFIDENTIAL

Page 586

1    said.

2                What I said is that the

3    strategic plan that I laid out in the

4    report is intended to address the harms

5    caused by platforms to schools, which

6    includes how students' mental health

7    impacts how they are, you know, showing

8    up in schools and the things that schools

9    have to contend with.  I can put it that

10   way.

11               So schools are having to

12   contend with many issues, including

13   disruptions to their classroom,

14   interference with class instruction,

15   having to think about technologies to put

16   in place to try to address the design

17   features that are taking away their

18   students from instruction.  They're

19   having to put mental health supports in

20   place, et cetera, et cetera.

21               So there are many things

22   that schools are having to do that I

23   would say kind of fall within the

24   umbrella of harms that I talk about in

Page 587

1    much more detail in the report.

2         Q.    You say in your report for

3    each of the six school districts that,

4    The strategic plan is to prevent and

5    mitigate the negative impact of social

6    media on the school district, its

7    schools, the school environment, student

8    learning and mental health.

9              Did I get that right?

10        A.    Can you refer me to the

11   page?

12        Q.    Sure.  Paragraph 9 on Page 3

13   of your report.

14        A.    Page 3 of the report,

15   Paragraph 9.  So is this Opinion 6?

16             I just want to make sure

17   we're looking at the same thing.

18   Paragraph 9, Opinion 6?

19        Q.    That's what it says.

20        A.    Okay.

21        Q.    So do you agree that in your

22   report you say that for each of the six

23   school districts, The strategic plan is

24   to prevent and mitigate the negative

CONFIDENTIAL

Page 588

1    impact of social media on Charleston
2    County School District, its schools, the
3    school environment, student learning and
4    mental health?
5                    ATTORNEY YEATES:  Object to
6            the form.
7                    THE WITNESS:  So I think you
8            asked me does it say that in every
9            school district report.  And the
10           answer would be no, because I'm
11           looking at Charleston County
12           School District report.
13                   So in this school district
14           report for Charleston County, it
15           talks about that.  It says,
16           Prevent and mitigate the negative
17           impact of social media on
18           Charleston County School District,
19           its schools, the school
20           environment, student learning and
21           mental health.
22   BY ATTORNEY KEYES:
23           Q.    Okay.  Maybe we're having a
24   nomenclature issue.

CONFIDENTIAL

Page 589

1          A.      Okay.

2          Q.      You have six separate

3    reports, one for each school district.

4                And the goal of each of

5    those reports is to lay out a strategic

6    plan for a particular school district?

7          A.      So the -- part of the goal

8    of the report for each of the six school

9    districts is to detail a

10   district-specific strategic plan that

11   prevents and mitigates the harms of the

12   defendants' platforms.  That's --

13         Q.      Okay.  Then if you'd go to

14   Page 23 of the same report.

15         A.      Okay.

16         Q.      One component of your

17   strategic plan for Charleston is new

18   staffing, correct?

19         A.      That's correct.

20         Q.      And you also have a

21   component of new staffing in your

22   strategic plan for each of the other five

23   school districts, correct?

24         A.      I do.

CONFIDENTIAL

Page 590

1          Q.    Another component of your
2   strategic plan for Charleston is
3   training?
4          A.    I call it professional
5   development.  And that's part of the plan
6   for Charleston, yes.
7          Q.    And you also have a
8   component of professional development in
9   your strategic plan for each of the other
10  five school districts, correct?
11         A.    I do have professional
12  development as part of the other five
13  school district plans.
14         Q.    And another component of
15  your strategic plan for Charleston is
16  data systems?
17         A.    That's correct.  I do have a
18  component of the plan that's to build and
19  sustain a data system to address the
20  harms, that's correct.
21         Q.    And you also have a
22  component of data systems in your
23  strategic plan for each of the other five
24  school districts, correct?

CONFIDENTIAL

Page 591

1          A.    Yes.  I have -- I have a
2     data system proposed in each of the five
3     other district plans.
4          Q.    Okay.  Focusing first on the
5     strategic plan for Charleston, on
6     Page 23, you identify the hiring that you
7     are recommending Charleston undertake as
8     part of the strategic plan, correct?
9          A.    Yes.
10          Q.    And you are recommending
11    that Charleston hire six district staff;
12    a director of digital safety, a director
13    of digital literacy, a director of life
14    skills education, a director of mental
15    health literacy, a director of student
16    mental health and a director of family
17    engagement and education, correct?
18          A.    That's correct.
19          Q.    You also recommend in the
20    strategic plan for each of the five other
21    school districts hiring the same six
22    positions at the district level?
23          A.    So they would be specific to
24    their -- to each of the other districts.

CONFIDENTIAL

Page 592

1              But one of the things that
2    we know, having done this work for a long
3    time with districts, is that it's really
4    essential to have district-level
5    leadership in positions where you are
6    creating new supports in the schools.
7              So it makes sense that these
8    positions would be both -- or in
9    Charleston as well as proposed in the
10   other five districts.
11             So these same positions --
12   position titles, I should say, are
13   recommended across the district reports.
14   That's correct.
15        Q.    Okay.  My question was a yes
16   or no.
17             You also recommend in the
18   strategic plan for each of the five other
19   school districts hiring the same six
20   positions at the district level?
21             ATTORNEY YEATES:  Object to
22        the form.
23   BY ATTORNEY KEYES:
24        Q.    The answer is correct,

CONFIDENTIAL

Page 593

```
 1  right?
 2                  ATTORNEY YEATES:  Object to
 3          the form.  Asked and answered.
 4                  THE WITNESS:  So I'm giving
 5          context, because you're saying the
 6          same positions.
 7                  It's the same position
 8          titles in each of the six
 9          districts.
10  BY ATTORNEY KEYES:
11          Q.    Okay.  Then in addition to
12  the positions that you recommend the
13  district create at the district level,
14  you also recommend hiring positions at
15  the school level, correct?
16          A.    In Charleston?  Or are you
17  asking about all --
18          Q.    Yes.
19          A.    -- six districts?
20          Q.    In Charleston.
21          A.    Yes.
22          Q.    And you also do the same
23  thing for the other five school
24  districts?
```

CONFIDENTIAL

Page 594

1          A.     Yes.
2          Q.     Okay.  And there are some
3    positions that you suggest the school
4    district hire one per school, right?
5          A.     Yes.
6          Q.     Specifically, you recommend
7    in your strategic plan for each of the
8    six school districts that they hire one
9    IT staff for educational technology
10   specialist per school?
11         A.     Yes.
12         Q.     You recommend in your
13   strategic plan for each of the school
14   districts that they hire one life skills
15   specialist per school?
16         A.     Yes.
17                ATTORNEY YEATES:  Object to
18         the form.
19                THE WITNESS:  Yes.
20   BY ATTORNEY KEYES:
21         Q.     You recommend in your
22   strategic plan for each of the six school
23   districts that they hire one family
24   engagement coordinator per school?

Page 595

1          A.    Yes.

2          Q.    You recommend in your

3    strategic plan for each of the six school

4    districts that they hire one peer

5    coordinator per school?

6          A.    Yes.

7          Q.    You recommend in your

8    strategic plan for each of the six school

9    districts that they hire one crisis

10   intervention specialist per school?

11         A.    Yes.

12         Q.    Okay.  And then for

13   Charleston you recommend that it hire, as

14   part of your strategic plan, certain

15   positions where the number of positions

16   is based on the number of students,

17   correct?

18         A.    Yes.

19         Q.    And you do the same thing

20   for the five other school districts?

21         A.    Yes.

22         Q.    And for each of the six

23   school districts, you recommend that the

24   school district hire a digital literacy

CONFIDENTIAL

Page 596

1    specialist for every 500 students in the

2    district?

3              A.    Yes.

4              Q.    And for each of the school

5    districts, you recommend that the school

6    district hire a mental health literacy

7    specialist position for every 500

8    students in the district?

9              A.    Yes.

10             Q.    And you -- for each of the

11   school districts, you recommend that the

12   school district hire a school-based

13   mental health clinician for every 500

14   students in the district?

15             A.    Yes.

16             Q.    And for each of the school

17   districts, you recommend that the school

18   district hire a school psychologist for

19   every 500 students in the district?

20             A.    Yes.

21             Q.    And then there are other

22   positions where, for each of the school

23   districts, you've recommended that the

24   school district hire a position for every

CONFIDENTIAL

Page 597

1    250 students, correct?

2             A.    I see one position where

3    it's per 250 students, yes.

4             Q.    And what position is that?

5             A.    The school counselor

6    position.

7             Q.    Okay.  And so for each of

8    the six school districts, you've

9    recommended that the school district hire

10   one school counselor for every 250

11   students in the district?

12            A.    Yes.

13            Q.    And then you have

14   recommended that each school district, as

15   part of your recommended strategic plan,

16   hire one school-based therapist for every

17   750 students?

18            A.    Yes.

19            Q.    So other than the number of

20   schools or the number of students in one

21   of these six districts changing, have you

22   made any different recommendations across

23   your strategic plans for these six school

24   districts?

CONFIDENTIAL

Page 598

1          ATTORNEY YEATES:  Object to
2     the form.
3          THE WITNESS:  So yes.  What
4     professional development looks
5     like, based on whether they have a
6     certain number of elementary,
7     middle or high school students,
8     and the number of people who would
9     be trained and the corresponding
10    number of hours that new staff
11    would be trained would vary across
12    the school districts.
13         And as would be expected,
14    when you're offering a strategic
15    plan, you want it to be based in
16    best practice and have some
17    consistency, in terms of drawing
18    on best practice programs and best
19    practices related to staffing.
20         So there's some consistency
21    across districts, as you would
22    hope for when you're designing a
23    plan based on evidence-based
24    practices.

CONFIDENTIAL

Page 599

1   BY ATTORNEY KEYES:

2          Q.    Okay.  With respect to the

3   staffing recommendations that you're

4   making in these six strategic plans, do

5   your recommendations regarding staffing

6   vary from school district to school

7   district?

8                  ATTORNEY YEATES:  Object to

9          the form.

10                 THE WITNESS:  So the

11         recommendations do vary with

12         respect to the number of people to

13         be hired, based on the number of

14         students in the school district

15         and the types of schools, whether

16         it be elementary, middle or high

17         school.

18  BY ATTORNEY KEYES:

19         Q.    Okay.  So the only variation

20  in the number of staff that you're

21  recommending be hired by each school

22  district is based on how many schools

23  they have or the size of their student

24  population; but, otherwise, your staffing

CONFIDENTIAL

Page 600

1    recommendations are consistent across the

2    strategic plans?

3                   ATTORNEY YEATES:   Object to

4         the form.

5                   THE WITNESS:   So the

6         staffing recommendations based on

7         the ratios are consistent across

8         the districts.   Because they are

9         based on the same principles of

10        what it would take to actually

11        remedy -- or address, would

12        probably be the better term,

13        address, you know, prevent and

14        mitigate the harms of social

15        media.

16                  So you're drawing on the

17        same logic for staffing across

18        districts.   The number of folks

19        would depend on the students.

20                  And this is very typical.

21        When you're thinking about

22        staffing up a program for a

23        certain intervention, you look to

24        the student body, the number of

CONFIDENTIAL

Page 601

1    students that you have, to
2    determine what staffing would be
3    needed, for example, to do
4    curriculum; so number of teachers
5    may be based on how many students
6    you have in a district, the number
7    of school psychologists might be
8    based on that as well.
9        So that consistency across
10   districts is not only to be
11   expected that would be, you know,
12   what you do to draw on best
13   practices.
14 BY ATTORNEY KEYES:
15   Q.    How many school districts in
16 the country have a district director of
17 digital safety?
18   A.    I could not tell you how
19 many districts across the country have a
20 director of digital safety.
21   Q.    How many school districts in
22 the country have a district director of
23 digital literacy?
24   A.    Again, to my point earlier,

CONFIDENTIAL

Page 602

1  some of these roles are more newly being
2  developed because of the impacts of
3  social media being newer.  So I would not
4  be surprised if they don't yet have them.
5           But I don't have the exact
6  number, if you're asking me, across, you
7  know, the -- the tens of thousands of
8  schools across the country how many have
9  that.  I don't know.
10      Q.    How many school districts in
11 the country have a district director of
12 life skills education?
13      A.    I would not know that.  In
14 fact, I don't think the data would exist
15 in one place.  And I don't know how many
16 have a director of life skills.
17      Q.    How many school districts in
18 the country have a district director of
19 mental health literacy?
20      A.    I don't know.
21      Q.    How many school districts in
22 the country have a district director of
23 student mental health?
24      A.    So, again, I don't have a

CONFIDENTIAL

Page 603

1    specific number there.

2              But what I can say is that

3    many districts have district-level

4    leadership around mental health.

5              What I'm calling for in the

6    plan is specific to mental health issues

7    that arise related to social media.  So

8    because school systems are often not

9    resourced to do that, I would be

10   surprised to find that many had them.

11        Q.    How many school districts in

12   the country have a district director of

13   family engagement and education?

14        A.    Again, I couldn't give you

15   an exact number.  I'm not sure who could

16   give you an exact number of that.

17              But what I can tell you is

18   that there are a number of districts who

19   hire -- they may call them family support

20   specialists or family engagement

21   specialist or family liaisons.

22              That's different than the

23   district director role that I'm -- that I

24   talk about in my strategic plans, which

CONFIDENTIAL

Page 604

1  focuses on a family -- a district

2  director of family engagement specific to

3  the harms of social media.

4        Q.    When advocating that these

5  six school districts hire a district

6  director of digital safety, did you look

7  to any model and borrow that position

8  from another model?

9              ATTORNEY YEATES:  Object to

10        the form.

11             THE WITNESS:  So the general

12        answer is yes.  Because, again --

13        so, you know, I've worked in

14        developing multi-tiered systems of

15        supports for schools for two

16        decades-plus.

17             And the -- when you look to

18        the implementation science around

19        how to actually implement

20        multi-tiered systems of support,

21        consistently across the

22        literature, it documents that

23        those types of kind of

24        comprehensive school mental health

CONFIDENTIAL

Page 605

1          systems are more successful when

2          you hire and utilize

3          district-level supports.

4               So if you're recommending a

5          certain body of work, let's say a

6          new mental health area, the

7          science would say it's important

8          that if you're going to try to do

9          this across schools, you need to

10         hire someone at the district.

11              One framework that comes to

12         mind for that would be the

13         positive behavior interventions

14         and supports, where they

15         consistently document, and, in

16         fact, start with, the

17         district-level leadership in order

18         to support the school-level

19         leadership.

20              So those are the frameworks

21         that I would have based that on.

22    BY ATTORNEY KEYES:

23         Q.    Can you identify any

24    specific districts that have the staffing

CONFIDENTIAL

Page 606

1  plan that you are advocating these six

2  school districts adopt?

3            ATTORNEY YEATES:  Object to

4       the form.

5            THE WITNESS:  So I would be

6       surprised, given the resource

7       constraints of schools and the

8       relatively new and evolving harms

9       to social -- of social media and

10      the defendants' platforms on young

11      people and on schools, if they

12      have yet staffed up this.

13           Again, this plan is really

14      looking, you know, holistically at

15      what are schools experiencing as a

16      result of the platforms and what

17      would be best practices to address

18      those harms?

19           So, unfortunately, schools

20      really haven't had the luxury of

21      putting that in place.  They are

22      trying their best, as you see

23      throughout the testimony of all of

24      the school folks, they are trying

CONFIDENTIAL

Page 607

```
1           their best to address the harms.
2           They are putting certain pieces in
3           place and plugging certain holes.
4                  But, again, it wouldn't
5           surprise me that this particular
6           district staffing model, which is,
7           really, what would -- what would
8           need to be in place to address the
9           harms, if you don't see that in
10          districts.
11    BY ATTORNEY KEYES:
12          Q.    Can you identify any
13    specific districts that have the staffing
14    plan that you are advocating these six
15    school districts adopt?
16          A.    No.
17                ATTORNEY YEATES:  Object to
18          the form.  And asked and answered.
19    BY ATTORNEY KEYES:
20          Q.    You say in your report that
21    the position of district director of
22    student mental health should have social
23    media expertise.
24          A.    Are you asking me that?
```

Page 608

1          Q.     Well, I'm -- I'm referring
2     you to that.
3          A.     Okay.
4          Q.     What do you --
5          A.     Yes.  I see it.
6          Q.     -- mean when you say that
7     position should have, quote, social media
8     expertise?
9          A.     So in my plan, I lay out
10    pretty comprehensively -- I'm happy to
11    read it, but I won't belabor it, unless
12    you'd like me to -- the school mental
13    health -- or the mental health
14    competencies that a team would need to
15    have in a school to address the harms of
16    social media.
17              And the district-level
18    person would, as is laid out in the
19    professional development plan, need to be
20    able to oversee not only the professional
21    development but also the implementation
22    of those specific competencies.
23              So that would include things
24    like -- I won't give you an exhaustive

CONFIDENTIAL

Page 609

1   list, it's in the -- a list of those

2   competencies is in the report.

3           But it would include things

4   like being able to screen for the impacts

5   of social media harm on young people,

6   being able to support students who are

7   experiencing impairment in their mental

8   health functioning.

9           Those are a couple of the

10  ones that are listed.

11      Q.    Is there any specific degree

12  or certification that demonstrates

13  someone has, quote, social media

14  expertise, end quote, as you use the

15  term?

16      A.    So this person would likely

17  be a licensed certified mental health

18  professional.  And there's various

19  degrees that would fall under that,

20  right.  So that could be a psychology

21  degree, a social work degree, a

22  counseling degree, a licensed marriage

23  family therapist.

24          Those are often people who

CONFIDENTIAL

Page 610

1  work in schools to support student mental

2  health.

3            The field, to my

4  understanding, has not yet developed a

5  certificate for social media expertise,

6  which is -- when that's the case, you

7  often lay out the competencies that would

8  be necessary for someone to demonstrate

9  that expertise, which is what I did in

10 the plan.

11        Q.    So how would a school

12 district, under your plan, evaluate

13 whether someone applying for the position

14 has, quote, social media expertise, as

15 you use the term?

16        A.    So I'm happy to turn to the

17 list of competencies.

18            But, first of all, there

19 would not necessarily be the expectation

20 that they would be hired with all of the

21 expertise, which is why there is a

22 professional development plan in place.

23            And part of that is having

24 district-level leaders who would be newly

CONFIDENTIAL

Page 611

1   hired engage in professional development
2   on those topics.
3               But as we would do when we
4   hire school mental health clinicians,
5   just as you would do if you hire a
6   district-level leader position, you would
7   go through the competencies.
8               And I imagine during the
9   interview process you would be asking
10  about that and their experience with that
11  and also areas where they might need
12  additional professional development.
13              Given that the mental health
14  impacts of social media platform
15  engagement for students is a relatively
16  new area, there may be some new training
17  that needs to happen for those staff.
18              And that would not be
19  unprecedented.  That's what you do when,
20  you know, there's a new harm to students.
21  So it would have been done, for example,
22  when students started using tobacco, when
23  they started using specific types of
24  substances.  New trainings are developed,

CONFIDENTIAL

Page 612

1  new competencies are developed.

2          It doesn't mean that

3  overnight there's a certificate or a

4  license for that competency or that area

5  of expertise.  But the field evolves to

6  develop those competencies.

7          Q.    Can you identify for me any

8  professional organization that recommends

9  that school districts hire the six

10  district-level positions you're

11 advocating for?

12             ATTORNEY YEATES:  Object to

13         the form.

14             THE WITNESS:  I don't know

15         that I can point to one

16         professional organization that

17         recommends all six positions.

18             There are professional

19         organizations that recommend

20         hiring of different competency

21         areas, like life skills or

22         social/emotional learning or

23         digital literacy.

24 BY ATTORNEY KEYES:

Page 613

1        Q.    What are those
2   organizations?
3        A.    So, for example, for life
4   skills, you have the Collaborative For
5   Academic and Social Emotional Learning.
6   That's probably the go-to national
7   resource for social emotional learning.
8   They work with districts all across the
9   country to support social emotional
10  learning, sometimes called life skills.
11  I chose life skills because it's often a
12  more accepted term.
13            But that's a national
14  organization that would recommend life
15  skills professionals in each school that
16  can support that instruction for
17  students.
18            I'd have to go back to my
19  report to look at the national body
20  around digital literacy, if you're
21  looking for the exact name.
22        Q.    Okay.  Can you name any
23  other professional organization that
24  recommends hiring of the positions that

Page 614

1  you've recommended these school districts

2  hire?

3       A.    Sure.  So with respect to a

4  director of student mental health, for

5  example, or school mental health, if you

6  look to the mental health organizations,

7  like the National Association of School

8  Psychologists, the School Social Workers

9  of America, the American School

10  Counseling Association, they recommend

11  district-level leadership to support

12  school mental health.

13            Again, I think most of, if

14  not all of, those organizations are still

15  navigating how to address and staff this

16  new area of social media harms on

17  students.

18            So do they recommend

19  district-level leadership for school

20  mental health?  Yes.

21       Q.    Would the six district-level

22  positions that you're advocating be

23  created only do work relating to

24  defendants' platforms?

Page 615

1              ATTORNEY YEATES:  Object to
2         the form.
3              THE WITNESS:  So what I
4         recommended in the plan is that
5         the positions are overseeing the
6         work related to the harms caused
7         by defendants' platforms.
8              That work involves a wide
9         area of topics, including life
10        skills, digital literacy, mental
11        health literacy.  Those are
12        specific to the harms of the
13        defendants' platforms.  That's
14        what I was instructed to do.
15   BY ATTORNEY KEYES:
16        Q.    Instructed by whom?
17        A.    By myself.  I mean, I'm
18   saying instructed to do.  That's kind of
19   what I see as, like, my role in this, is
20   to develop a plan.  And so --
21        Q.    Okay.  So would the
22   district-level positions that you're
23   advocating these six school districts
24   create provide services to students who

Page 616

1  had not used defendants' platforms?

2          ATTORNEY YEATES:  Object to

3      the form.

4          THE WITNESS:  So you're

5      asking would these positions have

6      anything to do with students who

7      might not have yet engaged with

8      the defendants' platforms?

9  BY ATTORNEY KEYES:

10         Q.    Yes.

11             Would they provide services

12 that would be received by students who

13 had not used the defendants' platforms?

14         A.    Okay.  So what I laid out

15 included, as I've said, a multi-tiered

16 system of support, which is based on a

17 public health framework which includes

18 prevention.

19             And so especially for our

20 younger kids, let's say our kindergarten,

21 first grade students, who may not yet --

22 although they certainly may have, but may

23 not yet -- have had direct exposure or be

24 personally using a defendants' platform,

CONFIDENTIAL

Page 617

1  they would still be a part of receiving

2  support from those professionals because

3  they would be, for example, receiving the

4  skills for how to navigate the impacts on

5  the schools and also potential mental

6  health impacts for exposure.

7            Given how many young people,

8  even at the elementary age, do start

9  using, you want to start prevention

10  early.

11            Just like most

12  kindergarteners are not perhaps smoking

13  cigarettes, but you still start substance

14  abuse prevention early with them just to

15  help them gain the skills so they know

16  how to navigate it.

17            And there are other skills

18  that are within, you know, the

19  programming that I offer that would be

20  quite relevant to preparing students to

21  not only engage with social media, if

22  they do so, but also to be learning in

23  environments where there's disruptions

24  related to social media.

Page 618

1            So even if a young person is
2    not experiencing it themselves, they may
3    be impacted by the harm in their school,
4    if that makes sense.
5            Q.    Okay.  Separate from the
6    education or prevention component of your
7    plan, with respect to the remainder of
8    your plan that is providing services to
9    students, would students who have never
10   used defendants' platforms be eligible
11   for those services?
12                ATTORNEY YEATES:  Object to
13        the form.
14                THE WITNESS:  So it's hard
15        for me to say what the eligibility
16        criteria would be for the
17        services, first of all.
18                But can I imagine, since
19        you're asking me to, you know,
20        kind of think about implementation
21        of the specific plan, can I
22        imagine students who may have not
23        engaged with a social media
24        platform still benefiting from the

CONFIDENTIAL

Page 619

```
 1          services because they had been
 2          harmed by or impacted by exposure
 3          of other students?  Yes.
 4               So if a student is in a
 5          classroom where they are trying to
 6          learn and the teacher is spending
 7          a third of their time trying to
 8          re-engage students who are
 9          disengaged, that impacts other
10          students.  They may suffer, their
11          academics may suffer, they may
12          seek the support of a school
13          counselor.  In that case, sure.
14   BY ATTORNEY KEYES:
15          Q.   Okay.  So you do envision
16   the services, besides education being
17   provided under your strategic plan, being
18   available to students who have never used
19   defendants' platforms?
20                    ATTORNEY YEATES:  Object to
21          the form.
22                    THE WITNESS:  I think I've
23          already answered that services --
24          the plan is intended to address
```

CONFIDENTIAL

Page 620

1          the -- to prevent and mitigate

2          harms.

3                Harms include disruptions to

4          the classroom, mental health harms

5          to students, just, you know,

6          problems in the classroom

7          environment and in the school

8          climate.

9                Those impact the broader

10         swath of students, not just those

11         who are immediately engaged, but

12         also other students in the school

13         building.

14               So you would hope that any

15         plan to mitigate the harms that

16         impact the entire -- or at least a

17         substantial part of a student

18         population would engage students

19         who may be suffering as a result.

20               So I would hate to see, you

21         know, criteria be only for a

22         student who happened to be on a

23         platform at a particular time.

24         Because other students may also be

CONFIDENTIAL

Page 621

1          feeling the impact of student
2          engagement and how that impacts
3          the schools.
4    BY ATTORNEY KEYES:
5          Q.    So under the plan that
6    you're recommending these six school
7    districts adopt, the staffing that is
8    created by your plan would be available
9    to services who have never used
10   defendants' platforms, yes?
11              ATTORNEY YEATES:  Object to
12         the form.  And asked and answered.
13              THE WITNESS:  So what I said
14         is --
15   BY ATTORNEY KEYES:
16         Q.    I didn't ask under -- under
17   what circumstances.
18              I asked you to confirm that
19   the staffing that is created by your plan
20   would be available to provide services to
21   students who never used defendants'
22   platforms?
23              ATTORNEY YEATES:  Please do
24         not cut off the witness.  Let her

CONFIDENTIAL

Page 622

1              answer the question.
2                    ATTORNEY KEYES:  Well, I
3              want her to answer my question and
4              not give me another speech.
5              Because we have limited time.
6                    ATTORNEY YEATES:  Objection.
7              Argumentative.
8                    THE WITNESS:  So the
9              services that would be available
10             to students under this plan would
11             be for students who are
12             experiencing harm related to the
13             platforms.
14                    That doesn't necessitate
15             that they would have used the
16             defendants' platform directly
17             themselves, because we see harm to
18             other students who are in a school
19             building that's impacted by the
20             defendants' platforms.
21   BY ATTORNEY KEYES:
22             Q.   Okay.  And I'm not asking
23   for your rationale on whether it's
24   appropriate or not.

CONFIDENTIAL

Page 623

1            I just want you to confirm

2    for me that students could get the

3    benefit of services provided under these

4    new staffing positions even if they had

5    never used defendants' platforms.

6            Is that correct?

7            ATTORNEY YEATES:  I object

8        to the form.  And asked and

9        answered multiple times.

10            THE WITNESS:  I think I've

11        said that that's -- that, yes,

12        students who may not have used the

13        platforms could still benefit from

14        services that are offered to

15        address the harms, because the

16        harms are not exclusive to those

17        students who may have used the

18        platforms.

19            They pervade the school.

20        They pervade peer relationships.

21        They pervade learning across the

22        board.  And there's a prevention

23        mechanism as well.

24            So for all of those reasons,

CONFIDENTIAL

Page 624

1          it would be essential to put

2          services in place for those

3          students who may not have yet used

4          a platform directly themselves.

5    BY ATTORNEY KEYES:

6          Q.    And that would include

7    students who have never used social media

8    at all?

9              ATTORNEY YEATES:  Object to

10         the form.  Asked and answered.

11              THE WITNESS:  So the plan

12         itself is for the entire school,

13         which includes universal

14         interventions for all students in

15         the school, including things like

16         digital literacy, mental health

17         literacy, life skills, so that

18         they can navigate a learning

19         landscape that is negatively

20         impacted by the defendants'

21         platforms.

22    BY ATTORNEY KEYES:

23         Q.    And that would include

24    students who have never claimed to be

Page 625

1  addicted to defendants' platforms or

2  social media?

3                 ATTORNEY YEATES:  Object to

4         the form.

5  BY ATTORNEY KEYES:

6         Q.    You can laugh all you want.

7  I'm trying to understand the parameters

8  of your plan.  So I --

9         A.    No, I'm laughing --

10         Q.    -- appreciate the respect of

11  just answering the question.

12         A.    I'm absolutely intending to

13  answer the question.  I'm laughing

14  because of my daily experience with

15  students.

16                 So I'm imagining students,

17  you know, and kind of how they talk about

18  themselves and their engagement to social

19  media.  I'm not laughing at you nor the

20  question.

21                 ATTORNEY YEATES:  I object

22         to the form.  And argumentative.

23                 THE WITNESS:  So forgive me

24         for the distraction there.

CONFIDENTIAL

Page 626

```
1              But can you repeat the
2         question?
3    BY ATTORNEY KEYES:
4         Q.    Yeah.
5              I want you to confirm that
6    students could get the benefit of
7    services provided under these new
8    staffing positions even if they had never
9    claimed to be addicted to defendants'
10   platforms or social media?
11             ATTORNEY YEATES:  Object to
12        the form.
13             THE WITNESS:  So, again,
14        it's a broad question.
15             But could a student who had
16        never claimed to be addicted to
17        social media platforms or the
18        defendants' platforms benefit from
19        some of the services in the plan?
20        Of course.  You would hope so.
21   BY ATTORNEY KEYES:
22        Q.    And they would be eligible
23   for the services you've outlined?
24             ATTORNEY YEATES:  Object to
```

CONFIDENTIAL

Page 627

1    the form.

2           THE WITNESS:  Again,

3    eligibility for the services is

4    often defined upon implementation.

5           So, you know, these are --

6    part of the plan is -- you know,

7    it's tailored at the district

8    level and districts would

9    determine specific eligibility,

10   perhaps.

11          But inherent in the plan is

12   that students who may not have

13   been exposed to or may not be

14   saying that they're addicted to

15   social media could engage in the

16   services.

17          But, again, there's a

18   variety of services that are

19   offered here, including things

20   like restorative practices after

21   conflict that may erupt in

22   relation to social media, which

23   often involves many students,

24   whether they're on social media,

CONFIDENTIAL

Page 628

1          not on social media, saying
2          they're addicted to social media
3          or not.
4               The services themselves
5          could apply to students who, you
6          know, don't meet the criteria that
7          you're laying out here.
8     BY ATTORNEY KEYES:
9          Q.   Okay.  So students would be
10    eligible to receive non-education
11    services from the various positions that
12    you're recommending without having to
13    make a showing of some sort that they
14    have a need connected to social media?
15               You're intending to benefit
16    the entire student population?
17               ATTORNEY YEATES:  Object to
18          the form.  And misstates
19          testimony.
20               THE WITNESS:  So there's a
21          few parts of how you said that
22          that I wouldn't be -- I think
23          you're asking me to agree with
24          something.  And I would not agree

CONFIDENTIAL

Page 629

1          with it.

2                  First of all, I think you

3          called the services

4          non-educational?

5    BY ATTORNEY KEYES:

6          Q.    I'm asking about the

7    component of your plan that is not

8    education, that is actually providing

9    services to individual students.

10         A.    That's what I --

11         Q.    And I want to -- I want to

12   understand, are those services available

13   to anyone or do students need to make

14   some kind of showing that they have some

15   kind of need that relates to social

16   media?

17                ATTORNEY YEATES:  Object to

18         the form.

19                THE WITNESS:  So I'm going

20         to address the first part of how

21         you phrased the question, because

22         I just want to make it clear that

23         I would not describe the services

24         here as non-educational.

CONFIDENTIAL

Page 630

1           When we talk about even
2       mental health services that happen
3       in schools, they are directly
4       related to a student's education
5       and their learning.  It's -- you
6       know, part of the primary role of
7       child development is to engage in
8       a school setting.
9           And so I just -- I would
10      just, you know, kind of not want
11      to say, yes, I agree,
12      non-educational, right, because
13      they are educational services in
14      the way that we think about them.
15          Would a -- the second part
16      of your question, I think, was
17      more about would a student have to
18      show something related to social
19      media to be eligible.
20          So the positions and the
21      services are specific to the
22      impact of social media.  And so
23      they would be, in some way, for
24      some of the services -- I'm

Page 631

1          thinking through the list of
2          services that we have.
3                    For some of them, they would
4          be specific to social media.  So a
5          student might indicate that they
6          were harmed by social media, for
7          example, or someone referring them
8          might.
9                    But there are other services
10         within the plan where -- for
11         example, a prevention service,
12         where they're learning skills to
13         navigate a social media landscape
14         or a learning environment where
15         they wouldn't have to say, hello,
16         I'm being impacted by social
17         media.  They would receive the
18         service because we know that they
19         are impacted by social media.
20                   That's very consistent with
21         how we do multi-tiered systems of
22         support in schools.
23    BY ATTORNEY KEYES:
24         Q.    Do you agree that every

CONFIDENTIAL

Page 632

1    teenager can benefit from learning better

2    stress management?

3          A.    I think most people, so

4    teenagers included, always can develop

5    skills around stress management.

6          Q.    Do you agree that every

7    teenager can benefit from coping skills

8    education?

9          A.    So I certainly think that

10   teenagers can benefit, in general, from

11   coping skills education.

12         Q.    Do you agree that every

13   teenager can benefit from social

14   emotional learning?

15         A.    So I think -- you know,

16   we're talking about every teenager.  And

17   my mind starts going to, also, students

18   who have severe developmental, cognitive

19   issues, et cetera.

20              But can most -- so I'm going

21   to use the term "most," because I think

22   that there's always, you know -- so can

23   most students benefit from social

24   emotional learning?  I think so.  Yeah.

CONFIDENTIAL

Page 633

1          Q.    Okay.  Do you agree that
2     every teenager can benefit from education
3     on digital misconduct?
4          A.    So I think teenagers can
5     benefit from education on digital
6     misconduct.
7               I mean, I would be curious
8     what you mean by "digital misconduct."
9     But yes.
10         Q.    You use that term in your
11    plan.
12         A.    So if it's how I used it,
13    sure.
14         Q.    Okay.  Do you agree that
15    every teenager can benefit from education
16    on digital literacy?
17         A.    I think teenagers can
18    benefit from education on digital
19    literacy.
20         Q.    Do you agree that every
21    teenager can benefit from education on
22    healthy online behaviors?
23         A.    Yes, I think teenagers can
24    benefit from that.

Page 634

1          Q.    Do you agree that every
2    teenager can benefit from positive
3    digital habits education?
4          A.    I think teenagers can
5    benefit from that, yes.
6          Q.    Do you agree that every
7    teenager can benefit from education on
8    emotional regulation?
9          A.    Yes.
10          Q.    Do you agree that every
11    teenager can benefit from education on
12    responsible decision-making?
13          A.    Yes.
14          Q.    Do you agree that every
15    teenager can benefit from education on
16    mental health awareness?
17          A.    I do think that most
18    teenagers can benefit from that.
19          Q.    Do you agree that every
20    teenager can benefit from help-seeking
21    behaviors?
22              ATTORNEY YEATES:  Object to
23          the form.
24              THE WITNESS:  Can they

Page 635

1          benefit from help-seeking
2          behaviors?  I actually don't --
3          I'm not totally sure what you mean
4          by that.
5              Can they benefit from
6          education on --
7   BY ATTORNEY KEYES:
8          Q.    Do you agree that every
9   teenager can benefit from education on
10  help-seeking behaviors?
11         A.    I think that that's a
12  helpful thing for teenagers to have.
13         Q.    Do you agree every teenager
14  can benefit from stigma reduction
15  education?
16         A.    So I think teenagers can
17  benefit from stigma reduction around
18  mental health.  Sure.
19         Q.    Including education on it?
20         A.    Oh, yeah.  Yeah.  Education
21  on mental health stigma and how to
22  decrease that?  Yes.  I think it's -- I
23  think it's valuable for teachers --
24  excuse me, for teenagers -- to use your

CONFIDENTIAL

Page 636

1    term -- to have that, yes.

2         Q.    And I just gave a list of

3    the components of your plan, right?

4              Because your plan envisions

5    education on all of those topics.

6              ATTORNEY YEATES:  Object to

7         the form.

8    BY ATTORNEY KEYES:

9         Q.    Yes?

10        A.    So you gave me a list of

11   components -- some components from my

12   plan.  That was not a comprehensive list

13   of all of the components of the plan.

14        Q.    Okay.  I gave you a list.

15             You agreed that all or most

16   teenagers would benefit from education

17   for -- on all of those topics?

18        A.    So to be clear, because the

19   plan that I lay out -- I think the terms

20   that you use were actually quite broad,

21   and I think I'm quite specific in the

22   plan to suggest that those categories

23   would be specific to social media

24   engagement.

CONFIDENTIAL

Page 637

1           So I agreed with the
2    statements or the -- some of the
3    questions you asked earlier about, could
4    students benefit from mental health
5    literacy?  Could they benefit from
6    digital literacy?  Yes.
7           Do I also think students
8    could benefit from some of the types of
9    mental health literacy and digital
10   literacy laid out in the plan that are
11   specific to how to engage with social
12   media or how to engage with school
13   systems that are impacted by social media
14   harms?  Yes.
15        Q.    And under your plan, all
16   students in the school could participate
17   in all of this education?
18        A.    So in the plan, there's
19   clearly laid out a multi-tiered system,
20   part of which is Tier 1, which is
21   considered universal, which is usually
22   for most students in a school building.
23           You're not always going to
24   be able to capture every student, whether

Page 638

1    there's a student who is missing a day of

2    school, et cetera.  So I'm always

3    reluctant to use the term "all."

4              But is it intended for the

5    school population, the universal Tier 1

6    supports?  Yes.

7         Q.    And in order to get the

8    benefit or participate in any of that

9    education, do students need to make any

10   showing at all?

11             ATTORNEY YEATES:  Object to

12        the form.

13             THE WITNESS:  Any showing

14        of --

15   BY ATTORNEY KEYES:

16        Q.    Any showing of harm?  Any

17   showing of need?  Any showing of

18   eligibility?

19             ATTORNEY YEATES:  Object to

20        the form.

21             THE WITNESS:  So the

22        nature -- to kind of go through

23        the public health model, the

24        nature of Tier 1 universal

CONFIDENTIAL

Page 639

1          supports is actually that you're
2          providing a foundation of, broadly
3          speaking, health prevention and
4          promotion, just like you would for
5          tobacco prevention.
6                    It's another, you know, kind
7          of helpful analogy here in the
8          sense that you would provide that
9          type of education universally,
10         recognizing that there's lots of
11         evidence to suggest that when you
12         provide that, given the risk
13         that's in the environment for
14         children and adolescents of, in
15         this case, we're talking about
16         tobacco, but in our case, we're
17         talking about social media,
18         there's a lot of evidence to
19         suggest that when you put in early
20         intervention, including education,
21         promotion and prevention, that it
22         mitigates the risk.
23                    So by its very nature, you
24         would not have to show that you've

CONFIDENTIAL

Page 640

1          been harmed.  Because it's to
2          prevent harm moving forward.  For
3          some of the services.
4   BY ATTORNEY KEYES:
5          Q.    In your plan for each of the
6   six school districts, you recommend a
7   ratio of 1 school psychologist to 500
8   students, correct?
9          A.    Yes.
10         Q.    And that's based on a ratio
11  recommended by the National Association
12  of School Psychologists?
13         A.    That's correct, yes.
14         Q.    Do you belong to the
15  National Association of School
16  Psychologists?
17         A.    I want to say that my
18  membership is current.  I've certainly
19  belonged, and I think I have current
20  membership.  You have to renew every
21  year.
22         Q.    You recommend in your plan
23  for each of the six school districts that
24  they hire one counselor for every 250

Page 641

1   students, correct?

2          A.     Yes.  Yes.

3          Q.     And that's based on the

4   ratio recommended by the American School

5   Counselor Association?

6          A.     Yes.  And recognized by the

7   field, yes.

8          Q.     Do you belong to the

9   American School Counselor Association?

10         A.     No.

11         Q.     How many states meet the

12  National Association of School

13  Psychologists recommendation of one

14  psychologist for every 500 students?

15         A.     I don't know offhand that

16  number.  So I can't answer that offhand,

17  how many states meet that.

18         Q.     Did you check at all or look

19  into that as part of your work?

20         A.     I don't know that I checked

21  the number across the states.  I don't

22  think that that information would have

23  been necessary when looking for the

24  specific information or when developing

CONFIDENTIAL

Page 642

1    opinions around the six specific school

2    districts who are only within six states,

3    no.

4                    ATTORNEY KEYES:  Vince,

5           would you display Tab 32, which

6           we'll mark as Exhibit-31?

7                         -  -  -

8                    (Whereupon, Exhibit

9           Hoover-31, No Bates, The National

10          Association of School

11          Psychologists, Student to School

12          Psychologist Ratio 2023?2024 Based

13          on the U.S. Department of

14          Education Common Core of Data, was

15          marked for identification.)

16                        -  -  -

17   BY ATTORNEY KEYES:

18          Q.    This is a document from the

19   National Association of School

20   Psychologists.  It's titled, Student to

21   School Psychologist Ratio, 2023 to 2024.

22                    Have you seen this document

23   before?

24          A.    I may have.  I look at lots

Page 643

1    of documents in my work, including some

2    from the National Association of School

3    Psychologists.  So it's hard to say.

4          Q.    If you scroll to the bottom,

5    you'll see that this data is as of

6    January 24th, 2025.

7              Do you see that?

8          A.    I do.

9          Q.    And do you see that the data

10   is from the U.S. Department of Education

11   National Center for Education Statistics,

12   the Common Core of Data?

13         A.    I do.

14         Q.    Are you familiar with the

15   Common Core of Data?

16         A.    I am, to a degree.

17         Q.    Did you look at any Common

18   Core of Data as you formed your opinions

19   in this case?

20         A.    Not to my recollection.  I

21   would have cited it in my sources if so.

22   But it wasn't necessary to inform my

23   opinions in this case.

24         Q.    Did you look at any Common

Page 644

1    Core of Data as you prepared your

2    recommended strategic plan?

3        A.    I don't think I cited that.

4    And if not, it's not something I would

5    have considered, nor would I have needed

6    to, to inform my opinions in this case.

7        Q.    According to this list, do

8    you see that there are only two states

9    that meet the National Association of

10   School Psychologists' recommendation of

11   one psychologist for every 500 students?

12       A.    You're going to have to give

13   me --

14            ATTORNEY YEATES:  Object to

15        the form.

16            THE WITNESS:  You're going

17        to have to give me a minute to

18        actually look at what this is.

19            Because, again, I'm not sure

20        if I've seen it before.  But I

21        certainly don't recall it.

22            So the data was provided --

23        will be monitoring.  I'm trying to

24        figure out what the numbers on the

CONFIDENTIAL

Page 645

1          right mean and what the bars mean.
2               I don't see the --
3     BY ATTORNEY KEYES:
4          Q.    Well, if you scroll down,
5     the bar shows a ratio of 500 students to
6     one school psychologist.  And the number
7     on the right shows what the ratio
8     actually --
9          A.    The ratio number.
10          Q.    -- is for each state.
11               So as you scroll down, do
12     you agree with me that, according to the
13     National Association of School
14     Psychologists, which sponsors this
15     recommended ratio, there are only two
16     states, Maine and Connecticut, that meet
17     it?
18               ATTORNEY YEATES:  Object to
19          the form.  Dr. Hoover, you can
20          take your time to review the data.
21               THE WITNESS:  Yeah.  I'm
22          just looking.
23               So I see that Maine, it
24          appears to meet it.  I see Puerto

CONFIDENTIAL

Page 646

1          Rico.  And then I see Connecticut.

2          And -- yes.

3                  And there's variability

4          across the other states.

5                  So I see those meeting the

6          1 to 500 ratio, yes.

7    BY ATTORNEY KEYES:

8          Q.    Okay.  So of the 50 states

9    there are only two, Maine and

10   Connecticut, that meet the ratio?

11         A.    According to this piece of

12   data.

13         Q.    Do you have any

14   understanding as to why 48 of the 50

15   states do not meet the recommended ratio?

16                ATTORNEY YEATES:  Object to

17         the form.

18                THE WITNESS:  I don't know

19         that I can speak specifically to

20         what's happening in each of the

21         states with respect to why they

22         don't meet the ratio.

23                I can speak to some of the

24         general issues.

CONFIDENTIAL

Page 647

1          I'm aware, as I detail in
2      the report, that there has been --
3      we have a context and a history of
4      a context of workforce challenges
5      with respect to school
6      psychologists.  And I'm aware of
7      that, you know, because of the
8      work that I do in the field.
9          Each state is a bit
10     different in terms of some of the
11     challenges.
12         Oftentimes -- and, again, in
13     my experience with districts, it's
14     because they don't have the
15     resources to hire the needed
16     professionals.  So when I'm
17     working with schools, they are
18     often lamenting, you know, if
19     they, you know, need an additional
20     psychologist but might not have
21     one.  So it's often because they
22     don't have the funding to hire a
23     needed school psychologist.
24         So this doesn't surprise me

Page 648

1          that schools can't meet the
2          ratios, because they are often --
3          they often have very limited
4          funding to do so.
5               So I think I mentioned
6          yesterday, they might have to make
7          a decision between a teacher or a
8          school psychologist.  It's a hard
9          decision to make.
10              ATTORNEY KEYES:  Vince,
11         would you show Tab 33, which we'll
12         mark as Hoover Exhibit-32?
13                   -   -   -
14              (Whereupon, Exhibit
15         Hoover-32, No Bates, American
16         School Counselor Association
17         Student-to-School-Counselor Ratio
18         2023?2024, was marked for
19         identification.)
20                   -   -   -
21   BY ATTORNEY KEYES:
22         Q.    This is a document that's
23   available from the American School
24   Counselor Association.  It lists the

Page 649

1   student to school counselor ratio for
2   2023 to 2024.
3               Do you see that?
4       A.    I do see that.
5       Q.    Did you undertake, in
6   forming your opinions in this case, to
7   look at what the actual student to school
8   counselor ratio was across the country?
9               ATTORNEY YEATES:  Object to
10          the form.
11              THE WITNESS:  It would have
12          been unnecessary to inform my
13          opinions.
14   BY ATTORNEY KEYES:
15       Q.    Did you undertake, in
16   formulating your strategic plan that
17   you're recommending, to look at what the
18   actual student to school counselor ratio
19   is across the country in different
20   states?
21              ATTORNEY YEATES:  Object to
22          the form.
23              THE WITNESS:  It would not
24          have altered my opinions.  So it

Page 650

1          was not part of informing the
2          opinion.
3                    ATTORNEY KEYES:  If you
4          scroll to the bottom, Vince.
5     BY ATTORNEY KEYES:
6          Q.    Dr. Hoover, do you see that
7     the data source for these ratios is also
8     the U.S. Department of Education,
9     National Center for Education Statistics,
10    Common Core of Data?
11         A.    I do see that.
12         Q.    And do you see that this
13    chart has an entry for each U.S. state,
14    and it shows a bar graph and the number
15    that reflects the actual
16    student-to-school-counselor ratio for
17    that state?
18                    ATTORNEY YEATES:  Object to
19         the form.
20                    THE WITNESS:  It appears so.
21         I would have to go through my
22         state song if I want to actually
23         count them all out.
24                    But I think so, yeah.

CONFIDENTIAL

Page 651

1    BY ATTORNEY KEYES:

2          Q.    Okay.  And do you see that

3    if you scroll from the top to the bottom,

4    there are only three states that have a

5    student-to-school-counselor ratio of 250

6    or less?  It's Hawaii, New Hampshire, and

7    Vermont.

8                  Do you see that?

9                  ATTORNEY YEATES:  Object to

10         the form.

11                  THE WITNESS:  I do see that.

12         I also see that the American

13         School Counselor Association

14         recommends a ratio of 250 to 1 on

15         the form.

16   BY ATTORNEY KEYES:

17         Q.    Right.  Which you said

18   before.

19         A.    Correct.

20         Q.    Yes.

21                  Do you know what research

22   went into either of the recommended

23   ratios that we've reviewed, either the

24   one for the National Association of

Page 652

1    School Psychologists or the American
2    School Counselor Association?
3                    ATTORNEY YEATES:  Object to
4            the form.
5                    THE WITNESS:  So I don't
6            know that I could speak to the
7            exact research methodology because
8            I was not a part of it.
9                    I did note in my report that
10           these have been long-established
11           ratios in the field.  They are
12           widely accepted in the field.  And
13           they're generally based on --
14           first of all, I should say, they
15           are coming from the organizations
16           that represent these professions.
17                   And they, to my
18           understanding, are revisited and
19           looked at.  And they reflect the
20           types of services that these
21           professionals may provide in
22           schools, you know, at a certain
23           point in time.  They've been
24           around for some time now.

CONFIDENTIAL

Page 653

1    BY ATTORNEY KEYES:

2         Q.    And these ratios for both

3    organizations are aspirational; that is,

4    they hope the school districts over time

5    will some day get to those ratios?

6                   ATTORNEY YEATES:  Object to

7              the form.

8                   THE WITNESS:  I'm laughing

9              because I think that they might

10             wish that they were in place

11             today.  But for limited resources

12             in our education system, they may

13             not be.

14                  I can't speak to whether

15             they might describe them as only

16             aspirational.  I think that,

17             rather, where I've heard them

18             described, it's this would be best

19             practice to meet kind of the, you

20             know, minimum standards of

21             baseline mental health care and

22             support for students or for school

23             counselors.  You know, they also

24             do some college and career

CONFIDENTIAL

Page 654

1          readiness work.
2                   So how I understand these is
3          this is considered best practice
4          in the field, best practice
5          standards, not just kind of
6          something we would wish for but
7          it's okay if it doesn't happen.
8     BY ATTORNEY KEYES:
9          Q.    So when you formulated your
10    strategic plan for each of the six school
11    districts and you identified how many
12    school counselors or school psychologists
13    should be hired under your plan, you took
14    the total population of students for that
15    district and then divided it by the
16    recommended ratio?
17         A.    For the -- for the different
18    categories.  So for the school
19    counselor -- the ones that we went over
20    that said, you know, 1 to 500, 1 to 250,
21    that would be accurate.
22         Q.    And then for purposes of
23    identifying how many school counselors or
24    school psychologists you recommend be

CONFIDENTIAL

Page 655

1    hired under your plan, you ignored

2    however many school counselors or school

3    psychologists the school district already

4    has --

5              ATTORNEY YEATES:  Object to

6         the form.

7    BY ATTORNEY KEYES:

8         Q.    -- correct?

9              You didn't factor that into

10   the new staffing?

11             ATTORNEY YEATES:  Object to

12        the form.

13             THE WITNESS:  So I certainly

14        didn't ignore the staffing they

15        already had.  I asked about it.  I

16        documented it in my report.  It's

17        on the SHAPE profile.  It came up

18        in the context of interviews and

19        deposition information.  Much of

20        it was in the plaintiff fact

21        sheet.

22             So far from ignoring it, I

23        actually considered the staffing

24        that they had.  And without fail,

CONFIDENTIAL

Page 656

1         the staffing was, in many cases --
2         most cases, I would say, for many
3         of the existing mental health
4         supports, they didn't even meet
5         the basic national standards for
6         some of these disciplines.
7              And beyond that, the
8         testimony, whether it was
9         depositions or informant
10        interviews, was very clear that
11        the existing capacity they had was
12        stretched thin, having to do work
13        to try to address some of the
14        social media harms that were
15        taking them away from some of the
16        other intended roles for their
17        positions.
18              So in developing a staffing
19        plan, I absolutely considered who
20        they had and the number of
21        positions and the nature of what
22        their work looks like right now in
23        the school system.
24    BY ATTORNEY KEYES:

Page 657

1          Q.    But you didn't include the
2    existing school counselors or school
3    psychologists in your calculation of how
4    many new school counselors or school
5    psychologists should be hired to get a
6    particular ratio?
7          A.    Very intentionally so.
8          Q.    Okay.
9          A.    Because it's well documented
10   that when you try to lay on new --
11   especially something of this magnitude
12   that is causing significant harm, you
13   will likely diminish the other activities
14   that they can do and their effectiveness.
15   And the fidelity with which they're going
16   to be able to implement will suffer.
17         Q.    Okay.  Have you calculated
18   what the ratio would be for school
19   counselors in any of the six school
20   districts if you include both the school
21   counselors that they already have and the
22   school counselors you suggest they hire?
23         A.    I wouldn't have done that,
24   because that would have been inconsistent

Page 658

1   with the plan that I'm proposing.

2          Q.    Have you calculated what the

3   ratio would be for school psychologists

4   for -- in any of the six school districts

5   if you include both the school

6   psychologists they already have and the

7   school psychologists you suggest they

8   hire?

9          A.    Again, I wouldn't have done

10  that.  That would have been inconsistent

11  with my plan, because I'm proposing that

12  you need new staffing to address new

13  harms.

14          Q.    Okay.  And going back to the

15  ratios that the National Association of

16  School Psychologists and the American

17  School Counselors Association recommend,

18  those are ratios they recommend for all

19  purposes in a school district, correct?

20                ATTORNEY YEATES:  Object to

21        the form.

22                ATTORNEY KEYES:  You can

23        take that down, Vince.

24                THE WITNESS:  So as we've

Page 659

1          talked about, the ratios have been
2          around for some time, well before
3          the impacts of social media.
4              And so I don't think I
5          would -- I know I wouldn't respond
6          to your question in the
7          affirmative, in the sense that I
8          don't think these ratios -- I know
9          they were established before the
10         impacts of social media.
11             And so do I think that the
12         ratios, as established, took into
13         account the potential harm and
14         resource strain of what's
15         happening right now in schools
16         from the defendants' platforms?
17         Absolutely not.
18  BY ATTORNEY KEYES:
19         Q.    Have you seen anything from
20  the National Association of School
21  Psychologists that the ratio should be
22  adjusted because of some issue of
23  students' use of social media?
24             ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 660

1          the form.
2                  THE WITNESS:  So I have not
3          seen the ratios shift in recent
4          years, nor would that suggest that
5          they're not recognizing the harms
6          of social media.
7    BY ATTORNEY KEYES:
8          Q.     Have you seen anything from
9    the American School Counselor Association
10   that the ratio should be adjusted because
11   of some issue of students' use of social
12   media?
13                 ATTORNEY YEATES:  Object to
14         the form.
15                 THE WITNESS:  So, again, the
16         ratios have been longstanding.  I
17         know they use that to advocate for
18         kind of the basic mental health
19         supports prior to the advent,
20         even, of social media and
21         certainly prior to our better
22         understanding of the impacts.
23                 So they have not necessarily
24         changed it.  But that doesn't

CONFIDENTIAL

Page 661

```
 1          surprise me.  Again, when you're
 2          contending with a new and evolving
 3          harm, you're still trying to
 4          navigate how to best staff and
 5          support that.
 6   BY ATTORNEY KEYES:
 7          Q.    My question was, have you
 8   seen anything from the American School
 9   Counselor Association that the ratio
10   should be adjusted because of some issue
11   of students' use of social media?
12               ATTORNEY YEATES:  Object to
13          the form.
14   BY ATTORNEY KEYES:
15          Q.    Have you seen anything?
16               ATTORNEY YEATES:  Object to
17          the form.  And asked and answered.
18               THE WITNESS:  I think I
19          answered.
20               But I see lots of documents
21          in the course of my work.  I
22          should preface with that.
23               To my recollection, I
24          haven't seen that they have
```

CONFIDENTIAL

Page 662

1          recommended adjusting the ratios

2          that they've had in place for many

3          years at this point.

4               But that doesn't negate that

5          they recognize the impacts of

6          social media.

7     BY ATTORNEY KEYES:

8          Q.     Have you seen anything from

9     the National Association of School

10    Psychologists that their recommended

11    ratios should be adjusted because of some

12    issue of students' use of social media?

13               ATTORNEY YEATES:   Object to

14          the form.

15               THE WITNESS:   So, again, I

16          look at lots of documents.   I

17          believe that I've seen things

18          related to the impacts of social

19          media by national professional

20          guild groups that represent school

21          folks.

22               Do I recall seeing a

23          specific document where they

24          recommend changing their ratios?

CONFIDENTIAL

Page 663

1        No.   But it wouldn't surprise me.

2             Again, these are

3        longstanding ratios that were

4        established before the advent of

5        social media and our understanding

6        of its harms.

7   BY ATTORNEY KEYES:

8        Q.    Have you gone to the

9   National Association of School

10  Psychologists and suggested that they

11  change the recommended ratio?

12       A.    That -- that would be

13  outside of my role to do that.

14       Q.    Have you gone to the

15  American Association of School Counselors

16  and suggested that they change the

17  recommended ratio?

18       A.    No.   That would not be

19  outside -- that would be outside of my

20  role to do that for those national

21  professional guild groups.

22             So the answer is no, I have

23  not made a recommendation that they

24  change their ratios to date.

CONFIDENTIAL

Page 664

1          Q.     And why would that be

2     outside of your role, given that you hold

3     yourself out as an expert on school

4     mental health and you're the co-director

5     of the National Center for School Mental

6     Health?

7          A.     Because those ratios are

8     established internal to the organizations

9     and to the leadership of the

10    organization.

11              Again, I can't speak to the

12    specific methodology or timing of the

13    establishment of the ratios, but those

14    are done within the organization.  I'm

15    not an employee of the National

16    Association of School Psychologists or

17    the American School Counselors

18    Association.

19              So if asked to be a part of

20    a committee around that, in a

21    hypothetical, would I give my input,

22    given my expertise?  Perhaps.  But would

23    I assume to be able to go to an

24    organization that I'm not an employee of

Page 665

1    and tell them to change those national

2    ratios?  No.

3              That doesn't mean that I

4    think -- and in my conversations with

5    districts, many people suggest that these

6    ratios are actually quite conservative.

7    So even if they're close to meeting the

8    ratio or they meet the ratio, they are

9    still struggling with mental health

10   concerns of their students to meet the

11   demand in the schools.

12         Q.    And so it's never occurred

13   to you to reach out to either

14   organization and say, based on everything

15   I know and based on everything I believe,

16   these ratios are too low or these ratios

17   need to be adjusted because of this

18   problem of students using social media

19   and the consequences that imposes on

20   schools?

21              ATTORNEY YEATES:  Object to

22         the form.

23              THE WITNESS:  So in fact, I

24         have had conversations over the

CONFIDENTIAL

Page 666

1     years with folks in these

2     organizations.  They've all --

3     leadership from these

4     organizations have been on our

5     advisory board, for example.

6          And in conversation, it is

7     not uncommon at all, over the

8     years, for us to lament the ratios

9     being inadequate to address the

10    mental health needs, especially as

11    they've increased over recent

12    years.

13          ATTORNEY KEYES:  Why don't

14    we take a break for lunch?

15          ATTORNEY YEATES:  Sure.

16          VIDEO TECHNICIAN:  The time

17    is 12:50 p.m.  We are off the

18    record.

19               -  -  -

20          (Whereupon, a luncheon

21    recess was taken.)

22               -  -  -

23          VIDEO TECHNICIAN:  The time

24    is 1:33 p.m., and we are on the

Page 667

1    record.

2    BY ATTORNEY KEYES:

3         Q.    Dr. Hoover, other than the

4    key informant interviews that you

5    reference in your reports, did you speak

6    with anyone else from any of the six

7    school districts?

8         A.    Outside of the key informant

9    interviews, no, I did not.

10         Unless -- at least not as

11    part of this litigation, no.

12         Q.    Did you conduct any kind of

13    survey of the staff or employees of any

14    of the six school districts for whom you

15    offered reports in this case?

16         A.    So the survey that I got

17    data from was the SHAPE profile, the

18    school mental health profile.

19         Outside of that, I didn't

20    personally conduct surveys with staff,

21    no.

22         Q.    Before this engagement, did

23    you do any consulting for any of the six

24    school districts?

CONFIDENTIAL

Page 668

1          A.    I don't believe so, no.  Not
2    specifically with any of these school
3    districts.
4          Q.    In connection with this
5    engagement, did you speak with anyone who
6    was a consultant for any of the six
7    school districts?
8          A.    Outside of the litigation
9    are you asking?  Sorry.  I may have --
10          Q.    No.  I said --
11          A.    -- missed the beginning.
12          Q.    No.  I asked in connection
13    with this engagement, did you speak with
14    anyone who was a consultant for any of
15    the six school districts?
16          A.    Not that I'm aware of, no.
17          Q.    Have you ever been in any of
18    the schools in Breathitt, Kentucky?
19          A.    Not that I'm aware of.
20                And the reason I'm pausing
21    is because I know I've presented across
22    the state of Kentucky before.  And I know
23    I've been in schools.
24                But I don't believe that

CONFIDENTIAL

Page 669

1    I've been in a school in Breathitt.

2          Q.    Have you ever been in any of

3    the schools in Charleston, South

4    Carolina?

5          A.    I've worked -- I presented

6    in Charleston, South Carolina, at some

7    point.

8                I don't know that I've been

9    in the schools in Charleston, inside of a

10   school building, no.

11         Q.    Have you ever been in any of

12   the schools in Harford, Maryland?

13         A.    I may have over the course

14   of my time living in Maryland.  I

15   honestly cannot recall.

16               I've been in many schools

17   across the state.  I don't know if I've

18   been in a school in Harford County.

19         Q.    Have you ever been in any of

20   the schools in DeKalb, Georgia?

21         A.    So, again, I know I've

22   worked in the state.  I don't recall

23   being in a school in DeKalb.

24         Q.    Have you ever been in any of

CONFIDENTIAL

Page 670

1   the schools in Irvington, New Jersey?

2           A.    I'd have to say the same,

3   that I know I've worked in New Jersey;

4   I've presented in New Jersey.

5                 I can't recall being in

6   school buildings in Irvington over the

7   course of, you know, two decades or so.

8           Q.    Have you ever been in any of

9   the schools in Tucson, Arizona?

10          A.    Similar here; I've worked a

11  fair amount in the state of Arizona with

12  state Department of Ed people, for

13  example.

14                But I don't know that I've

15  been in schools -- in a school building

16  in Tucson.

17          Q.    Is it your opinion that

18  Breathitt has inadequately funded its

19  schools?

20                ATTORNEY YEATES:  Object to

21          the form.

22                THE WITNESS:  I think

23          that's, honestly, a bit of a --

24          too general of a question for me

Page 671

1          to answer, whether Breathitt has
2          inadequately funded its schools.
3                 School funding is
4          complicated.  And I'm not budget
5          expert for schools.  So I think
6          that falls a little bit outside of
7          my expertise.  And I did not offer
8          an opinion on that specific
9          question, to my knowledge.
10  BY ATTORNEY KEYES:
11          Q.    Is it your opinion that
12  Breathitt has inadequately funded mental
13  health resources in its schools?
14                ATTORNEY YEATES:  Object to
15          the form.
16                THE WITNESS:  Again, I think
17          my opinions were more around
18          whether they have adequate
19          staffing to address the current
20          issues.
21                 So the question -- I don't
22          think I can answer the question of
23          have they inadequately funded.  I
24          think that feels a bit subjective

CONFIDENTIAL

Page 672

1          and, again, comes down to a budget

2          question that, to me, would

3          require, you know, more budget

4          expertise.

5    BY ATTORNEY KEYES:

6          Q.     Is it your opinion that

7    Breathitt has not provided funding for

8    the right number or right type of

9    positions for mental health resources in

10   its schools?

11              ATTORNEY YEATES:  Object to

12         the form.

13              THE WITNESS:  Again, I think

14         that's a loaded question in one

15         way, in the sense that I think

16         that, as I've talked about in

17         detail in my report, the mental

18         health needs of students have

19         evolved recently due to external,

20         you know, harms.

21              So whether they have

22         adequate resources -- I feel more

23         equipped to say that they don't

24         have adequate resources to address

Page 673

1          the issues that they're contending
2          with.
3    BY ATTORNEY KEYES:
4          Q.    For Charleston, Harford,
5    DeKalb, Irvington or Tucson, are you
6    offering an opinion that any of those
7    school districts have inadequately funded
8    their schools?
9                ATTORNEY YEATES:  Object to
10          the form.
11                THE WITNESS:  The opinion
12          that I offered is that they don't
13          have adequate resources to address
14          the harms.
15    BY ATTORNEY KEYES:
16          Q.    For Charleston or Harford,
17    DeKalb, Irvington or Tucson, is it your
18    opinion that those school districts have
19    inadequately funded mental health
20    resources in their schools?
21                ATTORNEY YEATES:  Object to
22          the form.
23                THE WITNESS:  Again, I think
24          that's -- the way the question is

CONFIDENTIAL

Page 674

1          phrased, to me -- the reason I'm

2          reluctant to agree to that is

3          because it suggests that the

4          schools would -- in my opinion,

5          this is how I'm hearing the

6          question -- that they should be

7          responsible for funding certain

8          services.

9                And I, as I offer in my

10         report, indicate that they are

11         inadequately resourced to address

12         some of the mental health needs

13         that their students are

14         experiencing.

15    BY ATTORNEY KEYES:

16         Q.    Is it your opinion that

17    Charleston or Harford or DeKalb or

18    Irvington or Tucson has not provided

19    funding for the right number or right

20    type of positions for mental health

21    resources in their schools?

22                ATTORNEY YEATES:  Object to

23         the form.

24                THE WITNESS:  The reality is

CONFIDENTIAL

Page 675

1          I think they are often doing the
2          best they can.
3               I think the districts -- I
4          mean, you're asking me a broad
5          question across six districts.  I
6          don't think that I can speak to
7          the specific budgets without, you
8          know, doing an analysis, which I
9          would not necessarily be equipped
10          to do to look budget line item by
11          budget line item.  So I did not
12          offer that opinion.
13               What I did offer was that
14          they are inadequately resourced to
15          address the mental health issues
16          of their students, particularly
17          when it comes to -- in the context
18          of this, I talk -- I did offer an
19          opinion about they're not
20          adequately resourced to support
21          the mental health impact related
22          to social media.
23   BY ATTORNEY KEYES:
24          Q.    Well, who bears

CONFIDENTIAL

Page 676

1   responsibility for the schools in these

2   six districts being inadequately

3   resourced to address some of the mental

4   health needs their students are

5   experiencing?

6                    ATTORNEY YEATES:  Object to

7            the form.  Scope.

8                    THE WITNESS:  So I don't,

9            first of all, think I said that

10           they were -- well, did you say

11           inadequately funded or

12           inadequately resourced?

13   BY ATTORNEY KEYES:

14           Q.    I used your term.

15                 You said before --

16           A.    Okay.

17           Q.    -- that these schools are

18   inadequately resourced to address some of

19   the mental health needs their students

20   are experiencing.

21                 So my question is, who bears

22   responsibility for that inadequate

23   resourcing?

24                    ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 677

1          the form.  Scope.

2                  THE WITNESS:  So, again, I

3          don't know that it falls within my

4          scope to say who bears

5          responsibility for addressing the

6          harms of the, you know,

7          defendants' platforms.

8                  My experience in the field

9          is that when there is an

10          externally imposed harm, let's

11          say, vaping or tobacco, for

12          examples that I've seen in

13          schools, that responsibility

14          sometimes does, often does, fall

15          on those who are imposing that

16          harm.

17  BY ATTORNEY KEYES:

18          Q.    Did Breathitt seek more

19  funding from the state of Kentucky for

20  mental health resources, as far as you

21  know?

22          A.    I don't know off the top of

23  my head, nor did I do -- I don't know, is

24  the --

CONFIDENTIAL

Page 678

1         Q.    Did Charleston seek more

2    funding from the state of South Carolina

3    for mental health resources, as far as

4    you know?

5         A.    I don't know whether they

6    sought additional resources from the

7    state.

8              What I can tell you, both in

9    Breathitt and in Charleston, given the

10   conversations that I had with their

11   district and school leaders, is that they

12   are wishing for more support.

13             So whether they actually

14   were able to seek that -- often the

15   funding is unavailable, you know, to seek

16   for the harms that we're talking about

17   here.

18             So I don't know whether they

19   did or not.  But, to me, that would not

20   speak to whether or not they're

21   experiencing the harms.  They're directly

22   saying they are.

23        Q.    In your prior answer, when

24   you refer to district and school leaders

Page 679

1    in Breathitt and Charleston, are you

2    referring to the key informants you spoke

3    with?

4           A.    I'm referring to the key

5    informants.  But also the information

6    from the plaintiff fact sheets and also

7    the deposition testimony.  And any other

8    documents, you know, that I would have

9    cited that pertain to the question.

10           Q.    And do you have an

11    understanding whether, given your belief

12    that these district and school leaders in

13    Breathitt and Charleston wished for more

14    support, whether they had actually taken

15    steps to get more financial support from

16    the state or from other -- some other

17    source to fund their mental health

18    resources?

19               ATTORNEY YEATES:  Object to

20         the form.

21               THE WITNESS:  So I'd have to

22         go into each of the district

23         reports to see what information I

24         had with respect to requesting

CONFIDENTIAL

Page 680

1          additional supports.

2                  What I can tell you

3          generally is that many of the

4          districts -- or districts that I

5          spoke with as part of this

6          referred, for example, to grants

7          that they had tried to secure and

8          other funds to try to address

9          mental health services as one

10          example.

11                  Again, you know, the fact is

12          they all clearly laid out that

13          they could benefit from and

14          desperately need additional

15          supports to deal with the harms

16          that are caused by the defendants'

17          platforms, so.

18  BY ATTORNEY KEYES:

19          Q.    Did Harford seek more

20  funding from the state of Maryland for

21  mental health resources?

22          A.    Again, I don't know whether

23  Harford sought additional funding from

24  the state of Maryland, outside of I am --

Page 681

1    because, you know, I'm closely tied to

2    the work in the state of Maryland, I know

3    that they've been part of a statewide

4    effort and sought additional funds

5    through something called the Consortium

6    on Coordinated Community Supports

7    Partnerships, where they did seek

8    additional mental health supports as part

9    of a statewide-funded initiative.  So I

10   am aware of that.

11              But what I will say is that

12   there may be other areas where they've

13   sought support that I'm unaware of.

14        Q.    Did Harford, Maryland,

15   participate in that statewide effort?

16        A.    To my knowledge, yes.

17        Q.    And what was the result of

18   that statewide effort?

19        A.    It's an ongoing effort.

20        Q.    So as far as you know, as a

21   result of the statewide effort, the state

22   of Maryland has not provided more mental

23   health resources to Harford?

24              ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 682

1        the form.

2              THE WITNESS:  I'm not sure

3        what you're asking.  Did they not

4        provide more resources?

5  BY ATTORNEY KEYES:

6        Q.    I'm asking, as far as you

7  know, did the state of Maryland provide

8  more mental health resources to Harford

9  as a result of the statewide effort you

10 just described?

11       A.    I don't believe in that

12 effort they -- they provided funding

13 directly to the schools.  There may be

14 training and technical assistance support

15 that they've offered.

16             And similar to other school

17 districts and, you know, as detailed in

18 the report, there may be ways that the

19 districts have sought support.

20             I don't know if you're

21 speaking only about financial support,

22 for example, but training and technical

23 assistance support, et cetera, from the

24 states.

CONFIDENTIAL

Page 683

1         Q.    Did DeKalb seek more funding
2    from the state of Georgia for mental
3    health resources?
4         A.    I don't know offhand
5    whether -- and if it's -- if it's
6    documented in their -- in the documents
7    that I reviewed and if I -- I would have
8    included it -- I may have included it, I
9    should say, in the section on the
10   resources that they have.
11        Q.    Did Irvington seek more
12   funding from the state of New Jersey for
13   more mental health resources?
14        A.    I don't know just sitting
15   here, without looking into the details of
16   the report.
17             And I don't know that I
18   would have -- I know that I wouldn't have
19   all of the details, nor would it have
20   informed or shaped whether -- the
21   opinions that I drew in this case.
22        Q.    And did Tucson seek more
23   funding from the state of Arizona for
24   more mental health resources?

CONFIDENTIAL

Page 684

1          A.     I don't know.  There may be
2     information documented.
3               Again, I recall documenting
4     some information, for example, about
5     grants that were sought, additional
6     efforts, ways that they had to
7     re-allocate their funds.
8               And I detailed those in my
9     report across districts.  They
10    re-allocated existing funds towards
11    social media-related efforts.
12         Q.    So when you reach the
13    conclusion, for each of these six school
14    districts, that they had inadequate
15    resources to address some of their mental
16    health needs, did you undertake any
17    systematic effort to figure out whether,
18    in fact, any of these school districts
19    had asked for more mental health
20    resources?
21               ATTORNEY YEATES:  Object to
22         the form.
23               THE WITNESS:  So in the
24         course of the key informant

Page 685

1          interviews, as well as in looking
2          at the plaintiff fact sheets, and
3          in some of the deposition
4          testimony -- again, we're talking
5          across six school districts, so,
6          you know, I'm happy to look into
7          that for each of the school
8          districts.
9               Can I recall generally that
10         they spoke to the resources that
11         had been sought to try to support
12         this issue?  Yes.  But if you're
13         asking for specific -- within
14         specific districts or for specific
15         people or what they said, I'd have
16         to go back to the source.
17    BY ATTORNEY KEYES:
18         Q.    In formulating what you are
19    recommending as a strategic plan for each
20    of the six school districts, did you
21    undertake to estimate the cost of
22    implementing those plans?
23         A.    So that was not part of my
24    role in this.

CONFIDENTIAL

Page 686

1           What I did was lay out best
2   practices.  As a part of that, do I
3   consider, you know, is this something --
4   what does staffing look like and do I
5   have some understanding of kind of some
6   costs associated?  Yes.
7           But I don't pretend to be an
8   economist or somebody who knows all of
9   the salaries of the different positions.
10       Q.    So did you consider any kind
11  of budget that would be required to fund
12  any of your strategic plans as you were
13  working on formulating them?
14       A.    It depends on what you mean
15  by consider the budget.  I mean, I think,
16  you know, as we -- as I develop plans,
17  having worked with schools and districts,
18  I understand some information about
19  budgets and about salaries.
20           But did I develop a budget
21  for this?  No.  That was not something I
22  was asked to do.
23       Q.    Well, separate from whether
24  you formed a budget, did you think about

CONFIDENTIAL

Page 687

1    the budgetary implications of your

2    strategic plan as you were formulating it

3    for any of the six school districts?

4              ATTORNEY YEATES:   Object to

5         the form.

6              THE WITNESS:   So it's hard

7         to, you know, develop a plan,

8         working in schools without

9         thinking about potential budgets.

10             But frankly, my -- what I

11        envisioned, you know, really, my

12        role to be in developing the plan

13        was to lean on what would the best

14        practices be to actually have an

15        effective, comprehensive plan to

16        prevent and mitigate the harms of

17        the defendants' platforms.

18             So did I consider those

19        things?  Did it come into my mind?

20        What could this cost?  First of

21        all, I'm not an econometrics -- an

22        economist, rather.  But it

23        wouldn't be, necessarily, what

24        would have formed or influenced

CONFIDENTIAL

Page 688

1          the opinions about what should be
2          in the plan.
3                Because my plan is based on
4          here is what best practices would
5          need to be.  Here is what it would
6          need to look like to address the
7          issue at hand.
8    BY ATTORNEY KEYES:
9          Q.    Without regard to cost?
10               ATTORNEY YEATES:  Object to
11         the form.
12               THE WITNESS:  I don't
13         think -- again, to restate, I
14         don't think, again, that my plan
15         was completely without regard.  I
16         think I certainly, as you're
17         developing plans, think about it.
18               But the components, the
19         staffing of the plan was really
20         focused on, what would it take to
21         actually address the impacts of
22         the defendants' platforms on
23         students and on schools?
24    BY ATTORNEY KEYES:

Page 689

1          Q.    At any point during your

2    engagement on this matter, did you

3    suggest or encourage that any of the six

4    school districts block access to any of

5    the defendants' platforms on their

6    network?

7          A.    That would not have been

8    something I would have done in the course

9    of a key informant interview.  That would

10   have been highly unusual to do in that

11   type of work.

12          When you're doing a key

13   informant interview, you're going in with

14   scientific inquiry to kind of understand

15   what's happening on the ground level.

16          My role there would not have

17   been to say, and here is the actions that

18   you need to take.  That wasn't part of

19   the process, nor would it be typical.

20          Q.    At any point during your

21   engagement on this matter, did you

22   suggest or encourage that any of the six

23   school districts block access to any of

24   the defendants' platforms on their

Page 690

1   school-issued devices?

2        A.    So, again, I just want to

3   clarify.  This is similar to something I

4   raised earlier, because I want to make

5   sure I'm understanding the question as

6   you intend it, or the intent of the

7   question.

8             So you say "in the course of

9   this" did I suggest this.  Are you

10  talking about in my direct communication

11  with the districts, is this something I

12  recommended?  Or are you talking about is

13  this something that's in the plan?

14            I just want to make sure I

15  know what you're talking about.

16       Q.    At any point since the time

17  you started working on this engagement,

18  did you suggest or encourage to anyone in

19  any of the six school districts that they

20  block access to any of the defendants'

21  platforms, either on their network or on

22  school-issued devices?

23            ATTORNEY YEATES:  Object to

24       the form.

Page 691

1              THE WITNESS:  So you're
2        talking about including what I
3        included in the reports, not just
4        in speaking with the districts?
5        I just want to make sure I
6        understand the full umbrella.
7              When you say in any -- in
8        any communication --
9    BY ATTORNEY KEYES:
10        Q.    Well --
11        A.    Because I don't think -- go
12   ahead.
13        Q.    You're seeking
14   clarification.
15              You don't say anywhere in
16   any of your written reports that the
17   school districts should block access to
18   the defendants' platforms either on their
19   network or on school-issued devices?
20        A.    So you are --
21              ATTORNEY YEATES:  Objection
22        to form.
23              THE WITNESS:  -- asking
24        about the reports?

CONFIDENTIAL

Page 692

1  BY ATTORNEY KEYES:

2        Q.    I'm not asking about the

3  reports.  Because I know those reports

4  don't say that.

5        A.    Well, I --

6        Q.    I'm not asking about the

7  reports.

8              I'm asking about in any of

9  your dealings --

10       A.    Including --

11       Q.    -- with school --

12       A.    -- the reports?

13       Q.    -- district -- no, not in

14 the reports.

15       A.    Not the reports.

16       Q.    Because I know what the

17 reports say and I know what they don't

18 say.  I'm not asking about the reports.

19              In any of your dealings with

20 anyone in any of the six school

21 districts, anyone you talked to, anyone

22 you otherwise correspond with, any of

23 their consultants, any of the lawyers,

24 did you suggest to any of them that the

CONFIDENTIAL

Page 693

1    school districts block access to any

2    social media platforms, including the

3    defendants' platforms, either on the

4    school district's network or on

5    school-issued devices?

6                   ATTORNEY YEATES:  Object to

7             the form.

8                   And you don't need to talk

9             about anything you discussed with

10            lawyers.

11                  THE WITNESS:  So as I said,

12            the only direct interactions that

13            I've had with the district would

14            have been in the -- for this

15            litigation, would have been in the

16            conduct of key informant

17            interviews. And it would have been

18            something I wouldn't have done as

19            part of that.

20                  So in that context, in my

21            direct communications with key

22            informant interviews in each of

23            these districts, those are not

24            recommendations that would have

Page 694

1        even come up.
2  BY ATTORNEY KEYES:
3        Q.   As you were formulating your
4  strategic plan for any of the six school
5  districts, is there any suggestion or
6  recommendation that you ended up
7  excluding from the plan because you
8  thought it would be too expensive?
9              ATTORNEY YEATES:  Object to
10        the form.
11              THE WITNESS:  Not that I can
12        think of.  I mean, I really was
13        designing a plan that I felt
14        aligned with public health
15        frameworks on how to address
16        complex issues that harm children
17        and aligning a plan directly to,
18        how do you address the harms that
19        have been identified for social
20        media with respect to schools and
21        young people?
22              So the plan was what it
23        would take to actually do this
24        effectively.  It was not

CONFIDENTIAL

Page 695

1          intended -- or wasn't informed by,

2          is this going to cost, you know, a

3          certain amount?  It was, what is

4          best practice to address the

5          issues at hand?

6    BY ATTORNEY KEYES:

7          Q.    Have you worked with any

8    school district in your career that could

9    afford a plan of the magnitude that

10   you're proposing in these six strategic

11   plans?

12              ATTORNEY YEATES:  Object to

13          the form.

14              THE WITNESS:  Again, that's,

15          frankly, hard to say, because

16          school budgets are -- they are

17          highly variable, first of all.

18          You have small rural districts.

19              You're asking about any

20          district I've worked with.  I

21          don't know.  Again, I'm not an

22          economist.  I don't manage school

23          budgets.

24              Schools have to make

CONFIDENTIAL

Page 696

1          decisions about how they spend.
2          And to my knowledge, none has been
3          able to -- at least let me speak
4          to the six bellwether districts,
5          since that is what we're talking
6          about.
7               They haven't been able to
8          address the issues here and fully
9          implement this type of plan, no.
10  BY ATTORNEY KEYES:
11          Q.    Earlier in this deposition
12  you said that you need new staffing to
13  address new harms.
14               Do you remember that
15  testimony?
16          A.    I remember saying that --
17  that in my reports, I recommended that
18  the six school districts include new
19  staffing or hire new staffing to address
20  new harms.
21          Q.    So is it the case, then,
22  that if there are new harms in the future
23  that are attributable to something else,
24  such as video gaming, you will need yet

Page 697

1 additional new staffing to address that

2 new set of harms?

3                     ATTORNEY YEATES:  Object to

4          the form.

5                     THE WITNESS:  So, first of

6          all, it's hard to predict what new

7          harms may come.

8                     What I can say is that we're

9          talking here not just about a

10          harm, we're talking about a

11          significant, pervasive novel harm

12          that is directly impacting the

13          student population in the

14          districts that we're talking about

15          and across districts nationally.

16                     So it's hard to imagine.

17          Could it happen?  It's hard to

18          imagine something of this scale.

19                     But because of this scale of

20          magnitude, right, we're talking

21          about the number of students, the

22          degree of harm, it warrants the

23          new staffing that is described in

24          the plans.

Page 698

1   BY ATTORNEY KEYES:

2        Q.    So if, in the future, there

3   is a significant, pervasive new harm

4   that's directly impacting the student

5   population in these six school districts,

6   is it your opinion that you would need

7   yet additional staffing on top of that to

8   address that new harm?

9              ATTORNEY YEATES:  Object to

10        the form.

11             THE WITNESS:  It's hard to

12        say.  I mean, you know, you're

13        asking me to look into a future

14        that we don't know yet and to

15        understand kind of what the

16        staffing might look like if these

17        had, in fact, been implemented,

18        and then what would the staffing

19        look like if a new harm came.

20             So it's -- it's almost

21        impossible to answer the question.

22        I can't -- I can't answer that.

23   BY ATTORNEY KEYES:

24        Q.    Well, I'm not asking you to

Page 699

1  predict whether there will be or won't be

2  a, to use your term, significant,

3  pervasive new harm.

4           I'm asking you, if there is

5  a significant, pervasive new harm that

6  directly impacts the student population,

7  will we need a whole other strategic plan

8  to address that harm --

9           ATTORNEY YEATES:  Object --

10  BY ATTORNEY KEYES:

11       Q.     -- whether it be from

12  artificial intelligence or online

13  gambling or video gaming or something

14  else?

15       A.    It's hard to say.

16           ATTORNEY YEATES:  Object to

17       the form.  Asked and answered.

18  BY ATTORNEY KEYES:

19       Q.    Why is it hard to say?

20       A.    Because you'd have to

21  actually look at what the data was

22  telling you then.  You would have to

23  speak to school districts to understand

24  what their experience was.  You would

CONFIDENTIAL

Page 700

1  have to understand how students are being

2  harmed, how schools are being harmed as a

3  result.

4           So to say if there was a new

5  harm, it's -- it's just too much of a

6  hypothetical to know what that would look

7  like, to then say, so you would need to

8  do A, B and C.

9           That's why you do an

10 analysis of what the harm looks like now.

11 You look to the science that exists.  And

12 you look at what's happening in the

13 school districts on the ground.

14      Q.   So you might need new

15 staffing if the additional staffing is

16 maxed out and you might not need new

17 staffing if the current staffing has

18 capacity; you don't know?

19           ATTORNEY YEATES:  Object to

20      the form.

21           THE WITNESS:  I think it's

22      fair to say that I don't know what

23      new harms could warrant new

24      staffing.

Page 701

1   BY ATTORNEY KEYES:

2         Q.     If sometime in the next 15

3   years one of the defendants' platforms

4   stop being available, would you make any

5   adjustments to your strategic plan?

6         A.     Not -- not that I'm aware

7   of, right.

8               So my plan is based on

9   the -- this moment in time and the harms

10  that we're seeing.  And the plan is based

11  on the platforms being in existence and

12  the harms that exist.

13              So, again, that's a

14  hypothetical that I think you would have

15  to look at, at the time.

16              But in this moment sitting

17  here, I would say the plan would remain

18  the same.  There is built into the plan,

19  as it says in the evaluation section, an

20  opportunity for continuous quality

21  improvement.

22              But once harm has occurred,

23  it's often the case that you need that

24  continued mental health treatment, right,

CONFIDENTIAL

Page 702

1   when -- let's say if social media
2   platform engagement has led to or
3   exacerbated anxiety in a young person.
4   That mental health treatment wouldn't end
5   the moment, you know, YouTube went
6   offline, for example.
7       Q.    I asked you earlier whether
8   there was any kind of eligibility
9   requirement for students to get the
10  benefit of the services provided by the
11  new positions that you suggest be
12  created.
13              And I understood you to say
14  that at least when it comes to education
15  or prevention efforts, those could
16  benefit everybody and, therefore,
17  everybody would be eligible; is that
18  fair?
19              ATTORNEY YEATES:  Object to
20          the form.
21              THE WITNESS:  So what I said
22          is that within a public health
23          framework, as is the case in other
24          public health initiatives, as is

Page 703

```
 1        the one that I laid out here, you
 2        have a universal level of support
 3        that includes education and
 4        prevention efforts that would
 5        apply to all students.
 6             My -- as I asserted earlier,
 7        that's not to suggest that they
 8        are not experiencing potential
 9        harms as a result of social media
10        exposure or as a result of the
11        harms in the school.  But that
12        would be at the universal level.
13             Then you have your Tier 2,
14        your Tier 3, as I lay out in the
15        plan, where Tier 2 would be for
16        students identified as at risk or
17        experiencing mild to moderate
18        concerns related to social media
19        harms.  Tier 3 would be for those
20        who are experiencing more moderate
21        to severe harms.
22   BY ATTORNEY KEYES:
23        Q.   So what is the gating
24   mechanism, under your plan, for deciding
```

CONFIDENTIAL

Page 704

1    who can participate in Tier 2 services?

2                    ATTORNEY YEATES:  Object to

3            the form.

4                    THE WITNESS:  So as laid out

5            in the mental health competency

6            section, and in kind of the data

7            structure -- it's in a couple of

8            places in the report -- there

9            would need to be mechanisms to

10           identify which students are

11           actually experiencing, again, at

12           risk for, mild to moderate

13           concerns, or, you know, do they

14           meet criteria for Tier 3 services?

15                   There would need to -- and

16           that's -- part of the plan is to

17           develop the data infrastructure

18           and to develop the competencies

19           and to train your staff, it's part

20           of the policies and programming

21           and professional development, to

22           train staff to be able to identify

23           those.

24                   And it's very consistent

CONFIDENTIAL

Page 705

1          with how you would implement other

2          training and screening and

3          identification systems for an

4          issue that a young person might

5          experience.

6    BY ATTORNEY KEYES:

7          Q.    Okay.  So students would

8    need to meet criteria for Tier 2 or

9    Tier 3 services?

10              ATTORNEY YEATES:  Object to

11         the form.

12              THE WITNESS:  I'm not sure

13         what you're asking me.  Would need

14         to meet it for what?

15   BY ATTORNEY KEYES:

16         Q.    You said there would need to

17   be mechanisms to identify which students

18   are actually experiencing, again, at risk

19   for, mild to moderate concerns or, you

20   know, do they meet criteria for Tier 3

21   services.

22              They are your words.

23         A.    Right.

24         Q.    So I just want a straight

CONFIDENTIAL

Page 706

1   answer.

2                   Do students, under your

3   plan, need to meet some kind of criteria

4   to get services under Tier 2 or Tier 3?

5                   ATTORNEY YEATES:  Object to

6           the form.  And asked and answered.

7                   THE WITNESS:  So to be

8           clear, within a public health

9           framework, Tier 2 services are not

10          intended for the entire service

11          population -- or the entire

12          student population, rather.

13                  It's typically only for

14          students who are experiencing mild

15          to moderate concerns or who are at

16          risk for, let's say, mental health

17          concerns in this case.

18                  But we'll -- in the plan

19          here, it's around harms where they

20          may be experiencing mild to

21          moderate impairment related to

22          those harms.

23                  And to receive those

24          services, typically, again, they

CONFIDENTIAL

Page 707

1              would be at risk for or they would
2              be experiencing mild to moderate.
3                   So I don't know how to
4              phrase it other than that.  That's
5              how we define Tier 2 in our
6              framework.
7     BY ATTORNEY KEYES:
8              Q.    Ma'am, with all due respect,
9     I mean, I've been, I think, quite patient
10    over the day, with you giving long
11    answers that don't really answer the
12    question.
13                   And we're going to come
14    back -- or we're going to at least go to
15    the judge and ask for more time, because
16    we're going to point to him the hundreds
17    of instances where we -- I ask
18    straightforward questions that call for a
19    yes or no, and you then give a long
20    answer that doesn't answer the question.
21                   My question was, do students
22    under your plan need to meet some kind of
23    criteria to get services under Tier 2 or
24    Tier 3?

Page 708

1              You can say yes, no, or I
2    don't know.
3              ATTORNEY YEATES:  Objection.
4    BY ATTORNEY KEYES:
5         Q.    Which is it?
6              ATTORNEY YEATES:  Object --
7    BY ATTORNEY KEYES:
8         Q.    I can't get a straight
9    answer from you as to what you need to do
10   under your plan to get services under
11   Tier 2 or Tier 3.
12             Is it everyone?  Is it
13   everyone who shows some kind of risk?  Is
14   it someone who shows some kind of risk
15   attributable to social media?  What is
16   it?
17             The jury and the judge are
18   going to want to know.  So I'd like to
19   hear the answer today.
20             ATTORNEY YEATES:  Object to
21        the form.  Argumentative.
22        Dr. Hoover has been doing her best
23        to answer your questions.  Many
24        questions cannot be answered with

Page 709

1          a yes or no.  She's giving
2          context, and that's totally
3          appropriate.
4    BY ATTORNEY KEYES:
5          Q.    Dr. Hoover, your counsel can
6    ask you whatever questions she wants to
7    provide context.  I'm entitled to the
8    answer to my question.
9              Do students, under your
10   plan, need to meet some kind of criteria
11   to get services under Tier 2 or Tier 3;
12   yes or no?
13              ATTORNEY YEATES:  Object to
14          the form.  Asked and answered
15          multiple times.  And object to the
16          multiple speeches that were
17          inappropriate and unnecessary.
18              THE WITNESS:  So as I
19          stated, this is not a yes-or-no
20          question, because I think it
21          warrants the context that
22          students -- and I've already said
23          this -- would need to meet
24          criteria for having -- being at

Page 710

1          risk for harm or at risk for

2          impairment or be experiencing mild

3          to moderate concerns.

4               I think I've already said

5          that.

6     BY ATTORNEY KEYES:

7          Q.    So you just said students

8     would need to meet criteria for being at

9     risk for harm or at risk for impairment

10    and to be experiencing mild to moderate

11    concerns.

12              Is that for Tier 2 or Tier 3

13    or both?

14         A.    So what I just described

15    that you just restated was for Tier 2.

16         Q.    So there are criteria for

17    students to get Tier 2 services?

18              ATTORNEY YEATES:  Object to

19         the form.

20              THE WITNESS:  So it depends

21         what you're asking about.

22              Are you talking about

23         specific to this plan?  In

24         general, there -- Tier 2 can be

CONFIDENTIAL

Page 711

1        applied to other areas.

2                For this plan, yes, there

3        would be, as what -- there would

4        be for other areas, there's

5        specific criteria that defines

6        what would constitute

7        appropriateness for Tier 2

8        services.

9                And I just laid those out.

10   BY ATTORNEY KEYES:

11        Q.    Okay.  And for those

12   students who need to meet criteria to

13   show they're at risk for harm or at risk

14   for impairment and to be experiencing

15   mild to moderate concerns, do they need

16   to link up that risk or those impairment

17   concerns to someone's use of social

18   media?

19                ATTORNEY YEATES:  Object to

20        the form.

21                THE WITNESS:  So for this

22        plan in particular, the risk for

23        Tier 2 or the mild to moderate

24        concerns would have to be related

Page 712

1          to social media impact.  That's
2          the intent of the plan.
3              That doesn't mean,
4          necessarily, that it had to be
5          that student's personal use of
6          social media, or the defendants'
7          platforms, it could also be that
8          they were experiencing mild to
9          moderate concerns related to the
10         impacts in the classroom, for
11         example, that we talked about many
12         times.
13   BY ATTORNEY KEYES:
14         Q.    Okay.  And so if a student
15   could not show a risk for -- a risk of
16   harm or mild to moderate concerns that
17   were somehow related to social media
18   impact, they would not be eligible for
19   services under Tier 2?
20             ATTORNEY YEATES:  Object to
21         the form.
22             THE WITNESS:  Under Tier 2
23         in this plan or in -- Tier 2 in a
24         school in general?

Page 713

1  BY ATTORNEY KEYES:

2      Q.    I'm talking about -- I'm

3  talking about your plan.  Your plan.

4  Your plan.

5      A.    Okay.

6      Q.    Just as we have been for the

7  bulk of today.

8          ATTORNEY YEATES:  Objection.

9      Form.

10          THE WITNESS:  Okay.

11      Sometimes you're asking about kind

12      of broader things in a school and

13      sometimes you're asking about the

14      plan.  So I just want to make sure

15      that I'm being clear.

16          So the -- the services -- I

17      want to make sure I have the

18      question right now.

19  BY ATTORNEY KEYES:

20      Q.    I'll ask it again.

21      A.    Okay.

22      Q.    If a student could not show

23  a risk of harm or impairment or mild to

24  moderate concerns that were somehow

CONFIDENTIAL

Page 714

1  related to social media impact, they

2  would not be eligible for services under

3  Tier 2 under your plan for these six

4  school districts?

5          ATTORNEY YEATES:  Object to

6      the form.

7          THE WITNESS:  So that's

8      consistent with how I have

9      described Tier 2 in the plans,

10     yes, that they would -- to be

11     eligible, essentially, and -- I

12     mean, to be appropriate for the

13     services that would be offered in

14     Tier 2 in this plan, yes, that

15     would be the general criteria that

16     you would consider for someone to

17     be eligible for Tier 2.

18 BY ATTORNEY KEYES:

19     Q.    Okay.  And are there

20 eligibility criteria for a student in one

21 of these six school districts to be

22 eligible for Tier 3 services under your

23 strategic plan?

24          ATTORNEY YEATES:  Object to

Page 715

1           the form.
2                  THE WITNESS:  So in general,
3           for students to be appropriate for
4           services at the Tier -- Tier 3
5           level, they would be experiencing
6           moderate to severe distress or
7           impairment.  Those are kind of the
8           general ways that we think about
9           who would be eligible for Tier 3.
10                  And in this case, within the
11          district plans, it would be
12          related to social media harm.
13   BY ATTORNEY KEYES:
14          Q.    What is your estimate of the
15   percentage of the population of any of
16   the six school districts' students who
17   are at risk for harm or risk for
18   impairment with moderate concerns --
19                  ATTORNEY YEATES:  Object --
20   BY ATTORNEY KEYES:
21          Q.    -- mild to moderate
22   concerns?
23                  ATTORNEY YEATES:  Object to
24          the form.

Page 716

1          THE WITNESS:  So because you
2     asked about what percent are at
3     risk for, I would say 100 percent.
4          If you mean -- I don't know
5     what you mean.  But because you
6     used the term "at risk for," it
7     could be anybody in the school
8     building.
9          At what level would we
10    estimate the number of students
11    who might be eligible for Tier 2
12    services or who might be
13    appropriate for Tier 2 services,
14    if we look at our typical public
15    health frameworks and multi-tiered
16    systems of support and how it
17    applies to these plans, the top
18    tier is typically about 3 to
19    5 percent of students.  The next
20    tier is typically about 10 to
21    15 percent -- or excuse me -- I've
22    got to get the numbers correct
23    here.
24          They talk about the 10 to

CONFIDENTIAL

Page 717

1          15 percent, 3 to 5, and then at

2          the bottom, roughly 85 percent of

3          students.

4                However, what I will say is

5          that, in fact, literature cited --

6          literature recently talked about

7          how the numbers need to be

8          adjusted at those tiers because of

9          the increase in mental health

10         issues in students in recent

11         years.

12               So I could point to specific

13         literature that talks about how

14         those numbers at Tier 2 and Tier 3

15         have increased over time.

16    BY ATTORNEY KEYES:

17         Q.    That's within a typical

18    MTSS?

19         A.    That's within a multi-tiered

20    system of support for school mental

21    health services.

22         Q.    But you are offering a

23    strategic plan that creates a separate

24    MTSS for students who have some risk of

Page 718

1  harm or some impairment concerns linked

2  with social media, right?

3            ATTORNEY YEATES:  Object to

4       the form.

5            THE WITNESS:  So I'm

6       offering a tiered framework for

7       how you would address the harms

8       for social media, yes.

9  BY ATTORNEY KEYES:

10       Q.   Okay.  So do you have an

11  estimate of what percentage of the

12  student body for any of these six school

13  districts is at risk of harm or risk of

14  impairment with mild to moderate concerns

15  that are related to social media such

16  that they would be eligible for your

17  Tier 2 services?

18            ATTORNEY YEATES:  Object to

19       the form.

20            THE WITNESS:  In some

21       respects, it's hard to put a

22       number on it right now because,

23       you know -- so I'm leaning on, as

24       I have with other things here,

Page 719

1          other public health frameworks
2          like multi-tiered system of
3          support for school mental health.
4          And that's why I provided the
5          numbers that I did.
6                  Because data systems are
7          still to be built and the
8          screening is still in process
9          of -- or would need to be created,
10         some of these numbers are to be
11         determined.
12                 It's hard to estimate,
13         because this is a new, novel harm
14         to schools.  And so to give you
15         precise numbers or even estimates
16         about, here is the number of
17         students that are specifically
18         suffering today would be hard to
19         do.
20                 In terms of that term "at
21         risk," I would say that the
22         majority of your school
23         population, if not all, are at
24         some level of risk.

CONFIDENTIAL

Page 720

1          But as far as mild to

2      moderate concerns, it would be a

3      bit hard to estimate, I would say,

4      right now.

5  BY ATTORNEY KEYES:

6          Q.    And when you say it's "hard

7  to estimate" because this is a new and

8  novel harm to schools, how novel is it,

9  based on all of your work on these cases?

10          A.    Well, it would be hard to

11  give you a precise date at which the

12  harms started.

13          But I know we've talked

14  about the time window for these cases of

15  2017 to 2025.  And I would say certainly

16  over that time, that relatively limited

17  time period, eight years, this has been

18  something they have been contending with.

19          Q.    And do you have an

20  understanding of why none of these school

21  districts for which you're offering

22  strategic plans have any data systems to

23  track all of the harms that you say

24  exist, that you say are significant but

CONFIDENTIAL

Page 721

1    that you cannot quantify?

2               ATTORNEY YEATES:  Object to

3          the form.

4               THE WITNESS:  Do I have --

5          first of all, you're asking about

6          all the data systems in all the

7          districts.  But I think if

8          you're -- if you want me to answer

9          generally do I have an

10         understanding about why systems --

11         school systems, including these

12         six districts, do not yet have the

13         capacity to track all of the harms

14         of the defendants' platforms, I

15         think it's because they're

16         woefully underresourced to have

17         been able to develop the

18         platforms, and we're still, as a

19         science, really understanding how

20         to best measure some of this.

21              But school districts don't

22         have the funding, at this point,

23         to measure and address every harm

24         of social media that they are

Page 722

1          experiencing, which is why we are

2          using other forms of data,

3          including speaking with the

4          personnel who are working in the

5          school districts and in the

6          schools.

7    BY ATTORNEY KEYES:

8          Q.    Did you have any

9    conversation with any of the key

10   informants for any of the six school

11   districts about why they didn't track any

12   of these harms?

13               ATTORNEY YEATES:  Object to

14         the form.

15               THE WITNESS:  Yes.

16   BY ATTORNEY KEYES:

17         Q.    What did they tell you?

18         A.    In -- just generally across

19   all the school districts?

20         Q.    Well, across the six school

21   districts for which you're offering these

22   strategic plans.

23         A.    Right.

24               ATTORNEY YEATES:  Object to

Page 723

1        the form.

2              THE WITNESS:  So generally

3        across those school districts?

4        You prefer that I not look

5        specifically to the testimony,

6        just kind of give you a general

7        recollection of what they said?

8   BY ATTORNEY KEYES:

9        Q.    I want your understanding of

10  what people from the six school districts

11  said to explain why they don't have any

12  systems to track any of the harms that

13  you say are significant based on your

14  conversations with them.

15              ATTORNEY YEATES:  Object to

16        the form.  Foundation.

17              THE WITNESS:  So to be

18        clear, it wasn't just the

19        conversations with them that

20        informed my opinions about the --

21        the extent -- or the existence and

22        extent of harm.

23              But generally, in the

24        discussions and the key informant

CONFIDENTIAL

1          interviews, it was shared -- and,

2          again, I'm not going to be

3          specific, because I'm not opening

4          the reports.  I'm happy to go --

5          detail through the reports.

6               But in general, there was a

7          consistent theme that they did not

8          have the data infrastructure to do

9          so yet, and that that was likely

10         due to limited resources.

11              So that certainly came up in

12         the discussions in the key

13         informant interviews.

14    BY ATTORNEY KEYES:

15         Q.   And didn't modify their data

16    infrastructure at all over an eight-year

17    period to track what they claim is a

18    significant problem?

19              ATTORNEY YEATES:  Object to

20         the form.

21              THE WITNESS:  I didn't say

22         that.

23              So --

24    BY ATTORNEY KEYES:

CONFIDENTIAL

1          Q.    You did tell me they don't
2    have the data infrastructure that tracks
3    the harms.
4                    ATTORNEY YEATES:  Please let
5          Dr. Hoover answer the question.
6                    Object to the form.
7    BY ATTORNEY KEYES:
8          Q.    So my question is, why
9    didn't they modify their data
10   infrastructure over an eight-year period
11   so that they could track, for some period
12   of time, what they claim is a significant
13   problem in their school districts?
14                   ATTORNEY YEATES:  Object to
15         the form.
16                   THE WITNESS:  So I didn't
17         say that in each of the these six
18         school districts that they have
19         made no modifications to their
20         data infrastructure.
21                   What I did say is -- and
22         what I experienced and documented
23         in the context of the key
24         informant interviews and in

Page 726

1          looking at the other source

2          documents, including plaintiff

3          fact sheets, is that the data

4          systems, if -- if they exist, do

5          not yet track enough to understand

6          the impact of the platforms on

7          students and on schools.

8                  If you're asking why, I

9          think I've answered that.  But I'm

10         happy to go into more detail.

11    BY ATTORNEY KEYES:

12         Q.    In each of your reports for

13    the six school districts, you say that

14    your opinions were also informed by

15    scientific literature on the subject

16    matter.

17                And you say that you used

18    literature review methods that are a

19    regular and ongoing part of your practice

20    and you said you routinely utilize

21    academic search engines.

22                Did I get that right?

23         A.    I can look at what I

24    referenced in the -- the language sounds

Page 727

1  familiar.

2         Q.    Paragraph 26 of your

3  reports.

4         A.    Which report?

5         Q.    Any one of them for any of

6  the six school districts.

7         A.    Yes.

8         Q.    Okay.  You say, I routinely

9  use academic search engines to identify

10  relevant scientific literature.

11              Did you use academic search

12  engines to identify relevant scientific

13  literature for purposes of your six

14  school district reports?

15         A.    Yes.

16         Q.    Did you use PubMed?

17         A.    I -- honestly, I don't know.

18  I can't recall which specific search

19  engines I used, in part, because I use

20  search engines regularly.

21              So I'm not sure which

22  specific search engines I used.

23         Q.    So you don't know whether

24  you used PubMed or PsycInfo or Google

Page 728

1  Scholar for purposes of identifying

2  relevant scientific literature for these

3  six school district reports?

4          A.    Correct.

5                ATTORNEY YEATES:  Object to

6          the form.

7  BY ATTORNEY KEYES:

8          Q.    You say that you, Routinely

9  use academic search engines to identify

10 relevant scientific literature using

11 different combinations of keywords, such

12 as -- and then you give a number of those

13 keywords in quotes.

14                Do you see that?

15         A.    I do see that.

16         Q.    Did you actually use all of

17 these keywords in your search of the

18 scientific literature for purposes of

19 this engagement?

20         A.    I don't have the list of

21 search terms that I used.  It would not

22 surprise me if I used these in

23 conjunction with others like social

24 media.

CONFIDENTIAL

Page 729

1          Q.    Okay.  Well, do you have a
2    list somewhere of the search terms that
3    you ran against some search engine to
4    identify relevant scientific literature
5    for purposes of your work in this case?
6          A.    I do not.
7                ATTORNEY YEATES:  Object to
8          the form.  And asked and answered.
9    BY ATTORNEY KEYES:
10         Q.    No way of reconstructing
11   which words you actually used?
12               ATTORNEY YEATES:  Object to
13         the form.
14               THE WITNESS:  No.
15   BY ATTORNEY KEYES:
16         Q.    Okay.  Is it your belief
17   that you used all of the keywords that
18   you list in Paragraph 26 of your reports
19   for purposes of identifying scientific
20   literature that's relevant to your
21   opinions in this case?
22         A.    I don't know.  I can't
23   recall.
24         Q.    Do you have a recollection

CONFIDENTIAL

Page 730

1   of using any other keywords besides the

2   ones that are listed in Paragraph 26 of

3   your report for purposes of identifying

4   scientific literature that's relevant to

5   your opinions in this case?

6          A.    As I said, a term that I

7   would have used would have been social

8   media.

9          Q.    You're confident that you

10  used social media as a term in searching

11  for relevant scientific literature by

12  using academic search engines?

13                ATTORNEY YEATES:  Object to

14          the form.

15                THE WITNESS:  As far as I

16          can recall, yes.

17  BY ATTORNEY KEYES:

18          Q.    For whatever keywords you

19  used in these academic search engine or

20  engines, when they hit on scientific

21  literature, did you print out or put in a

22  folder all of the studies or literature

23  that were hit on?

24          A.    No.  The articles that --

CONFIDENTIAL

Page 731

1    that I ended up using for this I have in
2    a folder.
3                But no.  I mean, I scan them
4    as they are coming -- you know, as I'm
5    pulling them.  So I'll look at them in
6    that way.
7                So did I save them all in a
8    folder?  No.
9         Q.    Okay.  So as I understand
10   it, you used some search terms, you don't
11   remember what they are, against some
12   search engine, but you're not -- you
13   don't know which one.
14                But when it -- when a search
15   term hit on a study, you would review the
16   study and some of the studies you would
17   then pull into a separate folder?
18                ATTORNEY YEATES:  Object to
19          the form.
20                THE WITNESS:  That's my
21          recollection of how -- how I saved
22          the documents.
23                I mean, you have to
24          understand I do this as part of my

CONFIDENTIAL

Page 732

1          regular academic work as well.

2          I'm consistently reviewing.

3                And I also may have used

4          articles that came across my desk

5          as an editor of a journal or just

6          in my regular reading of journals,

7          if that makes sense.  As an

8          academic, that's something we do,

9          so.

10   BY ATTORNEY KEYES:

11          Q.    And what is that separate

12   folder called?

13          A.    No idea.

14          Q.    Where is that separate

15   folder located?

16          A.    I -- I have it as the source

17   documents folder.  So I don't know.

18          Q.    And are all of the studies

19   or reports in that folder included on

20   your materials considered list?

21          A.    Yes.

22          Q.    So if you looked in your

23   folder, you don't believe there's a study

24   or a report sitting in that folder that

Page 733

1  you failed to list in your school

2  district-specific reports?

3          A.    Correct.

4          Q.    And so would you just sort

5  of skim a study or a report that hit on

6  one of these keywords to decide whether

7  you thought it was relevant?

8                ATTORNEY YEATES:  Object to

9          the form.

10                THE WITNESS:  It really

11          depends.  Again, having done this

12          for 30 years now, you get pretty

13          experienced at being able to

14          review abstracts, as well as

15          determining if there are articles

16          that you need to go more deeply

17          into to determine, in this case,

18          whether they would inform the

19          opinions.

20                So whether I skimmed or

21          looked at abstracts or went into

22          more detail would vary.

23  BY ATTORNEY KEYES:

24          Q.    So given whatever keywords

CONFIDENTIAL

Page 734

1   you used against whatever search engine

2   you used, that didn't hit on the National

3   Academies of Sciences, Engineering and

4   Medicine's publication entitled, quote,

5   Social Media and Adolescent Health?

6                    ATTORNEY YEATES:  Object to

7          the form.

8                    THE WITNESS:  I don't know

9          if it hit on that.  And I'd have

10         to look to my source documents to

11         say whether it was something that

12         I included as a source document.

13  BY ATTORNEY KEYES:

14         Q.    Well, it's not listed in

15  your source documents.

16                 Are you familiar with the

17  National Academies of Sciences,

18  Engineering and Medicine?

19         A.    Yes.

20         Q.    Are you a member?

21         A.    No.

22         Q.    Have you ever been a member

23  in the past?

24         A.    No.

Page 735

1          Q.    Have you ever been invited
2    to be a member?
3          A.    Not that I'm aware of.
4          Q.    Is the National Academies of
5    Sciences, Engineering and Medicine part
6    of the National Institute of Health, also
7    known as NIH?
8          A.    To be honest, I don't know.
9          Q.    Do you agree that the
10   National Academies of Sciences,
11   Engineering and Medicine is a preeminent
12   source for research and objective advice
13   on science, engineering and health
14   matters?
15              ATTORNEY YEATES:  Object to
16         the form.  Asked and answered.
17              THE WITNESS:  You know, I
18         think it's a source that is
19         respected in the field.
20              I think you used the word
21         "preeminent."  I don't know that
22         all scholars in the field would
23         think of that as the preeminent
24         source for scholarship, no.

CONFIDENTIAL

Page 736

1    BY ATTORNEY KEYES:

2         Q.    Have you ever presented your

3    views on any subject to the National

4    Academies of Sciences, Engineering and

5    Medicine?

6         A.    I think I may have.  But I'd

7    actually have to go to my CV to -- to

8    look.

9         Q.    On what topic or topics did

10   you present your views to the National

11   Academies of Sciences, Engineering and

12   Medicine?

13        A.    I'm going to have to look

14   through my presentations, unless you have

15   it offhand.

16             But I would have to go

17   through to see what topic it was.

18        Q.    Well, if you listed it in

19   your CV, it would be identified as

20   something you presented to the National

21   Academies?

22        A.    Correct.

23        Q.    Okay.  Given your confidence

24   that you used the term "social media" as

Page 737

1   one of the keywords against some academic

2   search engine and that the National

3   Academies of Sciences, Engineering and

4   Medicine published something titled,

5   quote, Social Media and Adolescent

6   Health, end quote, do you think you

7   reviewed it --

8           A.    I don't --

9           Q.    -- as part --

10          ATTORNEY YEATES:  Object to

11      the form.

12  BY ATTORNEY KEYES:

13          Q.    -- of your work in this

14  engagement?

15          ATTORNEY YEATES:  Object to

16      the form.

17          THE WITNESS:  I don't know

18      if I reviewed it.  If it was

19      something that I considered, it

20      would have been listed in the

21      documents reviewed.

22  BY ATTORNEY KEYES:

23          Q.    But it's not listed in the

24  documents reviewed.

CONFIDENTIAL

Page 738

1          A.    Okay.

2          Q.    So I'm trying to understand,

3    did you -- did your search not pick up on

4    it?  Or your search picked up on it and

5    you made a determination that it wasn't

6    something you were going to move into

7    this folder?

8          A.    I don't know.

9                ATTORNEY YEATES:  Object to

10         the form.

11               THE WITNESS:  I don't know.

12         And I don't know if it was in the

13         peer-reviewed literature or if

14         this is a monograph you're

15         speaking about.

16               I don't know if it's a

17         document that you're -- I'd have

18         to see it to know what you're

19         talking about.

20               But the answer to your

21         question is, I don't know.

22    BY ATTORNEY KEYES:

23         Q.    Well, before I asked you

24    about this report titled, Social Media

CONFIDENTIAL

Page 739

1  and Adolescent Health, did you know about

2  it?  Had you ever heard of it?

3              ATTORNEY YEATES:  Object to

4        the form.

5              THE WITNESS:  I don't know.

6        I'm not sure.

7  BY ATTORNEY KEYES:

8        Q.    Did you see it referenced in

9  any of the other expert reports in the

10  case?

11       A.    I don't know.  I'd have to

12  go back to their reports.

13       Q.    Is it something you're

14  curious about now because the National

15  Academies of Sciences, Engineering and

16  Medicine has published something on,

17  quote, Social Media and Adolescent

18  Health?

19       A.    I'm a curious person.  So

20  I'm always curious.

21       Q.    Okay.  Well, given that

22  you're a curious person, did you know

23  that the National Academies' report

24  concluded that, quote, The committee's

CONFIDENTIAL

Page 740

1    review of the literature did not support

2    the conclusion that social media causes

3    changes in adolescent health at the

4    population level?

5                    Did you know they had a

6    report that found that?

7                    ATTORNEY YEATES:  Object to

8          the form.  And not case specific.

9          You've already exceeded -- well

10         exceeded your time allotted by

11         Judge Kang.

12   BY ATTORNEY KEYES:

13         Q.    You can answer.

14         A.    So you're asking if I know

15   about a report that I can't recall

16   reviewing and a specific sentence it says

17   in there that I don't have in front of

18   me.

19                    But I can look at it.

20         Q.    You said you reviewed the

21   Telzer and Christakis reports --

22         A.    Correct.

23         Q.    -- as part of your work in

24   this case?

Page 741

1          A.      Correct.
2          Q.      Were you ever apprised that
3    there were other experts in this case who
4    offered responses to Telzer and
5    Christakis?
6          A.      I'm trying to remember,
7    because I was focused on my rebuttal
8    responses.
9               So I don't know that I saw
10   responses to their reports, no.
11         Q.      Did you ever ask plaintiffs'
12   counsel, hey, I've read Telzer and
13   Christakis, which are plaintiffs' side,
14   did the defendants offer any kind of
15   rebuttal expert to those opinions?
16               Did you ever ask?
17               ATTORNEY YEATES:  Object to
18        the form.
19               THE WITNESS:  I don't recall
20        asking that.  What I recall
21        focusing on were the rebuttals to
22        the reports that I did, which
23        included, you know, references to
24        Telzer and Christakis.

Page 742

1              So my -- I would, you

2         know -- I would have focused on

3         any concerns that came out with

4         respect to my reports at that

5         time.

6    BY ATTORNEY KEYES:

7         Q.    Well, given that you said

8    you reviewed the -- the relevant

9    scientific literature and you reviewed

10   Telzer and Christakis, whom you say

11   looked at the literature, weren't you

12   curious to know what other experts in the

13   case said about the same literature --

14              ATTORNEY YEATES:  Object to

15         form.

16   BY ATTORNEY KEYES:

17         Q.    -- or what they identified

18   as the relevant literature?

19              ATTORNEY YEATES:  Object to

20         the form.

21              THE WITNESS:  I don't know

22         what you mean, wasn't I curious

23         about it.

24              I mean, I honestly was quite

Page 743

1          focused on making sure I did a
2          very thorough job responding to
3          the responses to my reports.
4    BY ATTORNEY KEYES:
5          Q.    Okay.  But I'm asking about
6    something else.
7                I'm saying you said that you
8    tried to identify the relevant scientific
9    literature.  And you did that using
10   keywords, albeit ones you can't remember,
11   and you did it against a search engine or
12   engines, albeit ones you don't know
13   which, right?
14                If you were trying to
15   identify the relevant scientific
16   literature, why didn't you look at what
17   other experts in the case flagged as the
18   relevant scientific literature?
19                ATTORNEY YEATES:  Object to
20          the form.
21                THE WITNESS:  I would
22          disagree that I didn't look at
23          what other experts noted in the
24          literature.

CONFIDENTIAL

1           I reviewed their reports.  I
2        looked at what they presented.
3        But it does not mean that I didn't
4        consider things that they were
5        citing.
6   BY ATTORNEY KEYES:
7        Q.    You said your materials
8   considered list was complete, right?
9        A.    Correct.
10       Q.    Your materials considered
11  list doesn't cite any of the expert
12  reports that were offered in rebuttal to
13  Telzer or Christakis.
14           So you didn't review any of
15  the rebuttal reports --
16           ATTORNEY YEATES:  Object to
17       the form.  Misstates facts.
18  BY ATTORNEY KEYES:
19       Q.    -- right?
20       A.    My understanding is that I
21  reviewed all of the rebuttal reports for
22  my reports.  And I reviewed the original
23  expert reports, for example, I listed
24  them all, but Telzer, Christakis, and

Page 745

1    others that are listed.

2         Q.    I'm asking you about

3    rebuttals to Telzer and Christakis that

4    talk about the, quote, relevant

5    scientific literature.

6              And I'm trying to understand

7    why you didn't look at what any of the

8    other experts in the case said in

9    response to Telzer or Christakis, whom

10   you cite, or what they say about the

11   relevant scientific literature, which you

12   say you were seeking to find.

13             Why didn't you read those

14   rebuttals to Telzer and Christakis?

15             ATTORNEY YEATES:  Object to

16        the form.

17             THE WITNESS:  So, first of

18        all, I was focused on the review

19        of the response to my rebuttals.

20        And I had the information that I

21        needed to inform the opinions that

22        I offered.

23             So I certainly didn't feel

24        that I needed additional

CONFIDENTIAL

Page 746

1       information to inform those

2       opinions.

3   BY ATTORNEY KEYES:

4       Q.    Did you review, as part of

5   your work in this case, the 2022 study by

6   Sewall, S-E-W-A-L-L, titled, Does

7   Objectively Measured Social Media or

8   Smart Phone Use Predict Depression,

9   Anxiety or Social Isolation Among Young

10  Adults?

11          ATTORNEY YEATES:  Object to

12      the form.  And not case specific.

13          THE WITNESS:  So I have a

14      few areas that I'm going to have

15      to look, if you want me to speak

16      to one specific study and whether

17      I cited it.

18          It's not in this one.

19          So I'm looking across

20      multiple reports.

21  BY ATTORNEY KEYES:

22      Q.    I don't think your lists are

23  different by report.  But if you want to

24  check them all, that's fine.

CONFIDENTIAL

Page 747

1          Let me know if you find any

2   reference in any of the materials

3   considered list to the Sewall report from

4   2022.

5          A.    The lists are different,

6   which is why I'm checking multiple

7   reports.

8          Q.    You reviewed different --

9   scientific literature for different

10  school-district-specific reports?

11         A.    No, sorry.  I was speaking

12  to the main report and the -- or the

13  general report, I should say, using your

14  language, and then the follow-up reports.

15         So I just wanted to make

16  sure, because I have articles listed at

17  the end of each of these, so.

18         Okay.  I don't see that

19  particular report -- or particular

20  article cited, no.

21         Q.    Again, in Paragraph 26, you

22  talk about identifying the relevant

23  scientific literature, which is

24  literature that you then cited and

CONFIDENTIAL

Page 748

1    considered for your opinions, correct?

2              ATTORNEY YEATES:  Where are

3         you reading that from?

4              ATTORNEY KEYES:  Paragraph

5         26.

6              ATTORNEY YEATES:  Of which

7         report?

8              ATTORNEY KEYES:  Any of

9         them.

10             THE WITNESS:  Paragraph 26

11        of any of them.  So I can look to

12        the district reports?

13   BY ATTORNEY KEYES:

14        Q.    Yes.

15        A.    Okay.  So I've just got to

16   Paragraph 26.

17             Your -- did you have a

18   question?

19        Q.    Yes.

20             Paragraph 26, you talk about

21   identifying the relevant scientific

22   literature.  And that's the literature

23   that you then cited in your report and

24   considered for your opinions, correct?

CONFIDENTIAL

Page 749

1          A.    That's correct.  The
2    opinions in the report were cited -- were
3    informed by scientific literature.  And
4    that's what I cited in the reports.
5          Q.    So can you explain for me
6    whether it's a failure of your keywords
7    to identify the report or it was your
8    determination that it wasn't relevant
9    that you didn't review the 2023
10   Steinsbekk report or study?
11              ATTORNEY YEATES:  Object to
12         the form.  And asked and answered.
13         And not case specific.
14              THE WITNESS:  I thought you
15         were actually asking me earlier
16         about a Sewall study.
17   BY ATTORNEY KEYES:
18         Q.    I was.
19              Now I'm asking about
20   Steinsbekk.
21         A.    So would you like me to go
22   back and identify whether that's
23   something I cited?
24         Q.    No.  Because you were

CONFIDENTIAL

Page 750

1   already asked a whole bunch of studies
2   whether you reviewed, and you said no.
3   I'm not going to cover that.
4              What I am asking you is,
5   when you talk about reviewing the
6   relevant scientific literature for the
7   purposes of these six school districts,
8   do you have an explanation for why
9   studies weren't included in your
10  analysis?
11             Was it because the keywords
12  you used didn't flag the study or the
13  report, or is it that based on your
14  review you decided it wasn't relevant and
15  you didn't put it in the folder?
16             And so I'd like to know,
17  what is your answer when it comes to the
18  2023 Steinsbekk report?
19             ATTORNEY YEATES:  Object to
20        the form.  And not case specific.
21        And if you're asking about studies
22        she was asked about yesterday
23        during the general piece of this
24        deposition, then counsel should

CONFIDENTIAL

Page 751

1        have asked follow-up questions
2        yesterday.
3               It's not for you, today, to
4        use your case-specific time to ask
5        follow-ups that were left out
6        yesterday.
7               ATTORNEY KEYES:  I'm asking
8        specifically about the relevant
9        scientific literature she talked
10       about identifying and relying on
11       for her six school district
12       reports.
13              ATTORNEY YEATES:  And we
14       covered it yesterday.
15  BY ATTORNEY KEYES:
16       Q.    Dr. Hoover, you can answer.
17              Was it because the keywords
18  you used didn't flag the study or the
19  report or is it based on your review, you
20  decided it wasn't relevant and you didn't
21  put it in the folder?
22              ATTORNEY YEATES:  Object
23       to --
24  BY ATTORNEY KEYES:

Page 752

1          Q.     Which is it?

2                 ATTORNEY YEATES:   -- the

3          form.

4                 THE WITNESS:  I don't think

5          either of those would be a correct

6          characterization.

7                 And, frankly, if you're

8          speaking about specific studies,

9          I'd have to look at the study,

10         just as I would have done then, if

11         I -- if I saw it and reviewed it,

12         to make a determination about why.

13                But I can't speak to a

14         specific study that I don't see or

15         that I'm not sure about and what I

16         would have thought in that moment

17         if I did happen to review it.

18  BY ATTORNEY KEYES:

19         Q.     Is it the same answer for

20  all the other studies that Ms. Lehman

21  asked you about yesterday?

22                ATTORNEY YEATES:  Object to

23         the form.  And not case specific.

24         And I'd like to take a break.

CONFIDENTIAL

Page 753

1                ATTORNEY KEYES:  I'm going
2         to finish this line of
3         questioning.
4    BY ATTORNEY KEYES:
5         Q.    Is it the same answer?
6         A.    Is what the same answer?
7         Q.    I can go through each one of
8    these.
9                But I'm trying to
10   understand, for all these studies that
11   you were specifically asked about
12   yesterday, did you review it, and you
13   said no, I'm trying to understand what is
14   your explanation?
15               Is it that your keywords
16   didn't flag the study or they did flag
17   the study and you determined, based on
18   your review, it wasn't relevant?
19               What is the explanation for
20   not having reviewed all of these studies?
21               ATTORNEY YEATES:  Object to
22         the form.  And asked and answered.
23         And not case specific.  You've
24         exceeded your allotted time by

CONFIDENTIAL

Page 754

1            Judge Kang.

2                 THE WITNESS:  So the

3            documents that I cited in my

4            reports were the ones that were

5            considered for the opinion.

6                 Just because it's not listed

7            in a document cited doesn't mean

8            it was something that wouldn't

9            have been looked at, right.  But

10           it doesn't -- it means that it

11           wasn't considered for this

12           opinion -- the opinions that were

13           offered here.

14                 So when you say, like, what

15           was the decision point about was

16           it something that wasn't flagged

17           or that I didn't think was

18           pertinent, for example, to

19           rephrase what you said, I can't

20           speak to articles that I don't

21           have in front of me, because I

22           don't know.

23                 So it is -- so if you're

24           asking if my answer is the same, I

CONFIDENTIAL

Page 755

```
 1            guess it's the same.  Because I
 2            don't have each of those articles.
 3                  I can't remember from
 4            yesterday's deposition what the
 5            articles were, nor do I think I
 6            had them in front of me.  I was
 7            just looking through my sources to
 8            see if I had cited them.
 9    BY ATTORNEY KEYES:
10            Q.    You just testified that the
11    documents you cited in your reports, your
12    school district-specific reports, were
13    the ones that you were -- that were
14    considered for your opinions.
15            A.    That's correct.
16            Q.    Okay.  And that's what the
17    materials considered list is for, right?
18                  It's to have a comprehensive
19    list of everything that you considered in
20    forming your opinions and preparing your
21    report, right?
22            A.    Correct.
23            Q.    And that's the definition
24    you used in preparing your materials
```

CONFIDENTIAL

Page 756

1   considered list?

2         A.    Correct.   That's my

3   understanding of what a materials

4   considered list is, that it's the

5   materials that you considered -- that I

6   considered as I was developing the report

7   and informing the opinions.

8         Q.    So all of the studies that

9   Ms. Lehman reviewed with you that you

10  said you didn't review and aren't on your

11  materials considered list, by definition,

12  are things you didn't consider, right?

13            ATTORNEY YEATES:   Object to

14        the form.

15            THE WITNESS:  Suppose it --

16        it's -- it's dependent upon what

17        you mean by "considered."

18            So in the course of my

19        review process and in the course

20        of my daily reading, et cetera, I

21        may have considered that it wasn't

22        pertinent to an opinion.   That

23        doesn't mean it didn't come across

24        my desk or come up in a search

Page 757

1          engine, right.

2               So if you were to include,

3          for example, everything that came

4          up in a search engine, that would

5          not -- that would be more than

6          what's in the materials

7          considered, if that makes sense.

8    BY ATTORNEY KEYES:

9          Q.    Okay.  So your materials

10   considered list is actually the materials

11   you considered and deemed pertinent as

12   opposed to the materials you just

13   considered?

14         A.    That's what you do as a

15   scientist, right, is you're looking

16   through -- as you're doing a literature

17   review, if there's a study that comes up,

18   and let's say the abstract has nothing to

19   do with the question at hand, or it feels

20   like it would not be helpful in informing

21   your opinion, that would not be something

22   that you would use to consider it.

23         Q.    So for these studies that

24   you, yesterday, said you didn't review

CONFIDENTIAL

Page 758

1    and today you're saying aren't things you

2    considered and deemed pertinent, is it

3    because you just overlooked them or

4    because you decided you weren't going to

5    view them as pertinent?

6                    ATTORNEY YEATES:  Object to

7            the form.

8    BY ATTORNEY KEYES:

9            Q.    I'm trying to understand.

10                    Like, you've got a

11    methodology.  I'm entitled to understand

12    your methodology.

13                    And, clearly, your

14    methodology didn't cover all of these

15    studies.  Why not?

16                    ATTORNEY YEATES:  Object to

17            the form.  And the speech.  And

18            not case specific.

19                    THE WITNESS:  So I was going

20            to answer.  I'm forgetting the

21            first part of your question,

22            because you followed it up with

23            I'm trying to understand, et

24            cetera.

Page 759

1        So I think you -- you
2     perhaps misstated that yesterday I
3     indicated that I had never
4     reviewed documents or reviewed
5     articles.
6        I think what I was
7     answering, but I'd have to go back
8     to the deposition testimony,
9     because it was yesterday about the
10    general report, I think I
11    indicated that those were not in
12    my source documents, so that they
13    were not used in formulating the
14    report and considering -- and the
15    opinions in the report.
16        Does it mean it never came
17    up in a search engine?  Does it
18    mean that it wasn't something that
19    could have appeared in a search?
20    No.
21        I think that's very standard
22    for academic searches, so.
23  BY ATTORNEY KEYES:
24        Q.   Can you go to the last page

CONFIDENTIAL

Page 760

1  of your report on Page 45?

2          A.    Which report are you looking

3  at?

4          Q.    The same one we were looking

5  at a moment ago.  But you can look at any

6  of them.

7          A.    Which is which one?

8          Q.    How about your amended

9  expert report for the Charleston County

10 dated June --

11         A.    Charleston?

12              ATTORNEY YEATES:  Counsel,

13         are you going to let me go to the

14         restroom any time soon?

15              ATTORNEY KEYES:  I'd be

16         happy to in just one minute.

17              ATTORNEY YEATES:  Thank you.

18              THE WITNESS:  So the June

19         20th, amended report on, Page --

20         say it again.  Page?

21 BY ATTORNEY KEYES:

22         Q.    45.

23         A.    45.  Okay.

24         Q.    Okay.  Do you see that

CONFIDENTIAL

Page 761

1    certification at the bottom?

2         A.    I do.

3         Q.    Did you include that

4    certification on each of your reports in

5    this case?

6         A.    As far as I know, at least

7    something similar to it.

8              I think it was similar or if

9    not identical in language, yes.

10        Q.    And did you sign each report

11   showing that you were signing the

12   certification?

13        A.    I did.

14        Q.    And do you believe that this

15   report meets that certification?

16        A.    Let me just review it.

17              I'd have no reason to

18   believe otherwise.  But I want to -- yes,

19   the primary -- yes.

20        Q.    Do you believe that that

21   certification requires you to make a

22   balanced presentation of what the

23   scientific literature shows to the court?

24              ATTORNEY YEATES:  Object to

Page 762

1          the form.

2                  THE WITNESS:  I believe what

3          I attested to here is that I have

4          a duty of candor and professional

5          integrity, which, to me, means

6          being honest, being truthful and

7          presenting with professional

8          integrity, which I absolutely have

9          done in this case.

10   BY ATTORNEY KEYES:

11          Q.    And do you believe or

12   understand that that certification

13   requires you to make a balanced

14   presentation of what the scientific

15   literature shows to the court?

16                  ATTORNEY YEATES:  Object to

17          the form.

18                  THE WITNESS:  What I believe

19          I attested to is that I have an

20          overriding duty of candor and

21          professional integrity to help the

22          court on matters within my

23          expertise and in all submissions,

24          et cetera.

CONFIDENTIAL

Page 763

1                    So I don't see the word
2            "balanced" in here.  So you're
3            saying something that's actually
4            not within this.
5    BY ATTORNEY KEYES:
6            Q.    I'm asking for your
7    understanding of the certification you
8    signed.
9                    My question is, do you
10   believe or understand that this
11   certification requires you to make a
12   balanced presentation to the court of
13   what the scientific literature shows?
14                    You can say, yes, I have
15   that understanding; no, I don't have that
16   understanding; or I don't know.
17                    ATTORNEY YEATES:  Object
18           to -- object to the form.  And
19           asked and answered.
20                    THE WITNESS:  Or I can say
21           what I actually believe it means,
22           which is that I have a duty to be
23           truthful and honest and to act
24           with professional integrity, which

CONFIDENTIAL

Page 764

1          is what I am attesting to.
2     BY ATTORNEY KEYES:
3          Q.    And you can't say whether
4     that requires you, as part of that duty,
5     to give a balanced presentation to the
6     court of what the scientific literature
7     shows and doesn't show?
8               You're not willing to say it
9     covers that?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  So I'm willing
13         to say what I said, which is that
14         I'm attesting that I'm being
15         truthful and honest and acting
16         with professional integrity
17         throughout the entire case.
18              I think the term "balanced,"
19         as you're using it, is very hard
20         to define.  I don't know even what
21         you mean by that.
22     BY ATTORNEY KEYES:
23         Q.    I mean present both sides of
24     what the scientific literature shows.

CONFIDENTIAL

Page 765

1          With that explanation, do
2    you have an understanding as to whether
3    this certification requires you to give a
4    balanced presentation to the court of
5    what the scientific literature shows?
6              ATTORNEY YEATES:  Object to
7         the form.
8              THE WITNESS:  So I would
9         argue that there aren't just two
10        sides to any issue here and that
11        there's multiple factors that I
12        considered and presented
13        truthfully, with candor and
14        professional integrity.
15             ATTORNEY KEYES:  Why don't
16        we take a break?
17             VIDEO TECHNICIAN:  The time
18        is 2:46 p.m., and we are off the
19        record.
20                  -   -   -
21             (Whereupon, a brief recess
22        was taken.)
23                  -   -   -
24             VIDEO TECHNICIAN:  The time

CONFIDENTIAL

Page 766

1       is 3:01 p.m.  We are on the
2       record.
3  BY ATTORNEY KEYES:
4       Q.   Dr. Hoover, are you
5  currently helping any of the six school
6  districts implement the strategic plan
7  that you've recommended?
8       A.   Am I currently helping them
9  implement the plan?  No.
10      Q.   Have any of the six school
11 districts approached you about you
12 helping them implement the strategic
13 plan, in whole or in part?
14      A.   No.
15      Q.   Is it your expectation that
16 if the school district implements the
17 strategic plan, in whole or in part, they
18 would consult with you or hire you to
19 help them in that effort?
20          ATTORNEY YEATES:  Object to
21      the form.
22          THE WITNESS:  I can't
23      predict what the districts are
24      going to do.  But I have no

CONFIDENTIAL

Page 767

1          intention of that.
2     BY ATTORNEY KEYES:
3          Q.    Have you ever been an
4     associate superintendent for any school
5     district?
6          A.    No.
7          Q.    Have you ever been an
8     administrator for any school district?
9          A.    No.
10          Q.    Have you ever been a school
11     social worker?
12          A.    No.
13          Q.    Have you ever been a school
14     counselor?
15          A.    No.
16          Q.    Have you ever been a school
17     nurse?
18          A.    No.
19          Q.    Have you ever been a school
20     administrator?
21          A.    No.
22          Q.    Have you ever been a
23     principal?
24          A.    No.

CONFIDENTIAL

Page 768

1          Q.    Have you ever taught in a
2    middle school?
3          A.    No.
4          Q.    Have you ever taught in an
5    elementary school?
6          A.    No.
7          Q.    Have you taught in a high
8    school since 2008?
9          A.    The reason I'm pausing is
10   because I'm trying to think in the
11   context of supervision, would I have gone
12   in and taught a class or a seminar?
13              But outside of that, no.
14         Q.    Have you taught any class or
15   any seminar in a high school in the last
16   ten years?
17         A.    Honestly, that would be hard
18   for me to know.  Because I work in and
19   with schools a fair amount.
20              I don't know that I've
21   taught in a high school, a seminar, in
22   the last ten years.  Is it out of the
23   question?  No.  But I don't recall doing
24   that.

CONFIDENTIAL

Page 769

```
 1         Q.    In a recent update to your
 2   CV, you identified some recent
 3   publications or articles where you were
 4   quoted.  One of them was a July 2025 Ed
 5   Week article.
 6               Do you remember talking to a
 7   reporter from Ed Week?
 8               ATTORNEY YEATES:  Object to
 9         the form.  And this was covered
10         yesterday.  And it's not case
11         specific.  We're not going to go
12         through that article again.
13   BY ATTORNEY KEYES:
14         Q.    Do you remember that
15   article?
16         A.    I do.  So I just pulled up
17   my CV to make sure, because there are a
18   few from Ed Week.
19               But you're talking about the
20   July 2025 one?
21         Q.    Yes.
22         A.    Yes.
23         Q.    Did you disclose to the
24   journalist preparing that article that
```

CONFIDENTIAL

Page 770

1   you were a paid expert for the

2   plaintiffs?

3               ATTORNEY YEATES:  Object to

4           the form.  And not case specific.

5           And we covered this article

6           yesterday.  Today is not a day to

7           do the cleanup for yesterday.

8   BY ATTORNEY KEYES:

9           Q.    You can answer.

10          A.    I don't recall the specifics

11  of the conversation.  I've seen the

12  article.  But I don't recall the

13  specifics of the conversation.

14              I don't know that I would

15  have.  My understanding is that I'm not

16  to share that I'm a part of the

17  litigation, so.

18          Q.    Well, have you disclosed to

19  any journalist you've spoken with that

20  you're a paid expert for the plaintiffs?

21              ATTORNEY YEATES:  Object to

22          the form.  And not case specific.

23          You've exceeded your time allotted

24          by Judge Kang.

Page 771

1            THE WITNESS:  Not that I'm
2        aware of, no.
3    BY ATTORNEY KEYES:
4        Q.    Have you disclosed to any
5    professional journal to which you've
6    submitted any kind of article for
7    publication that you're a paid expert for
8    the plaintiffs?
9            ATTORNEY YEATES:  Do you
10        have any case specific questions?
11    BY ATTORNEY KEYES:
12        Q.    You can answer.
13            ATTORNEY YEATES:  Object to
14        the form.  And not case specific.
15        You've exceeded -- well exceeded
16        your time allotted by Judge Kang.
17        And we covered this yesterday.
18            THE WITNESS:  So, typically,
19        when you're submitting, if you
20        perceive a conflict of interest,
21        you may submit -- or you may be
22        asked to submit.  To my
23        recollection, I would not have
24        done that for any of the recently

Page 772

1        published articles.

2    BY ATTORNEY KEYES:

3        Q.    You don't view it as a

4    disclosable conflict of interest to let

5    the journal know that you are a paid

6    expert in civil litigation for the

7    plaintiffs and have been paid almost a

8    quarter of a million dollars when asking

9    the publication to publish your work?

10              ATTORNEY YEATES:  Object to

11          the form.  Foundation.  And not

12          case specific.  You've exceeded

13          your time allotted by Judge Kang.

14              THE WITNESS:  So the reason

15          I'm looking through my CV is

16          because the conflict of interest

17          that you state for a publication

18          is typically if you perceive it to

19          be a conflict of interest related

20          to a topic that you're presenting

21          on and if that's part of the

22          journal requirement, et cetera.

23              So it's not as easy as

24          saying, you know, kind of just

Page 773

1          broad sweeping, you present every
2          consulting agreement you're
3          working with or every litigation
4          you might be working with.
5                So the -- so in these
6          cases -- or in these most recent
7          publications, I don't believe that
8          that's something that I would have
9          submitted, no.
10   BY ATTORNEY KEYES:
11        Q.    Since July of 2024, when you
12   were engaged by the plaintiffs in this
13   litigation, have you disclosed to any
14   professional journal or any reporter that
15   you are a paid expert for the plaintiffs?
16        A.    No.
17                ATTORNEY YEATES:  Object to
18          the form.  And not case specific.
19                THE WITNESS:  I don't
20          believe I would have.  And I don't
21          believe that it would have been a
22          conflict of interest that would
23          have been reportable in those
24          circumstances.

CONFIDENTIAL

Page 774

1    BY ATTORNEY KEYES:

2        Q.    When you reviewed the

3    relevant scientific literature for

4    purposes of your opinions in the reports

5    you've issued, what did you need to see

6    in order to determine that there was a

7    causal link between students' use of

8    social media and harms to schools?

9              ATTORNEY YEATES:  Object to

10         the form.  Not case specific.  And

11         covered yesterday.

12              THE WITNESS:  So when I'm

13         reviewing the literature, I don't

14         look at it as, you know, I'm --

15         I'm looking at this article to

16         determine whether there is a

17         causal link.

18              Really, when I'm forming the

19         opinions in this case, I'm looking

20         at the totality of the literature

21         that I've used to form the

22         opinions.  And those are the

23         things that you consider together.

24              And we went over this,

CONFIDENTIAL

Page 775

1          again, yesterday.  But in the
2          absence of certain types of
3          studies, you would look to other
4          factors, whether there is multiple
5          correlational studies across
6          settings, whether there is
7          temporal sequencing, whether there
8          is a mechanism of change that's
9          theoretically defensible, et
10         cetera, et cetera.
11                So those are some of the
12         factors I would look at in the
13         literature to determine whether
14         it's relevant for causality.
15  BY ATTORNEY KEYES:
16         Q.    All right.  You say you're
17  looking at the totality of the
18  literature, and you said you're looking
19  for certain factors.
20                And you mentioned three of
21  them.  You mentioned temporal sequencing,
22  whether there's a mechanism of change
23  that's theoretical -- theoretically
24  defensible and whether there are multiple

Page 776

1  correlational studies across settings.

2              Are there other factors that

3  you're looking for as you review the

4  literature before you offer an opinion

5  that there is a causal link between

6  students' use of social media and harms

7  to schools?

8              ATTORNEY YEATES:  Counsel,

9         we're not going to go through a

10        deposition today of what we

11        covered yesterday.  This is not

12        case specific.  This is not a day

13        two of yesterday's deposition

14        where you get to re-ask questions

15        that were asked by other counsel.

16        I'm sure Judge Kang is now

17        available.  So I'd like to know if

18        you have any case-specific

19        questions.

20             ATTORNEY KEYES:  It is case

21        specific.

22             ATTORNEY YEATES:  It is not.

23        And it was already covered.

24  BY ATTORNEY KEYES:

Page 777

1          Q.     In your first report, the
2     very first report, did you talk about the
3     six school districts?
4          A.     The first report being the
5     May 16th general report?
6          Q.     Yes.
7          A.     Honestly, I have to go back
8     to it.  It's been a while.
9               Did I speak to the specific
10     districts?  I don't know that I did.  I'd
11     have to go look.
12               Do you want --
13          Q.     You said --
14          A.     -- to point me to a specific
15     place in here, I'm happy to --
16          Q.     You said you were going to
17     offer separate reports that were specific
18     to the school districts.
19          A.     Where was that?
20          Q.     Do you dispute that your
21     general report said that you were going
22     to submit separate school
23     district-specific reports?
24          A.     I've written so many reports

Page 778

1    at this point, I just want to make sure
2    that it's actually in here that I said I
3    was going to submit them.
4         Q.    Well, separate from whether
5    you said it in your first report, you did
6    submit six school district-specific
7    reports?
8         A.    That is correct.  As well as
9    the response to the rebuttals, six of
10   those as well.
11        Q.    Okay.  And you, in those six
12   school district-specific reports, talk
13   about the impact of student social media
14   use on those school districts and those
15   school environments and the student
16   mental health and learning in those
17   school districts, correct?
18        A.    Yes.  I speak about that in
19   the district-specific reports.
20        Q.    Okay.  And so you are
21   drawing a connection between students'
22   use of social media and what you say is
23   the impact on school districts, schools
24   and the school environment and student

CONFIDENTIAL

Page 779

1  mental health and learning.

2              It's Paragraph 2 of each of

3  your reports, right?

4        A.    Paragraph 2?

5              ATTORNEY YEATES:  Object to

6        the form.

7              THE WITNESS:  I'm looking at

8        one district report and

9        Paragraph 2 of my report, I'm

10       speaking about what I've been

11       retained as an expert for and that

12       I'm talking about the impact of

13       students' social media use on

14       school districts, schools and the

15       school environment, student mental

16       health and learning.

17 BY ATTORNEY KEYES:

18       Q.    And so for each of these six

19 school district-specific reports, you're

20 offering an opinion that students' use of

21 social media causes adverse consequences

22 to that particular school district, the

23 schools in that district, that school's

24 environment and the student mental health

CONFIDENTIAL

Page 780

1  and learning of students in that school
2  district?
3          A.    So in Opinion 2 -- I'm
4  looking specifically at the Breathitt
5  report right now -- I offer that, as I
6  opined in my general report, that the
7  damaging effects of students' social
8  media use on school district, schools and
9  the school environment, student
10  well-being and learning can be addressed
11  through a plan specific to Breathitt.
12          Q.    Okay.
13          A.    In terms of the impact
14  that's stated in Opinion 1, and I'm
15  talking about the cumulative negative
16  impacts of social media use on school
17  districts and -- and including Breathitt
18  County Board of Education.
19          Q.    And when you say "the
20  cumulative negative impacts of students'
21  social media use," you're saying that
22  students' use of social media has a
23  cumulative negative impact on the
24  particular school district, its schools

CONFIDENTIAL

Page 781

1    and its school environment, as well as

2    the mental health and learning of the

3    students in that school district?

4          A.    So what I'm saying in

5    Opinion 1 -- I'm looking at Breathitt

6    County's report right now -- is that --

7    that I have opined that the cumulative

8    negative impacts -- and I am general in

9    that beginning of the statement -- and

10   then I speak specifically here about

11   Breathitt County having to expend and

12   redirect already limited resources and

13   what they're increasingly tasked with as

14   a result of that.

15         Q.    Are you offering an opinion

16   that students' use of social media causes

17   harm to each of the six school districts?

18              ATTORNEY YEATES:  Object to

19         the form.

20              THE WITNESS:  So I do offer

21         the opinion that the defendants'

22         platforms have caused harm in each

23         of the school districts, on the

24         schools, and on the students in

Page 782

1          the schools.
2     BY ATTORNEY KEYES:
3          Q.    Okay.  So for purposes of
4     your opinion that the defendants'
5     platforms have caused harm in each of the
6     six school districts and their schools
7     and the students in those schools, I'm
8     trying to understand what you need to
9     find in order to conclude or support your
10     opinion that there is a causal
11     connection, a causal link between the
12     two.
13          A.    Okay.  So you want me to go
14     into the data --
15               ATTORNEY YEATES:  There's no
16          question pending.
17               THE WITNESS:  Okay.  You're
18          trying to understand that.
19     BY ATTORNEY KEYES:
20          Q.    You said --
21          A.    So what is the question?
22          Q.    -- I said I look at the
23     totality of the literature and I look at
24     factors.  And you mentioned three

CONFIDENTIAL

Page 783

1    factors.

2              And I'm asking, for purposes

3    of your opinion on causation for these

4    school districts, are you looking at any

5    other factors, besides the three you

6    listed, to support your opinion that

7    there is a causal link between students'

8    use of social media and the harms you're

9    identifying.

10           A.    So, first of all --

11                ATTORNEY YEATES:  Object to

12           the form.  Not case specific.  And

13           covered yesterday.

14                ATTORNEY KEYES:  It's

15           totally case specific.

16                THE WITNESS:  So, first of

17           all, I think I referred to the

18           totality of the literature that I

19           used in consideration for this,

20           not the totality of the literature

21           in the statement that I made

22           before.

23                I think you were referencing

24           a prior statement.  To my

CONFIDENTIAL

Page 784

1              recollection, I was talking about

2              that I reviewed the totality of

3              literature that I documented

4              considering for this case, and

5              with respect to other information

6              that I used to demonstrate

7              causation.

8                    So I started speaking -- I

9              didn't provide an exhaustive list

10             of what I consider in the

11             literature when considering

12             causation, right.  So that would

13             include prospective cohort

14             studies, longitudinal studies, et

15             cetera.

16                    Outside of the peer-reviewed

17             literature, looking specifically

18             to the cases, that is exactly why

19             it was important to actually look

20             at district-specific information.

21                    So as I've mentioned, I

22             looked through the plaintiff fact

23             sheets, which detail their

24             experiences with mental health

CONFIDENTIAL

Page 785

```
 1          systems and with the impact of
 2          social media.  And it's why I
 3          spoke with the people who are
 4          actually leading the district and
 5          who are working directly in
 6          schools.
 7               It's also why I looked to
 8          the depositions, as one part of
 9          the report, to understand the
10          experiences of the individuals who
11          are leading and working in
12          schools.
13               So those are part -- part of
14          what informed the causation of --
15          within the districts.
16 BY ATTORNEY KEYES:
17          Q.   So is part of your opinion
18 that there's a causal link here the fact
19 that some people said there was in their
20 depositions?
21               ATTORNEY YEATES:  Object to
22          the form.
23               THE WITNESS:  So, again, the
24          deposition testimony was one piece
```

Page 786

1          of information that I used to
2          inform the opinions in this case.
3                In terms of the causation,
4          the testimony and the depositions
5          may have spoken to that.
6          Certainly the key informant
7          interviews also spoke to some of
8          the elements of causation as well.
9    BY ATTORNEY KEYES:
10         Q.    I'm trying to understand the
11   basis for your opinion that there's a
12   causal link between students' use of
13   social media and the harms you've
14   identified for these six school
15   districts.
16                Are you saying that part of
17   the basis for that opinion is that some
18   people in their deposition said there's a
19   causal link?
20                ATTORNEY YEATES:  Object to
21         the form.
22                THE WITNESS:  So I think I
23         considered all of the information
24         that I had when forming my

CONFIDENTIAL

Page 787

1           opinions.  And that included
2           information from the depositions,
3           that included information from the
4           key informant interviews, that
5           included the scientific literature
6           on this, this included information
7           received from the districts or
8           information about the districts on
9           the plaintiff fact sheets.
10   BY ATTORNEY KEYES:
11           Q.    And can you identify for me
12   any other factor or any other framework,
13   besides what you've said, that, from the
14   perspective of the scientific literature,
15   is the basis for your opinion that
16   there's a causal link between students'
17   use of social media and the harms that
18   you're talking about?
19               ATTORNEY YEATES:  Object to
20           the form.  Not case specific.
21               THE WITNESS:  So the
22           scientific literature certainly
23           informed, and the expert reports
24           that I reviewed that went into

CONFIDENTIAL

Page 788

1          great detail about the science on
2          the -- not only the association
3          but the causation of social media,
4          the defendants' platforms, in this
5          case, on schools and on students.
6          So that was a piece of the
7          information.
8                And then I also looked to
9          other information when forming my
10         opinions.
11    BY ATTORNEY KEYES:
12         Q.    You say that the opinions
13    that you're offering in these six school
14    district reports draw upon your more than
15    25 years of experience as a researcher.
16              That's in Paragraph 2.  Do
17    you see that?
18         A.    Twenty-five years as a
19    clinician, researcher and consultant in
20    child and adolescent mental health within
21    school settings.
22         Q.    So you see the language I'm
23    referring to?
24         A.    I see the term "researcher"

CONFIDENTIAL

Page 789

1   and I see the "25 years," yes.

2          Q.    Have you conducted any

3   peer-reviewed research on whether

4   students' use of social media causes harm

5   to those students' mental health?

6                ATTORNEY YEATES:  Object to

7          the form.  Not case specific.  And

8          covered yesterday.

9                THE WITNESS:  So my research

10         is quite broad.  I've got about

11         100 peer-reviewed articles, most

12         of which focus generally on

13         comprehensive school mental health

14         systems.

15               My -- I wouldn't say that my

16         specific research area has been

17         the focus of social media impact.

18         My articles -- and reflect more

19         the school mental health.  And the

20         research that I've done have

21         looked at school mental health

22         broadly.

23               That being said, when we

24         think about student mental health,

CONFIDENTIAL

Page 790

1          we're looking at different impacts

2          on student mental health.  We're

3          talking about children,

4          adolescents, and, certainly,

5          social media is something that

6          impacts student mental health.

7                  So there are some experts

8          who -- whose, you know, specific

9          areas are looking at the design of

10         social media, for instance.

11                 My area of expertise, as I

12         laid out here, is really in

13         comprehensive school mental

14         health, part of which includes the

15         factors that might impact student

16         mental health.  A significant and

17         relatively new one being social

18         media.

19                 So it's a little hard to

20         tease apart, I guess, is the

21         answer.

22    BY ATTORNEY KEYES:

23         Q.    My question was very

24    specific.

CONFIDENTIAL

Page 791

1           Have you conducted any
2    peer-reviewed research on whether
3    students' use of social media causes harm
4    to those students' mental health?
5               ATTORNEY YEATES:  Objection.
6          Form.  Asked and answered.  Not
7          case specific.  And covered
8          yesterday.
9               THE WITNESS:  I think my
10         research has looked at factors
11         that impact student mental health.
12              It has not exclusively
13         looked at the impact of social
14         media on student mental health.
15   BY ATTORNEY KEYES:
16         Q.    Well, can you identify --
17   can you go to your CV and identify for me
18   any peer-reviewed research that you've
19   conducted on whether students' use of
20   social media causes harm to those
21   students' mental health?
22              ATTORNEY YEATES:  Object to
23         the form.  Asked and answered.
24         Not case specific.  Covered

Page 792

1          yesterday.

2                    THE WITNESS:  So I'm going

3          to go back to my CV and look

4          through my publications or my

5          grants or --

6  BY ATTORNEY KEYES:

7          Q.    You can look wherever you

8  want.

9                    I just want you to identify

10  with specificity any research --

11  peer-reviewed research that you've

12  conducted on whether students' use of

13  social media causes harm to their mental

14  health.

15          A.    Well --

16                    ATTORNEY YEATES:  Object to

17          the form.  Asked and answered.

18          Not case specific.  Covered

19          yesterday.

20                    THE WITNESS:  I think what I

21          just said is that the research

22          that I've conducted would not have

23          looked at the -- that social media

24          as a factor exclusive of other

Page 793

1          factors that impact student mental
2          health.
3                    And much of my research is
4          looking at the implementation of
5          school mental health systems.
6    BY ATTORNEY KEYES:
7          Q.    So is that to say you can't
8    identify what I'm asking for?
9                    ATTORNEY YEATES:  Same
10         objections.
11                   THE WITNESS:  I'm happy to
12         look through to see if there's
13         something specific to social
14         media.  I think we went through
15         most of this yesterday.
16                   But I don't recall, within
17         the peer-reviewed literature or
18         within the grants, specifically
19         studying the impact of social
20         media on student mental health.
21   BY ATTORNEY KEYES:
22         Q.    Have you conducted any
23   peer-reviewed research on whether
24   students' use of social media causes harm

CONFIDENTIAL

1   to schools?

2           ATTORNEY YEATES:  Object to

3       the form.  Not case specific.

4       Covered yesterday.

5           THE WITNESS:  Okay.  I

6       thought I just answered that.

7           But I would say, no, that I

8       don't think that my research focus

9       has been specifically looking at

10      social media exclusive of other

11      factors on mental health of young

12      people or student mental health.

13  BY ATTORNEY KEYES:

14      Q.   Have you published any

15  article, peer reviewed or not, that says

16  students' use of social media causes harm

17  to their schools?

18          ATTORNEY YEATES:  Object to

19      the form.  Not case specific.

20      Covered yesterday.

21          THE WITNESS:  Peer reviewed

22      or not?  I honestly cannot --

23      given all the publishing that I've

24      done, I don't know if I've

Page 795

1          mentioned social media in my
2          publications or not.
3                    Have I done unique research?
4          Part of the reason that, you know,
5          if you're a general specialist in
6          school mental health, that you
7          look to other experts who are
8          doing that research is because
9          they specialize in a certain
10         topic, like the direct impact of
11         social media.
12                    So you know I reviewed other
13         experts here.
14    BY ATTORNEY KEYES:
15         Q.    I'm just trying to
16    understand whether, prior to issuing the
17    school district-specific reports that
18    we've been talking about, you can point
19    to any research that you conducted, or
20    any research that you published about,
21    that talks about students' use of social
22    media causing harm to schools.
23                    Can you identify any such
24    research or publication?

CONFIDENTIAL

Page 796

1           A.    So as I've said --
2                 ATTORNEY YEATES:  Object to
3           the form.
4                 THE WITNESS:  So as I've
5           said, to know whether I had
6           actually spoken about specifically
7           social media within the context of
8           my publications, both peer
9           reviewed and not, I would have to
10          go back and look at the
11          publications.
12     BY ATTORNEY KEYES:
13          Q.    Ma'am, I'm not asking
14     whether you've spoken specifically about
15     social media.  My question is very
16     specific.
17                It's about whether students'
18     use of social media causes harm to
19     schools.  That's what my question is
20     about.
21                So I'm asking you, sitting
22     here today, with the benefit of your
23     extensive CV and given all of your
24     publications and all of your

CONFIDENTIAL

Page 797

1   presentations and all of your -- your

2   articles, have you, in any of those,

3   talked about students' use of social

4   media causing harm to schools?

5          ATTORNEY YEATES:  Object to

6          form.

7   BY ATTORNEY KEYES:

8          Q.    If you can't identify one,

9   that's fine.

10          But if you can, tell me what

11   it is specifically.

12          ATTORNEY YEATES:  Object to

13          the form.  Argumentative.  Not

14          case specific.  Covered yesterday.

15          THE WITNESS:  So now we're

16          including the presentations, just

17          to be clear, so the over 600

18          presentations.

19          You want me to think about,

20          in addition to the publications,

21          all the presentations, whether

22          I've ever talked about the impact,

23          the cause, or the fact that social

24          media causes mental health harms

Page 798

1          in young people?
2                  That would be virtually
3          impossible for me to do.
4    BY ATTORNEY KEYES:
5          Q.    I'll break it down.  I'll
6    break it down.
7          A.    Great.
8          Q.    Okay.  So to be very clear,
9    have you published any peer-reviewed
10   article or non-peer-reviewed article
11   where you talk about students' use of
12   social media causing harm to schools?
13                 Can you identify that?
14                 ATTORNEY YEATES:  Object to
15         the form.  Not case specific.
16         Already covered yesterday.  You've
17         allotted your time -- you've
18         exceeded your allotment of time
19         offered by Judge Kang.
20                 THE WITNESS:  I would have
21         to go back, given that there's
22         about -- there's over 100
23         articles, to see whether I spoke
24         about social media causing mental

CONFIDENTIAL

1          health impact within my

2          publications.

3   BY ATTORNEY KEYES:

4          Q.    Can you think of any one

5   sitting here right now?

6               ATTORNEY YEATES:   Same

7          objections.

8               THE WITNESS:   No.  I

9          couldn't do that, because I would

10         have to go back to them to look

11         through them.

12  BY ATTORNEY KEYES:

13         Q.    Okay.  Have you given any

14  presentations to any professional

15  audience where you talk about students'

16  use of social media causing harm to

17  schools?

18               ATTORNEY YEATES:   Object to

19         the form.  Not case specific.

20         Covered yesterday.

21               THE WITNESS:   So it would be

22         hard for me to know, within over

23         600 presentations, whether I've

24         made that statement or not.

Page 800

1    BY ATTORNEY KEYES:
2         Q.    Can you think of any one
3    sitting here right now?
4         A.    No.
5         Q.    Have you given any speech to
6    any audience where you talk about
7    students' use of social media causing
8    harm to schools?
9              ATTORNEY YEATES:  Object to
10         the form.  Not case specific.
11         Covered yesterday.  Asked and
12         answered.
13              THE WITNESS:  I certainly
14         may have.  But it would hard --
15         would be hard for me, without the
16         transcripts from all my
17         presentations, to know whether I
18         had made that statement.
19    BY ATTORNEY KEYES:
20         Q.    Can you think of any sitting
21    here right now?
22              ATTORNEY YEATES:  Same
23         objections.
24              THE WITNESS:  No.  No.

```
                                            Page 801
 1   BY ATTORNEY KEYES:
 2           Q.     What is Myspace?
 3           A.     What is Myspace?
 4           Q.     Uh-huh.
 5                  ATTORNEY YEATES:  That's
 6           certainly not case specific.  I'll
 7           object to that.
 8                  THE WITNESS:  I think it was
 9           an online -- I don't even know
10           what I would call it.
11                  I don't know.
12   BY ATTORNEY KEYES:
13           Q.     Did you understand that
14   Myspace was social media?
15                  ATTORNEY YEATES:  Object to
16           the form.  Not case specific.
17                  THE WITNESS:  I just said I
18           didn't --
19                  ATTORNEY YEATES:  Covered
20           yesterday.
21                  THE WITNESS:  I just said I
22           didn't know what it was, so.
23   BY ATTORNEY KEYES:
24           Q.     Have you ever heard of
```

CONFIDENTIAL

Page 802

1    Myspace?

2              ATTORNEY YEATES:  Same

3          objection.

4              THE WITNESS:  I've heard of

5          Myspace.

6    BY ATTORNEY KEYES:

7          Q.    Did you understand it to be

8    a social media company that ultimately

9    failed?

10             ATTORNEY YEATES:  Object to

11         the form.  Outside the scope.  Not

12         case specific.

13             THE WITNESS:  I don't -- I

14         don't think I know enough about it

15         to know what it was, to be totally

16         honest with you.

17   BY ATTORNEY KEYES:

18         Q.    Do you know whether

19   adolescents will be using social media at

20   all 15 years from now?

21         A.    I think it would be hard to

22   predict what social media will look like.

23             I think, given its

24   pervasiveness and in its current form,

CONFIDENTIAL

Page 803

1  the design features are such that it

2  would be pretty hard for young people to

3  move away from it.

4              So I can't predict what the

5  defendants' platforms are going to do or

6  if they're going to put, you know, age

7  restrictions on or if they're going to --

8  it's really hard for me to know what that

9  is going to look like 15 years from now.

10        Q.    Do you know whether

11  adolescents will be using social media

12  ten years from now?

13        A.    Again, it would be hard for

14  me to predict.  I would imagine that they

15  certainly would, given the current

16  climate and limited support that the

17  defendants' platforms have put in place

18  to cut -- cut back on this.

19              So I can't imagine.  But

20  it's hard for me to predict.

21        Q.    Have you conducted any

22  studies yourself attempting to forecast

23  any anticipated changes in how

24  adolescents use social media?

CONFIDENTIAL

Page 804

1          A.    No, I have not.

2               ATTORNEY YEATES:   Object to

3          the form.

4    BY ATTORNEY KEYES:

5          Q.    Have you done any research

6    of any studies by anyone else forecasting

7    anticipated changes in how adolescents

8    will use social media?

9               ATTORNEY YEATES:   Object to

10         the form.

11              THE WITNESS:   I'm actually

12         trying to think if any of the

13         literature that I looked at spoke

14         about forecasting into the future.

15         It may have, and I can't recall.

16              What I can say is that I've

17         certainly -- well, I don't know if

18         it's in the peer-reviewed

19         literature, but there are

20         certainly statements like, it's

21         not going anywhere, it's not going

22         away, the harms are not going

23         away.

24              So I don't know if that

CONFIDENTIAL

Page 805

1           speaks to your question.  But
2           that's the best forecast that I
3           can recall hearing about.
4    BY ATTORNEY KEYES:
5           Q.    For the strategic plans that
6    you are recommending in these reports on
7    the six school districts, can you
8    identify any school district that has
9    adopted such a strategic plan because of
10   the purported consequences of students
11   using social media?
12              ATTORNEY YEATES:  Object to
13         the form.  Asked and answered.
14              THE WITNESS:  So I just want
15         to make sure I understand the
16         question, because you said for the
17         specific -- the six districts and
18         then you said can you identify any
19         district.
20              Do you mean any of the six
21         districts or any district in the
22         universe that has adopted this
23         plan?
24   BY ATTORNEY KEYES:

CONFIDENTIAL

Page 806

1          Q.     Well, we know the six
2    districts have not --
3          A.     Okay.
4          Q.     -- adopted the strategic
5    plan.
6          A.     You started the question
7    with the six districts.  So I just wanted
8    to make sure that I understood the
9    question.
10          Q.     But I want to zero you in on
11    the strategic plan you're recommending --
12          A.     Okay.
13          Q.     -- for these six school
14    districts.
15          A.     Okay.
16          Q.     Okay.  Can you identify any
17    district, anywhere in the country, that
18    has adopted the strategic plan that you
19    are recommending in these six reports?
20               ATTORNEY YEATES:  Object to
21          form.  Asked and answered.
22               THE WITNESS:  So I thought
23          we had covered that.  But I'm
24          happy to restate that, to my

CONFIDENTIAL

Page 807

1          knowledge, no district has been
2          able to yet fully implement what
3          it would take to prevent and
4          mitigate the impact of the
5          defendants' platforms as I've laid
6          out in the strategic plans.
7                   ATTORNEY KEYES:  Dr. Hoover,
8          thank you for your time.  I'll
9          pass the witness.
10                  VIDEO TECHNICIAN:  The time
11         is 3:33 p.m., and we are off the
12         record.
13                       -   -   -
14                  (Whereupon, a brief recess
15         was taken.)
16                       -   -   -
17                  VIDEO TECHNICIAN:  The time
18         is 3:34 p.m., and we are on the
19         record.
20                       -   -   -
21                  EXAMINATION
22                       -   -   -
23   BY ATTORNEY NOLAN:
24         Q.    Good afternoon, Dr. Hoover.

CONFIDENTIAL

Page 808

1    My name is Jack Nolan.  I represent Snap.

2          A.    Good afternoon.

3          Q.    So for the district-specific

4    plans that you propose, you use the term

5    "social media" throughout those plans,

6    fair?

7          A.    I do use the term throughout

8    the plans.

9          Q.    But what you mean by social

10   media is the defendants' platforms;

11   YouTube, Facebook, Instagram, TikTok and

12   Snapchat, true?

13         A.    That is what I'm using it in

14   reference in these plans, yes.

15         Q.    All right.  If a student

16   were to be cyberbullied over text

17   message, would -- and they required

18   Tier 2 services -- or Tier 2 services

19   were appropriate for them, would they be

20   able to receive any of the Tier 2

21   services you are recommending in your

22   district-specific plans?

23                ATTORNEY YEATES:  Object to

24         the form.

Page 809

1              THE WITNESS:  So the

2        district-specific plans are

3        specific to the impacts of the

4        defendants' platforms.

5              There may be services in

6        place at their school to address

7        other forms of bullying.

8    BY ATTORNEY NOLAN:

9        Q.   Okay.  So in terms of the

10   plans that you're proposing, the

11   additional staffing, the additional

12   programming, the additional interventions

13   that are provided would not apply to

14   certain students who are bullied over

15   Discord, text message, Bluesky, Truth

16   Social, Reddit, any of those platforms

17   that are not belonging to the defendants,

18   true?

19              ATTORNEY YEATES:  Object to

20        the form.

21              THE WITNESS:  What I can say

22        is that the plan was intended to

23        address the harms caused by the

24        defendants' platforms.

CONFIDENTIAL

Page 810

1              And so the staffing that
2         would be put in place, the plans,
3         the programs, et cetera, are
4         intended to address students who
5         are harmed specifically by those
6         platforms.
7    BY ATTORNEY NOLAN:
8         Q.    And so if a student were
9    harmed by actions on another platform
10   that wasn't one of the defendants, would
11   they be turned away under your strategic
12   plans?
13              ATTORNEY YEATES:  Object to
14        the form.
15              THE WITNESS:  So to be
16        clear, my plans are to be built on
17        a foundation of existing services
18        in a school.  And many schools do
19        support students who may have been
20        bullied in -- in the context
21        you're offering of text messaging.
22        They might have that.
23              So when you say would they
24        be turned away, they may receive

Page 811

1           services.  So it's not that they
2           would never get a service.  But
3           would they be considered within
4           this strategic plan?  That's not
5           what we were looking at.
6    BY ATTORNEY NOLAN:
7           Q.    Okay.  So they would have to
8    use some of the resources that currently
9    exist at the school if they had to deal
10   with cyberbullying over text message,
11   true?
12          A.    Not necessarily.  They may
13   choose to use school resources or they
14   may have -- they may not choose to use
15   school resources.
16               But they would not be
17   specifically part of the plan that we've
18   laid out for the districts.
19          Q.    Okay.  Sitting here today,
20   have you -- are you offering any opinions
21   with respect to Snapchat that are not
22   covered in your reports?
23          A.    Am I offering opinions -- I
24   don't think I'm offering opinions that

Page 812

1    are outside of the report.

2         Q.    Okay. And that's true for

3    Snapchat, as well as every other

4    platform?

5         A.    The -- I mean, the opinions

6    I offer are with respect to the

7    defendants' platforms.  Understood.

8              But I'm not offering

9    opinions that are not in the reports, if

10   that's what you're asking.

11        Q.    Understood.

12        A.    Okay.

13        Q.    So if your opinion -- if

14   your reports are silent on a particular

15   issue, that means you're not offering

16   that opinion, true?

17             ATTORNEY YEATES:  Object to

18        the form.

19             THE WITNESS:  So I'm not

20        offering that opinion in the

21        context of these reports.  I laid

22        out the opinions that I had to

23        offer in the context up -- to

24        date.

Page 813

1   BY ATTORNEY NOLAN:

2          Q.    Now, do you have any sense,

3   for any of the school districts, the six

4   school districts, how many students are

5   bullied on text message or some other

6   platform versus how many are bullied on a

7   defendants' platform?

8                ATTORNEY YEATES:  Object to

9          the form.

10               THE WITNESS:  I don't know

11         that -- I certainly don't know

12         that offhand.  I don't know that I

13         have the data on that.

14               And, frankly, related to

15         some of the things I talked about

16         earlier, the data infrastructure

17         for a lot of the schools that we

18         work with, including in these

19         districts, likely would not have

20         been resourced enough and advanced

21         to be able to make those

22         distinctions.

23               So unfortunately not.

24   BY ATTORNEY NOLAN:

CONFIDENTIAL

Page 814

1        Q.    Does the technology exist to
2   make those distinctions currently?
3        A.    So that's -- I mean, that's
4   an interesting question.
5             Does the technology exist to
6   make the distinctions?  You could
7   certainly attempt, with existing
8   technology, to make distinctions between
9   sources of bullying.  And that may have
10  happened.  I'm not a tech expert.
11            But, again, I don't -- you
12  know, part of the plan is to help build
13  data infrastructure to allow for that, to
14  allow for at least an understanding of
15  the source of impact, and you mentioned
16  cyberbullying.
17       Q.    But what the school
18  districts would implement with respect
19  to -- I'm going to call it data
20  collection.
21            Is that a fair term?
22       A.    Sure.
23       Q.    What the school districts
24  would implement with respect to data

CONFIDENTIAL

Page 815

1   collection to gather this information,

2   nothing new needs to be invented in order

3   for them to do that, true?

4           A.    I don't know that that's

5   true.  I don't know the tech -- in terms

6   of the technology for creating, you know,

7   an intra-operable data system.

8                 Again, I don't -- know that

9   systems exist to collect mental health

10  data, for example, or mental health

11  referral data.  I don't know that it has

12  caught up to some of the direct impacts

13  of social media harm in schools.

14                And, you know, you're

15  talking about distinguishing between

16  platforms.  I don't know that that

17  technology exists, because I'm not a

18  technologist.

19          Q.    So with respect to mental

20  health referrals, that technology exists

21  currently, true?

22          A.    The technology to --

23          Q.    Track them.

24          A.    -- track mental health

CONFIDENTIAL

Page 816

1    referrals?

2              It exists to an extent.  And

3    a lot of school districts do not have it

4    or have it in very limited and poor form.

5         Q.    Understood.  But it exists.

6    And so if they had the money, they could

7    buy it today?

8         A.    Maybe.  Would there need to

9    be, you know, improvements on it?

10   Perhaps.  Could there be -- could it be

11   improved?  Perhaps.  But is there some

12   technology that exists?  Yes.

13        Q.    But are you saying that the

14   technology needed to implement your plans

15   does not exist in full form currently?

16             ATTORNEY YEATES:  Object to

17        the form.

18             THE WITNESS:  I'm not

19        suggesting that.  Again, not a

20        technologist here, so I want to be

21        a little bit cautious about what I

22        say exists in the technology field

23        and what doesn't.

24             In my experience in schools,

CONFIDENTIAL

Page 817

1          there exists data systems that

2          help with tracking referrals and

3          that help in identifying students

4          who may have mental health

5          concerns.

6    BY ATTORNEY NOLAN:

7          Q.    Okay.  So there are certain

8    data systems that exist?

9          A.    Yes.

10         Q.    And these school districts

11   have just chosen not to purchase or

12   implement those data systems, fair?

13              ATTORNEY YEATES:  Object to

14         the form.

15              THE WITNESS:  Not fair.

16   BY ATTORNEY NOLAN:

17         Q.    Well --

18         A.    No.

19         Q.    -- true or -- yes or no,

20   have they implemented the data systems

21   that exist?

22         A.    So you're --

23              ATTORNEY YEATES:  Object to

24         the form.

CONFIDENTIAL

Page 818

1              THE WITNESS:  So you're
2         asking broadly across six
3         districts and each of them has
4         different technology systems.  And
5         some, you know, may have more
6         limitations than others, which is
7         very consistent with what we see
8         in districts across the country.
9              And so you phrased the
10        question as they've chosen not to.
11        I would say that they are limited
12        by what they're -- they've been
13        able to resource.
14   BY ATTORNEY NOLAN:
15        Q.    Because they've made the
16   decision to spend their resources on
17   other things, right?
18             ATTORNEY YEATES:  Object to
19        the form.
20             THE WITNESS:  Well, what I
21        would -- how I would phrase it is
22        that they have limited budgets and
23        have -- I can't, first of all,
24        speak to the intentions behind

CONFIDENTIAL

Page 819

1          these specific school districts
2          and their purchasing.
3                What I can say is that I
4          know school districts struggle to
5          prioritize.  And they have to make
6          very difficult decisions.
7                And so every one of the six
8          districts that I spoke with did
9          report in investing in some way of
10         trying to track mental health,
11         whether it's the, you know,
12         student referrals that we talked
13         about or mental health outcomes.
14  BY ATTORNEY NOLAN:
15         Q.    And for the six districts
16  that you issued reports on, was there
17  investment in mental health referrals or
18  tracking mental health following the
19  COVID-19 pandemic?
20                ATTORNEY YEATES:  Object to
21         the form.
22                THE WITNESS:  Was there a
23         specific distinct investment?
24  BY ATTORNEY NOLAN:

CONFIDENTIAL

Page 820

1          Q.     Well, yeah, did they start
2     doing that after COVID?
3               ATTORNEY YEATES:  Object to
4          the form.
5               THE WITNESS:  I don't know,
6          honestly.  I don't know the date
7          at which some of the systems were
8          put into place.  I believe that
9          some of their mental health data
10         systems have been in place for
11         longer than the pandemic, so.
12    BY ATTORNEY NOLAN:
13         Q.     Okay.  And even though those
14    mental health tracking systems have been
15    in place for years at this point, they
16    don't track the reason for the
17    referral --
18               ATTORNEY YEATES:  Object to
19         the form.
20    BY ATTORNEY NOLAN:
21         Q.     -- to the level that would
22    say it was related to one of the
23    defendants' platforms or some other
24    reason?

CONFIDENTIAL

Page 821

1                ATTORNEY YEATES:  Object to
2         the form.
3                THE WITNESS:  So, again,
4         we're talking about data systems
5         across six different districts,
6         because they are under the
7         umbrella of the one question.
8                But in -- in my experience
9         looking at the information about
10        the data systems, and in my
11        discussions during key informant
12        interviews, I do not believe, at
13        this point, that they had the
14        capacity in their data systems to
15        consistently track whether a --
16        one of the defendants' platforms
17        was involved -- I think you gave
18        the example of an incident of
19        cyberbullying or a mental health
20        referral, I guess, was the next
21        question that you asked.
22                Do I think some data systems
23        attempt to capture that?  I recall
24        people saying, you know, sometimes

CONFIDENTIAL

Page 822

1           they were able to add notes.

2                   Having working -- having

3           worked with lots of school

4           districts, and even in speaking

5           with these particular school

6           districts, they often said that

7           they were not able to document

8           even within the existing systems.

9    BY ATTORNEY NOLAN:

10          Q.    They were completely unable

11   to document the cause or the suspected

12   cause of the mental health referral?

13                  ATTORNEY YEATES:  Object the

14          form.

15                  THE WITNESS:  Across all six

16          districts or are you asking

17          about --

18   BY ATTORNEY NOLAN:

19          Q.    Is there a particular

20   district that you're thinking of right

21   now that was completely unable to

22   document the underlying cause for the

23   mental health referral?

24                  ATTORNEY YEATES:  Object to

CONFIDENTIAL

Page 823

1          the form.

2                  THE WITNESS:  I can't

3          recall.  I'd have to go back to

4          see what the different systems

5          allowed for in terms of being able

6          to capture this.

7                  But, in general, you know,

8          you're asking about were they able

9          to document?  And I would say, as

10         I've said, they had limited

11         capacity to capture the data, to

12         understand all of the unique

13         causes or impacts of social media

14         harm.

15  BY ATTORNEY NOLAN:

16         Q.    Okay.  So they don't have

17  the data to understand all of the unique

18  causes or impacts of social media harm;

19  was that your testimony?

20                 ATTORNEY YEATES:  Object to

21         the form.

22                 THE WITNESS:  What I am

23         saying is that their data systems

24         are limited.  And that's part of

CONFIDENTIAL

Page 824

1          why I included a data
2          infrastructure need as part of the
3          strategic plan.
4     BY ATTORNEY NOLAN:
5          Q.    Okay.  Did you consider any
6     Snap internal documents in formulating
7     your opinions?
8          A.    No.
9          Q.    Did you consider the
10    deposition testimony of any Snap employee
11    in formulating your opinions?
12         A.    No.
13         Q.    Did you review any academic
14    literature that was specific to Snap or
15    Snap -- the Snapchat platform?
16         A.    So the scientific literature
17    that I reviewed, as well as scientific
18    literature that was cited by experts that
19    I cited in my reports, much of that
20    included Snap.
21         Q.    But were any of the articles
22    just about the Snapchat platform?
23              ATTORNEY YEATES:  Object to
24         the form.  And not case specific.

Page 825

1          THE WITNESS:  I don't

2     recall.

3               Sorry.

4               I don't recall.

5  BY ATTORNEY NOLAN:

6          Q.    You mentioned yesterday that

7  you do have a Snapchat account, right?

8          ATTORNEY YEATES:  Object to

9     the form.  And not case specific.

10         THE WITNESS:  I think so.

11  BY ATTORNEY NOLAN:

12         Q.    Okay.  Do you know what the

13  user name is?

14         ATTORNEY YEATES:  Object to

15    the form.  Not case specific.

16         THE WITNESS:  I have no

17    idea.

18  BY ATTORNEY NOLAN:

19         Q.    Okay.  Do you have any sense

20  of when the last time you used Snapchat

21  was?

22         ATTORNEY YEATES:  Object to

23    the form.  Not case specific.

24         THE WITNESS:  No.

Page 826

1    BY ATTORNEY NOLAN:

2         Q.    Any sense of how much time,

3    in total, you've ever spent on Snapchat?

4              ATTORNEY YEATES:  Object to

5         the form.  Not case specific.

6              THE WITNESS:  Maybe a couple

7         of hours total.

8    BY ATTORNEY NOLAN:

9         Q.    Over what period of time?

10        A.    My life.

11             ATTORNEY YEATES:  Object to

12        the form.  Not case specific.

13             THE WITNESS:  My life.

14   BY ATTORNEY NOLAN:

15        Q.    Okay.  That's fine.

16             And when you created the

17   Snapchat account, was this, like, a

18   couple of months ago?  A decade ago?  A

19   couple of years ago?  Like, any -- any

20   sense of when in time?

21             ATTORNEY YEATES:  Object to

22        the form.  Not case specific.

23             THE WITNESS:  I don't

24        recall.  It was not in the last

Page 827

1          month.

2     BY ATTORNEY NOLAN:

3          Q.    Okay.

4          A.    It was more than a year ago.

5          Q.    Okay.  Have you ever sent or

6     received a Snap?

7                ATTORNEY YEATES:  Object to

8          the form.  Not case specific.

9                THE WITNESS:  Yes.

10    BY ATTORNEY NOLAN:

11         Q.    Okay.  Have you ever sent or

12    received a chat on Snapchat?

13                ATTORNEY YEATES:  Object to

14         the form.  Not case specific.

15                THE WITNESS:  So the

16         difference between a Snap and a

17         chat on Snapchat is?

18    BY ATTORNEY NOLAN:

19         Q.    Snap is a picture.  A chat

20    is a message.

21                ATTORNEY YEATES:  Same

22         objections.

23                THE WITNESS:  So I've sent a

24         chat.  I don't know if I've sent a

Page 828

1          picture.

2     BY ATTORNEY NOLAN:

3          Q.    Okay.  Have you ever used

4     Snapchat to view, like, a story or video?

5               ATTORNEY YEATES:  Object to

6          the form.  Not case specific.

7               THE WITNESS:  I have no

8          idea.

9     BY ATTORNEY NOLAN:

10         Q.    Okay.  Have you ever used a

11     Snapchat lens?

12               ATTORNEY YEATES:  Object to

13          the form.  Not case specific.

14               THE WITNESS:  What is that?

15          Is that the things that --

16     BY ATTORNEY NOLAN:

17         Q.    You know, like, the doggy

18     ears?

19         A.    Oh.  Yes.

20         Q.    Okay.  Was the doggy ears

21     the one that you used?

22               ATTORNEY YEATES:  Object to

23          the form.  Not case specific.

24               THE WITNESS:  I don't know.

Page 829

1   BY ATTORNEY NOLAN:

2          Q.    Okay.  Have you ever had a

3   streak on Snapchat with a friend?

4                ATTORNEY YEATES:  Object to

5          the form.  Not case specific.

6                THE WITNESS:  No.

7   BY ATTORNEY NOLAN:

8          Q.    Do you know what a Snap

9   streak is?

10                ATTORNEY YEATES:  Object to

11          the form.  Not case specific.

12                THE WITNESS:  So I'll give

13          you my understanding, is that it's

14          when you have a consistent

15          communication between people and

16          you.

17                So I don't know if it's

18          daily.  I not sure exactly what it

19          is.  But that's my understanding.

20                It's another mechanism to --

21          what I understand -- the reason I

22          understand it is because young

23          people say they have to stay on

24          it, even when they're at camp or

CONFIDENTIAL

Page 830

1          on vacation, so that they can
2          maintain a streak.  That's why I
3          know what it is.
4   BY ATTORNEY NOLAN:
5          Q.    Do you have any sense of how
6   long it takes to maintain a streak?
7               ATTORNEY YEATES:  Object to
8          the form.  Not case specific.
9               THE WITNESS:  I do not.
10  BY ATTORNEY NOLAN:
11         Q.    Have you ever used the Snap
12  Map feature?
13              ATTORNEY YEATES:  Object to
14         the form.  Not case specific.
15              THE WITNESS:  I don't think
16         so.
17  BY ATTORNEY NOLAN:
18         Q.    Have you ever visited
19  Snapchat's Here For You resources?
20              ATTORNEY YEATES:  Object to
21         the form.  Not case specific.
22         You've exceeded your time allotted
23         by Judge Kang.
24              THE WITNESS:  I don't know.

Page 831

1    BY ATTORNEY NOLAN:

2         Q.    Okay.  If you did, would it

3    be in your materials considered list?

4              ATTORNEY YEATES:  Same

5         objection.

6              THE WITNESS:  Not

7         necessarily.

8              I think you just asked have

9         I seen it or reviewed it.  But I

10        don't know that it would be in my

11        materials reviewed.

12   BY ATTORNEY NOLAN:

13        Q.    Has your use of Snapchat for

14   a couple of hours over the course of your

15   life harmed your mental health?

16             ATTORNEY YEATES:  Object to

17        the form.  Not case specific.

18        You've exceeded your time allotted

19        by Judge Kang.

20             THE WITNESS:  I don't know.

21   BY ATTORNEY NOLAN:

22        Q.    Have you ever spoken to a

23   doctor or medical professional or mental

24   health professional about your use of

Page 832

1    Snapchat and its -- any effect on you?

2              ATTORNEY YEATES:  Object to

3         the form.  Not case specific.

4         Outside the scope.

5              THE WITNESS:  I was going to

6         say, are we going to detail my

7         personal health history here?

8         That feels like a private matter.

9              But the answer would be no.

10   BY ATTORNEY NOLAN:

11        Q.    Okay.  Could you explain to

12   me, at a high level, the different

13   sections or tabs within Snapchat?

14             ATTORNEY YEATES:  Object to

15        the form.  Not case specific.

16             THE WITNESS:  I don't think

17        I could, no.

18   BY ATTORNEY NOLAN:

19        Q.    Are you aware of any other

20   applications that use streaks?

21             ATTORNEY YEATES:  Object to

22        the form.  Not case specific.

23             THE WITNESS:  I'm actually

24        not.

CONFIDENTIAL

Page 833

1  BY ATTORNEY NOLAN:

2       Q.    Have you ever used Duolingo?

3            ATTORNEY YEATES:  Object to

4       the form.  Not case specific.

5            THE WITNESS:  I think I may

6       have used it, like, downloaded it,

7       used it, and then never used it

8       again.  It was -- it was an

9       ambitious goal.

10 BY ATTORNEY NOLAN:

11      Q.    What about Headspace?

12           ATTORNEY YEATES:  Object to

13      the form.  Not case specific.

14           THE WITNESS:  I think I've

15      seen Headspace.

16 BY ATTORNEY NOLAN:

17      Q.    Is it your opinion that all

18 apps with streaks are necessarily

19 harmful?

20           ATTORNEY YEATES:  Object to

21      the form.  Not case specific.

22           THE WITNESS:  I didn't offer

23      an opinion on that.

24 BY ATTORNEY NOLAN:

CONFIDENTIAL

Page 834

1          Q.    Do you have any idea what
2      sort of information is displayed on a
3      Snapchat user's profile?
4                  ATTORNEY YEATES:  Object to
5            the form.  Not case specific.
6                  THE WITNESS:  I could not
7            say with specificity.
8      BY ATTORNEY NOLAN:
9          Q.    Do you know what Spotlight
10     is within Snapchat?
11                 ATTORNEY YEATES:  Object to
12           the form.  Not case specific.
13                 THE WITNESS:  Spotlight?
14           No.
15     BY ATTORNEY NOLAN:
16         Q.    Do you know if Snap has
17     likes?
18                 ATTORNEY YEATES:  Object to
19           the form.  Not case specific.
20                 THE WITNESS:  I don't know
21           that.
22     BY ATTORNEY NOLAN:
23         Q.    When a user posts a public
24     story on Snapchat, is the number of times

Page 835

1   a story has been viewed public?

2               ATTORNEY YEATES:  Object to

3         the form.  Not case specific.

4               THE WITNESS:  I do not know.

5   BY ATTORNEY NOLAN:

6         Q.    Do you know what the average

7   age of a Snapchat user is?

8               ATTORNEY YEATES:  Object to

9         the form.  Not case specific.

10              THE WITNESS:  I want to say

11        that some of that was detailed in

12        the expert reports I looked at.

13              I know we certainly -- you

14        know, as I was writing, they

15        certainly looked at, you know, age

16        of different platform use.

17              Can I tell you, in this

18        moment, the average age of a Snap

19        user?  No.

20  BY ATTORNEY NOLAN:

21        Q.    Can you tell me what

22  percentage of students within any of the

23  school districts -- any of the six school

24  districts use Snapchat?

Page 836

1                    ATTORNEY YEATES:  Object to
2          the form.
3                    THE WITNESS:  I cannot give
4          you that number.  Usually when
5          that number -- part of the reason
6          you couldn't get that number is
7          because the data might not exist
8          within the school district.  So
9          you would have to extrapolate it
10         from national data, which is
11         pretty typical in the field, that
12         you would do that.
13                    If you don't have the data
14         infrastructure to collect that
15         within a certain site, you would
16         look to nationally collected data.
17    BY ATTORNEY NOLAN:
18            Q.    Okay.  But you don't know
19    if, for any of the six school districts,
20    that data varies from the national rate?
21                    ATTORNEY YEATES:  Object to
22          the form.
23                    THE WITNESS:  I wouldn't
24          know.  Because the data

Page 837

1           infrastructure might not be there
2           within the district, which is why
3           we recommend building district
4           data infrastructure so that they
5           can actually navigate this issue.
6    BY ATTORNEY NOLAN:
7           Q.    And since you don't know for
8    the specific districts and you're using
9    national data, do you know how much time
10   Snapchat users, on average, spend using
11   different features on the Snapchat app?
12                ATTORNEY YEATES:  Objection
13          to the form.  Not case specific.
14                THE WITNESS:  So, again, I
15          would have to recall specifically
16          the expert reports, where they did
17          go into some detail about features
18          and the different platforms and
19          time spent.
20                But do I have that number
21          for you right now?  No.
22   BY ATTORNEY NOLAN:
23          Q.    And in order to get those
24   numbers, you would be relying on the

CONFIDENTIAL

Page 838

1    other experts in this case; you didn't
2    independently identify that information,
3    true?
4                    ATTORNEY YEATES:  Object to
5         the form.  And not case specific.
6                    THE WITNESS:  So I looked to
7         the other experts because I
8         recall -- just since we're doing a
9         bit of a memory test here, I could
10        recall, you know -- I'd have to
11        look to the expert.
12                Could that have also been in
13        some of the literature that I
14        reviewed?  Possibly.
15   BY ATTORNEY NOLAN:
16        Q.    Okay.  And you believe that
17   the literature you reviewed may have
18   included a breakdown of how much time
19   Snapchat users spend using different
20   aspects of the platform?
21                    ATTORNEY YEATES:  Object to
22        the form.  Not case specific.
23                    THE WITNESS:  What I'm
24        saying is I -- it could be

CONFIDENTIAL

1          possible.  I didn't say I believe

2          that.  I don't know.

3    BY ATTORNEY NOLAN:

4          Q.    Sitting here today, you

5    don't know?

6          A.    I don't know --

7              ATTORNEY YEATES:  Same

8          objections.

9              THE WITNESS:  -- sitting

10         here today.

11   BY ATTORNEY NOLAN:

12         Q.    So, for example, you don't

13   know how much time Snapchat users spend

14   messaging using the chat feature on Snap,

15   true?

16             ATTORNEY YEATES:  Object to

17         the form.  Not case specific.

18             THE WITNESS:  So sitting

19         here today, I can't give you the

20         number of minutes that users on

21         Snap use messaging.

22   BY ATTORNEY NOLAN:

23         Q.    Have you seen that number

24   anywhere to your recollection?

Page 840

 1                    ATTORNEY YEATES:  Same

 2            objection.  And you have three

 3            more minutes.

 4                    THE WITNESS:  So I don't

 5            know if that specific number

 6            you're asking about, about that

 7            feature of Snap, was in the

 8            literature I've reviewed or the

 9            expert reports.

10   BY ATTORNEY NOLAN:

11            Q.    Did you ask the plaintiffs'

12   lawyers for that information?

13                    ATTORNEY YEATES:  Object to

14            the form.  Not case specific.

15                    THE WITNESS:  Did I ask or

16            could I ask?

17   BY ATTORNEY NOLAN:

18            Q.    Did you --

19            A.    I misunderstood your

20   question.

21            Q.    Did you --

22            A.    Did I --

23            Q.    -- ask the plaintiffs'

24   lawyers?

CONFIDENTIAL

Page 841

1           A.     -- ask that information?

2           Q.     Did you ask the plaintiffs'

3    lawyers for that information, the amount

4    of time Snapchat users spend using the

5    messaging portion of the app?

6                  ATTORNEY YEATES:  Object to

7           the form.  Not case specific.

8                  THE WITNESS:  Did I ask that

9           question specifically?  No.

10   BY ATTORNEY NOLAN:

11          Q.     Okay.  When a user opens the

12   Snapchat app, what do they see?

13                 ATTORNEY YEATES:  Object to

14          the form.  Not case specific.

15                 THE WITNESS:  I don't know

16          every user and what they see when

17          they open it.

18   BY ATTORNEY NOLAN:

19          Q.     Well, every user, when they

20   open it, sees the camera.

21                 Any reason to dispute that?

22                 ATTORNEY YEATES:  Object to

23          the form.  Not case specific.

24                 THE WITNESS:  I just don't

CONFIDENTIAL

Page 842

1          know what they see when they open
2          it.
3     BY ATTORNEY NOLAN:
4          Q.   Okay.  And I just have a few
5     more questions here.
6               Did you recommend to any of
7     the school districts that you consult for
8     that they bring a lawsuit against the
9     defendants in this case?
10              ATTORNEY YEATES:  Object to
11         the form.  And not case specific.
12              THE WITNESS:  Did I
13         recommend that they bring a
14         lawsuit?  No.
15    BY ATTORNEY NOLAN:
16         Q.   Okay.  Have you -- do you
17    believe that social media should be
18    banned?
19              ATTORNEY YEATES:  Object to
20         the form.  And not case specific.
21              THE WITNESS:  So I don't
22         think I've ever called for a ban
23         on social media.
24              What I've called for is that

CONFIDENTIAL

Page 843

1          we support schools, in this case
2          in these six districts, to address
3          the harms that the defendants'
4          platforms have caused to the
5          students in their schools and on
6          the school experience itself.
7    BY ATTORNEY NOLAN:
8          Q.    But only the defendants'
9    platforms, right?
10              ATTORNEY YEATES:  Object to
11         the form.
12              THE WITNESS:  In the case of
13         this litigation, that's what I'm
14         offering an opinion on, are these
15         six districts.
16   BY ATTORNEY NOLAN:
17         Q.    Is it your opinion that no
18   other social media platform has caused
19   any harm at all to students or schools?
20              ATTORNEY YEATES:  Object to
21         the form.  And not case specific.
22              THE WITNESS:  I didn't offer
23         an opinion on that.
24              What I did detail in my

Page 844

1           report is that the defendants'
2           platforms account for a -- the
3           vast majority of use by young
4           people; so elementary and
5           secondary students.
6      BY ATTORNEY NOLAN:
7           Q.    And by "vast majority," what
8      do you mean?
9                ATTORNEY YEATES:  Object to
10          the form.  Not case specific.  And
11          covered yesterday.
12               THE WITNESS:  So I detail --
13          I provided detailed numbers in the
14          reports around the different
15          plat -- the defendants' platforms
16          and levels of use.
17               So -- and it's gone into in
18          much more detail in some of the
19          expert reports that I reviewed.
20     BY ATTORNEY NOLAN:
21          Q.    Okay.  What percentage of
22     your income, since you've started working
23     on this litigation, has been from your
24     work as an expert in this case?

CONFIDENTIAL

Page 845

1              ATTORNEY YEATES:  Object to
2         the form.  And not case specific.
3              THE WITNESS:  I'd have to
4         calculate that.  I do trainings
5         that generate income and some
6         consulting work.  So I'm not
7         entirely sure.
8    BY ATTORNEY NOLAN:
9         Q.   So sitting here today, you
10   can't tell me what percentage of your
11   income, since you were retained in this
12   case, is from your expert work for these
13   six school districts, true?
14              ATTORNEY YEATES:  Object to
15        the form.  And not case specific.
16              THE WITNESS:  I can't give
17        you a percentage, no.
18   BY ATTORNEY NOLAN:
19        Q.   Okay.
20              ATTORNEY NOLAN:  Anybody
21        else?
22              ATTORNEY YEATES:  I have no
23        questions.  Thank you.
24              VIDEO TECHNICIAN:  I will

CONFIDENTIAL

Page 846

1          now be stating the on-record times

2          for each party.

3                    Andrew Keyes, representing

4          YouTube, went five hours, four

5          minutes.  John Nolan, representing

6          Snap, went 25 minutes.

7                    The time is 3:59 p.m.  We

8          are off the record.

9                         -   -   -

10                   (Whereupon, the deposition

11         concluded at 3:59 p.m.)

12                        -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 847

1                    C E R T I F I C A T E

2

3

4            I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10           Amanda Maslynsky-Miller

11           Certified Realtime Reporter

             Dated:  August 14, 2025

12

13

14

15

16

17           (The foregoing certification

18    of this transcript does not apply to any

19    reproduction of the same by any means,

20    unless under the direct control and/or

21    supervision of the certifying reporter.)

22

23

24

CONFIDENTIAL

Page 848

1                   INSTRUCTIONS TO WITNESS

2

3                   Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                   After doing so, please sign

9    the errata sheet and date it.

10                  You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                  It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 849

1                    - - - - - -

                     E R R A T A

2                    - - - - - -

3   PAGE    LINE    CHANGE

4   ____    ____    _____

5   ____    ____    _____

6   ____    ____    _____

7   ____    ____    _____

8   ____    ____    _____

9   ____    ____    _____

10  ____    ____    _____

11  ____    ____    _____

12  ____    ____    _____

13  ____    ____    _____

14  ____    ____    _____

15  ____    ____    _____

16  ____    ____    _____

17  ____    ____    _____

18  ____    ____    _____

19  ____    ____    _____

20  ____    ____    _____

21  ____    ____    _____

22  ____    ____    _____

23  ____    ____    _____

24  ____    ____    _____

CONFIDENTIAL

Page 850

1              ACKNOWLEDGMENT OF DEPONENT
2
              I,_____, do
3    hereby certify that I have read the
     foregoing pages,  1 - 847, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8     _____
      SHARON A. HOOVER, Ph.D.              DATE
9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

CONFIDENTIAL

Page 851

1                    LAWYER'S NOTES

2     PAGE   LINE

3     ____   ____   _____

4     ____   ____   _____

5     ____   ____   _____

6     ____   ____   _____

7     ____   ____   _____

8     ____   ____   _____

9     ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

CONFIDENTIAL

**[& - 20th]**                                                    Page 1

| **&** |
| --- |

**&**   402:16 403:3
403:10 404:3
404:10,19
405:11 406:3
406:10,16

| **0** |
| --- |

**07068**   405:13

| **1** |
| --- |

**1**   408:17,17
445:9 521:10
637:20 638:5
638:24 640:7
646:6 651:14
654:20,20
780:14 781:5
850:3
**10**   716:20,24
**100**   541:11
716:3 789:11
798:22
**10022**   404:21
**10036**   406:18
**10:05**   499:18
**10:18**   500:1
**10:21**   504:13
**10:26**   504:20
**11**   503:9,11,13
**117**   406:11
**1185**   406:17
**11:31**   582:14

**11:45**   582:21
**12**   543:16
553:21
**12:50**   666:17
**13**   402:9
**13th**   409:14
**14**   847:11
**15**   529:9
540:12 580:16
581:10,22
701:2 716:21
717:1 802:20
803:9
**16**   522:6
**16th**   777:5
**18**   473:16
**19**   819:19
**19087**   402:18
403:5
**1:33**   666:24
**1st**   528:22
551:18 552:1

| **2** |
| --- |

**2**   565:12,14
703:13,15
704:1 705:8
706:4,9 707:5
707:23 708:11
709:11 710:12
710:15,17,24
711:7,23
712:19,22,23
714:3,9,14,17

716:11,13
717:14 718:17
779:2,4,9
780:3 788:16
808:18,18,20
**20**   524:4
850:11
**200**   403:12
553:12
**20001**   404:12
**2000s**   554:6
**20024**   404:5
**2008**   768:8
**2010**   528:18
**2017**   412:10
413:8,22 414:9
414:20 415:2
415:15,22
416:9,17 417:2
417:11,17
418:3,20
419:10 421:10
421:23 422:11
422:22 423:14
424:2,14
425:21 426:9
427:5 430:6,24
431:12 432:7
432:16 433:11
434:7 435:5
436:10 437:6
437:21 438:18
439:10 440:18
442:2 449:16

450:10 451:5
451:20 452:21
453:9 454:6
455:2,19
456:15 458:11
460:5,23
461:22 462:20
464:2,17
465:10 466:19
489:2,21
720:15
**202**   404:6,13
**2022**   746:5
747:4
**2023**   407:17,21
642:12,21
648:18 649:2
749:9 750:18
**2024**   407:17,21
642:12,21
648:18 649:2
773:11
**2025**   402:9
409:14 416:18
417:3,12,18
422:22 437:21
453:9 454:6
528:23 551:18
583:7 643:6
720:15 769:4
769:20 847:11
**20th**   582:4
583:7 760:19

CONFIDENTIAL

**[210 - 973]**                                                                                      Page 2

| | | | |
|---|---|---|---|
| **210** 406:12 | **30** 407:12 | **434-5000** 404:6 | **648** 407:21 |
| **212** 404:21 | 533:1 540:23 | **446-4800** | **662-6000** |
| 406:19 | 543:17 564:11 | 404:21 | 404:13 |
| **2200** 406:5 | 564:14 733:12 | **45** 760:1,22,23 | **667-7706** 403:6 |
| **2222** 405:16 | 848:16 | **462-6000** | **680** 404:5 |
| **23** 589:14 | **301** 405:5 | 403:13 | |

**210** 406:12
**212** 404:21
  406:19
**2200** 406:5
**2222** 405:16
**23** 589:14
  591:6
**24th** 643:6
**25** 448:4
  449:10 516:3
  788:15 789:1
  846:6
**250** 597:1,3,10
  640:24 651:5
  651:14 654:20
**251** 405:6
**26** 727:2
  729:18 730:2
  747:21 748:5
  748:10,16,20
**280** 402:16
  403:5
**2:46** 765:18

**3**

**3** 587:12,14
  703:14,19
  704:14 705:9
  705:20 706:4
  707:24 708:11
  709:11 710:12
  714:22 715:4,9
  716:18 717:1
  717:14

**30** 407:12
  533:1 540:23
  543:17 564:11
  564:14 733:12
  848:16
**301** 405:5
**3047** 402:3,4
**305** 403:13
**308-1515** 405:6
**31** 407:15
  552:1 642:6,9
**310-3030**
  406:12
**31605** 847:10
**32** 407:19
  642:5 648:12
  648:15
**33** 648:11
**33131** 403:13
**33134** 405:17
**34th** 406:18
**36** 564:10
**36602** 405:5
**3:01** 766:1
**3:33** 807:11
**3:34** 807:18
**3:59** 846:7,11

**4**

**4** 551:19
**409** 406:6
  408:17
**410** 407:6

**434-5000** 404:6
**446-4800**
  404:21
**45** 760:1,22,23
**462-6000**
  403:13
**4700** 403:12
**48** 646:14
**4:22** 402:3

**5**

**5** 405:12
  716:19 717:1
**50** 558:2 646:8
  646:14
**500** 596:1,7,13
  596:19 640:7
  641:14 644:11
  645:5 646:6
  654:20
**501** 406:5
**556-2100**
  406:19
**564** 407:14

**6**

**6** 587:15,18
**600** 501:10
  544:13,15
  545:1 797:17
  799:23
**601** 404:20
**610** 403:6
**642** 407:18

**648** 407:21
**662-6000**
  404:13
**667-7706** 403:6
**680** 404:5

**7**

**73** 473:18
  476:12 478:5
  479:17 481:11
  581:11
**750** 597:17
**763-3260** 406:6
**77550** 406:6
**78212** 406:12

**8**

**808** 407:6
**808west.com**
  406:13
**847** 850:3
**85** 717:2
**850** 404:12
**877.370.3377**
  402:24
**8:59** 402:19
  409:15

**9**

**9** 582:6 583:1
  587:12,15,18
**917.591.5672**
  402:24
**973** 405:13,17

**[994-1700 - addicted]** Page 3

| | | | |
|---|---|---|---|
| **994-1700** | 808:20 813:21 | **access** 412:12 | 650:15 |
| 405:13,17 | 818:13 822:1,7 | 413:11 414:1 | **actually** 444:3 |
| **a** | 823:5,8 | 416:1,12 418:6 | 444:6 447:17 |
| | **above** 402:19 | 419:23,24 | 468:7 469:20 |
| **a.m** 402:19 | **absence** 447:14 | 421:18 422:7 | 482:5,6,10 |
| **a.m.** 409:15 | 775:2 | 422:18 450:23 | 483:2,8,17 |
| 499:18 500:1 | **absolutely** | 485:3,14 508:5 | 485:19 495:23 |
| 504:13,20 | 508:10 529:19 | 509:3 511:12 | 509:8 510:13 |
| 582:14,21 | 530:1,10 | 512:13 515:12 | 548:22 571:8 |
| **ability** 444:21 | 625:12 656:19 | 515:13 689:4 | 575:5 576:11 |
| 519:24 | 659:17 762:8 | 689:23 690:20 | 583:4 600:10 |
| **able** 427:8 | **abstract** 757:18 | 691:17 693:1 | 604:19 629:8 |
| 428:15 430:6 | **abstracts** | **accessible** | 635:2 636:20 |
| 430:23 436:16 | 733:14,21 | 451:11,15 | 639:1 644:18 |
| 439:5 440:8 | **abuse** 534:7 | **account** 659:13 | 645:8 650:22 |
| 441:5 442:14 | 535:1,23 | 825:7 826:17 | 655:23 665:6 |
| 447:8 452:22 | 617:14 | 844:2 | 678:13 679:14 |
| 453:8,23 454:5 | **academic** 613:5 | **accounts** 510:9 | 687:14 688:21 |
| 454:12,17 | 726:21 727:9 | **accurate** 466:7 | 694:23 699:21 |
| 455:1,18 | 727:11 728:9 | 469:21 654:21 | 704:11 705:18 |
| 456:13 458:10 | 730:12,19 | 848:20 | 728:16 729:11 |
| 473:7 474:6 | 732:1,8 737:1 | **acknowledg...** | 736:7 749:15 |
| 477:4 482:18 | 759:22 824:13 | 850:1 | 757:10 763:3 |
| 485:2 486:17 | **academics** | **act** 511:18 | 763:21 778:2 |
| 486:18 495:22 | 619:11 | 763:23 | 784:19 785:4 |
| 532:1 570:11 | **academies** | **acting** 764:15 | 796:6 804:11 |
| 572:17 574:7 | 734:3,17 735:4 | **action** 514:2 | 832:23 837:5 |
| 574:21 576:3 | 735:10 736:4 | **actions** 689:17 | **adaptation** |
| 577:7 608:20 | 736:11,21 | 810:9 | 551:10 552:21 |
| 609:4,6 637:24 | 737:3 739:15 | **actively** 510:21 | **add** 572:17 |
| 657:16 664:23 | 739:23 | **activities** | 822:1 |
| 678:14 696:3,7 | **accepted** 444:4 | 657:13 | **added** 573:17 |
| 704:22 721:17 | 613:12 652:12 | **actual** 497:24 | **addicted** 625:1 |
| 733:13 807:2 | | 549:2 649:7,18 | 626:9,16 |

**[addicted - aggregate]** Page 4

627:14 628:2
**addiction** 402:4
409:19 421:12
422:1,13 423:1
423:17 424:7
446:3,4
**addition**
593:11 797:20
**additional**
611:12 647:19
678:6 680:1,14
680:23 681:4,8
684:5 697:1
698:7 700:15
745:24 809:11
809:11,12
**additions** 563:8
**address** 470:15
477:12 481:5
484:13 497:16
512:6 536:23
538:9 541:20
543:10,23
544:18 545:3
570:9 571:9
572:23 581:5
583:22 584:8
584:11 585:11
586:4,16
590:19 600:11
600:13 606:17
607:1,8 608:15
614:15 619:24
623:15 629:20

656:13 658:12
666:9 671:19
672:24 673:13
674:11 675:15
676:3,18 680:8
684:15 688:6
688:21 694:15
694:18 695:4
696:8,13,19
697:1 698:8
699:8 718:7
721:23 809:6
809:23 810:4
843:2
**addressed**
477:9 540:20
542:4 780:10
**addresses**
471:7
**addressing**
447:12 538:17
547:14 552:22
553:2 558:14
573:15 677:5
**adequate**
671:18 672:22
672:24 673:13
**adequately**
675:20
**adhered** 530:17
**adjectives**
428:23
**adjusted**
659:22 660:10

661:10 662:11
665:17 717:8
**adjusting** 662:1
**adjustments**
701:5
**administration**
534:8 535:2,24
**administrator**
767:8,20
**administrators**
427:19 431:8
448:6,7 484:22
493:3 561:15
**adolescent**
402:3 409:19
734:5 737:5
739:1,17 740:3
788:20
**adolescents**
639:14 790:4
802:19 803:11
803:24 804:7
**adopt** 606:2
607:15 621:7
**adopted** 805:9
805:22 806:4
806:18
**adults** 746:10
**advanced**
813:20
**advancing**
540:11
**advent** 660:19
663:4

**adverse** 779:21
**advice** 735:12
**advisable** 504:5
**advisory** 666:5
**advocate**
501:15 505:20
511:1 512:5
515:19 660:17
**advocated**
500:23 501:18
504:24 506:2
506:15,17
507:6,10 508:3
509:1,18 510:7
510:17 515:10
**advocating**
604:4 606:1
607:14 612:11
614:22 615:23
**affiliated**
530:11
**affirmative**
659:7
**afford** 695:9
**afternoon**
807:24 808:2
**age** 526:23
553:19 617:8
803:6 835:7,15
835:18
**agencies** 535:8
537:5 538:23
**aggregate**
579:3,5

**[agnello - answered]** Page 5

| | | | |
|---|---|---|---|
| **agnello**  405:11 | **allocated** | 651:12 652:1 | 622:1,3 625:13 |
| **ago**  550:9 | 684:10 | 658:16 660:9 | 641:16 663:22 |
| 760:5 826:18 | **allotment** | 661:8 663:15 | 671:1,22 |
| 826:18,19 | 798:18 | 664:17 | 678:23 698:21 |
| 827:4 | **allotted**  501:5 | **americas** | 698:22 706:1 |
| **agree**  587:21 | 505:6 506:8,23 | 406:17 | 707:11,20,20 |
| 628:23,24 | 507:16 515:23 | **amount**  417:15 | 708:9,19,23 |
| 630:11 631:24 | 528:14 531:3 | 431:10 670:11 | 709:8 721:8 |
| 632:6,12 633:1 | 532:21 740:10 | 695:3 768:19 | 725:5 738:20 |
| 633:14,20 | 753:24 770:23 | 841:3 | 740:13 750:17 |
| 634:1,6,10,14 | 771:16 772:13 | **analogy**  481:9 | 751:16 752:19 |
| 634:19 635:8 | 798:17 830:22 | 639:7 | 753:5,6 754:24 |
| 635:13 645:12 | 831:18 | **analysis**  675:8 | 758:20 770:9 |
| 674:2 735:9 | **allow**  814:13 | 700:10 750:10 | 771:12 790:21 |
| **agreed**  409:3 | 814:14 | **andrew**  404:4 | 832:9 |
| 636:15 637:1 | **allowed**  485:14 | 410:18 846:3 | **answered** |
| **agreement** | 823:5 | **annual**  540:11 | 421:3 427:11 |
| 530:15 773:2 | **allows**  483:8 | 540:15 541:18 | 439:1 441:1 |
| **ahead**  556:17 | 578:10 | **answer**  408:5 | 442:11 452:2 |
| 691:12 | **alphabet**  404:8 | 442:12 462:9 | 454:14,16 |
| **air**  576:6 | **alter**  478:21 | 477:1 487:21 | 489:23 513:19 |
| **akeyes**  404:6 | **altered**  649:24 | 490:19 499:13 | 539:3 540:5 |
| **akin**  478:5 | **amanda**  402:20 | 501:8 502:11 | 575:2 576:23 |
| **alabama**  405:5 | 410:4 847:10 | 502:22 504:4 | 578:21 579:19 |
| **alaska**  551:11 | **ambitious** | 516:12 518:20 | 593:3 607:18 |
| **albeit**  743:10 | 833:9 | 518:21 522:23 | 619:23 621:12 |
| 743:12 | **amended** | 523:5,15,18 | 623:9 624:10 |
| **alerts**  485:5 | 560:23 582:4 | 524:20 525:7 | 661:17,19 |
| **aligned**  508:21 | 583:5 760:8,19 | 525:14,18,19 | 699:17 706:6 |
| 694:14 | **america**  614:9 | 527:7 532:2 | 708:24 709:14 |
| **aligning**  694:17 | **american** | 534:15 536:9 | 726:9 729:8 |
| **allen**  405:4 | 407:19 551:11 | 541:24 542:24 | 735:16 749:12 |
| **allocate**  684:7 | 614:9 641:4,9 | 558:4 588:10 | 753:22 763:19 |
| | 648:15,23 | 592:24 604:12 | 791:6,23 |

**[answered - asked]**                                                    Page 6

| | | | |
|---|---|---|---|
| 792:17 794:6 | **applications** | **area** 487:22 | **articles** 515:10 |
| 800:12 805:13 | 832:20 | 497:3 605:6 | 730:24 732:4 |
| 806:21 | **applied** 711:1 | 611:16 612:4 | 733:15 747:16 |
| **answering** | **applies** 716:17 | 614:16 615:9 | 754:20 755:2,5 |
| 625:11 759:7 | **apply** 479:20 | 789:16 790:11 | 759:5 769:3 |
| **answers** 443:17 | 628:5 703:5 | **areas** 448:22 | 772:1 789:11 |
| 707:11 850:4 | 809:13 847:18 | 552:18 611:11 | 789:18 797:2 |
| **anticipate** | **applying** | 612:21 681:12 | 798:23 824:21 |
| 472:3 573:1,4 | 610:13 | 711:1,4 746:14 | **artificial** |
| **anticipated** | **appreciate** | 790:9 | 699:12 |
| 803:23 804:7 | 437:3 625:10 | **arguably** | **asked** 419:20 |
| **antonio** 406:12 | **apprised** 741:2 | 557:13 | 421:3 427:11 |
| **anxiety** 464:6 | **approach** | **argue** 502:24 | 427:15 429:19 |
| 464:13,21 | 471:23 474:20 | 504:1 526:15 | 439:1 441:1 |
| 475:3,16 702:3 | 477:12 478:21 | 765:9 | 446:20 447:2 |
| 746:9 | 479:12,21 | **argumentative** | 452:5,8 454:14 |
| **anxious** 465:13 | **approached** | 429:9,15,18 | 489:23 492:7 |
| 466:3,8,23 | 766:11 | 468:4 525:5 | 496:2 497:11 |
| **anybody** | **approaches** | 622:7 625:22 | 510:20 513:19 |
| 576:11 716:7 | 479:15 480:3 | 708:21 797:13 | 539:3 547:19 |
| 845:20 | **appropriate** | **arizona** 670:9 | 562:24 563:9 |
| **anymore** | 563:15 622:24 | 670:11 683:23 | 563:18 575:2 |
| 525:15 | 709:3 714:12 | **array** 560:8 | 576:10,17 |
| **apart** 535:10 | 715:3 716:13 | 564:7 | 579:19 588:8 |
| 790:20 | 808:19 848:6 | **arrived** 503:10 | 593:3 607:18 |
| **app** 837:11 | **appropriaten...** | **article** 500:24 | 621:12,18 |
| 841:5,12 | 711:7 | 501:19 505:1 | 623:8 624:10 |
| **appearances** | **approval** | 506:3,18 | 637:3 655:15 |
| 403:1 404:1 | 561:22 | 507:11 747:20 | 661:17 664:19 |
| 405:1 406:1 | **approve** 561:13 | 769:5,12,15,24 | 668:12 684:19 |
| **appeared** | **apps** 833:18 | 770:5,12 771:6 | 686:22 699:17 |
| 759:19 | **arbitrary** | 774:15 794:15 | 702:7 706:6 |
| **appears** 645:24 | 491:16 | 798:10,10 | 709:14 716:2 |
| 650:20 | | | 729:8 735:16 |

**[asked - attorney]**                                         Page 7

| | | | |
|---|---|---|---|
| 738:23 749:12 | 616:5 618:19 | **assessments** | **attempted** |
| 750:1,22 751:1 | 622:22 628:23 | 447:4 572:2 | 488:5 490:2 |
| 752:21 753:11 | 629:6 668:9 | **assistance** | **attempting** |
| 753:22 763:19 | 675:4 682:3,6 | 539:24 682:14 | 482:17 487:23 |
| 771:22 776:15 | 685:13 691:23 | 682:23 | 487:24 490:9 |
| 791:6,23 | 692:2,6,8,18 | **associate** 767:4 | 536:22 584:19 |
| 792:17 800:11 | 695:19 698:13 | **associated** | 803:22 |
| 805:13 806:21 | 698:24 699:4 | 686:6 | **attempts** |
| 821:21 831:8 | 705:13 710:21 | **association** | 485:22 489:13 |
| **asking** 415:13 | 713:11,13 | 407:15,20 | 495:19 554:11 |
| 420:19 421:5 | 721:5 726:8 | 614:7,10 | **attested** 762:3 |
| 425:14 428:20 | 740:14 741:20 | 640:11,15 | 762:19 |
| 428:22 429:2 | 743:5 745:2 | 641:5,9,12 | **attesting** 764:1 |
| 430:1 432:22 | 749:15,19 | 642:10,19 | 764:14 |
| 433:3 434:2 | 750:4,21 751:7 | 643:2 644:9 | **attorney** 407:6 |
| 437:15,18 | 754:24 763:6 | 645:13 648:16 | 407:6 410:13 |
| 438:8 446:9 | 772:8 783:2 | 648:24 651:13 | 412:14,19,22 |
| 449:8 452:9 | 793:8 796:13 | 651:24 652:2 | 413:6,13,21 |
| 457:7,11 | 796:21 812:10 | 658:15,17 | 414:5,8,14,19 |
| 465:23 478:22 | 818:2 822:16 | 659:20 660:9 | 416:22 417:1,7 |
| 480:22 489:7 | 823:8 840:6 | 661:9 662:9 | 417:10 418:8 |
| 498:8 503:18 | **asks** 565:18 | 663:9,15 | 418:17 419:1,7 |
| 503:19 507:7 | **aspects** 838:20 | 664:16,18 | 419:14,19 |
| 510:23 511:15 | **aspirational** | 788:2 | 420:8,23 421:2 |
| 516:2,14 518:2 | 653:3,16 | **assume** 454:19 | 421:8,13,21 |
| 518:9,10,12 | **asserted** 703:6 | 517:8 664:23 | 422:3,8,14,20 |
| 519:20 521:15 | **assess** 560:3 | **assumed** | 423:2,12,18,24 |
| 521:24 533:7 | **assessing** | 427:16 429:19 | 424:8,13,18 |
| 537:18 549:14 | 563:15 | **assured** 578:3 | 425:4 426:1,8 |
| 556:23 557:1 | **assessment** | **attached** | 426:13 427:1 |
| 569:8 575:17 | 422:24 423:16 | 848:12 850:6 | 427:10,24 |
| 575:18 576:20 | 424:6 446:4 | **attempt** 492:10 | 428:9,18 429:4 |
| 593:17 602:6 | 559:23 560:7 | 814:7 821:23 | 429:7,17,21 |
| 607:24 611:9 | 561:16 569:18 | | 430:10,22 |

CONFIDENTIAL

**[attorney - attorney]**                                    Page 8

| | | | |
|---|---|---|---|
| 431:3,11,17 | 473:6 475:5 | 520:20 521:18 | 583:14 584:2 |
| 432:5,10,14,19 | 476:13,22,24 | 522:1,21 | 585:20,22 |
| 433:9,15 434:5 | 477:24 478:24 | 523:12 524:12 | 588:5,22 |
| 434:10 435:3,9 | 479:8 480:5,15 | 525:4,12 | 592:21,23 |
| 436:8,20,24 | 481:7 482:2 | 528:12,19 | 593:2,10 |
| 437:4,10,19 | 484:3,10 | 529:3,15 531:1 | 594:17,20 |
| 438:2,15,24 | 485:11,17 | 531:10,15 | 598:1 599:1,8 |
| 439:9,17 | 487:4,14 | 532:3,6,14,19 | 599:18 600:3 |
| 440:15,24 | 488:22 489:4 | 533:10 536:6 | 601:14 604:9 |
| 441:24 442:8 | 489:17,22 | 537:1,8 538:19 | 605:22 606:3 |
| 443:15,23 | 490:12,20,22 | 539:2,6,11 | 607:11,17,19 |
| 445:2 446:10 | 491:2,21 492:3 | 540:7,21 541:4 | 612:12,24 |
| 448:9 449:19 | 492:15,21 | 541:7,15,22 | 615:1,15 616:2 |
| 450:1,13 451:1 | 493:13,15,18 | 542:5,18 543:5 | 616:9 618:12 |
| 451:23 452:4 | 493:23 494:3,8 | 543:12,19 | 619:14,20 |
| 452:12,20 | 494:22 496:9 | 545:19 546:1,4 | 621:4,11,15,23 |
| 453:2,7,13,20 | 496:23 497:5 | 546:8,13,23 | 622:2,6,21 |
| 454:1,3,9,11,13 | 497:18 499:14 | 547:7,18 548:2 | 623:7 624:5,9 |
| 454:24 455:6 | 500:3,8,12,16 | 549:3,10,21 | 624:22 625:3,5 |
| 455:17,24 | 500:21 501:3,7 | 550:3,22 | 625:21 626:3 |
| 456:12,17 | 501:23 502:5,8 | 552:13 554:18 | 626:11,21,24 |
| 457:19 458:15 | 502:10,12,15 | 555:5,13,21 | 628:8,17 629:5 |
| 459:2,7 460:3 | 502:21,23 | 556:9,16,18,24 | 629:17 631:23 |
| 460:10,21 | 503:1,6,16,19 | 557:11,19,23 | 634:22 635:7 |
| 461:4,20 462:3 | 503:22,24 | 558:19,23 | 636:6,8 638:11 |
| 462:18 463:1 | 504:8,11,22 | 559:17 564:9 | 638:15,19 |
| 463:24 464:7 | 505:4,24 506:6 | 564:19,24 | 640:4 642:4,17 |
| 464:15,22 | 506:16,21 | 565:4,8,11,13 | 644:14 645:3 |
| 465:8,14 | 507:8,14 508:1 | 575:1,16 576:5 | 645:18 646:7 |
| 466:17,24 | 508:7,23 | 577:2 578:15 | 646:16 648:10 |
| 467:11,21,22 | 513:18 514:8 | 578:16,18 | 648:21 649:9 |
| 468:3 470:4,9 | 514:16 515:7 | 579:13,18 | 649:14,21 |
| 470:14 471:3 | 515:21 516:17 | 580:1,12 582:2 | 650:3,5,18 |
| 472:10,17 | 519:14 520:10 | 582:7,10,11,23 | 651:1,9,16 |

CONFIDENTIAL

**[attorney - attorney]**                                        Page 9

| | | | |
|---|---|---|---|
| 652:3 653:1,6 | 708:6,7,20 | 751:13,15,22 | 795:14 796:2 |
| 654:8 655:5,7 | 709:4,13 710:6 | 751:24 752:2 | 796:12 797:5,7 |
| 655:11 656:24 | 710:18 711:10 | 752:18,22 | 797:12 798:4 |
| 658:20,22 | 711:19 712:13 | 753:1,4,21 | 798:14 799:3,6 |
| 659:18,24 | 712:20 713:1,8 | 755:9 756:13 | 799:12,18 |
| 660:7,13 661:6 | 713:19 714:5 | 757:8 758:6,8 | 800:1,9,19,22 |
| 661:12,14,16 | 714:18,24 | 758:16 759:23 | 801:1,5,12,15 |
| 662:7,13 663:7 | 715:13,19,20 | 760:12,15,17 | 801:19,23 |
| 665:21 666:13 | 715:23 717:16 | 760:21 761:24 | 802:2,6,10,17 |
| 666:15 667:2 | 718:3,9,18 | 762:10,16 | 804:2,4,9 |
| 670:20 671:10 | 720:5 721:2 | 763:5,17 764:2 | 805:4,12,24 |
| 671:14 672:5 | 722:7,13,16,24 | 764:10,22 | 806:20 807:7 |
| 672:11 673:3,9 | 723:8,15 | 765:6,15 766:3 | 807:23 808:23 |
| 673:15,21 | 724:14,19,24 | 766:20 767:2 | 809:8,19 810:7 |
| 674:15,22 | 725:4,7,14 | 769:8,13 770:3 | 810:13 811:6 |
| 675:23 676:6 | 726:11 728:5,7 | 770:8,21 771:3 | 812:17 813:1,8 |
| 676:13,24 | 729:7,9,12,15 | 771:9,11,13 | 813:24 816:16 |
| 677:17 679:19 | 730:13,17 | 772:2,10 | 817:6,13,16,23 |
| 680:18 681:24 | 731:18 732:10 | 773:10,17 | 818:14,18 |
| 682:5 684:21 | 733:8,23 734:6 | 774:1,9 775:15 | 819:14,20,24 |
| 685:17 687:4 | 734:13 735:15 | 776:8,20,22,24 | 820:3,12,18,20 |
| 688:8,10,24 | 736:1 737:10 | 779:5,17 | 821:1 822:9,13 |
| 690:23 691:9 | 737:12,15,22 | 781:18 782:2 | 822:18,24 |
| 691:21 692:1 | 738:9,22 739:3 | 782:15,19 | 823:15,20 |
| 693:6 694:2,9 | 739:7 740:7,12 | 783:11,14 | 824:4,23 825:5 |
| 695:6,12 | 741:17 742:6 | 785:16,21 | 825:8,11,14,18 |
| 696:10 697:3 | 742:14,16,19 | 786:9,20 | 825:22 826:1,4 |
| 698:1,9,23 | 743:4,19 744:6 | 787:10,19 | 826:8,11,14,21 |
| 699:9,10,16,18 | 744:16,18 | 788:11 789:6 | 827:2,7,10,13 |
| 700:19 701:1 | 745:15 746:3 | 790:22 791:5 | 827:18,21 |
| 702:19 703:22 | 746:11,21 | 791:15,22 | 828:2,5,9,12,16 |
| 704:2 705:6,10 | 748:2,4,6,8,13 | 792:6,16 793:6 | 828:22 829:1,4 |
| 705:15 706:5 | 749:11,17 | 793:9,21 794:2 | 829:7,10 830:4 |
| 707:7 708:3,4 | 750:19 751:7 | 794:13,18 | 830:7,10,13,17 |

**[attorney - based]**                                                                    Page 10

| | | | |
|---|---|---|---|
| 830:20 831:1,4 831:12,16,21 832:2,10,14,18 832:21 833:1,3 833:10,12,16 833:20,24 834:4,8,11,15 834:18,22 835:2,5,8,20 836:1,17,21 837:6,12,22 838:4,15,21 839:3,7,11,16 839:22 840:1 840:10,13,17 841:6,10,13,18 841:22 842:3 842:10,15,19 843:7,10,16,20 844:6,9,20 845:1,8,14,18 845:20,22 848:16 **attributable** 579:8 696:23 708:15 **attribute** 498:17 574:7 574:14,21 576:3,21 577:3 577:7 **attributed** 578:12 | **attributing** 577:24 **atypical** 463:5 **audience** 799:15 800:6 **august** 402:9 409:14 551:18 552:1 847:11 **available** 466:16 474:14 501:1,21 505:3 506:4,19 516:22 517:16 518:18,24 571:7 619:18 621:8,20 622:9 629:12 648:23 701:4 776:17 **avenue** 404:5 404:20 406:17 **average** 835:6 835:18 837:10 **awarded** 538:5 **aware** 500:20 530:6 537:22 555:8 569:22 647:1,6 668:16 668:19 681:10 701:6 735:3 771:2 832:19 **awareness** 634:16 | **b** **b** 407:9 512:5 700:8 **back** 456:24 457:7,9,23 459:12,15,20 460:14 461:7 461:12 462:12 464:10 465:1 465:19 491:5 494:2 495:16 495:23 497:24 498:8,11,12,14 506:12 521:3,8 541:1,13 542:21 548:24 554:16 560:20 561:2 571:14 577:11 613:18 658:14 685:16 707:14 739:12 749:22 759:7 777:7 792:3 796:10 798:21 799:10 803:18 823:3 **balance** 574:17 **balanced** 761:22 762:13 763:2,12 764:5 764:18 765:4 **ball** 471:15 475:12 | **ban** 487:9 489:2,20 490:16 491:1 492:2,20 493:22 494:5 497:3 499:6 842:22 **banned** 842:18 **bans** 487:24 493:10 495:15 496:3,7 497:21 498:4 **bar** 645:5 650:14 **bars** 645:1 **based** 407:17 415:12 418:10 424:21 441:22 448:24 474:12 474:13,14 480:24 538:2 572:19 575:22 595:16 596:12 597:16 598:5 598:15,23,23 599:13,22 600:6,9 601:5 601:8 605:21 616:16 640:10 641:3 642:12 652:13 665:14 665:15 688:3 701:8,10 720:9 723:13 750:13 |

CONFIDENTIAL

**[based - breathitt]** Page 11

751:19 753:17
**baseline** 482:14
653:21
**basic** 656:5
660:18
**basis** 786:11,17
787:15
**bates** 407:12,15
407:19 564:14
642:9 648:15
**bears** 675:24
676:21 677:4
**beasley** 405:4
**beasleyallen....**
405:6
**becker** 405:12
**began** 411:2
**beginning**
577:23 668:11
781:9
**behavior**
605:13
**behavioral**
551:9 552:19
553:23 555:10
**behaviors**
487:2 633:22
634:21 635:2
635:10
**belabor** 608:11
**belief** 679:11
729:16
**believe** 456:3
576:20 578:2,6

662:17 665:15
668:1,24
682:11 732:23
761:14,18,20
762:2,11,18
763:10,21
773:7,20,21
820:8 821:12
838:16 839:1
842:17
**bellwether**
696:4
**belong** 640:14
641:8
**belonged**
640:19
**belonging**
809:17
**benefit** 623:3
623:13 626:6
626:18 628:15
632:1,7,10,13
632:23 633:2,5
633:15,18,21
633:24 634:2,5
634:7,11,15,18
634:20 635:1,5
635:9,14,17
636:16 637:4,5
637:8 638:8
680:13 702:10
702:16 796:22
**benefiting**
618:24

**best** 473:12
474:14 476:11
482:18 523:14
523:17 525:7
525:19 534:21
545:10 598:16
598:18,18
601:12 606:17
606:22 607:1
653:18 654:3,4
661:4 675:2
686:1 687:13
688:4 695:4
708:22 721:20
805:2
**better** 600:12
632:1 660:21
**beyond** 527:9
548:7 656:7
**binder** 521:10
**biscayne**
403:12
**bit** 417:24
448:13 559:3
561:19 647:9
670:23 671:6
671:24 720:3
816:21 838:9
**block** 508:4
509:2 511:11
512:12 515:11
515:12 689:4
689:23 690:20
691:17 693:1

**blocks** 503:8
**bluesky** 809:15
**board** 623:22
666:5 780:18
**body** 461:3,17
462:2 477:20
477:22 574:5
600:24 605:5
613:19 718:12
**bohnenkamp**
529:13,18
**bonnin** 406:3,4
**booklets** 541:2
541:14
**books** 552:1,3
**borrow** 604:7
**bottom** 643:4
650:4 651:3
717:2 761:1
**boulevard**
403:12 405:16
**bower** 405:16
**brain** 550:18
**break** 493:14
499:15 504:9
582:8 666:14
752:24 765:16
798:5,6
**breakdown**
838:18
**breathitt** 412:6
418:1,18 419:8
422:9 424:3
425:22 431:14

**[breathitt - case]**                                              Page 12

433:12 437:22
438:19 439:12
440:19 442:3
452:23 453:10
454:7 455:3,21
458:12 460:7
461:1,24
462:22 464:4
464:19 465:12
466:21 488:24
668:18 669:1
670:18 671:1
671:12 672:7
677:18 678:9
679:1,13 780:4
780:11,17
781:5,11
**brian**  406:23
409:12
**brief**  499:21
504:16 582:17
765:21 807:14
**bring**  486:19
513:15 515:14
842:8,13
**bringing**  554:1
**brittany**  529:14
**broad**  518:23
536:9 548:16
558:5 584:12
626:14 636:20
675:4 773:1
789:10

**broaden**
417:23
**broader**  620:9
713:12
**broadly**  536:10
557:15 558:4
639:2 789:22
818:2
**brody**  405:11
**budget**  671:4
672:1,3 675:10
675:11 686:11
686:15,20,24
**budgetary**
687:1
**budgets**  675:7
686:19 687:9
695:16,23
818:22
**build**  482:23
590:18 814:12
**building**  443:1
567:19 620:13
622:19 637:22
669:10 670:15
716:8 837:3
**buildings**  670:6
**built**  580:19
701:18 719:7
810:16
**bulk**  713:7
**bullied**  432:9
432:18 433:4
433:14 446:7

809:14 810:20
813:5,6
**bullying**  433:2
433:6,23 809:7
814:9
**bunch**  750:1
**burling**  404:10
**burner**  486:19
**buy**  816:7
**byrne**  405:11
**bytedance**
403:15,15
406:20,21

**c**

**c**  512:6 700:8
**calculate**  845:4
**calculated**
657:17 658:2
**calculation**
657:3
**california**
402:1 409:23
**call**  504:9
590:4 603:19
707:18 801:10
814:19
**called**  494:5,10
494:13,23
495:9 551:13
613:10 629:3
681:5 732:12
842:22,24

**calling**  603:5
**camera**  841:20
**camp**  829:24
**candor**  762:4
762:20 765:13
**capacity**
656:11 700:18
721:13 821:14
823:11
**capture**  432:24
433:5 434:15
437:14 438:7
440:9 442:14
444:15,21
447:9 570:18
570:21 637:24
821:23 823:6
823:11
**care**  653:21
**career**  545:8
653:24 695:8
**careers**  483:21
**careful**  516:7
570:19
**carefully**
521:20 848:4
**carella**  405:11
**carellabyrne....**
405:14,18
**carolina**  669:4
669:6 678:2
**case**  455:16
500:6,9,14,17
501:4 502:1,2

CONFIDENTIAL

**[case - cell]**                                                   Page 13

| | | | |
|---|---|---|---|
| 502:14 503:17 | 751:4 752:23 | 843:1,12,21 | 782:5 809:23 |
| 503:23 505:5 | 753:23 758:18 | 844:10,24 | 843:4,18 |
| 506:7,22 | 761:5 762:9 | 845:2,12,15 | **causes** 519:4 |
| 507:15 515:22 | 764:17 769:10 | **cases** 402:7 | 585:15 740:2 |
| 516:20 518:16 | 770:4,22 | 656:1,2 720:9 | 779:21 781:16 |
| 519:9 520:16 | 771:10,14 | 720:14 773:6 | 789:4 791:3,20 |
| 523:8 524:24 | 772:12 773:18 | 784:18 | 792:13 793:24 |
| 526:8,10 | 774:10,19 | **castillo** 406:10 | 794:16 796:18 |
| 528:13 530:4,6 | 776:12,18,20 | **catch** 420:17 | 797:24 823:13 |
| 531:2 532:20 | 783:12,15 | 436:16 439:6 | 823:18 |
| 533:12 534:14 | 784:4 786:2 | **categories** | **causing** 526:20 |
| 541:23 543:13 | 787:20 788:5 | 636:22 654:18 | 528:5 657:12 |
| 545:20 546:14 | 789:7 791:7,24 | **category** | 795:22 797:4 |
| 547:8 548:3 | 792:18 794:3 | 498:19 566:11 | 798:12,24 |
| 549:11 550:4 | 794:19 797:14 | 566:13 568:10 | 799:16 800:7 |
| 552:14 555:6 | 798:15 799:19 | **caught** 815:12 | **cautious** 548:9 |
| 555:22 556:19 | 800:10 801:6 | **causal** 774:7,17 | 550:12 572:3 |
| 557:24 558:24 | 801:16 802:12 | 776:5 782:10 | 816:21 |
| 562:6,10,13 | 824:24 825:9 | 782:11 783:7 | **cbits** 554:4 |
| 563:1 564:4 | 825:15,23 | 785:18 786:12 | **cecchi** 405:11 |
| 565:7 610:6 | 826:5,12,22 | 786:19 787:16 | **ceiland** 406:7 |
| 619:13 639:15 | 827:8,14 828:6 | **causality** | **cell** 412:12 |
| 639:16 643:19 | 828:13,23 | 775:14 | 413:11 414:1 |
| 643:23 644:6 | 829:5,11 830:8 | **causation** | 416:1,12 418:6 |
| 649:6 667:15 | 830:14,21 | 783:3 784:7,12 | 419:23 485:15 |
| 683:21 696:21 | 831:17 832:3 | 785:14 786:3,8 | 485:22 486:10 |
| 701:23 702:23 | 832:15,22 | 788:3 | 486:13,24 |
| 706:17 715:10 | 833:4,13,21 | **cause** 522:15 | 487:9,12,23 |
| 729:5,21 730:5 | 834:5,12,19 | 585:17 797:23 | 488:13 489:2 |
| 733:17 739:10 | 835:3,9 837:13 | 822:11,12,22 | 489:20 490:3,9 |
| 740:8,24 741:3 | 838:1,5,22 | **caused** 441:7 | 490:16 491:1 |
| 742:13 743:17 | 839:17 840:14 | 526:18 584:14 | 492:1,19 493:9 |
| 745:8 746:5,12 | 841:7,14,23 | 586:5 615:6 | 493:22 494:4 |
| 749:13 750:20 | 842:9,11,20 | 680:16 781:22 | 495:15,19,19 |

**[cell - child]** Page 14

496:3,7 497:3
497:21 498:4
499:6
**center** 403:11
528:10,18,21
529:6,23 530:3
530:12,18
532:4,9,15,24
533:14,24
534:4 535:21
537:3 538:22
540:9 559:19
561:9,12 562:1
569:19 571:19
572:15 643:11
650:9 664:5
**centers** 534:8
536:1
**certain** 595:14
598:6 600:23
605:5 607:2,3
652:22 674:7
695:3 775:2,19
795:9 809:14
817:7 836:15
**certainly**
427:17 460:2
463:6 467:16
469:8 481:15
532:12 535:8
553:16 554:7
556:8 558:13
616:22 632:9
640:18 644:21

655:13 660:21
688:16 720:15
724:11 745:23
786:6 787:22
790:4 800:13
801:6 803:15
804:17,20
813:11 814:7
835:13,15
**certificate**
610:5 612:3
847:1
**certification**
409:4 609:12
761:1,4,12,15
761:21 762:12
763:7,11 765:3
847:17
**certified**
402:21 609:17
847:11
**certify** 847:4
850:3
**certifying**
847:21
**cetera** 486:22
486:22 519:6
526:24 586:20
586:20 632:19
638:2 682:23
756:20 758:24
762:24 772:22
775:10,10
784:15 810:3

**challenge**
488:16
**challenges**
451:9 468:9
469:5,12,16,24
471:14 472:5,7
473:2 488:3
647:4,11
**challenging**
471:9 485:24
**change** 419:4
419:17 456:6
520:6 526:3
663:11,16,24
665:1 775:8,22
849:3
**changed**
453:17 660:24
**changes** 554:14
563:13,17
740:3 803:23
804:7 848:11
850:5
**changing**
597:21 662:24
**channel** 509:20
513:15 515:15
**characterizati...**
752:6
**charleston**
412:5 415:24
416:5,11,19
417:4,13,19,22
421:24 422:23

431:1 432:17
437:22 438:19
439:12 440:19
442:3 452:23
453:10 454:6
455:3,20
458:12 460:6
460:24 461:23
462:21 464:3
464:18 465:11
466:20 488:24
582:4 583:6,12
583:21 588:1
588:11,14,18
589:17 590:2,6
590:15 591:5,7
591:11 592:9
593:16,20
595:13 669:3,6
669:9 673:4,16
674:17 678:1,9
679:1,13 760:9
760:11
**chart** 650:13
**chat** 827:12,17
827:19,24
839:14
**check** 402:16
403:3 641:18
746:24
**checked** 641:20
**checking** 747:6
**child** 630:7
788:20

**[children - committee]** Page 15

**children** 526:6
639:14 694:16
790:3
**choose** 811:13
811:14
**chose** 613:11
**chosen** 817:11
818:10
**christakis**
740:21 741:5
741:13,24
742:10 744:13
744:24 745:3,9
745:14
**chromebooks**
486:18
**cigarettes**
617:13
**circumstances**
621:17 773:24
**cite** 562:4 575:5
744:11 745:10
**cited** 575:14
643:21 644:3
679:9 717:5
746:17 747:20
747:24 748:23
749:2,4,23
754:3,7 755:8
755:11 824:18
824:19
**citing** 744:5
**citycenter**
404:11

**civil** 772:6
**claim** 724:17
725:12
**claimed** 624:24
626:9,16
**clarification**
691:14
**clarify** 448:13
510:12 583:17
690:3
**class** 441:10
586:14 768:12
768:14
**classified**
448:22
**classify** 448:15
**classroom**
434:9,16,24
435:7,16,20
436:7,12 437:8
438:1,14,22
439:7,15 440:5
440:22 441:22
442:6,16 443:4
446:8 480:11
484:7,9 586:13
619:5 620:4,6
712:10
**classrooms**
425:3 444:7
484:19
**cleanup** 770:7
**clear** 420:24
425:9 430:14

434:22 440:2
480:18 484:21
519:17 541:10
552:16 629:22
636:18 656:10
706:8 713:15
723:18 797:17
798:8 810:16
**clearly** 519:2
637:19 680:12
758:13
**climate** 620:8
803:16
**clinician**
596:13 788:19
**clinicians** 611:4
**close** 665:7
**closely** 681:1
**cognitive** 551:9
552:19 553:23
555:10 632:18
**cohort** 784:13
**collaborative**
561:23 613:4
**colleagues**
530:17
**collect** 420:15
439:6 482:10
573:9 815:9
836:14
**collected**
423:22 425:19
426:5 836:16

**collecting**
423:7
**collection**
814:20 815:1
**collective** 563:6
**college** 653:24
**colloquially**
425:12
**combinations**
728:11
**come** 459:22
482:1 519:17
576:1 687:19
694:1 697:7
707:13 756:23
756:24
**comes** 553:18
605:11 672:1
675:17 702:14
750:17 757:17
**comfortable**
491:15 547:12
577:16
**coming** 652:15
731:4
**commencing**
402:18
**comment**
430:16
**commission**
850:12
**committee**
664:20

[committee's - connection]                                          Page 16

| committee's | competency | 705:19 706:15 | 542:2,12 |
|---|---|---|---|
| 739:24 | 612:4,20 704:5 | 706:17 710:3 | 543:21 |
| **common** | **complete** 744:8 | 710:11 711:15 | **confidence** |
| 407:18 553:18 | **completely** | 711:17,24 | 736:23 |
| 564:1 642:14 | 688:15 822:10 | 712:9,16 | **confident** 730:9 |
| 643:12,15,17 | 822:21 | 713:24 715:18 | **confidential** |
| 643:24 650:10 | **complex** 471:7 | 715:22 718:1 | 421:20 422:6 |
| **communicate** | 477:13 694:16 | 718:14 720:2 | 422:18 450:7 |
| 513:16 514:13 | **complicated** | 742:3 817:5 | 450:17 451:6 |
| 515:16,18 | 550:18 671:4 | **concerted** | 452:16,18 |
| **communicating** | **component** | 473:13 | 453:5 454:21 |
| 509:21 510:10 | 474:12 589:16 | **conclude** 782:9 | 456:21 |
| **communication** | 589:21 590:1,8 | **concluded** | **confidentiality** |
| 690:10 691:8 | 590:14,18,22 | 739:24 846:11 | 574:16 578:4 |
| 829:15 | 618:6 629:7 | **conclusion** | **confirm** 621:18 |
| **communicati...** | **components** | 684:13 740:2 | 623:1 626:5 |
| 693:21 | 547:15 548:17 | **conclusions** | **conflict** 627:21 |
| **communities** | 560:4 636:3,11 | 419:4 | 771:20 772:4 |
| 553:4 | 636:11,13 | **conduct** 667:12 | 772:16,19 |
| **community** | 688:18 | 667:20 693:16 | 773:22 |
| 509:22 510:11 | **comprehensive** | **conducted** | **confusing** |
| 513:17 514:15 | 512:1 536:13 | 789:2 791:1,19 | 429:12 492:9 |
| 515:17 565:22 | 537:23 545:3 | 792:12,22 | **conjunction** |
| 681:6 | 547:10,16 | 793:22 795:19 | 728:23 |
| **companies** | 556:2,4 558:15 | 803:21 | **connected** |
| 526:2 528:3 | 560:9 604:24 | **conducting** | 628:14 |
| **company** | 636:12 687:15 | 512:17 574:3 | **connecticut** |
| 402:23 802:8 | 755:18 789:13 | 577:18 | 645:16 646:1 |
| **competencies** | 790:13 | **conference** | 646:10 |
| 608:14,22 | **comprehensi...** | 540:11,15,24 | **connection** |
| 609:2 610:7,17 | 521:7 608:10 | 542:7 543:8,18 | 411:5 480:12 |
| 611:7 612:1,6 | **concerns** | 543:22 544:4 | 668:4,12 |
| 704:18 | 468:20 665:10 | **conferences** | 778:21 782:11 |
| | 703:18 704:13 | 541:12,18 | |

**[connolly - coordinated]** Page 17

**connolly** 404:3
410:19
**consequences**
541:20 543:10
543:24 544:18
665:19 779:21
805:10
**conservative**
665:6
**consider** 444:1
479:11 489:7
505:19 556:6
686:3,10,15
687:18 714:16
744:4 756:12
757:22 774:23
784:10 824:5,9
**consideration**
783:19
**considered**
493:11 559:12
637:21 644:5
654:3 655:23
656:19 732:20
737:19 744:8
744:10 747:3
748:1,24 754:5
754:11 755:14
755:17,19
756:1,4,5,6,11
756:17,21
757:7,10,11,13
758:2 765:12
786:23 811:3

831:3
**considering**
759:14 784:4
784:11
**consistency**
598:17,20
601:9
**consistent**
425:1 426:20
435:21 502:7
502:13 513:6
600:1,7 631:20
704:24 714:8
724:7 818:7
829:14
**consistently**
431:21,23
435:19 439:21
468:18 485:4
488:15 604:21
605:15 732:2
821:15
**consists** 545:15
**consortium**
681:5
**constant**
424:23 425:1
**constantly**
531:20,21
572:4
**constitute**
711:6
**constraints**
606:7

**consult** 766:18
842:7
**consultant**
513:21 668:6
668:14 788:19
**consultants**
692:23
**consulting**
667:23 773:2
845:6
**consults** 539:20
**contain** 546:21
**contained**
549:17
**contemporan...**
574:3
**contend** 586:9
586:12
**contending**
483:17 661:2
673:1 720:18
**content** 547:13
548:11 584:17
**context** 523:24
538:18 558:18
559:13 581:7
581:24 593:5
647:3,4 655:18
675:17 693:20
709:2,7,21
725:23 768:11
796:7 810:20
812:21,23

**continuation**
411:1
**continue**
501:24
**continued**
404:1 405:1
406:1 701:24
**continuous**
701:20
**contribute**
532:11
**contributed**
532:13
**contributing**
532:10
**contributors**
561:8
**control** 492:6
528:2 534:9
536:1 847:20
**conversation**
577:23 666:6
722:9 770:11
770:13
**conversations**
495:13 511:8
511:16 512:9
513:12 514:10
576:2 665:4,24
678:10 723:14
723:19
**coordinated**
681:6

| | | | |
|---|---|---|---|
| **coordinator** | 752:5 755:15 | 641:5,9 648:16 | **course** 448:1 |
| 569:4 594:24 | 755:22 756:2 | 648:17,24 | 511:1 545:8 |
| 595:5 | 778:8,17 850:4 | 649:1,8,18 | 580:17 626:20 |
| **coping** 551:15 | **corrections** | 650:16 651:5 | 661:21 669:13 |
| 632:7,11 | 848:5,7 850:5 | 651:13 652:2 | 670:7 684:24 |
| **copy** 566:5 | **correctly** | 654:19 660:9 | 689:8 690:8 |
| **core** 407:18 | 510:15 581:10 | 661:9 767:14 | 756:18,19 |
| 548:16 642:14 | 585:14 | **counselors** | 831:14 |
| 643:12,15,18 | **correlational** | 568:19 653:23 | **court** 402:1,20 |
| 644:1 650:10 | 775:5 776:1 | 654:12,23 | 409:22 410:3 |
| **correct** 412:3,4 | **correspond** | 655:2 657:2,4 | 761:23 762:15 |
| 412:7 421:1 | 692:22 | 657:19,21,22 | 762:22 763:12 |
| 440:23 445:9 | **corresponding** | 658:17 663:15 | 764:6 765:4 |
| 453:24 457:21 | 598:9 | 664:17 | 848:20 |
| 481:9,12 482:1 | **corroborates** | **count** 466:7 | **court's** 502:7 |
| 484:9 485:16 | 436:5 | 650:23 | **cov.com** 404:13 |
| 495:2 499:1 | **cost** 572:10 | **countries** 553:4 | **cover** 548:16 |
| 552:4,8 562:6 | 685:21 687:20 | **country** 448:3 | 750:3 758:14 |
| 565:15,16,22 | 688:9 695:2 | 601:16,19,22 | **covered** 451:12 |
| 574:1 589:18 | **costs** 686:6 | 602:8,11,18,22 | 528:15 751:14 |
| 589:19,23 | **counsel** 409:3 | 603:12 613:9 | 769:9 770:5 |
| 590:10,17,20 | 410:2 411:19 | 649:8,19 | 771:17 774:11 |
| 590:24 591:8 | 412:21 420:6 | 806:17 818:8 | 776:11,23 |
| 591:17,18 | 493:13 530:7,7 | **county** 405:7 | 783:13 789:8 |
| 592:14,24 | 582:7 709:5 | 582:5 583:6,12 | 791:7,24 |
| 593:15 595:17 | 741:12 750:24 | 583:21 588:2 | 792:18 794:4 |
| 597:1 623:6 | 760:12 776:8 | 588:11,14,18 | 794:20 797:14 |
| 640:8,13 641:1 | 776:15 | 669:18 760:9 | 798:16 799:20 |
| 651:19 655:8 | **counseling** | 780:18 781:11 | 800:11 801:19 |
| 658:19 716:22 | 609:22 614:10 | **county's** 781:6 | 806:23 811:22 |
| 728:4 733:3 | **counselor** | **couple** 609:9 | 844:11 |
| 736:22 740:22 | 407:19,20 | 704:7 826:6,18 | **covers** 764:9 |
| 741:1 744:9 | 597:5,10 | 826:19 831:14 | **covid** 819:19 |
| 748:1,24 749:1 | 619:13 640:24 | | 820:2 |

Golkow Technologies,
A Veritext Division

**[covington - date]** Page 19

covington
    404:10
craig   406:4,11
create   569:16
    593:13 615:24
created   614:23
    621:8,19
    702:12 719:9
    826:16
creates   717:23
creating   592:6
    815:6
crisis   595:9
criteria   618:16
    620:21 628:6
    704:14 705:8
    705:20 706:3
    707:23 709:10
    709:24 710:8
    710:16 711:5
    711:12 714:15
    714:20
criticize   474:4
crystal   471:15
    475:12
cumulative
    780:15,20,23
    781:7
curious   633:7
    739:14,19,20
    739:22 742:12
    742:22
current   640:18
    640:19 671:19

700:17 802:24
    803:15
currently   766:5
    766:8 811:8
    814:2 815:21
    816:15
curriculum
    601:4
cut   621:24
    803:18,18
cv   551:6,18,22
    552:1 558:4
    736:7,19 769:2
    769:17 772:15
    791:17 792:3
    796:23
cyberbullied
    808:16
cyberbullying
    811:10 814:16
    821:19

**d**

d   407:2
daily   625:14
    756:20 829:18
damaging
    780:7
daniel   404:4
data   407:18
    412:20 413:16
    415:12,20
    416:16 418:11
    420:7,14,16

421:1,6 423:8
424:11 428:15
430:2 432:13
432:23,23
433:5,20,21
434:4,13
435:21 436:4
436:14,15
437:13 438:6,8
439:4 440:2,8
441:3,12,12
442:13 443:18
443:21 444:2,4
444:15,17
445:22 446:23
447:7,15,17,20
447:24 449:21
452:19 453:5
453:16,21
457:16 459:3
460:14 461:9
462:6 463:5,10
463:18 465:1
466:5,11 467:4
467:16,17,18
467:23 468:7
468:12 469:3,5
469:11,22
476:4 478:15
478:15 481:22
482:7,10,11
483:2,11,12,19
484:1 486:6
488:20 491:19

493:1 495:23
560:10 563:1
564:8 573:8
581:13 590:16
590:19,22
591:2 602:14
642:14 643:5,9
643:12,15,18
644:1,22
645:20 646:12
650:7,10
667:17 699:21
704:6,17 719:6
720:22 721:6
722:2 724:8,15
725:2,9,20
726:3 782:14
813:13,16
814:13,19,24
815:7,10,11
817:1,8,12,20
820:9 821:4,10
821:14,22
823:11,17,23
824:1 836:7,10
836:13,16,20
836:24 837:4,9
date   402:19
    409:14 560:16
    560:17,21
    663:24 720:11
    812:24 820:6
    848:9 850:8

**[dated - dekalb]**                                                                 Page 20

| | | | |
|---|---|---|---|
| **dated**  583:7 | 818:16 | 438:11 441:8 | 809:4,17,24 |
| 760:10 847:11 | **decisions** | 442:7 443:5 | 810:10 812:7 |
| **david**  405:12 | 488:11 696:1 | 444:24 468:22 | 813:7 820:23 |
| 406:4 | 819:6 | 493:7 496:20 | 821:16 842:9 |
| **day**  411:16 | **decline**  473:9 | 500:5,24 | 843:3,8 844:1 |
| 427:23 436:1 | 579:17 580:11 | 501:20 505:2 | 844:15 |
| 483:18 485:16 | 580:23 581:18 | 506:3 507:11 | **defensible** |
| 485:23 486:11 | 581:21 | 508:17 509:11 | 775:9,24 |
| 486:14 487:1 | **decrease** | 510:3 516:21 | **deficit**  426:24 |
| 490:4,11 | 471:11 472:4 | 517:15 518:17 | **deficits**  426:19 |
| 494:18 571:10 | 473:1,18 474:8 | 519:11 520:1 | **define**  539:15 |
| 638:1 653:5 | 474:16 475:16 | 520:17 523:9 | 707:5 764:20 |
| 707:10 770:6 | 475:19 476:10 | 525:1 526:9 | **defined**  627:4 |
| 776:12 850:11 | 476:12 478:6 | 527:12 537:15 | **defines**  711:5 |
| **days**  848:16 | 479:18 581:8,9 | 569:23 583:23 | **definition** |
| **dbonnin**  406:7 | 581:11 635:22 | 584:12 589:12 | 755:23 756:11 |
| **dc**  404:5,12 | **decreased** | 606:10 614:24 | **degree**  609:11 |
| **de**  405:16 | 431:24 | 615:7,13 616:1 | 609:21,21,22 |
| **deal**  484:6 | **dee**  402:20 | 616:8,13,24 | 643:16 697:22 |
| 585:6 680:15 | **deemed**  757:11 | 618:10 619:19 | **degrees**  609:19 |
| 811:9 | 758:2 848:19 | 621:10,21 | **dekalb**  405:7 |
| **dealing**  476:1 | **deep**  473:9 | 622:16,20 | 412:6 418:2,19 |
| **dealings**  692:9 | **deeply**  733:16 | 623:5 624:20 | 419:9 422:10 |
| 692:19 | **defendant** | 625:1 626:9,18 | 424:4 425:23 |
| **decade**  826:18 | 500:14 | 659:16 677:7 | 431:14 433:12 |
| **decades**  535:16 | **defendants** | 680:16 687:17 | 437:23 438:20 |
| 604:16 670:7 | 403:14 404:7 | 688:22 689:5 | 439:13 440:20 |
| **decide**  733:6 | 404:14,22 | 689:24 690:20 | 442:4 452:24 |
| **decided**  750:14 | 406:20 410:20 | 691:18 693:3 | 453:10 454:7 |
| 751:20 758:4 | 414:12,23 | 701:3 712:6 | 455:4,21 |
| **deciding** | 416:20 417:5 | 721:14 741:14 | 458:13 460:7 |
| 703:24 | 418:23 420:3 | 781:21 782:4 | 461:1,24 |
| **decision**  634:12 | 424:24 427:22 | 788:4 803:5,17 | 462:22 464:4 |
| 648:7,9 754:15 | 435:17 437:9 | 807:5 808:10 | 464:19 465:12 |

466:21 489:1
669:20,23
673:5,17
674:17 683:1
**delivered**
544:13
**demand** 665:11
**demerath**
406:10
**demonstrate**
522:14 610:8
784:6
**demonstrated**
473:18
**demonstrates**
609:12
**department**
407:17 534:6
534:10 535:13
535:22 536:2
642:13 643:10
650:8 670:12
**depend** 600:19
**dependent**
756:16
**depends** 686:14
710:20 733:11
**deponent**
409:24 850:1
**deposing**
848:16
**deposition**
402:13 408:2
409:16 411:2,6

411:16 440:2
445:21 486:6
492:1,7,19
493:1 502:3
503:13 575:7
575:18 576:14
579:7 655:19
679:7 685:3
696:11 750:24
755:4 759:8
776:10,13
785:24 786:18
824:10 846:10
847:6 848:3,13
848:17,19
**depositions**
445:13 460:15
491:11 496:16
496:18 498:1
656:9 785:8,20
786:4 787:2
**depressed**
451:22 452:10
455:5,12,23
456:5 474:8
**depression**
449:18 450:12
450:24 451:4
453:1,12 454:8
458:7 472:16
746:8
**deprivation**
463:16 519:5

**deprived**
462:24 463:23
479:6
**describe** 445:7
469:15 581:8
629:23 653:15
**described**
493:21 539:8
653:18 682:10
697:23 710:14
714:9
**describing**
496:15
**description**
407:11 545:24
**descriptions**
445:4
**design** 520:8
522:10 526:3,5
526:16,19
527:20 586:16
790:9 803:1
**designing**
598:22 694:13
**desk** 732:4
756:24
**desperately**
680:14
**detail** 437:16
444:18 483:1
507:20 527:3
584:21 587:1
589:9 647:1
672:17 724:5

726:10 733:22
784:23 788:1
832:6 837:17
843:24 844:12
844:18
**detailed** 426:16
441:18 446:17
447:7 469:7
473:19 682:17
684:8 835:11
844:13
**details** 501:12
516:3 543:15
545:1 548:11
548:21 550:7
683:15,19
**determination**
738:5 749:8
752:12
**determine**
471:17 601:2
627:9 733:17
774:6,16
775:13
**determined**
719:11 753:17
**determining**
733:15
**develop** 438:6
508:20 509:13
510:4 512:21
522:18 550:10
612:6 615:20
632:4 686:16

**[develop - disclosed]**                                           Page 22

| | | | |
|---|---|---|---|
| 686:20 687:7 | **dgilfillan** | **difficult**  413:3 | 678:21 682:13 |
| 704:17,18 | 405:14 | 413:17,19 | 694:17 697:12 |
| 721:17 | **diagnosed** | 463:11 478:17 | 698:4 699:6 |
| **developed** | 421:11,24 | 486:11 488:11 | 785:5 |
| 546:18 548:24 | 422:12 446:2 | 819:6 | **director**  528:10 |
| 549:15 550:9 | 449:17 452:6 | **difficulty**  550:6 | 528:17,21 |
| 561:4 570:16 | 456:15 458:7 | **digital**  566:2,15 | 529:1,8,10,22 |
| 571:14 602:2 | 458:14 459:6 | 568:13 591:12 | 540:9 566:1,15 |
| 610:4 611:24 | 461:3,17 | 591:13 595:24 | 566:19 567:2,9 |
| 612:1 | 462:17 464:6 | 601:17,20,23 | 567:24 591:12 |
| **developing** | 472:15 475:2 | 604:6 612:23 | 591:12,13,14 |
| 604:14 641:24 | 477:19 | 613:20 615:10 | 591:15,16 |
| 656:18 687:12 | **diagnoses** | 624:16 633:3,5 | 601:16,20,22 |
| 688:17 756:6 | 451:9 478:22 | 633:8,16,18 | 602:11,16,18 |
| **development** | **difference** | 634:3 637:6,9 | 602:22 603:12 |
| 561:6,23 562:2 | 481:22 827:16 | **dimensions** | 603:23 604:2,6 |
| 572:13 590:5,8 | **different** | 562:23 | 607:21 614:4 |
| 590:12 598:4 | 448:17 547:15 | **diminish** | 664:4 |
| 608:19,21 | 558:7 560:3 | 657:13 | **directors** |
| 610:22 611:1 | 562:23 569:7 | **diminished** | 468:14 529:13 |
| 611:12 630:7 | 597:22 603:22 | 426:12 427:7 | **disagree**  482:5 |
| 704:21 | 612:20 647:10 | 428:6 430:8 | 485:20 497:7 |
| **developmental** | 649:19 654:17 | 431:2,16 446:6 | 743:22 |
| 632:18 | 686:9 728:11 | **direct**  483:15 | **disagreeing** |
| **device**  412:13 | 746:23 747:5,8 | 574:13 575:13 | 521:23 |
| 413:12 414:2 | 747:9 790:1 | 577:14 616:23 | **disciplined** |
| 416:2,13 418:7 | 818:4 821:5 | 690:10 693:12 | 480:11 |
| 420:1 | 823:4 832:12 | 693:21 795:10 | **disciplines** |
| **devices**  485:16 | 835:16 837:11 | 815:12 847:20 | 656:6 |
| 509:4 512:14 | 837:18 838:19 | **direction**  408:5 | **disclosable** |
| 515:14 690:1 | 844:14 | **directly**  441:13 | 772:4 |
| 690:22 691:19 | **differently** | 442:22 468:16 | **disclose**  769:23 |
| 693:5 | 561:20 | 576:12 622:16 | **disclosed** |
| | | 624:4 630:3 | 770:18 771:4 |

**[disclosed - district]**                                                     Page 23

773:13
**discontinue**
 500:6 507:12
 519:11 520:18
 523:10 525:2
**discord**  809:15
**discuss**  494:4
 495:14 498:3
 532:17 533:16
 534:12 541:18
 543:8 546:11
 549:7 552:11
 555:3,14
**discussed**
 554:21,24
 693:9
**discusses**  547:5
 547:23 550:1
**discussion**
 495:18,18
 511:2 530:22
 531:12
**discussions**
 435:12 572:1
 723:24 724:12
 821:11
**disease**  534:9
 536:1
**disengaged**
 619:9
**dismissing**
 495:6
**dismissive**
 495:4

**disorder**  461:3
 461:18 464:6
 464:21 477:20
 478:19
**disorders**
 464:13
**display**  564:10
 642:5
**displayed**
 834:2
**disposal**  449:22
**dispute**  777:20
 841:21
**disrupted**
 440:4 485:5
**disrupting**
 438:13
**disruption**
 434:16,19
 436:6 440:10
 440:11 441:10
 441:21 443:4
 443:13 519:5
**disruptions**
 434:23 435:15
 439:7 442:15
 480:19 484:7
 484:18,24
 485:12 487:12
 488:18 586:13
 617:23 620:3
**disruptive**
 434:9 435:7
 436:12 437:8

437:24 438:21
 439:14 440:21
 442:5 446:8
 480:10 487:2
**distinct**  819:23
**distinction**
 499:10
**distinctions**
 813:22 814:2,6
 814:8
**distinguishing**
 815:15
**distracted**
 424:17 425:8
 425:17,24
 427:22 431:24
 446:5
**distraction**
 425:2 433:24
 625:24
**distractions**
 487:11
**distress**  715:6
**district**  402:1,1
 405:7 407:13
 407:14 409:22
 409:22 411:13
 419:23 423:7
 426:17 427:20
 429:1 433:19
 434:20 442:22
 442:24 444:19
 445:5,15
 446:18 448:6

449:3,4 451:16
 454:23 456:22
 457:8,15 458:2
 463:9 467:4,8
 471:2 486:4
 487:10 489:12
 489:16 490:7
 490:14,16,24
 491:12,17,19
 493:2 496:6
 497:20 498:10
 499:10 503:4
 509:4 511:13
 512:14 513:1
 513:10 515:14
 517:4 562:22
 563:6 564:15
 564:16 565:18
 566:1,15,19
 567:2,9,14,24
 570:21 574:5
 580:10 582:5
 583:7 587:6
 588:2,9,12,13
 588:18 589:3,6
 589:10 590:13
 591:3,11,22
 592:4,13,20
 593:13,13
 594:4 595:24
 596:2,6,8,12,14
 596:18,19,24
 597:9,11,14
 599:6,7,14,22

**[district - districts]** Page 24

| | | | |
|---|---|---|---|
| 601:6,16,22 | **district's** | 510:17,22 | 607:13,15 |
| 602:11,18,22 | 563:16 693:4 | 511:11 512:12 | 612:9 613:8 |
| 603:3,12,23 | **districts** 406:14 | 513:14,23 | 614:1 615:23 |
| 604:1,5 605:3 | 412:2 418:15 | 514:4,13 | 621:7 627:8 |
| 605:10,17 | 434:1,4,14 | 515:11 516:10 | 640:6,23 642:2 |
| 607:6,21 | 438:6 439:21 | 517:21 519:19 | 647:13 653:4 |
| 608:17 610:12 | 441:4,15,20 | 520:5 521:1 | 654:11 657:20 |
| 610:24 611:6 | 443:9,19 444:3 | 528:6 536:22 | 658:4 665:5 |
| 612:10 614:11 | 444:9,12 | 538:12,16 | 667:7,14,24 |
| 614:19,21 | 446:22 448:3 | 545:12 560:2 | 668:3,7,15 |
| 615:22 627:7 | 448:14 449:7 | 561:15 562:5,9 | 673:7,18 675:3 |
| 654:15 655:3 | 449:10,12 | 562:15,19 | 675:5 676:2 |
| 658:19 678:11 | 459:4,11,19 | 563:9,21 | 680:4,4 682:17 |
| 678:24 679:12 | 461:19 463:14 | 569:16 570:4 | 682:19 684:9 |
| 679:22 692:13 | 463:15,21 | 571:22 573:9 | 684:14,18 |
| 693:13 695:8 | 464:14 465:4,7 | 577:22 587:3 | 685:5,8,14,20 |
| 695:20 715:11 | 468:2 470:1,8 | 587:23 589:9 | 686:17 687:3 |
| 727:14 728:3 | 470:13,16,19 | 589:23 590:10 | 689:4,23 |
| 733:2 747:10 | 470:22 472:12 | 590:24 591:21 | 690:11,19 |
| 748:12 751:11 | 474:23 476:15 | 591:24 592:3 | 691:4,17 |
| 755:12 766:16 | 477:16 479:2 | 592:10,19 | 692:21 693:1 |
| 767:5,8 777:23 | 480:7 481:20 | 593:9,19,24 | 693:23 694:5 |
| 778:6,12,19 | 481:23 484:6 | 594:8,14,23 | 695:18 696:4 |
| 779:8,19,22,23 | 484:21 487:22 | 595:4,9,20,23 | 696:18 697:14 |
| 780:2,8,24 | 488:4,24 489:9 | 596:5,11,17,23 | 697:15 698:5 |
| 781:3 784:20 | 489:19 490:2 | 597:8,21,24 | 699:23 700:13 |
| 785:4 788:14 | 491:10 493:5 | 598:12,21 | 714:4,21 |
| 795:17 805:8 | 493:20 494:7 | 600:8,18 | 715:16 718:13 |
| 805:19,21 | 494:16 496:4 | 601:10,15,19 | 720:21 721:7 |
| 806:17 807:1 | 497:2 498:9 | 601:21 602:10 | 721:12,21 |
| 808:3,22 809:2 | 502:20 503:3,8 | 602:17,21 | 722:5,11,19,21 |
| 822:20 836:8 | 503:21 505:17 | 603:3,11,18 | 723:3,10 |
| 837:2,3 | 508:4,14 509:2 | 604:5 605:24 | 725:13,18 |
| | 509:19 510:1,8 | 606:2 607:10 | 726:13 727:6 |

CONFIDENTIAL

**[districts - easy]**                                                    Page 25

750:7 766:6,11
766:23 777:3
777:10,18
778:14,17,23
779:14 780:17
781:17,23
782:6 783:4
785:15 786:15
787:7,8 805:7
805:17,21
806:2,7,14
811:18 813:3,4
813:19 814:18
814:23 816:3
817:10 818:3,8
819:1,4,8,15
821:5 822:4,6
822:16 835:23
835:24 836:19
837:8 842:7
843:2,15
845:13
**divided**   654:15
**division**   409:13
**doctor**   831:23
**document**
402:6 459:16
565:2 583:4
605:15 642:18
642:22 648:22
662:23 734:12
738:17 754:7
822:7,11,22
823:9

**documented**
443:11 484:17
655:16 657:9
683:6 684:2
725:22 784:3
**documenting**
684:3
**documents**
408:10 445:18
457:10 459:18
459:23 461:13
462:13 463:13
465:20 466:14
467:10 491:13
493:2 531:24
533:3 534:2
545:14 547:2
548:6 549:2,20
550:10,21
604:22 643:1
661:20 662:16
679:8 683:6
726:2 731:22
732:17 734:10
734:15 737:21
737:24 754:3
755:11 759:4
759:12 824:6
**doggy**   828:17
828:20
**doing**   444:2
473:21 510:20
513:7 523:14
523:17 525:7

525:19 526:12
527:14 528:3
563:11 579:2
675:1,8 689:12
708:22 757:16
768:23 795:8
820:2 838:8
848:8
**dollars**   772:8
**domains**   564:3
**doubt**   423:10
536:19
**downloaded**
833:6
**dr**   410:14
428:20 500:4
504:23 522:22
523:14 529:9
529:13,14,17
529:18,18
564:23 582:24
645:19 650:6
667:3 708:22
709:5 725:5
751:16 766:4
807:7,24
**draft**   529:16,20
**drafting**   546:3
546:7 549:7
**drafts**   530:11
**draw**   475:19
476:7 601:12
788:14

**drawing**
534:21 598:17
600:16 778:21
**drew**   469:10
535:18 683:21
**due**   440:5,11
442:16 572:10
672:19 707:8
724:10
**duly**   410:8
847:5
**duolingo**   833:2
**duty**   762:4,20
763:22 764:4
**dwhiteley**
404:7
**dysmorphic**
461:3,17
477:20

**e**

**e**   407:2,9 746:6
849:1
**earlier**   601:24
637:3 690:4
696:11 702:7
703:6 749:15
813:16
**early**   554:6
617:10,14
639:19
**ears**   828:18,20
**easy**   772:23

**[econometrics - engagement]**                                      Page 26

| econometrics | educators | either   418:4,21 | eliminating |
| 687:21 | 427:18  431:9 | 419:11  446:1 | 490:3,8 |
| **economist** | 434:21  443:2 | 538:10  548:12 | **elliot**   404:17 |
| 686:8  687:22 | 484:23 | 651:22,23 | **ellis**   404:19 |
| 695:22 | **effect**   585:16 | 665:13  690:21 | **emotional** |
| **ed**   670:12 | 832:1 | 691:18  693:3 | 568:20  612:22 |
| 769:4,7,18 | **effective** | 752:5 | 613:5,7,9 |
| **edition**   551:8 | 687:15 | **electronic** | 632:14,24 |
| 554:5,12 | **effectively** | 412:13  413:12 | 634:8 |
| **editor**   732:5 | 694:24 | 414:2  416:2,13 | **employed** |
| **education** | **effectiveness** | 418:7  420:1 | 565:21,21 |
| 407:17  425:10 | 477:10  657:14 | 485:15 | **employee** |
| 534:10  535:14 | **effects**   780:7 | **elementary** | 497:20  529:22 |
| 536:3  566:20 | **effort**   471:22 | 598:6  599:16 | 664:15,24 |
| 568:1  591:14 | 471:24  473:14 | 617:8  768:5 | 824:10 |
| 591:17  602:12 | 473:17,22 | 844:4 | **employees** |
| 603:13  618:6 | 478:9  479:16 | **elements**   786:8 | 496:7  570:22 |
| 619:16  628:10 | 483:6  561:8 | **eligibility** | 667:13 |
| 629:8  630:4 | 563:6  681:4,15 | 618:15  627:3,9 | **encourage** |
| 632:8,11  633:2 | 681:18,19,21 | 638:18  702:8 | 514:11  689:3 |
| 633:5,15,18,21 | 682:9,12 | 714:20 | 689:22  690:18 |
| 634:3,7,11,15 | 684:17  766:19 | **eligible**   618:10 | **ended**   694:6 |
| 635:6,9,15,19 | **efforts**   472:2 | 626:22  628:10 | 731:1 |
| 635:20  636:5 | 477:8  536:11 | 630:19  702:17 | **engage**   611:1 |
| 636:16  637:17 | 536:13,16 | 712:18  714:2 | 617:21  619:8 |
| 638:9  639:9,20 | 539:22  684:6 | 714:11,17,22 | 620:18  627:15 |
| 642:14  643:10 | 684:11  702:15 | 715:9  716:11 | 630:7  637:11 |
| 643:11  650:8,9 | 703:4 | 718:16 | 637:12 |
| 653:12  702:14 | **eight**   720:17 | **eliminate** | **engaged**   485:8 |
| 703:3  780:18 | 724:16  725:10 | 486:13,24 | 616:7  618:23 |
| **educational** | **eiland**   406:3,4 | 490:10 | 620:11  773:12 |
| 568:7  594:9 | **eilandlaw.com** | **eliminated** | **engagement** |
| 629:4,24 | 406:7,7 | 485:13  487:3,6 | 432:3  435:1 |
| 630:12,13 | | | 440:6,12 |

441:22 442:16
485:6 488:7
508:12 522:10
554:2 562:11
562:12 568:1
569:4,12
591:17 594:24
603:13,20
604:2 611:15
621:2 625:18
636:24 667:22
668:5,13 689:2
689:21 690:17
702:2 728:19
737:14
**engaging**
451:16 460:8
476:19 554:10
563:21
**engine** 729:3
730:19 731:12
734:1 737:2
743:11 757:1,4
759:17
**engineering**
734:3,18 735:5
735:11,13
736:4,11 737:3
739:15
**engines** 726:21
727:9,12,19,20
727:22 728:9
730:12,20
743:12

**enhance** 538:10
**entire** 535:17
620:16 624:12
628:16 706:10
706:11 764:17
**entirely** 845:7
**entirety** 565:3
**entitled** 709:7
734:4 758:11
**entry** 650:13
**environment**
508:18 530:24
531:14 585:2
585:18 587:7
588:3,20 620:7
631:14 639:13
778:24 779:15
779:24 780:9
781:1
**environments**
617:23 778:15
**envision** 619:15
**envisioned**
687:11
**envisions** 636:4
**equally** 536:10
**equipped**
572:24 573:15
672:23 675:9
**errata** 848:6,9
848:12,15
850:6
**erupt** 627:21

**especially**
444:16 469:5
537:12 616:19
657:11 666:10
**esquire** 403:4,4
403:11 404:4,4
404:11,20
405:4,12,16
406:4,4,11,17
**essential** 592:4
624:1
**essentially**
545:21,22
714:11
**established**
652:10 659:9
659:12 663:4
664:8
**establishment**
664:13
**estimate**
472:14 475:1
475:14 476:17
477:18 479:4
480:9 579:14
580:7 685:21
715:14 716:10
718:11 719:12
720:3,7
**estimates**
480:23 719:15
**estimating**
433:18

**et** 486:21,22
519:6 526:24
586:20,20
632:19 638:2
682:23 756:20
758:23 762:24
772:22 775:9
775:10 784:14
810:3
**evaluate**
610:12
**evaluation**
482:9,23
534:20,22
559:24 580:20
701:19
**evening** 411:6
**everybody**
702:16,17
**evidence**
474:13 527:23
537:14 581:15
598:23 639:11
639:18
**evolved** 672:19
**evolves** 612:5
**evolving**
436:16 441:6
444:16,23
476:2,6 477:6
478:12,19
479:13,22,24
481:4 487:19
570:2 606:8

CONFIDENTIAL

**[evolving - experiencing]**                                                    Page 28

661:2
**exacerbated**
702:3
**exact** 426:23
427:2,17
429:20 437:17
458:6 461:15
471:10,13
551:6 581:19
602:5 603:15
603:16 613:21
652:7
**exactly** 457:12
471:17 473:24
475:13 477:13
524:6 579:3
580:21 784:18
829:18
**examination**
410:11 807:21
**examined**
410:9
**example** 433:1
446:24 451:18
454:23 471:12
488:14 513:2
520:6 534:21
534:23 553:15
601:3 611:21
613:3 614:5
617:3 631:7,11
666:5 670:13
680:6,10
682:22 684:4

702:6 712:11
744:23 754:18
757:3 815:10
821:18 839:12
**examples** 540:6
553:9 554:1,15
677:12
**exceeded** 740:9
740:10 753:24
770:23 771:15
771:15 772:12
798:18 830:22
831:18
**except** 409:6
850:5
**excluding**
694:7
**exclusive** 557:5
559:5,15
623:16 792:24
794:10
**exclusively**
556:15 791:12
**excuse** 635:24
716:21
**executive**
529:10
**exemplar**
473:11 476:11
478:6
**exemplars**
473:13 581:3
**exhaustive**
608:24 784:9

**exhibit** 445:9
551:19 564:11
564:13 582:6
583:1 642:6,8
648:12,14
**exist** 424:12
433:20 434:4
436:14 438:9
442:14 444:18
447:17 466:6
475:20 602:14
701:12 720:24
726:4 811:9
814:1,5 815:9
816:15 817:8
817:21 836:7
**existence** 533:1
701:11 723:21
**existing** 479:14
479:20 480:2
480:24 581:3
656:3,11 657:2
684:10 810:17
814:7 822:8
**exists** 415:21
423:11 560:11
700:11 815:17
815:20 816:2,5
816:12,22
817:1
**expect** 472:24
474:15 581:17
**expectation**
610:19 766:15

**expected**
480:19 598:13
601:11
**expend** 781:11
**expense** 572:5
**expensive**
694:8
**experience**
448:5 493:6
508:16 535:5
535:16 553:19
611:10 625:14
647:13 677:8
699:24 705:5
788:15 816:24
821:8 843:6
**experienced**
470:1 472:8
473:4 725:22
733:13
**experiences**
446:18 512:8
513:24 784:24
785:10
**experiencing**
434:19 441:20
468:10 469:17
494:18 585:9
606:15 609:7
618:2 622:12
674:14 676:5
676:20 678:21
703:8,17,20
704:11 705:18

706:14,20
707:2 710:2,10
711:14 712:8
715:5 722:1
**expert** 411:11
435:22 467:12
469:14 519:23
530:15 582:4
583:6 664:3
671:5 739:9
741:15 744:11
744:23 760:9
770:1,20 771:7
772:6 773:15
779:11 787:23
814:10 835:12
837:16 838:11
840:9 844:19
844:24 845:12
**expertise**
607:23 608:8
609:14 610:5,9
610:14,21
612:5 664:22
671:7 672:4
762:23 790:11
**experts** 483:20
517:22 741:3
742:12 743:17
743:23 745:8
790:7 795:7,13
824:18 838:1,7
**expires** 850:12

**explain** 723:11
749:5 832:11
**explained**
503:9
**explanation**
750:8 753:14
753:19 765:1
**exposed** 627:13
**exposure**
616:23 617:6
619:2 703:10
**expressing**
458:24
**extensive**
796:23
**extent** 434:15
472:14 475:1
476:17 477:18
479:4 480:9
554:8 580:21
723:21,22
816:2
**external** 482:20
573:2 672:19
**externally**
677:10
**extract** 428:16
**extrapolate**
836:9
**extrapolated**
581:13

**f**

**f** 404:14
**facebook**
404:15,15,15
404:15,16
808:11
**facing** 451:10
**fact** 446:17
447:2,21 449:6
457:2 602:14
605:16 655:20
665:23 679:6
680:11 684:18
685:2 698:17
717:5 726:3
784:22 785:18
787:9 797:23
**factor** 477:11
482:20 655:9
787:12 792:24
**factors** 496:21
556:6 557:6
559:15 765:11
775:4,12,19
776:2 782:24
783:1,5 790:15
791:10 793:1
794:11
**facts** 522:14
744:17
**faculty** 515:16
**fail** 655:24
848:18

**failed** 733:1
802:9
**failure** 749:6
**fair** 578:17
670:11 700:22
702:18 768:19
808:6 814:21
817:12,15
**fall** 585:3
586:23 609:19
677:14
**fallen** 508:10
509:6 557:18
**falls** 502:15
671:6 677:3
**familiar** 517:8
517:18 643:14
727:1 734:16
**families** 448:7
486:19 509:21
510:10
**family** 567:24
568:4,5 569:4
569:6,10,11
591:16 594:23
603:13,19,20
603:21 604:1,2
609:23
**far** 426:5,22
455:10 530:6
655:22 677:20
678:3 681:20
682:6 720:1
730:15 761:6

**[farm - form]** Page 30

farm  405:12
fax  402:24
feature  500:6
  500:15 507:13
  519:12 520:19
  523:11 525:3
  830:12 839:14
  840:7
features  485:7
  519:21 520:7
  526:5,16,19
  527:19,24
  586:17 803:1
  837:11,17
federal  535:7
feel  466:8
  491:14 521:12
  672:22 745:23
feeling  621:1
feels  671:24
  757:19 832:8
felt  455:22
  466:23 495:4
  694:13
ferpa  451:13
fidelity  657:15
field  447:15
  473:13 476:1
  480:1 487:18
  544:10 610:3
  612:5 641:7
  647:8 652:11
  652:12 654:4
  677:8 735:19

735:22 816:22
  836:11
figure  644:24
  684:17
filing  409:4
fill  563:10
  573:11
filled  562:9,15
  562:18,21
  563:4
financial
  403:11 679:15
  682:21
find  603:10
  745:12 747:1
  782:9
fine  428:22
  429:14 746:24
  797:9 826:15
fingertips
  450:8 459:14
finish  450:4
  493:16 503:12
  544:7 753:2
firm  405:4
  406:3 410:18
first  411:15
  528:9,16
  544:23 554:5
  560:14,23
  561:4 566:22
  591:4 610:18
  616:21 618:17
  629:2,20

652:14 676:9
  687:20 695:17
  697:5 721:5
  745:17 758:21
  777:1,2,4
  778:5 783:10
  783:16 818:23
five  589:22
  590:10,12,23
  591:2,20
  592:10,18
  593:23 595:20
  788:18 846:4
flag  750:12
  751:18 753:16
  753:16
flagged  743:17
  754:16
floor  406:18
florida  403:13
  405:17
focus  556:12
  558:21 559:3
  789:12,17
  794:8
focused  497:4
  497:10 688:20
  741:7 742:2
  743:1 745:18
focuses  604:1
focusing  546:9
  591:4 741:21
folder  730:22
  731:2,8,17

732:12,15,17
  732:19,23,24
  738:7 750:15
  751:21
folks  424:22
  425:5,11 495:3
  572:22 600:18
  606:24 662:21
  666:1
follow  563:18
  747:14 751:1,5
followed
  758:22
following
  563:22 819:18
follows  410:9
forecast  803:22
  805:2
forecasting
  804:6,14
foregoing
  847:17 850:3
forgetting
  758:20
forgive  625:23
form  409:6
  412:15,23
  413:14 414:6
  414:15 416:23
  417:8 418:9
  419:2,15 420:9
  421:3,14 422:4
  422:15 423:3
  423:19 424:9

**[form - form]**                                                    Page 31

| | | | |
|---|---|---|---|
| 424:19 425:1 | 507:15 508:8 | 638:12,20 | 733:9 734:7 |
| 426:2,14 | 513:19 514:17 | 644:15 645:19 | 735:16 737:11 |
| 427:11 428:10 | 515:22 519:15 | 646:17 649:10 | 737:16 738:10 |
| 430:11 431:4 | 520:21 522:2 | 649:22 650:19 | 739:4 740:8 |
| 431:18 432:11 | 523:13 525:5 | 651:10,15 | 741:18 742:15 |
| 432:20 433:16 | 531:2 532:20 | 652:4 653:7 | 742:20 743:20 |
| 434:11 435:10 | 536:7 537:9 | 655:6,12 | 744:17 745:16 |
| 437:1,11 438:3 | 539:3,12 | 658:21 660:1 | 746:12 749:12 |
| 439:1,18 441:1 | 540:22 541:8 | 660:14 661:13 | 750:20 752:3 |
| 442:9 443:24 | 541:23 542:19 | 661:17 662:14 | 752:23 753:22 |
| 444:4 446:11 | 543:13 545:20 | 665:22 670:21 | 756:14 758:7 |
| 449:20 450:14 | 546:14 547:8 | 671:15 672:12 | 758:17 762:1 |
| 451:24 452:13 | 548:3 549:11 | 673:10,22 | 762:17 763:18 |
| 453:3,14 454:2 | 550:4 552:14 | 674:23 676:7 | 764:11 765:7 |
| 454:14 455:7 | 555:6,22 | 677:1 679:20 | 766:21 769:9 |
| 456:1,18 | 556:19 557:24 | 682:1 684:22 | 770:4,22 |
| 458:16 459:8 | 558:24 565:9 | 687:5 688:11 | 771:14 772:11 |
| 460:11 461:5 | 569:18 575:2 | 690:24 691:22 | 773:18 774:10 |
| 462:4 463:2 | 576:6 578:19 | 693:7 694:10 | 774:21 779:6 |
| 464:8,23 | 579:19 580:13 | 695:13 697:4 | 781:19 783:12 |
| 465:15 467:1 | 583:15 585:21 | 698:10 699:17 | 785:22 786:21 |
| 468:4 470:10 | 588:6 592:22 | 700:20 702:20 | 787:20 789:7 |
| 471:4 472:18 | 593:3 594:18 | 704:3 705:11 | 791:6,23 |
| 475:6 476:23 | 598:2 599:9 | 706:6 708:21 | 792:17 794:3 |
| 478:1 479:9 | 600:4 604:10 | 709:14 710:19 | 794:19 796:3 |
| 480:16 482:3 | 606:4 607:18 | 711:20 712:21 | 797:6,13 |
| 484:11 485:18 | 612:13 615:2 | 713:9 714:6 | 798:15 799:19 |
| 487:15 489:5 | 616:3 618:13 | 715:1,24 718:4 | 800:10 801:16 |
| 489:23 490:21 | 619:21 621:12 | 718:19 721:3 | 802:11,24 |
| 491:3 492:4,22 | 623:8 624:10 | 722:14 723:1 | 804:3,10 |
| 493:24 494:9 | 625:4,22 | 723:16 724:20 | 805:13 806:21 |
| 496:10 497:6 | 626:12 627:1 | 725:6,15 728:6 | 808:24 809:20 |
| 500:9,17 501:4 | 628:18 629:18 | 729:8,13 | 810:14 812:18 |
| 505:5 506:7,22 | 634:23 636:7 | 730:14 731:19 | 813:9 816:4,15 |

**[form - general]**                                              Page 32

816:17 817:14
817:24 818:19
819:21 820:4
820:19 821:2
822:14 823:1
823:21 824:24
825:9,15,23
826:5,12,22
827:8,14 828:6
828:13,23
829:5,11 830:8
830:14,21
831:17 832:3
832:15,22
833:4,13,21
834:5,12,19
835:3,9 836:2
836:22 837:13
838:5,22
839:17 840:14
841:7,14,23
842:11,20
843:11,21
844:10 845:2
845:15 850:5
**formed**  643:18
686:24 687:24
**former**  476:7
**forming**  493:12
533:21 649:6
755:20 774:18
786:24 788:9
**forms**  447:17
468:12 722:2

809:7
**formulated**
654:9
**formulating**
649:16 685:18
686:13 687:2
694:3 759:13
824:6,11
**forward**  640:2
**found**  740:6
**foundation**
412:23 482:3
639:2 723:16
772:11 810:17
**four**  846:4
**framework**
474:11 481:4,5
581:17 582:1
605:11 616:17
702:23 706:9
707:6 718:6
787:12
**frameworks**
471:21 475:20
476:8 478:10
481:1 581:4
605:20 694:15
716:15 719:1
**frankly**  411:10
421:17 486:12
487:18 535:4
572:19 687:10
695:15 752:7
813:14

**free**  521:12
**friend**  829:3
**front**  583:1
740:17 754:21
755:6
**frontline**  431:9
434:21
**full**  433:6
434:15 691:6
816:15
**fully**  432:24
696:8 807:2
**function**  500:7
500:15 507:13
507:20 519:13
520:19 523:11
525:3
**functioning**
609:8
**fund**  679:17
686:11
**funded**  572:11
670:18 671:2
671:12,23
673:7,19
676:11 681:9
**funding**  540:1
572:12,15
647:22 648:4
671:3 672:7
674:7,19
677:19 678:2
678:15 680:20
680:23 682:12

683:1,12,23
721:22
**funds**  572:6
680:8 681:4
684:7,10
**future**  471:16
475:13 572:10
580:17,20
696:22 698:2
698:13 804:14

**g**

**g**  405:12
**gain**  617:15
**gained**  449:3
**gaining**  537:13
**galveston**  406:6
**gambling**
699:13
**gaming**  696:24
699:13
**gather**  815:1
**gathered**
445:14 498:22
**gating**  703:23
**general**  469:9
518:21 521:9
522:5 604:11
632:10 646:24
670:24 710:24
712:24 714:15
715:2,8 723:6
724:6 747:13
750:23 759:10

**[general - grants]** Page 33

| | | | |
|---|---|---|---|
| 777:5,21 780:6 | 606:6 611:13 | 542:20 554:16 | 524:13,16 |
| 781:8 795:5 | 617:7 639:12 | 556:17 558:6 | 605:8 629:19 |
| 823:7 | 664:2,22 678:9 | 560:20 561:2 | 632:17,20 |
| **generally** | 679:11 733:24 | 565:11 566:8 | 637:23 644:12 |
| 518:22 652:13 | 736:23 739:21 | 577:11 578:11 | 644:16 657:15 |
| 680:3 685:9 | 742:7 794:23 | 589:13 611:7 | 658:14 689:13 |
| 721:9 722:18 | 796:23 798:21 | 613:6,18 | 695:2 707:13 |
| 723:2,23 | 799:13 800:5 | 638:22 650:21 | 707:14,16 |
| 789:12 | 802:23 803:15 | 664:23 679:22 | 708:18 724:2 |
| **generate** 845:5 | 847:7 850:4 | 685:16 691:11 | 736:13 738:6 |
| **georgia** 669:20 | **giving** 593:4 | 707:14 724:4 | 746:14 750:3 |
| 683:2 | 707:10 709:1 | 726:10 733:16 | 753:1 758:4,19 |
| **gilfillan** 405:12 | **go** 441:11 | 736:7,16 | 760:13 766:24 |
| **give** 412:17 | 457:6,9,23 | 739:12 749:21 | 769:11 776:9 |
| 428:4 429:23 | 458:18 459:12 | 753:7 759:7,24 | 777:16,21 |
| 429:23 431:6 | 459:15,20 | 760:13 769:11 | 778:3 792:2 |
| 436:21 437:17 | 461:7,12 | 776:9 777:7,11 | 803:5,6,7,9 |
| 439:3 463:19 | 462:12 463:17 | 782:13 791:17 | 804:21,21,22 |
| 495:22 525:14 | 464:10 465:1 | 792:3 796:10 | 814:19 832:5,6 |
| 551:7 581:19 | 465:19 467:6 | 798:21 799:10 | **golkow** 402:23 |
| 603:14,16 | 472:16 475:3 | 823:3 837:17 | 409:13 |
| 608:24 622:4 | 476:20 477:22 | **goal** 584:6 | **good** 410:14,16 |
| 644:12,17 | 479:6 480:13 | 589:4,7 833:9 | 495:21 581:14 |
| 664:21 707:19 | 480:20 489:10 | **goes** 433:2 | 582:9 807:24 |
| 719:14 720:11 | 490:5 491:5 | **going** 429:4,8 | 808:2 |
| 723:6 728:12 | 494:1 495:16 | 471:9,18 | **google** 404:8 |
| 764:5 765:3 | 497:24 498:8 | 473:24 474:7 | 410:20 727:24 |
| 829:12 836:3 | 498:11,12,14 | 494:12 495:22 | **gotten** 445:5 |
| 839:19 845:16 | 512:3,21 517:2 | 495:23 501:24 | **grade** 616:21 |
| **given** 421:19 | 517:3,5 521:8 | 502:5,24 | **grant** 558:22 |
| 501:10 505:9 | 527:3 531:18 | 503:12,14 | **grants** 538:4 |
| 506:13 507:4 | 531:23 533:13 | 504:1,6 512:7 | 540:1 555:16 |
| 507:23 525:13 | 534:16 537:20 | 513:9,21 | 555:17,23 |
| 525:23 550:9 | 541:1,13 | 521:14 524:3 | 556:10,21 |

CONFIDENTIAL

**[grants - harm]**                                                         Page 34

| | | | |
|---|---|---|---|
| 557:3,14,20 | **habits**  634:3 | 643:3 648:8 | 476:19 477:6 |
| 558:2,7,8,10,11 | **hampshire** | 687:6 695:15 | 478:12,20 |
| 558:18 559:8 | 651:6 | 697:6,16,17 | 479:13,22,24 |
| 559:14 680:6 | **hand**  688:7 | 698:11 699:15 | 481:4 485:1 |
| 684:5 792:5 | 695:5 757:19 | 699:19 718:21 | 522:15,15,17 |
| 793:18 | **happen**  611:17 | 719:12,18 | 526:6,20 |
| **graph**  650:14 | 630:2 654:7 | 720:3,6,10 | 527:20 528:5 |
| **grapple**  571:4 | 697:17 752:17 | 764:19 768:17 | 573:2 609:5 |
| **great**  410:21 | **happened** | 790:19 799:22 | 611:20 618:3 |
| 582:12 788:1 | 620:22 814:10 | 800:14,15 | 622:12,17 |
| 798:7 | **happening** | 802:21 803:2,8 | 638:16 640:2 |
| **greater**  527:3 | 435:15 440:9 | 803:13,20 | 657:12 659:13 |
| **ground**  441:17 | 441:16 444:13 | **harford**  412:6 | 661:3 677:10 |
| 444:6 689:15 | 451:17 585:4 | 418:2,19 419:9 | 677:16 694:16 |
| 700:13 | 646:20 659:15 | 422:10 424:5 | 697:10,11,22 |
| **group**  555:9 | 689:15 700:12 | 425:23 431:15 | 698:3,8,19 |
| **groups**  551:14 | **happy**  427:12 | 433:12 437:23 | 699:3,5,8 |
| 553:2 662:20 | 459:11 461:11 | 438:20 439:13 | 700:5,10 |
| 663:21 | 467:4 470:15 | 440:20 442:4 | 701:22 710:1,9 |
| **guess**  465:21 | 477:2 491:8 | 452:24 453:11 | 711:13 712:16 |
| 505:15 755:1 | 517:3 541:1 | 454:7 455:4,22 | 713:23 715:12 |
| 790:20 821:20 | 544:21 548:5 | 458:13 460:8 | 715:17 718:1 |
| **guidance** | 550:20 558:6 | 461:2 462:1,23 | 718:13 719:13 |
| 545:11 | 566:5 608:10 | 464:5,20 | 720:8 721:23 |
| **guide**  546:10 | 610:16 685:6 | 465:13 466:22 | 723:22 781:17 |
| 546:11,16 | 724:4 726:10 | 489:1 669:12 | 781:22 782:5 |
| 547:4,20,21,23 | 760:16 777:15 | 669:18 673:4 | 789:4 791:3,20 |
| **guides**  545:15 | 793:11 806:24 | 673:16 674:17 | 792:13 793:24 |
| **guild**  662:20 | **hard**  416:16 | 680:19,23 | 794:16 795:22 |
| 663:21 | 433:7 439:3 | 681:14,23 | 796:18 797:4 |
| **h** | 450:19 499:8 | 682:8 | 798:12 799:16 |
| **h**  407:9 | 501:11 535:10 | **harm**  436:17 | 800:8 815:13 |
| | 544:24 566:5 | 460:9 474:16 | 823:14,18 |
| | 580:21 618:14 | 474:20 476:2,6 | 843:19 |

CONFIDENTIAL

**[harmed - health]**                                              Page 35

| | | | |
|---|---|---|---|
| **harmed**   585:5 | 658:13 660:5 | 474:11,19 | 588:4,21 |
| 619:2 631:6 | 663:6 672:20 | 475:20,24 | 591:15,16 |
| 640:1 700:2,2 | 673:14 677:6 | 476:7 478:9,20 | 596:6,13 |
| 810:5,9 831:15 | 678:16,21 | 479:12,14 | 602:19,23 |
| **harmful**   522:11 | 680:15 687:16 | 480:2 481:1,5 | 603:4,6 604:24 |
| 833:19 | 694:18 696:13 | 512:1 528:11 | 605:6 607:22 |
| **harming** | 696:20,22 | 528:22 529:11 | 608:13,13 |
| 473:15 581:5 | 697:2,7 700:23 | 529:24 530:4 | 609:8,17 610:2 |
| **harms**   444:16 | 701:9,12 703:9 | 530:13,19 | 611:4,13 614:4 |
| 444:23 447:12 | 703:11,19,21 | 532:5,16 | 614:5,6,12,20 |
| 472:7 473:3 | 706:19,22 | 533:15 534:1,5 | 615:11 616:17 |
| 482:15,19 | 718:7 720:12 | 534:6,7,22 | 617:6 620:4 |
| 484:14,16 | 720:23 721:13 | 535:2,21,22,24 | 624:16 630:2 |
| 497:16 505:18 | 722:12 723:12 | 536:14,17 | 634:16 635:18 |
| 508:22 519:2,3 | 725:3 774:8 | 537:4,16 538:2 | 635:21 637:4,9 |
| 521:6 522:8 | 776:6 783:8 | 538:11,14,22 | 638:23 639:3 |
| 526:17 527:18 | 786:13 787:17 | 540:10,12 | 653:21 656:3 |
| 527:23 528:7 | 797:24 804:22 | 542:8 545:10 | 660:18 664:4,6 |
| 536:24 537:15 | 809:23 843:3 | 547:16 548:18 | 665:9 666:10 |
| 554:9 569:22 | **hate**   620:20 | 551:1 552:6,10 | 667:18 671:13 |
| 571:9 583:22 | **hawaii**   651:6 | 555:2 556:2,5 | 672:9,18 |
| 584:8,13,15,18 | **head**   412:18 | 557:16 558:11 | 673:19 674:12 |
| 584:20,22 | 460:19 465:6 | 558:13,15 | 674:20 675:15 |
| 585:1,1,15,16 | 465:24 677:23 | 559:23 560:4 | 675:21 676:4 |
| 585:17 586:4 | **headspace** | 560:10,12 | 676:19 677:20 |
| 586:24 589:11 | 833:11,15 | 561:10,12,16 | 678:3 679:17 |
| 590:20 600:14 | **health**   407:13 | 563:16,23 | 680:9,21 681:8 |
| 604:3 606:8,18 | 446:24 450:5 | 564:16 567:3 | 681:23 682:8 |
| 607:1,9 608:15 | 451:8,17 457:4 | 567:10 568:24 | 683:3,13,24 |
| 614:16 615:6 | 468:8,17,20,23 | 569:19 570:24 | 684:16,19 |
| 615:12 620:2,3 | 468:24 469:4 | 571:19 581:1,4 | 694:14 701:24 |
| 620:4,15 | 469:11,16,24 | 581:16 582:1 | 702:4,22,24 |
| 623:15,16 | 471:7,13,20 | 584:23 585:5 | 704:5 706:8,16 |
| 637:14 656:14 | 472:2 473:2,14 | 586:6,19 587:8 | 716:15 717:9 |

**[health - hours]** Page 36

717:21 719:1,3
734:5 735:6,13
737:6 739:1,18
740:3 778:16
779:1,16,24
781:2 784:24
788:20 789:5
789:13,19,21
789:24 790:2,6
790:14,16
791:4,11,14,21
792:14 793:2,5
793:20 794:11
794:12 795:6
797:24 799:1
815:9,10,20,24
817:4 819:10
819:13,17,18
820:9,14
821:19 822:12
822:23 831:15
831:24 832:7
**health's** 559:20
**healthy** 633:22
**hear** 708:19
**heard** 413:2
428:24 486:3
487:7 488:4,19
653:17 739:2
801:24 802:4
**hearing** 674:5
805:3
**held** 402:15
409:17

**hello** 631:15
**help** 438:5
617:15 634:20
635:1,10
762:21 766:19
814:12 817:2,3
**helpful** 564:6
635:12 639:7
757:20
**helping** 766:5,8
766:12
**hey** 496:24
523:2 741:12
**hhs** 535:14
**high** 412:11
413:10 414:11
415:4,24
416:19 417:13
418:4,21
419:11 468:19
506:4,20
516:22 517:16
518:7,18 598:7
599:16 768:7
768:15,21
832:12
**highly** 689:10
695:17
**hipaa** 451:13
**hire** 571:23
572:22 591:11
594:4,8,14,23
595:4,9,13,24
596:6,12,18,24

597:9,16
603:19 604:5
605:2,10 611:4
611:5 612:9
614:2 640:24
647:15,22
657:22 658:8
696:19 766:18
**hired** 599:13,21
610:20 611:1
654:13 655:1
657:5
**hiring** 591:6,21
592:19 593:14
612:20 613:24
**history** 647:3
832:7
**hit** 730:20,23
731:15 733:5
734:2,9
**hold** 521:8
664:2
**holdings**
404:15
**holds** 565:19
**holes** 607:3
**holistically**
484:13 492:24
606:14
**honest** 735:8
762:6 763:23
764:15 802:16
**honestly**
457:23 474:3

491:4 531:18
544:6 560:15
561:2 669:15
670:23 727:17
742:24 768:17
777:7 794:22
820:6
**hoover** 402:14
407:4,12,15,19
410:1,7,14
428:20 500:4
504:23 522:22
523:14 564:14
564:23 582:6
582:24 583:1
642:9 645:19
648:12,15
650:6 667:3
708:22 709:5
725:5 751:16
766:4 807:7,24
850:8
**hope** 572:21
598:22 620:14
626:20 653:4
**host** 544:8
**hosted** 540:10
542:7
**hour** 503:2,7
**hours** 436:1
485:8 503:2,9
503:11,13
598:10 826:7
831:14 846:4

[huh - impacting]                                                        Page 37

| | | | |
|---|---|---|---|
| **huh** 801:4 | 440:21 442:5 | 793:8 795:23 | 496:19 509:10 |
| **human** 534:6 | 443:8 445:8,19 | 797:8 798:13 | 510:2 514:21 |
| 535:23 | 445:20,22 | 805:8,18 | 530:22 531:9 |
| **hundred** | 446:3,5,6,7 | 806:16 838:2 | 531:12 532:17 |
| 553:11 | 451:21 452:10 | **identifying** | 533:6,16 536:3 |
| **hundreds** | 455:5,11 459:5 | 654:23 728:1 | 537:6 538:14 |
| 505:9 506:12 | 460:8 461:2 | 729:19 730:3 | 538:24 539:9 |
| 507:3,22 516:4 | 462:1,23 464:5 | 747:22 748:21 | 540:17 542:13 |
| 516:15 550:15 | 464:20 465:13 | 751:10 783:9 | 546:11 547:5 |
| 707:16 | 466:3,22 | 817:3 | 547:24 549:8 |
| **hypothetical** | 476:18 477:21 | **ignore** 655:14 | 550:1 552:11 |
| 664:21 700:6 | 479:5 529:12 | **ignored** 655:1 | 555:3,19 556:6 |
| 701:14 | 576:13 654:11 | **ignoring** | 556:13 559:7 |
| **i** | 694:19 703:16 | 655:22 | 570:14 587:5 |
| | 736:19 742:17 | **ii** 402:10 | 588:1,17 620:9 |
| **idea** 732:13 | 769:2 786:14 | **illustrative** | 620:16 621:1 |
| 825:17 828:8 | **identify** 416:16 | 498:24 | 630:22 675:21 |
| 834:1 | 425:6 511:9 | **image** 462:2 | 712:1,18 714:1 |
| **ideation** 459:1 | 512:10 513:13 | 477:22 | 726:6 778:13 |
| **identical** 761:9 | 527:11,18 | **imagine** 423:6 | 778:23 779:12 |
| **identification** | 537:2 538:21 | 611:8 618:18 | 780:13,23 |
| 564:17 642:15 | 540:13,18 | 618:22 697:16 | 785:1 789:17 |
| 648:19 705:3 | 541:6 542:10 | 697:18 803:14 | 790:15 791:11 |
| **identified** | 542:15 551:3 | 803:19 | 791:13 793:1 |
| 422:23 423:15 | 551:21 565:19 | **imagining** | 793:19 795:10 |
| 424:5,16 425:7 | 578:13 591:6 | 625:16 | 797:22 799:1 |
| 425:23 426:11 | 605:23 607:12 | **immediate** | 807:4 814:15 |
| 427:6 428:6 | 612:7 704:10 | 572:10 | **impacted** 618:3 |
| 430:8 431:1,15 | 704:22 705:17 | **immediately** | 619:2 622:19 |
| 432:8,17 | 727:9,12 728:9 | 620:11 | 624:20 631:16 |
| 433:13 434:8 | 729:4 743:8,15 | **impact** 447:5 | 631:19 637:13 |
| 435:6 436:11 | 749:7,22 | 468:21 470:7 | **impacting** |
| 437:7,24 | 787:11 791:16 | 470:23 471:13 | 697:12 698:4 |
| 438:21 439:14 | 791:17 792:9 | 482:14 483:23 | |

[impacts - including]                                      Page 38

| | | | |
|---|---|---|---|
| **impacts**  508:18 | **implementati...** | 798:3 | 569:4,20 |
| 511:24 512:19 | 473:21 475:23 | **improve**  481:6 | 571:21 584:14 |
| 545:4 557:4,8 | 477:7,8 480:20 | 536:13 539:21 | 608:23 609:3 |
| 571:4 572:23 | 545:11 604:18 | **improved** | 620:3 624:6,23 |
| 584:12 586:7 | 608:21 618:20 | 816:11 | 657:1,20 658:5 |
| 602:2 609:4 | 627:4 793:4 | **improvement** | 696:18 757:2 |
| 611:14 617:4,6 | **implemented** | 474:16 477:10 | 761:3 784:13 |
| 619:9 621:2 | 471:1 472:2 | 481:11 701:21 | **included** |
| 659:3,10 | 475:4 476:21 | **improvements** | 440:14 442:19 |
| 660:22 662:5 | 477:23 479:7 | 816:9 | 447:10 493:9 |
| 662:18 688:21 | 480:14 481:19 | **improving** | 498:21,23 |
| 699:6 712:10 | 487:9 489:8 | 536:17 | 534:1 553:9 |
| 780:16,20 | 579:16 580:9 | **inadequate** | 554:14 567:18 |
| 781:8 790:1,6 | 583:20 698:17 | 432:23 666:9 | 568:10 616:15 |
| 809:3 815:12 | 817:20 | 676:22 684:14 | 632:4 683:8,8 |
| 823:13,18 | **implementing** | **inadequately** | 691:3 732:19 |
| **impairment** | 685:22 | 670:18 671:2 | 734:12 741:23 |
| 609:7 706:21 | **implements** | 671:12,23 | 750:9 787:1,3 |
| 710:2,9 711:14 | 766:16 | 673:7,19 | 787:5,6 824:1 |
| 711:16 713:23 | **implications** | 674:11 675:14 | 824:20 838:18 |
| 715:7,18 718:1 | 687:1 | 676:2,11,12,18 | **includes**  445:12 |
| 718:14 | **implied**  527:1 | **inappropriate** | 482:7 566:11 |
| **imperative** | **important** | 709:17 | 568:2 569:6 |
| 848:14 | 564:3 605:7 | **incident**  821:18 | 586:6 616:17 |
| **implement** | 784:19 | **include**  467:17 | 624:13 703:3 |
| 486:1 487:23 | **imposed**  573:2 | 472:13 474:24 | 790:14 |
| 583:12,18 | 677:10 | 476:16 477:17 | **including**  441:9 |
| 604:19 657:16 | **imposes**  665:19 | 478:16 479:3 | 441:12,13 |
| 696:9 705:1 | **imposing** | 480:8,23 | 442:21 468:13 |
| 766:6,9,12 | 677:15 | 498:16 526:21 | 471:21 478:15 |
| 807:2 814:18 | **impossible** | 536:12 540:3 | 550:24 554:2 |
| 814:24 816:14 | 437:16 481:20 | 566:1,15,19 | 574:12 584:23 |
| 817:12 | 486:15 505:11 | 567:2,9,13,24 | 586:12 615:9 |
| | 581:23 698:21 | 568:7,13,17,24 | 624:15 627:19 |

**[including - infrastructure]**                                    Page 39

635:19 639:20
643:1 691:2
692:10 693:2
721:11 722:3
726:2 780:17
797:16 813:18
**income**   844:22
845:5,11
**inconsistent**
509:8 511:22
512:16 657:24
658:10
**incorrect**   574:2
**increase**   717:9
**increased**
432:2 666:11
717:15
**increasing**
441:6
**increasingly**
569:24 781:13
**incredibly**
485:24
**independent**
559:5
**independently**
838:2
**index**   408:2
**indicate**   457:24
458:1 472:24
631:5 674:10
**indicated**
426:18 435:14
443:2 458:20

469:2,13 478:3
526:19 577:13
759:3,11
**indicators**
446:20
**individual**
574:16 629:9
**individuals**
430:17 439:23
443:9 560:3
574:18 575:8
576:22 579:1,9
579:10 785:10
**inevitably**
538:8
**influenced**
687:24
**inform**   420:21
455:15 456:11
458:9 469:23
513:24 535:17
643:22 644:6
649:12 733:18
745:21 746:1
786:2
**informant**
445:20 498:13
511:17 512:4
512:17 513:7
574:10,20,24
575:12 576:18
577:12,16,19
578:24 579:22
580:4 656:9

667:4,8 684:24
689:9,13
693:16,22
723:24 724:13
725:24 786:6
787:4 821:11
**informants**
443:20 445:6
494:6,14 495:1
495:9,11,14
497:13 498:4
498:18,22
499:5 511:10
512:11 513:13
514:11,19
573:21 575:20
575:22 576:2,8
577:5,9,21
578:5,12 679:2
679:5 722:10
**information**
420:15,18
421:20 422:6
422:19 430:20
439:3 442:20
443:19 444:22
445:12,13
446:14 447:22
448:18 449:6
450:7,16,21
452:16 454:18
454:20 456:9
457:3 459:10
460:16 464:11

464:12 465:17
466:16 467:7
468:13 482:15
483:16 493:9
494:2 496:14
498:1,13,21,24
530:16 542:22
546:22 549:18
576:15 641:22
641:24 655:19
679:5,23 684:2
684:4 686:18
745:20 746:1
784:5,20 786:1
786:23 787:2,3
787:6,8 788:7
788:9 815:1
821:9 834:2
838:2 840:12
841:1,3
**informed**   535:6
683:20 695:1
723:20 726:14
749:3 785:14
787:23
**informing**
564:4 650:1
756:7 757:20
**infrastructure**
482:8 560:11
563:2 704:17
724:8,16 725:2
725:10,20
813:16 814:13

**[infrastructure - interviews]**                    Page 40

824:2 836:14
837:1,4
**inherent**
526:18 527:4
527:10 627:11
**initially** 576:10
**initiative**
535:12 537:3
538:21 681:9
**initiatives**
534:11,13
537:19,21,24
538:6,18 539:7
702:24
**injury** 402:4
409:20
**input** 664:21
**inquire** 512:7
513:23
**inquires** 560:7
**inquiry** 444:11
447:19 497:4
514:6,21
689:14
**inside** 669:9
**insistent**
486:20
**instagram**
404:16 808:11
**instance** 501:18
790:10
**instances**
707:17

**institute** 538:1
735:6
**instituted**
489:1,20
490:17 496:3,8
498:5 499:7
**instituting**
493:22 497:2
**instruct** 504:3
**instructed**
615:14,16,18
**instruction**
435:20 586:14
586:18 613:16
**instructional**
436:2 485:3
**instructions**
848:1
**instrument**
561:24
**instruments**
572:7
**integrity** 762:5
762:8,21
763:24 764:16
765:14
**intelligence**
699:12
**intend** 690:6
**intended** 484:6
484:13 560:1
570:9 586:4
619:24 638:4
656:16 695:1

706:10 809:22
810:4
**intending**
509:9 625:12
628:15
**intent** 690:6
712:2
**intention** 555:9
767:1
**intentionally**
657:7
**intentions**
818:24
**interactions**
463:8 693:12
**interest** 573:7
573:10 577:15
771:20 772:4
772:16,19
773:22
**interesting**
494:13 496:13
526:13 539:14
814:4
**interference**
586:14
**internal** 571:24
664:8 824:6
**interpret**
413:20
**interpreted**
510:18
**interpreting**
510:14

**intersect**
584:24
**intersection**
469:18 470:2
**intervention**
474:9 551:1,9
551:12 552:6
552:10,16,20
553:24 555:3
555:10 595:10
600:23 639:20
**interventions**
605:13 624:14
809:12
**interview**
497:12 513:5
515:6 577:16
579:1 611:9
689:9,13
**interviewed**
440:1 574:19
575:11 579:12
**interviewees**
497:13
**interviewing**
511:23
**interviews**
424:21 428:24
431:22 445:20
486:5 495:17
497:14 511:17
511:20 512:4
512:17 513:7
573:21,23

CONFIDENTIAL

**[interviews - kang]**                                    Page 41

574:1,4,20
575:12,19,23
576:19 577:12
577:19 578:5
579:22 580:4
655:18 656:10
667:4,9 685:1
693:17,22
724:1,13
725:24 786:7
787:4 821:12
**intra**  815:7
**invented**  815:2
**investigation**
558:22
**investigator**
555:15,15,18
556:1,12,22,22
557:21,22
**investing**  819:9
**investment**
819:17,23
**invited**  735:1
**involved**
468:16 532:9
537:22 538:7
562:2 569:11
821:17
**involves**  615:8
627:23
**irvington**
405:19 412:6
418:1,18 419:8
422:9 424:3

425:22 431:14
433:12 437:23
438:20 439:12
440:20 442:4
452:24 453:10
454:7 455:3,21
458:13 460:7
461:1,24
462:22 464:4
464:19 465:12
466:21 489:1
670:1,6 673:5
673:17 674:18
683:11
**isolation**  746:9
**issue**  447:23
471:8 477:13
494:16 536:3
538:24 539:8
540:16 542:12
556:12 570:2
588:24 659:22
660:11 661:10
662:12 685:12
688:7 705:4
765:10 812:15
837:5
**issued**  509:4
512:14 515:14
516:20 526:8
561:14 583:10
690:1,22
691:19 693:5
774:5 819:16

**issues**  441:7
462:1 477:21
483:18 581:5
586:12 603:6
632:19 646:24
671:20 673:1
675:15 694:16
695:5 696:8
717:10
**issuing**  795:16
**item**  675:10,11
**items**  552:3
**iteration**
554:12
**iterations**
572:1

**j**

**j**  404:4
**jack**  404:20
808:1
**jack.nolan**
404:22
**january**  643:6
**jersey**  405:13
670:1,3,4
683:12
**jill**  529:13
**job**  743:2
**jog**  550:18
**john**  846:5
**journal**  732:5
771:5 772:5,22
773:14

**journalist**
769:24 770:19
**journals**  732:6
**judge**  501:6
503:6 504:10
505:7 506:9,24
507:17 515:24
528:14 531:4
532:22 707:15
708:17 740:11
754:1 770:24
771:16 772:13
776:16 798:19
830:23 831:19
**july**  769:4,20
773:11
**june**  528:22
582:3 583:7
760:10,18
**jury**  708:17
**justice**  538:1

**k**

**k**  404:14
553:20
**kang**  501:6
503:6 505:7
506:9,24
507:17 515:24
528:14 531:4
532:22 740:11
754:1 770:24
771:16 772:13
776:16 798:19

**[kang - keyes]**                                                      Page 42

| | | | |
|---|---|---|---|
| 830:23 831:19 | 689:9,12 | 460:3,21 | 541:4,15 542:5 |
| **kathryn** 403:11 | 693:16,21 | 461:20 462:18 | 543:5,19 546:1 |
| **kaylie** 406:11 | 722:9 723:24 | 463:24 464:15 | 546:8,23 |
| **keep** 441:5 | 724:12 725:23 | 465:8 466:17 | 547:18 549:3 |
| 485:7 523:3 | 786:6 787:4 | 467:11,22 | 549:21 550:22 |
| **kennedy** | 821:11 | 470:4,14 | 554:18 555:13 |
| 404:11 | **keyes** 404:4 | 472:10 473:6 | 556:9,24 |
| **kentucky** | 407:6 410:13 | 476:13,24 | 557:19 558:19 |
| 668:18,22 | 410:18 412:19 | 478:24 480:5 | 559:17 564:9 |
| 677:19 | 413:6,21 414:8 | 481:7 484:3 | 564:19,24 |
| **kept** 450:6 | 414:19 417:1 | 485:11 487:4 | 565:4,11,13 |
| **kessler** 402:16 | 417:10 418:17 | 488:22 489:17 | 575:16 577:2 |
| 403:3 | 419:7,19 | 490:12,22 | 578:16 579:13 |
| **key** 443:20 | 420:23 421:8 | 491:21 492:15 | 580:1 582:2,10 |
| 445:6,19 494:5 | 421:21 422:8 | 493:15,18 | 582:23 584:2 |
| 494:14,24 | 422:20 423:12 | 494:3,22 | 585:22 588:22 |
| 495:9,10,13 | 423:24 424:13 | 496:23 497:18 | 592:23 593:10 |
| 497:13 498:4 | 425:4 426:8 | 499:14 500:3 | 594:20 599:1 |
| 498:13,18,22 | 427:1,24 | 500:12,21 | 599:18 601:14 |
| 499:5 511:10 | 428:18 429:17 | 501:7 502:5,10 | 605:22 607:11 |
| 511:16 512:3 | 429:21 430:22 | 502:15,21,23 | 607:19 612:24 |
| 512:11,17 | 431:11 432:5 | 503:6,19,24 | 615:15 616:9 |
| 513:7,13 | 432:14 433:9 | 504:11,22 | 619:14 621:4 |
| 514:11,19 | 434:5 435:3 | 505:24 506:16 | 621:15 622:2 |
| 573:20 574:9 | 436:8 437:4,19 | 507:8 508:1,23 | 622:21 624:5 |
| 574:19,23 | 438:15 439:9 | 514:8 515:7 | 624:22 625:5 |
| 575:12,19,22 | 440:15 441:24 | 516:17 520:10 | 626:3,21 628:8 |
| 576:2,7,18 | 443:15 445:2 | 521:18 522:21 | 629:5 631:23 |
| 577:4,12,16,18 | 448:9 450:1 | 524:12 525:12 | 635:7 636:8 |
| 577:21 578:5 | 451:1 452:4,20 | 528:19 529:15 | 638:15 640:4 |
| 578:12,23 | 453:7,20 454:3 | 531:10 532:3 | 642:4,17 645:3 |
| 579:22 580:4 | 454:11,24 | 532:14 533:10 | 646:7 648:10 |
| 667:4,8 679:2 | 455:17 456:12 | 537:1 538:19 | 648:21 649:14 |
| 679:4 684:24 | 457:19 459:2 | 539:6 540:7 | 650:3,5 651:1 |

[keyes - know]                                                                    Page 43

| | | | |
|---|---|---|---|
| 651:16 653:1 | 739:7 740:12 | 729:17 730:1 | **kirkland** |
| 654:8 655:7 | 742:6,16 743:4 | 730:18 733:6 | 404:19 |
| 656:24 658:22 | 744:6,18 746:3 | 733:24 737:1 | **kirkland.com** |
| 659:18 660:7 | 746:21 748:4,8 | 743:10 749:6 | 404:22 |
| 661:6,14 662:7 | 748:13 749:17 | 750:11 751:17 | **klehman** |
| 663:7 666:13 | 751:7,15,24 | 753:15 | 403:14 |
| 667:2 671:10 | 752:18 753:1,4 | **kids** 616:20 | **kmorgan** |
| 672:5 673:3,15 | 755:9 757:8 | **kind** 411:11 | 406:13 |
| 674:15 675:23 | 758:8 759:23 | 448:17 497:8 | **knew** 554:7 |
| 676:13 677:17 | 760:15,21 | 536:10 548:21 | **know** 415:12 |
| 680:18 682:5 | 762:10 763:5 | 572:2 585:3,8 | 415:20 420:13 |
| 685:17 688:8 | 764:2,22 | 586:23 604:23 | 432:22 433:1 |
| 688:24 691:9 | 765:15 766:3 | 615:18 618:20 | 435:24 438:5 |
| 692:1 694:2 | 767:2 769:13 | 625:17 629:14 | 449:11 450:19 |
| 695:6 696:10 | 770:8 771:3,11 | 629:15 630:10 | 452:17 457:1 |
| 698:1,23 | 772:2 773:10 | 638:22 639:6 | 458:3 459:21 |
| 699:10,18 | 774:1 775:15 | 653:19 654:5 | 461:15 462:6 |
| 701:1 703:22 | 776:20,24 | 660:18 667:12 | 463:9 466:1 |
| 705:6,15 707:7 | 779:17 782:2 | 686:5,10 | 470:20 473:21 |
| 708:4,7 709:4 | 782:19 783:14 | 689:14 698:15 | 483:13 485:21 |
| 710:6 711:10 | 785:16 786:9 | 702:8 704:6 | 486:7 487:20 |
| 712:13 713:1 | 787:10 788:11 | 706:3 707:22 | 488:21 489:8 |
| 713:19 714:18 | 790:22 791:15 | 708:13,14 | 489:18 490:15 |
| 715:13,20 | 792:6 793:6,21 | 709:10 713:11 | 491:15 492:6 |
| 717:16 718:9 | 794:13 795:14 | 715:7 723:6 | 497:1 501:10 |
| 720:5 722:7,16 | 796:12 797:7 | 741:14 771:6 | 501:15 508:14 |
| 723:8 724:14 | 798:4 799:3,12 | 772:24 | 512:6 516:3,6 |
| 724:24 725:7 | 800:1,19 801:1 | **kindergarten** | 516:9 520:3,11 |
| 726:11 728:7 | 801:12,23 | 616:20 | 524:2,4,5 |
| 729:9,15 | 802:6,17 804:4 | **kindergarten...** | 525:17 526:21 |
| 730:17 732:10 | 805:4,24 807:7 | 617:12 | 527:6 528:2 |
| 733:23 734:13 | 846:3 | **king** 402:17 | 531:19 535:11 |
| 736:1 737:12 | **keywords** | 403:5,10 | 535:15 537:23 |
| 737:22 738:22 | 728:11,13,17 | 406:16 | 539:17 542:1 |

CONFIDENTIAL

**[know - language]**                                    Page 44

| | | | |
|---|---|---|---|
| 542:22 546:20 | 669:17,21 | 750:16 754:22 | **knowledge** |
| 547:15 548:14 | 670:3,7,14 | 761:6 763:16 | 452:18 562:23 |
| 549:16 550:14 | 672:3,20 675:8 | 764:20 768:18 | 563:5 572:14 |
| 553:10 559:4 | 677:3,6,21,22 | 768:20 770:14 | 671:9 681:16 |
| 560:15,17,18 | 677:23 678:4,5 | 772:5,24 | 696:2 807:1 |
| 561:22 562:14 | 678:15,18 | 774:14 776:17 | **known**   735:7 |
| 562:17 563:20 | 679:8 680:11 | 777:10 790:8 | **knows**   686:8 |
| 567:17 570:3 | 680:22 681:1,2 | 794:24 795:4 | **kotlarsky** |
| 571:9 572:12 | 681:20 682:7 | 795:12 796:5 | 406:17 |
| 572:21 573:3 | 682:17,20 | 799:22 800:17 | **kslaw.com** |
| 575:8 577:15 | 683:4,14,17,18 | 801:9,11,22 | 403:14 406:19 |
| 578:6 580:16 | 684:1 685:6 | 802:14,15,18 | **ktmc.com** |
| 583:2 584:1 | 686:3,16 687:7 | 803:6,8,10 | 403:6,7 |
| 586:7 592:2 | 687:11 690:15 | 804:17,24 | **l** |
| 600:13 601:11 | 692:3,16,17 | 806:1 813:10 | **l**   403:4 746:6,6 |
| 602:7,9,13,15 | 695:2,21 | 813:11,12 | **laid**   482:24 |
| 602:20 604:13 | 698:12,14 | 814:12 815:4,5 | 484:15 533:18 |
| 606:14 611:20 | 700:6,18,22 | 815:6,8,11,14 | 584:16 586:3 |
| 612:14 617:15 | 702:5 704:13 | 815:16 816:9 | 608:18 616:14 |
| 617:18 618:19 | 705:20 707:3 | 818:5 819:4,11 | 637:10,19 |
| 620:5,21 | 708:2,18 716:4 | 820:5,6 821:24 | 680:12 703:1 |
| 625:17 627:5,6 | 718:23 720:13 | 823:7 825:12 | 704:4 711:9 |
| 628:6 630:6,10 | 727:17,23 | 827:24 828:17 | 790:12 807:5 |
| 631:18 632:15 | 729:22 731:4 | 828:24 829:8 | 811:18 812:21 |
| 632:22 639:6 | 731:13 732:17 | 829:17 830:3 | **lament**   666:8 |
| 641:15,20 | 734:8 735:8,17 | 830:24 831:10 | **lamenting** |
| 646:18 647:7 | 735:21 737:17 | 831:20 834:9 | 647:18 |
| 647:18,19 | 738:8,11,12,16 | 834:16,20 | **landscape** |
| 651:21 652:6 | 738:18,21 | 835:4,6,13,14 | 624:19 631:13 |
| 652:22 653:20 | 739:1,5,11,22 | 835:15 836:18 | **language** |
| 653:23 654:20 | 740:5,14 741:9 | 836:24 837:7,9 | 726:24 747:14 |
| 659:5,8 660:17 | 741:23 742:2 | 838:10 839:2,5 | 761:9 788:22 |
| 665:15 668:21 | 742:12,21 | 839:6,13 840:5 | |
| 668:22 669:8 | 743:12 747:1 | 841:15 842:1 | |

CONFIDENTIAL

**[large - line]**                                                     Page 45

| | | | |
|---|---|---|---|
| **large** 427:20 | **leadership** | **length** 469:15 | 602:12,16 |
| 428:3 575:10 | 435:13 439:20 | **lens** 828:11 | 612:21 613:3 |
| **largely** 435:16 | 442:23 443:1 | **leon** 405:16 | 613:10,11,14 |
| **laugh** 625:6 | 444:5 446:19 | **level** 443:1 | 615:9 624:17 |
| **laughing** 625:9 | 562:21 575:9 | 496:8 497:22 | 826:10,13 |
| 625:13,19 | 592:5 603:4 | 498:6 499:7,10 | 831:15 |
| 653:8 | 605:17,19 | 499:11 567:14 | **light** 438:10 |
| **law** 402:15 | 614:11,19 | 567:20 568:3 | **likely** 413:2 |
| 405:4 406:3 | 664:9 666:3 | 591:22 592:4 | 424:11 505:14 |
| 410:18 | **leading** 444:7,8 | 592:20 593:13 | 554:6,9 558:16 |
| **laws** 451:13 | 444:9 785:4,11 | 593:15 603:3 | 573:12 581:14 |
| **lawsuit** 842:8 | **lean** 448:4 | 605:3,17,18 | 609:16 657:13 |
| 842:14 | 687:13 | 608:17 610:24 | 724:9 813:19 |
| **lawyer's** 851:1 | **leaning** 718:23 | 611:6 612:10 | **likes** 834:17 |
| **lawyers** 692:23 | **learn** 619:6 | 614:11,19,21 | **likewise** 525:16 |
| 693:10 840:12 | **learning** 485:9 | 615:22 627:8 | **limit** 503:7 |
| 840:24 841:3 | 568:21 587:8 | 689:15 703:2 | 518:5 |
| **lay** 519:2 589:5 | 588:3,20 | 703:12 715:5 | **limitations** |
| 608:9 610:7 | 612:22 613:5,7 | 716:9 719:24 | 444:20 818:6 |
| 636:19 657:10 | 613:10 617:22 | 740:4 820:21 | **limited** 469:6 |
| 686:1 703:14 | 623:21 624:18 | 832:12 | 482:12 483:10 |
| **laying** 475:9 | 630:5 631:12 | **levels** 844:16 | 488:9 522:22 |
| 628:7 | 631:14 632:1 | **lever** 529:10,17 | 546:24 572:6 |
| **leader** 563:4 | 632:14,24 | **lexington** | 622:5 648:3 |
| 611:6 | 778:16 779:1 | 404:20 | 653:11 720:16 |
| **leaders** 425:10 | 779:16 780:1 | **liability** 402:4 | 724:10 781:12 |
| 426:17 427:20 | 780:10 781:2 | 409:20 | 803:16 816:4 |
| 434:21 449:3 | **leave** 473:5 | **liaisons** 603:21 | 818:11,22 |
| 483:16 486:4 | 544:10 548:19 | **license** 612:4 | 823:10,24 |
| 491:24 492:18 | **led** 702:2 | **licensed** 609:17 | **limits** 548:8 |
| 493:3 494:15 | **left** 751:5 | 609:22 | **line** 408:6,6,6 |
| 560:2 610:24 | **lehman** 403:11 | **life** 566:19 | 408:11,11,11 |
| 678:11,24 | 752:20 756:9 | 568:17,20 | 408:16,16,16 |
| 679:12 | | 591:13 594:14 | 408:21,21,21 |

**[line - look]**                                                    Page 46

675:10,11
753:2 849:3
851:2
**lines** 466:12
**link** 711:16
774:7,17 776:5
782:11 783:7
785:18 786:12
786:19 787:16
**linked** 718:1
**list** 412:7
445:16,18
566:4 569:14
574:18 609:1,1
610:17 631:1
636:2,10,12,14
644:7 728:20
729:2,18
732:20 733:1
744:8,11 747:3
755:17,19
756:1,4,11
757:10 784:9
831:3
**listed** 439:24
446:12 458:1
493:1 537:5
538:23 551:23
551:24 552:3
568:11 573:18
573:19 583:3
609:10 730:2
734:14 736:18
737:20,23

744:23 745:1
747:16 754:6
783:6
**lists** 565:17
648:24 746:22
747:5
**literacy** 566:16
567:3 568:13
568:24 591:13
591:15 595:24
596:6 601:23
602:19 612:23
613:20 615:10
615:11 624:16
624:17 633:16
633:19 637:5,6
637:9,10
**literature**
443:12 484:18
532:12 533:20
604:22 717:5,6
717:13 726:15
726:18 727:10
727:13 728:2
728:10,18
729:4,20 730:4
730:11,21,22
738:13 740:1
742:9,11,13,18
743:9,16,18,24
745:5,11 747:9
747:23,24
748:22,22
749:3 750:6

751:9 757:16
761:23 762:15
763:13 764:6
764:24 765:5
774:3,13,20
775:13,18
776:4 782:23
783:18,20
784:3,11,17
787:5,14,22
793:17 804:13
804:19 824:14
824:16,18
838:13,17
840:8
**litigation** 402:5
409:21 667:11
668:8 693:15
770:17 772:6
773:3,13
843:13 844:23
**little** 429:12
448:13 492:9
550:17 671:6
790:19 816:21
**living** 669:14
**llc** 403:16
404:8,8,15,15
404:16,16
406:21
**llp** 402:16
403:3,10 404:3
404:10,19
406:16

**loaded** 672:14
**located** 449:13
732:15
**locking** 488:13
**logic** 572:20
600:17
**long** 420:13
471:6 473:22
482:7 483:7
547:2 592:2
652:10 707:10
707:19 830:6
**longer** 820:11
**longitudinal**
784:14
**longstanding**
660:16 663:3
**look** 433:21
447:16,23
448:17 456:24
459:12,16,20
460:1,14
461:11 462:8
463:18 466:14
467:3 469:3
471:5,16,20
475:12 479:13
481:14 489:11
490:6 491:5,7
491:8,18,20
494:2 496:5,13
517:4 521:4,14
527:17 528:1
537:17 541:1

**[look - make]**                                                      Page 47

541:14 548:5
549:1,13,19
550:20 554:17
557:4,8 560:16
561:2 564:6
565:5 566:4,6
581:2 600:23
604:6,17
613:19 614:6
641:18 642:24
643:17,24
644:18 649:7
649:17 662:16
675:10 685:6
686:4 688:6
698:13,16,19
699:21 700:6
700:11,12
701:15 716:14
723:4 726:23
731:5 734:10
736:8,13
740:19 743:16
743:22 745:7
746:15 748:11
752:9 760:5
774:14 775:3
775:12 777:11
782:22,23
784:19 792:3,7
793:12 795:7
796:10 799:10
802:22 803:9
836:16 838:11

**looked**   411:10
449:5 457:16
459:10 492:23
496:16,18
556:1 559:6,13
652:19 732:22
733:21 742:11
744:2 754:9
784:22 785:7
788:8 789:21
791:10,13
792:23 804:13
835:12,15
838:6
**looking**   522:4,5
538:9 557:15
567:18 571:15
587:17 588:11
606:14 613:21
641:23 645:22
683:15 685:1
726:1 746:19
755:7 757:15
760:2,4 772:15
774:15,19
775:17,18
776:3 779:7
780:4 781:5
783:4 784:17
790:1,9 793:4
794:9 811:5
821:9
**looks**   580:16
598:4 656:22

700:10
**lot**   434:23
457:9 459:10
459:23 469:10
488:2 524:6
531:6,7 533:2
535:6,12 573:5
639:18 813:17
816:3
**lots**   491:10,11
491:12 502:16
570:4 639:10
642:24 661:20
662:16 822:3
**louis**   405:5
**low**   665:16
**lunch**   666:14
**luncheon**
666:20
**luxury**   606:20

**m**

**ma'am**   538:20
707:8 796:13
**macken**   403:4
**made**   420:22
500:5,13 501:1
501:21 502:17
505:2 506:4,19
516:21 517:15
518:18,22
520:4 540:15
541:17 542:11
543:7 574:13

575:6 597:22
663:23 725:19
738:5 783:21
799:24 800:18
818:15 848:7
**magnitude**
657:11 695:9
697:20
**main**   747:12
**maine**   404:5
645:16,23
646:9
**maintain**   830:2
830:6
**majority**
719:22 844:3,7
**make**   488:10
489:12 505:15
510:14 517:24
518:1 521:6,22
525:9 554:13
563:7,13,17
566:7 571:17
587:16 628:13
629:13,22
638:9 648:6,9
690:4,14 691:5
695:24 701:4
713:14,17
747:15 752:12
761:21 762:13
763:11 769:17
778:1 805:15
806:8 813:21

**[make - media]** Page 48

| | | | |
|---|---|---|---|
| 814:2,6,8 | **maryland** | 567:12 608:6 | 775:8,22 |
| 819:5 848:4 | 669:12,14 | 612:2 615:17 | 829:20 |
| **makes** 573:17 | 680:20,24 | 633:7,8 635:3 | **mechanisms** |
| 592:7 618:4 | 681:2,14,22 | 645:1,1 665:3 | 704:9 705:17 |
| 732:7 757:7 | 682:7 | 675:4 686:14 | **media** 402:3 |
| **making** 481:21 | **maslynsky** | 686:15 694:12 | 409:18 415:5 |
| 599:4 634:12 | 402:20 847:10 | 698:12 707:9 | 415:18 417:14 |
| 743:1 | **material** 485:3 | 712:3 714:12 | 417:20 419:13 |
| **manage** 695:22 | **materials** 545:7 | 716:4,5 731:3 | 420:4 421:12 |
| **management** | 732:20 744:7 | 731:23 742:22 | 422:1,13,24 |
| 632:2,5 | 744:10 747:2 | 742:24 744:3 | 423:16 424:6 |
| **manual** 552:21 | 755:17,24 | 754:7 756:17 | 432:3 435:2,8 |
| 553:12 554:17 | 756:3,5,11 | 756:23 759:16 | 435:17 436:2 |
| **manuals** | 757:6,9,10,12 | 759:18 764:21 | 436:13 438:11 |
| 548:13,15 | 831:3,11 | 764:23 805:20 | 439:8,16 440:5 |
| 551:2,4,22 | **matter** 409:18 | 808:9 812:5 | 440:11,12,23 |
| 552:6,10,16 | 411:5,20,23 | 814:3 844:8 | 441:8,23 |
| 553:7,22 554:5 | 491:23 492:17 | **means** 539:21 | 442:17 443:6 |
| 554:21 555:2,3 | 508:3 509:1,18 | 754:10 762:5 | 444:23 446:2,4 |
| 555:11,12 | 510:7 689:2,21 | 763:21 812:15 | 447:4,5,13 |
| **map** 830:12 | 726:16 832:8 | 847:19 | 468:22 469:18 |
| **mapping** | **matters** 735:14 | **measurable** | 470:3 471:11 |
| 583:10 | 762:22 | 470:6,23 | 472:6 480:13 |
| **mark** 404:17 | **matthew** 403:4 | **measure** | 482:16,19 |
| 564:11 642:6 | **maxed** 700:16 | 482:18 483:3 | 483:24 484:8 |
| 648:12 | **mcgee** 406:23 | 721:20,23 | 484:14 485:5 |
| **marked** 408:20 | 409:12 | **measured** | 488:6 497:17 |
| 445:9 551:19 | **md** 402:3 | 746:7 | 505:18 506:19 |
| 564:17 582:6 | **mdl** 402:3,4 | **measures** | 507:21 510:2,9 |
| 642:15 648:18 | **mean** 458:17 | 497:14 | 511:24 512:19 |
| **market** 406:5 | 466:9 474:2 | **measuring** | 514:13 515:18 |
| **marriage** | 496:12 526:15 | 483:8 | 519:3 526:2,17 |
| 609:22 | 537:18 539:16 | **mechanism** | 528:2 530:23 |
| | 558:9 559:7 | 623:23 703:24 | 531:9,13 |

**[media - mental]** Page 49

| | | | |
|---|---|---|---|
| 532:18 533:7 | 624:7 625:2,19 | 789:4,17 790:5 | 704:14 705:8 |
| 533:17 536:4 | 626:10,17 | 790:10,18 | 705:14,20 |
| 536:19 537:6 | 627:15,22,24 | 791:3,14,20 | 706:3 707:22 |
| 538:13 539:1,9 | 628:1,2,14 | 792:13,23 | 709:10,23 |
| 540:4,16 | 629:16 630:19 | 793:14,20,24 | 710:8 711:12 |
| 541:21 542:13 | 630:22 631:4,6 | 794:10,16 | **meeting** 646:5 |
| 543:4,11 544:1 | 631:13,17,19 | 795:1,11,22 | 665:7 |
| 544:19 545:4 | 636:23 637:12 | 796:7,15,18 | **meets** 761:15 |
| 546:12 547:6 | 637:13 639:17 | 797:4,24 | **melissa** 403:4 |
| 547:24 549:8 | 656:14 659:3 | 798:12,24 | 503:24 |
| 549:19 550:2 | 659:10,23 | 799:16 800:7 | **meltzer** 402:16 |
| 552:12 553:7 | 660:6,12,20 | 801:14 802:8 | 403:3 |
| 553:14,15 | 661:11 662:6 | 802:19,22 | **member** 568:5 |
| 554:3,9,15,21 | 662:12,19 | 803:11,24 | 734:20,22 |
| 554:24 555:4 | 663:5 665:18 | 804:8 805:11 | 735:2 |
| 555:20 556:7 | 675:22 684:11 | 808:5,10 | **members** |
| 556:13 557:5,9 | 693:2 694:20 | 815:13 823:13 | 565:18 |
| 557:17 558:16 | 702:1 703:9,18 | 823:18 842:17 | **membership** |
| 559:11 570:8 | 708:15 711:18 | 842:23 843:18 | 640:18,20 |
| 570:14 571:4 | 712:1,6,17 | **medical** 831:23 | **memory** 838:9 |
| 572:23 573:16 | 714:1 715:12 | **medicine** | **mental** 407:13 |
| 579:17 580:10 | 718:2,8,15 | 734:18 735:5 | 446:24 450:5 |
| 580:22 581:21 | 721:24 728:24 | 735:11 736:5 | 451:7,17 457:4 |
| 583:22 584:9 | 730:8,10 734:5 | 736:12 737:4 | 468:8,16,19,23 |
| 585:15 587:6 | 736:24 737:5 | 739:16 | 468:24 469:4 |
| 588:1,17 | 738:24 739:17 | **medicine's** | 469:11,15,24 |
| 600:15 602:3 | 740:2 746:7 | 734:4 | 471:13 473:2 |
| 603:7 604:3 | 774:8 776:6 | **meet** 444:11 | 512:1 528:11 |
| 606:9 607:23 | 778:13,22 | 628:6 641:11 | 528:22 529:11 |
| 608:7,16 609:5 | 779:13,21 | 641:17 644:9 | 529:23 530:3 |
| 609:13 610:5 | 780:8,16,21,22 | 645:16,24 | 530:13,19 |
| 610:14 611:14 | 781:16 783:8 | 646:10,15,22 | 532:5,16 |
| 614:16 617:21 | 785:2 786:13 | 648:1 653:19 | 533:14 534:1,5 |
| 617:24 618:23 | 787:17 788:3 | 656:4 665:8,10 | 534:7,22 535:2 |

**[mental - misrepresent]**                                    Page 50

| | | | |
|---|---|---|---|
| 535:21,24 | 637:4,9 653:21 | 821:19 822:12 | 417:19 418:5 |
| 536:14,17 | 656:3 660:18 | 822:23 831:15 | 418:22 419:12 |
| 537:4,16 538:2 | 664:4,5 665:9 | 831:23 | 501:1,21 505:3 |
| 538:11,14,22 | 666:10 667:18 | **mention** 533:6 | 506:20 516:22 |
| 540:10,12 | 671:12 672:9 | 535:11 | 517:16 518:7 |
| 542:8 545:10 | 672:17 673:19 | **mentioned** | 518:18 598:7 |
| 547:16 548:18 | 674:12,20 | 430:15 511:19 | 599:16 768:2 |
| 551:1 552:6,10 | 675:15,21 | 535:20 540:2 | **mild** 703:17 |
| 555:2 556:2,5 | 676:3,19 | 648:5 775:20 | 704:12 705:19 |
| 557:16 558:10 | 677:20 678:3 | 775:21 782:24 | 706:14,20 |
| 558:13,15 | 679:17 680:9 | 784:21 795:1 | 707:2 710:2,10 |
| 559:20 560:4,9 | 680:21 681:8 | 814:15 825:6 | 711:15,23 |
| 560:12 561:9 | 681:22 682:8 | **message** 808:17 | 712:8,16 |
| 561:12,16 | 683:2,13,24 | 809:15 811:10 | 713:23 715:21 |
| 563:16,23 | 684:15,19 | 813:5 827:20 | 718:14 720:1 |
| 564:15 567:2 | 701:24 702:4 | **messaging** | **miller** 402:20 |
| 567:10 568:24 | 704:5 706:16 | 810:21 839:14 | 410:4 847:10 |
| 569:19 570:23 | 717:9,20 719:3 | 839:21 841:5 | **million** 772:8 |
| 571:19 584:23 | 778:16 779:1 | **met** 410:15 | **mind** 490:14 |
| 585:5 586:6,19 | 779:15,24 | **meta** 404:14 | 521:12 605:12 |
| 587:8 588:4,21 | 781:2 784:24 | **methodology** | 632:17 687:19 |
| 591:14,16 | 788:20 789:5 | 533:19 652:7 | **minimum** |
| 596:6,13 | 789:13,19,21 | 664:12 758:11 | 653:20 |
| 602:19,23 | 789:24 790:2,6 | 758:12,14 | **minute** 499:15 |
| 603:4,6 604:24 | 790:13,16 | **methods** | 644:17 760:16 |
| 605:6 607:22 | 791:4,11,14,21 | 726:18 | **minutes** 839:20 |
| 608:12,13 | 792:13 793:1,5 | **methvin** 405:4 | 840:3 846:5,6 |
| 609:7,17 610:1 | 793:20 794:11 | **metric** 413:18 | **misconduct** |
| 611:4,13 614:4 | 794:12 795:6 | **miami** 403:13 | 480:12 633:3,6 |
| 614:5,6,12,20 | 797:24 798:24 | 405:17 | 633:8 |
| 615:10 617:5 | 815:9,10,19,24 | **michael** 404:11 | **misinterpreted** |
| 620:4 624:16 | 817:4 819:10 | **middle** 413:24 | 511:4 |
| 630:2 634:16 | 819:13,17,18 | 414:22 415:17 | **misrepresent** |
| 635:18,21 | 820:9,14 | 416:11 417:4 | 495:24 |

**[missed - national]**                                          Page 51

| | | | |
|---|---|---|---|
| **missed**  668:11 | 707:2 710:3,10 | **morgan**  406:11 | 490:15 498:18 |
| **missing**  638:1 | 711:15,23 | **morning** | 543:1 562:1 |
| **misspeak** | 712:9,16 | 410:14,16 | 613:21,22 |
| 507:24 546:19 | 713:24 715:6 | **move**  738:6 | 808:1 825:13 |
| **misstate**  489:15 | 715:18,21 | 803:3 | **named**  446:15 |
| **misstated** | 718:14 720:2 | **moving**  416:5 | 579:11 |
| 759:2 | **modifications** | 640:2 | **names**  574:18 |
| **misstates** | 725:19 | **mtss**  717:18,24 | 577:14 578:7 |
| 443:24 468:5 | **modified**  529:7 | **multi**  471:23 | **nancy**  529:9 |
| 559:1 585:21 | **modify**  500:14 | 474:12 477:11 | **national**  407:15 |
| 628:18 744:17 | 507:12 519:12 | 477:12 513:3 | 415:12 418:11 |
| **misunderstood** | 520:18 523:10 | 581:16 604:14 | 433:21 441:12 |
| 840:19 | 525:2 724:15 | 604:20 616:15 | 443:11,21 |
| **mitigate**  536:23 | 725:9 | 631:21 637:19 | 445:22 447:24 |
| 584:19 587:5 | **modifying** | 716:15 717:19 | 469:3,10 |
| 587:24 588:16 | 519:21 | 719:2 | 483:19 528:10 |
| 600:14 620:1 | **module**  550:16 | **multiple** | 528:18,21 |
| 620:15 687:16 | **modules** | 441:11 498:9 | 529:6,23 530:3 |
| 807:4 | 545:12 547:11 | 517:22 521:16 | 530:12,18 |
| **mitigates** | 548:23 549:17 | 521:17 534:11 | 532:4,9,15,24 |
| 589:11 639:22 | 550:8 | 548:23 550:8 | 533:14,24 |
| **mitigation** | **moment**  436:22 | 623:9 709:15 | 534:4 535:21 |
| 509:13 | 460:18 461:14 | 709:16 746:20 | 537:3 538:1,22 |
| **mkennedy** | 514:3 701:9,16 | 747:6 765:11 | 540:9 545:10 |
| 404:13 | 702:5 752:16 | 775:4,24 | 559:19 561:9 |
| **mmacken** | 760:5 835:18 | **myeates**  403:6 | 561:11 569:18 |
| 403:7 | **money**  816:6 | **myspace**  801:2 | 571:19 572:15 |
| **mobile**  405:5 | **monitoring** | 801:3,14 802:1 | 613:6,13,19 |
| **model**  604:7,8 | 526:22 644:23 | 802:5 | 614:7 640:11 |
| 607:6 638:23 | **monograph** | **n** | 640:15 641:12 |
| **moderate** | 738:14 | **n**  404:11 407:2 | 642:9,19 643:2 |
| 703:17,20 | **month**  827:1 | **name**  409:11 | 643:11 644:9 |
| 704:12 705:19 | **months**  826:18 | 410:17 449:1 | 645:13 650:9 |
| 706:15,21 | | | 651:24 656:5 |

| | | | |
|---|---|---|---|
| 658:15 659:20 | **necessary** | **needed** 420:21 | **new** 404:21,21 |
| 662:9,19 663:9 | 447:11 482:23 | 455:15 456:11 | 405:13 406:18 |
| 663:20 664:5 | 610:8 641:23 | 601:3 644:5 | 406:18 436:16 |
| 664:15 665:1 | 643:22 848:4 | 647:15,23 | 444:16,22 |
| 734:2,17 735:4 | **necessitate** | 745:21,24 | 476:2,2,6 |
| 735:6,10 736:3 | 622:14 | 816:14 | 477:6 478:12 |
| 736:10,20 | **need** 439:6 | **needing** 422:24 | 478:19,20 |
| 737:2 739:14 | 455:14 491:18 | 423:16 424:6 | 479:12,21,21 |
| 739:23 836:10 | 522:20,23 | 446:3 | 479:23 481:4 |
| 836:20 837:9 | 523:3 525:15 | **needs** 520:6 | 487:21 529:12 |
| **nationally** | 528:6 534:15 | 611:17 666:10 | 553:3,4,4 |
| 426:21 486:8 | 549:13 605:9 | 672:18 674:12 | 570:1 573:2 |
| 697:15 836:16 | 607:8 608:14 | 676:4,19 | 589:17,21 |
| **native** 551:11 | 608:19 611:11 | 684:16 815:2 | 592:6 598:10 |
| 551:11 | 628:14 629:13 | **negate** 662:4 | 605:6 606:8 |
| **nature** 638:22 | 629:15 638:9 | **negative** 462:2 | 611:16,16,20 |
| 638:24 639:23 | 638:17 647:19 | 477:21 587:5 | 611:24 612:1 |
| 656:21 | 658:12 665:17 | 587:24 588:16 | 614:16 623:4 |
| **navigate** | 680:14 688:5,6 | 780:15,20,23 | 626:7 651:6 |
| 482:22 536:23 | 689:18 693:8 | 781:8 | 655:10 657:4 |
| 570:14 617:4 | 696:12,24 | **negatively** | 657:10 658:12 |
| 617:16 624:18 | 698:6 699:7 | 624:19 | 658:12 661:2 |
| 631:13 661:4 | 700:7,14,16 | **network** 508:6 | 670:1,3,4 |
| 837:5 | 701:23 704:9 | 511:13 515:12 | 683:12 696:12 |
| **navigating** | 704:15 705:8 | 689:6 690:21 | 696:13,18,19 |
| 614:15 | 705:13,16 | 691:19 693:4 | 696:20,22 |
| **necessarily** | 706:3 707:22 | **never** 516:7 | 697:1,2,6,23 |
| 456:10 505:19 | 708:9 709:10 | 618:9 619:18 | 698:3,8,19 |
| 561:21 610:19 | 709:23 710:8 | 621:9,21 623:5 | 699:3,5 700:4 |
| 660:23 675:9 | 711:12,15 | 624:7,24 626:8 | 700:14,16,23 |
| 687:23 712:4 | 717:7 719:9 | 626:16 665:12 | 700:23 702:11 |
| 811:12 831:7 | 733:16 774:5 | 759:3,16 811:2 | 719:13 720:7 |
| 833:18 | 782:8 816:8 | 833:7 | 790:17 815:2 |
| | 824:2 | | |

**[newcomer - object]**                                        Page 53

| | | | |
|---|---|---|---|
| **newcomer** | 842:3,15 843:7 | 428:13,16 | 434:3 458:6 |
| 551:14,15 | 843:16 844:6 | 429:11,20,22 | 460:19 466:1 |
| 553:1 | 844:20 845:8 | 429:24 431:6 | 468:19 644:24 |
| **newer** 602:3 | 845:18,20 | 437:17 440:3 | 716:22 717:7 |
| **newly** 602:1 | 846:5 | 451:3 457:13 | 717:14 719:5 |
| 610:24 | **nomenclature** | 458:23 461:15 | 719:10,15 |
| **night** 517:12 | 588:24 | 462:15 463:20 | 837:24 844:13 |
| **nih** 735:7 | **non** 502:1 | 463:22 465:5 | **nurse** 767:17 |
| **nolan** 404:20 | 628:10 629:4 | 466:7 472:15 | **nw** 404:12 |
| 407:6 807:23 | 629:24 630:12 | 474:1 475:2,14 | |
| 808:1 809:8 | 798:10 | 476:18 477:19 | **o** |
| 810:7 811:6 | **northern** 402:1 | 479:5 480:10 | **o'hanlon** |
| 813:1,24 817:6 | 409:22 | 481:16 581:9 | 406:10 |
| 817:16 818:14 | **notary** 850:14 | 595:15,16 | **oath** 410:23 |
| 819:14,24 | **note** 471:22 | 597:19,20 | **object** 412:14 |
| 820:12,20 | 652:9 | 598:6,8,10 | 412:22 413:13 |
| 822:9,18 | **noted** 410:2 | 599:12,13,20 | 414:5,14 |
| 823:15 824:4 | 435:23 439:22 | 600:18,24 | 416:22 417:7 |
| 825:5,11,18 | 486:1 743:23 | 601:4,6 602:6 | 418:8 419:1,14 |
| 826:1,8,14 | 848:11 850:6 | 603:1,15,16,18 | 420:8 421:2,13 |
| 827:2,10,18 | **notes** 573:24 | 641:16,21 | 422:3,14 423:2 |
| 828:2,9,16 | 574:3,12 822:1 | 645:6,9 650:14 | 423:18 424:8 |
| 829:1,7 830:4 | 851:1 | 656:20 672:8 | 424:18 426:1 |
| 830:10,17 | **notice** 402:15 | 674:19 697:21 | 426:13 427:10 |
| 831:1,12,21 | **notifications** | 716:10 718:22 | 428:9 429:8 |
| 832:10,18 | 485:6 | 719:16 728:12 | 430:10 431:3 |
| 833:1,10,16,24 | **novel** 697:11 | 834:24 836:4,5 | 432:10 436:22 |
| 834:8,15,22 | 719:13 720:8,8 | 836:6 837:20 | 438:2,24 |
| 835:5,20 | **number** 412:17 | 839:20,23 | 446:10 449:19 |
| 836:17 837:6 | 418:12 419:20 | 840:5 | 452:12 454:1,9 |
| 837:22 838:15 | 425:17 426:5 | **numbers** | 454:13 455:6 |
| 839:3,11,22 | 426:17,23 | 428:19,20,22 | 455:24 456:17 |
| 840:10,17 | 427:3,14,17,21 | 428:23 429:2 | 458:15 459:7 |
| 841:10,18 | 428:1,2,4,5,12 | 429:13 433:19 | 460:10 461:4 |

CONFIDENTIAL

**[object - object]**                                                      Page 54

| | | | |
|---|---|---|---|
| 462:3 463:1 | 565:8 575:1 | 694:9 695:12 | 773:17 774:9 |
| 464:7,22 | 576:5 578:15 | 697:3 698:9 | 779:5 781:18 |
| 465:14 466:24 | 578:18 579:18 | 699:9,16 | 783:11 785:21 |
| 470:9 471:3 | 580:12 583:14 | 700:19 702:19 | 786:20 787:19 |
| 472:17 475:5 | 585:20 588:5 | 704:2 705:10 | 789:6 791:22 |
| 476:22 477:24 | 592:21 593:2 | 706:5 708:6,20 | 792:16 794:2 |
| 479:8 480:15 | 594:17 598:1 | 709:13,15 | 794:18 796:2 |
| 482:2 484:10 | 599:8 600:3 | 710:18 711:19 | 797:5,12 |
| 485:17 487:14 | 604:9 606:3 | 712:20 714:5 | 798:14 799:18 |
| 489:4,22 | 607:17 612:12 | 714:24 715:19 | 800:9 801:7,15 |
| 490:20 491:2 | 615:1 616:2 | 715:23 718:3 | 802:10 804:2,9 |
| 492:3,21 | 618:12 619:20 | 718:18 721:2 | 805:12 806:20 |
| 493:23 494:8 | 621:11 623:7 | 722:13,24 | 808:23 809:19 |
| 496:9 497:5 | 624:9 625:3,21 | 723:15 724:19 | 810:13 812:17 |
| 500:8,16 501:3 | 626:11,24 | 725:6,14 728:5 | 813:8 816:16 |
| 504:2 505:4 | 628:17 629:17 | 729:7,12 | 817:13,23 |
| 506:6,21 | 634:22 636:6 | 730:13 731:18 | 818:18 819:20 |
| 507:14 508:7 | 638:11,19 | 733:8 734:6 | 820:3,18 821:1 |
| 513:18 514:16 | 644:14 645:18 | 735:15 737:10 | 822:13,24 |
| 515:21 519:14 | 646:16 649:9 | 737:15 738:9 | 823:20 824:23 |
| 520:20 522:1 | 649:21 650:18 | 739:3 740:7 | 825:8,14,22 |
| 523:12 525:4 | 651:9 652:3 | 741:17 742:14 | 826:4,11,21 |
| 528:12 531:1 | 653:6 655:5,11 | 742:19 743:19 | 827:7,13 828:5 |
| 532:19 536:6 | 658:20 659:24 | 744:16 745:15 | 828:12,22 |
| 537:8 539:2,11 | 660:13 661:12 | 746:11 749:11 | 829:4,10 830:7 |
| 540:21 541:7 | 661:16 662:13 | 750:19 751:22 | 830:13,20 |
| 541:22 542:18 | 665:21 670:20 | 752:22 753:21 | 831:16 832:2 |
| 543:12 545:19 | 671:14 672:11 | 756:13 758:6 | 832:14,21 |
| 546:13 547:7 | 673:9,21 | 758:16 761:24 | 833:3,12,20 |
| 548:2 549:10 | 674:22 676:6 | 762:16 763:17 | 834:4,11,18 |
| 550:3 552:13 | 676:24 679:19 | 763:18 764:10 | 835:2,8 836:1 |
| 555:5,21 | 681:24 684:21 | 765:6 766:20 | 836:21 838:4 |
| 556:16,18 | 687:4 688:10 | 769:8 770:3,21 | 838:21 839:16 |
| 557:23 558:23 | 690:23 693:6 | 771:13 772:10 | 840:13 841:6 |

**[object - okay]** Page 55

841:13,22
842:10,19
843:10,20
844:9 845:1,14
**objection**
431:17 432:19
433:15 434:10
435:9 437:1,10
439:17 440:24
442:8 443:23
450:13 451:23
453:2,13
467:21 468:3
532:7 622:6
691:21 708:3
713:8 791:5
802:3 831:5
837:12 840:2
**objections**
409:6 529:4
531:16 546:5
557:12 793:10
799:7 800:23
827:22 839:8
**objective**
735:12
**objectively**
746:7
**observable**
522:8
**occurred**
665:12 701:22
**offer** 470:5
473:7 487:8,17

517:14 520:16
522:6 523:8
524:24 568:20
617:19 671:7
674:9 675:12
675:13,18
741:14 776:4
777:17 780:5
781:20 812:6
812:23 833:22
843:22
**offered** 419:6
419:18 456:6
457:5 467:13
470:18,22
516:18 517:1
518:16 519:10
522:18 523:22
523:24 526:9
527:5 528:4
560:8 623:14
627:19 667:15
673:12 682:15
714:13 741:4
744:12 745:22
754:13 798:19
**offering** 502:18
520:24 526:1
598:14 673:6
717:22 718:6
720:21 722:21
779:20 781:15
788:13 810:21
811:20,23,24

812:8,15,20
843:14
**offhand** 542:1
641:15,16
683:4 736:15
813:12
**officer** 529:22
**offices** 402:15
**offline** 702:6
**oftentimes**
473:20 569:9
647:12
**oh** 452:7
554:22 635:20
828:19
**okay** 412:9
416:7 417:23
420:24 421:9
425:20 428:8
429:1 430:4
443:16 445:3
448:10 450:2
452:1,7,11
470:17 487:7
490:13 495:3
495:12 499:16
504:8 511:7,14
518:14 525:16
546:2,9 552:2
552:9 565:24
578:9 580:6
582:11 584:3,6
585:13 587:20
588:23 589:1

589:13,15
591:4 592:15
593:11 594:2
595:12 597:7
599:2,19 608:3
613:22 615:21
616:14 618:5
619:15 622:22
628:9 633:1,14
636:14 646:8
651:2 654:7
657:8,17
658:14 676:16
705:7 711:11
712:14 713:5
713:10,21
714:19 718:10
727:8 729:1,16
731:9 736:23
738:1 739:21
743:5 747:18
748:15 755:16
757:9 760:23
760:24 778:11
778:20 780:12
782:3,13,17
794:5 798:8
799:13 806:3
806:12,15,16
809:9 811:7,19
812:2,12 817:7
820:13 823:16
824:5 825:12
825:19 826:15

**[okay - overriding]**                                                              Page 56

| | | | |
|---|---|---|---|
| 827:3,5,11 | 587:18 650:2 | 643:18,23 | 613:2 614:6,14 |
| 828:3,10,20 | 670:17 671:8 | 644:6 649:6,13 | 652:15 653:3 |
| 829:2 831:2 | 671:11 672:6 | 649:24 671:17 | 664:8 666:2,4 |
| 832:11 836:18 | 673:6,11,18 | 683:21 688:1 | **original**  744:22 |
| 838:16 841:11 | 674:4,16 | 723:20 726:14 | 848:15 |
| 842:4,16 | 675:12,19 | 729:21 730:5 | **outcomes**  481:6 |
| 844:21 845:19 | 698:6 754:5,12 | 733:19 741:15 | 483:3 819:13 |
| **once**  701:22 | 756:22 757:21 | 745:21 746:2 | **outlined**  626:23 |
| **ones**  573:19 | 776:4 779:20 | 748:1,24 749:2 | **outset**  578:4 |
| 609:10 654:19 | 780:3,14 781:5 | 754:12 755:14 | **outside**  412:13 |
| 730:2 743:10 | 781:15,21 | 755:20 756:7 | 413:12 414:2 |
| 743:12 754:4 | 782:4,10 783:3 | 759:15 774:4 | 414:13,24 |
| 755:13 | 783:6 785:17 | 774:19,22 | 415:5,7,19 |
| **ongoing**  681:19 | 786:11,17 | 786:2 787:1 | 416:2,13,20 |
| 726:19 | 787:15 812:13 | 788:10,12 | 417:5,14,20 |
| **online**  633:22 | 812:16,20 | 811:20,23,24 | 418:7,23 |
| 699:12 801:9 | 833:17,23 | 812:5,9,22 | 419:13,24 |
| **open**  841:17,20 | 843:14,17,23 | 824:7,11 | 420:1,4 508:10 |
| 842:1 | **opinions**  419:5 | **opportunity** | 509:6 579:6 |
| **opening**  724:3 | 419:17 420:22 | 701:20 | 663:13,19,19 |
| **opens**  841:11 | 453:18 455:16 | **opposed**  557:22 | 664:2 667:8,19 |
| **operable**  815:7 | 456:6,11 | 757:12 | 668:8 671:6 |
| **operations** | 467:13 469:23 | **order**  502:7 | 680:24 768:13 |
| 404:15 | 491:23 492:17 | 583:21 605:17 | 784:16 802:11 |
| **opined**  780:6 | 493:12 502:19 | 638:7 774:6 | 812:1 832:4 |
| 781:7 | 516:24 518:4 | 782:9 815:2 | **overall**  472:23 |
| **opinion**  458:9 | 521:1,5,15 | 837:23 | **overlap**  575:10 |
| 470:5,22 487:9 | 522:6,9,13,17 | **organization** | **overlooked** |
| 487:17 516:19 | 523:21 524:1 | 612:8,16 | 758:3 |
| 517:14 518:16 | 525:22,23 | 613:14,23 | **overnight** |
| 519:10 520:17 | 527:1,5,11,22 | 664:10,14,24 | 612:3 |
| 521:12,21 | 528:4 533:12 | 665:14 | **overriding** |
| 523:8 524:24 | 533:22 564:4 | **organizations** | 762:20 |
| 526:2,9 587:15 | 584:16 642:1 | 520:2,9 612:19 | |

[oversee - past]                                        Page 57

oversee  608:20
overseeing
  615:5

**p**

p.c.  405:11
p.m.  666:17,24
  765:18 766:1
  807:11,18
  846:7,11
pa  409:17
page  407:11
  408:6,6,6,11,11
  408:11,16,16
  408:16,21,21
  408:21 552:1
  566:9 587:11
  587:12,14
  589:14 591:6
  759:24 760:1
  760:19,20
  849:3 851:2
pages  553:12
  850:3
paid  770:1,20
  771:7 772:5,7
  773:15
pandemic
  819:19 820:11
paper  540:14
  540:19 541:17
  542:11,16
  543:2,7

paragraph
  587:12,15,18
  727:2 729:18
  730:2 747:21
  748:4,10,16,20
  779:2,4,9
  788:16
parameters
  625:7
parental
  526:22
parents  513:17
  514:14 515:17
parsimonious
  573:8
part  420:11,16
  438:5 440:13
  442:18 444:10
  445:10 447:11
  447:18 482:5
  484:6,15 485:1
  502:2 509:16
  509:24 513:3,5
  530:14 536:20
  540:2 556:4,8
  562:10,12
  563:18 570:23
  572:10 574:4
  574:11,15,19
  575:6 576:24
  577:10 581:16
  584:10 589:7
  590:5,12 591:8
  595:14 597:15

610:23 617:1
  620:17 627:6
  629:20 630:6
  630:15 637:20
  641:19 650:1
  652:8 664:19
  667:11 680:5
  681:3,8 685:23
  686:2 689:18
  693:19 704:16
  704:19 726:19
  727:19 731:24
  735:5 737:9
  740:23 746:4
  758:21 764:4
  766:13,17
  770:16 772:21
  785:8,13,13,17
  786:16 790:14
  795:4 811:17
  814:12 823:24
  824:2 836:5
participant's
  548:13
participants
  545:16 547:21
  547:23
participate
  546:3,7 637:16
  638:8 681:15
  704:1
participated
  549:7

particular
  412:3 419:23
  473:17 519:12
  520:19 523:10
  525:2 570:17
  574:9,23 576:3
  576:4 577:4,4
  577:8,8,24
  589:6 607:5
  620:23 657:6
  711:22 747:19
  747:19 779:22
  780:24 812:14
  822:5,19
particularly
  675:16
partner  568:4
  569:7,10
partnered
  534:5
partnering
  538:8
partners  535:7
partnership
  536:12
partnerships
  535:7,19 681:7
parts  628:21
party  846:2
pass  807:9
past  476:5
  477:8 478:11
  565:7 734:23

CONFIDENTIAL

**[patient - phrased]**                                                    Page 58

| | | | |
|---|---|---|---|
| **patient**  707:9 | 575:11 576:4 | 718:11 835:22 | **pervade**  623:19 |
| **patterson** | 581:6 598:8 | 844:21 845:10 | 623:20,21 |
| 529:14,18 | 599:12 606:11 | 845:17 | **pervasive** |
| **pausing**  668:20 | 609:5,24 617:7 | **performance** | 697:11 698:3 |
| 768:9 | 632:3 665:5 | 559:24 | 699:3,5 |
| **payments** | 670:12 685:15 | **period**  473:16 | **pervasiveness** |
| 404:16 | 694:21 723:10 | 473:23 581:11 | 802:24 |
| **peer**  532:11 | 785:3,19 | 581:22 720:17 | **ph**  402:24 |
| 595:4 623:20 | 786:18 794:12 | 724:17 725:10 | **ph.d.**  402:14 |
| 738:13 784:16 | 798:1 803:2 | 725:11 826:9 | 410:1,7 850:8 |
| 789:3,11 791:2 | 821:24 829:15 | **person**  562:1 | **phd**  407:4 |
| 791:18 792:11 | 829:23 844:4 | 569:11 578:13 | **phone**  412:12 |
| 793:17,23 | **people's**  537:16 | 608:18 609:16 | 413:11 414:1 |
| 794:15,21 | **perceive** | 618:1 702:3 | 416:1,12 418:6 |
| 796:8 798:9,10 | 771:20 772:18 | 705:4 739:19 | 419:24 485:22 |
| 804:18 | **percent**  473:18 | 739:22 | 486:10,13,21 |
| **pending**  782:16 | 476:12 478:5 | **personal**  402:4 | 486:24 487:9 |
| **pennsylvania** | 479:17 481:11 | 409:19 412:12 | 487:12,23 |
| 402:18 403:5 | 581:11 716:2,3 | 413:11 414:2 | 489:2,20 |
| **people**  429:1 | 716:19,21 | 416:2,13 418:6 | 490:16 491:1 |
| 430:14,19 | 717:1,2 | 420:1 485:15 | 492:2,20 |
| 434:18 436:17 | **percentage** | 519:3 712:5 | 493:10,22 |
| 441:14 445:5 | 412:11 413:10 | 832:7 | 494:4 495:15 |
| 445:14 468:9 | 413:24 414:11 | **personally** | 495:19 496:3,7 |
| 468:17 469:12 | 414:18,22 | 616:24 667:20 | 497:3,21 498:4 |
| 469:17 473:15 | 415:4,17,24 | **personnel** | 499:6 746:8 |
| 474:17,21 | 416:11,18 | 484:23 493:4 | **phones**  485:15 |
| 476:3 491:10 | 417:3,12,18,21 | 722:4 | 486:19 488:13 |
| 494:17 498:9 | 418:4,21 | **perspective** | 490:3,9 495:20 |
| 511:9 512:10 | 419:11,22 | 787:14 | **phrase**  561:19 |
| 513:12 514:10 | 420:2 425:14 | **pertain**  679:9 | 707:4 818:21 |
| 527:21 528:6 | 471:10 474:8 | **pertinent** | **phrased**  629:21 |
| 538:15 544:8 | 476:10 482:1 | 754:18 756:22 | 674:1 818:9 |
| 556:7 574:14 | 581:20 715:15 | 757:11 758:2,5 | |

[pi - platform]                                                    Page 59

| | | | |
|---|---|---|---|
| **pi**  556:23 557:1 | 770:20 771:8 | 595:3,8,14 | 708:10 709:10 |
| 557:2,4,14 | 772:7 773:12 | 597:15 598:15 | 710:23 711:2 |
| **pick**  738:3 | 773:15 840:11 | 598:23 603:6 | 711:22 712:2 |
| **picked**  738:4 | 840:23 841:2 | 606:1,13 | 712:23 713:3,3 |
| **picture**  434:1 | **plan**  438:5 | 607:14 608:9 | 713:4,14 714:3 |
| 827:19 828:1 | 440:14 442:19 | 608:19 610:10 | 714:14,23 |
| **piece**  467:3 | 447:12 453:19 | 610:12,22 | 717:23 766:6,9 |
| 646:11 750:23 | 456:8 470:7,23 | 615:4,20 618:7 | 766:13,17 |
| 785:24 788:6 | 470:24 471:6 | 618:8,21 | 780:11 805:9 |
| **pieces**  607:2 | 472:22 475:3 | 619:17,24 | 805:23 806:5 |
| **pipeline**  538:11 | 475:10 476:20 | 620:15 621:5,8 | 806:11,18 |
| **place**  406:11 | 477:22 479:7 | 621:19 622:10 | 809:22 811:4 |
| 428:15 440:8 | 480:14,21 | 624:11 625:8 | 811:17 814:12 |
| 526:22 570:11 | 481:18,21 | 626:19 627:6 | 824:3 |
| 586:16,20 | 482:7 483:7 | 627:11 629:7 | **planned**  572:9 |
| 602:15 606:21 | 484:4,12 | 631:10 633:11 | **planning** |
| 607:3,8 610:22 | 508:21 509:14 | 636:3,4,12,13 | 525:24 |
| 624:2 653:10 | 510:5,24 514:1 | 636:19,22 | **plans**  590:13 |
| 662:2 777:15 | 517:2,7 519:18 | 637:10,15,18 | 591:3 597:23 |
| 803:17 809:6 | 521:2 522:19 | 640:5,22 644:2 | 599:4 600:2 |
| 810:2 820:8,10 | 541:19 543:9 | 649:16 654:10 | 603:24 685:22 |
| 820:15 | 543:22 544:17 | 654:13 655:1 | 686:12,16 |
| **places**  704:8 | 545:3 570:9 | 656:19 658:1 | 688:17 695:11 |
| **plaintiff**  403:7 | 571:6 579:16 | 658:11 685:19 | 697:24 714:9 |
| 405:7,18 | 580:9,16 | 687:2,7,12,15 | 715:11 716:17 |
| 406:13 446:16 | 583:11,19 | 688:2,3,14,19 | 720:22 722:22 |
| 447:21 449:5 | 584:7,11,19 | 690:13 694:4,7 | 805:5 807:6 |
| 457:2 655:20 | 585:11 586:3 | 694:13,17,22 | 808:4,5,8,14,22 |
| 679:6 685:2 | 587:4,23 589:6 | 695:9 696:9 | 809:2,10 810:2 |
| 726:2 784:22 | 589:10,17,22 | 699:7 701:5,8 | 810:12,16 |
| 787:9 | 590:2,5,9,15,18 | 701:10,17,18 | 816:14 |
| **plaintiffs**  406:8 | 590:23 591:5,8 | 703:15,24 | **plat**  844:15 |
| 420:6 741:11 | 591:20 592:18 | 704:16 706:3 | **platform**  440:6 |
| 741:13 770:2 | 594:7,13,22 | 706:18 707:22 | 488:8 493:6,7 |

**[platform - possible]**                                      Page 60

| | | | |
|---|---|---|---|
| 500:7,15 | 523:9 525:1 | **please** 429:16 | **portion** 841:5 |
| 507:21 516:9 | 526:17 527:20 | 524:20 527:11 | **position** 473:23 |
| 518:6 560:1 | 537:15 569:23 | 621:23 725:4 | 565:20 566:2 |
| 611:14 616:24 | 572:4 583:23 | 848:3,8 | 568:8,14,18 |
| 618:24 620:23 | 583:24 584:13 | **plugging** 607:3 | 569:5 592:12 |
| 622:16 624:4 | 586:5 589:12 | **plus** 501:10 | 593:7 596:7,24 |
| 702:2 810:9 | 606:10,16 | 553:11 604:16 | 597:2,4,6 |
| 812:4 813:6,7 | 614:24 615:7 | **point** 423:7,23 | 604:7 607:21 |
| 824:15,22 | 615:13 616:1,8 | 433:7 445:23 | 608:7 610:13 |
| 835:16 838:20 | 616:13 618:10 | 450:20 461:11 | 611:6 |
| 843:18 | 619:19 621:10 | 486:8 488:19 | **positioned** |
| **platforms** | 621:22 622:13 | 489:2,20 | 572:22 |
| 404:14 414:12 | 622:20 623:5 | 491:17 521:13 | **positions** |
| 414:24 416:20 | 623:13,18 | 528:3 571:18 | 567:15 569:14 |
| 417:5 418:23 | 624:21 625:1 | 601:24 612:15 | 569:20 570:6 |
| 420:4 424:24 | 626:10,17,18 | 652:23 662:3 | 571:5,13,21 |
| 427:23 432:4 | 659:16 677:7 | 669:7 689:1,20 | 572:18 573:18 |
| 435:2,18,19 | 680:17 687:17 | 690:16 707:16 | 575:9 591:22 |
| 436:3 437:9 | 688:22 689:5 | 717:12 721:22 | 592:5,8,11,20 |
| 438:12 439:8 | 689:24 690:21 | 754:15 777:14 | 593:6,12,14 |
| 441:9,23 442:7 | 691:18 693:2,3 | 778:1 795:18 | 594:3 595:15 |
| 443:6,7 444:24 | 701:3,11 712:7 | 820:15 821:13 | 595:15 596:22 |
| 445:1 468:23 | 721:14,18 | **policies** 704:20 | 612:10,17 |
| 469:19 470:3 | 726:6 781:22 | **ponce** 405:16 | 613:24 614:22 |
| 496:20 497:17 | 782:5 788:4 | **poor** 816:4 | 615:5,22 616:5 |
| 501:1,20 505:2 | 803:5,17 807:5 | **population** | 623:4 626:8 |
| 506:4 507:12 | 808:10 809:4 | 599:24 620:18 | 628:11 630:20 |
| 508:17 509:11 | 809:16,24 | 628:16 638:5 | 656:17,21 |
| 510:2,3 512:20 | 810:6 812:7 | 654:14 697:13 | 672:9 674:20 |
| 514:22 515:2 | 815:16 820:23 | 698:5 699:6 | 686:9 702:11 |
| 516:21 517:15 | 821:16 837:18 | 706:11,12 | **positive** 605:13 |
| 518:17,24 | 843:4,9 844:2 | 715:15 719:23 | 634:2 |
| 519:11,22 | 844:15 | 740:4 | **possible** 839:1 |
| 520:18 522:11 | | | |

**[possibly - prevention]**                                      Page 61

| | | | |
|---|---|---|---|
| **possibly**  465:19 | **predict**  473:24 | 424:2,15 | 507:22 515:9 |
| 568:4 838:14 | 475:17 477:5 | 425:21 426:10 | 516:5,15 |
| **posts**  834:23 | 478:17 580:21 | 427:5 430:7,24 | 543:16 544:14 |
| **potential**  617:5 | 697:6 699:1 | 431:13 432:7 | 544:16 545:1,5 |
| 659:13 687:9 | 746:8 766:23 | 432:16 433:11 | 545:17 549:5,6 |
| 703:8 | 802:22 803:4 | 434:7 435:5 | 549:24 550:11 |
| **power**  549:24 | 803:14,20 | 436:10 437:6 | 736:14 797:1 |
| **powerpoint** | **predicting** | 437:21 438:18 | 797:16,18,21 |
| 545:17 549:5,6 | 481:3 | 439:11 440:18 | 799:14,23 |
| 549:24 | **preeminent** | 442:2 449:16 | 800:17 |
| **practice**  434:18 | 735:11,21,23 | 450:11 451:5 | **presented** |
| 472:21 498:21 | **preface**  544:24 | 451:20 452:22 | 542:23 543:3 |
| 563:19,22 | 661:22 | 455:2,19 | 544:3,3,17 |
| 574:12 577:1 | **prefer**  723:4 | 456:15 458:11 | 668:21 669:5 |
| 577:11,18 | **prepare**  520:14 | 460:5,23 | 670:4 736:2,20 |
| 578:24 598:16 | **prepared** | 461:22 462:20 | 744:2 765:12 |
| 598:18 653:19 | 517:11 518:15 | 464:2,17 | **presenting** |
| 654:3,4 695:4 | 519:9 520:16 | 465:10 466:19 | 544:8 545:2 |
| 726:19 | 523:7 524:23 | 489:3 543:20 | 762:7 772:20 |
| **practices** | 545:8 644:1 | 544:11 736:10 | **pretend**  686:7 |
| 474:13 513:7 | **preparing** | 764:23 773:1 | **pretty**  608:10 |
| 534:20,21 | 491:23 492:17 | **presentation** | 733:12 803:2 |
| 545:11 598:19 | 533:11 617:20 | 500:23 501:19 | 836:11 |
| 598:24 601:13 | 755:20,24 | 505:1 506:2,18 | **prevent**  587:4 |
| 606:17 627:20 | 769:24 | 507:10 540:14 | 587:24 588:16 |
| 686:2 687:14 | **present**  406:23 | 540:19 541:17 | 600:13 620:1 |
| 688:4 | 412:10 413:9 | 542:3,10,16 | 640:2 687:16 |
| **pre**  542:7,12 | 413:23 414:10 | 543:7 761:22 | 807:3 |
| 543:8,22 | 414:21 415:3 | 762:14 763:12 | **prevention** |
| **precise**  429:22 | 415:16,23 | 764:5 765:4 | 471:22 509:13 |
| 475:14 523:23 | 416:10 418:4 | **presentations** | 534:9 536:2 |
| 719:15 720:11 | 418:20 419:10 | 501:11,13 | 616:18 617:9 |
| **precisely** | 421:10,23 | 505:10,13 | 617:14 618:6 |
| 447:10 | 422:11 423:14 | 506:13 507:3 | 623:22 631:11 |

CONFIDENTIAL

**[prevention - provided]**                                              Page 62

639:3,5,21
702:15 703:4
**prevents**
589:11
**previously**
445:8 551:19
582:6
**primary**
443:12 630:6
761:19
**principal**
555:18,24
556:11,21
557:22 767:23
**principles**
600:9
**print**   730:21
**prior**   660:19,21
678:23 783:24
795:16
**prioritize**   819:5
**privacy**   451:13
**private**   832:8
**probably**
460:13 463:16
473:12 549:1
549:13 553:8
558:2 561:18
600:12 613:6
**probe**   467:15
**problem**   446:1
665:18 724:18
725:13

**problems**
467:14,20,24
481:24 620:6
**process**   444:11
512:16 514:5
514:20 561:22
561:23 562:3
577:17 611:9
689:19 719:8
756:19
**produce**   463:11
**produced**
533:2
**production**
408:10
**products**   402:4
409:20
**professional**
544:13,16
590:4,8,11
598:4 608:19
608:20 609:18
610:22 611:1
611:12 612:8
612:16,18
613:23 662:19
663:21 704:21
762:4,7,21
763:24 764:16
765:14 771:5
773:14 799:14
831:23,24
**professionals**
538:3 613:15

617:2 647:16
652:21
**professions**
652:16
**profile**   407:13
407:14 559:21
560:6,13 561:1
561:6,13
562:16,18
563:8,14
564:15,16
565:6 566:1,14
566:18 567:1,5
567:8,23 568:6
568:12,16,22
568:23 569:3
569:18 570:17
571:13,20
655:17 667:17
667:18 834:3
**profiles**   559:20
562:5,8
**program**
540:14,19
541:2,13,16
542:10,16
543:6 600:22
**programming**
474:13 617:19
704:20 809:12
**programs**
598:18 810:3
**prohibited**
526:11 527:14

527:16
**project**   473:10
537:22
**promotion**
639:4,21
**pronged**
471:23 477:12
**proposal**
580:19 582:1
**propose**   808:4
**proposed**   591:2
592:9
**proposing**
472:22 478:8
658:1,11
695:10 809:10
**propounded**
850:5
**prospective**
784:13
**provide**   615:24
616:11 621:20
639:8,12
652:21 682:4,7
709:7 784:9
**provided**   468:7
574:17 619:17
623:3 626:7
644:22 672:7
674:18 681:22
682:12 702:10
719:4 809:13
844:13

CONFIDENTIAL

**[providers - question]**                                                    Page 63

**providers**
  450:18 468:24
**providing**
  618:8 629:8
  639:2
**prussia**   402:17
  403:5
**psychologist**
  407:16 596:18
  640:7 641:14
  642:12,21
  644:11 645:6
  647:20,23
  648:8
**psychologists**
  407:16 601:7
  614:8 640:12
  640:16 641:13
  642:11,20
  643:3 644:10
  645:14 647:6
  652:1 654:12
  654:24 655:3
  657:3,5 658:3
  658:6,7,16
  659:21 662:10
  663:10 664:16
**psychology**
  609:20
**psycinfo**
  727:24
**public**   405:19
  471:7,20 472:1
  473:14 474:11

474:19 475:19
475:24 476:7
478:9,20
479:12,14
480:2 481:1,5
545:4 581:1,4
581:16,24
616:17 638:23
694:14 702:22
702:24 706:8
716:14 719:1
834:23 835:1
850:14
**publication**
  734:4 771:7
  772:9,17
  795:24
**publications**
  769:3 773:7
  792:4 795:2
  796:8,11,24
  797:20 799:2
**publicly**   500:22
  501:18 504:24
  506:1,17 507:9
**publish**   532:5
  772:9
**published**
  532:16 533:15
  737:4 739:16
  772:1 794:14
  795:20 798:9
**publishing**
  794:23

**pubmed**   727:16
  727:24
**puerto**   645:24
**pull**   479:19
  509:19 510:8
  551:17 731:17
**pulled**   769:16
**pulling**   731:5
**purchase**
  817:11
**purchasing**
  819:2
**purport**   575:22
  576:1
**purported**
  805:10
**purpose**   555:11
  584:11
**purposes**
  509:20 510:9
  654:22 658:19
  727:13 728:1
  728:18 729:5
  729:19 730:3
  750:7 774:4
  782:3 783:2
**pursuant**
  402:14
**put**   457:20,22
  458:2,8 474:11
  482:21 488:12
  499:3 570:11
  573:4,12 586:9
  586:15,19

624:1 639:19
718:21 730:21
750:15 751:21
803:6,17 810:2
820:8
**putting**   606:21
  607:2

**q**

**qualitative**
  445:4,11
  447:19
**quality**   548:17
  701:20
**quantification**
  473:8
**quantify**   427:8
  427:13 430:2
  467:19,24
  481:21 721:1
**quantitative**
  444:14 478:15
**quarter**   772:8
**question**
  408:20 409:7
  413:1 438:16
  454:4 462:10
  474:4 487:5,20
  492:8,12
  494:20 496:12
  499:13 502:14
  503:4,23
  510:15 513:4
  517:13 518:21

**[question - really]**                                    Page 64

| | | | |
|---|---|---|---|
| 520:12 521:24 | 814:4 818:10 | 769:4 | **ratios** 600:7 |
| 523:1,5,6,15,18 | 821:7,21 | **quotes** 498:17 | 648:2 650:7 |
| 523:19 524:8 | 840:20 841:9 | 498:23 575:14 | 651:23 652:11 |
| 524:21,22 | **questioning** | 576:1,3,7 | 653:2,5 658:15 |
| 525:11,18,20 | 753:3 | 577:4,8 578:8 | 658:18 659:1,8 |
| 526:14 532:2 | **questions** | 579:6 728:13 | 659:12 660:3 |
| 536:9 538:20 | 419:21 447:1 | | 660:16 662:1 |
| 539:14 554:19 | 502:1,6 503:15 | **r** | 662:11,24 |
| 555:1 558:5 | 504:7 510:19 | **r** 849:1,1 | 663:3,24 664:7 |
| 567:22 575:24 | 511:4 522:24 | **radnor** 402:17 | 664:13 665:2,6 |
| 576:10,16 | 525:8 637:3 | 403:5 409:17 | 665:16,16 |
| 577:6 592:15 | 707:18 708:23 | **raised** 690:4 | 666:8 |
| 622:1,3 625:11 | 708:24 709:6 | **ran** 729:3 | **reach** 665:13 |
| 625:13,20 | 751:1 771:10 | **range** 553:19 | 684:12 |
| 626:2,14 | 776:14,19 | **rapid** 441:6 | **read** 491:12 |
| 629:21 630:16 | 842:5 845:23 | **rate** 836:20 | 546:16 608:11 |
| 659:6 661:7 | 850:4 | **rather** 653:17 | 741:12 745:13 |
| 670:24 671:9 | **quite** 486:11 | 687:22 706:12 | 848:3 850:3 |
| 671:21,22 | 509:8 547:10 | **ratio** 407:16,21 | **readiness** 654:1 |
| 672:2,14 | 617:20 636:20 | 640:7,10 641:4 | **reading** 732:6 |
| 673:24 674:6 | 636:21 665:6 | 642:12,21 | 748:3 756:20 |
| 675:5 676:21 | 707:9 742:24 | 645:5,7,9,15 | **real** 494:17 |
| 679:9 690:5,7 | 789:10 | 646:6,10,15,22 | 522:7 554:1 |
| 698:21 707:12 | **quote** 467:14 | 648:17 649:1,8 | **reality** 572:24 |
| 707:20,21 | 473:8 534:10 | 649:18 650:16 | 674:24 |
| 709:8,20 | 574:9 575:19 | 651:5,14 | **realize** 490:14 |
| 713:18 725:5,8 | 575:22 578:11 | 654:16 657:6 | **really** 482:21 |
| 738:21 748:18 | 578:11 608:7 | 657:18 658:3 | 490:5 523:20 |
| 757:19 758:21 | 609:13,14 | 659:21 660:10 | 523:22 535:15 |
| 763:9 768:23 | 610:14 734:4 | 661:9 663:11 | 547:10 592:3 |
| 782:16,21 | 737:5,6 739:17 | 663:17 665:8,8 | 606:13,20 |
| 790:23 796:15 | 739:24 745:4 | **rationale** | 607:7 687:11 |
| 796:19 805:1 | **quoted** 574:8 | 622:23 | 688:19 694:12 |
| 805:16 806:6,9 | 574:22 576:12 | | 707:11 721:19 |

**[really - recommends]**                                    Page 65

733:10 774:18
790:12 803:8
**realtime**   402:21
847:11
**reason**   423:10
668:20 674:1
761:17 768:9
772:14 795:4
820:16,24
829:21 836:5
841:21 848:5
**reasonable**
545:23
**reasoning**
503:10
**reasons**   452:15
486:9,16,21
623:24
**rebuttal**   411:12
517:23 741:7
741:15 744:12
744:15,21
**rebuttals**
741:21 745:3
745:14,19
778:9
**recall**   421:5,5
458:22 481:16
495:17 497:19
501:11 505:23
506:11 507:2,5
507:19 516:12
534:19 545:2
550:14 563:11

581:9 644:21
662:22 669:15
669:22 670:5
684:3 685:9
727:18 729:23
730:16 740:15
741:19,20
768:23 770:10
770:12 793:16
804:15 805:3
821:23 823:3
825:2,4 826:24
837:15 838:8
838:10
**recalling**
489:13 499:9
550:6
**receipt**   848:17
**receive**   628:10
631:17 706:23
808:20 810:24
**received**
616:12 787:7
827:6,12
**receiving**   617:1
617:3
**recent**   483:22
537:12 558:13
660:3 666:11
717:10 769:1,2
773:6
**recently**   672:19
717:6 771:24

**recess**   499:21
504:16 582:17
666:21 765:21
807:14
**recognize**
662:5
**recognized**
641:6
**recognizing**
639:10 660:5
**recollection**
447:3 490:1
499:4,13
533:23 534:19
553:13 572:8
578:10 643:20
661:23 723:7
729:24 731:21
771:23 784:1
839:24
**recommend**
482:6 524:9
562:20 571:5
583:11 591:19
592:17 593:12
593:14 594:6
594:12,21
595:2,7,13,23
596:5,11,17
612:19 613:14
614:10,18
640:6,22
654:24 658:17
658:18 662:24

837:3 842:6,13
**recommendat...**
518:23 520:4
561:14 571:18
641:13 644:10
663:23 694:6
**recommendat...**
597:22 599:3,5
599:11 600:1,6
693:24
**recommended**
592:13 596:23
597:9,14,15
614:1 615:4
640:11 641:4
644:2 645:15
646:15 651:22
654:16 662:1
662:10 663:11
663:17 690:12
696:17 766:7
**recommending**
471:1 484:5
569:15 571:22
583:20 584:7
591:7,10
599:21 605:4
621:6 628:12
649:17 685:19
805:6 806:11
806:19 808:21
**recommends**
612:8,17
613:24 651:14

**[reconstructing - remember]**                                        Page 66

**reconstructing**
729:10
**record**  409:11
410:3 430:5
499:19 500:2
504:14,21
573:23 578:10
582:15,22
666:18 667:1
765:19 766:2
807:12,19
846:1,8 847:6
**records**  450:6
451:8
**reddit**  809:16
**redirect**  781:12
**reduce**  479:16
487:11 488:18
**reduced**  485:13
487:6
**reducing**
485:22 486:10
**reduction**
635:14,17
**refer**  445:3,17
545:9 587:10
678:24
**reference**  545:7
550:24 551:5
558:3 559:18
667:5 747:2
808:14
**referenced**
534:24 573:20

576:14 726:24
739:8
**references**
741:23
**referencing**
783:23
**referral**  815:11
820:17 821:20
822:12,23
**referrals**
446:24 815:20
816:1 817:2
819:12,17
**referred**  494:24
495:8,10 680:6
783:17
**referring**  462:7
552:7 608:1
631:7 679:2,4
788:23
**reflect**  652:19
789:18
**reflected**
567:15
**reflects**  650:15
**regard**  688:9
688:15
**regarding**
599:5
**regular**  726:19
732:1,6
**regularly**  448:8
531:22 727:20

**regulation**
634:8
**relate**  412:2
503:4
**related**  435:1
435:16 439:8
517:1 521:5
522:7,13
527:23 554:15
558:10,12
598:19 603:7
615:6 617:24
622:12 630:4
630:18 662:18
675:21 684:11
703:18 706:21
711:24 712:9
712:17 714:1
715:12 718:15
772:19 813:14
820:22
**relates**  402:6
629:15
**relating**  614:23
**relation**  627:22
**relationships**
623:20
**relatively**  570:1
570:1 606:8
611:15 720:16
790:17
**released**  560:14
560:24

**relevant**  617:20
727:10,12
728:2,10 729:4
729:20 730:4
730:11 733:7
742:8,18 743:8
743:15,18
745:4,11
747:22 748:21
749:8 750:6,14
751:8,20
753:18 774:3
775:14
**relied**  469:13
483:15,19,20
484:2
**reluctant**
507:19 638:3
674:2
**rely**  442:21
477:8 478:14
479:24 480:2
483:11
**relying**  445:24
478:10 751:10
837:24
**remain**  701:17
**remainder**
618:7
**remains**  488:16
**remedy**  600:11
**remember**
505:12 516:2
533:8 544:24

**[remember - reports]**                                    Page 67

| | | | |
|---|---|---|---|
| 548:10 549:15 | 567:16 579:2 | **reported** | 518:13 519:8 |
| 566:22 696:14 | 582:4 583:6,10 | 435:22 455:22 | 520:13,15 |
| 696:16 731:11 | 584:17,22 | 456:4 458:23 | 521:17,20 |
| 741:6 743:10 | 586:4 587:1,2 | 465:4 468:19 | 523:3,4,7 |
| 755:3 769:6,14 | 587:13,14,22 | **reporter** | 524:5,7,23 |
| **remind**  436:21 | 588:9,12,14 | 402:21,21 | 526:7 529:17 |
| **reminder** | 589:8,14 | 410:4 769:7 | 529:21 530:4,5 |
| 410:17 | 607:20 609:2 | 773:14 847:11 | 532:5,10,13,17 |
| **reminding** | 613:19 647:2 | 847:21 | 533:2,5,9,12,15 |
| 525:18 | 652:9 655:16 | **reporting** | 534:3,13 540:8 |
| **remove**  495:19 | 672:17 674:10 | 466:22 | 542:6,9 545:6 |
| **renew**  640:20 | 682:18 683:16 | **reports**  411:7,8 | 550:23 552:7 |
| **repeat**  524:19 | 684:9 704:8 | 411:11,13,14 | 555:14 559:19 |
| 626:1 | 727:4 730:3 | 411:17 412:1 | 562:4 574:6,9 |
| **rephrase** | 732:24 733:5 | 427:18 434:20 | 574:23 575:4 |
| 524:10,11,13 | 738:24 739:23 | 435:23 441:19 | 575:15,21 |
| 524:15 754:19 | 740:6,15 | 445:7 453:18 | 576:13 579:15 |
| **replaced**  529:1 | 746:23 747:3 | 456:7 457:21 | 580:8 589:3,5 |
| **report**  411:12 | 747:12,13,19 | 457:24 458:18 | 592:13 667:5 |
| 426:16 439:22 | 748:7,23 749:2 | 461:8 467:18 | 667:15 679:23 |
| 444:18 446:13 | 749:7,10 | 468:5 469:8,14 | 691:3,16,24 |
| 447:7 458:3 | 750:13,18 | 470:6,18,21 | 692:3,3,7,12,14 |
| 469:9 473:19 | 751:19 755:21 | 471:19 472:13 | 692:15,17,18 |
| 478:16 480:18 | 756:6 759:10 | 472:13 474:24 | 696:17 724:4,5 |
| 480:24 481:15 | 759:14,15 | 474:24 476:16 | 726:12 727:3 |
| 483:1 496:22 | 760:1,2,9,19 | 476:16 477:14 | 727:14 728:3 |
| 499:1 503:17 | 761:10,15 | 477:17,17 | 729:18 732:19 |
| 510:24 512:22 | 777:1,2,4,5,21 | 478:3 479:3,3 | 733:2 739:9,12 |
| 517:19 521:9 | 778:5 779:8,9 | 480:8,8 483:14 | 740:21 741:10 |
| 522:5 526:5 | 780:5,6 781:6 | 486:2 490:6 | 741:22 742:4 |
| 527:3 533:19 | 785:9 812:1 | 498:14,17 | 743:3 744:1,12 |
| 533:22 534:1 | 819:9 844:1 | 499:3 502:18 | 744:15,21,22 |
| 534:17 535:3,5 | **reportable** | 503:20 516:19 | 744:23 746:20 |
| 535:17 540:13 | 773:23 | 517:9,14,21 | 747:7,10,14 |

**[reports - restrictions]**                                                    Page 68

748:12 749:4
751:12 754:4
755:11,12
761:4 774:4
777:17,23,24
778:7,12,19
779:3,19
787:23 788:14
795:17 805:6
806:19 811:22
812:9,14,21
819:16 824:19
835:12 837:16
840:9 844:14
844:19
**repository**
533:13
**represent**
410:19 652:16
662:20 808:1
**representing**
403:7,14 404:7
404:14,22
405:7,18 406:8
406:13,20
846:3,5
**reproduction**
847:19
**request**   408:10
500:5,13
**requesting**
679:24
**require**   672:3

**required**
526:10 527:13
527:16 686:11
808:17
**requirement**
702:9 772:22
**requires**
761:21 762:13
763:11 764:4
765:3
**research**
484:17 513:10
542:21 543:17
544:4,9 651:21
652:7 735:12
789:3,9,16,20
791:2,10,18
792:10,11,21
793:3,23 794:8
795:3,8,19,20
795:24 804:5
**researcher**
788:15,19,24
**reserved**   409:7
502:3
**resides**   520:1
**resilience**
551:13 553:1
**resource**   606:6
613:7 659:14
818:13
**resourced**
603:9 674:11
675:14,20

676:3,12,18
813:20
**resources**
488:9 531:7
570:12 571:2,8
647:15 653:11
671:13 672:9
672:22,24
673:13,20
674:21 677:20
678:3,6 679:18
680:21 681:23
682:4,8 683:3
683:10,13,24
684:15,20
685:10 724:10
781:12 811:8
811:13,15
818:16 830:19
**resourcing**
676:23
**respect**   446:19
469:11,23
490:8 511:18
576:18 599:2
599:12 614:3
618:7 625:10
646:21 647:5
679:24 694:20
707:8 742:4
784:5 811:21
812:6 814:18
814:24 815:19

**respected**
735:19
**respecting**
524:3 573:10
**respects**   718:21
**respond**   561:19
659:5
**responding**
517:22 743:2
**response**
522:20 525:9
573:6 745:9,19
778:9
**responses**
741:4,8,10
743:3
**responsibilities**
509:6
**responsibility**
676:1,22 677:5
677:13
**responsible**
634:12 674:7
**restate**   466:5
477:2 492:13
494:19 524:11
524:18 688:13
806:24
**restated**   710:15
**restorative**
627:20
**restrictions**
526:23 803:7

**[restroom - roseland]** Page 69

| | | | |
|---|---|---|---|
| **restroom** | 464:11 465:18 | **rico** 646:1 | 703:16 704:12 |
| 760:14 | 517:12 521:19 | **right** 438:16 | 705:18 706:16 |
| **result** 472:8 | 532:11 651:23 | 443:22 449:2 | 707:1 708:13 |
| 528:7 606:16 | 683:7 737:7,18 | 459:13 474:14 | 708:14 710:1,1 |
| 620:19 681:17 | 737:21,24 | 482:13 488:7 | 710:9,9 711:13 |
| 681:21 682:9 | 738:13 740:20 | 495:1 496:17 | 711:13,16,22 |
| 700:3 703:9,10 | 742:8,9 744:1 | 498:19 545:18 | 712:15,15 |
| 781:14 | 744:21,22 | 549:23 563:19 | 713:23 715:17 |
| **results** 491:1 | 747:8 750:2 | 570:21 572:5 | 715:17 716:3,6 |
| 492:1,19 | 752:11 753:20 | 585:19 587:9 | 717:24 718:13 |
| 493:21 497:21 | 756:9 759:4,4 | 593:1 594:4 | 718:13 719:21 |
| 499:6 | 774:2 784:2,16 | 609:20 630:12 | 719:24 |
| **retain** 574:16 | 787:24 789:3 | 636:3 645:1,7 | **road** 402:17 |
| **retained** | 789:11 791:2 | 651:17 656:22 | 403:5 405:12 |
| 779:11 845:11 | 791:18 792:11 | 659:15 672:8,8 | **role** 500:11 |
| **retired** 529:8 | 793:17,23 | 674:19,19 | 501:15 505:20 |
| **return** 848:15 | 794:15,21 | 697:20 701:7 | 508:11,13 |
| **review** 411:4,9 | 795:12 796:9 | 701:24 705:23 | 509:7,16,24 |
| 411:17 533:20 | 798:9,10 | 713:18 718:2 | 511:21,22 |
| 645:20 726:18 | 804:18 824:17 | 718:22 720:4 | 512:23 514:1,3 |
| 731:15 733:14 | 831:9,11 | 722:23 726:22 | 514:5,23 |
| 740:1 744:14 | 838:14,17 | 743:13 744:8 | 519:17 525:23 |
| 745:18 746:4 | 840:8 844:19 | 744:19 754:9 | 527:17 528:8 |
| 749:9 750:14 | **reviewing** | 755:17,21 | 544:8 561:5 |
| 751:19 752:17 | 459:18 732:2 | 756:12 757:1 | 603:23 615:19 |
| 753:12,18 | 740:16 750:5 | 757:15 775:16 | 630:6 663:13 |
| 756:10,19 | 774:13 | 779:3 780:5 | 663:20 664:2 |
| 757:17,24 | **revise** 571:20 | 781:6 784:12 | 685:24 687:12 |
| 761:16 776:3 | **revised** 560:22 | 799:5 800:3,21 | 689:16 |
| 824:13 | 561:3 | 808:15 818:17 | **roles** 570:22 |
| **reviewed** 411:7 | **revisit** 544:21 | 822:20 825:7 | 602:1 656:16 |
| 430:21 445:18 | **revisited** | 837:21 843:9 | **roseland** |
| 457:9,14 | 652:18 | **risk** 474:16 | 405:13 |
| 459:17 463:13 | | 639:12,22 | |

**[rosica - school]**                                          Page 70

| | | | |
|---|---|---|---|
| **rosica** 406:23 | 772:24 780:21 | 454:22 456:22 | 529:11,23 |
| **roughly** 581:10 | 781:4 786:16 | 463:8 468:1 | 530:3,12,19,24 |
| 717:2 | 816:13 821:24 | 472:11 474:22 | 531:14 532:5 |
| **routinely** | 823:23 838:24 | 476:14 477:15 | 532:16 533:14 |
| 726:20 727:8 | **says** 587:19 | 479:1 480:6 | 533:24 534:4 |
| 728:8 | 588:15 701:19 | 481:19,23 | 534:22 535:21 |
| **rural** 448:11,16 | 740:16 794:15 | 484:5,8,9 | 536:14,21 |
| 695:18 | **scale** 697:18,19 | 485:10,16,23 | 537:4,23 538:2 |
| **s** | **scan** 731:3 | 486:4 487:10 | 538:11,16,22 |
| **s** 403:11,12 | **scholar** 728:1 | 487:13 488:23 | 540:10,11 |
| 405:16 407:9 | **scholars** 735:22 | 490:13,15,24 | 542:8 545:10 |
| 746:6 | **scholarship** | 491:12,16,18 | 547:16 548:17 |
| **safety** 486:21 | 550:24 735:24 | 491:24 492:18 | 551:1 552:5 |
| 537:24 566:2 | **school** 405:7 | 494:15 496:4,6 | 556:2,5 557:15 |
| 591:12 601:17 | 406:14 407:13 | 496:8 497:1,20 | 558:10,12,15 |
| 601:20 604:6 | 407:16,16,19 | 497:22 498:5 | 559:19,23 |
| **salaries** 686:9 | 407:20 412:2 | 499:7,11 501:2 | 560:4,9,11 |
| 686:19 | 412:11,13 | 501:21 502:19 | 561:9,12,14,15 |
| **samhsa** 534:20 | 413:10,12,24 | 503:21 505:3 | 562:5,9,15,22 |
| 535:14 | 414:3,11,13,22 | 505:17 506:5 | 563:9,9,16,21 |
| **san** 406:12 | 414:24 415:4,6 | 506:20,20 | 563:23 564:15 |
| **save** 731:7 | 415:7,17,19,24 | 508:4,18 509:2 | 565:18,21 |
| **saved** 731:21 | 416:3,11,14,19 | 509:3,19 510:8 | 567:19 568:3 |
| **saw** 476:10 | 416:21 417:4,6 | 510:17,21 | 568:19 569:15 |
| 479:17 741:9 | 417:13,14,19 | 511:10,13 | 569:19 570:20 |
| 752:11 | 417:20 418:5,5 | 512:1,11,13 | 570:23 571:19 |
| **saying** 516:7 | 418:7,21,22,24 | 513:1,14,22 | 571:22 573:9 |
| 544:24 547:12 | 419:11,12,13 | 514:4,12 | 574:5 577:21 |
| 585:7,14 593:5 | 419:24 420:2,4 | 515:11,13 | 582:5 583:7 |
| 615:18 627:14 | 423:6 427:19 | 516:22,22 | 585:2,17 587:3 |
| 628:1 678:22 | 427:23 441:4 | 517:16,16 | 587:6,7,23 |
| 696:16 743:7 | 442:24 443:18 | 518:7,18,19 | 588:2,3,9,12,13 |
| 758:1 763:3 | 446:18 448:5 | 520:5 521:1 | 588:18,19 |
| | 449:2,4,7,10,11 | 528:6,11,22 | 589:3,6,8,23 |

CONFIDENTIAL

**[school - schools]**

| | | | |
|---|---|---|---|
| 590:10,13,24 | 642:1,10,11,19 | 692:11,20 | 788:21 789:13 |
| 591:21 592:19 | 642:21 643:2 | 693:1,4,5 | 789:19,21 |
| 593:15,23 | 644:10 645:6 | 694:4 695:8,16 | 790:13 793:5 |
| 594:3,4,8,10,13 | 645:13 647:5 | 695:22 696:18 | 795:6,17 805:7 |
| 594:15,22,24 | 647:23 648:8 | 698:5 699:23 | 805:8 806:13 |
| 595:3,5,8,10,20 | 648:16,17,23 | 700:13 703:11 | 809:6 810:18 |
| 595:23,24 | 649:1,7,18 | 712:24 713:12 | 811:9,13,15 |
| 596:4,5,11,12 | 650:16 651:5 | 714:4,21 | 813:3,4 814:17 |
| 596:12,16,17 | 651:13 652:1,2 | 715:16 716:7 | 814:23 816:3 |
| 596:18,22,24 | 653:4,22 | 717:20 718:12 | 817:10 819:1,4 |
| 597:5,8,9,10,14 | 654:10,12,12 | 719:3,22 | 822:3,5 835:23 |
| 597:16,23 | 654:18,23,24 | 720:20 721:11 | 835:23 836:8 |
| 598:7,12 599:6 | 655:2,2,3 | 721:21 722:5 | 836:19 842:7 |
| 599:6,14,17,21 | 656:23 657:2,2 | 722:10,19,20 | 843:6 845:13 |
| 601:7,15,21 | 657:4,4,18,19 | 723:3,10 | **school's** 779:23 |
| 602:10,17,21 | 657:20,22 | 725:13,18 | **schooling** |
| 603:8,11 604:5 | 658:3,4,5,7,16 | 726:13 727:6 | 537:17 538:15 |
| 604:24 605:18 | 658:17,19 | 727:14 728:3 | **schools** 405:19 |
| 606:2,24 | 659:20 660:9 | 733:1 747:10 | 420:13 423:21 |
| 607:15 608:12 | 661:8 662:9,20 | 750:7 751:11 | 441:15 444:7 |
| 608:15 610:11 | 663:9,15 664:3 | 755:12 766:5 | 469:1 473:3 |
| 611:4 612:9 | 664:5,16,17 | 766:10,16 | 482:12,21 |
| 613:15 614:1,5 | 667:7,14,18,24 | 767:4,8,10,13 | 483:18 485:1 |
| 614:7,8,9,12,19 | 668:2,7,15 | 767:16,19 | 497:15 509:12 |
| 615:23 618:3 | 669:1,10,18,23 | 768:2,5,8,15,21 | 510:3 512:20 |
| 619:12 620:7 | 670:6,15 671:3 | 777:3,18,22 | 514:23 515:2 |
| 620:12 621:6 | 673:7,18 | 778:6,12,14,15 | 519:4,18 |
| 622:18 623:19 | 678:11,24 | 778:17,23,24 | 522:19 526:1 |
| 624:12,15 | 679:12 682:16 | 779:14,15,19 | 530:23 531:13 |
| 630:8 637:12 | 684:13,18 | 779:22 780:1,8 | 532:18 533:17 |
| 637:16,22 | 685:5,7,20 | 780:9,16,24 | 536:5,21 537:7 |
| 638:2,5 640:6 | 687:3 689:4,23 | 781:1,3,17,23 | 539:1,10,19,20 |
| 640:7,12,15,23 | 690:1,19,22 | 782:6 783:4 | 540:17 541:19 |
| 641:4,9,12 | 691:17,19 | 786:14 788:13 | 542:14 543:9 |

**[schools - see]**                                                    Page 72

| | | | |
|---|---|---|---|
| 543:23 544:18 | 674:21 676:1 | 689:14 726:15 | 727:22 728:9 |
| 545:13 546:12 | 676:17 677:13 | 727:10,12 | 728:17,21 |
| 547:6 548:1 | 682:13 686:17 | 728:2,10,18 | 729:2,3 730:12 |
| 549:9 550:2 | 687:8 688:23 | 729:4,19 730:4 | 730:19 731:10 |
| 551:10 552:12 | 694:20 695:24 | 730:11,20 | 731:12,14 |
| 552:20 553:5 | 700:2 719:14 | 742:9 743:8,15 | 734:1 737:2 |
| 555:4,20 | 720:8 722:6 | 743:18 745:5 | 738:3,4 743:11 |
| 556:14 557:10 | 726:7 768:19 | 745:11 747:9 | 756:24 757:4 |
| 560:2 569:23 | 774:8 776:7 | 747:23 748:21 | 759:17,19 |
| 570:4,10,15 | 778:23 779:14 | 749:3 750:6 | **searches** |
| 571:2,7,11,16 | 779:23 780:8 | 751:9 761:23 | 759:22 |
| 572:22 573:14 | 780:24 781:24 | 762:14 763:13 | **searching** |
| 584:9,14,20 | 782:1,6,7 | 764:6,24 765:5 | 730:10 |
| 585:1,2,4,6,8 | 785:6,12 788:5 | 774:3 787:5,14 | **second** 551:8 |
| 585:10,12,17 | 794:1,17 | 787:22 824:16 | 554:12 566:9 |
| 586:5,8,8,11,22 | 795:22 796:19 | 824:17 | 630:15 |
| 587:7 588:2,19 | 797:4 798:12 | **scientist** 447:16 | **secondary** |
| 592:6 597:20 | 799:17 800:8 | 513:9,22 | 844:5 |
| 599:15,22 | 810:18 813:17 | 539:19 757:15 | **section** 552:3 |
| 602:8 604:15 | 815:13 816:24 | **scope** 433:6 | 565:12,14 |
| 605:9 606:7,11 | 843:1,5,19 | 676:7 677:1,4 | 683:9 701:19 |
| 606:15,19 | **science** 474:14 | 802:11 832:4 | 704:6 |
| 610:1 617:5 | 475:23 477:7 | **screen** 564:21 | **sections** 832:13 |
| 621:3 630:3 | 479:20 581:2 | 609:4 | **secure** 680:7 |
| 631:22 647:17 | 604:18 605:7 | **screening** | **see** 426:20 |
| 648:1 652:22 | 700:11 721:19 | 705:2 719:8 | 458:18 460:15 |
| 659:15 665:11 | 735:13 788:1 | **scroll** 547:1 | 464:11 465:2 |
| 665:20 668:18 | **sciences** 734:3 | 565:1 566:3 | 465:21 466:15 |
| 668:23 669:3,9 | 734:17 735:5 | 643:4 645:4,11 | 467:7 474:7,15 |
| 669:12,16,20 | 735:10 736:4 | 650:4 651:3 | 491:24 492:18 |
| 670:1,9,15,19 | 736:11 737:3 | **scrolling** 566:8 | 493:19 498:1 |
| 671:2,5,13 | 739:15 | **sealing** 409:4 | 501:14 523:19 |
| 672:10 673:8 | **scientific** | **search** 726:21 | 531:23 533:13 |
| 673:20 674:4 | 447:18 514:6 | 727:9,11,18,20 | 560:20 561:3 |

CONFIDENTIAL

**[see - shape]**                                                    Page 73

| | | | |
|---|---|---|---|
| 564:20 565:2 | **seen** 485:21 | **sequencing** | 715:4 716:12 |
| 567:7 568:3 | 486:14 530:4,5 | 775:7,21 | 716:13 717:21 |
| 597:2 606:22 | 642:22 644:20 | **series** 533:8 | 718:17 808:18 |
| 607:9 608:5 | 659:19 660:3,8 | 545:14,17 | 808:18,21 |
| 615:19 620:20 | 661:8,15,24 | **service** 560:8 | 809:5 810:17 |
| 622:17 643:5,7 | 662:8,17 | 564:7 631:11 | 811:1 |
| 643:9 644:8 | 677:12 770:11 | 631:18 706:10 | **serving** 512:5 |
| 645:2,23,24 | 831:9 833:15 | 811:2 | 528:20 530:15 |
| 646:1,5 649:3 | 839:23 | **services** 444:8 | 544:7 |
| 649:4 650:6,11 | **sees** 841:20 | 451:18 457:4 | **sessions** 541:11 |
| 650:12 651:2,8 | **self** 455:22 | 469:1 534:6,8 | **set** 548:22 |
| 651:11,12 | 456:4 460:9 | 535:2,23,24 | 572:12 697:2 |
| 661:20 679:23 | 466:22 476:19 | 538:3 539:21 | **setting** 630:8 |
| 728:14,15 | **seminar** 768:12 | 563:1 615:24 | **settings** 520:7 |
| 736:17 738:18 | 768:15,21 | 616:11 618:8 | 775:6 776:1 |
| 739:8 747:18 | **sense** 573:17 | 618:11,17 | 788:21 |
| 752:14 755:8 | 592:7 618:4 | 619:1,16,23 | **several** 446:13 |
| 760:24 763:1 | 639:8 659:7 | 621:9,20 622:9 | 517:20 536:18 |
| 774:5 788:17 | 672:15 732:7 | 623:3,14 624:2 | 540:6 542:2 |
| 788:22,24 | 757:7 813:2 | 626:7,19,23 | 549:16 550:9 |
| 789:1 793:12 | 825:19 826:2 | 627:3,16,18 | 575:4 |
| 798:23 818:7 | 826:20 830:5 | 628:4,11 629:3 | **severe** 632:18 |
| 823:4 841:12 | **sent** 827:5,11 | 629:9,12,23 | 703:21 715:6 |
| 841:16 842:1 | 827:23,24 | 630:2,13,21,24 | **sewall** 746:6 |
| **seeing** 571:10 | **sentence** | 631:2,9 640:3 | 747:3 749:16 |
| 662:22 701:10 | 740:16 | 652:20 674:8 | **shape** 407:13 |
| **seek** 619:12 | **separate** 499:2 | 680:9 702:10 | 559:20,21,22 |
| 677:18 678:1 | 562:10 584:20 | 704:1,14 705:9 | 560:6,13 561:1 |
| 678:14,15 | 589:2 618:5 | 705:21 706:4,9 | 561:6,13 562:4 |
| 680:19 681:7 | 686:23 717:23 | 706:24 707:23 | 562:8,16,18 |
| 683:1,11,22 | 731:17 732:11 | 708:10 709:11 | 563:8,14 |
| **seeking** 634:20 | 732:14 777:17 | 710:17 711:8 | 564:14 565:6 |
| 635:1,10 | 777:22 778:4 | 712:19 713:16 | 565:24 566:14 |
| 691:13 745:12 | | 714:2,13,22 | 566:18 567:1,8 |

**[shape - six]**                                               Page 74

567:23 568:6
568:12,16,23
569:3,17
571:20 655:17
667:17
**shaped** 683:20
**share** 530:16
770:16
**shared** 455:10
530:8 724:1
**sharing** 499:1
**sharon** 402:14
407:4 409:24
410:7 850:8
**sheet** 655:21
848:7,9,12,15
850:6
**sheets** 446:17
447:21 449:6
457:2 679:6
685:2 726:3
784:23 787:9
**shift** 660:3
**show** 459:4
529:16,20
530:10 630:18
639:24 648:11
711:13 712:15
713:22 764:7
**showing** 586:7
628:13 629:14
638:10,13,16
638:17,17
761:11

**shows** 645:5,7
650:14 708:13
708:14 761:23
762:15 763:13
764:7,24 765:5
**siculus** 404:17
**side** 741:13
**sides** 764:23
765:10
**sign** 761:10
848:8
**signature**
847:10
**signed** 763:8
**significant**
418:12 427:14
428:2 431:10
436:6 440:3
441:9,21 443:3
444:19 467:14
468:7 474:15
474:20 484:24
657:12 697:11
698:3 699:2,5
720:24 723:13
724:18 725:12
790:16
**significantly**
438:13 485:13
487:6,11
488:17
**signing** 761:11
848:10

**silent** 812:14
**similar** 434:14
559:9 581:3
670:10 682:16
690:3 761:7,8
**single** 457:8
505:12
**sit** 457:12
462:14
**site** 513:1
836:15
**sitting** 457:17
458:22 460:18
461:14 463:21
465:24 481:16
489:18 499:3
543:1 547:3
549:23 577:6
683:14 701:16
732:24 796:21
799:5 800:3,20
811:19 839:4,9
839:18 845:9
**situation**
454:22
**six** 412:2
443:18 459:19
468:1 470:8,13
470:16,19,21
472:11 474:22
476:14 477:15
479:1 480:6
481:19 488:3
488:23 489:19

491:9 493:20
494:7 498:9
502:19 503:2
503:20 508:4
509:2 510:1
511:10 512:11
513:13 517:21
549:5 562:5
563:9 571:22
577:21 587:3
587:22 589:2,8
591:11,21
592:19 593:8
593:19 594:8
594:22 595:3,8
595:22 597:8
597:21,23
599:4 604:5
606:1 607:14
612:9,17
614:21 615:23
621:6 640:6,23
642:1,2 654:10
657:19 658:4
667:6,14,23
668:6,15 675:5
676:2 684:13
685:5,20 687:3
689:3,22
690:19 692:20
694:4 695:10
696:4,18 698:5
714:3,21
715:16 718:12

**[six - social]**                                                                 Page 75

| | | | |
|---|---|---|---|
| 721:12 722:10 | **skimmed** | 837:10,11 | 511:24 512:19 |
| 722:20 723:10 | 733:20 | 838:19 839:13 | 514:13 515:18 |
| 725:17 726:13 | **slade**   405:4 | 841:4,12 | 519:3 526:2,17 |
| 727:6,13 728:3 | **slade.methvin** | **snapchat's** | 528:2 530:23 |
| 750:7 751:11 | 405:6 | 830:19 | 531:9,13 |
| 766:5,10 777:3 | **sleep**   462:23 | **snapshot**   564:6 | 532:18 533:7 |
| 778:6,9,11 | 463:15,23 | **social**   402:3 | 533:17 536:4 |
| 779:18 781:17 | 479:6 519:5 | 409:18 415:5 | 536:19 537:6 |
| 782:6 786:14 | **slides**   550:15 | 415:18 417:14 | 538:13 539:1,9 |
| 788:13 805:7 | **slightly**   529:7 | 417:20 419:13 | 540:4,16 |
| 805:17,20 | **small**   695:18 | 420:4 421:12 | 541:21 542:13 |
| 806:1,7,13,19 | **smart**   746:8 | 422:1,13,24 | 543:3,11,24 |
| 813:3 818:2 | **smoking** | 423:16 424:6 | 544:19 545:4 |
| 819:7,15 821:5 | 617:12 | 426:12,19,24 | 546:12 547:6 |
| 822:15 835:23 | **snap**   404:23 | 427:7 428:6 | 547:24 549:8 |
| 836:19 843:2 | 808:1 824:6,10 | 430:9 431:2,16 | 549:18 550:2 |
| 843:15 845:13 | 824:14,15,20 | 432:1,3 435:1 | 552:11 553:7 |
| **size**   599:23 | 827:6,16,19 | 435:8,17 436:2 | 553:14,15 |
| **skills**   426:12,19 | 829:8 830:11 | 436:13 438:11 | 554:3,9,15,21 |
| 426:24 427:7 | 834:16 835:18 | 439:8,15 440:5 | 554:24 555:4 |
| 428:7 430:9 | 839:14,21 | 440:10,11,22 | 555:20 556:7 |
| 431:2,16 432:1 | 840:7 846:6 | 441:8,23 | 556:13 557:5,9 |
| 446:6 551:15 | **snapchat** | 442:17 443:5 | 557:17 558:16 |
| 566:20 568:17 | 808:12 811:21 | 444:23 446:2,4 | 559:11 568:20 |
| 568:20 591:14 | 812:3 824:15 | 446:6 447:4,5 | 570:8,14 571:4 |
| 594:14 602:12 | 824:22 825:7 | 447:13 468:22 | 572:23 573:15 |
| 602:16 612:21 | 825:20 826:3 | 469:18 470:2 | 579:17 580:10 |
| 613:4,10,11,15 | 826:17 827:12 | 471:11 472:5 | 580:22 581:20 |
| 615:10 617:4 | 827:17 828:4 | 480:13 482:16 | 583:22 584:9 |
| 617:15,17 | 828:11 829:3 | 482:19 483:24 | 585:15 587:5 |
| 624:17 631:12 | 831:13 832:1 | 484:8,14 485:5 | 588:1,17 |
| 632:5,7,11 | 832:13 834:3 | 488:6 497:16 | 600:14 602:3 |
| **skim**   733:5 | 834:10,24 | 505:18 506:19 | 603:7 604:3 |
| | 835:7,24 | 507:21 510:2,9 | 606:9,9 607:22 |

**[social - specialist]**                                      Page 76

| | | | |
|---|---|---|---|
| 608:7,16 609:5 | 738:24 739:17 | **song** 650:22 | **south** 669:3,6 |
| 609:13,21 | 740:2 746:7,9 | **soon** 760:14 | 678:2 |
| 610:5,14 | 767:11 774:8 | **sorry** 414:7 | **southeast** |
| 611:14 612:22 | 776:6 778:13 | 429:7 450:3 | 403:11 |
| 613:5,7,9 | 778:22 779:13 | 566:7 579:20 | **space** 544:10 |
| 614:8,16 | 779:21 780:7 | 668:9 747:11 | 579:21 848:6 |
| 617:21,24 | 780:16,21,22 | 825:3 | **spalding** |
| 618:23 624:7 | 781:16 783:8 | **sort** 628:13 | 403:10 406:16 |
| 625:2,18 | 785:2 786:13 | 733:4 834:2 | **speak** 411:19 |
| 626:10,17 | 787:17 788:3 | **sought** 678:6 | 411:22 434:18 |
| 627:15,22,24 | 789:4,17 790:5 | 680:23 681:4 | 444:5 496:21 |
| 628:1,2,14 | 790:10,17 | 681:13 682:19 | 522:8,16 526:4 |
| 629:15 630:18 | 791:3,13,20 | 684:5 685:11 | 535:4 550:13 |
| 630:22 631:4,6 | 792:13,23 | **sounds** 548:7 | 646:19,23 |
| 631:13,16,19 | 793:13,19,24 | 726:24 | 652:6 653:14 |
| 632:13,23 | 794:10,16 | **source** 448:24 | 664:11 667:5 |
| 636:23 637:11 | 795:1,11,21 | 449:1,9 461:9 | 668:5,13 675:6 |
| 637:13 639:17 | 796:7,15,18 | 461:13 462:12 | 678:20 696:3 |
| 656:14 659:3 | 797:3,23 | 463:13,18 | 699:23 746:15 |
| 659:10,23 | 798:12,24 | 465:1,20 | 752:13 754:20 |
| 660:6,11,20 | 799:16 800:7 | 466:14 467:7 | 777:9 778:18 |
| 661:11 662:6 | 801:14 802:8 | 493:2 534:2 | 781:10 818:24 |
| 662:12,18 | 802:19,22 | 650:7 679:17 | **speaking** |
| 663:5 665:18 | 803:11,24 | 685:16 726:1 | 441:13 442:21 |
| 675:22 684:11 | 804:8 805:11 | 732:16 734:10 | 499:5 510:21 |
| 693:2 694:19 | 808:5,9 809:16 | 734:12,15 | 534:19 584:22 |
| 702:1 703:9,18 | 815:13 823:13 | 735:12,18,24 | 639:3 682:21 |
| 708:15 711:17 | 823:18 842:17 | 759:12 814:15 | 691:4 722:3 |
| 712:1,6,17 | 842:23 843:18 | **sources** 430:21 | 738:15 747:11 |
| 714:1 715:12 | **somebody** | 441:11 443:13 | 752:8 779:10 |
| 718:2,8,15 | 451:15 539:20 | 446:14 448:18 | 784:8 822:4 |
| 721:24 728:23 | 686:8 | 483:12 533:21 | **speaks** 805:1 |
| 730:7,10 734:5 | **someone's** | 535:18 643:21 | **specialist** 568:8 |
| 736:24 737:5 | 711:17 | 755:7 814:9 | 568:13,17 |

**[specialist - specifically]**                              Page 77

| | | | |
|---|---|---|---|
| 569:1 594:10 | 515:1,22 516:8 | 642:1 662:23 | 808:22 809:2,3 |
| 594:15 595:10 | 516:8,13 517:3 | 664:12 671:8 | 819:1,23 |
| 596:1,7 603:21 | 517:4 518:6 | 675:7 685:13 | 824:14,24 |
| 795:5 | 520:13 521:11 | 685:14,14 | 825:9,15,23 |
| **specialists** | 527:12,19,22 | 710:23 711:5 | 826:5,12,22 |
| 603:20 | 528:13 531:2,8 | 717:12 724:3 | 827:8,14 828:6 |
| **specialize** | 532:20 535:11 | 727:18,22 | 828:13,23 |
| 795:9 | 537:18,20 | 733:2 740:8,16 | 829:5,11 830:8 |
| **specific**   411:13 | 540:6 541:23 | 746:12,16 | 830:14,21 |
| 414:17 415:1 | 542:3 543:3,13 | 747:10 749:13 | 831:17 832:3 |
| 417:15,21 | 545:20 546:14 | 750:20 751:4 | 832:15,22 |
| 425:16 428:16 | 546:21 547:8 | 752:8,14,23 | 833:4,13,21 |
| 429:11 432:13 | 548:3 549:11 | 753:23 755:12 | 834:5,12,19 |
| 434:3 437:15 | 549:18 550:4 | 758:18 769:11 | 835:3,9 837:8 |
| 439:22 443:5 | 550:19 552:14 | 770:4,22 | 837:13 838:5 |
| 443:18 449:9 | 552:17,17,22 | 771:10,14 | 838:22 839:17 |
| 451:8 458:1,22 | 553:2 554:20 | 772:12 773:18 | 840:5,14 841:7 |
| 459:16 460:1 | 555:6,22 | 774:10 776:12 | 841:14,23 |
| 460:16 461:9 | 556:19 557:24 | 776:18,21 | 842:11,20 |
| 462:6,15 | 558:24 560:17 | 777:9,14,17,23 | 843:21 844:10 |
| 463:19 464:12 | 570:8 572:7,12 | 778:6,12,19 | 845:2,15 |
| 467:3 468:1 | 572:17 574:8 | 779:19 780:11 | **specifically** |
| 469:22 471:12 | 574:14,22 | 783:12,15 | 415:10,13 |
| 474:7 478:18 | 575:5 578:8,13 | 784:20 787:20 | 418:15 420:11 |
| 480:23 481:23 | 579:8,10 | 789:7,16 790:8 | 421:6 442:15 |
| 484:20 489:13 | 589:10 591:23 | 790:24 791:7 | 443:8 456:24 |
| 491:16 495:23 | 603:1,6 604:2 | 791:24 792:18 | 478:18,21 |
| 496:14 500:9 | 605:24 607:13 | 793:13 794:3 | 489:11 490:7 |
| 500:17 501:4 | 608:22 609:11 | 794:19 795:17 | 498:8 506:15 |
| 501:12 502:1,2 | 611:23 615:12 | 796:16 797:14 | 507:6 518:2 |
| 502:14 503:17 | 618:21 627:9 | 798:15 799:19 | 524:9 534:16 |
| 503:23 505:5 | 630:21 631:4 | 800:10 801:6 | 547:12 549:16 |
| 506:7,22 | 636:21,23 | 801:16 802:12 | 550:7 562:17 |
| 507:15,20 | 637:11 641:24 | 805:17 808:3 | 566:12 568:11 |

**[specifically - statements]**                                    Page 78

594:6 646:19
668:2 719:17
723:5 751:8
753:11 780:4
781:10 784:17
793:18 794:9
796:6,14
797:11 810:5
811:17 837:15
841:9
**specificity**
477:5 792:10
834:7
**specifics**
511:19 550:13
770:10,13
**speech**  500:23
501:19 504:24
506:2,18
507:10 523:13
622:4 758:17
800:5
**speeches**  515:8
709:16
**spend**  483:20
696:1 818:16
837:10 838:19
839:13 841:4
**spending**
435:24 619:6
**spent**  414:12
414:23 415:5
415:18 416:19
417:4,13,16,19

418:22 419:12
420:3 483:21
826:3 837:19
**spillover**
585:16
**spoke**  421:7
443:10 449:2
463:15 469:9
494:6 496:1
497:12 514:19
518:3 553:6
558:3 570:7
577:20 679:2
680:5 685:10
785:3 786:7
798:23 804:13
819:8
**spoken**  439:20
491:11 505:16
526:16 770:19
786:5 796:6,14
831:22
**sponsors**
645:14
**spotlight**  834:9
834:13
**squarely**
502:16
**st**  405:5
**staff**  567:20
570:5 591:11
594:9 598:10
599:20 611:17
614:15 661:4

667:13,20
704:19,22
**staffed**  606:12
**staffing**  560:10
563:1 564:7
565:14 567:18
589:18,21
598:19 599:3,5
599:24 600:6
600:17,22
601:2 605:24
607:6,13 621:7
621:19 623:4
626:8 655:10
655:14,23
656:1,18
658:12 671:19
686:4 688:19
696:12,19,19
697:1,23 698:7
698:16,18
700:15,15,17
700:17,24
809:11 810:1
**standard**
472:21 533:20
563:19,22
574:11 576:24
577:11,17
581:1 759:21
**standards**
653:20 654:5
656:5

**stands**  559:22
**start**  449:11
573:15 605:16
617:8,9,13
820:1
**started**  611:22
611:23 690:17
720:12 784:8
806:6 844:22
**starts**  632:17
**state**  535:8
538:4 559:9
560:1 645:10
647:9 650:13
650:17,22
668:22 669:17
669:22 670:11
670:12 677:19
678:2,7 679:16
680:20,24
681:2,21 682:7
683:2,12,23
772:17 848:5
**stated**  413:2
441:3 559:9
568:21 709:19
780:14
**statement**
574:8,22 781:9
783:21,24
799:24 800:18
**statements**
439:23 502:17
574:13 575:5

**[statements - student's]**                                    Page 79

| | | | |
|---|---|---|---|
| 577:14 578:1 | **stipulations** | 592:18 594:7 | **struggle**   819:4 |
| 637:2 804:20 | 408:15 | 594:13,22 | **struggling** |
| **states**   402:1 | **stop**   514:12 | 595:3,8,14 | 665:9 |
| 409:21 487:24 | 515:15,17 | 597:15,23 | **student**   407:16 |
| 527:15 536:15 | 701:4 | 598:14 599:4 | 407:20 444:8 |
| 538:5,12 | **stopped**   528:20 | 600:2 603:24 | 468:14 484:22 |
| 545:12 641:11 | **story**   828:4 | 619:17 644:2 | 493:4 567:9 |
| 641:17,21 | 834:24 835:1 | 649:16 654:10 | 587:7 588:3,20 |
| 642:2 644:8 | **straight**   705:24 | 685:19 686:12 | 591:15 599:23 |
| 645:16 646:4,8 | 708:8 | 687:2 694:4 | 600:24 602:23 |
| 646:15,21 | **straightforward** | 695:10 699:7 | 607:22 610:1 |
| 649:20 651:4 | 707:18 | 701:5 714:23 | 614:4 619:4 |
| 682:24 | **strain**   659:14 | 717:23 720:22 | 620:17,22 |
| **statewide**   681:3 | **strapped** | 722:22 766:6 | 621:1 626:15 |
| 681:9,15,18,21 | 482:12 | 766:12,17 | 628:16 630:17 |
| 682:9 | **strategic** | 805:5,9 806:4 | 631:5 637:24 |
| **stating**   491:15 | 447:11 453:19 | 806:11,18 | 638:1 642:11 |
| 518:1 846:1 | 456:7 470:24 | 807:6 810:11 | 642:20 648:17 |
| **statistics** | 471:6 472:22 | 811:4 824:3 | 649:1,7,18 |
| 643:11 650:9 | 480:21 508:21 | **streak**   829:3,9 | 650:16 651:5 |
| **stay**   829:23 | 509:14 510:5 | 830:2,6 | 697:13 698:4 |
| **steep**   472:3 | 510:24 513:24 | **streaks**   832:20 | 699:6 706:12 |
| 473:1 478:4 | 517:1 519:18 | 833:18 | 712:14 713:22 |
| 581:18 | 521:2 522:18 | **street**   404:12 | 714:20 718:12 |
| **steinsbekk** | 525:24 541:19 | 405:5 406:5 | 778:13,15,24 |
| 749:10,20 | 543:9,22 | **stress**   632:2,5 | 779:15,24 |
| 750:18 | 544:17 545:3 | **stretched** | 780:9 789:24 |
| **stenographic** | 571:6 579:15 | 656:12 | 790:2,6,15 |
| 410:3 | 580:8 583:11 | **strong**   551:14 | 791:11,14 |
| **steps**   679:15 | 584:7 586:3 | 553:11 | 793:1,20 |
| **stigma**   635:14 | 587:4,23 589:5 | **structure** | 794:12 808:15 |
| 635:17,21 | 589:10,17,22 | 482:24 529:6 | 810:8 819:12 |
| **stipulated** | 590:2,9,15,23 | 704:7 | **student's**   630:4 |
| 409:2 | 591:5,8,20 | | 712:5 |

**[students - students]**

| | | | |
|---|---|---|---|
| **students** | 459:5 460:6,24 | 554:2,10 | 653:22 654:14 |
| 412:11 413:10 | 461:16,23 | 555:19 556:13 | 659:23 660:11 |
| 414:1,11,23 | 462:16,21 | 557:9 569:24 | 661:11 662:12 |
| 415:4,18 416:1 | 463:22 464:3 | 570:15 579:16 | 665:10,18 |
| 416:12,19 | 464:18 465:11 | 580:9 581:20 | 672:18 674:13 |
| 417:4,13,19 | 466:2,8,20 | 584:8,23 585:5 | 675:16 676:4 |
| 418:5,5,13,22 | 472:15 474:1,9 | 585:9,14 586:6 | 676:19 688:23 |
| 418:22 419:12 | 475:2,15 | 586:18 595:16 | 697:21 700:1 |
| 419:12,22 | 476:18 477:19 | 596:1,8,14,19 | 702:9 703:5,16 |
| 420:3 421:11 | 479:5 480:10 | 597:1,3,11,17 | 704:10 705:7 |
| 421:24 422:12 | 484:8 485:2,14 | 597:20 598:7 | 705:17 706:2 |
| 422:23 423:15 | 486:16,20 | 599:14 600:19 | 706:14 707:21 |
| 424:3,4,4,5,16 | 495:20 501:2 | 601:1,5 609:6 | 709:9,22 710:7 |
| 425:7,17,22 | 501:22 505:3 | 611:15,20,22 | 710:17 711:12 |
| 426:6,11,18,23 | 506:5,20 508:5 | 613:17 614:17 | 715:3,16 |
| 427:6,15,21 | 508:20 509:3 | 615:24 616:6 | 716:10,19 |
| 428:5,17 430:7 | 509:12,21 | 616:12,21 | 717:3,10,24 |
| 431:1,15,23 | 510:4,10 | 617:20 618:9,9 | 719:17 726:7 |
| 432:8,17 433:4 | 511:12 512:13 | 618:22 619:3,8 | 774:7 776:6 |
| 433:13 434:8 | 512:21 513:16 | 619:10,18 | 778:21 779:13 |
| 435:6,18,24 | 514:14,22 | 620:5,10,12,18 | 779:20 780:1,7 |
| 436:11 437:7 | 515:11,13,16 | 620:24 621:21 | 780:20,22 |
| 437:22 438:19 | 515:19 516:23 | 622:10,11,18 | 781:3,16,24 |
| 439:13 440:4 | 517:17 518:7 | 623:2,12,17 | 782:7 783:7 |
| 440:19 442:3 | 518:19 519:2,6 | 624:3,7,14,24 | 786:12 787:16 |
| 443:14 446:1 | 519:7 522:12 | 625:15,16 | 788:5 789:4,5 |
| 448:8 449:17 | 530:22 531:12 | 626:6 627:12 | 791:3,4,19,21 |
| 450:6,10 451:3 | 532:18 533:16 | 627:23 628:5,9 | 792:12 793:24 |
| 451:8,21 | 536:4 537:6 | 629:9,13 | 794:16 795:21 |
| 452:23 453:11 | 539:1,9 540:16 | 632:17,23 | 796:17 797:3 |
| 454:8 455:4,11 | 541:20 542:13 | 637:4,7,16,22 | 798:11 799:15 |
| 455:20 456:4 | 543:10,24 | 638:9 640:8 | 800:7 805:10 |
| 456:14 458:6 | 544:19 551:16 | 641:1,14 | 809:14 810:4 |
| 458:12,23 | 552:23 553:21 | 644:11 645:5 | 810:19 813:4 |

**[students - supports]**                                      Page 81

| | | | |
|---|---|---|---|
| 817:3 835:22 | **submitted** | 594:3 636:22 | **support**   408:2 |
| 843:5,19 844:5 | 412:1 472:12 | 639:11,19 | 444:8 484:23 |
| **studies**   730:22 | 474:23 476:15 | 657:22 658:7 | 493:4 551:15 |
| 731:16 732:18 | 477:16 479:2 | 660:4 665:5 | 568:4 569:6,10 |
| 750:1,9,21 | 480:7 771:6 | 689:3,22 690:9 | 571:8 603:19 |
| 752:8,20 | 773:9 | 690:18 692:24 | 604:20 605:18 |
| 753:10,20 | **submitting** | 702:11 703:7 | 609:6 610:1 |
| 756:8 757:23 | 771:19 | **suggested** | 613:9,16 |
| 758:15 775:3,5 | **subscribed** | 492:10 525:22 | 614:11 616:16 |
| 776:1 784:14 | 850:10 | 663:10,16 | 617:2 619:12 |
| 784:14 803:22 | **substance** | **suggesting** | 631:22 653:22 |
| 804:6 | 534:7 535:1,23 | 501:16 816:19 | 661:5 675:20 |
| **study**   433:22 | 617:13 850:6 | **suggestion** | 678:12 679:14 |
| 483:22 555:19 | **substances** | 497:9 694:5 | 679:15 681:13 |
| 731:15,16 | 611:24 | **suggests**   674:3 | 682:14,19,21 |
| 732:23 733:5 | **substantial** | **suicidal**   456:16 | 682:23 685:11 |
| 746:5,16 | 475:18 581:8 | 458:14,24 | 703:2 716:16 |
| 749:10,16 | 620:17 | 459:1,6 476:19 | 717:20 719:3 |
| 750:12 751:18 | **suburban** | **suite**   403:12 | 740:1 782:9 |
| 752:9,14 | 448:11,16,16 | 406:5 | 783:6 803:16 |
| 753:16,17 | 448:23 | **summarize** | 810:19 843:1 |
| 757:17 | **succeeded** | 470:12 | **supported** |
| **studying** | 528:24 | **summit**   542:8 | 539:23 |
| 793:19 | **successful** | 542:21 543:8 | **supporting** |
| **subject**   726:15 | 478:11 479:14 | 544:5,9 | 551:13 552:24 |
| 736:3 848:10 | 480:4 605:1 | **summits** | 577:15 |
| **subjective** | **successfully** | 543:17,22 | **supports**   457:4 |
| 671:24 | 477:9 | **sun**   570:20 | 468:15,17 |
| **submissions** | **suffer**   619:10 | **superintendent** | 586:19 592:6 |
| 762:23 | 619:11 657:16 | 767:4 | 604:15 605:3 |
| **submit**   771:21 | **suffering** | **supervision** | 605:14 638:6 |
| 771:22 777:22 | 620:19 719:18 | 768:11 847:21 | 639:1 656:4 |
| 778:3,6 | **suggest**   469:21 | **supplied** | 660:19 680:1 |
| | 486:23 525:17 | 443:20 458:2 | 680:15 681:6,8 |

CONFIDENTIAL

**[suppose - talked]**                                                    Page 82

**suppose**   539:13
  756:15
**supposed**   485:9
**sure**   413:7
  473:11 489:12
  493:15 504:11
  510:14 517:24
  518:1 521:7,22
  525:10 559:22
  580:2 582:10
  583:5 587:12
  587:16 603:15
  614:3 619:13
  633:13 635:3
  635:18 644:19
  666:15 682:2
  690:5,14 691:5
  705:12 713:14
  713:17 727:21
  739:6 743:1
  747:16 752:15
  769:17 776:16
  778:1 805:15
  806:8 814:22
  829:18 845:7
**surprise**   567:12
  571:12 572:16
  607:5 647:24
  661:1 663:1
  728:22
**surprised**
  602:4 603:10
  606:6

**surveillance**
  466:11
**survey**   667:13
  667:16
**surveys**   667:20
**suspected**
  822:11
**sustain**   590:19
**sustained**   472:4
  473:1,9,22
  478:5 581:18
**sw**   404:5
**swath**   620:10
**swear**   410:5
**sweeping**
  518:23 773:1
**sworn**   410:8
  847:5 850:10
**system**   428:15
  483:2 485:10
  512:2 559:24
  560:5,10,12
  561:17 563:16
  563:24 570:24
  590:19 591:2
  616:16 637:19
  653:12 656:23
  717:20 719:2
  815:7
**systematic**
  684:17
**systems**   420:14
  420:17 432:24
  433:5 434:13

  436:15 437:14
  438:6,9 439:5
  440:8 441:3
  442:13 444:17
  447:8 463:5
  466:5 469:6
  483:11 536:14
  536:17 538:12
  547:17 548:18
  556:3,5 557:16
  558:16 564:8
  590:16,22
  603:8 604:14
  604:20 605:1
  631:21 637:13
  705:3 716:16
  719:6 720:22
  721:6,10,11
  723:12 726:4
  785:1 789:14
  793:5 815:9
  817:1,8,12,20
  818:4 820:7,10
  820:14 821:4
  821:10,14,22
  822:8 823:4,23

**t**

**t**   403:4 407:9
  849:1
**tab**   564:10
  566:22 642:5
  648:11

**tabs**   531:6
  567:7 832:13
**tailored**   627:7
**take**   493:14
  499:15 504:9
  511:5 514:2
  525:13 573:24
  574:12 582:8
  600:10 645:20
  658:23 666:14
  688:20 689:18
  694:23 752:24
  765:16 807:3
**taken**   402:14
  499:22 504:17
  582:18 666:21
  679:14 765:22
  807:15
**takes**   830:6
**talk**   513:22
  586:24 603:24
  625:17 630:1
  675:18 693:8
  716:24 745:4
  747:22 748:20
  750:5 777:2
  778:12 798:11
  799:15 800:6
**talked**   468:21
  544:20 572:20
  574:15 580:15
  659:1 672:16
  692:21 712:11
  717:6 720:13

**[talked - ten]**                                            Page 83

751:9 797:3,22
813:15 819:12
**talking**  425:10
430:3 445:6,11
474:19 483:4
491:9 499:9
505:21 527:2
553:20 580:3
583:17 632:16
639:15,17
678:16 685:4
690:10,12,15
691:2 696:5
697:9,10,14,20
710:22 713:2,3
738:19 769:6
769:19 779:12
780:15 784:1
787:18 790:3
795:18 815:15
821:4
**talks**  588:15
717:13 795:21
**target**  536:3
**targeted**  537:5
538:24 539:8
539:16,17
**targeting**  540:3
585:12
**tasked**  781:13
**taught**  768:1,4
768:7,12,14,21
**teacher**  619:6
648:7

**teachers**  601:4
635:23
**team**  561:8
565:18 608:14
**tease**  535:10
790:20
**tech**  519:22
814:10 815:5
**technical**
539:24 682:14
682:22
**technician**
406:23 409:10
499:17,24
504:12,19
582:13,20
666:16,23
765:17,24
807:10,17
845:24
**technologies**
404:16 586:15
**technologist**
815:18 816:20
**technology**
568:7 594:9
814:1,5,8
815:6,17,20,22
816:12,14,22
818:4
**teen**  546:11
547:5,24 549:8
550:1 552:11
555:4

**teenager**  632:1
632:7,13,16
633:2,15,21
634:2,7,11,15
634:20 635:9
635:13
**teenagers**
632:4,10 633:4
633:17,23
634:4,18
635:12,16,24
636:16
**teens**  554:24
**tell**  412:10
413:9,15,23
414:10,17,21
415:3,9,11,16
415:23 416:10
416:18 417:3
417:12,18
418:2,19 419:9
419:21 421:9
421:15,22
422:10,21
423:13 424:1
424:10,15,20
425:21 426:10
427:4 429:10
430:6,23
431:13,20
432:6,15
433:10 434:6
435:4,12 436:9
436:18 437:5

437:20 438:17
439:11 440:17
442:1 449:15
449:23 450:9
451:19 452:22
453:8,23 454:5
454:12,17
455:1,18 456:3
456:13 457:12
457:17 458:10
460:4,22
461:21 462:19
464:1,16 465:9
466:18 487:19
488:1 523:2
525:15 543:15
548:15 554:4
577:22 601:18
603:17 665:1
678:8 680:2
722:17 725:1
797:10 835:17
835:21 845:10
**telling**  451:2
523:4 699:22
**telzer**  740:21
741:4,12,24
742:10 744:13
744:24 745:3,9
745:14
**temporal**  775:7
775:21
**ten**  499:15
768:16,22

**[ten - think]**                                                    Page 84

| | | | |
|---|---|---|---|
| 803:12 | **testimony** | 595:19 635:12 | 561:18 566:9 |
| **tens**  602:7 | 407:4 443:24 | **things**  430:3 | 569:21 575:3 |
| **tenth**  404:12 | 445:21 459:22 | 433:23 438:7 | 576:22 578:20 |
| **term**  425:6,11 | 469:14 490:23 | 446:9 451:14 | 579:21 584:4 |
| 471:6 482:7 | 491:6 493:8,19 | 462:17 515:20 | 585:24 586:15 |
| 483:7 494:13 | 496:6 497:19 | 526:21 556:3 | 588:7 602:14 |
| 494:20 495:5 | 497:24 559:1 | 570:10 573:11 | 614:13 618:20 |
| 584:5 600:12 | 575:7,18 579:7 | 573:12 586:8 | 619:22 623:10 |
| 609:15 610:15 | 585:21 606:23 | 586:21 592:1 | 628:22 629:2 |
| 613:12 632:21 | 628:19 656:8 | 608:23 609:3 | 630:14,16 |
| 633:10 636:1 | 679:7 685:4 | 624:15 627:19 | 632:3,9,15,21 |
| 638:3 676:14 | 696:15 723:5 | 662:17 687:19 | 632:24 633:4 |
| 699:2 716:6 | 759:8 785:24 | 713:12 718:24 | 633:17,23 |
| 719:20 730:6 | 786:4 823:19 | 744:4 756:12 | 634:4,17 |
| 730:10 731:15 | 824:10 847:7 | 758:1 774:23 | 635:11,16,22 |
| 736:24 764:18 | **testing**  476:5 | 813:15 818:17 | 635:23 636:19 |
| 788:24 808:4,7 | **texas**  406:6,12 | 828:15 | 636:21 637:7 |
| 814:21 | 406:14 | **think**  413:16,19 | 640:19 641:22 |
| **terminology** | **text**  808:16 | 416:15 432:12 | 644:3 648:5 |
| 495:7 518:8,11 | 809:15 810:21 | 432:23 433:5 | 650:24 653:9 |
| **terms**  440:10 | 811:10 813:5 | 468:6 469:20 | 653:16 659:4,8 |
| 444:20 497:2 | **thank**  437:2 | 474:2 480:17 | 659:11 661:18 |
| 519:5 521:2 | 567:6 760:17 | 488:20 492:8 | 665:4 670:22 |
| 559:7 579:11 | 807:8 845:23 | 492:11 496:12 | 671:5,16,22,24 |
| 598:17 636:19 | **theme**  724:7 | 499:12 501:17 | 672:13,15 |
| 647:10 719:20 | **theoretical** | 504:5 506:10 | 673:23 675:1,3 |
| 728:21 729:2 | 775:23 | 508:14 509:7 | 675:6 676:9 |
| 731:10 780:13 | **theoretically** | 513:3 518:22 | 686:15,24 |
| 786:3 809:9 | 775:9,23 | 519:1 522:19 | 688:13,14,16 |
| 815:5 823:5 | **therapist** | 525:21 526:1 | 688:17 691:11 |
| **test**  838:9 | 597:16 609:23 | 539:4,18 | 694:12 700:21 |
| **tested**  475:21 | **thin**  656:12 | 544:20 547:4 | 701:14 707:9 |
| **testified**  410:9 | **thing**  505:12 | 547:22 549:22 | 709:20 710:4 |
| 755:10 | 587:17 593:23 | 553:11 559:2 | 715:8 721:7,15 |

CONFIDENTIAL

**[think - titles]**                                                   Page 85

| | | | |
|---|---|---|---|
| 726:9 735:18 | 749:14 752:16 | **tiered**   604:14 | 620:23 622:5 |
| 735:20,23 | 794:6 806:22 | 604:20 616:15 | 645:20 652:23 |
| 736:6 737:6 | **thousands** | 631:21 637:19 | 652:24 653:4 |
| 746:22 752:4 | 602:7 | 716:15 717:19 | 659:2 666:16 |
| 754:17 755:5 | **three**   510:19 | 718:6 719:2 | 666:23 669:14 |
| 759:1,6,10,21 | 551:1 552:2,5 | **tiers**   717:8 | 690:16 701:9 |
| 761:8 764:18 | 552:9 555:2 | **tiktok**   403:15 | 701:15 707:15 |
| 768:10 783:17 | 651:4 775:20 | 403:15,16 | 717:15 720:14 |
| 783:23 786:22 | 782:24 783:5 | 406:20,21,21 | 720:16,17 |
| 789:24 791:9 | 840:2 | 808:11 | 725:12 740:10 |
| 792:20 793:14 | **threw**   494:20 | **time**   409:8,15 | 742:5 751:4 |
| 794:8 797:19 | 584:4 | 414:12,23 | 753:24 760:14 |
| 799:4 800:2,20 | **tied**   681:1 | 415:5,18 | 765:17,24 |
| 801:8 802:14 | **tier**   637:20 | 416:20 417:5 | 770:23 771:16 |
| 802:21,23 | 638:5,24 | 417:14,16,20 | 772:13 798:17 |
| 804:12 811:24 | 703:13,14,15 | 418:23 419:13 | 798:18 807:8 |
| 821:17,22 | 703:19 704:1 | 420:3 423:23 | 807:10,17 |
| 825:10 830:15 | 704:14 705:8,9 | 432:2 436:2 | 825:20 826:2,9 |
| 831:8 832:16 | 705:20 706:4,4 | 473:23 479:18 | 826:20 830:22 |
| 833:5,14 | 706:9 707:5,23 | 486:10 499:8 | 831:18 837:9 |
| 842:22 | 707:24 708:11 | 499:17,24 | 837:19 838:18 |
| **thinking** | 708:11 709:11 | 500:18 501:5 | 839:13 841:4 |
| 506:12 523:20 | 709:11 710:12 | 504:12,19 | 846:7 |
| 537:12 570:17 | 710:12,15,17 | 505:6 506:8,23 | **times**   623:9 |
| 600:21 631:1 | 710:24 711:7 | 507:16 511:6 | 709:15 712:12 |
| 687:9 822:20 | 711:23 712:19 | 515:23 522:23 | 834:24 846:1 |
| **third**   619:7 | 712:22,23 | 524:3 528:14 | **timing**   664:12 |
| **thirty**   848:16 | 714:3,9,14,17 | 531:3 532:21 | **title**   569:7 |
| **thorough**   525:9 | 714:22 715:4,4 | 533:3 546:24 | **titled**   642:20 |
| 743:2 | 715:9 716:11 | 547:1 548:8 | 737:4 738:24 |
| **thought**   442:10 | 716:13,18,20 | 560:23 573:10 | 746:6 |
| 452:2 454:16 | 717:14,14 | 573:11 576:7 | **titles**   551:6 |
| 563:14 564:5 | 718:17 808:18 | 582:9,13,20 | 592:12 593:8 |
| 694:8 733:7 | 808:18,20 | 592:3 619:7 | |

**[tobacco - tucson]**                                    Page 86

**tobacco**   471:21
  471:24 473:15
  478:6 479:15
  479:16 481:8
  611:22 639:5
  639:16 677:11
**today**   438:17
  457:18 463:22
  466:1 499:4
  502:1,4 503:1
  543:1 547:3
  554:8 577:7
  653:11 708:19
  713:7 719:18
  751:3 758:1
  770:6 776:10
  796:22 811:19
  816:7 839:4,10
  839:19 845:9
**today's**   409:14
**together**
  774:23
**took**   574:2
  654:13 659:12
**tool**   564:1,6
**top**   412:17
  465:6,24 651:3
  677:22 698:7
  716:17
**topaz**   402:16
  403:3
**topic**   493:17
  540:20 550:19
  552:17 736:9

736:17 772:20
  795:10
**topics**   542:17
  611:2 615:9
  636:5,17 736:9
**total**   654:14
  826:3,7
**totality**   496:17
  774:20 775:17
  782:23 783:18
  783:20 784:2
**totally**   482:4
  635:3 709:2
  783:15 802:15
**touched**   542:17
**towards**   488:12
  684:10
**track**   720:23
  721:13 722:11
  723:12 724:17
  725:11 726:5
  815:23,24
  819:10 820:16
  821:15
**tracking**   817:2
  819:18 820:14
**tracks**   725:2
**train**   704:19,22
**trained**   553:16
  598:9,11
**trainer's**
  548:12
**trainers**   545:16
  546:10 547:20

**training**   546:10
  590:3 611:16
  682:14,22
  705:2
**trainings**
  611:24 845:4
**transcript**
  847:18 848:17
  848:19
**transcription**
  850:4
**transcripts**
  800:16
**transition**
  551:13 553:1,3
**trauma**   551:10
  552:20,22
**treated**   450:11
  450:20,23
  451:4 452:8
  453:1,11 454:8
  464:20
**treatment**
  454:21 701:24
  702:4
**trial**   406:23
  409:8
**tricky**   559:3
**tried**   488:8
  680:7 743:8
**true**   440:16
  808:12 809:18
  811:11 812:2
  812:16 815:3,5

815:21 817:19
  838:3 839:15
  845:13 847:6
**truth**   809:15
**truthful**   762:6
  763:23 764:15
**truthfully**
  765:13
**try**   482:13
  493:16 507:19
  544:9 586:16
  605:8 656:13
  657:10 680:8
  685:11
**trying**   420:17
  467:15 483:22
  495:7 548:10
  566:21 570:13
  570:19 571:3
  606:22,24
  619:5,7 625:7
  644:23 661:3
  738:2 741:6
  743:14 745:6
  753:9,13 758:9
  758:23 768:10
  782:8,18
  786:10 795:15
  804:12 819:10
**tucson**   412:5
  412:11,21
  413:10,24
  414:11,17,22
  415:1,4,13,17

**[tucson - understand]**                                            Page 87

| | | u | |
|---|---|---|---|
| 421:11 423:15 | tying   577:13 | | 707:22,23 |
| 424:16,22 | 578:7 | **u.s.**   407:17 | 708:10,10 |
| 425:5,7,10 | **type**   473:22 | 534:5,10 | 709:9,11 |
| 426:11 427:5 | 475:10 477:11 | 535:22 536:2 | 712:19,22 |
| 428:5 430:7 | 479:11 515:5 | 642:13 643:10 | 714:2,3,22 |
| 432:8 434:8,13 | 553:23 581:15 | 650:8,13 | 810:11 821:6 |
| 434:22 435:6 | 581:24 639:9 | **uh**   801:4 | 847:20 |
| 435:14 436:11 | 672:8 674:20 | **ultimately** | **underlying** |
| 437:7 448:10 | 689:11 696:9 | 802:8 | 497:8 822:22 |
| 448:21 449:17 | **types**   472:1 | **umbrella** | **underreported** |
| 450:10 451:3 | 599:15 604:23 | 557:18 586:24 | 433:2 |
| 451:21 455:20 | 611:23 637:8 | 691:6 821:7 | **underresourced** |
| 456:14 460:6 | 652:20 775:2 | **unable**   822:10 | 721:16 |
| 460:24 461:23 | **typical**   434:17 | 822:21 | **understand** |
| 462:21 464:3 | 447:15 463:7 | **unavailable** | 410:22 416:4 |
| 464:18 465:11 | 474:6,18 475:9 | 678:15 | 433:24 441:16 |
| 466:20 488:24 | 478:7,13 480:1 | **unaware** | 444:12,13 |
| 670:9,16 673:5 | 498:20 512:16 | 681:13 | 451:16 469:4 |
| 673:17 674:18 | 514:20 570:22 | **unclear**   430:19 | 482:13 483:23 |
| 683:22 | 578:23 600:20 | 488:21 | 492:10 493:5 |
| **turn**   547:20 | 689:19 716:14 | **uncommon** | 496:19 510:1 |
| 582:3 610:16 | 717:17 836:11 | 666:7 | 511:14,23,24 |
| **turned**   810:11 | **typically** | **under**   410:23 | 512:18 513:10 |
| 810:24 | 420:14 426:4 | 451:12 551:24 | 514:21 532:24 |
| **turning**   549:4 | 451:14 454:20 | 552:3 557:18 | 563:23 570:13 |
| **tweaks**   563:7 | 455:9 456:21 | 568:9 570:20 | 571:3 576:17 |
| **twenty**   788:18 | 463:7 466:6 | 572:11 609:19 | 585:13 625:7 |
| **two**   436:1 | 481:2 515:4 | 610:12 619:17 | 629:12 654:2 |
| 483:6 529:12 | 570:5 571:16 | 621:5,16,16 | 686:18 689:14 |
| 545:15 604:15 | 573:11 706:13 | 622:10 623:3 | 691:6 698:15 |
| 644:8 645:15 | 706:24 716:18 | 626:7 637:15 | 699:23 700:1 |
| 646:9 670:7 | 716:20 771:18 | 654:13 655:1 | 726:5 731:9,24 |
| 765:9 776:13 | 772:18 | 703:24 706:2,4 | 738:2 745:6 |
| 782:12 | | | 753:10,13 |

**[understand - used]**                                        Page 88

| | | | |
|---|---|---|---|
| 758:9,11,23 | 813:23 | 514:24 | 699:2 711:17 |
| 762:12 763:10 | **unique**  795:3 | **use**  425:6 435:8 | 712:5 727:9,11 |
| 782:8,18 785:9 | 823:12,17 | 436:13 437:9 | 727:16,19 |
| 786:10 795:16 | **united**  402:1 | 439:15 440:22 | 728:9,16 746:8 |
| 801:13 802:7 | 409:21 536:15 | 442:6 471:11 | 751:4 757:22 |
| 805:15 823:12 | **universal** | 472:6,9 473:12 | 774:7 776:6 |
| 823:17 829:21 | 624:13 637:21 | 476:12 479:17 | 778:14,22 |
| 829:22 | 638:5,24 703:2 | 480:12 481:3 | 779:13,20 |
| **understanding** | 703:12 | 482:10 484:8 | 780:8,16,21,22 |
| 448:20 449:4 | **universally** | 485:23 486:13 | 781:16 783:8 |
| 449:13 492:12 | 639:9 | 486:24 487:12 | 786:12 787:17 |
| 508:15 509:10 | **universe** | 488:8 493:6,7 | 789:4 791:3,19 |
| 519:23 525:10 | 805:22 | 494:9 495:7 | 792:12 793:24 |
| 563:20 610:4 | **unnecessary** | 513:16 514:13 | 794:16 795:21 |
| 646:14 652:18 | 649:12 709:17 | 518:6,8 519:3 | 796:18 797:3 |
| 660:22 663:5 | **unprecedented** | 530:23 531:13 | 798:11 799:16 |
| 679:11 686:5 | 611:19 | 532:18 533:16 | 800:7 803:24 |
| 690:5 720:20 | **unspecified** | 539:9 540:17 | 804:8 808:4,7 |
| 721:10,19 | 429:1 430:15 | 542:14 546:11 | 811:8,13,14 |
| 723:9 744:20 | 430:17 | 547:5,24 549:8 | 831:13,24 |
| 756:3 763:7,15 | **unusual**  689:10 | 550:1 552:11 | 832:20 835:16 |
| 763:16 765:2 | **update**  572:6 | 553:7,14,14 | 835:24 839:21 |
| 770:15 814:14 | 572:11,16 | 555:4,19 | 844:3,16 |
| 829:13,19 | 769:1 | 556:13 557:9 | **used**  481:8 |
| **understood** | **updated**  531:20 | 561:15 564:2 | 500:18 533:21 |
| 569:24 702:13 | 531:21,22 | 576:6 579:16 | 561:24 565:6,7 |
| 806:8 812:7,11 | **updating**  572:4 | 580:9 581:21 | 575:13 616:1 |
| 816:5 | **ups**  751:5 | 584:8 585:15 | 616:13 618:10 |
| **undertake** | **urban**  448:10 | 609:14 610:15 | 619:18 621:9 |
| 491:22 492:16 | 448:15,16,21 | 632:21 633:10 | 621:21 622:15 |
| 591:7 649:5,15 | 448:23 | 635:24 636:20 | 623:5,12,17 |
| 684:16 685:21 | **urge**  511:11,17 | 638:3 659:23 | 624:3,7 633:12 |
| **unfortunately** | 512:12,24 | 660:11,17 | 676:14 716:6 |
| 571:1 606:19 | 513:4,14 514:2 | 661:11 662:12 | 726:17 727:19 |

CONFIDENTIAL

**[used - want]**                                                                    Page 89

727:22,24
728:21,22
729:11,17
730:7,10,19
731:10 732:3
734:1,2 735:20
736:24 750:12
751:18 755:24
759:13 774:21
783:19 784:6
786:1 825:20
828:3,10,21
830:11 833:2,6
833:7,7 848:20
**user** 825:13
834:23 835:7
835:19 841:11
841:16,19
**user's** 834:3
**users** 837:10
838:19 839:13
839:20 841:4
**uses** 569:19
**using** 425:11
515:15,17
536:4 537:6
539:1 540:16
541:21 542:13
543:11,24
544:19 554:24
611:22,23
616:24 617:9
665:18 722:2
728:10 730:1

730:12 731:1
743:9 747:13
764:19 802:19
803:11 805:11
808:13 837:8
837:10 838:19
839:14 841:4
**usually** 450:3,6
519:24 541:11
637:21 836:4
**utilize** 605:2
726:20

**v**

**vacation** 830:1
**valuable**
635:23
**vaping** 677:11
**variability**
646:3
**variable** 559:5
695:17
**variables** 559:6
**variation**
599:19
**varies** 836:20
**variety** 450:18
468:11 486:16
496:20 565:17
627:18
**various** 555:16
609:18 628:11
**vary** 598:11
599:6,11

733:22
**vast** 844:3,7
**vehicle** 563:15
**verifiable**
526:24
**veritext** 402:23
409:13
**vermont** 651:7
**version** 407:14
564:16
**versus** 813:6
**video** 409:10
409:16 499:17
499:24 504:12
504:19 582:13
582:20 666:16
666:23 696:24
699:13 765:17
765:24 807:10
807:17 828:4
845:24
**videographer**
406:23 409:12
**videotape**
402:13
**view** 758:5
772:3 828:4
**viewed** 835:1
**views** 736:3,10
**vince** 406:23
564:9,24
565:12 642:4
648:10 650:4
658:23

**virtually**
486:15 505:11
581:23 798:2
**visited** 830:18
**volume** 402:10
**voluntarily**
583:12,18
584:5
**vpns** 486:17

**w**

**w** 746:6
**waived** 409:5
**want** 428:12,12
428:19 429:10
429:13,22
430:13 459:15
461:10,10
465:21 470:12
470:20 474:3
481:14 489:15
495:24 504:3
505:15 507:23
510:12,14
516:6 517:24
518:1 521:4,4
521:6,22 523:5
523:22 524:10
525:8 544:23
546:19 547:20
548:9,20 549:1
553:8 566:9
583:16 587:16
598:15 617:9

**[want - witness]**                                                           Page 90

| | | | |
|---|---|---|---|
| 622:3 623:1 | **ways** 682:18 | **wish** 653:10 | 465:16 467:2 |
| 625:6 626:5 | 684:6 715:8 | 654:6 | 468:6 470:11 |
| 629:11,11,22 | **wc.com** 404:6,7 | **wished** 679:13 | 471:5 472:19 |
| 630:10 640:17 | **we've** 468:12 | **wishing** 678:12 | 475:7 478:2 |
| 650:22 690:2,4 | 468:20 484:1 | **witness** 408:5 | 479:10 480:17 |
| 690:14 691:5 | 485:21 486:14 | 410:5 412:16 | 482:4 484:12 |
| 705:24 708:18 | 532:12 533:2 | 412:24 413:15 | 485:19 487:16 |
| 713:14,17 | 536:12 537:13 | 414:7,16 | 489:6,24 491:4 |
| 721:8 723:9 | 537:21 538:7 | 416:24 417:9 | 492:5,23 494:1 |
| 746:15,23 | 651:23 658:24 | 418:10 419:3 | 494:11 496:11 |
| 761:18 777:12 | 720:13 795:18 | 419:16 420:10 | 497:7 499:16 |
| 778:1 782:13 | 811:17 | 421:4,15 422:5 | 500:10,19 |
| 792:8,9 797:19 | **website** 530:19 | 422:16 423:4 | 505:8 506:10 |
| 805:14 806:10 | 530:21 531:6 | 423:20 424:10 | 507:1,18 508:9 |
| 816:20 835:10 | 531:11,19,24 | 424:20 426:3 | 513:20 514:18 |
| **wanted** 429:20 | 532:1 | 426:15 427:12 | 516:1 519:16 |
| 570:21 747:15 | **week** 769:5,7 | 428:11 429:6 | 520:22 522:3 |
| 806:7 | 769:18 | 429:15 430:12 | 523:16 525:6 |
| **wants** 709:6 | **welcome** 413:4 | 431:5,19 | 528:16 529:5 |
| **warrant** 700:23 | **went** 651:22 | 432:12,21 | 531:5,17 532:8 |
| **warrants** | 654:19 702:5 | 433:17 434:12 | 532:23 536:8 |
| 697:22 709:21 | 733:21 774:24 | 435:11 436:23 | 537:10 539:4 |
| **washington** | 787:24 793:14 | 437:12 438:4 | 539:13 540:23 |
| 404:5,12 | 846:4,6 | 439:2,19 441:2 | 541:9,24 |
| **watched** 486:7 | **west** 406:11 | 442:10 444:1 | 542:20 543:14 |
| **way** 413:1 | **whiteley** 404:4 | 446:12 449:21 | 545:21 546:6 |
| 427:9 438:10 | **wide** 615:8 | 450:15 452:1 | 546:15 547:9 |
| 486:23 501:15 | **widely** 652:12 | 452:14 453:4 | 548:4 549:12 |
| 539:18 568:22 | **williams** 404:3 | 453:15 454:15 | 550:5 552:15 |
| 581:12 583:3 | 410:19 | 455:8 456:2,19 | 555:7,23 |
| 586:10 630:14 | **willing** 764:8 | 458:17 459:9 | 556:17,20 |
| 630:23 672:15 | 764:12 | 460:12 461:6 | 557:13 558:1 |
| 673:24 729:10 | **window** 720:14 | 462:5 463:3 | 559:2 565:10 |
| 731:6 819:9 | | 464:9,24 | 575:3 576:9 |

**[witness - worked]**                                                    Page 91

| | | | |
|---|---|---|---|
| 578:20 579:20 | 704:4 705:12 | 800:13,24 | **woefully** |
| 580:14 583:16 | 706:7 709:18 | 801:8,17,21 | 721:16 |
| 588:7 593:4 | 710:20 711:21 | 802:4,13 | **wondering** |
| 594:19 598:3 | 712:22 713:10 | 804:11 805:14 | 510:13 |
| 599:10 600:5 | 714:7 715:2 | 806:22 807:9 | **word** 559:3 |
| 604:11 606:5 | 716:1 718:5,20 | 809:1,21 | 735:20 763:1 |
| 612:14 615:3 | 721:4 722:15 | 810:15 812:19 | **words** 705:22 |
| 616:4 618:14 | 723:2,17 | 813:10 816:18 | 729:11 |
| 619:22 621:13 | 724:21 725:16 | 817:15 818:1 | **work** 444:2 |
| 621:24 622:8 | 729:14 730:15 | 818:20 819:22 | 505:17 508:2 |
| 623:10 624:11 | 731:20 733:10 | 820:5 821:3 | 508:24 509:17 |
| 625:23 626:13 | 734:8 735:17 | 822:15 823:2 | 510:6 534:24 |
| 627:2 628:20 | 737:17 738:11 | 823:22 825:1 | 535:9,12 592:2 |
| 629:19 634:24 | 739:5 741:19 | 825:10,16,24 | 605:5 609:21 |
| 638:13,21 | 742:21 743:21 | 826:6,13,23 | 610:1 613:8 |
| 644:16 645:21 | 745:17 746:13 | 827:9,15,23 | 614:23 615:6,8 |
| 646:18 649:11 | 748:10 749:14 | 828:7,14,24 | 641:19 643:1 |
| 649:23 650:20 | 752:4 754:2 | 829:6,12 830:9 | 647:8 654:1 |
| 651:11 652:5 | 756:15 758:19 | 830:15,24 | 656:12,22 |
| 653:8 655:13 | 760:18 762:2 | 831:6,20 832:5 | 661:21 681:2 |
| 658:24 660:2 | 762:18 763:20 | 832:16,23 | 689:11 720:9 |
| 660:15 661:18 | 764:12 765:8 | 833:5,14,22 | 729:5 732:1 |
| 662:15 665:23 | 766:22 771:1 | 834:6,13,20 | 737:13 740:23 |
| 670:22 671:16 | 771:18 772:14 | 835:4,10 836:3 | 746:5 768:18 |
| 672:13 673:11 | 773:19 774:12 | 836:23 837:14 | 772:9 813:18 |
| 673:23 674:24 | 779:7 781:20 | 838:6,23 839:9 | 844:24 845:6 |
| 676:8 677:2 | 782:17 783:16 | 839:18 840:4 | 845:12 |
| 679:21 682:2 | 785:23 786:22 | 840:15 841:8 | **worked** 448:2 |
| 684:23 687:6 | 787:21 789:9 | 841:15,24 | 449:9 570:3 |
| 688:12 691:1 | 791:9 792:2,20 | 842:12,21 | 604:13 669:5 |
| 691:23 693:11 | 793:11 794:5 | 843:12,22 | 669:22 670:3 |
| 694:11 695:14 | 794:21 796:4 | 844:12 845:3 | 670:10 686:17 |
| 697:5 698:11 | 797:15 798:20 | 845:16 847:5,7 | 695:7,20 822:3 |
| 700:21 702:21 | 799:8,21 | 848:1 | |

**[worker - yeates]**                                    Page 92

| | | | |
|---|---|---|---|
| **worker** 767:11 | 416:9,17 417:2 | 533:1 535:4 | 438:24 439:17 |
| **workers** 614:8 | 417:11,17 | 536:18 537:13 | 440:24 442:8 |
| **workforce** | 418:3,20 | 540:12,24 | 443:23 446:10 |
| 538:10 647:4 | 419:10 421:10 | 542:2 543:16 | 449:19 450:13 |
| **working** | 421:23 422:11 | 543:17 546:17 | 451:23 452:12 |
| 420:12 423:20 | 422:22 423:14 | 548:24 550:9 | 453:2,13 454:1 |
| 441:14 448:5 | 424:2,14 | 558:14 571:14 | 454:9,13 455:6 |
| 509:24 539:19 | 425:20 426:9 | 660:4 662:3 | 455:24 456:17 |
| 647:17 686:13 | 430:6,24 | 666:1,8,12 | 458:15 459:7 |
| 687:8 690:17 | 431:12 432:7 | 701:3 717:11 | 460:10 461:4 |
| 722:4 773:3,4 | 432:16 433:11 | 720:17 733:12 | 462:3 463:1 |
| 785:5,11 822:2 | 434:7 435:5 | 768:16,22 | 464:7,22 |
| 844:22 | 436:10,19 | 788:15,18 | 465:14 466:24 |
| **world** 554:1 | 437:6,21 | 789:1 802:20 | 467:21 468:3 |
| **worth** 535:16 | 438:17 439:10 | 803:9,12 | 470:9 471:3 |
| **woven** 535:15 | 440:17 442:2 | 820:15 826:19 | 472:17 475:5 |
| **write** 524:7 | 449:16 450:10 | **yeates** 403:4 | 476:22 477:24 |
| **writing** 835:14 | 451:4,20 | 412:14,22 | 479:8 480:15 |
| **written** 517:19 | 452:21 453:9 | 413:13 414:5 | 482:2 484:10 |
| 691:16 777:24 | 454:5 455:2,19 | 414:14 416:22 | 485:17 487:14 |
| **wrong** 585:23 | 456:14 458:11 | 417:7 418:8 | 489:4,22 |
| **x** | 460:5,23 | 419:1,14 420:8 | 490:20 491:2 |
| **x** 407:2,9 | 461:22 462:20 | 421:2,13 422:3 | 492:3,21 |
| **y** | 464:2,17 | 422:14 423:2 | 493:13,23 |
| **yeah** 578:8 | 465:10 466:19 | 423:18 424:8 | 494:8 496:9 |
| 626:4 632:24 | 473:16 483:6 | 424:18 426:1 | 497:5 500:8,16 |
| 635:20,20 | 560:18,19 | 426:13 427:10 | 501:3,23 502:8 |
| 645:21 650:24 | 580:16 581:10 | 428:9 429:4,7 | 502:12 503:1 |
| 820:1 | 581:22 640:21 | 430:10 431:3 | 503:16,22 |
| **year** 412:9 | 724:16 725:10 | 431:17 432:10 | 504:8 505:4 |
| 413:8,22 414:9 | 827:4 | 432:19 433:15 | 506:6,21 |
| 414:20 415:2 | **years** 448:4 | 434:10 435:9 | 507:14 508:7 |
| 415:15,22 | 449:10 483:22 | 436:20,24 | 513:18 514:16 |
| | 516:4 529:9 | 437:10 438:2 | 515:21 519:14 |

**[yeates - yelena]**                                                    Page 93

| | | | |
|---|---|---|---|
| 520:20 522:1 | 634:22 636:6 | 729:7,12 | 801:15,19 |
| 523:12 525:4 | 638:11,19 | 730:13 731:18 | 802:2,10 804:2 |
| 528:12 529:3 | 644:14 645:18 | 733:8 734:6 | 804:9 805:12 |
| 531:1,15 532:6 | 646:16 649:9 | 735:15 737:10 | 806:20 808:23 |
| 532:19 536:6 | 649:21 650:18 | 737:15 738:9 | 809:19 810:13 |
| 537:8 539:2,11 | 651:9 652:3 | 739:3 740:7 | 812:17 813:8 |
| 540:21 541:7 | 653:6 655:5,11 | 741:17 742:14 | 816:16 817:13 |
| 541:22 542:18 | 658:20 659:24 | 742:19 743:19 | 817:23 818:18 |
| 543:12 545:19 | 660:13 661:12 | 744:16 745:15 | 819:20 820:3 |
| 546:4,13 547:7 | 661:16 662:13 | 746:11 748:2,6 | 820:18 821:1 |
| 548:2 549:10 | 665:21 666:15 | 749:11 750:19 | 822:13,24 |
| 550:3 552:13 | 670:20 671:14 | 751:13,22 | 823:20 824:23 |
| 555:5,21 | 672:11 673:9 | 752:2,22 | 825:8,14,22 |
| 556:16,18 | 673:21 674:22 | 753:21 756:13 | 826:4,11,21 |
| 557:11,23 | 676:6,24 | 758:6,16 | 827:7,13,21 |
| 558:23 565:8 | 679:19 681:24 | 760:12,17 | 828:5,12,22 |
| 575:1 576:5 | 684:21 687:4 | 761:24 762:16 | 829:4,10 830:7 |
| 578:15,18 | 688:10 690:23 | 763:17 764:10 | 830:13,20 |
| 579:18 580:12 | 691:21 693:6 | 765:6 766:20 | 831:4,16 832:2 |
| 582:7,11 | 694:9 695:12 | 769:8 770:3,21 | 832:14,21 |
| 583:14 585:20 | 697:3 698:9 | 771:9,13 | 833:3,12,20 |
| 588:5 592:21 | 699:9,16 | 772:10 773:17 | 834:4,11,18 |
| 593:2 594:17 | 700:19 702:19 | 774:9 776:8,22 | 835:2,8 836:1 |
| 598:1 599:8 | 704:2 705:10 | 779:5 781:18 | 836:21 837:12 |
| 600:3 604:9 | 706:5 708:3,6 | 782:15 783:11 | 838:4,21 839:7 |
| 606:3 607:17 | 708:20 709:13 | 785:21 786:20 | 839:16 840:1 |
| 612:12 615:1 | 710:18 711:19 | 787:19 789:6 | 840:13 841:6 |
| 616:2 618:12 | 712:20 713:8 | 791:5,22 | 841:13,22 |
| 619:20 621:11 | 714:5,24 | 792:16 793:9 | 842:10,19 |
| 621:23 622:6 | 715:19,23 | 794:2,18 796:2 | 843:10,20 |
| 623:7 624:9 | 718:3,18 721:2 | 797:5,12 | 844:9 845:1,14 |
| 625:3,21 | 722:13,24 | 798:14 799:6 | 845:22 |
| 626:11,24 | 723:15 724:19 | 799:18 800:9 | **yelena**   406:17 |
| 628:17 629:17 | 725:4,14 728:5 | 800:22 801:5 | |

CONFIDENTIAL

**[yesterday - zuckerberg]**                                        Page 94

| | |
|---|---|
| **yesterday** | 606:10 609:5 |
| 410:15 411:2,6 | 617:7 618:1 |
| 411:16 528:15 | 694:21 702:3 |
| 544:21 573:22 | 705:4 746:9 |
| 574:15 648:6 | 794:11 798:1 |
| 750:22 751:2,6 | 803:2 829:22 |
| 751:14 752:21 | 844:3 |
| 753:12 757:24 | **younger**  616:20 |
| 759:2,9 769:10 | **youth**  479:16 |
| 770:6,7 771:17 | 551:12 |
| 774:11 775:1 | **youtube**  404:8 |
| 776:11 783:13 | 410:20 508:5 |
| 789:8 791:8 | 509:3,20 |
| 792:1,19 | 511:12 512:13 |
| 793:15 794:4 | 513:1,15 |
| 794:20 797:14 | 515:12,13,15 |
| 798:16 799:20 | 520:6 702:5 |
| 800:11 801:20 | 808:11 846:4 |
| 825:6 844:11 | **z** |
| **yesterday's** | |
| 755:4 776:13 | **zachary**  405:16 |
| **ygr**  402:3 | **zbower**  405:18 |
| **ykotlarsky** | **zero**  806:10 |
| 406:19 | **zoom**  405:2 |
| **york**  404:21,21 | 406:2 |
| 406:18,18 | **zuckerberg** |
| **young**  436:17 | 404:17 |
| 468:9,17 | |
| 469:12,16 | |
| 473:15 474:17 | |
| 474:20 476:3 | |
| 527:21 528:5 | |
| 537:16 538:15 | |
| 556:7 581:6 | |