**Exhibit 109**

**SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**

**Rebuttal Expert Report of Brian G. Osborne**
**July 30, 2025**

## Table of Contents

**Introduction & Qualifications** ........................................................................................................ 3

**Executive Summary of Opinions** .................................................................................................. 3

**Methodology** ..................................................................................................................................... 3

**Part I: Unified Reply** ...................................................................................................................... 5

    Scope and Role of School Leadership .......................................................................................... 11

    Systemic Harm Argument ............................................................................................................. 12

    Responsibility and Agency ........................................................................................................... 14

**Part II: Additional Expert-specific replies of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth** ............ 17

    Response to the Report of Dr. Kelvin Adams ............................................................................... 17

    Response to the Report of Dr. Stephen J. Aguilar ....................................................................... 18

    Response to the Report of Dr. Randy Auerbach ........................................................................... 18

    Response to the Report of Dr. Ian Gotlib ..................................................................................... 19

    Response to the Report of Dr. Ethan Hutt .................................................................................... 20

    Response to the Report by Dr. Joshua Hyman .............................................................................. 22

    Response to the Report of Dr. Matthew Jennings ......................................................................... 23

    Response to the Report of Dr. Darius Lakdawalla ....................................................................... 24

    Response to the Report of Dr. Michele Moore ............................................................................. 25

    Response to the Report of Dr. Robert Nelson ............................................................................... 26

    Response to the Report of Dr. Jack Smith .................................................................................... 27

    Response to the Report of Dr. Matthew D. Springer ..................................................................... 28

    Response to the Report of Dr. Diana Wildermuth ........................................................................ 30

**Conclusion** ...................................................................................................................................... 31

**Reservation of Rights** .................................................................................................................... 32

**Certification** .................................................................................................................................... 33

## Introduction & Qualifications

1.      I am Brian G. Osborne, Ed.D., and I have been retained as an expert in MDL No. 3047 Local Governments and School Districts v Social Media Companies RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION, Case number 4:22-MD-3047 U.S. District Court for the Northern District of California.

2.      I submitted my opening report as a professional educational leader with years of experience leading, supporting, and advising public school educational leaders, not as a clinical psychologist, a statistician, or a technologist. My background includes years as a district superintendent and now as a professor of practice in educational leadership, where I prepare, mentor, and consult with practicing school leaders. My understanding of how social media affects schools stems directly from ongoing, firsthand engagements with current superintendents, principals, and other school system leaders, as well as from my own experience managing the day-to-day realities of public schooling in an increasingly digital environment.

## Executive Summary of Opinions

3.      This reply is in two parts.

4.      First, because there are numerous and voluminous defense expert rebuttal reports, Part I is a "unified reply" that addresses the themes that emerge across the multiple reports submitted by the thirteen defense experts (Drs. Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth).[1][2]

5.      Second, this unified reply is followed by a brief reply to each expert witness in Part II. While these experts bring their individual disciplinary perspectives to the conversation, ranging from psychology to education policy, many of their criticisms are premised on a misunderstanding of the purpose, scope, and disciplinary foundation of my expert report.

## Methodology

6.      As is appropriate in my field of expertise, my report reflects an experience-based synthesis of information collected from current school leaders and 33 years of expertise and experience. These insights are informed by well-documented patterns that have emerged across

---

[1] In their July 2025 Reports, Robert W. Platt, Ian Gotlib, and Randy Auerbach each assert that I opine in my May 16, 2025 Report that the scientific evidence supports the position that social media causes poor mental health outcomes among students in educational settings. Although it is my understanding that other experts have offered opinions in support of this position, neither my May 2025 report, nor this rebuttal report, address that issue.

[2] *See* Expert Reports of Dr. Kelvin Adams, Stephen J. Aguilar, Randy Auerbach, Ian Gotlib, Ethan Hutt, Joshua Hyman, Matthew Jennings, Darius Lakdawalla, Michele Moore, Robert Nelson, Jack Smith, Matthew D. Springer, and Diana Wildermuth.

school systems over time as compulsive personal social media use by students has become prevalent: increases in student anxiety, distraction, interpersonal conflict, and classroom disruption; increased pressure on school personnel to manage social media-related incidents; and the diversion of leadership time away from instruction and improvement toward reactive crisis management. Nothing in Defendants' experts reports changes my opinion that the design and influence of social media platforms are causing disruptions and resource expenditures in school districts.

7.      This opinion is consistent with my professional role as a professor of practice in educational leadership. Professors of practice are tasked with bridging the worlds of scholarship and lived institutional experience. My contribution is to articulate how platform-level design decisions—such as the lack of meaningful safeguards or warnings, the addictive attention-capture features embedded in apps, and the 24/7 connectivity they promote—as well as Defendants' targeting of students and schools create practical and leadership-level consequences in real-world school settings.

8.      The rebuttal authors suggest that my report is too anecdotal or lacks scientific rigor, as if I were offering a clinical or experimental study along with my opinions. But my expert testimony draws on a different kind of rigor: the kind developed through sustained professional immersion, critical reflection, and pattern recognition across institutions over time. In other words, my decades of experience in educational leadership and study are directly applicable to the phenomenon at issue. My expertise lies in interpreting how systems function, how leaders respond to new challenges, and what organizational capacities are being stretched or broken in the current educational environment challenged by social media platforms

9.      My report aims to illuminate a perspective that is often underrepresented in conversations about the impact of social media: the perspective of a broad and diverse array of individuals responsible for leading public schools. My intent was not to diagnose psychological harm but rather to describe how institutional leadership capacity and school district operations are being undermined by challenges emerging from social media platforms.

10.     Defendants' expert reports make many unfounded assertions. The unified reply that follows in Part I addresses several themes that recur across the thirteen expert reports. First, it rebuts unfounded claims that my opening report fails to establish a causal connection between the design of social media platforms and the disruptions observed in schools. Second, it addresses challenges to my characterization of school leadership's evolving role and responsibilities in the face of rising student use of social media platforms. Third, it further explains the systemic nature of the harms described, countering misguided efforts to portray these disruptions as isolated or anecdotal. Fourth, it engages with arguments about responsibility and agency, specifically, whether the burden of addressing social media's effects should fall solely on schools and families. Finally, it addresses district-specific counterfactuals that wrongly suggest my conclusions are undermined by local data or context, further providing a broader institutional perspective in response.

11.     Please see attached Appendix C for a full list of the materials I considered in preparing this rebuttal report.

**Part I: Unified Reply**

<u>Causation and Specificity</u>

12.    All thirteen Defense experts cited above wrongly argue that my opening report fails to demonstrate a causal relationship between the design features of social media platforms and the specific harms experienced by students, school leaders, and school systems.[3]

13.    To be clear, my report does not aim to establish causation through experimental or statistical means. I am not a clinical psychologist or a data scientist. I do not present experimental findings, nor do I offer statistical modeling. Instead, I write from the perspective of an educational leader and professor of practice with decades of experience and accumulated knowledge from studying and observing the daily life of schools and school districts. In my current role, I work closely with superintendents, principals, and district leadership teams across various contexts. What my report seeks to capture is how the presence and influence of student personal social media use is reshaping the responsibilities and constraints of school leadership, causing already budget-constrained school districts to divert and devote substantial resources to addressing the harms caused by social media.

14.    My professional methodology is grounded in 33 years of sustained professional attention to public education: 27 years of working in public schools (nine as a teacher, six in district leadership roles and twelve as a superintendent in two districts) and six years as a professor of practice and consultant.  Overall, I have substantial experience working directly with school and district leaders to navigate real-world educational challenges. Whether in my role as a university professor, director of a regional study council, executive coach, or consultant to superintendents and leadership teams, my core practice has been to support leaders in understanding their environments, clarifying problems, and taking informed action in real time.

15.    This kind of leadership advising necessarily depends on a methodology that is both rigorous and context sensitive. I use a structured approach that draws from data when available—such as survey feedback, district documents, or observed patterns across schools—but also relies on systematic inquiry into the lived experiences of educational leaders. This includes listening to how superintendents, principals, and teacher-leaders describe the emerging pressures they face, what is occupying their attention, where they are forced to shift resources, and how their priorities are shaped or disrupted over time.

16.    This approach reflects a widely accepted and practiced methodology in the field of educational leadership and executive coaching. This field interprets patterns of leadership behavior, analyzes the specific scenarios of cases as they arise, and extracts lessons from real-time practice. These methods are particularly suited to environments like schools and districts, which are complex, dynamic, and deeply embedded in local context.

---

[3] *See,* e.g.,Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth.

17.     In my teaching, I train aspiring leaders to interpret multifaceted educational problems by learning to ask the right questions, identify systemic patterns, recognize competing demands, and adapt to shifting conditions. My coaching work similarly involves guiding experienced leaders as they wrestle with challenges, identify leverage points to address them, and weigh competing trade-offs. These are not abstract exercises; they involve high-stakes decisions made in response to unfolding events. In this sense, my methodology is rooted in applied leadership practice, where expertise is judged not by abstract theory alone but by the ability to support effective leadership decisions in context.

18.     Quantitatively, my insights are built from sustained interaction with hundreds of leaders over time who work in schools of varying demographics, sizes, and locations. I teach roughly 40 students a year, almost all of whom are public school leaders or aspiring leaders. As a consultant, I provide executive coaching one-on-one to approximately 15-20 school and school district leaders annually. These engagements often last multiple years and involve regular consultation around strategic decision-making, stakeholder engagement, and crisis response. I also deliver  training sessions in leadership and governance, where I observe recurring patterns in participant feedback, which provides me with further insight into shared challenges facing schools. As director of the Lehigh University School Study Council, I work with over 25 member districts and facilitate monthly sessions with superintendents and leadership teams. These gatherings surface shared challenges and allow for the comparative observation of trends across systems. Through these sessions, I maintain a running dialogue with sitting superintendents on topics including staffing, student well-being, public trust, instructional coherence, and, increasingly, the impact of social media on school culture and operations. Overall, since leaving the superintendency six years ago, I have worked with upwards of 350-400 individuals with substantive experience in public education.

