**Exhibit 110**

# SCHOOL DISTRICT/LOCAL GOVERNMENT ENTITY PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
2                    -   -   -
3    IN RE: SOCIAL MEDIA      : Case No.
     ADOLESCENT               : 4:22-MD-03047-YGR
4    ADDICTION/PERSONAL       : MDL No. 3047
     INJURY PRODUCTS          :
5    LIABILITY LITIGATION,    :
                              :
6    This Document Relates to:
     All Actions              :
7
8
                     -   -   -
9
               SEPTEMBER 4, 2025
10
                     -   -   -
11
12            Videotaped deposition of
13   BRIAN OSBORNE, Ed.D., taken pursuant to
14   notice, was held at the law offices of
15   Kessler Topaz Meltzer & Check, LLP, 280
16   King of Prussia Road, Radnor,
17   Pennsylvania 19087, commencing at 9:09
18   a.m., on the above date, before Amanda
19   Dee Maslynsky-Miller, a Court Reporter
20   and Certified Realtime Reporter.
21
22                   -   -   -
          GOLKOW, A VERITEXT COMPANY
23      877.370.3377 ph| 917.591.5672 fax
               deps@golkow.com
24

CONFIDENTIAL

```
                                          Page 2

 1    APPEARANCES:
 2
 3            MEHRI & SKALET, PLLC
              BY: CYRUS MEHRI, ESQUIRE
 4            2000 K Street NW
              Suite 325
 5            Washington, DC 20006
              (202) 822-5100
 6            cmehri@findjustice.com
              Representing the Plaintiffs
 7
 8
 9
              BROCKSTEDT MANDALAS FEDERICO, LLC
10            BY: MATTHEW P. LEGG, ESQUIRE
              2850 Quarry Lake Drive
11            Suite 220
              Baltimore, Maryland 21209
12            (410) 421-7777
              mlegg@lawbmf.com
13            Representing the Plaintiffs
14
15
              WILLIAMS & CONNOLLY LLP
16            BY: DANIEL WHITELEY, ESQUIRE
              680 Maine Avenue SW
17            Washington, DC 20024
              (202) 434-5000
18            dwhiteley@wc.com
              Representing the Defendants,
19            YouTube, LLC, and Google LLC
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES: (Continued)
 2
 3
             COVINGTON & BURLING LLP
 4           BY: CHRISTIAN J. PISTILLI, ESQUIRE
             One CityCenter
 5           850 Tenth Street, NW
             Washington, DC 20001
 6           (202) 662-6000
             cpistilli@cov.com
 7
             - and -
 8
             BY: CONNOR KENNEDY, ESQUIRE
 9           3000 El Camino Real
             5 Palo Alto Square
10           10th Floor
             Palo Alto, California 94306
11           (650) 632-4700
             ckennedy@cov.com
12           Representing the Defendant,
             Meta Platforms, Instagram and
13           Siculus
14
15
16           KING & SPALDING LLP
             BY: KATHRYN S. LEHMAN, ESQUIRE
17           Southeast Financial Center
             200 S Biscayne Boulevard
18           Suite 4700
             Miami, Florida 33131
19           klehman@kslaw.com
             Representing the Defendants,
20           TikTok Inc., ByteDance Inc.,
             ByteDance Ltd., TikTok Ltd., and
21           TikTok, LLC
22
23
24
```

```
                                              Page 4
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
 4          MUNGER, TOLLES & OLSON LLP
            BY: ROWLEY J. RICE, ESQUIRE
 5          350 South Grand Avenue
            50th Floor
 6          Los Angeles, California 90071
            (213) 683-9100
 7          rowley.rice@mto.com
            Representing the Defendant,
 8          Snap, Inc.
 9
10
            KESSLER TOPAZ MELTZER & CHECK, LLP
11          BY: TYLER S. GRADEN, ESQUIRE
            280 King of Prussia Road
12          Radnor, Pennsylvania 19087
            (610) 667-7706
13          tgraden@ktmc.com
            Representing the MDL and JCCP
14          Plaintiffs
15
16
            BROCKSTEDT MANDALAS FEDERICO, LLC
17          BY: JUSTIN WEATHERS, PARALEGAL
            2850 Quarry Lake Drive
18          Suite 220
            Baltimore, Maryland 21209
19          (410) 421-7777
            jweathers@lawbmf.com
20          Representing the Plaintiffs
21
22
23
24
```

CONFIDENTIAL

Page 5

```
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
             LEVIN SEDRAN & BERMAN LLP
 4           BY: FREDERICK S. LONGER, ESQUIRE
             BY: MICHAEL M. WEINKOWITZ, ESQUIRE
 5           510 Walnut Street
             Suite 500
 6           Philadelphia, Pennsylvania 19106
             (877) 882-1011
 7           flonger@lfsblaw.com
             mweinkowitz@lfsblaw.com
 8           Representing the Plaintiffs
 9
10
             EILAND & BONNIN LAW FIRM
11           BY: CRAIG EILAND, ESQUIRE
             BY: DAVID BONNIN, ESQUIRE
12           2200 Market Street
             Suite 501
13           Galveston, Texas 77550
             (409) 763-3260
14           ceiland@eilandlaw.com
             dbonnin@eilandlaw.com
15           Representing the Plaintiffs
16
17           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
             BY: KELLY MCNABB, ESQUIRE
18           250 Hudson Street
             8th Floor
19           New York, New York 10013
             (212) 355-9500
20           Kmcnabb@lchb.com
             Representing the Plaintiffs
21
22
23
24
```

CONFIDENTIAL

Page 6

```
 1   APPEARANCES: (Continued)
 2   VIA ZOOM:
 3
 4        COVINGTON & BURLING LLP
          BY: AUSTIN BEAUDOIN, LAW CLERK
 5        The New York Times Building
          620 Eighth Avenue
 6        New York, New York 10018
          (212) 841-1000
 7        Representing Meta Platforms,
          Instagram and Siculus
 8
 9
10
11   ALSO PRESENT:
     Olivia Sattan, Videographer
12   Ray Moore, Trial Technician
13
                    -   -   -
14
15
16
17
18
19
20
21
22
23
24
```

Page 7

```
 1                     -   -   -
 2                  I N D E X
 3                     -   -   -
 4
    Testimony of:  BRIAN OSBORNE, Ed.D.
 5
 6       By Attorney Pistilli              13
         By Attorney Rice                 352
 7       By Attorney Lehman               359
         By Attorney Whiteley             374
 8       By Attorney Mehri                383
 9
10                     -   -   -
11                E X H I B I T S
12                     -   -   -
13
    NO.            DESCRIPTION                  PAGE
14
    Osborne-1     No Bates
15                Curriculum Vitae of
                  Brian Osborne, Ed.D.        20
16
    Osborne-2     No Bates
17                1/8/25 E-mail,
                  Osborne to Kennedy          81
18
    Osborne-3     No Bates
19                Invoices                    84
20  Osborne-4     No Bates
                  Promoting Equity in the Modern
21                Superintendency             89
22  Osborne-5     No Bates
                  Pioneering Use of Technology
23                Transforms Teaching in
                  New York Schools            96
24
```

CONFIDENTIAL

```
                                              Page 8

  1                      -   -   -
  2               E  X  H  I  B  I  T  S
  3                      -   -   -
  4
      NO.              DESCRIPTION                    PAGE
  5
      Osborne-6        No Bates
  6                    Materials Considered
                       List                          100
  7
      Osborne-7        No Bates
  8                    5/16/25 Expert Report of
                       Brian G. Osborne              109
  9
      Osborne-8        No Bates
 10                    7/30/25 Rebuttal Expert Report
                       of Brian G. Osborne           110
 11
      Osborne-9        No Bates
 12                    Qualitative research and
                       Educational leadership:
 13                    Essential dynamics to consider
                       When designing and conducting
 14                    Studies                       200
 15   Osborne-10       No Bates
                       Leadership Behaviours of
 16                    Principals in Inclusive
                       Educational Settings          219
 17
      Osborne-11       No Bates
 18                    Journal of Youth Studies,
                       Volume 26                      294
 19
      Osborne-12       No Bates
 20                    Neuroscience and Biobehavioral
                       Reviews, Volume 120           303
 21
      Osborne-13       No Bates
 22                    Plaintiffs Fact Sheet         331
 23   Osborne-14       No Bates
                       Dekalb County, Social Media
 24                    Guidelines for Students       334
```

CONFIDENTIAL

```
                                         Page 9

 1                   -   -   -
 2               E X H I B I T S
 3                   -   -   -
 4
    NO.            DESCRIPTION                    PAGE
 5
    Osborne-15     No Bates
 6                 Frontiers in Psychology; An
                   Affective Neuroscience
 7                 Framework for the Molecular
                   Study of Internet Addiction;
 8                 Montag                        383
 9  Osborne-16     No Bates
                   Psychological Inquiry;
10                 Adolescent Development in
                   the Digital Media Context;
11                 Nesi                          385
12  Osborne-17     No Bates
                   Journal of Psychoeducational
13                 Assessment; Distress Among
                   Adolescents: An Exploration
14                 of Mattering, Social Media
                   Addiction, and School
15                 Connectedness; Watson         386
16  Osborne-18     No Bates
                   Clinical Child Psychology;
17                 Exploring Adolescents'
                   Perspectives on Social Media
18                 and Mental Health and
                   Well-Being - A Qualitative
19                 Literature Review;
                   Anjali Popat and Carolyn
20                 Tarrant                       388
21  Osborne-19     No Bates
                   Science Daily; March 22, 2026,
22                 Social Media Use Associated
                   With Depression Among U.S.
23                 Young Adults                  389
24
```

CONFIDENTIAL

Page 10

1                    -   -   -

2              E X H I B I T S

3                    -   -   -

4

   NO.                 DESCRIPTION                      PAGE

5

   Osborne-20    No Bates

6                 Learning Policy Institute -
                  How Money Matters for

7                 Schools; Bruce D. Baker      391

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 11

1                           -   -   -

2               DEPOSITION SUPPORT INDEX

3                           -   -   -

4

5    Direction to Witness Not to Answer

6    Page Line      Page Line      Page Line

7    None

8

9

10   Request for Production of Documents

11   Page Line      Page Line      Page Line

12   294      2

13

14

15   Stipulations

16   Page Line      Page Line      Page Line

17   12       1

18

19

20   Question Marked

21   Page Line      Page Line      Page Line

22   None

23

24

CONFIDENTIAL

Page 12

```
 1                - - -
 2              (It is hereby stipulated and
 3         agreed by and among counsel that
 4         sealing, filing and certification
 5         are waived; and that all
 6         objections, except as to the form
 7         of the question, will be reserved
 8         until the time of trial.)
 9                - - -
10              VIDEO TECHNICIAN:  We are
11         now on the record.  My name is
12         Olivia Sattan, and I'm a
13         videographer for Golkow.  Today's
14         date is September 4th, 2025, and
15         the time is 9:09 a.m.
16              This video deposition is
17         being held in Radnor,
18         Pennsylvania, in the matter of In
19         Re: Social Media Adolescent
20         Addiction Personal Injury Products
21         Liability Litigation for the Court
22         of the United States District
23         Court, Northern District of
24         California.  The deponent is Brian
```

CONFIDENTIAL

Page 13

1         Osborne.
2              Counsel will be noted on the
3         stenographic record.  The court
4         reporter is Amanda Miller, and
5         will now swear in the witness.
6                   -  -  -
7              BRIAN OSBORNE, after having
8         been duly sworn, was examined and
9         testified as follows:
10                  -  -  -
11                  EXAMINATION
12                  -  -  -
13    BY ATTORNEY PISTILLI:
14         Q.    Good morning, Dr. Osborne.
15         A.    Good morning.
16         Q.    My name is Chris Pistilli.
17    I'm an attorney with the law firm of
18    Covington and Burling.  I represent Meta,
19    and I'm going to be deposing you today on
20    behalf of Meta, TikTok, Snap and YouTube.
21              If I refer to those
22    companies collectively as "defendants,"
23    will you understand what I mean?
24         A.    I will.

CONFIDENTIAL

Page 14

1          Q.    Could you please state your

2    full name for the record?

3          A.    Brian Osborne.

4          Q.    Could you please state your

5    current employer and job title?

6          A.    Lehigh College of Education.

7    I'm a professor of practice.

8          Q.    Have you ever been deposed

9    before?

10         A.    I have.

11         Q.    How many times?

12         A.    Once.

13         Q.    And what was that matter?

14         A.    That was a matter involving

15   the United Federation of Teachers in New

16   York City.  And it was about due process

17   rights for probationary teachers.

18               This was in 2012.

19         Q.    Did you testify as an expert

20   in that matter?

21         A.    No.

22         Q.    Have you ever testified at a

23   trial before?

24         A.    I have, yes.

CONFIDENTIAL

Page 15

1          Q.    And what was that matter?
2          A.    I testified in two trials.
3    One was a tenure case.  It was an
4    administrative law judge proceeding.  I
5    don't remember exactly when; I think it
6    was the '11/'12 school year.  I was
7    superintendent in South Orange Maplewood
8    at the time, and it was a tenure case.
9              And the second time was in
10   New York in 2022.  And that was a
11   discrimination case against New Rochelle
12   where I had been superintendent.
13         Q.    And you were a fact witness
14   in both of those trials?  Strike that.
15             Were you an expert in either
16   of those matters?
17         A.    No.  No.
18         Q.    Before we go any further,
19   I'd like to go over a few ground rules
20   with you.
21             You understand you're under
22   oath today, right?
23         A.    I do.
24         Q.    That means you have to offer

CONFIDENTIAL

Page 16

1   truthful, accurate, complete testimony?

2         A.     That's my understanding.

3         Q.     Is there any reason you

4   can't do that today?

5         A.     No.

6         Q.     Is there anything that would

7   adversely affect your ability to

8   understand my questions or recall

9   information today?

10        A.     No.  No.

11        Q.     The court reporter is going

12  to be writing down what we say today.

13  That means that your answers to my

14  questions need to be verbal so they can

15  appear on the record.

16             Is that fair?  Do you

17  understand that?

18        A.     I understand that.

19        Q.     Okay.  And because the court

20  reporter can only write down what one of

21  us is saying at a time, let's both do our

22  best to not speak over one another.

23             I'll try to wait for you to

24  finish your answer before I ask my next

CONFIDENTIAL

Page 17

1  question.  And I'd ask you to let me

2  finish my question before you start

3  answering.

4              Is that fair?

5      A.    That makes sense to me.

6      Q.    If at any point I say

7  something that's unclear, you don't

8  understand my question, please let me

9  know, and I'll clarify it for you.

10             Otherwise, I'm going to

11  assume that you understand my question.

12             Is that fair?

13     A.    Okay.  I'll do that.

14     Q.    And if you need to take a

15  break, just let me know.  I'll want you

16  to answer the question that's pending,

17  but I'm always happy to accommodate a

18  break, okay?

19     A.    Thank you.

20     Q.    What, if anything, did you

21  do to prepare for your deposition today?

22     A.    I read the reports that I

23  wrote and some of the other depositions.

24     Q.    What other depositions?

CONFIDENTIAL

Page 18

1          A.    I skimmed the one from

2    Hoover, just to get an idea of, like,

3    what this is -- how this goes.

4          Q.    Any other depositions?

5          A.    Yes.  I read -- I skimmed, I

6    think it's Leslie.

7                That's it.

8          Q.    Leslie and Hoover

9    depositions?

10         A.    Yeah.

11         Q.    Other than those deposition

12    transcripts and your reports, did you

13    read anything else to prepare for your

14    deposition today?

15         A.    No.

16         Q.    Did you meet with counsel to

17    prepare for your deposition?

18         A.    I did.

19         Q.    Who did you meet with?

20         A.    With Cyrus, Matt and Nick

21    Lee.

22         Q.    On how many occasions did

23    you meet?

24         A.    Three times, I think.

Page 19

1          Q.     For about how long each
2     time?
3          A.     The first one was short,
4     maybe an hour.  And then I met again for
5     just a short half-hour.
6               And then the third time was
7     longer, it was a few hours.
8          Q.     Like, three hours?
9          A.     Three -- three, four hours,
10    yeah.
11         Q.     Did you speak with anyone
12    other than counsel about your deposition?
13         A.     No.
14         Q.     Do you know what the
15    bellwether school districts in this case
16    are?
17         A.     You know, I don't think I
18    recall all of them.
19               I know Tucson is one.
20    Irvington is one.  Charleston is one, I
21    think.  And then there are three others I
22    know.
23         Q.     Breathitt, DeKalb and
24    Harford, are those the other three?

CONFIDENTIAL

Page 20

1          A.      Okay.  Yes.

2          Q.      If I say so.

3          A.      No.  I recall that, yes.

4          Q.      Did you speak to anyone at

5    those districts?

6          A.      I did not, no.

7          Q.      Other than what we've

8    already discussed, did you do anything to

9    prepare for your deposition today?

10         A.      Other than what we

11   discussed, no, not that I recall.

12              Thought a lot about what I

13   might say.

14              ATTORNEY PISTILLI:  Let's

15         pull up Tab 1.  And we can mark

16         this for identification as

17         Exhibit-1.

18                   -   -   -

19              (Whereupon, Exhibit

20         Osborne-1, No Bates, Curriculum

21         Vitae of Brian Osborne, Ed.D., was

22         marked for identification.)

23                   -   -   -

24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 21

```
 1          Q.     Is this a copy of your CV?
 2          A.     Yes, this is my resume.
 3          Q.     And could you just briefly
 4   describe your educational background?
 5          A.     Sure.  My educational
 6   background is one of -- do you mean my --
 7   my -- like, the education I received?
 8          Q.     Yes.  Your education.
 9          A.     Oh, okay.  I earned a
10   Bachelor's degree from Colgate University
11   in philosophy and religion.  A Master's
12   degree in teaching of mathematics from
13   New York University.  A Master's degree
14   in public administration and policy from
15   Harvard Graduate School of Education that
16   I had a concentration in the urban
17   superintendents program.  And a Doctoral
18   degree also from Harvard Graduate School
19   of Education in public policy and
20   administration, also with a concentration
21   in the urban superintendents program.
22                I see here that the degrees
23   are administration, planning and social
24   policy.  I think I just called them the
```

CONFIDENTIAL

Page 22

1    wrong thing just now.

2         Q.     In 2003, 2004, you were the

3    director of the office of instructional

4    technology?

5         A.     In the New York City

6    Department of Education, that's right.

7         Q.     What did that position

8    entail?

9         A.     That position entailed

10   responsibility for Title IID planning and

11   expenditure for the New York City

12   Department of Education, as well as

13   coordinating with regional instructional

14   technology specialists across the city.

15        Q.     And then from 2004 to 2007,

16   you had a different position with the New

17   York City Department of Education?

18        A.     Yes.

19        Q.     What position was that?

20        A.     Chief of staff of teaching

21   and learning.

22        Q.     And what did that position

23   entail?

24        A.     That position entailed

CONFIDENTIAL

Page 23

1  directly supporting the deputy chancellor

2  for teaching and learning.  So there was

3  a large set of responsibilities and an

4  expansive portfolio.

5           The deputy chancellor was

6  responsible for all of teaching and

7  learning and instruction, central

8  offices, oversaw the regional

9  instructional superintendents and,

10  through them, the principals of all the

11  schools in the city.

12           So in that capacity, I led

13  central office instructional support for

14  the initiatives of ten regional

15  superintendents for the local

16  instructional superintendents.  There was

17  another district called District 75,

18  which was specific to special education,

19  and schools citywide.

20           And that involved supporting

21  on operations, on curriculum and

22  instruction.  All the teaching and

23  learning initiatives.

24      Q.    And during your time with

CONFIDENTIAL

Page 24

1    the New York City Department of
2    Education, were students allowed
3    unfettered access to their digital
4    devices?
5         A.    I can't answer that.
6    There's -- there's a -- the system is
7    vast, you know; it has more than one
8    million kids.  It has, like, 1,500
9    schools.  So I'm sure practices varied
10   from place to place.
11              I don't know if kids were
12   allowed unfettered access in all places.
13        Q.    Were there any district-wide
14   policies at the time you were with the
15   New York City Department of Education?
16              ATTORNEY MEHRI:  Objection.
17              Go ahead.
18              THE WITNESS:  Were there
19        any --
20   BY ATTORNEY PISTILLI:
21        Q.    Any district-wide policies
22   relating to the use of digital devices?
23        A.    I suppose there were.  I
24   mean, I don't recall specifically.

CONFIDENTIAL

Page 25

1          Q.    You don't recall what those
2     policies were?
3          A.    I don't recall what those
4     policies were, no.  This was 20 years
5     ago.
6          Q.    And then why did you leave
7     the New York City Department of
8     Education?
9          A.    I left the New York City
10    Department of Education because I was
11    recruited to become superintendent in
12    South Orange Maplewood, New Jersey.
13         Q.    During what period of time
14    were you superintendent in South Orange
15    Maplewood?
16         A.    From 2007 to 2014.
17         Q.    How many students were in
18    that district?
19         A.    There were about 7,000
20    students in that district.
21         Q.    And how many schools?
22         A.    We had nine schools.
23         Q.    And during your time as a
24    superintendent, were students allowed

CONFIDENTIAL

Page 26

1   unfettered access to their digital

2   devices?

3           A.    You know, I don't -- I don't

4   exactly recall.  And I'm not sure exactly

5   what the policies would have been in

6   every classroom and in every school

7   during that time.

8                2007, things were --

9   digital -- portable personal digital

10  devices were pretty new on the scene.  So

11  I'm not sure what the rules were in every

12  place.

13          Q.    Do you recall any

14  district-wide policies, at any time while

15  you were superintendent, relating to the

16  use of digital devices?

17          A.    I don't recall specific

18  policies, no.

19          Q.    Why did you leave your

20  position with the South Orange Maplewood

21  public schools?

22          A.    I left South Orange

23  Maplewood public schools because I was

24  recruited to be superintendent in New

Page 27

1   Rochelle, New York.

2           Q.      And for how long were you

3   superintendent in New Rochelle, New York?

4           A.      About four years.  A little

5   more than four years.

6           Q.      From 2014 to 2018?

7           A.      Yes.

8           Q.      How many students in that

9   district?

10          A.      New Rochelle had, at the

11  time, about 11,000 students.

12          Q.      And how many schools?

13          A.      There were 11 schools.

14          Q.      And from 2014 to 2018 when

15  you were superintendent in New Rochelle,

16  were students allowed unfettered access

17  to their digital devices?

18          A.      Again, I can't -- I'm -- I

19  can't answer that question, because

20  there's a large system with variation

21  across schools and classrooms.  So some

22  may have been.

23          Q.      Did you, as superintendent,

24  put in place any district-wide policies

CONFIDENTIAL

Page 28

1  relating to the use of digital devices?

2          A.    Not that I recall.

3          Q.    And since 2008, you've

4  worked primarily as a consultant and a

5  professor at Lehigh University; is that

6  right?

7                ATTORNEY MEHRI:  Objection.

8                THE WITNESS:  No.

9  BY ATTORNEY PISTILLI:

10         Q.    Could you describe your

11 employment since 2018?

12         A.    Oh.  Since 2018, yes.

13         Q.    So since 2018, you've worked

14 as a professor at Lehigh and as a

15 consultant?

16         A.    Yes.

17         Q.    Could you generally describe

18 what your work as a consultant entails?

19         A.    Sure.  As an educational

20 consultant in educational leadership, I

21 provide a number of services to different

22 organizations.

23                The primary one being that I

24 serve as an executive coach, usually for

CONFIDENTIAL

Page 29

1  new principals or new superintendents or

2  new district, like, central office

3  leaders.

4         Occasionally, if someone

5  needs extra support, they're not new but

6  they're struggling and they need extra

7  support, that's one area of my work as an

8  educational consultant.

9         Another area is providing

10 support for superintendents and their

11 boards of education on issues of

12 governance and improving governance

13 practices.

14         I also will provide some

15 professional development to leaders as a

16 whole or whatever a superintendent may be

17 facing as a problem of practice.

18      Q.    And in your consulting

19 roles, do you assist with developing or

20 changing district-wide policies?

21      A.    Generally, no.  My work with

22 regard to policy promulgation as an

23 educational consultant would not be

24 direct.  It would be supporting a school

CONFIDENTIAL

Page 30

```
 1    or a school district leader in thinking
 2    through the implications of a particular
 3    policy and anticipating unintended
 4    negative consequences, in communicating
 5    well with various constituents and
 6    understanding, like, law and regulation.
 7              So my role isn't to develop
 8    policy or suggest policy.  My role is to
 9    support their leader -- the leaders in
10    their work about how they think about
11    promulgating policy.
12         Q.    And have you ever been
13    asked, in your role as a consultant, to
14    develop policies relating to social
15    media?
16         A.    I've not been asked in my
17    role as an educational consultant to
18    develop policies about anything,
19    including social media.
20         Q.    When was the last time you
21    taught in a classroom?
22         A.    What do you mean by
23    "classroom"?
24         Q.    Fair enough.
```

CONFIDENTIAL

Page 31

1              A K-through-12 classroom.

2        A.    The last time I was the

3   primary teacher in a K-through-12

4   classroom, is that what you mean?

5        Q.    Yes.

6        A.    Like, as my full-time job,

7   not as a visiting teacher or something

8   like that?

9        Q.    Yes.

10       A.    It was in -- I was last a

11  teacher in 2000, yeah.

12            VIDEO TECHNICIAN:  Can we go

13       off the record for a second?

14            ATTORNEY PISTILLI:  Sure.

15            VIDEO TECHNICIAN:  The time

16       is 9:26 a.m.  We are going off the

17       record.

18                 -  -  -

19            (Whereupon, a brief recess

20       was taken.)

21                 -  -  -

22            VIDEO TECHNICIAN:  The time

23       is 9:29 a.m.  We are going back on

24       the record.

CONFIDENTIAL

Page 32

1    BY ATTORNEY PISTILLI:

2         Q.    Before we went off the

3    record, you said you thought the last

4    time you were a classroom teacher was

5    2000?

6         A.    That's right.

7         Q.    So if you could look at

8    Page 3 of your CV with me.

9              It says in 2000 you were a

10   principal intern at the Edwards Middle

11   School; is that right?

12        A.    It does say that, yes.

13        Q.    What's a principal intern?

14        A.    So I interned with a

15   principal in Boston, and this was part of

16   my graduate program that was specific to

17   students who were in the Harvard's urban

18   superintendents program who had not yet

19   been principals as a way to ensure that

20   we had some learning about the

21   principal's day-to-day work.

22        Q.    But so that -- that wasn't a

23   classroom teaching position, was it?

24        A.    No.  I was intern to the

CONFIDENTIAL

Page 33

1   principal.

2          Q.    Okay.  Then just continuing

3   to look at your resume, I see from 1991

4   to 1994 you were a fifth grade bilingual

5   teacher; is that right?

6          A.    Yes.

7          Q.    And that was a classroom

8   teaching position?

9          A.    Yes.

10         Q.    And then were any of the

11  positions listed here on your resume

12  after 1994 classroom teaching positions?

13         A.    Yes.

14         Q.    Which?

15         A.    The -- my role at The New

16  School for Arts and Sciences.  I had a

17  teaching position there.

18         Q.    Okay.  You were a co-founder

19  of that school?

20         A.    Yes.

21         Q.    You also taught a class?

22         A.    My primary responsibility

23  was as a teacher.

24         Q.    Are you employed by any of

CONFIDENTIAL

Page 34

1    the plaintiffs in this litigation?

2         A.    No, not to my knowledge.

3         Q.    Have you ever been?

4         A.    By "plaintiffs" you mean the

5    six districts?

6         Q.    Let's start with the six

7    districts, yes.

8         A.    I -- you said -- no, I have

9    not been employed by any of those six

10   districts, no.

11        Q.    Were you employed by other

12   districts that you are aware are

13   plaintiffs in the social media

14   litigation?

15        A.    No.

16        Q.    Were you employed by

17   Baltimore?

18        A.    No.

19        Q.    Are you an expert in

20   technology?

21        A.    My expertise is not as a

22   technologist, no.

23        Q.    Are you an expert in digital

24   design?

CONFIDENTIAL

Page 35

```
 1          A.    My expertise is not in
 2   digital design.
 3          Q.    Are you an expert in social
 4   media platform design?
 5          A.    My expertise is not in
 6   social media platform design.
 7          Q.    Are you an expert in
 8   algorithms?
 9          A.    My expertise is not in
10   algorithms.
11          Q.    Are you an expert in data
12   science?
13          A.    My expertise is not in data
14   science.
15          Q.    Are you an expert in
16   statistics?
17          A.    My expertise is not in
18   statistics.
19          Q.    Are you an expert on product
20   safety?
21          A.    My expertise is not in
22   product safety.
23          Q.    Are you a psychologist?
24          A.    I am not a psychologist.
```

CONFIDENTIAL

Page 36

1          Q.     Are you a psychiatrist?

2          A.     I am not a psychiatrist.

3          Q.     Are you an epidemiologist?

4          A.     I am not an epidemiologist.

5          Q.     Are you a public health

6     expert?

7          A.     I'm not a public health

8     expert.

9          Q.     Are you an expert on mental

10    health?

11         A.     I am not an expert on mental

12    health.

13         Q.     Are you an expert on

14    addictive behavior?

15         A.     I'm not an expert on

16    addictive behavior.

17         Q.     Are you an expert on

18    compulsive behavior?

19         A.     I'm not an expert on

20    compulsive behavior.

21         Q.     Are you an expert on

22    attention deficit disorders?

23         A.     I'm not an expert on

24    attention deficit disorders.

CONFIDENTIAL

Page 37

```
 1          Q.    Are you an expert on
 2   emotional dysregulation?
 3          A.    I'm not an expert on
 4   emotional dysregulation.
 5          Q.    Are you an expert on
 6   burnout?
 7          A.    I'm not an expert on
 8   burnout.
 9          Q.    Are you an expert on
10   cognitive disorders or deficits?
11          A.    I'm not an expert on
12   cognitive disorders or deficits.
13          Q.    You're not qualified to
14   diagnose mental health problems or
15   disorders, are you?
16          A.    I'm not a psychologist or a
17   psychiatrist, so I don't diagnose mental
18   health problems.
19          Q.    And you don't diagnose
20   behavioral problems or disorders either?
21          A.    I don't diagnose disorders.
22          Q.    Have you ever been hired to
23   write a 15-year plan for a school
24   district?
```

CONFIDENTIAL

Page 38

1          A.    I've never been hired
2    specifically to write a plan for a school
3    district, no.
4          Q.    Other than what we've
5    already discussed, do you have any other
6    professional roles currently?
7          A.    No.
8          Q.    Around what percentage of
9    your time is spent on teaching at Lehigh?
10         A.    I'm not sure my exact
11   percentage of time.  And, of course, it
12   would depend on time of year.
13              And I would say during the
14   semesters or the time when -- when
15   courses are in session, half my time,
16   roughly.
17         Q.    And when courses are not in
18   session, it's less?
19         A.    Right.  When courses are not
20   in session, then my teaching
21   responsibility would be around, you know,
22   planning and refining syllabi or
23   developing a new course or something like
24   that, yeah.

CONFIDENTIAL

Page 39

1        Q.    And so what would the
2  percentage be during the non-session
3  times?
4        A.    I don't -- I can't say an
5  exact percentage.  I think it varies
6  depending on -- like, if what I'm
7  teaching next is a course I've taught
8  before, then that percentage might be
9  very high.
10            If what I'm teaching next is
11  something that I have taught before, then
12  it might be a little bit lower.
13            So it's no -- there's no,
14  like, real good way to answer that.
15        Q.    But so even when class is in
16  session, around half of your time is
17  spent on your private consulting work?
18        A.    No.  I think that there's a
19  portion of my time as a professor of
20  practice that's not strictly dedicated to
21  teaching.
22        Q.    What percentage of your time
23  during -- when classes are in session do
24  you spend on private consulting work?

CONFIDENTIAL

Page 40

1          A.     When classes are in session,
2    20 percent, about, more or less.
3          Q.     And when classes are not in
4    session?
5          A.     It varies depending on, you
6    know, what I'm engaged to do.  It could
7    be higher or lower.
8          Q.     More than 50 percent?
9          A.     Only for short bits of time
10   if an engagement demands it.
11         Q.     And just to confirm, you
12   have not been a superintendent since
13   2018, right?
14         A.     That's correct.
15         Q.     So you were no longer a
16   superintendent during the COVID-19
17   pandemic?
18         A.     That's correct, yeah.
19         Q.     You agree that that had a
20   profound impact on K-through-12 education
21   in the United States?
22              ATTORNEY MEHRI:  Objection.
23              THE WITNESS:  COVID had a
24        profound impact on K-through-12

CONFIDENTIAL

Page 41

1          education in the United States,

2          certainly.

3     BY ATTORNEY PISTILLI:

4          Q.     Do you agree with bans on

5     electronic devices in schools?

6          A.     Will you ask that again?

7               ATTORNEY MEHRI:   Objection.

8               THE WITNESS:   What do you

9          mean?

10              Go ahead.   Sorry.

11    BY ATTORNEY PISTILLI:

12         Q.     Do you agree with policies

13    banning electronic devices in schools?

14         A.     So like I said before, my

15    role isn't to, like, promulgate policy or

16    advocate for any particular policy.   It's

17    really to assist and support the

18    educational leaders who would have that

19    responsibility to think through all the

20    sort of, like, complexities, unintended

21    negative consequences, constituency

22    communication, like, regulation, that --

23    that kind of stuff, to make sure they're

24    considering everything.

Page 42

1           So I don't have a position
2    on, like, banning anything.  I think it
3    depends on what the leader is facing in
4    that context.
5           Q.    So in your consulting work,
6    you don't advocate for banning electronic
7    devices in schools?
8                 ATTORNEY MEHRI:  Objection.
9                 THE WITNESS:  Yeah, I think
10        that's what I just said.
11   BY ATTORNEY PISTILLI:
12          Q.    What do you understand to be
13   the purpose of electronic device bans in
14   schools?
15          A.    Do you have -- do you have,
16   like, a particular one in mind?  I think
17   the purposes might vary.
18          Q.    A ban on using cell phones
19   during school hours.
20          A.    And so your question is?
21          Q.    What do you understand the
22   purpose of such policies to be?
23          A.    So I -- I don't know.  I
24   would need to talk with the leaders who

CONFIDENTIAL

Page 43

1    promulgated that policy.

2              But in light of the -- of

3    the compulsive use of social media by

4    students and its sort of negative impact

5    on the schools, I would think that it

6    would be about trying to mitigate some of

7    that impact.

8         Q.    Well, have you ever -- you

9    said you've never recommended a policy

10   around electronic device use to a school,

11   right?

12        A.    Well, I can't recall, as

13   superintendent, like, what we did

14   specifically about device use.

15             But since then, as an

16   educational consultant, I've not really

17   advocated or recommended a policy about

18   anything, including social media or

19   device uses.

20             Because that's not really my

21   role.  It's not what I do in relation to

22   the leaders that I'm coaching or

23   supporting.  My role with them is really

24   to support their thinking, like, to try

CONFIDENTIAL

Page 44

1    to help them understand the complexities

2    of policies that they might be

3    considering, helping them understand,

4    like, how policy gets promulgated, if

5    it's a superintendent, like how they

6    might discuss it with their Board of

7    Education.

8              But the kind of policy

9    decision or selection or advocacy, that's

10   not really within the realm of what I do.

11        Q.    You understand that cell

12   phones can be used for many different

13   purposes, right?

14        A.    Sure.

15        Q.    It can be used for texting?

16        A.    Yes.

17        Q.    It can be used to conduct

18   research?

19        A.    Yes.

20        Q.    It can be used to take

21   notes?

22        A.    I suppose.

23        Q.    It can be used to take

24   pictures?

CONFIDENTIAL

Page 45

1          A.     Okay.

2          Q.     You agree that they can be

3     used to take pictures, right?

4          A.     Cell phones can be used to

5     take pictures, yeah.  Sure.

6          Q.     They can be used as a

7     calculator to do math, right?

8          A.     Correct.  They can.

9          Q.     They can be used to write

10    e-mails?

11         A.     Yes.

12         Q.     To read e-mails?

13         A.     Yes.

14         Q.     To browse the Internet?

15    Read the news?  Check the weather?

16         A.     Cell phones can be used to

17    browse the Internet, check the weather,

18    yes.

19         Q.     To play video games?

20         A.     Cell phones can be used to

21    play video games, sure.

22         Q.     To stream movies?

23         A.     Yes.

24         Q.     To find directions?

Page 46

1           A.      Uh-huh, yes.

2           Q.      To check the time?

3           A.      Cell phones can be used to

4    check the time.

5           Q.      To organize your calendar?

6           A.      Cell phones can be used for

7    scheduling and calendaring, yes.

8           Q.      It can be used to pay

9    someone money you owe them?

10          A.      Yes.  Cell phones can be

11   used to transfer funds, yes.

12          Q.      And all of those are things

13   that can cause distraction if they're

14   occurring during class, right?

15               ATTORNEY MEHRI:  Objection.

16               THE WITNESS:  I suppose.  In

17          my experience, those are not the

18          functions of personal digital --

19          digital device use that is causing

20          the kind of widespread distraction

21          that I describe in my report and

22          that has an adverse impact on

23          school operations and school

24          leaders.

CONFIDENTIAL

Page 47

```
 1              Those -- those aspects are
 2         not the focus.  The focus is
 3         really on social media use,
 4         because there are design features
 5         on the platforms that lead to more
 6         compulsive use.
 7              I'm not an expert in this,
 8         but that's -- that's the focus of
 9         my report.
10   BY ATTORNEY PISTILLI:
11         Q.    Well, what's your basis for
12   saying that that's what students are
13   doing on their phones?
14         A.    So the basis of me saying
15   that that's what students are doing on
16   their phones comes from several places.
17              One, it comes from my
18   experience in schools, supporting school
19   leaders.  I have been in schools -- since
20   leaving the superintendency, I've been in
21   schools some 40 to 50 days a year, at
22   least part -- part days.  I've talked
23   with aspiring leaders that I train and
24   teach as graduate students in my classes.
```

CONFIDENTIAL

Page 48

1   I talk with the school principals and
2   school superintendents and district
3   leaders that I'm contracted to support as
4   an educational consultant and an
5   executive coach.
6               When I go to schools to do
7   that work, I'm using a methodology that
8   couples some direct observation as well
9   as some interviews with those leaders to
10  understand their leadership practice.
11              So there's been -- there's
12  been hundreds of people that I have
13  interacted with -- with during this time
14  in these ways that I'm describing in all
15  sorts of schools, elementary schools,
16  middle schools, high schools, different
17  districts, different types of districts.
18              And the observations are
19  direct of student use.  My interactions
20  with these principals, I'm also listening
21  to what they tell me.  I'm sometimes
22  present when they have to intervene or
23  deal with different situations.
24              So that's one area that

CONFIDENTIAL

Page 49

1  gives me some insight into the fact that

2  students are using these particular

3  platforms rather compulsively.

4          Then I also read the

5  depositions from the plaintiff districts,

6  and that sort of converged with what I

7  was seeing.  It was, like, very much

8  clear that the patterns that I had

9  observed over the last six years were

10  some that the -- you know, the testimony

11  on record was also, like, seeing the same

12  thing.

13          And I conducted a literature

14  review also, where I read some reports.

15  I read some -- I read the Surgeon

16  General's statement.  I looked at Pew

17  Research Center stuff, CDC stuff.

18          Like, those kind of research

19  reports, which is -- which are suggesting

20  that, you know, there's research and

21  studies that show that these are the

22  platforms that students are predominantly

23  using.

24          So that's kind of, like, the

CONFIDENTIAL

Page 50

1  basis is sort of multifaceted, if you

2  will.

3           Q.    So let's break those down by

4  categories.

5           A.    Sure.

6           Q.    As I understand it, you

7  mentioned four things.

8                 Deposition transcripts from

9  this case, right?

10          A.    Uh-huh.

11          Q.    A literature review that

12  we'll get to later; that was another one,

13  right?

14          A.    Okay.  Yes.

15          Q.    And then the other two were

16  based on your consulting work, which was

17  a combination of interviews with school

18  leaders and direct observation, correct?

19          A.    Yes.

20          Q.    And so, then, just sort of

21  interviews with school leaders,

22  essentially what you're saying is they

23  told you that their kids were using

24  social media, right?

CONFIDENTIAL

Page 51

1              ATTORNEY MEHRI:  Objection.

2              THE WITNESS:  That's

3        partially what I'm saying, yes.

4        It's not limited to that.

5              I'm also there when they're

6        experiencing, like, their

7        leadership responsibilities and

8        observing how they handle

9        different situations.

10             And there I see, like,

11        there's a rather constant stream

12        of workload that comes to the

13        principals that involves -- has

14        its genesis where something is

15        going on on social media or is

16        related to the kids' generalized

17        anxiety about how they might

18        appear on social media or what

19        might happen or their concern

20        about what happened previously,

21        like the night before, something

22        like that.

23             So a lot of this ends up

24        being -- you know, a lot of it

CONFIDENTIAL

Page 52

```
 1          comes to the principal's office or

 2          a lot of it is the principals

 3          working with their staff on these

 4          issues for their students.  Like,

 5          it's pretty pervasive.

 6   BY ATTORNEY PISTILLI:

 7          Q.    So can you give me an

 8   example of an incident that you directly

 9   observed relating to social media?

10          A.    There are lots of incidents

11   where -- that I could describe.  There's

12   no one particular anecdote that's going

13   to be illustrative of the entire pattern.

14              The pattern that I'm seeing

15   is that -- this is -- this is

16   multifaceted.  It can't be, like,

17   encapsulated in a particular story.

18              Because what we're seeing is

19   that -- we're seeing that students'

20   attention is really fragmented.  It's not

21   just the pull to check, but it's also the

22   thought process that is going on, that

23   students are seriously preoccupied by

24   what's going on on social media.  It's
```

CONFIDENTIAL

Page 53

1    become part of the social fabric of their

2    lives.

3                    Students are often coming to

4    school sleep deprived because of their

5    compulsive use of social media.

6                    And then instances get

7    amplified on social media.  They get

8    either started on social media or they

9    get amplified by social media.  And

10   students' preoccupation with their

11   standing, their social standing, becomes

12   part of -- sort of the fabric that is

13   destabilizing schools.

14           Q.    If a student arrives tired

15   or preoccupied, how do you know the

16   reason they're tired or preoccupied?

17           A.    I think some people will ask

18   them, certainly.  It would come out in

19   the course of conversations that they

20   have with their teachers or their

21   counselors.

22                    But that's -- again, that's

23   not really, like -- my particular area of

24   expertise is not to diagnose, like, those

CONFIDENTIAL

Page 54

1    individual instances.

2              What I'm looking at is the

3    way that the work of school leaders has

4    changed and continues to change and is

5    becoming more challenging because of

6    these issues that are now, like,

7    prevalent in the student body.

8         Q.    You told me that you've

9    directly observed leaders responding to

10   incidents involving social media.

11             Could you please describe

12   one such incident for me?

13             ATTORNEY MEHRI:  Asked and

14        answered.

15             THE WITNESS:  Yeah.  I mean,

16        what inevitably is happening is

17        when students are agitated and

18        upset and they're in the

19        principal's office and they're

20        talking about what's going on,

21        their -- much of what is happening

22        with them is that they have social

23        concerns.

24             I mean, that's really

Page 55

1    particular to adolescents, right,
2    the frontal cortex isn't yet
3    developed, their interactions and
4    relationships with their peers is
5    of primary importance to them.
6         And their -- whatever it is
7    that's going on, they feel, like,
8    this sense of social
9    accountability.  They need to be
10   responding really fast.  Or they
11   feel some kind of pull to -- to be
12   involved so that they don't miss
13   out.
14        Or if there's conflict
15   happening, you know, then that
16   gets exacerbated as well.
17        Students are also in a state
18   of, I would say, like, a
19   generalized anxiety.  Like,
20   there's this low-level humming
21   anxiety within the fabric of the
22   student body.  It affects the
23   schools because they're concerned
24   about being evaluated, being,

Page 56

```
 1        like, ranked.  They want their
 2        validation.  They're afraid
 3        somebody is going to expose them
 4        for something.
 5             It's that underlying
 6        preoccupation that so often is
 7        permeating through whatever the
 8        issue is that the -- that the
 9        principal needs to intervene.
10   BY ATTORNEY PISTILLI:
11        Q.    But I'm -- I'm asking you a
12   different question, sir.
13             I'm asking you to describe
14   to me a specific instance where you
15   observed a school leader responding to
16   what you refer to as social media
17   concerns.
18             ATTORNEY MEHRI:  Asked and
19        answered.
20             THE WITNESS:  Yeah, it's not
21        that I'm reluctant to share
22        stories.  It's just that I
23        don't -- that is not the point and
24        it wasn't part of my report.
```

CONFIDENTIAL

Page 57

1              So I feel like a
2        particular -- a particular story,
3        anecdote, is -- is not helpful to
4        understanding the pattern and the
5        way that the patterns, then,
6        accumulate to having an adverse
7        impact on schools.
8  BY ATTORNEY PISTILLI:
9        Q.    Well, you said you've
10  directly observed instances involving
11  social media during the time you've spent
12  at schools, correct?
13       A.    Yeah.
14       Q.    And I would just like to
15  understand what you've directly observed.
16              ATTORNEY MEHRI:  Asked and
17        answered.
18              Go ahead.
19              THE WITNESS:  I appreciate
20        that -- your desire to know that.
21              It's not contained in my
22        report.  And those kind of
23        descriptions come from the
24        deposition testimony that you

Page 58

1          already have.  There's lots of
2          instances where notifications are
3          interrupting instruction, where
4          students are concerned and they're
5          bringing up, like, emotional
6          concerns to their counselors or
7          their principals about things that
8          are happening with their friends
9          that are exacerbated on social
10         media.
11              There's issues of complexity
12         around limitations and personal
13         device use interrupting
14         instruction.  Teachers being
15         frustrated about students' lack of
16         attention span.
17              I mean, this is what's
18         happening virtually in -- in my
19         interactions with these school
20         leaders pretty much all the time.
21   BY ATTORNEY PISTILLI:
22         Q.    Well, I'm trying to ask you
23   a different question.  We'll get to what
24   school leaders tell you.

CONFIDENTIAL

Page 59

1              I'm asking, you say you've
2     observed personally instances in specific
3     schools where specific individuals are
4     responding to social media-related
5     issues.
6              And I want to understand
7     what your direct observations are.
8              ATTORNEY MEHRI:  Objection.
9         Mischaracterizes testimony.
10             But go ahead.
11             THE WITNESS:  Yeah, so
12        the -- what I'm reporting on here
13        in my report is the patterns that
14        I've observed across my work in
15        supporting school leaders and
16        school district leaders.
17        Particular instances inform those
18        patterns.
19             But what's prevalent, what
20        is -- what's salient to me in my
21        observation is how they pervade so
22        much of the interactions that are
23        going on between -- between
24        students, among students, between

Page 60

1           students and staff that then end

2           up having an impact on the

3           leader's work.

4                This could be interactions

5           between -- like, nonstop

6           interactions between students and

7           teachers about not checking.  It

8           could be students who are feeling

9           left out.  Students who are

10          feeling exposed.  Students who are

11          preoccupied with the validation

12          that they're getting online.

13               All of this stuff gets

14          untangled in the conversations

15          that sometimes leaders have with

16          students.

17   BY ATTORNEY PISTILLI:

18          Q.    It could be any of those

19   things.

20               But I'm asking, which of

21   those things have you directly observed?

22          A.    Oh, I've observed all of

23   them frequently --

24          Q.    Sure. Please describe --

Page 61

1          A.      -- across many, many
2     different schools.
3          Q.      Please describe your direct
4     observations.
5          A.      I think I'm trying to do
6     that.
7               So in my work with school
8     leaders and school district leaders, the
9     purpose of my interaction with them is to
10    try to strengthen their leadership.
11               I ask them about what their
12    pressing problems of practice are.  I ask
13    them about what kinds of issues are most
14    pressing on them, where their biggest
15    opportunities are.  And I couple those
16    kind of conferencing conversations and
17    interviews with observations of their
18    leadership in action, like, in their
19    school context.
20               And what I'm -- what I'm
21    trying to describe to you, in response to
22    your question, is that throughout those
23    interactions, elements of incursion on
24    time -- so schools and school leaders

CONFIDENTIAL

Page 62

1  are -- school leaders and district

2  leaders are feeling, like, the imperative

3  to protect kids, to provide them safety

4  emotionally and physically is really

5  heightened.  And it's diverting their

6  attention from some of their core

7  responsibilities about improving teaching

8  and learning or maintaining a positive

9  school culture.

10           And it's because -- not

11  because of any particular, like, one

12  single incident.  It's because there's a

13  cumulative effect of the generalized

14  anxiety that is now woven into the social

15  fabric of primarily adolescents but also

16  children, children and adolescents.

17           So principals and

18  superintendents and district leaders,

19  they're telling me that this is becoming

20  a time diversion, a resource strain in

21  trying to meet all of these needs.

22           It's not incumbent in a

23  particular incident.  It's a generalized

24  pattern.

CONFIDENTIAL

Page 63

1          Q.    Sitting here today, can you
2    describe to me any specific incident that
3    you directly observed involving social
4    media in a school?
5                    ATTORNEY MEHRI:  Asked and
6            answered.
7                    THE WITNESS:  I guess I -- I
8            guess I couldn't necessarily,
9            because, number one, the work that
10           I'm doing with the school and
11           school leaders, like, there's an
12           element of trust and even
13           confidentiality that enters into
14           that conversation with them.
15                   And, also, the instances
16           where students are fighting and it
17           comes down to something that
18           happened on a platform or students
19           are distracted, it comes down to
20           something that happened on a
21           platform, students are not
22           sustaining their attention and
23           it's frustrating teachers because
24           they're not completing readings or

CONFIDENTIAL

Page 64

```
 1        assignments.  Students are coming
 2        worn out and sleep deprived to
 3        school and that's affecting their
 4        performance and interactions.  Or
 5        students are just not interacting,
 6        like, face-to-face with their
 7        peers or others.
 8             It's pervasive, it's
 9        happening, like, all the time in
10        schools.
11  BY ATTORNEY PISTILLI:
12        Q.   But you're unable to provide
13  a single example of it happening,
14  correct?
15             ATTORNEY MEHRI:  Objection.
16        Asked and answered.
17             THE WITNESS:  It's that to
18        look at a single example, I
19        didn't -- I didn't go about
20        preparing my report in trying to
21        document or describe a bunch of
22        different examples.
23             Other testimony does that.
24        Like, the depositions from the --
```

CONFIDENTIAL

Page 65

1        from the plaintiff districts,
2        district leaders, they do that;
3        they describe a lot of those
4        particular anecdotes.
5            My -- what my report offers
6        and what I'm offering here is a
7        convergence of evidence that shows
8        that the pervasive effects, like,
9        the compulsive personal use of
10       social media by the student body
11       is imposing leadership -- it's
12       imposing on leaders in their
13       attempt to fulfill their
14       responsibilities.  And that that's
15       happening on a widespread basis.
16           And my -- my pattern
17       identification is over six years
18       of being in schools and talking
19       with lots of aspiring leaders and
20       lots of school leaders.
21           No one anecdote will capture
22       that or stand out or even -- or I
23       would even be able to, like,
24       accurately describe it right now

Page 66

1           sitting here.

2    BY ATTORNEY PISTILLI:

3           Q.    A pattern is made up of

4    discrete instances, right?

5                 ATTORNEY MEHRI:  Objection.

6                 THE WITNESS:  A pattern, to

7           me, is when something reaches a

8           point where it's predictable in

9           nature.

10                So the patterns that we're

11          seeing now that are predictable

12          are these negative impacts on

13          students, in terms of attention

14          fragmentation and sleep

15          deprivation and fear of missing

16          out, all this stuff that is

17          associated with their social media

18          use, creating a generalized

19          anxiety and destabilizing school

20          district operations and imposing

21          on school leaders so that their

22          time is taken off task, off their

23          mission and purpose of improving

24          teaching and learning in order to

CONFIDENTIAL

Page 67

1          deal with the mental health issues

2          and the disruptions that occur as

3          a result of the students'

4          compulsive social media use.

5   BY ATTORNEY PISTILLI:

6          Q.    But you don't have a single

7   instance of a negative impact that you

8   directly observed that you can share with

9   me today?

10             ATTORNEY MEHRI:  Asked and

11          answered.

12             THE WITNESS:  Yeah, there

13          are instances in my report that I

14          included that I could look at now

15          and share with you, if you want.

16  BY ATTORNEY PISTILLI:

17         Q.    Things that you personally

18  directly observed in a school?

19         A.    I didn't include those in my

20  report.  I --

21         Q.    Okay.  I'm asking, do you

22  have any?

23             ATTORNEY MEHRI:  Asked and

24          answered.

CONFIDENTIAL

Page 68

1                  THE WITNESS:  Yeah, I do
2           think I answered that question
3           already.
4     BY ATTORNEY PISTILLI:
5           Q.    And your answer was no, you
6     can't, right?
7                  ATTORNEY MEHRI:  Objection.
8                  THE WITNESS:  That
9           mischaracterizes my answer.
10    BY ATTORNEY PISTILLI:
11          Q.    Sorry.  Please tell me what
12    the negative instances are?
13          A.    I did already.  I -- so I'll
14    say -- I'll say it again.
15                 But the -- the negative
16    instances are cumulative in effect.  You
17    want me to describe a particular one.
18    The research does that.  Other expert
19    testimonies -- testimony does that.
20                 I'm telling you that as I
21    interact with aspiring leaders or school
22    leaders, the overwhelming patterns are
23    that there's a pervasive effect that --
24    that is present in the school community,

CONFIDENTIAL

Page 69

1    in the student body that leaders are now
2    needing to respond to.
3                    So I'm not going to describe
4    a particular incident.  But I will tell
5    you that when there's conflict among
6    students, the conflict is exacerbated
7    because of the interactions on social
8    media.  When students are feeling
9    insecure or want attention, that's fueled
10   by their need for validation, which is
11   linked to their social media use.
12                   Students' ability to focus
13   on lessons and complete all their work
14   is -- teachers are now saying is
15   compromised because of their social media
16   use.
17                   All of that stuff shows up
18   in my interactions with school
19   district -- with school leaders and
20   school district leaders.
21        Q.    That's not something you've
22   ever personally witnessed?
23                   ATTORNEY MEHRI:  Objection.
24        Mischaracterizes testimony.

CONFIDENTIAL

Page 70

```
 1              THE WITNESS:  You know, that
 2         is a mischaracterization.  Thank
 3         you.
 4              As I stated before, I
 5         witness it, like, all the time
 6         when I'm in schools.
 7   BY ATTORNEY PISTILLI:
 8         Q.   Okay.  So tell me about one
 9   time that you witnessed it.
10              ATTORNEY MEHRI:  Asked and
11         answered.
12              THE WITNESS:  Yeah, yeah.  I
13         understand your insistence to try
14         to boil this -- like, narrow this
15         down to a particular instance so
16         then we can talk about the nature
17         of that instance and what is going
18         on and who is at fault, I suppose.
19              But what I'm telling you is
20         that the particular instances at
21         this point, it's the -- it's the
22         pervasiveness, the way that
23         there's a social media saturation
24         that's woven into the social
```

CONFIDENTIAL

Page 71

1          fabric of teens and adolescents;
2          it's affecting their mental health
3          on a -- on a two-scale basis in
4          schools.
5                 And what I see, because my
6          work is really with school leaders
7          and trying to strengthen their
8          leadership, I see that this is
9          imposing constraints and
10         impositions on their leadership
11         time and their leadership capacity
12         to fulfill their -- their primary
13         duties.
14  BY ATTORNEY PISTILLI:
15         Q.    So it's pervasive, but
16  you're unwilling tell a jury about one
17  single instance when it's happened that
18  you've personally observed?
19                 ATTORNEY MEHRI:  Objection.
20                 THE WITNESS:  I think
21         there's -- I think there's ample
22         testimony already on record from
23         the school districts who were
24         deposed that describe specific

CONFIDENTIAL

Page 72

1          instances.

2    BY ATTORNEY PISTILLI:

3          Q.    I'm asking about what you've

4    witnessed in schools.

5          A.    Yeah.  I understand that's

6    what you're asking.  And I'm really

7    trying to answer your question.

8                What I see in schools

9    mirrors what the testimony on record is

10   saying about specific instances.  So --

11   and I've described them in terms of

12   students' attention and it frustrating

13   teachers, conflict among students being

14   exacerbated, students' sort of

15   self-esteem and self-concept being --

16   being compulsively linked to, like, how

17   much validation they're getting on the

18   social media platforms.

19                And that this is underlying

20   what is interrupting and intervening in

21   the leaders' work.  It's also creating

22   resource allocation issues at the

23   district level.

24         Q.    I'm going to go back to what

CONFIDENTIAL

Page 73

```
 1   we were talking about earlier.
 2              You agree that there are
 3   lots of things that kids can do on a
 4   phone, right?  We talked about a lot of
 5   them?
 6        A.    Yeah.  You named a whole
 7   bunch of things that a phone could be
 8   used for.  And then I don't recall
 9   exactly our conversation there.
10              But I did note that the
11   social media platform use has a different
12   quality.  Like, there's a different level
13   of engagement that, although I'm not an
14   expert in the features, I understand is
15   attributable to the features in the
16   platforms themselves.
17        Q.    If a teacher sees a student
18   on their phone during class, they don't
19   know what they're doing on their phone,
20   right, if they're standing in the front
21   of the classroom?
22              ATTORNEY MEHRI:  Objection.
23              THE WITNESS:  Yeah, I can't
24        answer that.  Like, sometimes
```

CONFIDENTIAL

Page 74

```
 1         teachers circulate and they
 2         actually look at what's on the
 3         phones.  Sometimes they have
 4         interactions with the kid and what
 5         exactly they were doing comes out.
 6  BY ATTORNEY PISTILLI:
 7         Q.    I mean, I've got my phone
 8  right here, you can't tell what app I'm
 9  using, right?
10         A.    Obviously, I can't see the
11  screen on your phone.
12         Q.    And if a teacher is standing
13  in front of a student they, similarly,
14  can't see the screen on the phone, right?
15              ATTORNEY MEHRI:  Objection.
16              THE WITNESS:  So I don't
17         know if you've been in -- in
18         classrooms, but teachers, one
19         practice that they frequently use
20         that's pretty common in teaching
21         is circulating.
22              So, yeah, sometimes teachers
23         are in the front of the room and
24         in that case, I suppose they
```

Page 75

1          wouldn't be able to see what's on
2          student devices.  But oftentimes
3          they're circulating, and they can.
4   BY ATTORNEY PISTILLI:
5          Q.    But unless they're directly
6   looking at the screen, they don't know
7   what the kid is doing?
8               ATTORNEY MEHRI:  Objection.
9               THE WITNESS:  I don't --
10         like, this is -- this is -- I
11         don't have an opinion about that.
12         Like, that's not what I'm writing
13         about here or what I'm here to
14         testify to.
15              I've been in lots of
16         classrooms, and oftentimes
17         teachers know what the students
18         are doing even if they can't
19         directly see what's in front of
20         them.
21              Teachers tend to know their
22         students and have insight into
23         what they're doing in their class.
24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 76

1          Q.     You've been paid by the
2    plaintiffs to provide opinions in this
3    case, right?
4          A.     Yes.
5          Q.     How did you first become
6    involved in this litigation?
7          A.     I first got contacted by --
8    I think it's called Rubin Anders.  So
9    they contacted me to ask if I might be
10   interested.
11         Q.     Is that, like, a search firm
12   or law firm?
13         A.     I don't -- I'm not exactly
14   sure.  My understanding is they, like,
15   find expert witnesses for cases.
16                But this is my first time
17   doing this.  So I don't really know how
18   that works.
19         Q.     And when were you contacted?
20         A.     I was contacted in summer,
21   sometime summer of 2024 initially.
22         Q.     Summer of 2024?
23         A.     Yeah.
24         Q.     And when did you actually

CONFIDENTIAL

Page 77

1  become retained?

2          A.    In, I think it was, late

3  March of 2025.

4          Q.    So you weren't retained

5  until March of 2025?

6          A.    Yeah.  Yes.

7          Q.    And between the summer of

8  2024 and 2025, were you in any way

9  involved in these matters?

10         A.    No, I was not.  I had an

11  initial conversation with Rubin Anders

12  and a conference call.  And then I didn't

13  hear anything until January.  And then I

14  didn't hear anything until March.

15         Q.    Who was involved in the

16  conference call in 2024?

17         A.    I don't exactly -- I think

18  Tyler Garden -- is Tyler's last name

19  Garden?  And Melissa Yeates.  I think

20  they were the two people that I talked

21  to.

22               But I'm not exactly sure.

23         Q.    And then what -- there was

24  another contact in January of 2025?

Page 78

1          A.    Yeah.  Early -- early
2    January, somewhere, like, New Year's or
3    the day after, Rubin Anders, they let me
4    know that the -- the plaintiffs' side
5    was, like, all set.
6              So I interpreted that as,
7    you know, they don't need me, and I won't
8    be working on it.
9        Q.    And then they contacted you
10   again in March of 2025?
11        A.    Yes.
12        Q.    And what specific opinions
13   were you asked to provide?
14        A.    I wasn't asked to provide
15   any specific opinions.
16        Q.    What were you asked to do?
17        A.    I was asked to -- to
18   generate an expert report that would give
19   my perspective and opinions about the
20   effects of social media use by students
21   on educational leaders.
22              So the scope was kind of,
23   like, describing what educational leaders
24   do and then describing whether --

CONFIDENTIAL

Page 79

1   how what they do is affected by social

2   media use.

3        Q.    And you were asked to be an

4   independent expert, right?

5        A.    I don't -- what does that

6   mean?

7        Q.    Well, were -- what do --

8   what do you understand your role as an

9   expert to be?

10       A.    I think I just described it.

11             So to offer my expert

12   opinion of the work that leaders do in

13   schools and school districts and how

14   social media is impacting that, their

15   responsibilities, their ability to

16   fulfill their duties.

17       Q.    And when you approached that

18   task, were you approaching it with a view

19   toward helping the plaintiffs in these

20   cases?

21       A.    I was approaching it as a

22   view towards taking on a task such that I

23   would be able to reflect on my

24   experiences, look at the deposition

CONFIDENTIAL

Page 80

1  testimony, and do a literature review to

2  better understand, like, what are the

3  interactions here, what is -- what is

4  going on?

5          Q.    Did you come to that task

6  with preconceived notions?

7          A.    The -- the patterns that I

8  had been seeing in schools and school

9  districts did lead me to wonder what is

10  going on, in terms of student social

11  media use.

12          Q.    But you were attempting to

13  reach objective and unbiased conclusions,

14  right?

15          A.    I was, based on -- based on

16  these convergence of evidence that I

17  described before, yeah.

18          Q.    Right.  And when you were

19  retained in March of 2025, you weren't

20  rooting for either side, right?

21          A.    Was I rooting for either

22  side?  No, I didn't think of it in terms

23  of rooting for either side.

24                  ATTORNEY PISTILLI:  If we

CONFIDENTIAL

Page 81

1          can pull up Tab 3, please.

2                    -   -   -

3                (Whereupon, Exhibit

4          Osborne-2, No Bates, 1/8/25

5          E-mail, Osborne to Kennedy, was

6          marked for identification.)

7                    -   -   -

8    BY ATTORNEY PISTILLI:

9          Q.    Do you recognize this

10   e-mail, sir?

11               ATTORNEY PISTILLI:  We can

12         mark this as Exhibit-2.

13               THE WITNESS:  Yes, I

14         recognize this e-mail.

15   BY ATTORNEY PISTILLI:

16         Q.    This is an e-mail from you

17   to attorneys at the Covington and Burling

18   law firm, correct?

19         A.    Yes.

20         Q.    And you stated in that

21   e-mail in January of 2025 that you are,

22   quote, rooting for the other guys, right?

23         A.    I did put that in this

24   e-mail, yeah.

CONFIDENTIAL

Page 82

1          ATTORNEY PISTILLI:  Is this
2      a good time for a break?
3          VIDEO TECHNICIAN:  The time
4      is 10:16 a.m.  We are going off
5      the record.  This is the end of
6      Media 1.
7              -   -   -
8          (Whereupon, a brief recess
9      was taken.)
10              -   -   -
11          VIDEO TECHNICIAN:  The time
12      is 10:31 a.m.  We are going back
13      on the record.  This is the
14      beginning of Media 2.
15  BY ATTORNEY PISTILLI:
16      Q.    Dr. Osborne, what are your
17  current sources of income?
18      A.    My current sources of income
19  are the work that I'm doing for this
20  case, obviously, my role at Lehigh's
21  College of Education as a professor of
22  practice, and then some consulting income
23  from different school districts.
24      Q.    And what were your sources

CONFIDENTIAL

Page 83

1    of income last year?

2         A.    My sources of income last

3    year were Lehigh College of Education

4    position as a professor of practice, and

5    some consulting earnings from a few

6    different school districts.

7         Q.    And for this year,

8    approximately what percentage of your

9    earnings come from your work on this

10   litigation?

11        A.    Oh, I don't know.  It's not

12   over yet.

13        Q.    So far this year.

14        A.    So far what percentage?

15        Q.    Yes.

16        A.    I don't -- I don't know

17   exactly.  I'd need to calculate it out.

18   Like, I'm not -- I'm not sure.

19        Q.    You're getting paid $465 per

20   hour for your work for plaintiffs in this

21   litigation?

22        A.    No.

23        Q.    How much are you getting

24   paid?

CONFIDENTIAL

Page 84

1          A.     $300 per hour.

2                 -   -   -

3                 (Whereupon, Exhibit

4          Osborne-3, No Bates, Invoices, was

5          marked for identification.)

6                 -   -   -

7    BY ATTORNEY PISTILLI:

8          Q.     I'm handing you what's been

9    marked as Exhibit-3, which is Tab 72.

10                ATTORNEY PISTILLI:  We'll go

11         ahead and mark this as Exhibit-3.

12   BY ATTORNEY PISTILLI:

13         Q.     Do you recognize Exhibit-3?

14         A.     Yes.

15         Q.     Do you see a rate listed

16   there of $465 per hour?

17         A.     I do.

18         Q.     Is that your rate for this

19   litigation?

20         A.     No.

21         Q.     Do you understand that

22   plaintiffs are paying $465 per hour for

23   your time in this litigation?

24                ATTORNEY MEHRI:  Objection.

CONFIDENTIAL

Page 85

```
 1              THE  WITNESS:   That's  my

 2         assumption,  looking  at  this

 3         invoice.

 4    BY  ATTORNEY  PISTILLI:

 5         Q.     But  you  personally  are  only

 6    getting  $300  per  hour;  that's  your

 7    testimony?

 8         A.     Yes,  that's  correct.

 9         Q.     And  approximately  how  many

10    hours  have  you  worked  on  this  litigation

11    during  the  2025  calendar  year  to  date?

12         A.     I  don't  know.   There's  --

13    there  aren't  totals  of  hours  on  this.   So

14    I'd  --  I'd  have  to  add  them  all  up.

15         Q.     We  --  we  may  come  back  to

16    this.

17              What's  your  compensation

18    from  Lehigh  for  a  year,  approximately?

19         A.     You're  asking  how  much  I  get

20    paid  by  Lehigh?

21         Q.     Yes.

22         A.     I  don't  know  the  exact

23    number.  ███  █  ███  ████  ██  ███████  I

24    think.
```

CONFIDENTIAL

Page 86

1          Q.    And approximately how much
2    have you made from private consulting
3    work this year, other than work on this
4    litigation?
5          A.    What do you mean by "this
6    year"?
7          Q.    Calendar year 2025 to date.
8          A.    I don't know.
9          Q.    More or less than what
10   you've made from Lehigh?
11         A.    Less.
12         Q.    Less than $100,000?
13         A.    Yes.   The earnings so far
14   this year, less than $100,000 for sure.
15   Yeah.
16         Q.    Less than $50,000?
17         A.    I don't -- I don't know.
18               That's retrievable if it's
19   important to know.   I can find out.
20         Q.    Sure.   That would be great.
21   Thank you.
22               Your CV notes that you're an
23   associate editor of the American
24   Association of School Administrators; is

CONFIDENTIAL

Page 87

1  that right?

2         A.    Not exactly.  I've become

3  editor, and I guess I didn't update my CV

4  with that.  I became editor starting in

5  July, I guess.

6         Q.    You were previously on the

7  editorial review board?

8         A.    No.

9         Q.    No?  Just what is your --

10 you're currently editor of the -- strike

11 that.

12               You said you became an

13 editor starting in July.

14               Did you have a role with

15 that organization prior to July?

16        A.    With the Journal of

17 Scholarship & Practice --

18        Q.    Yes.

19        A.    -- at AASA?

20              Yes.  Prior to July, I was

21 associate editor.

22        Q.    Okay.  And you're also on

23 the editorial review board of the AASA

24 Journal of Scholarship & Practice; is

Page 88

1   that right?

2           A.    Oh, that's -- yes.

3           Q.    And what is the Journal of

4   Scholarship & Practice?

5           A.    The Journal of Scholarship &

6   Practice is a quarterly publication by

7   AASA, which is the National

8   Superintendents Association.

9                 It's a peer-reviewed journal

10  that publishes articles that are

11  submitted from researchers for

12  publication and are of interest to a

13  superintendent audience.

14          Q.    It includes articles about

15  challenges facing schools and educators?

16                ATTORNEY MEHRI:  Objection.

17                THE WITNESS:  Yeah, I think

18          you could say that.  It includes

19          research products from people who

20          are researching in education and

21          submitted to be published in the

22          journal.

23                ATTORNEY PISTILLI:  Let's

24          take a look at Tab 4.

CONFIDENTIAL

Page 89

```
 1                     -   -   -
 2              (Whereupon, Exhibit
 3         Osborne-4, No Bates, Promoting
 4         Equity in the Modern
 5         Superintendency, was marked for
 6         identification.)
 7                     -   -   -
 8  BY ATTORNEY PISTILLI:
 9         Q.    Do you recognize Tab 4,
10  which we can mark as Exhibit-4?
11         A.    What I'm seeing here looks
12  like an article from fall 2021 of the
13  Journal of Scholarship & Practice.
14         Q.    And this was --
15         A.    Give me -- give me a moment.
16         Q.    This is an article that was
17  published in the AASA Journal of
18  Scholarship & Practice while you were on
19  the editorial board, right?
20         A.    I'm just familiarizing
21  myself.
22               I don't recall when I joined
23  the editorial board.  Let me look at my
24  CV.  But it may be.
```

CONFIDENTIAL

Page 90

1              Okay.  Yeah, I started in
2    2019.  So I started on the editorial
3    board in 2019, yes.  So this would have
4    been published while I was on the
5    editorial board, correct.
6         Q.    Do you recognize this
7    article?
8         A.    No.  I'm just familiarizing
9    myself now.
10        Q.    Do you know the authors of
11   the article?
12        A.    I don't think so.
13        Q.    And this article that your
14   journal published was based on results
15   from the American Superintendent 2020
16   Decennial Study, correct?
17        A.    Sorry, I'm trying to -- I'm
18   just seeing this for the first time, so
19   it will just take me a minute.  I need to
20   go back now and see what it says here.
21              It does reference the
22   American Superintendent 2020 Decennial
23   Study.
24              And so it says here that, in

CONFIDENTIAL

Page 91

1   this article, We endeavor to take another

2   look at the data from the American

3   Superintendent 2020 Decennial Study using

4   equity as a lens to reexamine the data

5   set.  We will describe the findings from

6   the decennial study, but in the

7   discussion compare and contrast those to

8   the systemic levels of inequity as

9   posited by Radd, Generett, Gooden and

10  Theoharris.  Additionally, using the

11  framework for action, we will discuss how

12  superintendents might go -- might best go

13  about promoting equity and building

14  support for equitable practices in their

15  districts.

16            So that paragraph is, like,

17  at the end of, I guess, what you would

18  call the introduction here.

19         Q.    Sure.  And just looking with

20  me at the abstract if you would.

21            Do you see where it says,

22  The article focuses on how equity

23  operates within and around issues of

24  community relations and social media and

CONFIDENTIAL

Page 92

1  further considers the extent to which

2  these issues help obfuscate -- help or

3  obfuscate promoting equity and the

4  benefits and banes of superintendents

5  attempting to do so.

6           Do you see that?

7      A.    Yes.  You read that from the

8  abstract.

9      Q.    And so this article

10 considers whether social media helps

11 promote equity?

12          ATTORNEY MEHRI:  Objection.

13          THE WITNESS:  So I haven't

14      had a chance to read the whole

15      article.  So I can't really

16      comment on that.  But if you give

17      me a minute, I'll -- I can -- I

18      can familiarize myself.

19          I don't draw that

20      conclusion, necessarily, from,

21      like, the abstract that you read,

22      that that's, like, the point of

23      the article.  I don't think that

24      is -- that's the point.

CONFIDENTIAL

Page 93

1           But, like I said, I

2       haven't -- I don't know this

3       article.  So give me a minute.

4   BY ATTORNEY PISTILLI:

5           Q.    Maybe I can help.  If we

6   take a look at Page 16 on the screen.

7               Do you see where the article

8   says, More than three out of five

9   superintendents urged principals and

10  teachers to maintain social media

11  accounts to communicate with parents and

12  students?

13          A.    I'm getting there.  Hang on.

14              This is 16?  I see, you've

15  highlighted it here.  Let me just get the

16  context.

17              I see.  So the article is --

18              ATTORNEY MEHRI:  Is there a

19      question pending?

20              THE WITNESS:  Oh.  I beg

21      your pardon.

22  BY ATTORNEY PISTILLI:

23          Q.    If you wanted to share

24  something about the article, please go

CONFIDENTIAL

Page 94

1    ahead.

2            A.    No.  I'd rather be

3    responsive to your questions.

4            Q.    Sure.

5                  So do you understand that

6    this article is reporting that the

7    majority of America's superintendents

8    reported that social media was a valuable

9    communication tool?

10                ATTORNEY MEHRI:  Objection.

11                THE WITNESS:  I see here

12          that the article is examining --

13          and I still haven't read the whole

14          thing.  I haven't had time to read

15          the whole thing.

16                But the article is looking

17          at ways that superintendents

18          address equity as an issue in

19          their school communities.  And

20          among the many strategies that it

21          seems to describe in this article,

22          one is the intentional,

23          institutional, curated use of

24          social media accounts by

CONFIDENTIAL

Page 95

1          educational leaders as a

2          communication tool with parents

3          and students.

4                  I do see -- I do see that,

5          yes.

6    BY ATTORNEY PISTILLI:

7          Q.    And, in fact, three out of

8    five superintendents were advocating for

9    the use of social media accounts to

10   communicate with parents and students,

11   right?

12         A.    There --

13                ATTORNEY MEHRI:  Objection.

14                Go ahead.

15                THE WITNESS:  Sure.  What

16         this article is reporting -- and,

17         again, I haven't had time to read

18         the whole thing or examine its

19         basis.

20                The members of the editorial

21         review board don't read all the

22         articles.  That's not the role of

23         that position.

24                But now reading it in part

CONFIDENTIAL

Page 96

1          here and seeing the part that

2          you've highlighted, I think what

3          you're pointing out is that

4          superintendents encourage

5          principals to use social media as

6          a communications tool.

7                    And that does -- that does

8          comport with what I've -- that

9          does comport with an element of my

10         report.

11                   ATTORNEY PISTILLI:  Let's

12         take a look at Tab 6.

13                        -   -   -

14                   (Whereupon, Exhibit

15         Osborne-5, No Bates, Pioneering

16         Use of Technology Transforms

17         Teaching in New York Schools, was

18         marked for identification.)

19                        -   -   -

20  BY ATTORNEY PISTILLI:

21         Q.    I'm handing you what's been

22  marked as Exhibit-5.

23         A.    Thank you.

24         Q.    Do you recognize Exhibit-5?

CONFIDENTIAL

Page 97

1          A.     Hang on.  Not immediately.

2                 Yes.  This was a long time

3    ago.  Yes, I recognize Exhibit-5.

4                 Well, hang on.  I recognize

5    this first page.

6                 ATTORNEY MEHRI:  Chris, just

7          a quick question.  Did you mean to

8          mark the back half of this with

9          all these photos?

10                ATTORNEY PISTILLI:  I think

11         that's probably just the complete

12         document as it printed.

13                ATTORNEY MEHRI:  Okay.  It

14         seems to have a different date.

15         Like, the first few pages say

16         129 -- oh, those are Bates

17         numbers.  Okay.  I just wanted to

18         check that's what you intended.

19   BY ATTORNEY PISTILLI:

20         Q.     Dr. Osborne, this is an

21   article you wrote entitled, Pioneering

22   Use of Technology Transforms Teaching in

23   New York Schools, right?

24         A.     The first three pages is

CONFIDENTIAL

Page 98

1    that, yes.  I don't recognize the rest.

2         Q.    And in this article, you

3    advocate for integrating technology in

4    the classroom, correct?

5         A.    Give me a minute.  This was,

6    like, ten years ago.  So I want to be

7    accurate about what I said here.

8              Okay.  Yes.  This is -- I

9    wrote this in 2015.

10        Q.    Right.  And in 2015, before

11   you were hired by plaintiffs as an

12   expert, you advocated for integrating

13   technology into American classrooms,

14   right?

15             ATTORNEY MEHRI:  Objection.

16             THE WITNESS:  That's --

17        that's accurate.  I did do that in

18        this article, and in other roles

19        that I held as well.

20             There was good reason to

21        believe that the educational

22        benefits in 2015 would be

23        transformative for learning and

24        education and that one of the

Page 99

1    primary equity concerns was

2    addressing the digital divide.

3        And as superintendent, what

4    I'm describing -- what I'm

5    describing in this article is how,

6    as superintendent, we increased

7    Internet access in our schools and

8    in the areas surrounding our

9    schools.  And that would have been

10   in the '14/'15 school year.

11   BY ATTORNEY PISTILLI:

12       Q.    And you also advocated for

13   reinforcing ways to harness the powerful

14   resources for learning that exist in the

15   increasingly technology-rich world,

16   right?

17       A.    Sorry.  Where are you

18   looking here?

19       Q.    The last sentence of your

20   article.

21       A.    The last sentence.

22             What's your question?

23       Q.    So you advocated, before you

24   were hired as an expert in this

CONFIDENTIAL

Page 100

1    litigation, for harnessing the powerful

2    resources for learning that exist in the

3    increasingly technology-rich world,

4    right?

5                    ATTORNEY MEHRI:  Objection.

6                    Go ahead.

7                    THE WITNESS:  Yes.

8                    ATTORNEY PISTILLI:  Let's go

9            ahead and take a look at Tab 9.

10                        -   -   -

11                    (Whereupon, Exhibit

12            Osborne-6, No Bates, Materials

13            Considered List, was marked for

14            identification.)

15                        -   -   -

16    BY ATTORNEY PISTILLI:

17            Q.    I'm handing you a document

18    that's been marked as Exhibit-6.

19                    Do you recognize this

20    document?

21            A.    Yes.  This is the materials

22    considered list.

23            Q.    Who generated this list?

24            A.    I generated this list.

CONFIDENTIAL

Page 101

1      Q.    How did you determine which

2   documents to include on this list?

3      A.    Okay.  So the documents I

4   included in this list came from -- oh, I

5   see.

6           I included on this list

7   documents that I accessed or skimmed or

8   looked at when I was generating the

9   report.  Some of them might not have

10  gotten into the citations, but I did look

11  at them.

12     Q.    And is this a complete list

13  of all the materials you considered in

14  forming your opinions?

15     A.    Yes, to the best of my

16  knowledge, it is -- should be, yeah.

17     Q.    How did you go about

18  deciding which documents to review for

19  purposes of drafting your report?

20     A.    For purposes of drafting my

21  report, I found documents mostly using

22  Google Scholar.  I put in keywords.

23          I mean, some of them I knew

24  and I was familiar with.  So I wanted to

Page 102

1  establish, like, a baseline understanding

2  of what school leader and

3  superintendents' responsibilities were.

4            So I went to documents that

5  I understood to be, like, source

6  documents for that.  For example, the --

7  like, the National Standards documents.

8            And then for the ones that

9  were, you know, more outside the scope of

10  my experience but that I wanted to learn

11  about for purposes of understanding

12  better how social media impacts the work

13  of leaders and schools, I did a search

14  using Google Scholar.

15       Q.    Because that was not

16  previously within the scope of your

17  experience?

18            ATTORNEY MEHRI:  Objection.

19            THE WITNESS:  I don't know

20       what you mean by that.

21  BY ATTORNEY PISTILLI:

22       Q.    You referred to those as --

23  that as a topic that was more outside the

24  scope of your experience that you wanted

CONFIDENTIAL

Page 103

1    to learn about, correct?

2          A.    The -- I wanted to do a

3    literature review to understand better

4    what the impact of the design features of

5    the platforms were, you know, like, what

6    the harms were.

7                And what I learned from the

8    literature -- much of what I learned from

9    the literature, there was a convergence

10   with the experience that I was having as

11   I interacted with educational leaders on

12   a regular basis over those six years and

13   even back to when I was superintendent in

14   New Rochelle.

15               Like, much of the

16   frustrations and the impact that I was

17   seeing in the schools or that was

18   reported to me by school leaders or part

19   of my interaction with them as I

20   developed, worked -- endeavored to

21   develop their leadership effectiveness,

22   the literature review, then, added to my

23   knowledge base, sort of insight into some

24   of the design of the features and how the

CONFIDENTIAL

Page 104

1  features were, basically, intentionally
2  engineered to prolong students'
3  engagement on the platforms.  So that was
4  one convergence also.
5              And then the -- there's a
6  long list of depositions considered here.
7  And I skimmed a lot of these.  I didn't
8  read them all carefully.
9              But I looked at the specific
10 kind of instances that the school
11 district representatives were testifying
12 to.  And what I found was that the
13 experience that I had and the patterns
14 that I recognized and the literature and
15 the reports from, like, the Surgeon
16 General, that kind of thing, and the
17 testimony on record were all converging
18 in ways that really provided sort of,
19 like, a reflection of or even validation
20 of what I was seeing school leaders
21 dealing with.
22              So that's why I did the
23 literature review.  Because up until
24 doing the literature review, I wasn't,

Page 105

1    like, really well informed about the

2    linkages between the platform features

3    and the students' compulsive personal use

4    of social media that I knew was having a

5    big impact on schools.

6              But the convergence of these

7    things sort of formed the basis for the

8    opinions that I offered in my report.

9         Q.    Right.  But just so we're

10   clear, you referred to needing to do the

11   literature review because it was outside

12   the scope of your experience.

13             And you were referring,

14   then, to the impact of platform design on

15   students, correct?

16        A.    Yeah.  I guess what I meant

17   to say was outside my expertise.  And

18   because I hadn't -- up until, really,

19   doing this literature review, I hadn't

20   read much of the peer-reviewed literature

21   that shows that the features in the

22   social media platforms are heavily linked

23   to students' compulsive use of social

24   media.

CONFIDENTIAL

Page 106

1            What I -- what that did for

2    my understanding was validate a lot of

3    the interactions that I had with school

4    leaders.  Like, oh, no wonder they're

5    having such a problem with this.  Like, I

6    knew the problem was there and existed,

7    you could see it in the work that the

8    school leaders were doing.

9            But the understanding of the

10   specific intentional design features was

11   something that really came out of the

12   literature for me.

13        Q.    Right.  But just so we're

14   clear, you're not here today as an expert

15   in platform design, right?  We already

16   agreed to that?

17        A.    Oh, yes.  I'm not an expert

18   in the platform design.

19            Like, I -- I read literature

20   from people who researched this.  That

21   would not make me an expert.  But it

22   would make me have, like, some knowledge

23   into some of those linkages that they

24   found in their research.

Page 107

1          Q.    So getting back to your
2    materials considered list.
3               Did you request any
4    documents from plaintiffs' counsel?
5          A.    Yeah.  I requested the --
6    the depositions.  Because I thought it
7    would be good for me to see what the
8    school and school district leaders were
9    putting on the record as a way to sort of
10   triangulate what I was seeing in my
11   interactions with school leaders and my
12   direct observations of schools and then
13   what they were reporting, as well as sort
14   of what the -- what the literature was
15   showing.
16               So that -- that
17   triangulation or convergence, like, the
18   way that those sort of streams of
19   evidence and knowledge came together for
20   me is what led to the opinions in my
21   report.
22         Q.    Did you request any primary
23   documents from the school districts?
24               ATTORNEY MEHRI:  Objection.

CONFIDENTIAL

1                THE WITNESS: What are

2        primary documents?

3   BY ATTORNEY PISTILLI:

4        Q.    Rather than deposition

5   testimony, actual documents produced by

6   the school districts.

7                ATTORNEY MEHRI:  Objection.

8                Go ahead.

9                THE WITNESS:  What do you

10       mean?

11  BY ATTORNEY PISTILLI:

12       Q.    So you're aware that, for

13  instance, school districts have annual

14  budgeting processes and, you know,

15  publish various documents around that,

16  right?

17       A.    Oh, yes.

18       Q.    Yes.

19             And they have policy and

20  procedure documents?

21       A.    Yes.

22       Q.    Did you request any of those

23  sorts of materials for any of the school

24  district plaintiffs?

CONFIDENTIAL

Page 109

1          A.    No.  I didn't think that
2    that was necessary.
3          Q.    Were there any documents you
4    asked the plaintiffs' lawyers for that
5    they didn't give you?
6          A.    I don't think so.  Not that
7    I recall.
8                ATTORNEY PISTILLI:  Let's
9          take a look at Tab 10.
10                    -  -  -
11          (Whereupon, Exhibit
12          Osborne-7, No Bates, 5/16/25
13          Expert Report of Brian G. Osborne,
14          was marked for identification.)
15                    -  -  -
16    BY ATTORNEY PISTILLI:
17          Q.    I'm handing you what we're
18    marking as Exhibit-7.
19                Is Exhibit-7 a copy of the
20    report you submitted in this case?
21          A.    Yes, it appears so.
22          Q.    You submitted this report on
23    May 16, 2025?
24          A.    Yes.

Page 110

1          Q.    And is there anything in
2     your report that you need to correct?
3          A.    There is.  There are a
4     couple of places where I found that the
5     references, the citation text itself
6     is -- is incorrect.
7          Q.    What are those?
8          A.    I don't remember exactly.
9     But there's a couple -- there's a couple,
10     like, places where there's a year wrong
11     or the author's name is wrong or
12     something like that.
13              But other than that, the
14     opinions in the text of the report, I
15     stand by that.
16                    -   -   -
17              (Whereupon, Exhibit
18         Osborne-8, No Bates, 7/30/25
19         Rebuttal Expert Report of Brian G.
20         Osborne, was marked for
21         identification.)
22                    -   -   -
23     BY ATTORNEY PISTILLI:
24          Q.    I'm going to hand you what

CONFIDENTIAL

Page 111

1    has been marked as Exhibit-8, which is

2    Tab 11.

3            A.    Thank you.

4            Q.    Is this the rebuttal report

5    that you submitted in this litigation?

6            A.    This is my reply to the 13

7    rebuttal reports, yes.

8            Q.    And you submitted this on

9    July 30 of 2025?

10           A.    Yes.

11           Q.    Anything you need to amend

12   or correct in this report?

13           A.    I don't think so, no.

14           Q.    Did you author these reports

15   yourself?

16           A.    Yes.

17           Q.    Did anyone assist you in the

18   drafting of the reports?

19           A.    No.

20           Q.    Did the lawyers play any

21   role in the drafting process?

22           A.    They did not -- some light

23   editing.

24           Q.    Is there any opinion that

Page 112

1    you currently plan to offer at trial
2    that's not contained in your two reports?
3          A.    No.
4          Q.    Let's go back to your
5    opening report, Tab 10, Exhibit-7, and
6    take a look at Page 5.
7          A.    Okay.
8          Q.    Do you see where you wrote,
9    In preparing this report, I relied on a
10   combination of professional expertise,
11   field-based knowledge, review of relevant
12   materials and current research in
13   educational leadership, educational
14   operations and student well-being?
15                Do you see that?
16         A.    Yes.
17         Q.    And does that accurately
18   describe the methodology you used in your
19   reports?
20         A.    It's not a complete
21   explanation of the methodology.  But that
22   is the sources that I used, yes.
23         Q.    Well, let's take a look at
24   the different sources you list.

CONFIDENTIAL

Page 113

1              You say you consulted

2    peer-reviewed studies, national surveys,

3    professional standards documents, such as

4    PSEL, and public reporting from

5    organizations like the Pew Research

6    Center.  These resources confirmed and

7    contextualized my experience in the

8    field.

9              Do you see that in Paragraph

10   18?

11        A.    That's Paragraph 18?

12              Yes, I see that.

13        Q.    And are those the public

14   sources that you reviewed to form your

15   opinions in this case?

16        A.    Yes.

17        Q.    And those sources generally

18   discuss national trends or general

19   professional standards, right?

20        A.    Some of them do.

21        Q.    None of them are specific to

22   any of the plaintiff school districts in

23   this case, correct?

24        A.    Not to my knowledge, no.

CONFIDENTIAL

1          Q.    And in your original report,
2     you don't discuss any potential
3     alternative causes to the alleged harm on
4     students in schools that you address in
5     your report, correct?
6          A.    I think I do touch on that.
7     One minute.  Let me find it.
8               Okay.  I must have done that
9     in the other report.  Sorry to take all
10    that time, but I thought I had it here.
11              Okay.  Thanks for letting me
12    look through this.  I think I was
13    thinking of the -- of the reply.
14         Q.    So in forming your opinions
15    that you offered in your opening report,
16    you don't consider any potential
17    alternative causes, correct?
18         A.    I was --
19              ATTORNEY MEHRI:  Objection.
20              Go ahead.
21              THE WITNESS:  Sorry.
22              I was looking at the --
23         specifically, I was looking at the
24         impact of compulsive personal

Page 115

1          social media use by students.
2          That was the -- sort of the scope
3          of the task.
4    BY ATTORNEY PISTILLI:
5          Q.    Did the scope of the task
6    understand -- involve understanding
7    alleged mental health harms that school
8    districts were dealing with?
9          A.    Sorry, would you ask me that
10   again?
11         Q.    Sure.
12              Did the scope of your
13   assignment include looking at alleged
14   mental health harms that the plaintiff
15   school districts were experiencing and
16   responding to?
17              ATTORNEY MEHRI:   Objection.
18              THE WITNESS:   In -- in part.
19         But the scope was about the
20         students' compulsive personal use
21         of social media and its impact on
22         the work of school leaders and
23         school district leaders.
24   BY ATTORNEY PISTILLI:

Page 116

1          Q.     Are you offering any

2    opinions that student mental health harms

3    have impacted schools and school leaders?

4               ATTORNEY MEHRI:   Objection.

5               THE WITNESS:   Yes, I think

6          so.

7               Opinion 1 is the emotionally

8          destabilizing effects of social

9          media, particularly students'

10         compulsive use -- oh, wait, this

11         may be more.

12              I think this is -- the

13         emotional destabilizing effects of

14         social media, particularly

15         students' compulsive use, fear of

16         exposure, exclusion or public

17         shaming are now shaping behavior

18         and mental health in ways that

19         fundamentally disrupt school

20         operations, school climate, and

21         the educational experience.

22              So that's the first opinion

23         that I offer.  And I think you're

24         asking me if I offer an opinion

CONFIDENTIAL

1          about how mental health is
2          affecting school district
3          operations or school leaders or,
4          like, the other things that I
5          looked at.
6     BY ATTORNEY PISTILLI:
7          Q.    Yes.  I'm asking, are you
8     offering the opinion that schools have
9     been impacted as a result of student
10    mental health harms?
11              ATTORNEY MEHRI:  Asked and
12         answered.
13              THE WITNESS:  Yeah.  I mean,
14         I'm happy to read this again, if
15         you want.  This is my opinion.
16         The text is here.
17    BY ATTORNEY PISTILLI:
18         Q.    And your opinion refers to
19    behavioral and -- and mental health
20    issues.
21              And so my question is
22    whether you made any effort to determine
23    whether it was, in fact, social media
24    causing the behavioral and mental health

CONFIDENTIAL

Page 118

1    issues as opposed to any potential other

2    causes of behavioral and mental health

3    issues?

4         A.    That was a really long

5    question.  Would you, like, help me

6    understand your question?

7         Q.    Sure.

8              So did you consider whether,

9    in fact, any behavioral and mental health

10   issues that were impacting school

11   districts were, in fact, caused by

12   something other than social media in the

13   course of forming your opinions in this

14   case?

15        A.    I see.

16             I looked at the impact of

17   the students' compulsive personal social

18   media use on school district operations

19   and on the work of leaders.  And in

20   the -- in the reading that I did from the

21   research literature, in the examination

22   of testimony on the record from school

23   district and school leaders, and in my

24   own interactions with lots and lots of

CONFIDENTIAL

Page 119

1    school leaders or aspiring school leaders

2    or district leaders over the course of

3    the last six years, it's clear to me that

4    the mental health harms and the impact on

5    school district operations that is

6    attributable to the students' compulsive

7    social media use is a specific, unique,

8    qualitatively different problem than many

9    of the others that form the context in

10   which public education functions.

11             So while your question is,

12   did I consider other factors.  I mean,

13   it's always in my work, other factors.

14   But the scope of this was about social

15   media use.

16             And as I wrote in my reply,

17   the social media use is of a different

18   quality than many of the other factors

19   that the rebuttal reports -- reports took

20   great pains to identify.

21             It's unique in its effect on

22   the student body and on school

23   operations.  It also exacerbates,

24   basically, all the other problems that

CONFIDENTIAL

Page 120

1    you're likely to name next.

2             And unlike many of the other

3    ills that students face and that create

4    issues for schools and school districts,

5    the prolonged engagement leading to

6    compulsive use of social media is

7    predictable by design and known.

8             So that's -- yeah.  That's

9    my answer to your question.

10        Q.    How do you know that social

11   media is unique if your methodology

12   didn't involve even considering other

13   potential causes of student mental health

14   issues?

15             ATTORNEY MEHRI:  Objection.

16             THE WITNESS:  I think that

17        mischaracterizes my methodology.

18             One part of my methodology

19        was doing a literature review.

20        And you asked how I found the

21        literature.  I told you that I

22        used Google Scholar, and I looked

23        for research articles that were

24        about student mental health and

CONFIDENTIAL

Page 121

1          social media so that I could
2          understand that interaction.
3                But there's other parts of
4          my methodology that inform my
5          opinion, my claim that the
6          compulsive personal use of social
7          media by students is creating new
8          harms to school district
9          operations and the work of school
10         leaders, as well as exacerbating
11         other problems that exist in the
12         context of public education.
13                And that part of the
14         methodology comes from -- largely
15         from my experience of interacting
16         with school and school district
17         leaders, a career of working on
18         improving educational outcomes for
19         all students, as well as my
20         reading of the testimony on
21         record.
22    BY ATTORNEY PISTILLI:
23         Q.   Let's take a look at
24    Paragraph 15 of your report.

CONFIDENTIAL

Page 122

1          Sorry.  My apologies.
2    Let's -- if we could switch over to
3    Exhibit-8, let's take a look at
4    Paragraph 15 of your rebuttal report.
5               And this, again, is a
6    portion of your report describing your
7    methodology, correct?
8          A.    This describes a bit about
9    the -- my approach to the leadership
10   advising I do in my capacity as a teacher
11   of graduate students who are aspiring
12   leaders or the direct support that I
13   provide, usually as an executive coach or
14   a provider of professional development
15   for new leaders, or, sometimes, leaders
16   who are -- who are struggling with
17   different issues.
18               That's what -- that's what
19   this describes here, as opposed to my
20   methodology for the report as a whole.
21         Q.    So just so I'm clear, you're
22   saying this describes the methodology
23   that you use in your professional
24   consulting work, correct?

CONFIDENTIAL

Page 123

1          ATTORNEY MEHRI:  Objection.

2          THE WITNESS:  Yeah, so the

3      beginning of the paragraph says,

4      This kind of leadership advising.

5          And the "this kind of

6      leadership advising" is a

7      reference back to the prior

8      paragraph where I put, Overall, I

9      have substantial experience

10     working directly with the school

11     and school district -- with school

12     and district leaders to navigate

13     real-world educational challenges.

14         And I added this here

15     because the work that I do when

16     I'm supporting those school and

17     district leaders is not haphazard.

18     It is dependent on methodology

19     that is core to the field of

20     educational leadership study, even

21     though my role as a practitioner

22     and not an academic is not to

23     produce research studies but,

24     rather, to try to help the leader

CONFIDENTIAL

Page 124

1          who I'm working with directly.
2                  Nevertheless, I draw from a
3          tradition of methodology that is
4          well established in the field of
5          study of educational leadership.
6   BY ATTORNEY PISTILLI:
7          Q.     And is that same methodology
8   that you rely on in working with school
9   districts the methodology and experience
10  that you are bringing to bear in forming
11  your opinions in this case?
12                 ATTORNEY MEHRI:   Objection.
13                 THE WITNESS:   Yes, in part.
14          I think I described before how the
15          evidence based -- base that leads
16          to my opinions is really a
17          convergence of, essentially, four
18          different things.
19                 One is my experience as a
20          superintendent -- well, as an
21          educator and, in part, a
22          superintendent.
23                 Second, the work that I do
24          as an educational consultant,

CONFIDENTIAL

Page 125

1          especially in my capacity as
2          executive coach but also other --
3          other related work.
4                Third, the literature review
5          that I did after being prompted
6          to -- to engage in this task for
7          this case.
8                And, fourth, the testimony
9          on record from school and school
10         district leaders.
11               These things converged in a
12         way that leads to a reliability
13         and a rigor and resulted in my --
14         in the opinions that I offered in
15         my report.
16   BY ATTORNEY PISTILLI:
17         Q.    Sure.  And when you are
18   serving as a consultant to school
19   districts, the structured approach that
20   you employ draws from data when
21   available, correct?
22               ATTORNEY MEHRI:  Objection.
23               THE WITNESS:  I suppose when
24         relevant.  Like, it depends on

CONFIDENTIAL

Page 126

1    what the school district leader is
2    grappling with.
3            So if a school district
4    leader is needing to plan some
5    professional development that's
6    data informed or present results
7    that are based on data, then they
8    may want me to provide support to
9    them in their engagement with that
10   data.
11           So that's a way in which I
12   guess what you're calling data
13   would be -- would be used.
14           I would also call data
15   the -- my direct observations of
16   the context in which the leader is
17   working.  So my executive coaching
18   is not only one-on-one
19   conferencing with the leader, but
20   I want to make sure that I get a
21   fuller picture by coupling that
22   with direct observations of their
23   leadership and practice.
24               And that kind of

CONFIDENTIAL

Page 127

1          triangulation, if you will, is

2          part of the discipline of study of

3          educational leadership.

4   BY ATTORNEY PISTILLI:

5          Q.     In Paragraph 15 of your

6   rebuttal report you wrote, I use a

7   structured approach that draws from data

8   when available, such as survey feedback,

9   district documents, correct?

10         A.     It does say that, yes.

11         Q.     And that's an accurate

12   description of the work that you do

13   advising school leaders and school

14   districts, correct?

15         A.     It -- it can be a part, yes.

16                So the structured approach

17   that I'm trying to describe here, it may

18   vary by context, but it includes sort of

19   multiple ways of interacting with that

20   school leader, understanding the context

21   that the district is in.

22                So if a superintendent is

23   considering a policy change on something

24   that would have -- that would impact on

CONFIDENTIAL

Page 128

1   the entire community, then they might

2   collect survey feedback about that.  And

3   I would engage with that leader to look

4   at their -- their documents, like, what

5   does their policy say?  What does the

6   survey say?  What are their people saying

7   across the schools?  Like, what do the

8   teachers say?  What does the teachers'

9   union say?  So that they're collecting a

10  variety of perspectives and data on

11  whatever the particular problem or

12  practice is that they're trying to

13  address.

14          Q.    Right.  Because district

15  documents that shed light on the issues a

16  school district is confronting are

17  relevant to the work you do in

18  consulting, correct?

19              ATTORNEY MEHRI:  Objection.

20              THE WITNESS:  Often, yes.

21  BY ATTORNEY PISTILLI:

22          Q.    Are you aware that the six

23  bellwether school district plaintiffs in

24  this case have produced nearly 900,000

CONFIDENTIAL

Page 129

1    documents in this litigation?

2          A.    No.  That's a lot of

3    documents.  No, I wasn't aware.

4          Q.    And you reviewed zero of

5    them; is that right?

6          A.    I didn't see it as necessary

7    for my role in the -- in producing my

8    opinions.

9          Q.    Let's go back to Exhibit-7,

10   if we could.  Take a look at Paragraph 65

11   on Page 18, if you would.

12               Do you see where you wrote,

13   The mental health toll on young people

14   caused by social media use has resulted

15   in student emotional needs that, in many

16   schools, overwhelm the capacity of

17   school-based mental health providers, who

18   often serve as the primary providers of

19   youth mental health services?

20               Do you see that?

21          A.    I do.

22          Q.    But you don't know how many

23   school-based mental health providers any

24   of the six bellwether school districts

Page 130

1    have, right?

2         A.    I do not know that specific

3    information, no.

4         Q.    You haven't reviewed any

5    documents relating to the school-based

6    mental health providers at any of the six

7    bellwether plaintiff districts, correct?

8         A.    I didn't see that as

9    necessary to my task.

10        Q.    So, then, I take it you're

11   not offering an opinion that the capacity

12   of school-based mental health providers

13   in any of the six plaintiff districts

14   have been overwhelmed, correct?

15             ATTORNEY MEHRI:  Objection.

16        Asked and answered.

17             THE WITNESS:  What I'm

18        offering is an opinion that this

19        is common to schools.  It's common

20        to the schools that I've seen in

21        my interactions with school

22        leaders and visits to schools.

23             It appears in the

24        literature.  And it is also

CONFIDENTIAL

Page 131

1    evident in the testimony on
2    record.
3         So as to the specifics of
4    those particular schools, as I
5    already said, I didn't review
6    those specifics.  But there is a
7    generalized pattern that is
8    unmistakable that the mental
9    health providers in the school are
10   often maxed out because of the
11   mental health issues that the
12   research shows are clearly linked
13   to the students' compulsive
14   personal use of social media.
15 BY ATTORNEY PISTILLI:
16        Q.    But just to -- to make sure
17  it's clear to the jury, whether that
18  general trend is true at any of the six
19  specific plaintiffs in this case, that's
20  not something you looked at?
21             ATTORNEY MEHRI:  Objection.
22   Mischaracterizes the testimony.
23             THE WITNESS:  That isn't
24   something that I looked at.  It

CONFIDENTIAL

Page 132

1          would be a supposition.

2                  The prevalence is undeniable

3          across schools.  So although it

4          would be supposition, it would not

5          be surprising if that is the case.

6                  And testimony on the record,

7          I think from others, may

8          demonstrate that that is so.

9   BY ATTORNEY PISTILLI:

10         Q.    But for you, it would just

11   be a supposition?

12         A.    It wasn't --

13                ATTORNEY MEHRI:  Objection.

14                THE WITNESS:  Sorry.

15                It wasn't within the scope

16         of the task that I took on.

17                ATTORNEY PISTILLI:  Let's

18         take another quick break.

19                VIDEO TECHNICIAN:  The time

20         is 11:34 a.m.  This is the end of

21         Media 2, and we are going off the

22         record.

23                      -  -  -

24                (Whereupon, a brief recess

CONFIDENTIAL

```
                                        Page 133
 1          was taken.)

 2                       -   -   -

 3               VIDEO TECHNICIAN:  The time

 4          is 11:50 a.m.  This is the

 5          beginning of Media 3, and we're

 6          going back on the record.

 7   BY ATTORNEY PISTILLI:

 8          Q.     If we could continue looking

 9   at Exhibit-7, Page 18, please.  And in

10   particular, I'd draw your attention to

11   Paragraph 66.

12               You wrote, Student social

13   media use has led to attention span

14   deficiencies that hinder learning

15   objectives and negatively impact teacher

16   morale.

17               Do you see that?

18          A.     Yes.

19          Q.     Did you look at any

20   documents or data regarding teacher

21   morale for any of the six plaintiff

22   school districts?

23               ATTORNEY MEHRI:  Objection.

24               THE WITNESS:  No, I didn't
```

CONFIDENTIAL

Page 134

```
 1          look at documents pertaining to
 2          the six districts.  I didn't think
 3          it was necessary for the task.
 4  BY ATTORNEY PISTILLI:
 5          Q.    So you don't have any
 6  understanding as to teacher morale in
 7  those six specific districts, correct?
 8          A.    My understanding of teacher
 9  morale is more general and draws from the
10  sources of evidence that I've already
11  cited.
12          Q.    None of which relate to the
13  six specific plaintiffs, correct?
14              ATTORNEY MEHRI:  Objection.
15              THE WITNESS:  They -- you're
16          asking if I looked at documents
17          from the six plaintiff districts?
18              You've asked me several
19          times.  I've answered the same way
20          every time.  I didn't look at any
21          of those documents.
22              You can keep asking me if
23          you want.
24  BY ATTORNEY PISTILLI:
```

                                    Page 135

1          Q.    So any -- any opinions
2    regarding teacher morale for the six
3    specific districts would be a supposition
4    on your part?
5                 ATTORNEY MEHRI:  Objection.
6                 THE WITNESS:  It would be.
7          It's my understanding that
8          plaintiffs have other experts that
9          looked at district-specific data.
10   BY ATTORNEY PISTILLI:
11         Q.    Take a look now with me, if
12   you would, at Paragraph 67.
13                You wrote, Third, routine
14   discipline issues have escalated in both
15   frequency and intensity.
16                Do you see that?
17         A.    I do.
18         Q.    Do you have a general
19   understanding that school districts
20   maintain documents and data regarding
21   disciplinary issues?
22         A.    Schools and districts
23   maintain documents regarding disciplinary
24   issues, yes.

CONFIDENTIAL

Page 136

1          Q.    And do you have an
2   understanding as to whether any of the
3   six plaintiffs maintain such documents?
4          A.    Only insofar as they're
5   public school entities; and in my
6   experience, basically, a lot of them do
7   to some extent.
8          Q.    But you've not reviewed any
9   documents or data from any of the six
10  plaintiffs relating to discipline issues,
11  correct?
12              ATTORNEY MEHRI:  Objection.
13              THE WITNESS:  No, I've not
14        looked at any documents or data
15        from the six school districts.
16  BY ATTORNEY PISTILLI:
17         Q.    So as to those six districts
18  specifically, you don't have any
19  information regarding the frequency and
20  intensity of disciplinary issues,
21  correct?
22              ATTORNEY MEHRI:  Objection.
23              THE WITNESS:  From the six
24        specific districts, I don't have

CONFIDENTIAL

Page 137

1          any direct information that is
2          about those particular districts.
3          I didn't see that as necessary for
4          the task.
5   BY ATTORNEY PISTILLI:
6          Q.    And then in Paragraph 68,
7   you reference bullying.
8               You also don't have any
9   information about bullying for any of the
10  six plaintiff school districts, correct?
11               ATTORNEY MEHRI:   Objection.
12               THE WITNESS:   My
13          observations here and the opinions
14          that I offer are generalized
15          across public schools.   I don't
16          have specific information
17          regarding those instances in the
18          six school districts.
19               I didn't review any
20          documents of those districts.   I
21          didn't think it was necessary for
22          the task.
23  BY ATTORNEY PISTILLI:
24          Q.    So sitting here today, you

CONFIDENTIAL

Page 138

1    don't know whether social media has

2    facilitated and amplified bullying for

3    any of the six specific plaintiff school

4    districts, correct?

5                    ATTORNEY MEHRI:  Objection.

6                    THE WITNESS:  Looking at the

7            effects of social media and its

8            use on the six districts in

9            particular was not within the

10           scope of my task.

11                   Rather, I looked at the

12           impact of compulsive personal

13           social media use by students on

14           schools and the work that school

15           leaders do, school and school

16           district operations more

17           generally.

18   BY ATTORNEY PISTILLI:

19        Q.    You don't know what work

20   schools and school districts have done

21   specifically at any of the six plaintiff

22   school districts, correct?

23                   ATTORNEY MEHRI:  Objection.

24                   THE WITNESS:  Correct.  As I

CONFIDENTIAL

Page 139

1         stated before, I didn't talk with
2         anyone from those six districts.
3         I didn't review any documents from
4         those six districts.  I didn't
5         think that it was necessary for
6         the task.
7    BY ATTORNEY PISTILLI:
8         Q.    Sure.  If we could turn to
9    Page 21 and look at Paragraph 75.
10             You see where you wrote,
11   These effects are not abstract.  They
12   manifest in schools every day through
13   reduced student focus, escalating peer
14   conflict, emotional dysregulation, and
15   rising demand for mental health services.
16             Do you see that?
17        A.    Yes.  Well put.
18        Q.    And am I correct that you
19   didn't look at any documents or data
20   relating to whether there's been reduced
21   student focus at any of the six specific
22   plaintiff school districts, correct?
23        A.    That's right.  I didn't look
24   at whether there was any data regarding

CONFIDENTIAL

Page 140

1    reduced student focus at any of the six

2    specific districts.

3                My report is more

4    generalized than that.  I didn't think

5    looking at those specific districts was

6    necessary for the task.

7         Q.   So you don't know whether

8    there is reduced student focus at any of

9    the six specific plaintiff districts,

10   correct?

11               ATTORNEY MEHRI:  Objection.

12               THE WITNESS:  What I know is

13          that in schools there's a link

14          between students' compulsive

15          personal use of social media and

16          reduced student focus and that

17          that is a present reality in all

18          the schools that I've worked in

19          and the schools that my graduate

20          students who are aspiring leaders

21          work in.

22   BY ATTORNEY PISTILLI:

23         Q.   But it would be supposition

24   on your part to say that there was

                                    Page 141

1   reduced student focus specifically in any

2   of those six districts, because you've

3   never looked at any information relevant

4   to that, correct?

5              ATTORNEY MEHRI:  Objection.

6        Mischaracterizes the testimony.

7              THE WITNESS:  While it would

8        not be a difficult extrapolation

9        to make, I don't make it here.

10  BY ATTORNEY PISTILLI:

11        Q.    So you're not offering the

12  opinion that there's reduced student

13  focus, escalating peer conflict,

14  emotional dysregulation at any of the six

15  specific plaintiffs, correct?

16        A.    What I'm offering is that

17  the effects of students' personal

18  compulsive social media use manifest in

19  schools every day through reduced student

20  focus, escalating peer conflict,

21  emotional dysregulation and rising demand

22  for health services.

23              My claims are from the

24  literature that I read, the testimony

Page 142

1    that I reviewed, and my own experience as
2    superintendent, as well as an educational
3    consultant working in many schools of
4    different types over a long period of
5    time and interacting with many leaders
6    and aspiring leaders within those school
7    environments.
8              The research that I've read
9    and the experience that I have did not,
10   to my knowledge, specifically include the
11   six districts.
12             The testimony that I
13   reviewed may have.  But I don't recall,
14   because at that point I think I reviewed
15   testimony from plaintiff districts that
16   may not have been in the six.
17        Q.    So let's focus for a minute
18   on the rising demand for mental health
19   services.
20             You didn't look at any
21   documents or data relating to the demands
22   for mental health services at any of the
23   six plaintiff school districts, correct?
24        A.    I did not look at documents

CONFIDENTIAL

Page 143

1  related to the demand -- rising demand

2  for mental health services in any of the

3  six districts.  I didn't see that as

4  necessary to the task.

5          Q.    So you don't have any basis,

6  sitting here today, to say there is a

7  rising demand at any of the six specific

8  plaintiff school districts, correct?

9              ATTORNEY MEHRI:  Objection.

10             THE WITNESS:  I didn't

11         review any documents from the six

12         districts.  I didn't interview any

13         people from the six districts.  I

14         can't claim specifically that

15         there is a rise in demand for

16         mental health services in the six

17         districts.

18             What I can say is that based

19         on my experience, my interactions

20         with school leaders and aspiring

21         school leaders, my review of the

22         research and my reading of the

23         testimony on record is that

24         there's a convergence of evidence

CONFIDENTIAL

Page 144

1          that demonstrates rising demand

2          for mental health services to meet

3          the needs that are created by the

4          students' compulsive use of social

5          media that I understand, from the

6          literature, is linked to the

7          design features of the platforms.

8                And I can say that across

9          the scope of evidence that I was

10         considering to reach my opinions.

11         I think it would not be hard to

12         extrapolate that there is likely

13         to be, in the six districts, a

14         rising demand for mental health

15         services.

16                But that was outside of the

17         scope of what I looked at

18         specifically, because I didn't

19         think that it was necessary to the

20         task.

21    BY ATTORNEY PISTILLI:

22          Q.    All right.  So just so it's

23    clear to the jury, you can't claim that

24    there is a rise in demand for mental

CONFIDENTIAL

Page 145

1  health services in the six districts,

2  correct?

3            ATTORNEY MEHRI:  Objection.

4       Asked and answered.

5            THE WITNESS:  I think I

6       would answer the question the same

7       way that I just did.

8  BY ATTORNEY PISTILLI:

9       Q.   If you could turn back to

10  Page 17.  Take a look at Opinion 1.

11            Do you see where you write,

12  The emotionally destabilizing effects of

13  social media, particularly students'

14  compulsive use, fear of exposure,

15  exclusion or public shaming, are now

16  shaping behavior and mental health in

17  ways that fundamentally disrupt school

18  operations, school climate and the

19  educational experience.

20            Do you see that?

21       A.   I do.  Well put.

22       Q.   Did you look at any

23  documents or data relating specifically

24  to whether and to what extent students in

CONFIDENTIAL

Page 146

1    any of the six specific school districts

2    at issue here engage in, quote/unquote,

3    compulsive use?

4         A.    I didn't look at any data or

5    documents regarding students' compulsive

6    use specific to the six districts.

7              I didn't think that that was

8    necessary for the task.

9         Q.    And so, then, I take it the

10   same is true for fear of exposure,

11   exclusion or public shaming, you didn't

12   look at anything specific to the six

13   districts, correct?

14             ATTORNEY MEHRI:  Objection.

15             THE WITNESS:  I didn't look

16        at anything specific to the six

17        districts in terms of documents or

18        direct reports or observation

19        regarding fear of exposure,

20        exclusion or public shaming in the

21        six particular districts.

22             I didn't think that it was

23        necessary to the task.  And I

24        understand other plaintiff experts

Page 147

1       have done so.

2   BY ATTORNEY PISTILLI:

3       Q.    So, then, I take it, sitting

4   here today, you don't know whether school

5   operations, school climate and the

6   educational experience have been

7   disrupted at any of these six specific

8   school districts, correct?

9           ATTORNEY MEHRI:  Objection.

10          THE WITNESS:  What I know is

11       that, by and large, across schools

12       and school districts, public

13       education, are experiencing

14       disruption in school operations

15       and school climate and in the

16       educational experience,

17       attributable to students'

18       compulsive personal use of social

19       media that is driven by the design

20       features in the platforms.

21           And I reached that opinion

22       based on my personal experience,

23       the interactions that I've had

24       with school leaders and aspiring

Page 148

```
 1          school leaders on a regular basis
 2          over a long period of time in a
 3          variety of schools and school
 4          districts, my review of the
 5          literature and my reading of the
 6          testimony on record.
 7              It would not be a difficult
 8          extrapolation to suppose that
 9          that's happening in the six
10          districts as well.  But I am not
11          prepared to make that claim today.
12  BY ATTORNEY PISTILLI:
13          Q.    So you've not done the work
14  to know whether there are school
15  operations, school climate and
16  educational experience disruptions
17  specifically in any of the six districts,
18  correct?
19              ATTORNEY MEHRI:  Objection.
20          Asked and answered.
21              THE WITNESS:  I would answer
22          verbatim with the answer that I
23          just gave.
24  BY ATTORNEY PISTILLI:
```

Page 149

1          Q.    You didn't look at any
2    documents or data from any of the six
3    districts relating in any way to
4    disruptions of school operations, school
5    claimant or educational experience,
6    correct?
7          A.    I did not look at any data
8    specific to the six districts nor talk
9    with anyone in the six districts, because
10   I didn't think that that was necessary
11   for the task.
12         Q.    If you could please turn to
13   Page 21.  Take a look at Opinion 2.
14              You write, The cumulative
15   impact of social media saturation and its
16   associated emotional strain diminishes
17   educator morale, increases staff burnout,
18   contributes to a pervasive sense of
19   instability in school environments.
20              Do you see that?
21         A.    Yes.  Well put.
22         Q.    Did you look at any
23   documents or data relating to educator
24   morale in any of the six plaintiff school

CONFIDENTIAL

Page 150

1    districts?

2          A.    I did not look at any data

3    related to educator morale in the six

4    specific school districts.

5                I didn't think that that was

6    necessary to the task.

7          Q.    You didn't look at any

8    documents either, right?

9          A.    I beg your pardon?

10          Q.    You said you didn't look at

11    data.

12                My question was about

13    documents and data.  So I just want to

14    make sure the record is clear.

15                You didn't look at any

16    documents or data relating to educator

17    morale, correct?

18          A.    I looked at a lot of data --

19    a lot of documents related to the impact

20    of students' compulsive personal use of

21    social media.

22                And among the documents that

23    I looked at, one of the adverse impacts

24    is on educator morale and staff burnout,

Page 151

1   insofar as teachers are now needing to

2   instruct students who are experiencing

3   fragmented attention and increased

4   anxiety to scale.

5           I looked at -- I looked at

6   documents related to that --

7       Q.    So my --

8       A.     -- in the research.

9       A.     It's in my --

10      Q.    My question was --

11      A.     -- materials considered

12  list.

13      Q.    My question, sir, was --

14          ATTORNEY MEHRI:  Let him

15      answer the question.

16          THE WITNESS:  I'm done.

17      Thank you.

18  BY ATTORNEY PISTILLI:

19      Q.     -- specifically, did you

20  look at any documents or data relating to

21  educator morale at the six school

22  district plaintiffs?

23      A.    Oh, I see.  I think you

24  asked it differently before.

Page 152

1                    I did not look at any

2    documents or data related to educator

3    morale in the six specific districts.

4                    I did not think that it was

5    necessary to the task.

6            Q.    And is the same true for

7    staff burnout?

8            A.    Are you asking me whether I

9    reviewed data or documents related to

10   staff burnout in any of the six specific

11   districts?

12           Q.    Yes.

13           A.    My answer would be the same.

14           Q.    And you, similarly, didn't

15   look at any documents or data relating to

16   the school environment at any of the six

17   specific districts, correct?

18           A.    I did not look at data or

19   documents related to instability of

20   school environment for -- specific to the

21   six districts.

22                   I did not think that it was

23   necessary to the task.

24           Q.    So I take it, then, you're

CONFIDENTIAL

                                    Page 153

1    not offering any opinions about educator

2    morale, staff burnout or the school

3    environment specific to the six plaintiff

4    school districts, correct?

5                    ATTORNEY MEHRI:  Objection.

6                    Go ahead.

7                    THE WITNESS:  I'm offering

8            an opinion that in schools

9            generally, based on my experience

10           as an educational leader, the

11           educational consulting work that

12           I've done, which has had many --

13           which has included many

14           interactions with school leaders

15           and aspiring school district

16           leaders -- or aspiring school

17           leaders and school district

18           leaders in a variety of contexts

19           over a long period of time.

20                    And the research that I

21           reviewed, as well as the testimony

22           on record from the school

23           districts, that there is a

24           pervasive sense of instability in

CONFIDENTIAL

Page 154

1          school environments that is
2          attributable to the students'
3          compulsive personal social media
4          use.  And that compulsion is
5          driven by features that are in the
6          designs of the platforms.
7                 I did not look at data or
8          documents specific to the six
9          districts, because I did not think
10         that it was necessary to the task.
11                However, I think it would be
12         an easy extrapolation to make.
13         I'm just not doing that today.
14         I'm not making that claim about
15         those districts.
16    BY ATTORNEY PISTILLI:
17         Q.    You're not doing it because
18    you don't have the basis in fact to do
19    it, correct?
20                ATTORNEY MEHRI:  Objection.
21                THE WITNESS:  I'm not sure
22         what you mean.
23    BY ATTORNEY PISTILLI:
24         Q.    It would be a supposition on

Page 155

1  your part, given what you have and
2  haven't looked at, to offer any opinions
3  about educator morale, staff burnout or
4  the school environment at the six
5  specific school districts, correct?
6              ATTORNEY MEHRI:  Objection.
7         And mischaracterizes his
8         testimony.
9              THE WITNESS:  I guess I
10         would say that if extrapolation is
11         inherently supposition, then yes,
12         it would be supposition.
13             It would take some
14         extrapolation to make the claim on
15         these six districts.  I think it
16         would be an easy extrapolation to
17         make.  But I'm not making that
18         here today.
19  BY ATTORNEY PISTILLI:
20         Q.    And do you plan to make that
21  extrapolation at a later time?
22         A.    I -- I do not plan to, not
23  unless I'm asked to look at data and
24  documents from the specific six districts

Page 156

1    and the scope of my task changes.

2         Q.    Right.  Because that would

3    be a change in the scope of your task,

4    correct?

5         A.    You're asking me if looking

6    at the six specific districts, their data

7    and documents, would be a change in the

8    scope of my task?  Yes, it would be.

9         Q.    Let's take a look at

10   Opinion 3 on Page 23.

11            You say, The growing need to

12   allocate additional funding for mental

13   health and student support services is

14   intensifying already difficult tradeoffs

15   in resource allocation.

16            You've not looked at any

17   documents or data relating to funding for

18   mental health and student support

19   services in any of the six plaintiff

20   school districts, correct?

21         A.    I've not looked at data or

22   documents related to the need for

23   additional funding for mental health or

24   student support services in any of the

CONFIDENTIAL

Page 157

1   six districts.

2        Q.    So --

3        A.    I did not think that it was

4   necessary to the task.

5        Q.    So sitting here today, you

6   don't have any basis to know whether, in

7   fact, there is a need for additional

8   funding for mental health and student

9   support services in the six districts,

10  correct?

11            ATTORNEY MEHRI:  Objection.

12            THE WITNESS:  My basis for

13        the opinion that there's a growing

14        need to allocate general funding

15        for mental health and student

16        support services and that that is

17        intensifying already difficult

18        tradeoffs in resource allocation

19        is based on the sources of

20        evidence that I considered that

21        converged to show that this is a

22        reality in schools and school

23        districts across a variety of

24        settings in a variety of places

CONFIDENTIAL

Page 158

1          and that the -- my experience, the

2          research, the testimony on record

3          suggests that this is pervasive

4          across public education settings

5          in the country.

6    BY ATTORNEY PISTILLI:

7          Q.    But it would be --

8          A.    The --

9              ATTORNEY MEHRI:  Let him --

10             THE WITNESS:  The -- for me

11         to claim that it would be -- that

12         that is also true in the six

13         specific districts would be an

14         extrapolation, because I did not

15         review data or documents specific

16         to the six districts.

17             I think that it would be an

18         easy extrapolation to make.  But

19         I'm not making that claim here

20         today.

21   BY ATTORNEY PISTILLI:

22         Q.    And you've not looked at the

23   documents or data that would be needed to

24   do so, correct?

CONFIDENTIAL

Page 159

1          A.    I've looked at enough
2    documents and data to think that it would
3    be reasonable to make the extrapolation,
4    although I'm not doing that here.
5               But I've not looked at
6    specific documents and data in the six
7    school districts specifically that would
8    be required to verify such a claim.
9               I didn't think that it was
10   necessary to my task.  And further, it's
11   my understanding that other plaintiff
12   experts have done so.
13        Q.    If you could please turn to
14   Opinion 4 of your report on Page 25.
15              You say, Promulgating and
16   enforcing rules to limit social media and
17   personal electronic devices in schools is
18   operationally complex and often a source
19   of conflict among school staff, students
20   and families.
21              Do you see that?
22        A.    Yes.  Well put.
23        Q.    Do you know whether any of
24   the bellwether school districts have

CONFIDENTIAL

Page 160

1  instituted cell phone policies or other
2  rules limiting the use of electronic
3  devices in their schools?
4        A.    I do not know whether the
5  six specific districts have instituted
6  policies or rules to limit social media
7  and personal electronic devices in their
8  schools.
9            I didn't look at data and
10 documents from the six specific
11 districts.  I didn't think that it was
12 necessary to the task that I was given.
13       Q.    So, again, this opinion
14 you're offering here that promulgating
15 and enforcing rules to limit social media
16 and personal electronic devices in
17 schools is operationally complex and
18 often a source of conflict is not based
19 on any information specific to the six
20 school district plaintiffs, correct?
21            ATTORNEY MEHRI:  Objection.
22            THE WITNESS:  The basis of
23       my opinion that promulgating and
24       enforcing rules to limit social

CONFIDENTIAL

Page 161

1    media and personal electronic

2    devices in schools is

3    operationally complex and often a

4    source of conflict among school

5    staff, students and families is a

6    result of convergence of evidence

7    from my experience, my work over

8    the last six years as an

9    educational consultant interacting

10   with school leaders and aspiring

11   school leaders, district leaders,

12   as well as my review of relevant

13   literature from peer-reviewed

14   journals and the testimony on

15   record.

16        And that forms the basis of

17   my claim that, in schools, these

18   kind of enforcement rules are

19   difficult and complex and

20   sometimes have unintended negative

21   consequences.

22        It would be supposition,

23   extrapolation to know that that is

24   true in the six districts.  I did

CONFIDENTIAL

Page 162

```
 1         not look at data or documents to

 2         verify that that is true in the

 3         six specific districts, because it

 4         wasn't within the -- it wasn't

 5         necessary to the task.  And it's

 6         my understanding that other

 7         plaintiff experts may have done

 8         so.

 9  BY ATTORNEY PISTILLI:

10         Q.    Please turn to Page 29 and

11  look with me at Opinion 5.

12              You say, The cumulative

13  effect of these demands is increased

14  cost, diverted resources, heightened

15  emotional strain, and reduced leadership

16  capacity, negatively impacting school

17  districts, schools and public education.

18              Do you see that?

19         A.    I do.

20         Q.    Did you look at any

21  documents or data relating to whether

22  there are increased costs at any of the

23  six plaintiff school districts?

24         A.    I did not look at any data
```

CONFIDENTIAL

Page 163

1   or documents specific to the six school

2   districts.

3             The basis of my opinion here

4   is on the experience that I've had, the

5   interactions I've had with numerous

6   school leaders and aspiring school

7   leaders in a variety of contexts over

8   multiple years, including time in those

9   schools, my review of relevant literature

10  and my reading of the testimony on

11  record.

12            This suggests to me -- my

13  opinion, as a result, is that this

14  cumulative effect is present in schools

15  and school districts across the country.

16            I think that the evidence

17  that I looked at and suggest may well be

18  transferable to other sites and schools.

19  The transferability idea is well

20  established in the practice of academia

21  and educational leadership.

22            I'm not suggesting that here

23  today, because I did not make that

24  extrapolation.  And I did not examine

CONFIDENTIAL

Page 164

1    data and documents related to the school

2    districts in order to -- or specific to

3    those school districts in order to verify

4    that that opinion and claim would be true

5    in those specific districts, because I

6    did not think that it was necessary to my

7    task.  And it's my understanding that

8    other plaintiff experts may have done so.

9          Q.    And am I also right that you

10   didn't look at any documents or data

11   relating to whether any of the six

12   plaintiff school districts had any

13   diverted resources?

14         A.    I did not look at any data

15   or documents specific to the school -- to

16   the six school districts.

17         Q.    And the same is true for

18   heightened emotional strain, right, you

19   didn't look at any documents or data

20   relating to the six plaintiffs, correct?

21         A.    With regard to heightened

22   emotional strain, I did not look at data

23   or documents that are specific to the six

24   districts.

Page 165

1          I make that opinion and

2    claim about schools and school districts

3    generally based on a convergence of

4    evidence that derives from my experience

5    as an educational leader and an educator

6    in public education, my interactions with

7    school leaders and aspiring school

8    leaders and district leaders in my

9    capacity as an educational consultant,

10   the research that I reviewed when I

11   conducted a literature review, and the

12   testimony on record.

13          I did not look at data and

14   documents from the six districts

15   specifically.  So I can't make claims

16   that are specific to those districts

17   about heightened emotional strain, except

18   insofar as it may be easy to extrapolate

19   on the evidence that converged in my work

20   to those districts.

21          But I'm not saying that it's

22   transferable, because I didn't myself do

23   the investigation to verify those claims.

24          It did not seem to me that

Page 166

1    doing so was necessary to my task.  And

2    it's also my understanding that other

3    plaintiff experts may have done so.

4         Q.    And you also didn't look at

5    any documents or data relating to any

6    reduced leadership capacity of the six

7    plaintiff school districts, correct?

8         A.    I did not look at data or

9    documents from the six specific school

10   districts.

11        Q.    And so it would be

12   supposition on your part to say that

13   those six specific districts have had

14   increased costs, diverted resources,

15   heightened emotional strain or reduced

16   leadership capacity, correct?

17             ATTORNEY MEHRI:  Objection.

18             THE WITNESS:  If you were to

19        characterize extrapolation or a

20        reasonable assumption of

21        transferability as supposition,

22        then I would agree with you.

23   BY ATTORNEY PISTILLI:

24        Q.    Do you characterize it as

CONFIDENTIAL

Page 167

1  supposition?
2         A.    Do I characterize
3  extrapolation and transferability as
4  supposition?  I haven't given the
5  question much consideration previously,
6  so I'm not sure.
7              But I think that reasonable
8  extrapolation and transferability on the
9  basis of strong evidence of patterns in
10  like settings is probably stronger than
11  supposition.
12             But I'm not making those
13  claims here today, because I didn't
14  review any data or documents related to
15  the six specific districts.  It wasn't
16  within the scope of my task to do so, so
17  I didn't think that it was necessary.
18             And it's my understanding
19  that other plaintiff experts may have
20  considered those sources of evidence.
21        Q.    And you would -- you would
22  need to look at that specific documents
23  and data before you made a reasonable
24  extrapolation, correct?

CONFIDENTIAL

Page 168

1              ATTORNEY MEHRI:  Objection.

2              THE WITNESS:  While I'm not

3         making a reasonable extrapolation

4         here today, I do think that one

5         could make a reasonable

6         extrapolation through the concept

7         of transferability to like

8         settings to make such claims about

9         the six specific school districts.

10             But for me to feel

11        comfortable doing that as an

12        expert witness, I would need to

13        verify those reasonable

14        extrapolations and transferability

15        assumptions using data and

16        documents from the specific school

17        districts.

18             And since I did not review

19        data and documents from those

20        specific districts, I would stop

21        short of saying that they could be

22        verified in those particular

23        settings.

24             I would suggest that a

CONFIDENTIAL

Page 169

1          concept of transferability and

2          extrapolation probably would apply

3          here, since there's so many

4          similarities among schools and

5          school districts.  But I didn't do

6          that.

7               It was -- didn't seem

8          necessary to me for my task.  And

9          it's my understanding that other

10          plaintiff experts may have looked

11          at that specific data set.

12   BY ATTORNEY PISTILLI:

13          Q.    And doing that is not within

14   the scope of your work in this case,

15   correct?

16          A.    I think I've said that

17   repeatedly and clearly, yes.

18          Q.    In your report, all of your

19   opinions relate to social media

20   generally, correct?

21          A.    They relate to social media

22   specifically as it pertains to Facebook,

23   Instagram, Snapchat, TikTok and YouTube.

24          Q.    Well, you understand that

CONFIDENTIAL

Page 170

1  social media is more than just those five

2  platforms, right?

3           A.    It may be.  But that's not

4  part of what I considered here.

5                 When I thought of social

6  media, I thought of Facebook, Instagram,

7  Snapchat, TikTok and YouTube.

8           Q.    Where do you define social

9  media in your report?

10          A.    I may not have defined it

11  specifically in the report.

12                I'm reviewing now.  I don't

13  recall exactly.

14                I don't think I have a

15  precise definition of social media in my

16  report.

17                As I was working on it and

18  as I speak with you today, my

19  understanding of social media is

20  Facebook, Instagram, Snapchat, TikTok and

21  YouTube.

22          Q.    Is Twitter social media?

23          A.    I don't really have an

24  opinion about that.

Page 171

1          Q.    Is Discord social media?

2          A.    I don't have an opinion

3    about that.

4          Q.    You just don't know one way

5    or the other?

6          A.    I -- I don't have an opinion

7    about that.  The scope of social media

8    that is within my consideration here as I

9    talk with you today and was in my head as

10   I wrote the report was Facebook,

11   Instagram, Snapchat, TikTok and YouTube.

12         Q.    Now, you rely on literature

13   that you reviewed in forming your

14   opinions about social media, correct?

15         A.    In part, yes.

16         Q.    And is that literature's

17   discussion of social media limited to

18   those five platforms?

19         A.    I don't recall.

20               Is there -- is there one

21   that you're specifically thinking about?

22         Q.    Well, right now I'm just

23   asking.

24               Do you have a recollection

CONFIDENTIAL

Page 172

1    as to whether the literature you reviewed
2    regarding social media was limited to the
3    five specific platforms at issue in this
4    litigation?
5            A.    I don't recall whether the
6    literature was specifically limited to
7    Facebook, Instagram, Snapchat, TikTok and
8    YouTube.
9            No, I'm not -- I don't -- I
10   don't recall.  I'd need to look at, like,
11   a specific piece of research and see
12   whether the authors defined it that way.
13           Q.    We can come back to that.
14           You also relied on testimony
15   from school district personnel in their
16   depositions, correct?
17           A.    Yes.
18           Q.    And they offered testimony
19   about social media, correct?
20           A.    They did.  That was what the
21   topic was, yes.
22           Q.    Yes.  And the testimony that
23   they offered was not limited to those
24   five platforms you reference, correct?

Page 173

1                    ATTORNEY MEHRI:  Objection.
2                    THE WITNESS:  I don't -- I
3          don't recall.  I mean, I read or
4          skimmed, like, hundreds of pages
5          of deposition documents.  I don't
6          recall.
7                    If you want me to look at
8          one, I'd be happy to review it.
9          But I don't know.
10   BY ATTORNEY PISTILLI:
11        Q.     You also, in your report,
12   reference the design features of social
13   media platforms, correct?
14        A.     Are you referencing a
15   specific part?
16        Q.     Well, it comes up quite a
17   bit in your report, but we can look at
18   Paragraph 106 as an example.
19        A.     106.  This is in the May
20   16th report?
21        Q.     Yes.
22                ATTORNEY MEHRI:  What
23          paragraph, please?
24                ATTORNEY PISTILLI:  106.

CONFIDENTIAL

Page 174

1                ATTORNEY MEHRI:   106.

2                THE WITNESS:   Okay.   Thank

3        you.

4    BY ATTORNEY PISTILLI:

5        Q.    And there you refer to the

6    structural design of the social media

7    platforms?

8        A.    Yes.

9        Q.    And then, similarly, you can

10   take a look, if you would, at

11   Paragraph 68.

12              You see in Paragraph 68 you

13   say, The features of social media

14   companies.  The features social media

15   companies choose to build into their

16   platforms facilitate and amplify

17   bullying.

18       A.    Yes.  Well put.

19       Q.    So do you now -- are you

20   with me when you talk about -- when I ask

21   you questions about the design features

22   of defendants' platforms?

23       A.    I understand now you're

24   asking me about Paragraphs 68 and 106 --

CONFIDENTIAL

Page 175

1  106.

2        Q.    Was it -- is it your

3  testimony to the jury that the design

4  features of defendants' platforms have an

5  adverse impact on school districts?

6        A.    I believe so, yes.

7        Q.    And is the use of -- use of

8  algorithms to promote addictive

9  engagement on defendants' platforms one

10 of the design features that you have in

11 mind?

12       A.    So I'm not an expert on all

13 the myriad of design features.  I'm not

14 an expert in how they're engineered.  I

15 wouldn't be a good source of naming all

16 of them or knowing or understanding the

17 difference across the platforms.

18             What I would say is that

19 they are designed and engineered in a way

20 to capture and manufacture student

21 attention, where the time that students

22 are on the platforms is the product and

23 that the design of the features is

24 intended to prolong that engagement.

Page 176

1                  How exactly that works, what

2       the students are actually thinking about,

3       how it's engineered and coded, that is,

4       really, like, a level of detail that I'm

5       not an expert in.

6                  I have a couple of things

7       here because they seemed, like, salient

8       to me.  But I by no means understand,

9       like, how all of that specifically works.

10           Q.    But the -- the publishing of

11      content to promote addictive engagement

12      is part of the harmful impacts that

13      you're opining on, correct?

14                 ATTORNEY MEHRI:  Objection.

15           Mischaracterizes the testimony.

16                 THE WITNESS:  Yeah, I'm

17           not -- I'm not actually opining

18           about that.

19                 What I'm actually opining on

20           is the -- is that the social

21           media -- the design of the social

22           media platforms is intended to

23           prolong student engagement.

24                 There's a multiple -- there

CONFIDENTIAL

Page 177

1     are multiple features that -- that

2     are used for this, is my

3     understanding.  I don't -- I don't

4     really understand how that's

5     coded.  I'm not an expert in that

6     stuff.

7            What I do know is that the

8     students' need for continued

9     validation, that their -- that the

10    social media platforms now make up

11    a great deal of their social

12    fabric, that students experience a

13    fear of missing out, that they

14    experience, like, a social

15    accountability where they need to

16    respond in realtime, where they

17    want to know what people think

18    about them all the time.

19            If you think about children,

20    teens, adolescents and the fact

21    that their frontal cortex is not

22    yet fully developed and that

23    their -- their attention -- their

24    interaction with their peers is of

CONFIDENTIAL

Page 178

1              such primary importance to them
2              and their brain development at
3              that age, then this manipulation
4              of their attention around their
5              social connections that is
6              designed to prolong their
7              attention so that it can be
8              commodotized, that's what I think
9              causes the serious harms to school
10             district operations and to the
11             work of school leaders and school
12             district leaders.
13   BY ATTORNEY PISTILLI:
14             Q.    Turn again with me to
15   Paragraph 106 of your report, please.
16             A.    What -- 106, you said?
17             Q.    Yes.
18                   You say, Thus, while
19   platforms have become normalized in youth
20   culture, their structural design
21   contributes to serious educational and
22   emotional harm, and schools
23   disproportionately bear the burden of
24   response.  This burden must be understood

CONFIDENTIAL

Page 179

1  not as a by-product of school failure but

2  as a predictable consequence of platform

3  design decisions that prioritize

4  engagement over well-being.

5              Do you see your opinion that

6  you wrote there?

7          A.    Yes.  Well put.  I stand by

8  that.

9          Q.    Okay.  What platform design

10 decisions are you referring to in

11 Paragraph 106?

12         A.    So I'll repeat what I said

13 before.

14              I'm not an expert in the

15 platform designs.  I don't have the

16 background nor did I look at the

17 specific, like, design features and -- to

18 be able to list all of them or understand

19 how they interact with each other or the

20 differences across the different

21 platforms.

22              But what I know is that

23 there are features that are baked into

24 the design that are intended to

CONFIDENTIAL

Page 180

1    prioritize engagement over the students'
2    well-being, over their education, over
3    their learning.  And that it's
4    predictable that that's going to lead to
5    a compulsive use.
6              It's also predictable that
7    that compulsive use will have negative
8    effects on their health and that that
9    predictability is something that the
10   design platforms may have even known
11   about but not really warned schools,
12   warned what was going to happen and have
13   not really taken responsibility for.
14             That's my -- that's my
15   understanding.
16             It's about the design
17   decisions and the features sort of as a
18   whole and their -- the way students are
19   interacting with the platforms and the
20   impact on school district operations, on
21   diverted leadership time, on resource
22   allocation decisions, on school
23   environments that are unsettled, with
24   this sort of generalized anxiety that

Page 181

1    hums in the background as a result.

2         Q.    You just testified, sir,

3    What I know is that there are features

4    that are baked into the design that are

5    intended to prioritize engagement over

6    the students' well-being, over their

7    education, over their learning.

8              What features are you

9    referring to?

10         A.    Yeah, the list of specific

11   features is not really something that I'm

12   an expert on or am prepared to talk

13   about.

14              What I know is that they're

15   there, they exist, they're in the design

16   and they're designed intentionally so

17   that students will spend more time on the

18   apps, on the platforms, engage more, and

19   that that leads to compulsive use on the

20   part of students, and that that

21   compulsive use, those design features

22   have a negative impact on school district

23   operations and on the work of school

24   leaders and school -- school district

CONFIDENTIAL

Page 182

1    leaders.

2                The ins-and-outs of the

3    specific designs, how they work, how

4    they're coded, how they're engineered,

5    the psychology of dopamine hits and how

6    exactly they take advantage of children

7    and youth when they're vulnerable and

8    their frontal cortex is not fully

9    developed, like, the specifics of all of

10   that, that's not within the realm of my

11   expertise.

12               I understand that other

13   plaintiff experts may have specific

14   expertise about that.  And I'll leave

15   that to the experts.

16        Q.    I'm not asking you for

17   engineering specifics, with all due

18   respect.

19               You said that you know there

20   are features that, in your opinion, have

21   certain impacts.

22               What features are you

23   referring to when you make that

24   statement?

CONFIDENTIAL

Page 183

1          A.    The design of the social
2    media platforms, Facebook, Instagram,
3    Snapchat, TikTok, YouTube, the design
4    results in features.  And the design is
5    intended to prolong engagement, whether
6    that's for the well-being of the student
7    or not.
8               The prolonged engagement is
9    a way of capturing and monetizing
10   attention.  That's the intent, and that's
11   the way -- the way that much of the
12   features were designed.
13              What those features are, how
14   they interact with one another, how
15   they're coded, what the differences are
16   across the platforms, like, that was
17   outside the scope of what I was asked to
18   do.  And it's outside the scope of my
19   expertise.
20         Q.    But so you include in your
21   opinions about social media any and all
22   design features that allegedly promote
23   prolonged engagement; is that fair?
24              ATTORNEY MEHRI:  Object.

Golkow Technologies,
                    A Veritext Division

CONFIDENTIAL

Page 184

1        Mischaracterizes his testimony.

2             THE WITNESS:  No, I don't

3        think that's fair.  I don't think

4        I put any and all anywhere in the

5        report.

6             And I don't understand the

7        nuances of the features and the

8        way that they might be changing

9        and all of that well enough to say

10       which ones are the specific

11       culprits.

12            What I know is that as a

13       result of them, sort of the

14       cumulative effect is leading to a

15       mental health -- increased mental

16       health issues, drains on school

17       research -- resources, diverted

18       leadership time and a generalized

19       anxiety that burdens the school

20       environment and causes harms to

21       school district operations and the

22       work of school leaders and school

23       district leaders.

24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 185

1          Q.    Let's turn back quickly to
2     Paragraph 68.
3          A.    Sure.  One second.
4                Okay.  Got it.
5          Q.    There you say, The features
6     that social media companies choose to
7     build into their platform facilitate and
8     amplify bullying.
9                Do you see that?
10          A.    I do see that.
11          Q.    And are -- does the -- does
12     part of the harmful impact that you
13     attribute to social media relate to
14     cyberbullying that occurs in posts or
15     comments that appear on defendants'
16     platforms?
17          A.    The -- will you ask that
18     question again, please?
19          Q.    Does part of the harmful
20     impact that you attribute to social media
21     relate to cyberbullying that occurs in
22     posts or comments on defendants'
23     platforms?
24          A.    The harmful impact that I

CONFIDENTIAL

Page 186

1    attribute to the design features of the

2    social media platforms are those features

3    that lead to compulsive use.

4                I think that that includes a

5    whole bunch of different

6    attention-seeking behaviors on the parts

7    of kids that is compelled by their need

8    to stay engaged with the -- with the

9    platforms.  And it has effects in the way

10   that they are experiencing the school

11   day, their social life inside and outside

12   of school.

13               Students now, as a result of

14   sort of the saturation of social media

15   use and the interactions that students

16   are having on the platforms and the

17   platforms themselves are creating, like,

18   a -- like a compulsion, where students --

19   they're going to, in the regular course

20   of their development, seek validation.

21               But now that validation

22   is -- is external and compulsive to the

23   platforms.  For example, wanting to get

24   attention for whatever it is that

CONFIDENTIAL

Page 187

1  they're -- that they're putting out there
2  into the world.
3            Certainly it can amplify
4  acts of cruelty.  It can make students be
5  fearful of exposure.  But by no means is
6  my testimony here related specifically to
7  that particular use of the platform.
8  It's the overall effect of the platforms
9  and their design that seeks to prolong
10  engagement that's leading to the
11  compulsive use.
12       Q.    Well, bullying has been
13  around long before social media, right?
14       A.    Yes.  Bullying has been
15  around long before social media, as well
16  as many other things that schools grapple
17  with.
18            And like all those other
19  factors, social media creates new
20  problems and it also exacerbates existing
21  problems.  Bullying is one of those
22  examples where it makes -- gives students
23  access to students, students will engage
24  in attention-seeking behavior.  They may

CONFIDENTIAL

Page 188

1  be more likely to bully because of the

2  attention that it gets online.  Victims

3  are accessible, like, all the time.

4              So bullying that existed

5  before might have been temporal in

6  nature, it didn't necessarily create a

7  permanent record.  It was, like,

8  interactions between kids in a specific

9  place and time.

10             And, you know, you could

11 extrapolate this to all sorts of things

12 that negatively affect kids in schools,

13 that the social media use, the compulsive

14 social media use, creates new harms and

15 actually exacerbates old harms.  And the

16 bullying is a perfect example of that, I

17 think.

18       Q.    Right.  Like, kids would

19 write mean things about other kids on

20 bathroom walls, right?

21             ATTORNEY MEHRI:  Objection.

22             THE WITNESS:  What -- sure.

23       Yes.

24 BY ATTORNEY PISTILLI:

Page 189

1          Q.    Yeah.  And that would be
2    bullying?
3                ATTORNEY MEHRI:  Objection.
4                THE WITNESS:  Well, I don't
5          want -- like, I'm not here as an
6          expert in bullying.
7                But bullying has a certain
8          definition.  And maybe it would be
9          and maybe it wouldn't be.  It kind
10         of depends on the context and
11         what's being said and who the kids
12         are.
13               Probably.  It probably
14         sounds like it could be a form of
15         bullying.  It certainly is not
16         nice.
17   BY ATTORNEY PISTILLI:
18         Q.    You know, so-and-so is fat
19   and ugly and I'm going to beat her up;
20   that would be bullying, right?
21               ATTORNEY MEHRI:  Objection.
22               THE WITNESS:  A statement
23         like that may or may not be
24         considered bullying in the context

Page 190

1          of schools, yeah.
2    BY ATTORNEY PISTILLI:
3          Q.    How would it not be
4    considered bullying?
5          A.    Okay.  So I'm not here to be
6    an expert on bullying or talk about
7    bullying.
8                I think what you're -- what
9    you're trying to say is that the harm is
10   caused by the specific instance of the
11   bullying.  What I'm saying is that that's
12   not the case.  There may be harm.  But
13   the harm is in the compulsive use of the
14   students of the social media platforms.
15               The fact that it leads them
16   to be so attention seeking, because the
17   design features are created to prolong
18   their attention so that their attention
19   can be curated and manufactured as a
20   product, in and of itself leads to mental
21   health issues, generalized anxiety, need
22   for compulsive use of the platforms
23   themselves, and that that is what is
24   creating the harm that is affecting

CONFIDENTIAL

Page 191

1   school district operations, school

2   leaders and school district leaders in

3   the course of doing their work.

4          Q.     So it's your testimony to

5   the jury that there's not harm that flows

6   from the words a kid uses, whether it be

7   in a social media post or otherwise, that

8   are threatening and demeaning to other

9   students in and of itself?

10              ATTORNEY MEHRI:  Objection.

11          Mischaracterizes his testimony.

12              THE WITNESS:  It does -- I

13          do think that mischaracterizes my

14          testimony.

15              I don't think that my

16          testimony is about those specific

17          words.  I think that my testimony

18          is about the compulsive personal

19          use of social media by young

20          people in early stages of their

21          development and the way in which

22          that leads to compulsive use, the

23          effect that has on a school

24          environment and, therefore, the

CONFIDENTIAL

Page 192

1          strain on resource allocation and

2          the impact on leadership time and

3          the work that leaders need to do

4          to further education and improve

5          the school culture.

6  BY ATTORNEY PISTILLI:

7          Q.    And my question is, is part,

8  at least, of the harm from bullying,

9  whether it occurs online or in person,

10 the actual derogatory or threatening

11 words said to another student and the

12 impact of those words on the student?

13          ATTORNEY MEHRI:  Objection.

14          Asked and answered.

15          THE WITNESS:  So embedded in

16          your question is about the harm of

17          bullying.

18          Of course bullying does

19          harm.  But that's not what my

20          report is about and that's not

21          what I'm speaking about here.  I'm

22          not talking about the harm of

23          bullying.

24          I'm talking about the harm

CONFIDENTIAL

Page 193

1          of compulsive personal student use

2          of social media platforms,

3          Facebook, Instagram, Snapchat,

4          TikTok and YouTube.

5               You seem to be trying to get

6          me to say that bullying does or

7          does not do harm.  As an educator,

8          of course bullying does harm.  But

9          that's not the point of what we're

10         talking about here.

11              What we're talking about

12         here is the social media

13         platforms' intention to engage

14         attention in a prolonged way that

15         is leading to compulsive personal

16         social media use by students.

17              ATTORNEY PISTILLI:  This is

18         probably a pretty good natural

19         stopping point.

20              ATTORNEY MEHRI:  Okay.

21              VIDEO TECHNICIAN:  The time

22         is 12:50 p.m.  We are going off

23         the record.  This ends Media

24         Unit 3.

CONFIDENTIAL

Page 194

```
 1                    -  -  -
 2              (Whereupon, a luncheon
 3         recess was taken.)
 4                    -  -  -
 5              VIDEO TECHNICIAN:  The time
 6         is 1:43 p.m.  This is the
 7         beginning of Media 4, and we're
 8         going back on the record.
 9  BY ATTORNEY PISTILLI:
10         Q.    If you could just, please,
11  go back and take a look at Exhibit-3.
12  It's your invoice.
13         A.    Okay.
14         Q.    And does this reflect all of
15  the time that you've spent working on
16  this matter through the end of August?
17         A.    It does, yes.
18         Q.    And so you didn't perform
19  any work on this matter between May 16th
20  of 2025, and July 10th, 2025; that's
21  correct?
22         A.    That's correct.
23         Q.    If I were to tell you that
24  we've added up the total number of hours
```

CONFIDENTIAL

Page 195

1    here and it reflects 166.75 hours, does
2    that sound about right to you?
3            A.    I didn't -- I didn't add
4    them, so I don't -- I don't know what the
5    total is.
6                I could -- I could do
7    addition now if you want.  I'd need,
8    like, a pen or a calculator or something
9    like that.
10               Did you -- did you want me
11   to add it up?
12       Q.    Whatever you need to do to
13   let me know if you agree that it's around
14   166, 167 hours.
15       A.    Okay.  Sorry, I didn't know
16   you were waiting for me to agree with
17   that.  Okay.
18               Does anybody have a pen?
19               Thank you, Cyrus.
20               If I added correctly, I got
21   166.75.
22       Q.    Since you have your
23   calculator out, could you multiply that
24   by $300, which is your hourly rate?

CONFIDENTIAL

Page 196

1        A.    Sure.   But there's one entry
2    that's travel where the rate is less, so
3    that wouldn't match up exactly.
4              But to do what you asked,
5    it's $50,025, is 166 -- shoot, 166.75
6    times 300.
7        Q.    And recognizing there's the
8    one travel, would you agree that you've
9    made approximately $50,000 working on
10   this matter from April through the end of
11   August of this year?
12       A.    A little less than $50,000
13   during that time, looks -- that looks
14   right.
15       Q.    Thanks.
16              If you could now turn to
17   Exhibit-8, I believe, is your rebuttal
18   report.
19       A.    Okay.
20       Q.    All right.   And then we
21   talked a little bit about this earlier
22   where you described the professional
23   methodology that you employ in your
24   consulting work, correct?

CONFIDENTIAL

Page 197

1              And that's included on

2    Paragraphs 14 and 15?

3         A.    Are you asking me if you

4    asked me questions about this?

5         Q.    Do you recall that we

6    discussed earlier the work that you use

7    in your -- the methodology that you use

8    in your professional consulting work and

9    leadership advising?

10        A.    Yes.

11        Q.    Yes.

12              And you discuss some of that

13   on -- in Paragraphs 14 and 15 of your

14   rebuttal, right?

15        A.    Yes.

16        Q.    And then you go on in

17   Paragraph 16 to say, This approach

18   reflects a widely accepted and practiced

19   methodology in the field of educational

20   leadership and executive coaching.

21              Do you see that?

22        A.    I do, yes.

23        Q.    You don't cite anything to

24   support that proposition in your report

Page 198

1  here, do you?

2        A.    Here in Paragraph 16, no.

3        Q.    And so what -- is there any

4  literature that supports your assertion

5  that your approach reflects a widely

6  accepted and practiced methodology?

7        A.    Yes.

8        Q.    What would that be?

9        A.    There are two articles that

10 I pulled from -- I don't have them with

11 me.

12              But there's -- there's an

13 article about educational leadership and

14 qualitative research and another one

15 about educational leadership in context,

16 both around 2015 or so.

17        Q.    Are they cited elsewhere in

18 your report?

19        A.    Yeah.  The Brooks and

20 Normore piece, I think, is one.  And then

21 there's -- there's another one that I

22 have here, but I don't know if that's --

23 there are two -- there are two articles

24 that appeared in academic journals

CONFIDENTIAL

Page 199

1   related to qualitative research and the
2   study of educational leadership.
3              And I drew on those as a way
4   to reflect that the methodology and
5   approach that I used to -- in my
6   executive coaching to support the leaders
7   in their leadership development is
8   grounded in an established, acceptable
9   methodology.
10             The difference, I would add,
11  is that the work product for me is not a
12  research article for submission in a
13  journal but, rather, the improvement of
14  the educational leaders' effectiveness
15  with whom I'm working.
16         Q.    But the accepted and
17  practiced methodology that you claim to
18  bring to bear in this report is what's
19  reflected in those articles?
20         A.    It is, yes.
21         Q.    And then just so I'm clear,
22  the Brooks and Normore article cited in
23  Footnote 4, that's one of them.
24             What's the other?  Is it

CONFIDENTIAL

Page 200

1   Footnote 5?

2          A.    Yeah, I think so.  I

3   don't -- I didn't bring all those

4   articles with me, and I'm not sure

5   exactly, like, how things line up.  I

6   don't remember exactly.

7                 But those are -- those are

8   articles that are guiding in terms of

9   researchers, like, doctoral students and

10  their study of educational leadership.

11         Q.    Let's take a look at the

12  Brooks and Normore article.  It's Tab 13.

13                      -   -   -

14                 (Whereupon, Exhibit

15          Osborne-9, No Bates, Qualitative

16          Research and Educational

17          Leadership: Essential dynamics to

18          Consider When Designing and

19          Conducting Studies, was marked for

20          identification.)

21                      -   -   -

22  BY ATTORNEY PISTILLI:

23         Q.    I'm handing you what's been

24  marked as Exhibit-9.

Page 201

1          A.     Thank you.

2               ATTORNEY MEHRI:   What

3          exhibit number is this one?

4               ATTORNEY PISTILLI:

5          Exhibit-9.

6     BY ATTORNEY PISTILLI:

7          Q.     Have you had a chance to

8     look at the article?

9          A.     I'm reading as quickly as I

10    can.   I just need to refresh.

11               Okay.   Thank you.   I read

12    quickly.   I might need to read certain

13    parts again.

14          Q.     Sure.   Well, take a look at

15    Page 800 with me, if you would, please.

16               There's a section that

17    starts, Data collection and qualitative

18    studies of educational leadership.

19          A.     Got it.

20          Q.     Do you see in the, I think,

21    third sentence, it says, There are three

22    basic types of qualitative data that

23    scholars have generated in order to

24    explore their research questions,

CONFIDENTIAL

Page 202

1    interviews, observations and documents.

2                Do you see that?

3        A.    I do see that, yes.

4        Q.    And do you agree that those

5    are the three basic types of qualitative

6    data that are used in the methodology

7    you're relying on?

8        A.    I would agree with that,

9    yes.

10       Q.    So let's talk about each in

11   turn.

12               The first is interviews,

13   correct?

14       A.    The first of the three is

15   interviews, yes.

16       Q.    And did you conduct any

17   interviews of any of the six plaintiff

18   school districts in this case?

19       A.    We covered this well before

20   lunch.

21               But, no, I did not conduct

22   any interviews of the -- of people from

23   the six specific school districts.

24       Q.    And then the second is

CONFIDENTIAL

Page 203

1   observations; is that right?

2          A.    That's right.

3          Q.    Did you undertake any

4   observations of any of the six school

5   districts?

6          A.    I did not undertake

7   observations of any of the six school

8   districts.

9              It didn't seem necessary to

10  the task that I was given.

11         Q.    And the last of the three is

12  documents, correct?

13         A.    It is.

14         Q.    And the article explains

15  that, Document analysis is a systematic

16  procedure for reviewing or evaluating

17  documents.

18         A.    I don't --

19         Q.    Sorry.  I'm looking at the

20  bottom of Page 801.

21         A.    Okay.  I see that sentence

22  now, yep.

23         Q.    Do you agree that document

24  analysis is a systematic procedure for

Page 204

1    reviewing or evaluating documents, both

2    printed and electronic material?

3            A.    I would agree with that,

4    yes.

5            Q.    And did you undertake any

6    document analysis relating to the six

7    plaintiff school districts in this case?

8            A.    I did not do any document

9    analysis or review any documents from the

10   six specific school districts in this

11   case.

12            It wasn't necessary for my

13   task.  And it's my understanding that

14   other plaintiff experts may have done so.

15            Q.    Do you see on the next page,

16   802, first full paragraph, it says, It is

17   common for scholars to use school

18   improvement plans, meeting

19   agenda/minutes, school newsletters,

20   letters home to the parents and the like

21   as qualitative documents.

22            Do you see that?

23            A.    I do see that.

24            Q.    Did you review any of those

CONFIDENTIAL

Page 205

1  categories of qualitative documents in

2  forming your opinions in this case?

3          A.    Will you ask me that

4  question again?

5          Q.    Sure.

6              Did you review any of those

7  categories of qualitative documents in

8  forming your opinions in this case for

9  the six specific school districts?

10          A.    I see.

11              No.  For the six specific

12  school districts, I did not review any of

13  the described qualitative documents in

14  this sentence.

15              It wasn't necessary for the

16  task that I had.  And it's my

17  understanding that other plaintiff

18  experts may have done so.

19          Q.    And you see on the bottom of

20  Page 802, it references this concept of

21  triangulation?

22              ATTORNEY MEHRI:  What

23      sentence?

24  BY ATTORNEY PISTILLI:

Page 206

1          Q.    The very bottom of Page 802.

2          A.    That begins, If

3    triangulation?  Yes.

4          Q.    Well, it also appears in the

5    immediately prior sentence.

6          A.    I see.

7                Yes.

8          Q.    And that refers, right, to

9    the idea that a rigorous application of

10   this methodology would involve bringing

11   to bear multiple categories of

12   information.

13               So you would want to look at

14   interviews, observations and documents

15   rather than -- rather than just rely on

16   one in isolation, right?

17               ATTORNEY MEHRI:  Objection.

18               THE WITNESS:  I think that

19          that's a fair statement.

20               And I also think that I did

21          do that in the context of your

22          question specifically.  Because my

23          evidence base that I used to

24          render the opinions that I offer

CONFIDENTIAL

Page 207

1         comes from my experience, it comes

2         from my interactions with school

3         leaders and aspiring school

4         leaders who are graduate students,

5         it comes from a review of the

6         literature and it comes from

7         testimony on record.

8               So I believe that I have

9         triangulated to come to the

10        opinions that I offer in my expert

11        reports.

12  BY ATTORNEY PISTILLI:

13        Q.    Well, you've not looked at

14  any documents relating to the six school

15  districts, you've not conducted any

16  interviews of personnel of the six school

17  districts, and you've not undertaken any

18  observations of the six school districts,

19  correct?

20        A.    That's correct.  But I don't

21  think that's what you asked me.

22        Q.    The question was, so you

23  would want to look at interviews,

24  observations and documents rather than

CONFIDENTIAL

Page 208

1    just rely on one in isolation?

2          A.    Yes.   Correct.

3                And my response is that

4    that's what I did, in two respects.

5                Number one, the methodology

6    that we're talking about here, where you

7    started in the reply to the 13 rebuttals,

8    is an explanation of the methodology that

9    I use in my work as an educational

10   consultant providing educational --

11   excuse me, providing executive coaching

12   to new leaders or leaders who may be

13   struggling or aspiring leaders.

14               And the reference to this

15   particular piece of scholarship is to

16   explain that the work that I do in

17   endeavoring to improve those leaders'

18   leadership performance reflects a level

19   of standard and rigor that is common to

20   the field of the study of educational

21   leadership, even though the product, for

22   me, is not a piece of research literature

23   submitted to a journal but, rather, I use

24   the methods in order to improve the

Page 209

1  performance of the person with whom I am

2  working.

3        Q.    So when you do your

4  professional consulting work, you conduct

5  interviews of the personnel, the district

6  you're working with, you do observations

7  of the district, and you look at the

8  district's documents, correct?

9            ATTORNEY MEHRI:  Objection.

10       Mischaracterizes testimony.

11            Go ahead.

12            THE WITNESS:  When I work

13       with a particular client on

14       improving their leadership, I use

15       the concept, from the study of

16       educational leadership, of

17       triangulation.

18            The triangulation that I use

19       involves interviewing the person

20       that I am there to support as well

21       as the person who evaluates that

22       person, others in their school

23       community.  So there's a series of

24       what you would call interviews,

CONFIDENTIAL

Page 210

1           conversations, interactions in

2           order to try to make meaning out

3           of the challenges that this

4           particular leader may be facing.

5                   I also make sure to observe

6           the leader in their context, in

7           the course of performing their

8           leadership duties so that I can

9           triangulate what I'm hearing from

10          the leader and other informants

11          with what I'm actually seeing

12          about the leader's behaviors and

13          the influence that that leader has

14          within their school community.

15                  Lastly, in terms of

16          documents, it depends.  My reach

17          to documents in order to help an

18          individual improve their

19          leadership performance will depend

20          on the context of what are the set

21          of leadership challenges or

22          emerging circumstances that that

23          person may be facing.

24    BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 211

1          Q.     But just so we're clear,

2     when you did your report for this

3     litigation, you didn't do any interviews,

4     observations or documents relating to the

5     six plaintiff school districts, correct?

6          A.     That's correct.  I've been

7     consistent about that for the majority of

8     the day.  It's well described in the

9     report.

10               And I didn't see that doing

11    that was necessary for the task that I

12    was given.  I think that other plaintiff

13    experts may have done so.

14               My opinions were based on a

15    convergence of evidence that comes from

16    my experience as a school practitioner

17    and district leader, the work that I do

18    as an educational consultant providing

19    executive coaching to current leaders who

20    may be new or struggling, as well as

21    aspiring leaders, the research -- the

22    literature review that I conducted and

23    the research that I was able to access

24    and read, as well as the testimony on

CONFIDENTIAL

Page 212

1    record from school and school district

2    leaders about the impact of students'

3    compulsive personal social media use on

4    their school or school environments or

5    communities.

6              Q.    Do you see the sentence on

7    the first paragraph of 803, If there is

8    an imbalance, say if there is only or

9    primarily interview data and only a

10   sprinkling of observation or document

11   data, we should call into question the

12   rigor and quality of the study?

13             A.    I do see that.

14             Q.    Do you agree with that

15   statement?

16             A.    It depends.  The authors

17   here are describing methods for

18   conducting a single study of a phenomena

19   associated with school leadership.  And

20   their audience is geared towards

21   researchers in the field, doctoral

22   students or research faculty, in an

23   attempt to provide some guidance about

24   what kind of standards a study should

CONFIDENTIAL

Page 213

1  meet within that discipline.

2           And insofar as that's what
3  they're meaning here, then I would think
4  that if there seems to be an imbalance
5  in, say, a student's doctoral work where
6  they're over-relying on only one form of
7  evidence, that questions could be raised
8  about the degree to which they're
9  triangulating and the degree to which the
10  study could benefit from the use of other
11  observation or data -- other -- other
12  types of data.

13        Q.    So just to make sure I
14  understand you, that's -- you agree that
15  that's an accurate statement as it
16  applies to rigorous academic work in the
17  field?

18              ATTORNEY MEHRI:  Objection.
19        Mischaracterizes his testimony.

20              THE WITNESS:  I think -- I
21        think the authors here are trying
22        to offer ideas and guidance to
23        strengthen the quality of research
24        about educational leadership by

CONFIDENTIAL

Page 214

1          describing methods that could be
2          brought to bear on particular
3          research studies.
4               And they're making the point
5          here that a research study that
6          endeavors to study a question in
7          the area of educational leadership
8          ought to have different kinds of
9          evidence so that the study
10         benefits from the triangulation of
11         types of evidence.
12    BY ATTORNEY PISTILLI:
13         Q.    Let's -- let's talk about
14    the other article that you referenced a
15    few moments ago.
16              There's an article cited in
17    Footnote 5 of your rebuttal report.  We
18    can go back to that.  I believe it's
19    Exhibit-8, Page 7.
20         A.    You said Page 8?
21         Q.    Page 7.
22         A.    Okay.
23         Q.    You write, In educational
24    leadership, it is widely recognized that

CONFIDENTIAL

Page 215

1    effective research and decision-making

2    must be grounded in an understanding of

3    context.  As Crow, Miskel and Peterson

4    argue, the study of leadership cannot be

5    meaningfully separated from the dynamic,

6    lived realities of the school

7    environment.

8              Do you see that?

9         A.    I do see that.

10        Q.    And then you go on to say,

11   Educational leadership is deeply

12   contextual, requiring inquiry methods

13   that attend to cultures, relationships

14   and complexities that characterize actual

15   practice, right?

16        A.    Sorry, where are you with

17   that one?

18        Q.    Oh.  Just the next sentence

19   in Paragraph 24.

20        A.    You read the sentence, They

21   emphasize that --

22        Q.    Yes.

23        A.    -- is that what you read?

24              Okay.  Yes, I see that.

CONFIDENTIAL

Page 216

1          Q.    And do you agree that your
2     field involves contextual inquiry into
3     the schools and school districts that
4     you're studying?
5          A.    I'm not sure how you mean
6     contextual inquiry.  But I think I'm
7     going to agree with what you're saying.
8               That the authors here, what
9     they're -- what they're saying and what
10    is an understanding in the discipline of
11    the study of educational leadership,
12    which is usually about the study of an
13    educational leader or an -- or a
14    leadership strategy or leadership
15    behaviors, that to gain an understanding
16    of that requires an understanding of the
17    context in which that leader is leading.
18         Q.    And so you would need to
19    understand things like the budget that
20    the leader is dealing with?
21         A.    I think it depends upon --
22    in the case of research methodology, it
23    would depend on what the research
24    questions are.

CONFIDENTIAL

Page 217

1               For me, because I am not a
2      producer of research, it would depend --
3      what I -- what I work on, the end result
4      of my work, if you will, or the purpose,
5      is to help a leader in their leadership
6      development and help them grow to be
7      stronger leaders.
8               In either case, whether it's
9      to produce a leadership study or to help
10     a particular leader, the understanding of
11     the context in which they're working is
12     important.
13              That may or may not include
14     specific access or specific review of
15     budget documents.  Budget documents, in
16     and of themselves, may be outside the
17     scope of the research question, if it's a
18     research article being produced or a --
19     or a research project being undertaken.
20              Or, for me in the work of
21     executive coaching, it may not be within
22     the scope of those areas where a leader
23     will most benefit from attention, where
24     the leader's leadership development will

CONFIDENTIAL

Page 218

1  benefit from attention.

2           Q.     So if it's a research

3  project, what you're saying is they would

4  need to understand the context of the

5  budget if the research question related

6  to the district's expenditures, but not

7  if it was about something else; is that

8  fair?

9           A.     Yes, I think that's fair.

10                 If the research question was

11  about, say, a superintendent's

12  decision-making process, either in

13  substance or in process how they go about

14  creating a school district budget, then

15  the researcher would need, I think, to

16  review budget documents as part of their

17  triangulation in addition to interviewing

18  the superintendent, maybe observing what

19  happens in those kind of process

20  meetings.

21                 That would be an important

22  part of the triangulation exercise that's

23  being called for by these authors in

24  their attention to methods for

Page 219

1    educational leadership studies.

2        Q.    And the authors you're

3    referring to are Crow, Miskel and

4    Peterson; is that right?

5        A.    I don't have -- I think so.

6    I don't have the article in front of me.

7        Q.    Sure.  Well, do you know who

8    Crow, Miskel or Peterson are?

9        A.    I don't know them, no.

10        Q.    And the article that you're

11    citing here is entitled, Leadership

12    Behaviors of Principals in Inclusive

13    Educational Settings; is that right?

14        A.    That's the -- that's the

15    language here.  I don't -- I don't have

16    the article in front of me to verify

17    that.

18        Q.    Sure.  Well, let's take a

19    look at the article.

20                  -  -  -

21            (Whereupon, Exhibit

22        Osborne-10, No Bates, Leadership

23        Behaviours of Principals in

24        Inclusive Educational Settings,

CONFIDENTIAL

Page 220

1        was marked for identification.)

2                    -   -   -

3    BY ATTORNEY PISTILLI:

4        Q.    I'm handing you what's been

5    marked as Exhibit-10.

6        A.    Thank you.

7              ATTORNEY MEHRI:  This is a

8        different article.

9              ATTORNEY PISTILLI:  Sorry.

10        Is it Exhibit-10?

11    BY ATTORNEY PISTILLI:

12        Q.    So my question for you, sir,

13    is, is this the article that you intended

14    to cite in your report?

15        A.    Give me a minute to read.

16              You know, I don't recall.  I

17    do see that there's a mismatch with the

18    citation and the author's name.  So I

19    mentioned earlier that there was -- there

20    might have been some mistakes there.

21        Q.    So look with me again at

22    Footnote 5 of your rebuttal report.

23        A.    Sorry.  One second.

24              Yes.  I'm looking at that.

CONFIDENTIAL

Page 221

1          Q.      And you cite in Footnote 5

2    an article entitled, Leadership Behaviors

3    of Principals in Inclusive Educational

4    Settings.

5                  Do you see that?

6          A.      I do.

7          Q.      And do you see that that is

8    the title of the article in Exhibit-10?

9          A.      I do see that, yes.

10         Q.      And then do you see you

11   include in your citation in your report,

12   Journal of Educational Administration,

13   35/5?

14                 Do you see that?

15         A.      I do.

16         Q.      And do you see that the

17   article I've handed you in Exhibit-10 is,

18   in fact, from the Journal of Educational

19   Administration, Volume 35, Number 5?

20         A.      Yes, I see that.

21         Q.      And your citation includes

22   the year 1997.

23                 And Volume 35, Number 5 of

24   the Journal of Educational Administration

CONFIDENTIAL

Page 222

1    is also from 1997, correct?

2         A.    I see that, yes.

3         Q.    And your citation is to

4    Pages 411 to 427; is that right?

5         A.    That's the citation here,

6    yes.

7         Q.    And the article I've handed

8    you is on Pages 411 to 427 of the Journal

9    of Educational Administration, Volume 35,

10   Number 5, correct?

11        A.    It is, yes.

12        Q.    But the author's name is

13   different, right?

14        A.    It is different.  It looks

15   like I messed this up a bit.  I might

16   have -- I might have confused articles.

17   I'm not -- I'm not sure.  I would need to

18   go back and double check.

19             This may be -- this may be

20   an error in the citation or it may be

21   that I confused the articles as I was

22   reading.  I'm not sure.

23             Whether -- you know, the

24   import of that would be determined by

CONFIDENTIAL

Page 223

1    other people.

2              But I think the point here

3    about leadership being contextual and

4    understanding the context that -- in

5    which leaders are acting is both a

6    standard part -- expectation of

7    methodology for educational research

8    studies and also informs my practice as

9    an educational consultant providing

10   executive coaching to educational

11   leaders.

12        Q.    Could we go back to

13   Exhibit-8, please, for a minute?  Take a

14   look again at Footnote 5.

15              And if -- you see you've

16   included in your report a hyperlink to

17   the article that you are citing?

18        A.    I do see that, yes.

19              ATTORNEY PISTILLI:  And

20        could we click on that, please?

21              TRIAL TECHNICIAN:  (Trial

22        technician complies with request.)

23   BY ATTORNEY PISTILLI:

24        Q.    Do you agree that when we

CONFIDENTIAL

                                              Page 224

1   click on the hyperlink you provided, it
2   takes us to the article by Patreese D.
3   Ingram we've just been looking at?
4           A.    Yes, it looks like it.
5           Q.    Sitting here today, is there
6   some Crow, Miskel and Peterson article
7   that you believe you actually read and
8   that exists?
9           A.    You know, sitting here
10  today, I'm actually not sure now.
11          I see the -- I see the
12  author's name is incorrect here.  And was
13  it another article I was drawing from
14  around educational leadership being
15  deeply contextual?  I would need to go
16  back and kind of recreate.  Yeah, I'm
17  not -- I'm not -- I'm not sure.
18          Again, I think it doesn't
19  really detract from the point about
20  methodology or the way that it attaches
21  to the work that I do.
22          Q.    Do you agree with me that
23  the article that you've actually linked
24  to here entitled, Leadership Behaviors of

Page 225

1    Principals in Inclusive Educational
2    Settings, does not support the
3    proposition that the study of leadership
4    cannot be meaningfully separated from the
5    dynamic, lived realities of the school
6    environment?
7            A.    So --
8                ATTORNEY MEHRI:  Objection.
9                THE WITNESS:  -- I would --
10        I would need to read this to
11        either -- to refresh my memory, to
12        see what I think of that.
13            I'd be happy to do that if
14        you'd like.
15            You're asking me whether
16        this article supports the concept
17        of educational -- supports the
18        concept of the importance of
19        context in the study of
20        educational leadership, if I'm
21        understanding you right.
22    BY ATTORNEY PISTILLI:
23            Q.    Well, just take a look with
24    me, if you would, at Page 411 of the

CONFIDENTIAL

Page 226

1   article.

2           A.    I'll need to -- I'll need to

3   review the whole thing, I think, here.

4   At least give it a skim.  I'll try to be

5   efficient in time.

6                 Okay.  What are you asking

7   me now?

8           Q.    So you say in Paragraph 24

9   that the Leadership Behaviors of

10  Principals in Inclusive Educational

11  Settings article argues that the study of

12  leadership cannot be meaningfully

13  separated from the dynamic lived

14  realities of the school environment.

15                The authors of the article

16  emphasize that educational leadership is

17  deeply contextual, requiring inquiry

18  methods that attend to cultures,

19  relationships and complexities that

20  characterize actual practice.  My

21  methodology reflects this stance.

22                And my question for you,

23  sir, is just whether the article we're

24  looking at in Exhibit-10 supports that

CONFIDENTIAL

Page 227

1  description of the methodology?

2          A.    No.  You know, reading it

3  now, I don't think it does.

4              I think this is a -- I think

5  this is a mistake that I made in the

6  citation.  There was, indeed, another --

7  a second article that spoke to this issue

8  and that I meant to be referring to here,

9  but I don't -- I don't recall what it

10  was.

11              Yeah.  So that I -- that, I

12  think, is a mistake.

13              The overall point, of

14  course, is between the two articles what

15  I'm trying to demonstrate here is that

16  there's a discipline to the study of

17  educational leadership, and it's usually

18  talked about insofar as it applies to the

19  production of research reports that are

20  then submitted to academic journals.

21              I use many of the concepts,

22  triangulation, contextualization, use of

23  coupling observations with interviews in

24  the methodology that I employ in the

Page 228

1  educational consulting that I do to

2  provide executive coaching to school

3  leaders or aspiring school leaders.

4              And that that approach is

5  rigorous and not haphazard and lends to

6  the credibility of that strand of my

7  evidence base that relies on my work in

8  those schools and my pattern

9  identification across those schools.

10  It's just one of the strands.

11              But that is the general

12  approach that I take.

13         Q.    But just so we're clear, the

14  only sources that you cite for the

15  proposition that your approach reflects a

16  widely accepted and practiced methodology

17  in the field are the articles cited in

18  Footnotes 4 and 5 of your reply, correct?

19              ATTORNEY MEHRI:  Objection.

20              THE WITNESS:  Give me a

21         second to just skim through and

22         see if that's the only place.  I

23         think that that's true.

24              This is the one.

CONFIDENTIAL

Page 229

1            There's one further article

2        by Clark and O'Donahue, hopefully

3        I didn't mess up this citation as

4        well, but it is in Footnote 23 on

5        Page 21.

6            And I'd have to look at the

7        article and examine that prior

8        paragraph that you were asking me

9        about.  I think I may have

10       intended to reference this

11       article, not the Ingram one.  I

12       think that was an error in the

13       citation.

14           I don't know if you have the

15       Clark and O'Donahue article.  But

16       if you do, I think that's the

17       other piece of literature that

18       suggests that education --

19       scholarship and research in the

20       areas of educational leadership

21       benefits from the concept of

22       context.

23           ATTORNEY PISTILLI:  It's

24       probably about time for a break.

CONFIDENTIAL

Page 230

```
 1          Let us see if we can find the
 2     article.
 3              THE WITNESS:  Okay.  Cool.
 4     I don't know -- yeah.
 5              VIDEO TECHNICIAN:  The time
 6     is 2:44 p.m.  This is the end of
 7     Media 4, and we are going off the
 8     record.
 9                   -   -   -
10              (Whereupon, a brief recess
11     was taken.)
12                   -   -   -
13              VIDEO TECHNICIAN:  The time
14     is 3 o'clock p.m.  This is the
15     beginning of Media 5, and we're
16     going back on the record.
17              ATTORNEY MEHRI:  Thank you
18     for giving me a second.
19              Before the break, there was
20     some discussion about the correct
21     citations to peer-reviewed
22     articles.  And I think this
23     article from Clark and Donahue is
24     the one that you guys are -- or
```

```
                                    Page 231
 1          O'Donahue are the one you guys
 2          might have been looking for.  But
 3          you have to ask the witness to
 4          clarify.
 5   BY ATTORNEY PISTILLI:
 6          Q.    Actually, if you would,
 7   please, could we take a look at
 8   Exhibit-7?  And turn to Page 5.
 9          Do you see Paragraph 16?
10          A.    Okay.
11          Q.    And this is your report,
12   correct?
13          A.    Yes.
14          Q.    You write, This report draws
15   on my experience as a school and district
16   leader, including service as a
17   superintendent.  As a consultant and
18   coach to educational leaders, I regularly
19   engage with superintendents, principals,
20   and district teams in urban, suburban,
21   and rural contexts across the country.
22   These interactions provided a broad
23   understanding of the systemic challenges
24   schools face due to social media use and
```

Page 232

1    the design of social media platforms.
2              Do you see that?
3         A.    I do.
4         Q.    And you're referring there
5    to conversations you've had with school
6    officials, correct?
7              ATTORNEY MEHRI:  Objection.
8              Go ahead.
9              THE WITNESS:  In part, yes.
10   BY ATTORNEY PISTILLI:
11        Q.    And in your report on a
12   number of occasions you relay information
13   that was conveyed to you by different
14   school officials, correct?
15        A.    I don't know what you mean
16   by "convey."  I don't think I, like,
17   conveyed anything specific that was
18   reported to me.
19              I think that the opinions
20   that I offer that reflect, in part, many
21   of these interactions are indicative of
22   the patterns of leadership challenges
23   that I am learning about through these
24   interactions with, as you call it,

                                      Page 233

1    official officials, school -- school

2    leaders and school district leaders.

3          Q.    Right.  And so your opinions

4    are based on interactions with school

5    leaders, correct?

6                ATTORNEY MEHRI:  Objection.

7                THE WITNESS:  My opinions

8          are based on a convergence of

9          evidence or data sources, if you

10         will.

11               One is my experience as a

12         practitioner and a leader in K-12

13         educational systems.

14               A second area of reliance is

15         on my interactions with a variety

16         of school leaders, school district

17         leaders, and aspiring leaders in

18         multiple contexts across various

19         schools and school districts over

20         a long period of time.

21               The third area is the

22         literature review and some of the

23         research studies that I read.

24               And a fourth is the

CONFIDENTIAL

Page 234

1          testimony on record.

2                  So it's on the basis of a

3          convergence of -- of evidence that

4          demonstrates that students'

5          personal compulsive use of social

6          media is destabilizing schools and

7          school communities in ways that

8          strain resources and divert

9          leadership attention.

10   BY ATTORNEY PISTILLI:

11          Q.     But one of the sources

12   you're relying on, just to, please, focus

13   on the question I'm asking, is

14   information you learned from

15   conversations and interactions with

16   individuals in school districts other

17   than the six plaintiff school districts,

18   correct?

19          A.     Yeah.   I think you asked if

20   my opinions are based on what I'm hearing

21   from those school leaders.

22                  So I just wanted to be clear

23   that in part it is.   But it's based on

24   more than that, and it's based on sort of

CONFIDENTIAL

Page 235

1   this concept of convergence and
2   triangulation across these different
3   areas of work and attention.
4           Q.    And do you have any records
5   of the conversations on which your
6   opinions are based in part?
7           A.    You mean, like, notes and
8   stuff like that?
9           Q.    Yes.
10          A.    No, I don't.  I don't.
11          Q.    Do you have records of who
12  the conversations were with that your
13  opinions are based on?
14          A.    I don't know what you mean
15  by "records."  I've talked with a lot of
16  people.
17          Q.    But you don't have notes of
18  those conversations?
19          A.    I don't -- I don't generally
20  keep -- sometimes I keep notes for the
21  purposes of that engagement; like, if I'm
22  working with a particular leader, they're
23  describing something to me, I don't want
24  to forget it, I might write it down.

Page 236

1          But usually those notes
2     don't really survive the engagement.
3          Q.    You didn't consult any notes
4     from those conversations in preparing
5     your report, did you?
6          A.    No.
7          Q.    And did all of your
8     conversations with those school leaders
9     follow the same methodology?
10         A.    No.    There were different --
11    the interactions with the school leaders
12    or the aspiring school leaders, happened
13    for a variety of purposes and in many
14    different contexts.
15              So the methodology I would
16    have adjusted to be -- to be specific to
17    those circumstances, I think.    For
18    example, if I'm at a conference and I'm
19    talking with educational leaders, it
20    might just be more conversational.
21              Where my methodology is more
22    consistent is if I'm doing executive
23    coaching for a particular school leader
24    or a struggling leader, like, somebody

CONFIDENTIAL

Page 237

1  new or somebody who is a school district
2  official who might be new.
3            Then I bring to bear sort of
4  a more -- maybe not consistent in every
5  way, but conceptually consistent approach
6  in which I value the concept of
7  triangulation and context that is in the
8  literature around studies of educational
9  leadership.
10       Q.   Did you discuss the same
11  topics with all of the educational
12  leaders?
13       A.    No.  I mean, the -- since
14  leaving the superintendency, I've talked
15  with hundreds of school leaders in a
16  variety of contexts.  And my focus is
17  always on the things that are most
18  pressing on them.  So sometimes the
19  conversations vary.
20            The use of time, and time is
21  a scarce resource, and the degree to
22  which it's being diverted by mental
23  health concerns linked to students'
24  compulsive personal social media use is a

CONFIDENTIAL

                                              Page 238

1    resounding theme across those

2    conversations.

3            Q.    But you didn't

4    systematically go about inquiring into

5    that subject using consistent methods in

6    having all these disparate conversations,

7    correct?

8                    ATTORNEY MEHRI:  Objection.

9                    THE WITNESS:  No, that

10         wasn't the purpose of that work.

11   BY ATTORNEY PISTILLI:

12           Q.    And sitting here today, you

13   can't tell me who these people are who

14   underlie at least some portion of your

15   opinion in this case, correct?

16           A.    It wouldn't add value to do

17   so.  I mean, I've talked with quite a

18   number of people, like, hundreds of

19   people in different contexts, in

20   different places.

21                    My professional life is

22   spent interacting with educational

23   leaders or aspiring educational leaders,

24   students who are graduate students in the

CONFIDENTIAL

Page 239

1   classes that I teach, clients, colleagues

2   in some of the networks that I run or

3   participate in running, colleagues that I

4   interact with at conferences or know from

5   my graduate program or other connections

6   in what I would -- you would -- I would

7   think of as, like, a wide professional

8   network.

9          Q.    But these conversations form

10  an important part of the basis for your

11  opinions, correct?

12         A.    Yeah, I think they do.

13                These -- these

14  conversations, over a long period of

15  time, have enabled me to identify

16  patterns in what kinds of emerging

17  problems are now most pressing on the

18  field of educational leadership, on

19  educational leaders.

20                So the fact that issues

21  related to social media use -- to

22  students' social media use and the

23  accompanying mental health issues,

24  distractions, attention fragmentation,

CONFIDENTIAL

Page 240

1    lack of sleep, generalized anxiety around

2    social status and social inclusion, fear

3    of missing out, all of that stuff is a

4    regular part of those conversations --

5    becomes a regular part of those

6    conversations when I'm demonstrating my

7    interest in what is most pressing upon

8    people, how would those leaders describe

9    their leadership challenges.

10            Q.    But despite the importance

11   of those conversations to your opinion,

12   you're not willing to tell the jury even

13   who you had them with, right?

14                 ATTORNEY MEHRI:    Objection.

15           Mischaracterizes.

16                 THE WITNESS:    The -- the --

17           those conversations form a basis

18           of understanding what is happening

19           in schools generally and has --

20           when converging with the testimony

21           on record and the literature that

22           I reviewed, my own experience as

23           superintendent forms a basis for

24           the general opinions that I offer

CONFIDENTIAL

Page 241

1    here.

2         And my opinions are

3    reflective of those general

4    patterns.

5         ATTORNEY PISTILLI:  Move to

6    strike as nonresponsive.

7  BY ATTORNEY PISTILLI:

8    Q.    Are you willing to tell a

9  jury who you spoke with or not?

10   A.    It's not that I'm unwilling

11 tell the jury, which is different from

12 agreeing to do so.

13         It's that the case that I'm

14 making doesn't rely on a particular

15 informant in this process that I've gone

16 on.

17         There -- my firsthand

18 observations or my interpretation of

19 understanding from the accounts and

20 interactions that I've had with a very

21 large sample size of leaders across

22 various types of schools with different

23 demographic student profiles over a long

24 period of time, that's what I relied on

CONFIDENTIAL

Page 242

1    for my report.  And I wouldn't want to go

2    beyond the -- the context of that report.

3           Q.    So you have no notes of

4    these conversations, right?

5                 ATTORNEY MEHRI:  Objection.

6           Asked and answered.

7                 THE WITNESS:  I don't

8           generally keep notes on the

9           conversations.  Those interactions

10          are part of what I do

11          professionally on a regular basis.

12               I will occasionally take

13          notes if those notes help me to

14          support a particular leader by

15          noting something that I want to

16          make sure that I don't forget or

17          that I follow up for that person

18          or that I consider.

19               But generally speaking, when

20          the engagement is over, you know,

21          so are my notes.  I pretty much

22          toss them.

23   BY ATTORNEY PISTILLI:

24          Q.    So without notes of the

Page 243

1    conversation or without knowing who those

2    people are, you're essentially asking the

3    jury to take your word for what they said

4    without any ability to independently test

5    that?

6                    ATTORNEY MEHRI:  Objection.

7                    THE WITNESS:  I think

8            it's -- I think it's testable.  I

9            think that to independently test,

10           one could at least approximate my

11           methodology.  And, you know, I

12           would submit that it's highly

13           likely that the same opinions

14           would result.

15   BY ATTORNEY PISTILLI:

16           Q.    But there's no way anyone

17   could know who you spoke with or what

18   they told you, other than taking your

19   word for it, correct?

20                    ATTORNEY MEHRI:  Objection.

21                    THE WITNESS:  The report

22           describes my methodology, the

23           kinds of people I talk with, the

24           kinds of schools, variety of

CONFIDENTIAL

Page 244

```
 1          schools in which I've had those
 2          interactions, the methodology that
 3          I use when I provide executive
 4          coaching or educational consulting
 5          to a school or a school district.
 6                And it's from those
 7          interactions and that activity
 8          that I've gained the view
 9          reflective in my opinions about
10          the negative impact of students'
11          compulsive personal social media
12          use on schools and school
13          districts.
14                ATTORNEY PISTILLI:  Move to
15          strike as nonresponsive.
16     BY ATTORNEY PISTILLI:
17          Q.    My question was, there's no
18     way anyone could know who you spoke with
19     or what they told you other than taking
20     your word for it, correct?
21                ATTORNEY MEHRI:  Objection.
22          Asked and answered.  And
23          argumentative.
24                THE WITNESS:  Yeah, I guess
```

CONFIDENTIAL

Page 245

1           I -- I think I answered the
2           question already.
3  BY ATTORNEY PISTILLI:
4           Q.    How would I go about knowing
5  who you spoke with or what they told you?
6           A.    I don't know that knowing
7  the specifics of what schools I went to
8  or who I talked to would shed light.
9                I think that anyone who
10 spends time, as I have, in the ways that
11 I have with some background in how
12 schools work and in public education, who
13 talks to -- you know, it doesn't have to
14 be, like, 350 to 400 people over six
15 years, but a fairly decent sample size of
16 school leaders and school district
17 leaders would learn from those
18 interactions that there are patterns of
19 harm to school districts and schools that
20 emanate from the compulsive personal use
21 of social media -- student use of social
22 media.
23                It's not just my word for
24 it.  It's also existent in the testimony

CONFIDENTIAL

Page 246

1   on record from lots of different school

2   and school district leaders, as well as

3   in much of the literature.

4           And my understanding is some

5   of the other experts have some similar

6   things to say.

7           ATTORNEY PISTILLI:  Move to

8       strike as nonresponsive.

9   BY ATTORNEY PISTILLI:

10      Q.    How would I go about knowing

11  who you spoke with or what they told you?

12          ATTORNEY MEHRI:  Objection.

13      Asked and answered.  And you're

14      being argumentative.

15          THE WITNESS:  Yeah, I think

16      you asked me this question three

17      times now.  I don't have anything

18      new to say.

19  BY ATTORNEY PISTILLI:

20      Q.    It's not possible for me to

21  know who you spoke with or what they told

22  you; true or false?

23      A.    That's the same question in

24  a different form.  I've already answered

CONFIDENTIAL

Page 247

1    it a couple of times.

2         Q.    You have not, sir.  You have

3    not answered it.

4              I would like you to tell the

5    jury how they could know who you spoke

6    with and what they told you.

7              ATTORNEY MEHRI:  Objection.

8         Asked and answered.

9              THE WITNESS:  I understand

10        that that's what you would like.

11             I've already --

12   BY ATTORNEY PISTILLI:

13        Q.    But you're not willing to do

14   it, correct?

15        A.    I've answered.

16             The opinions that I rely on

17   reflect a methodology of interaction

18   across a large number of -- of school

19   leaders and aspiring school leaders.

20             Their experiences are also

21   reflected in testimony on record, where

22   you have a large body of accounts.

23             ATTORNEY PISTILLI:  Move to

24        strike as nonresponsive.

CONFIDENTIAL

                                        Page 248

1   BY ATTORNEY PISTILLI:

2        Q.    Let's take a look at

3   Paragraph 18 of your report.

4            ATTORNEY MEHRI:  Say that

5        again, Chris.  Where are we again?

6            ATTORNEY PISTILLI:  18 of

7        the rebuttal report.

8            ATTORNEY MEHRI:  Paragraph

9        18?

10           ATTORNEY PISTILLI:  Yes.

11  BY ATTORNEY PISTILLI:

12       Q.    Do you see in Paragraph 18

13  you write, Quantitatively, my insights

14  are built from sustained interactions

15  with hundreds of leaders over time.

16           Who are those hundreds of

17  leaders?

18       A.    Those are leaders in school

19  districts where I either have graduate

20  students who are aspiring leaders and

21  they work in those schools.  Some of them

22  are also already leaders and they are

23  aspiring to a higher position.  They are

24  leaders in the school districts where I

CONFIDENTIAL

Page 249

1    have worked as an educational consultant.

2                    There are also leaders

3    outside of that pool in two respects.

4    One, I -- as part of my responsibilities,

5    I lead a school study council that

6    includes about 25 districts and their --

7    members of their leadership teams.  And I

8    also participate in a network in New

9    Jersey that has a dozen or so districts a

10   year.

11                   As well as interactions that

12   are more informal and less contracted

13   with colleagues that I know

14   professionally and encounter at

15   conferences or in other conversations

16   across the country.

17        Q.     What are the names of those

18   leaders?

19        A.     Yeah.  I realize you're

20   going to keep asking me the names of the

21   leaders over and over again.

22                   And what I'm testifying to

23   in the report is that the specific

24   anecdotes, the specific schools, the

Page 250

1  specific leaders, they're all informative
2  of the generalized patterns that I'm
3  attesting to in my report on the basis of
4  my experience, these interactions, the
5  research and literature that I read, and
6  the testimony on record.
7           So similar to what you asked
8  me earlier, to account -- to recount
9  specific observations, you're now asking
10 me to identify specific conversations.
11          And they're just not -- they
12 don't -- they don't add to the weight of
13 my report in isolation.
14     Q.    So I take it you're also not
15 willing to tell me about any of the
16 specific anecdotes on which your opinions
17 are based in part?
18     A.    I think we went over that
19 territory this morning.  My response has
20 not changed.
21     Q.    So you're not going to do
22 it?
23     A.    I'm not.  Because what's
24 going to happen if we do -- if we go

CONFIDENTIAL

Page 251

1    there is then you're going to pick apart

2    the particular anecdote in an attempt to

3    deflect blame or isolate something that

4    is not at issue.

5              What I'm saying here is that

6    as a result of all of this evidence, the

7    convergence of evidence, declarations at

8    a high level like the Surgeon General,

9    we're seeing increases in mental health

10   stress, we're seeing increases in

11   interruptions to the school environment,

12   we're seeing increases in generalized

13   anxiety and students being apprehensive

14   about their social standing in their

15   compulsive need for validation on the

16   platforms in ways that is impacting on

17   the school environment, school

18   operations, the work of school leaders,

19   the work of school district leaders,

20   making it more difficult for those school

21   officials and teachers to advance

22   teaching and learning in their schools.

23        Q.    You don't think the jury is

24   entitled to pick apart the particular

CONFIDENTIAL

Page 252

```
1   anecdotes on which your opinions are
2   based to determine for themselves whether
3   they actually support your sweeping
4   conclusions?
5              ATTORNEY MEHRI:  Objection
6         to asking him for a legal
7         conclusion.
8              THE WITNESS:  Yes, that's
9         what I -- thank you.  That's what
10        I was just going to say.
11             I'm not -- I'm not a lawyer.
12        I don't know what the jury is
13        entitled to or not.
14  BY ATTORNEY PISTILLI:
15        Q.   Well, you understand that
16  you're here under oath today to provide
17  testimony to the jury, right?
18        A.   I understand that, yes.
19        Q.   Right.  But you're not
20  willing to tell the jury the particular
21  anecdotes because you don't want them
22  picked apart, right?
23             ATTORNEY MEHRI:  Objection.
24        Mischaracterizes testimony.
```

                                        Page 253

1              THE WITNESS:  And I may have
2         misheard your prior question.
3              Would you reframe, please?
4    BY ATTORNEY PISTILLI:
5         Q.    You're not willing to tell
6    the jury the particular anecdotes because
7    you don't want them picked apart, right?
8              ATTORNEY MEHRI:  Objection.
9              THE WITNESS:  That's not it.
10        It's that it's my belief that the
11        opinions that I offer and the
12        methodology that I describe within
13        the report stands on its own
14        merit, stands on its own two feet,
15        so to speak, and that I do not
16        need to deliver now new or
17        additional evidence that exceeds
18        what I've already described in my
19        report or in the reply to the
20        rebuttals.
21   BY ATTORNEY PISTILLI:
22        Q.    Sir, this is the evidence
23   you rely on in your report.
24             Those anecdotes form the

CONFIDENTIAL

Page 254

1   basis for your opinion; true or false?

2              ATTORNEY MEHRI:  Objection.

3         And argumentative.

4         Mischaracterizes his testimony.

5              THE WITNESS:  It is a

6         mischaracterization to call them

7         anecdotes.

8   BY ATTORNEY PISTILLI:

9         Q.    You called them anecdotes,

10  sir.

11             ATTORNEY MEHRI:  We're

12        getting into an argument.  Let's

13        ask questions and --

14             THE WITNESS:  Yeah.  I

15        thought you said at the beginning

16        that if I was answering a question

17        you would allow me to finish and

18        that I wasn't also to interrupt

19        you.

20  BY ATTORNEY PISTILLI:

21        Q.    We've both lapsed on

22  occasion.  I apologize.

23        A.    Okay.  I don't -- I don't

24  think that I have.  But I appreciate your

CONFIDENTIAL

Page 255

1  apology.

2           The -- it's a

3  mischaracterization to call what I'm

4  describing anecdotal.  You are asking for

5  anecdotes, and that's what I'm describing

6  as anecdotes, the particular one-off

7  stories that you want me to provide in

8  response to your question.

9           But my -- the basis of my

10 opinion is not anecdotal.  If it were a

11 single story or a handful of stories, it

12 could be characterized as anecdotal.  But

13 it's not.

14           I've been doing this for a

15 long time in a lot of different places,

16 interacting with a lot of different

17 school leaders, with a primary concern of

18 assisting them in being effective in

19 their positions so that they can deliver

20 the best possible education for our

21 nation's kids.

22           And I'm attuned to the

23 challenges and struggles that they face

24 in doing their work as a result of all of

CONFIDENTIAL

Page 256

1  these interactions and the bulk of my

2  career being involved in this work.

3      Q.    You rely, as a basis for

4  your opinions, on conversations you've

5  had with school leaders; true or false?

6      A.    I rely in part, as a basis

7  for my opinions, on the patterns that

8  I've gleaned from numerous conversations

9  over a long period of time in different

10 types of schools with school leaders and

11 aspiring school leaders.

12      I say "in part" because it's

13 not my sole reliance.  I also rely on the

14 experience that I bring to this as a

15 school leader and practitioner, on the

16 research that I reviewed as a result of

17 doing a literature review, as well as the

18 testimony on record from many others who

19 attested to the harmful effects of

20 compulsive personal student use of social

21 media on their school environments or

22 their school districts.

23      Q.    In Paragraph 18, you use the

24 word "quantitatively."

CONFIDENTIAL

Page 257

1            What do you mean by that?

2       A.      What I meant by that is I

3   wanted to provide a way to understand the

4   robustness of the sample size that I'm

5   talking about.

6            Since my methodology relies

7   on qualitative methods, I wanted to make

8   sure I included something that indicates

9   that this isn't just going to a school or

10  two, this isn't just a single district,

11  this isn't just one year of paying

12  attention to the problems because I got

13  asked to do this.

14           This is a career's worth of

15  work that reflects teaching graduate

16  students, about 40 a year, who are public

17  school leaders or aspiring leaders;

18  executive coaching one-on-one to a couple

19  dozen, maybe 15, 20 school and school

20  district leaders annually, that varies by

21  year; working with districts who

22  participate in the study council or in

23  the network of superintendents; and that

24  since leaving the superintendency, this

CONFIDENTIAL

Page 258

1    has become a large number of interactions

2    and touch points from which my opinions

3    are, in part, derived.

4            Q.    You've not done any

5    quantitative analyses, have you?

6            A.    This is another area that

7    we've been over well.  So I'll repeat

8    again that I've not done any quantitative

9    analysis.

10           My report does not claim to

11   have done any quantitative analysis.

12   It's not the basis of my expertise.

13           I also didn't see it as

14   necessary for the task that I was given.

15   And it's my understanding that other

16   experts may have done so.

17           Q.    You implemented budgets when

18   you were a superintendent, correct?

19           A.    I'm sorry, I didn't hear

20   you.  Sorry.

21           Q.    You implemented budgets when

22   you were a superintendent?

23           A.    I guess you could call -- I

24   don't know what you mean by "implemented

Page 259

1  budgets."  But yes --

2          Q.    You were in charge of the

3  budgeting process?

4          A.    As superintendent, I had a

5  role in the development of the school

6  district budget, yes.

7          Q.    And, typically, you would be

8  the one who would present it to the

9  board?

10         A.    Yes, typically.

11         Q.    And would you agree that

12  part of the budgeting process is making

13  sure that the plans for spending for the

14  next year align with the district's

15  current priorities?

16         A.    I would agree, yes, that

17  that's a -- that's a major part of the

18  budgeting -- budget developing process is

19  to align resource allocation with

20  initiatives and priorities, yes.

21         Q.    Because you want the budget

22  to align with addressing any significant

23  areas of concern that the district is

24  facing, right?

CONFIDENTIAL

Page 260

1           ATTORNEY MEHRI:  Objection.

2           Go ahead.

3           THE WITNESS:  To the extent

4      possible.  There's quite a number

5      of constraints.  But, yes, I would

6      agree with that.

7   BY ATTORNEY PISTILLI:

8           Q.    And school district

9   budgeting processes are typically public

10  and well documented processes, correct?

11          A.    Typically, there's public

12  discourse, as well as public

13  documentation regarding a school

14  district's budget.

15              The degree to which

16  that's -- what -- what did you call --

17  you used an adjective there, I think.

18          Q.    Typically public and well

19  documented processes?

20          A.    Yeah.  The degree to which

21  you might call it well documented is

22  maybe a little subjective and would vary

23  across districts.

24              But typically they all have

CONFIDENTIAL

Page 261

1   some kind of public-facing documentation,

2   yes.

3           Q.    Switching gears.

4                 We agreed earlier that

5   you're not an expert in platform design,

6   right?

7           A.    We did.  I'm not an expert

8   in platform design.

9           Q.    Sure.  And I just want to

10  probe that a little bit.

11                Do you know what the acronym

12  "UI" stands for?

13          A.    I do not know what the

14  acronym "UI" stands for.

15          Q.    Do you know what content

16  ranking is?

17          A.    I don't know what content

18  ranking is.

19          Q.    Do you know what candidate

20  generation is?

21          A.    I don't know what candidate

22  generation is.

23          Q.    Do you know what a

24  classifier is in the context of

CONFIDENTIAL

Page 262

1  recommendation algorithms?

2        A.    I don't know what a

3  classifier is in the context of algorithm

4  recommendations, no.

5        Q.    Do you know what an

6  interface -- interface interference is?

7        A.    I don't know what interface

8  interference is.

9        Q.    Do you know what UX design

10  principles are?

11        A.    I don't know what UX design

12  principles are.

13        Q.    Do you have any technical

14  knowledge of how recommendation

15  algorithms work?

16        A.    I don't have any technical

17  knowledge of how algorithm

18  recommendations work.

19        Q.    Do you have an Instagram

20  account?

21        A.    I don't have an Instagram --

22  I might have an Instagram account.  I

23  think at one point I probably opened one.

24              But if it still exists, I

CONFIDENTIAL

Page 263

1  don't know.  It's not something I ever
2  use anymore.
3        Q.    Have you ever posted
4  anything on Instagram?
5        A.    I don't think I've ever
6  posted anything on Instagram, no.
7        Q.    When was the last time,
8  approximately, that you opened your
9  Instagram account?
10        A.    I have no idea.  Years.
11        Q.    Do you have any firsthand
12  experience with Instagram's features?
13        A.    No, not really.  None to
14  speak of.
15        Q.    Do you know what Reels is?
16        A.    I think I know what Reels
17  is, yeah.
18        Q.    What's Reels?
19        A.    I think Reels are the little
20  videos that play on Facetime.  I think
21  that's what they are.
22              But this is not really my
23  expertise, so I'm not sure.  They're
24  called different things in different

CONFIDENTIAL

Page 264

1    places.  And I'm not one to keep track of

2    all that.

3          Q.    Do you know the difference

4    between Reels and Explore?

5          A.    The difference between Reels

6    and Explore?

7          Q.    Yes.

8          A.    No.

9          Q.    Can you explain how autoplay

10   works on Instagram Reels?

11         A.    I don't think so.  I don't

12   know how this stuff works.  Like, I don't

13   know how the coding works and everything.

14               I think what you mean is

15   that when one reel is over another one

16   starts.  I think.

17               But I don't -- I don't know

18   if that's what you mean by autoplay.

19         Q.    So, then, I take it you're

20   not able to explain to me how autoplay

21   works on Reels?

22         A.    Didn't I just answer that

23   question?

24               ATTORNEY MEHRI:  Do you need

CONFIDENTIAL

Page 265

1          more water?

2                    THE WITNESS:  No.

3                    ATTORNEY MEHRI:  Okay.

4     BY ATTORNEY PISTILLI:

5          Q.    You said, I don't know what

6     you mean by autoplay.

7                    My question was, do you know

8     how autoplay works on Reels?

9          A.    No, I think I said more than

10    that.  But I'll try to say it again.

11                   I don't know what auto -- I

12    don't know how autoplay works on Reels,

13    like, I don't know how that stuff is

14    coded or how it really works.

15                   I think autoplay is when one

16    reel ends and another one starts.  I

17    think that's what you mean by autoplay.

18    But I don't know, because this is, like,

19    not really my area of expertise.

20         Q.    Do you have a Facebook

21    account?

22         A.    I do have a Facebook

23    account, yes.

24         Q.    How often do you use it?

CONFIDENTIAL

Page 266

1          A.    I use the Facebook account
2    occasionally.  Like, it depends on the
3    time of year.  I primarily use the
4    Facebook account to stay in touch with an
5    interest group around parents of a
6    particular college.
7                So there's -- like, there
8    might be more activity in September, say,
9    and then I stop looking.
10               So not very often.
11         Q.    How long have you had a
12   Facebook account?
13         A.    Oh, I have no idea.  A long
14   time.
15         Q.    Do you post things on
16   Facebook?
17         A.    I don't.
18               Sorry.  Occasionally if I
19   have a specific question that I need
20   answered by that interest group that I
21   spoke about, I will sometimes post there
22   as a way to try to get information.
23         Q.    Do you know --
24         A.    I have done that, yeah.

CONFIDENTIAL

Page 267

1          Q.    Do you know what Facebook's
2    News Feed feature is?
3          A.    Okay.  Not really.  But what
4    I think it is is that in the -- in what
5    people see is included news pieces in
6    what they see in I guess what's called
7    their feed.
8                I think that's what it
9    means.  I'm not quite sure.  This is not
10   my area of expertise.
11               ATTORNEY MEHRI:  I'll just
12          caution the witness not to
13          speculate.
14               If you know the answer --
15               THE WITNESS:  Okay.
16               ATTORNEY MEHRI:  -- you can
17          answer.
18               THE WITNESS:  Thank you.
19   BY ATTORNEY PISTILLI:
20         Q.    Do you have any firsthand
21   experience with the Facebook Messenger
22   feature?
23         A.    I do.  Very limited, yes.
24         Q.    What is that experience?

CONFIDENTIAL

Page 268

1          A.    That experience is that

2    there was something that someone said

3    that they found on Facebook Marketplace

4    that we might be interested in getting,

5    because we wanted this, like, particular

6    thing.

7                And I found it and I

8    messaged the person who was selling it,

9    and they messaged me back.

10         Q.    Do you have familiarity with

11   Facebook Stories?

12         A.    No, I don't know what

13   Stories are.

14         Q.    Do you know what Facebook

15   Live is?

16         A.    Sort of, because there -- I

17   don't want to speculate.

18                But I saw a movie where

19   somebody put somebody on Facebook Live.

20   So I think it's just a way of

21   broadcasting live what's happening in

22   realtime through the phone's video

23   functionality.

24         Q.    Do you have a Snapchat

CONFIDENTIAL

Page 269

1   account?

2          A.    I do not have a Snapchat

3   account, no.

4          Q.    Do you have any firsthand

5   experience with any of Snapchat's

6   features?

7          A.    I don't.

8          Q.    No firsthand experience with

9   its chat function?

10         A.    I don't have any firsthand

11  experience with any of Snapchat's

12  features.

13         Q.    Do you have a TikTok

14  account?

15         A.    No.

16         Q.    Do you have any firsthand

17  experience with any of TikTok's features?

18         A.    Yes.

19         Q.    Which features are those?

20         A.    I don't know what the

21  features would be called.  But, like,

22  I've seen the videos on my phone.

23         Q.    Do you know what TikTok's

24  For You feed is?

CONFIDENTIAL

Page 270

1          A.     No.
2          Q.     Do you know what TikTok's
3    Following feed is?
4          A.     No.
5          Q.     Do you know what TikTok's
6    Discover feed is?
7          A.     No.
8          Q.     Do you know what TikTok Live
9    is?
10         A.     No.
11         Q.     Do you have a YouTube
12   account?
13         A.     I don't think I have a
14   YouTube account.  That's -- like, I've
15   looked at YouTube.  But I think it's a
16   different thing to have an account then
17   to look at videos.
18         Q.     Do you post things on
19   YouTube?
20         A.     No.
21         Q.     Do you have any firsthand
22   experience with YouTube's features?
23         A.     Yes.
24         Q.     What is that experience?

CONFIDENTIAL

Page 271

1          A.    Well, so I've accessed

2   videos on YouTube occasionally and watch

3   them.  And I see that there's a

4   content -- a comment section, I think

5   that's a feature.  I've not posted

6   comments, but I've seen it.

7               And then on the right side

8   they have, like, other things that you

9   might be interested in looking at.  And I

10  think that that's a -- what you would

11  consider a feature.

12              So I've seen -- like, I've

13  seen that.

14          Q.    Do you have firsthand

15  experience with YouTube's home page?

16          A.    No.  I didn't know there was

17  a home page for YouTube.

18          Q.    Any experience with its

19  subscriptions page?

20          A.    No.

21          Q.    Any experience with YouTube

22  Shorts?

23          A.    YouTube Shorts?  I don't

24  think so.

CONFIDENTIAL

Page 272

1    Q.    If we could, let's go back
2  to Exhibit-7, which is your original
3  report.  And we'll take a look at
4  Page 30.
5              Do you see Paragraph 104?
6    A.    Yes.
7    Q.    You say there, The current
8  school context has been radically altered
9  by social media platforms' unregulated
10  and psychologically manipulative nature.
11  Designed to capture and hold user
12  attention through feeds, infinite
13  scrolling, and realtime notifications,
14  these platforms have created conditions
15  of compulsive use, particularly among
16  adolescents.
17              My question for you, sir, is
18  what is your basis as an expert for that
19  statement?
20    A.    So mostly my learning about
21  this comes through the literature review
22  that I did.  I think some of it may have
23  come through the testimony on record as
24  well, but I'm not -- I'm not entirely

CONFIDENTIAL

Page 273

1  sure of that.

2              And it was in doing some of

3  the reading that I came to really

4  understand that there are design features

5  that are intended to capture and

6  manufacture attention as the product that

7  is being sold.

8              And that the design of the

9  social media platforms also exploits

10  vulnerabilities in young people, in

11  children and teens and adolescents whose

12  frontal cortex is still developing, as a

13  way to encourage their compulsive use so

14  that they extend their engagement on the

15  platforms.

16              And that that is linked to

17  mental health issues that are rising, to

18  attention span issues, to students -- to

19  children, adolescents feeling, like,

20  socially anxious.  The way that they're

21  concerned about their social status is

22  now, you know, quantified, I guess, in a

23  way by how much attention they get on the

24  platforms; their -- their need to feel

CONFIDENTIAL

Page 274

1    sort of continuously connected so that

2    they don't miss anything or they don't --

3    you know, there's like a social

4    accountability, I guess you could say,

5    where they need to respond and be in the

6    mix on the platforms all the time.

7                    So that learning from the

8    literature also converged with much of

9    what I was seeing about the effects on

10   schools and what school leaders are

11   dealing with.  Like, the ideas really

12   came together there about what is really

13   going on and led to the opinions that I

14   offer in the report.

15        Q.    I believe you agreed with me

16   that you're not a platform design expert,

17   right?

18        A.    I am not a platform design

19   expert.

20        Q.    You're not a psychologist or

21   a psychiatrist or people -- someone who

22   studies the frontal cortex, right?

23        A.    I'm not a psychologist or a

24   psychiatrist or someone who studies brain

Page 275

1   development specifically, no.

2          Q.    And do you plan to tell the

3   jury that it is your expert opinion that

4   defendants' platforms were designed to

5   capture and hold user attention?

6          A.    Let me -- let me just check

7   my -- my intent is to testify to the

8   opinions that I offer.

9                And the paragraph that you

10  pointed to is, like, supporting of an

11  opinion.  So let me just look at the

12  opinions.

13               You're asking me, I think,

14  if I specifically intend to offer an

15  opinion that there's an intentional

16  nature to the design of the platforms in

17  order to engage student attention and

18  prolong that attention?

19         Q.    I'm asking whether you plan

20  to tell the jury that it's your expert

21  opinion that defendants' platforms are

22  designed to capture and hold user

23  attention.

24         A.    I think that would be

CONFIDENTIAL

Page 276

1  outside my opinions and outside of my

2  expertise.

3              So sitting here now, it

4  wouldn't be my intention and it's not in

5  the language of my opinions, although

6  there is, as you just pointed out, some

7  language in a supporting section.

8              But that would not be my

9  intention.  I think I would leave that to

10  other experts who would know more about

11  that than me.

12      Q.    And do you recall earlier

13  that we had some discussions about

14  platform features that, in your opinion,

15  contribute to schools' social

16  media-related harm?  Do you recall that

17  discussion this morning?

18      A.    I think I remember it a

19  little bit differently than you just

20  described it.

21              Because I think what I

22  recall is you asking me about a number of

23  features and me replying that the

24  specific features, like, how they worked,

CONFIDENTIAL

Page 277

1  how they're designed, how they're coded,

2  which platforms have which features, when

3  and how the features change, how they

4  interact with each other, all that kind

5  of thing is something that I don't know

6  about and is outside the area of

7  expertise.

8            And you just asked me right

9  now if we had a conversation about the

10  features.

11            So maybe we're talking about

12  the same thing.  But I just wanted to

13  characterize it the way that I remember

14  it.

15      Q.    Sure.

16            So you -- broadly speaking,

17  your testimony is that schools and school

18  districts have been harmed as a result of

19  students' social media use, correct?

20      A.    Well put.  Yes.

21      Q.    And when you talk about

22  those harms caused by social media, you

23  mean to include in that harms caused by

24  feeds, infinite scrolling and realtime

CONFIDENTIAL

Page 278

1   notifications, correct?

2                    ATTORNEY MEHRI:  Objection.

3                    THE WITNESS:  I know I put

4            them here as sort of illustrative

5            examples, but I don't -- it's not

6            my intention to really talk about

7            any particular features.  There --

8            that's sort of outside my area of

9            expertise.

10  BY ATTORNEY PISTILLI:

11           Q.    But it's also not your

12  intention, when considering whether

13  school districts have suffered social

14  media harm, to exclude feeds or infinite

15  scrolling or realtime notifications,

16  right?

17                   ATTORNEY MEHRI:  Objection.

18                   THE WITNESS:  I'm having

19           trouble with the logic of your

20           question, because you're asking

21           me, like, my intention to not

22           include something or something

23           like that?

24                   Just, will you help me

CONFIDENTIAL

Page 279

1    understand what you're asking me?

2    BY ATTORNEY PISTILLI:

3        Q.    Sure.

4            When you offer testimony

5    about what you view as social media

6    harms, you're -- you're not excluding

7    from that harms that flow from

8    interactions with features that include

9    feeds, infinite scrolling and realtime

10   notifications, are you?

11           ATTORNEY MEHRI:  Objection.

12           THE WITNESS:  It's really a,

13       like, particular -- particular

14       sort of phrasing of the question.

15           It's not my intent to

16       exclude or include any particular

17       features.  It would be my intent

18       to say I'm not really an expert on

19       the features, because that's true,

20       I think they change a lot.

21           As you just established, I

22       don't have a ton of firsthand

23       experience.

24           It would be my intent to say

CONFIDENTIAL

Page 280

1          that there are these features that
2          lead to compulsive use on the part
3          of young people and adolescents.
4          And that that compulsive personal
5          use of social media by school-aged
6          children is creating a burden on
7          schools that challenge resource
8          allocation, divert leadership
9          time.
10                So I wouldn't -- I would
11         make the link between the design
12         features' intention to prolong
13         engagement having an impact on the
14         school environment and posing new
15         harms and exacerbating existing
16         harms, especially to the leaders
17         who are attempting to fulfill
18         their leadership duties.
19    BY ATTORNEY PISTILLI:
20         Q.    And the features that impose
21    harms on school districts include the
22    ones you reference in Paragraph 104 of
23    your report, right, feeds, infinite
24    scrolling and realtime notifications?

CONFIDENTIAL

Page 281

1            ATTORNEY MEHRI:  Objection.

2            THE WITNESS:  My -- my

3       reading of the literature is that,

4       yeah, they do.  And probably some

5       others.

6            I just am not able to speak

7       to the details of all of this,

8       because I don't understand how

9       they're coded or what their

10      particulars are or the differences

11      among the platforms or how the

12      features interact with one

13      another.

14            So I think in terms of,

15      like, naming particular features,

16      that wouldn't be my intent.  I

17      would leave that for other experts

18      who understand this stuff better

19      than me to do.

20            But what I have observed and

21      what I see in a convergence of

22      evidence is that the cumulative

23      effects of this have created,

24      like, a generalized anxiety,

Page 282

1          destabilized school environments,

2          challenged resource allocations

3          because of the greater need for

4          mental health services, diverted

5          leadership attention so now

6          they're paying attention to

7          intervening in social media

8          associated crises and addressing

9          students' increased anxiety and

10         teachers' struggles with

11         attention, student attention, that

12         kind of thing.

13                That's where -- that's where

14         I think my expertise lies.

15    BY ATTORNEY PISTILLI:

16         Q.    If we could go back to your

17    rebuttal report, Exhibit-8, and look at

18    Page 3, please.

19         A.    Sure.

20         Q.    And in Footnote 1, you say,

21    In their July 2025 reports, Robert W.

22    Platt, Ian Gotlib and Randy Auerbach each

23    assert that I opine in my May 16th, 2025,

24    report that the scientific evidence

Page 283

1    supports the position that social media

2    causes poor mental health outcomes among

3    students in educational settings.

4    Although -- although it is my

5    understanding that other experts have

6    offered opinions in support of this

7    position, neither my May 2025 report nor

8    this rebuttal report addresses that

9    issue.

10                Do you see that?

11        A.    I do, yeah.

12        Q.    And do you stand by that

13   statement in your rebuttal report?

14        A.    For the most part.  I mean,

15   I'm not a statistician.  I'm not a

16   clinical psychologist.  I'm not a mental

17   health expert.  I don't conduct, like,

18   controlled studies.

19                So my understanding here of

20   scientific evidence, that -- the use of

21   scientific evidence is kind of best left

22   to people who are statisticians or

23   scientists or engaged deeply in this

24   material.  They are the people who

Page 284

1  conduct the research themselves.

2          For me, I would -- in this

3  respect, as far as reading literature,

4  I'm more of a -- of a consumer of their

5  reports.  And their reports have, you

6  know, informed how I think about these --

7  about these issues.

8          Q.    But you don't intend to

9  offer to the jury the expert opinion that

10 the scientific evidence supports the

11 position that social media causes poor

12 mental health outcomes among students in

13 educational settings, do you?

14          A.    I think that's best left to

15 other experts who understand the

16 statistics and the research design that

17 would enable someone to make such a

18 claim.

19          Q.    You are not qualified to

20 offer an expert opinion that the

21 scientific evidence supports the position

22 that social media causes poor mental

23 health outcomes among students in

24 educational settings, right?

Page 285

1          A.     I can read the literature.
2     So I can say that these studies influence
3     how I think about these things and that
4     is part of how I came to the opinions
5     that I have.
6                 But as far as the -- the
7     exact, like, nature of the causality and
8     how it works, like, how exactly it causes
9     these mental health outcomes, I would
10    want to leave that to other experts who
11    are statisticians or scientists or
12    conduct research into this particular
13    question.
14          Q.     Right.  Because you're not
15    an expert in mental health, right?
16          A.     Yeah, I think you asked me
17    that earlier, maybe a couple of times.
18    And I think I also just said that.
19                 I'm not an expert in mental
20    health.  And I'm not a statistician.  And
21    I'm not, like, a data scientist or
22    clinical psychologist or any of those
23    things.
24                 ATTORNEY PISTILLI:  Good

CONFIDENTIAL

Page 286

1          time for a break.
2                   THE WITNESS:  Yes.  I have
3          to go to the bathroom again.
4          Thank you.
5                   VIDEO TECHNICIAN:  The time
6          is 3:57 p.m.  This is the end of
7          Media 5, and we are going off the
8          record.
9                         -   -   -
10                  (Whereupon, a brief recess
11         was taken.)
12                        -   -   -
13                  VIDEO TECHNICIAN:  The time
14         is 4:22 p.m.  This is the
15         beginning of Media 6, and we're
16         going back on the record.
17  BY ATTORNEY PISTILLI:
18         Q.   Dr. Osborne, you've referred
19  at various points today to a literature
20  review you conducted.
21                  Could you please describe
22  that literature review?
23         A.   Sure.  My literature review
24  was I used Google Scholar to find

Page 287

1    articles related to social media and

2    student mental health.  I entered, like,

3    various keywords in there.  I can't

4    remember exactly what, but social media,

5    mental health, schools.

6              And then I just downloaded

7    and skimmed and read articles that seemed

8    like they would be relevant.

9         Q.    And in the course of that

10   literature review, did you identify any

11   articles that suggested there was not a

12   causal connection between social media

13   use and mental health harms?

14             A.    I didn't -- that the article

15   suggested that there's not a causal link?

16             I don't know.  I don't

17   remember.  Throughout the articles, it

18   seems like the preponderance of evidence

19   is that there's linkages to -- to mental

20   health concerns.

21        Q.    You don't recall whether you

22   reviewed any articles that contradicted

23   that view?

24             A.    I don't recall any specific

CONFIDENTIAL

Page 288

1    articles that, like, contradicted that

2    view.

3              There were -- there were

4    articles that may have said that there's

5    evidence mixed or there's a need for more

6    research or something statistically

7    wasn't significant or something like

8    that.

9         Q.    And was your literature

10   review limited to the impact to -- of

11   social media and student mental health?

12              ATTORNEY MEHRI:  Objection.

13              THE WITNESS:  No, because

14         part of the literature review that

15         I was doing initially was around

16         the importance of school leaders

17         and what their scope of duties and

18         responsibilities are.

19              So I did some on the, like,

20         the purpose of public education.

21         Some on the role of educational

22         leaders, like what's the

23         importance of them being able to

24         do their work well.  And then

Page 289

1              social -- like, adolescent,

2              childhood social media use and

3              mental health.

4                      I don't remember all, like,

5              the keywords that I used.  But

6              that's -- I felt like finding

7              literature and research that

8              addressed those questions would

9              help enable me to understand the

10             task that I was given to take a

11             look at what's the impact of

12             social media on schools and school

13             leaders.

14     BY ATTORNEY PISTILLI:

15             Q.    And did you do a literature

16     review on any topics other than the

17     purpose of public education, educational

18     leadership and social media use and its

19     connection to mental health issues?

20             A.    Probably, because I used a

21     variety of different keywords.

22                   But I think that, in the

23     main, captures what I did.

24             Q.    Anything else that you can

CONFIDENTIAL

Page 290

1  recall as you sit here today?

2         A.    As I sit here today, no, I

3  don't -- I don't remember specifically,

4  like, what other keywords I would have

5  put into Google Scholar to identify

6  articles that I should read.

7         Q.    And, then, did you read all

8  the articles that you relied on in your

9  report?

10         A.    I did, yeah.

11         Q.    And you ensured yourself

12  that they were well founded?

13         A.    What do you mean by that?

14         Q.    That they were credible

15  scholarship, that it would be appropriate

16  to rely on?

17         A.    Yeah, I think that's fair.

18               Like, I don't -- I'm not a

19  researcher, a methodologist.  So I don't

20  have a rubric for what would be, what did

21  you call it, well -- well --

22         Q.    Well founded?

23         A.    -- well founded methodology.

24               But what I was paying

CONFIDENTIAL

Page 291

1    attention to was, you know, where did it
2    appear; because some of the scholarly
3    journals, I would infer an inclusion in
4    some of those journals means that it's
5    pretty well founded.
6                    And I did look at the
7    methodology to get whether it was, like,
8    a meta-analysis of other literature or a
9    qualitative study or a case -- single
10   case study, like what kind of study it
11   was.  Yes.
12          Q.    Let's take a look at your
13   rebuttal report, which I believe is
14   Exhibit-8, if you go to Page 10.
15                    You see in the footnote
16   there you cite an article by Popat, S.,
17   and Tarrant, A., 2023, Social Media,
18   Mental Health and Young People:  Emerging
19   Research and Implications in the Youth
20   Studies Journal?
21          A.    Yes.
22          Q.    Do you know who S. Popat or
23   A. Tarrant are?
24          A.    Beyond them being authors

CONFIDENTIAL

Page 292

1    about this, no.

2            Q.    So you don't -- besides the

3    fact that they authored this article, you

4    don't know anything about them?

5            A.    I didn't, as part of my

6    literature review, like, look into the

7    background or particularities of the

8    authors.

9                I didn't think it was

10   necessary.  And I didn't take the time to

11   do that.

12           Q.    Are you aware that there's

13   no journal called Youth Studies Journal?

14           A.    I guess I am now.

15               I said I know that there are

16   a couple of places, this may be one,

17   where my citations are faulty.

18           Q.    When -- when did you learn

19   that your citations were faulty?

20               ATTORNEY MEHRI:  Objection.

21               THE WITNESS:  I don't

22        recall.  When -- when preparing

23        for this.

24   BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 293

1          Q.     Did you make any effort to
2     correct your citations?
3          A.     Yes.
4          Q.     What efforts were those?
5          A.     I looked at the materials
6     cited in the May 16th report and
7     recreated the citations to identify if
8     there were any errors.  And if there
9     were, what errors there were.
10         Q.     Did you identify your
11    citation to S. Popat and A. Tarrant in
12    the Youth Studies Journal as an error?
13         A.     I think that I did, yes.
14    But I don't recall exactly.
15                Because I think this is one
16    where there was a -- there was an article
17    by the same authors that is the article
18    that I used and referred to.
19         Q.     By S. Popat and A. Tarrant?
20         A.     Yeah.  Yeah.  This is the --
21    yeah, I don't have those articles here.
22                But I downloaded articles,
23    and I put them in the folder with names
24    of -- the names of the authors or the

CONFIDENTIAL

Page 294

1   organization.  And that's what I worked

2   from.

3                ATTORNEY PISTILLI:  We'd

4        call for the production of those

5        articles.

6   BY ATTORNEY PISTILLI:

7        Q.    Were you, perchance, meaning

8   to refer here to the Journal of Youth

9   Studies?

10       A.    I don't know.  I don't

11  recall.

12       Q.    Well, unlike Youth Studies

13  Journal, are you aware that there is a

14  journal that exists called the Journal of

15  Youth Studies?

16       A.    I'm not really familiar with

17  all the journals that exist.  So I don't

18  know.  I'd have to look for that.

19                ATTORNEY PISTILLI:  Let's

20       take a look at Tab 59, please.

21                    -   -   -

22                (Whereupon, Exhibit

23        Osborne-11, No Bates, Journal of

24        Youth Studies, Volume 26, was

Page 295

1          marked for identification.)

2                    -  -  -

3   BY ATTORNEY PISTILLI:

4          Q.    I'll represent to you that

5   this is a composite exhibit with all ten

6   issues of the 2023 volume of the Journal

7   of Youth Studies.

8                 We're going to go ahead and

9   mark this as the next exhibit in turn.

10                I've now handed you

11  Exhibit-11.

12         A.    Okay.  Thank you.

13         Q.    And I can represent to you

14  that Exhibit-11 is a composite with all

15  ten issues of the Journal of Youth

16  Studies for 2023.

17         A.    Okay.

18         Q.    And looking at that

19  composite exhibit, do you agree with me

20  that there's no article by S. Popat and

21  A. Tarrant that was published in 2023 in

22  the Journal of Youth Studies?

23         A.    Yes, I would agree with

24  that.

CONFIDENTIAL

Page 296

1              That -- I think I was trying
2    to explain that that citation is a
3    mistaken duplicate of the other article
4    by the same authors.
5          Q.    What's the other article by
6    the same authors?
7          A.    I think it's this 2022
8    article.  There may be errors in here as
9    well.
10             But there is a Popat and
11   Tarrant article that I used as part of my
12   literature review.
13         Q.    Is it cited in your
14   materials considered?
15         A.    It's cited in the -- it's
16   cited, maybe incorrectly, in my May 16th
17   report.
18         Q.    All right.  Let's take a
19   look at another citation in your report.
20             Do you see you've cited
21   there an article by D. Watson, K. Topping
22   and S. Drew from 2022 entitled, The
23   Impact of Social Media Use on Adolescent
24   Mental Health, Systematic Review, Journal

CONFIDENTIAL

Page 297

1    of Adolescence.

2              Do you see that?

3         A.    I do.  And I do recall that

4    this citation is flawed.

5              There's an article by Watson

6    that I used that -- I think you just

7    asked for all the articles, so we can

8    make sure we provide them -- but the

9    citation here doesn't match the article.

10             The references to Watson in

11   the text should line up and match the

12   article that I intended to cite.  But

13   that's the wrong citation.

14        Q.    What's the name of the

15   Watson that you intended to cite?

16        A.    I don't -- I don't recall,

17   and I didn't bring that corrected list

18   with me.

19        Q.    But you have a corrected

20   list?

21        A.    I -- yeah, I just -- you

22   asked if I did anything to correct the

23   citations, and I responded to you that I

24   did.

CONFIDENTIAL

Page 298

1              In the materials cited from

2    the May report, I went through the ones

3    that I had downloaded into that folder,

4    and then I double-checked the citations

5    to see if they matched.  And I found a

6    number of errors in the citations.

7              This one I do recall

8    because, to my dismay, the last name of

9    the first author matches, but the rest of

10   the citation is -- is faulty.

11        Q.    Well, if we can go to

12   Exhibit-7 and look at Page 35 real quick.

13        A.    Exhibit-7.  Sure.

14        Q.    You see on Page 35, in this

15   alphabetical list of references you

16   provide, there's one reference to Watson

17   on Page 35, right?

18        A.    Yes.  That's the one I just

19   described, that there is an article by a

20   Watson, though last name of the first

21   author is Watson, but it doesn't match

22   the rest of this citation.  This citation

23   is erroneous.

24        Q.    But this -- it's the same

CONFIDENTIAL

Page 299

1    erroneous citation in both of your

2    reports, correct?

3            A.    That's a good question.  I

4    think so.

5                  Because as I was working

6    through the reply to the rebuttals, I was

7    going back to these citations and looking

8    at where I had made the similar points

9    already in my initial report and then

10   copying and pasting those citations into

11   the footnote.

12                 So if it was wrong in the

13   first one, then it's most likely wrong in

14   the second one.

15           Q.    And to your knowledge, there

16   is no article by D. Watson, K. Topping

17   and S. Drew entitled, The Impact of

18   Social Media Use on Adolescent Mental

19   Health: Systematic Review?

20           A.    Yes.

21                 ATTORNEY MEHRI:  Objection.

22                 Go ahead.

23                 THE WITNESS:  Oh, I'm sorry.

24                 That's correct, yeah.

CONFIDENTIAL

Page 300

1          There's an article by a Watson.
2          But the rest of this citation
3          is -- is erroneous.  It's faulty.
4    BY ATTORNEY PISTILLI:
5          Q.    Sure.  And then if we could
6    just go back to the native version of
7    Exhibit-8, the rebuttal report.
8          A.    Sorry, where are we?
9          Q.    Page 10 of your rebuttal
10   report.
11         A.    Okay.  I'm there.
12         Q.    Do you see that in your
13   report you provide a URL link to your
14   citation?
15         A.    Yeah, I do.
16              ATTORNEY PISTILLI:  And if I
17          could just ask if we could, please
18          click on the link that you provide
19          there.
20   BY ATTORNEY PISTILLI:
21         Q.    This article doesn't exist,
22   right?
23              ATTORNEY MEHRI:  Objection.
24              THE WITNESS:  Yeah, that's

CONFIDENTIAL

Page 301

1          correct.  To my dismay, I

2          discovered that the article that

3          was authored by a Watson that I

4          did use and is in my list of

5          articles that were part of my

6          literature review and that I did

7          read and inform my opinions

8          doesn't match this citation, to my

9          dismay.

10              And so it's not surprising

11         that this link also does not work.

12              I apologize for that.

13    BY ATTORNEY PISTILLI:

14         Q.    Well, you say it's in the

15    list of articles that were part of your

16    literature review.

17              You're referring to your

18    materials considered list, correct?

19         A.    Well, no.  I was referring

20    to the -- the articles that, as a result

21    of my search for scholarly articles using

22    Google Scholar, that I downloaded into a

23    folder on my computer and named after the

24    last name of the -- like, the file name

Page 302

1    itself was named after the last name of
2    the author or, like, the organization
3    that the article was from.
4            And then I worked through --
5    I worked through that.  So that's where
6    that article actually, like, sits.
7            And I wish that I had
8    brought the -- the corrected list.  But I
9    didn't bring that.
10        Q.   Let's take a look at Page 9
11   of your report, Footnote 9.
12            ATTORNEY MEHRI:  Page 9 or
13       Footnote 9?
14            ATTORNEY PISTILLI:  Both.
15   BY ATTORNEY PISTILLI:
16        Q.   Do you see that in
17   Footnote 9 you purport to cite an article
18   by Montag, C., Sindermann, C., Becker,
19   B., and Panksepp, J., from 2021?
20        A.   I do.
21        Q.   And that's an article
22   entitled, An Affective Neuroscience
23   Framework For the Molecular Study of
24   Internet and Smartphone Use Disorder.

Page 303

1              Do you see that?

2         A.    I do.

3         Q.    And that is from

4    Neuroscience and Biobehavioral Reviews,

5    on Page 571 to 582?

6         A.    Yeah.  That's what it says

7    here.

8              I'm anticipating you're

9    going to tell me that it doesn't exist or

10   this citation is faulty and the link is

11   broken.

12             That may very well be true.

13   I made some mistakes on the citations.

14             ATTORNEY PISTILLI:  Let's

15        take a look at Tab 62, please.

16                  -   -   -

17             (Whereupon, Exhibit

18        Osborne-12, No Bates, Neuroscience

19        and Biobehavioral Reviews, Volume

20        120, was marked for

21        identification.)

22                  -   -   -

23   BY ATTORNEY PISTILLI:

24        Q.    This is from the -- the

CONFIDENTIAL

Page 304

1  121st volume of Neuroscience and

2  Biobehavioral Reviews that you cite.

3           And I would just ask you to

4  please confirm for the jury that the

5  article you purport to cite does not, in

6  fact, appear in the Neuroscience and

7  Biobehavioral Reviews?

8           ATTORNEY MEHRI:  Objection.

9           THE WITNESS:  Yes, I will --

10       I will confirm that.

11  BY ATTORNEY PISTILLI:

12       Q.   I'll hand you what's been

13  marked as Exhibit-12, which is what we've

14  been looking at together on the screen.

15           ATTORNEY PISTILLI:  And,

16       then, Ray, if we could click again

17       on the link.

18  BY ATTORNEY PISTILLI:

19       Q.   Do you -- do you see, Dr.

20  Osborne, you again have provided a link

21  that purports to take us to the journal

22  article that you've purported to cite?

23           Do you see that?

24       A.   Yeah, I see that.

CONFIDENTIAL

Page 305

1             ATTORNEY PISTILLI:  And then
2        can we please click on that link?
3             TRIAL TECHNICIAN:  Which
4        page is that again?  I'm sorry.
5             ATTORNEY PISTILLI:  Page 9,
6        the Montag article.
7             TRIAL TECHNICIAN:  (Trial
8        tech complies with request.)
9    BY ATTORNEY PISTILLI:
10        Q.    And, in fact, you've
11   provided a link to an article entitled,
12   Probiotics Treatment Improves Cognitive
13   Impairment in Patients and Animals:  A
14   Systematic Review and Meta-Analysis,
15   correct?
16        A.    Yes, I see that that's what
17   it links to.
18        Q.    All right.  Let's take a
19   look at the immediately following article
20   cited by you in your expert report
21   purportedly by J. Nesi, M.J. Prinstein,
22   and E.H. Telzer.
23             Do you see that one?
24        A.    Yes.

Page 306

1          Q.    And at least according to
2    your citation, this is a 2018 article
3    entitled, Adolescent Social Media Use and
4    Mental Health, a Developmental
5    Neuroscience Perspective in Current
6    Directions in Psychological Science.
7               Do you see that?
8          A.    Yeah, I do.  I think that's
9    also a bad citation.
10              These authors exist and
11   there's an article that I read and used
12   as part of my literature review.  And I
13   think when I -- when I reference it in
14   text, even if the details of the
15   citations are wrong it points to that
16   article.
17              So while it's my intention
18   to provide all of the articles that I
19   used, I think this citation is also off.
20              ATTORNEY PISTILLI:  Let's go
21        ahead and again click on the link
22        you provided.
23              TRIAL TECHNICIAN:  (Trial
24        tech complies with request.)

CONFIDENTIAL

Page 307

1   BY ATTORNEY PISTILLI:

2        Q.    Again, this article doesn't

3   exist, right, even though you cited it?

4             ATTORNEY MEHRI:  Objection.

5             THE WITNESS:  Well, the --

6        so there is an article that exists

7        by these authors that I did use.

8             You know, I guess this link

9        doesn't go to that article.  Some

10       of the other details of the -- of

11       the citation might be incorrect.

12            But there is, yes, an

13       article that exists by these

14       authors that I used.

15  BY ATTORNEY PISTILLI:

16       Q.    So your representation is

17  that there's an article by J. Nessi,

18  M.J. Prinstein and E.H. Telzer that you

19  relied on?

20       A.    Yeah, that's what I recall,

21  sitting here right now.

22            As I was doing the -- the

23  check on all the citations after

24  realizing that some weren't good, I

CONFIDENTIAL

Page 308

1    matched the citations to the articles

2    that I had downloaded, when I did my

3    search using Google Scholar to match up

4    articles with the -- you know, the

5    citations with actual articles that I

6    read.  And this one is one that I recall

7    resides in that folder and that I read

8    and used in the literature review.

9         Q.    So we've discussed a number

10   of instances now where you've cited

11   articles that don't exist or at least

12   don't exist by the name they are cited by

13   or don't appear in the -- the journal

14   that you've cited, correct?

15        A.    I think there are two

16   that -- that don't exist.  The second

17   Popat and Tarrant is actually a duplicate

18   of the first.  And then the other one

19   is -- oh, where were we just -- is the

20   Montag, Sindermann article.

21             The others, to my knowledge,

22   actually do exist.  I downloaded them

23   into this folder and used them in my

24   literature review.  I then, you know,

CONFIDENTIAL

Page 309

1   made the -- what I realize now -- very

2   unfortunate error of trying to use Gemini

3   to APA format those citations and got

4   back bad citations.

5                So there are a couple like

6   that.  You -- you found, though, one for

7   Watson, Popat, Montag.

8                But as far as I -- as far as

9   I know, the two -- well, one it's not

10  that it doesn't exist, it's, like, a bad

11  duplicate.  And then there's one that I

12  think doesn't exist.

13               But I would have to go back

14  and check.  And that's just -- that's

15  just my error for not carefully double

16  checking that.

17       Q.    Well, so we'll go through

18  each of them.

19               You agree that there's at

20  least one article you've cited that

21  doesn't exist, right?

22       A.    Yeah, I think that that's

23  right.  I have to double check.

24       Q.    And --

CONFIDENTIAL

Page 310

1           A.      When I realized the error, I
2    double checked everything in the
3    citations of the May report, and then I
4    kind of stopped doing that work.
5                   So I -- I would have to do
6    the rest of the -- any citation that I
7    put anywhere to double check all that.
8           Q.      And it's your testimony that
9    this resulted as a use of your -- as a --
10   as a result of your use of Gemini?
11          A.      For the purpose of
12   formatting APA citations.  So I took the
13   articles that I read -- I was working
14   from the articles in the alphabetical
15   order as they appeared using the file
16   name that I -- that I downloaded and
17   worked from that list.
18                  And then when it just came
19   to, you know, creating citations that
20   comported with the -- with the APA format
21   and structure, instead of using, like,
22   Citation Machine, which I had used
23   before, I just used a tool that was new
24   to me to see if it would work, as an

CONFIDENTIAL

Page 311

1  experiment.

2              And I'm learning the lesson

3  that it didn't work so good.

4        Q.    Gemini is artificial

5  intelligence, right?

6        A.    Yes.

7        Q.    And as a result of your use

8  of artificial intelligence, you agree

9  you've cited at least one article in your

10  report that, in fact, doesn't exist?

11        A.    There is -- there is an

12  article in the footnote that I need to

13  double check to see if it was an article

14  that I actually gave to it or how that

15  got in there.

16        Q.    What article is that?

17        A.    Well, I think it's the one

18  you found.  The Montag article.

19              But as I said, when I

20  realized there were these citation errors

21  I went through the work cited in the May

22  16th report.  And I haven't gone through

23  all of them in the other reports or the

24  longer list of materials considered to

Page 312

1    identify -- like, match them to a

2    specific article or see if they're

3    duplicates or what.

4         Q.    So sitting here today,

5    you're not even certain that some of the

6    materials that you cited to the court and

7    to the jury in your report are real,

8    right?

9              ATTORNEY MEHRI:  Objection.

10             THE WITNESS:  No, I'm fairly

11        certain that they're -- they're

12        all real or maybe all real except

13        for this one.

14             Granted, there's some more

15        due diligence that I -- that I

16        need to do for verification

17        purposes.

18   BY ATTORNEY PISTILLI:

19        Q.    Were you informed that

20   there's an order in this case that says,

21   Parties and counsel shall not file or

22   otherwise present to the court any

23   briefs, pleadings, materials, other

24   documents or argument which contain

CONFIDENTIAL

Page 313

1  AI-hallucinated citations to law, case or

2  legal citations which are fictitious or

3  nonexistent or any uncorraboratible

4  assertions of fact?

5              Did your lawyers tell you

6  that?

7       A.    Not that I recall

8  specifically.

9       Q.    And I think you would agree

10  with me that you've cited several

11  fictitious articles in your report,

12  right?

13              ATTORNEY MEHRI:  Objection.

14       Mischaracterizes his testimony.

15  BY ATTORNEY PISTILLI:

16       Q.    They don't exist, right?

17              ATTORNEY MEHRI:  Objection.

18       Mischaracterizes his testimony.

19              THE WITNESS:  No, I'm not

20       sure.  I think all the articles

21       that I use in my citations in the

22       May 16th report do exist, even if

23       there are errors on the citation

24       list itself.

CONFIDENTIAL

                                                    Page 314

1                The other one you noticed, I

2           have to look.  I have to look at

3           that -- all of those and see what

4           happened there.

5    BY ATTORNEY PISTILLI:

6           Q.    Certainly, you've agreed

7    with me that there are several articles

8    cited in your rebuttal report that don't

9    exist by the name and title and journal

10   that you've cited, right?

11                ATTORNEY MEHRI:   Objection.

12                THE WITNESS:   I think what I

13          said is I have the articles.  And

14          when I used the tool for APA

15          formatting, I got back some bad

16          results.  I didn't double check.

17          That was a big mistake, obviously.

18                But those articles exist,

19          the ones in the -- in the May 16th

20          report that I went through, like,

21          citation by citation.  I need to

22          do it for the other -- for the

23          other report.

24   BY ATTORNEY PISTILLI:

Page 315

1          Q.    Could you turn to Page 16 of
2    your rebuttal report, Paragraph 57?
3                 Do you see where you wrote,
4    Several defense experts have also
5    cherry-picked data to support their
6    arguments while ignoring other data
7    points?
8                 Do you see that?
9          A.    I do.
10                ATTORNEY MEHRI:  Did you say
11         57?
12                ATTORNEY PISTILLI:
13         Paragraph 57.
14    BY ATTORNEY PISTILLI:
15         Q.    You previously agreed with
16    me, right, that you yourself didn't
17    review any documents or data produced by
18    any of the six plaintiff school districts
19    in this case, right?
20                ATTORNEY MEHRI:  Objection.
21                THE WITNESS:  That's -- yes,
22         I did not review any data or
23         documents from the specific school
24         districts.

CONFIDENTIAL

Page 316

1           I did read the rebuttal
2       reports.  And their use of data
3       seemed to me to be selective.
4   BY ATTORNEY PISTILLI:
5           Q.    But you have no knowledge or
6   understanding of what data actually
7   exists for any of the six bellwether
8   districts, correct?
9           A.    Not so much -- like, for
10  example, I know that there are reports on
11  discipline in school districts, there are
12  reports on budgets in school districts,
13  there are reports on staffing in school
14  districts.
15          So if I see that someone
16  chose a particular data source that acts
17  as a counterfactual without context, you
18  know, it raises, for me, questions about
19  selectivity.
20          Q.    Well, to say it was
21  cherry-picked you would need to have an
22  understanding that other data is
23  available, correct?
24                  ATTORNEY MEHRI:  Objection.

CONFIDENTIAL

Page 317

1              THE WITNESS:  Well, it's
2       based on the understanding that
3       other data is available, data that
4       would also be, like, quantitative
5       reports but also data that would
6       explain, like, the context of any
7       particular data that's being
8       examined.
9              I don't think it requires me
10      to know, like, all the existing
11      data in a particular district to
12      see that there's a selective use
13      in the district-specific rebuttal
14      reports.
15 BY ATTORNEY PISTILLI:
16      Q.    Well, in order to know that
17 it's cherry-picked, you would have to
18 understand whether or not it's
19 representative of what actually exists,
20 correct?
21              ATTORNEY MEHRI:  Objection.
22      And asked and answered.
23              THE WITNESS:  You know, I
24      don't know what you mean by

CONFIDENTIAL

Page 318

1          "representative."  I don't think
2          so.
3    BY ATTORNEY PISTILLI:
4          Q.    What do you mean when you
5    say something is cherry-picked?
6          A.    What I mean is that it seems
7    to me that there's a selectivity about a
8    particular data set in order to try to
9    prove a counterfactual.
10         A.    And the selectivity could be
11   excluding other potentially relevant data
12   or, you know, other explanations of what
13   is going on in that data set.
14         Q.    So it could be excluding
15   other data.
16              But in order to know whether
17   it actually is, you would have to look at
18   the data itself, right?
19              ATTORNEY MEHRI:  Objection.
20              THE WITNESS:  I think it
21         suffices to observe that there's a
22         selectivity by reading the report
23         itself and how data is used by
24         that author.

CONFIDENTIAL

Page 319

1  BY ATTORNEY PISTILLI:

2       Q.    But sitting here today,

3  you're not aware of any data from any of

4  the six bellwether school districts that

5  contradicts any of the assertions in

6  defendants' experts reports, correct?

7            ATTORNEY MEHRI:  Objection.

8            THE WITNESS:  I would agree

9       with that.  I think that's a fair

10      statement.

11  BY ATTORNEY PISTILLI:

12      Q.    You agree, don't you, that

13  social media alone is not the sole cause

14  of challenges faced by school districts?

15      A.    I would agree that there

16  is -- it's not a sole cause.  It's not a

17  mono-causal issue, correct.

18      Q.    And you also agree that

19  issues like poverty and school violence

20  shape the educational environment and

21  place ongoing demands on schools?

22      A.    You named poverty and gun

23  violence?  I would agree that poverty and

24  gun violence place demands on schools,

CONFIDENTIAL

Page 320

1  yes.

2           And I would say that -- I

3  think we went over this a little bit

4  earlier, that students' compulsive

5  personal use of social media seems to me

6  of a different quality than those other

7  contextual realities that schools

8  confront when they're executing on their

9  educational mission to educate all

10 students.

11          That poverty has, of course,

12 long existed and creates issues.  Those

13 issues are exacerbated by social media

14 issues.

15          I would say gun violence is

16 a little bit different in that although

17 it is very traumatic if it happens, where

18 it happens, and if it happens in a

19 school, extremely traumatic, and that has

20 some ripple effects across school

21 communities.

22          But there's something

23 pervasive in the social media use that is

24 of a different quality.

Page 321

1          Q.    You didn't do any
2    statistical analysis to determine the
3    extent to which any of these other issues
4    that cause mental health strains on
5    students and can impact the school
6    environment drove any increases in mental
7    health expenditures that any of the
8    districts faced, have you?
9          A.    That was a really long
10   question.  What -- what are you asking
11   me?
12         Q.    You didn't do any work to
13   try to determine the extent to which, in
14   your opinion, social media is driving the
15   increase in mental health expenditures
16   for schools versus all of the other
17   potential factors that could be driving
18   mental health expenditures in schools,
19   did you?
20         A.    I didn't do a statistical
21   analysis about the contributive power of
22   different factors.  I'm not a
23   statistician.
24                And I didn't think that that

CONFIDENTIAL

Page 322

1    was necessary for the task that I was

2    given.

3              Q.    It's always been the

4    responsibility of public schools to

5    address new issues in society as they

6    emerge, right?

7                   ATTORNEY MEHRI:  Objection.

8                   THE WITNESS:  I'm not sure I

9           want to agree with that fully.

10                  I think public schools exist

11          as public institutions in our

12          nation's democracy and, therefore,

13          of course, they're affected by

14          emerging issues, various things

15          that happen in school communities,

16          circumstances in which students

17          are living.  Yeah.

18                  But I think I -- I think I

19          need to be reminded of your

20          question.

21    BY ATTORNEY PISTILLI:

22              Q.    Well, in order to serve

23    their core mission of educating students,

24    schools have long had to respond to

CONFIDENTIAL

Page 323

1  changes and developments in society,
2  right?
3          A.    Sure, yes.
4          Q.    And there have always been
5  obstacles that have made it more
6  difficult for schools to fulfill their
7  mission of teaching students, right?
8          A.    There have always been
9  challenges, yes.
10              I think that this particular
11  challenge created by students' personal
12  compulsive use of social media is of a
13  different quality.  And also, the source
14  is sort of more identifiable, if you
15  will.
16              So the fact that, of course,
17  it impacts on schools and school
18  districts should not mean that it is an
19  expectation that schools and school
20  districts alone are responsible for
21  addressing and ameliorating the harms,
22  when they themselves have no control over
23  the design of the platforms that's
24  leading to this kind of compulsive use.

CONFIDENTIAL

Page 324

1          Q.    But kids have always, from
2    time to time, misbehaved or not paid
3    attention during instructional time,
4    right?
5          A.    Issues of behavior
6    management in classes, student
7    disciplinary practices -- like, school's
8    disciplinary practices, that's beyond the
9    opinions of what I'm offering here.
10              But I do acknowledge that
11   many of these problematic interactions
12   have, of course, preceded the use of
13   social media.
14              But it's different now,
15   because social media exacerbates their
16   impact as students engage in ever more
17   attention-seeking behaviors or become
18   preoccupied and anxious about their place
19   in the social fabric of their social
20   media use.
21              It's also created new levels
22   of problems as students' misbehavior
23   might be driven by, triggered by
24   something that happened online, driven by

CONFIDENTIAL

Page 325

1  their fears that come from a fear of
2  overexposure or a fear of missing out or
3  the generalized anxiety of their need for
4  validation.
5              Like, those kinds of things
6  make what may have been for school
7  leaders relatively routine incidents of
8  misbehavior into things that can become
9  much more disruptive or much more
10 widespread, can be much more harmful to
11 individual kids, but overall have the
12 impact on the school environment itself
13 that is a bit destabilizing and means
14 that educational leaders need to be
15 intervening, attending to the issues that
16 are all stemming from social media use.
17      Q.    Well, respectfully, sir, my
18 question was a little different and
19 substantially narrower.
20              I'm just asking if you agree
21 that long before there was social media
22 kids sometimes misbehaved or didn't pay
23 attention during instructional time?
24              ATTORNEY MEHRI:   Objection.

CONFIDENTIAL

Page 326

1          Asked and answered.

2                THE WITNESS:   I recognize

3          that you're asking a narrower

4          question.

5                Yet, this is in the context

6          of an examination of social media

7          and its impact on the school

8          environment.  So it's hard for me

9          to answer the narrow question in

10         isolation of the broader questions

11         that are on the table in this

12         discussion.

13   BY ATTORNEY PISTILLI:

14         Q.    Are you just willing to tell

15   the jury, one way or the other, whether,

16   in your expert opinion, as a lifetime

17   educator, kids sometimes acted out in

18   class or didn't pay attention before

19   social media existed?

20         A.    I think I want to stay

21   within the opinions that I offer.

22                So I would say that a number

23   of issues, of course, preceded social

24   media.  That's, like, undeniable.  Kids'

CONFIDENTIAL

Page 327

1    misbehavior is one.
2              The concern that I'm
3    bringing and the opinions that I'm
4    offering are about how those kinds of I
5    guess what you would call problems or
6    challenges to the school environment, are
7    affected by a school environment now that
8    is -- where social media use in the
9    student body is so pervasive and
10   unregulated social media use without much
11   guardrails intended to increase
12   engagement, leading to sort of this need
13   for constant validation, knowing what's
14   going on online, so -- on the platforms.
15             So it's like the routine
16   misbehaviors that might have happened in
17   the past, there's a different level of
18   risk, exposure and threat now, I think,
19   that is affecting a school community.
20        Q.    It's always been the part of
21   classroom teachers to engage in classroom
22   management, right?
23        A.    Yeah, I'm not here to talk
24   much about effective instruction.

CONFIDENTIAL

Page 328

1           But certainly teachers

2    managing the -- their classroom is part

3    of their responsibilities, yes.

4           Q.    Can you take a look at

5    Page 13 of your rebuttal report,

6    Paragraph 45?

7           A.    Okay.

8           Q.    And do you agree that

9    educators in school systems utilize

10   social media in positive and productive

11   ways?

12          A.    Yes.  And this also gets to

13   the article that you had me review this

14   morning that appeared in the Journal of

15   Leadership and Practice, where you

16   highlighted that superintendents

17   encourage principals to use social media

18   for purposes of communication.

19               And so -- well, ask me your

20   question again, please.  I lost track of

21   it.

22          Q.    I just asked you if you

23   agree that educators in school systems

24   utilize social media in positive and

CONFIDENTIAL

Page 329

1  productive ways?

2          A.      Educators and leaders in

3  schools and school districts can use

4  social media in positive and productive

5  ways, yes.

6          Q.      It can use it to do things

7  like share information with families?

8          A.      They can use social media

9  to -- as a communication vehicle,

10  primarily to share information with

11  families or with the wider community as

12  well.

13          Q.      They can use social media to

14  celebrate students' successes?

15          A.      They can use social media to

16  highlight student accomplishment or

17  celebrate student successes, yes.

18          Q.      And they can use social

19  media to promote school events?

20          A.      Educators and district

21  leaders and school leaders can use social

22  media to promote school events, yes.

23          Q.      And they can use social

24  media to foster professional learning

CONFIDENTIAL

                                        Page 330

1   communities?

2           A.    Educators and educational

3   leaders can use social media to foster

4   professional learning communities, yes.

5           Q.    Are you aware that many of

6   the districts at issue in this litigation

7   use social media in these ways?

8           A.    I don't have any direct

9   knowledge of that.  But it doesn't

10  surprise me, because it's a widespread

11  practice in educational leadership.

12          Q.    So it wouldn't surprise you,

13  for instance, to learn that the Irvington

14  Public School system has and uses a

15  YouTube channel?

16              ATTORNEY MEHRI:  Objection.

17              THE WITNESS:  That would not

18          surprise me to learn that the

19          Irvington School District has a

20          YouTube channel that they use

21          to -- for purposes of

22          communication with their school

23          communities.

24  BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 331

```
 1        Q.    And are you aware that some
 2   of the plaintiff school district
 3   bellwethers in this litigation also
 4   integrate social media into their
 5   classroom instruction?
 6              ATTORNEY MEHRI:  Objection.
 7              THE WITNESS:  How do you
 8        mean?
 9              ATTORNEY PISTILLI:  Let's
10        take a look at Tab 42.
11                   -   -   -
12              (Whereupon, Exhibit
13        Osborne-13, No Bates, Plaintiffs
14        Fact Sheet, was marked for
15        identification.)
16                   -   -   -
17   BY ATTORNEY PISTILLI:
18        Q.    So this is the plaintiff
19   fact sheet for the Board of Education of
20   Harford County.
21              Do you see that?
22        A.    Yeah.  Do --
23        Q.    We're getting you the paper
24   copy.
```

CONFIDENTIAL

Page 332

1          A.      Thank you.

2          Q.      And I take it you didn't

3    review any of the plaintiff fact sheets

4    for any of the specific bellwether

5    plaintiffs in these cases, right?

6          A.      No, not that I recall.  To

7    the best of my recollection, I'm seeing

8    this for the first time.

9          Q.      Sure.  If you could just

10   take a quick look at Page 23.

11         A.      Sure.  Let me just get an

12   idea of what this is.

13                 Okay.  Thanks.  And this is

14   for?

15         Q.      Harford.

16         A.      Harford.

17                 And you want me to look at

18   what part?

19         Q.      Sure.  Page 23.

20         A.      Thank you.

21         Q.      Do you see there where

22   Harford was asked, Has your district

23   incorporated the use of any of

24   defendants' platforms in its curriculum

Page 333

1    since the 2017-2018 school year?

2            A.    Let's see.

3                  Yes.  I see that.

4            Q.    And you see that Harford

5    answered yes to that question?

6            A.    Yeah, I do.

7            Q.    And they indicated that they

8    use YouTube videos in the science

9    curriculum, right?

10           A.    Yeah.  They do have science

11   here, YouTube videos in the curriculum.

12           Q.    And they also use YouTube

13   channels and posts in connection with the

14   mathematics curriculum, right?

15           A.    Yeah, I see that here.  They

16   have a -- they have YouTube -- YouTube,

17   Math Fail.  I don't know what that is.

18                 Okay.

19           Q.    And they also use Twitter

20   and Facebook, it says?

21           A.    I see that.

22                 ATTORNEY PISTILLI:  Let's

23         take a look at Tab 55.

24                 Can I see that for one

CONFIDENTIAL

Page 334

1          second?
2                    THE WITNESS:  This one?
3                    ATTORNEY PISTILLI:  I'm just
4          not certain that I noted for the
5          record that this has been marked
6          as Exhibit-13.  Thank you.
7                         -  -  -
8                    (Whereupon, Exhibit
9          Osborne-14, No Bates, Dekalb
10         County, Social Media Guidelines
11         for Students, was marked for
12         identification.)
13                         -  -  -
14    BY ATTORNEY PISTILLI:
15         Q.    I'll give you now a document
16    that's been marked as Exhibit-14.
17         A.    Thank you.
18         Q.    I take it, since you didn't
19    look at any of the plaintiff districts'
20    documents, that this is not something
21    you've seen before?
22         A.    That's right.  I think I'm
23    seeing this for the first time.
24         Q.    You're generally familiar

CONFIDENTIAL

Page 335

1    with the idea that some schools may issue

2    guidelines on various topics?

3          A.    Sure.  Of course.

4          Q.    And this appears to you to

5    be a DeKalb County School District social

6    media guidelines for students?

7          A.    It does.

8          Q.    And if you could take a look

9    at Page 6.

10          A.    Just give me one second to

11    get the full context here.

12                Okay.  Thank you.  Got it.

13          Q.    And do you see where DeKalb

14    tells its students that social media is a

15    powerful tool when used correctly?

16          A.    No.  Sorry.  Where is that?

17          Q.    The bottom of Page 6.

18          A.    Bottom of 6.

19          A.    Okay.  It's a pretty

20    powerful tool whether used correctly or

21    incorrectly, I guess.

22          Q.    And DeKalb also told its

23    students that social media is a way to

24    have fun, right?

CONFIDENTIAL

Page 336

1          A.    Oh, the preceding sentence,
2    right?  You can have fun by
3    participating, blah, blah, blah.  That?
4          Q.    Yes.
5          A.    Yes, I see that.
6          Q.    Yeah.  You can have fun by
7    participating in trending topics, right?
8          A.    Yes, I see that.
9          Q.    You can use social media to
10   have fun by participating in dance
11   challenges, right?
12         A.    I see that here, yes.
13         Q.    You can have fun by
14   commenting during your favorite
15   television show, right?
16         A.    That's what it says here.
17         Q.    Yep.  So these guidelines
18   are highlighting some positive aspects of
19   social media, right?
20         A.    They are.
21         Q.    And they're not saying
22   students shouldn't use social media at
23   all, right?
24                ATTORNEY MEHRI:  Objection.

Page 337

1                THE WITNESS:  Correct.
2          That's not what they're saying
3          here.
4    BY ATTORNEY PISTILLI:
5          Q.    In fact, they're encouraging
6    them to use social media, right?
7                ATTORNEY MEHRI:  Objection.
8                THE WITNESS:  I don't know
9          if I would characterize this as
10         encouragement or just an
11         acknowledgment that it's going to
12         happen, so they're trying to offer
13         some guidelines in a way that will
14         be well received by students and
15         families.
16   BY ATTORNEY PISTILLI:
17         Q.    Well, and they're
18   highlighting positive uses of social
19   media, right?
20               ATTORNEY MEHRI:  Objection.
21               THE WITNESS:  Yeah, let's
22         see.
23               If I look at what they're
24         doing, they're -- they're

CONFIDENTIAL

Page 338

1          highlighting a number of things.

2          The importance of being

3          respectful.  They're saying that

4          there should be some

5          responsibility for posts, asking

6          for permission.

7               They are also highlighting

8          some dangers of cyberbullying.

9          Its potential to be disruptive.

10         That students have no right to

11         privacy.  That poor behavior and

12         inappropriate digital

13         communication may violate the

14         student code of conduct.  The

15         importance of protecting identity

16         and privacy, following rules,

17         reporting problems.

18               There's just a little bit at

19         the end here about what you

20         highlighted, having fun and it

21         being a powerful tool.

22               It's definitely a powerful

23         tool.

24    BY ATTORNEY PISTILLI:

CONFIDENTIAL

Page 339

1           Q.    And they're -- they're
2    highlighting the fact that social media
3    can be used to connect different people
4    and views from across the world, right?
5                     ATTORNEY MEHRI:  Objection.
6           Mischaracterizing his testimony
7           about the full document.
8                     THE WITNESS:  Well, sure,
9           they are.
10                    Is there a question?
11   BY ATTORNEY PISTILLI:
12          Q.    Yes.
13                    And they are also
14   highlighting that social media can be
15   used to share with family or friends or
16   to get to know about your favorite brands
17   or celebrities, right?
18          A.    Sorry.  I had -- I had
19   pulled away.
20                    Oh, yeah.  That's also in
21   that minor paragraph at the end of the
22   document, yeah.
23          Q.    So they are -- they are both
24   promoting the responsible use of social

CONFIDENTIAL

Page 340

1    media but also highlighting the ways that

2    it can be used responsibly and in a

3    positive way?

4          A.    I don't know that I would

5    characterize it as a promo.  But sure.

6               They're trying to offer some

7    guidance to enable students to have

8    better control of their social media use,

9    be respectful, and avoid some of the

10   obvious negative things like

11   cyberbullying and posting somebody

12   without their permission, violating the

13   code of conduct, issues like account

14   impersonation, bullying, criminal

15   activity, harassment, hate speech,

16   inappropriate photos, spam, violence.

17              They're -- they're talking

18   about a number of things here in an

19   attempt to provide some guidance to their

20   students about following rules, I guess

21   because they know that students are going

22   to be on social media.

23         Q.    And they are attempting to

24   provide a balanced view, right?

CONFIDENTIAL

Page 341

1              ATTORNEY MEHRI:  Objection.
2              I'd caution the witness to
3         speculate about things that you
4         don't have knowledge about.
5              THE WITNESS:  Yeah.  Thanks.
6              I was just going to say, I
7         don't know what they're intending
8         to do here.  And sitting here, I'm
9         not sure that I would -- I don't
10        know that they're attempting to
11        provide a balanced view or that
12        this is a balanced view.
13   BY ATTORNEY PISTILLI:
14        Q.    Well, do you agree that it's
15   important to assess both the -- any
16   potential benefits or positive impacts of
17   social media alongside any potential
18   negative effects?
19        A.    Sure.  I think that -- I
20   think that that's important.  And I think
21   that I've done that in the course of
22   developing my opinions.
23             So you've pointed to two
24   different categories of beneficial social

Page 342

1   media use.  One is from Page 13,
2   Paragraph 45, of my reply to the 13
3   rebuttal reports.
4            And there I describe how the
5   rebuttals indicate that schools -- and
6   you asked me a whole line of questions
7   and you also showed me a document about a
8   school -- I think it was a school -- a
9   school district -- this is the fact
10  sheet, if I remember -- yeah -- Harford
11  fact sheet, about educators using some
12  social media platforms integrated into
13  part of their curriculum.
14            So this one I think I
15  address pretty clearly, at least in the
16  rebuttal report.  And I think is -- is an
17  important concept, that educators' and
18  school leaders' use of social media in a
19  way that is curated, intentional,
20  purposeful is an entirely different usage
21  of the platforms than students who are
22  using it in an unregulated sort of
23  unsupervised, very frequent basis in ways
24  that expose them to -- expose them and

CONFIDENTIAL

Page 343

1    make them vulnerable to compulsive use

2    and to some of the design features that

3    create prolonged engagement and capture

4    students' attention as a product in and

5    of itself.

6              Those two uses are very

7    separate and distinct, in my mind, and in

8    my reports.

9         Q.    Well, just --

10        A.    Educators are going to use

11   educational materials, they're available

12   from wherever they come, if they think

13   it's going to improve the education of

14   their students.

15             The example in the Harford

16   fact sheet is YouTube videos, for

17   example.  A teacher who shows a YouTube

18   video that is about something educational

19   in their classroom, that -- I think it

20   would be fair to say that's, like --

21   that's a beneficial use.  Like, that's

22   a -- that's not a bad thing.  That's a

23   positive thing.

24             And school district leaders

CONFIDENTIAL

Page 344

1    that -- you know, I think you made the

2    example of, like, using Facebook to -- to

3    promote a student event or something like

4    that, that's -- that's a positive use.

5                Like, that's adults using

6    the platforms in a very positive way to

7    communicate with their school community

8    about goings on in the school or even to

9    use some educational materials as part of

10   their -- of their curriculum and

11   instruction.

12               I think that, you know,

13   schools and school -- educators who are

14   doing that are doing it, you know,

15   because it's useful and, in part, because

16   social media has become so ubiquitous.

17               And school leaders and

18   school district leaders are doing it

19   because that's the way that they can,

20   like, reach their parents.  Because a lot

21   of people are on social media.  So it's,

22   like, an effective way of conducting

23   public relations.

24               The other -- and that --

Page 345

1    that whole category of use, I never --
2    like, I don't think that that's
3    necessarily problematic.  I think that it
4    could have beneficial uses in those -- in
5    those circumstances.
6                What -- the important
7    distinction for me is that those are
8    adults using tools at their disposal in
9    ways that are going to further the
10   educational mission of the stool or
11   school district.
12               The other category of
13   positive use you said is, like, well,
14   kids getting validation or kids having
15   fun.  You -- you quoted here from DeKalb,
16   they can have fund by participating in
17   trending topics, dance challenges and
18   commenting on their favorite television
19   show.
20               Yeah, I think that there can
21   be some positive aspects to a sense of
22   belonging, to finding common interests,
23   to validation and connection.
24               The difficulty here is that

CONFIDENTIAL

Page 346

1   those avenues are then a gateway to the

2   exposure to some of the more manipulative

3   aspects of the social media platforms,

4   and it exposes young people to risks

5   of -- of compulsive use and of being

6   compelled by the way that the platforms

7   work to uses that then create mental

8   health problems or fragment their

9   attention or interrupt their sleep or

10  just create, like, a generalized kind of

11  anxiety, needing more and more of that

12  external validation.

13          So you're asking about

14  positive uses.  And just to sum up -- I

15  know it's been a long answer --

16      Q.    It's been over six minutes,

17  sir.

18      A.    -- but one is the adult use

19  when intentional, sure.  Students being

20  validated, finding common interests,

21  maybe a sense of belonging, maybe fun and

22  enjoyment, yes.  But it comes with great

23  risks.

24              And in the end, the

CONFIDENTIAL

Page 347

1  cumulative effects of the harms far

2  outweigh the positive benefits that are

3  described in those couple of sentences.

4          Q.    And in your opening report,

5  sir, when you formed your opinions in

6  this case, you didn't take into account

7  or address in any way those positive

8  uses, correct?

9              ATTORNEY MEHRI:  Objection.

10 BY ATTORNEY PISTILLI:

11         Q.    And if you could please

12 answer my question.

13         A.    I think -- I think I did.

14             I beg your pardon.  It must

15 be in the -- in the reply to the

16 rebuttal.

17             I thought I had put

18 something in here about adult use for

19 communication purposes and the like not

20 being conflated with students' compulsive

21 personal use of the social media

22 platforms.

23             I thought I had that in

24 here.  But it might -- it might be in

CONFIDENTIAL

Page 348

1    the -- in the reply.

2           Q.    Now that you've had a chance

3    to review it, you agree with me that you

4    don't address at all positive uses of

5    social media by either students or school

6    districts or educators in your opening

7    report?

8                 ATTORNEY MEHRI:  Objection.

9                 THE WITNESS:  I think I

10          would agree with you.

11                I'm not going to read every

12          word of the report.  I'm sort of

13          skimming paragraph by paragraph to

14          see if I address that adult use

15          aspect.

16                Because I recall doing it,

17          but I'm just not finding it in a

18          really quick reread here.

19                And the -- the -- you know,

20          the -- it's not that I didn't

21          consider it or it's not mentioned

22          in the literature.  It's just

23          that, to me, the -- the harms so

24          outweigh those benefits,

Page 349

1          especially when it comes to the
2          way that students are using it and
3          how they're set up to compel
4          compulsive use.
5    BY ATTORNEY PISTILLI:
6          Q.    But even though it's in the
7    literature and you acknowledge that
8    student use of social media can have some
9    benefits, you chose not to acknowledge
10   that at all in offering your affirmative
11   opinions in your opening report, correct?
12         A.    Yeah, again, I'd need to
13   read every bit.  But I think that that's
14   true.
15               And it basically reflects my
16   opinion that there -- yes, I would
17   acknowledge those benefits.  But they're
18   not really noteworthy in that the issue
19   here is that if students are going on for
20   fun, for entertainment, for a sense of
21   validation, to find common interests, to
22   be, like, entertained by the dance
23   videos, those might have, like, some kind
24   of potential or hypothetical benefit to

CONFIDENTIAL

Page 350

1    the user.

2                    They expose the students to

3    the harms that I think are pervasive in

4    the platforms, in -- in Facebook,

5    Instagram, Snapchat, TikTok and YouTube.

6                    So you're getting students

7    who are still in an age of development,

8    where they need that social connection or

9    they're looking for that sense of

10   validation, and they might go on the

11   platforms for, like, some reason that you

12   would say is beneficial or is positive.

13   Then they're on the platforms.  And the

14   platforms are designed, then, to try to

15   capture their attention and prolong their

16   engagement.

17                    So even the benefits,

18   hypothetical or real, come with a risk to

19   students, to children and adolescents.

20   And that risk is that, then, they're

21   going to be compelled to use social media

22   compulsively or compare themselves to

23   others on social media or develop

24   negative self-concept or the fear of

CONFIDENTIAL

Page 351

1   missing out or end up using it when they

2   should be sleeping or have their sort of

3   attention split so much and so frequently

4   that it's hard for them to persist in

5   prolonged tasks related to their

6   learning.

7           That's what I think is

8   happening and why I probably gave short

9   thrift to what you would call, you know,

10  the potential or hypothetical benefits of

11  social media use by children and

12  adolescents.

13          ATTORNEY PISTILLI:  Why

14      don't we take a break?

15          ATTORNEY MEHRI:  Yeah, we've

16      been going for a while.  Yeah,

17      okay.

18          VIDEO TECHNICIAN:  The time

19      is 5:40 p.m.  This is the end of

20      Media 6.  And we are going off the

21      record.

22                -   -   -

23          (Whereupon, a brief recess

24      was taken.)

CONFIDENTIAL

Page 352

```
 1                   -   -   -
 2              VIDEO TECHNICIAN:  The time
 3         is 5:57 p.m.  This is the
 4         beginning of Media 7, and we are
 5         going back on the record.
 6              ATTORNEY PISTILLI:  Chris
 7         Pistilli, counsel for Meta just
 8         wanted to say that I have no
 9         further questions at this time and
10         I'm going to be passing the
11         witness to my co-counsel and also
12         going to be holding the deposition
13         open pending production of the
14         articles that we discussed earlier
15         today.
16                   -   -   -
17              EXAMINATION
18                   -   -   -
19    BY ATTORNEY RICE:
20         Q.   Good afternoon, Mr. Osborne.
21    My name is Rowley Rice.  I'm counsel for
22    Snap.  I just have a few questions for
23    you.
24              In connection with providing
```

Page 353

1  your opinions in this case, did you do

2  anything to learn how the Snapchat app

3  works?

4          A.    No.

5          Q.    And so I take it, then,

6  you're not familiar with streaks on

7  Snapchat, correct?

8          A.    There -- it was referenced

9  in one of the articles that I read.  So

10 my understanding is streak is, like, a

11 reward system, I guess, where two people

12 who are communicating with each other on

13 Snapchat would try to do it, I think

14 every day.

15          The idea is like -- the

16 streak is, like, the daily sending of a

17 message.  And the idea is to keep up the

18 streak by doing it every day without a

19 break in a day communicating.

20          I think that's what the

21 article described.

22          Q.    And do you understand that

23 for a user to maintain a streak on

24 Snapchat, it only takes a few seconds for

CONFIDENTIAL

Page 354

1  them to send a picture?

2          A.    Oh, I -- I don't -- I don't

3  know what it takes, yeah.

4          Q.    And are you aware that there

5  are other apps that use streaks?

6          A.    No, I guess I'm not.  I

7  think when I read that it was specific to

8  Snapchat.

9                But it doesn't surprise me.

10  I'm not an expert in the features.

11          Q.    And you're not familiar with

12  the use of lenses on Snapchat, correct?

13          A.    Lenses?

14          Q.    Lenses.

15          A.    I don't know what that is.

16          Q.    And are you familiar with

17  how stories work on Snapchat?

18          A.    So this was also described,

19  because I think -- I don't want to

20  speculate.

21                I think stories is a way

22  that a user will have multiple posts that

23  they can then invite other people to see,

24  I think.  I don't know.

CONFIDENTIAL

Page 355

1          Q.     And are you -- are you aware
2     if, when a user posts a public story on
3     Snapchat, if the number of times a story
4     has been viewed is public?
5          A.     The number of times the
6     story has been viewed is public?
7          Q.     Are you aware, one way of
8     the other, whether that's true?
9          A.     No, I don't know.
10         Q.     And are you familiar with
11    any data regarding how much time Snapchat
12    users, on average, spend using different
13    features of the Snapchat app?
14         A.     I'm not -- I don't have that
15    information, no.
16         Q.     For instance, so you're not
17    aware, then, how much time Snapchat users
18    spend messaging with friends versus
19    engaging with other aspects of the
20    platform, correct?
21         A.     That's right.  I don't have
22    that information.
23         Q.     And you did not review any
24    internal Snap documents in formulating

Page 356

1   your opinions, correct?

2           A.    No, not to my knowledge.

3           Q.    And you did not review any

4   deposition testimony of Snap employees,

5   correct?

6           A.    I don't think so, no.

7           Q.    Are you a parent,

8   Mr. Osborne?

9           A.    Yes.

10          Q.    What age are your children?

11                ATTORNEY MEHRI:  Let me just

12          instruct the witness, to the

13          extent they get into the personal

14          use of your kids of the platforms,

15          only testify to the extent you're

16          comfortable.

17                THE WITNESS:  Okay.  Thank

18          you.

19                They are 23 and 20.

20   BY ATTORNEY RICE:

21          Q.    Do you know if they have

22   Snapchat?

23          A.    Yeah, I don't really want to

24   talk about my kids.

Page 357

1          Q.    So you're unwilling to
2   answer, one way or the other, whether
3   your children have Snapchat accounts?
4          A.    Well, they're, like, young
5   adults.  I don't know what they have.
6          Q.    Do you know if they had
7   Snapchat accounts when they were
8   teenagers?
9          A.    Yeah.  I'm aware that they
10  had Snapchat accounts when they were
11  teenagers.
12         Q.    Do you think their use of
13  Snapchat as teenagers harmed their mental
14  health?
15         A.    I don't know.
16         Q.    To your knowledge, have your
17  children ever sought diagnosis or
18  treatment from a medical professional for
19  their use of Snapchat?
20               ATTORNEY MEHRI:  And, again,
21         I'm going to instruct the witness
22         that you only testify to the
23         extent that you're comfortable
24         about your kids.

CONFIDENTIAL

Page 358

1          THE WITNESS:  You're asking
2      me if my kids sought -- ask me the
3      question again, please.
4   BY ATTORNEY RICE:
5          Q.    Yes.  To your knowledge,
6   have your children ever sought medical
7   treatment relating to their use of
8   Snapchat?
9          A.    To my knowledge, they have
10  not sought medical assistance related to
11  their use of Snapchat, no.
12          Q.    When a user opens Snapchat
13  on their phone, are you aware what part
14  of the app they initially see?
15          A.    No.
16          Q.    So is it fair to say, then,
17  before today you were unaware that when a
18  user opens the Snapchat app, it opens to
19  a camera?
20          A.    I -- I didn't know that, no.
21          Q.    Earlier we discussed your
22  work with superintendents and principals.
23          Have you ever recommended to
24  any of the superintendents or principals

CONFIDENTIAL

Page 359

1    you work with that they bring a lawsuit

2    against the defendants in this case?

3            A.    No, I have not.

4            Q.    Do you believe social media

5    should be banned, Mr. Osborne?

6            A.    I don't have an opinion

7    about that.

8                  ATTORNEY RICE:  No further

9            questions.

10                 ATTORNEY LEHMAN:  Let's go

11           off the record while we --

12                 VIDEO TECHNICIAN:  The time

13           is 6:04 p.m.  We are going off the

14           record.

15                       -  -  -

16                 (Whereupon, a brief recess

17           was taken.)

18                       -  -  -

19                 VIDEO TECHNICIAN:  The time

20           is 6:05 p.m.  We are going back on

21           the record.

22                       -  -  -

23                 EXAMINATION

24                       -  -  -

Page 360

1    BY ATTORNEY LEHMAN:

2         Q.    Good evening.  I want to

3    make sure -- you've been testifying for a

4    number of hours today.

5              I want to make sure that you

6    are still able to give full and complete

7    answers to questions at this point?

8         A.    Sure.  Thank you for

9    checking.

10         Q.    Okay.  We haven't met.  My

11    name is Katie Lehman.  Although we did

12    walk in together at the same time this

13    morning.  And I'm here on behalf of the

14    TikTok defendants.  So I have some --

15    some questions for you.

16              Are you able to estimate how

17    much time you have spent watching videos

18    from TikTok?

19         A.    You mean over the course of

20    my life?

21         Q.    Yes, sir.

22         A.    No, I couldn't estimate

23    that.  But I would say it's not very

24    much.

Page 361

1          Q.     Less than five hours?

2          A.     Sounds about right.  Maybe

3    five hours total time.

4          Q.     And I believe you said you

5    do not have a TikTok account, correct?

6          A.     Correct.

7          Q.     All right.  And so what have

8    been the circumstances for those

9    occasions when you have seen TikTok

10   videos?

11         A.     Yeah, someone will send them

12   to me.  Usually, like, my wife finds

13   something that she thinks is funny.

14              So she'll send it to me in a

15   text.  I'll open it.  It will always ask

16   me if I want to, like, open an app or

17   start an app.  I just put no.

18              I think the other link is,

19   like, view in browser or something like

20   that.  So I click that and that enables

21   me to see the video --

22         Q.     Okay.

23         A.     -- without having an

24   account.

CONFIDENTIAL

Page 362

1          Q.     And so on those occasions,
2     you watch the one video that your wife or
3     someone else has sent you and that's sort
4     of a discrete experience that you have?
5          A.     Yeah, pretty much.
6          Q.     Have you --
7          A.     Yeah.
8          Q.     When you say "pretty much,"
9     is there more to that experience?
10         A.     I think I just -- I think
11    that once it plays, then another one will
12    play.
13         Q.     Are you sure about that?
14         A.     I'm not sure about that.  So
15    let me not speculate.
16                I think I just watch the one
17    video, and I'm done, but.
18         Q.     Okay.  Have you ever
19    actually been with someone and gone on
20    the TikTok app or platform directly with
21    someone who is an account holder?
22         A.     You mean someone who, like,
23    has their phone and they say, hey, look
24    at this --

                                    Page 363

1          Q.     Exactly.  Something like
2    that.
3          A.     -- this is on TikTok?
4                 Yes.
5          Q.     So at any time have you ever
6    watched more than one or maybe two videos
7    in a row on TikTok?
8          A.     Oh, I don't recall.  Maybe.
9          Q.     You mentioned that you serve
10   as an executive coach?
11         A.     Yes.
12         Q.     Okay.  Have you ever
13   recommended to one of your executive
14   coaching clients that they should not use
15   TikTok?
16         A.     I've never recommended that,
17   no.
18         Q.     Have you ever recommended to
19   one of your executive coaching clients
20   that they not use any social media
21   platform?
22         A.     No, I wouldn't -- that
23   wouldn't be my role and not something I
24   would ever recommend, no.

CONFIDENTIAL

Page 364

1          Q.    Have you ever advised one of
2     the school districts that you're working
3     with that they should not use TikTok?
4          A.    No, I've never -- I've never
5     advised that to a school or school
6     district, no.
7          Q.    Have you ever advised one of
8     the school districts that you're working
9     with that they should not use any social
10    media platform?
11         A.    No, I've never -- I've never
12    made that recommendation.
13         Q.    Did you review any TikTok
14    company documents in forming your
15    opinions?
16         A.    I don't think so.  Not to my
17    knowledge.
18         Q.    Did you review any internal
19    company documents from any social media
20    company?
21         A.    I don't think so.  Only,
22    maybe, insofar as somebody referenced it
23    in another report.
24              But I don't think I accessed

Page 365

1  any of those documents, no.

2       Q.    Did you review the

3  deposition of any TikTok employee?

4       A.    No.

5       Q.    Did you review the

6  deposition of any employee of any social

7  media company?

8       A.    I don't think so.

9       Q.    Have you performed any

10 analysis that looked not at social media

11 generally, but specifically at TikTok?

12      A.    No, I have not performed any

13 analysis like that.

14      Q.    Are you offering any

15 opinions that are unique to TikTok as

16 opposed to social media generally?

17           ATTORNEY MEHRI:  Objection.

18           Go ahead.

19           THE WITNESS:  I'm not, no.

20 BY ATTORNEY LEHMAN:

21      Q.    Have you ever reviewed

22 TikTok's user agreement?

23      A.    No, I don't think so.

24      Q.    Do you know what the default

CONFIDENTIAL

Page 366

1  settings are on TikTok accounts for users
2  who are under 18?
3          A.    I don't.
4          Q.    Do you know what limits are
5  placed on accounts for TikTok users who
6  are under 18?
7          A.    I don't.
8          Q.    Do you know what features
9  are available to TikTok users who are
10 under 18?
11         A.    No, I don't.
12         Q.    Did you attempt to determine
13 what percentage of the impacts of social
14 media that you have discussed are
15 attributable specifically to TikTok?
16         A.    No, I did not attempt to do
17 that.
18         Q.    Have you attempted to
19 determine what percentage of the impacts
20 of social media that you have discussed
21 are attributable to any specific social
22 media platform?
23         A.    No, I didn't make an
24 analysis like that.  I didn't think it

CONFIDENTIAL

Page 367

1    was necessary to my task.

2          Q.    Can you say, to a reasonable

3    degree of scientific certainty, that the

4    impacts of social media would be

5    different if TikTok did not exist?

6          A.    Ask me that question again.

7          Q.    Of course.

8                Can you say, to a reasonable

9    degree of scientific certainty, that the

10   impacts of social media would be

11   different if TikTok did not exist?

12         A.    No, I don't think I could.

13               I don't know what you mean

14   by "scientific certainty."  But I'm not a

15   data scientist, so I'm pretty sure the

16   answer is no.

17         Q.    Okay.  Well, so, then, let

18   me -- let me ask a better question.

19               Based on your  area of

20   expertise and the scope of your

21   testimony, could you say with any

22   certainty that the impacts of social

23   media would be different if TikTok did

24   not exist?

CONFIDENTIAL

Page 368

1         A.    I can't make that claim, no.
2         Q.    Okay.  And would your answer
3   be the same if I asked you about any of
4   the other individual platforms who are
5   named as defendants in this litigation?
6         A.    I think my answer would be
7   the same.
8         Q.    Okay.  Outside of this
9   litigation, have you ever before reviewed
10  an order issued by a trial court?
11        A.    I don't -- I don't know.  I
12  was involved in that one in -- in New
13  York, and I don't know if that's
14  characterized as a trial court.  And I
15  don't recall what orders I might have
16  reviewed.
17            So I think the answer is no.
18  But I did testify in that one case, so
19  maybe.
20        Q.    Okay.  Well, so, then, let
21  me -- let me ask you a follow-up
22  question.
23            Outside of this litigation,
24  have you ever reviewed a motion or a

Page 369

1    brief that a party submitted to a court

2    in litigation?

3         A.    Sure.  Probably.  I teach a

4    class in school law and ethics.  So I

5    suppose as part of the materials I would

6    have reviewed motions like that, as part

7    of cases.

8             But nothing specific that I

9    recall.

10        Q.    Have you ever taught

11   anything about social media in the class

12   that you teach about school law and

13   ethics?

14        A.    No, I have not.

15        Q.    Now, you have in your

16   materials considered list several news

17   articles about TikTok challenges about

18   fires in Chromebooks.

19        A.    Yeah.

20        Q.    And also a single article

21   about students who were creating fake

22   teacher accounts.

23        A.    Right.

24        Q.    Other than those -- and I

CONFIDENTIAL

Page 370

1  think it's approximately five articles on
2  those two topics -- does your materials
3  considered list include any other article
4  that is specific to TikTok?
5          A.    I don't think so.  I don't
6  think it does.
7                And those were just meant to
8  be illustrative examples.
9          Q.    And just so we're clear, the
10 challenge that was referenced in the
11 articles on your materials considered
12 list, that was about students putting
13 something metal in a USB port on their
14 Chromebook so it might catch fire?
15         A.    That's right.
16         Q.    Okay.  And that was just
17 something that was posted by different
18 people who were on the TikTok platform?
19         A.    That caught -- that --
20 something -- sure, I guess it was, yeah.
21 Yeah.
22                ATTORNEY MEHRI:  I would
23         just ask you not to speculate when
24         you're answering questions.

CONFIDENTIAL

Page 371

1           THE WITNESS:  Yeah.  Your
2      question is?
3  BY ATTORNEY LEHMAN:
4           Q.   My question is, what -- the
5  sort of backstory on those articles was
6  that a number of people on TikTok posted
7  videos encouraging other students to put
8  something metal in the USB port in their
9  Chromebook to see what would happen,
10  correct?
11          A.   Yeah.  My -- my use of it is
12  an illustrative example of sort of the
13  extent of attention-seeking behaviors
14  that can result as a -- as a result from
15  the students' attention-seeking behaviors
16  related to their social media use.
17          Q.   Okay.  And then the other
18  article that we referenced, and it was a
19  single article, it was a New York Times
20  article about some middle school students
21  who created accounts pretending to be
22  their teachers, correct?
23          A.   Uh-huh.  That's right.
24               And that I -- my intention

Page 372

1    of using that was to sort of show that

2    school communities, even when not

3    directly affected by some particular

4    thing, there is this sort of generalized

5    anxiety that happens that can even

6    include staff.  Because now staff are

7    also vulnerable to things that might

8    happen on social media.

9         Q.    And in that circumstance,

10   the staff were being impacted by the

11   accounts that were created and the things

12   that were said in posts by students at

13   their own school, correct?

14        A.    They were being affected by

15   a lot of things.  That's -- that's

16   certainly one of them.

17             But I think the ability of

18   students to create accounts that were

19   impersonating their teachers was, like,

20   one thing that caught my attention in

21   that.

22             Another was the -- the

23   way -- there's a -- there's a spread and

24   a permanence to the kind of messaging

CONFIDENTIAL

Page 373

1    that was going on that caught my

2    attention and I thought was -- was

3    illustrative of some of the problems of

4    the attention-seeking incentives that are

5    baked into social -- students' use of

6    social media platforms.

7              ATTORNEY LEHMAN:  Those are

8         all the questions that I have at

9         this time.  But I would join in

10        the request to keep the deposition

11        open pending the production of

12        additional articles.

13             That will be off the record.

14             ATTORNEY MEHRI:  Any other

15        defense counsel?  Okay.  More

16        defendants.  We have to pass the

17        baton.

18             ATTORNEY WHITELEY:  You can

19        drop us from the case whenever you

20        want.

21             ATTORNEY MEHRI:  Oh, that's

22        not happening.  If they run out of

23        time, I'm just asking the

24        videographer keep us --

CONFIDENTIAL

Page 374

1            ATTORNEY WHITELEY:  How much
2       time?
3            VIDEO TECHNICIAN:  Right
4       now, from this segment, it's about
5       17, 18 minutes of the 33 we had
6       left.
7            ATTORNEY WHITELEY:  We can
8       go back on the record.
9            VIDEO TECHNICIAN:  We were
10      on.  We didn't go off.
11           ATTORNEY WHITELEY:  That's
12      fine.
13                    -   -   -
14                  EXAMINATION
15                    -   -   -
16  BY ATTORNEY WHITELEY:
17       Q.    Hello, Dr. Osborne.  My name
18  is Daniel Whiteley.  I represent the
19  Google and YouTube defendants.  And I
20  just have a few more questions for you,
21  okay?
22       A.    Sure.
23       Q.    You earlier talked about
24  your children and whether or not they had

CONFIDENTIAL

Page 375

1    Snapchat accounts.

2                My question is, do you know

3    if your children had YouTube accounts

4    when they were under the age of 18?

5                ATTORNEY MEHRI:  Again, I'll

6            instruct you to answer these kind

7            of questions to the extent you're

8            comfortable.

9                THE WITNESS:  Sure.  Thank

10           you.

11               I don't know.

12   BY ATTORNEY WHITELEY:

13       Q.    Okay.  Do you know if they

14   used YouTube, even if they did not have a

15   YouTube account, before they were 18?

16       A.    I don't know.

17       Q.    Do you know if your children

18   have ever used YouTube?

19       A.    Do I know for sure that

20   they've used YouTube?  Like, it's hard

21   for me to imagine that they hadn't, but I

22   guess that's speculation.

23               I don't recall an instance

24   where I saw them, like, watching YouTube.

CONFIDENTIAL

Page 376

1          But -- yeah, but -- yeah,
2     that's my answer.
3          Q.    Have you ever instructed
4     your children not to use YouTube?
5          A.    I've never instructed my
6     children not to use YouTube, no.
7          Q.    And in your reports and
8     today, if I'm getting this right, you
9     talked about identifying patterns, right?
10         A.    Uh-huh, yes.
11         Q.    Is identifying patterns a
12    recognized methodology in your field?
13         A.    I -- I would think that it
14    is, yes, it is -- it is an identifiable
15    methodology to the extent that someone
16    who is researching in educational
17    leadership has a research question that's
18    answerable through a methodology that
19    says, okay, identify patterns.
20              For me, the -- the pattern
21    identification comes from, like, a really
22    large sample size over time of the
23    leaders and aspiring leaders with whom
24    I've interacted.

CONFIDENTIAL

Page 377

1          Q.    And can you identify for me
2     any published research in educational
3     leadership that uses pattern
4     identification to identify a nationwide
5     pattern affecting students across the
6     country?
7          A.    That's a difficult question
8     to answer, because there's -- like,
9     there's a number of studies about a
10    variety of things that look at nationwide
11    trends.  And those nationwide trends are,
12    of course, like, the culmination of
13    pattern identification.
14               So I'm not -- I'm not sure
15    what you're asking or if I'm -- if I'm
16    getting it.
17               I want to be responsive to
18    your question, but I don't think I
19    understand it.
20          Q.    Sure.  I'll try asking it in
21    a more simple way.
22               Can you point me to any
23    particular article in your field where
24    someone used pattern identification to

CONFIDENTIAL

Page 378

1    identify a pattern that is affecting all

2    students in the K-through-12 cohort in

3    the country?

4           A.    As I sit here today, like,

5    nothing in particular comes to mind.

6    There might be a limiting part of your

7    question about "all students."

8                But there are, like, lots of

9    studies that look at trends and patterns

10   across the nation as they affect students

11   and K-12 education.  I can't name one

12   that would be helpful.  But that -- that

13   is certainly something that exists.

14          Q.    And what are the steps in

15   pattern identification?

16          A.    So the steps in pattern

17   identification, for me, were a result of

18   those numerous interactions that I've had

19   with school leaders and aspiring school

20   leaders in a variety of schools of

21   different types over a number of years.

22                And the interactions that

23   I've had, the observations that I've

24   made, the circumstances that I've looked

CONFIDENTIAL

Page 379

1  at across these different sites, the

2  patterns emerge that inform my

3  impressions and my opinion that the

4  compulsive use of social media and the

5  accompanying increases in mental health

6  are impacting on school leaders' ability

7  to perform their essential duties.

8          Q.    So separate from what you

9  considered your steps for pattern

10  identification to be, what are the

11  recognized or accepted steps in the field

12  for pattern identification?

13          A.    You mean, like, where is the

14  educational leadership template, rubric

15  for doing something that would be called

16  pattern identification?

17          Q.    Well, let's start there,

18  sure.

19          A.    Yeah, I don't know that

20  there -- that there is one.

21          Q.    Okay.  Is there a certain

22  number of data points that you need for

23  an instance or a phenomenon to rise to

24  the level of a pattern?

CONFIDENTIAL

Page 380

1          A.    Oh, that's a very
2     interesting question.
3               I guess it depends what
4     you're considering and for what purpose.
5          Q.    So you can't point me to any
6     particular standard or threshold?
7          A.    Of -- I'm not a
8     statistician.  So I'm aware that there's,
9     like, a concept of statistical
10    significance and that kind of thing.
11              But my methods were
12    qualitative.  And what I'm submitting is
13    that my opinions are based on a pretty
14    large sample size that, to me, seems to
15    be sufficient to say, okay, I have
16    expertise in educational leadership and
17    this is what I'm seeing and, therefore,
18    these are the opinions that I'm rendering
19    when asked about social media and its
20    impact on schools and school leaders.
21              I don't know that there's,
22    like, a threshold that would be
23    independently verifiable, as, you know,
24    okay, this is enough of a sample size.

CONFIDENTIAL

Page 381

1            But I would say that, you
2    know, I've spent a lot of time in
3    schools.  I've been with a lot of school
4    leaders.  It's been over a long period of
5    time.  I think that this gives me a
6    pretty good basis from which to say I
7    have a good pulse on what's happening in
8    schools.
9            Q.    And on the time point, is
10   there a, you know, specific length of
11   time over which a phenomenon must occur
12   for it to rise to the level of a pattern?
13            A.    I think my answer would be,
14   like, really parallel to the other -- to
15   my other answers.
16            I'm not sure.  I don't think
17   that there's a template for this.  I'm
18   not a statistician.
19            I know that the observations
20   that I made about this particular
21   phenomenon started when I was
22   superintendent in New Rochelle, and they
23   were really salient as I left that school
24   district and started as a professor of

CONFIDENTIAL

Page 382

1  practice in 2018, and have persisted and
2  intensified since.
3          Q.    Do you know what percent of
4  teachers in the U.S. use YouTube in the
5  classroom?
6          A.    I don't know what percent of
7  teachers in the U.S. use YouTube in the
8  classroom, no.
9              ATTORNEY WHITELEY:  No
10         further questions from me.  Thank
11         you for your time.  And YouTube
12         joins the request to hold open the
13         deposition.
14             ATTORNEY MEHRI:  Give us a
15         chance for a short break.
16             ATTORNEY WHITELEY:  Sure.
17         We can go off the record.
18             VIDEO TECHNICIAN:  The time
19         is 6:25 p.m.  We are going off the
20         record.
21                   -   -   -
22             (Whereupon, a brief recess
23         was taken.)
24                   -   -   -

CONFIDENTIAL

```
                                        Page 383
 1              VIDEO TECHNICIAN:  The time
 2         is 6:41 p.m.  We are going back on
 3         the record.
 4                     -   -   -
 5                  EXAMINATION
 6                     -   -   -
 7    BY ATTORNEY MEHRI:
 8         Q.    Dr. Osborne, I appreciate
 9    your perseverance and patience, we've
10    been going for about nine plus hours.
11              You started this morning
12    saying that you've had some citation
13    typos.  And I want to give you a chance
14    to go through some of those and have an
15    opportunity to correct that.
16         A.    Okay.
17              ATTORNEY MEHRI:  This is a
18         document I'm going to mark as
19         Exhibit-15.
20                     -   -   -
21              (Whereupon, Exhibit
22         Osborne-15, No Bates, Frontiers in
23         Psychology; An Affective
24         Neuroscience Framework for the
```

Page 384

1              Molecular Study of Internet
2              Addiction; Montag, was marked for
3              identification.)
4                        -   -   -
5    BY ATTORNEY MEHRI:
6         Q.    This is an article called,
7    An Affective Neuroscience Framework for
8    the Molecular Study of Internet
9    Addiction.  And the first author on it is
10   Christian Montag, and then there's also
11   Sindermann, Becker and Panksepp.
12              Are you familiar with this?
13        A.    Yes.
14        Q.    And did you review this and
15   rely on it as part of your reports?
16        A.    I did.
17        Q.    And was this -- did you
18   intend to cite this in your report?
19        A.    Yes.
20        Q.    If you can pull up your July
21   30th report and look at Page 9.
22        A.    Got it.
23        Q.    Do you see a cite to Montag,
24   Sindermann, Becker and Panksepp at the

CONFIDENTIAL

Page 385

1    bottom of Page 9?

2            A.    I do.

3            Q.    Is Exhibit-15 the article

4    you meant to cite?

5            A.    It is.

6            Q.    Okay.

7                  ATTORNEY MEHRI:  I'm going

8            to mark a new document Exhibit-16.

9                       -   -   -

10                 (Whereupon, Exhibit

11           Osborne-16, No Bates,

12           Psychological Inquiry; Adolescent

13           Development in the Digital Media

14           Context; Nesi, was marked for

15           identification.)

16                      -   -   -

17   BY ATTORNEY MEHRI:

18           Q.    Dr. Osborne, before you is a

19   document entitled -- or an article

20   entitled, Adolescent Development in the

21   Digital Media Context.  The first author

22   is Jacquelyn Nesi, N-E-S-I, and then

23   there's Telzer and Prinstein as other

24   authors.

Page 386

1           Have you seen this before
2    today?
3        A.    Yes.
4        Q.    Was this a peer-reviewed
5    article that you reviewed and relied on
6    as part of your report?
7        A.    I did.
8        Q.    Okay.  Can you look at your
9    July 30th report on Page 9?
10       A.    Yes.
11       Q.    Was this a cite you meant to
12   have at the bottom of Page 9 where it
13   mentions Nesi, Princeton and Telzer?
14       A.    Yes, yes.
15           ATTORNEY MEHRI:  I'm going
16       to mark Exhibit-17.
17               -   -   -
18           (Whereupon, Exhibit
19       Osborne-17, No Bates, Journal of
20       Psychoeducational Assessment;
21       Distress Among Adolescents: An
22       Exploration of Mattering, Social
23       Media Addiction, and School
24       Connectedness; Watson, was marked

CONFIDENTIAL

Page 387

1          for identification.)

2                    -   -   -

3    BY ATTORNEY MEHRI:

4          Q.    Dr. Osborne, this is a

5    peer-reviewed article entitled, Distress

6    Among Adolescents, an Exploration of

7    Mattering Social Media Addiction and

8    School Connectedness by Joshua Watson as

9    the first author, and then also there's

10   an author named Prosek, P-R-O-S-E-K, and

11   Giordano, G-I-O-R-D-A-N-O.

12              Have you seen this article

13   before today?

14         A.    Yes.  This was part of my

15   literature review.

16         Q.    And was this an article that

17   you -- well, I'll turn your attention to

18   your July 30th report on Page 10.

19              And you'll see near the

20   bottom in the citations there's an

21   article regarding Watson.

22              Do you see that?

23         A.    Yes.

24         Q.    Was this the article that

CONFIDENTIAL

Page 388

1    you intended to cite --

2          A.     It is.

3          Q.     -- on the bottom of Page 10?

4          A.     It is, yes.

5          Q.     Okay.

6                 ATTORNEY MEHRI:  I'm going

7          to mark Exhibit-18.

8                      -   -   -

9                 (Whereupon, Exhibit

10         Osborne-18, No Bates, Clinical

11         Child Psychology; Exploring

12         Adolescents' Perspectives on

13         Social Media and Mental Health and

14         Well-Being - A Qualitative

15         Literature Review; Anjali Popat

16         and Carolyn Tarrant, was marked

17         for identification.)

18                      -   -   -

19   BY ATTORNEY MEHRI:

20         Q.     Dr. Osborne, before you is a

21   document -- or a peer-reviewed article

22   entitled, Exploring Adolescents'

23   Perspectives on Social Media and Mental

24   Health and Well-Being:  A Qualitative

Page 389

1    Literature Review.  The first author is
2    Angeli Popat and then the second is --
3    last name is Tarrant, T-A-R-R-A-N-T.
4              Have you seen this before
5    today?
6         A.    Yes.
7         Q.    Was this one of the articles
8    you relied on and found as part of your
9    literature review?
10        A.    It is.
11        Q.    And turning your attention
12   to your July 30th report, on Page 10
13   where it mentions Popat and Tarrant, was
14   this the article you intended to cite?
15        A.    Yes.
16        Q.    Okay.
17                   -   -   -
18             (Whereupon, Exhibit
19        Osborne-19, No Bates, Science
20        Daily; March 22, 2026, Social
21        Media Use Associated With
22        Depression Among U.S. Young
23        Adults, was marked for
24        identification.)

CONFIDENTIAL

```
                                        Page 390
 1                  -   -   -
 2   BY ATTORNEY MEHRI:
 3         Q.    Dr. Osborne, before you is
 4   an article in Science Daily, March 22nd,
 5   2016.
 6               Have you seen this document
 7   before?
 8         A.    Yes.
 9         Q.    And this is a document you
10   reviewed as part of your literature
11   review?
12         A.    Yes.
13         Q.    And you cited -- intended to
14   cite in your report?
15         A.    I did, yes.
16         Q.    I'd ask for you to look at
17   Page 35 on your initial report from
18   May -- May 16th, 2025.
19         A.    Okay.
20         Q.    Is Exhibit-19 what you
21   intended to cite on Page 35 where there's
22   a reference to Science Daily?
23         A.    Yes.
24         Q.    Okay.
```

Page 391

1           ATTORNEY MEHRI:  I'm going
2      to mark Exhibit-20.
3                 -   -   -
4           (Whereupon, Exhibit
5      Osborne-20, No Bates, Learning
6      Policy Institute - How Money
7      Matters for Schools; Bruce D.
8      Baker, was marked for
9      identification.)
10                -   -   -
11  BY ATTORNEY MEHRI:
12      Q.    Dr. Osborne, there's an
13  article in front of you that's marked
14  Exhibit-20 from The Learning Policy
15  Institute, the author is Bruce D. Baker,
16  How Money Matters for Schools.
17           Do you see that?
18      A.    I do.
19      Q.    Was it your intent to have
20  this article as the correct cite on the
21  bottom of Page 33 of your initial
22  report --
23      A.    Yes.
24      Q.    -- where it says Learning

                                    Page 392

1    Policy Institute?

2            A.    Yes.

3            Q.    Okay.

4                ATTORNEY MEHRI:   I don't

5        have any further questions.

6                But I will represent to

7        defense counsel that next week

8        we'll send both reports with typos

9        fixed on the citations.

10               ATTORNEY PISTILLI:   Sure.

11       We are going to continue to hold

12       the deposition open because,

13       obviously, we've just received

14       these and haven't had a chance to

15       look at them.

16               But with that caveat, I

17       don't know that we have anything

18       further at this time.

19               ATTORNEY MEHRI:   We're happy

20       to meet and confer with you in a

21       reasonable way at a reasonable

22       time after you get the typos

23       corrected.

24               Okay.   Thank you for your

CONFIDENTIAL

Page 393

1    patience.

2           VIDEO TECHNICIAN:  The time

3    is 6:52 p.m.  We are going off the

4    record.  This concludes today's

5    video testimony.

6               -   -   -

7           (Whereupon, a brief recess

8    was taken.)

9               -   -   -

10          VIDEO TECHNICIAN:  So Meta

11   was on the record for six hours,

12   26.  Snap was on for five.  TikTok

13   was on for 11.  Google YouTube was

14   on for nine.  And plaintiffs were

15   on for ten.

16          ATTORNEY MEHRI:  Can you go

17   through those numbers again, if

18   you don't mind?

19          VIDEO TECHNICIAN:  Meta was

20   on for six hours 26 minutes.

21   Snapchat was on for five minutes.

22   TikTok was on for eleven minutes.

23   Google YouTube was on for nine

24   minutes.  Plaintiffs were on for

CONFIDENTIAL

Page 394

1      ten minutes.

2           ATTORNEY MEHRI:   Okay.

3           Anything else?   Safe

4      travels, everybody.

5                -   -   -

6           (Whereupon, the deposition

7      concluded at 6:53 p.m.)

8                -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

Page 395

1                    CERTIFICATE

2

3

4              I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10

         Amanda Maslynsky-Miller

11       Certified Realtime Reporter

         Dated:  September 7, 2025

12

13

14

15

16

17              (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

CONFIDENTIAL

Page 396

1              INSTRUCTIONS TO WITNESS

2

3              Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8              After doing so, please sign

9    the errata sheet and date it.

10              You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14              It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

CONFIDENTIAL

Page 397

1                    - - - - - -

                  E R R A T A

2                    - - - - - -

3    PAGE    LINE    CHANGE

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

CONFIDENTIAL

Page 398

1              ACKNOWLEDGMENT OF DEPONENT
2
                I,_____, do
3    hereby certify that I have read the
     foregoing pages,  1 - 391, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8     _____
      BRIAN OSBORNE, Ed.D.              DATE
9
10
     Subscribed and sworn
11   to before me this
     _____ day of _____, 20_____.
12
     My commission expires:_____
13
14   _____
     Notary Public
15
16
17
18
19
20
21
22
23
24

CONFIDENTIAL

Page 399

1                    LAWYER'S NOTES

2    PAGE    LINE

3    ____    ____    _____

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____

CONFIDENTIAL

**[& - 2008]**                                                    Page 1

| & |
| --- |

**&**   1:15 2:3,15
3:3,16 4:4,10
5:3,10,17 6:4
87:17,24 88:4
88:5 89:13,18

| 0 |
| --- |

**03047**   1:3

| 1 |
| --- |

**1**   7:14 11:17
20:15,17,20
82:6 116:7
145:10 282:20
398:3
**1,500**   24:8
**1/8/25**   7:17
81:4
**10**   8:15 109:9
112:5 219:22
220:5,10 221:8
221:17 226:24
291:14 300:9
387:18 388:3
389:12
**100**   8:6
**100,000**   86:12
86:14
**10013**   5:19
**10018**   6:6
**104**   272:5
280:22

**106**   173:18,19
173:24 174:1
174:24 175:1
178:15,16
179:11
**109**   8:8
**10:16**   82:4
**10:31**   82:12
**10th**   3:10
194:20
**11**   8:17 15:6
27:13 111:2
294:23 295:11
295:14 393:13
**11,000**   27:11
**110**   8:10
**11:34**   132:20
**11:50**   133:4
**12**   8:19 11:17
15:6 31:1,3
40:20,24
233:12 303:18
304:13 378:2
378:11
**120**   8:20
303:20
**121st**   304:1
**129**   97:16
**12:50**   193:22
**13**   7:6 8:21
111:6 200:12
208:7 328:5
331:13 334:6
342:1,2

**14**   8:23 99:10
197:2,13 334:9
334:16
**15**   9:5 37:23
99:10 121:24
122:4 127:5
197:2,13
257:19 383:19
383:22 385:3
**16**   9:9 93:6,14
109:23 197:17
198:2 231:9
315:1 385:8,11
**166**   195:14
196:5
**166.75**   195:1
196:5
**166.75.**   195:21
**167**   195:14
**16th**   173:20
194:19 282:23
293:6 296:16
311:22 313:22
314:19 390:18
**17**   9:12 145:10
374:5 386:16
386:19
**18**   9:16 113:10
113:11 129:11
133:9 248:3,6
248:9,12
256:23 366:2,6
366:10 374:5
375:4,15 388:7

388:10
**180,000**   85:23
**19**   9:21 40:16
389:19 390:20
**19087**   1:17
4:12
**19106**   5:6
**1991**   33:3
**1994**   33:4,12
**1997**   221:22
222:1
**1:43**   194:6

| 2 |
| --- |

**2**   7:16 11:12
81:4,12 82:14
132:21 149:13
**20**   7:15 10:5
25:4 40:2
257:19 356:19
391:2,5,14
398:11
**200**   3:17 8:14
**2000**   2:4 31:11
32:5,9
**20001**   3:5
**20006**   2:5
**20024**   2:17
**2003**   22:2
**2004**   22:2,15
**2007**   22:15
25:16 26:8
**2008**   28:3

CONFIDENTIAL

**[2012 - 5]**                                                                Page 2

**2012**   14:18
**2014**   25:16
   27:6,14
**2015**   98:9,10,22
   198:16
**2016**   390:5
**2017-2018**
   333:1
**2018**   27:6,14
   28:11,12,13
   40:13 306:2
   382:1
**2019**   90:2,3
**202**   2:5,17 3:6
**2020**   90:15,22
   91:3
**2021**   89:12
   302:19
**2022**   15:10
   296:7,22
**2023**   291:17
   295:6,16,21
**2024**   76:21,22
   77:8,16
**2025**   1:9 12:14
   77:3,5,8,24
   78:10 80:19
   81:21 85:11
   86:7 109:23
   111:9 194:20
   194:20 282:21
   282:23 283:7
   390:18 395:11

**2026**   9:21
   389:20
**21**   139:9
   149:13 229:5
**212**   5:19 6:6
**21209**   2:11
   4:18
**213**   4:6
**219**   8:16
**22**   9:21 389:20
**220**   2:11 4:18
**2200**   5:12
**22nd**   390:4
**23**   156:10
   229:4 332:10
   332:19 356:19
**24**   215:19
   226:8
**25**   159:14
   249:6
**250**   5:18
**26**   8:18 294:24
   393:12,20
**280**   1:15 4:11
**2850**   2:10 4:17
**29**   162:10
**294**   8:18 11:12
**2:44**   230:6

**3**

**3**   7:18 32:8
   81:1 84:4,9,11
   84:13 133:5
   156:10 193:24

194:11 230:14
   282:18
**30**   111:9 272:4
   396:16
**300**   84:1 85:6
   195:24 196:6
**3000**   3:9
**303**   8:20
**3047**   1:4
**30th**   384:21
   386:9 387:18
   389:12
**31605**   395:10
**325**   2:4
**33**   374:5
   391:21
**331**   8:22
**33131**   3:18
**334**   8:24
**35**   221:19,23
   222:9 298:12
   298:14,17
   390:17,21
**35/5**   221:13
**350**   4:5 245:14
**352**   7:6
**355-9500**   5:19
**359**   7:7
**374**   7:7
**383**   7:8 9:8
**385**   9:11
**386**   9:15
**388**   9:20

**389**   9:23
**391**   10:7 398:3
**3:57**   286:6

**4**

**4**   1:9 7:20
   88:24 89:3,9
   89:10 159:14
   194:7 199:23
   228:18 230:7
**40**   47:21
   257:16
**400**   245:14
**409**   5:13
**410**   2:12 4:19
**411**   222:4,8
   225:24
**42**   331:10
**421-7777**   2:12
   4:19
**427**   222:4,8
**434-5000**   2:17
**45**   328:6 342:2
**465**   83:19
   84:16,22
**4700**   3:18
**4:22**   1:3 286:14
**4th**   12:14

**5**

**5**   3:9 7:22
   96:15,22,24
   97:3 112:6
   162:11 200:1
   214:17 220:22

Golkow Technologies,
A Veritext Division

[5 - acceptable]                                                    Page 3

221:1,19,23
222:10 223:14
228:18 230:15
231:8 286:7
**5/16/25**   8:8
109:12
**50**   40:8 47:21
**50,000**   86:16
196:9,12
**50,025**   196:5
**500**   5:5
**501**   5:12
**50th**   4:5
**510**   5:5
**55**   333:23
**57**   315:2,11,13
**571**   303:5
**582**   303:5
**59**   294:20
**5:40**   351:19
**5:57**   352:3

**6**

**6**   8:5 96:12
100:12,18
286:15 335:9
335:17,18
351:20
**610**   4:12
**62**   303:15
**620**   6:5
**632-4700**   3:11
**65**   129:10

**650**   3:11
**66**   133:11
**662-6000**   3:6
**667-7706**   4:12
**67**   135:12
**68**   137:6
174:11,12,24
185:2
**680**   2:16
**683-9100**   4:6
**6:04**   359:13
**6:05**   359:20
**6:25**   382:19
**6:41**   383:2
**6:52**   393:3
**6:53**   394:7

**7**

**7**   8:7 109:12,18
109:19 112:5
129:9 133:9
214:19,21
231:8 272:2
298:12,13
352:4 395:11
**7,000**   25:19
**7/30/25**   8:10
110:18
**72**   84:9
**75**   23:17 139:9
**763-3260**   5:13
**77550**   5:13

**8**

**8**   8:9 110:18
111:1 122:3
196:17 214:19
214:20 223:13
282:17 291:14
300:7
**800**   201:15
**801**   203:20
**802**   204:16
205:20 206:1
**803**   212:7
**81**   7:17
**822-5100**   2:5
**84**   7:19
**841-1000**   6:6
**850**   3:5
**877**   5:6
**877.370.3377**
1:23
**882-1011**   5:6
**89**   7:21
**8th**   5:18

**9**

**9**   8:11 100:9
200:15,24
201:5 302:10
302:11,12,13
302:17 305:5
384:21 385:1
386:9,12
**900,000**   128:24

**90071**   4:6
**917.591.5672**
1:23
**94306**   3:10
**96**   7:23
**9:26**   31:16
**9:29**   31:23

**a**

**a.m.**   1:18 12:15
31:16,23 82:4
82:12 132:20
133:4
**aasa**   87:19,23
88:7 89:17
**ability**   16:7
69:12 79:15
243:4 372:17
379:6
**able**   65:23 75:1
79:23 179:18
211:23 264:20
281:6 288:23
360:6,16
**above**   1:18
**abstract**   91:20
92:8,21 139:11
**academia**
163:20
**academic**
123:22 198:24
213:16 227:20
**acceptable**
199:8

[accepted - adolescents']                                          Page 4

**accepted**
197:18 198:6
199:16 228:16
379:11
**access** 24:3,12
26:1 27:16
99:7 187:23
211:23 217:14
**accessed** 101:7
271:1 364:24
**accessible**
188:3
**accommodate**
17:17
**accompanying**
239:23 379:5
**accomplishm...**
329:16
**account** 250:8
262:20,22
263:9 265:21
265:23 266:1,4
266:12 269:1,3
269:14 270:12
270:14,16
340:13 347:6
361:5,24
362:21 375:15
**accountability**
55:9 177:15
274:4
**accounts** 93:11
94:24 95:9
241:19 247:22

357:3,7,10
366:1,5 369:22
371:21 372:11
372:18 375:1,3
**accumulate**
57:6
**accurate** 16:1
98:7,17 127:11
213:15 396:20
**accurately**
65:24 112:17
**acknowledge**
324:10 349:7,9
349:17
**acknowledg...**
337:11 398:1
**acronym**
261:11,14
**acted** 326:17
**acting** 223:5
**action** 61:18
91:11
**actions** 1:6
**activity** 244:7
266:8 340:15
**acts** 187:4
316:16
**actual** 108:5
192:10 215:14
226:20 308:5
**actually** 74:2
76:24 176:2,17
176:19 188:15
210:11 224:7

224:10,23
231:6 252:3
302:6 308:17
308:22 311:14
316:6 317:19
318:17 362:19
**add** 85:14
195:3,11
199:10 238:16
250:12
**added** 103:22
123:14 194:24
195:20
**addiction** 1:4
9:7,14 12:20
384:2,9 386:23
387:7
**addictive** 36:14
36:16 175:8
176:11
**addition** 195:7
218:17
**additional**
156:12,23
157:7 253:17
373:12
**additionally**
91:10
**address** 94:18
114:4 128:13
322:5 342:15
347:7 348:4,14
**addressed**
289:8

**addresses**
283:8
**addressing**
99:2 259:22
282:8 323:21
**adjective**
260:17
**adjusted**
236:16
**administration**
21:14,20,23
221:12,19,24
222:9
**administrative**
15:4
**administrators**
86:24
**adolescence**
297:1
**adolescent** 1:3
9:10 12:19
289:1 296:23
299:18 306:3
385:12,20
**adolescents**
9:13 55:1
62:15,16 71:1
177:20 272:16
273:11,19
280:3 350:19
351:12 386:21
387:6 388:22
**adolescents'**
9:17 388:12

**[adult - analysis]** Page 5

| | | | |
|---|---|---|---|
| **adult** 346:18 347:18 348:14 | **affective** 9:6 302:22 383:23 384:7 | **agreed** 12:3 106:16 261:4 274:15 314:6 315:15 | 157:18 180:22 192:1 259:19 280:8 |
| **adults** 9:23 344:5 345:8 357:5 389:23 | **affects** 55:22 | | **allocations** 282:2 |
| | **affirmative** 349:10 | **agreeing** 241:12 | **allow** 254:17 |
| **advance** 251:21 | **afraid** 56:2 | **agreement** 365:22 | **allowed** 24:2 24:12 25:24 27:16 |
| **advantage** 182:6 | **afternoon** 352:20 | **ahead** 24:17 41:10 57:18 59:10 84:11 94:1 95:14 100:6,9 108:8 114:20 153:6 209:11 232:8 260:2 295:8 299:22 306:21 365:18 | |
| **adverse** 46:22 57:6 150:23 175:5 | **age** 178:3 350:7 356:10 375:4 | | **alongside** 341:17 |
| **adversely** 16:7 | **aged** 280:5 | | **alphabetical** 298:15 310:14 |
| **advised** 364:1,5 364:7 | **agenda** 204:19 | | **altered** 272:8 |
| | **agitated** 54:17 | | **alternative** 114:3,17 |
| **advising** 122:10 123:4,6 127:13 197:9 | **ago** 25:5 97:3 98:6 214:15 | | **alto** 3:9,10 |
| **advocacy** 44:9 | **agree** 40:19 41:4,12 45:2 73:2 166:22 195:13,16 196:8 202:4,8 203:23 204:3 212:14 213:14 216:1,7 223:24 224:22 259:11 259:16 260:6 295:19,23 309:19 311:8 313:9 319:8,12 319:15,18,23 322:9 325:20 328:8,23 341:14 348:3 348:10 | **ai** 313:1 | **amanda** 1:18 13:4 395:10 |
| **advocate** 41:16 42:6 98:3 | | **algorithm** 262:3,17 | **ameliorating** 323:21 |
| **advocated** 43:17 98:12 99:12,23 | | **algorithms** 35:8,10 175:8 262:1,15 | **amend** 111:11 |
| | | | **america's** 94:7 |
| **advocating** 95:8 | | **align** 259:14,19 259:22 | **american** 86:23 90:15,22 91:2 98:13 |
| **affect** 16:7 188:12 378:10 | | **alleged** 114:3 115:7,13 | **ample** 71:21 |
| **affected** 79:1 322:13 327:7 372:3,14 | | **allegedly** 183:22 | **amplified** 53:7 53:9 138:2 |
| | | **allocate** 156:12 157:14 | **amplify** 174:16 185:8 187:3 |
| **affecting** 64:3 71:2 117:2 190:24 327:19 377:5 378:1 | | **allocation** 72:22 156:15 | **analyses** 258:5 |
| | | | **analysis** 203:15 203:24 204:6,9 |

CONFIDENTIAL

**[analysis - area]** Page 6

258:9,11 291:8
305:14 321:2
321:21 365:10
365:13 366:24
**anders** 76:8
77:11 78:3
**anecdotal**
255:4,10,12
**anecdote** 52:12
57:3 65:21
251:2
**anecdotes** 65:4
249:24 250:16
252:1,21 253:6
253:24 254:7,9
255:5,6
**angeles** 4:6
**angeli** 389:2
**animals** 305:13
**anjali** 9:19
388:15
**annual** 108:13
**annually**
257:20
**answer** 11:5
16:24 17:16
24:5 27:19
39:14 68:5,9
72:7 73:24
120:9 145:6
148:21,22
151:15 152:13
264:22 267:14
267:17 326:9

346:15 347:12
357:2 367:16
368:2,6,17
375:6 376:2
377:8 381:13
**answerable**
376:18
**answered**
54:14 56:19
57:17 63:6
64:16 67:11,24
68:2 70:11
117:12 130:16
134:19 145:4
148:20 192:14
242:6 244:22
245:1 246:13
246:24 247:3,8
247:15 266:20
317:22 326:1
333:5
**answering** 17:3
254:16 370:24
**answers** 16:13
360:7 381:15
398:4
**anticipating**
30:3 303:8
**anxiety** 51:17
55:19,21 62:14
66:19 151:4
180:24 184:19
190:21 240:1
251:13 281:24

282:9 325:3
346:11 372:5
**anxious** 273:20
324:18
**anybody**
195:18
**anymore** 263:2
**apa** 309:3
310:12,20
314:14
**apart** 251:1,24
252:22 253:7
**apologies** 122:1
**apologize**
254:22 301:12
**apology** 255:1
**app** 74:8 353:2
355:13 358:14
358:18 361:16
361:17 362:20
**appear** 16:15
51:18 185:15
291:2 304:6
308:13
**appearances**
2:1 3:1 4:1 5:1
6:1
**appeared**
198:24 310:15
328:14
**appears** 109:21
130:23 206:4
335:4

**application**
206:9
**applies** 213:16
227:18
**apply** 169:2
395:18
**appreciate**
57:19 254:24
383:8
**apprehensive**
251:13
**approach**
122:9 125:19
127:7,16
197:17 198:5
199:5 228:4,12
228:15 237:5
**approached**
79:17
**approaching**
79:18,21
**appropriate**
290:15 396:6
**approximate**
243:10
**approximately**
83:8 85:9,18
86:1 196:9
263:8 370:1
**apps** 181:18
354:5
**april** 196:10
**area** 29:7,9
48:24 53:23

| | | | |
|---|---|---|---|
| 85:23 214:7 | 223:17 224:2,6 | 198:23 199:19 | 197:4 207:21 |
| 233:14,21 | 224:13,23 | 200:4,8 222:16 | 234:19 242:6 |
| 258:6 265:19 | 225:16 226:1 | 222:21 227:14 | 244:22 246:13 |
| 267:10 277:6 | 226:11,15,23 | 228:17 230:22 | 246:16 247:8 |
| 278:8 367:19 | 227:7 229:1,7 | 287:1,7,11,17 | 250:7 257:13 |
| **areas**  99:8 | 229:11,15 | 287:22 288:1,4 | 277:8 285:16 |
| 217:22 229:20 | 230:2,23 | 290:6,8 293:21 | 297:7,22 |
| 235:3 259:23 | 287:14 291:16 | 293:22 294:5 | 317:22 326:1 |
| **argue**  215:4 | 292:3 293:16 | 297:7 301:5,15 | 328:22 332:22 |
| **argues**  226:11 | 293:17 295:20 | 301:20,21 | 342:6 368:3 |
| **argument** | 296:3,5,8,11,21 | 306:18 308:1,4 | 380:19 |
| 254:12 312:24 | 297:5,9,12 | 308:5,11 | **asking**  56:11,13 |
| **argumentative** | 298:19 299:16 | 310:13,14 | 59:1 60:20 |
| 244:23 246:14 | 300:1,21 301:2 | 313:11,20 | 67:21 72:3,6 |
| 254:3 | 302:3,6,17,21 | 314:7,13,18 | 85:19 116:24 |
| **arguments** | 304:5,22 305:6 | 352:14 353:9 | 117:7 134:16 |
| 315:6 | 305:11,19 | 369:17 370:1 | 134:22 152:8 |
| **arrives**  53:14 | 306:2,11,16 | 370:11 371:5 | 156:5 171:23 |
| **article**  89:12,16 | 307:2,6,9,13,17 | 373:12 389:7 | 174:24 182:16 |
| 90:7,11,13 | 308:20 309:20 | **artificial**  311:4 | 197:3 225:15 |
| 91:1,22 92:9 | 311:9,12,13,16 | 311:8 | 226:6 229:8 |
| 92:15,23 93:3 | 311:18 312:2 | **arts**  33:16 | 234:13 243:2 |
| 93:7,17,24 | 328:13 353:21 | **asked**  30:13,16 | 249:20 250:9 |
| 94:6,12,16,21 | 369:20 370:3 | 54:13 56:18 | 252:6 255:4 |
| 95:16 97:21 | 371:18,19,20 | 57:16 63:5 | 275:13,19 |
| 98:2,18 99:5 | 377:23 384:6 | 64:16 67:10,23 | 276:22 278:20 |
| 99:20 198:13 | 385:3,19 386:5 | 70:10 78:13,14 | 279:1 321:10 |
| 199:12,22 | 387:5,12,16,21 | 78:16,17 79:3 | 325:20 326:3 |
| 200:12 201:8 | 387:24 388:21 | 109:4 117:11 | 338:5 346:13 |
| 203:14 214:14 | 389:14 390:4 | 120:20 130:16 | 358:1 373:23 |
| 214:16 217:18 | 391:13,20 | 134:18 145:4 | 377:15,20 |
| 219:6,10,16,19 | **articles**  88:10 | 148:20 151:24 | **aspect**  348:15 |
| 220:8,13 221:2 | 88:14 95:22 | 155:23 183:17 | **aspects**  47:1 |
| 221:8,17 222:7 | 120:23 198:9 | 192:14 196:4 | 336:18 345:21 |

CONFIDENTIAL

**[aspects - attorney]**

346:3 355:19
**aspiring**  47:23
65:19 68:21
119:1 122:11
140:20 142:6
143:20 147:24
153:15,16
161:10 163:6
165:7 207:3
208:13 211:21
228:3 233:17
236:12 238:23
247:19 248:20
248:23 256:11
257:17 376:23
378:19
**assert**  282:23
**assertion**  198:4
**assertions**
313:4 319:5
**assess**  341:15
**assessment**
9:13 386:20
**assignment**
115:13
**assignments**
64:1
**assist**  29:19
41:17 111:17
**assistance**
358:10
**assisting**
255:18

**associate**  86:23
87:21
**associated**  9:22
66:17 149:16
212:19 282:8
389:21
**association**
86:24 88:8
**assume**  17:11
**assumption**
85:2 166:20
**assumptions**
168:15
**attached**
396:12 398:6
**attaches**  224:20
**attempt**  65:13
212:23 251:2
340:19 366:12
366:16
**attempted**
366:18
**attempting**
80:12 92:5
280:17 340:23
341:10
**attend**  215:13
226:18
**attending**
325:15
**attention**  36:22
36:24 52:20
58:16 62:6
63:22 66:13

69:9 72:12
133:10,13
151:3 175:21
177:23 178:4,7
183:10 186:6
186:24 187:24
188:2 190:16
190:18,18
193:14 217:23
218:1,24 234:9
235:3 239:24
257:12 272:12
273:6,18,23
275:5,17,18,23
282:5,6,11,11
291:1 324:3,17
325:23 326:18
343:4 346:9
350:15 351:3
371:13,15
372:20 373:2,4
387:17 389:11
**attested**  256:19
**attesting**  250:3
**attorney**  7:6,6
7:7,7,8 13:13
13:17 20:14,24
24:16,20 28:7
28:9 31:14
32:1 40:22
41:3,7,11 42:8
42:11 46:15
47:10 51:1
52:6 54:13

56:10,18 57:8
57:16 58:21
59:8 60:17
63:5 64:11,15
66:2,5 67:5,10
67:16,23 68:4
68:7,10 69:23
70:7,10 71:14
71:19 72:2
73:22 74:6,15
75:4,8,24
80:24 81:8,11
81:15 82:1,15
84:7,10,12,24
85:4 88:16,23
89:8 92:12
93:4,18,22
94:10 95:6,13
96:11,20 97:6
97:10,13,19
98:15 99:11
100:5,8,16
102:18,21
107:24 108:3,7
108:11 109:8
109:16 110:23
114:19 115:4
115:17,24
116:4 117:6,11
117:17 120:15
121:22 123:1
124:6,12
125:16,22
127:4 128:19

Golkow Technologies,
A Veritext Division

CONFIDENTIAL

**[attorney - austin]** Page 9

| | | | |
|---|---|---|---|
| 128:21 130:15 | 201:2,4,6 | 292:24 294:3,6 | 356:20 357:20 |
| 131:15,21 | 205:22,24 | 294:19 295:3 | 358:4 359:8,10 |
| 132:9,13,17 | 206:17 207:12 | 299:21 300:4 | 360:1 365:17 |
| 133:7,23 134:4 | 209:9 210:24 | 300:16,20,23 | 365:20 370:22 |
| 134:14,24 | 213:18 214:12 | 301:13 302:12 | 371:3 373:7,14 |
| 135:5,10 | 220:3,7,9,11 | 302:14,15 | 373:18,21 |
| 136:12,16,22 | 223:19,23 | 303:14,23 | 374:1,7,11,16 |
| 137:5,11,23 | 225:8,22 | 304:8,11,15,18 | 375:5,12 382:9 |
| 138:5,18,23 | 228:19 229:23 | 305:1,5,9 | 382:14,16 |
| 139:7 140:11 | 230:17 231:5 | 306:20 307:1,4 | 383:7,17 384:5 |
| 140:22 141:5 | 232:7,10 233:6 | 307:15 312:9 | 385:7,17 |
| 141:10 143:9 | 234:10 238:8 | 312:18 313:13 | 386:15 387:3 |
| 144:21 145:3,8 | 238:11 240:14 | 313:15,17 | 388:6,19 390:2 |
| 146:14 147:2,9 | 241:5,7 242:5 | 314:5,11,24 | 391:1,11 392:4 |
| 148:12,19,24 | 242:23 243:6 | 315:10,12,14 | 392:10,19 |
| 151:14,18 | 243:15,20 | 315:20 316:4 | 393:16 394:2 |
| 153:5 154:16 | 244:14,16,21 | 316:24 317:15 | 396:16 |
| 154:20,23 | 245:3 246:7,9 | 317:21 318:3 | **attorneys** 81:17 |
| 155:6,19 | 246:12,19 | 318:19 319:1,7 | **attributable** |
| 157:11 158:6,9 | 247:7,12,23 | 319:11 322:7 | 73:15 119:6 |
| 158:21 160:21 | 248:1,4,6,8,10 | 322:21 325:24 | 147:17 154:2 |
| 162:9 166:17 | 248:11 252:5 | 326:13 330:16 | 366:15,21 |
| 166:23 168:1 | 252:14,23 | 330:24 331:6,9 | **attribute** |
| 169:12 173:1 | 253:4,8,21 | 331:17 333:22 | 185:13,20 |
| 173:10,22,24 | 254:2,8,11,20 | 334:3,14 | 186:1 |
| 174:1,4 176:14 | 260:1,7 264:24 | 336:24 337:4,7 | **attuned** 255:22 |
| 178:13 183:24 | 265:3,4 267:11 | 337:16,20 | **audience** 88:13 |
| 184:24 188:21 | 267:16,19 | 338:24 339:5 | 212:20 |
| 188:24 189:3 | 278:2,10,17 | 339:11 341:1 | **auerbach** |
| 189:17,21 | 279:2,11 | 341:13 347:9 | 282:22 |
| 190:2 191:10 | 280:19 281:1 | 347:10 348:8 | **august** 194:16 |
| 192:6,13 | 282:15 285:24 | 349:5 351:13 | 196:11 |
| 193:17,20 | 286:17 288:12 | 351:15 352:6 | **austin** 6:4 |
| 194:9 200:22 | 289:14 292:20 | 352:19 356:11 | |

CONFIDENTIAL

**[author - bates]**                                                      Page 10

**author**  111:14
  298:9,21 302:2
  318:24 384:9
  385:21 387:9
  387:10 389:1
  391:15
**author's**
  110:11 220:18
  222:12 224:12
**authored**  292:3
  301:3
**authors**  90:10
  172:12 212:16
  213:21 216:8
  218:23 219:2
  226:15 291:24
  292:8 293:17
  293:24 296:4,6
  306:10 307:7
  307:14 385:24
**auto**  265:11
**autoplay**  264:9
  264:18,20
  265:6,8,12,15
  265:17
**available**
  125:21 127:8
  316:23 317:3
  343:11 366:9
**avenue**  2:16 4:5
  6:5
**avenues**  346:1
**average**  355:12

**avoid**  340:9
**aware**  34:12
  108:12 128:22
  129:3 292:12
  294:13 319:3
  330:5 331:1
  354:4 355:1,7
  355:17 357:9
  358:13 380:8

**b**

**b**  7:11 8:2 9:2
  10:2 302:19
**bachelor's**
  21:10
**back**  31:23
  72:24 82:12
  85:15 90:20
  97:8 103:13
  107:1 112:4
  123:7 129:9
  133:6 145:9
  172:13 185:1
  194:8,11
  214:18 222:18
  223:12 224:16
  230:16 268:9
  272:1 282:16
  286:16 299:7
  300:6 309:4,13
  314:15 352:5
  359:20 374:8
  383:2

**background**
  21:4,6 179:16
  181:1 245:11
  292:7
**backstory**
  371:5
**bad**  306:9
  309:4,10
  314:15 343:22
**baked**  179:23
  181:4 373:5
**baker**  10:7
  391:8,15
**balanced**
  340:24 341:11
  341:12
**baltimore**  2:11
  4:18 34:17
**ban**  42:18
**banes**  92:4
**banned**  359:5
**banning**  41:13
  42:2,6
**bans**  41:4
  42:13
**base**  103:23
  124:15 206:23
  228:7
**based**  50:16
  80:15,15 90:14
  112:11 124:15
  126:7 129:17
  129:23 130:5
  130:12 143:18

  147:22 153:9
  157:19 160:18
  165:3 211:14
  233:4,8 234:20
  234:23,24
  235:6,13
  250:17 252:2
  317:2 367:19
  380:13
**baseline**  102:1
**basic**  201:22
  202:5
**basically**  104:1
  119:24 136:6
  349:15
**basis**  47:11,14
  50:1 65:15
  71:3 95:19
  103:12 105:7
  143:5 148:1
  154:18 157:6
  157:12 160:22
  161:16 163:3
  167:9 234:2
  239:10 240:17
  240:23 242:11
  250:3 254:1
  255:9 256:3,6
  258:12 272:18
  342:23 381:6
**bates**  7:14,16
  7:18,20,22 8:5
  8:7,9,11,15,17
  8:19,21,23 9:5

Golkow Technologies,
A Veritext Division

**[bates - break]**                                                                Page 11

9:9,12,16,21
10:5 20:20
81:4 84:4 89:3
96:15 97:16
100:12 109:12
110:18 200:15
219:22 294:23
303:18 331:13
334:9 383:22
385:11 386:19
388:10 389:19
391:5
**bathroom**
188:20 286:3
**baton** 373:17
**bear** 124:10
178:23 199:18
206:11 214:2
237:3
**beat** 189:19
**beaudoin** 6:4
**becker** 302:18
384:11,24
**becoming** 54:5
62:19
**beg** 93:20
150:9 347:14
**beginning**
82:14 123:3
133:5 194:7
230:15 254:15
286:15 352:4
**begins** 206:2

**behalf** 13:20
360:13
**behavior** 36:14
36:16,18,20
116:17 145:16
187:24 324:5
338:11
**behavioral**
37:20 117:19
117:24 118:2,9
**behaviors**
186:6 210:12
216:15 219:12
221:2 224:24
226:9 324:17
371:13,15
**behaviours**
8:15 219:23
**belief** 253:10
**believe** 98:21
175:6 196:17
207:8 214:18
224:7 274:15
291:13 359:4
361:4
**bellwether**
19:15 128:23
129:24 130:7
159:24 316:7
319:4 332:4
**bellwethers**
331:3
**belonging**
345:22 346:21

**beneficial**
341:24 343:21
345:4 350:12
**benefit** 213:10
217:23 218:1
349:24
**benefits** 92:4
98:22 214:10
229:21 341:16
347:2 348:24
349:9,17
350:17 351:10
**berman** 5:3
**bernstein** 5:17
**best** 16:22
91:12 101:15
255:20 283:21
284:14 332:7
**better** 80:2
102:12 103:3
281:18 340:8
367:18
**beyond** 242:2
291:24 324:8
**big** 105:5
314:17
**biggest** 61:14
**bilingual** 33:4
**biobehavioral**
8:20 303:4,19
304:2,7
**biscayne** 3:17
**bit** 39:12 122:8
173:17 196:21

222:15 261:10
276:19 320:3
320:16 325:13
338:18 349:13
**bits** 40:9
**blah** 336:3,3,3
**blame** 251:3
**board** 44:6
87:7,23 89:19
89:23 90:3,5
95:21 259:9
331:19
**boards** 29:11
**body** 54:7
55:22 65:10
69:1 119:22
247:22 327:9
**boil** 70:14
**bonnin** 5:10,11
**boston** 32:15
**bottom** 203:20
205:19 206:1
335:17,18
385:1 386:12
387:20 388:3
391:21
**boulevard** 3:17
**brain** 178:2
274:24
**brands** 339:16
**break** 17:15,18
50:3 82:2
132:18 229:24
230:19 286:1

**[break - carolyn]**                                                          Page 12

351:14 353:19
382:15
**breathitt** 19:23
**brian** 1:13 7:4
7:15 8:8,10
12:24 13:7
14:3 20:21
109:13 110:19
398:8
**brief** 31:19
82:8 132:24
230:10 286:10
351:23 359:16
369:1 382:22
393:7
**briefly** 21:3
**briefs** 312:23
**bring** 199:18
200:3 237:3
256:14 297:17
302:9 359:1
**bringing** 58:5
124:10 206:10
327:3
**broad** 231:22
**broadcasting**
268:21
**broader** 326:10
**broadly** 277:16
**brockstedt** 2:9
4:16
**broken** 303:11
**brooks** 198:19
199:22 200:12

**brought** 214:2
302:8
**browse** 45:14
45:17
**browser** 361:19
**bruce** 10:7
391:7,15
**budget** 216:19
217:15,15
218:5,14,16
259:6,18,21
260:14
**budgeting**
108:14 259:3
259:12,18
260:9
**budgets** 258:17
258:21 259:1
316:12
**build** 174:15
185:7
**building** 6:5
91:13
**built** 248:14
**bulk** 256:1
**bully** 188:1
**bullying** 137:7
137:9 138:2
174:17 185:8
187:12,14,21
188:4,16 189:2
189:6,7,15,20
189:24 190:4,6
190:7,11 192:8

192:17,18,23
193:6,8 340:14
**bunch** 64:21
73:7 186:5
**burden** 178:23
178:24 280:6
**burdens** 184:19
**burling** 3:3 6:4
13:18 81:17
**burnout** 37:6,8
149:17 150:24
152:7,10 153:2
155:3
**bytedance** 3:20
3:20

**c**

**c** 302:18,18
**cabraser** 5:17
**calculate** 83:17
**calculator** 45:7
195:8,23
**calendar** 46:5
85:11 86:7
**calendaring**
46:7
**california** 1:1
3:10 4:6 12:24
**call** 77:12,16
91:18 126:14
209:24 212:11
232:24 254:6
255:3 258:23
260:16,21

290:21 294:4
327:5 351:9
**called** 21:24
23:17 76:8
218:23 254:9
263:24 267:6
269:21 292:13
294:14 379:15
384:6
**calling** 126:12
**camera** 358:19
**camino** 3:9
**candidate**
261:19,21
**capacity** 23:12
71:11 122:10
125:1 129:16
130:11 162:16
165:9 166:6,16
**capture** 65:21
175:20 272:11
273:5 275:5,22
343:3 350:15
**captures**
289:23
**capturing**
183:9
**career** 121:17
256:2
**career's** 257:14
**carefully** 104:8
309:15 396:4
**carolyn** 9:19
388:16

**[case - check]**                                                      Page 13

| | | | |
|---|---|---|---|
| **case**  1:3 15:3,8 | **cause**  46:13 | **certainly**  41:2 | 392:14 |
| 15:11 19:15 | 319:13,16 | 53:18 187:3 | **chancellor**  23:1 |
| 50:9 74:24 | 321:4 | 189:15 314:6 | 23:5 |
| 76:3 82:20 | **caused**  118:11 | 328:1 372:16 | **change**  54:4 |
| 109:20 113:15 | 129:14 190:10 | 378:13 | 127:23 156:3,7 |
| 113:23 118:14 | 277:22,23 | **certainty**  367:3 | 277:3 279:20 |
| 124:11 125:7 | **causes**  114:3,17 | 367:9,14,22 | 397:3 |
| 128:24 131:19 | 118:2 120:13 | **certificate** | **changed**  54:4 |
| 132:5 169:14 | 178:9 184:20 | 395:1 | 250:20 |
| 190:12 202:18 | 283:2 284:11 | **certification** | **changes**  156:1 |
| 204:7,11 205:2 | 284:22 285:8 | 12:4 395:17 | 323:1 396:11 |
| 205:8 216:22 | **causing**  46:19 | **certified**  1:20 | 398:5 |
| 217:8 238:15 | 117:24 | 395:11 | **changing**  29:20 |
| 241:13 291:9 | **caution**  267:12 | **certify**  395:4 | 184:8 |
| 291:10 312:20 | 341:2 | 398:3 | **channel**  330:15 |
| 313:1 315:19 | **caveat**  392:16 | **certifying** | 330:20 |
| 347:6 353:1 | **cdc**  49:17 | 395:21 | **channels** |
| 359:2 368:18 | **ceiland**  5:14 | **challenge**  280:7 | 333:13 |
| 373:19 | **celebrate** | 323:11 370:10 | **characterize** |
| **cases**  76:15 | 329:14,17 | **challenged** | 166:19,24 |
| 79:20 332:5 | **celebrities** | 282:2 | 167:2 215:14 |
| 369:7 | 339:17 | **challenges** | 226:20 277:13 |
| **catch**  370:14 | **cell**  42:18 44:11 | 88:15 123:13 | 337:9 340:5 |
| **categories**  50:4 | 45:4,16,20 | 210:3,21 | **characterized** |
| 205:1,7 206:11 | 46:3,6,10 | 231:23 232:22 | 255:12 368:14 |
| 341:24 | 160:1 | 240:9 255:23 | **charge**  259:2 |
| **category**  345:1 | **center**  3:17 | 319:14 323:9 | **charleston** |
| 345:12 | 49:17 113:6 | 327:6 336:11 | 19:20 |
| **caught**  370:19 | **central**  23:7,13 | 345:17 369:17 | **chat**  269:9 |
| 372:20 373:1 | 29:2 | **challenging** | **check**  1:15 4:10 |
| **causal**  287:12 | **certain**  182:21 | 54:5 | 45:15,17 46:2 |
| 287:15 319:17 | 189:7 201:12 | **chance**  92:14 | 46:4 52:21 |
| **causality**  285:7 | 312:5,11 334:4 | 201:7 348:2 | 97:18 222:18 |
| | 379:21 | 382:15 383:13 | 275:6 307:23 |

309:14,23
310:7 311:13
314:16
**checked** 298:4
310:2
**checking** 60:7
309:16 360:9
**cherry** 315:5
316:21 317:17
318:5
**chief** 22:20
**child** 9:16
388:11
**childhood**
289:2
**children** 62:16
62:16 177:19
182:6 273:11
273:19 280:6
350:19 351:11
356:10 357:3
357:17 358:6
374:24 375:3
375:17 376:4,6
**choose** 174:15
185:6
**chose** 316:16
349:9
**chris** 13:16
97:6 248:5
352:6
**christian** 3:4
384:10

**chromebook**
370:14 371:9
**chromebooks**
369:18
**circulate** 74:1
**circulating**
74:21 75:3
**circumstance**
372:9
**circumstances**
210:22 236:17
322:16 345:5
361:8 378:24
**citation** 110:5
220:18 221:11
221:21 222:3,5
222:20 227:6
229:3,13
293:11 296:2
296:19 297:4,9
297:13 298:10
298:22,22
299:1 300:2,14
301:8 303:10
306:2,9,19
307:11 310:6
310:22 311:20
313:23 314:21
314:21 383:12
**citations**
101:10 230:21
292:17,19
293:2,7 297:23
298:4,6 299:7

299:10 303:13
306:15 307:23
308:1,5 309:3
309:4 310:3,12
310:19 313:1,2
313:21 387:20
392:9
**cite** 197:23
220:14 221:1
228:14 291:16
297:12,15
302:17 304:2,5
304:22 384:18
384:23 385:4
386:11 388:1
389:14 390:14
390:21 391:20
**cited** 134:11
198:17 199:22
214:16 228:17
293:6 296:13
296:15,16,20
298:1 305:20
307:3 308:10
308:12,14
309:20 311:9
311:21 312:6
313:10 314:8
314:10 390:13
**citing** 219:11
223:17
**city** 14:16 22:5
22:11,14,17
23:11 24:1,15

25:7,9
**citycenter** 3:4
**citywide** 23:19
**ckennedy** 3:11
**claim** 121:5
143:14 144:23
148:11 154:14
155:14 158:11
158:19 159:8
161:17 164:4
165:2 199:17
258:10 284:18
368:1
**claimant** 149:5
**claims** 141:23
165:15,23
167:13 168:8
**clarify** 17:9
231:4
**clark** 229:2,15
230:23
**class** 33:21
39:15 46:14
73:18 75:23
326:18 369:4
369:11
**classes** 39:23
40:1,3 47:24
239:1 324:6
**classifier**
261:24 262:3
**classroom** 26:6
30:21,23 31:1
31:4 32:4,23

**[classroom - compare]**

33:7,12 73:21
98:4 327:21,21
328:2 331:5
343:19 382:5,8
**classrooms**
27:21 74:18
75:16 98:13
**clear**   49:8
105:10 106:14
119:3 122:21
131:17 144:23
150:14 199:21
211:1 228:13
234:22 370:9
**clearly**   131:12
169:17 342:15
**clerk**   6:4
**click**   223:20
224:1 300:18
304:16 305:2
306:21 361:20
**client**   209:13
**clients**   239:1
363:14,19
**climate**   116:20
145:18 147:5
147:15 148:15
**clinical**   9:16
283:16 285:22
388:10
**cmehri**   2:6
**coach**   28:24
48:5 122:13
125:2 231:18

363:10
**coaching**   43:22
126:17 197:20
199:6 208:11
211:19 217:21
223:10 228:2
236:23 244:4
257:18 363:14
363:19
**code**   338:14
340:13
**coded**   176:3
177:5 182:4
183:15 265:14
277:1 281:9
**coding**   264:13
**cognitive**   37:10
37:12 305:12
**cohort**   378:2
**colgate**   21:10
**colleagues**
239:1,3 249:13
**collect**   128:2
**collecting**
128:9
**collection**
201:17
**collectively**
13:22
**college**   14:6
82:21 83:3
266:6
**combination**
50:17 112:10

**come**   53:18
57:23 80:5
83:9 85:15
172:13 207:9
272:23 325:1
343:12 350:18
**comes**   47:16,17
51:12 52:1
63:17,19 74:5
121:14 173:16
207:1,1,5,6
211:15 272:21
346:22 349:1
376:21 378:5
**comfortable**
168:11 356:16
357:23 375:8
**coming**   53:3
64:1
**commencing**
1:17
**comment**   92:16
271:4
**commenting**
336:14 345:18
**comments**
185:15,22
271:6
**commission**
398:12
**commodotized**
178:8
**common**   74:20
130:19,19

204:17 208:19
345:22 346:20
349:21
**communicate**
93:11 95:10
344:7
**communicating**
30:4 353:12,19
**communication**
41:22 94:9
95:2 328:18
329:9 330:22
338:13 347:19
**communicati...**
96:6
**communities**
94:19 212:5
234:7 320:21
322:15 330:1,4
330:23 372:2
**community**
68:24 91:24
128:1 209:23
210:14 327:19
329:11 344:7
**companies**
13:22 174:14
174:15 185:6
**company**   1:22
364:14,19,20
365:7
**compare**   91:7
350:22

**[compel - confronting]** Page 16

compel  349:3
compelled
  186:7 346:6
  350:21
compensation
  85:17
complete  16:1
  69:13 97:11
  101:12 112:20
  360:6
completing
  63:24
complex
  159:18 160:17
  161:3,19
complexities
  41:20 44:1
  215:14 226:19
complexity
  58:11
complies
  223:22 305:8
  306:24
comport  96:8,9
comported
  310:20
composite
  295:5,14,19
compromised
  69:15
compulsion
  154:4 186:18
compulsive
  36:18,20 43:3

47:6 53:5 65:9
67:4 105:3,23
114:24 115:20
116:10,15
118:17 119:6
120:6 121:6
131:13 138:12
140:14 141:18
144:4 145:14
146:3,5 147:18
150:20 154:3
180:5,7 181:19
181:21 186:3
186:22 187:11
188:13 190:13
190:22 191:18
191:22 193:1
193:15 212:3
234:5 237:24
244:11 245:20
251:15 256:20
272:15 273:13
280:2,4 320:4
323:12,24
343:1 346:5
347:20 349:4
379:4
compulsively
  49:3 72:16
  350:22
computer
  301:23
concentration
  21:16,20

concept  72:15
  168:6 169:1
  205:20 209:15
  225:16,18
  229:21 235:1
  237:6 342:17
  350:24 380:9
concepts
  227:21
conceptually
  237:5
concern  51:19
  255:17 259:23
  327:2
concerned
  55:23 58:4
  273:21
concerns  54:23
  56:17 58:6
  99:1 237:23
  287:20
concluded
  394:7
concludes
  393:4
conclusion
  92:20 252:7
conclusions
  80:13 252:4
conditions
  272:14
conduct  44:17
  202:16,21
  209:4 283:17

284:1 285:12
338:14 340:13
conducted
  49:13 165:11
  207:15 211:22
  286:20
conducting
  8:13 200:19
  212:18 344:22
confer  392:20
conference
  77:12,16
  236:18
conferences
  239:4 249:15
conferencing
  61:16 126:19
confidentiality
  63:13
confirm  40:11
  304:4,10
confirmed
  113:6
conflated
  347:20
conflict  55:14
  69:5,6 72:13
  139:14 141:13
  141:20 159:19
  160:18 161:4
confront  320:8
confronting
  128:16

[confused - contradicts]                                    Page 17

confused
  222:16,21
connect  339:3
connected
  274:1
connectedness
  9:15 386:24
  387:8
connection
  287:12 289:19
  333:13 345:23
  350:8 352:24
connections
  178:5 239:5
connolly  2:15
connor  3:8
consequence
  179:2
consequences
  30:4 41:21
  161:21
consider  8:13
  114:16 118:8
  119:12 200:18
  242:18 271:11
  348:21
consideration
  167:5 171:8
considered  8:6
  100:13,22
  101:13 104:6
  107:2 151:11
  157:20 167:20
  170:4 189:24

190:4 296:14
  301:18 311:24
  369:16 370:3
  370:11 379:9
considering
  41:24 44:3
  120:12 127:23
  144:10 278:12
  380:4
considers  92:1
  92:10
consistent
  211:7 236:22
  237:4,5 238:5
constant  51:11
  327:13
constituency
  41:21
constituents
  30:5
constraints
  71:9 260:5
consult  236:3
consultant  28:4
  28:15,18,20
  29:8,23 30:13
  30:17 43:16
  48:4 124:24
  125:18 142:3
  161:9 165:9
  208:10 211:18
  223:9 231:17
  249:1

consulted
  113:1
consulting
  29:18 39:17,24
  42:5 50:16
  82:22 83:5
  86:2 122:24
  128:18 153:11
  196:24 197:8
  209:4 228:1
  244:4
consumer
  284:4
contact  77:24
contacted  76:7
  76:9,19,20
  78:9
contain  312:24
contained
  57:21 112:2
content  176:11
  261:15,17
  271:4
context  9:10
  42:4 61:19
  93:16 119:9
  121:12 126:16
  127:18,20
  189:10,24
  198:15 206:21
  210:6,20 215:3
  216:17 217:11
  218:4 223:4
  225:19 229:22

237:7 242:2
  261:24 262:3
  272:8 316:17
  317:6 326:5
  335:11 385:14
  385:21
contexts  153:18
  163:7 231:21
  233:18 236:14
  237:16 238:19
contextual
  215:12 216:2,6
  223:3 224:15
  226:17 320:7
contextualiza...
  227:22
contextualized
  113:7
continue  133:8
  392:11
continued  3:1
  4:1 5:1 6:1
  177:8
continues  54:4
continuing
  33:2
continuously
  274:1
contracted
  48:3 249:12
contradicted
  287:22 288:1
contradicts
  319:5

CONFIDENTIAL

**[contrast - counsel]**                                                      Page 18

| | | | |
|---|---|---|---|
| **contrast** 91:7 | 232:5 234:15 | 138:4,22,24 | 301:18 305:15 |
| **contribute** | 235:5,12,18 | 139:18,22 | 308:14 316:8 |
| 276:15 | 236:4,8 237:19 | 140:10 141:4 | 316:23 317:20 |
| **contributes** | 238:2,6 239:9 | 141:15 142:23 | 319:6,17 337:1 |
| 149:18 178:21 | 239:14 240:4,6 | 143:8 145:2 | 347:8 349:11 |
| **contributive** | 240:11,17 | 146:13 147:8 | 353:7 354:12 |
| 321:21 | 242:4,9 249:15 | 148:18 149:6 | 355:20 356:1,5 |
| **control** 323:22 | 250:10 256:4,8 | 150:17 152:17 | 361:5,6 371:10 |
| 340:8 395:20 | **convey** 232:16 | 153:4 154:19 | 371:22 372:13 |
| **controlled** | **conveyed** | 155:5 156:4,20 | 383:15 391:20 |
| 283:18 | 232:13,17 | 157:10 158:24 | 398:4 |
| **converged** 49:6 | **cool** 230:3 | 160:20 164:20 | **corrected** |
| 125:11 157:21 | **coordinating** | 166:7,16 | 297:17,19 |
| 165:19 274:8 | 22:13 | 167:24 169:15 | 302:8 392:23 |
| **convergence** | **copy** 21:1 | 169:20 171:14 | **corrections** |
| 65:7 80:16 | 109:19 331:24 | 172:16,19,24 | 396:5,7 398:5 |
| 103:9 104:4 | **copying** 299:10 | 173:13 176:13 | **correctly** |
| 105:6 107:17 | **core** 62:6 | 194:21,22 | 195:20 335:15 |
| 124:17 143:24 | 123:19 322:23 | 196:24 202:13 | 335:20 |
| 161:6 165:3 | **correct** 40:14 | 203:12 207:19 | **cortex** 55:2 |
| 211:15 233:8 | 40:18 45:8 | 207:20 208:2 | 177:21 182:8 |
| 234:3 235:1 | 50:18 57:12 | 209:8 211:5,6 | 273:12 274:22 |
| 251:7 281:21 | 64:14 81:18 | 222:1,10 | **cost** 162:14 |
| **converging** | 85:8 90:5,16 | 228:18 230:20 | **costs** 162:22 |
| 104:17 240:20 | 98:4 103:1 | 231:12 232:6 | 166:14 |
| **conversation** | 105:15 110:2 | 232:14 233:5 | **council** 249:5 |
| 63:14 73:9 | 111:12 113:23 | 234:18 238:7 | 257:22 |
| 77:11 243:1 | 114:5,17 122:7 | 238:15 239:11 | **counsel** 12:3 |
| 277:9 | 122:24 125:21 | 243:19 244:20 | 13:2 18:16 |
| **conversational** | 127:9,14 | 247:14 258:18 | 19:12 107:4 |
| 236:20 | 128:18 130:7 | 260:10 277:19 | 312:21 352:7 |
| **conversations** | 130:14 134:7 | 278:1 293:2 | 352:11,21 |
| 53:19 60:14 | 134:13 136:11 | 297:22 299:2 | 373:15 392:7 |
| 61:16 210:1 | 136:21 137:10 | 299:24 301:1 | |

**[counselors - data]**                                      Page 19

**counselors**
  53:21 58:6
**counterfactual**
  316:17 318:9
**country**  158:5
  163:15 231:21
  249:16 377:6
  378:3
**county**  8:23
  331:20 334:10
  335:5
**couple**  61:15
  110:4,9,9
  176:6 247:1
  257:18 285:17
  292:16 309:5
  347:3
**couples**  48:8
**coupling**
  126:21 227:23
**course**  38:11,23
  39:7 53:19
  118:13 119:2
  186:19 191:3
  192:18 193:8
  210:7 227:14
  287:9 320:11
  322:13 323:16
  324:12 326:23
  335:3 341:21
  360:19 367:7
  377:12
**courses**  38:15
  38:17,19

**court**  1:1,19
  12:21,23 13:3
  16:11,19 312:6
  312:22 368:10
  368:14 369:1
  396:20
**cov.com**  3:6,11
**covered**  202:19
**covid**  40:16,23
**covington**  3:3
  6:4 13:18
  81:17
**cpistilli**  3:6
**craig**  5:11
**create**  120:3
  188:6 343:3
  346:7,10
  372:18
**created**  144:3
  190:17 272:14
  281:23 323:11
  324:21 371:21
  372:11
**creates**  187:19
  188:14 320:12
**creating**  66:18
  72:21 121:7
  186:17 190:24
  218:14 280:6
  310:19 369:21
**credibility**
  228:6
**credible**  290:14

**criminal**
  340:14
**crises**  282:8
**crow**  215:3
  219:3,8 224:6
**cruelty**  187:4
**culmination**
  377:12
**culprits**  184:11
**culture**  62:9
  178:20 192:5
**cultures**  215:13
  226:18
**cumulative**
  62:13 68:16
  149:14 162:12
  163:14 184:14
  281:22 347:1
**curated**  94:23
  190:19 342:19
**current**  14:5
  82:17,18
  112:12 211:19
  259:15 272:7
  306:5
**currently**  38:6
  87:10 112:1
**curriculum**
  7:15 20:20
  23:21 332:24
  333:9,11,14
  342:13 344:10
**cv**  21:1 32:8
  86:22 87:3

  89:24
**cyberbullying**
  185:14,21
  338:8 340:11
**cyrus**  2:3 18:20
  195:19

**d**

**d**  7:2 10:7
  224:2 296:21
  299:16 387:11
  391:7,15
**daily**  9:21
  353:16 389:20
  390:4,22
**dance**  336:10
  345:17 349:22
**dangers**  338:8
**daniel**  2:16
  374:18
**data**  35:11,13
  91:2,4 125:20
  126:6,7,10,12
  126:14 127:7
  128:10 133:20
  135:9,20 136:9
  136:14 139:19
  139:24 142:21
  145:23 146:4
  149:2,7,23
  150:2,11,13,16
  150:18 151:20
  152:2,9,15,18
  154:7 155:23

156:6,17,21
158:15,23
159:2,6 160:9
162:1,21,24
164:1,10,14,19
164:22 165:13
166:5,8 167:14
167:23 168:15
168:19 169:11
201:17,22
202:6 212:9,11
213:11,12
233:9 285:21
315:5,6,17,22
316:2,6,16,22
317:3,3,5,7,11
318:8,11,13,15
318:18,23
319:3 355:11
367:15 379:22
**date**   1:18 12:14
85:11 86:7
97:14 396:9
398:8
**dated**   395:11
**david**   5:11
**day**   32:21,21
78:3 139:12
141:19 186:11
211:8 353:14
353:18,19
398:11
**days**   47:21,22
396:16

**dbonnin**   5:14
**dc**   2:5,17 3:5
**deal**   48:23 67:1
177:11
**dealing**   104:21
115:8 216:20
274:11
**decennial**
90:16,22 91:3
91:6
**decent**   245:15
**deciding**
101:18
**decision**   44:9
215:1 218:12
**decisions**   179:3
179:10 180:17
180:22
**declarations**
251:7
**dedicated**
39:20
**dee**   1:19
**deemed**   396:19
**deeply**   215:11
224:15 226:17
283:23
**default**   365:24
**defendant**   3:12
4:7
**defendants**
2:18 3:19
13:22 174:22
175:4,9 185:15

185:22 275:4
275:21 319:6
332:24 359:2
360:14 368:5
373:16 374:19
**defense**   315:4
373:15 392:7
**deficiencies**
133:14
**deficit**   36:22,24
**deficits**   37:10
37:12
**define**   170:8
**defined**   170:10
172:12
**definitely**
338:22
**definition**
170:15 189:8
**deflect**   251:3
**degree**   21:10
21:12,13,18
213:8,9 237:21
260:15,20
367:3,9
**degrees**   21:22
**dekalb**   8:23
19:23 334:9
335:5,13,22
345:15
**deliver**   253:16
255:19
**demand**   139:15
141:21 142:18

143:1,1,7,15
144:1,14,24
**demands**   40:10
142:21 162:13
319:21,24
**demeaning**
191:8
**democracy**
322:12
**demographic**
241:23
**demonstrate**
132:8 227:15
**demonstrates**
144:1 234:4
**demonstrating**
240:6
**department**
22:6,12,17
24:1,15 25:7
25:10
**depend**   38:12
210:19 216:23
217:2
**dependent**
123:18
**depending**   39:6
40:5
**depends**   42:3
125:24 189:10
210:16 212:16
216:21 266:2
380:3

CONFIDENTIAL

**[deponent - development]**                                          Page 21

| | | | |
|---|---|---|---|
| **deponent**  12:24 | **derogatory** | **descriptions** | **desire**  57:20 |
| 398:1 | 192:10 | 57:23 | **despite**  240:10 |
| **deposed**  14:8 | **describe**  21:4 | **design**  34:24 | **destabilized** |
| 71:24 | 28:10,17 46:21 | 35:2,4,6 47:4 | 282:1 |
| **deposing**  13:19 | 52:11 54:11 | 103:4,24 | **destabilizing** |
| 396:16 | 56:13 60:24 | 105:14 106:10 | 53:13 66:19 |
| **deposition**  1:12 | 61:3,21 63:2 | 106:15,18 | 116:8,13 |
| 11:2 12:16 | 64:21 65:3,24 | 120:7 144:7 | 145:12 234:6 |
| 17:21 18:11,14 | 68:17 69:3 | 147:19 173:12 | 325:13 |
| 18:17 19:12 | 71:24 91:5 | 174:6,21 175:3 | **detail**  176:4 |
| 20:9 50:8 | 94:21 112:18 | 175:10,13,23 | **details**  281:7 |
| 57:24 79:24 | 127:17 240:8 | 176:21 178:20 | 306:14 307:10 |
| 108:4 173:5 | 253:12 286:21 | 179:3,9,17,24 | **determine** |
| 352:12 356:4 | 342:4 | 180:10,16 | 101:1 117:22 |
| 365:3,6 373:10 | **described** | 181:4,15,21 | 252:2 321:2,13 |
| 382:13 392:12 | 72:11 79:10 | 183:1,3,4,22 | 366:12,19 |
| 394:6 395:6 | 80:17 124:14 | 186:1 187:9 | **determined** |
| 396:3,13,17,19 | 196:22 205:13 | 190:17 232:1 | 222:24 |
| **depositions** | 211:8 253:18 | 261:5,8 262:9 | **detract**  224:19 |
| 17:23,24 18:4 | 276:20 298:19 | 262:11 273:4,8 | **develop**  30:7,14 |
| 18:9 49:5 | 347:3 353:21 | 274:16,18 | 30:18 103:21 |
| 64:24 104:6 | 354:18 | 275:16 280:11 | 350:23 |
| 107:6 172:16 | **describes**  122:8 | 284:16 323:23 | **developed**  55:3 |
| **depression** | 122:19,22 | 343:2 | 103:20 177:22 |
| 9:22 389:22 | 243:22 | **designed** | 182:9 |
| **deprivation** | **describing** | 175:19 178:6 | **developing** |
| 66:15 | 48:14 78:23,24 | 181:16 183:12 | 29:19 38:23 |
| **deprived**  53:4 | 99:4,5 122:6 | 272:11 275:4 | 259:18 273:12 |
| 64:2 | 212:17 214:1 | 275:22 277:1 | 341:22 |
| **deps**  1:23 | 235:23 255:4,5 | 350:14 | **development** |
| **deputy**  23:1,5 | **description** | **designing**  8:13 | 9:10 29:15 |
| **derived**  258:3 | 7:13 8:4 9:4 | 200:18 | 122:14 126:5 |
| **derives**  165:4 | 10:4 127:12 | **designs**  154:6 | 178:2 186:20 |
| | 227:1 | 179:15 182:3 | 191:21 199:7 |

CONFIDENTIAL

**[development - disorders]**                                                    Page 22

217:6,24 259:5
275:1 350:7
385:13,20
**developmental**
306:4
**developments**
323:1
**device**  42:13
43:10,14,19
46:19 58:13
**devices**  24:4,22
26:2,10,16
27:17 28:1
41:5,13 42:7
75:2 159:17
160:3,7,16
161:2
**diagnose**  37:14
37:17,19,21
53:24
**diagnosis**
357:17
**difference**
175:17 199:10
264:3,5
**differences**
179:20 183:15
281:10
**different**  22:16
28:21 44:12
48:16,17,23
51:9 56:12
58:23 61:2
64:22 73:11,12

82:23 83:6
97:14 112:24
119:8,17
122:17 124:18
142:4 179:20
186:5 214:8
220:8 222:13
222:14 232:13
235:2 236:10
236:14 238:19
238:20 241:11
241:22 246:1
246:24 255:15
255:16 256:9
263:24,24
270:16 289:21
320:6,16,24
321:22 323:13
324:14 325:18
327:17 339:3
341:24 342:20
355:12 367:5
367:11,23
370:17 378:21
379:1
**differently**
151:24 276:19
**difficult**  141:8
148:7 156:14
157:17 161:19
251:20 323:6
377:7
**difficulty**
345:24

**digital**  9:10
24:3,22 26:1,9
26:9,16 27:17
28:1 34:23
35:2 46:18,19
99:2 338:12
385:13,21
**diligence**
312:15
**diminishes**
149:16
**direct**  29:24
48:8,19 50:18
59:7 61:3
107:12 122:12
126:15,22
137:1 146:18
330:8 395:20
**direction**  11:5
**directions**
45:24 306:6
**directly**  23:1
52:8 54:9
57:10,15 60:21
63:3 67:8,18
75:5,19 123:10
124:1 362:20
372:3
**director**  22:3
**disciplinary**
135:21,23
136:20 324:7,8
**discipline**
127:2 135:14

136:10 213:1
216:10 227:16
316:11
**discord**  171:1
**discourse**
260:12
**discover**  270:6
**discovered**
301:2
**discrete**  66:4
362:4
**discrimination**
15:11
**discuss**  44:6
91:11 113:18
114:2 197:12
237:10
**discussed**  20:8
20:11 38:5
197:6 308:9
352:14 358:21
366:14,20
**discussion**  91:7
171:17 230:20
276:17 326:12
**discussions**
276:13
**dismay**  298:8
301:1,9
**disorder**
302:24
**disorders**  36:22
36:24 37:10,12
37:15,20,21

| | | | |
|---|---|---|---|
| **disparate** 238:6 | 61:8 62:1,18 | 345:11 364:6 | 148:10,17 |
| **disposal** 345:8 | 65:2 66:20 | 381:24 | 149:3,8,9 |
| **disproportion...** | 69:19,20 72:23 | **district's** 209:8 | 150:1,4 152:3 |
| 178:23 | 104:11 107:8 | 218:6 259:14 | 152:11,17,21 |
| **disrupt** 116:19 | 108:24 115:23 | 260:14 | 153:4,23 154:9 |
| 145:17 | 117:2 118:18 | **districts** 19:15 | 154:15 155:5 |
| **disrupted** | 118:23 119:2,5 | 20:5 34:5,7,10 | 155:15,24 |
| 147:7 | 121:8,16 | 34:12 48:17,17 | 156:6,20 157:1 |
| **disruption** | 123:11,12,17 | 49:5 65:1 | 157:9,23 |
| 147:14 | 125:10 126:1,3 | 71:23 79:13 | 158:13,16 |
| **disruptions** | 127:9,21 | 80:9 82:23 | 159:7,24 160:5 |
| 67:2 148:16 | 128:14,16,23 | 83:6 91:15 | 160:11 161:24 |
| 149:4 | 135:9 138:16 | 107:23 108:6 | 162:3,17,23 |
| **disruptive** | 151:22 153:15 | 108:13 113:22 | 163:2,15 164:2 |
| 325:9 338:9 | 153:17 160:20 | 115:8,15 | 164:3,5,12,16 |
| **distinct** 343:7 | 161:11 165:8 | 118:11 120:4 | 164:24 165:2 |
| **distinction** | 172:15 178:10 | 124:9 125:19 | 165:14,16,20 |
| 345:7 | 178:12 180:20 | 127:14 129:24 | 166:7,10,13 |
| **distracted** | 181:22,24 | 130:7,13 | 167:15 168:9 |
| 63:19 | 184:21,23 | 133:22 134:2,7 | 168:17,20 |
| **distraction** | 191:1,2 209:5 | 134:17 135:3 | 169:5 175:5 |
| 46:13,20 | 209:7 211:17 | 135:19,22 | 202:18,23 |
| **distractions** | 212:1 218:14 | 136:15,17,24 | 203:5,8 204:7 |
| 239:24 | 231:15,20 | 137:2,10,18,20 | 204:10 205:9 |
| **distress** 9:13 | 233:2,16 237:1 | 138:4,8,20,22 | 205:12 207:15 |
| 386:21 387:5 | 244:5 245:16 | 139:2,4,22 | 207:17,18 |
| **district** 1:1,1 | 246:2 251:19 | 140:2,5,9 | 211:5 216:3 |
| 12:22,23 23:17 | 257:10,20 | 141:2 142:11 | 233:19 234:16 |
| 23:17 24:13,21 | 259:6,23 260:8 | 142:15,23 | 234:17 244:13 |
| 25:18,20 26:14 | 317:11,13 | 143:3,8,12,13 | 245:19 248:19 |
| 27:9,24 29:2 | 329:20 330:19 | 143:17 144:13 | 248:24 249:6,9 |
| 29:20 30:1 | 331:2 332:22 | 145:1 146:1,6 | 256:22 257:21 |
| 37:24 38:3 | 335:5 342:9 | 146:13,17,21 | 260:23 277:18 |
| 48:2 59:16 | 343:24 344:18 | 147:8,12 148:4 | 278:13 280:21 |

CONFIDENTIAL

**[districts - driven]**                                    Page 24

315:18,24
316:8,11,12,14
319:4,14 321:8
323:18,20
329:3 330:6
334:19 348:6
364:2,8
**diversion** 62:20
**divert** 234:8
280:8
**diverted**
162:14 164:13
166:14 180:21
184:17 237:22
282:4
**diverting** 62:5
**divide** 99:2
**doctoral** 21:17
200:9 212:21
213:5
**document** 1:6
64:21 97:12
100:17,20
203:15,23
204:6,8 212:10
334:15 339:7
339:22 342:7
383:18 385:8
385:19 388:21
390:6,9
**documentation**
260:13 261:1
**documented**
260:10,19,21

**documents**
11:10 101:2,3
101:7,18,21
102:4,6,7
107:4,23 108:2
108:5,15,20
109:3 113:3
127:9 128:4,15
129:1,3 130:5
133:20 134:1
134:16,21
135:20,23
136:3,9,14
137:20 139:3
139:19 142:21
142:24 143:11
145:23 146:5
146:17 149:2
149:23 150:8
150:13,16,19
150:22 151:6
151:20 152:2,9
152:15,19
154:8 155:24
156:7,17,22
158:15,23
159:2,6 160:10
162:1,21 163:1
164:1,10,15,19
164:23 165:14
166:5,9 167:14
167:22 168:16
168:19 173:5
202:1 203:12

203:17 204:1,9
204:21 205:1,7
205:13 206:14
207:14,24
209:8 210:16
210:17 211:4
217:15,15
218:16 312:24
315:17,23
334:20 355:24
364:14,19
365:1
**doing** 47:13,15
63:10 73:19
74:5 75:7,18
75:23 76:17
82:19 104:24
105:19 106:8
120:19 154:13
154:17 159:4
166:1 168:11
169:13 191:3
211:10 236:22
255:14,24
256:17 273:2
288:15 307:22
310:4 337:24
344:14,14,18
348:16 353:18
379:15 396:8
**donahue**
230:23
**dopamine**
182:5

**double** 222:18
298:4 309:15
309:23 310:2,7
311:13 314:16
**downloaded**
287:6 293:22
298:3 301:22
308:2,22
310:16
**dozen** 249:9
257:19
**dr** 13:14 82:16
97:20 286:18
304:19 374:17
383:8 385:18
387:4 388:20
390:3 391:12
**drafting** 101:19
101:20 111:18
111:21
**drains** 184:16
**draw** 92:19
124:2 133:10
**drawing**
224:13
**draws** 125:20
127:7 134:9
231:14
**drew** 199:3
296:22 299:17
**drive** 2:10 4:17
**driven** 147:19
154:5 324:23
324:24

**[driving - educator]**                                                      Page 25

| | | | |
|---|---|---|---|
| **driving** 321:14 | **earlier** 73:1 | 83:3 88:20 | 213:24 214:7 |
| 321:17 | 196:21 197:6 | 98:24 119:10 | 214:23 215:11 |
| **drop** 373:19 | 220:19 250:8 | 121:12 147:13 | 216:11,13 |
| **drove** 321:6 | 261:4 276:12 | 158:4 162:17 | 219:1,13,24 |
| **due** 14:16 | 285:17 320:4 | 165:6 180:2 | 221:3,12,18,24 |
| 182:17 231:24 | 352:14 358:21 | 181:7 192:4 | 222:9 223:7,9 |
| 312:15 | 374:23 | 229:18 245:12 | 223:10 224:14 |
| **duly** 13:8 395:5 | **early** 78:1,1 | 255:20 288:20 | 225:1,17,20 |
| **duplicate** 296:3 | 191:20 | 289:17 331:19 | 226:10,16 |
| 308:17 309:11 | **earned** 21:9 | 343:13 378:11 | 227:17 228:1 |
| **duplicates** | **earnings** 83:5,9 | **educational** | 229:20 231:18 |
| 312:3 | 86:13 | 8:12,16 21:4,5 | 233:13 236:19 |
| **duties** 71:13 | **easy** 154:12 | 28:19,20 29:8 | 237:8,11 |
| 79:16 210:8 | 155:16 158:18 | 29:23 30:17 | 238:22,23 |
| 280:18 288:17 | 165:18 | 41:18 43:16 | 239:18,19 |
| 379:7 | **ed.d.** 1:13 7:4 | 48:4 78:21,23 | 244:4 249:1 |
| **dwhiteley** 2:18 | 7:15 20:21 | 95:1 98:21 | 283:3 284:13 |
| **dynamic** 215:5 | 398:8 | 103:11 112:13 | 284:24 288:21 |
| 225:5 226:13 | **editing** 111:23 | 112:13 116:21 | 289:17 319:20 |
| **dynamics** 8:13 | **editor** 86:23 | 121:18 123:13 | 320:9 325:14 |
| 200:17 | 87:3,4,10,13,21 | 123:20 124:5 | 330:2,11 |
| **dysregulation** | **editorial** 87:7 | 124:24 127:3 | 343:11,18 |
| 37:2,4 139:14 | 87:23 89:19,23 | 142:2 145:19 | 344:9 345:10 |
| 141:14,21 | 90:2,5 95:20 | 147:6,16 | 376:16 377:2 |
| **e** | **educate** 320:9 | 148:16 149:5 | 379:14 380:16 |
| **e** 7:2,11,17 8:2 | **educating** | 153:10,11 | **educator** |
| 9:2 10:2 45:10 | 322:23 | 161:9 163:21 | 124:21 149:17 |
| 45:12 81:5,10 | **education** 14:6 | 165:5,9 178:21 | 149:23 150:3 |
| 81:14,16,21,24 | 21:7,8,15,19 | 197:19 198:13 | 150:16,24 |
| 385:22 387:10 | 22:6,12,17 | 198:15 199:2 | 151:21 152:2 |
| 397:1 | 23:18 24:2,15 | 199:14 200:10 | 153:1 155:3 |
| **e.h.** 305:22 | 25:8,10 29:11 | 200:16 201:18 | 165:5 193:7 |
| 307:18 | 40:20 41:1 | 208:9,10,20 | 326:17 |
| | 44:7 82:21 | 209:16 211:18 | |

CONFIDENTIAL

**[educators - engagement]**                                                    Page 26

**educators**
88:15 328:9,23
329:2,20 330:2
342:11,17
343:10 344:13
348:6
**edwards** 32:10
**effect** 62:13
68:16,23
119:21 162:13
163:14 184:14
187:8 191:23
**effective** 215:1
255:18 327:24
344:22
**effectiveness**
103:21 199:14
**effects** 65:8
78:20 116:8,13
138:7 139:11
141:17 145:12
180:8 186:9
256:19 274:9
281:23 320:20
341:18 347:1
**efficient** 226:5
**effort** 117:22
293:1
**efforts** 293:4
**eighth** 6:5
**eiland** 5:10,11
**eilandlaw.com**
5:14,14

**either** 15:15
37:20 53:8
80:20,21,23
150:8 217:8
218:12 225:11
248:19 348:5
**el** 3:9
**electronic** 41:5
41:13 42:6,13
43:10 159:17
160:2,7,16
161:1 204:2
**element** 63:12
96:9
**elementary**
48:15
**elements** 61:23
**eleven** 393:22
**emanate**
245:20
**embedded**
192:15
**emerge** 322:6
379:2
**emerging**
210:22 239:16
291:18 322:14
**emotional** 37:2
37:4 58:5
116:13 129:15
139:14 141:14
141:21 149:16
162:15 164:18
164:22 165:17

166:15 178:22
**emotionally**
62:4 116:7
145:12
**emphasize**
215:21 226:16
**employ** 125:20
196:23 227:24
**employed**
33:24 34:9,11
34:16
**employee** 365:3
365:6
**employees**
356:4
**employer** 14:5
**employment**
28:11
**enable** 284:17
289:9 340:7
**enabled** 239:15
**enables** 361:20
**encapsulated**
52:17
**encounter**
249:14
**encourage** 96:4
273:13 328:17
**encouragement**
337:10
**encouraging**
337:5 371:7
**endeavor** 91:1

**endeavored**
103:20
**endeavoring**
208:17
**endeavors**
214:6
**ends** 51:23
193:23 265:16
**enforcement**
161:18
**enforcing**
159:16 160:15
160:24
**engage** 125:6
128:3 146:2
181:18 187:23
193:13 231:19
275:17 324:16
327:21
**engaged** 40:6
186:8 283:23
**engagement**
40:10 73:13
104:3 120:5
126:9 175:9,24
176:11,23
179:4 180:1
181:5 183:5,8
183:23 187:10
235:21 236:2
242:20 273:14
280:13 327:12
343:3 350:16

**[engaging - exacerbating]**                                      Page 27

engaging
  355:19
engineered
  104:2 175:14
  175:19 176:3
  182:4
engineering
  182:17
enjoyment
  346:22
ensure  32:19
ensured  290:11
entail  22:8,23
entailed  22:9
  22:24
entails  28:18
entered  287:2
enters  63:13
entertained
  349:22
entertainment
  349:20
entire  52:13
  128:1
entirely  272:24
  342:20
entities  136:5
entitled  97:21
  219:11 221:2
  224:24 251:24
  252:13 296:22
  299:17 302:22
  305:11 306:3
  385:19,20

387:5 388:22
entry  196:1
environment
  152:16,20
  153:3 155:4
  184:20 191:24
  215:7 225:6
  226:14 251:11
  251:17 280:14
  319:20 321:6
  325:12 326:8
  327:6,7
environments
  142:7 149:19
  154:1 180:23
  212:4 256:21
  282:1
epidemiologist
  36:3,4
equitable  91:14
equity  7:20
  89:4 91:4,13
  91:22 92:3,11
  94:18 99:1
errata  396:6,9
  396:12,15
  398:6
erroneous
  298:23 299:1
  300:3
error  222:20
  229:12 293:12
  309:2,15 310:1

errors  293:8,9
  296:8 298:6
  311:20 313:23
escalated
  135:14
escalating
  139:13 141:13
  141:20
especially
  125:1 280:16
  349:1
esquire  2:3,10
  2:16 3:4,8,16
  4:4,11 5:4,4,11
  5:11,17
essential  8:13
  200:17 379:7
essentially
  50:22 124:17
  243:2
establish  102:1
established
  124:4 163:20
  199:8 279:21
esteem  72:15
estimate
  360:16,22
ethics  369:4,13
evaluated
  55:24
evaluates
  209:21
evaluating
  203:16 204:1

evening  360:2
event  344:3
events  329:19
  329:22
everybody
  394:4
evidence  65:7
  80:16 107:19
  124:15 134:10
  143:24 144:9
  157:20 161:6
  163:16 165:4
  165:19 167:9
  167:20 206:23
  211:15 213:7
  214:9,11 228:7
  233:9 234:3
  251:6,7 253:17
  253:22 281:22
  282:24 283:20
  283:21 284:10
  284:21 287:18
  288:5
evident  131:1
exacerbated
  55:16 58:9
  69:6 72:14
  320:13
exacerbates
  119:23 187:20
  188:15 324:15
exacerbating
  121:10 280:15

CONFIDENTIAL

**[exact - experience]**                                                    Page 28

| | | | |
|---|---|---|---|
| **exact** 38:10 | **exceeds** 253:17 | 129:9 133:9 | **existed** 106:6 |
| 39:5 85:22 | **except** 12:6 | 194:11 196:17 | 188:4 320:12 |
| 285:7 | 165:17 312:12 | 200:14,24 | 326:19 |
| **exactly** 15:5 | 398:5 | 201:3,5 214:19 | **existent** 245:24 |
| 26:4,4 73:9 | **exclude** 278:14 | 219:21 220:5 | **existing** 187:20 |
| 74:5 76:13 | 279:16 | 220:10 221:8 | 280:15 317:10 |
| 77:17,22 83:17 | **excluding** | 221:17 223:13 | **exists** 224:8 |
| 87:2 110:8 | 279:6 318:11 | 226:24 231:8 | 262:24 294:14 |
| 170:13 176:1 | 318:14 | 272:2 282:17 | 307:6,13 316:7 |
| 182:6 196:3 | **exclusion** | 291:14 294:22 | 317:19 378:13 |
| 200:5,6 285:8 | 116:16 145:15 | 295:5,9,11,14 | **expansive** 23:4 |
| 287:4 293:14 | 146:11,20 | 295:19 298:12 | **expectation** |
| 363:1 | **excuse** 208:11 | 298:13 300:7 | 223:6 323:19 |
| **examination** | **executing** | 303:17 304:13 | **expenditure** |
| 13:11 118:21 | 320:8 | 331:12 334:6,8 | 22:11 |
| 326:6 352:17 | **executive** 28:24 | 334:16 383:19 | **expenditures** |
| 359:23 374:14 | 48:5 122:13 | 383:21 385:3,8 | 218:6 321:7,15 |
| 383:5 | 125:2 126:17 | 385:10 386:16 | 321:18 |
| **examine** 95:18 | 197:20 199:6 | 386:18 388:7,9 | **experience** |
| 163:24 229:7 | 208:11 211:19 | 389:18 390:20 | 46:17 47:18 |
| **examined** 13:8 | 217:21 223:10 | 391:2,4,14 | 102:10,17,24 |
| 317:8 | 228:2 236:22 | **exist** 99:14 | 103:10 104:13 |
| **examining** | 244:3 257:18 | 100:2 121:11 | 105:12 113:7 |
| 94:12 | 363:10,13,19 | 181:15 294:17 | 116:21 121:15 |
| **example** 52:8 | **exercise** 218:22 | 300:21 303:9 | 123:9 124:9,19 |
| 64:13,18 102:6 | **exhibit** 20:17 | 306:10 307:3 | 136:6 142:1,9 |
| 173:18 186:23 | 20:19 81:3,12 | 308:11,12,16 | 143:19 145:19 |
| 188:16 236:18 | 84:3,9,11,13 | 308:22 309:10 | 147:6,16,22 |
| 316:10 343:15 | 89:2,10 96:14 | 309:12,21 | 148:16 149:5 |
| 343:17 344:2 | 96:22,24 97:3 | 311:10 313:16 | 153:9 158:1 |
| 371:12 | 100:11,18 | 313:22 314:9 | 161:7 163:4 |
| **examples** 64:22 | 109:11,18,19 | 314:18 322:10 | 165:4 177:12 |
| 187:22 278:5 | 110:17 111:1 | 367:5,11,24 | 177:14 207:1 |
| 370:8 | 112:5 122:3 | | 211:16 231:15 |

**[experience - facebook]**                                    Page 29

233:11 240:22
250:4 256:14
263:12 267:21
267:24 268:1
269:5,8,11,17
270:22,24
271:15,18,21
279:23 362:4,9
**experiences**
79:24 247:20
**experiencing**
51:6 115:15
147:13 151:2
186:10
**experiment**
311:1
**expert**  8:8,10
14:19 15:15
34:19,23 35:3
35:7,11,15,19
36:6,8,9,11,13
36:15,17,19,21
36:23 37:1,3,5
37:7,9,11 47:7
68:18 73:14
76:15 78:18
79:4,9,11
98:12 99:24
106:14,17,21
109:13 110:19
168:12 175:12
175:14 176:5
177:5 179:14
181:12 189:6

190:6 207:10
261:5,7 272:18
274:16,19
275:3,20
279:18 283:17
284:9,20
285:15,19
305:20 326:16
354:10
**expertise**  34:21
35:1,5,9,13,17
35:21 53:24
105:17 112:10
182:11,14
183:19 258:12
263:23 265:19
267:10 276:2
277:7 278:9
282:14 367:20
380:16
**experts**  135:8
146:24 159:12
162:7 164:8
166:3 167:19
169:10 182:13
182:15 204:14
205:18 211:13
246:5 258:16
276:10 281:17
283:5 284:15
285:10 315:4
319:6
**expires**  398:12

**explain**  208:16
264:9,20 296:2
317:6
**explains**  203:14
**explanation**
112:21 208:8
**explanations**
318:12
**exploits**  273:9
**exploration**
9:13 386:22
387:6
**explore**  201:24
264:4,6
**exploring**  9:17
388:11,22
**expose**  56:3
342:24,24
350:2
**exposed**  60:10
**exposes**  346:4
**exposure**
116:16 145:14
146:10,19
187:5 327:18
346:2
**extend**  273:14
**extent**  92:1
136:7 145:24
260:3 321:3,13
356:13,15
357:23 371:13
375:7 376:15

**external**  186:22
346:12
**extra**  29:5,6
**extrapolate**
144:12 165:18
188:11
**extrapolation**
141:8 148:8
154:12 155:10
155:14,16,21
158:14,18
159:3 161:23
163:24 166:19
167:3,8,24
168:3,6 169:2
**extrapolations**
168:14
**extremely**
320:19

**f**

**fabric**  53:1,12
55:21 62:15
71:1 177:12
324:19
**face**  64:6,6
120:3 231:24
255:23
**facebook**
169:22 170:6
170:20 171:10
172:7 183:2
193:3 265:20
265:22 266:1,4

CONFIDENTIAL

## [facebook - feeling]

Page 30

266:12,16
267:21 268:3
268:11,14,19
333:20 344:2
350:4
**facebook's**
267:1
**faced** 319:14
321:8
**facetime**
263:20
**facilitate**
174:16 185:7
**facilitated**
138:2
**facing** 29:17
42:3 88:15
210:4,23
259:24 261:1
**fact** 8:22 15:13
49:1 95:7
117:23 118:9
118:11 154:18
157:7 177:20
190:15 221:18
239:20 292:3
304:6 305:10
311:10 313:4
323:16 331:14
331:19 332:3
337:5 339:2
342:9,11
343:16

**factors** 119:12
119:13,18
187:19 321:17
321:22
**faculty** 212:22
**fail** 333:17
396:18
**failure** 179:1
**fair** 16:16 17:4
17:12 30:24
183:23 184:3
206:19 218:8,9
290:17 319:9
343:20 358:16
**fairly** 245:15
312:10
**fake** 369:21
**fall** 89:12
**false** 246:22
254:1 256:5
**familiar** 101:24
294:16 334:24
353:6 354:11
354:16 355:10
384:12
**familiarity**
268:10
**familiarize**
92:18
**familiarizing**
89:20 90:8
**families** 159:20
161:5 329:7,11
337:15

**family** 339:15
**far** 83:13,14
86:13 284:3
285:6 309:8,8
347:1
**fast** 55:10
**fat** 189:18
**fault** 70:18
**faulty** 292:17
292:19 298:10
300:3 303:10
**favorite** 336:14
339:16 345:18
**fax** 1:23
**fear** 66:15
116:15 145:14
146:10,19
177:13 240:2
325:1,2 350:24
**fearful** 187:5
**fears** 325:1
**feature** 267:2
267:22 271:5
271:11
**features** 47:4
73:14,15 103:4
103:24 104:1
105:2,21
106:10 144:7
147:20 154:5
173:12 174:13
174:14,21
175:4,10,13,23
177:1 179:17

179:23 180:17
181:3,8,11,21
182:20,22
183:4,12,13,22
184:7 185:5
186:1,2 190:17
263:12 269:6
269:12,17,19
269:21 270:22
273:4 276:14
276:23,24
277:2,3,10
278:7 279:8,17
279:19 280:1
280:12,20
281:12,15
343:2 354:10
355:13 366:8
**federation**
14:15
**federico** 2:9
4:16
**feed** 267:2,7
269:24 270:3,6
**feedback** 127:8
128:2
**feeds** 272:12
277:24 278:14
279:9 280:23
**feel** 55:7,11
57:1 168:10
273:24
**feeling** 60:8,10
62:2 69:8

273:19
**feet**  253:14
**felt**  289:6
**fictitious**  313:2
  313:11
**field**  112:11
  113:8 123:19
  124:4 197:19
  208:20 212:21
  213:17 216:2
  228:17 239:18
  376:12 377:23
  379:11
**fifth**  33:4
**fighting**  63:16
**file**  301:24
  310:15 312:21
**filing**  12:4
**financial**  3:17
**find**  45:24
  76:15 86:19
  114:7 230:1
  286:24 349:21
**finding**  289:6
  345:22 346:20
  348:17
**findings**  91:5
**findjustice.com**
  2:6
**finds**  361:12
**fine**  374:12
**finish**  16:24
  17:2 254:17

**fire**  370:14
**fires**  369:18
**firm**  5:10 13:17
  76:11,12 81:18
**first**  19:3 76:5
  76:7,16 90:18
  97:5,15,24
  116:22 202:12
  202:14 204:16
  212:7 298:9,20
  299:13 308:18
  332:8 334:23
  384:9 385:21
  387:9 389:1
**firsthand**
  241:17 263:11
  267:20 269:4,8
  269:10,16
  270:21 271:14
  279:22
**five**  93:8 95:8
  170:1 171:18
  172:3,24 361:1
  361:3 370:1
  393:12,21
**fixed**  392:9
**flawed**  297:4
**flonger**  5:7
**floor**  3:10 4:5
  5:18
**florida**  3:18
**flow**  279:7
**flows**  191:5

**focus**  47:2,2,8
  69:12 139:13
  139:21 140:1,8
  140:16 141:1
  141:13,20
  142:17 234:12
  237:16
**focuses**  91:22
**folder**  293:23
  298:3 301:23
  308:7,23
**follow**  236:9
  242:17 368:21
**following**  270:3
  305:19 338:16
  340:20
**follows**  13:9
**footnote**  199:23
  200:1 214:17
  220:22 221:1
  223:14 229:4
  282:20 291:15
  299:11 302:11
  302:13,17
  311:12
**footnotes**
  228:18
**foregoing**
  395:17 398:3
**forget**  235:24
  242:16
**form**  12:6
  113:14 119:9
  189:14 213:6

239:9 240:17
  246:24 253:24
  398:5
**format**  309:3
  310:20
**formatting**
  310:12 314:15
**formed**  105:7
  347:5
**forming**  101:14
  114:14 118:13
  124:10 171:13
  205:2,8 364:14
**forms**  161:16
  240:23
**formulating**
  355:24
**foster**  329:24
  330:3
**found**  101:21
  104:12 106:24
  110:4 120:20
  268:3,7 298:5
  309:6 311:18
  389:8
**founded**  290:12
  290:22,23
  291:5
**founder**  33:18
**four**  19:9 27:4
  27:5 50:7
  124:17
**fourth**  125:8
  233:24

[fragment - give]                                              Page 32

**fragment** 346:8
**fragmentation**
  66:14 239:24
**fragmented**
  52:20 151:3
**framework** 9:7
  91:11 302:23
  383:24 384:7
**frederick** 5:4
**frequency**
  135:15 136:19
**frequent**
  342:23
**frequently**
  60:23 74:19
  351:3
**friends** 58:8
  339:15 355:18
**front** 73:20
  74:13,23 75:19
  219:6,16
  391:13
**frontal** 55:2
  177:21 182:8
  273:12 274:22
**frontiers** 9:6
  383:22
**frustrated**
  58:15
**frustrating**
  63:23 72:12
**frustrations**
  103:16

**fueled** 69:9
**fulfill** 65:13
  71:12 79:16
  280:17 323:6
**full** 14:2 31:6
  204:16 335:11
  339:7 360:6
**fuller** 126:21
**fully** 177:22
  182:8 322:9
**fun** 335:24
  336:2,6,10,13
  338:20 345:15
  346:21 349:20
**function** 269:9
**functionality**
  268:23
**functions** 46:18
  119:10
**fund** 345:16
**fundamentally**
  116:19 145:17
**funding** 156:12
  156:17,23
  157:8,14
**funds** 46:11
**funny** 361:13
**further** 15:18
  92:1 159:10
  192:4 229:1
  345:9 352:9
  359:8 382:10
  392:5,18

**g**

**g** 8:8,10 109:13
  110:19 387:11
**gain** 216:15
**gained** 244:8
**galveston** 5:13
**games** 45:19,21
**garden** 77:18
  77:19
**gateway** 346:1
**geared** 212:20
**gears** 261:3
**gemini** 309:2
  310:10 311:4
**general** 104:16
  113:18 131:18
  134:9 135:18
  157:14 228:11
  240:24 241:3
  251:8
**general's** 49:16
**generalized**
  51:16 55:19
  62:13,23 66:18
  131:7 137:14
  140:4 180:24
  184:18 190:21
  240:1 250:2
  251:12 281:24
  325:3 346:10
  372:4
**generally** 28:17
  29:21 113:17

  138:17 153:9
  165:3 169:20
  235:19 240:19
  242:8,19
  334:24 365:11
  365:16
**generate** 78:18
**generated**
  100:23,24
  201:23
**generating**
  101:8
**generation**
  261:20,22
**generett** 91:9
**genesis** 51:14
**getting** 60:12
  72:17 83:19,23
  85:6 93:13
  107:1 254:12
  268:4 331:23
  345:14 350:6
  376:8 377:16
**giordano**
  387:11
**give** 52:7 78:18
  89:15,15 92:16
  93:3 98:5
  109:5 220:15
  226:4 228:20
  334:15 335:10
  360:6 382:14
  383:13

CONFIDENTIAL

**given** 155:1
160:12 167:4
203:10 211:12
258:14 289:10
322:2 395:7
398:4
**gives** 49:1
187:22 381:5
**giving** 230:18
**gleaned** 256:8
**go** 15:18,19
24:17 31:12
41:10 48:6
57:18 59:10
64:19 72:24
84:10 90:20
91:12,12 93:24
95:14 100:6,8
101:17 108:8
112:4 114:20
129:9 153:6
194:11 197:16
209:11 214:18
215:10 218:13
222:18 223:12
224:15 232:8
238:4 242:1
245:4 246:10
250:24 260:2
272:1 282:16
286:3 291:14
295:8 298:11
299:22 300:6
306:20 307:9

309:13,17
350:10 359:10
365:18 374:8
374:10 382:17
383:14 393:16
**goes** 18:3
**going** 13:19
16:11 17:10
31:16,23 51:15
52:12,22,24
54:20 55:7
56:3 59:23
69:3 70:17
72:24 80:4,10
82:4,12 110:24
132:21 133:6
180:4,12
186:19 189:19
193:22 194:8
216:7 230:7,16
249:20 250:21
250:24 251:1
252:10 257:9
274:13 286:7
286:16 295:8
299:7 303:9
318:13 327:14
337:11 340:21
341:6 343:10
343:13 345:9
348:11 349:19
350:21 351:16
351:20 352:5
352:10,12

357:21 359:13
359:20 373:1
382:19 383:2
383:10,18
385:7 386:15
388:6 391:1
392:11 393:3
**goings** 344:8
**golkow** 1:22
12:13
**golkow.com**
1:23
**good** 13:14,15
39:14 82:2
98:20 107:7
175:15 193:18
285:24 299:3
307:24 311:3
352:20 360:2
381:6,7
**gooden** 91:9
**google** 2:19
101:22 102:14
120:22 286:24
290:5 301:22
308:3 374:19
393:13,23
**gotlib** 282:22
**gotten** 101:10
**governance**
29:12,12
**grade** 33:4
**graden** 4:11

**graduate** 21:15
21:18 32:16
47:24 122:11
140:19 207:4
238:24 239:5
248:19 257:15
**grand** 4:5
**granted** 312:14
**grapple** 187:16
**grappling**
126:2
**great** 86:20
119:20 177:11
346:22
**greater** 282:3
**ground** 15:19
**grounded**
199:8 215:2
**group** 266:5,20
**grow** 217:6
**growing** 156:11
157:13
**guardrails**
327:11
**guess** 63:7,8
87:3,5 91:17
105:16 126:12
155:9 244:24
258:23 267:6
273:22 274:4
292:14 307:8
327:5 335:21
340:20 353:11
354:6 370:20

**[guess - health]**                                      Page 34

375:22 380:3
**guidance**
  212:23 213:22
  340:7,19
**guidelines**  8:24
  334:10 335:2,6
  336:17 337:13
**guiding**  200:8
**gun**  319:22,24
  320:15
**guys**  81:22
  230:24 231:1

**h**

**h**  7:11 8:2 9:2
  10:2
**half**  19:5 38:15
  39:16 97:8
**hallucinated**
  313:1
**hand**  110:24
  304:12
**handed**  221:17
  222:7 295:10
**handful**  255:11
**handing**  84:8
  96:21 100:17
  109:17 200:23
  220:4
**handle**  51:8
**hang**  93:13
  97:1,4
**haphazard**
  123:17 228:5

**happen**  51:19
  180:12 250:24
  322:15 337:12
  371:9 372:8
**happened**
  51:20 63:18,20
  71:17 236:12
  314:4 324:24
  327:16
**happening**
  54:16,21 55:15
  58:8,18 64:9
  64:13 65:15
  148:9 240:18
  268:21 351:8
  373:22 381:7
**happens**
  218:19 320:17
  320:18,18
  372:5
**happy**  17:17
  117:14 173:8
  225:13 392:19
**harassment**
  340:15
**hard**  144:11
  326:8 351:4
  375:20
**harford**  19:24
  331:20 332:15
  332:16,22
  333:4 342:10
  343:15

**harm**  114:3
  178:22 190:9
  190:12,13,24
  191:5 192:8,16
  192:19,22,24
  193:7,8 245:19
  276:16 278:14
**harmed**  277:18
  357:13
**harmful**  176:12
  185:12,19,24
  256:19 325:10
**harms**  103:6
  115:7,14 116:2
  117:10 119:4
  121:8 178:9
  184:20 188:14
  188:15 277:22
  277:23 279:6,7
  280:15,16,21
  287:13 323:21
  347:1 348:23
  350:3
**harness**  99:13
**harnessing**
  100:1
**harvard**  21:15
  21:18
**harvard's**
  32:17
**hate**  340:15
**head**  171:9
**health**  9:18
  36:5,7,10,12

37:14,18 67:1
71:2 115:7,14
116:2,18 117:1
117:10,19,24
118:2,9 119:4
120:13,24
129:13,17,19
129:23 130:6
130:12 131:9
131:11 139:15
141:22 142:18
142:22 143:2
143:16 144:2
144:14 145:1
145:16 156:13
156:18,23
157:8,15 180:8
184:15,16
190:21 237:23
239:23 251:9
273:17 282:4
283:2,17
284:12,23
285:9,15,20
287:2,5,13,20
288:11 289:3
289:19 291:18
296:24 299:19
306:4 321:4,7
321:15,18
346:8 357:14
379:5 388:13
388:24

**hear** 77:13,14
258:19
**hearing** 210:9
234:20
**heavily** 105:22
**heightened**
62:5 162:14
164:18,21
165:17 166:15
**heimann** 5:17
**held** 1:14 12:17
98:19
**hello** 374:17
**help** 44:1 92:2
92:2 93:5
118:5 123:24
210:17 217:5,6
217:9 242:13
278:24 289:9
**helpful** 57:3
378:12
**helping** 44:3
79:19
**helps** 92:10
**hey** 362:23
**high** 39:9 48:16
251:8
**higher** 40:7
248:23
**highlight**
329:16
**highlighted**
93:15 96:2
328:16 338:20

**highlighting**
336:18 337:18
338:1,7 339:2
339:14 340:1
**highly** 243:12
**hinder** 133:14
**hired** 37:22
38:1 98:11
99:24
**hits** 182:5
**hold** 272:11
275:5,22
382:12 392:11
**holder** 362:21
**holding** 352:12
**home** 204:20
271:15,17
**hoover** 18:2,8
**hopefully** 229:2
**hour** 19:4,5
83:20 84:1,16
84:22 85:6
**hourly** 195:24
**hours** 19:7,8,9
42:19 85:10,13
194:24 195:1
195:14 360:4
361:1,3 383:10
393:11,20
**hudson** 5:18
**huh** 46:1 50:10
371:23 376:10
**humming**
55:20

**hums** 181:1
**hundreds**
48:12 173:4
237:15 238:18
248:15,16
**hyperlink**
223:16 224:1
**hypothetical**
349:24 350:18
351:10

**i**

**ian** 282:22
**idea** 18:2
163:19 206:9
263:10 266:13
332:12 335:1
353:15,17
**ideas** 213:22
274:11
**identifiable**
323:14 376:14
**identification**
20:16,22 65:17
81:6 84:5 89:6
96:18 100:14
109:14 110:21
200:20 220:1
228:9 295:1
303:21 331:15
334:12 376:21
377:4,13,24
378:15,17
379:10,12,16

384:3 385:15
387:1 388:17
389:24 391:9
**identify** 119:20
239:15 250:10
287:10 290:5
293:7,10 312:1
376:19 377:1,4
378:1
**identifying**
376:9,11
**identity** 338:15
**ignoring** 315:6
**iid** 22:10
**ills** 120:3
**illustrative**
52:13 278:4
370:8 371:12
373:3
**imagine** 375:21
**imbalance**
212:8 213:4
**immediately**
97:1 206:5
305:19
**impact** 40:20
40:24 43:4,7
46:22 57:7
60:2 67:7
103:4,16 105:5
105:14 114:24
115:21 118:16
119:4 127:24
133:15 138:12

[impact - individual]                                                    Page 36

149:15 150:19
175:5 180:20
181:22 185:12
185:20,24
192:2,12 212:2
244:10 280:13
288:10 289:11
296:23 299:17
321:5 324:16
325:12 326:7
380:20
**impacted**   116:3
117:9 372:10
**impacting**
79:14 118:10
162:16 251:16
379:6
**impacts**   66:12
102:12 150:23
176:12 182:21
323:17 341:16
366:13,19
367:4,10,22
**impairment**
305:13
**imperative**
62:2 396:14
**impersonating**
372:19
**impersonation**
340:14
**implemented**
258:17,21,24

**implications**
30:2 291:19
**import**   222:24
**importance**
55:5 178:1
225:18 240:10
288:16,23
338:2,15
**important**
86:19 217:12
218:21 239:10
341:15,20
342:17 345:6
**impose**   280:20
**imposing**   65:11
65:12 66:20
71:9
**impositions**
71:10
**impressions**
379:3
**improve**   192:4
208:17,24
210:18 343:13
**improvement**
199:13 204:18
**improves**
305:12
**improving**
29:12 62:7
66:23 121:18
209:14
**inappropriate**
338:12 340:16

**incentives**
373:4
**incident**   52:8
54:12 62:12,23
63:2 69:4
**incidents**   52:10
54:10 325:7
**include**   67:19
101:2 115:13
142:10 183:20
217:13 221:11
277:23 278:22
279:8,16
280:21 370:3
372:6
**included**   67:14
101:4,6 153:13
197:1 223:16
257:8 267:5
**includes**   88:14
88:18 127:18
186:4 221:21
249:6
**including**   30:19
43:18 163:8
231:16
**inclusion**   240:2
291:3
**inclusive**   8:16
219:12,24
221:3 225:1
226:10
**income**   82:17
82:18,22 83:1

83:2
**incorporated**
332:23
**incorrect**   110:6
224:12 307:11
**incorrectly**
296:16 335:21
**increase**   321:15
327:11
**increased**   99:6
151:3 162:13
162:22 166:14
184:15 282:9
**increases**
149:17 251:9
251:10,12
321:6 379:5
**increasingly**
99:15 100:3
**incumbent**
62:22
**incursion**   61:23
**independent**
79:4
**independently**
243:4,9 380:23
**index**   11:2
**indicate**   342:5
**indicated**   333:7
**indicates**   257:8
**indicative**
232:21
**individual**   54:1
210:18 325:11

**[individual - intended]** Page 37

| | | | |
|---|---|---|---|
| 368:4 | 312:19 | 153:24 | **instruct** 151:2 |
| **individuals** | **informs** 223:8 | **instagram** 3:12 | 356:12 357:21 |
| 59:3 234:16 | **ingram** 224:3 | 6:7 169:23 | 375:6 |
| **inequity** 91:8 | 229:11 | 170:6,20 | **instructed** |
| **inevitably** | **inherently** | 171:11 172:7 | 376:3,5 |
| 54:16 | 155:11 | 183:2 193:3 | **instruction** |
| **infer** 291:3 | **initial** 77:11 | 262:19,21,22 | 23:7,22 58:3 |
| **infinite** 272:12 | 299:9 390:17 | 263:4,6,9 | 58:14 327:24 |
| 277:24 278:14 | 391:21 | 264:10 350:5 | 331:5 344:11 |
| 279:9 280:23 | **initially** 76:21 | **instagram's** | **instructional** |
| **influence** | 288:15 358:14 | 263:12 | 22:3,13 23:9 |
| 210:13 285:2 | **initiatives** | **instance** 56:14 | 23:13,16 324:3 |
| **inform** 59:17 | 23:14,23 | 67:7 70:15,17 | 325:23 |
| 121:4 301:7 | 259:20 | 71:17 108:13 | **instructions** |
| 379:2 | **injury** 1:4 | 190:10 330:13 | 396:1 |
| **informal** | 12:20 | 355:16 375:23 | **integrate** 331:4 |
| 249:12 | **inquiring** 238:4 | 379:23 | **integrated** |
| **informant** | **inquiry** 9:9 | **instances** 53:6 | 342:12 |
| 241:15 | 215:12 216:2,6 | 54:1 57:10 | **integrating** |
| **informants** | 226:17 385:12 | 58:2 59:2,17 | 98:3,12 |
| 210:10 | **ins** 182:2 | 63:15 66:4 | **intelligence** |
| **information** | **insecure** 69:9 | 67:13 68:12,16 | 311:5,8 |
| 16:9 130:3 | **inside** 186:11 | 70:20 72:1,10 | **intend** 275:14 |
| 136:19 137:1,9 | **insight** 49:1 | 104:10 137:17 | 284:8 384:18 |
| 137:16 141:3 | 75:22 103:23 | 308:10 | **intended** 97:18 |
| 160:19 206:12 | **insights** 248:13 | **institute** 10:6 | 175:24 176:22 |
| 232:12 234:14 | **insistence** | 391:6,15 392:1 | 179:24 181:5 |
| 266:22 329:7 | 70:13 | **instituted** | 183:5 220:13 |
| 329:10 355:15 | **insofar** 136:4 | 160:1,5 | 229:10 273:5 |
| 355:22 | 151:1 165:18 | **institutional** | 297:12,15 |
| **informative** | 213:2 227:18 | 94:23 | 327:11 388:1 |
| 250:1 | 364:22 | **institutions** | 389:14 390:13 |
| **informed** 105:1 | **instability** | 322:11 | 390:21 |
| 126:6 284:6 | 149:19 152:19 | | |

CONFIDENTIAL

intending    238:22 255:16
  341:7
intensified
  382:2
intensifying
  156:14 157:17
intensity
  135:15 136:20
intent    183:10
  275:7 279:15
  279:17,24
  281:16 391:19
intention
  193:13 276:4,9
  278:6,12,21
  280:12 306:17
  371:24
intentional
  94:22 106:10
  275:15 342:19
  346:19
intentionally
  104:1 181:16
interact    68:21
  179:19 183:14
  239:4 277:4
  281:12
interacted
  48:13 103:11
  376:24
interacting
  64:5 121:15
  127:19 142:5
  161:9 180:19

interaction
  61:9 103:19
  121:2 177:24
  247:17
interactions
  48:19 55:3
  58:19 59:22
  60:4,6 61:23
  64:4 69:7,18
  74:4 80:3
  106:3 107:11
  118:24 130:21
  143:19 147:23
  153:14 163:5
  165:6 186:15
  188:8 207:2
  210:1 231:22
  232:21,24
  233:4,15
  234:15 236:11
  241:20 242:9
  244:2,7 245:18
  248:14 249:11
  250:4 256:1
  258:1 279:8
  324:11 378:18
  378:22
interest    88:12
  240:7 266:5,20
interested
  76:10 268:4
  271:9

interesting
  380:2
interests
  345:22 346:20
  349:21
interface    262:6
  262:6,7
interference
  262:6,8
intern    32:10,13
  32:24
internal    355:24
  364:18
interned    32:14
internet    9:7
  45:14,17 99:7
  302:24 384:1,8
interpretation
  241:18
interpreted
  78:6
interrupt
  254:18 346:9
interrupting
  58:3,13 72:20
interruptions
  251:11
intervene    48:22
  56:9
intervening
  72:20 282:7
  325:15
interview
  143:12 212:9

interviewing
  209:19 218:17
interviews    48:9
  50:17,21 61:17
  202:1,12,15,17
  202:22 206:14
  207:16,23
  209:5,24 211:3
  227:23
introduction
  91:18
investigation
  165:23
invite    354:23
invoice    85:3
  194:12
invoices    7:19
  84:4
involve    115:6
  120:12 206:10
involved    23:20
  55:12 76:6
  77:9,15 256:2
  368:12
involves    51:13
  209:19 216:2
involving    14:14
  54:10 57:10
  63:3
irvington    19:20
  330:13,19
isolate    251:3
isolation
  206:16 208:1

250:13 326:10
**issue** 56:8
  94:18 146:2
  172:3 227:7
  251:4 283:9
  319:17 330:6
  335:1 349:18
**issued** 368:10
**issues** 29:11
  52:4 54:6
  58:11 59:5
  61:13 67:1
  72:22 91:23
  92:2 117:20
  118:1,3,10
  120:4,14
  122:17 128:15
  131:11 135:14
  135:21,24
  136:10,20
  184:16 190:21
  239:20,23
  273:17,18
  284:7 289:19
  295:6,15
  319:19 320:12
  320:13,14
  321:3 322:5,14
  324:5 325:15
  326:23 340:13

**j**

**j** 3:4 4:4 302:19
  305:21 307:17

**jacquelyn**
  385:22
**january** 77:13
  77:24 78:2
  81:21
**jccp** 4:13
**jersey** 25:12
  249:9
**job** 14:5 31:6
**join** 373:9
**joined** 89:22
**joins** 382:12
**joshua** 387:8
**journal** 8:18
  9:12 87:16,24
  88:3,5,9,22
  89:13,17 90:14
  199:13 208:23
  221:12,18,24
  222:8 291:20
  292:13,13
  293:12 294:8
  294:13,14,14
  294:23 295:6
  295:15,22
  296:24 304:21
  308:13 314:9
  328:14 386:19
**journals**
  161:14 198:24
  227:20 291:3,4
  294:17
**judge** 15:4

**july** 87:5,13,15
  87:20 111:9
  194:20 282:21
  384:20 386:9
  387:18 389:12
**jury** 71:16
  131:17 144:23
  175:3 191:5
  240:12 241:9
  241:11 243:3
  247:5 251:23
  252:12,17,20
  253:6 275:3,20
  284:9 304:4
  312:7 326:15
**justin** 4:17
**jweathers** 4:19

**k**

**k** 2:4 31:1,3
  40:20,24
  233:12 296:21
  299:16 378:2
  378:11 387:10
**kathryn** 3:16
**katie** 360:11
**keep** 134:22
  235:20,20
  242:8 249:20
  264:1 353:17
  373:10,24
**kelly** 5:17
**kennedy** 3:8
  7:17 81:5

**kessler** 1:15
  4:10
**keywords**
  101:22 287:3
  289:5,21 290:4
**kid** 74:4 75:7
  191:6
**kids** 24:8,11
  50:23 51:16
  62:3 73:3
  186:7 188:8,12
  188:18,19
  189:11 255:21
  324:1 325:11
  325:22 326:17
  326:24 345:14
  345:14 356:14
  356:24 357:24
  358:2
**kind** 41:23 44:8
  46:20 49:18,24
  55:11 57:22
  61:16 78:22
  104:10,16
  123:4,5 126:24
  161:18 189:9
  212:24 218:19
  224:16 261:1
  277:4 282:12
  283:21 291:10
  310:4 323:24
  346:10 349:23
  372:24 375:6
  380:10

**[kinds - lawbmf.com]**                                      Page 40

**kinds**  61:13
    214:8 239:16
    243:23,24
    325:5 327:4
**king**  1:16 3:16
    4:11
**klehman**  3:19
**kmcnabb**  5:20
**knew**  101:23
    105:4 106:6
**know**  17:9,15
    19:14,17,19,22
    24:7,11 26:3
    38:21 40:6
    42:23 49:10,20
    51:24 53:15
    55:15 57:20
    70:1 73:19
    74:17 75:6,17
    75:21 76:17
    78:4,7 83:11
    83:16 85:12,22
    86:8,17,19
    90:10 93:2
    102:9,19 103:5
    108:14 120:10
    129:22 130:2
    138:1,19 140:7
    140:12 147:4
    147:10 148:14
    157:6 159:23
    160:4 161:23
    171:4 173:9
    177:7,17

    179:22 181:3
    181:14 182:19
    184:12 188:10
    189:18 195:4
    195:13,15
    198:22 219:7,9
    220:16 222:23
    224:9 227:2
    229:14 230:4
    232:15 235:14
    239:4 242:20
    243:11,17
    244:18 245:6
    245:13 246:21
    247:5 249:13
    252:12 258:24
    261:11,13,15
    261:17,19,21
    261:23 262:2,5
    262:7,9,11
    263:1,15,16
    264:3,12,13,17
    265:5,7,11,12
    265:13,18
    266:23 267:1
    267:14 268:12
    268:14 269:20
    269:23 270:2,5
    270:8 271:16
    273:22 274:3
    276:10 277:5
    278:3 284:6
    287:16 291:1
    291:22 292:4

    292:15 294:10
    294:18 307:8
    308:4,24 309:9
    310:19 316:10
    316:18 317:10
    317:16,23,24
    318:12,16
    333:17 337:8
    339:16 340:4
    340:21 341:7
    341:10 344:1
    344:12,14
    346:15 348:19
    351:9 354:3,15
    354:24 355:9
    356:21 357:5,6
    357:15 358:20
    365:24 366:4,8
    367:13 368:11
    368:13 375:2
    375:11,13,16
    375:17,19
    379:19 380:21
    380:23 381:2
    381:10,19
    382:3,6 392:17
**knowing**
    175:16 243:1
    245:4,6 246:10
    327:13
**knowledge**
    34:2 101:16
    103:23 106:22
    107:19 112:11

    113:24 142:10
    262:14,17
    299:15 308:21
    316:5 330:9
    341:4 356:2
    357:16 358:5,9
    364:17
**known**  120:7
    180:10
**kslaw.com**  3:19
**ktmc.com**  4:13

**l**

**lack**  58:15
    240:1
**lake**  2:10 4:17
**language**
    219:15 276:5,7
**lapsed**  254:21
**large**  23:3
    27:20 147:11
    241:21 247:18
    247:22 258:1
    376:22 380:14
**largely**  121:14
**lastly**  210:15
**late**  77:2
**law**  1:14 5:10
    6:4 13:17 15:4
    30:6 76:12
    81:18 313:1
    369:4,12
**lawbmf.com**
    2:12 4:19

CONFIDENTIAL

**[lawsuit - leadership]**                                    Page 41

| | | | |
|---|---|---|---|
| **lawsuit**  359:1 | 62:2,18 63:11 | 212:2 217:7 | 71:8,10,11 |
| **lawyer**  252:11 | 65:2,12,19,20 | 223:5,11 228:3 | 103:21 112:13 |
| **lawyer's**  399:1 | 66:21 68:21,22 | 228:3 231:18 | 122:9 123:4,6 |
| **lawyers**  109:4 | 69:1,19,20 | 233:2,2,5,16,17 | 123:20 124:5 |
| 111:20 313:5 | 71:6 72:21 | 233:17 234:21 | 126:23 127:3 |
| **lchb.com**  5:20 | 78:21,23 79:12 | 236:8,11,12,19 | 162:15 163:21 |
| **lead**  47:5 80:9 | 95:1 102:13 | 237:12,15 | 166:6,16 |
| 180:4 186:3 | 103:11,18 | 238:23,23 | 180:21 184:18 |
| 249:5 280:2 | 104:20 106:4,8 | 239:19 240:8 | 192:2 197:9,20 |
| **leader**  30:1,9 | 107:8,11 | 241:21 245:16 | 198:13,15 |
| 42:3 56:15 | 115:22,23 | 245:17 246:2 | 199:2,7 200:10 |
| 102:2 123:24 | 116:3 117:3 | 247:19,19 | 200:17 201:18 |
| 126:1,4,16,19 | 118:19,23 | 248:15,17,18 | 208:18,21 |
| 127:20 128:3 | 119:1,1,2 | 248:20,22,24 | 209:14,16 |
| 153:10 165:5 | 121:10,17 | 249:2,18,21 | 210:8,19,21 |
| 210:4,6,10,13 | 122:12,15,15 | 250:1 251:18 | 212:19 213:24 |
| 211:17 216:13 | 123:12,17 | 251:19 255:17 | 214:7,24 215:4 |
| 216:17,20 | 125:10 127:13 | 256:5,10,11 | 215:11 216:11 |
| 217:5,10,22 | 130:22 138:15 | 257:17,17,20 | 216:14,14 |
| 231:16 233:12 | 140:20 142:5,6 | 274:10 280:16 | 217:5,9,24 |
| 235:22 236:23 | 143:20,21 | 288:16,22 | 219:1,11,22 |
| 236:24 242:14 | 147:24 148:1 | 289:13 325:7 | 221:2 223:3 |
| 256:15 | 153:14,16,17 | 325:14 329:2 | 224:14,24 |
| **leader's**  60:3 | 153:18 161:10 | 329:21,21 | 225:3,20 226:9 |
| 210:12 217:24 | 161:11,11 | 330:3 342:18 | 226:12,16 |
| **leaders**  29:3,15 | 163:6,7 165:7 | 343:24 344:17 | 227:17 229:20 |
| 30:9 41:18 | 165:8,8 178:11 | 344:18 376:23 | 232:22 234:9 |
| 42:24 43:22 | 178:12 181:24 | 376:23 378:19 | 237:9 239:18 |
| 46:24 47:19,23 | 182:1 184:22 | 378:20 379:6 | 240:9 249:7 |
| 48:3,9 50:18 | 184:23 191:2,2 | 380:20 381:4 | 280:8,18 282:5 |
| 50:21 54:3,9 | 192:3 199:6,14 | **leadership**  8:12 | 289:18 328:15 |
| 58:20,24 59:15 | 207:3,4 208:12 | 8:15 28:20 | 330:11 376:17 |
| 59:16 60:15 | 208:12,13,17 | 48:10 51:7 | 377:3 379:14 |
| 61:8,8,24 62:1 | 211:19,21 | 61:10,18 65:11 | 380:16 |

CONFIDENTIAL

## [leading - listening]

Page 42

**leading** 120:5
184:14 187:10
193:15 216:17
323:24 327:12
**leads** 124:15
125:12 181:19
190:15,20
191:22
**learn** 102:10
103:1 245:17
292:18 330:13
330:18 353:2
**learned** 103:7,8
234:14
**learning** 10:6
22:21 23:2,7
23:23 32:20
62:8 66:24
98:23 99:14
100:2 133:14
180:3 181:7
232:23 251:22
272:20 274:7
311:2 329:24
330:4 351:6
391:5,14,24
**leave** 25:6
26:19 182:14
276:9 281:17
285:10
**leaving** 47:20
237:14 257:24
**led** 23:12
107:20 133:13

274:13
**lee** 18:21
**left** 25:9 26:22
60:9 283:21
284:14 374:6
381:23
**legal** 252:6
313:2
**legg** 2:10
**lehigh** 14:6
28:5,14 38:9
83:3 85:18,20
86:10
**lehigh's** 82:20
**lehman** 3:16
7:7 359:10
360:1,11
365:20 371:3
373:7
**lends** 228:5
**length** 381:10
**lens** 91:4
**lenses** 354:12
354:13,14
**leslie** 18:6,8
**lesson** 311:2
**lessons** 69:13
**letters** 204:20
**letting** 114:11
**level** 55:20
72:23 73:12
176:4 208:18
251:8 327:17
379:24 381:12

**levels** 91:8
324:21
**levin** 5:3
**lfsblaw.com**
5:7,7
**liability** 1:5
12:21
**lieff** 5:17
**lies** 282:14
**life** 186:11
238:21 360:20
**lifetime** 326:16
**light** 43:2
111:22 128:15
245:8
**likely** 120:1
144:12 188:1
243:13 299:13
**limit** 159:16
160:6,15,24
**limitations**
58:12
**limited** 51:4
171:17 172:2,6
172:23 267:23
288:10
**limiting** 160:2
378:6
**limits** 366:4
**line** 11:6,6,6,11
11:11,11,16,16
11:16,21,21,21
200:5 297:11
342:6 397:3

399:2
**link** 140:13
280:11 287:15
300:13,18
301:11 303:10
304:17,20
305:2,11
306:21 307:8
361:18
**linkages** 105:2
106:23 287:19
**linked** 69:11
72:16 105:22
131:12 144:6
224:23 237:23
273:16
**links** 305:17
**list** 8:6 100:13
100:22,23,24
101:2,4,6,12
104:6 107:2
112:24 151:12
179:18 181:10
297:17,20
298:15 301:4
301:15,18
302:8 310:17
311:24 313:24
369:16 370:3
370:12
**listed** 33:11
84:15
**listening** 48:20

**[literature - looked]** Page 43

| literature 9:19 | literature's | 148:2 153:19 | 162:1,11,20,24 |
|---|---|---|---|
| 49:13 50:11 | 171:16 | 187:13,15 | 164:10,14,19 |
| 80:1 103:3,8,9 | **litigation** 1:5 | 233:20 239:14 | 164:22 165:13 |
| 103:22 104:14 | 12:21 34:1,14 | 241:23 255:15 | 166:4,8 167:22 |
| 104:23,24 | 76:6 83:10,21 | 256:9 266:11 | 172:10 173:7 |
| 105:11,19,20 | 84:19,23 85:10 | 266:13 320:12 | 173:17 174:10 |
| 106:12,19 | 86:4 100:1 | 321:9 322:24 | 179:16 194:11 |
| 107:14 118:21 | 111:5 129:1 | 325:21 346:15 | 200:11 201:8 |
| 120:19,21 | 172:4 211:3 | 381:4 | 201:14 206:13 |
| 125:4 130:24 | 330:6 331:3 | **longer** 5:4 19:7 | 207:23 209:7 |
| 141:24 144:6 | 368:5,9,23 | 40:15 311:24 | 219:19 220:21 |
| 148:5 161:13 | 369:2 | **look** 32:7 33:3 | 223:14 225:23 |
| 163:9 165:11 | **little** 27:4 39:12 | 64:18 67:14 | 229:6 231:7 |
| 171:12 172:1,6 | 196:12,21 | 74:2 79:24 | 248:2 270:17 |
| 198:4 207:6 | 260:22 261:10 | 88:24 89:23 | 272:3 275:11 |
| 208:22 211:22 | 263:19 276:19 | 91:2 93:6 | 282:17 289:11 |
| 229:17 233:22 | 320:3,16 | 96:12 100:9 | 291:6,12 292:6 |
| 237:8 240:21 | 325:18 338:18 | 101:10 109:9 | 294:18,20 |
| 246:3 250:5 | **live** 268:15,19 | 112:6,23 | 296:19 298:12 |
| 256:17 272:21 | 268:21 270:8 | 114:12 121:23 | 302:10 303:15 |
| 274:8 281:3 | **lived** 215:6 | 122:3 128:3 | 305:19 314:2,2 |
| 284:3 285:1 | 225:5 226:13 | 129:10 133:19 | 318:17 328:4 |
| 286:19,22,23 | **lives** 53:2 | 134:1,20 | 331:10 332:10 |
| 287:10 288:9 | **living** 322:17 | 135:11 139:9 | 332:17 333:23 |
| 288:14 289:7 | **llc** 2:9,19,19 | 139:19,23 | 334:19 335:8 |
| 289:15 291:8 | 3:21 4:16 | 142:20,24 | 337:23 362:23 |
| 292:6 296:12 | **llp** 1:15 2:15 | 145:10,22 | 377:10 378:9 |
| 301:6,16 | 3:3,16 4:4,10 | 146:4,12,15 | 384:21 386:8 |
| 306:12 308:8 | 5:3,17 6:4 | 149:1,7,13,22 | 390:16 392:15 |
| 308:24 348:22 | **local** 23:15 | 150:2,7,10,15 | **looked** 49:16 |
| 349:7 387:15 | **logic** 278:19 | 151:20 152:1 | 101:8 104:9 |
| 388:15 389:1,9 | **long** 19:1 27:2 | 152:15,18 | 117:5 118:16 |
| 390:10 | 97:2 104:6 | 154:7 155:23 | 120:22 131:20 |
| | 118:4 142:4 | 156:9 160:9 | 131:24 134:16 |

CONFIDENTIAL

**[looked - marked]**                                              Page 44

135:9 136:14
138:11 141:3
144:17 150:18
150:23 151:5,5
155:2 156:16
156:21 158:22
159:1,5 163:17
169:10 207:13
270:15 293:5
365:10 378:24
**looking** 54:2
75:6 85:2
91:19 94:16
99:18 114:22
114:23 115:13
133:8 138:6
140:5 156:5
203:19 220:24
224:3 226:24
231:2 266:9
271:9 295:18
299:7 304:14
350:9
**looks** 89:11
196:13,13
222:14 224:4
**los** 4:6
**lost** 328:20
**lot** 20:12 51:23
51:24 52:2
65:3 73:4
104:7 106:2
129:2 136:6
150:18,19

235:15 255:15
255:16 279:20
344:20 372:15
381:2,3
**lots** 52:10 58:1
65:19,20 73:3
75:15 118:24
118:24 246:1
378:8
**low** 55:20
**lower** 39:12
40:7
**lunch** 202:20
**luncheon** 194:2

**m**

**m** 5:4
**m.j.** 305:21
307:18
**machine**
310:22
**made** 66:3 86:2
86:10 117:22
167:23 196:9
227:5 299:8
303:13 309:1
323:5 344:1
364:12 378:24
381:20 396:7
**mail** 7:17 81:5
81:10,14,16,21
81:24
**mails** 45:10,12

**main** 289:23
**maine** 2:16
**maintain** 93:10
135:20,23
136:3 353:23
**maintaining**
62:8
**major** 259:17
**majority** 94:7
211:7
**make** 41:23
106:21,22
126:20 131:16
141:9,9 148:11
150:14 154:12
155:14,17,20
158:18 159:3
163:23 165:1
165:15 168:5,8
177:10 182:23
187:4 210:2,5
213:13 242:16
257:7 280:11
284:17 293:1
297:8 325:6
343:1 360:3,5
366:23 368:1
396:4
**makes** 17:5
187:22
**making** 154:14
155:17 158:19
167:12 168:3
214:4 215:1

218:12 241:14
251:20 259:12
**management**
324:6 327:22
**managing**
328:2
**mandalas** 2:9
4:16
**manifest**
139:12 141:18
**manipulation**
178:3
**manipulative**
272:10 346:2
**manufacture**
175:20 273:6
**manufactured**
190:19
**maplewood**
15:7 25:12,15
26:20,23
**march** 9:21
77:3,5,14
78:10 80:19
389:20 390:4
**mark** 20:15
81:12 84:11
89:10 97:8
295:9 383:18
385:8 386:16
388:7 391:2
**marked** 11:20
20:22 81:6
84:5,9 89:5

CONFIDENTIAL

**[marked - media]**                                    Page 45

96:18,22
100:13,18
109:14 110:20
111:1 200:19
200:24 220:1,5
295:1 303:20
304:13 331:14
334:5,11,16
384:2 385:14
386:24 388:16
389:23 391:8
391:13
**market**  5:12
**marketplace**
268:3
**marking**
109:18
**maryland**  2:11
4:18
**maslynsky**  1:19
395:10
**master's**  21:11
21:13
**match**  196:3
297:9,11
298:21 301:8
308:3 312:1
**matched**  298:5
308:1
**matches**  298:9
**material**  204:2
283:24
**materials**  8:6
100:12,21

101:13 107:2
108:23 112:12
151:11 293:5
296:14 298:1
301:18 311:24
312:6,23
343:11 344:9
369:5,16 370:2
370:11
**math**  45:7
333:17
**mathematics**
21:12 333:14
**matt**  18:20
**matter**  12:18
14:13,14,20
15:1 194:16,19
196:10
**mattering**  9:14
386:22 387:7
**matters**  10:6
15:16 77:9
391:7,16
**matthew**  2:10
**maxed**  131:10
**mcnabb**  5:17
**md**  1:3
**mdl**  1:4 4:13
**mean**  13:23
21:6 24:24
30:22 31:4
34:4 41:9
54:15,24 58:17
74:7 79:6 86:5

97:7 101:23
102:20 108:10
117:13 119:12
154:22 173:3
188:19 216:5
232:15 235:7
235:14 237:13
238:17 257:1
258:24 264:14
264:18 265:6
265:17 277:23
283:14 290:13
317:24 318:4,6
323:18 331:8
360:19 362:22
367:13 379:13
**meaning**  210:2
213:3 294:7
**meaningfully**
215:5 225:4
226:12
**means**  15:24
16:13 176:8
187:5 267:9
291:4 325:13
395:19
**meant**  105:16
227:8 257:2
370:7 385:4
386:11
**media**  1:3 8:23
9:10,14,17,22
12:19 30:15,19
34:13 35:4,6

43:3,18 47:3
50:24 51:15,18
52:9,24 53:5,7
53:8,9 54:10
56:16 57:11
58:10 59:4
63:4 65:10
66:17 67:4
69:8,11,15
70:23 72:18
73:11 78:20
79:2,14 80:11
82:6,14 91:24
92:10 93:10
94:8,24 95:9
96:5 102:12
105:4,22,24
115:1,21 116:9
116:14 117:23
118:12,18
119:7,15,17
120:6,11 121:1
121:7 129:14
131:14 132:21
133:5,13 138:1
138:7,13
140:15 141:18
144:5 145:13
147:19 149:15
150:21 154:3
159:16 160:6
160:15 161:1
169:19,21
170:1,6,9,15,19

CONFIDENTIAL

**[media - mehri]** Page 46

| | | | |
|---|---|---|---|
| 170:22 171:1,7 | 319:13 320:5 | 388:13,23 | 131:21 132:13 |
| 171:14,17 | 320:13,23 | 389:21 | 133:23 134:14 |
| 172:2,19 | 321:14 323:12 | **medical** 357:18 | 135:5 136:12 |
| 173:13 174:6 | 324:13,15,20 | 358:6,10 | 136:22 137:11 |
| 174:13,14 | 325:16,21 | **meet** 18:16,19 | 138:5,23 |
| 176:21,22 | 326:6,19,24 | 18:23 62:21 | 140:11 141:5 |
| 177:10 183:2 | 327:8,10 | 144:2 213:1 | 143:9 145:3 |
| 183:21 185:6 | 328:10,17,24 | 392:20 | 146:14 147:9 |
| 185:13,20 | 329:4,8,13,15 | **meeting** 204:18 | 148:19 151:14 |
| 186:2,14 | 329:19,22,24 | **meetings** | 153:5 154:20 |
| 187:13,15,19 | 330:3,7 331:4 | 218:20 | 155:6 157:11 |
| 188:13,14 | 334:10 335:6 | **mehri** 2:3,3 7:8 | 158:9 160:21 |
| 190:14 191:7 | 335:14,23 | 24:16 28:7 | 166:17 168:1 |
| 191:19 193:2 | 336:9,19,22 | 40:22 41:7 | 173:1,22 174:1 |
| 193:12,16,23 | 337:6,19 339:2 | 42:8 46:15 | 176:14 183:24 |
| 194:7 212:3 | 339:14 340:1,8 | 51:1 54:13 | 188:21 189:3 |
| 230:7,15 | 340:22 341:17 | 56:18 57:16 | 189:21 191:10 |
| 231:24 232:1 | 342:1,12,18 | 59:8 63:5 | 192:13 193:20 |
| 234:6 237:24 | 344:16,21 | 64:15 66:5 | 201:2 205:22 |
| 239:21,22 | 346:3 347:21 | 67:10,23 68:7 | 206:17 209:9 |
| 244:11 245:21 | 348:5 349:8 | 69:23 70:10 | 213:18 220:7 |
| 245:22 256:21 | 350:21,23 | 71:19 73:22 | 225:8 228:19 |
| 272:9 273:9 | 351:11,20 | 74:15 75:8 | 230:17 232:7 |
| 276:16 277:19 | 352:4 359:4 | 84:24 88:16 | 233:6 238:8 |
| 277:22 278:14 | 363:20 364:10 | 92:12 93:18 | 240:14 242:5 |
| 279:5 280:5 | 364:19 365:7 | 94:10 95:13 | 243:6,20 |
| 282:7 283:1 | 365:10,16 | 97:6,13 98:15 | 244:21 246:12 |
| 284:11,22 | 366:14,20,22 | 100:5 102:18 | 247:7 248:4,8 |
| 286:7,15 287:1 | 367:4,10,23 | 107:24 108:7 | 252:5,23 253:8 |
| 287:4,12 | 369:11 371:16 | 114:19 115:17 | 254:2,11 260:1 |
| 288:11 289:2 | 372:8 373:6 | 116:4 117:11 | 264:24 265:3 |
| 289:12,18 | 379:4 380:19 | 120:15 123:1 | 267:11,16 |
| 291:17 296:23 | 385:13,21 | 124:12 125:22 | 278:2,17 |
| 299:18 306:3 | 386:23 387:7 | 128:19 130:15 | 279:11 281:1 |

288:12 292:20
299:21 300:23
302:12 304:8
307:4 312:9
313:13,17
314:11 315:10
315:20 316:24
317:21 318:19
319:7 322:7
325:24 330:16
331:6 336:24
337:7,20 339:5
341:1 347:9
348:8 351:15
356:11 357:20
365:17 370:22
373:14,21
375:5 382:14
383:7,17 384:5
385:7,17
386:15 387:3
388:6,19 390:2
391:1,11 392:4
392:19 393:16
394:2
**melissa**  77:19
**meltzer**  1:15
4:10
**members**  95:20
249:7
**memory**  225:11
**mental**  9:18
36:9,11 37:14
37:17 67:1

71:2 115:7,14
116:2,18 117:1
117:10,19,24
118:2,9 119:4
120:13,24
129:13,17,19
129:23 130:6
130:12 131:8
131:11 139:15
142:18,22
143:2,16 144:2
144:14,24
145:16 156:12
156:18,23
157:8,15
184:15,15
190:20 237:22
239:23 251:9
273:17 282:4
283:2,16
284:12,22
285:9,15,19
287:2,5,13,19
288:11 289:3
289:19 291:18
296:24 299:18
306:4 321:4,6
321:15,18
346:7 357:13
379:5 388:13
388:23
**mentioned**  50:7
220:19 348:21
363:9

**mentions**
386:13 389:13
**merit**  253:14
**mess**  229:3
**message**  353:17
**messaged**
268:8,9
**messaging**
355:18 372:24
**messed**  222:15
**messenger**
267:21
**met**  19:4
360:10
**meta**  3:12 6:7
13:18,20 291:8
305:14 352:7
393:10,19
**metal**  370:13
371:8
**methodologist**
290:19
**methodology**
48:7 112:18,21
120:11,17,18
121:4,14 122:7
122:20,22
123:18 124:3,7
124:9 196:23
197:7,19 198:6
199:4,9,17
202:6 206:10
208:5,8 216:22
223:7 224:20

226:21 227:1
227:24 228:16
236:9,15,21
243:11,22
244:2 247:17
253:12 257:6
290:23 291:7
376:12,15,18
**methods**
208:24 212:17
214:1 215:12
218:24 226:18
238:5 257:7
380:11
**miami**  3:18
**michael**  5:4
**middle**  32:10
48:16 371:20
**miller**  1:19
13:4 395:10
**million**  24:8
**mind**  42:16
175:11 343:7
378:5 393:18
**minor**  339:21
**minute**  90:19
92:17 93:3
98:5 114:7
142:17 220:15
223:13
**minutes**  204:19
346:16 374:5
393:20,21,22
393:24 394:1

CONFIDENTIAL

**[mirrors - nature]**                                                    Page 48

**mirrors**  72:9
**misbehaved**
　324:2 325:22
**misbehavior**
　324:22 325:8
　327:1
**misbehaviors**
　327:16
**mischaracteri...**
　70:2 254:6
　255:3
**mischaracteri...**
　59:9 68:9
　69:24 120:17
　131:22 141:6
　155:7 176:15
　184:1 191:11
　191:13 209:10
　213:19 240:15
　252:24 254:4
　313:14,18
**mischaracteri...**
　339:6
**misheard**  253:2
**miskel**  215:3
　219:3,8 224:6
**mismatch**
　220:17
**missing**  66:15
　177:13 240:3
　325:2 351:1
**mission**  66:23
　320:9 322:23
　323:7 345:10

**mistake**  227:5
　227:12 314:17
**mistaken**  296:3
**mistakes**
　220:20 303:13
**mitigate**  43:6
**mix**  274:6
**mixed**  288:5
**mlegg**  2:12
**modern**  7:20
　89:4
**molecular**  9:7
　302:23 384:1,8
**moment**  89:15
**moments**
　214:15
**monetizing**
　183:9
**money**  10:6
　46:9 391:6,16
**mono**  319:17
**montag**  9:8
　302:18 305:6
　308:20 309:7
　311:18 384:2
　384:10,23
**moore**  6:12
**morale**  133:16
　133:21 134:6,9
　135:2 149:17
　149:24 150:3
　150:17,24
　151:21 152:3
　153:2 155:3

**morning**  13:14
　13:15 250:19
　276:17 328:14
　360:13 383:11
**motion**  368:24
**motions**  369:6
**move**  241:5
　244:14 246:7
　247:23
**movie**  268:18
**movies**  45:22
**mto.com**  4:7
**multifaceted**
　50:1 52:16
**multiple**
　127:19 163:8
　176:24 177:1
　206:11 233:18
　354:22
**multiply**
　195:23
**munger**  4:4
**mweinkowitz**
　5:7
**myriad**  175:13

| **n** |
|---|

**n**  7:2 385:22
　387:11 389:3
**name**  12:11
　13:16 14:2
　77:18 110:11
　120:1 220:18
　222:12 224:12

　297:14 298:8
　298:20 301:24
　301:24 302:1
　308:12 310:16
　314:9 352:21
　360:11 374:17
　378:11 389:3
**named**  73:6
　301:23 302:1
　319:22 368:5
　387:10
**names**  249:17
　249:20 293:23
　293:24
**naming**  175:15
　281:15
**narrow**  70:14
　326:9
**narrower**
　325:19 326:3
**nation**  378:10
**nation's**  255:21
　322:12
**national**  88:7
　102:7 113:2,18
**nationwide**
　377:4,10,11
**native**  300:6
**natural**  193:18
**nature**  66:9
　70:16 188:6
　272:10 275:16
　285:7

CONFIDENTIAL

navigate
123:12
near   387:19
nearly   128:24
necessarily
63:8 92:20
188:6 345:3
necessary
109:2 129:6
130:9 134:3
137:3,21 139:5
140:6 143:4
144:19 146:8
146:23 149:10
150:6 152:5,23
154:10 157:4
159:10 160:12
162:5 164:6
166:1 167:17
169:8 203:9
204:12 205:15
211:11 258:14
292:10 322:1
367:1 396:4
need   16:14
17:14 29:6
42:24 55:9
69:10 78:7
83:17 90:19
110:2 111:11
156:11,22
157:7,14
167:22 168:12
172:10 177:8

177:15 186:7
190:21 192:3
195:7,12
201:10,12
216:18 218:4
218:15 222:17
224:15 225:10
226:2,2 251:15
253:16 264:24
266:19 273:24
274:5 282:3
288:5 311:12
312:16 314:21
316:21 322:19
325:3,14
327:12 349:12
350:8 379:22
needed   158:23
needing   69:2
105:10 126:4
151:1 346:11
needs   29:5 56:9
62:21 129:15
144:3
negative   30:4
41:21 43:4
66:12 67:7
68:12,15
161:20 180:7
181:22 244:10
340:10 341:18
350:24
negatively
133:15 162:16

188:12
neither   283:7
nesi   9:11
305:21 385:14
385:22 386:13
nessi   307:17
network   239:8
249:8 257:23
networks   239:2
neuroscience
8:20 9:6
302:22 303:4
303:18 304:1,6
306:5 383:24
384:7
never   38:1 43:9
141:3 345:1
363:16 364:4,4
364:11,11
376:5
nevertheless
124:2
new   5:19,19 6:5
6:6,6 7:23
14:15 15:10,11
21:13 22:5,11
22:16 24:1,15
25:7,9,12
26:10,24 27:1
27:3,3,10,15
29:1,1,2,5
33:15 38:23
78:2 96:17
97:23 103:14

121:7 122:15
187:19 188:14
208:12 211:20
237:1,2 246:18
249:8 253:16
280:14 310:23
322:5 324:21
368:12 371:19
381:22 385:8
news   45:15
267:2,5 369:16
newsletters
204:19
nice   189:16
nick   18:20
night   51:21
nine   25:22
383:10 393:14
393:23
non   39:2
nonexistent
313:3
nonresponsive
241:6 244:15
246:8 247:24
nonstop   60:5
normalized
178:19
normore
198:20 199:22
200:12
northern   1:1
12:23

Golkow Technologies,
A Veritext Division

**[notary - observed]**                                                   Page 50

| | | | |
|---|---|---|---|
| **notary** 398:14 | 377:9 378:21 | 120:15 123:1 | 315:20 316:24 |
| **note** 73:10 | 379:22 | 124:12 125:22 | 317:21 318:19 |
| **noted** 13:2 | **numbers** 97:17 | 128:19 130:15 | 319:7 322:7 |
| 334:4 396:11 | 393:17 | 131:21 132:13 | 325:24 330:16 |
| 398:6 | **numerous** | 133:23 134:14 | 331:6 336:24 |
| **notes** 44:21 | 163:5 256:8 | 135:5 136:12 | 337:7,20 339:5 |
| 86:22 235:7,17 | 378:18 | 136:22 137:11 | 341:1 347:9 |
| 235:20 236:1,3 | **nw** 2:4 3:5 | 138:5,23 | 348:8 365:17 |
| 242:3,8,13,13 | **o** | 140:11 141:5 | **objections** 12:6 |
| 242:21,24 | | 143:9 145:3 | **objective** 80:13 |
| 399:1 | **o** 387:10,11,11 | 146:14 147:9 | **objectives** |
| **noteworthy** | **o'clock** 230:14 | 148:19 153:5 | 133:15 |
| 349:18 | **o'donahue** | 154:20 155:6 | **observation** |
| **notice** 1:14 | 229:2,15 231:1 | 157:11 160:21 | 48:8 50:18 |
| **noticed** 314:1 | **oath** 15:22 | 166:17 168:1 | 59:21 146:18 |
| **notifications** | 252:16 | 173:1 176:14 | 212:10 213:11 |
| 58:2 272:13 | **obfuscate** 92:2 | 188:21 189:3 | **observations** |
| 278:1,15 | 92:3 | 189:21 191:10 | 48:18 59:7 |
| 279:10 280:24 | **object** 183:24 | 192:13 206:17 | 61:4,17 107:12 |
| **noting** 242:15 | **objection** 24:16 | 209:9 213:18 | 126:15,22 |
| **notions** 80:6 | 28:7 40:22 | 225:8 228:19 | 137:13 202:1 |
| **nuances** 184:7 | 41:7 42:8 | 232:7 233:6 | 203:1,4,7 |
| **number** 28:21 | 46:15 51:1 | 238:8 240:14 | 206:14 207:18 |
| 63:9 85:23 | 59:8 64:15 | 242:5 243:6,20 | 207:24 209:6 |
| 194:24 201:3 | 66:5 68:7 | 244:21 246:12 | 211:4 227:23 |
| 208:5 221:19 | 69:23 71:19 | 247:7 252:5,23 | 241:18 250:9 |
| 221:23 222:10 | 73:22 74:15 | 253:8 254:2 | 378:23 381:19 |
| 232:12 238:18 | 75:8 84:24 | 260:1 278:2,17 | **observe** 210:5 |
| 247:18 258:1 | 88:16 92:12 | 279:11 281:1 | 318:21 |
| 260:4 276:22 | 94:10 95:13 | 288:12 292:20 | **observed** 49:9 |
| 298:6 308:9 | 98:15 100:5 | 299:21 300:23 | 52:9 54:9 |
| 326:22 338:1 | 102:18 107:24 | 304:8 307:4 | 56:15 57:10,15 |
| 340:18 355:3,5 | 108:7 114:19 | 312:9 313:13 | 59:2,14 60:21 |
| 360:4 371:6 | 115:17 116:4 | 313:17 314:11 | 60:22 63:3 |

**[observed - operationally]**                                    Page 51

| | | | |
|---|---|---|---|
| 67:8,18 71:18 | 340:6 | 339:20 354:2 | 383:16 385:6 |
| 281:20 | **offered**  105:8 | 363:8 373:21 | 386:8 388:5 |
| **observing**  51:8 | 114:15 125:14 | 380:1 | 389:16 390:19 |
| 218:18 | 172:18,23 | **okay**  16:19 | 390:24 392:3 |
| **obstacles**  323:5 | 283:6 | 17:13,18 20:1 | 392:24 394:2 |
| **obvious**  340:10 | **offering**  65:6 | 21:9 33:2,18 | **old**  188:15 |
| **obviously** | 116:1 117:8 | 45:1 50:14 | **olivia**  6:11 |
| 74:10 82:20 | 130:11,18 | 67:21 70:8 | 12:12 |
| 314:17 392:13 | 141:11,16 | 87:22 90:1 | **olson**  4:4 |
| **occasion** | 153:1,7 160:14 | 97:13,17 98:8 | **once**  14:12 |
| 254:22 | 324:9 327:4 | 101:3 112:7 | 362:11 |
| **occasionally** | 349:10 365:14 | 114:8,11 174:2 | **ones**  102:8 |
| 29:4 242:12 | **offers**  65:5 | 179:9 185:4 | 184:10 280:22 |
| 266:2,18 271:2 | **office**  22:3 | 190:5 193:20 | 298:2 314:19 |
| **occasions**  18:22 | 23:13 29:2 | 194:13 195:15 | **ongoing**  319:21 |
| 232:12 361:9 | 52:1 54:19 | 195:17 196:19 | **online**  60:12 |
| 362:1 | **offices**  1:14 | 201:11 203:21 | 188:2 192:9 |
| **occur**  67:2 | 23:8 | 214:22 215:24 | 324:24 327:14 |
| 381:11 | **official**  233:1 | 226:6 230:3 | **open**  352:13 |
| **occurring** | 237:2 | 231:10 254:23 | 361:15,16 |
| 46:14 | **officials**  232:6 | 265:3 267:3,15 | 373:11 382:12 |
| **occurs**  185:14 | 232:14 233:1 | 295:12,17 | 392:12 |
| 185:21 192:9 | 251:21 | 300:11 328:7 | **opened**  262:23 |
| **offer**  15:24 | **oftentimes**  75:2 | 332:13 333:18 | 263:8 |
| 79:11 112:1 | 75:16 | 335:12,19 | **opening**  112:5 |
| 116:23,24 | **oh**  21:9 28:12 | 351:17 356:17 | 114:15 347:4 |
| 137:14 155:2 | 60:22 83:11 | 360:10 361:22 | 348:6 349:11 |
| 206:24 207:10 | 88:2 93:20 | 362:18 363:12 | **opens**  358:12 |
| 213:22 232:20 | 97:16 101:4 | 367:17 368:2,8 | 358:18,18 |
| 240:24 253:11 | 106:4,17 | 368:20 370:16 | **operates**  91:23 |
| 274:14 275:8 | 108:17 116:10 | 371:17 373:15 | **operationally** |
| 275:14 279:4 | 151:23 215:18 | 374:21 375:13 | 159:18 160:17 |
| 284:9,20 | 266:13 299:23 | 376:19 379:21 | 161:3 |
| 326:21 337:12 | 308:19 336:1 | 380:15,24 | |

**[operations - outside]**                                               Page 52

| | | | |
|---|---|---|---|
| **operations** | 284:20 321:14 | 380:18 | 13:1,7,14 14:3 |
| 23:21 46:23 | 326:16 349:16 | **opportunities** | 20:20,21 81:4 |
| 66:20 112:14 | 359:6 379:3 | 61:15 | 81:5 82:16 |
| 116:20 117:3 | **opinions**  76:2 | **opportunity** | 84:4 89:3 |
| 118:18 119:5 | 78:12,15,19 | 383:15 | 96:15 97:20 |
| 119:23 121:9 | 101:14 105:8 | **opposed**  118:1 | 100:12 109:12 |
| 138:16 145:18 | 107:20 110:14 | 122:19 365:16 | 109:13 110:18 |
| 147:5,14 | 113:15 114:14 | **orange**  15:7 | 110:20 200:15 |
| 148:15 149:4 | 116:2 118:13 | 25:12,14 26:20 | 219:22 286:18 |
| 178:10 180:20 | 124:11,16 | 26:22 | 294:23 303:18 |
| 181:23 184:21 | 125:14 129:8 | **order**  66:24 | 304:20 331:13 |
| 191:1 251:18 | 135:1 137:13 | 164:2,3 201:23 | 334:9 352:20 |
| **opine**  282:23 | 144:10 153:1 | 208:24 210:2 | 356:8 359:5 |
| **opining**  176:13 | 155:2 169:19 | 210:17 275:17 | 374:17 383:8 |
| 176:17,19 | 171:14 183:21 | 310:15 312:20 | 383:22 385:11 |
| **opinion**  75:11 | 205:2,8 206:24 | 317:16 318:8 | 385:18 386:19 |
| 79:12 111:24 | 207:10 211:14 | 318:16 322:22 | 387:4 388:10 |
| 116:7,22,24 | 232:19 233:3,7 | 368:10 | 388:20 389:19 |
| 117:8,15,18 | 234:20 235:6 | **orders**  368:15 | 390:3 391:5,12 |
| 121:5 130:11 | 235:13 239:11 | **organization** | 398:8 |
| 130:18 141:12 | 240:24 241:2 | 87:15 294:1 | **ought**  214:8 |
| 145:10 147:21 | 243:13 244:9 | 302:2 | **outcomes** |
| 149:13 153:8 | 247:16 250:16 | **organizations** | 121:18 283:2 |
| 156:10 157:13 | 252:1 253:11 | 28:22 113:5 | 284:12,23 |
| 159:14 160:13 | 256:4,7 258:2 | **organize**  46:5 | 285:9 |
| 160:23 162:11 | 274:13 275:8 | **original**  114:1 | **outs**  182:2 |
| 163:3,13 164:4 | 275:12 276:1,5 | 272:2 396:15 | **outside**  102:9 |
| 165:1 170:24 | 283:6 285:4 | **osborne**  1:13 | 102:23 105:11 |
| 171:2,6 179:5 | 301:7 324:9 | 7:4,14,15,16,17 | 105:17 144:16 |
| 182:20 238:15 | 326:21 327:3 | 7:18,20,22 8:5 | 183:17,18 |
| 240:11 254:1 | 341:22 347:5 | 8:7,8,9,10,11 | 186:11 217:16 |
| 255:10 275:3 | 349:11 353:1 | 8:15,17,19,21 | 249:3 276:1,1 |
| 275:11,15,21 | 356:1 364:15 | 8:23 9:5,9,12 | 277:6 278:8 |
| 276:14 284:9 | 365:15 380:13 | 9:16,21 10:5 | 368:8,23 |

[outweigh - part]                                                        Page 53

outweigh   347:2
  348:24
overall   123:8
  187:8 227:13
  325:11
overexposure
  325:2
oversaw   23:8
overwhelm
  129:16
overwhelmed
  130:14
overwhelming
  68:22
owe   46:9
own   118:24
  142:1 240:22
  253:13,14
  372:13

      p

p   2:10 387:10
p.m.   193:22
  194:6 230:6,14
  286:6,14
  351:19 352:3
  359:13,20
  382:19 383:2
  393:3 394:7
page   7:13 8:4
  9:4 10:4 11:6,6
  11:6,11,11,11
  11:16,16,16,21
  11:21,21 32:8

93:6 97:5
112:6 129:11
133:9 139:9
145:10 149:13
156:10 159:14
162:10 201:15
203:20 204:15
205:20 206:1
214:19,20,21
225:24 229:5
231:8 271:15
271:17,19
272:4 282:18
291:14 298:12
298:14,17
300:9 302:10
302:12 303:5
305:4,5 315:1
328:5 332:10
332:19 335:9
335:17 342:1
384:21 385:1
386:9,12
387:18 388:3
389:12 390:17
390:21 391:21
397:3 399:2
pages   97:15,24
  173:4 222:4,8
  398:3
paid   76:1 83:19
  83:24 85:20
  324:2

pains   119:20
palo   3:9,10
pandemic
  40:17
panksepp
  302:19 384:11
  384:24
paper   331:23
paragraph
  91:16 113:9,11
  121:24 122:4
  123:3,8 127:5
  129:10 133:11
  135:12 137:6
  139:9 173:18
  173:23 174:11
  174:12 178:15
  179:11 185:2
  197:17 198:2
  204:16 212:7
  215:19 226:8
  229:8 231:9
  248:3,8,12
  256:23 272:5
  275:9 280:22
  315:2,13 328:6
  339:21 342:2
  348:13,13
paragraphs
  174:24 197:2
  197:13
paralegal   4:17
parallel   381:14

pardon   93:21
  150:9 347:14
parent   356:7
parents   93:11
  95:2,10 204:20
  266:5 344:20
part   32:15
  47:22,22 53:1
  53:12 56:24
  95:24 96:1
  103:18 115:18
  120:18 121:13
  124:13,21
  127:2,15 135:4
  140:24 155:1
  166:12 170:4
  171:15 173:15
  176:12 181:20
  185:12,19
  192:7 218:16
  218:22 223:6
  232:9,20
  234:23 235:6
  239:10 240:4,5
  242:10 249:4
  250:17 256:6
  256:12 258:3
  259:12,17
  280:2 283:14
  285:4 288:14
  292:5 296:11
  301:5,15
  306:12 327:20
  328:2 332:18

**[part - performing]**                                            Page 54

342:13 344:9
344:15 358:13
369:5,6 378:6
384:15 386:6
387:14 389:8
390:10
**partially** 51:3
**participate**
239:3 249:8
257:22
**participating**
336:3,7,10
345:16
**particular** 30:2
41:16 42:16
49:2 52:12,17
53:23 55:1
57:2,2 59:17
62:11,23 65:4
68:17 69:4
70:15,20
128:11 131:4
133:10 137:2
138:9 146:21
168:22 187:7
208:15 209:13
210:4 214:2
217:10 235:22
236:23 241:14
242:14 251:2
251:24 252:20
253:6 255:6
266:6 268:5
278:7 279:13

279:13,16
281:15 285:12
316:16 317:7
317:11 318:8
323:10 372:3
377:23 378:5
380:6 381:20
**particularities**
292:7
**particularly**
116:9,14
145:13 272:15
**particulars**
281:10
**parties** 312:21
**parts** 121:3
186:6 201:13
**party** 369:1
**pass** 373:16
**passing** 352:10
**past** 327:17
**pasting** 299:10
**patience** 383:9
393:1
**patients** 305:13
**patreese** 224:2
**pattern** 52:13
52:14 57:4
62:24 65:16
66:3,6 131:7
228:8 376:20
377:3,5,13,24
378:1,15,16
379:9,12,16,24

381:12
**patterns** 49:8
57:5 59:13,18
66:10 68:22
80:7 104:13
167:9 232:22
239:16 241:4
245:18 250:2
256:7 376:9,11
376:19 378:9
379:2
**pay** 46:8
325:22 326:18
**paying** 84:22
257:11 282:6
290:24
**peer** 88:9
105:20 113:2
139:13 141:13
141:20 161:13
230:21 386:4
387:5 388:21
**peers** 55:4 64:7
177:24
**pen** 195:8,18
**pending** 17:16
93:19 352:13
373:11
**pennsylvania**
1:17 4:12 5:6
12:18
**people** 48:12
53:17 77:20
88:19 106:20

128:6 129:13
143:13 177:17
191:20 202:22
223:1 235:16
238:13,18,19
240:8 243:2,23
245:14 267:5
273:10 274:21
280:3 283:22
283:24 291:18
339:3 344:21
346:4 353:11
354:23 370:18
371:6
**percent** 40:2,8
382:3,6
**percentage**
38:8,11 39:2,5
39:8,22 83:8
83:14 366:13
366:19
**perchance**
294:7
**perfect** 188:16
**perform** 194:18
379:7
**performance**
64:4 208:18
209:1 210:19
**performed**
365:9,12
**performing**
210:7

[period - pistilli]                                                    Page 55

**period** 25:13
142:4 148:2
153:19 233:20
239:14 241:24
256:9 381:4
**permanence**
372:24
**permanent**
188:7
**permeating**
56:7
**permission**
338:6 340:12
**perseverance**
383:9
**persist** 351:4
**persisted** 382:1
**person** 192:9
209:1,19,21,22
210:23 242:17
268:8
**personal** 1:4
12:20 26:9
46:18 58:12
65:9 105:3
114:24 115:20
118:17 121:6
131:14 138:12
140:15 141:17
147:18,22
150:20 154:3
159:17 160:7
160:16 161:1
191:18 193:1

193:15 212:3
234:5 237:24
244:11 245:20
256:20 280:4
320:5 323:11
347:21 356:13
**personally** 59:2
67:17 69:22
71:18 85:5
**personnel**
172:15 207:16
209:5
**perspective**
78:19 306:5
**perspectives**
9:17 128:10
388:12,23
**pertaining**
134:1
**pertains** 169:22
**pervade** 59:21
**pervasive** 52:5
64:8 65:8
68:23 71:15
149:18 153:24
158:3 320:23
327:9 350:3
**pervasiveness**
70:22
**peterson** 215:3
219:4,8 224:6
**pew** 49:16
113:5

**ph** 1:23
**phenomena**
212:18
**phenomenon**
379:23 381:11
381:21
**philadelphia**
5:6
**philosophy**
21:11
**phone** 73:4,7
73:18,19 74:7
74:11,14 160:1
269:22 358:13
362:23
**phone's** 268:22
**phones** 42:18
44:12 45:4,16
45:20 46:3,6
46:10 47:13,16
74:3
**photos** 97:9
340:16
**phrasing**
279:14
**physically** 62:4
**pick** 251:1,24
**picked** 252:22
253:7 315:5
316:21 317:17
318:5
**picture** 126:21
354:1

**pictures** 44:24
45:3,5
**piece** 172:11
198:20 208:15
208:22 229:17
**pieces** 267:5
**pioneering**
7:22 96:15
97:21
**pistilli** 3:4 7:6
13:13,16 20:14
20:24 24:20
28:9 31:14
32:1 41:3,11
42:11 47:10
52:6 56:10
57:8 58:21
60:17 64:11
66:2 67:5,16
68:4,10 70:7
71:14 72:2
74:6 75:4,24
80:24 81:8,11
81:15 82:1,15
84:7,10,12
85:4 88:23
89:8 93:4,22
95:6 96:11,20
97:10,19 99:11
100:8,16
102:21 108:3
108:11 109:8
109:16 110:23
115:4,24 117:6

[pistilli - platforms]                                        Page 56

| | | | |
|---|---|---|---|
| 117:17 121:22 | 246:19 247:12 | **place**  24:10,10 | 5:8,15,20 8:22 |
| 124:6 125:16 | 247:23 248:1,6 | 26:12 27:24 | 34:1,4,13 76:2 |
| 127:4 128:21 | 248:10,11 | 188:9 228:22 | 78:4 79:19 |
| 131:15 132:9 | 252:14 253:4 | 319:21,24 | 83:20 84:22 |
| 132:17 133:7 | 253:21 254:8 | 324:18 | 98:11 107:4 |
| 134:4,24 | 254:20 260:7 | **placed**  366:5 | 108:24 109:4 |
| 135:10 136:16 | 265:4 267:19 | **places**  24:12 | 128:23 131:19 |
| 137:5,23 | 278:10 279:2 | 47:16 110:4,10 | 134:13 135:8 |
| 138:18 139:7 | 280:19 282:15 | 157:24 238:20 | 136:3,10 |
| 140:22 141:10 | 285:24 286:17 | 255:15 264:1 | 141:15 151:22 |
| 144:21 145:8 | 289:14 292:24 | 292:16 | 160:20 164:20 |
| 147:2 148:12 | 294:3,6,19 | **plaintiff**  49:5 | 331:13 332:5 |
| 148:24 151:18 | 295:3 300:4,16 | 65:1 113:22 | 393:14,24 |
| 154:16,23 | 300:20 301:13 | 115:14 130:7 | **plan**  37:23 38:2 |
| 155:19 158:6 | 302:14,15 | 130:13 133:21 | 112:1 126:4 |
| 158:21 162:9 | 303:14,23 | 134:17 137:10 | 155:20,22 |
| 166:23 169:12 | 304:11,15,18 | 138:3,21 | 275:2,19 |
| 173:10,24 | 305:1,5,9 | 139:22 140:9 | **planning**  21:23 |
| 174:4 178:13 | 306:20 307:1 | 142:15,23 | 22:10 38:22 |
| 184:24 188:24 | 307:15 312:18 | 143:8 146:24 | **plans**  204:18 |
| 189:17 190:2 | 313:15 314:5 | 149:24 153:3 | 259:13 |
| 192:6 193:17 | 314:24 315:12 | 156:19 159:11 | **platform**  35:4,6 |
| 194:9 200:22 | 315:14 316:4 | 162:7,23 164:8 | 63:18,21 73:11 |
| 201:4,6 205:24 | 317:15 318:3 | 164:12 166:3,7 | 105:2,14 |
| 207:12 210:24 | 319:1,11 | 167:19 169:10 | 106:15,18 |
| 214:12 220:3,9 | 322:21 326:13 | 182:13 202:17 | 179:2,9,15 |
| 220:11 223:19 | 330:24 331:9 | 204:7,14 | 185:7 187:7 |
| 223:23 225:22 | 331:17 333:22 | 205:17 211:5 | 261:5,8 274:16 |
| 229:23 231:5 | 334:3,14 337:4 | 211:12 234:17 | 274:18 276:14 |
| 232:10 234:10 | 337:16 338:24 | 315:18 331:2 | 355:20 362:20 |
| 238:11 241:5,7 | 339:11 341:13 | 331:18 332:3 | 363:21 364:10 |
| 242:23 243:15 | 347:10 349:5 | 334:19 | 366:22 370:18 |
| 244:14,16 | 351:13 352:6,7 | **plaintiffs**  2:6 | **platforms**  3:12 |
| 245:3 246:7,9 | 392:10 | 2:13 4:14,20 | 6:7 47:5 49:3 |

**[platforms - posted]**                                      Page 57

49:22 72:18
73:16 103:5
104:3 105:22
144:7 147:20
154:6 170:2
171:18 172:3
172:24 173:13
174:7,16,22
175:4,9,17,22
176:22 177:10
178:19 179:21
180:10,19
181:18 183:2
183:16 185:16
185:23 186:2,9
186:16,17,23
187:8 190:14
190:22 193:2
193:13 232:1
251:16 272:9
272:14 273:9
273:15,24
274:6 275:4,16
275:21 277:2
281:11 323:23
327:14 332:24
342:12,21
344:6 346:3,6
347:22 350:4
350:11,13,14
356:14 368:4
373:6
**platt**   282:22

**play**   45:19,21
111:20 263:20
362:12
**plays**   362:11
**pleadings**
312:23
**please**   14:1,4
17:8 54:11
60:24 61:3
68:11 81:1
93:24 133:9
149:12 159:13
162:10 173:23
178:15 185:18
194:10 201:15
223:13,20
231:7 234:12
253:3 282:18
286:21 294:20
300:17 303:15
304:4 305:2
328:20 347:11
358:3 396:3,8
**pllc**   2:3
**plus**   383:10
**point**   17:8
56:23 66:8
70:21 92:22,24
142:14 193:9
193:19 214:4
223:2 224:19
227:13 262:23
360:7 377:22
380:5 381:9

**pointed**   275:10
276:6 341:23
**pointing**   96:3
**points**   258:2
286:19 299:8
306:15 315:7
379:22
**policies**   24:14
24:21 25:2,4
26:5,14,18
27:24 29:20
30:14,18 41:12
42:22 44:2
160:1,6
**policy**   10:6
21:14,19,24
29:22 30:3,8,8
30:11 41:15,16
43:1,9,17 44:4
44:8 108:19
127:23 128:5
391:6,14 392:1
**pool**   249:3
**poor**   283:2
284:11,22
338:11
**popat**   9:19
291:16,22
293:11,19
295:20 296:10
308:17 309:7
388:15 389:2
389:13

**port**   370:13
371:8
**portable**   26:9
**portfolio**   23:4
**portion**   39:19
122:6 238:14
**posing**   280:14
**posited**   91:9
**position**   22:7,9
22:16,19,22,24
26:20 32:23
33:8,17 42:1
83:4 95:23
248:23 283:1,7
284:11,21
**positions**   33:11
33:12 255:19
**positive**   62:8
328:10,24
329:4 336:18
337:18 340:3
341:16 343:23
344:4,6 345:13
345:21 346:14
347:2,7 348:4
350:12
**possible**   246:20
255:20 260:4
**post**   191:7
266:15,21
270:18
**posted**   263:3,6
271:5 370:17
371:6

CONFIDENTIAL

**[posting - priorities]**                                                      Page 58

posting   340:11
posts   185:14,22
   333:13 338:5
   354:22 355:2
   372:12
potential   114:2
   114:16 118:1
   120:13 321:17
   338:9 341:16
   341:17 349:24
   351:10
potentially
   318:11
poverty   319:19
   319:22,23
   320:11
power   321:21
powerful   99:13
   100:1 335:15
   335:20 338:21
   338:22
practice   14:7
   29:17 39:20
   48:10 61:12
   74:19 82:22
   83:4 87:17,24
   88:4,6 89:13
   89:18 126:23
   128:12 163:20
   215:15 223:8
   226:20 328:15
   330:11 382:1
practiced
   197:18 198:6

199:17 228:16
practices   24:9
   29:13 91:14
   324:7,8
practitioner
   123:21 211:16
   233:12 256:15
preceded
   324:12 326:23
preceding
   336:1
precise   170:15
preconceived
   80:6
predictability
   180:9
predictable
   66:8,11 120:7
   179:2 180:4,6
predominantly
   49:22
preoccupation
   53:10 56:6
preoccupied
   52:23 53:15,16
   60:11 324:18
prepare   17:21
   18:13,17 20:9
prepared
   148:11 181:12
preparing
   64:20 112:9
   236:4 292:22

preponderance
   287:18
present   6:11
   48:22 68:24
   126:6 140:17
   163:14 259:8
   312:22
pressing   61:12
   61:14 237:18
   239:17 240:7
pretending
   371:21
pretty   26:10
   52:5 58:20
   74:20 193:18
   242:21 291:5
   335:19 342:15
   362:5,8 367:15
   380:13 381:6
prevalence
   132:2
prevalent   54:7
   59:19
previously
   51:20 87:6
   102:16 167:5
   315:15
primarily   28:4
   62:15 212:9
   266:3 329:10
primary   28:23
   31:3 33:22
   55:5 71:12
   99:1 107:22

108:2 129:18
   178:1 255:17
princeton
   386:13
principal   32:10
   32:13,15 33:1
   56:9
principal's
   32:21 52:1
   54:19
principals   8:16
   23:10 29:1
   32:19 48:1,20
   51:13 52:2
   58:7 62:17
   93:9 96:5
   219:12,23
   221:3 225:1
   226:10 231:19
   328:17 358:22
   358:24
principles
   262:10,12
prinstein
   305:21 307:18
   385:23
printed   97:12
   204:2
prior   87:15,20
   123:7 206:5
   229:7 253:2
priorities
   259:15,20

Golkow Technologies,
A Veritext Division                          www.veritext.com

**[prioritize - provide]**                                              Page 59

| | | | |
|---|---|---|---|
| **prioritize** 179:3 | **proceeding** | 113:19 122:14 | 329:22 344:3 |
| 180:1 181:5 | 15:4 | 122:23 126:5 | **promoting** 7:20 |
| **privacy** 338:11 | **process** 14:16 | 196:22 197:8 | 89:3 91:13 |
| 338:16 | 52:22 111:21 | 209:4 238:21 | 92:3 339:24 |
| **private** 39:17 | 218:12,13,19 | 239:7 329:24 | **prompted** |
| 39:24 86:2 | 241:15 259:3 | 330:4 357:18 | 125:5 |
| **probably** 97:11 | 259:12,18 | **professionally** | **promulgate** |
| 167:10 169:2 | **processes** | 242:11 249:14 | 41:15 |
| 189:13,13 | 108:14 260:9 | **professor** 14:7 | **promulgated** |
| 193:18 229:24 | 260:10,19 | 28:5,14 39:19 | 43:1 44:4 |
| 262:23 281:4 | **produce** 123:23 | 82:21 83:4 | **promulgating** |
| 289:20 351:8 | 217:9 | 381:24 | 30:11 159:15 |
| 369:3 | **produced** | **profiles** 241:23 | 160:14,23 |
| **probationary** | 108:5 128:24 | **profound** 40:20 | **promulgation** |
| 14:17 | 217:18 315:17 | 40:24 | 29:22 |
| **probe** 261:10 | **producer** 217:2 | **program** 21:17 | **proposition** |
| **probiotics** | **producing** | 21:21 32:16,18 | 197:24 225:3 |
| 305:12 | 129:7 | 239:5 | 228:15 |
| **problem** 29:17 | **product** 35:19 | **project** 217:19 | **propounded** |
| 106:5,6 119:8 | 35:22 175:22 | 218:3 | 398:5 |
| 128:11 | 179:1 190:20 | **prolong** 104:2 | **prosek** 387:10 |
| **problematic** | 199:11 208:21 | 175:24 176:23 | **protect** 62:3 |
| 324:11 345:3 | 273:6 343:4 | 178:6 183:5 | **protecting** |
| **problems** 37:14 | **production** | 187:9 190:17 | 338:15 |
| 37:18,20 61:12 | 11:10 227:19 | 275:18 280:12 | **prove** 318:9 |
| 119:24 121:11 | 294:4 352:13 | 350:15 | **provide** 28:21 |
| 187:20,21 | 373:11 | **prolonged** | 29:14 62:3 |
| 239:17 257:12 | **productive** | 120:5 183:8,23 | 64:12 76:2 |
| 324:22 327:5 | 328:10 329:1,4 | 193:14 343:3 | 78:13,14 |
| 338:17 346:8 | **products** 1:4 | 351:5 | 122:13 126:8 |
| 373:3 | 12:20 88:19 | **promo** 340:5 | 212:23 228:2 |
| **procedure** | **professional** | **promote** 92:11 | 244:3 252:16 |
| 108:20 203:16 | 29:15 38:6 | 175:8 176:11 | 255:7 257:3 |
| 203:24 | 112:10 113:3 | 183:22 329:19 | 297:8 298:16 |

**[provide - quarterly]**                                    Page 60

300:13,18
306:18 340:19
340:24 341:11
**provided**
104:18 224:1
231:22 304:20
305:11 306:22
**provider**
122:14
**providers**
129:17,18,23
130:6,12 131:9
**providing**  29:9
208:10,11
211:18 223:9
352:24
**prussia**  1:16
4:11
**psel**  113:4
**psychiatrist**
36:1,2 37:17
274:21,24
**psychoeducat...**
9:12 386:20
**psychological**
9:9 306:6
385:12
**psychologica...**
272:10
**psychologist**
35:23,24 37:16
274:20,23
283:16 285:22

**psychology**  9:6
9:16 182:5
383:23 388:11
**public**  21:14,19
26:21,23 36:5
36:7 113:4,13
116:16 119:10
121:12 136:5
137:15 145:15
146:11,20
147:12 158:4
162:17 165:6
245:12 257:16
260:9,11,12,18
261:1 288:20
289:17 322:4
322:10,11
330:14 344:23
355:2,4,6
398:14
**publication**
88:6,12
**publish**  108:15
**published**
88:21 89:17
90:4,14 295:21
377:2
**publishes**  88:10
**publishing**
176:10
**pull**  20:15
52:21 55:11
81:1 384:20

**pulled**  198:10
339:19
**pulse**  381:7
**purport**  302:17
304:5
**purported**
304:22
**purportedly**
305:21
**purports**
304:21
**purpose**  42:13
42:22 61:9
66:23 217:4
238:10 288:20
289:17 310:11
380:4
**purposeful**
342:20
**purposes**  42:17
44:13 101:19
101:20 102:11
235:21 236:13
312:17 328:18
330:21 347:19
**pursuant**  1:13
**put**  27:24 81:23
101:22 123:8
139:17 145:21
149:21 159:22
174:18 179:7
184:4 268:19
277:20 278:3
290:5 293:23

310:7 347:17
361:17 371:7
**putting**  107:9
187:1 370:12

**q**

**qualified**  37:13
284:19
**qualitative**
8:12 9:18
198:14 199:1
200:15 201:17
201:22 202:5
204:21 205:1,7
205:13 257:7
291:9 380:12
388:14,24
**qualitatively**
119:8
**quality**  73:12
119:18 212:12
213:23 320:6
320:24 323:13
**quantified**
273:22
**quantitative**
258:5,8,11
317:4
**quantitatively**
248:13 256:24
**quarry**  2:10
4:17
**quarterly**  88:6

**question**  11:20
12:7 17:1,2,8
17:11,16 27:19
42:20 56:12
58:23 61:22
68:2 72:7
93:19 97:7
99:22 117:21
118:5,6 119:11
120:9 145:6
150:12 151:10
151:13,15
167:5 185:18
192:7,16 205:4
206:22 207:22
212:11 214:6
217:17 218:5
218:10 220:12
226:22 234:13
244:17 245:2
246:16,23
253:2 254:16
255:8 264:23
265:7 266:19
272:17 278:20
279:14 285:13
299:3 321:10
322:20 325:18
326:4,9 328:20
333:5 339:10
347:12 358:3
367:6,18
368:22 371:2,4
375:2 376:17

377:7,18 378:7
380:2
**questions**  16:8
16:14 94:3
174:21 197:4
201:24 213:7
216:24 254:13
289:8 316:18
326:10 342:6
352:9,22 359:9
360:7,15
370:24 373:8
374:20 375:7
382:10 392:5
398:4
**quick**  97:7
132:18 298:12
332:10 348:18
**quickly**  185:1
201:9,12
**quite**  173:16
238:17 260:4
267:9
**quote**  81:22
146:2
**quoted**  345:15

**r**

**r**  387:10,11
389:3,3 397:1
397:1
**radd**  91:9
**radically**  272:8

**radnor**  1:16
4:12 12:17
**raised**  213:7
**raises**  316:18
**randy**  282:22
**ranked**  56:1
**ranking**  261:16
261:18
**rate**  84:15,18
195:24 196:2
**rather**  49:3
51:11 94:2
108:4 123:24
138:11 199:13
206:15,15
207:24 208:23
**ray**  6:12 304:16
**reach**  80:13
144:10 210:16
344:20
**reached**  147:21
**reaches**  66:7
**read**  17:22 18:5
18:13 45:12,15
49:4,14,15,15
92:7,14,21
94:13,14 95:17
95:21 104:8
105:20 106:19
117:14 141:24
142:8 173:3
201:11,12
211:24 215:20
215:23 220:15

224:7 225:10
233:23 250:5
285:1 287:7
290:6,7 301:7
306:11 308:6,7
310:13 316:1
348:11 349:13
353:9 354:7
396:3 398:3
**reading**  95:24
118:20 121:20
143:22 148:5
163:10 201:9
222:22 227:2
273:3 281:3
284:3 318:22
**readings**  63:24
**real**  3:9 39:14
123:13 298:12
312:7,12,12
350:18
**realities**  215:6
225:5 226:14
320:7
**reality**  140:17
157:22
**realize**  249:19
309:1
**realized**  310:1
311:20
**realizing**
307:24
**really**  41:17
43:16,20,23

**[really - record]** Page 62

44:10 47:3
52:20 53:23
54:24 55:10
62:4 71:6 72:6
76:17 92:15
104:18 105:1
105:18 106:11
118:4 124:16
170:23 176:4
177:4 180:11
180:13 181:11
224:19 236:2
263:13,22
265:14,19
267:3 273:3
274:11,12
278:6 279:12
279:18 294:16
321:9 348:18
349:18 356:23
376:21 381:14
381:23
**realm** 44:10
182:10
**realtime** 1:20
177:16 268:22
272:13 277:24
278:15 279:9
280:24 395:11
**reason** 16:3
53:16 98:20
350:11 396:5
**reasonable**
159:3 166:20

167:7,23 168:3
168:5,13 367:2
367:8 392:21
392:21
**rebuttal** 8:10
110:19 111:4,7
119:19 122:4
127:6 196:17
197:14 214:17
220:22 248:7
282:17 283:8
283:13 291:13
300:7,9 314:8
315:2 316:1
317:13 328:5
342:3,16
347:16
**rebuttals** 208:7
253:20 299:6
342:5
**recall** 16:8
19:18 20:3,11
24:24 25:1,3
26:4,13,17
28:2 43:12
73:8 89:22
109:7 142:13
170:13 171:19
172:5,10 173:3
173:6 197:5
220:16 227:9
276:12,16,22
287:21,24
290:1 292:22

293:14 294:11
297:3,16 298:7
307:20 308:6
313:7 332:6
348:16 363:8
368:15 369:9
375:23
**receipt** 396:17
**received** 21:7
337:14 392:13
**recess** 31:19
82:8 132:24
194:3 230:10
286:10 351:23
359:16 382:22
393:7
**recognize** 81:9
81:14 84:13
89:9 90:6
96:24 97:3,4
98:1 100:19
326:2
**recognized**
104:14 214:24
376:12 379:11
**recognizing**
196:7
**recollection**
171:24 332:7
**recommend**
363:24
**recommendat...**
262:1,14
364:12

**recommendat...**
262:4,18
**recommended**
43:9,17 358:23
363:13,16,18
**record** 12:11
13:3 14:2
16:15 31:13,17
31:24 32:3
49:11 71:22
72:9 82:5,13
104:17 107:9
118:22 121:21
125:9 131:2
132:6,22 133:6
143:23 148:6
150:14 153:22
158:2 161:15
163:11 165:12
188:7 193:23
194:8 207:7
212:1 230:8,16
234:1 240:21
246:1 247:21
250:6 256:18
272:23 286:8
286:16 334:5
351:21 352:5
359:11,14,21
373:13 374:8
382:17,20
383:3 393:4,11
395:6

records   235:4
  235:11,15
recount   250:8
recreate   224:16
recreated   293:7
recruited   25:11
  26:24
reduced   139:13
  139:20 140:1,8
  140:16 141:1
  141:12,19
  162:15 166:6
  166:15
reel   264:15
  265:16
reels   263:15,16
  263:18,19
  264:4,5,10,21
  265:8,12
reexamine   91:4
refer   13:21
  56:16 174:5
  294:8
reference   90:21
  123:7 137:7
  172:24 173:12
  208:14 229:10
  280:22 298:16
  306:13 390:22
referenced
  214:14 353:8
  364:22 370:10
  371:18

references
  110:5 205:20
  297:10 298:15
referencing
  173:14
referred   102:22
  105:10 286:18
  293:18
referring
  105:13 179:10
  181:9 182:23
  219:3 227:8
  232:4 301:17
  301:19
refers   117:18
  206:8
refining   38:22
reflect   79:23
  194:14 199:4
  232:20 247:17
reflected
  199:19 247:21
reflection
  104:19
reflective   241:3
  244:9
reflects   195:1
  197:18 198:5
  208:18 226:21
  228:15 257:15
  349:15
reframe   253:3
refresh   201:10
  225:11

regard   29:22
  164:21
regarding
  133:20 135:2
  135:20,23
  136:19 137:17
  139:24 146:5
  146:19 172:2
  260:13 355:11
  387:21
regional   22:13
  23:8,14
regular   103:12
  148:1 186:19
  240:4,5 242:11
regularly
  231:18
regulation   30:6
  41:22
reinforcing
  99:13
relate   134:12
  169:19,21
  185:13,21
related   51:16
  59:4 125:3
  143:1 150:3,19
  151:6 152:2,9
  152:19 156:22
  164:1 167:14
  187:6 199:1
  218:5 239:21
  276:16 287:1
  351:5 358:10

  371:16
relates   1:6
relating   24:22
  26:15 28:1
  30:14 52:9
  130:5 136:10
  139:20 142:21
  145:23 149:3
  149:23 150:16
  151:20 152:15
  156:17 162:21
  164:11,20
  166:5 204:6
  207:14 211:4
  358:7
relation   43:21
relations   91:24
  344:23
relationships
  55:4 215:13
  226:19
relatively   325:7
relay   232:12
relevant   112:11
  125:24 128:17
  141:3 161:12
  163:9 287:8
  318:11
reliability
  125:12
reliance   233:14
  256:13
relied   112:9
  172:14 241:24

**[relied - request]**                                                      Page 64

290:8 307:19
386:5 389:8
**relies** 228:7
257:6
**religion** 21:11
**reluctant** 56:21
**rely** 124:8
171:12 206:15
208:1 241:14
247:16 253:23
256:3,6,13
290:16 384:15
**relying** 202:7
213:6 234:12
**remember** 15:5
110:8 200:6
276:18 277:13
287:4,17 289:4
290:3 342:10
**reminded**
322:19
**render** 206:24
**rendering**
380:18
**repeat** 179:12
258:7
**repeatedly**
169:17
**reply** 111:6
114:13 119:16
208:7 228:18
253:19 299:6
342:2 347:15
348:1

**replying**
276:23
**report** 8:8,10
46:21 47:9
56:24 57:22
59:13 64:20
65:5 67:13,20
78:18 96:10
101:9,19,21
105:8 107:21
109:13,20,22
110:2,14,19
111:4,12 112:5
112:9 114:1,5
114:9,15
121:24 122:4,6
122:20 125:15
127:6 140:3
159:14 169:18
170:9,11,16
171:10 173:11
173:17,20
178:15 184:5
192:20 196:18
197:24 198:18
199:18 211:2,9
214:17 220:14
220:22 221:11
223:16 231:11
231:14 232:11
236:5 242:1,2
243:21 248:3,7
249:23 250:3
250:13 253:13

253:19,23
258:10 272:3
274:14 280:23
282:17,24
283:7,8,13
290:9 291:13
293:6 296:17
296:19 298:2
299:9 300:7,10
300:13 302:11
305:20 310:3
311:10,22
312:7 313:11
313:22 314:8
314:20,23
315:2 318:22
328:5 342:16
347:4 348:7,12
349:11 364:23
384:18,21
386:6,9 387:18
389:12 390:14
390:17 391:22
**reported** 94:8
103:18 232:18
**reporter** 1:19
1:20 13:4
16:11,20
395:11,21
**reporting**
59:12 94:6
95:16 107:13
113:4 338:17

**reports** 17:22
18:12 49:14,19
104:15 111:7
111:14,18
112:2,19
119:19,19
146:18 207:11
227:19 282:21
284:5,5 299:2
311:23 316:2
316:10,12,13
317:5,14 319:6
342:3 343:8
376:7 384:15
392:8
**represent**
13:18 295:4,13
374:18 392:6
**representation**
307:16
**representative**
317:19 318:1
**representatives**
104:11
**representing**
2:6,13,18 3:12
3:19 4:7,13,20
5:8,15,20 6:7
**reproduction**
395:19
**request** 11:10
107:3,22
108:22 223:22
305:8 306:24

CONFIDENTIAL

**[request - review]**                                                    Page 65

373:10 382:12
**requested**
  107:5
**required**  159:8
**requires**
  216:16 317:9
**requiring**
  215:12 226:17
**reread**  348:18
**research**  8:12
  44:18 49:17,18
  49:20 68:18
  88:19 106:24
  112:12 113:5
  118:21 120:23
  123:23 131:12
  142:8 143:22
  151:8 153:20
  158:2 165:10
  172:11 184:17
  198:14 199:1
  199:12 200:16
  201:24 208:22
  211:21,23
  212:22 213:23
  214:3,5 215:1
  216:22,23
  217:2,17,18,19
  218:2,5,10
  223:7 227:19
  229:19 233:23
  250:5 256:16
  284:1,16
  285:12 288:6

289:7 291:19
  376:17 377:2
**researched**
  106:20
**researcher**
  218:15 290:19
**researchers**
  88:11 200:9
  212:21
**researching**
  88:20 376:16
**reserved**  12:7
**resides**  308:7
**resounding**
  238:1
**resource**  62:20
  72:22 156:15
  157:18 180:21
  192:1 237:21
  259:19 280:7
  282:2
**resources**
  99:14 100:2
  113:6 162:14
  164:13 166:14
  184:17 234:8
**respect**  182:18
  284:3
**respectful**
  338:3 340:9
**respectfully**
  325:17
**respects**  208:4
  249:3

**respond**  69:2
  177:16 274:5
  322:24
**responded**
  297:23
**responding**
  54:9 55:10
  56:15 59:4
  115:16
**response**  61:21
  178:24 208:3
  250:19 255:8
**responsibilities**
  23:3 51:7 62:7
  65:14 79:15
  102:3 249:4
  288:18 328:3
**responsibility**
  22:10 33:22
  38:21 41:19
  180:13 322:4
  338:5
**responsible**
  23:6 323:20
  339:24
**responsibly**
  340:2
**responsive**  94:3
  377:17
**rest**  98:1 298:9
  298:22 300:2
  310:6
**result**  67:3
  117:9 161:6

163:13 181:1
  184:13 186:13
  217:3 243:14
  251:6 255:24
  256:16 277:18
  301:20 310:10
  311:7 371:14
  371:14 378:17
**resulted**  125:13
  129:14 310:9
**results**  90:14
  126:6 183:4
  314:16
**resume**  21:2
  33:3,11
**retained**  77:1,4
  80:19
**retrievable**
  86:18
**return**  396:15
**review**  9:19
  49:14 50:11
  80:1 87:7,23
  95:21 101:18
  103:3,22
  104:23,24
  105:11,19
  112:11 120:19
  125:4 131:5
  137:19 139:3
  143:11,21
  148:4 158:15
  161:12 163:9
  165:11 167:14

CONFIDENTIAL

**[review - rochelle]**                                                 Page 66

| | | | |
|---|---|---|---|
| 168:18 173:8 | 368:16,24 | 105:9 106:13 | 324:4 327:22 |
| 204:9,24 205:6 | 369:6 386:4,5 | 106:15 108:16 | 332:5 333:9,14 |
| 205:12 207:5 | 387:5 388:21 | 113:19 128:14 | 334:22 335:24 |
| 211:22 217:14 | 390:10 | 129:5 130:1 | 336:2,7,11,15 |
| 218:16 226:3 | **reviewing** | 139:23 144:22 | 336:19,23 |
| 233:22 256:17 | 170:12 203:16 | 150:8 156:2 | 337:6,19 |
| 272:21 286:20 | 204:1 | 164:9,18 170:2 | 338:10 339:4 |
| 286:22,23 | **reviews** 8:20 | 171:22 187:13 | 339:17 340:24 |
| 287:10 288:10 | 303:4,19 304:2 | 188:18,20 | 355:21 361:2,7 |
| 288:14 289:16 | 304:7 | 189:20 195:2 | 369:23 370:15 |
| 292:6 296:12 | **reward** 353:11 | 196:14,20 | 371:23 374:3 |
| 296:24 299:19 | **rice** 4:4 7:6 | 197:14 203:1,2 | 376:8,9 |
| 301:6,16 | 352:19,21 | 206:8,16 | **rights** 14:17 |
| 305:14 306:12 | 356:20 358:4 | 215:15 219:4 | **rigor** 125:13 |
| 308:8,24 | 359:8 | 219:13 222:4 | 208:19 212:12 |
| 315:17,22 | **rich** 99:15 | 222:13 225:21 | **rigorous** 206:9 |
| 328:13 332:3 | 100:3 | 233:3 240:13 | 213:16 228:5 |
| 348:3 355:23 | **right** 15:22 | 242:4 252:17 | **ripple** 320:20 |
| 356:3 364:13 | 22:6 28:6 32:6 | 252:19,22 | **rise** 143:15 |
| 364:18 365:2,5 | 32:11 33:5 | 253:7 259:24 | 144:24 379:23 |
| 384:14 387:15 | 38:19 40:13 | 261:6 271:7 | 381:12 |
| 388:15 389:1,9 | 43:11 44:13 | 274:17,22 | **rising** 139:15 |
| 390:11 | 45:3,7 46:14 | 277:8 278:16 | 141:21 142:18 |
| **reviewed** 88:9 | 50:9,13,24 | 280:23 284:24 | 143:1,7 144:1 |
| 105:20 113:2 | 55:1 65:24 | 285:14,15 | 144:14 273:17 |
| 113:14 129:4 | 66:4 68:6 73:4 | 296:18 298:17 | **risk** 327:18 |
| 130:4 136:8 | 73:20 74:8,9 | 300:22 305:18 | 350:18,20 |
| 142:1,13,14 | 74:14 76:3 | 307:3,21 | **risks** 346:4,23 |
| 152:9 153:21 | 79:4 80:14,18 | 309:21,23 | **road** 1:16 4:11 |
| 161:13 165:10 | 80:20 81:22 | 311:5 312:8 | **robert** 282:21 |
| 171:13 172:1 | 87:1 88:1 | 313:12,16 | **robustness** |
| 230:21 240:22 | 89:19 95:11 | 314:10 315:16 | 257:4 |
| 256:16 287:22 | 97:23 98:10,14 | 315:19 318:18 | **rochelle** 15:11 |
| 365:21 368:9 | 99:16 100:4 | 322:6 323:2,7 | 27:1,3,10,15 |

[rochelle - school]                                              Page 67

103:14 381:22
**role** 30:7,8,13
30:17 33:15
41:15 43:21,23
79:8 82:20
87:14 95:22
111:21 123:21
129:7 259:5
288:21 363:23
**roles** 29:19
38:6 98:18
**room** 74:23
**rooting** 80:20
80:21,23 81:22
**roughly** 38:16
**routine** 135:13
325:7 327:15
**row** 363:7
**rowley** 4:4
352:21
**rowley.rice** 4:7
**rubin** 76:8
77:11 78:3
**rubric** 290:20
379:14
**rules** 15:19
26:11 159:16
160:2,6,15,24
161:18 338:16
340:20
**run** 239:2
373:22
**running** 239:3

**rural** 231:21

**s**

**s** 3:16,17 4:11
5:4 7:11 8:2
9:2 10:2
291:16,22
293:11,19
295:20 296:22
299:17 385:22
387:10
**safe** 394:3
**safety** 35:20,22
62:3
**salient** 59:20
176:7 381:23
**sample** 241:21
245:15 257:4
376:22 380:14
380:24
**sattan** 6:11
12:12
**saturation**
70:23 149:15
186:14
**saw** 268:18
375:24
**saying** 16:21
47:12,14 50:22
51:3 69:14
72:10 122:22
128:6 165:21
168:21 190:11
216:7,9 218:3

251:5 336:21
337:2 338:3
383:12
**says** 32:9 90:20
90:24 91:21
93:8 123:3
201:21 204:16
303:6 312:20
333:20 336:16
376:19 391:24
**scale** 71:3
151:4
**scarce** 237:21
**scene** 26:10
**scheduling**
46:7
**scholar** 101:22
102:14 120:22
286:24 290:5
301:22 308:3
**scholarly** 291:2
301:21
**scholars** 201:23
204:17
**scholarship**
87:17,24 88:4
88:5 89:13,18
208:15 229:19
290:15
**school** 9:14
15:6 19:15
21:15,18 26:6
29:24 30:1
32:11 33:16,19

37:23 38:2
42:19 43:10
46:23,23 47:18
48:1,2 50:17
50:21 53:4
54:3 56:15
58:19,24 59:15
59:16 61:7,8
61:19,24 62:1
62:9 63:4,10
63:11 64:3
65:20 66:19,21
67:18 68:21,24
69:18,19,20
71:6,23 79:13
80:8 82:23
83:6 86:24
94:19 99:10
102:2 103:18
104:10,20
106:3,8 107:8
107:8,11,23
108:6,13,23
113:22 115:7
115:15,22,23
116:3,19,20
117:2,3 118:10
118:18,22,23
119:1,1,5,22
120:4 121:8,9
121:16,16
123:10,11,11
123:16 124:8
125:9,9,18

**[school - schools]**                                                        Page 68

| | | | |
|---|---|---|---|
| 126:1,3 127:13 | 168:9,16 169:5 | 251:18,19,20 | 381:23 386:23 |
| 127:13,20 | 172:15 175:5 | 255:17 256:5 | 387:8 |
| 128:16,23 | 178:9,11,11 | 256:10,11,15 | **school's**  324:7 |
| 129:17,23,24 | 179:1 180:20 | 256:21,22 | **schools**  7:23 |
| 130:5,12,21 | 180:22 181:22 | 257:9,17,19,19 | 10:7 23:11,19 |
| 131:9 133:22 | 181:23,24,24 | 259:5 260:8,13 | 24:9 25:21,22 |
| 135:19 136:5 | 184:16,19,21 | 272:8 274:10 | 26:21,23 27:12 |
| 136:15 137:10 | 184:22,22 | 277:17 278:13 | 27:13,21 41:5 |
| 137:18 138:3 | 186:10,12 | 280:5,14,21 | 41:13 42:7,14 |
| 138:14,15,15 | 191:1,1,2,23 | 282:1 288:16 | 43:5 47:18,19 |
| 138:20,22 | 192:5 202:18 | 289:12 315:18 | 47:21 48:6,15 |
| 139:22 142:6 | 202:23 203:4,7 | 315:23 316:11 | 48:15,16,16 |
| 142:23 143:8 | 204:7,10,17,19 | 316:12,13 | 53:13 55:23 |
| 143:20,21 | 205:9,12 207:2 | 319:4,14,19 | 57:7,12 59:3 |
| 145:17,18 | 207:3,14,16,18 | 320:19,20 | 61:2,24 64:10 |
| 146:1 147:4,5 | 209:22 210:14 | 321:5 322:15 | 65:18 70:6 |
| 147:8,12,14,15 | 211:5,16 212:1 | 323:17,19 | 71:4 72:4,8 |
| 147:24 148:1,3 | 212:1,4,4,19 | 325:6,12 326:7 | 79:13 80:8 |
| 148:14,15 | 215:6 216:3 | 327:6,7,19 | 88:15 96:17 |
| 149:4,4,19,24 | 218:14 225:5 | 328:9,23 329:3 | 97:23 99:7,9 |
| 150:4 151:21 | 226:14 228:2,3 | 329:19,21,22 | 102:13 103:17 |
| 152:16,20 | 231:15 232:5 | 330:14,19,22 | 105:5 107:12 |
| 153:2,4,14,15 | 232:14 233:1,1 | 331:2 333:1 | 114:4 116:3 |
| 153:16,17,22 | 233:2,4,16,16 | 335:5 342:8,8 | 117:8 120:4 |
| 154:1 155:4,5 | 233:19 234:7 | 342:9,18 | 128:7 129:16 |
| 156:20 157:22 | 234:16,17,21 | 343:24 344:7,8 | 130:19,20,22 |
| 159:7,19,24 | 236:8,11,12,23 | 344:13,17,18 | 131:4 132:3 |
| 160:20 161:4 | 237:1,15 244:5 | 345:11 348:5 | 135:22 137:15 |
| 161:10,11 | 244:5,12 | 364:2,5,5,8 | 138:14,20 |
| 162:16,23 | 245:16,16,19 | 369:4,12 | 139:12 140:13 |
| 163:1,6,6,15 | 246:1,2 247:18 | 371:20 372:2 | 140:18,19 |
| 164:1,3,12,15 | 247:19 248:18 | 372:13 378:19 | 141:19 142:3 |
| 164:16 165:2,7 | 248:24 249:5 | 378:19 379:6 | 147:11 148:3 |
| 165:7 166:7,9 | 251:11,17,17 | 380:20 381:3 | 153:8 157:22 |

**[schools - see]**                                      Page 69

| | | | |
|---|---|---|---|
| 159:17 160:3,8 | **sciences** 33:16 | **second** 15:9 | 202:2,3 203:21 |
| 160:17 161:2 | **scientific** | 31:13 124:23 | 204:15,22,23 |
| 161:17 162:17 | 282:24 283:20 | 185:3 202:24 | 205:10,19 |
| 163:9,14,18 | 283:21 284:10 | 220:23 227:7 | 206:6 211:10 |
| 165:2 169:4 | 284:21 367:3,9 | 228:21 230:18 | 212:6,13 215:8 |
| 178:22 180:11 | 367:14 | 233:14 299:14 | 215:9,24 |
| 187:16 188:12 | **scientist** 285:21 | 308:16 334:1 | 220:17 221:5,7 |
| 190:1 216:3 | 367:15 | 335:10 389:2 | 221:9,10,14,16 |
| 228:8,9 231:24 | **scientists** | **seconds** 353:24 | 221:20 222:2 |
| 233:19 234:6 | 283:23 285:11 | **section** 201:16 | 223:15,18 |
| 240:19 241:22 | **scope** 78:22 | 271:4 276:7 | 224:11,11 |
| 243:24 244:1 | 102:9,16,24 | **sedran** 5:3 | 225:12 228:22 |
| 244:12 245:7 | 105:12 115:2,5 | **see** 21:22 33:3 | 230:1 231:9 |
| 245:12,19 | 115:12,19 | 51:10 71:5,8 | 232:2 248:12 |
| 248:21 249:24 | 119:14 132:15 | 72:8 74:10,14 | 258:13 267:5,6 |
| 251:22 256:10 | 138:10 144:9 | 75:1,19 84:15 | 271:3 272:5 |
| 274:10 276:15 | 144:17 156:1,3 | 90:20 91:21 | 281:21 283:10 |
| 277:17 280:7 | 156:8 167:16 | 92:6 93:7,14 | 291:15 296:20 |
| 287:5 289:12 | 169:14 171:7 | 93:17 94:11 | 297:2 298:5,14 |
| 319:21,24 | 183:17,18 | 95:4,4 101:5 | 300:12 302:16 |
| 320:7 321:16 | 217:17,22 | 106:7 107:7 | 303:1 304:19 |
| 321:18 322:4 | 288:17 367:20 | 112:8,15 113:9 | 304:23,24 |
| 322:10,24 | **screen** 74:11,14 | 113:12 118:15 | 305:16,23 |
| 323:6,17,19 | 75:6 93:6 | 129:6,12,20 | 306:7 310:24 |
| 329:3 335:1 | 304:14 | 130:8 133:17 | 311:13 312:2 |
| 342:5 344:13 | **scrolling** | 135:16 137:3 | 314:3 315:3,8 |
| 378:20 380:20 | 272:13 277:24 | 139:10,16 | 316:15 317:12 |
| 381:3,8 391:7 | 278:15 279:9 | 143:3 145:11 | 331:21 332:21 |
| 391:16 | 280:24 | 145:20 149:20 | 333:2,3,4,15,21 |
| **science** 9:21 | **sealing** 12:4 | 151:23 159:21 | 333:24 335:13 |
| 35:12,14 306:6 | **search** 76:11 | 162:18 172:11 | 336:5,8,12 |
| 333:8,10 | 102:13 301:21 | 174:12 179:5 | 337:22 348:14 |
| 389:19 390:4 | 308:3 | 185:9,10 | 354:23 358:14 |
| 390:22 | | 197:21 201:20 | 361:21 371:9 |

**[see - show]** Page 70

| | | | |
|---|---|---|---|
| 384:23 387:19 | **sees** 73:17 | **september** 1:9 | 283:3 284:13 |
| 387:22 391:17 | **segment** 374:4 | 12:14 266:8 | 284:24 366:1 |
| **seeing** 49:7,11 | **selection** 44:9 | 395:11 | **several** 47:16 |
| 52:14,18,19 | **selective** 316:3 | **series** 209:23 | 134:18 313:10 |
| 66:11 80:8 | 317:12 | **serious** 178:9 | 314:7 315:4 |
| 89:11 90:18 | **selectivity** | 178:21 | 369:16 |
| 96:1 103:17 | 316:19 318:7 | **seriously** 52:23 | **shaming** |
| 104:20 107:10 | 318:10,22 | **serve** 28:24 | 116:17 145:15 |
| 210:11 251:9 | **self** 72:15,15 | 129:18 322:22 | 146:11,20 |
| 251:10,12 | 350:24 | 363:9 | **shape** 319:20 |
| 274:9 332:7 | **selling** 268:8 | **service** 231:16 | **shaping** 116:17 |
| 334:23 380:17 | **semesters** | **services** 28:21 | 145:16 |
| **seek** 186:20 | 38:14 | 129:19 139:15 | **share** 56:21 |
| **seeking** 186:6 | **send** 354:1 | 141:22 142:19 | 67:8,15 93:23 |
| 187:24 190:16 | 361:11,14 | 142:22 143:2 | 329:7,10 |
| 324:17 371:13 | 392:8 | 143:16 144:2 | 339:15 |
| 371:15 373:4 | **sending** 353:16 | 144:15 145:1 | **she'll** 361:14 |
| **seeks** 187:9 | **sense** 17:5 55:8 | 156:13,19,24 | **shed** 128:15 |
| **seem** 165:24 | 149:18 153:24 | 157:9,16 282:4 | 245:8 |
| 169:7 193:5 | 345:21 346:21 | **serving** 125:18 | **sheet** 8:22 |
| 203:9 | 349:20 350:9 | **session** 38:15 | 331:14,19 |
| **seemed** 176:7 | **sent** 362:3 | 38:18,20 39:2 | 342:10,11 |
| 287:7 316:3 | **sentence** 99:19 | 39:16,23 40:1 | 343:16 396:7,9 |
| **seems** 94:21 | 99:21 201:21 | 40:4 | 396:12,15 |
| 97:14 213:4 | 203:21 205:14 | **set** 23:3 78:5 | 398:6 |
| 287:18 318:6 | 205:23 206:5 | 91:5 169:11 | **sheets** 332:3 |
| 320:5 380:14 | 212:6 215:18 | 210:20 318:8 | **shoot** 196:5 |
| **seen** 130:20 | 215:20 336:1 | 318:13 349:3 | **short** 19:3,5 |
| 269:22 271:6 | **sentences** 347:3 | **settings** 8:16 | 40:9 168:21 |
| 271:12,13 | **separate** 343:7 | 157:24 158:4 | 351:8 382:15 |
| 334:21 361:9 | 379:8 | 167:10 168:8 | **shorts** 271:22 |
| 386:1 387:12 | **separated** | 168:23 219:13 | 271:23 |
| 389:4 390:6 | 215:5 225:4 | 219:24 221:4 | **show** 49:21 |
| | 226:13 | 225:2 226:11 | 157:21 336:15 |

**[show - snapchat]**

345:19 372:1
**showed** 342:7
**showing** 107:15
**shows** 65:7
69:17 105:21
131:12 343:17
**siculus** 3:13 6:7
**side** 78:4 80:20
80:22,23 271:7
**sign** 396:8
**signature**
395:10
**significance**
380:10
**significant**
259:22 288:7
**signing** 396:10
**similar** 246:5
250:7 299:8
**similarities**
169:4
**similarly** 74:13
152:14 174:9
**simple** 377:21
**sindermann**
302:18 308:20
384:11,24
**single** 62:12
64:13,18 67:6
71:17 212:18
255:11 257:10
291:9 369:20
371:19

**sir** 56:12 81:10
151:13 181:2
220:12 226:23
247:2 253:22
254:10 272:17
325:17 346:17
347:5 360:21
**sit** 290:1,2
378:4
**sites** 163:18
379:1
**sits** 302:6
**sitting** 63:1
66:1 137:24
143:6 147:3
157:5 224:5,9
238:12 276:3
307:21 312:4
319:2 341:8
**situations**
48:23 51:9
**six** 34:5,6,9
49:9 65:17
103:12 119:3
128:22 129:24
130:6,13
131:18 133:21
134:2,7,13,17
135:2 136:3,9
136:15,17,23
137:10,18
138:3,8,21
139:2,4,21
140:1,9 141:2

141:14 142:11
142:16,23
143:3,7,11,13
143:16 144:13
145:1 146:1,6
146:12,16,21
147:7 148:9,17
149:2,8,9,24
150:3 151:21
152:3,10,16,21
153:3 154:8
155:4,15,24
156:6,19 157:1
157:9 158:12
158:16 159:6
160:5,10,19
161:8,24 162:3
162:23 163:1
164:11,16,20
164:23 165:14
166:6,9,13
167:15 168:9
202:17,23
203:4,7 204:6
204:10 205:9
205:11 207:14
207:16,18
211:5 234:17
245:14 315:18
316:7 319:4
346:16 393:11
393:20
**size** 241:21
245:15 257:4

376:22 380:14
380:24
**skalet** 2:3
**skim** 226:4
228:21
**skimmed** 18:1
18:5 101:7
104:7 173:4
287:7
**skimming**
348:13
**sleep** 53:4 64:2
66:14 240:1
346:9
**sleeping** 351:2
**smartphone**
302:24
**snap** 4:8 13:20
352:22 355:24
356:4 393:12
**snapchat**
169:23 170:7
170:20 171:11
172:7 183:3
193:3 268:24
269:2 350:5
353:2,7,13,24
354:8,12,17
355:3,11,13,17
356:22 357:3,7
357:10,13,19
358:8,11,12,18
375:1 393:21

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **snapchat's** | 144:4 145:13 | 284:11,22 | 366:13,20,21 |
| 269:5,11 | 147:18 149:15 | 287:1,4,12 | 367:4,10,22 |
| **social**   1:3 8:23 | 150:21 154:3 | 288:11 289:1,2 | 369:11 371:16 |
| 9:14,17,22 | 159:16 160:6 | 289:12,18 | 372:8 373:5,6 |
| 12:19 21:23 | 160:15,24 | 291:17 296:23 | 379:4 380:19 |
| 30:14,19 34:13 | 169:19,21 | 299:18 306:3 | 386:22 387:7 |
| 35:3,6 43:3,18 | 170:1,5,8,15,19 | 319:13 320:5 | 388:13,23 |
| 47:3 50:24 | 170:22 171:1,7 | 320:13,23 | 389:20 |
| 51:15,18 52:9 | 171:14,17 | 321:14 323:12 | **socially**   273:20 |
| 52:24 53:1,5,7 | 172:2,19 | 324:13,15,19 | **society**   322:5 |
| 53:8,9,11 | 173:12 174:6 | 324:19 325:16 | 323:1 |
| 54:10,22 55:8 | 174:13,14 | 325:21 326:6 | **sold**   273:7 |
| 56:16 57:11 | 176:20,21 | 326:19,23 | **sole**   256:13 |
| 58:9 59:4 | 177:10,11,14 | 327:8,10 | 319:13,16 |
| 62:14 63:3 | 178:5 183:1,21 | 328:10,17,24 | **somebody**   56:3 |
| 65:10 66:17 | 185:6,13,20 | 329:4,8,13,15 | 236:24 237:1 |
| 67:4 69:7,11 | 186:2,11,14 | 329:18,21,23 | 268:19,19 |
| 69:15 70:23,24 | 187:13,15,19 | 330:3,7 331:4 | 340:11 364:22 |
| 72:18 73:11 | 188:13,14 | 334:10 335:5 | **sorry**   41:10 |
| 78:20 79:1,14 | 190:14 191:7 | 335:14,23 | 68:11 90:17 |
| 80:10 91:24 | 191:19 193:2 | 336:9,19,22 | 99:17 114:9,21 |
| 92:10 93:10 | 193:12,16 | 337:6,18 339:2 | 115:9 122:1 |
| 94:8,24 95:9 | 212:3 231:24 | 339:14,24 | 132:14 195:15 |
| 96:5 102:12 | 232:1 234:5 | 340:8,22 | 203:19 215:16 |
| 105:4,22,23 | 237:24 239:21 | 341:17,24 | 220:9,23 |
| 115:1,21 116:8 | 239:22 240:2,2 | 342:12,18 | 258:19,20 |
| 116:14 117:23 | 244:11 245:21 | 344:16,21 | 266:18 299:23 |
| 118:12,17 | 245:21 251:14 | 346:3 347:21 | 300:8 305:4 |
| 119:7,14,17 | 256:20 272:9 | 348:5 349:8 | 335:16 339:18 |
| 120:6,10 121:1 | 273:9,21 274:3 | 350:8,21,23 | **sort**   41:20 43:4 |
| 121:6 129:14 | 276:15 277:19 | 351:11 359:4 | 49:6 50:1,20 |
| 131:14 133:12 | 277:22 278:13 | 363:20 364:9 | 53:12 72:14 |
| 138:1,7,13 | 279:5 280:5 | 364:19 365:6 | 103:23 104:18 |
| 140:15 141:18 | 282:7 283:1 | 365:10,16 | 105:7 107:9,13 |

CONFIDENTIAL

**[sort - spoke]**                                                    Page 73

107:18 115:2
127:18 180:17
180:24 184:13
186:14 234:24
237:3 268:16
274:1 278:4,8
279:14 323:14
327:12 342:22
348:12 351:2
362:3 371:5,12
372:1,4
**sorts**   48:15
108:23 188:11
**sought**   357:17
358:2,6,10
**sound**   195:2
**sounds**   189:14
361:2
**source**   102:5
159:18 160:18
161:4 175:15
316:16 323:13
**sources**   82:17
82:18,24 83:2
112:22,24
113:14,17
134:10 157:19
167:20 228:14
233:9 234:11
**south**   4:5 15:7
25:12,14 26:20
26:22
**southeast**   3:17

**space**   396:6
**spalding**   3:16
**spam**   340:16
**span**   58:16
133:13 273:18
**speak**   16:22
19:11 20:4
170:18 253:15
263:14 281:6
**speaking**
192:21 242:19
277:16
**special**   23:18
**specialists**
22:14
**specific**   23:18
26:17 32:16
56:14 59:2,3
63:2 71:24
72:10 78:12,15
104:9 106:10
113:21 119:7
130:2 131:19
134:7,13 135:3
135:9 136:24
137:16 138:3
139:21 140:2,5
140:9 141:15
143:7 146:1,6
146:12,16
147:7 149:8
150:4 152:3,10
152:17,20
153:3 154:8

155:5,24 156:6
158:13,15
159:6 160:5,10
160:19 162:3
163:1 164:2,5
164:15,23
165:16 166:9
166:13 167:15
167:22 168:9
168:16,20
169:11 172:3
172:11 173:15
179:17 181:10
182:3,13
184:10 188:8
190:10 191:16
202:23 204:10
205:9,11
217:14,14
232:17 236:16
249:23,24
250:1,9,10,16
266:19 276:24
287:24 312:2
315:23 317:13
332:4 354:7
366:21 369:8
370:4 381:10
**specifically**
24:24 38:2
43:14 114:23
136:18 138:21
141:1 142:10
143:14 144:18

145:23 148:17
151:19 159:7
165:15 169:22
170:11 171:21
172:6 176:9
187:6 206:22
275:1,14 290:3
313:8 365:11
366:15
**specifics**   131:3
131:6 182:9,17
245:7
**speculate**
267:13 268:17
341:3 354:20
362:15 370:23
**speculation**
375:22
**speech**   340:15
**spend**   39:24
181:17 355:12
355:18
**spending**
259:13
**spends**   245:10
**spent**   38:9
39:17 57:11
194:15 238:22
360:17 381:2
**split**   351:3
**spoke**   227:7
241:9 243:17
244:18 245:5
246:11,21

CONFIDENTIAL

**[spoke - struggling]**                                    Page 74

247:5 266:21
**spread** 372:23
**sprinkling**
212:10
**square** 3:9
**staff** 22:20 52:3
60:1 149:17
150:24 152:7
152:10 153:2
155:3 159:19
161:5 372:6,6
372:10
**staffing** 316:13
**stages** 191:20
**stance** 226:21
**stand** 65:22
110:15 179:7
283:12
**standard**
208:19 223:6
380:6
**standards**
102:7 113:3,19
212:24
**standing** 53:11
53:11 73:20
74:12 251:14
**stands** 253:13
253:14 261:12
261:14
**start** 17:2 34:6
361:17 379:17
**started** 53:8
90:1,2 208:7

381:21,24
383:11
**starting** 87:4
87:13
**starts** 201:17
264:16 265:16
**state** 14:1,4
55:17 396:5
**stated** 70:4
81:20 139:1
**statement**
49:16 182:24
189:22 206:19
212:15 213:15
272:19 283:13
319:10
**states** 1:1 12:22
40:21 41:1
**statistical**
321:2,20 380:9
**statistically**
288:6
**statistician**
283:15 285:20
321:23 380:8
381:18
**statisticians**
283:22 285:11
**statistics** 35:16
35:18 284:16
**status** 240:2
273:21
**stay** 186:8
266:4 326:20

**stemming**
325:16
**stenographic**
13:3
**steps** 378:14,16
379:9,11
**stipulated** 12:2
**stipulations**
11:15
**stool** 345:10
**stop** 168:20
266:9
**stopped** 310:4
**stopping**
193:19
**stories** 56:22
255:7,11
268:11,13
354:17,21
**story** 52:17
57:2 255:11
355:2,3,6
**strain** 62:20
149:16 162:15
164:18,22
165:17 166:15
192:1 234:8
**strains** 321:4
**strand** 228:6
**strands** 228:10
**strategies**
94:20
**strategy** 216:14

**streak** 353:10
353:16,18,23
**streaks** 353:6
354:5
**stream** 45:22
51:11
**streams** 107:18
**street** 2:4 3:5
5:5,12,18
**strengthen**
61:10 71:7
213:23
**stress** 251:10
**strictly** 39:20
**strike** 15:14
87:10 241:6
244:15 246:8
247:24
**strong** 167:9
**stronger**
167:10 217:7
**structural**
174:6 178:20
**structure**
310:21
**structured**
125:19 127:7
127:16
**struggles**
255:23 282:10
**struggling** 29:6
122:16 208:13
211:20 236:24

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **student** 48:19 | 55:17 58:4,15 | 239:22 244:10 | 293:12 294:9 |
| 53:14 54:7 | 59:24,24 60:1 | 248:20 251:13 | 294:12,15,24 |
| 55:22 65:10 | 60:6,8,9,10,16 | 257:16 273:18 | 295:7,16,22 |
| 69:1 73:17 | 63:16,18,21 | 277:19 282:9 | 377:9 378:9 |
| 74:13 75:2 | 64:1,5 66:13 | 283:3 284:12 | **study** 9:7 90:16 |
| 80:10 112:14 | 67:3 69:6,8,12 | 284:23 320:4 | 90:23 91:3,6 |
| 116:2 117:9 | 72:12,13,14 | 320:10 321:5 | 123:20 124:5 |
| 119:22 120:13 | 75:17,22 78:20 | 322:16,23 | 127:2 199:2 |
| 120:24 129:15 | 93:12 95:3,10 | 323:7,11 | 200:10 208:20 |
| 133:12 139:13 | 104:2 105:3,15 | 324:16,22 | 209:15 212:12 |
| 139:21 140:1,8 | 105:23 114:4 | 329:14 334:11 | 212:18,24 |
| 140:16 141:1 | 115:1,20 116:9 | 335:6,14,23 | 213:10 214:5,6 |
| 141:12,19 | 116:15 118:17 | 336:22 337:14 | 214:9 215:4 |
| 156:13,18,24 | 119:6 120:3 | 338:10 340:7 | 216:11,12 |
| 157:8,15 | 121:7,19 | 340:20,21 | 217:9 225:3,19 |
| 175:20 176:23 | 122:11 131:13 | 342:21 343:4 | 226:11 227:16 |
| 183:6 192:11 | 138:13 140:14 | 343:14 346:19 | 249:5 257:22 |
| 192:12 193:1 | 140:20 141:17 | 347:20 348:5 | 291:9,10,10 |
| 241:23 245:21 | 144:4 145:13 | 349:2,19 350:2 | 302:23 384:1,8 |
| 256:20 275:17 | 145:24 146:5 | 350:6,19 | **studying** 216:4 |
| 282:11 287:2 | 147:17 150:20 | 369:21 370:12 | **stuff** 41:23 |
| 288:11 324:6 | 151:2 154:2 | 371:7,15,20 | 49:17,17 60:13 |
| 327:9 329:16 | 159:19 161:5 | 372:12,18 | 66:16 69:17 |
| 329:17 338:14 | 175:21 176:2 | 373:5 377:5 | 177:6 235:8 |
| 344:3 349:8 | 177:8,12 180:1 | 378:2,7,10 | 240:3 264:12 |
| **student's** 213:5 | 180:18 181:6 | **studies** 8:14,18 | 265:13 281:18 |
| **students** 8:24 | 181:17,20 | 49:21 113:2 | **subject** 238:5 |
| 24:2 25:17,20 | 186:13,15,18 | 123:23 200:19 | 396:10 |
| 25:24 27:8,11 | 187:4,22,23,23 | 201:18 214:3 | **subjective** |
| 27:16 32:17 | 190:14 191:9 | 219:1 223:8 | 260:22 |
| 43:4 47:12,15 | 193:16 200:9 | 233:23 237:8 | **submission** |
| 47:24 49:2,22 | 207:4 212:2,22 | 274:22,24 | 199:12 |
| 52:4,19,23 | 234:4 237:23 | 283:18 285:2 | **submit** 243:12 |
| 53:3,10 54:17 | 238:24,24 | 291:20 292:13 | |

**[submitted - sure]** Page 76

| submitted | suite 2:4,11 | 94:17 95:8 | supposition |
| 88:11,21 | 3:18 4:18 5:5 | 96:4 102:3 | 132:1,4,11 |
| 109:20,22 | 5:12 | 231:19 257:23 | 135:3 140:23 |
| 111:5,8 208:23 | sum 346:14 | 328:16 358:22 | 154:24 155:11 |
| 227:20 369:1 | summer 76:20 | 358:24 | 155:12 161:22 |
| submitting | 76:21,22 77:7 | supervision | 166:12,21 |
| 380:12 | superintende... | 395:21 | 167:1,4,11 |
| subscribed | 7:21 47:20 | support 11:2 | sure 21:5 24:9 |
| 398:10 | 89:5 237:14 | 23:13 29:5,7 | 26:4,11 28:19 |
| subscriptions | 257:24 | 29:10 30:9 | 31:14 38:10 |
| 271:19 | superintendent | 41:17 43:24 | 41:23 44:14 |
| substance | 15:7,12 25:11 | 48:3 91:14 | 45:5,21 50:5 |
| 218:13 398:6 | 25:14,24 26:15 | 122:12 126:8 | 60:24 76:14 |
| substantial | 26:24 27:3,15 | 156:13,18,24 | 77:22 83:18 |
| 123:9 | 27:23 29:16 | 157:9,16 | 86:14,20 91:19 |
| substantially | 40:12,16 43:13 | 197:24 199:6 | 94:4 95:15 |
| 325:19 | 44:5 88:13 | 209:20 225:2 | 115:11 118:7 |
| suburban | 90:15,22 91:3 | 242:14 252:3 | 125:17 126:20 |
| 231:20 | 99:3,6 103:13 | 283:6 315:5 | 131:16 139:8 |
| successes | 124:20,22 | supporting | 150:14 154:21 |
| 329:14,17 | 127:22 142:2 | 23:1,20 29:24 | 167:6 185:3 |
| suffered 278:13 | 218:18 231:17 | 43:23 47:18 | 188:22 196:1 |
| suffices 318:21 | 240:23 258:18 | 59:15 123:16 | 200:4 201:14 |
| sufficient | 258:22 259:4 | 275:10 276:7 | 205:5 210:5 |
| 380:15 | 381:22 | supports 198:4 | 213:13 216:5 |
| suggest 30:8 | superintende... | 225:16,17 | 219:7,18 |
| 163:17 168:24 | 218:11 | 226:24 283:1 | 222:17,22 |
| suggested | superintende... | 284:10,21 | 224:10,17 |
| 287:11,15 | 21:17,21 23:9 | suppose 24:23 | 242:16 257:8 |
| suggesting | 23:15,16 29:1 | 44:22 46:16 | 259:13 261:9 |
| 49:19 163:22 | 29:10 32:18 | 70:18 74:24 | 263:23 267:9 |
| suggests 158:3 | 48:2 62:18 | 125:23 148:8 | 273:1 277:15 |
| 163:12 229:18 | 88:8 91:12 | 369:5 | 279:3 282:19 |
| | 92:4 93:9 94:7 | | 286:23 297:8 |

CONFIDENTIAL

298:13 300:5
313:20 322:8
323:3 332:9,11
332:19 335:3
339:8 340:5
341:9,19
346:19 360:3,5
360:8 362:13
362:14 367:15
369:3 370:20
374:22 375:9
375:19 377:14
377:20 379:18
381:16 382:16
392:10
**surgeon**   49:15
104:15 251:8
**surprise**   330:10
330:12,18
354:9
**surprising**
132:5 301:10
**surrounding**
99:8
**survey**   127:8
128:2,6
**surveys**   113:2
**survive**   236:2
**sustained**
248:14
**sustaining**
63:22
**sw**   2:16

**swear**   13:5
**sweeping**   252:3
**switch**   122:2
**switching**
261:3
**sworn**   13:8
395:5 398:10
**syllabi**   38:22
**system**   24:6
27:20 330:14
353:11
**systematic**
203:15,24
296:24 299:19
305:14
**systematically**
238:4
**systemic**   91:8
231:23
**systems**   233:13
328:9,23

**t**

**t**   7:11 8:2 9:2
10:2 389:3,3
397:1
**tab**   20:15 81:1
84:9 88:24
89:9 96:12
100:9 109:9
111:2 112:5
200:12 294:20
303:15 331:10
333:23

**table**   326:11
**take**   17:14
44:20,23 45:3
45:5 88:24
90:19 91:1
93:6 96:12
100:9 109:9
112:6,23 114:9
121:23 122:3
129:10 130:10
132:18 135:11
145:10 146:9
147:3 149:13
152:24 155:13
156:9 174:10
182:6 194:11
200:11 201:14
219:18 223:13
225:23 228:12
231:7 242:12
243:3 248:2
250:14 264:19
272:3 289:10
291:12 292:10
294:20 296:18
302:10 303:15
304:21 305:18
328:4 331:10
332:2,10
333:23 334:18
335:8 347:6
351:14 353:5
**taken**   1:13
31:20 66:22

82:9 133:1
180:13 194:3
230:11 286:11
351:24 359:17
382:23 393:8
**takes**   224:2
353:24 354:3
**talk**   42:24 48:1
70:16 139:1
149:8 171:9
174:20 181:12
190:6 202:10
214:13 243:23
277:21 278:6
327:23 356:24
**talked**   47:22
73:4 77:20
196:21 227:18
235:15 237:14
238:17 245:8
374:23 376:9
**talking**   54:20
65:18 73:1
192:22,24
193:10,11
208:6 236:19
257:5 277:11
340:17
**talks**   245:13
**tarrant**   9:20
291:17,23
293:11,19
295:21 296:11
308:17 388:16

[tarrant - testimony]                                             Page 78

389:3,13
task 66:22
79:18,22 80:5
115:3,5 125:6
130:9 132:16
134:3 137:4,22
138:10 139:6
140:6 143:4
144:20 146:8
146:23 149:11
150:6 152:5,23
154:10 156:1,3
156:8 157:4
159:10 160:12
162:5 164:7
166:1 167:16
169:8 203:10
204:13 205:16
211:11 258:14
289:10 322:1
367:1
tasks 351:5
taught 30:21
33:21 39:7,11
369:10
teach 47:24
239:1 369:3,12
teacher 31:3,7
31:11 32:4
33:5,23 73:17
74:12 122:10
133:15,20
134:6,8 135:2
343:17 369:22

teachers 14:15
14:17 53:20
58:14 60:7
63:23 69:14
72:13 74:1,18
74:22 75:17,21
93:10 128:8,8
151:1 251:21
282:10 327:21
328:1 371:22
372:19 382:4,7
teaching 7:23
21:12 22:20
23:2,6,22
32:23 33:8,12
33:17 38:9,20
39:7,10,21
62:7 66:24
74:20 96:17
97:22 251:22
257:15 323:7
teams 231:20
249:7
tech 305:8
306:24
technical
262:13,16
technician 6:12
12:10 31:12,15
31:22 82:3,11
132:19 133:3
193:21 194:5
223:21,22
230:5,13 286:5

286:13 305:3,7
306:23 351:18
352:2 359:12
359:19 374:3,9
382:18 383:1
393:2,10,19
technologist
34:22
technology
7:22 22:4,14
34:20 96:16
97:22 98:3,13
99:15 100:3
teenagers
357:8,11,13
teens 71:1
177:20 273:11
television
336:15 345:18
tell 48:21 58:24
68:11 69:4
70:8 71:16
74:8 194:23
238:13 240:12
241:8,11 247:4
250:15 252:20
253:5 275:2,20
303:9 313:5
326:14
telling 62:19
68:20 70:19
tells 335:14
telzer 305:22
307:18 385:23

386:13
template
379:14 381:17
temporal 188:5
ten 23:14 98:6
295:5,15
393:15 394:1
tend 75:21
tenth 3:5
tenure 15:3,8
terms 66:13
72:11 80:10,22
146:17 200:8
210:15 281:14
territory
250:19
test 243:4,9
testable 243:8
testified 13:9
14:22 15:2
181:2
testify 14:19
75:14 275:7
356:15 357:22
368:18
testifying
104:11 249:22
360:3
testimonies
68:19
testimony 7:4
16:1 49:10
57:24 59:9
64:23 68:19

**[testimony - think]**                                                    Page 79

| | | | |
|---|---|---|---|
| 69:24 71:22 | **tgraden** 4:13 | 105:7 117:4 | 144:11,19 |
| 72:9 80:1 85:7 | **thank** 17:19 | 124:18 125:11 | 145:5 146:7,22 |
| 104:17 108:5 | 70:2 86:21 | 176:6 187:16 | 149:10 150:5 |
| 118:22 121:20 | 96:23 111:3 | 188:11,19 | 151:23 152:4 |
| 125:8 131:1,22 | 151:17 174:2 | 200:5 216:19 | 152:22 154:9 |
| 132:6 141:6,24 | 195:19 201:1 | 237:17 246:6 | 154:11 155:15 |
| 142:12,15 | 201:11 220:6 | 263:24 266:15 | 157:3 158:17 |
| 143:23 148:6 | 230:17 252:9 | 270:18 271:8 | 159:2,9 160:11 |
| 153:21 155:8 | 267:18 286:4 | 285:3,23 | 163:16 164:6 |
| 158:2 161:14 | 295:12 332:1 | 322:14 325:5,8 | 167:7,17 168:4 |
| 163:10 165:12 | 332:20 334:6 | 329:6 338:1 | 169:16 170:14 |
| 172:14,18,22 | 334:17 335:12 | 340:10,18 | 177:17,19 |
| 175:3 176:15 | 356:17 360:8 | 341:3 372:7,11 | 178:8 184:3,3 |
| 184:1 187:6 | 375:9 382:10 | 372:15 377:10 | 186:4 188:17 |
| 191:4,11,14,16 | 392:24 | **think** 15:5 18:6 | 190:8 191:13 |
| 191:17 207:7 | **thanks** 114:11 | 18:24 19:17,21 | 191:15,17 |
| 209:10 211:24 | 196:15 332:13 | 21:24 30:10 | 198:20 200:2 |
| 213:19 234:1 | 341:5 | 39:5,18 41:19 | 201:20 206:18 |
| 240:20 245:24 | **theme** 238:1 | 42:2,9,16 43:5 | 206:20 207:21 |
| 247:21 250:6 | **theoharris** | 53:17 61:5 | 211:12 213:3 |
| 252:17,24 | 91:10 | 68:2 71:20,21 | 213:20,21 |
| 254:4 256:18 | **thing** 22:1 | 76:8 77:2,17 | 216:6,21 218:9 |
| 272:23 277:17 | 49:12 94:14,15 | 77:19 79:10 | 218:15 219:5 |
| 279:4 310:8 | 95:18 104:16 | 80:22 85:24 | 223:2 224:18 |
| 313:14,18 | 226:3 268:6 | 88:17 90:12 | 225:12 226:3 |
| 339:6 356:4 | 270:16 277:5 | 92:23 96:2 | 227:3,4,4,12 |
| 367:21 393:5 | 277:12 282:12 | 97:10 109:1,6 | 228:23 229:9 |
| 395:7 | 343:22,23 | 111:13 114:6 | 229:12,16 |
| **texas** 5:13 | 372:4,20 | 114:12 116:5 | 230:22 232:16 |
| **text** 110:5,14 | 380:10 | 116:12,23 | 232:19 234:19 |
| 117:16 297:11 | **things** 26:8 | 120:16 124:14 | 236:17 239:7 |
| 306:14 361:15 | 46:12 50:7 | 132:7 134:2 | 239:12 243:7,8 |
| **texting** 44:15 | 58:7 60:19,21 | 137:21 139:5 | 243:9 245:1,9 |
| | 67:17 73:3,7 | 140:4 142:14 | 246:15 250:18 |

**[think - time]**                                                   Page 80

| | | | |
|---|---|---|---|
| 251:23 254:24 | 347:13,13 | 93:8 95:7 | 38:9,11,12,14 |
| 260:17 262:23 | 348:9 349:13 | 97:24 201:21 | 38:15 39:16,19 |
| 263:5,16,19,20 | 350:3 351:7 | 202:5,14 | 39:22 40:9 |
| 264:11,14,16 | 353:13,20 | 203:11 246:16 | 46:2,4 48:13 |
| 265:9,15,17 | 354:7,19,21,24 | **threshold** | 57:11 58:20 |
| 267:4,8 268:20 | 356:6 357:12 | 380:6,22 | 61:24 62:20 |
| 270:13,15 | 361:18 362:10 | **thrift**  351:9 | 64:9 66:22 |
| 271:4,10,24 | 362:10,16 | **tiktok**  3:20,20 | 70:5,9 71:11 |
| 272:22 275:13 | 364:16,21,24 | 3:21 13:20 | 76:16 82:2,3 |
| 275:24 276:9 | 365:8,23 | 169:23 170:7 | 82:11 84:23 |
| 276:18,21 | 366:24 367:12 | 170:20 171:11 | 90:18 94:14 |
| 279:20 281:14 | 368:6,17 370:1 | 172:7 183:3 | 95:17 97:2 |
| 282:14 284:6 | 370:5,6 372:17 | 193:4 269:13 | 114:10 132:19 |
| 284:14 285:3 | 376:13 377:18 | 270:8 350:5 | 133:3 134:20 |
| 285:16,18 | 381:5,13,16 | 360:14,18 | 142:5 148:2 |
| 289:22 290:17 | **thinking**  30:1 | 361:5,9 362:20 | 153:19 155:21 |
| 292:9 293:13 | 43:24 114:13 | 363:3,7,15 | 163:8 175:21 |
| 293:15 296:1,7 | 171:21 176:2 | 364:3,13 365:3 | 177:18 180:21 |
| 297:6 299:4 | **thinks**  361:13 | 365:11,15 | 181:17 184:18 |
| 306:8,13,19 | **third**  19:6 | 366:1,5,9,15 | 188:3,9 192:2 |
| 308:15 309:12 | 125:4 135:13 | 367:5,11,23 | 193:21 194:5 |
| 309:22 311:17 | 201:21 233:21 | 369:17 370:4 | 194:15 196:13 |
| 313:9,20 | **thirty**  396:16 | 370:18 371:6 | 226:5 229:24 |
| 314:12 317:9 | **thought**  20:12 | 393:12,22 | 230:5,13 |
| 318:1,20 319:9 | 32:3 52:22 | **tiktok's**  269:17 | 233:20 237:20 |
| 320:3 321:24 | 107:6 114:10 | 269:23 270:2,5 | 237:20 239:15 |
| 322:10,18,18 | 170:5,6 254:15 | 365:22 | 241:24 245:10 |
| 323:10 326:20 | 347:17,23 | **time**  12:8,15 | 248:15 255:15 |
| 327:18 334:22 | 373:2 | 15:8,9 16:21 | 256:9 263:7 |
| 341:19,20,20 | **threat**  327:18 | 19:2,6 23:24 | 266:3,14 274:6 |
| 342:8,14,16 | **threatening** | 24:14 25:13,23 | 280:9 286:1,5 |
| 343:12,19 | 191:8 192:10 | 26:7,14 27:11 | 286:13 292:10 |
| 344:1,12 345:2 | **three**  18:24 | 30:20 31:2,6 | 324:2,2,3 |
| 345:3,20 | 19:8,9,9,21,24 | 31:15,22 32:4 | 325:23 332:8 |

CONFIDENTIAL

**[time - triangulation]**                                    Page 81

| | | | |
|---|---|---|---|
| 334:23 351:18 | 286:19 290:1,2 | **topping** 296:21 | **transforms** |
| 352:2,9 355:11 | 312:4 319:2 | 299:16 | 7:23 96:16 |
| 355:17 359:12 | 352:15 358:17 | **toss** 242:22 | 97:22 |
| 359:19 360:12 | 360:4 376:8 | **total** 194:24 | **traumatic** |
| 360:17 361:3 | 378:4 386:2 | 195:5 361:3 | 320:17,19 |
| 363:5 373:9,23 | 387:13 389:5 | **totals** 85:13 | **travel** 196:2,8 |
| 374:2 376:22 | **today's** 12:13 | **touch** 114:6 | **travels** 394:4 |
| 381:2,5,9,11 | 393:4 | 258:2 266:4 | **treatment** |
| 382:11,18 | **together** | **toward** 79:19 | 305:12 357:18 |
| 383:1 392:18 | 107:19 274:12 | **towards** 79:22 | 358:7 |
| 392:22 393:2 | 304:14 360:12 | 212:20 | **trend** 131:18 |
| **times** 6:5 14:11 | **told** 50:23 54:8 | **track** 264:1 | **trending** 336:7 |
| 18:24 39:3 | 120:21 243:18 | 328:20 | 345:17 |
| 134:19 196:6 | 244:19 245:5 | **tradeoffs** | **trends** 113:18 |
| 246:17 247:1 | 246:11,21 | 156:14 157:18 | 377:11,11 |
| 285:17 355:3,5 | 247:6 335:22 | **tradition** 124:3 | 378:9 |
| 371:19 | **toll** 129:13 | **train** 47:23 | **trial** 6:12 12:8 |
| **tired** 53:14,16 | **tolles** 4:4 | **transcript** | 14:23 112:1 |
| **title** 14:5 22:10 | **ton** 279:22 | 395:18 396:17 | 223:21,21 |
| 221:8 314:9 | **took** 119:19 | 396:19 | 305:3,7,7 |
| **today** 13:19 | 132:16 310:12 | **transcription** | 306:23,23 |
| 15:22 16:4,9 | **tool** 94:9 95:2 | 398:4 | 368:10,14 |
| 16:12 17:21 | 96:6 310:23 | **transcripts** | **trials** 15:2,14 |
| 18:14 20:9 | 314:14 335:15 | 18:12 50:8 | **triangulate** |
| 63:1 67:9 | 335:20 338:21 | **transfer** 46:11 | 107:10 210:9 |
| 106:14 137:24 | 338:23 | **transferability** | **triangulated** |
| 143:6 147:4 | **tools** 345:8 | 163:19 166:21 | 207:9 |
| 148:11 154:13 | **topaz** 1:15 4:10 | 167:3,8 168:7 | **triangulating** |
| 155:18 157:5 | **topic** 102:23 | 168:14 169:1 | 213:9 |
| 158:20 163:23 | 172:21 | **transferable** | **triangulation** |
| 167:13 168:4 | **topics** 237:11 | 163:18 165:22 | 107:17 127:1 |
| 170:18 171:9 | 289:16 335:2 | **transformative** | 205:21 206:3 |
| 224:5,10 | 336:7 345:17 | 98:23 | 209:17,18 |
| 238:12 252:16 | 370:2 | | 214:10 218:17 |

| | | **u** | 59:6 70:13 |
|---|---|---|---|
| 218:22 227:22 | **tucson** 19:19 | | 72:5 73:14 |
| 235:2 237:7 | **turn** 139:8 | **u.s.** 9:22 382:4 | 79:8 80:2 |
| **triggered** | 145:9 149:12 | 382:7 389:22 | 84:21 94:5 |
| 324:23 | 159:13 162:10 | **ubiquitous** | 103:3 115:6 |
| **trouble** 278:19 | 178:14 185:1 | 344:16 | 118:6 121:2 |
| **true** 131:18 | 196:16 202:11 | **ugly** 189:19 | 144:5 146:24 |
| 146:10 152:6 | 231:8 295:9 | **uh** 46:1 50:10 | 169:24 174:23 |
| 158:12 161:24 | 315:1 387:17 | 371:23 376:10 | 176:8 177:4 |
| 162:2 164:4,17 | **turning** 389:11 | **ui** 261:12,14 | 179:18 182:12 |
| 228:23 246:22 | **twitter** 170:22 | **unable** 64:12 | 184:6 213:14 |
| 254:1 256:5 | 333:19 | **unaware** | 216:19 218:4 |
| 279:19 303:12 | **two** 15:2 50:15 | 358:17 | 247:9 252:15 |
| 349:14 355:8 | 71:3 77:20 | **unbiased** 80:13 | 252:18 257:3 |
| 395:6 | 112:2 198:9,23 | **unclear** 17:7 | 273:4 279:1 |
| **trust** 63:12 | 198:23 208:4 | **uncorraborati...** | 281:8,18 |
| **truthful** 16:1 | 227:14 249:3 | 313:3 | 284:15 289:9 |
| **try** 16:23 43:24 | 253:14 257:10 | **undeniable** | 317:18 353:22 |
| 61:10 70:13 | 308:15 309:9 | 132:2 326:24 | 377:19 |
| 123:24 210:2 | 341:23 343:6 | **under** 15:21 | **understanding** |
| 226:4 265:10 | 353:11 363:6 | 252:16 366:2,6 | 16:2 30:6 57:4 |
| 266:22 318:8 | 370:2 | 366:10 375:4 | 76:14 102:1,11 |
| 321:13 350:14 | **tyler** 4:11 77:18 | 395:20 | 106:2,9 115:6 |
| 353:13 377:20 | **tyler's** 77:18 | **underlie** | 127:20 134:6,8 |
| **trying** 43:6 | **types** 48:17 | 238:14 | 135:7,19 136:2 |
| 58:22 61:5,21 | 142:4 201:22 | **underlying** | 159:11 162:6 |
| 62:21 64:20 | 202:5 213:12 | 56:5 72:19 | 164:7 166:2 |
| 71:7 72:7 | 214:11 241:22 | **understand** | 167:18 169:9 |
| 90:17 127:17 | 256:10 378:21 | 13:23 15:21 | 170:19 175:16 |
| 128:12 190:9 | **typically** 259:7 | 16:8,17,18 | 177:3 180:15 |
| 193:5 213:21 | 259:10 260:9 | 17:8,11 42:12 | 204:13 205:17 |
| 227:15 296:1 | 260:11,18,24 | 42:21 44:1,3 | 215:2 216:10 |
| 309:2 337:12 | **typos** 383:13 | 44:11 48:10 | 216:15,16 |
| 340:6 | 392:8,22 | 50:6 57:15 | 217:10 223:4 |

**[understanding - use]**                                             Page 83

| | | | |
|---|---|---|---|
| 225:21 231:23 | **unregulated** | 116:10,15 | 277:19 280:2,5 |
| 240:18 241:19 | 272:9 327:10 | 118:18 119:7 | 283:20 287:13 |
| 246:4 258:15 | 342:22 | 119:15,17 | 289:2,18 |
| 283:5,19 316:6 | **unsettled** | 120:6 121:6 | 296:23 299:18 |
| 316:22 317:2 | 180:23 | 122:23 127:6 | 301:4 302:24 |
| 353:10 | **unsupervised** | 129:14 131:14 | 306:3 307:7 |
| **understood** | 342:23 | 133:13 138:8 | 309:2 310:9,10 |
| 102:5 178:24 | **untangled** | 138:13 140:15 | 311:7 313:21 |
| **undertake** | 60:14 | 141:18 144:4 | 316:2 317:12 |
| 203:3,6 204:5 | **unwilling**  71:16 | 145:14 146:3,6 | 320:5,23 |
| **undertaken** | 241:10 357:1 | 147:18 150:20 | 323:12,24 |
| 207:17 217:19 | **update**  87:3 | 154:4 160:2 | 324:12,20 |
| **unfettered**  24:3 | **upset**  54:18 | 175:7,7 180:5 | 325:16 327:8 |
| 24:12 26:1 | **urban**  21:16,21 | 180:7 181:19 | 327:10 328:17 |
| 27:16 | 32:17 231:20 | 181:21 186:3 | 329:3,6,8,13,15 |
| **unfortunate** | **urged**  93:9 | 186:15 187:7 | 329:18,21,23 |
| 309:2 | **url**  300:13 | 187:11 188:13 | 330:3,7,20 |
| **unintended** | **usage**  342:20 | 188:14 190:13 | 332:23 333:8 |
| 30:3 41:20 | **usb**  370:13 | 190:22 191:19 | 333:12,19 |
| 161:20 | 371:8 | 191:22 193:1 | 336:9,22 337:6 |
| **union**  128:9 | **use**  7:22 9:22 | 193:16 197:6,7 | 339:24 340:8 |
| **unique**  119:7 | 24:22 26:16 | 204:17 208:9 | 342:1,18 343:1 |
| 119:21 120:11 | 28:1 43:3,10 | 208:23 209:14 | 343:10,21 |
| 365:15 | 43:14 46:19 | 209:18 212:3 | 344:4,9 345:1 |
| **unit**  193:24 | 47:3,6 48:19 | 213:10 227:21 | 345:13 346:5 |
| **united**  1:1 | 53:5 58:13 | 227:22 231:24 | 346:18 347:18 |
| 12:22 14:15 | 65:9 66:18 | 234:5 237:20 | 347:21 348:14 |
| 40:21 41:1 | 67:4 69:11,16 | 237:24 239:21 | 349:4,8 350:21 |
| **university** | 73:11 74:19 | 239:22 244:3 | 351:11 354:5 |
| 21:10,13 28:5 | 78:20 79:2 | 244:12 245:20 | 354:12 356:14 |
| **unmistakable** | 80:11 94:23 | 245:21 256:20 | 357:12,19 |
| 131:8 | 95:9 96:5,16 | 256:23 263:2 | 358:7,11 |
| **unquote**  146:2 | 97:22 105:3,23 | 265:24 266:1,3 | 363:14,20 |
| | 115:1,20 | 272:15 273:13 | 364:3,9 371:11 |

CONFIDENTIAL

**[use - videos]**                                      Page 84

371:16 373:5
376:4,6 379:4
382:4,7 389:21
**used** 44:12,15
44:17,20,23
45:3,4,6,9,16
45:20 46:3,6,8
46:11 73:8
112:18,22
120:22 126:13
177:2 199:5
202:6 206:23
260:17 286:24
289:5,20
293:18 296:11
297:6 306:11
306:19 307:14
308:8,23
310:22,23
314:14 318:23
335:15,20
339:3,15 340:2
375:14,18,20
377:24 396:20
**useful** 344:15
**user** 272:11
275:5,22 350:1
353:23 354:22
355:2 358:12
358:18 365:22
**users** 355:12,17
366:1,5,9
**uses** 43:19
191:6 330:14

337:18 343:6
345:4 346:7,14
347:8 348:4
377:3
**using** 42:18
48:7 49:2,23
50:23 74:9
91:3,10 101:21
102:14 168:15
238:5 301:21
308:3 310:15
310:21 342:11
342:22 344:2,5
345:8 349:2
351:1 355:12
372:1
**usually** 28:24
122:13 216:12
227:17 236:1
361:12
**utilize** 328:9,24
**ux** 262:9,11

**v**

**validate** 106:2
**validated**
346:20
**validation** 56:2
60:11 69:10
72:17 104:19
177:9 186:20
186:21 251:15
325:4 327:13
345:14,23

346:12 349:21
350:10
**valuable** 94:8
**value** 237:6
238:16
**variation** 27:20
**varied** 24:9
**varies** 39:5
40:5 257:20
**variety** 128:10
148:3 153:18
157:23,24
163:7 233:15
236:13 237:16
243:24 289:21
377:10 378:20
**various** 30:5
108:15 233:18
241:22 286:19
287:3 322:14
335:2
**vary** 42:17
127:18 237:19
260:22
**vast** 24:7
**vehicle** 329:9
**verbal** 16:14
**verbatim**
148:22
**verifiable**
380:23
**verification**
312:16

**verified** 168:22
**verify** 159:8
162:2 164:3
165:23 168:13
219:16
**veritext** 1:22
**version** 300:6
**versus** 321:16
355:18
**victims** 188:2
**video** 12:10,16
31:12,15,22
45:19,21 82:3
82:11 132:19
133:3 193:21
194:5 230:5,13
268:22 286:5
286:13 343:18
351:18 352:2
359:12,19
361:21 362:2
362:17 374:3,9
382:18 383:1
393:2,5,10,19
**videographer**
6:11 12:13
373:24
**videos** 263:20
269:22 270:17
271:2 333:8,11
343:16 349:23
360:17 361:10
363:6 371:7

**[videotaped - weinkowitz]** Page 85

**videotaped**
  1:12
**view** 79:18,22
  244:8 279:5
  287:23 288:2
  340:24 341:11
  341:12 361:19
**viewed** 355:4,6
**views** 339:4
**violate** 338:13
**violating**
  340:12
**violence** 319:19
  319:23,24
  320:15 340:16
**virtually** 58:18
**visiting** 31:7
**visits** 130:22
**vitae** 7:15
  20:21
**volume** 8:18,20
  221:19,23
  222:9 294:24
  295:6 303:19
  304:1
**vulnerabilities**
  273:10
**vulnerable**
  182:7 343:1
  372:7

**w**

**w** 282:21

**wait** 16:23
  116:10
**waiting** 195:16
**waived** 12:5
**walk** 360:12
**walls** 188:20
**walnut** 5:5
**want** 17:15
  56:1 59:6
  67:15 68:17
  69:9 98:6
  117:15 126:8
  126:20 134:23
  150:13 173:7
  177:17 189:5
  195:7,10
  206:13 207:23
  235:23 242:1
  242:15 252:21
  253:7 255:7
  259:21 261:9
  268:17 285:10
  322:9 326:20
  332:17 354:19
  356:23 360:2,5
  361:16 373:20
  377:17 383:13
**wanted** 93:23
  97:17 101:24
  102:10,24
  103:2 234:22
  257:3,7 268:5
  277:12 352:8

**wanting** 186:23
**warned** 180:11
  180:12
**washington** 2:5
  2:17 3:5
**watch** 271:2
  362:2,16
**watched** 363:6
**watching**
  360:17 375:24
**water** 265:1
**watson** 9:15
  296:21 297:5
  297:10,15
  298:16,20,21
  299:16 300:1
  301:3 309:7
  386:24 387:8
  387:21
**way** 32:19
  39:14 54:3
  57:5 70:22
  77:8 107:9,18
  125:12 126:11
  134:19 145:7
  149:3 171:4
  172:12 175:19
  180:18 183:9
  183:11,11
  184:8 186:9
  191:21 193:14
  199:3 224:20
  237:5 243:16
  244:18 257:3

266:22 268:20
273:13,20,23
277:13 326:15
335:23 337:13
340:3 342:19
344:6,19,22
346:6 347:7
349:2 354:21
355:7 357:2
372:23 377:21
392:21
**ways** 48:14
  94:17 99:13
  104:18 116:18
  127:19 145:17
  234:7 245:10
  251:16 328:11
  329:1,5 330:7
  340:1 342:23
  345:9
**wc.com** 2:18
**we've** 20:7 38:4
  194:24 224:3
  254:21 258:7
  304:13 308:9
  351:15 383:9
  392:13
**weather** 45:15
  45:17
**weathers** 4:17
**week** 392:7
**weight** 250:12
**weinkowitz** 5:4

CONFIDENTIAL

**[went - work]**                                                                Page 86

| | | | |
|---|---|---|---|
| **went** 32:2 | 56:20 57:19 | 191:12 192:15 | **witnessed** |
| 102:4 245:7 | 59:11 63:7 | 206:18 209:12 | 69:22 70:9 |
| 250:18 298:2 | 64:17 66:6 | 213:20 225:9 | 72:4 |
| 311:21 314:20 | 67:12 68:1,8 | 228:20 230:3 | **witnesses** 76:15 |
| 320:3 | 70:1,5,12 | 231:3 232:9 | **wonder** 80:9 |
| **whiteley** 2:16 | 71:20 73:23 | 233:7 238:9 | 106:4 |
| 7:7 373:18 | 74:16 75:9 | 240:16 242:7 | **word** 243:3,19 |
| 374:1,7,11,16 | 81:13 85:1 | 243:7,21 | 244:20 245:23 |
| 374:18 375:12 | 88:17 92:13 | 244:24 246:15 | 256:24 348:12 |
| 382:9,16 | 93:20 94:11 | 247:9 252:8 | **words** 191:6,17 |
| **wide** 24:13,21 | 95:15 98:16 | 253:1,9 254:5 | 192:11,12 |
| 26:14 27:24 | 100:7 102:19 | 254:14 260:3 | **work** 28:18 |
| 29:20 239:7 | 108:1,9 114:21 | 265:2 267:12 | 29:7,21 30:10 |
| **widely** 197:18 | 115:18 116:5 | 267:15,18 | 32:21 39:17,24 |
| 198:5 214:24 | 117:13 120:16 | 278:3,18 | 42:5 48:7 |
| 228:16 | 123:2 124:13 | 279:12 281:2 | 50:16 54:3 |
| **wider** 329:11 | 125:23 128:20 | 286:2 288:13 | 59:14 60:3 |
| **widespread** | 130:17 131:23 | 292:21 299:23 | 61:7 63:9 |
| 46:20 65:15 | 132:14 133:24 | 300:24 304:9 | 69:13 71:6 |
| 325:10 330:10 | 134:15 135:6 | 307:5 312:10 | 72:21 79:12 |
| **wife** 361:12 | 136:13,23 | 313:19 314:12 | 82:19 83:9,20 |
| 362:2 | 137:12 138:6 | 315:21 317:1 | 86:3,3 102:12 |
| **williams** 2:15 | 138:24 140:12 | 317:23 318:20 | 106:7 115:22 |
| **willing** 240:12 | 141:7 143:10 | 319:8 322:8 | 118:19 119:13 |
| 241:8 247:13 | 145:5 146:15 | 326:2 330:17 | 121:9 122:24 |
| 250:15 252:20 | 147:10 148:21 | 331:7 334:2 | 123:15 124:23 |
| 253:5 326:14 | 151:16 153:7 | 337:1,8,21 | 125:3 127:12 |
| **wish** 302:7 | 154:21 155:9 | 339:8 341:2,5 | 128:17 138:14 |
| **witness** 11:5 | 157:12 158:10 | 348:9 352:11 | 138:19 140:21 |
| 13:5 15:13 | 160:22 166:18 | 356:12,17 | 148:13 153:11 |
| 24:18 28:8 | 168:2,12 173:2 | 357:21 358:1 | 161:7 165:19 |
| 40:23 41:8 | 174:2 176:16 | 365:19 371:1 | 169:14 178:11 |
| 42:9 46:16 | 184:2 188:22 | 375:9 395:5,7 | 181:23 182:3 |
| 51:2 54:15 | 189:4,22 | 396:1 | 184:22 191:3 |

CONFIDENTIAL

**[work - years]**                                        Page 87

| | | | |
|---|---|---|---|
| 192:3 194:19 | **workload** | **x** | 297:21 299:24 |
| 196:24 197:6,8 | 51:12 | **x**  7:2,11 8:2 9:2 | 300:15,24 |
| 199:11 208:9 | **works**  76:18 | 10:2 | 303:6 304:24 |
| 208:16 209:4 | 176:1,9 264:10 | **y** | 306:8 307:20 |
| 209:12 211:17 | 264:12,13,21 | | 309:22 322:17 |
| 213:5,16 217:3 | 265:8,12,14 | **yeah**  18:10 | 327:23 331:22 |
| 217:4,20 | 285:8 353:3 | 19:10 31:11 | 333:6,10,15 |
| 224:21 228:7 | **world**  99:15 | 38:24 40:18 | 336:6 337:21 |
| 235:3 238:10 | 100:3 123:13 | 42:9 45:5 | 339:20,22 |
| 245:12 248:21 | 187:2 339:4 | 54:15 56:20 | 341:5 342:10 |
| 251:18,19 | **worn**  64:2 | 57:13 59:11 | 345:20 349:12 |
| 255:24 256:2 | **worth**  257:14 | 67:12 68:1 | 351:15,16 |
| 257:15 262:15 | **woven**  62:14 | 70:12,12 72:5 | 354:3 356:23 |
| 262:18 288:24 | 70:24 | 73:6,23 74:22 | 357:9 361:11 |
| 301:11 310:4 | **write**  16:20 | 76:23 77:6 | 362:5,7 369:19 |
| 310:24 311:3 | 37:23 38:2 | 78:1 80:17 | 370:20,21 |
| 311:21 321:12 | 45:9 145:11 | 81:24 86:15 | 371:1,11 376:1 |
| 346:7 354:17 | 149:14 188:19 | 88:17 90:1 | 376:1 379:19 |
| 358:22 359:1 | 214:23 231:14 | 101:16 105:16 | **year**  15:6 37:23 |
| **worked**  28:4,13 | 235:24 248:13 | 107:5 117:13 | 38:12 47:21 |
| 85:10 103:20 | **writing**  16:12 | 120:8 123:2 | 83:1,3,7,13 |
| 140:18 249:1 | 75:12 | 176:16 181:10 | 85:11,18 86:3 |
| 276:24 294:1 | **wrong**  22:1 | 189:1 190:1 | 86:6,7,14 |
| 302:4,5 310:17 | 110:10,11 | 198:19 200:2 | 99:10 110:10 |
| **working**  52:3 | 297:13 299:12 | 224:16 227:11 | 196:11 221:22 |
| 78:8 121:17 | 299:13 306:15 | 230:4 234:19 | 249:10 257:11 |
| 123:10 124:1,8 | **wrote**  17:23 | 239:12 244:24 | 257:16,21 |
| 126:17 142:3 | 97:21 98:9 | 246:15 249:19 | 259:14 266:3 |
| 170:17 194:15 | 112:8 119:16 | 254:14 260:20 | 333:1 |
| 196:9 199:15 | 127:6 129:12 | 263:17 266:24 | **year's**  78:2 |
| 209:2,6 217:11 | 133:12 135:13 | 281:4 283:11 | **years**  25:4 27:4 |
| 235:22 257:21 | 139:10 171:10 | 285:16 290:10 | 27:5 49:9 |
| 299:5 310:13 | 179:6 315:3 | 290:17 293:20 | 65:17 98:6 |
| 364:2,8 | | 293:20,21 | 103:12 119:3 |

CONFIDENTIAL

**[years - zoom]**                                                    Page 88

| | |
|---|---|
| 161:8 163:8 | 330:15,20 |
| 245:15 263:10 | 333:8,11,12,16 |
| 378:21 | 333:16 343:16 |
| **yeates**  77:19 | 343:17 350:5 |
| **yep**  203:22 | 374:19 375:3 |
| 336:17 | 375:14,15,18 |
| **ygr**  1:3 | 375:20,24 |
| **york**  5:19,19 | 376:4,6 382:4 |
| 6:5,6,6 7:23 | 382:7,11 |
| 14:16 15:10 | 393:13,23 |
| 21:13 22:5,11 | **youtube's** |
| 22:17 24:1,15 | 270:22 271:15 |
| 25:7,9 27:1,3 | **z** |
| 96:17 97:23 | |
| 368:13 371:19 | **zero**  129:4 |
| **young**  9:23 | **zoom**  4:2 5:2 |
| 129:13 191:19 | 6:2 |
| 273:10 280:3 | |
| 291:18 346:4 | |
| 357:4 389:22 | |
| **youth**  8:18 | |
| 129:19 178:19 | |
| 182:7 291:19 | |
| 292:13 293:12 | |
| 294:8,12,15,24 | |
| 295:7,15,22 | |
| **youtube**  2:19 | |
| 13:20 169:23 | |
| 170:7,21 | |
| 171:11 172:8 | |
| 183:3 193:4 | |
| 270:11,14,15 | |
| 270:19 271:2 | |
| 271:17,21,23 | |