SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - - - - x
DISTRICT OF COLUMBIA,        : Docket Number:  2023 CAB 006550
　　　　Plaintiff,           :
　　　　　　　　　　　　　　　:
　　　　　vs.                 :
　　　　　　　　　　　　　　　:
META PLATFORMS, INC.,        :
ET AL.,                      :
　　　　Defendants.          : Friday, December 12, 2025
- - - - - - - - - - - - - - x Washington, D.C.


　　　　The above-entitled action came on for a Status

hearing before the HONORABLE YVONNE M. WILLIAMS, Associate

Judge, in Courtroom Number 131.


APPEARANCES:

On Behalf of the Plaintiff:

JIMMY R. ROCK, Esquire
KEVIN VERMILLION, Esquire
Washington, D.C.


On Behalf of the Defendants:

JOHN J. DEBOY, Esquire
TIMOTHY C. HESTER, Esquire
AMBER CHARLES, Esquire


Also Present:

BRENDAN DOWNES, Esquire
Third Parties


25-05843



1

P R O C E E D I N G S

THE COURT:  Okay.

THE DEPUTY CLERK:  Calling the matter of District of Columbia v. Meta Platforms, Inc., et al., Case Number 2023 LTB 6550.  Parties, please state your names for the record, beginning with the plaintiff.

THE COURT:  Okay.

MR. VERMILLION:  Good morning, Your Honor.  Kevin Vermillion and Jimmy Rock on behalf of the plaintiff, the District of Columbia.

MR. ROCK:  Good morning.

THE COURT:  Good morning.  And for the defendant?

MR. DEBOY:  Good morning, Your Honor.  John DeBoy for the Meta defendants.

THE COURT:  Good morning.

MR. HESTER:  Good morning, Your Honor.  Timothy Hester on behalf of the defendants.

THE COURT:  Good morning.

MS. CHARLES:  Good morning, Your Honor.  Amber Charles on behalf of the defendants.

THE COURT:  All right.  Good morning.

MR. VERMILLION:  And, Your Honor, we, we, we also have someone from the third-party agencies here.

MR. TOWNS:  Good morning, Your Honor.  My name



2

is Brendan Downes on behalf of third-party agencies.

THE COURT: All right. Good morning. Let's start with the third-party agencies. So, where are we on the, wait one second. Where are we on the status of the agency compliance with the subpoenas that have been pending since, I think, sometime this summer, or maybe September?

MR. DOWNES: Yes. Your Honor, the agencies have made substantial progress in producing documents to Meta. The Court may recall Meta subpoenaed ten agencies in this matter. Two of those agencies didn't have any responsive documents. Of the remaining eight, there are seven that had about 30000 documents in total. We've completed the entire first pass review of those documents. That yielded about 16,000 documents or so for a second pass review, and we're about 75 percent of the way through that process. So, we're actually hopeful that at least when it comes to the seven of the eight agencies that have responsive documents, that we'll finish producing those documents by the end of next week or so. The only, remaining agency --

THE COURT: So, you have been producing those documents on ongoing?

MR. DOWNES: Yes.

THE COURT: Okay.

MR. DOWNES: I believe we've made five or so



productions to date, including one yesterday.  The Department of Health remains.  The initial poll of documents from the Department of Health yielded about 1.5 million documents.  That, sort of needless to say, is not something that we can reasonably review internally.  This has been a massive effort amongst all the agencies to pull these documents, upload them into relativity.  It's also been quite a large expenditure of resources for OAG.  It's involved about nine folks, nine employees to review these documents, about a thousand hours of document review. We've started discussions with Meta as to how to reasonably narrow that universe, Department of Health numbers down to something reasonable, and hopefully, we'll get to that place.

THE COURT:  Does anyone have any response?  Is that consistent with what you've been --

MS. CHARLES:  Yes, Your Honor.  Thank you.  To begin with the Department of Health, the background here is that nearly six months ago, the agency has proposed a set of 16 custodians for the Department of Health.  Meta asked on several occasions to discuss potential narrowing of those custodians in exchange for some additional OSSE and SBBE custodians, other agencies that we felt were easier to collect and had more relevant documents.  We were told repeatedly by Mr. Downes and his predecessor



4

that it was too late to negotiate custodians.  So, we were surprised to hear just last week that Mr. Downes said the custodians that they had chosen unilaterally to proceed with are now too expansive; and he, his request to us was to, to narrow from 16 that he had selected to four.

We said we would be happy to meet and confer, but we would not agree to a unilateral narrowing to four custodians, four custodians from a key agency.  And we also requested information about this burden.  Specifically, if we were to select a number of custodians, we need to know how much, how many responsive documents each of those custodians have --

THE COURT:  Right.

MS. CHARLES:  -- to make an informed decision.  I believe we were told last night that they're unable to provide a custodian-specific document hit count.  I understand, and Mr. Downes can, of course, correct me if I misunderstood his emails, but when they're discussing the quantity of documents and the purported burden here, this is the raw collection.  It is not the number of hits after search terms are applied.  So, we do think there's more work to be done to, you know, if you collect a full email file, but then we have search terms to apply to that that can narrow --

THE COURT:  Right.



MS. CHARLES:  -- that set significantly.

THE COURT:  So, search terms have not been applied to this 1.5 million yet?

MR. DOWNES:  Search terms actually have been applied, and that has yielded 1.5 million for the apartment company.

THE COURT:  So, you've done 16 custodians, one, and apply, you've, you've searched 1.5, I'm sorry, searched 16 custodians, applied search terms, and that yield 1.5 million documents?

MR. DOWNES:  Yes, Your Honor.  Yes, Your Honor.

THE COURT:  Okay.

MS. CHARLES:  And we have requested an understanding of how those documents are divided between custodians.  I understand that's a typical thing that vendors can do, so I'm happy to have a further discussion with Mr. Downes as to why that's not possible for his vendor; but we do think that is basic information we need to justify these burden concerns, expressly because these, again, are the custodians the agency self-selected, and the agency has refused to engage with us on negotiations.

As to the other agencies, we have reviewed the incoming productions.

THE COURT:  Okay.

MS. CHARLES:  Approximately, I think, 4,700



6

documents have been produced of, I think, he said roughly 16,000 reviewed.  We do have concerns about certain deficiencies in those productions that we'll be raising with the agencies.  And we also do have concerns.  We have, in an attempt to move discovery along, we have issued 30(b)(6) deposition notices to the agencies.  To date, the agencies have refused to make any witness available.  They have said they don't want to start even negotiating on those subpoenas unless we voluntarily withdraw them to start negotiations of who they will actually make available until after their productions are complete.  So, we do understand there's substantial more work to be done to finalize document productions, and then at the agency's request to begin having the discussions about 30(b)(6) witnesses and fact witnesses.

Meta was ready to proceed with those depositions this month.  It was the agency's request that they be put off.  So, we do think we, to respect that request, need sufficient time to finalize the document productions, have us intake and understand those document productions, and then take those depositions.

THE COURT:  Okay.

MR. DOWNES:  Happy to respond, Your Honor.  When it comes to deposition notices, the reason why we wanted to hold those in abeyance was because we didn't know what



the documents were going to say, right?  I represent ten agencies, right?  I've had the distinct pleasure of reviewing almost every single document we produced to Meta.  I don't think it would be a surprise to the Court that very little of what we produced is relevant.

THE COURT:  Right.

MR. DOWNES:  It's not.  What they seek here is, essentially, a fishing expedition in many ways.  If I could briefly list some of the things they requested in their subpoenas, which also include, which also came with deposition notices, research investigation study service, et cetera, relating to COVID, drug use, physical exercise, family trauma, academic pressure, poverty, homelessness, gun violence, domestic violence, political polarization, global warfare, and climate change.

The case, as I understand it, is not about the actions of District Government.  It's about Meta's actions or inactions.

THE COURT:  Right.

MR. DOWNES:  And I also don't understand the District to assert that social media is the only cause of childhood depression.  I don't think anyone would seriously assert that one way or the other.  The number of causes is endless.

So, what I said to Meta was, look, let's all



8

take a look at these documents. Let's see what the agencies produce. If they have a whole bunch of stuff that comes back that's relevant, directly relevant to the case, social media, Meta, and its influence on young people, of course, we're not going to stand in the way at deposition. But everyone, let's take a look and let's reasonably proceed. Let's not try to depose everyone in the D.C. Government just because OAG happened to sue them. That didn't seem like a practical way forward.

If I could circle back on, on the, the Department of Health documents? Essentially, the poll was just so massive that our tech folks reached an impasse, right? There was just no way to reasonably proceed. We're paying outside contractors to mull through this data to try to get it up on the system. We've expended more than $120,000 to date on these contractors trying to get it up in the system. It just wasn't working. So, once you look at sort of this thing globally and say, hey, have to narrow this down reasonably. We've already spent thousands of hours on this with, in a situation where all the information produced is of highly questionable relevance. We have to narrow this down somewhat reasonably.

The List of the custodians that we got originally from the Department of Health, they said these



are folks that are most, most likely to have responsive information. And we went to Meta and said, look, you guys can select the four custodians you would like to proceed with, and maybe the four custodians will come up with a gold mine of relevant information and it makes sense to open it up further after that. But that seemed like a very reasonable way to proceed.

THE COURT: Okay.

MS. CHARLES: May I respond briefly?

THE COURT: But one second.

MS. CHARLES: Okay.

THE COURT: Okay.

MS. CHARLES: Thank you. In 2024, there was a dispute as to whether the Office of the Attorney General needed to represent D.C.'s agencies. The decision was made that it didn't, which we have respected. But as part of that decision, we were also informed the Court ordered that we would be able to receive from the third parties discovery as though they were parties.

To that extent, we have followed the Court's order. We have issued these subpoenas. We have worked with the agencies over the course of a year to provide them time to respond to them. What we're experiencing now is effectively a last minute bait and switch where after serving responses and objections that conceded the



relevance and agreed to search for these documents, we have continued to get a trickle of the agreements we have previously made, the custodians we have previously agreed to are too much, and you have to narrow.  You cannot take that positions, because our understanding of the relevance is that these items are only relevant in, in their position, we disagree with this, to remedies and not liability.

