[*Submitting Counsel on Signature Page*]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THIS DOCUMENT RELATES TO: | MDL No. 3047 |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case Nos. 4:22-md-03047-YGR-PHK |
| | 4:23-cv-05448-YGR |
| ---------------------------------------------------------- | **LETTER BRIEF BY THE STATE ATTORNEYS GENERAL REGARDING TRIAL STRATEGY** |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

## INTRODUCTION

The 29 State AGs present a unified case: one single presentation of evidence that Meta engaged in nationwide misconduct to design its social media platforms in a manner that harmed the mental and physical health of children across the country, to illegally ensnare under-13 users onto its platforms, and to deceive the public of the true safety risks. Neither Meta's misconduct nor the widespread harm that resulted was affected by state borders. While different State AGs bring different state-law claims to hold Meta accountable, there is no material variation in the presentation of evidence necessary to establish that liability. This is a civil law-enforcement action seeking penalties, injunctive relief, and disgorgement of Meta's profits. Damages are not sought on behalf of any state, state agency, or individual. Therefore, a single joint trial, with a single presentation of evidence proving Meta's nationwide misconduct, is far and away the most efficient path forward.

From the outset, the State AGs have coordinated to investigate and litigate a single case. Over the course of a two-year investigation, the State AGs jointly examined Meta's conduct as a technology company that operates nationally—offering the same addictive, harmful social-media services and features to children, and lying in the same manner about those services and features—regardless of geography. The State AGs filed this enforcement action as a single complaint; have coordinated all aspects of litigation; briefed all substantive motions as a single unit; and planned for a single trial with a single set of common evidence and witnesses. To prove their case, the State AGs expect to offer several lay and expert witnesses, none of which is specific to any particular state.[1] This approach has already maximized efficiencies and conserved resources for the Court and all parties—including Meta, which has taken full advantage of the State AGs' pre-trial coordination. Now, Meta seeks to inject delay, uncertainty, and massive inefficiency, arguing for multiple trials to span <u>years</u>, involving copycat re-presentations of the exact same evidence and witnesses of Meta's nationwide misconduct, over and over again.

To be sure, this will be a complex trial. But multi-sovereign consumer-protection enforcement actions in federal court are not uncommon, even if most typically settle prior to trial. Since the November

---

[1] The State AGs will file a witness list with the Court in advance of the January case management conference to provide more insight into the presentation and scope of evidence.

2025 Case Management Conference, the State AGs have identified a case providing an example of multiple State AGs' consumer protection claims being litigated as part of a unified bench trial. In a 2017 enforcement action brought by California[2], North Carolina, Illinois, and Ohio, alongside the United States, Judge Myerscough of the Central District of Illinois "concluded that DISH Network and its agents committed more than 65 million violations of telemarketing statutes and regulations" following a single bench trial on all Plaintiffs' consumer protection claims. *United States v. Dish Network L.L.C.*, 954 F.3d 970, 973 (7th Cir. 2020). That verdict was substantially affirmed by the Seventh Circuit. *Id.*

The pervasiveness and severity of Meta's misconduct necessitate a trial of significant scale and complexity. However, this is precisely where the State AGs' pre-trial coordination serves a critical function – enabling a unified and streamlined multi-state proceeding. Meta, having raised no objection to and indeed having benefited from the efficiencies of this coordinated approach throughout the investigation, motion practice, and both fact and expert discovery, now seeks to dismantle that coordination at the trial stage. Meta's proposed severance would fragment the case into more than a dozen separate trials, burdening the Court with years of continuous litigation and undermining the very efficiencies that have thus far advanced the case.

To support this untenable path forward, Meta makes vague suggestions of "prejudice" and other concerns. But Meta does not—and cannot—dispute that its misconduct is the same no matter which state-law theory of liability is charged. The single presentation of evidence as to this misconduct will prove each of the State AGs' claims, even if there are minor elemental variations among them. To the extent Meta seeks to introduce state-specific evidence, that evidence is irrelevant to the determination of Meta's liability: all applicable state law causes of action turn on evidence of Meta's misconduct, not the conduct of government enforcement agencies. *See, e.g.*, *Utah Power & Light Co.*, 243 U.S. 389, 409 (1917) ("[N]eglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest."). Meta cannot reasonably justify a trial plan that would require 19 repetitive, serial trials over several years, rather than a single, efficient joint proceeding. Nor is there any

---

[2] The lead state prosecutor on the Dish enforcement action is now a federal judge in the Southern District of California, Hon. Jinsook Ohta.

1  meaningful value to be gained from staging a selection of the State AGs' claims as "bellwethers." Meta

2  is already facing separate state-court actions, two of which—New Mexico and Tennessee—are scheduled

3  to proceed to trial ahead of this Court's timeline. Judgments for the State AG case in this MDL—composed

4  of the largest law enforcement Plaintiff group and reflecting the greatest impacted population total out of

5  any related case in the country—would meaningfully advance resolution of all disputes against Meta for

6  its nationwide conduct. Ultimately, Meta's effort to fragment the trial process reflects neither the realities

7  of this case nor the scope of its nationwide conduct but is rather a transparent attempt to delay resolution

8  through manufactured complexity.

9  **I.   A SINGLE JOINT TRIAL WITH A SINGLE PRESENTATION OF EVIDENCE IS MOST EFFICIENT**

10  The State AGs propose a single joint trial, with the AGs' presentation of evidence (including cross-

11  examination of Meta's witnesses) lasting approximately four weeks. This would involve the joint

12  presentation of evidence proving all 37 counts in the State AGs' complaint, including the COPPA claims

13  of all 29 State AGs and the 36 state-law consumer-protection counts alleged by 18 State AGs. A 37-count

14  trial is manageable, particularly where, as discussed below, the consumer-protection counts all arise from

15  a common nucleus of facts about Meta's misconduct and closely track one another in terms of the elements

16  to be proven, with minor variations between state laws. *See, e.g.*, *Howard v. United States*, 372 F.2d 294,

17  301 (9th Cir. 1967) (rejecting defendant's argument that "sheer number of counts alone created an

18  unfavorable impression on the jury" because "the use of multicount indictments charging offenses of

19  similar character is a sanctioned practice").

20  To promote clarity in the jury's deliberations and resulting verdicts, the jury instructions will begin

21  with the standard Ninth Circuit Manual of Model Jury Instructions (Chapters 1 and 3), appropriately edited

22  for delivery after the close of evidence. In accordance with this Court's standing order on Pretrial

23  Instructions in Civil Cases (as updated March 17, 2025), the transition instruction will be tailored to

24  introduce the jury to the structure of the remaining instructions. This includes a brief explanation of how

25  the elements of each claim and relevant legal definitions will be presented. This format ensures that the

26  jury can consider each state's claims independently and accurately, reducing the risk of conflating legal

27  standards and safeguarding Meta's due process rights. The parties will use opening statements and closing

28  arguments to further assist the jury in understanding the similarities and differences among the applicable

state laws. Although the states' respective legal standards are substantively aligned such that any potential prejudice is minimal, the process outlined above, including individual jury instruction packets, ensures that any conceivable prejudice or juror confusion is eliminated.

### A.    The Same Evidence Will Prove Meta's Misconduct in Every State

All categories of evidence are relevant as to all consumer protection states. As alleged—and as the State AGs will prove—Meta has engaged in massive, pervasive nationwide misconduct. In an effort to stay relevant and maintain growth of its platforms, Facebook and Instagram, Meta's business model depends on obtaining, retaining, and engaging teens to spend time on those platforms. As part of this strategy, Meta's platforms provide its young users with capabilities and features designed to promote this growth and encourage increased use of its platforms, all while Meta knows of serious, documented harms relating to using its platform and these features. Sixteen State AGs have remaining claims asserting that this conduct amounts to unfair business acts or practices with respect to four of Meta's platforms' features: appearance-altering filters, time restriction tools, the multiple accounts function, and ineffective age verification tools. Aware of the potential negative brand impacts from the perception that its platforms were addictive or unsafe, Meta engaged in a concerted campaign to downplay the risks of its platforms, which 18 State AGs allege constitute deceptive business acts or practices. There is no evidence that Meta's unfair conduct varies meaningfully from state to state, and the same deceptive statements and omissions apply to all states' claims. Accordingly, a single trial will be sufficient to prove all state consumer protection claims.

