Exhibit 5

GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, *pro hac vice*
tharris@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

David P. Mattern, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd., ByteDance Ltd.,*
*and TikTok LLC*

*[Additional parties and counsel listed on signature*
*pages]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL NO. 3047 |
| | Case No.:    4:25-cv-02310-YGR |
| This Document Relates To: | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (DEKALB) (SD MSJ NO. 5)** |
| *DeKalb County School District v. Meta Platforms, Inc., et al.* | **UNREDACTED VERSION** |
| | *[Filed concurrently with Declaration of David P. Mattern and [Proposed] Order]* |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |
| | Date:         January 26, 2025 |
| | Time:         8:00 AM |
| | Courtroom:  1, Fourth Floor |

1    **<u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>**

2    PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable

3  Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern

4  District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby

5  do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary

6  judgment on all claims by Plaintiff DeKalb County School District.  This Motion is based on this

7  Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers

8  submitted in connection with the Motion, the accompanying Declaration of David P. Mattern and

9  the exhibits thereto, and any other matters presented at the time of the hearing.

10    **<u>STATEMENT OF RELIEF SOUGHT</u>**

11    Defendants seek entry of summary judgment in their favor on all causes of action that

12  Plaintiff asserts against Defendants or, in the alternative, partial summary judgment as to Plaintiff's

13  claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

14

15  Dated: September 30, 2025                     Respectfully Submitted,

16                                 By: */s/ David P. Mattern*
                                  GEOFFREY M. DRAKE, *pro hac vice*
17                                gdrake@kslaw.com
                                  TACARA D. HARRIS, pro hac vice
18                                tharris@kslaw.com
                                  KING & SPALDING LLP
19                                1180 Peachtree Street, NE, Suite 1600
                                  Atlanta, GA 30309
20                                Telephone: (404) 572-4600
                                  Facsimile: (404) 572-5100
21
                                  DAVID P. MATTERN, *pro hac vice*
22                                dmattern@kslaw.com
                                  KING & SPALDING LLP
23                                1700 Pennsylvania Avenue, NW
                                  Suite 900
24                                Washington, D.C. 20006
                                  Telephone: (202) 737-0500
25                                Facsimile: (202) 626-3737

26                                BAILEY J. LANGNER (SBN 307753)
                                  *blangner@kslaw.com*
27                                KING & SPALDING LLP
                                  50 California Street, Suite 3300
28                                San Francisco, CA 94111

1

1

Telephone: (415) 318-1200
Facsimile: (415) 318-1300

2

3

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd.,*
*ByteDance Ltd., and TikTok LLC*

4

5

*[Additional parties and counsel listed on*
*signature pages]*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................. 1

II.    BACKGROUND ................................................................................... 3

  A.   District Background ......................................................................... 3

  B.   DeKalb's Lack of Evidence .............................................................. 5

  C.   DeKalb's Theory of Damages .......................................................... 7

  D.   DeKalb's Proposed "Strategic Plan" ................................................ 8

  E.   The Court's Motion-to-Dismiss Ruling ........................................... 9

III.   LEGAL STANDARD ......................................................................... 11

IV.   ARGUMENT ..................................................................................... 12

  A.   DeKalb Lacks Competent Evidence of Causation ........................... 12

     1.   DeKalb's Allegations of Specific Harms All Rely Impermissibly on Third-Party Wrongdoing and Protected Publishing Activities ............... 14

     2.   DeKalb Has No Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform. ............................................................ 17

  B.   DeKalb Cannot Show It Is Entitled to Past Damages ...................... 22

     1.   DeKalb Cannot Show Defendants Caused It to Divert Financial Resources ............. 23

     2.   DeKalb Has No Admissible Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms .......................... 27

     3.   DeKalb Cannot Recover for Property Damage, which Results from Third-Party Acts 30

  C.   DeKalb's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under Georgia Law ............................................................................ 30

     1.   DeKalb Cannot Recover the Plan as Equitable Relief for Its Nuisance Claim ........... 32

     2.   The Costs of the Hoover Plan Are Not Recoverable as Future Damages ................... 37

     3.   DeKalb's Strategic Plan Is Impermissibly Derivative ................................. 38

  D.   Defendants Are Entitled to Summary Judgment on DeKalb's Failure-to-Warn Claim ..... 39

     1.   Defendants Do Not Owe DeKalb a Duty to Warn the District Directly ..................... 39

     2.   DeKalb Lacks Evidence Supporting Its Failure to Warn Claim .................................. 41

     3.   DeKalb Cannot Assert a Claim that Defendants Failed to Warn Students ................. 43

  E.   The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries. ................................................. 43

V.    CONCLUSION .................................................................................. 44

i

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases:**

3   *Accessory Overhaul Grp., Inc. v. Mesa Airlines, Inc.*,
    994 F.Supp.2d 1296 (N.D. Ga. 2014) ................................................................. 37
4
    *Anderson v. Liberty Lobby, Inc.*,
5   477 U.S. 242 (1986) ........................................................................................... 11

6   *Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) .............................................................................. 38
7
8   *Atlanta & W.P.R. Co. v. Haralson*,
    133 Ga. 231 (1909) ............................................................................................ 24
9
10  *Barrett Props., LLC v. Roberts Capital, Inc.*,
    316 Ga. App. 507 (2012) .................................................................................... 12
11
    *Berry v. Hamilton*,
12  246 Ga. App. 608 (2000) .................................................................................... 21

13  *Boafo v. Hospital Corp. of America*,
    177 Ga. App. 75 (1985) ...................................................................................... 44
14
15  *Bradley Center v. Wessner*,
    250 Ga. 199 (1982) ............................................................................................ 18
16
17  *Callaway Gardens Resort, Inc. v. Grant*,
    365 Ga. App. 222 (2022) .................................................................................... 19
18
    *Cannon v. Jeffries*,
19  250 Ga. App. 371 (2001) .................................................................................... 18

20  *Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ........................................................................................... 11
21
22  *Certainteed Corp. v. Fletcher*,
    300 Ga. 327 (2016) ...................................................................................... 40, 43
23
24  *City of Huntington v. AmerisourceBergen Drug Corp.*,
    609 F. Supp. 3d 408 (S.D.W.V. 2022) ............................................................... 34
25
26  *City of Richmond Hill v. Maia*,
    301 Ga. 257 (2017) ............................................................................................ 12
27  *Cotto Law Grp., LLC v. Benevidez*,
28  362 Ga. App. 850 (2022)................................................................................ 26, 29

ii

*CSX Transp. v. Williams*,
278 Ga. 888 (2005) ............................................................................................. 40

*Davis v. Firestone Tire & Rubber Co.*,
196 F. Supp. 407 (N.D. Cal. 1961) ...................................................................... 18

*Davis v. Stark*,
198 Ga. 223 (1944) ............................................................................................. 33

*Doe (K.B.) v. Backpage.com, LLC*,
724 F. Supp. 3d 882 (N.D. Cal. 2024) ......................................................... 16, 21

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025).......................................................................... 39

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024)..................................................................... 16, 39

*In re Gen. Motors LLC Ignition Switch Litig.*, 23
339 F. Supp. 3d 262 (S.D.N.Y. 2018)................................................................. 23

*Georgia Cas. & Sur. Co. v. Salter's Indus. Servs., Inc.*,
318 Ga. App. 620 (2012)..................................................................................... 41

*Henricksen v. ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) ......................................................... 17

*Hubbard v. Bayer HealthCare Pharma., Inc.*,
407 F. Supp. 3d 1317 (N.D. Ga. 2019) ............................................................. 41

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) ......................................................... 36, 37

*J. D. Jewell, Inc. v. Hancock*,
226 Ga. 480, 175 S.E.2d 847 (1970).................................................................. 33

*J.N. Legacy Grp., Inc. v. City of Dallas*,
322 Ga. App. 475 (2013)..................................................................................... 37

*Johnson v. Am. Nat. Red Cross*,
253 Ga. App. 587 (2002)..................................................................................... 22

*Johnson v. Avis Rent A Car Sys., LLC*,
311 Ga. 588 (2021) ............................................................................................. 12

*Khoros, LLC v. Lenovo (United States), Inc.*,
3:20-cv-03399-WHO, 2020 WL 12655516 (N.D. Cal. Oct. 5, 2020) ........................................ 44

iii

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) .................................................................................................. 16

*Kuciemba v. Victory Woodworks, Inc.*,
531 P.3d 924 (Cal. 2023) ......................................................................................................... 41

*Lemmon v. Snap Inc.*,
995 F.3d 1085 (9th Cir. 2021) .................................................................................................. 16

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) ................................................................................................... 16

*Mayor & City Council of Baltimore v. Purdue Pharma, L.P.*,
No. 24-C-18-000515 (Md.Cir.Ct. Aug 8, 2025) ...................................................................... 36

*MCI Comms. Servs. v. CMES, Inc.*,
291 Ga. 461 (2012) .......................................................................................... 22, 23, 24, 27, 29

*Mitsubishi Int'l. Corp. v. Cardinal Textile Sales, Inc.*,
14 F.3d 1507 (11th Cir. 1994) .................................................................................................. 32

*Morris v. Starbucks Corporation*,
1:18-CV-5034-TWT, 2019 WL 7496785 (N.D. Ga. Sep.27 2019) ............................................ 18

*In re Nat'l Prescription Opiate Litig.*,
—N.E. 3d—, No. 23-1155, 2024 WL 5049302 (Ohio Dec. 10, 2024) ....................................... 36

*Nat'l Prescription Opiate Litig.*,
No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025) .......................................................... 36

*Neely, v. St. Paul Fire and Marine Ins. Co.*,
584 F.2d 341 (9th Cir. 1978) ............................................................................................. 14, 18

*Nipper v. Collins*,
90 Ga. App. 827 (1954) ............................................................................................................ 24

*Nobles v. Jiffy Mkt. Food Store Corp.*,
260 Ga. App. 18 (2003) ........................................................................................................ 37-38

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .......................................................................................... 17, 20, 21

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) .................................................................................................... 26

*Pandya v. Marriott Hotel Servs., Inc.*,
552 F. Supp. 3d 1364 (N.D. Ga. 2021) ..................................................................................... 14

*People v. ConAgra Grocery Products Co.*, 36
17 Cal. App. 5th 51 (2017).............................................................................................. 36

*R & R Insulation Services, Inc. v. Royal Indem. Co.*,
307 Ga. App. 419 (2010)................................................................................................. 41

*Reichwaldt v. Gen. Motors LLC*,
1:16-CV-2171-TWT, 2018 WL 11343518 (N.D. Ga. Mar.1, 2018) ................................ 43

*Rhynes v. Stryler Corp.*,
No. 10-5619, 2011 WL 2149095 (N.D. Cal. May 31, 2011) ........................................... 32

*Robinson v. C.R. Bard, Inc.*,
16-cv-00942-JST, 2016 WL 3361825 (N.D. Cal. June 17, 2016) ................................... 32

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)...................................................................................... 32, 33

*Soremekun v. Thrifty Payless, Inc.*,
509 F.3d 978 (9th Cir. 2007)........................................................................................... 11

*State ex rel. Hunter v. Johnson & Johnson*,
499 P.3d 719 (Okla. 2021).............................................................................................. 34

*Superior Farm Mgmt., L.L.C. v. Montgomery*,
270 Ga. 615 (1999) ........................................................................................................ 33

*Swint v. Mae*,
340 Ga. App. 480 (2017).......................................................................................... 17, 19

*Tucker Nursing Ctr., Inc. v. Mosby*,
303 Ga. App. 80 (2010) .................................................................................................. 26

*Tuggle v. Helms*,
231 Ga. App. 899 (1998)........................................................................................... 18, 29

*Twitter, Inc. v. Barr*,
445 F. Supp. 3d 295 (N.D. Cal. 2020) ........................................................................... 11

*Walker v. CSX Transp. Inc.*,
650 F.3d 1392 (11th Cir. 2011)....................................................................................... 14

*Wechsler v. Wells Fargo Bank, N.A.*,
17-cv-04571-EDL, 2018 WL 10246117 (N.D. Cal. Jan. 25, 2018)................................. 14

*Whitehead v. Green*,
365 Ga. App. 610 (2022).................................................................................................. 41

*In re Williams Sec. Litig. – WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ........................................................................... 17, 20, 21

*Wood v. Marathon Ref. Logistics Serv. LLC*,
4:19-cv-04287-YGR, 2024 WL 2242688 (N.D. Cal. Mar. 21, 2024) ........................................... 32


**Other Authorities:**

Fed. R. Civ. P. 56(a) ...................................................................................................... 11
Fed. R. Civ. P. 56(c) ...................................................................................................... 26
Fed. R. Evid. 602 ........................................................................................................... 25
Fed. R. Evid. 801 ........................................................................................................... 25

1
## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.     INTRODUCTION

3       Plaintiff DeKalb County School District, one of the largest school districts in Georgia, has

4  faced numerous challenges in recent years.  More than 75 percent of its schools are considered high

5  poverty by the state.  It has dealt with "chronic absenteeism" from its students and from pervasive

6  dysfunction in its administration.  It grappled with the challenges of the COVID-19 pandemic and

7  its significant impact on students.  And it faced a shortage of mental health providers.  Discovery

8  revealed that these factors harmed its students' overall wellbeing and ability to function at school.

9       At the same time, DeKalb has used Defendants' platforms extensively to promote its own

10  activities and connect with the community, including incorporating Defendants' platforms into

11  student outreach programs and encouraging students to utilize Defendants' platforms in DeKalb-

12  sanctioned activities.  Nevertheless, DeKalb now claims that Defendants owe it money to combat

13  an alleged mental health "crisis" among its students, which it attributes to students' use of

14  Defendants' platforms.  But while there is evidence of harm from myriad other factors, DeKalb

15  does not have evidence to support its claims of harm from students' use of Defendants' platforms.

16  Discovery established that DeKalb cannot support allegations that it is facing "serious financial and

17  resource disruptions" resulting from student use of "addictive and dangerous features of

18  Defendants' platforms," Dkt. 729 (the "Master Complaint") at ¶¶ 3-4.  Summary judgment is

19  warranted on a series of independent grounds.

