# Exhibit 6

WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli, *pro hac vice*
Ashley W. Hardin, *pro hac vice*
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000
jpetrosinelli@wc.com
ahardin@wc.com

*Attorney for Defendants YouTube, LLC
and Google LLC*

*[Additional parties and counsel listed on
signature pages]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION, <br><br> THIS DOCUMENT RELATES TO: <br><br> *Board of Education of Harford County v. Meta Platforms Inc., et al.*, | MDL No. 3047 <br><br> Case No.: 4:23-cv-03065-YGR <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ No. 6)** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Magistrate Judge: Hon. Peter H. Kang <br><br> Date: January 26, 2026 <br> Time: 8:00 AM <br> Place: Courtroom 1, 4th Floor |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Defendants on all claims by Plaintiff Board of Education of Harford County ("Harford"). This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declaration of Ashley W. Hardin, and the exhibits thereto, and any other matters presented at the time of the hearing.

## STATEMENT OF RELIEF SOUGHT

Defendants seek entry of summary judgment in their favor on all causes of action that Harford asserts against Defendants or, in the alternative, partial summary judgment as to Harford's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

DATED:        September 30, 2025                Respectfully submitted,

**WILLIAMS & CONNOLLY LLP**

/s/ *Ashley W. Hardin*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and Google LLC.*

*[Additional parties and counsel listed on signature pages]*

1

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ................................................................................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ....................................................................................................3

        A.      Harford County Public Schools ................................................................3

        B.      Harford's Lack of Evidence......................................................................6

        C.      Harford's Theory of Damages ..................................................................8

        D.      Harford's Proposed "Strategic Plan" .....................................................10

        E.      The Court's Motion to Dismiss Ruling....................................................11

III.    LEGAL STANDARD............................................................................................13

IV.     ARGUMENT ........................................................................................................13

        A.      Harford Lacks Competent Evidence of Causation....................................13

                1.      Harford's Allegations of Specific Harms All Impermissibly Rely on Third Party Content and Protected Publishing Activities....................................16

                2.      Harford Has No Competent Evidence of Mental Health Harms Tied To Any Defendant's Specific Platform..........................................................20

        B.      Harford Cannot Show It Is Entitled To Past Damages. .........................23

                1.      Harford Cannot Show Defendants Caused It To Divert Financial Resources. ...............................................................25

                        a)      Harford cannot recover "lost time" damages...............................25

                        b)      Harford has no competent evidence establishing these "lost time" damages............................................................26

                                (1)      Harford's Evidence of Teacher "Lost Time" Damages Is Insufficient. .........................................26

                                (2)      Harford's Evidence of Counselor and Psychologist "Lost Time" Damages Is Insufficient. .......................................28

                2.      Harford Has No Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms...........................................29

                        a)      Harford has no evidence it hired new mental health personnel because of Defendants' platforms................................................29

i

b)    Harford has no evidence it implemented new technology because of Defendants' platforms. ............................................................30

3.    Harford Cannot Recover Property Damage That Results from Third-Party Acts. ............................................................................................32

C.    Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under the Law ........................................................................................33

1.    Harford Cannot Recover the Plan as Equitable Relief for Its Nuisance Claim. ..........................................................................................34

a)    Harford has an adequate remedy at law. .......................................34

b)    The strategic plan is not a proper "abatement" remedy. ...............36

2.    The Costs of the Strategic Plan Are Not Recoverable as Future Damages. ..........................................................................................39

3.    Harford's Strategic Plan Is Impermissibly Derivative. .............................41

D.    Defendants Are Entitled to Summary Judgment on Harford's Failure-To-Warn Claim. ..........................................................................................41

1.    Defendants Do Not Owe Harford a Duty To Warn the District Directly. .42

2.    Harford Lacks Evidence Supporting Its Failure To Warn Claim. ............43

3.    Harford Cannot Assert a Claim that Defendants Failed To Warn Students. ..........................................................................................45

E.    The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries. ......................46

V.    CONCLUSION ..............................................................................................47

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Adams v. Comm'rs of Trappe,*
    102 A.2d 830 (Md. 1954) ..................................................................35, 36

4

5

*AGV Sports Grp., Inc. v. Protus IP Sols., Inc.,*
    10 A.3d 745 (Md. 2010) ....................................................................26, 30

6

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)..................................................................................13

7

8

*Anne Arundel County v. Express Scripts, Inc.,*
    No. 24-cv-00090-MJM (D. Md. Feb. 21, 2025) .......................................15

9

10

*Asibem Assoc., Ltd. V. Rilli,*
    286 A.2d 160 (Md. 1972) .........................................................................41

11

*Asphalt & Concrete Servs., Inc. v. Perry,*
    108 A.3d 558 (Md. Ct. Spec. App. 2015) ................................................14

12

13

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.,*
    241 F.3d 696 (9th Cir. 2001) ...................................................................41

14

15

*Atkinson Warehousing & Distrib., Inc. v. Ecolab, Inc.,*
    99 F. Supp. 2d 665 (D. Md. 2000) ...........................................................32

16

*Becker v. State,*
    767 A.2d 816 (Md. 2001) ...................................................................35, 36

17

18

*Bishop Processing Co. v. Davis,*
    132 A.2d 445 (Md. 1957) .........................................................................36

19

20

*Carter v. Wallace & Gale Asbestos Settlement Tr.,*
    96 A.3d 147 (Md. 2014) ...........................................................................41

21

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).................................................................................13

22

23

*Certainteed Corp. v. Fletcher,*
    794 S.E.2d 641 (Ga. 2016)........................................................................42

24

25

*City of Huntington v. AmerisourceBergen Drug Corp.,*
    609 F. Supp. 3d 408 (S.D.W.V. 2022).....................................................37

26

27

*Cleveland v. Groceryworks.com, LLC,*
    200 F. Supp. 3d 924 (N.D. Cal. 2016) .....................................................29

28

*CR-RSC Tower I, LLC, v. RSC Tower I, LLC,*
    56 A.3d 170 (Md. 2012) ...................................................................................26

*Davidson v. Miller,*
    344 A.2d 422 (Md. 1975) .................................................................................40

*Doe (K.B.) v. Backpage.com, LLC,*
    724 F. Supp. 3d 882 (N.D. Cal. 2024) .......................................................19, 23

*Doe v. Grindr Inc.,*
    128 F.4th 1148 (9th Cir. 2025) .........................................................................42

*Doe v. Pharmacia & Upjohn Co.,*
    879 A.2d 1088 (Md. 2005) ...............................................................................46

*Erhart v. BofI Holding, Inc.,*
    445 F. Supp. 3d 831 (S.D. Cal. 2020) ..............................................................28

*Est. of Bride ex rel. Bride v. Yolo Technologies, Inc.,*
    112 F.4th 1168 (9th Cir. 2024) .........................................................................18

*Gourdine v. Crews,*
    955 A.2d 769 (Md. 2008) .............................................................................43, 45

*Grace v. Bd. of Liquor License Comm'rs,*
    2018 WL 367852, at *4 (Md. Ct. Spec. App. Jan. 11, 2018) ...........................15

*Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,*
    642 A.2d 219 (Md. 1994) .................................................................................15

*Henricksen v. ConocoPhillips Co.,*
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ........................................................20

*Holzhauer v. Saks & Co.,*
    697 A.2d 89 (Md. 1997) ...................................................................................20

*In re JUUL Labs, Inc. Marketing, Sales Practices & Products Liability Litigation,*
    497 F. Supp. 3d 552 (N.D. Cal. 2020) .............................................................38

*In re Nat'l Prescription Opiate Litig.,*
    2025 WL 354758 (6th Cir. Jan. 31, 2025) .......................................................38

*In re Nat'l Prescription Opite Litig.,*
    265 N.E.3d 1 (Ohio 2024).................................................................................38

*In re Williams Sec. Litig.-WCG Subclass,*
    558 F.3d 1130 (10th Cir. 2009) ........................................................................19

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.,*
    287 F.3d 866 (9th Cir. 2002) ...........................................................................29

iv

*Khoros, LLC v. Lenovo (United States), Inc.*,
   2020 WL 12655516 (N.D. Cal. Oct. 5, 2020)...................................................................46

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) ...................................................................................18

*Kuciemba v. Victory Woodworks, Inc.*,
   531 P.3d 924 (Cal. 2023) ...........................................................................................43

*Lemmon v. Snap Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ...................................................................................19

*Liller v. State Highway Admin.*,
   333 A.2d 644 (Md. Ct. Spec. App. 1975) ...................................................................36

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
   127 F.4th 516 (4th Cir. 2025) ...................................................................................19

*Mack Trucks, Inc. v. Coates*,
   No. 2709, 2018 WL 217592 (Md. Ct. Spec. App. May 11, 2018) ...................................43

*Martin v. Howard County*,
   709 A.2d 125 (Md. 1998) ...........................................................................................36

*Mayor & City Council of Balt. v. B.P. P.L.C.*,
   No. 24-C-18-004219 (Cir. Ct. Balt. City July 10, 2024) ...................................................15

*Mayor & City Council of Balt. v. Monsanto Co.*,
   No. RDB-19-0483, 2020 WL 1529014 (D. Md. Mar. 31, 2020)......................................24

*Mayor & City Council of Balt. v. Purdue Pharma, L.P.*,
   No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025) ............................................................38

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ...................................................................................36

*Nelson v. Am. Honda Motor Co.*,
   2021 WL 2877919 (W.D. Penn. May 17, 2021)............................................................44

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ...................................................................................19

*Oklahoma ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021)...........................................................................................37

*Orr v. Bank of Am., NT & SA*,
   285 F.3d 764 (9th Cir. 2002) ...................................................................................27

*People v. ConAgra Grocery Products Co.*,
   227 Cal. Rptr. 3d 499 (Ct. App. 2017) ...........................................................38, 39

v

*Phipps v. Gen. Motors Corp.*,
   363 A.2d 955 (Md. 1976) ........................................................................43

*Pierce v. Johns-Manville Sales Corp.*,
   464 A.2d 1020 (Md. 1983) .............................................................39, 40

*Pittway Corp. v. Collins*,
   973 A.2d 771 (Md. 2009) .......................................................................14

*Rhynes v. Stryker Corp.*,
   2011 WL 2149095 (N.D. Cal. May 31, 2011) ....................................35

*Roberts v. Equian, LLC*,
   2025 WL 2144965 (D. Md. July 29, 2025)........................................47

*Robinson v. C.R. Bard, Inc.*,
   2016 WL 3361825 (N.D. Cal. June 17, 2016) ...................................36

*Schultz v. Bank of Am., N.A.*,
   990 A.2d 1078 (Md. 2010) .....................................................................24

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ...............................................................35

*Soremekun v. Thrifty Payless, Inc.*,
   509 F.3d 978 (9th Cir. 2007) ...............................................................14

*Spaw, LLC v. City of Annapolis*,
   156 A.3d 906 (Md. 2017) .......................................................................37

*Strong v. Prince George's County*,
   549 A.2d 1142 (Md. Ct. Spec. App. 1988) ........................................24

*Sugarman v. Liles*,
   190 A.3d 344 (Md. 2018) .........................................................27, 28, 33

*Tadjer v. Montgomery County*,
   479 A.2d 1321 (Md. 1984) .....................................................................15

*Twitter, Inc. v. Barr*,
   445 F. Supp. 3d 295 (N.D. Cal. 2020) ...............................13, 14, 19

*Under Armour, Inc. v. Ziger/Snead, LLP*,
   158 A.3d 1134 (Md. Ct. Spec. App. 2017) ........................................26

*United States v. Ansari*,
   No. 23-2703, 2024 WL 5231260 (9th Cir. Dec. 27, 2024)................29

*United States v. Shih*,
   73 F.4th 1077 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 820 (2024)....................29

vi

*VFD Consulting, Inc. v. 21st Servs.*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) ...................................................................16

*Whitaker v. Prince George's County*,
    514 A.2d 4 (1986) .................................................................................................36

*Wolff v. Magal*,
    No. 819, 2022 L 22822682 (Md. Ct. Spec. App. June 23, 2022) ......................24

*Wood v. Marathon Refin. Logistics Serv. LLC*,
    2024 WL 1242688 (N.D. Cal. Mar. 21, 2024) ...................................................35

*Wood v. Toyota Motor Corp.*,
    760 A.2d 315 (Md. Ct. Spec. App. 2000) ..........................................................21

*Yonce v. SmithKline Beecham Clinical Laboratories, Inc.*,
    680 A.2d 569 (Md. Ct. Spec. App. 1996) ....................................................14, 15

**OTHER AUTHORITIES**

First Amendment ...................................................................................1, 12, 16, 17

Fed. R. Civ. P. 30(b)(6)................................................................................................47

Fed. R. Civ. P. 56(a) ...................................................................................................13

Fed. R. Civ. P. 56(c) ...................................................................................................27

Fed. R. Evid. 701(a) ...................................................................................................29

Fed. R. Evid. 702 ........................................................................................10, 20, 27

Fed. R. Evid. 703 .............................................................................................27, 29

Fed. R. Evid. 801 .......................................................................................................27

8 Md. L. Encyclopedia *Damages* § 19 (West 2025) .............................................26

58 Am. Jur. 2d *Nuisances* § 261 (West 2025).........................................................36

*Black's Law Dicionary* (8th ed. 2004) ......................................................................2

*Black's Law Dicionary* (10th ed. 2014) ..................................................................37

Restatement (Second) of Torts § 821B (A.L.I. 1979)............................................15

Harford Cnty. Pub. Schs. Website,
    https://www.hcps.org/superintendent/stateofthedistrict.aspx (last visited Sept. 24, 2025) .3

*Home Page*, Harford Cnty. Pub. Schs., at 12–13, https://www.hcps.org (last visited Sept. 24, 2025) ..................................................................................................................................5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Harford County Public Schools, located in Harford County, Maryland, is a public school district covering mostly suburban and rural areas on the outskirts of the Baltimore metropolitan area. Between 2017 and present (the time period for which Harford seeks damages), Harford has struggled with a litany of issues impacting students, including effects from the COVID-19 pandemic (including chronic absenteeism), school and community-based violence, gang-related activity, funding shortfalls, high teacher and staff turnover, inadequate student support resources in the face of significant need (including homelessness), and racial discrimination. At the same time, Harford extensively used several of Defendants' platforms to promote its own activities and connect with the school community, and encourages and recommends use of YouTube in the school curriculum. Nevertheless, Harford now claims that it is owed money from Defendants to combat an alleged mental health "crisis" among its students, which it claims is due to its students' use of Defendants' platforms. But in sharp contrast to evidence of harms from community violence, funding shortfalls, COVID-19, and myriad other factors, Harford's evidence fails to show that students' use of the at-issue-features of Defendants' platforms caused the District to incur costs. Harford cannot support its allegations, and summary judgment is warranted on a series of independent grounds as to all of Harford's claims.

