Exhibit 11

1  WILLIAMS & CONNOLLY LLP
   Joseph G. Petrosinelli, *pro hac vice*
2  Ashley W. Hardin, *pro hac vice*
   680 Maine Avenue SW
3  Washington, DC 20024
   Tel.: (202) 434-5000
4  jpetrosinelli@wc.com
   ahardin@wc.com
5

6  *Attorney for Defendants YouTube, LLC*
   *and Google LLC*
7

8  *[Additional parties and counsel listed on*
   *signature pages]*
9

10                    UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13  IN RE: SOCIAL MEDIA ADOLESCENT          MDL No. 3047
    ADDICTION/PERSONAL INJURY
14  PRODUCTS LIABILITY LITIGATION,          Case No.: 4:23-cv-03065-YGR

15  THIS DOCUMENT RELATES TO:               **REPLY IN SUPPORT OF**
                                            **DEFENDANTS' MOTION FOR**
16                                          **SUMMARY JUDGMENT (HARFORD)**
    *Board of Education of Harford County v. Meta*  **(SD MSJ No. 6)**
17  *Platforms Inc., et al.*

18                                          Judge: Hon. Yvonne Gonzalez Rogers
                                            Magistrate Judge: Hon. Peter H. Kang
19

20                                          Date: January 26, 2026
                                            Time: 8:00 AM
21                                          Place: Courtroom 1, 4th Floor

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT ......................................................................................................................... 1

    A.    Harford Has No Evidence of Causation.................................................................. 1

        1.    Harford Must Show Both Cause-in-Fact and Proximate Causation.................................................................................................... 2

        2.    Harford's Evidence of Alleged Student "Mental Health" Harm Is Not Tied to Defendants' Actionable Conduct....................................... 3

        3.    Harford's Evidence of "Diverted Instructional Time" Is Not Tied to Defendants' Actionable Conduct. ...................................................... 9

        4.    Harford's Only Out-of-Pocket Costs Are Not Tied to Defendants' Actionable Conduct.......................................................... 11

    B.    Harford Has No Evidence That a Failure To Warn Harmed the District. .......... 12

        1.    The "Heeding Presumption" Does Not Apply........................................ 12

        2.    Even If the Heeding Presumption Applied, The Evidence Uniformly Shows that Harford Would Not Have Heeded Any Warning................................................................................................... 14

    C.    Harford Fails To Demonstrate Recoverable Past Damages.............................. 16

        1.    Harford Cannot Recover Damages for Diverted Time. ....................... 16

        2.    The District Has No Competent Evidence of Out-of-Pocket Expenses. ................................................................................................ 17

    D.    The Hoover Plan Is Not a Proper Abatement Remedy Under Maryland Law. ......................................................................................................................... 18

    E.    Harford Cannot Show It Is Reasonably Certain To Suffer Future Damages...................................................................................................................... 20

III.  CONCLUSION................................................................................................................. 20

i

1

## <u>TABLE OF AUTHORITIES</u>

2

### CASES

3

*Adams v. Comm'rs of Trappe*,
    102 A.2d 830 (Md. 1954) ...................................................................................... 18

4

5

*Aerotec Int'l v. Honeywell Int'l*,
    836 F.3d 1171 (9th Cir. 2016) ................................................................................ 4

6

*AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*,
    10 A.3d 745 (Md. 2010) ........................................................................................ 16

7

8

*Bank of N.Y. Mellon v. Lewis*,
    796 F. App'x 956 (9th Cir. 2020) ........................................................................... 2

9

10

*Courtney v. Canyon Television & Appliance Rental, Inc.*,
    899 F.2d 845 (9th Cir. 1990) ................................................................................ 10

11

*Davidson v. Miller*,
    344 A.2d 422 (Md. 1975) ...................................................................................... 20

12

13

*DiLeo v. Nugent*,
    592 A.2d 1126 (Md. Ct. Spec. App. 1991) ........................................................... 20

14

*Eagle-Picher Indus., Inc. v. Balbos*,
    604 A.2d 445 (Md. 1992) ............................................................................... 13, 14

15

16

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
    2023 WL 4352081 (N.D. Fla. July 5, 2023) ......................................................... 13

17

*KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*,
    2021 WL 5832242 (D. Md. Nov. 2, 2021) ............................................................ 16

18

19

*MacDonald v. Patriot, LLC*,
    2017 WL 1788115 (Md. Ct. Spec. App. May 5, 2017) ......................................... 16

20

21

*Maryland v. Exxon Mobil Corp.*,
    406 F. Supp. 3d 420 (D. Md. 2019) .................................................................. 3, 13

22

23

*Mayor and City Council of Baltimore v. Purdue Pharma, L.P.*,
    No. 24-C-18-000515 (Md. Cir. Ct. Aug. 8, 2025) .......................................... 18, 19

24

*McKenzie v. Anne Arundel County*,
    2016 WL 4379127 (Md. Ct. Spec. App. Aug. 17, 2016) ................................. 12, 13

25

26

*Mitchell v. Rite Aid, Inc.*,
    290 A.3d 1125 (Md. App. Ct. 2023), *cert. denied*, 296 A.3d 419 (Md. 2023) ............... 2, 3

27

28

ii

*Mouradian v. City of Los Angeles,*
    2023 WL 2558398 (C.D. Cal. Jan. 25, 2023) ................................................. 10

*Palmer v. Hoffman,*
    318 U.S. 109 (1943) ............................................................................................. 8

*Pierce v. Johns-Manville Sales Corp.,*
    464 A.2d 1020 (Md. 1983) ................................................................................ 20

*Safari Club Int'l v. Haaland,*
    31 F.4th 1157 (9th Cir. 2022) ........................................................................... 14

*Spaw, LLC v. City of Annapolis,*
    156 A.3d 906 (Md. 2017) ................................................................................. 18

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) .............................................................. 2

*U.S. Gypsum Co. v. Mayor & City Council of Balt.,*
    647 A.2d 405 (Md. 1994) ................................................................................. 13

*Under Armour, Inc. v. Ziger/Snead, LLP,*
    158 A.3d 1134 (Md. Ct. Spec. App. 2017) ....................................................... 16

*Wagnon v. Rocklin Unified Sch. Dist.,*
    2024 WL 4654239 (E.D. Cal. Nov. 1, 2024) .................................................... 10

*Yonce v. SmithKline Beecham Clinical Laboratories, Inc.,*
    680 A.2d 569 (Md. Ct. Spec. App. 1996) ..................................................... 2, 8

**OTHER AUTHORITIES**

First Amendment ..................................................................................................... 1, 4

Fed. R. Evid. 602 ......................................................................................................... 4

Fed. R. Evid. 702 ................................................................................................. 10, 21

Restatement (Second) of Torts § 432(2) (A.L.I. 1965) ................................................. 2

*Baltimore Asks Maryland Supreme Court to Hear Appeal in Opioid Lawsuit,*
    BALTIMORE BANNER (Nov. 12, 2025) ............................................................... 19

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Harford claims to possess a "mountain of evidence" showing compulsive or problematic

4   use by students, allegedly caused by Defendants' platforms and their design choices.  Harford

5   Opp. (ECF No. 2395) 2.  However, in the sections of its Opposition addressing "causation and

6   mental health" and "diverted instructional time," *id.* at 4–7, Harford does not cite anything linking

7   Defendants' platform features or design choices to Harford's claimed injuries.   Harford's

8   arguments do not respond to Defendants' core arguments or address the actual conduct at issue.

9   Moreover, Harford cannot rely on its failure-to-warn theory to circumvent this Court's order

10  holding that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs'

11  theories of recovery" by prohibiting the imposition of liability for third-party content and

12  protected publishing activities.  First SD Order (ECF No. 1267) 2.  That argument fails because

13  Defendants owed no duty to warn Harford, and there is no evidence showing that a lack of

14  warnings caused Harford's alleged harms.

