# EXHIBIT H

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

*Social Media Cases*
JCCP5255
(Lead Case: 22STCV21355)

Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: November 10, 2025

**Defendants' Motion to Exclude Expert Testimony of Meredith McCarron**

Court's Ruling:  The Motion is denied.

      Meredith McCarron (McCarron) is a data scientist with expertise in data mining and data analytics.  Plaintiffs have retained McCarron to offer testimony about the accuracy of Defendants' usage data.

      Defendants seek to exclude McCarron's expert testimony by offering four arguments.  First, Defendants argue that McCarron improperly "employs a made-up 'sanity test' to purportedly evaluate the validity of Defendants' time spent data." (Defs' Mot., at p. 6.)  Second, Defendants argue that "McCarron's purported analysis of Plaintiffs' sessions data is neither reliable nor helpful to the factfinder." (Defs' Mot., at p. 6.)  Third, Defendants argue that McCarron lacks expertise as to "device data" and thus cannot offer testimony as to "the reliability of the data extracted from Plaintiffs' devices." (Defs' Mot., at p. 7.)  Finally, Defendants argue McCarron's tallies of the number of interactions for each of the three bellwether trial Plaintiffs suffers from the same "fundamental errors" identified by Defendants in the first three arguments.

      As to Defendants' first argument, McCarron does not use the term "sanity test" in the portions of her expert report that Defendants cite.  (Defs' Mot., at pp. 9-10, citing Rep. ¶¶ 207-216.)  Rather, she explains that she "attempted to validate the data submitted by Defendants that showed

1

Plaiontiffs' time spent and session length by cross-comparing these datasets against the user interaction snapshots." (Rep. ¶ 207.) Defendants argue that her analysis "involves nothing more than a superficial visual comparison of Plaintiffs' time spent (*i.e.*, the total amount of time a user spent on a platform each day) with their 'interactions' (*i.e.*, time-stamped entries for a limited set of completed user actions such as likes, comments, video views, and messages) to see if they correspond in some undefined way with one another." (Defs' Mot., at pp. 9-10.) In essence Defendants maintain that "time spent" and "interactions" do not correspond with one another, and that any comparison between these data sets is inherently unreliable.

McCarron's analysis is not exclusively premised on a "superficial visual comparison." Rather, based on the data she has assembled and the charts she has prepared to illustrate the overlay of number of interactions with time spent, McCarron makes observations that question the accuracy of sessions data. For example, she points out that KGM's time spent on Meta in a particular month "shows days with less than a half hour of time spent in days when she sent or received thousands of messages" (Rep. ¶ 210), and that YouTube's data reports no time spent for KGM on the platform during a period then "interactions data [for KGM] show dozens of comments and hundreds of likes on YouTube videos … " (Rep. ¶ 212.) Defendants suggest possible explanations for the seeming data anomalies highlighted by McCarron, but Defendants fail to demonstrate that, in making the comparison between time spent and number of interactions, McCarron has applied a faulty scientific methodology.

Google's own data expert, Julien Ackert (Ackert), has testified that a comparison of two data sources that have similar information is an appropriate "validation exercise" for determining data accuracy. (Ackert Depo., Ex. F to Mandich Decl., at pp. 167-169.) Ackert, in one instance, also looked at patterns of usage of a platform on a day when certain data suggested interactions with the platform but other data suggested no usage. (Ackert Depo., Ex. E to Mandich Decl., at pp. 103-104.) Because users of social media engage in "interactions" when spending time on social media, measuring the two datasets together is one logical way of testing time spent data. Defendants' identification of the limitations of this methodology is an issue for cross-examination at trial.

The term "sanity test" was used by McCarron in her deposition when counsel challenged her to define a rule regarding how many interactions per minute would be reasonable to determine that the data sets were accurate. (McCarron Depo., at p. 285.) In a further exchange with counsel, when asked whether she had "any rubric that would tell me how many minutes I'm supposed to have associated with a particular type of interaction,"

2

McCarron responded: "You should have a nonzero number of minutes, that's for sure." (*Id.* at p. 286.) While McCarron adopted the phrase "sanity test" in her deposition to describe a relationship between time spent data and interactions data that could call the reliability of the data sets into question, Defendants incorrectly argue that this term describes the totality of McCarron's validation methodology.

