# EXHIBIT J

FILED
Superior Court of California
County of Los Angeles
12/03/2025
David W. Slayton, Executive Officer / Clerk of Court
By: _____A. Rosas_____ Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

*Social Media Cases*
JCCP5255
(Lead Case: 22STCV21355)

Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: November 10, 2025

**Defendants' Motion to Exclude the Expert Testimony of Dr. Stuart Murray**

Tentative Ruling:   The Motion is denied.

     Murray is "the Franklin Mint Professor of Psychiatry and Biobehavioral Sciences at the University of California, Los Angeles (UCLA)," and also serves "as the Director of the Eating Disorders Program at UCLA, which is located in the Resnick Neuropsychiatric Hospital at UCLA … ." (Murray Rep., Defs' Ex. A to General Causation Mot., at p. 6.)  Murray "received a dual Doctorate of Clinical Psychology and Ph.D. from the University of Sydney in 2012, both of which included a specialized focus in eating disorders and body image. [He] also completed a Postdoctoral Fellowship at the University of California, San Diego – which specialized in eating disorders." (Murray Rep., Defs' Ex. A to General Causation Mot., at p. 6.)  Murray has "been licensed to practice as a clinical psychologist in the State of California since 2015."  (R.K.C. Murray Rep., at p. 6.)

     Murray has been proffered as an expert as to both general causation and specific causation.  Murray has diagnosed R.K.C. with the following disorders: (1) Persistent Depressive Disorder, with Suicidal Ideation; (2) Binge Eating Disorder; (3) Panic Disorder, in Remission; (4) Insomnia due to other Menal Disorder (Social Media Addiction), in Remission; and (5) Social Media Addiction.  (R.K.C. Murray Rep., at p. 4.)  Murray concludes that R.K.C. "has exhibited behavioral and cognitive symptoms of addiction to social media and, based upon the results of clinically reliable comparable

1

assessments, was addicted to social media, specifically Facebook, Instagram, YouTube, Snapchat, and TikTok," that R.K.C.'s "addictive use of social media causally contributed to a substantial degree to his worsened state of mental health," that "R.K.C.'s addiction to social media was a substantially contributing factor to his diagnoses of Persistent Depressive Disorder, Binge Eating Disorder, Panic Disorder, Insomnia, and Other Specified Behavioral and Emotional Disorder," and that "R.K.C.'s addiction to social media exacerbated and made worse R.K.C.'s general mental health and his diagnoses of mental health disorders." (R.K.C. Murray Rep., at p. 4.)

To reach these conclusions, Murray conducted a mental evaluation of R.K.C. (R.K.C. Murray Rep., at p. 12.) Murray explains:

> 40. My assessment utilized an array of assessment instruments, some of which are self-report measures and some of which are clinician-administered measures. All are psychometrically valid measures I would routinely use in clinical assessment.
> • Mini Neuropsychiatric Interview (MINI): A widely used and psychometrically valid structured diagnostic interview, which is designed to assess a wide range of DSM psychiatric disorders, and symptom severity.
> • Eating Disorder Examination (EDE): A widely used and psychometrically valid structured diagnostic interview, which is designed to assess a wide range of DSM eating disorders, and symptom severity.
> • Eating Disorder Examination – Questionnaire (EDE-Q): A widely used and psychometrically valid self-report questionnaire, which is designed to assess a wide range of DSM eating disorders, and symptom severity.
> • Binge Eating Scale: A widely used and psychometrically valid self-report questionnaire, which is designed to assess the behavioral, emotional and cognitive symptoms of binge eating disorder.
> • Depression Anxiety and Stress Scale (DASS-21): A widely used and psychometrically valid self-report questionnaire that assesses the severity of depressive, anxiety and stress-related symptoms.
> • Patient Health Questionnaire (PHQ-9): A widely used and psychometrically valid self-report questionnaire that assesses the severity of depressive symptoms.
> • Body Dysmorphic Disorder Questionnaire: A widely used and psychometrically valid self-report

> questionnaire that assesses the severity of body dysmorphic disorder symptoms.
> • Social Media Disorder Scale: A widely used and psychometrically valid, self-report questionnaire that assesses problematic social media use.

(R.K.C. Murray Rep., at pp. 13-14, internal footnotes omitted.)  Murray interviewed R.K.C. and his father for a total of ten hours, even though a normal new-patient assessment can typically be conducted within six hours. (8/26/2025 Murray Dep., at 553:15-18, 335:15-23.)

