# EXHIBIT L

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

*Social Media Cases*
**JCCP5255**
**(Lead Case: 22STCV21355)**

Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: November 10, 2025

**Defendants' Motion to Exclude Non-Causation Opinions of Arturo Bejar**

Court's Ruling:  The court denies the Motion.

On May 16, 2025, Plaintiffs disclosed that they would be relying on the expert testimony of Arturo Bejar (Bejar).  (See Defs' Ex. A.)  Bejar has not provided a report in connection with his expert testimony in this case.  Plaintiffs described Bejar's background as follows:

> Mr. Béjar has 30 years of experience in online and social media user safety. He began working in the tech industry at the age of 15 for IBM. Mr. Béjar graduated with a degree in mathematics from King's College in 1993. In 1994, he began work at Electric Communities, a social media startup, where he focused on security issues. Mr. Béjar joined Yahoo! in 1998, where he took on a role equivalent to the Chief Security Officer of the company. He was the first engineer at Yahoo! dedicated to writing security code. His job was to make sure that every product that Yahoo! made was safe for the people using it, which involved, among other things, implementing protections for kids and using test accounts to assess the safety of the platform and the effectiveness of safety features. Mr. Béjar joined Meta in 2009, as the company's site integrity team manager. He continued to work at Meta through 2015, and his role greatly expanded

1

during that time to include not only site integrity, but also customer care and other teams. In coordination with Meta CEO Mark Zuckerberg, Mr. Béjar created the Protect and Care team, a cross-functional group that managed Facebook's technical security and the safety of users and served as the program's senior engineer and project leader. His work at Meta included recommending and implementing safety features on the Facebook platform, and monitoring and assessing the platform for potential safety risks and harms. This included, for example, developing and implementing a reporting framework that was used by Facebook to identify harmful activity on the platform. In this role, Mr. Béjar interfaced directly with Meta's senior leadership, including Mr. Zuckerberg and COO Sheryl Sandberg, regarding Meta's safety program. Mr. Béjar retired from Meta in 2015 to spend time with his family but continued to consult with a number of technology firms about their safety programs. In 2019, Meta requested that Mr. Béjar return as a part-time consultant to assist and advise Instagram's wellbeing team. Mr. Béjar's second stint at Meta lasted from 2019 to 2021. As part of his consulting work at Meta, Mr. Béjar performed an assessment of Instagram's safety framework to identify existing problems causing harms to users, and to develop potential solutions. That assessment included creating and conducting a large-scale user survey to identify the harms occurring to users on Instagram. Based on that survey and other investigations, Mr. Béjar developed a set of safety recommendations for Instagram, which he communicated directly to Meta's top leadership, including Mr. Zuckerberg. Mr. Béjar later testified in front of the US Senate Judiciary Committee about the harms that stem from Meta's platforms. Mr. Béjar's testimony covered both his personal knowledge and experience working at Meta and independent research and testing of Meta's platforms and safety features. Mr. Béjar was also retained by Meta's 'Oversight Board' to advise on issues of youth safety after his consulting stint at the company. Meta has described Mr. Béjar as having "world-class expertise" and that "[t]here are fewer than 10 people in the world meeting [Bejar's] qualifications, we estimate, most of whom are retired or employed at [Meta's] competitors."

(Defs' Ex. A, at pp. 1-2, brackets in original.)

2

In their initial disclosure, Plaintiffs stated that Bejar may offer testimony on numerous topics, including "[h]is personal knowledge and experience related to how design defects on Meta's platforms can cause harm to minors (e.g., age verification, reporting processes, beauty filters, public like counts, infinite scroll, default settings, private messages, reels, ephemeral content, and connecting children with adult strangers) … ." (Defs' Ex. A, at p. 2.)

Plaintiffs have explained that they "proffer Mr. Béjar as both a fact witness to testify about his time at Meta, and as a non-retained expert to testify about his expert views on the adequacy of Meta's safety systems." (Pls' Opp. Defs' General Causation Bejar Mot., at p. 3.)  Thus, Bejar does not offer testimony as to any platforms other than Facebook and Instagram.

In ruling on a prior *Sargon* motion filed by Defendants with respect to Bejar, this court determined that Bejar can offer testimony stating his conclusions that certain design features of social media platforms can lead to "excessive use," but the court concluded that Bejar cannot offer testimony to show that use of social media platforms leads to certain mental health problems.  (Ruling on Defendants' General Causation *Sargon* Motions, Sept. 22, 2025, at pp. 32-33.)  The court noted that Bejar, running tests of Instagram's safety features, had "applied industry practice testing to Instagram's design features."  (Ruling on Defendants' General Causation *Sargon* Motions, Sept. 22, 2025, at p. 34.)

In a Motion filed before this court had issued its ruling on the general causation *Sargon* motions, Defendants move to exclude Bejar's "non-causation opinions."  "To apply some structure to Mr. Béjar's opinions, [Defendants' Motion] categorizes Mr. Béjar's non-causation opinions as follows: (1) age detection; (2) warnings and disclosures; (3) safety features; and (4) the miscellaneous remaining opinions, such as those about online bullying, which amount to the purest *ipse dixit*."  (Defs' Mot., at p. 8.)

