# EXHIBIT M

E-Served: Jan 6 2026 1:51PM PST Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

01/06/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

*Social Media Cases*
**JCCP5255**
**(Lead Case: 22STCV21355)**

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Defendants' Joint MIL 2: To Prohibit Plaintiffs' Counsel from Stating, Arguing, or Suggesting that Plaintiff Has or Had Additional Access on Defendants' Platforms**

Court's Ruling:  The Motion is largely denied.  However, Plaintiffs' counsel may not suggest to the jury that Defendants were *required* to locate additional accounts used by Plaintiffs in this litigation other than by conducting searches using the information provided by Plaintiffs in their UAIO responses.


Defendants move for an order prohibiting "Plaintiffs' counsel from suggesting to the jury that: (1) Plaintiffs accessed Defendants' platforms via any user account that was not disclosed in discovery pursuant to the December 14, 2023 User Account Information Order ('UAIO'); or (2) that there are or may be additional user accounts registered to or used by Plaintiffs that they cannot recall but which Defendants should have located and identified." (Defs' Joint MILs 1-8, at p. 12.)  But Defendants also request an order preventing *Plaintiffs* from testifying about "undisclosed accounts": "Plaintiffs should not be able to claim that they used or were allegedly injured via undisclosed, third-party accounts."  (Defs' Joint MILs 1-8, at pp. 12-13.)

        Defendants argue that any mention of undisclosed accounts should be excluded for three reasons: (1) its admission "would flout the case management procedures the Court implemented to govern discovery relating to plaintiff user accounts and would contravene the stated purpose of and terms of the UAIO"; (2) "any arguments about potential (unidentified)

additional user accounts for the bellwether Plaintiffs are not relevant because they are unsupported by any evidence"; and (3) "under Evidence Code § 352, allowing Plaintiffs to make assertions speculating about or suggesting the possibility of access to unidentified accounts would create a substantial risk of unfair prejudice to Defendants, confusing the core issues in the case, and misleading the jury to believe Defendants have withheld evidence that simply does not exist."  (Defs' Joint MILs 1-8, at p. 13.)

Plaintiffs oppose the Motion because they believe it would improperly require Plaintiffs and their counsel "to tether all evidence and argument to a particular account," rather than "allowing Plaintiffs and others to testify about their general usage habits" without specifying particular accounts.  (Pls' Opp. Defs' Joint MILs 1-8, at p. 6.)  Plaintiffs add that they "should not be barred from presenting evidence about their social media usage simply because it conflicts with Defendants' flawed data."  (Pls' Opp. Defs' Joint MILs 1-8, at p. 8.)  "R.K.C., for example, indicated in his sworn Plaintiff Fact Sheet that he began using TikTok and Snapchat in 2018, when he was around eight years old. … But both TikTok and Snap claim that, according to their data, R.K.C.'s earliest identified accounts were created in 2022."  (Pls' Opp. Defs' Joint MILs 1-8, at p. 8.)

Defendants respond that they "do not seek to preclude Plaintiffs from testifying regarding their general social media usage habits as they relate to each platform, or otherwise bar all evidence untethered from a particular account."  (Defs' Reply ISO Joint MILs 1-8, at p. 6.)  Defendants clarify that they merely ask the court "to prohibit Plaintiffs' counsel from arguing or suggesting that (1) Plaintiffs accessed Defendants' platforms via any account Plaintiffs failed to disclose during three years of intensive discovery, or (2) that Plaintiffs may have registered or used other accounts that they cannot recall, particularly with any implication that Defendants should have located and identified such phantom, undisclosed accounts."  (Defs' Reply ISO Joint MILs 1-8, at p. 6.)

It is important to clarify the nature, purpose and limitations of prior disclosures and other discovery in this proceeding.  When the parties were having difficulty negotiating a stipulated document preservation order in the MDL litigation, and when Defendants indicated to this court that, as time passed, data concerning Plaintiffs' social media accounts and usage was being deleted in the ordinary course of business, this court told Plaintiffs' counsel to develop a process for identifying Plaintiffs' known social media accounts to Defendants so that Defendants could preserve evidence.  This led to the agreed UAIO.  In general terms, Plaintiffs were required to identify social media user accounts they could recall and to provide other information (email address and cell phone number) that would allow Defendants to

attempt to locate the identified account and other accounts. Defendants were to compile a list of all accounts the "Defendant has reason to believe are or were registered to that Plaintiff."

Plaintiffs never represented that identification of known accounts was preclusive – throughout discovery Plaintiffs have testified that they used certain of Defendants' platforms (and in some cases created multiple accounts or used accounts belonging to others) but do not recall user name or password information. Defendants never represented that they comprehensively have identified all accounts belonging to Plaintiffs, and they never represented that they have the ability to comprehensively identify all accounts belonging to Plaintiffs. For example, Plaintiffs' counsel recently represented that he found an additional account belonging to a Plaintiff by conducting a Google search, and Plaintiffs asked that the court order Defendants to conduct "enhanced user account identification procedures" to identify all accounts used by Plaintiffs. Defendants argued that they had not been required by prior discovery demands to conduct such searches and that any such process would be unduly burdensome. After hearing Plaintiffs' Motion, the court denied it. (Minute Order of Oct. 20, 2025 denying Plaintiffs' Motion to Compel Meta and Snap to Conduct Enhanced User Account Identification.) Thus, in this litigation, neither side has been required to certify that all user accounts used at any time by each Plaintiff have been identified.

