**AMENDED** Exhibit 14

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

```
                                             Page 1

 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE: SOCIAL MEDIA          )
     ADOLESCENT ADDICTION/        )
 4   PERSONAL INJURY PRODUCTS     )
     LIABILITY LITIGATION         ) MDL No. 3047
 5   _____) Case No. 4:22-md-03047-YGR
                                  )
 6   This Document Relates To:    )
                                  )
 7   ALL ACTIONS                  )
     _____)

 8
 9
          ***** HIGHLY CONFIDENTIAL (COMPETITOR) *****
10              PURSUANT TO PROTECTIVE ORDER
11
                VIDEOTAPED DEPOSITION OF
12                LARRY BIRNBAUM, Ph.D.
                   AUGUST 15, 2025
13              9:05 a.m. to 6:29 p.m.
                         at
14              Covington & Burling
          850 10th St NW, Washington, DC 20001
15
16
17
18   Reported By: Amanda Blomstrom, RMR, CRR,
     CSR TX #8785/CA #12681/IL #84-3634
19
20
                 _____
21                  GOLKOW - VERITEXT
               877.370.DEPS | fax 917.591.5672
22                  deps@golkow.com
```

HIGHLY CONFIDENTIAL

Page 2

```
 1                    APPEARANCES
 2   FOR THE PLAINTIFFS:
 3        MOTLEY RICE LLP
          BY: WARREN PREVIN, ESQ.
 4        BY: ABIGAIL BURMAN, ESQ.
          401 9th Street, NW
 5        Suite 630
          Washington, D.C. 20004
 6        202.386.9610
          pwarren@motleyrice.com
 7        aburman@motleyrice.com
 8   FOR THE STATE OF CALIFORNIA:
 9        OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
          BY: MEGAN O'NEILL, ESQ.
10        455 Golden Gate Avenue
          Suite 11000
11        San Francisco, California 94102-7004
          415.510.4400
12        megan.oneill@doj.ca.gov
13   FOR THE STATE OF TENNESSEE:
14        OFFICE OF THE TENNESSEE ATTORNEY GENERAL
          BY: CHRIS A. DUNBAR, ESQ.
15        UBS Tower
          315 Deaderick Street
16        Nashville, Tennessee 37243
          615.741.3491
17        chris.dunbar@ag.tn.gov
18   FOR THE STATE OF NEW JERSEY:
19        OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
          BY: MANDY K. WANG, ESQ.
20        124 Halsey Street
          Fifth Floor
21        Newark, New Jersey 07101
          973.648.2052
22        mandy.wang@law.njoag.gov
```

HIGHLY CONFIDENTIAL

```
                                        Page 3
 1              APPEARANCES (CONT'D)
 2   FOR THE DEFENDANTS META PLATFORMS, INC., F/K/A
     FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC; FACEBOOK
 3   OPERATIONS, LLC; FACEBOOK PAYMENTS, INC.; FACEBOOK
     TECHNOLOGIES, LLC; INSTAGRAM, LLC; SICULUS, INC.;
 4   AND MARK ELLIOT ZUCKERBERG:
 5        COVINGTON BURLING LLP
          BY: MICHAEL N. KENNEDY, ESQ.
 6        BY: ANDREW J. HENLEY, ESQ.
          One CityCenter
 7        850 10th Street, NW
          Washington, D.C. 20001
 8        202.662.5215
          mkennedy@cov.com
 9        ahenley@cov.com
               -and-
10        BY: JUNMO KIM, ESQ.
          The New York Times Building
11        620 Eighth Avenue
          New York, New York 10018-1405
12        ckim@cov.com
13
14
     ALSO PRESENT:
15
          JOHNNATHAN RUFF
16
17   LITIGATION TECHNICIAN:
18        JUSTIN BILY, Novak
19
     VIDEOGRAPHER:
20
          DeSHAWN WHITE, Golkow
21
22
```

