# AMENDED Exhibit 1002

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

```
                                            Page 1
 1            UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3    -----------------------------x
      IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No. 4:22-md-
 4    ADDITION/PERSONAL INJURY       ) 3047-YGR
      PRODUCTS LIABILITY LITIGATION  )
 5    -----------------------------x
 6
 7        SUPERIOR COURT OF THE STATE OF CALIFORNIA
 8            FOR THE COUNTY OF LOS ANGELES
 9                SPRING STREET COURTHOUSE
10    COORDINATION PROCEEDING        )
      SPECIAL TITLE [RULE 3,400]     ) Lead Case No. for
11                                   ) Filing Purposes
      SOCIAL MEDIA CASES             ) 22STCV21355
12    _____  )
                                     )
13    This Document Relates to:      )
      STATE OF TENNESSEE, et al.,    )
14        vs.                        )
      META PLATFORMS, INC., and      ) CONTAINS HIGHLY
15    INSTAGRAM, LLC, Case No.       ) CONFIDENTIAL
      23-1364-IV                     ) INFORMATION
16    -----------------------------x
17
18                 V O L U M E   I
19        VIDEOTAPED DEPOSITION OF TANAYA KASAVANA
20                SAN DIEGO, CALIFORNIA
21                 JANUARY 28, 2025
22                     9:14 A.M.
23    Job No.: 7026733
24    Pages: 1 - 350
25    Reported by: Leslie A. Todd, CSR No. 5129 and RPR
```

```
                                          Page 8
 1               P R O C E E D I N G S
 2               -------------------
 3               THE VIDEOGRAPHER:  We are now on
 4         the record.  My name is David Kim.  I'm
 5         a videographer for Golkow.  Today's date
 6         is January 28th, 2025, and the time is
 7         9:14 a.m.
 8               This video deposition is being
 9         held in San Diego, California, in the
10         matter of In Re Social Media Adolescent
11         Addiction/Personal Injury Products
12         Liability Litigation, MDL 3047, in the
13         United States District Court of the
14         Northern District of California.
15               The deponent is Tanaya Kasavana.
16               Will counsel in the room please
17         identify themselves for the record.
18               MR. AUSTIN:  Good morning.  May
19         it please the Court.  Ron Austin on
20         behalf of the school districts, the
21         plaintiffs in the PSC.
22               MS. HAILESELASSIE:  I'm Jade
23         Haileselassie.  I'm with Motley Rice,
24         and I'm appearing for the plaintiffs
25         today as well.
```

```
                                       Page 9
 1              MS. WADHWANI:  Neelum Wadhwani
 2         on behalf of Google, YouTube, and the
 3         witness.
 4              MS. YOUNG:  Sophia Young on
 5         behalf of YouTube.
 6              MS. BAACHUS:  Denisha Baachus on
 7         behalf of Google and YouTube.
 8              MS. MACHOCK:  Samantha Machock
 9         on behalf of Google and YouTube.
10              THE VIDEOGRAPHER:  The court
11         reporter is Leslie Todd, and she will
12         now swear in the witness.
13                 TANAYA KASAVANA,
14         and having been first duly sworn,
15     was examined and testified as follows:
16                  EXAMINATION
17   BY MR. AUSTIN:
18         Q.     Good morning, Ms. Kasavana.
19              MS. HAILESELASSIE:  Did we check
20         the Zoom to see if anyone was joining
21         remotely?
22              THE VIDEOGRAPHER:  We -- we have
23         five on remotely now.
24              MS. HAILESELASSIE:  Okay.  They
25         should announce as well, correct?
```

```
 1                    THE VIDEOGRAPHER:  We do them on
 2          the written record --
 3                    MS. HAILESELASSIE:  Okay.
 4                    THE VIDEOGRAPHER:  -- if that's
 5          okay.
 6                    MS. HAILESELASSIE:  And will
 7          that include Alanna Austin?  She is not
 8          in the room, but she is joining.
 9                    THE REPORTER:  Yes, it will.
10                    MR. AUSTIN:  Are we ready?
11          Let's go.
12     BY MR. AUSTIN:
13          Q.      Good morning, Ms. Kasavana.  How
14     are you, ma'am?
15          A.      I'm well.
16          Q.      Thank you.  Can you introduce
17     yourself to the ladies and gentlemen of the jury,
18     please?
19          A.      My name is Tanaya Kasavana.
20          Q.      Okay.  And I've already introduced
21     myself.  My name is Ron Austin, and I'm here
22     today on behalf of plaintiffs, the school
23     districts and the children and families across
24     the country who alleged harm caused by Google and
25     YouTube, and we sued Google and YouTube in
```

```
                                          Page 11
 1    federal court.
 2              Are you aware of that?
 3         A.        I am.
 4         Q.        Okay.  We're here in San Francisco
 5    this morning to take your deposition.  Have you
 6    ever given a deposition before?
 7         A.        I have not.
 8         Q.        Okay.  This is your first rodeo.
 9         A.        It is.
10         Q.        Yes, ma'am.  Are you committed to
11    testifying truthfully?
12         A.        I am.
13         Q.        Yes, ma'am.  Fair enough.
14              Is there anything that would
15    prohibit you from giving full testimony -- a full
16    deposition today?  Are you tired, sick, on any
17    medications, anything of such?
18         A.        I am not.
19         Q.        Yes, ma'am.  Have you had an
20    opportunity to prepare for this deposition?
21         A.        I have.
22         Q.        Okay.  And how many hours
23    approximately have you spent preparing for this
24    deposition?
25         A.        Approximately ten hours.
```

Page 12

1          Q.        Approximately ten hours.  Have
2     you a -- have you met with anyone outside of your
3     attorneys in preparation for this deposition?
4          A.        I have not.
5          Q.        Have you spoken to anyone outside
6     of your attorneys in preparation for this
7     deposition?
8          A.        I have not.
9          Q.        Okay.  And so there are no text
10    messages, no e-mails in reference to the
11    litigation as a whole?
12         A.        There are not.
13         Q.        During the course of a deposition,
14    it's a question and answer.  I'll ask a question,
15    and I'll wait and allow you to answer.
16                    You just nodded your head yes, and
17    we all do that.  Please note that this particular
18    deposition is being video and audio taped, and so
19    sometimes if you're making head movements, it's
20    not caught.
21                    So I'm going to ask that you give a
22    verbal answer.  Is that fair?
23         A.        That's fair.
24         Q.        I'm also going to ask -- or assume
25    if you answer the question, I will assume you

Page 13

1  understand the question I'm asking.  Is that

2  fair?

3       A.     Yes.

4       Q.     So if I ask a question and you're

5  unsure what I'm asking, please ask me to repeat

6  myself.

7       A.     I will.

8       Q.     Thank you, ma'am.

9              For the record, we usually ask for

10  your address.  If you don't mind, just give us

11  your name and give us your address, please.

12       A.     My home address?

13       Q.     I don't want that on the record.

14  Just give us your office address, and counsel

15  will agree to make sure you are available for

16  whatever reason if you're no longer employed by

17  Google in the future.

18              MS. WADHWANI:  Well, we can take

19        up any questions of availability or

20        unavailability or what Google is or is

21        not willing to do in the event that

22        Ms. Kasavana ultimately leaves Google,

23        but we're not going to agree to that

24        right now today.

25              MR. AUSTIN:  I was just

```
 1        attempting not to have her put her home
 2        address on the record.  That's the sole
 3        purpose of the question.
 4              MS. WADHWANI:  Okay.  We will
 5        remain in contact with Ms. Kasavana.  If
 6        that issue comes up, we will definitely
 7        talk to you about it, and if we need to
 8        make her available, we can provide you
 9        with that information.
10              MR. AUSTIN:  Fair enough.
11   BY MR. AUSTIN:
12        Q.    Ms. Kasavana, which documents did
13   you prepare -- which documents did you review in
14   preparation for your deposition?
15              MS. WADHWANI:  Objection to
16        form, calls for attorney-client
17        privilege, and I'm going to direct the
18        witness not to answer on the basis of
19        privilege.
20              MR. AUSTIN:  Counsel, can you
21        assure us that she has not reviewed any
22        records that was turned over to counsel?
23              MS. WADHWANI:  I can assure you
24        of that.
25              MR. AUSTIN:  Fair enough.
```

Page 15

1    BY MR. AUSTIN:

2         Q.      Ms. Kasavana, in preparation for

3    your deposition, did you take any notes?

4         A.      I did not.

5         Q.      Okay.  Do you have any notes that

6    you created once you got notice you were

7    taking -- you were going to have a deposition?

8         A.      I do not.

9         Q.      And how long have you been aware

10   that you were going to have to give a deposition?

11        A.      Maybe about six months.

12        Q.      About six months now.  And in those

13   six months, how many times have you spoken to

14   your attorneys in preparation?

15        A.      About four.

16        Q.      Anyone else?

17        A.      No.

18        Q.      Fair enough.  I'm going to show you

19   what we're going to mark as Google-YouTube-

20   Kasavana 1, which is our notice.

21                (Google-YouTube-Kasavana

22                Exhibit No. 1 was marked for

23                identification.)

