**AMENDED Exhibit 1003**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

```
                                            Page 1
 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
     ******************************
 3    IN RE:   SOCIAL MEDIA ADOLESCENT   Case No.
 4    ADDICTION/PERSONAL INJURY          4:22-MD-03047-YGR
 5    PRODUCTS LIABILITY LITIGATION
 6    ******************************
 7    This Document Relates To:         MDL No. 3047
 8
 9    ALL ACTIONS
10    ******************************
11
12
13                 VIDEOTAPED DEPOSITION OF
14                    JOHN M. HARDING
15
16
17   Held At:          MORGAN LEWIS
                       One Market
18                     Spear Tower, 28th Floor
                       San Francisco, California
19
                       March 25th, 2025
20                        9:04 a.m.
21
22
23
24   Reported By:
25   MAUREEN O. POLLARD, CSR #14449, RDR
```

Page 9

1              P R O C E E D I N G S

2

3          THE VIDEOGRAPHER:  We are now on the

4     record.  My name is Alejandro Zamora Ruiz,

5     I am the videographer for Golkow.

6          Today's date is March 25, 2025, and the

7     time is 9:04 a.m. Pacific Time.

8          This video deposition is being held at

9     Morgan Lewis at One Market Plaza, Spear

10    Tower, San Francisco, California 94105, in

11    the matter of In Re:  Social Media

12    Adolescent Addiction/Personal Injury

13    Products Litigation for the United States

14    District Court, Northern District of

15    California.

16          The deponent is John Harding.

17          Counsel will be noted on the

18    stenographic record.

19          And the court reporter will now

20    introduce themselves and swear in the

21    witness.

22          THE STENOGRAPHER:  My name is Maureen

23    Pollard, California CSR Number 14449.

24                    *    *    *

25          ///

Page 10

1    Whereupon,

2                        JOHN M. HARDING,

3    being first duly sworn to testify to the truth, the

4    whole truth, and nothing but the truth, was examined

5    and testified as follows:

6                        EXAMINATION

7    BY MR. DRAPER:

8            Q.    Good morning, Mr. Harding.

9            A.    Good morning.

10           Q.    My name is Glenn Draper, and I'm one of

11   the attorneys for the kids and families and school

12   districts and other local government agencies who

13   have brought claims against the social media

14   companies including YouTube.  I had a chance to

15   introduce myself before the deposition started.

16                   We're here in San Francisco today at

17   the offices of the Morgan Lewis law firm to take

18   your deposition.  You are appearing pursuant to a

19   notice of deposition that we will go ahead and mark

20   as YouTube-Harding Exhibit 1.

21                       (Whereupon, Google-YouTube-Harding-1

22                       was marked for identification.)

23   BY MR. DRAPER:

24           Q.    And I'll go ahead and hand it to you.

25   And we're going to look at it a little more in-depth

Page 11

1    in a minute, but it's my habit just to mark those

2    always as the first exhibit.

3              So this deposition is being taken in

4    what's called an MDL, which stands for multidistrict

5    litigation, in federal court, and it will also be

6    used in what is called a JCCP, which stands for

7    Judicial Commission Coordinated Proceeding, in

8    California state court.  So you might hear me use

9    both those terms today, MDL and JCCP.  It's just the

10   way these cases are grouped together.  Okay?

11        A.    Okay.

12        Q.    Have you ever had your deposition taken

13   before?

14        A.    Yes.

15        Q.    And when?  When did you have it taken

16   before?

17        A.    It was quite some time ago, maybe 10,

18   15 years ago.

19        Q.    And was it a case that had to do with

20   your work at Google or YouTube?

