**AMENDED Exhibit 1024**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

HIGHLY CONFIDENTIAL

Page 9

1    FEBRUARY 26, 2025                9:36 A.M. PACIFIC TIME
2                    P R O C E E D I N G S
3
4                    MORNING SESSION
5            THE VIDEOGRAPHER:  We are now on the
6    record.  My name is Chris Ritona.  I'm the
7    videographer with Golkow.  Today's date is
8    February 26th, 2025, and the time is approximately
9    9:36 a.m. Pacific.  This video deposition is being
10   held in San Francisco, California at Wilson Sonsini
11   in the matter of the Social Media Adolescent
12   Addiction Personal Injury Products Liability
13   Litigation, for the U.S. District Court, for the
14   Northern District of California, and the deponent
15   today is Dr. Jessica Dzuban.
16           Counsel's appearances will be noted on the
17   stenographic record.  The court reporter today is
18   Kathleen Maltbie, and she will now introduce herself
19   and swear in the witness.
20           THE REPORTER:  Good morning.  We are on
21   the record.  Today's date is February 26, 2025.  My
22   name is Kathleen Maltbie.  I am a certified
23   shorthand reporter licensed in the State of
24   California, California CSR No. 10068, also licensed
25   in the states of Nevada and Texas.

HIGHLY CONFIDENTIAL

Page 10

```
 1              Would you raise your right hand, please?
 2               JESSICA DZUBAN, Psy.D.,
 3                  having been duly sworn,
 4          was examined and testified as follows:
 5              MS. HAILESELASSIE:  Good morning.  My name
 6   is Jade Haileselassie with Motley Rice, and I
 7   represent the plaintiffs in this matter, personal
 8   injury and also school district plaintiffs.
 9              MS. BREAKELL:  Good morning.  My name is
10   Riley Breakell.  I'm an attorney at Motley Rice, and
11   I also represent the plaintiffs in this matter,
12   personal injury and school districts.
13              MS. WADHWANI:  I think we're putting
14   appearances on the stenographic record, right?  Or
15   do you want me to go through it?
16              MS. HAILESELASSIE:  Okay.  Thank you.  I
17   had forgotten we were doing that convention.
18              EXAMINATION BY MS. HAILESELASSIE
19   BY MS. HAILESELASSIE:
20       Q.   Good morning, Ms. Dzuban.  So you've just
21   heard me introduce myself.
22              Will you please introduce yourself for the
23   jury?
24       A.   Yes.  Dr. Jessica Dzuban.
25       Q.   Thank you.
```

HIGHLY CONFIDENTIAL

Page 11

1          And as you heard me say, I'm here today on
2    behalf of the plaintiffs.  There are hundreds of
3    children and school districts who have alleged that
4    the conduct of Google has injured them, and they
5    have filed suit against Google and YouTube in
6    federal court.  So we are here this morning in
7    San Francisco to take your deposition.
8          You've been sworn in by the court
9    reporter, and you're under oath that you'll testify
10   truthfully today.
11         Are you committed to testifying truthfully
12   in this matter today?
13      A.   Yes.
14         MS. WADHWANI:  Objection to form.
15   Objection to the preamble.
16         Just give me a moment before answering.
17         THE WITNESS:  Okay.
18         MS. WADHWANI:  Thanks.
19         THE WITNESS:  Yes.
20   BY MS. HAILESELASSIE:
21      Q.   So that means even though we're here in
22   this conference room, you're testifying just as
23   though you are sitting before the judge and jury,
24   and your deposition is being recorded in a number of
25   ways.  It is being videotaped.  There will also be a

HIGHLY CONFIDENTIAL

Page 12

1    stenographic record, which will be turned into a

2    written transcript.  Either the video or the

3    transcript of your testimony today can be presented

4    later in court or it can be used for any purposes

5    authorized under state or federal law.

