# EXHIBIT 2


# DISINFORMATION NATION: SOCIAL MEDIA'S ROLE IN PROMOTING EXTREMISM AND MISINFORMATION

## VIRTUAL JOINT HEARING

BEFORE THE

### SUBCOMMITTEE ON COMMUNICATIONS AND TECHNOLOGY

AND THE

### SUBCOMMITTEE ON CONSUMER PROTECTION AND COMMERCE

OF THE

## COMMITTEE ON ENERGY AND COMMERCE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

———————

MARCH 25, 2021

———————

**Serial No. 117–19**



Published for the use of the Committee on Energy and Commerce

govinfo.gov/committee/house-energy
energycommerce.house.gov

# DISINFORMATION NATION: SOCIAL MEDIA'S ROLE IN PROMOTING EXTREMISM AND MIS-INFORMATION

————

**THURSDAY, MARCH 25, 2021**

House of Representatives,
Subcommittee on Communications and Technology
joint with the
Subcommittee on Consumer Protection and
Commerce,
Committee on Energy and Commerce,
*Washington, DC.*

The subcommittees met, pursuant to notice, at 12:01 p.m., via Cisco Webex online video conferencing, Hon. Michael F. Doyle (chairman of the Subcommittee on Communications and Technology) presiding.

Members present: Representatives Doyle, Schakowsky, Rush, Eshoo, Butterfield, Matsui, Castor, McNerney, Welch, Clarke, Schrader, Cárdenas, Dingell, Veasey, Kelly, McEachin, Soto, O'Halleran, Rice, Craig, Trahan, Pallone (ex officio), Latta (Subcommittee on Communications and Technology ranking member), Bilirakis (Subcommittee on Consumer Protection and Commerce ranking member), Upton, Scalise, Guthrie, Kinzinger, Johnson, Long, Bucshon, Mullin, Hudson, Walberg, Carter, Duncan, Dunn, Curtis, Lesko, Pence, Armstrong, and Rodgers (ex officio).

Also present: Representatives Tonko, Blunt Rochester, Schrier, Burgess, McKinley, Griffith, Crenshaw, and Joyce.

Staff present: AJ Brown, Counsel; Jeffrey C. Carroll, Staff Director; Parul Desai, FCC Detailee; Jennifer Epperson, Counsel; Lisa Goldman, Senior Counsel; Waverly Gordon, General Counsel; Daniel Greene, Professional Staff Member; Tiffany Guarascio, Deputy Staff Director; Perry Hamilton, Clerk; Alex Hoehn-Saric, Chief Counsel, Communications and Consumer Protection; Ed Kaczmarski, Policy Analyst; Zach Kahan, Deputy Director, Outreach and Member Service; Jerry Leverich, Senior Counsel; Dan Miller, Professional Staff Member; David Miller, Counsel; Phil Murphy, Policy Coordinator; Joe Orlando, Policy Analyst; Kaitlyn Peel, Digital Director; Tim Robinson, Chief Counsel; Chloe Rodriguez, Clerk; Andrew Souvall, Director of Communications, Outreach and Member Services; Sydney Terry, Policy Coordinator; Anna Yu, Professional Staff Member; Michael Cameron, Minority Policy Analyst, Consumer Protection and Commerce, Energy, Environment; Nate Hodson, Minority Staff Director; Peter Kielty, Minority General Counsel; Bijan Koohmaraie, Minority Chief Counsel;

2

Tim Kurth, Minority Chief Counsel, Consumer Protection and Commerce; Kate O'Connor, Minority Chief Counsel, Communications and Technology; and Michael Taggart, Minority Policy Director.

Mr. DOYLE. The Subcommittee on Communications and Technology and Subcommittee on Consumer Protection and Commerce will now come to order. Today we will be holding a joint hearing entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation."

Due to the COVID–19 public health emergency, today's hearing is being held remotely. All Members and witnesses will be participating via videoconferencing. As part of our hearing, microphones will be set on mute for the purpose of eliminating inadvertent background noise.

Members and witnesses, you will need to unmute your microphones each time you wish to speak. Additionally, Members will need to be visible on screen in order to be recognized.

Due to the anticipated length of this hearing, the committee will take a 15-minute recess around 3 o'clock to provide witnesses and Members a restroom break.

Finally, documents for the record can be sent to Ed Kaczmarski and Joe Orlando at the email addresses we have provided to your staff. All documents will be entered into the record at the conclusion of the hearing.

The Chair will now recognize himself for 5 minutes.

**OPENING STATEMENT OF HON. MIKE DOYLE, A REPRESENTATIVE IN CONGRESS FROM THE COMMONWEALTH OF PENNSYLVANIA**

Our Nation is drowning in disinformation driven by social media. Platforms that were once used to share photos of kids with grandparents are all too often havens of hate, harassment, and division. The way I see it, there are two faces to each of your platforms.

Facebook has Family and Friends Neighborhood, but it is right next to the one where there is a White nationalist rally every day. YouTube is a place where people share quirky videos, but down the street antivaxxers, COVID deniers, QAnon supporters, and Flat Earthers are sharing videos. Twitter allows you to bring friends and celebrities into your home, but also Holocaust deniers, terrorists, and worse.

Now, it would be one thing if every user chose where to go organically, but almost everything is scripted on social media platforms. Facebook recognizes antisocial tendencies in one user and invites them to visit the White nationalists. YouTube sees another user is interested in COVID–19 and autostarts an antivax video. On Twitter, a user follows the trending conversation never knowing it is driven by bots and coordinated disinformation networks run by foreign agents.

Your platforms have changed how people across the planet communicate, connect, learn, and stay informed. The power of this technology is awesome and terrifying, and each of you has failed to protect your users and the world from the worst consequence of your creations.

Twitter was no different, if you go to any of the super spreader accounts that remain up despite policies meant to curb antivax content, you'll see this content.

You **can** take down this content, you **can** reduce division, you **can** fix this—but you choose not to.

We saw your platforms remove ISIS terrorist content; we saw you tamp down on COVID misinformation at the beginning of the pandemic; we have seen disinformation drop when you have promoted reliable news sources and removed serial disinformation super spreaders from your platforms.

You have the means, but time after time, you are picking engagement and profit over the health and safety of your users, our Nation, and our democracy.

These are serious issues, and to be honest—it seems like you all just shrug off billion-dollar fines. Your companies need to be held accountable—we need rules, regulations, technical experts in government, and audit authority of your technologies. Ours is the committee of jurisdiction, and we will legislate to stop this. The stakes are simply too high.

Mr. DOYLE. The Chair will now recognize Mr. Latta, ranking member of the Subcommittee on Communications and Technology, for 5 minutes for his opening statement.

### OPENING STATEMENT OF HON. ROBERT E. LATTA, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF OHIO

Mr. LATTA. Well, I thank the chairman for recognizing me. And I want to thank our witnesses for being with us today, for a conversation that is long overdue in the Energy and Commerce Committee. I am deeply concerned by your decisions to operate your companies in a vague and biased manner, with little to no accountability while using Section 230 as a shield for your actions and their real-world consequences.

Your companies have the power to silence the President of the United States, shut off legitimate journalism in Australia, shut down legitimate scientific debate on a variety of issues, dictate which articles or websites are seen by Americans when they search the internet. When these actions are taken, users have little to no recourse to appeal the decision—if they are aware of your actions. In most cases, we simply don't know.

What does this mean for everyday Americans? We are all aware of Big Tech's ever-increasing censorship of deserving voices and their commitment to serve the radical progressive agenda by influencing a generation of children, who are moving, shutting down, or canceling any news, books, and even now toys, that aren't considered woke. This is fundamentally un-American.

At a recent hearing on disinformation and extremism online, Professor Turley, one of the Nation's foremost experts on constitutional law, testified about the "Little Brother Problem," a problem which private entities do for the government which it cannot legally do for itself.

As of January of this year, Google has a greater than 92 market share in search. Facebook has over 2.7 billion monthly users. And Twitter has 187 million daily users. Your companies have enormous control over whose ideas are seen, read, or heard around the world. This gives you great power. And if misused, as we have seen in recent years, your actions have a ripple effect throughout the world that result in American voices being removed from the marketplace of ideas.

While the Little Brother Problem of censorship is frightening enough, other serious harms are occurring on these platforms that

6

affect ordinary Americans. Young American children and teenagers are addicted—actually addicted—to their devices and social media. This problem has been exacerbated by the pandemic and will only get worse if children continue to be separated from their peers and cannot learn from their teachers in a classroom.

Your platforms are purposely designed to keep our children hooked to their screens. The use of social media has been linked to increased rates of depression, mental illness, cyberbullying, and suicide among America's youth. Illegal drugs continue to be sold online despite your previous commitment to solve these issues.

Mr. Chairman, I do ask unanimous consent to submit a letter from the National Association of Boards of Pharmacy for the record.

Mr. DOYLE. Without objection, so ordered.

[The information appears at the conclusion of the hearing.]

Mr. LATTA. Thank you very much.

Serious problems continue to persist, and I wonder how much you are truly dedicating to combating these actions. What actions are you taking to educate Americans about the dangers of using your site, especially the dangers for kids?

As ranking member of the Subcommittee on Communications and Technology, we have oversight of any change made to Section 230 of the Communications Decency Act. Section 230 provides you with liability protection for content moderation decisions made in good faith. Based on recent actions, however, it is clear that in your definition of good faith, moderation includes censoring viewpoints you disagree with and establishing a faux independent appeals process that doesn't make its content moderation decisions based on American principles of free expression. I find that highly concerning.

I look forward to today's hearing as an important step in reconsidering the extent to which Big Tech deserves to retain the significant liability protection. And with that, Mr. Chairman, I yield back the balance of my time.

[The prepared statement of Mr. Latta follows:]

PREPARED STATEMENT OF HON. ROBERT E. LATTA

Good morning to our witnesses, and welcome to this long overdue conversation with the Energy and Commerce Committee.

I am deeply concerned by your decisions to operate your companies in a vague and biased manner, with little to no accountability, while using Section 230 as a shield for your actions and their real-world consequences.

Your companies have the power to silence the President of the United States, shut off legitimate journalism in Australia, shut down legitimate scientific debate on a variety of issues, and dictate which articles or websites are seen by Americans when they search the Internet. When these actions are taken, users have little to no recourse to appeal the decision—if they are aware of your actions. In most cases, we simply do not know.

What does this mean for everyday Americans?

We are all well aware of Big Tech's ever increasing censorship of conservative voices and their commitment to serve the radical progressive agenda by influencing a generation of children and removing, shutting down, or canceling any news, books, and, now, even toys that aren't considered "woke." This is fundamentally un-American.

At a recent hearing on disinformation and extremism online, Professor Turley, one of the Nation's foremost experts on constitutional law, testified about "the little brother problem"—a problem in which private entities do for the Government what

7

it cannot legally do for itself. As of January of this year, Google has greater than 92% market share in search, Facebook has over 2.7 billion monthly users, and Twitter has over 187 million daily users.

Your companies have enormous control over whose ideas are seen, read, or heard around the world. This gives you great power—and if misused, as we have seen in the recent years, your actions have ripple effects throughout the world that result in American voices being removed from the marketplace of ideas.

While the little brother problem of censorship is frightening enough, other serious harms are occurring on these platforms that affect ordinary Americans.

Young American children and teenagers are addicted, actually addicted, to their devices and social media. This problem has been exacerbated by the pandemic and will only get worse if children continue to be separated from their peers and cannot learn from their teachers in a classroom.

Your platforms are purposely designed to keep our children hooked to their screens. The use of social media has been linked to increased rates of depression, mental illness, cyberbullying, and suicide among America's youth. Illegal drugs continue to be sold online despite your previous commitments to solve these issues [Mr. Chairman, I would like to submit a letter from the National Association Boards of Pharmacy for the record]. Serious problems continue to persist, and I wonder how much you are truly dedicating to combating these actions.

What actions are you taking to educate Americans about the dangers of using your site? Especially the dangers for our kids?

As ranking member on the Subcommittee for Communications and Technology, we have oversight over any change made to Section 230 of the Communications Decency Act. Section 230 provides you with liability protection for content moderation decisions made in "good faith." Based on recent actions, however, it is clear that your definition of "good faith" moderation includes censoring viewpoints you disagree with and establishing a faux independent appeals process that does not make its content moderation decisions based on American principles of free expression. I find that highly concerning.

I look at today's hearing as an important step in reconsidering the extent to which Big Tech deserves to retain their significant liability protection.

I yield back.

Mr. DOYLE. Thank you. The gentleman yields back.

The Chair now recognizes Chair Schakowsky, chair of the Subcommittee on Consumer Protection and Commerce, for 5 minutes for her opening statement.

## OPENING STATEMENT OF HON. JAN SCHAKOWSKY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS

Ms. SCHAKOWSKY. Thank you. It is a pleasure to cochair this meeting with you.

I want to welcome our witnesses and thank them for coming. It is not an exaggeration to say that your companies have fundamentally and permanently transformed our very culture and our understanding of the world. Much of this is for good, but it is also true that our country, our democracy, even our understanding of what is truth has been harmed by the proliferation and dissemination of misinformation and extremism, all of which has deeply divided us.

What our witnesses today need to take away from this hearing is that self-regulation has come to the end of its road, and that this democracy, this democratic—the people that you see before you, elected by the people, is preparing to move forth with legislation and regulation.

The regulation that we seek should not attempt to limit constitutionally protected freedom of speech, but it must hold platforms accountable when they are used to incite violence and hatred or, as in the case of the COVID pandemic, spread misinformation that costs thousands of lives.

8

All three of the companies that are here today run platforms that are hotbeds of misinformation and disinformation. And despite all the promises and new policies to match, disinformation was rampant in the 2020 election, especially targeting vulnerable communities. For example, Spanish language ads run by the Trump campaign falsely accused President Biden of being endorsed by Venezuelan President Maduro.

The spread of disinformation fed upon itself until it arrived at the Capitol of the United States on January 6th, which cost five lives. The lives lost in the insurgency were not the first cases of these platforms' failure, nor even the worst. In 2018, Facebook admitted a genocide of the Rohingya people in Myanmar was planned and executed on Facebook.

2020 saw the rise of coronavirus disinformation on Facebook platforms, including the playing of the—they called it "The Plandemic." This film got 1.8 million views and 150,000 shares before it was removed. Disinformation like "Plandemic" made people skeptical of the need for vaccines and almost certainly cost—contributed to the horrible loss of life during the pandemic. Disinformation also hops platforms to spread viruses. Disinformation also hops from platform to platform. "The Plandemic" actually was first on YouTube before it was on Facebook and Instagram and Twitter.

Misinformation regarding the election dropped 73 percent across social media platforms after Twitter permanently suspended Trump as well as—and also the Capitol insurgency and QAnon.

But the question really is: What took so long? The witnesses here today have demonstrated time and time again that they do not—that self-regulation has not worked. They must be held accountable for allowing disinformation and misinformation to spread. And that is why I will be introducing the Online Consumer Protection Act, which I hope will earn bipartisan support. And thank you. I will yield back.

[The prepared statement of Ms. Schakowsky follows:]

### PREPARED STATEMENT OF HON. JAN SCHAKOWSKY

I want to welcome our witnesses and thank them for coming. It is not an exaggeration to say that your companies have fundamentally and permanently transformed our very culture: and our understand of the world.

Much of this is for the good, but it is also true that our country, our democracy, even our understanding of what is truth, has been harmed by the proliferation of disinformation, misinformation, and extremism, all of which has deeply divided us.

What our witnesses need to take away from this hearing is that self-regulation has come to the end of its road, and that this democratically elected body is prepared to move forward with legislation and regulation.

The regulation we seek should not attempt to limit constitutionally protected free speech, but it must hold platforms accountable when they are used to incite violence and hatred—or as in the case of the Covid pandemic—spread misinformation that costs thousands of lives.

All three companies here today run platforms that are hotbeds of misinformation and disinformation.

Despite all the promises and new policies to match, disinformation was rampant in the 2020 election—especially targeting vulnerable communities.

For example, Spanish language ads run by the Trump campaign falsely claimed President Biden was endorsed by Venezuelan President Maduro. The spread of disinformation fed upon itself until it came to a head in the historic assault on our Capitol and our democracy on January 6th, which cost 5 lives.

9

The lives lost to the Insurrection were not the first casualties of these platforms' failures, nor are they the worst. In 2018, Facebook admitted a genocide of the Rohingya people in Myanmar was planned and executed on Facebook.

2020 saw the rise of coronavirus disinformation on Facebook's platforms including the propaganda film "Plandemic." This film got 1.8 million views and 150,000 shares before it was removed by Facebook.

Disinformation like "Plandemic" made people skeptical of the need for vaccines and almost certainly contributed to the horrible loss of life during the pandemic.

Disinformation also hops platforms to spread virally across the internet. "Plandemic" was first posted on YouTube before taking off on Facebook, Instagram, and Twitter.

Misinformation regarding the election dropped by 73% across social media platforms after Twitter permanently suspended Trump as well as accounts tied to the Capitol Insurrection and QAnon. The question is, what took so long?

The witnesses here today have demonstrated time and again that promises to self-regulate don't work. They must be held accountable for allowing disinformation and misinformation to spread across their platforms, infect our public discourse, and threaten our democracy.

That's why I'll be introducing the Online Consumer Protection Act, which I hope will earn bipartisan support.

Thank you, and I yield back.

