# EXHIBIT A

E-Served: Jan 16 2026  4:03PM PST  Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/16/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: January 14, 2026**

**Plaintiff K.G.M.'s Motion in Limine to Exclude References to the
Alleged Domestic Violence Incident Between Plaintiff's Mother and
Father at Age Three**

Court's Ruling:  The Motion is denied.


K.G.M. moves to exclude "evidence of an alleged domestic violence incident that supposedly occurred when Plaintiff K.G.M. was three years old, based on a medical record of treater Alison Pratt."  (Pl's Mot., at p. 1.)  The domestic violence resulted in (1) K.G.M.'s father's arrest, and (2) K.G.M.'s parents' divorce.  K.G.M. requests that the court exercise its discretion under Evidence Code section 352 to exclude this relevance because it is irrelevant, speculative, and highly prejudicial.

K.G.M. points to evidence tending to show that K.G.M. did not witness the alleged domestic violence when she was three years old.  K.G.M.'s Motion is thus based on the argument that the claim that the alleged domestic violence negatively affected K.G.M.'s mental health "lacks foundation."  However, there is evidence cited by Defendants in their Opposition that could be interpreted by the jury as showing that the domestic violence inflicted by K.G.M.'s father against K.G.M.'s mother may have affected K.G.M.'s mental health in some way and at some point.  For example, K.G.M. has testified that her mother told her in elementary school that K.G.M.'s "father had hit [K.G.M.'s mother] more than once."  (Chaput Decl. ISO Defs' Joint Opps. MILs, Ex. 15, at 92:21—93:9.)  K.G.M.'s mother testified that K.G.M. attended therapy sessions with her mother when K.G.M.

was three or four years old, and K.G.M.'s mother agreed that she "had [K.G.M.] see a therapist because [K.G.M.'s mother was] concerned about the long-term impact of her father's domestic violence."  (Ex. B to K.G.M. MIL No. 6, Depo. of K.G.M.'s mother at p. 88.)  Indeed, K.G.M.'s own expert witness on specific causation has testified that a "history of domestic violence … could potentially be a contributing factor" causing K.G.M.'s alleged mental health harms.  (Chaput Decl. ISO Defs' Joint Opps. MILS, Ex. 43, at 70:1-6.)  The evidence thus has probative value on the important issue of causation.

In light of the evidence's probative value, it will not be excluded under Evidence Code section 352.  K.G.M.'s argument that the introduction of the evidence would "necessitate significant trial time on collateral issues" is not persuasive.  (Pl's Reply, at p. 3.)  An examination of what may have caused K.G.M.'s alleged mental health harms is central to this litigation.  K.G.M. also fails to show that evidence that K.G.M.'s father committed domestic abuse when K.G.M. was three years old would "create an emotional bias against Plaintiff."  (Pl's Reply, at p. 3, internal citations, quotation marks, and brackets omitted.)

Date: 1/16/2026

Carolyn B. Kuhl / Judge

Judge of the Superior Court of Los Angeles

FILED
Superior Court of California
County of Los Angeles

01/16/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: January 14, 2026**

**Meta's Motion 2: To Exclude Unrelated "Reputational" Evidence Regarding Facebook or Instragram, Including References to Election Interference, Genocide, Alleged Privacy Violations, Alleged Gender Discrimination, or "Facemash"**

Court's Ruling:  The Motion is granted.


Meta claims that Plaintiffs have at times injected allegations concerning election interference, genocide, alleged privacy violations, alleged gender discrimination, and a website created by Mark Zuckerberg while a student at Harvard in 2003 called "Facemash."  Meta requests that the court prohibit Plaintiffs from making any references to, or introducing any evidence or argument concerning, these topics (and other similar, unrelated topics) because they are (1) irrelevant, (2) substantially more prejudicial than probative, and (3) improper character evidence.

First, Meta notes that Plaintiffs do not allege that they were harmed by the alleged actions; Meta thus argues that the evidence has no relevance at trial.  With respect to privacy violations and alleged gender discrimination, Meta points out that earlier pleaded causes of action based on these topics have been dismissed from the operative Master Complaint.  Second, Meta argues that the evidence should be excluded under Evidence Code section 352 because any limited probative value is substantially outweighed by undue prejudice to Meta.  Meta contends that the only reason Plaintiffs seek to introduce the evidence is to tarnish Meta's reputation in the eyes of the jury.  Third, Meta argues that the evidence would be improper character

evidence under Evidence Code section 1101 because it would be offered to show that Meta acted improperly as to Plaintiffs because it acted improperly with respect to unrelated issues.

In their Opposition, Plaintiffs attempt to show how the evidence at issue here might be tangentially related to relevant information. Despite this, it is nonetheless clear that Plaintiffs' evidence of unrelated bad acts would have limited probative value and pose a significant risk of unduly prejudicing Meta in front of the jurors. For example, Plaintiffs propose to use evidence relating to a non-relevant platform created in 2003 (while Mr. Zuckerberg was in college) called "Facemash" to show that Mr. Zuckerberger's "behavior" in designing that platform suggests that he also designed Facebook/Instagram to be harmful. (See Pls' Opp. Meta's MILs, at p. 7; see also Pls' Opp. Meta's MILs, at p. 7 [claiming that the evidence of unrelated actions will help show "how Meta responded when confronted with those harms" and thus demonstrate Meta's improper response with respect to Plaintiffs]. Such evidence is not only unduly prejudicial, it is inadmissible under Evidence Code section 1101. Plaintiffs make no argument to show that references to genocide or election interference would not unfairly tarnish Meta's reputation in the eyes of the jury. And Meta is correct that earlier claims based on privacy violations and gender discrimination have been dismissed from the case. Accordingly, the "reputational" evidence is excluded under Evidence Code section 352.

