# EXHIBIT 16

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for SNAP INC.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>ALL ACTIONS | MDL No. 3047<br><br>CASE NO.: 4:22-md-03047-YGR-PHK<br><br>Honorable Yvonne Gonzalez Rogers<br><br>**DECLARATION OF NIK SRIVASTAVA IN SUPPORT OF OMNIBUS JOINT SEALING STIPULATION IN CONNECTION WITH PLAINTIFFS' CORRECTED OMNIBUS OPPOSITION BRIEF EXHIBITS** |

I, Nik Srivastava, declare and state as follows:

1. I am a Product Manager for the Growth team at Snap Inc. ("Snap"). I have been employed at Snap since January 2022 and have served in my current role since January 2022. Previously, I was a Senior Product Manager at Microsoft. I make this declaration based on personal knowledge. If called as a witness, I could and would testify competently to the facts stated herein.

Case No. 4:22-md-03047-YGR

2.      As a Product Manager, I am responsible for guiding the strategy, development, and implementation of various features within Snap, including oversight of testing and product timelines. In this capacity, I also work closely with Snap's safety teams on issues related to friending safety, including ensuring that new product features are designed and implemented in ways that promote user safety and align with Snap's internal safety standards, while also improving the safety of existing features. Over the course of my employment at Snap, I have acquired personal knowledge of Snap's practices and procedures concerning the maintenance of the confidentiality of its strategic, business, and marketing information.

3.      I submit this Declaration in support of Snap's motion to seal portions of certain exhibits to Plaintiffs' Corrected Omnibus Opposition to Defendants' Motions for Summary Judgment dated December 11, 2025 (Omnibus Opposition). The documents described below contain trade secrets, confidential product or business information, or data that, if disclosed publicly, would cause significant competitive harm to Snap. Specifically, Snap is requesting narrowly tailored, partial sealing for the documents below to capture only the specific information that would cause competitive harm to Snap if publicly disclosed.

4.      The documents fall into three general categories, each of which poses risks to Snap's competitive standing and/or the safety of its users, as described further below: (I) proprietary product development, analytics, and engagement metrics; (II) safety and moderation frameworks; and (III) monetization and competitive strategy. Also noted are documents which I understand the Court previously sealed.

5.      These categories and corresponding documents are summarized in the chart immediately below and described in more detail in the paragraphs that follow:

| Category | Description | Exhibits / Bates Nos. |
|---|---|---|
| 1. Proprietary Product Development, Analytics, and Engagement Metrics | Proprietary engagement metrics, internal analytics, and product strategy materials. Disclosure would reveal confidential R&D approaches and results as well as product strategies, enabling competitors to anticipate or replicate Snap's innovations. | Ex 859 (Weissinger depo) Ex 889 (SNAP0409320) Ex 906 (SNAP2066440) Ex 915 (SNAP7340154) Ex 937 (SNAP1940643) Ex 939 (SNAP4712437) Ex 1155 (SNAP2857687) Ex 1161 (SNAP4569874) Ex 1162 (SNAP3654430) |
| 2. Safety and Moderation Frameworks | Internal safety and content moderation systems, including proprietary enforcement logic and detection parameters. Public disclosure could enable bad actors to exploit moderation systems and compromise Snap's safety infrastructure. | Ex 906 (SNAP2066440) Ex 1170 (SNAP6398196) |
| 3. Monetization and Competitive Strategy | Non-public revenue models and monetization planning. Disclosure would reveal sensitive financial modeling and competitive positioning. | Ex 859 (Weissinger depo) Ex 937 (SNAP1940643) |

6. The highlighted portions of Exhibits 889 (Bates SNAP0409320, at -320, -322, -323, -327, -328, and -332), and 915 (SNAP7340154, at -154, -155, and -157) disclose Snap's non-public daily active user ("DAU") metrics from recent years, which Snap uses internally to monitor user engagement with the Snapchat platform in different markets. These DAU figures constitute confidential user data metrics that Snap closely guards as key indicators of the platform's performance, growth trends, and competitive position. Snap does not publicly disclose DAU data at this level of granularity or recency. Public disclosure would provide competitors with insight into Snap's recent engagement trends and competitive position, enabling them to benchmark against Snap's internal metrics and adjust their own product, advertising, growth, and monetization strategies to capitalize on trends in Snapchat's user base. Exhibit 889 further contains non-public, proprietary research on comparative use of platforms and business information concerning internal performance metrics, including granular insights into the company's user engagement trends, regional performance disparities, and areas of strategic concern, including specific declines in user activity by state and metropolitan region. Exhibit 915

further contains monthly active user metrics, incremental DAU figures, and charts reflecting granular fluctuations in DAU that are not publicly disclosed. Competitors could use this information to adjust their own product development, marketing, or user-acquisition strategies in ways that would unfairly disadvantage the company.

