UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>ALL CASES | Case No. 4:22-md-03047-YGR<br><br>MDL No. 3047[1]<br><br>**ORDER DENYING RULE 702 MOTION TO EXCLUDE SCHOOL DISTRICT EXPERTS** |

Defendants Meta (for Facebook and Instagram), Google (for YouTube), ByteDance (for TikTok), and Snapchat have collectively filed motions to exclude: (1) the opinions of the school district plaintiffs' six experts offering school district-specific opinions (the "SD Experts"); (2) the opinions of the Attorneys General and school district plaintiffs' general causation experts (the "GC Experts") on grounds of certain purported methodological failings; and (3) the opinions of the GC Experts for failure to account for Section 230 and the First Amendment.[2] This order resolves the SD Experts motion given its significance to the Breathitt school district trial in June. Forthcoming orders will decide the other two.

Having carefully considered the papers submitted, as well as oral argument from counsel on January 26, 2026, and for the reasons set forth more fully below, defendants' motion to exclude the testimony of the school district experts is **DENIED**.

**I.    BACKGROUND**

The facts of this case are well known to the parties. The Court provides some basic background and facts upon which the decision relies.

---

[1] This order relates to the six bellwether school district cases, Case No. 4:23-cv-0180-YGR (Breathitt); Case No. 4:25-cv-02310-YGR (DeKalb); Case No. 4:24-cv-01382-YGR (Tuscon); Case No. 4:23-cv-04659-YGR (Charleston); Case No. 4:23-cv-01467-YGR (Irvington); and Case No. 4:23-cv-03065-YGR (Harford).

[2] Respectively, Dkt. No. 2291, ["SD Experts Mtn."]; Dkt. No. 2295, ["GC Experts Mtn."]; and Dkt. No. 2292, ["Section 230 Mtn."].

The school district plaintiffs sue defendants on a theory that the design of defendants' platforms engenders compulsive and problematic use by students, causing disruption with which the districts are forced to cope. At the motion to dismiss stage, defendants argued that the districts' negligence and nuisance claims were barred by Section 230 of the Communications Decency Act of 1996, which provides certain protections to online platforms, and the First Amendment. The Court explained that the SDs may proceed on a "core theory of injury [which] focuses on the impact of compulsive use *itself*, irrespective of third-party content, defendants' protected publishing activity and defendants' protected first-party speech." (Mot. to Dismiss Order, ("MTD Order"), Dkt. No. 1267 at 26.) Now at the summary judgment stage, the school districts adduce evidence to support this theory, including the expert reports challenged here by defendants. Plaintiffs' GC Experts put forth opinions to show that defendants negligently designed their platforms in ways that cause harmful use.[3] Plaintiffs' SD Expert opinions, in turn, seek to show that each district experienced harm due to their students' compulsive social media use.

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Experts who are "qualified . . . by knowledge, skill, experience, training, or education," Fed.R. Evid. 702, and whose opinions otherwise meet Rule 702's requirements, may offer opinions "not based on personal knowledge or observations." *Moreno v. Ross Island Sand & Gravel Co.*, 2015

---

[3] The AG plaintiffs likewise put forward General Causation expert opinions for the same purposes, including two additional experts—Dr. Lauren Hale and Dr. Bradley Zicherman—who defendants also challenge.

WL 5604443, at *6 (E.D.Cal. 2015). Experts may also rely on "reports that would otherwise be hearsay" for the basis of their opinion. *Fannie Mae v. LaRuffa*, 702 F. App'x 505, 507 (9th Cir. 2017). Additionally, evidence that "could be presented in an admissible form at trial" may be considered in opposition to summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). As a result, "[h]earsay objections are often premature at summary judgment when asserted by a moving party." *Moreno*, 2015 WL 5604443, at *5. "[A] party opposing a motion for summary judgment seeks a trial, not a verdict, and it stands to reason that if evidence may be converted to admissible form for trial, it should not be excluded at summary judgment." *Id*.

### III.    MOTION TO EXCLUDE SCHOOL DISTRICT EXPERTS

Defendants move to exclude the opinions of six SD experts[4] and fourteen GC experts[5]. In this Order, the Court addresses defendants' arguments with respect to each SD expert although the noted challenges (i.e. methodological, Section 230 and 1st Amendment) contain significant overlap among the various experts.

#### A. ROBERT KLEIN

Dr. Klein describes his assignment as one:

> to design, execute, and analyze a market research survey to measure the time middle school and high school teachers employed by Plaintiff have been forced to divert from teaching due to student use of social media.

