# AMENDED Exhibit 702

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

```
                                        Page 1

 1            UNITED STATES DISTRICT COURT

 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4    ----------------------------x

      IN RE: SOCIAL MEDIA ADOLESCENT ) Case No. 4:22-md-

 5    ADDICTION/PERSONAL INJURY      ) 3047-YGR

      PRODUCTS LIABILITY LITIGATION  ) MDL No. 3047

 6    ----------------------------x

 7

 8         SUPERIOR COURT OF THE STATE OF CALIFORNIA

 9              FOR THE COUNTY OF LOS ANGELES

10                 UNLIMITED JURISDICTION

11

      COORDINATION PROCEEDING        ) Judicial Council

12    SPECIAL TITLE [RULE 3.550]     ) Coordination

                                     ) No. 5255

13    SOCIAL MEDIA CASES             )

      _____ ) Judge Carolyn Kuhl

14

15

          CONTAINS HIGHLY CONFIDENTIAL INFORMATION

16

17              V O L U M E   I

18       VIDEOTAPED DEPOSITION OF JAMES BESER

19             PALO ALTO, CALIFORNIA

20                APRIL 2, 2025

21                 9:08 A.M.

22

23    Job No.: 7222033

24    Pages: 1 - 442

25    Reported by: Leslie A. Todd, CSR No. 5129 and RPR
```

HIGHLY CONFIDENTIAL

Page 13

```
 1                    ------------
 2              P R O C E E D I N G S
 3          April 2, 2025, 9:08 a.m.
 4                    ------------
 5              THE VIDEOGRAPHER:  We're now on
 6       the record.  My name is James
 7       Vonwiegen.  I'm a videographer for
 8       Golkow.  Today's date is April 2nd,
 9       2025, and the time is 9:08 a.m.
10              The video deposition is being
11       held in Palo Alto, California, in the
12       matter of Social Media Adolescent
13       Addiction/Personal Injury Products
14       Liability Litigation for the United
15       States District Court for the Northern
16       District of California.
17              The deponent is James Beser.
18              Counsel will be noted on the
19       stenographic record.
20              The court reporter is Leslie
21       Todd, California CSR 5129, who will
22       now swear in the witness.
23              JAMES BESER,
24        and having been first duly sworn,
25       was examined and testified as follows:
```

HIGHLY CONFIDENTIAL

Page 14

1                    EXAMINATION
2    BY MR. DRAPER:
3         Q.    Good morning, Mr. Beser.  My
4    name is Glenn Draper.  I am one of the
5    attorneys for the kids and families and
6    school districts and other local government
7    agencies who have brought claims against the
8    social media companies, including YouTube.
9               I had a chance to introduce
10   myself before the deposition got started.
11   We're here in Palo Alto at the offices of
12   Wilson Sonsini to take your deposition.
13              You are appearing pursuant to a
14   notice of deposition, which we'll go ahead
15   and mark as YouTube Beser Exhibit 1.
16              (YouTube Beser Exhibit No. 1 was
17         marked for identification.)
18   BY MR. DRAPER:
19        Q.    So you get the copy with the
20   sticker on it.  Here's a copy for your
21   counsel.
22              MS. WADHWANI:  Thank you.
23              MR. DRAPER:  A copy for me, and
24        an extra one.
25   BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 15

1          Q.       I'm going to ask you some more
2     questions about this in a moment.
3                   Sir, this deposition is being
4     taken in what's called an MDL, which stands
5     for multidistrict litigation in federal
6     court, and it will also be used in what is
7     called a JCCP, which stands for Judicial
8     Commission Coordinated Proceeding, in
9     California state court.  I'm actually the
10    attorney for the JCCP, and my colleague
11    Audrey Siegel will be asking you some
12    questions for the MDL later today or maybe
13    tomorrow.  Okay.
14                   You might hear me use both of
15    those terms, MDL and JCCP.  It's just the way
16    these cases are grouped together.  All right?
17          A.       Mm-hmm.  Yes.
18          Q.       Great.  Have you ever had your
19    deposition taken before, sir?
20          A.       No.
21          Q.       All right.  Ever testified in
22    court before?
23          A.       No.
24          Q.       All right.  I'm going to cover
25    basic ground rules for the deposition, okay?

HIGHLY CONFIDENTIAL

Page 16

1    You've been sworn by the court, which means
2    you're under oath.  That means you're
3    testifying just as though you were sitting in
4    a courtroom before a jury and a judge.  And
5    in fact, you may hear me or your attorney
6    refer to the jury today, even though they're
7    not physically present.
8                 Do you understand?
9         A.     Yes.
10        Q.     And that's because this
11   deposition is being recorded.  You can
12   obviously see the camera and the court
13   reporter.  The video and the written
14   transcript may be presented later in court or
15   used for any other purposes authorized under
16   state and federal rules of procedure and
17   evidence.
18                 Have you got any questions
19   about that?
20        A.     No.
21        Q.     Great.
22                 It's important that you answer
23   my questions verbally today because the court
24   reporter is taking down everything that we
25   say.  So if you nod or answer with uh-huh or

