# AMENDED Exhibit 1001

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

```
                                          Page 1

 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3

 4   IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-

     ADOLESCENT ADDICTION/            YGR MDL No. 3047

 5   PERSONAL INJURY PRODUCTS

     LIABILITY LITIGATION            MDL No. 3047

 6   _____

 7   This Document Relates to:

 8   ALL ACTIONS

 9   _____

10

11          30(B)(6)/PMQ FOR GOOGLE/YOU TUBE

12       VIDEOTAPED DEPOSITION OF ERIN TURNER

13           Wednesday, January 22, 2025

14             SAN FRANCISCO, CALIFORNIA

15

16

17

18

19

20

21

22

23

     Reported By:

24   KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

     California CSR 10068, Nevada CCR 995, Texas CSR

25   12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR
```

Page 61

1   is not in my area.

2   BY MS. HAILESELASSIE:

3       Q.   You've never inquired of anyone why that's

4   the case?

5       A.   No.

6       Q.   Okay.  I'll have marked now -- I believe

7   it's already been marked Exhibit 4.

8               (Whereupon, Deposition Exhibit 4

9               was marked for identification.)

10  BY MS. HAILESELASSIE:

11      Q.   And I will represent to you that this is

12  an exhibit from another deposition that we did

13  earlier this year of -- Ms. Weikert -- who just

14  helped us identify the areas that you're going to

15  address with us.  So you're welcome to look through

16  it, but it's mostly a list of names, programs,

17  features and groups within YouTube.  So I'm just

18  directing you to the parts that are relevant to her

19  deposition.

20               So if you could look at page 9.

21               Do you see where it says, "Responsible

22  Content & Creators?"

23               MR. KRAMER:  I'm going to object to the

24  characterization of the document.

25               But you can go ahead and look through.

Page 62

```
 1            THE WITNESS:  What page is that on?
 2    BY MS. HAILESELASSIE:
 3         Q.   This is page 9.
 4         A.   Page 9.
 5              Okay.
 6         Q.   Okay.  It lists a couple of things that
 7    YouTube suggests we talk to you about, a teen
 8    wellbeing classifier and age appropriate classifier.
 9              Do you see that?
10         A.   I see that, yes.
11         Q.   Okay.  And I'm just showing you that so
12    you understand what's guiding a lot of my
13    questioning today.
14              Do you understand?
15         A.   Okay.
16         Q.   So the Teen Wellbeing classifier, and then
17    in parentheses, it specifies Volume Impacts
18    Wellbeing.
19              Are you generally knowledgeable about that
20    product?
21              MR. KRAMER:  Objection to form.
22              THE WITNESS:  This is a product my team is
23    responsible for.
24    BY MS. HAILESELASSIE:
25         Q.   Is it a product you're generally
```

Page 63

1    knowledgeable on?

2         A.    Yes.

3         Q.    Okay.  And this is the project termed VIBE

4    as an acronym for volume impacts wellbeing, correct?

5         A.    Correct.

6         Q.    Can you please explain to the jury what a

7    classifier is?

8              MR. KRAMER:  Objection to form.

9              THE WITNESS:  A classifier is a way for us

10   to identify content and make a definition of

11   content, and then use a model to identify that

12   content at scale.

13   BY MS. HAILESELASSIE:

14        Q.    Would it be accurate to say that it's an

15   algorithm that automatically categorizes content?

16             MR. KRAMER:  Objection to form.

17             THE WITNESS:  You could say it is an

18   algorithm that identifies content that meets a

19   certain definition, a specific definition.

20   BY MS. HAILESELASSIE:

21        Q.    Okay.  So you understand how classifiers

22   are operationalized?

