# AMENDED Exhibit 1003

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Page 1

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA

2

   ******************************
3   IN RE:   SOCIAL MEDIA ADOLESCENT   Case No.
4   ADDICTION/PERSONAL INJURY          4:22-MD-03047-YGR
5   PRODUCTS LIABILITY LITIGATION
6   ******************************
7   This Document Relates To:        MDL No. 3047
8
9   ALL ACTIONS
10  ******************************
11
12
13                 VIDEOTAPED DEPOSITION OF
14                     JOHN M. HARDING
15
16
17  Held At:          MORGAN LEWIS
                     One Market
18                   Spear Tower, 28th Floor
                     San Francisco, California
19
                     March 25th, 2025
20                        9:04 a.m.
21
22
23
24  Reported By:
25  MAUREEN O. POLLARD, CSR #14449, RDR

1                P R O C E E D I N G S

2

3            THE VIDEOGRAPHER:  We are now on the

4       record.  My name is Alejandro Zamora Ruiz,

5       I am the videographer for Golkow.

6            Today's date is March 25, 2025, and the

7       time is 9:04 a.m. Pacific Time.

8            This video deposition is being held at

9       Morgan Lewis at One Market Plaza, Spear

10      Tower, San Francisco, California 94105, in

11      the matter of In Re:  Social Media

12      Adolescent Addiction/Personal Injury

13      Products Litigation for the United States

14      District Court, Northern District of

15      California.

16            The deponent is John Harding.

17            Counsel will be noted on the

18      stenographic record.

19            And the court reporter will now

20      introduce themselves and swear in the

21      witness.

22            THE STENOGRAPHER:  My name is Maureen

23      Pollard, California CSR Number 14449.

24                    *    *    *

25            ///

Page 10

1    Whereupon,

2                    JOHN M. HARDING,

3    being first duly sworn to testify to the truth, the

4    whole truth, and nothing but the truth, was examined

5    and testified as follows:

6                         EXAMINATION

7    BY MR. DRAPER:

8            Q.    Good morning, Mr. Harding.

9            A.    Good morning.

10           Q.    My name is Glenn Draper, and I'm one of

11   the attorneys for the kids and families and school

12   districts and other local government agencies who

13   have brought claims against the social media

14   companies including YouTube.  I had a chance to

15   introduce myself before the deposition started.

16                    We're here in San Francisco today at

17   the offices of the Morgan Lewis law firm to take

18   your deposition.  You are appearing pursuant to a

19   notice of deposition that we will go ahead and mark

20   as YouTube-Harding Exhibit 1.

21                    (Whereupon, Google-YouTube-Harding-1

22                    was marked for identification.)

23   BY MR. DRAPER:

24           Q.    And I'll go ahead and hand it to you.

25   And we're going to look at it a little more in-depth

Page 11

1    in a minute, but it's my habit just to mark those
2    always as the first exhibit.
3                    So this deposition is being taken in
4    what's called an MDL, which stands for multidistrict
5    litigation, in federal court, and it will also be
6    used in what is called a JCCP, which stands for
7    Judicial Commission Coordinated Proceeding, in
8    California state court.  So you might hear me use
9    both those terms today, MDL and JCCP.  It's just the
10   way these cases are grouped together.  Okay?
11          A.    Okay.
12          Q.    Have you ever had your deposition taken
13   before?
14          A.    Yes.
15          Q.    And when?  When did you have it taken
16   before?
17          A.    It was quite some time ago, maybe 10,
18   15 years ago.
19          Q.    And was it a case that had to do with
20   your work at Google or YouTube?
21          A.    Yes.
22          Q.    And what was the context of the case?
23          A.    It was a patent lawsuit.
24          Q.    Patent lawsuit.  Okay.
25                    And is that the only deposition you've

