# AMENDED Exhibit 7

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Confidential - Pursuant to Protective Order

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT          )   MDL Number:
ADDICTION/PERSONAL INJURY PRODUCTS      )   4:22-MD-3047-YGR
LIABILITY LITIGATION                    )
_____)

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING                 )
SPECIAL TITLE [RULE 3.400]              )
SOCIAL MEDIA CASES                      ) Lead Case No. for
                                        ) Filing Purposes
_____) 22STCV21355
                                        )
This Document Relates to:               )
                                        )
STATE OF TENNESSEE,                     )
ex rel. JONATHAN SKRMETTI,              )
ATTORNEY GENERAL and REPORTER,          )
v.                                      )
META PLATFORMS, INC., and               )
INSTAGRAM, LLC,                         )
Case No. 23-1364-IV                     )
_____)

Confidential - Pursuant to Protective Order
VIDEOTAPED DEPOSITION of
DARIUS KILSTEIN, VOLUME I
Palo Alto, California
December 17, 2024

Pages 1 - 427
JENNY L. GRIFFIN, CSR No. 3969 - RMR, CRR, CCRR, CRC

Confidential - Pursuant to Protective Order

43

1    exhibit for you and your counsel.

2         I think in most instances it's going to be

3    easiest for you to look at the screen, but you will

4    also have a paper copy if you need it.  Some of the

5    documents are just lengthy, and the tech will be

6    able to get to the reference or the page or slide

7    faster than you flipping through the pages.

8              MR. SCHMIDT:  You're marking this as 0?

9              MS. GOTWALS:  It was Tab 0.  It's going to

10   be marked as Meta-Kilstein-1.

11             MR. SCHMIDT:  Okay.

12             (Exhibit 1 was marked for

13              identification and is attached to the

14              transcript.)

15   BY MS. GOTWALS:

16       Q.   So if at any time you're unclear about

17   where we are in an exhibit, please let me know.  As

18   I said, it might be easier to do it on the screen

19   when it comes to some exhibits with multiple pages.

20       A.   Sure.

21       Q.   Do you recognize this document in front of

22   you?

23       A.   Yes.

24       Q.   Can you tell me what it is?

25       A.   It's my LinkedIn profile.

Confidential - Pursuant to Protective Order

44

1    Q.    Does it appear to be a true and accurate

2    representation of your LinkedIn profile?

3    A.    Yes.

4    Q.    And you authored this LinkedIn profile,

5    correct?

6    A.    That's correct.

7    Q.    So this LinkedIn profile shows that you are

8    a director in data science at Instagram; is that

9    right?

10    A.    That's correct.

11    Q.    And that's actually -- the parent company

12    is Meta?

13    A.    That's correct.

14    Q.    Have you always been a director at Meta?

15    A.    No.

16    Q.    What other positions have you held?

17    A.    I joined as a data science manager, and I

18    did that for about -- oh, I can't tell you exactly,

19    but somewhere between three and four years, at which

20    point I was promoted to director.

21    Q.    What's the difference between manager and

22    director?

23    A.    Not too much.  It's more just the internal

24    levels they give to people based on your performance

25    and how you're doing.  But, in general, the tasks

Confidential - Pursuant to Protective Order

1    and responsibilities were similar.

2        Q.    Did it have a greater span of control?

3        A.    No.

4        Q.    Same number of employees worked for you?

5        A.    Yes.

6        Q.    Did you just receive the one promotion?

7        A.    I've had two promotions, but the first one

8    was within manager.  So I was a data science

9    manager, Level VI, then promoted to data science

10   manager, Level VII, and then promoted to director.

11       Q.    Thank you.

12             So prior to Meta you worked for SoundCloud

13   for four years; right?

14       A.    That's correct.

15       Q.    So can we look -- scroll down, thank you.

16             It's easier on the screen.  It might be a

17   little bit bigger there.  Let's get the description

18   you provided under your SoundCloud employment.

19   Looking down at that third bullet, you describe

20   yourself as a "growth hacking extraordinaire."

21             Did I read that correctly?

22       A.    I see that.

23       Q.    And the fourth bullet you wrote:

24                  "Beacon and evangelist for

25                  data-informed decision-making."

Confidential - Pursuant to Protective Order

46

1              Did I read that correctly?

2      A.    That's correct.

3      Q.    So is it fair to say that data and metrics

4    are important to your job at Meta?

5      A.    Yes.

6            MS. GOTWALS:  Speaking of your job at Meta,

7    can we pull up previously marked Tab 1.  And we will

8    mark this as Meta-Kilstein-2.

9            (Exhibit 2 was marked for

10               identification and is attached to the

11               transcript.)

12   BY MS. GOTWALS:

13     Q.    While they get the paper exhibit, if you

14   would look at the screen, do you recognize this

15   organizational chart?

16           MR. SCHMIDT:  I need to get the document,

17   please.

18           Thank you.

19           THE WITNESS:  Yes, I see it.

20   BY MS. GOTWALS:

21     Q.    Do you recognize it?

22     A.    Yes.

23     Q.    So I'll represent to you that this was

24   produced to us by Meta's lawyer from your custodial

25   files.

Confidential - Pursuant to Protective Order

47

1           Do you have any reason to dispute that?

2      A.   No.

3      Q.   Did you receive this presentation, this

4  organizational chart, as an employee for Meta doing

5  Meta's business?

6      A.   I believe I received this at some point,

7  yes.

8      Q.   And you have no reason to believe the

9  content of this presentation in front of you was in

10  any way altered from how it appeared in your

11  custodial files?

12      A.   I don't see anything that looks off.

13           MS. GOTWALS:  Thank you.

14           MR. SCHMIDT:  May I just ask.  Do you know

15  why there's no Bates stamp on this?  Was this a

16  native document?

17           MS. GOTWALS:  It was.  We can get you a

18  Bates number if you need it.

19           MR. SCHMIDT:  Yeah, I need it.

20           MS. GOTWALS:  The Bates number for this

21  document is META3047MDL-047-00579249.

22           MR. SCHMIDT:  Thank you.

23           MR. PHELPS:  And, Paul, we'll -- I think we

24  have an agreement afterwards to coordinate Bates

25  stamps in the relevant actions as needed.

Confidential - Pursuant to Protective Order

48

1          MR. SCHMIDT:  Yeah.

2   BY MS. GOTWALS:

3     Q.   So looking at the first slide here on the

4   front, is that a current representation of the

5   leadership staffing in data science?

6     A.   No.  Not current.

7     Q.   How has it changed?

8     A.   This here was a representation of one

9   specific product group within Instagram, the

10  communities product group.  That has since

11  disbanded.  That was about -- it disbanded about

12  nine months ago.  My role has changed since.

13    Q.   So who -- to whom do you report now?

14    A.   █████████████████████████████

15    Q.   And for how long did you report to █████

16  ███████████?  Am I saying that correctly?

17    A.   You got that right.  Yes.  I would say

18  approximately three years.  I can't tell you for

19  certain.

20    Q.   Let's move to the third slide or the third

21  page in the exhibit there.

22         So notwithstanding that the communities

23  group was disbanded, is this a current

24  representation of the ecosystems group?

25    A.   No.

Confidential - Pursuant to Protective Order

49

1       Q.   How is it different?

2       A.   The ecosystems team was also disbanded.

3       Q.   Okay.  Do the names listed below you here

4   still report to you?

5       A.   No.  I currently have no reports.

6       Q.   How long has that been the case?

7       A.   About nine months now.

8       Q.   So what are you currently doing at Meta?

9       A.   I transferred back to individual

10  contributor, which means I just do data analysis.  I

11  am situated in the Instagram Home product group, but

12  I don't focus on any specific thing.  I just jump

13  around to different areas based on what's required.

14      Q.   You still hold the title of director?

15      A.   Yes.

16           MS. GOTWALS:  Let's talk a little bit about

17  the nature of the work you have done for Meta.

18           Lance, could you pull up previously marked

19  Tab 2?  We will mark this exhibit Meta-Kilstein-3.

20           (Exhibit 3 was marked for

21            identification and is attached to the

22            transcript.)

23  BY MS. GOTWALS:

24      Q.   So, once again, I'll represent to you that

25  this was produced to us by lawyers from Meta from

Confidential - Pursuant to Protective Order

50

1    your custodial files.

2            Do you have any reason to dispute that?

3        A.    Just give me a moment to quickly review.

4        Q.    Of course.

5        A.    Okay.  So what was the question?

6        Q.    The question was if I represent to you that

7    this was produced from Meta's files by its lawyers

8    from your custodial files, do you have any reason to

9    dispute that?

10       A.    No.

11       Q.    So is this a series of emails from

12   September 2021?

13       A.    Yes.

14       Q.    And you sent and received these emails via

15   your company email address?

16       A.    That's correct.

17       Q.    That's ███████████████?

18       A.    Yes.

19       Q.    And you sent and received these emails as a

20   regular part of your job for Meta?

21       A.    Correct.

22       Q.    Doing Meta's business?

23       A.    Yes.

24       Q.    And it's a regular practice of business of

25   Meta to send and receive emails?

Confidential - Pursuant to Protective Order

51

1      A.    That's correct.

2      Q.    So looking at just the very top email

3   there, it looks like it's an email from Pavni

4   Diwanji on September 10th, 2021?

5      A.    That's one that I sent to her.

6      Q.    I'm sorry.  Yes.  An email from you to

7   Pavni Diwanji on September 10th?

8      A.    That's correct.

9      Q.    Who is Pavni Diwanji?

10     A.    She was a -- I believe VP of product at the

11   time, leading some of the work on youth for

12   Instagram.

13     Q.    Okay.  Is she still at Meta?

14     A.    I don't believe so.

15         MS. GOTWALS:  Lance, if you could pull out

16   the third and fourth paragraphs on the screen for

17   him here starting with "I manage."

18   BY MS. GOTWALS:

19     Q.    Here you state:

20            "I manage the ecosystem pillar for

21            IG which is basically an understand

22            pillar (DS(5), UXR(2), DE(3), TPM(1).

23            I've hired very senior people across

24            most functions.  So it's basically like

25            a bit of a special ops team.  I'm a DS

Confidential - Pursuant to Protective Order

52

1               manager by trade, but acting as a PM

2               for the pillar as well."

3                    Did I read that correctly?

4       A.    Yes.

5       Q.    So let's straighten out a few acronyms

6    here.  DS, is that data science?

7       A.    That's correct.

8       Q.    And UXR?

9       A.    User research.

10      Q.    DE?

11      A.    Data engineers.

12      Q.    And TPM?

13      A.    Technical product manager.

14      Q.    So does that mean that the PM in the last

15   sentence is product manager as well?

16      A.    Correct.

17      Q.    You then state:

18               "The way I run the pillar is to

19               pick what I think the biggest questions

20               are for IG and focus on them.  Since

21               inception of the pillar, for me, it's

22               been teen engagement.  And a lot of

23               what we do is basically trying to

24               understand what we should do to help

25               those users (e.g., we put Direct on the

Confidential - Pursuant to Protective Order

53

1              map last half and have many other balls

2              in the air.)  I'm also leading the

3              close friends workstream from a DS POV

4              and have people on the ground in

5              entertainment, DS."

6                   Did I read that correctly?

7      A.    Yes.

8      Q.    So, again, DS is the data science.  IG is

9  Instagram?

10     A.    Correct.

11     Q.    POV meaning point of view?

12     A.    Yes.

13     Q.    So is this an accurate description of what

14  you did for the ecosystems pillar?

15     A.    Yeah.

16     Q.    And, again, you're not doing this anymore;

17  is that right?

18     A.    That's correct.

19     Q.    As part of your work for Meta, were you

20  subjected to regular job performance reviews?

21     A.    Yes.

22     Q.    Were they called PSCs?

23     A.    Yes.

24     Q.    And those reviews were interactive; right?

25     A.    What do you mean by "interactive"?

Confidential - Pursuant to Protective Order

54

1      Q.   Well, there was a self-evaluative process
2  incorporated?
3      A.   That's correct.
4      Q.   In 2019, would you have gone through that
5  review process with ██████████?
6      A.   I can't remember exact dates, but probably.
7           MS. GOTWALS:  Okay.  Well, we'll pull up an
8  exhibit.
9           Can you pull up previously marked Tab 3.
10  And this one we will mark as Meta-Kilstein-4.
11           (Exhibit 4 was marked for
12           identification and is attached to the
13           transcript.)
14  BY MS. GOTWALS:
15      Q.   I'll represent to you again that this was
16  produced to us by Meta's lawyers from your custodial
17  files.
18           Do you have any reason to dispute that?
19      A.   I'm just taking a quick second to read the
20  document.
21           MR. SCHMIDT:  While he's doing that, would
22  you mind just reading the Bates into the record.
23           MS. GOTWALS:  Yes.  The Bates number for
24  this document is META3047MDL-020-00535032.
25           MR. SCHMIDT:  Thank you.

