**AMENDED** Exhibit 39

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

CONFIDENTIAL

```
                                          Page 1

 1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE: SOCIAL MEDIA        ) Case No. 4:22-md-3047-YGR
     ADOLESCENT ADDICTION/      )
 4   PERSONAL INJURY PRODUCTS   ) MDL No. 3047
     LIABILITY LITIGATION       )
 5   _____)
                                )
 6   This Document Relates To:  )
                                )
 7   ALL ACTIONS                )
     _____)
 8
             SUPERIOR COURT OF THE STATE OF CALIFORNIA
 9                    COUNTY OF LOS ANGELES
                     UNLIMITED JURISDICTION
10
     COORDINATION PROCEEDING        )
11   SPECIAL TITLE (RULE 3.550)     ) Judicial Council
                                    ) Coordination Proceeding
12   SOCIAL MEDIA CASES             ) No. 5255
     _____)
13   This Document Relates To:      )
                                    ) Judge: Carolyn B. Kuhl
14   ALL ACTIONS                    ) Dept. 12
     _____)
15
16        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
17        30(B)(6) VIDEOTAPED DEPOSITION OF ███████
                      MAY 8, 2025
18                   (Pages 1 - 209)
                 9:30 a.m. to 4:00 p.m.
19
                   Covington & Burling
20        850 10th St NW, Washington, DC 20001
21
     Reported By: Amanda Blomstrom, RMR, CRR, and
22   CSR TX #8785/CA #12681/IL #84-3634
```

CONFIDENTIAL

```
                                            Page 2
 1              APPEARANCES
 2   FOR THE MDL PERSONAL INJURY/SCHOOL DISTRICT PLAINTIFFS:
 3        WAGSTAFF & CARTMELL LLP
          BY: MARC K. ERICKSON, ESQ.
 4        BY: ZACHERY E. GAYLON, ESQ.
          BY: MATTHEW A. KAUFMAN, ESQ. (Via Zoom)
 5        BY: ROBERT G. GROVES, ESQ. (Via Zoom)
          4740 Grand Avenue
 6        Suite 300
          Kansas City, Missouri 64112
 7        816.701.1100
          merickson@wcllp.com
 8        zgalyon@wcllp.com
          mkaufman@wcllp.com
 9        rgroves@wcllp.com
10
     FOR THE MDL PERSONAL INJURY/SCHOOL DISTRICT PLAINTIFFS:
11
          ANAPOL WEISS
12        BY: PAIGE BOLDT, ESQ. (Via Zoom)
          130 North 18th Street
13        Suite 1600
          Philadelphia, Pennsylvania 19103
14        215.929.8822
          pboldt@anapolweiss.com
15
16   FOR THE MDL PERSONAL INJURY/JCCP PLAINTIFFS:
17        GOZA & HONNOLD
          BY: GRACE QUINLAN, ESQ. (Via Zoom)
18        9500 Nall Avenue
          Suite 400
19        Overland Park, Kansas 66207
          913.451.3433
20        gquinlan@gohonlaw.com
21
22
```

CONFIDENTIAL

```
                                                Page 3
 1               APPEARANCES (CONT'D)
 2   FOR THE STATE OF COLORADO:
 3        OFFICE OF THE COLORADO ATTORNEY GENERAL
          BY: STEVEN KAUFMANN, ESQ. (Via Zoom)
 4        Ralph L. Carr Judicial Building
          1300 Broadway
 5        9th Floor
          Denver, Colorado 80203
 6        720.508.6000
          steven.kaufmann@coag.gov
 7
     FOR THE STATE OF CONNECTICUT:
 8
          OFFICE OF THE CONNECTICUT ATTORNEY GENERAL
 9        BY: KRISLYN LAUNER, ESQ. (Via Zoom)
          165 Capitol Ave
10        Hartford, Connecticut 06106
          860.808.5150
11        krislyn.launer@ct.gov
12
     FOR THE STATE OF NEW JERSEY:
13
          OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
14        BY: VERNA J. PRADAXAY, ESQ.
          124 Halsey Street
15        5th Floor
          Newark, New Jersey 07101
16        609.712.2828
          verna.pradaxay@law.njoag.gov
17
     FOR THE STATE OF WEST VIRGINIA:
18
          OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
19        BY: ABBY CUNNINGHAM, ESQ. (Via Zoom)
          BY: LAUREL K. LACKEY, ESQ. (Via Zoom)
20        P.O. Box 1789
          Charleston, West Virginia 25326
21        304.558.8986
          abby.g.cunningham@wvago.gov
22        laurel.k.lackey@wvago.gov
```

