# AMENDED Exhibit 286

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

```
                                                  Page 1

 1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE: SOCIAL MEDIA            )
     ADOLESCENT ADDICTION/          )
 4   PERSONAL INJURY PRODUCTS       )   MDL No. 3047
     LIABILITY LITIGATION           )
 5                                  )
 6      SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
         COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE
 7
 8   COORDINATION PROCEEDING        )
     SPECIAL TITLE [RULE 3.400]     )
 9                                  )
     SOCIAL MEDIA CASES             )   Lead Case No.
10   _____) )   22STCV21355
     This Document Relates To       )
11                                  )
     STATE OF TENNESSEE, ex rel.    )
12   JONATHAN SKRMETTI,             )
     ATTORNEY GENERAL and           )
13   REPORTER,                      )
     v.                             )
14   META PLATFORMS, INC., and      )
     INSTAGRAM, LLC.                )
15   _____)
16        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
17          VIDEOTAPED DEPOSITION OF ANTIGONE DAVIS
                         VOLUME 1
18                    MARCH 4, 2025
                    (Pages 1 - 376)
19               9:09 a.m. to 6:59 p.m.
20                 Covington & Burling
           850 10th St NW, Washington, DC 20001
21
     Reported By: Amanda Blomstrom, RMR, CRR, and
22   CSR TX #8785/CA #12681/IL #84-3634
```

CONFIDENTIAL

```
                                           Page 16
 1                    ANTIGONE DAVIS,
 2    having been first duly sworn, testified as follows:
 3                       EXAMINATION
 4    BY MR. KAUFMANN:
 5        Q.    Good morning, Ms. Davis.  I am Steven
 6    Kaufmann.  I'm from the Colorado Attorney General's
 7    office.  I'll be asking you some questions and
 8    showing you some documents today.
 9              Before we get started, there are a few
10    preliminaries that I need to read into the record,
11    starting with some stipulations that the parties have
12    agreed to.
13              So, to begin, to further the efficiency of
14    the coordinated depositions among the plaintiffs'
15    groups who have served what's going to be marked as
16    Exhibit 1, which is the Third Amended Cross-Notice
17    Videotaped Deposition of Antigone Davis, and that
18    will be Exhibit 1 to this deposition.
19              All parties agree that any plaintiff
20    group or defendant may participate in or take the
21    deposition virtually or remotely, including
22    conducting virtual or remote questioning.
```

CONFIDENTIAL

Page 17

1              To further the efficiency of the

2    coordinated depositions among plaintiffs' groups, all

3    parties agree that all deposition testimony and

4    deposition transcripts are treated as taken in each

5    plaintiff group's pending actions for purposes of

6    Federal Rules of Civil Procedure 32 and the analogous

7    rules under the Massachusetts Rules of Civil

8    Procedure, the Tennessee Rules of Civil Procedure,

9    the California Rules of Civil Procedure, and other

10   relevant state rules, with admissibility at trial to

11   be determined for each plaintiff group's

12   aforementioned rules.

13             To further the efficiency of the

14   coordinated depositions among plaintiff groups, an

15   objection raised by one plaintiff group shall be

16   treated as an objection raised by all plaintiff

17   groups.  Correspondingly, an objection raised by one

18   defendant shall be treated as an objection raised by

19   all defendants, except in the cases brought by the

20   various State Attorneys General in the multidistrict

21   litigation in which only Meta is a defendant.  In

22   those cases, objections raised by defendants other

Page 18

1    than Meta shall have no effect.

2            All objections and motions to strike,

3    except as to form, and unless discussed herein, are

4    reserved for trial or a later proceeding in each

5    plaintiff group's pending action in which this

6    transcript is used.

7            Does any counsel present have anything to

8    add by way of stipulation for the record?

9            Thank you.

10           (Exhibit Meta-A_Davis-1 marked.)

11   BY MR. KAUFMANN:

12       Q.    Ms. Davis, I will ask you to give a verbal

13   answer to each of my questions.  The court reporter

14   cannot capture nods or other gestures.

15           Do you understand that?

16       A.    I do.

17       Q.    Okay.  If you need to take a break, please

18   let me know.

19           Okay?

20       A.    Okay.

21       Q.    Are you represented by counsel today?

22       A.    I am.

Page 19

1      Q.    And who is your counsel?

2      A.    Mike from Covington.

3      Q.    Great.

4            Have you ever been deposed before?

5      A.    I have not.

6      Q.    Okay.  You have given testimony before?

7      A.    I have given testimony before.

8            (Sotto voce discussion between the witness

9      and counsel.)

