**AMENDED Exhibit 830**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

1            UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA
2
3      ******************************
                                    Case No.
       IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
4      ADDICTION/PERSONAL INJURY
       PRODUCTS LIABILITY LITIGATION
5                                   MDL No. 3047
       ******************************
6
       This Document Relates To:
7
       ALL ACTIONS
8
       ******************************
9
10        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                  COUNTY OF LOS ANGELES
11                UNLIMITED JURISDICTION
12     *************************
13     Coordination Proceeding    Judicial Council
       Special Title              Coordination Proceeding
14     (Rule 3.550)               No. 5255
15      SOCIAL MEDIA CASES        Judge:  Carolyn B. Kuhl
                                  Dept. 12
16     *************************
17        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
                  VIDEOTAPED DEPOSITION OF
18
                  DAVID L. BOYLE
19
20     Held At:        Skadden Arps Slate Meagher & Flom
                       2000 Avenue of the Stars
21                     Los Angeles, California
22                  February 27th, 2025
                         9:36 a.m.
23
24
       Reported By:
25     MAUREEN O. POLLARD, CSR #14449, RDR

1              have been such an area of priority and

2              focus for us, that's why implicitly those

3              are stated as our top priorities on these

4              severe harms.  And we've made a lot of

5              progress on those areas, and so that's

6              really, I think, what the document was

7              stating, is those severe harms are a top

8              area of focus.

9                   But we do care about the whole range of

10             safety issues and put forth resources on

11             them.

12   BY MR. AYERS:

13        Q.   I'm handing you what's been marked as

14   Exhibit 7 to your deposition.

15                   (Whereupon, Exhibit Snap-Boyle-7 was

16             marked for identification.)

17   BY MR. AYERS:

18        Q.   Exhibit 7 is Bates numbered

19   SNAP6108881.  The title of the document is "Parental

20   Perception Theme."

21                   Do you recognize this document?

22        A.   This looks like sort of an outline or

23   notes document and a brainstorming document prior to

24   the production of the final SSP document.

25        Q.   Right.

```
1                   And if you look to the last page of the

2    document, it's a metadata slipsheet, and the

3    custodian is Snap.  The file name is Safety SSP

4    Kickoff_Parental Perception.Docx.

5                   Do you see that?

6         A.    That's what it says, yes.

7         Q.    And it was created on September 7,

8    2023, correct?

9         A.    That's what it says, yes.

10        Q.    Would you have seen this at the time?

11                  MS. TELLER:  Objection.  Speculation.

12                  THE WITNESS:  For this particular doc,

13             I'm not certain, but I think the way to

14             think about this document in relation to

15             the final SSP document is on each of the

16             themes listed in the SSP document, they had

17             these brainstorm documents where they were

18             taking notes about all the ideas related to

19             each theme.

20                  So I think what you're looking at here

21             is a document that had a number of notes

22             and ideas that relate to the themes that

23             were eventually in the final SSP document.

24   BY MR. AYERS:

25        Q.    Right.
```

1              So this document related to the theme

2     we just discussed, parental perception, correct?

3          A.    It says --

4              MS. TELLER:  Objection.

5          Characterization of the document.

6              Go ahead.

7              THE WITNESS:  The title is "Parental

8          Perception Theme."

9     BY MR. AYERS:

10         Q.    And the theme -- and then it goes on to

11    say, "What is the theme?"  And it states, "Earning

12    parents' trust by doing the right things to help

13    keep Snapchatters (ages 13-24) safe."

14              Right?

15         A.    That's what it says, yes.

16         Q.    Is it fair to say that the cohort of

17    teens 13 to 24 is a significant population for Snap?

18              MS. TELLER:  Objection.  Vague.

19              THE WITNESS:  Well, the majority of our

20         users are not in that age demographic, but,

21         I mean, I think, as stated, it is

22         describing something reasonable, which is

23         earning parents' trust by doing the right

24         things to help keep Snapchatters safe.

25              ///

1    BY MR. AYERS:

2           Q.    Are you aware that Snap touts to reach

3    90 percent of US users ages 13 to 24?

4           A.    That specific number sounds like

5    something that would be in our investor

6    presentation, but that's a different number than --

7    so because we reach 90 percent of 13 and 24 users,

8    that does not mean that 90 percent of our users are

9    13 to 24, right?  So those are kind of separate

10   quantitative points.

11          Q.    What is the age group that makes up the

12   majority of Snapchatters?

13          A.    Well, the majority of Snapchat users in

14   the US are older than this age group, but which

15   specific age group reaches the majority I think

16   would depend how you bucket the age groups.

17          Q.    Well, how do you bucket the age groups?

18          A.    Well --

19                MS. TELLER:  Objection.  Vague.

20                THE WITNESS:  I think we're going on a

21           little bit of a tangent here, but we have

22           buckets where we look at, I think as we

23           talked about yesterday, 13 to 17, 18 to 20,

24           21 to 24, 25 to 34, and 35 plus.  And none

25           of those individually are the majority of

```
 1                our user base, and certainly 13 to 17 users
 2                are not anywhere near the majority of our
 3                user base.
 4    BY MR. AYERS:
 5          Q.    So where is this reflected?
 6          A.    Where is what reflected?
 7          Q.    These buckets of users.
 8                MS. TELLER:  Objection.  Vague.
 9                THE WITNESS:  I'm not sure I'm
10           following.  In our data or...
11    BY MR. AYERS:
12          Q.    Yeah, where would it be documented
13    about where the majority of users fall within, which
14    group -- which of these groups?
15                MS. TELLER:  Objection.  Vague.
16                THE WITNESS:  I mean, we have internal
17           data tools where we can look at our US
18           daily active users by which age groups
19           they're in, and the majority definitely are
20           not in the 13 to 17 age group.
21    BY MR. AYERS:
22          Q.    Is that Looker?
23          A.    Looker would be one of the places where
24    you'd be able to access that data, yes.
25          Q.    Okay.  And so you just testified
```

1   earlier that Gen X is the majority of users, did you

2   not?

