**AMENDED Exhibit 948**


**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                          - - -

4    IN RE:  SOCIAL MEDIA ADOLESCENT            MDL NO.
     ADDICTION/PERSONAL INJURY PRODUCTS         3047
5    LIABILITY LITIGATION                       CASE NO.

6    THIS DOCUMENT RELATES TO:                  4:22-MD-03047-YGR

7    ALL ACTIONS

8

9         SUPERIOR COURT OF THE STATE OF CALIFORNIA
                FOR THE COUNTY OF LOS ANGELES
10                  UNLIMITED JURISDICTION

11   COORDINATION PROCEEDING
     SPECIAL TITLE (RULE 3.550)
12                                              JCCP

13   SOCIAL MEDIA CASES                         JUDICIAL COUNCIL
     _____       PROCEEDING NO. 5255
14

15   THIS DOCUMENT RELATES TO:                  JUDGE CAROLYN B. KUHL
                                                DEPT. 12
16   ALL ACTIONS
                           - - -
17         CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

18              ** VIDEOTAPED DEPOSITION**

19                      JULIET SHEN

20              Tuesday, March 4, 2025

21

22

23   Reported by:

24   Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

25

1    explorations related to this topic.  If so, I could

2    link them in the Relevant Snap Research section."

3              Do you see that?

4        A.   Yes.

5        Q.   You respond at 9:36, saying:

6              "Hmm, this is still my 'volunteer' work

7    area, ha ha.  But I haven't done anything recently."

8              I read that correctly, right?

9        A.   Yes.

10       Q.   Ma'am, what you're telling Ms. ███ is that

11   you haven't delivered any mental health and

12   well-being features recently, right?

13             MR. UMHOFER:  Objection, misstates the

14        document.

15       A.   This was an area of work that I was doing

16   on top of my actual responsibilities around online

17   safety.  I was not expected to deliver anything, and

18   I hadn't at this time.

19   BY MR. FREEDMAN:

20       Q.   That's a "yes" to my question?  You're

21   saying you haven't delivered any mental health or

22   well-being features recently?

23             MR. UMHOFER:  Same objection.

24       A.   I don't know what you consider "recently."

25   The year before, I had launched Here For You.

BY MR. FREEDMAN:

Q.   Well, what would you consider recently when you wrote "recently"?

A.   I don't remember what I meant at the time.

Q.   I think you said you hadn't done anything recently, right?

MR. UMHOFER:  Objection, misstates the document.

A.   Yes.

BY MR. FREEDMAN:

Q.   And the reason why this was a volunteer work area is because Snap didn't have a dedicated product manager focused on mental health and well-being features?

MS. DEGTYAREVA:  Objection, speculation, foundation.

MR. UMHOFER:  Join.

A.   That's my understanding.

BY MR. FREEDMAN:

Q.   You continue on:

"There is some work planned for a Here For You hub.  No spec yet, but literally discussed it today.  Unfortunately, nothing linkable."

I read that correct, right?

A.   Yes.

```
 1              MS. DEGTYAREVA:  Okay.
 2              MR. FREEDMAN:  Let's see if we can clear
 3         up the blurriness here a bit.
 4              THE VIDEOGRAPHER:  Auto focus button.
 5    BY MR. FREEDMAN:
 6         Q.   Ms. Shen, I'm going to represent to you
 7    that this is a -- what we call a "Plaintiff fact
 8    sheet."  This is a document that Snapchat has asked
 9    our minor plaintiffs to fill out and to identify the
10    features on Snapchat that they've used and whether
11    it contributed to their injuries.
12              Now, today I'm going to cross these out,
13    and I want to ask about your awareness of whether --
14    and excuse my terrible handwriting, Ms. Shen --
15    whether these features can be addictive or whether
16    they can cause mental health harms such as suicidal
17    thoughts, body dysmorphia, anxiety, or depression.
18    Okay?
19              So let's go one by one?
20              MS. DEGTYAREVA:  I'm going to make a
21         standing objection to the use of this document
22         based on speculation, foundation, vague and
23         ambiguous.
24              MR. UMHOFER:  I'll join that.  And so on
25         questions, we'll just have a standing objection
```

1          to the use of this document in asking these

2          questions.

