1  [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  IN RE: SOCIAL MEDIA ADOLESCENT          MDL No. 3047
    ADDICTION/PERSONAL INJURY
12  PRODUCTS LIABILITY LITIGATION           Case No. 4:22-md-03047-YGR

13  _____  **STATE ATTORNEYS GENERAL'S**
    THIS DOCUMENT RELATES TO:               **OPPOSITION TO META'S MOTION**
14                                          **FOR SUMMARY JUDGMENT AND**
    4:23-cv-05448                           **CROSS-MOTION FOR PARTIAL**
15                                          **SUMMARY JUDGMENT**

16                                          Judge: Hon. Yvonne Gonzalez Rogers

17                                          Magistrate Judge: Hon. Peter H. Kang

18                                          Date: April 15, 2026
                                            Time: 1:00 PM
19                                          Place: Courtroom 1, 4th Floor

20

21

22

23

24

25

26

27

28

### NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT, at 1:00 PM on April 15, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, the eighteen State Attorneys General Plaintiffs asserting claims under their state consumer protection laws will and hereby do move this Court, under Federal Rule of Civil Procedure 56, for an order granting partial summary judgment in favor of those AGs regarding the commerce-related elements of their state consumer protection laws. This Cross-Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Cross-Motion, the accompanying Declarations of Megan O'Neill and Kate Gooler and the exhibits thereto, and any other matters presented at the time of the hearing.

### STATEMENT OF RELIEF SOUGHT

The eighteen AGs asserting claims under their state consumer protection laws seek entry of partial summary judgment in their favor on all commerce-related elements of those laws, including regarding consumer transactions, trade and commerce, and the course of business.

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................ 1

II. LEGAL STANDARD .................................................................................................. 2

III. ARGUMENT ............................................................................................................. 3

   A.  Meta Is Not Entitled to Summary Judgment on the AGs' Deception Claims. ................ 3

      1.  The AGs' claims related to Meta's "addiction" statements are actionable and
          supported by ample evidence. .................................................................................. 3

         a.  Meta misstates state law and the AGs' evidentiary burdens. ................................ 4

         b.  There is ample evidence of the addictive nature and design of Meta's platforms,
             and Meta's knowledge thereof. ........................................................................... 8

      2.  Meta's legal challenges to the AGs' deception claims fail. ..................................... 13

         a.  The AGs cross-move for partial summary judgment on consumer transaction,
             trade and commerce, and course of business elements. ...................................... 14

         b.  Meta's statements are deceptive commercial speech and so entitled to no First
             Amendment protection. ...................................................................................... 20

         c.  The *Noerr-Pennington* doctrine does not protect Meta's misrepresentations...... 22

         d.  Meta's statements, in context, are not puffery. ................................................... 25

         e.  Meta's statute of limitation defense does not impact the AGs' claims. ............... 26

   B.  Meta Is Not Entitled to Summary Judgment on the AGs' Unfairness Claims.............. 29

      1.  Section 230 does not bar the AGs' unfairness claims............................................. 29

      2.  The First Amendment does not bar the AGs' unfairness claims. ............................ 31

      3.  Substantial evidence exists for all elements of the AGs' unfairness claims. .......... 34

         a.  Meta's features substantially injure millions of American youth. ....................... 34

         b.  There is significant evidence that Meta violated state laws following *Sperry*..... 36

         c.  Meta aggressively targets youths' vulnerabilities as business strategy and thus
             harms are not reasonably avoidable. .................................................................. 38

         d.  Meta's remaining arguments regarding specific states lack basis in law or fact. 39

   C.  Meta Is Not Entitled to Summary Judgment on the AGs' Request for Disgorgement. . 41

      1.  The Court has inherent equitable power to award disgorgement............................. 41

      2.  The AGs are entitled to equitable relief under federal equitable principles. .......... 43

3. The AGs provided a reasonable approximation of profits for disgorgement...........45

4. The AGs' requests for disgorgement and civil penalties do not have extraterritorial effect or exceed statutes of limitations....................................................................46

D. Meta Is Not Entitled to Summary Judgment on the AGs' COPPA Claim. ..................47

1. Meta has actual knowledge of U13 users on its platforms.......................................47

2. There is a genuine dispute of material fact as to whether the platforms, or portions thereof, are directed to children. ...............................................................................50

a. There is evidence that the platforms are directed to children.............................51

b. There is evidence that *portions* of the platforms are directed to children. ...........54

3. The AGs' COPPA claim is not barred by the statute of limitations or laches.........55

4. Disgorgement is available to the AGs under COPPA's remedial provision............57

IV. CONCLUSION .............................................................................................................59

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v Elenis*,
  600 U.S. 570 (2023) ................................................................................................ 33

*Aboushaban v. American Signature Inc.*,
  2021 WL 798874 (E.D. Va. Feb. 1, 2021) .............................................................. 6

*Adams v. American Cyanamid Co.*,
  498 N.W.2d 577 (Neb. Ct. App. 1992) .................................................................. 40

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ................................................................................................ 23

*Am. Elec. Power Co., Inc. v. Connecticut*,
  564 U.S. 410 (2011) ................................................................................................ 58

*Am. Nat'l Univ. of Ky. v. Kentucky*,
  2019 WL 2479608 (Ky. Ct. App. June 14, 2019) ............................................ 5, 40

*Amarel v. Connell*,
  102 F.3d, 1494 (9th Cir. 1996) .............................................................................. 25

*Angelilli v. Activision Blizzard, Inc.*,
  781 F. Supp. 3d 691 (N.D. Ill. 2025) .................................................................... 31

*Anonymous Taxpayer v. South Carolina Dep't of Revenue*,
  661 S.E.2d 73 (S.C. 2008) ..................................................................................... 27

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) .......................................................................... 20, 21

*Arrow Elecs., Inc. v. Quantum Corp.*,
  764 F. Supp. 3d 854 (N.D. Cal. 2025) .................................................................... 2

*Aryeh v. Canon Business Solutions, Inc.*,
  55 Cal.4th 1185 (2013) .......................................................................................... 27

*B&G Foods N. Am., Inc. v. Embry*,
  29 F.4th 527 (9th Cir. 2022) .................................................................................. 24

*Barnes v. Sea Hawaii Rafting, LLC*,
  889 F.3d 517 (9th Cir. 2018) ................................................................................... 2

*Beardsall v. CVS Pharmacy, Inc.*,
  953 F.3d 969 (7th Cir. 2020) ............................................................................... 6, 7

*Bibeau v. Pacific Northwest Research Foundation Inc.*,
  188 F.3d 1105 (9th Cir. 1999) ............................................................................... 56

*BP Am. Prod. Co. v. Burton*,
  549 U.S. 84 (2006) ................................................................................................. 56

*BP Am. Prod. Co. v. Patterson*,
  263 P.3d 103 (Colo. 2011) ................................................................................. 27

*Brockey v. Moore*,
  107 Cal. App. 4th 86 (2003) ............................................................................... 6

*Brown v. Stored Value Cards, Inc.*,
  2021 WL 76951 (D. Or. Jan. 8, 2021) ............................................................... 38

*Bustamante v. KIND, LLC*,
  100 F.4th 419 (2d Cir. 2024) .............................................................................. 7

*Cal. Motor Trans. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ........................................................................................... 22

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024) ............................................................... 29, 30, 31

*Cancellier v. Federated Dep't Stores*,
  672 F.2d 1312 (9th Cir. 1982) ........................................................................... 43

*Carcano v. JBSS, LLC*,
  684 S.E.2d 41 (N.C. App. 2009) ........................................................................ 15

*Carol Studios, Inc., v. Doo Young Hong*,
  2013 WL 6592747 (Ill. Ct. App. 2013) .............................................................. 15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) ........................................................................................... 20

*Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC*,
  77 Cal. App. 5th 729 (2022) ............................................................................... 5

*Chattin v. Cape May Greene*,
  591 A.2d 943 (N.J. 1991) ................................................................................... 5

*Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc.*,
  659 F.2d 695 (5th Cir. 1981) ............................................................................. 4

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S. Ct. 1464 (2022) ....................................................................................... 32

*City of Columbia v. Omni Outdoor Adver., Inc.*,
  499 U.S. 365 (1991) ........................................................................................... 23

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
  254 F.3d 882 (9th Cir. 2001) ............................................................................. 30

*Cleary Bldg. Corp. v. David A. Dame, Inc.*,
  674 F. Supp. 2d 1257 (D. Colo. 2009) ............................................................... 16

*Clemens v. Daimler-Chrysler*,
  534 F. 3d 1017 (9th Cir. 2008) .......................................................................... 6

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) .................................................................................. 22

*Com. ex. rel Conway v. Thompson*,
   300 S.W.3d 152 (Ky. 2009) ...................................................................................... 42

*Com., by Creamer v. Monumental Props., Inc.*,
   329 A.2d 812 (1974) ................................................................................................. 36

*Comm. to Protect our Agric. Water v. Occidental Oil & Gas Co.*,
   235 F. Supp. 3d 1132 (E.D. Cal. 2017).................................................................... 23

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
   194 A.3d 1010 (Pa. 2018) ........................................................................................... 6

*Commonwealth of Kentucky v Marathon Petroleum Co., LP.*,
   191 F. Supp. 3d 694 (W.D. Ky. 2016) ..................................................................... 39

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
   858 F.2d 499 (9th Cir. 1988)..................................................................................... 56

*Connecticut v. Sandoz, Inc.*,
   2026 WL 395842 (D. Conn. Feb. 12, 2026) ............................................................ 43

*Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*,
   219 F. Supp. 3d 878 (S.D. Ind. 2019) ...................................................................... 38

*Continental Airlines, Inc. v. Intra Brokers, Inc.*,
   24 F.3d 1099 (9th Cir. 1994)..................................................................................... 44

*Cook v. Fam. Motors, LLC*,
   2022 WL 3269946 (W.D. Mo. Aug. 10, 2022).......................................................... 19

*Coppola Const. Co. v. Hofman Enters. Ltd. P'ship*,
   2010 WL 4723453 (Conn. Superior Ct. Nov. 2, 2010).............................................. 15

*Cox v. Sears Roebuck & Co.*,
   647 A.2d 454 (N.J. 1994)........................................................................................... 15

*CTIA - The Wireless Ass'n v. City of Berkeley*,
   928 F.3d 832, 841 (9th Cir. 2019).............................................................................. 21

*Dagley v. Haag Eng'g Co.*,
   18 S.W.3d 787 (Tex. App. 2000) ............................................................................... 18

*de Lacour v. Colgate-Palmolive Co.*,
   2024 WL 36820 (S.D.N.Y. Jan. 3, 2024)..................................................................... 7

*DirecTV, Inc. v. Garza*,
   2005 WL 2269053 (E.D. Wash. Sep. 16, 2005) ........................................................ 57

*Doe v. Grindr, Inc.*,
   128 F.4th 1148 (9th Cir. 2025)................................................................................... 31

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ........................................................................... 29, 30, 31

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019) .............................................................................. 29, 31

*Edgenet, Inc. v. GS1 AISBL*,
  742 F. Supp. 2d 997 (E.D. Wis. 2010) ........................................................................ 19

*Eichman v. Fotomat Corp.*,
  880 F.2d 149 (9th Cir. 1989) ................................................................................ 26

*Elder v. Cornet Insurance Co.*,
  201 Ill. App. 3d 733 (1st Dist. 1990) ......................................................................... 40

*Evergreen Safety Council v. RSA Network, Inc.*,
  697 F.3d 1221 (9th Cir. 2012) ................................................................................ 57

*F.T.C. v. Bronson Partners, LLC*,
  654 F.3d 359 (2d Cir. 2011) ......................................................................... 45, 57, 58

*F.T.C. v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972) .................................................................................... 34, 36

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ................................................................................ 31

*First American Corp. v. Al-Nahyan*,
  17 F. Supp. 2d 10 (D.D.C. 1998) ............................................................................. 43

*Fischl v. Armitage*,
  128 F.3d 50 (2d Cir. 1997) .................................................................................. 34

*Force v. ITT Hartford Life & Annuity Ins. Co.*,
  4 F. Supp. 2d 843 (D. Minn. 1998) ........................................................................... 16

*Ford Motor Co. v. Mayes*,
  575 S.W.2d 480 (Ky. App. 1978) ............................................................................. 39

*FTC v. DirecTV, Inc.*,
  2018 WL 3911196 (N.D. Cal. Aug. 18, 2018) .................................................................. 7

*Garneau v. Bush*,
  838 N.E.2d 1134 (Ind. Ct. App. 2005) ........................................................................ 27

*Gennari v. Weichert Co. Realtors*,
  691 A.2d 350 (N.J. 1997) ................................................................................. 5, 15

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ........................................................................................ 22

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) ........................................................................................ 47

vii

*Gradney v. Polar Beverages*,
    797 F. Supp. 3d 1016 (N.D. Cal. 2025) .................................................. 5

*Gray v. N.C. Ins. Underwriting Ass'n*,
    529 S.E.2d 676 (N.C. 2000) .................................................................. 39

*Gregg v. Ameriprise Fin., Inc.*,
    245 A.3d 637 (Pa. 2021) ......................................................................... 5

*Group Health Plan, Inc. v. Philip Morris, Inc.*,
    68 F. Supp. 2d 1064 (D. Minn. 1999) .................................................. 17

*Harrell v. BMW of N. Am.*, LLC,
    517 F. Supp. 3d 527 (D.S.C. 2021) ...................................................... 27

*Haseman v. Gerber Prods. Co.*,
    2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024) ........................................ 6

*HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*,
    805 F. Supp. 2d 1115 (D. Colo. 2011) ................................................. 24

*I.T. v. ChoicePoint LLC*,
    2025 WL 2495079 (W.D. Wash. Aug. 29, 2025) ................................... 15

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ......................................... 24

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) .................................................. 25

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................ 58

*In re GNC Corp.*,
    789 F.3d 505 (4th Cir. 2015) .................................................................. 6

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*,
    609 F. Supp. 3d 942  (N.D. Cal. 2022) ................................................... 7

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020) .................................................. 25

*In re R. M. J.*,
    455 U.S. 191 (1982) .............................................................................. 22

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    702 F. Supp. 3d 809 (N.D. Cal. 2023) .................................................. 29

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    753 F. Supp. 3d 849 (N.D. Cal. 2024) .................................................... 1

*In re Syngenta AG MIR 162 Corn Litig.*,
    131 F. Supp. 3d 1177 (D. Kan. 2015) .................................................. 18

*In re Toyota Motor Corp. Unintended Acc. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................... 25

*Ingalls v. Morgan*,
10 N.Y. 178 (1854) .............................................................................................. 5

*Inman v. Ken Hyatt Chrysler Plymouth, Inc.*,
363 S.E.2d 691 (S.C. 1988) ................................................................................ 38

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ............................................................................................ 47

*Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Crop.*,
2020 WL 4743502 (Minn. Ct. App. Aug. 17, 2020) ........................................... 16

*Joe Hand Promotions, Inc. v. Mills*,
567 F. Supp. 2d 719 (D.N.J. 2008) ..................................................................... 15

*Johnson v. Trumpet Behav. Health, LLC*,
No. 3:21-CV-03221-WHO, 2022 WL 74163 (N.D. Cal. Jan. 7, 2022) ............... 44

*JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*,
2014 WL 793525 (D. Colo. Feb. 26, 2014) ......................................................... 5

*Kling v. Hallmark Cards, Inc.*,
225 F.3d 1030 (9th Cir. 2000) ............................................................................ 56

*Kokesh v. SEC*,
581 U.S. at 457 (2017) ....................................................................................... 57

*Kugler v. Romain*,
279 A.2d 640 (N.J. 1971) .................................................................................... 39

*Lebanon Cnty. Employees' Ret. Fund v. Collis*,
287 A.3d 1160 (Del. Ch. 2022) .......................................................................... 27

*Lehrman v. South Chicago Cable, Inc.*,
569 N.E.2d 99 (1st Dist. 1991) ............................................................................ 6

*Lemmon v. Snap*,
995 F.3d 1085 (9th Cir. 2021) ............................................................... 29, 30, 31

*Liu v. SEC*,
591 U.S. 71 (2020) ................................................................................. 44, 45, 58

*Louzon v. Ford Motor Co.*,
718 F.3d 556 (6th Cir. 2013) .............................................................................. 28

*Marshall v. Miller*,
276 S.E.2d 397 (N.C. 1981) ............................................................................... 36

*McCarthy v. WPB Partners, LLC*,
2016 WL 4014581 (D.N.H. July 26, 2016) .......................................................... 19

*McNeary-Calloway v. JP Morgan Chase Bank, N.A.*,
　863 F. Supp. 2d 928 (N.D. Cal. 2012) ........................................................................ 15

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
　91 F.4th 238 (4th Cir. 2024).......................................................................................... 21

*Miami Herald Publ'g Co. v. Tornillo*,
　418 U.S. 241 (1974) ....................................................................................................... 33

*Milkovich v. Lorain Journal Co.*,
　497 U.S. 1 (1990) ........................................................................................................... 22

*Mitchell v. Robert DeMario Jewelry, Inc.*,
　361 U.S. 288 (1960) ....................................................................................................... 41

*Mobile Oil Corp. v. Higgenbotham*,
　436 U.S. 618 (1978) ....................................................................................................... 58

*Monster Energy Co. v. Integrated Supply Network, LLC*,
　533 F. Supp. 3d 928 (C.D. Cal. 2021)........................................................................... 43

*Moody v. Netchoice, LLC*,
　603 U.S. 707 (2024) ....................................................................................................... 31

*Moore v. Bird Eng'g Co., P.A.*,
　41 P.3d 755 (Kan. 2002) .................................................................................................. 5

*Moore v. Mars Petcare US, Inc.*,
　966 F.3d 1007 (9th Cir. 2020).......................................................................................... 4

*Nat'l Rural Telecomms Co-op v. DIRECTV, Inc.*,
　319 F. Supp. 2d 1059 (C.D. Cal. 2003).......................................................................... 34

*NetChoice, LLC v. Bonta*,
　113 F.4th 1101 (9th Cir. 2024)....................................................................................... 21

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
　516 F. Supp. 3d 1293 (D.N.M. 2012) ............................................................................ 51

*New York ex rel. Spitzer v. Feldman*,
　2003 WL 21576518 (S.D.N.Y. July 10, 2003) .............................................................. 27

*NN&R, Inc. v. One Beacon Ins. Grp.*,
　2006 WL 1765077 (D.N.J. June 26, 2006) ...................................................................... 5

*Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*,
　331 F. Supp. 92 (C.D. Cal. 1971).................................................................................. 25

*Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank*,
　85 N.Y.2d 20 (1995) ................................................................................................. 14, 17

*Owens v. DRS Auto. Fantomworks, Inc.*,
　764 S.E.2d 256 (Va. 2014)............................................................................................... 5

*Palmer v. Gorecki,*
   844 N.E.2d 149 (Ind. Ct. App. 2006) ......................................................... 27

*Palmeri v. Wilkie Farr & Gallagher LLP,*
   156 A.D.3d 564 (N.Y. App. 2017) ............................................................... 26

*Payne v. Hook,*
   74 U.S. 425 (1868) ....................................................................................... 43

*People by Madigan v. CMK Invs., Inc.,*
   2015 WL 4038896 (N.D. Ill. June 30, 2015) .............................................. 43

*People ex rel. Schneiderman v. Greenberg,*
   27 N.Y.3d 490 (2016) ................................................................................... 42

*People ex rel. Spitzer v. Direct Revenue, LLC,*
   2008 WL 1849855 (N.Y. Sup. Ct. Mar. 12, 2008) ..................................... 42

*People v. Ernst & Young, LLP,*
   980 N.Y.S.2d 456 (2014) .............................................................................. 42

*People v. Experian Data Corp.,*
   106 Cal. App. 5th 799 (2024) ....................................................................... 27

*People v. Forest E. Olson, Inc.,*
   137 Cal. App. 3d 137 (Ct. App. 1982) ........................................................... 5

