# EXHIBIT 3

CONFIDENTIAL

Page 1

1      UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3  * * * * * * * * * * * * * * *
4  IN RE:  SOCIAL MEDIA ADOLESCENT
   ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY
5  LITIGATION
6  THIS DOCUMENT RELATES TO:  Breathitt County
   School District, By and Through The Breathitt
7  Board of Education v. Meta Platforms, Inc.,
   et al.
8
   Member Case No.:  4:23-cv-01804
9
     * * * * * * * * * * * * * * *
10
11
12   REMOTE VIDEOTAPED DEPOSITION OF PHILLIP WATTS
13
             July 28, 2025
14       10:01 a.m. to 11:39 a.m.
15      REPORTED BY ANITA KORNBURGER
        REGISTERED PROFESSIONAL REPORTER
16
17
18
     * * * * * * * * * * * * * * *
19
20
21
22
23
24
25

```
                                                    Page 13
 1        A.   Those are places for students to store
 2   their cell phones during instructional time.
 3        Q.   And then the next item, Amazon's the
 4   vendor, and it says cell phone holders.  What's
 5   that a reference to?
 6        A.   I believe that is the same kind of
 7   reference, just a different name.  A place for
 8   students to put their cell phones in the classroom
 9   during instructional time.
10        Q.   In both cases you assign 100 percent to
11   social media?
12        A.   Yes.
13        Q.   Now, just because a kid's on their cell
14   phone during instructional time, that doesn't mean
15   they're on social media; right?
16             MS. EMERY:  Objection, form.  This has
17   been previously asked and answered, Chris, in
18   multiple depositions with this witness.
19             THE WITNESS:  One of the biggest --
20             MS. EMERY:  You already have this
21   testimony.
22             THE WITNESS:  In an attempt to answer
23   this, one of the biggest distractions is the social
24   media is the issue the teachers seem to have the
25   most problem with.
```

CONFIDENTIAL

Page 14

```
 1  BY MR. PISTILLI:
 2       Q.   Well, now I'm trying to understand the
 3  hundred percent here.  And as your counsel
 4  referenced, you've previously been deposed in this
 5  litigation; right?
 6       A.   Yes.
 7       Q.   And you were under oath at that time?
 8       A.   Yes.
 9       Q.   And you swore to tell the truth?
10       A.   Yes.
11       Q.   And you agree that cell phones are used
12  by students for a variety of activities that have
13  nothing to do with social media; right?
14       A.   If that's what I said, yes, cell phones
15  can be used for a variety of things.  But one of
16  our biggest challenges is the social media.
17       Q.   Right.  But they're also used for gaming;
18  right?
19       A.   Yes.
20       Q.   Messaging?
21       A.   Yes.
22            MS. EMERY:  Objection, form.
23  BY MR. PISTILLI:
24       Q.   And the pouches that you purchased --
25            MS. EMERY:  Objection, form.
```

Page 15

```
 1   BY MR. PISTILLI:
 2        Q.   -- for the purpose of getting the phones
 3   out of students' hands during class time; right?
 4        A.   Yes.
 5        Q.   And so if the purpose was to get the
 6   phones out of students' hands, and if, as you've
 7   previously acknowledged under oath, that kids do
 8   more things on social media other than use phones,
 9   how did you arrive at the figure of 100 percent for
10   social media for the cell phone caddies?
11        A.   Like I said, I worked with the attorneys.
12   This was what -- the number I thought was best.  I
13   don't feel like as a school system we probably
14   would have made these purchases if it would not
15   have been for social media interruptions or
16   classroom interruptions.  So I -- that number is
17   subjective.
18        Q.   But kids do more on their phone than just
19   social media; right?
20             MS. EMERY:  Objection, form.  Asked and
21   answered.  I'm going to instruct the witness not to
22   answer.  You literally just asked this question,
23   Chris.  And you've asked it multiple times in other
24   depositions.
25   BY MR. PISTILLI:
```

