# EXHIBIT 5

Page 1

```
              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA


IN RE: SOCIAL MEDIA          : MDL No.
ADOLESCENT                   : 4:22-md-3047-YGR
ADDICTION/PERSONAL INJURY    :
PRODUCTS LIABILITY           : MDL No. 3047
LITIGATION                   :
_____

THIS DOCUMENT RELATES TO:    :
ALL CASES                    :



                    - - -

              AUGUST 12, 2025

                    - - -
```

Videotape deposition of SHARON A. HOOVER, Ph.D., taken pursuant to notice, was held at the law offices of Kessler Topaz Meltzer & Check LLP, 280 King of Prussia Road, Radnor, Pennsylvania 19087, commencing at 9:05 a.m, on the above date, before Amanda Dee Maslynsky-Miller, a Court Reporter and Certified Realtime Reporter.

                    - - -
       GOLKOW, A Veritext Company
    877.370.3377 ph| 917.591.5672 fax

1  that I cover when I'm doing the
2  interviews.  And those are what
3  contributes to the report.  So it's
4  outlined that way in my report.
5       Q.   And so is there a written
6  set of topics that you use to guide these
7  conversations?
8       A.   No.  I mean, I had the
9  report outline and then followed
10 according to that, so.
11            Yeah.  I can point you to,
12 you know, the outline in the report if
13 needed.
14      Q.   Sure.  We'll talk about that
15 in a moment.
16            Would those -- when you say
17 the "outline" from the report, is that
18 just the major topic headings from your
19 report?
20      A.   Exactly.
21      Q.   Did you record the
22 interviews in any way?
23      A.   No -- well, let me -- let me
24 clarify.

 1              So I took contemporaneous
 2   notes, which is what I would typically do
 3   when I'm interviewing folks for my
 4   district.  So I took notes that were
 5   essentially part of the report.  Yeah.
 6        Q.    Okay.  So I don't believe we
 7   have received those notes.
 8              So we are going to ask to
 9   receive those, okay?
10        A.    There's no notes beyond
11   what's in the actual report.  So when I
12   say I took notes, they, then, were
13   iteratively developed into the report.
14              So it's not a separate set
15   of notes.  So that's why I was
16   clarifying.
17        Q.    Okay.  And so, then, are all
18   of the comments made by each of these
19   interviewees reflected in the individual
20   district reports?
21        A.    So as you'll see in the
22   reports, what I did, which, again, would
23   be typical of what I would do when I'm
24   interviewing any district -- and I

 1   interview districts all the time -- is I
 2   take notes through the interview and then
 3   I synthesize the information and pull in
 4   illustrative quotes, for example.
 5             And that's what's in the
 6   report.
 7        Q.   And so are there any -- is
 8   there any remaining documentation of the
 9   entirety of what these interviewees have
10   said other than the illustrative quotes
11   that have remained in your reports?
12        A.   No.
13             ATTORNEY YEATES:  Object to
14        the form.  Misstates testimony.
15   BY ATTORNEY LEHMAN:
16        Q.   Did you invite any counsel
17   from the defense to attend any of the
18   interviews that you conducted?
19        A.   I don't think that would
20   have been my role.  So if you're asking
21   if I did, no.
22        Q.   Do you anticipate conducting
23   any other key informant interviews beyond
24   what's reflected in Exhibit-1?

```
 1              speaking to and in the harms that
 2              I'm proposing to prevent and
 3              mitigate in the strategic plan.
 4    BY ATTORNEY LEHMAN:
 5         Q.    And do you have an opinion
 6    as to the specific harms caused by any
 7    one specific feature on a -- on a defense
 8    platform?
 9         A.    So, again, I would rely more
10    on the experts who dove more deeply into
11    that, right, who looked at each specific
12    feature.
13              What I can say is that, you
14    know, some of the features that I'm aware
15    of and that I've, you know, certainly
16    spoken, during the key informant
17    interviews and during discussions with
18    school districts and school leaders and
19    families in my work, speak about specific
20    features, whether it's the auto play and
21    scrolling or the -- again, I've already
22    spoken to some, the lack of parental
23    controls, the age verification; those
24    things certainly get our young people on
```

