1

2

[*Submitting Counsel on Signature Page*]

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11

IN RE: SOCIAL MEDIA ADOLESCENT
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION

12

13

14

15

16

This Document Relates to:

17

*Breathitt County Board of Education v. Meta
Platforms, Inc., et al.*
Case No.: 4:23-cv-01804

18

19

20

21

22

23

24

25

26

27

28

MDL No. 3047

Case No. 4:22-md-3047-YGR

**PLAINTIFF'S MOTION IN LIMINE #5, TO
EXCLUDE CERTAIN OPINIONS OF
TIKTOK'S EXPERT DR. CHRIS MATTMANN
AND SNAP'S EXPERT DR. SANDEEP
CHATTERJEE**

**[REDACTED]**

Judge: Hon. Yvonne Gonzalez Rogers

Magistrate Judge: Hon. Peter H. Kang

1    **I.     <u>INTRODUCTION</u>**

2        When this Court ruled that Defendants cannot be held "liable for their content moderation activities,"

3    it laid down a marker: "theor[ies] of harm . . . must . . . not take issue with defendants' choices as to what

4    content to take down or censor." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F.

5    Supp. 3d 809, 853 n. 58 (N.D. Cal. 2023), *motion to certify appeal denied*, No. 4:22-MD-03047-YGR, 2024

6    WL 1205486 (N.D. Cal. Feb. 2, 2024).

7        Two experts proposed by TikTok and Snap did not get the memo. They offer multiple opinions about

8    "defendants' choices as to what content to take down or censor"—in an attempt to show that these companies

9    made excellent choices in this regard. *Contra id*. The Court should not allow these proposed expert opinions

10   to derail this litigation. Plaintiff's focus has always been the social media Defendants' product features and

11   failure to warn—not their choices to leave up or take down content.

12       Defendants seek to salvage these opinions about content moderation by insisting that they would only

13   be offered to rebut Plaintiffs' theories of harm or evidence. But calling these rebuttal opinions does not make

14   them so. In reality, Defendants' expert opinions on content moderation are non-sequiturs: They do not in fact

15   respond to any of Plaintiff's theories of harm or evidence. Rather, these expert opinions merely serve as a

16   conduit for alleged facts and data about the companies' content moderation practices, and are offered to bolster

17   their purportedly "good" character. Such expert opinions are inadmissible for several of reasons and should

18   be excluded.

19       Because Breathitt's experts are not opining about content moderation, neither Dr. Mattmann nor Dr.

20   Chatterjee's opinions about content moderation are squarely cabined to particular paragraphs. However, the

21   Court should exclude, at a minimum, opinion 1 (¶¶ 10, 20, 66-172) of Dr. Mattmann's opening MDL Report

22   and opinion 1 (¶¶ 11, 20, 92-198) of Dr. Mattmann's rebuttal MDL report, and the opinions set out in ¶¶ 88,

23   90-91 of Dr. Chatterjee's MDL expert report. To eliminate any potential confusion, the Court should further

24   rule that Defendants' experts may not opine about their content moderation practices at trial. If, however,

25   TikTok and Snap are allowed to present these expert opinions, then they must take the bitter with the sweet:

26   Breathitt should then be allowed to openly discuss all the ways that the deficient content moderation by

27   TikTok and Snap hurt kids, families, and schools.

28

## II.   **BACKGROUND**

TikTok and Snap each propose an expert on content moderation.[1] Each company takes the position that these opinions are offered to rebut "Plaintiffs' claims and evidence (including their experts' opinions) regarding the kinds and impact of third-party content available on Defendants' platforms." ECF 2183 at 1.[2] TikTok takes this position notwithstanding the fact that its proposed expert opined extensively about content moderation in his *opening* report.

