# Exhibit A

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                                                         Page 1
 1           UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
 2
             Case No. 4:22-md-03047-YGR
 3                  MDL No. 3047
 4   IN RE:  SOCIAL MEDIA ADOLESCENT
     ADDICTION/PERSONAL INJURY
 5   PRODUCTS LIABILITY LITIGATION,
 6   THIS DOCUMENT RELATES TO:
     Breathitt County School District,
 7   By and Through The Breathitt
     Board of Education
 8   v. Meta Platforms, Inc., et al.
 9   Member Case No.:  4:23-cv-01804
10   _____
11       DEPOSITION OF:  KERA HOWARD 30(b)(6)
     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12   _____
13   The video deposition of Kera Howard was taken before
14   Janine N. Leroux, Stenographic Court Reporter and
15   Notary Public in and for the State of Kentucky, at
16   the Breathitt County Schools Central Office located
17   at 420 Court Street, Jackson, Kentucky commencing
18   on March 10th, 2025, at the approximate hour of
19   8:59 a.m.   This deposition was taken in accordance
20   with Federal Rules of Civil Procedure 26 and 30.
21
22
23
24
25   Job No. MDLG7222610-1
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

```
                                                          Page 2
 1      APPEARANCES:
 2
        RONALD E. JOHNSON, JR., ESQUIRE
 3      SARAH EMERY, ESQUIRE
        HENDY JOHNSON VAUGHN
 4      2380 Grandview Drive
        Ft. Mitchell, Kentucky 41017
 5      rjohnson@justicestartshere.com
        semery@justicestartshere.com
 6
        APPEARING ON BEHALF OF THE PLAINTIFFS
 7
 8      CHRISTIAN J. PISTILLI, ESQUIRE
        COVINGTON & BURLING LLP
 9      One City Center
        850 Tenth Street, NW
10      Washington DC 20001-4956
        cpistilli@cov.com
11
        and
12
        MATTHEW E. DePAZ, ESQUIRE
13      KATELYN A. ROMEO, ESQUIRE
        SHOOK, HARDY & BACON, L.L.P
14      2555 Grand Boulevard
        Kansas City, Missouri 64108
15      mdepaz@shb.com
        kromeo@shb.com
16
        APPEARING ON BEHALF OF THE META PLATFORMS, et al.
17
18      FARAZ SHAHIDPOUR, ESQUIRE
        KIRKLAND & ELLIS, LLP
19      333 West Wolf Point Plaza
        Chicago, Illinois 60654
20      faraz.shahidpour@kirkland.com
21      REMOTE APPEARANCE ON BEHALF OF DEFENDANTS,
        SNAP INC.
22
23
24
25
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 3

```
 1    APPEARANCES CONTINUED:
 2
      PATRICK PRICE, ESQUIRE
 3    KING & SPALDING LLP
      500 West Second Street
 4    Austin, Texas 78701
      pprice@kslaw.com
 5
      APPEARING ON BEHALF OF THE DEFENDANTS,
 6    TIKTOK, INC., BYTEDANCE LTD. and TIKTOK LTD.,
      TIKTOK, LLC
 7
 8    ANDREW KEYES, ESQUIRE
      WILLIAMS & CONNOLLY LLP
 9    680 Maine Avenue, SW
      Washington, DC 20024
10    akeyes@wc.com
11    REMOTE APPEARANCE ON BEHALF OF THE DEFENDANTS,
      YOUTUBE LLC and GOOGLE LLC
12
13    ALSO APPEARING:
14    JEFF SINDIONG, VIDEOGRAPHER
      RAY MOORE, EXHIBIT TECHNICIAN
15
16
17
18
19
20
21
22
23
24
25
```

Page 105

1    A.    I do not.
2    Q.    So you don't know the period over which
3    this 200 to 220 students --
4    A.    It would have been in that school year.
5    Q.    You're saying this is for a specific
6    school year?
7    A.    No.  This is from 2017 to 2018, since
8    that school year, so it would have just been since
9    that period of time.
10   Q.    So essentially this was in call it
11   2013 -- 2013 or so -- 20 -- strike that.
12         2023 or so, counselors were asked to
13   provide their best recollection --
14   A.    Yes.
15   Q.    -- going all the way back to 2017?
16   A.    Yes.
17   Q.    And then what does it mean to say they
18   were seen due to issues relating to social media?
19   A.    In my personal experience at my
20   facility, students will come in and normally the
21   first thing they do is turn their phone around and
22   say, look at this.  And it's always -- it's
23   normally a social media platform where someone
24   else is communicating with them, either in an
25   inappropriate way or something of that nature, or

Page 106

