# Exhibit 2

CONFIDENTIAL

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
 4   IN RE:  SOCIAL MEDIA ADOLESCENT
      ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY
 5   LITIGATION
 6   THIS DOCUMENT RELATES TO:  Breathitt County
      School District, By and Through The Breathitt
 7   Board of Education v. Meta Platforms, Inc.,
      et al.
 8
      Member Case No.:  4:23-cv-01804
 9
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
10
11
12     REMOTE VIDEOTAPED DEPOSITION OF JEREMY HALL
13
                    July 28, 2025
14            12:32 p.m. to 2:28 p.m.
15          REPORTED BY ANITA KORNBURGER
             REGISTERED PROFESSIONAL REPORTER
16
17
18
        *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
19
20
21
22
23
24
25
```

Golkow Technologies,
877-370-3377            A Veritext Division            www.veritext.com

Page 21

1  talked about the use at his other depositions as
2  well.  You questioned him about use by students at
3  other depositions as topics were raised.  If you
4  cared about it, the time to have asked it was then.
5  BY MR. PISTILLI:
6      Q.   Sir, are you aware of any of the
7  defendants' policies relating to use by students
8  under the age of 13?
9           MS. EMERY:  You can answer, Jeremy.
10          THE WITNESS:  Yes, I know about those
11 policies.
12 BY MR. PISTILLI:
13     Q.   So, like, just to take Instagram as an
14 example.  You're not allowed to use it if you're
15 under 13; right?
16     A.   That doesn't mean kids don't do that.
17     Q.   Well, my -- my question for you is, have
18 you ever reported to Meta the fact that --
19     A.   Yes.
20     Q.   -- your fifth and sixth grade students
21 are using Instagram?
22     A.   We have reported issues with Facebook and
23 also Snapchat.
24     Q.   Have you ever reported under 13 use by a
25 student to any of the defendants' platforms?

1  the third time on this same question.
2              THE WITNESS:  I wouldn't have a number
3  for you, but I can tell you there's incidents where
4  we've had to report issues on these platforms with
5  these students.
6  BY MR. PISTILLI:
7      Q.   On how many occasions have you reported
8  underage use specifically?
9              MS. EMERY:  Objection, form.  Asked and
10 answered for the fourth time.
11 BY MR. PISTILLI:
12     Q.   Mr. Hall?
13     A.   Can you repeat the question, please?
14             MR. PISTILLI:  I'll ask the court
15 reporter to please read the question back.
16             COURT REPORTER:  One moment, please.  "On
17 how many occasions have you reported underage use
18 specifically?"
19             THE WITNESS:  I don't know that number.
20 BY MR. PISTILLI:
21     Q.   Turning back to your affidavit.  You say,
22 "Nearly every fifth and sixth grade student who
23 walks into our school is dealing with an issue
24 related to social media."  Can you help me
25 understand what you mean by "an issue related to

Page 29

1   social media" in your affidavit?
2       A.   What that's referring to is the impact on
3   students.  So it could be a direct impact or an
4   indirect impact.
5       Q.   Would you tell me what you mean by a
6   direct impact?
7       A.   Well, first of all, it's interrupting
8   instructional time if something comes up.  So
9   that's one way of impacting.  It could be friends
10  who are being bullied on these platforms that would
11  impact those students.  So when we say nearly every
12  fifth and sixth grade student has been impacted,
13  those would be ways, not necessarily that they're
14  directly on that in that specific social media
15  platform.
16      Q.   So any direct impacts beyond interruption
17  of instructional time and bullying?
18      A.   Inappropriate comments, inappropriate
19  images, those types of things being transmitted.
20      Q.   Anything else?
21      A.   Not that I can think of at this moment.
22      Q.   Then you also referred to indirect
23  impacts.  What are they?
24      A.   That's the instructional side that we
25  were talking about.  And it could be the

Page 31

1  their friends may be bullied or have inappropriate
2  content?
3       A.   Or targeted.  'Cause let's face it, our
4  kids, they don't text anymore.  They use these
5  social media platforms to communicate.
6       Q.   Right.  And the anxiety flows from the
7  concerns about what might be communicated about
8  them by their peers; right?
9       A.   Yes.
10           MS. EMERY:  Objection to form.
11           MR. PISTILLI:  Could we take down the
12  zoom, please?  Not the exhibit, just the call-out.
13  BY MR. PISTILLI:
14       Q.   Let's take a look at paragraph 13.  You
15  say, "When I started as a principal in August 2018,
16  I spent approximately ten percent of my time on
17  social media-related concerns.  By 2020, that
18  number had risen to around 15 percent.  Now, in
19  2025, I spend anywhere from 20 to 25 percent of my
20  work time addressing social media issues."
21           And are the social media-related
22  concerns and social media-related issues that you
23  reference in paragraph 13 the same things that we
24  were talking about a moment ago?
25       A.   Yeah, including, like, investigations of

Page 32

