GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania, NW, Suite 900
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

*Attorneys for Defendants
TikTok Inc., ByteDance Inc., TikTok Ltd.,
ByteDance Ltd., and TikTok LLC*

[*Additional parties and counsel listed on signature pages*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>*Breathitt County Board of Education v. Meta Platforms, Inc. et al.* | MDL: 3047<br><br>Case No. 4:23-cv-01804-YGR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date:     March 18, 2026<br>Time:     9:00 am<br>Location: Courtroom 1, 4th Floor |

# TABLE OF CONTENTS

Pages(s)

I. INTRODUCTION ............................................................................................................. 1
   A. Dr. Ethan Hutt ....................................................................................................... 1
   B. Dr. Keith Hampton ............................................................................................... 1
II. LEGAL STANDARD ...................................................................................................... 2
III. ARGUMENT .................................................................................................................... 2
   A. Plaintiff Sidestepped the Court's Limits on Motions in Limine ........................... 2
   B. Dr. Hutt's Opinions are Admissible ..................................................................... 2
      1. Dr. Hutt's Opinions Are Relevant .............................................................. 3
      2. Dr. Hutt's Opinions Are Not Impermissible Legal Conclusions ............... 4
      3. Dr. Hutt is Qualified to Offer His Opinions .............................................. 5
      4. Dr. Hutt Addresses Matters Beyond the Knowledge of the Jury ............... 5
      5. Dr. Hutt Employed a Reliable Methodology ............................................. 5
   C. Dr. Hampton's Opinions Are Admissible ............................................................. 7
      1. Dr. Hampton Used a Reliable Methodology to Reach His Opinions ........ 7
      2. Dr. Hampton's Moral Panic Opinion Is Relevant and Helpful .................. 9
IV. CONCLUSION ............................................................................................................... 10

i

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

# TABLE OF AUTHORITIES

**Case(s)** **Page(s)**

*Broyles v. Maudilio*,
    2021 WL 5988272 (W.D. Ky. Oct. 21, 2021) ............................................................................... 3

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) ................................................................................................... 2

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ...................................................................................................... 5

*May v. Holzknecht*,
    320 S.W.3d 123 (Ky. Ct. App. 2010) ......................................................................................... 3

*Nationwide Transportation Finance v. Cass Information Systems*,
    523 F.3d 1051 (9th Cir. 2008) .................................................................................................... 4

*Schwartz v. Hasty*,
    175 S.W.3d 621 (Ky. Ct. App. 2005) ......................................................................................... 3

*Scott v. Ross*,
    140 F.3d 1275 (9th Cir. 1998) ........................................................................................... 4, 5, 6, 9

*Zeiger v. WellPet LLC*,
    526 F. Supp. 3d 652, 679-80 (N.D. Cal. 2021) .......................................................................... 4

**Other Authoraties:**

Restatement (Second) of Torts § 821B (1979) ................................................................................. 3

Fed. R. Evid. 403 ............................................................................................................................. 3

Fed. R. Evid. 702 ......................................................................................................................... 2, 5

# I. INTRODUCTION

Plaintiff's motion to exclude the testimony of Dr. Ethan Hutt and Dr. Keith Hampton is a transparent attempt to silence experts whose testimony directly responds to and rebuts the damages and causation theories proposed by Plaintiff's own experts. Plaintiff's challenges are procedurally and substantively flawed, as they center on disagreements with the experts' conclusions—matters that go to the weight of the evidence, not its admissibility. Notably, Plaintiff seeks to exclude Defendants' experts by quibbling with their literature reviews and historical analyses, even as they have previously defended their own experts' testimony by arguing that similar criticisms are best addressed through cross-examination. Plaintiff's Motion in Limine No. 4 should be denied.

## A. Dr. Ethan Hutt

Dr. Ethan Hutt, a Professor in the School of Education at the University of North Carolina, is a widely published scholar who focuses on the history of education, school reform, and education policy. Dr. Hutt's testimony would respond to the "strategic" plan put forward by Plaintiff's expert, Dr. Sharon Hoover, by putting into historical context (1) how schools have made decisions to address new social phenomena and (2) the effects of expanding the curriculum to address these new subjects. *See, e.g.*, Pl.'s Ex. C, Hutt Rpt. ¶¶ 2-4. Dr. Hutt employed the same historical method he uses as an academic to develop these opinions: he reviewed "the major secondary works in the relevant fields, including, but not limited to, the history of education, [and] history of school reform," and "conducted additional primary research on specific issues and topics." *Id.* ¶ 15.

