UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

This Document Relates to:

ALL CASES

Case No. 4:22-md-03047-YGR

MDL No. 3047

**ORDER GRANTING IN PART AND DENYING IN PART RULE 702 MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS**

Defendants Meta (for Facebook and Instagram), Google (for YouTube), ByteDance (for TikTok), and Snapchat have collectively filed motions to exclude the opinions of (1) the school district plaintiffs' six experts offering school district-specific opinions (the "SD Experts"); (2) the school district and state Attorney General ("AG") plaintiffs' general causation experts (the "GC Experts") on grounds of methodological and other failings; and (3) the GC Experts for failure to account for Section 230 and the First Amendment.[1] The Court's Order Denying Rule 702 Motion to Exclude School District Experts addressed the first motion. (Dkt. No. 2750.) This order resolves the other two.

Having carefully considered the papers submitted, as well as oral argument from counsel on January 26, 2026, and for the reasons set forth more fully below, defendant's motions to exclude the opinions of the GC Experts are **DENIED IN PART** and **GRANTED IN PART**.

## I.    BACKGROUND

The facts of this case are well known to the parties. The Court provides some basic background and facts upon which the decision relies.

---

[1] Respectively, Dkt. No. 2291, ["SD Experts Mtn."]; Dkt. No. 2295, ["GC Experts Mtn."]; and Dkt. No. 2292, ["Section 230 Mtn."]. Defendant Meta additionally filed a separate Motion to Exclude the Expert Testimony of Mitch Prinstein, Dkt. No. 2304, ["Prinstein Mtn."], as jointly stipulated by the parties and permitted by the Court. *See* Dkt. No. 2256 at 3 n.5, granted by the Court at Dkt. No. 2274. For the purposes of this order, the Prinstein Mtn. is considered along with defendants' other motions to exclude the GC Experts' opinions.

1

The school district and state AG plaintiffs sue on a theory that defendants "designed their platforms to foster compulsive use by minors," resulting in harms to children, schools and school districts, local governments, and public health. (Dkt. No. 1214, Order Largely Denying in Part Meta's Motion to Dismiss the Multistate Attorneys General Complaint but Limiting the Scope of Claims ["AGs MTD Order"] at 2.) At the motion to dismiss stage, the Court permitted claims to proceed on a "core theory of injury [which] focuses on the impact of compulsive use *itself*, irrespective of third-party content, defendants' protected publishing activity and defendants' protected first-party speech." (Dkt. No. 1267, Mot. to Dismiss Order ["SD MTD Order"] at 26.) The Court also held that plaintiffs' allegations were actionable with respect to certain design features not barred by Section 230 or the First Amendment. (*See id*., 13-14.)

Defendants now challenge the general causation opinions of plaintiffs' experts who aim to show that the design of social media platforms can cause compulsive use and related harms.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

It is long well understood that experts who are "qualified . . . by knowledge, skill, experience, training, or education," and whose opinions otherwise meet Rule 702's requirements, may offer opinions not based on personal knowledge or observations. Fed. R. Evid. 702.

2

## III.    MOTIONS TO EXCLUDE GENERAL CAUSATION OPINIONS

Defendants move to exclude the opinions of thirteen GC Experts.[2] In this Order, the Court addresses defendants' arguments with respect to each GC Expert as to Section 230, the First Amendment, methodological criticisms, and several other grounds.

### A.  DR. DIMITRI CHRISTAKIS

Dr. Christakis describes his assignment as one to:

> provide an expert assessment of what, if any, role social media (SM) usage plays in youth mental health and function. I was also asked to review the specific features of SM that adversely contribute to mental health and function. Lastly, I was asked to opine as an expert in public health and pediatrician as to the necessity to fully inform parents and their children as to the full risks associated with use of SM.

(Expert Report of Dr. Dmitiri Christakis ["Christakis Rep."], Dkt. No. 2504-3, Ex. 15 ¶ 1.) Dr. Christakis received his M.D. from University of Pennsylvania in 1993, completed residency and fellowship programs in pediatric medicine, and received a Master's in Public Health degree from the University of Washington in 1998. He has held appointments as a professor and physician at the University of Washington since 1998; served as Director of the Center for Child Health, Behavior and Development at Seattle Children's Research Institute for nearly 20 years; and served on myriad boards and expert committees related to research on children and media. Defendants do not challenge his qualifications.

---

[2] Dr. Dimitri Christakis, Dr. Drew Cingel, Dr. Gary Goldfield, Dr. Anna Lembke, Dr. Ramin Mojtabai, Dr. Stuart Murray, Dr. Eva Telzer, Dr. Jean Twenge, Dr. Sharon Hoover, Mr. Arturo Bejar, Dr. Lauren Hale, Dr. Bradley Zicherman, and Dr. Mitch Prinstein. The School District plaintiffs offer each of the general causation experts excepting Dr. Hale, Dr. Zicherman, and Dr. Prinstein who are AG experts only. The Court interprets defendants' request as seeking to exclude all of each experts' opinions and testimony, except where specifically identified otherwise.

### 1. Section 230, The First Amendment, and Specific Platforms

Defendants seek to exclude Dr. Christakis' opinions on the basis that he fails to disentangle the effects of each defendant's actionable defects from features and content barred by Section 230 and the First Amendment.

As described in the SD Experts Order, plaintiffs may proceed on the theory that the design of defendants' platforms causes students to compulsively use social media, which in turn results in costs to the school district. Dr. Christakis' opinions speak to relevant parts of this theory, including that defendants' design features render teens addicted to the platforms, resulting in negative consequences for those users. (*See, e.g.*, Christakis Rep. ¶ 7 ("Specific design features of Facebook, Instagram, Snap, YouTube, and TikTok work in concert to promote both the addictive nature of social media and its associated harms.") Moreover, Christakis' report analyzes the specific design features the Court ruled at motion to dismiss were actionable under Section 230 and the First Amendment (the "Actionable Defects"). (*See, e.g.*, Christakis Rep. ¶ 564 (age verification and parental controls); *id*. ¶ 195 (beauty filters).) That the report does not tease out causation as to each actionable feature does not bar admissibility of all such evidence. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F.Supp.2d 1053, 1066–67 (C.D.Cal. 2013) ("[N]o single expert provides a self-sufficient opinion that [defendants' conduct] in fact caused the [plaintiff's harm]. This is not dispositive."). The motion on this ground is denied.[3] The Court will address the issue of balance at a trial conference.

---

[3] The Court notes here that this argument is made with respect to twelve experts, namely Drs. Christakis, Cingel, Goldfield, Lembke, Mojtabai, Murray, Telzer, Twenge, Hoover, Hale, Prinstein, and Zicherman. The same analysis and decision applies across the board.

### 2. Methodological Reliability

Next, defendants challenge the reliability of Christakis' methodologies on several grounds, including that the literature upon which he relies does not support his claims that the platforms' design defects result in user addiction and harm, and that Christakis lacks sufficient expertise on the design features themselves.

On the first, Christakis attests that he conducted a "systematic review" of available meta-analyses, studies, and other information in forming his opinions that the design of defendants' platforms harm student-age users. (Christakis Rep. ¶ 20.) He appears to have considered hundreds of such publications and discusses in detail studies that "present arguments that countervail [his] findings." (*Id*. ¶¶ 531-558.) To the extent defendants contest his conclusions about what the overall body of literature indicates, that is a matter for cross-examination, not exclusion. *See Engilis v. Monsanto Company*, 151 F.4th 1040, 1050 (9th Cir. 2025).

The second ground, that Christakis lacks sufficient technical expertise relating to the design features, also does not require exclusion. Christakis' opinions speak generally to the impact of the design defects, including that better user controls, parental controls, and age verification would reduce risks to children. Given his robust consideration of scientific literature, which included those aspects of the design of defendants' platforms, and his decades of relevant academic research and clinical practices, the Court concludes his opinions are not barred on this ground. These criticisms go to weight, not admissibility.

### 3. Reliance on Company Documents

Next, defendants argue that Christakis' opinions should be excluded because he relies on defendants' internal company documents. Though defendants identify no caselaw barring an expert from considering company documents, they assert that Christakis' consideration of company

documents does not meet accepted scientific standards because he does not typically review company documents when authoring academic publications.

