# AMENDED Exhibit 2

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - -

IN RE:  SOCIAL MEDIA ADOLESCENT         :MDL NO.
ADDICTION/PERSONAL INJURY PRODUCTS      :4:22-MD-
LIABILITY LITIGATION                    :3047-YGR
                                        :
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE
- - -
COORDINATION PROCEEDING SPECIAL TITLE   :
(RULE 3,400)                            :
                                        :
SOCIAL MEDIA CASES                      :
_____ :LEAD CASE
                                        :NO. FOR
THIS DOCUMENT RELATES TO:               :FILING
                                        :PURPOSES
STATE OF TENNESSEE, ex rel, JONATHAN    :22STCV21355
SKRMETTI, ATTORNEY GENERAL and          :
REPORTER,                               :
                                        :
        V.                              :
                                        :
META PLATFORMS, INC., and INSTAGRAM,    :
LLC                                     :
                                        :
CASE NO. 23-1364-IV                     :
- - -
DEPOSITION UNDER VIDEO EXAMINATION OF
VAISHNAVI JAYAKUMAR
JANUARY 30, 2025
VOLUME I

                    Videotaped deposition of
VAISHNAVI JAYAKUMAR, taken pursuant to notice, was
held at the law offices of Baker Botts, LLP, 30
Rockefeller Plaza, New York, New York, beginning at
9:24 a.m., on the above date, before Michelle L.
Ridgway, a Registered Professional Reporter,
Certified Court Reporter (NJ-CCR # XI02126),
Certified Realtime Reporter, Certified Shorthand
Reporter  (CA-CSR # 14592), and Notary Public.

that?

A.          I opted to have independent counsel.

Q.          Okay.  Do you know why they asked you that question?

A.          I think they --

MR. SNEED:  Object to form.  Sorry.

THE WITNESS:  I think they suggested it might be easier for us to prepare if they co-represented me, but -- but eventually I decided to have independent counsel.

BY MR. WARREN:

Q.          I see.

All right.  Could you please introduce yourself to the jury, Ms. Jayakumar?

A.          Sure.  I'm Vaishnavi.  I live in New York.  I currently run a product and policy advisory known as Vyanams Strategies, VYS for short.  We advise companies, civil societies and governments on how to build safe equitable products for children and teens online.  That ranges from social media, to gaming, to marketplace products, to AI products.  I've been doing this for about a year.

Prior to this, I spent the last

Page 23

14 years of my career working on child safety and tech policy in a variety of different roles.

My most recent role was the head of youth policy at Meta, which I held until May of 2023. I started my time at Meta as the head of safety and well-being for Instagram specifically, and then over time my portfolio evolved.

Prior to Meta I had spent about eight -- eight years -- oh no, I spent ten years working on some of these issues. I led video policies at Twitter. I was the first head of safety for Twitter in the Asia-Pacific region. And I worked on child safety and privacy for Google within their central team covering Asia-Pacific, Middle East, Africa, and Russia.

And then prior to that I started my career right out of college as a Imagineer at the Walt Disney Company.

Q.    Excellent. Let's go one step even before that. Where did you grow up?

A.    I grew up in Singapore.

Q.    In Singapore. And where were you educated?

A.    I was educated in Singapore until I -- until it was college time. And then I did my

Page 38

A.          Safety first motto.  I don't think it is.

Q.          Okay.  I'd like to ask you about a product feature on Instagram called Reels.  Are you familiar with that feature?

A.          Yes.

Q.          Can you explain for the jury what that is?

A.          Reels was Meta's answer to TikTok. It was a series of chained short-form videos that are recommended to users as they go through the Reels tab.

Q.          Was Reels launched while you were at Meta?

A.          Yes.

Q.          Okay.  And, again, that's an Instagram feature?

A.          It was originally on Instagram. Facebook now has Reels as well.

Q.          Okay.  In your experience, was the launch of Reels on Instagram handled in a way that best protected the safety of Instagram's youngest users?

A.          No, I don't think so.

Q.          And can you explain how?

Page 43

late August/early September, did that include the United States?

A.    Yes.  I believe so.

Q.    Okay.  So let's fast forward a month.

I'm going to hand you what we'll mark as Exhibit 4.  And this is a document which begins with the Bates number META3047MDL-034-00329532.

(Document marked for identification as Jayakumar Exhibit 4.)

BY MR. WARREN:

Q.    Take a minute, please, just to orient yourself with that document.

Again, I'll direct your attention to some specific parts of this.

But, first, is this another installment of your monthly safety update?

A.    This is another installment of the biweekly update.

Q.    Thank you for that correction.

And, again, you have sent this to several individuals at Meta who are identified on the bcc line; is that correct?

A.    Yes, correct.

Page 44

Q.        Okay.  Please direct your attention to the top of Page 3.

Do you see the bullet labeled, "Instagram Reels launching globally on August 5th"?

A.        Mm-hmm.

Q.        Okay.  Did you write that?

A.        I did.

Q.        All right.  Let's start near the bottom of this bullet.

You write:

One continued exposure for us is that we still do not have a sense of how minors' follow or DM graphs are changing after they go viral and the way in which this risk will be amplified when we launch globally.

Did I read that correctly?

A.        Yes, you did.

Q.        Those were your words?

A.        Yes.

Q.        Okay.  Can you explain to the jury what a "follow graph" is?

A.        It refers to the kind of users that are either following a minor, or that the minor is following themselves.

Q.        Okay.  So maybe in layman's terms,

it's the connections that exist for someone on Instagram?

A.    Yeah.

Q.    Okay.  And what does the phrase "DM graphs" mean?

A.    It's similarly the messaging connections that exist for someone on Instagram.

Q.    Okay.  And is DM short for direct messaging?

A.    Yes, direct messaging.

Q.    And direct messaging is a communication feature built into Instagram; is that correct?

A.    Yes.

Q.    Okay.  And can you explain to the jury what your concern was as articulated in this sentence?

A.    So prior to Reels launching, I had flagged that when minors, say teen users, or, you know, when young people's Reels get recommended within -- within the Reels platform, that's going to suddenly expose them to a very wide range of audiences.

Typically a user who posts a video would have that video seen by the people they

Page 46

follow, if they are public accounts.  Again, it might be seen by the people who -- sorry, the people who follow them, rather.  Even if it was a public account, it would only be seen by the accounts that already currently follow them.

But by introducing Reels, anyone, including people who never followed them, never knew that the account existed, would now know that the user existed, minor existed, and that they had these kind -- they had posted videos.

So that could incentivize, for example, in the worst-case scenario, an adult predator.  It could incentivize them to reach out to the minor, try to connect with them, befriend them, try, you know, send them messages, when they previously wouldn't have even known about the minor's existence on the platform.

Q.        Okay.  And you go on in this section to state:

We had asked for this mitigation to be in place following the v2 launches but have hit a wall with the Data Science team working on this due to limited bandwidth.

Did I read that correctly?

A.        Yes, you did.

Page 47

Q.        What was the mitigation you were asking for?

A.        So we wanted to understand whether or not minors' follow or DM graphs were going to change after they went viral.  And by going viral, I refer to getting a lot of views or a lot of engagement on Reels.

And one of the recommendations I had made early on is that, to make this the safest experience possible, perhaps we can filter out minor accounts from Reels altogether.

The mitigation specifically that we had asked for was we want to measure and understand this risk.

I think I may have been more comfortable with us just filtering out the accounts altogether.  But as a prelude to that, at least I wanted to understand well, what is the level of risk we are talking about.

And we couldn't get -- we couldn't get that analysis done before the v2 launches.

Q.        And you couldn't get that analysis done because Meta didn't allocate the technical resources necessary to get that analysis done, correct?

Page 48

MR. SNEED:  Object to form.

THE WITNESS:  The data science team just didn't have the bandwidth to handle it.  They had a lot of other projects they were working on, and this isn't a project they could support.

BY MR. WARREN:

Q.        Okay.  And otherwise -- in other words, this mitigation did not become a priority for the data science team ahead of the launch of Reels?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  I would agree with that.

BY MR. WARREN:

Q.        Okay.  Earlier in the paragraph, you appear to identify another safety issue with Reels, although I'd ask if you can confirm them for me.  But let's read the quote.

You say:

Our integrity classifiers are less effective on video and not calibrated for short-form video in particular (i.e., all Reels content).

Did I read that correctly?

A.        Yes, you did.

Page 54

have the power to fix that.

Q.        Okay.  All you could do is flag it for others which is what you did?

A.        Yes.  I think in part because the -- I think I'd mentioned previously there were a lot of limits on, you know, what I could do in my role.  So the most I could do in this particular context was flag it for everyone.

(Document marked for identification as Jayakumar Exhibit 5.)

BY MR. WARREN:

Q.        Okay.  I'm going to hand you what's been marked as Exhibit 5.

This is a short one.  Just let me know when you've had a chance to review it.  For the record, this is META3047MDL-020-00271442.

Okay.  This is a chat between you and ▮▮▮▮▮▮▮ from July 29, 2020; is that right?

A.        Yes.

Q.        And did you send and receive these messages in the ordinary course of your work at Meta?

A.        Yes.

Q.        Okay.  And this would have been right around the time of the biweekly update that

Page 55

we just looked at, right?

A.        Yes.

Q.        Okay.  Can you please read to the jury your message to Ms. ███ starting with the second sentence.

A.        "There are a few areas around child endangerment, it'd be great to discuss for H2" -- the second half of the year.  "Our existing classifiers do not work great on short-form video content, which is effectively all of Reels content.  We also have identified known risks around virality that there is no current mitigation for in the Reels product roadmap - namely, predatory DMs from adults sent to minors who are more easily discovered via their Reels content.  +1 to ███'s suggestion to get on a call to preliminarily discuss this before looping in anyone specific from child safety CI."

                Which refers to the central integrity team.

Q.        Okay.  So this was you, again, expressing the same concern about the inefficacy of the classifiers in catching harmful content on Reels, correct?

A.        Yes.

Page 56

Q.        Okay.  And I see at the top of this chat there's actually several other e-mail addresses; is that right?

A.        Yes.

Q.        So those people also would have seen your chat message to Ms. █████?

A.        Yes.

Q.        Okay.  And what was Ms. █████'s role at the company?

A.        I don't remember.  I think she was a technical program manager.

Q.        Okay.  Ms. Jayakumar, at the time Reels launched, would you agree that Meta did not have an effective way of enforcing its community standards on Reels?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, I would agree with that.

BY MR. WARREN:

Q.        Okay.  Did the -- to the best of your knowledge, did Meta warn the public that it didn't have an effective way to implement its community standards on Reels?

MR. SNEED:  Object to form.

THE WITNESS:  To the best of my

Page 57

knowledge, no.

BY MR. WARREN:

Q.        Did Meta modify its community standards to make clear that they were not being enforced effectively on Reels?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  No, not -- not to the best of my knowledge.

BY MR. WARREN:

Q.        Okay.  Do you think someone reading Meta's community standards in the fall of 2020 would have any way of knowing those policies were not being effectively enforced on Reels?

MR. SNEED:  Objection to form and foundation.

THE WITNESS:  I don't think so.

BY MR. WARREN:

Q.        Okay.  I'm going to hand you another exhibit.  This will be Exhibit 7.

(Document marked for identification as Jayakumar Exhibit 6.)

BY MR. WARREN:

Q.        And for the record this is META3047 --

Page 58

MR. WARREN:  I'm sorry.  This will be Meta 6.  Withdrawn.  I'll move to strike my own comment.

This will be Exhibit 6.

And for the record, this is META3047MDL-034-00037237.

BY MR. WARREN:

Q.        All right.  This is a really long document.  You can take as much time as you need to browse it, although I will be focusing you in on specific areas.  Just let me know when you're ready.

A.        I think we can go.

Q.        Okay.  Do you recognize this document?

A.        Yes.  I believe this is a document that Antigone puts together -- put together for Meta leadership on child safety across the different products and services of Meta.

Q.        Okay.  And the document is entitled, "Child Safety State of Play (9/24)"; is that right?

A.        Yes, correct.

Q.        And I take it that's a reference to September 24th?

Page 59

A.          Yes.  Correct.

Q.          Okay.  I'd like your help in identifying the year of this document.  And if you browse to the back, you'll see a comment history that may provide some clues here.

A.          I think this is from 2020.

Q.          And I'll just direct you to the page ending in 37255 in case that helps.

A.          Yes.  This is from 2020.

Q.          Okay.  And it appears that you opened this conversation at some point in 2020; is that right?

MR. SNEED:  Object to form.

MR. WARREN:  What's the basis of that objection?

MR. SNEED:  Where are you -- could you point me in the document where you're referring to?

MR. WARREN:  I just did.  37255.

MR. SNEED:  37255?

MR. WARREN:  55.

MR. SNEED:  Where on the document does it indicate that?

MR. WARREN:  It says at the top, "Vaishnavi J opened your conversation."

MR. SNEED:  The basis of the objection is the mischaracterization of the document given that also █████████████████ ████████████████████████████████████████ ██████, and several others opened this conversation.

MR. WARREN:  How is that an objection to my question?  My question was it appears that you opened this conversation at some point in 2020.

MR. SNEED:  That's the basis of the objection.

MR. WARREN:  Okay.  Are you going to stand on that?

MR. SNEED:  Sure.

MR. WARREN:  Okay.

BY MR. WARREN:

Q.        Ms. Jayakumar, let me ask you again.

Does it appear you opened this conversation in 2020?

A.        I -- I am not sure if I did.  It looks like we -- it looks like many of us had conversations in here.  I don't -- because multiple people are seen as opening the conversation.  I don't think so.

Page 61

Q.          Okay.  That's fine.  But you've seen the document before?

A.          Yes, I have.

Q.          All right.  So let's look at the substance.  I'll direct you to 37245.

A.          Mm-hmm.

Q.          Do you see the heading, "Internal Readiness/State of Play"?

A.          Yes.

Q.          Can you read the first two sentences that follow?

A.          "Overall we are quite vulnerable when it comes to age management on our apps.  To some degree this is because leadership has decided to live with certain risks at least in the near term."

Q.          Do you agree that was the child safety/state of play as of September 24, 2020?

A.          Yes, I agree.

Q.          All right.  And please flip to Page 37247, just one over.

Do you see the heading on this page that says:

Not ready; work has not been prioritized and more resources are needed?

Page 62

A.        Yes.

Q.        Okay.  And a couple rows underneath that heading it says:

Addressing virality on Instagram.

Do you see that?

A.        Yes.

Q.        Can you read the description to the jury?

A.        "Minors who go viral on Instagram will likely experience increased interactions with unknown people.  As their content and by extension their account becomes surfaced to more unconnected people, they would benefit from additional protections that they can turn on, like limiting who can send them private DMs or follow requests.  However, with a lack of age data, we cannot effectively develop solutions at scale that address virality of minors on Instagram without also generating a large number of false positives/false negatives."

Q.        Okay.  So this is the same issue you'd flagged in your June and July biweekly safety updates prior to the launch of Reels, correct?

A.        Yes.

Q.        Okay.  So is it fair to say that

Page 63

several weeks after the launch of Reels in the United States, the issue still hadn't been addressed?

A.      Yes.  That's fair.

Q.      Okay.  Now, please flip to the page ending in 37249.

Do you see the section called, "Immediate Product Vulnerabilities"?

A.      Yeah.

Q.      And there's a bullet that says IG, meaning Instagram, correct?

A.      Mm-hmm, yes.

Q.      Okay.  Can you read the first sub-bullet.

A.      "Lack classifiers to detect and take action on problematic aggregated content on surfaces like Explore, hashtag pages, Reels."

Q.      Okay.  Now we've talked about that problem with respect to Reels already, correct?

A.      Yes.

Q.      Can you explain that problem with respect to Explore and hashtag pages?

First of all, what is Explore?

A.      The Explore -- Explore is a tab on Instagram that you can tap into that shows you a

Page 64

range of images and videos, some might be from people you follow, many might be from people you don't follow. It's tailored to your interests based on a number of factors, including what you've seen before on Instagram.

Q.    Okay. And what are hashtag pages?

A.    Hashtag pages are, if you type in a hashtag, say #puppies, you'll get an Instagram page that's full of content from people you may know or may not know, that's -- that has all been tagged with that hashtag, #puppies.

Q.    Okay. So how do you understand the phrase "lack classifiers to detect and take action on problematic aggregated content on surfaces like Explore and hashtag pages"?

A.    I think when I wrote this, or when I contributed this input to the team that wrote this, I was referring to the fact that individual pieces of content can be taken down or taken action on, but when -- pieces of content that might be borderline, appearing in aggregate, don't have any solution for them.

So the best way I can think of explaining that is through an example.

If someone were to post a picture

Page 65

of a minor that was nude, that would be a violation of our child sexual abuse materials policy and that piece of content would be taken down.

If somebody had an account that was entirely dedicated to teen gymnasts in skimpy clothing, no individual piece of content, it's fine to post team gymnasts on Instagram, there's many reasons, gym clubs have their own accounts, but if the whole account is dedicated to that, in aggregate that looks like a lot of content that is sexualizing minors.

The same applies if you, say, type in the #teen, and then have a whole page of results showing teens in, you know, very little clothing.

And so while individual pieces of content may be okay on their own and not have been posted with any bad intention, in aggregate, they promote minor sexualization and we need a way to deal with that.  We need a way to either filter them out of the hashtag pages, make sure that only a certain percentage of those non-violating images appear in Explore or hashtag pages.  And we certainly need to filter them out of services like Reels.

Q.    Okay.  And so the classifiers that

Page 66

Instagram had at that time actually were not able to detect and take action with respect to that issue on Explore and hashtag pages, correct?

A.      Yes, correct.

Q.      And they weren't able to take action with respect to that issue on Reels for the additional reason that they weren't just tuned to dealing with short-form video at all, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, correct.

BY MR. WARREN:

Q.      Okay.  Did Meta leadership warn parents or kids about any of these risks that you just testified about?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Meta did not warn parents and kids about the specific types of risks within the product.  But they did have digital literacy programs and media literacy programs where they try to tell parents how to, you know, govern their children's use of the platform.

BY MR. WARREN:

Q.      Right.  And helpful though that is, those materials don't actually inform parents or

Page 67

kids that Instagram didn't have an automated way to detect and take action on problematic aggregated content on Explore, Reels, and hashtag pages, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that's correct.

MR. WARREN:  Okay.  It's been about an hour, maybe more.  Why don't we take a break.  Okay, thanks.

THE VIDEOGRAPHER:  The time right now is 10:19 a.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 10:35 a.m.  We're back on the record.

BY MR. WARREN:

Q.      Okay.  Ms. Jayakumar, before the break, you had testified about a problem with Reels related to the visibility of young people to adults; is that correct?

A.      Yes.

Q.      Okay.  Now, it's correct that around this time, Meta was considering a new safety intervention called Private By Default, is that true?

A.      Yes.

Page 68

Q.          Okay.  And that --

MR. SNEED:  Object to form.  Sorry.
Go ahead.

