# AMENDED Exhibit 3

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/        )
PERSONAL INJURY PRODUCTS     )   MDL No. 3047
LIABILITY LITIGATION         )
                             )
                             )

 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING      )
SPECIAL TITLE [RULE 3.400]   )
                             )
SOCIAL MEDIA CASES           )   Lead Case No.
_____)   22STCV21355
This Document Relates To     )
                             )
STATE OF TENNESSEE, ex rel.  )
JONATHAN SKRMETTI,           )
ATTORNEY GENERAL and         )
REPORTER,                    )
v.                           )
META PLATFORMS, INC., and    )
INSTAGRAM, LLC.              )
_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VIDEO-RECORDED
DEPOSITION OF ALISON LEE, Ph.D.
(Pages 1 - 465)
Covington & Burling
415 Mission Street, San Francisco, California
Thursday, February 6, 2025, 9:19 a.m.
- - - -

REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

Page 17

Q.   All right.   Thank you for bearing with me through that.

To begin, could you please introduce yourself to the jury.

A.   My name is Alison Lee.   I am a researcher. And my areas of focus are youth thriving, community, sense of belonging, and particularly -- traditionally in K-12 context, but now also in digital spaces.

Q.   Okay.   So I'm going to hand you a document that will be Exhibit 1.

(Whereupon, Meta-Lee Exhibit 1 was marked for identification.)

BY MR. DUNBAR:

Q.   Feel free to take a second to review it. Let me know when you're ready.

Ready?

A.   Uh-huh.

Q.   So I'll represent to you that this is your LinkedIn profile, which we pulled from that website.

Did you prepare this yourself?

A.   Yes, I did.

Q.   Does it accurately reflect your professional and educational history?

A.   Yes, it does.

Page 18

Q.    Can you please tell the jury a little bit about your education.

A.    Sure.

I went to Teachers College, Columbia University for initially what was a master's in educational psychology that then eventually turned into a Ph.D. in cognitive science and education with an application towards educational technology.

I also collected a master's in learning analytics at Columbia, which was a new program designed to take machine learning applications into education and psychology.  So how could we use the latest techniques in modeling and statistical modeling and use that to make inferences about what people are thinking and feeling in a particular digital environment.

Q.    Okay.  Do you understand that you're here today to talk about your employment at Meta?

A.    Yes.

Q.    Before we dive into that, can you tell us about your employment history prior to joining Meta?

A.    Yes, I can.

After I graduated from Columbia -- during my time at Columbia University, I had already started to do a number of research consulting, both

for -- at tech companies as well as education non-profits.

My first role coming out of my grad school experience was working for an education nonprofit called EL Education, which is not at all about technology. It was an organization that was focused on the school model that enabled young people to do work that matters to them. It's a K-12 systems model. We partnered with 132 schools around the country, 17 different school districts. And that work, initially, as a senior research scientist, was focused on this idea of character and belonging.

So how do we help young people cultivate the kinds of skills that enable them to thrive, what does that mean for them to be able to lead their own learning, to have a sense of purpose, to have empathy and care for other people, and to pursue work that really matters to them.

And what was clear from that research was that kids, in order for them to feel empowered to do that work, have to be situated within communities where they feel safe. They feel a sense of belonging. They feel a sense of care from the people around them and they feel supported to do the work that matters most to them.

CONFIDENTIAL

Page 20

And so I spent about five years sitting in circles in classrooms all around the country, whether it was here in Oakland, California; Queens, New York; Saint Paul, Minnesota; Beaverton, Oregon, asking kids, like, what does belonging mean to you, what does that feel like, who are you surrounded by, where do you find it.  How does respect, trust, care, empathy factor into whether or not you feel safe to have a sense of belonging.

And while all the schools that we were part of were -- cared deeply about creating the conditions where kids could feel that way, what was increasingly clear was that many kids around the country that don't go to EL schools do not get that sense of community and connection from the schools that they -- that they attend.

And so where they're not getting it from the local communities that they have, they were increasingly turning to digital communities, right. Creating spaces for themselves to feel safe, to feel heard, to explore their interests.  They were creating communities that they were leading on Discord and they're going on Reddit and learning things for themselves.  They were connecting with other people that were -- shared affinities with

CONFIDENTIAL

Page 21

them, right.  And finding safe spaces for themselves.

And yet, many of the adults that were in these young people's lives either were afraid to have a conversation about digital spaces or pretended like they were just not good for kids, right.  Especially educators were not quite ready to have those conversations about those digital community spaces as places where young people were actually engaging in deep learning and community.

And so that was what led me to really deeply care about what is it about this space that adults seem to be missing around how young people are engaging in digital communities.  We need to understand that better because there can be a lot of good that can happen in it.  There can be a lot of power.  In fact, young people are already leading the way and carrying those spaces for good.

And there's also likely a lot of harm that may happen as a result of lack of support to those young people, especially in those digital spaces that were not designed for young people in the first place.

Q.   Thank you.

So just one point of clarification, I

CONFIDENTIAL

Page 22

mentioned we're going to be talking about your employment at Meta.  Was that company formerly known as Facebook?

A.    Yes.

Q.    Okay.  Can we agree that when I use the term "Meta" in this deposition, I'm referring to the company that used to be known as Facebook?

A.    Yes.

Q.    Okay.  Now, when did you join Meta?

A.    Well, according to this, March 2021.

Q.    Okay.  And you worked for Instagram in particular, right?

A.    Correct.

Q.    Okay.  Can you say a little more about your ambitions when you joined the company?

A.    Yeah.  So the transition was in 2021.  I had just wrapped up what was a really painful role at EL, transitioning all of our schools into a digital format.  It was during the pandemic.

And so it was incredibly painful to see particularly young people, who were the first in their families to hopefully graduate from high school and go on to college, suddenly drop out of school in order to help support their families.  And it was incredibly painful to see the inequities that

were happening across the country, especially due to the pandemic. And I was burnt out from that role.

And I -- what I saw at Instagram was, number one, the ability to make an impact on a larger scale. I felt like if there is something -- even though I felt a great degree of impact in the small nonprofit that we were -- it's not a small nonprofit, but when you think about it relative to the larger population, 130 schools is nothing, right.

And so I was thinking, like, the tradeoff and impact of being able to make impact on the kids that attend the 130 schools versus a larger scale impact on the large swaths of young people that are using Instagram. Could I be making a better impact in that way.

It was also not all completely altruistic. I was burnt out working for a nonprofit, carrying a lot of student debt at that point, and so my aspiration was can I get -- find myself more stability and security by working at a place like Instagram, where I could have some upward economic stability and growth.

Q. Okay. So with regard to the work you just described to make internet spaces more safe for

CONFIDENTIAL

Page 24

young people, were there specific things you wanted to achieve at your role at Instagram?

MS. BARNHART:  Object to the form.

THE WITNESS:  My goals at Instagram were to -- especially knowing that I was working in the integrity space, asking pretty critical questions around how do we keep young people safer on our platform, and also how do we create the spaces for when they do thrive to make that more intentional. What might young people need to actually be supported to thrive.

And by "thrive," I mean feel fullest expression, feel safe to express themselves, to find the people that they care about, to find communities that they care about.  How do we intentionally design towards that and then also mitigate any harms that might happen.

I also had a very particular orientation towards equity.  Given my research at EL Education, it was super clear that there were some pretty foundational variations in who got the most resources in education versus least resources.  Who felt the most safe versus least safe.  Deepest sense of belonging versus least sense of belonging in our communities.

Page 25

And those were driven by socioeconomic lines, by gender lines, by LGBT identification, by English language learning lines, by racial lines.

And so I cared really deeply about that to say if that is true in so much of our societal systems that there are systematic groups that are closer to harm and further from safety, then that is also likely true in digital systems and safety that augment and replicate those same societal systems.

And so my aim, even though I was not hired as an equity researcher, was to look at, as integrity, who are we keeping safe on our platform, who is closest to safety, who are we best serving, and who are we furthest from serving well.

BY MR. DUNBAR:

Q.   Were you able to have as much impact as you hoped on the issues you cared about during your time at Instagram?

A.   I had some impact.  But I don't think it was to the extent that I had hoped for.  I had very open questions about what that impact might look like, given that it was my first experience in a big tech company.  I knew that it was going to be a massive organization that had lots of competing priorities, lots of different teams.  And so I

Page 26

didn't go in thinking that I was going to change, like -- like, I don't think my ego would have been that big for me to expect that I would have changed the entire organization.

But I had hoped that the research that I had -- would have had, joined a larger course of voices that would have galvanized towards change. And I think that was partially realized, but not fully realized in the way that I had hoped.

Q.   Okay.  I think we're going to have a chance to talk about that a bit today.

But before we do, can you tell me which positions you held during your tenure at Instagram?

A.   Yep.  So I was a senior UX researcher focused on relevance integrity.

(Whereupon, a brief discussion off the record.)

THE WITNESS:  It -- I can explain what that means in a moment.

I was there from March 2021 until May 2022.  That title did not change, despite some reorganizations that were happening.  So I had shifted from being on the relevance team, which is the Feed team at Instagram, from March until maybe September or October.  And then around October,

Page 27

there was a massive reorganization, where anybody who touched trust and safety and integrity were then reorganized under an umbrella trust and safety and social impact pillar.

My title didn't change during that time, but the structure of where I sat changed.

After that, I joined the central Meta responsible AI team, also as a senior researcher. That happened from June to December of 2022.

BY MR. DUNBAR:

Q. Can you help me understand the skills you believe you brought to your role at Instagram?

A. Aside from the expected skills that are required for a mixed-methods researcher at that level, so I was expected to deploy both quantitative and qualitative methods to answer critical questions around my area of focus. I was expected to formulate those research questions myself, to execute that, and to also translate those research insights into actionable recommendations to either a product team or specific engineers on my team or to larger organizational wide sort of recommendations for what we would do in response to that research.

I think that's expected for anybody at the senior researcher level. I think -- on top of that,

CONFIDENTIAL

Page 28

I think I added very specific areas of expertise around how do young people think and learn, given my background in cognitive science.  I think I added expertise around how young people learn in communities, what is a social component of it.  How do young people seek out communities and sense of belonging.  So all of that research around social situativity, right.