19.     My expert report is consistent with the methodology typical in educational leadership development. True to this discipline, rather than offering statistical proof of a direct causal link between social media platforms and specific student outcomes—a task better suited for other experts in this case—my report documents how school and district leaders are perceiving, responding to, and being burdened by the effects of platform-driven behavior in their schools. The patterns I describe are based not only on direct statements from educational leaders but also on their practical implications: changes in time allocation, the repurposing of staff responsibilities, adjustments to district policies, and strategic shifts in school priorities.

20.     In this regard, my work is both experiential and generalizable. While grounded in lived professional experience, it is not merely anecdotal. My methodology is comparable to that used by other educational leadership researchers and practitioners: making sense of complex environments by identifying systemic patterns and interpreting the cumulative effects of policy, design, and organizational behavior.

21.     The core purpose of my work is to help leaders lead better. That means equipping them to act decisively and wisely in the face of evolving challenges that include but are not limited to external factors outside of their control, often without the luxury of longitudinal data or randomized control trials and often without complete information. It requires being able to read the moment, understand its implications, and chart a path forward. The methodology I use,

and the insights I offer, are rooted in this applied, reproducible, and widely respected professional tradition.

22.    As a professor of practice, my university role is not to conduct research but to guide current and aspiring leaders. Nevertheless, my general approach is informed by qualitative research traditions that are widely accepted and standard in the field of educational leadership. Unlike experimental or purely statistical analyses, qualitative inquiry in this field emphasizes deep contextual understanding, practitioner insight, and the interpretation of real-world dynamics as experienced by those in leadership roles. As noted in Qualitative research and educational leadership: Essential dynamics to consider when designing and conducting studies [4], qualitative methods—including narrative inquiry, case-based examples, and thematic analysis of lived experience—are core to how leadership dilemmas are investigated and understood.

23.    This approach is particularly appropriate when examining systemic disruptions— such as those posed by widespread student use of social media platforms—that interact with the social, organizational, and relational fabric of schools. It is crucial to inform and support the decision-making needs of leaders who must act in real-time, often responding to emerging circumstances and contextual phenomena without the luxury of complete data or empirical conclusions. My report reflects this methodological tradition by drawing on conversations, professional judgment, and patterns across districts to show how social media use affects leadership capacity, school climate, and student wellbeing. These are not isolated anecdotes; they are field-based observations supported by repeated patterns, consistent themes, and grounded analysis—hallmarks of rigorous qualitative work in education, even if they have not resulted in published peer-reviewed study.

24.    In educational leadership, it is widely recognized that effective research and decision-making must be grounded in an understanding of context. As Crow, Miskel, and O'Donoghue (2016)[5] argue, the study of leadership cannot be meaningfully separated from the dynamic, lived realities of the school environment. They emphasize that educational leadership is deeply contextual, requiring inquiry methods that attend to cultures, relationships, and complexities that characterize actual practice. My methodology reflects this stance. Rather than relying solely on abstract generalizations or experimental data, I draw on experience-based, practitioner-informed evidence — including qualitative accounts, contextual interpretation, and institutional observations — to garner insight into how social media-related harms are manifesting in real schools. This approach is consistent with a longstanding tradition in educational research that values rich, interpretive insights and situates leadership within its operational context. In doing so, my methodology aligns with well-established practices in the

---

[4] Brooks, J. S., & Normore, A. H. (2015). Qualitative research and educational leadership: Essential dynamics to consider when designing and conducting studies. *International Journal of Educational Management*, *29*(7), 798-806. https://doi.org/10.1108/IJEM-06-2015-0083

[5] Clarke, S., & O'Donoghue, T. (2016). Educational Leadership and Context: A Rendering of an Inseparable Relationship. *British Journal of Educational Studies*, *65*(2), 167–182. https://doi.org/10.1080/00071005.2016.1199772

field and provides grounded, relevant understanding for addressing the emerging issues that educational leaders face in public school contexts.

25.     Furthermore, in the practice-oriented subfield of educational leadership, the experience and professional judgment of seasoned leaders are recognized as valid and necessary forms of knowledge production. As a former superintendent and professor of practice, I bring an insider's understanding of the leadership demands school administrators face. This practitioner-informed perspective is a recognized strength, not a limitation, in assessing how school systems function under pressure from evolving external forces.

26.     Over time, as supported by my own experience and observations as well as the relevant literature cited in my original report and that has been produced since that report was written, a consistent institutional pattern has emerged: as students' use of social media has become more immersive, compulsive, and socially consequential, school leaders are increasingly called upon to manage disruptions that originate or escalate online, as well as the challenges of decreased teacher morale and student attention. As stated in my prior report, these disruptions include deteriorating focus, interpersonal conflict, behavioral volatility, increased anxiety and other mental health problems, and new threats to student safety and emotional well-being. Importantly, these disruptions are becoming an embedded feature of the school environment, diverting leadership energy away from instruction, culture-building, and staff development toward crisis management and reactive supervision.

27.     My report did not assert that social media alone is the sole cause of challenges faced by school leadership. Economic, familial, and developmental factors certainly may contribute. However, social media platforms, in their current form and design, are a significant cause of harm to schools and school districts as they create new harms and amplify the intensity and frequency of existing challenges.

28.     Drs. Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth wrongly assert that the disruptions described in my opening report are more accurately attributed to the lingering effects of the COVID-19 pandemic rather than to social media. I agree that COVID-19 had an impact on student well-being, school functioning, and the broader educational ecosystem. However, this does not negate the harms caused or exacerbated by social media, nor does it preclude social media's contribution to a new baseline of institutional stress, which must be addressed by schools and districts.[6]

29.     In fact, many of the same features that made schools vulnerable during the pandemic (e.g., social isolation, breakdowns in routine, student disengagement, and increased screen time) were and continue to be compounded by the design of social media platforms that reward compulsive use and amplify social comparison. Schools were grappling with the impact of social media before and during the COVID-19 pandemic, and social media harms persist and have escalated post-pandemic.

---

[6] *See*, Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, Wildermuth.

30.    Drs. Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth suggest that poverty, school violence, or other longstanding social challenges, not social media, are the true sources of the harms I describe. I do not dispute that these background conditions shape the educational environment and place ongoing demands on schools. However, these factors do not account for the specific, acute disruptions that have emerged with the widespread compulsive use of social media by students. Social media platforms have introduced new forms of harm that are distinct in both mechanism and impact: containing features that exploit the particular vulnerability of young people and harming school districts that must contend with these significant negative impacts of social media along with substantial distractions and significant negative impacts on learning, school functioning and the school environment. The fact that poverty and community violence predate social media does not mean that schools are not now contending with a qualitatively new and different layer of disruption due to social media harms. In fact, as many school leaders have testified in their depositions, these platforms are creating new harms and exacerbating existing vulnerabilities, not merely reflecting them.[7] This is consistent with what I am seeing in schools and hearing from the leaders that I regularly interact with. It is precisely this overlay of novel, unregulated social media harms on top of enduring challenges that is causing school and school district leaders to divert attention away from the core responsibilities explained in my original report.[8]

31.    My observations are reinforced by a growing body of research that identifies associations between social media use and adverse student outcomes, such as emotional dysregulation, decreased attention, sleep disturbances, and behavioral concerns.[9] When

---

[7] *See*, e.g., May 16, 2025 Report of Osborne at paragraph 56-60, 80.

[8] *See*, Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, Wildermuth.

[9] Andreassen, C. S., Pallesen, S., & Griffiths, M. D. (2017). The relationship between addictive use of social media, narcissism, and self-esteem: Findings from a large national survey. *Addictive Behaviors, 64,* 287–293. https://doi.org/10.1016/j.addbeh.2016.03.006

Angwaomaodoko, E. A. (2024). The Impact of Social Media on Youth Education and Well-being. *Path of Science, 10*(4), 1010–1017. https://doi.org/10.22178/pos.103-8

Diaz, A. D., Peeples, D. A., & Weigle, P. E. (2025). Depression and Social Media Use in Children and Adolescents. *Pediatric Clinics of North America*, *72*(2), 175–187. https://doi.org/10.1016/j.pcl.2024.07.033

MacKenzie, M. D., Scott, H., Reid, K., & Gardani, M. (2022). Adolescent perspectives of bedtime social media use: A qualitative systematic review and thematic synthesis. *Sleep Medicine Reviews*, *63,* 101626. https://doi.org/10.1016/j.smrv.2022.101626

Montag, C., Sindermann, C., Becker, B., & Panksepp, J. (2016). An Affective Neuroscience Framework for the Molecular Study of Internet Addiction. *Frontiers in Psychology*, *7*. https://doi.org/10.3389/fpsyg.2016.01906

considered alongside the lived experience of educators such as myself, those I have worked with, and testimony from school leaders, such studies demonstrate that social media use is a significant cause of harm to schools and districts and negatively impacts school climate and student well-being.

32.     All thirteen of the Defense experts wrongly suggest that I overgeneralize from anecdote or rely too heavily on personal experience. My intention is not to substitute experience for empirical research, but to highlight the perspective of those tasked with managing schools under these new conditions. The vantage point of practical educational leadership provides insight into institutional patterns derived from observational and qualitative evidence that often fall outside the scope of controlled studies.

33.     Ultimately, my report is not a controlled study that attempts to isolate variables. It is an experience-based, institutional analysis grounded in long-term, system-level engagement with public education. It aims to illuminate how school districts and school leadership are being pulled toward reactive duties that compromise their ability to build strong school cultures and advance teaching and learning.

Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent Development in the Digital Media Context. *Psychological Inquiry*, *31*(3), 229–234. https://doi.org/10.1080/1047840X.2020.1820219

Office of the U.S. Surgeon General. (2023). *Social Media and Youth Mental Health: The U.S. Surgeon General's advisory*. U.S. Department of Health and Human Services. https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

Patchin, J. W. (2023, October 4*). Cyberbullying Continues to Rise among Youth in the United States*. Cyberbullying Research Center. https://cyberbullying.org/cyberbullying-continues-to-rise-among-youth-in-the-united-states-2023

Popat, A., & Tarrant, C. (2022). Exploring adolescents' perspectives on social media and mental health and well-being – A qualitative literature review. *Clinical Child Psychology and Psychiatry*, *28*(1), 323–337. https://doi.org/10.1177/13591045221092884

Scott, H., Biello, S. M., & Woods, H. C. (2019). Identifying drivers for bedtime social media use despite sleep costs: The adolescent perspective. *Sleep Health*, *5*(6), 539–545. https://doi.org/10.1016/j.sleh.2019.07.006

Siebers, T., Beyens, I., Pouwels, J. L., & Valkenburg, P. M. (2021). Social media and Distraction: An Experience Sampling Study among Adolescents. *Media Psychology*, *25*(3), 343-366. https://doi.org/10.1080/15213269.2021.1959350

University of Pittsburgh Schools of the Health Sciences. (2016, March 22). *Social media use associated with depression among US young adult*s. ScienceDaily. https://www.sciencedaily.com/releases/2016/03/160322100401.htm

Watson, J. C., Prosek, E. A., & Giordano, A. L. (2021). Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness. *Journal of Psychoeducational Assessment*, *40*(1), 95-107. https://doi.org/10.1177/07342829211050536

Scope and Role of School Leadership

34.     Drs. Adams, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth wrongly suggest that social media is simply the latest in a series of societal shifts that schools have been expected to navigate.[10] Their argument implies that school leaders have always needed to respond to external forces–such as economic downturns, new technologies, and changes in family structure, even the call for driver's education–and that social media should be treated in the same manner. In this view, the disruptions caused by social media are just another challenge for effective leaders to manage. But these historical shifts and the success of public education in meeting those challenges do nothing to dispute the relationship between Defendants and the unique and serious harm their platforms have caused to school districts.

35.     Moreover, I do not dispute that adaptation is a core function of school leadership. My own professional identity has been shaped by helping leaders adapt to changing circumstances. But I believe it is a mistake to treat today's social media landscape as equivalent to past disruptions.

36.     What distinguishes the impact of social media is its structure: the way it compels continual engagement, amplifies emotionally charged experiences, and pervades the school day through mobile access. It creates conditions in which both students and staff are exposed to unregulated and often harmful dynamics, including constant distraction, public shaming, peer surveillance, and rapid rumor proliferation.[11] And because these dynamics don't operate on a school schedule, the work of managing them spills over into every hour of the day, from the early morning arrival of students in emotional distress, to after-hours harms that reignite tensions the next day.

37.     This has created a new kind of pressure on educational leaders. In districts and schools, principals and superintendents are spending significant time on social media crisis management—meeting with parents and providing resources to address harmful effects of social

---

[10] *See*, Expert Reports of Adams, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, Wildermuth.

[11] Cyberbullying Research Center. (2021, February 24). *Amicus curiae brief in support of petitioners, Supreme Court of the United States, No. 20-255.* https://www.supremecourt.gov/DocketPDF/20/20-255/169848/20210224135419750_20-255tsacCyberbullyingResearchCenter.pdf

Vogels, E. A., Gelles-Watnick, R. & Massarat, N. (2022, August 10). *Teens, Social Media and Technology 2022.* Pew Research Center. https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022

Watson, J. C., Prosek, E. A., & Giordano, A. L. (2021). Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness. *Journal of Psychoeducational Assessment*, *40*(1), 95-107. https://doi.org/10.1177/07342829211050536

media use, investigating conflicts that began on social media, or working with law enforcement to understand online threats, among other things. These efforts are often essential, and many leaders respond with skill and urgency. However, these efforts also divert time and attention away from leadership's central focus: improving instruction, developing teachers, and fostering a positive school environment.

38.     To the best of their abilities within budget restraints, educational leaders equip students to regulate, cope, and ultimately thrive within a rapidly changing environment in which ubiquitous social media plays a powerful role.  Instead, the cumulative demands of managing social media-related harms have reached a scale that compromises leaders' ability to fully attend to the core work of teaching and learning. This is not a reflection of failure on the part of school leaders, but instead of the way asymmetry between the scope of the challenge and the resources available to address it affects the work of educational leaders.

39.     The rebuttals suggest that strong leaders will "manage" these dynamics. And I agree; of course, they will, to the best of their abilities.  However, in my view, this ignores the opportunity costs involved. Every hour spent addressing a social media harm is an hour not spent in classrooms, in coaching conversations, or in planning meaningful improvements. The cost is not only to the leader's bandwidth, but to the long-term instructional and relational health of the school.

<u>Systemic Harm Argument</u>

40.     Drs. Adams, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth question the characterization of social media as a systemic threat to education.[12] They argue that schools remain operational and that educational leaders have long had to contend with complex societal shifts. I do not dispute that schools continue to function, often with inspiring ingenuity and care. Nor do I claim that social media alone explains the full range of challenges facing schools today. Instead, my expert opinion is that the structure and design of dominant social media platforms are introducing new stressors into already fragile school ecosystems, and that this added strain is reshaping the work of school districts and school leadership, making it increasingly difficult to attend to the aspects of foundational responsibilities that I described in my opening report.

41.     I am not asserting that social media has rendered schools inoperable or incapacitated leadership entirely. However, the effects of compulsive social media use are distorting the allocation of leadership time and energy in ways that make it more challenging for schools to fulfill their instructional and developmental missions and are monopolizing educators' time and resources. The system is still running, but in many places, it is running harder only to stand still or fall behind, and the cost of that effort falls on schools and school districts.

42.     It is true that leaders adapt to changing conditions; this is the nature of the job. However, the pace, scale, and nature of the disruptions caused by social media are qualitatively

---

[12] *See*, Expert Reports of Adams, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, Wildermuth.

different from those of many prior challenges. Unlike previous shifts, such as the introduction of the internet, the rise of texting, or even the spread of smartphones themselves, today's social media platforms are engineered with a precision that compels continuous engagement, social comparison, and almost constant exposure to conflict, outrage, and curated performance. These dynamics are not incidental. They are central to how these platforms capture and monetize user attention, and students are among the most susceptible users.

43.      What makes this a systemic issue is not just that students are affected, but that schools are forced to respond to the consequences. As I wrote in my opening report, the nature of this disruption is not limited to isolated incidents of misbehavior or distraction. It manifests across domains: in student mental health crises that are created or intensified by compulsive use, on-platform drama, or harassment; in peer conflicts that begin in social media posts and erupt physically at school; in the erosion of instructional time as teachers manage social media distractions and fallout; and in the steady redirection of leadership attention from long-term planning to short-term crisis management. The reach extends across nearly every department of a school district. Not only must teachers spend significant portions of their day policing the distractions created by social media's omnipresence, but building administrators must investigate social media misconduct, mediate disputes, and impose consequences. Counseling staff and school psychologists face rising caseloads of students experiencing anxiety, depression, and social withdrawal linked to social media use. Technology departments must manage filtering, device restrictions, and digital citizenship education while fielding technical issues and workarounds. Safety officers and school resource officers are called upon to assess and respond to threats, whether real or rumored, that are escalated by viral posts or anonymous tips. Communications teams are tasked with responding to public panic sparked on social media platforms. Central office administrators are forced to update policies, coordinate professional development, and redirect strategic efforts. These burdens are not abstract. They are real, recurring, and reshaping the daily operations of public education.

44.      This shift is often most apparent in schools that are already under-resourced. In these contexts, a principal pulled into managing a social media caused crisis will have less time and attention to devote to instructional walkthroughs or to teacher support. A counselor helping a student navigate mental health issues stemming from social media use may be forced to postpone family outreach or mental health referrals for other students. These tradeoffs accumulate. Over time, they can alter the trajectory of school improvement efforts and exacerbate inequities between schools, with those that cannot shield themselves from the worst effects often being the most disadvantaged.

45.      Drs. Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth wrongly argue that social media cannot be harmful to schools if teachers and districts themselves use it for educational or communication purposes.[13] Their suggestion is that use of social media by schools, teachers, or districts undermines the claim that these platforms are harmful. This line of argument conflates institutional adaptation with endorsement. Schools often feel compelled to use available tools to reach students and families, even when those tools carry risks. The fact that a district maintains a

---

[13] *See*, Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer and Wildermuth.

social media presence does not negate the burdens that platform design impose on instruction, student well-being, or leadership capacity. In fact, such use often reflects a strategic response to the same attention economy that creates the problems described in this report. While the defense experts note that educators and school systems may utilize social media in positive and productive ways (for example, to share information with families, celebrate student successes) promote events, or foster professional learning communities, this fails to recognize that curated, controlled educator use is distinct from student social media use, which is often compulsive and harmful. The personal social media use by children at issue here is far different from the formal uses described in the defense reports.

46.    The existence of positive use cases by educators and school systems do not negate the broader concerns raised in my opening report or the harms to schools and districts. The core issue is not whether social media can be used constructively in school settings. The problem is that the addictive design and targeting by these platforms of schools and students prioritizes engagement over well-being, particularly for young users, creating systemic pressures that schools must continually manage. A teacher using Instagram to post classroom updates or a district communications office using Facebook for public relations is not the same as a student receiving many targeted notifications during the school day.  The defense reports fail to recognize that the design of these platforms encourage continual use, disrupt sleep, and otherwise negatively impact youth mental health, which may undermine student focus, self-image, or sense of safety and which harms schools and districts, among other things. These are not symmetrical dynamics.

47.    Moreover, many school leaders are ambivalent about their institutional use of social media. They adopt it in part because it is where students already are, not because they believe it is unambiguously beneficial. Some describe it as a necessary concession to a dominant communication ecosystem that they cannot fully control. In that sense, schools' strategic use of social media often reflects an attempt to work within a system that is already reshaping student behavior and community expectations, rather than an endorsement of its effects.

48.    In short, school districts and school leaders have not failed in the face of social media disruption. They are doing the best they can. However, they are doing so under conditions that divert them from their highest-leverage responsibilities. Recognizing this should not be viewed as a negative critique of their leadership or capacity to manage.

Responsibility and Agency

49.    Drs. Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth emphasize that schools, parents, and communities are managing responses to the harms of social media in similar ways they have with other emerging issues in history.[14] They suggest that, in response to the harmful aspects of social media, schools will educationalize the problems and address them through teaching information literacy, developing parent education programs, and implementing and enforcing

---

[14] *See*, Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer and Wildermuth.

sensible in-school usage policies. Indeed, educators and families are the frontline of support for children, and strong school–family partnerships are crucial to student success. Educational leaders are already engaging in these efforts, often under intense pressure and with limited resources. What is overlooked in the defense reports is that these in-school efforts take time and money away from their core responsibilities. Social media companies also have the ability to dedicate their resources and efforts to supporting schools and families—through transparency, robust warnings, improved safety tools, age-appropriate design, and direct investment in digital literacy and well-being initiatives—instead of shifting blame to educators for not solving the very problems the platforms created. Schools are left managing a crisis not of their own making, with limited resources.