But relevant is relevant.  This is discovery we need.  The D.C. is proceeding here, and we expect they intend to show to a factfinder data trends, overall data trends in the District.  Depression rates have increased. Anxiety rates have increased.  Whatever data trends that they may offer, we have a right to respond to that same fact finder to explain those data trends, and that includes explaining these are not caused by social media. They are caused by these alternative causes.

Now certainly, all ten agencies may not have relevant information about every potential alternative cause, and we can have those, those discussions.  For instance, just to take one example, we subpoenaed the District of Columbia Consumer Licensing, Consumer Protection Office.  We ended up, through negotiations with Mr. Downes, saying we just want to take a one-hour deposition on a single topic, which is whether this agency



received consumer complaints about Meta. And we were still told, we don't believe that's relevant to your case, to this consumer protection action case, and we won't put up a witness. So, we are not against narrowing to make sure that we are not overburdening anyone, and we certainly are not attempting to depose everyone in the, in the D.C. Government; but we do have a right to discovery in this case that is relevant not only to the agency's conception of the District's claims, but also to our defenses and our ability to present to a fact finder the explanations that show these trends that you're pointing to, that this affirmative evidence that you're introducing about trends is not caused by social media. And I don't think that is the District's action or inaction. I think it is the District's knowledge of other facts that impact teen mental health.

THE COURT: Okay. Well, it seems as though, I mean, I understand you are at odds on how you want to resolve it; but it seems as though the length, and I have a, one second. You have one more thing you need to say or --

MR. DOWNES: We could go back and forth for a while, I'm sure.

THE COURT: Yeah, but we don't need to go back and forth. But I mean, it seems as though you all need to



meet and confer, figure out how to whittle-down this 1.5 million documents. I mean, your subpoena request, it is very broad and expansive. Like, and I don't think the District is, the District's allegation is not that social media is the only thing that's causing kids depression, so, so we don't need, so, and there's no juror, no person in the District is, who is going to believe, no juror who is going to believe that, you know, social media is the end all and be all, the killer of all children, and the depression that, it's, you know, it's, that's, that's not ever going to be believed by anyone. Everyone knows, you know, we have gun violence in the District. We have multiple causes of why teens may have issues in the, of depression in the District, one of which the allegation is, is on social media.

For that reason, it seems as though we should be able to narrow down the searches. We don't need to get in, it's just, all these alternative reasons, like, which often are public reports that the District issues through the Department of Health. I've seen the public reports. They exist. So, if there are public reports, get, find the public reports. They are out there by the dozens over the past ten years. They really are.

Juvenile court, social services, there are just lots of public reports talking about the issues facing



children that have been issued by the District in various agencies. To the extent there are other things, we can try to find those and narrow down the 1.5 million; but I'm not going to allow sort of an intent on what mostly is just public reports and public research that's been done in the public. So, but see what you can meet and confer on, and then we'll go from there.

MS. CHARLES: Thank you, Your Honor.

THE COURT: If you need to file, if we need to have another hearing, or need to discuss this further, I'm sure you'll let me know, and we can sort of resolve that, okay?

MR. DOWNES: Thank you, Your Honor.

THE COURT: All right. Mr. Rock?

MR. ROCK: Good morning, Your Honor. Jimmy Rock on behalf of the District. We, we had three Meta-related discovery issues we wanted to bring up with Your Honor this morning.

THE COURT: What are those?

MR. ROCK: The first relates to the Court's order compelling discovery into the February 25 incident --

THE COURT: Right.

MR. ROCK: -- where gruesome and sexual content was shown. And then we have a privilege logging related



issue, and then also an issue related to reopening deposition because of the designated documents that Meta is in the process of producing that it is de-designating from its privilege logs.

THE COURT:  Okay.

MR. ROCK:  So, I'll start with the February 15 incident.  Back in July, Your Honor ordered document productions into executive level communications --

THE COURT:  Right.

MR. ROCK:  -- and historical documents about the incident.  We've reached agreement essentially on search terms for that, and those documents are coming in.

THE COURT:  Okay.

MR. ROCK:  Your Honor also asked Meta to provide information about whether it could quantify the number of District users who saw that gruesome content, the young users.

THE COURT:  Right.  So, someone at the last hearing said they can't, which I found to be unbelievable, but

MR. ROCK:  So, they can't do it now --

THE COURT:  Okay.

MR. ROCK:  -- because Meta destroyed the, the data that would be necessary to do it.  So, for 90 days, Meta keeps impression data for Facebook and Instagram.



Impression data is everything a user does or sees on the platform. The February incident happened on February 26. Five days later, March 3, the District issues RFPs to Meta about that, that called for this data. Meta did not retain that data.

THE COURT: Right.

MR. ROCK: They allowed the impression data to be destroyed. What it has retained is a, around one percent sample of data from that day. And they have offered to give that to the District, and the District rely on that to calculate the number of users that were shown. We've consulted with the statistician. That one percent sample is too small to meaningfully create an outcome of how, who else saw it. So, the District has instead proposed that Meta stipulate that every active user, young District user that day, saw the, saw the, the content. Meta has, has not agreed to do that; and so, we're going to need to file a motion for an adverse inference or discovery sanction in order to have that.

THE COURT: I don't know that Meta, I don't know that Meta can stipulate to that. Like, Meta could probably, it seems like Meta could stipulate to that they were, that, stipulate to something, like, this information was shown; and every District resident certainly had access to see it.



MR. ROCK:  It was on --

THE COURT:  But I can't think they can guarantee that everybody saw it.  But why can't they say that if the information was available and every District person had access to see it?

MR. ROCK:  Well, I, I think that they can't argue that, that everyone did see it.  As long as they're not going to stand up in front of the jury and say, we don't know who all saw this because the reason we don't know at this point is because they destroyed the data that they calculated the exact number.

THE COURT:  Okay.

MS. CHARLES:  May I respond?

THE COURT:  Yeah.

MS. CHARLES:  Yeah?  First of all, we did not destroy any data that was requested by the RFPs when served.  The RFPs requested assessments and reports about this incident, which we have preserved; and the RFPs requested internal and external communications, for instance, concerning the incident, which we have preserved.  The data that is discussed here, the first instance this came up was the, the Court's question, I think two hearings ago, where you said, could you quantify this?  And we said we can go and look.  There was never a request for quantification.  There was never an



interrogatory requesting such quantification.

When the Court raised this for the first time, it was already past the standard retention period for a dataset, which is all content viewed by all users on Instagram.  So, it's an incredibly, incredibly large dataset.  It is not in any way limited to this February incident.  It is not in any way identified in the company's files as related to this incident.  We, the, the issues --

THE COURT:  But I don't want all content users. I just want District of Columbia residents.

MS. CHARLES:  Well, it, it, it's one dataset --

THE COURT:  Okay.

MS. CHARLES:  -- which to the extent the dataset is still present, could be limited to District of Columbia, but it's one dataset that was maintained.  By the time this issue came up, that data was past its typical retention period, but we do have a one percent sample of that data.  So, what we have suggested --

THE COURT:  How many users are in that?

MS. CHARLES:  Nationwide, there's hundreds of thousands.  The one percent sample of, of people who are estimated by the company's prediction age and location models to be in D.C. is about 1,700.  We understand that to be statistically significant, the one percent sample of



those D.C. residents, at least predictive D.C. residents that can be extrapolated from. But nationwide, it is much larger than that. The reason we have suggested providing the sample only as to D.C. is that's what we understood the District requested, but we would certainly be happy to, to discuss producing that one percent sample nationwide that would provide them a larger absolute numerical set from which to extrapolate.

And, and we do believe even the D.C. sample is statistically significant, but we have offered to provide that data, and we have offered to cross-reference that data with a dataset that shows all of the content that was observable during the February incident that was later taken action against, the content that Meta identified as problematic subject to that incident and took action to remove.

So, we do believe those datasets provide them the information they need to make a reasonable quantification here of the number of impacted residents. We don't believe any adverse inference is appropriate, or this is not data that was initially requested by their request. Once the issue of quantification came up, we have found a workable solution to it. Certainly, if the District proceeds to file a motion, we will respond; but we don't think there's really anything there in terms of



19

claims of spoliation or destruction.  That's simply not what happened.

THE COURT:  Okay.  Why don't you file a motion so I can have the timeline on whether or not, so I can have the specific wording of everything so I can understand even if it is a spoliation?  Because if, tell me your last name again, because I don't --

MS. CHARLES:  Charles.

THE COURT:  Charles?  Because if Ms. Charles, if Ms. Charles is correct, and I didn't, I didn't go back and review specifically the timeline on this, if Ms. Charles is, if Ms. Charles is correct, because I think at the last hearing, I had a brief conversation with -- you were at the, you argued and someone else argued.  I forgot who else argued.

MS. CHARLES:  Yes.  My colleague, Mr. Chaput.

THE COURT:  Mr. Chaput.  He, he was there, too. And, and he, you and him were arguing against the, argued that this spoliation claim may even exist.  So, I need to understand.  So, in writing, if I see it in writing, I'll be able to understand it more clearly, what the timeline is, and know how to respond to that.  So, we'll do that.

MR. ROCK:  Certainly.  We'll, we'll, we'll file the motion.  The dataset that Meta does retain is, is responsive to Your Honor's motion to compel.  It should



20

have already been produced over to the District.

THE COURT: Right.

MR. ROCK: They're not giving it to us because we won't agree to accept that as --

THE COURT: No, no..

MR. ROCK: -- a process --

THE COURT: We shouldn't be, we shouldn't be putting, we shouldn't put in barriers to what I've already asked. So, turn over what I've already asked you to turn over, which is the dataset. Whether or not we have to address something else, that's, that's probably the subject of the motion, but we need to turn over the 1,700 that exist. Turn that over. Okay. Go ahead.

MR. ROCK: The second issue is a, is a privilege logging issue. Meta has taken a position in this case that if it produces a document with redaction, so produces a document, some of it you can read, some of it is redacted, that Meta will not provide a privilege laws for those documents. And that is, that, the District has been not in a possession position to meaningfully assess the privilege of that. And this is particularly important for documents that are subject to the crime fraud order, because many of those are documents where they were partially redacted.