### 1.    Evidence Supporting the State AGs' Unfairness Claims

The State AGs' unfairness claims will rely upon a universal body of evidence across the sixteen states' claims premised on unfair business acts or practices. These claims concern four discrete features: appearance-altering filters, time restriction tools, the multiple accounts function, and Meta's age verification tools.

First, regarding appearance-altering filters, the State AGs have robust evidence of deliberate actions taken at the very top of Meta where executives, specifically Mark Zuckerberg himself, chose to disregard company-solicited expert research and feedback regarding the negative effects of appearance-altering filters, especially on teenage girls. Instead, Mr. Zuckerberg directed that a temporary ban on

cosmetic surgery filters be rescinded and that users of all ages be permitted to use even filters depicting "nip and tuck" plastic surgery effects. Why? He thought the ban was paternalistic and that removing it would be in the interests of platform growth, and purportedly, innovation and expression. But other executives at Meta—notably, those with teenage daughters themselves—opposed lifting that ban, or at least, preferred less dramatic alternatives where such filters might not have been available to users under certain ages. The harms ascribed to these filters include body dysmorphia, eating disorders, anxiety and depression—the last two of which are known preconditions for suicidality. These harms are described by experts retained by Meta internally prior to litigation, internal company research conducted by Meta, witness testimony, and the State AGs' experts in this case.

Second, regarding Meta's time restriction tools, the State AGs plan to submit evidence that these tools are insufficient to mitigate the excessive and unhealthy usage of Meta's platforms. Meta's tools like Sleep Mode, Quiet Mode, Take a Break, Daily Limit, and Teen Accounts rely on teens exercising self-regulation, which Meta knows is a vulnerability of its teen users and their underdeveloped prefrontal cortex, or alternately, it requires teens to voluntarily cooperate with their parents. Even with that cooperation, other features of Meta's platforms like the multiple accounts feature permit users to avoid parental detection and circumvent time restriction tools. Meta's time restriction tools typically either send users a notification regarding their time spent on the platform at certain intervals or do not send notifications during certain hours. But those tools do not effectively restrict time spent on the platform because at no point does Meta actually restrict use of its platforms. These tools are dismissible and do not constitute a meaningful amount of friction designed to reduce platform usage in light of other features on the platform encouraging use. This is particularly problematic given internal communications, research, and testimony discussing paltry adoption rates for these tools, teens' lack of self-control, teens having an addict's narrative about their social media use, and feedback from young users and high time-spent users that they desired effective time restriction tools at higher rates than older users and users with lower time spent.

Third, regarding Meta's multiple accounts function, Meta estimated at one time that its teen users had secondary, "Finsta," or "Spam" accounts on its platforms at over double the rate as did adults. The State AGs will rely on internal research, communications, and witness and expert testimony to show how

Meta thought secondary accounts drove increased usage; how Meta knew that teens used this feature to avoid parental supervision; how multiple, unconnected accounts could limit the efficacy of its time restriction tools; how multiple accounts might encourage risky behavior or facilitate inappropriate contacts; and how multiple accounts can exacerbate mental health harms and stimy development when used in conjunction with curated, public-facing "main" accounts on Meta's platforms.

Fourth, regarding Meta's age verification tools, Meta fails to employ processes which either effectively prevent children under age 13 from joining or using Instagram and Facebook or effectively detect and remove those children and their data after they joined. For example, Meta has failed and continues to fail to remove multiple accounts belonging to child users it has identified, including failing to remove accounts hard-linked to child user accounts prior to at least December 2021, and continuing to fail to remove accounts soft-matched to child users' accounts. Meta further fails to take measures to prevent child users whose accounts it detects and disables from creating new accounts on Facebook and Instagram, and Meta employs deficient processes for reviewing reports of children under 13 on its platforms, including because the review process ignores evidence of children admitting that they are underage. These deficient age verification tools exist in the face of research showing a myriad of negative mental health outcomes from using Meta's platforms, like anxiety, depression, insomnia, impaired sleep, eating disorders, suicide, and a host of other negative outcomes—all of which are particularly acute for kids under age 13. Internal communications, company research, and employee and expert testimony will prove these violations.

### 2.    Evidence Supporting the States' Deception Claims

Meta's deceptive practices were similarly universal. Aware that public concern over its platform's health and safety risks threatened its brand, Meta engaged in a nationwide messaging campaign to downplay these risks, which the State AGs will show misled reasonable consumers. The State AGs will enter into evidence Meta's "internal narrative audit" and messaging tests, where the company sought to craft the optimal messaging to quiet widespread consumer concern about its platforms' addictiveness and safety impacts for teens. The State AGs will also provide dozens of examples of statements by high-level Meta executives mirroring these internal messaging guidelines, which all worked together to create misleading impressions along four overarching themes.

First, the State AGs will show that Meta's statements deceptively sought to reassure consumers that it prioritizes health and safety over its own business interests. The State AGs will contrast statements like CEO Mark Zuckerberg posting on his own page that "these accusations . . . that we prioritize profit over safety and well-being . . . . [are] just not true," with evidence that Meta weakened, delayed or altogether shelved changes that their own researchers believed could improve well-being at the expense of engagement, and underfunded or disbanded teams dedicated to user well-being.

Second, the State AGs will prove that Meta downplayed the addictiveness of its platforms. The State AGs will contrast statements such as a Medium article by a top Meta executive stating that the goal of platform features is "to make sure you see what you find most meaningful[,] not to keep you glued to your smartphone for hours on end," with internal research showing how Meta was well-aware of the addictiveness of its platforms and designed and implemented several novel features intended to induce more compulsive use, all based on extensive internal research into the unique vulnerabilities of the teenage brain.

Third, the State AGs will show that Meta downplayed the safety risks of its platforms. The State AGs will introduce into evidence Meta's statements that its Community Standards Enforcement Reporting was the "most significant" metric for measuring well-being on its platforms even as the company suppressed less favorable research showing higher numbers of negative user experiences on the platforms. Fourth, the State AGs will show that Meta misled the public that it was keeping under-13 users off its platforms. The State AGs will contrast several executive statements reassuring the public that under-13-year-olds are "not allowed" on Instagram with documented evidence of Meta failing to enforce its age policies and internal knowledge that its age-gates were insufficient to keep these users off the platform.

The State AGs' expert Adam Alter will explain how a reasonable consumer would understand these statements and why consumers would be misled into thinking that the platforms were more secure and less harmful than they actually are. Alter explains that unlike many tangible consumer products whose nature allows for independent evaluation of company claims, social media platforms are "credence goods" whose nature consumers do not fully understand, thus requiring consumers to rely more on companies' official statements about product safety. Meta's scheme of deceptive reassurance relied on several brand management tactics, such as drumbeat messaging—where consumers are continuously and repeatedly

1  exposed to key messages about safety, and which has been effective in public health campaigns—and the

2  use of "proof points" and favorable research to lend credibility. These tactics play on a reasonable

3  consumer's lack of ability to evaluate the true health and safety risks of social media, and resulting reliance

4  on the company to provide this material information, in order to instill a misleading impression that the

5  platforms are safer and less addictive and harmful than they actually are.