20       *First*, DeKalb's claims for nuisance and negligence fail because it has not adduced

21  competent evidence of causation under Georgia law.  This Court limited the scope of DeKalb's

22  claims, holding that it can predicate claims only on certain actionable conduct—the features that

23  the Court found are not protected by Section 230 or the First Amendment.  This Court similarly

24  held that DeKalb cannot recover for injuries caused by third-party content, third-party conduct, or

25  protected publishing activities.  But the only instances of social-media-related incidents DeKalb

26  documented are related to third-party content or third-party conduct.  At the same time, DeKalb

27  adduced no competent evidence that each Defendant's platform(s) caused any mental health issues

28  among any particular students.  DeKalb lacks the most basic facts about its students' use of

1

Defendants' platforms. It does not know how frequently its students use Defendants' platforms, what features they use, or what effects those features have on its students. At most, DeKalb's evidence relates to its students' use of cellphones or "social media" generally, which DeKalb itself defines to encompass significantly more than just Defendants' platforms. Even that evidence is general and sparse, often relying on speculation and guess work, and is insufficient to show causation under Georgia law. As a result, DeKalb cannot establish that any one of Defendants' platforms—let alone the actionable features of that platform—*caused* its students any harm or that DeKalb incurred expenses as a result of that harm.

*Second*, summary judgment is warranted on DeKalb's failure to adduce evidence of damages. DeKalb seeks damages, primarily for the time its staff purportedly "lost," as an opportunity cost rather than an actual incurred cost, while addressing social media-related issues. But Georgia law squarely forecloses recovery for "lost time" because DeKalb did not suffer any actual, out-of-pocket monetary loss. Even if "lost time" were compensable, DeKalb has no competent, contemporaneous evidence proving lost teacher time. It instead presents only a retrospective, made-for-litigation survey based on an unreliable sample of teachers as "evidence" of its "lost time." Nor has DeKalb presented any competent evidence supporting its out-of-pocket losses for payments to certain vendors or proved entitlement to property damage repairs.

*Third*, DeKalb's proposed "abatement" remedy is improper in form and substance. DeKalb seeks between $2.4 and $4.3 billion through a 15-year "strategic plan" to fund mental health programs in schools (irrespective of any connection to Defendants' alleged conduct). But as a threshold matter, DeKalb is not entitled to abatement because it has an adequate remedy at law: money damages. Still worse, DeKalb's "strategic plan" does not constitute proper abatement under Georgia law, which requires that the offending party cease *the conduct* that caused the alleged nuisance. DeKalb's plan does nothing to address or "abate" Defendants' alleged conduct and therefore is not abatement. The plan is also not recoverable as "future damages" because it depends entirely on speculative future events and is untethered from the injuries that DeKalb alleges.

*Fourth*, DeKalb has no competent evidence supporting the critical elements of its failure-to-warn claim. There is no duty for Defendants to warn a school district that its students' use of

1   Defendants' platforms may cause the district financial problems. No court has ever held that a

2   company is required to provide a warning to a non-user of a product or service that another's use

3   may cause financial injury to the non-user. DeKalb also lacks evidence that it would have behaved

4   differently if a warning had been delivered. And, under clear Georgia Supreme Court precedent,

5   DeKalb cannot base a failure to warn claim on Defendants' alleged failure to provide warnings to

6   third parties such as students and their parents.

7   **II.    BACKGROUND**

8        **A.    District Background**

9        Located near Stone Mountain in the greater Atlanta metropolitan area, DeKalb currently

10  enrolls more than 91,000 students in approximately 137 schools and employs over 15,600 staff

11  members within DeKalb County, Georgia. Ex. A at ¶¶ 9-11. DeKalb has seen more than its fair

12  share of dysfunctional leadership over the years. For example, DeKalb has had six superintendents

13  in the last 12 years, including two terminated by the Board of Education. Ex. B at

14  DEKALB1999312. DeKalb has also long struggled with filling vacancies for its mental health

15  personnel positions, including school psychologists and social workers. DeKalb falls far below the

16  nationally recommended ratios for these positions. *See* Ex. C (Sauce Dep.) at 92:17–93:24, 102:22–

17  105:12; Ex. D (Towns 30(b)(6) Dep.) at 291:1–6; 296:10–299:18; Ex. E (Towns 30(b)(6) Dep. Ex.

18  25); Ex. F (Revels Dep.) at 212:2–212:10.

19       Compounding these issues, DeKalb's students have faced substantial challenges impacting

20  their mental health and education. More than 75% of DeKalb schools are Title I schools, which

21  the State of Georgia identifies as high-poverty schools. Ex. G (Moore-Sanders Dep.) at 41:20–

22  42:9. Typically, over 1,000 DeKalb students per year are identified as unhoused. Ex. F (Revels

23  Dep.) at 169:22–170:5. DeKalb experienced so much "chronic absenteeism" within its schools that

24  it implemented an intervention program in 2018 aimed at getting students to go to school every

25  day. Ex. A at ¶ 40.

26       Then, following the COVID-19 pandemic, DeKalb administrators noted a post-pandemic

27  increase in mental health challenges for students upon return to in-person instruction, including

28  anxiety, depression, and grief/loss. Ex. F (Revels Dep.) at 115:6–116:20. DeKalb also experienced

a rise in disciplinary incidents post-pandemic, including increased incidences of violence and bullying.  *See* Ex. G (Moore-Sanders Dep.) at 130:24–131:4; Ex. D (Towns 30(b)(6) Dep.) at 258:5–259:12.  During the 2021–2022 school year, "bullying, fighting, and other disturbing behavior" related to violence was a concern sufficient to warrant the then-Superintendent to send to all employees and parents within the DeKalb school district a letter about the increased incidents of bullying.  Ex. G (Moore-Sanders Dep.) at 127:2–24, 129:14–131:4; Ex. H.

In recognizing that the current slate of mental health providers was insufficient to attend to the needs of its students, particularly in light of the effect of the pandemic, DeKalb applied for grants specifically to address this shortage: "DCSD is a local education agency with demonstrated need and is proposing measures to increase the number of credentialed school-based mental health providers" so as to "provide much needed school psychological services to DCSD which is a high-needs district … [t]hese needs were perhaps most evident during the COVID 19 pandemic …" *See* Ex. I at DEKALB0992640–41.  There were no references in that grant application to the purported impact of Defendants' platforms (or even social media generally) on student mental health—nor could DeKalb representatives point to any other grant applications discussing those topics either. *Id.*, *see also* Ex. F (Revels Dep.) at 213:20–213:25.

At the same time (including after filing its lawsuit), DeKalb maintained a heavy social media presence.  DeKalb utilized social media to distribute positive messages to its students, including student TikTok videos and community and school YouTube videos.  Ex. J at DEKALB1381293; Ex. G (Moore-Sanders Dep.) at 163:23–164:17; Ex. K (Kirkland Dep.) at 155:23–156:3.  DeKalb further incorporated Defendants' platforms into its student outreach programs and encouraged its students to utilize Defendants' platforms as part of, for example, anti-bullying campaigns.  *See* Ex. J at DEKALB1381293 (DeKalb's "Stop the Violence Campaign" involved a contest for students to create TikTok videos that feature key messaging related to minimizing student violence); Ex. L at DEKALB946641–42.  DeKalb recognizes "social media and digital communication" as "a powerful communications tool" and "key components to our everyday lives." Ex. M at DEKALB133130; Ex. JJ at DEKALB1252467; Ex. KK at DEKALB133145.  Indeed, one of DeKalb's missions is to educate all its students on technology

1    and to integrate the use of technology into the curriculum, *see* Ex. N (Davis Dep.) at 46:7–47:15,

2    68:3–11; Ex. D (Towns 30(b)(6) Dep.) at 75:2–11; Ex. N (Davis Dep.) at 46:7–47:15, 68:3–11; Ex.

3    D (Towns 30(b)(6) Dep.) at 75:2–11.

4         **B.    DeKalb's Lack of Evidence**

5         Before filing this lawsuit, DeKalb undertook *no* effort to assess the impacts of social media[1]

6    use on its students' mental health or the connection between social media use and its students'

7    education.  *See* ==Ex. A at ¶¶ 47, 48, 50 (DeKalb does not possess any existing report, survey,==

8    ==analysis, study, or other documentation that provides an overview of or describes the prevalence of==

9    ==harms allegedly associated with student social media use, including associated mental health issues==

10   ==and classroom disruption).==  DeKalb never determined the number of students that have accounts

11   on each Defendant's platform or the amount of time each student (or even the average student)

12   spends on each Defendant's platform each day.  Ex. D (Towns 30(b)(6) Dep.) at 102:4–24.  And

13   DeKalb has no evidence showing how much time its students spend using Defendants' platforms

14   as opposed to engaging in other activities on their cell phones, such as texting or playing video

15   games.  Ex. D (Towns 30(b)(6) Dep.) 102:9–17.

16        Nor has DeKalb tracked or produced any quantitative data establishing how many of its

17   students were referred to mental health services as a result of social media, either generally or

18   specifically because of any of Defendants' platforms.  For instance, DeKalb's Director of Wrap

19   Around Services—which oversees, among other things, the Counseling and Mentoring and School

20   Social Work Services Departments—is "not aware of any numerical data" and has not conducted a

21   search for that type of data.  Ex. F (Revels Dep.) at 194:25–195:19.

22        Similarly, despite claiming that its students' "addictive" use of social media caused

23   significant disruption to DeKalb's operations, DeKalb does not separately track how many of the

24   (historically) tens of thousands of disciplinary reports—generated as a result of student disruptive

25   conduct and stored within Infinite Campus, Ex. O (Logan Dep.) at 70:10–13; *see also* Ex. P—are

26   _____

27   [1] Notably, DeKalb defines "social media" broadly, as "the collective of online communications
     channels dedicated to community-based input, interaction, content-sharing and collaboration." Ex.
     Q at DEKALB037872.  To illustrate this broad definition, DeKalb refers to "blogging about music,
28   sports or news events"; posting updates on "Twitter," and "participating in a teacher-established
     Edmodo group" (online learning platform) as examples of social media.  *Id.*

1  attributable to social media, much less any specific platform or its specific features. Ex. O (Logan

2  Dep.) at 70:14–23. In a one-time exercise, done after this lawsuit was filed, DeKalb searched for

3  "social media and other associated terms" through narrative comments in Infinite Campus

4  disciplinary reports. For an eight-month period covering the beginning of the 2023 school year

5  through the end of March 2024, DeKalb calculated that there was a total of only 49 disciplinary

6  incidents purportedly related to social media "and other associated terms"—just 0.19 percent of the

7  total number of disciplinary incidents logged in Infinite Campus during that time period.[2] *See* Ex.

8  R (Expert Rep. of Dr. Diana Wildermuth) at ¶ 43; Ex. S; Ex. D (Towns 30(b)(6) Dep.) at 156:13–

9  19, 158:20–25, 159:4–14. Even from this tiny fraction, DeKalb's representatives candidly

10 acknowledged that these disciplinary incidents generally related to *content* found on social media.

11 Ex. O (Logan Dep.) at 213:18–217:21 (describing "social media posts," "inappropriate messages

12 shared," "fight sites," and "threats towards other students" and "the school" prompting discipline

13 due process hearings).

14      Otherwise, DeKalb's evidence of incidents related to social media is based solely on

15 *anecdotes* from teachers and parents. But none of these alleged incidents or issues are

16 contemporaneously, or even post-hoc, memorialized. *See* Ex. O (Logan Dep.) at 98:8–99:7. And

17 the number of disciplinary reports overall actually declined in many of the years that DeKalb alleges

18 that social media caused significant disruptions in its schools. Ex. P (29,721 disciplinary reports

19 during the 2017–2018 school year; 28,809 disciplinary reports from 2018–2019; 24,206

20 disciplinary reports from 2019–2020). Those figures significantly decreased from earlier points in

21 time. *Id.* (92,583 disciplinary reports during the 2001–2002 school year; 110,901 disciplinary

22 reports in 2005–2006; 53,008 disciplinary reports in 2013–2014).

23      Indeed, DeKalb's internal documents acknowledge that disruptions are often caused by a

24 student's cell phone use generally (as opposed to Defendants' platforms or "social media"

25 specifically). For example, in a presentation titled "Reducing Cell Phone Use in High School,"

26

27 [2] In contrast, the 2018–2019 and 2019–2020 school years had the following disciplinary incident
   counts: "battery" with 2,682, and 1,620 reports; "disorderly conduct" with 6,175 and 4,809 reports;
28 "other-attendance related" with 3,073 and 3,004 reports; and "other-student incivility" with 7,303
   and 5,596 reports. Ex. P.

1   DeKalb concluded that "research indicates a rise in anxiety and depression among students who
2   use phones excessively." Ex. T at DEKALB797662. DeKalb's 30(b)(6) corporate representative
3   conceded that this conclusion was about cellphone use generally and was "not specific to social
4   media." *See* Ex. D (Towns 30(b)(6) Dep.) at 180:1–181:3; *see also* Ex. D (Towns 30(b)(6) Dep.)
5   at 102:4–103:13 (agreeing that a student could access text messages or a Netflix movie on their
6   phone during the school day). For this reason, DeKalb purchased Yondr pouches and cellphone
7   lockers as part of a pilot program in select schools to keep students from accessing their phones
8   generally, not just Defendants' platforms—costs that DeKalb now seeks to recover in their entirety
9   from Defendants. *See* Ex. T at DEKALB797676 ("The DeKalb County School District has
10  launched a new initiative to reduce student cellphone use during the school day. This initiative
11  involves a pilot program utilizing two different approaches: Yondr Pounches … [and] Cell Phone
12  Lockers. … The primary goal of this initiative is to improve student focus and reduce distractions
13  in the classroom by limiting cell phone access during school hours.").

14  **C.    DeKalb's Theory of Damages**

15  DeKalb seeks nearly $180 million in past damages in two categories. Neither category
16  tethers DeKalb's supposed harms to the actionable aspect of Defendants' platforms.

17  ***"Lost Time" Opportunity Costs***. DeKalb seeks $178.5 million in wages and benefits as
18  "damages," which are not based on an amount of money it expended as a result of Defendants'
19  conduct. *See* Ex. U (Am. Expert Rep. of Dr. Bryce Ward) at ¶1. Instead, its damages figure is
20  primarily based on a loose estimate of how much time its teachers "lost" addressing social media
21  issues during the 2017–2018 through 2023–2024 school years. *Id.* at ¶10. DeKalb's evidence
22  consists of unverified survey responses from 187 teachers out of 2,977—only 6% of DeKalb's
23  current middle- and high-school teachers—about the amount of time in their day, down to the
24  minute, they spent addressing "unauthorized" social media use over the past decade. Ex. V (Expert
25  Rep. of Robert Klein) at ¶ 20, 22–41. The survey asked only about "social media" generally and
26  did not ask respondents to limit their estimates to Defendants' platforms or certain platform
27  features. *Id.* ¶¶ 14, 32–36, 38. DeKalb's experts then took those responses, calculated the
28  percentage of instruction time purportedly spent addressing "social media," and multiplied that

1   percentage against the wages and benefits of all middle- and high-school teachers to arrive at a sum

2   of $178.5 million.  *Id.* at ¶ 41; Ex. U (Am. Expert Rep. of Dr. Bryce Ward) at ¶ 1, 34–36.