*First*, Harford's claims for nuisance and negligence fail because it lacks sufficient evidence of causation. This Court limited the scope of Harford's claims at the pleadings stage, holding that Harford can predicate claims only on certain actionable conduct—Defendants' use of the features that the Court concluded were not protected by Section 230 or the First Amendment or Defendants' alleged failure to warn. By the same token, the Court made clear that Harford cannot recover for injuries caused by third-party conduct, third-party content, or protected publishing activities. But the social media-related incidents of which Harford has evidence stem from bullying, other third-party content on the platforms, or third-party conduct such as vandalism. Harford lacks sufficient proof that each Defendant's platform(s) caused any mental health issues among any particular

students.  Indeed, Harford lacks the most basic facts about its students' use of Defendants' platforms—it does not know how often students use any platform, what features they use, or what effects those features have on its students.  At most, Harford's evidence relates to its students' use of cellphones or "social media" generally—but even that evidence is general and sparse.  As a result, Harford cannot establish that any one of Defendants' platforms—let alone the actionable features of that platform—*caused* its students any harm or that Harford incurred expense as a result of that harm.

*Second*, summary judgment is warranted on Harford's failure to adduce evidence of past damages.  Harford seeks past damages primarily for the time its staff purportedly "lost" while addressing social media issues.  But Maryland law requires that damages be directly and proximately caused by Defendants' conduct and established with reasonable certainty.  Even if "lost time" were compensable, Harford has no competent, contemporaneous evidence proving lost time; it instead presents only a retrospective, made-for-litigation survey based on an unreliable sample of teachers as "evidence" of its "lost time."  Nor has Harford presented any competent evidence tying its few claimed out-of-pocket losses for payments to certain vendors and property damage repairs to Defendants' actionable conduct.

*Third,* Harford's proposed "abatement" remedy is also improper in form and substance.  Harford seeks $1.1 to $1.5 billion through a 15-year "strategic plan" to fund mental health programs in schools (irrespective of any connection to Defendants' alleged conduct).  But as a threshold matter, Harford is not entitled to abatement because it has an adequate remedy at law—*i.e.*, money damages (notwithstanding the fact that Harford cannot prove that it should recover such damages).  Further, substantively, Harford's "strategic plan" does not constitute proper abatement, which requires that the offending party cease *the conduct* causing the alleged nuisance.  Harford's abatement plan does nothing to address or "abate" Defendants' conduct and therefore fails to constitute abatement.  The plan is also not recoverable as "future damages" because it depends entirely on speculative future events and is untethered from the injuries that Harford alleges.

*Fourth*, Harford has no evidence supporting the critical elements of its failure-to-warn claim. There is no duty for Defendants to warn a district that its students' use of Defendants' platforms may cause the district financial problems. No court has ever held that a company is required to provide a warning to a non-user of a product or service that others' use of that product or service may cause financial injury to the non-user. Harford also lacks evidence that it would have behaved differently if a warning had been delivered. Nor can Harford assert a claim based on Defendants' alleged failure to provide warnings to third parties such as students and their parents.

## II.    BACKGROUND

### A.    Harford County Public Schools

As of September 2024, the Harford County School District consisted of 55 schools serving 37,855 students. Ex. 1 (*State of the District*, Harford Cnty. Pub. Schs. Website, https://www.hcps.org/superintendent/stateofthedistrict.aspx (last visited Sept. 24, 2025)). For years, Harford's students have faced substantial challenges. According to Superintendent Sean Bulson, students are facing a number of "sources of . . . mental health challenges," including: trauma and abuse (physical, emotional, or sexual abuse); poverty; drug and alcohol abuse; direct or indirect exposure to gun violence; participation in active shooter drills; homelessness; racism; homophobia; social and political movements (e.g., Me Too and Black Lives Matter); and societal debates about sexuality and gender. Ex. 2 (May 15, 2025 Deposition of Superintendent Sean W. Bulson ("May 15, 2025 Bulson Dep.")) 219:13–227:24. Harford has "extremely elevated student discipline rates, elevated student chronic absenteeism, and alarming data self-reported on the annual YRBS [Youth Risk Behavior Survey] surveys completed by Harford students." Ex. 3 (HCPS_00016071) at -072. The suicide mortality rate across all of Harford County has exceeded the state average every year since 2014 and "has been exacerbated since COVID." *Id.* at -073.

Harford experienced devastating and lasting impacts from the COVID-19 pandemic and long-term shutdown. Harford's superintendent readily agrees that "the shutdown of in-person learning and the isolation during COVID-19 had a negative impact on teenagers" and "pre-teens." Ex. 2 (May 15, 2025 Bulson Dep.) 199:13–20. He testified that COVID-19 "exacerbated" many

challenges like "suicide ideation," "mental health," "more extreme version[s] of challenging behavior," "chronic absenteeism," and "students who had gone the wrong direction or had stalled with regard to their learning around core academic subjects as well." *Id.* at 199:21–200:24; *see also* Ex. 4 (HCPS_00017428) (Harford's 2023 attendance proposal addressing the "**COVID-EFFECT**" and explaining that "[t]he COVID era increased a permissive attitude about attending school among parents/students" (emphasis in original)).

Threats of mass violence occur at school "frequently," and gang-related activity has increased over the past few years. Ex. 5 (30(b)(6) Deposition of Supervisor of Safety and Security Donoven Brooks ("Brooks 30(b)(6) Dep.")) 48:5–19; Ex. 6 (30(b)(6) Deposition of Supervisor of Pupil Personnel Services Dwayne Edward Williams ("Williams 30(b)(6) Dep.")) 108:20–109:7; *see also id.* at 110:17–112:8 (acknowledging Harford's students have been increasingly drawn to join gangs over the last five to ten years). There have been three shootings on or near school property since 2016, which were "traumatic for the school community." Ex. 5 (Brooks 30(b)(6) Dep.) 24:4–32:7, 38:12–15.

Harford also has a history of funding shortfalls, which have put educational services for certain at-risk children and youth in jeopardy, including mental health services. *See* Ex. 7 (Deposition of Assistant Superintendent for Business Services Deborah Judd ("Judd Dep.")) 50:21–51:1 (explaining funding shortfalls); Ex. 8 (HCPS_00106625) at -629 (project proposal submitted by Harford staff to support its student unhoused population, noting that Harford "struggled with meeting the financial obligations to fund the budget for the 2019–2020 school year," and, "[d]ue to the funding gap," "the need to provide unremitting educational services for at risk children and youth were impacted"); Ex. 9 (HCPS_00096094) at Slide 13 ("HCPS needs to make mental health a priority. The lack of interest for funding mental health positions is unacceptable."). Harford has also experienced challenges with hiring and retention. Over the past several years, Harford "lost several school psychologists to higher paying school districts and experienced a greatly reduced candidate pool." Ex. 10 (HCPS_00029159) at -159–60 (noting that staff turnover "greatly impacts our ability to offer high quality, consistent services to our schools"); Ex. 11 (HCPS_00432372) at -

500 (budget discussing negative impacts of teacher staffing reductions including "class size increases," "diminished course offerings," "potential for safety issues," and inability to provide "needed reading intervention for at risk students").

Racism has also been a problem in the district, with a legacy of institutional racism as well as individual students having been subject to acts of racism by fellow students on several documented occasions. *See, e.g.*, Ex. 2 (May 15, 2025 Bulson Dep.) 227:25–229:16 (superintendent explaining that "there have been a number of isolated, some larger, some smaller incidents, everything from vandalism of a racist nature to bullying"); Ex. 12 (HCPS_00323427) at -427 (display of a racial slur); Ex. 2 (May 15, 2025 Bulson Dep.) 229:17–231:21 (explaining that the Maryland State Department of Education has sanctioned Harford multiple times for racial disproportionality including "disproportionately provid[ing] disciplinary consequences to Asian students" and for "over-identifying black students in special education at certain schools").

Despite knowing that many of these other factors have a significant impact on student mental health, *id.* at 219:13–227:24, Harford claims in this lawsuit that student use of Defendants' platforms is the cause of most of its students' mental health issues and the reason it has had to expend additional resources and divert staff time, *see* Pls.' First Amended Master Compl. (Local Government and School District) ("Master Compl.") (ECF No. 729), ¶¶ 3–6, 32; Ex. 13 (Pl.'s Bd. of Educ. of Harford County's Am. Objs. and Resps. to Defs.' Interrogatories (Set 3) (Apr. 14, 2025) ("Harford's Apr. 14, 2025 Interrogatory Resps.")) at 2–4. But at the same time, Harford encourages its students to use "21st century devices to supplement instruction and learning." Ex. 14 (HCPS_00122261) at -261. Harford has used social media as a tool since *at least* 2013, continues to operate its own social media pages (Facebook, Twitter, Instagram, YouTube), and encourages students and parents to follow them. *See* Ex. 15 (*Home Page*, Harford Cnty. Pub. Schs., at 12–13, https://www.hcps.org (last visited Sept. 24, 2025)); *See* Ex. 16 (HCPS_00347775) at -775 (listing "Social Media for Disaster Response and Recovery" as one of Communication Department's "Accomplishments [for] FY 2013"); Ex. 17 (HCPS_00114511) at -514, -516 (annual Parent-Student Handbook encouraging parents and students to follow Harford on Facebook, Twitter, Instagram,

1   and YouTube).  In the case of YouTube, Harford began allowing students to access YouTube on

2   school networks and on school-issued devices in 2020 at the request of the Office of Curriculum

3   Management.  Ex. 18 (March 14, 2025 30(b)(6) Deposition of Director of Technology Andrew

4   Moore ("March 14, 2025 Moore 30(b)(6) Dep.")) 19:9–16, 21:3–14.  Indeed, Harford's curriculum

5   includes YouTube as an "approved" and "*recommended* resource."  Ex. 19 (May 9, 2025 Deposition

6   of Superintendent Sean Bulson ("May 9 Bulson Dep.")) 136:18–138:16[1]; *see also* Ex. 20

7   (HCPS_00537476) at -478 ("In our curriculum we often include videos from youtube which

8   normally teachers have always shown on their whiteboard.").

9           In 2024, Harford implemented a new cell phone policy that prohibited cell phone use in

10  classrooms and limited students' access to personal devices based on their grade levels.  Ex. 14

11  (HCPS_00122261); *see also* Ex. 19 (May 9, 2025 Bulson Dep.) 79:13–80:11 (explaining how the

12  new policy works for middle and high school students).  Harford leaders say that the new policy has

13  significantly reduced the rate of student misbehavior.  *See* Ex. 21 (30(b)(6) Deposition of Assistant

14  Superintendent for Student Support Services Bernard Hennigan ("Hennigan 30(b)(6) Dep."))

15  100:2–21 (policy has led to a "major decline" in "serious issues and disruptions").  Harford leaders

16  reported these positive results to the Board of Education and highlighted a roughly 30–40% drop in

17  fights.  *Id.* at 98:23–100:25.

18          **B.      Harford's Lack of Evidence**

19          Before filing this case, Harford undertook *no* effort to assess its students' social media use

20  in schools, the impacts of social media use on its students' mental health, or the connection between

21  social media use and its students' education.

22          Harford does not track students' use of "social media" and does not know how frequently

23  students are using their cell phones or electronic devices in school and has no data about how much

24  or how often students are using cell phones, electronic devices, or social media.  *See* Ex. 19 (May

25  9, 2025 Bulson Dep.) 85:16–87:17 (no quantitative data on how much time Harford students use

26  their cell phones, or for how much time or how frequently they use social media generally or

27

28  ---
    [1] Unless otherwise noted, all emphases are added and internal citations and quotation marks omitted.

Defendants' platforms at school); Ex. 22 (March 14, 2025 Deposition of Director of Technology Andrew Moore ("March 14, 2025 Moore Dep.")) 8:11–13 (no data on students' use of social media); Ex. 23 (Deposition of Supervisor of Safety and Security Donoven Brooks ("Brooks Dep.")) 171:16– 173:19 (same); Ex. 7 (Judd Dep.) 17:3–18:18 (has not collected or reviewed any quantitative data about students' use of cell phones or social media at school or at home).

Harford's disciplinary reports do not show how many disciplinary incidents involved social media or Defendants' platforms.  *See* Ex. 24 (HCPS_00228706) (districtwide aggregate data showing 2022–23 disciplinary incidents; report does not indicate whether incidents involved social media or Defendants' platforms); Ex. 6 (Williams 30(b)(6) Dep.) 63:21–64:5 (conceding he lacks any source of information to quantity the number of disciplinary incidents in any given year that involve social media); Ex. 23 (Brooks Dep.) 103:12–25 (Supervisor of Safety and Security admitting he has no data reflecting how often social media plays a role in fights or violence).  For certain kinds of safety threats or incidents, Harford completes threat and risk assessments.  Ex. 21 (Hennigan 30(b)(6) Dep.) 35:21–37:21.  Harford is unaware of any compilation of aggregate data from these threat and risk assessments.  Ex. 21 (Hennigan 30(b)(6) Dep.) 37:22–38:13; Ex. 6 (Williams 30(b)(6) Dep.) 72:16–73:7 (threat assessments are not tracked "at the system level"; "I would have to call the principal and say, 'Pull your staff together and let me know how many threat assessments you've conducted this year'").  Nor have administrators gone through each assessment to see if a particular incident involved social media.  *See* Ex. 21 (Hennigan 30(b)(6) Dep.) 38:14– 20 ("Q. So if you wanted to know how many threat assessments involve social media in some way, you'd have to go through each of those threat assessments? A. Yes. Q. Have you ever done that? A. No.").

Harford likewise has not compiled data reflecting how many students (if any) have been diagnosed with a mental health issue linked to Defendants' platforms or reflecting how often it provides mental health services related to students' use of Defendants' platforms.  According to Harford's Executive Director of Student Support Services, if such data exists, it would primarily be found in "school based mental-health report[s]" from Harford's third-party mental health providers.

1  *See* Ex. 21 (Hennigan 30(b)(6) Dep.) 44:6–45:22, 47:14–48:5.  He believes those reports show "the

2  number of children [those providers have] seen and the reasons for the visits."  *Id.* 45:6–12.  In fact,

3  those reports *do not* show "reasons for the visits."  *E.g.*, Ex. 25 ("2022-23 SBMH Data").  Those

4  reports do not say why students needed mental health services, let alone whether their mental health

5  concerns were in any way related to cell phones, social media, or Defendants' platforms.  *See id.*

6      **C.**    **Harford's Theory of Damages**

7      Harford seeks $55.49 million in past damages, the sum of alleged "lost time" damages and

8  certain "out-of-pocket" costs.  This figure is not based on an amount of money expended or any

9  similar actual calculable loss.  The "lost time" damages are instead primarily based on a loose

10  estimate of how much time its staff "lost" addressing social media issues, totaling nearly $55.36

11  million.  Harford also seeks $132,794 in "out-of-pocket" expenses related to two network filtering

12  products that allow Harford to block or filter out applications and other content from being accessed

13  on district-issued devices or devices connected to Harford's networks.