15      As for damages, Harford concedes that it lacks evidence of property damage or lost

16  psychologist and counselor time, and that it is not seeking compensation for new and increased

17  mental health resources.  Harford also cannot show that Defendants caused it to incur its claimed

18  out-of-pocket costs for content filtering software because it concedes it purchased that software

19  to comply with federal law.  In support of its claim for lost teacher time, Harford relies solely on

20  the Klein survey (Harford Opp. 13) which is both unreliable and inadmissible.  *See* Harford Mot.

21  (ECF No. 2296) 26–28.  Finally, the few pages of deposition testimony Harford cites to support

22  its purported "need for abatement" only illustrate that Harford's claims arise from third-party

23  content and conduct and were not caused by Defendants' actionable conduct.  Harford Opp. 13.

24  ## II.   ARGUMENT

25      ### A.   Harford Has No Evidence of Causation.

26      Harford claims that it has "considerable evidence" that Defendants' actionable conduct

27  caused three categories of harm: (1) mental health harms; (2) "diverted instructional time"; and

28

1

1    (3) certain "technology costs."[1]  Harford Opp. 2–3.  But the few pieces of evidence Harford

2    presents are not sufficient to create a triable issue on cause-in-fact because none of that evidence

3    connects Defendants' actionable conduct to any of Harford's three alleged harms.

4              **1.      Harford Must Show Both Cause-in-Fact and Proximate Causation.**

5          As a threshold matter, Harford contends that "apportioning liability" is not its burden

6    under the substantial factor test and that "multiple tortfeasors cannot escape liability simply

7    because all of their actions harmed the plaintiff."  *Id.* at 4.  But the issue is not whether multiple

8    tortfeasors *can* be liable—the issue is that Harford does not have sufficient evidence that any

9    Defendant *was* a substantial factor in causing its alleged injuries.  Under the substantial factor

10   test, Harford must show that each Defendant's actionable conduct was *both* a cause-in-fact and a

11   legally cognizable cause of any diversion of financial resources.  Put another way, Harford must

12   demonstrate that, "standing alone," each Defendant's actionable conduct "would have wrought

13   the identical harm."  *See Yonce v. SmithKline Beecham Clinical Laboratories, Inc.*, 680 A.2d 569,

14   575–76 (Md. Ct. Spec. App. 1996); Harford Mot. 14.  "If there is no causation in fact, [this

15   Court's] . . . inquiry has reached a terminal point."  *Yonce*, 680 A.2d at 576.

16         To survive summary judgment, then, Harford must put forward evidence that each

17   Defendant's conduct "itself [was] sufficient to bring about harm to [Harford]."  Restatement

18   (Second) of Torts § 432(2) (A.L.I. 1965); *see also Mitchell v. Rite Aid, Inc.*, 290 A.3d 1125, 1157

19   (Md. App. Ct. 2023) ("[P]laintiff must show that the defendant's conduct was a but-for cause of

20   the plaintiff's injuries, or, if one of multiple causes, that 'it is more likely than not that *the*

21   *defendant's* conduct was a substantial factor in producing the plaintiff's injuries.'" (emphasis

22

---

23   [1] By not raising it in its opposition, Harford waived any argument that it was harmed as a result
     of any "challenges" that were "promoted" by Defendants.  *See Bank of N.Y. Mellon v. Lewis*, 796
24   F. App'x 956, 957 (9th Cir. 2020) (finding plaintiff waived argument "by failing to raise it in
     opposition to [defendant's] summary judgment motion"); *Stichting Pensioenfonds ABP v.*
25   *Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[F]ailure to respond in
     an opposition brief to an argument put forward in an opening brief constitutes waiver or
26   abandonment in regard to the uncontested issue." (citations omitted)).  Furthermore, Harford does
     not and cannot dispute that its corporate representative could not identify such evidence.  *See*
27   *generally* Harford Mot. 18–19; First SD Order 25.  For other arguments Harford waived, *see infra*
     n.4 (filters), p.16 (diverted counselor and psychologist time), and n.9 (property damages).
28

1    added) (citation omitted)), *cert. denied*, 296 A.3d 419 (Md. 2023) (Table).  It is not sufficient for

2    Harford to show that the combined effects of Defendants' actions caused Harford's injury.  *See*

3    *Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 455 (D. Md. 2019) (rejecting State's

4    argument that it plausibly alleged causation under the substantial factor test based on allegations

5    that "defendants are collectively responsible" for contamination).  Harford cannot satisfy this test

6    because it has not shown—or even attempted to show—"that any single defendant's conduct was

7    *sufficient* to cause its injury," *id.* (emphasis added), or even some subset of its injuries.

8         Thus, this Court should grant summary judgment.  Harford's own cited cases compel that

9    result.  *See, e.g.*, Harford Opp. 4 (citing *Mitchell*, 290 A.3d at 1157–58 (granting summary

10    judgment on cause-in-fact because "the evidence produced . . . failed to generate any material

11    issue of fact," and noting that although plaintiffs' "expert[ ] identified a number of issues with

12    [defendant's] security protocols, he could not identify any causal link between the perceived

13    breaches and [plaintiffs'] injuries")).

14
15    **2.    Harford's Evidence of Alleged Student "Mental Health" Harm Is Not
         Tied to Defendants' Actionable Conduct.**

16         Harford begins its brief by discussing mental health harms to students allegedly caused

17    by Defendants.  But it concedes that it does "not seek compensation for expanded mental health

18    resources beyond the lost time for staff providing those resources."  Om. Opp. (ECF No. 2414-1)

19    198.  Harford cannot recover for mental health harms to students without some evidence that

20    those harms caused financial injury to Harford.  *See* Harford Mot. 24; First SD Order 19–20.

21    Because Harford concedes its claim for expanded mental health resources, summary judgment in

22    Defendants' favor is warranted on Harford's claim that they caused it to expend resources on

23    alleged student mental health harms.

24         But the Opposition also makes clear that there is no evidence that Defendants' actionable

25    conduct caused any alleged student mental health harms.  Harford claims it need not show that

26    Defendants' actionable conduct, as opposed to content, caused its alleged harms because "third-

27    party content is []admissible at trial."  Harford Opp. 3.  But Defendants did not argue one way or

28    the other whether such evidence is admissible or not because of Section 230 or the First

3

1    Amendment.  They argued that, per this Court's orders, Defendants' publication of third-party

2    content cannot form the basis of liability.  Harford Mot. 11–13.  But that is what Harford relies

3    upon, and it cannot survive summary judgment.

4         ***Testimony from Bernard Hennigan, Executive Director of Student Support Services.***

5    Harford relies heavily on Hennigan in an attempt to survive summary judgment, but when asked

6    how social media has harmed students, Hennigan gave examples of content-related harms: he

7    explained that students experienced "dysregulation [as] a result of, in some cases, *things that*

8    *they've seen, done, posted been posted about them* on social media."  Harford Mot. Ex. 28

9    (Hennigan Dep.) (ECF 25-30) 60:8–22 (emphasis added).[2]  Even if these vague allegations could

10    support Harford's claims, they are plainly barred by Section 230 under this Court's orders.

11         The rest of Hennigan's testimony cited by Harford is anecdotal speculation that fails to

12    connect any of the alleged harms to Defendants' actionable conduct, and "anecdotal speculation

13    and supposition are not a substitute for evidence" that can survive summary judgment.  *Aerotec*

14    *Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1174 (9th Cir. 2016) (granting summary judgment on that

15    basis).  For example, Hennigan testified that "we have not seen this drastic change in the mental

16    health of our children . . . over the last hundred years that we have seen in this very short window

17    since social media came on the rise," Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No.