As Plaintiffs explain, McCarron's methodology also can be used "to determine whether the time spent data shows a user on the platform at times when the user was clearly on the platform." (Pls' Opp., at p. 7.) For example, when comparing time spent data with interactions data, McCarron observed that one Plaintiff appears to have spent time viewing recommended content (interactions) 40 minutes after the end of a session. (See Pl's Opp., at p. 5, citing McCarron 7/17/25 Rept., ¶ 22.) Such opinions are appropriate for addressing the accuracy of Defendants' data.

In Defendants' Motion, TikTok argues that McCarron failed to reliably carry out sessions data validation because she improperly double-counted duplicate interactions that had been presented to her by TikTok in separate files. As evidence for this allegedly inadmissible double-counting, TikTok offers as evidence the deposition of McCarron in which she repeatedly testifies that she considered data from separate TikTok files to be separate action types and therefore counted them separately. (McCarron Depo., at pp. 699-708.) When asked whether the files contained the same or duplicate information, McCarron testified that she would "need to open up those files and look at them to tell you if they're duplicate." (McCarron Depo., at p. 702.) Thus, McCarron's deposition cannot serve as a factual predicate for the court to find on this Motion that McCarron's analysis as to TikTok double-counted individual interactions. McCarron did not admit such alleged error in her deposition. The only other evidence cited by TikTok in making this argument is two excerpts from TikTok's data, which are not explained in a declaration by a person with knowledge of the documents, and which are not self-explanatory. (Motion at p. 13, lines 10-11.)

In Defendants' Reply Brief, TikTok also argues that McCarron's analysis is incorrect as to TikTok because she assumed that TikTok's sessions data were recorded in UTC and not in the time zone of the user's device's reported location. This argument was raised for the first time in the Reply Brief, and Plaintiffs did not have an opportunity to address it in their Opposition (although Plaintiffs conceded at oral argument that McCarron had corrected her analysis to account for the correct time zone used by TikTok). The court will not consider this argument because it was not timely raised and because it turns on factual issues as to which the court is not fully

3

informed by the parties' briefing (e.g., whether TikTok's data as produced clearly indicated the time zone associated with the recorded event).

Defendants' second argument is that the "sessions data validation" is unhelpful and unreliable. Defendants take issue with McCarron's conclusion "that, of the more than 600,000 sessions that Meta and the TikTok Defendants produced in these cases, 'thousands' of sessions had interactions that occurred after a session ended but before the next session began." (Defs' Reply, at p. 9.) Defendants fault McCarron for failing to specify the exact number of sessions that had interactions occurring after a session ended but before the next session began.

Defendants' attack on the "sessions data validation" appears to be an argument regarding the *sufficiency* of the evidence—not an argument that the methodology employed is unreliable. Defendants can be taken to argue that the results of the sessions data validation would not, without more, prove that Defendants' data is incomplete or unreliable. This argument is for the jury; it does not justify exclusion of McCarron's testimony. That McCarron has identified numerous purported inaccuracies or anomalies in Defendants' data is helpful to the jury's determination of the accuracy of Defendants' data. If Defendants believe that the "error rate" for the sessions data is so low as to prove the reliability of Defendants' data, then they may so argue at trial.

Third, Defendants argue that McCarron is unqualified to offer opinions about "device data." Defendants fault McCarron for not having in-depth knowledge about how data on a device (such as an iPhone) is stored, recorded, and/or extracted. But McCarron does not purport to offer opinions on these topics. Instead, McCarron will offer testimony regarding her analysis of the data itself that was extracted from devices. Defendants will be free to show at trial that the device data provided to McCarron is inaccurate or was recorded differently from the data kept by Defendants.

Finally, Defendants argue that McCarron's Plaintiff-specific opinions will not assist the trier of fact. This argument is unpersuasive. Defendants have signaled their intention to rely on their own data to make arguments about whether the platforms could have been a substantial cause of each Plaintiff's alleged harm. McCarron will opine that the data for each Plaintiff that is offered by Defendants is not accurate. McCarron's testimony as to each Plaintiff will thus serve to bolster each Plaintiff's testimony regarding their own usage.

Date: 12/3/2025                              _____
                                             Judge of the Superior Court

5