Defendants move to exclude Murray's specific causation testimony as to R.K.C.  Defendants raise four main arguments in support of their Motion.  First, Defendants argue that Murray's opinions are unreliable because they are based on self-reporting by R.K.C. and R.K.C.'s father that does not accord with Defendants' data.  Second, Defendants claim that the methodology employed was unreliable because (1) social media addiction is not a "recognized diagnosis," and (2) Murray used a questionnaire related to "internet gaming disorder."  Third, Defendants claim that Murray's opinions would not be able to show that any single platform was a substantial cause of R.K.C.'s harms.  And fourth, Murray's opinions are unreliable because Murray failed to adequately take account of alternative causes of R.K.C.'s harms.

Defendants first claim is that Murray's testimony is inadmissible because he "over relies" on self-reported data, even though there is alternative evidence available; and, because the self-reported data was provided in interviews that were not recorded, Defendants claim that Murray's analysis is a "black box" that cannot be adequately tested or disproved.  Defendants fail to show that it is improper or unscientific in normal clinical practice for a psychologist to (1) rely on self-reported information from the patient and his family members, or (2) gather information in an interview that is not transcribed by the psychologist.  Murray's analysis is admissible if he employed "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772, internal citations and quotation marks omitted.)

Here, Murray has explained that, in conducting his analysis of R.K.C., he did not "do anything different in … than [his] general clinical practice." (8/25/2025 Murray Dep., at 37:18-21.)  While Defendants argue that Murray should have relied more on evidence from this litigation that Defendants believe is more favorable to their positions, they fail to demonstrate that a psychologist's diagnosis is scientifically unreliable

3

whenever it fails to rely on such information.  If Defendants believe that Murray failed to adequately take into account certain types of information, then they can raise the issue at trial to question the credibility of Murray's opinions before the jury.

Defendants rely on *Valero v. Board of Retirement of Tulare County Employees' Assn.* (2012) 205 Cal.App.4th 960 (*Valero*), to argue that a mental health professional's opinion based on a plaintiff's self-reports is unreliable.  But in that case the trial court did not exclude expert testimony but only concluded, as a trier of fact, that the doctors' reports were not persuasive and were impeached by other evidence.  (*Id.* at pp. 967-968.) The Court of Appeal held only that the trial court's findings of fact had substantial support in the record.  (*Id.* at p. 968.)  This case does not support Defendants' argument that Murray's testimony should be excluded.

Defendants fault Murray for failing to rely on their own data regarding R.K.C.'s use of their platforms.  But the accuracy and completeness of Defendants' data is a disputed question that must be resolved by the jury at trial.  Murray chose not to rely on the data because he considered Plaintiffs' position that the data is inaccurate. (See R.K.C. Murray Rept., at p. 18, fn. 26.)  If Defendants can demonstrate to the jury that their data is accurate and complete, then they may be able to undermine Murray's testimony in front of the jury.  Moreover, Defendants fail to address Murray's explanation that he chose not to rely on Defendants' data because "such usage data is highly technical and not data that I would typically encounter in my clinical practice while treating patients." (R.K.C. Murray Rept., at p. 18, fn. 26.) This latter point further buttresses the basic fact that Murray followed his normal practices as a clinical psychologist when assessing R.K.C.

Defendants claim that Murray failed to adequately consider R.K.C.'s medical and academic records, which Defendants believe undermine Murray's conclusions.  However, Murray did review R.K.C.'s medical and academic records.  Defendants merely disagree with Murray's conclusions (i.e., how much weight Murray gave to those records).  Defendants can raise this issue during cross-examination.

Again taking issue with Murray's conclusions, Defendants claim that Murray failed to adequately account for malingering or other recall issues— i.e., account for the fact that R.K.C. would exaggerate or fail to remember relevant details.  But Defendants again fail to show that Murray's methodology did not accord with typical clinical practice of a practicing psychologist.  Murray has testified that he assessed whether R.K.C. was engaged in "malingering" and ultimately concluded that R.K.C. was not. (See 8/25/2025 Murray Dep., at 465:1—466:9.)  Defendants can present

evidence at trial to attempt to undermine the credibility of Murray's assessment. Similarly, "recall issues" can be raised to help the jury weigh Murray's testimony.