Defendants argue first that Bejar's opinions about age detection are inadmissible for two reasons: (1) Bejar is unqualified to opine about age detection and verification; and (2) Bejar's opinions about proactive age verification are unreliable.  Bejar is qualified to opine about age detection and age verification features of a social media platform.  Bejar worked "on age verification or age prediction tools [for Meta] from 2009 to 2015." (Bejar MDL Dep. (Defs' Ex. B), at 668:2-5.)  Before working for Meta, Bejar was the "equivalent of a chief security officer" at Yahoo!, where "a significant part of [his] job … [was] to be involved in protecting kids from a safety standpoint."  (Bejar MDL Dep., at 32:14—33:6.)  Bejar's work involved

3

"child account verification." (Bejar MDL Dep., at 768:5-11.) Bejar clarified at his deposition that he "had a role in developing proactive age-detection systems" at both Yahoo! and Meta. (Bejar JCCP Dep. (Defs' Ex. C), at 174:14-19; see also Pls' Opp., at p. 4 [quoting additional testimony making clear that Bejar has significant, first-hand experience regarding safety, age detection, and proactive age verification].) Defendants have also failed to show that Bejar's proactive age verification opinions are unreliable. Bejar worked for Meta and thus has direct knowledge of Meta's operations. Bejar also has ample expertise regarding safety and age verification on internet platforms. Bejar can rely on his substantial experience to draw conclusions from his interactions with Meta's platforms from the standpoint of a platform user or someone viewing content present on Meta's platforms.

Defendants next address Bejar's opinions regarding warnings, which Defendants summarize as follows: "that Instagram has risks that should be disclosed to users and that such warnings would have reduced the harm to teen users." (Defs' Mot., at p. 10.) Defendants argue that Bejar's opinions about warnings are inadmissible because: (1) Bejar is not qualified to opine about warning design or efficacy; and (2) Bejar's testimony about warnings is unreliable.

Before addressing Defendants' arguments regarding warnings, the court notes that the summary of warnings opinions offered by Defendants suggests that Bejar might offer general causation testimony: i.e., that a proper warning would have reduced harm. Bejar cannot offer such general causation testimony. However, an opinion that, in general, companies should implement proper warnings if they intend to reduce harm, is *not* a general causation opinion, but is instead an opinion about appropriate and careful business practices of social media company.

As for experience, Plaintiffs have demonstrated that Bejar has experience with public safety disclosures. Bejar has testified that, in his prior work, he built "product interventions … around warnings and measured the effectiveness of [the warnings] and how you know [if they work] or not." (Bejar JCCP Dep., at 149:1-22.) When discussing his expertise related to parental warnings on Instagram, Bejar explained that he has done "significant work in effective security notices [to] see what drives behavior or not … ." (Bejar MDL Dep., at 873:22—874:1.) Bejar also testified that he had experience at both Yahoo! and Meta in crafting language to accurately describe the features of an online platform for users. (Bejar MDL, at 864:18—865:2.)

Defendants have also failed to show that Bejar's warnings testimony is unreliable. In order to testify as to Meta's lack of warnings, Bejar is not

4

required to rely on "consumer surveys" or "focus groups." (Defs' Mot., at p. 11.) Defendants' argument appears to be made based on the assumption that Bejar would offer testimony as to *causation*. However, as explained above, Bejar cannot offer such testimony; and Plaintiffs do not claim that he will be called to testify at trial as to causation.

Defendants next claim that Bejar's "test account" and "safety testing" methodology is unreliable. As noted above, this court has already rejected this argument. (Ruling on Defendants' General Causation *Sargon* Motions, Sept. 22, 2025, at pp. 33-34.) If Defendants believe that there are any problems with the way Bejar conducted testing, they may raise those issues on cross examination at trial.

Defendants' final argument is that Bejar's remaining opinions are "unsupported *ipse dixit*." Defendants point to five different statements included in Plaintiffs' original expert disclosure for Bejar. The statements are made in regard to (1) the level of bullying on Instagram as observed by Bejar, (2) Meta's alleged failure to provide necessary resources to work on safety and wellbeing issues when Bejar was employed by Meta, (3) whether children are more vulnerable to online harms than adults, (4) whether Meta properly acted to prevent or reduce children's problematic use of Instagram, and (5) whether Bejar's four-step safety framework for child-safety would likely reduce harm. Defendants have failed to show that Bejar's testimony must be excluded at trial. First, most of the statements can properly be characterized as *fact witness* testimony, given Bejar's years of experience working on safety issues for Meta. Second, Bejar has the relevant expertise to opine on Meta's operations and on appropriate and careful business practices regarding child safety issues. As an expert in safety on internet platforms, Bejar's statement that children require more safety features than adults (apart from being a rather uncontroversial claim) is within his expertise and based on his own knowledge and work in this area; to make the claim that a social media company should provide additional safety features for children, Bejar need not be a practicing child psychologist. Finally, Bejar's testimony as to opinions regarding his own four-step safety framework is not inadmissible. Defendants are incorrect to characterize such testimony as general causation testimony: Bejar instead offers his view of what a reasonable business decision would have been if Meta wanted to reduce potential harm to children. Moreover, Bejar may opine as to his suggested framework based on his years of experience working on safety features; he need not, as Defendants claim, rely on some additional, unspecified "data." (Defs' Mot., at p. 16.) Bejar has testified that he saw the framework employed in real-world situations, and that he monitored its effectiveness, but that Instagram never implemented that framework. (See Pls' Opp., at p. 15 [quoting relevant testimony].)

5