The fact that a Plaintiff cannot identify each and every social media account she may have used as a minor is not inconsistent with testimony by that Plaintiff that she accessed social media accounts that were not formally disclosed in this litigation. Defendants can identify nothing in the UAIO that bars testimony regarding undisclosed accounts merely because a Plaintiff has been unable to recall sufficient information to identify such an account. Defendants argue that Plaintiffs cannot rely on evidence that they did not disclose. (See, e.g., Defs' Reply ISO Joint MILs 1-8, at pp. 6-7.) But Plaintiffs have disclosed in this litigation that they used social media outside of the specific accounts that have been disclosed through the UAIO; and Defendants do not show that Plaintiffs are withholding particular evidence from Defendants merely because they say they are incapable of offering sufficient evidence to identify every account linked to their prior social media usage. Nor would admission of testimony by Plaintiffs regarding undisclosed accounts be unduly prejudicial to Defendants. Defendants will be free to explain to the jurors that there is no evidence of such accounts beyond the testimony of Plaintiffs.

In opposing Defendants' Motion, Plaintiffs have presented no evidence tending to show that Defendants failed to meet their discovery obligations in

identifying accounts pursuant to the UAIO.  Given the lack of such evidence, it would be improper for Plaintiffs' counsel to suggest to the jury that there are additional accounts used by Plaintiffs which Defendants were *required* to locate in this litigation but did not locate.  However, Plaintiffs' counsel is not precluded from arguing that there may be additional accounts belonging to Plaintiffs that have not been located by Defendants.

Date: 01/6/2026

Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court

E-Served: Jan 6 2026 1:51PM PST Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/06/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Defendants' Joint MIL 8: To Exclude Evidence of Harms Allegedly Suffered by Non-Plaintiff Social Media Users**

Court's Ruling:  The Motion is denied.


        Defendants move to "exclude evidence and argument concerning any alleged harms suffered by those other social media users, and any treatment they received, purportedly because of their social media use."  (Defs' Joint MILs 1-8, at p. 29.)  Defendants argue that such evidence is irrelevant and prejudicial.  Defendants argue that the evidence would distract the jury and necessitate undue consumption of time.  In short, Defendants appear to request that the court exercise its discretion to exclude the evidence under Evidence Code section 352.

        In their two-paragraph Motion, Defendants fail to identify any specific evidence that they seek to exclude at trial.  As Plaintiffs point out, "[i]t is unclear whether Defendants seek to exclude certain harms, or harms to certain persons, or the fact others have been harmed by the same products, or the number of persons harmed by their products."  (Pls' Opp. Defs' Joint MILs 1-8, at p. 28.)  Defendants' Motion thus fails to comply with Local Rule 3.57, which requires a party filing a motion in limine to identify the specific matter alleged to be inadmissible.  Because the court does not know with any specificity what type of evidence Defendants seek to exclude, "the court cannot intelligently rule on admissibility" as to the broad category of evidence to which Defendants refer.  (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 671.)

Evidence that social media users—other than Plaintiffs—have been harmed by use of Defendants' platforms is relevant to Plaintiffs claims.  As Plaintiffs correctly explain, "[e]vidence that Defendants' platforms harmed others supports Plaintiffs' core issues of failure to warn, causation, corporate knowledge, and punitive damages."  (Pls' Opp. Defs' Joint MILs 1-8, at p. 30.)  Plaintiffs' general causation experts—whom this court has already determined may testify at trial—offer general causation testimony in part based on evidence and conclusions regarding how social media platforms cause mental health harms to non-party users of those platforms.  Defendants' broad request in their Motion could improperly exclude such expert testimony, despite its probative value.  Moreover, evidence of harm occurring to non-parties is also relevant to the question of whether Defendants knew or should have known that their platforms were causing harm, and whether they should have warned Plaintiffs of such harms.  Defendants insist that "the Due Process Clause forbids the imposition of punitive damages 'to punish a defendant for injury that it inflicts upon nonparties.' "  (Defs' Reply ISO Defs' MILs 1-8, at p. 22, quoting *Philip Morris USA v. Williams* (2007) 549 U.S. 346, 353 (*Philip Morris*).)  Be that as it may, it is also true that "[e]vidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible … ."  (*Philip Morris*, at p. 355.)

In their Reply Brief, Defendants seem to retreat somewhat to an argument that evidence of other users' injuries must be "substantially similar" to a particular Plaintiff's alleged injuries.  (Reply at pp. 21-22.)  Defendants provide no specific evidence that will or may be offered at trial that does not meet this test.  The general causation testimony that this court has held to be admissible, for example, addresses substantially similar harm suffered by minors from the same or substantially similar social media features and interactions.

Given the significant probative value of such evidence, it would be improper to exclude it under section 352.  Defendants fail to demonstrate a risk of undue prejudice or jury confusion resulting from admission of the evidence.

Date: 1/6/2026

_____
Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court

**FILED**
Superior Court of California
County of Los Angeles

01/06/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Defendants' Joint MIL 22: To Exclude Evidence of or Reference to Features Not Alleged to Have Harmed Plaintiffs**

Court's Ruling:  The Motion is denied.