HIGHLY CONFIDENTIAL

Page 4

```
 1                    Z O O M   A P P E A R A N C E S
 2
    Annie Kouba, Motley Rice
 3  Chris Chiou, Wilson Sonsini
    Corin Stigall, CO OAG
 4  Elizabeth Orem, CO OAG
    Haylee Privitera, King & Spalding
 5  Jason L. Lichtman, Lieff Cabraser
    Jess Carroll, Motley Rice
 6  Josh Olszewski, CA DOJ
    Katy Lawrimore, Motley Rice
 7  Krislyn Launer, CT OAG
    Kristen Lejnieks, Jones Day
 8  Kristin Huber, Bass Berry & Sims
    Lindsey Barnhart, Covington
 9  Lucy Malone, Wagstaff
    Mandy Wang, NJ OAG
10  Matt Donohue, Wilson Sonsini
    Mohamed.Said, Munger Tolles
11  Patrick Gurski
    Shaheen.Sheikh, CO OAG
12  Steve.Kaufmann, CO OAG
    Tom
13  Verna Pradaxay, NJ OAG
    Zach Richards
14
15
16
17
18
19
20
21
22
```

HIGHLY CONFIDENTIAL

Page 25

1    don't work in neural networks, but I work in the

2    applications of these things to the kinds of problems

3    that are at issue in this case.

4         Q.    Okay.  You said you're not an expert in

5    clinical psychology, neuroscience, psychiatry, and

6    epidemiology, correct?

7         A.    That's true.

8         Q.    Okay.  Are you an expert in any behavioral

9    science?

10        A.    No.

11        Q.    And you haven't authored papers in any of

12   the fields I just mentioned?

13        A.    I've published papers with psychologists,

14   so there might be some papers I've done in

15   psychology, yes.

16        Q.    What papers are those?

17        A.    I did a paper with Doug Medin on decision-

18   making, a number of -- maybe a couple decades ago or

19   something like that.  So papers -- there are

20   occasional papers that were published in psychology

21   journals or conferences or the Cognitive Science

22   Conference that would be -- maybe border on

HIGHLY CONFIDENTIAL

Page 26

```
1    psychology or where I was working with psychologists.
2         Q.    Okay.  But in those papers, you weren't
3    lending your expertise in those particular fields to
4    those works, correct?
5              Let me reask the question.
6              Because you're not an expert in cognitive
7    psychology -- let me reask the question.  Withdrawn.
8              Because you're not an expert in cognitive
9    science or psychology, when you were coauthoring
10   those papers, those were not the fields in which you
11   were offering expertise, correct?
12        A.    I think my colleagues were sufficiently
13   competent to judge whatever I was offering and
14   whether it was valuable or not.
15        Q.    Okay.  You haven't received grant money
16   to study issues within any of the fields that I
17   just mentioned, correct; clinical psychology,
18   neuroscience, psychiatry, epidemiology, behavioral
19   science?
20        A.    Grants.
21              I mean, I might have been on a grant that
22   was involved in a cognitive science project of some
```

HIGHLY CONFIDENTIAL

Page 27

1    kind, but I -- I can't recall.

2         Q.    Okay.  So the best of your recollection,

3    you can't --

4         A.    Best of my recollection.  My focus has

5    been in computer science, obviously.

6         Q.    Okay.  And you haven't taught courses in

7    any of the fields I just mentioned, which, again, are

8    clinical psychology, neuroscience, psychiatry,

9    epidemiology, and behavioral science?

10        A.    I mean, I've taught courses that touch on

11   those or I've co-taught courses with faculty members

12   that might touch on those subjects.

13        Q.    What courses are those?

14        A.    I mean, I think a long time ago I taught a

15   course in cognitive science, an intro course to

16   cognitive science.  I had to teach an HCI course

17   once.  I mean, I think there is a couple of courses

18   along those lines.  That's not really behavioral

19   science, but it's as close as computer science comes,

20   I suppose, to behavioral science.

21        Q.    Okay.  But you don't keep yourself abreast

22   of developments in those fields, right?

Page 28

1        A.     It's not my area of professional

2     expertise, no.  In general, things touch on it.

3        Q.     Okay.  Are you offering any opinions

4     concerning whether use of Meta's products is

5     associated with an increased risk of depression?

6        A.     I'm not.

7        Q.     Are you offering any opinions concerning

8     whether use of Meta's products is associated with an

9     increased risk of anxiety?