24                MR. AUSTIN:  And for the record,

25        moving forward, they will all be marked

Page 16

1      Google-YouTube-Kasavana, but I may just
2      say "Exhibit" moving forward, and -- I
3      don't want to have to continue to repeat
4      it.
5   BY MR. AUSTIN:
6        Q.      Have you seen the notice, ma'am?
7        A.      I have.
8        Q.      And are you prepared to testify in
9   connection with this notice?
10       A.      I am.
11       Q.      Okay.  Fair enough.
12              And I didn't clear it up earlier.
13              Please understand, Ms. Kasavana,
14   that although we're taking a deposition, it's as
15   if we're in court, and so this testimony may be
16   used for the benefit of the ladies and gentlemen
17   of the jury, and as such proceed accordingly.  Is
18   that fair?
19       A.      I understand.
20       Q.      Okay.  Thank you.
21              Ms. Kasavana, I'm going to --
22              MR. AUSTIN:  We would like to
23       move Exhibit 1 into the record.
24   BY MR. AUSTIN:
25       Q.      Ms. Kasavana, you provided us with

Page 17

```
 1    a current CV; is that correct?
 2           A.      That's correct.
 3           Q.      Okay.  I'm going to show you
 4    what we are marking as Google-YouTube 2.
 5                   (Google-YouTube-Kasavana
 6                   Exhibit No. 2 was marked
 7                   for identification.)
 8    BY MR. AUSTIN:
 9           Q.      And actually, can you identify
10    it for the record, please.
11           A.      This is my LinkedIn profile.
12           Q.      Is this -- does your LinkedIn
13    profile differ from your current CV?
14           A.      This is my current CV.
15           Q.      Okay.  Have you looked over --
16    is there anything that's inaccurate or not
17    included on the CV?
18           A.      No.
19           Q.      For the -- for my benefit, can you
20    give me your current job title and duties?
21           A.      I'm the director of product
22    marketing at YouTube for core and responsibility.
23           Q.      And how long have you had that job?
24           A.      I've been director since March of
25    2023.
```

Page 18

1          Q.      Okay.  And prior to that position,
2     which position did you hold?
3          A.      I led the kids and family product
4     marketing team.
5          Q.      And how long were you in that
6     position?
7          A.      I joined YouTube in that role in
8     March of 2018.
9          Q.      Prior to 2018, you were not with
10    Google/YouTube?
11         A.      I was with Google.  I was in a
12    sales role at Google.
13         Q.      And so now you -- you work for
14    Google currently but are assigned to YouTube?
15         A.      That's right.
16         Q.      Okay.  And tell me about your
17    sales role with Google prior to 2018, please.
18         A.      Sure.  I joined the company in
19    2015.  I was part of a group that was helping
20    what we consider traditional brand advertisers
21    figure out how Google and the Google suite of
22    advertising products can best meet their needs.
23         Q.      Fair enough.
24                 I was given a copy of a notice
25    of a 30(b)(6) deposition, and in it it gave

```
                                        Page 19
 1     your role -- I'm going to mark it as

 2     Google-YouTube Exhibit 3.

 3                    (Google-YouTube-Kasavana

 4                    Exhibit No. 3 was marked

 5                    for identification.)

 6     BY MR. AUSTIN:

 7          Q.     And I'll give it to you and ask

 8     that you turn to page 6.

 9                    MS. WADHWANI:  Put the first two

10           aside?

11                    MR. AUSTIN:  Yes, ma'am.  We're

12           moving -- as I'm moving forward, for the

13           record, I'm moving all of these into the

14           record, if you will.  I have now

15           identified them.  I don't want to forget

16           to move them.

17                    MS. WADHWANI:  Yeah, they'll be

18           marked as exhibits to the deposition.

19                    Sorry, I'll switch with you and

20           give you the official one.

21                    THE WITNESS:  Okay.

22                    And I'm sorry, did you say

23           page 6?

24     BY MR. AUSTIN:

25          Q.     Page 6, yes, ma'am.
```

Page 20

```
 1                  Go down to "Marketing Related to
 2   Youth/Parents."
 3          A.      Sure.
 4          Q.      Are the things listed there your
 5   responsibility?
 6          A.      The YouTube marketing core
 7   responsibility and youth.
 8          Q.      Yes, ma'am.
 9          A.      That's right.
10          Q.      Is there anything that was your
11   responsibility that's not included here?
12                  MS. WADHWANI:  Objection.  Form.
13   BY MR. AUSTIN:
14          Q.      Are there any other duties that
15   you have that's not included under this
16   heading?
17                  MS. WADHWANI:  Same objection.
18                  Did you hear the question?
19                  THE WITNESS:  No.  I'm sorry.
20                  MR. AUSTIN:  I'm sorry.
21                  THE WITNESS:  I thought you
22          objected, and so I was being quiet.
23                  MS. WADHWANI:  Oh, no, I'm
24          sorry.  When I -- unless I direct you
25          not to answer a question --
```

```
 1                THE WITNESS:  Got it.
 2                MS. WADHWANI:  -- when I lodge
 3        my objections, you should go ahead and
 4        answer.
 5                THE WITNESS:  Got it.
 6                MS. WADHWANI:  So, Mr. Austin,
 7        would you like the court reporter to
 8        read back your question?
 9                MR. AUSTIN:  Please, ma'am.
10                THE WITNESS:  I apologize.
11                THE REPORTER:  "Are there any
12        other duties that you have that's not
13        included under this heading?
14                MS. WADHWANI:  And I have an
15        objection to form to that question.
16                Now go ahead and answer.
17                THE WITNESS:  So all of my
18        responsibilities are covered by core
19        responsibility and youth, which is the
20        title listed here.
21    BY MR. AUSTIN:
22        Q.      Fair enough.
23                And finally, I'm going to mark
24    Google-YouTube-Kasavana 4, which is our
25    initial disclosures.
```

Page 22

```
 1                    (Google-YouTube-Kasavana

 2                    Exhibit No. 4 was marked

 3                    for identification.)

 4    BY MR. AUSTIN:

 5         Q.      And I'm going to ask you to turn

 6    to page 2.

 7                    And midway down, do you see your

 8    name?

 9         A.      I do.

10         Q.      Okay.  And can you read exactly

11    what we have by your name, please.

12         A.      On the left-hand side or the

13    right-hand side?

14         Q.      Let's try the right-hand side.

15         A.      "Tanaya Kasavana likely has

16    discoverable information, including regarding

17    marketing related to parental controls and youth

18    safety features on YouTube."

19         Q.      Is that statement accurate?

20         A.      That is accurate.

21         Q.      Do you have any other

22    information that's not included on this

23    disclosure?

24                    MS. WADHWANI:  Objection to

25         form.
```

Page 23

```
1                    THE WITNESS:  No, I believe that
2         this captures my role.
3    BY MR. AUSTIN:
4         Q.       Fair enough.  Thank you.
5                    MR. AUSTIN:  We're going to move
6         that as well.
7    BY MR. AUSTIN:
8         Q.       Let's go to Bates number
9    2603564.  Go to page 5 -- Exhibit 5.
10                   I'm going to show you what we're
11   marking as Google-YouTube-Kasavana 5, which is
12   "YouTube Kids:  Brand Crisis Response
13   Marketing Playbook."
14                   (Google-YouTube-Kasavana
15                   Exhibit No. 5 was marked
16                   for identification.)
17                   MS. WADHWANI:  Can she have a
18        moment to look at the document?
19                   MR. AUSTIN:  Yes, ma'am.
20   BY MR. AUSTIN:
21        Q.       And I'm going to direct you to
22   the pages I need you to go to.  I don't -- we
23   don't necessarily need to look at every page.
24        A.       (Peruses document.)
25        Q.       Ms. Kasavana?
```

Page 70

```
 1          Q.        And so that's, yes, it would be
 2     considered a global issue?
 3          A.        Yes.
 4          Q.        Okay.  Fair enough.  A local
 5     issue as well, a regional issue as well?
 6          A.        Yes.
 7          Q.        Does YouTube send out a rapid
 8     response team using third parties to handle
 9     local issues -- local and regional issues?
10          A.        What do you mean --
11          Q.        Do you use a third party to help
12     you, let's say, triage problems that may
13     happen locally or regionally?
14                    MS. WADHWANI:  Objection to
15          form.
16                    Go ahead.
17                    THE WITNESS:  Can you give me an
18          example of a third party?  I'm not sure.
19     BY MR. AUSTIN:
20          Q.        Any third party that's -- any
21     party that's not in-house YouTube.  Does
22     YouTube use the PTA -- does YouTube use any
23     third-party vendor to help handle or deal with
24     problems that may occur -- may occur locally
25     or regionally?
```