21        A.    Yes.

22        Q.    And what was the context of the case?

23        A.    It was a patent lawsuit.

24        Q.    Patent lawsuit.  Okay.

25              And is that the only deposition you've

```
                                            Page 12
 1    given before today?
 2            A.      Yes.
 3            Q.      Ever testified in court before?
 4            A.      No.
 5            Q.      I'm sure your attorney has covered some
 6    of these rules for a deposition, but I just want to
 7    go over them again to make sure you have them in
 8    mind.  Okay?
 9            A.      Okay.
10            Q.      You've been sworn by the court
11    reporter, which means you're under oath.  You're
12    testifying just as though you were sitting in a
13    courtroom before a jury and a judge, right?
14            A.      Okay.
15            Q.      You understand that?
16            A.      Yes.
17            Q.      Okay.  And, in fact, you might hear me
18    or your attorney refer to the jury today even though
19    they're not physically present.  Okay?
20            A.      Okay.
21            Q.      And that's because the deposition is
22    being recorded -- you can see the video camera, I'm
23    sure -- and the video and the written transcript may
24    be presented later in court or used for any other
25    purposes authorized under state or Federal Rules of
```

```
                                            Page 13
 1   procedure and evidence.
 2              Do you understand?
 3        A.    I do.
 4        Q.    Any questions about that?
 5        A.    Not right now.
 6        Q.    Okay.  It's important you answer my
 7   questions today verbally because the court reporter
 8   is taking down everything that we say, so if you nod
 9   or answer with something like uh-huh or uh-uh, it
10   doesn't really come through on transcript.
11              Do you understand?
12        A.    I do.
13        Q.    Okay.  And it's really important that
14   we not talk over each other because it's hard for
15   the court reporter to take down two people talking
16   at once.  I'll do my best to let you complete your
17   answer before I ask the next question, and if you
18   could do your best to let me complete the question
19   before you begin your response, that will make sure
20   we have a clean transcript.
21              Do you understand?
22        A.    I do.
23        Q.    Okay.  You're doing great so far.
24              I'll tell you that I sometimes struggle
25   with this, so you can expect that we're going to
```

Page 14

1    have to stop and do it over again to make sure we
2    have a clean record where we're not talking over
3    each other.  It doesn't mean we're doing anything
4    wrong, it's not really a natural way to talk.  But,
5    you know, if I ask you to repeat an answer or to let
6    me make sure I finish an answer -- or finish a
7    question before you begin your response, I'm just
8    doing it to make sure we have a clean record.  All
9    right?
10        A.    Okay.
11        Q.    Okay.  If you don't understand my
12   question, just ask me to repeat it or rephrase it
13   and I will.  Okay?
14        A.    Okay.
15        Q.    You're represented by an attorney
16   today?
17        A.    Yes.
18        Q.    Lauren White, right?
19        A.    Yes.
20        Q.    Your attorney might have some
21   objections to some of my questions today.  Let her
22   complete the objection before you respond.  Most of
23   the time I think your attorney is going to tell you
24   to go ahead and answer the question despite the
25   objection, and that's so we can take the transcript

Page 15

```
 1   to the Judge later, get a ruling on the objection.
 2   If the objection is overruled, we don't have to come
 3   back and ask the question, we already have the
 4   answer.  If the objection is sustained, the Judge
 5   will toss out the question and the response to it.
 6   But it's just so the whole process goes faster.
 7   Okay?
 8           A.    Okay.
 9           Q.    So there will be a few times today --
10   there may be a few times today where your lawyer
11   tells you not to answer the question, so that's
12   another reason to let her finish the objection
13   before you answer.  Okay?
14           A.    Okay.
15           Q.    There will be a few times today where
16   we're all talking at once and we'll have to stop and
17   do everything over sequentially, question,
18   objection, answer, happens most every deposition.
19                 Do you understand?
20           A.    I do.
21           Q.    You can take a break today when you
22   want.  I usually like to break about every
23   90 minutes.  If you want one sooner, just ask.  The
24   only rule is you have to answer the pending
25   question, right?
```

```
1              Do you understand?
2        A.    I do.
3        Q.    Anything that would affect your memory
4   or ability to tell the truth today?
5        A.    No.
6        Q.    You haven't taken any medications that
7   might make it difficult to you -- or difficult for
8   you to concentrate or remember?
9        A.    No.
10       Q.    All right.  Got a good night sleep last
11  night?
12       A.    Yes.
13       Q.    Excellent.
14             Questions at all kind of before we
15  begin?
16       A.    No, not right now.
17       Q.    Okay.  So you're represented today by
18  Lauren White from the Wilson Sansoni firm, correct?
19       A.    Correct.
20       Q.    She also represents Google and YouTube.
21             You understand that?
22       A.    I do.
23       Q.    When did you find out we had requested
24  your deposition in this case?
25       A.    I believe it was five or six weeks ago.
```