6            Do you have any questions about that?

7    A.   No.

8    Q.   I'm sure you've been well prepared by your

9    counsel on what to expect today, but I want to go

10   over some general rules for a deposition, just so we

11   have a record that we're all on the same page as far

12   as that's concerned.

13           First of all, your responses should be

14   verbal.  And you've already been great about doing

15   that, but in typical conversation, there may be

16   situations where you lapse into nodding or shaking

17   your head.  So if that should happen, I'll just

18   remind you that we need a verbal response on the

19   record so it can be recorded by the court reporter.

20           Another thing that can happen in

21   conversation is talking over each other.  You may

22   anticipate what I'm going to say.  If that happens,

23   we'll just have to make sure that we get the

24   question on the record and then the answer after it,

25   so it can be, again, clearly reported by the court

HIGHLY CONFIDENTIAL

Page 13

1    reporter.

2              Do you agree?

3              MS. WADHWANI:  Objection to form.

4              THE WITNESS:  Agree with what?

5    BY MS. HAILESELASSIE:

6         Q.    That we'll try not to speak over each

7    other.

8         A.    Yes.

9         Q.    Thank you.

10             And your counsel will also be making

11   objections, as has already occurred, to my questions

12   today.  That will be to preserve the record, but you

13   will still need to answer the question after the

14   objection unless your counsel tells you not to.

15             Do you understand?

16        A.    Yes.

17        Q.    You can take a break at any point today.

18   What we will try to do is go for about an hour.  If

19   we're making good progress on a section or a

20   document, we may go a little longer.  But should you

21   need to take a break, just let me know, and as long

22   as there's not a question pending, then we can go

23   ahead and do that.

24             Do you understand?

25        A.    Yes.

HIGHLY CONFIDENTIAL

```
                                          Page 14

 1        Q.   Is there anything that would affect your

 2   memory today?

 3        A.   No.

 4        Q.   Did you get a good night of sleep?

 5        A.   I did.

 6        Q.   And is there anything that would affect

 7   your ability to tell the truth today?

 8        A.   No.

 9        Q.   We're in the office of Wilson Sonsini.

10             Are you represented by attorneys from

11   Wilson Sonsini?

12        A.   No.  I'm --

13        Q.   Okay.  Who -- who are you represented by

14   today?

15        A.   By Neelum Wadhwani.

16        Q.   And have you signed an engagement letter

17   with Ms. Wadhwani?

18        A.   I -- no.

19        Q.   Are you paying Ms. Wadhwani to represent

20   you?

21        A.   No.

22        Q.   Okay.  Who is -- who is paying for your

23   representation?

24        A.   Neelum is representing YouTube, and I

25   believe being paid by Google YouTube.
```

Q. Have you signed a common interest agreement with -- with Google or YouTube?

A. I'm not even sure what that is, so I don't think so.

Q. Have you -- have you signed any kind of agreement with any of the defendants in this litigation, either Google, YouTube or TikTok, or any law firm related to this representation?

MS. WADHWANI: Objection to form.

THE WITNESS: No.

BY MS. HAILESELASSIE:

Q. Okay. Do you consider that your interest is -- that your interest is the same in this litigation as the defendants?

MS. WADHWANI: Objection to form. Calls for a legal conclusion.

THE WITNESS: Sorry, can you repeat the question?

BY MS. HAILESELASSIE:

Q. So have you decided that your interest and Google's interest are aligned for purposes of this litigation?

MS. WADHWANI: Objection to form. Calls for a legal conclusion.

She's not a lawyer.

HIGHLY CONFIDENTIAL

Page 16

1              THE WITNESS:  I -- I feel like I have my

2      own interest in this as to giving information about

3      my time working there, but I can't presume to know

4      what Google's interests are in this case.

5      BY MS. HAILESELASSIE:

6          Q.    Fair enough.

7                Do you currently work for TikTok?

8          A.    Yes.

9          Q.    Do you understand that TikTok is also a

10     defendant in this action?