Mr. DOYLE. The gentlelady yields back.

The Chair now recognizes Mr. Bilirakis, ranking member for the Subcommittee on Consumer Protection and Commerce, for 5 minutes for his opening remarks.

### OPENING STATEMENT OF HON. GUS M. BILIRAKIS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF FLORIDA

Mr. BILIRAKIS. Thank you, Mr. Chairman. I appreciate it. Thank you for participating in today's hearing, all the witnesses and the Members.

I have been thinking about this hearing since our side first requested this hearing last year. My time in college has provided me enough knowledge about the history of the committee to know what the Telecommunications Act was and, importantly, what it wasn't. Components of that law have been struck down by the courts, while other provisions are interpreted and applied differently than first conceived. This is all a departure from congressional intent.

Regardless of what one thinks of whether all of the Communications Decency Act was the right approach, the same members that voted for Section 230 voted for that entire bill. The statute was meant to protect our society, specifically our children.

To our witnesses today, here lies the problem for you: You don't want the Federal Government telling you what parts of your company you are allowed to operate. So imagine things from our perspective when you pick and choose what parts of the law you want to follow.

I really do admire your ingenuity. You have created something truly remarkable, in my opinion. But with that power, you must also be Good Samaritans, and you have an obligation to be stewards of your platform. If your legal department doesn't believe you are bound to the intent of the law, I would hope your moral compasses will.

Many of my colleagues will raise legitimate concerns about the attack on the Capitol from January, and other colleagues can point to what occurred in our cities last summer. These were all inci-

10

dents where social media escalated tension, incited chaos, and bred extremism through echo chambers and algorithms.

As a new Republican leader, quite an honor, on the commerce protection and commerce committee—so the Consumer Protection and Commerce committee—I have been digging into how your companies operate. That led me to run a survey of my district following our Big Tech hearing announcement. The conclusion is my constituents simply don't trust you anymore.

With thousands of responses, over 82 percent say they do not trust Big Tech to be good stewards of their platforms or consistently enforce their policies. That includes my constituent who told me, "We were providing information to local families on teen suicide risks on Facebook Livestream. It was blocked by Facebook."

Another constituent said she has seen countless teens be bullied online or simply not able to process a devastating comparison game that they are forced to deal with on social media. Others told me they stopped using your services altogether out of fear and distrust. One even told me they quit social media due to treatment from your companies over their families' Christian views.

Each one of these represents a story of how your companies have failed people. And you will be hearing from my colleagues with more of these stories about how Big Tech has lost its way, highlighting a much larger problem. People want to use your services, but they suspect your coders are designing what they think we should see and hear by keeping us online longer than ever, and all with the purpose to polarize or monetize us, disregarding any consequences for the assault on our inherent freedoms which we hold so dearly.

So I don't want to hear about how changing your current law is going to affect startups because I have heard directly from them, accusing you of anticompetitive tactics. None of us want to damage entrepreneurs. What I do want to hear is what you will do to bring our country back from the fringes and stop the poisonous practices that drive depression, isolation, and suicide, and instead cooperate with law enforcement to protect our citizens.

Our kids are being lost while you say you will try to do better, as we have heard countless time already. We need true transparency and real change. We need, again, not empty promises from you, and we have heard that over and over again. The fear you should have coming into this hearing today isn't that you are going to get upbraided by a Member of Congress. It is that our committee knows how to get things done when we come together. We can do this with you or without you. And we will.

Thank you, Mr. Chairman. I yield back.

[The prepared statement of Mr. Bilirakis follows:]

### Prepared Statement of Hon. Gus M. Bilirakis

Thank you for participating in today's hearing. I have been thinking about this hearing since our side first requested it last year.

My time in Congress has provided me enough knowledge about the history of this committee to know what the Telecommunications Act was and importantly what it wasn't.

Components of that law have been struck by the courts, while other provisions are interpreted and applied differently than first conceived. This is all a departure from Congressional intent.

11

Regardless of what one thinks of whether all of the Communications Decency Act was the right approach, the same Members that voted for Section 230 voted for that entire bill—the statute was meant to protect our society, specifically our kids.

To our witnesses today, here lies the problem for you. You don't want the Federal Government telling you what parts of your company you're allowed to operate. Imagine things from our perspective when you pick and choose what parts of the law you want to follow.

I really do admire your ingenuity. You have created something truly remarkable. But with that power you must also be Good Samaritans, and you have an obligation to be stewards of your platform. If your legal department doesn't believe you are bound to the intent of the law, I would hope your souls and consciences will.

Many of my colleagues will raise legitimate concerns about the attack on the Capitol from January, and other colleagues can point to what occurred in our cities last summer. These were all incidents where social media escalated tension, incited chaos, and bred extremism through echo chambers and algorithms.

As the new Republican leader on the Consumer Protection and Commerce subcommittee, I have been digging into how your companies operate. That led me to run a survey of my district following our Big Tech hearing announcement. The conclusion is my constituents simply don't trust you anymore. With thousands of responses, over 82% said they do not trust Big Tech to be good stewards of their platforms or consistently enforce their policies. That includes my constituent who told me "We were providing information to local families on teen suicide risks on Facebook Livestream, and it was blocked by Facebook." Another constituent said she is seeing "countless teens be bullied online or simply not able to process the devastating comparison game that they are forced to deal with on social media." Others told me they stopped using your services all together out of fear and distrust, one even told me they quit social media due to treatment from your companies over their family's Christian views. Each one of these represents a story of how your companies have failed people, and you'll be hearing from my colleagues with more of these stories about how Big Tech has lost its way, highlighting a much larger problem.

People want to use your services, but they suspect your coders are designing what they think we should see and hear, by keeping us online longer than ever, and all with the purpose to polarize and monetize us, disregarding any consequences for the assault on our inherent freedoms.

So I don't want to hear about how changing current law is going to hurt startups, because I've heard directly from them accusing you of anticompetitive tactics. None of us want to damage entrepreneurs.

What I do want to hear is what you will do to bring our country back from the fringes and stop the poisonous practices that drive depression, isolation, and suicide, and instead cooperate with law enforcement to protect our citizens. Our kids are being lost while you say you will "try to do better" as we've heard countless times already. We need true transparency and real change, not empty promises.

The fear you should have coming into this hearing today isn't that you're going to get yelled at by a Member of Congress, it's that our committee knows how to get things done when we come together. We can do this with you or without you. And we will.

Thank you, I yield back.

Mr. DOYLE. The gentleman yields back.

The Chair now recognizes Mr. Pallone, chairman of the full committee, for 5 minutes for his opening statement.

**OPENING STATEMENT OF HON. FRANK PALLONE, JR., A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY**

Mr. PALLONE. Thank you, Chairman Doyle and Schakowsky, for this very important hearing. We are here today because the spread of disinformation and extremism has been growing online, particularly on social media, where there are little to no guardrails in place to stop it.

And unfortunately this disinformation and extremism doesn't just stay online. It has real-world, often dangerous, and even violent consequences. And the time has come to hold online platforms

13

Members on this committee have suggested legislative solutions and introduced bills. The committee is going to consider all these options so that we can finally align the interests of these companies with the interests of the public and hold the platforms and their CEOs accountable when they stray.

That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey. You have failed to meaningfully change after your platforms played a role in fomenting insurrection, in abetting the spread of the virus, and trampling Americans civil liberties.

And while it may be true that some bad actors will shout "Fire!" in a crowded theater, by promoting harmful content your platforms are handing them a megaphone to be heard in every theater across the country and the world. Your business model itself has become the problem.

And the time for self-regulation is over. It is time we legislate to hold you accountable. That is what we are going to do. And I want to thank you, Mr. Chairman, Mr. Doyle, and Ms. Schakowsky because I know that you are very serious about moving forward on legislation, which we will do. I promise everyone.

Thank you, and I yield back.

[The prepared statement of Mr. Pallone follows:]

PREPARED STATEMENT OF HON. FRANK PALLONE, JR.

We are here today because the spread of disinformation and extremism has been growing online, particularly on social media, where there are little to no guardrails in place to stop it. And unfortunately, this disinformation and extremism doesn't just stay online. It has real world, often dangerous and even violent consequences. The time has come to hold online platforms accountable for their part in the rise of disinformation and extremism.

According to a survey conducted by Pew earlier this month, 30 percent of Americans are still hesitant or simply do not want to take the COVID–19 vaccine. On January 6, our Nation's Capitol was violently attacked. This month, Homeland Security Secretary Mayorkas identified domestic violent extremism as the "greatest threat" to the United States. And crimes against Asian Americans have risen by nearly 150 percent since the beginning of the COVID–19 pandemic.

Each of these controversies and crimes have been accelerated and amplified on social media platforms through misinformation campaigns, the spread of hate speech, and the proliferation of conspiracy theories.

Five years ago, during the 2016 Presidential elections, Facebook, Google, and Twitter were warned about—but simply ignored—their platforms' role in spreading disinformation. Since then, the warnings have continued, but the problem has only gotten worse. Only after public outrage and pressure, did these companies make inadequate attempts to appease critics and lawmakers. But despite the public rebuke, Wall Street continued to reward the companies' strategy to promote misinformation and disinformation by driving their stock prices even higher.

And now, despite repeated promises to seriously tackle this crisis, Facebook, Google, and Twitter instead routinely make minor changes to their policies in response to the public relations crisis of the day. They will change some underlying internal policy that may or may not be related to the problem. But that's it. The underlying problem remains.

It is now painfully clear that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms. And, therefore, it is time for Congress and this committee to legislate and realign these companies' incentives to effectively deal with disinformation and extremism.

Today, our laws give these companies, and their leaders, a blank check to do nothing. Rather than limit the spread of disinformation, Facebook, Google, and Twitter have created business models that exploit the human brain's preference for divisive content to get Americans hooked on their platform, at the expense of the public interest. It isn't just that social media companies are allowing disinformation to spread—it's that, in many cases, they are actively amplifying and spreading it them-

14

selves. Fines, to the extent they are levied at all, have simply become the cost of doing business.

The dirty truth is that they are relying on algorithms to purposefully promote conspiratorial, divisive, or extremist content so they can rake in the ad dollars. This is because the more outrageous and extremist the content, the more engagement and views these companies get from their users. More views equal more money.

It's crucial to understand that these companies aren't just mere bystanders—they are playing an active role in the meteoric rise of disinformation and extremism.

So when a company is actually promoting this harmful content, I question whether existing liability protections should apply.

Members on this committee have suggested legislative solutions and introduced bills. The committee is going to consider all these options so that we can finally align the interests of these companies with the interests of the public and hold the platforms, and their CEOs, accountable when they stray.

That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey. You have failed to meaningfully change after your platforms played a role in fomenting insurrection, in abetting the spread of COVID–19, and trampling Americans civil rights.

And while it may be true that some bad actors will shout fire in a crowded theater, by promoting harmful content, your platforms are handing them a megaphone to be heard in every theater across the country and the world. Your business model itself has become the problem.

The time for self-regulation is over. It is time we legislate to hold you accountable. With that, I yield back.

Mr. DOYLE. The gentleman yields back. The Chair now recognizes Mrs. Rodgers, the ranking member of the full committee, for 5 minutes for her opening statement.

## OPENING STATEMENT OF HON. CATHY McMORRIS RODGERS, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF WASHINGTON

Ms. RODGERS. Thank you, Mr. Chairman.

Ten years ago, when I joined Big Tech platforms, I thought they would be a force for good. I thought that they would help us build relationships and promote transparency in Congress. I can testify today I was wrong. That is not what has transpired. You have broken my trust. Yes, because you failed to promote the battle of ideas and free speech. Yes, because you censor political viewpoints you disagree with. Those polarizing actions matter for democracy.

But do you know what convinced me Big Tech is a destructive force? It is how you have abused your power to manipulate and harm our children. Your platforms are my biggest fear as a parent. I am a mom of three school-aged kids, and my husband and I are fighting the Big Tech battles in our household every day.

It is a battle for their development, a battle for their mental health, and ultimately a battle for their safety. I have monitored your algorithms. I have monitored where your algorithms lead them. It is frightening. And I know that I am not alone.

After multiple teenage suicides in my community, I reached out to our schools and we started asking questions: What is going on with our kids? What is making them feel so alone, so empty and in despair? And this is what I heard over and over again from parents, pediatricians, school administrators, and teachers: They are all raising the alarm about social media.

A day doesn't go by that I don't talk to friends and other parents who tell me their 14-year-old is depressed, she used to love soccer, now they can't get her to do anything, she never gets off her device or leaves her room. I think about a mom who told me she can't

15

leave her daughter alone—ever—because she harms herself. Or the family who is recovering after almost losing their daughter to a predator she met online.

These stories are not unique to me or eastern Washington. I recently heard of a young college student who has lost nine friends to suicide. This is unimaginable. The science on social media is becoming clear. Between 2011 and 2018, rates of depression, self-harm, suicides, and suicide attempts exploded among American teens.

During that time, rates of teen depression increased more than 60 percent, with a larger increase among young girls. Between 2009 and 2015, emergency room admissions for self-harm among 10-to-14-year-olds tripled. And suicide substantially increased.

One study found during that time teens who use their devices for 5 or more hours a day were 66 percent more likely to have at least 1 suicide-related outcome compared to those who used theirs for just 1. Other studies found that teens who spend more time online report lower psychological well-being and more feelings of loneliness.

Remember, our kids, the users, are the product. You, Big Tech, are not advocates for children. You exploit and profit off of them. Big Tech needs to be exposed and completely transparent for what you are doing to our children so parents like me can make informed decisions. We also expect Big Tech to do more to protect children, because you haven't done enough. Big Tech has failed to be good stewards of your platforms.

I have two daughters and a son with a disability. Let me be clear: I do not want you defining what is true for them. I do not want their future manipulated by your algorithms. I do not want their self-worth defined by the engagement tools you built to attract their attention. I do not want them to be in danger from what you have created. I do not want their emotions and vulnerabilities taken advantage of so you can make more money and have more power.

I am sure most of my colleagues on this committee who are parents and grandparents feel the same way. Over 20 years ago, before we knew what Big Tech would become, Congress gave you liability protections. I want to know: Why do you think you still deserve those protections today? What will it take for your business model to stop harming children? I know I speak for millions of moms when I say we need answers, and we will not rest until we get them.

Thank you.

[The prepared statement of Mrs. Rodgers follows:]

PREPARED STATEMENT OF HON. CATHY MCMORRIS RODGERS

Thank you, Mr. Chairman. 10 years ago—when I joined Big Tech platforms—I thought they would be a force for good.

I thought they would help us build relationships and promote transparency in Congress. I can testify today, I was wrong. That is not what has transpired. You've broken my trust. Yes, because you've failed to promote the battle of ideas and free speech.

Yes, because you censor political viewpoints you disagree with. Those polarizing actions matter for democracy. But, do you know what has convinced me Big Tech

16

is a destructive force? It's how you've abused your power to manipulate and harm our children.

Your platforms are my biggest fear as a parent. I'm a mom of three schoolaged kids. My husband and I are fighting the Big Tech battles in our household every day. It's a battle for their development. A battle for their mental health and—ultimately—a battle for their safety. I've monitored where your algorithms lead them. It's frightening. I know I'm not alone. After multiple teenage suicides in my community, I reached out to our schools and we started asking questions.

What's going on with our kids? What's making them feel so alone? So empty and in despair? This is what I hear over and over again from parents...pediatricians...school administrators...and teachers.

They all are raising the alarm about **social media**. A day doesn't go by that I don't talk to friends and other parents who tell me: Their 14-year-old is depressed. She used to love soccer. Now, they can't get her to do anything. She never gets off her device or leaves her room.

I think about a mom who told me she can't leave her daughter alone **EVER** because she harms herself. Or the family who is recovering from almost losing their daughter to a predator she met online.

These stories are not unique to me or Eastern Washington. I recently heard of a young college student who has lost 9 friends to suicide. This is unimaginable. The science on social media is becoming clearer.

Between 2011 and 2018, rates of depression, self-harm, suicides, and suicide attempts exploded among American teens. During that time, rates of teen depression increased by more than **SIXTY percent**, with the larger increase among young girls.

Between 2009 and 2015, emergency room admissions for self-harm among 10 to 14-year-old girls tripled and suicides substantially increased.

One study found that during that time, teens who used their devices for 5 or more hours a day were 66 percent more likely to have at least one suicide-related outcome compared to those who used their device for just one. Other studies have found that teens who spend more time online report lower psychological well-being and more feelings of loneliness.

Remember our kids—the users—are the product. You—Big Tech—are **not** advocates for children. You exploit and profit off them.

Big Tech needs to be exposed and completely transparent for what you are doing to our children so parents like me can make informed decisions. We also expect Big Tech to do more to protect children because you haven't done enough. Big Tech has failed to be good stewards of your platforms. I have two daughters and a son with a disability.

Let me be clear, I do not want you defining what is true for them. I do not want their future manipulated by your algorithms. I do not want their self-worth defined by the engagement tools you've built to own their attention. I do not want them to be in danger from what you've created. I do not want their emotions and vulnerabilities taken advantage of so you can make more money and have more power.

I'm sure most of my colleagues on this committee—who are also parents and grandparents—feel the same way. Over 20 years ago, before we knew what Big Tech would become, Congress gave you liability protections.

I want to know why do you think you still deserve those protections today? What will it take for your business model to stop harming children? I know I speak for millions of moms when I say we need these answers and we will not rest until we get them.