Date: 1/16/2026

_____
    Carolyn B. Kuhl / Judge
Judge of the Superior Court of Los Angeles

E-Served: Jan 16 2026  4:03PM PST  Via Case Anywhere

FILED
Superior Court of California
County of Los Angeles

01/16/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
A. Rosas

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: January 14, 2026**

**Plaintiff K.G.M.'s Motion in Limine to Exclude Alleged Drug Use and Drug Seeking Behavior**

Court's Ruling:  The Motion is granted in part.  Evidence concerning K.G.M.'s 2019 hospitalization may include reference to K.G.M. being punished by her mother for, among other things, having allegedly smoked marijuana.  It may not include reference to a past history of smoking marijuana.  All other references to alleged drug use and drug seeking behavior are excluded.


K.G.M. moves to exclude evidence, testimony or argument related to her alleged drug use and drug-seeking behavior.  K.G.M. argues that, because "none of Defendants' experts opine that Plaintiff's mental health harms were drug related," the evidence "bears no relevance whatsoever." (Pl's Mot. at pp. 1-2.)  K.G.M. argues that the evidence should be excluded under Evidence Coe section 352.

In their Opposition, Defendants fail to point to any evidence they might offer at trial (be it expert opinion or lay testimony) to show that K.G.M.'s alleged drug use may have directly caused her mental health harms.  Defendants would thus have the jurors speculate that the fact that K.G.M. allegedly smoked marijuana was what caused her alleged harms.  Given the speculative nature of Defendants' claim, such evidence is of very limited probative value.  Weighed against this limited probative value is a serious risk of prejudice.  Such evidence would "confuse[] the issues for the jury and encourage[] them to speculate whether marijuana use was a factor" in causing K.G.M.'s harms.  (*Hernandez v. County of Los Angeles*

1

(2014) 226 Cal.App.4th 1599, 1615.)  The evidence could also be used as "impermissible character evidence" to impugn K.G.M.'s reputation in front of the jury.  (*Id.*)

In a footnote, Defendants also argue that the evidence of alleged drug use could be relevant to the failure to warn claim because "Plaintiff's failure to heed well-known warnings about the risks of drug use is relevant to Defendants' defense that a warning would not have been heeded by Plaintiff."  (Defs' Opp., at p. 3, fn. 3.)  However, as K.G.M. points out, "Defendants do not point to any evidence of 'well-known warnings about the risks of drug use.' "  (Pl's Reply, at p. 3.)  Defendants' lack of evidence on this question is striking, given that Defendants would ask the jurors to draw speculative analogies between the "warnings about the risks of drug use" and the relevant warnings regarding social media use.  Assuming Defendants had cited the necessary evidence to support their argument, such a speculative analogy would involve an undue consumption of time at trial.  The jury would need to examine the types of warnings regarding drug use, whether and which such warnings were actually provided to K.G.M., when such warnings were provided to K.G.M., what type of drug use K.G.M. engaged in after receiving such warnings, whether K.G.M. used drugs for which she had received relevant warnings, whether the provided warnings regarding drug use were sufficiently similar to the types of warnings Plaintiffs claim Defendants should have provided here, and whether legal social media use by minors is sufficiently similar to illegal drug use by minors.  Defendants' argument also papers over the fact that Plaintiffs have alleged that the warnings were also important to minors' *parents*, who may have restricted or prohibited their children's social media use had they been adequately informed of the alleged dangers of social media use.  To make the speculative analogy work for the purposes of K.G.M.'s failure-to-warn claim, Defendants would thus also have to show that K.G.M.'s *mother* disregarded "well-known warnings about the risks of drug use" and allowed K.G.M. to engage in illegal drug use.  In short, the probative value of the evidence is extremely limited, while the risk of undue consumption of time and undue prejudice is high.

The evidence of alleged drug use can only be admitted for the very limited purpose of providing context to an incident in which K.G.M. was hospitalized in 2019 for suicidal ideation because she was punished by her mother for "a lot of bad stuff," including for "smoking weed."  (See Defs' Opp., at p. 2.)  The hospitalization and its potential causes are highly relevant to this litigation.  But the only evidence of drug use that is necessary to provide sufficient context for this incident is the fact that alleged marijuana use was one of the reasons K.G.M.'s mother punished her. There is no evidence in the record to suggest that K.G.M. was hospitalized

*because* she allegedly smoked marijuana; the mention of marijuana is only relevant to the context of K.G.M.'s punishment, which may have triggered suicidal ideation.  Given the risk of undue prejudice from the introduction of evidence of drug use, no other evidence or mention of such evidence may be provided at trial.

Date: 1/16/2026

Carolyn B. Kuhl / Judge

Judge of the Superior Court of Los Angeles

E-Served: Jan 16 2026  4:03PM PST  Via Case Anywhere

FILED
Superior Court of California
County of Los Angeles

01/16/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES**

***Social Media Cases***
**JCCP5255
(Lead Case: 22STCV21355)**

**Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: January 14, 2026**

**Trial 1 Bellwethers' Motion in Limine to Exclude Reference to Other
Legal Cases or Settlements by Plaintiffs or Their Family Members**

Court's Ruling:  The Motion is granted.


Plaintiffs move to exclude evidence of other unrelated settlements or lawsuits involving the Plaintiffs and/or their families.  Plaintiffs point to evidence that Plaintiffs' parents have brought lawsuits in the past that are unrelated to social media use.  Plaintiffs argue that such evidence is irrelevant to Plaintiffs' claims and would be unduly prejudicial.

Defendants respond by arguing that the evidence "is probative of bias, motive, and credibility."  (Defs' Opp., at p. 2.)  "For example, the evidence shows that Plaintiff RKC's father—i.e., the individual who brought RKC's lawsuit—has a pattern of using litigation for financial gain. Such evidence is undoubtedly relevant and not substantially outweighed by any undue prejudice."  (Defs' Opp., at p. 2.)  Defendants further argue that "evidence that RKC's father has received monetary settlements from at least two prior lawsuits goes directly to his motivation for bringing this lawsuit on behalf of RKC."  (Defs' Opp., at pp. 2-3.)  Defendants note evidence showing that RKC's father was the one who decided to bring a lawsuit on RKC's behalf.