7. The highlighted portion of Exhibit 1161 (Bates SNAP4569874, at -877) discloses non-public, competitively sensitive information concerning Snap's friending and ranking systems, reflecting the relative importance and effectiveness of a core product surface in driving user growth and retention. Snap does not publicly disclose this level of feature-specific quantitative contribution, and public disclosure would allow competitors to assess and benchmark Snap's friending mechanics, prioritize replication of Snap's most effective growth levers, and adjust their own onboarding and recommendation strategies accordingly without incurring comparable development or testing costs. This would give Snap's competitors an unfair advantage. Moreover, I understand that the Court already granted Snap's request to seal the specific metric at issue. *See* ECF No. 2544.

8. The highlighted portions of Exhibit 1162 (Bates SNAP3654430, at -435) disclose non-public quantitative metrics relating to Snapchat's friending features and its use, along with the relative contribution of various friending mechanisms to friending activity. Snap does not publicly disclose this level of quantitative detail regarding feature-level usage or contribution to core engagement flows. Public disclosure would provide competitors with insight into the relative importance and effectiveness of Snap's friending mechanisms, allowing them to benchmark against Snap's internal performance and adjust their own product design and growth strategies accordingly. In particular, a competitor could use this information to optimize their own onboarding flows to mimic high-connection paths without having invested in necessary research and testing, such as user-trust tradeoffs, associated with facilitating friending.

9. The highlighted portion of Exhibit 939 (Bates SNAP4712437, at -437) discloses a specific, non-public quantitative metric reflecting the increase in daily active users attributable to an internal test that reduced quiet hours for notifications on the platform. While Snap has publicly discussed Quiet Hours as a general user-experience feature, it does not disclose the precise DAU

1  impact associated with internal notification experiments. Public disclosure of this specific DAU
2  impact would reveal the effectiveness of a particular growth lever, allowing competitors to infer
3  how changes to notification timing affect user engagement and to adjust their own notification
4  strategies accordingly without investing in similar testing.

5      10.   The highlighted portion of Exhibit 1170 (Bates SNAP6398196, at -196) discloses
6  the thresholds used in Snap's Quick Add protections for minors—namely, the number of mutual
7  friends required before an under-18 user may be surfaced as a recommendation. This figure
8  reflects an internal operational parameter of Snap's safety systems. Public disclosure of the
9  specific threshold would risk enabling circumvention of Snap's minor-protection safeguards by
10 allowing bad actors to infer how to manipulate connections to bypass those protections.

11     11.   The highlighted portions of Exhibit 906 (Bates SNAP2066440, at -445, -447, -451,
12 and -453) disclose confidential information about Snap's content moderation and user-safety
13 systems, including policies, enforcement thresholds, and lock windows. Public release of this
14 information could allow bad actors to circumvent Snap's detection systems and safety and
15 moderation controls, undermining the effectiveness of those systems and posing safety and
16 security risks to Snap's users.

17     12.   The highlighted figure in Exhibit 1155 (Bates SNAP2857687, at -690), discloses a
18 nonpublic quantitative metric reflecting Snap's internal attribution of advertising revenue to a
19 specific product surface. This figure reveals the relative commercial significance of that product
20 surface within Snap's advertising business and is not publicly disclosed. Public disclosure of this
21 discrete revenue percentage would provide competitors with insight into Snap's internal
22 monetization structure and strategic priorities, enabling them to assess which product surfaces
23 drive the greatest share of advertising revenue and to calibrate their own product and monetization
24 strategies accordingly. Moreover, I understand that the Court already granted Snap's request to
25 seal the specific metric at issue. *See* ECF No. 2544.

26     13.   Exhibit 859 to the Omnibus Opposition contains excerpts of the transcript of the
27 deposition of Michael Weissinger, which I understand was taken in the above-captioned case. The
28 highlighted portion of page 224 of the transcript reflects the same nonpublic quantitative metric

1  referenced in Exhibit 1155 and should be protected from disclosure for the same reasons as those
2  noted above. As noted above, I understand that the Court already granted Snap's request to seal
3  the specific metric at issue. *See* ECF No. 2544.

4        14. The highlighted portions of Exhibit 937 (Bates SNAP1940643, at -645, -647, -648)
5  disclose non-public data related to the volume of streak losses, along with internal data used for
6  revenue projections related to Snap's Streak Restore feature. Public disclosure would reveal
7  assessments of the commercial potential of the Streak Restore feature, information that
8  competitors could use to evaluate Snap's monetization strategy and inform their own product and
9  pricing decisions.

10       15. As a matter of policy and practice, Snap treats these data as confidential and Snap
11 employees with access to this information closely guard it from disclosure to competitors or
12 customers. Disclosure of this information to the public or competitors, including competitors who
13 are co-defendants in this very case, would cause significant competitive harm to Snap. The figures
14 reflect and are the result of the company's proprietary research, development, and strategic
15 processes—information that would be highly valuable to competitors in the industry.

16     I declare under penalty of perjury under the laws of the State of California that the
17 foregoing is true and correct.

18     Executed on this 6th day of February, 2026, at Los Angeles, California.

                                                                Nik Srivastava