(Dkt. No. 2407-08, Declaration of Melissa Yeates, ("Yeates Decl."), Ex. 6 ¶ 14.) Dr. Klein received his Bachelor of Science degree in Mechanical Engineering in 1966 from the Massachusetts Institute of Technology (MIT) and a Master of Science degree in 1968 from the MIT Sloan School of Management. For the past 36 years, he has worked in the field of conducting

---

[4] (i) Dr. Robert Klein, (ii) Dr. Bryce Ward, (iii) Dr. Jeffrey Meyers, (iv) Dr. Sharon Hoover, (v) Dr. Douglas Leslie, and (vi) Mr. Brian Osborne.

[5] (i) Dr. Dimitri Christakis, (ii) Dr. Drew Cingel, (iii) Dr. Gary Goldfield, (iv) Dr. Anna Lembke, (v) Dr. Ramin Mojtabai, (vi) Dr. Stuart Murray, (vii) Dr. Eva Telzer, (viii) Dr. Jean Twenge, (ix) Dr. Sharon Hoover, (x) Mr. Arturo Bejar, (xi) Ms. Lotte Rubaek, (xii) Dr. Lauren Hale, (xiii) Dr. Bradley Zicherman, and (xiv) Dr. Mitch Prinstein. Each of the bellwether plaintiffs offer the opinions of all six of the school district experts and twelve of the fourteen general causation experts, excepting Dr. Lauren Hale and Dr. Bradley Zicherman who are AG experts only.

market research. (*Id*. ¶¶ 5-8.) By way of overview, Klein prepared and implemented a survey that asked teachers to report the number of minutes, during a typical day, diverted from teaching due to "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)" at various intervals from 2014 to the 2024-2025 school year. (*Id*. ¶¶ 10, 12.) Klein then issued reports as to each bellwether school district that estimates, using the survey results, the time that teachers in each district spent dealing with social media instead of teaching the scheduled curriculum. *Id*. These estimates form the basis for part of the school district plaintiffs' "lost time" damages: that is, the opportunity cost in dollars of which the school districts were deprived of their employees' value.[6]

Defendants do not challenge Klein's qualifications to conduct surveys. Instead, defendants level three categories of objections to exclude his opinions in their entirety: (1) a failure to account for this Court's MTD order requiring that liability be based on certain actionable features of defendants' platforms; (2) retrospective reporting; and (3) lack of representativeness.

The Court addresses each.

### 1. Failure to Account for This Court's MTD Order

Defendants assert that the questions used in the survey (1) ask about "social media" generally rather than specifically, i.e. to each of defendants' particular platforms and (2) do not exclude from consideration third-party content or the barred features. As a result, defendants contend, Klein's report is not relevant and could not help a jury.

As to the first, having reviewed the survey, the Court confirms that it does in fact name each defendant's platforms but then adds the words "e.g.," and "etc.," and provides a general category title ("social media"). Defendants assert that these additions invite consideration of other social media platforms. Plaintiffs respond that Dr. Klein phrased the question as he did to maintain consistency with the survey's other questions and thus avoid revealing the purpose of the survey, which could bias responses.

---

[6] In addition to lost teacher time, plaintiffs also seek to recover the lost time of other employees. This other type of lost time was not part of Klein's survey but is introduced through other experts relying on witness affidavits.

4

"[P]urported flaws in survey design . . . will usually go to the weight a jury accords the survey, not whether the jury can be shown it in the first place." *Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *8 (N.D.Cal. 2022). Defendants offer no reason why Klein's choice of phrasing "renders the survey unreliable as a matter of law, or why [it] [wa]s so wrong that the jury cannot be trusted to evaluate the merits of [their] objections." *Id*. This objection is overruled.

As to the second, and as described in the Court's Order Denying Motion for Summary Judgment as to Breathitt school district (Dkt. No. 2728, "Breathitt MSJ Order"), plaintiffs may proceed on their theory that defendants' negligent design of their platforms causes students' compulsive social media use which, in turn, results in costs to the school district. Dr. Klein's evidence speaks to the effects of students' compulsive use of social media, which is critical to plaintiffs' theory; that it does not tease out causation as to each actionable feature does not bar admissibility. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F.Supp. 2d 1053, 1066–67 (C.D.Cal. 2013) ("[N]o single expert provides a self-sufficient opinion that [defendants' conduct] in fact caused the [plaintiff's harm]. This is not dispositive.").