HIGHLY CONFIDENTIAL

Page 17

```
 1   uh-uh, it doesn't come through on the
 2   transcript clearly.
 3              Do you understand?
 4       A.    Yes.
 5       Q.    It's also really important that
 6   we not talk over each other because it's hard
 7   for the court reporter to take down two
 8   people talking at once.  I will do my best to
 9   let you complete your answer before I ask the
10   next question, and if you can do your best to
11   let me complete the question before you begin
12   your response, even though you know what I'm
13   going to say, that would help make sure we
14   have a clean transcript.
15              Do you understand?
16       A.    Yes.
17       Q.    Okay.  I myself personally
18   struggle with this, so I will make mistakes
19   today, and you might too.  It's no big deal.
20   We'll just fix it and go on.  All right?
21       A.    Sounds good.
22       Q.    You are represented by an
23   attorney today, correct?
24       A.    Yes.
25       Q.    Ms. Neelum Wadhwani, right?
```

HIGHLY CONFIDENTIAL

Page 18

1    Right?

2         A.    Yes.

3         Q.    All right.  Your attorney might

4    have objections to some of my questions

5    today.  Let her complete the objections

6    before you respond.

7               Understand?

8         A.    I understand.

9         Q.    All right.  Most of the time

10   your attorney I suspect will tell you to go

11   ahead and answer the question despite the

12   objection, and that's so we can take the

13   transcript to the judge, get a ruling on the

14   objection, and if the objection is overruled,

15   we don't have to come back to ask the

16   question because you've already answered it.

17   Right.

18               There may be a few times when

19   your lawyer tells you not to answer the

20   question.  That's another reason to make sure

21   you let her finish the objection before you

22   answer, but you should take your queues about

23   the objections and whether to answer from

24   your attorney.

25               Do you understand?

HIGHLY CONFIDENTIAL

Page 19

1          A.      Yes.
2          Q.      All right.  I expect there will
3     be a few times today where we're all talking
4     at once, and we'll have to stop and do it
5     over sequentially, like question, objection,
6     answer.  Happens most every deposition.  It's
7     not a problem.  We'll just -- we'll just do
8     it over a little bit more slowly.  All right?
9          A.      Sounds good.
10          Q.      Okay.  You can take a break
11     today.  I like to break myself around every
12     90 minutes, but if you need one sooner, just
13     ask.  The only rule is you have to answer the
14     pending question, so you can't run out while
15     there is a question pending.
16                  Understand?
17          A.      Understand.
18          Q.      All right.  Anything that would
19     affect your memory or your ability to tell
20     the truth today?
21          A.      No.
22          Q.      You haven't taken any
23     medications that might make it difficult for
24     you to concentrate or remember?
25          A.      No.

HIGHLY CONFIDENTIAL

Page 20

```
 1        Q.      Got a good night's sleep?
 2        A.      Yes.
 3        Q.      Fantastic.
 4                Any questions before we kind of
 5   move into the substance?
 6        A.      No.
 7        Q.      All right.  As you said, you're
 8   represented by Ms. Wadhwani today.  You
 9   understand she represents Google and YouTube
10   as well?
11        A.      I understand.
12        Q.      All right.  When did you find
13   out that we had requested your deposition in
14   this case, sir?
15        A.      Sometime in the second half of
16   last year.  I don't remember --
17        Q.      Okay.  So it's been a while.
18        A.      Yeah, it's been several months.
19        Q.      Okay.  Have you met with
20   Ms. Wadhwani or other attorneys representing
21   Google and YouTube to prepare for this
22   deposition?
23        A.      Yes.
24        Q.      All right.  I don't want to ask
25   about the content of any of your meetings
```

HIGHLY CONFIDENTIAL

Page 21

1   with your attorneys, but I want to ask a

2   little about the circumstances of those

3   meetings.  Okay?

4          A.      Okay.

5          Q.      When was the first time you met

6   with them?

7          A.      I don't recall exactly, but I

8   believe it was this year.

9          Q.      This year being 2025, so

10  sometime in the last three months.

11         A.      It may have been the end of

12  last year, but, yes, sometime in the last

13  three or four months.

14         Q.      Okay.  How many times have you

15  met with them?

16         A.      I don't recall exactly, but

17  somewhere on the order of five.

18         Q.      And how long total would you

19  say you have spent with your attorneys

20  preparing for this deposition, sir?

21         A.      I don't recall exactly, but I

22  would estimate it to be about ten hours.

23         Q.      All right.  Let's go ahead and

24  look at what we have marked as YouTube Beser

25  Exhibit 1.  This is a copy of the deposition

HIGHLY CONFIDENTIAL

Page 22

1    notice for today's deposition.

2                Have you seen this document

3    before, sir?

4                MS. WADHWANI:  This is

5         Exhibit 2.

6                MR. DRAPER:  This is Exhibit 1.

7         Yeah.

8                MS. WADHWANI:  Oh, sorry.  I'm

9         sorry.  You are correct.  I saw Riley

10        preparing a document and I jumped

11        ahead.  I apologize, Mr. Draper.