23        A.    Correct.

24             MR. KRAMER:  Objection to the form.

25   / /

Page 64

1    BY MS. HAILESELASSIE:
2        Q.   Do you have a technical understanding of
3    how they work?
4        A.   When you say "operationalize," can you
5    give me some more examples of what you mean?
6        Q.   Well, you agreed that you understand how
7    they're operationalized.
8             I mean, do you have a technical
9    understanding of how classifiers work?
10       A.   Well --
11            MR. KRAMER:  Objection.
12            Sorry.
13            Objection to form.  Object.
14   Mischaracterizes testimony.
15            THE WITNESS:  So I'm -- I'm asking you
16   to -- I responded before asking you to clarify what
17   you mean by "operational."  That means something to
18   me that might be different from what you're
19   asking --
20   BY MS. HAILESELASSIE:
21       Q.   What does it mean to you?
22       A.   -- so I'm asking for clarification.
23       Q.   What does it mean to you?
24       A.   To me, that means that we identify the
25   content that we're looking to identify and build a

Page 65

1    model that can identify that content.  And then we
2    deploy that model.
3         Q.   Do you work on the technical aspects of
4    that model?
5         A.   I am --
6              MR. KRAMER:  Objection to form.
7              THE WITNESS:  I am not an engineer.
8    BY MS. HAILESELASSIE:
9         Q.   Okay.  And the teen wellbeing classifier,
10   once it identifies content or categorizes content,
11   is there another step to the functioning of it?
12             MR. KRAMER:  Objection to form.
13             THE WITNESS:  So there are two steps.  One
14   is identification of content, and then the treatment
15   of that content.
16   BY MS. HAILESELASSIE:
17        Q.   Okay.  And is there -- are there various
18   types of treatment that might occur?
19        A.   There are a whole range of ways content
20   could be treated.
21        Q.   What -- which ways?
22        A.   Well, can you -- can you be specific about
23   what you're -- what you're asking for?
24        Q.   I -- I can't because my -- that's my
25   question to you, what -- what might it do with the

Page 66

1   content after it's identified?

2           MR. KRAMER:  Objection to form.

3           THE WITNESS:  Well, the goal of the -- of

4   this particular classifier is to identify content

5   and treat it in recommendations.  So in this case,

6   treatment could be dispersing content.

7   BY MS. HAILESELASSIE:

8       Q.   And when you say "dispersing," do you mean

9   removing it from recommendations?

10          MR. KRAMER:  Object to form.

11          THE WITNESS:  So as you can see in this

12  exhibit, this classifier is volume impacts

13  wellbeing.  And this content is content that is not

14  problematic in a single view.  And so, therefore,

15  the content is -- based on input from our experts,

16  is dispersed.

17  BY MS. HAILESELASSIE:

18      Q.   Okay.  When it's dispersed, where does it

19  go?

20      A.   So dispersion would mean that it is

21  reduced, the concentration of the content would be

22  reduced.

23      Q.   Okay.  Are there any other classifiers

24  used by YouTube that disperse content related to

25  teen wellbeing other than the teen wellbeing

Page 67

1    classifier --
2            MR. KRAMER:  Objection.
3    BY MS. HAILESELASSIE:
4        Q.   -- that is listed here?
5            MR. KRAMER:  Objection to form.
6            THE WITNESS:  There is a huge amount of --
7    a huge number of safeguards in place across YouTube
8    for all of our teen and adult users.  This is one of
9    many that are in place to provide a responsible
10   experience.
11   BY MS. HAILESELASSIE:
12       Q.   And are any of those that you just
13   mentioned specifically related to teen wellbeing
14   other than the teen wellbeing classifier?
15           MR. KRAMER:  Objection to form.
16           THE WITNESS:  I would say all of those
17   support teens to some degree, teen wellbeing.  The
18   goal of -- as you asked me earlier, the goal of
19   responsibility is to have an experience that is
20   providing guardrails on safety and quality, and
21   YouTube has done extensive work in that area for
22   both teen users and adult users.  So this is one of
23   many that will support teens' wellbeing and their
24   experience on YouTube, their experience with content
25   on YouTube.

Page 68

1   BY MS. HAILESELASSIE:

2       Q.   Okay.  Are there certain categories of

3   content that the teen wellbeing classifier is

4   seeking to disperse?

5       A.   Yes.

6       Q.   What are they?

7       A.   So these -- the -- this classifier covers

8   several categories.  I actually have a question for

9   you.  I have a -- maybe something that might be ...

10          MR. KRAMER:  Can we go off the record?

11          THE VIDEOGRAPHER:  Time is now 11:11.

12   Going off the record.

13          (Off video record only.)

14          MS. HAILESELASSIE:  There's a pending

15   question.

16          THE REPORTER:  I'm sorry, do you agree to

17   go off the record?

18          MS. HAILESELASSIE:  There's a pending

19   question.