Page 12

```
 1   given before today?
 2          A.    Yes.
 3          Q.    Ever testified in court before?
 4          A.    No.
 5          Q.    I'm sure your attorney has covered some
 6   of these rules for a deposition, but I just want to
 7   go over them again to make sure you have them in
 8   mind.  Okay?
 9          A.    Okay.
10          Q.    You've been sworn by the court
11   reporter, which means you're under oath.  You're
12   testifying just as though you were sitting in a
13   courtroom before a jury and a judge, right?
14          A.    Okay.
15          Q.    You understand that?
16          A.    Yes.
17          Q.    Okay.  And, in fact, you might hear me
18   or your attorney refer to the jury today even though
19   they're not physically present.  Okay?
20          A.    Okay.
21          Q.    And that's because the deposition is
22   being recorded -- you can see the video camera, I'm
23   sure -- and the video and the written transcript may
24   be presented later in court or used for any other
25   purposes authorized under state or Federal Rules of
```

```
                                              Page 13

 1    procedure and evidence.

 2                 Do you understand?

 3         A.    I do.

 4         Q.    Any questions about that?

 5         A.    Not right now.

 6         Q.    Okay.  It's important you answer my

 7    questions today verbally because the court reporter

 8    is taking down everything that we say, so if you nod

 9    or answer with something like uh-huh or uh-uh, it

10    doesn't really come through on transcript.

11                 Do you understand?

12         A.    I do.

13         Q.    Okay.  And it's really important that

14    we not talk over each other because it's hard for

15    the court reporter to take down two people talking

16    at once.  I'll do my best to let you complete your

17    answer before I ask the next question, and if you

18    could do your best to let me complete the question

19    before you begin your response, that will make sure

20    we have a clean transcript.

21                 Do you understand?

22         A.    I do.

23         Q.    Okay.  You're doing great so far.

24                 I'll tell you that I sometimes struggle

25    with this, so you can expect that we're going to
```

Page 14

1   have to stop and do it over again to make sure we

2   have a clean record where we're not talking over

3   each other.  It doesn't mean we're doing anything

4   wrong, it's not really a natural way to talk.  But,

5   you know, if I ask you to repeat an answer or to let

6   me make sure I finish an answer -- or finish a

7   question before you begin your response, I'm just

8   doing it to make sure we have a clean record.  All

9   right?

10         A.    Okay.

11         Q.    Okay.  If you don't understand my

12  question, just ask me to repeat it or rephrase it

13  and I will.  Okay?

14         A.    Okay.

15         Q.    You're represented by an attorney

16  today?

17         A.    Yes.

18         Q.    Lauren White, right?

19         A.    Yes.

20         Q.    Your attorney might have some

21  objections to some of my questions today.  Let her

22  complete the objection before you respond.  Most of

23  the time I think your attorney is going to tell you

24  to go ahead and answer the question despite the

25  objection, and that's so we can take the transcript

Page 15

1    to the Judge later, get a ruling on the objection.
2    If the objection is overruled, we don't have to come
3    back and ask the question, we already have the
4    answer.  If the objection is sustained, the Judge
5    will toss out the question and the response to it.
6    But it's just so the whole process goes faster.
7    Okay?
8            A.     Okay.
9            Q.     So there will be a few times today --
10   there may be a few times today where your lawyer
11   tells you not to answer the question, so that's
12   another reason to let her finish the objection
13   before you answer.  Okay?
14           A.     Okay.
15           Q.     There will be a few times today where
16   we're all talking at once and we'll have to stop and
17   do everything over sequentially, question,
18   objection, answer, happens most every deposition.
19                  Do you understand?
20           A.     I do.
21           Q.     You can take a break today when you
22   want.  I usually like to break about every
23   90 minutes.  If you want one sooner, just ask.  The
24   only rule is you have to answer the pending
25   question, right?

Page 16

1          Do you understand?

2     A.    I do.

3     Q.    Anything that would affect your memory

4  or ability to tell the truth today?

5     A.    No.

6     Q.    You haven't taken any medications that

7  might make it difficult to you -- or difficult for

8  you to concentrate or remember?

9     A.    No.

10    Q.    All right.  Got a good night sleep last

11 night?

12    A.    Yes.

13    Q.    Excellent.

14          Questions at all kind of before we

15 begin?

16    A.    No, not right now.

17    Q.    Okay.  So you're represented today by

18 Lauren White from the Wilson Sansoni firm, correct?

19    A.    Correct.

20    Q.    She also represents Google and YouTube.

21          You understand that?

22    A.    I do.

23    Q.    When did you find out we had requested

24 your deposition in this case?