Confidential - Pursuant to Protective Order

55

1              THE WITNESS:  Okay.

2    BY MS. GOTWALS:

3        Q.    The question pending is do you have any

4    reason to dispute that this is from your custodial

5    files?

6        A.    No.

7        Q.    Do you recognize this spreadsheet?

8        A.    Yeah.  It's a long time ago.  Yeah.

9        Q.    Can you tell us what it is?

10       A.    It looks like some -- it looks like we were

11   looking at the different areas of what it would mean

12   to operate at a different level at Instagram and,

13   basically, trying to ascertain how well I'm doing

14   under each of the important -- I don't know how to

15   say it, but each of the important things that we

16   look for in data science.

17             MR. SCHMIDT:  I'll just note for the

18   record, I suspect because this is produced as a

19   spreadsheet, it looks like there's a lot of text cut

20   out of the printout.  So we don't have the full text

21   of the document.

22             MS. GOTWALS:  Okay.

23             Can you show me a copy of the printed

24   exhibit.

25             Okay.  If you wouldn't mind, we'll review

Confidential - Pursuant to Protective Order

1    on the screen and then I'll make sure that you get

2    printed copies with the full text for purposes of

3    the exhibit.  We'll need to reproduce it with the

4    full text for the court reporter as well.

5              MR. SCHMIDT:  Okay.  And, obviously, we'll

6    just reserve rights about it, but understood.

7              MS. GOTWALS:  Thank you.  I appreciate

8    that.

9    BY MS. GOTWALS:

10        Q.    Did you receive and author portions of this

11   spreadsheet as an employee of Meta doing Meta's

12   business?

13        A.    It looks like it.

14        Q.    And you have no reason to believe the

15   contents of this spreadsheet in front of you were in

16   any way altered?

17             MR. SCHMIDT:  Objection.  Foundation.

18             THE WITNESS:  I couldn't tell you.

19   BY MS. GOTWALS:

20        Q.    So looking at the spreadsheet, it says on

21   the far left -- and if you want to look here on the

22   screen so we can get the full text -- it looks like

23   on the left we've got job expectations.

24             Is that fair?

25        A.    Yes.

Confidential - Pursuant to Protective Order

57

1      Q.   And then the fourth column, which is

2   Column D that has your name under it, ██████, that

3   would be where you put your comments in; right?

4      A.   Yes.

5      Q.   Okay.  So you're evaluating your own

6   work product in that column; is that right?

7      A.   That's correct.

8      Q.   So let's look at the second box in that

9   column.

10         MS. GOTWALS:  And if -- Lance, if you could

11   expand that -- it's a Box D-3.  Expand that for him

12   so he can see all the text.

13   BY MS. GOTWALS:

14      Q.   And, actually, I think, if you look at the

15   part at the top, you can also read it.  It says:

16             "Alongside ██████, I define a huge

17         part of growth's overall product

18         strategy as well as write and present a

19         large portion of our H plan to M Team."

20             Did I read that correctly?

21      A.   Yes.

22      Q.   What is the H plan?

23      A.   The half plan.  So the things that we were

24   planning to do in the upcoming half.

25      Q.   Of the year?

Confidential - Pursuant to Protective Order

58

1      A.    Yes.

2      Q.    What is the M Team?

3      A.    Management team.

4      Q.    So since at least 2019, you were leading

5  efforts at Meta in growth and metrics; is that

6  correct?

7      A.    In 2019 I was data science manager for the

8  Growth Pillar.

9      Q.    And did working in the Growth Pillar

10 involve looking at metrics?

11     A.    Yes.

12           MS. GOTWALS:  Lance, if you could pull up

13 previously marked Tab 4.  And we'll mark this one as

14 Meta-Kilstein-5.

15           (Exhibit 5 was marked for

16            identification and is attached to the

17            transcript.)

18 BY MS. GOTWALS:

19     Q.    Once again, I'll represent to you this was

20 produced to us by Meta's lawyers and it came from

21 your custodial files.

22           Do you have any reason to dispute that?

23     A.    No.

24     Q.    Do you recognize this document?

25     A.    Yes.

59

1    Q.   This is another performance review;

2 correct?

3    A.   That's correct.

4    Q.   And "2021 H1" means it's from the first

5 half of 2021?

6    A.   Yes.

7    Q.   And who was your supervisor that would have

8 provided this review in 2021?

9    A.   This would be ██████████.

10    Q.   So if we can look down on the first page

11 there under detailed feedback, call out that first

12 paragraph, Lance, the first bullet there.

13       It says:

14         "Strategic impact.  Darius helped

15        IG leads (and other app leads) realize

16        just how important Direct is for

17        US teens cementing the need to drive

18        value for teens in H2 and to create a

19        Private Sharing pillar within Sharing

20        Experiences.  Additionally, Darius'

21        work helped push this into the topline

22        goal for IG."

23       Did I read that correctly?

24    A.   Yes.

25    Q.   What is "Direct"?

Confidential - Pursuant to Protective Order

60

1      A.   Direct is the messaging portion of the
2  Instagram app.
3      Q.   And what is a topline goal?
4      A.   A topline goal is a goal that the company
5  takes on in a half.
6      Q.   So based on your work, Meta elevated a
7  Private Sharing pillar within Sharing Experiences to
8  a topline goal?
9      A.   You would have to ask them exactly why they
10  did it, but I suspect that my work informed that
11  decision.
12          MS. GOTWALS:  Okay.  You can take down the
13  callout.  Can we go down three-quarters down to the
14  second page, actually.
15          Let's actually start where it says
16  "strategic impact."
17  BY MS. GOTWALS:
18      Q.   This says:
19              "Strategic impact.  Darius
20              proactively led the effort across the
21              family, looking at whether we have an
22              age-up or engagement problem for teens
23              and young adults across Instagram and
24              Facebook.
25              "This presentation motivated app

Confidential - Pursuant to Protective Order

61

1          leads, including Cox, to initiate a

2          major workstream within Facebook to

3          help people age-up from Instagram to

4          Facebook; e.g., Tom Allison sent an

5          email triggering these workstreams.

6          three days after the presentation to

7          app leads.  Alex Schultz called the

8          study out at the CP All Hands as the

9          work that everyone should read."

10              Did I read that correctly?

11     A.   Yes.

12     Q.   Who is Cox?

13     A.   That's Chris Cox.  He's our VP of product

14  at Meta.

15     Q.   VP of product?

16     A.   I believe so.

17     Q.   Who is Alex Schultz?

18     A.   He is the head of marketing and analytics

19  for Meta.

20     Q.   Is he also a vice president?

21     A.   I believe so.

22     Q.   Who is Tom Allison?

23     A.   He is the CEO of Facebook app.

24     Q.   Do you believe that this is an accurate

25  description of your strategic impact at Meta as part

Confidential - Pursuant to Protective Order

62

1    of your job?

2        A.    I suspect that my work did have an

3    influence on these people.  So, yeah.

4            MS. GOTWALS:  Okay.  Can we take down this

5    callout, and if we scroll down this page

6    three-quarters of the way to the bullet that says

7    "Elevating product impact" and just call out that

8    bullet, please.

9    BY MS. GOTWALS:

10       Q.    This says:

11               "Elevating product impact.  Darius

12               acted as the central POC between the

13               CPP org and IG and informed

14               prioritization and leadership buy-in

15               for age models, closeness measurement

16               and people accounting."

17               Did I read that correctly?

18       A.    Yes.

19       Q.    So POC is point of contact; right?

20       A.    Correct.

21       Q.    What is the CPP org?

22       A.    Central platform.  I'm not sure what the

23    last P stands for.

24       Q.    What is it?

25       A.    It's a large product group within Meta.

Confidential - Pursuant to Protective Order

63

1    They own a lot of different things.  I couldn't tell

2    you all the things they own, but my work with them

3    was mainly around the different models that they

4    created -- age, closeness, and people models --

5    that Instagram used for analytics.

6        Q.   We will talk a little bit more about those

7    models later, but do you believe that this is an

8    accurate description of how you elevated product

9    impact at Meta?

10       A.   I'm not really sure why they say "elevated

11   product impact," but I think the statement is

12   correct, that I acted as a central POC between the

13   CPP org and Instagram on those three specific

14   models.

15           MS. GOTWALS:  Thank you.

16           Lance, can you pull up previously marked

17   Tab 5, please.  We'll mark this one as

18   Meta-Kilstein-6.

19           (Exhibit 6 was marked for

20           identification and is attached to the

21           transcript.)

22   BY MS. GOTWALS:

23       Q.   I'll represent to you that this was

24   produced to us by Meta's lawyers from your custodial

25   files.

Confidential - Pursuant to Protective Order

1              Do you have any reason to dispute that?

2      A.    No.

3      Q.    Do you recognize this document?

4      A.    Yes.

5      Q.    This is a summary of a PSC; is that right?

6      A.    That's correct.

7      Q.    For the second half of 2021?

8      A.    That's correct.

9      Q.    This review and this summary here were

10  provided by ███ as well?

11     A.    That's correct.

12     Q.    So we'll start reading at about the middle

13  of the paragraph here.  It states:

14              "Your initiative to make sense of

15              teen data revealed one of the most

16              alarming trends facing Instagram to

17              date, teen DAU decline.  Further, your

18              and ███' clear early diagnosis that

19              the decline is caused by teen PMF

20              pivoted the entire connections pillar

21              strategy and reinforced IG's strategy

22              of being a teen-first app."

23              Did I read that correctly?

24     A.    Yes.

25     Q.    Do you believe that was an accurate

Confidential - Pursuant to Protective Order

65

1    description of your role and impact in Meta?

2        A.    Yes.

3        Q.    And DAU, that's daily active users; right?

4        A.    That's correct.

5        Q.    PMF is product market fit?

6        A.    That's correct.

7              MS. GOTWALS:  Lance, can you pull up

8    previously marked Tab 6.  And we'll mark this one as

9    Meta-Kilstein-7.

10              (Exhibit 7 was marked for

11              identification and is attached to the

12              transcript.)

13              THE WITNESS:  That screen is different to

14    the document.

15              MS. GOTWALS:  Okay.  The document is the --

16              MR. PHELPS:  Why don't you put that one to

17    the side, and we're going to redistribute that in a

18    second.  Let's just mark that as --

19              (Brief discussion held off the

20              stenographic record.)

21              MS. GOTWALS:  The Bates number of

22    Meta-Kilstein-7 is META3047MDL-046-00286948.

23              MR. SCHMIDT:  Thanks.

24    BY MS. GOTWALS:

25        Q.    Do you recognize this document?

Confidential - Pursuant to Protective Order

1      A.   Yes.

2      Q.   If I represent to you that it was produced

3  to us by Meta's lawyers from your custodial files,

4  do you have any reason to dispute that?

5      A.   No.

6      Q.   This is another performance review;

7  correct?

8      A.   That's correct.  This is a mid-cycle review

9  so it's sort of a check-in before the actual

10 performance review.

11     Q.   And that's mid-cycle 2023?

12     A.   Yes.  I couldn't tell you if this was H1 or

13 H2.

14     Q.   Would this have been provided by ██████?

15     A.   Yes.

16     Q.   So let's read starting at the top.  It

17 says:

18          "Hi, Darius.  You've hit a major

19          milestone in your career.  You are now

20          leading one of IG's company priorities

21          as well as you are the face for IG's

22          Number 1 objective" -- and we'll skip

23          the hyperlink.

24          "Our Number 1 objective remains

25          turning around developed markets teen

Confidential - Pursuant to Protective Order

67

1               DAU and MAU trends and getting on a

2               path to be the first-choice app for

3               teens."

4                   Did I read that correctly?

5       A.    Yes.

6       Q.    Do you believe this is an accurate

7   description of your role and impact at Meta in 2023?