CONFIDENTIAL

```
                                            Page 4

 1                 APPEARANCES (CONT'D)
 2    FOR THE DEFENDANTS META PLATFORMS, INC., F/K/A
      FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC; FACEBOOK
 3    OPERATIONS, LLC; FACEBOOK PAYMENTS, INC.; FACEBOOK
      TECHNOLOGIES, LLC; INSTAGRAM, LLC; SICULUS, INC.;
 4    AND MARK ELLIOT ZUCKERBERG:
 5         COVINGTON BURLING LLP
           BY: CHRISTIAN J. PISTILLI, ESQ.
 6         BY: MADELEINE DOLAN, ESQ.
           BY: CASANDRA MERCEDES DELGADO, ESQ.
 7         BY: CHERINE FOTY, ESQ. (Via Zoom)
           One CityCenter
 8         850 10th Street, NW
           Washington, D.C. 20001
 9         202.662.6000
           cpistilli@cov.com
10         mdolan@cov.com
           cdelgado@cov.com
11         cfoty@cov.com
12
      FOR THE DEFENDANT SNAP:
13
           MUNGER TOLLES & OLSON LLP
14         BY: MAGGIE J. BUSHELL, ESQ. (Via Zoom)
           350 South Grand Avenue
15         50th Floor
           Los Angeles, California 90071
16         213.683.9141
           maggie.bushell@mto.com
17
18    FOR THE DEFENDANTS TIKTOK INC. AND BYTEDANCE INC.:
19         KING & SPALDING LLP
           BY: BRITTANY LITZINGER, ESQ. (Via Zoom)
20         633 West Fifth Street
           Suite 1600
21         Los Angeles, California 90071
           213.443.4351
22         blitzinger@kslaw.com
```

CONFIDENTIAL

Page 5

```
 1              APPEARANCES (CONT'D)
 2   FOR THE DEFENDANTS YOUTUBE LLC AND GOOGLE LLC:
 3        WILSON SONSINI GOODRICH & ROSATI PC
          BY: TOMAS ARRIAGA, ESQ. (Via Zoom)
 4        953 East Third Street
          Suite 100
 5        Los Angeles, California 90013
          323.210.2942
 6        tarriaga@wsgr.com
 7
 8   ALSO PRESENT:
 9        KRISTEN LEJNIEKS, Esq., Meta In-House Counsel
10
11   LITIGATION TECHNICIAN:
12        OLIVIA SATTAN, Golkow
13
     VIDEOGRAPHER:
14
          DeSHAWN WHITE, Golkow
15
16
                  ZOOM APPEARANCES
17
     Abigail's iPhone
18   Benjamin Swanson
     Caitlin Micko
19   Corin Stigall
     Mandy Wang
20   Savannah Grant
     Zach Richards
21
22
```

CONFIDENTIAL

```
                                              Page 13
 1            Exhibit 1, I understand it, is a printout
 2   of your LinkedIn profile; is that correct?
 3        A.    That's correct.
 4        Q.    Okay.  And what is Exhibit 2?
 5        A.    Exhibit 2 is a short bio about my
 6   employment history.
 7        Q.    Okay.  So you have -- let's walk through
 8   your experience, starting, it looks like, in 2016.
 9   Is that the first time you went to work for a Meta
10   entity?
11        A.    Yes.
12        Q.    Okay.  And who exactly did you work -- get
13   hired by in June of '16?
14        A.    The specific name of --
15        Q.    Yeah.
16        A.    -- the person --
17        Q.    What company --
18        A.    -- that hired me?
19        Q.    No, what company.
20        A.    Oh.  Well, I was technically hired to work
21   on the Instagram app, which was owned by Facebook.
22        Q.    Okay.  And this is a 30(b)(6) deposition.
```