10           MR. IMBROSCIO:  I'm sorry.  Just right ...

11           MR. KAUFMANN:  Let the record reflect that

12     the witness --

13           MR. IMBROSCIO:  Yeah, yeah.

14           MR. KAUFMANN:  -- and counsel are

15     conferring.

16           (Sotto voce discussion between the witness

17     and counsel.)

18           THE WITNESS:  Oh, gosh, I'm so sorry.  I

19     did have a deposition in the spring.  I forgot.  I

20     have testified in court.  And I also have done a

21     short deposition in the spring.  I completely

22     blanked.

CONFIDENTIAL

Page 20

```
 1            Thank you.
 2            MR. IMBROSCIO:  It was in the NetChoice
 3    matter, as a third-party.  So it was -- sorry.
 4            THE WITNESS:  I apologize.
 5    BY MR. KAUFMANN:
 6       Q.    Thank you.
 7       A.    Thank you.
 8       Q.    So you'll need to answer my questions
 9    verbally, rather than giving an um-hmm or nodding
10    your head.
11            Do you understand that?
12       A.    I do understand.  If I make a mistake,
13    please correct me.
14       Q.    Okay.
15       A.    I'm sure I will.
16       Q.    You're under oath today, and you're
17    required to provide truthful testimony to the full
18    extent of your knowledge as if you were in trial.
19            If you have some knowledge, even if it's
20    incomplete, you should tell me what you know.
21            Do you understand that?
22       A.    I do --
```

CONFIDENTIAL

Page 21

1          MR. IMBROSCIO:  Object.  Object to the

2    form of the question.

3          You can answer.

4          THE WITNESS:  I do understand.

5    BY MR. KAUFMANN:

6      Q.    Okay.  I will try not to talk over you to

7    the best I can, and I'd ask you to do the same.  Just

8    wait for me to finish before you answer the question.

9          Okay?

10     A.    I will try to do the same, yes.

11     Q.    Okay.  Your counsel will raise objections

12   to my questions from time to time.  Unless your

13   counsel instructs you not to answer a question, you

14   should answer the question as I've asked it.

15          Do you understand that?

16     A.    I do understand.

17     Q.    Okay.  You understand that this deposition

18   is being taken for multiple lawsuits against Meta;

19   some by private plaintiffs and some by state

20   attorneys general.

21          Do you understand that?

22     A.    I do understand.

CONFIDENTIAL

Page 22

1       Q.    Okay.  The information that you provide
2   during this deposition may be used in each of those
3   cases or proceedings.
4              Do you understand that?
5       A.    I do.
6       Q.    Okay.  Are you aware of anything that may
7   affect your ability to give truthful and complete
8   testimony today?
9       A.    I am not aware of any --
10      Q.    Okay.
11      A.    -- such thing.
12      Q.    When I refer to "Meta," I'm referring to
13  all of the defendants in this litigation and each of
14  the platforms that Meta owns or operates.
15             Do you understand that?
16      A.    I do.
17             MR. IMBROSCIO:  And you mean all the Meta
18  defendants in this litigation?
19             MR. KAUFMANN:  That's correct.
20             MR. IMBROSCIO:  Yeah.
21             MR. KAUFMANN:  Thank you, Counsel.
22             MR. IMBROSCIO:  That's okay.

Page 23

1    BY MR. KAUFMANN:

2        Q.    What did you do to prepare for your

3    deposition today?

4        A.    I had meetings with my lawyers.

5        Q.    Approximately how many meetings did you

6    have?

7        A.    Well, it's a little hard to say because

8    the deposition kept getting moved, but maybe about a

9    half dozen in the last -- up for this particular

10   moment in time.

11       Q.    Okay.  And approximately how many hours

12   were those deposition -- those deposition preparation

13   sessions?

14       A.    They varied.  Some were a few hours; some

15   were longer.  But maybe, if I had to guess, maybe

16   20 hours total, if I were putting together the number

17   of times and the number of hours.

18       Q.    Did you meet or speak with anyone at Meta

19   to prepare for your deposition?

20       A.    No.  Other than the lawyers here.

21       Q.    Okay.  Did you speak with anyone at Meta

22   who is not a lawyer?

CONFIDENTIAL

Page 24

1     A.    No.

2     Q.    Okay.  Did you talk to anyone else about

3   this deposition or your testimony today?

4     A.    Other than letting people know I would be

5   in the deposition and not at work, no.