3                   MS. TELLER:  Objection.  Misstates

4           prior testimony.

5                   THE WITNESS:  No.  Because now people

6           older than 25 are considered millennials,

7           right?  So this is just talking about the

8           13 to 24 age group.  So I'm considered a

9           millennial and I'm 36 now.

10  BY MR. AYERS:

11          Q.    Didn't you just say that people, the

12  older people like 35 and up don't use Snapchat?

13                  MS. TELLER:  Objection.

14          Mischaracterizes prior testimony.

15                  THE WITNESS:  I think we're kind of

16          mixing two concepts.

17                  People 35 and over use Snapchat at a

18          lower rate than they use apps like

19          Instagram or YouTube, right?  That is true.

20                  But there's still a really sizable

21          number of 35-plus year old users that use

22          Snapchat in the United States, but it's not

23          nearly as large as an app like YouTube,

24          where virtually every adult uses YouTube,

25          right?

1              Do you understand the point I'm making?

2         It's the difference between what percent of

3         Snapchat's users are teenagers, which is

4         actually a pretty low number, versus what

5         percent of teenagers use Snapchat, which is

6         a pretty high number.

7    BY MR. AYERS:

8         Q.    And yet you're claiming that the age

9    group above 25 is the majority of Snapchat users?

10        A.    In the United States, 25 and older is

11   larger than younger, yes.

12        Q.    How many US teens use Snapchat?

13             MS. TELLER:  Objection.  Calls for

14        speculation.

15             THE WITNESS:  Yeah, I don't know the

16        number off the top of my head, but it does

17        sound like you were referencing one of our

18        investor relations presentations earlier

19        that had some numbers that were public.

20   BY MR. AYERS:

21        Q.    Millions, right?

22             MS. TELLER:  Objection.  Speculation.

23             THE WITNESS:  It would definitely be

24        within the millions.

25             ///

David Boyle                                    150

```
1    BY MR. AYERS:
2         Q.    One of the -- one of the things Snap
3    wanted to do to earn parent trust was to introduce
4    parents to the benefits of Snapchat, right?  That's
5    in the second bullet?
6                   MS. TELLER:  One second.
7                   Objection, compound.  And objection to
8              the characterization of document.
9                   Go ahead, David.
10                  THE WITNESS:  Well, this is largely a
11             brainstorm and kind of notes document, so I
12             think that's listed as one of the ideas,
13             right.  You can see there's a lot of
14             shorthand here, Introducing parents/Raising
15             Awareness/Informing/Debunking Myths.
16                  But I think it speaks to the general
17             concept that I was talking about earlier,
18             which is that we know that, you know,
19             parents use Snapchat at lower rates than
20             they use YouTube or other apps that are
21             just much larger with older populations
22             than we are, and so there's some amount of
23             work that we have to do to help them
24             understand how Snapchat works, how to use
25             the safety features, how, you know, they
```

David Boyle                                         151

```
1              can use Snapchat safely with their teens as
2              well to better understand how the product
3              works and how to keep them safe.
4    BY MR. AYERS:
5         Q.    And if you go down to underneath that
6    bullet, the sub-bullet, the last one, it reads,
7    Scaled Game:  Traditional PR, Digital
8    Marketing/Communications.
9              Right?  Do you see that there?
10        A.    It says, "Scaled Game:  Traditional PR,
11   Digital Marketing/Comms."
12        Q.    And "comms" is communications, correct?
13        A.    That's right, yeah.
14        Q.    And you have a digital marketing and
15   communications teams, correct?
16        A.    We have a communications team and we
17   have a marketing team.
18        Q.    And this document was talking about
19   leveraging both of those teams, correct?
20        A.    That seems to be the case, yes.
21        Q.    And do you see there toward the bottom
22   of the first page it states, "We are not
23   prioritizing:  Mental Health."
24              Did I read that correctly?
25        A.    You know, again, I think what you're --
```

1    the document you're looking at here is a notes in

2    shorthand document that probably was, you know, not

3    meant for wide distribution.  I think this is just

4    people that were working to prepare the overall

5    document were taking notes and jotting things down.

6    You can see there's a lot of shorthand here.

7    There's a lot of incomplete thoughts and dangling

8    sentences here.

9              And so I think what, you know, was

10   being said, if you look at the sub-bullets below,

11   was there just is not a prioritization of greatly

12   different product experience for 13-to-15 users for,

13   you know, under 13 product experiences listed there,

14   so I just think that these are some notes that are

15   written in kind of messy shorthand.

16        Q.   Sir, that's what it says, correct?  It

17   says, "We are not prioritizing:  Mental Health."

18              Do you see that there?

19              MS. TELLER:  Objection to the

20         characterization of the document.