3                You can certainly ask the questions,

4          but --

5                MR. FREEDMAN:  Right.

6     BY MR. FREEDMAN:

7          Q.   So Ms. Shen, we're going to go through

8     these features and we are going to tell the jury

9     whether or not you conducted any research into

10    whether or not these individual features cause

11    addiction or mental health harms.

12                Ms. Shen, as the lead safety product

13    manager who is the internal expert on safety in and

14    beyond the product team, did you ever come up with

15    any research as to whether or not sending or

16    receiving chats or Snaps can be addictive or cause

17    mental health harms?

18                MR. UMHOFER:  Objection to the preamble.

19          Assumes facts.

20                MS. DEGTYAREVA:  Join.

21          A.   To clarify your question, am I answering

22    for both columns, or do you prefer to ask one by one

23    or --

24    BY MR. FREEDMAN:

25          Q.   We're going to ask for each row here.  So

Juliet Shen                                              189

1    we're going to do one of these features listed at a

2    time, and you're going to tell me whether or not you

3    conducted any research into whether or not the

4    feature could be addictive or whether it can

5    contribute to mental health harms, okay?

6              So as lead safety product manager, the

7    expert in safety both in and beyond the product,

8    sending or receiving chats or Snaps could be

9    addictive.

10             Have you conducted any research into that?

11             MR. UMHOFER:  Same objection.

12             MS. DEGTYAREVA:  Join.

13       A.   I personally haven't.

14   BY MR. FREEDMAN:

15       Q.   How about whether they contribute to

16   mental health harms?

17             MR. UMHOFER:  Just for the record, I'm

18             going to reflect that she gave an answer.  What

19             was written down was not her answer, but the

20             word "no" was written down, which did not

21             appear in her answer.

22             I just want to make the record clear about

23             what's being said as opposed to what's being

24             written down.

25

1    BY MR. FREEDMAN:

2        Q.    Ma'am, do you understand that the answers

3    I'm asking you to provide are whether or not you

4    conducted research about whether each one of these

5    features were addictive or caused mental health

6    harms?

7        A.    I again want to clarify that I never

8    personally did research, and I want to know if what

9    you're -- if the spirit of your question means if

10   I'm aware of other teams doing research, or if I'm

11   aware that such research was done at Snap.

12            I'm not sure if I understand your

13   question.

14       Q.    My question is whether you or the people

15   working for you, as safety product managers in

16   charge of all safety products relating to child

17   safety and safety product, conducted research into

18   whether these features could be addictive or cause

19   mental health harms.

20            Do you understand that?

21       A.    I do, but I didn't have anyone reporting

22   to me.  So it would just be me.

23            So just to clarify again, the question is

24   whether I personally did any research on these

25   areas?

1    BY MR. FREEDMAN:

2         Q.    Yes.

3         A.    Okay.  Thank you.

4         Q.    So the answer is "no" for sending and

5    receiving features, correct, or chats and Snaps?

6         A.    Correct that it's "no."

7               Oh, for mental harms specifically on

8    sending and receiving chats or Snaps related to

9    grooming, I did some research on my own.

10        Q.    Okay.  Say, yes on grooming.

11              But nothing related to depression,

12   anxiety, stress, or suicidal thoughts?

13        A.    I did a little bit of research in terms of

14   how sending chats to your friends can help people

15   when they're in a mental health crisis.

16        Q.    But how about whether or not they can

17   cause mental health harms?

18              MR. UMHOFER:  Objection, vague as to the

19        word "they."

20        A.    I don't remember the specific questions we

21   used, but I believe the overall topic was around

22   mental well-being, and this is the information that

23   was provided to us by teenagers.

24   BY MR. FREEDMAN:

25        Q.    Okay.  So we'll change this one to yes?

1     Does that sound right?

2          A.   Yes.

3          Q.   How about did you --

4               MS. DEGTYAREVA:  Just for the record, the

5          document is listed as "yes, grooming," where

6          her answer was beyond that.

7               MR. FREEDMAN:  Okay.  "Yes, and grooming."

8          How about that?

9               MS. DEGTYAREVA:  Sure.  It still doesn't

10         represent her answer exactly, so I'll note for

11         the record that's not what her answer was.