*People v. Johnson & Johnson,*
   77 Cal. App. 5th 295 (Cal. App. 2022) ....................................................... 14

*People v. Overstock.com,*
   12 Cal. App. 5th 1064 (2017) ......................................................................... 3

*People v. Trump,*
   217 A.D.3d 609 (N.Y. App. Div. 1st Dep't 2023) ...................................... 28

*Pharm. Rsch. & Manufacturers of Am. v. Stolfi,*
   153 F.4th 795 (9th Cir. 2025) ...................................................................... 21

*Pick v. Kay,*
   2020 WL 12919340 (C.D. Cal. July 7, 2020) ............................................ 25

*Porter v. Warner Holding Co.,*
   328 U.S. 395 (1946) ............................................................................... 41, 57

*Progressive West Ins. Co. v. Superior Court,*
   135 Cal.App.4th 263 (Cal. Ct. App. 2005) ................................................. 34

*Quality Environmental Processes, Inc. v. I.P. Petroleum Co., Inc.,*
   144 So.3d 1011 (La. 2014) ........................................................................... 36

*Rainbow Realty Grp., Inc. v. Carter,*
   131 N.E.3d 168 (Ind. 2019) ......................................................................... 36

*Rambus Inc. V. Hynix Semiconductor Inc.*,
  2007 WL 1792327 (N.D. Cal. June 19, 2007) ........................................................ 26

*Rearden, LLC v. Rearden Commerce, Inc.*,
  683 F.3d 1190 (9th Cir. 2012) ................................................................................. 51

*Reed v. NBTY, Inc.*,
  2014 WL 12284044 (C.D. Cal. Nov. 18, 2014) ........................................................ 6

*Rhino Linings U.S. v. Rocky Mt. Rhino Lining*,
  62 P.3d 142 (Colo. 2003) .......................................................................................... 4

*Rhode Island v. Lead Indus. Ass'n*,
  2001 WL 345830 (Super. Ct. Apr. 2, 2001) ............................................................ 56

*Robinson v. Toyota Motor Credit Corp.*,
  775 N.E.2d 951 (Ill. 2002) ...................................................................................... 36

*Rucker v. Huffman*,
  392 S.E.2d 419 (N.C. Ct. App. 1990) ...................................................................... 6

*Rumsfeld v. FAIR*,
  547 U.S. 47 (2006) .................................................................................................. 32

*S.E.C. v. Hallam*,
  42 F.4th 316 (5th Cir. 2022) ................................................................................... 58

*S.E.C. v. E-Smart Techs., Inc.*,
  139 F. Supp. 3d 170 (D.D.C. 2015) ........................................................................ 57

*S.E.C. v. First City Fin. Corp.*,
  890 F.2d 1215 (D.C. Cir. 1989) .............................................................................. 45

*S.E.C. v. First Pac. Bancorp*,
  142 F.3d 1186 (9th Cir. 1998) ................................................................................ 44

*S.E.C. v. Fowler*,
  6 F.4th 255 (2d Cir. 2021) ...................................................................................... 46

*S.E.C. v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ........................................................................... 45, 46

*S.E.C. v. Rind*,
  991 F.2d 1486 (9th Cir. 1993) ........................................................................... 55, 56

*S.E.C. v. Spartan Sec. Grp., Ltd.*,
  620 F. Supp. 3d 1207 (M.D. Fla. 2022) .................................................................. 45

*S.E.C. v. Sripetch*,
  154 F.4th 980 (9th Cir. 2025) ................................................................................. 58

*Sebade v. Sebade*,
  28 N.W.3d 19 (Neb. 2025) ...................................................................................... 27

STATE ATTORNEYS GENERAL'S OPPOSITION TO META'S MOTION FOR SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

*Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*,
  2018 WL 1535285 (D.N.J. Mar. 29, 2018) ..................................................... 15

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ..................................................................................... 51

*Smith v. Gateway Ford-Mercury, Inc.*,
  No. 58,610, 1987 WL 1496941 (Kan. Ct. App. Aug. 13, 1987)........................... 4

*Smith v. Prime Cable*,
  658 N.E.2d 1325 (Ill. Ct. App. 1995) .............................................................. 5

*Snardon v. Snardon*,
  2009 WL 2059094 (Ky. App. July 17, 2009) ..................................................... 39

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................................................... 32, 33

*Staples v. U.S.*,
  511 U.S. 600 (1994) ..................................................................................... 47

*State ex rel. Brady v. Pettinaro Enters.*,
  870 A.2d 513 (Del. Ch. 2005) ......................................................................... 27

*State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*,
  755 N.W.2d 583 (Neb. 2008) .......................................................................... 36

*State ex rel. Stovall v. Meneley*,
  271 Kan. 355 (2001) ..................................................................................... 56

*State ex rel. Swanson v. Am. Family Prepaid Legal Corp.*,
  2012 WL 2505843 (Minn. Ct. App. July 12, 2012)............................................ 4

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms, Inc.*,
  414 S.C. 33 (2015) ....................................................................................... 37

*State v. LG Elecs., Inc.*,
  186 Wash. 2d 1 (2016) .................................................................................. 56

*State v. Minn. Sch. of Bus.*,
  935 N.W.2d 124 (Minn. 2019)......................................................................... 45

*State v. Orion Processing, LLC*,
  2016 WL 7435679 (N.C. Super. Dec. 20, 2016) ............................................... 42

*State v. TikTok Inc.*,
  245 N.E.3d 681 (Ind. Ct. App. 2024)............................................................... 15

*Stevens v. Motorists Mut. Ins. Co.*,
  759 S.W.2d 819 (Ky. 1988) ............................................................................ 24

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014)........................................................................... 4

*Tanner v. Int'l Isocyanate Inst., Inc.*,
   2008 WL 11374393 (N.D. Ala. June 9, 2008) ........................................................................... 23

*Teller v. Bill Hayes, Ltd.*,
   213 A.D.2d 141 (N.Y. App. 1995) ........................................................................................... 15

*Texas v. Johnson*,
   491 U.S. 397 (1989) ............................................................................................................... 32

*Tim Torres Enters., Inc. V. Linscott*,
   416 N.W.2d 670 (Wis. Ct. App. 1987) ..................................................................................... 6

*Tuosto v. Philip Morris USA Inc.*,
   2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ......................................................................... 23

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ............................................................................................................... 32

*U.S. ex rel. Schutte v. SuperValu Inc.*,
   598 U.S. 739 (2023) ............................................................................................................... 47

*U.S. v. O'Brien*,
   391 U.S. 367 (1968) ............................................................................................................... 32

*U.S. v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) .............................................................................................. 23

*U.S. v. Wenger*,
   427 F.3d 840 (10th Cir. 2005) ................................................................................................ 20

*Ulbrich v. Groth*,
   78 A.3d 76 (2013) .................................................................................................................. 36

*Union Ink Co. v. AT&T Corp.*,
   801 A.2d 361  (App. Div. 2002) ............................................................................................... 6

*Vermont v. Meta Platforms, Inc.*,
   2024 WL 3741424 (Vt. Super. Ct. July 29, 2024) ................................................................... 32

*Versluys v. Weizenbaum*,
   2023 WL 6880412 (D. Or. Oct. 18, 2023) .............................................................................. 28

*Via Christi Reg'l Med. Ctr., Inc. v. Reed*,
   314 P.3d 852 (Kan. 2013) ...................................................................................................... 39

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ............................................................................................................... 21

*Wandke v. Nat'l R.R. Passenger Corp.*,
   2023 WL 184251 (W.D. Wash. Jan. 13, 2023) ........................................................................ 57

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ............................................................................................................... 32

*Washington v. GEO Grp., Inc.*,
    2019 WL 2084463 (W.D. Wash. May 13, 2019) ........................................................ 56

*Weaver v. Champion Petfoods USA Inc.*,
    3 F. 4th 927 (7th Cir. 2021) ........................................................................................ 6

*Weiss v. Swanson*,
    948 A.2d 433 (Del. Ch. 2008) .................................................................................... 27

*Williams v. Gerber*,
    552 F.3d 934 (9th Cir. 2008) ..................................................................................... 25

*Willow Springs Condominium Ass'n., Inc. v. Seventh BRT Dev. Corp.*,
    717 A.2d 77 (1998) ..................................................................................................... 37

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985) .............................................................................................. 20, 21

*Zeiger v. WellPet LLC*,
    526 F. Supp. 3d 652 (N.D. Cal. 2021) ............................................................ 1, 4, 11

**Statutes**

15 U.S.C. §§ 6501–6505 ................................................................................... passim

2023 Minn. Laws, ch. 57, art. 1, § 4, subd. 3 ........................................................... 37

230 ILCS 10 *et seq.* ................................................................................................... 37

28 U.S.C. § 1658 ........................................................................................................ 55

47 U.S.C. § 230 .......................................................................................................... 31

6 Del. C. § 2513 ......................................................................................................... 15

705 ILCS 405/4-1 *et seq.* ........................................................................................... 37

705 ILCS 410 ............................................................................................................. 37

73 P.S. § 201-8 ............................................................................................................. 5

73 Pa. Stat. Ann. § 201-8 ........................................................................................... 40

815 ILCS 505/7 .......................................................................................................... 40

815 ILCS 510/2 .......................................................................................................... 16

Colo. Rev. Stat. § 18-1-501 ......................................................................................... 4

Colo. Rev. Stat. § 6-1-105 ............................................................................... 4, 16, 40

Colo. Rev. Stat. § 6-1-115 ......................................................................................... 27

Conn. Gen Stat. § 42-110o .................................................................................... 5, 40

Del. Code Ann. tit. 6, § 2511 ......................................................................................... 34

Del. Code Ann. tit. 6, § 2532 ......................................................................................... 16

Ind. Code § 24-5-0.5-4 .............................................................................................. 40, 41

Ind. Code § 24-5-0.5-8 ................................................................................................... 40

K.R.S. § 15.020 ............................................................................................................. 42

K.R.S. § 367.170 ........................................................................................................... 40

K.R.S. § 367.190 ........................................................................................................... 40

Kan. Stat. 50-626 .......................................................................................................... 15

Kan. Stat. 50-627 ...................................................................................................... 39, 40

La. R.S. 51:1407 ........................................................................................................... 40

Minn. Stat. § 325F.69, subd. 8 ...................................................................................... 36

Minn. Stat. § 325D.43 *et seq.* ....................................................................................... 17

Minn. Stat. § 325M.10, *et seq.* ..................................................................................... 37

Minn. Stat. § 325M.33 .................................................................................................. 37

Minn. Stat. § 325M.335 ................................................................................................ 37

Minn. Stat. 325D.44 ...................................................................................................... 16

N.C.G.S. § 75-15.1 ....................................................................................................... 42

N.C.G.S. § 75-15.2 ....................................................................................................... 41

N.Y. Exec. Law § 63 ................................................................................................ 16, 28

Neb. Rev. Stat. § 87-302 ............................................................................................... 16

S.C. Code Ann. § 39-5-110 ........................................................................................ 5, 40

Va. Code § 59.1-1-198 .................................................................................................. 15

Va. Code § 59.1-206 ....................................................................................................... 5

Va. Code § 59-1-200 ...................................................................................................... 15

Wis. Stat. § 100.18 ........................................................................................................ 14

**Other Authorities**

Kay P. Kindred, *God Bless the Child: Poor Children, Parens Patriae, and a State Obligation to Provide Assistance*, 57 Ohio St. L.J. 519 (1996) ........................................................ 37

Restatement (Second) of Contracts § 12 ........................................................................ 37

Restatement (Second) of Torts § 283A ......................................................................... 37

Restatement (Third) of Restitution § 3 .......................................................................... 44

**Rules**

Fed. R. Civ. P. 15 ......................................................................................................... 44

Fed. R. Civ. P. 56 ..................................................................................................... 2, 28

**Regulations**

16 C.F.R. § 312.2 ............................................................................................. 50, 51, 54

78 Fed. Reg. 3972 (Jan. 17, 2013) ................................................................................ 51

89 Fed. Reg. 2034 (Jan. 11, 2024) ................................................................... 47, 50, 54

90 Fed. Reg. 16918 (Apr. 22, 2025) ....................................................................... 50, 51

## I.    INTRODUCTION

Meta moves to prevent this entire enforcement action from ever reaching the factfinder because, says Meta, there are no genuine disputes as to any material facts, and thus this Court must hold—as a matter of law—that Meta's statements are not misleading, that its conduct is not unfair, and that it has not violated COPPA. In consumer protection actions like this, the pretrial relief that Meta seeks is extraordinary, and here should be summarily denied. *See, e.g.*, *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 682 (N.D. Cal. 2021) ("Whether a practice is deceptive, fraudulent, or unfair is generally a question of fact which requires consideration and weighing of evidence from both sides."). In its Motion, Meta distorts the requirements of both state and federal law and ignores mountains of evidence showing that it has engaged in a widespread scheme of deceptive and unfair conduct, misleading the public about its commitment to protecting American kids and downplaying its dismal record in prioritizing the safety and privacy of its youngest, most vulnerable users.

Meta's deceptive statements—including those that left out crucial information—form a web of lies and half-truths that created a misleading picture of a company that cared about the wellbeing of its youngest users. As this Court held, Meta's actionable misrepresentations should not be "parsed and isolated" as Meta does in its Motion; rather, the Court should "consider [those statements] in the context of the alleged scheme as a whole." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 889 (N.D. Cal. 2024) ("ECF 1214"). Meta does not challenge the factual record supporting the misleading nature of the vast majority of its misrepresentations: statements relating to platforms' safety; the company's prioritization of profits overs safety; the utter failure of its "safety" tools, including Teen Accounts; and the presence of children under 13 on its platforms. Meta's attempt to isolate so-called "addiction" statements should be rejected not only because it misconstrues state law and ignores heaps of evidence showing that Meta knew its platforms were addictive, but also because Meta fails to reckon with those statements' connection to the company's overall deceptive scheme.

Meta also seeks summary judgment with respect to the AGs' unfairness claims related to three features—time restriction tools, the multiple accounts function, and appearance-altering filters—on baseless arguments that there is no evidence supporting any element of any AG's claims.

But the harms inventoried in Meta's internal research, documents, and communications say otherwise, as do mental health experts. These harms were not accidental, unexpected, or avoidable given Meta's strategy of targeting youth for usage metrics, market saturation, and maintaining industry relevance—all while fully aware of teen vulnerabilities and risks.

With respect to the Children's Online Privacy Protection Act ("COPPA"), Meta says there is no evidence that its platforms are child directed or that it had actual knowledge of users under the age of 13 ("U13s" or "children") on its platforms. Yet it misstates legal standards and disregards abundant evidence from internal communications and research showing that Meta deployed tools known to be appealing to U13s, courted advertisers appealing to those users, and failed to take action on users it knew to be underage.

Meta's remaining legal challenges to the AGs' claims and remedies—including with respect to Section 230, the First Amendment, and disgorgement—improperly relitigate issues this Court has already decided and misinterpret the law. Finally, it is the AGs, not Meta, who are entitled to summary judgment on commerce-related elements of state consumer protection statutes. For these reasons, set forth more fully below, Meta's Motion must be denied.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgement shall be denied if the nonmoving party, "by its own affidavits or discovery, set[s] forth specific facts showing that a genuine issue of fact exists for trial." *Arrow Elecs., Inc. v. Quantum Corp.*, 764 F. Supp. 3d 854, 865 (N.D. Cal. 2025) (citations omitted). In assessing the presence or absence of a genuine dispute as to a material fact, "[r]easonable doubts . . . are resolved against the moving party and inferences are drawn in the light most favorable to the nonmoving party." *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018) (citations omitted).

1    **III.    ARGUMENT**

2          **A.  Meta Is Not Entitled to Summary Judgment on the AGs' Deception Claims.**

3          Summary judgment for Meta on the AGs' deception claims is not proper here: disputes of

4    material fact exist as to so-called "addiction" misrepresentations; it is the AGs—not Meta—who

5    are entitled to summary judgment on commerce-related elements; and Meta's remaining legal

6    challenges to the actionability of its misrepresentations fail.[1]

7                  **1.  The AGs' claims related to Meta's "addiction" statements are actionable and**
8                       **supported by ample evidence.**

9          Meta made numerous statements asserting that (1) its platforms, Instagram and Facebook,

10   are not addictive and (2) it does not design those platforms to be addictive, as part of its deceptive

11   scheme to convince consumers that its platforms were safe for minors.[2] Meta distorts the legal

12   standards applicable to the AGs' deception claims.[3] Further, in contending that, as a matter of law,

13   ────────────────────

14   [1] The AGs have not "abandoned" their omissions claims. Defs' Mot. Summ. J., ECF 2704 at 3 &
     n.2 ("MSJ"). The AGs' deception claims (including omissions claims of those AGs with separate
15   statutory provisions for such claims) are not based on Meta's wholesale silence. The AGs'
     "omissions" claims seek to hold Meta accountable for its affirmative statements that were likely to
16   mislead or deceive because they failed to disclose other relevant information. *See, e.g., People v.
     Overstock.com*, 12 Cal. App. 5th 1064, 1079 (2017).

17
     [2] Meta identified an incomplete list of these statements in its Motion. Misrepresentations related to
18   addiction also include those identified in (1) Professor Adam Alter's expert report at Statements
     B6-B9, Ex. 1, Alter Rpt. p. 128–29 (Table 5), 135 (Table 6), and (2) interrogatory responses, Ex.
19   2, State AGs' Fourth Supp. Resp. to Defendants' First Set of Interrog. at 5 (identifying statements
     in paragraphs 167, 169, and 187 of the AGs' Complaint); *id.* at 10 (identifying January 29, 2023
20   Antigone Davis statement). Additionally, Meta engaged in deceptive acts and practices with respect
     to statements regarding the company's so-called "safety" features that did little to curb young
21   people's addictive use or ameliorate other health issues associated with their use of the Platforms.
     Meta has not sought summary judgment on the basis of a purported lack of falsity, knowledge, or
22   tendency to deceive with respect to those statements. In any event, there is significant evidence
     demonstrating those features' lack of efficacy and the company's knowledge thereof. ████████
23
     ███████████████████████████████████████████████████████████████████████████
24
     ███████████████████████████████████████████████████████████████████████████
25
     ███████████████████████████████████████████████████████████████████████████
26   ██████████████████████████ Unless otherwise specified, all exhibits referenced in this
     Motion are exhibits to the Declaration of Megan O'Neill, attached hereto.
27
     [3] Meta's Motion and Appendix include numerous inaccuracies regarding state consumer protection
28   law. While the AGs address many of these inaccuracies where relevant to the Court's summary

its statements have no tendency to deceive, are not false, and are not made with knowledge, Meta ignores ample evidence to the contrary, including internal company research and corroborating expert testimony. Summary judgment is improper on these fact-bound issues, which should go to the trier of fact. *See Zeiger*, 526 F. Supp. 3d at 682.

**a. Meta misstates state law and the AGs' evidentiary burdens.**

**Falsity.** Meta argues that establishing actionable deception requires a statement to be "demonstrably false," MSJ at 9, but state consumer protection laws do not have such a rigid requirement. Legally actionable misstatements include statements "which, although true, [are] either actually misleading or which ha[ve] a capacity, likelihood or tendency to deceive or confuse the public." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) (citations omitted); *see also Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc.*, 659 F.2d 695, 703 (5th Cir. 1981) (collecting cases agreeing that "[t]he basic test under every type of 'unfair competition' is the 'likelihood of confusion' test") (citations omitted); *Suchanek v. Sturm Foods,* Inc., 764 F.3d 750, 761–62 (7th Cir. 2014). Meta addresses "falsity" requirements for only eight states and expressly mischaracterizes the standards of three.[4] Meta admits that the remaining five AGs can prove deception in this case without showing falsity. *See* MSJ at 9 n.27 (conceding that these AGs rely on some statutory provisions that do not require falsity).