Page 16

1  Q. Well, Mr. Watts, what I'm trying to
2  understand from you is if the purpose of the cell
3  phone caddies is to address phone use in general,
4  how did you come up with the one hundred percent
5  figure?
6           MS. EMERY: Objection, form.
7  Mischaracterizes testimony. You can answer.
8           THE WITNESS: I've tried to answer,
9  Chris. We probably would not have bought those
10 cell phone caddies. It's a very low amount. It's
11 a subjective percentage. We probably would not
12 have bought -- purchased the caddies or the
13 holders, and that is my belief, if it was not for
14 social media. I mean, I don't know how many more
15 times you're going to ask this.
16 BY MR. PISTILLI:
17     Q. Now, when a student gets in trouble for
18 using a phone during instructional time, how does
19 the teacher know what platform they're using?
20          MS. EMERY: Objection, form. Previously
21 asked and answered at multiple depositions. I'm
22 going to instruct the witness not to answer.
23          MR. PISTILLI: We're going to have to go
24 to the Court, then.
25          MS. EMERY: If you want to have a talk

```
 1   about -- if you have a question that's tied to this
 2   affidavit, great.  But he's already been asked that
 3   exact same question multiple times, Chris.
 4           MR. PISTILLI:  It is relevant to this
 5   affidavit based upon the representation of --
 6           MS. EMERY:  It's testimony that you
 7   already have.  It's testimony that you already
 8   have.  You literally just tried to impeach him with
 9   testimony on this exact same question from a prior
10   deposition.  We agreed to this on topics and on
11   areas that have not already been previously
12   questioned.  This exact question has been asked,
13   Chris.
14           MR. PISTILLI:  Well, I'm entitled to
15   understand the basis and explore the basis for the
16   hundred percent figure and ask him questions that,
17   frankly, call into question the veracity and
18   accuracy of the hundred percent figure, which is
19   precisely what I'm doing.
20           MS. EMERY:  And if you've already
21   previously asked those questions, you already have
22   that testimony and those answers.  If you have a
23   question that's actually tied to the hundred
24   percent and that's not a question that you've asked
25   today or previously, great.
```

Page 18

```
 1  BY MR. PISTILLI:
 2      Q.   Did you discuss the hundred percent
 3  figure for the cell phone caddies with your
 4  classroom teachers?
 5      A.   No.
 6      Q.   Did you go to them and say when you take
 7  a phone away from a kid, do you know what app or
 8  program or platform they're using?
 9      A.   Could you re-ask that again?
10      Q.   Sure.  Did you ask your teachers, when a
11  student has their cell phone taken away for being
12  used during class, whether they know what
13  application or platform or service was being used
14  at the time that the student committed the
15  infraction?
16      A.   No.
17      Q.   And is it your understanding that that's
18  information that your teachers have?
19      A.   No.  There's no way to document that many
20  infractions in the school day with trying to cover
21  what we're here for, the learning and teaching.
22      Q.   So the teachers don't know what
23  application is being used in their classroom?
24           MS. EMERY:  Objection, form.  Previously
25  asked and answered.
```

Page 19

```
 1            THE WITNESS:  The teachers would know
 2   most -- know most of the time what they were doing.
 3   But as far as a way to document the accuracy of
 4   that would almost be impossible with everything a
 5   classroom teacher is challenged with doing.
 6   BY MR. PISTILLI:
 7        Q.   How would the teachers know?
 8        A.   Most students would tell you what they
 9   were doing.  Most of -- their peers would tell.
10   Most teachers that were active moving around the
11   room would have a sense to what was going on, but
12   no documentation, not unless it's elevated to a
13   different level.
14        Q.   Let's go back up to the top, Kids First.
15   What is Kids First?
16        A.   Kids First is what -- I believe is a
17   program through our family and -- most likely
18   through our family youth service centers where they
19   come in and talk to kids in a whole group setting
20   about education programs.  And it's usually
21   centered around social media and other topics.
22        Q.   What specific social media programming
23   was included in Kids First?
24        A.   Couldn't be exact without going back and
25   looking at some of the agendas and some of the
```

Page 60

1  level with these problems, do you have an
2  understanding about what the primary problem with
3  cell phones is, what students tends to be on?
4       A.   Social media.  They bring a lot of things
5  back to school and expect our counselors and
6  principals to help solve all the problems about a
7  lot of things that take place out of school,
8  whether it's relationships with their friends or
9  parents, or just bad behavior, bad decisions.
10 Really creates a much larger caseload for
11 administrators and teachers to follow up on.
12      Q.   Now, you were asked whether you had
13 conducted any analyses or looked at any hard data
14 in reaching the percentage that you assigned.  Do
15 you recall that?
16      A.   Yes.
17      Q.   Okay.  When you were looking at and
18 assigning these percentages, did you consider your
19 experience and your past conversations with
20 teachers, with principals, with guidance counselors
21 about these issues?
22      A.   Yes.  And I always thought I went with
23 the conservative number.
24      Q.   You said that multiple times, and defense
25 counsel didn't ask you what you meant by that.