Page 235

1  social media.
2              The features that keep them
3  engaged and kind of amplify things that
4  happen and then cause disruptions in the
5  schools, those are the things that we
6  hear about.
7              Am I expert in the
8  technology that drives that?  No.  Am
9  I -- do I consider myself expert in kind
10 of the -- what happens as a consequence
11 of some of the design features in our
12 school settings and in terms of the young
13 people's mental health?  Yes.
14      Q.   Do you agree that you're not
15 an expert in how algorithms work?
16      A.   Well, algorithms is a broad
17 statement -- or a broad term, I should
18 say.
19              So I know what an algorithm
20 is, I believe.  But it's probably -- that
21 term is probably used differently in
22 different contexts.
23              So maybe you can specify a
24 little bit.

CONFIDENTIAL

Page 402

```
 1         UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2
 3   IN RE: SOCIAL MEDIA          : MDL No.
     ADOLESCENT                   : 4:22-md-3047-YGR
 4   ADDICTION/PERSONAL INJURY    :
     PRODUCTS LIABILITY           : MDL No. 3047
 5   LITIGATION                   :
     _____
 6
     THIS DOCUMENT RELATES TO:    :
 7   ALL CASES                    :
 8
 9                   - - -
               AUGUST 13, 2025
10                VOLUME II
                    - - -
11
12
13            Videotape deposition of
14   SHARON A. HOOVER, Ph.D., taken pursuant
15   to notice, was held at the law offices of
16   Kessler Topaz Meltzer & Check LLP, 280
17   King of Prussia Road, Radnor,
18   Pennsylvania 19087, commencing at
19   8:59 a.m, on the above date, before
20   Amanda Dee Maslynsky-Miller, a Court
21   Reporter and Certified Realtime Reporter.
22
23                   - - -
          GOLKOW, A Veritext Company
24      877.370.3377 ph| 917.591.5672 fax
```

Page 574

1  interviews, correct?
2      A.   That's incorrect.  I took
3  contemporaneous notes as I was conducting
4  the interviews, which then became part of
5  the body of each of the school district
6  reports.
7      Q.   Are you able to attribute
8  any specific quoted statement in one of
9  these reports to a particular, quote, key
10 informant?
11     A.   So part of my standard
12 practice is to take notes, including
13 direct statements made, and to not
14 attribute them to specific people, as we
15 talked about yesterday, in part, to
16 retain their individual confidentiality.
17          To balance that, I provided
18 a list of the names of the individuals
19 that were interviewed as part of the key
20 informant interviews.
21     Q.   Are you able to attribute
22 any specific quoted statement in one of
23 these reports to a particular key
24 informant?

Page 577

1       practice not to do so.
2  BY ATTORNEY KEYES:
3       Q.    Well, you don't attribute
4  particular quotes to particular key
5  informants.
6             My question is, sitting here
7  today, are you able to attribute
8  particular quotes to particular
9  informants?
10      A.    No.   That wouldn't be part
11 of my standard practice, to go back to
12 key informant interviews where I
13 indicated that I wouldn't be tying their
14 direct statements to their names in the
15 interest of, you know, supporting a
16 comfortable key informant interview
17 process, which is very standard for
18 practice when you're conducting key
19 informant interviews.
20      Q.    When you spoke with each of
21 the key informants in these six school
22 districts, did you tell them, at the
23 beginning of the conversation, that you
24 would not be attributing particular

CONFIDENTIAL

Page 578

1  statements to them?
2        A.    Yes, I believe I did.
3        Q.    And you assured them of that
4  confidentiality at the outset of these
5  interviews with key informants?
6        A.    I believe I let them know
7  that I wouldn't be tying their names to
8  specific quotes.  But yeah.
9        Q.    Okay.  And so you have no
10 record and no recollection that allows
11 you to go through, quote by quote that
12 you've attributed to key informants, and
13 identify the specific person who said
14 that --
15              ATTORNEY YEATES:  Object --
16 BY ATTORNEY KEYES:
17       Q.    -- is that fair?
18              ATTORNEY YEATES:  Object to
19       the form.
20              THE WITNESS:  I think I've
21       already answered that.
22              But I would not.  And,
23       again, this is very typical of key
24       informant practice, that you