That expert, Chris Mattmann, holds a doctorate in Computer Science and now works as a social media researcher. In Section VIII of his opening report, tellingly titled "Content Moderation," Dr. Mattmann extensively and impermissibly opines on the scale, scope, and efficacy of TikTok's content moderation systems. Dr. Mattmann's first opinion (contained within Section VIII) squarely focuses on the opinion that TikTok's content moderation is "industry-leading" in "scale and efficacy[.]" (Declaration of Andre Mura ("Decl.") Ex. 1 (Mattmann Opening Report ¶ 20)). After citing to and quoting extensively from ████████████████ ██████████████████████████████████████████████████████, Dr. Mattmann claims that ██████████████████████████████████████ (¶ 170), and ███████████████ ███████████████████████████████████████ (¶ 172)—all in the realm of content moderation, specifically. The crux of Dr. Mattmann's opinion in this Section is that TikTok's content moderation policies and practices should exculpate it in this case. (¶¶ 66-172). Dr. Mattmann recapitulates these same opinions (often using identical language) in his rebuttal report. *See* Decl. Ex. 2 (Mattmann Rebuttal Report ¶¶ 92-198).

Dr. Sandeep Chatterjee, Snap's proposed expert, is currently the CEO of a technology consulting company. His report engages in the same gambit as Dr. Mattmann's, opining that Snap "bar[s] a number of types of content," has "implemented multiple layers of moderation" to "address potentially sensitive or suggestive material," and has "actively adjusted policies to exclude inappropriate material." (Decl. Ex. 3 (Chatterjee Report ¶¶ 88, 90-91)). Dr. Chatterjee takes pains to note that Snap's systems are ████████████ and applauds Snap for ██████████████████ its content moderation policies (¶ 90).

---

[1] Meta initially proposed an expert on content moderation, Dr. Emilio Ferrara, but withdrew that expert in this case on March 2, 2026.

[2] As Defendants know, Plaintiffs' expert Professor Sarah Roberts served a report seeking to rebut the content moderation opinions of Defendants' experts. The Roberts rebuttal opinions are offered only if the Court admits the expert opinions of Defendants' content moderation experts.

1

## III.   **ARGUMENT**

2      Defendants have repeatedly said that their experts' content moderation opinions are only offered as

3  rebuttal evidence. *E.g.*, ECF 2183 at 1-2. But this is plainly not the case for Dr. Mattmann's opening report,

4  which includes one hundred and six paragraphs in the "Content Moderation" section without a single cite to

5  a single Plaintiffs' expert report. (Ex. 1, Mattmann Opening Report ¶¶ 66-172). Nor is it true for Dr.

6  Chatterjee, who attempts to frame his opinions about content *moderation* as a rebuttal to

7                                                                                    . *See* Decl. Ex. 3 at ¶ 93 ("

8

9

10                                           "). Drs. Mattmann and Chatterjee's opinions are non sequiturs

11  masquerading as rebuttal. Whether, how, to what extent, and for what purpose Defendants moderate content

12  says nothing about whether, how, to what extent, and for what purpose they recommend content that it allows

13  onto its platform. ECF 2172 at 2. The former set of questions are irrelevant to this case.

14      The opinions of these two experts are not admissible rebuttal opinions for three other reasons.

15      First, opinions that Defendants' content moderation systems are effective are not relevant to Breathitt's

16  theory of harm or helpful to the jury. None of Breathitt's claims or legal theories seek to hold Defendants

17  liable for failing to moderate content. So whether Defendants are doing a good job at content moderation (or

18  not) is neither responsive nor relevant to Breathitt's theory of the case, or the evidence Breathitt will use to

19  support that case. Moreover, Defendants' experts do not even opine about systems in place during the relevant

20  time period. These failures mean the opinions cannot even accomplish their stated purpose: to "rebut" the

21  evidence presented at trial.

22      Second, evidence of content moderation will be confusing and distracting, and will open the door to a

23  wave of contrary evidence—including evidence of specific content Defendants failed to moderate—that

24  would pull time and attention away from the trial's central issues. Any tangential relevance of content

25  moderation efficacy is dwarfed by the delay, inconvenience, and confusion its admission is likely to cause.

26      Third, beyond lacking probative value, these opinions work as improper character evidence offered to

27  bolster the jury's view of Defendants as moral and ethical companies who could not have harmed students

28

and schools in these ways. Courts are clear that using character evidence in this way is inadmissible, and these expert opinions are no different.