```
 1      they have posted something about them.  And that
 2      then leads to them having anxiety or something of
 3      that nature that we then have to handle in those
 4      situations.
 5           Q.   So its -- its -- they are upset because
 6      of the content posted by another student?
 7           A.   Normally directed toward them, yes.
 8           Q.   So the sort of -- I just want to make
 9      sure I understand it.  What's -- what's causing
10      their issue is what another kid is saying about
11      them?
12           A.   Yes.  Or spread about them.  We've also
13      had nude pictures sent to -- via social media to
14      other students or pictures of them taken while in
15      school that have been sent to other students.
16           Q.   And so it's -- it's the -- the students
17      are bothered by the content of what another kid is
18      posting?
19           A.   It is, normally, yes.
20           Q.   And like is that the majority of what
21      this 200 to 220 student estimate is based on?
22           A.   Yes, I would say so.
23           Q.   So it's mostly what the other -- social
24      media is upsetting them because other kids are
25      using it to communicate about them in a way that
```

Page 107

1    they find harmful.
2         A.    Yes.
3         Q.    The same way that kids used to write
4    notes?
5         A.    Pretty much.
6         Q.    Same way that kids used to write things
7    on the bathroom wall.
8         A.    True.  It just happens to reach a much
9    greater amount of students this way.
10        Q.    Are there any other issues that you as
11   Breathitt corporate representative want to tell me
12   about that are included within the 200 to 220
13   student estimate here?
14        A.    We also have had situations where
15   things have been posted on social media before the
16   school has been able to identify any issues at all
17   and take care of any things.  We have also had
18   students who have done something minuscule but
19   then it has been twisted around into a huge event
20   and students are fearful.
21        Q.    So one of the things you said was
22   you've had situations where things have been
23   posted on social media before the school has been
24   able to identify any issues at all and take care
25   of anything, I'm not sure I understand what you

Page 108

```
 1    mean by that.
 2         A.   We actually had -- at one point in time
 3    we had a poster that was posted somewhere during
 4    an event, and it was actually a gay pride poster.
 5    A lot of students took offense to that, and we
 6    didn't even know that it was there.  It was posted
 7    in a place where we would not see it normally, and
 8    that was posted on social media before they ever
 9    came and said this is offensive to me or to anyone
10    else.
11              Also, we had -- we had an event with
12    the trust do not trust list.  Before anyone knew
13    about the list, they took a picture of it and
14    posted it on social media.
15         Q.   So you're saying sometimes there's
16    something out there that's bothering students and
17    you first learn about it through social media.
18         A.   Through social media
19         Q.   Right.  Like for instance, some of your
20    students were offended by a gay pride poster that
21    was put up in the school.
22         A.   Yes.
23         Q.   And the school didn't learn about the
24    content of that poster until --
25         A.   Yes.
```

Page 109

```
 1        Q.   -- it was posted on social media.
 2        A.   Yes.  We've also had probably upwards
 3   of 20 Instagram pages where students would go
 4   around the school and take inappropriate pictures
 5   of the females and then post them, or they would
 6   take videos of fights that occurred and would post
 7   them to those Instagram pages.
 8        Q.   Yeah.  And the fights were occurring
 9   anyway on campus, right?
10        A.   They were.
11        Q.   And it was just so happened that you
12   learned about them through social media.
13        A.   No, we knew about the -- in those
14   situations we knew about the fights.  It was the
15   videos that were taken that we did not know about.
16        Q.   But so this was, again, the fights
17   happened on school.
18        A.   They did.
19        Q.   And then this was just someone
20   amplified that content --
21        A.   Yeah.
22        Q.   -- by posting it.
23        A.   Yes.
24        Q.   Same thing with the -- the trust don't
25   trust list or the no hit list.  That -- that
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 110

1   happened and then it just was known to the world
2   by virtue of social media.
3       A.   Yes.
4       Q.   Now, when you say here that students
5   have been seen due to issues, I just want to sort
6   of understand what seen means a little better.
7       A.   Absolutely.  So we have school
8   counselors in each of our schools.  We also have a
9   guidance specialist who travels to all of our
10  schools.  Students who have mental health issues,
11  we try to -- sometimes it depends on the severity
12  of that, we refer those to our Kentucky River
13  Community Care partners who are in-house
14  clinicians.
15           And then we also make sure that there
16  are students that we see regularly just maybe to
17  do a check in, check out, or students that we do
18  do sessions with because we know they have ongoing
19  issues.
20           And a lot of our social media issues
21  that we have are serious enough that they normally
22  go through our principals first, and then they
23  come to us for mental health services.
24      Q.   And give me -- what do you mean serious
25  enough they go through the principal first?