```
 1   contacts.  All that would be included as well.
 2        Q.   What do you mean by investigation of
 3   contacts?
 4        A.   Talking to the students as groups,
 5   getting to the bottom of what happened, where it
 6   started, those types of things.
 7        Q.   When you say investigation of contacts,
 8   what do you mean by contacts?
 9             MS. EMERY:  Objection, form.
10             THE WITNESS:  The students involved.  Are
11   you talking about the contacts that we made?  That
12   would be, like, the parents' contacts.  That would
13   be -- that may involve having law enforcement
14   involved in that.  It could be a counselor that
15   you're getting in touch with to work with some of
16   these students.
17   BY MR. PISTILLI:
18        Q.   Well, you said investigation of contacts.
19   And I just -- I don't understand what you mean by
20   contacts in that sentence.
21        A.   I don't know what I meant by that either.
22   What I'm saying is when we talk to the students in
23   groups of what -- to find out what happened, the
24   other contacts would be the ones that we'll make
25   with parent contacts, outside agencies to get
```

Page 33

```
 1   involved with these incidents.
 2       Q.   And parents, you mean like if there's a
 3   bullying incident, for instance, you would contact
 4   the parents of the bully; right?
 5            MS. EMERY:  Objection.
 6            THE WITNESS:  And there are also times --
 7            MS. EMERY:  You can answer.  Sorry,
 8   Jeremy.
 9            THE WITNESS:  There are also times when
10   the parents contact us to let us know that
11   something's going on.  So that would be part of
12   that too on the other -- from the other side.
13   BY MR. PISTILLI:
14       Q.   And then you mentioned things like
15   agencies and law enforcement.  Is that when threats
16   are made?
17       A.   Yes, that would involve something like
18   that.
19       Q.   Anything other than threats?
20       A.   Just anything that would be breaking the
21   law would be -- you have to involve law
22   enforcement, like inappropriate images being sent,
23   those types of things.
24       Q.   So this -- this is reporting criminal
25   conduct by students?
```

```
                                                    Page 34
 1         A.    Yeah, in those situations.
 2         Q.    Any other examples besides threats and
 3   inappropriate images?
 4         A.    Well, sometimes there's arguments
 5   involved in that, so you're trying to get to the
 6   bottom of why the students are arguing.  Can you
 7   mediate that out between the students.  It may not
 8   be as serious as a threat or a breaking of the law.
 9   It may just be that you're trying to work out
10   issues between those students so they don't have
11   social/emotional issues down the road.
12         Q.    And again, the arguments are, you know,
13   someone says something mean or posts something, you
14   know, posts a derogatory image, is that what you
15   mean?
16         A.    It just might be comments.  It could be a
17   conflict between the -- between the students.  You
18   have to work that out so that does -- their problem
19   does not escalate into something bigger that takes
20   up even more time.
21         Q.    So like one of them says something mean
22   or hurtful about another one, basically?
23         A.    And it gets reported, and then you deal
24   with that.
25         Q.    Any other examples of social
```

Page 45

1  Q. What do you mean by that?
2  A. There may be a post that started at home
3  the night before and it spills over into the school
4  day for the next day that we have to deal with
5  that.
6  Q. When you say a post that starts at home,
7  what are you referring to?
8  A. A group chat or a group message that's
9  being used by those students in those classes.
10  Q. So this is the inappropriate comments or
11  images we discussed earlier?
12  MS. EMERY: Objection, form.
13  Mischaracterizes. You can answer.
14  THE WITNESS: Yes.
15  BY MR. PISTILLI:
16  Q. Anything else?
17  A. Just thinking back. And probably like
18  being on, like, YouTube on their devices, that
19  would be an issue as well, when they're not
20  supposed to be, or those types of things.
21  Q. So just to make sure I have the list,
22  it's being on devices when you're not supposed to,
23  bullying, instigating drama, and these posts that
24  contain inappropriate or derogatory comments or
25  images. Is that the complete list?

Page 46

1  A. In groups, group chats.
2  Q. So posts in group chats with
3  inappropriate or derogatory comments or images?
4  A. Yes.
5      MR. PISTILLI: All right. We've been
6  going an hour. You want to take just, like, ten
7  minutes, and then I think we can probably wrap it
8  up in not too long after that.
9      THE VIDEOGRAPHER: Okay. I'll get us off
10 the record. All right. Okay. The time is 1:30
11 p.m. Going off the record.
12             (Break taken.)
13     THE VIDEOGRAPHER: The time is 1:41 p.m.
14 Back on the record.
15 BY MR. PISTILLI:
16 Q. All right. Now, Mr. Hall, you'll recall
17 before the break we were working on a list of what
18 you meant by social media concerns that you were
19 addressing in 2020; correct?
20 A. I do recall that conversation.
21 Q. And --
22 A. Talked about the 2025 as well.
23 Q. Yep. So that was going to be my
24 question. Is the list any different for 2025?
25 A. I wouldn't think it would be different,

Page 84

```
 1                    CERTIFICATE
 2     I, Anita Kornburger, Registered Professional
 3      Reporter and Certified Shorthand Reporter, do
 4      hereby certify that prior to the commencement
 5      of the deposition, Jeremy Hall was duly
 6      remotely sworn by me to testify to the truth,
 7      the whole truth and nothing but the truth.
 8         I DO FURTHER CERTIFY that the foregoing is
 9      a verbatim transcript of the testimony as taken
10      stenographically by me at the time, place and
11      on the date set forth, to the best of my
12      ability.
13             I DO FURTHER CERTIFY that I am neither
14      a relative nor employee nor attorney nor
15      counsel of any of the parties to this action,
16      and that I am neither a relative nor employee
17      of such attorney or counsel, and that I am not
18      financially interested in the action.
19
20      _____
21      Anita Kornburger
        Registered Professional Reporter
22      Certified Shorthand Reporter
        Notary Public
23
        Dated: July 28, 2025
24
25
```