Plaintiff mischaracterizes the bases of Dr. Hutt's opinions[1] and fails to establish that any should be excluded simply because aspects of his historical analysis are unfavorable to Plaintiff's case. Dr. Hutt's testimony is admissible: He is qualified to offer the opinions at issue, his testimony addresses matters beyond the general knowledge of jurors, his methodology conforms to generally accepted standards, and the probative value of his testimony outweighs any prejudice.

## B. Dr. Keith Hampton

Dr. Keith Hampton, a Professor of Sociology at Michigan State University, is a well-

---

[1] Plaintiff only challenges two of Dr. Hutt's opinions and not his analysis of alternative explanations for trends in student outcomes. MIL No. 4 at 1.

1

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

respected sociologist whose academic research and opinions focus on the role of social networks in society—a topic at the heart of Plaintiff's case here. Notably, Plaintiff never challenges Dr. Hampton's qualifications to reach his opinions, and they would have no basis to do so. Instead, Plaintiff quibbles with Dr. Hampton's methodology and misconstrues his opinions. Contrary to Plaintiff's claim, Dr. Hampton did not "ignore[]" relevant evidence or "breeze[]" over his analysis of the published literature on social media use. MIL No. 4 at 6. Instead, Dr. Hampton used sound scientific methodology to analyze hundreds of peer-reviewed scientific articles to conclude that there is no reliable evidence that social media or features of social media cause the various mental health harms alleged by Plaintiff. Similarly, Dr. Hampton bases his "moral panic" opinion on extensive research, and he explains in detail why Plaintiff's claims about social media fall within this well-accepted phenomenon.

## II.   LEGAL STANDARD

"Generally, expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry' and 'reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (cleaned up).

## III.   ARGUMENT

### A.   Plaintiff Sidestepped the Court's Limits on Motions in Limine

As an initial matter, the Court should strike Plaintiff's motion because it improperly attempts to "combin[e] people in one motion . . . to expand the number" of motions permitted. 2/11/26 CMC Tr. at 33:16-18. At the February 11 CMC, the Court limited the parties to five motions in limine, including Rule 702 expert challenges. *Id.* By combining two experts into a single motion, making completely independent Rule 702 arguments as to the opinions and methodologies of each expert, Plaintiff has sought to circumvent the Court's explicit instruction. *Id.*

### B.   Dr. Hutt's Opinions are Admissible

Plaintiff challenges Dr. Hutt's opinions that: (1) "[s]chool responses to the rise of social media, such as they are, reflect a predictable continuation of this historical trend rather than a deviation from it"; and (2) "[h]istorically, American society often responds to a new social trend or

an acute concern by 'educationalizing' the issue—that is, by turning the issue into a new school subject or new responsibility for schools. . . . These tendencies result in educationalization efforts rarely being effective." Pl.'s Ex. C, Hutt Rpt. ¶ 2-3. Plaintiff's arguments fail for five reasons.

### 1. Dr. Hutt's Opinions Are Relevant

Plaintiff's expert, Dr. Hoover, has proposed a vague but sweeping 15-year "strategic" plan. Dr. Hutt's opinions that similar efforts to use schools to address new societal issues—including teen driver safety through driver's education, youth drug use through D.A.R.E., and poor financial decision making through financial literacy programs—have historically been ineffective is directly relevant to the jury's evaluation of the Hoover plan. *See, e.g.*, Pl.'s Ex. C, Hutt Rpt. ¶ 132. "A general goal of compensatory damages in tort cases is to put the victim in the same position he would have been prior to the injury or make him whole to the extent that it is possible to measure his injury in terms of money." *Schwartz v. Hasty*, 175 S.W.3d 621, 625 (Ky. Ct. App. 2005). Plaintiff must both prove that its alleged future damages are "reasonably certain" to occur, *May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct. App. 2010), and establish "the amount of damages with reasonable certainty," *Broyles v. Maudilio*, 2021 WL 5988272, at *1 (W.D. Ky. Oct. 21, 2021). Dr. Hutt's opinion about the lack of historical success of educationalized programs is relevant to demonstrate that Plaintiff cannot prove with reasonable certainty that its proposed damages to fund this educationalized program would actually "make [it] whole." Indeed, Dr. Hoover herself attempts to justify the reasonableness of her damages opinions by analogizing her plan to past school-based anti-tobacco efforts (ECF 2407-87 ¶ 107), and Dr. Hutt should have the opportunity to point to historic counter-examples in rebuttal.