The argument strains credulity. Under Rule 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Experts routinely consider the evidence in the case including, as here, company documents that Christakis concluded corroborate the opinions he formed based on scientific literature and his experience. To illustrate, Christakis concludes that:

> [C]ertain design features of social media increase usage, including problematic usage and addictive behavior . . . . The medical and academic community recognize the harm that flows from the use of these features. *Similarly, there are ample Defendant documents providing additional support that these features increase usage, including problematic and addictive usage.*

(Christakis Rep. ¶ 268) (emphasis supplied).  An expert may analyze company documents and opine on whether they are consistent with the rest of the expert's analysis. That said, to reference such information explicitly, it must be in the trial record. An expert cannot independently proffer the information.

Christakis may not opine as to defendants' intent, however. Christakis states that defendants' internal documents "reveal that the resources Defendants put towards mitigating [social media's] harmful effects were weighed against user engagement and the risk of subsequent loss of revenue. Perhaps as a consequence, Defendants only instituted minimal change prior to the initiation of this litigation." (*Id*. ¶ 8.) Christakis was only "asked to opine as an expert in public health and pediatrician." (*Id*. ¶ 1.) He does not have specialized knowledge to opine that defendants care more about profit than user wellbeing and that this motive animated their design decisions. This paragraph is stricken.

6

The motion to exclude the entirety of his opinions on these grounds is **DENIED** with the exception of the noted opinion at paragraph 8, which is stricken.[4]

### B. DR. DREW CINGEL (PI/SD)

Dr. Cingel describes his assignment as one to:

> describe the scholarly definitions of core constructs, including social media and mental health . . . [and] then provide an overview of core aspects of adolescent development and use these aspects of development to show how multiple design features, consistent across Instagram, Facebook, TikTok, Snapchat, and YouTube, take advantage of these developmental differences and susceptibilities to promote excessive use of these products.

(Expert Report of Dr. Drew Cingel ["Cingel Rep."], Dkt. No. 2504-3, Ex. 50 ¶ 38.) Cingel received his Ph.D. in Media, Technology, and Society from Northwestern University in 2016, since which time he has held appointments as a professor at University of California, Davis ("UC Davis") and director of UC Davis's Human Development and Media Lab, which focuses on "how human development shapes media choices and influences perceptions and effects of media, primarily in the areas of moral development and mental health." (*Id*. ¶ 21.) Cingel has published dozens of peer-reviewed articles and research papers on media and human development, chaired boards and committees in that field, and is co-editor of *Media Psychology*, an academic journal.

### 1. Qualifications to Opine on Adolescent Development or Platform Development

Defendants first criticize Cingel's qualifications to opine on the impact of social media on adolescent mental health, since he is a communications professor rather than a scientist or clinician, and so lacks relevant expertise. Plaintiffs respond that Cingel's lack of a psychology degree does not preclude him from testifying about how the adolescent brain reacts to social media when he has

---

[4] Defendants contend that plaintiffs' general causation experts Dr. Cingel, Dr. Goldfield, and Dr. Lembke must likewise be excluded because they rely upon internal company documents. For the portions of this Order resolving that same issue, the Court refers to the analysis and guidance provided here.

studied that exact issue for years. Rule 702 requires only that an expert be qualified by "knowledge, skill, experience, training, or education" in the relevant discipline. Fed. R. Evid. 702.

Having read Cingel's report, the Court agrees and finds that the opinions he offers regarding social media's impact on human development are within his "knowledge, skill, experience, training, or education." The studies upon which Cingel bases his opinions chiefly examine adolescents' use of social media and how those use patterns are associated with stress, anxiety, sleeplessness, and other measures of well-being. As a Ph.D. who researches media and human development, the ability to understand and evaluate such evidence falls within the bounds of his expertise. It is true that Cingel is not a doctor or neuroscientist, but neither does he purport to opine on complex neurological issues or cutting-edge clinical practices. The Court denies the motion on this ground.

Defendants next critique Cingel's qualifications to opine, as he does in some of his sixteen opinions, on the timing of defendants' design choices and priorities. In one instance, Cingel opines that "[w]hen individuals within the defendant companies noted concerns with the companies' designs and user mental health, companies consistently made design choices that prioritized time spent on the platform (with implications for company revenue) over child and adolescent mental health." (Cingel Rep. ¶ 14.) These opinions are not based on any expertise and are excludable. Cingel's expertise is in the connection between social media and human development. He may not argue that product designers chose profit over user health.[5] That a jury can decide.

Cingel's opinions at paragraphs 16(d) and 16(e) raise similar concerns. For example, at paragraph 16(d), Cingel opines that defendants "consistently delayed or withheld from the public

---

[5] Further, in providing his opinions, Cingel offers those internal company documents for the proposition that defendants were warned of negative impacts on users but prioritized growth and engagement. It is not clear whether he expected to offer those independently. As noted above, an expert may not be a "mere conduit[] for hearsay" and to the extent he proffers such at trial, it will be excluded. *Williams v. Illinois*, 567 U.S. 50, 80 (2012).

research that showed these negative associations and effects, did not expediently re-design their products for the protection of youth mental health, and/or did not expediently fix or otherwise notify or warn parents or adolescents of problems." Likewise, he opines at paragraph 16(e) that defendants had "ample opportunity to re-design their products to protect and promote adolescent mental health," but "did not design safer products in a timely manner or effective way when the need arose." Cingel could testify at trial that none of defendants' business records he reviewed indicated that recommended design fixes or warnings were implemented. He cannot, however, proffer argument that defendants should have been more proactive. That said, and as noted above, the Court declines to exclude the entirety of his opinions on these grounds.

### 2.   Section 230, The First Amendment, and Specific Platforms

As with the other experts, defendants criticize Cingel for failing to offer opinions that the Actionable Defects of defendants' platforms themselves cause the alleged harms. They also criticize Cingel's reliance on research that speaks to the impact of social media generally rather than teasing out the impact of specific features of defendants' individual platforms. The Court disagrees. Cingel does, in fact, discuss how the actionable features of defendants' specific platforms can cause harm. (*See, e.g.*, Cingel Rep. ¶¶ 118-30 (Snapchat, Instagram, TikTok, and YouTube beauty filters); *id.* ¶¶ 264-272 (TikTok, Snapchat, and Meta's age verification controls).) Cingel also addresses why relying on studies that consider social media platforms together is methodologically reliable. (*Id.* ¶ 44 ("[S]tudies generally do not find differences as a function of the platform under study. Indeed, several multi-platform studies show that the recognized link between adolescent social media use and mental health outcomes tends to be similar across platforms (e.g., Beyens et al., 2024; Valkenburg et al., 2021; van der Wal et al., 2025).").)

For these reasons, and the reasons already discussed, *supra* Section III(A)(1), the Court declines to grant the motion on these grounds.

9

### 3. Research Evidence Does Not Support Causal Claims

Defendants argue that Cingel improperly relies on correlational studies to draw causal conclusions about the relationship between social media use and teen mental health issues. Plaintiffs respond that Cingel thoroughly considers the strengths and limitations of the studies he reviewed and draws appropriate conclusions based on the evidence in aggregate.

The Court is persuaded that Cingel's conclusions are based on "sufficient facts or data" to be of use to a jury. Fed. R. Evid. 702(b). Cingel considers a broad array of meta-analyses, cross-sectional and longitudinal studies; discusses what conclusions can and cannot be drawn from each type of research, including how social media affects different sub-populations of users more or less strongly; and describes where different pieces of evidence support or cut against his opinions. (*See* Cingel Rep. ¶¶ 139-223.) Cingel's opinions about what the body of literature collectively suggests is likewise measured. (*Id.* ¶ 12. ("When reviewed in totality, the available evidence . . . demonstrates that social media substantially contributes to negative mental health effects for substantial numbers of adolescents").) As a result, the Court declines to exclude Cingel's opinions on this ground. *See Engilis,* 151 F.4th at 1050 (expert opinions admissible when they are "not the junk science Rule 702 was meant to exclude") (cleaned up). If defendants believe Cingel's conclusions are wrong, they "will be able adequately to expose the weaknesses of [his] testimony with effective cross-examination." *Mullins v. Premier Nutrition Corporation*, 178 F.Supp.3d 867, 876 (N.D.Cal. 2016).