BY MR. WARREN:

Q.          Okay.  That intervention would have
limited the visibility of young people to adult
strangers?

A.          Yes.

Q.          Okay.  So I'm going to hand you
another document.  This will be Exhibit 7.

(Document marked for identification
as Jayakumar Exhibit 7.)

BY MR. WARREN:

Q.          And for the record this is
META3047MDL-050-00285759.

Okay.  Ms. Jayakumar, is this a
chat thread between you and ██████████████ from
August 24, 2020?

A.          Yes.

Q.          And can you please tell the jury
who Ms. ██████████ is.

A.          ██████████████ was my counterpart
on the privacy team.  So she looked after privacy
policy.

Q.          Okay.  And can you please read the

Page 69

first two messages in this chat?

A.          From ▮▮▮▮▮:   "Hi!  Hope you're doing well.  Do you happen to know the status of the IG Smart Defaults launch?"

And then from me:  "I do - we were initially supposed to launch private by default on September 2nd after approval from IG leads, but that has now been scrapped due to growth concerns, and the product team has been given some time to come up with ways to mitigate the drop in growth."

Q.          Okay.  Now when you said the launch of private by default was "scrapped due to growth concerns," did those concerns include the safety feature's potential impact on growing the overall number of Instagram users?

A.          Yes.

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.          Did the concerns include the feature's potential impact on the amount of time that users spend on Instagram?

MR. SNEED:  Object to form.

THE WITNESS:  I don't think it was about time spent.  I think it was about how people discover one another and how the number of total

Page 70

users increases.

BY MR. WARREN:

Q.        Fair enough.

So did the growth concerns then include the potential safety feature's possible impact on engagement between Instagram users?

A.        Yes.

MR. SNEED:  Object to form and foundation.

BY MR. WARREN:

Q.        Okay.  And those growth impacts would have meant a decrease in Instagram's revenue, correct?

MR. SNEED:  Same objections.

THE WITNESS:  Yes.  It would have.

BY MR. WARREN:

Q.        Okay.  And that was a concern that resulted in pushing back the launch date of the safety feature, right?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  Is it fair to say this is an example of Meta leadership prioritizing growth over

Page 71

safety?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.      Okay.  Now was a version of private by default ultimately launched?

A.      Yes.

Q.      Okay.  When it launched, did it apply to all teen accounts?

A.      No.  It applied to new accounts that were signing up to the platform that were declaring themselves to be teenagers.

Q.      Okay.  Was it ever applied to all teen accounts?

A.      It was applied to all teen accounts at the end of last year, as part of the teen accounts launch.

Q.      Okay.  So that would be the end of 2024, correct?

A.      Yes.

Q.      Okay.  So fully four years after this chat with Ms. ████████?

A.      Yes.

Q.      Okay.  So I'm going to ask you some

Page 72

questions about how private by default worked.  But first a preliminary question:

What is a default setting?

A.        A default setting is something that your account comes with when you sign up for it. It means that -- for example, a default setting might look like, when you sign up for an account, nobody can message you.  You can go in and change that setting if you want.  But as default, nobody can come -- nobody can message you.

Q.        Okay.  And you say that you can go in and change the setting if you want.  Do Instagram users generally do that?

A.        Generally speaking, most users, not just within Instagram, don't change their default settings until they are in a moment of crisis.  And then they look to perhaps adjust their settings.

Q.        Okay.  So the name "private by default" suggests this was a default.  Would you agree?

A.        Yes.

Q.        Was it actually a default setting?

MR. SNEED:  Object to form.

THE WITNESS:  It was -- I don't know if it would have been considered a default

Page 73

setting in layman terms, but it was a default preselected option on a screen.

BY MR. WARREN:

Q.        What do you mean by "default preselected option"?

A.        Sorry for how confusing that sounds.

So a typical -- if you said to somebody, oh, this is an account that is private by default, I think an assumption would be, I sign up, I'm a teenager on the platform, my account is private.  I will go into settings and change that to be a public account if I want to.

The way in which private by default ultimately launched was, I sign up, I say I'm a teenager, I get a screen asking me if I want to have a public account or a private account, and the private option is selected.  So on that screen, I make a choice to say, well, this is a public account or a private account.  Yeah.

Q.        Okay.  So it's not a baked-in default that just operates from the jump.  Rather, it's a screen that gives you an option private or public?

MR. SNEED:  Object to form.

Page 74

THE WITNESS:  Correct.

BY MR. WARREN:

Q.    Okay.  If private by default had been an actual default of the kind you were just describing, with the option to disable it in settings, do you think that would have resulted in more teens with private accounts?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.  I think so.

BY MR. WARREN:

Q.    And why do you think that?

A.    We have data to suggest that teens generally don't change their settings.

Even with the screen option, which is, you know, a pretty easy toggle between two choices, six out of ten teens said that they weren't changing their settings.  They were just going to go with whatever the app suggested.

So if it had been truly -- a true default, that they had to go into their settings later and change, it's highly unlikely that most of them would have done that.

Q.    Okay.  So that ultimately would have been more protective of teen safety, do you

think?

A.        Yes.  I think so.

Q.        Okay.  But it's not what Instagram did, right?

A.        It's not what Instagram did.

Q.        Okay.  And is it fair to say that growth concerns are what motivated Instagram to pick the less safety protected version of private by default?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  This is the -- yes, this was the conversation in 2020.

BY MR. WARREN:

Q.        So that was a yes to my question?

A.        Yes, yes.

Q.        Okay.  Let's change topics.  I want to ask you some general questions about Instagram's business model and its user base.  Are you familiar with those topics?

A.        Yes.

Q.        Okay.  Instagram is an ad-supported platform, correct?

A.        Yes.

Q.        And that means it earns revenue by

Page 77

THE WITNESS:  Yes.

BY MR. WARREN:

Q.       How is it able to do that?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  The -- Instagram looks at a number of signals about the user to understand what types of content might be most appealing to them.  Both organic content posted by other users, as well as promoted content, so things like ads.

That can range from signals such as accounts that they follow, accounts that their friends follow, content that they've liked or engaged with in some way.  There's a wide variety of signals, but those collectively give the app a good idea of what a user might be interested in seeing.

BY MR. WARREN:

Q.       Okay.  And when you use the word "signals," just so that the jury understands, does that refer to data about users?

A.       Yes.

Q.       Okay.  And you said there's a wide variety of data about users that Instagram collects

Page 78

in order to target ads, right?

A.        Yes.

Q.        Okay.  And I'd like to understand some types of that data.

Does that include data about users' interests?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Does it include photos and videos of the user?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Does it include geolocation information about the user?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Does it include the usernames of the user?

MR. SNEED:  Object to form and

Page 79

foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Does it include the gender of the user?

MR. SNEED:  Same objections.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  Are there any other kinds of signals that you can describe sitting here today?

MR. SNEED:  Objection.

THE WITNESS:  They could look at a signal such as interests that you and a friend have in common, or interests that a large number of your friends have in common, and for example, infer that that might suggest something about your own interests as somebody who is friends with all these different accounts.

BY MR. WARREN:

Q.        Is one of the signals that Instagram analyzes, "hover time," meaning how long a user hovers over a certain image?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I don't know with

Page 85

THE WITNESS:  Yes.  That's right.

BY MR. WARREN:

Q.        Okay.  So I'm going to hand you what has been marked as Exhibit 8.

(Document marked for identification as Jayakumar Exhibit 8.)

BY MR. WARREN:

Q.        And for the record, this is Meta --

A.        Oh, I would like to change my earlier answer.

Q.        Sure.

A.        Could you repeat the question, the previous question.

Q.        Up to 2021, is it correct that Instagram was just taking users at their word with respect to their age?

A.        There were some measures Instagram was taking to be more certain about age.  So for example, it did have a reporting flow where you could report users for being underage and they would review that.

If an account was reported for anything -- for any other type of violation, the reviewer would also review the account and make sure that it, you know, wasn't actually an underage

Page 86

person on the platform.  So there were a couple of other things the company was doing.

MR. WARREN:  Okay.  Can we take a quick break?

THE WITNESS:  Mm-hmm.

THE VIDEOGRAPHER:  The time right now is 10:51 a.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 10:54 a.m.  We're back on the record.

BY MR. WARREN:

Q.       Okay.  So, Ms. Jayakumar, you said there were some measures Instagram was taking to be more certain about age, right?

A.       Yes.

Q.       Okay.  And you said it had a reporting flow where people could report users for being underage, correct?

A.       Yes.

Q.       Now, that wouldn't actually address the problem of an adult pretending to be underage in order to engage in sexual exploitation, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Page 87

Q.        Okay.  And you said that another mitigation measure was that an account reported for another type of violation would be reviewed and analyzed for age, right?

A.        Yes.

Q.        So in the situation that you just described of a 23-year-old man sexually grooming a 15-year-old, something bad would have to happen first in order for the 20-year-old -- 23-year-old account to get flagged in the first place, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  That's right.

BY MR. WARREN:

Q.        Okay.  And then after that had happened, the account would be analyzed for their age and potentially action would be taken, right?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  So were those mitigation measures you just described sufficient to prevent the grooming hypothetical that you gave moments ago?

A.        No.  They are not sufficient for

Page 88

that.

But I was answering the question of, you know, did Meta have anything in place to identify underage users.

Q.    Fair enough.

So it had some things in place, but not enough to prevent some very serious safety issues for kids?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    Okay.  Let me direct your attention, actually, back to what was previously marked as Exhibit 6.

And this would be the child safety/state of play from September 24, 2020.

Just let me know when you're there.

A.    Yep, I'm here.

Q.    Can you please direct your attention to the page ending in 37246.

Do you see the section labeled "U13 Enforcement"?

A.    Yes.

Q.    What does U13 enforcement mean?

A.    It means removing users under the

Page 89

age of 13 from the platform.

Q.    Okay.  Now, in the middle of this description, it reads:

There's also a current U13 backlog.

Do you see that?

A.    Yes.

Q.    And what does it say in the parentheses next to that?

A.    "Approximately 450,000 job backlog."

Q.    Okay.  And what do you understand that to mean?

MR. SNEED:  Object to foundation.

THE WITNESS:  There are 450,000 reports or noted incidents of potential users under the age of 13 that need to be reviewed and addressed.

BY MR. WARREN:

Q.    Okay.  And a little bit further down, it says:

This backlog is currently not resourced and has been escalated to Ops Resources.

Do you see that?

A.    Yes.

Q.    Okay.  What does that mean?

Page 90

MR. SNEED:  Object to foundation.

THE WITNESS:  It means that there weren't -- there weren't staff allocated to reviewing and addressing the backlog, like reviewing those cases.  And so we have escalated the case to the ops resources team which might have head count and ability to staff -- to review the backlog.

BY MR. WARREN:

Q.       Okay.  Let me direct your attention to what we'll mark as Exhibit 8.

(Document marked for identification as Jayakumar Exhibit 9.)

MR. WARREN:  For the record, this is a document ending in -- I'm sorry.  This is a document bearing the Bates number META3047MDL-020-00278850.

BY MR. WARREN:

Q.       Let me know when you've had a chance to review that.  And take your time.

Are you ready?

A.       Yes.

Q.       Okay.  This appears to be a chat thread among you, ███████████████████████, and ████████████ from March 23, 2021.

Page 91

Do you agree with that?

A.        Yes.

Q.        And was this chat thread conducted in the ordinary course of your work in Meta?

A.        Yes.

Q.        Can you explain to the jury who the other folks on this chat are?

A.        ███████ and ██████ were our safety policy representatives in the Asia-Pacific region. And then █████ was my child safety counterpart who worked on all the other products outside of Instagram.

Q.        And that would include Messenger and Facebook?

A.        Yes.

Q.        Okay.  So the chat starts with Ms. ██████.  She writes to you, Ms. ██████, and Ms. ██████.  Seems to indicate that some of Meta's partners had been asking for in-app reporting for underage accounts.

Do you agree with that?

A.        Yes.

Q.        What does "in-app reporting" mean?

A.        So at the time, if you wanted to report a user for being under 13, you had to go to

Page 92

a web form.  And so, you know, go out of the app essentially, go to a form and then report that account for being under 13.

She was asking whether we could just include it within the app itself.  So within the app, if you click on a piece of content now, you can report it for a variety of violations.  She was asking if we could also include an option to report the account within the app itself for being underage.

Q.        Would that have facilitated more reports of under-13 Instagram users?

A.        Yes.  It's a much faster, much more seamless way to report users.

Q.        So is it fair to say that prior to March 23, 2021, that in-app reporting option did not exist on Instagram for the reporting of underage users?

A.        Yes.  That's accurate.

Q.        Okay.  Now, you respond to Ms. ███████.  What was your response?

A.        I said that I think we would have -- do you want me to read it out or?

Q.        Well, you can read it out, but I also want to know what you were thinking.

Page 93

A.          I think I said yes, I think folks would very much be interested in doing this.  But it would be a significant lift from the legal and privacy perspective.

Q.          Okay.  Why did you think it would be a significant lift from a legal perspective?

A.          I think in-app reporting just increases the volume of accounts that need to be -- that would -- that would come in our way.  And we already had that huge backlog of 450,000 accounts, which I think you saw in a previous report.

And so it would increase the legal risk if we're now getting all these additional reports of potentially underage users.

Q.          I see.  So the concern was that the in-app reporting option would actually work and result in a large number of reports of potential under-13 users, but then Instagram wouldn't have the resources to actually go through all of those; is that fair?

MR. SNEED:  Object to form and the characterization.

THE WITNESS:  That was my -- that was my perspective and that was my impression from working with the different teams across the board.

Page 94

BY MR. WARREN:

Q.    Okay.  And you're obviously not a lawyer, correct?

A.    Yes.

Q.    So you were addressing this and raising this concern more from a resource standpoint; is that right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  My -- my point was that -- and I -- you know, I fully support including in-app reporting for under-13 accounts. I was talking to ███████ more about the likelihood of us being able to get that passed, rather than the inherent value of getting it passed.

BY MR. WARREN:

Q.    I see.

So your concern then seems to be twofold.  One, if we do this, are we going to have the bodies to actually go through the reports. That's one you already talked about, right?

A.    Mm-hmm, yes.

Q.    And then it seems like you had a second concern which was, I'm not sure we're going to be able to convince people to do this; is that correct?

Page 95

MR. SNEED:  Object to form.  Characterization.

THE WITNESS:  I think my primary concern is that I don't think we can convince people to do this.  And one of the reasons is because it would introduce an enormous risk to have all of these additional accounts that we know we're not getting resourcing for.  We already know that we have 450,000 accounts that we haven't been able to staff and review.  Increasing that by some incredibly large number, which is -- I think would be off the table for our legal and privacy teams from a risk perspective.

BY MR. WARREN:

Q.      Understood.

Okay.  Now I would like to just direct you to Ms. █████'s response.  She says:

We're working on improving our underage reporting flows and backlog.  It is a longer term project though (clearing the backlog is the immediate concern right now).

Did I read that correctly?

A.      Yes, you did.

Q.      So she was agreeing with you there still was a large backlog of reports of potential

Page 96

under-13-age users, right?

A.        Yes.

Q.        Okay.

MR. SNEED:  Object to form.  Sorry.

BY MR. WARREN:

Q.        Okay.  And then she provides what she calls a data point.  I'm going to quote here. She says:

For reporting, currently there's no way for users to report under-13 users on Facebook in-app and it takes over seven screens for users to report under-13 users on Instagram.

Did I read that correctly?

A.        Yes.

Q.        Do you have any reason to doubt the accuracy of what ███████ said?

A.        No.  ██████ was very well-plugged into our child safety work.

Q.        Okay.  And then she goes on to say:

On enforcement, we currently have a backlog of over 2.5 million cases age-related reports to review.

Do you see that?

A.        Yes.

Q.        Do you have any reason to doubt the

Page 97

accuracy of that?

A.    No, I don't think that was -- I think that was very accurate.

And it kind of backs up an earlier point that I made that I don't think we would have been able to get, you know, the legal and privacy appetite to handle risk when we already had such a huge backlog of cases to review.

Q.    Okay.  So the previous document we looked at indicated there were about 450,000 reports.  Here it says over 2 million reports.

Do you have an understanding of why there was that growth, or are these just measuring different things?

MR. SNEED:  Object to form.
Characterization.

THE WITNESS:  I don't have a reference as to why there was that growth, but it also wouldn't surprise me.  We have, you know, so many users on Instagram and Facebook.  It -- that doesn't necessarily seem like a huge jump in that period of time.

BY MR. WARREN:

Q.    Okay.  Do you know if the 2.5 million was referring to the whole family of

Page 98

apps monitored by Meta as opposed to just Instagram?

MR. SNEED:  Object.  Foundation.

THE WITNESS:  I don't know which specific subset it was referring to.

Given that ████ primarily worked on Facebook, it might have just been Facebook.  But it could have been across both Facebook and Instagram.

BY MR. WARREN:

Q.    Okay.  Regardless, your understanding is, as of this point in time, there were somewhere between half a million to 2.5 million reports of under-13 users on META Platforms, right?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    Okay.  And that was a backlog that Meta had not yet gotten around to reviewing, right?

A.    Yes.

MR. SNEED:  Same objections.

BY MR. WARREN:

Q.    ████████'s description of a

Page 99

seven-screen-long reporting option seems to me to be pretty clunky.  How does it seem to you?

MR. SNEED:  Object to form.

THE WITNESS:  That is really clunky.  Generally for seamlessness of the user experience, we don't typically recommend more than two or three screens.  The more screens you have, the greater the drop-off of reports, because it's just too much work for people to keep going through the process to report something.

BY MR. WARREN:

Q.      Got it.

Okay.  So I want to just put these pieces together before we move on.

Until December 2019, Meta didn't even ask kids on Instagram for their birthdays, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.      And when Meta finally started asking that question, it learned that lots of kids lie, right?

MR. SNEED:  Same objection.  And foundation.

Page 100

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        So as a belt-and-suspenders measure, Meta gave people the option to report under-13 users, but it didn't do that on the Instagram app itself, and it made the reporting option seven screens long, right?

MR. SNEED:  Object.  Compound.  And foundation.

THE WITNESS:  I don't know if the -- I don't know when Instagram started offering the option to report under-13 users.  It could have been before they started collecting age.  I don't know.

BY MR. WARREN:

Q.        Okay.  In any event, the reporting option that existed as of March 2021 was insufficiently clean and clear to allow people to easily report underage users, right?

MR. SNEED:  Object to the characterization.  Foundation.

THE WITNESS:  In my opinion, I think it was a really complicated process.

And just, you know, as someone who has been in the industry for a long time, it didn't

seem to be at par with what, you know, other

industry players would typically offer as a

reporting option.

BY MR. WARREN:

Q.        Sure.

And if Meta had committed more

resources to the project, could it have cleared out

that backlog?

MR. SNEED:  Object to form.  Calls

for speculation.

THE WITNESS:  I think -- I think we

could have reviewed those cases with more

resourcing.

BY MR. WARREN:

Q.        Okay.  All right.  I'm going to

introduce an exhibit to address one of counsel's

foundation objections really quickly.  And this

will be kind of a standalone.