And then finally my orientation towards equity.  So really asking these questions around who is farthest from harm, who is closest to harm, who's closest to safety.

Q.  Okay.  While you were at Instagram, did you use the skills you just described to produce high quality work product to the best of your ability?

MS. BARNHART:  Object to the form.

THE WITNESS:  I hope so.  I think so.  I tried my best to do so.

BY MR. DUNBAR:

Q.  When you communicated with colleagues, did you try to convey accurate information to the best of your ability?

A.  Yes.

Q.  Did you strive to conduct your work with

Page 29

integrity and honesty during your time at Instagram?

A.    Yes.

MS. BARNHART:  Object to the form.

BY MR. DUNBAR:

Q.    During your work at Instagram, did you do a significant amount of work on the Reel surface?

A.    Yes, I did.

Q.    And just for clarity, can you explain what a surface is in the context of Instagram?

A.    Sure.

A surface is a specific component of the platform.  So there's actually multiple surfaces even within a single product.  So you can -- for example, if you pull up Instagram, the first place that you have of the four tabs that are on the bottom is the feed.  Within the feed there's actually multiple surfaces, right.

There's Stories at the very top.  If you click on it, you will see people posting these 24-hour videos or pictures.  That's Stories at the very top.

And then even within the feed there are multiple surfaces, right.  So as you're scrolling through Instagram, what you will see are two different types of content:  Connected content,

CONFIDENTIAL

Page 30

which is content from people that you follow or accounts that you follow, and unconnected content, which is from people you do not follow.  Those are the recommended content that Instagram shows you, right.

So one of the surfaces that we often talk about in that feed itself is in-feed recommendations, IFR, right.  That's -- within the feed, interspersed throughout your connected content, are these recommendations that are in your feed.

Let's assume that you have been on Instagram all day and you've been scrolling all day and you finished seeing all the possible content that you could possibly see from your connected accounts.  The people that you follow.  Once you hit the very bottom of that, there's another surface called end of feed recommendations.  That's actually a slightly different set of recommendation algorithms that dictate end of feed, or EOF, compared to in-feed recommendations.

Another surface that's relevant to this conversation around Reel recommendations is the Explore tab.  So if you go to the bottom of Instagram and you click over to the -- the little

icon that looks like a magnifying glass, that's called Explore.  It's where you go to search for new content.  In that -- it is called the Explore tab. And in the Explore tab, you will see both Reels and normal posts interspersed throughout that.  And that's another surface.

Q.   Okay.  So you just mentioned Reels as one of the surfaces that one might use on Instagram. Can you just explain the Reels surface in layman's terms?

A.   Yeah, the Reels -- Reels is a type of content actually.

Q.   Okay.

A.   And Reels can be entered into many multiple surfaces, right.  You can inject it into the in-feed recs.  You can inject that into the Explore.  And there's actually a separate -- there was, at one point -- I keep forgetting whether they took that away or they brought it back.  There was, at one point, a Reels tab unto itself.  That's another surface.

Q.   Okay.

A.   At the time in 2021, it was a -- the newest product that Instagram had launched.  And they had hired me specifically to conduct Reels

integrity and safety research because it was such a new product.  They were building fast.  There were clear market competitive motivations to build that product fast and make it as compelling as possible.

And I was a -- prior to me, there was only one other integrity researcher on the relevance integrity team.  And so they actually hired me on to focus specifically on Reels integrity.  Because at that point the product had existed for maybe a year, not even.  And they were just starting to dig into, okay, how do we make sure that this is a safe product.

Q.   I'm going to hand you a document which will be Exhibit 2.

(Whereupon, Meta-Lee Exhibit 2 was marked for identification.)

BY MR. DUNBAR:

Q.   Please feel free to take a moment to familiarize yourself.  If it's helpful, I'm introducing the exhibit just for the title and the date.

Ready?

A.   Yeah.

Q.   Okay.  Does this appear to be an article from Meta's website titled "Introducing Instagram

Page 45

BY MR. DUNBAR:

Q.   As before, take a moment to familiarize yourself with it.

This is going to be Exhibit 4, for the record.

Okay.  Do you recognize this document?

A.   I do.

Q.   Okay.  Is this a document that you worked on during your time at Instagram?

A.   Yes, it is.

Q.   Okay.  Does it appear to be an accurate reproduction of that work?

A.   Yes, it does.

Q.   Okay.  Is this a slide deck that was generated as part of the Reels integrity work we just discussed?

A.   Yes.

Q.   Okay.  Did you ultimately generate two slide decks for your Reels integrity work?

A.   Oh, I think there was a lot more than two. I think you'd have to get more specific on which.

Q.   Okay.  At least two?

A.   At least two, yes.

Q.   So we'll turn to another deck in a bit, but for now, could you please read the first slide

CONFIDENTIAL

Page 46

for the jury.

A.    The timeline one or --

Q.    The cover.

A.    -- TLDR?

Q.    The --

A.    The very top.  Okay.  "Emerging Reels Integrity Challenges.  Alison Lee."

Q.    Does that first slide indicate you were the author of this deck?

A.    Yes.

Q.    When you prepared this presentation, did you make best efforts to deploy your skills as a researcher?

MS. BARNHART:  Object to the form.

THE WITNESS:  Yes.

BY MR. DUNBAR:

Q.    Did you approach this work with integrity?

MS. BARNHART:  Object to the form.

THE WITNESS:  Yes.

BY MR. DUNBAR:

Q.    Did you intend that this would convey important information to colleagues within Instagram?

A.    Yes.

Q.    Turning to the deck's second slide, you

CONFIDENTIAL

Page 47

note in the upper left-hand corner, quote, "I reviewed the related body of Reels, integrity, and well-being (equity, teens) research to identify key priority areas for Reels."

Do you see that?

A. Yes, I do.

Q. Does this mean that you reviewed a host of internal research in preparing this presentation?

A. Yes.

Q. Slide 2 reads, on the left side here, "TLDR:  The Reels ecosystem makes it more vulnerable to integrity challenges."

Do you see that?

A. Yes, I see it.

Q. And TLDR is an acronym for "Too Long, Didn't Read," right?

A. Yes, that's right.

Q. So, in other words, TLDR means summary. Okay.

On the right side of that slide, there is some information organized as 1, 2, and 3.

Do you see that?

A. Yes, I see it.

Q. Can you help me understand?  What does that first item mean?

Page 48

A.    The first item reads, "There are multiple Reels teams launching a high volume of product improvements, leading to increases in sexually suggestive and objectionable content."

And the recommendation below that says, "Reels product teams should coordinate to release launches strategically, and consider integrity impacts proactively for new product launches."

Before I get into this particular one, it's quite -- before any researcher starts new research in any sort of new area, the first thing that they do is conduct a literature review. What do we already know about the space. What do we know about how the system is set up. What do we know about prior existing research.

So that's what this literature review is, is that due diligence in that first step. Part of that review is to look specifically at, well, how is this particular system changing very quickly. What are the things that might lead to potential risk.

This first bullet is talking about the fact that there are many, many teams that are working on Reels, launching a high volume of product launches. So anytime you have many, many people working on a single product, that means inherently

CONFIDENTIAL

Page 49

higher volatility, right.

If -- let's say we were all collectively together trying to build a bike, and you're responsible for gears, and I was responsible for wheels, and somebody else was responsible for the handlebar.  But all of us are constantly tuning and improving our section, our little section of the bike.  Inherently, that's going to mean, man, this thing does not fit with that thing, or maybe the culmination of those two things together are creating increased volatility, right.

And so that's -- that's naming that this increased volume and pace of product improvements may be leading to the increases that we -- in sexually suggestive and objectionable content.

At that time, we had been already tracking what our models were detecting as the prevalence of objectionable content and prevalence of sexual content.  And even from our models at that state, was already detecting that were -- there were higher rates of both of those types of content on the Reels platform, on the Reels content type, compared to our other ones.

Q.   Okay.  I think we'll have a chance to get into that in a bit more detail down the road.  But

Page 50

moving ahead here, the second system of that -- sorry -- strike that.

The second sentence of item one says, "Reels product teams should coordinate to release launches strategically, and consider integrity impacts proactively for new product launches."

Do you see that?

A.    Yes, I do.

Q.    In your view, as someone who researched Reels integrity, was Instagram launching product improvements to Reels without sufficiently considering the integrity impacts?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  There are integrity guardrails that are in place for product teams.

Page 51

However, what we saw as a result of the Reels work was that that was not sufficient to actually prevent these products from regressing integrity in the longer run, either in isolation, but in a time series way, so maybe it didn't regress integrity in the short-term, in the ███████████████ that it was ██████████████, but it did lead to regressions maybe a month out or two months out or three months

CONFIDENTIAL

Page 52

out.  So that's one way that it was not sufficient to consider that impact.

And the other way that it didn't consider the impact was the additive cumulative or the interaction effects between multiple launches.  What that means is that if you've got many, many launches that are happening at the same time, and all of them are just before that 5 percent threshold, maybe this one regresses at 3 percent, that one regresses at 4 percent, well, cumulatively, collectively if you're launching 20 product launches over the course of a month, those things are going to add up cumulatively.

We also did not test for whether there were interaction effects.  So going back to that bike analogy, maybe you're working on a pedal that makes you go faster, and I'm working on the chain that makes you -- us go faster.  Our goal, both, collectively is to make this bike more fun and faster.  What we didn't realize was that there was an interaction effect, where the combination of your pedals and my gears actually made it more unsafe, more volatile, right.

So there were no -- to my knowledge, there were no post-talk or -- post-talk as in after the

fact -- or interim sort of analyses to assess whether or not there were inter -- cumulative effects, long-term effects, or interaction effects between the product launches that ultimately regressed integrity.

What we did see, though, was whatever was happening in that black box, that, later on, the cumulation of all of these launches, did lead to integrity regressions.

BY MR. DUNBAR:

Q. Okay. So, in short, you did not believe that Instagram was sufficiently considering the integrity impacts before launching these product improvements?