50.     Additionally, acknowledging the agency of schools and parents does not absolve the social media platforms of responsibility. The central concern raised in my report is not merely that children use social media, but that platforms are deliberately designed to encourage compulsive, immersive engagement. These design choices are not neutral; they have significant implications. They are engineered to maximize attention, extend time on devices, and deepen user dependency, often in ways that exploit the vulnerabilities of students and have significant negative impacts on schools and districts.  The social media companies also failed to adequately warn users about the addictive nature of their products, particularly for pre-teens and teens whose brain development and ability to regulate emotions are still forming.

51.     Schools do not have control over these design features, nor do they have the capacity to regulate them. Yet they are left to manage the fallout. When a student loses sleep due to late-night scrolling, develops mental health disorders like anxiety and depression caused by social media, or acts out in response to social media, it is educators, not engineers, who respond. When classroom focus erodes, when disciplinary incidents trace back to online conflict, or when school counselors are overwhelmed by students grappling with anxiety rooted in social media peer dynamics, the institution absorbs the burden.

52.     The Defendant social media companies failed to inform schools and the public about the addictive nature of their platforms. Notwithstanding this failure by the platforms, schools can indeed take steps to educate students about responsible use and to cultivate a healthy school culture. But these efforts exist within constraints. Unlike the social media companies, schools cannot reprogram the addictive mechanics of these tools. They do not have the power to change these features on their own. And while parental involvement is crucial, parents, too, are often navigating this landscape with limited tools, incomplete information, and an asymmetric power dynamic relative to billion-dollar technology companies.

53.     Dr. Hutt's suggestion that social media use is just another social problem that is being "educationalized" overlooks the power imbalance at play. Platforms exert an outsized influence over youth attention and behavior through mechanisms that are largely invisible and inaccessible to both educators and parents. In this context, it is reasonable to ask whether those who design the systems are responsible for addressing the harms with robust warnings and safer designs.

54.     Defendants' experts also assert that my report overstates the complexity and distractions involved in creating and implementing limitations policies that remove social media use from schools through cellphone bans or other rules and regulations to govern their appropriate use. For example, Dr. Adams says, "If a school district wants to regulate phone use, then a school district can regulate phone use," as though it were a matter of flipping a switch. While it is true that some schools and districts have experimented with policies to restrict in-school social media use, this should not be seen as evidence that the issue is easily resolved. Promulgating such policies often requires extensive planning, communication with families, negotiation with staff, and attention to legal and community expectations. Even where formal restrictions exist, school leaders must manage the real-world enforcement of those rules dealing with hidden phones, constant exceptions, uneven ability of staff to enforce, and frequent student pushback. Like any other school regulation, these limitations are not self-executing. They require sustained attention and operational bandwidth, which in turn diverts time and focus from other priorities and results in unmet needs.

55.     In another version of reality, one in which social media platforms had been designed to support reflection, curiosity, and non-addictive, constructive engagement, schools might be finding ways to incorporate them into classrooms, leadership development, or extracurricular learning. Instead, many school leaders feel they have little choice but to restrict access altogether. That necessity is a consequence of commercial design choices that prioritize engagement and profit over developmental benefit. The burden of mitigation is placed on institutions that have no control over the underlying mechanics of the harm. Moreover, in-school phone bans do nothing to stop the substantial negative impacts on students from social media use outside of school, which reverberate in the school environment.

56.     Parents value the ability to communicate with their children during the school day, whether to coordinate transportation, offer emotional support, confirm their safety, or simply stay connected. Phone bans—though often necessary—can strain this relationship, creating tension between schools and families. Again, the harm does not originate in the presence of technology, but in the way platforms are designed and deployed, forcing schools into all-or-nothing policy decisions in an attempt to regain control.

<u>Response to District-Level Counterfactuals</u>

57.     Drs. Adams, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth submit district-specific reports purport to challenge the opinions in my opening report by pointing to local data that purportedly contradicts or complicates my conclusions.[15] For example, they cite disciplinary records that show declines rather than increases, or survey data indicating that student mental health concerns were already elevated before the rise of social media platforms. These localized rebuttals argue that social media cannot be identified as a systemic cause of disruption, since not all indicators point in the same direction in every setting. These experts ignore that existing data systems may not capture emerging harms like those stemming from social media. Several defense experts have also cherry-picked data to support their arguments while ignoring other data points that show the

---

[15] *See*, Expert Reports of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer and Wildermuth.

negative impact of social media in the school districts.[16]  Regardless, any variability in the limited local data does not invalidate the broader patterns on which I opine. A school district that has successfully implemented restorative justice practices may see a decline in formal disciplinary incidents, for example, but this does not mean that social media has not negatively impacted student behavior. It may mean that the district is expending greater leadership effort and resource investment to manage disruption in ways that are not captured by disciplinary data alone.

58.     Similarly, with respect to pre-existing concerns around mental health or student well-being, I do not claim that there were no student mental health issues before social media. However, it is my opinion that social media has created additional mental health issues and has intensified or altered the character of these existing challenges, introducing new dynamics (such as continuous exposure, digital surveillance by peers, and rapid escalation of harm) that create new stressors and compound existing stressors, complicating the work of student support teams and requiring additional resources.

59.     The crux of my opinion is not that social media explains every institutional challenge or that every metric should show uniform decline in every possible time period. Instead, my opinion is that the nature of platform design, and its emphasis on maximizing engagement, impacts school responsibilities in ways that demand new kinds of vigilance, new time trade-offs, and new strategies and additional resources for crisis response. These demands are showing up in school systems, even if limited local data does not always capture them.

60.     In short, the presence of particular educational outcomes (e.g., lower discipline rates, higher graduation rates, improved test scores) does not negate systemic effects of social media harms. Schools that are able to function well despite the pressures of social media are fortunate. Their efforts often involve a significant investment of time, staffing, and strategic leadership to mitigate harms that are externally generated and largely beyond their institutional control. My report aims to highlight the institutional tradeoffs and to acknowledge the growing burden that school systems now bear as a result of platform dynamics and harms they did not create but are nonetheless compelled to try to address.

**Part II: Additional Expert-specific replies of Adams, Aguilar, Auerbach, Gotlib, Hutt, Hyman, Jennings, Lakdawalla, Moore, Nelson, Smith, Springer, and Wildermuth**

<u>Response to the Report of Dr. Kelvin Adams</u>

61.     Dr. Adams argues that my claims about the redirection of leadership time and attention are vague or overstated. My report did not attempt to quantify these costs in minutes or dollars; this is the role of other Plaintiffs' experts. However, the shift I describe is real: time that would otherwise be spent on instructional leadership is now being absorbed by social media-related triage, crisis response, and community management. These are not incidental adjustments; they represent a structural change in what school leaders must prioritize. While Dr.

---

[16] *See*, e.g., May 16, 2025 Report of Hoover.

Adams insists that school systems are still "functioning," functionality alone does not negate that schools and districts are facing significant negative impacts caused by social media.

62.     Dr. Adams asserts that because some schools have found positive educational uses for social media, it cannot be harmful in the ways I describe. But the fact that it can be used by educators does not negate the reality that platform design choices—especially those aimed at maximizing engagement—have introduced widespread challenges for student well-being and school operations.[17] The harms described in my report are not due to the presence of social media as an abstract concept, but rather to Defendants' specific design choices and platform features that, as documented by other experts, foster compulsive use and include other harmful features.[18] Schools and students are struggling with platforms that have minimal educational value and cause significant harms to schools and districts.

63.     In sum, while I appreciate Dr. Adams's experience (which is mostly limited to a single school district), I respectfully maintain that the burdens on schools caused by social media design are real, measurable, and increasingly unsustainable.

Response to the Report of Dr. Stephen J. Aguilar

64.     Dr. Aguilar's rebuttal focuses heavily on critiquing the methodologies employed in my report, particularly the use of interviews and observational accounts from educational leaders. He characterizes this as anecdotal and purportedly insufficient for supporting broader conclusions about harm.

65.     Dr. Aguilar also questions the attribution of student mental health concerns and classroom disruption to social media. He notes that such problems are multi-determined and suggests I have overlooked broader social and environmental contributors. My report does not argue for monocausality; while no single factor accounts for all changes in student well-being or behavior, I identify social media design as a significant factor that causes new harms and exacerbates existing challenges. This is consistent with the broader youth mental health literature and aligns with concerns expressed across districts.[19]

66.     Finally, Dr. Aguilar suggests that educational leaders may not be qualified to evaluate the specific harms associated with social media platform design. This risks undervaluing the role of practitioner expertise in system-level understanding. School and district leaders are not commenting on the technical mechanics of platform design; they are commenting on the observable effects those designs have on students, classrooms, and learning environments. As such, their assessments offer direct and valuable insight into institutional harms based on their professional experience, as is standard in the field of educational leadership.

Response to the Report of Dr. Randy Auerbach

---

[17] *See,* e.g., May 16, 2025 Osborne Report at paragraph 71.
[18] *Id.*
[19] *See*, e.g., Osborne Report at paragraphs 80 and 89.

67.     Dr. Auerbach's critique centers on his assertion that my report fails to establish a scientifically valid causal link between social media use and educational harm, and that my observations are anecdotal rather than empirical. As I made clear in both my opening report and in the unified reply above, my opinion is based on professional expertise developed through decades of leadership and consultation in school systems and extensive conversations with district leaders, as is standard in the field of educational leadership development and executive coaching, as explained above.

68.     Dr. Auerbach conflates the role of a clinical or lab-based researcher with that of a systems-oriented educational expert. My task was not to conduct new scientific experiments, but to assess and interpret the educational impacts of social media platforms as experienced in real-world settings.[20] Educators are grappling daily with the concrete fallout of platform-caused behavior and issues, including sleep deprivation, classroom disengagement, cyberbullying, and the displacement of instructional focus by crises rooted in social media activity.