THE COURT: Right.



MR. ROCK: And so, Meta has taken the position that it will not individually log those documents. We think they need to, in order for us to move to assess it, and our understanding is it will take a court order to get them to do that.

THE COURT: Right. So, Ms. Charles, I don't understand that. Are you, are you going to, who is responding on that point? Oh, counsel.

MR. HESTER: Oh, Your Honor.

THE COURT: Tell me your last name again.

MR. HESTER: Hester, Timothy Hester.

THE COURT: Mr. Hester, thank you.

MR. HESTER: Thank you, Your Honor.

THE COURT: What, what, why are we not providing a privileged log on redacted documents?

MR. HESTER: In the, it starts with the MDL litigation, Your Honor, which is the beginning of --

THE COURT: The multi-district litigation, right?

MR. HESTER: -- of this teen mental health litigation, and there's a protocol in place there that there's no need for the parties to log redactions. The reason is that when you have a redaction, you have the information that would be provided on the log. You have the authors. You have the dates. You have the subject



matter of the document.  So, the redaction is simply, for instance, a block that says privilege; but all of the information that would be provided on a log is on the face of the document available to the other side.  So, neither, no parties in this litigation, and it's all over the country, have been logging redactions.  So, that's the reason is it, it's wasted work to be --

THE COURT:  Okay.

MR.  HESTER:  -- logging something when you can look at a document and see what the subject is, who the authors are, what the date is.  The only thing that's redacted is the information that's privileged.

MR. ROCK:  And we know --

THE COURT:  Are you just talking about the kind of privilege they're asserting?

MR. ROCK:  And, and also, the, the source.  What is the source of it?  And let me give you a concrete example of, of how this, of, of why, why Meta is describing it doesn't work here.  We have documents that the Court has seen where you have two researchers.

THE COURT:  Right.

MR. ROCK:  No lawyers on those chains --

THE COURT:  Right.

MR. ROCK:  -- talking between themselves about advice received from lawyers.



23

THE COURT:  Right.

MR. ROCK:  All we get is that those communications with a box that says priv.  It doesn't say attorney-client privilege, it doesn't say attorney work product, and Meta is asserting some type of privilege over that.  We don't know who the legal advice comes from.  We don't know what it is.  We don't know how they're substantiating that burden.  We have gotten Meta to give us two individualized privilege logs that cover documents like this.  And what we have seen in looking at those particular privilege logs makes it that much more important that go through this exercise of actually articulating what privilege are asserted.

Documents one and two, they're the subject of the District's crime fraud ruling.  Two, two researchers talking to each other, and there is some information that they get redacted.  Meta gave us in, in one instance, this one is they give us an individualized log, gave us a log for that communication, document log.  And so, that log was provided last May.

At that point in time, it identified a lawyer and a law firm as the source of the privileged information.  Several weeks ago, Meta provided an amended log where it said, actually, it wasn't that law firm and it wasn't that lawyer.  It was a different law firm that



24

provided that advice.

And then we asked Meta, well, who at that law firm provided that advice that you're relying on?  It took them weeks to identify the individual lawyers.  So, the, the District has concerns that the, that the privilege assertions that, and a lot of these documents, we, we just can't meaningfully evaluate them.  Meta needs to go through the process of providing individualized logs.

MR. HESTER:  Your Honor, may I respond briefly?

THE COURT:  Yes, please.

MR. HESTER:  So, so throughout this litigation, and it is all over the country, throughout this litigation, when one of the plaintiffs raises a question about a particular redaction on a particular document, we are willing to provide more information as Mr. Rock indicated we did.  So, when there's a question about a particular redaction, we do provide more information, but it's an extraordinarily large volume of documents.  And to go through the process of putting, creating a log for every redaction and every document is wasted effort.  And so, the way we, the parties have been proceeding under this MDL protocol, which is in place, under the MDL protocol, there is no requirement.

THE COURT:  Which state is that?  What state is that out of, the actual, I forgot, the actual multi-



25

district litigation?

MR. HESTER:  So, so, so the MDL protocol is, there is an MDL that's pending in the Northern District of California.

THE COURT:  Right.

MR. HESTER:  And so, a very, very large share of the documents that have been produced to the District and all over the Country come out of that MDL.  Then there's additional productions that have been made in the individual states, or here in this jurisdiction.  When we first began the discovery process with the District, one of the points we made in our objections, and stating our position, was that we would follow the MDL protocol to govern the production of documents.  And it's really necessary to do that, otherwise, it's a lot of rework of things that have already been done in the MDL, and the District did not object to our following the basic protocol.  If the District has a question about a particular redaction, we're prepared to provide the information as we have done.

MR. ROCK:  We have consistently been telling Meta, we do not agree to be bound by the MDL protocol, that we're entitled --

THE COURT:  Okay.

MR. ROCK:  -- we're entitled to have our own



26

privilege logs here.  And another reason this has become important, because after the Court's credit fraud order, we went to Meta and we said, look, are, will you agree to individually log documents like documents one and two? Were there researchers talking about legal advice?

THE COURT:  Right.

MR. ROCK:  Will you agree to do individualized logs for similar documents like that, so that we can know how many of those exist?  And we did that, in part, because Meta was making arguments in other courtrooms about how there are only those four documents and no others like them.  And, and Meta said, no, we will not provide you individualized logs for documents like that.

And so, now we're left in, in the dark.  We, we, we get --

THE COURT:  Okay.  Well, why don't we do this? It seems to me we have these four documents, and it seems, and I don't know how, see, the only reason why we're even here on these four documents is because of a claw back, which means they accidentally got produced, and then we had to give them back to; and the District, as they should, gave them back to, to Meta.  So, that means, I don't know, the, the document review process, so I don't want it, I don't know if it's, you know, it can be, I don't know who missed those documents.  That's what I'm



27

saying.  Because I know the document review can be very intense and it can, but it can also be sort of monotonous and it's easy to miss stuff when there's 5 million documents sitting in front of 24 people in a room trying to get stuff out.  So, I get it.

But it's, so to the extent there are other documents that exist that are, because these researchers, you know, they're chatty.  They're clearly very, they're very chatty.  And so, to the extent that we have those documents that exist amongst the researchers, let's do a log of those documents.  There can't be that many of them.  If there are only the four, then there are only the four.  But if there are others, then let's know what, let's do a log of them so that we don't have, because that's the only ones I think the District is interested in.  I don't think, I don't want to, we don't need to address the others.

MR. HESTER:  I don't, I don't think there's a realistic way to, to do that, Your Honor.  In other words, it would be, what, any redaction of, of, of communications between researchers that, that, where we've redacted privileged advice, it would be through this whole 2.5 million document production.  There could be redactions of that sort.  To do the work, to find them, is a --

THE COURT:  So, you're talking about going back



and looking at documents that you've already produced in the MDL litigation?

MR. HESTER:  I, I, as I understood --

THE COURT:  Is that what you're --

MR. HESTER:  Yes.

THE COURT:  -- is that what you're, that's what you believe you have to do to be able to meet that request to go back and look at the 2.5 million again?

MR. HESTER:  Well, I, Your Honor, I'm, we couldn't really I, I, I'm not sure what it means to say other documents like that.  I mean, when, if we have a particular question on a particular document, so if we have a claw back on a particular document, and if there's questions about, well, what, what's the basis for the claw back, we're prepared to engage on that.  What I think would not be reasonable is to require us to go back through over 2.5 million documents and log every redaction.  And, and --

THE COURT:  Well, what is the document review production in this case?  Like, how, what is the document production in this case?

MR. HESTER:  Most of the documents produced in this case are out of the MDL, Your Honor.  And then there's, perhaps, some modest additional documents we produce in response to the District's request; but the



largest volume of documents is out of the MDL.

THE COURT:  And how many documents is that?

MR. HESTER:  Over 2.5 million, Your Honor.

MR. ROCK:  But, but all of those aren't, aren't marked attorney-client privilege.  It, it, this is what has, has been so confounding and is informed by the fact that it took Meta more than six months to identify the actual lawyers that it thinks are the source of the legal advice in document one.  They, they must have identified these documents as attorney-client privilege at some point.  They must be marked inside of their document review system like that.  So, it's not all 2.5 million.  They can spit out the ones that are marked attorney-client privilege.  And they must have a basis for having a certain,  the attorney-client privilege over that document.

THE COURT:  Well, let me ask you this question, Mr. Hester, because I'm, I'm going back to my law firm days when I did my fair share of document review.  When you hit a document, at least I thought there, you could, you could, it could be it could be privileged, it could be, there are different categories you can put a document in, and you log that internally.  Do you have the, is that what was done in this case?  Like, you know it internally what it was marked as, but you don't necessarily have to



let everybody else know, but you know internally what this particular document is marked as?

MR. HESTER:  Yes, Your Honor.  I think that would be right.

THE COURT:  Okay.

MR. HESTER:  But, but the, the, the point here is to create a log of all of the redactions.  It's a, it's a stunning amount of work.

THE COURT:  No, I understand that.  And I'm not, I don't want people to waste money.  It seems that we need to be able to come to something reasonable.  I don't, if they have been required in another litigation to not produce an attorney privileged, an attorney, or a privilege log that we usually produce in the cases, at least that I have pending before me, if they've been required in another case to not produce a privilege log and they've then produced a bunch of documents that they are now duplicating in the production to the District, it is a lot to have them go back and produce a privilege log. Perhaps, they can just, can you just identify bates stamp numbers and tell which ones are privileged from whatever it is you have, and then you don't have to do a whole, it can just be a, a different kind of log with two columns, a bates stamp number, and it's attorney-client privileged, these are the documents you identified as attorney-client



privileged, as opposed to some other privilege?

MR. HESTER:  Well, I should be clear, Your Honor.  We, we have provided a log if we've withheld the document entirely.  I think what Mr. Rock is talking about is the question --

THE COURT:  Is the one redacted.  Right.

MR. HESTER:  -- of redactions.

THE COURT:  Because I know usually a privilege log has multiple columns in it, multiple categories.