6  **B.    The States' Consumer Protection Claims are Substantially Similar**

7      Sixteen State AGs assert claims under their respective unfairness statutes and eighteen assert claims

8  under their respective deception statutes. While the precise language may vary across these laws, at their

9  base, these statutes prohibit Meta from engaging in unfair or deceptive business practices in the interests

10  of growth and engagement at the expense and detriment of its vulnerable, minor users. As most of the

11  statutes have been interpreted, states' consumer protection laws are afforded broad and flexible

12  interpretation in order to provide consumers with remedial protection from harmful business practices.[3]

13

14  [3] *See*, *e.g.*, **California:** *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)
   (California's Unfair Competition Law "was intentionally framed in its broad, sweeping language,
15  precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's
   invention would contrive." (cleaned up)); Cal. Bus. & Prof. Code § 17002 ("This chapter shall be liberally
16  construed[.]"); **Colorado:** *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001)
   (the legislature "could not have possibly enumerated all, or even most, of the practices that the CCPA was
17  intended to cover."); **Connecticut:** Conn. Gen. Stat. § 42-110b(d) ("It is the intention of the legislature
   that this chapter be remedial and be so construed."); **Delaware:** *Young v. Joyce*, 351 A.2d 857, 859 (Del.
18  1975) (The DCFA's "primary purpose is to protect the consumer and accordingly is to be liberally
   construed."); **Illinois:** *Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E. 2d 1012, 1018 (Ill. 1981)
19  ("'[U]nfair practice[s]' . . . are inherently insusceptible of precise definition . . . the concept [is] flexible,
   [and] defined on a case-by-case basis, 'in view of the futility of attempting to anticipate and enumerate all
20  of the (unfair) methods' and practices that fertile minds might devise.") (citation omitted); **Indiana:**
   *Gasbi, LLC v. Sanders*, 120 N.E.3d 614, 618 (Ind. Ct. App.), *transfer granted, opinion vacated,* 130
21  N.E.3d 1137 (Ind. 2019), *vacated*, 130 N.E.3d 94 (Ind. 2019) ("The [DCSA] "is a "remedial statute."" It
   "shall be liberally construed and applied to promote its purposes and policies.") (quoting *Kesling v. Hubler*
22  *Nissan, Inc.*, 997 N.E. 2d 327, 332 (Ind. 2013); Ind. Code § 24-5-0.5-1)).; **Kansas:** *Via Christi Reg'l Med.*
   *Ctr., Inc. v. Reed*, 314 P.3d 852, 863–64 (Kan. 2013) ("The KCPA expressly provides that it is to be
23  construed liberally in order to protect consumers[.]"); **Kentucky:** *Stevens v. Motorists Mut. Ins. Co.*, 759
   S.W.2d 819, 821 (Ky. 1988) ("The Kentucky legislature created a statute which has the broadest
24  application in order to give Kentucky consumers the broadest possible protection for allegedly illegal
   acts."); **Louisiana:** *Monroe Medical Clinic, Inc. v. Hospital Corp. of America*, 522 So.2d 1362, 1365 (La.
25  App. 2d Cir. 1988) ("It has been established that this legislation is broad and does not specify particular
   violations[;] [t]hus what constitutes an unfair trade practice is to be determined on a case-by-case basis.")

26  (continued…)

27

28

1    In light of this extensive case support for the flexibility and broad application of the states' consumer

2    protection statutes, even where the states' elements differ in jury instruction packets, the flexibility

3    afforded to each state's law makes it so that no evidence admissible for one state would be irrelevant for

4    any other state. Even under states' differing elements—which the State AGs' propose be set forth in

5    individual packets for each state's elements—the same evidence will prove Meta's misconduct in every

6    state. This becomes readily apparent when examining the case law providing the elements for each state's

7    unfairness and deception claims.

8        **1.    Unfairness Elements**

9        Of the sixteen states pursuing unfairness claims against Meta, at least seven states approach this

10    question as guided by the factors discussed in *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405

11    U.S. 233, 244 n.5 (1972) and consider whether the conduct offends some public policy; is unethical,

12    oppressive, or unscrupulous; is substantially injurious to consumers; or some combination of those

13    factors.[4]

14    _____

15    (citations omitted); **Minnesota:** *State by Humphrey v. Phillip Morris, Inc.*, 551 N.W.2d 490, 496 (Minn.
      1996) ("These statutes are generally very broadly construed to enhance consumer protection."); **New**

16    **Jersey:** *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 461 (N.J. 1994) ("[T]hose [legislative] purposes are
      advanced as well by courts' affording the Attorney General 'the broadest kind of power to act in the

17    interest of the consumer public.'"); **New York:** *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (2000)
      ("Section 349 of the General Business Law [was] enacted in 1970 as a broad consumer protection measure

18    . . . .") **North Carolina:** *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 627 S.E.2d 629, 674 (N.C. Ct.

19    App. 2006), *aff'd in part, modified in part and remanded*, 653 S.E.2d 393 (N.C. 2007) (There is a "broad
      remedial purpose behind Chapter 75," North Carolina's consumer protection statute); **Pennsylvania:**

20    *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018) ("As
      a remedial statute, it is to be construed liberally to effectuate that goal" of "protect[ing] the consumers of

21    the Commonwealth against fraud and unfair or deceptive business practices.") (citations omitted); **South**
      **Carolina:** *Young v. Century Lincoln-Mercury, Inc.*, 396 S.E.2d 105, 108 (SC. Ct. App. 1989) ("The UTPA

22    should be given a liberal construction."); **Virginia:** *Owens v. DRS Automotive Fantomworks, Inc.*, 764

23    S.E.2d 256, 260 (Va. 2014) ("[T]he legislative purpose underlying the VCPA was, in large part, to expand
      the remedies afforded to consumers to relax the restrictions imposed upon them by the common law.");

24    **Wisconsin:** *Mueller v. Harry Kaufmann Motorcars, Inc.*, , 859 N.W.2d 451, 459 (Wis. Ct. App. 2014)
      ("The context of Wis. Stat. § 100.18's placement within the Deceptive Trade Practices Act [indicates] its

25    clear remedial purpose. . . .").

26    [4] *See, e.g.*, **Connecticut:** *Edmands v. CUNO, Inc.*, 892 A.2d 938, 954 n. 16 (Conn. 2006) ("It is well
      settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the

27    cigarette rule . . . for determining whether a practice is unfair[.]"); **Illinois:** *Robinson v. Toyota Motor*

28    (continued…)

Three other States have claims informed to various degrees by factors from the FTC Act such as whether the conduct causes or is likely to cause substantial injury to consumers; whether that conduct was reasonably avoidable; and whether that conduct is outweighed by any countervailing benefits.[5]

Three states prohibit unconscionable acts or practices, an expansive element referring to Meta's superior resources, unequal bargaining power between it and youth, and the company's departures from good faith and fair dealing.[6]

_____

*Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002) (considering *Sperry* and noting that a practice may be unfair "because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three"); **Louisiana:** *A&W Sheet Metal, Inc. v. Berg Mechanical, Inc.*, 653 So. 3d 158, 164 (La. App. 2d Cit. 04/05/95)("A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers[.]"); **Minnesota:** Minn. Stat. § 325F.69 Subd. 8 ("unfair or unconscionable" means "any" act or practice that "offends public policy", is "unethical, oppressive, or unscrupulous," or which "is substantially injurious to consumers."); **Nebraska:** *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 590–91 (Neb. 2008) ("[P]laintiff must prove that the practice either '(1) fell within some common-law, statutory or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous."); **North Carolina:** *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981) ("A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers."); **South Carolina:** *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 188 (S.C. 2015) ("An unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive.").