3        ***Out-of-Pocket Expenditures***.  The remaining $1,585,398 that DeKalb seeks constitute out-

4   of-pocket vendor costs to keep its students from accessing personal electronic devices while at

5   school—including the Yondr Pouches and cellphone lockers that were incurred to address students'

6   general cellphone use, and a percentage of the cost of the District's internet content filter service,

7   Lightspeed.  *See* Ex. W (Expert Rep. of Jeffrey E. Meyers) at Appendix C.  DeKalb began using

8   Lightspeed as early as 2014 to comply with the Children's Internet Protection Act, 47 U.S.C. § 254

9   ("CIPA"), not as a result of Defendants' platforms or actionable features.  *See* Ex. X at

10  DEKALB136970 (Lightspeed Content Filter "enables" DeKalb to comply with CIPA); Ex. Y at 2;

11  Ex. N (Davis Dep.) at 135:2–10.  Furthermore, DeKalb never separately categorized or tracked any

12  expenditures it allegedly incurred as a result of Defendants' platforms or budgeted for expenditures

13  it anticipated needing to incur due to Defendants' platforms.  Ex. Z (Schueneman 30(b)(6) Dep.) at

14  41:12–42:13; 96:12–20; 98:11–99:10.

15       **D.     DeKalb's Proposed "Strategic Plan"**

16       DeKalb also seeks payment of between $2.4 and $4.3 billion to implement a 15-year

17  "strategic plan," outlined by DeKalb's expert, Dr. Sharon Hoover, to address anticipated student

18  mental health and learning needs.  *See* Ex. AA (Am. Expert Rep. of Dr. Douglas L. Leslie), at 1.

19       The strategic plan recommends hiring 1,916 additional staff, including psychologists, social

20  workers, and even IT staff.  Ex. BB (Am. Expert Rep. of Dr. Sharon Hoover) at ¶ 97.  This is more

21  than three times the total number of individuals DeKalb currently employs in these positions.

22  *Compare with id.* at ¶ 38.  The plan would also create numerous new positions, such as 184 "digital

23  literacy specialists," 137 "life skills specialists," 137 "family engagement coordinators," and 184

24  "school-based mental health clinicians."  *Id.* ¶ 97.  If hired, these and the other recommended

25  professionals would serve all students—including some prospective students who have not yet been

26  born—not just those students who use Defendants' platforms or certain features of the platforms.

27  Ex. CC (August 12, 2025 Hoover Dep.) at 300:17–307:5; Ex. DD (August 13, 2025 Hoover Dep.)

28  at  622:22–624:21;  803:10-804:1.     The  strategic  plan  recommends  implementing  numerous

initiatives to address student mental health and digital literacy, such as a new data infrastructure system to purportedly assist schools in identifying students with social-media-related health concerns, increased mental health literacy and life skills programming to help students manage their online activities and their offline relationships, and school culture and community building initiatives, such as clubs, community events, and parent education efforts. Ex. BB (Am. Expert Rep. of Dr. Sharon Hoover) at ¶¶ 62–63, 66–67.

The plan does not make any recommendations regarding changes to the operation of any platform. *See generally, id.*; The plan does not account for any changes to Defendants' platform that might occur over the plan's 15-year timeline, such as removal of the features responsible for the alleged harm. Ex. CC (August 12, 2025 Hoover Dep.) at 308:11–20 ("I haven't studied the changes on the social media platforms"); Ex. DD (August 13, 2025 Hoover Dep.) at 526:1–3 ("I don't think I'm offering an opinion that the social media companies change their design."). Nor does the plan consider potential changes in how students might use Defendants' platforms over the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely. Ex. DD (August 13, 2025 Hoover Dep.) at 803:10–20 ("it would be hard for me to predict" whether adolescents will still be using social media ten years from now), 803:21–804:1 (Hoover has not studied anticipated changes in how students use social media).

### E. The Court's Motion-to-Dismiss Ruling

In an apparent deviation from its clear embrace of technology and social media, DeKalb, along with hundreds of other school districts, filed its First Amended Master Complaint against Defendants alleging public nuisance and negligence claims on March 27, 2024. *See* Master Complaint.

At the motion-to-dismiss stage, the Court recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected publishing activities. Order Granting in Part and Denying in Part Motion to Dismiss School District and Local Government Entities Master Complaint ("SD Order") (ECF 1267) at 2. The Court similarly held that Defendants could not be held liable for non-foreseeable third-party conduct, absent some narrow exceptions

9

1   for conduct promoted by Defendants. *Id.* The Court permitted DeKalb to proceed on its "core

2   theory" that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and

3   (2) that compulsive use "caused the plaintiff school districts to respond by expending resources."

4   SD Order at 2. But at the same time, the Court made clear that the case must focus on "the *specific*

5   *conduct* through which the defendants allegedly violated their duties to plaintiffs"—*i.e.*,

6   Defendants' use of the limited set of "at-issue features" that the Court held are not barred by Section

7   230 and the First Amendment. PI Order at 14 (emphasis added); *see* SD Order at 12–13 (applying

8   analysis to school district claims).

9        Specifically, the Court permitted DeKalb to proceed insofar as its claims were based on

10   Defendants' use of certain "at issue" features—*i.e.*, Defendants' alleged:

11     • failure to implement robust age verification processes to determine users' ages;

12     • failure to implement effective parental controls;

13     • failure to implement effective parental notifications;

14     • failure to implement opt-in restrictions to the length and frequency of use sessions;

15     • creating barriers that make it more difficult for users to delete and/or deactivate their

16       accounts than to create them in the first instance;

17     • failure to label content that has been edited, such as by applying a filter;

18     • making filters available to users so they can, among other things, manipulate their

19       appearance; and

20     • failure to create adequate processes for users to report suspected CSAM to defendants'

21       platforms.

22   SD Order at 12–13 (hereinafter, the "at-issue features").[3] By contrast, the Court held that Plaintiffs

23   could not base their claims on any of the following features:

24     • use of algorithms to promote [purportedly] addictive engagement;

25     • failing to institute blocks to use during certain times of day (such as during school

26

27   [3] The SD Order appears to have mistakenly included the "failure to enable default protective limits
to the length and frequency of use sessions" as a feature that was not barred. But this Court

28   explained in its order addressing Section 230 that claims based on this alleged failure were barred
because it "would inherently limit what defendants are able to publish." *See* PI Order at 16.

1     hours or late at night);

2     • not providing a beginning and end to a user's "Feed";

3     • publishing geolocating information for minors;

4     • recommending minor accounts to adult strangers;

5     • limiting content to short-form and ephemeral content, and allowing private content;

6     • timing and clustering of notifications of third-party content in a way that promotes

7     addiction; and

8     • timing and clustering of notifications of defendants' content to increase addictive use.

9  SD Order at 14. The Court also declined "at [the motion to dismiss] stage … to hold Section 230

10 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform

11 features or as to platform construction in general." *Id.* at 45. Accordingly, as used in this

12 memorandum, Defendant's "actionable conduct" consists of (1) Defendants' use of the "at-issue"

13 features, and (2) Defendants' alleged failure to warn.

14     Defendants now bring this Motion for Summary Judgment, or in the alternative, Motion for

15 Partial Summary Judgment, as to DeKalb's negligence and public nuisance causes of action.

16 **III.    LEGAL STANDARD**

17     Summary judgment is required when "there is no genuine dispute as to any material fact

18 and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the

19 moving party would not bear the burden at trial, the motion need only specify the basis for summary

20 judgment and identify those portions of the record, if any, which it believes demonstrate the absence

21 of a genuine issue of material fact on some essential element of the claims." *Twitter, Inc. v. Barr*,

22 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (citing *Celotex Corp. v. Catrett*,

23 477 U.S. 317, 323 (1986)). "The burden then shifts to the opposing party to establish the existence

24 of material disputes of fact that may affect the outcome of the case under the governing substantive

25 law." *Id.* (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). "The evidence

26 presented by the parties must be admissible. Conclusory, speculative testimony in affidavits and

27 moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."

28 *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007).

1    **IV.    ARGUMENT**

2        **A.    DeKalb Lacks Competent Evidence of Causation[4]**

3        This Court made clear that to prove causation DeKalb must connect Defendants' *actionable*

4   conduct to its alleged injuries.  Its claims cannot be based on social media or electronic device use

5   generally, third-party content, third-party conduct, or Defendants' protected publishing activities.

6   PI Order at 14; SD Order at 12–13.  Despite the sweeping allegations in the Master Complaint,

7   DeKalb lacks evidence that any Defendant's actionable conduct caused it injury.

8        To succeed on its negligence claim, DeKalb must prove both causation in fact and

9   proximate causation.  *See City of Richmond Hill*, 301 Ga. at 258–259.  Causation requires a plaintiff

10  to prove (1) that but for a defendant's wrongful conduct, plaintiff would not have sustained its

11  injuries (cause in fact), and (2) that there exists "a legally attributable causal connection between

12  the defendant's conduct and the alleged injury" (proximate cause).  *City of Richmond Hill v. Maia*,

13  301 Ga. 257, 258–259 (2017)*; Barrett Props., LLC v. Roberts Capital, Inc*., 316 Ga. App. 507, 509

14  (2012).  A determination that a defendant's conduct was not the proximate cause of the injury is a

15  matter of policy and should be determined in defendant's favor if "the defendant's conduct and the

16  plaintiff's injury are too remote for the law to countenance recovery."  *Johnson v. Avis Rent A Car*

17  *Sys., LLC*, 311 Ga. 588, 593 (2021).  "Significantly, a mere possibility of such causation is not

18  enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are

19  at best evenly balanced, it becomes the duty of the court to grant summary judgment for the

20  defendant."  *Stadterman v. Southwood Realty Co*., 361 Ga. App. 613, 615 (2021) (internal

21  quotations omitted).

22        For its public nuisance claim, too, DeKalb must prove both causation-in-fact and proximate

23  causation.  *Green Meadows Hous. Partners, LP v. Macon-Bibb Cnty.*, 372 Ga. App. 724, 731–732

24  (2024).  A public nuisance involves a "significant" and "unreasonable" interference with a public

25  right.  *City of College Park v. 2600 Camp Creek, LLC*, 293 Ga. App. 207, 209 (2008); Restatement

---

26  [4] As this Court previously held, in an MDL, on issues of state law, the Court "applies the state law
27  that would have been applied to the underlying case as if it had never been transferred into the
    MDL."  SD Order at 11.  Here, Georgia law applies to the state-law arguments addressed in this
28  motion.  *See Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621
    (11th Cir. 1983); *see also* SD Order at 36 (analyzing Georgia law).

(Second) of Torts § 821B (1979).  Thus, to survive summary judgment on its nuisance claim, DeKalb must come forward with evidence that each Defendant's actionable conduct caused a significant and unreasonable interference with a public right that was a direct cause of DeKalb's injuries, and that the injuries were a foreseeable result for which liability may fairly be imposed. *See Green Meadows*, 372 Ga. App. at 731 ("the tortfeasor must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance" and "in order to establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury" (internal quotations omitted)); SD Order at 26.

Now, after completing discovery, the record is clear that DeKalb in fact has *no competent evidence* to support the assertion that it was injured as a result of Defendants' actionable conduct.

*First,* DeKalb has no evidence that it was harmed as a result of the at-issue features or any alleged failure to warn.  Tellingly, the at-issue features are primarily features that users or their parents can choose to use or not use, such as parental controls, parental notifications, time limits, account deactivation, or CSAM reporting.  DeKalb adduced no evidence that giving parents or users additional controls would meaningfully impact the district where DeKalb has no control over what parents and users do with those features.  Rather, DeKalb's only evidence of specific harms allegedly caused by Defendants' platforms relates to third-party content: in the limited instances where DeKalb's witnesses testified about allegedly harmful disruptions in their schools, they consistently and expressly testified that such disruptions arose from the publication of allegedly harmful content on Defendants' platforms.  Any claims based on such harms are barred by Section 230 and the First Amendment and thus are not actionable.  SD Order at 24–25; PI Order at 14.

*Second*, setting aside instances relating to third-party conduct, DeKalb has no competent evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses.  SD Order at 2.  Indeed, DeKalb lacks even basic information about the extent or nature of its students' use of Defendants' platforms or about students' mental health.  Although DeKalb may gesture toward fact or expert testimony about "social media" or cellphone use generally as the purported cause of harm, such evidence is insufficient to meet its burden on summary judgment.

1    For these reasons, summary judgment on causation grounds is warranted.  *See, e.g., Pandya*

2 *v. Marriott Hotel Servs., Inc.*, 552 F. Supp. 3d 1364, 1380 (N.D. Ga. 2021) (granting summary

3 judgment for the defendant and noting that, "[i]n asserting two different theories as to which alleged

4 hazard (or combination thereof) caused the fall, Plaintiffs only speculate as to causation."); *Walker*

5 *v. CSX Transp. Inc*., 650 F.3d 1392, 1401 (11th Cir. 2011) (affirming summary judgment for

6 defendants where plaintiff "presented no evidence from which a jury could infer that Defendants'

7 omissions, even if negligent, were a proximate cause of his injury, an essential element of his

8 negligence claim under Georgia law."); *Wechsler v. Wells Fargo Bank, N.A.*, 17-cv-04571-EDL,

9 2018 WL 10246117, *10 (N.D. Cal. Jan. 25, 2018) (granting summary judgment for the defendant

10 where plaintiff failed to adequately plead causation, "an essential element of negligence."); *Neely,*

11 *v. St. Paul Fire and Marine Ins. Co.*, 584 F.2d 341, 346 (9th Cir. 1978) (affirming summary

12 judgment in defendants' favor where "the meager evidence presented by the plaintiff [] would not

13 'rationally support' a verdict in his favor" because "a jury would inevitably have to rely in large

14 part upon surmise and speculation").