14      ***"Lost Time" Opportunity Costs.***  The vast majority of Harford's alleged compensatory

15  damages are for the "opportunity cost" of the time its staff allegedly spent addressing social media-

16  related harms.  Harford's evidence for this theory consists of (i) a made-for litigation survey that

17  asked teachers to retrospectively estimate the time they spent on issues relating to social media

18  (including but not limited to Defendants' platforms) over the last 11 years; and (ii) interrogatory

19  responses relying on Mr. Hennigan's testimony.  Ex. 26 (Amended Expert Report of Dr. Bryce

20  Ward – Harford ("Am. Ward Harford Rep.")) ¶¶ 13, 31, 33.

21      Of the 1,378 teachers invited, only 136 (or 10%) completed surveys sent by Harford's expert.

22  Ex. 27 (Expert Report of Robert L. Klein – Harford ("Klein Harford Rep.")) at App'x E-1.  Those

23  respondents were asked to estimate the amount of instruction time that they recalled had been

24  "diverted" by unauthorized student use of social media for various periods of time since 2014.  *Id.*

25  ¶¶ 27–38.  While the survey specifically called out each Defendant's platform(s) as an example of

26  "social media," the survey was not limited to Defendants' platforms and inquired about "social

27  media" generally and did not ask respondents to limit their estimates to certain features of

28

Defendants' platforms. *Id.* ¶¶ 14, 32–36, 38. Harford's expert then calculated the amount of "lost time" as a percentage of teachers' salaries and benefits. Ex. 26 (Am. Ward Harford Rep.) ¶¶ 39–40. Based on this method, Harford's expert claims the District incurred lost opportunity costs of approximately $40.4 to $54.4 million with respect to teachers, depending on whether benefits are included in the calculation. *Id.* ¶ 40. Harford also relies on employee testimony as evidence of alleged lost time for counselors and psychologists. Harford's expert claims the District incurred additional lost opportunity costs of approximately $799,000 to $994,000 with respect to counselors and psychologists, depending on whether benefits are included in the calculation. *Id.* ¶ 41. This brings the total in claimed lost opportunity costs for teachers, counselors, and psychologists to $41.24 million (without benefits) to $55.36 million (with benefits). *Id.* ¶ 42.

Of the three witnesses whose deposition testimony was identified as sources supporting Dr. Ward's "lost time" estimates for counselors and psychologists, only Harford's Assistant Superintendent of Student Support Services Bernard Hennigan testified about relevant time-loss percentages. Ex. 28 (Deposition of Assistant Superintendent for Student Support Services Bernard Hennigan ("Hennigan Dep.")) 51:16–60:7 (discussing justification for the estimation that 5% of time spent by staff in the psychological services department and 10% of staff in the school counselling services department is spent on issues concerning social media). Mr. Hennigan acknowledged the analyses underlying those estimates were based on broad considerations such as phone use in addition to social media and were not verified by anyone else. Ex. 28 (Hennigan Dep.) 52:23–53:16; *id.* at 56:10–58:8. Dr. Ward relied on these sources but did not take any steps to validate any of them, instead assuming the accuracy of the time estimates and employee depositions used as inputs. Ex. 29 (Deposition of Expert Dr. Bryce Ward ("Ward Dep.")) 103:22–106:24.

***Out-of-Pocket Expenditures.*** Harford also seeks to recover expenditures it allegedly incurred because of Defendants' platforms. Harford's claimed out-of-pocket damages include $132,794 related to two network filtering products that allow Harford to block or filter out applications and other content from being accessed on district-issued devices or devices connected to Harford's networks. Ex. 30 (Expert Report of Jeffrey E. Meyers – Harford ("Meyers Harford

Rep.")) at App'x C.  Harford purchased the software to meet the requirements of the Children's Internet Protection Act.  Ex. 31 (May 29, 2025 30(b)(6) Deposition of Director of Technology Drew Moore ("May 29, 2025 Moore 30(b)(6) Dep.")) at 33:4–34:11.  The software filters all content (and not just social media), Ex. 22 (March 14, 2025 Moore Dep.) 14:15–15:6, and applies to staff and guests (not just students), Ex. 18 (March 14, 2025 Moore 30(b)(6) Dep.) at 18:3–19:8, 27:8–13. While Harford seeks to recover 20% of the costs associated with this software, the administrator who provided the estimates upon which Harford bases its damages amount admitted that he never confirmed whether the data upon which he relied—time estimates from two employees—were limited to events involving social media, much less Defendants' platforms.  Ex. 31 (May 29, 2025 Moore 30(b)(6) Dep.) 28:24–29:5.

### D.    Harford's Proposed "Strategic Plan"

Harford also seeks to receive money to fund a *$1.1 to $1.5 billion* "strategic plan" developed by one of its experts, Dr. Sharon Hoover, to "abate" the alleged public nuisance.  *See generally* Ex. 32 (Amended Expert Report of Dr. Sharon Hoover – Harford ("Am. Hoover Harford Rep.")); *see also* Defendants' Rule 702 Motion to Exclude School District Expert Testimony at Section III.E (seeking to exclude Dr. Hoover's opinions).  Dr. Hoover's plan, which is substantially the same in all six bellwether districts in terms of the recommended services, stretches 15 years into the future and seeks to establish a panoply of initiatives at Harford addressing, among other things, mental health, student wellbeing, family engagement, digital literacy, and data infrastructure.  *See, e.g.*, Ex. 32 (Am. Hoover Harford Rep.) ¶¶ 145–63; *infra* Section IV.C.

In 2023–24, Harford had approximately 423 on-campus health professionals.  Ex. 32 (Am. Hoover Harford Rep.) ¶ 31.  Yet the strategic plan recommends hiring *783* additional staff, including psychologists, social workers, and even IT staff.  *Id.* ¶ 106.  The plan would also create numerous new positions, such as 76 "digital literacy specialists," 54 "life skills specialists," 54 "family engagement coordinators," and 76 "school-based mental health clinicians."  *Id.*  If hired, these and the other recommended professionals would serve *all* students, not just those students who use Defendants' platforms or certain features of the platforms.  Ex. 33 (August 12, 2025 Deposition of

Dr. Sharon Hoover ("August 12, 2025 Hoover Dep.")) 300:19–303:1; Ex. 34 (August 13, 2025 Deposition of Dr. Sharon Hoover ("August 13, 2025 Hoover Dep.")) 622:22–624:21, 802:18–804:1. This would include some prospective students who have not yet been born. The strategic plan recommends implementing numerous initiatives to address student mental health and digital literacy, such as a new data infrastructure system to purportedly assist schools in identifying students with social-media-related health concerns, increased mental health literacy and life skills programming to help students manage their online activities and their *offline* relationships, and school culture and community building initiatives, such as clubs, community events, and parent education efforts. Ex. 32 (Am. Hoover Harford Rep.) ¶¶ 65–67, 75, 110, 145.

The plan does not make any recommendations regarding changes to the operation of any of Defendants' platforms. *See generally* Ex. 32 (Am. Hoover Rep.). The plan does not account for any changes to Defendants' platform that might occur over the plan's 15-year timeline, such as changes to or removal of the features responsible for the alleged harm. *See* Ex. 33 (August 12, 2025 Hoover Dep.) 308:19–20 ("I haven't studied the changes on the social media platforms"); Ex. 34 (August 13, 2025 Hoover Dep.) 526:1–526:3 ("I don't think I'm offering an opinion that the social media companies change their design."). Nor does the plan consider potential changes in how students might use Defendants' platforms over the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely. *Id.* at 803:10–20 ("it would be hard for me to predict" whether adolescents will still be using social media 10 years from now), 803:21–804:1 (Hoover has not studied anticipated changes in how students use social media).

### E.    The Court's Motion to Dismiss Ruling

At the motion-to-dismiss stage, the Court recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected publishing activities. Order Granting in Part and Denying in Part Defs.' Motion to Dismiss the School District and Local Government Entities' Master Complaint ("SD Order") (ECF No. 1267) at 2. The Court similarly held that Defendants could not be held liable for non-foreseeable third-party conduct, absent some narrow

exceptions for conduct promoted by Defendants.  *Id.*  The Court permitted Harford to proceed on its "core theory" that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources."  SD Order at 2.  At the same time, the Court made clear that the case must focus on "the *specific conduct* through which the defendants allegedly violated their duties to plaintiffs"—*i.e.*, Defendants' use of the limited set of features that the Court has held are not barred by Section 230 and the First Amendment.  Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("PI Order") (ECF No. 430) at 14; *see* SD Order at 12–13 (applying analysis to school district claims).

Specifically, the Court permitted Harford to proceed insofar as its claims were based on Defendants' use of certain features—i.e., Defendants' alleged

- failure to implement robust age verification processes to determine users' ages;
- failure to implement effective parental controls;
- failure to implement effective parental notifications;
- failure to implement opt-in restrictions to the length and frequency of use sessions;
- creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;
- failure to label content that has been edited, such as by applying a filter;
- making filters available to users so they can, among other things, manipulate their appearance; and
- failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

SD Order at 12–14 (hereinafter, the "at-issue features").  By contrast, the Court held that Plaintiffs could *not* base their claims on any of the following features:

- use of algorithms to promote [purportedly] addictive engagement;
- failing to institute blocks to use during certain times of day (such as during school hours or late at night);
- not providing a beginning and end to a user's "Feed";
- publishing geolocating information for minors;
- recommending minor accounts to adult strangers;
- limiting content to short-form and ephemeral content, and allowing private content;

- timing and clustering of notifications of *third-party* content in a way that promotes addiction; and

- timing and clustering of notifications of *defendants'* content to increase addictive use.

SD Order at 14.[2]  The Court also declined "at [the motion to dismiss] stage . . . to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general."  SD Order at 45.  Accordingly, as used in this memorandum, Defendants' "actionable conduct" consists of (1) Defendants' use of the at-issue features and (2) Defendants' alleged failure to warn.

### III.    LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims."  *Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The evidence presented by the parties must be admissible.  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

### IV.    ARGUMENT

#### A.    Harford Lacks Competent Evidence of Causation.

Rejecting an "all or nothing" approach, this Court has made clear that—in order to prove causation—Harford must connect Defendants' *actionable conduct*—as opposed to social media or

---

[2] The SD Order included the "failure to enable default protective limits to the length and frequency of use sessions" as a feature that was not barred.  SD Order at 13.  But the Court explained in its order addressing Section 230 that claims based on this alleged failure *were barred* because it "would inherently limit what defendants are able to publish." PI Order at 16.

electronic device use generally, third-party content, third-party conduct, or Defendants' protected publishing activities—to its alleged injuries. *See* PI Order at 14; SD Order at 12–13.

To succeed on its negligence claim, Harford must prove that Defendants' conduct proximately caused its injury. *See, e.g.*, *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009) ("It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'" (alteration in original)). To be a proximate cause of an injury, the negligent act must be both a cause-in-fact and a legally cognizable cause. *See id.* In Maryland, two tests are used to determine whether cause-in-fact exists—the "but for" test and the "substantial factor" test. *Id.* Here, the Court should apply the "but for" test, which applies when the harms would not have occurred in the absence of the defendant's alleged conduct. *Pittway*, 973 A.2d 771, 786–87. But "[r]egardless of the test employed, the focus remains on the fundamental and sometimes metaphysical inquiry into the nexus between the defendant's negligent act and the resultant harm to the plaintiff," *Yonce v. SmithKline Beecham Clinical Laboratories, Inc.*, 680 A.2d 569, 576 (Md. Ct. Spec. App. 1996), and under either test, to establish cause-in-fact, Harford must show that the actionable features of each Defendant's platform(s) "*actually* produced [the] injury," *Asphalt & Concrete Servs., Inc. v. Perry*, 108 A.3d 558, 574 (Md. Ct. Spec. App. 2015), *aff'd*, 133 A.3d 1143 (Md. 2016). Even under the substantial factor test, Defendants are entitled to summary judgment because Harford has no evidence that any Defendant's actionable conduct, standing alone, was sufficient to bring about its alleged harms.[3]

The legal causation inquiry involves an analysis of "public policy considerations" to determine whether a defendant should be held responsible for the consequences of a negligent act and "most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Pittway*, 973 A.2d at 787–88. As a matter of law, a defendant cannot be the legal cause of an injury when "the negligence of another is the moving and effective cause of the

---

[3] The substantial factor test applies only where the plaintiff has evidence that "two independent causes concur to bring about an injury, and *either cause, standing alone*, would have wrought the identical harm." *Perry*, 108 A.3d at 574 (quoting *Yonce*, 680 A.2d at 575–76 (Md. Ct. Spec. App. 1996)). Harford has no evidence that any one of Defendant's platforms standing alone would have caused its alleged injury.

injury . . . . [O]r if the injury is so remote in time and space from defendant's original negligence and another's negligence intervenes." *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 642 A.2d 219, 230 (Md. 1994).

For its public nuisance claim, Harford must also prove both causation-in-fact and legal causation.[4] A public nuisance is "an act that causes substantial interference with the public's right to public safety, public health, and public convenience." *Grace v. Bd. of Liquor License Comm'rs*, No. 1389, Sept. Term 2016, 2018 WL 367852, at *4 (Md. Ct. Spec. App. Jan. 11, 2018) (citing *Tadjer v. Montgomery County*, 479 A.2d 1321, 1327–28 (Md. 1984)); Restatement (Second) of Torts § 821B (A.L.I. 1979)). Thus, to survive summary judgment on its nuisance claim, Harford must come forward with evidence that each Defendant's actionable conduct caused a substantial interference with the public right to health that was a direct cause of Harford's injuries, and that the injuries were a foreseeable result for which liability may fairly be imposed. *See* SD Order at 26; Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss the School District and Local Government Entities' Claims of Public Nuisance (ECF No. 1332), at 21–23.

Now that discovery has been completed, the record is clear that Harford in fact has *no evidence* to support the assertion that it was injured as a result of actionable conduct by Defendants. *First*, Harford has no evidence that it was harmed as a result of the at-issue features or any alleged failure to warn. Tellingly, the at-issue features are primarily features that *users* or their *parents* can choose to use or not use, such as parental controls, parental notifications, time limits, account

---

[4] After the Court issued its motion to dismiss ruling allowing public nuisance claims to proceed under Maryland law, the United States District Court for the District of Maryland, in a separate matter involving a county plaintiff alleging that pharmacy benefit managers and prescription drug distributors created a public nuisance by partnering with opioid manufacturers to promote opioid use for financial gain, certified, *inter alia*, the following question to the Maryland Supreme Court: "[W]hat are the elements of such a public nuisance claim, and what types of potential relief can a local government plaintiff seek when asserting such a claim?" *Anne Arundel County v. Express Scripts, Inc.*, No. 24-cv-00090-MJM (D. Md. Feb. 21, 2025) (certifying state law question). This term, the Maryland Supreme Court is also considering whether "Maryland law preclude[s] nuisance claims based on injuries allegedly caused by the worldwide production, promotion, and sale of a lawful consumer product." *Mayor & City Council of Balt. v. B.P. P.L.C.*, No. 24-C-18-004219 (Cir. Ct. Balt. City July 10, 2024), *appeal docketed*, No. 11, Sept. Term 2025 (Md. Apr. 24, 2025). The Maryland Supreme Court's decisions in these cases could potentially impact the viability of Harford's public nuisance claim under Maryland law.

deactivation, or CSAM reporting.  Harford has provided no evidence that giving parents or users additional controls would have any meaningful impact on the district where Harford has no control over what parents and users do with those features.   Rather, Harford's limited evidence of specific harms allegedly caused by Defendants' platforms is about third-party content: Harford's witnesses have consistently and expressly testified that allegedly harmful disruptions in schools occurred as a result of the publication of harmful content on Defendants' platforms.  Any claims based on such harms are barred by Section 230 and the First Amendment and are not actionable.