18    2400-6) 155:10–19, but Hennigan has no personal knowledge or any other basis to opine

19    regarding shifts in student mental health over the past century.  *See* Fed. R. Evid. 602.

20         He also opined that "students have become so addicted to getting onto their social media

21    on their phone that someone's desire to take that from them is equivalent to taking a drug from a

22    drug addict."  Harford Opp. 1 (citing Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No.

23    2400-6) 109:8–15).  Not only does Hennigan lack any expertise in whether social media is the

24    "equivalent to taking a drug," he could not give *any* examples of students who are "addicted to

25    getting on their social media"—let alone students' alleged compulsive use of Defendants'

26    platforms or the impact of that use on students' mental health.  *See* Harford Opp. Ex. 15 (Hennigan

27

28    [2] Cited ECF numbers are from the MDL docket (No. 4:22-md-03047-YGR), unless citing exhibits
     to Defendants' Harford Motion, which are from the Harford docket (No. 4:23-cv-03065-YGR).

1  Dep.) (ECF 2400-17) 114:2–5 (never treated private practice patients for "social media

2  addiction"); *id.* at 16:3–8 (never diagnosed any Harford student with "social media addiction");

3  *id.* at 125:18–126:12 (unable to identify data showing how many Harford students are addicted

4  to social media).

5       In fact, Hennigan testified that Harford keeps extensive records of students' behavioral

6  and mental health concerns and treatment, including: school-based mental health data and reports

7  ("SBMH Reports"); threat and risk assessments; suicide ideation reports; attendance and

8  discipline dashboards; psychological testing reports; documentation from "reintegration

9  meetings" after a student hospitalization; the Wellness Needs Assessment; bullying, harassment,

10 and intimidation reports; and reports provided to the Harford County Health Department.  *See*

11 Harford Opp. Ex. 4 (Hennigan 30(b)(6)) (ECF No. 2400-6) 24:7–28:1, 45:3–22.  He specifically

12 noted that the SBMH Reports would reflect how many students were treated or counseled for

13 social media addiction.  *Id.* at 47:14–19, 48:7–49:11.  Neither the SBMH Reports, nor any of the

14 other types of records referenced, contain any such information regarding the number of students

15 treated for social media addiction or any other link between Defendants' actionable conduct to

16 any increased mental health costs or student mental health harms.[3]  *See* Harford Mot. Ex. 25

17 (2022-23 SBMH Data) (ECF 25-27); *see also* Harford Mot. 6–8, 21–22; Harford Opp. 4–6.  And

18 despite overseeing Harford's psychology and counseling departments, Hennigan could not recall

19 *any* discussions with Harford students—other than his children's friends—during which a student

20 reported having "issues with getting off social media."  Harford Opp. Ex. 15 (Hennigan Dep.)

21 (ECF No. 2400-17) 11:9–15, 119:18–120:16.

22       In an attempt to move Hennigan's testimony out of the realm of speculation, Harford

23 argues that its claims are based on Hennigan's "first-hand" observations—for example, the

24 "change" he has seen "in both boys and girls" purportedly caused by social media.  Harford Opp.

25 4–5.  But Harford omitted portions of Hennigan's testimony specifying that he attributed those

26

27 ─────────────
[3] Of these records, Harford cites only the Wellness Needs Assessment.  Harford Opp. 5–6 (citing
28 Harford Opp. Ex. 9 (HCPS_00027780) (ECF No. 2400-11)).  As discussed above, that document
   does not link the alleged harm to *Defendants' platforms,* let alone their actionable conduct.

changes to camera phones, *not* Defendants' platforms or even social media broadly: "I spoke a lot today about the—our girls and our females, and *when the forward-facing camera came out*, depression, anxiety, the suicides skyrocketed."[4]  Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No. 2400-6) 155:20–23 (emphasis added).  Hennigan also testified that he has observed that the rate at which boys are "getting their driver's license, getting jobs, going outside and playing, . . . [and] dating" all "dramatically dropped . . . in the last several years when social media came on the rise."  Harford Opp. 5 (quoting Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No. 2400-6) 156:8–16).  None of that has anything to do with harm *to Harford*, but, in any event, Hennigan did not say how Defendants' platforms (or any feature of those platforms) contributed to this change in behavior; nor did he say how boys' changed behavior was driving increased mental health costs, Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No. 2400-6) 154:17–156:23, 157:14–158:21, which Harford expressly disclaimed, *see* Om. Opp. 196–199.  In fact, as part of the same monologue, Hennigan attributed students' mental and behavioral health harms to issues *other* than students' use of Defendants' platforms.  For example, Hennigan blamed *parents'* cell phone use for their children's mental and behavioral health issues.  *See id.* at 156:20–158:16 (attributing students' behavioral changes to mothers who are not "looking [their] child in the eyes when [they] breast-feed" because "[i]f you're going to look at your phone instead of look at your child, they will be permanently impacted"); *see also id.* at 157:14–4 (adding that parents are "not taking the initiative" by, for example, "not teaching them their letters").

*"District leaders'" statements to Dr. Hoover.*  Harford cites Dr. Hoover's unrecorded "qualitative interviews" with "District leaders" during which those administrators purportedly stated that there has been a "decline in our students' ability to appropriately socialize with each other because so many of their interactions are with *a phone*."  Harford Opp. 5 (quoting Harford Opp. Ex. 7 (Hoover Harford Rep.) (ECF 2400-9) ¶ 51) (emphasis added).  Although Dr. Hoover

---

[4] Although the Districts discuss the existence of filters in their Omnibus Opposition, *see* Om. Opp. 51–53, 103–06, 143–44, 182–84, Harford does not dispute that it has no evidence that it suffered any harm as a result of a Defendant's filter, *see* Harford Mot. 19.  Therefore, each Defendant is entitled to summary judgment on Harford's claims based on filters.  *See supra* note 1 (compiling waiver cases).

1    disclosed which administrators she interviewed, she anonymized her notes—meaning she does

2    not know which quote came from which administrator.  *See* SD Daubert Mot. Ex. 65 (Hoover

3    Dep. Vol. II) (ECF No. 2297-68) 577:3–19.  In addition to being impermissible hearsay, *see* Om.

4    Reply Part II.A.2, this evidence does not specifically identify Defendants' platforms (let alone

5    any actionable conduct), or even social media broadly, and it is not linked back to any alleged

6    financial harm to Harford.

7         ***A 2023 Wellness Needs Assessment***.  Harford cites a student survey reporting that 41%

8    of students spend two to six hours "looking *at a screen outside the school day*" and some spend

9    more than six hours on screens.  Harford Opp. 5 (quoting Harford Opp. Ex. 9 (HCPS_00027780)

10   (ECF No. 2400-11) (emphasis added)).[5]  That survey did not even ask what type of screens

11   students were using or how they were using them (watching movies? browsing the internet?

12   playing video games? doing homework?), *see* Harford Opp. Ex. 9 (HCPS_00027780) (ECF No.

13   2400-11) -801, and so cannot establish causation with respect to any Defendant's actionable

14   conduct.  Moreover, Harford does not tie this survey about screen time outside the school day to

15   its alleged financial harms.

16        ***Focus Group Report on Student Cell Phones.***  Harford cites its Strategic Focus Group

17   Report on Student Cell Phones, which collects "personal opinions and experience[s]," Harford

18   Opp. Ex. 10 (HCPS_00174744) (ECF No. 2400-12) -747, from "HCPS stakeholders regarding

19   student *cell phone use*," Harford Opp. 5 (emphasis added).  Harford claims this report "provides

20   evidence of the *mental health harms* and *disruptive effects* of social media." *Id.* (emphasis added).