Defendants argue that Murray failed to properly administer psychological assessment instruments. Defendants claim that the assessment instruments were improperly administered for two reasons: (1) Murray used the instruments to measure past symptoms even though the instruments are only designed to measure present symptoms; and (2) Murray used instruments that are meant to be used with adult patients. Plaintiffs cast doubt the factual accuracy of this second point. But, more importantly, any improper administration of certain psychological assessment instruments would not, without more, justify outright exclusion of Murray's opinions. These instruments helped to clarify and contextualize the information that was primarily gathered in the in-person interviews. The primary basis of Murray's diagnoses was the in-person interviews. (See, e.g., 8/26/2025 Murray Dep. At 268:23—267:4.) Any claimed improper use of the psychological assessment instruments is again more properly raised during cross-examination.

Defendants' second main argument is based on the claim that "social media addiction" is not recognized in the DSM-5. This court has already addressed and rejected this argument when ruling on general causation expert *Sargon* motions. (Ruling on Defendants' General Causation *Sargon* Motions, Sept. 22, 2025, at p. 25.) Moreover, Defendants do not challenge the claim that, in his own clinical practice, Murray has diagnosed conditions that are not yet codified. (See Pls' Opp., at p. 10.) The additional arguments raised by Defendants as to the diagnosis of "social media addiction" (i.e., that Murray did not follow the DSM-5's instructions, that the diagnosis "ignored" Defendants' data, and that R.K.C. and his father were allowed to engage in "malingering" (see Defs' Reply, at pp. 9)) are proper subjects for cross-examination, but they do not justify outright exclusion of Murray's opinions.

Defendants' third argument is that Murray has failed to adequately distinguish between platforms or disentangle content from features. Murray's purported failure to adequately assign causation to each of Defendants' platforms is more properly viewed as a question of whether Murray's report, viewed alone, is sufficient evidence to prove any one Defendant's liability for the alleged harms suffered by R.K.C. This no doubt explains why Defendants rely on cases addressing the sufficiency of the evidence rather than exclusion of expert testimony. (Defs' Reply, at p. 11, citing *N.C. v. Hain Celestial Group, Inc.*, 2023 WL 8261722, at *4 (Cal.Super.) [granting the defendants' motion for summary judgment due to

5

inadequate evidence presented by the plaintiff].)  The issue is one for the jury; it does not justify exclusion of testimony under *Sargon*.

As for the failure to disentangle content, this court has already explained that, under Section 230, Plaintiffs' experts are not required to "disentangle" harms caused by content from harms caused by design features.  To be sure, if Defendants could show that Murray's diagnoses only considered third-party content viewed by R.K.C. on Defendants' platforms, then Defendants could properly move to exclude Murray's testimony.  But Defendants have not done so here.  Murray presents diagnoses that he bases on the design features of the platforms.  (See, e.g., R.K.C. Murray Rep., at p. 36 ["In my opinion, to a reasonable degree of medical certainty, exposure to social media platform design features was a substantial causal contributor to the onset and maintenance of R.K.C.'s persistent depressive disorder, insomnia, binge eating disorder, panic disorder, and other specified behavioral and emotional disorder - social media addiction"].)  Murray's testimony, especially when viewed in light of other evidence potentially showing that social media design features cause harm and that R.K.C. was exposed to such design features, would allow a jury to determine that the design features were a *substantial* cause (even if not the *sole* cause) of R.K.C.'s diagnosed conditions.

Finally, Defendants argue that Murray failed to rule out known alternative causes.  But Murray stated at deposition that he *did* consider alternative causes when making diagnoses in this litigation.  (8/25/2025 Murray Dep., at 102:13-21.)  Murray took into account "disjointed family dynamics" related to events in R.K.C.'s life; Murray also addressed R.K.C.'s weight issues.  (See R.K.C. Murray Rep., at pp. 38-39.)  Murray stated at deposition that he included R.K.C.'s mother's incarceration in his analysis.  (8/26/2025 Murray Dep., at 395:1—398:20.)  Insofar as Defendants believe that Murray failed to properly weigh these alternative causes in conducting his mental health analysis, they can present that argument to the jury.

Date: 12/3/2025

_____
Carolyn B. Kuhl / Judge
The Honorable Caroly Kuhl
Judge of the Superior Court