Defendants move for an order prohibiting Plaintiffs from presenting any evidence or argument related to features on Defendants' platforms that they do not claim caused them harm.  Relying on each Plaintiff's Plaintiff Fact Sheets (PFS) and on testimony provided in this action, Defendants list the specific design features found on the platforms that are not alleged to have caused each Plaintiff's harms.  (Def's Joint MILs 22-24, at pp. 6-8.) Defendants argue that evidence regarding such features should be excluded under Evidence Code section 352.


Plaintiffs dispute the factual claim that they did not interact with all of the features on Defendants' platforms.  Plaintiffs convincingly argue that the mere fact that a Plaintiff did not specifically mention a given feature does not mean that that Plaintiff, when using the platform, did not interact with that feature.  As presented, Plaintiffs' case is that design features of the platforms function together to make the platforms addictive and thereby cause mental health harms.  There is no legal or factual support for the conclusion that this court must accept and impose Defendants' feature-by-feature approach to liability: the task for this court is instead to make sure that liability is not improperly premised on third-party *content* present on the platforms.

1

Moreover, Defendants' argument that responses to PFSs have a preclusive effect is procedurally incorrect.  The PFSs were completed by Plaintiffs at the outset of the litigation.  Subsequently, Plaintiffs had an opportunity for discovery to understand how the design choices of Defendants as reflected in the platforms' operations affected them and contributed to the harms they allege.  Moreover, subsequent to completing PFSs Plaintiffs had the benefit of the opinions of general and special causation experts whose expertise further disclosed how the features of Defendants' platforms may have interacted to allegedly cause addiction and resulting mental health harms.  Arbitrarily excluding evidence of certain features would present a distorted picture of how the platforms actually operated when used by Plaintiffs.  Evidence of the platforms' design and operation is directly relevant to this case and must be accorded significant probative value.

It is difficult to provide any meaningful guidance based on this Motion in Limine.  A Motion in Limine must provide "[s]pecific identification of the matter alleged to be inadmissible and prejudicial."  (Los Angeles County Local Rule 3.57(a)(1).)  Here Defendants seek to preclude reference to platform features not specifically identified in PFSs, which is inappropriate for the reasons stated above.  Any other limitation regarding relevance is simply too ill-defined.  To be sure, it may be that certain features of some Defendants' platforms had no relationship to the harm alleged by some Plaintiffs.  For example, geolocation, while central to the claims of a Plaintiff who alleges that a predatory third party used that feature to locate and harm that Plaintiff, may have no relationship to the harm suffered by a Plaintiff who either did not use a platform with that feature or whose privacy was unaffected by that feature.

Date: 1/6/2026

_____
Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court

E-Served: Jan 6 2026  1:51PM PST  Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/06/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Defendants' Joint MIL 25: To Exclude Testimony by Treating Physicians and Therapists Outside the Scope of Their Care and Treatment of Each Plaintiff, Including General Causation Opinions**

Court's Ruling:  The Motion is denied.


Defendants move to exclude any and all testimony from Plaintiffs' treating physicians and therapists that is not based on their care and treatment of each Plaintiff, including general causation opinions.  Defendants cite what they believe are examples of Plaintiffs' counsel eliciting general causation testimony from treating physicians during their depositions.  (Defs' Joint MILs 25-28, at p. 12.)  Defendants argue that it would be improper and unfair to admit such testimony at trial because these treating physicians and therapists "have not been designated as experts in this case, did not provide expert reports and reliance materials, and otherwise did not comply with the requirements governing expert opinion testimony under California law." (Defs' Joint MILs 25-28, at p. 10.)

Plaintiffs respond as follows:

> Defendants fundamentally mischaracterize the scope of permissible treating physician testimony and would deprive the jury of essential information needed to understand the treatment provided to Plaintiffs. Treating physicians may— and routinely do—provide case-specific opinions regarding factors that impact their patients' conditions and treatment.

(Pls' Opp. Defs' Joint MILs 25-28, at p. 1.)  Plaintiffs explain that "[e]xcluding this testimony would prevent the jury from understanding why treating physicians made certain treatment decisions, how physicians assessed their patients' condition, the relationship between treatment and the patients' social media use, or the complete picture of the patients' care and recovery."  (Pls' Opp. Defs' MILs 25-28, at p. 4.)

"[T]he trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following: (a) List that witness as an expert under Section 2034.260. (b) Submit an expert witness declaration. (c) Produce reports and writings of expert witnesses under Section 2034.270. (d) Make that expert available for a deposition under Article 3 (commencing with Section 2034.410)."  (Code Civ. Proc., § 2034.300, emphasis added.)

Section 2034.300 does not apply in its entirety to treating physicians, however.  "Retained experts must be designated, and the designation must be accompanied by the 'expert witness declaration' ... . But treating physicians are not 'retained experts' ..., and no expert declaration is required when a party intends to call a treating physician for the purpose of eliciting expert testimony; it is sufficient if a treating physician is identified by name and address in the proponent's designation of expert witnesses."  (*Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1422-1423.)