10       A.     I'm not.

11       Q.     Are you offering any opinions concerning

12    whether use of Meta's products can cause an increased

13    risk of any mental health problem?

14       A.     I'm not.

15       Q.     Are you offering any opinions whether use

16    of Meta's products by teenagers can lead to an

17    increased risk of eating disorders?

18       A.     No.

19       Q.     Suicidality?

20       A.     No.

21       Q.     Okay.  Is it fair to say at a general

22    level you didn't examine whether or to what extent

HIGHLY CONFIDENTIAL

Page 29

1    Meta's products pose risks of harm to users?

2         A.    I'm not an expert in that area, and I

3    wouldn't offer an opinion in this context around

4    something like that.

5         Q.    Okay.  Are you familiar with the term

6    "problematic use"?

7         A.    I am.

8         Q.    What does that term mean?

9         A.    It was a term used, I mean primarily

10   within Meta itself, to talk about people generally

11   overusing their services, I think using it too

12   frequently or using it too much time or using it at

13   inappropriate times, things that would interrupt

14   the -- interrupt their lives in ways that might be

15   not helpful to them living a healthy life.

16        Q.    Okay.  Are you offering any opinions

17   regarding whether Meta's users experience problematic

18   use?

19        A.    No.

20        Q.    So you aren't offering any opinions

21   regarding whether the design of Meta's products can

22   lead to problematic use for some people?

HIGHLY CONFIDENTIAL

Page 30

1           MR. KENNEDY:   Objection to form.

2           THE WITNESS:   I'm offering opinions about

3    the design of Meta's systems insofar as they lie

4    within my area of expertise, and I think whether they

5    were designed to lead to certain kinds of outcomes,

6    such as problematic -- whether they were specifically

7    designed, for example, in certain ways to encourage

8    problematic use, let's put it that way.

9    BY MR. WARREN:

10       Q.    Okay.  I understand the sentence that you

11   just said, but, respectfully, it wasn't quite an

12   answer to my question.  So let me ask it again, and

13   if it's not clear what I'm asking, you just let me

14   know.

15           Are you offering any opinions regarding

16   whether the design of Meta's products can lead to

17   problematic use for some people?

18           MR. KENNEDY:   Objection to form; asked and

19   answered.

20           THE WITNESS:   I -- I think the answer is

21   no.

22   BY MR. WARREN:

HIGHLY CONFIDENTIAL

Page 134

1    of -- a kind of a cold start problem for content as

2    well.

3              So -- so it's intentional in the

4    sense that Meta -- Meta's systems need to gather

5    information about that content in order to be able to

6    properly recommend it to people.  But it's -- so they

7    do that.  I mean, the alternative would be not

8    introducing new content, I suppose.

9              So if you believe that a functional

10   requirement of a system should be that it can grow

11   and introduce new content, then it's kind of

12   unavoidable as well.

13             But it is intentional because they want to

14   be able to introduce new content.

15   Q.    Okay.  In any event, we have here listed

16   ten reasons for variability in the user feeds of

17   Instagram and Facebook?

18   A.    Correct.

19   Q.    You agree with that?

20             Okay.  Let's talk about an eleventh.

21             When you reviewed Meta's source code, did

22   you see any README files that contained references to

HIGHLY CONFIDENTIAL

Page 220

1      Q.    And "Daily Active Users" is a measure of

2    engagement at the user-wide level, correct?

3      A.    Correct, yes.

4      Q.    Okay.  So is it fair for me, in the

5    aggregate, to put a box around all of these proxies

6    and metrics and to label them "User Engagement"?

7            MR. KENNEDY:  Objection to form.

8            THE WITNESS:  I think in different ways

9    they are measures of user engagement; sometimes in

10   the aggregate, sometimes with respect to individual

11   items, but, yes.

12   BY MR. WARREN:

13     Q.    Okay.  So you're not disputing that Meta's

14   ranking systems employ user engagement objectives,

15   are you?

16     A.    No.

17     Q.    Okay.  And you're not disputing that

18   Meta's ranking algorithm optimizes for engagement

19   proxies, right?