Page 71

```
 1              MS. WADHWANI:  Objection to
 2       form.
 3              THE WITNESS:  I can't speak for
 4       all of YouTube, but in marketing, we
 5       have a partnership with the
 6       Parent-Teacher Association.
 7  BY MR. AUSTIN:
 8       Q.      Any other association outside of
 9  the PTA?
10       A.      We've had partnerships with Common
11  Sense networks.
12       Q.      Anyone else outside of PTA and
13  Common Sense network?
14       A.      I can't speak to the exhaustive
15  list, but those are some examples.
16       Q.      And those are credible
17  third-party vendors that y'all use?
18              MS. WADHWANI:  Objection to
19       form.
20  BY MR. AUSTIN:
21       Q.      Or partnerships that you have.
22  Are they credible?
23       A.      I believe so.
24       Q.      All right.  Let's go to page 10.
25              Can you read the title?
```

Page 91

```
 1        Q.       Thank you for that.
 2                 Can we turn to page 20, please.
 3                 Can you explain that graph to
 4     us, please.
 5                 MS. WADHWANI:  Objection to
 6          form.
 7                 THE WITNESS:  So this is a chart
 8          that maps the communications to users by
 9          that same matrix.
10     BY MR. AUSTIN:
11        Q.       Okay.  And why does a low risk,
12     high visibility issue -- low risk, high
13     visibility issue receive the same treatment as
14     the high risk, low visibility?
15                 MS. WADHWANI:  Objection to
16          form.
17                 THE WITNESS:  Can you repeat
18          that question?
19     BY MR. AUSTIN:
20        Q.       The low risk -- I'm sorry -- why
21     do the low risk, high visibility issues
22     receive the same treatment as the high risk,
23     low visibility?
24                 MS. WADHWANI:  Same objections.
25                 THE WITNESS:  I mean, this is --
```

Page 92

```
 1          we don't have infinite resources, so
 2          this is a framework proposed at the time
 3          of how to prioritize.
 4     BY MR. AUSTIN:
 5          Q.     And so you're saying because of
 6     budgetary concerns for Google/YouTube, that
 7     these two scenarios are treated the same?
 8               MS. WADHWANI:  Objection to
 9          form, mischaracterizes prior testimony.
10               THE WITNESS:  I didn't reference
11          budget.  It's --
12     BY MR. AUSTIN:
13          Q.     You said infinite --
14               MS. WADHWANI:  Can she finish
15          her answer, please?
16               MR. AUSTIN:  Yes.  I'm sorry.
17     BY MR. AUSTIN:
18          Q.     I'm sorry, ma'am, were you
19     finished?
20          A.     That's okay.
21               All of these teams have what I
22     would say are our day jobs, right, what we come
23     in every single day to work on to make our
24     products better.  And what this is showing is in
25     the case of an escalation, how we can ensure that
```

Page 93

1    we are getting the right information back to our
2    users in a way that also takes into consideration
3    people's time and responsibilities.
4    BY MR. AUSTIN:
5         Q.    Ma'am, for the ladies and
6    gentlemen of -- benefit of the ladies and
7    gentlemen of the jury, can we go through
8    exactly what YouTube -- Google/YouTube do in
9    response to these?
10        A.    So I want to clarify that this is
11   not all of YouTube -- this doesn't represent all
12   of the teams.  This represents the marketing
13   team.
14             So there are teams.  Right, this
15   was a marketing doc.  There are teams that sit
16   outside of marketing that also are focused on
17   answering user questions, feedback.  Like we have
18   a -- we have other teams in addition to
19   marketing.  So I do want to make sure that I
20   clarify that.
21        Q.    Yes, ma'am.
22        A.    Okay.
23        Q.    But in relation to marketing and
24   for you, can you give the ladies and gentlemen
25   of the jury, tell them how exactly it's

Page 94

1    handled.

2           A.       So sorry, which --

3           Q.       So both of them.  They're both

4    the same.

5           A.       -- which quadrant?

6           Q.       And so the -- the low risk, high

7    visibility issues receive the same treatment

8    as the high risk, low visibility.  So it's

9    highlighted on our screen.

10                  Can you go through it for the

11   ladies and gentlemen of the jury and explain

12   what they do.

13          A.       Sure.

14                  MS. WADHWANI:  Objection to

15          form.

16                  Go ahead.

17                  THE WITNESS:  So e-mail, we have

18          e-mail marketing newsletters.  Those are

19          subject to users wanting to opt in to

20          those e-mails, which is why it's saying

21          targeted.

22                  On the social channels, if

23          the -- if there is an opportunity to

24          reply or direct message the user with

25          more information, that can be helpful to

                                        Page 95

 1          them.  That's the next bullet.
 2                  Search engine -- SEM is
 3          shorthand for search engine marketing.
 4          So we constantly -- back to the point of
 5          investing a lot of time and effort to
 6          make sure that parents are educated on
 7          the tools that we provide and the
 8          features, we run search engine marketing
 9          always to answer queries.  So, you know,
10          what products, what parental controls
11          does YouTube have.  Right.  So that's
12          that.
13     BY MR. AUSTIN:
14          Q.      Right.  And so we --
15                  MS. WADHWANI:  Wait.  Let her --
16                  MR. AUSTIN:  I'm sorry.
17                  MS. WADHWANI:  -- finish,
18          please.
19     BY MR. AUSTIN:
20          Q.      Are you finished with that?
21          A.      I was going to finish the rest of
22     the bullets.
23          Q.      You can, and then I'll come
24     back.
25          A.      Okay.

Page 96

1          Q.       Sorry.

2          A.       So search engine marketing then

3    drives to the website, which is the next -- which

4    is the next bullet.  The website aggregates all

5    of the helpful information.  It has how-to videos

6    on how to set up the parental controls.  It helps

7    break down and answer frequently answered

8    questions.

9               And then advocates, you know, one

10    of the things that we see in research with

11    parents -- you've heard the adage, "It takes a

12    village."  Right.  Parents have trusted partners

13    that they turn to.  The National PTA is one of

14    those.  Right.  It's an incredible organization

15    of parents who are dedicated.

16               And so when we are -- we want to

17    make sure that those trusted voices also have the

18    correct information so that they can also make

19    sure to distribute that information to users such

20    that it's helpful to them.

21          Q.       Thank you very much for that

22    answer, ma'am.

23               Now, if we can go back to SEM.

24    What exactly -- can you tell the ladies and

25    gentlemen, after all the good things that SEM

Page 97

```
 1    does, can you tell the ladies and gentlemen of
 2    the jury what actions does YouTube take?
 3                    MS. WADHWANI:  Objection to
 4          form.
 5    BY MR. AUSTIN:
 6          Q.      On the document, what does it
 7    say?
 8                    MS. WADHWANI:  Objection to
 9          form.
10                    THE WITNESS:  So SEM, so let's
11          just explain how SEM works.
12    BY MR. AUSTIN:
13          Q.      You --
14          A.      Because that's important.
15                    Search engine marketing is --
16    search engine marketing is -- if we as a brand or
17    a product can decide to run marketing -- to run
18    search ads in response to queries to a user's
19    searches, and so that is an evergreen investment
20    that we make, YouTube parental controls, so on
21    and so forth.
22                    And so the reason that you see no
23    action here is because it's working as intended.
24    It's just evergreen.
25          Q.      And so in this particular
```

Page 98

```
 1    scenario when we're dealing with low risk,
 2    high visibility and high risk, low visibility,
 3    when it comes to SEM, YouTube takes no action,
 4    correct?
 5                    MS. WADHWANI:  Objection to
 6          form, mischaracterizes --
 7    BY MR. AUSTIN:
 8          Q.      As it relates to what's on this
 9    document, ma'am.
10                    MS. WADHWANI:  Objection to
11          form.
12                    Go ahead and answer.
13                    THE WITNESS:  That's because we
14          have evergreen search engine
15          marketing -- "evergreen" meaning always
16          on -- to answer and to help -- to help
17          parents understand all of the tools and
18          controls and features that we offer.
19    BY MR. AUSTIN:
20          Q.      Fair enough.
21                    On the sheet of paper, it says
22    "no action," correct?
23          A.      It does.
24          Q.      Okay.  And let's go to website.
25    It says, "What do you do in reference to the
```

Page 99

1    website?"

2         A.       Similarly, the website is -- exists

3    and is updated on a continuous basis to reflect

4    the product changes that we make when we roll out

5    new features.  So that's an evergreen initiative.

6                  And so in response to this, we

7    don't need to take further action because it's

8    just something that we make sure is maintained

9    and up to date with the most helpful information

10   for parents and caregivers at all times.

11        Q.       Fair enough.  So you take no

12   action there, correct?

13                 MS. WADHWANI:  Objection to

14        form, mischaracterizes testimony.

15   BY MR. AUSTIN:

16        Q.       Yes, ma'am?

17                 MS. WADHWANI:  Objection to

18        form.