Page 17

1          Q.    Have you met with Ms. White who
2     represents Google and YouTube to prepare for the
3     deposition?
4               MS. WHITE:  You can answer that yes or
5          no.
6               THE WITNESS:  Yes.
7     BY MR. DRAPER:
8          Q.    I don't want to ask about the content
9     of any of your meetings with the attorneys, but I
10    want to ask a little bit about the circumstances of
11    those meetings.  Okay?
12         A.    Okay.
13         Q.    When was the first time you met with
14    the attorneys?
15         A.    Soon after I found out about the
16    deposition, about five or six weeks ago, I think.
17         Q.    Okay.  How many times have you met with
18    them?
19         A.    Four, I believe.
20         Q.    And about how long total would you say
21    that you've spent with them preparing for this
22    deposition?
23         A.    Approximately ten hours.
24         Q.    Okay.  All right.  So now we're going
25    to get to what we have marked as YouTube-Harding

Page 18

1   Exhibit 1.  This is the Notice of In-Person
2   Videotaped Deposition of John Harding.
3              Have you seen this document before?
4        A.    Let me take a look.
5        Q.    Sure.
6        A.    I don't believe I have.
7        Q.    Okay.  There is on page 2 a request
8   that you bring certain documents with you to the
9   deposition, and I'd like to go through those
10  document requests and see if you have any of those
11  documents with you even though you haven't seen the
12  notice.  Okay?
13       A.    Okay.
14       Q.    Are you there?  Do you see on the
15  bottom around line 21 at page 2 --
16       A.    I see this.
17       Q.    Right.
18             -- "Please Take Further Notice," and
19  then it has a list.
20       A.    Okay.
21       Q.    Okay.  Number 1 is, "All documents and
22  communications used to refresh the witness's
23  recollection."
24             When you were meeting with Ms. White or
25  other attorneys for Google and YouTube, did you

Page 19

```
 1   review any documents or communications?
 2            MS. WHITE:  You can answer that yes or
 3        no.
 4            THE WITNESS:  Yes.
 5   BY MR. DRAPER:
 6        Q.   Okay.  Did those documents or
 7   communications refresh your recollection about the
 8   events that were described in those documents or
 9   communications?
10            A.   No.
11            Q.   No.  Okay.
12            MR. DRAPER:  Have all of the -- and
13        this is directed to your attorney actually,
14        not to you.
15            Have all of the documents that the
16        witness reviewed been produced and marked
17        with a Google Bates stamp in this
18        litigation?
19            MS. WHITE:  They have.
20            MR. DRAPER:  Okay.
21   BY MR. DRAPER:
22        Q.   Okay.  Number 2, sir, is a copy of your
23   curriculum vitae.  And your attorneys forwarded us
24   yesterday a copy of your LinkedIn profile that has a
25   list of your professional history and
```

```
                                        Page 20
 1   accomplishments.  So that will suffice for that one.
 2              Number 3 is the employee custodial
 3   file.
 4              MR. DRAPER:  An, was that produced in
 5         this case.
 6              MS. TRUONG:  Yes.
 7              MR. DRAPER:  Great.  We got it.
 8   BY MR. DRAPER:
 9        Q.   Did you make any notes to help you for
10   this deposition, sir?
11        A.   No.
12        Q.   Okay.  That takes care of number 5.
13              All right.  I don't want to ask about
14   any of the rest of them.
15              Okay.  Let me ask you a little bit
16   about your background, okay?  So you're currently
17   the vice president of engineering for YouTube Music
18   and YouTube Premium?
19        A.   That's correct.
20        Q.   Okay.  And who do you report to in that
21   role?
22        A.   Scott Silver.
23        Q.   Okay.  And you have had that position
24   since 2017?
25              MS. WHITE:  Objection.
```