11         A.    Yes.

12         Q.    Have you spoken to anyone about this

13     deposition, other than Ms. Wadhwani or other lawyers

14     from her firm?

15         A.    I have informed a handful of people that

16     I'm being deposed, without further details.

17         Q.    Okay.  For clarification, you have -- have

18     you -- have you only informed people of the date and

19     time of the deposition and the fact that you are

20     being deposed?

21         A.    The date, the time, and the subject

22     matter, depending on the person.

23         Q.    Did any of the people you spoke with about

24     your deposition, other than your lawyers, work at

25     Google?

HIGHLY CONFIDENTIAL

```
                                              Page 17
 1        A.   Did anyone work at Google that knows about
 2   the deposition?  Yes.
 3        Q.   Was that someone you spoke to about your
 4   deposition?
 5        A.   That I informed that I was being deposed,
 6   yes.
 7        Q.   Okay.  Who was that?
 8        A.   ████████████████████████, Garth
 9   Graham, one of my former managers, informed him I
10   was being deposed.  I believe that's all.
11        Q.   Okay.  Sorry.  For clarification, are
12   those two different people?
13        A.   Correct.
14        Q.   Okay.  What is ██████████████  name?
15        A.   ██████████████.
16        Q.   Did any of the people that you spoke with
17   other than your lawyers work at TikTok?
18        A.   Yes.
19        Q.   And who did you speak to at TikTok?
20        A.   I spoke to a couple people who I wasn't
21   able to complete work for this week, just informed
22   them that I was being deposed.  I informed my
23   manager, my manager's manager, given I needed the
24   time off.  I informed TikTok's legal team to make
25   sure --
```

HIGHLY CONFIDENTIAL

Page 18

1           MS. WADHWANI:  You don't need to speak
2      about communications you had with TikTok's legal
3      team, but -- so you can stop with that, that you
4      informed them about the deposition.
5           THE WITNESS:  Correct.  I informed them.
6      Yeah.  And I think a couple other people were
7      wondering why I was out of office this week.  But,
8      again, just that I was being deposed.
9      BY MS. WADHWANI:
10          Q.   Okay.  And, again, for clarification, did
11     you speak with any of these people about the
12     substance of your testimony today?
13          A.   No.  Absolutely not.
14          Q.   Have you been deposed before?
15          A.   No.
16          Q.   How many times did you meet with your
17     lawyers to prepare for this deposition?
18          A.   Maybe four, five times.
19          Q.   And how long were those meetings?
20          A.   I think there was an initial call that was
21     maybe 30 minutes to an hour, and then a two-hour
22     phone call or -- yeah.  And then four hours for two
23     days, that I can remember.
24          Q.   Four hours on each of two days?
25          A.   Each of the two days, correct.

HIGHLY CONFIDENTIAL

Page 19

1      Q.    So is it you spent about 11 hours in
2  preparation; is that right?
3      A.    That sounds about right.  It may have been
4  plus or minus, yeah.
5      Q.    Did you review documents in preparation
6  for your deposition?
7      A.    Yes.
8      Q.    Do you know approximately how many
9  documents you reviewed?
10     A.    Maybe ten.  I did not keep track.
11     Q.    Did the documents you reviewed refresh
12 your recollection for purposes of your deposition?
13     A.    Certain project names, yes.
14     Q.    Okay.  And I'll just ask your defending
15 counsel.
16          MS. HAILESELASSIE:  Have -- were all of
17 the documents that Dr. Dzuban reviewed produced in
18 this litigation?
19          MS. WADHWANI:  Yes, they were.
20          MS. HAILESELASSIE:  Thank you.
21 BY MS. HAILESELASSIE:
22     Q.    Did you take any notes in preparation for
23 your deposition?
24     A.    I did not.
25     Q.    Have you reviewed any of the plaintiffs'

HIGHLY CONFIDENTIAL

Page 20

1    complaints in this case?

2         A.    No.

3         Q.    Have you talked about this litigation

4    generally with your coworkers at TikTok?