Thank you.

Mr. DOYLE. I thank the gentlelady. The gentlelady yields back.

The Chair would now like to remind Members that, pursuant to committee rules, all Members' written opening statements shall be made a part of the record.

I would now like to introduce our witnesses for today's hearing and thank them all for appearing today. First we have Mark Zuckerberg, chairman and chief executive officer of Facebook; Sundar Pichai, chief executive officer of Google; and Jack Dorsey, chief executive officer of Twitter.

47

over the last year. The initial Stop the Steal group started on Facebook and gained over 350,000 followers in less than a day, faster than almost any other in your platform's history, and they were immediately calling for violence.

In mid-December, you stopped promoting high-quality news outlets for election content at a time when the disinformation was as its height. And finally, the FBI has released numerous documents showing that many of the insurrectionists used Facebook to coordinate and plan the attack on January 6th.

So my question is: How is it possible for you not to at least admit that Facebook played a central role or a leading role in facilitating the recruitment, planning, and execution of the attack on the Capitol?

Mr. ZUCKERBERG. Chairman, my point is that I think that the responsibility here lies with the people who took the actions to break the law and take—and do the insurrection.

And secondarily, also, the people who spread that content, including the President but others as well, with repeated rhetoric over time saying that the election was rigged and encouraging people to organize. I think that those people bear the primary responsibility as well. And that was the point that I was making.

Mr. DOYLE. I understand that. But your platforms supercharged that. You took what—a thing and magnified it. In 12 hours you got 350,000 people in your site. You gin this up. Your algorithms make it possible to supercharge these kinds of opinions. I think we are here because of what these platforms enabled, how your choices put our lives and our democracy at risk. And many of us just find it just unacceptable.

I want to ask each of you another question: Do you think vaccines that have been approved for COVID–19 work? Just yes or no. Do you think the vaccines that have been approved work? Mr. Zuckerberg?

Mr. ZUCKERBERG. Yes.

Mr. DOYLE. Mr. Pichai?

Mr. PICHAI. Yes. Absolutely.

Mr. DOYLE. Mr. Dorsey?

Mr. DORSEY. Yes. But I don't think we are here to discuss our own personal opinions.

Mr. DOYLE. I just want to know if you think the vaccines work. Yes?

Mr. DORSEY. Yes. However——

Mr. DOYLE. Thank you. OK. So if you think the vaccines work, why have your companies allowed accounts that repeatedly offend your vaccine disinformation policies to remain up? I mean, according to report, just 12 accounts on Facebook, Twitter, and Instagram account for 65 percent of all the vaccine disinformation on your platforms. You are exposing tens of millions of users to this every day. I don't have the stats on YouTube, but my understanding is it is similar.

So my question is: Why, in the midst of a global pandemic that has killed over half a million Americans, that you haven't taken these accounts down that are responsible for the preponderance of vaccine disinformation on your platforms? Will you all commit to taking these platforms down today? Mr. Zuckerberg?

48

Mr. ZUCKERBERG. Congressman, yes, we do have a policy against allowing vaccine disinformation——

Mr. DOYLE. Oh, I know you have a policy, but will you take the sites down today? You still have 12 people up on your site doing this. Will you take them down?

Mr. ZUCKERBERG. Congressman, I would need to look at the— and have our team look at the exact examples to make sure they violate the policy——

Mr. DOYLE. Look at them today and get back to us tomorrow because those still exist. We found them as early as last night.

Mr. Pichai, how about you?

Mr. PICHAI. We have removed over 850,000 videos and we——

Mr. DOYLE. But have you removed them all? Do you still have people that are spreading disinformation on your platforms? There are about 12 superspreaders.

Mr. PICHAI. We have clear policies and we take down content. Some of the content is allowed if it is people's personal experiences. But we definitely——

Mr. DOYLE. OK. Thank you. Mr. Dorsey? I see my time is getting expired. Mr. Dorsey? Will you take these sites down? You got about 12 superspreaders. Will you take them down?

Mr. DORSEY. Yes. We remove everything against our policy.

Mr. DOYLE. Thank you.

I see my time is expired. I will now yield to the ranking member, Mr. Latta, for his 5 minutes.

Mr. LATTA. I thank my friend for yielding.

Amanda Todd was just 15 years old when she hung herself. Amanda met a man online who took inappropriate screenshots of Amanda and proceeded to follow her around the internet and harass her for years. He found her classmates on Facebook and he would send them the picture he took of her. To cope with the anxiety, Amanda turned to drugs and alcohol. But it became too much for her.

Mr. Zuckerberg, clearly Ms. Todd was underage, so the photo that was shared to harass her was illegal. Do you believe that Facebook bears any responsibility for the role it played in her death? Yes or no?

Mr. ZUCKERBERG. Sorry, I was muted. Congressman, that is a— it is an incredibly sad story. And I think that we certainly have a responsibility to make sure that we are building systems that can fight and remove this kind of harmful content. In the case of child exploitation content, we have been building systems for a long time that use AI, and we have thousands of people working on being able to identify this content and remove it, and I think our systems are generally pretty effective at this. And I think it is our responsibility to make sure that we keep improving them.

Mr. LATTA. My time—my time is pretty short, but would you say yes or no then?

Mr. ZUCKERBERG. Sorry. Can you repeat that?

Mr. LATTA. Well, in the question, yes or no, then? Any responsibility?

Mr. ZUCKERBERG. Congressman, I believe that the responsibility of the platform——

49

Mr. LATTA. OK. Well, let me move on because I have got—I am very short on time.

Do you believe that Facebook should be held accountable for any role in her death? Yes or no?

Mr. ZUCKERBERG. Congressman, the responsibility that I think platforms should have——

Mr. LATTA. OK.

Mr. ZUCKERBERG [continuing]. Is to build effective systems to moderate this content.

Mr. LATTA. I am going to have to move on. I am going to have to take it that you are just not responding to the question.

Unfortunately, stories like Amanda Todd's are only becoming more common. While we all can talk about how your platforms can be used for good or evil, the evil seems to persevere.

Mr. Zuckerberg, you stated that you support thoughtful changes to Section 230 to ensure that tech companies are held accountable for certain actions that happen on their platforms, such as child exploitation. What specific changes do you support in Section 230?

Mr. ZUCKERBERG. Thanks, Congressman. I would support two specific changes, especially for large platforms—although I want to call out that I think for smaller platforms I think we need to be careful about any changes that we make that remove their immunity, because that could hurt competition. So let me just call on these for larger platforms.

I think, first, platforms should have to issue transparency reports that state the prevalence of content across all different categories of harmful content, everything from child exploitation to terrorism to incitement of violence to intellectual property violations to pornography, whatever the different harms are, and——

Mr. LATTA. Well, let me ask real quick now: Where are these transparency reports you are being reported to, and how often do you think that should be going out?

Mr. ZUCKERBERG. Oh, Congressman, as a model, Facebook has been doing something to this effect for every quarter, where we report on the prevalence of each category of harmful content and how effective our systems are at identifying that content and removing it in advance. And I think the company should be held accountable for having effective systems to do that broadly.

The second change that I would propose is creating accountability for the large platforms to have effective systems in place to moderate and remove clearly illegal content, so things like sex trafficking or child exploitation or terrorist content. And I think it would be reasonable to condition immunity for the larger platforms on having a generally effective system in place to moderate clearly illegal types of content.

Mr. LATTA. Let me interrupt real quick because I am running really short on time. Because I know in your testimony you are talking about that you would—you say that platforms should not be held liable if a particular piece of content evades its detection.

So again, that is one of the areas when you are talking about the transparency and also the accountability I would like to follow up on.

Let me ask you real quick, Mr. Pichai, yes or no: Do you agree with Mr. Zuckerberg's changes to Section 230?

50

Mr. PICHAI. There are definitely good proposals around transparency and accountability, which I have seen in various legislative proposals as well, which I think are important principles and we would certainly welcome legislative approaches in that area.

Mr. LATTA. OK. Mr. Dorsey, do you agree with Mr. Zuckerberg? Yes or no? On the changes on 230?

Mr. DORSEY. I think the ideas around transparency are good. I think it is going to be very hard to determine what is a large platform and a small platform, and it may incentivize the wrong things.

Mr. DOYLE. OK. The gentleman's time is expired.

Mr. LATTA. Thank you very much. My time is expired, and I yield back.

Mr. DOYLE. The Chair now recognizes Chair Schakowsky, chair of the Subcommittee on Consumer Protection and Commerce, for 5 minutes.

Ms. SCHAKOWSKY. Thank you so much.

Mr. Zuckerberg, immediately after the Capitol insurgency, Sheryl Sandberg did an interview in which she insisted that the siege was largely planned on smaller platforms, that—but the court filings actually show something quite the opposite, that the Proud Boys and Oath Keepers used Facebook to coordinate in real time during the siege.

And so my question for you is: Will you admit today that Facebook groups, in particular, played a role in fomenting the extremism that we saw and that led to the Capitol siege?

Mr. ZUCKERBERG. Congresswoman, thanks for the question on this. In the comment that Sheryl made, what I believe that we were trying to say was—and what I stand behind—is what was widely reported at the time, that after January 6th——

Ms. SCHAKOWSKY. No. But I am sorry to interrupt, as many of my colleagues have had to do because we only have 5 minutes. But would you say that—and would you admit that Facebook played a role?

Mr. ZUCKERBERG. Congresswoman, I think certainly there was content on our services, and from that perspective, I think that there is further work that we need to do to make our services and moderation more effective.

Ms. SCHAKOWSKY. I have heard that. OK. I am going to ask Mr. Pichai a question.

Many companies have used Section 230 as a shield to escape consumer protection laws. And I have a bill that would actually not protect companies that do that. And so, Mr. Pichai, would you agree that that that would be proper use, to not allow liability protection for those who violate consumer protection laws?

Mr. PICHAI. Congresswoman, consumer protection laws are very important areas, like we comply with COPPA and HIPAA. I think the right approach is to have legislation in applicable areas and have us——

Ms. SCHAKOWSKY. OK. I am going to have to interrupt again. Is that a yes, that if a law has been broken, a consumer protection law, that it would not—there would not be liability protection under Section 230 for you?

51

Mr. PICHAI. We rely on the liability protections to actually take strong action in, particularly, new types of content. When the Christchurch shooting happened, within a few minutes our teams had to make decisions about the content to take down. That certainty is what we rely on.

But I agree with you that we should have strong consumer protection laws and be subject to it and have agencies like the FTC have clear oversight over those laws and how we comply with them.

Ms. SCHAKOWSKY. Let me just ask a real—thank you—a real yes or no, quickly. Do you think that when you take money to run advertisements that promote disinformation, that you are exempt from liability? Yes or no? Yes or no?

Mr. PICHAI. Section 230——

Ms. SCHAKOWSKY. Mr. Zuckerberg? Yes or no?

Mr. ZUCKERBERG. Congresswoman, I don't know the legal answer to that. But we don't allow misinformation in our ads. And any ad that has been fact-checked as false, we don't allow it to run as an ad.

Ms. SCHAKOWSKY. OK. And Mr. Dorsey?

Mr. DORSEY. Again, I also would need to review the legal precedent for it. But we would not allow that.

Ms. SCHAKOWSKY. OK. And Mr. Pichai?

Mr. PICHAI. We are subject to FTC's deceptive ad practices, so there are statutes which apply to us. We removed over 3 billion bad ads last year alone.

Ms. SCHAKOWSKY. OK. Let me ask one more question: Do you think that Section 230 should be expanded to trade agreements that are being made, as happened in the U.S. trade agreement with Mexico and Canada? Yes or no? Mr. Zuckerberg.

Mr. ZUCKERBERG. Congresswoman, my primary goal would be to help update Section 230 to reflect the kind of modern reality in what we have learned over 25 years. But that said, I do still think that Section 230 plays a foundational role in the development of the internet and——

Ms. SCHAKOWSKY. I hear you. But I am talking now about trade agreements. Mr. Pichai?

Mr. PICHAI. Congresswoman, I think there is value in it. But if there are evolution of Section 230, that should apply. And so in a flexible way, being able to do that would be good, I think.

Ms. SCHAKOWSKY. Mr. Dorsey?

Mr. DORSEY. I don't fully understand the ramifications of what you are suggesting. So I would have to review any——

Ms. SCHAKOWSKY. I am saying to have a liability shield that would be international and clarify it in trade agreements. And I think it is a bad idea.

Mr. DOYLE. The gentlelady's time has expired.

Ms. SCHAKOWSKY. Thank you. I yield back.

Mr. DOYLE. The Chair now recognizes Mr. Bilirakis, ranking member of the Subcommittee on Consumer Protection and Commerce, for 5 minutes.

Mr. BILIRAKIS. Thank you, Mr. Chairman. I appreciate it.

Mr. Dorsey, you have heard briefly about what I am hearing again my district. My opening remarks, you have heard them. The

52

other key part with these stories that we are hearing when we conduct these surveys is how we empower law enforcement.

In a hearing last year, we received testimony that since 2016 Twitter has intentionally curtailed sharing threat data with law enforcement fusion centers. Here is the question: You are well aware that on Twitter and Periscope, that traffic has increased from bad actors seeking to groom children for molestation, lure females into sex trafficking, sell illegal drugs, incite violence, and even threaten to murder police officers.

Are you willing to reinstate this cooperation, retain evidence, and provide law enforcement the tools to protect our most vulnerable? Yes or no?

Mr. DORSEY. Well, first, child sexual exploitation has no place on our platform, and I don't believe that is true. We work with local law enforcement regularly.

Mr. BILIRAKIS. So you are saying that this is not true, what I am telling you? Are you willing to reinstate—reinstate; in other words, it is not going on now—reinstate this cooperation with law enforcement to retain evidence and provide law enforcement the tools to protect our most vulnerable?

Mr. DORSEY. We would love to work with you in more detail on what you are seeing. But we work with law enforcement regularly. We have a strong partnership.

Mr. BILIRAKIS. So you are saying that this is not true, what I am telling you?

Mr. DORSEY. I don't believe so. But I would love to understand the specifics.

Mr. BILIRAKIS. Will you commit to doing what I am telling you you are not doing in the future, and work with me on this?

Mr. DORSEY. We will commit to continue doing what we are doing.

Mr. BILIRAKIS. And what is that? You are saying that the—so in other words——

Mr. DORSEY. Working with the local law enforcement.

Mr. BILIRAKIS. OK. Well, let me go on to the next question. But I am going to follow up with this to make sure you are doing this. I mean, our children's lives are in jeopardy here.

Mr. Zuckerberg, we have heard you acknowledge mistakes about your products before. There are now media reports of an Instagram for under-13 being launched. My goodness. Between this and YouTube Kids, you and Mr. Pichai have obviously identified a business case for targeting this age bracket with content, and I find that very concerning, targeting this particular age bracket, 13 and under.

Given these free services, how exactly would you be making money, or are you trying to monetize our children, too, and get them addicted early? And will you be allowing your own children to use this site with the default settings? We are talking about, again, the site that apparently is being launched for children 13 and under, or under 13, actually. Can you please answer that question for me?

Mr. ZUCKERBERG. Congressman, we are early in thinking through how this service would work. There is clearly a large number of people under the age of 13 who would want to use a service

53

like Instagram. We currently do not allow them to do that. I think the offer——

Mr. BILIRAKIS. What would be beneficial to our children to launch this kind of service?

Mr. ZUCKERBERG. Well, Congressman, I think helping people stay connected with friends and learn about different content on-line is broadly positive. There are clearly issues that need to be thought through and worked out, including how parents can control the experience of kids, especially kids under the age of 13. And we haven't worked through all of that yet, so we haven't kind of formally announced the plans. But I think that something like this could be quite helpful for a lot of people.

Mr. BILIRAKIS. Excuse me. OK, I will reclaim my time.

Mr. Pichai, your company has had failures to rating content for kids. What advice would you offer your challenge here?

Mr. PICHAI. Congressman, we have invested a lot in a one-of-a-kind product, YouTube Kids. The content there is—we work with trusted content partners. Think Sesame Street as an example of the type of channel you would find there, science videos and cartoons. And we take great effort to make sure——

Mr. BILIRAKIS. I need to reclaim my time. I have one more—one last question for Mr. Zuckerberg.

Do you have concerns with what has appeared on your platform hosted by YouTube? And with regard to your children, about—in general. Do you have concerns, yes or no?

Mr. ZUCKERBERG. Congressman, are you asking me about YouTube?

Mr. BILIRAKIS. Yes. I am asking you about YouTube.

Mr. ZUCKERBERG. Congressman, I use YouTube to watch educational videos with my children, and——

Mr. BILIRAKIS. Do you have concerns? First, for your children and your family personally? Do you have concerns?

Mr. ZUCKERBERG. Well, Congressman, my children are 5 and 3 years old. So when I watch content on YouTube with them, I am doing it and supervising them. So in that context, no, I haven't particularly had concerns. But I think it is important that if anyone is building a service for kids under the age of 13 to use by themselves, that there are appropriate parental controls.

Mr. DOYLE. The gentleman's time is expired.

Mr. BILIRAKIS. Thank you.

Mr. DOYLE. I would ask all Members to try to stick to our 5-minute rule so that we can get out of here before midnight.

The Chair will now recognize Mr. Pallone, the full committee chair, for 5 minutes.