Defendants thus admit that they seek to introduce the prior acts of Plaintiffs' parents/guardians (i.e., the filing of unrelated, *presumably* unmeritorious litigation) to show that the parents/guardians have engaged in similar acts when filing *this* litigation.  But "evidence of a person's character

or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Defendants cannot introduce evidence that, say, RKC's father initiated baseless lawsuits in the past in order to show that the current lawsuit is baseless.

In order to avoid exclusion of the evidence under Evidence Code section 1101, subdivision (a), Defendants argue that they instead intend to use the evidence to prove "bias, motive, and credibility." (Evid. Code, § 1101, subd. (b).) This argument is unpersuasive. Ultimately, the purpose of introducing the evidence is to show that *this litigation* was filed for purportedly improper purposes (the recovery of damages) because a plaintiff's parent/guardian filed prior litigation for the purpose of recovering damages.

While Defendants attempt to suggest that evidence of prior lawsuits/settlements shows that the prior lawsuits were meritless, Defendants do not actually point to any evidence that might demonstrate this point. Defendants thus appear to rely on the premise that the mere existence of prior lawsuits/settlements suggests that the plaintiff involved acted improperly. This court does not accept this improper inference that the mere filing of litigation, without more, impugns the character, honesty, and credibility of the plaintiff.

Defendants are unable to show that the evidence would have any real relevance to the issues at trial. For example, the fact that RKC's father received monetary settlements in prior lawsuits that had nothing to do with Defendants says nothing about whether RKC suffered mental health harms as a result of using Defendants' social media platforms. Indeed, the mere fact that RKC's father filed two prior lawsuits, without more, says nothing about RKC's father's credibility: perhaps he was harmed and merely exercised his right to file litigation in a court of law. Even if the evidence could be interpreted as showing that RKC is motivated by potential financial gain, surely Defendants do not need to rely on prior litigation evidence to show that a civil litigant seeking damages is motivated to recover money from the defendant. Yet, introduction of such evidence at trial would create a substantial danger of undue prejudice, of confusing the issues, and of misleading the jury. The evidence is thus inadmissible under Evidence Code section 352.

In *Lowenthal v. Mortimer* (1954) 125 Cal.App.2d 636, the court found that introduction of the fact that plaintiff had filed 15 other lawsuits "could have had no effect other than to prejudice the jury against the plaintiffs."

The court held that evidence of the 15 prior lawsuits was properly excluded because California is among the states that exclude evidence of the character of a person alleging a negligent act "as throwing light on the probabilities of his conduct on the occasion in question." (*Id.* at p. 642.) Defendants cite *Moreno v. Sayre* (1984) 162 Cal.App.3d 116 (*Moreno*), in support of their argument.  But that case involved the issue of whether a jury should be informed of a sliding scale recovery agreement (see Cal. Code Civ. Proc. 877.5) entered into by alleged defendant tortfeasors and the plaintiff *in the same case being considered by the jury.* (*Id.* at pp. 126-127.)   Thus, *Moreno* involved circumstances completely inapposite to Defendants' proposed use of evidence of unrelated, prior litigation filed by a Plaintiff.

Federal courts have held that, "unless the prior lawsuits have been shown to be fraudulent, the probative value of evidence pertaining to a plaintiff's litigation history is substantially outweighed by the danger of jury bias." (*Henderson v. Peterson* (N.D. Cal., July 15, 2011, No. C 07-2838 SBA PR) 2011 WL 2838169, at *5; see also *Outley v. City of New York* (2d Cir. 1988) 837 F.2d 587, 592 ["[t]he charge of litigiousness is a serious one, likely to result in undue prejudice against the party charged, unless the previous claims made by the party are shown to have been fraudulent"].) Such a rule applies here under section 352.  There is no evidence that Plaintiffs' guardians/parents have engaged in fraud.  The evidence has little to no probative value but could waste time and cause the jurors to conclude that a Plaintiff's claims lack merit merely because that Plaintiff's parent has been a litigant in separate civil litigation.

The parties also discuss evidence concerning RKC's father's internet searches regarding class actions and advertising of various attorneys, and his internet activity visiting websites concerning social media addiction litigation.  The reasons why a plaintiff decides to initiate litigation is relevant to the credibility of the plaintiff as a witness.  (See CACI No. 107.)  But that relevance pertains to the litigation before the court, not to the plaintiff's interest in other types or subject matters of litigation.  Just as the fact a plaintiff previously filed a civil action is more prejudicial than probative (unless the prior lawsuit is shown to have been fraudulent), the fact a plaintiff has *considered* filing unrelated litigation is more prejudicial than probative.  A plaintiff's interest in *possible* litigation on subjects unrelated to the current litigation is of far less probative value than prior litigation the plaintiff did in fact file.  A plaintiff's subjective consideration of *possible* litigation is relevant only to a prejudicial "charge of litigiousness," or to an attempt to show the plaintiff's "character trait" for litigiousness based on his thought process regarding unrelated *possible* lawsuits that he did not in fact file.  Neither rationale supports admissibility.  Evidence concerning RKC's

father's internet searches or other research concerning lawsuits or potential claims unrelated to the current litigation concerning social media addiction is excluded under Evidence Code sections 352 and 1101.

Date: 1/16/2026                        Carolyn B. Kuhl / Judge
                          Judge of the Superior Court of Los Angeles

E-Served: Jan 16 2026  4:03PM PST  Via Case Anywhere

FILED
Superior Court of California
County of Los Angeles

01/16/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
            A. Rosas

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: January 14, 2026**

**TikTok Motion in Limine 1: To Exclude Information Regarding Use of the TikTok Defendants' Unrelated Services Outside of the United States**

Court's Ruling:  The Motion is granted as to all non-Douyin platforms operated outside of the United States.  However, the Motion is denied as to Douyin and its operation in China.