Returning to defendants' "relevance" objection, the Court does not find that the two challenges vitiate the probative value of the survey in its entirety. That defendants may cross examine on these issues is valid, but the issue is one of weight, not admissibility. The motion on this ground is denied.

**2.     Retrospective Reporting**

Defendants next argue that Klein's method of asking respondents to recall how many minutes they spent dealing with social media years ago is unreliable, as people cannot recall such details with precision. Plaintiffs respond that retrospective surveys are standard and accepted in research literature outside of litigation, and that the Klein survey also included instructions not to guess and a "don't know" answer to avoid recall bias.

Defendants' cited authority fails to show that the Ninth Circuit prohibits admitting retrospective surveys. Indeed, one of defendants' cited cases acknowledges that survey respondents "might reliably remember" certain retrospective events. *In re: Autozone, Inc.*, 2016 WL 4208200, at *19 (N.D.Cal. 2016). Where the survey respondents, as with the teachers here, cannot be expected to have kept records of the relevant subject matter over many years, retrospective "survey evidence is relevant to give an approximation of damages." *Alcantar v. Hobart Serv.*, 2013 WL 156530, at *2 (C.D.Cal. 2013) (unreasonable to expect employees to keep records of every meal break provided). That is the purpose for which plaintiffs offer the survey here. As above, these disputed methodological issues go to weight, not admissibility. This objection is overruled.

### 3.     Lack of Representativeness and Hearsay Objections

Defendants argue that only a fraction of the districts' teachers responded to Klein's surveys and that Klein has no way of knowing whether those who responded were representative of the full population of teachers in the districts. The Third Edition of the *Reference Manual on Scientific Evidence* describes high survey response rates as "desirable," but nevertheless notes that "surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates." *Reference Manual on Scientific Evidence* (3d ed.) (2011) at 384-85. Regardless, "any problems with the response rate affect the weight, and not the admissibility of the study." *Alcantar*, 2013 WL 156530, at *4. The Court declines to grant the motion on this ground.

Defendants further assert that Klein's survey failed to sufficiently account for "non-response bias," which they claim is contrary to the Third Edition of the *Reference Manual for Scientific Evidence* and grounds for exclusion. In general, critiques regarding such "technical inadequacies," including survey methodology, "bear on the weight of the survey, not its admissibility." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263–64 (9th Cir. 2001) (same); *Prudential Ins. Co. of America v. Gibraltar Financial Corp. of California*, 694 F.2d 1150, 1156 (9th Cir. 1982) (same). "On the other hand, substantial

1  deficiencies in the design or execution of a survey of individuals is grounds for its complete
2  exclusion." *In re: Autozone, Inc.*, 2016 WL 4208200, at *16 (N.D.Cal. 2016) (internal quotations
3  omitted). To that end, defendants cite several cases excluding survey results where the expert failed
4  to address non-response bias, along with other significant methodological flaws. *See Jimenez v.*
5  *Allstate Insurance Company*, 2019 WL 13088814, at *18 (C.D.Cal. 2019) (expert's failure to
6  persuade the court that survey responses were representative of class "weigh[ed] in favor of
7  granting" Rule 702 motion); *Autozone*, 2016 WL 4208200, at *18-20 (granting class decertification
8  motion where problems with the survey were "fundamental," including that the expert "did not
9  adequately account for the possibility of nonresponse bias.")

10  The Court finds these non-binding cases distinguishable and not persuasive here. In
11  *Autozone*, the court's concerns about non-response bias were driven by a particular "type of non-
12  response called selected non-response," that is, that "some of the persons called actively choose not
13  to respond for particular reasons." 2016 WL 4208200, at *18. Hundreds of respondents actively
14  refused to participate in the *Autozone* plaintiffs' survey, such that "refusals outnumbered surveys
15  responded to by almost two-thirds," an unexplained red flag that raised concerns of systemic errors.
16  *Id*. The *Autozone* court was also concerned with "self-interest bias," the risk that survey results
17  were biased by the incentive for class members to respond in ways to maximize their monetary
18  award. The survey respondents here, in contrast, are not class members or plaintiffs and lack that
19  incentive. Likewise, *Jimenez* involved concerns not present here, including that 86% of
20  respondents—who were also potential class members—were aware of the lawsuit, and that the
21  expert appeared to have inappropriately combined responses to several questions in making his
22  tabulations. 2019 WL 13088814, at *23-24.