12                MR. DRAPER:  That's okay.  We

13        marked it a few minutes ago, but we're

14        still on Exhibit 1.

15                THE VIDEOGRAPHER:  Can we go

16        off the record for two minutes?

17                MR. DRAPER:  You want to go off

18        the record for two minutes?

19                THE VIDEOGRAPHER:  I'm sorry,

20        the --

21                MR. DRAPER:  Yes.

22                THE VIDEOGRAPHER:  The time is

23        9:16, and we're off the record.

24                (Pause in the proceedings.)

25                THE VIDEOGRAPHER:  The time is

HIGHLY CONFIDENTIAL

Page 23

```
 1         9:19.  We're back on the record.
 2   BY MR. DRAPER:
 3         Q.    Okay, sir, we had to break for
 4   a little technical issue, but we are back on
 5   the record.
 6               We're looking at what we have
 7   previously marked as YouTube Beser Exhibit 1.
 8   This is a copy of your notice of deposition.
 9               And my question to you, sir --
10   I can't remember if you answered it or not,
11   so I'm going to ask it again -- have you seen
12   this before?
13         A.    I do not believe I've seen this
14   document.
15         Q.    All right.  If you look at
16   page 2 and 3, the deposition notice asks that
17   you bring certain documents with you.  Your
18   attorneys may have brought those.  I'm just
19   going to ask about those document requests.
20   Okay?
21               MS. WADHWANI:  And, Mr. Draper,
22         I'll just note for the record that
23         Google and YouTube reached a mutual
24         agreement several months ago regarding
25         what would be produced or what would
```

HIGHLY CONFIDENTIAL

Page 24

1          not be produced --
2                    MR. DRAPER:  Yeah.
3                    MS. WADHWANI:  -- for any
4          particular witness.  Of course,
5          Mr. Beser is not aware of that
6          agreement, but we have produced
7          documents for Mr. Beser in advance of
8          this deposition consistent with our
9          agreement.
10                   MR. DRAPER:  I'll cover that.
11    BY MR. DRAPER:
12          Q.    Okay.  So, Mr. Beser, the first
13    request is for all documents and
14    communications used to refresh the witness's
15    recollection.
16                   Sir, in your preparations for
17    this deposition, did you review any specific
18    documents or communications?
19                   MS. WADHWANI:  And that's just
20          a yes or no right now.
21                   THE WITNESS:  Yes.
22                   MR. DRAPER:  Okay.  And so for
23          your attorney, the question is, have
24          all of the documents and
25          communications that he reviewed been

HIGHLY CONFIDENTIAL

Page 25

1       produced and marked in this

2       litigation?

3                MS. WADHWANI:  Yes.

4                MR. DRAPER:  Great.

5   BY MR. DRAPER:

6       Q.      Number 2, sir, is a copy of

7   your CV, and we have received from your

8   counsel a copy of your LinkedIn profile which

9   contains that kind of information, and why

10  don't we go ahead and mark that as Exhibit 2

11  at this time.

12                (YouTube Beser Exhibit No. 2 was

13       marked for identification.)

14                THE WITNESS:  So put this one

15       away?

16                MS. WADHWANI:  You might need

17       to hold on to --

18  BY MR. DRAPER:

19      Q.      Yeah, I'm not quite done with

20  that.  We're just going to mark that one as

21  Exhibit 2.  And I'm not going to refer to it,

22  so you can just kind of put it aside.

23      A.      Okay.

24      Q.      All right.  Number 3 asks for

25  your employee custodial file, and that has

HIGHLY CONFIDENTIAL

Page 26

1    been produced to us.

2                 Number 4 asked for any

3    documents relied on by the witnesses in

4    preparation to testify at this deposition.  I

5    think we've covered that with our

6    stipulation.

7                 MS. WADHWANI:  Correct.

8    BY MR. DRAPER:

9        Q.    Did you take any notes, sir, to

10   help prepare for this deposition?

11       A.    No.

12       Q.    All right.  And I think that's

13   all we need to cover with that.  So we can

14   put that one aside.

15                 MS. WADHWANI:  You can sit it

16       here face down, that way if Mr. Draper

17       wants to refer back to an exhibit he

18       has reviewed, it's easy for us to find

19       it.

20                 THE WITNESS:  Okay.  Sounds

21       good.

22   BY MR. DRAPER:

23       Q.    All right.  I'm going to ask

24   you some questions about your background now,

25   sir.