20          MR. KRAMER:  Is it a privilege concern?

21          THE WITNESS:  I have a question about the

22   time period.

23          MR. KRAMER:  Oh, sorry.  We can go on the

24   record.  I thought it was a privilege concern.

25          THE WITNESS:  I wasn't sure if it would be

Page 69

1    privileged or not.

2            Maybe the question is for you.

3            Is the question of the time period?

4            MR. KRAMER:  Sorry, can we go back on the

5    record?

6            THE VIDEOGRAPHER:  Time is now 11:11.

7    Back on the record.

8            THE WITNESS:  Can you clarify the time

9    period you're looking for?

10   BY MS. HAILESELASSIE:

11       Q.   So if -- if it started as one thing and

12   then it evolved, then that is part of my question as

13   well, and we can explore that a bit.  But I am just

14   trying to find out what -- what is covered by the

15   teen wellbeing classifier, the categories of --

16       A.   Okay.

17       Q.   -- of content?

18       A.   So we're always expanding and improving

19   these, and this -- this classifier currently covers

20   five categories of content.

21           So one category is physical -- social

22   comparison of physical appearance.  Another category

23   is social aggression.  More recently, we have

24   added -- let's see.  We've added three new

25   categories.  We've added financial -- wealth

Page 70

1    obsession, hostility and disrespect towards others.
2    I'm trying to remember the third one.  I can't
3    remember the third one off the top of my head, but
4    we have five categories.  So this has expanded since
5    it was launched.
6        Q.   Okay.  That's -- that's fine.  If you
7    think of it later, we can come back to it and you
8    can just let me know you remembered the last one.
9             Are you generally knowledgeable about the
10   creation of VIBE, the origins of the VIBE product?
11       A.   Yes.
12       Q.   Okay.  And I think you've already answered
13   this, but it sounds like VIBE was created in
14   recognition of the fact that there is some content,
15   although not prohibited, it is problematic to
16   youthful viewers when viewed repeatedly; is that
17   accurate?
18            MR. KRAMER:  Objection to form.  Lack of
19   foundation.  Mischaracterizes testimony.
20            THE WITNESS:  So as I mentioned earlier,
21   there is a very extensive -- there are a very
22   extensive set of classifiers intended to deliver
23   responsible experience for all of our users,
24   including teens on YouTube.  And we looked at where
25   we had small gaps to fill in.  And this was one area

Page 71

1  that we identified together with our expert
2  committee.
3          And as you -- you asked me -- the nature
4  of the content is content that is not violative, not
5  borderline, but potentially, for some users, in
6  volume may have some effect on their wellbeing.
7  BY MS. HAILESELASSIE:
8      Q.   Okay.  So it's the volume that's the --
9  that's the issue, more so than the content, correct?
10     A.   Yeah, that's correct.
11     Q.   Okay.  ███████████████████████████
   ██████████████████████████████████████████████
   ██████████████   And then in parentheses, it says (as
14 read):
15                  ████████████████████████████
   ████████████████████████
   ██████████████████████████████████████
   ████████████████████████████████████
19     A.   I think there's some inaccuracy here.
20 So --
21     Q.   Okay.  Well, and let me step back for a
22 minute, because I don't think we have actually
23 defined MFK, but that is made for kids, right?
24     A.   MFK is made for kids.
25     Q.   What is -- what is the inaccuracy?



Page 72

Page 73

███████████████████████

███  ██████

███  ████████████████████████

████████████████

███  ██████

███  ██████████████████████

7    A.    The --

8          MR. KRAMER:  Objection to form.

█████████████  █████████████████

██████████████████████████

██████████████████████████████

████████████  ████████████  ████████

██████████████████████████████

███████████  █████████████████

█████████████████

16   BY MS. HAILESELASSIE:

17        Q.    Okay.  We'll probably come back to this.

18              If you'll just turn to the page 15.  At

19   the top under "Digital Wellbeing Features," you were

20   listed along with the teen wellbeing features.  I'm

21   just getting there myself.  (As read):