25    A.    I believe it was five or six weeks ago.

                                              Page 17

1          Q.    Have you met with Ms. White who
2    represents Google and YouTube to prepare for the
3    deposition?
4               MS. WHITE:   You can answer that yes or
5          no.
6               THE WITNESS:   Yes.
7    BY MR. DRAPER:
8          Q.    I don't want to ask about the content
9    of any of your meetings with the attorneys, but I
10   want to ask a little bit about the circumstances of
11   those meetings.  Okay?
12         A.    Okay.
13         Q.    When was the first time you met with
14   the attorneys?
15         A.    Soon after I found out about the
16   deposition, about five or six weeks ago, I think.
17         Q.    Okay.  How many times have you met with
18   them?
19         A.    Four, I believe.
20         Q.    And about how long total would you say
21   that you've spent with them preparing for this
22   deposition?
23         A.    Approximately ten hours.
24         Q.    Okay.  All right.  So now we're going
25   to get to what we have marked as YouTube-Harding

Page 18

1    Exhibit 1.  This is the Notice of In-Person

2    Videotaped Deposition of John Harding.

3                Have you seen this document before?

4         A.    Let me take a look.

5         Q.    Sure.

6         A.    I don't believe I have.

7         Q.    Okay.  There is on page 2 a request

8    that you bring certain documents with you to the

9    deposition, and I'd like to go through those

10   document requests and see if you have any of those

11   documents with you even though you haven't seen the

12   notice.  Okay?

13        A.    Okay.

14        Q.    Are you there?  Do you see on the

15   bottom around line 21 at page 2 --

16        A.    I see this.

17        Q.    Right.

18              -- "Please Take Further Notice," and

19   then it has a list.

20        A.    Okay.

21        Q.    Okay.  Number 1 is, "All documents and

22   communications used to refresh the witness's

23   recollection."

24              When you were meeting with Ms. White or

25   other attorneys for Google and YouTube, did you

Page 19

```
 1   review any documents or communications?
 2              MS. WHITE:  You can answer that yes or
 3         no.
 4              THE WITNESS:  Yes.
 5   BY MR. DRAPER:
 6        Q.    Okay.  Did those documents or
 7   communications refresh your recollection about the
 8   events that were described in those documents or
 9   communications?
10        A.    No.
11        Q.    No.  Okay.
12              MR. DRAPER:  Have all of the -- and
13         this is directed to your attorney actually,
14         not to you.
15              Have all of the documents that the
16         witness reviewed been produced and marked
17         with a Google Bates stamp in this
18         litigation?
19              MS. WHITE:  They have.
20              MR. DRAPER:  Okay.
21   BY MR. DRAPER:
22        Q.    Okay.  Number 2, sir, is a copy of your
23   curriculum vitae.  And your attorneys forwarded us
24   yesterday a copy of your LinkedIn profile that has a
25   list of your professional history and
```

                                        Page 20

1    accomplishments.  So that will suffice for that one.

2                Number 3 is the employee custodial

3    file.

4                MR. DRAPER:  An, was that produced in

5         this case.

6                MS. TRUONG:  Yes.

7                MR. DRAPER:  Great.  We got it.

8    BY MR. DRAPER:

9         Q.    Did you make any notes to help you for

10   this deposition, sir?

11        A.    No.

12        Q.    Okay.  That takes care of number 5.

13              All right.  I don't want to ask about

14   any of the rest of them.

15              Okay.  Let me ask you a little bit

16   about your background, okay?  So you're currently

17   the vice president of engineering for YouTube Music

18   and YouTube Premium?

19        A.    That's correct.

20        Q.    Okay.  And who do you report to in that

21   role?

22        A.    Scott Silver.

23        Q.    Okay.  And you have had that position

24   since 2017?