8       A.    Not exactly.  I think it's a little bit

9   overflattering.  I wouldn't say that I was leading

10  the company priority or the face of the Number 1

11  objective.

12      Q.    Did you disagree with that statement at the

13  time?

14      A.    Yes.

15      Q.    How would you describe your role in

16  Instagram mid-cycle 2023?

17      A.    I was involved leading the data science

18  portion of the work for the number one objective at

19  the time, which was trying to turn around the

20  developed market's teen-down metrics.  I was more

21  focused on the data science.

22      Q.    I see.  So would it be safe to say, based

23  on these performance reviews, that you were one of

24  the top contributors on growth and metrics as it

25  relates to Instagram and teens?

Confidential - Pursuant to Protective Order

68

1      A.    I think --

2            MR. SCHMIDT:  Objection.  Foundation.

3            THE WITNESS:  I'd say at this point in

4   time, I was leading the data science work on teens

5   and growth.

6   BY MS. GOTWALS:

7      Q.    So let's talk a little bit about metrics,

8   then.

9            On your LinkedIn profile you described

10  yourself as a beacon and evangelist for

11  data-informed decision-making; right?

12     A.    That's correct.

13     Q.    And your work at Meta involves

14  data-informed decision-making; right?

15     A.    That's correct.

16     Q.    So Meta tracked some metrics internally on

17  the performance of its Instagram app; correct?

18     A.    Yes.

19     Q.    So let's start by just looking at some of

20  the metrics that Meta tracked.

21           Are you familiar with the term "IG

22  criticals"?

23     A.    Yes.

24     Q.    What are IG criticals?

25     A.    It's a list of the sort of top metrics that

Confidential - Pursuant to Protective Order

203

1      Q.    When did you first hear internally that
2  Meta was considering defaulting teen accounts to
3  private at sign-up?
4      A.    I don't recall the exact date.
5            MS. GOTWALS:  Can we pull up Tab 44,
6  please.  And we will mark this as Exhibit 29.
7            (Exhibit 29 was marked for
8            identification and is attached to the
9            transcript.)
10 BY MS. GOTWALS:
11     Q.    I'll represent to you this was produced to
12 us by Meta's lawyers and came from your custodial
13 files.
14            Do you have any reason to dispute that?
15     A.    No.
16     Q.    This is a chat between you and ████████
17 and ████████████████?
18     A.    Yes.
19     Q.    Is that correct?
20     A.    That's correct.
21     Q.    And it's August 2019; right?
22     A.    Yes.
23     Q.    Who is ████████████████?
24     A.    She was a design lead for growth at the
25 time on Instagram.

Confidential - Pursuant to Protective Order

1     Q.  And in August of 2019 were you still with

2  the Growth Pillar?

3     A.  Yes.

4     Q.  And who is ███████████?

5     A.  He was a product manager for Instagram

6  growth at the time.

7     Q.  Okay.  So let's read -- at the top here it

8  says -- ██████ says:

9         "I just caught up with ██████████,

10         and he forgot to give us some relevant

11         feedback in the morning review around

12         private accounts.  It seems that in the

13         Tuesday review for well-being, Adam and

14         ████████ both pushed on us, starting to

15         move towards creating accounts private

16         by default."

17         Did I read that correctly?

18     A.  Yes.

19     Q.  Who is ███████?

20     A.  ███████████.  He's the head of design

21  now for Instagram.  I think at the time he was a

22  design lead for the communities product group, which

23  growth and well-being were part of.

24     Q.  And is the Adam reference here Adam

25  Mosseri?

Confidential - Pursuant to Protective Order

205

1          A.    I suspect so.

2          Q.    And who is ████████?

3          A.    ████████ was a VP of product who reported in

4     to Adam at the time.

5          Q.    So in this chat ████████ mentions that

6     they're -- that Adam and ████████ both pushed towards

7     moving -- creating accounts private by default;

8     correct?

9          A.    That's correct.

10         Q.    So, to your knowledge, is this when you

11    first heard about the concept of private by default?

12         A.    I don't recall.

13         Q.    Do you have any independent recollection of

14    hearing about it before then?

15         A.    No.

16         Q.    Let's see what ████████ said next.

17               "The ask in that meeting was,

18               apparently, how to go about testing the

19               effects of that immediately.  My

20               thought is that we could identify a few

21               cohorts for whom we think this is

22               useful, teens 13 to 18, women in

23               emerging markets, potentially secondary

24               accounts, to get the ball rolling on

25               this."

Confidential - Pursuant to Protective Order

1          Did I read that correctly?

2     A.   Yes.

3     Q.   What does she mean by "testing the effects

4  of that"?

5     A.   To run it -- I imagine what she meant is to

6  run a test defaulting certain groups to private and

7  to understand how metrics would move so we can get

8  an understanding of the growth and engagement

9  impacts.

10     Q.   So it was to test the impact on internal

11  metrics related to users of Instagram; right?

12          MR. SCHMIDT:  Object to the

13  characterization.

14          THE WITNESS:  Yeah.  That's correct.

15  BY MS. GOTWALS:

16     Q.   And in her statement here, she says:

17          "We can identify a few cohorts for

18          whom we think this is useful."

19          Teens 13 to 18 is the first one she

20  suggests; correct?

21     A.   Yes.

22     Q.   Do you recall what your first thought was

23  when you heard about the concept of private by

24  default?

25     A.   I don't recall.

Confidential - Pursuant to Protective Order

207

1    Q.   Let's see if it's in this chat.  Can we
2    scroll down to Darius' first comment here.
3         You said:
4             "Holy shit.  What's the rationale
5         for the push?  This will likely smash
6         engagement, DAP, MAP, et cetera."
7             Did I read that correctly?
8    A.   Yes.
9    Q.   And then ████████ response to that is:
10            "Current climate?  Policy
11        pressure?  Potentially contributing to
12        teen suicides?"
13            Did I read that correctly?
14   A.   Yes.
15   Q.   And then you asked her:
16            "What policy pressure?"
17        Right?
18   A.   Yes.
19   Q.   And her response was:
20            "What are we doing to protect
21        minors?"
22            Correct?
23   A.   Yes.
24   Q.   So as a result of this chat with ████, did
25   you begin testing the effects of private by default

Confidential - Pursuant to Protective Order

208

1    on teen user accounts?

2         A.    I don't recall exactly when we started

3    those tests.

4         Q.    But you did start tests?

5         A.    At some point, yes.

6               MS. GOTWALS:   Okay.  Let's pull up Tab 45,

7    please.  This will be Meta-Kilstein-30.

8               (Exhibit 30 was marked for

9               identification and is attached to the

10              transcript.)

11   BY MS. GOTWALS:

12        Q.    I'll represent to you again that this was

13   produced to us by lawyers for Meta from your

14   custodial files.

15              Do you have any reason to dispute that?

16        A.    No.

17        Q.    So this is a chat between you and ███████

18   in August of 2020; correct?

19        A.    Yes.

20        Q.    And for clarity, the "to" line says ███████

21   ████   but it looks like there is another name here.

22              Is ██████   the name that she goes by, and

23   that is her actual first name?

24        A.    Yes, that's correct.

25        Q.    So if we could go to the fifth page of this

Confidential - Pursuant to Protective Order

209

1    chat, and this says -- can you pull out a little

2    bit.  Can you zoom out, please, so I can see the top

3    of it.  Go up to the preceding page, please.

4          Okay.  I apologize.  We're going to go to

5    page 5.  ████████  says:

6                "Not sure if you saw my response

7                back to Alex.  I added you.  Might be

8                good for Bocking and him to push."

9                Did I read that correctly?

10    A.    Yes.

11    Q.    Do you know what she's talking about here?

12    A.    I believe there was some discussion about

13    whether to launch private by default at that

14    specific point in time.

15    Q.    Okay.  So let's keep reading.  ████████

16    says:

17                "Although not sure if you

18                100 percent agree with my thought that

19                we can try more things.  I think you

20                guys at least formally said no to that;

21                right?"

22                And your response says:

23                "Yep.  Bocking is exchanging

24                emails with ████████.  I reached out to

25                Andrew privately and told him that I

Confidential - Pursuant to Protective Order

1          disagree with this decision.  And he

2          agrees.  Looks like Alex does too."

3              So who is Bocking in this exchange?

4     A.   He is a VP of product that works in the

5   central growth organization in Meta.

6     Q.   And the Andrew that's referenced here?

7     A.   It's the same person.  Andrew Bocking.

8     Q.   I see.

9          So Andrew and Bocking is the same person.

10   And then Alex, is that Alex Schultz?

11    A.   Yes.

12    Q.   So your chat here says that Andrew Bocking

13   is speaking with ██████ and that he also disagrees

14   with the decision and looks like Alex does too;

15   correct?

16    A.   Yes.

17    Q.   Was that decision the decision to ship

18   private by default at that time?

19          MR. SCHMIDT:  Objection.  Foundation.

20          THE WITNESS:  I believe so.  I don't

21   recall.

22   BY MS. GOTWALS:

23    Q.   Let's keep reading for some more context,

24   then.  So your next comment is:

25              "We can try more things.  It's

Confidential - Pursuant to Protective Order

211

1            just not as lucrative as US DAU.  So we

2            put it on hold this half."

3         Did I read that correctly?

4    A.   Yes.

5    Q.   What is US DAU in this context?

6    A.   I believe at the time we were seeing

7    softness in just overall daily active users for the

8    US for all ages.  And so the growth team that I was

9    leading at the time decided to reprioritize some of

10   our work and focus more on just US users more

11   broadly.

12   Q.   So your next comment down here says:

13            "With more staffing, we could.

14            Although I think we'll never really

15            mitigate enough."

16            Did I read that correctly?

17   A.   Yes.

18   Q.   What are you mitigating?

19   A.   So when you default an account to private,

20   what we found is that it was really hard for teens

21   to find their friends or for their friends to find

22   them.  And, therefore, they would, you know, be

23   connected with less value that Instagram can provide

24   to their life and have less meaningful experiences.

25   And this is what our -- my main concern with the

Confidential - Pursuant to Protective Order

1    private-by-default launch.

2        Q.    So by "mitigate," you meant mitigate the

3    impact on teen user metrics; right?

4                MR. SCHMIDT:  Objection.  Foundation.

5                THE WITNESS:  Yeah.  Mitigate the friending

6    losses, which also led to engagement declines.

7    BY MS. GOTWALS:

8        Q.    So the friending losses and the engagement

9    declines would lead to declines in teen daily active

10   users; correct?

11               MR. SCHMIDT:  Objection.  Foundation.

12               THE WITNESS:  That's correct.

13   BY MS. GOTWALS:

14       Q.    So you followed up by saying:

15               "This is, basically, Karina/███████

16           pigeonholing our org into a corner."

17               Who is Karina?

18       A.    Karina was someone who worked in the policy

19   team at the time.

20       Q.    And remind us who ███████ is.

21       A.    He was a VP of product who reported in to

22   Adam.

23       Q.    Your next statement is:

24               "Their argument is that if we

25           don't do it, regulators will force us

Confidential - Pursuant to Protective Order

213

1               anyway, and it's only a matter of
2               time."
3                    Did I read that correctly?
4      A.    Yes.
5      Q.    And ██████ seems to agree with you.  At the
6    bottom she says:
7               "You can build something smarter
8               than default by private.  For example,
9               not letting people who are 2-plus
10              degrees from you or some measure of
11              familiarity get in touch with you."
12                   Did I read that correctly?
13     A.    Yes.
14     Q.    What is she talking about there?
15     A.    I believe there she's talking about
16   reachability settings on Instagram Direct.  So like
17   who can contact you in Direct.  And she's basically
18   saying that maybe one way to solve this safety
19   concern is to restrict who can actually send you
20   messages on Instagram to being people that are
21   likely people that you know.
22     Q.    Okay.  Your response to that, though, was:
23              "This was never really about
24              increasing safety.  It was all for the
25              PR wins."

Confidential - Pursuant to Protective Order

1                    Did I read that correctly?

2        A.    Yes.

3        Q.    So you thought that the private-by-default

4    launch was about PR and regulators; right?

5             MR. SCHMIDT:  Object to characterization.

6             THE WITNESS:  I'm not sure if I really

7    though that or felt that for sure in the moment.

8    You know, this is something that -- maybe I was

9    venting.  I have a very casual chat with my --

10   chatting relationship with my manager at the time.