Page 14

1    Do you have an understanding of what that means?

2         A.    I do.

3         Q.    Okay.  And so this is a deposition --

4               Will you get Tab 40 for me.

5               -- that, in which you are representing --

6    you are representing -- you are the representative of

7    Meta today.

8               You understand that, correct?

9         A.    I do.

10        Q.    Okay.  And you understand that you are

11   responsible for answering questions on behalf of,

12   that you are speaking for the Meta entities, correct?

13        A.    Yes.

14        Q.    And in -- what is your understanding of

15   what the Meta entities are?

16        A.    The Meta entities include the -- what we

17   refer to as the family of apps.  So that includes

18   Instagram; WhatsApp; Facebook, the app; and a number

19   of other entities.

20        Q.    And you understand that you are here to

21   testify on behalf of the Meta -- Meta entities, even

22   if you personally don't have knowledge of the topics

CONFIDENTIAL

Page 15

1    that you're talking about?

2        A.    Correct.

3        Q.    I'm going to go over the Dep -- the

4    Deposition Notice on the various topics in a minute

5    here, but I want to go back to your LinkedIn profile.

6        A.    Sure.

7        Q.    So in 20 -- in June of 2016, you were

8    hired as Public Policy manager, Global Politics,

9    Government and Elections, and that was at Instagram,

10   correct?

11       A.    Correct.

12       Q.    Okay.  Explain to me what your job

13   responsibilities were as Public Policy manager.

14       A.    Sure.  So my job was to help educate

15   individuals in government, government agencies,

16   political figures, political campaigns, on the tools

17   that Instagram offered to help them connect with

18   voters.

19            I also was responsible for coming up with

20   creative campaigns to encourage young people to

21   engage in the civic sphere on Instagram.  So that

22   could include things like vote stickers on Instagram

CONFIDENTIAL

Page 16

1    Stories, to promoting ways to ensure you are

2    registered to vote through Instagram.

3         Q.    Okay.  Were you a lobbyist for Instagram

4    or Meta at that point?

5         A.    No.

6         Q.    Have you ever served as a lobbyist for any

7    of the Meta entities?

8         A.    No.  I have not registered as a lobbyist.

9         Q.    Who did you report to when you were the

10   public policy manager?

11        A.    I reported to an individual named

12   John Tass-Parker.

13        Q.    And what was his title?

14        A.    He was the head of Global Politics,

15   Government and Elections at Instagram.

16        Q.    Is that the title you have now?

17        A.    It is not.

18        Q.    In describing your responsibilities as

19   Public Policy manager, you talked about encouraging

20   young people to vote.  Tell me about that.  What was

21   your role specifically in that regard?

22        A.    Sure.  So we recognized that there was a

Page 17

1   clear visual component to how young people were

2   engaging in elections.  If you think about the

3   selfies people were taking of their "I Voted"

4   stickers.  And so we wanted to capitalize on that and

5   figure out how we can encourage more young people to

6   share the things that they cared about most when it

7   came to civic engagement on Instagram.

8         So I mentioned before, there were some

9   creative stickers where we'd work with artists to put

10  them on to Instagram Stories that young people could

11  leverage after they voted; that was both here in the

12  U.S., but also globally we launched these stickers.

13         And then we also helped partnerships with

14  different elections, organizations, where we would

15  encourage people to register to vote through what's

16  called a QP on Instagram.  So when you log on to

17  Instagram, you have it at the top of your News Feed,

18  an entry point where you can register to vote.

19      Q.    In that effort, did you engage with any

20  school districts?