6     Q.    Okay.  Over what time period did your

7   preparation sessions occur?

8     A.    Within the last couple of weeks, except

9   that there were these ones when we thought my

10   deposition was earlier; so those were a while ago.

11     Q.    Okay.  Did you review any documents or

12   other materials to prepare for today's deposition?

13     A.    Some of the --

14           MR. IMBROSCIO:  You can answer "yes" or

15   "no" on that.

16           THE WITNESS:  Yes.

17   BY MR. KAUFMANN:

18     Q.    Okay.  Did you provide any documents to

19   your counsel?

20     A.    No.

21     Q.    Okay.  Did you review any transcripts in

22   advance of today's deposition?

CONFIDENTIAL

Page 25

1          MR. IMBROSCIO:  You mean in addition to --
2    or, excuse me.  I'm going to instruct her not to
3    answer anything that we've done in our preparation
4    session.
5          You can answer to the extent you've
6    reviewed transcripts outside of anything we -- we've
7    worked on together.
8          THE WITNESS:  Outside of anything, no.
9    BY MR. KAUFMANN:
10        Q.    Okay.  What's your current position at
11   Meta?
12        A.    I'm the Vice President and Global Head of
13   Safety at Meta for Safety Policy.
14        Q.    And you're also a licensed attorney?
15        A.    I don't know I -- I have a J.D.  I passed
16   the bar.  My license is no longer active.
17        Q.    Okay.  Do you provide any legal advice in
18   your role at Meta?
19        A.    No.
20        Q.    Have you provided any legal advice in your
21   role at Meta?
22        A.    No.  That would be against the rules

Golkow Technologies,
A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 26

1    for --

2          Q.     Okay.

3          A.     -- being a lawyer.

4          Q.     Generally what does your team do?

5          A.     So my team basically works on safety

6    policy across the company.  We work -- the way I

7    think of our work is we try to take a 360-degree

8    approach: does the company have the right policies in

9    place with regard to, in particular, young people's

10   safety and well-being on the platform; does it

11   have the right tools, those are the tools in the

12   background, technology in the background, as well as

13   in the foreground; do we have the right resources and

14   support for both young people and their families; and

15   then, are we being informed by the important

16   stakeholders, so experts, in this area.

17         Q.     And are those internal experts as well as

18   external experts?

19         A.     Yeah.  We -- we hire people internally,

20   and we also use external experts or work with

21   external experts.

22         Q.     Okay.  Are some of those external experts

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL



CONFIDENTIAL



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL



CONFIDENTIAL



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL



Golkow Technologies,
A Veritext Division

CONFIDENTIAL



CONFIDENTIAL



Golkow Technologies,
A Veritext Division

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL



CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

CONFIDENTIAL

1
1
1
1
1
1
1
1
1
1
2
2
2

Golkow Technologies,
A Veritext Division

CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL

1
1
1
1
1
1
1
1
1
1
2
2
2

CONFIDENTIAL





CONFIDENTIAL

Page 99

1          MR. IMBROSCIO:  Object to the form;

2    foundation.

3          THE WITNESS:  Pardon me.  Can you repeat

4    the question?

5    BY MR. KAUFMANN:

6          Q.    Do you recall that in the second half of

7    2021 more than 5.5 million accounts were removed from

8    Facebook and Instagram?

9          A.    I don't recall that number.  I don't know

10    where you're getting that number from.  But it may be

11    an accurate number.  I -- I don't know.

12          Q.    Okay.

13          If we could look at what we'll mark as

14    Exhibit 9, at META3047MDL-050-00219590, please.

15          (Exhibit Meta-A_Davis-9 marked.)

16    BY MR. KAUFMANN:

17          Q.    Now, this is a chat among a number of

18    individuals at Meta.  I don't believe you were on the

19    chat, but it includes a woman by the name of ███████

20    █████████████████

21          Do you know her?

22          A.    I think she's an attorney.

CONFIDENTIAL

Page 100

1       Q.      Okay.   Is she a practicing attorney at

2    Meta?

3       A.      I believe she's at Meta.

4               MR. IMBROSCIO:  Just give me a minute.

5               Given that testimony, let me just look at

6    the document to make sure there hasn't --

7               MR. KAUFMANN:  Sure.

8               MR. IMBROSCIO:  -- been anything ...

9               (Pause.)