21              THE WITNESS:  So while it says those

22         words and notes in shorthand, I just kind

23         of remind you that the final SSP document

24         is this Exhibit 6, and I'm not aware of

25         where this document says, quote, "We are

David Boyle                                        153

1           not prioritizing:  Mental Health."
2                I think here we're just talking about a
3           document of notes that was from some
4           brainstorm meetings and was probably
5           written in shorthand.  But, you know, I
6           didn't write this document, so I can't, you
7           know, speak to the state of thought of, you
8           know, probably Alex who was taking these
9           notes.
10               MR. AYERS:  Move to strike as
11          nonresponsive everything after "So while it
12          says those words."
13     BY MR. AYERS:
14          Q.   Sir, if you go back to Exhibit 6, as
15     you said, there's nothing in Exhibit 6 that you can
16     point to other than making reports that says "mental
17     health."
18               MS. TELLER:  Objection.
19          Mischaracterizes prior testimony.
20               THE WITNESS:  Well, I think that this
21          final document is meant to be a very, very
22          concise one-page document that summarizes
23          our very top initiatives for safety in a
24          very condensed format, and so, you know, it
25          is making the statements that our top

1           priority for the year is really mostly

2           centered around these severe harms, you

3           know, child sex abuse material, lethal drug

4           activity, and that's just the relative

5           prioritization of these issues by our team.

6    BY MR. AYERS:

7           Q.    And improvement of parental perception,

8    right?

9           A.    That is one of the listed initiatives.

10          Q.    And the document isn't a single-pager,

11   it's 13 pages long, correct?

12          A.    Let me clarify that the top five

13   initiatives, right, that are listed comprise about

14   one page.  So there's a lot of information in the

15   appendix, but what I'm just getting at is that this

16   was intended to be a very, very condensed document

17   and list of priorities, not a fully exhaustive list

18   of priorities, and what it's really meant to

19   indicate is that the top priority for the year is to

20   focus on these severe harms.

21          Q.    And it didn't include anything that it

22   was not prioritizing, correct?

23          A.    Sorry, could you rephrase the question

24   a bit?  Like there's --

25          Q.    The document, the SSP, did not --

David Boyle                                             155

1                    MS. TELLER:  Hold on.

2                    THE WITNESS:  Oh, no, please continue.

3          It's okay.

4     BY MR. AYERS:

5          Q.    The document -- strike that.

6                    The document, SSP, did not include any

7     initiatives that it was not prioritizing, correct?

8                    MS. TELLER:  Objection.  Vague.

9                    THE WITNESS:  No.  There's other work

10            that we do that is not listed in this

11            document.  This is just meant to be a

12            summary of our very, very top priorities

13            for the year.

14     BY MR. AYERS:

15          Q.    And if you go to the -- back to

16     Exhibit 7, on the second page, Bates ending in 82.

17                    Do you see it there?

18                    If you go to the next page --

19          A.    82, yep.

20          Q.    -- 82, you'll see that there is Alex

21     Osborne who reports -- who reported to you.

22                    He was a safety product manager that

23     led the team, correct?

24          A.    That's right, yes.

25          Q.    And if you look at A11, which was -- if

David Boyle                                              156

1    you go back to look, was a comment to the notes, he

2    writes, "We should discuss it as a group but mental

3    health, while extremely important, fell below the

4    relative to the other major initiatives.  What is

5    your sense for this one?  I worry that it doesn't

6    have enough real differentiators to be worthwhile

7    relative to the other items above."

8              Do you see that there?

9         A.   That's what the comment says, yes.

10        Q.   So Snap's safety cross-functional team

11   thought of doing traditional PR and digital

12   marketing and communications, right?

13             MS. TELLER:  Objection.  Vague,

14        foundation.

15             THE WITNESS:  Well, this group includes

16        our marketing/communications team, and so

17        it is their job to do communications and

18        marketing.

19             And we did marketing of things like

20        Family Center so that when parents are

21        trying to learn about Snapchat parental

22        controls they can easily find Family

23        Center.

24   BY MR. AYERS:

25        Q.   Is it fair to say that Snap was

David Boyle                                           157

1    determined that if parents viewed Snap more

2    favorably more 13 to 15-year-olds would be able to

3    join Snapchat?

4                    MS. TELLER:  Objection.  Vague.

5                    THE WITNESS:  I think we would all

6              agree that if parents have a higher level

7              of understanding and trust of any online

8              service they'll be more likely to, you

9              know, permit their teens to join and use

10             that product.  I would never dispute that.

11             And I think it's a good thing if they build

12             trust in our service and if they feel

13             enough, you know, understanding and trust

14             of Snapchat to allow their teens to use it.

15   BY MR. AYERS:

16             Q.   And Snap was concerned about parent

17   perception preventing daily active user growth,

18   correct?

19             A.   I think we definitely are concerned if

20   we read surveys where users are telling us that they

21   are deciding to not allow their teens to use a

22   service.  That is a concern of ours, and we want to

23   understand why and how to address it.

24             Q.   In fact, Snap created an entire

25   cross-functional team to address parental

David Boyle                                        158

1    perception, correct?

2                MS. TELLER:  Objection.

3           Mischaracterizes the documents.

4                THE WITNESS:  Well, you can see a list

5           of the five priorities listed in the SSP

6           document.  It's one of the five that we

7           were working on.

8    BY MR. AYERS:

9         Q.    It's not good, is it, that the safety

10   cross-functional team prioritized PR and

11   communications for parental perception over mental

12   health?

13               MS. TELLER:  Objection.  Vague,

14          argumentative.

15               THE WITNESS:  I think that's a little

16          bit of an apples and oranges comparison

17          here, because we have communications and

18          marketing people that are literally part of

19          the cross-functional team, and so if they

20          were not doing communications and

21          marketing, they wouldn't -- they'd still be

22          doing some other form of communication and

23          marketing, right.  The communications and

24          marketing people wouldn't be solving mental

25          health problems.