12    BY MR. FREEDMAN:

13         Q.   Ms. Shen, you were never a part of any

14    research related to whether or not using lenses or

15    filters could be addictive, right?

16         A.   No.

17         Q.   Never a part of any research related to

18    whether mental health harms could be caused by

19    lenses or filters?

20         A.   I believe I was shared on some research

21    related to lenses and the potential mental harm they

22    could do.

23         Q.   You didn't contribute on it.  You just

24    said you worked with it shared with you?

25         A.   To the best of my recollection.

1    Q.    You don't remember ever conducting or

2    participating in any research related to mental

3    health harms with lenses and filters?

4    A.    I wasn't on the lens or filter team.

5    Q.    So that's a "no"?

6    A.    Right.

7    Q.    How about whether communicating with other

8    users via voice or video call could be addictive?

9    Did you ever participate in any research related to

10   that?

11   A.    No.

12   Q.    How about whether communicating with other

13   users via voice or video call could cause mental

14   health harms?

15   A.    No.

16   Q.    As the only product safety manager in

17   child safety areas, how about whether posting

18   stories could be addictive?

19         Did you ever contribute to any research on

20   that?

21   A.    No.

22   Q.    How about mental health harms?

23   A.    No.

24   Q.    Ma'am, as you look through the rest of the

25   features on this page, is it a "no" for each one?

```
1            MS. DEGTYAREVA:  Objection, compound
2        question.
3            MR. UMHOFER:  Join.
4        A.    Sorry.  Can you move the paper up a
5    little?
6    BY MR. FREEDMAN:
7        Q.    Sorry about that.
8        A.    I believe I contributed to some research
9    around posting and viewing content on Spotlight and
10   its impact on well-being.  And the content on
11   Spotlight just wasn't very good, and so I think the
12   research showed that it was not addictive.
13       Q.    So "no" for all of these except for "yes"
14   for posting content on Spotlight?
15       A.    I believe posting and viewing content on
16   Spotlight.
17       Q.    And what was your research into mental
18   health harms for those?
19       A.    I don't know if we did that.
20       Q.    So then you did not contribute to any
21   research into viewing and posting content on
22   Spotlight?
23            MS. DEGTYAREVA:  Objection, misstates the
24        testimony.
25       A.    To clarify my response, I believe I said
```

1    we did some research on whether it was addictive.

2    BY MR. FREEDMAN:

3         Q.   Oh, just addictive, but not whether or not

4    posting or viewing could cause mental health harms?

5         A.   Right.

6         Q.   I'll write no, no, no, no, yes, yes, no,

7    no.  Does that look right?

8         A.   I'm not sure that this captures what I

9    said, but I believe that this intends to represent

10   what you want it to represent.

11        Q.   Ma'am, is anything here incorrect?  Did

12   you contribute to researching any of these features

13   and whether they could be addictive or cause mental

14   health harms where I marked "no"?

15        A.   No.

16             MR. UMHOFER:  Again, just a standing

17        objection to the way in which this document is

18        being used, but I think we've already

19        established that.

20   BY MR. FREEDMAN:

21        Q.   Let's turn to these -- same thing here.

22             Ma'am, did you contribute to any research

23   into whether or not viewing content on Discover

24   could be addictive?

25        A.   No.

1        Q.    What about whether it can cause mental

2    health harms?

3        A.    I believe I contributed to some research.

4        Q.    What was that research?

5        A.    To the best of my recollection, I believe

6    some of that research was around the types of

7    content that could be shown to people and the kind

8    of mental stress it could cause.

9        Q.    And what was the -- where will we find

10   that research?

11       A.    I don't remember.

12       Q.    Who ran that study?

13       A.    I'm not -- can we clarify what you mean by

14   "research"?

15       Q.    Sure.

16             Did you -- were there any scientific

17   studies into the way in which the viewing content on

18   Discover could impact mental health of children?

19             MS. DEGTYAREVA:  Objection, vague and

20        ambiguous.

21             MR. UMHOFER:  Join.

22       A.    Can you specify what you mean by

23   "scientific study"?