**Knowledge.** Meta argues that misrepresentations are not actionable "absent evidence that the speakers themselves believed or had reason to believe that Meta's platforms are addictive." MSJ at 14. Not so. Most state laws that Meta identifies as requiring intent "to deceive, cause harm, or induce reliance" (which Meta argues encompasses knowledge of falsity), MSJ at 9 n.26, have no such requirement,[5] just like most of the other state laws that Meta does not mention. Meta similarly

judgment analysis, the AGs' silence on particular issues of state law is not a concession that Meta has accurately described those laws.

[4] *See Smith v. Gateway Ford-Mercury, Inc.*, No. 58,610, 1987 WL 1496941, at *7 (Kan. Ct. App. Aug. 13, 1987) (setting forth standard as " capacity or tendency to deceive"); *State ex rel. Swanson v. Am. Family Prepaid Legal Corp.*, 2012 WL 2505843, at *6 (Minn. Ct. App. July 12, 2012) (same); *Rhino Linings U.S. v. Rocky Mt. Rhino Lining*, 62 P.3d 142, 148 (Colo. 2003) (same).

[5] *See* Colo. Rev. Stat. §§ 6-1-105(1)(e) & (rrr) ("knowingly" or "recklessly"), 6-1-105(1)(g) ("knows or should know"), 18-1-501(6) (defining "knowingly" as a general intent standard); *Smith*

misconstrues the relevance of knowledge for civil penalties; not only is eligibility for civil penalties separate from questions of liability, but most state laws authorize civil penalties for "willful" deception, which is more akin to negligence than knowing falsity. *See, e.g.*, *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at \*4 ("[A] willful statutory violation may occur when the conduct in question is simply marked by careless disregard whether or not one has the right so to act.") (cleaned up).[6]

Moreover, Meta's focus on the knowledge of individual speakers is misplaced. The AGs seek to hold Meta—not its executives—liable; thus, it is *Meta's* knowledge that is relevant. *See, e.g.*, *Certain Underwriters at Lloyd's London v. ConAgra Grocery Prods. Co., LLC*, 77 Cal. App. 5th 729, 751 (2022) ("An entity's employees' collective knowledge is . . . what matters."); *People v. Forest E. Olson, Inc.*, 137 Cal. App. 3d 137, 139–41 (Ct. App. 1982) (analyzing knowledge of company under California's False Advertising Law); *Ingalls v. Morgan*, 10 N.Y. 178, 184–85 (1854) ("[I]t must be taken for granted that the principal knows whatever the agent knows."). Meta's contention otherwise is based on a flatly incorrect reading of Colorado and New Jersey case law. *See JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 793525, at \*7 (D. Colo. Feb. 26, 2014) (applying common law fraud standard, not consumer protection statutes); *NN&R, Inc. v. One Beacon Ins. Grp.*, 2006 WL 1765077, at \*13 (D.N.J. June 26, 2006) (same); *cf. Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 365 (N.J. 1997) ("One who makes an affirmative misrepresentation is liable even in the absence of knowledge.").

---

*v. Prime Cable*, 658 N.E.2d 1325, 1335 (Ill. Ct. App. 1995); *Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at \*4 (Ky. Ct. App. June 14, 2019); *Chattin v. Cape May Greene*, 591 A.2d 943, 945–46 (N.J. 1991); *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014); *Moore v. Bird Eng'g Co., P.A.*, 41 P.3d 755, 763–64 (Kan. 2002). That some states have specific statutory provisions requiring a heightened showing of intent only highlights the fact that more general provisions of those statutes lack that requirement. *See, e.g.*, *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 645 (Pa. 2021). Finally, Meta ignores that California's Unfair Competition Law has no knowledge requirement. *See Gradney v. Polar Beverages*, 797 F. Supp. 3d 1016, 1028 n.4 (N.D. Cal. 2025).

[6] *See, e.g.*, 73 P.S. § 201-8(b); S.C. Code Ann. § 39-5-110(c) (defining "willful" violation as when defendant "knew or should have known that his conduct was a violation" of the law, rather than that a statement was false); Conn. Gen. Stat. § 42-110o(b) (similar); Va. Code § 59.1-206(A) (similar).

Meta's remaining cases are inapposite. Unlike the AGs, the plaintiffs in *In re GNC Corp.* "elected to plead that [defendant's] representations are false rather than true but misleading." 789 F.3d 505, 515 (4th Cir. 2015). And in *Aboushaban v. American Signature Inc.*, the plaintiff put forward "no [] proof" of underlying facts making defendant's conduct deceptive, which is in stark contrast to this case, where the AGs have identified significant evidence proving deception from Meta's internal files. 2021 WL 798874, at *3 (E.D. Va. Feb. 1, 2021); *see also Reed v. NBTY, Inc.*, 2014 WL 12284044, at *14–15 (C.D. Cal. Nov. 18, 2014) (granting summary judgment where plaintiffs offered only unsworn expert reports and their own testimony); *infra* Part III.A.1.b.

**Tendency to Deceive.** Meta grossly overstates the AGs' burden at summary judgment regarding the tendency or likelihood of misleading consumers, wrongly asserting that the AGs must put forward extrinsic evidence. MSJ at 15. The finder of fact can evaluate whether statements have a tendency or likelihood to deceive based on the factual evidence and their own assessment of the statements' meaning; extrinsic evidence such as "surveys and expert testimony regarding consumer assumptions and expectations . . . are not required." *Clemens v. Daimler-Chrysler*, 534 F. 3d 1017, 1026 (9th Cir. 2008). This is true under each relevant state law, including the seven that Meta specifically discusses.[7]

Meta's cited cases do not hold that extrinsic evidence is always required and are further distinguishable: for example, those cases granted summary judgment where plaintiffs offered no evidence regarding consumer understanding, or where expert analysis on this topic was lacking in some significant way.[8] In contrast, a trier of fact here can find Meta's statements misleading on

---

[7] *See Brockey v. Moore*, 107 Cal. App. 4th 86, 99 (2003); *Lehrman v. South Chicago Cable, Inc.*, 569 N.E.2d 99, 104 (Ill. App. Ct. 1991); *Union Ink Co. v. AT&T Corp.*, 801 A.2d 361, 378 (App. Div. 2002); *Rucker v. Huffman*, 392 S.E.2d 419, 421 (N.C. Ct. App. 1990); *Haseman v. Gerber Prods. Co.,* 2024 WL 1282368, at *14 (E.D.N.Y. Mar. 25, 2024); *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1023 (Pa. 2018); *Tim Torres Enters., Inc. V. Linscott*, 416 N.W.2d 670, 674 (Wis. Ct. App. 1987).

[8] *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 974 (7th Cir. 2020) (granting summary judgment where plaintiffs "offered no evidence that the products fell short of consumers' expectations in any material way" and it was not reasonable that consumer would understand "100% aloe vera" to communicate a certain quantity of acemannan in the product); *Weaver v. Champion Petfoods USA Inc.*, 3 F. 4th 927, 935–37 (7th Cir. 2021) (applying statute for private claims with materiality requirement not applicable to AG claims, and finding plaintiff "only offered

1   their face, particularly in the context of Meta's extensive knowledge of the addictive properties of

2   its platforms. *See infra* Part III.A.1.b. Further, Meta's internal documents— 

7                                                                                              Finally, unlike in the cases

8   Meta cites, the AGs' expert testimony on this issue—which provides *additional* evidence from

9   which the trier of fact can find a tendency to deceive—appropriately analyzes all relevant

10  statements and explains in detail the basis of the expert's opinion as to how a reasonable consumer

11  could interpret those statements. *See, e.g.*, Ex. 1, Alter Rpt. ¶¶ 5–17, 75–100, 144–66 (describing

12  the social psychology underlying how consumers perceive Meta's messages and the experience that

13  informs this analysis); *see also* Ex. 14, Alter Dep. 97:11–98:5.[10]

_____

18  his own testimony" and no other evidence regarding how a reasonable consumer would interpret
    certain terms); *FTC v. DirecTV, Inc.*, 2018 WL 3911196, at *8 (N.D. Cal. Aug. 18, 2018) (granting

19  judgment after trial in part because expert did not analyze net impression on consumers, engage in
    content analysis, or assess more than a small fraction of advertisements); *see also In re JUUL Labs,*

20  *Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1009 n.52 (N.D. Cal. 2022)
    (finding *DirecTV* unpersuasive at summary judgment in part because *DirecTV* court had benefit of

21  full factual record after trial); *de Lacour v. Colgate-Palmolive Co.*, 2024 WL 36820, at *7
    (S.D.N.Y. Jan. 3, 2024) (internal documents did not pertain to consumer understanding);

22  *Bustamante v. KIND, LLC,* 100 F.4th 419, 433–34 (2d Cir. 2024) (same). Some cases also looked
    to the federal Lanham Act, rather than the relevant state laws, in imposing particular requirements.

23  *See, e.g.*, *Beardsall,* 953 F.3d at 973–76.

24  [9]

27  [10] These issues are also addressed in the AGs' opposition to Meta's Rule 702 motion to exclude

28  Alter, which is being filed concurrently with this opposition.

1

    **b.** **There is ample evidence of the addictive nature and design of Meta's platforms, and Meta's knowledge thereof.**

2

3

    Even if Meta were right regarding the legal requirements of the AGs' claims—which it is not—there are disputes of material fact as to the falsity, tendency to deceive, and knowledge elements of the claims, because of the significant evidence tending to prove those elements. For example,

4

5

6

7



8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 _____

25 [11]

26

27

28

1  •

2

3

4      Other internal documents and deposition testimony describe how Meta exploited users'

5  vulnerabilities in order to cultivate addictive use and maximize engagement with the platforms:

6  •

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9

1    Meta's ████████████████████████████████████████████████

2    ██████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████

5    ██████████████████████████████████████

6    Expert testimony corroborates this evidence, providing that "Meta platform features

7    encourage problematic social media use, consistent with clinical dependency," Ex. 8, Prinstein Rpt.

8    ¶ 2, which "interfere[s] with [youth's] ability to sleep, eat, and focus on schoolwork, among other

9    essential activities," Ex. 9, Prinstein Reb. Rpt. ¶ 3; *see also id.* ¶¶ 13–17; Ex. 8, Prinstein Rpt. ¶¶

10   35–44. Further, "[s]ocial media addiction is a serious concern," and "[s]ocial media use is

11   particularly problematic for teens and youth due to their underdeveloped brains." Ex. 6, Zicherman

12   Rpt. ¶¶ 1–2; *see also id.* ¶¶ 22–37. "Many Instagram features are harmful to teen and youth mental

13   health," and youth face harms from "Instagram addiction." *Id.* at ¶ 3–4; *see also id.* at ¶¶ 45–46,

14   55–61.[15] ████████████████████████████████████████████████

15   ██████████████████████████████████████. Expert testimony also provides

16   the factfinder with a framework for assessing Meta's statements and how they could be understood

17   by a reasonable consumer in context. *See* Ex. 1, Alter Rpt. ¶¶ 27–398. This testimony provides

18   additional evidence from which the trier of fact can find that Meta's statements had a tendency to

19   deceive.

20   ──────────────

21   ██████████████████████████████████████████████████████████

22   ██████████████████████████████████

23   █ ████████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████████

25   ████████████████████████████████

26   [15] Meta's one-sentence argument regarding the AGs' general causation expert opinions—which

27   borrows from its Rule 702 motion, *see* MSJ at 13 (citing Defs' Mot. to Exclude General Causation
     Testimony of Pls' Experts, ECF 2295)—is meritless for the reasons explained in the AGs'

28   opposition to that motion, *see* Pls' Response to Defs' Mot., ECF 2404.



Meta argues that the AGs' deception claims fail because the American Psychiatric Association (APA) and the World Health Organization (WHO) have not yet classified "social media addiction" as a clinically diagnosable condition. *See* MSJ at. 10–13. Yet whether these organizations currently recognize "social media addiction" has no bearing on the AGs' claims.[16] Meta's public statements do not refer to clinically diagnosable mental health disorders. Instead, Meta's executives denied that its platforms are "addictive" or are designed to be "addictive." *See, e.g.*, MSJ, Ex. 4 at 9 ("[W]e certainly do not design the product in [an addictive] way."); MSJ, Ex. 1 at 38–39 ("I disagree with calling our product addictive."). As Meta concedes, the crux of the AGs' consumer protection laws is how a reasonable consumer would understand Meta's messages. MSJ at 15. Particularly when the evidence is viewed in the light most favorable to the AGs, a reasonable consumer could understand these statements to convey a lay meaning of the term "addiction," as involving a loss of control and resulting harms, rather than the specific meaning used by medical professionals for clinical diagnoses. *See Zeiger*, 526 F. Supp. 3d at 682–83 (denying summary judgment because "[h]ow a reasonable consumer would understand [competing understandings of a statement] is a quintessential matter for the jury.").[17] Although the trier of fact could independently make this determination from the evidence described above, expert testimony also supports this conclusion. Ex. 1, Alter Rpt. ¶¶ 202–204 (explaining the "lay" meaning of addiction); Ex.8, Prinstein Rpt. ¶ 35. In any case, there is evidence from which the factfinder could conclude that addictive or compulsive use of social media *is* a clinically diagnosable condition with serious mental and physical health ramifications for young people.[18]

---

[16] The testimony of State witnesses regarding their awareness of these issues is similarly not probative. *See* MSJ at 10 & n.29.

[17] *See also* Declaration of Kate Gooler ("Gooler Dec.") Ex. A, *"Addiction,"* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/addiction (defining addiction as "a strong inclination to do, use, or indulge in something repeatedly"); Gooler Dec. Ex. B, *"Addiction,"* Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/addiction (same as "an inability to stop doing or using something, especially something harmful").

[18] *See, e.g.,* Ex. 6, Zicherman Rpt. ¶¶ 22–34; Gooler Dec. Ex. C, *What Is Technology Addiction?*, American Psychological Ass'n, https://www.psychiatry.org/patients-families/technology-addictions-social-media-and-more/what-is-technology-addiction ("Social media addiction involves problematic and compulsive use of social media . . . often resulting in problems in

11

Moreover, whether "social media addiction" exists as a clinically diagnosable condition is even more attenuated from the question whether Meta *designed* its platforms to be addictive in a way that makes its statements to the contrary false or misleading. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Meta also faults the AGs for not pointing to certain kinds of evidence related to addiction and social media. MSJ at 13. But randomized controlled trials—*i.e.*, subjecting teenagers to "experimental conditions that could cause unknown, long-term damage"—are impossible and unethical in this context, Ex. 9, Prinstein Reb. Rpt. ¶¶ 25–28; *see also* Ex. 44, Hale Reb. Rpt. ¶ 82, and are not the only relevant evidence. *See*, *e.g.*, Ex. 9, Prinstein Reb. Rpt. ¶ 28; Ex. 44, Hale Reb. Rpt. ¶ 82. Moreover, AG experts draw on extensive literature and studies—including correlational studies, longitudinal studies, time-series research, and studies drawing on epidemiological science—discussing social media addiction, problematic use, compulsive use, and "clinical dependency." Ex. 8, Prinstein Rpt. ¶ 35 (explaining the many terms scientists use for this phenomenon).[19]

Further, although the AGs do not need to show the personal knowledge of individual speakers, *see supra* Part III.A.1.a, there is significant evidence that the relevant executives were aware of information making their statements false or misleading. CEO and board chair Mark Zuckerberg, Head of Instagram Adam Mosseri, and Global Head of Safety Antigone Davis are all

---

functioning and disrupted real-world relationships."); Gooler Dec. Ex. D, *Health Advisory on Social Media Use in Adolescence*, American Psychological Ass'n, May 9, 2023, https://www.apa.org/topics/social-media-internet/health-advisory-adolescent-social-media-use (recommending routine screening of adolescents for "problematic social media use"); Gooler Dec. Ex. E, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory (Dep't of Health & Human Servs. Office of the Surgeon Gen. 2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf (discussing the "potential risk of harm from excessive and problematic use").

[19] *See* Ex. 8, Prinstein Rpt. A1–A8; Ex. 9, Prinstein Reb. Rpt. A1–A7; Ex. 6, Zicherman Rpt. A1–A5; Ex. 45, Zicherman Reb. Rpt. A1–2; Ex. 44, Hale Reb. Rpt. A1–A9; Ex. 46, Twenge Rpt. D1–13; Ex. 47, Twenge Reb. Rpt. D1-D19 (listing academic sources consulted).

1  high-level corporate executives of Meta.[20] Each has significant authority and exercises broad

2  leadership over Meta's platforms, including as to safety and wellbeing issues.[21] ███████

3  ████████████████████████████████████████████████████████████

4  ████████████████████.[22]

5         **2. Meta's legal challenges to the AGs' deception claims fail.**

6         Meta's misrepresentations are actionable; Meta's arguments to the contrary are not

7  grounded in the law or the facts of this case; and summary judgment should be granted to the AGs

8  with respect to commerce-related elements.

9

10

11  [20] Gooler Dec. Ex. F, Executives, *Meta Media Gallery,* Meta.com, https://www.meta.com/media-
12  gallery/executives/; Ex. 48, Davis Dep. 25:12– 13.

13  [21] █████████████████████████████████████████████████████
14  █████████████████████████████████████████████████████
15  ███████████████████████████████████

16  [22] ███████████████████████████████████████████████████████
17  ████████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████████████████
21  ████████████████████████████████████████████████████████████
22  ████████████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████████
25  ████████████████████████████████████████████████████████████
26  ████████████████████████████████████████████████████████████
27  ████████████████████████████████████████████████████████████
28  ████████████████████████████████████████████████████████████

**a. The AGs cross-move for partial summary judgment on consumer transaction, trade and commerce, and course of business elements.**

This Court held that Meta's alleged deceptive conduct satisfied the commerce-related elements of the AGs' consumer protection laws based on of Meta's alleged business model. *See* ECF 1214 at 62–73. The uncontroverted evidence now demonstrates that Meta's business model is indeed as alleged, and summary judgment for the AGs is proper because the undisputed facts demonstrate that requirements related to consumer transactions, trade or commerce, and the course of business have been satisfied.[23] Meta's provision of "access to its platform in exchange for its users' personal data and time spent viewing . . . advertisements which generate profit" satisfies the "consumer transaction" requirements because it is "an exchange for valuable consideration," *see* ECF 1214 at 66–67; it is also Meta's "primary trade or commerce;" *see id.* at 68–71. "In the course of business" requirements are likewise plainly met.

**i. The AGs have met the relevant state-law standards.**

State laws contain commerce-related requirements to ensure that certain one-off or non-commercial transactions are excluded. *See, e.g., Oswego Laborers Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25–27 (1995) (NY Gen. Bus. Law §§ 349 and 350 only require that the act or practice "have a broader impact on consumers at large" as opposed to "single shot transaction[s]," such as "[p]rivate contract disputes.") Meta's Appendix as to these elements provides accurate citations to relevant state laws. *See* MSJ, App. A at A2–A3 (rows 6-8). Yet Meta's Motion misconstrues distinguishable cases to argue that commerce-related elements are not satisfied, when the AGs have indisputably shown that they are:

**Consumer Transaction.** State laws define "consumer transaction" in "unique but similar ways," generally including a sale or other transfer of property or services. *See* ECF 1214 at 63–64.

---

[23] Meta did not move for summary judgment on this ground as to California or Wisconsin, but the AGs include all eighteen consumer protection AGs in this cross-motion. The undisputed facts show that California law is satisfied because the representations at issue were made about Meta's services, State AGs' Amended Complaint, ECF 207, Case No. 4:23-cv-05448-YGR, at ¶¶ 866; 869 ("Compl."); *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 316–17 (Cal. App. 2022), *as modified on denial of reh'g* (Apr. 27, 2022), and Wisconsin law is satisfied because the representations concern the use of Meta's platforms, Compl. at ¶ 1170; Wis. Stat. § 100.18(1).

1  These laws do not require that statements are material or made to induce a consumer transaction,

2  as Meta claims.[24]

3      **Trade or Commerce**. Similarly, "with little material variation," "trade or commerce"

4  typically includes a sale or other distribution of property or services. *See* ECF 1214 at 67–68.