### A. Defendants' content moderation testimony is not relevant rebuttal evidence.

Defendants' attempt to rebut Breathitt's claims and evidence through expert testimony about their content moderation practices springs from a false premise. None of Breathitt's legal claims seek to hold Defendants liable for failure to moderate content. ECF 2728 at 12 (reaffirming that "certain platform design choices . . . are sufficiently independent from content to avoid Section 230"). Instead, Breathitt seeks to hold Defendants liable for their own actions, including their failure to warn of known risks from the platform as a whole. *Id.* at 30-31 (denying summary judgment on failure to warn because "plaintiffs have proffered evidence of independent knowledge of harm from specific features").

Because Breathitt does not seek to hold Defendants liable for content moderation, Defendants' content moderation practices—and their experts' opinions that Defendants excelled in taking down bad content—is utterly beside the point. The jury will decide whether Defendants breached three state-law duties—(i) the duty to warn students, parents, and school districts about the risk of compulsive and addictive use from Defendants' platforms; (ii) the duty not to negligently design and target at young people platforms with an addictive platform, *see In re Soc. Media*, 702 F. Supp. 3d at 819; and (iii) the duty not to interfere with the public rights to health, safety, and education through the foregoing actions. None of these duties require Defendants to monitor or remove third-party content. Defendants' content moderation practices cannot come in to rebut an argument that Breathitt is not making (and that the Court has held Breathitt cannot make). These opinions, therefore, should be excluded as irrelevant and unhelpful to the jury. Fed. R. Evid. 402; *see also* Fed. R. Evid. 401; *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387-88 (2008) (relevancy must be determined "in the context of the facts and arguments in a particular case"—it "'is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.'").

In response, Defendants may observe that Breathitt intends to proffer evidence that Defendants' platforms as a whole were substantial factors in causing their harm. That is true, and it is permitted. In denying Defendants' motion for summary judgment, the Court held that Breathitt had "proffered evidence of independent knowledge of harm from specific features" and thus could proceed on a failure-to-warn theory

because "the duty derives from defendants' independent knowledge of a foreseeable risk of harm . . ." ECF 2728 at 30-31; *see also* ECF 1214 at 2 (declining to dismiss liability "predicated on a failure-to-warn of known risks of addiction attendant to any platform features or as to platform construction in general"). Here, Defendants' independent knowledge from scientific studies and internal research that (for example) endless scroll, algorithmic recommendations, beauty filters, or notifications were causing students to use their apps compulsively and disrupting classrooms may be admissible to show that defendants had independent knowledge of a foreseeable risk of harm. That duty *would* require Defendants to put others on notice of known harms, but it *would not* require Defendants to change anything about how, what, or when they publish. *See Internet Brands, Inc*., 824 F.3d at 851; *see also Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1179 (9th Cir. 2024) (no Section 230 protection where "online content is involved in these facts, and content moderation is one possible solution for [defendant] to fulfill its promise, [but] the underlying duty . . . is the promise itself").

Breathitt's proffer of platform-wide evidence does not open the door to the content moderation opinions of Drs. Mattmann and Chatterjee, which remain irrelevant and unhelpful. Breathitt has no intention of bandying about bad content before the jury. Nor does it have any intention of arguing to the jury that it was harmed because of content that should have, but was not, taken down. To the extent evidence about content is contextually relevant—for instance, in explaining Snap's defective mechanisms for CSAM reporting, an unprotected feature, *see* ECF 2728 at 5— the appropriate approach to resolve issues with Breathitt's evidentiary offerings is to "deal with [that] evidence according to Rule 403, which permits the Court to exclude from consideration evidence for which the 'probative value is substantially outweighed by a danger' of unfair prejudice or jury confusion." *Id.* at 18 n. 9 (quoting Fed. R. Evid. 403). The correct approach is *not* the wholesale admission of expert opinions on content moderation. Those opinions are not relevant to the argument that Defendants had *knowledge* that children could not tear themselves away from their screens because Defendants' content-agnostic recommendation engines were designed to keep them hooked. Nor are they responsive to the argument that Defendants failed to warn of the risks they knew about.