Page 111

1   Describe the process for me.
2        A.   We have a lot of issues with students
3   receiving messages on Snapchat from people that
4   they do not know that might be mildly threatening
5   from people on the outside.  But normally that
6   doesn't occur at school, that occurs when they're
7   home.  But, unfortunately, like you said, we take
8   care of a lot of their needs so they bring those
9   to us first.
10            And we've had issues where we have had
11  local law enforcement involved, or we have several
12  issues with students where they have made threats
13  against theirselves on social media, and that will
14  come to me by way of my principal or local law
15  enforcement as well.
16       Q.   Okay.  So let's start with the first
17  example you gave.  This is third-party posters are
18  reaching out to your students, right?
19       A.   Yes.
20       Q.   And the issue created for the student
21  is the content of the message that that third
22  party sends to them, right?
23       A.   Yes.
24       Q.   And then when it comes to the second
25  thing you mentioned, the self-harm, that's an

Page 112

```
 1    instance where a child is potentially having a
 2    crisis, thinking about harming themselves.
 3         A.    Yes.
 4         Q.    And in fact, it's through social media
 5    that you learn about that and have the opportunity
 6    to provide them assistance.
 7         A.    Yes.  And it normally comes by way of
 8    someone else that they are talking to.  They
 9    normally bring that to our attention.
10         Q.    But that -- that's an issue that's in
11    their life anyway, and social media helps you
12    learn about it and address it.
13         A.    Sometimes it does, sometimes it's
14    social media-driven.  It's just such a quick way
15    for students to communicate with other students
16    that we don't get with text messaging or anything,
17    or even face-to-face because you don't have to do
18    that.
19         Q.    What evidence do you have of social
20    media-driven as you used the term?
21         A.    We get a lot of bullying via social
22    bullying, cyberbullying.
23         Q.    Okay.  And so, again, that's -- it's
24    the -- the bully sends bullying content via some
25    or other social media.
```

Page 113

```
 1        A.    Cyber outlet.
 2        Q.    Cyber outlet, yes.  And then it's --
 3   it's that content that is causing a disturbance to
 4   the student.
 5        A.    Yes.
 6        Q.    Besides the range of issues we've
 7   discussed already, are there other types of social
 8   media-related issues for which Breathitt has seen
 9   students?
10        A.    I don't believe so.
11        Q.    So we've talked about sort of a
12   complete list of the range of issues.
13        A.    Yes.
14              MR. PISTILLI:  Why don't we go ahead
15        and take another break.  It's been an hour.
16              THE VIDEOGRAPHER:  We are now going off
17        record.  The time is 10:55.
18              (Thereupon, a break was taken.)
19              THE VIDEOGRAPHER:  We're now back on
20        the record.  The time is 11:00.  You may
21        continue.
22   BY MR. PISTILLI:
23        Q.    Hi, just looking at the last sentence
24   of this question we've been looking at, it says:
25   This does not include students who are seen by
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Page 154

1    STATE OF KENTUCKY        )
                              )
2    COUNTY OF MONTGOMERY     )
3              I, JANINE N. LEROUX, Court Reporter and
4    Notary Public in and for the State of Kentucky at
5    Large, certify that the facts stated in the
6    caption hereto are true, and that at the time and
7    place stated in said caption the witness named in
8    the caption hereto personally appeared before me.
9              I further certify that after being duly
10   sworn by me the witness was examined by counsel
11   for the parties, and that said testimony was taken
12   in stenotype by me and later reduced to
13   computer-aided transcription, and that the
14   foregoing is a true record of the testimony given
15   by said witness.
16             The foregoing deposition has been
17   submitted to the witness for reading and signing.
18
19
20
21   *[signature: Janine Leroux]*
22
23        JANINE LEROUX - COURT REPORTER
          NOTARY PUBLIC STATE-AT-LARGE
24        MY COMMISSION EXPIRES: NOVEMBER 26, 2027
          NOTARY ID KYNP1406
25