Similarly, Dr. Hutt's opinions are relevant to Plaintiff's public nuisance theory. To succeed, Plaintiff must establish that Defendants created an *unreasonable* and *substantial* interference with a public right. Second SD Order (ECF 1332) at 2–3 (quoting Restatement (Second) of Torts § 821B (1979)). Kentucky's model jury instructions on nuisance contemplate that the jury should decide whether any "annoyance" is both "unreasonable" or "substantial." *See* Cetrulo, Kentucky Instructions to Juries–Civil (Palmore) §§ 48.01–48.05. Dr. Hutt's opinions on the historical developments of public education and schools' evolving role in addressing societal issues is directly relevant to

3

whether social media caused an "unreasonable" annoyance or merely a "predictable continuation of" historical trends. Pl.'s Ex. C, Hutt Rpt. ¶ 2. Plaintiff's argument that Dr. Hutt's testimony is "advocacy" excludable under Rule 403 is meritless. Expert witnesses regularly offer opinions favorable to one side. The appropriate response to disagreement is cross-examination, not exclusion. *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998).

### 2. Dr. Hutt's Opinions Are Not Impermissible Legal Conclusions

Much of Plaintiff's argument is a contention that Dr. Hutt is offering impermissible legal conclusions. *See* MIL No. 4 at 6-7. Before Plaintiff filed this motion, Defendants informed Plaintiff that they were willing to clarify the opinions that Dr. Hutt is offering to make clear that he will not offer opinions at trial that constitute legal conclusions.[2] In addition to those clarifications, Defendants are also withdrawing the last sentence of paragraph 175 of his report. These clarifications remove opinions that could be construed as legal conclusions, *see* MIL No. 4 at 6-7 (quoting Pl.'s Ex. C, Hutt Rpt. ¶¶ 134, 175) thereby mooting these arguments from Plaintiff while preserving the historical analysis at the core of Dr. Hutt's testimony. Contrary to Plaintiff's contention, Dr. Hutt's testimony will not "instruct the jury regarding how it should decide" the case. MIL No. 4 at 6 (quoting *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 679-80 (N.D. Cal. 2021)). Rather, he will provide historical context showing that schools have repeatedly adapted their curricula to address social and technological changes noting that these efforts have often been ineffective. These are factual observations about historical patterns, not legal conclusions.

Dr. Hutt's opinions stand in stark contrast to the legal conclusions barred in *Nationwide Transportation Finance v. Cass Information Systems*, 523 F.3d 1051, 1059-60 (9th Cir. 2008). *See* MIL No. 4 at 4, 6-7. There, the Ninth Circuit affirmed exclusion of opinion testimony that told the jury that a party's actions in a contract dispute were reasonable because the other party violated the Uniform Commercial Code. Here, Dr. Hutt will not offer any testimony about what the law requires any party to do nor that any party has violated the law.

---

[2] Specifically, Defendants offered to withdraw paragraphs 21, 69, and 135 in their entirety; the first sentence of paragraph 67; the last sentence of paragraph 134; and to revise the last sentence of paragraph 4 to state: "Dr. Hoover's report, which seeks to devise school responses to social media and to hold social media companies responsible for the cost of doing so, is entirely out of step with the long history of educationalization in American schools."

### 3. Dr. Hutt is Qualified to Offer His Opinions

Plaintiff understandably does not challenge Dr. Hutt's qualifications to opine about the history of American education. MIL No. 4 at 2. Rather, Plaintiff argues he lacks qualifications in "social media" or "children's mental health." *Id.* at 8. But that misses the mark. Dr. Hutt is offered to testify on the history of schools' responses to social phenomena—precisely his area of expertise. In *Scott v. Ross*, the Ninth Circuit held that an expert was qualified to opine about the historical context of organizations like the defendant despite arguments "that [he] did not specifically study [the defendant organization or its practices]." 140 F.3d at 1286. The Ninth Circuit held this "does not undermine [the expert's] credibility" because Rule 702 "contemplates a broad conception of expert qualifications." *Id.* In the same way, Dr. Hutt's expertise qualifies him to opine on historical patterns of schools responding to social concerns and the effectiveness of those policy responses— even without specific research on social media or student mental health.