### 4. Reliance on Company Documents

Defendants argue that Cingel's opinions that rely on company documents should be excluded as lay testimony. For the reasons previously explained, company documents are part of the factual record and Cingel is permitted to rely on them in forming his opinions. The motion on this ground is denied. That said, and as already discussed, while he may opine that documents

10

independently offered into evidence corroborate his conclusions, Cingel may not serve as a "mere conduit" for these documents. *Williams*, 567 U.S. at 80.

### 5. Use of "Excessive," "Compulsive," "Addictive" or Similar Terms

Defendants take issue with Cingel characterizing certain patterns of social media usage as "addictive," "compulsive," "excessive," or using other similar terms. They argue that Cingel fails to define these terms with reference to an accepted scientific threshold regarding what amount of usage is addictive, compulsive, or excessive.

Defendants do not cite authority that an expert's opinions should be excluded when certain terms in their opinions are not defined. Regardless, Cingel's report makes clear how he uses these terms and where they are rooted in academic literature. (*See, e.g.*, Cingel Rep. ¶ 273 ("Scholarly literature also shows that *problematic social media use, characterized by a struggle to stop using, and use that displaces sleep among other indicators*, has an even stronger contribution to poor adolescent mental health than general time spent using these platforms") (emphasis supplied); *id.* ¶ 39 ("I also review and synthesize literature that shows that problematic social media use – *defined as a type of social media use characterized by addiction-like symptoms, reflecting a non-substance related disorder where negative consequences occur for the user due to a preoccupation and compulsion to excessively use social media platforms (Shannon et al., 2022)* – is consistently implicated in adverse adolescent mental health across a range of mental health indicators.") (emphasis supplied).)

Moreover, many instances of those terms in Cingel's report simply refer to the terms as they are used in the academic studies he describes or defendants' own documents. (*See, e.g.*, *id.* ¶ 171 n.177 (quoting Meta document that states: "Teens talk of Instagram in terms of an 'addicts narrative' spending too much time indulging in a compulsive behavior that they know is negative but feel powerless to resist."); *id.* 244 ("In its 'TikTok for Good 2021 Business Plan & Vision'

document, for example, TikTok states: "Addiction to technology is a ubiquitous problem that TikTok and most other platforms deal with today. Addiction takes many forms such as overall time spent on an app, de-prioritizing other important areas of life, and generating self-worth based on number of likes, all of which and countless others have made us realize the consequences of optimizing for engagement and retention metrics."); *see also id.* Ex. B, pp. 89-144 (literature citations with dozens of titles containing "addiction" or similar terms). Cingel's opinions "rest[] on a reliable foundation and [are] relevant to the task at hand," as required by Rule 702, without needing to further specify those terms. *Primiano*, 598 F.3d at 564 (9th Cir. 2010).

The motion is **DENIED** with the exceptions of the noted opinions which are stricken.

### C. DR. GARY GOLDFIELD (PI/SD)

Dr. Goldfield describes his assignment as one to:

> Conduct[] a comprehensive literature review to reach evidenced-based conclusions regarding the impact of social media use (SMU) on mental health outcomes in children and adolescents. This review examines drivers (antecedents) of social media use and problematic social media use (PSMU), as well as mechanisms, and a myriad of developmental, sociodemographic, neurobiological, genetic, personality, and social vulnerabilities that either alone, or in combination, can amplify/buffer social media use harms.

(Expert Report of Dr. Gary Golfield ["Goldfield Rep."], Dkt. No. 2504-3, Ex. 51 ¶ 11.) Goldfield has a Ph.D. from Carleton University in Health Psychology and has been a professor at the University of Ottawa, and clinical researcher at the Children's Hospital of Eastern Ontario Research Institute, for two decades. Goldfield has published dozens of articles on screen time, social media, and health, and is a principal investigator on large-scale studies relating to mental health and addictive behavior among children and teens. (*See id.* ¶¶ 2-7). Defendants do not challenge his expert qualifications.

**1. Section 230, The First Amendment, and Specific Platforms**

As with the other GC experts, defendants seek to exclude Goldfield's opinions on the basis that they fail to disentangle each defendant's actionable conduct from content and features barred by Section 230 and the First Amendment. Though defendants object to portions of Goldfield's report discussing features that this Court ruled Section 230 or the First Amendment barred from forming the basis of school district plaintiffs' nuisance and negligence claims, Goldfield also considered the Actionable Defects in forming his opinions. (*See, e.g.*, Goldfield Rep. ¶¶ 381-84 (age verification); *id*. ¶¶ 390, 446 (filters and lenses).) For this and the other reasons already discussed, Section 230 and the First Amendment do not bar admission of Goldfield's opinions under Rule 702. *See supra* Section III(A)(1).

**2. Bradford Hill Analysis**

Defendants argue that Goldfield's opinions should be excluded because he improperly analyzed the "Bradford Hill" factors, i.e. a set of criteria used to draw causal conclusions from associational or correlative evidence. Defendants do not contest that Bradford Hill analysis is appropriate or that Goldfield analyzed the correct factors. Instead, they contend that Goldfield's analysis is "transdiagnostic," meaning that he improperly lumped together evidence about different mental health conditions. Defendants cite one out-of-circuit case, *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig. (Acetaminophen)*, 707 F.Supp.3d 309 (S.D.N.Y. 2023), for the proposition that an expert must conduct a separate Bradford Hill analysis for each mechanism of harm. Here, defendants suggest, *Acetaminophen* required Goldfield to conduct a separate Bradford Hill analysis on the association between each defendant's particular features and each type of mental health harm.

The Court finds *Acetaminophen* distinguishable. In that case, plaintiffs' experts were tasked with assessing whether acetaminophen use *in utero* could cause Attention Deficit Hyperactivity

Disorder (ADHD) or Autism Spectrum Disorder (ASD). 707 F.Supp.3d at 338. In doing so, they reviewed studies on ADHD, ASD, and other neurodevelopmental disorders (NDDs), despite meaningful differences among the conditions. *Id*. at 338. They then concluded that acetaminophen can each cause *each* of the at-issue conditions—ADHD and ASD—based in part on a Bradford Hill analysis that grouped all the studies together. *Id*. at 339. For example, the experts concluded the "strength" criterion of the analysis was satisfied as to ADHD and ASD, based on evidence of a strong association between acetaminophen and NDDs as a whole. In fact, studies showed only a weak linkage between acetaminophen and ASD. *Id*. at 347-48. As the court pointed out, this flaw "raises a question of relevance. After all, this litigation [was] brought to obtain recovery on behalf of those who have been diagnosed with ASD or ADHD, not on behalf of anyone with, for example, a deficit in communication or self-regulation." *Id*. at 339. Based on these and myriad other serious methodological failures, the court excluded their opinions. *Id*. at 334.

The *Acetaminophen* court's concerns are not found here. Goldfield was tasked with evaluating whether social media use can cause mental health problems. Consideration of studies linking social media to a variety of mental health conditions is relevant to that task. By contrast, and as an example, had his task been to evaluate whether social media causes negative body image, but he relied on evidence about social media use and sleeplessness, then similar concerns could have arisen. As it is, the Court does not conclude that Goldfield's Bradford Hill analysis was of an inappropriate "transdiagnostic" nature.

Likewise, defendants' contention that *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F.Supp. 981, 987 (C.D. Cal. 1996) requires Goldfield to disaggregate evidence as to each platform separately does not persuade. First, Goldfield does analyze each defendant's platforms in the report, and explains why they are similar in relevant ways such that considering them together makes sense. (*See, e.g.*, Goldfield Rep. ¶¶ 39, 48, 52.) Additionally, as explained in the Breathitt

14

MSJ Order, the Court's concern in *Sanderson*—where an individual had been doused with fragrances 16,000 times but was unable to identify the makers of the fragrances—that no specific defendant could be identified as to blame are not present here. Finally, *Sanderson* related to the sufficiency of evidence upon summary judgment, not the admissibility of one piece of evidence. While an expert opinion might not, alone, suffice to permit a plaintiff's case to survive summary judgement, it may nonetheless be admissible to prove a portion of that case. The Court declines to grant the motion on this ground.