So I'm going to introduce an

exhibit that we'll mark as Exhibit 9 and -- is it

Exhibit 10?  This will be Exhibit 10, I'm sorry.

MR. DRAKE:  You marked Exhibit 8

for the record.  So that got marked and then you

went to 9.  So I marked it 8, 9.  If it's okay, we

can use that numbering and then clear it up at a

Page 132

be marked as Exhibit 14.  This is a document
bearing the Bates stamp META3047MDL-040-00541333.

(Document marked for identification
as Jayakumar Exhibit 14.)

BY MR. WARREN:

Q.        Okay.  This appears to be a chat
between you and ███████████████?

A.        Mm-hmm, yes.

Q.        And it looks like the chat is from
November 23, 2021; is that right?

A.        Yes.

Q.        Who is Ms. ███████?

A.        ███████ was a researcher at Meta.

Q.        Okay.  And do you know what type of
research she worked on in particular?

A.        She worked on a number of the
safety and well-being research products.  This
conversation was in relation to a talk that she was
giving where she talked about how she used to work
on sleep products at Bose.

Q.        Okay.  Did you participate in this
chat during the ordinary course of your work at
Meta?

A.        Yes.

Q.        Okay.  Could you read your opening

Page 133

message to ██████████, please?

A.    "I didn't know you used to work on sleep products.  We should chat about well-being more broadly.  There are a number of sleep-promoting interventions I want to urge Meta towards."

Q.    Why did you send that note to ██████████?

A.    She had just spoken about how she used to work on sleep products, and some of their research around better sleep that could potentially be translated into what we do.

And I had responded to her saying that, you know, from a practitioner perspective, as a person kind of developing strategies and ideas for product and policy teams, I really wanted to pitch a number of sleep-promoting interventions to improve the well-being of young people on the platform.

Q.    Okay.  And ██████████ responds that she worked for about four years at Bose on sleep products.  She says people have awful sleep habits.

Do you see all that?

A.    Yes.

Q.    And what did you say in response?

Page 134

A.          I said that:

I would love to brainstorm on what we can do across the family of apps about this. Social media addiction is such a problem, and I optimistically think we have a lot of low-hanging fruit we can pick here.

Q.          Okay.  Now, this chat was about nine months after ███████████ had told you that in her view social media addiction was not a companywide concern for Meta, correct?

A.          Correct.

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.          So none of that low-hanging fruit had been picked earlier in 2021 by Meta, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yeah.  None of them had been picked.

BY MR. WARREN:

Q.          Okay.  Ms. Jayakumar, if you knew that the risk of social media addiction had been raised to Meta executives in 2016, would it surprise you that in 2021, there was still low-hanging fruit to address that issue?

MR. SNEED:  Object to form and

Page 135

foundation.

THE WITNESS:  Would it surprise me, no.

BY MR. WARREN:

Q.        Why wouldn't it surprise you?

A.        I could imagine -- I mean I -- there are many things that are raised through senior leadership, you know, over the course of, say, five years.  And I think it would really depend on how much external pressure there was. How much regulatory pressure there was to do something in the space.  How much advertising business pressure there was.  And if those pressures didn't exist, then I wouldn't be surprised if the low-hanging fruit hadn't been picked in 2021.

Q.        If you knew the risk of social media addiction had been raised to Meta executives in 2016, do you think Meta should have picked the low-hanging fruit to address that problem?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes, I do.

Yes, I do.

BY MR. WARREN:

Q.        At any point while you worked at Meta, did the company warn its user base that Instagram could be addictive?

A.        No.

Q.        At any point while you worked at Meta, did it warn its user base of the risk of problematic use of Instagram other than addiction?

MR. SNEED:  Object to form.

THE WITNESS:  No.  And I don't know that there was an acceptance, you know -- externally, that there was any acceptance that there were ways in which an app could be used problematically.

BY MR. WARREN:

Q.        But internally that was a conversation that researchers were having, correct?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.  It's a conversation internally researchers were having. But I don't know if -- I don't think it's something that there was consensus on within the broader Meta leadership.

So researchers, data scientists, product policy teams, we can do a lot of work and

we can bring a lot of evidence to the table that is not equivalent to having volume or support for that hypothesis at a leadership level.

BY MR. WARREN:

Q.      Okay.  So because Meta leadership had not bought into the data and evidence concerning problematic use, they did not warn Instagram's user base about that issue, correct?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  That would be -- that would be my impression.

BY MR. WARREN:

Q.      Okay.  So let me ask you about the low-hanging fruit that you had in mind.  And let's start with the recommendation algorithm.

In your experience, did the algorithm, as deployed in the Explore and Reels parts of Instagram, contribute to social media addiction?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I think it played one role.  I think social media addiction is a really complex issue.  And I don't want to characterize

Page 138

any one app as solely driving it.  But yes, I think it played a role.

BY MR. WARREN:

Q.        And what was the role that it played?

A.        I think the design of the algorithm to promote sustained engagement by continuously showing appealing content and increasingly appealing content can play a role in drawing viewers into the experience for longer periods of time than they necessarily would want for themselves.

That said, there are other factors, of course, that can play a role.  And I want -- you know, as somebody who has been in the industry for a long time, I want to be really clear that it's not a single deciding factor but it does have a role to play, yes.

Q.        Okay.  And in your experience, did the recommendation algorithm, as deployed in the Explore and Reels part of Instagram, contribute to other kinds of problematic use besides addiction?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I think that there

Page 157

as Jayakumar Exhibit 16.)

MR. WARREN:  This is a document bearing the Bates stamp META3047MDL-040-00337135.

BY MR. WARREN:

Q.      And I'll represent to you that this document was produced by Meta and it came from your electronic files.  Do you have any reason to dispute that?

A.      No.

Q.      What's the title of this document?

A.      "AR Beauty Effects:  Stakeholder Engagement."

Q.      Was this document created by employees of Meta?

A.      Yes.

Q.      Did you review this document while you were working at Meta?

A.      Yes.

Q.      Okay.  And can you remind the jury what AR stands for?

A.      Augmented reality.

Q.      Okay.  Please direct your attention to the bottom of the first page where it says, "Feedback Summary."

Do you see that?

Page 158

A.          Yes.

Q.          Does this section of the document summarize the feedback that Meta received from experts concerning augmented reality beauty filters?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes, it does.

BY MR. WARREN:

Q.          Okay.  Can you please read the first two bullets?

A.          "Generally, stakeholders support making a distinction between effects achieved via makeup versus those that can only be achieved via cosmetic surgery, though no line will be perfect."

Q.          And what about the next bullet?

A.          "These extreme beauty effects can have severe impacts on both the individuals using the effects and those viewing the images."

Q.          Do you agree with that statement?

A.          Yes, I do.

Q.          Can you read the last bullet, the one beginning with "children"?

A.          "Children are particularly vulnerable, however many others are vulnerable as

Page 159

well: those with a history of mental health
challenges, eating disorders, et cetera."

Q.    Okay.  Do you agree with that?

A.    Yes.

Q.    All right.  Can you please flip the
page.  Do you see the heading titled, "Summary for
Boz e-mail"?

A.    Yes.

Q.    Who is Boz?

A.    This is Andrew Bosworth.  At the
time he was the head of the VR team.

Q.    Was he a senior leader at Meta?

A.    Yes.  Very senior.

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.    Can you please read the first
paragraph of this summary?

A.    "We spoke with 18 experts including
psychologists, researchers, body image activists,
and AR professionals.  We made sure to focus our
outreach on experts who could provide research
insights and findings about the impact of social
media and internet technologies on youth identity
development, body image, including Body Dysmorphic
Disorder (colloquially know as 'Snapchat

Page 160

dysmorphia'), and mental health.  A large majority, including individuals in the AR field, recommended prohibiting these filters, citing known impacts to body image and mental health of other forms of media that idealize unrealistic beauty standards. We discussed corrective actions that were less prohibitive, including limiting cosmetic surgery filters to adults and/or utilizing watermarks, however these actions were not viewed as sufficient protections because (1) the universe of users who are vulnerable to negative impacts from such filters is much broader than those ages 13 to 17, and (2) past research on labeling photoshopped imagery found that they do not insulate viewers from its negative affects.  There was agreement in our conversations that we should be careful to limit cosmetic filters even when used in conjunction with a costume, animal features, fantasy effects and accessories, especially because these are often most popular with our youngest users who are attracted to the fun/imaginary play aspect of these filters but are gradually exposed and increasingly grow accustomed to their idealized face over their real one."

Q.        Do you take issue with anything in

Page 161

that paragraph?

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.        Well, let me ask it a different way.  I'll withdraw the question.

Is it your understanding that these findings were put into an e-mail that was sent to Andrew Bosworth?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  That's my understanding, yes.

This predates my time at the company though, but it is my understanding.

BY MR. WARREN:

Q.        Did Meta leadership follow the feedback it received from the 18 experts that it consulted?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  No, it did not.

BY MR. WARREN:

Q.        Who made that decision?

MR. SNEED:  Object to form and foundation.

Page 162

THE WITNESS:  I believe Boz made the final decision.

BY MR. WARREN:

Q.    What was your involvement with respect to this issue?

A.    I joined after the consultations that happened with this list of experts in 2019.

And I was there when an escalation around this topic took place.

I wasn't closely involved in it because it was pretty early in my time at the company.

And then I received the direction that Boz had overturned the initial decision to move forward with removing these filters from the store.

My role after that was then to go back -- was to actually develop a set of arguments around why it might be a good thing to keep these filters in store.

However, while keeping them in store, we would not recommend them actively.  So they would just be available but not recommended.

And then my role was to develop arguments as to why this is a better option than

Page 163

removing them altogether, and to go back to these experts and talk to them about our decision and make sure that they were kept updated about the direction we had gone in.

Q.    Okay.  So is it fair to say that you were asked to help effectuate Andrew Bosworth's decision to keep cosmetic beauty filters on Instagram?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  I was -- I was tasked with socializing the decision with our community of experts.

BY MR. WARREN:

Q.    Did you agree with the decision?

A.    I did not.

Q.    Did Meta leadership make the right decision in restoring augmented reality cosmetic beauty filters to Instagram?

MR. SNEED:  Object to form and foundation and vague.

THE WITNESS:  I do not think that Meta made the right decision there, no.

BY MR. WARREN:

Q.    And why is that?

Page 164

A.      I'm sorry?

Q.      Why is that?

MR. SNEED:  Object to form.

THE WITNESS:  I think we heard a good amount of feedback both from experts, as well as a good amount of research and community feedback around how people were feeling about beauty filters.

Purely from -- I mean, my expertise is in safety and well-being.  So from a safety and well-being perspective, I didn't think that this was the right approach to take.

I could understand the other reasons, and you know, the other kind of motivations around it.  But from a safety and well-being perspective, I didn't think that this was the right decision.

BY MR. WARREN:

Q.      Do you have an understanding as to why this decision was made?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  My understanding, and this is really from what I was told, you know, from the -- about Boz's decision, which was indirectly

communicated.

But my understanding is that AR -- these AR filters are incredibly popular, and we do see a lot of use about -- of these filters. They are also really popular on other platforms like Snap and TikTok and so that -- actually Snap more than TikTok.

And I think banning them would have felt like a competitive loss in contrast to, you know, someone who was actively using these features and very successfully using these features.

BY MR. WARREN:

Q.        So a few minutes ago I previewed that I wanted to discuss with you three different features related to negative social comparison. We talked about the first one, beauty filters.

A.        Mm-hmm.

Q.        And do you agree that -- well, let me withdraw the question.

I'd like to ask you about the second one, the public display or tally of likes.

So to start, can you explain to the jury what a like is?

A.        A like is a reaction that someone can make on the app to a piece of content that

Page 166

suggests that they saw, acknowledged, or liked this content in some way.

Q.     Okay.  So let's say I post a video on Reels.  Will I be able to see how many people liked that video?

A.     Yes, you will.

Q.     Hopefully lots.

Will other users be able to see how many likes my video received?

A.     Yes.

Q.     At some point did researchers at Meta determine that that feature may be exacerbating negative social comparison for kids?

MR. SNEED:  Object to form and foundation and characterization.

THE WITNESS:  Yes.  Researchers have put together a really compelling package of information based on their interviews and user research suggesting that -- I'm sorry -- suggesting that likes might be one way in which we could target the issue of negative social comparison.

They had identified a number of other methods as well, and likes was one of them.

BY MR. WARREN:

Q.     Who is Adam Mosseri?

Page 167

A.          He is the head of Instagram.

Q.          Also a fairly senior leader at Meta?

A.          Yes.

Q.          Did Adam Mosseri announce at some point that Instagram would be launching a new safety feature to address the problem of visible likes exacerbating negative social comparison?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  He announced it in 2019.

BY MR. WARREN:

Q.          And what was the project called?

A.          It was called Project Daisy.

Q.          What happened to Project Daisy?

MR. SNEED:  Object to form.  Vague. Foundation.

THE WITNESS:  Project Daisy eventually launched in a very different form than what had originally tested.  What had originally been tested was turning off the like count in general for all users.

What eventually launched was including the option to turn off likes in the settings tab and letting users go in and decide

Page 168

whether they wanted to hide likes or not.

BY MR. WARREN:

Q.        Was the version of Project Daisy that launched as protective of youth safety as the version that was under consideration?

MR. SNEED:  Object to form and foundation and calls for speculation.

THE WITNESS:  I think that the version of Project Daisy that launched did not address the core issue of negative social comparison that the original version of the product was trying to target.

BY MR. WARREN:

Q.        And why do you think that?

A.        We've previously talked about how most people don't go into their settings and change them unless really they are, you know, in a moment of crisis or trying to protect their safety or well-being in some active way, because they've encountered some harm.

In this case, because the option was simply in the settings, we didn't anticipate, and I don't think -- nobody -- people didn't really go in and adjust those settings in any significant quantities.  And so the issue of -- the goal of

that's been marked for identification as Exhibit 17.  This appears to be a chat between you Ms. _____ from April 9, 2021.

Do you agree with that?

A.      Yes.

Q.      Were these chats sent in the ordinary course of your work at Meta?

A.      Yes.

Q.      Who is _____?

A.      _____ at the time was on the Instagram public policy team.

Q.      In this conversation, were you and Ms. _____ discussing how Instagram's recommendation of content could exacerbate eating disorders?

A.      Yes.

Q.      At 10:03 a.m., Ms. _____ asks you:

Would we consider not surfacing certain content in our rec surfaces that we know to be triggering?

Do you see that?

A.      Yes.

Q.      What are rec surfaces?

A.      These are places where Instagram recommends content, like the Explore tab or Reels.

Q.      And you respond:

Totally - we're working on a borderline ED policy right now to address this and are just kicking this off.

Did I read that correctly?

A. Yes.

Q. Ms. ████ then says at 10:06 a.m.:

The image that ████ sent yesterday of an Explore feed is really problematic, and the ownership of that is also on us since it's an unconnected recommended surface.

Did I read that correctly?

A. Yes.

Q. And we talked about this briefly, but how did you understand Ms. ████ when she referred to an unconnected recommended surface?

MR. SNEED: Object to form.

THE WITNESS: Recommendation surfaces include content from people whom you may not follow or accounts that you may not know. And that's what we mean by an unconnected surface.

BY MR. WARREN:

Q. Do you recall the images that Ms. ████ was referencing here?

A. I don't recall the specific images that ████ sent us, no.

Q.    Okay.  So I'm going to show you those images.  And I've actually handed you a document bearing the Bates stamp META3047MDL-145-00000001.

And that's been marked for identification as Exhibit 18.

(Document marked for identification as Jayakumar Exhibit 18.)

BY MR. WARREN:

Q.    Do you have that in front of you?

A.    I do.

Q.    And I'll represent to you that there are some files that are shared in the course of this chat, and those are attached to the back of this document.

A.    Okay.

Q.    Any reason to dispute that?

A.    No.  No reason.

Q.    Okay.  And you can see about halfway down -- sorry, withdrawn.

This appears to be a chat thread from April 8, 2021, between you, Ms. ████, and ████████████████ ; is that correct?

A.    Yes.

Q.    Okay.  And you can see about

Page 181

halfway down, Mr. ███████ says:

The question is that there is content that will continue to be created on the platform that makes teens feel back about themselves.

I assume he meant bad, and that was a typo. Do you agree?

A.      Yes.

Q.      Okay. And did I read that correctly?

A.      Yes.

Q.      And then he shares some screenshots. And he asks, "What can we do about that"; is that right?

A.      Yes.

Q.      Okay. And can you flip to the attachments? They are up on the screen as well.

TRIAL TECH:  Do you want them up side by side, two pages?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.      How would you describe the Explore feeds that are displayed here?

A.      They are predominately feminine, mostly women -- mostly young women or young girls.

Page 182

They are indexed largely towards, you know -- well, there are a number of pieces of content with young girls or women in minimal clothing.  A lot of them are kind of self-image or representations, either selfies or photos taken of themselves in mirrors.

And they are predominately white images.  There are very few people of color in these images.

Q.    And what about the Explore screen on the right?

A.    Explore screen on the right.  So...

MR. SNEED:  Are you referring to ending in Page 5?

THE WITNESS:  These two are the same.

BY MR. WARREN:

Q.    There should be another page.

TRIAL TECH:  I think everybody got the same.

THE WITNESS:  This -- this screen shot has a number of images featuring cosmetic procedures or makeup.  Yeah, a number of cosmetic procedures.

BY MR. WARREN:

Page 183

Q.          Okay.  So let's go back to the prior exhibit if we can, that's Exhibit 17.

A.          Mm-hmm.

Q.          And this is your conversation with Ms. ▬▬▬.  So, again, at 10:06 a.m., Ms. ▬▬▬ says:

The images that ▬▬▬ sent yesterday of an Explore feed is really problematic.

And are the images we just looked at what Ms. ▬▬▬ was referencing?

MR. SNEED:  Object to form.

THE WITNESS:  The images she's referencing.  Yes, I think so.

BY MR. WARREN:

Q.          Okay.  Do you agree those are really problematic?

A.          I think they could be problematic. I wouldn't say definitively that they are problematic.

Q.          And under what circumstances would they be problematic?

A.          I think social comparison in particular, and, you know, eating disorders is a really complex space.  So it really would depend on a number of factors, including the preexisting

Page 184

conditions of the people who were viewing that content.  One could argue that if you already struggle with negative social comparison, being flooded with a wave of images like that could be -- could make you feel really bad about yourself.

But it's not a given that anyone who looks at those images would necessarily feel bad about themselves or compare themselves to one another in a negative way.

It also depends on how often that is the composition of their Explore tab.

So if you log into Instagram once and that's your Explore tab, and then, you know, you log in another three times and your Explore tab looks different, I don't think that would have as much of an impact on social comparison as if, say, every time you opened your Instagram app, you were getting flooded with aggregate set of images.

Q.    And you've worked on youth safety for over a decade, correct?

A.    Yes.

Q.    In your experience, do teenage girls have a higher degree of social comparison than the median population?

MR. SNEED:  Object to form and

Page 185

foundation.