MS. BARNHART: Object to the form. Foundation.

THE WITNESS: I think that the integrity guardrails that they put in place were not sufficient to seriously consider the integrity impacts and that there were other alternative strategies that they could have used.

BY MR. DUNBAR:

Q. Okay. So moving ahead to Item 2 on the right side here, can you please explain the second item on this slide?

Page 54

A.    Uh-huh.

MS. BARNHART:  I am going to object that this calls for a narrative and lodge a standing objection to these kind of vague questions that result in very long testimony.

MR. WARD:  You can answer.

THE WITNESS:  Okay.

BY MR. DUNBAR:

Q.    Okay.  Let's try it this way.  I'll withdraw the question.

The second item on the slide says, "The focus on entertainment/mimicry, and the teen audience leaves Reels more open to 1) sexually suggestive and offensive content and 2) vulnerability of younger people."

Do you see that?

A.    Yes, I do see it.

Q.    Just beneath that, it says, quote, "Reels teams should build user-centered tools (audience controls, recommendation feedback) and preventive mechanisms (i.e., tuning ranking models, protections for minors) to keep users safe."

Did I read that correctly?

A.    Yes.

Q.    In the second sentence of that second

Page 55

point, you suggest that Reels team should build user-centered controls, such as audience controls, and recommendation feedback.

What did you mean by "audience controls"?

A.    That -- audience controls means that right at that point -- and if you even go back to the original press release that was given under Exhibit 2, even that document names that, at that point, there was only two types of audiences that you could have for Reels.  You could either have that private, set to private, so only people who you permit to follow you to see those Reels, or completely public, which means that it is fully open to anybody who's on the platform.

Audience controls means being able to tune or tailor who might your content reach.  And that came from, initially, some feedback from users telling us that there were specific audiences that they wanted to reach.  And I think it would also be an interesting -- like, at that time, it was suggested as a user-centered tool.  So if users had a particular preference, could we give them that option to tune who got to see their data -- or who got to see their content.

Q.    Okay.  So through your research at

CONFIDENTIAL

Page 56

Instagram, is it fair to say that you learned Reels posted by young users were distributed by Instagram in ways those young users would not prefer?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think that were true in general, that there were content that was being distributed on Reels that were reaching audiences that users did not intend as original audience.  And we also conducted research that showed that young people had a preferred audience that they wished to reach.

And there was also research that suggested that particularly young women who were producing content on Reels were experiencing unwanted interactions as a result of their content being shown to people that they did not wish to have it be shown to.

BY MR. DUNBAR:

Q.   Do you know how that happened?

MS. BARNHART:  Object to the form.  Calls for a narrative.

THE WITNESS:  It would happen the way that any other Reel would be distributed to a public audience, which is that it was sourced from the

CONFIDENTIAL

Page 57

billions of posts that are created every day and then shown and recommended to users on the basis of what a -- any particular user's preferences are -- or detected preferences are, right.  And we use that through the user signal.

So, for example, Chris, if you're really into bikes, we would try to know that through your user interactions and preference signals.  So if you follow a lot of bike content, if you like, share, DM, do all of these user signals, we would use those signals to recommend content that you have engaged with previously.

BY MR. DUNBAR:

Q.   Okay.  So, in other words, were Instagram's algorithms delivering young users' Reels to people those young users were not connected to?

MS. BARNHART:  Object to the form.
Foundation.

THE WITNESS:  Yes.

BY MR. DUNBAR:

Q.   And did that distribution sometimes endanger those young users?

MS. BARNHART:  Object to the form.
Foundation.

THE WITNESS:  I think I would like to

Page 58

refer specifically to some of the research that we had conducted that specifically named that there were young people, particularly young women, who we surveyed or interviewed, that named -- that they experienced unwanted interactions or unwanted contact as a result of their Reels being shown to people that they did not want their content being -- or that they had no knowledge or awareness or control over that content being shown to.

BY MR. DUNBAR:

Q.   Okay.  I think we'll be able to get into that in a little more detail later.  But to the specific question -- strike that.

Was that one example where that distribution could endanger young users?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  Can you repeat that question again?

BY MR. DUNBAR:

Q.   Sure.

Was that one example where the algorithmic distribution could endanger young users?

A.   Yes, it could endanger young users as a result of that distribution.

CONFIDENTIAL

Page 59

Q.   Okay.   So returning to the second sentence in Item 2, what did you mean by "recommendation feedback"?

A.   Recommendation feedback was the ability to collect information from users that say, hey, you showed me this content of bikes, but I actually have no interest in bikes, so can I see less of this.  Or I'm not interested.

So those user controls already exist in feed, right.  So if you click on a particular, like, menu button on a particular unconnected content, you could say not interested.  But those recommendation tools were not yet explicitly built for Reels.  They were built for your feed.

Q.   So were Instagram's algorithms sending young users categories of content on Reels that the young users did not want to see?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  It's hard to say whether they did or did not want to see.  At that time, Reels ranking, I would say, was in its most nascent form.  And so it was just taking the most popular, most generic popular stuff that they could find and showing it to as many people as possible.

CONFIDENTIAL



///

CONFIDENTIAL

Page 61

BY MR. DUNBAR:

Q.   Okay.  And we'll have a chance to talk about that a bit more in a bit.  But going back to the document.

In that same sentence, you also say, "Reels teams should build preventative mechanisms, i.e., tuning models, ranking models, protections for minors, (to keep users safe)."

Where you recommend "tuning ranking models," what did you mean?

MS. BARNHART:  Objection.  Calls for a narrative.

THE WITNESS:  I have to really go back and look specifically at because you have to remember that this is a TLDR of a large -- of a larger slide deck.  So forgive me if I actually flip further into the slide deck to remember what I was referencing.

There's a couple of different points, I think, that are related to this.  We had named that there were -- there's two -- there's two points I would name to this around tuning ranking models. The first is that we saw that different subsurfaces on Reels were more vulnerable to spikes in objectionable and sexually suggestive data.

So, for example, Reels cover, which is a

CONFIDENTIAL

Page 62

particular subsurface, it's basically when you click on -- before you click on a video, there's, like, a static image and a lot of times people would put sexually suggestive content or really sensational, like clickbait-y covers.  So we saw that was a subsurface that was problematic.

In-feed unit, what we called RIFU, Reels in-feed unit, that's what was being injected into people's feed, that was also a different -- that's a completely different ranking model, right.  So that's what -- that might be one way that I meant around tuning ranking models.  Is there ways that, if we know a particular subsurfaces are riskier than others, can we do some tuning to the riskier models, right.

And the second connected piece here is this idea of focus on entertainment and mimicry and the teen audiences.  And if you remember, Reels is basically Instagram's version of TikTok.  And so at the time, everybody was locked up inside and doing TikTok dances.  We're doing these, like, silly trends.  And many of those trends are very benign, right.  And those trends are oftentimes -- once it goes viral, everybody's producing those videos at a higher rate.

CONFIDENTIAL

Page 63

So -- and there were some trends that were quite risky.  So, for example, we talked about the Wap trend for teens, which was a particular dance that was to a song that was risky, that young people were, in particular, engaging in.  Or trends that were mocking disabilities.  Those are two different instances of trends that were non-recommendable, but were going viral very quickly.

And so that was another recommendation to say, given that Reels was built on this idea of a virality, of things catching on like wildfire and moving very quickly, can we get ahead of bad trends before they catch fire.  So that's another method of tuning a ranking model in order to actually try to not let -- let good trends go forward, but if there is trends that are, you know, non-recommendable, can we get ahead of that.

BY MR. DUNBAR:

Q.   Okay.  Do you know how many minors were using Reels at this point?

MS. BARNHART:  Object to the form.

THE WITNESS:  I wouldn't be able to name that number.

BY MR. DUNBAR:

Q.   Okay.

Page 64

A.    There was a dashboard at that time that indicated the number of people that we thought were under 18.  But I can't remember that number.

Q.    Would it be fair to say that there were at least hundreds of thousands?

MS. BARNHART:  Objection.  Form.  Asked and answered.  Lacks foundation.

THE WITNESS:  I think that's probably a modest estimation.

BY MR. DUNBAR:

Q.    Do you think it would be fair to say that there were millions of young users using Reels at this time?

MS. BARNHART:  Same objections.

THE WITNESS:  Yes, I think so.

BY MR. DUNBAR:

Q.    Could you please turn ahead to slide number 5.

Does this slide provide a little more context about the relationship between product launches and integrity issues we were just discussing?

A.    A little bit more detail.  It names specifically the volume of launches and the -- what proportion of those launches led to integrity

regressions.

Q.    It says at the top of the right side, "We released a high volume (100-plus in H1 2021) of product launches, 17 leading to integrity regressions."

Do you see that?

A.    Yes, I see it.

Q.    Could some of those integrity regressions mean that Reels was less safe than it was before?

MS. BARNHART:  Object to the form.  Asked and answered.

THE WITNESS:  Less safe than it was before, that's one possibility.  Another possibility is that our integrity models were getting better and so they were actually detecting the -- like, the prevalence of bad content at a higher rate.  So maybe it was underestimating it before and it was getting better, and it was becoming more accurate now.

What it does also say, though, is that where the product -- before the product launches came out, the prevalence that was detected at that point -- prior to the launch, is lower than the -- than the integrity prevalence after they were launched.

BY MR. DUNBAR:

Q.    In any case, it says here that more than 100 product launches occurred in the first half of 2021 and 17 of those led to integrity regressions, right?

A.    Yes, that's right.

Q.    Okay.  Could you please turn ahead to slide number 8.

I think you mentioned this point a second ago, but could you please just read this slide for the jury.

A.    Sure.

On the left-hand side, it says trends -- is that right, the trends, mimicry, and entertainment?

Q.    I think that may be one slide ahead.  I'm looking at...

A.    Uh-huh.

"Mimicry, trends, and entertainment: great for engagement, not so great for integrity.  Who's at greatest risk?"

Q.    What is the implication when you say that mimicry, trends, and entertainment were great for engagement, not so great for integrity?