69.     I also note that Dr. Auerbach's rebuttal does not refute the existence of these patterns, but instead argues that they cannot be attributed uniquely to social media because of other factors such as school violence or under-resourced mental health systems. I agree that such background conditions matter, but they do not negate the acute, significant role that social media plays. As I stated in my report, social media platforms are not the sole source of educational challenge, but they are a powerful and novel driver of disruption that school systems are being forced to address with limited resources.

<u>Response to the Report of Dr. Ian Gotlib</u>

70.     Dr. Gotlib specializes in adolescent mental health and brain development. I agree with his view that youth mental health is a multifaceted issue and that social media should not be seen as the sole cause of rising distress among young people. However, I disagree with his assertion that there is no credible evidence linking social media use to meaningful mental health challenges and educational burdens.[21] His report reflects a narrow interpretation of causality and overlooks a growing body of interdisciplinary research and lived experience that shows how specific platform design features and engagement patterns are contributing factors to student harm.

71.     There is mounting evidence that social media is worsening key indicators of youth well-being. The fact that social media is not the sole factor does not negate its significant negative impact on students, schools and districts. In particular, Dr. Gotlib's claim that there is no consensus in the scientific community about social media's role in adolescent distress misrepresents the current state of the literature. There is substantial convergence across public health, psychology, education, and epidemiology that social media use (especially high-

---

[20] *See*, e.g., Osborne Report paragraphs 15-22.

[21] *See* Gotlib Report at paragraph 186.

Andreassen, C. S., Pallesen, S., & Griffiths, M. D. (2017). The relationship between addictive use of social media, narcissism, and self-esteem: Findings from a large national survey. *Addictive Behaviors*, *64*, 287–293. https://doi.org/10.1016/j.addbeh.2016.03.006

frequency or social comparison–oriented use) is associated with increased risk of depression, anxiety, suicidal ideation, and body dissatisfaction in adolescents. The U.S. Surgeon General, along with leading pediatric and psychiatric associations have now issued formal warnings, and numerous peer-reviewed studies document statistically significant associations between social media exposure and negative mental health outcomes, particularly for girls.[22]

72.     Dr. Gotlib fails to address the day-to-day implications for schools. As an educational leader, I observe how the harms he describes in clinical terms (anxiety, attention dysregulation, sleep loss, relational conflict, emotional volatility) manifest daily in classrooms, school nurse visits, crisis team referrals, discipline issues, and reduced attention span. Even if these outcomes are not always diagnosable mental health disorders, they are real, widespread, and disruptive to learning and school operations. Dismissing these as either typical adolescent stress or as problems unrelated to social media underestimates the scope of what educators, schools and districts are facing.

73.     Furthermore, Dr. Gotlib's expertise in controlled clinical research leads him to emphasize limitations in cross-sectional or observational studies without fully acknowledging practical realities. Schools are not labs; they are real-world settings where action is needed in the face of new harms like social media.

74.     In sum, Dr. Gotlib offers a perspective that is not grounded in real-world practice. Other Plaintiffs' experts refute his characterizations of the state of the scientific literature and his insistence on a scientifically unfounded and unattainable level of proof; his perspective also leads to inaction in the face of growing harm. I respect his scholarship but disagree with his conclusion that social media is an unlikely contributor to the rising crisis in adolescent mental health, and I strongly disagree with his implication that schools should not treat it as an urgent, material challenge.

<u>Response to the Report of Dr. Ethan Hutt</u>

75.     Dr. Hutt claims that the American public education system has always absorbed broad social issues—poverty, racism, family instability, and more—and that dealing with these social forces is not an aberration, but rather part of the school system's historic role. He suggests the challenges posed by social media are not new or uniquely burdensome, but rather part of the

---

[22] Young, E., McCain, J. L., Mercado, M. C., Ballesteros, M. F., Moore, S., Licitis, L., Stinson, J., Jones, S. E., & Wilkins, N. J. (2024). Frequent Social Media Use and Experiences with Bullying Victimization, Persistent Feelings of Sadness or Hopelessness, and Suicide Risk Among High School Students — Youth Risk Behavior Survey, United States, 2023. *MMWR Supplements*, *73*(4), 23-30. http://dx.doi.org/10.15585/mmwr.su7304a3

Office of the U.S. Surgeon General. (2023). *Social Media and Youth Mental Health: The U.S. Surgeon General's advisory*. U.S. Department of Health and Human Services. https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

ongoing project of "educationalization"—the tendency of society to offload social problems onto schools.

76.    I agree with Dr. Hutt that American schools have long been tasked with absorbing and responding to a wide range of social challenges, many of which are well beyond their intended scope. This pattern, what some scholars call the "educationalization" of social problems, is real. But it is not, as Dr. Hutt seems to suggest, a justification for continuing to do so without scrutiny or accountability, especially when this particular burden is avoidable, escalated by design decisions made by private companies targeted to school-aged children, and of sufficient scale and impact to significantly adversely affect school operations.

77.    To say that schools have always faced external pressures is not the same as saying they should continue to shoulder them without recourse especially when those pressures are being created and amplified by commercial platforms with no educational mission. Dr. Hutt fails to explain why the unexamined normalization of new harms should be accepted just because public schools have always been expected to support children.  His argument is akin to suggesting that a school should absorb the costs of cleaning up drinking water contaminated by a factory operating next door.  Certainly, the school <u>could</u> pick up the tab for remediation, to protect its students, but there is no logical reason it <u>should</u>.

78.    Dr. Hutt also argues that my report leans too heavily on anecdote and professional judgment, suggesting that these forms of evidence lack the rigor necessary to support causal claims. My opinions are based on my interactions with school and district leaders, published research literature, and my 33 years of experience in this field. This is a standard method in qualitative evaluation and educational leadership practice, particularly when dealing with systemic phenomena that are difficult to isolate in controlled studies, as addressed by scholars such as Brooks, J. S., & Normore, A. H. (2015) and Clarke, S., & O'Donoghue, T. (2016).[23]  Dr. Hutt's preference for strictly empirical methods may reflect the norms of a different epistemological tradition, but understates the importance of field-based evidence in understanding emergent, multifactorial challenges like social media's impact on schools.

79.    Dr. Hutt further suggests that the harms described in my report reflect longstanding educational challenges and systemic weaknesses rather than any distinct or attributable effect from social media platforms. I agree that public schools have long been under-resourced and overburdened. However, to say that schools have always faced difficulties does not negate the significant harms caused by social media. In many districts, leaders describe an increasing burden in recent years—due to the addictive design of social media platforms—that has overwhelmed existing student support systems and demanded escalating and significant amounts of leadership attention and resources. These burdens reflect a qualitative shift in the

---

[23] Brooks, J. S., & Normore, A. H. (2015). Qualitative research and educational leadership: Essential dynamics to consider when designing and conducting studies. *International Journal of Educational Management*, *29*(7), 798-806. https://doi.org/10.1108/IJEM-06-2015-0083

Clarke, S., & O'Donoghue, T. (2016). Educational Leadership and Context: A Rendering of an Inseparable Relationship. *British Journal of Educational Studies*, *65*(2), 167–182. https://doi.org/10.1080/00071005.2016.1199772

intensity, pace, and scale of school-based disruptions. My report does not suggest that social media is the only stressor schools face, but it argues that platform design has made things materially worse for schools and districts.

80.    Dr. Hutt also suggests that I may be attributing to social media harms that are better explained by the COVID-19 pandemic. To be clear: I do not dispute that COVID was disruptive to schools and to student well-being. However, the disruptions associated with social media use—and the ways those disruptions interact with student attention, social relationships, disciplinary environments, and mental health–are distinct from the impact of the pandemic and have worsened in its aftermath.

81.    In sum, Dr. Hutt's critique underestimates the value of field-based insights, oversimplifies the complexity of educational causality, and fails to adequately acknowledge the structural imbalance between school systems and platform designers. My report aims not to assign simplistic blame, but to elevate the real-world pressures that schools are navigating in an effort to serve students in the face of social media harms.

<u>Response to the Report by Dr. Joshua Hyman</u>

82.    Dr. Joshua Hyman asserts that social media has not had a substantial impact on student mental health or academic outcomes and that the empirical foundation for the plaintiffs' claims is lacking. While his analysis draws on econometric techniques, his conclusions rest on narrow methodological assumptions and overlook critical dynamics of how social media harms manifest in school settings.

83.    Dr. Hyman frequently cites national datasets and macro-level trends, suggesting that indicators such as suicide rates or NAEP scores have not shifted in a manner that implicates social media. In addition, not all social media harms may necessarily be captured by this data or uniformly affect national averages; they often manifest in concentrated disciplinary crises, acute student needs, and emotionally dysregulated behaviors that overwhelm school systems, and national aggregate data may not track all these issues.[24]

84.    Moreover, Dr. Hyman's reliance on national test score trends (such as NAEP) to evaluate educational impact is particularly ill-suited to detect the disruptions school leaders are experiencing. Test scores are blunt instruments, and their broad stability says little about the increasing time school staff must divert toward crisis response, suicide prevention, and social media-related investigations.

85.    Dr. Hyman's report is notably dismissive of the testimony and observations of school leaders, asserting that they are "subjective" and therefore unreliable. This position disregards the critical role of practitioner expertise in educational leadership, as explained earlier in this report. School leaders are the first to observe patterns in student behavior, disciplinary trends, and systemic strain. Their collective experience and testimony across districts and states

_____

[24] *See*, e.g., May 16, 2025 Report of Twenge at paragraphs 15-60 and May 16, 2025 Report of Mojtabai at paragraphs 177-184; 245.

reflects a coherent, repeated pattern: schools are experiencing new and intensifying disruptions caused by student social media use. These disruptions include expending resources to address mental health and disciplinary issues, social comparison spirals, bullying that follows students into their homes and persists throughout the school day, episodes of grooming, sextortion, and the transmission of nonconsensual intimate imagery facilitated by platform design choices, compulsive use and behavior that disrupts the learning environment.

86.     Even if standardized test scores remain flat, when principals, counselors, and teachers are forced to spend disproportionate time addressing social media harms, instruction suffers, school climate degrades, and student well-being is compromised.

87.     Dr. Hyman suggests that school districts are attempting to shift responsibility for all student struggles onto social media companies. This is a mischaracterization. School leaders recognize that various factors influence student well-being, including family dynamics, economic conditions, and developmental stages. What is new, and what has overwhelmed existing student support systems, is the scale, persistence, and design of social media platforms that exacerbate existing vulnerabilities and introduce new forms of harm.