MR. HESTER:  Yes.

THE COURT:  Is it possible just to say bates stamp, what is by identified internally as you, privileged because of what, as opposed --

MR. ROCK:  Well, and --

THE COURT:  Go ahead.

MR. ROCK:  Yeah.  So, the, I think the reason the MDL protocol doesn't work here is because, as, as Meta just represented it, the reason for not doing a log is because if there are instances where the source of the legal communication is obvious on the face of the partially redacted document, there's no reason to log that; and the District is not asking them to log that.  They're asked, we're asking them to log documents like documents one and two in the crime fraud order, where you have --



THE COURT:  Where it's not --

MR. ROCK:  -- no lawyer identified on there.

THE COURT:  Right.

MR. ROCK:  You have two non0lawyers talking about information.  And then in those instances, all we are going to get is --

THE COURT:  The redaction?

MR. ROCK:  -- is, is a document between two non-researchers and, or two researchers, two non-lawyers.  They need to, they need in those instances to give us a log that identifies the source of the, of the, of the legal, of, of the legal communication; and, and they need to do that, in part, because when I get to my third point, I want to talk about 60,000 documents that are de-designating off of their privilege logs that were withheld from us when we're trying to take depositions in this case.

MR. HESTER:  Your Honor, I, I think it's, it's not workable what Mr. Rock is suggesting, Documents like the four documents at issue in the claw back.  It's, it's a very, it's an arduous process to go back through and find all documents that have no lawyer on them, and to figure out if, if there's been a redaction, to figure out the basis for the redaction.  That's, the parties have been proceeding in this big litigation of which the



District's litigation is a part.  Parties have been proceeding for several years on the understanding that neither side would be logging these redactions.  So, to go back now is a tremendous amount of work.  I think the much more sensible way to proceed is if the District has a question on a particular document redaction, we can answer it, as we have done.

THE COURT:  All right.  I mean I --

MR. ROCK:  If they can answer it with an individualized log, we're happy to provide them the bates numbers --

THE COURT:  Okay.  Well, then provide them your document request up, that you, upon which you have, you're, you're seeking clarity, whatever the, whatever clarity you're seeking, and give those to counsel, and then counsel can respond.

MR. ROCK:  Yes.

THE COURT:  We'll do that.

MR. ROCK:  And to be clear, would it be responding by an individualized log?  Because they, they have, they haven't since done that.

THE COURT:  Whatever.  Well, identify the documents that, that you're seeking clarity about, and then they can respond.

MR. HESTER:  And, Your Honor --



34

THE COURT: Which is what Mr. Hester says that they can do.

MR. HESTER: Yes. I mean, if, if it's a reasonable number, if, if it's, if it's 100,000 documents, that's not reasonable. But I assume if the District has some narrow limited questions about particular redactions, that we would be able to respond to that in a reasonable way.

THE COURT: Okay. Well, let's do it that way.

MR. ROCK: And then the final issue plays on this, which is that we have, have seen, traditionally, Meta has had an issue with over designation of the, of privilege in litigations; and we have now seen that in this case. Several months ago, Meta told us it would be producing around 60,000 documents that it had previously withheld as privileged to the District. We are still in the process of receiving those. They have not all been fully produced to us. We've gotten some of them.

We see in those documents clearly nonprivileged information. One of them was attached to the District's reply on the original crime fraud motion, which was a communication from Mark Zuckerberg to a bunch of other executives right after the Francis Howland incident. And that particular document was withheld by Meta as, as a privilege. Clearly, it's not privileged.



The District had to take Mark Zuckerberg's deposition in March of this year.  One hundred percent, I would have asked him about that document.  Incredibly important document in this case.

THE COURT:  Well, now he just has to be re-deposed, you know, but --

MR. ROCK:  Yes.  And so, and so the District has asked Meta to agree to reopen depositions based on this and have taken the position --

THE COURT:  Well, now --

MR. ROCK:  -- the position that is not going to be one of the things they're going to do.  So, I think we'll need to move to reopen several depositions.

THE COURT:  Well, I mean, now I can't.  I mean, once you, you know, if you're going to release the privilege on 60,000 documents, I mean, now they, now I have to let them retake, re-depositions, take more depositions if there are now 60,000 documents they didn't have before in preparation for deposition.

MR. HESTER:  Well, Your Honor, I, I mean, first of all, I think it's important to keep the numbers in mind.  There's over 2.5 million they have.

THE COURT:  I got you.  I'm not saying it's --

MR. HESTER"  And so, it's a small --

THE COURT:  -- I'm not saying --



MR. HESTER:  -- size.

THE COURT:  -- it's half the documents.  It's a small slice, but it's still a significant, it's a significant number of documents.

MR. HESTER:  But, but, but, Your Honor, I, I just two points I, I would like to respond to.  First of all, the suggestion that traditionally Meta has had a problem with over-designating, we don't.  We don't accept.  We disagree with fundamentally.  We have --

THE COURT:  Yeah, I don't know --

MR. HESTER:  -- undertaken --

THE COURT:  That's not before me.  So, I don't --

MR. HESTER:  I know.

THE COURT:  -- so, I don't agree with that.  So, I don't, because I haven't seen that, so --

MR. HESTER:  Thank you.  I, I just wanted to --

THE COURT:  -- in front of me, yeah.

MR. HESTER:  -- clarify that, Your Honor.

THE COURT:  Uh-huh.

MR. HESTER:  But the second point is, Meta has undertaken a process in good faith over the summer, and, and we're just finishing it up.  We've been working very hard over months to undertake a review, a re-review of the entire privilege log from the MDL production.  The, the



MDL production was done very quickly to get the documents to the plaintiffs.  So, Meta, on its own initiative, undertook this re-review; and we have finished now with that re-review process.  We're certainly open to discussion if there are meaningful documents that have been produced through this re-review that warrant a re-deposition.  We're not saying flat-out no, but we also think there has to be some reasonable engagement on that, that it's not just --

THE COURT:  Well, I'm assuming the request is based upon a reasonable engagement.  I'm not assuming the District is just willy nilly going to call the CEO.  Is, is Mark Zuckerberg the CEO, or is he just

MR. HESTER:  Yes, he is, Your Honor.

THE COURT:  I'm not assuming they're going to call the CEO of Facebook into a, or Meta, excuse me, into a deposition to just, you know, waste his time, or waste anybody's time.  I'm not assuming that.  I'm assuming that they do have a reasonable basis to re-depose him based upon the 60,000 documents.

MR. HESTER:  Well, we have not been asked yet for a redeposition of Mr. Zuckerberg or others.  I mean this is --

THE COURT:  That's because he's asking me.

MR. HESTER:  -- this process is just finishing,



38

Your Honor.  I just want to be clear on it.  I think the, the next step, reasonably, is for the District to take a look at what's being reproduced and to see if, I mean, for instance, there may be near duplicates.  There may be subjects that have already been fully-covered in a deposition that don't warrant reopening, et cetera, et cetera.  I think that process has to play out.  We can't just reflexively say, well, with 60,000 new documents, all the depositions open up.  We haven't heard a specific proposal from the District --

THE COURT:  No, no, no.

MR. HESTER:  -- yet.

THE COURT:  Right.  So, and I, you're exact, you're, so that, right.  So, just like you're not going to want your employees, let alone your high-level C suite employees to be deposed, the District doesn't like its employees, let alone its high-level, mayor or whomever, to be deposed as well, the District has.  So, if that's, both sides, you want to protect who gets deposed, how long, when, and I get that.

So, what are the parameters?  Do you know what your parameters are yet, or do you want to wait to file a motion on that, you're just sort of letting me know it's coming?

MR. ROCK:  I'm letting you know it's coming.



There are specific ones.  We have specifically raised reopening Mr. Zuckerberg's deposition with Meta's counsel.

THE COURT:  How long do you meet with Mr. Zuckerberg, do you think?

MR. ROCK:  I, I think based on what we've seen so far, at least a couple hours.

MR. HESTER:  Your Honor, we, we don't think that's reasonable, yet We would like to have an opportunity to engage with the District on it.  I, I, this is the first time I've heard about it.  Maybe others on my team have heard about it.  But, but there's going to --

THE COURT:  Well --

MR. HESTER:  -- I mean, question of reopening Mr. Zuckerberg's deposition is a meaningful one.  He's already been through two depositions now in this litigation.  So, I think that, that's something that we think will require motions practice.  We, we'll need to engage --

THE COURT:  Well --

MR. HESTER:  -- with the District to understand.

THE COURT:  Okay.  Well, let me say this.  I understand, continue to meet and confer, but this is what happens when we do, when, when documents are not turned over in a timely fashion.  We sort of engage in depositions before we have all the documents.  We, we



thought the documents were privileged, but they're not privileged, and so now we have revealed whatever documents. So, $60,000, 60,000 documents out of 2.5 million, percentage-wise is not a lot. But 60,000 documents by itself is a lot. So that, you know, and so --

MR. ROCK: In our experience from looking at these documents so far that have come to us is they are all incredibly hot documents. I mean, the, I, the example I gave you that was attached to the reply, I mean, I took Mr. Zuckerberg's deposition. And had I had that document, and I went into that deposition being told by Meta, his custodial files have fully been turned over, so you can take his deposition meaningfully now, had I had that document, a hundred percent I would have used it in that exam.

THE COURT: Right. So, let's just assume we're not trying to waste anybody's time, meet and confer about, assume that I'm going to allow some more depositions. Narrow it down to who we need to depose. Do we really need to depose Mr. Zuckerberg? Is there someone else that we can depose? But if we have to depose Mr. Zuckerberg, tell me what it is, tell me why, and see if you can work with Mr. Hester on getting that done.

MR. ROCK: Thank you, Your Honor.



THE COURT:  Just meet and confer on it.  Okay.  I didn't, I don't, I mean, I was not here.  I know there's a motion for reconsideration pending on the, my order to, granting the District's claw back request.  So, I mean I wasn't going to take oral argument, but I assume you have, if you, we can talk about it, if you'd like.  Because, first, I just want to ask a question.  Mr. DeBoy, is that you?