[5] **California** law similarly looks to whether the conduct's utility is outweighed by the harm to consumers. *Progressive West Ins. Co. v. Superior Court*, 135 Cal.App.4th 263, 285 (Cal. Ct. App. 2005). **Delaware:** Del. Code Ann. tit. 6, § 2511(9) ("'Unfair practice' means any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."). **New York**'s consumer protection statute, GBL § 349, was likewise modeled after the FTC Act, and courts look to the Act when assessing violations of the state statute. *See Spitzer v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (N.Y.S. 2005) (recognizing that "the interpretations of the Federal Trade Commission Act . . . are useful in determining the aforementioned violations under both the Executive Law and General Business Law").

[6] *See*, *e.g.*, **Kansas:** *In re Motor Fuel Temperature Sales Pracs. Litig., 2012*, 867 F. Supp. 2d 1124, 1142 (D. Kan. 2012) (considering range of factors under KCPA to determine whether act was unconscionable, including among others, whether Defendant "took advantage of the inability of the consumer reasonably to protect the consumer's interest because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor[.]"); **Kentucky:** "Where no specific definition is provided for terms contained in a statute, Kentucky law instructs that words of a statute shall be construed according to their common and approved usage[.] . . ." *Johnson v. Branch Banking and Trust*

(continued…)

1

2.     **Deception Elements**

2

Consider also the eighteen states asserting claims for deceptive conduct. At least fourteen states are

3

entirely coterminous in that Meta's conduct is deemed deceptive if it has the capacity, tendency, or

4

likelihood to deceive reasonable consumers.[7]

5

6

*Co.*, 313 S.W.3d 557, 559 (Ky. 2010) (internal quotation marks omitted). "Unconscionable" means

7

"'manifestly unfair or inequitable.'" *Snardon v. Snardon*, No. 2007-CA-002114-MR, 2009 WL 2059094, at *2 (Ky. App. July 17, 2009) (quoting *Wilhoit v. Wilhoit*, 506 S.W.2d 511, 513 (Ky. 1974)); *Ford Motor*

8

*Co v. Mayes*, 575 S.W.2d 480, 485 (Ky. App. 1978) (unconscionable under KCPA included unfair and

9

inequitable practices); *see also Commonwealth v. Marathon Petroleum Co.*, 191 F. Supp. 3d 694, 706 (W.D. Ky. 2016) (Kentucky law "require[s] privity of contract to 'exist between the parties in a suit alleging a violation of the Consumer Protection Act[,]' [b]ut this section applies to private individuals, not

10

Kentucky's Attorney General."); **New Jersey:** *D'Ercole Sales, Inc. v. Fruehauf Corp.*, 501 A.2d 990, 998

11

(N.J. App. Div. 1985) (unconscionable conduct reflects departures from "good faith, honesty in fact and observance of fair dealing").

12

[7] *See, e.g.*, **California:** *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017) ("Under

13

the FAL, the CLRA, and the fraudulent prong of the UCL, conduct is considered deceptive or misleading if the conduct is 'likely to deceive' a 'reasonable consumer.'") (citation omitted); **Colorado:** *Rhino*

14

*Linings USA, Inc. v. Rocky Mt. Rhino Lining, Inc.*, 62 P.3d 142, 148 (Colo. 2003) ("[P]roof that the representation had the capacity to deceive will satisfy the deceptive trade practices requirement.");

15

**Connecticut:** *Bailey Employment Sys., Inc. v. Hahn*, 545 F. Supp. 62, 67 (D. Conn. 1982) (constructing CUTPA to mean that "an act or practice is deceptive whether it has a tendency or capacity to deceive");

16

**Illinois:** *Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1335 (Ill. App. 1995) (conduct is "deceptive

17

on its face if it creates the likelihood of deception or has the capacity to deceive"); **Kansas:** *FTC v. Affiliate Strategies, Inc.*, 849 F. Supp. 2d 1085, 1107 (D. Kan. 2011) (granting summary judgment under KCPA

18

where "[t]he Court found that the[] representations were material and were likely to mislead an ordinary consumer"); **Kentucky:** *Corder v. Ford Motor Co.*, 285 F. App'x 226, 227–28 (6th Cir. 2008)

19

(constructing the KCPA to include practices that are "likely to mislead consumers acting reasonably under

20

the circumstances"); **Minnesota:** *State ex. rel. Swanson v. Am. Family Prepaid Legal Corp.*, 2012 WL 2505843, at *6 (Minn. Ct. App. July 12, 2012) (affirming holding where "unlawful deception pursuant to

21

Minnesota's consumer protection laws is 'the tendency or capacity to deceive.'"); **Nebraska:** *Raad v.*

22

*Wal-Mart Stores*, 13 F. Supp. 2d 1003, 1013 (D. Neb. 1998) ("[T]o prove a deceptive act, one must prove that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of

23

deception.") (international quotations and citations omitted); **New York:** *People ex rel. Spitzer v. Gen. Elec. Co.*, 302 A.D.2d 314, 314-15 (N.Y.S. 2003) ("Under § 63(12), the test for fraud is whether the

24

targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud" and

25

under New York General Business Law 349 the act or practice must be "likely to mislead a reasonable consumer acting reasonably under the circumstances"); **New Jersey:** *Cox v. Sears Roebuck & Co.*, 647

26

A.2d 454, 462 (N.J. 1994) ("A practice can be unlawful even if no person was in fact misled or deceived thereby [and] [t]he capacity to mislead is the prime ingredient of all types of consumer fraud."); **North**

27

**Carolina:** *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981) (following FTC Act standard where "a practice is deceptive if it has the capacity or tendency to deceive; proof of actual deception is not

28

(continued…)

Additionally, seven of those states also consider evidence of how Meta's conduct was deceptive as it concerns the characteristics, uses, benefits, sponsorship, or other aspects of Meta's platforms.[8]

The vast majority of the eighteen deception states permit deception claims based upon Meta's omissions of material facts.[9]

---

[8] **Pennsylvania:** *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1030 (Pa. 2018) ("'An act or practice is deceptive . . . if it has the capacity or tendency to deceive[,]' and '[n]either the intention to deceive nor actual deception must be proved; rather it need only be shown that the acts and practices are capable of being interpreted in a misleading way.'"); **South Carolina:** *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 188 (S.C. 2015) ("A deceptive practice is one which has a tendency to deceive."); **Virginia:** *Ballagh v. Fauber Enterprises, Inc.*, 773 S.E.2d 120, 125–26 (Va. 2015) (rejecting argument that VCPA deviated from model Uniform Trade Practices Act and its meaning of "deceptive" as "causes likelihood of confusion or misunderstanding" given legislature's instruction "that the VCPA 'shall be applied as remedial legislation'") (citations omitted); *Weaver v. Champion Petfoods USA*, Inc., 3 F.4th 927, 934 (7th Cir. 2021) (deception "may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true."). *See also* **Louisiana:** *Risk Mgmt. Servs., L.L.C. v. Moss*, 40 So.3d 176 (La. App. 5 Cir. 4/13/10) ("a trade *practice* is 'deceptive' for the purposes of the LUTPA when it *amounts to* fraud, deceit, or *misrepresentation*." (emphasis added)).