15
16   **1. DeKalb's Allegations of Specific Harms All Rely Impermissibly on Third-**
     **Party Wrongdoing and Protected Publishing Activities**

17    The Court made clear that liability in this case cannot arise from the (i) "mere publication

18 of content," or (ii) features that the Court held are protected by Section 230 or the First Amendment.

19 SD Order at 25.  And it made clear that "non-foreseeable third-party conduct—such as "dangerous

20 challenges, threats, and crimes disseminated or perpetrated on defendants' platforms—"cannot be

21 attribut[ed] to defendants."  *Id.* at 26.  Thus, to satisfy its burden on summary judgment, DeKalb

22 must come forward with evidence that Defendants' actionable conduct—as opposed to content,

23 protected features, or third-party bad acts—caused it harm.  DeKalb has failed to do so.

24    DeKalb has no competent evidence that it was harmed because of the at-issue features.  For

25 example, DeKalb has no evidence regarding the number of its students who used Defendants'

26 platforms, let alone evidence broken down by students' ages.  Thus, it is unsurprising that DeKalb

27 lacks evidence that Defendants' alleged failure to implement "robust" age verification processes

28 caused it to incur expenses.  DeKalb also has no competent evidence that giving users platform-

level tools to set their own voluntary time limits (above and beyond the controls already available on the users' devices) or changing the processes for account deactivation would have meaningfully reduced the use of any platform by DeKalb students, let alone that any such reduction would have led to DeKalb incurring fewer expenses.  DeKalb similarly lacks evidence that it incurred expenses due to Defendants' alleged failure to implement effective parental controls or notifications as it has no evidence of how many parents already use parental controls or how many would use different controls had they been available.  Indeed, the same holds true for each of the "at-issue" features. Nor has DeKalb presented evidence of what any warning should have looked like or that such a warning would have made a difference to DeKalb's alleged harms.  *Infra*, Section IV(D).

Instead, the only *specific* evidence of harm that DeKalb proffered is harm caused by third-party bad acts and protected publishing activities on Defendants' platforms—precisely the type of conduct the Court has found is not actionable.  By way of examples, DeKalb may attempt to assert that disruptions from students' "scrolling" is sufficient to tether its harms to the "infinite scroll" feature.  Notwithstanding that the Court held that Section 230 bars recovery for allegations focused on "[n]ot providing a beginning and end to a user's 'Feed,'" Dkt. 430 at 16, n.16, DeKalb has no evidence, beyond speculation, that the "scrolling" its students were allegedly doing was on Defendants' platforms.  DeKalb's former interim and deputy superintendent, and current part-time executive administrator, conceded that it was "probable" that the students' "scrolling" was due to them watching a video on Netflix or from looking at a website on the Internet.  Ex. G (Moore-Sanders Dep.) at 187:23–188:18.

Of the 49 disciplinary incidents DeKalb identified as purportedly related to social media, DeKalb's representatives acknowledged that when social media has come up in disciplinary proceedings it is related to *content* on social media.  Ex. O (Logan Dep.) at 213:18–217:21. Likewise, DeKalb's former interim and deputy superintendent, and current part-time executive administrator, claimed that "utilizing social media" might create issues because students "who may not be living what they believe is an ideal life" see others' content on social media suggesting "that everybody is happy and hunky-dory and having a wonderful time."  Ex. G (Moore-Sanders Dep.) at 135:3–19.

There is no dispute that such content on Defendants' platforms was posted by third parties. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (user comments and posts are "prototypical" user-provided content within the scope of Section 230). The Court already determined that Defendants' publication of content falls squarely within the heartland of Section 230, is not actionable, and cannot be used to establish that Defendants caused harm to DeKalb. PI Order at 14–19; *see also, e.g.*, *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1172, 1182 (9th Cir. 2024) (Section 230 protects publishers of "harassing and bullying speech").

While recognizing that "mere publication of third-party content" cannot form the basis of liability under Section 230, the Court in its SD Order carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" certain content through "conduct like providing cash prizes to challenge participants" may not be barred by federal law. SD Order at 25. DeKalb, however, has no evidence that any Defendant provided cash prizes to any participant in a dangerous challenge, created filters that facilitated dangerous challenges, or otherwise "promoted, developed, or participated in a foreseeably dangerous challenge" that caused DeKalb harm beyond the Defendants' mere "algorithmic publication, curation, or amplification" of the challenge. Defendants are therefore entitled to summary judgment regarding challenges. Similarly, the Court recognized that liability might arise as a result of a filter created by a Defendant itself. *Id*. But DeKalb has no evidence that it suffered any harm as a result of filters—let alone a filter created by a Defendant. Summary judgment on filters is thus also warranted.

In short, because DeKalb cannot connect Defendants' actionable conduct—as opposed to third-party wrongdoing or the publication of content—to its alleged injuries, Defendants are entitled to summary judgment. *See, e.g., Lemmon v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (allowing claim to proceed where alleged duty violated was "fully independent of [Defendants'] role in monitoring or publishing third-party content") (emphasis added); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (CDA bars "state tort claims [that] are inextricably intertwined with [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024) (granting summary judgment where claim "intertwined" with conduct protected by Section 230); *see also*

1    *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th

2    Cir. 2013) ("Because there are a tangle of factors that affect refinancing and sale, evidence that

3    certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of

4    those risks from other economic factors."); *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d

5    1130, 1132 (10th Cir. 2009) (granting summary judgment where "theories of loss causation could

6    not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud

7    related news and events").

8           **2.    DeKalb Has No Evidence of Mental Health Harms Tied To Any
              Defendant's Specific Platform.**
9

10          DeKalb's "core theory" of injury—and the basis on which the Court permitted it to proceed

11   at the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive

12   use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond

13   by expending resources."  SD Order at 2.  The record, however, is devoid of competent evidence

14   that DeKalb suffered injuries as a result of its students' "compulsive use" of each Defendant's

15   specific platform(s).  Although DeKalb points to generalized testimony regarding harms from

16   "social media" use or cellphone use writ large, that testimony is insufficient to carry DeKalb's

17   burden that it suffered harm from each Defendant's actionable conduct.

18          As a threshold matter, and as explained in Defendants' Rule 702 motion on general

19   causation, the scientific evidence does not support the theory that that use of Defendants' platforms

20   causes youth to engage in the type of problematic behaviors alleged.  Because DeKalb cannot

21   establish general causation, Defendants are entitled to summary judgment.  *See, e.g., Henricksen v.*

22   *ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) (granting summary judgment

23   following exclusion of general causation opinions under Rule 702).

24          But setting that aside, DeKalb has no competent evidence that any of the alleged harms are

25   attributable to each Defendant's platforms—or even to all Defendants' platforms combined.  "To

26   withstand summary judgment, Plaintiffs [are] required to come forward with some evidence

27   showing a causal link *between each Defendants' negligence* and [Plaintiffs'] injury." *Swint v. Mae*,

28   340 Ga. App. 480, 485 (2017) (emphasis added) (affirming grant of summary judgment in

17

1   defendants' favor where plaintiffs failed to prove, with evidence, a causal link to their injuries from

2   each defendant's actions).  The plaintiff must put forward specific facts establishing the elements

3   of negligence as to *each* defendant and may not rest upon generalized allegations.  *Bradley Center*

4   *v. Wessner*, 250 Ga. 199, 200 (1982); *Tuggle v. Helms*, 231 Ga. App. 899, 902 (1998); *see also*

5   *Cannon v. Jeffries*, 250 Ga. App. 371, 373 (2001) (granting summary judgment for defendants in

6   medical malpractice action where plaintiff's causation expert was only opined that she "*thought*

7   two possibilities *may have contributed*" to plaintiff's injuries without allocating percentage of

8   probability) (emphasis in original); *see Neely*, 584 F.2d at 346 (affirming summary judgment in

9   defendants' favor where "the evidence simply fail[ed] to provide enough information from which

10  a fair-minded juror could logically infer that one explanation of the cause of the contamination

11  [was] more likely true than another."); *Davis v. Firestone Tire & Rubber Co.*, 196 F. Supp. 407,

12  409 (N.D. Cal. 1961) ("A mere 'possibility' of causation is not sufficient, and where the cause

13  remains one of speculation or conjecture, it is the duty of the court to direct a verdict.  Where the

14  evidence leaves the cause of the accident uncertain or unknown, the jury should not be permitted

15  to guess as between possibilities."); *Morris v. Starbucks Corporation*, 1:18-CV-5034-TWT, 2019

16  WL 7496785, *3 (N.D. Ga. Sep.27 2019) (granting summary judgment for defendant in negligence

17  action where "Plaintiff's testimony, standing alone, cannot reasonably support the inference that

18  specific acts of negligence on the part of the Defendant's employees caused [harm].").

19       DeKalb has no competent evidence that any student—much less a significant number of

20  students—has used one or more of Defendants' platforms in a way that harms his/her mental health.

21  DeKalb never tracked and does not have any information about student use of social media, nor did

22  DeKalb track or otherwise quantify the amount of time each student (or even the average student)

23  spends on social media.  *See* Ex. D (Towns 30(b)(6) Dep.) at 102:4–24; Ex. G (Moore-Sanders

24  Dep.) at 132:23–133:20.  DeKalb also did not track any quantitative data establishing how many

25  of its students were referred to mental health services because of social media generally or

26  Defendants' platforms specifically.  Ex. F. (Revels Dep.) at 193:24–194:6.

27       Without such evidence, DeKalb is left with only speculative "anecdotal data" to establish

28  some form of connection between Defendants' platforms and its alleged harms.  But even that

1   "anecdotal data" could only connect the students' alleged diminished mental wellness to

2   *cellphones*—not students' use of Defendants' platforms or any at-issue feature of the platforms.

3   That kind of generalized information, unmoored from DeKalb's actual claims, is insufficient.  *See*

4   PI Order at 14 (focusing on Defendants' "specific conduct"); *Swint v. Mae*, 340 Ga. App. at 485

5   (plaintiff must show connection between "between each Defendants' negligence and [Plaintiffs']

6   injury").

7       DeKalb's executive administrator readily conceded that "there was no data to tell us" that

8   the uptick in referrals for behaviors such as anxiety, depression, feelings of worthlessness, isolation

9   were "related to social media," and the anecdotal support only amounted to reactions from students

10  being required to "put their phones away."   Ex. G (Moore-Sanders Dep.) at 182:10–183:4.

11  Similarly, DeKalb's Director of Wrap Around Services described witnessing a single student at

12  McNair High School exhibit erratic behavior—including screaming "give me my phone back"—

13  when her cellphone was taken away.  Ex. F. (Revels Dep.) at 198:3–199:12.  But she conceded that

14  the student "did not mention social media" during her supposed outburst.  *Id*. at 197:21–205:21.

15      This lack of specific evidence about Defendants' platforms specifically or social media

16  generally, and their alleged effects on DeKalb's students is particularly problematic given that

17  DeKalb's internal documents acknowledge—and its representatives conceded—that disruptions

18  could stem from a variety of other applications or functions of a students' cellphone.  Ex. T at

19  DEKALB797662 ("research indicates a rise in anxiety and depression among students who use

20  phones excessively"); Ex. D (Towns 30(b)(6) Dep.) at 180:1–181:3; *see also* Ex. D (Towns

21  30(b)(6) Dep.) at 102:4–103:13.  This evidence fails to create "a reasonable basis for the conclusion

22  that it is more likely than not that the conduct of the defendant was a cause in fact of the result."

23  *See Callaway Gardens Resort, Inc. v. Grant*, 365 Ga. App. 222, 225 (2022) (holding that decedent's

24  statement that they caught their toe on uneven sidewalk did not establish causation in light of

25  decedent's use of a walking cane, history of Parkinson's disease, recent stroke, history of balance

26  issues, and multiple falls in the years preceding the incident).

27      Equally problematic is DeKalb's broad definition of "social media": "the collective of

28  online communications channels dedicated to community-based input, interaction, content-sharing

1    and collaboration." Ex. Q at DEKALB037872. To illustrate this broad definition, DeKalb refers

2    to "blogging about music, sports or news events"; posting updates on "Twitter," and "participating

3    in a teacher-established Edmodo group" (an online learning platform) as examples of what DeKalb

4    considers to be social media. *See id.* But at the same time, DeKalb has not set forth any evidence

5    that the harms allegedly caused by "social media" are caused specifically by Defendants' platforms,

6    versus other platforms such as Twitter, or "blog[s] about music or news events." *See id.* In fact,

7    according to DeKalb, "[s]ocial media" is "important because social media tools offer exceptional

8    transparency, support effective communication by helping expand reach, foster engagement, and

9    increase access to credible information externally and internally." *Id.*

10        DeKalb's experts likewise fail to link DeKalb's alleged injuries to actionable conduct by

11    each Defendant. For example, Plaintiffs' retained expert Dr. Sharon Hoover groups together all

12    "social media" platforms—including those not at issue. *See generally* Ex. BB (Am. Expert Rep.

13    of Dr. Sharon Hoover). At no point in her report does Dr. Hoover define "social media," and she

14    certainly does not define it to include only the five platforms at issue, let alone separate out those

15    platforms. Dr. Hoover conceded in her deposition that her causation analysis and opinions are not

16    specific to any platform. *See* Ex. CC (August 12, 2025 Hoover Dep.) at 154:2–17 ("I didn't parse

17    out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera.

18    So I didn't think about it that way."), 261:21–262:24 (admitting she did not perform a causation

19    analysis for any individual platform); *see also Nuveen Mun. High Income Opportunity Fund v. City*

20    *of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) (affirming summary judgment where

21    plaintiff failed to set forth expert evidence that took "a tangle of factors" and for failing to

22    "reasonably distinguish the impact of those" factors) (citing *In re Williams Sec. Litig. – WCG*

23    *Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) and noting that the Tenth Circuit affirmed summary

24    judgment for the defendants where the plaintiffs' expert's "theories of loss causation could not

25    distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related

26    news and events").