*Second*, setting aside instances related to third party content, Harford has no admissible evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses.  Indeed, Harford lacks even basic information about the extent or nature of its students' use of Defendants' platforms.  While Harford may gesture toward fact or expert testimony about "social media" or cellphone use generally, such evidence is insufficient to meet its burden on summary judgment.   For these reasons, summary judgment on causation grounds is warranted.  *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) ("Summary judgment in a negligence action is appropriate if the record does not support . . . proximate cause . . . ."); *see also* SD Order at 21–22 ("where the existence of proximate cause turns not on a question of fact but on whether the facts alleged are capable of establishing proximate cause, the issue is a matter of law resolvable" by the court).

### 1.     Harford's Allegations of Specific Harms All Impermissibly Rely on Third Party Content and Protected Publishing Activities.

The Court has made clear that liability in this case cannot arise from the (i) "mere publication" of content or (ii) features that the Court held are protected by Section 230 or the First Amendment.  SD Order at 12–14, 25.  It has likewise made clear that "non-foreseeable third-party conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms"—"cannot be attribut[ed] to defendants." *Id.* at 25–26.  Thus, to satisfy its burden on summary judgment, Harford must come forward with evidence that Defendants' *actionable conduct*—as opposed to content, protected features, or third-party bad acts—caused it harm.

1   Harford has no competent evidence that it was harmed as a result of the at-issue features or

2   any failure to warn.  For example, Harford has no evidence regarding the number of its students

3   who used Defendants' platforms, let alone evidence broken down by students' ages.  Thus, it is

4   unsurprising that Harford lacks evidence that Defendants' alleged failure to implement "robust" age

5   verification processes caused it to incur expenses.  Harford also has no evidence that giving users

6   platform-level tools to set their own voluntary time limits (above and beyond the controls already

7   available on the users' devices) or changing the processes for account deactivation would have

8   meaningfully reduced the use of any platform by Harford's students, let alone that any such

9   reduction would have led to Harford incurring less expenses.  Harford similarly lacks evidence that

10  it incurred expenses as a result of Defendants' alleged failure to implement effective parental

11  controls or notifications as it has no evidence of how many parents already use parental controls or

12  how many would use different parental controls had they been implemented.  The same holds true

13  for each of the "at-issue" features.  Nor has Harford presented evidence of what any warning should

14  have looked like or that such a warning would have made a difference to Harford's alleged harms.

15  *See infra* Section IV.D.

16      Instead, the only *specific* evidence that Harford has proffered is of harm caused by third-

17  party content, third-party conduct, and protected publishing activities on Defendants' platforms—

18  precisely the type of conduct the Court has found is not actionable.  *See* Ex. 5 (Brooks 30(b)(6)

19  Dep.) 13:23–14:19 (discussing threats "posted to social media"); Ex. 6 (Williams 30(b)(6) Dep.)

20  58:14–60:2 (explaining conflicts and fights are often "escalated by the video recording that occurred

21  and all of the posts that occur"); *id.* at 69:21–70:20 (mentioning investigation of "threats that a

22  student has posted on social media"); Ex. 35 (Deposition of Director of Communications Jillian

23  Lader ("Lader Dep.")) 26:17–28:18 (discussing "repercussions of a comment or a post" on social

24  media.  Harford's Assistant Superintendent for Student Support Services testified that there are

25  students experiencing "dysregulation [as] a result of, in some cases, *things that they've seen, done,*

26  *posted, been posted about them on social media*."  Ex. 28 (Hennigan Dep.) 60:8–22.  He further

27  agreed that students who are experiencing poor self-esteem, suffering with anxiety and depression,

28

having issues with self-harm, or struggling with their sexuality because social media are being adversely impacted by the content they see, receive, post, and of which they are subjects. *Id.* at 63:4–17. Harford has no evidence that Defendants' at-issue features caused mental health harms or were the cause of any distractions in schools.

There is no dispute that such content on Defendants' platforms was posted by third parties. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) ("The prototypical service qualifying for [CDA] immunity is an online messaging board . . . on which [users] post comments and respond to comments posted by others."). Defendants' publication of that content falls squarely within the heartland of conduct protected by Section 230, is not actionable, and cannot be used to establish that Defendants caused harm to Harford. *See* PI Order at 14–19; *see also, e.g.*, *Est. of Bride ex rel. Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168, 1172, 1182 (9th Cir. 2024) (Section 230 protects publishers of "harassing and bullying speech"), *cert. denied*, 145 S. Ct. 1435 (2025).

While recognizing that "mere publication" of third-party content cannot form the basis of liability under Section 230, the Court in its SD Order carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" through "conduct like providing cash prizes to challenge participants." SD Order at 25. Harford, however, has no evidence that any Defendant itself provided cash prizes to any participant in a dangerous challenge, created filters that facilitated dangerous challenges, or otherwise "promoted, developed, or participated in a foreseeably dangerous challenge" that caused Harford harm beyond the Defendant's mere "algorithmic publication, curation, or amplification" of the challenge. *Id.* at 26. Harford's Pupil Personnel Supervisor, Buzz Williams, could recall only "six to ten instances" related to alleged challenges on Instagram, Snapchat, and TikTok. Ex. 6 (Williams 30(b)(6) Dep.) 90:2–91:3, 92:12–93:9. Mr. Williams recalled incidents involving property damage in bathrooms, "break-in and entry rooftop access," and students spraying fire extinguishers—but he could not give any specifics. *See id.* at 93:8–9 ("I can't give you any more specifics"); *id.* at 99:9–11 ("Those are the . . . major incidents that I can recall specifically from challenges."). But all the instances that Mr. Williams recited involved vandalism by third parties, without any evidence that any Defendant promoted that

1   conduct.  Mr. Williams initially claimed that the students who participated in those challenges were

2   "[s]pecifically incited or motivated by the platform," but he agreed that this meant students' were

3   motivated by other *users* on the platforms.  *Id.* at 99:17–100:6.  When asked whether he had any

4   factual basis for "thinking that TikTok itself was encouraging . . . challenges," Mr. Williams

5   admitted that "[a]ll of my information is inference and reflection" based on what he recalled hearing

6   from students and parents.  *Id.* at 101:2–7.  Mr. Williams likewise admitted he had "no" "factual

7   basis for thinking that any other defendant was encouraging anyone to engage in one of these

8   challenges."  *Id.* at 101:8–11.

9       Similarly, the Court recognized that liability might arise as a result of a filter created by a

10  Defendant itself (as opposed to filters created by third parties).  Again, however, Harford has no

11  evidence that it suffered any harm as a result of a filter created by a Defendant.  Summary judgment

12  on filters is thus also warranted.  *See Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal.

13  2020).

14      In short, because Harford cannot connect *Defendants' actionable conduct*—as opposed to

15  third-party wrongdoing or the publication of content—to its alleged injuries, Defendants are entitled

16  to summary judgment.  *See, e.g.*, *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021)

17  (allowing claim to proceed where alleged duty violated was "*fully independent of* [Defendants'] role

18  in monitoring or publishing third-party content"); *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127

19  F.4th 516, 525 (4th Cir. 2025) (CDA bars "state tort claims [that] are inextricably intertwined with

20  [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com, LLC*, 724 F.

21  Supp. 3d 882, 885 (N.D. Cal. 2024) (granting summary judgment where claim "intertwined" with

22  conduct protected by Section 230); *Nuveen Mun. High Income Opportunity Fund v. City of

23  Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that

24  affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must

25  reasonably distinguish the impact of those risks from other economic factors."); *In re Williams Sec.

26  Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (granting summary judgment where

27

28
                                    19

1    "theories of loss causation could not distinguish between loss attributable to the alleged fraud and

2    loss attributable to non-fraud related news and events").

3         **2.       Harford Has No Competent Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform.**

4

5         Harford's "core theory" of injury—and the basis on which the Court permitted it proceed at

6    the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive use

7    of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by

8    expending resources." SD Order at 26. Setting aside alleged incidents involving third party content

9    and wrongdoing, however, the record is clear that Harford has no competent evidence that it was

10   injured as a result of its students' "compulsive use" of each Defendant's specific platform(s). While

11   Harford points to generalized testimony regarding harms from "social media" use or smartphone

12   use generally, that testimony cannot meet Harford's burden to show that it was injured by each

13   Defendants' specific platform(s)—let alone each Defendant's actionable conduct.

14        As a threshold matter, and as explained in Defendants' Rule 702 motion on general

15   causation, the scientific evidence actually does *not* support the theory that Defendants' platforms

16   can cause youth to engage in the type of "compulsive use" alleged. Because Harford cannot

17   establish general causation, Defendants are entitled to summary judgment. *See, e.g.*, *Henricksen v.*

18   *ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) ("General causation and

19   specific causation are essential elements of Plaintiffs' prima facie case . . . . Expert testimony is

20   necessary to make this showing" and without reliable expert testimony, "the jury could only

21   speculate that a causal relationship exists."); *Holzhauer v. Saks & Co.*, 697 A.2d 89, 96 (Md. 1997)

22   (explaining that, where a case presents an issue of a "complex and technical nature," lay jurors

23   "would not be permitted to draw an inference of negligence without the aid of expert testimony");

24   *Wood v. Toyota Motor Corp.*, 760 A.2d 315, 319 (Md. Ct. Spec. App. 2000) (applying this

25   understanding to the products liability context).

26        Even setting that foundational defect aside, Harford cannot establish that the individual

27   Defendant's specific platform(s)—or even all of the Defendants' platforms combined—caused it

28

harm.  Harford lacks basic information about the extent or nature of its students' use of Defendants'
platforms.  It does not know the answer to key threshold questions, including: how often its students
used Facebook, Instagram, YouTube, TikTok, or Snapchat; for how long they used them; or which
features of the platforms they used.  Ex. 19 (May 9, 2025 Bulson Dep.) 86:9–87:17 (Superintendent
has no "quantitative data" on how frequently or for how much time students spend using
Defendants' platforms); Ex. 25 (Lader Dep.) 33:18–24, 35:13–19 (not aware of any data from HCPS
tracking how many students use Defendants' platforms and stating "I do not track students' use of
social media"); Ex. 23 (Brooks Dep.) 171:16–173:19 (cannot speak to how students are using their
cell phones or electronic devices in school and has no data about how much or how often students
are using cell phones, electronic devices, or social media).  Although Harford began asking students
about their total *screentime* use in a 2022 survey, that survey *still* does not ask about students' use
of social media generally or Defendants' platforms specifically.  Ex. 36 (HCPS_00046480) at -483,
-501 (surveying students about their general "screen time" outside of school—without asking what
type of device they were using or what platforms they were using).  This lack of evidence about
students' use of *Defendants' platforms* is fatal to their causation arguments.  As Harford witnesses
admit, students use their phones for a wide range of activities, including using many other apps and
platforms.  *See, e.g.*, Ex. 28 (Hennigan Dep.) 39:3–47:15 (mentioning Minecraft, Pandora, Apple
Music, WhatsApp, the "iPhone camera app," and "text messaging," among others).   In fact,
Assistant Superintendent of Student Support Services Bernard Hennigan assigned partial blame for
the alleged harms to other platforms not operated by Defendants.  *See* Ex. 21 (Hennigan 30(b)(6)
Dep.) 121:3–123:21 (agreeing that BeReal, Discord, GroupMe, Kik, Omegle, Pinterest, Reddit,
Twitch, Tumblr, WhatsApp, X (formerly known as Twitter) and Yik Yak are responsible for
contributing to students' mental, emotional, social or behavioral health problems).[5]

      Harford similarly lacks evidence tying any student's use of Defendants' platforms, much
less a significant number of students' use, to any mental health harms.  As discussed above, *supra*

---

[5] Mr. Hennigan also testified that other people and products were responsible for contributing to
students' mental, emotional, social, and behavioral health problems, including JUUL and the
manufacturers of other vaping products, alcohol companies, tobacco companies, "community
members, parents," and other students.  Ex. 21 (Hennigan 30(b)(6) Dep.) 114:1–18, 115:21–121:2.

1   Section II.A, Harford's corporate representative testified that, if such data exists, it would primarily

2   be found in the "school-based mental-health report[s]." *See* Ex. 21 (Hennigan 30(b)(6) Dep.) 45:3–

3   22, 47:14–48:5.  But those reports do not show the reasons for the visits, nor do they indicate

4   whether the students' mental health concerns were related to cell phones, social media, or

5   Defendants' platforms.  *E.g.*, Ex. 25 (2022-23 SBMH Data).  Other sources of data cited by Harford

6   witnesses do not contain this information either.  Harford does not have any documents aggregating

7   data from threat and risk assessments.  Ex. 21 (Hennigan 30(b)(6) Dep.) 37:22–38:20; Ex. 6

8   (Williams 30(b)(6) Dep.) 72:16–73:7 (threat assessments are not tracked "at the system level"; "I

9   would have to call the principal and say, 'Pull your staff together and let me know how many threat

10  assessments you've conducted this year'").  And administrators have never tried to analyze how

11  many threat assessments involve social media.  *See* Ex. 21 (Hennigan 30(b)(6) Dep.) 38:14–20.  Nor

12  does the District possess any aggregate disciplinary data that can show how many incidents are

13  related to students' use of Defendants' platforms (either in or out of school).  *See* Ex. 24

14  (HCPS_00228706) (districtwide aggregate data showing 2022–23 disciplinary incidents; report

15  does not indicate whether incidents involved social media or Defendants' platforms); Ex. 6

16  (Williams 30(b)(6) Dep.) at 32:18–25; *id.* at 55:8–21 (District does not know how many disciplinary

17  incidents are related to students' use of social media, with the witness answering as follows to a

18  query about whether he could provide the percentage of discipline incidents between 2017 and 2025

19  that involved social media: "[t]hrough my own experiences," but "[i]n terms of database-quality

20  information . . . . [t]hat information is not recorded" ); Ex. 23 (Brooks Dep.) 103:12–25 (Supervisor

21  of Safety and Security admitting he has no data reflecting how often social media plays a role in

22  fights or violence).