21   But the report *does not* tie social media (let alone each Defendants' platform) to any "mental

22   health harms" or "disruptive effects."  The report never mentions Defendants.  *See generally*

23   Harford Opp. Ex. 10 (HCPS_00174744) (ECF No. 2400-12).  The report lists 25 perceived

24   disadvantages of *cell phone use* during school, such as: "Access to inappropriate websites and

25

26   _____

27   [5] Harford accuses Defendants of "ignor[ing]" this documentary evidence.  Harford Opp. 5.  In
     fact, Defendants explained why this evidence was insufficient in their opening Motion and even

28   attached the Wellness Needs Assessment as an Exhibit.  *See* Harford Mot. 21; Harford Mot. Ex.
     36 (HCPS_00046480) (ECF No. 25-38).

content," "Disengagement," "Class disruption," and "Cyberbullying and harassment." *Id.* at -748. Only two of the listed "disadvantages" were related to social media. *See id.* First, it listed the "Influence of social media" as one potential disadvantage of cell phones in school. *Id.* But the report does not explain what that "[i]nfluence" was, *see id.*, so it cannot establish a link to each Defendants' actionable conduct *or* students' alleged mental health harms. The only other "social media"-related disadvantage listed is plainly about content. *Id.* ("Unwanted sharing of media through airdrop, texting, and social media."); *see* PI Order (ECF No. 430) 18 (discussing case law holding that "private messaging functions do fall within the publishing umbrella"). Elsewhere in the Opposition, Harford cites some of the other 23 listed "drawbacks." Harford Opp. 7 (listing, among others, "Defiance," "Increased cognitive load," and "Inability to focus"). But Harford acknowledges, as it must, that the report merely found that those are potential disadvantages of "*student cell phone use*" generally. *Id.* (emphasis added). In any event, the report is inadmissible hearsay, aggregating anonymous "personal opinions" from teachers, administrators, parents, and students in a self-serving report. Harford Opp. Ex. 10 (HCPS_00174744) (ECF No. 2400-12) -747; *see also Palmer v. Hoffman*, 318 U.S. 109, 113–14 (1943) ("[T]he fact that a company . . . record[s] its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business.").

*    *    *

Harford's purported "considerable evidence," Harford Opp. 2, does not mention any Defendant *period*, much less any one of their platforms' actionable features. Harford cites prior studies by its experts for the sweeping proposition that "when students use their cellphones, it is primarily to use social media." *Id.* at 7. Expert testimony about teens' social media use and school-day cell phone use (nationwide) do not support the substantial logical leap that Harford asks the Court (and jury) to make—that this data reflects *Harford students' use of Defendants' platforms and their at-issue features*. Harford has thus entirely failed to show that, "standing *alone*," each Defendant's actionable conduct "would have wrought the *identical* harm." *See Yonce*, 680 A.2d at 575–76 (emphases added).

Moreover, while Harford cites to testimony condemning "social media," this evidence

8

fails to demonstrate a nexus between each Defendants' platform, students' alleged mental health harms, and Harford's alleged financial harms.  Harford admits that it does not have *any* evidence reflecting how many students allegedly suffer from mental health harms related to social media generally, nor to any of the at-issue features.  *See* Harford Mot. 6–8; Harford Opp. 3.

### 3. Harford's Evidence of "Diverted Instructional Time" Is Not Tied to Defendants' Actionable Conduct.

Harford also fails to identify any evidence that Defendants' actionable conduct caused its employees to lose the value of "instructional time":

***Testimony from Superintendent Sean Bulson.***  Harford repeatedly mischaracterizes Bulson's testimony.  Harford claims that he "testified that *social media platforms* are 'constantly present in our classrooms and . . . a challenge that the teachers every day struggle with how to address.'"  Harford Opp. 6 (emphasis added) (quoting Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 94:5–19).  He did not.  Bulson's testimony referred explicitly to cell phone use broadly, not social media use specifically:

> Q.  Have you spoken with any principal or assistant principal about the amount of time they spend on students' use of *cell phones or personal electronic devices?*
>
> A.  Again, explicit conversations just on that topic, *no* . . . [But] it's something that's constantly present in our classrooms and, you know, a challenge that the teachers every day struggle with how to address.

Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 94:5–19 (emphases added).

Harford then inaccurately asserts that Bulson testified that "[e]very minute a teacher spends getting a child off of *social media* is a minute that 'cuts into instructional time.'"  Harford Opp. 6 (emphasis added) (quoting Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 84:3–15).  When, in fact—as Harford quotes on the first page of its Opposition—Bulson said that "trying to take a *phone* from a student who is noncomplying, essentially that cuts into instructional time."  Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 84:3–10 (emphasis added); Harford Opp. 1.  Harford's persistent muddling of the record is a tacit

1    acknowledgment that it cannot tie Defendants' actionable conduct to its alleged harms.

2        ***Hearsay repeated by Hennigan.***    Harford cites testimony that is undisputedly

3    inadmissible hearsay; Hennigan testified that he "*recalled a teacher telling him* that 'it was a

4    struggle to keep the attention of the students in part because of wanting to access their phones

5    during the day and in part because of their rewiring of their brain due to social media outside the

6    school day.'"  Harford Opp. 6 (emphasis added) (quoting Harford Opp. Ex. 15 (Hennigan Dep.)

7    (ECF No. 2400-17) 123:21–124:1);[6] *see also Courtney v. Canyon Television & Appl. Rental, Inc.*,

8    899 F.2d 845, 851 (9th Cir. 1990) (hearsay assertions "are inadmissible at summary judgment").

9        ***Focus Group Report on Student Cell Phones.***    Harford again cites the Strategic Focus

10   Group Report on Student Cell Phones.  *See* Harford Opp. 6–7.  As explained above, the report is

11   inadmissible.  And, in any event, this report makes only passing references to the "influence of

12   social media"—without tying this alleged "influence" to Defendants' actionable conduct *or* the

13   alleged diverted instructional time.  *Id.* (quoting Harford Opp. Ex. 10 (HCPS_00174744) (ECF

14   No. 2400-12) 6–8).  Testimony and documents about cell phone use or the general "influence of

15   social media" cannot meet Harford's burden to establish that Defendants' actionable conduct

16   caused the alleged lost instruction time.  *See infra* Part II.C.1.

17       ***Klein's survey.***    Harford does not meaningfully respond to Defendants' argument that

18   Klein's survey of certain Harford teachers cannot establish a causal link between Defendants'

19   actionable conduct and lost instruction time, relying only on the Districts' Omnibus Opposition.

20   *See* Harford Mot. 26–28; Harford Opp. 6.  As discussed in Defendants' Omnibus Reply, the Klein

21   survey is inadmissible.  *See* Om. Reply Part II.C.1.

22       Again, Harford has not cited any testimony or evidence about students' use of Defendants'

---

24   [6] This testimony is inadmissible for a second reason: as a lay witness, the lone teacher recalled by
25   Hennigan cannot testify to whether social media can "rewire" a child's brain.  *See, e.g.*,
     *Mouradian v. City of Los Angeles*, 2023 WL 2558398, at *3 (C.D. Cal. Jan. 25, 2023)
26   ("[O]pinions regarding the basis for a PTSD diagnosis and the symptoms of such a diagnosis
     would likely require 'scientific, technical, or other specialized knowledge' that would bring such
27   testimony within the scope of Rule 702."); *Wagnon v. Rocklin Unified Sch. Dist.*, 2024 WL
     4654239, at *3 (E.D. Cal. Nov. 1, 2024) (plaintiff's mother could testify to her observations of
28   the nonverbal plaintiff's reactions to the defendant's conduct, but not as to a "diagnosis, opinion,
     or the cause of [the plaintiff's] alleged injuries.").