Defendants are incorrect that Plaintiffs' failure to submit expert reports means that Plaintiffs' treating physicians and therapists cannot offer expert opinions related to their treatment and diagnosis of Plaintiffs.  The California Supreme Court has explained:

> For such a witness [a treating physician], no expert witness declaration is required, and he may testify as to any opinions formed on the basis of facts independently acquired and informed by his training, skill, and experience. This may well include opinions regarding causation and standard of care because such issues are inherent in a physician's work. An opposing party would therefore be prudent to ask a treating physician at his deposition whether he holds any opinions on these subjects, and if so, in what manner he obtained the factual underpinning of those opinions.

(*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 39.)  When a treating physician determines that use of a social media platform has caused a Plaintiff to suffer mental health harms, that physician may do so based on

background knowledge that could be characterized as "general causation testimony."  Nonetheless, such testimony is admissible despite the absence of an expert report, as long as that testimony remains tethered to the treatment and diagnosis of the particular Plaintiff.  A physician does not treat and diagnose a patient in a vacuum.

Defendants do not contend that they have been deprived of the opportunity to depose Plaintiffs' treating physicians.  As is evident from Defendants' moving papers, the Plaintiffs' treating physicians have been deposed.  Defendants argue that they "were never properly notified of Plaintiffs' treaters' qualifications or any fees they might have charged, and, thus, Defendants did not depose them as experts."  (Motion at p. 13.)  But any failure to formally list the treating physicians and therapists as "experts" was not "unreasonable" under section 2034.300.  Both Defendants and Plaintiffs have long been aware that the treating physicians and therapists would be offering expert opinions, including opinions about whether social media use caused a Plaintiff's alleged harms.  As physicians and therapists, their qualifications obviously were relevant and could be inquired into at their depositions.  Any issue regarding fees apparently were taken care of as part of the deposition process.  Any failure to formally list the treating physicians and therapists as "experts" cannot be analogized to cases where the party failed to indicate that a treating physician would provide *any* testimony, resulting in the opposing party's failure to depose that physician before trial.  (See, e.g., *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1684 disapproved of on other grounds by *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30.)  Defendants have not shown that they would be unfairly prejudiced by allowing the Plaintiffs' physicians and therapists to testify within the scope of testimony permitted by California law, including opinions regarding causation that are inherent in a treating physician's work.

Date: 01/06/2026

Carolyn B. Kuhl / Judge

Judge of the Los Angeles Superior Court

**FILED**
Superior Court of California
County of Los Angeles

01/06/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Trial 1 Bellwethers' Motions in limine to Exclude "Time Spent" and "Session" Usage Data by Defendants [MIL No. 1 of 16]**

Court's Ruling:  The Motion is denied.


Plaintiffs move to exclude Defendants' "time spent" and "session" data from trial.  Plaintiffs argue that the data should be excluded entirely from trial because Plaintiffs believe it is "incomplete, unreliable, and in some cases unverifiable due to destroyed or missing source records … ."  (Pls' Not. Mot., at p. 2.)  Plaintiffs seek to exclude Defendants' data pursuant to Evidence Code section 210 and 352.

According to Plaintiffs: (1) "Meta's 'time spent' and 'session' metrics are incomplete, inconsistent, and cannot be verified because they depend on underlying 'taps' data—the raw logs of every swipe, scroll, and touch a user performs"; (2) "Snap's 'time spent' and 'session' metrics are similarly incomplete"; (3) "TikTok's 'time spent' and 'session' metrics suffer from significant gaps that make its reported averages unreliable"; and (4) "YouTube's datasets suffer from the same reliability problems as the other Defendants, rendering them unsuitable for expert reliance or summary judgment."  (Pls' Mot., at pp. 1-6.)  Defendants, for their part, present evidence to show that their data are reliable.  (Defs' Opp., at pp. 7-16.)

In essence, Plaintiffs thus present argument for why Defendants' data—which are collected and maintained in the normal course of business— are insufficient to accurately reflect Plaintiffs' real usage of the platforms.

Plaintiffs thus present an argument that must be heard by the trier of fact when weighing the evidence.

The usage data is of course relevant at trial; Plaintiffs cannot show otherwise.  Evidence is relevant if it has "*any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210, emphasis added.)  Plaintiffs admit that the question of "how much and how often Plaintiffs used these platforms" is one of the "central issues in this case."  (Pls' Mot., at p. 1.)  Data as to that usage—even if incomplete—are thus extremely relevant at trial.  Plaintiffs take "too narrow a view of relevancy": any supposed incompleteness of Defendants' data "goes to the weight of the evidence, not its admissibility." (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1514.)

Plaintiffs argue that the data, even if relevant, should be excluded under Evidence Code section 352 because the admission of the data at trial "would create substantial danger of undue prejudice, confuse the issues, and mislead the jury."  (Pls' Mot., at p. 9.)  Plaintiffs essentially take the position that evidence that one party believes is insufficient to prove a certain fact is necessarily prejudicial to the party opposing the admission of such evidence. Plaintiffs' position does not accord with California procedure.  The accuracy of Defendants data—as well as Plaintiffs' claims about their own usage—is a disputed question of fact that must be submitted to the jurors, who will then have to decide the question of Plaintiffs' actual usage.  The supposed incompleteness of Defendants' data is an issue for the jury to weigh as the trier of fact.  And the apparent deficiencies in Defendants' data will not confuse the issues or mislead the jury: Plaintiffs will be free to explain their view that Defendants' data is a flawed measure of Plaintiffs actual usage of the platforms.