20     A.    Optimizes for engagement proxies.

21           Meta's ranking system is trying to

22   determine what are the most relevant things, safest

HIGHLY CONFIDENTIAL

Page 307

1    opinion about whether Meta should have warned

2    parents, teens, or the public at large about

3    potential harms flowing from its ranking algorithm;

4    yes or no?

5         A.    I am not a business ethicist, so I'm

6    not -- I'm not offering an opinion on that.

7         Q.    Okay.

8         A.    No.

9         Q.    So before we leave this document, can you

10   turn to Slide 22, please.

11        A.    This is the same document?

12        Q.    Yes, indeed.

13        A.    Page 22?

14        Q.    Yes, sir.

15        A.    Okay.  Thank you.

16        Q.    What's the title of this slide?

17        A.    It's called:  Monetizable Users of Value.

18        Q.    "Monetizable User Value"?

19        A.    Correct.

20        Q.    And do you see it defines that term in the

21   first bullet?

22        A.    The weighted sum, the time spent,

HIGHLY CONFIDENTIAL

Page 308

1   monetization efficiency of that time spent, yes.

2        Q.    So to put that in plain English.  Meta

3   tracks how much money it can earn from every minute

4   someone spends on Facebook, right?

5        A.    That's right.

6        Q.    Okay.  Can you flip one slide forward.

7        A.    To the previous slide.

8        Q.    Can you direct your attention to the first

9   bullet at the bottom, please, under "Methodology

10  Details."

11       A.    This is under the one that begins, "For

12  the first time in recent years"?

13       Q.    Sorry, I meant the next slide-slide, not

14  the next page.  It begins with "Monetizable User

15  Value - Product Breakdown."

16       A.    Okay.  Yes.  Thank you.

17       Q.    Okay.  You see the first bullet at the

18  bottom?

19       A.    I do.

20       Q.    Okay.  And that indicates that monetizable

21  user value was a goal metric, right?

22       A.    Sure.

HIGHLY CONFIDENTIAL

Page 309

1        Q.    Meaning it's measurable and optimizable?

2              MR. KENNEDY:  Objection to form.

3              THE WITNESS:  "Facebook App Fixed MUV."

4    Yes.

5    BY MR. WARREN:

6        Q.    Okay.  You didn't mention monetizable user

7    value as a goal metric in your report, did you?

8        A.    No.

9        Q.    Okay.

10             Time for a break?

11             MR. KENNEDY:  Sure.

12             MR. WARREN:  All right.  Take a quick one.

13    Thank you.

14             THE VIDEOGRAPHER:  The time is 3:22 p.m.

15             We are now off the record.

16             (Recess taken.)

17             THE VIDEOGRAPHER:  The time is 3:36 p.m.

18             We are now on the record.

19    BY MR. WARREN:

20        Q.    Okay.  Let's switch topics.

21             You agree that Meta has no means for

22    assessing the relationships among two or more content

HIGHLY CONFIDENTIAL

Page 310

1   items being considered for inclusion in someone's

2   feed?

3          A.    In general, that's true.

4          Q.    And that's known as pointwise

5   optimization?

6          A.    I think that's what they call it, yes.

7          Q.    Okay.  And it means that Meta's ranking

8   algorithm considers each piece of content in

9   isolation without reference to other pieces of

10  content that might appear before or after in the

11  finalized slate?

12         A.    That's correct.  Modulo some additional

13  things, but that's the basic -- the basic

14  architecture is that, yes.

15         Q.    Did you say "modulo"?

16         A.    I apologize.  There are some other

17  aspects to it, but the basic architecture is as

18  you've described.

19         Q.    Okay.  You agree that content that's not

20  otherwise harmful can become harmful when aggregated

21  in the user's feed, true?

22         A.    I think that's a possibility, yes.

HIGHLY CONFIDENTIAL

Page 319

1          A.     They consistent of separate, separate sets

2    of -- they are separate sets of programs, or, rather,

3    they are -- they consist of sets of programs.  If you

4    want to label one set content moderation and call

5    that a system, I -- I don't see an objection to that.

6    I just don't want to leave the implication that

7    content recommendation is -- is not actually

8    intimately connected with it in a variety of ways.

9    That's all.

10         Q.     I think you've made that point now --

11         A.     Okay.

12         Q.     -- like four or five times.

13         A.     And I apologize for being repetitive, but

14   I -- but I --

15         Q.     And it's just not an answer to my

16   question.  So you've made the point.