19   BY MR. AUSTIN:

20        Q.       Is that correct?

21        A.       Yes.

22        Q.       Okay.  Thank you.

23                 Now, it says -- on the

24   "Advocates" it says -- what does it say,

25   "Reactive" --

```
 1          A.        "Reactive comms."
 2          Q.        Okay.  And so for the -- for the
 3     low risk, high visibility, and the high risk,
 4     low visibility, you have a reactive approach
 5     to the problem, correct?
 6          A.        That is not correct.  What --
 7          Q.        Does it not say that on this
 8     page, ma'am?
 9          A.        Well, let me explain what "reactive
10     comms" means.  So what "reactive comms" means in
11     the situation of, take Momo, for instance, where
12     as we are monitoring and we are learning very
13     quickly and validating that none of those videos
14     exist on YouTube, and it is a viral hoax, one of
15     the things that we do is we arm those partners
16     with the truth such that -- and what "reactive"
17     means is we're not asking them to go out and
18     proactively tell their parents, but we want them
19     to have the authoritative information of what is
20     happening such that if there are parents -- if
21     there are parents or PTA leaders -- I'm going to
22     use the PTA as an example -- if PTA leaders, you
23     know, local school districts are calling in to
24     National PTA, they have the correct information.
25                    That's what we mean by "reactive."
```

Page 101

1    It's that we are not asking them to go out and
2    make a statement.  We're just saying, Hey, as a
3    partner to us, and as a trusted voice to parents
4    and communities, we want you to have the accurate
5    information.  That's what that means when we say
6    "reactive comms."
7           Q.      Thank you, ma'am.
8                   So if you go to high visibility,
9    high risk, it differs greatly in terms of how
10   you respond socially, correct?
11                  MS. WADHWANI:  Objection to
12        form.
13                  THE WITNESS:  Yeah --
14   BY MR. AUSTIN:
15          Q.      It responds -- and for SEM, the
16   response greatly differs from the previous
17   scenario, correct?
18                  MS. WADHWANI:  Objection to
19        form.
20                  THE WITNESS:  I don't
21        necessarily agree with your
22        characterization of "greatly differs."
23        It's different in that we're saying
24        we -- we might do a proactive post that
25        reaches all users, but you can also see

                                           Page 105

1                   It is the same.  We take all of
2           this feedback.  That's what I said
3           before.  There's a standard procedure
4           and process for us to constantly be
5           monitoring feedback from our users
6           across a variety of channels, and
7           there's a standard procedure internally
8           as a cross-functional team where we take
9           that feedback, and we look at our
10          products and we look at our policies,
11          and we make sure that we are being the
12          best that we can be for our family.  The
13          difference that you're seeing here on
14          this chart is just the communication.
15                  And so again, I just -- I want
16          to make very clear that like we are --
17          we are taking that feedback, all
18          feedback, we take feedback across a
19          variety of our channels, and we funnel
20          it into our process.
21     BY MR. AUSTIN:
22          Q.      Thank you, ma'am.
23                  Let's move to page 27.
24                  Ma'am, this is what a -- do you
25     have it?  Look on your screen.

Page 106

```
 1        A.        I do.
 2                  MS. WADHWANI:  Thank you.
 3    BY MR. AUSTIN:
 4        Q.        And this is an e-mail from the
 5    PTA; is that correct?  A PTA e-mail, parents'
 6    concerns -- or parents' comments?
 7                  MS. WADHWANI:  Objection to
 8        form.
 9                  THE WITNESS:  I believe this is
10        an illustrative mock.
11    BY MR. AUSTIN:
12        Q.        Can you read the first -- can
13    you read the title of the first paragraph.
14        A.        "Combatting misinformation in
15    schools - partner with the Parent-Teacher
16    Association and access their newsletters and
17    e-mail lists for important YouTube Kids
18    responses."
19        Q.        Why is there an emphasis on
20    misinformation?
21        A.        This is -- it goes back to the
22    example -- the Momo example is a really good
23    example, right.  We've seen, right, in these
24    cases where inaccurate information is being
25    spread and it's being spread quickly.
```

```
                                                Page 107

 1                    And we want -- again, this all
 2       comes back to making sure that we can give our
 3       parents and our caregivers and our users and --
 4       the right information of what is happening and
 5       what we're doing about it.  So that's what
 6       "combatting misinformation" refers to.
 7              Q.     Okay.  The title of this
 8       presentation is what, crisis management; is
 9       that correct?  So this entire document is
10       about crisis management.  Is that fair?
11                    MS. WADHWANI:  Objection to
12              form, mischaracterizes the document.
13                    THE WITNESS:  This document is
14              in the spirit of continuous improvement.
15              You'll see us do this across everything.
16                    So I would say that this
17              document is kind of reflecting on
18              escalations that had happened and taking
19              learnings, and coming with, you know,
20              perspectives on how we can always be
21              better.
22       BY MR. AUSTIN:
23              Q.     Why not emphasize on trends or
24       signs that are potentially disturbing?
25                    MS. WADHWANI:  Objection to
```

Page 108

```
 1        form.
 2                    THE WITNESS:  I'm not sure I
 3        understand the question.
 4   BY MR. AUSTIN:
 5        Q.      You emphasize -- you're
 6   emphasizing misinformation or crises -- or
 7   crisis.  Why not emphasize on trends?  Why you
 8   don't put an emphasis on what's going on with
 9   trends or -- or videos that are potentially
10   disturbing?
11                    MS. WADHWANI:  Same objection.
12                    THE WITNESS:  The context of
13        this slide (indicating) within -- again,
14        within the document is -- one of the
15        dynamics we observed was in the case,
16        again, Momo, just misinformation,
17        inaccurate information, like basically
18        spreading very quickly.
19                    So again, this slide is about
20        how can we get -- set the facts
21        straight.  It doesn't mean -- there are
22        many things that we do beyond that, but
23        this slide is about simply the fact that
24        we had observed a lot of incorrect
25        information spreading very quickly.
```

Page 109

1    BY MR. AUSTIN:

2         Q.      Do you ever communicate with

3    PTAs where there's a real risk that isn't

4    necessarily trending?

5                      MS. WADHWANI:  Objection to

6              form.

7                      THE WITNESS:  Our partnership

8              with the PTA is rooted in

9              getting helpful information about our

10             products and policies out to PTA

11             members.  Like they're a phenomenal

12             partner that way.

13   BY MR. AUSTIN:

14        Q.      Right.  But wouldn't it be

15   awesome if your phenomenal partner were armed

16   with information that there were

17   potentially -- there were harmful videos that

18   was trending so that they could get that out

19   to their students, their administrators, their

20   superintendents?

21                      Do you not think that that's

22   extremely important -- if in fact the PTA is a

23   trusted partner, would you not consider it

24   crucial that you arm them with the information

25   of harmful content that is trending so that

```
                                        Page 110
 1      they could get in front of it from the school
 2      district level, from the teacher level, from
 3      the principal level, to help them combat the
 4      problem?
 5                    MS. WADHWANI:  Objection to
 6           form, compound, foundation.
 7                    Go ahead.
 8                    THE WITNESS:  I'm trying to
 9           understand your question.  I want to --
10           this is not the only reason or scenario
11           where we partner with the PTA.
12      BY MR. AUSTIN:
13           Q.      I understand.  I didn't ask you
14      if that was the only reason.
15                    I'm asking, do you ever give
16      them that information so they can arm their
17      superintendents, their principals and their
18      teachers with harmful content or harmful
19      videos that is trending to help them protect
20      their children or their students?
21                    MS. WADHWANI:  Objection to
22           form.
23                    THE WITNESS:  So I want to --
24           again, your use of "harmful," just I
25           don't -- I don't necessarily agree with
```

1          your use of "harmful."

2                    There are many things we do.  So

3          if you want to use the case of pranks,

4          we have community guidelines against

5          pranks.

6     BY MR. AUSTIN:

7          Q.       Do you ever inform the PTA of

8     potentially disturbing or harmful videos that

9     is trending?

10                    MS. WADHWANI:  Objection to

11         form.

12                    THE WITNESS:  As a -- as a part

13         of everything that we do, we might --

14         that's what reactive comms might be

15         about, right, like keeping our partners

16         abreast of situations.

17    BY MR. AUSTIN:

18         Q.       Do you ever communicate with the

19    PTA where there's a real risk that isn't

20    necessarily trending?

21                    MS. WADHWANI:  Objection to

22         form.

23                    THE WITNESS:  I can't speak on

24         behalf of everybody that works with the

25         PTA at YouTube.

Page 112

1    BY MR. AUSTIN:

2        Q.        This relates to who you work

3    with at the PTA.  How about that?  Let's start

4    with that.

5        A.        I think -- again, as the document

6    outlines, if we -- we give parents all the

7    information that we can that might -- and we've

8    outlined in this document different ways that we

9    do that.  There are other teams that also do

10   that.  And so there may be times where we might

11   be including the PTA in that.  But I can't speak

12   for every single -- every single piece of

13   feedback that a user might have.

14   BY MR. AUSTIN:

15       Q.        So is that a "no"?

16                 MS. WADHWANI:  Objection.  Form,

17           asked and answered.

18                 THE WITNESS:  Yeah, that's

19           not -- I'm saying like over the years,

20           it -- it is entirely possible.