Page 21

```
 1              Is there a question?
 2              MR. DRAPER:  Yes, that's a question.
 3    BY MR. DRAPER:
 4         Q.    Have you had that position since 2017?
 5         A.    Yes.
 6         Q.    All right.  Prior to that you were the
 7    vice president of engineering for emerging
 8    experiences at YouTube, right?
 9         A.    That's correct.
10         Q.    Okay.  You had that position from 2015
11    to 2017, correct?
12         A.    That's correct.
13         Q.    Okay.  And emerging experiences means
14    that you worked on the engineering for non-core
15    YouTube experiences, things like YouTube Living
16    Room, right?
17         A.    Correct.
18         Q.    YouTube Living Room is a version of
19    YouTube designed to be seen on a television and
20    watched similar to Netflix?
21         A.    That's correct.
22         Q.    Okay.  And you also worked on YouTube
23    Live which involves live broadcasts on YouTube?
24              MS. WHITE:  Objection.  Is there a
25         question?
```

Page 22

```
 1              MR. DRAPER:  Yes, that's the question.
 2   BY MR. DRAPER:
 3        Q.    Did you work on YouTube Live which
 4   involves live broadcasts on YouTube?
 5        A.    Yes.
 6        Q.    Okay.  And you also worked on YouTube
 7   Gaming, correct?
 8        A.    Correct.
 9        Q.    And YouTube Music, correct?
10        A.    That's correct.
11        Q.    All right.  And you would agree with me
12   that music and gaming are two areas that are
13   critical for YouTube's efforts to attract young
14   users?
15              MS. WHITE:  Object to form.
16              THE WITNESS:  We view them as key
17         efforts for all of YouTube's users.
18   BY MR. DRAPER:
19        Q.    Okay.  And isn't it true that most of
20   the music and gaming users are on the younger side
21   at YouTube?
22              MS. WHITE:  Object to form.
23              THE WITNESS:  I don't actually have
24         that data in memory.
25              ///
```

Page 23

```
 1   BY MR. DRAPER:
 2        Q.    Okay.  All right.  Before you were vice
 3   president of engineering for emerging experiences,
 4   you were an engineering director at YouTube from
 5   2010 to 2014, is that right?
 6        A.    That's correct.
 7        Q.    Okay.  And in that role you were part
 8   of the core engineering team, right?
 9        A.    That's correct.
10        Q.    Okay.  And you worked on things like
11   building out YouTube's infrastructure and
12   operations, video ingestion processing, streaming,
13   playback, data warehouse, that kind of thing, right?
14        A.    That's correct.
15        Q.    All right.  And before you were an
16   engineering director you were an engineering manager
17   at YouTube from 2007 to 2010, right?
18        A.    That's correct.
19        Q.    Okay.  The engineering manager position
20   at YouTube was your first job at YouTube, correct?
21        A.    That's correct.
22        Q.    All right.  And prior to that you were
23   a software engineer at Google from 2005 to 2007?
24        A.    That's correct.
25        Q.    All right.  And at Google, one of the
```

Page 24

1   things you worked on was the Google video player, is

2   that right?

3          A.    That's correct.

4          Q.    All right.  Okay.  That's your

5   background out of the way.  I want to ask you some

6   things about your day-to-day work at YouTube now.

7   All right?

8          A.    Okay.

9          Q.    What are the different ways you

10  communicate with your coworkers at YouTube?

11         A.    We use Gmail, we use Google Chat, we

12  talk in person, we use Google Meet for

13  videoconferencing, occasionally phone calls.  And

14  then we use documents like Google Docs, Google

15  Sheets, Google Slides.

16         Q.    Okay.  And I've seen in the documents

17  fairly often offsite meeting notes.  Is that kind of

18  a regular thing that's done at YouTube?

19              MS. WHITE:  Object to form.

20              THE WITNESS:  Teams will have, like,

21         offsite strategy meetings or fun events,

22         yes.

23  BY MR. DRAPER:

24         Q.    Okay.  All right.  Are you one of those

25  people who routinely cleans out their e-mail inbox?

Page 25

1          A.     What do you mean by "clean out"?

2          Q.     Well, there are some people -- I'm not

3     one of them, but there are some people who will

4     delete e-mails when they've read them or when they

5     think they no longer need them, and then there's

6     other people, I am one, who like never delete

7     anything and just let it sit.