5         A.    No.  I mean, that it's happening.  People

6    know that this lawsuit is happening, but not about

7    details.

8         Q.    Do you understand what the litigation is

9    about?

10        A.    Yes.

11              MS. WADHWANI:  And let me just say, you

12   can answer that question to the extent that you

13   don't reveal any conversations you have had with

14   lawyers, conversations -- other than conversation

15   with a lawyer, based on your understanding of that

16   or any other sources other than lawyers, you can

17   testify to.

18              THE WITNESS:  All of my understanding of

19   what this case is about has been in discussion with

20   lawyers.

21              MS. WADHWANI:  Okay.  So you -- so I'm

22   going to instruct you not to answer.

23              THE WITNESS:  Yes.

24   BY MS. HAILESELASSIE:

25        Q.    Okay.  What is your understanding about

HIGHLY CONFIDENTIAL

Page 21

```
 1    what this lawsuit is about?
 2              MS. WADHWANI:  So Dr. Dzuban just
 3    testified that her understanding is based on
 4    communications with counsel, and so I'm going to
 5    instruct her not to answer that question.
 6              MS. HAILESELASSIE:  Okay.  I'm not asking
 7    her what counsel said.  I'm asking her for her
 8    understanding.
 9              MS. WADHWANI:  Correct.  But her
10    understanding is based on her communications with
11    counsel.
12    BY MS. HAILESELASSIE:
13        Q.   Have you ever read reports about this
14    litigation, public reports?
15        A.   No.
16        Q.   Were you aware of the litigation before
17    you knew you'd be deposed for it?
18        A.   Yes.
19        Q.   And how were you aware of it?
20        A.   During my time at YouTube, I was informed
21    by legal counsel that --
22              MS. WADHWANI:  That -- that --
23              THE WITNESS:  Okay.
24              MS. WADHWANI:  That's enough.
25              THE WITNESS:  Okay.
```

HIGHLY CONFIDENTIAL

Page 22

1   BY MS. HAILESELASSIE:

2       Q.    At this time, I just want to ask if you'll

3   commit to staying in touch with Ms. Wadhwani and

4   your attorneys regarding your whereabouts, whether

5   or not you're working at TikTok, so you can be

6   located in the event you need to be deposed at a

7   live trial.

8           Will you agree to that?

9           MS. WADHWANI:  I mean, Jade, if you need

10  to reach her, you can always reach out to me and we

11  can work out.  But we're not going to agree to -- at

12  this moment, to necessarily produce her or not

13  produce her at your request.  So as per the normal

14  course, if you are seeking Dr. Dzuban in the future,

15  please give me a call and I'm happy to talk to you.

16          MS. HAILESELASSIE:  Understood.

17  BY MS. HAILESELASSIE:

18      Q.    We are going to look at tab A, which is

19  going to be marked as Exhibit 1.

20          (Whereupon, Deposition Exhibit 1

21           was marked for identification.)

22  BY MS. HAILESELASSIE:

23      Q.    Dr. Dzuban, I'm showing you what's been

24  marked as Exhibit 1.  Actually, our -- and I'll just

25  say this once for the record.  Our naming convention

HIGHLY CONFIDENTIAL

Page 23

1    here is rather clunky.  It is Google YouTube Dzuban

2    Exhibit 1.  For the rest of this deposition, I will

3    just refer to the exhibits by their numbers.  But

4    I'm showing you what's been marked as Exhibit 1, and

5    it's the notice of your videotaped deposition.

6              Do you see that?

7         A.   Correct.  Yes.

8         Q.   Have you seen your deposition notice

9    before?

10        A.   I believe so.

11        Q.   Thank you.  You can put that one aside for

12   now.

13             I want to ask you a few questions about

14   your background.

15             What degrees do you hold and which

16   institutions did you receive them from?

17             MS. WADHWANI:  Objection to form.

18   Compound.

19             Go ahead.

20             THE WITNESS:  You want my highest degree

21   or all of them?