Mr. PALLONE. Thank you, Chairman Doyle. My questions are of Mr. Zuckerberg and Mr. Pichai. But I just want to say, after listening to the two of you's testimony, you definitely give the impression that you don't think that you are actively in any way promoting this misinformation and extremism. And I totally disagree with that.

You are not passive bystanders. You are not nonprofits or religious organizations that are trying to do a good job for humanity. You are making money. And the point we are trying to make today—or at least I am—is that when you spread disinformation,

54

misinformation, extremism, actively promoted and amplified, you do it because you make more money.

And so I kind of deny the basic premise of what you said. But let me get to the questions. Let me ask Mr. Zuckerberg. According to a May 2020 Wall Street Journal report, a Facebook researcher concluded that Facebook's own recommendation tools were tied to a significant rise in membership in extremist Facebook groups in Germany. I wrote to you last month requesting this research and related documents. I trust you will fully cooperate with the committee's inquiry and provide all requested documents and information.

But my question is, and please yes or no: Were you aware of this research showing that 64 percent of the members in the extremist Facebook groups studied joined because of Facebook's own recommendations to join these extremist groups in Germany? Were you aware of that, yes or no?

Mr. ZUCKERBERG. Congressman, this is something that we study because we want to make sure our products——

Mr. PALLONE. But I am asking whether you were aware of it. It is a simple question. Yes or no: Were you aware of it? That is all I am asking. Were you aware of it?

Mr. ZUCKERBERG. Aware at what time? After we studied that——

Mr. PALLONE. I just asked if you were aware of it, Mr. Zuckerberg. Yes or no? If not, I am going to assume that the answer is yes. OK?

Mr. ZUCKERBERG. Congressman, I have seen the study. It was about a——

Mr. PALLONE. All right. So your answer is yes.

Mr. ZUCKERBERG [continuing]. Contest leading up to the German election. And we have since——

Mr. PALLONE. I appreciate that. Let me go to the final question, which relates to that. You said yes. OK.

The troubling research I mentioned demonstrates that Facebook was not simply allowing disinformation and extremism to spread, it actively amplified it and spread it. This is my point. Nonetheless, Facebook didn't permanently stop recommending political and civil groups to the United States until after the January 6th insurrection, years after it was made aware of this research.

The fact that Facebook's own recommendation system helped populate extremist groups compels us to reevaluate platforms' liabilities. Now, back to that Wall Street Journal article.

Facebook's chief product officer, Chris Cox, championed an internal effort to address division on Facebook and proposed a plan that would have reduced the spread of content by hyperactive users on the far left and far right. The article alleges, Mr. Zuckerberg, that you personally reviewed this proposal and approved it, but only after its effectiveness was decreased to 80 percent.

Is that true? Yes or no, please?

Mr. ZUCKERBERG. Congressman, we have made a lot of measures that—to fight this content, including——

Mr. PALLONE. Did you approve it after its effectiveness was decreased to 80 percent? Yes or no?

Mr. ZUCKERBERG. Congressman, I can't speak to that specific example. But we have put in place a lot of different measures, and I think that they are effective, including——

55

Mr. PALLONE. Did you review the proposal and approve it?

Mr. ZUCKERBERG. Congressman, we do a lot of work in this area and I review a lot of proposals and we move forward on a lot of steps.

Mr. PALLONE. It is not a difficult question. I am just asking if you reviewed this internal proposal and you approved it. And you won't even answer that. It is so easy to answer that question. It is very specific.

All right. You won't answer. Right? Yes or no?

Mr. ZUCKERBERG. Congressman, that is not what I said. I said I did review that in addition to many other proposals and things that we have taken action on.

Mr. PALLONE. You whether or not——

Mr. ZUCKERBERG. Including shutting off recommendations for civic and political groups.

Mr. PALLONE. Did you approve it with the 80 percent decrease in effectiveness?

Mr. ZUCKERBERG. Congressman, I don't remember that specifically. But we have taken a number of different——

Mr. PALLONE. OK. Let me——

Mr. ZUCKERBERG [continuing]. Steps on this.

Mr. PALLONE. Let me go to Mr. Pichai. Mr. Pichai, according to the New York Times, YouTube's recommendation algorithm is responsible for more than 70 percent of the time users spend on YouTube. In fact, a former design ethicist at Google was quoted as saying, "If I am YouTube and I want you to watch more, I am always going to steer you towards Crazy Town."

Mr. Pichai, is YouTube's recommendation algorithm designed to encourage users to stay on the site? Yes or no? Is it designed to encourage users to stay on the site? Yes or no?

Mr. PICHAI. Content responsibilities are our number one goal, so that trumps everything.

Mr. PALLONE. I am only asking—very simple—whether YouTube's recommendation algorithm is designed to encourage users to stay on the site. Simple question. Yes or no.

Mr. PICHAI. That is not the sole goal, Congressman. That would definitely——

Mr. PALLONE. So the answer is yes. OK. So the bottom line is, simply put, your company's bottom line compels you to amplify extremist and dangerous content. You are not bystanders. And what happens online doesn't stay online. It has real-world consequences. That is why Congress has to act, because you are not bystanders. You are encouraging this stuff.

Thank you, Mr. Chairman.

Mr. DOYLE. The gentleman's time is expired.

The Chair now recognizes Ms. Rodgers, the full committee ranking member, for 5 minutes.

Ms. RODGERS. We tragically lost a number of young people to suicide in my community. In a 3-year period from 2013 to 2016, the suicide rate more than doubled in Spokane County. In the last six months, one high school lost three teens. Right now suicide is the second-leading cause of death in the entire State of Washington for teens 15 to 19 years old.

56

As I mentioned, it has led to many painful conversations trying to find some healing for broken families and communities. And together we have been asking, what has left our kids with a deep sense of brokenness? Why do children, including kids we have lost in middle school, feel so empty at such a young, vulnerable age?

Well, some studies are confirming what parents in my community already know: Too much time on screens and social media is leading to loneliness and despair. And it seems to be an accepted truth in the tech industry because what we are hearing today: Making money is more important.

Bill Gates put a cap on screen time for his daughter. Steve Jobs once said in a quote, "We limit how much technology our kids use at home." Mr. Zuckerberg, you have also said that your kids—or you don't want your kids sitting in front of screens passively consuming content.

So Mr. Zuckerberg, yes or no: Do you agree too much time in front of screens, passively consuming content, is harmful to children's mental health?

Mr. ZUCKERBERG. Congresswoman, the research that I have seen on this suggests that if people are using computers and social——

Ms. RODGERS. Could you answer yes or no? I am sorry. Could you use yes or no?

Mr. ZUCKERBERG. I don't think that the research is conclusive on that. But I can summarize what I have learned, if that is helpful.

Ms. RODGERS. I will follow up at a later time because I do know that Facebook has acknowledged that passive consumption on your platform is leading to people feeling worse. And you said that going from video to video is not positive. Yet Facebook is designed to keep people scrolling. Instagram is designed to get users to go from video to video.

So I would like to ask you, if you said earlier that you don't want kids sitting in front of the screens passively consuming content, and your products are designed to increase screen time, do you currently have any limitations on your own kids' use of your products, or how do you think that will change as they get older?

Mr. ZUCKERBERG. Sure, Congresswoman. My daughters are 5 and 3, and they don't use our products. Actually, that is not exactly true. My eldest daughter, Max, I let her use Messenger Kids sometimes to message her cousins. But overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely.

Passively consuming content doesn't have those positive benefits to well-being but isn't necessarily negative. It just isn't as positive as connecting. And the way we design our algorithms is to encourage meaningful social interactions. So it is a common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend.

The News Feed team at Facebook and the Instagram team——

Ms. RODGERS. Thank you, Mr. Zuckerberg. I do have a couple more questions.

So do you agree that your business model and the design of your products is to get as many people on the platform as possible and

57

to keep them there for as long as possible? If you could answer yes or no, that would be great.

Mr. ZUCKERBERG. Congresswoman, from a mission perspective, we want to serve everyone. But our goal is not—we don't—I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend. I believe that if we build a useful product which——

Ms. RODGERS. OK. Thank you. Thank you. We all have limited time. I think the business model suggests that it is true.

It was mentioned earlier that you are studying extremism. I would like to ask, yes or no, of all of you, beginning with Mr. Zuckerberg: Has Facebook conducted any internal research as to the effect your products are having on the mental health of our children?

Mr. ZUCKERBERG. Congressman, I know that this is something that we try to study, and I am——

Ms. RODGERS. Can you say yes or no? I am sorry.

Mr. ZUCKERBERG. I believe the answer is yes.

Ms. RODGERS. OK. Mr. Dorsey, has Twitter?

Mr. DORSEY. I don't believe so, but we will follow up with you.

Ms. RODGERS. OK. Mr. Pichai, has Google conducted any research on the effect your products are having on the mental health of children?

Mr. PICHAI. We consult widely with expert third parties on this area, including SAMHSA and other mental health organizations, and invest a lot of time and effort in this area.

Ms. RODGERS. OK. I would like to see that. It sounds like you have studied extremism. Let's get focused on our children.

Mr. DOYLE. The gentlelady's time is expired.

The Chair now recognizes Mr. Rush for 5 minutes.

Bobby, you need to unmute.

There you go.

Nope, you are still muted.

Mr. RUSH. I want to thank you, Mr. Chairman. We all agree that social media sites should not be tools for stoking racial division or exacerbating racial injustice. However, there is a broad finding of research that demonstrates the disproportionate effects of disinformation and White supremacy extremism on women and people of color, especially Black people.

We have seen, and continue to see, that too often social media sites put their earnings before equality. Simply stated, your corporations carelessly put profits over people. Misinformation, outlandish conspiracy theories, and incendiary content targeting minorities remains firmly, and social media companies, your companies, are profiting from hate and racism on these platforms by harnessing data and generating advertising revenue from such content.

There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past.

This is the very reason why I ask Mr. Dorsey, I remember you at our 2018 hearing to commit to commissioning an independent third-party civil rights audit of Twitter. This response at the hear-

58

ing was followed up with a joint letter from Chairman Pallone and myself confirming that commitment.

It is 3 years later, and I am still waiting, Mr. Dorsey, for the results of that audit. Where is that audit, Mr. Dorsey?

Mr. DORSEY. Thank you. We have taken another approach, which is to work with civil rights orgs on a regular basis. We have regular conversations with civil rights orgs multiple times a year.

Mr. RUSH. Mr. Dorsey, where is the audit that Members of Congress, including the chairman of the committee—where is the audit that we asked you and you agreed to forward?

Mr. DORSEY. We don't have it. We sought a different approach with——

Mr. RUSH. I don't have it either, and I thought that you were being very, very disingenuous. As a matter of fact, I thought that you had lied to the committee and you should be condemned for that. And I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way. This was nothing but an empty promise that you made.

You haven't taken this issue seriously, and Mr. Dorsey I as a black man in America, my experiences are different from your experiences. This audit is very, very important to me and to those who are similarly situated just as I am. Facebook, to their credit, has completed an audit. And there is no reason, simply no reason under the sun, that corporation as large as yours should not have completed that audit.

Mr. Dorsey, has Twitter evaluated the disparate impact from COVID–19 misinformation on the African American community, and simply has not even attempted to identify messages to combat COVID–19 misinformation targeted at African Americans and emphasized reliable, trustworthy medical information?

Mr. DORSEY. Yes on both. And we review with civil rights orgs on a regular basis. That is the solution we chose.

Mr. DOYLE. The gentleman's time is expired.

The Chair now recognizes Mr. Upton for 5 minutes.

Mr. UPTON. Thank you, Mr. Chairman.

As I listen to this hearing, like it or not, it sounds like everybody on both sides of the aisle is not very happy. I think we all believe that there is a lot of responsibility that should be shared for some of the issues that we have raised today by the three of you. And I would just offer—or speculate, I guess you could say—that we are going to see some changes in Section 230.

The President, former President Trump, vetoed a pretty big bill, the defense bill, earlier last year over this very issue because he wanted the total repeal and he didn't get it. But I know that the Senate now has got some legislation that is pending that is looking at a couple reforms. And my sense is that we may see something here in the near future as well.

I serve as one of only two House members on the Commission on Combating Synthetic Opioid Trafficking. It is a multi-Federal agency. It is cochaired by David Trone in the House and Tom Cotton in the Senate. And there is a lot of concern that we all have, not only as parents but as community leaders across the country, on opioids and the inability to remove illegal offers of opioids, steroids, even fake COVID–19 vaccines. Very troubling, I think, as we see

59

some of these platforms push such content to a user in real search of it.

So I guess my first question is to you, Mr. Zuckerberg. The sale of illegal drugs on your platform does violate your policy, yet it does remain a problem on your platforms. Can you explain the resources that you currently have devoted to addressing the issue and whether or not you plan to develop more? And this is an issue that I intend to raise with the Commission as we look forward to this in the next number of months.

Mr. ZUCKERBERG. Thanks, Congressman. I think this is an important area and a good question. We have more than a thousand engineers who work on our what we call integrity systems that basically are AI systems that try to help find content that violates our policies. You are right that that content does violate our policies. And we also have more than 35,000 people who work in content review who basically are either responding to flags that they get from the community or checking things that our AI systems flag for them but are unsure about.

And this is an area—and when we are talking about reforming Section 230—where I think it would be reasonable to expect that large platforms, especially, build effective systems to be able to combat and fight this kind of clearly illegal content. I think that there will be a lot of ongoing debate about how to handle content which people find distasteful or maybe harmful but is legal. But in this case, when the content is illegal, I think it is pretty reasonable to expect that large platforms build effective systems for moderating this.

Mr. UPTON. So we saw earlier this week—of course, we don't know all the facts on this terrible shooting in Boulder, Colorado. It appears, at least some of the initial reports, that the alleged shooter was in fact bullied, and I think I saw some press reports that some of it had happened online as well.

What process do you have that would allow parents or families to be able to pursue antibullying efforts that might be on your platforms?

Mr. ZUCKERBERG. Thanks, Congressman. I think bullying is a really important case to consider for Section 230 because, first of all, it is horrible, and we need to fight it, and we have policies that are against it. But it also is often the case that bullying content is not clearly illegal.

So when we talk about needing the ability under something like Section 230 to be able to moderate content which is not only clearly illegal content but broader, one of the primary examples that we have in mind is making sure that we can stop people from bullying children. And here we work with a number of advocacy groups. We work with law enforcement to help fight this. This is a huge effort and part of what we do, and I think it is extremely important.

Mr. UPTON. And other than taking the approach that you don't want to see any changes to 230, what suggestions might you have for us as we examine this issue?

Mr. ZUCKERBERG. Sorry, Congressman. I am not saying that I don't think that there should be changes. I am saying that I think 230 still broadly is important, so I wouldn't repeal the whole thing.

60

But the three changes that I have basically suggested are—one is around transparency, that large platforms should have to report on a regular cadence, for each category of harmful content, how much of that harmful content they are finding and how effective their systems are at dealing with it.

The second thing I think that we should do is hold large platforms to a standard where they should have effective systems for handling clearly illegal content, like opioids or child exploitation or things like that.

And the threshold thing that I think is an important principle is that these policies really do need to apply more to large platforms. And I think we need to find a way to exempt small platforms, so that way—when I was getting started with Facebook, if we had gotten hit with a lot of lawsuits around content, it might have been prohibitive for me to get started. And I think none of us here want to see the next set of platforms from being stopped from kind of being able to get started and grow.

Mr. DOYLE. The gentleman's time is expired.

The Chair now recognizes Ms. Eshoo.

Ms. ESHOO. Am I unmuted? Thank you, Mr. Chairman. And good morning—well, it is still—we are Californians, so it is good morning for us.

I want to start by saying that content moderation, like removing posts or banning accounts, is about treating symptoms. And I think that we need to treat symptoms, but I also think that we need to address two underlying diseases. The first is that your products amplify extremism. The second is that your business models of targeted ads enable misinformation to thrive because you chase user engagement at great cost to our society.

So to Mr. Pichai, last month the Anti-Defamation League found that YouTube amplifies extremism. Scores of journalists and researchers agree. And here is what they say happens: A user watching an extremist video is often recommended more such videos, slowly radicalizing the user. YouTube is not doing enough to address recommendations, and it is why Representative Malinowski and myself introduced the Protecting Americans from Dangerous Algorithms Act to narrowly amend Section 230 so courts can examine the role of algorithmic amplification that leads to violence.

And it is also why I, along with 40 of my House colleagues, wrote to each of you about this issue. And Mr. Chairman, I ask that those letters be placed into the record.

[The letters appear at the conclusion of the hearing.]

Ms. ESHOO. So my question to you, Mr. Pichai, is: Are you willing to overhaul YouTube's core recommendation engine to correct this issue? Yes or no?

Mr. PICHAI. Congresswoman, we have overhauled our recommendation systems, and I know you have engaged on these issues before, pretty substantially in pretty much any area.

Ms. ESHOO. Now, Mr. Pichai, yes or no, because we still have a huge problem. And I outlined what they—are you saying that the Anti-Defamation League doesn't know what they are talking about? All these journalists and researchers? There is a lot more to address. And that is why I am asking you if you are willing to over-

69

violence have grown exponentially as a result, and we know it is true specifically after January 6.

So Mr. Zuckerberg, let me ask you: According to Hany Farid at Berkeley, numerous external studies and some of your own internal studies have revealed that your algorithms are actively promoting divisive, hateful, and conspiratorial content because it engages users to spend more time.