ByteDance seeks to exclude evidence related to social media platforms it operates in other countries.  The briefing focuses on "Douyin," the platform that ByteDance operates in China.  ByteDance maintains that "evidence about unrelated services offered outside the United States is irrelevant to any issue in this case to be tried and would result in a significant diversion of the parties', the Court's, and the jury's already limited time for these trials … ."  (ByteDance's Reply ISO ByteDance's MILs, at p. 2.)  ByteDance stresses that Douyin is operated by a different company than the one that operates TikTok in the United States, although ByteDance is the parent company of both.

Plaintiffs seek to introduce evidence regarding Douyin, which Plaintiffs believe is a safer version of TikTok, to show that ByteDance "could implement better screen time management and minor safety features that it knew would better protect minor users."  (Pls' Opp. ByteDance's MILs, at p. 1.)

1

The evidence is not inadmissible under Evidence Code section 352. The evidence is relevant to the question of ByteDance's knowledge and technical capabilities and TikTok's decision making concerning platform features such as screen time management.  Plaintiffs have cited evidence that could be relied upon by the trier of fact to conclude that an analysis of Douyin and TikTok together suggests that ByteDance knowingly designed TikTok to be less safe for minor users even though it was able to implement better safety features.  (See, e.g., Pls' Opp. ByteDance's MILs, at pp. 1-2.) For example, one TikTok witness testified that analyzed Douyin's screen time management features in making choices about TikTok's platform design and that Douyin implemented time management tools before or at the same time that TikTok was launched in the United States.  (Craick Decl. Ex. 3, Furlong Dep., at pp. 450-451, 458, 460-461.)

ByteDance argues that the evidence regarding Douyin is inadmissible because its admission would require ByteDance to submit substantial evidence "to explain why [Douyin's] features were implemented in response to various cultural trends and norms guided by Chinese regulations." (ByteDance's Reply ByteDance's MILs, at p. 4.)  However, ByteDance fails to show why this evidence would be directly relevant to Plaintiffs' use of Douyin evidence.  The reasons why ByteDance designed Douyin with certain features for Chinese users is not the relevant question; the relevant question is why such features were not employed the same way in the United States for TikTok.  That an effective safety feature was ultimately employed for Douyin in order to, say, comply with Chinese regulations may explain why the feature was included in Douyin, but does not explain why ByteDance decided not to employ that effective safety feature for TikTok in the United States.  In any event, the bases for ByteDance's design decisions are central to this litigation.  Evidence offered by the parties as to ByteDance's design choices at both TikTok and Douyin is thus highly relevant information, which justifies the time required for the presentation of such evidence.

ByteDance argues that Plaintiffs' arguments as to relevance are misguided because "many of the features Plaintiffs claim could have been implemented in the United States are only applicable to Douyin's under 14-year-old experience," and therefore the Douyin evidence "would only be arguably relevant to TikTok's under-13 experience in the United States." (ByteDance's Reply ByteDance's MILs, at p. 3.)  But the fact that ByteDance utilized certain safety features for young children in China is nonetheless relevant to the question of what ByteDance knew about available safety features and the dangers associated with a lack of such features for minor users generally.

As ByteDance notes in its Reply, Plaintiffs have not responded to the Motion with respect to platforms other than Douyin.  For example, Plaintiffs do not address Toutiao or versions of the TikTok platform available exclusively in other countries.  In light of this silence as to other platforms, the court grants the Motion as to all non-Douyin platforms operated outside of the United States.

Date: 1/16/2026

Carolyn B. Kuhl / Judge

Judge of the Superior Court of Los Angeles

3

**FILED**
Superior Court of California
County of Los Angeles

01/16/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
          A. Rosas

**SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES**

*Social Media Cases*
**JCCP5255
(Lead Case: 22STCV21355)**

**Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: January 14, 2026**

**YouTube Motion in Limine 1: To Exclude Evidence Regarding Hearsay
Complaints that YouTube Has Received from Non-Party Users**

Court's Ruling:  The Motion is largely denied.  However, the two third-party
complaints mentioned by Google on pages 8 and 9 of its Motions in Limine
(see description below) are excluded under Evidence Code section 352 and
Exhibits 5043 and 5044 are excluded unless Plaintiff makes an appropriate
showing of admissibility for some portion of those Exhibits, in which case
only the admissible portion or portions will be admitted.

         Google moves to exclude all evidence of third-party complaints that
Google has received from non-parties to this litigation, which Google claims
are unverified hearsay and irrelevant at trial.  Google claims that these
"unverified complaints include negative feedback from anonymous users
regarding a wide number of issues, including YouTube features and content.
Plaintiffs have questioned YouTube witnesses about this feedback during
depositions, and are therefore likely to seek to use these complaints at trial."
(Google's MILs, at p. 7.)  Google raises three arguments in support of its
request to exclude the information.  First, Google argues that "feedback
from individuals who are not parties to this case regarding their own
experiences on YouTube or their purported own mental health issues are
irrelevant to Plaintiffs' claims."  (Google's MILs, at p. 7.)  Second, Google
argues that "unverified statements from third parties made outside this
litigation regarding their experiences on YouTube are classic inadmissible
hearsay."  (Google's MILs, at p. 8.)  And third, Google argues that, "even if

1

Plaintiffs were to attempt to offer such third-party user complaints for a non-hearsay purpose, such as notice, they should nevertheless be excluded" as unduly prejudicial and cumulative. (Google's MILs, at p. 8.)

This court already has denied Defendants' Joint MIL 8: To Exclude Evidence of Harms Allegedly Suffered by Non-Plaintiff Social Media Users. In ruling on that Motion, the court stated that Defendants had failed "to identify any specific evidence that they seek to exclude at trial." For the most part, the same is true of the current Motion. With two exceptions, the current Motion does not comply with LASC Local Rule 3.57(a)(1), which requires the moving party (after meeting and conferring with opposing counsel) to provide "[s]pecific identification of the matter alleged to be inadmissible and prejudicial."