23  As the Third Edition of the *Reference Manual on Scientific Evidence* notes, "the key is
24  whether nonresponse is associated with systematic differences in response that cannot be
25  adequately modeled or assessed." *Reference Manual on Scientific Evidence* (3d ed.) (2011) at 385.
26  The Court does not view the risks of "systematic differences in response" here as particularly high
27  or concerning. As discussed above, the concerns about self-interest bias are not present. Klein also
28

took various steps to ensure reliability, including conducting the survey in a "double-blind" manner to avoid bias, instructing respondents not to guess to reduce the likelihood of non-meaningful responses, and pretesting the survey to ensure teachers reliably understood the questions. (Dkt. No. 2407-8, Yeates Decl., Ex. 6 ¶¶ 16, 39, 17). To the extent that defendants contend more is required, such critiques are appropriate for cross-examination. As above, the Court concludes that the methodological issues raised by defendants here are not grounds for exclusion.[7]

### B. BRYCE WARD

Dr. Ward received his Ph.D. in economics from Harvard University and has worked for decades in the fields of economic and statistical analysis. (Dkt. No. 2407-35, Yeates Decl., Ex. 33 ¶ 2.) Dr. Ward describes his assignment as one to "calculate the amount of money districts expended while teachers, counselors, and/or administrators addressed issues caused by social media in the school environment." (*Id*. ¶ 5.) By way of overview, Dr. Ward proceeded by multiplying estimates of "diverted time" due to social media—relying on Dr. Klein's teacher survey and witness affidavits—by the "compensation or cost of time for the relevant staff in the district" to calculate the districts' "past losses." (*Id*. ¶¶ 13, 34.) His "analysis of past damages for diversion thus equals the amount of time diverted times the cost of that time." (*Id*. ¶ 12.)

#### 1. Lost Time Damages Barred

Defendants maintain that the law of each bellwether plaintiff's state exclude from damages any lost time *un*accompanied by an added financial expenditure. As applied here, they assert that because Dr. Ward calculated damages based on the value of teacher and administrator time diverted from other tasks, and not involving new costs to plaintiffs (*i.e.*, no additional staff hired), the damages' calculations are irrelevant. Defendants maintain that because the school districts

---

[7] Additionally, Klein's opinions are not barred on the grounds that the survey results are out-of-court hearsay statements from the respondents. In general, "survey evidence should be admitted as long as it is conducted according to accepted principles and is relevant." *Fortune Dynamic*, 618 F.3d 1025 at 1037 (cleaned up); *see also Alcantar*, 2013 WL 156530, at *2, 5 (denying motion to exclude survey evidence used to show liability and to approximate damages). As already discussed, experts may rely on information that is otherwise hearsay in forming their opinions, and hearsay evidence can be considered upon summary judgment if it may be converted at trial to admissible form. *Supra* Section II.

1  would have paid the same salaries regardless, the districts' "lost time" damages are not recoverable
2  and thus the opinion should be excluded as irrelevant.
3  　　　　Contrary to defendants' position, none of the school districts are barred under state law
4  from recovering for their employees' lost and diverted time.[8] *See, e.g., Lurry v. PharMerica Corp.*,
5  2024 WL 2965642, at 3 (W.D.Ky. 2024) ("lost time and opportunity costs" recoverable under
6  Kentucky law); *Aaron's, Inc. v. MDC Grp., Inc.*, 2010 WL 11505919, at *7 (N.D.Ga. 2010) (under
7  Georgia law, damages based on employee time "diverted from their normal job duties" not barred
8  even where employee salaries were "a cost that [plaintiff] would have incurred regardless");
9  *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1146 (3d Cir. 1990) ("the value of the time [plaintiffs']
10 employees expended in attempting to reduce or avert the damage" from defendants' conduct
11 recoverable under New Jersey law); *Charleston Lumber Co. v. Miller Hous. Corp.*, 458 S.E.2d 431,
12 437 (S.C.Ct.App. 1995) ("lost employee time" a compen-sable damage under South Carolina law);
13 *Under Armour, Inc. v. Ziger/Snead*, LLP, 232 Md. App. 548, 557 (2017) ("diverted employee
14 time" a compensable loss in Maryland); *PivotHealth Holdings LLC v. Horton*, 2025 WL 1865788,
15 at *2 (D.Ariz. July 7, 2025) (employee time spent responding to defendants' conduct sufficiently
16 concrete damages under Arizona law); *see also State v. Rouse*, 647 N.W.2d 286, 289 (Wis.Ct.App.
17 2002) (collecting cases and noting that "[m]ost courts that have considered the issue have
18 concluded that a plaintiff can recover the value of employees' lost services as damages"); *Convoy
19 Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir. 1982) (same).
20 　　　　Accordingly, the Court declines to exclude Dr. Ward's opinions on the basis that lost
21 employee time is not a cognizable form of damages. The motion on this ground is denied.