HIGHLY CONFIDENTIAL

Page 27

```
 1              You attended the University of
 2   Michigan where you obtained a degree in
 3   electrical engineering and computer science
 4   in 1999.  Correct?
 5         A.     Correct.
 6         Q.     After you graduated from the
 7   University of Michigan, you worked at
 8   DoubleClick, the advertising company that
 9   provides internet ad services until 2002.  Is
10   that right?
11         A.     That's right.
12         Q.     All right.  Did you meet
13   Mr. Mohan when you were at DoubleClick?
14         A.     Yes.
15         Q.     Did you know him or work for
16   him?
17         A.     I worked for Neal for part of
18   that time.
19         Q.     Oh, interesting.  Okay.
20              In 2002, you returned to school
21   to get your MBA at the University of
22   California at Los Angeles?
23         A.     Yes.
24         Q.     After receiving your MBA, you
25   worked for several startups, including
```

Page 28

```
 1    5to1.com and Xoom, but with an X?
 2         A.     That's correct.
 3         Q.     Is that pronounced Zoom?
 4         A.     It's pronounced Zoom.
 5         Q.     Okay.  All right.  In 2010, you
 6    started at Google as a group product manager
 7    for ads, correct?
 8         A.     Correct.
 9         Q.     And then in 2016, you came to
10    YouTube to work as the product manager for
11    YouTube Kids.  Is that right?
12         A.     Correct.
13         Q.     All right.  And then in 2017,
14    your position changed to senior director of
15    product management for youth at YouTube.  Is
16    that right?
17         A.     I sort of collapsed a lot of
18    stuff during the YouTube times for space.
19         Q.     Okay.
20         A.     So it was not in 2017 that I
21    was promoted.  I got promoted twice while at
22    YouTube.  The years, I think it was, the
23    first promotion was in 2019.  And the second
24    promotion -- that was to director.  And the
25    second promotion at YouTube to senior
```

HIGHLY CONFIDENTIAL

Page 29

1    director was something like 2022, '21 maybe.
2         Q.    Okay.  So do I have your
3    current position correct, senior director of
4    product management for youth at YouTube?
5         A.    Yes, that is correct.
6         Q.    All right.  I have also heard
7    your position described as the director of
8    the youth vertical at YouTube?
9         A.    That would be a fine way to
10   describe it.
11        Q.    Okay.  What does that mean,
12   "youth vertical"?
13        A.    So the youth vertical is sort
14   of a shorthand for the safety and
15   responsibility of under 18 users on YouTube.
16   That's broken out into a couple different
17   areas of work, depending on sort of the ages
18   of the children under 18 we're talking about.
19   If we're discussing very young kids, that
20   includes the YouTube Kids' app, as well as
21   what we call "made for kids" content across
22   YouTube.  So there's a lot we do with the
23   creators who make kids content, et cetera.
24             Moving a little bit older for
25   the, you know, tweens 9 to 12, we have a

HIGHLY CONFIDENTIAL

Page 30

1    product built for tweens that is a

2    supervised -- we call it Supex internally,

3    you may have seen that, but it's a supervised

4    experience for parents to supervise their

5    somewhat older kids on the YouTube main app.

6    That is completely managed sort of on my

7    team.

8              And then when we manage -- talk

9    about teens and what we do for teens, it's

10   much more of a matrix across YouTube.  Lots

11   of different teams participate.  Of course,

12   it's a big matrix for everything, but really

13   teens -- I really focus -- my team really

14   focuses on the responsibility aspects of

15   teens.  So safety quality specifically.

16        Q.      All right.  So as part of your

17   role as senior director of product management

18   for youth, you're involved in the design and

19   application of safety features designed to

20   protect kids under 18 in various ways.

21              MS. WADHWANI:  Objection to

22        form.

23              Go ahead.

24              THE WITNESS:  So not fully.

25        There are other teams, as I mentioned,

HIGHLY CONFIDENTIAL

Page 31

1          like trust and safety that manages
2          some aspects of safety, like our
3          community guidelines enforcement, et
4          cetera.  So, you know, we partner
5          closely with those kinds of teams.
6          But everything beyond community
7          guidelines, it's a pretty fair
8          generalization to say what you said.
9     BY MR. DRAPER:
10         Q.    All right.  My next question is
11    how does your job differ from Matt Halprin's
12    job as global head of trust and safety at
13    YouTube?
14         A.    So Matt Halprin manages the
15    policy development and enforcement.  He, you
16    know, doesn't have product teams.  He doesn't
17    launch products, right.  His team comes up
18    with the policies that you might see on our
19    help center, you know, the content
20    guidelines, things like creators, and you
21    might get a strike.  That's based on our
22    policy if you're a creator and you do
23    something against our community guidelines.
24    His team develops all of that policy, and
25    then -- and I might be missing a few things,

HIGHLY CONFIDENTIAL

Page 32

1    so this is my understanding of it, but I
2    believe it's really kind of two parts.
3    Building the policy, publishing the policy,
4    and then enforcing the policy with teams of
5    people who would, you know, look at videos,
6    right, and kind of make a judgment call based
7    on that policy.
8         Q.    So one way I have seen it
9    described is that Mr. Halprin looks at
10   individual videos, and then the youth team
11   handles more kind of infrastructure changes
12   that apply kind of across the board.
13            MS. WADHWANI:  Objection to
14        form.
15            THE WITNESS:  So I might get
16        more specific in that there is a trust
17        and safety product management team
18        that is kind of a peer to my team, and
19        they partner more closely with, you
20        know, enforcing through technological
21        interventions to find, you know,
22        violative videos that, for instance,
23        might get in -- queued in a reviewer
24        pipeline that a human would look at,
25        right?  That's not my --

HIGHLY CONFIDENTIAL

Page 33

1   BY MR. DRAPER:

2       Q.      That's classifiers.

3       A.      They -- yes, you could probably

4   simplify it to that.