22                   Teen wellbeing classifier (to

23              reduce concentration of

24              non-violative content that is

25              potentially harmful to teens in

Page 74

```
 1              high volume.)
 2              Do you see that?
 3      A.   Yes.
 4      Q.   Is that the same thing that we've just
 5   looked at, VIBE?
 6      A.   Yes.
 7      Q.   And do you know what the 2022 in
 8   parentheses refers to next to this classifier?
 9      A.   That refers to when this was -- this work
10   was launched.
11      Q.   All right.  I'm going to have marked
12   Exhibit 5 -- you can put that one to the side.
13   Thank you.
14              Okay.  Actually, before we take a look at
15   5, does your work -- so your work extends to YouTube
16   Kids, correct?
17      A.   Yes.
18      Q.   And do you work on YouTube shorts?
19      A.   My -- our signals are applied to YouTube
20   shorts.
21              (Whereupon, Deposition Exhibit 5
22               was marked for identification.)
23   BY MS. HAILESELASSIE:
24      Q.   Okay.  So taking a look at what has been
25   marked as Exhibit 5, this Bates -02480437 is an
```

Page 180



15        Q.    Okay.  We can put this to the side.  I'm

16    going to mark Exhibit 10.

17                (Whereupon, Deposition Exhibit 10

18                was marked for identification.)

19    BY MS. HAILESELASSIE:

20        Q.    This is an email with the Bates

21    ending -02490539.  And it is an email from

22    ██████████  to you, Ms. Turner.

23                Who is ██████████?

24        A.    ██████████  is a member of the new GAPP

25    team.

Page 181

```
 1        Q.    What is the GAPP team?
 2        A.    Government affairs and public policy.
 3        Q.    This email is dated April 17th, 2023.
 4              And what is the subject?
 5        A.    The subject says (as read):
 6                    [Just us] regarding
 7              privileged -- Re: privileged KOF
 8              pov: on biggest teen protection
 9              needs.
10        Q.    Okay.  And if you will turn to -0540, do
11   you see your message to ████    starting this thread?
12              MR. KRAMER:  Objection to the form.
13   BY MS. HAILESELASSIE:
14        Q.    Is that the first email in the thread, or
15   email to █████████?
16        A.    I'm just reading -- I'm just reading this
17   here.
18              I -- I can't really tell from this whether
19   this was the first email in that thread.  But I
20   don't know -- yeah.  I can't tell for sure if this
21   was -- if there was something before that.
22        Q.    Okay.  Well, I will represent to you, I
23   haven't removed anything from this document, and did
24   not -- did not see any others with earlier emails,
25   but I understand you're telling me that you can't
```

Page 182

1  represent that that is the initial one in the

2  thread.  But at least on this document, there is an

3  email on April 5th, 2023 at 9:55 p.m.

4          And you are writing to -- is it ███ and

5  ███    Is that correct?

6      A.    That's what it says here.

7      Q.    Okay.  Do you know who ███ is?

8      A.    ███ is another member of the same team

9  ███ is on.

10     Q.    And that's --

11     A.    Government affairs and public policy.

12     Q.    Okay.  And your message starts off (as

13  read):

14              Privileged.  ███, please

15              advise.

16              Do you see that?

17     A.    I do.

18     Q.    Who is ███, if you know?

19     A.    That would have been ██████, who is

20  one of the recipients on this email.

21     Q.    Okay.  And will you please read your

22  email?

23     A.    (As read):

24              Privileged: ███, please

25              advise.  Hi, ████████, during

1          Q2 I am leading an xfn team (those
2          on cc) to pull together our
3          holistic teen wellbeing road map
4          and a go-to market plan for H2.
5          One thing we'd like to understand
6          from a KOF point of view is our
7          biggest opportunity areas.  We have
8          a weekly working session with most
9          on this thread.  Can you make time
10         to join us next week to share your
11         point of view on the top three to
12         five issues?  We're looking for a
13         rough stack ranking.
14     Q.    Okay.  So what -- what is the information
15   you're trying to get from them?
16     A.    We take a broad view in trying to
17   understand from our users what's happening with
18   their needs and also other stakeholders in the -- in
19   the marketplace.  So, for example, keeping formers
20   and regulators so we can pull together a holistic
21   picture of what our user needs and risks might be.
22     Q.    And KOF is key opinion formers?
23     A.    That's correct.
24     Q.    You mentioned regulators.
25         Are regulators key opinion formers?