25              MS. WHITE:  Objection.

Page 21

```
 1                 Is there a question?
 2                 MR. DRAPER:  Yes, that's a question.
 3   BY MR. DRAPER:
 4         Q.    Have you had that position since 2017?
 5         A.    Yes.
 6         Q.    All right.  Prior to that you were the
 7   vice president of engineering for emerging
 8   experiences at YouTube, right?
 9         A.    That's correct.
10         Q.    Okay.  You had that position from 2015
11   to 2017, correct?
12         A.    That's correct.
13         Q.    Okay.  And emerging experiences means
14   that you worked on the engineering for non-core
15   YouTube experiences, things like YouTube Living
16   Room, right?
17         A.    Correct.
18         Q.    YouTube Living Room is a version of
19   YouTube designed to be seen on a television and
20   watched similar to Netflix?
21         A.    That's correct.
22         Q.    Okay.  And you also worked on YouTube
23   Live which involves live broadcasts on YouTube?
24                 MS. WHITE:  Objection.  Is there a
25            question?
```

Page 22

```
 1              MR. DRAPER:  Yes, that's the question.
 2    BY MR. DRAPER:
 3         Q.    Did you work on YouTube Live which
 4    involves live broadcasts on YouTube?
 5         A.    Yes.
 6         Q.    Okay.  And you also worked on YouTube
 7    Gaming, correct?
 8         A.    Correct.
 9         Q.    And YouTube Music, correct?
10         A.    That's correct.
11         Q.    All right.  And you would agree with me
12    that music and gaming are two areas that are
13    critical for YouTube's efforts to attract young
14    users?
15              MS. WHITE:  Object to form.
16              THE WITNESS:  We view them as key
17          efforts for all of YouTube's users.
18    BY MR. DRAPER:
19         Q.    Okay.  And isn't it true that most of
20    the music and gaming users are on the younger side
21    at YouTube?
22              MS. WHITE:  Object to form.
23              THE WITNESS:  I don't actually have
24          that data in memory.
25              ///
```

Page 23

1    BY MR. DRAPER:

2          Q.    Okay.  All right.  Before you were vice

3    president of engineering for emerging experiences,

4    you were an engineering director at YouTube from

5    2010 to 2014, is that right?

6          A.    That's correct.

7          Q.    Okay.  And in that role you were part

8    of the core engineering team, right?

9          A.    That's correct.

10         Q.    Okay.  And you worked on things like

11   building out YouTube's infrastructure and

12   operations, video ingestion processing, streaming,

13   playback, data warehouse, that kind of thing, right?

14         A.    That's correct.

15         Q.    All right.  And before you were an

16   engineering director you were an engineering manager

17   at YouTube from 2007 to 2010, right?

18         A.    That's correct.

19         Q.    Okay.  The engineering manager position

20   at YouTube was your first job at YouTube, correct?

21         A.    That's correct.

22         Q.    All right.  And prior to that you were

23   a software engineer at Google from 2005 to 2007?

24         A.    That's correct.

25         Q.    All right.  And at Google, one of the

Page 24

1   things you worked on was the Google video player, is

2   that right?

3          A.    That's correct.

4          Q.    All right.  Okay.  That's your

5   background out of the way.  I want to ask you some

6   things about your day-to-day work at YouTube now.

7   All right?

8          A.    Okay.

9          Q.    What are the different ways you

10  communicate with your coworkers at YouTube?

11         A.    We use Gmail, we use Google Chat, we

12  talk in person, we use Google Meet for

13  videoconferencing, occasionally phone calls.  And

14  then we use documents like Google Docs, Google

15  Sheets, Google Slides.

16         Q.    Okay.  And I've seen in the documents

17  fairly often offsite meeting notes.  Is that kind of

18  a regular thing that's done at YouTube?

19              MS. WHITE:  Object to form.

20              THE WITNESS:  Teams will have, like,

21           offsite strategy meetings or fun events,

22           yes.

23  BY MR. DRAPER:

24         Q.    Okay.  All right.  Are you one of those

25  people who routinely cleans out their e-mail inbox?

Page 25

1          A.    What do you mean by "clean out"?

2          Q.    Well, there are some people -- I'm not

3    one of them, but there are some people who will

4    delete e-mails when they've read them or when they

5    think they no longer need them, and then there's

6    other people, I am one, who like never delete

7    anything and just let it sit.

8          A.    I don't delete my e-mails generally.  I

9    use Gmail's archive feature which keeps them but

10   removes them from my inbox.