11            I would be surprised if they didn't

12   actually care about safety.  And so I'm sure safety

13   is one of the reasons why they did consider private

14   by default.

15   BY MS. GOTWALS:

16       Q.    But you did state explicitly in a chat with

17   your manager that this was not about increasing

18   safety; it was for PR wins; correct?

19       A.    I said that here.  But, again, I couldn't

20   tell you exactly why Instagram leadership wanted to

21   do private by default.  And you definitely better

22   ask them on the motivations.

23       Q.    And you were concerned, it seems, about

24   protecting the metrics; correct?

25            MR. SCHMIDT:  Object to characterization.

Confidential - Pursuant to Protective Order

215

1              THE WITNESS:  My specific role in this
2     project was to understand the growth and engagement
3     knock-on effects of this change and make sure that
4     those are well understood by leadership so that they
5     can make an informed decision.
6              MS. GOTWALS:  Let's look at how that played
7     out, then.  Can we pull up Tab 46.
8              So this will be Exhibit Meta-Kilstein-31.
9              (Exhibit 31 was marked for
10             identification and is attached to the
11             transcript.)
12    BY MS. GOTWALS:
13         Q.    Again, I will represent to you that this
14    was produced to us by lawyers from Meta.  It came
15    from your custodial files.
16             Do you have any reason to dispute that?
17         A.    No.
18         Q.    So this is a chat between you and ██████
19    ██;  correct?
20         A.    Yes.
21         Q.    In August 2020;  right?
22         A.    That's correct.
23         Q.    Who is ████████████
24         A.    He was an engineer on the friending team.
25         Q.    So at the beginning of this chat, he's

Confidential - Pursuant to Protective Order

1    inquiring about an ask and an objective; correct?

2        A.    Yes.

3        Q.    So let's read his question.  He says:

4                    "Hey, morning, Darius.  Just

5              wanted to understand more about the ask

6              for changing the NUX step experience.

7              What is the objective here and how can

8              we conclude PBD work?"

9                    Again.  That's the private by default;

10   correct?

11       A.    Yes.

12       Q.    (Reading):

13                   "I understand we're doing this due

14             to drop in metrics, but by running this

15             test, what do we hope to achieve?

16             Obvious thing is metrics will drop

17             less, but by how much would even be

18             enough to ship?  And how much more work

19             do we need to do in space when growth

20             isn't even the main stakeholders for

21             shipping this experience (PXFN and WB

22             team are.)"

23                   Did I read that correctly?

24       A.    Yes.

25       Q.    So what is PXFN?

Confidential - Pursuant to Protective Order

217

1      A.   I believe it's a privacy XFN.  It's a group
2   of people that consult on privacy.
3      Q.   And WB is well-being; right?
4      A.   That's correct.
5      Q.   So ███████ is saying here that growth
6   isn't the main stakeholders; privacy and well-being
7   are; is that right?
8      A.   Yes, that's correct.
9      Q.   So is ███████ asking how important this
10  work is that you've asked him to do?
11     A.   He was asking, I believe, about one
12  specific follow-on from private by default -- I
13  don't recall which one it is -- and asking how much
14  longer we needed to work on it.
15     Q.   And he says next:
16               "I'm asking since you already know
17          we have other priorities such as US
18          DAU, SU in Stories, et cetera.  Just
19          making sure we don't keep going back
20          and forth on this for the next few
21          weeks or longer.  And I know you may
22          not have all the answers to this, but
23          just wanted to get more clarity on
24          expectations and objectives so we know
25          why we are doing this work and hope to

Confidential - Pursuant to Protective Order

218

1          help close this out soon.  Thanks."
2               Did I read that correctly?
3     A.   Yes.
4     Q.   So ███████ is asking you in this case how
5     important this is.
6     A.   Yes.
7     Q.   And your response is:
8               "Hey, fair question.  I see
9          blocking this launch as more impactful
10         than US DAU."
11              Did I read that correctly?
12    A.   Yes.
13    Q.   And you had asked ██████ to run numbers
14    on an alternative solution to private by default;
15    correct?
16              MR. SCHMIDT:  Object to characterization.
17              THE WITNESS:  I don't recall exactly what
18    we were asking him to do.  He wouldn't run numbers.
19    He's an engineer.  I believe they were going to
20    build a different solution or different product
21    experience, but I don't recall today what that was.
22    BY MS. GOTWALS:
23    Q.   So, procedurally, ██████ would build a
24    different experience, and then maybe you would test
25    the metrics on it to see the impact; is that right?

Confidential - Pursuant to Protective Order

1          MR. SCHMIDT:  Object to characterization.

2          THE WITNESS:  Yeah.  He would create an

3  experiment, and we would review the results.

4  BY MS. GOTWALS:

5     Q.   And you said that this experiment was more

6  impactful than US DAU; right?

7          MR. SCHMIDT:  Object to characterization.

8          THE WITNESS:  What I meant here is the work

9  on working this launch, or at least understanding a

10  different way to launch it, would be more impactful

11  than the work that that team was doing to contribute

12  to US daily active users.

13  BY MS. GOTWALS:

14     Q.   So US daily active users, as you mentioned

15  earlier, that issue was that daily active users was

16  declining overall, not just with teens; correct?

17     A.   Correct.

18     Q.   So you said blocking the launch of private

19  by default was more impactful than research on

20  overall declines in the company; is that right?

21          MR. SCHMIDT:  Object to characterization.

22          THE WITNESS:  I was saying that -- I said

23  blocking this launch, but I think what I meant was

24  trying to find a different solution was more

25  impactful for that team to focus on than to focus on

Confidential - Pursuant to Protective Order

220

1    the daily active user growth in the United States.

2    BY MS. GOTWALS:

3        Q.    So you were very concerned about the impact

4    on the number of teen daily active users that

5    private by default would have; right?

6        A.    Yes.

7              MR. SCHMIDT:  Object to characterization.

8    BY MS. GOTWALS:

9        Q.    And you were asking ███████ to create an

10   alternative that you could run numbers on; correct?

11       A.    I can't remember exactly what we were

12   asking him to do, but it was probably something in

13   line with that.

14       Q.    Let's go to the bottom of the first page

15   here.

16             So ███████ says:

17                 "I know your views on this and

18                 understand that this is the right thing

19                 to do for growth.  Just wondering for

20                 after we run this test, we should see

21                 less drop.  Do you have any baseline in

22                 mind where less say if it's only

23                 X percent hit to US DAU, it would be

24                 fine from a data perspective?"

25                 Did I read that correctly?

Confidential - Pursuant to Protective Order

1        A.    Yes.

2        Q.    So you believed that the issue was contact

3    by strangers or creeps reaching out to children in

4    Direct Messaging; correct?

5        A.    It looks that way.

6        Q.    And private by default did more than that;

7    right?

8        A.    Yes.

9        Q.    Did you continue to discuss private by

10   default and the metrics impact with others in Meta?

11       A.    Most likely.

12       Q.    Do you recall discussing it at a community

13   check-in with IG leads the very next day or a few

14   days later?

15       A.    I honestly don't remember.

16             MR. SCHMIDT:  Okay.  Let's pull up Tab 47.

17   This will be marked as Meta-Kilstein- -- are we at

18   32?

19             MS. WANG:  Yes.

20             MS. GOTWALS:  32.

21             (Exhibit 32 was marked for

22             identification and is attached to the

23             transcript.)

24             THE WITNESS:  Thanks.

25   ///

Confidential - Pursuant to Protective Order

230

1    BY MS. GOTWALS:

2        Q.    This is Meta-Kilstein-33.  Again, I'll

3    represent to you that this was produced to us by

4    lawyers for Meta.  It came from your custodial

5    files.

6              Do you have any reason to dispute that?

7        A.    No.

8        Q.    Who is ███  ███████?

9        A.    He was a research leader for the

10   communities product group.

11       Q.    And this is a chat between you and him on

12   September 2nd, 2020; correct?

13       A.    Yes.

14       Q.    So the day after that community leads

15   check-in meeting?

16       A.    Yes.

17       Q.    So in this chat, you discuss private by

18   default.

19              If we can scroll down to where you say,

20   "Also, I'd like to check in."

21              Thank you.

22              You said:

23                  "Also, I'd like to check in at

24              some point in the next week or so.  I

25              feel like we've done a pretty shitty

Confidential - Pursuant to Protective Order

231

1          job incorporating your PBD feedback
2          into the latest round just because it's
3          extremely difficult to do.  So would
4          love to spend some time debriefing on
5          that."
6              Did I read that correctly?
7     A.   Yes.
8     Q.   It looks like ███ response is:
9          "The CC deck is insightful.  I
10         hadn't seen this shared before.
11         Hopefully, we can get an update with
12         the PSC data" --
13             Oh, I'm sorry.  That is not in
14    response to this.
15             MR. SCHMIDT:  I think it is.
16             MS. GOTWALS:  That is not -- hold on.
17    BY MS. GOTWALS:
18    Q.   Let me read that again.
19         "The CC deck is insightful.  I
20         hadn't seen this shared before.
21         Hopefully, we can get an update with
22         the PSC data.  I'll reach out to the
23         Donna/HR team on that."
24             Did I read that correctly?
25    A.   Yes.

Confidential - Pursuant to Protective Order

232

1     Q.   And then he says:

2              "Yeah, I've jumped into the PBD

3          doc, and it says very much WIP at

4          different stages each time I peek at

5          it.  Thanks for flagging.  I think

6          we're anchoring a bit on current

7          systems of measurement that may be

8          detracting from the narrative I'm

9          trying to help craft."

10             Did I read that correctly?

11    A.   Yes.

12    Q.   Again, here the PBD is private by default;

13    correct?

14    A.   Yes.

15    Q.   And WIP just means work in progress;

16    correct?

17    A.   Correct.

18    Q.   So ███ is saying that he reviewed your

19    private-by-default doc, and it still seems to be a

20    work in progress; is that right?

21    A.   Yes.

22    Q.   And your response is:

23             "Yeah, I see this as two

24          workstreams that are separate but

25          related.  Keep regulators away.  Keep

Confidential - Pursuant to Protective Order

233

1         teens engaged.  Make teens safe.  I

2         think where growth is coming from is

3         that for us, we really only have

4         bandwidth for one.  We all believe two

5         is important and the right thing to do.

6         And so the question is how important is

7         it for community leads and IG leads and

8         who should invest in it?"

9              Did I read that correctly?

10   A.   Yes.

11   Q.   You then said:

12         "What we've learned is that the

13         hatchet approach of defaulting people

14         to private on day one means that people

15         just use the platform a lot less.  So

16         it's not really the most elegant

17         solution to solving the specific teen

18         safety concerns."

19              Did I read that correctly?

20   A.   Yes.

21   Q.   And then further down you say:

22         "I guess the misalignment between

23         where you and I are today is, should we

24         take the hatchet approach or not?  As a

25         guardian of ecosystem metrics, of

Confidential - Pursuant to Protective Order

234

1          course I'm going to favor the nuanced

2          approach."

3                 Did I read that correctly?

4     A.    Yes.

5     Q.    So you described private by default as the

6    hatchet approach; correct?

7     A.    In this communication, yes.

8     Q.    And you described yourself as a guardian of

9    ecosystem metrics; right?

10    A.    Yeah.  My role in this project was to look

11   at the effect on growth and engagement.  And there

12   are other people who were looking at the effect on

13   safety.

14    Q.    Your concern here was ecosystem metrics;

15   correct?

16          MR. SCHMIDT:  Objection.  Asked and

17   answered.

18          THE WITNESS:  Yes.  My role was to look at

19   the growth and ecosystem impacts of this experiment.

20   BY MS. GOTWALS:

21    Q.    And from your perspective, ecosystem

22   metrics, people used the platform less when it

23   was -- when private by default was set up; correct?

24    A.    That's correct.

25          MR. SCHMIDT:  Object to characterization.

Confidential - Pursuant to Protective Order

235

1    BY MS. GOTWALS:

2       Q.    And in this case, people using the platform

3    less was teens; correct?

4       A.    Yes.

5       Q.    And you didn't believe that was the best

6    solution because of the impact on ecosystem metrics;

7    correct?

8       A.    Yeah.  Like I said, that was -- my role in

9    this was to explain the effects on growth and

10   ecosystem impact, and there were other people who

11   were looking at the safety aspect.  And then it was

12   up to leadership to weigh those two and make the

13   decision.