21      A.    No.

22      Q.    Then from 2018 to 2021, you became

Page 18

1    Public -- I'm sorry, Policy Programs manager for

2    Youth Safety and Well-Being, correct?

3        A.    That's correct.

4        Q.    And what were your job responsibilities at

5    that point?

6        A.    My job was to build partnerships and

7    programs to help ensure the safety and well-being of

8    young people on Instagram.

9            There are a number of ways that we did

10   that.  I would build partnerships with different

11   youth organizations, let's say the Girl Scouts of

12   America, and develop a program on digital literacy

13   that we would then share with young people involved

14   with the Girl Scouts so that they knew the tools that

15   they needed to navigate online spaces safely and

16   confidently.

17           I would also work with external experts

18   in different fields around youth safety and well-

19   being -- so that could be bullying prevention, mental

20   health -- and we would bring their expertise into the

21   product development cycle.  What that means is we

22   would connect them with different folks on our

CONFIDENTIAL

Page 19

1    Product Team to make sure we were considering all

2    angles as we developed different products.

3        Q.    And other than the Girl Scouts, what other

4    types of entities did you build partnerships with?

5        A.    Sure.  We developed partnerships with

6    the -- let's see, the National Eating Disorders

7    Association, Trevor Project, the National PTA, a

8    number of groups that -- that reached young people,

9    specific young audiences, but then also the people

10   that we know who are often talking to them about

11   digital safety; so that often included parent

12   organizations.

13       Q.    And when you say "parent organizations,"

14   are you talking about school parent organizations or

15   other parent organizations?

16       A.    The primary partner that we worked with

17   to -- to reach parents would be the National PTA.

18       Q.    And did you ever work directly with any

19   school districts while you served as the Policy

20   Programs manager, Youth Safety and Well-Being, from

21   2018 to 2021?

22              MR. PISTILLI:  Just so -- are you asking

CONFIDENTIAL

Page 20

1   her personal capacity?

2            MR. ERICKSON:  Yes.

3            MR. PISTILLI:  Okay.

4            THE WITNESS:  Well, through our program

5   with the National PTA, the National PTA has a

6   network, of course, of schools that they work with,

7   and so, when we would build educational materials

8   around youth safety and well-being and the resources

9   that parents should be aware of as they talked to

10  their teens about navigating Instagram, we would have

11  a select handful of events at schools.

12  BY MR. ERICKSON:

13       Q.    Okay.  When you had -- hand -- did you

14  personally attend any of these events at schools?

15       A.    I did.

16       Q.    Would you only attend events in the local

17  area, or would you attend events all over the

18  country?

19       A.    I attended events outside of the local

20  area.

21       Q.    And how often during those three years

22  were you attending events at school districts or

CONFIDENTIAL

Page 25

1          To get in to schools, oftentimes there is

2     a grant associated with that through the National

3     PTA, and that's just to make sure they can provide

4     pizza to the parents and teachers who come out, and

5     other resources for those events.

6          Q.    When did the relationship between Meta and

7     the National PTA start?

8          A.    I can't say with specificity because I do

9     think it predates me, but I think that Facebook began

10    a relationship with the National PTA as early as

11    2014, possibly earlier.

12         Q.    So in the approximately last 10 or

13    11 years in which Meta has had this relationship with

14    the National PTA, has the National PTA always handled

15    direct contact with the schools or has there been any

16    point where Meta entities directly contacted schools

17    for the purposes of the National PTA relationship?

18              MR. PISTILLI:  Object to the form.

19              You can answer.

20              THE WITNESS:  Yeah, I -- I can't recall

21    a time that Meta or Instagram or Facebook worked

22    directly with those schools as it relates to the

Page 26

1   National PTA.  In fact, I think the National PTA

2   is pretty focused on making sure they own those

3   relationships and own communications.

4   BY MR. ERICKSON:

5       Q.    So essentially what you're saying is,

6   essentially, the National PTA is preventing Meta

7   entities from contacting the schools directly?

8           MR. PISTILLI:  Objection; misstates prior

9   testimony.