10              MR. KAUFMANN:  This is 9, correct?

11              MS. SHEIKH:  (Nodding head.)

12              MR. IMBROSCIO:  Steve, I'm just -- you

13   know, just looking.  Where does it say ███████████

14   ██████?  I'm just --

15              THE WITNESS:  Right here.

16              MR. IMBROSCIO:  Oh, as one of the people.

17   What page is it?  893?

18              (Sotto voce discussion between counsel and

19   the witness.)

20              MR. IMBROSCIO:  Okay.

21              It looks like -- I don't see anything that

22   looks like legal advice, but ...

CONFIDENTIAL

```
                                        Page 101
 1              MR. KAUFMANN:  It did not strike me as
 2    anything -- as legal advice when I reviewed this
 3    document.
 4              MR. IMBROSCIO:  Yeah.  Thank you for
 5    giving me the chance --
 6              MR. KAUFMANN:  Sure.
 7              MR. IMBROSCIO:  -- to look at it.
 8              Hopefully you've had a chance to.
 9              Okay.  I don't think it's a -- you used
10    the word "work chat."  I don't think that's
11    technically a "work chat."  It's something else.  I'm
12    not sure what it's called, but it's -- work chats are
13    a little different.  But you can ask the witness.
14    BY MR. KAUFMANN:
15         Q.    Do you -- do you know what the tool is
16    that Meta uses for communicating -- for these types
17    of communications?
18         A.    It's not discernible to me from this which
19    tool they are using, sorry.
20         Q.    Okay.
21              Okay.  If you could look at the
22    January 25th, 2:02 a.m. message from ████████████
```

CONFIDENTIAL

Page 102

1    ███████.  And it's just --

2          A.    January 25th?

3          Q.    I believe that's right.

4          A.    Do you have a page --

5                MR. IMBROSCIO:  Yeah, at 90 --

6                THE WITNESS:  -- maybe just to help,

7    please?  Sorry.

8    BY MR. KAUFMANN:

9          Q.    Sure, sure.

10               MR. IMBROSCIO:  93, at the bottom.

11               THE WITNESS:  Okay.  I see it.  I mean, I

12   have the page.

13   BY MR. KAUFMANN:

14         Q.    It's -- it's at the 9 -9593, about a third

15   of the way down.

16               Do you see that?

17         A.    2:02, "Can we combine this one"?

18         Q.    Yes.

19         A.    Okay.

20         Q.    Yes.

21               She says, "Can we combine the Q3 and Q4

22   figures for the following stat: 'In the last two

CONFIDENTIAL

Page 103

1    quarters of 2021, Meta removed more than 4.8 million

2    accounts on Facebook and 1.7 million accounts on

3    Instagram because they were unable to meet our

4    minimum age requirement.'"

5            Do you see that?

6        A.    I do.

7        Q.    Okay.  Does that refresh your recollection

8    as to whether or not accounts were removed in that

9    number range during that time period?

10        A.    It doesn't refresh my recollection.  I

11    apologize.  I see the numbers here, and they -- it

12    looks like they add up to 5.5 million.

13        Q.    Okay.

14        A.    Yes.

15        Q.    Okay.  Now, if you'll look at August 25th.

16    This seems to be a very long communication trail.

17    But on the Page 9592.

18        A.    The prior page, yeah.

19        Q.    Yeah.

20            On August 25th, about two-thirds of the

21    way down, from ███████████████.

22            Do you see that?

```
                                              Page 104
 1        A.    I do.
 2        Q.    Okay.  And who is ███████████?
 3        A.    I don't know.
 4        Q.    You don't know?
 5        A.    No.
 6        Q.    Do --
 7        A.    I mean, I've heard his name before.  I
 8   don't -- other than tell you his name, I don't know
 9   what --
10        Q.    Okay.
11        A.    -- team he works on.
12        Q.    He's a Meta employee?
13        A.    Yes.
14        Q.    Okay.
15        A.    I think all of these are Meta employees.
16        Q.    Okay.  As best you understand, this is a
17   comment history or communication among various Meta
18   employees; is that right?
19        A.    It looks to be --
20        Q.    Okay.
21        A.    -- to me, yes.
22        Q.    And ██████████ says, "Hi all -
```

Page 105

1    wondering if we're planning to update this stat with

2    new numbers that can be shared publicly?  The Public

3    Affairs Marketing team is looking at the possibility

4    of using this stat (IG only) in an upcoming youth

5    well-being campaign, and wanted to see if it would be

6    possible."

7                   And he then cc's ███████ █████████, and

8    ████████████.