1          So I think one way or another they will

2          be doing communications or marketing.

3          That's part of their job description.

4     BY MR. AYERS:

5          Q.    Sure.

6              But it's not good that Snap was

7     prioritizing parental perception for growth over

8     teen mental health, right?

9              MS. TELLER:  Objection.

10             Mischaracterizes prior testimony and the

11             documents.

12             THE WITNESS:  I think that's not really

13             like fungible -- a fungible comparison

14             between these groups of people where the

15             most explicit prioritization we're making

16             here is the severe harms problem with

17             technical and operational resources that

18             are people that do not work on

19             communications, right.

20             So I understand the point that you're

21             trying to make, and I, you know, understand

22             that, you know, the framing of this from,

23             you know, again, a notes document that was

24             written with sentence fragments and kind of

25             brainstorming notes comes across in a

1          particular way that I don't think that the,

2          you know, author probably would be pleased

3          with the way that this is coming across

4          when viewed in this context.

5               But we do take teen mental health very

6          seriously.  It's just in the particular

7          planning here we had to state that our top

8          priority was focusing on these severe harms

9          like, you know, drug sales, sextortion, and

10         child sex abuse material.  It's not to say

11         that we don't commit significant

12         operational resources to dealing with kind

13         of reports related to mental health issues,

14         it's just the top priority for the year was

15         focusing on these severe harms issues as we

16         define them.

17    BY MR. AYERS:

18         Q.    And the severe harm issues related to

19    parent perception, correct?

20               MS. TELLER:  Objection.

21         Mischaracterizes prior testimony.

22               THE WITNESS:  No.  The severe harms

23         issues relate to Exhibit 6, initiative

24         number 1, and that was listed as the top

25         priority for the year.

```
1    BY MR. AYERS:
2         Q.   And parental perception made number 3,
3    right?
4              MS. TELLER:  Objection.
5    BY MR. AYERS:
6         Q.   Made number 3 of 5, right?
7              MS. TELLER:  Objection to
8         characterization of the document.
9              THE WITNESS:  It's listed there, but I
10        think the number 1 priority was and
11        continues to be a focus on addressing these
12        severe harms.
13   BY MR. AYERS:
14        Q.   And teen mental health didn't make the
15   top five, right?
16        A.   It's not listed in the annual planning
17   document, but it doesn't mean we haven't committed
18   significant resources and operational resources to
19   those problems.
20        Q.   If Snap had prioritized parental
21   perception of Snapchat over teen mental health, do
22   you believe that would be problematic?
23             MS. TELLER:  Objection.  Vague,
24        argumentative, compound, assumes facts not
25        in evidence, improper hypothetical.
```

1            answered, vague, foundation.

2                  THE WITNESS:  I think if there were any

3            specific studies or kind of point-in-time

4            studies or analysis, that likely would have

5            been conducted by our user research team.

6                  Nothing specifically comes to mind, you

7            know -- there's not like one specific

8            metric or document I can recall, but I

9            think, you know, it's possible our user

10           research team at different points in time

11           has looked into questions like this.

12   BY MR. AYERS:

13       Q.    I'm not asking you to speculate, sir.

14            I'm asking you, isn't it true that Snap

15   does not collect any data relating to the mental

16   health impacts of its platform?

17                  MS. TELLER:  Objection.  Asked and

18            answered, vague, foundation.

19                  THE WITNESS:  I can't fully answer that

20            question.  I again would just refer to I

21            think if that kind of data were being

22            collected, it would likely be by our user

23            research team, where we'd have to use more

24            nuanced quantitative methods that I'm not

25            aware of.

1    BY MR. AYERS:

2         Q.    And are you aware that Morgan

3    Hammerstrom testified that no research on mental

4    health impacts was done?

5              MS. TELLER:  Objection.  Assumes facts

6         not in evidence.

7              THE WITNESS:  Well, I think to my

8         earlier point, if we were doing that

9         analysis, it would be on the user research

10        team and so Morgan would be the best person

11        to respond to that.

12   BY MR. AYERS:

13        Q.    And at any point in time have you ever

14   requested any study to be done or data related to

15   Snapchat's impact on teen mental health?

16             MS. TELLER:  Objection.  Vague.

17             THE WITNESS:  I don't know off the top

18        of my head.

19   BY MR. AYERS:

20        Q.    Did you not think that data related to

21   Snapchat's impact on teen mental health would help

22   inform your product roadmap?

23             MS. TELLER:  Objection.  Argumentative,

24        vague, compound.