24   BY MR. FREEDMAN:

25       Q.    Ma'am, as the lead -- former lead safety

1    product manager, what do you believe a scientific

2    study is?

3         A.   There are many types of scientific

4    studies, going from hard sciences to social

5    sciences.  And the way that those experiments and

6    studies can be conducted can differ based on the

7    field.  I'm not sure which kind of study you're

8    referring to here.

9         Q.   How about were there any medical -- did

10   you consult with any medical professionals or

11   anybody with a science degree who was there to

12   determine whether or not viewing content on Discover

13   could cause mental health harms?

14        A.   No.  And if we are using that definition,

15   then I would like to go back to the prior page, and

16   we did not do that kind of study for the other types

17   of areas as well.

18        Q.   Let's go back to this page for a second.

19             So you're saying that no scientists or

20   medical professionals would have been involved in

21   either of these two studies that we had previously

22   talked about?

23             MR. UMHOFER:  I'm going to object as

24        compound and asked and answered, but now we're

25        going back with a new definition.  I just think

1           this document has become relatively useless

2           given the changing and moving definitions of

3           what research is.

4               MS. DEGTYAREVA:  I would join in that

5           objection.

6    BY MR. FREEDMAN:

7           Q.   Ma'am, when you said "yes" to those two

8    features, what was your definition of "study"?

9               MS. DEGTYAREVA:  Objection.  The question

10          that was asked was about research and not

11          study.

12   BY MR. FREEDMAN:

13          Q.   Ma'am, I can rephrase.

14              What was your definition of "research"

15   when you said "yes" to those two things?

16              MR. UMHOFER:  Objection.  There's three

17          things she said "yes" to.

18          A.   In my previous responses when I was

19   talking about research, I was talking about both UX

20   research, which is a pretty standardized structural

21   way of understanding user behavior, as well as

22   research in terms of a deep dive in terms of

23   behavior.

24              This can sometimes mean working with data

25   science to better understand patterns of behavior,

1    but not always.

2    BY MR. FREEDMAN:

3         Q.    Was the purpose of any of those studies

4    specifically to determine whether or not these

5    features could cause addiction in children?

6         A.    I don't believe so.

7         Q.    Now, when you said "yes" to viewing

8    content on Spotlight and posting content on

9    Spotlight, who led those research efforts?

10        A.    I don't remember.

11        Q.    Can you tell us anything about the

12   research you said "yes" to originally?

13        A.    We wanted to understand the user behavior

14   of Spotlight and why it wasn't more used, and so we

15   worked with data scientists and other types of

16   researchers at Snap on that.

17        Q.    So the goal of that research was to

18   understand why it wasn't being used more, right?

19        A.    Yes.

20        Q.    Not whether or not it was causing

21   addiction?

22        A.    I believe it was abundantly clear that it

23   was not causing addiction.

24        Q.    Based on what, ma'am?

25        A.    From what I recall, the usage numbers.

Juliet Shen                                                    200

1      Q.   And what were those usage numbers?

2      A.   I don't know.

3      Q.   Who was involved in this research?

4      A.   Maybe Josh Siegel.

5      Q.   What is Josh Siegel's title?

6      A.   His title changed many times while I was

7    at Snap, but for the purposes of this question, he

8    was the head of Spotlight product.

9      Q.   And you're saying that you were involved

10   in some sort of effort with Josh Siegel to determine

11   whether or not Snapchat was addictive or Spotlight

12   was addictive?

13     A.   That was not the focus of our research,

14   but there was relevant information in terms of

15   Spotlight not being addictive.

16     Q.   Did you ever recommend that you take that

17   data that you and Mr. Siegel had gathered and give

18   it to any expert in mental health or addiction?

19     A.   No.

20     Q.   Did you consult with any experts outside

21   of Snapchat in the fields of addiction or mental

22   health in designing that study?

23     A.   No.

24     Q.   As you've testified to a couple of times

25   here today, you're not a certified addiction

1    specialist, right?

2         A.    Yes.

3         Q.    You have never held any degrees -- or

4    positions, rather, related to diagnosing addiction

5    in others?

6         A.    No.

7         Q.    And you never set out to determine whether

8    or not viewing or posting content on Spotlight could

9    be addictive, correct?