5  Contrary to Meta's suggestion, MSJ at 22, this element does not require that a statement be

6  addressed to the consumer market directly, and Meta's commercial activity here is far from a one-

7  time transaction or a personal interaction unrelated to a business enterprise, as the Court has

8  previously found. *See* ECF 1214 at 69–71 (providing that the "exchange of users' use of Meta's

9  platforms for their personal data is Meta's 'primary trade or commerce'"). There is no evidence that

10  Meta's statements and conduct relate to anything other than its primary business—its ongoing

11  provision of the Facebook and Instagram platforms—and Meta's cases are not analogous to the

12  circumstances of this case.[25]

13      **Course of Business.** The "course of business" language in several state statutes is a broad

14  requirement that relevant conduct relate to an occupation or business. Nowhere do these laws

---

16  [24] New Jersey need not show reliance, and liability exists regardless of whether "any person has in fact been misled, deceived or damaged thereby." *Gennari¸* 691 A.2d at 366 (internal citations omitted); *see also McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 963 (N.D. Cal. 2012) (finding that *Joe Hand Promotions, Inc. v. Mills*, 567 F. Supp. 2d 719 (D.N.J. 2008), appears contrary to New Jersey Supreme Court holdings regarding reliance). *Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc*., 2018 WL 1535285 (D.N.J. Mar. 29, 2018) addresses a different aspect of New Jersey law irrelevant to deceptive representations, and no intent is required for affirmative acts. *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994). For Indiana, Meta cites inapposite case law regarding private litigants, *I.T. v. ChoicePoint LLC*, 2025 WL 2495079, at *8 (W.D. Wash. Aug. 29, 2025), and Indiana courts have already found that social media business models fall under the DCSA, *State v. TikTok Inc.*, 245 N.E.3d 681, 696 (Ind. Ct. App. 2024). Delaware, Kansas, and Virginia law do not require materiality or inducement. *See* 6 Del. C. § 2513(a); Kan. Stat. 50-626(a); Va. Code § 59.1-1-198; 59-1-200(A).

[25] *See Coppola Const. Co. v. Hofman Enters. Ltd. P'ship,* 2010 WL 4723453, at *4 (Conn. Superior Ct. Nov. 2, 2010) (failure to pay contractor was incidental to primary business); *Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 145 (N.Y. App. 1995) (Gen. Bus. Law § 349 not designed for private contract disputes); *Carol Studios*, *Inc., v. Doo Young Hong*, 2013 WL 6592747 (Ill. Ct. App. 2013) (conduct between two businesses, not consumers); *Carcano v. JBSS, LLC*, 684 S.E.2d 41 (N.C. App. 2009) (dispute between investors in failed real estate partnership). In addition, Meta provides no support for a consumer market requirement as to Connecticut, Kentucky, Louisiana, Nebraska, New York, Pennsylvania, or South Carolina.

---

1  suggest that the term "business" excludes sales or transfers of property or services.[26] And, contrary

2  to Meta's assertions, these state laws do not require a statement to be made to someone with whom

3  the speaker *regularly* conducts business.[27]

### ii. The undisputed evidence shows that these elements have been satisfied.

5  Regardless of Meta's misreading of these elements, there is no genuine dispute of material

6  fact that Meta's deceptive conduct was in connection with consumer transactions, commerce, trade,

7  and business. ████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ██████████████████████████████████ Meta's statements relating to its platforms are thus

19 in furtherance of its primary business as a for-profit social media provider.

20 Meta contends that certain misrepresentations were not "communicated," "directed,"

21 "made," or "provided to" consumers or "the consumer market." MSJ at 23–25. Yet these statements

---

[26] *See* Neb. Rev. Stat. § 87-302(a); Minn. Stat. 325D.44, subd. 1; 815 ILCS 510/2(a); Del. Code Ann. tit. 6, § 2532(a); Colo. Rev. Stat. Ann. § 6-1-105(1); N.Y. Exec. Law § 63(12).

[27] Meta cites a Colorado case where claims merely did not relate to the defendant's business, *Cleary Bldg. Corp. v. David A. Dame, Inc.,* 674 F. Supp. 2d 1257, 1271 (D. Colo. 2009), but the statements do in this case. Meta cites an inapposite, unpublished defamation case from Minnesota to argue a "regularly conducted business" requirement, MSJ at 22 (citing *Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Crop.,* 2020 WL 4743502 (Minn. Ct. App. Aug. 17, 2020)), but claims under Minn. Stat. § 325D.44, subds. 1(5), (7), and (14) have no such requirement. *See Force v. ITT Hartford Life & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 856–57 (D. Minn. 1998). Meta does not support its assertions as to Delaware, Illinois, Nebraska, or New York.

were broadly directed at consumers as part of Meta's overall public relations effort to influence consumer decision-making. *See* Ex. 1, Alter Rpt. ¶¶ 61–74; Ex. 66, META3047MDL-022-00059669 at -684–85; *see also* Ex. 67, META3047MDL-019-00056633 at -633–36; *infra* Part III.A.2.d. The Court must analyze Meta's deceptive scheme holistically, rather than parse individual statements. *See Oswego*, 85 N.Y.2d at 25.

Even were the Court to analyze each statement Meta raises without considering the company's wider scheme of deception, these statements are broadly directed at consumers. Contrary to Meta's claim that two statements "made at technology conferences" were limited to "the technology industry," MSJ at 24, both statements were made at events hosted by large media organizations during interviews held on stage with reporters. The interviews were then reported on by those and other news outlets, and videos of the interviews remain widely available on those news organizations' websites.[28] With respect to statements made to Congress, Meta merely cites—misleadingly—to *Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999). But Minnesota's DTPA does not require that statements be made to consumers, *see* Minn. Stat. § 325D.43 *et seq.*, and nothing in *Group Health Plan* holds otherwise. Regardless, Meta amplified its Congressional appearances among the general public; for example, Mosseri announced his upcoming appearance on his Twitter (X) account.[29] The hearings were opportunities for Meta to reach consumers countrywide: during one, a Senator exhorted Zuckerburg to apologize to victims' families "on national television"; Zuckerberg addressed families in the room, assuring

---

[28] Gooler Dec. Ex. G, *Adam Mosseri and Tracee Ellis Ross in Conversation with Arielle Pardes* (Video), Wired (Nov. 9, 2019), https://www.wired.com/video/watch/adam-mosseri-and-tracee-ellis-ross-in-conversation-with-arielle-pardes; Gooler Dec. Ex. H, *Instagram's Eva Chen on Fashion, Pimples, and How to Get More Followers on Instagram* (Video), Bloomberg (April 17, 2018), https://www.bloomberg.com/company/stories/instagrams-eva-chen-fashion-pimples-get-followers-instagram/.

[29] Gooler Dec. Ex. I, Adam Mosseri (@mosseri), Twitter (X), (Nov. 24, 2021, 11:26AM), https://x.com/mosseri/status/1463574645584453632?s20 (stating in text and video that "I'm looking forward to sharing more of the work we're doing [to keep young people safe online] in the weeks ahead" and, at 1:48, "I'm going to be talking about these issues with Congress relatively soon").

them—and anyone watching on television or online, live or later—of Meta's commitment to safety.[30]

Meta also offers one inapposite case to argue that the AGs must show that users read statements on Meta's website before using Meta's platforms. Meta MSJ at 25. As noted *supra* n.24, *Pep Boys* does not address relevant New Jersey law, pursuant to which proof of reliance is *not* required. As Meta concedes, state consumer protection laws require that the conduct at issue had a tendency to deceive, rather than proof that particular consumers were deceived. MSJ at 15. Regardless, statements posted on Meta's website are directed to consumers.[31]

Meta further argues that statements on earnings calls do not meet statutory requirements for deception. But *Syngenta* addresses an earnings call attended by "fewer than ten non-Syngenta participants," and explains that, under different circumstances, statements on earnings calls can be "made for the purpose of influencing customers and may be sufficiently disseminated." *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1226, 1231, 1241 (D. Kan. 2015). By contrast, Meta highlights statements on earnings calls in subsequent "community updates" posted to Facebook, *see* MSJ, Ex. 25, indicating that those statements are made at least in part to influence consumers, and Meta's earnings calls are among the most widely disseminated of any company's globally. *See* Ex. 1, Alter Rpt. ¶¶ 152. And *Dagley* has no relevance here, where consumers are in a direct relationship with Meta, Texas's DTPA is not at issue, and misrepresentations were made on earnings calls rather than to an insurer. *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 791–92 (Tex. App. 2000).

Meta argues that its statement to the Barnet Coroner's Court was not directed at consumers. MSJ at 23–24. In fact, the subject of the inquest—a teen's suicide—had garnered considerable

---

[30] Gooler Dec. Ex. J, *Mark Zuckerberg Apologizes to Victims' Families at Senate Hearing on Child Sexual Exploitation* (Video), C-SPAN (Jan. 31, 2024), https://www.c-span.org/clip/public-affairs-event/mark-zuckerberg-apologizes-to-victims-families-at-senate-hearing-on-child-sexual-exploitation/5104639.

[31] *See, e.g.*, MSJ, Ex. 22 at 3 (providing advice for "Keeping Your Account Secure"); MSJ, Ex. 52 (blog post entitled "Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents"); MSJ, Ex. 54 (blog post entitled "Reshape Your Instagram With a Recommendations Reset").

1    public interest, ███████████████████████████████████

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████ Unlike the

4    cases Meta cites regarding statements made in judicial proceedings, Meta's in-court statement went

5    directly to the safety of its platforms and is squarely the kind of conduct contemplated by state

6    consumer protection statutes. *See McCarthy v. WPB Partners, LLC,* 2016 WL 4014581, at *6

7    (D.N.H. July 26, 2016) (conduct in bankruptcy court "so dissimilar to the acts enumerated" in the

8    state consumer protection statute that it could not serve as the basis of a claim); *Cook v. Fam.*

9    *Motors, LLC*, 2022 WL 3269946, at *6–7 (W.D. Mo. Aug. 10, 2022) (not turning on statement

10   having been made within court proceeding).

11           Finally, Meta points to statements in Meta's "talking points and other internal documents,"

12   citing *Edgenet, Inc. v. GS1 AISBL* for the notion that a statement must have been "communicated

13   to a consumer." MSJ at 23. But *Edgenet* assesses whether a misrepresentation shows "intent *to*

14   *induce consumers to buy* . . . Defendants' services." *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d

15   997, 1030 (E.D. Wis. 2010) (emphasis added). In any event, ████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████

20           The evidence shows that the information contained in the statements described in this

21   section was in fact transmitted to consumers, including through major media outlets such as CBS

22   This Morning, NBC Today, the Washington Post, and People.[33] *See* Ex. 1, Alter Rpt. ¶¶ 385–87

---

[32] *See* Ex. 170, META3047MDL-003-00165633, at -633–34; MSJ, Ex. 7 at -420–21; MSJ, Ex. 9
at -792; MSJ, Ex. 10 at -314–15; MSJ, Ex. 11 at -752–53; MSJ, Ex. 12 at -162–63 (referring to
"talking points" as "TPs"); MSJ, Ex. 13 at -207, -224; MSJ, Ex. 14 at -569; MSJ, Ex. 15 at -445;
*see also* Ex. 1, Alter Rpt. ¶ 72.

[33] Gooler Dec. Ex. K, June 26, 2019, "CBS This Morning," CBS.com, https://archive.org/details/
KPIX_20190626_140000_CBS_This_Morning/start/1080/end/1140; Gooler Dec. Ex. L, Dec. 7,
2021, "NBC Today," NBC.com, https://archive.org/details/KNTV_20211207_150000_Today/
start/1860/end/1920; Gooler Dec. Ex. M, Dwoskin, Elizabeth, Nov. 9, 2021, "Facebook releases
new reports on transparency and oversight amid criticism," washingtonpost.com, https://www.

1    (noting factors, present here, increasing likelihood of transmission, and providing instances of

2    transmission). Of course, such vast transmission of Meta's messaging did not occur by accident;

3    ████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████ In that sense, Meta

6    succeeded.

7         Based on the evidence set forth above, Meta's deceptive conduct indisputably meets the

8    commerce-related requirements. The lack of a genuine factual dispute regarding these elements is

9    only more pronounced given that state consumer protections laws must be broadly construed to

10   serve their remedial purpose. *See* ECF 1214 at 64, 68–69. The Court should thus grant the AGs'

11   cross-motion for summary judgment on these elements.

12        **b. Meta's statements are deceptive commercial speech and so entitled to no First Amendment protection.**

13        Meta alleges that four statements are protected by the First Amendment because they are

14   pure opinions. MSJ at 25–27. This is incorrect because these statements constitute misleading

15   commercial speech. The First Amendment does not protect false or misleading commercial speech

16   because such speech frustrates consumers' First Amendment interests in receiving accurate

17   information about their consumer choices. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*

18   *of New York*, 447 U.S. 557, 563 (1980). In establishing the contours of commercial speech,

19   courts must draw "common sense distinction[s]," *Zauderer v. Office of Disciplinary Counsel of*

20   *Supreme Court of Ohio*, 471 U.S. 626, 637 (1985) (internal citations omitted), between commercial

21   and noncommercial speech, looking to "the nature of the speech taken as a whole," *U.S. v.*

22   *Wenger*, 427 F.3d 840, 847 (10th Cir. 2005) (citations omitted). While commercial speech analysis

23   often begins with "speech that does no more than propose a commercial transaction," the Ninth

24   Circuit has recognized that "this definition [i]s just a starting point." *Ariix, LLC v. NutriSearch*

25   *Corp.*, 985 F.3d 1107, 1151 (9th Cir. 2021) (citations omitted). A "functional" understanding of

26   _____

27   washingtonpost.com/technology/2021/11/09/facebook-community-standards-report-oversight/;
     Gooler Dec. Ex. N, Hahn, Jason, Mar. 16, 2021, "Instagram Will No Longer Allow Adults to
28   Message Minors Who Don't Already Follow Them," people.com, https://people.com/human-
     interest/instagram-will-no-longer-allow-adults-to-message-teens-who-dont-already-follow-them/.

commercial speech thus extends beyond the realm of traditional advertising. *See Zauderer*, 471 U.S. at 637–38.

Here, the challenged statements are commercial speech because they reflect a commercial actor's description of the attributes of its goods and services on matters relevant to consumers' decision-making, *see, e.g.*, *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 841, 848 (9th Cir. 2019) (speech about the dangers of cell phones is commercial speech), including "improvements to a brand's image" and "general exposure of a product" to a public audience, *Ariix*, 985 F.3d at 1117; *see also Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 153 F.4th 795, 820–21 (9th Cir. 2025). Meta nevertheless claims that any speech relating to a "controversial matter of public concern" cannot be commercial. MSJ at 26. But "speech connected with the sale of a good or service—promoting the product or service, explaining it, or giving warnings about it—is commercial." *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248 (4th Cir. 2024) (quotations omitted). So, the fact that the challenged statements address "alleged harm to teens and children caused by social media use," MSJ at 26, does not alter their overall character as commercial. There is sufficient evidence for the trier of fact to find that Meta was economically motivated to make the challenged statements, *see supra* Part III.A.2.a.ii (discussing Meta's business model); *infra* Part III.A.2.d (explaining Meta's public relations messaging campaigns), and that the statements address attributes of Meta's platforms, such as safety and addictiveness, that are relevant to consumers' decision-making about whether and how to use those platforms. *See Ariix*, 985 F.3d at 1116; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976).[34]

---

[34] The challenged statements are meaningfully different than the disclosure regime analyzed in *NetChoice, LLC v. Bonta*, which the Ninth Circuit found regulated more than mere commercial speech because that regime's "primary effect" was to compel businesses to engage in "subjective opinions" about "speech-based harms." 113 F.4th 1101, 1108–09, 1119–20 (9th Cir. 2024). In contrast, the challenged statements here—such as Zuckerberg's testimony that he believed Meta had built "effective" systems to keep child exploitation content off their platforms, *see* MSJ, Ex. 2 at 48–49—address attributes of Meta's commercially available goods and services that inform listeners' decision-making and that the public may not be kept in "ignorance" of. *Virginia State Bd. of Pharmacy*, 425 U.S. at 770.

Further, the challenged statements are *unprotected* commercial speech because they are misleading. Meta argues that the statements are protected because "a reasonable person would understand them as expressions of the speaker's opinion rather than assertions of fact." MSJ at 26. Meta draws from defamation law to insist that the question is whether these statements are fact or opinion. *See generally Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) (defamation action); *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974) (libel action). But the proper question in the commercial speech context is instead whether the contested speech is false or misleading. *See In re R. M. J.*, 455 U.S. 191, 202 (1982). Commercial statements are misleading, and thus unprotected, when "special possibilities for deception" are presented, such that the public is operating with a "comparative lack of knowledge" and therefore is "especially susceptible to abuses that the States have a legitimate interest in controlling." *Id.* The challenged statements are misleading because they conceal from the public the potential harms and risks associated with using Meta's platforms. Further, these statements are made by individuals whom the public expects to have expert knowledge of the platforms because of their relationship to the platforms—such that the public is operating from a comparative lack of knowledge when those experts conceal information about their platforms' harms and dangers. *See* Ex. 1, Alter Rpt. ¶¶ 52–57. Consequently, a reasonable consumer would be misled into thinking that Meta leaders are vouching for their platforms' safety, and believe them.

### c. The *Noerr-Pennington* doctrine does not protect Meta's misrepresentations.

This Court has already rejected Meta's attempt to invoke the *Noerr-Pennington* doctrine, ECF 1214 at 45, and its Motion provides no reason for the Court to revisit these issues at this pre-trial stage. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982) (reversing grant of summary judgment because certain issues related to *Noerr-Pennington* are questions of fact).

The First Amendment—through the lens of *Noerr-Pennington* or independently—does not shield from liability deceptive conduct that is prohibited by valid consumer protection statutes. *See Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972) (providing, in the *Noerr-*

*Pennington* context, that First Amendment rights "may not be used as the means or pretext for achieving substantive evils"). Nor does the First Amendment protect commercial speech that is false or misleading. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 563–64 (1980). Moreover, *Noerr-Pennington* does not encompass false or misleading statements made to Congress. *U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–504 (1988) (indicating that "misrepresentations made under oath at a legislative committee hearing" "would not necessarily be entitled to the same antitrust immunity allowed deceptive practices in the political arena").[35]

Here, there is significant evidence that Meta made false and misleading statements to Congress regarding its platforms' addictiveness and safety, its prioritization of user wellbeing, and the presence of U13s on its platforms, *see supra* Part III.A.1.b (discussing evidence of addictiveness); *infra* Part III.B.3.a (same as to certain harmful aspects of the platforms);[36] *infra* Part III.D.2 (same as to the platforms' appeal to and success in attracting U13s), and that, in doing so, it was engaging in commercial speech. *See supra* Part III.A.2.b & nn. 29–30 and accompanying text.[37]

---

[35] Meta's cases on this point are not binding and unpersuasive. *See Comm. to Protect our Agric. Water v. Occidental Oil & Gas Co.*, 235 F. Supp. 3d 1132, 1155 (E.D. Cal. 2017) (describing *Noerr-Pennington*'s application to legislative testimony in dicta); *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007) (engaging in cursory analysis of sham exception to *Noerr-Pennington* that did not assess the limited First Amendment protections for commercial speech); *Tanner v. Int'l Isocyanate Inst., Inc.*, 2008 WL 11374393, at *21 (N.D. Ala. June 9, 2008) (same).