Finally, even if content moderation were *generally* probative of some issue in the case (despite being entirely divorced from Breathitt's theory of harm), the defense experts' opinions on content moderation would still offer little value because they opine only on the *current state* of Defendants' content moderation practices,

not the state of content moderation throughout the relevant time period. Breathitt's evidence shows that it was impacted by social media from at least 2014 to the present. *E.g.*, ECF 2297-13 (Klein R.) ¶ 1. But Defendants' experts' opinions apply almost exclusively to present-day practices. *E.g.*, Decl. Ex. 1 (Mattmann R.) ¶ 104 (discussing ███████████████████████████████████), ¶ 150 (███████████████████████████); Decl. Ex. 3 (Chatterjee R.) ¶ 88 (citing ███████████████████████). If Defendants tried to rebut a particular piece of content using their content moderation defense, they would need to establish not only that the content violated their policies, but that it violated the policies that were in place *at the time the content was posted* and that the company had a sufficiently robust content moderation ecosystem *at that time* to have promptly removed the content. *E.g.*, Decl. Ex. 4 (Loftus Dep.) at 243:10-244:4 (███████████████████████████). Nothing in these expert reports do that.



### B. Defendants' irrelevant "rebuttal" evidence will unnecessarily derail trial when a limiting instruction would adequately protect their interests.

Because Defendants squarely admit that this expert testimony is offered purely as rebuttal evidence (and as such, would be offered only to respond to evidence the Court already ruled admissible)—the better approach is the one the Court already charted: If Defendants object at trial that certain evidence is barred by Section 230, "the Court will deal with evidence according to Rule 403," rather than adopt a "blanket rule of inadmissibility." ECF 2728 at 18 n.9 (citation omitted). If any of Breathitt's admissible evidence requires cautioning the jury that Defendants cannot be held liable for publishing, moderating, or failing to remove third-party content, a limiting instruction in the context of that specific evidence is the best way to resolve that issue.

Defendants' alternative—meeting Plaintiff's admissible evidence about negligent design and failure to warn with inadmissible and irrelevant evidence about inactionable content moderation—will turn the trial into a sideshow of purely collateral issues. For example, Defendants claim that evidence about the efficacy of their content moderation systems overall is directly responsive to evidence that involves recommendation systems, *see* ECF 2183 at 2, but ignore that these systems are both factually *and* causally distinct. *See* ECF 2172 at 2 (noting that a company could improve content moderation without fixing the addictive quality of a recommender system, and vice-versa). Entertaining evidence of content moderation systems—for which

Defendants *cannot* be held liable—will necessarily "change the focus of trial," ECF 2172 at 3, eat up cross-examination time on the efficacy of those systems, and divert time to interrogate the reliability and veracity of those opinions, all of which are extraneous to the issues the jury must decide. The Ninth Circuit has affirmed excluding evidence that would "inject[] needless confusion into an already complex case" and which goes only "to a collateral issue." *City of Long Beach v. Standard Oil Co. of Calif.*, 46 F.3d 929, 937 (9th Cir. 1995). Establishing that Defendants employ effective content moderation systems is wholly unnecessary for them to rebut Breathitt's evidence.

### C. Defendants' content moderation opinions are a backdoor attempt to introduce improper character evidence.

Even though Breathitt's theory of harm does not "take issue with defendants' choices as to what content to take down or censor[,]" *In re Soc. Media*, 702 F. Supp. 3d at 853 n. 58, Defendants still want to be able to talk about what a good job they are doing moderating content. So Defendants' experts ███████████████████████████████████████████████████████████████████████████. *E.g.*, Decl. Ex. 3 (Chatterjee R.) ¶ 95 (███████████████████████████████████████████████████████); Decl. Ex. 1 (Mattmann R.) ¶ 292 (███████████████████████████████████████████████████████████████████████); *id.* ¶ 296 (██████████████████████████████████████████████████████). But there is no link between these encomiums and any conduct to which Breathitt may seek to attach liability. As a result, such testimony necessarily asks the jury to conclude that Snap and TikTok are ███████████████████████████ companies *generally*, and that they likely acted in conformity with that character when designing and operating their platforms *generally*.