### 4. Dr. Hutt Addresses Matters Beyond the Knowledge of the Jury

Plaintiff contends that Dr. Hutt's testimony "will not assist the jury" because he "does not opine on . . . platform design, student behavior, compulsive use, school disruption, or operational costs." MIL No. 4 at 9. Again, this argument misunderstands Dr. Hutt's testimony. Expert testimony is "proper for the jury" if the expert testifies "regarding matters beyond the general knowledge of jurors." *Scott*, 140 F.3d at 1286. Here, the average juror lacks specialized knowledge about the historical evolution of American schools, the phenomenon of "educationalization," or the historical outcomes of efforts to address social concerns through schools.

### 5. Dr. Hutt Employed a Reliable Methodology

Plaintiff argues that Dr. Hutt's opinions are "untethered to the facts" and constitute "pure ipse dixit." MIL No. 4 at 7-8. This argument misapprehends both historical methodology and Rule 702's reliability standard. Where testimony concerns "non-scientific" issues, the reliability inquiry "depends heavily on the *knowledge and experience* of the expert, rather than upon scientific foundations." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Indeed, the Ninth Circuit has endorsed that a historical methodology satisfies Rule 702 when it conforms to "a generally accepted explanatory theory, as indicated by his citation to other authors . . .

5

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

who have discussed theories consistent with his." *Scott*, 140 F.3d at 1286. Dr. Hutt's methodology meets this standard. He consulted major secondary works in the history of education, conducted primary research using government reports and policy documents, and cited extensively to peer-reviewed scholarship by leading historians. *See, e.g.*, Pl.'s Ex. C, Hutt Rpt. ¶¶ 14-15. This approach—consulting primary and secondary sources to produce interpretive narratives grounded in empirical evidence—reflects standard historical methodology accepted by scholars in the field. *Id.*

Plaintiff emphasizes Dr. Hutt's testimony that he could not think of any facts that could change his opinions as a basis to argue that Dr. Hutt's opinions are "untethered to the facts." MIL No. 4 at 8. This testimony reflects confidence in his historical analysis, and Plaintiff fails to cite to how Dr. Hutt testified that that if historical data were "corrected" or "updated," he would consider such information. Ex. A, Hutt Dep. 146:9-21.

Plaintiff's argument that Dr. Hutt did not review any case-specific documents, *see* MIL No. 4 at 8, is likewise beside the point. As Dr. Hutt explained, such documents are "not relevant to the conclusions [he] was drawing" as his conclusions concern historical patterns spanning over 150 years. Ex. A, Hutt Dep. 141:8-17. An expert applying historical methodology properly relies on historical sources—not litigation discovery—to draw conclusions about long-term patterns. Dr. Hutt's opinions rely on historical data concerning long-term trends in public education. Case-specific facts therefore would not be expected to alter his conclusions—just as such facts would not ordinarily change the general causation opinions of Plaintiff's experts.

Plaintiff's contention that, aside from drug prevention programs, Dr. Hutt "asserts ineffectiveness without citing any effectiveness research" is factually incorrect. MIL No. 4 at 9. Dr. Hutt's report discusses the effectiveness of long-term outcomes of "healthy eating" programs and gun safety programs. Pl.'s Ex. C, Hutt Rpt. ¶¶ 111, 114-16. He also discusses at length the effectiveness of digital literacy programs, *id.* ¶¶ 117-32, including the National Academies' report on *Social Media and Adolescent Health*, which concluded that such programs "were falling well short of their promise." *Id.* ¶ 127. Regardless of these programs' successes or failures, Dr. Hutt's opinions on educationalization aim to demonstrate that such programs come with costs, including that they "must necessarily displace time spent on other subjects during the school day." *Id.* ¶ 78.

6

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

### C. Dr. Hampton's Opinions Are Admissible

Plaintiff also seeks to preclude Dr. Keith Hampton from testifying that (1) there is "no evidence" that social media is harmful to youth or adolescent mental health", MIL No. 4 at 5; and (2) the reaction to social media bears remarkable similarities to other moral panics throughout history, in which new technologies have been blamed for harming society and mental health without valid scientific support. *Id*. at 3. As to both opinions, Dr. Hampton's methodologies are sound, and his opinions will assist the jury.