### 3.  Reliance on Company Documents

As with Christakis and Cingel, defendants seek to exclude Goldfield's opinions on the basis that he impermissibly relies on company documents. As already discussed, *supra* Section III(A)(3), an expert may review company documents and state that they are consistent with the expert's scientific understanding, which Goldfield does. (Goldfield Rep. ¶ 457 ("Based on my review of Defendants' internal documents, as well as my in-depth analysis of the relevant scientific literature, Defendants did not implement adequate safeguards and did not fully inform parents and children about the risks of their platforms. This opinion is grounded in established psychological and behavioral science and corroborated by the Defendants' own internal documents.") The Court declines to grant defendants' Rule 702 motion on this ground.

### 4.  "Academic Performance" Literature

Finally, defendants take issue with the conclusions Goldfield draws from two studies about the relationship between social media use and academic performance, arguing that Goldfield misinterprets the studies' results and that they insufficiently support his opinions. Plaintiffs respond that defendants mischaracterize those studies and the conclusions Goldfield drew from them.

"Importantly, the Court's duty is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Ringcentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171869,

15

at *2 (N.D.Cal. 2021); *Primiano*, 598 F.3d at 564 (same). Defendants have not identified methodological errors or analytical gaps that render Goldfield's opinions inadmissible, but rather disagreement with the implications of and weight that should be afforded to some of his sources. Those critiques are fodder for cross-examination but do not warrant exclusion.

The motion to exclude Goldfield's opinions is **DENIED**.

### D. DR. ANNA LEMBKE

Dr. Anna Lembke obtained her medical degree from Stanford University in 1995 and completed her residency in psychiatry in 2000. She is a Professor of Psychiatry and Addiction Medicine at Stanford; Chief of Stanford's Addiction Medicine Dual Diagnosis Clinic; Medical Director of Addiction Medicine at Stanford; and chairs Stanford's Addiction Medicine Task Force. Each of her opinions concern whether social media can be addictive to young people and adversely affect their mental health. Defendants do not challenge her qualifications to opine on this topic.

### 1. Section 230, The First Amendment, and Specific Platforms

As with the other GC Experts, defendants seek to exclude Lembke's opinions on the basis that she fails to disentangle the effects of each platform's actionable features from content and features barred by Section 230 and the First Amendment. For the reasons already discussed, this is not a bar to admissibility. *See supra* Section III(A)(1).

### 2. Methodological Reliability

Defendants next argue that Lembke's opinions that social media can be addictive are unreliable because they are untethered from the underlying science. In large measure, this appears to be a criticism rooted in two issues, namely: (1) that the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5," a manual published by the American Psychiatric Association) and the International Classification of Diseases 11th Edition ("ICD-11") do not list "social media

addiction" as a disorder; and (2) that Lembke's understanding of addiction is divorced from that of the scientific community. Neither point persuades the Court to exclude her opinions.

As Lembke points out, more than a decade of research on social media has been conducted since the American Psychiatric Association ("APA") issued the DSM-5 in 2013. (Dkt. No. 2504-3, Expert Report of Dr. Anna Lembke ["Lembke Rep."], Ex. 10 at 11). The APA, Lembke states in her report, has more recently issued at least one statement defining "social media addiction," and Lembke notes that she expects the term to be incorporated in the next edition of the DSM. (*Id.*) As such, the disagreement appears to be about the weight ascribed to different pieces of evidence, which is a classic issue for trial. Defendants may attempt, on cross-examination, to use the term's absence from the DSM-5 and ICD-11 to expose weaknesses in Lembke's testimony, but the Court does not find it to be grounds for exclusion in light of the proffer that the analysis is a forthcoming addition to the DSM. *See Mullins*, 178 F.Supp.3d at 876.

Second, with respect to whether Lembke's views on addiction are unsupported and not accepted by the scientific community, she explains her views on social media and addiction with reference to a wide variety of peer-reviewed publications, defendants' own research, and her clinical practice. (See, *e.g., Lembke Rep*. at 8-35.) To the extent defendants' critique is that "social media addiction" is not uniformly used and defined in the literature, Lembke explains that "Social media addiction goes by different terms in the medical literature, including *social media disorder*, *social media use disorder*, *problematic use of social media*, *problematic social media use*, and so on," and that while "the term *problematic use* and its variants are often used as a synonym for social media addiction, it is also used in some contexts to refer to social media use short of addiction but which causes certain similar harms." (*Id*. at 7.) As noted earlier, these terms also appear in defendants' own documents, including internal studies. (*See, e.g.*, Lembke Rep. at 24 (Meta study titled "Understanding Perceptions of Problematic Facebook Use," which used the

"Bergen Social Media Addiction Scale" as a measurement tool); *id.* at 36 (Meta internal study discussing "problematic use sometimes called 'social media addiction' externally"); *id.* at 38 (Meta internal study finding "Teens and young adults are more likely to report experiencing problematic use.") Defendants' concerns appear to be not with the "soundness of [Lembke's] methodology" but with her conclusions. *Ringcentral*, 2021 WL 12171869, at *2.

### 3. Reliance on Company Documents

As with the other GC Experts, defendants seek to exclude Lembke's opinions on the basis that she relies on internal company documents. Lembke's opinions appear to apply her expertise to interpret those documents rather than merely parrot them. (*See* Lembke Rep. at 23-78 (applying analytical frameworks and published literature in assessing the addictive potential of each defendant platform).) For that reason, and for the reasons previously explained, the Court declines to grant defendants' motion on this ground. *See supra* Section III(A)(3).

### 4. Rebuttal Opinion

Defendants argue Lembke's rebuttal opinion that, "[g]iven the known risks, Defendants should warn adolescents and their parents about the addictive nature of their platforms," improperly opines on the ultimate issue of failure to warn. (Lembke Rebuttal Rep. at 1.) The Court finds the challenge meritorious.

"While expert testimony that concerns an ultimate issue is not per se improper [under Rule 704(a)] . . . [w]hen an expert undertakes to tell the trier of fact what result to reach, [s]he does not aid an understanding of the evidence or the determination of a fact in issue, but rather seeks to substitute [her] judgment for that of the trier of fact." *KJ-Park, LLC v. Match Group, LLC*, 2024 WL 4068830, at *2 (N.D.Cal., 2024); *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (same). Lembke's conclusion that a warning was required here opines on a question reserved for the jury. Even if it did not go to the ultimate issue, Lembke offers no expertise about warnings—

e.g., about the form or nature a warning should take, or why one would be effective. As such, the Court excludes that quoted portion of her opinion.

The motion to exclude Lembke is **DENIED** except for the noted opinions which are stricken.

### E. DR. RAMIN MOJTABAI

Dr. Mojtabai describes his assignment as one to:

> address the question whether problematic use of social media can cause or contribute to development mental health problems in youth, including depression and depressive symptoms, suicidal ideations, body dissatisfaction and eating disorders . . . [and to] prepare an expert report on what relationship there is, if any, between social media use and adverse mental health outcomes in adolescents and youth.

(Expert Report of Dr. Ramin Mojtabai ["Mojtabai Rep."], Dkt. No. 2504-3, Ex. 13 ¶¶ 1, 8.) Mojtabai obtained a Ph.D. in Clinical Psychology from the University of Tulsa in 1996 and a Master's of Public Health ("M.P.H.") from Columbia University in 2002. Mojtabai is an epidemiologist and professor of psychiatry at Tulane University School of Medicine. Defendants do not seek to exclude his opinions based on his qualifications.

#### 1. Section 230, The First Amendment, and Specific Platforms

Defendants argue, as with the other GC Experts, that Section 230 and the First Amendment bar admission of Mojtabai's opinions. Mojtabai does discuss evidence relevant to a jury's understanding of how defendants' actionable features, including filters and barriers to account deactivation, can affect mental health. (*See, e.g.*, Mojtabai Rep. ¶¶ 186-195 (beauty filters); *id*. ¶¶ 121, 170 (effects of account deactivation).) For this reason, and for the reasons previously discussed, the motion on this ground is denied. *See supra* Section III(A)(1).