THE WITNESS:  Yes.  Teenage girls generally -- well, teenage girls report having higher levels of negative social comparison.  That doesn't necessarily mean that they have more than, say, teenage boys.

But certainly more than the median, say, adult population.

BY MR. WARREN:

Q.        Okay.  So the Explore feeds we just looked at are more likely to be problematic for teenage girls than, say, adult men, would you agree?

MR. SNEED:  Object to form and foundation and vague.

THE WITNESS:  They might have a higher likelihood of that, yes.

BY MR. WARREN:

Q.        Okay.  And if the Explore feed of a teenage girl is composed of pages that look like that, then it's more likely that could create problems of negative social comparison, would you agree?

MR. SNEED:  Object to form and foundation.

Page 186

THE WITNESS:  More likely than what?

BY MR. WARREN:

Q.          More likely than if that was just a one off.

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.          Okay.  So Ms. ▮▮▮▮ says at the end of that sentence:

The ownership of that is also on us.

What did you understand her to mean when she said that?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I think what she meant by that, and I -- this is just my opinion based on what she's written, her point was that these are not accounts that people have chosen to follow or that even, you know, young people have chosen to follow.  If they had chosen to follow them, you could argue that, you know, they made that choice to see that content.

Page 187

But in these cases, we are recommending this content that's from people that you don't follow, and, therefore, the responsibility of making sure those are responsible recommendations falls to us.

BY MR. WARREN:

Q.    And did you agree with Ms. ▇▇▇?

A.    Yes.

Q.    Now, you responded to Ms. ▇▇▇ by saying:

Yeah - the challenge is that when you zoom in, any one of those photos probably wouldn't be triggering, but in an Explore grid with all these photos stacked against one another, it's pretty overwhelming.

Did I read that correctly?

A.    Yes.

Q.    And can you explain that?

A.    The problem with -- the difficulty with moderating aggregated content or surfaces with aggregated content is that any one of those pieces of content is not going to violate any policy. It's not even necessarily going to be borderline violative of any policies.

But when you combine them in

Page 188

aggregate, and, you know, you've got dozens of these images in one page on the Explore tab, that gets -- that can be a really overwhelming experience.

And at the time, this was in 2021, I don't think we had done enough work to, like, understand or mitigate the impact of aggregated surfaces.  And there were a number of ways in which we hadn't done enough work on them.  And I think the Explore grid was a really good example of that.

Q.        Okay.  And during the three and a half years that you worked at Meta, did it devote the technical resources and the time necessary to address this problem?

MR. SNEED:  Object to form.

THE WITNESS:  I think there was some efforts to address these problems.  For example, the borderline ED policy that I mention in here.

And we had very supportive product partners.  But due to just overall under-resourcing of this area, we certainly couldn't move as fast or as extensively as we would have liked, given the solutions that were available to us.

BY MR. WARREN:

Q.          And let me just explore what you just said.

So you were referring to a borderline policy; is that right?

A.          Mm-hmm, yes.

Q.          And that refers to content that may not violate the letter of Instagram's community standards, but it may still be something that you want to demote or remove; is that right?

A.          Yes.

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.          Okay.  But a borderline policy would not address problems arising from the aggregation of content that isn't even borderline, right?

MR. SNEED:  Object to form.

THE WITNESS:  A borderline policy would not address the problems that arise from aggregated content that isn't borderline.

However, if you expand the borderline policy to include more types of content, then you could make an impact on recommendation surfaces.

BY MR. WARREN:

Page 190

Q.        Okay.  Let's take dieting tips as an example.

A.        Right.

Q.        Okay.  Dieting tips do not violate Instagram's community standards, correct?

A.        They do not.

Q.        And they don't violate Instagram's borderline policy correct?

A.        The current -- they don't violate the current iteration of the borderline policy, yes.  But we could -- we could change that.

Q.        Right.  But when you were working there, they did not violate the borderline policy, correct?

A.        Right.  But that was the work we were doing to try and see if we could expand the borderline policy to include more types of content that we would say, this is content that we just don't want to recommend.

Q.        Right.  And the policy was never actually expanded to cover dieting tips, correct?

                    MR. SNEED:  Object to form and foundation.

                    THE WITNESS:  Yes.  That's correct.

BY MR. WARREN:

Q.        Okay.  So if an Explore grid for a teenage girl consists entirely of dieting tips, that would not violate Instagram's community standards and it would not violate Instagram's borderline policies, correct?

MR. SNEED:  Object to form, vague.

THE WITNESS:  Correct.

BY MR. WARREN:

Q.        But that could still create a problem for that individual because of the aggregated nature of that content, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, definitely.

BY MR. WARREN:

Q.        And that's not a problem that Instagram devoted the technical resources to fix while you were there, correct?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  That's correct.

BY MR. WARREN:

Q.        Okay.  So let's continue on with the chat with you and Ms. ███████.

At 10:13 a.m. she says:

Girls as young as 8 start to lose

Page 192

self-confidence because of negative self-image and social comparison.  It's when they become aware of their bodies versus others.

Did I read that correctly?

A.        Yes.

Q.        Do you agree with what Ms. ▮ wrote?

A.        Yes, I do.

Q.        Can you read your response please?

A.        I said, "Yeah and we're playing the same role today in their perception of self-identity that magazines and music videos played when we were growing up."

Q.        Do you stand by that?

A.        I do.

Q.        Did Meta ever warn kids that Instagram uses their data to aggregate and push content that can harm how they see themselves?

MR. SNEED:  Object to form.  Characterization.  And foundation.

THE WITNESS:  No, I don't think so.

BY MR. WARREN:

Q.        I want to direct your attention to the second page of this document.

At 10:18 a.m. Ms. ▮ says:

Page 193

There are really meaty legal issues separate and apart of the policy and public health concerns.  Largely by way of deceptiveness (which I think is something that we should start leveraging more).

Did I read that correctly?

A.         Yes.

Q.         Is it correct that Ms. ████ was suggesting to you that if Instagram didn't address this problem, it could create legal issues related to deceptiveness?

MR. SNEED:  Object to form, foundation, and calls for a legal conclusion.

THE WITNESS:  This was nearly four years ago.  But I believe that is accurate.

BY MR. WARREN:

Q.         Okay.  So before we move on -- and we'll take a quick break -- I'd like your help summarizing where we are.

So you've now testified, I believe, that Instagram was aware that some of its younger users could experience negative social comparison through use of the platform, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

Page 194

BY MR. WARREN:

Q.        Meta heard from experts that cosmetic beauty filters contributed to that problem, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        But instead of banning those filters, it allowed them to continue being used on Instagram, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Meta also heard from internal researchers that publicly visible like counts contributed to negative social comparison, correct?

MR. SNEED:  Object to form.

THE WITNESS:  They heard that negative -- publicly visible like counts could contribute and could be a factor in contributing to negative social comparison.

BY MR. WARREN:

Q.        And Instagram explored changing that feature in a way that would have mitigated the problem, correct?

Page 195

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        But it didn't actually roll out the version of that feature that would have helped; instead it did something watered down, correct?

MR. SNEED:  Object to form and characterization.

THE WITNESS:  Yes, correct.

BY MR. WARREN:

Q.        And you also testified about how Instagram's recommendation algorithm can contribute to negative social comparison and actually exacerbate eating disorders.

Do you agree with that?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        And you testified, during your three and a half years at the company, you flagged how that was an issue on Explore and Reels, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, I did.

BY MR. WARREN:

Page 196

Q.        But Meta did not invest sufficient resources to solve that problem either, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

MR. WARREN:  Okay.  I'm going to move into another unit.  Why don't we take a break.

MR. SNEED:  Okay.

THE VIDEOGRAPHER:  The time right now is 2:10 p.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 2:21 p.m.  We're back on the record.

BY MR. WARREN:

Q.        Okay.  Ms. Jayakumar, I'd like to ask you some questions now about a difficult topic. It maybe difficult to discuss and difficult for the jury to hear about, but it's an important one.

Are you familiar with the acronym SSI?

A.        Yes.

Q.        And what does that stand for?

A.        It stands for suicide and self-injury.

(Document marked for identification as Jayakumar Exhibit 19.)

Page 217

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  I've handed you Exhibit 22 and Exhibit 23.  Are you familiar with these documents?

A.        Yes.

Q.        Okay.  Is Exhibit 22 a copy of Meta's policy on suicide, self-injury, and eating disorders from May 4, 2020?

A.        Yes.

Q.        And is Exhibit 23 a copy of Meta's policy on suicide, self-injury, and eating disorders from January 2025?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  And I'd ask you to just compare the first three paragraphs in the 2020 and 2025 versions of the policy, and let the jury know if they are the same.

A.        Yes.  They are the same.

Q.        So this aspect of Meta's suicide, self-injury, and eating disorders policy hasn't changed since roughly around the time you started working at Meta, correct?

Page 218

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    Okay.  Can you please read the second paragraph of the policy to the jury?

A.    "While we do not allow people to intentionally or unintentionally celebrate or promote suicide, self-injury or eating disorders, we do allow people to discuss these topics because we want our services to be a space where people can share their experiences, raise awareness about these issues, and seek support from one another."

Q.    Please read the first sentence of the next paragraph.

A.    "We remove any content that encourages suicide, self-injury or eating disorders, including fictional content such as memes or illustrations, and any self-injury content which is graphic regardless of context."

Q.    Do these policies reflect the promise that Mr. Mosseri made in his February 2019 interview?

MR. SNEED:  Object to form and foundation.

Page 221

and well-being for Instagram, and later the head of youth -- youth safety and well-being, which evolved into head of youth policy.

Q.        In your experience, despite what the policy said, does Instagram's algorithm sometimes push content that promotes suicide?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  The algorithm does sometimes push content that, in aggregate, could be seen as encouraging suicide but not at the individual level.

BY MR. WARREN:

Q.        In your experience, despite what the policy said, does Instagram's algorithm sometimes push content that promotes self-injury?

MR. SNEED:  Object to form.

THE WITNESS:  Again, in the aggregate level, the -- Instagram might promote content that, in aggregate, could be seen as promoting self-injury, but not at the individual level.

BY MR. WARREN:

Q.        And does Instagram's algorithm push that aggregated content to kids?

Page 222

                         MR. SNEED:  Object to form.

                         THE WITNESS:  Yes.

BY MR. WARREN:

     Q.          If a Meta employee -- let me strike

that question.

                         Is it fair to say that there's a

disconnect between the suicide and self-injury

policy and the aggregated content that actually

gets recommended by Instagram's algorithm?

                         MR. SNEED:  Object to form and

foundation.

                         THE WITNESS:  Yes.

BY MR. WARREN:

     Q.          Okay.  So let's go back to right

around when you started at Instagram, around the

time of your conversation with Ms. ███████.  I'm

going to hand you an exhibit that we will mark as

Exhibit 24.

                         (Document marked for identification

as Jayakumar Exhibit 24.)

                         MR. WARREN:  It bears the Bates

stamp META3047MDL-040-00544758.

BY MR. WARREN:

     Q.          And I'll represent to you that this

document was produced to the plaintiffs by Meta and

Page 259

A.          Yes.

MR. WARREN:  And these will be Exhibits 27 and 28.

(Document marked for identification as Jayakumar Exhibit 27.)

(Document marked for identification as Jayakumar Exhibit 28.)

BY MR. WARREN:

Q.          And Exhibit 27 is a document bearing the Bates stamp META3047MDL-037-00266408.

Do you have that in front of you?

A.          Yes.

Q.          And what is this document?

A.          These are the Instagram community guidelines.

Q.          Okay.  And I'll represent to you this is a version of those guidelines that was provided to the plaintiffs by Meta in the course of this litigation.  Any reason to doubt or dispute that?

A.          No.

Q.          And if you flip to the back of this document, you'll see the metadata for it.  And the metadata, including the file name, indicate this version of the guidelines is dated April 15, 2020.

Page 260

Do you see that?

A.        It says April 23, 2020.

Q.        Okay.  And can you read the title?

A.        Wait.  Which one?

Q.        The title on the metadata.

A.        Community -- oh.  "Community Guidelines 2020-04-15."  Yeah.

Q.        So maybe there's some uncertainty as to when in April, but you have no reason to doubt that these are Instagram's community guidelines from April 2020, correct?

A.        Yes.

Q.        All right.  And Exhibit 28 is a version of the Instagram community guidelines pulled from Meta's website on January 24, 2025, as reflected in the top right corner.  Any reason to doubt or dispute that?

A.        No.

Q.        Okay.  And if you look at the top of the page, you'll see a note indicating that these guidelines were moved on November 12, 2024.

Do you see that?

A.        Yes.

Q.        And the note also indicates that, "None of the standards will change and they will

Page 261

continue to apply across Instagram."

Do you see that?

A.      Yes.

Q.      Do you have any reason to doubt that this is an accurate version of Instagram's community guidelines at least as of November 12, 2024?

A.      No.

Q.      Okay.  So we'll refer to Exhibit 27 as the April 2020 version of the guidelines and Exhibit 28 as the November 2024 version of the guidelines.  Is that fair?

A.      Yes.

Q.      Okay.  Did you become familiar with Instagram's community guidelines in the course of your work at Meta?

A.      Yes.

Q.      Okay.  And are they a public-facing document?

A.      Yes.

Q.      All right.  Please direct your attention to the April 2020 version of the guidelines.

Can you please read to the jury the last sentence on the first page?

A.    "We have zero tolerance when it comes to sharing sexual content involving minors or threatening to post intimate images of others."

Q.    All right.  Now please direct your attention to the November 2024 version of the guidelines, specifically the middle of the third page.

Do you see the same sentence there?

A.    Yes.

Q.    So at least from April 2020, to November 2024, Instagram represented to the public that it had zero tolerance when it comes to sharing sexual content involving minors?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    And that's the right policy for the company to have, zero tolerance, would you agree?

A.    Yes, I would agree.

Q.    Okay.  In your experience, did Instagram's algorithm, in fact, sometimes recommend to its users sexual content involving minors?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

Page 263

BY MR. WARREN:

Q.        Did that include content that sexualized minors?

A.        Yes.

MR. SNEED:  Object to form and foundation.

BY MR. WARREN:

Q.        All right.  I'm handing you now a document that we'll mark as Exhibit 29.

(Document marked for identification as Jayakumar Exhibit 29.)

BY MR. WARREN:

Q.        And this is a document bearing the Bates stamp META3047MDL-040-00541113.

All right.  This appears to be a chat thread that includes several people, including you, dated March 28, 2020.

Do you agree?

A.        Yes.

Q.        And, again, this would have been very shortly after you started at Meta?

A.        Yes.

Q.        Did this chat take place in the ordinary course of your work at Meta?

A.        Yes.

Page 264

Q.        And all the e-mail addresses identified on here are official Meta e-mail addresses, right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Who is ██████████?

A.        ██████████ was our -- well, is our Latin America safety policy representative.

Q.        Okay.  And who is ███████ ███████?

A.        Our safety policy representative for Sub-Saharan Africa.

Q.        Can you read the message Ms. ████ sent to this group, including you, at 6:45 a.m.?

A.        "@silent is anyone else receiving child abuse reports on platform?  In the last 24 hours I have received a ton.  Sad face.  I've seen terrible things, we're not detecting it.  Sad face."

Q.        Okay.  And Ms. ████'s messages would have been received by all the individuals in the to line, correct?

A.        Correct.

Q.        And that includes Ms. ██████, Ravi

Page 265

Sinha, and ████████████?

A.          Yes.

Q.          And yourself?

A.          Yes.

Q.          I'm handing you another document that we'll mark for identification as Exhibit 30.

(Document marked for identification as Jayakumar Exhibit 30.)

BY MR. WARREN:

Q.          This document bears the Bates stamp META3047MDL-050-00285734.

Is this a chat thread among you and other Meta employees from March 30, 2020?

A.          Yes.

Q.          Did you participate in this chat in the ordinary course of your work at Meta?

A.          Yes.

Q.          Can you please tell the jury who the other individuals are that are on this thread?

A.          ████████████ was the head of public policy for Instagram in Europe.  Karina Newton was the director of public policy for Instagram.  So ████ reported in to Karina.

I don't remember who ████████████ was, but I think she was on the content strategy

Page 266

team.

_____ was on the content strategy team, so the team that would be able to modify language that appears within the app.

And _____ was Instagram public policy lead for Germany.

_____, ___ _____ was Instagram product policy. And I think that's it.

Q.       Okay. Now you participated in this chat in the ordinary course of your work at Meta?

A.       Yes.

Q.       All right. Apologies if I already asked you that.

This chat is two days after the last document we looked at in which _____ said she received a ton of child abuse reports and seen terrible things, correct?

A.       Yes.

Q.       All right. The chat begins with a message from Ms. _____; is that right?

A.       Yes.

Q.       And it appears she was flagging an issue relating to the reporting of child sexual abuse material on Instagram; is that right?

Page 267

A.       Yes.

Q.       Okay.  Specifically she points out that when users were reporting this content, they would get a popup message; is that right?

A.       Yes.

Q.       And she shares an image of that message, which I'll represent to you is at the back of this exhibit.  Any reason to dispute that?

A.       I don't think I have the image.

Q.       It should be -- it should have the last digits 285737.  Do you see that?

A.       I don't have that.

MR. WARREN:  All right.  Let's go off the record and we'll fix that.  I apologize.

THE VIDEOGRAPHER:  The time right now is 3:54 p.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 4:10 p.m.  We're back on the record.

BY MR. WARREN:

Q.       Okay.  Ms. Jayakumar, do you now see the attachment to this exhibit?

A.       I do.

Q.       Okay.  And can you please read the popup message to the jury?

Page 268

A.          "We couldn't review your report. We have fewer people available to review the reports because of the coronavirus (COVID-19) pandemic, so we're only able to review content with the most potential for harm.  If you don't want to see amyloves0916 on Instagram, you can unfollow, mute or block them to hide their posts and comments from your feed.  Reports like yours are an important part of making Instagram a safe and welcoming place for everyone."

Q.          Okay, terrific.  And just to orient, Ms. █████ was sending this popup message to you and several others and flagging that this was showing up in response to reports of child sexual abuse material on Instagram; is that right?

A.          Yes.  That's right.

Q.          Okay.  And so then you and several others discuss what to do about this.

Karina Newton at 9:11 a.m. says:

Weird that we sent this back for CEI.

Did I read that correctly?

A.          Yes, correct.

Q.          Okay.  And is CEI another term for child sexual abuse material?

A.        Yes.

Q.        Okay.  And does it stand for child exploitation imagery?

A.        Yes.

Q.        Okay.  Did you also think it was weird that Instagram would be telling people that it couldn't review reports of child sexual abuse material?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that was odd.

BY MR. WARREN:

Q.        Okay.  And then at 9:29 a.m., ███████████ writes:

I think the issue here is that we shouldn't be auto-closing CEI.

Is that right?

A.        Yes, that's right.

Q.        So that's a somewhat different concern, right?

A.        Yes.

Q.        Ms. █████ isn't expressing a concern with what Instagram tells users who report child sexual abuse material.  She's expressing a concern with what Instagram actually does in response to those reports.  Is that fair?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes, correct.