A.    Yeah.

CONFIDENTIAL

Page 67

MS. BARNHART:  Object to the form.  Calls for a narrative.

THE WITNESS:  If you flip to the subsequent slide after, it describes specifically what those things are.

Mimicry means that you're following somebody else's trend, right.  So somebody creates a video with a particular dance.  You follow that by mimicking it.

Trends, in general, just means that there's a particular format that's getting popular and so you follow that trend, right.  So a lot of, like, the ice bucket challenge would be considered a trend, right.

And also, entertaining content, things that were meant to be funny, things that were meant to be salacious or exciting.  Many of them are benign, but some of them oftentimes were considered borderline non-recommendable.  And so that's what we were seeing here.

In this particular content -- in this particular blue slide here, it was talking specifically about dimensions that were leading to the greater likelihood of ███████████████████ █████████████

Page 68

BY MR. DUNBAR:

Q.   Okay.  And at that time, were trends, mimicry, and entertainment prominent features of the Reels experience?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I would say that trends and mimicry were probably the primary things that the Reels platform was designed to promote.  That was what made TikTok incredibly competitive during the pandemic, was this rise in trends and mimicry, doing dances or filming videos that were funny or entertaining for themselves or for their audience. And these viral trends that everybody else could hop onto to do together.

BY MR. DUNBAR:

Q.   So as you previewed, the next slide in this deck, slide 9, provides additional context about what we've been discussing.

The first sentence on the right side of that slide reads, "Ranking models cause integrity regressions by increasing the prevalence of non-recommendable content."

Could you please explain that statement for the jury?

Page 69

A.    That's right.  So that's looking specifically at what dimensions of those product launches we mentioned earlier.  So do you remember, there were many teams that were working on improving the entertainment engagement quality of Reels, right.

And so when we look at the particular launches that were causing the most egregious integrity regressions, that was actually the engineering team's work.  They went in and looked at all the different product launches that were regressing integrity the most.

CONFIDENTIAL

Page 70

The mimicry submodel and down -- downranking watermarked media.  So watermarked media is anything that has a watermark that indicates that that content came from somewhere else.  99 percent of the time for Reels, it was TikTok.  There was a TikTok watermark on the side because TikTok was smart and said anytime you create a video on TikTok, we're going to put a little TikTok icon on the side.

So downranking watermark media was probably somebody's team that was saying, like, we want less content stolen from TikTok and more original Instagram content.  So by downranking.  But all three of these models increased the prevalence of sexually suggestive content.

Q.   Okay.  And that blue sentence at the top of the right side says "non-recommendable" -- "non-recommendable content" -- strike that.

A moment ago, did you explain that non-recommendable content is a category of content that Instagram defines that is not appropriate for promotion?

A.   It is content --

MS. BARNHART:  Object to the characterization.

THE WITNESS:  Non-recommendable content is

CONFIDENTIAL

Page 71

content that, if we detect it to be non-recommendable, we would not want to show it to people who otherwise do not follow that account.

BY MR. DUNBAR:

Q.   And do I understand correctly that ranking models here refer to Instagram's formulas that influence what content users will see?

A.   Yes, that's right.  It's one of two models that influences what users will see.

Q.   Okay.  So does this blue sentence mean that Instagram's own formulas were promoting content on Reels that Instagram itself deemed appropriate -- inappropriate for promotion?

MS. BARNHART:  Object to characterization. Foundation.

THE WITNESS:  There are different treatments based off of the score that's assigned to a non-recommendable content, right, because all of this is machine detected.  So it is not a binary -- if we put a piece of content in front of you, right, and you're a machine, you're not a human, without human expertise labeling, we cannot tell if a particular piece of content is what -- with a hundred percent certainty, unless we get a human to look at it, that it's sexually suggestive or not.

CONFIDENTIAL

Page 72

But the reason why these scores matter, in my explanation, is based off of what

So let me back up for a second.

I talked about ranking as one of two different types of models that we use to source content to share with people, right.  So on a given day, there might be millions of posts that are created, right.  There's so many people on our platform, they're all creating content.

CONFIDENTIAL



CONFIDENTIAL

Page 74

[REDACTED]

[REDACTED]          So that's what this is talking about --

BY MR. DUNBAR:

Q.   Okay.

A.   [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

So those probability thresholds are actually really important and that's how content that's otherwise considered non-rec may make it to the ranking model.  But the challenge is, for every content that maybe is downranked by integrity might be upranked by some other component of the engagement model.

Q.   So as a product of the process you just described, were Instagram's formulas promoting non-recommendable content to users?

MS. BARNHART:  Object to the form. Foundation.

CONFIDENTIAL

Page 75

THE WITNESS:  Non-recommendable content certainly made its way into recommendations.  That much is clear.

BY MR. DUNBAR:

Q.  Okay.

A.  Despite integrity treatments that were applied at both sourcing and ranking, it was abundantly clear to our users, and even within our internal investigations, that there was non-recommendable content that was being shown to users.

Q.  Okay.  And just to be clear, that was occurring even where a user did not follow the user who posted the content?

MS. BARNHART:  Object to the form.  Foundation.

THE WITNESS:  Correct.  Correct.

BY MR. DUNBAR:

Q.  So the final two sentences on this slide state, quote, "Unconnected dancing videos featuring young girls raise safety concerns.  Studies and internal feedback suggests that people are uncomfortable with seeing and concerned about the safety of unconnected Reels content of tween and young girls dancing and posing."

CONFIDENTIAL

Do you see that?

A.   Yes, I see that.

Q.   And in this context, does unconnected mean these people are not following one another?

A.   Correct.  Unconnected means that it is content that you are not -- from an account you are not following.

Q.   Okay.  So is this describing instances where Instagram's algorithms deliver Reels content of tween and young girls dancing and posing to people who did not otherwise know those girls?

MS. BARNHART:  Object to the form.

THE WITNESS:  Yes, that's right.

MS. BARNHART:  Characterization.

BY MR. DUNBAR:

Q.   Do you know if those unconnected recipients include adults?

A.   Yes.

Q.   Could those unconnected recipients include pedophiles?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  If the pedophiles were known to us, and ███████████████████████████

███████████████████████████████████████

CONFIDENTIAL

Page 77

████████████████████████████████████████████

████████████████, they would not be shown to those particular groups.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

BY MR. DUNBAR:

    Q.   Okay.  So just a few slides ago, we read that Instagram launched 100-plus so-called product improvements in the first half of 2021, right?

    A.   Yes, that's correct.

    Q.   And in all those so-called improvements, Instagram did not solve this problem?

    MS. BARNHART:  Object to the form. Characterization.

    THE WITNESS:  At this moment in time, it did not solve this problem.

BY MR. DUNBAR:

    Q.   Do you believe Instagram acted urgently enough to determine why its algorithms were surfacing unconnected videos of tween and young girls dancing and posting to unconnected users?

    MS. BARNHART:  Object to the form.

Page 78

Foundation.

THE WITNESS:  I think that because this content was otherwise considered benign, right, there was nothing sexually suggestive about it, they treated it as an -- a content quality problem rather than necessarily a child safety problem.

Where it became a child safety problem ███ ████████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████████ .

But otherwise, any dancing videos that people were displeased about or were, like, I don't care about this, why is this an issue, they treated it as an engagement problem and not necessarily as an integrity problem.

And so the assumption was that the more content and the better content that we got and the better the engagement models we got and the more we get people to produce content that's not just kids dancing, it would solve that problem.  It would solve that quality engagement problem.

BY MR. DUNBAR:

Q.   Okay.  So just to be clear, on the point about Instagram's algorithms surfacing unconnected videos of teen -- tween and young girls dancing and

posing, do you believe the company acted urgently enough to solve that problem?

MS. BARNHART:  Object to the form.  Asked and answered.

THE WITNESS:  My team's response -- or rather, my response was first to ask who is creating this content, right.  Where is this coming from and what do we know from there.  And we actually did continuous investigations after that point -- or rather, I did.  I took on that mantle of being, like, well, is it coming from accounts that are otherwise parental accounts, right.  Is it mom's account that someone's borrowing to make a dance.

Is it somebody who's lying about their age and pretending that they are 15, 16 years old when they were actually younger, in which case we would take action to actually shut those -- those accounts down.  Or, and more egregiously, are they aggregator accounts.  So accounts that were intentionally collecting videos of young girls dancing for their own interests.  And that would indicate CSAM concerns.

That latter one where we started to notice that there was a significant pattern of aggregator accounts was taken very seriously by Meta.  There

Page 80

was a cross-product team, a legal expert, CSAM experts, people who were expertise in that particular product, that said we need to go after those aggregator accounts because we know that they are intentional bad actors.

But for the former two, where it was, like, well, otherwise this content is technically benign, right. People are allowed to dance on our platform. It might be not be desirable on our platform, but they're allowed to dance. And little kids are allowed to dance. They did not consider anything more than just as better content comes up, it will take care of that problem.

MR. DUNBAR: Respectfully, Dr. Lee, I need to move to strike that answer to the extent it did not respond to my specific question. My question was a little bit different.

Q. Specifically, with regard to the algorithms surfacing unconnected videos of tween and young girls dancing and posing, do you believe the company acted urgently enough to solve that problem?

MS. BARNHART: We'll oppose that motion. That answer was just as responsive as the many other narrative responses you've been eliciting throughout the day, Counsel.

Page 81

THE WITNESS:  I think that the company took some components of these risks seriously and others did not.  As for sharing Reels of kids dancing and posing, I think they treated it like any other sort of undesirable but benign content type.

BY MR. DUNBAR:

Q.  Do you believe the company should have devoted more resources to solve this problem sooner?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think they could have done very specific engineering solutions that could have moved faster to resolve this challenge.  So, for example, detecting the age of the subject within a particular content.  And saying, hey, as a policy line or as a flat rule, we're not going to show content of -- that depicts people that we think are likely to be 12 years old or under to people who they're unconnected to.  That could have been a solution, both an engineering and a policy solution.

BY MR. DUNBAR:

Q.  Okay.  Let's turn ahead to slide 12, please.

Could you please read the sentence on the left side of this slide for the jury.