88.     Dr. Hyman's conclusions are constrained by a narrow econometric frame that fails to grapple with the lived realities of school systems and operations. His dismissal of practitioner testimony and his reliance on certain national aggregates serve to obscure the crisis schools are experiencing. My analysis provides a more relevant and responsive analysis by integrating educator perspectives, acknowledging the limits of traditional metrics, and engaging with the novel as well as cumulative, compounding nature of social media harms on school communities.

Response to the Report of Dr. Matthew Jennings

89.     Dr. Jennings argues that I fail to establish a causal link between social media platforms' conduct and educational harm. As I explain in both my initial report and unified reply above in the section on causation and specificity, my opinion is not offered as a formal statistical analysis of individual outcomes. While Jennings stresses the limits of correlation, he overlooks the emerging consensus from national surveys, district leaders, and multiple disciplines that platform design features are contributing to student distress and institutional strain. Superintendents and principals are not drawing these conclusions from theory; they are drawing them from daily experience.

90.     Jennings also asserts that my report lacks district-specific analysis. My role as an expert was not to conduct a forensic audit of each district's data, but to offer a national, practice-informed perspective on systemic impacts that are widely experienced by schools and districts. My report is not intended to supplant local data but to contextualize it within a broader framework of educational leadership. My opinion is not that all harms appear identically in all places but rather that social media platforms have introduced new and widespread burdens that school systems, including those in this case, have had no choice but to address.[25]

---

[25] *See*, e.g., May 16, 2025 Report of Osborne at paragraphs 56-63.

91.     Dr. Jennings also suggests that my reliance on experience and qualitative judgment does not constitute proper expert analysis. But in educational leadership, such expertise is foundational. Leading schools requires a combination of on-the-ground responsiveness and systems-level strategy, both of which are informed by accumulated professional knowledge. My conclusions arise from nearly 30 years in the field, including direct leadership of school systems, academic training, and consultative partnerships with districts. I supplemented this with published research, survey data, and firsthand reports from educators, including testimony gathered in this case.[26] Unlike the abstract, population-level lens Dr. Jennings applies, my analysis reflects what real educators are confronting in real time.

92.     Finally, Dr. Jennings implies that I exaggerate the scope of social media's impact, framing current challenges as the latest in a long history of disruptions to school life. While I agree that schools are accustomed to adapting, the challenges posed by modern social media are qualitatively different. Educators are not dealing with just another behavioral fad—they are navigating an always-on ecosystem that reaches into their classrooms without invitation or consent. As multiple school officials have testified, they are now forced to devote significant administrative capacity to addressing platform-enabled distraction, fights, threats, "challenges," and interpersonal conflicts that rapidly escalate online before erupting in person.[27] They are implementing new policies, retraining staff, revising discipline procedures, and trying to respond to harms that originate outside school but play out daily within it. This is not an overreaction; it is an adaptation to a fundamentally new kind of harm—one designed and distributed by companies over which schools have no meaningful control.

93.     In sum, Dr. Jennings's perspective underestimates the distinctive character of platform-driven disruption in the modern school environment. His critique does not align with the experience and testimony of school leaders in this case, nor with the urgent demands educators now face. I stand by my opinion that social media platform design has created new and widespread burdens that educational leaders must manage at the expense of instructional time, staff capacity, and student well-being.

Response to the Report of Dr. Darius Lakdawalla

94.     Dr. Darius Lakdawalla's report focuses primarily on questioning the relevance and reliability of the educational perspectives presented in my opening report. He argues that because I do not provide causal statistical evidence linking social media use to harm, my conclusions are "speculative" and "not useful" for informing public policy or litigation. This critique misrepresents both the scope of my assignment and the nature of my expertise.

95.     My report is not intended to adjudicate the economic magnitude of social media's harms in financial terms. Rather, it aims to illuminate the concrete ways in which platform design has affected students' behavior, mental health, and safety in the school environment and has negatively impacted schools and districts, as understood and experienced by educators. In

---

[26] *See*, e.g., May 16, 2025 Report of Osborne.
[27] *See*, e.g., May 16, 2025 Report of Osborne at paragraphs 56, 58, 62, 80.

this regard, Dr. Lakdawalla's economic framing is not the appropriate lens through which to evaluate my contribution. He treats the absence of a cost-benefit calculation as a methodological failing when, in fact, it simply reflects that I was not tasked with producing an economic model.

96.     Dr. Lakdawalla also suggests that I fail to distinguish between "correlation and causation," and that my report relies on "selective anecdotes" or "unverified impressions." This critique overlooks the fact that my report is not a statistical study but a synthesis of professional knowledge, institutional experience, and field-based testimony from district leaders, school staff, and students themselves. The patterns I describe, such as rising levels of anxiety, depression, sleep loss, classroom disruption, cyberbullying, and self-harm, are all supported by educators' observations and are not isolated or incidental. They reflect a consistent and growing set of concerns expressed across districts and school systems. While these observations may not be in the form of an econometric study, they are nonetheless vital to understanding how social media affects the day-to-day functioning of schools and the well-being of the students they serve.

97.     Moreover, Dr. Lakdawalla's assertion that educational professionals are not equipped to assess the harms of social media because we have "not attempted to assess how the purported harms to the school district would change in an appropriate counterfactual world" or "fail to quantify the effect of the at-issue conduct on adolescent mental health" (Lakdawalla pages 4-5) underestimates the vantage point school leaders occupy and the responsibility they have to address the harms they confront day in and day out.

98.     Educators are often the first to detect when a student's mental health is deteriorating, when peer conflicts escalate due to social media, or when classroom dynamics are disrupted by social media-related behavior. To suggest that these observations are not meaningful unless quantified through formal economic methods is to exclude a critical source of data and insight.

99.     School leaders are not speculating about abstract risks; they are responding to actual harms, incidents such as emergency room visits, disciplinary crises, suicidal ideation, lost instructional time and disruptions that require immediate attention, as well as the increased anxieties associated with the constant social media comparisons that affect efforts to create positive school climates.

100.     In short, while I respect Dr. Lakdawalla's economic expertise, his critique applies an evaluative framework that is misaligned with the nature of my report. My role is distinct from the economic analysis Dr. Lakdawalla offers, and his criticisms do not change my opinions.

<u>Response to the Report of Dr. Michele Moore</u>

101.     Dr. Michele Moore's report questions the validity of my conclusions, arguing that my analysis does not reflect the perspectives or needs of students themselves, but instead relies on "speculation" by school officials. This framing overlooks the purpose and value of educator testimony in my field.

102.    Dr. Moore argues that school leaders and district personnel cannot serve as credible sources of information about student experience and mental health outcomes. I disagree. In my role as a former superintendent, a professor of educational leadership, and a consultant working closely with schools, I have found that educators are among the first adults to notice changes in student behavior, emotional regulation, peer dynamics, and overall well-being. Educators are not guessing at the effects of social media—they are managing them daily, whether in the form of classroom disruptions, disciplinary referrals, emotional dysregulation, or crises involving self-harm.

103.    Dr. Moore further suggests that my report inappropriately centers adult perspectives and fails to incorporate student voice or youth-centered frameworks. The focus of my report is not intended to substitute for the voices of young people, but rather to reflect the institutional impact that social media platform design has had on schools and on the adults responsible for creating safe, supportive environments. Many of the statements cited in my report come from adults who relay student concerns, reflect parental input, or respond to observable harm. These voices are not detached from student experience—they are often intermediaries translating and responding to what students themselves are experiencing.

104.    Moreover, Dr. Moore suggests that because social media has potential benefits for identity formation and community building, the harms raised by school leaders are overstated. The existence of potential benefits does not negate the very real, significant harms that schools are encountering. Indeed, the concern is not with all facets of social media use, but with the combination of specific design features that contribute to documented patterns of sleep deprivation, emotional distress, and peer conflict, resulting in harms to schools and districts.

105.    Finally, Dr. Moore's assertion that school officials are merely "grappling with change" or "adapting to evolving youth culture" minimizes the scope and severity of the challenges they are managing. The leaders that I interact with are not concerned about adult discomfort with technology or misunderstanding of student culture. They are concerned about practical, daily obstacles to learning, safety, and student well-being, obstacles that educators believe are caused or exacerbated by social media use.

106.    In conclusion, I appreciate Dr. Moore's emphasis on student-centered thinking; however, I respectfully maintain that the insights of school leaders and educators are also essential to understanding the effects of social media on schools and districts. My report does not claim to replace student voice but rather to examine the institutional experience of those charged with supporting students through this uniquely complex and harmful social media environment.

<u>Response to the Report of Dr. Robert Nelson</u>

107.    Dr. Robert Nelson's report critiques my expert opinion by asserting that I offer no valid basis for concluding that social media has harmed students or schools. He further suggests that my findings are rooted in subjective impressions rather than empirical evidence, and that my report mischaracterizes the available research. However, his critique reflects a narrow view of both the evidence I presented and the function of professional judgment in education leadership.

108.     Dr. Nelson's most distinctive argument is that I failed to demonstrate that social media has caused net harm, and that my observations overlook offsetting benefits that social media may provide to students. Yet he overlooks that social media platforms have caused significant concrete harms to schools and districts that far outweigh any benefits. These harms are operational realities reported by educators across districts and regions, which require significant resources to address.

109.     Dr. Nelson also argues that my report ignores alternative explanations for rising mental health issues, such as economic disruption, the COVID-19 pandemic, or changes in parenting styles. Educators are not attributing every challenge to social media, but they are consistently reporting an increase in harms that are being caused and intensified by social media patterns.

110.     A unique aspect of Dr. Nelson's critique is his suggestion that because some districts have managed social media use well, the harms I describe must reflect failures of adult adaptation or inadequate policy. This framing misrepresents the main point of my report. My conclusions arise from educational leaders doing their best to meet student needs in the face of social media challenges. The issue is not a lack of adult effort, but the scale and design of platforms that operate beyond the reach of most school-based controls. School leaders cannot modify the platforms' design features but they are left to respond to harms caused by social media platforms.