MR. DEBOY:  Yes, Your Honor.

THE COURT:  Okay.  So, there's, I have two questions before I get it, if we want to, before we get into the content.  One is, assuming I understand that if we had a lawyer, if we had a hearing, all the lawyers are going to come in and say, that's not what I told the researchers, something like that.  And two, I read the declaration from Ms. Soller, who I know well.  Why is this relevant to my consideration?  Why do I need to hear from the Rules of Professional Responsibility on what lawyers, I mean, I,I,  I do know that.  I don't know that it's irrelevant to my analysis, but you help me understand, Mr. DeBoy.

MR. DEBOY:  Yes.  Certainly, Your Honor.  And, and good morning.  Ms. Soller is, is an expert in legal ethics.

THE COURT:  Yep.



MR. DEBOY: She has a lot of experience over her career advising on legal ethics issues, including privilege issues. She served on a number of committees that are relevant to that issue. We believe that the documents and the briefing, and the other exhibits that have been submitted, are certainly sufficient for Your Honor to rule on the motion for reconsideration.

At the same time, as an expert in legal ethics and in privilege issues, we submitted the declaration from Ms. Soller because we thought it might be helpful to the Court to have her perspective.

THE COURT: Uh-huh.

MR. DEBOY: As we noted in our briefing, there are numerous cases in which courts have taken opinions of those kind under consideration in matters involving legal ethics issues. Certainly, there are other courts who have said that, that they don't need to hear such opinions. We submitted it to the extent it's helpful to the Court, but we think at the same time, the Court can rule on our motion with or without Ms. Soller's declaration. So, of course, we would leave it to Your Honor's discretion

THE COURT: As to whether --

MR. DEBOY: -- as to whether you wish to entertain those opinions or not, but we've submitted them to the extent that they're helpful to the Court.



THE COURT: Okay. Then is your argument to me on the motion for reconsider, if you're, are you ready just to talk about the motion for reconsideration briefly? Can you talk about it, because I know I didn't say let's talk, I didn't. Usually, I put change to things to a motion hearing. This was largely just going to be a meeting about, a discussion about discovery. So, I'm not trying to sandbag you to talk about this when you weren't prepared to talk about it. So, if you want to, if you can ask, answer a couple questions, I'd appreciate it. If not, you don't have to.

MR. DEBOY: Certainly, Your Honor. And, and our position on it is that we, we think the motion for consideration is very important. We would like to be --

THE COURT: Uh-huh.

MR. DEBOY: -- heard on it.

THE COURT: Oh, okay.

MR. DEBOY: At the same time, if Your Honor would prefer to do this in a separate hearing or a separate conference scheduled for, specifically for that purpose, we would be happy to do that. So, we leave it to Your Honor's discretion as to when you would like to hear from us on it.

THE COURT: Well, no, I'm happy to hear. We'll announce it. Since we're here, and you're, is the



Government ready to respond here?

MR. ROCK:  Yes, we're --

THE COURT:  Oh, okay.

MR. ROCK:  -- we're prepared, Your Honor.

THE COURT:  Okay.  Good.  All right.  So, tell me, okay, I, well, obviously, I've read your motion for reconsideration; and you're arguing that I have done manifest errors of law with respect to my application of the crime fraud exception, to which, at this juncture, I disagree.  But tell me what it is you think I have applied legally that's an error of law in in terms, that, that's an error of law; because under the, my understanding of the crime fraud, obviously, it's, you know, probable cause to believe that it's sort of covering up, I suppose, crime fraud or some sort of misconduct.  And I understand from, the D.C. Court of Appeals does not necessarily address the misconduct part that came out of the D.C. Circuit; but the D.C. Court of Appeals seems to me to be addressing the crime fraud exception in the context of actual criminal cases.  I haven't, maybe you tell me if I'm wrong, and I could be wrong, I haven't seen any D.C. Court of Appeals cases that address the crime fraud exception in a civil context, which is very different.  And I did notice, well, so, so let me hear from you what your position is on that, but just that legal point.



MR. DEBOY:  So, is Your Honor's question what are our legal arguments, or is --

THE COURT:  Yes.

MR. DEBOY:  Okay.  So --

THE COURT:  -- legal argument on the application of the crime fraud exception in this case, and what I got wrong.

MR. DEBOY:  Certainly, Your Honor.

THE COURT:  What do you believe I got wrong?

MR. DEBOY:  So, in our papers, we outlined what we believe are three errors.  One was the factual error, which I would like an opportunity to address today as well.  And then there were two legal issues that we brought forward in our motion for reconsideration.  The first of those two is that we read the Court's order to suggest that ongoing litigation limited the ability of Meta lawyers to advise their client on research-related issues.  In the October 23 order, the Court noted that the four documents at issue were created during the pendency of litigation involving teen mental health.

And I believe most of Your Honor's statements in the order about that issue are on pages nine and ten of the order.  And one of the quotes, for example, that, that we, that drew our attention is this one.  "Meta's counsel offered such legal advice to specifically limit Meta's



46

potential liability while Meta was already the subject of a related multi-district litigation."  And that's on page ten of your, Your Honor's order.

THE COURT:  Right.

MR. DEBOY:  But in our position, Your Honor, is that there is nothing improper in advising a client, for a lawyer to advise a client on how its conduct might affect its standing in pending litigation or in the context of a Government investigation.  So, the fact that litigation exists does not limit counsel's ability to opine on liability in that setting.  In fact, that is counsel's duty to do that, advising on language formulations and the risks associated with language is a core function of lawyers.  Advising on proposed courses of action, such as whether a research study should be undertaken and the risks associated with certain actions, is also a core function of, of lawyers.

THE COURT:  Well, then when does it cross into spoliation?  Because spoliation, when you're advising a client to alter, amend and the like, can also, because you are, you in your footnote, there's a footnote in your brief that identifies a case in the Eastern District of Virginia that found spoliation encompasses the crime fraud exception.  So, how does that, how does that not go into that?



MR. DEBOY:  So, Your Honor, spoliation, well, first and foremost --

THE COURT:  Spoliation, yes.

MR. DEBOY:  I'm sorry, Your Honor.

THE COURT:  No.  No.  Go ahead.

MR. DEBOY:  Spoliation did not occur here. These documents don't show spoliation.  They show lawyers advising on language, lawyers advising on proposed courses of action.  They do not involve spoliation.  Now, Your Honor, the, the cases in D.C. that we've cited don't specifically address spoliation, but I would say this about it.

THE COURT:  Right.

MR. DEBOY:  If there was an instruction by a lawyer to, to spoliate a document, that has not occurred here.  That would be a different matter.  In some circumstances, spoliation could be, could be even be a criminal offense in some circumstances.

THE COURT:  Right.

MR. DEBOY:  That is not what we, what we have here.  So, given the, the facts of this case, where the guidance is about language, where the guidance is about proposed courses of action, to the extent that any of that conduct could fit, that sort of advice could fit within the crime fraud exception, it's our view that that, that



48

that, Your Honor, would be, would be a legal error.  And that's, that's where, you know, as we saw, as we understood the Court's order, it was suggesting that in the context of ongoing litigation, or an ongoing investigation, that advice on language formulations, advice on proposed courses of action could be pulled within the crime fraud exception.  And we believe that there's no case in the District of Columbia.  There's no case anywhere that we're aware of, including the cases from other jurisdictions that are cited in the order, that could capture that sort of standard lawyer advice on language and proposed courses of action.  So, in our view, Your Honor, respectively, to the extent that the order was capturing the advice that was given here, it certainly extends far beyond the crime fraud exception as articulated in D.C., or, or anywhere else.

And, Your Honor, I mentioned that there was another, what we have presented to the Court is another legal error in the order, and it's related to what we've just discussed.  And it's that capturing other types of misconduct.  So, the first legal error is really about this, this setting of ongoing litigation and whether there was any limitation on the ability of lawyers to advise in that setting, which we would say that there isn't.  And then the second legal error is, is one, I guess I've



49

already mentioned, Your Honor, which is to the extent that the crime fraud exception is being interpreted to capture the standard legal advice of advising on language, advising on proposed courses of action, that was, in our view, Your Honor, error.

The October 23 order states that the label of the crime fraud exception may be misleading --

THE COURT:  Right.

MR. DEBOY:  -- because the exception applies to any crime, fraud, or other type of misconduct.  But in the District of Columbia, the exception is, is consistent with its name.  It applies to crimes and frauds.  We see that in several cases of the D.C. Court of Appeals, In Re Public Defender Service, in which the Court of Appeals --

THE COURT:  Right.  That's what I said in the beginning.  Like, the D.C. Court, that's why, well, go ahead.

MR. DEBOY:  yeah.  And D.C. Court of Appeals stated there that the crime fraud exception applies when a client uses the lawyer's advice or other services to engage in or assist a crime or fraud.  And then consistent with that clear holding, the Court of Appeals very recently clarified en banc in the Moore case that this exception rests on the idea that a client abuses her relationship with her attorney by using the relationship



to commit an unlawful act.  And we also cite --

THE COURT:  Right.

MR. DEBOY:  -- in our brief, Your Honor, the restatement, which says that the authorities agree that the exception stated in this section applies to client conduct defined as a crime or fraud, and the actual instances in which a broader exception might apply are probably few and isolated, and it would be difficult to formulate a broader exception that is not objectionably vague.  And so, even if the exception encompasses something more than strictly crimes or frauds, that conduct must amount to an unlawful act closely related to crime or fraud.  And in the few cases in the District where we see that reference to other misconduct, we also see that language about unlawful acts.  And when we look --

THE COURT:  Right.

MR. DEBOY:  -- at the cases at issue that are cited that involve that, or that, that mention that, other misconduct concept, they're talking about very serious misconduct by lawyers, fraud or bribery.  For example, in the In Re Sealed case in the D.C. Circuit, that's talking about bribery and illegal corporate contributions.  And then the Rambus case that Your Honor cited from the Eastern District of Virginia, that case involved

eScribers

spoliation --

THE COURT: Spoliation.

MR. DEBOY: -- which we discussed a little, a little while ago which, as I mentioned, did not occur here.