[8] **Colorado:** Colo. Rev. Stat. § 6-1-105(1)(g) ("characteristics, ingredients, uses, benefits, alterations, or quantities" or "standard, quality, or grade, or . . . of a particular style or model"); **Delaware:** 6 Del. C. § 2532(a)(5) ("causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification"); **Illinois:** 815 ILCS 510/2(5) and (7) ("sponsorship, approval, characteristics, . . . uses, benefits, or quantities," "status, affiliation, or connection," or "standard, quality, or grade, or . . . a particular style or model"); **Indiana:** Ind. Code § 24-5-0.5-3(b)(1) and (2) ("sponsorship, approval, performance, characteristics, accessories, uses, or benefits" or "standard, quality, grade, style, or model"); **Kansas:** Kan. Stat. Ann. § 50-626(a)(1)(D) ("standard, quality, grade, style or model"); **Minnesota:** Minn. Stat. § 325D.44, subds. 5 & 7 ("sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" or "standard, quality, or grade, or . . . of a particular style or model"); **Nebraska:** Neb. Rev. Stat. § 87-302(a)(2) & (7) ("source, sponsorship, approval, or certification," or "characteristics, ingredients, uses, benefits, or quantities . . . or status, affiliation, or connection"); **Virginia:** Va. Code § 59.1-200(A)(5) & (6)   ("quantities, characteristics, ingredients, uses, or benefits" or "standard, quality, grade, style, or model").

[9] *See*, *e.g.*, **Colorado:** Colo. Rev. Stat. § 6-1-105(1)(u) ("Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."); **Connecticut:** *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990) ("[T]he misleading representation, omission, or practice must be material"); **Delaware:** Del. Cod. Ann. tit. 6 § 2513(a) ("[C]oncealment, suppression, or omission of any material fact"); **Illinois:** 815 ILCS 505/2 ("concealment, suppression or omission of any material fact);" **Indiana:** *State v. TikTok Inc.*, 245 N.E.3d

(continued…)

---

### 3.    Trade, Commerce, or Business Elements

Many states' claims require showing that Meta's conduct occurred in the course of business, in trade or commerce, or that Meta was a supplier. The Court has already held that these elements are satisfied by "the alleged exchange of users' use of Meta's platforms for their personal data," which "is Meta's 'primary trade or commerce.'" ECF 1214 at 71. Similarly, although only four states' claims require demonstrating some form of recurring or public impact, such evidence is easily encompassed within other states' elements given evidence that will be submitted about the number of children impacted across the country and the rates at which these harms occur on Meta's platforms with millions of minor users.

### 4.    Knowledge, Recklessness, and Intent Elements

At the November 2025 Case Management Conference, the Court inquired specifically as to elements of intent within states' consumer protection laws. Only one state's unfairness claim requires demonstrating that Meta knowingly or recklessly engaged in any unfair practice. Colo. Rev. Stat. § 6-1-105(1)(rrr) & 6-1-105(4)(b). As discussed above, there is significant evidence of Meta's knowing and reckless conduct regarding Meta's internal research and communications relating to appearance-altering filters, time

---

681, 695–96 (Ind. Ct. App. 2024) (as to "the question of whether implied misrepresentations were actionable under the DCSA, the amended statutory language made clear that they are. *See* I.C.§ 24-5-0.5-3(a)."); **Kansas:** Kan. Stat. Ann. § 50–626(b)(3) ("willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact"); **Kentucky:** *Naiser v. Unilver U.S., Inc.*, 975 F. Supp. 2d 727, 741–42 (W.D. Ky. 2013) ("The Court agrees with Plaintiffs that their KCPA claim can be based on Unilever's alleged failure to disclose the product's defect and warn consumers of its risk of producing adverse effects."); **Minnesota:** *Minnesota ex rel. Hatch v. Fleet Mortg. Corp.*, 158 F. Supp. 2d 962, 967 (D. Minn. 2001) ("The MCFA and UDTPA are broader than common law fraud and support omissions as violations."); **New Jersey:** N.J. Stat. Ann. § 56:8-2 ("concealment, suppression, or omission of any material fact"); **New York:** *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 741 (N.Y.2d 1995) ("deceptive acts and practices, whether representations or omissions, [are] limited to those likely to mislead a reasonable consumer"); **North Carolina:** *Rosenthal v. Perkins*, 257 S.E.2d 63, 67 (N.C. Ct. App. 1979) (permitting a deceptive practices claim based on omissions to proceed even where traditional fraud elements were not satisfied); *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 958 (C.D. Cal. 2012) (Noting North Carolina consumer protection law is "liberally construe[d] . . . to permit claims based on omissions alone"); **South Carolina:** *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,* 414 S.C. 33, 70 (2015) ("'deception cases' may include representations or omissions. . . . FTC guidance further instructs that 'there must be a representation, omission, or practice that is likely to mislead the consumer.'"); **Virginia:** *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 718 (Va. 2001) ("[P]roof of misrepresentation by nondisclosure requires 'evidence of a knowing and a deliberate decision not to disclose a material fact.").

restriction tools, the multiple accounts function, and its age-verification tools. The same evidence that other states plan to submit in support of their unfairness claims will cleanly demonstrate any knowledge or recklessness necessary for Colorado's unfairness claim without any additional, Colorado-specific evidence regarding these features.

Deception claims in four states require demonstrating Meta's knowledge, willfulness, or recklessness.[10] Three states' omissions claims require demonstrating intent to rely upon the concealment.[11] Two state's claims require the deception be intended to induce use.[12] Even for those states where intent is not an element to prove liability under state consumer protection statutes, willfulness, knowledge, recklessness, or intent are often relevant for obtaining civil penalties, costs, or determining

---

[10] *See, e.g.,* **California:** *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 508 (Cal. Ct. App. 2024) (discussing FAL, not UCL claim, as requiring statement "'which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading'"); **Colorado:** Colo. Rev. Stat. 6-1-105(1)(e) (a "false representation" under C.R.S.§ 6-1-105(1)(e) must be made "knowingly or recklessly"). Five states' omissions claims require that evidence. *See, e.g.,* Colo. Rev. Stat.§ 6-1-105(1)(u) (a defendant violates the CCPA through an omission where it "[f]ails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale...."); **Delaware:** *S&R Assocs., L.P. v. Shell Oil Co*., 725 A.2d 431, 440 (Del. Super. Ct. 1998 ("intentionally concealed material facts with the intent others would rely upon such concealment"); **Kansas:** Kan. Stat. Ann. § 50–626(b)(2) ("willful use"); **New Jersey:** N.J. Stat. Ann. § 56:8-2 ("knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such"); **Virginia:** *Lambert v. Downtown Garage*, 262 Va. 707, 714 (2001) ("evidence of a knowing and a deliberate decision not to disclose a material fact").

[11] *See, e.g.*, **Colorado:** Colo. Rev. Stat. § 6-1-106(1)(u) (omissions are actionable where a defendant fails to disclose material information "if such failure to disclose such information was intended to induce the consumer to enter a transaction"); **Delaware:** Del. Cod. Ann. tit. 6 § 2513(a) ("with intent that others rely upon such concealment, suppression, or omission"); **Illinois:** 815 ILCS 505/2 ("with intent that others rely upon the concealment, suppression, or omission of such material fact"); **New Jersey:** *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 441 (D.N.J. 2012) ("with the intention that the consumer rely upon the concealment").

[12] *See, e.g.*, **California:** Cal. Bus. & Prof. Code § 17500 et seq. (false advertising claim may be based on statement made for purposes of inducing public to use services); **Wisconsin:** Wis. Stat. § 100.18(1) (claims do not require intent to deceive but require "intent to sell, distribute, increase the consumption of or in any wise dispose of").

the amount thereof.[13] While the State AGs do not take a position on the severability of any remedies phase of trial in this briefing, the relevance of knowledge and intent in that context demonstrates how a single trial examining the same body of evidence as to all states would further efficient resolution of this dispute.

### C.    The Jury Should Receive Instructions Specific to Each State

To preserve the integrity of each State's legal framework and to avoid juror confusion, the State AGs propose a structured jury instruction packet. First, the jurors will be presented with a general "umbrella" set of instructions, consistent with this Court's standard practices, covering universal legal principles and procedural guidance. Next, jurors will receive a directive stating: "You will now evaluate the evidence as it pertains to each individual claim brought by each State. You will be provided with state-specific definitions, legal elements, and a corresponding verdict form or forms. Your consideration of each State's claims must be confined to that State's legal standards and should not influence your evaluation of any other State's claims. You must not substitute one State's definition or instruction for another."