27                                    *       *       *

28

1    DeKalb's failure to present evidence regarding each Defendant's platform(s) is
2    compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms.
3    *See supra,* Section IV.A.1.  At bottom, DeKalb is required to come forward with evidence that each
4    Defendant's actionable conduct caused it to incur injury.  *See Berry v. Hamilton*, 246 Ga. App. 608,
5    609 (2000) ("[T]he mere fact that an accident happened and a plaintiff was injured affords no basis
6    for recovery unless the plaintiff carries her burden of proof and shows that the accident was caused
7    by *specific acts of negligence of the defendant*" and granting summary judgment in defendants
8    favor where plaintiff failed to meet this burden) (emphasis added).  This requires DeKalb to
9    disentangle both (1) alleged harms flowing from online activity that does not involve a given
10   Defendant, and (2) alleged harms flowing from third-party content and protected publishing
11   activity accessed by students on each Defendant's platform.  But DeKalb and its experts have done
12   neither.  *See* Defs.' Mot. To Exclude Testimony of Sch. Dist. Experts at § III.A (filed Sep. 30,
13   2025).

14   Accordingly, even if Plaintiffs' experts are correct that DeKalb experienced harm due to
15   "social media" generally, their opinions do nothing to establish that DeKalb experienced harm
16   specifically from each Defendant's actionable conduct—*i.e.*, excluding third-party wrongdoing,
17   content published on Defendants' (and others') platforms, and the protected features of Defendants'
18   platforms.  That wholesale failure is fatal on summary judgment.  PI Order at 14–19; *see also*
19   *Nuveen Mun. High Income Opportunity Fund*, 730 F.3d at 1123 ("Because there are a tangle of
20   factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible
21   for a loss must reasonably distinguish the impact of those risks from other economic factors."); *In*
22   *re Williams Sec. Litigation-WCG Subclass*, 558 F.3d at 1132 (granting summary judgment where
23   "theories of loss causation could not distinguish between loss attributable to the alleged fraud and
24   loss attributable to non-fraud related news and events"); *Backpage.com*, LLC, 724 F. Supp. 3d at
25   885 (granting summary judgment where claim "intertwined" with conduct protected by Section
26   230).

27
28

**B.    DeKalb Cannot Show It Is Entitled To Past Damages**

DeKalb, the party seeking damages, "has the burden of proof of showing the amount of loss in a manner in which the jury … can calculate the amount of the loss with a reasonable degree of certainty." *MCI Comms. Servs. v. CMES, Inc.*, 291 Ga. 461, 463 (2012).  And without established damages, DeKalb's claims fail as a matter of law.[5]

DeKalb adduced no competent evidence to prove that it is entitled to damages for any of the categories of injuries that this Court allowed to proceed.  No competent evidence supports that DeKalb suffered any injuries for "diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage." SD Order at 19–20.

Three reasons merit summary judgment on this issue.  *First*, while DeKalb seeks to recover past damages based on its experts' calculation of damages relating to alleged "lost time"—*i.e.*, costs related to the percentage of time that DeKalb teachers purportedly had to spend addressing issues related to "social media" these costs are not recoverable under Georgia law.  In any event, DeKalb lacks competent evidence that it actually incurred such damages.  *Second*, DeKalb has no competent evidence that it hired new mental health personnel, developed new mental health resources, implemented other new resources, or incurred any other out-of-pocket costs as a result of Defendants' actionable conduct.  *Third*, DeKalb cannot recover for repairing property damage because—to the extent DeKalb has any evidence of property damage related to Defendants' platforms—the evidence is undisputed that this damage resulted from third-party acts, which the Court has held cannot form the basis of liability.

---

[5] To maintain a cause for negligence, a plaintiff must prove damages as an essential element of the claim.  *Johnson v. Am. Nat. Red Cross*, 253 Ga. App. 587, 591 (2002).  "Failure to demonstrate recoverable damages is fatal to… claims of negligence."  *Id.* (affirming trial court's granting of defendant's summary judgment motion on ordinary and professional negligence where plaintiff "failed to present evidence of any recoverable damages").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 1. DeKalb Cannot Show Defendants Caused It To Divert Financial Resources

There is no evidence establishing with "reasonable certainty" that DeKalb diverted financial resources as a result of Defendants' actionable conduct. *MCI*, 291 Ga. at 463. DeKalb does *not* claim that it had to hire any additional teachers or staff as a result of Defendants' platforms. Instead, DeKalb claims that "relevant staff time during the school day—such as that of teachers—is finite" and that "some portion of that time is redirected away from other tasks," to purportedly deal with the distractions of "Defendants' conduct." Ex. U (Am. Expert Rep. of Dr. Bryce Ward) at ¶ 10. On that theory, DeKalb asserts that it is entitled to $178.5 million in "lost time" damages for the time that its teachers purportedly spent addressing issues related to social media. But that is not a recoverable category of damage, and DeKalb has not met its evidentiary burden to prove entitlement to the claimed amount. *See MCI Comms.*, 291 Ga. at 464 ("MCI cannot recover loss of use damages absent some showing of monetary loss").

### a. DeKalb Cannot Recover "Lost Time" Damages

Under Georgia law, the "underlying principle of compensatory damages" is to "put the aggrieved party in the position, as near as possible, as he or she would have been without the injury or damage." *MCI Comms.*, 291 Ga. at 464 (emphasis added). Because "an injury to a person or damage to property is required for a tort to be actionable," damages cannot be based on the claim that the defendant's conduct has interfered with the plaintiff's ability to use its existing infrastructure or services. *See id.* at 464. "[T]he purpose of damages is to place an injured party in the same position as it would have been in had there been no injury or breach of duty, that is, to compensate for the injury actually sustained." *Id.* at 462. Where "damages are not based *on amounts… actually lost*, requiring [the defendant] to pay these "damages" would only result in an unfair windfall" to the plaintiff. *Id.* at 465 (emphasis added). Applying this principle, courts have held that a plaintiff cannot recover damages for "lost time" absent a showing of actual monetary loss. *Id.* at 464 ("MCI cannot recover loss of use damages absent some showing of monetary loss"); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 307, 309, 312 (S.D.N.Y. 2018) (holding that Georgia law does not recognize lost time as a cognizable damage absent proof

23

1    of lost earning or income associated with lost time, citing *Atlanta & W.P.R. Co. v. Haralson*, 133

2    Ga. 231 (1909) and *Nipper v. Collins*, 90 Ga. App. 827 (1954)).

3        DeKalb does not seek to recover damages for "amounts … actually lost." *MCI*, 291 Ga. at

4    465.  Instead, DeKalb points to unverified survey responses from 187 teachers—only 6% of

5    DeKalb's current middle- and high-school teachers—about the amount of time in their day they

6    purportedly spent addressing "distractions" due to social media over the past decade. Ex. V (Expert

7    Rep. of Robert Klein) at ¶¶ 20, 22–41.  DeKalb's experts then took those responses, calculated the

8    percentage of instructional time purportedly spent addressing social media, and multiplied that

9    percentage against the wages and benefits to all middle-school and high-school teachers within the

10   DeKalb school district to come to a sum of $178.5 million.  Ex. V (Expert Rep. of Robert Klein) at

11   ¶ 41; Ex. U (Am. Expert Rep. of Dr. Bryce Ward) at ¶¶ 1, 34–36.

12       That is not an "actual loss" under Georgia law.  DeKalb did not spend $178.5 million as a

13   result of "lost" teacher time due to Defendants' platforms, and it did not hire any new teachers or

14   pay any teachers additional wages or benefits.  DeKalb's own expert admitted that money DeKalb

15   pays its teachers in salary and benefits is not dependent on how time is spent performing their

16   duties.  Critically, DeKalb would have paid that same amount in wages and benefits to its teachers

17   even if Defendants' platforms did not exist at all or if fewer of its students used Defendants'

18   platforms.  *See* Ex. EE (Ward Dep.) at 165:21–166:11, 167:8–169:6 (Plaintiffs' damages expert

19   agreeing he is not "opining that because of Defendants' platforms specifically any school district

20   had to pay teachers more than they would have paid teachers if Defendants' platforms did not

21   exist"); 187:15–188:18; *see MCI Comms.*, 291 Ga. at 461 (noting that plaintiff produced "no

22   evidence that it issued any customer refunds or credits, lost any customers, or lost any profits due

23   to" defendant's conduct).  As a result, any award of damages would not restore DeKalb to its prior

24   position but instead be a windfall—precisely the result Georgia law prohibits.  *See MCI*, 291 Ga.

25   at 463, 465 ("[C]ompensation, not enrichment, is the basis for the award of damages …. As MCI's

26   claimed loss of use damages are not based on amounts MCI actually lost, requiring CMES to pay

27   these 'damages' would only result in an unfair windfall to MCI.").

28       The Georgia Supreme Court's ruling in *MCI Communications* is instructive.  There, a

24

1   telecommunications company sought damages against an excavator that accidentally severed one

2   of the company's underground fiber-optic cables.  291 Ga. at 461.  The Supreme Court held that

3   the company had incurred no monetary loss beyond cost of repair; the company "did not suffer any

4   lost profits, and thus it has failed to show damage qualifying as loss of use that would require

5   compensation."  *Id*. at 464.  In rejecting the company's argument that it was required to use its

6   spare restorative system and was thus entitled to reimbursement, the Supreme Court held that "to

7   require [defendant] to reimburse the cost of a system that MCI uses for several purposes and for all

8   kinds of outages, including those caused by MCI or other third parties, would be inequitable and

9   would result in placing MCI in a position significantly better than it would have been without the

10  severance."  *Id*. at 464.

11      So too here: as in *MCI*, DeKalb did not expend any additional money because its staff's

12  time was allegedly diverted because of Defendants' platforms and thus it did not incur any actual

13  monetary loss from Defendants' actionable conduct.  Accordingly, DeKalb cannot prove that it

14  incurred an actual monetary loss due to Defendant's actionable conduct and cannot recover any

15  damages to compensate it for salaries and benefits it would have paid anyway.

16          **b.  DeKalb Has No Competent Evidence To Establish "Lost Time"**
17              **Damages.**

18      Even if the Court were to accept that DeKalb could recover "lost time" damages in theory,

19  DeKalb has not met its burden to adduce competent evidence to justify this award.  *Pollman*, 689

20  Ga. at 768.

21      During fact discovery, DeKalb did not produce any documentary or contemporaneous

22  evidence supporting its claims of lost time attributable to Defendants' actionable conduct, and

23  DeKalb's own personnel readily admitted there is no such evidence. Ex. D (Towns 30(b)(6) Dep.)

24  at 94:19–96:15; Ex. G (Moore-Sanders Dep.) at 133:21–134:23, 185:24–186:11; Ex. O (Logan

25  Dep.) at 200:15–201:6.  The singular line in DeKalb's former Chief Information Officer's affidavit

26  stating that "teachers, principals, and other staff who work in schools consistently reported that

27  students were attempting to access social media…" is insufficient for lack of personal knowledge

28  and hearsay.  *See* Ex. FF (Davis Affidavit) at ¶ 9; Fed. R. Evid. 602, 801.  Even if the Court credits

25

1    this statement, it does not establish the amount of time purportedly lost.  At most, DeKalb sets forth

2    vague, anecdotal, post hoc, non-specific references to time spent attending to purported disruptions

3    due to cell phone use or social media use generally (*i.e.*, not specifically as to any of Defendants'

4    platforms or its actionable features)—typically in the form of hearsay statements by individuals

5    lacking personal knowledge.

6          DeKalb then attempts to patch this hole through expert testimony.  DeKalb relies on the

7    survey responses from 187 unnamed teachers that do not identify the purported teacher by name,

8    are not signed under penalty of perjury, and are only in the record via DeKalb's expert reports,

9    making them inadmissible hearsay.  *See* Fed. R. Civ. P. 56(c); *Orr v. Bank of Am., NT & SA*, 285

10   F.3d 764, 774–778 (9th Cir. 2002); Fed. R. Evid. 801.  The use of a retrospective survey to

11   purportedly measure—down to the minute—the amount of time that teachers purportedly spent

12   dealing with social-media related "distraction" for periods of up to a decade or longer is not a

13   reliable methodology.  *See* Defs.' Mot. To Exclude Testimony of Sch. Dist. Experts at §§ III.A, B,

14   C, E (filed Sep. 30, 2025).  And DeKalb's survey expert did nothing to test or ensure that the

15   answers of the self-selected *6%* of teachers who responded to the survey could be extrapolated

16   reliably and applied to the other *94%* of teachers who declined to participate.  DeKalb thus failed

17   to establish with "reasonable certainty" their estimate of lost time damages.

18         Indeed, the survey questions ask only about time spent dealing with "social media"

19   generally.  Even though the survey was designed by DeKalb expressly for this litigation, the

20   questions were not specific to the four Defendants in this case.  And they made no effort to

21   distinguish between time spent dealing with issues arising from the at issue features, as opposed to

22   issues arising from, for example, third-party content posted on Defendants' (or other) platforms.

23   Accordingly, the "lost time" estimates are plainly not estimates of time spent addressing

24   Defendants' actionable conduct.

25         In short, DeKalb has not met its "burden of proof of showing the amount of loss in a manner

26   in which the jury … can calculate the amount of the loss with a reasonable degree of certainty"

27   *Tucker Nursing Ctr., Inc. v. Mosby*, 303 Ga. App. 80, 82 (2010); *see also Cotto Law Grp., LLC v.*

28   *Benevidez*, 362 Ga. App. 850, 853–54 (2022) (holding that an award of zero damages is authorized

if the plaintiff fails to offer sufficiently specific or credible evidence to enable the calculation of damages with reasonable certainty).  Because there is neither admissible nor non-speculative evidence as to the amount of time actually lost, summary judgment should be granted for Defendants.  *Id.*; *see also* Defs.' Mot. To Exclude Testimony of Sch. Dist. Experts at §§ III.B, C, D, E, F, and G (filed Sep. 30, 2025).

### 2.  DeKalb Has No Admissible Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms

DeKalb fares no better in its attempt to justify its damages for alleged out-of-pocket costs— *i.e.*, new mental health personnel or third-party vendor costs.  There is no evidence that any of these costs were the result of Defendants' actionable conduct.

### a.  DeKalb Has No Evidence It Hired New Mental Health Personnel Because of Defendants' Platforms

While DeKalb initially claimed that it had to hire new staff to address mental health issues caused by Defendants' platforms, *see* Ex. A ¶ 22 (stating that DeKalb had to "hire additional mental health personnel… develop additional mental health resources"), DeKalb adduced no evidence that it hired any new mental health personnel or developed new mental health resources, and therefore incurred additional expenses, as a result of Defendants' actionable conduct.  *See supra,* Section IV.A.2.  Thus, DeKalb cannot show any basis for recovering this category of damages.  *MCI Comms. Servs.*, 291 Ga. at 462.