23      Harford's experts likewise fail to link Harford's alleged injuries to actionable conduct by

24  each specific Defendant.  For example, Dr. Sharon Hoover impermissibly groups together all "social

25  media" platforms—including those not at issue.  *See generally* Ex. 32 (Am. Hoover Harford Rep.).

26  At no point in her report does Dr. Hoover define "social media," and she certainly does not define

27  it to include only the five platforms at issue, let alone separate out those platforms.  Dr. Hoover

28

conceded in her deposition that her causation analysis and opinions are not specific to any platform. *See* Ex. 33 (August 12, 2025 Hoover Dep.) 154:2–13 ("I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera.  So I didn't think about it that way."); *id.* at 262:18–24 (admitting she did not perform a causation analysis for any individual platform).

*     *     *

Importantly, Harford's failure to present evidence regarding each Defendant's platform(s) is compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms or Defendants' alleged failure to warn.  *See supra* Section IV.A.  At bottom, Harford is required to come forward with evidence that each Defendant's actionable conduct caused it to incur injury. This requires it to disentangle both (1) alleged harms flowing from online activity that does not involve a given Defendant and (2) alleged harms flowing from third party content and protected publishing activity accessed by students on each Defendant's platform(s).  But Harford and its experts have done neither, instead focusing broadly on social media use.  *See generally* Defendants' Motion to Exclude Plaintiffs' General Causation Expert Testimony; Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony.  Accordingly, even if Harford's experts were correct that Harford has experienced harm as a result of "social media" generally, their opinions do nothing to establish that Harford has experienced harm arising specifically from each Defendant's actionable conduct—*i.e.*, excluding third party wrongdoing, content published on Defendants' (and others') platforms, and the protected features of Defendants' platforms.  That wholesale failure is fatal on summary judgment.  *See* PI Order at 14–19; *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024).

**B.    Harford Cannot Show It Is Entitled to Past Damages.**

Damages is an essential element of Harford's negligence claim.  *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086 (Md. 2010).  The District "has the burden of proving, by a preponderance of the evidence that [its] damages were caused by the negligence of the [D]efendant[s]."  *Strong v. Prince George's County*, 549 A.2d 1142, 1145 (Md. Ct. Spec. App. 1988).  Failure to demonstrate

23

recoverable damages is fatal to claims of negligence.  *See Wolff v. Magal*, No. 819, Sept. Term, 2021, 2022 WL 2282682, at *8 (Md. Ct. Spec. App. June 23, 2022) (affirming trial court's grant of defendant's summary judgment motion as "there was no evidence that [decedent] suffered any recoverable harm as a result of Appellees' alleged negligence").  The same burden is true with respect to public nuisance.  *Mayor & City Council of Balt. v. Monsanto Co.*, No. RDB-19-0483, 2020 WL 1529014, at *8 (D. Md. Mar. 31, 2020) (explaining, in the public nuisance context, that "the plaintiff has the burden of proving the fact of and the extent of the damages he has sustained," and "[t]hose damages must be proved with reasonable certainty, and may not be based on speculation or conjecture").

In holding that the School Districts' claims were not improperly derivative of their students' alleged harms, the Court found that they had adequately alleged the following injuries that were unique to them: "diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage."  SD Order at 19–20.

But Harford did not prove that it has any such financial injuries, and therefore it has not shown damages resulting from Defendants' actionable conduct.  *First*, Harford claims damages relating to alleged "lost time"—*i.e.*, costs related to the time that Harford teachers and staff purportedly had to spend addressing issues related to "social media."  But these costs are not recoverable under Maryland law and, separately, Harford lacks competent evidence that it incurred such damages.  *Second*, Harford has no competent evidence that it hired new mental health personnel, developed new mental health resources, or implemented other new resources as a result of Defendants' actionable conduct.  *Third*, Harford cannot recover for repairing property damage because the evidence is undisputed that this damage resulted from third-party acts, which cannot form the basis of liability under this Court's prior ruling.

1

2

### 1.  Harford Cannot Show Defendants Caused It to Divert Financial Resources.

Harford does not claim damages associated with hiring any additional staff or from paying existing staff more because of Defendants' actionable conduct.  Instead, Harford's expert claims that "relevant staff time during the school day—such as that of teachers—is finite" and that "some portion of that time is redirected away from other tasks" to deal with social media.  Ex. 26 (Am. Ward Harford Rep.) ¶10.  On that basis, Harford asserts that it is entitled to $55.36 million in "lost time" damages for the time that its teachers, counselors, and psychologists purportedly spent addressing issues related to social media.  *Id.* ¶ 42; *id.* ¶¶ 40–41 (figure includes $54.4 million in teachers' wages and benefits and nearly $1 million in wages and benefits for school counselors and psychologists).[6]  Harford cannot recover this damage because it is not a recoverable category of damage and Harford has not met its evidentiary burden to prove it is entitled to the claimed amount.

### a)    Harford cannot recover "lost time" damages.

Under Maryland law, "the loss of time per se is not compensable unless it is directly connected with some loss of advantages, benefits, or revenues which might have been produced by the profitable use and employment of such time."  8 Md. L. Encyclopedia *Damages* § 19 (West 2025).  Maryland authority does not support an award of compensatory damages where, as here, the plaintiff did not lose any money or spend any extra money as a result of the "lost time" and would have spent the *identical* amount of money in the absence of the alleged wrongdoing.  Rather, compensatory damages are "[a]n amount awarded to a complainant to compensate for a proven

---

[6] Harford has consistently asserted throughout discovery that its "damages computations require expert calculation," that "[e]xpert analysis is required to fully compute [Harford's] past compensatory damages," and that Harford "explicitly reserves the right to serve expert reports and/or amended disclosures which reflect different past compensatory damages numbers and/or total damages numbers than those provided herein based on additional information and/or expert analysis."  Ex. 37 (Pl.'s Bd. of Educ. of Harford County's Second Supp. Initial Discl. (Nov. 15, 2024) ("Harford's Second Supp. Initial Discl.")) ¶ 4.  Considering Harford's repeated representations that its expert reports will provide a computation of the damages it seeks to recover, to the extent that any alleged damages were not included in Harford's expert reports, those damages should be deemed abandoned.

1    injury or loss; damages that repay actual losses." *AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 10

2    A.3d 745, 752 n.14 (Md. 2010) (quoting *Black's Law Dictionary* 418 (8th ed. 2004)).[7]

3    Harford has no evidence of actual losses. Harford did not spend $55.36 million as a result

4    of "lost" teacher, counselor, and psychologist time due to Defendants' platforms, nor did it fail to

5    earn that amount as a result of Defendants' platforms. As Dr. Ward acknowledged, what Harford

6    pays its staff is not dependent on *how* time is spent performing their duties. *See* Ex. 29 (Ward Dep.)

7    165:21–166:22; *id.* at 167:8–168:15 (agreeing he is "not opining that because of Defendants'

8    platforms specifically a school district had to pay teachers more than the school district would have

9    paid teachers if Defendants' platforms did not exist"). And Harford has not identified any advantage

10   or benefit that it failed to receive as a result of the alleged diversion of time. 8 Md. L. Encyclopedia

11   *Damages* § 19 (West 2025). Harford therefore cannot recover damages for alleged "lost time."

12          **b)       Harford has no competent evidence establishing these "lost time"**
13          **damages.**

14   Even if the Court were to accept that Harford could recover "lost time" damages, Harford

15   failed to meet its burden to produce competent evidence to justify this award. *See Sugarman v.*

16   *Liles*, 190 A.3d 344, 369 (Md. 2018) ("Damages must be actual, not speculative, remote, or

17   uncertain.").

18          **(1)       Harford's Evidence of Teacher "Lost Time" Damages Is**
19          **Insufficient.**

20   Harford offers only Mr. Klein's teacher survey as evidence of alleged lost time for teachers,

21   which is insufficient as a matter of law to establish lost damages. Ex. 26 (Am. Ward Harford Rep.)

22   ¶¶ 31–37 (relying on Klein survey).

23   _____

24   [7] Maryland courts have allowed recovery for damages where a plaintiff proved that employee time
     was diverted from income-generating work to non-income generating work or where lost profits
25   could otherwise be proven with certainty, but those circumstances are not present here. *See CR-*
     *RSC Tower I, LLC, v. RSC Tower I, LLC*, 56 A.3d 170, 182 (Md. 2012) (explaining claim for
26   consequential or special damages "when lost profits are claimed for lost income from business
     operations that would have been made but for the breach"); *Under Armour, Inc. v. Ziger/Snead,*
27   *LLP*, 158 A.3d 1134, 1139 (Md. Ct. Spec. App. 2017) (affirming damages award where employee
     time was diverted from income-producing work in order "to assist counsel in preparing a lawsuit to
28   collect wrongfully withheld fees and defending against a meritless lawsuit by appellant").

1    To calculate the amount of damages allegedly incurred for teacher lost time, Mr. Klein

2 invited all of Harford's currently employed, full-time middle school and high school teachers (1,378

3 total) to respond to a survey that asked each survey taker to estimate how much time the teacher

4 spent on instruction and how much of that time was spent addressing distractions due to "social

5 media" (defined as including, but not limited to, Defendants' platforms) over the past decade (going

6 back to 2014). Ex. 27 (Klein Harford Rep.) ¶¶ 20–39. Only 136 teachers, or 10% of Harford's

7 middle and high school teachers, responded to the survey. *Id.* at App'x E-1. Harford's experts took

8 the unverified responses of the 136 unnamed teachers and calculated the average percentage of

9 instruction time purportedly spent addressing social media, *id.* at ¶ 41, and then multiplied that

10 percentage against the wages *and benefits* of middle and high school teachers to come to a sum of

11 nearly $54.4 million. Ex. 26 (Am. Ward Harford Rep.) ¶ 40; *id.* at tbl. 5.

12    The survey responses do not identify the purported teacher by name, are not signed under

13 penalty of perjury, and are inadmissible hearsay that cannot be smuggled into evidence via Harford's

14 expert reports. *See* Fed. R. Civ. P. 56(c); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 774–78 (9th

15 Cir. 2002); Fed. R. Evid. 801; Fed. R. Evid. 703. Moreover, for the reasons explained in

16 Defendants' Rule 702 motion, the Klein survey (and the damages report based on that survey) is

17 unreliable and inadmissible: conducting a post-hoc survey of time spent on social media disruptions

18 going back up to a decade or more and then extrapolating from the responses of the 136 self-selected

19 individuals who chose to answer to the approximately 1,378 teachers in the district who did not is

20 not a reliable methodology. *See* Defendants' Motion to Exclude School District Expert Testimony

21 at Section III.B–III.C. There is no degree of certainty, let alone a reasonable degree, that the answers

22 of this *11%* of teachers about how they supposedly spent their time over the past decade could be

23 reliably extrapolated and applied to the other *89%* of teachers who declined to participate in this

24 survey and who may teach different grades in different schools. Nor can it be applied reliably to

25 teachers previously employed by the District—whose tenures cover some portion of 2014 to

26 present—who were never given the opportunity to take the survey.

27

28

1    Harford's teacher lost time estimates also suffer from another, independently fatal flaw: the

2    survey questions ask only about time spent dealing with "social media" generally. The questions

3    specifically mention each Defendant's platform(s) as an example of "social media," but the survey

4    was not specific to the four Defendants in this case. And they made no effort to distinguish between

5    time spent dealing with issues arising from the at-issue features, as opposed to issues arising from,

6    for example, third party content posted on Defendants' (or other) platforms. Accordingly, the "lost

7    time" estimates are plainly not estimates of time spent addressing Defendants' actionable conduct,

8    and Harford has failed to meet its burden of proof to prove its damages are "actual, not speculative,

9    remote, or uncertain." *Sugarman*, 190 A.3d at 369.

10                     **(2)    Harford's Evidence of Counselor and Psychologist "Lost
                               Time" Damages Is Insufficient.**

11

12    Harford relies on interrogatory responses the testimony of Mr. Hennigan, Harford's

13    Assistant Superintendent of Student Support Services, as evidence of alleged lost time with respect

14    to counselors and psychologists.

15    Dr. Ward adopted Mr. Hennigan's estimated percentages (which are reflected in the

16    interrogatory answers) to calculate lost time for Harford's counselors and psychologists. Dr. Ward

17    admitted that he took no steps to validate any of the sources upon which he relied for his analysis,

18    instead assuming the accuracy of the time estimates in the interrogatory responses and employee

19    testimony that he used as inputs. Ex. 29 (Ward Dep.) 105:2–13. Courts do not permit an expert to

20    convert unverified hearsay into admissible evidence. *See United States v. Ansari*, No. 23-2703,

21    2024 WL 5231260, at *2 (9th Cir. Dec. 27, 2024) (affirming trial court's decision to exclude expert

22    testimony "which was based on 'untested, self-serving hearsay'"); *Erhart v. BofI Holding, Inc.*, 445

23    F. Supp. 3d 831, 839, 841 (S.D. Cal. 2020) (noting that an expert may not "merely act[] as a

24    transmitter for testimonial hearsay," and finding it "inappropriate to allow [the expert] to place

25    [personnel cost] evidence before the jury by taking advantage of Rule 703's relaxed personal

26    knowledge and hearsay requirements").

27

28
                                                    28

1      The deposition testimony does not support Dr. Ward's calculations.    Mr. Hennigan's

2  testimony makes clear that the estimates were not limited to time lost due to Defendants' at-issue

3  conduct but instead incorporated issues arising from "phone use" in general.    Ex. 28 (Hennigan

4  Dep.) at 55:16–57:23.    Such speculation constitutes an inadmissible lay opinion under Rule 701

5  given that it is not "rationally based on the witness's perception."  Fed. R. Evid. 701(a).    Dr. Ward

6  nonetheless incorporated it without scrutiny in his damages calculation.    Ex. 29 (Ward Dep.)

7  103:22–108:22.

8      Because Harford relies on speculative estimates that are not tailored to Defendants'

9  actionable conduct, Harford has no admissible evidence to support its claimed lost time damages of

10  nearly $1 million with respect to counselors and psychologists.  Ex. 26 (Am. Ward Harford Rep.)

11  ¶ 41.    *See Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 937 (N.D. Cal. 2016)

12  ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine

13  issues of fact and defeat summary judgment."); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287

14  F.3d 866, 874–85, 874 n.1 (9th Cir. 2002) (noting that declarant "statements [that] lack foundation

15  and constitute hearsay" are accorded "no weight" when considering a motion for summary

16  judgment, and affirming the trial court's grant of summary judgment in favor of defendants).

17           **2.      Harford Has No Evidence that It Incurred Specific Additional Costs**
              **Because of Defendants' Platforms.**
18

19      Harford fares no better in its attempt to justify its damages for alleged out-of-pocket costs—

20  i.e. new mental health personnel or third-party vendor costs.  There is no evidence that any of these

21  costs were the result of Defendants' actionable conduct.