1    platforms, much less the at-issue features—only testimony about cell phones or social media in

2    general.    Harford does not rely upon its ==disciplinary reports—which track classroom

3    disruptions—because those records do not reflect whether a disruption was related to social media

4    (let alone any of Defendants' platforms).==    *See* Harford Mot. 22 (citing Harford Mot. Ex. 24

5    (HCPS_00228706) (ECF No. 25-26) -706 (Harford disciplinary reports)); Harford Opp. 6–7.

6    Harford simply fails to provide sufficient evidence to defeat Defendants' motion.

7
        **4.    Harford's Only Out-of-Pocket Costs Are Not Tied to Defendants'
8            Actionable Conduct.**

9        Harford seeks reimbursement only for the cost of certain firewall and internet-content

10    filtering software—not for property damage or the costs of any increase in mental health services.

11    Om. Opp. 196–199; *see also infra* Part II.C.2. But Harford cannot show that Defendants caused

12    the District to incur these costs because it *does not dispute* that it is required to purchase this

13    software to comply with federal law.    *See* Harford Opp. 14; Harford Opp. Ex. 23

14    (HCPS_00055970) (ECF No. 2400-25) -972 ("The use of this filter system also allows Harford .

15    . . to comply with the Children Internet Protection Act (CIPA)."). Harford also does not dispute

16    that, in order to comply with CIPA, it has paid for an internet content filter every year since

17    2000—before any Defendant's platform existed. *See* Harford Mot. Ex. 31 (May 29, 2025 Moore

18    30(b)(6) Dep.) (ECF No. 25-33) 32:9–34:11; Harford Opp. 14. The fact that Harford used a filter

19    purchased for purposes of CIPA compliance to regulate students' access to various websites (in

20    this case, to *unblock* YouTube in 2020) does not establish that it purchased the filter because of

21    Defendants. *See* Om. Opp. at 198 (claiming that Harford used its CIPA filter for "filtering specific

22    to social media, not just what law requires" (citing Om. Opp. Ex. 598 (Mar. 14, 2025 Moore

23    30(b)(6) Dep.) (ECF 2349-78) 21:5–24:25)). These undisputed material facts are dispositive:

24    Defendants' conduct is not a cause-in-fact of this expense.[7]

25

26    _____

    [7] Contrary to Harford's assertions, Defendants do not "insist" that a "laundry list" of other
27    "societal factors . . . are the *true* cause of Harford's mental health crisis." Harford Opp. 7
    (emphasis added). Rather, Defendants merely pointed out that the record evidence tying these
28    other problems to mental health harms underscores the *lack* of similar evidence concerning
    Defendants' actionable conduct. *See* Harford Mot. 3–5; *see also* Harford Mot. Ex. 2 (May 15,

                                                11

**B.      Harford Has No Evidence That a Failure To Warn Harmed the District.**

For reasons explained in Defendants' Harford Motion and Omnibus Reply (Harford Mot. 41–46; Om. Reply Part II.B.1), Defendants do not have a duty to warn Harford.  But even if they did, Harford has no evidence that an alleged failure to warn caused it any damage.  Harford Mot. 43–45.  Recognizing its lack of evidence, Harford claims it does not need any because it can take advantage of the "heeding presumption" under Maryland law.  See Harford Opp. 9–11.  But under Maryland law, that presumption does not apply here, and even if it did, Defendants successfully rebutted it.

**1.      The "Heeding Presumption" Does Not Apply.**

The heeding presumption does not apply for two independent reasons.

*First*, Maryland law is clear: "The [h]eeding [p]resumption arises in product liability cases."  *McKenzie v. Anne Arundel County*, 2016 WL 4379127, at *9 (Md. Ct. Spec. App. Aug. 17, 2016).  Harford has not brought a product liability claim and previously argued to this Court that its claims "do not concern product liability law as they do not seek to recover for injuries suffered from a defective product."  Second SD Order (ECF No. 1332) at 19 (quoting ECF No. 668 at 30).  As such, the heeding presumption is inapplicable here.

Maryland courts have rejected similar attempts to broaden the heeding presumption's application outside the product liability context.  In *McKenzie*, plaintiff argued on appeal that the trial court erred in refusing to instruct the jury on the heeding presumption in her negligence case against Anne Arundel County for its failure to maintain a stop sign.  2016 WL 4379127, at *8.  The plaintiff urged "that the court's failure to provide the instruction limited her ability to present to the jury the theory that she would have stopped at the stop sign had it been present, and thus to establish the effect of the County's negligence."  *Id.*  The Court of Special Appeals of Maryland

2025 Bulson Dep.) (ECF No. 27-1) 219:13–231:21 (listing "sources of . . . mental health challenges" including COVID-19; gun violence in schools; drug and alcohol abuse; poverty; homelessness; physical, emotional, and sexual abuse and trauma; racism; homophobia; and social and political movements); *see also* Harford Opp. Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No. 2400-6) 67:5–68:1 (agreeing it is "a pretty universally accepted conclusion" that bullying and cyberbullying—non-actionable third-party conduct—have negative impacts on students' attention and behavior during class).

1   "d[id] not agree." *Id.* "Because [the plaintiff's] claims ar[o]se out of the law of negligence," the

2   Court "[saw] no basis upon which to conclude that the court erred in refusing to instruct the jury

3   on a doctrine derived from products liability." *Id.* at *9. Consistent with that case law, Harford's

4   cited cases discuss the heeding presumption in the context of a product liability claim. *See, e.g.*,

5   *Exxon*, 406 F. Supp. 3d at 432; *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2023 WL

6   4352081, at *3 (N.D. Fla. July 5, 2023); *Eagle-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 469

7   (Md. 1992). Having disclaimed bringing products liability claims, Harford cannot turn around

8   and use a product-liability doctrine to save its lack of causation evidence.

9        *Second*, Harford does not cite any authority that would allow it to apply a presumption

10  that students and parents would have acted differently in the face of an adequate warning and

11  thereby avoided causing Harford's alleged harms. Rather, as set forth by caselaw, the heeding

12  presumption is "a presumption that *plaintiffs* would have heeded a legally adequate warning had

13  one been given." *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 647 A.2d 405, 413 (Md.

14  1994) (emphasis added). Harford's cited cases are exemplary. In *U.S. Gypsum* the City of

15  Baltimore sued the maker of an asbestos-containing fireproofing spray for the costs of removing

16  treated surfaces, alleging that, had it been warned earlier of the dangers of asbestos, it would have

17  heeded the warning and begun remediation efforts sooner, thus saving money on the costs of the

18  remediation. *Id.* at 408, 413. In *3M Combat*, the plaintiff, an individual soldier, provided

19  evidence that a warning about the 3M earplugs' defects would have prevented his auditory injuries

20  because the Army would not have supplied them and, even if it had, he, personally, would not

21  have used them. 2023 WL 4352081, at *3. Harford has presented no evidence regarding what

22  students and parents would have done in the face of different warnings. In *Exxon*, a case involving

23  strict liability, rather than negligent failure to warn, the state, suing in its *parens patriae* capacity,

24  alleged at the pleading stage that citizens would have avoided gasoline blended with a cancer-

25  causing agent had they been warned. 406 F. Supp. 3d at 433, 464. That case has no bearing here

26  at the summary judgment stage in a non *parens patriae* case.

27       In order to prevent Harford's alleged harms, not only would Harford have to have acted

28  differently in the face of an adequate warning, but because it is not the end-user, students and

13

1   parents would also have to have acted differently in order to avoid the alleged mental health and

2   classroom disruption harms.  No case has ever allowed such a double-layer of presumption.