In their Reply, Plaintiffs request that admission of the data come with certain "limitations on how Defendants use it":

> Defendants and their witnesses should not be allowed to extrapolate from the usage data to draw conclusions about Plaintiffs' engagement with their platforms over periods of time that are not captured by the data. Further, neither Defendants nor their experts should be permitted to present their usage data as conclusive proof of Plaintiffs' total usage given its known limitations.

(Pls' Reply, at p. 1.)  This request is denied because it was not included in the original Motion and Defendants did not have a full opportunity to respond to it in their Opposition.  Moreover, the request fails to provide

adequate support for the claim that data regarding Plaintiff's usage during certain time periods is entirely irrelevant to a Plaintiff's usage during other periods of time.  It is not this court's role to tell the jurors that, in effect, they must assume that Plaintiffs' usage during time periods for which there is no data was substantially different from usage during time periods for which Defendants have data.  As the triers of fact, the jurors must determine what weight to give the incomplete data.

Date: 01/6/2026

Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court

E-Served: Jan 6 2026 1:51PM PST Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/06/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
                A. Rosas

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Plaintiff K.G.M.'s Motion in Limine to Exclude "Pencil Incident" Evidence**

**Plaintiff K.G.M.'s Motion in Limine to Exclude Irrelevant and Unduly Prejudicial Evidence Concerning Sexual Activity or Communications [MIL No. 1 of 6]**

Court's Ruling:  The court orders the parties to meet and confer to attempt to agree on (1) how the "Pencil Incident" can be described in a manner that indicates the seriousness of the allegation but does not invite juror speculation as to whether K.G.M. in fact engaged in the alleged conduct, and (2) how the context for the peer bullying K.G.M. experienced can be described in a manner that indicates it involved accusations a teen would find highly disturbing.  Insofar as the allegations are described as being of a sexual nature, the description should be generalized to avoid, to the extent possible, inflaming and confusing the jury.  The parties are to report back to the court regarding the outcome of their meet and confer discussions by January 14, 2025.

        K.G.M. has filed two Motions in Limine that seek to exclude certain evidence of allegations that she engaged in particular sexual activity.  Defendants seek to present evidence of these allegations to show that K.G.M.'s mental health was affected by peer "bullying" using these allegations (which K.G.M. says are false) and by the consequences of such allegations.  Importantly, in opposing both Motions in Limine, Defendants

agree that the relevance of the evidence turns on the effects and consequences of the accusations on K.G.M.'s mental health regardless of the truth of the allegations.  Defendants therefore concede that the truth of the allegations is not an issue in this litigation.

*Background Concerning the Alleged "Pencil Incident"*

K.G.M. moves to exclude evidence regarding "an allegation by one of KGM's peers that she placed a pencil in her vagina and made peers look" (Pencil Incident).  (Pl's Not. Mot., at p. 1.)  Plaintiffs further explain:

> The "Pencil Incident" refers to an allegation by two of KGM's peers that KGM placed a pencil in her vagina and made students look. The principal discussed the allegation in a meeting with KGM's mother. KGM received detention and was suspended. The school did not adequately perform due diligence with respect to the allegation.
> KGM denies the allegation. (KGM Dep. at 219:22-24 ["Q. Did you stick a pencil in your vagina and have your peers look? A. No."].) Her mother also claims it did not happen. (KAG Dep. at 205:10-22 [KGM "didn't stick the pencil in [her vagina]."].) KGM told the school that the allegation was not true. (KGM Dep. at 220:20-22.) She explained that the student who reported the alleged incident to the principal was "known for being a liar and spreading stuff about people," and that KGM previously "had a falling out" with the student. (*Id.* at 220:10-17.) The school did not adequately investigate the allegation. (*Id.* at 220:23-221:1.)

(Pl's Mot., at p. 1.)

Defendants have pointed to evidence tending to show that the "Pencil Incident" significantly affected K.G.M.'s mental health.  Indeed, both Defendants' and Plaintiffs' experts have opined that the fallout from the peer allegations concerning the "Pencil Incident" caused K.G.M. serious mental harm, including suicidal ideation.  As K.G.M. points out in the Reply, one of Defendants' experts has concluded that mental health harms arose, in part, from the fact that K.G.M. believes "she was wrongly accused by her classmates of participating in a sexual act."  (Pls' Reply, at p. 2, internal citations and quotation marks omitted.)  Defendants are thus correct when they state that, "regardless of whether the sex act at issue occurred, evidence related to the pencil incident (and the bullying that took place as a result) is relevant to demonstrate alternate causation … ."  (Defs' Opp., at p. 5.)

However, as stated above, Defendants agree that it is irrelevant whether K.G.M. actually placed a pencil in her vagina.  Given the sensitive nature of the alleged facts, it would be improper to allow Defendants to introduce evidence for the purpose of showing that K.G.M. did in fact engage in the act of which she was accused.  The relevance of the evidence turns on the effects and consequences of the accusation on K.G.M.'s mental health, regardless of the truth of the allegations that led to her suspension and the reactions of her peers.