17                My question is simply:  From a software

18   engineering perspective, from the perspective of

19   code, there is a set of programs and protocols that

20   comprise the content moderation system and there is

21   another set of programs and protocols that comprise

22   the content recommendation system.

HIGHLY CONFIDENTIAL

Page 330

1  sequence like this is kind of beyond their

2  capabilities, which, in fact, is one of the points

3  in my -- in my -- in my report.

4  BY MR. WARREN:

5      Q.    Let's posit that the construction of this

6  sequence just happened without there being someone

7  who was orchestrating it in an intentional way with

8  the deliberate goal of harming the user.  Okay?  Can

9  we posit that?  The sequence is just a picture.

10      A.    I don't know how likely the sequence is.

11  I mean, I'd have to go through all the letters.  I

12  mean, this is an extremely unlikely sequence, in

13  fact.  If you went through --

14      Q.    Okay.  Let's change the hypothetical then.

15  Let's say it's a hypothetical that comes from a

16  client example of getting a series of dieting tips

17  that become more and more extreme and that eventually

18  turn into pro-anorexia content and eating disorder-

19  promoting content.  Okay?  And let's posit that none

20  of those individual pieces of content was violative

21  of any content moderation policy on Meta's platform.

22  Can you accept that hypothetical --

HIGHLY CONFIDENTIAL

Page 331

1        A.    So --

2        Q.    -- as we --

3        A.    -- first of all, thank you for giving me a

4   real example --

5        Q.    Sure.

6        A.    -- that actually makes some sense.

7        Q.    Okay.

8        A.    I appreciate that.

9        Q.    And do understand the example?

10       A.    I do.

11       Q.    Okay.

12       A.    Absolutely.

13       Q.    Okay.  And, again, part of this

14   hypothetical is that no individual piece of content

15   on its own is --

16       A.    Might be --

17       Q.    -- violative of a content moderation

18   policy?

19            MR. KENNEDY:  Let him finish.

20            THE WITNESS:  Yeah, none of them by

21   themselves might be particularly problematic.

22   //

HIGHLY CONFIDENTIAL

Page 332

1    BY MR. WARREN:

2        Q.    Okay.  So improving the enforcement of

3    content moderation policies in that example is not

4    going to fix the problem with the sequence, is it?

5        A.    So --

6            MR. KENNEDY:  Objection to form.

7            THE WITNESS:  -- a couple of things to say

8    about this.  I mean, so I guess here we're into a

9    particular kind of problem, which I addressed

10   somewhat in my report and which is raised in the

11   Complaints, concerning sort of focusing in on

12   particular areas of content that are problematic and

13   leading to a user seeing a lot of content in a

14   certain -- in a certain area, which, each by

15   themselves might not be a particular problem, but

16   taken together in the aggregate could be -- could be

17   sort of, let's say, potentially harmful or -- or

18   something that they find objectionable or that is

19   emotionally problematic for them.  This, in fact, as

20   a -- as a sort of a potential extrapolative problem

21   of content recommendation systems, which I discuss in

22   my report and which is discussed of course in the

HIGHLY CONFIDENTIAL

Page 333

1  Complaint and in many of the -- of your experts'

2  reports as well, and, you know, it's a serious

3  problem for the reasons that you are -- and a

4  difficult problem for exactly the reasons that you

5  raise here and that we're now discussing.

6              And so the question becomes, you know,

7  if you're asking me what do -- what can Meta's

8  Recommendation Systems do about this problem --

9  BY MR. WARREN:

10      Q.    Let me pause you there, because I'm not.

11  I'm asking you:  Can Meta's content moderation

12  policies fix that problem?

13              MR. KENNEDY:  Objection to form.

14              THE WITNESS:  Can the content moderation

15  policies by themselves with the current technology?

16  It's -- it would be quite difficult.

17  BY MR. WARREN:

18      Q.    Okay.  Can better enforcement of content

19  moderation policies fix the problem you just

20  identified?