21   BY MR. AUSTIN:

22       Q.        Do you ever instruct the PTA on

23   recommended counseling services or coping

24   mechanisms they can use when a high risk --

25   when a high risk video has lots of views, even

Page 113

1    once the video has been removed?

2                    MS. WADHWANI:  Objection to

3            form.

4                    THE WITNESS:  The premise of

5            that question of high risk and coping,

6            I'm not sure that I agree with.  But as

7            I've stated before, we give the PTA the

8            relative -- the relevant information of

9            what -- what we are doing and, yeah, of

10           how YouTube is addressing.

11   BY MR. AUSTIN:

12           Q.     Sorry, ma'am.  Was that a --

13   another "no"?

14                    MS. WADHWANI:  Objection to

15           form, objection to the

16           mischaracterization of prior testimony,

17           asked and answered.

18                    THE WITNESS:  Yeah, I understand

19           that you are looking for a yes, no, on

20           every single one of these questions.

21           The challenge with that is that

22           there's -- there's just more nuance

23           here.

24   BY MR. AUSTIN:

25           Q.     Do you remember -- can you cite

Page 114

1    to the ladies and gentlemen of the jury any

2    time that you, your marketing department, have

3    offered or suggested counseling services or

4    coping mechanisms for disturbing videos that

5    were seen by school age children to the PTA?

6    Have you -- or to the schools themselves, have

7    you suggested any sort of counseling for them,

8    any coping mechanisms?

9              MS. WADHWANI:  Objection to

10         form, compound, asked and answered.

11              THE WITNESS:  The premise of

12         that question is that our -- watching

13         these videos require counseling.  And

14         again, I'm not a medical expert, so as

15         far as I can recall, no, I don't believe

16         that we have provided the PTA with

17         counseling services.

18    BY MR. AUSTIN:

19         Q.     Or suggestions.  Not that you've

20    done -- suggestions of resources that they can

21    access.

22              MS. WADHWANI:  Objection to

23         form.

24              THE WITNESS:  Sorry.  Who can

25         access?

Page 115

```
 1    BY MR. AUSTIN:
 2         Q.        The students or the teachers
 3    who's seen the disturbing videos, the
 4    administrators who's having to deal with the
 5    kids who have seen the disturbing videos, have
 6    you suggested any resources, any counseling
 7    resources, any resources that they could tap
 8    into to help them manage the problems?
 9                   MS. WADHWANI:  Objection to
10         form, asked and answered.
11                   THE WITNESS:  I have not, as far
12         as I can recall.
13    BY MR. AUSTIN:
14         Q.        Thank you for that, ma'am.
15    Let's move on.
16                   MS. WADHWANI:  We've been going
17         about an hour and 10 minutes.  Should we
18         take a break?
19                   MR. AUSTIN:  Have we been going
20         that long?
21                   MS. WADHWANI:  Yes.
22                   MR. AUSTIN:  Ouch.  That means
23         I'm in trouble.  We can take a break.  I
24         was supposed to do that at the first
25         hour.  But that's on me.  I'll fix it.
```

Page 116

1           We can take a break, yes.

2           THE VIDEOGRAPHER:  We are now

3       going off the record, and the time is

4       11:45 a.m.

5           (Lunch recess.)

6           THE VIDEOGRAPHER:  We are now

7       going back on the record, and the time

8       is 12:28 p.m.

9           MR. AUSTIN:  Thank you, sir.

10  BY MR. AUSTIN:

11       Q.    Ms. Kasa- --

12       A.    Kasavana.

13       Q.    I'm sorry.

14       A.    That's okay.

15       Q.    Ms. Kasavana, let's see if we

16  can get started and I can get myself in gear.

17           We're going to turn to

18  Exhibit 7, which is going to be marked as

19  Google-YouTube-Kasavana starting with Bates

20  number GOOG-3047MDL-00117952.

21           (Google-YouTube-Kasavana

22           Exhibit No. 7 was marked for

23           identification.)

24  BY MR. AUSTIN:

25       Q.    The title is "YouTube Kids

Page 204

```
1    YouTube and refusing to get off of YouTube,
2    not school related, during those school hours,
3    would you agree then that the YouTube in this
4    chart, the 65 million or so, are being used
5    inside of the school hours in a
6    non-school-related manner?
7                    MS. WADHWANI:  Objection to
8         form, foundation, hypothetical.
9                    THE WITNESS:  Yeah, I -- I am
10        reacting to the data that's on the slide
11        in front of me.
12   BY MR. AUSTIN:
13        Q.      Yes, ma'am.  And I'm saying to
14   you that if superintendents and principals are
15   testifying that students are using
16   unauthorized YouTube time, refusing to get off
17   of YouTube time during school hours, this
18   chart will substantiate the fact that -- that
19   fairly high usage, at least up to 65 million
20   usage during that time?
21                   MS. WADHWANI:  Objection to
22        form, foundation, hypothetical.
23                   THE WITNESS:  Here's what I will
24        say:  We don't want kids to be
25        distracted in school.  We want kids to
```

Page 205

```
 1          be focused in school and we want kids to
 2          learn.  It's why Family Link announced
 3          school time mode where parents can limit
 4          their kids to have access to YouTube.
 5                    Again, we provide parents the
 6          control.  We hear the concerns.  We take
 7          those concerns really seriously.  I
 8          don't want -- I want kids to pay
 9          attention.  I want my own kids to pay
10          attention and I want all kids to pay
11          attention.  So we build features and
12          tools and parental controls to help with
13          that.
14  BY MR. AUSTIN:
15          Q.     Does YouTube not think that it's
16  problematic that the nation's children are
17  being distracted by its app during school
18  hours to the tune of within, let's call it, 80
19  or 85 percent of YouTube's ████   █████ of
20  usage?  Do YouTube not take any responsibility
21  for that?
22                    MS. WADHWANI:  Objection to
23          form, foundation.
24                    THE WITNESS:  I think we show we
25          deeply care.  I just -- I just
```

1          referenced a parental control that we've

2          launched such that you can actually not

3          allow any access during the school

4          hours.

5     BY MR. AUSTIN:

6          Q.          Thank you.  When did that

7     program launch?

8          A.          We announced it last year.

9          Q.          Oh, 2023 or 2024?

10         A.          2024.

11         Q.          And what about the kids who were

12    attempting to get educated in 2023, and what

13    about the superintendents and the principals

14    who were attempting to educate the children in

15    2022, and what about the principals and

16    superintendents trying to educate their kids

17    in 2021 and 2020 and 2019, 2018, 2017, 2016,

18    2015, where were those controls?  What

19    happened to those children?

20                    MS. WADHWANI:  Objection to

21         form, compound.

22    BY MR. AUSTIN:

23         Q.          Why were they sacrificed?

24                    MS. WADHWANI:  Objection to

25         form, compound, foundation,

Page 207

1          argumentative.

2                    THE WITNESS:  I don't

3          disagree -- I don't agree with your

4          characterization that they were

5          sacrificed.

6                    We have been -- we take the role

7          of YouTube really seriously.  We hear

8          concerns.  We provide parental controls.

9          There were and there are more parental

10         controls than just school time.

11         Administrators have control over access

12         to YouTube.

13                   Again, we're always listening

14         and working towards providing as many

15         features and controls and tools that we

16         can provide.

17   BY MR. AUSTIN:

18         Q.       Ma'am, was there anything

19   preventing YouTube from putting restrictions

20   in place or parental controls in place in 2015

21   or 2016 or 2017 or 2018 or 2019, 2020, 2021,

22   2022?  Was there anything preventing them from

23   putting those parental guidelines in place,

24   saving those children, saving those

25   superintendents, saving those principals?

Page 248

```
 1                    (Recess.)
 2                    THE VIDEOGRAPHER:  We are now
 3          going back on the record, and the time
 4          is 3:49 p.m.
 5     BY MR. AUSTIN:
 6          Q.        I'm going to show you --
 7                    Good afternoon, Ms. Kasavana.
 8          A.        Good afternoon.
 9          Q.        Ma'am, I'm sorry.
10                    I will show you what's being
11     marked as Google-YouTube-Kasavana 10.
12                    (Google-YouTube-Kasavana
13                    Exhibit No. 10 was marked for
14                    identification.)
15     BY MR. AUSTIN:
16          Q.        It bears Bates number 00128842.
17     It's titled "PTA versus CSM Exploration."
18                    THE REPORTER:  I'm sorry, I
19          can't hear you.
20                    MR. AUSTIN:  I'm sorry.
21     BY MR. AUSTIN:
22          Q.        It bears Bates number 00128842
23     titled "PTA versus CSM Exploration.  The Point
24     Qualitative Findings," dated June 8, 2021.
25                    The slide deck itself is
```

Page 249

1    undated, but the metadata would indicate, if
2    you go to the last page, July 27, 2021.
3                    Okay.  This document was June 8,
4    2021.
5                    They produced this in reference
6    to being from your custodial file.
7                    Do you have any reason to
8    believe that is not what it purports to be?
9        A.       So I -- I don't recall this
10   document.  It doesn't mean that it might not be a
11   part of my files, because, like I said before,
12   lots of documents get shared with me.
13       Q.       Have you had an opportunity to
14   review it?
15       A.       Sorry.  Do you -- are you giving me
16   an opportunity to review it?
17       Q.       Yes, ma'am.  I'm just asking,
18   have you -- I'm trying to move.
19       A.       Oh, yeah -- I mean, can I take a
20   second to look at this document?
21       Q.       Yes, ma'am.  I'm trying to
22   follow my marching orders.
23       A.       (Peruses document.)  Okay.
24       Q.       I'm going to ask you to go to
25   slide 3.