8          A.     I don't delete my e-mails generally.  I

9     use Gmail's archive feature which keeps them but

10    removes them from my inbox.

11         Q.     Okay.  Do you have any form of auto

12    delete that applies to your e-mails, sir?

13         A.     I don't believe so.

14         Q.     Okay.  I've seen lots of Google slide

15    presentations in the YouTube documents.  Seems like

16    a pretty common way to present information to fellow

17    YouTube employees, right?

18         A.     Yes.

19         Q.     Do you keep a file of the Google slide

20    presentations you've worked on?

21              MS. WHITE:  Object to form.

22              THE WITNESS:  I don't keep a file.

23          Google Slides just has them all.

24    BY MR. DRAPER:

25         Q.     Okay.  All right.  Do you work on a

Page 26

1    laptop or a desktop?

2              A.    Primarily a laptop.

3              Q.    Okay.  And do you keep any work files,

4    e-mails, Google slide presentations stored locally

5    on your computer as opposed to stored in a larger

6    company-wide storage system?

7              A.    No.  I use the cloud storage.

8              Q.    So you mentioned Google Chats.  Is that

9    a common or uncommon feature that you use to

10   communicate with people at YouTube?

11             A.    It's fairly common.

12             Q.    All right.  I understand that Google

13   Chats has a setting, I think it's called "history

14   off," so that chats aren't saved for more than a

15   short period.

16                   Do you understand that?

17             A.    I've heard of that feature.

18             Q.    Okay.  Do you know how it works?

19             A.    I do not.

20             Q.    Is it your habit to leave history on,

21   or do you usually have history off?

22             A.    I don't do any changes to the history

23   settings.

24             Q.    Okay.  Have you ever been asked by

25   anyone at YouTube to turn history off in a specific

Page 27

1    chat string?

2          A.    I don't believe so.

3          Q.    Do you have an official work phone

4    provided to you by YouTube for your business

5    purposes?

6          A.    No.

7          Q.    Do you have a personal phone?

8          A.    I do.

9          Q.    Do you ever use your personal phone to

10   communicate with other YouTube employees about work?

11         A.    Yes.

12         Q.    Do you text with other YouTube

13   employees about work from your personal phone?

14         A.    No.

15         Q.    So how do you communicate with them

16   from your personal phone?

17         A.    Voice calls.

18         Q.    Voice calls.  Okay.

19               Mr. Harding, do you agree that a

20   corporation should not release an application

21   designed for teens and younger kids without knowing

22   that the application is safe for them?

23               MS. WHITE:  Object to form.

24               THE WITNESS:  I think when we release

25          applications we try to balance the needs of

Page 40

```
 1   founded, the founders knew they wanted to have a
 2   video hosting site but they weren't sure exactly
 3   what type of video hosting site it would be?
 4              MS. WHITE:  Objection.  Lacks
 5         foundation.
 6              THE WITNESS:  I don't know what their
 7         plans were when they founded it.
 8   BY MR. DRAPER:
 9         Q.   Did you know that they considered
10   having YouTube be a video dating site?
11              MS. WHITE:  Objection.  Lacks
12         foundation.
13              THE WITNESS:  I heard lots of different
14         stories about founding lore of the company.
15   BY MR. DRAPER:
16         Q.   Is that one of them?
17         A.   That is one of the stories.
18         Q.   Okay.  All right.  Would you agree with
19   me that in the time that you have been at YouTube
20   since 2007, growth, however it's been measured, has
21   been an important goal at YouTube.
22              MS. WHITE:  Objection to form.
23              THE WITNESS:  Growth of value is
24         probably the main thing we look at, are we
25         delivering value for the ecosystem.
```

Page 41

1    BY MR. DRAPER:

2         Q.    However it's measured, growth has been

3    an important goal at YouTube in the time you've been

4    there?

5              MS. WHITE:  Objection to form.

6    BY MR. DRAPER:

7         Q.    Correct?

8              MS. WHITE:  Objection to form.

9              THE WITNESS:  Growth of the value that

10        we're delivering through the product, yes.