22   BY MS. HAILESELASSIE:

23        Q.   Post secondary.

24        A.   Secondary is high school?

25        Q.   Correct.

HIGHLY CONFIDENTIAL

```
                                          Page 24
 1       A.   I have an associate's degree from Skyline
 2  College in liberal studies, I have a bachelor's
 3  degree from San Francisco State in humanities, I
 4  have a master's degree in clinical psychology from
 5  California Institute of Integral Studies, and I have
 6  a doctorate in clinical psychology from that same
 7  school.
 8       Q.   What year did you receive your doctorate
 9  in psychology -- in psychology?
10       A.   2011.
11       Q.   What was the focus of your dissertation?
12       A.   My dissertation was focused on reducing
13  recidivism rates in state prisons, or factors that
14  reduce risk of recidivism in state prisons.
15       Q.   Are you currently licensed to practice
16  psychology?
17       A.   I am.
18       Q.   In which states do you hold a license?
19       A.   California.
20       Q.   When did you first obtain your license?
21       A.   2012.
22       Q.   And have you ever been suspended or
23  revoked?
24       A.   No.
25       Q.   Please describe your current employment.
```

HIGHLY CONFIDENTIAL

Page 25

1          A.    I currently work at TikTok as the global
2     head of mental health policy.
3          Q.    How long have you held that position?
4          A.    Since September 2024.
5          Q.    What are your primary responsibilities?
6          A.    I oversee all policy development for any
7     matters related to mental health.  I also serve as
8     subject matter expert sort of across partnerships,
9     products, youth safety in relation to mental health.
10          Q.    And where were you employed before your
11     current position?
12          A.    My job before was at Google as YouTube's
13     global head of mental health.
14          Q.    And in that position, what were your
15     responsibilities?
16          A.    My core work was I oversaw all of our
17     product and content partnerships as it related to
18     mental health, and then served as an internal
19     subject matter expert across policy, product,
20     government relations, sort of whatever teams needed
21     the help.
22          Q.    And what was your position prior to -- to
23     global head of mental health for YouTube?
24          A.    I was the -- I was employed by Google as a
25     chief mental health advisor for YouTube, and I also

HIGHLY CONFIDENTIAL

Page 26

1    was a clinical co-lead for benefits for employment

2    mental health for the company.

3         Q.    What are your areas of specialization?

4         A.    Anxiety, complex childhood trauma, young

5    adult identity development, grief and loss, crisis

6    stabilization, critical incident response.  Those

7    are my primary specializations, clinically.  I would

8    say now, with my work, also translational science of

9    synthesizing research and external expertise or

10   expertise in the space for program and products

11   intervention and policy design.

12        Q.    And are all of those areas of

13   specialization relevant to your current job?

14        A.    A lot of them are, yes.

15        Q.    And were they relevant to your prior

16   position with YouTube as global head of mental

17   health?

18        A.    Yes.

19        Q.    How so?

20        A.    In particular, crisis stabilization was a

21   big part of the role of understanding how to support

22   users in acute distress.  So that was a big piece.

23   And then certainly as a translational scientist,

24   while I was sort of an internal subject matter

25   expert, I wasn't, you know, the world's expert in

HIGHLY CONFIDENTIAL

Page 27

1   anything.  So I would work with the world's experts
2   on various topics, synthesize expert consensus,
3   synthesize external research and make sure clinical
4   integrity wasn't lost in implementation, whether
5   that be policy, product, partnerships.
6       Q.   When you say, "understanding how to
7   support users in acute distress," how would you
8   determine that users were in acute distress?
9       A.   Typically, it's through search query
10  signals, so what's called, like, an SOS search query
11  that indicates somebody may be at high risk or
12  seeking content that may not be -- that may be
13  harmful.  So suicide, self-harm, disordered
14  eating-related queries.
15      Q.   Okay.  I'm -- we're going to look at
16  tab B, and it's going to be marked as Exhibit 2.
17          (Whereupon, Deposition Exhibit 2
18           was marked for identification.)
19          MS. WADHWANI:  Thank you.
20  BY MS. HAILESELASSIE:
21      Q.   I'm showing you now what has been marked
22  as Exhibit 2.
23          Is this your current public LinkedIn
24  profile?
25      A.   Let me take a look.