Do you think those studies are wrong? And if not, what are you guys doing to reverse course on that?

Mr. ZUCKERBERG. Sure. Thank you, Congressman. This is an important set of topics.

In terms of groups, we stopped recommending all civic and political groups even though I think a lot of the civic and political groups are healthy, because we were seeing that that was one vector that there might be polarization or extremism, and groups might start off with one set of views but migrate to another place. So we have removed that completely. And we did it first as an exceptional measure during the election; and since the election we have announced that we are going to extend that policy indefinitely.

For the rest of the content in News Feed and on Instagram, the main thing that I would say is I do think that there is quite a bit of misperception about how our algorithms work and what we optimize for. I have heard a lot of people say that we are optimizing for keeping people on the service.

The way that we view this is that we are trying to help people have meaningful social interactions. People come to social networks to be able to connect with people. If we deliver that value, then it will be natural that people use our services more. But that is very different from setting up algorithms in order to just kind of try to tweak and optimize and get people to spend every last minute on our service, which is not how we designed the company or the services.

Mr. KINZINGER. Thanks. I don't mean to interrupt you. I do have another question.

Mr. Chairman, I want to ask unanimous consent to insert for the record an article from the Wall Street Journal titled "Facebook Executives Shut Down Efforts to Make the Site Less Divisive."

[The article appears at the conclusion of the hearing.]

Mr. KINZINGER. Let me move on to the next one. For years I have called for increased consumer protection from companies on fake accounts and bad actors who use them to exploit others. This issue affected me personally. In 2015, a woman from India spent all of her money on a flight to come see me because she claimed to have developed a relationship with me over Facebook.

In 2019 I sent you, Mr. Zuckerberg, a letter highlighting the issue, and your team provided a relatively inadequate response. Since then, I have introduced two pieces of legislation, Social Media Accountability and Account Verification Act, and the Social Media Fraud Mitigation Act, both of which aim to curb this activity.

So Mr. Zuckerberg, the last time you came before us, you stated that Facebook has a responsibility to protect its users. Do you feel that your company is living up to that? And further, what have you done to remove those fake accounts?

70

Mr. ZUCKERBERG. Thanks. So fake accounts are one of the bigger integrity issues that we face. I think in the first half of—well, in the last half of last year, we took down more than a billion fake accounts, just to give you a sense of the volume, although most of those our systems are able to identify within seconds or minutes of them signing up because the accounts just don't behave in a way that a normal person would in using the service.

But this is certainly one of the highest-priority issues we have. We see a large prevalence of it. Our systems, I think, at this point are pretty effective in fighting it, but they are not perfect, and there are still a few percent that get through. And it is a big issue and one we will continue working on.

Mr. KINZINGER. Thank you. I would love to ask the rest—the others a question, but I don't have time. So I yield back, Mr. Chairman. Thank you for your attention.

Mr. DOYLE. I thank the gentleman.

The Chair now recognizes Ms. Castor for 5 minutes.

Ms. CASTOR. Well, thank you, Mr. Chairman.

Gentlemen, since you were last here in front of the committee, the illegal activities, the expanse of unwitting Americans, the rampant misinformation on your platforms, have gotten worse. Part of the reason for this toxic stew is that you employ manipulative methods to keep people cemented to the platform, often amplifying discord. And it boosts your bottom line. You enjoy an outdated liability shield that incentivizes you to look the other way or take half-measures while you make billions at the expense of our kids, our health, the truth, and now we have seen the very foundation of our democracy.

I have been working for over a year with advocates and other members on an update to the children's protections online. You all know the tracking and manipulation of children under age 13 is against the law, but Facebook, Google, YouTube, and other platforms have broken that law or have found ways around it. Many have been sanctioned for knowingly and illegally harvesting personal information of children and profiting from it.

I have a question for each of you, just a qusick yes or no: Did you all watch "The Social Dilemma," where former employees of yours or other Big Tech platforms say they do not allow their kids on social media? Mr. Zuckerberg?

Mr. ZUCKERBERG. Congresswoman, I haven't seen it——

Ms. CASTOR. Yes or——

Mr. ZUCKERBERG [continuing]. But I am obviously familiar with it.

Ms. CASTOR. OK. Mr. Pichai? Yes or no?

Mr. PICHAI. Yes. I have seen the movie.

Ms. CASTOR. And——

Mr. DORSEY. No. No.

Ms. CASTOR. OK. Well, Mr. Zuckerberg, there is a good reason that they have the former execs say that. Are you aware of the 2019 Journal of the American Medical Association pediatric study that the risk of depression for adolescents rises with each daily hour spent on social media? And I am not talking screen time. I am not talking about Facetime or sending text messages to friends. But are you aware of that research?

71

Mr. ZUCKERBERG. Congresswoman, I am not aware of that research.

Ms. CASTOR. All right. What about the 2019 HHS research that suicide rates among kids aged 10 to 14 increased by 56 percent between 2007 and 2017 and tripled—tripled—for kids between the age of 10 and 14? Yes or no?

Mr. ZUCKERBERG. Congresswoman, I am aware of the issue——

Ms. CASTOR. Yes. So yes. Certainly you are also aware of the research that indicates a correlation between the rise in hospital admissions for self-harm and the prevalence of social media on phones and the apps on platforms that are designed to be addictive and keep kids hooked. Yes?

[No response.]

Ms. CASTOR. Well, how about you, Mr. Pichai? Are you aware of the JAMA pediatric September 2020 study where they tested hundreds of apps used by children aged 5 and under, many of which were in the Google Play Store's family section? The study found 67 percent of the apps tested showed transmission of identifying info to third parties in violation of the COPPA law? Are you familiar?

Mr. PICHAI. Extensively spent time on this area. We introduced a curated set of apps for kids on the Play Store. We give digital well-being tools so that people can take a break, set time patterns, can set time limits for children. So the concept of——

Ms. CASTOR. Let me ask you this, then, Mr. Pichai: How much are you making in advertising revenue from children under the age 13?

Mr. PICHAI. Most of our products other than a specific product designed for kids, YouTube—most of our products are not eligible for children under the age of 13.

Ms. CASTOR. Yes. So you are not going to provide that.

Mr. Zuckerberg, how much advertising revenue does Facebook—do you make from behavioral surveillance advertising targeted towards kids under age 13?

Mr. ZUCKERBERG. Congresswoman, it should be none of it. We don't allow children under the age of 13——

Ms. CASTOR. Are you——

Mr. ZUCKERBERG [continuing]. On the services that run advertising.

Ms. CASTOR. Oh, are you saying that there are no kids on Instagram under the age of 13 right now?

Mr. ZUCKERBERG. Congresswoman, children under the age of 13 are not allowed on Instagram. When we find out that they are there——

Ms. CASTOR. No. That is not the answer. I think, of course, every parent knows that there are kids under the age of 13 on Instagram. And the problem is that you know it, and you know that the brain and social development of our kids is still evolving at a young age. There are reasons in the law that we set that cutoff at 13. But now, because these platforms have ignored it, they have profited off of it, we are going to strengthen the law. And I encourage all of my colleagues to join in this effort. I have heard a lot of bipartisan support here today.

72

We also need to hold the corporate executives accountable and give parents the tools that they need to take care and protect their kids.

Thank you, Mr. Chairman. I yield back.

Mr. DOYLE. The gentlelady's time is expired.

The Chair recognizes Mr. Johnson for 5 minutes.

Mr. JOHNSON. Thanks, Mr. Chairman.

Over a decade ago, Americans watched Facebook, Twitter, and Google emerge from humble beginnings. We were curious to see how these new, innovative companies would improve our lives. The results are in, and they are deeply concerning.

We have seen a surge in cyberbullying, child porn, radical extremism, human trafficking, suicides, and screen addiction, all of which have been linked to the use of social media. Our Nation's political discourse has never been uglier, and we haven't been this divided since the Civil War.

Yet Big Tech marches on uninhibited. What is their newest target? Children under the age of 13. News outlets this week have reported that Facebook is planning to create an Instagram app designed for children under the age of 13. We have talked about it here already today. Elementary and middle school students.

By allowing Big Tech to operate under Section 230 as is, we will be allowing these companies to get our children hooked on their destructive products for their own profit. Big Tech is essentially handing children a lit cigarette and hoping they stay addicted for life.

In 1994, Democratic Congressman Henry Waxman chaired a hearing with the CEOs of our Nation's largest tobacco companies. During his opening statement, he stated, and I quote, "Sadly, this deadly habit begins with our kids. In many cases they become hooked quickly and develop a lifelong addiction that is nearly impossible to break."

So, Mr. Zuckerberg and Mr. Dorsey, you profit from your company's hooking users to your platforms by capitalizing on their time. So yes or no: Do you agree that you make money off of creating an addiction to your platforms? Mr. Zuckerberg?

Mr. ZUCKERBERG. Congressman, no. I don't agree with that.

Mr. JOHNSON. OK. Thank you. Thank you.

Mr. ZUCKERBERG. What we do is——

Mr. JOHNSON. That is what I needed, a yes or a no, because you do.

Mr. Dorsey?

Mr. DORSEY. No.

Mr. JOHNSON. OK. All right. Let me go on.

Chairman Waxman went on to say, and I quote, "For decades, the tobacco companies have been exempt from the standards of responsibility and accountability that apply to all other American corporations. Companies that sell aspirin, cars, and soda are all held to strict standards when they cause harm, and that we demand that when problems occur, corporations and their senior executives be accountable to Congress and the public. This hearing marks the beginning of a new relationship between Congress and the tobacco companies." That is what Chairman Waxman said in 1994.

73

So For all three of you, Mr. Zuckerberg, Mr. Dorsey, and Mr. Pichai: Do you agree that the CEOs that—as the CEOs of major tech companies, you should be held accountable to Congress and the public? Mr. Zuckerberg?

Mr. ZUCKERBERG. Congressman, I think we are accountable to Congress and to the public.

Mr. JOHNSON. Do you think you should be held accountable?

Mr. ZUCKERBERG. I am not sure I understand what you mean, but I think so.

Mr. JOHNSON. It is an easy question. Should you be held account-able——

Mr. ZUCKERBERG. Yes.

Mr. JOHNSON [continuing]. To Congress and the public for the way you run your business?

Mr. ZUCKERBERG. Yes. And we are.

Mr. JOHNSON. OK. All right. Thank you.

Mr. Dorsey?

Mr. DORSEY. Yes. Accountable to the public.

Mr. JOHNSON. OK. Accountable—no. I said accountable to Congress and the public. We represent the public. So you agree?

Mr. DORSEY. Yes.

Mr. JOHNSON. OK. Thank you. Mr. Pichai?

Mr. PICHAI. Yes. I am here today because I am accountable to Congress and members of the public.

Mr. JOHNSON. OK. Great. Well, gentlemen, let me tell you this, and I think I have heard it mentioned by several of my other colleagues. There is a lot of smugness among you. There is this air of untouchableness in your responses to many of the tough questions that you are being asked.

So let me tell you all this. All of these concerns that Chairman Waxman stated in 1994 about Big Tobacco apply to my concerns about Big Tech today, about your companies. It is now public knowledge that former Facebook executives have admitted that they use the tobacco industry's playbook for addictive products. And while this is not your first hearing in front of Congress, I can assure you that this hearing marks a new relationship between all of us here today. There will be accountability.

Mr. Chairman, I yield back.

Mr. DOYLE. I thank the gentleman. He yields back.

The Chair now recognizes Mr. McNerney for 5 minutes.

Mr. McNERNEY. I want to thank the chair for organizing this hearing, and I thank the participants. This is a lot of work on your behalf and a long day for you. I appreciate that.

Are you all aware that your platforms are behemoths, and that the Americans are demanding that we step in and rein in your platforms both in terms of how you handle our data and how platforms handle disinformation that causes real harm to Americans and to the democracy itself?

I understand the tension you have between maximizing your profits by engaging to your platforms on the one hand and by the need to address disinformation and real harm it causes on the other hand. Your unwillingness to unambiguously commit to enforcing your own policies and removing the 12 most egregious

75

to be or should know to be false or misleading information, including ads that are placed in videos, promoted content, and ads that are placed above, below, or on the site of a piece of content?

Mr. Zuckerberg, would you answer with a yes or no first, please?

Mr. ZUCKERBERG. Congressman, that is very nuanced. I think the questions to determine whether something is misinformation is a process that I think would need to be spelled out well in a law like that.

Mr. MCNERNEY. Well, OK. I appreciate that.

Mr. Dorsey?

Mr. DORSEY. Yes. I would oppose it until we see the actual requirements and what the ramifications are. We need to understand that.

Mr. MCNERNEY. OK. And Mr. Pichai, would you oppose a prohibition like this?

Mr. PICHAI. The principle makes sense. In fact, advertisers don't want anywhere or near to be content like that. And so we already have incentives. You can imagine reputable advertisers, like consumer products advertisers, do not want any ads to appear next to information that could turn off their consumers. So we have natural incentives to do the right thing here.

Mr. MCNERNEY. You all say you want a safe and open platform for everyone. You say it is not in your company's interest to have this information on your platform. So you shouldn't oppose efforts that would prevent harming the American people.

I yield back.

Mr. DOYLE. The gentleman's time is expired. The gentleman yields back.

The Chair now recognizes Mr. Long for 5 minutes.

Mr. LONG. Thank you, Mr. Chairman.

Mr. Pichai, I am going to ask you a yes-or-no question, and just tell me if you know the difference in these two words: yes and no?

Mr. PICHAI. Yes.

Mr. LONG. Mr. Zuckerberg, same question for you. Do you know the difference in yes and no?

Mr. ZUCKERBERG. Yes, Congressman.

Mr. LONG. And Mr. Dorsey, same question for you. Do you know the difference in two words, yes or no?

Mr. DORSEY. Yes.

Mr. LONG. I am sorry?

Mr. DORSEY. Yes.

Mr. LONG. Is that a yes? I didn't——

Mr. DORSEY. Yes. I know the difference.

Mr. LONG. Thank you. I want a steak dinner there from one of my colleagues. They didn't think I could get all three of you to answer a yes-or-no question. I did it.

Mr. Zuckerberg, let me ask you: How do you ascertain if a user is under 13 years old?

Mr. ZUCKERBERG. Congressman, on services like Facebook, we have people put in a birthday when they register.

Mr. LONG. That is handy. So a 13-year-old would never—I mean, an 11-year-old would never put in the wrong birthday by 2 years and say they were 13? Is that kind of your policy?

76

Mr. ZUCKERBERG. Congressman, it is more nuanced than that. But I think you are getting at a real point, which is that people lie. And we have additional systems that try to determine what someone's age might be, so if we detect that someone might be under the age of 13, even if they lied, we kick them off.

But this is part of the reason why we are exploring having a service for Instagram that allows under-13s on, because we worry that kids may find ways to try to lie and evade some of our systems. But if we create a safe system that has appropriate parent controls, then we might be able to get people into using that instead. We are still early in figuring this out, but that is a big part of the theory and what we are hoping to do here.

Mr. LONG. But currently they are now allowed to use Instagram. Correct?

Mr. ZUCKERBERG. That is correct. Our policies do not allow people under the age of 13 to use it.

Mr. LONG. I am from Missouri, the Show Me State. And just to say that no one under 13 can get on to me doesn't pass the Missouri smell test of "show me." So I was thinking with you, Mr. Zuckerberg, you created the Facebook Oversight Board as a way to help hold Facebook accountable. They are currently looking at Facebook's decision to remove President Trump's Facebook account.

If the oversight board determines that Facebook should have left President Trump's account up, what will you do?

Mr. ZUCKERBERG. Congressman, we will respect the decision of the oversight board, and if they tell us that former President Trump's account should be reinstated, then we will honor that.

Mr. LONG. I don't know why people call Attorney General Ashcroft "Attorney General," but when they speak of President Trump, they call him "former President." But I guess I will leave that for another day.

Sticking with you again, Mr. Zuckerberg, my understanding is that the Facebook Oversight Board is comprised of members from all over the world. As you are well aware, the United States has the strictest protections on free speech than any other country.

Since the decisions of the board are being made by a panel rather than the U.S. court of law, how can you assure members of this committee and the American people that the oversight board will uphold free speech and make their decisions based on American laws and principles?

Mr. ZUCKERBERG. Congressman, the members of the oversight board were selected because of their views on free expression and strong support of it. That is why we created the oversight board, to help us defend these principles and to help us balance the different aspects of human rights, including free expression.

But each of the people on the oversight board was selected because of a strong commitment to free expression, and I think the decisions that the oversight board has made so far reflect that.

Mr. LONG. OK. Let me move on to Mr. Dorsey.

Mr. Dorsey, I know you are from the Show Me State also. Have you been vaccinated against COVID–19?

Mr. DORSEY. Not yet.

Mr. LONG. Mr. Pichai, have you been vaccinated against COVID–19?

77

Mr. PICHAI. Sorry. I missed the question, Congressman?

Mr. LONG. I know. I bore a lot of people. Have you been vaccinated against COVID–19?

Mr. PICHAI. Congressman, I was very fortunate to have received it last week.

Mr. LONG. So you have one shot. You have another one to go? Or is it just Johnson & Johnson, where you just need one?

Mr. PICHAI. I still have one more shot to go.

Mr. LONG. And Mr. Zuckerberg, same question: Have you been vaccinated against COVID–19?

Mr. ZUCKERBERG. I have not yet, but hope to as soon as possible.