In the current Motion, Defendant YouTube recognizes that evidence of harms to third parties are relevant and admissible to show a defective condition or the cause of injury "provided that the circumstances of the other accidents are similar and not too remote." (*Ault v. Int'l Harvester Co.* (1974) 13 Cal.3d 113, 121-22.) Evidence of third-party complaints also can be offered to show that Google had reason to know that its platform caused users' harm. Google recognizes in its Motion that such "notice" evidence is not inadmissible hearsay. Thus, third-party complaints may potentially be relevant to whether (1) Google acted negligently in operating/designing its platform because it was made aware that its operation could cause harm, (2) Google negligently failed to warn users of potential harms about which it should have been aware, and/or (3) a determination of whether Google can be held liable for punitive damages. As was the case with Defendants' similarly broad Joint MIL 8 (To Exclude Evidence of Harms Allegedly Suffered by Non-Plaintiff Social Media Users), the court denies the broad relief requested by the current Motion in Limine.

However, in its Motion, Google identifies two third-party complaints that refer to third-party content found on Google's platform. Google states:

> Plaintiffs in recent depositions asked a witness to read inflammatory complaints about unknown content creators and eating disorder content that Plaintiffs never interacted with, and which are irrelevant to this case. This includes complaints that an "[unspecified content creator's] social media could . . . literally be deadly. Eating Disorders are the MOST lethal mental health disorders. . . . [T]hese posts are actually killing people, as in causing death," Barrett Ex. 12 at 26, and that another (again, unspecified) "influencer" was "promoting a deadly life style [sic], much like taking drugs

that will result in death. Too many young girls are dead
because of eating disorders. Please stop this," id. at 111.

(Google's MILs, at pp. 8-9., internal brackets and ellipses in original.)
Plaintiffs do not provide argument as to these particular third-party
complaints.  In light of application of Section 230, it is unlikely that such
complaints regarding potentially harmful third-party content would be
relevant to what Google should have known about the *design features* of its
platform.  Weighed against this limited probative value is the danger that
these complaints—which claim that the third-party content can lead to
death—are potentially unduly prejudicial.  These two third-party complaints
are thus properly excluded under Evidence Code section 352.

At oral argument on the current Motion in Limine, counsel for YouTube
proffered to the court the entirety of Plaintiffs' Exhibits 5043 and 5044.
These exhibits, consisting of 55 and 193 pages, appear to be print-outs of
unfiltered user complaints against YouTube, with as many as 20 entries per
page.  In many (perhaps most) instances, the subject matter of the
complaints has nothing whatsoever to do with this case.  Users complain
that content they posted has not received views or has not received enough
views, that they have been unable to unsubscribe to YouTube for a family
member who is blind and not able to use YouTube, that an adblockers is not
working, that a YouTube account was terminated or removed, that a user
was unsubscribed from channels, that the rpms for "shorts" were cut, that a
user's account was hacked and sold, and on and on.  Clearly much or most
of the content of these exhibits is simply irrelevant to this litigation.  Exhibits
5043 and 5044 are excluded unless Plaintiffs make an appropriate showing
of admissibility for some portion of those documents, in which case only the
admissible portion or portions will be marked and received.

Date: 1/16/2026                              Carolyn B. Kuhl / Judge
                                   Judge of the Superior Court of Los Angeles

3

**FILED**
Superior Court of California
County of Los Angeles

01/21/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
A. Rosas

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: December 16, 2025**

**Plaintiff K.G.M.'s Motion in Limine to Exclude "Pencil Incident" Evidence**

**Plaintiff K.G.M.'s Motion in Limine to Exclude Irrelevant and Unduly Prejudicial Evidence Concerning Sexual Activity or Communications [MIL No. 1 of 6]**

Court's Ruling:  This ruling modifies a ruling previously issued by this court on January 6, 2026.  The court now holds as follows:
- Any reference to the "Pencil Incident" shall be described (in accordance with the description used by one of Defendants' experts) as K.G.M. allegedly "participating in a sexual act" or "engaging in an embarrassing sexual act."
- In any references to peer bullying of K.G.M. concerning K.G.M.'s alleged sexual conduct, such conduct shall be described as K.G.M. allegedly "participating in sexual activity."


    K.G.M. has filed two Motions in Limine that seek to exclude certain evidence of allegations that she engaged in particular sexual activity. Defendants seek to present evidence of these allegations to show that K.G.M.'s mental health was affected by peer "bullying" using these allegations (which K.G.M. says are false) and by the consequences of such allegations.  Importantly, in opposing both Motions in Limine, Defendants agree that the relevance of the evidence turns on the effects and consequences of the accusations on K.G.M.'s mental health regardless of the

1

truth of the allegations.  Defendants therefore concede that the truth of the allegations is not an issue in this litigation.

*Background Concerning the Alleged "Pencil Incident"*

K.G.M. moves to exclude evidence regarding "an allegation by one of KGM's peers that she placed a pencil in her vagina and made peers look" (Pencil Incident).  (Pl's Not. Mot., at p. 1.)  Plaintiffs further explain:

> The "Pencil Incident" refers to an allegation by two of KGM's peers that KGM placed a pencil in her vagina and made students look. The principal discussed the allegation in a meeting with KGM's mother. KGM received detention and was suspended. The school did not adequately perform due diligence with respect to the allegation.
> KGM denies the allegation. (KGM Dep. at 219:22-24 ["Q. Did you stick a pencil in your vagina and have your peers look? A. No."].) Her mother also claims it did not happen. (KAG Dep. at 205:10-22 [KGM "didn't stick the pencil in [her vagina]."].) KGM told the school that the allegation was not true. (KGM Dep. at 220:20-22.) She explained that the student who reported the alleged incident to the principal was "known for being a liar and spreading stuff about people," and that KGM previously "had a falling out" with the student. (*Id.* at 220:10-17.) The school did not adequately investigate the allegation. (*Id.* at 220:23-221:1.)