　　　　**2.　　Opinions Based on Unreliable Inputs**

23 　　Defendants argue that because Dr. Ward unquestioningly accepted inadmissible inputs (Dr.
24 Klein's survey and school district employee affidavits) to his calculations, his opinions must be
25 excluded. As discussed above, the Court finds that the Klein survey is admissible. *Supra* at III(A).

---

[8] The Breathitt MSJ Order provides further analysis of this issue under Kentucky law. The Court's forthcoming summary judgment orders for the other bellwether school districts will do the same.

9

"An expert is permitted to rely on the opinion of another expert," moreover, without needing to independently validate it. *Int'l Swimming League, Ltd. v. World Aquatics*, 2025 WL 3257200, at *8 (N.D.Cal. 2025). Likewise, and as discussed in the Breathitt MSJ Order, defendants have not carried their burden to demonstrate that plaintiffs' employee affidavits are barred from forming the basis of an expert's opinions.[9] As such, defendants' contentions "as to the reliability of the facts and opinions [Dr. Ward] relied upon . . . are questions of weight and credibility for a jury, not questions of reliability for admissibility." *Int'l Swimming League*, 2025 WL 3257200 at *8.

### C. Jeffrey Meyers

Mr. Meyers describes his assignment as one to calculate each school district's "past damages relating to certain out-of-pocket costs attributable to the alleged improper actions of Defendants." (Dkt. No. 2407-65, Yeates Decl., Ex. 63 ¶ 23.) Meyers received his Bachelor of Science degree in 2003 from Louisiana State University and a Master of Science degree in Mathematics in 2004 from the University of New Orleans. (*Id.*, Appx. A). Meyers was designated a certified Master Analyst in Financial Forensics by The National Association of Certified Valuators and Analysts in 2010. (*Id.* ¶ 4.) Meyers has also served as a financial expert in dozens of litigation matters, including in the *Deepwater Horizon* MDL for which he calculated "lost profits and economic damages." (*Id.* ¶ 7.) Defendants do not challenge Meyers' qualifications.

Rather, defendants argue that neither Meyers nor the affiants upon which he relied tied those expenditures specifically to defendants' actionable conduct but simply to "social media" in general. Meyers issued reports for each school district regarding the value of those direct damages, which he calculated by multiplying the districts' relevant expenditures by the portion of those expenditures attributable to student social media use (the "Allocation Percents"). (*Id.* ¶ 23.) Meyers relied on affidavits from school district administrators, which provided those Allocation Percents as to the vendor costs. (*Id.* ¶ 21.)

---

[9] As already discussed, experts may rely on information that is otherwise hearsay in forming their opinions, and hearsay evidence can be considered upon summary judgment if it may be converted at trial to admissible form. *Supra* Section II.

As discussed above and in the Breathitt MSJ Order, plaintiffs may proceed on their theory that defendants' negligent design of their platforms causes students' compulsive social media use which, in turn, harms the school districts. Meyers' opinions regarding the districts' costs due to student social media use are relevant to that theory and so are admissible. Defendants' objections go to weight, not admissibility. The motion on those grounds is denied.

### D. SHARON HOOVER

Dr. Hoover describes her assignment as one:

> to analyze the impact of student social media use on school districts, schools, the school environment, and student mental health and learning and to develop a comprehensive, district-led strategic plan to prevent and mitigate the negative impact of student social media use on school districts, schools, the school environment, student well-being and learning.

(Dkt. No. 2407-82, Yeates Decl., Ex. 80 ¶ 2.) Hoover received her Bachelor of Science in Psychology from Miami University in 1996 and her Doctorate in Clinical Psychology from the University of Maryland Baltimore County in 2002. (*Id*. ¶ 12.) Hoover has been a licensed psychologist in Maryland for over 20 years and a co-director of National Center for School Mental Health (NCSMH) since 2010. In those roles, she advises schools and education agencies on building school mental health systems. (*Id*. ¶¶ 11-14.) Hoover has also provided expert consultation to government agencies, published over 90 peer-reviewed articles, and testified before the United States Congress. (*Id*. ¶¶ 19-20.) Defendants do not challenge her qualifications.

#### 1. Failure to Account for This Court's MTD Order

Defendants contend that Hoover's opinions (i) discuss "social media" in general, not defendants' platforms and (ii) are based in part on third-party content and the non-actionable features (e.g. online threats, embarrassing photos, notifications) as causes of harm; and further that Hoover fails to disentangle the actionable and non-actionable portions in assessing the harm to the SDs. On this basis they assert the opinions are not relevant and would be unhelpful to a jury.