5               Where my team, I'm -- I roll up

6   into a different part of the organization

7   that much -- much more focuses on search and

8   discovery, so our recommendation engine, our

9   search.  And, you know, does build

10  classifiers, but amongst other things, to,

11  you know, look at kind of corpora of videos,

12  if you will, bodies of videos.

13      Q.      All right.  Let me ask you some

14  questions about your day-to-day work at

15  YouTube.

16              What are the different ways

17  that you communicate with your coworkers at

18  YouTube?

19      A.      Lots of ways.  We e-mail.  We

20  have lots of meetings.  We build documents,

21  you know, written documents, PowerPoint --

22  well, Google slides, presentations.  We chat.

23  You know, kind of normal course of business

24  stuff.

25      Q.      Are you one of those people who

HIGHLY CONFIDENTIAL

Page 43

1          at the document to see the chats, and
2          I want to make sure since there are
3          different groups represented on this
4          document.
5                  MR. DRAPER:  I am talking about
6          the group of people that is defined in
7          the "to" field up here.
8                  THE WITNESS:  As I mentioned,
9          this was a best practice for us as a
10         team, so it should not have been a
11         surprise for them.
12   BY MR. DRAPER:
13         Q.     All right.  Let me show you
14   another document.  This one we will mark as
15   YouTube Beser Exhibit 4.
16                 (YouTube Beser Exhibit No. 4 was
17         marked for identification.)
18                 MR. DRAPER:  And for the
19         record, it was produced by the
20         attorneys for YouTube and Google and
21         is designated Bates number 00788582.
22   BY MR. DRAPER:
23         Q.     You can go ahead and take a
24   look.  I'm only going to ask you about a
25   small part of it, so I don't think it's worth

HIGHLY CONFIDENTIAL

Page 44

1    looking through the whole thing.

2            A.      Okay.

3            Q.      Are you ready for me to go

4    ahead and ask some questions about this

5    document?

6            A.      If you could just give me one

7    moment, please.

8            Q.      Sure.

9            A.      (Peruses document.)  Okay.

10           Q.      All right.  If you look at the

11   last page, you will see that you are one of

12   the custodians for this document.  Do you see

13   that?

14           A.      Yes.

15           Q.      All right.  The document is

16   titled on the first page "Responsibility Team

17   Meeting Notes."  Do you agree?

18           A.      That's what the document says.

19           Q.      All right.  What was the

20   responsibility team?

21           A.      I've never seen this document,

22   or at least I do not recall seeing this

23   document.  It could refer to lots of things,

24   you know.  We do refer to ourselves as a

25   responsibility team, but lots of other teams

HIGHLY CONFIDENTIAL

Page 45

1    do as well for different types of issues.

2         Q.    All right.  If you look at the

3    first entry dated 5/28/2020, there's a bullet

4    point, and the first bullet point is -- it

5    says "Sharon," but I think it's pronounced

6    Sharone (phonetic), "focusing on medical

7    health and mental health."

8              Do you see that?

9         A.    I do.

10        Q.    That refers to Sharon Stovezky

11   who is a member of your team?

12        A.    No, Sharon does not report to

13   me.

14        Q.    She does not report to you.

15   Okay.

16             Do you have any reason to

17   believe this document is not what it appears

18   to be, a record of the meetings of the

19   responsibility team at YouTube?

20             Going back to 2016, if you look

21   at the end of the document, the entries are

22   in reverse chronological order, so the first

23   entry is November 30th, 2016, and then the

24   most recent entry is May 28th, 2020, on

25   page 1.

HIGHLY CONFIDENTIAL

Page 46

1              MS. WADHWANI:  Objection to

2        form.

3              THE WITNESS:  I don't know what

4        this document was.

5    BY MR. DRAPER:

6        Q.    Is there anything that strikes

7    you as unusual?  You've seen documents in

8    this format at YouTube?

9        A.    Nothing particularly unusual.

10   It looks like meeting notes.

11       Q.    Great.

12             So if you could just look at

13   the page that's designated 8601.

14             Sir, 8601 includes a record of

15   the meetings of the responsibility team at

16   YouTube for December 14th, 2018.  Do you see

17   that?

18       A.    At the bottom of the page, yes.

19       Q.    All right.  And then the first

20   bullet point is for launches and milestones.

21   Do you see that?

22       A.    I do.

23       Q.    And then on the second page,

24   which is 8602, there is another bullet point

25   that says "Mailing lists."

HIGHLY CONFIDENTIAL

Page 47

1        A.      I see it.

2        Q.      Do you see that?

3        A.      Yes, I see that.

4        Q.      All right.  And you see that it

5   identifies some new mailing lists, correct?

6        A.       That's what it appears to do.

7        Q.       All right.  And then there is

8   the second from the bottom, a hollow bullet

9   point that says:  "Three chat rooms (by

10  default) history off."