Page 184

1        A.    That is a broad term that we use, but
2    typically they -- they could be.
3        Q.    Who else would be a key opinion informer?
4            MR. KRAMER:  Objection to the form.
5            THE WITNESS:  That -- that is the term
6    that typically our government affairs team would
7    use.  I don't know who else would fall into that
8    bucket.
9    BY MS. HAILESELASSIE:
10       Q.    Would it include users of YouTube?
11           MR. KRAMER:  Objection to the form.
12           THE WITNESS:  Users are -- are our biggest
13   priority.  We are very user centered in
14   understanding their needs, but we also like to
15   understand the landscape as a whole and what other
16   issues may be of impact to our users.
17           So regulators and how they are seeing the
18   needs of our users are an important data point for
19   us.
20   BY MS. HAILESELASSIE:
21       Q.    Are users included in the term "key
22   opinion formers"?
23           MR. KRAMER:  Objection to the form.
24           THE WITNESS:  They are -- they are not.
25   / /

Page 8

1   JANUARY 22, 2025                9:38 A.M. PACIFIC TIME

2                    P R O C E E D I N G S

3

4                    MORNING SESSION

5            THE VIDEOGRAPHER:  We are now on the

6   record.  My name is Darnell Brown, and I'm the

7   videographer with Golkow.  Today's date is

8   January 22nd, 2025, and the time is 9:38 a.m.

9            This video deposition is being held in

10  San Francisco, California, in the matter of Social

11  Media Adolescence Addiction Personal Injury, for the

12  United States District Court, for the Northern

13  District of California.

14           The deponent is Erin Turner.

15           Counsel, could you please identify

16  yourselves.

17           MS. HAILESELASSIE:  My name is

18  Jade Haileselassie.  I'm with MotleyRice, and I

19  represent the plaintiffs in this action, both the

20  personal injury plaintiffs and the school districts.

21           MS. TRUONG:  An Truong, Simmons Hanly

22  Conroy, for plaintiffs as well.

23           MR. KRAMER:  Andrew Kramer from Wilson

24  Sonsini for YouTube.

25           MS. VALLES:  Lizette Valles from Wilson

```
                                                    Page 9
 1   Sonsini for YouTube.
 2           MR. BERKLEY:  Demarron Berkley, in-house
 3   counsel for YouTube and Google.
 4           THE VIDEOGRAPHER:  Counsel over Zoom?
 5           MR. WHITE:  Kevin White of Gibson Dunn &
 6   Crutcher on behalf of TikTok defendants.
 7           MS. URBAN:  Marissa Urban on behalf of
 8   YouTube.
 9           MR. FLASTER:  This is Eben Flaster with my
10   colleague Katelyn Romeo from -- excuse me.  Shook,
11   Hardy & Bacon, LLP, in Philadelphia, representing
12   the Meta defendants.  Thank you.
13           THE VIDEOGRAPHER:  The court reporter is
14   Kathleen Maltbie, who will now swear in the witness.
15                     ERIN TURNER,
16              having been duly sworn,
17        was examined and testified as follows:
18           EXAMINATION BY MS. HAILESELASSIE
19   BY MS. HAILESELASSIE:
20       Q.  Good morning, Ms. Turner.  You've already
21   heard me introduce myself, and I have had a chance
22   to meet you, but I want to introduce myself again.
23           I represent the plaintiffs, as you heard
24   me say, in this action.  The plaintiffs are hundreds
25   of personal injury plaintiffs, and those are
```

Page 10

1    children and their parents, and I also represent

2    school districts.  And many of those plaintiffs

3    allege they have been injured by the conduct of

4    YouTube.

5             Do you understand that?

6        A.   Yes.

7        Q.   And we're here this morning in

8    San Francisco to take your deposition.  You've been

9    sworn in by the court reporter, and you're under

10   oath that you're going to testify truthfully.

11            Are you committed to doing that today?

12       A.   Yes.

13       Q.   And that means, even though we're here in

14   this lovely courtroom -- this conference room, your

15   deposition today has the same effect as if you were

16   testifying before a judge and a jury, even though

17   they are not here.  It is being videotaped and is

18   also being recorded stenographically.  There's a

19   written record that's going to be produced.  And

20   either the video or the written record can be

21   presented in court, or used for any purpose that's

22   authorized under the state and federal rules.