11         Q.    Okay.  Do you have any form of auto

12   delete that applies to your e-mails, sir?

13         A.    I don't believe so.

14         Q.    Okay.  I've seen lots of Google slide

15   presentations in the YouTube documents.  Seems like

16   a pretty common way to present information to fellow

17   YouTube employees, right?

18         A.    Yes.

19         Q.    Do you keep a file of the Google slide

20   presentations you've worked on?

21              MS. WHITE:  Object to form.

22              THE WITNESS:  I don't keep a file.

23        Google Slides just has them all.

24   BY MR. DRAPER:

25         Q.    Okay.  All right.  Do you work on a

Page 26

1    laptop or a desktop?

2           A.    Primarily a laptop.

3           Q.    Okay.  And do you keep any work files,

4    e-mails, Google slide presentations stored locally

5    on your computer as opposed to stored in a larger

6    company-wide storage system?

7           A.    No.  I use the cloud storage.

8           Q.    So you mentioned Google Chats.  Is that

9    a common or uncommon feature that you use to

10   communicate with people at YouTube?

11          A.    It's fairly common.

12          Q.    All right.  I understand that Google

13   Chats has a setting, I think it's called "history

14   off," so that chats aren't saved for more than a

15   short period.

16                Do you understand that?

17          A.    I've heard of that feature.

18          Q.    Okay.  Do you know how it works?

19          A.    I do not.

20          Q.    Is it your habit to leave history on,

21   or do you usually have history off?

22          A.    I don't do any changes to the history

23   settings.

24          Q.    Okay.  Have you ever been asked by

25   anyone at YouTube to turn history off in a specific

```
                                              Page 27
 1   chat string?
 2          A.    I don't believe so.
 3          Q.    Do you have an official work phone
 4   provided to you by YouTube for your business
 5   purposes?
 6          A.    No.
 7          Q.    Do you have a personal phone?
 8          A.    I do.
 9          Q.    Do you ever use your personal phone to
10   communicate with other YouTube employees about work?
11          A.    Yes.
12          Q.    Do you text with other YouTube
13   employees about work from your personal phone?
14          A.    No.
15          Q.    So how do you communicate with them
16   from your personal phone?
17          A.    Voice calls.
18          Q.    Voice calls.  Okay.
19                Mr. Harding, do you agree that a
20   corporation should not release an application
21   designed for teens and younger kids without knowing
22   that the application is safe for them?
23                MS. WHITE:  Object to form.
24                THE WITNESS:  I think when we release
25           applications we try to balance the needs of
```

Page 40

1   founded, the founders knew they wanted to have a
2   video hosting site but they weren't sure exactly
3   what type of video hosting site it would be?
4               MS. WHITE:  Objection.  Lacks
5          foundation.
6               THE WITNESS:  I don't know what their
7          plans were when they founded it.
8   BY MR. DRAPER:
9          Q.   Did you know that they considered
10   having YouTube be a video dating site?
11               MS. WHITE:  Objection.  Lacks
12          foundation.
13               THE WITNESS:  I heard lots of different
14          stories about founding lore of the company.
15   BY MR. DRAPER:
16          Q.   Is that one of them?
17          A.   That is one of the stories.
18          Q.   Okay.  All right.  Would you agree with
19   me that in the time that you have been at YouTube
20   since 2007, growth, however it's been measured, has
21   been an important goal at YouTube.
22               MS. WHITE:  Objection to form.
23               THE WITNESS:  Growth of value is
24          probably the main thing we look at, are we
25          delivering value for the ecosystem.

Page 41

1    BY MR. DRAPER:

2         Q.    However it's measured, growth has been

3    an important goal at YouTube in the time you've been

4    there?

5              MS. WHITE:  Objection to form.

6    BY MR. DRAPER:

7         Q.    Correct?

8              MS. WHITE:  Objection to form.

9              THE WITNESS:  Growth of the value that

10         we're delivering through the product, yes.

11   BY MR. DRAPER:

12        Q.    I see.

13             When you were the engineering director

14   at YouTube from 2010 to 2014, one of your jobs was

15   to make sure that the YouTube infrastructure, the

16   equipment and software that makes YouTube run, video

17   ingestion, processing streaming, one of your jobs

18   was to make sure that infrastructure was capable of

19   handling the growth that was planned, right?