14      Q.    You were the guardian of ecosystem metrics?

15      A.    Yes.  That was my role.

16            MS. GOTWALS:  Thank you.

17            We'll take a break.

18            THE VIDEOGRAPHER:  The time is 2:05.  We're

19   off the record.

20            (Recess taken.)

21            THE VIDEOGRAPHER:  The time is 2:25.  We're

22   back on the record.

23   BY MS. GOTWALS:

24      Q.    The last exhibit we were looking at was in

25   September of 2020; right?

Confidential - Pursuant to Protective Order

236

1       A.    Yes.

2       Q.    Did Meta ship private by default in 2020?

3       A.    I don't believe so.

4       Q.    But they revived it in 2021; right?

5       A.    I believe that's correct.

6       Q.    So they did not ship the version that you

7    were talking about with ███████████; right?

8       A.    That's right.

9             MS. GOTWALS:  Can we pull up Tab 48,

10   please.  And we'll mark this one Meta-Kilstein-34.

11            (Exhibit 34 was marked for

12            identification and is attached to the

13            transcript.)

14   BY MS. GOTWALS:

15      Q.    Once again, I'll represent to you this was

16   produced to us by lawyers from Meta from your

17   custodial files.

18            Do you have any reason to dispute that?

19      A.    No.

20      Q.    This is a chat between you and ███████████

21   in March 2021; correct?

22      A.    Yes.

23      Q.    Who is ███████████?

24      A.    He was a product manager on the friending

25   team at the time.

Confidential - Pursuant to Protective Order

237

1       Q.    So at 11:56 there, you said:
2             "Guess what.  They're reviving
3             private by default.  LOL.  My God,
4             remember this."
5             Did I read that correctly?
6       A.    Yes.
7       Q.    And then you shared what looks like
8  probably a chart; right?
9       A.    It looks like it.
10            MS. GOTWALS:  Okay.  Can we pull up Tab 49.
11 We'll mark this one Meta-Kilstein-35.
12            (Exhibit 35 was marked for
13             identification and is attached to the
14             transcript.)
15 BY MS. GOTWALS:
16      Q.    Do you recognize this chart?
17      A.    I don't recall it.
18      Q.    If I represent to you that this is the
19 chart attached here to this chat, do you have any
20 reason to dispute that?
21      A.    No.
22      Q.    And this chart shows the negative impacts
23 on metrics of private by default; right?
24      A.    Yes.
25      Q.    That's what's represented by the column

Confidential - Pursuant to Protective Order

238

1    "Private First" and then also "Private by Default";

2    correct?

3        A.   I don't recall exactly what "Private First"

4    was referring to today.

5        Q.   Do you recall recommending the option of

6    "Private First" versus "Private by Default"?

7        A.   I honestly don't remember at this point in

8    time.

9        Q.   Okay.  So this is measuring some of the

10   metrics that we've seen before; right?  Daily active

11   people, sessions, time spent, impressions,

12   et cetera; correct?

13       A.   Yes.

14       Q.   So going back to Exhibit 34, the chat, and,

15   again, your response to them reviving this was:

16                 "My God, remember this."

17                 Right?

18       A.   Yes.

19       Q.   Were you concerned about the revival of

20   private by default in 2021?

21            MR. SCHMIDT:  Objection.  Characterization.

22            THE WITNESS:  I honestly don't recall.

23   BY MS. GOTWALS:

24       Q.   Were you concerned about the negative

25   impacts of metrics -- on metrics by private by

Confidential - Pursuant to Protective Order

239

1  default?

2      A.   Yes.

3      Q.   When they revived private by default, did

4  they limit the scope to under 16 and only those with

5  a stated age?

6      A.   I honestly don't remember exactly what they

7  did in the end.  I wasn't involved in the second

8  iteration.

9          MS. GOTWALS:  Okay.  Let's pull up Tab 12.

10  And this will be Meta-Kilstein-36.

11          (Exhibit 36 was marked for

12          identification and is attached to the

13          transcript.)

14  BY MS. GOTWALS:

15      Q.   I'll represent to you that this was

16  produced to us by lawyers from Meta from your

17  custodial files.

18          Do you have any reason to dispute that?

19      A.   No.

20      Q.   This is a chat between you and ██████

21  ██████████ in April 2021; correct?

22      A.   Yes.

23      Q.   So at the top of the chat -- well, first of

24  all, who is ████████████████?

25      A.   He was a data scientist on my team.

Confidential - Pursuant to Protective Order

240

1    Q.    So he worked for you?

2    A.    Yes.

3    Q.    So he says:

4              "By the way, I think the team

5         privacy stuff will have a much lower

6         impact now that we are only talking

7         about U16 and stated age. ███████████

8    ████████████████████████████████

9    ████████████████████████████  ██████████

10   ████████████████████████████████████

11         ████████████████████████████

12   ███████████████████████████████

13   ████████████████████████████████████

14   ██████████████████████

15              Did I read that correctly?

16   A.    Yes.

17   Q.    So, again, when private by default was

18   revived in 2021, that version had a much lower

19   impact on metrics; correct?

20              MR. SCHMIDT:  Objection.  Foundation.

21              THE WITNESS:  I don't recall exactly what

22   they ended up shipping; so I can't tell you for

23   certain.  I'm not sure what his point is here about

24   stated age.  I think, like, it was always on stated

25   age.  Like, it was at the point of registration

Confidential - Pursuant to Protective Order

241

1    where we provided -- defaulted due to private.  And

2    we asked for people's age at registration.  So I'm

3    not sure what point he was trying to make here.

4    BY MS. GOTWALS:

5        Q.    In 2021, did all profiles have a stated

6    age?

7        A.    No.  I believe we collected that sometime

8    in 2021.

9        Q.    So the version in 2020 wouldn't have had a

10   stated age because there was no stated age; correct?

11       A.    We collected it from some people, but not

12   from all people.  So there would be some people with

13   and some people without.  But I believe that private

14   by default was defaulting new accounts to private.

15            And the only time we would know if someone

16   was a teen or not when they register is if they tell

17   us that they're a teen.

18       Q.    ██████ here says that:

19                "6.5 percent of US teens will even

20            see the upsell."

21       A.    Oh.  Okay.

22       Q.    That's a statement that they're upselling

23   it to existing teen users; correct?

24       A.    So this refreshes my memory a little bit,

25   actually.

Confidential - Pursuant to Protective Order

242

1          MR. SCHMIDT:  Just a second.  Objection.

2    Foundation.

3          THE WITNESS:  I think what he's referring

4    to here is not necessarily private by default, the

5    overall project.  I think he's referring to a

6    specific upsell that we ran at the top of Instagram

7    to tell people that they can change their account

8    settings to private.

9    BY MS. GOTWALS:

10        Q.    And then the next statement he makes is:

11    ███████████████████████████████

12    ██████████████████  ████████

13    ██████████████████████████████████

14    ███████████████████████████████

15    ██████████████

16              Did I read that correctly?

17        A.    Yes.

18        Q.    So in this, he's talking about the prompt

19    to new teen users; correct?

20        A.    Yes.

21        Q.    And he says that the impact should be less

22    than last time due to some of the mitigations

23    shipped.

24              Do you know what those mitigations were?

25        A.    I remember that the friending team spent

Confidential - Pursuant to Protective Order

243

1    quite a bit of time trying to make it easier to find

2    your friends or for your friends to find you on

3    Instagram if your account is private.

4              And so I suspect he's referring to some of

5    those things that the team did to make it easier to

6    find your friends.

7         Q.    So the impact that he's referencing there

8    is the impact again to metrics; correct?

9         A.    Yes.

10        Q.    So this version that they're shipping in

11   2021 had less of an impact on metrics.

12        A.    That's what the document suggests.

13        Q.    The next thing he says here is:

14              "However, we will definitely have

15              to keep an eye on the well-being guys.

16              In the product team meeting yesterday,

17              ███████ said, 'Leadership is willing to

18              take a 4 percent hit on teen ecosystem

19              metrics for these default changes.

20              Since we will now probably go under

21              that, that leaves us with a few

22              percentage of impact budget to use up

23              with other changes.  Like comment

24              privacy.'"

25              Did I read that correctly?

Confidential - Pursuant to Protective Order

244

1        A.    Yes.

2        Q.    So who is ███?

3        A.    I believe he is referring to ███████    who

4    was a product manager on the well-being team.

5        Q.    And he is relaying that ████ said that

6    leadership was willing take a 4 percent hit on

7    ecosystem metrics; correct?

8        A.    That's what he's saying here.

9        Q.    But that the version of default changes

10   they're looking at won't come up to 4 percent;

11   correct?

12       A.    That's correct.

13       Q.    In fact, it's a few percent below that.

14   Right?

15       A.    Yes.

16       Q.    Can we scroll down, please.

17             And then one of your responses here is:

18                 "Thanks for keeping an eye on

19             them.  Let's make sure there's a clear

20             upside in terms of privacy wins for the

21             things they suggest to offset any

22             potential losses."

23                 Did I read that correctly?

24       A.    Yes.

25       Q.    And the losses you're talking about are

Confidential - Pursuant to Protective Order

245

1    losses to daily active users, for example?

2        A.    I suspect so.

3        Q.    What do you mean by "a clear upside in

4    terms of privacy"?

5        A.    To make sure that there are clear,

6    measurable benefits to privacy, or things like

7    privacy or safety or things that the well-being team

8    really cares about.

9        Q.    So down at the bottom you say:

10                "I just think it's like policy

11                wants us to do something to have a win

12                so they're scrambling to figure out

13                what."

14                Did I read that correctly?

15       A.    Yes.

16       Q.    Do you remember when Meta ended up shipping

17   this version of private by default?

18       A.    I can't tell you for certain.

19                MS. GOTWALS:  Can we pull up Tab 51. We'll

20   mark this Exhibit Meta-Kilstein-37.

21                (Exhibit 37 was marked for

22                identification and is attached to the

23                transcript.)

24   BY MS. GOTWALS:

25       Q.    And I'll represent to you that this was

Confidential - Pursuant to Protective Order

327

1    thing I'm going to do is go over a few documents

2    that Ms. Gotwals went over, and I'm just going to

3    kind of follow up on a few things.  Then I'm going

4    to raise a few new things.  And then, hopefully, we

5    should be done.  Okay?

6        A.    Okay.

7        Q.    Okay.  All right.

8              I want to start, Mr. Kilstein, with

9    Exhibit 7.  It's already entered into evidence, and

10   I can give you a Bates label.

11             Just let me know when you find it.

12       A.    There's a lot of documents.

13             MR. OLIVER:  I understand.

14             MR. SCHMIDT:  Which exhibit?

15             MR. OLIVER:  It's Exhibit 7.

16             MR. SCHMIDT:  Thank you.

17             MR. OLIVER:  Okay.  Just for the record,

18   this was previously marked as Plaintiff's Exhibit 7.

19   The Bates label is META3047MDL-046-00286948.

20             Did you get that, Madam Court Reporter?

21             THE STENOGRAPHER:  (Nods head.)

22   BY MR. OLIVER:

23       Q.    Mr. Kilstein, you recall answering some

24   questions about this document; correct?

25       A.    Yes.

Confidential - Pursuant to Protective Order

328

1      Q.    And this is a document that you are
2    familiar with; right?
3      A.    Yes.
4      Q.    This is a -- is this a review, if I
5    remember correctly, of you?
6      A.    This is a mid-cycle review.  So checking in
7    during the half on how I'm doing.
8      Q.    Ms. Gotwals asked you some questions about
9    the very top paragraph.  And I'm just going to read.
10   The first sentence says:
11                "Our Number 1 objective remains
12              turning around developed markets teen
13              DAU and MAU trends, and getting on a
14              path to be the first-choice app for
15              teens."
16              Did I read that correctly?
17              MR. SCHMIDT:  And I'll object.  Repetitive.
18              THE WITNESS:  Yes, you did.
19   BY MR. OLIVER:
20     Q.    And this was the primary thing you were
21   working on at the time; right?
22              MR. SCHMIDT:  Object to characterization.
23              THE WITNESS:  I believe working on teen
24   growth was my main focus at that point in time.
25   ///

Confidential - Pursuant to Protective Order

329

1    BY MR. OLIVER:

2        Q.    For as long as you've been at the company

3    Instagram, its number one objective when it came to

4    growth was to grow its teen audience; correct?