10          THE WITNESS:  Yeah, I wouldn't say

11  "preventing."  That would imply that there was a

12  strong desire for us to connect directly with the

13  schools.  I think it's more, that's the process.

14  They have a number of corporate partners that they

15  work with, from GM, you know, to Meta to X to a

16  number of different corporate partners.  So that's

17  just their mode of operation.

18  BY MR. ERICKSON:

19      Q.    So as I understand your testimony, Meta

20  did not have a strong desire to contact the schools

21  that were being serviced by the National PTA under

22  this relationship; is that correct?

CONFIDENTIAL

Page 39

1    it is something that is -- is potentially harmful for

2    a student.

3        Q.    And so how recently was this School

4    Partnership Program launched?

5        A.    The School Partnership Program, we've --

6    launched a pilot back in 2024 with a select handful

7    of schools, in partnership with ISTE, the

8    International Society for Technology and Education,

9    and we're looking to have a larger launch of up to a

10   thousand schools over the next few months.

11       Q.    Okay.  So the School Partnership Program

12   pilot was launched after this lawsuit was filed,

13   correct?

14       A.    The School Partnerships Program was

15   launched in 2024.  I know teams were having

16   conversations around this concept before that,

17   before 2024.

18            There are challenges with building a flow

19   like this.  It's important that we're able to verify

20   that someone is actually an administrator with a

21   school.  There is difficulties with doing that.  So

22   we wanted to make sure we were getting this right

CONFIDENTIAL

Page 40

```
 1   before we deployed it here in the U.S.
 2        Q.    Okay.  My question was very specific.
 3              The School Partnership Program pilot was
 4   launched after the lawsuit was filed, correct?
 5              MR. PISTILLI:  Objection; asked and
 6   answered.
 7              THE WITNESS:  When was the lawsuit
 8   specifically filed?
 9   BY MR. ERICKSON:
10        Q.    Do you know?
11        A.    I don't.
12        Q.    Okay.  The Amended Petition was filed
13   March 27, 2024.
14        A.    The pilot then happened after that.
15        Q.    And who -- the -- who oversees the School
16   Partnership Program; who is the responsible person
17   for it?
18        A.    There are a number of people who are
19   working on the technological side of this initiative,
20   who are working on communicating about it; so there's
21   not one singular individual.  There is a -- there is
22   a product team that's working on this.  There's --
```

CONFIDENTIAL

Page 47

1    that could be reported?

2             MR. PISTILLI:  Objection; misstates prior

3    testimony.

4             THE WITNESS:  I am aware of bullying and

5    harassment being involved.  It --

6    BY MR. ERICKSON:

7        Q.    And violence?

8        A.    And graphic violence.

9        Q.    And so what does it mean -- what does

10   "graphic violence" mean?

11       A.    It can include anything that might happen

12   at school.  So if there is a fight at school and

13   someone takes a video of it and posts it to -- to one

14   of the platforms, that would be something that an

15   administrator could report to us.

16       Q.    Okay.  So the potential violations that

17   are reported up through the School Partnership Pilot

18   Program at this point include bullying and harassment

19   and graphic violence, correct?

20       A.    That's my understanding.

21       Q.    Okay.  And so, as I understand what you're

22   saying, if there is a fight video or something that

Page 50

1      Q.    Okay.  So --

2            (Brief interruption.)

3   BY MR. ERICKSON:

4      Q.    Okay.  So as I understand this prioritized

5   review, the School Partnership Program, the

6   administrators can contact you and request that a

7   post, a specific post, be taken down, correct?

8      A.    Um-hmm.

9      Q.    "Yes"?

10     A.    It can be a post.  It could be an account

11  as well.

12     Q.    Okay.  Is there any special process

13  undertaken to take down an account in the School

14  Partnership Program?

15     A.    There's no special process.  Any report

16  that we're receiving from a school administrator

17  associated with the School Partnership Program is

18  prioritized for review.