9         A.     Um-hmm.

10        Q.     Okay.  Do you see that?

11        A.     I do.

12        Q.     Okay.  So, first of all, who are ██████

13    ████████ and █████████████; do you know?

14        A.     Now they don't have last names.

15               No, I don't know.  I'm sorry.

16        Q.     Okay.  And do you know if Meta ever

17    disclosed the information about the number of

18    accounts removed from Instagram during 2021 because

19    of the inability to verify the age?

20        A.     I don't know if we disclosed.  I -- I do

21    know that we have very strict rules with regard to

22    trying to release this type of data.  We don't want

CONFIDENTIAL

Page 106

1    to make inaccurate statements, and so they're very

2    careful, which it -- it sounds like that's the

3    discussion that's going on here.

4         Q.    Has Meta ever tracked how many

5    13-year-olds were blocked from creating accounts

6    on its platforms?

7         A.    I -- I don't know.

8              MR. IMBROSCIO:  Object.  Object to the

9    form.

10             You can answer.

11             THE WITNESS:  I don't know.  I don't know

12   how they would be able to do that.  Even if you were

13   blocked, for example, we wouldn't know whether you

14   were actually 13 or under 13.

15   BY MR. KAUFMANN:

16        Q.    Okay.  When did Meta --

17             MR. IMBROSCIO:  Steven, just, you said

18   "blocked."  Do you mean prohibited from getting an

19   account or blocked?  There's a tool called

20   "blocking."  I think you guys may not be talking

21   about the --

22             MR. KAUFMANN:  Okay.

CONFIDENTIAL

Page 107

1          MR. IMBROSCIO:  -- same thing.

2          THE WITNESS:  Oh, yeah.

3     BY MR. KAUFMANN:

4          Q.    So what's the tool called "blocking"

5     then --

6          A.    So the tool that's --

7          Q.    -- for an account?

8          A.    -- for blocking is blocking people's --

9     like if you're interacting with someone who may be

10    bothering you and you want to block them.

11         Q.    Okay.  Yeah, I'm asking you about accounts

12    where someone was unable to gain access because they

13    were under 13.

14         A.    Right.  I don't think we would be able to

15    measure that because we would not know for certain if

16    the person was under the age of 13.

17         Q.    When did Meta start asking individuals to

18    voluntarily provide information about their age?

19         A.    I don't know the exact age -- or, the

20    exact date, but I think it's public.  And I think

21    Instagram came later than Facebook.  I want to say

22    2019.  But I also don't want to --

Page 108

1        Q.     Okay.

2        A.     -- misspeak.

3        Q.     When did Meta require that users provide

4    their age?

5        A.     Again, it varies for the different -- for

6    the different apps.  I believe Instagram may have

7    been 2019.  They were already asking for age on

8    Facebook when I joined.  But I don't know the exact

9    specific dates.

10       Q.     And if a user failed to put their age in,

11   for a period of time, Meta defaulted the user either

12   to the age of 18 or 25; is that right?

13             MR. IMBROSCIO:  Object to the form.

14             You keep saying "Meta."  I think it

15   probably would help to be more specific, given her

16   testimony.

17   BY MR. KAUFMANN:

18       Q.     Okay.  Let's talk about Instagram first.

19             If a user failed to enter their age on

20   Instagram, Instagram defaulted the user either to 18

21   or 25, depending on when?

22       A.     I'm not the -- probably the right person

```
                                          Page 109
 1    to ask that question.  I don't know the specifics of
 2    what they --
 3         Q.    Okay.
 4         A.    -- what they did at that time.
 5         Q.    Okay.  Is the same true for Facebook, that
 6    you wouldn't know the information about what the
 7    default --
 8         A.    What they defaulted?
 9         Q.    -- age was?
10         A.    I wouldn't remember.
11         Q.    Okay.  Meta is aware that many individuals
12    don't put their age in when they open an account or
13    put the wrong age in; is that correct?
14         A.    I --
15               MR. IMBROSCIO:  Object to the form.
16               You can answer.
17               THE WITNESS:  Again, I don't think that
18    Meta is aware.  But, again, I don't know about not
19    putting their age in entirely.
20               It is possible for people to lie about
21    their age, which is why we've tried to put in place
22    things like reporting accounts that may be underage,
```

CONFIDENTIAL

Page 110

1   why we try to use age estimation to identify accounts

2   that may be lying about -- about their age.

3   BY MR. KAUFMANN:

4       Q.    When did you first put in place tools to

5   help determine if a person didn't put in their

6   accurate age?