25             THE WITNESS:  You know, again, I think

David Boyle                                                    184

```
 1              word that you found those studies and I
 2              don't doubt it, but I just -- I haven't
 3              specifically read or seen studies like the
 4              ones you're describing.
 5   BY MR. AYERS:
 6         Q.    Wouldn't it be reckless for someone in
 7   your position to ignore research about the risks of
 8   the product you design?
 9              MS. TELLER:  Objection.  Argumentative,
10              assumes facts not in evidence, vague.
11              THE WITNESS:  I would not characterize
12              myself as a reckless person at all.
13              There's a lot of articles and information
14              released about Snapchat all the time, and,
15              you know, I can't speak for all of it.
16   BY MR. AYERS:
17         Q.    Sir, what is Project Butterfly?
18              MS. TELLER:  Objection.  Foundation.
19              THE WITNESS:  Project Butterfly, I, you
20              know -- I can't remember exactly what
21              the -- you know, like the mission statement
22              on this topic was when it originally came
23              up, but it definitely coincided with a
24              renewed effort to involve our marketing and
25              communications team and our safety work to
```

```
1              ensure that it was being communicated to
2              parents and their teens so they understand
3              the work that we're doing, they understand
4              parental controls, they can find them.
5                   So I think it, you know, relates to
6              some of the work that, you know, you were
7              questioning me about earlier around
8              marketing communications work that our
9              marketing communications team was doing
10             within the safety cross-functional group to
11             ensure that we have communicated the work
12             that we're doing around safety with all
13             stakeholders and the public.
14  BY MR. AYERS:
15        Q.   So it's fair to say that related to
16  parent perception, Snap created an entire
17  cross-functional team to address it, correct?
18             MS. TELLER:  Objection.  Misstates
19             prior testimony, vague.
20             THE WITNESS:  I mean, I think it is
21             largely the same set of people that were
22             already working within our safety
23             cross-functional, but as we spoke about
24             earlier, we have several different
25             priorities for that safety cross-functional
```

```
1              group.
2                  One of them was the marketing
3              communications aspects and parental
4              perception, and, you know, that work and
5              that project I think was, you know,
6              nicknamed Project Butterfly.
7                  So, really, I think we're just talking
8              about the same topic and the same work that
9              we were speaking about earlier around
10             marketing communications and parental
11             perception.
12   BY MR. AYERS:
13             Q.   I'm handing you what's been marked as
14   Exhibit 8 to your deposition.
15                  (Whereupon, Exhibit Snap-Boyle-8 was
16             marked for identification.)
17   BY MR. AYERS:
18             Q.   I'll represent for the record that
19   Exhibit 8 is Snapchat document Bates-numbered
20   SNAP6019186.  And the document is titled "DAU Growth
21   Update, Snap Inc. - September 14, 2023 Board of
22   Directors Meeting."
23                  Do you see that there, sir?
24             A.   That's what it says, yes.
25             Q.   Have you seen this document before?
```

1        A.    Definitely is a document I would have

2    seen before and contributed to.

3        Q.    Do you attend these meetings?

4            MS. TELLER:  Objection.  Vague.

5            THE WITNESS:  I usually do, yes.

6    BY MR. AYERS:

7        Q.    So what is this document?

8        A.    This document is one of several

9    documents we produce for updates for our board of

10   directors meeting each quarter.

11       Q.    Okay.  If you scroll to page 3 of the

12   document, which is Bates ending in 88.  Let me know

13   when you're there.

14       A.    I'm there.

15       Q.    It says right on page 3, in the middle

16   of the page, "We believe one of the main factors

17   driving DAU declines," daily active users declines,

18   "in our 13-17 year old segment in the US is parents

19   disallowing their 13, 14 and 15 year olds from

20   installing Snapchat due to safety concerns about

21   Snapchat and social media in general."

22            Do you see that there?

23       A.    That's what it says, yes.

24       Q.    The board presentation further revealed

25   that "47% of 13 and 14 year olds who aren't on

1    Snapchat cite their parents as the reason," right?

2         A.    That's what it says.

3         Q.    And is that research from your user

4    research group?

5              MS. TELLER:  Objection.  Foundation.

6              THE WITNESS:  I can't say for certain,

7         but that kind of information most likely

8         would have come from our user research team

9         because they're responsible for some of

10        this survey-based data.

11   BY MR. AYERS:

12        Q.    So it's fair to say that this is citing

13   that parental disapproval is a major factor driving

14   daily active users' decline among that age group,

15   correct?

16             MS. TELLER:  Objection.

17        Mischaracterizes the document.

18             THE WITNESS:  Well, just as stated, so

19        of the 13 and 14 year olds that are not on

20        Snapchat, 47 percent cite that their

21        parental, you know, disapproval is the

22        primary reason.

23   BY MR. AYERS:

24        Q.    The document also indicates that Snap's

25   historical focus on teens may actually amplify the

1   problem, our problem, correct?

2       A.    Sorry, which sentence are you referring

3   to?

4           MS. TELLER:  I think he's looking at

5         the second-to-last sentence.

6   BY MR. AYERS:

7       Q.    Yeah, the second-to-last sentence in

8   that same paragraph.

9           MS. TELLER:  And I'll object as

10        mischaracterizes the document.

11  BY MR. AYERS:

12      Q.    Do you see it there?

13      A.    Well, I see the point being made here

14  that, so "our research shows that parents are up to

15  5x more likely to let their teenager use Snapchat"

16  if they also use Snapchat themselves, which that's

17  really the same point that I was speaking to you

18  about earlier, which is that from a parental

19  perception perspective, we are at a disadvantage

20  compared to some of these other platforms that have

21  higher use amongst parents and older users than we

22  do, because what we see is that the parents who use

23  Snapchat have a much higher perception of its safety

24  because they understand the problem.

25           And as you can see the last sentence,

David Boyle                                              190

1    quote, "Platforms with older demographics will not

2    have the 'fear of the unknown' issue we face," which

3    we believe is a big part of it, because virtually

4    all parents use YouTube, right?  And we just see

5    that parents are more -- generally more approving of

6    platforms that they themselves use.

7            Q.    And the sentence starts off, "Our

8    concentration with teens historically," right?

9            A.    "Our concentration with teens

10   historically," yes.

11           Q.    And is that an accurate statement?

12                 MS. TELLER:  Objection.  Vague.

13                 THE WITNESS:  Well, I think the point

14             being made was the same one that we were

15             just talking about, which is that Snapchat

16             really just caught on with -- initially

17             with the younger millennial generation, and

18             then as they aged up, many of them have

19             continued to use Snapchat, but Gen X and

20             older users generally have never used

21             Snapchat, and those are a lot of the

22             parents, right?