10             MS. DEGTYAREVA:  Objection, misstates the

11        testimony.

12             MR. UMHOFER:  Join.

13        A.    I'm not sure I understand the question.

14   BY MR. FREEDMAN:

15        Q.    Ma'am, did you ever create an OKR to

16   understand whether Spotlight could cause addiction?

17        A.    No.

18        Q.    Let's move back here.

19             Ma'am, rather than go feature by feature,

20   I'm going to ask you to look at the screen.

21             Can you tell me whether or not you have

22   conducted or participated in any research related to

23   determining whether each one of these features could

24   cause addiction or mental health harms?

25             MS. DEGTYAREVA:  Objection, vague and

1        ambiguous.

2              MR. UMHOFER:  Join.

3        A.   No.

4  BY MR. FREEDMAN:

5        Q.   When you say "no," what do you mean?

6        A.    I mean that -- I mean that I didn't

7  contribute to research on addiction or mental health

8  harms for the features that I see on this paper in

9  front of me.

10       Q.   So it would be fair to say I could write a

11  "no" for all of these, right?

12       A.   Yes.

13            MR. FREEDMAN:  Ms. Shen and members of the

14        jury, I apologize again about my terrible

15        handwriting.

16            We're going to mark this demonstrative as

17        Exhibit 14.

18            MR. UMHOFER:  Please note our objection.

19            MS. DEGTYAREVA:  Yes.  We object to this

20        exhibit.

21            (Exhibit 14 was received and marked for

22  identification, as of this date.)

23            MR. FREEDMAN:  I think this might be a

24        good place for a break.

25            THE VIDEOGRAPHER:  The time is 2:20 p.m.

Juliet Shen                                              221

1    affects children more than not, but I have no reason

2    to believe it wouldn't apply to children.

3    BY MR. FREEDMAN:

4         Q.   Ms. Shen, I guess I'm just wondering as

5    the lead safety product manager who personally

6    believes that skin lightening features or filters

7    and other beautification features can have negative

8    impact on individuals' well-being, how much research

9    did you try to conduct into whether or not that was

10   true on Snapchat?

11        A.   I'm not sure if I can quantify how much

12   research, but I did look for news articles or other

13   types of studies showing that this could be harmful.

14        Q.   Did you ever raise these concerns with

15   anybody else at Snapchat?

16        A.   Yes.

17        Q.   Ms. Shen, does Snapchat still offer skin

18   lightening filters and beautification filters to

19   children?

20             MS. DEGTYAREVA:  Objection, foundation.

21             MR. UMHOFER:  Join.

22        A.   I'm sorry.  I thought you said my name.  I

23   think that right now on Snap, there are a lot more

24   user-generated lenses, meaning lenses that were

25   created by not Snap the company but by users of

Juliet Shen                                             222

1    Snapchat's product, and so I don't know if those

2    contain skin lightening features or not.

3            I still see face lenses, but I haven't

4    used Snapchat that often to try to figure out if

5    they're lightening my skin or not.

6    BY MR. FREEDMAN:

7        Q.   How about this, ma'am.  Did you ever

8    receive any notice while you were working at Snap

9    that Snap had terminated the use or accessibility of

10   skin lightening filters to children?

11       A.   I vaguely remember hearing about how they

12   were going to work on removing skin lightening to

13   focus on other face features.

14       Q.   Ma'am, my question was whether or not that

15   practice had stopped by the time you left Snapchat?

16       A.   Not to my recollection.

17       Q.   Sitting here today, you can't tell us that

18   Snapchat has removed all skin lightening filters for

19   users who have indicated that they're under the age

20   of 18?

21           MR. UMHOFER:  Objection, lacks foundation,

22       calls for speculation.