[36] *See also, e.g.*, Ex. 71, META3047MDL-003-00018009 at -009–17; Ex. 72, META3047MDL-003-00101724 at -728–31; Ex. 17, META3047MDL-003-00091414 at -420; Ex. 12, META3047MDL-003-00109173 at -176; Ex. 73, META3047MDL-014-00347782; Ex. 74, META3047MDL-004-00015029; Ex. 75, ▮▮▮ Dep. 69:19–70:10; Ex. 76, Clegg Dep. 118:4–150:5 ▮▮▮▮▮▮ Ex. 77, META3047MDL-003-00133741 ▮▮▮

[37] There also is evidence that Meta's statements were not aimed at "procuring favorable government action" but rather were part of a broader deceptive scheme to convince consumers that its platforms

Even were the Court to look past this evidence, Meta still cannot show, as a matter of law, that (1) "the lawsuit imposes a burden on petitioning rights," (2) "the alleged activities constitute protected petitioning activity," and (3) "the statute at issue may be construed to avoid that burden." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022). There is a factual dispute as to whether Meta "was seeking any redress from Congress" or if it "intended to influence" "any particular legislation or government effort." *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020). Meta points to no specific bill or proposed legislative amendment before Congress that it was seeking to influence. Indeed, Meta admits that it did not seek to present its views to Congress; instead, Congress called on Meta executives to appear. MSJ at 19. The focus of each hearing was Congress's information-gathering regarding potential harms of Meta's platforms.[38] And even if *portions* of that testimony could be considered petitioning, many misrepresentations were not in service of that activity.[39] Further, the AGs' claims do not burden Meta's petitioning rights, but only limit it in misleading Congress and the public, and the broad and remedial consumer protection laws at issue must be construed to include such deception.[40]

---

were safe, such that the sham exception to *Noerr-Pennington* applies. *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 367, 380 (1991) (applying exception when defendant "use[s] the governmental process itself as opposed to the outcome of that process" to violate the law). *See infra* Part III.A.2.d; ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

[38] *See* Gooler Dec. Ex. O, Letter from Sen. Blumenthal & Sen. Blackburn to Mark Zuckerberg (Aug. 4, 2021) at 1, https://www.blumenthal.senate.gov/imo/media/doc/8.4.21%20-%20Facebook%20-%20Mental%20Health%20and%20Kids%20Letter.pdf ("[W]e write to request information about Facebook's internal research into the effects of social media platforms on kids' well-being in advance of a September hearing on this matter."); MSJ, Ex. 2 at 2 (explaining that purpose of March 2021 hearing was to explore "[s]ocial [m]edia's [r]ole in [p]romoting [e]xtremism and [m]isinformation").

[39] *See, e.g.*, MSJ, Ex. 4 at 1, 9 (misrepresentation regarding addictive design of platform in context of hearing on "[c]ensorship and the 2020 [e]lection"); MSJ, Ex. 2 at 56 (misrepresentations regarding the "positive mental health benefits" of the platforms and whether Meta has "goals of trying to increase the amount of time that people spend" on the platforms, in response to question about whether Zuckerberg places limits on his own children's use of social media).

[40] *See, e.g.*, *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011) (Colorado's consumer protection statute "should be liberally construed to serve its broad purpose and scope."); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988)

Neither does *Noerr-Pennington* apply to Meta's appearance at a United Kingdom inquest regarding a teen's suicide. Meta cites no cases in which participation in a judicial proceeding as merely a witness, rather than in connection with filing a lawsuit or instituting a claim, qualifies as petitioning activity. *See* MSJ at 20–-21 (*citing Pick v. Kay,* 2020 WL 12919340, at *5 (C.D. Cal. July 7, 2020) (immunizing activities in connection with lawsuits defendant filed)).[41] Meta's statement that its platforms were safe is deliberately misleading, as just discussed, and there is no evidence that Meta was intending to influence the government as opposed to public opinion.[42]

### d. Meta's statements, in context, are not puffery.

Meta's statements about its platforms' safety, positive impacts, the goals of specific tools, and the company's priorities are part of a scheme of consistent messaging that works to deceive consumers; it is not puffery. "[W]hether a statement is deemed puffery is generally considered a question of fact, not law." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1004–05 (N.D. Cal. 2018). To evaluate whether a statement is nonactionable puffery, the statement must be viewed in its proper context, rather than in isolation. *Williams v. Gerber*, 552 F.3d 934, 939 n.3 (9th Cir. 2008). Claims about safety take on a more specific meaning when viewed in the full context of an advertising campaign aimed at influencing consumer perception of a product. *See, e.g.*, *In re Toyota Motor Corp. Unintended Acc. Mktg., Sales*

---

(Kentucky's consumer protection statute "has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts.").

[41] Meta similarly cites no cases holding that participation in a *foreign court proceeding* is subject to *Noerr-Pennington*. *See* MSJ at 20 n.57 (*citing Amarel v. Connell*, 102 F.3d, 1494, 1520 (9th Cir. 1996), which stated, without analysis, that "efforts to influence . . . Korean officials" qualified). *But see Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 108 (C.D. Cal. 1971) (declining to apply *Noerr-Pennington* in foreign context based on doctrine's underlying rationales).

[42] *See supra* at 18–19. More generally, Meta's statements to Congress and at the inquest are admissible as evidence of Meta's broad deceptive scheme regarding the safety of its platforms for young people, even if they do not form an independent basis for liability. *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 614 (N.D. Cal. 2020) (*Noerr-Pennington* "does not foreclose use of communications to government as evidence.").

1  *Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1177 (C.D. Cal. 2010) (no puffery where

2  statements were part of "campaign" to promote focus on "safety").

3       Here, context demonstrates why Meta's statements are actionable.



10  *See* Ex. 1, Alter Rpt. ¶ 129. When placed in the proper context of

11  Meta's scheme to change consumer perceptions, Meta's argument that these statements are mere

12  puffery must be rejected.

13       **e.  Meta's statute of limitations defense does not impact the AGs' claims.**

14       Meta seeks summary judgment as to occurrences within its scheme of deception that fall

15  outside the statutes of limitations, but that argument fails for several independent reasons. *First*, the

16  statute of limitations can be tolled by continuing violations, in which case it is measured from the

---

43

[44] *See, e.g.*, Ex. 82, META3047MDL-047-00006936 at 8; Ex. 174, ███ Dep. Ex. 17, at -390; Ex. 83, META3047MDL-003-00031387 at -462; Ex. 79, META3047MDL-019-00069311.

45

Ex. 86, META3047MDL-020-00635783 at -783; Ex. 70, ███ Dep. Ex. 18, at 3–4; Ex. 87, META3047MDL-034-00012951 at -951; Ex. 66, META3047MDL-022-00059669 at 682–84; *see also* Ex. 1, Alter Rpt. ¶¶ 101–36.

last occurrence.[46] For example, Meta's alleged misconduct in publishing misleading CSER reports constitutes a chain of occurrences with the most recent falling well within the statute of limitations.[47] Similarly, as discussed above, *supra* Part III.A.2.d Meta's deceptive statements were part of a coordinated scheme of drumbeat messaging, and Meta does not dispute that most of the statements fall within the limitations period. The few statements to which Meta points are part of Meta's larger scheme of deception and are thus actionable. *Second*, the AGs could not have known that the statements Meta identifies were deceptive until at least September 2021, when it came to light that Meta's internal research showed its platforms were harmful.[48] The AGs' deception claims based on those statements thus did not accrue until well within the applicable limitations periods.[49]

---

[46] *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("When a plaintiff alleges a continuing violation of the law . . . the statute of limitations runs from the last overt act."); *Rambus Inc. V. Hynix Semiconductor Inc.*, 2007 WL 1792327, at *1 (N.D. Cal. June 19, 2007) (similar for California's Unfair Competition Law); *Palmeri v. Wilkie Farr & Gallagher LLP*, 156 A.D.3d 564, 568 (N.Y. App. 2017) (similar for New York's General Business Law); *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1178 (Del. Ch. 2022) (similar for Delaware law); *Palmer v. Gorecki*, 844 N.E.2d 149, 156 (Ind. Ct. App. 2006); Colo. Rev. Stat. § 6-1-115 (statute of limitations runs from "the date on which the last in a series of such acts or practices occurred").

[47] Meta continues to publish CSER reports with the same deceptive messaging—that the reports supposedly "demonstrate [Meta's] continued commitment to making Instagram and Facebook safe." *See, e.g.*, Ex. 88, META3047MDL-020-00131974 at -974 (Q4 2021 Report); Ex. 89, META3047MDL-087-00006161 at -161 (Q3 2022 Report); Gooler Dec. Ex. P, *Community Standards Enforcement Report*, https://transparency.meta.com/reports/community-standards-enforcement (Q3 2025 Report).

[48] *See, e.g.*, Gooler Dec. Ex. Q, Georgia Wells, Jeff Horwitz & Deepa Seetharaman, *Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show*, Wall St. J. (Sept. 14, 2021), https://www.congress.gov/117/meeting/house/114054/documents/HHRG-117-IF02-20210922-SD003.pdf

[49] *See Anonymous Taxpayer v. South Carolina Dep't of Revenue*, 661 S.E.2d 73, 80 (S.C. 2008) ("The limitations period begins to run when a party knows or should know, through the exercise of due diligence, that a cause of action might exist."); *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513 (Del. Ch. 2005) (similar for Delaware law); *People v. Experian Data Corp.*, 106 Cal. App. 5th 799, 809 (2024) (similar for California law); Colo. Rev. Stat. § 6-1-115 (pegging statute of limitations to "after the consumer discovered or in the exercise of reasonable diligence should have discovered" the violation). Further, given Meta's deception, the fraudulent concealment doctrine also applies. *See Garneau v. Bush*, 838 N.E.2d 1134, 1142 (Ind. Ct. App. 2005); *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal.4th 1185, 1192 (2013); *New York ex rel. Spitzer v. Feldman*, 2003 WL 21576518, at *4 (S.D.N.Y. July 10, 2003); *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008); *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011); *Harrell v. BMW of N.*

*Third,* there is a genuine dispute of fact about whether certain statements Meta identifies as pertaining only to Facebook actually are limited to that platform, particularly in the context of Meta's larger deceptive scheme concerning the safety of its platforms. One statement, for example, is made in the context of discussing social networks generally, and others concern a measurement that Meta deceptively touts in reports concerning both Facebook and Instagram. *See* MSJ, Ex. 29; MSJ, Ex. 35; MSJ, Ex. 44; MSJ, Ex. 55. *Finally,* even if certain statements fall beyond the statute of limitations and are not tolled, a motion for summary judgment is not the proper vehicle to exclude them, as those motions seek adjudication as to a claim or an entire action, not specific pieces of evidence. *See* Fed. R. Civ. P. 56; *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013). Meta does not argue that any of the AGs' deception claims fall outside the scope of the applicable statutes of limitations in their entirety. Should Meta wish to exclude certain pieces of evidence, it must use the proper vehicle—a motion in limine.[50]

\*        \*        \*

Meta has waived any argument as to misrepresentations that it did not identify in its Motion as well as the three misrepresentations that it references in a footnote. *See* MSJ at 29 & n.82 (citing MSJ, Ex. 88; MSJ, Ex. 89; MSJ, Ex. 90); *Versluys v. Weizenbaum*, 2023 WL 6880412, at \*2 (D. Or. Oct. 18, 2023) (waiver if party "does not adequately develop the argument"). In any case, there is evidence of these three statements' misleading nature: ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

---

*Am.*, LLC, 517 F. Supp. 3d 527, 537–38 (D.S.C. 2021); *Sebade v. Sebade*, 28 N.W.3d 19, 47 (Neb. 2025).

[50] Meta also fails to acknowledge that New York's claims pursuant to N.Y. Exec. Law § 63(12) have a six-year statute of limitations. *See People v. Trump*, 217 A.D.3d 609 (N.Y. App. Div. 1st Dep't 2023).

**B. Meta Is Not Entitled to Summary Judgment on the AGs' Unfairness Claims.**

Meta seeks summary judgment on the AGs' unfairness claims: first, by raising Section 230 and the First Amendment, and second, by arguing that there is no evidence for any element of any state's claims. Both arguments fail.[51]

**1. Section 230 does not bar the AGs' unfairness claims.**

Meta's argument that unfairness claims pertaining to three particular features are barred by Section 230 because those features are "neutral publishing tools," MSJ at 30, misunderstands this circuit's caselaw. While the Ninth Circuit has held that a website operator was "immune from liability under [Section 230] because its functions . . . were content-neutral tools used to facilitate communications," *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019), this quote must be read in context. The court relied on the website operator providing content-neutral tools to conclude that the operator "did not create content." *Id.* Here, the AGs' unfairness claims do not assert that Meta created any content.[52] Therefore, whether those features are content neutral tools has no bearing on the Court's Section 230 analysis.

Further, Meta's argument reduces the *Barnes* inquiry to whether Meta is merely a publisher of third-party content. The Ninth Circuit has rejected that framing repeatedly. Courts look to the theory of liability, not whether publication is tangentially implicated. *See Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740–43 (9th Cir. 2024); *see also Lemmon v. Snap*, 995 F.3d 1085, 1092 (9th Cir. 2021). The AGs' claims "do[] not seek to hold [Meta] responsible as a publisher or speaker," but for "its own conduct, principally for the creation" of harmful features. *Lemmon*, 995 F.3d at 1093 (cleaned up). The mere presence of third-party content does not trigger Section 230 protection. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (rejecting Meta's "but-for" test).

---

[51] Meta does not seek summary judgment with respect to unfairness claims regarding its deficient age verification tools and functions, a feature which this Court held was not subject to Section 230 immunity. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 829–30 (N.D. Cal. 2023) ("ECF 430"). Meta had notice of these claims. *See* Compl. ¶¶ 725–29; Ex. 171, State AGs' Resp. to Meta's 1st Set of Interrog. No. 4; AGs' Trial Strategy Ltr. Br., ECF 2715 at 7. Meta has thus waived any arguments for summary judgment as to those claims.

[52] The AGs do not concede that the appearance-altering filters are content. But, to the extent they are, and as discussed below, discovery has shown that Meta is an information content provider of those filters.

Instead, Section 230 "cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties." *Lemmon*, 995 F.3d at 1093. The AGs' unfairness claims fault Meta for *Meta's* product features and *Meta's* design choices—not for the substance of any user's post.

As a threshold point, the Court need not conduct a feature-by-feature analysis here, where Meta's features act in concert to harm kids, Compl. at ¶ 411, and the AGs' claims target the web of addictive and harmful features that Meta has created. Regardless, each feature Meta spotlights implicates Meta's own product design, and each can be modified or removed without altering any third-party content.[53] *See Lemmon*, 995 F.3d at 1092 (no Section 230 immunity where defendant "could have satisfied its 'alleged obligation' . . . without altering the content that [defendant's] users generate"). *First*, Meta frames the AGs' challenge to its time-management tools as an attack on editorial decisions. But the AGs' theory is not that Meta must suppress or edit any post; it is that Meta designed and deployed ineffective safeguards—marketing them as youth-protective—while continuing to operate a suite of features engineered to induce compulsive use. The asserted duty is to avoid a design that foreseeably harms youth, which "differs markedly" from publishing. *Lemmon*, 995 F.3d at 1092–93; *Calise*, 103 F.4th at 742. Nor would the AGs' suggested remedies require Meta to regulate third-party speech: making time limits default-on, hard-stop, age-tailored, and non-circumventable, or placing friction at points of overuse, can be accomplished without altering or removing any content. Even if vulnerable children ultimately consume less content, the ability of other users to post third-party content is unchanged. That is precisely the *Internet Brands* paradigm in which Section 230 does not apply. *Internet Brands*, 824 F.3d at 851.

*Second*, the AGs' theory of liability regarding Instagram's multiple-accounts functionality is not that Meta is liable for what users post from second or third accounts; it is that Meta designed frictionless account switching that serves as an end-run around safety tools (including time restrictions and age verification), *see* Ex. 7, Iyer Rpt. ¶ 61; Ex. 6, Zicherman Rpt. ¶ 56, thereby promoting compulsive engagement and defeating parental oversight. That theory sounds in product

---

[53] The other features in the AGs' complaint also target Meta's product design. Although this Court has dismissed some of those features, this Court can modify that interlocutory order. *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 886 (9th Cir. 2001).

architecture, not publication. *See Calise*, 103 F.4th at 742; *Lemmon*, 995 F.3d at 1092. Meta's reliance on cases where harm flowed from third-party communications is thus inapposite. *See Dyroff*, 934 F.3d at 1098–1101 (third-party communications related to the sale of heroin); *Doe v. Grindr, Inc.*, 128 F.4th 1148, 1152–54 (9th Cir. 2025) (third-party communications leading to sexual assault). Possible remedies likewise require no content changes: Meta could limit or disable account switching for minors, require verified adult authorization to add accounts, or cap accounts per device, without touching the substance of any post. *See Internet Brands*, 824 F.3d at 851.

  *Finally*, the AGs' claims regarding filters focus on Meta's decision to provide effects that exploit teens' vulnerabilities around body image and social comparison—contributing to anxiety and other mental-health harms. These claims do not depend on the substance of any particular filtered image; they challenge Meta's feature-level design choices in determining which filters it makes available to users. That is product design, not editorial review. *Lemmon*, 995 F.3d at 1092–93; *see also* ECF 430 at 15.

  Meta is wrong that the filters constitute third-party content. But even if the court determines the filters originated as third-party content, Meta is not entitled to Section 230 immunity because its active development process rendered it an "information content provider." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008). Meta's reliance on *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 699 (N.D. Ill. 2025) is misplaced because ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Meta "materially contributed" to the development and deployment of filters, and thus became "responsible, in whole or in part, for the creation or development of [the] information." *See* 47 U.S.C. § 230(f)(3).

### 2. The First Amendment does not bar the AGs' unfairness claims.

  The AGs' unfairness claims do not implicate *Moody v. Netchoice, LLC* because they do not address Meta's content moderation standards. 603 U.S. 707, 718 (2024) (holding that "laws limit[ing] the platforms' capacity to engage in content moderation"—that is, the process of

"prohibit[ing] or discourag[ing]" particular "subjects or messages"—are "unlikely to withstand First Amendment scrutiny"). Rather, the claims target "psychologically manipulative Platform features designed to maximize young users' time spent on its Social Media Platforms." Compl. at ¶ 4; *see* Ex. 43, ███████████████████████████████████████████ ███████████████████████████ These features "make it difficult for young users to cease engagement with Meta's Platforms—*independent of the content with which the users interact*." Compl. at ¶ 373 (emphasis added); *see also id.* at ¶ 65. *Moody* declined to consider whether such features are protected by the First Amendment. 603 U.S. at 736 n.5.

The AGs' unfairness claims challenge Meta's conduct—specifically, "develop[ing] and refin[ing]" addictive and harmful features. Compl. at ¶ 4. Conduct is what an entity does, while speech is what it says. *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). Because the AGs' claims target what Meta does (i.e., develop features), not what it says, they regulate non-expressive conduct and are not subject to heightened scrutiny. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Even if the Court finds that the AGs' claims implicate expressive conduct or seek to regulate Meta's speech, they are not "related to the suppression of free expression," *Texas v. Johnson*, 491 U.S. 397, 403 (1989), nor do they target "particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (citation omitted). Meta's platforms are equally addictive and harmful regardless of what content they feed users—"porn or puppies"—and young users "are harmed by the time spent, not by what they are seeing." *Vermont v. Meta Platforms, Inc.*, 2024 WL 3741424 at *5 (Vt. Super. Ct. July 29, 2024). Thus, intermediate scrutiny would apply. *U.S. v. O'Brien*, 391 U.S. 367, 376–77 (1968); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641–42 (1994). Government action survives intermediate scrutiny if it (1) promotes a substantial government interest (2) that would be achieved less effectively absent the government action. *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). As enforcers of their states' consumer protection laws, the AGs have a substantial interest in protecting children from harms caused by social media. And the injunctive relief the AGs seek, such as implementing effective time restrictions, would curb young users' compulsive use of social media. Meta's current time-management tools do not accomplish this goal effectively. Ex. 7,

1    Iyer Rpt. ¶¶ 37–44, 61–63; Ex. 6, Zicherman Rpt. ¶ 59; Ex. 94, Gray Rpt. ¶ 111. Thus, the AGs'

2    interest would be served less effectively if their unfairness claims were not allowed to proceed.