Rule 404(a)(1) bars such testimony. The Federal Rules do not allow evidence of good (or bad) character evidence to prove that a civil defendant acted in conformity with that trait. Fed. R. Evid. 404(a) Advisory Committee Notes (explaining the "difficulty" with offering character evidence in civil cases comes from its tendency "to distract the trier of fact from the main question of what actually happened on the particular occasion" and its subtle permission "to reward the good man . . . despite what the evidence in the case shows actually happened"). Courts read Rule 404(a) as prohibiting character evidence about a defendant writ large, allowing exceptions *only* in criminal cases. *E.g.*, *Ginter v. Nw. Mut. Life Ins. Co.*, 576 F. Supp.

627, 630 (E.D. Ky. 1984) (examining the Advisory Committee Notes to Fed. R. Evid. 404(a)); *Rios v. City of Reno*, 2009 WL 10715477, at *6 n.3 (D. Nev. 2009) (disallowing evidence of good character in a civil case because "[i]n civil cases, there is no exception allowing introduction of general good or bad character evidence to show acts in conformity therewith").

Moreover, these experts are not an appropriate vessel for the Defendants to introduce facts that paint them in a good but misleading light. An expert cannot "regurgitate" company documents and "cannot serve as a conduit for facts and data" that the company wants in the record. *See* Order on 702 Motions, ECF 2750 at 18. Much of the ███████████████████████████████ appear aimed at painting the company's ████████████████████████. *E.g.*, Decl. Ex. 1 (Mattmann R.) ¶ 86 (████████ ████). But in reality, ██████████████████████████████████████ ████████████████████████. *E.g.*, Decl. Ex. 4 (Loftus Dep.) at 243:10-245:7 (███████████████████████████████████████████████████ ███████████████████████████████████████).

Allowing testimony about Defendants' "good" character would "open the door" to rebuttal evidence about Defendants' bad character (although admitting character evidence would be unprecedented in a civil case). *Bishop v. Harris*, 2021 WL 8893635, at *3-4 (C.D. Cal. Dec. 16, 2021). Even if not otherwise relevant, Breathitt could, for example, introduce evidence that TikTok endorsed a creator with a severe eating disorder and refused to remove her from the platform even after numerous experts warned the company it was promoting eating disorders. Omnibus Opp. to Summary Judgment, ECF 2414.1 at 62, 92. Similarly, Breathitt could rebut testimony about ██████████████████████ █████████████████. *E.g.*, Decl. Ex. 4 (Loftus Dep.) at 258:13-260:6 (████ ████████████████████████████████). Such evidence would foreseeably distract the jury with issues that are not a part of this case in the first place, which is why the Court should exclude the content moderation opinions under Rule 403 from the outset.

## IV.    **CONCLUSION**

The Court should preclude Defendants from opining on their content moderation systems, including by excluding opinion 1 (¶¶ 10, 20, 66-172) of Dr. Mattmann's opening MDL Report and opinion 1 (¶¶ 11, 20, 92-198) of his rebuttal MDL report, and the opinions set out in ¶¶ 88, 90-91 of Dr. Chatterjee's MDL

- 9 -

expert report, because these opinions are irrelevant and unhelpful to the jury, likely to confuse or mislead the jury about Breathitt's actual theories of liability, improperly bias the jury into believing that Defendants are typically "good" actors, and waste time with extended digressions about complex collateral issues. Rules 402, 403, and 404(a) each give this Court an offramp. It need only select which exit to take.

Dated:  March 2, 2026                    Respectfully submitted,


By: /s/ *Lexi J. Hazam*


Lexi J. Hazam
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

RONALD E. JOHNSON, JR.
SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com
semery@justicestartshere.com

Counsel for Breathitt

ANDRE M. MURA
**GIBBS MURA LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: 510-350-9700
amm@classlawgroup.com

Plaintiffs' Steering Committee Leadership

## ATTESTATION

I, Andre M. Mura, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: March 2, 2026

By: */s/ Andre M. Mura*