Indeed, perhaps for that reason, Plaintiff's letter brief identifying anticipated Daubert motions only challenged Dr. Hampton's opinions regarding moral panics. ECF 2172. Even if the Court were to decide that Plaintiff did not forfeit a challenge to Dr. Hampton's other opinions, Dr. Hampton's methodologies are sound, and his opinions will assist the jury.

#### 1. Dr. Hampton Used a Reliable Methodology to Reach His Opinions

Plaintiff's argument about Dr. Hampton's so-called "no evidence" opinion misconstrues his opinion by plucking a single statement from his deposition testimony out of context. As Dr. Hampton stated in the very passage that Plaintiff cites, his opinion is that "[t]here is no evidence based on reliable data of harm." Hampton Dep. Tr. at 167:16-17 (emphasis added). This is the opinion that Dr. Hampton disclosed in his report, Pl.'s Ex. D, Hampton Rpt. ¶ 10 (Opinions 2, 4 and 5); ¶¶ 291-413, and the opinion that Dr. Hampton may offer if he testifies at trial. The JCCP court concluded that this opinion "is based on scientifically reliable methodologies, namely, a reliance on the scientific literature." JCCP Order at 3. Because Plaintiff's motion addresses only a strawman "opinion" that Dr. Hampton has not disclosed and would not offer at trial, Plaintiff's motion to exclude Dr. Hampton's "no evidence" opinion should be denied.[3]

Dr. Hampton's actual opinion about the lack of reliable evidence of harm—which Plaintiffs do not challenge—is well supported and admissible. Dr. Hampton reviewed over 150 peer-reviewed scientific studies that attempted to assess whether social media use is associated with an increased risk of mental health disorders, such as depression or anxiety, and detailed his assessment

---

[3] As for the JCCP's decision to limit how Dr. Hampton could describe his opinion ("no evidence" v. "no reliable evidence"), Defendants are not aware of any federal decision that has made this distinction as to an expert's general causation opinion (and Plaintiff cites none).

of that literature in his expert report. Pl.'s Ex. D, Hampton Rpt. ¶ 10 (Opinions 2, 4 and 5); ¶¶ 291-413; *see also* Ex. B, Hampton Dep. at 222:23–223:19, 230:21–24, 250:17–23. Based on this extensive data and drawing on nearly 30 years of experience in the field, Dr. Hampton concludes that: (1) "[c]urrent data does not allow any reliable assessment to determine what percentage, if any, that social media is contributing to an increase in mental health diagnoses or suicide in youth"; (2) experimental studies that assess social media use "suffer from a number of critical methodological flaws" and "fail to establish that social media use is causing mental health disorders"; (3) "[e]xisting observational studies do not demonstrate a causal relationship between social media and adolescent mental health disorders" and "time series studies (i.e., snapshots based on a sample of some population, repeated over time with different participants) and correlational studies cannot demonstrate causality." Pl.'s Ex. D, Hampton Rpt. ¶ 10 (Opinions 2, 4 and 5). This comprehensive analysis belies Plaintiff's claim that it was somehow inadequate.

Unable to challenge the substance of Dr. Hampton's analysis, Plaintiff instead contends that he failed to consider certain studies. But for every situation cited in Plaintiff's Motion, the studies did not assess causality, as they were cross-sectional studies. It is well-recognized that these studies cannot be used for causal inferences. Plaintiff's own expert, Dr. Dimitri Christakis, recognized this very fact in his own publication. Ex. C, Christakis, et al., *What factors are associated with achieving high continuity of care?*, 36 FAM. MED. 55, 60 (2004) ("we measured associations cross-sectionally and therefore cannot draw causal conclusions"). The Reference Manual on Scientific Evidence makes a similar assessment. Ref. Manual at 560-61 (cross-sectional studies do not establish that the "exposure preceded the disease, which would be necessary for drawing any causal inference" and "do not determine the development of disease or risk of disease (incidence)"). These sources refute Plaintiff's claim that these are "high-quality" studies that can be used for causal inferences. *See* MIL No. 4 at 5. Dr. Hampton did not "ignore[]" these studies; rather, he explained why he appropriately placed little to no value on them as they only measure a snapshot in time and cannot establish causation. Pl.'s Ex. D, Hampton Rpt. ¶ 391 (cross-sectional study designs "preclude[] claims of causality"); Ex. B, Hampton Dep. 168:16–19, 263:10–14, 368:10–15. Thus, not including them in a causal analysis was sound.