#### 2. Methodological Reliability

As with the other GC Experts, defendants contend that Mojtabai's opinions are unreliable because he draws causal conclusions from cross-sectional studies that show only correlation. This criticism does not persuade. Mojtabai's report makes clear he considered "longitudinal [and]

19

experimental studies," not merely the cross-sectional type of which defendants complain. (Mojtabai Rep. ¶ 19.) Mojtabai further explains, and defendants do not dispute, that the different types of studies can be organized in a hierarchy of how much insight and value they offer. (*Id*. ¶ 54.) As he explains, and defendants again do not dispute, cross-sectional studies have limitations but also offer value, particularly when considered in combination with other studies. (*Id*. ¶ 55.) As a result, Mojtabai gave greater weight to longitudinal studies when considering the totality of the evidence in forming his opinions. (*Id*. ¶ 69 ("In reviewing the evidence for the causal association of social media use with adverse mental health problems, I considered where in the pyramid of evidence the research studies could be placed . . . [and] where available, gave precedence to findings from longitudinal and experimental studies . . . ").) After considering those longitudinal studies, he concluded their results aligned with the cross-sectional studies. (*Id*. ¶ 147 ("In line with cross-sectional studies, most of the longitudinal studies found significant associations between the extent of social media use and depression and anxiety.").) Given his measured consideration of the collective body of evidence, the Court declines to exclude Mojtabai's opinions on the basis that he improperly assumed that association equals causation.

Relatedly, defendants critique Mojtabai's application of Bradford Hill, referenced above, on the basis that he improperly lumps together evidence on the relationship between social media and different mental health conditions. For the reasons explained earlier, the Court is not persuaded that the concerns implicated in *In Re Acetaminophen* arise here. *See supra* Section III(C)(2). Nor, for the reasons already discussed, is Mojtabai required to disaggregate his analysis by each platform. He contends, and defendants do not dispute, that the platforms share enough similarities that evidence on social media as a group can be relevant to a jury. (*See, e.g.*, Mojtabai Rep. ¶ 2 (similarities across platforms in mechanisms linking social media use and mental health harms).)

Additionally, defendants argue that the studies that Mojtabai relied on assessed only self-reported symptoms, not actual diagnoses, rendering his conclusions unreliable. Defendants identify no authority suggesting that the Ninth Circuit bars expert testimony that considered studies involving self-reported symptom data. Moreover, Mojtabai's report explicitly considered that self-reported symptoms can be one of many possible limitations of any given study, and discusses steps he took to address the issue, including by combining with evidence regarding diagnoses made in a clinical setting. (*See, e.g.*, Mojtabai Rep. ¶¶ 71-81.) Defendants may cross-examine Mojtabai on this topic, but it goes to the weight of his opinion, not admissibility.

Finally, defendants object that "social media addiction" and "problematic social media use" are not generally accepted in the scientific community. Mojtabai cites dozens of studies that evaluate the relationship between "social media addiction" or "problematic social media use" and mental health outcomes using those very terms, or nearly identical ones, in their titles. (*See* Mojtabai Rep. at 89-106.) For this reason and those already discussed, this argument does not require exclusion. *See supra* Section III(D)(2).

The motion is **DENIED**.

### F.  DR. STUART MURRAY

Dr. Stuart Murray describes his assignment as one to assess "the impact of social media used among children and adolescents and young adults on their mental health, specifically including body image and disordered eating." (Expert Report of Dr. Stuart Murray ("Murray Rep."), Dkt. No. 2504-3, Ex. 32 ¶ 1.) Murray obtained his doctorate in Clinical Psychology and Ph.D. from the University of Sydney in 2012. (*Id*. ¶ 5.) He is a licensed clinical psychologist in California, professor of psychiatry and biobehavioral sciences at the University of California, Los Angeles (UCLA), director of the Eating Disorders Program at UCLA's Resnick Neuropsychiatric

Hospital, and director of UCLA's Translational Research in Eating Disorders Program. (*Id*. at 4-6.) Defendants do not challenge his qualifications.

### 1. Section 230, The First Amendment, and Specific Platforms

Here, again, defendants seek exclusion because of a failure to disaggregate the effects of the Actionable Defects from content or features barred under Section 230 and the First Amendment or as to each defendant's specific platform. For the reasons already discussed, the Court declines to grant defendants' motion on this ground. *See supra* Section III(A)(1).

### 2. Methodological Reliability

Murray avers that he performed a "systematic review . . . aimed at minimizing bias" of the scientific literature and considered hundreds of publications regarding mental health, eating disorders, and social media use in arriving at his opinions. (Murray Rep. ¶¶ 35-41 (explaining methodology); *see also id*. at 228-475 (list of publications considered).) As with the other GC Experts, defendants seek exclusion because Murray considered studies involving self-reported symptoms, used correlational evidence to draw causal conclusions, and failed to disentangle the effects of social media use upon each type of eating disorder. For the reasons already discussed as to each of these criticisms, none persuade.

Additionally, defendants assert that Murray "cherry-picked" studies to support his predetermined conclusions. The sole basis for this contention appears to be that, at deposition, Murray could not name a longitudinal study discussed in his report that found no association between social media use and eating disorders. The Court is not persuaded that a deponent's ability to recall, to the satisfaction of opposing counsel, a particular study fitting counsel's criteria (longitudinal, named in the report, showing zero association between social media and the purported harms) is dispositive of whether an expert used reliable methods. Regardless, upon re-direct he subsequently testified to countervailing studies he considered. (Dkt. No. 2405-3, MDL

22

Deposition of Dr. Stuart Murray ["Murray Dep."], Ex. 58 at 319:17-321:14.) His lack of recall at the moment of examination is a topic for cross-examination, not exclusion.

The motion to exclude on these grounds is **DENIED**.

### G. DR. EVA TELZER (PI/SD)

Dr. Telzer describes her task as one to:

> provide an overview of the adolescent brain, the vulnerabilities that exist that increase the risk of harm for social media, and the relationship between social media use and function and structural changes to the adolescent brain . . . based upon [her] own education, knowledge, training, experience and research, a review of literature examining the effects of social media on adolescent brain development and mental health, and the work of others in the field, as well as underlying Defendant documents and deposition testimony.

(Expert Report of Dr. Eva Telzer ["Telzer Rep."], Dkt. No. 2504-3, Ex. 62 ¶ 1.) Telzer completed her Ph.D. in psychology from the University of California Los Angeles (UCLA) in 2012 and has been a professor since that time. Telzer obtained tenure as a professor of psychology and neuroscience at the University of North Carolina Chapel Hill (UNC) in 2019 and serves as a director of UNC's developmental psychology program and Center for Technology Use, Brain, and Psychological Development. Defendants do not question her qualifications to opine on adolescent brain development.

#### 1. Section 230, The First Amendment, and Specific Platforms

Defendants seek to exclude Telzer's opinions on the basis that they do not disaggregate the effects of each platform's Actionable Defects from that of content or features that Section 230 or the First Amendment bar from forming the basis of liability. For the reasons already discussed, the Court declines to grant defendants' motion on this ground. *See supra* Section III(A)(1).

#### 2. Methodological Reliability

Next, defendants argue that Telzer's opinions are unreliable because she relies on correlative studies to draw casual conclusions, analogizes from studies of phone use to social

media, and "cherry-picks" favorable studies while ignoring literature contrary to her conclusions.[6] Defendants' assertions do not warrant exclusion. As Telzer explains, and defendants do not contest, the methodologies that she and others in her field employ—such as longitudinal studies, which track changes in a person over time while holding constant potentially-confounding background factors—can help support causal inferences from data. (*See* Telzer Rep. ¶¶ 368-373.) Telzer considered a wide variety of studies of different methodologies, including such longitudinal studies, in drawing her conclusions about what the totality of the evidence suggests. (*See, e.g.*, *Id.* ¶¶ 295-299, 321, 337, 361-363.) An expert may reasonably rely on their "clinical experience and reviewed scientific literature" to form their opinions, as Telzer has done here. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 967 (9th Cir. 2021). Defendants may attempt to undermine Telzer's conclusions via cross-examination, but her analysis is "not the junk science Rule 702 was meant to exclude." *Engilis,* 151 F.4th at 105; *see also Mullins*, 178 F.Supp.3d at 876.