MR. WARREN:  And, Mr. Sneed, I'd ask that you let me finish my question before you lodge your objection, please.

MR. SNEED:  Do my best.

BY MR. WARREN:

Q.        Couple minutes later you chime in, you ask whether this could be a function of how the reporter reported it.  Maybe they reported it as something other than CEI.

Do you see that?

A.        Yes.

Q.        And what did you mean?

A.        Well, it could have been that, you know, it was actually CEI or CSAM and they reported it as -- you know, maybe they reported it as bullying and harassment or hate or graphic content.

Q.        Okay.  And, again, CSAM is shorthand for child sexual abuse material, right?

A.        Yes, correct.

Q.        Okay.  But Ms. Newton responds to you and seems to say that's actually not the source of the problem.  Is that fair?

Page 271

MR. SNEED:  Object to form.

THE WITNESS:  That's what she says, yes.

BY MR. WARREN:

Q.    And she says, specifically:

It doesn't actually matter what people chose in the reporting flow.  We run classifiers to categorize.

Do you see that?

A.    Yes.

Q.    And you say, "Ahh, I see," correct?

A.    Yes.

Q.    Okay.  And how did you understand Ms. Newton's clarification there?

A.    I understood it to mean that our classifiers are proactively classifying this content as CEI and then would remove it.  So the reason why someone reports it really shouldn't matter.

Q.    Okay.  And since it's been a few hours, can you remind the jury again what classifiers are?

A.    Classifiers are machine learning algorithms that proactively look for -- in this case, integrity classifiers are machine learning

Page 272

algorithms that actively look for content that could be violating any one of our policies.

Q.    Okay.  So am I correct that Ms. Newton was essentially saying it doesn't matter how people report this, Instagram is using our own technology to figure out what it is and whether it's child sexual abuse material, is that fair?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  Correct.

BY MR. WARREN:

Q.    And so please flip to the next page.

Do you see your message at 9:40 a.m.?

A.    Yes.  Correct.

Q.    Can you please read that to the jury:

A.    "If CEI is determined by classifiers, not the queue it's reported in, then it seems we'd always have this issue.  During this time where we're only reviewing the most severe harms, have we considered specific reporting flows for those harms?"

Q.    And what did you mean?

A.    So Karina was saying, and I think

Page 273

earlier on, I think ███████ -- I think -- let me see.

So Karina was saying that regardless of the queue you report it in, our classifiers are automatically detecting and labeling content as CEI.

And so then I said, if that's the case, then we would always be -- get this issue. Where, you know, it sounds like what might be happening is the classifier is not marking those pieces of content as CEI and then is sending -- and because it's not CEI, isn't, you know, sending them for review or removing them. Instead it's sending the reporting person a message saying sorry, we couldn't review your report.

Q. So just so we have a clear record, Ms. Jayakumar. Were you expressing a concern that Instagram's classifiers were not accurate enough to remove child sexual abuse material on the Instagram platform?

MR. SNEED: Object to form.

THE WITNESS: I was -- I was saying that this issue -- I was saying that this issue wouldn't go away if the classifier was at fault. If this was an issue of the classifier being at

fault, then this was -- this issue wasn't going to go away.  And so I was suggesting that we offer a specific reporting option instead.  So a specific reporting option for CEI.

BY MR. WARREN:

Q.          Okay.  And so as of this moment in time, March 30, 2020, is it correct that Instagram did not have a specific way for people to report child sexual abuse material on the platform?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.          Okay.  And that would have been true whether the user was actually a user of Instagram -- let me withdraw the question.

And that would have been true whether the person doing the reporting was logged into Instagram or not; is that correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  That's right.

BY MR. WARREN:

Q.          Okay.  And can you read to the jury Ms. ████████'s response to your question?

A.          "We don't have an in-app reporting option for CEI that I'm aware of."

Q.        And can you read to the jury Ms. Newton's response to your question?

A.        "We do not."

Q.        Okay.  And can you read to the jury Ms. ████████ 's further response at 9:43 a.m.?

A.        "I don't think updating our reporting flow options is minimal product work. And I'd be concerned that people would abuse this reporting option to report anything they want reviewed and we'd need to review it because it's been reported as CEI."

Q.        So did you interpret Ms. ████████ to essentially be saying, A, it'd be a ton of work to build a reporting option for child sexual abuse material, and B, if we did that, then anything that came through that channel, we'd have to review, which would be even more work?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Yes.  That's how I interpreted her message.  I was kind of -- I remember this conversation now, and it was very surprising to me.  Because reporting CEI is sort of baked into most platforms.  It was a surprise to me, I was only two months into the company, it was

a surprise to me that you couldn't report CEI within the app.

BY MR. WARREN:

Q.    Did you feel like Instagram should have developed a reporting option for reporting child sexual abuse material?

A.    Yes, I made this recommendation multiple times.  I think, you know, when I joined I made this recommendation here in this chat.  I made it several times in conversations after that.  Eventually I believe Instagram did report -- include the option.  But there was a lot of pushback along these lines, that it would be significant product work and that people might abuse the reporting option.

Q.    Does Ms. ████████'s response strike you as putting the safety of kids first?

MR. SNEED:  Object to form.

THE WITNESS:  It does not.

BY MR. WARREN:

Q.    Okay.  And during this time, Instagram had options for reporting other kinds of content that violated its policies, like spam, right?

A.    Yes.  Exactly.  There were many

Page 277

other issues that could be reported in-app, but not CEI.

Q.        Okay.  So you have no doubt that Instagram had the technological ability to create an option for people to specifically report child sexual abuse material?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  It is not a significant amount of product work.  It's you essentially add an additional option to the existing number of reporting, you know, options that are out there.

It is significant work to integrate that into the reviewing queues and then take a look at the reports that have come in.  But the actual work of introducing a reporting option is not significant.

BY MR. WARREN:

Q.        Okay.  Let me direct your attention to the message you sent at 9:50 a.m.

A.        Okay.

Q.        Could you read that to the jury, please?

A.        "If reports are being categorized using classifiers, I'm not sure that re-reporting

the content is going to change that.  The best option is one where a classifier just doesn't get it wrong, but where it does, re-reporting may not help."

Q.        Okay.  And were you responding here to the suggestion made earlier in the chat that maybe Instagram should just make people report child sexual abuse material again after receiving that popup?

MR. SNEED:  Object to form.

THE WITNESS:  Yeah, the earlier conversation was essentially suggesting that instead of saying we're not able to review your report, to actually urge people to report the content again, if they feel like it is a serious harm like CEI.

And I was saying that, well, if the classifier is not detecting it as CEI now, re-reporting it is not going to suddenly make the classifier detect that as CEI.

BY MR. WARREN:

Q.        Okay.  So if that suggestion had gone into effect, people only would have had to report spam once, but they would have had to report child sexual abuse material twice in order for

Page 280

material was zero tolerance, correct?

A.    Yes.  That was a problem.

Q.    Okay.  So if the classifier wasn't actually working, there'd be a disconnect between what was on the platform and what the policy was, correct?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Yes, that's right.

BY MR. WARREN:

Q.    Okay.  I'm going to hand you another exhibit.  And this will be marked as Exhibit 31, and it's a document bearing the Bates stamp META3047MDL-144-00000324.

(Document marked for identification as Jayakumar Exhibit 31.)

BY MR. WARREN:

Q.    Okay.  Please turn to the third page of this.

Do you see your name in the middle of the page?

A.    Yes.

Q.    And does that indicate to you that, while you were working at Meta, you saw this conversation?

Page 281

A.        Yes.  I commented on the conversation.

Q.        All right.  Very well.

And this appears to be a September -- I'm sorry, I apologize, withdrawn.

This document appears to be dated June 16, 2020.  Do you agree with that?

A.        Yes.

Q.        And the title of the document is, "Instagram Test User:  Minor Sexualization/CEI Discoverability."

Do you agree with that?

A.        Yes.

Q.        Can you explain what this document is?

A.        So ██████████████ was on the investigations team, if I'm remembering the name correctly, but had essentially run a test to see the likelihood of being surfaced -- minor -- content sexualizing minors in certain environments.

So she created an Instagram test user, followed about 70 accounts that I think were either sexualizing minors or talking about minors in some way -- actually it doesn't specify which accounts she followed.  So I don't know.

Page 282

But the result of the test was that, had once she followed those accounts, the Feed, Explore, and Recommended accounts were filled almost exclusively with minor sexualization content and accounts.

Q. Okay. And it appears there were some other results as well, right?

A. Yes. The -- the user -- the test account that they set up also received over 20 follow requests.

And in the top results of the Explore section, the Explore tab which is a recommendation surface, they found CEI being recommended.

Q. Okay. So just to summarize. Investigators at Instagram set up a test account, and in less than 24 hours of setting up that account, the Feed, Explore, and Recommended Accounts sections were filled with minor sexualization content, and child sexual abuse material was recommended to the account as the top result in Explore, correct?

A. Correct.

MR. SNEED: Object to form. Characterization.

Page 286

minors behaving in a very sexualized way. It could be just, you know, a skimpy outfit. It could be a provocative dance. But it wouldn't necessarily meet the threshold of being CEI. So it's sort of a -- if you want to think about it, the closest analogy is minor sexualization is the borderline policy for CEI.

BY MR. WARREN:

Q.    Can you go back to the other exhibit, which is Exhibit 31.

A.    Yes.

Q.    And can you read that third bullet under the TL;DR section.

A.    "CEI being recommended as the top result in the Explore section."

Q.    Okay. So the investigation indicated that child sexual abuse material was being recommended in Explore, correct?

A.    Yes.

Q.    And that is inconsistent with the zero tolerance policy that had been in place for Instagram, at least since April 2020, correct?

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Yes.  Correct.

Page 287

BY MR. WARREN:

Q.        You can put that document to one side.  I'm going to hand you the next exhibit which is Exhibit 32.

(Document marked for identification as Jayakumar Exhibit 32.)

MR. WARREN:  And this is a document bearing the Bates stamp META3047MDL-047-01219676.

BY MR. WARREN:

Q.        Have you had a chance to review Exhibit 32?

A.        Yes.

Q.        This appears to be a September 28, 2020, chat thread among you, ██████████████, and ██████████, do you agree?

A.        Yes.

Q.        Who is Ms. ████████?

A.        ██████ was a data scientist on the child safety team.

Q.        And who is Mr. ████████?

A.        Also on the child safety team as well.

Q.        Okay.  Did you participate in this chat in the ordinary course of your work at Meta?

A.        Yes.

Page 288

Q.        Okay.  So September 28, 2020, is three months roughly after the last document we looked at, correct?

A.        Yes.

Q.        Okay.  And it's several months after the document in which you had raised the possibility that Instagram's classifier for child sexual abuse material might have some problems; is that right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  Yes.

BY MR. WARREN:

Q.        And at 1:02 p.m., Ms. ▇▇▇▇ writes to the group and says:

Our CEI deletes on Instagram versus Facebook are approximately 21 times fewer.

Did I read that correctly?

A.        Yes.

Q.        What does that statistic mean?

A.        It means that, if you look at the amount of CEI being removed proactively on Instagram, versus Facebook, Instagram has far fewer number of CEI deletions.

Q.        Okay.  And then Ms. ▇▇▇▇ goes on to provide her own explanation.  At 1:04 p.m. she

Page 289

says:

Basically our enforcement overall on Instagram is not as good and prone to errors we have less experience with.

Did I read that correctly?

A.     Yes.

Q.     Okay.  Did you agree with that statement?

A.     Yes.

Q.     And then Ms. ████ continues with:

Another stat: We are autoenforcing 90 times fewer IIC on Instagram than on Facebook.

Did I read that correctly?

A.     Yes.

Q.     Does IIC stand for inappropriate interactions with children?

A.     Yes.

Q.     So what does that statistic mean?

A.     That means that we're automatically removing or -- automatically removing 90 times less amount of inappropriate interactions with children on Instagram than on Facebook.

Q.     And that's not because there was 90 times less of that content on Instagram versus Facebook, correct?

Page 296

you just testified?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  That's right.

BY MR. WARREN:

Q.        Okay.  I'm going to hand you the next exhibit.  This will be Exhibit 33.  It's a document bearing the Bates number META3047MDL-031-00192305.

(Document marked for identification as Jayakumar Exhibit 33.)

BY MR. WARREN:

Q.        This appears to be an internal presentation prepared by Meta employees titled, "Child Safety on Instagram, Actor behaviors and opportunities?"

Do you agree with that?

A.        Yes.

Q.        And I'll represent to you that this was produced to us by Meta.  Any reason to dispute that?

A.        No.

Q.        All right.  Before we talk about the presentation, can you turn to the page ending in 2337?

A.        Okay.

Page 297

Q.      All right.  Do you see your name listed at the bottom of the page as a point of contact?

A.      Yes.

Q.      Okay.  Do you recall seeing this presentation before?

A.      Yes.

Q.      Okay.  And at the back of this document is a sheet containing its metadata, and I'll represent to you the metadata we were provided by Meta's counsel indicates the document was created on October 2, 2020.  Do you have any reason to dispute that?

A.      No.

Q.      Okay.  So let's go to the first page after the title page.

Can you read to the jury the goal of this presentation?

MR. SNEED:  I'm just going to object to the characterization of the created date. But I understand what you're referring to.

Go ahead.

THE WITNESS:  "To summarize and present early data explorations on bad actors who seek to interact inappropriately with or harm

minors on Instagram."

BY MR. WARREN:

Q.      Okay.  And there's a trigger warning at the bottom.  Can you read that?

A.      "This deck includes images that illustrate bad actors behaviors.  These include (but are not limited to) IIC, CEI, and MS."

Q.      IIC is inappropriate interactions with children?

A.      Yes.

Q.      CEI is child exploitation imagery?

A.      Yes.

Q.      And MS is minor sexualization, right?

A.      Yes.

Q.      Is it fair to say the authors of this presentation thought a warning was necessary, given that sort of content was contained in the document?

A.      Yes.

MR. SNEED:  Object to form and foundation.

BY MR. WARREN:

Q.      And do you agree that's a responsible thing to do because, generally

speaking, people don't want to be exposed to sexual content involving kids, right?

A.      Yes.

Q.      All right.  Can you flip to the slide ending in 2308.

Is this a summary slide?

A.      Yes.

Q.      Can you read to the jury Point 5 on the summary slide?

A.      "We are only at the beginning of our journey.  We have a long road ahead of understanding, sizing, detecting, filling gaps in policy, developing solutions, and ensuring consistent and appropriate enforcement."

Q.      Okay.  Would you agree this is consistent with the e-mail thread we just looked at, in which you indicated there were detection, measurement, and enforcement challenges related to child sexual abuse material?

A.      Yes.

Q.      Please turn to the next slide.

Can you read the headline?

A.      "Data on the size of the problem and gaps."

Q.      Can you read the data underneath?

Page 300

A.    38 times more victims on Instagram compared to Facebook.  Yet, 21 times fewer CEI deletes compared to Facebook.  And 90 times fewer auto-enforcing of inappropriate interactions with children, compared to Facebook.

Q.    Now, there's a ton of info in this presentation.  But I'd like to turn to some examples that are raised in the presentation.

And that may be hard, which is why the trigger warning is on the presentation.  So I apologize to you that we have to do it.

Can you please turn to the page ending in 2324.

What's the title of the slide?

A.    "Accounts Sexualizing Teens."

Q.    And do you agree that what's displayed underneath are, in fact, images on Instagram that sexualize teens?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    Including one account titled "Beautiful Little Models"?

A.    Yes.

Q.    And one account titled "Teen Bikini

Page 301

Pic"?

A.          Yes.  Yes.

Q.          Let's turn to the next slide.  It's called, "Searching and Discovering," right?

A.          Yes.

Q.          Can you read the subtitle?

A.          "As part of Project Gumshoe, community operations and" -- I forget what OS is -- "CO and OS investigators collaborated with Central Integrity to create a test account that simulated the bad actor discoverability process.  Below are some recommendations and suggestions for this account."

Q.          And when it says recommendations and suggestions, it's referring to what the Instagram algorithm recommended and suggested to the test account, correct?

A.          Yes.

Q.          And can you describe what was recommended and suggested to the account?

MR. SNEED:  Object to form.

THE WITNESS:  Accounts that referenced young boys and young children, as well as megalinks, which is a form of file transfer that takes place off platform and has been used in many

Page 302

instances to transfer CEI between individuals.

BY MR. WARREN:

Q.        In the top left box, it appears there's an image of someone just typing the letter H into a search bar.  Do you agree with that?

A.        Yes.

Q.        What's the first account that Instagram recommends?

MR. SNEED:  Object to form.

THE WITNESS:  "Hottieskids."

BY MR. WARREN:

Q.        And what is the description of the account?

A.        "Hot young boys."

Q.        And let's look at the picture to the right, which is called "Discover People." What's that feature on Instagram?

A.        It's accounts that you may want to follow or that you may find interesting based on your interests and people you follow.

Q.        And Instagram affirmatively suggests accounts to users through that feature, right?

A.        Yes.

Q.        And what did it suggest to this

Page 303

account?

MR. SNEED:  Object to form.

THE WITNESS:  It seemed to recommend a number of accounts related to young children.

BY MR. WARREN:

Q.        Including an account called "hotcutes"?

A.        Yes.

Q.        And in this screen capture, one of the accounts appears to end in "boy745," and include a picture of a young boy with no shirt, right?

A.        Boy745 -- oh yes, that's right.

Q.        Can you describe the screenshot to the right of that?

A.        This looks like the Explore tab of this account, and the videos and images being recommended are all of young boys, many of whom are shirtless or presented in a sexualizing way.

Q.        Let's flip to the next page. What's the title of the slide?

A.        "Soliciting Images."

Q.        Can you read the subheading please:

A.        "Lower risk if soliciting from

Page 304

other actors.  Higher risk if soliciting from targets (see below slides on Active/Higher effort behaviors).  This behavior is illegal and reportable to NCMEC.  It's common for actors to pose as teens."

Q.    And is it your understanding of what follows, that these are examples of adults posing as teens to sexually exploit kids on Instagram?

MR. SNEED:  Object to form.  Characterization.

THE WITNESS:  It's not clear if these are adults posing as teens.  But it does look like accounts claiming to be teens.

BY MR. WARREN:

Q.    Accounts claiming to be teens and soliciting --

A.    Soliciting sexual images, yes.

Q.    Okay.  And that includes an account that says, "DM me I am 15"?

A.    Yes.

Q.    And underneath, the hashtags include, gay 12 years old.  And that's misspelled, correct?

A.    Yes.

Q.        And is it your understanding that hashtags are commonly misspelled to avoid detection?

A.        Yes.  They commonly are misspelled to avoid detection, but there needs to be some sort of consensus within the community to actually make them valuable hashtags.

Q.        And underneath it says, "DM me I'm 14 bottom looking for daddy or BBC," correct?

A.        Yes.

Q.        Does that have any place on Instagram?

A.        No, not at all.

Q.        But it was on Instagram, right?

A.        Yes.

Q.        Let's turn to the next page. What's the title of this slide?

A.        "Hashtags."

Q.        And what's the subheading?

A.        "Using Hashtags to find (and also share) content."

Q.        And underneath there's a screen shot with a search bar.  Do you agree?

A.        Yes.

Q.        And it appears the investigator has

typed "childporn" into the search bar.  Do you agree?