Page 82

A.    Yeah.

"Teens are the target audience for Reels, but we have limited knowledge, tech, and tools to keep them safe.  But, here's what we do know."

Q.    Okay.  The first two sentences on the right side of this slide say, quote, "Teens hear about and see integrity issues at higher rates on Reels, but they're less bothered by them than adults.  Teens especially see and hear about more profanity and nudity, as well as bullying and hate."

Do you see that?

A.    Yes, I do see it.

Q.    And just to be clear, when you say teens are "less bothered by them than adults," does that mean teens are less harmed?

MS. BARNHART:  Object to the form.

THE WITNESS:  It's based off of what is in our TRIPS data.  So in our TRIPS survey, we ask a follow-up question after we ask, in the last week, have you seen nudity or have you seen something sexually suggestive.  And then after -- if they say yes, then we ask something along the lines -- this is not perfect, but something along the lines of, like, how much did that bother you on a scale of 1 to 5.

CONFIDENTIAL

Page 83

So that's what that's referencing of, like, how -- that they're less bothered by, it's their own personal, like, a scale of ranking of how much they're experiencing.

BY MR. DUNBAR:

Q.   Okay.  So here, it's fair to say "bothered" is not analogous to harmed?

MS. BARNHART:  Object to the form. Characterization.

THE WITNESS:  I'd have to look at the survey item itself.  I wouldn't -- yeah.

BY MR. DUNBAR:

Q.   Okay.  Well, in fact, the next sentence says, "Teens don't think deeply about safety risks until something bad happens."

Do you see that?

A.   Uh-huh.  Yes, I see it.

Q.   The next sentence states, quote, "Consider this with 1) how frequently content featuring minors shows up on Reels recommendations (see slide 9), 2) teens are fueled to produce by likes and comments, and 3) teens are more willing to talk to people who are 'friends of friends.'"

Did I read that correctly?

A.   Yes, you read that correctly.

Q.   Okay.  Dr. Lee, could you please read the last two sentences on this slide for the jury, the blue sentence and then the sentence beneath it.

A.   Yeah.

"Teens want more control over who sees their content on Reels.  While this finding focused on audience control out of social risk (i.e., being embarrassed by content), that aligns with research on teens' preference for privacy, control, and awareness to address harm."

Q.   Thank you.

And the left side of this slide that you read earlier says, "But here's what we know," right?

A.   Yes.

Q.   So Instagram knew that teens wanted more control over who sees their content, right?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think I'd have to look at -- this must -- this finding must have come from a teen safety research study that I included in my literature review.  So that's what I'm going to say, is that there must be a study that indicates this finding or else I wouldn't have said it.  Which indicates, yes, Instagram would have -- had already

Page 85

conducted research on this topic.

BY MR. DUNBAR:

Q.   Okay.  Fair enough.  And I think we'll have a chance to get into that a bit more later.

But do I understand correctly that Instagram had not rolled out those kinds of controls at this point since the surface launched?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  At this point, there were not specialized user control or audience controls for Reels, no.

BY MR. DUNBAR:

Q.   Okay.  And as a result, teen users had no ability to prevent Instagram from recommending their content to adults they did not know?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  They had one option for controlling who gets to see their content, either set to private or set to public.  And we did see that teens, as a result, if they had experienced something, or if they were just more aware of privacy concerns, would set their content to private.

Page 86

But to set to private means that they wouldn't -- their content won't be shown to anybody unless they are following them.  And what we saw was that teens, especially teen creators, teen influencers who wanted to grow an audience were willing to take that risk to get the reward of being shown to more people because they weren't fueled by likes and comments.  They were fueled by growing an audience.

BY MR. DUNBAR:

Q.   Okay.  Just one final question on this exhibit, Dr. Lee.

To your knowledge, did Meta ever disclose any of the information contained in this slide deck to the public?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  Not to my knowledge.  It was never intended for public consumption.

MR. DUNBAR:  Okay.  Thank you.

I think we're ready to move on to another exhibit.  I might propose, if it's okay with others, that we take a quick break.

THE VIDEOGRAPHER:  Time is now 10:51. Going off the record.

CONFIDENTIAL

Page 101

Q.   Sure.  I'm going to hand you another document.

(Whereupon, Meta-Lee Exhibit 6 was marked for identification.)

BY MR. DUNBAR:

Q.   This is going to be Exhibit 6.  Please feel free to take a moment to familiarize yourself, and let me know when you're ready.

A.   Yes.

Q.   Okay.  On the very last page of this document, do you see that you created this document on September 8, 2021?  I apologize.  It might be the second-to-last page.

A.   Yes, I see that.

Q.   Could you -- turning back to the first page, could you describe the goals you had in mind when you proposed this research?

A.   This was a follow-up from the suggestions that we saw in the previous slide deck that we saw, which was to try to understand are they -- are there things that are motivating young people, particularly young women, to produce this content. How do they perceive it in terms of risk.  Who are they intending to reach.  And, if they experience any particular harm or greater risk, are they aware

Page 102

of those risks and what do they do to try to
mitigate that risk and how do they keep themselves
from harm.  That was the intention of this research.

Q.  Okay.  So how did you intend to accomplish
that goal?

MS. BARNHART:  Objection.  Calls for a
narrative.

THE WITNESS:  The goal was to find a
particular subgroup of young people who are
regularly producing on Reels.  I think there was a
particular intention of finding young people who
were producing content that were, you know, dancing
videos, or videos that we would say either are,
like, benign but risky, right, or on the borderline
of sexually suggestive.  And interview them in a way
that didn't feel judgmental about what they were
trying to produce, but really try to understand
their experiences, try to understand what was
motivating them to produce, who they were trying to
reach and what potential risks they perceived.

BY MR. DUNBAR:

Q.  Okay.  Just for clarity, is it okay if I
refer to this piece of research as the "interview
study" moving forward?  I know "Interview" is in the
title at the top.

Page 103

A. Yes.

Q. Okay. Thank you.

So just beneath the title, there's a background section containing a number of bullet points.

Do you see that?

A. Yes.

Q. Okay. I'd like to ask a few questions about that eighth bullet, which is the second from the bottom.

Do you see that one?

A. Yes.

Q. Okay. That bullet says, quote, "'True' exploitation of minors (i.e., suggestive dancing/positioning)."

Did I read that correctly so far?

A. Yes.

Q. It continues, "We need to better detect and filter content depicting minors in sexually suggestive ways on Reels, as the reporting vs. prevalence data suggests that we're permitting many to 'slip through the cracks.'"

Do you see that?

A. Yes, I see that.

Q. Are you saying here that there's a lot of

Page 104

bad stuff being promoted on Reels that is slipping through the cracks because it does not violate one of Instagram's defined categories?

MS. BARNHART:  Object to the form.

THE WITNESS:  It is actually suggesting that it is being flagged as non-recommendable content.  Otherwise we wouldn't have the data that shows that sexually suggestive content featuring minors is at a higher rate on Reels than other places.

So it suggests that we do actually have models that are trying to predict with some degree of accuracy what this content looks like.

And what it's also saying is that, despite the integrity team's best efforts to either filter it out at the sourcing layer or downrank it in the ranking layer, that it is still coming -- filtering through the cracks.

BY MR. DUNBAR:

Q.   Okay.  So this is a sort of different issue from what I described.

This is, instead, the algorithm's delivering content that is in the non-recommendable category?

A.   Yes, that's correct.

Q.   At this point, do I understand correctly that we're more than a year into Reels' launch?

A.   This is -- if this was created in September of 2021, in contrast to the press release, yes, it's been a year.

Q.   Okay.  So a year into Reels' launch, the Reels' algorithms are delivering users content that the company categorized as non-recommendable?

MR. WARD:  Object to the form.

BY MR. DUNBAR:

Q.   Is that right?

MR. WARD:  Characterization.

THE WITNESS:  I think that that's true for all of our content types, and it's also true for Reels.

BY MR. DUNBAR:

Q.   So let's look to the final bullet in the background section.  That bullet says, quote, "Benign but still risky content featuring minors: Children dancing/posing unto itself is not problematic, but it becomes an issue if bad actors see it."

Did I read that correctly so far?

A.   Yes.

Q.   Continues, "New approaches to protect

children and teens (i.e., preventing visibility between known IIC adults and minors on other surfaces like Explore) should be ported to Reels as soon as possible."

Did I read that correctly?

A.   Yes, you read that correctly.

Q.   And what does "known IIC adults" mean here?

A.   It means that there are accounts that we have flagged that have had previous inappropriate interactions with children on our platform.  So they get a flag on our -- on their account.

Q.   Okay.  So are those adult users Instagram has identified for the risk that they may pursue inappropriate interactions with children?

A.   Yes, that's correct.

Q.   ███████   ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████

MS. BARNHART:   Object to the characterization.  Foundation.

THE WITNESS:   ████████████████████
████████████████████████████████████

CONFIDENTIAL

Page 107

[REDACTED]

BY MR. DUNBAR:

Q.   Okay.  Just as a reminder, we're a year into the Reels product's launch at this point; is that right?

A.   Yes, that's right.

Q.   And that had not yet happened, a year into the surface's launch, or the product's launch rather?

A.   Not to my knowledge at that time.  It could have happened if -- without my knowledge, but I'm making the recommendation clearly not knowing if that has happened or not.

Q.   Okay.  So, as far as you're aware, it had not happened?

CONFIDENTIAL

Page 108

A.   Yes.

Q.   Okay.  As far as you're aware, did Instagram ever disclose that risk to the public?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  Not to my knowledge.

BY MR. DUNBAR:

Q.   Okay.  You can set that exhibit to the side.

So we just discussed your proposal for the interview study, as you agreed I could call it, that you proposed after your Reels integrity research.

Was there a second piece of follow-up research that you proposed following your Reels integrity work?