111.     Dr. Nelson further claims that I do not cite randomized controlled trials (RCTs) or other forms of high-certainty evidence to support my conclusions. This is true—but it reflects the nature of the assignment I was given. I was not retained to conduct a meta-analysis or causal inference study. I was retained to offer a synthesis within my field of expertise of how social media affects students and learning environments. In this context, the consistency and urgency of the patterns I describe—across multiple districts and school types—constitute a legitimate and relevant form of evidence.

<u>Response to the Report of Dr. Jack Smith</u>

112.     Dr. Smith's report attacks my opinions on three grounds: (1) that my professional opinion lacks empirical rigor, (2) that my report fails to demonstrate causality between social media and school-based impacts, and (3) that school systems are capable of addressing these challenges through local policy choices.

113.     While Dr. Smith critiques my report for not employing a formal causal research design, my analysis is consistent with other professionals and experts in my field, as explained above in the unified reply section on causation and specificity.  As I have noted, other Plaintiffs' experts address formal causation research.

114.     Dr. Smith argues that many of the challenges I describe—such as student distraction, behavioral escalation, and mental health strain—are not demonstrably linked to social media. However, my report addresses this directly. Educators are not observing a general deterioration in student behavior with no discernible cause. They are reporting specific incidents

and patterns tied to social media use, such as harassment, compulsive use that disrupts sleep, and attention dysregulation. While longitudinal studies will continue to deepen our understanding, the current literature and expert opinions offered in this case demonstrate social media's significant harmful impact.

115.    Dr. Smith emphasizes that school systems can enact policies to restrict in-school social media use. I acknowledge this explicitly in both my opening report and the unified reply above. But creating and enforcing such policies requires leadership time, policy design, stakeholder negotiation, and continual enforcement. It diverts enormous time away from the educational mission of school districts. It also demands investments in technology, staff supervision, and policy training. These burdens fall squarely on educators and are often less effective when the platforms are designed to evade restrictions or make usage difficult to monitor. Moreover, the fact that schools are increasingly resorting to restriction or removal of tools that designed differently would not be harmful or could even have useful educational potential is itself evidence of a systemic problem. If platforms had prioritized student well-being or educational compatibility in their design choices, and properly warned the public, the policy response from schools might look very different.

116.    In short, Dr. Smith's rebuttal undervalues other specialties, institutional realities and the convergence of experience among those tasked with leading schools. My report does not claim to settle all scientific questions, but it faithfully reflects the lived experience of school and district leaders contending with rising challenges caused by social media.

<u>Response to the Report of Dr. Matthew D. Springer</u>

117.    Dr. Matthew D. Springer's report critiques the absence of a control group, statistical analysis, or formal causal modeling in my opening report, and argues that my conclusions lack generalizability and policy utility as a result. However, his critique misinterprets both the purpose of my report and the type of evidence that supports it.

118.    To be clear, I was not asked to conduct a program evaluation or a formal impact study, nor does my report claim to do so. My role was to assess, interpret, and communicate how school leaders and educators are dealing directly with the effects of social media platform design on student behavior, mental health, and school functioning within my own expertise as a Professor of Practice. I am not offering randomized trial data, but an informed opinion based on experience and study of the real challenges schools and school districts face every day. These insights are not "policy evaluations"; they are field-based observations from the front lines.

119.    Dr. Springer further suggests that the harms educators describe may stem not from social media itself, but from what social media displaces such as sleep, in-person interaction, or physical activity. While displacement is a valid consideration, it does not disprove the role of platform design. On the contrary, it reinforces it: if students are consistently losing sleep, attention, or emotional regulation because they are spending excessive time on social media, then it is crucial to ask why that is happening. As reported in the literature, the features of these platforms are designed in ways that make it difficult for young people to disengage. From

the vantage point of schools, the outcome is a reallocation of time, and a rise in dysregulated behavior, mental health crises, and disruptions to learning.

120.    Dr. Springer also claims that I overstate the consensus among educators about the role of social media in these challenges. While my report does not claim to be based on a statistically representative sample, it draws from my interactions over time with school leaders across multiple regions and systems. The themes that emerged, ranging from cyberbullying to chronic distraction to increased anxiety, are not isolated or idiosyncratic. They are strikingly consistent, regardless of district size or student demographics. That consistency reflects a growing professional concern for school leaders.

121.    Another critique Dr. Springer raises is that my report fails to articulate a clear theory of change or to identify the specific mechanisms by which social media causes harm. While I was not writing a theoretical or mechanistic study, the mechanisms of concern are well-described in both educator experience and scholarly literature.[28]  Educators in direct contact with

---

[28] Andreassen, C. S., Pallesen, S., & Griffiths, M. D. (2017). The relationship between addictive use of social media, narcissism, and self-esteem: Findings from a large national survey. *Addictive Behaviors, 64,* 287–293. https://doi.org/10.1016/j.addbeh.2016.03.006

Angwaomaodoko, E. A. (2024). The Impact of Social Media on Youth Education and Well-being. *Path of Science*, *10*(4), 1010–1017. https://doi.org/10.22178/pos.103-8

Diaz, A. D., Peeples, D. A., & Weigle, P. E. (2025). Depression and Social Media Use in Children and Adolescents. *Pediatric Clinics of North America*, *72*(2), 175–187. https://doi.org/10.1016/j.pcl.2024.07.033

MacKenzie, M. D., Scott, H., Reid, K., & Gardani, M. (2022). Adolescent perspectives of bedtime social media use: A qualitative systematic review and thematic synthesis. *Sleep Medicine Reviews*, *63*, 101626. https://doi.org/10.1016/j.smrv.2022.101626

Montag, C., Sindermann, C., Becker, B., & Panksepp, J. (2016). An Affective Neuroscience Framework for the Molecular Study of Internet Addiction. *Frontiers in Psychology*, *7*. https://doi.org/10.3389/fpsyg.2016.01906

Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent Development in the Digital Media Context. *Psychological Inquiry*, *31*(3), 229–234. https://doi.org/10.1080/1047840X.2020.1820219

Office of the U.S. Surgeon General. (2023). *Social Media and Youth Mental Health: The U.S. Surgeon General's advisory*. U.S. Department of Health and Human Services. https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

Patchin, J. W. (2023, October 4*). Cyberbullying Continues to Rise among Youth in the United States*. Cyberbullying Research Center. https://cyberbullying.org/cyberbullying-continues-to-rise-among-youth-in-the-united-states-2023

students are observing not abstract correlations, but concrete behavioral patterns that reflect the harmful effects of social media.

122.    Finally, Dr. Springer suggests that my report does not offer actionable or policy-relevant findings. But understanding how practitioners experience a problem is a crucial precursor to developing effective responses. My report does not attempt to prescribe particular remedies, instead, it highlights the scope and urgency of the social media harms schools are being forced to confront.

123.    In short, Dr. Springer's critique holds my report to standards it was not designed or required to meet. My opinions are based on my experience in schools and interacting with school and school district leaders and reflects how the design of social media platforms affects students and schools. That perspective, while different from modeling causation as Dr. Springer seems to suggest I should, is well-accepted in the educational field in order to inform full understanding of the problem.

<u>Response to the Report of Dr. Diana Wildermuth</u>

124.    Dr. Diana Wildermuth wrongly argues that my report offers "lay opinion dressed up as expertise" and suggests that it fails to meet the standards of professional reliability. Dr.

Popat, A., & Tarrant, C. (2022). Exploring adolescents' perspectives on social media and mental health and well-being – A qualitative literature review. *Clinical Child Psychology and Psychiatry*, *28*(1), 323–337. https://doi.org/10.1177/13591045221092884

University of Pittsburgh Schools of the Health Sciences. (2016, March 22). *Social media use associated with depression among US young adult*s. ScienceDaily. https://www.sciencedaily.com/releases/2016/03/160322100401.htm

Scott, H., Biello, S. M., & Woods, H. C. (2019). Identifying drivers for bedtime social media use despite sleep costs: The adolescent perspective. *Sleep Health*, *5*(6), 539–545. https://doi.org/10.1016/j.sleh.2019.07.006

Siebers, T., Beyens, I., Pouwels, J. L., & Valkenburg, P. M. (2021). Social media and Distraction: An Experience Sampling Study among Adolescents. *Media Psychology*, *25*(3), 343-366. https://doi.org/10.1080/15213269.2021.1959350

Watson, J. C., Prosek, E. A., & Giordano, A. L. (2021). Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness. *Journal of Psychoeducational Assessment*, *40*(1), 95-107. https://doi.org/10.1177/07342829211050536

Young, E., McCain, J. L., Mercado, M. C., Ballesteros, M. F., Moore, S., Licitis, L., Stinson, J., Jones, S. E., & Wilkins, N. J. (2024). Frequent Social Media Use and Experiences with Bullying Victimization, Persistent Feelings of Sadness or Hopelessness, and Suicide Risk Among High School Students — Youth Risk Behavior Survey, United States, 2023. *MMWR Supplements*, *73*(4), 23-30. http://dx.doi.org/10.15585/mmwr.su7304a3

Wildermuth's critique reflects a misunderstanding of both the basis for my conclusions and the legitimate role of practitioner expertise in evaluating school district challenges and operations.

125.    A central theme of Dr. Wildermuth's critique is that I do not apply a scientific methodology and instead rely on unverified anecdotes. This mischaracterizes the approach I took. As an experienced educational leader, I have been trained to interpret patterns of behavior, institutional stress, and student well-being over time and across systems. My report offers a methodological, field-based synthesis of testimony from district leaders, school staff, and relevant documentation. These are informed assessments made by professionals with deep knowledge of their students and schools, often supported by internal records and firsthand accounts.

126.    What makes Dr. Wildermuth's critique distinctive among defense experts is her focus on legal admissibility standards despite the fact that she is not a lawyer. She argues that I do not reliably apply principles or methods of my field and that my opinions, therefore, lack a sufficient foundation. In doing so, she suggests that educational leadership is not a discipline that can provide valid insights on questions involving student mental health, behavior, or institutional harm. This is wrong. School leaders have both the responsibility and the training to assess patterns of concern, allocate resources in response to emerging risks, and interpret environmental factors that affect student safety and learning.

127.    Dr. Wildermuth also critiques my reliance on qualitative data, suggesting that it renders my conclusions speculative. She misunderstands the value of qualitative data, which is widely accepted and used by educators evaluating and responding to challenges in schools. I did not attempt to present my report as a statistical analysis. Instead, I explained the professional logic by which social media harms school districts.