So, Your Honor, the District has not cited any case from the District of Columbia that could be read to expand the crime fraud exception beyond actual crime or fraud. And none of the documents at issue here contains any evidence of any crime, fraud, or any unlawful act, or for that matter, even any, any other form of misconduct. And so, to the extent that the October 23 order expanded the exception beyond its limited and well-defined boundaries, it was, Your Honor, in our view, error.

And the last thing I would just say is, again, on this, on this particular issue, we are unaware of any case anywhere, including in the cases that Your Honor has cited from other jurisdictions, that could pull the sort of standard lawyer advice of advising on language and advising on proposed courses of action within the crime fraud exception.

And then the last thing I'll say, Your Honor, you mentioned civil versus --

THE COURT: Criminal.

MR. DEBOY: -- criminal cases. I, I think Your



Honor is right that the, that the, the handful of cases that have squarely addressed this issue in the appellate courts in D.C. --

THE COURT:  Are criminal cases.

THE COURT:  -- -- were decided in the criminal context.

THE COURT:  Uh-huh.

MR. DEBOY:  But, Your Honor, I don't believe the standard would be any different in a, in a civil case. It's all about protecting the attorney-client privilege wherever that privilege is invoked.  And so, the, the standard would be the same in a civil case as it would be in a criminal case; and in any event, would have to capture a crime, or fraud, or something closely akin to that, which we don't, which we do not have in in this case.

And lastly, Your Honor, on that factual point, it's also articulated in our briefs, I'd like to be heard on, on that as well; but I understand Your Honor wanted to hear about the legal issues first.

THE COURT:  Okay.  Let me hear.  Who is arguing? Mr. Rock?

MR. ROCK:  Yes.  Yes, Your Honor.  So, the, I, I think I heard Meta just to say that the spoliation would fall under crime fraud, if you had advised to do that.



THE COURT:  Right.

MR. ROCK:  And so, their argument that the Court made a legal error falls apart because they can't accept the Court's factual findings in the order, which, which established probable cause for potential spoliation.

I just want to read from the Court's order. This is page ten describing the documents.  So, this is the first paragraph on page ten of, of Your Honor's October order, and you're describing the documents. Documents one and two contain communications between Meta researchers relating advice from Meta's counsel that researchers should remove portions of research showing Meta's knowledge of teen users' development, developmental vulnerability because the researchers could be used by Government enforcers investigating Meta.

If that is an accurate factual recitation of the portion that Meta claims is privileged, that is, establishes probable cause for potential spoliation here. As the District also pointed out in its opposition to the motion of reconsideration, if that's an accurate representation, that's also potentially criminal conduct in California, which had a CID out to Meta for this exact same type of conduct.  So, even if Meta were right that the Court had created an legal error, there's now also a potential crime implicated here.  It's a misdemeanor to,



54

to, to obscure documents responsive to that California CID.

It's also a fraud.  It's a consumer fraud.  This is part of the District's claims in this case, which is that Meta was hiding research about the problems that its platform had to young users.  So, it fits under all three of those, and I, and, and I think the real issue here is that Meta can't accept the Court's reading of those documents.

THE COURT:  So, let me just say this.  Let me go, let me come back to you, Mr. DeBoy.

MR. DEBOY:  Yes, Your Honor.

THE COURT:  Because I didn't stop you from your arguments, and as you were making the legal arguments, because ultimately, and I didn't go in great detail in my order about the potential, like, because what this does come back to, I think Mr. Rock is correct.  If my factual description is correct, and I hear you on my factual analysis, it does make out spoilation.  It does make out a violation of the CPPA, or certainly supports a violation of the CPPA, which is what this whole case is about.  And so, which is an unlawful act.  So, it may not be a criminal act, but it's certainly a civilly unlawful act.  And so, which is why I ruled the way I did.  And so, and I didn't want to stop your legal argument, but so let's go,



let's now send, circle back to the factual argument.

Tell me what you think I found -- what is wrong with the factual argument. Because I understand you're saying -- I know my order is a little bit -- it's sort of -- it says Meta's counsel informed Meta's researchers, when it probably should -- if I'm going to be more precise, I should have said the researchers communicated amongst themselves. In communicating amongst themselves, they believe that their counsel told them, that's what the researchers believed up in this email -- or messaging, whatever this message thing is. I don't know if it's email or not -- internal Meta messaging.

That they certainly believed, and they're quoting somebody, telling what they're concern -- oh, well, I don't want to read it on the record, but they're concerned about revealing some things, and the research that they're doing is going to undermine their position in the multidistrict litigation. And so how's that -- if they're told to change something in the specific language, remove any language, right? And it's not just a word or two, it is language referencing a specific -- a whole specific area

And I'm being vague purposefully, because I don't want to -- because I haven't -- we haven't unsealed this. This hasn't been unsealed. And so -- uh-oh. Uh-



oh.  Oh.  Okay.  And so I don't want -- and so if you're telling someone, mid-litigation, to remove language, to change something, which is the specific area that is the subject of the litigation that you're being sued for, how is that not relevant, or probable cause to believe that something -- crime, fraud, or other misconduct, is occurring?  I'm not saying it is occurring.  I'm just saying there's probable cause to believe.

Whether or not something happened, we can -- that's an issue of fact we can resolve at a trial, or summary judgment, or whatever.  But we're at a very early stage, which is discovery; probable cause to believe something occurred.  If anybody worked -- I don't know if you worked at the U.S. Attorney's office long ago, or litigation, you know, probable cause is a very low standard, generally speaking.  And you know, so that's where we are, and that's all I'm saying.  Why is that wrong?  Tell me why I'm wrong.

MR. DEBOY:  Yeah.  SO I would say, Your Honor, at the outset, that the factual argument that we make in our brief is really the core of the issue.

THE COURT:  Uh-huh.

MR. DEBOY:  And perhaps, we're all --

THE COURT:  That's why I should have started with factual argument, so I apologize.



MR. DEBOY:  And perhaps, we're essentially in agreement on that.

THE COURT:  Uh-huh.

MR. DEBOY:  But Your Honor, as a factual matter, none of the documents shows evidence of crime or fraud. And we submit that the further context that we've outlined in our reconsideration motion now makes that clear, and helps cut through the district's inaccurate framing --

THE COURT:  You mean with the declarations that you've attached, and --

MR. DEBOY:  Well, the briefing, the declarations, and also the testimony --

THE COURT:  And the deposition testimony?

MR. DEBOY:  -- that was included that the District has cited.  And so Your Honor, viewed without the District's inaccurate framing, none of the four documents shows evidence of crime or fraud.  None of these documents shows any instruction to alter, delete, or falsify research findings or data.  And I think it's helpful to briefly go through --

THE COURT:  They don't have to show findings. It didn't have to be findings, right?

MR. DEBOY:  Well, it --

THE COURT:  But go ahead.  I'll let you just argue.  Go ahead.  I'm sorry.



MR. DEBOY:  Certainly, Your Honor.  As I understood the Court's order, there was a conclusion by Your Honor that there was probable cause to show that research -- that lawyers had instructed to remove or alter research.

THE COURT:  Yeah.

MR. DEBOY:  And I think it's helpful to step through each of the four documents.  I'm not going to do so in a way that result -- that reveals the substance of the attorney-client communications, but I'd like to discuss each of them briefly.  So the first document is a --

THE COURT:  Okay.

MR. DEBOY:  -- is a chat exchange --

THE COURT:  Right.

MR. DEBOY:  -- between two nonlawyers --

THE COURT:  Yep.

MR. DEBOY:  -- at Meta.  The chat discusses, second-hand, legal advice on language describing a study population in the background section of a research plan. So it's discussing language in that section.  It's important to note, for context, that the study at issue did go forward.  And there is no instruction by any lawyer here to alter, delete, or falsify research.  There is discussion, second-hand, of attorney advice on language



59

used to describe research, in a background section of a document describing research, but not anything that is instructing anybody to delete or alter research.

And so it is a core function of lawyers to be able to say, when you're using language to talk about things, whether that's research, or anyone else, here's some guidance on language that may present legal risk versus language that may not; that's the first document. The second document is essentially the same.  It's a nearly identical chat exchange --

THE COURT:  Right.

MR. DEBOY:  -- between two nonlawyers, and it again describes, second-hand, the same advice about language in a background section.  There's no instruction to alter, delete, or falsify research.  We know that the author of these first two chat exchanges testified in her deposition, quote, that she could -- well, I'm sorry.  She testified in her deposition that she could not recall ever having been asked to, quote, "delete any conclusions of her research".  She also swore in the declaration that we submitted --

THE COURT:  Okay.  This is why -- what they said in the deposition, the denial of having -- all the denials, I get that's what they said in the deposition. What does it have to do with turning over the documents in



a discovery claw back motion?  You see what I'm saying? It's just where it's -- it's probable cause to believe, with the particular documents in front of me --  because what you're talking about is, we can litigate -- you know, if -- let's say we go to trial, and this researcher gets on the stand, and you ask her questions on direct, and the Government crosses her, or you want to, you know, take out the stand, you present this document, and she can explain this document on cross, what does it have to do with document production as to what actually happened?  When all I have to do is, it's probable cause to believe that something happened.

MR. DEBOY:  It has to do with whether that document is entitled to a privilege or not, and whether the privilege could be stripped because of the crime fraud exception.  And I think, in this context, it's particularly important to note that these documents, again, they're second-hand discussions of lawyer advice --

THE COURT:  Right.

MR. DEBOY:  -- in a casual setting.  Your Honor asked about the communication vehicle here, it's chat exchanges.

THE COURT:  Okay.

MR. DEBOY:  It's essentially, like, instant messages --



THE COURT: Okay.

MR. DEBOY: -- internally, within the company. And there's a second-hand communication here that the District has characterized as something improper, but that the sentences, themselves, in the documents do not show. And so the testimony of the --

THE COURT: I'm sorry. One second. I have to email my --

MR. DEBOY: Certainly.

THE COURT: I have to email my colleagues. I'm supposed to be in a meeting right now, and I'm not there.

MR. DEBOY: Understood.

THE COURT: Okay.

MR. DEBOY: Understood.