The State AGs have provided, for the Court's reference, illustrative examples of state-specific "mini packets." These materials are intended for demonstrative purposes only. The included jury instructions

---

[13] *See*, *e.g.*, **California:** Cal Bus. & Prof. Code § 17206 ("willfulness"); Cal Bus. & Prof. Code § 17536 ("willfulness"); **Colorado:** Colo. Rev. Stat. § 6-1-105 ("knowingly or recklessly"); **Connecticut:** Conn. Gen. Stat. § 42-110o(b) ("willfully"); **Delaware:** Del. Code Ann. tit. 6, § 2522(b) ("willfully"); **Illinois:** 815 ILCS 505/7(b) ("intent to defraud"); **Indiana:** Ind. Code 24-5-0.5-4(g) ("knowingly"), Ind. Code 24-5-0.5-2(a)(8) ("scheme, artifice, or device with intent to defraud"); **Kansas:** Kan. Stat. § 50-626 ("knowingly," "willful use"); **Kentucky:** *American Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at *4 (Ky. Ct. App. 2019) (discussing Rev. Stat. § 367.990(2)) ("willfully" defined as "careless disregard whether or not one has the right so to act"); **Louisiana:** La. Stat. Ann. § 51:1407(B) ("intent to defraud"); **Minnesota:** Minn. Stat. § 325F.69 ("intent that others rely"); **Nebraska:** Neb. Rev. Stat. Ann. § 87-303 (costs recoverable if "willfully engaged" in deceptive trade practice); **New Jersey:** N.J. Stat. § 56:8-2 ("knowing"); **New York:** *People v. McNair*, 862 N.Y.S.2d 810 (Sup. Ct. 2005) (maximum civil penalty warranted due to "deliberate and egregious" conduct); **North Carolina:** N.C. Gen. Stat. § 75-15.2 ("knowingly"); **Pennsylvania:** 73 Pa. Stat. Ann. § 201-8(b) ("willfully"); **South Carolina:** S.C. Code Ann. § 39-5-110(a) ("willfully"); **Virginia:** Va. Code § 59.1-206 ("willfully").

and verdict forms are substantively accurate and complete, enabling the Court to review and consider them in an informed manner.[14]

Each state's materials begin with a cover page, followed by a page outlining definitions unique to that jurisdiction. Thereafter, each claim is presented with a jury instruction, an elemental breakdown, and the corresponding verdict form. Although this structure may result in a substantial number of pages, the instructions are manageable and provide a clear, methodical approach that enables the jury to apply the evidence to each state individually and in an organized fashion.  This structured approach not only aids the jury but also strengthens the verdict's defensibility on appellate review. By delineating each state's claims, definitions, and verdict forms in a consistent and comprehensive format, the packets create a transparent record that demonstrates the jury was properly instructed on the applicable law for each jurisdiction. This clarity reduces the risk of confusion or conflation among state-specific legal standards and ensures that any appellate court can readily assess the legal sufficiency and procedural fairness of the instructions provided. Examples of three state specific packets have been filed as Attachment A.

## II.    THERE IS NO PREJUDICE TO META

Meta has raised vague suggestions of "prejudice" in the context of a multi-state trial, presumably arising from the factfinder hearing the same evidence when considering multiple, similar state-law theories of liability, some of which require elements like intent, and others which do not. Meta has never substantiated its claims of prejudice, nor could it.

First, consumer protection claims that require different elements are routinely pleaded in the same cases. For example, in terms of intent, claims for violations of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 et seq., require a finding of (at least) negligence that the defendant knew or should have known the deceptive statements were false. *See* Rutter Group, California Practice Guide: Civil Procedure, Sections 17200 and 17500 Contrasted, Bus. & Prof. C. 17200 § 4:8 (2025). Claims under the fraudulent prong of the Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code § 17200 et seq., in contrast, have no intent requirement. *See id*. Yet, the two claims are nearly always pleaded and tried

---

[14] Meta has not agreed to or endorsed the full contents of these materials.

together in the same action. *See id*. at § 4:15 ("A plaintiff contemplating a § 17500 claim should always assert a § 17200 claim."); *id.* at § 1:2 (UCL and FAL "figure prominently in a great deal of civil cases brought by the Attorney General and by consumer fraud units of district attorneys' offices" and "appear as part of virtually all consumer class actions in California.").

Second, while evidence of scienter may not be required to prove some of the State AGs' deception claims, it is still highly probative of those claims. As the Court has long recognized, because of social media platforms' lack of transparency, some of the best evidence of their safety risks is likely to be found in their internal documents and studies. CMC Transcript (Jan. 26, 2025), at 37:18-38:1. For example, Meta's internal researchers found that "Product features that are designed to exploit insecurity, or provide a dopamine rush (likes, notification, the pull-down-to-see, the infinite scroll, etc.), to increase time spent, are inherently at odds with well-being and take away from people's ability to consciously focusing on activities that add value to their lives." Deposition of ███████, February 11, 2025, Exhibit 16 at 10; Deposition of Mark Zuckerberg, March 27, 2025, Exhibit 6 at 826. This is direct evidence of scienter, demonstrating that Meta knew or should have known that its narrative that the platforms were safe was misleading. The same evidence also goes to establish the risks of the platforms, which the factfinder will need to consider when determining whether Meta's rosy safety messaging was misleading. "[A] piece of evidence may address any number of separate elements, striking hard just because it shows so much at once . . . ." *Old Chief v. United States*, 519 U.S. 172, 187 (1997).

Third, there is no reason to exclude evidence that is probative of certain elements that are present only in a subset of the State AGs' claims, such as materiality, intent, or significant public interest. Meta has never specified what evidence going to those elements it believes would be prejudicial for the same jury to hear when considering claims that do not require the State AGs prove those elements. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983)); *see also Sidibe v. Sutter Health*, 103 F.4th 675, 702 (9th Cir. 2024) ("The question under Rule 403 is not whether evidence is 'prejudicial . . . . It is inappropriate to exclude evidence under Rule 403 because it casts [the opposing party] in a *really* bad light.") (quoting *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 609

18

(7th Cir. 2014)). "Evidence . . . has force beyond any linear scheme of reasoning, and as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Old Chief*, 519 U.S. at 187.

That some states' laws may require proof of certain additional elements to establish liability does not create unfair prejudice to Meta – nor does it justify excluding highly probative evidence or embracing the extraordinary inefficiency of severing the case. The State AGs should be permitted to present a unified, cohesive narrative that satisfies the elements of all claims, rather than being forced to repeat substantially the same case in 19 separate trials before 19 different juries. Such fragmentation would serve no legitimate purpose and would only delay justice while imposing unnecessary burdens on the Court and the parties.