### b.  DeKalb Has No Admissible Evidence It Implemented New Programs Because of Defendants' Platforms

DeKalb seeks $1,585,398 in damages related to physical barriers to keep its students from accessing their phones while at school (*i.e.*, the costs for Yondr pouches and cellphone lockers incurred in 2024) and internet content filters (*i.e.*, 30% of costs from 2020 to present for Lightspeed software that allows DeKalb to filter out applications or other content from being accessed on district-issued devices or devices connected to DeKalb's networks).  *See* Ex. W (Expert Rep. of Jeffrey E. Meyers) at Appendix C.  But DeKalb's effort to tag Defendants with these costs fails for three reasons: (1) DeKalb has not shown that these expenses were triggered by students' use of *Defendants'* platforms, as opposed to their phones generally; (2) DeKalb has not shown that it was the "at issue" features of Defendants' platforms, as opposed to third-party content or protected

1    publishing activity, that triggered the need for physical and electronic barriers; and (3) DeKalb has

2    not calculated its alleged damages with any reasonable degree of certainty.

3          *First*, DeKalb cannot show that Defendants caused these damages.  The record is replete

4    with evidence that DeKalb purchased Yondr and cellphone lockers to keep students from accessing

5    their phones *generally*, not just Defendants' platforms.  *See* Ex. T at DEKALB797676 ("The

6    DeKalb County School District has launched a new initiative to reduce student *cellphone use* during

7    the school day.  This initiative involves a pilot program utilizing two different approaches: Yondr

8    Pounches… Cell Phone Lockers"… "The primary goal of this initiative is to improve student focus

9    and reduce distractions in the classroom by *limiting cell phone access* during school hours.")

10   (emphasis added).  Likewise, Lightspeed software—the technological blocker deployed by DeKalb

11   since 2014 to ensure DeKalb's compliance with CIPA—does far more than just filter Defendants'

12   platforms. Ex. N (Davis Dep.) at 135:2–136:16; Ex. X at DEKALB136970 (DeKalb seeking Board

13   approval of Lightspeed renewal, explaining that "[a]ccording to the Children[']s Internet Protection

14   Act (CIPA), school districts must filter inappropriate content on the internet" and "Lightspeed

15   Content Filter enables the district to provide this protection").  DeKalb has no competent evidence

16   that its Lightspeed costs—which it admitted federal law requires—are any greater because of social

17   media writ large, let alone Defendants' platforms.  Implementation of this technology even

18   precedes introduction of the TikTok platform.

19         *Second*, even if DeKalb could show that Defendants' platforms were one of the District's

20   many considerations in incurring these costs, DeKalb makes no showing that it incurred these costs

21   because of the *features* of Defendants' platforms to which this litigation is limited.  But DeKalb

22   has not shown that it incurred these costs because of Defendants' actionable conduct.  Instead, its

23   damages request is as to costs allegedly incurred in dealing with "social media" generally, which

24   amounts to an improper attempt to circumvent this Court's ruling.  Indeed, Plaintiffs' "out-of-

25   pocket damages" expert, Jeffrey Meyers, admits that he "has no way of knowing" whether "in the

26   absence of [D]efendants' at-issue conduct" any district's internet content filter costs "would have

27   been the same or less or more."  Ex. GG (Meyers Dep.) at 270:8–17.  Such costs related to "social

28   media" generally with no attempt to isolate the effects of the at-issue features cannot serve as the

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (DEKALB) (SD MSJ No. 5)
4:22-md-03047-YGR

1  basis for recovery of damages.  *See MCI Comms.*, 291 Ga. at 462–463 ("In a negligence action, an

2  out-of-pocket measure of damages is commensurate with the culpability of the tortfeasor…");

3  *Tuggle v. Helms*, 231 Ga. App. 899, 901–902 (1998) ("[That] the plaintiff may have sustained

4  injuries or damages affords no basis for recovery against a particular defendant unless the plaintiff

5  carries the burden of proof and shows that… [its] damages were caused by specific acts of

6  negligence on the part of the defendant.").

7      *Third*, DeKalb has not presented evidence that would render it possible to calculate the

8  amount of loss caused by Defendants' actionable conduct with any reasonable degree of certainty.

9  *MCI Comms. Servs.*, 291 Ga. at 463.  DeKalb does not track costs incurred from social media

10  generally, let alone the aspects of each Defendant's platform that the Court deemed actionable.[6]

11  Nor did DeKalb take any actions to track expenditures attributable to cellphone use generally, social

12  media writ large, or Defendants' platforms specifically as those expenditures occurred.  Ex. Z

13  (Schueneman 30(b)(6) Dep.) at 41:12–42:13.  This lack of specificity is particularly problematic

14  given the evidence that DeKalb incurs costs to curb its students' interaction with their cellphones

15  generally.  *See generally*, Ex. T at DEKALB797676; Ex. X; Ex. O (Logan Dep.) at 95:13–96:5; *see*

16  *Tuggle*, 231 Ga. App. at 902–903 (A plaintiff "must produce evidence which affords a reasonable

17  basis for the conclusion that it is more likely that not that the conduct of the defendant was a cause

18  in fact of the result. A mere possibility of such causation is not enough.").  DeKalb has therefore

19  adduced no competent evidence to allow a factfinder to be able to proportion costs appropriately

20  or to calculate damages with reasonable certainty.  *See MCI Comms. Servs.*, 291 Ga. at 463.

21

22

---

23  [6] DeKalb has no basis to recover 30% of its Lightspeed costs.  DeKalb based this percentage on its
    former Chief Information Officer's claim that "30% of Lightspeed costs are related to the District's
24  attempts to block and/or limit social media."  *See* Ex. W (Expert Rep. of Jeffrey E. Meyers) at ¶¶
    21-22; Ex. FF (Davis Affidavit) at ¶ 15.  But this statement rests on estimates by *other*, unnamed,
25  IT personnel as to how much time was expended in managing students' attempts to "bypass
    Lightspeed to access prohibited material, including social media" in 2024. Ex. FF (Davis Affidavit)
26  at ¶ 15.  This estimate is not limited to Defendants' platforms or even social media.  Further, DeKalb
    cannot explain why this 30% estimate, couched specifically with regard to Lightspeed in 2024,
27  should apply to Lightspeed costs incurred from 2020 to 2023, particularly where DeKalb has been
    incurring these costs since at least 2014 to be in compliance with CIPA.  *See Cotto Law Group*,
28  362 Ga. App. 853-54.  In any event, the statement is inadmissible hearsay and made without
    personal knowledge.

### 3. DeKalb Cannot Recover for Property Damage That Results from Third-Party Acts

Dekalb's Second Supplemental Initial Disclosure stated that DeKalb was seeking $667,654 relating to unspecified "Public Safety Expenses & Property Damage" allegedly caused by social media. But DeKalb has not presented evidence of specific instances of property damage that it attributes to Defendants and DeKalb's experts have not purported to calculate the amounts DeKalb has purportedly spent to address such property damage. And any such damage would have been caused by third-party acts, such as alleged vandalism purportedly stemming from social media challenges. Indeed, when asked to substantiate its property damages, DeKalb "refer[red]" Defendants to allegations in the Master Complaint, where allegations of property damage are tethered to Defendants' publication of content. *See* Ex. HH at 4 ("Plaintiff also refers Defendants to Part (IV) of the Plaintiffs' First Master Complaint (Local Government and School District) (ECF No. 729) for its contentions."); Master Compl. ¶¶ 109, 186, 787–788. But, as explained above, the Court precluded DeKalb from recovering for such conduct unless it could show that Defendants promoted the third-party content, such as by creating a filter to facilitate the challenge or paying participants cash prizes—and it did not. *Supra,* Section IV.A; SD Order at 25.

### C. DeKalb's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under Georgia Law

DeKalb further seeks between $2.4 and $4.3 billion to implement a proposed 15-year "strategic plan," authored by Plaintiff's expert, Dr. Sharon Hoover, to address anticipated student wellbeing and learning issues in the future (the "Hoover Plan"). *See generally,* Ex. BB (Am. Expert Rep. of Dr. Sharon Hoover). The Hoover Plan does not recommend that DeKalb stop allowing its students to access Defendants' platforms on its networks or devices or recommend changes to Defendants' conduct. The Hoover Plan's recommended staffing levels have no relationship to the number of DeKalb's students using Defendants' platforms or the amount of time they spend on the platforms. Nor is the Hoover Plan tied to addressing mental health issues allegedly resulting only from Defendants' platforms: the plan's recommendations are divorced from any attempt to estimate the level of alleged harm from Defendants' platforms to DeKalb or its students. Instead, the plan

30

applies to all students regardless of whether they use Defendants' platforms.  For example, the plan recommends hiring 1,910 additional staff to provide, among other things:

- "Screen Time Management Initiatives" which include a "ban on personal electronic devices during the school day," rather than a ban on accessing any specific social media platform;

- "Life skills programming" to teach students "empathy, emotion regulation, [and] navigating social pressure";

- "Mental Health literacy" to educate students, educators, and families about mental health challenges, not just those limited to use of Defendants' platforms;

- "Positive School Culture and Community Building," for schools to "promote offline social activities," which would involve expending resources on initiatives that are completely disconnected from Defendants' platforms or the internet;

- Promotion of in-person social activities such as clubs and community events to encourage belonging; and

- "Intensive mental health treatment" for students allegedly suffering from psychological effects of social media and other causes.

*See* Ex. BB (Am. Expert Rep. of Dr. Sharon Hoover) ¶¶ 59–73.

The Hoover Plan is not a cognizable remedy for either of DeKalb's claims.  *First*, DeKalb cannot recover the strategic plan as equitable relief for its nuisance claims for two separate reasons: (i) DeKalb admitted it has an adequate remedy at law—damages for its alleged nuisance and negligence claims—which forecloses any equitable relief; and (ii) even if DeKalb lacked an adequate remedy at law, the strategic plan is not a permissible remedy under Georgia law, which *only* allows a public nuisance to be abated by injunction.  *Second*, the Hoover Plan is not recoverable as future damages for DeKalb's negligence claim because it cannot be determined with reasonable certainty that DeKalb will incur the expenditures laid out in the 15-year Hoover Plan. *Third*, even if the Hoover Plan qualified as permissible equitable relief or future damages, the largest component of the strategic plan—the funding of mental health treatment for students—is impermissibly derivative of alleged injuries to students.

1

2

### 1. DeKalb Cannot Recover the Plan as Equitable Relief for Its Nuisance Claim

3

#### a. DeKalb Has an Adequate Remedy at Law

4

5

6

7

8

9

10

11

12

13

14

15

16

To obtain equitable relief, a plaintiff must show it lacks an adequate remedy at law. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020) (plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution"); *see Mitsubishi Int'l. Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994) (applying Georgia law and holding that "it is axiomatic that equitable relief is only available where there is no adequate remedy at law, and there is nothing in the Georgia statutory or decisional law to indicate that ordinary maxims of equity jurisprudence do not apply.  Indeed, the Georgia Code specifically provides that 'equity will not take cognizance of a plain legal right where an adequate and complete remedy is provided by law.'" (internal citations omitted)); *Wood v. Marathon Ref. Logistics Serv. LLC*, 4:19-cv-04287-YGR, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (Gonzalez Rogers, J.) (granting summary judgment on equitable remedy because "Plaintiffs have not explained why the existing remedy [at law] is inadequate").  DeKalb cannot do this because it admits that future damages are available for the same alleged harms.

17

18

19

20

21

22

23

24

25

26

27

Courts have consistently held that a remedy is "adequate" where damages are legally available, even if the plaintiff ultimately cannot prove entitlement to them. *See, e.g., Rhynes v. Stryler Corp.,* No. 10-5619, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable.") (emphasis in original); *Robinson v. C.R. Bard, Inc.*, 16-cv-00942-JST, 2016 WL 3361825, at *3 (N.D. Cal. June 17, 2016) (dismissing UCL claim because an adequate remedy at law existed through the "compensatory damages" sought by the plaintiff, even though all legal claims were simultaneously dismissed as barred by the statute of limitations; "the fact that Robinson's other claims have been barred by the statute of limitations does not affect the court's analysis").

28

DeKalb's nuisance and negligence claims rest on the same alleged conduct—the design of Defendants' platforms—and its proposed "strategic plan" is offered as both abatement and future damages. *See* Dkt. 2184 ("[I]n addition to abatement for those SDs with live nuisance claims, the plans also serve as a measure of future damages under their negligence claims."). That overlap makes equitable relief unavailable regardless of whether DeKalb is able to prove future damages (which as discussed below, it is not). *See Sonner*, 971 F.3d at 844 (affirming dismissal of claim for equitable relief because plaintiff "seeks the same sum in equitable restitution as … she requested in damages to compensate her for the same past harm"). Thus, the real problem is not that DeKalb lacks an adequate remedy at law but its inability to prove its entitlement to that remedy.

### b. The Strategic Plan is Not a Proper "Abatement" Remedy

Even if DeKalb were entitled to the equitable remedy of abatement (it is not), the strategic plan is not a proper abatement remedy under Georgia law because (i) it seeks monetary, not injunctive relief, and (ii) it is not aimed at the conduct allegedly causing the nuisance.

*First,* under well-established Georgia law, "a public nuisance may be abated in equity *by injunction only.*" *Green Meadows*, 372 Ga. App. at 733 (quoting *Davis v. Stark*, 198 Ga. 223, 230 (1944)) (emphasis in original) (reversing appointment of receiver to abate nuisance due to lack of "statutory authority or binding Georgia caselaw affirming the appointment of a receiver in any factual situation even remotely analogous to this one"). The strategic plan fails this test because it is focused on monetary relief, rather than injunctive.

*Second,* and independently, the Hoover Plan is not proper abatement relief because it targets supposed downstream effects of conduct rather than the offensive conduct itself. In the limited circumstances where Georgia has approved abatement relief, that relief has targeted the *offensive conduct itself*. *See, e.g.*, *Superior Farm Mgmt., L.L.C. v. Montgomery*, 270 Ga. 615 (1999) (affirming injunction halting construction of hog breeding facility as abatement of nuisance); *J. D. Jewell, Inc. v. Hancock*, 226 Ga. 480, 175 S.E.2d 847 (1970) (affirming order enjoining defendants from processing spoiled animal byproducts, which caused obnoxious odors that affected nearby residents, in order to abate the public nuisance). The Hoover Plan does no such thing. It consists solely of generalized recommendations for DeKalb to develop "comprehensive school mental

33

1    health systems to address" the alleged "damaging effects of social media." *See* Ex. AA (Am. Expert

2    Rep. of Dr. Douglas Leslie) at ¶ 12; *see also, generally,* Ex. BB (Am. Expert Rep. of Dr. Sharon

3    Hoover).  As in *Green Meadows*, there is no common law precedent or statutory authority that

4    supports the implementation of a strategic plan that targets downstream *effects* rather than the

5    offensive conduct itself, to abate a public nuisance.