22           **a)      Harford has no evidence it hired new mental health personnel**
                       **because of Defendants' platforms.**
23

24      Harford has not identified competent evidence that it hired any new mental health personnel

25  or developed new mental health resources and therefore incurred additional expenses because of

26  students' use of Defendants' platforms.    Harford's expert on out-of-pocket damages did not

27  calculate costs associated with increased hiring.  *See generally* Ex. 30 (Meyers Harford Rep.).  Thus,

28

1    Harford's claim for damages in this "out-of-pocket" costs category fails because it has not shown

2    an actual cost incurred and lacks competent evidence as to the (nonexistent) amount.  *See AGV*

3    *Sports Grp., Inc.*, 10 A.3d at 752 n.14.  In the absence of expert testimony, the vague unsupported

4    assertions of some Harford witnesses who claimed that the District has hired certain personnel as a

5    result of Defendants' platforms is insufficient to defeat summary judgment.  Those witnesses

6    claimed that documentation of the new hires exists, but they could not identify that evidence and

7    their testimony was otherwise purely anecdotal.  *See* Ex. 38 (Judd 30(b)(6) Dep.) 33:14–40:17

8    (unable to identify which positions were created).

9               **b)**    **Harford has no evidence it implemented new technology because**
**of Defendants' platforms.**

10

11         Harford seeks to recover $132,794 in costs associated with two network filtering products

12   that allow Harford to block access to applications and filter other content on district-issued devices

13   or devices connected to Harford's networks.  *See* Ex. 30 (Meyers Harford Rep.) at App'x C.  This

14   amount is 20% of the cost of one filter incurred annually between 2018 and 2020 plus 20% of the

15   cost of the second (replacement) filter incurred annually since 2020.  *Id.*; *see also id.* at ¶¶ 21–23

16   (calculating out-of-pocket vendor costs by multiplying the allocation percentages set forth in

17   Harford's discovery responses by the overall vendor costs).  Harford has failed to prove that these

18   technology costs are directly and proximately caused by Defendants' actionable conduct.

19         The filtering products deployed by Harford do far more than just filter the platforms at issue

20   in this litigation or only filter content for students.  As Superintendent Bulson testified during his

21   deposition, this software filters any "inappropriate *content*," not just social media.  Ex. 19 (May 9,

22   2025 Bulson Dep.) 165:18–166:22.  It restricts access to websites and content for staff and guests—

23   not just students.  Ex. 19 (May 9, 2025 Bulson Dep.) 166:18–22; Ex. 18 (March 14, 2025 Moore

24   30(b)(6) Dep.) 27:8–13 (the filter applies to anyone who accesses Harford's network).  Harford

25   chose a 20% "Allocation Percent[]" to apply to the costs of these technologies based on an estimate

26   from its Director of Technology that 20% of the Office of Technology & Information's *time* is spent

27   on student attempts to bypass the blockers to access social media sites and dealing with content

28

posted by students on social media.  *See* Ex. 31 (May 29, 2025 Moore 30(b)(6) Dep.) 12:18–29:5.

But there is no evidence that 20% of these technology *expenditures* are attributable to Defendants'

at-issue conduct.  Mr. Moore came up with his 20% estimate by asking two employees in the Office

of Technology & Information how much time they spend per week on "issues related to social

media." Ex. 31 (May 29, 2025 Moore 30(b)(6) Dep.) 16:18–17:14, 22:2–12.  These two individuals

told him that they have about four events a week that take 1–2 hours each to resolve.  *Id.* at 19:25–

21:7.  Mr. Moore did not confirm with those individuals (or anyone else) whether his 20%

calculation seemed accurate to them, nor did he substantiate his estimate with documentation of any

sort.  *Id.* at 21:14–22:1.  Hearsay and foundational evidentiary issues aside, *time spent* managing

students' attempts to bypass the filters to access prohibited material, including "social media," *id.*

at 16:18–19:12, is not a reliable measure of how much of its filtering and blocking technology *costs*

are attributable to social media, much less Defendants' platforms.  Moreover, Harford can provide

no explanation as to why this 20% figure, based on contemporary time estimates and untethered to

any supporting documents, should apply to filtering and blocking costs incurred from 2018 to 2024.[8]

Harford's attribution of 20% of the costs of its network filtering products to the Defendants

is flawed for a separate reason: Harford purchased the filters to meet the requirements of the

Children's Internet Protection Act (CIPA).  Consequently, as Director of Technology Andrew

Moore testified, Harford has been paying for an internet content filter *every year since 2000*—long

before any of Defendants platforms existed.  Ex. 31 (May 29, 2025 Moore 30(b)(6) Dep.) 32:9–

---

[8] Because Harford does not know how much time students are spending on cellphones generally or on other applications and websites available on laptops and other devices as opposed to Defendants' platforms, even Harford's estimate that 20% of its filtering and blocking software costs are attributable to social media generally amounts to nothing more than speculation. Ex. 23 (Brooks Dep.) 173:4–19 (has no data about for how long or how often students are using cell phones, electronic devices, or social media, or how students use social media); Ex. 35 (Lader Dep.) 105:20–23 (unaware of any data that she or HCPS has tracking how much students use Defendants' platforms); Ex. 7 (Judd Dep.) 17:19–18:18 (has not collected or reviewed quantitative data about students' use of cell phones or personal devices, about how frequently or for how long students use social media, or generally about students' use of district-issued devices).  Plaintiffs' expert Dr. Hoover acknowledged that Harford "lack[s] comprehensive systems for tracking digital harms, such as time spent on social media during the school day," and other measures to connect social media use to alleged harms. Ex. 39 (Rebuttal Expert Report of Dr. Sharon Hoover – Harford ("Reb. Hoover Harford Rep.")) ¶ 94.

34:11 ("Q. And do those purchases of an internet content filter to meet CIPA's requirements include Harford County Public Schools' purchases of Palto Alto and Cisco Umbrella? A. Yes."); Ex. 17 (HCPS_00114511) at -516 (stating that Harford uses an outside Internet filtering company to ensure the safety of students while accessing the Internet, noting that "use of this filter system also allows Harford County Public Schools to comply with the Child Internet Protection Act"). Harford has no evidence that these costs—which were required in order to comply with federal law—are any greater because of social media writ large, let alone Defendants' specific platforms.

Lastly, Harford makes no showing that these costs were incurred as a result of the *features* of Defendants' platforms to which this litigation is limited, as opposed to the content on those platforms. Harford is obligated to tether its request for damages to harms caused by the aspects of Defendants' platforms that the Court has deemed actionable. *See* SD Order at 13–14. Plaintiffs' out-of-pocket damages expert, Jeffrey Meyers, admits that he "ha[s] no way of knowing" whether, in the absence of Defendants' at-issue conduct any school district's internet content filter costs "would have been the same or less or more." Ex. 40 (Deposition of Jeffrey E. Meyers) 270:8–17.

Harford has therefore put forth no competent evidence to allow a factfinder to apportion costs appropriately or to calculate damages with reasonable certainty. *Atkinson Warehousing & Distrib., Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 669 (D. Md. 2000).

### 3. Harford Cannot Recover Property Damage That Results from Third-Party Acts.

Harford did not set forth any expert opinion in support of any costs related to property damage allegedly resulting from Defendants' platforms. Ex. 37 (Harford's Second Suppl. Initial Discl.) ¶ 4 ("[e]xpert analysis is required to fully compute [Harford's] past compensatory damages and [it] intends to supplement [its] damages computations at the time that expert reports are due"). Jeffrey Meyers, Harford's expert on out-of-pocket damages, did not include property damage in his analysis. *See generally* Ex. 30 (Meyers Harford Rep.). Harford's corporate representative vaguely testified that vandalism and property damage cost Harford "hundreds" in a given school year, and "thousands" in one particular year, but he could not identify any specific costs incurred because of

property damage that the District attributes to students' use of social media generally.  Ex. 6 (Williams 30(b)(6) Dep.) 95:8–20.  He also could not provide the number of incidents of vandalism or property damage that Harford attributes to student use of Defendants' platforms.  *Id.* at 89:8–25. Harford therefore has no competent evidence of any property-related damages.

### C.    Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under the Law.

Harford seeks as relief the payment of over *one billion dollars* to implement a voluntary 15-year "strategic plan," authored by Plaintiff's expert, Dr. Sharon Hoover, to address anticipated student wellbeing and learning issues in the future.  *See* Ex. 41 (Second Am. Expert Report of Douglas L. Leslie, Ph.D – Harford (Sept. 4, 2025) ("Second Am. Leslie Rep."))  ¶ 1.[9]  Dr. Hoover's strategic plan does not reference Defendants or their platforms in its recommendations, does not recommend that the district stop allowing its students to access Defendants' platforms on its networks or devices, and does not recommend changes to Defendants' conduct.  The plan is not tied to addressing only the mental health issues allegedly resulting from Defendants' platforms, and the plan's recommended staffing levels have no relationship to the number of Harford students using Defendants' platforms or the amount of time they spend on the platforms—neither Harford nor Dr. Hoover have that information.  Instead, the plan would provide comprehensive mental health and educational services to all students and their families *regardless* of whether they use Defendants' platforms and attempts to solve resource and funding problems that long pre-date and have nothing to do with Defendants' platforms.  For example, the plan recommends hiring and training *783* new employees to provide, among other things:

- Digital literacy education for students to teach "healthy boundaries with technology";
- "Life Skills programming" to teach students "empathy, emotion regulation, [and] navigating social media pressure";

---

[9] For reference, Harford's total budget for Fiscal Year 2024–2025 is approximately $780.1 million. Ex. 42 (Harford Cnty. Gov't Off. of Budget and Mgmt., *FY 25 Harford County Approved Budget in Brief*, at 16 (2024), https://user-60zwye.cld.bz/FY-25-Harford-County-Approved-Budget-in-Brief/16/.

1    • "Mental Health literacy" to educate students, educators, and families about mental health

2    challenges, not just those limited to use of Defendants' platforms;

3    • Anti-cyberbullying programming;

4    • Digital detox "challenges" to develop healthier relationships with screens and technology in

5    general;

6    • Promotion of in-person social activities such as clubs and community events to encourage

7    belonging; and

8    • "Intensive mental health treatment" for students allegedly suffering from psychological

9    effects of social media and other causes.

10    *See* Ex. 32 (Am. Hoover Harford Rep.) ¶¶ 68–80, 106.

11    Harford's strategic plan is not a proper remedy for any of Harford's claims. *First*, Harford

12    cannot recover the strategic plan as equitable relief for its nuisance claim for two reasons: (i) Harford

13    has admitted it has an adequate remedy at law—future damages for its alleged nuisance claims—

14    which forecloses any equitable relief; and (ii) even if Harford lacked an adequate remedy at law,

15    the strategic plan is not a permissible equitable remedy under Maryland law. *Second*, Harford's

16    strategic plan is not recoverable as future damages for its negligence claim because the plan's 15

17    years of expenditures do not compensate Harford for money that Harford will, with reasonable

18    certainty, have to spend in the future. *Third*, even if the plan qualified as permissible equitable relief

19    or future damages, the largest component of the strategic plan—the funding of mental health

20    treatment for students—is impermissibly derivative of alleged injuries to students.

21    **1.      Harford Cannot Recover the Plan as Equitable Relief for Its Nuisance**
           **Claim.**

22

23    **a)      Harford has an adequate remedy at law.**

24    To obtain equitable relief, a plaintiff must show that it lacks an adequate remedy at law,

25    which Harford cannot do because it admits that damages are available for the same alleged harms.

26    *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841, 844 (9th Cir. 2020) (plaintiff "must

27    establish that she lacks an adequate remedy at law before securing equitable restitution"); *Wood v.*

28

*Marathon Refin. Logistics Serv. LLC*, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (Gonzalez Rogers, J.) (granting summary judgment on equitable remedy because "Plaintiffs have not explained why the existing remedy [at law] is inadequate").[10]

Harford's nuisance and negligence claims rest on the same alleged conduct—the design of Defendants' platforms—and its proposed "strategic plan" is offered as both abatement and future damages. *See* Pls.' Resp. to Defs.' Letter Br. Re Anticipated Daubert and Summ. J. Mots. (ECF No. 2184), at 6 ("[I]n addition to abatement for those SDs with live nuisance claims, the plans also serve as a measure of future damages under their negligence claims."). That overlap makes equitable relief unavailable regardless of whether Harford is able to prove future damages (which as discussed below, it is not). *See Sonner*, 971 F.3d at 844 (affirming dismissal of claim for equitable relief because plaintiff "seeks the same sum in equitable restitution as . . . she requested in damages to compensate her for the same past harm").

Courts have consistently held that a remedy is "adequate" where damages are legally available, even if the plaintiff ultimately cannot prove entitlement to them. *See, e.g.*, *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable." (emphasis in original)); *Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825, at *3 & n.3 (N.D. Cal. June 17, 2016) (dismissing UCL claim because an adequate remedy at law existed through the "compensatory damages" sought by the plaintiff, even though all legal claims were simultaneously dismissed as barred by the statute of limitations; "the fact that Robinson's other claims have been barred by the statute of limitations does not affect the court's analysis"). The real problem here is not that Harford lacks an adequate remedy at law but its inability to prove its entitlement to that remedy.

---

[10] Maryland law aligns with federal equitable principles. *Becker v. State*, 767 A.2d 816, 821 (Md. 2001) ("The underlying principle governing equitable relief in suits to abate nuisances is that the injury is of such a nature that the complaining party cannot obtain an adequate remedy at law. Thus, in nuisance cases, . . . the equity court will grant an injunction where the injury is irreparable and cannot be adequately compensated in damages . . . ." (alterations in original) (quoting *Adams v. Comm'rs of Trappe*, 102 A.2d 830, 834 (Md. 1954))).

1

### b) The strategic plan is not a proper "abatement" remedy.

2   Even if Harford did not have an adequate remedy at law, the strategic plan is not a proper

3   abatement remedy under Maryland law.  In Maryland, a public nuisance is an unreasonable

4   interference with a right common to the general public.  *See Mayor & City Council of Baltimore v.*

5   *BP P.L.C.*, 31 F.4th 178, 210–11 (4th Cir. 2022).  The remedy of abatement for a public nuisance

6   under Maryland law is an injunction directing the offending party to cease *the conduct* causing the

7   alleged nuisance (or in cases involving pollution or physical structures, removing the physical

8   manifestation of the defendant's conduct).[11]  *See Martin v. Howard County*, 709 A.2d 125, 135–36

9   (Md. 1998) (equitable abatement of nuisance "seek[s] to terminate or to reduce *the activity* in various

10  ways"); *Spaw, LLC v. City of Annapolis*, 156 A.3d 906, 931 (Md. 2017) (abatement is not a penalty,

11  but instead is "the act of eliminating or nullifying" (quoting *Black's Law Dictionary* (10th ed.

12  2014)); *Adams v. Comm'rs of Trappe*, 102 A.2d 830, 833, 837 (Md. 1954) (ordering defendant to

13  remove gasoline pump and storage tank from public street).  "[A]n injunctive order to abate a

14  nuisance should go no further than necessary," *Becker v. State*, 767 A.2d 816, 822 (Md. 2001), and

15  should be tailored to the defendant's alleged conduct.