3           **2.     Even If the Heeding Presumption Applied, The Evidence Uniformly**
            **Shows that Harford Would Not Have Heeded Any Warning.**

4

5           Even if one applied, Defendants rebutted any heeding presumption as a matter of law.

6   *First*, the only thing Harford contends it would have done in the face of an adequate warning is

7   establish a school-day cell phone ban earlier.  Harford Opp. 10–11.  This is pure attorney-

8   argument, with no citation to any evidence.  *See Safari Club Int'l v. Haaland*, 31 F.4th 1157,

9   1176–77 (9th Cir. 2022) ("[B]are assertions unsupported by evidence in the record . . . cannot

10  survive summary judgment.").  Moreover, Harford contradicts itself, stating that such a ban has

11  not (and would not have) meant that students used Defendants' platforms sufficiently less to

12  reduce mental health harms or distractions in school.  Harford Opp. 11.  Harford says that "only

13  time will tell how well it will work in the long term, particularly given that students continue to

14  use social media outside of school," and describes enforcing such a policy as "holding back a

15  tsunami wave with your hand."  *Id.*  Thus, even if the heeding presumption *could* apply here,

16  Harford admits that it cannot show any actions it would have taken in response to such a warning

17  would have avoided its alleged harms.  *Eagle-Picher*, 604 A.2d at 469 ("[I]f a warning would not

18  have prevented the harm from occurring then a defendant who failed to warn is not

19  responsible. . . .").

20          *Second*, to this day, Harford *encourages* students and teachers to use YouTube for

21  educational purposes, and it does not block access to YouTube.  Harford began allowing students

22  to access YouTube on school networks and on school-issued devices in 2020 at the request of the

23  Office of Curriculum Instruction.  Harford Mot. Ex. 18 (Mar. 14, 2025 Moore 30(b)(6) Dep.)

24  (ECF No. 25-20) 19:9–16; 21:3–14.  As of 2025—approximately two years after Harford filed its

25  lawsuit—Harford's curriculum still includes YouTube as an "approved" and "*recommended*

26  resource."  Harford Mot. Ex. 19 (May 9, 2025 Bulson Dep.) (ECF No. 25-21) 136:18–138:16

27  (emphasis added); *see also* Harford Mot. Ex. 20 (HCPS_00537476) (ECF No. 25-22) -478 ("In

28  our curriculum we often include videos from youtube which normally teachers have always

                                        14

1    shown on their whiteboard.")  A school-day cell phone ban would have no impact on that school-

2    approved use of YouTube—either in class or after hours as part of homework.

3         Nor does Harford dispute that it continues to use its Facebook, Instagram, and YouTube

4    accounts.  Harford Opp. 11.  In fact, Harford *continues to encourage* students to use Facebook,

5    Instagram, YouTube, and other social media platforms to follow Harford.[8]  *See* Harford Opp. Ex.

6    5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 119:9–19 (explaining use of Facebook,

7    Instagram, and YouTube to "shar[e] school system information" with "[*s*]*tudents*, parents, staff,

8    [and the] community" (emphasis added)); Harford Mot. Ex. 17 (HCPS_00114511) (ECF No. 25-

9    19) -511, -514 (2023–2024 Parent Student Handbook Calendar instructs parents *and students* to

10   follow Harford on Facebook, Instagram, Twitter, and YouTube).  And Dr. Bulson testified that

11   he *continues to support* students' use of social media.  In 2019, a member of the Superintendent's

12   Student Advisory pitched a social media campaign to raise student awareness about mental health

13   resources.  Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 108:21–115:14;

14   *see also* Reply Ex. 1 (HCPS_00164400); Reply Ex. 2 (HCPS_00164401).  When asked about this

15   proposal, Dr. Bulson testified that *to this day*, he "*would continue to support the idea*" of a social

16   media campaign to raise awareness of mental health resources amongst students.  Harford Opp.

17   Ex. 5 (May 9, 2025 Bulson Dep.) (ECF No. 2400-7) 115:15–23, 118:11–119:8 (emphasis added);

18   *see also id.* at 115:25–116:9.

19        In light of this evidence of Harford's ongoing use of Defendants' platforms, there is no

20   basis for a jury to presume that Harford would have discontinued use of Defendants' platforms

21   had Defendants warned Harford of the alleged harms—particularly when the District has known

22   about its alleged harms since filing this lawsuit and yet still uses Defendants' platforms.  *See Soc.*

23   *Media Cases*, Nos. JCCP 5255, 23STCV31485, at 5, 7–8 (Cal. Super. Ct. Nov. 5, 2025) (granting

24

25   _____

26   [8] Harford argues that it does not promote its accounts on these platforms to students—citing
     testimony from one fact witness (Communications Director Jillian Lader).  Harford Opp. 11
27   (citing Harford Opp. Ex. 19 (Lader Dep.) (ECF No. 2400-21) 39:24–25).  The testimony of one
     fact witness does not negate the evidence that Harford itself—and many other Harford leaders—
28   promote those accounts to students.  *See* Harford Opp. Ex. 5 (May 9, 2025 Bulson Dep.) (ECF
     No. 2400-7) 119:9–19; Harford Mot. Ex. 17 (HCPS_00114511) (ECF No. 25-19) -511, -514.

1   motion for summary judgment as to plaintiffs' negligent failure to warn claim where plaintiff

2   continued to use YouTube even after filing the lawsuit).

3       **C.  Harford Fails To Demonstrate Recoverable Past Damages.**

4           **1.  Harford Cannot Recover Damages for Diverted Time.**

5           As an initial matter, Harford concedes that it cannot recover its nearly $1 million claimed

6   damages in diverted time for counselors and psychologists, as it failed to address the alleged

7   damages for those employee classifications in its Opposition.  *Compare* Harford Mot. 28–29

8   (arguing that Harford relies on speculative estimates that are not tailored to Defendants'

9   actionable conduct) *with* Harford Opp. 6–7, 11–14 (addressing diverted teacher time but failing

10  to address Defendants' arguments regarding Harford's diverted counselor and psychologist time)

11  *and* Om. Opp. 201–05 (same); *see also supra* note 1 (compiling waiver cases).

12          As to the alleged "lost time" for teachers, Harford's argument that it can recover damages

13  for diverted instructional time fails for three reasons: as a matter of law the District (1) cannot

14  recover damages for teachers' performance of typical work duties; (2) does not present competent

15  evidence of "lost time"; and (3) cannot recover damages for alleged harms to students.

16          *First*, Defendants do not contend that actual damages can *never* arise from diverted time

17  but rather that diverted time is only recoverable if Harford points to actual loss it suffered as a

18  result.   Contrary to Harford's argument, for teachers, managing distractions and teaching

19  classroom expectations is, and always has been, part of the job.  *See* Harford Mot. 25–26.  None

20  of the cases Harford cites grant damages for the performance of typical work duties.  *MacDonald*

21  *v. Patriot, LLC*, 2017 WL 1788115, at *11–12 (Md. Ct. Spec. App. May 5, 2017) (finding

22  evidence of damages where employee time was diverted away from otherwise *billable work* to

23  investigate Mr. MacDonald's actions); *see also AGV Sports Grp., Inc. v. Protus IP Sols., Inc.*, 10

24  A.3d 745, 752 (Md. 2010) (noting that actual damages could involve "lost employee *productivity*

25  associated with the receipt, review, and disposal of the unwanted faxes" (emphasis added));

26  *Under Armour, Inc. v. Ziger/Snead, LLP*, 158 A.3d 1134, 1135, 1138–39 (Md. Ct. Spec. App.

27  2017) (the cost of time diverted away "from *income-producing* work to assist counsel in preparing

28  a lawsuit" constitutes a measure of injury (emphasis added)); *KeraLink Int'l, Inc. v. Stradis*

16

*Healthcare, LLC*, 2021 WL 5832242 (D. Md. Nov. 2, 2021) (time diverted to address contamination issues), *aff'd sub nom. KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*, 60 F.4th 175 (4th Cir. 2023). Unlike the entities in those cases, Harford cannot show it suffered any actual loss resulting from the alleged diversion of teacher time.