*Background Concerning K.G.M.'s Alleged Sexual Activity or Communications*

K.G.M. also moves to exclude evidence regarding K.G.M.'s "sexual activity and graphic communications of a sexual nature."  (Pl's Not. Mot., at p. 2.)  "K.G.M. moves to exclude … social media posts, messages, communications, testimony, or other references to sexual activity, including offering compensated sexual exchanges, sexually explicit conversations, discussions of sexual fantasies, details of unsubstantiated sexual activity, and discussions of alleged sexual contact with animals."  (Pl's Mot., at p. 1.) K.G.M. contends that "[n]one of Defendants' experts connect any of this alleged conduct or any of the communications at issue to K.G.M.'s injuries." (Pl's Mot., at p. 1.)

In their Opposition, Defendants state that these communications are relevant to show that the bullying K.G.M. suffered caused her claimed mental health harms.  According to Defendants, the communications themselves (and evidence suggesting that K.G.M. engaged in certain sexual activity) are relevant because K.G.M. was bullied due to rumors that K.G.M. engaged in certain sexual activities.

While instances of bullying are relevant to the cause of K.G.M.'s alleged mental health harms, whether that bullying was based on events or communications that *actually* occurred prior to the bullying is irrelevant to the question of causation.  Defendants do not argue that evidence that K.G.M. engaged in the mentioned sexual acts or discussed certain sexual acts in the communications would themselves be relevant in any way at trial. Defendants contend that the jury would be unable to assess the bullying without admission of the referenced communications.  (See, e.g., Defs' Opp., at p. 2 [suggesting that the communications provide needed "context" for the bullying].)

*Discussion*

Evidence of a party's sexual activity "is highly prejudicial and inflammatory." (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1034.)  In addition, in this case allowing the jury to hear details of the "context" for the peer bullying that Defendants contend caused K.G.M.'s mental health harms would tend to confuse the jury because it would suggest that it is relevant for the jury to determine whether or not K.G.M. in fact engaged in the inflammatory sexual activity (putting a pencil in her vagina, engaging in compensated sex, having sexual contact with her dog) that was the subject of the bullying.  Under Evidence Code section 352, the probative value of the specific facts of the alleged sexual activity is overwhelmed by (1) the potential that the jury would be misled and would believe that whether or not K.G.M. engaged in the alleged sexual activity is relevant, and (2) the undue consumption of time necessary to allow Defendants to introduce evidence of the details of the alleged sexual activity and to allow Plaintiff to deny the specifics of the conduct of which she was accused by peers.

Nevertheless, Defendants are correct that they are entitled to present evidence of alternative causes for K.G.M.'s alleged emotional distress, and that the hurtful nature of the peer bullying would be better understood by the jury if the jurors were given some idea of the nature of K.G.M.'s peers' accusations.  This is particularly true regarding the "Pencil Incident," because the consequences of the accusation affected K.G.M.'s status at her school and both sides agree it caused her emotional harm, including suicidal ideation.

At oral argument on these two Motions in Limine, counsel on both sides indicated a willingness to meet and confer to attempt to agree on descriptive terminology for the nature of the allegations that K.G.M.'s peers made regarding her.  The court is grateful for this suggestion, and orders the parties to meet and confer to attempt to agree on (1) how the "Pencil Incident" can be described in a manner that indicates the seriousness of the allegation but does not invite juror speculation as to whether K.G.M. in fact engaged in the alleged conduct, and (2) how the context for the peer bullying K.G.M. experienced can be described in a manner that indicates it involved accusations a teen would find highly disturbing.  Insofar as the allegations are described as being of a sexual nature, the description should be generalized to avoid, to the extent possible, inflaming and confusing the jury.

Date: 01/06/2026

Carolyn B. Kuhl / Judge
Judge of Los Angeles Superior Court

E-Served: Jan 6 2026 1:51PM PST Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/06/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
              A. Rosas

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Plaintiff K.G.M.'s Motion in Limine to Exclude "Pencil Incident" Evidence**

**Plaintiff K.G.M.'s Motion in Limine to Exclude Irrelevant and Unduly Prejudicial Evidence Concerning Sexual Activity or Communications [MIL No. 1 of 6]**

Court's Ruling:  The court orders the parties to meet and confer to attempt to agree on (1) how the "Pencil Incident" can be described in a manner that indicates the seriousness of the allegation but does not invite juror speculation as to whether K.G.M. in fact engaged in the alleged conduct, and (2) how the context for the peer bullying K.G.M. experienced can be described in a manner that indicates it involved accusations a teen would find highly disturbing.  Insofar as the allegations are described as being of a sexual nature, the description should be generalized to avoid, to the extent possible, inflaming and confusing the jury.  The parties are to report back to the court regarding the outcome of their meet and confer discussions by January 14, 2025.


        K.G.M. has filed two Motions in Limine that seek to exclude certain evidence of allegations that she engaged in particular sexual activity.  Defendants seek to present evidence of these allegations to show that K.G.M.'s mental health was affected by peer "bullying" using these allegations (which K.G.M. says are false) and by the consequences of such allegations.  Importantly, in opposing both Motions in Limine, Defendants

agree that the relevance of the evidence turns on the effects and consequences of the accusations on K.G.M.'s mental health regardless of the truth of the allegations.  Defendants therefore concede that the truth of the allegations is not an issue in this litigation.