21              MR. KENNEDY:  Objection to form.

22              THE WITNESS:   I think it depends what you

HIGHLY CONFIDENTIAL

Page 353

1    harmful sequences be better if they did this?  I

2    think the answer is yes.  Of course, that would also

3    give them the ability to produce harmful sequences

4    through sort of variations, if -- to the extent that

5    variations in -- in -- in relevance constitute a

6    variable reward schedule and insofar as that actually

7    works, then -- then they would also be able to do

8    that deliberately.

9              But, as you say, they don't, in general --

10   or, as I just said, they don't in general have that

11   capability.

12   BY MR. WARREN:

13        Q.    Okay.  What are filter bubbles?

14        A.    Filter bubbles are, it's akin to some of

15   the problems we just talked about earlier where, in

16   some sense, it's the -- it's a kind of reasonable

17   extrapolation from the way content recommendation

18   systems work; that, because they try to recommend to

19   you content that they think you prefer based on your

20   previous preferences, that you might get into a state

21   where you're always being presented with content with

22   a similar point of view, for example.  That you're

HIGHLY CONFIDENTIAL

Page 354

1   not -- you're not really able to see a bigger

2   picture, that you're kind of trapped in a certain

3   sense, and you keep being reinforced for your beliefs

4   and you don't see things that might contradict those

5   beliefs, for example, or other points of view.  It's

6   often raised in connection with things like political

7   discussion in the country.

8            And, you know, I think it's a -- again,

9   it's a plausible extrapolation of how these things

10  operate, like some of the other problems we talked

11  about previously.

12           I don't know the extent to which it really

13  is a problem.  That would be another kind of computer

14  scientist's job to assess, in some sense.  But I take

15  it for granted that it's a legitimate concern.

16      Q.   Okay.  And it's a legitimate concern, not

17  just in the context of news and misinformation,

18  right?

19           MR. KENNEDY:  Objection to form.

20           THE WITNESS:  It could be.

21  BY MR. WARREN:

22      Q.   Okay.  But you have not examined yourself

HIGHLY CONFIDENTIAL

Page 365

1      Q.    In any event, you don't --

2      A.    It might.

3      Q.    -- dispute the possibility that it might,

4   right?

5      A.    It could.

6      Q.    Okay.  And, again, to be clear, this

7   phenomenon of rabbit-holing can arise with lots of

8   different types of content, right?

9      A.    Correct.

10     Q.    And it arises from the structure of the

11   ranking algorithm, not from any particular kind of

12   content, right?

13          MR. KENNEDY:  Objection to form.

14          THE WITNESS:  So to the extent that the

15   system is trying to present you with content that

16   it will hope you find relevant and interesting

17   because you have found similar content relevant and

18   interesting in the past, or people like you have

19   found similar content interesting and relevant in the

20   past, I think this is a plausible extrapolation of

21   the -- of the operations in these systems that this

22   could arise and it probably does arise.

```
                                             Page 366
 1   BY MR. WARREN:
 2        Q.    Okay.
 3        A.    I don't know for sure or the extent to
 4   which it does --
 5        Q.    Okay.
 6        A.    -- so -- I apologize, what was your
 7   question, though?
 8        Q.    My question was simply that the phenomenon
 9   of rabbit-holing is a -- let me withdraw the
10   question.
11             The phenomenon of rabbit-holing, to the
12   extent it occurs, arises from the operation of the
13   ranking system, not from any particular piece or type
14   of content, right?
15             MR. KENNEDY:   Objection to form.
16             THE WITNESS:   That's correct.
17   BY MR. WARREN:
18        Q.    Okay.  And the phenomenon of filter
19   bubbles, likewise, arise from the operation of the
20   ranking system, not from any particular piece or type
21   of content, right?
22        A.    That's correct.
```

HIGHLY CONFIDENTIAL

Page 468

1    Meta's systems can and maybe do apply different

2    weights for teen users?

3         A.    I've said so in my report.

4         Q.    Okay.  Did you examine how the ranking

5    systems behaves for teen users in particular?

6         A.    As compared with how it would -- would for

7    other people or --

8         Q.    Yeah.

9         A.    I mean, I -- I generally looked and -- I

10   mean, I generally looked and saw that the weights

11   were different, obviously, for teens.  That's what it

12   means to have a distinct value model.