Page 250

1                    MS. WADHWANI:   What page -- the
2           page numbers are at the bottom.
3                    THE WITNESS:   Page number?
4    BY MR. AUSTIN:
5           Q.      Can you read the section labeled
6    "Background," please.
7           A.       "The YouTube Kids & Family team
8    currently has a partnership with the Parent-
9    Teacher Association (PTA).  They are exploring
10   another partnership with Common Sense Media
11   (CSM), with a contract getting finalized over the
12   next few weeks."
13          Q.       Okay.  Turn to slide 6 titled
14   "Key Insights."
15          A.       I'm there.
16          Q.       And will you please read the
17   third insight, please.
18          A.        "While awareness of CSM is low,
19   those who are familiar think of it as a credible,
20   well-established organization with a track-record
21   of providing guidance on the safety of media for
22   kids."
23          Q.       And read the last insight on the
24   page.
25          A.        "CSM is seen as the strongest fit

Page 251

```
 1    for providing recommendations for app and video
 2    content.  Parents react well to the
 3    recommended -- to the recommended content due to
 4    its green check mark and branding that feels
 5    vetted, safe and is eye-catching."
 6            Q.       Okay.  And in the next column,
 7    it's a little hard to read, but I think you
 8    can see it on the screen.  Would you please
 9    read through all those boxes.
10                    MS. WADHWANI:  Can you see it?
11                    THE WITNESS:  Okay.  So these
12         are the implications.
13    BY MR. AUSTIN:
14            Q.       Yes, ma'am.
15            A.       "Because parents rely heavily on
16    word of mouth and their own research, explore
17    ways for parents to share read -- to share/read
18    reviews from other parents in an unbiased forum.
19                    "Communicate the role and scope of
20    the National PTA, including how and why the PTA
21    provides guidance for parents of young kids in
22    addition to school age kids.
23                    "Consider moving forward with a
24    partnership with CSM, as it has strong
25    associations with safeguarding kids.  Collaborate
```

Page 252

1    to increase awareness of this organization.

2                    "Further explore the potential to

3    pursue endorsements by both the PTA and CSM, as

4    together they would provide expertise for both

5    educational and safe content."

6            Q.      Do these implications involve

7    assessing partnerships with the National PTA

8    and CSM?

9            A.      I think as the title or the

10   background slide said, that we had -- at the time

11   we have a partnership with the PTA, and we're

12   exploring another partnership with CSM.

13           Q.      Is one of the purposes of those

14   partnerships with the National PTA and the CSM

15   to endorse content on YouTube?

16           A.      So again, I'm not the author of

17   this, and there are other teams that actually

18   manage partnerships at YouTube.

19                    But I think that this research was

20   looking at a variety of different ways of how we

21   might partner together and how that might be

22   helpful for parents.

23           Q.      And what's the purpose of

24   seeking such an endorsement to provide parents

25   guidance for videos on YouTube?

                                        Page 253

1            MS. WADHWANI:  Can you --
2            THE WITNESS:  Yeah, can you --
3        the implications, can you blow that up?
4            So what was your question again?
5    BY MR. AUSTIN:
6        Q.    I said, was the purpose of
7    seeking such endorsements to provide parents
8    guidance for videos on YouTube?
9            MS. WADHWANI:  Objection to
10        form.
11            THE WITNESS:  Yeah, it -- as
12        written here, it was -- the implication
13        was to explore the potential to pursue
14        endorsements by both the PTA and CSM.
15    BY MR. AUSTIN:
16        Q.    Can you read the title on slide
17    7.  Under "Common Sense."
18        A.    Sorry.  Was the question to read
19    the title?
20        Q.    Can you read the title on slide
21    7.  Yes, ma'am.  I sorry.
22        A.    "PTA and CSM At a Glance."
23        Q.    Under "Common Sense Media," do
24    you see where the perception of the
25    organization is rated positive?

Page 254

```
 1        A.        The perception of the organization
 2   is rated positive.
 3        Q.        Okay.  Do you agree with that
 4   assessment?
 5                  MS. WADHWANI:  Objection to
 6        form.
 7                  THE WITNESS:  I agree that
 8        that's what the -- this study showed.
 9   BY MR. AUSTIN:
10        Q.        Please turn to slide 9.  Can you
11   please read the title starting with "Parents."
12        A.        And, sorry, you wanted me to read
13   the title?
14        Q.        The title, yes, ma'am.  I'm
15   sorry.
16        A.        "Parents and engaged citizens alike
17   trust recommendations from friends, family and
18   teachers or unbiased online reviews more than
19   organizations guidance."
20        Q.        Can you read the five bullet
21   points under "Most Trusted."
22        A.        "Most Trusted Resources For
23   Content.
24                  "Family & friends, especially
25   parents of other young kids.
```

Page 255

1              "Teachers.
2              "Unbiased reviews from other
3     parents (not sponsored or posted by content
4     provider).
5              "Educational content providers like
6     PBS Kids and Noggin.
7              "Reviewing content for oneself."
8        Q.      Do you agree that YouTube
9     identified school teachers as one of the most
10    trusted resources for parents when it comes to
11    content?
12       A.      So I would point out that I was
13    just looking at the methodology of this.  The
14    methodology cited for the research that was
15    fielded, and this is a 15-question, online,
16    qualitative exploration.
17              So this is qual, which, you know,
18    plays a role in market research, but qual is
19    directional in nature.  They talked to 41
20    parents -- or, actually, 26 parents.
21              So, based on qualitative, like a
22    focus group, amongst 26 parents, teachers -- yes,
23    teachers are a trusted voice in parents' lives.
24       Q.      Do you have any reason to
25    disbelieve that?

```
                                        Page 256
 1              MS. WADHWANI:  Objection to
 2        form.
 3              THE WITNESS:  No.  I think that
 4        the data here based on the qual with 26
 5        parents states that teachers are a
 6        trusted -- a trusted source.
 7   BY MR. AUSTIN:
 8        Q.    Do you have any reason to
 9   disbelieve -- qualitative or not, do you have
10   any reason to believe that school teachers are
11   a trusted source?
12              MS. WADHWANI:  Objection to
13        form, foundation.
14              THE WITNESS:  I think that
15        conceptually, teachers are seen as
16        valuable members of the community.
17   BY MR. AUSTIN:
18        Q.    Is that a "yes" or a "no"?
19              MS. WADHWANI:  Objection to
20        form, foundation.
21              THE WITNESS:  I think in
22        general, yes, I feel like teachers are
23        trusted.
24   BY MR. AUSTIN:
25        Q.    Can you think of a scenario
```

Page 257

1    where teachers would not be a trusted resource

2    for parents when it comes to content?

3                    MS. WADHWANI:  Objection to

4         form, foundation, hypothetical.

5                    THE WITNESS:  Yeah, again, I

6         can't speak for all parents and all

7         teachers.  Right.  Like I think broadly

8         speaking, teachers play an important

9         role in parents' lives because they

10        teach their children.  But I -- I don't

11        think we can say every single parent

12        implicitly trusts every single teacher

13        and their approach, right, and their

14        choices.  There are a lot of parents at

15        my school that are complaining about

16        their teachers.

17   BY MR. AUSTIN:

18        Q.      Turn to slide 16, which is

19   entitled "While Awareness."  Do you see that?

20                Can you read that for me,

21   please?