11   BY MR. DRAPER:

12        Q.    I see.

13             When you were the engineering director

14   at YouTube from 2010 to 2014, one of your jobs was

15   to make sure that the YouTube infrastructure, the

16   equipment and software that makes YouTube run, video

17   ingestion, processing streaming, one of your jobs

18   was to make sure that infrastructure was capable of

19   handling the growth that was planned, right?

20             MS. WHITE:  Objection to form.

21             THE WITNESS:  That's correct.

22   BY MR. DRAPER:

23        Q.    All right.  From early on YouTube set

24   very ambitious goals for itself in terms of growth,

25   right?

Page 194

1           Q.    Okay.  And this document is an e-mail

2      from ████████████  on behalf of ████████████  at Google

3      to ████████████  at Google.

4                 Do you recognize any of those names?

5           A.    Yes.

6           Q.    And who are they, please?

7           A.    ████████████  was a product manager.  I

8      don't -- I don't know what Kubrik is.  ████████████,

9      the name is familiar, but I don't recall what he

10     did.

11          Q.    Okay.  All right.  And this is an

12     e-mail string dated June of 2012, correct?

13          A.    That's what it appears to be.

14          Q.    All right.  And if you look, sir, at

15     the bottom of the second page, ████████████  is

16     described as the engineering manager for Player at

17     YouTube.

18                Do you see that?

19          A.    I do.

20          Q.    Do you recall that position?

21          A.    I recall that as a position.

22          Q.    Okay.  Do you agree that since this

23     document was found in your custodial file that it

24     was sent to you somehow?

25                MS. WHITE:  Objection.  Lacks

Page 195

1          foundation.
2                  THE WITNESS:  I don't know how things
3              would end up in whatever custodial file it
4              is.
5    BY MR. DRAPER:
6          Q.    All right.  Any reason to think that
7    this document is not what it appears to be, an
8    e-mail between coworkers at YouTube?
9                  MS. WHITE:  Objection.  Lacks
10             foundation.
11                 THE WITNESS:  That's what it seems to
12             be.
13   BY MR. DRAPER:
14         Q.    All right.  If you look at the part of
15   the e-mail on the first page that was sent on
16   June 7, 2012 from ██████████, it's designated as
17   "Notes from iOS Creator App review."
18                 Do you see that?
19         A.    I do.
20         Q.    All right.  And then down below that it
21   says "Value prop."
22                 Do you see that?
23         A.    I do.
24         Q.    All right.  And the last item for Value
25   prop is, "Goal is not viewership, it's viewer

Page 196

```
 1    addiction."
 2                   Do you see that?
 3         A.    I do.
 4         Q.    Okay.  So you would agree with me that
 5    at least ████████ had in mind to make the YouTube
 6    application addictive as of June of 2012?
 7                   MS. WHITE:  Objection.  Lacks
 8             foundation, mischaracterizes the document.
 9                   THE WITNESS:  I don't know what he had
10             in mind.  The context of this document is
11             about a video creation app, so that last
12             sentence doesn't even make sense because
13             the video creation app -- that's what
14             Kubrik was, Kubrik was a code name for our
15             video creation app that we built at one
16             time.  I don't know, that wasn't even built
17             for viewers, it was built for creators.
18    BY MR. DRAPER:
19         Q.    And was it going to be integrated into
20    the YouTube application?
21         A.    I don't think so.
22         Q.    Was it released separately ever?
23         A.    I'm not sure if it ever released.  I
24    think it did, but I'm not sure.
25         Q.    I'm sorry, you said you didn't know
```

```
                                            Page 200

 1    application every day?

 2                MS. WHITE:  Objection.  Lacks

 3           foundation.

 4                THE WITNESS:  Again, I don't agree with

 5           the framing of the question, but I still

 6           don't know what warnings we do or don't

 7           issue.

 8    BY MR. DRAPER:

 9           Q.    And did YouTube ever warn parents or

10    children that it had set out to create an addictive

11    application?

12                MS. WHITE:  Objection.  Lacks

13           foundation.

14                THE WITNESS:  Again, I don't agree with

15           the premise, and I don't know what warnings

16           we do or don't issue.

17    BY MR. DRAPER:

18           Q.    All right.  Do you agree with me, sir,

19    that by 2017 or 2018 addiction to social media was a

20    concern both inside and outside of YouTube?

21                MS. WHITE:  Objection.  Lacks

22           foundation.

23                THE WITNESS:  It's out of my area of

24           responsibility and so I wasn't tracking

25           when things would have been on radar.  We
```