HIGHLY CONFIDENTIAL

Page 80

1      A.   Maybe it's good to differentiate.  Parent
2  complaints, I imagine, would go through a certain
3  channel.  User feedback would be solicited by
4  YouTube directly through UX research, for example,
5  or online surveys.
6           I -- that is the category that I worked
7  most heavily with, was UX feedback, expert feedback,
8  advocacy groups, things of that nature.  I will say
9  sometimes they would share parents' concerns, but,
10 again, I did not work directly with parent
11 complaints.
12     Q.   But you did sometimes learn of what the
13 complaints were, correct?
14     A.   I was -- I don't know if I would call them
15 complaints as much as concerns or curiousness.
16 Parents, for example, very often misunderstood how
17 the platform worked, and when they learned about our
18 efforts, how the platform worked and user safety
19 efforts, most times, they would be pleasantly
20 surprised.
21     Q.   So when you were hearing about these
22 parents' concerns, did you ever hear anyone voice
23 the concern that YouTube was affecting their child's
24 attention span?
25           MS. WADHWANI:  Objection to form.

HIGHLY CONFIDENTIAL

Page 81

```
 1              THE WITNESS:  Not that I can remember.
 2     BY MS. HAILESELASSIE:
 3         Q.   Do you recall ever hearing any concerns
 4     from parents that YouTube was affecting their
 5     child's development?
 6              MS. WADHWANI:  Same objection.
 7              THE WITNESS:  Not that I can remember.
 8     BY MS. HAILESELASSIE:
 9         Q.   Do you recall ever hearing concerns from
10     parents who were concerned that YouTube was
11     affecting their child's mental health?
12              MS. WADHWANI:  Same objection.
13              THE WITNESS:  Yes.
14     BY MS. HAILESELASSIE:
15         Q.   What were those concerns?
16         A.   The concerns centered around youth,
17     basically either affecting their body image, the
18     content affecting their body image or content
19     exposing them to instructional content on how to
20     engage in risky behaviors.
21         Q.   And who -- who spoke with you about those
22     concerns?
23         A.   American Academy of Pediatrics is one.
24     It's difficult because we worked with so many youth
25     advocacy groups, it's sometimes difficult to
```

HIGHLY CONFIDENTIAL

Page 82

1  remember who exactly it came from.  So I think it
2  would be easier for me to talk about the youth
3  advocacy groups we worked with in relation to mental
4  health.  But I wouldn't -- I remember for sure AAP,
5  but the other ones I wouldn't be confident in saying
6  exactly where it came from.
7      Q.   Is it accurate to say that parents were
8  reporting their concerns to these groups, and then
9  these groups were filtering the concerns to YouTube?
10          MS. WADHWANI:  Objection to form.
11  Foundation.
12          THE WITNESS:  Potentially.  I'm not
13  confident in saying yes to that.
14  BY MS. HAILESELASSIE:
15      Q.   How would parents report a concern to
16  YouTube directly if they had one?
17          MS. WADHWANI:  Objection to form.
18  Foundation.
19          THE WITNESS:  I don't -- I'm actually not
20  sure.
21  BY MS. HAILESELASSIE:
22      Q.   Did you ever -- outside of expert groups
23  and external experts, did you ever hear concerns
24  voiced in any form, whether it was public reports or
25  research about the affect of any type of social

HIGHLY CONFIDENTIAL

Page 83

1    media or digital media on the attention spans of

2    minors?