Mr. LONG. OK. It is not a personal preference not to get vaccinated, they just haven't got to your age group?

Mr. ZUCKERBERG. That is correct.

Mr. LONG. OK. Thank you. And I just cannot believe Robert Kennedy, Jr., is out there with his antivax stuff and it is allowed to stay up on Twitter.

With that, I yield back.

Mr. DOYLE. The gentleman yields back.

Let's see who is next. I don't see a name. Can staff show us who is next up?

Mr. Welch, you are recognized for 5 minutes.

Mr. WELCH. Thank you, Mr. Chairman.

What we are hearing from both sides of the aisle are enormous concerns about some of the consequences of the development of social media—the algorithmic amplification of disinformation, election interference, privacy issues, the destruction of local news, and also some competition issues. And I have listened carefully, and each of the executives has said that your companies are attempting to face these issues.

But a concern I have is whether, when the public interest is so affected by these decisions and by these developments, ultimately should these decisions be made by private executives who are accountable to shareholders, or should they be made by elected representatives accountable to voters?

So I really have two questions that I would like each of you, starting with Mr. Zuckerberg and then Mr. Pichai and then Mr. Dorsey, to address.

First, do you agree that many of these decisions that are about matters that so profoundly affect the public interest should be made exclusively by private actors like yourselves who have responsibilities for these major enterprises?

And secondly, as a way forward to help us resolve these issues or work with them, will you support the creation by Congress of a public agency, one like the Federal Trade Commission or the Securities and Exchange Commission, one that had staff that is expert in policy and technology, that has rulemaking and enforcement authority to be an ongoing representative of the public to address these emerging issues? Mr. Zuckerberg?

Mr. ZUCKERBERG. Congressman, I agree with what you are saying, and I have said a number of times that I think that private companies should not be making so many decisions alone that have to balance these complicated social and public equities.

89

Mr. ZUCKERBERG. Congresswoman, there are so many different parts of the service that I think it is probably right——

Mrs. DINGELL. Can I just——

Mr. ZUCKERBERG [continuing]. That not recommending political or civic groups probably isn't going to meaningfully decrease engagement. But we have taken a lot of HR steps, including reducing viral videos by about 50 million hours of watching a day, which have had a meaningful impact on engagement. But we do that because it helps make the service better and helps people like it more, which I think will be better for both the community and our business over the long term.

Mrs. DINGELL. OK. Mr. Zuckerberg, I am sorry to have to do this in 5 minutes. But given your promises in the fall, the events that transpired on January 6, and your two incentives that you yourself admit, I find it really difficult to take some of these assurances you are trying to give us today seriously.

I believe that regulators and independent researchers should have access to Facebook and other large social media platforms' recommendation algorithms, not just for groups but for any relevant feature that can be exploited or exploit private user data collected by the company to support extremism. And I support legislation to do so.

Mr. Zuckerberg, given your inability to manage your algorithms or your unwillingness to reduce controversial content, are you opposed to a law enabling regulators to access social media algorithms or other information technology that result in the promotion of harmful disinformation and extremist content?

Mr. ZUCKERBERG. Well, Congresswoman, while I don't necessarily agree with your characterization, I do think that giving more transparency into the systems is an important thing. We have people working on figuring out how to do this.

One of the nuances here in complexity is that it is hard to separate out the algorithms versus people's data which kind of goes into that to make decisions, and the data is private. So it is tough to make that public and transparent. But I do think that this is an important area of study on how to audit and make algorithms more transparent.

Mr. DOYLE. OK. The gentlelady's time is expired.

The Chair recognizes Mr. Duncan for 5 minutes.

Mr. DUNCAN. Thank you, Mr. Chairman. Let me first say that Democrats repeating disinformation about the motives of the murder in Atlanta during a hearing on disinformation is irony at its worst. The murderer admitted that he was a sex addict. The problem was addiction, mental illness. While my thoughts and prayers go out to the families who were impacted by this hideous crime, it was not a hate crime, and to say so is disinformation.

Mr. Dorsey, is it OK for a white male to tweet a picture of a KKK Klansman hood to a black woman?

Mr. DORSEY. No. That would go against our hateful conduct policy.

Mr. DUNCAN. Just this week, black conservative commentator Candice Owens was sent a tweet from a white liberal depicting a KKK hood. And your support center said that that racist harass-

90

ment of a conservative didn't violate your terms of service. What do you have to say about that?

Mr. DORSEY. We removed that tweet.

Mr. DUNCAN. OK. Thank you for doing that. Also this week, Syrian refugee Ahmad Al Aliwi Alissa, a Biden-supporting Muslim, allegedly murdered 10 people at a grocery store in Boulder, Colorado. Your support center told Newsweek that referring to this gentleman as a white Christian terrorist wasn't a violation of your misinformation policy. What do you have to say about that?

Mr. DORSEY. I don't know that case, but we can follow up with you on that.

Mr. LATTA. Thank you. Your promises from the last hearing that you will work on this or make it better rang completely hollow sometimes, so I ask that you do.

You have censored and taken down accounts of conservatives, Christian, and even pro-life groups. At the same time, liberals, tyrants, and terrorists continue to have unfettered access on Twitter. You were able to take down the account of a sitting United States President while he was still President. But you continue to allow State sponsors of terror to use Twitter as a platform, including the Ayatollah Khoumeini, Javad Zarif of Iran, or even Bashar al-Assad of Syria.

You act like judge and jury and continue to hide behind the liability protections in Section 230 of the Communications Decency Act, which Congress set up to foster a free and open internet. You think you are above the law because, in a sense, Congress gave you that power, but Congress gave you that liability shield to one end: that was the protection of innocent children. Catherine McMorris Rodgers knocked it out of the park today, hammering the point where children are vulnerable.

But let's look at the John Doe vs. Twitter case that is ongoing right now. According to the National Center on Sexual Exploitation, a teenage boy, a victim of child sex trafficking, had images of his abuse posted on Twitter. One of those videos went viral, and he became the target of bullying to the point of being suicidal. He contacted you to alert you that his sex abuse images were on your platform. You failed to take them down. His mother contacted you to alert you, and again you failed to take them down.

They called the police and they followed up with you with a police report. Your support center told the family that, after review, the illegal video was not a violation of your terms of service. In the meantime, the illegal video accrued over 167,000 views.

It took a threat from a Homeland Security agent to get Twitter to take down the video. Even then you took no action against the accounts that were sharing it and continue to share sexually explicit videos of minors in clear violation of the law and in clear violation of your duties under Section 230 of the Communications Decency Act, as they were passed.

So in the eyes of Twitter, it is better to be a pedophile pornographer, a woke racist, or a state sponsor of terror than it is to be a conservative, even a conservative President. You have abused the Section 230 liability shield we gave you to protect children and used it to silence conservatives instead.

91

As we have heard today, your abuses of your privilege are far too numerous to be explained away and far too serious to ignore. So it is time for your liability shield to be removed—your immunity shield and the immunity shield of other woke companies who choose to score political points with their immunity shields rather than protect children.

My colleagues have been asking you if you deserve to continue to receive immunity under Section 230. Let me answer the question for you: No, you don't. You all think you do, but you don't because you continue to do a disservice to that law and its intent.

The United States Constitution has the First Amendment, and that should be your guide. Protecting the speech of users of your platform instead of trading them in like hostages and forcing things through algorithms to lead them down a path.

The American people really are tired of you abusing your rights, abandoning their values. So one of the Christian leaders that you banned, Mr. Dorsey, had as her last post a Scripture verse that you took down. And I want to leave it here today, Psalm 34:14. "Depart from evil and do good; seek peace and pursue it." Rather than silence that wise advice, I strongly suggest that you follow it.

Now, I have heard a lot of stuff on this hearing today about 230 protections. I challenge my colleagues to really get serious about doing something about this liability shield so that we do have a fair and free internet and people aren't censored.

With that, Mr. Chairman, I yield back.

Mr. DOYLE. The gentleman's time is expired.

The Chair recognizes Ms. Kelly for 5 minutes.

Ms. KELLY. Thank you, Mr. Chair. Thank you to the witnesses who are testifying today.

The business model for your platforms is quite simple: Keep users engaged. The more time people spend on social media, the more data harvested and targeted ads sold. To build that engagement, social media platforms amplify content that gets attention. That can be cat videos or vacation pictures, but too often it means content that is incendiary, contains conspiracy theories or violence.

Algorithms in your platforms can actively funnel users from the mainstream to the fringe, subjecting users to more extreme content, all to maintain user engagement. This is a fundamental flaw in your business model that mere warning labels, temporary suspension of some accounts, and even content moderation cannot address. And your company's insatiable desire to maintain user engagement will continue to give such content a safe haven if doing so improves your bottom line.

I would like to ask my first question of all the witnesses. Do each of you acknowledge that your company has profited off harmful misinformation, conspiracy theories, and violent content on your platform? Just say yes or no. Starting with Mr. Dorsey, yes or no?

Mr. DORSEY. No. That is not our business.

Ms. KELLY. Mr. Zuckerberg?

Mr. ZUCKERBERG. No, Congresswoman. I don't think we profit from it. I think it hurts our service.

Ms. KELLY. Mr. Pichai?

92

Mr. PICHAI. Congresswoman, it is certainly not our intent, and we definitely do not want such content. And we have clear policies against it.

Ms. KELLY. Well, since you all said no, can you please provide to me in writing how you manage to avoid collecting revenue from ads either targeted by or served on such content? So I will be expecting that.

There is a difference between a conversation in a living room and one being pumped out to millions of followers, from discouraging voting and COVID–19 misinformation to encouraging hate crimes. The harms are real and disproportionate.

Do you acknowledge that such content is having especially harmful effects on minorities and communities of color? Yes or no again? I don't have a lot of time, so yes or no? Mr. Dorsey?

Mr. DORSEY. Yes.

Ms. KELLY. Mr. Pichai?

Mr. PICHAI. Yes.

Ms. KELLY. Mr. Zuckerberg?

Mr. ZUCKERBERG. Yes. I think that's right.

Ms. KELLY. Thank you. If your financial incentive is that human psychology leads to the creation of a system that promotes emotionally charged content that is often harmful, do you believe that you can address the—do you believe that you will always need to play Whac-a-mole on different topics? Mr. Zuckerberg?

Mr. ZUCKERBERG. Congressman, I do think that we can take systematic actions that help to reduce a large amount of this. But there will always be some content that gets through those systems that we will have to react to.

Ms. KELLY. Mr. Dorsey?

Mr. DORSEY. That is not our incentive, but I agree with Mark. Our model is to constantly integrate. We are going to miss some things, and we will go too far in some cases.

Ms. KELLY. Mr. Pichai?

Mr. PICHAI. I agree largely with what Mark and Jack said. And we—a lot of channels, we remove thousands of misleading election videos. There are many involving threats, and we are very vigilant.

Ms. KELLY. OK. More transparency and research into the AI models you use is needed. I understand that they are constantly evolving and proprietary. However, those obstacles must not be insurmountable. Would you agree to some type of test bed to evaluate your procedures and technology for disparate impacts? And would you welcome minimal standards set by the government? I only have 44 seconds.

Mr. DORSEY. I will go. You are not calling us. But we—yes, we are interested in opening all this up and going a step further in having a protocol. I don't think that should be government-driven, but it should be open and transparent that the government can look at it and understand how it works.

Mr. ZUCKERBERG. I agree that this is an area where research would be helpful. And I think some standards, especially amongst the civil rights community, would be helpful guidance for the companies.

Mr. PICHAI. Congresswoman, we work with many third parties. I just mentioned the HUD collaboration we had. Definitely would

95

change disinformation is on your platform and how much the Climate Change Information Center has reduced it?

Mr. ZUCKERBERG. Sure. Thanks, Congressman. Our approach to fighting misinformation—of which climate misinformation, I think, is a big issue, so I agree with your point here. We take a multipronged approach. One is to try to show people authoritative information, which is what the Climate Information Center does.

But then we also try to reduce the spread of misinformation around the rest of the service through this independent third-party fact-checking program that we have in which one of the fact-checkers is specifically focused on science feedback and climate feedback type of issues.

Overall, I would be happy to follow up and share more details on what we have seen across those. But this is certainly an area that I agree is extremely important and needs multiple tactics to address.

Mr. MCEACHIN. Well, thank you. And it is my understanding that this climate center was modeled after your COVID–19 Information Center. However, different standards still apply for both organic content and paid-for advertising for climate change versus COVID–19.

Why does Facebook not apply the same standards of fact-checking on climate change that it does on COVID–19 content?

Mr. ZUCKERBERG. Congressman, you are right that the Climate Information Center was based off our work on the COVID Information Center and Election Information Center. In terms of how we treat misinformation overall, we divide the misinformation into things that could cause imminent physical harm—of which COVID misinformation that might lead someone to get sick or hurt or vaccine misinformation falls in the category of imminent physical harm—and we take down that content.

Then other misinformation are things that are false but may not lead to imminent physical harm. We label and reduce their distribution but leave them up. So that is the broad approach that we have, and that sort of explains some of the differences between some of the different issues and how we approach them.

Mr. MCEACHIN. Mr. Pichai—and I hope I am pronouncing that correctly, sir—YouTube has employed contextualization tools linking viewers to similar sources as Facebook's Climate Center. That being said, you restricted but have not removed some repeat offenders from your platform such as Prager University, a nonaccredited university producing climate change denial content.

Are you not concerned that by restricting those videos and not removing repeat offenders, that people who are determined to find those videos to validate their fears will indeed find them and share them with others?

Mr. PICHAI. Congressman, it is an incredibly important area. In general, in these areas we rely on raising authoritative information, both by showing information panels as well as raising scientific content, academic content, and journalistic content so our algorithms rank those types of content higher for an area like climate change, similar to election integrity and COVID.

And obviously it is an area where there is a range of opinions people can express. We have clear policies, and if it is violative, we

96

remove. If it is not violative but if it is not deemed to be of high quality, we don't recommend the content. And that is how we approach it, and we are committed to this area as a company.

We lead in sustainability. We have committed to operating 24/7 on a carbon-free basis by 2030. And it is an area where we are investing significantly.

Mr. McEACHIN. Well, thank you. I have run out of time. Mr. Dorsey, I apologize to you. Perhaps we will have an opportunity to have a conversation.

Mr. Chairman, I give you my 2 seconds.

Mr. DOYLE. I thank the gentleman. The gentleman yields back. The Chair now recognizes Mr. Curtis for 5 minutes.

Mr. CURTIS. Thank you, Mr. Chairman. And thank you to our witnesses.

My first comment is to point out that in her 2019 Presidential campaign, Senator Elizabeth Warren, Democrat, called for the breaking up of your companies. Several weeks ago, in a speech at CPAC, Senator Josh Hawley, Republican, also said that Big Tech companies should be broken up. I don't think I need to point out the irony of Josh Hawley validating Elizabeth Warren at CPAC.

There seems to be a train wreck coming. Unfortunately, the very few tools that we have in our tool bag are regulation and breaking up. Mr. Zuckerberg, I read through your terms of service, including the dense community standards document. In your terms of service, you state that you cannot control and do not take responsibility for content posted on your platform.

The community standards document, which is frequently cited as why content is or is not censored, says you sometimes make content moderation decisions based off what is considered best for the public interest or public discourse.

I know in your testimony you said that companies need to earn their liability protections. That is great. But that doesn't address the concerns people understandably share about your past or current views on what is or is not acceptable.

How do you claim you cannot take responsibility and therefore should maintain your liability protections for content posted on your site, but at the same time state that your platform or monitored content based off what is in the public's best interest? That appears to be two-sided.

Mr. ZUCKERBERG. Congressman, thanks. People use our services to share and send messages billions of times a day. And it would be impossible for us to scan or understand everything that was going on, and I don't think that our society would want us to take the steps that would be necessary to monitor every single thing. I think that we would think that that would infringe on our freedoms.

So broadly, I think it is impossible to ask companies to take responsibility for every single piece of content that someone posts, and that, I think, is the wisdom of 230. At the same time, I do think that we should expect large platforms to have effective systems for being able to handle, broadly speaking, categories of content that are clearly illegal.

So we have talked today about child exploitation and opioids and sex trafficking and things like that. And I think it is reasonable to

97

expect that companies have systems that are broadly effective, even if they are not going to be exactly perfect, and there are still going to be some pieces of content that inevitably get through, just like no police department in the city is able to eliminate all crime.

Mr. CURTIS. I am going to jump in only because we are out of time. I would love to spend more time on that with you.

Let me also ask you. Utah is known for Silicon Slopes, our start-up community. You have called for government regulation, but some view this with skepticism because larger companies tend to deal with regulation much better than small companies.

If you think back to your college days, the early startup phase of Facebook, what challenges do you see for startups to compete and what cautions should Congress consider as we look at regulations that potentially could be a barrier for companies that might be your future competition?

Mr. ZUCKERBERG. Thanks. I think that this is a really important point whenever we are talking about regulation. And I want to be clear that the recommendations that I am making for Section 230 I would only have applied to larger platforms.

I think it is really critical that a small platform, the next student in a dorm room or in a garage, needs to have a relatively low—as low as possible regulatory burden in order to be able to innovate and then get to the scale where they can afford to put those kind of systems in place. So I think that that is a really important point to make.

But I think that that goes for the content discussions that we are having around 230. It probably also applies to the privacy law that I hope that Congress will pass this year or next year to create a Federal U.S. privacy standard. And I also think that we should be exploring proactively requiring things like data portability that would make it easier for people to take data from one service to another.