(Pl's Mot., at p. 1.)

Defendants have pointed to evidence tending to show that the "Pencil Incident" significantly affected K.G.M.'s mental health.  Indeed, both Defendants' and Plaintiffs' experts have opined that the fallout from the peer allegations concerning the "Pencil Incident" caused K.G.M. serious mental harm, including suicidal ideation.  As K.G.M. points out in the Reply, one of Defendants' experts has concluded that mental health harms arose, in part, from the fact that K.G.M. believes "she was wrongly accused by her classmates of participating in a sexual act."  (Pls' Reply, at p. 2, internal citations and quotation marks omitted.)  Defendants are thus correct when they state that, "regardless of whether the sex act at issue occurred, evidence related to the pencil incident (and the bullying that took place as a result) is relevant to demonstrate alternate causation … ."  (Defs' Opp., at p. 5.)

However, as stated above, Defendants agree that it is irrelevant whether K.G.M. actually placed a pencil in her vagina.  Given the sensitive nature of the alleged facts, it would be improper to allow Defendants to introduce evidence for the purpose of showing that K.G.M. did in fact engage in the act of which she was accused.  The relevance of the evidence turns on the effects and consequences of the accusation on K.G.M.'s mental health, regardless of the truth of the allegations that led to her suspension and the reactions of her peers.

*Background Concerning K.G.M.'s Alleged Sexual Activity or Communications*

K.G.M. also moves to exclude evidence regarding K.G.M.'s "sexual activity and graphic communications of a sexual nature."  (Pl's Not. Mot., at p. 2.)  "K.G.M. moves to exclude … social media posts, messages, communications, testimony, or other references to sexual activity, including offering compensated sexual exchanges, sexually explicit conversations, discussions of sexual fantasies, details of unsubstantiated sexual activity, and discussions of alleged sexual contact with animals."  (Pl's Mot., at p. 1.)  K.G.M. contends that "[n]one of Defendants' experts connect any of this alleged conduct or any of the communications at issue to K.G.M.'s injuries."  (Pl's Mot., at p. 1.)

In their Opposition, Defendants state that these communications are relevant to show that the bullying K.G.M. suffered caused her claimed mental health harms.  According to Defendants, the communications themselves (and evidence suggesting that K.G.M. engaged in certain sexual activity) are relevant because K.G.M. was bullied due to rumors that K.G.M. engaged in certain sexual activities.

While instances of bullying are relevant to the cause of K.G.M.'s alleged mental health harms, whether that bullying was based on events or communications that *actually* occurred prior to the bullying is irrelevant to the question of causation.  Defendants do not argue that evidence that K.G.M. engaged in the mentioned sexual acts or discussed certain sexual acts in the communications would themselves be relevant in any way at trial.  Defendants contend that the jury would be unable to assess the bullying without admission of the referenced communications.  (See, e.g., Defs' Opp., at p. 2 [suggesting that the communications provide needed "context" for the bullying].)

*Discussion*

3

Evidence of a party's sexual activity "is highly prejudicial and inflammatory." (*Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1034.)  In addition, in this case allowing the jury to hear details of the "context" for the peer bullying that Defendants contend caused K.G.M.'s mental health harms would tend to confuse the jury because it would suggest that it is relevant for the jury to determine whether or not K.G.M. in fact engaged in the inflammatory sexual activity (putting a pencil in her vagina, engaging in compensated sex, having sexual contact with her dog) that was the subject of the bullying.  Under Evidence Code section 352, the probative value of the specific facts of the alleged sexual activity is overwhelmed by (1) the potential that the jury would be misled and would believe that whether or not K.G.M. engaged in the alleged sexual activity is relevant, and (2) the undue consumption of time necessary to allow Defendants to introduce evidence of the details of the alleged sexual activity and to allow Plaintiff to deny the specifics of the conduct of which she was accused by peers.

Nevertheless, Defendants are correct that they are entitled to present evidence of alternative causes for K.G.M.'s alleged emotional distress, and that the hurtful nature of the peer bullying would be better understood by the jury if the jurors were given some idea of the nature of K.G.M.'s peers' accusations.  This is particularly true regarding the "Pencil Incident," because the consequences of the accusation affected K.G.M.'s status at her school and both sides agree it caused her emotional harm, including suicidal ideation.

At oral argument on these two Motions in Limine, counsel on both sides indicated a willingness to meet and confer to attempt to agree on descriptive terminology for the nature of the allegations that K.G.M.'s peers made regarding her.  On January 6, 2026, in a written ruling, the court asked counsel to meet and confer to attempt to agree on (1) how the "Pencil Incident" can be described in a manner that indicates the seriousness of the allegation but does not invite juror speculation as to whether K.G.M. in fact engaged in the alleged conduct, and (2) how the context for the peer bullying K.G.M. experienced can be described in a manner that indicates it involved accusations a teen would find highly disturbing.  Insofar as the allegations are described as being of a sexual nature, the description should be generalized to avoid, to the extent possible, inflaming and confusing the jury.

On January 20, 2026, at the Final Status Conference for K.G.M.'s trial, the counsel for Plaintiffs and for Meta advised the court that, despite their best efforts, they were unable to agree on descriptive language that would fairly describe the "Pencil Incident" and the context of the peer bullying

4

K.G.M. experienced.  Balancing the respective interests and the potential prejudice outlined above, as well as recognizing the case law warning that evidence of a party's sexual activity is highly prejudicial and inflammatory, the court determines as follows:

- Any reference to the "Pencil Incident" shall be described (in accordance with the description used by one of Defendants' experts) as K.G.M. allegedly "participating in a sexual act" or "engaging in an embarrassing sexual act."
- In any references to peer bullying of K.G.M. concerning K.G.M.'s alleged sexual conduct, such conduct shall be described as K.G.M. allegedly "participating in sexual activity."