Again, plaintiffs may proceed on their theory that defendants' negligent design of their platforms arguably results in disruption and costs to the school districts. Hoover's opinions speak directly to this theory. (Dkt. No. 2407-82, Yeates Decl., Ex. 80 ¶ 35) (research finds social media is

11

a "significant source of distraction for students"); (*id*. ¶ 36) (average student use of social media during school day is "problematic"); (*id*. ¶¶ 38-39) (excessive phone use during class time driven by social media platforms including YouTube and Snapchat); (*id*. ¶¶ 77-83) (describing burden of compulsive social media use on school resources). As already discussed, "[r]eliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Primiano*, 598 F.3d at 565 (9th Cir. 2010).

Accordingly, the Court concludes Section 230 and the First Amendment do not render Hoover's opinions irrelevant and unhelpful to a jury.

### 2. Specific Causation Opinions Not Based on Sufficient Facts or Data

Defendants seek to exclude all of Hoover's opinions on the basis of a lack of data. More specifically, defendants contend Hoover (a) lacks data on (i) how much time each districts' students spend on social media; and (ii) how many students in the districts are addicted to social media, depressed, bullied, or suffered diminished social skills; and (b) relies on unreliable or irrelevant sources such as plaintiffs' fact sheets, "School Health Assessment and Performance Evaluation" profiles (an assessment tool), and "key informant" interviews with teachers and administrators of each district. As a result, defendants argue, Hoover's causation opinions are not based on independent data but instead regurgitate plaintiffs' theory. Defendants analogize Hoover's "key informant" interviews to *Therasense, Inc. v. Becton, Dickinson & Co.*, which decried that "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." 2008 WL 2323856 (N.D.Cal. 2008).

The Court disagrees that *Therasense* is an apt analogy. Hoover explains that her opinions rest on a multiplicity of inputs, including her own research on school mental health systems, review of the scientific literature, graduate-level training in research and medicine, professional experience as a director of the National Center for School Mental Health, interactions with educational providers, and district-specific data. (*See* Dkt. No. 2407-82, Yeates Decl., Ex. 80, ¶¶ 24-27.) That her interviews with teachers and administrators also informed Hoover's understanding of how

social media affected the districts is hardly surprising, much less nefarious. Hoover's key informant interviews, moreover, describe student compulsive use of social media and resulting distraction and anxiety—evidence that is also offered by affidavits and deposition testimony of the school districts' teachers and administrators. *Cf. Therasense*, 2008 WL 2323856 at *2. ("**Coming from the expert alone** . . . any opinion based on such untested and partisan foundation is not based on sufficient facts and data within the meaning of Rule 702") (emphasis supplied). Hoover is not barred on hearsay grounds, either, from considering those interviews when forming her opinion. *See Fannie Mae v. LaRuffa*, 702 F. App'x 505, 507 (9th Cir. 2017) (experts may rely on hearsay for the basis of their opinions). The Court concludes that Hoover's specific causation opinions are based on sufficient facts and data for the purposes of Rule 702.

### 3. Abatement Plan Not Appropriate Remedy

Defendants claim that Hoover's strategic plan is irrelevant and must be excluded because it cannot support a claim for abatement. The Court agrees that Hoover's plan cannot be used for abatement purposes; however, because the plan supports future damages, her opinions are admissible for that purpose. *See* Breathitt MSJ Order at 22-23.

### 4. No Basis for Proposed Staffing Levels, Training, or Timeframe in Abatement Plan

Defendants maintain that Dr. Hoover's proposed strategic plans for each school district are mere *ipse dixit*, including her recommendations about how many new staff to hire, what levels of training to provide, and the duration of the plan. With respect to the latter, defendants criticize Dr. Hoover's 15-year proposal given her analogy to the tobacco cases which were also 15 years. They assert she provides no explanation for why 15 years would also be effective here.