11               Do you see that?

12        A.      I see that.

13        Q.      All right.  So for the youth

14  team, you told me it was best practice to

15  kind of keep history off in the chats.  For

16  this responsibility team, it seems it's also

17  a practice to keep history off in the chat

18  rooms.  Do you agree?

19               MS. WADHWANI:  Objection to

20          form, foundation, mischaracterizes

21          prior testimony.

22               THE WITNESS:  Again, this

23          wasn't my team.  I don't know what

24          team norms they had.

25  BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 48

1      Q.     But at least in this instance,
2  they are by default keeping history off in
3  their chat rooms?
4             MS. WADHWANI:  Objection to
5        form.
6             THE WITNESS:  That's what the
7        document says.
8  BY MR. DRAPER:
9      Q.     All right.  Have you talked
10  with people on other teams outside the youth
11  team and either told them or been told by
12  them to keep history off in the chats?
13      A.     I don't recall.
14      Q.     Would it surprise you that
15  other teams also at YouTube also have a
16  practice of keeping history off in their
17  chats?
18             MS. WADHWANI:  Objection to
19        form.
20             THE WITNESS:  Well, I can only
21        speak for my team, which was it led to
22        a lot of confusion for junior folks
23        who would go back in time and take
24        things out of context.  And so it
25        wouldn't surprise me if other teams

HIGHLY CONFIDENTIAL

Page 49

1          did similar.
2     BY MR. DRAPER:
3          Q.     Did anyone ever tell you that
4     you should have history off on your chats?
5     Anybody senior to you ever tell you that?
6          A.     I don't recall ever being told
7     that.
8          Q.     Do you have an official work
9     phone?
10         A.     I'm not exactly sure what that
11    means.  I have a phone that is not paid for
12    by Google.
13         Q.     Okay.  So I would call that
14    not.
15         A.     Not.  Yeah, I don't know what
16    official means, but I don't think.
17         Q.     All right.  So you use your
18    personal phone occasionally for business
19    purposes?
20         A.     I have my e-mail on there and
21    my chat.
22         Q.     All right.  Do you ever text
23    with other YouTube employees from your
24    personal phone?
25         A.     Very rarely.

HIGHLY CONFIDENTIAL

Page 50

1      Q.      Ever text about business things
2  or -- you know, I'm not interested if you
3  text about going out to dinner on Tuesday
4  night, but --
5      A.      No, the texts are usually to
6  coordinate, say, like a weekend meeting or
7  something.  It's usually -- I can only recall
8  logistic texts.
9      Q.      Okay.  Mr. Beser, do you agree
10 that a corporation should not release an
11 application designed for teens and younger
12 kids without knowing that the application is
13 safe for them?
14             MS. WADHWANI:  Objection to
15        form.
16             THE WITNESS:  So I take a
17        little bit of issue with the word
18        "safe" because that is a relative
19        term.  So I think that I would find a
20        problem saying it's safe to any given
21        person at any given time.  The word
22        "safe" can mean different things.
23 BY MR. DRAPER:
24      Q.      Sure.  Do you agree that a
25 corporation should not release an application

HIGHLY CONFIDENTIAL

```
                                        Page 51
 1   designed for teens or younger kids without
 2   knowing what the safety hazards are for that
 3   application?
 4              MS. WADHWANI:  Objection to
 5         form.
 6              THE WITNESS:  I agree that when
 7         you are launching a product for youth,
 8         it is important to have a high degree
 9         of responsibility, which would mean
10         knowing what the risks are.
11   BY MR. DRAPER:
12         Q.    And do you agree that a
13   corporation that wants to release an
14   application designed for teens and younger
15   kids should test the application for safety
16   before releasing it?
17              MS. WADHWANI:  Objection to
18         form.
19              THE WITNESS:  I would agree
20         that you would need to have some
21         information about where the risks are,
22         which could come through testing.
23         Again, that's a bit of a broad term.
24         But yeah.
25   BY MR. DRAPER:
```

                                        Page 154

1              So kids will use YouTube.  It's
2    written in our North Star principles, right.
3    And so if they're going to use YouTube, we
4    want them to use YouTube in the most
5    age-appropriate, safe and high quality way as
6    possible.
7         Q.    One of the goals for YouTube
8    Kids was to create the next generation of
9    YouTube users.  Do you agree?
10        A.    So I'd like to point out that I
11   started on the kids team.  This is probably
12   one of the first things I saw or commented
13   on.
14        Q.    Right.
15        A.    So we were trying -- I was
16   learning and figuring out a lot.  Right.  So
17   I just want that to be noted that a lot of
18   these things might have been hot takes.
19              And again, I don't know what we
20   used this deck for.  It might have been my
21   own scratch pad.  There is actually a slide
22   that says "Scratch pad."  So I might have
23   just been trying to get my thoughts
24   organized.
25        Q.    Okay.  If you will just look at