23            Do you understand that?

24       A.   Yes.

25       Q.   Do you have any questions about that?

Page 11

1      A.    No.

2      Q.    Okay.  And I'm sure -- I'm sure you've

3    been well prepared by your counsel for the

4    proceedings today, but just so we have a record

5    that's on the record that we're all on the same

6    page, I do want to go over some ground rules.

7           So I think the court reporter has already

8    mentioned a few of them, and you're already doing

9    some of it, just responding verbally, so that's

10   right.  But I would just go over that, put it on the

11   record.  So we talked about your responses should be

12   verbal.  It's very natural in conversation, as you

13   go along, that you might nod your head or shake your

14   head, but the court reporter can't record that.  So

15   in the event that that happens, I'll just remind

16   you.

17          Another thing that happens that's pretty

18   natural in conversation is that we might speak over

19   each other.  But what we'll try to do today is I'll

20   finish my question, your counsel may have an

21   objection, and even if your counsel objects, you

22   should still answer the question.  There may come a

23   point where we do speak over each other and have to

24   go back and do it in order, question, objection,

25   answer.  That kind of happens often in depositions.

```
                                                 Page 12
 1   But if it does, nobody is doing anything wrong,
 2   we've just kind of lapsed into that natural
 3   conversation situation.
 4           Do you -- do you understand?
 5       A.   Yes.
 6       Q.   Okay.  And you can take a break at any
 7   point.  I generally like to go for about an hour and
 8   a half, but if you need to take a break, the only
 9   thing that I would ask is that if there's a pending
10   question, that you do answer the question and then
11   I'm happy to let you take a break.  You're certainly
12   not captive to this -- to this questioning today.
13           Do you understand?
14       A.   Yes.
15       Q.   Okay.  Is there anything that would affect
16   your memory today?
17       A.   No.
18       Q.   Did you get a good night's sleep last
19   night?
20       A.   Yes.
21       Q.    Is there anything that would affect your
22   ability to tell the truth today?
23       A.   No.
24       Q.   Okay.  And we are here today in
25   San Francisco in the office of Wilson Sonsini.
```

Page 13

1            Are you represented by the attorneys here
2     at Wilson Sonsini?
3          A.   Yes.
4          Q.   Did you sign an engagement letter with
5     them?
6          A.   No.
7          Q.   Okay.  Are you paying them to represent
8     you?
9          A.   Let's go back.  When you say they're
10    representing me, what do you mean?  They're
11    representing YouTube, and I'm an employee of
12    YouTube.
13         Q.   Okay.  Have you signed an agreement
14    with -- and when you say "YouTube," you consider
15    yourself an employee of YouTube?
16         A.   I'm an employee of Google, and I
17    specifically work at YouTube, which is owned by
18    Google.
19         Q.   Okay.  And it's your understanding that
20    Wilson Sonsini represents Google?
21         A.   Correct.
22         Q.   Okay.  And represents YouTube as well,
23    obviously?
24         A.   Yes.
25         Q.   Okay.  And have you signed an agreement

Page 14

1   with -- I'm gonna say "Google."  When I refer to
2   "Google," please understand that unless I specify, I
3   am referring to Google and YouTube as well.
4        A.   Mm-hmm.
5        Q.   Have you -- have you signed an agreement
6   with Google regarding your representation?
7        A.   No.
8        Q.   Okay.  Do you consider that your interests
9   are the same as Google's in this litigation?
10            MR. KRAMER:  Objection to form.
11            THE WITNESS:  Can you clarify?
12            MR. WHITE:  Counsel, could we get a
13   stipulation that an objection for one is an
14   objection for all?
15            MS. HAILESELASSIE:  Of course.
16            THE WITNESS:  I'm not sure I understand
17   the question.  Can you clarify what you mean?
18   BY MS. HAILESELASSIE:
19        Q.   Sure.
20            Sometimes in litigations, interests can
21   diverge.  So the reason I'm asking this is really to
22   preface the question.  If -- if you feel at any
23   point today that -- that your interest diverge with
24   Google's, do you understand that you would still be
25   obligated to tell the truth even though you're