20             MS. WHITE:  Objection to form.

21             THE WITNESS:  That's correct.

22   BY MR. DRAPER:

23        Q.    All right.  From early on YouTube set

24   very ambitious goals for itself in terms of growth,

25   right?

Page 194

1    Q.    Okay.  And this document is an e-mail

2    from ▮▮▮▮▮▮▮ on behalf of ▮▮▮▮▮▮ at Google

3    to ▮▮▮▮▮ at Google.

4         Do you recognize any of those names?

5    A.    Yes.

6    Q.    And who are they, please?

7    A.    ▮▮▮▮▮▮ was a product manager.  I

8    don't -- I don't know what Kubrik is.  ▮▮▮▮▮▮,

9    the name is familiar, but I don't recall what he

10   did.

11   Q.    Okay.  All right.  And this is an

12   e-mail string dated June of 2012, correct?

13   A.    That's what it appears to be.

14   Q.    All right.  And if you look, sir, at

15   the bottom of the second page, ▮▮▮▮▮▮ is

16   described as the engineering manager for Player at

17   YouTube.

18        Do you see that?

19   A.    I do.

20   Q.    Do you recall that position?

21   A.    I recall that as a position.

22   Q.    Okay.  Do you agree that since this

23   document was found in your custodial file that it

24   was sent to you somehow?

25                MS. WHITE:  Objection.  Lacks

Page 195

```
 1            foundation.
 2                   THE WITNESS:  I don't know how things
 3            would end up in whatever custodial file it
 4            is.
 5   BY MR. DRAPER:
 6        Q.    All right.  Any reason to think that
 7   this document is not what it appears to be, an
 8   e-mail between coworkers at YouTube?
 9                   MS. WHITE:  Objection.  Lacks
10            foundation.
11                   THE WITNESS:  That's what it seems to
12            be.
13   BY MR. DRAPER:
14        Q.    All right.  If you look at the part of
15   the e-mail on the first page that was sent on
16   June 7, 2012 from ███████████, it's designated as
17   "Notes from iOS Creator App review."
18                   Do you see that?
19        A.    I do.
20        Q.    All right.  And then down below that it
21   says "Value prop."
22                   Do you see that?
23        A.    I do.
24        Q.    All right.  And the last item for Value
25   prop is, "Goal is not viewership, it's viewer
```

Page 196

1    addiction."

2                    Do you see that?

3            A.    I do.

4            Q.    Okay.  So you would agree with me that

5    at least ███████ had in mind to make the YouTube

6    application addictive as of June of 2012?

7                    MS. WHITE:  Objection.  Lacks

8            foundation, mischaracterizes the document.

9                    THE WITNESS:  I don't know what he had

10           in mind.  The context of this document is

11           about a video creation app, so that last

12           sentence doesn't even make sense because

13           the video creation app -- that's what

14           Kubrik was, Kubrik was a code name for our

15           video creation app that we built at one

16           time.  I don't know, that wasn't even built

17           for viewers, it was built for creators.

18   BY MR. DRAPER:

19           Q.    And was it going to be integrated into

20   the YouTube application?

21           A.    I don't think so.

22           Q.    Was it released separately ever?

23           A.    I'm not sure if it ever released.  I

24   think it did, but I'm not sure.

25           Q.    I'm sorry, you said you didn't know

Page 200

1  application every day?

2        MS. WHITE:  Objection.  Lacks

3     foundation.

4        THE WITNESS:  Again, I don't agree with

5        the framing of the question, but I still

6        don't know what warnings we do or don't

7        issue.

8  BY MR. DRAPER:

9     Q.   And did YouTube ever warn parents or

10  children that it had set out to create an addictive

11  application?

12        MS. WHITE:  Objection.  Lacks

13     foundation.

14        THE WITNESS:  Again, I don't agree with

15        the premise, and I don't know what warnings

16        we do or don't issue.

17  BY MR. DRAPER:

18     Q.   All right.  Do you agree with me, sir,

19  that by 2017 or 2018 addiction to social media was a

20  concern both inside and outside of YouTube?