5            MR. SCHMIDT:    Objection.    Foundation.

6            THE WITNESS:    No, that's not correct.

7    There was a period in time where it became the

8    number one objective.    I can't remember exactly what

9    that date was.

10   BY MR. OLIVER:

11       Q.    Roughly what period of time do you remember

12   that becoming the number one objective for

13   Instagram?

14       A.    I suspect around this time.    It looks like

15   they're taking a quote from a post where somebody

16   said that that was the number one objective.    I

17   suspect that that was the first time.    So I would

18   say in 2023 somewhere.    Some point in 2023.

19       Q.    Now, as a result of -- actually, strike

20   that.

21            I'm going to ask you to go to Exhibit 9.

22            (Brief discussion held off the

23            stenographic record.)

24            MR. SCHMIDT:    Lance, if you want to just

25   tell us like a half beat ahead which ones you want,

Confidential - Pursuant to Protective Order

330

1    we'll have it ready for you.

2              MR. OLIVER:  It's --

3              MR. SCHMIDT:  We've got 9 now.

4              MR. OLIVER:  Yeah.  I'm just going to have

5    to go one by one.

6              MR. SCHMIDT:  Sure.

7    BY MR. OLIVER:

8         Q.   Okay.  Mr. Kilstein, you have Exhibit 9 in

9    your hand; correct?

10        A.   Yes.

11        Q.   If you will, look at the third bullet point

12   on the first page that states:

13   ████████████████████████████████████████

14   ████████████████████████████████████████

15              Did I read that correctly?

16        A.   Yes, you did.

17        Q.   And at this time, and throughout its

18   existence, Instagram with competing primarily with

19   TikTok, YouTube and Snapchat; is that true?

20              MR. SCHMIDT:  Object to characterization.

21              THE WITNESS:  Those were apps that user --

22   user bases using were -- I suspect those were the

23   selected competitors I was referring to here, but I

24   can't recall exactly which ones were here.

25   ///

Confidential - Pursuant to Protective Order

331

1    BY MR. OLIVER:

2        Q.   Well, if you look at the document, the

3    selected competitors are actually named; right?

4        A.   Oh.  Yes.  Sorry.  I see that now.

5        Q.   So the first one is TikTok; right?

6        A.   Yes.

7        Q.   And it was forecasted to surpass Instagram

8    in US daily active users on September 6, 2023;

9    correct?

10       A.   Yes.

11       Q.   And then the next competitor is YouTube,

12   and it was expected to close in on 2 billion global

13   daily active users by the end of 2022; right?

14       A.   According to the forecast, yes.

15       Q.   And, then, Snap is expected to continue to

16   show modest growth; right?

17       A.   Yes.

18       Q.   Now, in this bullet point -- and this email

19   is from you; right?

20       A.   Yes.

21       Q.   So you created or gathered this information

22   and circulated it to people; right?

23       A.   Someone on my team gathered the

24   information; but yes, and then I circulated it to

25   people.

Confidential - Pursuant to Protective Order

332

1    Q.    So you took responsibility for telling the
2    rest of your colleagues about this information;
3    right?
4    A.    That is correct.
5    Q.    And according to this bullet point, when
6    you all were predicting your competitors' success
7    versus Instagram, you looked at two factors, at
8    least here.  One was being a daily active user --
9    and a number of daily active users; right?
10    A.    Yes.
11    Q.    And that's a metric?
12    A.    Correct.
13    Q.    That's a growth metric; correct?
14    A.    Correct.
15    Q.    And the other growth metric you compared
16    yourself against with your competitors was time
17    spent on the application; right?
18    A.    That's correct.  Those were the only
19    two metrics we had access to in the systems we had
20    for competitive data.
21    Q.    So at that time and as long as you
22    remember, those other three applications in
23    Instagram were competing for the time that teen
24    users spent on their platforms; right?
25    MR. SCHMIDT:  Object to characterization.

Confidential - Pursuant to Protective Order

333

1    BY MR. OLIVER:

2        Q.    That's the thing they were competing for?

3              MR. SCHMIDT:  Object to characterization.

4              THE WITNESS:  That's not exactly what this

5    says.  It says "We made DAU and time spent

6    forecasts."

7              I wouldn't say we were necessarily

8    competing for time, but we were more interested in

9    user growth.

10   BY MR. OLIVER:

11       Q.    And user growth is often referred to as

12   engagement; correct?

13       A.    It's more of a growth metric.  Daily active

14   users.  For engagement, we normally use a metric

15   called sessions.

16       Q.    And one of the things that you looked at,

17   that you tracked users on -- teen users, in

18   particular, was the time they spent on the app;

19   right?

20       A.    That's one of the variety of metrics we

21   looked at, yes.

22       Q.    Okay.  And if you look at the next page,

23   you actually called these -- first of all, the big

24   heading at the top of the second page is "Ecosystem

25   Health"; correct?

Confidential - Pursuant to Protective Order

334

1      A.   Yes.

2      Q.   And that refers to the health of -- well,

3   when you say "ecosystem," what does that mean to

4   you?  Just explain that for me.

5      A.   Sure.  It's, basically, a summary of how

6   we -- how users are using our app on average on

7   aggregate.

8      Q.   And so in order to be healthy and

9   competitive, you want your metrics to be good

10  metrics?  You want them to be meeting certain goals;

11  right?

12     A.   In general, yes.

13     Q.   So, for example, you want to have more

14  daily active teen users; right?

15     A.   Yes.

16     Q.   Okay.  And that's one of the things you

17  measured under key metrics; correct?

18     A.   That is correct.

19     Q.   And another thing that you measured under

20  key metrics was time spent per DAU; correct?

21          MR. SCHMIDT:  Objection.  Repetitive.

22          THE WITNESS:  That is correct.

23  BY MR. OLIVER:

24     Q.   And I believe you testified that ██████

25  that's ███████████ per daily active user; is that

Confidential - Pursuant to Protective Order

335

1    right?

2        A.    That is correct.

3             MR. SCHMIDT:  Objection.

4    BY MR. OLIVER:

5        Q.    So --

6             MR. SCHMIDT:  I've got to make my

7    objection.  Objection.  Repetitive under the

8    deposition protocol order.

9    BY MR. OLIVER:

10       Q.    So at the time, Mr. Kilstein, Instagram and

11   your team, in particular, was tracking to fractions

12   of a minute how many minutes teen users were

13   spending on Instagram; right?

14            MR. SCHMIDT:  Objection.  Repetitive.

15            THE WITNESS:  We took the average of how

16   much time people spent on a daily basis and

17   represented it here with a decimal point.

18   BY MR. OLIVER:

19       Q.    And it was so precise that you were getting

20   down to the seconds, basically; right?

21            MR. SCHMIDT:  Objection.  Characterization.

22            THE WITNESS:  You couldn't tell exactly how

23   many seconds there were here.  It would be ███ of a

24   minute.  I'm not sure exactly how many seconds that

25   were.  But we are able to track how many seconds

Confidential - Pursuant to Protective Order

1    people spend on the app.

2    BY MR. OLIVER:

3        Q.    Now, the next thing below that is overall

4    impressions.

5                Do you see that?

6        A.    Yes.

7        Q.    Can you tell the ladies and gentlemen of

8    the jury what an impression is?

9        A.    It's viewing a piece of content.

10       Q.    So -- and you're going to have to help me

11   here.  First of all, this column is talking about

12   US teens; correct?

13       A.    That is correct.

14       Q.    It's not talking about adults; right?

15       A.    That is correct.

16       Q.    So when it says 208.2 impressions, is that

17   per day, or is that per daily active user per day?

18   It's not clear to me.

19                Do you understand what I'm saying?

20       A.    Yes.  I believe this is per daily active

21   user.

22       Q.    So for every day that an active teen user

23   would come on here, they would spend an average of

24   ███████████████  on the app; correct?

25       A.    Yes.

Confidential - Pursuant to Protective Order

337

1    Q.   And they would have -- during that

2    ███████████ -- an average of ███████████

3    ███████████ during that ███████████ on average;

4    right?

5    A.   That's what this data says.

6    Q.   And your goal in the growth team was for

7    US teens to make that number or those numbers go up;

8    right?

9         MR. SCHMIDT:  Object to characterization.

10        THE WITNESS:  My job was more focused on

11   growth.  So we were more focused on the daily active

12   user and the monthly active user metrics.

13   BY MR. OLIVER:

14   Q.   But you wanted the daily active teen user

15   number to go up above your competitor; correct?

16        MR. SCHMIDT:  Objection.  Asked and

17   answered.  Foundation.

18        THE WITNESS:  In general, we wanted to

19   increase the daily active users for teens, that's

20   correct.  And it would be good if they were above

21   competitors, but that wasn't something that we

22   goaled on specifically.

23   BY MR. OLIVER:

24   Q.   And you actually wanted the time spent per

25   DAU to go up as well; correct?

Confidential - Pursuant to Protective Order

338

1           MR. SCHMIDT:  Object to characterization.
2           THE WITNESS:  We never actually goaled on
3     time spent as a metric.  It's a metric that we
4     track.  It's not a metric that we goal on.  For the
5     engagement side, we measure cap 15 sessions.
6     BY MR. OLIVER:
7        Q.   So the reason -- this 208.2 impressions, is
8     that 208.2 impressions with any content, or is it
9     208.2 impressions of commercial or advertising
10    content?
11       A.   This is with any content.
12           MR. SCHMIDT:  That's okay.  You've got to
13    give me a second to object.  But go ahead.
14           THE WITNESS:  This is of any content on
15    Instagram.
16    BY MR. OLIVER:
17       Q.   And right below that under key metrics, you
18    have ad impressions; correct?
19       A.   That's correct.
20       Q.   And that's blank.  Why is that blank?
21       A.   I don't recall.  I don't recall if we
22    served ads to teens or not, or if they were very
23    negligible and so we didn't include them.  I
24    honestly couldn't tell you right now.
25       Q.   The reason that -- when you say "ad

Confidential - Pursuant to Protective Order

339

1    impression," what that means is when a teen user
2    engages with or spends time looking at an
3    advertisement; correct?
4        A.    "Ad impressions" means how many ads did you
5    see in a day.
6        Q.    And the way that Meta makes money off
7    Instagram is when users engage with advertising;
8    right?
9        A.    I believe that's --
10           MR. SCHMIDT:  Object to characterization.
11           THE WITNESS:  I believe the main way that
12    Meta makes money is through advertising; correct.
13    BY MR. OLIVER:
14        Q.    And you might see in your documents
15    repeated reference to the term "monetization."
16    Right?
17           MR. SCHMIDT:  Object to characterization.
18    Foundation.
19           THE WITNESS:  It depends on the document,
20    but I imagine that shows up in some documents.
21    BY MR. OLIVER:
22        Q.    You've seen that term before; right?
23        A.    Yes.
24        Q.    And you've used that term before in your
25    discussions with colleagues; correct?

Confidential - Pursuant to Protective Order

371

1              MR. SCHMIDT:  Object to characterization.

2              THE WITNESS:  The idea that I'm trying to

3     get across here is that maybe there are other ways

4     we can have the same safety benefits and reduce the

5     friending impact, the growth impact.

6     BY MR. OLIVER:

7         Q.    Nobody on this chain -- neither you,

8     Mr. Darius Kilstein, or ████████ -- actually

9     endorsed a safety-at-all-cost approach, did you?

10             MR. SCHMIDT:  Object to characterization.

11             THE WITNESS:  I don't know what ████ ended

12    up endorsing.  Like I said, my job was to give the

13    ecosystem metrics and the costs to growth and

14    engagement to leadership.  And they also looked at

15    the safety gains as part of private by default and

16    made a decision.

17             MR. OLIVER:  So let's look at -- Katy,

18    let's get -- what exhibit are we on?