19     Q.    Okay.  Does a school need to have its own

20  Instagram account or Facebook account in order to

21  make one of these complaints?

22     A.    I believe so.

CONFIDENTIAL

Page 52

1      A.    It's all done in-app, and so a school,

2   when they are brought into the program, is able to

3   access additional resources directly through the app.

4   It may bump them to an external website, but they're

5   all resources that were developed with leading

6   experts and partners.

7      Q.    And were those leading experts and

8   partners compensated by Meta?

9      A.    I don't know.

10     Q.    Who would know?

11     A.    I think ████████████ would know.  I

12  do know we -- we compensated the International

13  Society for Technology and Education for the pilot

14  initiative, because they had to do, as I mentioned,

15  the communications with schools and identifying

16  schools.  I don't know, though, about the content,

17  which is what your question was specifically.

18     Q.    And so, in terms of reporting these

19  violations, the school administrator has to do that

20  through their Facebook app or their Instagram app,

21  correct?

22     A.    Correct.

CONFIDENTIAL

Page 94

1    two."

2             You see that?

3        A.    I do.

4        Q.    Okay.  And so this is what we were talking

5    about a little bit with regard to Scott Bratsman,

6    correct?

7        A.    Yes.

8        Q.    Okay.

9        A.    I think so, yeah.

10       Q.    And the Product Team was trying to come up

11   with a way to confirm where -- where teens went to

12   high school as part of this youth growth strategy,

13   correct?

14       A.    Yes, they were looking to understand how

15   they could correctly identify a teen's school

16   affiliation.  You'll see, on the next few pages, and

17   we discussed this too with other conversations I had,

18   a lot of teens would put Hogwarts, I like some of the

19   other examples included here, so there were a number

20   of challenges for correctly identifying what school a

21   teen went to.

22       Q.    Okay.  Let's go to the next page, please.

CONFIDENTIAL

Page 97

1    opportunity is.

2        Q.    In order for Facebook to grow their youth

3    market, they thought it was important for them to

4    know where these students went to high school,

5    correct?

6        A.    It appears to be something that we were

7    exploring.  It's important to note, though, that this

8    didn't end up going to market.

9        Q.    Even though the students themselves more

10   than half the time didn't want to tell Facebook where

11   they went to high school, Facebook wanted to figure

12   out where they went to high school, correct?

13       A.    I don't know if a teen didn't want to or

14   if a teen just didn't include their school.  I don't

15   know that saying Hogwarts is because they're

16   intentionally trying to obfuscate their school

17   affiliation with Meta.  I think some teens just

18   didn't include that information.

19       Q.    Well, when given the opportunity to

20   volunteer where they went to high school, more than

21   50 percent of the students declined to do that,

22   didn't they?

CONFIDENTIAL

Page 145

1    question again?  I want to make sure I'm answering

2    it, but I --

3        Q.    Does Meta have any information about how

4    students use the Meta social media apps while at

5    school?

6        A.    So from conversations that I had with a

7    number of people who looked into this at different

8    times, it looks like they're able to -- to look at

9    different signals to understand when teens are online

10   and jump to whether that is during the school day or

11   not, or if they are physically at school, using some

12   of the technology we talked before where we're

13   understanding the location, if you're at a movie

14   theater or --

15       Q.    Okay.  So --

16       A.    -- a store, so --

17       Q.    -- your testimony is that the only

18   information that Meta has about how students use

19   Meta's social media apps while at school is the

20   different signals that they can use to identify

21   where the app is being used, correct?

22            MR. PISTILLI:  Objection; misstates prior

CONFIDENTIAL

Page 146

1    testimony.

2                THE WITNESS:  Yeah.

3                No, I -- forgive me, I thought you were

4    asking, like, technically how.  I mean, often,

5    product teams have conversations with teens to

6    understand their online experience, how they're using

7    the platform.  So it's very reasonable that in some

8    of those focus group conversations or in research,

9    students are asked about or offer up information

10   about how they use social media or our apps

11   specifically while at school.