7       A.    So we've been -- again, there's sort of

8   a series of different things that we've tried over

9   periods of time.  So sometimes we would use signals

10  to try to identify, like individual signals.  We've

11  also built out machine learning.

12          So there have been a number of different

13  things that have been tested over the years to try to

14  do that well.

15      Q.    When did that first start?

16      A.    I don't know if it start -- if it preceded

17  me.  I know that there were efforts to try to do it.

18  It's a very challenging, industry-wide, known

19  problem.

20      Q.    Meta understands that many users may

21  overstate their age to access certain features not

22  available to younger users; is that correct?

CONFIDENTIAL

Page 111

1       A.    We don't -- I don't know if we know
2    specifically.  We are aware that people try to lie
3    and/or not share their accurate age.
4       Q.    Okay.  Now, you mentioned that Meta put
5    in place certain tools or machine learning to help
6    detect the age of individuals; is that right?
7       A.    We've tested a number of different things
8    around -- over the years.  I think, again, as I've
9    said, this is an industry-wide challenge to
10   understand the age.  We've tried using various
11   signals to get us more accurate age.  We've tried
12   using different methods.  We're now -- we've recently
13   launched age estimation, Google recently launched age
14   estimation.
15           This is a true industry challenge that
16   people have not been able to easily solve, which is
17   why we've been pushing, in part, for this legislation
18   at the OS level where they have that parent -- at
19   least parent-attested age of minors.
20      Q.    Okay.  So Meta's first use of tools for
21   age verification was related to Facebook Dating in
22   late 2022; is that correct?

CONFIDENTIAL

Page 112

1      A.    I don't know that it was the first use.  I

2  do know that we use tools there to try to block

3  minors from accessing Dating.

4      Q.    Okay.  You would agree that Facebook and

5  Instagram weren't designed for users under the age of

6  13?

7      A.    Yes.  That's in our Terms of Service.  We

8  don't want -- we want to prevent those from being --

9  under the age of 13 from being on the platform.

10      Q.    You would agree that use of Meta's

11  platforms by under-13 users could be harmful to

12  those users?

13           MR. IMBROSCIO:  Object to the form.

14           THE WITNESS:  I -- I wouldn't necessarily

15  make that statement about any one kid.  But what I

16  can say is that our platform was designed with those

17  meant to be 13 and above.

18  BY MR. KAUFMANN:

19      Q.    In addition to excluding under-13 users,

20  Meta has policies, tools, and features to exclude

21  certain content from teen users; is that right?

22      A.    To -- there's some that we gate

CONFIDENTIAL

Page 113

1  from -- from people who are under the age of 18.

2  There is some that we don't recommend to people who

3  are under the age of 18.  When something violates our

4  policies, we're going to remove it entirely.

5       Q.    And when you say there -- there is

6  something that you "gate," you're talking about

7  making an effort to prevent that from reaching a teen

8  account; is that right?

9       A.    Correct.

10      Q.    Okay.

11      A.    People -- not Teen Accounts as what we

12  talked about from -- the new launch of Teen Accounts,

13  but from teens, from those --

14      Q.    Okay.

15      A.    -- under the age of 18.

16           MR. KAUFMANN:  If we could look at what we

17  premarked as COAG 4.

18           This is 10?

19           MS. SHEIKH:  (Nodding head.)

20           (Exhibit Meta-A_Davis-10 marked.)

21           THE WITNESS:  Can I get a little water,

22  please.  That's why I went to this one.

CONFIDENTIAL

Page 890

1                    REPORTER'S CERTIFICATION
               DEPOSITION OF ANTIGONE DAVIS
2                       MARCH 5, 2025
3         I, Amanda Blomstrom, a Notary Public in and for
4    the District of Columbia, hereby certify to the
5    following:
6         That the witness, ANTIGONE DAVIS, was duly sworn
7    by the officer and that the transcript of the oral
8    deposition is a true record of the testimony given by
9    the witness;
10        That the deposition transcript was submitted to
11   the witness or to the attorney for the witness for
12   examination and signature;
13        I further certify that I am neither counsel for,
14   related to, nor employed by any of the parties or
15   attorneys in the action in which this proceeding was
16   taken, and further that I am not financially or
17   otherwise interested in the outcome of the action.
18        Certified to by me this 19th day of March, 2025.
19                     *Amanda Blomstrom*
20        _____
          Amanda Blomstrom, CRR, RMR, CLR
21        Texas CSR No. 8785
          California CSR No. 12681
22        Illinois CSR No. 84-3634