23                 And so because we never really caught

24             on with that demographic either when they

25             were growing up or as adults, we just have

1              lower usage amongst these older

2              demographics than these other products like

3              YouTube or Facebook or Instagram or others.

4       BY MR. AYERS:

5              Q.    And then the document explains that

6       Snap formed Project Butterfly, a cross-functional

7       group, that includes marketing, comms, trust and

8       safety, product, legal, policy, and more, correct?

9                   MS. TELLER:  Objection.  Vague.

10                  THE WITNESS:  I mean, I think there's

11             language here that, yeah, if you could

12             scroll down, that -- you know, the document

13             speaks for itself.  "Project Butterfly -

14             that cuts across marketing, comms, trust

15             and safety, product, legal, policy, and

16             more.  The goal of the group is to make

17             measurable progress building trust with the

18             parents of 13-17 year olds."

19                  And then it lists out a number of

20             activities below that are not just

21             marketing and communication related, are

22             actually talking about product improvements

23             and safety improvements.

24                  So, you know, I don't think it's

25             unreasonable to say that "The goal of a

David Boyle                                      215

1          So both of those things are true, that

2    like, yes, of course it, you know -- more users in,

3    you know, appropriate age groups above the age of 13

4    is, you know, good for our business generally, but a

5    lot of our growth opportunity at this point is with

6    users that are 18 and older.  It's just a larger

7    population.

8          Q.    Would you agree that Snap is highly

9    invested in retaining and growing its 13 to 17 user

10   base?

11             MS. TELLER:  Objection.  Vague.

12             THE WITNESS:  Well, I think the thing

13        that we see with messaging services

14        generally is that any messaging service

15        that a user uses for a significant period

16        of time has very, very high long-term

17        retention, if that makes sense.

18             So we see that users that might start

19        using Snapchat when they're 16 or 17, a

20        really high proportion of them continue

21        using that service five or even ten years

22        later, because if that's the main way you

23        use to communicate with your friends,

24        that's -- it's a behavior that people don't

25        often change and just decide to switch from

David Boyle                                          216

1          using Snapchat or iMessage to, you know,

2          Facebook Messenger one day, right?

3               So messaging products tend to have

4          really high long-term retention, where

5          because your whole friend group, all of

6          your groups, your social network use the

7          same messaging service.  Once people choose

8          a messaging service that they prefer, they

9          don't quickly or easily switch to a

10         different one.

11              So from that perspective, we definitely

12         want to ensure that as users join our

13         service for messaging, they continue using

14         it for many, many years beyond that.

15  BY MR. AYERS:

16         Q.   You personally have been very concerned

17  about Snap losing the teen demographic, correct?

18              MS. TELLER:  Objection.  Vague.

19              THE WITNESS:  Well, when, you know --

20         again, to the earlier point, because users

21         tend to stick with a messaging service for

22         a long period of time, if the rising, you

23         know, demographic of teens is using other

24         messaging services or other products,

25         that's a habit that they will probably

David Boyle                                                    246

1              desktop or web experience for many years,
2              it really was a basic feature that our
3              users expected.
4    BY MR. AYERS:
5         Q.    So, sir, sitting here today do you deny
6    that Snap was focused on seizing the back-to-school
7    season to boost engagement?
8              MS. TELLER:  Objection.  Vague.
9              THE WITNESS:  I think, you know,
10             respectfully, Counsel, we're probably
11             talking about a couple of different topics
12             here.
13             On the point around back to school, the
14             back-to-school season, which also includes
15             college-age students, for what that's
16             worth, what we see in that fall season for
17             high school and college-aged students is
18             that it's a really important time of the
19             year where they're forming new friendships,
20             they're meeting new people, in real life
21             they're making new groups at their colleges
22             or their schools around sports or the
23             classes or activities that they're in.
24             So there's also a lot of additional
25             marketing that other services do around

David Boyle                                                          247

```
 1              that time.  I mean, if you've seen -- on TV
 2              you'll see ads for back-to-school sales, so
 3              it's a commonly understood period in time
 4              where there's additional marketing.
 5              They're done by companies because it is a
 6              formative time of year for a lot of people.
 7    BY MR. AYERS:
 8         Q.    Sir, I've just handed you what's been
 9    marked as Exhibit 14 to your deposition.
10                   (Whereupon, Exhibit Snap-Boyle-14 was
11              marked for identification.)
12    BY MR. AYERS:
13         Q.    It's a Snap document, SNAP3836439.
14              MS. TELLER:  I'll just mark for the
15         record that counsel was making a hand
16         motion to suggest the witness should hurry
17         up finishing his answer, which I'm sure
18         he's not suggesting that the witness
19         shouldn't completely answer, but I did want
20         to get that on the record.
21              THE WITNESS:  Would it be okay if we
22         take a five-minute break?
23              MS. TELLER:  Yes.  David, it's up to
24         you.
25              MR. AYERS:  Can you give me the
```

1          And so, you know, I think the team here

2    is just saying they want to make sure we have the

3    best experience possible for them as they come back

4    and, you know, come back from vacation and start

5    using their PCs again more and get settled back in.

6          Q.   And at the -- towards the bottom of the

7    document, under "Features" it states, "August saw

8    the transition from recovery after summer break in

9    North America to renewed growth."

10          Right?  Do you see that there?

11          A.   Yes.  As I mentioned, during August

12   when everyone is traveling and on vacation, they use

13   their PCs a lot less, and they resume using them

14   again in, you know, September and late August.