23           MS. DEGTYAREVA:  Join.

24       A.   I have never worked on the lens team and I

25   also don't know how the lens algorithm works in

```
1          A.    I'm not sure what that means in this
2    context.
3          Q.    What about in any context?
4          A.    I think it's referring to the planning
5    process for how we would detect grooming.
6          Q.    And you would agree with me that, based on
7    Mr. ██████s statement, he's indicating that prior to
8    around May of 2022, Snap had not kickstarted the
9    grooming detection planning?
10             MS. DEGTYAREVA:  Objection, speculation,
11         foundation.
12             MR. UMHOFER:  Join.
13         A.    I can't speak to what ██████ meant in that
14   moment.  We've always worked on grooming, but I
15   believe this was a focused effort.
16   BY MR. FREEDMAN:
17         Q.    Well, he doesn't use the words "focused
18   effort," right?
19         A.    No.
20         Q.    He doesn't say this is just going to be
21   another iteration of the type of detection planning
22   we've had in place for years?
23         A.    We didn't have as much of our proactive
24   detection framework until ██████ joined earlier in
25   2022.
```

```
 1          Q.    So you would agree with me that prior to
 2   2022 when Mr. ████ started, Snap didn't have a
 3   proactive grooming detection framework?
 4          A.    Yes.
 5          Q.    Mr. ████ continues.  He says:
 6                "It is probably the hardest problem, and
 7   given our ephemeral product" -- and then there's an
 8   emoji there or some sort of symbol.
 9                Do you know what that is?
10          A.    I believe it is what we called shrugging
11   in the tech industry.  It's an emoji that's looks
12   like this (indicating) of a person shrugging.
13          Q.    Gotcha.  Now, he says here, that grooming
14   detection planning is the hardest problem.
15                Can you tell us what grooming is?
16          A.    I believe in this context, and to the best
17   of my ability to explain it, grooming refers to a
18   form of child sexual exploitation in which an adult
19   through longterm or short-term behavior/engagement
20   with a child, develops a, quote/unquote,
21   relationship with the child.
22                Predators can also groom a child's parents
23   or guardians in order to gain more access to the
24   minor.
25          Q.    Prior to 2022, Snap did not have a
```

1         MR. UMHOFER:  Objection, calls for

2     speculation, lacks foundation.

3     A.   I don't know how I can remember something

4  that I don't remember.  The question kind of

5  confused me.

6  BY MR. FREEDMAN:

7     Q.   Ma'am, you'd agree with me that through --

8  you'd agree with me that Snap has never warned

9  parents about the existence of CSAM on its platform,

10  correct?

11         MS. DEGTYAREVA:  Objection, speculation,

12     foundation.

13     A.   There are multiple other teams that handle

14  outreach to parents and schools, as well as through

15  public feeds like Discover.  But I wasn't on those

16  teams, so I'm not sure what they did and what they

17  didn't include in their materials.

18  BY MR. FREEDMAN:

19     Q.   As the lead child safety product manager,

20  you weren't consulted by any of those teams about

21  these child safety issues, were you?

22     A.   I don't remember.

23     Q.   One thing we can agree on, hopefully, is

24  that you never warned parents about issues with

25  Snap's trust and safety teams, right?

1          MS. DEGTYAREVA:  Objection, speculation,

2     foundation, vague and ambiguous.

3          A.   I don't know.

4     BY MR. FREEDMAN:

5          Q.   You never warned parents about issues with

6     the leadership team for Snap's trust and safety

7     team?

8          A.   I don't believe so.

9               Also, can we take a quick break so I can

10    go to the restroom?

11          MR. FREEDMAN:  Absolutely.

12          THE VIDEOGRAPHER:  The time right now is

13    5:06 p.m.  We're off the record.

14          (Recess.)

15          THE VIDEOGRAPHER:  The time right now is

16    5:15 p.m.  We're back on the record.

17    BY MR. FREEDMAN:

18          Q.   Welcome back, Ms. Shen.

19               Before we went to break, we were talking a

20    little bit about harmful content on the Snapchat

21    platform.

22               I want to know, as the lead child safety

23    product manager, did you ever do any research about

24    whether Snapchat's content algorithms were feeding

25    harmful content to children?

1    the way that the algorithm feeds people under the

2    age of 18 sexual content.  Are you aware that this

3    has happened on Snapchat?

4              MS. DEGTYAREVA:  Objection, speculation,

5         foundation, assumes facts.

6              MR. UMHOFER:  Join.

7         A.   I'm not aware.

8    BY MR. FREEDMAN:

9         Q.   Just to be clear here, you're saying that,

10   as a former lead product safety manager responsible

11   for child safety areas, you're not aware of whether

12   or not the algorithm has ever fed sexual content to

13   children?