3         The Court need not conduct a feature-by-feature analysis because the AGs' claims target the

4    web of addictive and harmful features that Meta has created. However, if the Court considers Meta's

5    feature-by-feature arguments, those arguments fail. *First*, the AGs' claims regarding time

6    restrictions do not "seek to compel Meta to exercise editorial control." MSJ at 33. How much time

7    young users are allowed to spend on Meta's platforms does not affect what content is posted on

8    those platforms. When a third party posts a picture or video, that content has been published on

9    Meta's platform. Whether a user views content is an entirely separate question from whether the

10   content has been posted. The AGs' claims regarding time restrictions thus do not require Meta to

11   remove any posts or otherwise exercise editorial control. *See* ECF 430 at 22 ("[T]ools to limit the

12   amount of time [users] spend on a platform do[] not alter what the platform is able to publish.").

13   Nor would the AGs' claims "require Meta to speak," MSJ at 33, because developing features is

14   conduct, not speech.

15        *Second*, Meta does not have an unfettered "First Amendment right to determine how *many*

16   *accounts* a user can create." MSJ at 34 (emphasis in original). Unlike the right-to-reply law at issue

17   in *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 247–48 (1974), which compelled newspapers

18   to publish views with which it disagreed "to ensure that a wide variety of views reach the public,"

19   the AGs' claims regarding the multiple accounts feature are not an attempt to alter the variety of

20   views shared on Meta's platforms. Instead, they target Meta's choice to design the multiple accounts

21   feature to "encourage[] young users to continuously engage with Instagram." Compl. at ¶ 370; *see*

22   *infra* Part III.B.3. Even if these claims incidentally burden speech, they do not target speech and

23   therefore do not implicate the First Amendment. *See Sorrell*, 564 U.S. at 567.

24        *Finally*, Meta's appearance-altering filters are not "entitled to the same First Amendment

25   protections afforded to the artwork of [the] graphic designer" in *303 Creative*, which addressed

26   whether *custom* artwork was protected and where the state conceded that the websites were

27   "expressive in nature." *303 Creative LLC v Elenis*, 600 U.S. 570, 582, 593 (2023). Here, Meta has

28   presented no evidence that filters are custom for each user, as opposed to simply templates or "an

overlay" into which all users can input their pictures. Ex. 96, ▮▮▮▮ Dep. 92:4–12. And the AGs have not conceded that filters are expressive in nature. *See* ECF 430 at 22 (filters are "non-expressive").

### 3. Substantial evidence exists for all elements of the AGs' unfairness claims.

Meta essentially seeks summary judgement under every element of every AG's unfairness claims.[54] In doing so, Meta both ignores the record and misstates the law.

#### a. Meta's features substantially injure millions of American youth.

Evidence of substantial injury is relevant for states guided by the FTC Act as well those following *Sperry*.[55] "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people, or if it raises a significant risk of concrete harm.'" ECF 1214 at 46 (citations omitted). Substantial injury includes "a host of emotional harms that are substantial and real and [which] cannot fairly be classified as either trivial or speculative." *Id.* (citations omitted). "[B]ody image and eating disorders are real conditions that can be diagnosed by medical professionals" and "knowingly developing tools that encourage youth addiction 'cannot fairly be classified as either trivial or speculative.'" *Id.* (citations omitted). There is abundant evidence of such harms here.

---

[54] Meta's recounting of state standards for unfairness is not entirely correct. Delaware and New York employ the same standard as Section 5 of the FTC Act in this case. Del. Code Ann. tit. 6, § 2511(9); Compl. ¶¶ 1077–84. California employs a similar balancing testing weighing the harms of the conduct against its utility. *Progressive West Ins. Co. v. Superior Court*, 135 Cal.App.4th 263, 285 (Cal. Ct. App. 2005). Connecticut, Illinois, Indiana, Louisiana, Minnesota, Nebraska, North Carolina, Pennsylvania, and South Carolina follow or borrow elements from *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 255 n. 5 (1972). Colorado, Kansas, Kentucky, Nebraska, and New Jersey's claims sound in "unconscionability."

[55] For Delaware and New York, whose claims in this case track the FTC Act, Meta identifies no benefits of its three features, nor has it identified any "utility" of its conduct under California's standard. MSJ at 36–37. The AGs have identified several harms; any purported benefits Meta suggests are inappropriate to raise in its reply; and regardless, tasks like "weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997); *see also Nat'l Rural Telecomms Co-op v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1077 n.27 (C.D. Cal. 2003), *on reconsideration in part* (June 5, 2003) (noting that "the jury will be allowed to determine . . . whether the gravity of the alleged harm to Plaintiffs outweighs the utility of [the] conduct").

1    Meta's time restriction tools are tissue-paper barriers and a public relations stunt to convince

2  parents that Meta meaningfully tries to curb problematic use of its platforms. More time spent on

3  social media is linked to more depression, unhappiness, low life satisfaction, and low psychological

4  well-being. Ex. 46, Twenge Rpt. ¶¶ 62–71 & 80–90; Ex. 102, META3047MDL-032-00000933 at

5  -966; Ex. 103, META3047MDL-047-00912997 at -033. ███████████████████████

6  ████████████████████████████████████████████████████

7  ███████  Such use interferes with teens' sleep quality and duration, which in turn causes

8  significant negative effects on youths' attention, behavior, mood, stress regulation, safety, body

9  shape, and academic performance. Ex. 8, Prinstein Rpt. at ¶¶ 53, 54, & 67; Ex. 44, Hale Reb. Rpt.

10  at ¶¶ 27, 34. ████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████

21    Meta's multiple accounts function fares no better. ████████████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████



Dep. 211:14–212:11; 223:11–225:4, 226:12–227:23; 296:12–297:16. This squarely shows that the multiple accounts function circumvents safety features.

**b. There is significant evidence that Meta violated state laws following *Sperry*.**

There is also evidence that Meta's conduct violated "public policy as it has been established by statutes, the common law, or otherwise" and was "immoral, unethical, unscrupulous."[56]

---

[56] No state following *Sperry*, 405 U.S. at 244 n.5, must show all three elements (including substantial injury, as discussed above), and liability may be found either because of the degree to which the conduct meets one of the criteria or because, to a lesser extent, it meets all three. *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002); *Ulbrich v. Groth*, 78 A.3d 76, 100 (2013); s*ee also Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 174 (Ind. 2019) (quoting *Town of Brownsburg v. Fight Against Brownsburg Annexation*, 124 N.E.3d 597, 605 (Ind. 2019)) (Unfair is undefined and interpreted using its "plain, or ordinary and usual, sense."); *Quality Environmental Processes, Inc. v. I.P. Petroleum Co.*, Inc., 144 So.3d 1011 (La. 2014) ("case-by-case basis"); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 590–91 (Neb. 2008) ("[P]laintiff must prove that the practice either '(1) fell within some common-law, statutory or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous.'"); *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981) ("depends upon the facts of each case"); Minn. Stat. § 325F.69, subd. 8 (using disjunctive "or"); *Com., by Creamer v.*

Connecticut need not point to any specific policy,[57] while other states do point to specific policies reflected in state or federal law aimed at preventing and reducing addiction; protecting children's privacy and wellbeing online, including COPPA; or protecting children's welfare broadly.[58] Regardless, Meta cannot dispute that at common law, there is a public policy to protect minors from harm. Minors typically lack legal capacity to enter binding contracts and are treated differently than adults in tort, and the common law has recognized states' ability to intervene on behalf of minors' welfare for centuries.[59]

Meta unethically capitalized on developmental vulnerabilities of American adolescents and made immoral decisions as to the health of these users for the unscrupulous purpose of market relevance against competing social media platforms. Meta's time restriction tools ███████████ ███████████████████████████████████████████████████████████████. Ex. 106, META3047MDL-294-00126937 at -940. Regarding multiple accounts, ████████████ ████████████████████████████████████████████████████

---

*Monumental Props., Inc.*, 329 A.2d 812, 817–820 (1974) (discussing federal laws' relevance to interpreting the Pennsylvania Consumer Protection Law, including how "Congress chose not to delineate precisely the type of unfair . . . practices outlawed" and how such laws are "applied broadly to whatever business conduct injured . . . consumer[s]") (citations omitted); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms, Inc.*, 414 S.C. 33, 57 (2015) ("unfair" is "not defined" and courts "will be guided by" federal law).

[57] *Willow Springs Condominium Ass'n., Inc. v. Seventh BRT Dev. Corp.*, 717 A.2d 77 (1998) ("CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law.").

[58] *See, e.g.*, Compl. ¶ 896 (Connecticut citing COPPA); *id.* at ¶¶ 954–55 (Illinois citing Juvenile Court Act of 1987, Article IV ("Addicted Minors"); 705 ILCS 405/4-1 *et seq.*; Juvenile Drug Court Treatment Act, 705 ILCS 410; Illinois Gambling Act, 230 ILCS 10 *et seq.*; and COPPA); ¶ 1087(c) (North Carolina citing COPPA); *see also* Minn. Stat. §§ 325M.33 (providing transparency requirements), 325M.335 (requiring warning labels), and 325M.10, *et seq.* (providing heightened protections for Minnesota minors' online consumer data); 2023 Minn. Laws, ch. 57, art. 1, § 4, subd. 3 (commissioning social media reports); *Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d at 192 n. 19 ("The health, welfare, and safety of the lives and property of the people of [South Carolina] are matters of public concern.") (quoting S.C. Const. Art. XII, § 1)).

[59] *See, e.g.*, Restatement (Second) of Contracts § 12; Restatement (Second) of Torts § 283A cmt. b ("The special standard to be applied in the case of children arises out of the public interest in their welfare and protection."); Kay P. Kindred, *God Bless the Child: Poor Children, Parens Patriae, and a State Obligation to Provide Assistance*, 57 Ohio St. L.J. 519, 526 n.45 (1996).

████████████████████████████████████████████████ Ex. 110,

META3047MDL-031-00086272 at -272–73; *see also* Ex. 114, META3047MDL-031-00088636 at

-636–37; Ex. 95, META3047MDL-136-00009474 at -567. ███████████████████████████

██████████████████████████████████████████████ *See* Ex. 99,

META3047MDL-003-00179481; Ex. 113, META3047MDL-014-00377295 at -295–97. Meta's

conduct is even more morally repugnant in light of ████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████

Meta summarily argues that state laws prohibiting this kind of conduct are

unconstitutionally vague, MSJ at 38, but that superficial argument "falters in the face of a century's

worth of legislative and judicial guidance establishing and refining" the meaning of the term

"unfair" to include such conduct. *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 219 F.

Supp. 3d 878, 903–04 (S.D. Ind. 2019); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 363 S.E.2d

691, 693 (S.C. 1988) ("The federal act, upon which our state UTPA is based, has long been upheld

against this challenge") (citations omitted).

### c. Meta aggressively targets youths' vulnerabilities as business strategy and thus harms are not reasonably avoidable.

When there is a factual dispute as to whether harms were reasonably avoidable, summary

judgement is inappropriate. *Brown v. Stored Value Cards, Inc.*, 2021 WL 76951, at *2 (D. Or. Jan.

8, 2021). Minors lack a "free and informed choice," especially given their "unique susceptibility,"

and thus cannot reasonably avoid the harms linked to Meta's features. ECF 1214 at 48. All three

features reflect marketing decisions Meta made in attempts to keep young users on its platforms,



Meta's inverted argument that no one uses time restrictions, so harms are thus avoidable, misses the point that the harm derives from the false security Meta gives parents and the injuries linked to time spent on its platforms. *Id.*

**d. Meta's remaining arguments regarding specific states lack basis in law or fact.**

Meta argues that the Kansas, Kentucky,[60] Nebraska, and New Jersey AGs' "unfairness" claims fail because there is no evidence of unconscionable, inequitable, or one-sided conduct, or conduct that generally departs from standards of good faith and fair dealing.[61] Again, Meta inaccurately construes and oversimplifies state law.[62] It also ignores the factual record: Meta

---

[60] Meta incorrectly argues that Kentucky must show that Meta enforced unfair terms of a contract. MSJ at 39 n.93; *see Commonwealth of Kentucky v Marathon Petroleum Co., LP.*, 191 F. Supp. 3d 694, 706 (W.D. Ky. 2016) ("The Kentucky Attorney General's power to bring consumer-protection suits falls outside of § 367.220 [for private litigants], and thus privity is not necessary.").

[61] North Carolina's law also provides liability for unconscionable-type "conduct manifesting an inequitable assertion of power or position." *Gray v. N.C. Ins. Underwriting Ass'n*, 529 S.E.2d 676, 681 (N.C. 2000).

[62] Kansas law enumerates "an illustrative, nonexclusive list of circumstances that a court 'shall consider' in determining whether an act or practice is unconscionable," including the inability of the consumer to protect their best interests because of certain factors; whether the defendant made misleading statements upon which consumers were likely to rely; or whether the transaction was excessively one-sided. *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 314 P.3d 852, 867 (Kan. 2013); Kan. Stat. Ann. § 50-627(b). In Kentucky, "unconscionable" means "manifestly unfair or inequitable," *Snardon v. Snardon*, 2009 WL 2059094, at *2 (Ky. App. July 17, 2009), and refers to business practices misusing superior resources or bargaining power, s*ee Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485–86 (Ky. App. 1978). In New Jersey, unconscionability "is an amorphous concept obviously designed to establish a broad business ethic." *Kugler v. Romain*, 279 A.2d 640, 651 (N.J. 1971). In Nebraska, "[u]nconscionability is determined in light of all

purposefully exploited developing teenage brains and the unique susceptibility of minors as a business strategy and concealed or outright misrepresented information regarding the safety of its platforms. *See supra* Parts III.A.1.b, III.B.3.b, & n.36. As discussed above, on one hand, minor users of Meta's platforms were exposed to increased risks of eating disorders, body dysmorphic disorder, anxiety, depression, addictive habit formation, sleep disturbances, academic disruptions, and hosts of other negative mental health impacts, while on the other hand, Meta successfully obtained market saturation and millions of hours spent by youth across the country on its platforms, all while never disclosing or addressing the true risks of features driving that use. *See, e.g.*, Ex. 99, META3047MDL-003-00179481 at -481; Ex. 109, META3047MDL-019-00067884 at 31; Ex. 105, META3047MDL-294-00138688 at -700

Finally, Meta again ignores the record to argue that there is no evidence of intent, and it misstates the legal standards applicable to multiple states. Colorado law does not require showing intent, merely that Meta acted "knowingly or recklessly," and Kentucky law has no such requirement.[63] Meta argues in footnotes that Illinois, Kansas, and Louisiana require intent for liability, but it misstates the law in those states.[64] Meta also elevates the degree of scienter required for penalties.[65] Regardless, as detailed *supra* Parts III.A.1.b & III.B.3.c, there is significant

surrounding circumstances." *Adams v. American Cyanamid Co.*, 498 N.W.2d 577, 590 (Neb. Ct. App. 1992).

[63] *Compare* C.R.S. § 6-1-105(1)(rrr), *with* K.R.S. §§ 367.170, 367.190; *see also Am. Nat'l Univ. of Kentucky, Inc.*, 2019 WL 2479608, at *4 ("[E]vil purpose or criminal intent is not a necessary prerequisite" and a "'willful' statutory violation [for penalties] may occur when the conduct in question is simply marked by careless disregard whether or not one has the right so to act.") (citation omitted) (unpublished).

[64] Illinois is merely required to demonstrate that Meta's conduct was with intent that consumers rely on the act, which is a low hurdle adequately demonstrated by evidence of the act itself. *Elder v. Cornet Insurance Co.*, 201 Ill. App. 3d 733, 752 (1st Dist. 1990). Kansas is not "required" to demonstrate intent, but rather, unconscionability can depend on "circumstances of which the supplier knew or had reason to know." Kan. Stat. 50-627(b). Louisiana law only requires intent for penalties, not liability. *See* La. R.S. 51:1407(B).

[65] Civil penalties are recoverable for willful unfairness violations in Connecticut, Delaware, Pennsylvania, and South Carolina. Conn. Gen. Stat. § 42-110o(b); 6 Del. C. § 2522(b); 73 Pa. Stat. Ann. § 201-8(b); S.C. Code Ann. § 39-5-110(a). Civil penalties are available in Illinois, Indiana, and Louisiana with intent to defraud. 815 ILCS 505/7(b); Ind. Code § 24-5-0.5-8; La. R.S.

evidence that 

. This evidence is more than sufficient to raise a dispute of material fact regarding the deliberate, willful, knowing, and reckless nature of Meta's conduct.

### C. Meta Is Not Entitled to Summary Judgment on the AGs' Request for Disgorgement.

All eighteen AGs asserting consumer protection claims seek disgorgement; Meta moves for summary judgment on this request as to only nine.[66] Contrary to Meta's assertions, disgorgement is available under state law; comports with federal principles of equity; and is supported by evidence tying Meta's misconduct to unjust enrichment.

### 1. The Court has inherent equitable power to award disgorgement.

Meta's argument that this Court requires express authorization in the relevant statutes of California, Indiana, Kentucky, New York, and North Carolina to exercise its full equitable powers, MSJ at 40, is incorrect, and Meta cites no authority to support it. To the contrary, "[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291 (1960) (finding that a provision granting jurisdiction to "restrain" violations of a statute encompassed all equitable powers, including to order restitution) (citation omitted). Further, where "the public interest is involved . . . those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

_____

51:1407(b). North Carolina and Indiana permit penalties for knowing violations. N.C.G.S. § 75-15.2; Ind. Code § 24-5-0.5-4(g).

[66] Meta has long been on notice of the AGs' request. *See, e.g.*, Ex. 116, 2nd Supp. Resp. to Meta's 1st Set of Interrog. Apr. 10, 2025 at No. 6 (explicitly identifying "disgorgement" as a category of relief sought). Meta has waived its argument as to the remaining nine AGs.

***Kentucky.*** Meta argues that the Kentucky Consumer Protection Act only permits courts to "'restore' any 'money or property'" to consumers "paid out as a result of any practice declared to be unlawful." MSJ at 40 n.94. Meta cites a statute for private litigants, but the Kentucky AG "exercise[s] all common law duties and authority . . . except where modified by statut[e]." KRS 15.020. Nothing in KRS 367.200 changes the fact that, "[u]nder the common law, the attorney general has the power to bring *any action* . . . to protect the public interest," *Com. ex. rel Conway v. Thompson*, 300 S.W.3d 152, 173 (Ky. 2009) (emphasis added), or Kentucky courts' willingness to adopt common law unjust enrichment and restitution, *see* ECF 1214 at 75 n.83 (citing *Haeberle v. St. Paul and Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989)). And the law Meta cites instructs that courts "may make such additional orders or judgments as may be necessary." KRS 367.200. It follows, as this Court recognized, that "the broader sense of restitution that encompasses . . . disgorgement" is available under the KYCPA. *See* ECF 1214 at 75 n.83.

***New York.*** Meta relies on a 2008 case from a state trial court, *People ex rel. Spitzer v. Direct Revenue, LLC*, 2008 WL 1849855 (N.Y. Sup. Ct. Mar. 12, 2008), for the proposition that disgorgement is not authorized by N.Y. Exec. Law 63(12). MSJ at 41. But in 2016, in *People ex rel. Schneiderman v. Greenberg*, New York's highest court held that disgorgement is available under the statute's residual relief clause. 27 N.Y.3d 490, 497–98 (2016). New York appellate courts have also held that "disgorgement does not require a showing or allegation of direct losses to consumers . . . ; the source of the ill-gotten gains is immaterial." *People v. Ernst & Young, LLP*, 980 N.Y.S.2d 456, 457 (2014) (citing cases).

***Indiana and North Carolina.*** The plain language of Ind. Code § 24-5-0.5-4(c)(1) and (c)(2) invokes the Court's equitable jurisdiction, including the power to grant restitution. Similarly, N.C.G.S. § 75-15.1 invokes the Court's full equitable power, including to order disgorgement, by permitting the AG to obtain "the restoration of any moneys or property . . . obtained by any defendant as a result of [the UDTPA] violation." *See also State v. Orion Processing, LLC*, 2016 WL 7435679, at *8 (N.C. Super. Dec. 20, 2016) (providing disgorgement of revenues to North Carolina AG). These states' statutes do not restrict the Court's equitable power, and Meta does not argue otherwise.