As for the Surgeon General's Advisory, it is not, and does not purport to be, an academic analysis of the causal literature that made a causal finding. Indeed, it acknowledges that the evidence does not support a causal finding. *See* Social Media and Youth Mental Health: U.S. Surgeon General's Advisory 3 (2023), https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf ("This document is not an exhaustive review of the literature"); *id.* at 11 (acknowledging that any relationship between mental health and social media may be "bidirectional"). As for meta-analyses, Dr. Hampton analyzed a number of these studies. Pl.'s Ex. D, Hampton Rpt. ¶¶ 379-86. As for Plaintiff taking issue with Dr. Hampton excluding non-peer reviewed literature, he explained that materials that are not peer-reviewed present a "high risk of bias" and therefore receive little weight in a causal analysis. Ex. B, Hampton Dep. 292:9-14. Dr. Hampton also appropriately explained why he accorded certain sources little weight: "If I read it, I'm not ignoring it. There are reasons to exclude studies, such as they're not scientific, or there is no way of assessing the scientific validity." *Id*. at 401:23-402:1. In sum, Dr. Hampton's decision to focus on peer-reviewed, causally relevant studies reflects appropriate scientific methodology.

### 2. Dr. Hampton's Moral Panic Opinion Is Relevant and Helpful

Dr. Hampton's opinion that the reaction to social media "bears remarkable similarities" to other moral panics throughout history is relevant to Plaintiff's causation theories. Pl.'s Ex. D, Hampton Rpt. ¶ 10 (Opinion 1). Moral panics, as Dr. Hampton explains, are "disproportionate, widespread fears" that a new "technology poses a threat to society," leading to "isolated events and decontextualized evidence [becoming] accepted as commonplace." *Id.* ¶ 21. Dr. Hampton explains that throughout modern history—from the telegraph to the telephone to television—new technologies have been blamed for harming society and mental health, even though "these claims lack valid, scientific data in support." *Id.* ¶ 13. This opinion directly undermines Plaintiff's causation theories by providing historical and sociological context for evaluating the current claims about social media, especially given the claims of widespread harms to students and schools, necessarily inviting examination of broader historical patterns and trends. In the Ninth Circuit, background testimony that assists the jury in understanding the issues is admissible even if it does not directly prove an element of the case. *Scott*, 140 F.3d at 1286. Notably, Plaintiff nowhere challenges the reliability of Dr.

9

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

Hampton's source materials regarding the history of moral panics. Nor does Plaintiff argue that "moral panics" about other technology have not occurred throughout history or that other researchers have not studied them. (They have.) Dr. Hampton's analyzes these very publications.

Plaintiff relies heavily on the JCCP excluding Dr. Hampton's moral panic opinion. That ruling does not bind this Court and was wrongly decided for several reasons. The JCCP Order does not account for what a moral panic is and is not. As Dr. Hampton explains, in the context of new technology, moral panics occur when new technology is introduced; exaggerated and *unsupported* claims of harm spark public fear and concern; others respond to the perceived threat; panic subsides as evidence undercuts the exaggerated claims; and then a new perceived threat is introduced that re-starts the cycle. Pl.'s Ex. D, Hampton Rpt. ¶¶ 21-60. The new technology allegedly causing mental health harms is a common thread. *See e.g.*, *id*. ¶¶ 37, 39-45. Moral panics have occurred with the introduction of newspapers, radio, television and the telephone. *Id*. ¶¶ 37, 39-49, 52-60. These are documented incidents of prior moral panics as no reliable evidence supported the alleged harms. Here, after an extensive literature analysis, Dr. Hampton found a lack of reliable scientific data to establish that social media causes mental health disorders claimed by some and, in addition, that the reaction to social media use mirrors that of prior moral panics. Accordingly, Dr. Hampton's analysis meets all of the relevance factors set out in the JCCP's Order. JCCP Order at 4.

Second, as for the methodology analysis in the JCCP Order, *id*. at 4-5, Dr. Hampton meets those factors as well. Dr. Hampton described scientific sources that have analyzed how to identify a moral panic, Pl.'s Ex. D, Hampton Rpt. ¶¶ 21, 23-24, and his methodology discussed those moral panics where there was a lack of scientific evidence that newspapers, radio, television and telephones caused the harms that were once attributed to them. Pl.'s Ex. D, Hampton Rpt. ¶¶ 21-60. The JCCP Order also viewed Dr. Hampton's moral panic opinion through the lens of believing that Dr. Hampton's opinion "assumes (without providing a basis for that assumption) that a society's negative reactions to a new technology suggest that the technology does not cause harm." JCCP Hampton Sargon Order at 5. But Dr. Hampton never offers this opinion.