Likewise, defendants' criticism that Telzer "cherry-picks from the scientific literature" is overstated. Telzer cites to hundreds of published studies upon which her opinions rely. (*See* Telzer Rep. ¶¶ 197-246). Defendants' evidence that Telzer "cherry-picked" studies is limited to: (1) some paragraphs of her report do not cite to published literature but instead to company documents; (2) Telzer testified at deposition that the absence of the term "social media addiction" in the DSM-5 is not dispositive; and (3) several of the studies she considered were about smartphone use. None of these arguments warrant exclusion.[7] Where, as here, the platforms have only recently been

---

[6] As with other GC Experts, defendants argue that Dr. Telzer's opinions should be excluded because she considered internal company documents. As previously discussed, the Court declines to exclude her opinions on that basis. *See supra* Section III(A)(3).

[7] Additionally, defendants argue that Dr. Telzer's opinions regarding "problematic" or "addiction-like" social media use are not generally accepted or supported. For the reasons already discussed, *supra* Section III(B)(5), the Court declines to exclude her testimony on this ground.

evaluated, internal analysis is relevant. Whether smartphone use makes a persuasive analogy to social media use goes to weight, not admissibility. The prior conclusions regarding the DSM are equally apt here. *Supra* Section III(D)(2).

### 3. Smartphone Opinions and Data

Defendants object to Telzer's opinion regarding the frequency with which students use their phones during the school day. (Telzer Rep. ¶ 15 ("[S]everal studies indicate that students are picking up their phone extensively throughout the day, including some students that are picking up over 100 times a school day and spending greater than 1/3 of each school hour on social media.")) Defendants' primary concern is that this opinion is based on an unpublished data set that defendants have not had the chance to examine. The parties dispute whether the figures referenced in that opinion are from Telzer's unpublished data or other published research, and whether plaintiffs have sufficiently supplied defendants with any unpublished data. In particular, the "100 times a school day" figure appears to refer to a third-party study Tezler cites in her report. (Telzer Rep. ¶ 328.) ("Common Sense media conducted a study that found that adolescents were more likely to check their phone over 100 times per day." (Radesky, 2023).)

As discussed in the Court's Order Denying Rule 702 Motion to Exclude School District Experts ("SD Daubert Order"), while an expert may support her analysis with published studies, she cannot merely parrot their results to a jury. Telzer does just that when she opines that "several studies indicate that students are picking up their phone . . . over 100 times a school day and spending greater than 1/3 of each school hour on social media." (*Id*. ¶15.) Under Rule 702, Telzer may testify about her research and opine, at a general level, that other studies are consistent with her own findings.[8] However, she cannot affirmatively relay the specifics of those other studies.

---

[8] In fact, portions of Telzer's report describe conclusions from her own research that potentially align these figures. Telzer Rep. ¶ 331 (students in her study picked up phones between 13 to 143 times a day); *id*. ¶ 332 (students in her study spent >38% of school time on phones).

In contrast to her opinion offered at ¶ 15, other portions of Telzer's report properly frame an opinion she may offer. (*See* Tezler Rep. ¶¶ 328 ("This study, and others discussed below, are consistent with my own research regarding phone use during school hours support my opinion that students are spending significant time on their phones and social media during school hours.").) As such, the Court permits her opinions as modified in accordance with the above guidance.

### 4.  Opinion on Social Media Use for Non-Educational Purposes

Defendants object to the following paragraph in Telzer's rebuttal report:

> While platforms like YouTube can have educational value, we know from research that many students primarily engage with it for non-educational purposes, even during school. This is not just anecdotal; it is supported by a growing body of literature, including my own empirical work, peer-reviewed research, and nationally representative surveys such as those from Common Sense Media. Taken together, the full picture provides strong and consistent evidence that social media is a pervasive problem for school learning in the U.S. today.

(Dkt. No. 2405-3, Expert Rebuttal Report of Dr. Eva Telzer ["Telzer Rebuttal Rep."], Ex. 63 ¶ 132.) Defendants contend that Telzer fails to support the argument that YouTube use in the classroom is for non-educational purposes and seek to exclude her opinions on that basis. This paragraph is not one of the twelve opinions Telzer offers on rebuttal, which each relate to her methodology and her general conclusions about the risks of social media. Thus, it is not clear how this subsection could be offered. While YouTube did not bring a motion to strike, the Court is unclear on whether Telzer intends to offer trial testimony as to whether students use YouTube primarily for non-educational purposes. This issue warrants further clarification.[9]

---

[9] Defendants contend that Telzer was unable at deposition to provide evidence to support the proposition that students primarily engage with YouTube for non-educational purposes. Telzer responded that she would need to check her records before providing a citation. *See* Dkt. No. 2405-3, MDL Deposition of Dr. Eva Telzer ["Telzer MDL Dep."], Ex. 68 at 195:17-18; 195:21-25; 196:6-7. Defendants did not ask Telzer to provide the information following her deposition nor file a motion to compel. After defendants raised the issue in briefing, plaintiffs responded citing several studies they contend support Telzer's conclusion, but which do not appear in her reports.

The motion to exclude Telzer's opinions is **DENIED** except as to the noted opinions which will be discussed further at a conference.

### H.  DR. JEAN TWENGE (PI/SD, AGS)

Dr. Twenge describes her assignment as one to "provide [her] expert opinion on the relationship between social media use and mental health among adolescents." (Expert Report of Dr. Jean Twenge ["Twenge Rep."], Dkt. No. 2504-3, Ex. 75.) Twenge received her Ph.D. in psychology from the University of Michigan in 1998 and has been a tenured professor at San Diego State University's psychology department for over two decades. (*Id.* ¶ 10.) Twenge has authored or co-authored over two hundred scholarly articles, books, and book chapters on topics in the field of psychology, including regarding trends in teen mental health and social media use. (*Id.* ¶ 8.) Defendants do not challenge her qualifications to opine on this topic.

#### 1.  Section 230, The First Amendment, and Specific Platforms

For the reasons previously discussed, the Court declines to grant defendants' motion on the ground that the opinions do not disaggregate the effects of the Actionable Defects from content or features barred under Section 230 and the First Amendment. *See supra* Section III(A)(1).

#### 2.  Bradford Hill Analysis and Causal Conclusions

Here, defendants contend not just that Twenge's Bradford Hill analysis was faulty, but that the literature she reviewed otherwise cannot support causal inferences. The Court addresses each.

Defendants do not deny that Twenge conducted a Bradford Hill analysis, but rather contend that it was so flawed as to require exclusion. For this proposition, they identify the similarity of Twenge's discussion of the Bradford Hill criteria, Twenge Rep. ¶¶ 95-107, to a Substack post by Dr. Anna Lembke, one of plaintiff's other GC Experts, which also analyzes data regarding social media and mental health according to each Bradford Hill criterion. (*See* Dkt. No. 2298-2, Simonsen Decl., Ex. 75). Defendants then note that Lembke's Substack post itself disclaimed "using this post

27

to claim that a causal relationship has been definitively established," because doing so would require additional work to consider "all available studies and relevant data." (*Id*.) Defendants contend that because Twenge's Bradford Hill analysis merely parrots Lembke's Substack post, Twenge has failed to conduct sufficiently fulsome analysis.

Having read Twenge's report and Lembke's Substack post, the Court disagrees. Twenge's report attests that she reviewed nearly 200 publications in forming her opinions, suggesting that she has done a more fulsome literature review. (Twenge Rep., Ex. D 1-13.) Twenge's analysis of the Bradford Hill criteria also discusses research evidence not in Lembke's post. (*See, e.g.*, Twenge Rep. ¶¶ 95, 97 (referencing studies by Liu et al., Orben, Twenge & Farley, Reuben et al., and Twenge et al. in analyzing the first criterion); ¶ 99 (referencing studies by Boer et al., Schrijvers et al., and Twenge et al. in analyzing the second criterion); ¶ 101 (referencing studies by Braghieri et al. and Twenge et al. in analyzing the fourth criterion). That Twenge and Lembke, who both study social media, would consider some, but not all, of the same evidence is not surprising nor grounds for exclusion.