A.        Yes.

Q.        And what are the hashtag results that Instagram recommends in response to that search query?

MR. SNEED:  Object to form.

THE WITNESS:  Plenty of hashtags with the term "child porn" in it.

BY MR. WARREN:

Q.        Including one that says, "child porn is good," right?

A.        Yes.

Q.        And one that says, "child porn collection"?

A.        Yes.

Q.        Let's skip to the slide ending in 2332 please.

What's the title of this slide?

A.        "Comments."

Q.        And how would you describe the content that's depicted on this slide?

A.        They are all comments on images of young girls and they are -- some of them are just very appreciative, but many of them are fully

Page 307

sexualizing.

Q.      Including one comment that says, "I'm going to slide right in," right?

A.      Yes.

Q.      And the screen shot in the middle appears to display the account of username trade_mega_link1.

Do you see that?

A.      Yes.

Q.      The description says, "Trade and exchange boy or girl mega," and the word "trade" is misspelled.

Do you see that?

A.      Wait.  Where am I looking?  Is it on this page?

Q.      Mm-hmm.

A.      I don't see that.

Q.      All right.  Based on your experience of working on digital child safety issues, is "mega" a common misspelling of image used by pedophiles?

A.      It can be.  It's usually more an abbreviation for megalinks, a platform where CEI images and links are shared.

Q.      All right.  Let's go to the slide

Page 308

ending in 2334.  Do you see that?

A.       Yes.

Q.       What's the title of this slide?

A.       "Sharing content & connecting."

Q.       And here, do you see a screen shot displaying the account of username trade_mega_link1?

A.       Yes.

Q.       All right.  And the description here says, "trade and exchange boy or girl mega," correct?

A.       Megalink, yes.

Q.       Okay.  And the account appears to have several photos of young shirtless boys, right?

A.       Yes.

Q.       Including one boy who appears to be sleeping?

A.       Yes.

Q.       And on the right, are those examples of pedophiles messaging one another on Instagram, that the authors of this presentation included as an example?

A.       Yes.  These are child sexual abuse predators messaging one another, essentially trying to build community and trade images.

Q.        Let's turn to the next page.  And this will be the last one from this document.

The slide is called "User Experience," right?

A.        Yes.

Q.        Would you agree this appears to relay the impressions provided to Instagram by three of its users?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Can you read them to the jury?

A.        "Seeking.  'We had an account called "High school girls robotics team" and we started to get some older men following us and watching us.  I realized that they probably just searched 'high school' or 'girls' to find us."

From a teen woman.

"Commenting.  'She posted a picture in a bikini and there were all these older men making inappropriate comments and asking when she would post more pictures.  Mom speaking on daughter's/influencer's experience."

"Stalking.  'I'll see a random person watching my Story and when I look into them

Page 310

I realize it's an old man with kids and a wife. What business does he have watching a young girl's Story?  Teen woman."

Q.        Okay.  And actually let's do two pages forward.  And then we'll be done with this document.  Do you see the slide called "Contacting"?

A.        Yes.

Q.        And do you see the grey box at the bottom?

A.        Yes.

Q.        Can you please read that to the jury?

A.        "Disrupt the ability for predators to find targets on Instagram:  Facebook disrupts the ability for predators to discover minors (using People You May Know) to prevent unconnected adults from discovering or initiating conversations with minors.  Instagram has no similar logic for Accounts You May Follow.  We're in the process of understanding minor discoverability on selected surfaces on Instagram (example: search, suggested accounts).  For more on proactive detection and product solutions, refer to: 'Child safety landscape - Instagram' (POC, point of contact,

Page 311

Vaishnavi J."

Q.        And that's you, right?

A.        That's me, yes.

Q.        Okay.  What are the Accounts You May Follow feature?

A.        Accounts You May Follow -- so on Facebook, you know, it's really centered on finding your friends.  On Instagram it's not necessarily the case.  You may follow a celebrity chef, you may follow a gardener.

And so the concept of recommending people you may know on Facebook, on Instagram translates into accounts that you may want to follow or that you may be interested in.

When I joined Instagram, I think it was one of the first things that I flagged for the child safety team saying that hey, Accounts You May Follow is surfacing minors on Instagram.  So it was one of the first things that I noticed, you know, as part of my assessment of the platform.

And so, this kicked off this project to really understand where are we able to easily detect minors on the platform.  And then this document, "Child safety landscape - Instagram" captured some of those surfaces.

Page 312

Q.        Okay.  Earlier we looked at a slide that had an image labeled "Discover People."

Do you recall that?

A.        Yes.

Q.        Is that the same as Accounts You May Follow?

A.        Yes.

Q.        Okay.  And through Accounts You May Follow, Instagram affirmatively recommends certain accounts to its users, correct?

A.        Yes.

Q.        And you're saying that shortly after you joined, you flagged the problem that Accounts You May Follow may be surfacing pedophile accounts to users, right?

MR. SNEED:  Object to form.

THE WITNESS:  I -- I flagged that accounts you may know may be surfacing minor accounts to users.  So teen accounts to users.

BY MR. WARREN:

Q.        I see.  And this presentation was from October 2020, that's ten months after you joined, right?

A.        Yes.

Q.        And as of ten months after you

Page 313

joined, Instagram had not fixed the problem that you had identified of Accounts You May Follow surfacing minor accounts to adults, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Correct, yeah.  So Facebook -- as it says here, Facebook already had disrupted this ability.  So minors weren't surfacing in account -- in People You May Know, so that potential predators wouldn't be able to find them.  Instagram had not yet done that.

BY MR. WARREN:

Q.        And we looked at some of the results of that earlier in this presentation, correct?

A.        Yes.

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.        Do you agree that the things we just looked at are hard to stomach?

A.        Yes.

Q.        Is any of it consistent with Meta's public-facing policy of zero tolerance for child exploitation?

MR. SNEED:  Object to form.

THE WITNESS:  No.  It's not.

Page 314

BY MR. WARREN:

Q.      Did Meta at any point caveat its public-facing policy by identifying these problems to the public?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I think Meta has talked on occasion and regularly about the challenges with finding some of this content. It's, you know, engaged a number of partnerships with industry.  But I don't think it's ever really articulated the extent of the -- the severity of the problem on the platform.

BY MR. WARREN:

Q.      And we looked at the policy, which was consistent from 2020 to 2025, correct?

A.      Yes.

Q.      And at no point did Meta edit that policy to say, we have a zero tolerance policy that we have a problem enforcing, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.      Did Meta warn parents of these dangers to their children on Instagram?

Page 315

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        You believe they warned --

A.        Oh no, sorry, they didn't warn parents.

Q.        Let me ask the question again to get a clean record.

Did Meta warn parents of these dangers to their children on Instagram?

MR. SNEED:  Object to form.

THE WITNESS:  No.

BY MR. WARREN:

Q.        Did Meta warn children they may be exposed to these sorts of interactions?

MR. SNEED:  Object to form.

THE WITNESS:  No.

BY MR. WARREN:

Q.        But Meta thought it was worth including a trigger warning on this presentation for its own employees, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        All right.  Let's look at another

Page 326

CERTIFICATE


I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, VAISHNAVI JAYAKUMAR, have the opportunity to read and sign the deposition transcript.

*Michelle L Gray*

_____

MICHELLE L. RIDGWAY,
Certified Shorthand Reporter,
(CA-CSR # 14592)
(Certified Court Reporter
(NJ-CCR # XI02126)
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public
Dated:    February 4, 2025


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 327

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

**Exhibit 2B**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR

MDL No. 3047

In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 331

                    UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF CALIFORNIA
                              -  -  -
        IN RE:  SOCIAL MEDIA ADOLESCENT        :MDL NO.
        ADDICTION/PERSONAL INJURY PRODUCTS     :4:22-MD-
        LIABILITY LITIGATION                   :3047-YGR
                                               :
             SUPERIOR COURT OF THE STATE OF CALIFORNIA
                  FOR THE COUNTY OF LOS ANGELES
                    SPRING STREET COURTHOUSE
                              -  -  -
        COORDINATION PROCEEDING SPECIAL TITLE  :
        (RULE 3,400)                           :
                                               :
        SOCIAL MEDIA CASES                     :
        _____    :LEAD CASE
                                               :NO. FOR
        THIS DOCUMENT RELATES TO:              :FILING
                                               :PURPOSES
        STATE OF TENNESSEE, ex rel, JONATHAN   :22STCV21355
        SKRMETTI, ATTORNEY GENERAL and         :
        REPORTER,                              :
                                               :
                 V.                            :
                                               :
        META PLATFORMS, INC., and INSTAGRAM,   :
        LLC                                    :
                                               :
        CASE NO. 23-1364-IV                    :
                              -  -  -
             DEPOSITION UNDER VIDEO EXAMINATION OF
                      VAISHNAVI JAYAKUMAR
                      JANUARY 31, 2025
                         VOLUME II

                 Continued videotaped deposition of
        VAISHNAVI JAYAKUMAR, taken pursuant to notice, was
        held at the law offices of Baker Botts, LLP, 30
        Rockefeller Plaza, New York, New York, beginning at
             a.m., on the above date, before Michelle L.      8:34
        Ridgway, a Registered Professional Reporter,
        Certified Court Reporter (NJ-CCR # XI02126),
        Certified Realtime Reporter, Certified Shorthand
        Reporter  (CA-CSR # 14592), and Notary Public.

Page 349

horrifying images of child sexual abuse and content sexualizing minors?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        And that content was actively recommended by Instagram on various surfaces like Explore and Discover People; is that fair?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        And you agree those images were inconsistent with Meta's publicly stated zero tolerance policy towards child sexual abuse material?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  And that brings us to where we left off yesterday, which is Exhibit 34.

Do you have that in front of you?

A.        Yes.

Q.        Okay.  And the first e-mail that we looked at was ▇▇▇▇▇▇▇▇▇, and it was sent on November 16, 2020.

Page 350

Do you recall that?

A.    Yes.

Q.    And Ms. ▮▮▮▮▮ sent an e-mail from the Norwegian Broadcasting Corporation, correct?

A.    Yes.

Q.    And you testified that you had -- you recalled seeing that article at the time and being upset about it; is that right?

A.    Yes, I was.

Q.    Okay.  So we had been looking at ▮▮▮▮▮▮▮'s response on November 16, 2020.  Can you direct your attention to that?

A.    Yes.

Q.    And Mr. ▮▮▮▮▮ ends his response by saying, "Clearly, we've handed over too much decision power to a technology that's not ready for that yet, and it's beginning to erode people's trust in our systems."

Did I read that correctly?

A.    Yes.

Q.    Did you agree with Mr. ▮▮▮▮▮'s sentiment?

A.    I agreed that we needed to be more thoughtful about how many of these decisions were going to be automated versus how many of them

Page 351

should continue to be reviewed by humans.

Q.        Okay.  Let's look at earlier in his e-mail.  He says this, and I'm quoting:

"Here's what Mark said about sending our reviewers home on a press call back in March."

Did I read that correctly?

A.        Yes.

Q.        And the Mark in question is Mark Zuckerberg, correct?

A.        Yes.

Q.        And the reference to sending reviewers home is a reference to Meta's work-from-home policy during COVID-19, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

MR. WARREN:  Mr. Sneed, please let me finish my question before you object.

MR. SNEED:  Sure.

BY MR. WARREN:

Q.        What follows appears to be a quotation from Mark Zuckerberg, given in response to a question from an NPR reporter.  Do you agree?

MR. SNEED:  Object to form and foundation.

Page 352

THE WITNESS:  I agree.

BY MR. WARREN:

Q.        Mr. ███████ highlights some aspects of that quote in red.

Do you see that?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        I'd like to read the beginning, and you can tell me if I read it correctly.

Mr. Zuckerberg said:

"We have moved, or are in the process of moving, the most sensitive types of content that need to get extra attention over to full-time employees for the time being.  So that's the work on suicide and self-injury prevention. It's the work on child exploitation, counter -- counter-terrorism.  Those are kind of the types of examples.  We're actually surging the number of people who are working on those things."

Did I read that correctly?

A.        Yes.

Q.        That's not actually what happened, is it?

A.        Meta did increase the number of

Page 353

full-time employees who were working on those things. The issue that ███ was pointing out is that before the classifiers could proactively -- before the classifiers could -- before humans can review the content, classifiers need to, you know, review and send the content over to people to be reviewed. And the classifiers weren't doing that correctly.

Q.    Well, let's look at Mr. ████████'s response on the first page of the document.

Can you flip to that?

A.    Yes.

Q.    And actually, let me withdraw that question.

Do you see your response to Mr. ██████ on November 18, 2020?

A.    Yes.

Q.    And do you see the first bullet of your response?

A.    Yes.

Q.    Can you read that, please.

A.    "The CO," community operations, "human review capacity for CEI is at approximately 30 percent. CO Safety suspects this will continue to be true for many more months to come for large

Page 354

pools of queues with less than 20 percent projected supply for the near future."

Q.    Does reading that cause you to want to revise the testimony you just provided about the amount of human reviewers that were available to review sexual abuse material?

MR. SNEED:  Object to form.

THE WITNESS:  So what Mark was referring to, from my understanding, was the issue of moving some of this work, a lot of this work, from external vendors to full-time employees.

And in the process -- and so the number of full-time employees working on the issue surged, but the human review capacity was still really low because there's not that many full-time employees that can review CEI.

BY MR. WARREN:

Q.    So I don't know if I'm completely following your answer, Ms. Jayakumar.

A.    Yeah.

Q.    Just help me understand.

A.    Yes.

Q.    So Mr. Zuckerberg appears to have said, we're surging the number of people who are working on those things, and "things" includes

child exploitation.  That's what he told the press.

Do you agree with that?

A.        I do.

Q.        Okay.  And in your response to Mr. ████████'s e-mail, you point out that human review capacity for child sexual abuse material is at approximately 30 percent of what it should be.

Do you agree with that?

A.        Yes, I do.

Q.        So that's not a surge, is it?

MR. SNEED:  Object to form.

THE WITNESS:  So it's not a surge in the total number of people, but it's still a surge in the total number of full-time employees.

So typically, CEI was not handled -- the review of CEI content wouldn't be handled by full-time employees.  It would be handled by contractors or vendors that are part of big outsourcing operations.

Those folks -- so he -- what he was saying is that we're moving the review of this content from those folks to full-time employees.

So surging the number of people was surging the number of full-time employees who were working on this.  But the overall capacity is still

Page 356

very low.  That's true.

BY MR. WARREN:

Q.        Okay.  I just want to make sure I'm clear so we can get a clear record.

It appears that the number of full-time reviewers for this material went up.

A.        Yes.

Q.        But the number of contract reviewers to review this material went down?

A.        Yes.

Q.        Okay.  And on net, that resulted in less human review of child sexual abuse material during COVID; is that correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  Yes.

BY MR. WARREN:

Q.        And what Mr. Zuckerberg says, again, is, "We're actually surging the number of people who are working on those things."

Do you see that?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  And I think that that sounded a little bit more vague than it should have.  Because it sounded like it was the total number of reviewers, when it sounds like what

Page 357

he really meant was the number of full-time employees.

BY MR. WARREN:

Q.    Okay.  Well, regardless of what he meant or not, he said, "We're surging the number of people who are working on child exploitation," correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    But, in fact, Meta was not surging the number of people working on child exploitation, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Not the total number of people, no.

BY MR. WARREN:

Q.    Okay.  And as a consequence of that, the capacity to review potential child sexual abuse material on Instagram went down significantly during COVID; isn't that correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that's correct.

BY MR. WARREN:

Q.    Okay.  And you provided a stat to

Page 358

your teammates indicating that actually the projected supply of reviewers was less than 20 percent of what it needed to be; is that correct?

A.        Yes, correct.

Q.        Okay.  And at no point did Meta warn parents that, actually, Meta only had 20 percent of the bodies it would need to review potential child sexual abuse material on Instagram, did it?

MR. SNEED:  Object to form. Foundation.

THE WITNESS:  Not to my knowledge, no.

BY MR. WARREN:

Q.        And do you think parents had a right to understand that?

MR. SNEED:  Object to form.  Calls for a legal conclusion.

THE WITNESS:  I do think parents had a right to know that.

BY MR. WARREN:

Q.        Okay.  Especially during the pandemic when more kids were necessarily online; is that right?

Page 371

problem had not been fixed in the intervening

12 months?

          A.          Yes.

          Q.          Okay.  You can put that document to

one side.

                      I'm going to hand you what's been

marked for identification as Exhibit 36.  This is a

document bearing the Bates stamp

META3047MDL-020-00151907.

                      (Document marked for identification

as Jayakumar Exhibit 36.)

BY MR. WARREN:

          Q.          And I'll represent this was

produced to us by Meta and found within your

electronic files.  Do you have any reason to

dispute that?

          A.          No.

          Q.          Okay.  Do you recall seeing this

document before?

          A.          I'm familiar with this

interstitial, yes.

          Q.          Okay.  And am I correct that this

is a screen shot of Instagram with the word

"childporn" written in the search bar?

          A.          Yes.

Q.        And this displays an interstitial that pops up in response to entering that search, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        Okay.  Can you read the text of this interstitial, please.

A.        "This May Be Associated With Child Sexual Abuse.

"This term is sometimes associated with sexual images or videos of children.

"Child sexual abuse or viewing sexual imagery of children can lead to imprisonment and other severe personal consequences.

"This abuse causes extreme harm to children and searching and viewing such materials adds to that harm.

"If you see this type of activity here, see how to report it to us and to law enforcement in the link below."

Q.        Okay.  And then there are two options underneath that text.

Do you see that?

A.        Yes.

Page 373

Q.        The first option says, "See How To Report," correct?

A.        Yes.

Q.        And then the second option says, "See results anyway."

Do you see that?

A.        Yes.

Q.        So that option allowed the user to click past the warning and see the results of the child porn search despite the warning; is that correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        And the interstitial makes clear that what may appear after clicking that button include child sexual abuse and sexual imagery of children, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

THE VIDEOGRAPHER:  Excuse me, Counsel.  I'm sorry to interrupt.  I'm getting a notification that their audio is not okay.  So can we just go off the record just to clear that up?

MR. WARREN:  No, we can't.

Page 377

Wall Street Journal article in that post, correct?

A.    Yes.

Q.    I'm going to hand you a copy of that, which we'll mark for identification as Exhibit 38.

(Document marked for identification as Jayakumar Exhibit 38.)

BY MR. WARREN:

Q.    Is this the article that you referenced in your LinkedIn post?

A.    Yes.

Q.    The lead reporter is someone named Jeff Horwitz; is that right?

A.    Yes.

Q.    Did you speak to him?

A.    I did.

Q.    When?

A.    I don't know the exact date, but when he was preparing this article.

Q.    Okay.  And the article is dated November 27, 2023; is that right?

A.    Yes.

Q.    Okay.  What did you tell Mr. Horwitz?

A.    I said that we either need to ramp

up our content detection capabilities or we should just block out minor content from Recommendations.