A.   Yes.  I remember that we also conducted a diary study.

Q.   Okay.  Can you, just in general terms, explain to the jury what that study was about?

A.   Sure.  So, as you recall, there were multiple Reels integrity challenges.  The interview that we just -- that we just overviewed was trying to understand one particular slice of the problem, which was, well, young people are producing a lot of dancing videos.  We have to solve that dancing video

Page 191

Q.    Okay.

A.    So maybe it's not added harm, but it's just continuation of harm, rather than mitigation of that.

Q.    So I'm going to hand you another document, which will be Exhibit 18.  And I'm -- as always, feel free to take some time to familiarize yourself with the document.  This one is a lengthy document.

(Whereupon, Meta-Lee Exhibit 18 was marked for identification.)

THE WITNESS:  Yeah.

BY MR. DUNBAR:

Q.    Are you ready to go?

On the cover sheet for this exhibit, before you get to the slide deck itself, do you see that you're listed as a custodian on the cover sheet?  Very first page of the stapled stack.

A.    This one, yes.

Yes, I am.

Q.    Okay.  Do you have any reason to believe that you did not possess this document during your tenure at Meta?

A.    No, I don't believe there's any reason to believe that.

Q.    You do not have any reason to believe that

CONFIDENTIAL

Page 192

you did not possess it?

A. I possessed this, I think -- I believe I was one of the authors.

Q. Okay. What is this document?

A. This document is a -- highlighting a study on Instagram Teen Reels, uncovering their motivations for producing Reels, their intentions, motivations, and also any risks that they encountered as a result of producing Reels.

At the very end of it, it produces a set of recommendations.

It's produced on Meta rather than Instagram copy, which we have seen in the PowerPoints, that format. It's in Meta, which suggests that this was either done after the swap into the central social impact team, which means that I was technically no longer an Instagram employee, but a central Meta social impact employee. Or I was reading it out to a Meta audience. I can't recall the exact context.

Q. Okay. Could you please turn to the fourth slide which appears to provide a research overview.

Do you see that?

A. Yes, I do.

Q. Okay. Based on this slide, does this deck

CONFIDENTIAL

Page 193

appear to discuss things that motivate teens to post on Reels?

MS. BARNHART:  Objection.  Foundation.

THE WITNESS:  It says here that the research objectives are to identify and examine what motivates teens to post Reels, who they intend to reach as their target audience, and what potential risks or unwanted interactions they might have had and how they responded.

BY MR. DUNBAR:

Q.    Okay.  At the bottom of that slide, does it indicate that this information was generated through 20 remote interviews with Instagram users aged 13 to 17 between February and March of 2022?

A.    Yes, that's correct.

Q.    Okay.  I will represent to you that the first half of this deck discusses a number of positive experiences that Reels can afford teens.

Would you agree that Reels, and social media more generally, can be a positive experience for users?

A.    Yes.  I would say that in our research, we have often discussed the connections between the two.  That it can be a very positive and powerful experience for them.

CONFIDENTIAL

Page 194

Q.   But would you also agree that Reels and social media can also expose teens to harmful experiences?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  There is -- by inherently publishing on a platform that was not made for them and exposing them to a public audience, there is an inherent risk associated with their production.

BY MR. DUNBAR:

Q.   So is it fair to say that the positive and negative features of Reels or social media are not mutually exclusive?

A.   They are not mutually exclusive.  Just because we have an index on one does not mean that that -- that is the absence of the other.

MS. BARNHART:  Objection to form.

BY MR. DUNBAR:

Q.   Could you please skip ahead to the 25th slide, which is a title page that reads, "03 Risk factors for unwanted interactions."

(Whereupon, a brief discussion off the record.)

BY MR. DUNBAR:

Q.   Because this is a long deck without

Page 195

pagination built in, I figured this might be a helpful anchor point.

But if you turn to the next slide, there is a sentence that reads, quote, "Participants viewed social media as inherently risky.  Negative comments and their potential psychological toll were widely accepted as the price of admission."

Do you see that?

A.    Yes, I do see that.

Q.    Below that statement, there are six blue boxes.  Do I understand correctly that those are submissions from the teen respondents?

A.    Those are pulled quotes from the interviews that were conducted with them, yes.

Q.    Okay.  Could you please read the third blue box on the left?

A.    The one that starts, "Because"?

Q.    Yes.

A.    "Because Instagram can make you depressed. Because if you are a soft-hearted individual, social media can eat you up.  All I can say is if you have low self-esteem and is insecure about yourself, you don't really need to be on social media until you deal with yourself and deal with your inner wounds. But until then, I don't think you should really be

Page 196

on Instagram.  P7."

Q.    Would you agree that low self-esteem and insecurity are common among teens?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I would have to reference extant research on youth well-being in order to answer that question, yeah.

BY MR. DUNBAR:

Q.    Could you please turn to the next slide.

Do you see the sentence on this slide that says, quote, "Participants viewed potential physical harm from others as a rare but real risk of posting videos, and of social media use more generally."

Do you see that?

A.    Yes, I do see that.

Q.    So in addition to the perceived psychological risks discussed on the last slide, the teen respondents also told the company that they perceive physical risks to social media use, correct?

A.    Yes, that's correct.

Q.    And "participants" refer to 20 teen respondents between the ages of 13 and 17 who use Reels; is that right?

A.    Yes, that's correct.

Q.    Okay.  Would you please skip ahead three slides to the slide with the sentence that begins, "All teen girls."

A.    Should I wait for us to get to that point? It looks like we're -- that one is one earlier, right?

Q.    Correct.

A.    There we go, yes.

Q.    Are you there?

A.    Yep.

Q.    Okay.

A.    "All teen girls reported that they themselves, or a friend, had received inappropriate compliments or other unwanted sexualized interactions."

Q.    And just to be very clear, these are 13- to 17-year-olds girls, right?

A.    That's correct.

MS. BARNHART:  Object to the form.

BY MR. DUNBAR:

Q.    And every one of them reported that?

MS. BARNHART:  Object to the form.

THE WITNESS:  That were part of the sample, yes.

CONFIDENTIAL

Page 198

BY MR. DUNBAR:

Q.    Could you please skip ahead 15 slides to the slide that begins, "User sophistication skewed low."

Are you there?

A.    Uh-huh.

Q.    That full sentence reads, quote, "User sophistication skewed low, decreasing ability to mitigate risks."

Do you see that?

A.    Yes, I do see it.

Q.    The next sentence states, "Participants often suggested features that already exist, when they were asked what privacy or safety features they wish were available on IG or TT."

Did I read that correctly?

A.    Yes, you did.

Q.    Does this indicate to you that users did not have a meaningful awareness of the available safety features?

MS. BARNHART:    Object to the characterization.

THE WITNESS:    This would suggest that they desired those features but were unaware that they -- how to access them or where they were on the product

Page 199

itself.

BY MR. DUNBAR:

Q.   And if the users were unaware of those products or did not know how to access them, would those features provide safety for those users?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  That's a really hard question to ask.  I think when utilized, they can. But if they're not searchable and they're not findable, it certainly limits their ability to help people.

BY MR. DUNBAR:

Q.   So the first bullet under that sentence reads, "Availability of account blocking, comment, deleting, and reporting were the most widely known to participants.  How these tools worked exactly was less well understood.  Participants who weren't sure what happens when they report or block someone did not feel safer from these tools and were less likely to use them."

Do you see that?

A.   Yes, I do see that.

Q.   Based on your experience as a researcher at Meta, are safety features such as account

Page 200

blocking, comment deleting, and reporting effective if users do not know about them or how to use them?

MS. BARNHART:  Object to the form.

THE WITNESS:  They are insufficiently effective.  They are insufficient for meeting the intentions of that function, yes.

BY MR. DUNBAR:

Q.  Based on your experience as a researcher at Meta, do you believe the company should have done more to educate teen users and their parents about available safety features?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  Yes, I think they could have done that better.  And that could have been done either by greater outreach and PR about these tools, or a user interface that made those tools clearer and most accessible to users.

BY MR. DUNBAR:

Q.  When you reference the user interface, based on your experience as a researcher at Meta, do you believe the company should have presented available safety features more prominently in the app?

MS. BARNHART:  Object to the form.

Page 238

prevalence was.

Q.   Okay.  So turning to this exhibit in front of you, does this appear to be an e-mail you received from Kyle Andrews during your tenure at the company?

A.   Yes, it does.

Q.   Do you recall receiving this e-mail?

A.   I mean, I don't remember...

Q.   Do you have any reason to doubt that you received this e-mail?

A.   I have no reason to doubt that.

Q.   Does this indicate to you that you received access to the BEEF survey presentation?

A.   Yeah.  Yes.

Q.   You can set that exhibit aside.

I'm going to hand you another exhibit, which will be Exhibit 25.

(Whereupon, Meta-Lee Exhibit 25 was marked for identification.)

THE WITNESS:  Thank you.

BY MR. DUNBAR:

Q.   Please feel free to take some time to familiarize yourself with the document and let me know when you're ready.

A.   Uh-huh.

CONFIDENTIAL

Page 239

Q.    Okay.  Are you ready?

A.    Yeah.

Q.    Do you recognize this document?

A.    I do.

Q.    Does it appear to be a version of the BEEF survey you received during your time at Instagram?

MS. BARNHART:  Object to the form.

THE WITNESS:  Yes, it does.

BY MR. DUNBAR:

Q.    Okay.  The title of this slide deck reads, "Bad Experiences and Encounters Framework (BEEF) Survey."

Do you see that?

A.    Yes, I do.

Q.    And do you see that it notes the data collection period was June 27th to July 8, 2021.

A.    Yes, I do see that.

Q.    Okay.  If you turn ahead to page 5, does this indicate to you that the BEEF survey involved a user survey where users reported whether they had experienced a range of bad experiences within the last seven days?

MS. BARNHART:  Object to the characterization.

THE WITNESS:  Yes, that's right.

CONFIDENTIAL

Page 240

BY MR. DUNBAR:

Q.    Okay.  If you turn ahead to page 7, do you see a slide titled "Sample size by issue"?

A.    Yes, I do.

Q.    At the bottom right corner of that slide, do you see a cell in that graph that provides the subtotal actual respondent number?

A.    Yes, I do.

MS. BARNHART:  Object to the form.  Foundation.