128.    Another incorrect assertion in Dr. Wildermuth's report is her claim that I improperly serve as a conduit for third-party hearsay and that my report lacks independent validation. My role is not to relay hearsay, but to apply my decades of expertise in the field to synthesize the judgment of educational professionals who are responding to persistent patterns. These judgments of trained leaders acting in their official capacities support and bolster my conclusions about how social media affects school districts.

129.    Finally, Dr. Wildermuth implies that because I do not quantify harm or isolate social media as the sole cause of school challenges, my opinions lack probative value. As detailed above, my report is designed to provide critical insight into understanding how social media platform design is affecting school districts by incorporating both academic studies and the perspective of educators and school leaders who witness its significant negative effects on a daily basis.

## Conclusion

130.    The defense expert reports reflect a fundamental disagreement, not so much over whether social media is affecting schools, but over how to interpret those effects and who should be held responsible. Based on years studying, observing and supporting school leaders in real-

world settings, the effects of social media on schools and districts are significant, cumulative, and increasingly difficult to manage within the existing capacity of educational institutions.

131.    The question is not whether schools are still functioning. Of course, they are. Educators are resilient, and students continue to be capable of growth and achievement. But schools and districts are functioning under social-media induced strain, causing expenditure and diversion of resources to address the significant harms they face due to social media. When systems are continually pulled into reactive postures, responding to conflict, managing the harms caused by social media, and navigating the blurred boundaries between in-school and out-of-school behaviors, the costs to schools and districts are real. These challenges result not only in leadership fatigue and eroded instructional focus but also in missed opportunities to build healthier school cultures and stronger learning environments.

## Reservation of Rights

132.    My testimony is based upon the information presently available to me. I reserve the right to amend or modify my testimony should circumstances warrant.

Page **32** of **33**

**Certification**

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Signature:  _Brian Osborne_____          Date:  _7/30/2025_
Brian G. Osborne, Ed.D.

# APPENDIX C

# MATERIALS CONSIDERED

## Articles

Andreassen, C. S., Pallesen, S., & Griffiths, M. D. (2017). The relationship between addictive use of social media, narcissism, and self-esteem: Findings from a large national survey. *Addictive Behaviors*, *64*, 287–293. https://doi.org/10.1016/j.addbeh.2016.03.006

Angwaomaodoko, E. A. (2024). The Impact of Social Media on Youth Education and Well-being. *Path of Science*, *10*(4), 1010–1017. https://doi.org/10.22178/pos.103-8

Brooks, J. S., & Normore, A. H. (2015). Qualitative research and educational leadership: Essential dynamics to consider when designing and conducting studies. *International Journal of Educational* Management, *29*(7), 798-806. https://doi.org/10.1108/IJEM-06-2015-0083

Clarke, S., & O'Donoghue, T. (2016). Educational Leadership and Context: A Rendering of an Inseparable Relationship. *British Journal of Educational Studies*, *65*(2), 167–182. https://doi.org/10.1080/00071005.2016.1199772

Cyberbullying Research Center. (2021, February 24). *Amicus curiae brief in support of petitioners, Supreme Court of the United States, No. 20-255*. https://www.supremecourt.gov/DocketPDF/20/20-255/169848/20210224135419750_20-255tsacCyberbullyingResearchCenter.pdf

Diaz, A. D., Peeples, D. A., & Weigle, P. E. (2025). Depression and Social Media Use in Children and Adolescents. *Pediatric Clinics of North America*, *72*(2), 175–187. https://doi.org/10.1016/j.pcl.2024.07.033

Ingram, P. D. (1997). Leadership behaviours of principals in inclusive educational settings. *Journal of Educational Administration*, *35*(5), 411-427. https://doi.org/10.1108/09578239710184565

MacKenzie, M. D., Scott, H., Reid, K., & Gardani, M. (2022). Adolescent perspectives of bedtime social media use: A qualitative systematic review and thematic synthesis. *Sleep Medicine Reviews*, *63*, 101626. https://doi.org/10.1016/j.smrv.2022.101626

Montag, C., Sindermann, C., Becker, B., & Panksepp, J. (2016). An Affective Neuroscience Framework for the Molecular Study of Internet Addiction. *Frontiers in Psychology*, *7*. https://doi.org/10.3389/fpsyg.2016.01906

Nesi, J., Telzer, E. H., & Prinstein, M. J. (2020). Adolescent Development in the Digital Media Context. *Psychological Inquiry*, *31*(3), 229–234. https://doi.org/10.1080/1047840X.2020.1820219

Office of the U.S. Surgeon General. (2023). *Social Media and Youth Mental Health: The U.S. Surgeon General's advisory*. U.S. Department of Health and Human Services. https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf

Patchin, J. W. (2023, October 4*). Cyberbullying Continues to Rise among Youth in the United States*. Cyberbullying Research Center. https://cyberbullying.org/cyberbullying-continues-to-rise-among-youth-in-the-united-states-2023

Popat, A., & Tarrant, C. (2022). Exploring adolescents' perspectives on social media and mental health and well-being – A qualitative literature review. *Clinical Child Psychology and Psychiatry*, *28*(1), 323–337. https://doi.org/10.1177/13591045221092884

Scott, H., Biello, S. M., & Woods, H. C. (2019). Identifying drivers for bedtime social media use despite sleep costs: The adolescent perspective. *Sleep Health*, *5*(6), 539–545. https://doi.org/10.1016/j.sleh.2019.07.006

Siebers, T., Beyens, I., Pouwels, J. L., & Valkenburg, P. M. (2021). Social media and Distraction: An Experience Sampling Study among Adolescents. *Media Psychology*, *25*(3), 343-366. https://doi.org/10.1080/15213269.2021.1959350

Thiagarajan, T. C., Newson, J. J., & Swaminathan, S. (2025). Protecting the Developing Mind in a Digital Age: A Global Policy Imperative. *Journal of Human Development and Capabilities*, *26*(3), 493-504. https://doi.org/10.1080/19452829.2025.2518313

University of Pittsburgh Schools of the Health Sciences. (2016, March 22). *Social media use associated with depression among US young adult*s. ScienceDaily. https://www.sciencedaily.com/releases/2016/03/160322100401.htm

Vogels, E. A., Gelles-Watnick, R. & Massarat, N. (2022, August 10). *Teens, Social Media and Technology 2022*. Pew Research Center. https://www.pewresearch.org/internet/2022/08/10/teens-social-media-and-technology-2022

Watson, J. C., Prosek, E. A., & Giordano, A. L. (2021). Distress Among Adolescents: An Exploration of Mattering, Social Media Addiction, and School Connectedness. *Journal of Psychoeducational Assessment*, *40*(1), 95-107. https://doi.org/10.1177/07342829211050536

Young, E., McCain, J. L., Mercado, M. C., Ballesteros, M. F., Moore, S., Licitis, L., Stinson, J., Jones, S. E., & Wilkins, N. J. (2024). Frequent Social Media Use and Experiences with Bullying Victimization, Persistent Feelings of Sadness or Hopelessness, and Suicide Risk Among High School Students — Youth Risk Behavior Survey, United States, 2023. *MMWR Supplements*, *73*(4), 23-30. http://dx.doi.org/10.15585/mmwr.su7304a3

## Litigation Documents – Plaintiffs' Expert Reports

May 16, 2025 Expert Report of Anna Lembke, M.D.

May 16, 2025 Expert Report of Jean Twenge, Ph.D.

May 16, 2025 Expert Report of Dimitri Christakis, Ph.D., M.P.H.

May 16, 2025 Expert Report of Ramin Mojtabai

May 16, 2025 Expert Report of Sharon Hoover, Ph.D.

May 16, 2025 Expert Report of Gary Goldfield, Ph.D. C. Psych.

**<u>Litigation Documents – Defense Expert Reports</u>**

July 9, 2025 General Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 9, 2025 General Expert Report of Neil Malhotra, Ph.D.

July 9, 2025 General Expert Report of Stephen Aguilar, Ph.D.

July 9, 2025 General Expert Report of Ethan Hutt, Ph.D.

July 9, 2025 General Expert Report of Ian Gotlib, Ph.D.

July 9, 2025 General Expert Report of Randy Auerbach, Ph.D.

July 9, 2025 General Expert Report of Robert Platt, Ph.D.

July 10, 2025 Charleston Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 10, 2025 DeKalb Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 10, 2025 Harford Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 10, 2025 Irvington Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 10, 2025 Tucson Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 11, 2025 Breathitt Expert Report of Diana Wildermuth, Ph.D., LPC, NCC, CCTP-II

July 11, 2025 Breathitt Expert Report of Darius Lakdawalla, Ph.D.

July 11, 2025 Charleston Expert Report of Darius Lakdawalla, Ph.D.

July 11, 2025 Harford Expert Report of Darius Lakdawalla, Ph.D.

July 11, 2025 Tucson Expert Report of Darius Lakdawalla, Ph.D.

July 11, 2025 DeKalb Expert Report of Joshua Hyman, Ph.D., with Appendices

July 11, 2025 Irvington Expert Report of Joshua Hyman, Ph.D., with Appendences

July 11, 2025 General Expert Report of Jack Smith, Ph.D., with Appendix A & B

July 11, 2025 General Expert Report of Kelvin Adams, Ph.D., with Appendix A & B

July 11, 2025 General Expert Report of Matthew Jennings, Ed.D., with Appendix A, B & C

July 11, 2025 Breathitt Expert Report of Robert Nelson, Ed.D., with Appendix A, B, C & D

July 11, 2025 Charleston Expert Report of Robert Nelson, Ed.D., with Appendix A, B, C & D

July 11, 2025 Tucson Expert Report of Michele Moore, Ed.D.

July 11, 2025 Tucson Expert Report of Matthew Springer, Ph.D.

July 11, 2025 Breathitt Expert Report of Ethan Hutt, Ph.D.

July 11, 2025 Charleston Expert Report of Ethan Hutt, Ph.D.

July 11, 2025 DeKalb Expert Report of Ethan Hutt, Ph.D.

July 11, 2025 Harford Expert Report of Ethan Hutt, Ph.D.

July 11, 2025 Irvington Expert Report of Ethan Hutt, Ph.D.

July 11, 2025 Tucson Expert Report of Ethan Hutt, Ph.D.