(Pause.)

THE COURT: Okay. Go ahead. I'm sorry about that.

MR. DEBOY: No problem, Your Honor. And as I was explaining, the context here is a casual chat exchange between nonlawyers describing advice that came from lawyers. And so I think your honor's question was, why should we look at the deposition testimony that the District cited? Why should we look at the declaration that that we submitted? And Your Honor, the reason that that information was helpful, because it confirms what we



submit the documents themselves show, which is that there was no instruction to alter or amend research; there was guidance on language.  And it's a lawyer's job, a lawyer has to be able to advise his or her client.

THE COURT:  Well, what are the limitations of that, when litigation is already pending?

MR. DEBOY:  Your Honor, I think the example, Your Honor --

THE COURT:  On the very issue -- on the very factual issue that the lawyers are advising the researchers to it.  They're being sued on the very issue that the researchers are researching, so what is the limitation?  Is there a limitation?

MR. DEBOY:  Well, it would have to be a crime -- fraud, or something closely akin to that.

THE COURT:  Okay.

MR. DEBOY:  And you know, Your Honor mentioned spoliation earlier.

THE COURT:  Yeah.

MR. DEBOY:  I think, as I mentioned, there could be situations.  I think it's going to be context specific, but there could be situations in which spoliation might fit within that exception.

THE COURT:  Right.  Because spoliation is not just the destruction of documents, it can be the



complete -- you know, it can be the amendment of documents. It can be the removal of words from documents such that the meaning of the document is something different than what it would have been had that word not -- we all -- had that word not been removed, which would then undermine, or not undermine, your position in the litigation. That's what I'm saying, it's just --

MR. DEBOY: Well, what it can't be --

THE COURT: Okay.

MR. DEBOY: -- is -- the rule cannot be that once litigation arises, a lawyer's ability to advise on courses of action, to advise on appropriate language used, is now off the table. That can't --

THE COURT: I'm not saying that a lawyer's ability to advise is removed; that doesn't make sense. Of course, a lot of your -- a lawyer is always going to advise its client, and should -- is required to do so.

MR. DEBOY: Correct.

THE COURT: But that is not the same thing as how these two individuals who work for Meta as researchers have interpreted what the lawyers told them, that's two -- it's two different things, it seems to me.

MR. DEBOY: Well, the individuals have said that there was no instruction to alter or delete. There is no instruction here to delete a document. There is no



context here about, you know, we have documents that are about to be produced in litigation, let's alter them or delete them; that is not what we have here. We have a situation in which researchers are doing their work, and lawyers are advising on language that they're using, in this instance here, in the background section of a document.

That is not spoliation. That is not advising to destroy evidence. That is standard legal advice on language to be used. And that is the sort of thing that -- that standard lawyer advice that lawyers need to be able to do, including in the situation where there may be pending litigation, particularly for a large company where there is often litigation pending. And so here, the documents we submit are clear as to there's no crime or fraud occurring.

But the deposition testimony that the District has cited, the declaration that we submitted, provide further context, and confirm that the researchers were not interpreting this advice that they received from counsel to mean delete or alter research. So those are the first two documents, Your Honor. As I mentioned, they're essentially the same. The third document is another chat exchange among nonlawyers. In fact, all four of these documents --



THE COURT:  Right.

MR. DEBOY:  -- are chat exchanges among nonlawyers.  The third document describes, second-hand, again, advice on whether and how a research study should be conducted, and the potential litigation risks associated with that study.  There is no instruction to alter, delete, or falsify research.  The study under discussion here, in fact, went forward.  The principal author of the chat testified in her deposition that no one had ever asked her to, quote, "Change her research findings to make them more favorable to the company, delete any of her research findings that could negatively impact Meta's business, or edit or change part of her research to make it reflect more positively on Meta's business", end quote.

Similarly, she also swore in her declaration, in the publicly available part of it that, quote, "No Meta lawyer had ever advised her to delete, conceal, alter, or amend research data results or conclusions, and that she was unaware of anyone else at Meta having received such instruction".

THE COURT:  These people still work at Meta, correct?

MR. DEBOY:  What's that, Your Honor?

THE COURT:  These researchers in these chats



still work at Meta?

MR. DEBOY:  They do, Your Honor.

THE COURT:  Right.  So I fully expect them to say that, right?

MR. DEBOY:  Well, Your Honor, I don't think so. I mean, these individuals receive legal advice frequently. They sometimes talk about it in chat exchanges, as we have seen.  And they have not stated in those chat exchanges that any of this -- you know, the conduct is that -- the District has described it, occurred.  They didn't say that somebody told them to delete, alter, or falsify research findings.  They're just --

THE COURT:  I'm not saying that the District --

MR. DEBOY:  -- talking about the language advice they receive -- I'm sorry, Your Honor.

THE COURT:  But the District is not saying that. What we're saying is that they were told to remove -- that they said they were told to remove language, remove language.

MR. DEBOY:  And what we show in our briefs, and -- is that that is not an instruction to delete or amend research.  Your Honor's order referred to deleting or amend.

THE COURT:  How is that not an order to amend your research, if you're told to remove language



specifically relevant to the very litigation topic that you're in?

MR. DEBOY:  Your Honor, a lawyer has to be able to say to a client, when you describe something that you're doing, here are the legal risks associated with that language.  Here they are just --

THE COURT:  Right.  So --

MR. DEBOY:  -- they are describing their research in these --

THE COURT:  Right.

MR. DEBOY:  -- in this instance.

THE COURT:  And a lawyer absolutely can say, here are the legal risks associated with that language. But the researchers in their chat are not saying, I was told the legal risks associated with this language are this, so maybe we should say this, right?  That's not what they're saying.  They're saying, OC, outside counsel, told us A, remove the language.  Okay.  So that's --

MR. DEBOY:  Your Honor, in this --

THE COURT:  -- two different -- so we can just go back.  We can go back, but I understand your point.  Go ahead.

MR. DEBOY:  I think it's important to keep in mind, too, here, this is a situation in which documents are being drafted --



THE COURT:  Right.

MR. DEBOY:  -- new documents are being drafted, and legal advice is being taken, legal advice is being sought on those documents.  And the lawyers are advising about language in those documents, in relation to legal risk.  This is not a situation in which there, let's say, is a document that's --

THE COURT:  But it's in relation to legal risk, not just generally speaking, right?  It's in relation to legal risk, because they are currently in litigation on the very issue that the researchers are researching.  That's what I keep coming back to, right?  If it was just generally, of course.  Every time a researcher puts something -- I'm sure they -- the legal -- legal in every industry, that's why most industries can't stand the legal department.  Because the legal department is always like, no, no, no, change all of it.  They can't stand us.  We get it.  Right?  But in the context of litigation, things, in my perspective, change; that's my concern.

MR. DEBOY:  Well, I think that goes to the legal issue we were discussing earlier, is, does the fact of litigation -- the fact of ongoing litigation, or an investigation, somehow limit a lawyer's advice to advise on language, or proposed courses of action, and --

THE COURT:  And I think it -- you can definitely



advise, but it seems to me that we have a document of the researchers talking amongst themselves. If this case were ever to go to trial, it's just the issue effect that needs to be addressed, that a jury can resolve. This is the factual question as to whether or not they were told they can get on the stand and say, we weren't told to really do anything. We were just being hyperbolic, or whatever, in the email -- in the in the chat.

It was just -- we were just, you know -- we're researchers just goofing off, joking back and forth. Because they were -- there was -- they're just sort of being, you know, a little bit flipping toward each other in the chats. You know, maybe there's a way -- you know, it's just -- you know, it's something like that. I don't know, but we'll see. I'm going to review, in great detail, again, before I issue my -- do this reconsideration order. I'm going to go through everything in great detail. Some of the declarations that I have, can you just give me the unredacted versions of the declarations?

MR. DEBOY: I believe we did, Your Honor. I believe we sent those in an envelope to chambers, but we can certainly resend them.

THE COURT: Oh. Well, I need to ask my law clerk; maybe we have them. Because I didn't see them,



70

because two of my law clerks were out sick this week, so they could be in there somewhere.

MR. DEBOY:  Yeah.  Would you like us to resend them for the Court's --

THE COURT:  Please.

MR. DEBOY:  -- in camera review?

THE COURT:  That would be great.

MR. DEBOY:  Okay.  We can certainly --

THE COURT:  Thank you.

MR. DEBOY:  -- do that, Your Honor.

THE COURT:  Thank you.

MR. ROCK:  And of course, the District has not been allowed to see those unredacted declarations, so we're at a bit of a disadvantage here.  I wanted to make three points of the law.

MR. DEBOY:  Well, Your Honor, you'd wanted to hear from me on the four -- you didn't get you to hear from me on the four documents.

THE COURT:  Yeah.  I mean, I got it.

MR. DEBOY:  Okay.  Well, I had some more to say on the other documents, but if you'd like to hear from Mr. Rock now, and then come back, it's -- of course, it's up to Your Honor.

THE COURT:  Okay.  What else did you have tell me on the other document?  Go ahead.



MR. DEBOY:  So I wanted to come back briefly to a point I made a few moments ago, which is that this is not documents that are in the can; that are, you know, on the truck headed out in litigation, and somebody is directing be altered.  These are new documents that are being drafted.  This is lawyer advice being given in the context of drafting.  And I think that's an important distinction that really puts a large wall of separation between anything that could be characterized as foliation and what is going on here.

The fact that litigation has arisen doesn't change a lawyer's ability to give advice on language that's being used in documents as they're being written.  I'd also note that the District, in its papers, and we highlighted this in our reply brief, effectively concedes this point, where they say, it is true that an attorney may advise their client to stop doing things that would further support a case against them.  Those aren't the words I would use, but that's another encapsulation of the principle that just because there's ongoing litigation, or an investigation, doesn't mean that a lawyer can't advise on documents as they're being created, or on proposed courses of action.