## III.  META'S STATE-SPECIFIC ARGUMENTS ARE A TACTICAL DISTRACTION, NOT A LEGAL BARRIER

Meta's claim that a single trial is unworkable because it may call a parade of state agency and State AG witnesses is a diversion – not a legitimate defense. Much, if not all, of this proposed testimony is irrelevant, unnecessarily complex, and designed to distract the jury from the central issue: whether Meta violated the consumer protection laws of the states in this action. This is a civil law-enforcement action, and the jury's task is to evaluate Meta's conduct – not the internal practices or views of non-party state agencies.  Those laws are designed to ensure the *public's* "right to protection from fraud, deceit and unlawful conduct, and the focus of the statute is on *the defendant's conduct*." *In re Tobacco II Cases*, 46 Cal. 4th 298, 324 (2009) (citation omitted and emphasis added) (discussing the UCL); *see also, e.g.*, *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) ("Unlike common-law fraud claims that focus on the victim's reliance or damages, the UCL focuses on the perpetrator's behavior."). Meta's attempt to inject dozens of state agency and State AG witnesses will serve only to distract from Meta's conduct and confuse the jury regarding the relevant issues. As the Ninth Circuit recently noted, the state agencies are "nonparty state agencies," and their testimony has no bearing on whether Meta engaged in unlawful conduct. *Cf.*, *In re California*, No. 25-584, 2025 WL 2427608, at *1 (9th Cir. Aug. 22, 2025). Neither does the 30(b)(6) testimony of State AG designees. Meta's argument is a red herring, and the Court should treat it as such. Accordingly, the State AGs anticipate filing motions in limine to exclude

much of Meta's anticipated state agency and State AG evidence, because it is irrelevant to the State AGs' claims or Meta's defenses. Put simply, in a consumer protection case "the conduct of the plaintiff is immaterial to the claims. . . ." *G & G Closed Cir. Events, LLC v. Alfaro*, No. 22-0543, 2023 WL 1803399, at *4 (E.D. Cal. Feb. 7, 2023) (striking affirmative defense of "bad faith" in a UCL case[15]. Nor are the State AGs' motives, not to mention the motives of nonparty state agency employees, relevant. *See, e.g.*, *Monster Energy Co. v. Vital Pharm., Inc.*, No. 18-01882, 2020 WL 2405295, at *12 (C.D. Cal. Mar. 10, 2020) (discussing irrelevance of plaintiff's "motivation for bringing suit") (citations omitted).

Moreover, most of Meta's affirmative defenses are not cognizable in a civil enforcement action. Meta claims in interrogatory responses that it anticipates raising purported affirmative defenses of "contributory and/or comparative fault" and "negligence." Yet these concepts are entirely inapplicable to statutory consumer protection claims, particularly when brought by government enforcers.[16] Furthermore,

---

[15] While the Court has recognized that unclean hands might be cognizable against the government in cases of conduct that is "so outrageous as to cause constitutional injury," ECF 191, at 3 n.2 (citing FTC v. Medicor LLC, 2001 WL 765628, at *3 (C.D. Cal. June 26, 2001)), Meta represented to the Court that it did not assert such a defense as to government conduct, instead limiting its purported defense to the actions of users, presumably children, who violated Meta's terms of service by signing up for accounts before they were 13. Id. at 2. Meta is estopped from bringing such a defense now. In any event, Meta has failed to elicit any such evidence in any of the over 100 nonparty state agency witness depositions it took in this action. Nor did Meta discover any such evidence in the dozens of Rule 30(b)(6) depositions it took, many of which troublingly involved testimony from the State AGs' attorneys of record in this action.

[16] *See, e.g.*, **California:** *G & G Closed Cir. Events, LLC v. Alfaro*, No. 22-0543, 2023 WL 1803399, at *8 (E.D. Cal. Feb. 7, 2023) (striking comparative negligence defense because "there is 'no discernable relationship' between negligence and the claims arising under [consumer protection statutes, including the UCL].")*; G & G Closed Cir. Events, LLC v. Nguyen*, No. 10-00168, 2010 WL 3749284, at *4–5 (N.D. Cal. Sept. 23, 2010) (striking comparative negligence and comparative negligence of third party defenses against a UCL claim); *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-07591, 2022 WL 4625624, at *4 (N.D. Cal. Apr. 18, 2022) ("penalties under the UCL are equitable remedies that provide no compensation to a plaintiff and do not even require proof of actual harm to or loss incurred by the plaintiff and [] as a result, comparative fault or comparative negligence does not apply as a defense to the [People's] UCL claim.") (internal quotation marks omitted) (citation omitted); **Kentucky:** *City of Paducah v. Gillispie*, 115 S.W.2d 574, 576 (Ky. 1938) ("[A] municipality or government cannot be affected by the laches of its agents or estopped from asserting its rights because of the acts or omissions of its official servants."); **Louisiana:** *Touro Infirmary v. Sizeler Architects*, 900 So. 2d 200, 203–04 (La. Ct. App. 2005) ("[O]ur courts have been consistent in not allowing comparative fault to be pled as a defense in an action for redhibition or any other non-tort claim. . . ."); **North Carolina:** *Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d 677, 680 (N.C. 1985) (contributory negligence is no defense to an unfair

(continued…)

---

1    even if some state-specific evidence is marginally relevant, 137 state witnesses is unnecessarily

2    cumulative and disproportionate to the needs of any specious defenses Meta might concoct.

3      Extensive state-specific evidence will also be irrelevant to remedies. The State AGs do not seek

4    damages—this is a law-enforcement action. Accordingly, expenditures of state agencies on mental health

5    (or any other) services are irrelevant. Nor do the State AGs seek forward-looking costs to fund abatement

6    plans, as in a public-nuisance action. The State AGs seek injunctive relief and monetary relief consisting

7    largely of civil penalties and disgorgement. That monetary relief will be calculated with formulas for

8    relevant State AGs' claims based on Meta's user and revenue data, combined with federal census data.

9    At bottom, this Court should reject Meta's attempt to manufacture complexity where none exists. The

10   State AGs will present a clear, coordinated case focused on Meta's uniform misconduct across

11   jurisdictions. Meta did not tailor its conduct to individual states—it engaged in the same harmful practices

12   nationwide. It is therefore untenable, and disingenuous, for Meta to now claim it must defend itself through

13   a fragmented, state-by-state trial strategy. Its insistence on injecting voluminous, state-specific evidence

14   is not only unnecessary—it is a deliberate effort to distract from the core issue: Meta's own conduct. This

15   tactic should be recognized for what it is: an improper attempt to "shift the focus of the case away from

16   [Meta's] actions and intent." *Yu v. Signet Bank/Virginia*, 126 Cal. Rptr. 2d 516, 534 (Cal. App. 2002). The

17   Court should not permit Meta to derail an efficient and fair trial with arguments that obscure rather than

18   illuminate the legal questions at hand.

19

20

21

22

23

24

25

26   ———————————————

27   practice claim; "the effect of the actor's conduct is of sole relevance"); **Virginia:** *Dick Kelly Enters. v. City of Norfolk*, 416 S.E.2d 680, 685 ("[C]ertain equitable defenses [such as estoppel, unclean hands, or

28   laches] do not apply to the state or local governments when acting, as here, in a governmental capacity.") (collecting cases).

DATED: 12/12/2025

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Krista Batchelder*
Krista Batchelder, CO Reg. No. 45066, *pro hac vice*
Deputy Solicitor General
Jason Slothouber, CO Reg. No. 43496, *pro hac vice*
Chief Trial Counsel, Consumer Protection
Lauren M. Dickey, CO Reg. No. 45773, *pro hac vice*
First Assistant Attorney General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6000
Krista.Batchelder@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
David Beglin (CA SBN 356401)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer (CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Megan.ONeill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109), *pro hac vice*
Philip Heleringer (KY Bar No. 96748), *pro hac vice*
Zachary Richards (KY Bar No. 99209), *pro hac vice*
Daniel I. Keiser (KY Bar No. 100264), *pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008), *Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017), *Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021), *Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),

Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

*Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Matthew J. Platkin, Attorney General for the State of New Jersey, and Elizabeth Harris, Acting Director of the New Jersey Division of Consumer Affairs*

**KRIS MAYES**
Attorney General
State of Arizona

*/s/ Laura Dilweg*
Laura Dilweg (AZ No. 036066, CA No. 260663)
Chief Counsel - Consumer Protection and Advocacy Section
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax: (602) 542-4377
Laura.Dilweg@azag.gov