6         The Hoover Plan does not seek to address Defendants' allegedly actionable conduct.  The

7    Hoover Plan would not require Defendants to change how they design, operate, or market their

8    platforms in general or for youth specifically—a fact that Hoover concedes.  Ex. DD (August 13,

9    2025 Hoover Dep.) at 525:21–526:3 ("I don't think I'm offering an opinion that the social media

10   companies change their design.").  The Hoover Plan does not recommend that DeKalb stop

11   allowing its students to access Defendants' platforms on its networks or devices and does not

12   recommend changes to Defendants' conduct.  There are no recommendations, for example, for

13   Defendants to remove any of the specific features at issue here, such as filters, or requirements that

14   Defendants revise their warnings or parental controls.  Because the Hoover Plan does not seek, in

15   equity, to address Defendants' conduct, the Hoover Plan is not proper "abatement" relief. *See, e.g.*,

16   *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 483–84 (S.D.W.V.

17   2022) (rejecting abatement plan "directed" at treating downstream harms of opioid use, rather than

18   "any of defendants' alleged nuisance-causing conduct"); *State ex rel. Hunter v. Johnson & Johnson*,

19   499 P.3d 719, 729 (Okla. 2021) (rejecting abatement plan that "does not stop the act or omission

20   that constitutes a nuisance").

21        Nor is the Hoover Plan tied to addressing mental health issues allegedly resulting *only* from

22   Defendants' platforms: the plan is not tied to the harms allegedly resulting from the design of

23   Defendants' platforms, and it goes far beyond what would be necessary to address any impacts of

24   the design of Defendants' platforms on DeKalb.

25        For example, the Hoover Plan seeks to address certain issues, such as bullying or

26   cyberbullying, which representatives from DeKalb admitted are issues that may occur without

27   social media use at all.  *See, e.g.,* Ex. D (Towns 30(b)(6) Dep.) at 128:2–14 (conceding that bullying

28   could occur without social media and that certain types of bullying exist extrinsic to social media);

*see also* Ex. H (stating that "violence has been a concern not only in our district, but also across the nation" and attributing uptick in bullying and violence to the pandemic). In fact, representatives from DeKalb directly attributed a rise in cyberbullying to the COVID-19 pandemic and *not* to any of Defendants' platforms. Ex. D (Towns 30(b)(6) Dep.) at 131:23–132:19 (agreeing that the pandemic caused behavioral issues, like instances of bullying, fighting, and other disturbing behavior, with and among students in DeKalb schools).

DeKalb has not adduced credible evidence as to how the Hoover Plan will "abate" any current or past harms allegedly caused by Defendants' platforms. The Hoover Plan focuses on supporting DeKalb's students for the next 15 years, which necessarily includes potential students who are now babies—and those who are not yet even born—and who have neither attended DeKalb schools nor used, much less suffered any alleged harm from, any Defendant's platform. It is impossible to predict whether any of those babies and unborn children will ever use Defendants' platforms or their allegedly harmful features, if those features still even exist years in the future. In fact, the services recommended in the Hoover Plan likely will not be available to help many current students who are allegedly suffering harms related to Defendants because they will age out of the DeKalb school system before any plan is fully implemented. *See* Ex. BB (Am. Expert Rep. of Dr. Sharon Hoover) at ¶¶ 102–134 (for each recommendation, proposing the first year for "training" of teachers to lead implementation and then years 2–15 generally for implementation). Thus, even if it were proper "abatement" relief to remediate the downstream personal injuries allegedly resulting from nuisance-causing conduct, the strategic plan does not do that. It is not tied to remediating mental health issues allegedly caused by Defendants but is instead a wish-list of programs that schools could provide in an ideal world to benefit all students, not just users of Defendants' platforms, and to solve endemic staffing, budget problems, and a host of societal ills not created by Defendants. Ex. CC (August 12, 2025 Hoover Dep.) at 300:19–307:5, Ex. DD (August 13, 2025 Hoover Dep.) at 622:22–624:4, 644:7–647:23 (explaining why 47 to 48 of the 50 states do not meet national recommendations on the number of school psychologists: "[W]e have a context and a history of … workforce challenges with respect to school psychologists…. [I]n my experience

1   with districts, it's because they don't have the resources to hire the needed professionals…. [I]t's

2   often because they don't have the funding to hire a needed school psychologist.").

3       No Georgia cases (or any appellate cases in the country) have recognized the sort of

4   "monetary abatement" remedy that DeKalb seeks. Defendants are aware of only two trial courts in

5   the country that have awarded this type of monetary abatement to treat downstream consequences

6   of alleged nuisance-causing conduct, both in the context of the opioid litigation. One was vacated

7   on appeal when the Sixth Circuit overruled the MDL court and held (like the other appellate court

8   to have considered the issue, the Oklahoma Supreme Court) that there was no cause of action for

9   public nuisance under the circumstances in the first place.[7] The other is a Maryland trial court

10  decision, which relied on that vacated MDL opinion.[8] DeKalb's strategic plan is therefore not

11  proper abatement relief and should be denied as a matter of law.

12      DeKalb's abatement plan would not pass muster even under the cases that have permitted

13  the payment of money as an equitable abatement remedy. *See, e.g.*, *People v. ConAgra Grocery*

14  *Products Co.*, 17 Cal. App. 5th 51 (2017); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods.*

15  *Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020). In *ConAgra*, the abatement remedy consisted

16  of an order for defendants to fund the removal of the lead paint from homes. 17 Cal. App. 5th at

17  132–33. It did not involve a monetary fund to treat downstream consequences of the alleged

18  nuisance, like funding for medical expenses or other treatment. Indeed, the court specified that

19  "the abatement account would be utilized not to recompense anyone for accrued harm but solely to

20

21  [7] *In re Nat'l Prescription Opiate Litig.*, No. 22-3750, 2025 WL 354758 (6th Cir. Jan. 31, 2025)
    (citing *In re Nat'l Prescription Opiate Litig.*, —N.E. 3d—, No. 23-1155, 2024 WL 5049302, at *7

22  (Ohio Dec. 10, 2024)) (recognizing that Ohio Supreme Court, via certified question, held that state
    statute overruled prior Ohio Supreme Court case permitting a cause of action for public nuisance

23  against gun manufacturers for unreasonably interfering with the public health and safety, and
    holding that nuisance claims brought by Ohio cities and counties in opioid litigation should have

24  been dismissed at the outset).
    [8] *See Mayor & City Council of Baltimore v. Purdue Pharma, L.P.*, No. 24-C-18-000515

25  (Md.Cir.Ct. Aug 8, 2025). There, the trial court held that the City of Baltimore could recover as an
    equitable remedy a "monetary abatement remedy" from two distributors of prescription opioids to

26  fund certain voluntary programs aimed at reducing harms associated with both legal and illegal
    opioid abuse. The court did not cite any Maryland cases that have awarded such a "monetary

27  abatement remedy," but relied only on the overturned opioid MDL trial court. In any event, even
    that opinion would not support the vast majority of Dr. Hoover's plan because the court rejected

28  the City's request for funding for "all of the proposed costs for treatment services and for supplies
    of the three … medications used in treatment." *Id.* at 26.

36

pay for the prospective removal of the hazards"—*i.e.*, removal of the lead paint from homes. *Id.* The abatement remedy was therefore tied to eliminating the defendants' conduct and removing the pollutant from the environment, not treating injuries from lead paint ingestion. Likewise, *In re JUUL Labs*, which was decided at the motion-to-dismiss stage, held only that an abatement fund might theoretically be proper and agreed with the general principle that "an equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff." 497 F. Supp. 3d at 653 (emphasis added) (quoting *ConAgra*, 17 Cal. App. at 132). The court was not faced with a fully developed evidentiary record of what the prospective fund might consist of or whether the proposed fund was actually tailored to address the alleged nuisance.

### 2. The Costs of the Strategic Plan Are Not Recoverable as Future Damages

Nor can DeKalb rescue the Hoover Plan by classifying its costs as future damages. The evidence provided by DeKalb renders future damages too remote and speculative to survive summary judgment. In Georgia, "at the summary-judgment stage, reasonable inferences to be drawn from [a plaintiff's] evidence of damages cannot be based on mere conjecture or possibility or upon evidence which is too uncertain or speculative." *Accessory Overhaul Grp., Inc. v. Mesa Airlines, Inc.*, 994 F.Supp.2d 1296 (N.D. Ga. 2014). "If the damage incurred by the plaintiff is only the imaginary or possible result of a tortious act, such damage is too remote to be the basis of recovery against the wrongdoer." *J.N. Legacy Grp., Inc. v. City of Dallas*, 322 Ga. App. 475, 485 (2013) (cleaned up).

DeKalb cannot show that it reasonably expects to have to make the expenditures recommended in Hoover's Plan over the next 15 years as a result of Defendant's actionable conduct. Rather, the plan is a separate, recommended expense that the district could, but does not have to, expend to fund programs to deal with student mental health generally—untethered to any specific features of Defendants' platforms. DeKalb has not instituted the Hoover Plan and presented no competent evidence that it will succeed in hiring the personnel or instituting the programs recommended by the Hoover Plan, nor that it is even reasonably certain to incur any of the hypothetical costs required to implement all of the Plan's components. The Hoover Plan is thus too "uncertain or speculative" to support the award of future damages. *See, e.g., Nobles v. Jiffy*

37

*Mkt. Food Store Corp.,* 260 Ga. App. 18, 21 (2003) (rejecting claim for future damages where neither an 18–year lease "nor any evidence cited to this court attempted to determine whether these up-front payments would bear any reasonable relationship to [plaintiff's] actual future damages, and it is difficult to infer such a relationship given the lengthy lease period"). Although Dr. Hoover testified that the plan constitutes "best practices," no public school district in the country has ever implemented this type of plan, and there is no professional organization that has ever suggested that a plan of this nature is necessary or advisable to address student use of social media in general, much less just Defendants' platforms. Ex. DD (August 13, 2025 Hoover Dep.) at 607:12–16; 806:16–807:6. A suggestion of expenditures for a novel set of optional, recommended programs that might be made only if a plaintiff receives a large monetary award in a lawsuit is not the type of "reasonably certain" future damages that are recoverable in Georgia.

### 3. DeKalb's Strategic Plan Is Impermissibly Derivative

Finally, DeKalb cannot recover for damages under the Hoover Plan as a matter of law because the Plan seeks to develop discretionary programs to educate, treat, and support students for their alleged injuries. Paying for treatment of others' injuries is the exact type of classic derivative injury for which recovery is not available. *See Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001) (rejecting public hospital districts' attempt to recover costs for treating patients suffering from tobacco-related illnesses).

At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on the basis that their alleged harms are impermissibly derivative of students' alleged harms. Dkt. 1267 at 21. The Court's reasoning was based on allegations that the School Districts had been directly injured because "they have had to hire mental health personnel and develop further mental health resources to mitigate the negative in-school consequences of their students' … use of defendants' platforms" and because "the school districts appear to seek recovery of unique damages." *Id.* at 19–21. The record evidence, however, now demonstrates that DeKalb does not seek recovery for those types of injuries, but rather to institute a sweeping plan for the benefit of students that it will not otherwise implement or be forced to implement. Thus, even if funding for

1  the strategic plan were the type of legally cognizable damages or abatement that DeKalb could

2  recover, any recovery would be for derivative injuries.

3  **D.     Defendants Are Entitled to Summary Judgment on DeKalb's Failure-to-Warn Claim**

4

5       If this Court does not grant summary judgment on the negligence and nuisance claims in

6  full, it should nevertheless grant summary judgment on DeKalb's failure to warn claim.  DeKalb

7  contends that "Defendants failed to adequately warn [DeKalb] about the physical and mental health

8  risks posed by their platforms and the increased resources that [DeKalb] would need to expend to

9  address the youth mental health crisis Defendants caused." Master Compl. ¶ 1034.  But Defendants

10  do not owe a duty to provide warnings to a school district that its students' use of Defendants'

11  platforms may cause financial harm to the district. Even if there were a duty to warn school districts,

12  DeKalb's claims fail for lack of evidence: DeKalb adduced no evidence of what a warning to school

13  districts should have said, to whom or how it should have been made, or that any warning would

14  have reduced DeKalb's alleged damages.

15       And to the extent that DeKalb contends that Defendants owed a tort duty *running to DeKalb*

16  to provide warnings *to its students* (or their parents), its claim likewise fails.

17       **1.   Defendants Do Not Owe DeKalb a Duty to Warn the District Directly**

18       DeKalb advances a novel theory on its failure to warn claim: it alleges that Defendants owed

19  a duty to provide a warning to school districts that student use of their platforms could cause harm

20  to those students, which might, in turn, cause the school district to expend additional resources in

21  responding to the harms to the students.  Master Compl. ¶¶ 1034, 1036.  But Defendants do not

22  owe a duty to provide warnings to a school district that its students' use of Defendants' platforms

23  may cause financial harm to the district.[9]  The determination of whether there is a duty to warn is

24

---

[9] Defendants also contend that they are entitled to summary judgment on DeKalb's failure-to-warn
25  claim that arises from third-party content or protected publishing activities for the threshold reason
that they are barred by Section 230.  *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025)
26  (barring claim "that Grindr had a duty to warn Doe about the risks of child sexual exploitation on
the App"); *Estate of Bride*, 112 F. 4th at 1179-80 (barring failure to warn claim challenging
27  anonymity feature of app that faulted app "for not mitigating, in some way, the harmful effects of
the harassing and bullying content" through anonymity feature).  Per the Court's instructions given
28  the pending appeal by Meta and TikTok, Defendants reserve their right to challenge DeKalb's
failure-to-warn claims as being barred by Section 230 at a later time.