16  Harford's abatement plan fails these standards.  *First*, the plan has nothing to do with

17  "abating" any conduct of Defendants.  The plan would not require Defendants to change how they

18  design, operate, or market their platforms in general or for youth specifically.  Ex. 34 (August 13,

19  2025 Hoover Dep.) 519:8–528:8 ("I don't think I'm offering an opinion that the social media

20  companies change their design.").  There are no recommendations, for example, for Defendants to

21  get rid of filters or use better or different warnings or parental controls.  Instead, Harford seeks over

22  one billion dollars to fund a voluntary plan that it could spend in its unfettered discretion to

23

---

24  [11] *See, e.g.*, *Becker*, 767 A.2d at 821 (describing actions to enjoin nuisances by "combating a range

25  of illegal activity, from the sale of illegal alcohol to [P]rostitution"); *Whitaker v. Prince George's County*, 514 A.2d 4, 10 (1986) (affirming equitable power of court to enjoin operation of

26  "bawdyhouse"); *Bishop Processing Co. v. Davis*, 132 A.2d 445, 450 (Md. 1957) (upholding injunction that abated nuisance by prohibiting factory owner from releasing "noxious and offensive

27  gases and odors"); *Liller v. State Highway Admin.*, 333 A.2d 644, 649 (Md. Ct. Spec. App. 1975) (requiring property owner to prevent earth slides onto adjoining public highway).  "[I]n the absence

28  of a statute prescribing another remedy, injunction is the proper means of obtaining relief from public nuisances."  58 Am. Jur. 2d *Nuisances* § 261 (West 2025).

1    implement an expansive range of programs for the social and emotional wellness of students

2    regardless of whether those students use or are otherwise exposed to Defendants' platforms.  Ex. 43

3    (Deposition of Dr. Douglas Leslie ("Leslie Dep.")) 67:3–14 ("Q.  Do you understand that the plan

4    and its components are not mandated or required by anything?  A.  That's my understanding.").

5    That is not proper "abatement" relief.  *See, e.g.*, *City of Huntington v. AmerisourceBergen Drug*

6    *Corp.*, 609 F. Supp. 3d 408, 483–84 (S.D.W.V. 2022) (rejecting abatement plan "directed" at

7    treating downstream harms of opioid use, rather than "any of defendants' alleged nuisance-causing

8    conduct"); *Oklahoma ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021)

9    (rejecting abatement plan that "does not stop the act or omission that constitutes a nuisance").

10    *Second*, the plan is not tied to the harms allegedly resulting from the design of Defendants'

11    platforms, and it goes far beyond what would be necessary to address any impacts of the design of

12    Defendants' platforms on Harford.  The plan purports to provide treatment for the next 15 years for

13    "students experiencing stress, anxiety, or emotional stress, including"—but, critically, not limited

14    to—"those struggling with the negative impacts of social media."  Ex. 32 (Am. Hoover Harford

15    Rep.) ¶ 77.  Given the plan's duration, services would be provided to students who are now babies—

16    and those who are not yet born—and have neither attended Harford schools nor used, much less

17    suffered any harm from, any Defendant's platform.  And it is impossible to predict how many of

18    these future students will ever use Defendants' platforms or their allegedly harmful features, if those

19    features will still exist years in the future, and whether and to what degree those children will suffer

20    any mental health harms as a result.  Thus, the plan is overinclusive and goes far beyond addressing

21    harms allegedly caused by Defendants.

22    At the same time, the services recommended in the plan would not be available to help many

23    current students who *are* allegedly suffering harms related to Defendants' platforms because they

24    will age out of the Harford school system before any plan is implemented.  Thus, even if it were

25    proper "abatement" relief to remediate the downstream personal injuries allegedly resulting from

26    nuisance-causing conduct, the strategic plan does not do that.  It is not tied to remediating mental

27    health issues allegedly caused by Defendants but is instead a wish-list of programs that schools

28

could provide in an ideal world to benefit all students, not just users of Defendants' platforms, and to solve endemic staffing and budget problems that were not created by Defendants. *See* Ex. 33 (August 12, 2025 Hoover Dep.) 300:17–307:5; Ex. 34 (August 13, 2025 Hoover Dep.) 644:7–648:9 (describing nationwide challenges in hiring school psychologists, such as a lack of funding).

There are no Maryland appellate cases (or any appellate cases in the country) that have recognized the sort of "monetary abatement" remedy that Harford seeks. Defendants are aware of only two trial courts in the country that have awarded this type of monetary abatement to treat downstream consequences of alleged nuisance-causing conduct, both in the context of the opioid litigation. One was vacated on appeal by the Sixth Circuit, which overruled the MDL court after the Ohio Supreme Court held (like the other appellate court to have considered the issue, the Oklahoma Supreme Court) that there was no cause of action for public nuisance under the circumstances in the first place.[12] The other is a Maryland trial court decision, which relied on that vacated MDL opinion.[13] Harford's strategic plan is therefore not proper abatement relief and should be denied as a matter of law.

Harford's abatement plan would not pass muster even under cases that have permitted the payment of money as an equitable abatement remedy. *See, e.g.*, *People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499 (Ct. App. 2017) and *In re JUUL Labs, Inc. Marketing, Sales Practices & Products Liability Litigation*, 497 F. Supp. 3d 552 (N.D. Cal. 2020). But in *ConAgra*, the abatement remedy consisted of an order for defendants to fund the removal of the lead paint

---

[12] *In re Nat'l Prescription Opiate Litig.*, 2025 WL 354758, at *1 (6th Cir. Jan. 31, 2025) (citing *In re Nat'l Prescription Opiate Litig.*, 265 N.E.3d 1, 11 (Ohio 2024) (recognizing that Ohio Supreme Court, via certified question, held that state statute overruled prior Ohio Supreme Court case permitting a cause of action for public nuisance against gun manufacturers for unreasonably interfering with the public health and safety, and holding that nuisance claims brought by Ohio cities and counties in opioid litigation should have been dismissed at the outset)).

[13] *See Mayor & City Council of Balt. v. Purdue Pharma, L.P.*, No. 24-C-18-000515 (Md. Cir. Ct. Aug 8, 2025). There, the trial court held that the City of Baltimore could recover as an equitable remedy a "monetary abatement remedy" from two distributors of prescription opioids to fund certain voluntary programs aimed at reducing harms associated with both legal and illegal opioid abuse. The court did not cite any Maryland cases that have awarded such a "monetary abatement remedy," but relied only on the overturned opioid MDL trial court. In any event, even that opinion would not support the vast majority of Dr. Hoover's plan because the court rejected the City's request for funding for "all of the proposed costs for treatment services and for supplies of the three . . . medications used in treatment." *Id.* at 26.

38

from homes.  227 Cal. Rptr. 3d at 514, 568–71.  It did not involve a monetary fund to treat downstream consequences of the alleged nuisance, like funding for medical expenses or other treatment.  Indeed, the court specified that "the abatement account would be utilized *not to recompense anyone for accrued harm* but solely to pay for the prospective removal of the hazards"—*i.e.*, removal of the lead paint from homes.  *Id.* at 569.  The abatement remedy was therefore tied to eliminating the defendants' conduct and removing the pollutant from the environment, not treating injuries from lead paint ingestion.  As for *JUUL*, which was decided at the motion-to-dismiss stage, held only that an abatement fund might theoretically be proper and agreed with the general principle that "[a]n equitable remedy's *sole* purpose is to eliminate the hazard that is causing prospective harm to the plaintiff."  497 F. Supp. 3d at 653 (quoting *ConAgra*, 227 Cal. Rptr. at 569).  The court was not faced with a fully developed evidentiary record of what the prospective fund might consist of or whether the proposed fund was actually tailored to address the alleged nuisance.

> **2.    The Costs of the Strategic Plan Are Not Recoverable as Future Damages.**

"In Maryland, recovery of damages based on future consequences of an *injury* may be had only if such consequences are reasonably probable or reasonably certain.  Such damages cannot be recovered if future consequences are 'mere possibilities.'"  *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020, 1026 (Md. 1983).  "Probability" requires showing "a greater than 50% chance that a future consequence will occur."  *Id.*  By contrast, "[m]ere possibility exists when the evidence is anything less."  *Id.*

Harford contends that its *injuries* are the distinct financial injuries of "having to expend, divert and increase [its] limited resources to address the ongoing youth mental health crisis."  Master Compl. ¶ 1026; *see also id.* ¶ 996; SD Order at 19–20.  Harford has steadfastly disclaimed that its injuries are the mental health and educational harms that students are allegedly experiencing because of Defendants' platform features.[14]  Even if Harford had such distinct financial injuries (it does not,

---

[14] Pls.' Opp'n to Defs.' Mot. to Dismiss the School District and Local Government Entities' Master Compl. (ECF No. 668), at 40–41 ("The injury pled by the School Districts—including the need to (i) hire additional personnel to address students' mental, emotional, and social health issues; and (ii) divert resources to address behavioral and disciplinary issues and educate staff, students, and

1   *see supra* Section IV.B), payment of past compensatory damages would make Harford whole for

2   its purely financial injuries.  And it could have sought those same types of damages for reasonably

3   certain future expenditures to be made as a result of Defendants' alleged actionable conduct, but it

4   does not.

5       Instead, it seeks as "future damages" the cost of the Hoover strategic plan, which is not about

6   compensating Harford for financial expenditures it reasonably expects *to have to make* over the next

7   15 years as a result of Defendants' actionable conduct.[15]   Rather, the plan is a separate,

8   *recommended* expense that the District *could*, but does not have to, expend.  Harford has not

9   instituted the Hoover strategic plan and has presented no competent evidence that it will succeed in

10  hiring the personnel or instituting the programs recommended by the plan, nor that it is even

11  reasonably certain to incur any of the hypothetical costs required to implement all of the plan's

12  components. Further, Harford is under no obligation to implement this plan, and absent a recovery

13  of money from Defendants in this lawsuit, Harford will *not* institute the plan or incur the associated

14  costs.  And while Dr. Hoover testified that the plan constitutes "best practices," Ex. 34 (August 13,

15  2025 Hoover Dep.) 605:23–607:10, no public school district in the country has ever implemented

16  this type of comprehensive plan, *id.* at 806:16–807:6.  The cost of implementing a novel set of

17  optional programs that might be adopted only if a plaintiff receives a large monetary award is not

18  the type of "reasonably certain" future damage that is recoverable in Maryland.  *See Pierce*, 464

19  A.2d at 1026 (expenditures that are "mere possibilities" are  not recoverable); *Davidson v. Miller*,

20  344 A.2d 422, 427 (Md. 1975) ("[A]ny future complications from a malady which are not probable

21  become a risk which the injured person must bear because the law cannot achieve justice if

22  _____

23  members of the public about the harms of Defendants' platforms and address property damage—is
    manifestly different in kind than the personal injury harms suffered by the users of Defendants'
24  platforms and the harm to the public at large.").

25  [15] Hoover's plan has an annual cost that is more than *ten times greater* than Harford's claimed past
    damages.  Harford claims that, from 2017 to 2024, it has been injured in the amount of $132,794
26  for out of pocket costs for internet content filters and $55 million in "lost" staff time.  *See supra*
    Part IV.B.  Harford's purported past damages are therefore approximately $7.85 million per year.
27  Ex. 26 (Am. Ward Harford Rep.) ¶ 1; Ex. 30 (Meyers Harford Rep.) at App'x C.  Harford claims
    the value of its strategic plan will cost $1.1 to $1.5 *billion* over 15 years, a cost of $73.3 to $100
28  million per year.  Ex 41 (Second Am. Leslie Rep.) ¶¶ 1–3.

speculation is to be used as the basis for determining damages."); *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 96 A.3d 147, 157 (Md. 2014) (compensatory damages "may not be based on speculation or conjecture" (quoting *Asibem Assoc., Ltd. v. Rill*, 286 A.2d 160, 162 (Md. 1972))).

### 3.  Harford's Strategic Plan Is Impermissibly Derivative.

As discussed above, funding for the strategic plan is not compensation for direct and distinct expenditures that Harford has been forced to make or will be forced to make as a result of Defendants' alleged tortious conduct.  Instead, the plan is about developing discretionary programs to educate, treat, and support *students* for their alleged injuries.  Paying for treatment of others' injuries is the type of classic derivative injury for which recovery is not available.  *See Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001) (rejecting public hospital districts' attempt to recover costs for treating patients suffering from tobacco-related illnesses).

At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on the basis that their alleged harms are impermissibly derivative of students' alleged harms.  SD Order at 15, 21.  The Court's reasoning was based on allegations that the School Districts had been directly injured because "they *have had to* hire mental health personnel and develop further mental health resources to mitigate the negative in-school consequences of their students' . . . use of defendants' platforms" and because "the school districts appear to seek *recovery of unique damages*." *Id.* at 20–21.  The record evidence now demonstrates that Harford does not seek recovery for those types of injuries, but to institute a sweeping plan for the benefit of students that it will not otherwise implement or be forced to implement.  Thus, even if funding for the strategic plan were the type of legally cognizable damages or abatement that Harford could recover, any recovery would be for derivative injuries.

### D.  Defendants Are Entitled to Summary Judgment on Harford's Failure-To-Warn Claim.

Harford contends that "Defendants failed to adequately warn [Harford] about the physical and mental health risks posed by their platforms and the increased resources that [Harford] would need to expend to address the youth mental health crisis Defendants caused."  Master Compl.

41

1   ¶ 1034. But Defendants do not owe a duty to provide warnings to a school district that its students'

2   use of Defendants' platforms may cause financial harm to the district, and Defendants are entitled

3   to summary judgment on Harford's failure-to-warn claim.[16]  Even if there were a duty to warn

4   school districts, Harford's claims fail for lack of evidence: Harford has adduced no evidence of what

5   a warning to school districts should have said, to whom or how it should have been made, or that

6   any warning would have reduced Harford's alleged damages.

7        And to the extent that Harford contends that Defendants owed a tort duty *running to Harford*

8   to provide warnings *to its students* (or their parents), its claim likewise fails.