*Second*, Harford doubles down on Klein's teacher time survey without adequately addressing its crucial flaws. *See* Harford Opp. 6, 13; Harford Mot. 26–28. Harford does not contest that Klein's survey is based on unsworn and post-hoc time estimates from just 10% of teachers. Harford Mot. 27; Harford Opp. 13. For the reasons elaborated in Defendants' Motion to Exclude the School District Experts (ECF No. 2297-1, at 10–18) and Defendants' Omnibus Reply, the Klein survey is unreliable and inadmissible. Harford has therefore failed to meet its burden of proving its damages are actual and not speculative.

*Third*, the alleged diverted instructional time harms students (if anyone), not the District. Harford claims that Maryland courts allow for the recovery of costs for diverted employee time because diverted time prevents employees from rendering *other services* to the District. *See* Om. Opp. 203. Yet Harford points to purported lost services (educational instruction) that teachers render *to students*. Harford suggests that its damages arise because classroom disruptions interfere with its mission "to help its students 'attain academic and personal success in a safe and caring environment.'" Harford Opp. 13. But Harford cites no authority that interference with its ability to help students attain academic and personal success, without some concrete loss to *the District*, is a compensable injury. Any injury for the alleged loss of students' learning is a derivative injury, at most. *See* Harford Mot. 41.

### 2.    The District Has No Competent Evidence of Out-of-Pocket Expenses.

Harford seeks "out-of-pocket" expenses related only to network filtering and monitoring software. Harford Mot. 8; Om. Opp. 197. Harford cannot recover these expenses given the undisputed evidence that Harford incurred them to comply with federal law, *supra* Part II.A.4. Harford admittedly does *not* seek any other out-of-pocket costs, including expenses associated with (1) technology lockers, Om. Opp. 196 n.12; (2) "expanded mental health resources" other than "lost time for staff providing those resources," *id.* at 198; or (3) social emotional learning

17

1   programming, *id.* at 199.[9]  Therefore, Harford's reference to increased "mental health salaries"

2   and growing demand for school-based mental health services, Harford Opp. 13–14, is not relevant

3   to its out-of-pocket costs because it admittedly does not seek "compensation for expanded mental

4   health resources beyond the lost time for staff providing those resources," Om. Opp. 198–99.[10]

5       **D.    The Hoover Plan Is Not a Proper Abatement Remedy Under Maryland Law.**

6           Harford's Opposition hardly references abatement and does not discuss Dr. Hoover's 15-

7   year "strategic plan."   And for good reason: Harford cannot identify any binding Maryland

8   decision that authorizes the remedy it seeks.  As discussed in the Omnibus Reply, in the Omnibus

9   Opposition, the Districts cite two Maryland cases, both of which are classic nuisance cases where

10  abatement meant an injunction to remove the instrumentality of the nuisance, not paying to treat

11  downstream physical or mental injuries.  *See, e.g.*, *Adams v. Comm'rs of Trappe*, 102 A.2d 830,

12  837 (Md. 1954) (defendant ordered to remove gas pump that was blocking public sidewalk and

13  was in violation of a municipal ordinance); *Spaw, LLC v. City of Annapolis*, 156 A.3d 906, 931

14  (Md. 2017) (property owner in violation of municipal historic preservation zoning ordinance

15  could be required to file an application for a certificate of approval prior to a building rehab); *see*

16  *also* Om. Reply Part II.D.2.[11]  Instead of pointing to governing appellate authority, Harford looks

17  to a singular trial court decision, *Mayor and City Council of Baltimore v. Purdue Pharma, L.P.*,

18

---

19  [9] Harford does not dispute, and therefore concedes, that it is not entitled to recover for property

20  damage.  *Compare* Harford Mot. 32–33 *with generally* Harford Opp; *see also supra* note 1.

    [10] Even if Harford were seeking damages for mental health resources, any claim to past damages

21  for additional mental health personnel would be entirely speculative, as Harford has not offered
    any evidence of what portion of the increased budget is allegedly attributable to Defendants'

22  actionable conduct as opposed to the other "myriad of issues" that affect the budget.  Harford

23  Opp. 13–14, Ex. 4 (Hennigan 30(b)(6) Dep.) (ECF No. 2400-6) 43:13–20.  None of Harford's
    damages experts calculated the costs of those salaries and put those forward as costs that Harford

24  is seeking.  Harford Mot. 29–30; *see also id.* at 25 n.6.

25  [11]The Districts' claim that dicta from *Spaw* "recognized . . . that requiring the defendant to not
    just halt the offending conduct but affirmatively undertake action to undo the effects of the

26  violation would be an appropriate form of abatement."  Om. Opp. 214.  *Spaw* did not recognize
    that.  Instead, it said that "[a]batement is 'the act of eliminating or nullifying,'" and that the City

27  could seek "to eliminate Spaw's violation of not complying with the administrative process—
    filing an application for a Certificate of Approval—by compelling it to do so."  156 A.3d at 931

28  (citation omitted).

1   No. 24-C-18-000515, slip op. at 1, 23 (Md. Cir. Ct. Aug. 8, 2025), which is currently being

2   appealed by the City of Baltimore,[12] and which Defendants distinguished in their opening brief.

3   *See* Om. Opp. 213; Harford Mot. 38 n.13.

4        Even if the Hoover Plan were an appropriate abatement remedy, Harford's Opposition

5   cites only a couple pages of deposition testimony to support its "need for abatement." *See* Harford

6   Opp. 14; Harford Opp. Ex. 18 (Brooks Dep.) (ECF No. 2400-20) 127:23–128:8.   Harford

7   highlights that its Supervisor of Safety and Security Donoven Brooks testified that many issues

8   between students "have a nexus to social media," Harford Opp. Ex. 18 (Brooks Dep.) (ECF No.

9   2400-20) 128:5–8, and estimated that "anywhere from 40 to 45 percent of [his staff's] time is

10  dealing with students and situations where we're finding out conflicts either originated on using

11  social media, or if they started in school, continue via the use of social media in these conflicts,"

12  *id.* at 127:23–128:4.  These statements have nothing to do with supporting Harford's need for the

13  15-year, $1 billion strategic plan.  But they do make plain that Harford's claimed injuries result

14  from third-party content and conduct, not Defendants' actionable conduct. When asked what he

15  meant by "nexus to social media," Brooks testified that he was talking about students "[m]aking

16  *threats* on social media; using social media *to bully*, using social media to make fake accounts

17  and *put[ting] out embarrassing pictures and information* about other students; [and] going on

18  social media to *discuss private and personal things* about students and their families."  *Id.* at

19  128:9–17 (emphases added).  This Court already held that Section 230 bars any theories that, like

20  these, "would necessarily require defendants to publish less third-party content."  PI Order 16.

21       If anything, Harford's Opposition highlights why the lengthy and costly abatement plan

22  is unnecessary.  Harford admits that "only time will tell how well [the cell phone ban] will work

23  in the long term."  Harford Opp. 11.  Dr. Hoover did not account for this cell phone ban in her

24  plan, and Harford therefore cannot demonstrate that a billion-dollar, 15-year strategic plan is

25  needed when the cell phone ban may ultimately significantly reduce its claimed injuries.  *See*

26  *generally* Harford Mot. Ex. 32 (Am. Hoover Harford Rep.) (ECF No. 25-34); Harford Mot. Ex.

27

28  [12] Madeleine O'Neill, *Baltimore Asks Maryland Supreme Court to Hear Appeal in Opioid Lawsuit*, Baltimore Banner (Nov. 12, 2025), https://tinyurl.com/sb8kez6y.