    *Background Concerning the Alleged "Pencil Incident"*

   K.G.M. moves to exclude evidence regarding "an allegation by one of KGM's peers that she placed a pencil in her vagina and made peers look" (Pencil Incident).  (Pl's Not. Mot., at p. 1.)  Plaintiffs further explain:

> The "Pencil Incident" refers to an allegation by two of KGM's peers that KGM placed a pencil in her vagina and made students look. The principal discussed the allegation in a meeting with KGM's mother. KGM received detention and was suspended. The school did not adequately perform due diligence with respect to the allegation.
>
> KGM denies the allegation. (KGM Dep. at 219:22-24 ["Q. Did you stick a pencil in your vagina and have your peers look? A. No."].) Her mother also claims it did not happen. (KAG Dep. at 205:10-22 [KGM "didn't stick the pencil in [her vagina]."].) KGM told the school that the allegation was not true. (KGM Dep. at 220:20-22.) She explained that the student who reported the alleged incident to the principal was "known for being a liar and spreading stuff about people," and that KGM previously "had a falling out" with the student. (*Id.* at 220:10-17.) The school did not adequately investigate the allegation. (*Id.* at 220:23-221:1.)

(Pl's Mot., at p. 1.)

   Defendants have pointed to evidence tending to show that the "Pencil Incident" significantly affected K.G.M.'s mental health.  Indeed, both Defendants' and Plaintiffs' experts have opined that the fallout from the peer allegations concerning the "Pencil Incident" caused K.G.M. serious mental harm, including suicidal ideation.  As K.G.M. points out in the Reply, one of Defendants' experts has concluded that mental health harms arose, in part, from the fact that K.G.M. believes "she was wrongly accused by her classmates of participating in a sexual act."  (Pls' Reply, at p. 2, internal citations and quotation marks omitted.)  Defendants are thus correct when they state that, "regardless of whether the sex act at issue occurred, evidence related to the pencil incident (and the bullying that took place as a result) is relevant to demonstrate alternate causation … ."  (Defs' Opp., at p. 5.)

However, as stated above, Defendants agree that it is irrelevant whether K.G.M. actually placed a pencil in her vagina.  Given the sensitive nature of the alleged facts, it would be improper to allow Defendants to introduce evidence for the purpose of showing that K.G.M. did in fact engage in the act of which she was accused.  The relevance of the evidence turns on the effects and consequences of the accusation on K.G.M.'s mental health, regardless of the truth of the allegations that led to her suspension and the reactions of her peers.

*Background Concerning K.G.M.'s Alleged Sexual Activity or Communications*

K.G.M. also moves to exclude evidence regarding K.G.M.'s "sexual activity and graphic communications of a sexual nature."  (Pl's Not. Mot., at p. 2.)  "K.G.M. moves to exclude … social media posts, messages, communications, testimony, or other references to sexual activity, including offering compensated sexual exchanges, sexually explicit conversations, discussions of sexual fantasies, details of unsubstantiated sexual activity, and discussions of alleged sexual contact with animals."  (Pl's Mot., at p. 1.) K.G.M. contends that "[n]one of Defendants' experts connect any of this alleged conduct or any of the communications at issue to K.G.M.'s injuries." (Pl's Mot., at p. 1.)

In their Opposition, Defendants state that these communications are relevant to show that the bullying K.G.M. suffered caused her claimed mental health harms.  According to Defendants, the communications themselves (and evidence suggesting that K.G.M. engaged in certain sexual activity) are relevant because K.G.M. was bullied due to rumors that K.G.M. engaged in certain sexual activities.

While instances of bullying are relevant to the cause of K.G.M.'s alleged mental health harms, whether that bullying was based on events or communications that *actually* occurred prior to the bullying is irrelevant to the question of causation.  Defendants do not argue that evidence that K.G.M. engaged in the mentioned sexual acts or discussed certain sexual acts in the communications would themselves be relevant in any way at trial. Defendants contend that the jury would be unable to assess the bullying without admission of the referenced communications.  (See, e.g., Defs' Opp., at p. 2 [suggesting that the communications provide needed "context" for the bullying].)

*Discussion*

Evidence of a party's sexual activity "is highly prejudicial and inflammatory." (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1034.)  In addition, in this case allowing the jury to hear details of the "context" for the peer bullying that Defendants contend caused K.G.M.'s mental health harms would tend to confuse the jury because it would suggest that it is relevant for the jury to determine whether or not K.G.M. in fact engaged in the inflammatory sexual activity (putting a pencil in her vagina, engaging in compensated sex, having sexual contact with her dog) that was the subject of the bullying.  Under Evidence Code section 352, the probative value of the specific facts of the alleged sexual activity is overwhelmed by (1) the potential that the jury would be misled and would believe that whether or not K.G.M. engaged in the alleged sexual activity is relevant, and (2) the undue consumption of time necessary to allow Defendants to introduce evidence of the details of the alleged sexual activity and to allow Plaintiff to deny the specifics of the conduct of which she was accused by peers.