13        Q.    Okay.

14              I'm going to hand you one more piece of

15   code.  This is META3047MDL-SC-001 --

16        A.    Are we done with this one?

17        Q.    Yes.

18        A.    Okay.

19        Q.    -- -00000007.

20        A.    Thank you.

21              Which one am I to look at.

22        Q.    Can you read the name of the feature at

HIGHLY CONFIDENTIAL

Page 469

1    Line 699?

2         A.    It says, "User is at work or school."

3         Q.    So Meta had built the technical capability

4    to infer whether a user was at school?

5         A.    It seems so.

6         Q.    And the code we looked at previously shows

7    that Meta could infer whether a user was a teen?

8         A.    We saw that, yes.

9         Q.    So between the two, Meta could have used

10   these features to suppress notifications to teens

11   during school hours?

12              MR. KENNEDY:  Objection to form.

13              THE WITNESS:  I didn't investigate -- my

14   report does not concern the notification mechanisms

15   of -- I was talking about content recommendation.

16   BY MR. WARREN:

17        Q.    So you don't know whether Meta did that?

18        A.    I don't.

19        Q.    Meta could have used these features to

20   reduce teen engagement with its platforms during

21   school hours, correct?

22        A.    I don't know the answer to that question.

Page 470

1      Q.    Well, are you aware of whether Meta did
2   that?
3      A.    You mean did they send fewer notifications
4   based on this; is that what you're trying to ask?
5      Q.    No.  I'm asking whether Meta changed the
6   value model for teenagers to reduce their usage of
7   the platform during school hours.
8      A.    I -- I don't think so.
9      Q.    Okay.  But it --
10     A.    But I don't know for sure.  But I don't
11  think so.  I saw nothing that looked like that, no.
12     Q.    Okay.  But it --
13     A.    And this refers again to the notification
14  algorithm, as far as I can tell.  Well, I think you
15  mentioned that this was about notifications.  Maybe
16  I'm wrong.
17     Q.    What about that refers to notifications?
18     A.    It doesn't, and I -- maybe I inferred
19  that.  I thought you had mentioned notifications.
20     Q.    Well, it was a question I asked you,
21  but --
22     A.    I see, okay.  So the answer is, I don't

HIGHLY CONFIDENTIAL

Page 471

1    know.

2         Q.    Okay.  But it is clear that they had the

3    ability to do that if they wanted to?

4              MR. KENNEDY:  Objection to form.

5              THE WITNESS:  Could do --

6    BY MR. WARREN:

7         Q.    It's clear, based on this review of code,

8    that Meta could have changed the value model for

9    teenagers to reduce their engagement with their

10   platforms during school hours, correct?

11             MR. KENNEDY:  Objection to form.

12             THE WITNESS:  I don't know the answer to

13   that question.  I didn't consider that.

14   BY MR. WARREN:

15        Q.    So it's possible?

16             MR. KENNEDY:  Objection to form.

17             THE WITNESS:  It might be possible.

18   BY MR. WARREN:

19        Q.    Okay.  We have a little bit of

20   housekeeping to do.  I don't have any other

21   substan- -- well, I actually have one more

22   substantive question.

HIGHLY CONFIDENTIAL

Page 481

1          REPORTER'S CERTIFICATION

        DEPOSITION OF LARRY BIRNBAUM, Ph.D.

2              AUGUST 15, 2025

3       I, Amanda Blomstrom, a Notary Public in and for

4    the District of Columbia, hereby certify to the

5    following:

6       That the witness, LARRY BIRNBAUM, Ph.D., was

7    duly sworn by the officer and that the transcript of

8    the oral deposition is a true record of the testimony

9    given by the witness;

10      That the deposition transcript was submitted to

11   the witness or to the attorney for the witness for

12   examination and signature;

13      I further certify that I am neither counsel for,

14   related to, nor employed by any of the parties or

15   attorneys in the action in which this proceeding was

16   taken, and further that I am not financially or

17   otherwise interested in the outcome of the action.

18      Certified to by me this 18th day of August,

19   2025.

20

        _____

21      Amanda Blomstrom, CRR, RMR, CLR

        Texas CSR No. 8785

22      California CSR No. 12681