22        A.      The headline?

23        Q.      Yes, ma'am.

24        A.      "While awareness of CSM is low,

25   parents who are familiar with it view it as a

Page 258

1    credible resource to provide guidance on the
2    safety of kids' apps, shows, and movies."
3         Q.        Please read the paragraph under
4    "CSM gives guidance for overall safety."
5         A.        "CSM Gives Guidance For Overall
6    Safety.  Parents think of CSM as a guide
7    specifically related to video, technology and
8    media content for kids.  CSM's focus is on
9    assessing the safety of content with which
10   children interact."
11        Q.        Was this perception of CSM by
12   parents YouTube's primary concern in forming a
13   partnership with CSM?
14                  MS. WADHWANI:  Objection to
15        form, foundation.
16                  THE WITNESS:  Sorry.  That was
17        like a nested question.  What's the
18        question?
19   BY MR. AUSTIN:
20        Q.        Was the perception of CSM by
21   parents YouTube's primary concern in forming a
22   partnership with CSM?
23                  MS. WADHWANI:  Same objection.
24                  THE WITNESS:  Not necessarily.
25        I think there are a lot of factors that

Page 259

1          we consider when engaging any third
2          party in a partnership.  I think the way
3          parents feel about CSM would be one of
4          those factors.
5     BY MR. AUSTIN:
6          Q.     Okay.  Based on these market
7     insights, did YouTube pursue a partnership
8     with CSM?
9          A.     So, again, I don't -- in marketing,
10    we are not the team responsible.  We have a
11    partnership's team.  They -- CSM -- my
12    understanding is CSM actually approached us for a
13    partnership.  And we were -- we did have a
14    partnership with them.
15         Q.     Okay.  So a partnership did come
16    to fruition.
17         A.     There was -- YouTube and CSM did
18    have a partnership.
19         Q.     Did the benefit of a partnership
20    accrue only to YouTube?
21              MS. WADHWANI:  Objection to
22         form, foundation.
23              THE WITNESS:  Again, I'm not
24         responsible for that partnership, and I
25         can't speak to the details of that

Page 260

1          partnership.  But in my experience,

2          partnerships are only engaged when they

3          are mutually beneficial to both parties.

4    BY MR. AUSTIN:

5          Q.     Does YouTube maintain its

6    partnership with CSM today?

7          A.     I believe that it has come to an

8    end.

9          Q.     And it's no longer?

10         A.     I believe so.  But again, I'm not

11   responsible for that, so I can't speak to like --

12         Q.     Fair enough.

13                Can you please read the

14   paragraph on the next slide 17, beginning with

15   "CSM is viewed."

16         A.     Sorry, 17?

17         Q.     Yes, ma'am.

18         A.     Okay.  "CSM is viewed as a trusted

19   expert that provides recommendations and guidance

20   to parents regarding safe technology and media

21   for kids.  Parents believe they are an

22   unbiased -- they are an unbiased, nonprofit

23   organization.  Unlike the PTA, no parents shared

24   negative experience with or perceptions of CSM."

25         Q.     So in comparing the National PTA

Page 261

1      and CSM, did YouTube determine that CSM was

2      more favorable -- more favorably perceived by

3      parents than the National PTA?

4                  MS. WADHWANI:  Objection to

5           form, foundation.

6                  THE WITNESS:  I don't think that

7           it's -- that it's more or less

8           favorable.  It breaks down what each is

9           good for.  Right.  Like the strengths of

10          each partnership.  And it makes a lot of

11          sense.  Right.  If you take a step back

12          and think about what the PTA's role is

13          and what their scope is, they are a

14          parent-teacher bridge.  Right.  And they

15          exist at all of the districts, they

16          exist in all the schools.

17                 Common Sense Media, like, their

18          entire focus is children's media.  So

19          they're just -- they're different kinds

20          of partners.

21     BY MR. AUSTIN:

22          Q.      Can you please read what Even K.

23     said about CSM -- Evan K., I'm sorry.

24          A.      "Safety.  Promotes safe use of

25     media with kids.

1                 "Trusted.  They thoroughly review
2    media that is appropriate for kids.
3                 "Independent.  They offer unbiased
4    opinions."
5         Q.      Then on the last page of slide
6    19, can you please read the title.
7         A.      "Among options, CSM stands out most
8    visually and feels vetted, safe; while PTA offers
9    a subtle education angle and 'experts' feel too
10   vague to trust."
11        Q.      So what's being depicted there?
12        A.      So based on what I see -- and
13   again, I'm not the author of this -- but based on
14   what I see here, this looks like they put into
15   testing concept mocks of the PTA or CSM,
16   potentially a partnership with them where they're
17   choosing content or endorsing content, and their
18   logo would be in the product.
19        Q.      Do you view Common Sense Media
20   as a trustworthy organization?  Do you view
21   them as a trustworthy organization?
22        A.      Yeah.  They're a -- a nonprofit, a
23   reputable nonprofit.  There are two arms of
24   Common Sense, though.  There's the nonprofit arm
25   and there's the for-profit arm.

Page 263

1          Q.       In general, do you think Common
2      Sense Media is perceived to be an organization
3      that promotes high quality research?
4          A.       I think that Common Sense Media is
5      one of many organizations that engages in
6      research.
7          Q.       YouTube opted to do a
8      partnership with CSM versus those
9      organizations?
10                   MS. WADHWANI:  Objection to
11              form, foundation.
12                   THE WITNESS:  Again, I don't
13              lead the partnerships team.  The
14              partnerships team would be best suited
15              to speak to the partners, you know, that
16              they -- they score partnerships with.
17     BY MR. AUSTIN:
18          Q.       How would you describe Common
19      Sense Media to a person who don't know
20      anything about it?
21                   MS. WADHWANI:  Objection to
22              form.
23                   THE WITNESS:  So, again, there's
24              two parts that I know of, and my
25              knowledge is working knowledge.  There's

Page 264

```
1            a for-profit arm; there's a
2            non-for-profit arm.  The non-for-profit
3            arm is focused on like children's media.
4                    And so they put out a lot of
5            like ratings on movies or TV shows and
6            help parents understand per their rubric
7            what might be recommended for what age
8            group.
9    BY MR. AUSTIN:
10           Q.      So that's the nonprofit or the
11   for-profit?
12           A.      I actually don't know.  Because
13   again, I don't manage those partnerships.
14   It's -- it's not in my responsibility.
15           Q.      Would you agree that Common
16   Sense Media provides advice, research and
17   community outreach to support kids' mental,
18   physical and emotional health, and explores
19   tech's efforts on the effects on well-being?
20                   MS. WADHWANI:  Objection to
21           form, foundation.
22                   THE WITNESS:  Yeah, it's hard
23           for me to agree to that, because I --
24           like I don't know where you're getting
25           it from.  Like, if we want to look at
```

Page 265

```
 1          their website together, that would be
 2          different.
 3    BY MR. AUSTIN:
 4          Q.       Do you think Common Sense Media
 5    is an authority on kids' mental, physical and
 6    emotional health with regards to online media?
 7                   MS. WADHWANI:  Objection to
 8          form, foundation.
 9                   THE WITNESS:  Again, I think
10          they are a nonprofit, and they are one
11          of many nonprofits.
12    BY MR. AUSTIN:
13          Q.       They are a nonprofit that
14    YouTube opted to partner with because of the
15    high favorability they got from parents.
16    Correct?
17                   MS. WADHWANI:  Objection to
18          form, foundation.
19                   THE WITNESS:  Again, that's not
20          what I said.  We have had partnerships
21          with the PTA as well.  Different
22          partners might fulfill different
23          objectives at any one time, and at any
24          one time we have many, many partners.
25          We've talked about the Kids and Family
```

Page 266

1          Advisory Committee.  We've talked about

2          FOSI.

3                   Like we -- you know, in our

4          efforts to do the right thing and to

5          build the best products and to build the

6          most positive experiences for all of our

7          users, we partner with a lot of experts

8          and academics.

9                   So, again, they're just one or

10         two of many.

11                  MR. AUSTIN:  Let's move to

12         Google-YouTube-Kasavana 11, please.

13                  (Google-YouTube-Kasavana

14                  Exhibit No. 11 was marked for

15                  identification.)

16    BY MR. AUSTIN:

17         Q.      Okay.  I'm now showing you

18    what's been marked as Exhibit 11, a report

19    entitled "2019, The Common Sense

20    Census:  Media Use by Tweens and Teens."  The

21    Bates number on this document is 00136856.

22                  I think Google/YouTube attorneys

23    produced this in reference to your custodial

24    file.

25                  Do you have any reason to

1          time on.

2                    So what I -- what I -- you had

3          me read out loud, there are three

4          sections of this overall presentation.

5          There is the context setting, there is

6          the product options for compliance, and

7          there is our strategy in the next 12

8          months.

9                    My contributions were -- or my

10         team's contributions were on one slide

11         in the first section around the context.

12                   You are now in the Section 2,

13         which is product options for compliance.

14         I do not as a marketer weigh in on the

15         product options.  Again, the product

16         options are driven by the product team,

17         the engineering team, the legal team,

18         the compliance -- the gap team.

19     BY MR. AUSTIN:

20         Q.      So if you go back to 8715.

21                 Is this part of what you worked

22     on?

23         A.      This is part of what I worked on.

24         Q.      Okay.  And so read the title to

25     me.

Page 330

1         A.        "Social media teen impact a major
2     social issue, not just with regulators."
3         Q.        Okay.  And so here part of your
4     work was dealing with the social impact -- the
5     social media teen impact on major social
6     issues, not just -- so including, but not
7     limited to, with regulators, correct?
8         A.        So what we are saying here is,
9     first of all, social media.  Okay.  We don't
10    consider ourselves social media.
11              Second of all, what this is -- the
12    context that we're showing, and we've talked
13    about this a number of times today, right,
14    because in my role as marketing, what is in my
15    remit is to understand feedback, both good and
16    concerns that might be out there.
17              And so what this slide is showing,
18    right, and we've talked about this in the past.
19    We've talked about press articles.  We've talked
20    about other -- other forms of feedback for us to
21    understand what our users are feeling.
22        Q.        And again it says, "Not just to
23    regulators."  And so part of what you were
24    doing, part of your marketing was dealing with
25    these issues in addition to dealing with

                                          Page 331

1       regulators, correct?