Page 201

```
 1          don't typically think of YouTube as social
 2          media, we're a video distribution platform,
 3          so the framing wouldn't apply.  But maybe I
 4          misunderstood the question.
 5    BY MR. DRAPER:
 6          Q.    Why don't you think of YouTube as a
 7    social media platform?
 8          A.    We're primarily about creators
 9    distributing video to an audience.  It's not a
10    social interaction platform.  Again, it's video
11    distribution/consumption for creators to build
12    businesses on.
13          Q.    At one time YouTube had the ability to
14    send direct messages from user to user, correct?
15               MS. WHITE:  Objection.  Lacks
16          foundation.
17               THE WITNESS:  That is correct.
18    BY MR. DRAPER:
19          Q.    And that feature was created in hopes
20    of fostering communities and allowing people to
21    discuss privately videos that they were watching?
22               MS. WHITE:  Objection.  Lacks
23          foundation.
24               THE WITNESS:  I believe the direct
25          messaging existed before we bought YouTube,
```

Page 227

1          A.    I don't believe I have.
2          Q.    The next bullet point is for "Late
3     night use."
4                Do you see that?
5          A.    I do.
6          Q.    And it says, "█ percent of teens on
7     YouTube watch past midnight on school nights."
8                Correct?
9          A.    That is what's written here.
10         Q.    And when it talks about █ percent of
11    teens on YouTube, it's talking about declared teens,
12    right?
13                MS. WHITE:  Objection.  Lacks
14           foundation.
15                THE WITNESS:  I'm not familiar with the
16           document, so I don't know how they're
17           determining that.
18    BY MR. DRAPER:
19         Q.    All right.  Are you familiar with the
20    distinction between declared teens and inferred
21    teens at YouTube?
22         A.    I've heard of the distinction, but I
23    don't understand the details of how they're defined.
24         Q.    You understand that a declared teen is
25    someone who would be a teenager according to the

```
                                                   Page 230
 1                Do you see that?
 2        A.    I do.
 3        Q.    All right.  And then the next bullet
 4   point is "Unintentional use," and it says, "Among
 5   users 18-24 years old, 23 percent report 'losing
 6   track of time on YouTube.'"
 7                Do you see that?
 8        A.    I do.
 9        Q.    "20 percent report 'procrastinating on
10   YouTube.'"
11                Do you see that?
12        A.    I do.
13        Q.    "And 20 percent report YouTube
14   'interfered with work, school, or homework.'"
15                Correct?
16                MS. WHITE:  Objection to form.
17            Mischaracterizes the document.
18                THE WITNESS:  That's what's written
19            here.
20   BY MR. DRAPER:
21        Q.    All right.  And so at this time in
22   2017, 2018, YouTube's focus on digital wellbeing was
23   concentrated on these areas, habitual heavy use,
24   late night use, unintentional use.
25                Do you agree?
```

Page 325

1              extend Watch Next."
2    BY MR. DRAPER:
3         Q.    Right.  I think we're talking about the
4    same thing.  Right?  Infinite scroll, it just never
5    stops?
6              MS. WHITE:  Objection.
7         Mischaracterizes testimony.
8              THE WITNESS:  It might be a nuance in
9              terms.  The way I understand this is
10             there's content available, it doesn't
11             scroll on its own, it's just you can keep
12             looking for more.
13   BY MR. DRAPER:
14        Q.    You just keep swiping, it's going to
15   keep showing up?
16             MS. WHITE:  Objection.
17        Mischaracterizes testimony.
18   BY MR. DRAPER:
19        Q.    Right?
20        A.    Again, not familiar with the feature,
21   but that sounds correct.
22        Q.    All right.  Okay.  I'm going to move on
23   to another document.
24             You would agree with me, sir, that
25   continued growth remains an important goal at

                                        Page 326

1    YouTube even today?

2                    MS. WHITE:  Objection.  Lacks

3            foundation.