3            MS. WADHWANI:  Objection to form.

4            THE WITNESS:  There was research that

5    certainly pointed to correlations, but not

6    causation.  And so similarly to the hypothesis I

7    provided earlier, a lot of the research pointed to

8    external factors that were affecting attention span

9    more.  So broadly.  Like, there's a lot of

10   correlation, for example, with the launch of the

11   iPhone with attention spans, but, again, it's --

12   they can't say the introduction of the iPhone

13   necessarily caused attention behaviors, but it's

14   interesting that attention trends have been affected

15   systemically for youth and adults over time.  But,

16   again, not the causation behind that.

17   BY MS. HAILESELASSIE:

18       Q.   Did you ever advise on the YouTube Shorts

19   product?

20       A.   No.

21       Q.   Did you ever hear complaints about

22   attention span from parents related to Shorts in

23   public reporting?

24       A.   Not that I can remember.

25       Q.   Okay.  We're going to go to tab W.  Will

HIGHLY CONFIDENTIAL

Page 223

1    establish principles that could help YouTube

2    advocate before Congress and global governments?

3              MS. WADHWANI:  Same objections.

4              THE WITNESS:  I believe the intent was to

5    inform -- to be a thought leader in the space and a

6    partner in the space to inform local governments to

7    create informed legislation.

8    BY MS. HAILESELASSIE:

9         Q.   So all I'm essentially asking is whether

10   this last goal that you've read is a goal of this

11   working group, and this is on a slide that says,

12   "Why this working group."  And I'm a little confused

13   about the pushback about that.

14             MS. WADHWANI:  Is there a question?

15             MS. HAILESELASSIE:  I don't think -- I

16   don't think I'm going to get an answer to this, and

17   I am -- I'm a little confused about why you don't

18   want to answer this question, but I am willing to

19   just move on from this.

20             MS. WADHWANI:  We object to your

21   characterization of Dr. Dzuban's responses.  She has

22   answered them, but I appreciate you moving on.

23             MS. HAILESELASSIE:  Okay.  We'll just look

24   briefly at tab BB, which we'll mark as Exhibit 13.

25   / /

HIGHLY CONFIDENTIAL

Page 224

1              (Whereupon, Deposition Exhibit 13

2               was marked for identification.)

3              MS. WADHWANI:  Thank you.

4    BY MS. HAILESELASSIE:

5         Q.   Exhibit 13 is Bates number

6    ending -04187318, and it's entitled "Affirmative

7    principle 6, mental health and wellbeing."  It was

8    produced to us by Google's attorneys from your

9    custodian file.  You're the only custodian, and the

10   last modified date is April 4th, 2023.

11              I'll give you a second to look at it, and

12   then my question will be, do you recall working on

13   this document?

14        A.   I remember giving feedback on this

15   principle.

16        Q.   Okay.  Do you think that you drafted any

17   part of this document?

18        A.   I believe I suggested edits to this

19   document, but I don't remember -- I was not the --

20   the author of this and don't remember if I --

21        Q.   Okay.

22        A.   I'm just reading here, sorry.

23              Yeah.  I don't remember if I did it live

24   or in writing or how it came about.

25        Q.   Okay.  Looking at the proposed principle

HIGHLY CONFIDENTIAL

Page 225

1    language, this -- this looks like this is definitely

2    a more fleshed out version than what we were just

3    looking at.

4           Do you mind reading the principle as it's

5    laid out here, the proposed principle language?

6           MS. WADHWANI:  Objection to the preamble.

7           THE WITNESS:  (As read):

8                Number 6, platform should

9            offer age-appropriate features to

10           support wellbeing and mental

11           health; platform should have

12           age-appropriate content safety and

13           quality policies and product

14           features that support the social

15           emotional development of under 18

16           users and protect their mental

17           health.  Specifically, they should

18           mitigate risks related to overuse,

19           content that is likely to have a

20           negative effect on their wellbeing

21           or mental health, and content that

22           encourages users to participate in

23           activities that are risky for their

24           wellbeing or mental health.