Mr. CURTIS. I want to thank you. I have got just a few seconds left. And Mr. Pichai, this is a little bit off topic so I am simply going to ask this question and submit it for the record and not ask for a response.

Almost a decade ago your company started Google Fiber. You introduced Kid Speed and free internet to all the residents of my home city, Provo, Utah. Sadly, it seems like your efforts to do this across the country were slowed down or even stopped by excessive government regulations. I would love you to share off the record— and I will submit it for the record—why government is making it so hard to expand internet across the country.

Thank you, Mr. Chairman, and I yield my time.

Mr. DOYLE. The gentleman yields back.

The Chair recognizes Mr. Soto for 5 minutes.

Mr. SOTO. Thank you, Mr. Chairman.

When television, radio, traditional newspapers, political blogs, and even private citizens spread lies, they can be sued and held liable for damages or FCC fines. But pursuant to 230, you all can't be sued. You have immunity. But it ain't 1996 anymore, is it? Meanwhile, lies are spreading like wildfire through platforms. Americans are getting hurt or killed. And the reason is your algorithms.

99

like messaging, right? Someone sends a text message to someone else. There is no algorithm there determining whether that gets delivered. People can just send that to someone else.

A lot of this stuff, I think, unfortunately was amplified on TV and in traditional news as well. There was certainly some of this content on Facebook, and it is our responsibility to make sure that we are building effective systems that can reduce the spread of that. I think a lot of those systems performed well during this election cycle. But it is an iterative process, and there are always going to be new things that we will need to do to keep up with the different threats that we face.

Mr. Soto. Mr. Zuckerberg, will you commit to boosting Spanish-language moderators and systems on Facebook, especially during election season, to help prevent this from happening again in Spanish language?

Mr. Zuckerberg. Congressman, this is already something that we focus on. We already beefed up and added more capacity to Spanish language fact-checking and Spanish language authoritative information resources. And that is certainly something that we hope to build on in the future. So the answer to your question is yes.

Mr. Doyle. The gentleman's time is expired.

The Chair now recognizes Mrs. Lesko for 5 minutes.

Mrs. Lesko. Thank you, Mr. Chair, and thank you to the witnesses.

I represent constituents in the great State of Arizona, and most of my constituents just want to be treated fairly, equitably, impartially, and they want to make sure that their private information stays private.

Mr. Pichai, does Wikipedia influence Google's search results?

Mr. Pichai. We do index, and Wikipedia is in our index. And for certain queries, if an answer from Wikipedia rises to the top of our ranking, yes, we do rely on it.

Mrs. Lesko. Thank you.

Mr. Dorsey, did you personally decide to ban President Trump from your platform?

Mr. Dorsey. We have a process that we go through to get there, and that came after a warning.

Mrs. Lesko. And did you make the final decision?

Mr. Dorsey. Ultimately, I have final responsibility.

Mrs. Lesko. Thank you.

And Mr. Pichai, in July 2018 the Wall Street Journal reported that Google let hundreds of outside developers scan the inboxes of millions of Gmail users. Mr. Pichai, do Google employees review and analyze Gmail users' content?

Mr. Pichai. Congresswoman, we take privacy very seriously. We don't use the data from Gmail for advertising, and our employees generally do not access it, only in narrow cases, either to troubleshoot with the right consent and permissions. There are prohibitions with enough checks and balances.

Mrs. Lesko. So I think what you are saying is occasionally your Google employees do review and analyze.

I have another question regarding that. Does Google share Gmail users' emails or analysis of your emails with third parties?

100

Mr. PICHAI. We do not sell any data. I think what you are referring to is users could give API access to third-party developers—for example, there are applications which could give travel-related information. So this is a user choice, and it is an API on top of the platforms. We have done numerous steps to make sure users have to go through multiple steps before they would give consent to a third party.

Mrs. LESKO. And so I have looked through your Google Privacy Statements and User Content, and I still have concerns about that. I am very concerned. I have Gmail accounts, just like millions of people, and I don't know if you are looking at them. I don't know who is looking at them. I don't know who is sharing them. I don't know what you are doing with them.

Mr. PICHAI. If I——

Mrs. LESKO. You make me concerned. Mr.—I only have——

Mr. PICHAI. If I could clarify one thing I said there?

Mrs. LESKO. Yes.

Mr. PICHAI. Only if a user asks us to troubleshoot an account, with that user's permission. But we do not look into users' email contents, and we do not share the contents with anyone else without the user's asking us to do so.

Mrs. LESKO. However, the Wall Street Journal had this article saying that hundreds of developers were reviewing the email contents. So I have to move on to another question because I only have a short time.

Mr. Dorsey, Twitter denied the Center for Immigration Studies the ability to promote four tweets that contained the phrases "illegal alien" and "criminal alien," even though those are the correct legal terms. Mr. Dorsey, if there is a warning posted related to a border threat, how will Twitter algorithms react to the use of the word "illegal" versus "undocumented"?

Mr. DORSEY. Well, it isn't about our algorithms. It is interpretation against our policy and if there are violations. But we can follow up with you on how we handle situations like that.

Mrs. LESKO. Well, this is the legal term, is "illegal alien." That is in law, in legal terms. I don't understand why you would not allow that. That is the legal, factual term. And with that, I am going to ask another question.

Mr. Zuckerberg, this has been brought up before. Do you believe that your platform harms children?

Mr. ZUCKERBERG. Congresswoman, I don't believe so. This is something that we study and we care a lot about. Designing products that improve people's well-being is very important to us. And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that.

And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services.

Mr. DOYLE. The gentlelady's time is expired.

The Chair now recognizes Mr. O'Halloran for 5 minutes.

Mr. O'HALLORAN. Thank you, Mr. Chairman. I am enlightened. Thank you to the panel today.

101

I am enlightened by what I have heard today: three of the most knowledgeable business people in the word, with beautiful profit centers, business models, a sense of the future direction that your companies want to go in, standards that are in many cases reliable but others not very much so, and a very big concern by the Congress of the United States on the direction you want to go in versus what is good for our Nation in total.

Mr. Zuckerberg, last October Facebook announced it removed a network of 202 accounts, 54 pages, and 76 Instagram accounts for violating your coordinated inappropriate behavior policy. A really forged network was based in [audio disruption] Arizona and ran its disinformation operation from 2018 to 2020 by creating fake accounts and commenting on other people's content about the 2018 midterm election, the 2020 Presidential election, COVID–19, and criticism and praise of creation of certain political parties and Presidential candidates. Sadly, Facebook only acted after a Washington Post investigation reported its findings.

While your testimony states since 2017 Facebook has removed over 100 networks of accounts for engaging in coordinated, inauthenticated behavior, where did Facebook fail by not finding this network over the course of a number of years? Mr. Zuckerberg.

Mr. ZUCKERBERG. Well, Congressman, we have a team of—I think it is more than 300 people who work on counterterrorism at this point, and basically trying to work with law enforcement and across the industry to basically find these networks of fake accounts and authentic accounts that are trying to spread behavior.

And I think we have gotten a lot more effective at this. I can't say that we catch every single one, but certainly I think we have gotten a lot more effective, including just this week we announced that we took down a network of Chinese hackers that were targeting Uyghur activists outside of China.

So we have gotten more sophisticated at this. Sometimes when we start finding a lead, we need to wait to kind of see the full extent of the network so we can take down the whole network. So that is a tradeoff that sometimes we are able to discuss with law enforcement and other times not, in terms of how we do enforcement. But overall, I think this effort has gotten a lot more sophisticated over the last 4 years.

Mr. O'HALLORAN. So you are happy with the amount of personnel that you have working on these issues?

Mr. ZUCKERBERG. Congressman, I think we have one of the leading teams in this area. We went from more than——

Mr. O'HALLORAN. Are you happy with—the question was: Are you happy with the amount of people you have working, the capacity that you have to take care of these issues?

Mr. ZUCKERBERG. Congressman, I think that the team is well-staffed and well-funded. We spend billions of dollars a year on these kind of content and integrity and security issues across the company. So I think that that is appropriate to meet the charge. And there are always things that we are going to want to do to improve the tactics of how we find this, and a lot of that over the last several years has been increasing the work that we do with law enforcement and the intelligence community——

109

swer. Most of these have absolutely no room for nuance. These aren't trick questions. I would just like to clarify a few facts.

So on February 25th, Facebook took down a video hosted by my colleague Representative Marie Newman in which she places the transgender flag outside her office. Is that correct, to your knowledge? Yes or no?

Mr. ZUCKERBERG. Congresswoman, I am not aware of this.

Ms. CRAIG. You are not aware of this?

Mr. ZUCKERBERG. No.

Ms. CRAIG. Well, the answer is yes. Facebook took her video down. According to Representative Newman, the reason Facebook gave for taking down the video was that it violated Facebook's community standards on hate speech and inferiority. Does that seem right to you, that if someone put up a trans flag and took a video of it and posted it on your platform, that it should be put down?

Mr. ZUCKERBERG. Congresswoman, no. That doesn't seem right to me. But I would need to understand the specifics of the case in more details.

Ms. CRAIG. Yes. Thank you. The answer is no, it is absolutely not right.

Meanwhile, across the hall, Representative Marjorie Taylor Greene from Georgia posted a video to Facebook. Her video showed her putting up a transphobic sign so that Representative Newman, the mother of a trans child, could "look at it every time she opens her door." Facebook allowed Representative Greene's video to remain online. Is that right? Yes or no?

Mr. ZUCKERBERG. Congresswoman, I am not aware of the specifics. But as I have said a number of times today, we do make mistakes, unfortunately, in our content moderation, and we hope to fix them as quickly as possible——

Ms. CRAIG. Reclaiming my time, reclaiming my time. The answer was yes, Representative Greene's video was allowed to remain online. Representative Newman reached out to Facebook, and a few hours later her video was restored with a perfunctory apology. But Representative Greene's video was never taken down. I am not even going to ask you if I am getting that right, as I was, because you obviously don't know.

Are you aware that Facebook has repeatedly flagged the transgender flag as hate speech and that trans-positive content ends up being taken down while transphobic content, like Representative Greene's video, is not taken down and is often shared widely? Yes or no?

Mr. ZUCKERBERG. Congresswoman, I am now aware of that specifically, but this is an instance of a broader challenge in identifying hate speech, which is that there is often a very nuanced difference between someone saying something that is racist versus saying something to denounce something that someone else said that was racist.

And we need to build systems that handle this content in more than 150 languages around the world, and we need to do it quickly. And, unfortunately, there are some mistakes in trying to do this quickly and effectively.

Ms. CRAIG. Mr. Zuckerberg, I am going to give you your nuance this one time.

110

As it exists today, do you think your company is going to get these content moderation decisions right on the first try eventually?

Mr. ZUCKERBERG. Congresswoman, if what you are asking is are we ever going to be perfect, the answer is no. I think that there will always be some mistakes, but I think we will get increasingly accurate over time. So for example, a few years back, we identified——

Ms. CRAIG. Mr. Zuckerberg, I only have a couple of minutes, or 1 minute left, so I am going to continue here.

As has been mentioned repeatedly throughout today, we just don't have faith that your companies have the proper incentives to proactively contemplate and address basic human rights. With that in mind, would you support legislation requiring social media companies to have an Office of Civil Rights reporting to the CEO, and that would mean you would have to reconsider your corporate structure, including the civil rights and human rights of the trans community?

Mr. ZUCKERBERG. Congresswoman, we took the unprecedented step of hiring a VP of civil rights, and I think we are one of the only companies that has done something similar to what you are saying.

Ms. CRAIG. Well, I hope that you do better, then, because this example I am giving you was completely unacceptable. This panel has done something truly rare in Washington these days: It has united Democrats and Republicans. Your industry cannot be trusted to regulate itself.

And with that, I yield back.

Mr. DOYLE. The gentlelady yields back.

The Chair now recognizes Mrs. Trahan for 5 minutes.

Mrs. TRAHAN. Thank you, Mr. Chairman.

I would like to turn the focus back to our children. My husband and I have five. Our oldest is 27, our youngest is 6, and over the years I have noticed how technology has been increasingly designed to capture their attention. The more time my first-grader spends scrolling through an app, the less time she is playing outside or enjoying face-to-face interactions with us.

Google and Facebook are not only doing a poor job of keeping our children under 13 off of YouTube and Instagram, as my colleagues have already mentioned today, but you are actively onboarding our children onto your ecosystems with apps like YouTube Kids, Facebook Messenger Kids, and now we are hearing Instagram for Kids. These applications introduce our children to social media far too early and include manipulative design features intended to keep them hooked.

Mr. Pichai, when a child finishes a video on YouTube or YouTube Kids, does the next video automatically play by default? And I think this one is a yes or no.

Mr. PICHAI. Sorry, I was muted. Congresswoman, I have children, too. I worry about the time they spend online, and I agree with you it is an important issue.

Mrs. TRAHAN. Yes.

Mr. PICHAI. We design YouTube——

Mrs. TRAHAN. The autoplay function by default? That is a yes——

Mr. PICHAI. On the main app, it is there, and for each video there is an easy on/off toggle. Users have preference to select——

Mrs. TRAHAN. But the default setting is yes. When a user who is predicted to be a teen is watching a YouTube video, are the number of likes displayed by default? Yes or no, please?

Mr. PICHAI. On all videos, I think we do have—across all videos we have.

Mrs. TRAHAN. Right. And Mr. Zuckerberg, will the recently reported Instagram app for kids have endless scroll enabled? Yes or no?

Mr. ZUCKERBERG. Sorry. Congresswoman, we are not done finalizing what the app is going to be. I think we are still pretty early in designing this. But I just want to say that——

Mrs. TRAHAN. Are you not sure or are you not sharing features or—and look, another feature of concern is the filter that adds an unnatural but perfect glow for my 10-year-old to apply to her face. Is that feature going to be part of Instagram for Kids?

Mr. ZUCKERBERG. Congresswoman, I don't know. I haven't discussed this with the team yet.

Mrs. TRAHAN. Well, look, please expect my office and many others to follow up, given what we know about Instagram's impact on teen mental health. We are all very concerned about our younger children.

And I just want to speak mother to father for a moment, fathers, because leading experts all acknowledge that social media sites pose risks to young people—inappropriate content, oversharing of personal information, cyberbullying, deceptive advertising—the list goes on. And those risks are exacerbated with more time children spend in these apps.

Mr. Pichai, you mentioned that you have children, and I have also read you limit their screen time. What do you say when one of your children doesn't want to put their phone down?

Mr. PICHAI. Congresswoman, the struggle is the same, particularly through COVID. It has been hard to moderate it. And I do take advantage of the parental controls and the digital well-being tools. We can limit the time on their apps. And so we have prohibitions in place.

Mrs. TRAHAN. I don't mean to cut you off, Mr. Pichai. But the last thing overworked parents need right now—especially right now—are more complex to-dos, which is what parental controls are. They need childcentric design by default.

Mr. Zuckerberg, I understand your children are younger. But when they start using social media, what will you say when they are craving their tablet over spending time face to face with you or with friends?

Mrs. TRAHAN. Well, Congresswoman, we haven't gotten to that point yet. But we are designing all of these tools—we designed Messenger Kids that the parents are in control. I think we have proven that that can be a good and safe experience. And I think that was one of the things that made us think that we should consider doing this for Instagram as well, by having it so that we have

112

a parent-controlled experience and, as you say, childcentric experience for people under the age of 13——

Mrs. TRAHAN. I am going—I am going to reclaim my time, only because. Connecting with others is one thing. Adding filters, no breaks for kids to take, and manipulating the design of these apps for our children is another. Look, this committee is ready to legislate to protect our children from your ambition.

What we are having a hard time reconciling is that, while you are publicly calling for regulation—which, by the way, comes off as incredibly decent and noble—you are plotting your next frontier of growth, which deviously targets our young children and which you all take great strides, with infinitely more resources, in protecting your own children.

This playbook is familiar. As some of my colleagues have pointed out, it is the same tactic we saw from alcohol companies and Big Tobacco: Start 'em young and bank on them never leaving, or at least never being able to. But these are our children, and their health and well-being deserve to take priority over your profits.

Mr. DOYLE. The gentlelady's time is expired.

The Chair now recognizes Mrs. Fletcher for 5 minutes.

Mrs. FLETCHER. Thank you, Chairman Doyle. And thanks to you and Chairwoman Schakowsky and Ranking Members Latta and Bilirakis for holding this hearing today. I agree with my colleagues. There is a broad consensus on a range of issues, and I appreciate the discussion.

As we have discussed extensively today, one of the big challenges of this rise of dangerous disinformation is that it denies us a basic set of shared facts to enable an informed debate like what we are having here today. And it is absolutely vital that we take charge and that we address this.

What we have seen is that countries whose interests are not aligned with ours, extremist organizations and others, have used online social media platforms to engage and to amplify extremist content and disinformation, from the COVID–19 pandemic to the January 6 insurrection, both of which we have talked about extensively.

We have seen that the real-world cost of this unchecked spread of disinformation is in lies. And like my colleagues, I worry that the structure of many social media companies, including those we have before us today, prioritize engagement, including engagement with provocative or extremist content, over responsible corporate citizenship.

So one of my greatest concerns regarding how extremist content and disinformation is allowed to spread on your platform is the lack of data transparency when it comes to independent analysis. Now, everyone has claimed they have an internal system, that it is about the systems, that you need good systems to remove and delete disinformation and extremist content.