Date: 1/21/2026

Carolyn B. Kuhl / Judge

Judge of the Superior Court of Los Angeles

5

FILED
Superior Court of California
County of Los Angeles

02/02/2026

David W. Slayton, Executive Officer / Clerk of Court

By: _____ Deputy
          A. Rosas

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**

**Meta's Motion to Exclude Certain Trial Testimony by Former Employee Jason Sattizahn**

Court's Ruling:  The Motion is granted in part.  Sattizahn may not offer testimony regarding specific attorney-client privileged communications. However, Sattizahn may provide testimony based on his personal knowledge regarding Meta's research practices and policies.


        Meta moves for an order in limine to exclude or limit testimony by former Meta employee Jason Sattizahn (Sattizahn).  Meta provides three main reasons for why the testimony should be excluded:

        First, as this Court recently held, Sattizahn's testimony is at its core about "advice by counsel concerning the direction of a client's future research activities, how that research should be characterized, and whether research findings should be made public"— communications that are squarely "within the protection of the attorney-client privilege." 1/15/26 Ruling on Pls.' Mot. to Comp. Prod. of Unredacted Docs. ("JCCP Privilege Ruling") at 4. Sattizahn should not be permitted to testify (and counsel should not be permitted to ask) about privileged communications with Meta's in-house counsel. Second, despite having been disclosed only as a fact witness, Sattizahn will seek to offer the type of speculative testimony this Court has already excluded as improper lay opinion testimony. See 9/22/25 Ruling on Def.' Gen. Causation Sargon Mots. ("GC Sargon Ruling") at 32-

1

33. Third, Sattizahn's testimony is irrelevant to K.G.M.'s claims and to these cases more generally: he had no role with Instagram—the only Meta service K.G.M. challenges. Any probative value of his testimony would, in any event, be substantially outweighed by its prejudicial effect, distraction, and likelihood to cause juror confusion.

(Meta's Mot., at p. 1, internal italics, bolded typeface, and brackets omitted.) Meta claims that, at a minimum, Sattizahn should be prohibited from testifying about Instagram, given that his testimony about Instagram is not based on personal knowledge. Finally, Meta argues that the court should preclude Plaintiffs from referring to Sattizahn as a "whistleblower."

Meta's first argument is well-taken, but it does not justify excluding all of Sattizahn's testimony. This court's prior conclusion applies equally here: "Advice by counsel concerning the direction of a client's future research activities, how that research should be characterized, and whether research findings should be made public is within the protection of the attorney-client privilege so long as evidence concerning such research is not destroyed and is not concealed in litigation." (Ruling on Pls' Mot. Compel Production, Jan. 15, 2026, at p. 4.) Nothing in the briefing currently before the court justifies reaching a different conclusion here. This court disagrees with Plaintiffs' contention that direction provided by an attorney regarding how a client should proceed with internal research to minimize legal risks is merely "business advice" that is not entitled to the attorney-client privilege. The fact that a business chooses to operate a certain way based on legal advice provided by its general counsel does not render the attorney-client communications non-privileged "business advice."

The court also rejects Plaintiffs' contention that Meta waived the privilege over the communications. Privilege "is waived with respect to a communication protected by the privilege if any holder of the privilege [i.e., Meta], without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone." (Evid. Code, § 912, subd. (a).) "[T]he holder of a privilege need only take 'reasonable steps' to protect privileged communications. No case has required that the holder of a privilege take extraordinary or heroic measures to preserve the confidentiality of such communications." (*Regents of University of California v. Superior Court* (2008) 165 Cal.App.4th 675, 675.) Here, the communications were made public by Sattizahn, not by Meta, and Sattizahn did not have authorization to reveal those communication publicly. Since then, Meta has continued to state that the testimony by Sattizahn includes privileged attorney-client communications. Plaintiffs fault Meta for having "failed to take any steps to remove the testimony from the public

record," but Plaintiffs fail to explain how Meta has the ability to remove Congressional testimony from the public record.  Meta's supposed failure to "raise privilege after the MDL Plaintiffs put [Sattizahn] on their witness list" is also insufficient to show waiver.  "Meta does not (contrary to Plaintiffs' suggestion) seek to exclude the entirety of Sattizahn's testimony on grounds of privilege." (Meta's Reply, at p. 3, fn. 3.)  Furthermore, Plaintiffs identify no authority suggesting that a party's failure to object to a witness's inclusion on a trial witness list would prevent that party from objecting to specific privileged testimony at trial.

Despite the foregoing, it is also true that the existence of legal advice regarding how Meta and its entities conducted research does not shield the actual facts of how and why such research was carried out.  This court has explained:

> [The fact that attorneys communicated direction to employees] does not mean that a party opponent cannot comment on the research itself, the direction of the research, the characterization of the research findings, or the fact that research was not made public (insofar as such facts are relevant in litigation). A party opponent may not, of course, invade any attorney-client privileged communications that may have motivated the client's decision-making regarding research.

(Ruling on Pls' Mot. Compel Production, Jan. 15, 2026, at p. 4.)  Accordingly, the privileged nature of the attorney-client communications does not render inadmissible Sattizahn's testimony regarding how he and other employees conducted research.  For example, Sattizahn may testify that, pursuant to the company's practices/policies, he excluded certain evidence from internal studies.  However, Sattizahn cannot state that, for example, on a given date he received a particular communication from a particular attorney; nor may Sattizahn detail the *specific* contents of that particular attorney communication.  Plaintiffs' counsel must refrain from asking questions that will elicit testimony as to the specific attorney-client communications Sattizahn received.  Meta is not incorrect to suggest that there is a danger that Sattizahn might volunteer attorney-client privileged information, but that danger cannot entirely be eliminated without improperly excluding relevant, non-privileged evidence; counsel and this court will have to work together to prevent Sattizahn from recounting specific attorney-client privileged communications when testifying before the jury.