The Court disagrees. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. Here, Hoover's strategic plan is validly connected to the task at hand—that is, her plan describes a series of interventions focused on student mental health and well-being in relation to social media. (*See* Dkt. No. 2407-82, Yeates Decl., Ex. 80 ¶¶ 23-36). Hoover applied her

knowledge and experience of the relevant discipline, through repeated citation to scientific literature and drawing upon her professional qualifications as a licensed psychologist and director of a center for school mental health policy. She hinges the 15 years on the effective lifecycle of a student's full school experience as well as with reference to "evidence from large-scale education reform and mental health implementation science [which] indicates that sustainable system change takes 10-15 years." (Hoover Rep. ¶ 112.) Defendants' disagreement with this metric concerns the weight of her opinion and does not bar admissibility. *See Primiano*, 598 F.3d at 564 ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

### E.  DOUGLAS LESLIE

Dr. Leslie describes his assignment as one to: "calculat[e] the present value of future costs associated with implementation of the plan . . . recommended by Dr. [Sharon] Hoover" for each school district. (Dkt. No. 2407-14, Yeates Decl., Ex. 96 ¶ 12.) Leslie received a Bachelor of Science degree from the University of Virginia in 1990 and Ph.D. in Economics from Yale University in 1998. (*Id*. ¶ 4.) Leslie has been a professor at the Pennsylvania State University for over 15 years and holds appointments in the Department of Public Health Sciences and Department of Psychiatry & Behavioral Health at the Penn State College of Medicine. (*Id*.) Leslie has published hundreds of articles and sits on the editorial board of, among other academic journals, the Journal of Mental Health Policy and Economics. (*Id*. ¶ 5.) Dr. Leslie's opinion is limited to costing out Dr. Hoover's strategic plan.

Defendants argue that Hoover's opinions should be excluded, which in turn requires Leslie's opinion to be excluded as well. As noted above, however, Hoover's plan is admissible under Rule 702. In general, "[a]n expert is permitted to rely on the opinion of another expert" and is not required to independently validate it. *Int'l Swimming League*, 2025 WL 3257200 at *8. Defendants may raise criticisms of Hoover's plans, and Leslie's calculations of those plans' costs, upon cross-examination. *In re Apple iPhone Antitrust Litig*., 2024 WL 5701895 at *11-13

(N.D.Cal. 2024) ("Objections to an expert's inputs may be raised on cross-examination.") The motion on this ground is denied.

### F. BRIAN OSBORNE

Uniquely among the SD experts, Dr. Osborne offers an opinion based on his "experience in public education, including service as a teacher, principal, superintendent, and consultant" and as a "professor of practice," rather than a traditional academic researcher, to offer what he describes as an "experience-based account of what is happening in schools." (Dkt. No. 2407-110, Yeates Decl., Ex. 108 ¶¶ 2, 20.) Osborne holds an Ed.D. in Administration, Planning, and Social Policy from the Harvard Graduate School of Education and an M.A. in Administration, Planning, and Social Policy from Harvard University. (*Id*. ¶¶ 11, 12.) Osborne has over 25 years of experience in public education, including as a teacher and superintendent of schools in New York and New Jersey. (*Id*. ¶ 6.) Osborne currently instructs and consults with educators across New Jersey and Pennsylvania, spending approximately 40-50 days a year in schools observing classroom instruction. (*Id*. ¶ 13.)

The Court addresses defendants' five challenges.

#### 1. Failure to Account for This Court's MTD Order

As with the other expert opinions, defendants object that Osborne fails to offer an opinion as to defendants' specific platforms or the actionable features and opines only on social media in general. For the same reasons previously articulated, the objection is overruled.

#### 2. Opinions Lack Reliable Methodology or are Hearsay

Defendants argue Osborne's lack of a reliable methodology precludes admission of his opinions. The objection is meritless in this context.

Rule 702 does not bar opinions based on significant experience in a particular industry, nor does it mandate a scientific analysis in the appropriate circumstance. *See Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training"). Osborne's opinions are based not only on discussions with teachers or administrators from plaintiffs' school districts but from his considerable work in the industry including his understanding of national trends

regarding social media in schools. That some of this may be hearsay is not a bar to his opinions, although it would be a bar if he attempted to regurgitate the hearsay at trial. *Supra* Section II. As such, Osborne is not required to exclude from consideration, in forming his opinions, conversations he has had with other educators throughout his years of practice. That Osborne's opinions are not based on interviews or data from the six bellwether plaintiff school districts does not render them inadmissible, either. *Id*. at 1430 ("Nor is the expert required to be personally familiar with the facts or data of the particular case about which he is testifying; an expert opinion may be based on any type of evidence commonly used by experts in the field.") As a result, his opinions are not barred based on a lack of reliable methodology or on hearsay grounds.

### 3. AI-Generated Citations

Defendants contend that Osborne admitted at deposition that articles upon which he purportedly relied do not exist, and that other incorrect citations were miscites generated by AI. Plaintiffs respond that none of the academic articles were actually false, but rather that citations were merely incorrectly formatted based on use of an AI citation tool, which was subsequently corrected. The Court declines to exclude Osborne's opinions on this basis. Defendants may, however, raise the issue on cross-examination.