HIGHLY CONFIDENTIAL

Page 155

```
 1   the -- the second slide here, sir, it -- it
 2   is entitled or has a caption that says "YTK
 3   Vision."  That of course stands for YouTube
 4   Kids.  I'm sorry.
 5           A.      I'm ahead of you, sir.  My bad.
 6           Q.      Right there, that one.  Right.
 7                   You see where it says "YTK
 8   Vision."  That of course stands for YouTube
 9   Kids vision, correct?
10           A.      Yes.
11           Q.      All right.  And it says:
12   "Create the next generations of YouTube
13   users."  Yes?
14           A.      That's what the slide says.
15           Q.      All right.  The thought was
16   that if you get kids hooked on YouTube Kids
17   at an early age, say four to eight, they
18   stick with YouTube as they get older and
19   remain YouTube users, right?
20                   MS. WADHWANI:  Objection to
21           form.
22                   THE WITNESS:  I mean the slide
23           lists out different age groups and has
24           arrows.  But as I mentioned before, we
25           are sort of assuming everyone uses
```

HIGHLY CONFIDENTIAL

Page 156

1          YouTube, and so we want to make sure

2          when those users are on YouTube, we

3          have them in the safest and most

4          appropriate place.

5    BY MR. DRAPER:

6          Q.      You say you assume everyone

7    uses YouTube.

8          A.      Mm-hmm.

9          Q.      I've seen it characterized a

10   little bit differently, that the goal is for

11   all kids to use YouTube.  Would you agree

12   with that characterization?

13                 MS. WADHWANI:  Objection to

14         form.

15                 THE WITNESS:  The -- so again,

16         this slide deck, I don't remember

17         exactly what we used it for.  It was

18         like maybe my first month possibly on

19         the product.  So irrespective of

20         what's said here, I wouldn't say that

21         the goal is for all kids to use

22         YouTube.  I think our goal is to be as

23         valuable as possible.

24                 YouTube is used in schools.

25         I've seen statistics like 95 percent

HIGHLY CONFIDENTIAL

Page 157

1          of teachers have used YouTube in the

2          last, you know, month or quarter or

3          year in classrooms.  And, you know,

4          YouTube is an incredible learning

5          device.  We see it as the library, but

6          organized for kids and to actually

7          help them find things that they might

8          want to go deeper on.  It is one of

9          the biggest search engines in the

10         world.

11                 So, yeah, kids are going to use

12         YouTube.

13                 MR. DRAPER:  For the record,

14         sir, I move to strike the

15         nonresponsive portion.

16   BY MR. DRAPER:

17         Q.     So still on this -- this same

18   slide, for kids younger than eight, it has a

19   statistic under it where it says, "Under 8,

20   ███  ████████ addressable users."  Do you see

21   that?  In blue?

22         A.     I see that.

23         Q.     Right.  And then for tweens, it

24   also says ████  ███████ addressable users,

25   correct?

HIGHLY CONFIDENTIAL

Page 158

```
 1        A.      That's what the slide says.
 2        Q.      Addressable users, I think you
 3   know from your marketing experience, is the
 4   total potential market?
 5                MS. WADHWANI:  Objection to
 6        form.
 7                THE WITNESS:  It can mean that.
 8        I don't recall exactly what was meant
 9        here, but -- it can mean that.
10   BY MR. DRAPER:
11        Q.      Okay.  And so this identifies,
12   and it says actually underneath the slide,
13   "███  ████████  kids under 13."
14                Is that -- that's more than in
15   the United States, you would agree?
16        A.      Yes.
17        Q.      Right.  That's worldwide.
18        A.      Yes.
19        Q.      All right.  And YouTube wanted
20   to reach every one of them, all ███  ████████,
21   correct?
22                MS. WADHWANI:  Objection to
23        form.
24                THE WITNESS:  I don't know what
25        YouTube wanted.  I certainly didn't
```

HIGHLY CONFIDENTIAL

Page 159

1          know in Q2 2016 when I had been at the
2          company for a very short period of
3          time.
4                    And as I mentioned before, we
5          just assumed YouTube is going to get
6          used by kids.
7     BY MR. DRAPER:
8          Q.    By every kid in the world?
9          A.    If they find --
10                    MS. WADHWANI:  Objection to
11          form.
12                    Go ahead.
13                    THE WITNESS:  If they find it
14          valuable and useful.
15     BY MR. DRAPER:
16          Q.    All right.  Let's look at the
17     next slide, please.
18                    The next slide has a heading.
19     It reads "YouTube Kids growth
20     strategy:  Become a daily tool for all U13
21     kids globally."
22                    Right?  Do you see that?
23          A.    I do see that.
24          Q.    Have you ever heard that goal
25     referred to as every kid, every day?

HIGHLY CONFIDENTIAL

Page 160

1          A.      I don't recall that.
2          Q.      All right.  And the strategy
3    you'll see -- you can see on here is twofold,
4    grow activations, right?  So more kids are on
5    the platform.  Yes?
6                    MS. WADHWANI:  Objection to
7          form.
8                    THE WITNESS:  It says, "Grow
9          reach."  So, yeah -- grow people
10         downloading the kids app.
11   BY MR. DRAPER:
12         Q.      Right.  And then on that upward
13   pointed arrow right to the left of it, it
14   says "Activations."
15         A.      Okay.
16         Q.      Right.  So grow activations,
17   grow reach, so more kids are on YouTube.
18   Right?
19                    MS. WADHWANI:  Objection to
20         form.
21                    THE WITNESS:  More users are
22         downloading and onboarding YouTube
23         Kids app is what that would mean, I
24         would guess.
25   BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 161

1      Q.      All right.  And then the other
2    part of the strategy is the lower bar, the
3    arrow pointing to the right, "Encourage
4    engagement."  Yes?
5          A.      No, I would not characterize
6    this as our strategy.  As I mentioned, this
7    is a slide deck I built within the first, you
8    know, few weeks or days of starting the
9    project --
10         Q.      Yeah.
11         A.      -- I was learning.  If I did
12   this deck, and I can't remember if I did it,
13   but I certainly participated in it at a
14   minimum, so it was a place for sketching down
15   some ideas so that I could talk to people and
16   learn more about how -- you know, how to
17   think about this area that was brand new for
18   me.
19         Q.      You're allowed to change your
20   mind, but at the time what you put down is
21   the strategy was twofold, grow reach and
22   encourage engagement.  Right?
23                MS. WADHWANI:  Objection to
24         form.
25                THE WITNESS:  The slide says

HIGHLY CONFIDENTIAL

Page 162

 1          that.   That doesn't make it the
 2          strategy.
 3   BY MR. DRAPER:
 4          Q.     And along those two axises --
 5   axes on the left, "Activations," and on the
 6   bottom, "DAV."  That stands for daily active
 7   viewers, correct?
 8          A.     That's what it stands for.
 9          Q.     Okay.  And then there's a black
10   arrow pointing upwards to the right.  Do you
11   see that?
12          A.     Yes.
13          Q.     And it's labeled "Goal,"
14   correct?
15          A.     Correct.
16          Q.     And it's pointing to a figure
17   "TAM," total addressable market, "███████
18   ███████."  Right?
19          A.     That's what the slide says.
20          Q.     Every kid, every day, globally.
21                 MS. WADHWANI:  Objection.
22   BY MR. DRAPER:
23          Q.     That's the goal.
24                 MS. WADHWANI:  Objection to
25          form.

HIGHLY CONFIDENTIAL

Page 163

1                    THE WITNESS:  That's not the

2          goal.

3   BY MR. DRAPER:

4          Q.    That was the goal at this time.

5                    MS. WADHWANI:  Objection to

6          form.

7   BY MR. DRAPER:

8          Q.    Do you disagree?

9          A.    No, I disagree.  This was a

10  slide that was made to sketch down some ideas

11  when I first started at this job so that I

12  could get feedback and understand better this

13  area.

14         Q.    All right.  So where it says:

15  "YouTube grow strategy, become a daily tool

16  for all U13 kids globally," that wasn't

17  right.  You didn't mean that.

18         A.    Well, it's evolved --

19                   MS. WADHWANI:  Objection to

20         form.

21                   Go ahead.

22                   THE WITNESS:  I think being a

23         tool for kids is an important part of

24         what YouTube Kids can do.

25  BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 164

1          Q.      Daily tool.

2          A.      Well, the idea of a tool is all

3    I'm commenting on.  And daily is not

4    something that, you know, once I started to

5    understand better this area, you know, was

6    something that didn't last very long.

7          Q.      Yeah.  Sir, I'm not saying

8    you're not allowed to change your mind.  I'm

9    just saying that at this time the goal was

10   all kids every day, all around the world.

11         A.      No.

12                 MS. WADHWANI:  Objection to

13         form, asked and answered.

14   BY MR. DRAPER:

15         Q.      Okay.

16                 MS. WADHWANI:  When you are at

17         a good point, we've been going about

18         an hour and 20.

19                 MR. DRAPER:  Yeah, let's take a

20         break.  Thank you.

21                 THE VIDEOGRAPHER:  The time is

22         11:42.  We're off the record.

23                 (Recess.)

24                 THE VIDEOGRAPHER:  The time is

25         11:55.  We're back on the record.

HIGHLY CONFIDENTIAL

Page 439

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2         The undersigned Certified Shorthand Reporter

3   does hereby certify:

4         That the foregoing proceeding was taken before

5   me at the place and time therein set forth, at

6   which time the witness was duly sworn; That the

7   testimony of the witness and all objections made

8   at the time of the examination were recorded

9   stenographically by me and were thereafter

10  transcribed, said transcript being a true and

11  correct copy of my shorthand notes thereof; That

12  the dismantling of the original transcript will

13  void the reporter's certificate.

14        In witness thereof, I have subscribed my name

15  this date:  April 4, 2025.

16

                          _____

17        _____

18        LESLIE A. TODD, CSR, RPR

19        Certificate No. 5129

20

21  (The foregoing certification of

22  this transcript does not apply to any

23  reproduction of the same by any means,

24  unless under the direct control and/or

25  supervision of the certifying reporter.)