Page 15

```
 1   represented by Google's attorneys?
 2        A.    Yes.
 3        Q.    Okay.  And that's really all I was getting
 4   at.
 5              Okay.  So I think I've already covered
 6   this, but just for the record, we're going to be
 7   talking about YouTube as a platform in this
 8   deposition, and then Google is -- do you understand
 9   them to be the parent company of YouTube?
10        A.    Yes.
11        Q.    And so when I'm referring to YouTube, I am
12   referring to the platform.
13              Have you spoken with anyone, other than
14   your attorneys, about your deposition?
15        A.    Only my manager.
16        Q.    Okay.  And who is your manager?
17        A.    James Beser.
18        Q.    Did you discuss your potential testimony
19   with Mr. Beser?
20        A.    No.
21        Q.    Did you discuss the litigation generally
22   with Mr. Beser?
23        A.    Only that I was going to be deposed.
24        Q.    And you haven't had any other
25   conversations with employees of Google regarding
```

Page 16

1    your deposition?

2        A.    No.

3        Q.    Have you had conversations with any former

4    employees about the -- about your deposition?  Any

5    former -- strike that.

6              Have you had any discussions with former

7    employees of Google about your deposition?

8        A.    No.

9        Q.    How many times did you meet with the

10   attorneys at Wilson Sonsini about your deposition?

11       A.    A handful of times.

12       Q.    Was it five times or less than five times?

13       A.    That sounds about right.

14       Q.    And when you met with your attorneys at

15   Wilson Sonsini, how many hours did you meet with

16   them on each occasion, approximately?

17       A.    A couple of hours.

18       Q.    A couple of hours approximately five

19   times; is that accurate?

20              MR. KRAMER:  Objection to form.

21              THE WITNESS:  That sounds about right.

22   BY MS. HAILESELASSIE:

23       Q.    Okay.  So about ten hours in meetings with

24   your attorneys ahead of your deposition?

25       A.    Give or take, that sounds about right.

Page 17

```
 1        Q.   Okay.  Somewhere between ten and 15 hours,
 2   do you think?
 3        A.   Probably less.
 4        Q.   Okay.  Less than 15, but more than ten?
 5        A.   I would say ten is about right.
 6        Q.   Okay.  And did you review any documents in
 7   preparation for your deposition?
 8        A.   Yes.
 9        Q.   Approximately how many documents did you
10   review?
11        A.   Also probably around ten.
12        Q.   Okay.
13             MS. HAILESELASSIE:  And just for the
14   record, are all of those documents that were
15   produced in this litigation?
16             MR. KRAMER:  They are.
17   BY MS. HAILESELASSIE:
18        Q.   Okay.  At this time, I'm going to have
19   marked your notice of deposition.  So -- sorry, this
20   is Tab A.
21             MR. KRAMER:  Sorry, Jade, I didn't want to
22   interrupt.  I got a note that it's hard for people
23   on Zoom to hear the witness and Jade.
24             THE VIDEOGRAPHER:  Time is now 11 -- time
25   is now 9:49.  Going off the record.
```

```
                                                Page 18

 1              (Whereupon, a recess was taken from
 2              9:49 a.m. to 9:54 a.m.)
 3              THE VIDEOGRAPHER:  Time is now 9:54.
 4      We're back on the record.
 5              MS. HAILESELASSIE:  Okay.  Thank you.
 6      BY MS. HAILESELASSIE:
 7          Q.   So before we went on break, I was marking
 8      what is going to be -- and I'll just say this for
 9      the first exhibit, we've got a great naming
10      convention here, it's GoogleYouTube Turner 1.  And
11      it is your notice of deposition.
12              (Whereupon, Deposition Exhibit 1
13              was marked for identification.)
14      BY MS. HAILESELASSIE:
15          Q.   Have you seen your deposition notice
16      before?
17          A.   Yes.
18          Q.   Okay.  And I -- I think other than the
19      start time, that all looks to be in order?
20          A.   Yes.
21          Q.   Okay.  Thank you.  And you can -- you can
22      put that aside.
23              I am going to have marked now Tab B.  This
24      is your CV from LinkedIn that was produced by the
25      attorneys for Google in this case.
```

Page 279

1            THE WITNESS:  So this is not a
2    comprehensive summary of the response from
3    executives.  We got quite a bit of support in
4    rapidly executing the project and on the fact that
5    it was launched.  In a review like this, there is a
6    word limit, and so this is a highly summarized
7    snippet that doesn't provide the full context on the
8    support from executives for this project.
9    BY MS. HAILESELASSIE:
10       Q.   Okay.  I just want to have you go back to
11   Exhibit 16.  Page 94, slide 94.
12            Begins "teen wellbeing is a huge problem."
13            Do you see the statistic 42 percent of
14   U.S. high school students said they felt
15   persistently sad or hopeless?
16       A.   I'm just looking to catch up with you.
17   Which deck are we looking in?
18       Q.   Exhibit 16, page -- slide 94.
19            Do you see that statistic?
20       A.   I'm -- I'm looking for the same page.
21   Give me just a second here.  Oh, yes.
22       Q.   And do you see also the quote (as read):
23                Teen girls who persistently
24            felt sad or hopeless increased
25            dramatically from 2011 to 2021

Page 280

1              jumping from 36 percent to

2              57 percent.

3         A.    I see these stats.

4         Q.    Okay.  Do you understand that period from

5    2011 to 2021 to be a period during which there was

6    widespread adoption of social media applications,

7    including YouTube?

8              MR. KRAMER:  Objection to form.

9              THE WITNESS:  So there's a couple of

10   points.  These are stats, as I mentioned.  We look

11   broadly to understand what's happening in the world

12   and make sure that we're proactively addressing

13   risks.  That doesn't mean that these are issues on

14   YouTube.  And second, YouTube is not a social media

15   app.  We don't have a social graph.  So I would not

16   put us in the bucket where there's social media

17   apps.

18   BY MS. HAILESELASSIE:

19        Q.    Do you agree that one of the primary

20   purposes of YouTube is to create communities around

21   video?

22             MR. KRAMER:  Objection to form.

23             THE WITNESS:  Our mission at YouTube is to

24   give users a voice and show them the world.  That's

25   our stated mission.

Page 291

1                      CERTIFICATE OF REPORTER
2               I, Kathleen A. Maltbie, Certified
3       Shorthand Reporter licensed in the State of
4       California, License No. 10068, the State of Nevada,
5       CCR 995, and the State of Texas, CSR 12212, hereby
6       certify that deponent was by me first duly sworn,
7       and the foregoing testimony was reported by me and
8       was thereafter transcribed with computer-aided
9       transcription; that the foregoing is a full,
10      complete, and true record of proceedings.
11              I further certify that I am not of counsel
12      or attorney for either or any of the parties in the
13      foregoing proceeding and caption named or in any way
14      interested in the outcome of the cause in said
15      caption.
16              The dismantling, unsealing, or unbinding
17      of the original transcript will render the
18      reporter's certificates null and void.
19              In witness whereof, I have hereunto set my
20      hand this day:
21      _____ Reading and Signing was requested.
        _____ Reading and Signing was waived.
22      ___x___ R┄                              ┄ested.
23      *Kathleen A. Wilkins*
        _____
24      KATHLEEN A. MALTBIE
        RPR-RMR-CRR-CCRR-CLR-CRC-RDR
25      California CSR 10068, Nevada CCR 995
        Texas CSR 12212

Page 291

                        CERTIFICATE OF REPORTER

1

2           I, Kathleen A. Maltbie, Certified

3    Shorthand Reporter licensed in the State of

4    California, License No. 10068, the State of Nevada,

5    CCR 995, and the State of Texas, CSR 12212, hereby

6    certify that deponent was by me first duly sworn,

7    and the foregoing testimony was reported by me and

8    was thereafter transcribed with computer-aided

9    transcription; that the foregoing is a full,

10   complete, and true record of proceedings.

11          I further certify that I am not of counsel

12   or attorney for either or any of the parties in the

13   foregoing proceeding and caption named or in any way

14   interested in the outcome of the cause in said

15   caption.

16          The dismantling, unsealing, or unbinding

17   of the original transcript will render the

18   reporter's certificates null and void.

19          In witness whereof, I have hereunto set my

20   hand this day:

21   _____ Reading and Signing was requested.

     _____ Reading and Signing was waived

22   ___x___ Re                              iested.

23          _Kathleen A. Wilkins_

            _____

24          KATHLEEN A. MALTBIE

            RPR-RMR-CRR-CCRR-CLR-CRC-RDR

25          California CSR 10068, Nevada CCR 995

            Texas CSR 12212