21        MS. WHITE:  Objection.  Lacks

22     foundation.

23        THE WITNESS:  It's out of my area of

24        responsibility and so I wasn't tracking

25        when things would have been on radar.  We

Page 201

```
 1            don't typically think of YouTube as social
 2            media, we're a video distribution platform,
 3            so the framing wouldn't apply.  But maybe I
 4            misunderstood the question.
 5   BY MR. DRAPER:
 6            Q.    Why don't you think of YouTube as a
 7   social media platform?
 8            A.    We're primarily about creators
 9   distributing video to an audience.  It's not a
10   social interaction platform.  Again, it's video
11   distribution/consumption for creators to build
12   businesses on.
13            Q.    At one time YouTube had the ability to
14   send direct messages from user to user, correct?
15            MS. WHITE:  Objection.  Lacks
16            foundation.
17            THE WITNESS:  That is correct.
18   BY MR. DRAPER:
19            Q.    And that feature was created in hopes
20   of fostering communities and allowing people to
21   discuss privately videos that they were watching?
22            MS. WHITE:  Objection.  Lacks
23            foundation.
24            THE WITNESS:  I believe the direct
25            messaging existed before we bought YouTube,
```

Page 227

1          A.    I don't believe I have.

2          Q.    The next bullet point is for "Late

3    night use."

4                Do you see that?

5          A.    I do.

6          Q.    And it says, "7 percent of teens on

7    YouTube watch past midnight on school nights."

8                Correct?

9          A.    That is what's written here.

10          Q.    And when it talks about 7 percent of

11    teens on YouTube, it's talking about declared teens,

12    right?

13                MS. WHITE:  Objection.  Lacks

14          foundation.

15                THE WITNESS:  I'm not familiar with the

16          document, so I don't know how they're

17          determining that.

18    BY MR. DRAPER:

19          Q.    All right.  Are you familiar with the

20    distinction between declared teens and inferred

21    teens at YouTube?

22          A.    I've heard of the distinction, but I

23    don't understand the details of how they're defined.

24          Q.    You understand that a declared teen is

25    someone who would be a teenager according to the

Page 230

1                    Do you see that?

2          A.    I do.

3          Q.    All right.  And then the next bullet

4    point is "Unintentional use," and it says, "Among

5    users 18-24 years old, 23 percent report 'losing

6    track of time on YouTube.'"

7                    Do you see that?

8          A.    I do.

9          Q.    "20 percent report 'procrastinating on

10   YouTube.'"

11                   Do you see that?

12         A.    I do.

13         Q.    "And 20 percent report YouTube

14   'interfered with work, school, or homework.'"

15                   Correct?

16                   MS. WHITE:  Objection to form.

17              Mischaracterizes the document.

18                   THE WITNESS:  That's what's written

19              here.

20   BY MR. DRAPER:

21         Q.    All right.  And so at this time in

22   2017, 2018, YouTube's focus on digital wellbeing was

23   concentrated on these areas, habitual heavy use,

24   late night use, unintentional use.

25                   Do you agree?

Page 325

1          extend Watch Next."
2    BY MR. DRAPER:
3          Q.    Right.  I think we're talking about the
4    same thing.  Right?  Infinite scroll, it just never
5    stops?
6               MS. WHITE:  Objection.
7          Mischaracterizes testimony.
8               THE WITNESS:  It might be a nuance in
9          terms.  The way I understand this is
10         there's content available, it doesn't
11         scroll on its own, it's just you can keep
12         looking for more.
13   BY MR. DRAPER:
14         Q.    You just keep swiping, it's going to
15   keep showing up?
16              MS. WHITE:  Objection.
17         Mischaracterizes testimony.
18   BY MR. DRAPER:
19         Q.    Right?
20         A.    Again, not familiar with the feature,
21   but that sounds correct.
22         Q.    All right.  Okay.  I'm going to move on
23   to another document.
24              You would agree with me, sir, that
25   continued growth remains an important goal at

Page 326

1    YouTube even today?

2              MS. WHITE:  Objection.  Lacks

3         foundation.

4              THE WITNESS:  Continuing growth of user

5         value, creator value, business value, yes.

6    BY MR. DRAPER:

7         Q.    Right.

8              And part of that goal is continuing to

9    refine the recommendation system for YouTube?

10             MS. WHITE:  Objection.  Lacks

11        foundation, vague.

12             THE WITNESS:  Improving our

13        recommendations is one way we hope to

14        deliver more value for all of those users.

15   BY MR. DRAPER:

16        Q.    And that includes pushing out the time

17   horizon that YouTube can predict with its algorithm?

18             MS. WHITE:  Objection.  Lacks

19        foundation, vague.

20             THE WITNESS:  I'm not sure what you

21        mean.

22   BY MR. DRAPER:

23        Q.    All right.  Well, let's look at a

24   document, then.  This would be 6768.

25             ///

Page 333

1    drive watch time?

2                MS. WHITE:  Objection.

3           Mischaracterizes the document, lacks

4           foundation.

5                THE WITNESS:  I didn't write this, so

6           I'm not sure, but when we talk about

7           predicting, the model would not be

8           necessarily trying to affect future

9           actions, this would be trying to predict

10          what user actions they would take.

11   BY MR. DRAPER:

12          Q.   Right.  Well, that's how the

13   recommendations model works, right?  It estimates if

14   I show -- "I" being YouTube, right -- if YouTube

15   shows the user this video, there is an estimate of

16   how long that user will remain on the platform, will

17   remain consuming YouTube videos, right?  That's what

18   the recommendation does, it's a giant prediction

19   engine?

20               MS. WHITE:  Objection.  Lacks

21          foundation.

22               THE WITNESS:  It is making predictions

23          of a number of different possible outcomes.

24          This talks about user actions and

25          satisfaction and valued watch time.

Page 334

1    BY MR. DRAPER:
2           Q.    Right.
3           A.    So my read of this is that it is trying
4    to predict what will happen over a longer time
5    period.
6           Q.    Exactly.
7                 Doesn't that kind of scare you a bit --
8                 MS. WHITE:   Object --
9    BY MR. DRAPER:
10          Q.    -- that the recommendation system is
11   going to get so good that it's going to be able to
12   not only predict what we're going to do in the
13   short-term, but now it's going to start predicting
14   what we're going to do in the longer term, even days
15   ahead?
16                MS. WHITE:   Objection.   Lacks
17          foundation.
18                THE WITNESS:   We're always trying to
19          improve our machine learning models to
20          better understand what users will value,
21          and so being able to take a longer time
22          horizon for a user I think allows us to
23          better understand what they will value.
24   BY MR. DRAPER:
25          Q.    Have you heard that the goal behind

Page 335

1  every view at YouTube is to drive long-term watch
2  time, long-term engagement?  Have you ever heard
3  that?
4         A.    Not that.  I've heard the goal to drive
5  long-term value.
6         Q.    And the goal of the recommendation
7  system is not only to predict what will happen, but
8  to influence what will happen by showing you
9  particular videos that are going to cause you to do
10 certain things?
11              MS. WHITE:  Objection.  Lacks
12         foundation.
13              THE WITNESS:  ██████████████████
   ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████      ████████████████
   ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████
20 BY MR. DRAPER:
21         Q.    I think I understand that.
22              Okay.  Another topic.
23              YouTube Shorts is a feature that
24 YouTube released in 2020, correct?
25         A.    I don't recall exactly when it

Page 350

1                CERTIFICATE OF COURT REPORTER

2

3            I, MAUREEN O'CONNOR POLLARD,

4        Registered Diplomate Reporter, CSR No.

5        14449 for the State of California, the

6        officer before whom the foregoing

7        deposition was taken, do hereby certify

8        that the foregoing transcript is a true

9        and correct record of the testimony

10       given; that said testimony was taken by

11       me stenographically and thereafter

12       reduced to typewriting under my

13       direction; and that I am neither

14       counsel for, related to, nor employed

15       by any of the parties to this case and

16       have no interest, financial or

17       otherwise, in its outcome.

18            Dated this 4th day of April, 2025.

19                    _Maureen O. Pollard_

20       _____

21       MAUREEN O'CONNOR POLLARD

22       CSR No. 14449

23

24

25