19             Mr. Kilstein, we're going to mark this as

20    Plaintiff's Exhibit 57.

21             For the court reporter, this is a -- we

22    haven't introduced this yet, have we?  I don't think

23    so.  We introduced a lot of decks.  I'm going to

24    call it the Bates label.  It's

25    META3047MDL-031-00136977.

Confidential - Pursuant to Protective Order

372

1              Joelle, did you all use this?  I just don't
2     want to put two --
3              MR. SCHMIDT:  I don't think they did.
4              MS. GOTWALS:  No.
5              THE WITNESS:  I don't have a copy.
6              (Brief discussion held off the
7              stenographic record.)
8              (Exhibit 57 was marked for
9              identification and is attached to the
10             transcript.)
11    BY MR. OLIVER:
12        Q.   Mr. Kilstein, when you've had a second to
13    familiarize yourself with the document, just let me
14    know, and I'll ask you some questions.
15             Are you ready to go?
16        A.   Sure.
17        Q.   This PowerPoint is also about the
18    private-by-default feature we discussed; correct?
19        A.   Looks like it.
20        Q.   The date is August 2020; correct?
21        A.   Yes.
22        Q.   I'll represent to you that we received this
23    as being produced from your custodial files.
24             Do you have any reason to doubt that?
25        A.   No.

Confidential - Pursuant to Protective Order

373

1      Q.   Since it was in your custodial files, it

2   means that, more likely than not, you received this

3   document at some point in your career; correct?

4      A.   Most likely.

5      Q.   And it's most likely that, at the point

6   that you received it, you reviewed it because this

7   is a decision in which you were involved; right?

8           MR. SCHMIDT:  Objection.  Foundation.

9           THE WITNESS:  I suspect so.

10  BY MR. OLIVER:

11     Q.   And, in fact, it says the growth -- and I'm

12  not the best on knowing who's on what team, but it

13  says the growth graph team is the author of this

14  presentation.

15          You were a part of that team at that time;

16  correct?

17     A.   I was part of the growth team.  And the

18  graph team was one subteam within growth.  And so I

19  oversaw the data science for the growth

20  organization, of which graph was a part of that.

21     Q.   So you were part of the overall team that

22  was preparing and presenting this document; correct?

23     A.   I oversaw that area.

24     Q.   Okay.  If you look at the first page --

25  second page.  The first slide discusses the goals of

Confidential - Pursuant to Protective Order

374

1    this PowerPoint presentation.

2             Do you see that?

3        A.    Yes.

4        Q.    The second goal was to make a go or no-go

5    decision for the global teen private-by-default

6    launch; right?

7        A.    Yes.

8        Q.    And the first goal actually says that you

9    were going to review the results and answer

10   questions on the impact of defaulting teens to

11   private accounts; correct?

12       A.    That's correct.

13       Q.    When it references "impact" there, it means

14   growth impact; correct?

15       A.    I don't recall exactly which metrics.  I'm

16   sure growth would have been a part of it.

17       Q.    Okay.  If you look at the third slide, it's

18   going to answer that question for us, isn't it?

19       A.    Here it would suggest that some of the

20   metrics we looked at were retention and engagement.

21       Q.    And retention and engagement metrics

22   included DAU; correct?

23       A.    Yes.

24       Q.    It included MAU; correct?

25       A.    Yes.

Confidential - Pursuant to Protective Order

375

1     Q.   Did it include time spent?

2     A.   I suspect we looked at that.

3     Q.   Look with me at Slide 5.

4          MR. SCHMIDT:  Is that 981?

5          MR. OLIVER:  Yes.  That's 981.  Thank you,

6     Paul.

7     BY MR. OLIVER:

8     Q.   It should say "Private by Default -

9     Executive Summary."

10         Do you see that, Mr. Kilstein?

11    A.   Yes.

12    Q.   Under the "Context" it says:

13              "The goal for defaulting teens to

14         private is to create a safer space for

15         teens that is both in line with teen,

16         parents, safety experts, and regulator

17         expectations."

18              Correct?

19         MR. SCHMIDT:  I think it says "parental."

20    But, otherwise, accurate.

21         MR. OLIVER:  Well, it does say "parental."

22    I can't read it.  It's very --

23         MR. SCHMIDT:  It's pretty hard to read.

24    BY MR. OLIVER:

25    Q.   Is that the correct reading of the

Confidential - Pursuant to Protective Order

                                                              376

1    document?

2         A.    I think so.

3         Q.    So you agree that the goal of private by

4    default was to make Instagram a safer place for

5    teens; right?

6         A.    I believe so.

7         Q.    And there were these three groups that had

8    expectations about the safety of the app for teens;

9    right?

10        A.    That's what this document suggests.

11        Q.    And in all of those groups, according to

12   this document, in order to bring Instagram in line

13   with their expectations, you needed to launch

14   private by default.

15              That was one of the goals of launching

16   private by default; right?

17              MR. SCHMIDT:  Objection.  Form.

18              THE WITNESS:  That's what the document

19   suggests.

20   BY MR. OLIVER:

21        Q.    So in October 2019, the growth team had

22   tested private by default in its strictest form;

23   right?

24              MR. SCHMIDT:  Objection.  Foundation.

25              THE WITNESS:  I don't recall the exact

Confidential - Pursuant to Protective Order

377

1    date.

2    BY MR. OLIVER:

3        Q.    Well, it actually says it in the document,

4    if we can get it highlighted.  If you highlight the

5    context, I believe.  Okay.

6            Do you see that now, Mr. Kilstein?

7        A.    Yes, I see that.

8        Q.    So in October 2019, the growth team did

9    some testing; right?

10       A.    Yes.

11       Q.    And the result of that testing was a loss

12   of 1.5 million teens from the monthly active persons

13   figure per year; correct?

14       A.    Those were the estimations, yes.

15       Q.    And, in your opinion, that was too much;

16   right?

17           MR. SCHMIDT:  Objection.  Foundation.

18           THE WITNESS:  From a growth perspective,

19   that's really huge numbers.  We never really see

20   declines like that.

21   BY MR. OLIVER:

22       Q.    Okay.  And you did not, therefore, endorse

23   launching private by default in its strictest form;

24   right?

25           THE WITNESS:  As a guardian of ecosystem

Confidential - Pursuant to Protective Order

378

1    metrics, it was not something that I thought was a

2    good idea.

3            MR. OLIVER:  So right below that there's a

4    section that says "Launch Trade-off."  Can we

5    highlight that as well since it is so hard to read.

6    BY MR. OLIVER:

7       Q.   The second sentence indicates that at the

8    time, Instagram was behind the industry in keeping

9    its platform safe for minors; correct?

10      A.   It talks about how -- yes.  That's right.

11   That's exactly what it says.

12      Q.   And it actually says that other platforms,

13   including your competitors -- TikTok -- had taken

14   bold moves to reduce the interactions between minors

15   and strangers; right?

16      A.   Yes.

17      Q.   But at that time Instagram had not taken

18   those bold moves; right?

19      A.   It looks like it.

20      Q.   And at the time Instagram had actually

21   already announced that they would launch the

22   private-by-default function as part of its December

23   age collection launch; right?

24      A.   That's what it says here.

25      Q.   So at that point Instagram had given the

Confidential - Pursuant to Protective Order

379

1    market and users an expectation that private by

2    default in that form would launch; right?

3         MR. SCHMIDT:  Object to characterization.

4         THE WITNESS:  I couldn't tell you for

5    certain, but that's what this document suggests.

6    BY MR. OLIVER:

7    Q.    So the next page is page 6.  And it says:

8              "Launch options and

9              recommendations."

10             Do you see that?

11   A.    Yes.

12   Q.    And there are two questions posed; right?

13   A.    Yes.

14   Q.    Okay.  The first question is:

15             "Do we believe there's more

16             meaningful work we can do to mitigate

17             the teen MAP drop?"

18             I read that correctly; right?

19   A.    Yes.

20   Q.    And that question is, essentially, asking

21   can we dampen the impact of private by default on

22   growth?  Right?  Can we mitigate that downward

23   growth trajectory?  True?

24   A.    That is correct.

25   Q.    And then Decision Number 2 is, hey, given

Confidential - Pursuant to Protective Order

380

1    the way that it's going to affect growth, do we

2    launch it anyway?  Right?

3              MR. SCHMIDT:  Object to characterization.

4              THE WITNESS:  I believe so.

5    BY MR. OLIVER:

6         Q.   Okay.  And under that Question 2, there are

7    two headings.  There's a group that says "Launch

8    Now"; correct?

9         A.   Yes.

10        Q.   And there's a group that says "Don't Launch

11   Now"; right?

12        A.   Yes.

13        Q.   So the teams that were recommending to

14   launch private by default in this strict form at

15   that time were the policy, legal, and communications

16   teams; correct?

17        A.   Yes.

18        Q.   The privacy and well-being teams; correct?

19        A.   Yes.

20        Q.   And the only team saying "don't launch it"

21   was the growth team; right?

22        A.   That's what this document suggests.

23             MR. SCHMIDT:  When we're through with this

24   document, can we break?

25             MR. OLIVER:  Sure.

Confidential - Pursuant to Protective Order

381

1              MR. SCHMIDT:  Thank you.

2    BY MR. OLIVER:

3       Q.   So look with me at page 7.  It's going to

4    be 983 on the Bates label.  And this -- take a

5    minute to look at it.

6              This summarizes the reasons that

7    Instagram's teams had determined they should launch

8    the private-by-default function; correct?

9       A.   Yes.

10      Q.   And the first one was that it was going to

11   increase teen safety; correct?

12      A.   That's correct.

13      Q.   And it says:

14              "Defaulting teens to private will

15              prevent high severity actions such as

16              child grooming and inappropriate

17              contact with minors."

18              Right?

19      A.   I see that.

20      Q.   So launching private by default would

21   prevent things like strangers sending pictures of

22   their genitalia to underage people; right?

23              MR. SCHMIDT:  Objection.  Foundation.

24              THE WITNESS:  That's possible.

25   ///

Confidential - Pursuant to Protective Order

1  BY MR. OLIVER:

2      Q.   Well, it's not possible.  That's what the

3  document says; right?

4           MR. SCHMIDT:  Object to characterization.

5           THE WITNESS:  It doesn't say that exactly,

6  but it says, yes, it can prevent high severity

7  actions such as child grooming and inappropriate

8  contact with minors.

9  BY MR. OLIVER:

10     Q.   So one kind of inappropriate contact with

11 minors would be sending pictures of your genitalia

12 to --

13     A.   Sure.

14     Q.   Okay.  And child grooming is even more

15 severe; right?

16     A.   Yes.  It's very severe.

17     Q.   That's when a sexual predator reaches out

18 to an underage person on Instagram or another social

19 media app and grooms them for abuse; right?

20     A.   Yes.

21     Q.   So one of the reasons that private by

22 default was good was because it would prevent those

23 things; true?

24           MR. SCHMIDT:  Object to characterization.

25           THE WITNESS:  Well, I don't know if it will

Confidential - Pursuant to Protective Order

383

1    prevent all the cases, but it would prevent some

2    cases, yes.

3    BY MR. OLIVER:

4        Q.    And you would agree with me that preventing

5    even one instance -- even one instance of a grooming

6    of a minor by a predator -- that would be worth it,

7    to launch private by default; right?  Even if we

8    just prevented one person from undergoing that

9    process.

10              MR. SCHMIDT:  Objection.  Foundation.

11              THE WITNESS:  Like I said, I really don't

12    make these decisions.  This is something that

13    Instagram leadership makes.  And my role in this

14    project was to talk about the ecosystem and the

15    growth impact.  And they are the people who weigh

16    these decisions and make those decisions.

17    BY MR. OLIVER:

18        Q.    But you and your team did make a

19    recommendation here; correct?

20        A.    That is correct.

21        Q.    And it was to not launch it; right?

22        A.    That's correct.

23        Q.    And that's ultimately what happened at this

24    time; correct?

25              MR. SCHMIDT:  Object to characterization.

Confidential - Pursuant to Protective Order

384

1          THE WITNESS:  I believe the project was
2    postponed to look at other potential solutions which
3    could also have these same safety benefits that are
4    lower impact to growth.
5    BY MR. OLIVER:
6        Q.   So the second reason that you should
7    default teams to private accounts is that's what
8    teen users expected from you; right?
9        A.   That's what this document suggests.
10       Q.   And the third reason was that's what teens'
11   parents expected from Instagram; correct?
12       A.   That's what the document suggests.
13       Q.   And the fourth reason was that's what legal
14   regulators expected; correct?
15       A.   Yes.  That's what the document suggests.
16       Q.   And the fifth reason was that's what safety
17   experts expected; correct?
18       A.   Again, that's what the document suggests.
19       Q.   And the sixth reason was that you had
20   already told people you were going to do it; right?
21       A.   Looks like it.
22       Q.   But you didn't do it at that time?
23       A.   My understanding is -- was it was postponed
24   a little bit longer.
25          MR. OLIVER:  Let's go to what we'll mark as

Confidential - Pursuant to Protective Order

568

1    BY MR. SCHMIDT:

2        Q.   Were you part of that final

3    decision-making?

4        A.   No.

5        Q.   Let's look at a document.  You were asked

6    some questions about teens using Instagram.  Do you

7    remember those?

8            MR. PHELPS:  Objection to form.

9            THE WITNESS:  Yes.  I remember being asked

10   about teens.

11   BY MR. SCHMIDT:

12       Q.   From your perspective, is there something

13   wrong with providing a service like Instagram that

14   is valuable for teens?

15           MR. PHELPS:  Objection.  Form.

16           THE WITNESS:  No.

17   BY MR. SCHMIDT:

18       Q.   Are you aware that other social media

19   companies focus on teens as well as adults, as do a

20   whole host of nonsocial media companies?

21           MR. PHELPS:  Objection.  Form.  Foundation.

22           THE WITNESS:  Yes.

23   BY MR. SCHMIDT:

24       Q.   Let's look at a document you were shown on

25   that.  I'm handing you Exhibit 16.  Do you remember

Confidential - Pursuant to Protective Order

569

1   being shown this document by plaintiffs' attorney

2   yesterday?

3       A.   I do.

4       Q.   Let's look at page 3 of this document,

5   please.

6           Do you see this message to you from █████

7   ████████   that you were asked about where there's

8   reference to the, quote, "early teen cohort"?

9       A.   Yes.

10          MR. PHELPS:  Objection.  Characterization.

11          MR. SCHMIDT:  I'm just going to note for

12  the record there's been objections to just about

13  every question.  99 percent of them are frivolous.

14          MR. PHELPS:  Hold on a second.  What's the

15  frivolity of that?

16          MR. SCHMIDT:  There's no objection to

17  asking a witness about his knowledge about his work.

18  That's not a proper foundation objection.  That is

19  laying foundation, as an example.

20          And I literally quoted the document on the

21  specific questions.

22          But let's move on, in terms of getting you

23  out of here, Mr. Kilstein.

24  BY MR. SCHMIDT:

25      Q.   Do you see four lines down there's a

Confidential - Pursuant to Protective Order

570

1    reference -- and I'm looking at the end of the

2    fourth line down where it begins "Given how..."

3              Do you see that?

4         A.   Yes.

5         Q.   Do you see there's a reference to given how

6    important this early teen cohort is for the future

7    of IG?  Do you see that?

8         A.   Yes.

9         Q.   Why is the early teen cohort important for

10   the future of Instagram?

11             MR. PHELPS:  Objection.  Foundation.

12             THE WITNESS:  The overall thought process

13   here is that teens will eventually grow up to become

14   adults.  And so to ensure the long-term success of

15   our platform, it's important to help people join

16   earlier where we know they make a lot of decisions

17   about things that they will do when they become

18   adults as well.

19   BY MR. SCHMIDT:

20        Q.   Did I understand you correctly yesterday to

21   say that your view is oftentimes, when you're

22   talking about technology, people tend to stick with

23   the technology they learn when they're an

24   adolescent --

25             MR. PHELPS:  Objection.  Form.

Confidential - Pursuant to Protective Order

1    BY MR. SCHMIDT:

2        Q.    -- over the course of their life or some

3    portion of their life?

4              MR. PHELPS:  I didn't mean to interrupt

5    you.

6              Objection.  Form.

7              THE WITNESS:  Yeah.  That's something that

8    we've always hypothesized, that social media could

9    be somewhat similar to, say, music where you, you

10   know, find your tastes early on and stick with them

11   over time.

12   BY MR. SCHMIDT:

13       Q.    Do you understand this comment about the

14   importance of this cohort to be consistent with that

15   view?

16       A.    Yes.

17       Q.    Now, when you were involved in this

18   discussion about how important this cohort is for

19   the future, did you understand that to relate to

20   obtaining advertising money from early teens at that

21   point in time?

22             MR. PHELPS:  Objection.  Form.

23             THE WITNESS:  Definitely not.

24   BY MR. SCHMIDT:

25       Q.    Why is that?

Confidential - Pursuant to Protective Order

697

1          THE WITNESS:  Like I said, I don't think
2     that's the case.
3     BY MS. GOTWALS:
4          Q.   So the purpose of the notification strategy
5     is one of growth; is that correct?
6          MR. SCHMIDT:  Object to characterization.
7          THE WITNESS:  Notifications is part of the
8     growth team, and their main metric is trying to
9     drive daily active users.
10          MS. GOTWALS:  Thank you.
11          I have nothing else.
12          (Brief discussion held off the
13          stenographic record.)
14                    FURTHER EXAMINATION
15     BY MR. OLIVER:
16          Q.   Good afternoon, Mr. Kilstein.  Again, Lance
17     Oliver for the MDL plaintiffs.  I'm going to try to
18     do this as quickly as possible.
19          MR. OLIVER:  What exhibit are we on, Madam,
20     Court Reporter?
21          I'm going to hand you what we're going to
22     mark as Plaintiffs' 77.
23          (Exhibit 77 was marked for
24          identification and is attached to the
25          transcript.)

Confidential - Pursuant to Protective Order

698

1              MR. OLIVER:  Did I hand you one that had

2     some writing on it?  No, I did not.  Okay.  Does

3     anybody else need copies?

4     BY MR. OLIVER:

5        Q.   Mr. Kilstein, take a moment to read this

6     document and let me know when you've had a chance to

7     familiarize yourself with it.

8              MR. OLIVER:  And while he's doing that, for

9     the record, this document, Plaintiff's Exhibit 77,

10    it's Bates-labeled META3047MDL-003-00013254.

11             THE WITNESS:  Yes.  Okay.

12    BY MR. OLIVER:

13       Q.   Mr. Kilstein, this is an internal work chat

14    between you and Mr. ███████ ███████; correct?

15       A.   That's correct.

16       Q.   Who was Mr. ███████?

17       A.   I believe he was a product manager on one

18    of the safety teams.  I think it was attached to

19    messaging.

20       Q.   Mr. ██████, based on your review of this

21    document, actually worked on the strictest form of

22    the private by default tool that you and I talked

23    about yesterday; correct?

24             MR. SCHMIDT:  Objection.  Foundation.

25             THE WITNESS:  I don't think he worked on

Confidential - Pursuant to Protective Order

699

1    private by default.  I think he worked on messenger

2    reachability, so people being able to reach out to

3    minors on Instagram Direct.

4    BY MR. OLIVER:

5        Q.   Okay.  Regardless, this time period,

6    October 30th, 2020, is the time period during which

7    we discussed yesterday that a decision was being

8    made whether or whether not to launch the strictest

9    form of private by default; correct?

10            MR. SCHMIDT:  Object to characterization.

11            THE WITNESS:  I believe it was around a

12   similar time.

13   BY MR. OLIVER:

14       Q.   Okay.  And you and Mr. ███████  discussed

15   private by default in this work chat; right?

16       A.   I believe so.

17       Q.   Okay.  About three-quarters of the way down

18   the page at -- right here, you say:

19            "Have we considered settings to

20            just let people turn off receiving

21            messages from people that do not follow

22            them?"

23            Did I read that correctly?

24       A.   That's correct.

25       Q.   And then you corrected yourself to say

Confidential - Pursuant to Protective Order

1    "don't" because you had spelled "do not"

2    incorrectly; right?

3        A.    That's correct.

4        Q.    And Mr. ██████ responds and says:

5              "We have.  And IGWB "--

6              That stands for Instagram well-being;

7    right?

8        A.    Yes.

9        Q.    (Reading):

10             "-- even explored private by

11             default for teens, but the growth

12             impact was too high and the decision

13             was to explore more nuanced and less

14             blunt solutions."

15             Did I read that correctly?

16       A.    Yes.

17             MR. SCHMIDT:  Objection.  Scope.

18   BY MR. OLIVER:

19       Q.    So whatever team he worked on, Mr. ██████

20   was aware that the well-being team had suggested a

21   very strict private by default for teens function;

22   correct?

23             MR. SCHMIDT:  Object to characterization.

24             THE WITNESS:  Here he's saying that he was

25   aware that IG well-being explored private by

Confidential - Pursuant to Protective Order

701

1    default, yes.

2    BY MR. OLIVER:

3        Q.   And he was also aware that that strictest

4    version of private by default that we discussed

5    yesterday was not, in fact, launched or approved;

6    correct?

7            MR. SCHMIDT:  Object to characterization.

8            THE WITNESS:  At that point in time, it

9    hadn't been launched.

10   BY MR. OLIVER:

11       Q.   Then Mr. ███████ says:

12           "Which is how we got here,"

13           exclamation point.

14           Right?

15       A.   Yes.

16       Q.   And by that, he just meant how you and I

17   are having this discussion.  That's why we're

18   talking about this; right?

19           MR. SCHMIDT:  Objection.  Gross

20   mischaracterization.

21           THE WITNESS:  "Which is how we got here."

22   Possibly that's what he means.

23   BY MR. OLIVER:

24       Q.   Okay.  And then you say:

25           "Ya.  PBD was my team" -- smiley

702

1          face with your tongue out -- "wasn't an

2          elegant solution.  Nobody looked at the

3          messaging solution, though."

4              Did I read that correctly?

5      A.   That's correct.

6      Q.   And that's what you said; right?

7      A.   Yes.

8      Q.   And when you say "PBD was my team," first

9  of all, you don't mean that your team developed

10  private by default because that's not true, is it?

11     A.   My -- there was a team -- an engineering

12  team -- the friending team did the first iteration

13  of private by default.  And at that time I was

14  overseeing work on the friending team.

15     Q.   But you didn't develop the private by

16  default function or app -- I don't know.  What would

17  you call it?  Function?

18     A.   Function.  Yeah.

19     Q.   Because that's not what you do; right?

20     A.   Correct.

21     Q.   Okay.  So when you say, "PBD was my team,"

22  you're referencing the fact that your team was the

23  one, the growth team, that recommended in October of

24  2020 to not launch the strictest version of private

25  by default; correct?

Confidential - Pursuant to Protective Order

703

1              MR. SCHMIDT:  Object to characterization.

2              THE WITNESS:  What I'm referencing here is

3       that the engineers on the friending team were the

4       people who actually created the first version of

5       private by default.  Even though it was a well-being

6       product and a safety product, the first iteration of

7       it was actually built by the growth team.

8       BY MR. OLIVER:

9          Q.   Well, regardless, based on the PowerPoint

10      that we looked at yesterday from October 2020, your

11      team was the team that said, "Do not launch this in

12      its current form"; correct?

13             MR. SCHMIDT:  Object to characterization.

14             THE WITNESS:  We had our objections to the

15      launch of that; correct.

16      BY MR. OLIVER:

17         Q.   And the reason was because the growth

18      impact was too high; correct?

19         A.   That is correct.

20         Q.   One of the documents you looked at with

21      your counsel, Mr. Schmidt -- and I don't know the

22      exhibit number.  Maybe you can help me.  It's the

23      one that says "Mental Health Understand."  It was

24      the Yoav Shapira development.

25             MR. SCHMIDT:  Yoav.  It's 72.

Confidential - Pursuant to Protective Order

742

1                              ---oOo---

2

3          I, JENNY L. GRIFFIN, hereby certify:

4          That I am a certified shorthand reporter in and for

5     the County of Alameda, State of California;

6          Prior to being examined, DARIUS KILSTEIN, the

7     witness named in the foregoing deposition, was by me

8     duly sworn to testify to the truth, the whole truth, and

9     nothing but the truth; that said deposition was taken

10    pursuant to notice at the time and place therein set

11    forth, and was taken down by me in stenotype and

12    thereafter transcribed by means of computer-aided

13    transcription, and that said deposition is a true record

14    of the testimony given by the witness.

15         I further certify that I am neither counsel for nor

16    related in any way to any party to said action, nor

17    otherwise interested in the outcome thereof.

18         In witness whereof, I have hereunto subscribed my

19    name December 31, 2024.

20

21                    JENNY L. GRIFFIN
                      CSR 3969, RMR, CRR, CCRR
22    _____

23              JENNY L. GRIFFIN, CSR #3969

24              Certified Shorthand Reporter

25