12   BY MR. ERICKSON:

13       Q.    In preparing for this deposition, you have

14   not reviewed any such information from focus groups,

15   have you?

16       A.    I've not.

17       Q.    Meta does not have any surveys that it's

18   conducted to determine how much -- how often students

19   are using the Meta social media apps while in school,

20   have -- have they?

21               MR. PISTILLI:  Object to the form.

22               THE WITNESS:  Again, my -- my exposure to

Page 190

1    adolescent girls using digital technologies.

2         And then I came to Instagram because I

3    felt so strongly about the power of these tools to

4    encourage young people to build community and do

5    amazing things.

6    BY MR. PISTILLI:

7         Q.    Do you remember testifying earlier today

8    about partnerships Meta has engaged in with educators

9    and folks in the education space?

10        A.    I do.

11        Q.    Can you please tell the jury about some of

12   those partnerships with educators.

13        A.    Sure.  So we have partnered with a number

14   of different organizations, like the National PTA,

15   for a number of years to make sure we are arming

16   parents and teachers and educators and young people

17   with the information they need to navigate social

18   media safely and competently.  And we've done this in

19   a number of ways.  The National PTA partnership has

20   taken many different forms.

21        Between the years of, I believe, 2018-

22   2019, we had something called Digital Family Nights

CONFIDENTIAL

Page 191

1    where, in partnership with the National PTA, there

2    were events at nearly 200 schools across the country,

3    in every single state, I believe, where we were

4    meeting with parents and teachers and talking to them

5    about the digital foundations of safety as it relates

6    to social media and -- and beyond.

7        Q.    What are some other initiatives Meta has

8    undertaken in partnership with the National PTA?

9             MR. ERICKSON:  Object to form.

10            You can answer.

11            THE WITNESS:  We've also built parents'

12   guides with the National PTA.  We -- which we've

13   distributed through a lot of their networks.  We've

14   brought them in as we've developed products that are

15   specifically geared towards supporting pare1nts and

16   young people.

17            Yeah, there -- there are events that we

18   have held over the past year, schools in -- a school

19   in Ohio, where we showed up and provided these

20   resources.  There is actually someone today, I

21   believe out in Utah, visiting the state PTA Utah

22   event -- convention there and hosting a session

Page 192

1  around our tools and resources, and then also hosting

2  a focus group with attendees to make sure we're

3  hearing the latest concerns, pain points, and also

4  things that they love about social media.

5  BY MR. PISTILLI:

6      Q.    And at these events does Meta personnel

7  have the opportunity to interact with school

8  personnel?

9      A.    We do.

10     Q.    And what sort of things, to your

11  understanding, are discussed with educators at

12  these events?

13     A.    It depends.  We will often do tabling

14  at these events, and so educators or parents or

15  administrators will come up to the booth and either

16  ask some really technical question or raise concerns

17  that they have.  They'll attend some of the sessions

18  to learn more, yeah.

19     Q.    Okay.  Thank you.

20     A.    Sure.

21     Q.    Switching gears.

22          Has Meta ever done any formal research

CONFIDENTIAL

Page 209

1              REPORTER'S CERTIFICATION

   DEPOSITION OF ██████████████

2                   MAY 8, 2025

3       I, Amanda Blomstrom, a Notary Public in and for

4   the District of Columbia, hereby certify to the

5   following:

6        That the witness, ██████████████, was duly sworn

7   by the officer and that the transcript of the oral

8   deposition is a true record of the testimony given by

9   the witness;

10       That the deposition transcript was submitted to

11  the witness or to the attorney for the witness for

12  examination and signature;

13       I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties or

15  attorneys in the action in which this proceeding was

16  taken, and further that I am not financially or

17  otherwise interested in the outcome of the action.

18       Certified to by me this 12th day of May, 2025.

19                   *Amanda Blomstrom*

20       _____

21       Amanda Blomstrom, CRR, RMR, CLR

         Texas CSR No. 8785

         California CSR No. 12681

22       Illinois CSR No. 84-3634