15          Q.   "We closed out August with our 7 day

16   average all time high at 857,000 unique users (the

17   answer to this month's click bait)."

18          Do you see that?

19          A.   Yes.

20          Q.   And then if you go above, it lists out

21   in Quarter 3 the top six product initiatives, right?

22   Do you see that there?

23          A.   Yes, I'm just reading it.  One second.

24   Thank you.

25          (Witness reviewing document.)

1          A.    Yes, I see everything.

2          Q.    And number 1, the number 1 top

3    initiative there is "more aggressive notifications

4    and OS teaching," right?

5          A.    That's what it says.

6          Q.    "Put simple, in-app instructions so

7    people allow their OS to show browser

8    notifications."

9                Do you see that?

10         A.    Yes.  I'm not sure if you've used a

11   messaging app on your computer before, but it's

12   actually really, really complicated to figure out

13   how to enable notifications in a browser, which for

14   a messaging app is really important.  If you get a

15   message from someone, you usually want to get a

16   notification about it.

17         Q.    And you wanted to make -- and the top

18   initiative was more aggressive notifications, right?

19                MS. TELLER:  Objection.

20                THE WITNESS:  That's not what this is

21           about.  It is teaching of how to actually

22           enable notifications in a browser.  It's

23           not about sending more notifications.  It's

24           just making sure that people actually know

25           how to enable notifications in a desktop

1              browser, which is actually pretty
2              difficult.
3    BY MR. AYERS:
4         Q.    And if you scroll to Bates ending in
5    989, which is page 5 of the document, let me know
6    when you're there.
7         A.    989.  Yes.
8         Q.    And under the first, the first KR --
9    what is a "KR"?
10        A.    "KR" is an abbreviation for key result.
11        Q.    And what's the "Web OKRs"?
12        A.    "OKR" stands for objectives and key
13   results, so it's also an abbreviation.
14        Q.    And so the first KR states, "Increase
15   Snapchat for Web daily active users from .4 million
16   to 1.6 million," correct?
17        A.    That's what it says.
18        Q.    And then if you go to the Status/Key
19   Launches, it states, "Transition from recovery after
20   summer break in North America to renewed growth,"
21   right?
22             MS. TELLER:  Objection.  Misstates the
23        document.
24             THE WITNESS:  It says, "Transition from
25        recovery after summer break in North

**AMENDED Exhibit 830 B**

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2
       ******************************
 3                                      Case No.
       IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
 4     ADDICTION/PERSONAL INJURY
       PRODUCTS LIABILITY LITIGATION
 5                                      MDL No. 3047
       ******************************
 6
       This Document Relates To:
 7
       ALL ACTIONS
 8
       ******************************
 9

10        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF LOS ANGELES
11                  UNLIMITED JURISDICTION

12     *************************

13     Coordination Proceeding    Judicial Council
       Special Title              Coordination Proceeding
14     (Rule 3.550)               No. 5255

15     SOCIAL MEDIA CASES         Judge:  Carolyn B. Kuhl
                                  Dept. 12
16     *************************

17
                CONTINUED VIDEOTAPED DEPOSITION OF
18
                         DAVID L. BOYLE
19

20     Held At:           Kirkland & Ellis
                          2049 Century Park East
21                        Suite 3700
                          Los Angeles, California
22
                          April 2nd, 2025
23                          9:38 a.m.

24
       Reported By:
25     MAUREEN O. POLLARD, CSR #14449, RDR
```

David Boyle                                                    502

1              A.    I can't remember reading anything that

2       is that specific, no.

3              Q.    Is it fair to say that Snap still

4       actively engineers notifications such as expiring

5       content reminders to deliberately create FOMO?

6              A.    No.  The point of these notifications

7       is not deliberately to create FOMO, it's to make

8       sure people know about things that happen on the

9       app, like one of their close friends posted a story

10      or sent a message.

11             Q.    Does Snap ever balance its growth

12      notifications against the mental health risks for

13      its vulnerable users, which is teenagers?

14                   MS. TELLER:  Objection.  Vague.

15                   THE WITNESS:  I mean, we definitely

16              have a number of features in place that do

17              try to limit the reach of notifications, so

18              obviously users need to opt in to

19              notifications to receive them at all.

20                   We have settings that allow people to

21              disable specific types of notifications in

22              their settings page.

23                   And then, lastly, for non-messaging

24              notifications, we do -- for users of all

25              ages we don't send them during nighttime

David Boyle                                              503

1              periods as well.

2                    So there are a number of things that we

3              do to give people control and to avoid

4              sending notifications during inappropriate

5              times of day.

6    BY MR. AYERS:

7         Q.    So you think -- you agree that it's

8    inappropriate for users, particularly teenagers, to

9    receive notifications at night?

10        A.    I think particularly for notifications

11   that would be notifications that they didn't receive

12   directly from a friend or a message directly from

13   their friend, we don't think it's valuable to send

14   those notifications, you know, after midnight or the

15   very early hours of the morning when they're likely

16   sleeping.  It's just better not to do that.

17        Q.    Well, you're aware that Snap still

18   sends notifications at night, correct?

19        A.    Well, if somebody sends you a direct

20   messaging notification at night, we will send that

21   because that is a friend that you've chosen to talk

22   to.  But if it's growth notifications that is not

23   directly from a friend, we avoid sending those at

24   night.

25        Q.    But doesn't that contradict your

David Boyle                                                                504

1    opinion that it's not best for teens to be receiving

2    notifications in the middle of the night?

3                    MS. TELLER:  Objection.

4              Mischaracterizes prior testimony,

5              argumentative.

6                    THE WITNESS:  Yeah, it's not the right

7              characterization.  I think when, you know,

8              someone sends you a direct message late at

9              night, that often can be because it's very

10             urgent or there's something that they need

11             help with.  And ultimately people have

12             control over settings with quiet hours and

13             other features in the operating system

14             where they can control that.

15                   I mean, I personally set that in my

16             iPhone where I don't receive any audible

17             notifications, I think, after 9:00 p.m.,

18             and those are common settings that people

19             use on their devices.

20   BY MR. AYERS:

21         Q.    Do you think Snap should respect

22   people's choices not to receive notifications?

23                   MS. TELLER:  Objection.  Vague.

24                   THE WITNESS:  Yes, we do respect

25             people's choices.  And if they disable

David Boyle                                                    508

1              re-enable them in the operating system if

2              they want to continue receiving messages

3              from their friends.

4     BY MR. AYERS:

5         Q.    And indeed that's a specific strategy

6     by Snap in order to try to decrease the rate of

7     notification declines, correct?

8         A.    I think every messaging app, you know,

9     including WhatsApp -- if you enable notifications in

10    WhatsApp, you'll notice that they have a lot of

11    prompts to enable notifications.  We have prompts to

12    remind people when they've disabled notifications

13    and to just make sure that they know that.

14        Q.    Does Snap allow users to schedule quiet

15    periods such as no notifications during school hours

16    or during bedtime?

17        A.    We don't specifically allow that, but

18    as I mentioned earlier, the operating systems

19    provide pretty widely used controls where you can

20    create your, you know, device-wide quiet hours.  I

21    mean, that's a feature I use, and it covers all

22    apps.

23              And we also have a way to mute

24    notifications from specific conversations or groups.

25    That's something a lot of users requested, because

1              15 minutes at this point.

2                  Go ahead, Chris.

3                     FURTHER EXAMINATION

4     BY MR. AYERS:

5          Q.    Mr. Boyle, you recall you had a very

6     lengthy direct exam with counsel for Snap, correct?

7     Do you recall talking about Quick Add?

8          A.    Yes.

9          Q.    All right.  I'm going to hand you what

10    is marked as Exhibit 47 to your deposition.

11                  (Whereupon, Snap-Boyle-47 was marked

12                  for identification.)

13    BY MR. AYERS:

14         Q.    Exhibit 47 is Bates-numbered

15    SNAP2487541.  It is titled "Voice of the Customer:

16    Friending," from October 2020, "Customer Ops

17    Channels:  In-App-Reporting."

18                  Are you familiar with this document,

19    sir?

20         A.    Not this specific one, but the general

21    format of these reports from our customer support

22    team.

23         Q.    The Voice of the Customer is Snap's

24    method of collecting user feedback on product

25    features, correct?

1          A.     That's right, yes.

2          Q.     And as the senior director of product

3     you would typically review Voice of the Customer

4     reports highlighting significant user concerns,

5     correct?

6          A.     Yes, or members of my team would.

7          Q.     And if you turn to page 8, Bates ending

8     in 48.  Let me know when you're there.

9          A.     Yeah.

10         Q.     All right.  There's feedback about

11    suggesting minors as friends for adults in Quick

12    Add, right?

13              MS. TELLER:  Object to the

14          characterization of the document.

15              THE WITNESS:  There's some feedback

16          there, yes.

17    BY MR. AYERS:

18         Q.     And under "Filtering Tools" -- you see

19    that in the left-hand column?

20         A.     Yes.

21         Q.     All right.  And then there's a bullet

22    point in the right-hand column next to it where it

23    says, in quotes, "'Stop suggesting minors a friends

24    for adults in Quick Add.'"

25              Right?

David Boyle                                                    617

1          A.    That's what it says.

2          Q.    And this feedback explicitly flags that

3    minors are being surfaced to adult users on Quick

4    Add, correct?

5                MS. TELLER:  Objection.  Foundation.

6                THE WITNESS:  That's what the report

7          says, but, you know, I don't know about the

8          specific case here.  I don't know how they

9          would know that a person is a minor,

10         because when someone is suggested in Quick

11         Add, there isn't, you know, any information

12         on their profile other than a cartoon

13         avatar.

14               But, you know, we receive a lot of, you

15         know, reports about different topics, as

16         you can see here, you know, thousands.

17   BY MR. AYERS:

18         Q.    Do you see any problems with minors

19   being recommended to adults via Quick Add?

20               MS. TELLER:  Objection.  Vague.

21               THE WITNESS:  I think, you know, as

22         we've noted, we add safeguards to ensure

23         that if minors are recommended to adults,

24         it's only intended to be people that they

25         might already know or have multiple mutual

David Boyle                                          642

1                CERTIFICATE OF COURT REPORTER

2

3            I, MAUREEN O'CONNOR POLLARD,

4       Registered Diplomate Reporter, CSR No.

5       14449 for the State of California, the

6       officer before whom the foregoing

7       deposition was taken, do hereby certify

8       that the foregoing transcript is a true

9       and correct record of the testimony

10      given; that said testimony was taken by

11      me stenographically and thereafter

12      reduced to typewriting under my

13      direction; and that I am neither

14      counsel for, related to, nor employed

15      by any of the parties to this case and

16      have no interest, financial or

17      otherwise, in its outcome.

18          Dated this 5th day of April, 2025.

19

20                 <%21527,Signature%>
                 _____

21              MAUREEN O'CONNOR POLLARD

22              CSR No. 14449

23

24

25