14             MR. UMHOFER:  Objection, asked and

15        answered.

16        A.   Right.

17   BY MR. FREEDMAN:

18        Q.   Well, ma'am, you'd agree that -- ma'am,

19   did you or anyone you know ever have any

20   conversations about consulting with school

21   counselors about the impacts of Snapchat on child's

22   education?

23        A.   Not that I remember.

24        Q.   What about any psychologists?

25        A.   And just specifying, specifically on the

1    users and 50 percent of beta users, right?

2         A.   Yes.

3         Q.   In the section titled "Why are we doing

4    this," correct?

5         A.   Yes.

6         Q.   And what you write is:  "In-app reporting

7    is a critical safety tool that has significant gaps

8    today."

9              I read that correctly?

10        A.   Yes.

11        Q.   Your assessment of the issues with this

12   critical safety tool were that it had significant

13   gaps; isn't that right?

14        A.   I think that what this shows is that we

15   were always trying to find problems and challenges

16   with what we were doing, and once we found those

17   problems, we fixed them.

18        Q.   Well, good job, because the problem you

19   found is that 96.7 percent of all existing account

20   reports did not lead to review; is that correct?

21        A.   Right.

22        Q.   And I guess you found this problem

23   sometime close to May 2022, right?

24        A.   Yes.

25        Q.   How long had Snap been allowing users to

Juliet Shen                                              341

1  report accounts?

2       A.    Approximately four years.

3       Q.    So for the first four years, 96.7 percent

4  of existing account reports didn't lead to any sort

5  of review, right?

6            MS. DEGTYAREVA:  Objection.  Misstates the

7       document, speculation, foundation.

8            MR. UMHOFER:  Join.

9       A.    I'm not sure.

10 BY MR. FREEDMAN:

11      Q.    Well, that's explicitly what you said,

12 right?

13      A.    I don't think I listed the amount of time

14 in here.

15      Q.    "96.7 percent of existing account reports

16 don't lead to review," is that what you said?

17      A.    Yes.

18      Q.    And it took you approximately four years

19 to identify and start to solve that issue with the

20 process, right?

21           MS. DEGTYAREVA:  Objection.  It assumes

22      facts and misstates the testimony in document.

23           MR. UMHOFER:  Join.

24      A.    I can't remember when we found this, but

25 we did prompt them to block the other person that

1    they were reporting.

2    BY MR. FREEDMAN:

3         Q.   Well, after you found it, did you delay

4    rolling out this feature?

5         A.   We had to build a fix.

6         Q.   How long did that take?

7         A.   I don't remember.

8         Q.   Okay.  We can also agree that prior to

9    2023, Snap didn't even offer children the ability to

10   report predatory Snap text messages on the app,

11   right?

12        A.   I left the company in 2022, so I'm not

13   really sure what happened afterward.

14             MR. UMHOFER:  Directing your attention to

15        tab 22, this is Exhibit -- we're going to mark

16        this 22.

17             (Exhibit 22 was received and marked for

18   identification, as of this date.)

19   BY MR. FREEDMAN:

20        Q.   Ma'am, this document has a title that says

21   "Business Case: Chat Text Reporting," right?

22        A.   Yes.

23        Q.   And if you look about a third of the way

24   down the page, it says, "Product owners Abby Tran

25   and Juliet Shen," right?

1                      CERTIFICATE

2

3    STATE OF NEW YORK  )

4                           :  ss

5              I, Angela M. Shaw-Crockett, a Certified Court

6    Reporter, Registered Merit Reporter and Notary Public within

7    and for the States of New York, New Jersey and Connecticut,

8    do hereby certify:

9              That JULIET SHEN, the witness whose deposition is

10   herein before set forth, was duly sworn by me and that such

11   deposition is a true record of the testimony given by such

12   witness.

13             I further certify that I am not related to any of

14   the parties to this action by blood or marriage and that I

15   am in no way interested in the outcome of this matter.

16             In witness whereof, I have hereunto set my hand

17   this 6th day of March, 2025

18

19             ----------------------------------------
             ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR, CSR
20           LICENSE NO. XI00218400

21

22

23

24

25