*California*. California seeks disgorgement under its consumer protection statutes only for the period beginning January 1, 2024, the effective date of California Government Code § 12527.6, which provides a disgorgement remedy under the UCL and FAL. Meta appears to argue that despite clear statutory authority, California cannot obtain disgorgement because the 2023 Complaint did not allege conduct that post-dated January 1, 2024. Given the ongoing nature of the conduct alleged, however, the Court has equitable power and discretion to award disgorgement after January 1, 2024, and Meta does not cite any contrary authority. California sufficiently pled a request for disgorgement in the Complaint. *See* Compl. at 195–96; *see also First American Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 28–29 (D.D.C. 1998) (prayer of "other and further relief as this Court deems appropriate" sufficient to request disgorgement). Further, under Fed. R. Civ. P. 54(c), the AGs are entitled to disgorgement if the evidence supports it, even if that relief is not explicitly demanded in the Complaint. *See also, e.g.*, *Cancellier v. Federated Dep't Stores*, 672 F.2d 1312, 1318–19 (9th Cir. 1982). Finally, California put Meta on notice of its disgorgement request repeatedly. *E.g.*, *supra* n.66; Ex. 117, Discovery Hearing Tr., May 6, 2024 at 90:1–20.

**2.  The AGs are entitled to equitable relief under federal equitable principles.**

Meta asserts, without any factual support, that disgorgement is unavailable because legal remedies are adequate. Meta does not identify *any available legal remedies* for the vast majority of AGs. Instead, Meta lists a few consumer protection statutes that may provide a damages remedy,[67] and then gestures to unnamed laws with unknown remedies, MSJ 42 n.95. The existence of a possible legal remedy does not make that remedy adequate. *See Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 934 (C.D. Cal. 2021); *Connecticut v. Sandoz, Inc.*, 2026 WL 395842, at *19 (D. Conn. Feb. 12, 2026) ("Whether a legal remedy is adequate must depend in part on whether it fulfills the function of the equitable remedy the plaintiff is seeking.").

In any event, legal remedies such as damages are not "complete and adequate" based "on the character of th[is] case." *Payne v. Hook*, 74 U.S. 425, 430 (1868). Here, the AGs bring suit on behalf of the public to enforce laws prohibiting unfair and deceptive business practices—not on

---

[67] Contrary to Meta's assertion, MSJ 42, Illinois law does not provide for compensatory damages in actions brought by the AG. *See People by Madigan v. CMK Invs., Inc.*, 2015 WL 4038896, at *2–3 (N.D. Ill. June 30, 2015).

behalf of private plaintiffs to make them whole. Consistent with this, disgorgement serves the distinct purpose of "depriv[ing]" Meta of illegal gains and "deter[ring]" unlawful conduct "by making [it] unprofitable." *S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998). Compensatory damages are also inadequate because they are exceedingly difficult to calculate; here, the conduct alleged has exposed teens to increased risks of myriad mental health and privacy-related harms, and the AGs' claims do not flow from or require the identification of affected individuals and proof of harm to them. *See* Restatement (Third) of Restitution § 3 (2011) (noting that disgorgement, not just damages, are needed to deter unlawful behavior if "unauthorized interference with [the plaintiff's] entitlement may yield profits exceeding any damages [the plaintiff] could prove"). Unlike damages, Meta's unjust gains can reasonably be calculated. *See* Ex. 118, Saba Rpt. at ¶¶ 175–213.

Meta also claims that the AGs have not pled that legal remedies are inadequate. Yet the AGs have alleged "specific facts . . . showing" the inadequacy of legal remedies. *See Johnson v. Trumpet Behav. Health, LLC*, No. 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) (cleaned up). Indeed, quantifying damages for hundreds of thousands of teen users based on harms linked to increased time spent on the platforms, usage at night or during school, and appearance-altering visual filters "defies calculation," rendering legal remedies inadequate. *See Continental Airlines, Inc. v. Intra Brokers, Inc.*, 24 F.3d 1099, 1105 (9th Cir. 1994); *see also, e.g.,* Compl. ¶ 80 (alleging hundreds of thousands of active teen users by state); ¶¶ 139–50 (alleging Meta's objective and efforts to increase teen time spent); ¶¶ 299–331 (alleging platforms' disruptions to school and sleep); ¶¶ 333–68 (alleging visual filters are associated with body image issues and decline in teen wellbeing).[68]

Finally, Meta's citation to *Liu v. SEC*, 591 U.S. 71 (2020), is wholly inapposite. MSJ 42. *Liu* concerns the Securities Exchange Act, specific language in 15 U.S.C. § 78u(d)(5) providing that relief "benefit . . . investors," and the deposit of disgorgement funds into the U.S. Treasury—none of which is at issue here. Further, Meta omits that the *Liu* Court did not hold that depositing disgorgement funds in the U.S. Treasury is improper where (as here) "it is infeasible to distribute"

---

[68] To the extent that the Meta suggests that the AGs must explicitly allege, in so many words, that legal remedies are inadequate, that argument elevates form over substance and could readily be addressed with an amendment to the Complaint. *See* Fed. R. Civ. P. 15(a)(2).

disgorgement funds to victims or identify them. *Liu*, 591 U.S. at 89–90; *see also F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011) ("[T]he nature of the harm [can be] so diffuse that the specific identities of the victims would be nearly impossible to ascertain."). Accordingly, district courts have permitted sending disgorgement awards to the Treasury after *Liu*. *S.E.C. v. Spartan Sec. Grp., Ltd.*, 620 F. Supp. 3d 1207, 1224 (M.D. Fla. 2022) (citing cases), *aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Spartan Sec. Grp., Ltd.*, 164 F.4th 1231 (11th Cir. 2026).

### 3. The AGs provided a reasonable approximation of profits for disgorgement.

The AGs have met their burden to provide "a reasonable approximation of profits causally connected to" Meta's unlawful conduct, which are subject to disgorgement. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citations omitted); *see also S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.").

The AGs' expert, Carl Saba, calculates the advertising profits associated with users who,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████    *See* Ex. 118, Saba Rpt. at ¶¶ 175–213. Ample evidence shows the causal connection between these profits and Meta's unfair and deceptive practices, particularly those aimed at maximizing young users' time spent on its platforms.[69] For example, Meta developed ineffective time restriction tools and the multiple accounts feature, ██████████████████████ ████████████████████████████    and Meta deceived the public about its platforms' addictive design and nature. *See, e.g.*, *supra* Parts III.B.3.a & III.A.1.b; Ex. 95, META3047MDL-136-00009474 at -510–17. Moreover, time spent is an indicator of harms, as "the more hours a day an adolescent uses social media, the more likely they are to be depressed or unhappy." Ex. 46, Twenge Rpt. ¶ 4.

---

[69] Meta incorrectly asserts that *State v. Minn. Sch. of Bus.*, 935 N.W.2d 124 (Minn. 2019) requires the Minnesota AG to prove a "causal nexus" between harm suffered by consumers and Meta's unlawful conduct, MSJ at 43 n.98, but that is a requirement for restitution, not disgorgement.

1    Further, Meta generates revenue by serving ads to users who spend time on the platforms.

2    *See supra* Part III.A.2.a.ii. The disgorgement of long-run profits that Meta obtains from Affected

3    Teens after they become adults is critical because, ████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████

7    Meta incorrectly asserts that "the AGs must prove that users would not have used Meta's

8    services in the absence of the challenged conduct" to calculate disgorgement. MSJ at 43. This

9    overstates the AGs' burden, as it calls for an infeasible analysis. *See* Ex. 172, Saba Reb. Rpt. at

10   ¶¶ 138–39. It is Meta's burden to "demonstrate that the [AGs'] disgorgement figure was not a

11   reasonable approximation," with "the risk of uncertainty" falling on Meta, the "wrongdoer."

12   *Platforms Wireless*, 617 F.3d at 1096. Meta fails to meet this burden; it does not provide any

13   alternative disgorgement calculation, much less an estimate of how usage would have changed

14   absent its unlawful conduct. *See, e.g.*, *S.E.C. v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021).

### 4.   The AGs' requests for disgorgement and civil penalties do not have extraterritorial effect or exceed statutes of limitations.

16   Meta's arguments going to standing and extraterritoriality are unsupported and inapposite.

17   To the extent required, the AGs will set forth civil penalties and disgorgement calculations on a

18   state-by-state basis, based in part on Meta's own geographical prediction data. *See generally* Ex.

19   118, Saba Rpt. at ¶¶ 125–265. Meta's arguments regarding statutes of limitations are addressed

20   *supra* Part III.A.2.e with respect to the AGs' deception claims; Meta has not raised the statute of

21   limitations with respect to the AGs' unfairness claims, thus waiving any argument to this effect.

[70]


**D. Meta Is Not Entitled to Summary Judgment on the AGs' COPPA Claim.**

There is no genuine dispute of material fact as to Meta's actual knowledge of certain categories of U13s. *See* AGs' Mot. Partial Summ. J., ECF 2695. With respect to other aspects of the AGs' COPPA claim, Meta ignores significant evidence that Meta has actual knowledge— including through willful blindness—as to other U13 users, and that its platforms are directed to children. Summary judgment should thus be denied.

**1. Meta has actual knowledge of U13 users on its platforms.**

"Actual knowledge" means being "aware of" information. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023). Actual knowledge may be proven by direct evidence or inferred from circumstantial evidence. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020); *see also Staples v. U.S.*, 511 U.S. 600, 615–16 n.11 (1994). Willful blindness can establish actual knowledge under COPPA. *See* COPPA Rule, 89 Fed. Reg. 2034, 2037 n.46 (2024) ("The concept of actual knowledge includes willful disregard.") (citing *Glob.-Tech Appliances, Inc.* v. *SEB S.A.*, 563 U.S. 754, 766 (2011)). To show willful blindness, "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc.*, 563 U.S. at 769.

As described in greater detail in the AGs' Motion for Partial Summary Judgment, Meta has actual knowledge that it is collecting and using personal information from certain categories of U13 users:



Issues of material fact exist regarding Meta's knowledge of additional U13 users. For example,

These examples are part of a campaign to avoid and deprioritize removing U13s from Meta's platforms.

1 ██████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████ [73]

3       Meta suggests it cannot be liable for using or retaining U13 data after it knows an account

4 belongs to a U13 user because Meta did not know the user was U13 when it was collecting the data,

5 MSJ at 49, but that argument fails. As Meta concedes, COPPA applies where the operator "has

6 'actual knowledge' that it is collecting **or maintaining** personal information from a U13," MSJ at

7 2, 44 (emphasis added), and COPPA's protections apply once the operator knows the user is U13,

8 even if data was initially collected previously, *see* 16 C.F.R § 312.5(a)(1) (requiring parental

9 consent "before any collection, **use, or disclosure** of personal information from children")

10 (emphasis added). ███████████████████████████████████████████████

11 ███████████████████████████████████████████████████████████████

12 ███████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████ "reasonable measures to

14 protect against unauthorized . . . use of[] the information" or "protect [its] confidentiality, security,

15 and integrity." 16 CFR §§ 312.10, 312.8.[75] ██████████████████████████

16 ███████████████████████████████████████████████████████████████

17 ███████████████████████████. This extensive evidence of Meta's knowledge of

18 U13 users on its platforms precludes summary judgment.

19 [73] ███████████████████████████████████████████████████████████

20 ███████████████████████████████████████████████████████████████

21 ███████████████████████████████████████████████████████████████

22

23 [74] See Ex. 142, █████████ 30(b)(6) Dep. (June 26, 2025) (Meta) 30:7–22, Ex. 143, ████████

24 30(b)(6) (June 26, 2025) (Meta) Amended Errata at 2; Ex. 144, ████████ Dep. (December 10, 2025) 155:4–17, 156:11–22.

25 [75] *See* Ex. 112, ████████ Dep. 349:16–351:22; Ex. 145, META3047MDL-020-00656153; Ex. 129,

26 McDaniel Rpt. (Second Corrected) at ¶¶ 363–367. Meta claims that 16 C.F.R. § 312.5(c)(6)(ii)-(iii) provides an exception. MSJ 50 at n.106. It does not for a number of reasons, including that this

27 provision only applies to "collecting a child's name and online contact information." 16 C.F.R. § 312.5(c)(6).

28 ████████████████████████████ *See* Ex. 146, META3047MDL-030-00000058 at -62–63; Ex. 112, ████████ Dep. 59:13-60:18.

Finally, contrary to Meta's argument, MSJ at 49–51, the AGs are not required to prove that Meta violated COPPA with respect to any particular child in their state. 15 U.S.C § 6504(a)(1) allows each AG to sue when they have "reason to believe that an interest of the residents of that State has been or *is threatened* or adversely affected by the engagement of any person *in a practice* that violates*" the COPPA Rule. 15 U.S.C. § 6504(a)(1) (emphasis added). The AGs may seek remedies directed at Meta's practices themselves (practices that are implemented nationwide with no state-by-state variation), including to "enjoin th[ose] practice[s]" and "enforce compliance with the regulation." *Id.* at 6504(a)(1)(A)-(B). In any event, ███████████████████████

████████████████████████████████████████████████████████████

███[76]

### 2. There is a genuine dispute of material fact as to whether the platforms, or portions thereof, are directed to children.

Meta is not entitled to summary judgement for the additional reason that there are disputes of material fact regarding whether Facebook and Instagram, or portions thereof, are directed to children. Under the COPPA and its implementing regulations, 16 C.F.R. § 312.2 ("COPPA Rule"), operators of websites or online services, or portions thereof, that are "directed to children" must comply with COPPA. 15 U.S.C. § 6502(a)(1). A website or online service, or a portion of that website or service, is "directed to children" if it "is targeted to children." 15 U.S.C. § 6501(10)(A). Whether a website or online service is entirely, or in part, targeted at children depends upon the totality of circumstances. 16 C.F.R. § 312.2; 90 Fed. Reg. 16918, 16937 (Apr. 22, 2025) ("[T]he inquiry in determining child-directedness requires consideration of a totality of the circumstances."); 89 Fed. Reg. 2034, 2046 (Jan. 11, 2024) (describing "the COPPA Rule's totality of the circumstances standard").

Meta is wrong that it must have had the *goal* of achieving a U13 audience in order for a platform be child-directed: COPPA specifies multiple factors to consider when making this determination, and a platform's "intended audience" is given no special weight compared to other

---

[76] *See* Ex. 129, Second Corrected McDaniel Rpt. pp. 113–17, 123-32, 147–49, 152, 157–58, 171–79 (Tables 9-11, 21, 23, 25, 27, 41–42, 46, 49, 58–60).

factors such as "subject matter," "visual content," "presence of child celebrities or celebrities who appeal to children," and "competent and reliable empirical evidence regarding audience composition." 16 C.F.R. § 312.2; 90 Fed. Reg. 16918, 16937 (Apr. 22, 2025); 78 Fed. Reg. 3972, 3984 (Jan. 17, 2013). This Court has already found that "[l]ittle credible debate exists that the legal structure requires a fact-intensive analysis to analyze the 'directed to children' test." ECF 1214 at 19. And granting summary judgment on multi-factor tests is generally disfavored because fact-intensive questions are better left for the factfinder. *See, e.g.*, *Rearden, LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012).

### a. There is evidence that the platforms are directed to children.

Meta argues that the AGs must show that content on its platforms "uniquely" or "disproportionately" appeals to children and contends that the AGs have not done so because they purportedly "cherry-pick examples of five third-party accounts" from each platform. MSJ at 47–48. Meta then provides a perfunctory evaluation of individual factors considered in the directed to children analysis. These arguments fail for both methodological and substantive reasons.[77]

Meta misconstrues the proper analysis. First, being directed to children *cannot* require targeting children as a platform's primary audience, because the COPPA Rule imposes additional obligations for platforms that are directed to children *and* target children as their primary audience. 16 C.F.R. § 312.2. The State AGs thus need not show that Meta's platforms "uniquely" or "disproportionately" appeal to children. Put differently, the directed to children standard requires children to be *an* audience, even if not *the* audience. Indeed, Meta's only case confirms this position. *See New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 516 F. Supp. 3d 1293, 1298 (D.N.M. 2012); *id.* at 1301 (contrasting "directed to children" with "directed to children as their . . . 'primary' audience"). Meta also argues that a platform "is not necessarily [U13]-directed merely because it

---

[77] Meta also relies on a cursory comment from an FTC rulemaking more than a decade ago to assert that Facebook and Instagram are general audience websites. *See* MSJ at 46. The FTC's statement appears in a footnote from 2013 guidance on amendments to the COPPA Rule. 78 Fed. Reg. 3972, 3982 n.126 (Jan. 17, 2013). The Commission did not reason or analyze why Facebook was used as an example as a general audience website and has not since repeated this statement. Further, the FTC did not have the benefit of the extensive discovery and expert opinions in this case. The Commission's note thus should not serve as a basis or persuasive authority for this Court to find Facebook is a general audience platform. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

1  includes content that is appropriate for [U13s]." MSJ at 47. But this again ignores the totality of the

2  circumstances test and the AGs' position: the AGs do not argue that Meta's platforms are child-

3  directed "merely" because of their content or audience composition, but based on a holistic analysis

4  of each platform.

5       Substantively, Meta disregards evidence in the record that establishes a genuine dispute of

6  material fact.[78] *First,* there is evidence that Meta intended to attract tweens.[79]



<hr />

[78] Meta's slippery slope argument—that if its platforms are directed to children, then many
nominally general interest services, such as basketball websites, would also be directed to
children—ignores the research, development, and outreach Meta conducted to make its platforms
more appealing to children. *See* MSJ at 47 n.104.

[79]                                          *See* Ex. 147, META3047MDL-003-00015900
at -901.

[80]

[81]



Further, Meta's nominal policy banning U13s is not dispositive as to Meta's intent to attract U13s: as discussed *supra* Part III.D.1,

*Second*,

---

[82] *See* Ex. 138, META3047MDL-277-00004920; Ex. 112, ████ 30(b)(6) Dep. 39:3–20, 43:25–45:4; Ex. 156, META3047MDL-065-00226334; Ex. 176, ████ 30(b)(6) Dep. Ex. 6 at 25; Ex. 157, META3047MDL-012-00000036 at -038–39; *see also* Ex. 158, META3047MDL-110-00000078 at -079.

STATE ATTORNEYS GENERAL'S OPPOSITION TO META'S MOTION FOR SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

1 ████████████████████████████████████████████████████

2 ████████████████████████████

3     *Third,* the evidence showing that certain third-party accounts post content particularly

4 appealing to U13s, far from being "cherry-picked," demonstrates that Meta's platforms as a whole

5 appeal to U13s, and that those platforms' personalized feeds display content appealing to U13 users.

6 Ex. 1, Alter Rpt. ¶¶ 491, 507, 558; Ex. 155, META3047MDL-004-00003522 at -554. Moreover,

7 ████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████

13 ███████████████████ Ex. 1, Alter Rpt. ¶ 502.

14     *Finally,* ████████████████████████████████████████

15 ████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████

20 *See* Ex. 163, META3047MDL-003-00016725 at -741.

21     **b. There is evidence that *portions* of the platforms are directed to children.**

22     Meta contends that it cannot be liable under COPPA on the basis that particular user pages

23 are directed at children. Meta's argument is contrary to the plain language of the COPPA statute

24 and regulations, which, as previously noted by this Court, do not "make any distinction between

25 platform-created and third-party content." ECF 1214 at 20; *see also* 15 U.S.C. 6501(10)(A)(ii); 16

26 C.F.R. 312.2. That portions of Meta's platforms can be directed to children due to the third-party

27 content on those platforms is hardly "novel"; it has been expressly endorsed by the FTC. *See*

28 COPPA Rule, 89 Fed. Reg. 2034, 2039 (proposed Jan. 11, 2024) ("[W]here third-party content on

1  a platform is child-directed under the Rule's multi-factor test but the platform does not target

2  children as its primary audience, the operator can request age information and provide COPPA

3  protections only to those users who are under 13.").

4      Significant evidence shows that portions of the platforms are directed to children. ███

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██  ███████████████████████████████████████████

8  ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████████████████████████████  █████████

12 ████████████████████████████████████████████████

13 ████████████████████  *See* Ex. 1, Alter Rpt. ¶¶ 488, 558.

14          **3.  The AGs' COPPA claim is not barred by the statute of limitations or laches.**

15     Under the *nullum tempus occurrit regi* doctrine, "actions by government officials are not

16 subject to state, or indeed any other, limitations periods" when suit is brought to vindicate public

17 rights or interests, unless there is "clear congressional intent" that those periods apply. *S.E.C. v.*

18 *Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993). Here, the AGs bring claims to protect "the interest[s] of

19 the residents of [their] State" in their "parens patriae" capacity, *see* 15 U.S.C. § 6504(a)(1), and 28

20 U.S.C. § 1658—the statute of limitations on which Meta relies—reflects no such clear intent.

21 Section 1658 applies to federal civil actions "[e]xcept as otherwise provided by law," 28 U.S.C. §

22 1658(a), and when it was enacted, the law was clear that statutes of limitations did not apply to

23 government actions enforcing public rights or protecting public interests under *nullum tempus*. *See,*

24 ──────────────────

25 [83] ████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

*e.g., Rind*, 991 F.2d at 1491 (collecting federal cases). And to the extent §1658 is ambiguous, this Court must resolve any ambiguity in favor of the government's ability to bring suit. *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95–96 (2006).

As with the AGs' deception claims, even if a statute of limitations applies, Meta's practice of collecting and retaining children's personal information in violation of COPPA—which continues into the present—means the statute of limitations is tolled and measured from the last occurrence. *See supra* Part III.A.2.e. Moreover, there is a genuine dispute of fact about when the AGs reasonably could have become aware of Meta's COPPA violations, due to Meta's deception related to U13s on its platforms. *See Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502–05 (9th Cir. 1988); *Bibeau v. Pacific Northwest Research Foundation Inc.*, 188 F.3d 1105, 1108–11 (9th Cir. 1999). █████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ Thus, even bracketing the foregoing doctrines, the AGs can at least pursue claims dating back to December 20, 2017.

Likewise, laches cannot bar states from enforcing the law when suing in their sovereign capacity to protect the public interest.[84] And as a factual matter, Meta misses the mark in arguing that the "mere existence" of reporting on the "presence of possible U13s" on its platforms is sufficient to trigger COPPA liability such that the AGs should have been aware of their claims as early as 2011. MSJ at 52. The AGs' awareness of potential COPPA violations stems from facts concerning Meta's internal practices that are not publicly available or readily ascertainable from the reporting Meta references. S*ee Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1039 (9th Cir. 2000). Even if laches were available, Meta must prove "both an unreasonable delay by the plaintiff

---

[84] *See Washington v. GEO Grp., Inc.*, 2019 WL 2084463, at *4 (W.D. Wash. May 13, 2019), *adhered to on denial of reconsideration*, 2019 WL 2224932 (W.D. Wash. May 23, 2019); *see also, e.g.*, *State v. LG Elecs., Inc.*, 186 Wash. 2d 1, 13 (2016); *Rhode Island v. Lead Indus. Ass'n*, 2001 WL 345830 at *12 (Super. Ct. Apr. 2, 2001); *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 389 (2001).

1    and prejudice to itself." *Evergreen Safety Council v. RSA Network, Inc.*, 697 F.3d 1221, 1226 (9th

2    Cir. 2012) (citation omitted). Any delay here is explained by investigations and coordinated

3    multistate efforts requiring significant time, evaluation, and public resources. *See DirecTV, Inc. v.*

4    *Garza*, 2005 WL 2269053, at *11 (E.D. Wash. Sep. 16, 2005). Meta's claim of "expectations-based

5    prejudice" is largely speculative and assumes that Meta would have acted differently had the AGs

6    sued earlier, and the mere departure of employees without showing how their absence specifically

7    affects Meta's ability to defend against claims is also insufficient to establish "evidentiary

8    prejudice." See *Wandke v. Nat'l R.R. Passenger Corp.*, 2023 WL 184251, at *9 (W.D. Wash. Jan.

9    13, 2023).

10            **4.  Disgorgement is available to the AGs under COPPA's remedial provision.**

11            Meta incorrectly asserts that disgorgement is a "punitive sanction" that COPPA prohibits.

12    MSJ at 53. Yet COPPA permits AGs to seek "other relief as the court may consider to be

13    appropriate." 15 U.S.C. § 6504(a)(1)(D). Meta's argument that this remedial provision refers to

14    injunctions, compensatory relief, and compliance orders alone is unfounded. No court has

15    interpreted this language to prohibit disgorgement. Rather, this language invokes the Court's full

16    equitable powers. *See supra* Part III.C.1. Unless Congress issues "a clear and valid legislative

17    command" to restrict equity, the mere existence of a statutory damages provision in a federal

18    enforcement statute does not foreclose pursuing equitable remedies. *See Porter*, 328 U.S. at 401–

19    02 (1946);[85] *Bronson*, 654 F.3d at 368.

20            Meta's argument likewise ignores well-established precedent that disgorgement is not

21    inherently "punitive." *See, e.g.*, *S.E.C. v. E-Smart Techs., Inc.*, 139 F. Supp. 3d 170, 183 (D.D.C.

22    2015) (citation omitted). Disgorgement is rooted in equity, intended to prevent unjust enrichment

23    and deter illegal conduct. *See supra* Part III.C.2. Meta cites *Kokesh v. SEC*, to argue otherwise, but

24    *Kokesh* held disgorgement was a penalty only "as applied" in a unique SEC enforcement context.

25    581 U.S. at 457, 465–67 (2017). Further, disgorgement does not become punitive if unlawful gains

26    are sent to the government, and disbursement to the government is not improper in situations like

---

27    [85] The *Porter* Court found no indication that the damages remedy in the statute it analyzed was
28    intended to impair or eliminate a coexisting statutory equitable remedy. *Porter*, 328 U.S. at 402
      n.5.

1   this, with diffuse harms and victims who are difficult to ascertain. *See supra* Part III.C.2 (discussing

2   *Bronson*, 654 F.3d at 373, and *Liu*, 591 U.S. at 89–90.

3      Meta also incorrectly relies on federal common law choice of law principles to argue that

4   the AGs must assert all other remedies are "inadequate" prior to seeking disgorgement. MSJ at 53–

5   54. Disgorgement is available to the AGs under explicit COPPA statutory provisions that displace

6   federal common law. *See Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424–25 (2011)

7   (providing that "[l]egislative displacement of federal common law" occurs when Congress

8   "addresses" the issue); *Mobile Oil Corp. v. Higgenbotham*, 436 U.S. 618, 625 (1978) (same).

9      Finally, Meta erroneously faults the AGs for being unable to trace profits Meta "earned"

10  from COPPA violations or from ads Meta targeted to U13 users. This overstates the AGs' burden

11  to set forth a "reasonable approximation" of ill-gotten gains. *See supra* Part III.C.3.[86] ████████

12  ████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████. It is untenable here for Meta

15  to assert that though it collected data from U13 users, no monetary relief is available simply because

16  Meta does not track profits attributable to that age group. *See In re Facebook, Inc. Internet Tracking*

17  *Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) ("[T]he assertion . . . that federal courts are powerless to

18  provide a remedy when an internet company surreptitiously collected private data . . . is untenable."

19  (quotation omitted)). Furthermore, questions of material fact remain regarding whether Meta

20

21

---

22  [86] COPPA's authorization for AGs to obtain "damage, restitution, or other compensation" and

23  "such other relief as the court may consider to be appropriate" reflects Congress's intent to confer
    broad remedial authority. 15 U.S.C. § 6504(a)(1)(C)–(D). Unlike statutes that expressly limit courts

24  to "equitable relief," COPPA contains no such restriction; subsection (D)'s open-ended
    authorization of "other relief as . . . appropriate" should therefore be read to encompass both

25  equitable and legal remedies—including both equitable and legal disgorgement. *See S.E.C. v.*
    *Hallam*, 42 F.4th 316 (5th Cir. 2022). Moreover, legal and equitable disgorgement are restitutionary

26  remedies expressly authorized by subsection (C). *See* 15 U.S.C. § 6504(a)(1)(C) (authorizing
    "restitution and other compensation"); *see also S.E.C. v. Sripetch*, 154 F.4th 980, 983 n.1 (9th Cir.

27  2025) (discussing "restitution remedy of disgorgement"), *cert. granted sub nom. Sripetch v. SEC*,

28  No. 25-466, 2026 WL 73091 (U.S. Jan. 9, 2026).

1  derived other value from U13 users—including but not limited to any value from training its

2  machine learning and generative AI models with U13 users' data.[87]

3  **IV.    CONCLUSION**

4        For the reasons set forth above, Meta's Motion should be denied, and the Court should

5  grant partial summary judgment to the AGs with respect to the commerce-related elements of state

6  consumer protection statutes.

1    Respectfully submitted,

2

3    **KRIS MAYES**                                    **ROB BONTA**
     Attorney General                                  Attorney General
4    State of Arizona                                  State of California

5    */s/ Reagan Healey*                               */s/ Megan O'Neill*
     Reagan Healey (AZ No. 038733), pro hac vice       Nicklas A. Akers (CA SBN 211222)
6    Assistant Attorney General                        Senior Assistant Attorney General
     Arizona Attorney General's Office                 Bernard Eskandari (CA SBN 244395)
7    2005 North Central Avenue                         Emily Kalanithi (CA SBN 256972)
     Phoenix, AZ 85004                                 Supervising Deputy Attorneys General
8    Phone: (602) 542-3725                             Megan O'Neill (CA SBN 343535)
     Fax: (602) 542-4377                               Nayha Arora (CA SBN 350467)
9                                                      Joshua Olszewski-Jubelirer
     Reagan.Healey@azag.gov                            (CA SBN 336428)
10   *Attorneys for Plaintiff State of Arizona, ex rel.* Marissa Roy (CA SBN 318773)
     *Kris Mayes, Attorney General*                    Brendan Ruddy (CA SBN 297896)
11                                                     Deputy Attorneys General
                                                       California Department of Justice
12   **PHILIP J. WEISER**                              Office of the Attorney General
     Attorney General                                  455 Golden Gate Ave., Suite 11000
13   State of Colorado                                 San Francisco, CA 94102-7004
                                                       Phone: (415) 510-4400
14   */s/ Krista Batchelder*                           Fax: (415) 703-5480
     Krista Batchelder, (CO Reg.45066), *pro hac vice* megan.oneill@doj.ca.gov
15   Deputy Solicitor General
     Shannon Stevenson (CO Reg. 35542), *pro hac*      *Attorneys for Plaintiff the People of the State*
16   *vice*                                            *of California*
     Solicitor General
17   Elizabeth Orem (CO Reg. 58309), *pro hac vice*
     Assistant Attorney General                        **RAÚL R. LABRADOR**
18   Colorado Department of Law                        Attorney General
     Ralph L. Carr Judicial Center                     State of Idaho
19   Consumer Protection Section
     1300 Broadway, 7ᵗʰ Floor                          */s/ James J. Simeri*
20   Denver, CO 80203                                  James J. Simeri (ID Bar No. 12332)
     Phone: (720) 508-6384                             pro hac vice
21   krista.batchelder@coag.gov                        Deputy Attorney General
     Shannon.stevenson@coag.gov                        Attorney General's Office
22   Elizabeth.orem@coag.gov                           P.O. Box 83720
                                                       Boise, ID 83720-0010
23   *Attorneys for Plaintiff State of Colorado, ex rel.* (208) 334-2424
     *Philip J. Weiser, Attorney General*              james.simeri@ag.idaho.gov
24
                                                       *Attorneys for Plaintiff State of Idaho*
25

26

27

28

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Rebecca Borné*
Rebecca Borné
(CT Juris No. 446982), pro hac vice
Tess E. Schneider
(CT Juris No. 444175), *pro hac vice*
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5400
Fax: 860-808-5593
Rebecca.Borne@ct.gov
Tess.Schneider@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Ryan Costa*
Marion Quirk (DE Bar 4136), pro hac vice
Director of Consumer Protection
Ryan Costa (DE Bar 5325), *pro hac vice*
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8811
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware,*
*ex rel. Kathleen Jennings, Attorney General*
*for the State of Delaware*


**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*


**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah M. Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Kaley Schrader, Assistant Attorney General
(KS Bar No. 27700), *pro hac vice*
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
Email: sarah.dietz@ag.ks.gov

*Attorneys for Plaintiff State of Kansas*

1  **ANNE E. LOPEZ**
   Attorney General
2  State of Hawaiʻi

3  */s/ Douglas S. Chin*
   Christopher J.I. Leong (HI JD No. 9662), *pro hac*
4  *vice*
   Supervising Deputy Attorney General
5  Kelcie K. Nagata (HI JD No. 10649), *pro hac vice*
6  Deputy Attorney General
   Department of the Attorney General
7  Commerce and Economic Development Division
   425 Queen Street
8  Honolulu, Hawaiʻi 96813
   Phone: (808) 586-1180
9  Christopher.ji.leong@hawaii.gov
10 Kelcie.k.nagata@hawaii.gov
   Douglas S. Chin (HI JD No. 6465), *pro hac vice*
11 John W. Kelly (HI JD No. 9907), *pro hac vice*
12 Special Deputy Attorney General
   Starn O'Toole Marcus & Fisher
13 733 Bishop Street, Suite 1900
   Honolulu, Hawaiʻi 96813
14 Phone: (808) 537-6100
15 dchin@starnlaw.com
   jkelly@starnlaw.com
16
17 *Attorneys for Plaintiff State of Hawaiʻi*

18 **KWAME RAOUL**
19 Attorney General
   State of Illinois
20
   */s/ Matthew Davies*
21 Susan Ellis, Chief, Consumer Protection
22 Division (IL Bar No. 6256460), *pro hac vice*
   Greg Grzeskiewicz, Chief, Consumer
23 Fraud Bureau (IL Bar No. 6272322), *pro hac vice*
   Jacob Gilbert, Deputy Chief, Consumer Fraud
24 Bureau (IL Bar No. 6306019), *pro hac vice*
   Matthew Davies, Supervising Attorney,
25 Consumer Fraud Bureau (IL Bar No. 6299608),
   *pro hac vice*
26 Daniel B. Roth, Assistant Attorney General,
27 Consumer Fraud Bureau (IL Bar No. 6290613),
   *pro hac vice*
28 Meera Khan, Assistant Attorney General,

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846)
*Pro hac vice*
Assistant Attorney General
Louisiana Department of Justice
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov

*Attorney for State of Louisiana*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388),
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180

Consumer Fraud Bureau (IL Bar No. 6345895),
*pro hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Daniel.Roth@ilag.gov
Meera.Khan@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*


**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

/s/ *Matthew Cocanougher*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

caitlin.micko@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*


**JENNIFER DAVENPORT**
Acting Attorney General
State of New Jersey

By: /s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Jennifer Davenport, Acting Attorney General for the State of New Jersey, and Jeremy E. Hollander, Acting Director of the New Jersey Division of Consumer Affairs*

1    **ANTHONY G. BROWN**
      Attorney General
2    State of Maryland

3    /s/ *Elizabeth J. Stern*
4    Philip D. Ziperman (Maryland CPF No.
      9012190379), *pro hac vice*
5    Deputy Chief, Consumer Protection Division
      Elizabeth J. Stern (Maryland CPF No.
6    1112090003), *pro hac vice*
      Assistant Attorney General
7    Office of the Attorney General of Maryland
8    200 St. Paul Place
      Baltimore, MD 21202
9    Phone: (410) 576-6417 (Mr. Ziperman)
      Phone: (410) 576-7226 (Ms. Stern)
10   Fax: (410) 576-6566
11   pziperman@oag.state.md.us
      estern@oag.state.md.us
12

13   *Attorneys for Plaintiff Office of the Attorney*
      *General of Maryland*
14
      **MICHAEL T. HILGERS**
15   Attorney General
      State of Nebraska
16
17   /s/ Anna M. Anderson
      Anna M. Anderson (NE #28080),
18   *pro hac vice*
      Benjamin J. Swanson (NE #27675),
19   *pro hac vice*
      Assistant Attorneys General
20   Nebraska Attorney General's Office
      1445 K Street, Room 2115
21   Lincoln, NE 68509
      (402) 471-6034
22   anna.anderson@nebraska.gov
      benjamin.swanson@nebraska.gov
23

24   *Attorneys for Plaintiff State of Nebraska*

25

26

27

28

**LETITIA JAMES**
Attorney General
State of New York

/s/ Nathaniel Kosslyn
Nathaniel Kosslyn, Assistant Attorney
General
(NY Bar No. 5773676), *pro hac vice*
nathaniel.kosslyn@ag.ny.gov
Alex Finkelstein, Assistant Attorney General
(NY Bar No. 5609623), *pro hac vice*
alex.finkelstein@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8000

**DAVE YOST**
Attorney General
State of Ohio

/s/ Kevin R. Walsh
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney*
*General Dave Yost*

**JEFF JACKSON**
Attorney General
State of North Carolina

*/s/ Charles White*
Charles G. White (N.C. State Bar No. 57735), *pro hac vice*
Assistant Attorney General
Kunal Choksi
Senior Deputy Attorney General
Josh Abram
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
Facsimile: (919) 716-6050
E-mail: cwhite@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

**DAVE SUNDAY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435), *pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ John Dunbar*
John J. Dunbar (Oregon Bar No. 842100)
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-1884
E-mail: john.dunbar@doj.oregon.gov

*Attorneys for State of Oregon ex rel. Dan Rayfield, Attorney General*

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975), *pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749), *pro hac vice*
Assistant Attorney General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
jlibet@scag.gov
annasmith@scag.gov
803-734-0536

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

**JAY JONES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Travis G. Hill
Chief Deputy Attorney General
Helen O. Hardiman
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Section Chief
Joelle E. Gotwals (VSB No. 76779),
Senior Assistant Attorney General
*pro hac vice*
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General
*pro hac vice*
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-8789
Facsimile: (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of*
*Virginia ex rel. Jay Jones, Attorney General*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/  Amanda Miiller*
By: Amanda Miiller (SD Bar No. 4271)
Deputy Attorney General
South Dakota Office of the Attorney General
1302 East SD Hwy 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: Amanda.Miiller@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JOHN B. MCCUSKLEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

1  **NICHOLAS W. BROWN**                    **JOSHUA L. KAUL**
   Attorney General State of Washington     Attorney General
2                                           State of Wisconsin
   */s/ Claire McNamara*
3  Claire McNamara (WA Bar No. 50097)      */s/ Brittany Copper*
   Gardner Reed (WA Bar No. 55630)         Brittany A. Copper
4  Assistant Attorneys General             Assistant Attorney General
   Washington State Office of the Attorney General    WI State Bar # 1142446, *pro hac vice*
5  800 Fifth Avenue, Suite 2000            Wisconsin Department of Justice
   Seattle, WA 98104                       Post Office Box 7857
6  (206) 340-6783                          Madison, Wisconsin 53707-7857
   claire.mcnamara@atg.wa.gov              (608) 266-1795
7  gardner.reed@atg.wa.gov                 Brittany.copper@wisdoj.gov

8  *Attorneys for Plaintiff State of Washington*

9                                          *Attorneys for Plaintiff State of Wisconsin*

10

11        **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

12        I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

13   DATED: February 27, 2026.

14                                          */s/ Megan O'Neill*
                                            Megan O'Neill
15

16                                    **ATTESTATION**

17

18        I, Megan O'Neill, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence
     to the filing of this document has been obtained from each signatory hereto.
19

20   DATED: February 27, 2026            */s/ Megan O'Neill*
                                            Megan O'Neill
21

22

23

24

25

26

27

28