### IV. CONCLUSION

Defendants respectfully request that Plaintiff's Motion in Limine No. 4 be denied.

10

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

| | | |
|---|---|---|
| Dated: March 9, 2026 | | Respectfully Submitted, |

By: */s/ David P. Mattern*
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, *pro hac vice*
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
blangner@kslaw.com
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

DANIEL M. PETROCELLI (SB #97802)
dpetrocelli@omm.com
SABRINA H. STRONG (SB #200292)
sstrong@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700

STEPHEN D. BRODY, *pro hac vice*
sbrody@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd.,*
*ByteDance Ltd., and TikTok LLC*

|   |   |
|---|---|
| 1 | |
| 2 | |
| 3 | By: */s/ Ashley M. Simonsen* |
|   | ASHLEY M. SIMONSEN (SBN 275203) |
|   | COVINGTON & BURLING LLP |
| 4 | 1999 Avenue of the Stars |
|   | Los Angeles, CA 90067 |
| 5 | Telephone: (424) 332-4800 |
|   | Facsimile: (424) 332-4749 |
| 6 | asimonsen@cov.com |
| 7 | Phyllis A. Jones (*pro hac vice*) |
|   | Paul W. Schmidt (*pro hac vice*) |
| 8 | Christian J. Pistilli (*pro hac vice*) |
|   | COVINGTON & BURLING LLP |
| 9 | One City Center |
|   | 850 Tenth Street, NW |
| 10 | Washington, DC 20001 |
|   | Telephone: (202) 662-6000 |
| 11 | Facsimile: (202) 662-6291 |
|   | pajones@cov.com |
| 12 | pschmidt@cov.com |
|   | cpistilli@cov.com |
| 13 | |
|   | *Attorneys for Defendants Meta Platforms,* |
| 14 | *Inc. f/k/a Facebook and Instagram, LLC* |
| 15 | |
| 16 | By: */s/ Jonathan H. Blavin* |
|   | JONATHAN H. BLAVIN (State Bar No. |
| 17 | 230269) |
|   | Jonathan.Blavin@mto.com |
| 18 | MUNGER, TOLLES & OLSON LLP |
|   | 560 Mission Street, 27th Floor |
| 19 | San Francisco, CA 94105 |
|   | Tel: (415) 512-4000 |
| 20 | |
|   | E. MARTIN ESTRADA (State Bar No. |
| 21 | 223802) |
|   | Martin.Estrada@mto.com |
| 22 | L. ASHLEY AULL (State Bar No. |
|   | 257020) |
| 23 | Ashley.Aull@mto.com |
|   | VICTORIA A. DEGTYAREVA (State Bar |
| 24 | No. 284199) |
|   | Victoria.Degtyareva@mto.com |
| 25 | MUNGER, TOLLES & OLSON LLP |
|   | 350 South Grand Avenue, 50th Floor |
| 26 | Los Angeles, CA 90071 |
|   | Tel.: (213) 683-9100 |
| 27 | |
|   | ALLISON BROWN (*pro hac vice*) |
| 28 | alli.brown@kirkland.com |

|   |   |
|---|---|
| 1 | KIRKLAND & ELLIS LLP |
| 2 | 2005 Market Street, Suite 1000 |
|   | Philadelphia, PA 19103 |
| 3 | Tel.: (215) 268-5000 |
| 4 | JESSICA DAVIDSON (*pro hac vice*) |
|   | jessica.davidson@kirkland.com |
| 5 | JOHN J. NOLAN (*pro hac vice*) |
|   | jack.nolan@kirkland.com |

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

*Attorneys for Defendant Snap Inc.*

By: */s/ Ashley W. Hardin*
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
J. ANDREW KEYES, *pro hac vice*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and Google LLC*

13

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE NO. 4 TO EXCLUDE "ADVOCACY OPINIONS" OF DEFENDANTS' EXPERTS DR. ETHAN HUTT AND DR. KEITH HAMPTON

**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

I, David P. Mattern, hereby attest, pursuant to N.D. Cal Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

By: */s/ David P. Mattern*
    DAVID P. MATTERN