Next, defendants contend that Twenge's analysis of the nine Bradford Hill criteria fail to explain how she weighs each one, and therefore her opinions must be excluded. Defendants cite no Ninth Circuit case requiring this rule and the Court declines to apply it here, particularly given the defendants' ability to depose her, and that their own cited authority is distinguishable as it addresses significant additional methodological issues not present here. *See, e.g., In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 258-59 (S.D.N.Y. 2018) ("grave methodological deficiencies" in how expert analyzed each criterion; expert committed the "ultimate red flag" of repeatedly relying on results of a retracted study); *In re Paraquat Products Liability Litigation*, 730 F.Supp.3d 793, 830-31, 850 (S.D.Ill. 2024) (expert's "violations of the rules of meta-analysis [were] evident from the very beginning of his process"; "methodological red

flag[s]" regarding how expert decided which studies to consider; that expert's "causation theory has not been adopted or independently validated in *any* peer-reviewed scientific analysis" was an "evidentiary red flag.")

Regardless, the Court is unclear to which, if any, of her opinions a flawed Bradford Hill analysis is fatal. While Bradford Hill analysis is used to make causal inferences from associational evidence, only one of Twenge's six opinions relies on purely correlational studies, and it is not framed as drawing causal conclusions. *See In re Roundup Products Liability Litigation*, 390 F.Supp.3d 1102, 1116 (N.D.Cal. 2018); Twenge Rep. ¶ 4 ("Correlational studies show that the more hours a day an adolescent uses social media, the more likely they are to be depressed or unhappy. These links are larger among girls.") Twenge's other opinions properly rely on different types of study designs that, defendants do not contest, can support causal inferences. (Twenge Rep. ¶ 2, 3 ("Time series studies . . . "strongly support" causation); ¶ 5 ("Longitudinal studies show that adolescents' social media use . . . leads to depression"); ¶ 6 ("Experimental studies . . . demonstrate[e] a causal path from social media use to lower psychological well-being"); ¶ 7 (Evidence in total demonstrates "clear casual path").) As a result, the Court declines to exclude Twenge's opinions on this ground.

Defendants advance several other arguments to bar Twenge's testimony. Defendants contend that Twenge's refusal to assign weight to the four types of studies she considered—"(1) time series studies, (2) correlational studies, (3) longitudinal studies, and (4) experimental studies"—necessitates exclusion. (*Id.* ¶ 14). In fact, Twenge's report discusses in detail the advantages and limitations of each of the four types of studies, and to what extent and how causal inferences can or cannot be made from each design. (*Id.* ¶¶ 15-22.) Moreover, defendants cite no authority that a lack of numerical weighting necessitates exclusion.

Next, defendants contend again that Twenge based her causation opinions only on cross-sectional and correlational studies which do not establish causality. As already discussed, Twenge's report makes clear that she also considered longitudinal and experimental studies which, she concluded, likewise "point toward social media use causing worse mental health." (*Id.* ¶ 14.) Moreover, Twenge explains how correlational studies, despite limitations, can be useful evidence. (*Id.* ¶ 20.) The Court is not persuaded that her opinions must be excluded on this ground.

Finally, defendants argue that because Twenge relies on self-reported symptoms and does not apportion harm among different social media platforms or across different types of mental health harms, her opinions must be excluded. For the reasons already discussed, defendants may cross-examine her on these issues, but none require exclusion.

The motion to exclude Twenge's opinions is **DENIED**.

## I.    DR. SHARON HOOVER (SD)

As discussed in greater detail in the SD Experts Order, Dr. Sharon Hoover is a licensed psychologist with over two decades of clinical and academic practice who offers opinions on the "impact of student social media use on school districts, schools, the school environment, and student mental health and learning," as well a strategic plan to deal with those impacts. (Expert Report of Dr. Sharon Hoover ["Hoover Rep."], Dkt. No. 2504-3, Ex. 78 ¶ 2.) Hoover offers three opinions relevant to defendants' challenge here to her general causation opinions (not to her strategic plan or specific causation opinions, which are addressed in the SD Experts Order). *First*, that social media use "presents several real and observable harms to students' functioning"; *second*, that those harms include "distraction," erosion of in-person social skills development," "diminished teaching effectiveness," and "detrimental effects on student mental health"; and *third*, that those impacts of student social media use "have required school districts and schools to expend and redirect already limited resources." (Hoover Rep. ¶¶ 3-5.)

**1. Section 230, The First Amendment, and Specific Platforms**

Here, too, the argument that exclusion is required for failure to disentangle the effects of each defendant platform's actionable and non-actionable conduct is denied.

**2. Methodological Reliability**

Defendants argue that Hoover's general causation opinions lack a reliable methodology, including because she draws causal conclusions from correlative studies, and does not provide an explicit framework for doing so. Plaintiffs respond that she formed her opinions based on a robust literature analysis as well as leveraging her experience in the field of school-based mental health interventions, which is permitted. *See Rogers v. Raymark Indus., Inc.*, 922 F.2d 1426, 1429 (9th Cir. 1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training").

Defendants' concerns do not require exclusion. To start, the Court is not convinced that Hoover considered studies that only point to mere association rather than causal direction. For example, Hoover cites longitudinal evidence suggesting social media use increases risk of mental health harms. (*See, e.g., id.* ¶¶ 42, 70.) Plaintiffs' experts aver, and defendants do not refute, that longitudinal data can suggest causal inferences. *See supra* Section III(G)(2). Nor does Hoover's reliance on the reports of several other GC Experts, Drs. Christakis, Mojtabai, Telzer, Lembke, Twenge, and Goldfield, *see id.* ¶ 3, prevent her from offering her opinions. *See In re Da Vinci Surgical Robot Antitrust Litig.*, 2024 WL 5697897, at *9 (N.D. Cal. 2024) (reliance on opinions of other experts in case permitted where those opinions are sufficiently reliable). Of course, to the extent this reliance suggests she substituted those other experts' general causation analyses for her own, defendants may cross-examine her on that subject at trial. *See Primiano*, 598 F.3d at 564.

### 3.   Waiver of Opinions as to Students

On reply, defendants contend that plaintiffs frame Hoover's opinions as being about the impact of student social media use on *schools* and so have waived their opposition to defendants' motion to exclude Hoover's opinions about the impact of social media on *students*. Given that a school cannot exist without students, the Court is not persuaded this is a distinction with a difference. The motion on this ground is denied.

The motion to exclude Hoover's opinions is **DENIED**.

### J.   MR. ARTURO BÉJAR

Arturo Béjar is a former Meta employee with "30 years of experience in online and social media user safety," including with responsibility for safety at Yahoo! beginning in 1998, followed by a six-year stint at Meta, from 2009 to 2015, as a manager with responsibility for safety and customer care for Facebook and, from 2019 to 2021, as a consultant for Meta advising Instagram's well-being team on user safety. Plaintiffs disclose Mr. Béjar as a non-retained expert on the basis that portions of his testimony may be considered expert testimony. Béjar seeks to testify regarding his "personal knowledge and experience" of the following twelve topics: (i) "online child safety and wellbeing"; (ii) safe and ethical design of online platforms; (iii) "the safety of Meta's platforms for minors"; (iv) "how design defects on Meta's platforms can cause harm to minors"; (v) "Meta's prioritization of growth and engagement over safety"; (vi) "online predation and prevention efforts"; (vii) "online bullying and harassment"; (viii) "drafting and assessing the adequacy disclosures concerning risks or known issues of online platforms"; (ix) "the design and efficacy of Meta's safety features" and alternative designs; (x) Meta's policies and disclosures about safety risks; (xi) "tests that he performed on the safety of Instagram and Facebook for children"; and (xii) his interpretation of "survey results and user testimonials concerning the safety of online platforms." (Dkt. 2405-3, Non-Retained Expert Disclosures, Ex. 92 at 4-5.)

## 1. Qualifications

Defendants first challenge Mr. Béjar's qualifications to offer general causation opinions because he is not a clinician or scientist. Plaintiffs do not dispute this characterization of his qualifications and confirm that Mr. Béjar will not opine on the causes of adolescent mental health issues or harms associated with social media, but rather upon how Meta's platforms are unsafe.

The Court agrees that Mr. Béjar is unqualified to opine as to the science or medicine of causation, and his testimony may not be offered for that purpose. He may, however, offer testimony based on his specialized knowledge in the field of platform design and safety.

## 2. Methodological Reliability

Defendants argue that Mr. Béjar lacks a reliable methodology because he did not meaningfully consult scientific literature, and because his efforts to test the safety of the Instagram platform were not based on a documented, repeatable, and peer-reviewed methodology. Plaintiffs respond that Mr. Béjar was not required to review scientific literature, and that his safety testing procedures were described in detail and captured on video.

Under Rule 702, an expert may offer technical and specialized knowledge based on industry experience so long as they "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, 2000 Advisory Committee Notes; *see also Federal Trade Commission v. Qualcomm Incorporated*, 2018 WL 6460573, at \*4 (N.D.Cal., 2018) (expert's opinions based on relevant industry experience "sufficiently reliable to be admissible even though they may not be founded in scientific data or fact.") Béjar offers specialized knowledge from his years of industry experience regarding platform design, safety, and related topics in keeping with this rule. At deposition, Béjar explained how he applied the same methods used throughout his career in online product and platform safety to the issues upon which he seeks to opine. (*See, e.g.*,

Dkt. 2405-3, MDL Deposition of Arturo Béjar ("Béjar Dep."), Ex. 90 at 200:9-13 (applying safety testing protocols learned across career to review Instagram platform for presence of underage users); *id*. at 1008:18-22 (discussing safety protocols learned across career for running user experiments).) He need not offer analysis of academic literature nor a peer-reviewed scientific methodology for those opinions based on his relevant industry experience. *Qualcomm*, 2018 WL 6460573 at *4. Sometimes practical and hands-on experience is more persuasive than the purely scientific. The challenge is one of weight not admissibility.

The motion to exclude Béjar is **DENIED**.

### K.  DR. LAUREN HALE (AGS ONLY)

Dr. Lauren Hale describes her assignment as to reply to Meta's expert Dr. Sarah Honaker, whose report opined "that 'there is no reliable evidence' that 'social media use is causally connected to sleep problems in adolescents' and criticizing studies that 'have attempted to assess the relationship between sleep and screen time and/or social media.'" (Expert Rebuttal Report of Dr. Lauren Hale ["Hale Rebuttal Rep."], Dkt. No. 2405-3, Ex. 87 ¶ 16.) Defendants do not question Hale's qualifications to opine on this topic.

### 1.  Section 230, The First Amendment, and Specific Platforms

For the reasons already discussed, these repeat arguments are denied.

### 2.  Methodological Reliability

As with the other GC Experts, defendants argue that Hale employs unreliable methodologies, including using studies that merely show correlation to establish causation; and considering studies about the effects of screen time in drawing her conclusions about the effects of social media. For the reasons previously discussed, none of these criticisms persuade. The Court denies the motion to exclude on this ground.

### L.  DR. BRADLEY ZICHERMAN (AGS ONLY)

Dr. Bradley Zicherman describes his assignment as one to:

> opine on the effects of excessive use of social media, including Instagram, and social media addiction on mental health-related symptoms based on my clinical expertise. I was also asked to opine on the effectiveness of current Meta platform restraints for youth, particularly under the age of 18; why social media addiction has been so difficult to treat; and which Instagram platform features are particularly harmful to youth mental health.

(Dkt. 2504-3, Expert Report of Bradley Zicherman ["Zicherman Rep."], Ex. 8 ¶ 19.) Zicherman received his M.D. in 2012 and is a clinical associate professor and director of the Youth Recovery Clinic at Stanford University, which evaluates and treats youth with addiction and mental health concerns. He is also medical director for an intensive outpatient program for youth suffering from addiction, and a treating psychiatrist at a residential addiction treatment center. (Zicherman Rep. ¶ 5.) Meta does not question Zicherman's qualifications.

### 1. Section 230, The First Amendment, and Specific Platforms

These repeat arguments are denied.

### 2. Methodological Reliability

Meta argues that Zicherman's opinions should be excluded because he failed to conduct a comprehensive and unbiased literature review. Plaintiffs respond that Zicherman was not required to do so because his opinions are based on his clinical experience.

As discussed, an expert's opinions may rest "upon personal knowledge or experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). Zicherman's report supplements his knowledge obtained from extensive clinical experience with analysis of published literature. It is not clear which of his opinions defendants believe is insufficiently supported by his years of medical training and experience treating patients with addiction, such that shortcomings in his review of the scientific literature would require exclusion. At trial, defendants may cross-examine

him regarding weaknesses in his literature review, but the Court declines to grant the motion on this ground.

Defendants raise the additional methodological concern that Zicherman's opinions about the effect of social media on teens are based on the patients he sees in his own clinical practice, which is a small slice of the overall population. The *Daubert* standard countenances many "different kinds of experts, and many different kinds of expertise," including based on "personal knowledge or experience." *Kumho*, 526 U.S. at 150. By necessity, expert opinions based upon personal knowledge or experience—such as Zicherman's clinical expertise—are rooted in a narrower slice of data than the collective knowledge of a scientific field. Yet they may nonetheless be relevant and helpful to a jury. As such, this issue goes to weight, not admissibility.

### 3. Qualifications to Offer "Dopamine-Release Theory" Opinion

Defendants argue that Zicherman opines that release of dopamine is the primary mechanism by which Instagram causes mental health harms, but at deposition was unable to answer scientific questions about dopamine release, admitting that it was outside his scope of practice. Plaintiffs respond that Zicherman understands the dopamine pathway consistent with that of a medical doctor who works with patients with addiction; and that he does not need to understand the dopamine mechanism at a detailed neuroscientific level.

Having read Zicherman's report, the Court understands him to opine that social media use can trigger the release of dopamine, which rewards and reinforces the behavior. (Zicherman Rep. ¶ 2.) This understanding is at a level appropriate for a clinician treating patients. He does not offer opinions about the precise neural pathways by which dopamine is transmitted which, nor does he need to, since the thrust of his opinions is about his clinical experience. If defendants dispute the underlying science regarding dopamine release and addiction, plaintiffs may need to elicit his

36

testimony via hypotheticals about what conclusions Zicherman would draw if his understanding of dopamine release was correct or how it would affect his conclusions if it were not.

The motion to exclude Zicherman is **DENIED**.

### M. DR. MITCH PRINSTEIN (AGS ONLY)

Dr. Mitch Prinstein describes his assignment as one to "opine on the effects of social media, including Instagram and Facebook, on the developing adolescent brain and how specific social media features impact developmental and mental health outcomes." (Dkt. 2405-3, Expert Report of Mitch Prinstein ["Prinstein Rep."], Ex. 12 ¶ 20.) Prinstein received his Ph.D. in clinical psychology in 1997 from the University of Miami. He is a professor of psychology and neuroscience at UNC; co-director of UNC's Winston Center on Technology and Brain Development; and Chief of Psychology, Integration and Strategy at the American Psychological Association (APA). (Prinstein Rep. ¶¶ 6-7.) Defendants do not challenge his qualifications.

#### 1. Section 230, The First Amendment, and Specific Platforms

These repeat arguments are denied.

#### 2. Methodological Reliability

Meta argues that Prinstein lacks a reliable methodology because he infers causal relationships from correlative studies, relies on certain studies Meta says do not support his views, and considered other studies that do not disentangle Meta's specific platforms from other social media companies'. For the reasons already discussed, each of these critiques are suited for cross-examination but do not require exclusion. The Court declines to grant the motion on this ground.

The motion to exclude Prinstein is **DENIED**.

## IV.   CONCLUSION

The motion to exclude is **DENIED** as to the general causation opinions of Dr. Dimitri Christakis, Dr. Drew Cingel, Dr. Gary Goldfield, Dr. Anna Lembke, Dr. Ramin Mojtabai, Dr.

Stuart Murray, Dr. Jean Twenge, Dr. Sharon Hoover, Mr. Arturo Béjar, Dr. Lauren Hale, Dr. Bradley Zicherman, and Dr. Mitch Prinstein. The motion is **GRANTED** as to the opinions of Dr. Dimitri Christakis, Dr. Drew Cingel, Dr. Eva Telzer and Dr. Anna Lembke discussed above and **DENIED** as to the remainder of their opinions.

This Order terminates Dkt. Nos. 2292, 2295, and 2304 in Case No. 22-md-03047.

**IT IS SO ORDERED.**

Dated:    March 17, 2026

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**