Q.        Okay.  Can you please read the first few paragraphs of the article to the jury.

A.        "Instagram's Reels video service is designed to show users streams of short videos on topics the system decides will interest them, such as sports, fashion or humor.

"The Meta Platforms-owned social app does the same thing for users its algorithm decides might have a prurient interest in children, testing by The Wall Street Journal showed."

Q.        Keep going, please.

A.        "The Journal sought to determine what Instagram's Reels algorithm would recommend to test accounts set up to follow only young gymnasts, cheerleaders and other teen and preteen influencers active on the platform.

"Instagram's system served jarring doses of salacious content to those test accounts, including risqué footage of children as well as overtly sexual adult videos - and ads for some of the biggest U.S. brands."

Q.        Okay.  Thank you.

Ms. Jayakumar, all of these

Page 379

problems were ones that you had flagged internally as early as March 2020, just weeks after you started at Meta, correct?

MR. SNEED: Object to form.

THE WITNESS: Many of these problems I had flagged as early as March. I think from March to May 2020.

BY MR. WARREN:

Q. And you agree that these problems are inconsistent with Meta's publicly stated zero-tolerance policy for child exploitation material, correct?

MR. SNEED: Object to form.

THE WITNESS: Yes. I agree.

BY MR. WARREN:

Q. All right. Let me direct your attention to the top of the second page.

Do you see a quote from a Meta vice president named Samantha Stetson?

A. Yes.

Q. Could you please read that to the jury.

A. "'Our systems are effective at reducing harmful content, and we've invested billions in safety, security and brand suitability

Page 380

solutions,'" said Samantha Stetson, a Meta vice president who handles relations with the advertising industry."

Q.    Okay.  Based on your three and a half years working at Meta on child safety issues, do you think it's accurate that Meta's systems are effective at reducing harmful content related to child sexualization and child exploitation?

MR. SNEED:  Object to form.

THE WITNESS:  Without any measure of how much of a reduction we are talking about, the statement is technically correct.

BY MR. WARREN:

Q.    Okay.  Well, let's unpack that, then.

What do you think constitutes effectiveness when it comes to reducing harmful content related to child sexualization and child exploitation?

A.    I don't think we can talk about effectively reducing harmful content without agreeing more broadly on what those -- what those metrics are.  Is it okay for 1 percent of the content on the platform to include child sexual abuse material, 2 percent, zero percent?

Page 381

As far as I know, I don't think Meta has ever specified what percentage would be considered effective.

And so, yes, the systems reduce harmful content, but it's not -- but not, in my opinion, by as much as they should.

Q.    Meta has specified a percentage, hasn't it?  It said zero.  It has a zero-tolerance policy for this material, isn't that correct?

A.    It is --

MR. SNEED:  Object to form. Characterization.

THE WITNESS:  Sorry.

It has a zero percent tolerance for child sexual exploitation.  It looks like Sam Stetson was talking about reducing harmful content more broadly.

BY MR. WARREN:

Q.    Right.  And I'm asking you about reducing harmful content related to child sexual exploitation.  That's my specific question.  So I'm going to ask you again.

Based on your experience working at Meta for three and a half years on child safety issues, do you think it's accurate to say that

Page 382

Meta's systems are effective at reducing harmful content related to child sexualization and child exploitation?

MR. SNEED:  Object to form.

THE WITNESS:  No.

BY MR. WARREN:

Q.    Thank you.

So please flip to the next page.

Near the bottom, do you see the paragraph beginning with "Current and former Meta employees"?

A.    Yes.

Q.    Could you please read that to the jury.

A.    "Current and former Meta employees said in interviews that the tendency of Instagram algorithms to aggregate child sexualization content from across its platform was known internally to be a problem.  Once Instagram pigeonholes a user as interested in any particular subject matter, they said, its recommendation systems are trained to push more related content to them."

Q.    Do you agree with the proposition in the first sentence there?

A.    I do.

Page 383

Q.        Were you one of the former Meta employees who said that to The Wall Street Journal?

THE WITNESS:  Mike?

Can I consult with my lawyer?

MR. WARREN:  Of course.  Why don't we go off the record and the tech can fix the audio too.

THE VIDEOGRAPHER:  The time right now is 9:12 a.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 9:15 a.m.  We're back on the record.

BY MR. WARREN:

Q.        I just want to direct your attention to one more part of this article, Ms. Jayakumar.

Near the bottom of that page it says, "Preventing the system from pushing noxious content to users interested in it" -- let me withdraw the question.

Okay.  Near the bottom of that page, Ms. Jayakumar, it says:

"Preventing the system from pushing noxious content to users interested in it requires significant changes to the recommendation

Page 384

algorithms that also drive engagement for normal users."

Did I read that correctly?

A.        Yes.

Q.        Okay.  And do you agree with that proposition?

A.        Yes.

Q.        Okay.  And then the next sentence in the article says, "Company documents reviewed by the Journal show that the company's safety staffers are broadly barred from making changes to the platform that might reduce daily active users by any measurable amount."

Did I read that correctly?

A.        Yes.

Q.        And based on your three and a half years of working at Instagram, do you agree that its safety staffers are broadly barred from making changes to the platform that might reduce daily active users by any measurable amount?

MR. SNEED:  Object to form.

THE WITNESS:  I'm not familiar with the company documents reviewed here.  But it is generally quite difficult to make changes that are -- it is generally pretty difficult to make

Page 385

safety changes that might impact growth or daily active users by any significant amount.

BY MR. WARREN:

Q.        And do you believe that's the reason why Instagram failed, over three years, to solve the problem of the Reels algorithm recommending child sexualization content to pedophiles?

MR. SNEED:  Object to form.

THE WITNESS:  I think it's a significant reason.

BY MR. WARREN:

Q.        Okay.  Turning to the next page here, it says here, "Even before the 2020 launch of Reels, Meta employees understood that the product posed safety concerns, according to former Meta employees."

Do you see that?

A.        Yes.

Q.        Do you agree with that proposition?

A.        Yes.

Q.        And finally, skip down one paragraph to the paragraph beginning with "In."

Do you see that?

A.        Yes.

Page 449

Speculation.

THE WITNESS:  Not based on what this document said in 2021.

BY MR. KOSSLYN:

Q.    Okay.  I'm going to turn us over to Exhibit 45, which is META3047MDL-014-00206538.

(Document marked for identification as Jayakumar Exhibit 45.)

BY MR. KOSSLYN:

Q.    So this appears to be an e-mail thread between you and ▮▮▮▮▮▮ and ▮▮▮▮▮▮; is that correct?

A.    Yes.  And Antigone Davis.

Q.    Yes.

I think you may have referenced this yesterday, but just refresh my recollection, who is ▮▮▮▮▮▮?

A.    ▮▮▮▮▮▮ was on the safety policy team with ▮▮▮▮ and me.  She reported into Antigone.

Q.    And you see the header, "Re: Child Safety State of Play - Timely/Action needed"?

A.    Yes.

Q.    Do you think this was discussing the Child Safety State of Play document we were

Page 450

just referencing?

A.          That's right.  Yeah.

Q.          Okay.  Take as long as you need to review this.

I'll note that I'm mostly going to be focusing on the original e-mail here from ████ ████, the 24th of September.  And specifically starting on the fourth page, which is Bates ending in 541, in the section labeled, "Not ready; work has not yet been prioritized," and then the rest of the document after that.

A.          Yeah.

Q.          So I'm going to walk through the various cells in this table and just ask you some follow-up questions.

I think we've gone over some of these features before, but I just want to confirm that they -- they are referring to the same things that you testified on yesterday.

A.          Sure.

Q.          And provide some additional information.

So, first, "Aggregated content on IG surfaces," can you explain what this was.

A.          Sure.

Page 451

So our -- the classifiers that were in place were able to proactively detect individual pieces of content that may violate some of our policies, for example, around child exploitation, suicide, self-injury, and so on. But they were not able to proactively detect and take action on groups of content that would appear in one spot together.

So the Explore tab, for example, on Instagram will have many pieces of content that all appear at the same time, or Hashtag page might be the same, Reels certainly is like that. And the classifiers that were currently in place could not detect when those aggregated surfaces were violating any of our policies.

Q.    Now, all of these cells are under the header, "Not ready; work has not been prioritized and more resources are needed"; is that right?

A.    Yes.

Q.    Do you know how many resources would have been needed to build this product?

MR. SNEED:  Object to form.

THE WITNESS:  I would not be able to say that definitively.  I would need to see -- I

Page 452

would need to, you know, really build out a product scope and then make that call.

BY MR. KOSSLYN:

Q.        Okay.  Why would this product have been useful to the platform and improve safety for minors?

A.        Because the -- because places like Explore, Hashtag pages, Reels, all feature -- featured minors and were viewable by minors.  So improving our ability to detect and remove problematic content from them would have made them safer, both as creators as well as viewers of the platform.

Q.        Thank you.

And then the next cell reads, "Block reach of unconnected adults to IG minors."

Can you describe what that product would have been?

A.        Yeah.  So we, I think, talked about this earlier in the deposition, but I was really keen on making sure that minors could not be proactively contacted by adults who had no connection to them.

This is something that was already in place as protection on Facebook Messenger, and

Page 453

it wasn't in place on Instagram.  However, we have far more discoverability of minors on Instagram than on Facebook.  There are also just a lot more young people using Instagram than, say, Facebook or Facebook Messenger.

So this was a gap that I had identified, saying that we, you know, don't have this protection in place on Instagram.  The product team -- so Interop refers to interoperability between Instagram DMs and Facebook Messenger.  So you have probably seen by now that you can kind of switch between those accounts when you're sending messages to one another.

And for that launch, product was not agreeing to protect this rule for cross-network messages sent by Facebook adults to Instagram minors, which would have amplified the problem even more, from my perspective.

Q.      Why did product not agree to do that, as you understand?

A.      From what I recall, and from this document, it sounds like this was actually -- the ability of Facebook adults to connect with Instagram minors was a big growth bet for the company in some, you know, really understandable

Page 454

ways.

For example, parents who might have an account on Facebook but not Instagram, wanting to reach out to their kids who are on Instagram but maybe not on Facebook.

And so this was a big growth bet for interoperability.

Q.    And was the lack of resources raised as a reason why Facebook was not doing this?

A.    No.  This wasn't due to a lack of resources.  This was a disagreement on the value of blocking the reach of unconnected adults.

Q.    Okay.  And the next cell, do you see, "IIC classifier use on IG"?

A.    Yes.

Q.    I think we also discussed this yesterday.  IIC stands for inappropriate interactions with children; is that right?

A.    Yes.

Q.    Can you just briefly describe what this feature was or would have been.

A.    The inappropriate interactions with children classifier -- there are actually a number of IIC classifiers.  Some of them looked at the direct messages, the kind of messages that, you

Page 455

know, were going back and forth.  Others looked at the way in which adults were trying to reach out to minors.

But overall, the premise was that these -- this set of classifiers were monitoring and proactively detecting any inappropriate interactions so they could either protect the minor more or penalize the adult more, or some combination of both.

Q.        And do you see in the cell to the right where it says, "We need about a week or two of CO review capacity in order to calibrate the classifier for IG use"?

A.        Yes.

Q.        Was that your understanding of the only requirement that would have been needed in order to make this technology work?

A.        So the classifier, as it stood at this time, was trained on Facebook data and not really Instagram data, so that's what we mean by calibrating it.

Yes, I think that sounds about right.  It wouldn't have taken too much review capacity to get it calibrated for Instagram use.

Q.        Do you see below that where it

Page 456

says, "This is low hanging fruit and fully supported by Child Safety CI and IG Policy.  We just need help getting CO to prioritize this"?

        A.        Yes.

        Q.        What is your understanding of why CO was not prioritizing this?

                  MR. SNEED:  Object to form and foundation.

                  THE WITNESS:  I don't remember why CO wasn't prioritizing this back then.  This was -- this was, you know, nearly five years ago.

                  But -- wait.  This was in 2020?

BY MR. KOSSLYN:

        Q.        Mm-hmm.

        A.        So, yeah, I don't remember -- I don't remember exactly why.  I don't have the documentation.

                  But in 2020, CO was extremely strapped in its resourcing abilities because of COVID-19.

        Q.        Understood.

                  Do you see below that, "Upsell reporting for Disappearing Mode"?

        A.        Yes.

        Q.        Can you explain what that was?

Page 457

A.          So Disappearing Mode, which is also known as Vanish Mode on Instagram today, allows you to send messages to people and then have it disappear, you know, right after.  They are ephemeral messages.

And so the retention period within -- on the back end for Instagram was 14 days.  It was one hour for Messenger.

Since Disappearing Mode is an ephemeral form of communication, in order to protect minors who might be subject to inappropriate messages or grooming messages, we wanted to upsell and really promote the value of reporting within Disappearing Mode.  And so the ask that we had made was support reporting upsells within Disappearing Mode to educate the user that even ephemeral messages can be reported and that they have a limited window of time in which to do so.

Q.          In the cell to the right it says, "However, product does not have the CO resource capacity to support reporting upsells within Disappearing Mode to educate the user that even ephemeral messages can be reported."

A.          Yes.

Page 458

Q.        Can you explain what that means?

A.        It meant that product did not -- well -- in terms -- from what I recall, it's -- I think what this is referring to is that if we upsold reporting, and if that resulted in a large volume of reports from, say, minors, we wouldn't have the capacity to review those reports, and the team that would review the reports would be the community operations team, and we wouldn't have the resources to do that.

Q.        Okay.  So if minors were getting a lot of ephemeral messages that contained reportable content, then they would not know to report those. And the concern is if they did know to report those, that there would be too many reports?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that's right.

BY MR. KOSSLYN:

Q.        Okay.  Do you know, did Meta disclose to the public at all that there were, on ephemeral messages, a large volume of IIC or CEI being conveyed?

MR. SNEED:  Object to form.

THE WITNESS:  I don't agree that a large amount of IIC or CEI was being conveyed

Page 459

through disappearing messages.  That -- that may have been the case, but I don't know if that's true.

But, no, Meta didn't provide any external warning that, you know, that there may be a likelihood of IIC or CEI taking place within disappearing messages.

BY MR. KOSSLYN:

Q.        Okay.  And then turning to the next cell that says, "Sex trafficking classifier."

Can you explain what this was.

A.        This would be a classifier to proactively detect content that is promoting or soliciting the trafficking of sex workers -- or, actually -- sorry -- trafficking of humans for sex, not necessarily sex workers.

Q.        Okay.  And can you read what the cell on the right says, just the first sentence.

A.        "We have one engineer dedicated to this work and we have no data science support to do some basic understand work to lower the strikes threshold for prostitution and sexual solicitation strikes (currently set at 17x, which is too high)."

Q.        What does that mean, do you know?

A.        So we had an engineer that was

Page 460

willing to build the classifier, but we needed data science to actually help us understand what the behaviors looked like, like what are the types of behaviors that might constitute sex trafficking on the platform, so that we could build and train the classifier with datasets. Without doing that, it was very difficult to justify lowering the strike threshold.

17X, by any measure across the industry, is a very, very high strike threshold. That means that you could incur 16 violations for prostitution and sexual solicitation, and upon the 17th violation, your account would be suspended.

Q. Okay. So there could be someone who did it 15 times on the platform and there would be no action against them?

MR. SNEED: Object to form.

THE WITNESS: Their content would be removed, you know, with the strike. But their account would be allowed to remain on the platform, yes.

BY MR. KOSSLYN:

Q. In your understanding, was Meta reliably accurate at detecting prostitution solicitations?

Page 461

MR. SNEED:  Object to form.

THE WITNESS:  Not to my recollection.

BY MR. KOSSLYN:

Q.        Okay.  Do you know if Meta ever warned the public, or disclosed to the public, that it was not capable of reliably, or with a high degree of reliability, determining when someone is soliciting prostitution?

MR. SNEED:  Object to form.

THE WITNESS:  No, I don't think so.

BY MR. KOSSLYN:

Q.        Okay.  Scrolling down slightly to the section -- this is now outside the table -- "Recommendation - Age Assurance."

A.        Okay.

Q.        I'm going to walk through just a few sentences throughout this.  I think this is mostly covered in the Exhibit 6 document we previously went through.

But do you see where it says, "We need leadership support to push product to act on knowledge we already have, i.e., clear our backlog, disable verified U13s"?

A.        Yes.

Page 462

Q.        Why do you understand that you needed leadership support to do that?

A.        All these -- all these decisions, all these moves, would require significant product input and -- sorry -- significant product effort. And so we needed -- this was a call, I think, to our leadership to persuade the product team to provide those resources and support this work.

Q.        And who would your leadership have been?

A.        This Child Safety State of Play would have gone to Meta's content policy leadership.

Q.        Do you remember who that would have been at this point?

A.        I don't know exactly who Antigone sent it to.  I didn't have visibility into that.

Q.        And then "disable verified U13s."

Is this just referring to the linked accounts issue or is there something else this incorporates as well?

A.        I think this refers to disabling any account that we know is under the age of 13.

Q.        Were there other accounts that Meta knew were under the age of 13 that weren't being

Page 463

disabled, that you're aware of?

A.        I don't recall.

Q.        Do you know who might?

A.        Antigone might.

Q.        And, "Against this backdrop, our enforcement is not consistent against all apps for a single known person."

Is this all referring to the cross-linking?

MR. SNEED:  Object to form.

THE WITNESS:  That's right.  Yes.

BY MR. KOSSLYN:

Q.        Do you know, was it just the Facebook and Instagram problem that was described in Exhibit 6 earlier?  Was it also Instagram to Facebook or some other app to other app?

A.        I don't recall -- I don't recall how fully -- like, which range of behaviors that was describing.

Q.        Okay.  Do you know who would?

A.        Probably the identity integrity team.

Q.        And then near the end of this page, "We also need leadership to support the basic principle that if we're using a signal to predict

Page 464

age for business purposes, it should be used to enforce on age."

What did you understand this to be referring to?

This is the same page.  It's the second-to-last sentence.

MR. SNEED:  Object to form.

THE WITNESS:  I'm trying to understand the context.

I believe this is referring to the fact that we sometimes use non-stated age signals, looking at, you know, different aspects of the account's behavior, to try and predict the age of that account, to decide what kind of ads might be most relevant to them, what the best type of promoted content would be for them.  And if we are able to do that for business purposes, it says then, we should also be able to do that for integrity purposes.  We should also be able to do that to identify an account, for example, as being under 13 and removing it from the platform.

BY MR. KOSSLYN:

Q.    So why would Meta use this algorithmically inferred age rather than stated age for these business purposes?

Page 465

MR. SNEED:  Object to form.

THE WITNESS:  Sometimes because stated age doesn't exist.  Instagram only started collecting stated age in 2019.  So in those cases, you would need an algorithmically inferred age.

There is also value to algorithmically inferred age sometimes.  It's sometimes a more accurate predictor than stated age, especially in cases where people lie about their age.

BY MR. KOSSLYN:

Q.      So you had referred to some of those business purposes as being advertising, right?

A.      Yes.

Q.      Do you know if there are other business purposes?

A.      That is the main one I can think of.

Q.      Okay.  Going down to the table now in the next page.  This is the cell marked, "Age Management" on the right.  I think much of this is the same as what ended up in Exhibit 6, so I'm not going to belabor it.

But just to refresh your

Page 466

recollection on the language. "In the meantime, our basic COPPA compliance is at risk when the product does not prioritize checkpointing and disabling U13s."

If you can go now down to the cell beneath it, this is under, "Not ready; work has not been prioritized and more resources are needed." "Age data on IG."

Do you see that?

A.    Yes.

Q.    Can you read the first two sentences?

A.    "Age models do not work as well in IG because IG only started to collect age data in December 2019. In addition, Adam Mosseri will not support upselling age collection for existing users because he sees it as intrusive data collection."

Q.    Okay. So why would the fact that Instagram had only started collecting age data in 2019 affect the quality of its age models?

A.    You need to be able to provide data points to the age models to train them, and if you don't have the stated age -- for example, if you don't have the stated age of an account, you can't really compare that against all the predictive

Page 467

signals you have and understand how close or -- you know, how close to correct or far from correct you are.

Q.          And this means that even if Meta wanted to use those age models for safety features, they would not have been as reliable as those on Facebook, for example?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  Yes, that's right.  I believe at this point it was 2020 -- actually, I think -- yeah, so this was in 2020, and so we only had stated age for maybe two-thirds of IG users.

BY MR. KOSSLYN:

Q.          Yeah.  I think that language is in the very next sentence.

So do you know or were you ever informed why Instagram did not collect age data from users prior to December 2019?

A.          Instagram had very little information on its users prior to -- in many ways, for a long time.

You know, if you think about the nature of Instagram as a product, you have a username that's not actually your real name.  You

Page 468

have a profile photo.  It doesn't have to be your profile photo.

For a long time it wasn't necessarily seen as something where you needed to assign, like, a whole, like, identity to it.

But then in 2019, I think IG decided to actually start collecting this data.

Q.    Do you know why they decided to do so in 2019?

A.    It predates my time there.

Q.    Okay.  And then as you just read, Adam Mosseri allegedly did not support age collection on existing users.

Do you understand the basis for that objection?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I understand what he's saying here, yes.

BY MR. KOSSLYN:

Q.    Just to clarify.  Do you understand that this is Adam Mosseri's language or this is someone characterizing Adam Mosseri?

MR. SNEED:  Object to form.

THE WITNESS:  This is someone

Page 469

characterizing Adam Mosseri.

BY MR. KOSSLYN:

Q.      Okay.  Do you understand if Instagram eventually did start collecting age information from existing users?

A.      Yes, we did.

Q.      Do you know why Instagram started doing so?

A.      I think it took a lot of ongoing conversations with Instagram leadership. Eventually, you know, we just -- let's see.  I want to be careful about that.

Eventually, the company decided to collect age.  I know it was an ongoing conversation at the Adam level.  But I don't think I can speculate on the exact reason why the company decided to eventually collect age for everyone.

Q.      Okay.  And it's the very last sentence, you "recommend engaging with IG leadership on collecting age for the remaining roughly 33 percent and prioritizing age model maturity on Instagram."

Do you understand that some of the remaining 33 percent may have been under the age of 13 at this time?

Page 470

A.          They may have been.

Q.          Okay.  And Instagram would have no way of knowing, because they did not disclose their age one way or another to Instagram; is that right?

A.          Yes.

MR. SNEED:  Object to form.

BY MR. KOSSLYN:

Q.          Okay.  Do you know if, subsequently, when Instagram did require users to state their age, even if they had an Instagram account, if any of those users said they were under the age of 13?

A.          If they had said they were under the age of 13, they wouldn't have been allowed to remain on the platform or to sign up for an account.  So yeah -- so I don't know.

Q.          I mean, to your knowledge, were there any users that, in fact, were not allowed to continue to have their account because they had indicated they were 12 or younger?

A.          Not to my knowledge.  Not to my direct knowledge.

Q.          Okay.  Would you have had direct knowledge if that was the case?

A.          I wouldn't necessarily have had

Page 471

direct knowledge. That would have gone through our, you know, moderators, and it would have -- it wouldn't have necessarily been raised to me. Because it was such a -- it was such a process, an automated process -- not an automated process, but it was such a process.

Q.        I understand.

If you can please scroll up. This is now to your reply to this original e-mail. This will be on Page 2, I believe. Page 1 and 2.

You say, "Hi, Karina, thank you for sharing - suggested edits from me are below."

And then one of your proposed edits is "Add to 'Not Ready'.

"We do not enforce against certain concerning behaviors at scale across Facebook/Instagram."

Do you see that?

A.        Yes.

Q.        Can you describe what you're describing here?

A.        So there were -- there are accounts on Instagram that don't have too much activity within the account, you know, when it comes to posts or stories that they are sharing. But all

Page 472

they do is leave very sexual, you know, quote, unquote, romantic messages on pictures of minors. And that's all the account does.

That, to me, was a very clear indicator of an account that was dedicated to minor sexualization. And this was something that we were really only able to address upon escalation.

And escalation is a long process. It means that someone may report the account. The account may be found to not be -- be not violating, and then some third party, maybe, that they have access to is able to escalate it to us, or to someone within the company, and then we would review it again, at which point it could be disabled.

Q.    If you can scroll all the way to the top. This is on the first page. When you say, "Hi, Sarah - on 1) This is a policy gap."

Can you describe what you mean here by a policy gap?

A.    Yes. So Sarah was saying in her e-mail that this might be because our AI tooling is not mature enough to proactively detect this content at scale. But what I was saying is that we don't have a policy around what to do with accounts

Page 473

that are only dedicated to leaving sexualizing comments on minors' posts.

And so I was saying that this isn't a question -- you can't have a product tool without the foundational policy.  So I was saying this is not a product issue, this is a policy issue.

Q.    So how would this have been enforced at this point, if there were such accounts?

A.    Yeah.  So at this point, what would happen is if -- let's say I, a user on Instagram, reported this piece of content, it would have not violated any of our -- this account -- sorry -- it would not have violated any of our policies.  I would have gotten back a message saying there was no violation.

I then would have had to find some way to escalate it, perhaps by contacting an Instagram employee or, you know, finding a civil society group that has a relationship with the company.

And then those employees or those external groups would escalate it internally to their contacts at the company who would then, you know, send it to an operations team, saying, hey,

Page 474

can you take a look at this case again.  So that's what an escalation would have looked like.

Q.          In your experience, how many teenagers have relations with Instagram employees or civil society groups?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  In my experience, very few.

BY MR. KOSSLYN:

Q.          Okay.  And just to confirm on this, this is something you're proposing to add to "not ready," as in Instagram, at present, was not doing anything to address this problem?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  That's right.

BY MR. KOSSLYN:

Q.          Do you know did Instagram or Meta warn the public that this was a risk and that this was not covered conduct?

MR. SNEED:  Object to form.

THE WITNESS:  No.  Meta did not.

BY MR. KOSSLYN:

Q.          And to your knowledge, did Meta revise its policies to address this at some point?

Page 475

A.        I don't remember.

Q.        Okay.  I'm done with this document. We can set it aside.

Sorry.  If we can reverse that for a moment and go back to -- this would be Page 6, Bates ending in 543.

MR. SNEED:  The e-mail or the --

MR. KOSSLYN:  No.  This is -- no, this is the table.

BY MR. KOSSLYN:

Q.        This is under the "Global use of age models."

A.        Okay.

Q.        Can you read the first sentence there.

A.        "The best performing age model is not yet globally operational, which leads to a patchwork of integrity measures across the company that leverage age.  We need more review resources to establish ground truth data on age in priority marks.  We should start by engaging with Core Dimensions (the product team who own the age models) on what markets we've identified and stack ranked as a Policy org to prioritize with their available H2 resources."

Page 476

Q.        Just to confirm, your understanding was the vast performing age model was not available or operational on Instagram itself; is that right?

A.        The best performing age --

Q.        Sorry.  Let me withdraw that.

Your understanding was that the age model that was available in the United States for Instagram was not highly performing; is that right?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that's correct.

BY MR. KOSSLYN:

Q.        Okay.  And is your understanding that that complicated or reduced the ability of integrity measures to be employed for minors on the platform?

MR. SNEED:  Object to form.

THE WITNESS:  Yes, that's correct.

BY MR. KOSSLYN:

Q.        Okay.  Thank you.  You can turn the document aside.

So I just would like us to briefly return to Exhibit 9, just to refresh your recollection on the date.

This document is from March 2021; is that correct?

Page 728

A.          It's right here.

Q.          Okay.  Do you see that?

A.          Yes.

Q.          Now, this was presented to you by defense counsel as a list of all the great things that Instagram has done to keep things safe.

Is that a fair characterization of the line of questions you were presented with?

MR. SNEED:  Object -- object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.          So I want to go through and discuss some of these with you, and we're going to start with the various kinds of nudges on Instagram.

Are you familiar with the word, "nudges"?

A.          Yes.

Q.          And nudges either prompt users to consider alternative behavior or provide them with resources on a particularly harmful issue; is that fair?

A.          Could you direct me to the page I should be looking at?

Q.          Sure.  Why don't we take a look at

Page 729

an example.  So the second page, at the top, July 2019.

Do you see that?

A.    July 2019.  Yes.

Q.    Okay.  And that's labeled, "Comment Warnings," correct?

A.    Yes.

Q.    And comment warnings "prompted people to reconsider posting comments that may be hurtful"; is that correct?

A.    Yes.

Q.    Okay.  Now, a comment warning wouldn't actually prevent Instagram users from posting hateful comments on someone else's post, correct?

A.    Correct.

Q.    So would you consider this a temporary Band-Aid or a foundational change in Instagram's architecture, geared towards child safety?

MR. SNEED:  Object to form.

THE WITNESS:  I think this is a valuable -- this is a valuable tool for Instagram to have launched, in part, because the context makes a really big difference.  And the same term,

the same expression, said by different people, to different audiences, could or could not be hateful.

And so I think including comment warnings was a good way -- a good nudge. We also know that when users are nudged or reminded that their policies might violate the rules, they have a higher likelihood of, you know, retracting what they want us to do -- retracting what they are going to do.

BY MR. WARREN:

Q. Right. So fair to say that it was a helpful intervention?

A. Yes.

Q. Okay. But it was not foundationally going to prevent hateful comments and bullying and harassment on the platform, right?

A. I would disagree with that. I think that nudges are a really effective way of discouraging these types of posts from happening. So I think it is an effective foundational move.

Q. All right. Very well. Let's talk about a different one.

In March 2021, Meta says on this document that it "restricted adults over 18 from starting private chats with teens they are not

Page 731

connected to on Instagram and Messenger."

Do you see that?

A.    Yes.

Q.    Okay.  Now, that tool's efficacy relies on the accuracy of Instagram's understanding of the age of users, correct?

A.    Yes.

Q.    If Instagram is wrong about how old either the teenager or the adult is, then this restriction is not going to accomplish very much; would you agree?

MR. SNEED:  Object to form.

THE WITNESS:  I agree.

BY MR. WARREN:

Q.    Okay.  And, in fact, as of March 2021, I believe you testified that Instagram's age inference model was not able to accurately identify many adults who described themselves as teenagers; is that correct?

A.    Correct.

Q.    And conversely, Instagram's age inference tool was not able to identify many teenagers who identified themselves as adults, correct?

A.    That's correct.

Page 732

Q.        Okay.  So while this sounded like a very good intervention, there were some significant limitations to it at the time it launched, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  I think this is a good example of some -- of an intervention that is a helpful tool but doesn't address the foundational issue of not being clear about user age on the platform.

BY MR. WARREN:

Q.        Okay.  So would this one be closer to a temporary Band-Aid or a foundational product solution?

MR. SNEED:  Object to form.

THE WITNESS:  I would say it was more of a Band-Aid.

BY MR. WARREN:

Q.        Okay.  And then let's look at right above -- right above there.

Do you see, February 2021, "We launched expert-backed resources."

Do you see that?

A.        Yes.

Q.        Okay.  Well, expert-backed resources do not prevent the platform from

Page 746

counsel about that?

A.        Yes.

Q.        And I believe you testified that the version that launched didn't impact growth as much as the product we wanted.

Did you say something to that effect?

A.        Yes.

Q.        And what did you mean by that?

A.        The original version of private by default that was scheduled to launch on, I think, September 2nd was scrapped from product because of growth concerns.  And so the version that eventually did launch resulted in a drop of growth, I believe, from the documents, of 2 to 5 percent, and the product team had built a bunch of mitigations to ensure that that drop in growth had been mitigated as much as possible.

Q.        Okay.  And the version that launched of private by default -- actually, let me withdraw the question.

Can you direct your attention to Exhibit 50, please.

A.        Yes.

Q.        And can you direct your attention

Page 747

to the page ending in 16780.

A.    Yes.

Q.    Okay.  And do you see the section called, "Prior Mitigations"?

A.    Yes.

Q.    And so is it correct that in order to offset the negative impact on growth metrics, Instagram came up with new notifications and reminders to launch at the same time that it was rolling out a version of private by default?

A.    That's correct.

Q.    Okay.  And that included contact join notifications?

A.    Yes.

Q.    And follow request reminder?

A.    Yes.

Q.    Okay.  So the mitigations were mitigations targeted at ensuring that Instagram didn't actually lose out on any growth when it launched the safety feature; is that correct?

MR. SNEED:  Object to form.

THE WITNESS:  It ensured that Instagram had the least negative impact on growth. There was some negative impact on the growth.

BY MR. WARREN:

Page 748

Q.        Okay.  And what about the version of private by default that launched was less safety protected than the version that you thought should be launched?

A.        A number of things.  But most critically, private by default was originally supposed to be for all users, and, instead, it was for new users and it was for new users under the age of 16.

Q.        Okay.  Not existing users?

A.        No.

Q.        And not new or existing users under the age of 18, correct?

A.        Correct.

Q.        Can you flip the page of this exhibit.

A.        I'm sorry.  Not under the age of 18, unless they were in EU or the UK.

Q.        Okay.  Very well.

But as far as American kids were concerned, no one under the age of 18 was getting this?

A.        No.

Q.        Okay.  I'm sorry.  Let me withdraw the question because I misstated.

Page 749

No one ages 17 and 18 was getting this, correct?

A.        Correct.

Q.        Okay.  So are you on the next page, 16781?

A.        Yes.

Q.        Can you direct your attention to the top right corner?

A.        Yes.

Q.        Okay.  Now, yesterday you talked about how private by default wasn't actually a default setting.  It was a preselection; is that right?

A.        In my opinion, yes, it's not a true default setting.

Q.        Okay.  And is the right-hand screen shot reflective of that testimony?

A.        Yes.

Q.        Okay.  Can you walk us through that.

A.        So when a user signs up for the platform, so a new teen user, they say their birthday, they state their birthday.  And if that birthday is below 16 -- so there's no age verification.  But if they say they are under the

Page 750

age of 16, then they would get this screen immediately after asking them if they want to have a private account or a public account.  And private was selected by default.

Q.          Okay.  And in your view, that's not a default setting in actuality, correct?

MR. SNEED:  Object to form.

THE WITNESS:  That, to me, is not a true default setting, no.

BY MR. WARREN:

Q.          All right.  Let's turn our attention to the topic of child sexual abuse material, which came up again in counseling from the defense -- questioning from the defense lawyer.

Do you recall that?

A.          Yes.

Q.          And let's look at Exhibit 51.

A.          Yes.

Q.          Do you recall Mr. Sneed questioning about Exhibit 51?

A.          Yes.

Q.          Okay.  And the exhibit concerns something called profile-level reporting for CEI on Instagram; is that correct?

A.          Yes.

Page 757

THE WITNESS:  Correct.

BY MR. WARREN:

Q.        And why did you have that caveat in your answers to Mr. Sneed?

A.        I wanted to be clear that this wasn't my opinion, and that's not why I shared it. I shared it because this was a study from the Cyber Policy Center.

Q.        Okay.  So that wasn't your opinion?

A.        This wasn't my opinion.

Q.        Okay.  Why wasn't it your opinion?

A.        Well, I hadn't done -- I hadn't researched whether or not Instagram truly had the most aggressive approach across all the platforms at this moment in time.  So I don't know if I would have agreed with this study or this statement.

Q.        Let's actually examine how aggressive Instagram's approach to suicide and self-injury aggregated content was.

And let's look at Exhibit 68, which was presented to you by the defense lawyer.

Do you have that in front of you?

A.        Did you say 68?

Q.        I did.

Now, unfortunately, this was

Page 758

produced in a format without page numbers, so I'm going to do my best to orient you.  About halfway through the deck, there is a slide called, "Approach to SSI Across Meta."  And it's got a table with a bunch of Xs.

A.        Yes.

Q.        Okay.  Now does this table indicate whether these approaches applied to one, some, or all of Meta's family of apps?

A.        This would suggest that this applies across the family of apps.

Q.        Okay.  But let's take a look a few pages forward from that.  The slide entitled, "What Did We Learn About SSI and Teens?"

Do you see that?

A.        Yes.

Q.        Okay.  And do you see the first box in the table under the column "Learning"?

A.        Yes.

Q.        And can you read that to the jury, please.

A.        "Significant gaps, complexity and inconsistency in usability, access and content of the resources we offer to users."

Q.        Okay.  And then product work for

that is identified as, "In progress and not roadmap," depending on the sub-bullet, correct?

A.    Correct.

Q.    Okay.  And there are other things that are identified as not roadmapped on this slide, correct?

A.    Correct.

Q.    And one of those is:  "There are additional levers we could pull to address problematic SSI content exposure, e.g., content dilution."

Correct?

A.    Correct.

Q.    All right.  And this site indicates that teens see more suicide and self-injury content than adults, correct?

A.    Yes.

Q.    And while that was roadmapped to be addressed in the second half of that year, meaning 2023, it hadn't actually been addressed as of that point in time, correct?

A.    Yes.

Q.    Okay.  So in 2023, 11 years after the acquisition of Instagram by Meta, it had not addressed the fact that teens were presented with

Page 760

more suicide and self-injury content than adults?

MR. SNEED:  Object to form.

BY MR. WARREN:

Q.        Is that correct?

A.        Yes.

Q.        Okay.  And it had not addressed the fact that there was significant gaps, complexity, and inconsistency in the usability, access, and content of the SSI-related resources that Meta offered to users, correct?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        And it had not pulled all the levers that it could to address problematic SSI content exposure to kids, right?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.        All right.  Now, you were asked some questions about various things that you said to external stakeholders.

Do you remember that?

A.        Yes.

Page 770

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, VAISHNAVI JAYAKUMAR, have the opportunity to read and sign the deposition transcript.

*Michelle L Gray*

_____
MICHELLE L. RIDGWAY,
Certified Shorthand Reporter,
(CA-CSR # 14592)
(Certified Court Reporter
(NJ-CCR # XI02126)
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public
Dated:  February 4, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)