BY MR. DUNBAR:

Q.    Does that indicate that over 237,000 respondents responded to this survey?

MS. BARNHART:  Object to the characterization.  Foundation.

THE WITNESS:  Sorry.  I'm just reading the text on the side to make sure I fully understand this chart.

Yes, that's correct.

BY MR. DUNBAR:

Q.    In your experience as a Ph.D.-trained researcher, is 237,000 respondents a large sample size?

A.    It is a very --

MS. BARNHART:  Object to the form.

Page 241

THE WITNESS:  For a survey, it is a very large sample size.

BY MR. DUNBAR:

Q.   And what would be the significance of a sample size that large?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  A sample size is important for two things.  The first is, does it provide you enough statistical power to make inferences about what's happening.  But another way of treating sample size is how -- what does sample size mean in relation to the larger population that you care about.

So another question that we would have is, of the sample size here, a very large number, 237,923, it certainly would meet the criteria for statistical significance.

BY MR. DUNBAR:

Q.   Okay.

A.   And let me just answer the second half of that question, which is, that when we think about the population statistics, though, the number of users that are on our platform, which probably total in the millions or maybe -- I don't know what the

number would be right now, 237 as a proportion of that may be small in proportion to that larger population.

So the follow-up questions that I would have is to say is this 237 representative of that larger population.  At minimum, does it reflect sort of the demographics that we would expect as a larger population sample.

Q.   Could you turn to page -- strike that.

In your research, you were particularly focused on issue rates by surface, right?

A.   Yes, that's correct.

Q.   Will you turn to page 12, please.

A.   Which one is that?  Is that the one "Issue rates by surface"?

Q.   That's correct.

Do you see that?

A.   Yes, I do.

Q.   In that chart on slide 12, do you see a column for Reels?

A.   Yes, I do.

Q.   Are there figures in that column that concerned you?

MS. BARNHART:  Object to the form.

THE WITNESS:  I'd have to look very

CONFIDENTIAL

Page 348

THE VIDEOGRAPHER:  Time is now 6:20. Going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Okay.  Time is now 6:26.  Back on the record.

BY MS. BARNHART:

Q.   Okay.  Dr. Lee, could you please take out Exhibit 16 from your pile, and this is a Workplace post called "IG Relevance Integrity FYI" that Mr. Dunbar asked you some questions about earlier.

Do you remember that?

A.   That's right.

Q.   And if you look at Exhibit 17, kind of next to it, I just want to confirm, Exhibit 17, the "Sensitive Reels Diary Study," that's the same study that's being discussed in Exhibit 16, correct?

A.   Yes, that's right.

Q.   Okay.  So let's -- let's look at Exhibit 16 first.

And in the first two sentences you described the methodology that you used for this diary study, correct?

A.   That's right.

Q.   And you say you "asked 54 participants (ages 13 to 24) to submit 374 Reels that they think

Page 349

might be entertaining for some people, but uncomfortable or upsetting to others."

Do you see that?

A.  Yes, I do.

Q.  I want to ask you a few questions about this methodology.

Of the 54 participants, do you recall how many were teenagers?

A.  Oh, I'd have to look into the actual diary study itself and the breakdown.

Q.  Okay.

A.  I don't recall.

Q.  And I don't -- I don't recall seeing that breakdown in any of the documents we've looked at today.

Do you?

A.  I don't.

Q.  Okay.

A.  Yeah.

Q.  Fair to say, though, that not all 54 were teenagers?

A.  Yes, I think so.

Q.  Okay.  And your diary study asked these participants to submit Reels that they thought might be entertaining for some people but uncomfortable or

Page 350

upsetting to others, right?

A.    Yes, that's right.

Q.    So this was not content that the participants necessarily thought were uncomfortable or upsetting, right?

MR. DUNBAR:  Object to the form.

THE WITNESS:  Correct.  We deliberately used the language of uncomfortable or upsetting to others as a third objective other.  Because we didn't want them to name necessarily that the sensitivity was for themselves.

However, we did ask them a follow-up question -- two follow-up questions, for every Reel that they submitted, which was:  Number one, how -- how personally entertaining do you find this Reel to be, and how personally upsetting or uncomfortable or upsetting do you find it to be.  And that's covered in the slides later on.

The reason why was we wanted to source as many possible sensitive Reels as possible without anchoring it on their own personal sense of upsetting or uncomfortable.

BY MS. BARNHART:

Q.    Why don't we look to the slides in Exhibit 17.  If you turn to slide 5, I just want to

Page 351

clarify.

So this chart is showing data relating to the 347, it looks like here, Reels that you asked participants to submit, correct?

A.    Yes, that's right.

Q.    And this chart doesn't tell us anything about whether those participants personally found any of this content to be objectionable or uncomfortable, right?

A.    It's on the subsequent page.  That's what the subsequent chart is telling us.

Q.    And what is -- so you're looking at page 6?

A.    That's right.  The green and red chart.

Q.    Do you know what, precisely, the question was asked for this -- for this that's shown in this chart?

A.    It doesn't say on here.  I would assume that it would mirror the language that we use in the BEEF survey or TRIP survey, because we try to be as consistent in the way we ask this question as possible.

Q.    And so you're confident -- your testimony here today is that the question asked was whether the users personally found the content upsetting,

Page 352

not whether -- how likely they were to rate -- let me start over.

Your testimony here today is that this survey asked whether users personally found the content uncomfortable or upsetting, not whether the users thought other people would find the content uncomfortable or upsetting?

MR. DUNBAR:  Object to the form.

THE WITNESS:  I'm trying to recall.  Give me one moment.

Yes.  I think that the question that we asked was, rate for us on a scale of 1 to 5, with 5 being the most uncomfortable or the most entertaining and 1 being the least entertaining or least discomfort, you find this Reel.

BY MS. BARNHART:

Q.   Okay.  There is nothing in Exhibit 16 or Exhibit 17 that reflects those kinds of questions, right?

MR. DUNBAR:  Object to the form.

THE WITNESS:  I don't think we ever put the explicit language in here.

BY MS. BARNHART:

Q.   So you're not confident that that, in fact, was asked, because the only question that is

CONFIDENTIAL

Page 353

explicitly referenced in these documents is whether the research participant thought other users would find the content uncomfortable or upsetting, correct?

MR. DUNBAR:  Same objection.

THE WITNESS:  We named here users perceived the entertainment and harm value of a Reel differently by integrity type.  That's what's indicated in Exhibit 16.

And then in 17, the title was, we asked users to rate how uncomfortable or upsetting for each Reel submission, and the scores that were produced below.

BY MS. BARNHART:

Q.  So if you go back to slide 5, am I correct that the takeaway from this data is that classifiers aren't perfect?

MR. DUNBAR:  Object to the form.

THE WITNESS:  This is explicitly naming that there are both content that is not being classified -- that is either -- in the instances, for example, of nudity and suggestive or drug, alcohol or tobacco sale, should have been caught by the classifiers but was still being shown to users. Or the policies that we were using to train these --

Page 354

these content types on, were not sufficient to cover the kinds of content that users were saying were the most harmful.

So I'll give you an example. Under Animal Cruelty, it is one of the -- it is the -- at the very bottom of the slide 5, of the 24 sample -- samples that they submitted that they considered animal cruelty, only 16.7 percent of them were considered non-recommendable. And yet, when you look on slide 6, when we looked at animal cruelty, it had one of the higher ratings of discomfort associated with it.

BY MS. BARNHART:

Q. All right. You can put this document away.

So aside -- well, you did a number of research studies when you worked in the relevance integrity team at Meta, correct?

A. Yes, that's right.

Q. And you've testified today, broadly, about the general categories of actions you believe should have been taken at Instagram based on your research, correct?

MR. DUNBAR: Objection to form.

THE WITNESS: Yes. I proposed a number of

Page 355

proposed product changes.

BY MS. BARNHART:

Q.   Okay.  And I want to talk through those specific product changes that you testified about earlier today.

So one category of, you know, actions to take in response to your research that I heard were what you called P0 goals.

Do you remember discussing P0 goals?

A.   P0 goals both in --

MR. DUNBAR:  Object to the form.

THE WITNESS:  -- my own research, so it was like priority -- the highest priority research that we would do, for myself.  I don't know if I ever talked about -- oh, I did.  I talked about the P0 goals for the larger team.

BY MS. BARNHART:

Q.   Okay.  And, in your view, those were the highest priority actions that Instagram should take, right?

MR. DUNBAR:  Object to the form.

THE WITNESS:  For the goals for the team, I did not set those by myself.  Those are actually the P0s, P1s and P2s that were set by the entire team.  So the -- set by engineering, by our PMs and

by our data scientists.

BY MS. BARNHART:

Q.   Okay.  What I'm referring to specifically, and I'll try to find the document, were the two P0 goals that you set for yourself relating to research that you wanted to do.

A.   Yeah.

Q.   It's Exhibit 8.

A.   That's separate.  Yeah, those are the P0s that I defined for myself.

Q.   Okay.  And just so we're clear, the -- you have identified two P0 self-identified goals today?

A.   Uh-huh.

Q.   Is that right?

A.   Those were --

MR. DUNBAR:  Object to the form.

THE WITNESS:  Yeah, self-identified and approved by my manager.  So there would be a point where I would get feedback from my cross-functional team and my manager to ensure those are, in fact, the most important P0s.  So they're not done in a vacuum.

BY MS. BARNHART:

Q.   Okay.  And the two P0s that you identified were two research studies that you wanted to

Page 357

conduct, the diary study and the interview study; is that right?

A.   Yes, that is correct.

Q.   Okay.  And, in fact, both of those studies were approved, correct?

MR. DUNBAR:  Object to the form.

THE WITNESS:  Eventually, they were approved.  I think, when we reviewed the documents, it was January 5th or something like that that they were finally approved.  So eventually, but not in H2 of 2021.

BY MS. BARNHART:

Q.   Okay.  But they were approved, so your two P0 goals that you self-identified were approved eventually?

MR. DUNBAR:  Asked and answered.  Object to form.

THE WITNESS:  They were set in September -- September 21st, and they were approved January 5th, so three months later.

BY MS. BARNHART:

Q.   Okay.  And can you recall any other P0 goals that you identified?

A.   That were not part of this?

Q.   Correct.

A.   We have one that was about amplification and rabbit holes.

Q.   What was the specific product recommendation, if anything, or research recommendations?

A.   Research recommendation.  The research recommendation was that there were both user reports, and, at the time, there was also a Wall Street Journal investigation that showed how easily it was for people to fall into bad rabbit holes.

Rabbit holes are what we call bad amplified states.  That means when you -- and we found that cold starts in particular, or being a brand-new user on the platform made it very easy for you to fall into those rabbit holes or those bad amplified states.

What that means exactly is, let's say you created a new account on Instagram.  At that point, we have very little signal about who you are, what you like, what your interests are.  But it just so happens that you follow one account about cookies.  Okay.  Now, that topic can be anything.  It just so happens that you chose a benign topic like cookies.  Well, because that is the earliest and only signal that we have, what we found was that the algorithm

over-indexed on that single piece of information and started spamming you with cookie content.

Now, that's just an undesirable user experience regardless, right. That was an engagement problem. But what we -- what the Wall Street Journal investigation uncovered and accelerated through our research was that those amplified states also apply to things like political polarization, sexually suggestive content, regulated goods content, and other non-desirable content. That was very easy to fall into bad rabbit holes of this bad content. So that was another P0 of research that was a priority for the team.

Q. By non-desirable content, do you mean not policy-violating content?

A. Non-recommendable content and/or potentially policy violating that we're not catching either.

MR. DUNBAR: Objection. Form.

BY MS. BARNHART:

Q. And what was your specific P0 goal that you articulated with respect to this research?

A. The goal was to, number one, identify what are the gateways or what are the mechanisms with which people fall into bad rabbit holes. And then

Page 452

MS. BARNHART:  Object to the characterization.

THE WITNESS:  Can you specify what you mean by "conduct"?

BY MR. DUNBAR:

Q.  So I'll -- I'll re-ask the question.

Do you recall some discussion with Meta's lawyer about whether the harms you identified in your research were harms arising out of content?

A.  Exposure to content, yes.

Q.  Right.

Will you agree that the problems that you identified on the Reels product weren't about content in a vacuum, but were rather about content plus the recommendations systems on Instagram?

MS. BARNHART:  Objection.  Objection to form.  And the characterization.

THE WITNESS:  Yes, that's correct.  Not only was it the exposure to the content, but it was also the ML models that were presenting that content to users.  And also, the inadequacy of the integrity models to try to suppress bad content despite the best efforts of an underresourced team.

BY MR. DUNBAR:

Q.  For example, we talked about Meta's

algorithm affirmatively pushing videos that were non-recommendable according to Instagram's own rules, right?

MS. BARNHART: Object to the characterization. Foundation.

THE WITNESS: Instagram was pushing videos writ large in any way that they could. Those included videos that were benign and also known to have higher rates of non-recommendable content.

BY MR. DUNBAR:

Q. And in some cases, we talked about occasions where the content that the algorithms were surfacing even fell into the violating category by Meta's categories, right?

MS. BARNHART: Object to the characterization.

THE WITNESS: Yes, not only non-recommended but violating.

BY MR. DUNBAR:

Q. And your research found that Instagram Reels was distributing Reels content in ways that young users did not want, right?

MS. BARNHART: Object to form. Characterization.

THE WITNESS: I think rather than using

the language of saying that users did not want, I think it was not in the way that teen users desired as their optimal audience.  And by not meeting their needs for their desired audience, it was exposing them to unwanted interactions and unwanted audiences.

BY MR. DUNBAR:

Q.   And it also found -- your research also found that Instagram Reels was serving users content they did not want to see, right?

MS. BARNHART:  Object to form. Characterization.

THE WITNESS:  Yes, according to the diary studies, it's clear there was content that was marked as undesirable by users that they were finding on unconnected surfaces.

BY MR. DUNBAR:

Q.   So would you agree, then, that your research showed that harms associated with Reels weren't just about the content in and of itself, rather the decisions Instagram's algorithms made about what content to promote --

MS. BARNHART:  Object to form. Characterization.  Foundation.

MR. DUNBAR:  I hadn't yet finished my

question, Counsel.

MS. BARNHART:  It sounded like you did.

MR. DUNBAR:  Let me ask it again.

BY MR. DUNBAR:

Q.  So would you agree, then, that your research showed that harms associated with Reels weren't just about the content in and of itself, but rather the decisions Instagram's algorithms made about what content to promote to users?

MS. BARNHART:  Object to form. Characterization.  Foundation.

THE WITNESS:  I don't think it was an explicit decision that was being made on behalf of any engagement or product lead to say we're going to show undesirable content to users.  The decision and the choice was to prioritizing recommending whatever most engaging, most compelling content and videos that were on Reels to as many users as possible.  So it wasn't an explicit decision.

But it was a consequence, a known consequence that by sharing lots and lots of videos to as many users as possible, part of the -- the videos that were being shown were -- included non-recommendable content that they knew existed at a higher rate than on other products and surfaces.

Page 456

BY MR. DUNBAR:

Q.   And do I correct -- recall correctly your testimony that the company could have invested more in the teams responsible for fixing those kinds of problems?

MS. BARNHART:  Object to the form. Characterization.  Foundation.

THE WITNESS:  Yes.  I believe that the company could have invested more in resources, time, energy, head count, and also taken action more quickly and more effectively in response.

BY MR. DUNBAR:

Q.   And in any case, would you agree that Instagram did not warn users about some of your findings about those harms?

MS. BARNHART:  Object to form. Characterization.  Foundation.

THE WITNESS:  None of my research was shown publicly.  It was not intended for a public audience.  But even if they did not share explicit research -- my explicit research to a public audience, I do not think that they named the severity and reach of these challenges on their platform.

Even the press releases only outlined --

used very vague language around "may" and "we don't want that." But it didn't name that these are real things that were happening nor the rate of those experiences.

BY MR. DUNBAR:

Q. And your research led you to believe that people were having those kinds of experiences, right?

A. Yes. In fact, they were reporting them at higher rates than what we were detecting.

Q. For example, we discussed several studies -- strike that.

We looked at other studies like BEEF that were not made public, right?

A. We looked at BEEF, yes.

Q. And you'd agree that the decision to not be fully transparent about the risks that Instagram posed to young users in particular, that lack of transparency could lead to more harm?

MS. BARNHART: Object to form. Characterization. Foundation.

THE WITNESS: I think that what they were sharing in their CSER report was an -- a deliberately incomplete picture in an underreporting of the rate of harmful content and experiences that

were happening on our platform.

BY MR. DUNBAR:

Q.   To that point, we looked at affirmative statements by Meta that presented a slant impression of Instagram's safety, such as CSERs and the annotated slide decks, right?

MS. BARNHART:  Object to the characterization.

THE WITNESS:  Yes.

BY MR. DUNBAR:

Q.   Would you agree that by creating the impression that Instagram was safer than it really was, that could contribute negatively to youth safety, too, right?

MS. BARNHART:  Objection to the form. Characterization.  And foundation.

THE WITNESS:  I think by underreporting and diminishing the findings that were leaked, and underreporting the prevalence of that, that they prevented the public from understanding the rate and severity of the risks that are associated with being on the platform, particularly for young people.

BY MR. DUNBAR:

Q.   You received some questions from Meta's lawyer getting at the notion that integrity issues

Page 459

are really hard problems.  Is that fair to say?

A.    Yes.

Q.    But would you also agree that social media companies have an obligation to make their best efforts to address issues they know exist on their platforms?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think the difficultness of a problem or the bigness of a problem is not an indicator of whether or not that problem is a priority over a problem to be solved or not.

As I named earlier, when it comes to complexity around these problems, what it ultimately comes down to is who is at risk as a consequence of these decisions.  Whose safety are we prioritizing, whose voice are we prioritizing, who is closest to safety and who is farthest from safety.

And so on that -- in that regard, I think those questions were not the leading questions that dictated the way that Meta acted or else they would have taken young people, who are the most vulnerable people in our society, their safety and well-being more seriously and would have acted accordingly.

///

Page 460

BY MR. DUNBAR:

Q.   During your tenure at Instagram, do you feel like the company did enough to warn users about the bad experiences they might encounter on the platform?

MS. BARNHART:  Object to the form. Characterization.  Foundation.  Asked and answered.

THE WITNESS:  No, I do not think that they did a sufficient job.

BY MR. DUNBAR:

Q.   During your tenure at Instagram, do you feel like you did everything in your power to try to reduce known unsafe experiences teens were having on Instagram?

A.   I think I did the best that I could with the locus of control that I had as a researcher.

Q.   During your tenure at Instagram, do you feel that the company's leadership did the same?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think that the leaders at Instagram, their attention and their priorities were elsewhere.  Namely, in growing their product, growing the platform, and increasing engagement.  I would say that they perhaps cared as a third or

Page 461

fourth order priority about safety and well-being.

I don't think that they did not care at all.  And I would say that those other concerns about engagement and growing the platform and product superceded those concerns about safety.

MR. DUNBAR:  No further questions.

Thank you again, Dr. Lee.

MS. BARNHART:  Nothing further from me.  So we can go off.

THE VIDEOGRAPHER:  Counsel for Meta's total time on the record was 3 hours and 1 minute.

Plaintiffs' counsel total time on the record was 5 hours and 37 minutes.

(Whereupon, a brief discussion off the record.)

THE VIDEOGRAPHER:  All Tennessee.  Sorry.

All Tennessee for 5 hours and 37 minutes.

This concludes the deposition.  Going off the record.

(Whereupon, a brief recess was taken.)

MR. WARD:  I would like a copy.  I would like a copy of the transcript, please.

(Whereupon, the deposition was concluded at 8:53 p.m.)

CONFIDENTIAL

Page 465

STATE OF CALIFORNIA    )

COUNTY OF YOLO         )

  I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

      ALISON LEE, Ph.D.,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

  I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720