We were briefly talking about the third document, which is a little bit different in that it's

eScribers

talking more about proposed courses of action, including a study that was discussed. It's important to keep in mind that that study did go forward. But regardless, the principal author of the chat at issue here testified in her deposition that no one had ever asked her to change her research findings, delete any of the research, and so forth. And she also swore in her declaration, again, that no Meta lawyer had ever advised her to delete, conceal, alter, or amend research data, results, or conclusion. And she was unaware of anyone else having received an instruction like that.

THE COURT: Okay.

MR. DEBOY: The study went forward, but regardless, there is nothing improper in a lawyer advising her client when a legal risks associated with a proposed course of action, in the lawyer's views, on whether it should be conducted or not. The fourth document -- the fourth and final document, Your Honor, again, it's another chat exchange among nonlawyers. It describes, again, second-hand, legal advice on language and other content in a slide deck describing research.

THE COURT: Right.

MR. DEBOY: It also describes advice on legal risks associated with certain language formulations and internal communications. Again, there is no instruction



to alter, delete, or falsify research.  As with the other documents, we're again talking about a setting in which new documents are being drafted.  We're not talking about a situation in which discovery materials are headed out the door for litigation.

And then, the Meta in-house attorney involved in this chat exchange swore in her declaration that she has never advised, nor would she ever advise, anyone to delete, conceal, alter, or amend research data results or conclusions.  So Your Honor, we think when one looks at the documents, one sees -- again, separated from the inaccurate framing that the District has put forward, based solely on its memory of documents it saw months ago. these documents --

THE COURT:  I mean, it's not just the District's framing.  I have the documents.  I'm reading them right now, but got you.

MR. DEBOY:  Understood, Your Honor.  Understood. And the documents all involve legal advice on summaries or descriptions of research.  They are summaries of research. They are descriptions of research.  They are talking about background for research.  These are not data or results. And this advice, again, describes, second-hand, by laypersons.

I think that's important to keep in mind,



because we don't have the exact language of the legal advice here, but it's advising on language formulations or proposed courses of action; again, no instruction to alter or delete.  The deposition testimony helps reinforce what the documents show, similarly with the declarations.  And in each instance, the underlying research existed, it remained in existence, and the advice concerned how best to summarize or describe that research and its background.

THE COURT:  Okay.

MR. DEBOY:  So Your Honor, to the extent that there was any conclusion by the Court in its order that it was anything other than standard lawyer practice of advising on language and proposed course of action, that, Your Honor, is what we submit as the is the factual error.

THE COURT:  Okay.  I got you.  Thank you, Mr. DeBoy.

MR. ROCK:  Thank you, Your Honor.  I think I'm just going to address document one.

THE COURT:  Okay.

MR. ROCK:  I think two, three, and four will speak for themselves.

THE COURT:  Yeah.

MR. ROCK:  I can cover all my points with document one.  So November of 2022, document one, is when that exchange happens.  The MDL is going on.  The



District, and other states have issued subpoenas to Meta that goes to its research about harm to young -- to youth. And you have two researchers, based on my recollection of that exchange, talking about a document they have created, a summary of their research, and they're being told by a lawyer to change that.

That's a document that exists, changes are going to be made to it. And my recollection is, the changes were going to be made because that summary, in its current form, might be helpful to Government enforcers.

THE COURT:  right.

MR. ROCK:  That that is probable cause that the document was changed.  That clearly gets past probable cause.  And so then the issue is, does that fact that they're having this exchange about a document they've already created, that legal's weighing on, and has told them to change, does that -- is that probable cause for potential spoliation, which would fit under crime fraud? Yes.

Is it probable cause of a fraud?  Yes.  This is one of the District's claims, consumer claims in this case.  Is it probable cause of a crime?  California CID, we've given to the Court, was in place at the time, that would have called for that research to be produced under --



THE COURT:  What does CID stand for?

MR. ROCK:  Civil investigating (indiscernible).

THE COURT:  Oh.  Okay.

MR. ROCK:  It's a (indiscernible) subpoena.

THE COURT:  Okay.

MR. ROCK:  And I really think that we are having a factual dispute with Meta.  They want to read the language of document one in a different frame, but --

THE COURT:  Right.

MR. ROCK:  -- it says what it says.  It's been some time since I've seen it.  It was pretty crystal clear to me, when I read it, what the researchers are talking about here.  Two points related to the factual record in this case.  One, the Stoller (phonetic) declaration, she never saw these four documents.  Every opinion that she's wanting to provide the Court with are not based on actually looking at the language that's inside those documents.  So it's not (indiscernible).

THE COURT:  You're talking about Ms. Mary Lou (phonetic) Soller?

MR. ROCK:  Yes.

THE COURT:  Okay.

MR. ROCK:  Yeah.  She was not shown those four documents.

THE COURT:  Yeah.



MR. ROCK:  So she can't apply on something they actually say.  And then, there are some sham declarations that were submitted by Meta in connection with the motion for reconsideration.  Document one, the District deposed the author of that.  And in her deposition, she said, I have no recollection of anyone ever telling me to do this.

THE COURT:  And now she has a recollection.

MR. ROCK:  Suddenly, she does have a recollection of it now, when Meta asked her to put in this declaration.  And of course, the District never got to examine her with document one, which might have refreshed her recollection, had she been forced, under oath, to sit there and read it, and explain what she meant.  So all of this factual stuff could have been submitted by Meta with the original motion, but even if the Court wants to take a look at some of this stuff, it's not very valuable.

THE COURT:  Okay.  All right.  I will take under --

MR. DEBOY:  Your Honor, may -- I'm sorry.  May I briefly respond?

THE COURT:  Okay.  Briefly.

MR. DEBOY:  Your Honor, so just a few quick points there.  One is, again, this is prospective document creation.  This is a situation in which documents are being created, and with --



THE COURT:  Right.  I think that what Mr. Rock is saying is that, with prospective document one, it's not prospective document creation.  It seems as though it is a document that's already been created, and she's being told to -- he or she is being told to change it --

MR. DEBOY:  Document --

THE COURT:  -- or remove language.  But go ahead.

MR. DEBOY:  Document one is a discussion of the background section of a research plan for a study that has not yet occurred.

THE COURT:  Okay.

MR. DEBOY:  And it's the description of -- it's a description of background.  It's a prospective -- talking about prospectively maybe doing a study, describing background.

THE COURT:  And you know that it's a background from what?  From the declaration?

MR. DEBOY:  The declaration makes that clear.

THE COURT:  Okay.

MR. DEBOY:  The declaration makes that clear.  It's not changing an existing doc.  This is not lawyers coming in and saying, hey, here's a -- here are some documents that were created long ago that are about to go out the door in discovery.



THE COURT:  right.

MR. DEBOY:  This this not that.  I would also say, Your Honor, I think that deposition testimony that Mr. Rock referred to is not quite being fairly characterized.  The question in that deposition was, have you ever been asked to delete any conclusions of your research?  No, not that I can recall.

THE COURT:  Right.  Okay.

MR. DEBOY:  Okay?  That's a pretty clear answer to the question, have you ever been asked to delete any conclusions?

THE COURT:  Right.

MR. DEBOY:  No.  The first word out of that answer --

THE COURT:  Right.

MR. DEBOY:  -- is, no.  So I think that's very clear.  And I don't think it's fair to characterize it as suggesting, oh, maybe, maybe not.  I can't remember.  That's not the appropriate context there.  And then, just in conclusion, Your Honor, I would say, again, there's ongoing litigation.

THE COURT:  Right.

MR. DEBOY:  There is often ongoing litigation that cannot limit a lawyer's ability to give advice on language and documents that are being created



prospectively.  Your Honor has mentioned the MDL a couple of times; when these -- as Your Honor has noted, while these documents were being created, there was ongoing litigation including there, but the MDL is not mentioned in these documents; I would just note that, to make that clear for the record.

And nor is there any indication in these documents that anyone is trying to interfere with any Government investigation, with any litigation, or anything along those lines, that's not -- just not in the documents.  That's being misread.  That's being read into the documents in a way that it's just not there.  So Your Honor, we would submit these are documents -- again, it's advice on language.  It's advice on prospective courses of action that may or may not be undertaken, and in which case were undertaken.  And Your Honor, that's standard lawyer advice.

THE COURT:  Okay.  I'm going to take it under advisement.  I will review everything thoroughly.

MR. ROCK:  Can ask one about timing of an order?

THE COURT:  Yeah.

MR. ROCK:  And I only ask this because --

THE COURT:  Timing of what?

MR. ROCK:  Timing of an order on the motion --

THE COURT:  Okay.



81

MR. ROCK: -- for reconsideration. And I only ask because this issue has been brought up in other courts where there are cases against Meta, and some of the judges there have indicated they may wait to decide this issue until Your Honor rules on the motion for reconsideration. And so it might be useful for those -- their trial is coming in January in some other cases where this might be relevant.

THE COURT: Let me say, my hope is to resolve it before the end of the year, so in the next couple of weeks. That's my hope. That's my plan. Now, the holidays are coming, you know, I don't want -- you know, I'm trying to give my law clerk a time -- some time off, you know, we're working together here, so -- but that is my hope. Okay?

MR. DEBOY: Understood, Your Honor.

THE COURT: Thank you.

MR. DEBOY: I would just say to that, we appreciate Your Honor giving this careful consideration. It's an important issue, and so we understand that the Court will give it the time it needs.

THE COURT: Absolutely. All right. Thank you all, very much.

MR. ROCK: Thank you, Your Honor.

MR. DEBOY: Thank you, Your Honor.



THE COURT:  Have a good weekend.

THE DEPUTY CLERK:  This Honorable Court stands adjourned.

THE COURT:  All right.  Thank you.

(Thereupon, the proceedings were concluded.)

* * * * *



CERTIFICATE OF TRANSCRIBER

I, Tracy Hahn, transcriber, do hereby certify that I have transcribed the proceedings had and the testimony adduced in the case of DISTRICT OF COLUMBIA v. META PLATFORMS, INC., ET AL., Docket Number:  2023 CAB 006550, in said Court, on the 12th day of December, 2025.

I further certify that the foregoing 83 pages constitute the official transcript of said proceedings as transcribed from audio recording to the best of my ability.

In witness whereof, I have hereto subscribed my name, this 15th day of December, 2025.

_____

TRANSCRIBER