*Attorneys for Plaintiff State of Arizona*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Rebecca Borné*
Rebecca Borné
(CT Juris No. 446982), pro hac vice
Tess E. Schneider
(CT Juris No. 444175), *pro hac vice*
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Rebecca.Borne@ct.gov
Tess.Schneider@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Ryan Costa*
Marion Quirk (DE Bar 4136), *pro hac vice*
Director of Consumer Protection
Ryan Costa (DE Bar 5325), *pro hac vice*

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

*/s/ Douglas S. Chin*
Christopher J.I. Leong (HI JD No. 9662), *pro hac vice*
Supervising Deputy Attorney General

23

Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8811
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware*

Kelcie K. Nagata (HI JD No. 10649), *pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawai'i 96813
Phone: (808) 586-1180
Christopher.ji.leong@hawaii.gov
Kelcie.k.nagata@hawaii.gov
Douglas S. Chin (HI JD No. 6465), *pro hac vice*
John W. Kelly (HI JD No. 9907), *pro hac vice*
Special Deputy Attorney General
Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawai'i 96813
Phone: (808) 537-6100
dchin@starnlaw.com
jkelly@starnlaw.com

*Attorneys for Plaintiff State of Hawai'i*

**RAÚL R. LABRADOR**
Attorney General
State of Idaho

By: */s/ James Simeri*
James Simeri (ID Bar No. 12332)
Deputy Attorney General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-4114
james.simeri@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Matthew Davies*
Susan Ellis, Chief, Consumer Protection Division (IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud Bureau (IL Bar No. 6306019)
Matthew Davies, Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6299608), *pro hac vice*
Daniel B. Roth, Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6290613)
Meera Khan, Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6345895)
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov

24

Jacob.Gilbert@ilag.gov
Matthew.Davies@ilag.gov
Daniel.Roth@ilag.gov
Meera.Khan@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82)
*pro hac vice*
Chief Counsel and Director of Consumer Protection Corinne Gilchrist (IN Atty No. 27115-53)
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49)
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846)
*pro hac vice*
Assistant Attorney General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Complex Litigation Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802

**KRIS W. KOBACH**
Attorney General
State of Kansas
*/s/ Sarah Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine (Maine Bar No. 5048),
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8829
michael.devine@maine.gov
*Attorney for Plaintiff State of Maine*

25

1  Tel: (225) 326-6435
2  NachabeA@ag.louisiana.gov
   *Attorney for State of Louisiana*
3
4  **ANTHONY G. BROWN**                        **KEITH ELLISON**
   Attorney General                           Attorney General
   State of Maryland                           State of Minnesota
5
6  /s/ *Elizabeth J. Stern*                    /s/ Caitlin Micko
   Philip D. Ziperman (Maryland CPF No.        Caitlin Micko (MN Bar No. 0395388)
7  9012190379), *pro hac vice*                 Assistant Attorney General
   Deputy Chief, Consumer Protection Division  Office of the Minnesota Attorney General
8  Elizabeth J. Stern (Maryland CPF No.        445 Minnesota Street, Suite 600
   1112090003), *pro hac vice*                 St. Paul, MN 55101
9  Assistant Attorney General                  Tel: (651) 724-9180
   Office of the Attorney General of Maryland  Caitlin.micko@ag.state.mn.us
10 200 St. Paul Place
   Baltimore, MD 21202                         *Attorney for State of Minnesota, by its*
11 Phone: (410) 576-6417 (Mr. Ziperman)        *Attorney General, Keith Ellison*
   Phone: (410) 576-7226 (Ms. Stern)
12 Fax: (410) 576-6566
   pziperman@oag.state.md.us
13 estern@oag.state.md.us
14
15 *Attorneys for Plaintiff Office of the Attorney*
   *General of Maryland*
16
17 **MICHAEL T. HILGERS**                       **LETITIA JAMES**
   Attorney General                           Attorney General
18 State of Nebraska                           State of New York
19 /s/ Anna M. Anderson                        /s/ Nathaniel Kosslyn
   Anna M. Anderson (NE #28080)                Nathaniel Kosslyn, Assistant Attorney General
20 Assistant Attorney General                  (NY Bar No. 5773676), *pro hac vice*
   *pro hac vice*                              nathaniel.kosslyn@ag.ny.gov
21 Benjamin J. Swanson (NE #27675)             Alex Finkelstein, Assistant Attorney General
   Assistant Attorney General                  (NY Bar No. 5609623), *pro hac vice*
22 Nebraska Attorney General's Office          alex.finkelstein@ag.ny.gov
   1445 K Street, Room 2115                    New York Office of the Attorney General
23 Lincoln, NE 68509                           28 Liberty Street
   (402) 471-6034                              New York, NY 10005
24 anna.anderson@nebraska.gov                  (212) 416-8000
   benjamin.swanson@nebraska.gov
25
26 *Attorneys for Plaintiff State of Nebraska*
27
28

LETTER BRIEF BY THE STATE ATTORNEYS GENERAL REGARDING TRIAL STRATEGY
4:22-md-03047-YGR-PHK; 4:23-CV-05448-YGR

**JEFF JACKSON**
Attorney General
State of North Carolina

*/s/ Charles White*
Charles G. White (N.C. State Bar No. 57735),
*pro hac vice*
Assistant Attorney General
Kunal Choksi
Senior Deputy Attorney General
Josh Abram
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
E-mail: cwhite@ncdoj.gov
*Attorneys for Plaintiff State of North
Carolina*

**DAN RAYFIELD**
Attorney General
State of Oregon

/s/ John Dunbar
John J. Dunbar (Oregon Bar No. 842100)
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile:  (971) 673-1884
E-mail: john.dunbar@doj.oregon.gov

*Attorneys for State of Oregon ex rel.
Dan Rayfield, Attorney General*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.

**DAVE YOST**
OHIO ATTORNEY GENERAL

/s/ Kevin R. Walsh
Melissa G. Wright (0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (0073999)
Senior Assistant Attorney General
Kevin.Walsh@ohioago.gov
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
614-466-1031

**DAVID W. SUNDAY, JR.**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Senior Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
717.787.3391
jburns@attorneygeneral.gov

*Attorneys for Plaintiff the Commonwealth of
Pennsylvania*

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General

27

Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
jlibet@scag.gov
annasmith@scag.gov
803-734-0536

*Attorneys for Plaintiff the State of South
Carolina,*
*ex rel. Alan M. Wilson, in His Official
Capacity as*
*Attorney General of the State of South
Carolina*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota
   /s/  *Amanda Miiller*
By: Amanda Miiller (SD Bar No. 4271)
Deputy Attorney General
1302 East SD Hwy 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Amanda.Miiller@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Chief Deputy Attorney General
Thomas J. Sanford
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Section
Chief
Joelle E. Gotwals (VSB No. 76779),
Senior Assistant Attorney General
*pro hac vice*
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General
*pro hac vice*
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:     (804) 786-8789
Facsimile:     (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of
Virginia*
*ex rel. Jason S. Miyares, Attorney General*

**NICHOLAS W. BROWN**
Attorney General State of Washington

*/s/ Claire McNamara*
Claire McNamara (WA Bar No. 50097)
Gardner Reed (WA Bar No. 55630)
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 340-6783
claire.mcnamara@atg.wa.gov
gardner.reed@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Brittany Copper*
Brittany A. Copper
Assistant Attorney General
WI State Bar # 1142446
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1795
Brittany.copper@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

**JOHN B. MCCUSKEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*

Laurel K. Lackey (WVSB No. 10267)
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
Telephone: (304) 267-0239
Email: laurel.k.lackey@wvago.gov
abby.g.cunningham@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. John B. McCuskey, Attorney General*

## **SIGNATURE CERTIFICATION**

Under Civ. L.R. 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized this filing.

DATED: 12/12/2025

*/s/ Krista Batchelder*
Krista Batchelder

*Attorney for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*