1    a legal question.  *See Certainteed Corp. v. Fletcher*, 300 Ga. 327, 330 (2016).  Whether to impose

2    a duty to warn in any given scenario is not only governed by foreseeability but also by public policy,

3    which "play[s] an important role" in the inquiry.  *Id*. (citing *CSX Transp. v. Williams*, 278 Ga. 888,

4    890 (2005)).  "To impose a duty that either cannot feasibly be implemented or, even if implemented,

5    would have no practical effect would be poor public policy indeed."  *Id*.

6         Although Georgia law recognizes that a duty to warn may "in some cases" be extended to

7    "reasonably foreseeable third parties," Georgia Supreme Court precedent instructs that this is not

8    one of those cases.  *Certainteed Corp.*, 300 Ga. at 330.

9         In  *Certainteed Corp.*, the plaintiff sued a manufacturer of asbestos-laden water pipes,

10   because she was diagnosed with mesothelioma after years of laundering asbestos-dust-covered

11   work clothing belonging to her father (the manufacturer's employee).  *Id*.  In declining to impose

12   a duty on the manufacturer to warn those who came into contact with its employees about the

13   potential dangers of lingering asbestos dust, the Georgia Supreme Court held that it would be

14   "unreasonable to impose a duty on [the manufacturer] to warn all individuals in [plaintiff]'s

15   position, whether those individuals be family members or simply members of the public who were

16   exposed to asbestos-laden clothing, as the mechanism and scope of such warnings would be

17   endless."  *Id*. at 331 (upholding summary judgment in defendant manufacturer's favor).

18        DeKalb's proposed duty to warn would be equally, if not more, unreasonable Defendants

19   are not aware of any case in any jurisdiction that has held there is a duty to warn a non-user of a

20   product or service that others' use of that product or service may cause financial injury to the

21   plaintiff.  Such a rule would lead to an absurd result—e.g., alcohol companies may need to warn

22   landlords that their tenants might damage property while under the influence of alcohol, and

23   tobacco companies may need to warn employers that they might need to pay increased healthcare

24   costs for employees who smoke.

25        Even in cases involving *physical* injuries, courts have held that a defendant has no duty to

26   warn third parties that they might become indirectly injured by a defendant's alleged negligence.

27   *See, e.g., id.*at 645 (finding manufacturer of a facility's "asbestos-laden water pipes" did not have

28   a duty to warn plaintiff of the dangers of asbestos dust where she claimed she developed

mesothelioma from laundering the asbestos-dust-covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of coronavirus at work). If there is no duty to warn a third party that a product might cause physical injury, then there is certainly no duty to warn a third party that the use of the product could cause downstream financial injuries.

While Defendants acknowledge that the Court previously held that Defendants owe a general duty of care to school districts, they respectfully submit that the Court's analysis does not support finding a duty to provide a warning directly to school districts about potential financial harms resulting from student use. None of the cases relied on by the Court in its prior rulings contemplate a duty to warn third parties that someone else may use the defendant's product or service, become injured, and thereby cause downstream economic consequences to the third party. *See* SD Order at 27–34. There is therefore no reason to deviate from the Georgia Supreme Court's well-reasoned holding.

### 2. DeKalb Lacks Evidence Supporting Its Failure to Warn Claim

Even if Defendants owed DeKalb a duty to warn, the claim still fails. A plaintiff asserting a failure to warn claim "must present evidence supporting a reasonable inference that the warning provided by the defendant would prevent the injury." *Georgia Cas. & Sur. Co. v. Salter's Indus. Servs., Inc.*, 318 Ga. App. 620, 626 (2012); *see generally R & R Insulation Services, Inc. v. Royal Indem. Co.*, 307 Ga. App. 419, 427 (2010). "An inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough." *Id*; *see also Hubbard v. Bayer HealthCare Pharma., Inc.*, 407 F. Supp. 3d 1317, 1320 (N.D. Ga. 2019) ("Without evidence that a different warning would have changed the prescribing decision, Plaintiff cannot show that her injury would have been avoided but for Bayer's alleged failure to warn."). Where a plaintiff cannot prove that it would have acted differently had it received such warnings, a failure to warn claim fails. *See Whitehead v. Green*, 365 Ga. App. 610, 629 (2022) (trial court erred in denying defendant's motion for summary

1    judgment where plaintiffs "could not say what, if anything, they would have done differently if

2    they had received such warnings").

3         Yet none of Plaintiff's experts opined that Defendants should have warned school districts

4    (as opposed to users and parents), save for one isolated statement that "parents, children and the

5    public (including schools) [should] be fully informed about the risks and harms the platforms

6    present." *See* Ex. II (Expert Rep. of Timothy Estes) at ¶ 316.  Nor has DeKalb offered any evidence

7    (fact or expert) of what a warning to school districts should have looked like or how it should have

8    been implemented.  Specifically, there is no evidence of *who* in the districts should have received

9    the warning, *what* it should have said, *when* it should have been provided, or *where* and *how* the

10   warning should have been communicated.  These are all significant questions given that the

11   allegation is that a warning should be provided to entities that may not themselves be users of or

12   have any interaction with the platforms.  Because the record is silent on each point, DeKalb has not

13   met its burden of proof.

14        DeKalb has not offered any evidence (fact or expert) that a warning directly to the district

15   would have reduced its alleged harms or damages.  There is no competent evidence that, in the face

16   of such a warning, DeKalb would have acted any differently.  Long after DeKalb supposedly

17   learned of the social media-induced injuries it sustained, which led it to file this litigation nearly

18   two years ago, DeKalb consistently maintained goals related to social media, including increasing

19   DeKalb social media account followers, engagement, and communication.  *See, e.g.,* Ex. K

20   (Kirkland Dep.) at 75:1–76:12.  Recent Superintendent and DeKalb Strategic plans indicate that

21   using social media to engage with the community continues to be a top priority for DeKalb.  *See*

22   *id.*  Indeed, DeKalb has maintained student social media guidelines since 2016 which describe

23   "social media and digital communication" as "key components to our everyday lives," Ex. Q at

24   DEKALB037871; and has even encouraged students to use the very same platforms that DeKalb

25   now alleges are causing it to experience substantial harm.  Ex. J (describing 12-week "Stop the

26   Violence" media campaign including student-made TikTok and YouTube videos); Ex. G (Moore-

27   Sanders Dep.) at 163:23–164:17.  Summary judgment is therefore warranted.

28

### 3. DeKalb Cannot Assert a Claim that Defendants Failed to Warn Students

To the extent that DeKalb is claiming that Defendants had a duty running to DeKalb based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Compl. ¶ 265, *Certainteed* precludes an imposition of such duty and Defendants are also entitled to summary judgment.

In *Certainteed*, the Georgia Supreme Court reversed the intermediate appellate court's conclusion that the manufacturer could have properly warned the daughter of its employee about the potential exposure to asbestos vis-à-vis a warning to the employee, calling this conclusion "problematic." *Certainteed Corp.*, 300 Ga. at 330. The Georgia Supreme Court reasoned that such a warning "aimed at protecting third parties would not have been systematically distributed or available to the individuals to which it was targeted, instead, the onus would have been on the *worker* to keep those third parties safe. It is not difficult to envision that, while some workers might have taken steps to protect or warn individuals with whom they came in contact, other workers might not have taken such steps." *Id.*; *see also Reichwaldt v. Gen. Motors LLC*, 1:16-CV-2171-TWT, 2018 WL 11343518, at *2–3 (N.D. Ga. Mar.1, 2018) (denying motion to amend judgment in defendant's favor, holding *Certainteed* barred a failure to warn claim brought by non-user or non-owner plaintiffs based on a duty premised on a failure to warn the user or owner of a product).

The same is true of DeKalb. It does not claim harm as a direct user of Defendants' platforms, but that it was a secondary victim of Defendants' alleged failure to warn users that they could become addicted or suffer mental health harms from use of Defendants' platforms. Imposition of a duty to warn users of Defendants' platforms that run from Defendants to school districts is thus unwarranted and unsupported. *See Reichwaldt*, 2018 WL 11343518, at *2–3.

### E. The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries.

SD Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section, "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible for the development and operation of Facebook and Instagram. *See* Ex. LL, Meta Defendants' Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question ("DWQ")

43

1    at 21–22, 25.  The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc.,

2    Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC

3    f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-

4    Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram.  *See id.*

5         Summary judgment should therefore be awarded to the Non-Operating Defendants for the

6    additional reason that they had no involvement in Plaintiff's alleged injuries.  "As a general matter,

7    corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely

8    have legal independence from each other and each can only be held liable for its own acts or

9    omissions."  *Khoros, LLC v. Lenovo (United States), Inc.*, 3:20-cv-03399-WHO, 2020 WL

10   12655516, at *14 (N.D. Cal. Oct. 5, 2020) (surveying California and Delaware law); *see Boafo v.*

11   *Hospital Corp. of America*, 177 Ga. App. 75, 76 (1985) ("subsidiary corporations" are

12   presumptively separate from "the parent" and are "apart and insulated from the existence of another

13   related corporation").[10]  And to sustain its claims, DeKalb must prove that *each Defendant* caused

14   it harm.  *See supra,* Section IV.A.  But DeKalb has no evidence by which to do so.  Indeed, the

15   evidence shows that the Non-Operating Defendants engage in activities wholly unrelated to the

16   school districts' claims, namely:  "payment processing" (Facebook Payments Inc); "operat[ing] …

17   data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "holding certain Instagram

18   intellectual property" (Instagram, LLC).  Ex. LL at 21–22, 25. For this additional reason, the Non-

19   Operating Defendants are all entitled to summary judgment.

20   **V.    CONCLUSION**

21        For the foregoing reasons, Defendants respectfully request that the Court grant summary

22   judgment in their favor or, in the alternative, partial summary judgment.

23

24

25

26

27

28   _____
     [10] Because this outcome is required under the laws of all three states potentially at issue, Meta does
     not apply a choice-of-law analysis or take a position on which state's law applies to this question.

1    Dated:  September 30, 2025                    Respectfully Submitted,

2                                                 By: */s/ David P. Mattern*
3                                                    GEOFFREY M. DRAKE, *pro hac vice*
                                                     gdrake@kslaw.com
4                                                    TACARA D. HARRIS, pro hac vice
                                                     tharris@kslaw.com
5                                                    KING & SPALDING LLP
                                                     1180 Peachtree Street, NE, Suite 1600
6                                                    Atlanta, GA 30309
                                                     Telephone: (404) 572-4600
7                                                    Facsimile: (404) 572-5100

8                                                    DAVID P. MATTERN, *pro hac vice*
                                                     dmattern@kslaw.com
9                                                    KING & SPALDING LLP
                                                     1700 Pennsylvania Avenue, NW
10                                                   Suite 900
                                                     Washington, D.C. 20006
11                                                   Telephone: (202) 737-0500
                                                     Facsimile: (202) 626-3737

12                                                   BAILEY J. LANGNER (SBN 307753)
                                                     *blangner@kslaw.com*
13                                                   KING & SPALDING LLP
                                                     50 California Street, Suite 3300
14                                                   San Francisco, CA 94111
                                                     Telephone: (415) 318-1200
15                                                   Facsimile: (415) 318-1300

16                                                   *Attorneys for Defendants*
17                                                   *TikTok Inc., ByteDance Inc., TikTok Ltd.,*
                                                     *ByteDance Ltd., and TikTok LLC*

18                                                By: */s/ Christian J. Pistilli*
19                                                   Ashley M. Simonsen (Bar No. 275203)
                                                     COVINGTON & BURLING LLP
20                                                   1999 Avenue of the Stars
                                                     Los Angeles, California 90067
21                                                   Telephone: (424) 332-4800
                                                     Facsimile: (424) 332-4749
22                                                   Email: asimonsen@cov.com

23                                                   Phyllis A. Jones (*pro hac vice*)
                                                     Paul W. Schmidt (*pro hac vice*)
24                                                   Christian J. Pistilli (*pro hac vice*)
                                                     COVINGTON & BURLING LLP
25                                                   One City Center
                                                     850 Tenth Street, NW
26                                                   Washington, DC 20001-4956
                                                     Telephone: (202) 662-6000
27                                                   Facsimile: (202) 662-6291
                                                     Email: pajones@cov.com
28                                                   Email: pschmidt@cov.com
                                                     Email: cpistilli@cov.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendants Meta Platforms,
Inc. f/k/a Facebook, Inc.; Facebook
Holdings, LLC; Facebook Operations,
LLC; Meta Payments Inc. f/k/a Facebook
Payments Inc.; Meta Platforms
Technologies, LLC f/k/a Facebook
Technologies, LLC; Instagram, LLC; and
Siculus LLC f/k/a Siculus, Inc.*

By:/s/ *John J. Nolan*

ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

JONATHAN H. BLAVIN
(State Bar No. 230269)
jonathan.blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA
(State Bar No. 284199)
victoria.degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100

*Attorneys for Defendant Snap Inc.*

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (DEKALB) (SD MSJ No. 5)
4:22-md-03047-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Ashley Hardin*
JOSEPH G. PETROSINELLI,
*pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC
and Google LLC*

1

**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

Dated: September 30, 2025      By:     /s/ David P. Mattern

4

     DAVID P, MATTERN
     *Attorney for Defendants TikTok Inc.,*
5
     *ByteDance Inc., ByteDance Ltd., TikTok*
     *Ltd., and TikTok, LLC*

6

     By:     /s/ Christian J. Pistilli

7

     CHRISTIAN J. PISTILLI
     *Attorneys for Defendants Meta Platforms,*
8
     *Inc. f/k/a Facebook, Inc.; Facebook*
     *Holdings, LLC; Facebook Operations,*
9
     *LLC; Meta Payments Inc. f/k/a Facebook*
     *Payments Inc.; Meta Platforms*
10
     *Technologies, LLC f/k/a Facebook*
     *Technologies, LLC; Instagram, LLC; and*
11
     *Siculus LLC f/k/a Siculus, Inc.*

12

     By:     /s/ John J. Nolan

     JOHN J. NOLAN
13
     *Attorneys for Defendant Snap Inc.*

14

     By:     /s/ Neelum J. Wadhwani

15

     NEELUM J. WADHWANI
     *Attorneys for Defendants YouTube, LLC*
16
     *and Google LLC*

17

18

**ATTESTATION PURSUANT TO LOCAL RULE 5-1**

19

I, David P. Mattern, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the

20

concurrence to the filing of this document has been obtained from each signatory hereto.

21

22

23

Dated: September 30, 2025      By:     /s/ David P. Mattern

     David P. Mattern

24

25

26

27

28

1