9        **1.     Defendants Do Not Owe Harford a Duty To Warn the District Directly.**

10       Harford advances a novel theory on its failure-to-warn claim:  it alleges that Defendants had

11  a duty to provide a warning to school districts—distinct from the warnings that allegedly should

12  have been provided to student users and parents—that student use of the platforms could cause harm

13  to those students, which might, in turn, cause the school district to expend additional resources in

14  responding to the harms to the students.  Master Compl. ¶¶ 1034, 1036.  Defendants are not aware

15  of any case in any jurisdiction that has held there is a duty to warn a non-user of a product that

16  others' use of that product may cause *financial* injury to the plaintiff.  Such a rule would lead to an

17  absurd result—*e.g.*, alcohol companies would need to warn landlords that their tenants might

18  damage property while under the influence of alcohol, and tobacco companies would need to warn

19  employers that they might need to pay increased healthcare costs for employees who smoke.  And

20  even in cases involving *physical* injuries, courts have held that a defendant has no duty to warn third

21  parties that they might become indirectly injured by a defendant's alleged negligence.  *See, e.g.*,

22  *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 643, 645 (Ga. 2016) (finding manufacturer of a

---

[16] Defendants also contend that they are entitled to summary judgment on Harford's failure-to-warn claim that arises from third-party content or protected publishing activities for the threshold reason that they are barred by Section 230.  *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025) (barring claim "that Grindr had a duty to warn Doe about the risks of child sexual exploitation on the App"); *Estate of Bride v. Yolo Technologies, Inc.*, 112 F. 4th 1168, 1179-80 (9th Cir. 2024) (barring failure to warn claim challenging anonymity feature of app that faulted app "for not mitigating, in some way, the harmful effects of the harassing and bullying content" through anonymity feature).  Per the Court's instructions given the pending appeal by Meta and TikTok, Defendants reserve their right to challenge Harford's failure-to-warn claims as being barred by Section 230 at a later time.

1    facility's "asbestos-laden water pipes" did not have a duty to warn plaintiff of the dangers of

2    asbestos dust where she claimed she developed mesothelioma from laundering the asbestos-dust-

3    covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks,*

4    *Inc.*, 531 P.3d 924, 943 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of

5    coronavirus at work).  If there is no duty to warn a third party that a product might cause physical

6    injury, then there is certainly no duty to warn a third party that the use of the product could cause

7    downstream financial injuries.

8         While Defendants acknowledge that the Court previously held that Defendants owe a

9    general duty of care to School Districts, they respectfully submit that the Court's analysis does not

10   support finding a duty to provide a warning directly to School Districts about potential financial

11   harms resulting from student use.  None of the cases relied on by the Court in its prior rulings

12   contemplate a duty to warn third parties that someone else may use the defendant's product or

13   service, become injured, and cause downstream economic consequences to the third party.  *See* SD

14   Order at 14; Order Largely Denying in Part Meta's Mot. to Dismiss the Multistate Attys. Gen.

15   Compl. (ECF No. 1214), at 32–36.  Recognizing such broad duties "would expand traditional tort

16   concepts beyond manageable bounds, because such duty could apply to all individuals who could

17   have been affected by" the user's use of the product or service.  *Gourdine v. Crews*, 955 A.2d 769,

18   786 (Md. 2008).

19              **2.    Harford Lacks Evidence Supporting Its Failure To Warn Claim.**

20        Even if Defendants owed Harford a duty to warn, the claim still fails.[17]  A plaintiff asserting

21   a failure to warn claim must show, among other elements, "that the plaintiff was injured as a

22   proximate result of the failure to warn."  *Mack Trucks, Inc. v. Coates*, No. 2709, Sept. Term, 2016,

23   2018 WL 2175932, at *7 (Md. Ct. Spec. App. May 11, 2018) (citing *Phipps v. Gen. Motors Corp.*,

24   363 A.2d 955, 958 (Md. 1976)).  In the circumstances at issue here, where the adequacy and efficacy

25   of a warning to a school district about alleged financial consequences from student use of online

26   platforms "are not within the common knowledge of jurors, . . . expert testimony is necessary to

27   
28   

---

[17] The Court already held that any duty to warn is limited by Section 230 to warnings about platform *features* and *designs*.  *See* SD Order at 34.

support [Harford's] warning defects claim." *Nelson v. Am. Honda Motor Co.*, No. 1:18-cv-000210 (Erie), 2021 WL 2877919, at *7–8 (W.D. Penn. May 17, 2021).

Yet none of Harford's experts opined that Defendants should have warned school districts (as opposed to users and parents), save for one isolated statement "that parents, children and the public (including schools) be fully informed about the risks and harms the platforms present." *See* Ex. 44 (Expert Report of Timothy Estes) ¶ 316.

Nor has Harford offered any evidence (fact or expert) of what a warning to school districts should have looked like or how it should have been implemented. Specifically, there is no evidence of *who* in the districts should have received the warning, *what* it should have said, *when* it should have been provided, or *where* and *how* the warning should have been communicated. These are all significant questions given that the allegation is that a warning should be provided to entities that may not themselves be users of or have any interaction with the platforms. [18] Because the record is silent on each point, Harford has not met its burden of proof.

Perhaps most critically, Harford has not offered any evidence (fact or expert) that a warning directly to the district would have reduced its alleged harms or damages. There is no evidence that, in the face of such a warning, Harford itself would have further restricted access to Defendants' platforms by students. The only record evidence is to the contrary: it continues to allow students to access YouTube even now, years after filing suit. And it has "always blocked" student access to Facebook, Instagram, TikTok, and Snapchat. Ex. 22 (March 14, 2025 Moore Dep.) 14:8–11. In the case of YouTube, Harford affirmatively encourages students to use the platform in the curriculum and for homework. *See* Ex. 19 (May 9, 2025 Bulson Dep.) 136:18–138:16; Ex. 35 (Lader Dep.) at 113:10–13. Harford only recently instituted a restrictive cell phone policy to reduce student access to social media platforms during the day; its Superintendent testified that, as a result, among other observed benefits, "there's been far less" conflicts allegedly attributable to social media. Ex. 19 (May 9, 2025 Bulson Dep.) at 72:8–75:15. There certainly is no evidence that a warning to *the school district* would have caused any *student* to use Defendants' platforms less and thereby avoid

---

[18] Harford uses some, but not all, of Defendants' platforms, *see* Ex. 35 (Lader Dep.) 35:20–22 (indicating Harford has accounts on Twitter, Instagram, Facebook, and YouTube).

44

1    the alleged harms of addiction and mental health problems in the first place, much less that *a*

2    *sufficient number of students* would have used the platforms less and experienced such fewer harms

3    that Harford would have had to expend materially fewer resources in responding to the alleged youth

4    mental health crisis in the district.[19]

5        **3.**    **Harford Cannot Assert a Claim that Defendants Failed to Warn Students.**

6           To the extent that Harford is claiming that Defendants had a duty running to the District

7    based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Compl.

8    ¶ 265, Defendants are also entitled to summary judgment.[20]

9           On this point, *Gourdine v. Crews*, 955 A.2d 769 (Md. 2008) is instructive.  There, the

10    plaintiff sued a pharmaceutical manufacturer after a driver suffering adverse effects from the

11    defendant's medications struck and killed plaintiff's husband.  The plaintiff acknowledged that the

12    manufacturer did not owe a duty to provide warnings directly to her husband.  Instead, she sought

13    to recover for injuries flowing from the manufacturer's failure to provide adequate warnings to the

14    users of its medications.  The court rejected that effort, holding that even if the warnings provided

15    to users were inadequate and automobile accidents were a foreseeable result of the inadequate

16    warnings, the manufacturer did not owe a duty to warn users running to and enforceable by potential

17    secondary victims like plaintiff's husband.  As the court explained, "there was no direct connection

18    between [the manufacturer's] warnings, or the alleged lack thereof, and [plaintiff's husband's]

19    injury.  In fact, there was no contact between [the manufacturer] and [plaintiff's husband]

20    whatsoever."  *Id.* at 786.

21           The same is true of Harford.  It does not claim harm as a direct user of Defendants' platforms,

22    but that it was a secondary victim of Defendants' alleged failure to warn users that they could

23    become addicted or suffer mental health harms from use of Defendants' platforms.  Imposition of a

---

[19] As explained in Section II.B, Harford lacks data permitting it to isolate the alleged harms caused by *any* factor—let alone from an alleged failure to warn it about potential downstream financial harms resulting from students' use of Defendants' platforms.

[20] Harford does not purport to bring representative claims on behalf of its students or their families. Nor could it. *See* Defs.' Motion to Dismiss the School District and Local Government Entities' Master Complaint (ECF No. 601), at 44–45 (explaining that "the students are not plaintiffs in this case, and the School Districts have not (and cannot) sue on their behalf").

45

1   duty to warn users of Defendants' platforms that runs from Defendants to school districts is thus

2   unwarranted and unsupported.  *See id.*; *see also Doe v. Pharmacia & Upjohn Co.*, 879 A.2d 1088,

3   1096–97 (Md. 2005) (employer had no duty running to employee's wife to warn employee of the

4   risk of HIV infection even though employer knew employee was exposed to HIV in his work and

5   that he was married).

6       **E.     The Court Should Grant Summary Judgment for the Non-Operating Meta
                  Defendants Not Even Arguably Involved in Any Alleged Injuries.**

7

8        SD Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section,

9   "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible for

10  the development and operation of Facebook and Instagram.  *See* Ex. 45 (Meta Defendants'

11  Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question ("DWQ"))

12  at 21–22, 25.  The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc.,

13  Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC

14  f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-

15  Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram.  *See id.*

16      Summary judgment should therefore be awarded to the Non-Operating Defendants for the

17  additional reason that they had no involvement in Plaintiff's alleged injuries.  "As a general matter,

18  corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely

19  have legal independence from each other and each can only be held liable for its own acts or

20  omissions."  *Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *14 (N.D. Cal.

21  Oct. 5, 2020) (surveying California and Delaware law); *see Roberts v. Equian, LLC*, 2025 WL

22  2144965, at *5 (D. Md. July 29, 2025) ("Maryland generally is more restrictive than other

23  jurisdictions in allowing a plaintiff to pierce the corporate veil" and the actions of parents and

24  subsidiaries generally cannot impute liability. (cleaned up) (collecting cases).[21]  And to sustain its

25  claims, Harford must prove that *each Defendant* caused it harm.  *See supra* Section IV.A.  But

26  Harford has no evidence by which to do so.  Indeed, the evidence shows that the Non-Operating

27
28
---
[21] Because this outcome is required under the laws of all three states potentially at issue, Meta does
not apply a choice-of-law analysis or take a position on which state's law applies to this question.

Defendants engage in activities wholly unrelated to the school districts' claims, namely: "payment processing" (Facebook Payments Inc); "operat[ing] . . . data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "holding certain Instagram intellectual property" (Instagram, LLC). Ex. 45 (DWQ) at 21–22, 25. For this additional reason, the Non-Operating Defendants are all entitled to summary judgment.

**V.    CONCLUSION**

Defendants seek entry of summary judgment in their favor on all causes of action that Harford asserts against Defendants or, in the alternative, partial summary judgment as to Plaintiff's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

Dated: September 30, 2025

WILLIAMS & CONNOLLY LLP

*/s/ Ashley W. Hardin*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and*
*Google LLC.*

COVINGTON & BURLING LLP

*/s/ Christian J. Pistilli*
ASHLEY M. SIMONSEN (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

PHYLLIS A. JONES (*pro hac vice*)
PAUL W. SCHMIDT (*pro hac vice*)
CHRISTIAN J. PISTILLI (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC;*
*Facebook Operations, LLC; Meta Payments Inc.*
*f/k/a Facebook Payments Inc.; Meta Platforms*
*Technologies, LLC f/k/a Facebook Technologies,*
*LLC; Instagram, LLC; and Siculus LLC f/k/a*
*Siculus, Inc.*

1

**KING & SPALDING LLP**

2
*/s/ Bailey J. Langner*
GEOFFREY M. DRAKE, *pro hac vice*

3
gdrake@kslaw.com
TACARA D. HARRIS, pro hac vice

4
tharris@kslaw.com
KING & SPALDING LLP

5
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309

6
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

7
DAVID P. MATTERN, *pro hac vice*

8
dmattern@kslaw.com
KING & SPALDING LLP

9
1700 Pennsylvania Avenue, NW
Suite 900

10
Washington, D.C. 20006
Telephone: (202) 737-0500

11
Facsimile: (202) 626-3737

12
BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*

13
KING & SPALDING LLP
50 California Street, Suite 3300

14
San Francisco, CA 94111
Telephone: (415) 318-1200

15
Facsimile: (415) 318-1300

16
*Attorneys for Defendants TikTok Inc., ByteDance*
*Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

17

18

19

20

21

22

23

24

25

26

27

28

49

**KIRKLAND & ELLIS LLP**

/s/ *John J. Nolan*
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

**MUNGER, TOLLES & OLSON LLP**

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6)
4:22-md-03047-YGR

1

## ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

4

DATED:   September 30, 2025         By:    */s/ Andrew J. Keyes*

5                                                  Andrew J. Keyes
                                                   *Attorney for Defendants YouTube, LLC and*
6                                                  *Google, LLC.*

7                                          By:    */s/ Christian J. Pistilli*
                                                   Christian J. Pistilli
8                                                  *Attorney for Defendants Meta Platforms,*
                                                   *Inc. f/k/a Facebook, Inc.; Facebook*
9                                                  *Holdings, LLC; Facebook Operations,*
                                                   *LLC; Meta Payments Inc. f/k/a Facebook*
10                                                 *Payments Inc.; Meta Platforms*
                                                   *Technologies, LLC f/k/a Facebook*
11                                                 *Technologies, LLC; Instagram, LLC; and*
                                                   *Siculus LLC f/k/a Siculus, Inc.*

12

13                                         By:    */s/ Bailey J. Langner*
                                                   Bailey J. Langner
14                                                 *Attorney for Defendants TikTok Inc.,*
                                                   *ByteDance Inc., ByteDance Ltd., TikTok*
15                                                 *Ltd., and TikTok, LLC*

16                                         By:    */s/ John J. Nolan*
                                                   John J. Nolan
17                                                 *Attorney for Defendant Snap Inc.*

18

19

## ATTESTATION PURSUANT TO LOCAL RULE 5-1

20

I, Ashley W. Hardin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence

21

to the filing of this document has been obtained from each signatory hereto.

22

23

24

DATED:   September 30, 2025         By:    */s/ Ashley W. Hardin*
                                                   Ashley W. Hardin
25                                                 *Attorney for Defendants YouTube, LLC and*
                                                   *Google, LLC*

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that, in accordance with ECF No. 341, on September 30, 2025, this motion and all attachments thereto were served to the following email addresses:

PSCServiceMDL3047@motleyrice.com

MetaNoticeofService@cov.com

SnapNoticeofService@mto.com

TikTokNoticeofService@faegredrinker.com

YouTubeServiceConfidentialDocs@wsgr.com

MWeinkowitz@lfsblaw.com

pwarren@motleyrice.com

lhazam@lchb.com

amm@classlawgroup.com

TShrack@lfsblaw.com

coanderson@lchb.com

scouch@motleyrice.com

gpanek@lchb.com

kmcnabb@lchb.com

myeates@ktmc.com

jjacobson@ktmc.com

pdandrea@lfsblaw.com

jruff@motleyrice.com


Dated: September 30, 2025              By: */s/ Ashley W. Hardin*
                                          Ashley W. Hardin, *pro hac vice*

                                          *Attorney for Defendants YouTube, LLC*
                                          *and Google LLC*