19

1    41 (2d Am. Leslie Rep.) (ECF No. 25-43); *see also* Harford Mot. 33–41; Om. Reply Part II.D.

2        **E.    Harford Cannot Show It Is Reasonably Certain To Suffer Future Damages.**

3        Though Harford does not dispute that future damages are only recoverable where they are

4    "reasonably certain," Om. Opp. 206 (citing *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020,

5    1026 (Md. 1983) and *Davidson v. Miller*, 344 A.2d 422, 427 (Md. 1975)), it presents no evidence

6    of reasonably certain future expenditures.  Harford does not say with reasonable certainty what

7    expenses it *will incur* a decade into the future due to injuries it has allegedly already suffered as

8    a result of Defendants' conduct; nor could it without knowing how technology will evolve, what

9    new interventions will be available, or how well its cell phone ban will work.  *See* Harford Opp.

10   11 ("[O]nly time will tell how well [the policy] will work in the long term . . . ."); *Davidson*, 344

11   A.2d at 427 ("[T]estimony concerning an injury which may only possibly ensue is something too

12   conjectural for the jury to receive or consider . . . .").  For the reasons explained above, in

13   Defendants' Harford Motion, and in the Rule 702 briefing, Dr. Hoover's strategic plan does not

14   fill that gap.  Harford Mot. 39–41; *see also Davidson*, 344 A.2d at 427 (finding error "to receive

15   into evidence [expert's] speculative opinion on the issue of [plaintiff's] potential problem").

16   Harford further misses the mark for a separate reason:  Harford suggests that the fact that Dr.

17   Hoover "opines that her detailed, 15-year strategic plans are necessary to prevent these future

18   injuries," and Dr. Leslie quantified the costs of implementation is sufficient to establish a genuine

19   issue of material fact on future damages.  *See* Om. Opp. 206.  But that gets the analysis backwards:

20   The question is not whether Harford can show that a $1.1 to $1.5 billion dollar plan can *prevent*

21   *future injuries*, the question is whether it is reasonably certain that Harford *will incur* future costs

22   as a result of its *existing injuries*.  *See DiLeo v. Nugent*, 592 A.2d 1126, 1134–35 (Md. Ct. Spec.

23   App. 1991) (jury could determine future medical expenses for an existing injury the plaintiff

24   "*sustained*" (emphasis added)).

25   **III.    CONCLUSION**

26        For the foregoing reasons, as well as the reasons stated in Defendants' Harford Motion

27   and Omnibus Reply, Defendants are entitled to summary judgment on Harford's claims.

28

Dated: December 5, 2025

**WILLIAMS & CONNOLLY LLP**

/s/ *Ashley W. Hardin*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and
Google LLC*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COVINGTON & BURLING LLP**

*/s/ Christian J. Pistilli*
ASHLEY M. SIMONSEN (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

PHYLLIS A. JONES (*pro hac vice*)
PAUL W. SCHMIDT (*pro hac vice*)
CHRISTIAN J. PISTILLI (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc.*
*f/k/a Facebook, Inc.; Facebook Holdings, LLC;*
*Facebook Operations, LLC; Meta Payments Inc.*
*f/k/a Facebook Payments Inc.; Meta Platforms*
*Technologies, LLC f/k/a Facebook Technologies,*
*LLC; Instagram, LLC; and Siculus LLC f/k/a*
*Siculus, Inc.*

1

KING & SPALDING LLP

2

*/s/ Bailey J. Langner*

3

GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com

4

TACARA D. HARRIS, pro hac vice
tharris@kslaw.com

5

KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600

6

Atlanta, GA 30309

7

Telephone: (404) 572-4600
Facsimile: (404) 572-5100

8

9

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com

10

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW

11

Suite 900
Washington, D.C. 20006

12

Telephone: (202) 737-0500
Facsimile: (202) 626-3737

13

14

BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*

15

KING & SPALDING LLP
50 California Street, Suite 3300

16

San Francisco, CA 94111
Telephone: (415) 318-1200

17

Facsimile: (415) 318-1300

18

*Attorneys for Defendants TikTok Inc., ByteDance*

19

*Inc., ByteDance Ltd., TikTok Ltd., and TikTok,*
*LLC*

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6) (22-MD-3047)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KIRKLAND & ELLIS LLP**

/s/ *Andrew M. Karp*
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

ANDREW M. KARP, *pro hac vice*
andrew.karp@kirkland.com
JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

**MUNGER, TOLLES & OLSON LLP**

JONATHAN H. BLAVIN (State Bar No.
230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State Bar No.
284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6) (22-MD-3047)

1    <u>**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**</u>

2         I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

4    DATED:   December 5, 2025                By:      /s/ J. Andrew Keyes
                                                       Andrew J. Keyes
5                                                      *Attorney for Defendants YouTube, LLC*
                                                       *and Google, LLC.*
6

7                                            By:      /s/ Christian J. Pistilli
                                                       Christian J. Pistilli
8                                                      *Attorney for Defendants Meta*
                                                       *Platforms, Inc. f/k/a Facebook, Inc.;*
9                                                      *Facebook Holdings, LLC; Facebook*
                                                       *Operations, LLC; Meta Payments Inc.*
10                                                     *f/k/a Facebook Payments Inc.; Meta*
                                                       *Platforms Technologies, LLC f/k/a*
11                                                     *Facebook Technologies, LLC;*
                                                       *Instagram, LLC; and Siculus LLC f/k/a*
12                                                     *Siculus, Inc.*

13

14                                           By:      /s/ Bailey J. Langner
                                                       Bailey J. Langner
15                                                     *Attorney for Defendants TikTok Inc.,*
                                                       *ByteDance Inc., ByteDance Ltd., TikTok*
16                                                     *Ltd., and TikTok, LLC*

17                                           By:      /s/ Andrew M. Karp
                                                       Andrew M. Karp
18                                                     *Attorney for Defendant Snap Inc.*

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6) (22-MD-3047)

1

## <u>ATTESTATION PURSUANT TO LOCAL RULE 5-1</u>

2

3
I, Ashley W. Hardin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the
concurrence to the filing of this document has been obtained from each signatory hereto.

4

5
DATED:   December 5, 2025                    By:    */s/  Ashley W. Hardin*
Ashley W. Hardin

6

7
*Attorney for Defendants YouTube, LLC
and Google, LLC*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (HARFORD) (SD MSJ NO. 6) (22-MD-3047)

1

## <u>CERTIFICATE OF SERVICE</u>

2

3    I hereby certify that, in accordance with ECF No. 341, on December 5, 2025, this motion

and all attachments thereto were served to the following email addresses:

4

5        PSCServiceMDL3047@motleyrice.com
        MetaNoticeofService@cov.com
6        SnapNoticeofService@mto.com
        TikTokNoticeofService@faegredrinker.com
7        YouTubeServiceConfidentialDocs@wsgr.com
        MWeinkowitz@lfsblaw.com
8        pwarren@motleyrice.com
        lhazam@lchb.com
9        amm@classlawgroup.com
        TShrack@lfsblaw.com
10       coanderson@lchb.com
        scouch@motleyrice.com
11       gpanek@lchb.com
        kmcnabb@lchb.com
12       myeates@ktmc.com
        jjacobson@ktmc.com
13       pdandrea@lfsblaw.com
        jruff@motleyrice.com
14

15

16

Dated:  December 5, 2025                    By:  */s/ Ashley W. Hardin*
17                                               Ashley W. Hardin, *pro hac vice*

18
                                            *Attorney for Defendants YouTube, LLC*
19                                           *and Google LLC*

20

21

22

23

24

25

26

27

28

27