Nevertheless, Defendants are correct that they are entitled to present evidence of alternative causes for K.G.M.'s alleged emotional distress, and that the hurtful nature of the peer bullying would be better understood by the jury if the jurors were given some idea of the nature of K.G.M.'s peers' accusations.  This is particularly true regarding the "Pencil Incident," because the consequences of the accusation affected K.G.M.'s status at her school and both sides agree it caused her emotional harm, including suicidal ideation.

At oral argument on these two Motions in Limine, counsel on both sides indicated a willingness to meet and confer to attempt to agree on descriptive terminology for the nature of the allegations that K.G.M.'s peers made regarding her.  The court is grateful for this suggestion, and orders the parties to meet and confer to attempt to agree on (1) how the "Pencil Incident" can be described in a manner that indicates the seriousness of the allegation but does not invite juror speculation as to whether K.G.M. in fact engaged in the alleged conduct, and (2) how the context for the peer bullying K.G.M. experienced can be described in a manner that indicates it involved accusations a teen would find highly disturbing.  Insofar as the allegations are described as being of a sexual nature, the description should be generalized to avoid, to the extent possible, inflaming and confusing the jury.

Date: 01/06/2026

Carolyn B. Kuhl / Judge
Judge of Los Angeles Superior Court

FILED
Superior Court of California
County of Los Angeles

01/06/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____  Deputy
                A. Rosas

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Plaintiff R.K.C.'s Motion in limine to Exclude Evidence from Father's Disclaimed Accounts and any Related Communications [MIL No. 1 of 5]**

Court's Ruling:  The Motion is granted.


     R.K.C. moves to exclude his "father's private communications with third parties, alleged uncharged criminal conduct, and inappropriate personal activities unrelated to Plaintiff's social media addiction claims."  (Pl's Not. Mot., at p. 2.)  Specifically, R.K.C. refers to five different communications that were sent using Defendants' platforms.  R.K.C. describes the communications as follows:

> These communications were sent by Plaintiff's father to other people, not to or involving the minor Plaintiff. Some messages appear sexual in nature, while others reference the father sharing "pills" with another person. None of these allegations resulted in criminal charges, convictions, or civil adjudications of wrongdoing.

(Pl's Mot., at p. 1.)  R.K.C. argues that these communications are (1) inadmissible as irrelevant, (2) inadmissible under Evidence Code section 1101, and (3) inadmissible under Evidence Code section 352.

     Defendants have presented evidence tending to show that the social media accounts on which the communications were sent were created by

1

R.K.C., and that R.K.C. used or at least had access to these social media accounts. (See Defs' Opp., at pp. 1-2.)  However, there is no evidence showing that R.K.C. saw these particular communications.  Defendants argue that the evidence is relevant to (1) whether the platforms caused R.K.C.'s harms, and (2) whether any warnings would have caused R.K.C.'s father to restrict R.K.C.'s usage.

The communications are inadmissible under Evidence Code section 352, which states that a court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

As for causation, Defendants take the position that the communications "show that lack of support and poor family dynamics, not Defendants' platforms, contributed to R.K.C.'s mental health issues." (Defs' Opp., at p. 3.)  In other words, Defendants seek to show that R.K.C.'s father was not a good parent, and the relevance of such evidence is outweighed by its prejudice.  Insofar as Defendants seek to show that R.K.C.'s father's failure to supervise R.K.C.'s social media use contributed to R.K.C.'s injury, Defendants admit they have admissions from R.K.C.'s father that "he did not monitor his son's social media use, failed to set boundaries, and encouraged his son to create social media accounts … ." (Opposition at p. 3, lines 15-17.)  Evidence about how R.K.C.'s father himself used social media, even on accounts created by R.K.C. at the father's request, is of very little additional probative value.

Weighed against the limited probative value of the communications, is a substantial danger of undue prejudice and of misleading the jury.  The communications involve sex, drugs, and potentially illegal activities that would capture the jurors' attention.  There is a real danger that the jurors would improperly rely on the evidence to reach conclusions about the father's character, and thus conclude that the father engaged in improper conduct in raising and supervising R.K.C. (See Evid. Code, § 1101, subd. (a).)  The communications also distract the jurors' attention away from the truly relevant issues at trial.

Nor are the communications relevant to the failure to warn claim.  The fact that an adult can exchange inappropriate messages (i.e., third-party content) with another adult on a social media platform does not mean that that adult is adequately aware of the dangers for minors associated with that platform's *design features*.  As Plaintiffs put it, "Defendants conflate general awareness of social media content … with the specific warnings at issue:

heightened risks to minors' mental health, addictive design that targeted minors, and features that exploit adolescent psychology … ." (Pls' Reply, at p. 2.) Defendants strenuously argue throughout this litigation (appropriately) that under Section 230 they cannot be held liable for the presence of third-party content on their platforms. Yet in this instance they appear to argue it is relevant that R.K.C.'s father was aware of sexual content on social media but still permitted R.K.C. to access social media. (Opposition at pp. 3-4.) If R.K.C.'s father testifies that he would have taken different action regarding R.K.C.'s social media use had he been warned of sexual content on Defendants' social media sites, R.K.C.'s father *may* open the door to impeachment based on R.K.C.'s father's own social media use. Absent such hypothetical circumstances, R.K.C.'s father's own postings have little probative value as to the failure to warn claims, and, as discussed above, they risk a substantial danger of undue prejudice.

Date: 01/6/2026

Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court