2              A.      Part of --

3                     MS. WADHWANI:  Objection to

4              form.

5                     Go ahead.

6                     THE WITNESS:  Part of what we

7              are doing, as I've said before, is to

8              understand the landscape and the broader

9              context within which our users are

10             experiencing our products.

11                    And so what you can see here,

12             right -- again, these are all about

13             social media.  Right.  They're all about

14             social media.  We do not consider

15             ourselves social media.  But what we

16             understand, right, and what we saw are

17             concerns being raised about the role of

18             social media with teenagers.

19                    And so that's part of the

20             broader landscape.  Right.  That's part

21             of the context setting for which -- for

22             -- within which we operate.

23      BY MR. AUSTIN:

24             Q.      And that broader landscape in

25      which you operate also included regulation --

Page 339

```
 1        A.        ████████  ████████████
 2        Q.        Okay.  And so if you go to the
 3   next box over there, it says what,  ████  ████████
 4   █  ████████  ████████████
 5        A.        That's right.
 6        Q.        Okay.  And so here they had a
 7   ████ █ on it, correct, this document?
 8        A.        I see that.
 9        Q.        And so at any time did YouTube
10   intend to market to the KOFs,  ████  ████  ███  ████
11   ████  ████  ████  ████████  ████  ████  ████  ████
12   ████  ████████  ████  ████  ████  █  ████████
13             MS. WADHWANI:  Objection to
14        form, foundation.
15             THE WITNESS:  Again, I can't
16        speak to that.  I do not create, nor do
17        I have those conversations with KOFs.
18             I feel like I -- again, the team
19        that -- the teams that are primarily
20        interfacing with those within the
21        context of upcoming evolving legislation
22        is our public policy team, our legal
23        team.  Like those are the primary teams.
24   BY MR. AUSTIN:
25        Q.        What's SMP?
```

1          A.          Social media platform is what I
2     assume, based on this context.
3          Q.          Okay.  And so from your
4     perspective from marketing, would you market
5     to any other decision makers or any other
6     politicians who were not a KOF?
7                    MS. WADHWANI:  Objection to
8          form.
9                    THE WITNESS:  My remit is to
10          focus on parents.
11     BY MR. AUSTIN:
12          Q.          And so would parents be
13     considered KOFs?  Would parents have a direct
14     or indirect pipeline into their elected
15     officials in terms of what legislation they
16     want and/or do not want put in place?
17                    MS. WADHWANI:  Objection to
18          form.
19                    THE WITNESS:  I mean, through
20          the nature of elected representatives
21          representing their constituents, and
22          parents are constituents, sure.
23     BY MR. AUSTIN:
24          Q.          Okay.  Fair enough.  So you
25     indicated that YouTube does not or did not

Page 341

1  consider themself a social media platform.

2  Correct?

3       A.     That's correct.

4       Q.     And so in this document here, it

5  says what, "YouTube" what?

6       A.     ███████████████████████████████

7  ████████████████

8       Q.     ████████████████████

9  ██████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ██████████████████████████████████

13 ██████████

14            MS. WADHWANI:  Objection to

15       form, foundation, compound.

16            THE WITNESS:  ████████████████

17 ████████████████████  ███████  ██████████

18 ██████████████████████████████████

19 ███████████████████████████████████

20 ████████████████████████  ██████████████

21 ████████████████████████████

22 ██████████████████████████████

23 █████████████████████████████

24 ████████████████████████████████████

25 ███████████████████████  ██████████████

Page 342

1          And so the point is, from a --
2     from an internal perspective, if you
3     side-by-side compare us to some of the
4     features that TikTok has or Snapchat has
5     or Meta has, right, like we don't have a
6     social graph.  That is the bedrock.



12          And again, this is for our legal
13     teams and our public policy teams.  This
14     is not for marketing to lead.
15  BY MR. AUSTIN:
16     Q.     Thank you.  On this document
17  here, at least YouTube ▆▆ ▆▆▆▆▆▆▆▆
18  ▆▆▆▆▆▆ ▆ ▆▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆▆▆▆ as it relates
19  to this document.  Can we agree with that
20  premise?
21          MS. WADHWANI:  Objection to
22     form, foundation, asked and answered.
23     THE WITNESS:  ▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆
24  ▆▆ ▆▆ ▆▆▆ ▆▆ ▆ ▆▆▆▆ ▆▆▆ ▆▆ ▆▆▆
25  ▆▆▆ ▆▆▆▆ ▆▆▆▆▆▆ ▆▆▆▆▆

Page 343

```
1   ████████ ████████ ████ ██ ██ ██ ██████
2   ████████ ████ █ ██ ██ ██████ ██ ████████
3   █ ████ ████ █ ████ ████ █ ████ ██ ██
4   ████ ████ ████
5        ████ ████████ ██ ████
6   ██████████ ████ ██████ █ ██ ████ ██
7   ██████ ████████ ██ ██ ██ ████ ██████ ██
8   ██ ██ ██████ ████ ██ ████ ████
9   ██████████ ████ ██████ ██ ████ ████
10  ████ ████████ ████ ████ ██████ ██ ████
11        ██ ██   That still doesn't mean that we
12        consider ourselves social media because
13        we don't have a social graph.
14  BY MR. AUSTIN:
15        Q.    Okay.  You agree that at least
16  there at that time that they ████████
17  ████████ █ ██████ .  ████████
18  ██ ██ ██ ██ ██████ ████ ████ ████
19  ██ ██ ██ ██████ ██████ ██ ████ ██
20  ██ ██ ██ ████ ██████ --
21  ██████ ██████ ████ █ ██ ██████
22  ██████   Can we agree to that?
23             MS. WADHWANI:  Objection to
24        form --
25             THE WITNESS:  No, not --
```



Page 344

1          MS. WADHWANI:  -- asked and

2      answered.

3          THE WITNESS:  Not necessarily.

4  ██████████████████████████████████

5  ████████████████████████████  ████

6  ██████████████████████████████████

7  ████████████████

8  BY MR. AUSTIN:

9      Q.  ████████  ████████████████

10 ████████████

11     A.  ████████████████████████

12     Q.  ██████████████

13     A.  ██████████████

14     Q.  ████████  ████████████████

15 ████████████████  ████████████████████

16 ████████████████

17     A.  ██████████████████████████████

18 ████████████████

19     Q.  ████████████████████████

20 ████████████████

21     A.  ████████████████████████

22 ████████

23     Q.  ████████  ██████████████████

24 ██████████████████████████████████

25 ██████████████████████████████████

Page 345

1      A.      According to -- I feel like I've

2   answered this.  ████████████████████████

3   █████████████████████████████████████████████

4   ████████████████████████████████████████████

5   █████████████████████████████████████

6   ████████████████████████████████████████████

7   ██████████████████████████     ███████████████

8   ███████████

9              MS. WADHWANI:  Counsel, we need

10         to take a break, please.

11              MR. AUSTIN:  Okay.

12              THE VIDEOGRAPHER:  Okay.  We are

13         now going off the record, and the time

14         is 6:00 p.m.

15              (Recess.)

16              THE VIDEOGRAPHER:  We are now

17         going back on the record, and the time

18         is 6:03 p.m.

19              MS. WADHWANI:  I believe we're

20         concluding Day 1 of this deposition, and

21         we will resume tomorrow.  Thank you.

22              THE VIDEOGRAPHER:  Okay.  This

23         concludes the video deposition,

24         Volume 1, of the video deposition of

25         Tanaya Kasavana.

Page 346

1           We are now going off the record.

2      And the time is 6:03 p.m.  And the total

3      used today was 6 hours and 20 minutes by

4      Mr. Austin.

5              MS. WADHWANI:  Thank you.

6              THE VIDEOGRAPHER:  We're now off

7      the record.

8              (Whereupon, the deposition of

9       TANAYA KASAVANA was adjourned at

10       6:03 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 347

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2        The undersigned Certified Shorthand Reporter

3   does hereby certify:

4        That the foregoing proceeding was taken before

5   me at the place and time therein set forth, at

6   which time the witness was duly sworn; That the

7   testimony of the witness and all objections made

8   at the time of the examination were recorded

9   stenographically by me and were thereafter

10  transcribed, said transcript being a true and

11  correct copy of my shorthand notes thereof; That

12  the dismantling of the original transcript will

13  void the reporter's certificate.

14        In witness thereof, I have subscribed my name

15  this date:  February 5, 2025.

16

17        _____

18        LESLIE A. TODD, CSR, RPR

19        Certificate No. 5129

20

21  (The foregoing certification of

22  this transcript does not apply to any

23  reproduction of the same by any means,

24  unless under the direct control and/or

25  supervision of the certifying reporter.)