4                    THE WITNESS:  Continuing growth of user

5            value, creator value, business value, yes.

6    BY MR. DRAPER:

7            Q.    Right.

8                    And part of that goal is continuing to

9    refine the recommendation system for YouTube?

10                   MS. WHITE:  Objection.  Lacks

11           foundation, vague.

12                   THE WITNESS:  Improving our

13           recommendations is one way we hope to

14           deliver more value for all of those users.

15   BY MR. DRAPER:

16           Q.    And that includes pushing out the time

17   horizon that YouTube can predict with its algorithm?

18                   MS. WHITE:  Objection.  Lacks

19           foundation, vague.

20                   THE WITNESS:  I'm not sure what you

21           mean.

22   BY MR. DRAPER:

23           Q.    All right.  Well, let's look at a

24   document, then.  This would be 6768.

25                   ///

Page 333

1 ████████████████████

2          MS. WHITE:  Objection.

3      Mischaracterizes the document, lacks

4      foundation.

5          THE WITNESS:  I didn't write this, so

6      I'm not sure, but when we talk about

7      predicting, ███████████████████

█ ████████████████████████████

█ ██████████████████████████████

█ ██████████████████████████

11 BY MR. DRAPER:

12     Q.    Right.  Well, that's how the

13 recommendations model works, right? ████████████

█ ████████████████████████████████

█ ██████████████████████████████████

█ ████████████████████████████████████

█ ████████████████████████ That's what

18 the recommendation does, it's a giant prediction

19 engine?

20          MS. WHITE:  Objection.  Lacks

21      foundation.

22          THE WITNESS: ████████████████████

█ ████████████████████████████████████

█ ██████████████████████████████

█ ████████████████████████████

Page 334

1    BY MR. DRAPER:

2         Q.    Right.

3         A.    ███████████████████████████

     ██████████████████████████████████

     ███████

6         Q.    Exactly.

7               Doesn't that kind of scare you a bit --

8               MS. WHITE:   Object --

9    BY MR. DRAPER:

10        Q.    --  ████████████████████████

     ████████████████████████████████████

     ██████████████████████████████

     █████████████████████████████████████

     ████████████████████████████████████

     ██████

16              MS. WHITE:   Objection.  Lacks

17         foundation.

18              THE WITNESS:   ██████████████

     ████████████████████████████

     ██████████████████████████████

     ████████████████████████

     ██████████████████████████

     ██████████████████████████

24    BY MR. DRAPER:

25        Q.    Have you heard that the goal behind

Page 335

1  every view at YouTube is to drive long-term watch

2  time, long-term engagement?  Have you ever heard

3  that?

4      A.    Not that.  I've heard the goal to drive

5  long-term value.

6      Q.    And the goal of the recommendation

7  system is not only to predict what will happen, but

8  to influence what will happen by showing you

9  particular videos that are going to cause you to do

10 certain things?

11          MS. WHITE:  Objection.  Lacks

12      foundation.

13          THE WITNESS:  ████████████████████

   ████████████████████████████████████████████

   ███████████████████████████████████████████

   ████████████████████████    ██████████████████

   █████████████████████████████████████████████

   █████████████████████████████████████████

   ████████████

20 BY MR. DRAPER:

21      Q.    I think I understand that.

22          Okay.  Another topic.

23          YouTube Shorts is a feature that

24 YouTube released in 2020, correct?

25      A.    I don't recall exactly when it

Page 350

1          CERTIFICATE OF COURT REPORTER

2

3          I, MAUREEN O'CONNOR POLLARD,

4     Registered Diplomate Reporter, CSR No.

5     14449 for the State of California, the

6     officer before whom the foregoing

7     deposition was taken, do hereby certify

8     that the foregoing transcript is a true

9     and correct record of the testimony

10    given; that said testimony was taken by

11    me stenographically and thereafter

12    reduced to typewriting under my

13    direction; and that I am neither

14    counsel for, related to, nor employed

15    by any of the parties to this case and

16    have no interest, financial or

17    otherwise, in its outcome.

18          Dated this 4th day of April, 2025.

19

20    _____

21    MAUREEN O'CONNOR POLLARD

22    CSR No. 14449

23

24

25