25                These mitigations should be

HIGHLY CONFIDENTIAL

Page 226

```
 1              strongest for the youngest users.
 2              In addition to broader mitigations,
 3              platform should be encouraged to
 4              raise developmentally appropriate
 5              authoritative mental health content
 6              to younger users who are seeking
 7              related information.  Finally,
 8              platform should be required to
 9              offer age-appropriate product
10              interventions for under 18 users
11              seeking self-harm information,
12              which indicates that they could be
13              in a crisis.
14   BY MS. HAILESELASSIE:
15       Q.   Do you recall what language you
16   contributed to this proposed principle language?
17              MS. WADHWANI:  Objection to form.
18              THE WITNESS:  No, I do not.
19   BY MS. HAILESELASSIE:
20       Q.   You are mentioned in two comments here,
21   comment 4 is to Erin Turner and says (as read):
22              Language below incorporates
23              feedback from Jessica.
24              Do you see that?
25       A.   Yes.
```

HIGHLY CONFIDENTIAL

Page 227

1      Q.   And then comment 10, which is attached to

2   the last part of the last sentence, which indicates

3   they could be in crisis, is also to Erin Turner and

4   asks (as read):

5               Is it okay to add back in?  I

6           think key opinion formers need the

7           context.

8           And then you're copied on that as well.

9           So are the key opinion formers that this

10  was intended for the legislators?

11     A.   I believe so.

12     Q.   Okay.  So the consideration about whether

13  to include language is with legislators in mind?

14          MS. WADHWANI:  Objection to form.

15  Foundation.

16          THE WITNESS:  I -- I believe so.  Yeah.

17  It mentioned KOFS here specifically.

18  BY MS. HAILESELASSIE:

19     Q.   Okay.  We can put that one aside.

20          Okay.  We're going to go to tab X, which

21  will be Exhibit 14.

22          (Whereupon, Deposition Exhibit 14

23           was marked for identification.)

24  BY MS. HAILESELASSIE:

25     Q.   Exhibit 14 is a document ending

HIGHLY CONFIDENTIAL

Page 262

1                CERTIFICATE OF REPORTER

2           I, Kathleen A. Maltbie, Certified

3    Shorthand Reporter licensed in the State of

4    California, License No. 10068, the State of Nevada,

5    CCR 995, and the State of Texas, CSR 12212, hereby

6    certify that deponent was by me first duly sworn,

7    and the foregoing testimony was reported by me and

8    was thereafter transcribed with computer-aided

9    transcription; that the foregoing is a full,

10   complete, and true record of proceedings.

11          I further certify that I am not of counsel

12   or attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any way

14   interested in the outcome of the cause in said

15   caption.

16          The dismantling, unsealing, or unbinding

17   of the original transcript will render the

18   reporter's certificates null and void.

19          In witness whereof, I have hereunto set my

20   hand this day:

21   _____ Reading and Signing was requested.

     _____ Reading and Signing was waived.

22   ___x___ Reading and Signing was not requested.

23   _____

          KATHLEEN A. MALTBIE

24        RPR-RMR-CRR-CCRR-CLR-CRC-RDR

          California CSR 10068, Nevada CCR 995

25        Texas CSR 12212

HIGHLY CONFIDENTIAL

```
                                            Page 1
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3    IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-
      ADOLESCENT ADDICTION/                  YGR
 4    PERSONAL INJURY PRODUCTS
      LIABILITY LITIGATION              MDL No. 3047
 5    _____
 6    This Document Relates to:
 7    ALL ACTIONS
 8     --
 9
10                   30(B)(6)/PMQ
11             VIDEOTAPED DEPOSITION OF
12             JESSICA DZUBAN, Psy.D.
13               HIGHLY CONFIDENTIAL
14            Wednesday, February 26, 2025
15             REPORTED REMOTELY VIA ZOOM
16              SAN FRANCISCO, CALIFORNIA
17
18
19
20
21
22
23
      Reported By:
24    KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
      California CSR 10068, Nevada CCR 995, Texas CSR
25    12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
```