But we have no way to verify how effective those systems are. And that is a huge part of the challenge before us. I think we all would agree that we need data and information to make good policy and to write good legislation which will be coming out of this committee.

113

So that brings me to a followup on my colleague Miss Rice's questions about data. As she mentioned, and it is my understanding that all three of your platforms chose to remove content that was posted regarding the Capitol insurrection on January 6. And I think we can all understand some of the reasons for that. But as a result, it is unavailable to researchers and to Congress.

So my question for each of you is: Will you commit to sharing the removed content with Congress to inform our information of the events of January 6 and also the issues before us today about how to respond to extremist and dangerous content online?

And I will start with Mr. Zuckerberg.

Mr. ZUCKERBERG. Thanks, Congresswoman. When we take down content that might be connected to a crime, I think we do, as a standard practice, try to maintain that so that we can share it with law enforcement if necessary. And I am sure our team can follow up to discuss that with you as well.

Mrs. FLETCHER. Sure. I appreciate that. And I understand that you have a legal obligation to cooperate with authorities and law enforcement in these cases. And I think that what I am talking about is also sharing it with us in Congress, and I appreciate your response there.

Mr. Dorsey?

Mr. DORSEY. We would like to do this, actually. We have been thinking about a program for researchers to get access to actions that we had to take. But all of this is subject to local laws, of course.

Mrs. FLETCHER. Well, and that may be something that we can help craft here. So I think that it is consistently something we have heard from researchers as well. It is a real area of challenge in not having the data. So I appreciate that.

And Mr. Pichai? Do you also agree?

Mr. PICHAI. Congresswoman—sorry, I was muted—we are working with law enforcement, and happy to connect with your office. And we cooperate as allowed by law while balancing the privacy of the people involved.

Mrs. FLETCHER. Well, thank you. So I appreciate all of your willingness to work with us and to assist Congress in addressing this attack on our Capitol and our country.

Another idea that I would like to touch base with you on in the time I have left, just over a minute, is the difference we see in how your platforms handle foreign extremist content versus domestic content. By all accounts, your platforms do a better job of combating posts and information from foreign terrorist organizations, or FTOs, like ISIS or al-Qaeda and others, where the posts are automatically removed, depending on keywords and phrases, et cetera.

The FTOs are designated by the State Department. There are rigorous criteria to identify groups that wish to cause harm to Americans. Currently there is no legal mechanism or definition for doing the same for domestic terror and hate groups.

Would a FSederal standard for defining a domestic terror organization similar to FTOs help your platforms better track and remove harmful content from your sites? Mr. Zuckerberg?

117

And Mr. Dorsey, are you confident that the conspiracy theorists or other purveyors of electoral misinformation and Stop the Steal on Twitter were not recommending to others?

Mr. DORSEY. I can't say that I was confident, but I know we did work really hard to make sure that if we saw any amplification that went against the terms of service, which this would, we took an action immediately. We didn't have any up-front indication that this would happen, so we had to react to it quite quickly.

Mr. TONKO. All right. Thank you. And who and what content your platforms recommend have real-world consequences, and the riot caused five deaths and shook our democratic foundations. And I believe that your platforms are responsible for the content you promote, and look forward to working with my colleagues to determine how to hold you accountable.

Mr. Pichai, Google and YouTube often slip under the radar as a source of disinformation. But in the last election, bad actors used ads on Google Search to scam people looking for voting information, and YouTube failed to remove videos that spread misinformation about the 2020 vote results.

So Mr. Pichai, when journalists pointed out in November that election misinformation was rampant on Google's YouTube, the company said it was allowing discussions of election processes and results. A month later YouTube said it would remove new content alleging widespread voter fraud in the 2020 election. Why did YouTube wait a month to take action on election misinformation?

Mr. PICHAI. If I could clarify here, we were taking down videos leading up to the election. There is obviously a month from the date of election till there are due processes, co-challenges, and we waited till this—we consulted with CISPA and Association of Secretaries of State. And on December 8, when the States certified the election, we started enforcing newer policies on December 9th.

To be very clear, we were showing information from the Associated Press, and we were proactively showing information high up in our search results to give relevant information throughout this election cycle.

Mr. DOYLE. The gentleman's time is expired.

Mr. TONKO. Thank you. Mr. Chair, I yield back.

The Chair recognizes Mr. McKinley for 5 minutes.

Mr. MCKINLEY. Thank you, Mr. Chairman, and this panel. You all have to be exhausted after being grilled all day long like this.

So my questions are to Mr. Zuckerberg.

When you came before our committee in 2018, you acknowledged that Facebook had used what you just said, "clear standards," preventing the sale of illegal drugs on your site. But you were shown examples of active posts that traffickers were still using that platform unlawfully to sell prescription opioids. You did apologize and confirm that "social media companies need to do a better job of policing these posts."

Now, 3 years later it appears a shell game is emerging. Facebook seems to have cleaned up its act, but you are now allowing Instagram, one of your subsidiaries, to become the new vehicle. Even though Instagram has the same policies against the sale of illegal substances, you are still allowing bad actors to push pills on your site.

118

It didn't take long for our staff to find numerous examples. For example, here is oxycodone that is being sold on your site. Here is Ritalin that is being sold on your site. Here is Xanax and Adderall that is being sold on your site. So these posts have—they are not new. They have been active since last fall.

If we can find posts this easily, shame on you for not finding them for yourself. Apparently you are not taking the warnings of Congress seriously. After drug manufacturers dumped millions of pills in our community, killing thousands, ravaging families, and destroying livelihoods, Congress responded by passing laws to hold them liable.

If a retail store is selling cigarettes to underage kids, that store is held liable. So why shouldn't you be held liable as well? Do you think you are above the law? You are knowingly allowing this poison to be sold on your platform into our communities, to our children, to our vulnerable adults.

Look. I have read Scott Galloway's book "The Four." I encourage all the members on this committee to read his book. It is a perfect depiction of the arrogance of Big Tech companies like Facebook, Google, Apple, and Amazon. He develops a very compelling argument as to why Big Tech companies should be broken into smaller companies, much like that occurred to AT&T in 1984.

Maybe it is time for Congress to have an adult conversation about this loss of liability protection and the need to reform our antitrust laws. I don't think Congress wants to tell you how to run your company, but maybe it should.

So Mr. Zuckerberg, let me close with this one question: Don't you think you would find a way to stop these illegal sales on your platforms if you were held personally liable?

Mr. ZUCKERBERG. I keep on getting muted.

Congressman, we don't want any of this content on our platforms, and I agree with you that this is a huge issue. We have devoted a lot of resources and have built systems that are largely quite effective at finding and removing the content. But I just think that what we all need to understand is that at the scale that these communities operate, where people are sharing millions or, in messages, billions of things a day, it is inevitable that we will not find everything, just like a police force in a city will not stop every single crime.

Mr. MCKINLEY. I agree.

Mr. ZUCKERBERG. So I think that we should——

Mr. MCKINLEY. But I ask you the question very directly, Mark. Should you not be held liable when people are dying because your people are allowing these sales to take place? We did it with manufacturers. We do it to the stores. Why aren't we doing it to the salesman that allows this to take place?

Mr. ZUCKERBERG. Well, Congressman, I don't think we are allowing this to take place. We are building systems that take the vast majority of this content off our systems. And what I am saying——

Mr. MCKINLEY. We have been dealing with this for 3 years, Mark. Three years this has been going on. And you said you were going to take care of it last time, but all you do is switch from Facebook over to Instagram. They are still doing it now. And you are saying "We need to do more."

119

Well, how many more families are going to die? How many more children are going to be addicted while you still study the problem? I think you need to be held liable.

Mr. ZUCKERBERG. Congressman, we are not sitting and studying the problem. We are building effective systems that work across both Facebook and Instagram. But what I am saying is that I don't think that we can expect that any platform will find every instance of harmful content. I think we should hold the platforms to be responsible for building generally effective systems at moderating these kinds of content.

Mr. DOYLE. The gentleman's time is expired.

Mr. MCKINLEY. I am not going to get an answer, Mike. Thank you.

Mr. DOYLE. The gentleman yields back. The Chair recognizes Ms. Blunt Rochester for 5 minutes.

Ms. BLUNT ROCHESTER. Thank you, Mr. Chairman, for allowing me to waive onto this important hearing. And thank you to the witnesses.

I want to focus on two areas: first, a consumer protection and safety issue, and second, more broadly, manipulation and privacy of our data.

On consumer protection and safety, earlier this year two infants from two different families ended up in the intensive care unit in Wilmington, Delaware, after being fed homemade baby formula based on instructional videos viewed on YouTube. One infant suffered from cardiac arrest that resulted in brain damage.

For years, the American Academy of Pediatrics has warned parents against homemade baby formulas because it puts infants at risk of serious illness and even death. And since at least 2018, the FDA has recommended against the use of homemade formula. Even as recent as 29 days ago, the FDA issued an advisory against homemade formula.

In February, my office informed your team, Mr. Pichai, and as a followup I have sent a letter requesting information and action on this issue in the hopes of a response by April 1st. Mr. Pichai, this is just a yes-or-no question: Can I count on a response to my letter by the deadline of April 1st?

Mr. PICHAI. Congresswoman, definitely yes. Heartbreaking to hear the stories. We have clear policies. Thanks for your highlighting this. I think the videos have been taken down, and we are happy to follow up and update the team.

Ms. BLUNT ROCHESTER. We checked today. For years, these videos have clearly violated your own stated policy of banning the videos that endanger the, as you say, "physical well-being of minors." And so I am pleased to hear that we will be hearing back from you.

And while we are considering Section 230, what is clear from this hearing is that we should all be concerned by all of your abilities to adequately—and just as importantly, rapidly—moderate content. In some of these cases, we are talking life and death.

Second, as many of my colleagues have noted, your companies profit when users fall down the rabbit hole of disinformation. The spread of disinformation is an issue all of us grapple with from all across the political specimen. Disinformation often finds its way to the people most susceptible to it because the profiles that you cre-

120

ate through massive data collection suggest what they will be receptive to.

I introduced the DETOUR Act to address common tactics that are used to get such personal data as possible. And these tactics are often called "dark patterns," and they are intentionally deceptive user interfaces that trick people into handing over their data.

For the people at home, many of you may know this as when you go on an app, it doesn't allow you to have a No option, or it will insinuate that you need to do something else, install another program like Facebook Messenger app to get on Facebook.

You all collect and use this information. Mr. Pichai, yes or no: Would you oppose legislation that banned the use of intentionally manipulative design techniques that trick users into giving up their personal information?

Mr. PICHAI. We definitely are happy to have oversight on these areas and explain what to do.

Ms. BLUNT ROCHESTER. Thank you. I have to go to Mr. Dorsey. Mr. Dorsey, yes or no?

Mr. DORSEY. Open to it.

Ms. BLUNT ROCHESTER. Mr. Zuckerberg?

Mr. ZUCKERBERG. Congresswoman, I think the——

Ms. BLUNT ROCHESTER. Yes or no, please.

Mr. ZUCKERBERG [continuing]. Principle makes sense, and the details matter.

Ms. BLUNT ROCHESTER. OK. Mr. Zuckerberg, your company recently conducted this massive ad campaign on how far the internet has come in the last 25 years. Great ad. You end it with a statement: "We support updated internet regulations to address today's challenges." Unfortunately, the proposal that you direct your viewers to fails to address dark patterns, user manipulation, or deceptive design choices.

Mr. Zuckerberg, will you commit now to include deceptive design choices as part of your platform for better internet regulations?

Mr. ZUCKERBERG. Congresswoman, I will think about it. My initial response is that I feel there are other areas that I think might be more urgently in need.

Ms. BLUNT ROCHESTER. That might be your—if you say this is a desire of yours to address the issues that we face today, dark patterns goes back to 2010, this whole issue of deceptive practices. And I hope that you will look into it.

I will say—Mrs. Trahan and others have mentioned—she mentioned our children. Others have mentioned seniors, veterans, people of color, even our very democracy, is at stake here. We must act and assure you—we will assure you we will act.

Thank you so much, and Mr. Chairman, I yield back 6 seconds.

Mr. DOYLE. I thank the gentlelady. The gentlelady yields back. And now the Chair recognizes Mr. Griffith for 5 minutes.

Mr. GRIFFITH. Thank you very much, Mr. Chair.

According to new data from the National Center for Missing and Exploited Children, Siler Pythian found the vast majority of child exploitation reports from Big Tech sites. Facebook had the most, 20.3 million. Google was second with 546,000-plus. Twitter had 65,000-plus. Put in perspective, MindGeek, the Canada-based parent company of major portion websites, had 13,229. Facebook

121

claims 90 percent of the flagged incidents were duplicates. All right. Let's accept that. That still leaves over 2 million incidents—2 million incidents.

Mr. Zuckerberg, yes or no, does Facebook have a problem with child exploitation on its platform?

Mr. ZUCKERBERG. Congressman, this is an area that we work on a lot. But the recent why those numbers are so high is because we are so proactive about trying to find this and send it to NCMEC and others who are doing good work in this area. We send content and flags over to them quite liberally, whenever we think that we might see that something is at issue.

And that is, I think, what the public should want us to do, not criticize us for sending over a large number of flags but should encourage the companies to do it.

Mr. GRIFFITH. So you are admitting that you all have a problem, and this is one way you are trying to work on it.

Mr. Pichai, yes or no: Do you agree with Mr. Zuckerberg that you all have a problem? Are you there?

Mr. PICHAI. Congressman, sorry, I was muted. This is an area which we invest very heavily. We have been praised by several authorities. We work proactively——

Mr. GRIFFITH. So the answer is yes.

Mr. Dorsey, yes or no: Do you agree?

Mr. DORSEY. If we see any problems, we try to resolve them as quickly as possible.

Mr. GRIFFITH. But you do have problems, and that is why you are trying to resolve them. I get that. The problem is, when you are talking about millions of incidents, and we take 90 percent of them as duplicates from the Facebook data, that is millions of incidents that are happening where our children are being exploited with child pornography on you all's sites. We have got to do better.

I think you all need, for everything that we have talked about today, an independent industrywide review team like the electronic industry did with the Underwriters Laboratory nearly 150 years ago. I told you all that when you were here before. Nobody has done anything. I don't think it needs to be within your company. I think it needs to be outside.

And on that vein, I would say to Google, special permission was given to Moonshot CVE to target ads against extremist keywords. Moonshot then directed thousands of individuals who searched for violent content to videos and posts of a convicted felon who espouses anti-law-enforcement, anti-Semitic, and anarchist viewpoints.

Mr. Pichai, are you aware of this problem?

Mr. PICHAI. Congressman, I am not aware of the specific issue. Last year we blocked over 3.1 billion bad ads, 6,000 ads per minute. And so we enforce vigorously. But I am happy to look into this specific issue and follow up back with you.

Mr. GRIFFITH. Well, here is what happened. You partnered with an outside group that didn't do their job. What are your standards when you partner with an outside group? What are your standards, and what are your philosophy? Because they sent people who were already looking for violence to a convicted felon with anarchist and anti-Semitic views.

122

Mr. PICHAI. There is no place for hate speech, and I am disappointed to hear of this. We will definitely look into it and follow up back with you.

Mr. GRIFFITH. Well, and I appreciate that. I recognize that. But I have the same concerns that Mr. McKinley had. And you weren't here last time, but we heard these same kinds of things about how "we are going to work on it" and how "we are going to get these problems resolved." And I forget when that hearing was, but a year or so ago.

And yet we continue to have the same problems, where political candidates' information is being taken down because for some reason it is flagged, where conservatives and people on the left are being hit and taken down. And I agree with many of the sentiments on both side of the aisle that, if you all aren't doing anything and it appears that you are not moving fast enough, we have no choice in Congress but to take action.

I don't want to. I would rather see you all do it, like the electric industry did with Underwriters Laboratory. But nobody is doing that. Nobody is coming up with a group that both sides of the aisle and the American families can feel comfortable with. And so we are going to have to take action, and it is probably going to be this year.

I yield back.

Mr. DOYLE. The gentleman yields back.

The Chair recognizes Ms. Schrier for 5 minutes.

Ms. SCHRIER. Thank you, Mr. Chair.

I am a pediatrician, and I have spent my life calming patients who are nervous about vaccines because of online misinformation. In fact, that is why I introduced a Vaccines Act when I was a new Member of Congress. Did you know that there are doctors who, after spending their entire day on the front line fighting this virus, come home at night and spend their scarce free time and family time fighting misinformation about vaccines online? And this misinformation, of course, comes primarily from Facebook and Twitter.

So the question is: Why do they do that? Well, they do it because of things like this that happened after I introduced the Vaccines Act. Here are some overt threats:

"Keep shoving this vaccine monitor down people's throats and expect riots."

"Be careful. You will answer for this tyranny one day."

"She needs to just disappear. Can we vote her out of office? I am enraged over these poison pushers."

"We have weapons and are trained to fight off possible forced vaccinations. I will die protecting my family."

And then there is just the misinformation.

"It says 'safe and effective' many times, yet no vaccine has been studied in a double-blind study." False.

"Who is going to take this vaccine? I heard rumors that it changes a person's DNA." False.

"You do not give"—excuse my language—"You do not give a shit about the health and welfare of our children. This horrid vaccine has already killed 600 people. You are deplorable." And of course that again is false.