Meta argues that testimony by Sattizahn as to how and why research was conducted should be excluded because Meta may have to rely on

attorney-client privileged communications to rebut Sattizahn's testimony. This argument is not persuasive. Meta cannot shield evidence regarding its business operations merely because those operations were informed by attorney-client privileged communications. That privileged communications might be useful in rebutting Sattizahn's testimony regarding how he and other employees were instructed to do their jobs perhaps demonstrates the danger of using attorneys to provide direct instruction to lower-level employees, but it does not justify excluding testimony from employees regarding their roles as researchers for Meta. It is not the role of the court in a ruling on a motion in limine to determine whether or not the testimony sought to be excluded is credible. If the testimony is admissible the jury determines its credibility. Moreover, the court notes that Plaintiffs have agreed to stipulate that Meta's cross-examination of Sattizahn "does not constitute waiver" of any asserted privilege. (Pls' Opp., at p. 9.)

Meta's second main argument is that Sattizahn should not be allowed to offer improper lay opinion testimony. Meta claims that "Plaintiff's counsel intends to present [Sattizahn] to the jury as a witness with expertise across a wide array of topics and the ability to offer opinion testimony on expert topics, including youth safety." (Meta's Mot., at p. 8.) As an example, Meta claims that "Sattizahn willingly and repeatedly speculated [at his deposition] about the intentions of the Reality Labs lawyers who advised him." (Meta's Mot., at p. 9.) Meta's second argument also is unpersuasive. The record makes clear that, as Plaintiffs state, Sattizahn will testify "about his experience working at Meta and Meta's research practices." (Pls' Opp., at pp. 12-13.) Such testimony is proper lay testimony, as Sattizahn's testimony would be based on facts within his personal knowledge. (*People v. Valencia (*2021) 11 Cal.5th 818, 837.) If a particular conclusion drawn by Sattizahn regarding Meta's motives in instructing researchers to exclude certain information in internal studies is too "speculative," that would not turn Sattizahn into an expert witness. Ultimately, a question calling for speculation or speculative testimony can be objected to at trial.

Meta's third argument is that Sattizahn's testimony should be excluded as irrelevant, prejudicial, and/or unsupported by Sattizahn's personal knowledge. Meta argues that, "[t]o the extent Sattizahn could offer any testimony related to any of the specific features challenged in these cases, it would be limited to Reality Labs' virtual reality products … ." (Meta' Mot., at p. 10.) Plaintiffs provide evidence in support of their contention that Sattizahn observed Meta's general research practices, practices that related to Reality Labs' virtual reality products, but also to Facebook and Instagram. (See, e.g., Pls' Opp., at p. 14, citing Sattizahn's testimony; see also McConnell Decl., Ex. E, Judge Kang's Order RE Admission of Sattizahn to Preliminary Witness List, Oct. 31, 2025, at p. 5 [stating that the court was

4

"not persuaded by Meta's characterization that Mr. Sattizahn's knowledge is strictly limited to [virtual reality] products"].)  If there is evidence that, as Sattizahn testified, Meta's researchers operated as a "single integrated company" rather than being "siloed" into "various product lines," then Sattizahn's testimony regarding his particular research regarding virtual reality products may be relevant to claims regarding Instagram and Facebook.  (Pls' Opp., at p. 14.)  The question of whether Meta directed its employees to conduct research in a way that would mask the detrimental effects of its platforms/products is potentially highly relevant to K.G.M.'s claims.  Given the testimony's probative value, Meta has failed to show that it should be excluded under Evidence Code section 352.  Meta's claims of "undue prejudice" are restatements of its arguments regarding privilege, which are adequately addressed above and do not justify exclusion of relevant evidence.

Meta argues that, at a minimum, Sattizahn should not be allowed to testify about Instagram, given that Sattizahn's personal knowledge is limited to Facebook and Reality Labs.  As explained above, it is possible that Sattizahn's research experience for Meta is relevant to K.G.M.'s claims concerning Instagram use, regardless of whether Sattizahn actually has personal knowledge about Instagram itself.  Meta is correct that Plaintiffs have failed to show that Sattizahn can offer testimony regarding how Instagram itself functioned, but Sattizahn may offer evidence at trial regarding his personal knowledge of Meta's research practices insofar as those research practices concern  issues relevant to Instagram's effects on minors.  Whether particular testimony lacks foundation must be determined at trial.

Finally, Meta argues that Plaintiffs' counsel should be precluded from referring to Sattizahn as a "whistleblower."  A "whistleblower is defined as "one who reveals something covert or who informs against another [¶] *especially*: an employee who brings wrongdoing by an employer or by other employees to the attention of a government or law enforcement agency." ("Whistleblower," Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/whistleblower.)  Meta argues that "labeling someone a 'whistleblower' in the presence of the jury carries with it the imprimatur that the individual is both telling the truth and has, in fact, uncovered evidence of wrongdoing."  (Meta's Mot., at p. 13.)  Plaintiffs can characterize Sattizahn's role using a term consistent with *their* view of the evidence – i.e., Plaintiffs' view that Sattizahn's testimony suggests wrongdoing in the nature of negligent failure to use care to protect minor users or to warn of the dangers of social media use by minors.

5

Meta cites two unpublished federal district court criminal cases decided under the Federal Rules of Evidence restricting the government's use of the term "victim" during a criminal trial on the ground that it the term was prejudicial insofar as it presupposed that a crime was committed.  (See Meta's Mot., at p. 13 [citing two unpublished federal district court cases].)  But even in *United States v. Gaviola* (E.D. Cal. 2025) 2025 U.S.Dist LEXIS 189532, one of the cases cited by Meta, the government was allowed to use the term "victim" to describe its allegations in opening and closing argument.  (*Id.* at *15-*16.)  Here, Meta does not dispute that Sattizahn provided testimony to Congress in order to reveal "something covert" about Meta's operations.  The fact that Plaintiffs' counsel refers to Sattizahn as a "whistleblower" in stating its theory of the case would not unfairly prejudice Meta at trial.

Date: 2/2/2026

Carolyn B. Kuhl / Judge
Judge of the Superior Court of Los Angeles