### 4. Not Qualified to Offer Opinions about Platform Design and Scientific Literature on Social Media

Defendants maintain that Osborne's conclusions that social media has adverse mental health effects on youth, and that platforms are engineered to maximize attention, are outside of his expertise as a former school administrator. The opinions that Dr. Osborne offers at a general level, however—that student use of social media disrupts and stresses school operations—do not fall outside of his expertise in school administration. (*See* Dkt. No. 2407-98, Yeates Decl., Ex. 96 ¶ 4(i-v).) Defendants did not bring a motion to strike. The motion to exclude the entirety of the opinion on these grounds is denied.

That said, for the parties' edification, portions of Osborne's report do stray from his expertise in school administration into the mental state of students and the design of platforms, topics for which he lacks specialized knowledge. The Court discusses these below.

### 5. Impermissible Legal Conclusions

Defendants argue that Osborne's statement that public education is a "public right" impermissibly wades into a legal question upon which only the Court may rule. Defendants did not bring a motion to strike. The motion to exclude the entirety of the opinion is denied. Osborne's opinions, *see* Yeates Decl., Ex. 96 ¶ 4(i-v), regarding the effect of student use of social media on school operations are proper subjects for expert testimony. To the extent he opines in general on the value of a public education, that too is within his expertise.

### 6. Trial Testimony

Despite the foregoing rulings, the Court is concerned with a number of the statements made in Dr. Osborne's report. To guide the parties, the Court discusses illustrative but non-exhaustive examples of several categories of testimony that would be excluded.

One, apropos of the last issue, Osborne may not opine on issues of law or ultimate fact. Osborne's report repeatedly describes education as a "public right." *See, e.g., id*. at 102. It is not clear what he means but his claim appears to conflict with controlling precedent. In *San Antonio Independent School Dist. v. Rodriguez,* the Supreme Court concluded that education was not a fundamental right protected by the Constitution. 93 S.Ct. 1278, 1281 (1973). To the extent Osborne's use of "public right" is an attempt to wade into the elements of plaintiffs' public nuisance claims, he cannot opine on the law. Fed.R.Evid. 702. This will be excluded if proffered in the manner identified in the report.

Two, portions of Osborne's report contain statements that are mere argument and not based on specialized expertise. (*See, e.g.*, Yeates Decl., Ex. 96 ¶¶ 23, 25, 27-32.) For example, at paragraph 23, Osborne states:

> Indeed, perhaps the only force in young people's lives that has become as universal as education is social media. Unfortunately, social media functions not to help educate all children but instead to profit from exploiting students' attention, disrupting the operations and educational mission of school districts and their schools in the process.

Statements such as this attempt to advance a narrative rather than offer expertise to a jury and are not proper grounds for expert testimony. Fed.R.Evid. 702. Testimony to this effect will be excluded if proffered at trial in the manner identified in the report. Other portions of Osborne's

report likewise contain statements that stray far from expertise and into argument. *Id*. ¶¶ 88, 89, 90, 101, 103, 107, 108, 110.

Three, and to be explicit, an expert can rely on hearsay to form his opinion but may not regurgitate it. For example, Osborne repeats information and quotes from transcripts of depositions of several school administrators in this litigation. (Yeates Decl., Ex. 96 ¶¶ 56-60, 62, 71, 80.) At trial, Osborne may be permitted to opine that factual information which is *independently offered* into evidence is consistent with or supports his opinions. He cannot, however, simply restate portions of deposition transcripts as fact. Fed.R.Evid. 703. Similarly, Osborne cannot serve as a conduit for facts and data from external studies and reports, as several portions of his report attempt to do. (*See, e.g., id*. ¶¶ 61 (describing news stories about viral challenges), 69 (relaying the results of academic studies about social media), 72 (same).)

Four, an expert's testimony must also be reasonably based in his field of knowledge. Fed.R.Evid. 703. Osborne states that students "fear being recorded, mocked, or turned into a meme," but is not a psychologist nor claims unique insight into the minds and thought processes of students. *Id*. ¶ 79. Because he is not able to testify to those students' motivations, such statements could not be offered as testimony.

**IV.   CONCLUSION**

Defendants' motion is **DENIED.**

This terminates Dkt. No. 2291 in Case No. 22-md-03047.

**IT IS SO ORDERED.**

Dated:   February 17, 2026

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE