# AMENDED Exhibit 8

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA              )
ADOLESCENT ADDICTION/            )
PERSONAL INJURY PRODUCTS         ) MDL No. 4:22-md-3047-YGR
LIABILITY LITIGATION             )
_____  )
    SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
      COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING          )
SPECIAL TITLE [RULE 3.400]       )
                                 )
SOCIAL MEDIA CASES               )   Lead Case No.
_____  )   22STCV21355
This Document Relates To         )
                                 )
STATE OF TENNESSEE, ex rel.      )
JONATHAN SKRMETTI,               )
ATTORNEY GENERAL and             )
REPORTER,                        )
v.                               )
META PLATFORMS, INC., and        )
INSTAGRAM, LLC.                  )
Case No. 23-1364-IV              )
_____  )

        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

           VIDEOTAPED DEPOSITION OF BRIAN BOLAND
                     APRIL 25, 2025
                    (Pages 1 - 422)
                 9:18 a.m. to 7:18 p.m.
                  Zuckerman Spaeder
          2100 L Street, NW, Washington, DC 20037

    Reported By: Amanda Blomstrom, RMR, CRR, and
    CSR TX #8785/CA #12681/IL #84-3634

Page 17

MR. JANSSEN:  Appreciate that, Andrew.
Thank you.  Thank you.

MR. SNEED:  Thank you.

BY MR. JANSSEN:

Q.    Mr. Boland, Exhibit 2, your LinkedIn
profile, do you recognize the contents of this, of
this document?

A.    I do.

Q.    Did you prepare the contents of your
LinkedIn profile?

A.    I did.

Q.    And my understanding is that when you
worked for the Facebook company it was called
"Facebook"; is that right?

A.    That's correct.

Q.    It's since changed names; is that your
understanding?

A.    That's my understanding.

Q.    For purposes of today's deposition, if
I reference the company as "Facebook" or as "Meta
Platforms" at times, is it your understanding -- are
you okay if I use those terms interchangeably in

CONFIDENTIAL

Page 18

terms of the -- what the company has been called and is called now?

MR. SNEED:  Object to form.

THEW WITNESS:  I'm comfortable with you -- unless you're specifically asking about one of apps --

BY MR. JANSSEN:

Q.    Understood.

A.    -- itself, and then if we could clarify, that would be great.

Q.    You bet.  I will do that.

Mr. Boland, if I could direct your attention to the -- Page 2 of 5 of your LinkedIn profile.  About a third of the way down, it says, "Facebook, 11 years 3 months."

Do you see that?

A.    I do.

Q.    Is that -- is that the amount of time that you spent working at Facebook?

A.    Yes, that's accurate.

Q.    And if you turn or look at Page 3 of 5, toward the bottom, it says, "Director, Product

CONFIDENTIAL

Marketing, September 2009."

Do you see that?

A.    I do.

Q.    Is that when you began working at Facebook?

A.    Yeah, that's what I started at the company.

Q.    And then if you look again back at Page 2 of 5, at that top position, right under "Facebook, 11 years 3 months," it says, "November 2020."

Is that when you finished your employment with Facebook?

A.    That's correct.

Q.    And if I could direct your attention back to that -- let me ask you, Mr. Boland:  When you first joined Facebook, what were your goals with joining the company?

MR. SNEED:  Object to form.

THE WITNESS:  When I joined Facebook in 2009, it was, well, an exciting career opportunity; so it's the ability to move from what I had done at Microsoft to build something new and something

Page 20

smaller that was a -- more of a startup at the time. And was really excited about the mission of the company. It was something that, it felt like, from walking in the door, that people really had a focus on a mission, and that was -- that was really appealing.

Q. And what was the mission of the company that you found attractive?

A. It was this idea of making the more -- the world more open and connected. So that you could actually create a set of technologies that enabled people to get to know each other better and build bonds that spanned groups that they wouldn't normally be in and really have that vision of connecting for good, connecting to actually make people more positively connected, rather than divided.

Q. Directing your attention to Page 3 of 5 of your Exhibit 2 LinkedIn profile. Again, starting with that Director of Product, Marketing position. You held that position from September 2009 through June 2013; is that correct?

A. That is correct.

Page 21

Q.    And what did you -- what were your roles and -- what was your role and what was your responsibilities in that first position you had with the company?

A.    That first phase was focused on building the ads products at Facebook, moving from kind of the initial fumbling that the company had done in ads to something that was a more robust advertising business and set of services.

Q.    What are ads products that you -- that you referenced?

A.    It was all of Facebook's auction-driven ads products, and eventually, towards the end, the brand ad products.  So the idea that an advertiser could show an ad on Facebook to anybody to reach them for the purpose of creating value for their business.

One of the things that we really focused on was being very principled in what we were building, and advertiser value was a core thing that we wanted to build towards.  That it wasn't just about making money, it wasn't just about showing ads to somebody.  It was about, how do you create value

Page 22

for a business who is advertising on Facebook?

Q.    Did people report to you in your position as Director of Product Marketing?

A.    Initially, no, but eventually I had a team.

Q.    Okay.  How large was that team at the end?

A.    I don't recall the exact number, but I think it was around ten.

Q.    And to whom did you report when you were in the role of Director of Product Marketing, if you recall?

A.    Yeah.  Initially it was ███████, and then it was eventually David Fischer.

Q.    And then if you look above that position, it lists another position, "VP Ads Product Marketing and Atlas."

        Do you see that?

A.    I do.

Q.    And you held that position from June 2013 to October 2014.

        Is that accurate?

A.    That is correct.

CONFIDENTIAL

Page 23

Q.    Was that a promotion from your position as Director, Product Marketing?

A.    Yes.

Q.    And you list as the description for that position as, "Continued to lead and expand Facebook's ads product" offering -- "offerings resulting in multiple billions in revenue growth."

Do you see that?

A.    I do.

Q.    In this time frame, Mr. Boland, was Facebook's ads products offering one of the largest sources of revenue for the Facebook company?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  Yes, it was.

BY MR. JANSSEN:

Q.    Was it the largest source of revenue for the Facebook company?

MR. SNEED:  Object to form.

THE WITNESS:  It was.

BY MR. JANSSEN:

Q.    And then, if you look above that second

Page 24

position of VP ads -- well, let me pause there and just go back for a second.

Throughout your time at the Facebook company, was the company's revenue from its ads product offerings the largest source of revenue for the company?

A.    It was.

Q.    Looking above to the next position you had, "VP Advertising Technology," you held that position from October 2014 to October 2016.

Is that accurate?

A.    That's accurate.

Q.    Was that another promotion from your last position at Facebook?

A.    Call it more of a reorganization of responsibilities rather than a promotion.

Q.    And what were your -- or, what did you do as VP of Advertising Technology?

A.    Over the course of 2014, 2015, we had acquired some companies in Atlas and LiveRail and had had aspirations to build a competitive product to Google's advertising technology suite.  So it was a

Page 25

pretty major initiative for us to try to see if we could -- could create something that would provide choice in the market, and a different view on how advertising could work.

And so that was -- the focus was on, we had a robust ads business at Facebook, how do we shift my attention to focus on this competitive product.

Q.    While working at Facebook in this time period, which of Facebook's applications did your work relate to?

A.    The -- yeah, the ad system would have powered ads on Facebook and on Instagram.

Q.    And then directing your attention now to Page 2 of 5 of your LinkedIn profile.  It lists your next position as "VP Publisher Solutions."  And that you held that position from October 2016 through January 2018.

Is that accurate?

A.    That's correct.

Q.    And was this position at VP -- as VP Publisher Solutions, was that a promotion from your

CONFIDENTIAL

Page 26

last position?

A.    Again, I considered it another phase of that organizational structure we were working on.

Q.    Understood.

What did you do in your role as VP Publisher Solutions?

A.    In that role, we had made a decision to -- we realized that we weren't going to be successful creating a unified double-click-style ad product at Facebook, and so we decided to split off different components of the advertising technology business and embed them in their core parts of the business.

So the main advertiser parts moved over to the Ads Team, and then, in this role, I was focused on building our Ads network; so how you could expand Facebook's ad offering off of Facebook.

Q.    The last part you referenced, offering the ad product off of Facebook, is that Facebook's Audience Network?

A.    That's correct.

Q.    And could you just provide a brief description of what that is, Facebook's Audience

CONFIDENTIAL

Page 27

Network?

A.    The idea behind Facebook's Audience Network was that we know that advertisers -- because we got really, really good at understanding how to create value for advertisers, we realized that we could provide those same set of services off of Facebook and other apps and other experiences.

And the Audience Network was designed to show ads that were not being shown on Facebook or on Instagram or Facebook properties into other third-party apps and experiences with the goal of creating that same advertiser value just in -- in different locations.

Q.    To whom did you report as VP Publisher Solutions?

A.    That was to Dan Rose.

Q.    And did you have a team that you supervised in that role?

A.    I did.

Q.    How many people did you supervise?

A.    I think around a hundred, but that's -- take that as a ballpark.

Page 28

Q.    Understood.

Your final position at Facebook is listed as "VP Partnerships Product Marketing, Partner Engineering, Marketing, Strategic Operations, & Analytics."

Did I read that correctly?

A.    You did.

Q.    And that you held that position for 2 years 11 months, from January 2018 to November 2020.

Is that accurate?

A.    That's correct.

Q.    Was that a promotion from your last position of VP Publisher Solutions?

A.    Yes.

Q.    And to whom did you report as -- if I just call it the "last position," VP Partnerships Product Marketing?

A.    Some mix of Dan Rose and then Marne Levine.  I don't -- there was a transition from Dan Rose to Marne, and I honestly can't remember what year that was.

Page 29

Q.    At some point while you held this last role was when you transferred to have Marne Levine supervising you or --

A.    Yeah, it was either that or the previous role.  It's just, time is a little bit of a blur.

Q.    Understood.

Did you have a team?

A.    I did.

Q.    And how large was that team in this last role at Facebook?

A.    It was about a 500-person team.

Q.    And what did you do as VP Partnerships Product Marketing?

A.    The full, the -- you want all the kind of broad brushstrokes of the --

Q.    That would be great.

A.    Okay.  Product Marketing -- so for this group, the context is actually helpful.  When I was in the ads business, my job was focused on advertisers specifically.  When we were in the Partnerships Team, you can think about that working on a broad array of third parties who partner with

Page 30

Facebook and how we build products and services and sales teams to support them and to bring them on to Facebook products broadly.

Product Marketing is focused on understanding customers and their needs.

Partner Engineering are engineers who actually work internally and externally to build last-mile solutions for customers.

The Marketing Team is marketing; telling the story of the broad array of businesses that we've worked on.

Strategic Operations is the business planning function, so helping internal teams plan for headcount, plan for the ways that they should develop processes to reach these customers.

And Analytics is a data analysis group who understands the data that we need to run the business across those products, which would have included Facebook's Watch; Video that's in the app; News; Games; Groups and Group Admins, which is a product on Facebook; Facebook developer solutions; the work we're doing on Internet Connectivity; Workplace,

CONFIDENTIAL

Page 31

which is the work version of Facebook, so Facebook for the office; Marketplace, which was the emerging shopping platform; Payments, which help people do payments through the Facebook platform; and then Audience Network as a product, so will remain a part of that purview.

Q.    And this position, VP Partnerships Product Marketing, that was the -- the last position you held at the company?

A.    That was.

Q.    When did you resign from Facebook?

A.    In June or July of 2020.

Q.    And when was your -- your final day with -- with the company?

A.    It was in November.  I can't remember the exact day.

Q.    So you resigned summer of 2020, but stayed on through November, sometime in that -- in there?

MR. SNEED:  Object to form.

THE WITNESS:  That's correct.

BY MR. JANSSEN:

Q.    Why is it that you decided to resign from

CONFIDENTIAL

Page 32

Facebook, Mr. Boland?

A.    I came to disagree with decisions the company was making around investments to understand whether the platform was harmful to users on the platform.

Q.    In your roles at Facebook, did you have the opportunity to work with any senior executives at Facebook?

A.    Yes.

Q.    Did you ever have the opportunity to work with Mr. Zuckerberg while you were at Facebook?

A.    I did.

Q.    In what ways did you work with Mr. Zuckerberg at Facebook?

A.    We, as a common course of business, would do product reviews with Mark or would do annual reviews with Mark and the M-Team leadership team, and so it was in a variety of product-specific reviews or business line reviews in the annual review process, depends on the acquisition of Atlas, LiveRail, so regular course of business.

Q.    On average, how many times a year might

CONFIDENTIAL

Page 51

Q.    Do you have any reason to believe that what's printed off as Exhibit 5 is any different than what's the live PDF on the Congress.gov website?

MR. SNEED:  Object to form; foundation.

THE WITNESS:  No reason to think that it would be otherwise.

BY MR. JANSSEN:

Q.    Thank you.  You can set aside Exhibit 4, the single-page document.

And I just wanted to ask you some questions about your prepared written statement --

A.    Okay.

Q.    -- starting at 110.

The document begins, says, "Testimony of Brian Thomas Boland."

That's you, correct?

A.    That is correct.

Q.    And a little below that it says, "Before the United States Senate Committee on Homeland Security and Governmental Affairs on 'Social Media's Impact on Homeland Security:  Part I.'"

Did I read that correctly?

CONFIDENTIAL

Page 52

A.    You did.

Q.    And then it says you submitted this on September 12th, 2022.

Is that accurate?

A.    That is accurate.

Q.    If I could direct your attention to the second paragraph of your prepared written statement and the last sentence of that paragraph, it says, "During my tenure at the company ... worked with the most senior executives at the company and was deeply embedded in the product development process."

Did I read that correctly?

A.    You did.

Q.    Now, earlier in your testimony you told us some about your work with Mr. Zuckerberg and Ms. Sandberg.  Are there other senior executives at the Facebook company with whom you worked closely while -- during your time at the company?

A.    A lot of different executives and VP level product and technical executives.

Q.    Is there any way to, I guess ballpark the -- I guess the number of people that you would

put in that category of senior executives with whom you worked at the company?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  Hard to ballpark because there -- there's a lot.

BY MR. JANSSEN:

Q.    Understood.

A.    I would say for -- surely for any of the product areas that I had previously mentioned across all those different areas, I would have worked with the leaders on those products at that level, as well as had interactions with senior-level executives on other business areas as well.  So pretty broad coverage of people that I worked directly with and people that I would converse with or ...

Q.    In the next paragraph you write, "In the last two years of my time at the company, the CrowdTangle team and product was a part of my organization, CrowdTangle is a tool that provides limited, albeit industry leading, transparency into public News Feed content on Facebook.  What finally

Page 54

convinced me that it was time to leave was that despite growing evidence that the News Feed may be causing harm globally, the focus on and investments in safety remained small and siloed."

Did I read that correctly?

A.    You did.

Q.    So that paragraph references the CrowdTangle tool.  Can you please explain what the CrowdTangle tool is for the jury.

A.    CrowdTangle -- which is no longer in existence, Meta has shut it down -- CrowdTangle was a product that was acquired by Facebook that provided external data on public content that was appearing in the News Feed so that publishers or activists or journalists, generally-interested parties in the public, could gain an understanding of the types of content that were appearing on Facebook in the News Feed and gain an understanding of the type of engagement that that content would have.

Q.    And what could either journalists or the public or researchers learn from using the CrowdTangle tool?

Page 55

MR. GOLDFARB:  Objection to form.

THE WITNESS:  There were some remarkable ways that the public used the CrowdTangle product. Activists around the world were able to spot trends in harmful content, whether that was divisive content around groups that could lead to harmful real-world violence and get ahead of staving that off, you could understand what content was going viral on the platform and see trends of the types of -- of content that may be harmful to communities.

It can be used to understand patterns, and some patterns were covered by journalists, like Kevin Roose from The New York Times looked at a specific political leaning of the content that he saw on the platform.

So it was a tool that enabled those interested parties to look after their audiences and find out what was happening on Facebook for the communities that they cared about.

BY MR. JANSSEN:

Q.    The last part of this paragraph of your prepared written statement says that "the focus on

CONFIDENTIAL

Page 56

and investments in safety remained small and siloed."

What did you mean by what you wrote there, that "investments in safety remained small and siloed"?

A.    In my role at the company, I had visibility into the way that financial and headcount investments were placed across different teams at the company.  And I had seen a couple of trends that concerned me; one, that the amount of headcount -- and these are employees, so "headcount" refers to who you can hire in the future, how big your team can grow -- wasn't being allocated towards measures focused on safety.  That previously, for things that were of critical importance to the company, we were signaled that those areas of responsibility were everyone's responsibility.  For example, when we had to grow our ads business, every team received a goal around advertising.  When we changed to be a mobile-first company, every team was given a goal of requiring that they show mobile designs in their work.

We didn't have teams -- we didn't have

Page 57

requirements for teams to show safety and trust metrics or responsibilities in their own products, rather, it was a separate team that was responsible for election integrity, those types of trust and safety issues.  It wasn't a mainline responsibility.

So those were the concerns that I had.

Q.    You noted that you saw that headcount was not being allocated to -- to safety issues.  In what time frame did you begin noticing that that allocation was effectively not occurring?

A.    I'd say in the last two years was the greatest visibility that I had to how headcount was more broadly allocated.  And, as I was looking to leave, I was advocating for growth in headcount in research specifically, that I was not able to convince others of or get allocated.

Q.    So this was in the 2018, 2019, 2020 period, or thereabouts, that you saw this issue of -- of lack of allocation to safety?

A.    Yes.  And 2020 was probably when I was most vocal with peers across the organization on the necessity that they allocate their own headcount

CONFIDENTIAL

Page 58

towards research of their own products.

Q. Who were you conveying that to and urging them to allocate headcount towards safety?

A. Two -- two real forums. One, there is an all-vice-presidents group at the company, where I posted in the group a -- we communicate a lot through posts at the company and through content on the workplace platform, and I posted to the leaders, all of the vice presidents in the company, that we had an opportunity to better understand our products and to better understand the impacts of our products on the world; and that each leader could take their own accountability to assign headcount to those types of research product -- projects. I advocated with News Feed product leaders in particular, with John Hagemann and Fidji Simo, to better study what was happening on our News Feed products.

And, as I resigned, I had offered to stay on at the company if I was allowed to lead the research and public data and CrowdTangle expansion to build up teams to truly understand what was happening on the platform, and I advocated that directly with

CONFIDENTIAL

Page 59

Chris Cox and Sheryl Sandberg and Mark Zuckerberg.

Q.    Let me ask you a few questions about that.

That post that you sent out to all VPs, do you recall the time frame that that went out?

A.    Sometime in 2020, but I can't remember when.

Q.    About to how many people would you have sent that post?

A.    I believe there were probably a couple hundred VPs at the time who all would have had it show up in the -- that group, which was a group that people tended to pay attention to.

Q.    And what response did you get to your post urging them to take accountability for their projects and enhance safety?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Objection to form.

THE WITNESS:  I had some people outside of the post tell me that they thought it was a good call to action, but that they felt that they didn't have as much freedom to allocate headcount to something like that without it being a broader mandate.

Page 60

BY MR. JANSSEN:

Q. A broader mandate from whom?

A. From one of the most senior leaders, Mark Zuckerberg or Sheryl or, you know, their group area lead, like a Chris Cox or an Andrew Bosworth.

Q. Did a call to action or mandate ever come from anyone in that group?

MR. SNEED: Object to form.

THE WITNESS: I never saw one.

BY MR. JANSSEN:

Q. And you said -- you referenced that people approached you outside the post. Did I -- did I hear that correctly?

A. That is correct.

Q. What do you mean by "outside the post"?

A. Just through chat or through verbally communicating it to me.

Q. Effectively taking the conversation one-on-one as opposed to in the VP group --

A. That --

Q. -- post?

A. -- that is correct.

CONFIDENTIAL

Page 61

Q.    And then you reference that you offered to stay on with the company past your resignation if you could head up the CrowdTangle effort.  Is that -- is that a correct understanding?

A.    It is partially.  It is three specific ideas that I had laid out.

One, we had an external research partnerships team that, through that budgeting process, that headcount process that year, didn't receive meaningful investment.  And I felt that external research partnerships were critical to understanding what was happening on the platform.  And I offered to both expand and lead so that it was a robust program.

Two, over the last year at the company, I had spent time in the internal user research groups, internal Facebook groups, to understand the types of research that researchers were doing.  And it seemed extremely promising for our researchers to spend more time understanding how Facebook, the product, was impacting the people who used Facebook.  And I felt that leading a team to build up that expertise would

Page 62

be extremely impactful in a positive sense.

And then the third is that, while research partnerships can enable researchers to have access to more sensitive information, that we still needed a public tool that would enable more people to have oversight, and, frankly, contribute their opinions, their expertise to this global platform.  And that was what CrowdTangle would have been able to do.

Q.    And you've referenced that group that was working to better understand Facebook's impact on its users.  Was that group studying both good and bad impacts of Facebook on its users?

MR. SNEED:  Object to form and foundation.

THEW WITNESS:  I saw work from that team that looked at the potentially harmful uses or the potentially harmful outcomes that could happen on the platform.

BY MR. JANSSEN:

Q.    And what was the response from senior leadership as to your proposal to focus on and head up those -- those three things that you just described?

CONFIDENTIAL

Page 63

A.    They said that -- that there was a mix. Some said that we just weren't going to be able to invest and focus on that at the time, and others said that I was just fundamentally wrong in my concerns.

Q.    For the latter part, the -- the folks who said that you were fundamentally wrong about what you sought to pursue, who -- who had that opinion?

A.    Andrew Bosworth was very firm that I was wrong.

Q.    Anyone else?

A.    He was the most vocal in believing that I had unfounded concerns.

Q.    Mr. Boland, if I could now direct your attention to the next paragraph in your prepared written statement.  Actually, back up.

What role did Mr. Bosworth have at the company at the time that you were engaging with him on this issue?

A.    At the time I believe he was the head of Reality Labs, but I can't be certain.

Q.    And what is Reality Labs?

A.    It is Facebook's Metaverse and glasses,

Page 64

virtual and augmented reality products.

Q.    The next paragraph of your prepared written statement says, "The documents released by Frances Haugen, the Facebook whistleblower who last fall testified in Congress, highlight issues around polarization globally and the power of Facebook to lead people down a path to more extreme beliefs. These papers demonstrate thoughtful, well researched documentation of the harms that greatly concerned me. This research was done by highly skilled Facebook employees - experts in their field - and was extensive."

Did I read that correctly?

A.    You did.

Q.    And in the second sentence of that paragraph, you reference "the harms that greatly concerned" you.

Can you please describe what those harms were, Mr. Boland?

A.    I had become concerned, primarily due to my -- the fact that CrowdTangle reported to me and I started to see more and more of the data, actual data

from CrowdTangle, that the Facebook News Feed was likely creating division between people.  There was a lot of focus after 2016 on a very specific type of division, which was around political polarization.  But the reality is that there are a lot of other ways people can be divided against each other, whether that's based on race, whether that's based on immigration status, whether that's based on religion, or any of the other myriad reasons that people could be divided.  I started to feel like there was a preponderance of divisive content in the News Feed, and that we were large -- we were likely to be influencing people to hate others around them.

You have to keep in mind that for the majority of my time at the company I helped to build an advertising system that provably, provably, could change the way that you feel about a brand of toothpaste, or any other product.  The market and advertiser spend is based purely on return on investment.  Did you sell more of their products?

The ads that are in the News Feed are just like the other content in the News Feed.  And so if

Page 66

you could change the way someone felt about toothpaste, then you could change the way that other people felt about other people. And that concern, that we saw red flags but didn't deeply understand whether that powerful News Feed was changing the way that people felt, were the types of harms that I was most concerned about.

Q. Are you aware that when Ms. Haugen testified to Congress, that she also testified to issues of mental health harms to kids relating to Instagram use?

MR. GOLDFARB: Objection to form --

MR. SNEED: Objection to form.

MR. GOLDFARB: -- foundation.

THE WITNESS: I was aware of her testimony, and I was also aware of the articles, and saw that that was one of the topics that she covered.

BY MR. JANSSEN:

Q. Was that, that harm to kids from Instagram use, was that a harm or an issue that concerned you during your time at the company?

MR. SNEED: Object to form.

CONFIDENTIAL

Page 80

that at a break.

THE WITNESS:  I have not signed it yet. If we could --

MR. GOLDFARB:  I can -- I can print -- I can print one out --

MR. SNEED:  How about we go off the record for a moment here and address issues around the protective order.

MR. JANSSEN:  Okay.

THE VIDEOGRAPHER:  The time is 10:47 a.m. We are now off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 10:59 a.m. We are now on the record.

BY MR. JANSSEN:

Q.    Mr. Boland, thank you for signing the Tennessee protective order while we were on break.

So I'm going to show you what's been marked as Exhibit 6 for purposes of your deposition. The first page of Exhibit 6 has in the bottom right-hand corner the Bates No. METATNAG-040-00001918.  And I will not be asking you questions on

CONFIDENTIAL

Page 81

the page ending -1918 or the page ending in -1919. Those are two emails there where you are not copied. But I'll be focusing my questions on the last three pages of the email marked as Exhibit 6.

MR. GOLDFARB:  And, Mr. Boland, if you need to --

BY MR. JANSSEN:

Q.   Yes --

MR. GOLDFARB:  -- review --

BY MR. JANSSEN:

Q.    -- take the time you need to look at it.

MR. GOLDFARB:  -- the document to -- so you're able to answer questions, please do.

MR. SNEED:  And just to be clear.  As we discussed off the record, Meta -- on behalf of Meta, we would object to the use of the first couple of pages, given that Mr. Boland is not on it, as a Highly Confidential document.

THE WITNESS:  Okay.

BY MR. JANSSEN:

Q.   So, Mr. Boland, if I could first direct your attention to the page of Exhibit 6 with the

CONFIDENTIAL

Page 82

Bates number ending 1926 in the bottom right-hand corner.

A.   Yes.

Q.   Do you see there about three-quarters of the way down the page there is an email from Ms. Sandberg?

A.   Yes.

Q.   It's on April 4th, 2014, at 4:30 p.m. and so she writes, "All, Mark wants to explore my favorite idea again, an ads-free version of Facebook. His reasoning is that offering this, even if we only broke even, would be a major brand improvement for us."

Did I read that correctly?

A.   You did.

Q.   Do you have an understanding of what an "ads-free version of Facebook" is?

A.   It would be the option for users to pay for their use of Facebook, as opposed to Facebook being free for them, in exchange for not having ads in their Facebook News Feed or on their Facebook website.

CONFIDENTIAL

Page 83

Q.    And then if you turn to the next page of Exhibit 6, Ms. Sandberg's email continues.  She writes, "Joel can help coordinate this work."  And she writes "Parts:" and then, in the second bullet point down from there, she references "Bolland," with two Ls.

Do you see that?

A.    I do.

Q.    Do you understand that to be a reference to you, Mr. Boland?

A.    I do.

Q.    And is she describing there what she's asking you to do with regards to looking into this issue?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  Yes.

BY MR. JANSSEN:

Q.    As for an ads-free version of Facebook, to your knowledge, Mr. Boland, has Facebook ever launched an ads-free version of the Facebook application in the United States?

A.    To my knowledge, no.

CONFIDENTIAL

Page 84

Q.    In the next email after Ms. Sandberg's email, Mr. Wehner -- did I pronounce that correctly?

A.    You did.

Q.    He replies at 4:43 p.m. on Friday, April 4th.

Do you see that?

A.    I do.

Q.    And you were listed as a copy on that email from Mr. Wehner.

Do you see that?

A.    I do.

Q.    And then in the second paragraph of the body of his email, he writes, "When we looked at this in the past the break even was a surprisingly high subscription price given the likelihood of adverse selection by highly engaged users."

Did I read that correctly?

A.    You did.

Q.    Do you have an understanding of what is meant by "adverse selection by highly engaged users"?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form and foundation.

Page 85

MR. GOLDFARB:  Foundation.

THE WITNESS:  I do.

BY MR. JANSSEN:

Q.    What is "adverse selection by highly engaged users"?

MR. SNEED:  Same objections.

THE WITNESS:  If you look at how people use Facebook products, not every person uses Facebook the same way or the same amount of time, or even the same type of ways that they engage.

Some people would be a clicky user.  They actually click on more things.  Some people may show up far more frequently, multiple times an hour, some people might show up once a week.

The people who were the most engaged users of Facebook, who spent the most time on Facebook, would also, as a per-user basis, generate the most advertising revenue for Facebook.  And if the people who use Facebook the most become the most likely to pay for an ads-free version of Facebook, then, in order to replace that lost revenue, you need to have a relatively high price point because the people

Page 86

leaving the ad system, opting out of ads or the --

opting in to the paid version, would sacrifice a

disproportionately large amount of advertising

revenue.

BY MR. JANSSEN:

    Q.    And you testified that the people who

spent the most time on Facebook would also be, as a

per-user basis, generate the most advertising revenue

for Facebook.  Was that the same for Instagram during

your time at the company?

            MR. SNEED:  Object to form and foundation.

            THE WITNESS:  I don't have data on that or

recall seeing specific data on that.

BY MR. JANSSEN:

    Q.    If I could now direct your attention to

the page ending in 1925, the next email after

Mr. Wehner's.  It is one from Susan Li.  It begins

about two-thirds of the way down the page on Bates

ending 12 -- 1925.

            Do you see that?

    A.    I do.

    Q.    And Ms. Li sent that on Friday, April 4,

CONFIDENTIAL

Page 87

2014, at 4:53; is that correct?

A.    That is what the email says.

Q.    And you again are listed as a copy on Ms. Li's email; is that correct?

A.    That is correct.

Q.    And then she writes, "Below is the email that I distributed the last time we looked at this (last August).  The data is a little bit dated but I think the distribution is still directionally true - happy to refresh if this group thinks that would be valuable."

And then below that she begins a paragraph that says, "We wanted to follow up ...."

Do you see that?

A.    I do.

Q.    Is it your understanding that that paragraph beginning with "We wanted to follow up" is what she's recirculating from when the group last looked at this issue of an ads-free version of Facebook?

A.    That is how I would read it.

Q.    So looking further down into that

Page 88

paragraph beginning with "We wanted to follow up," the last sentence beginning on that page ending in 1925, it says, "Max looked at the distribution of revenue across users and found, as we might have expected, that a very small percentile users comprise an enormous amount of revenue."

Did I read that correctly?

A.    You did.

Q.    Do you have an understanding of what's written there, "that a very small percentile of users comprise an enormous amount of revenue"?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I do.

BY MR. JANSSEN:

Q.    Is it the same issue you were just describing regarding Mr. Wehner's email regarding highly engaged users generating revenue for the Facebook company?

MR. SNEED:  Same objections.

THE WITNESS:  I do.

BY MR. JANSSEN:

Q.    Can you just please explain for the jury

Page 89

your understanding of what it means that a very small percentile of users comprise an enormous amount of revenue?

A.    In that if you have a broad distribution of people using Facebook's products and services, that the way that they engage will follow a distribution that's not uniform, and that a small number of people who use Facebook's products are very significant users of Facebook's products and click on a lot of things and engage with a lot of content on Facebook; and so, those people, by the fact that they spend more time and engage with more content, including ads, would generate more revenue than the average user on Facebook.

Q.    Are you able to quantify those issues at all; either the small number of users or the -- the proportionate amount of revenue that that small number may generate for the company?

MR. SNEED:  Object to form.

THE WITNESS:  I don't remember that.

BY MR. JANSSEN:

Q.    The email goes on to state, "He also found

CONFIDENTIAL

Page 90

that ARPU rises steadily with daily impression count, implying that ARPU is pretty heavily correlated with user activity."

Do you see that?

A.    I do.

Q.    What does the acronym "ARPU" mean?

A.    That stands for average revenue per user.

Q.    And in Ms. Li's email she notes "that ARPU rises steadily with daily impression count."

Do you have an understanding of what that means?

A.    I do.

Q.    What does that mean, "that ARPU rises steadily with daily impression count"?

MR. SNEED:  Object to form.

THE WITNESS:  One quick correction.  I can't remember if it's average or annual revenue per user.

BY MR. JANSSEN:

Q.    Okay.

A.    But the revenue-per-user part is correct.

It essentially says that that metric of

Page 91

per-user revenue is not necessarily caused by user activity, but that if you have a lot more activity on the platform, you generate a lot more revenue from that user activity.

In this case, talking about impression counts, meaning how many stories, posts, videos, a person would see on the platform.

Q.    Does the company take efforts to increase users' activity on the platform?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. JANSSEN:

Q.    In what ways, to your knowledge, does the company do that?

A.    By looking at ways that you could design the layout of Facebook, how you would rank stories, so ranking plays a significant role in how people find the content on Facebook interesting to them.

Generally the more interesting that content is -- and "interesting" applies very broadly because some things that are rage-inducing can be

interesting -- but as the algorithm can rank more interesting content, then you can get people to share more posts, click on them, comment, like, et cetera.

Q.   You -- again, your answer, by saying that the design of the layout of Facebook could increase user activity on the application, what did you mean by the design of the layout of Facebook?

MR. SNEED:  Object to form.

THE WITNESS:  There is a lot of work that you can do in how you change all aspects of a post or a story, including the way that you represent the title of a post, including the way that you show whether people have engaged with that post, including minor things like the color shading behind the post. All of those changes, and countless more, can impact the way that people engage with content on Facebook-style platforms.

BY MR. JANSSEN:

Q.   Are you aware of any other things that the company may do to increase user activity on the platform?

MR. GOLDFARB:  Objection to form.

Page 93

THE WITNESS:  Not top of mind.

BY MR. JANSSEN:

Q.    Thank you.  You can set aside Exhibit 6, Mr. Boland.

And -- actually, bear with me one moment. I spoke too soon.  My apology, Mr. Boland.  If I could ask you to pick up Exhibit 6 again.

So I asked you a question about the first part of that last sentence at the top of page ending 1926.  And "ARPU" either stands for average or annual revenue per user, one of those.  I wanted to ask you about that last part of that sentence beginning after the comma.

So again, just reading the whole sentence. It says, "He also found that ARPU rises steadily with daily impression count, implying that ARPU is pretty heavily correlated with user activity."

Do you see that?

A.    I do.

Q.    And does that describe what you've been testifying to over the past few minutes regarding the company's revenue increasing from ad surveying based

CONFIDENTIAL

Page 94

on increased usage of the Facebook platform by users?

MR. SNEED:  Object to form.

THE WITNESS:  Yes.  More usage correlates with more money.

BY MR. JANSSEN:

Q.    Thank you, Mr. Boland.  Now we can move on from Exhibit 6.  Apology for that.

A.    No problem.

(Exhibit Meta-Boland-7 marked.)

BY MR. JANSSEN:

Q.    Next I want to show you an email that you sent during your time at the Facebook company that's been marked as Exhibit 7.

A.    Okay.

Q.    So Exhibit 7, the bottom right-hand corner, see it has a Bates number METATNAG-019-01460678?

A.    I do.

Q.    And this is an email from you; is that correct?

A.    That is correct.

Q.    And it's dated June 13th, 2018; is that

CONFIDENTIAL

THE WITNESS:  Yes, that would be that some of these products like Messenger Kids would eventually have people become Facebook app users, so Facebook Blue users.

BY MR. JANSSEN:

Q.    And was that a goal of the Facebook company in this 2018 time period?

MR. SNEED:  Object to form and foundation.

THE WITNESS:  I don't know that that was a specific company-level goal, but I do know that there were teams and people working on those types of products.

BY MR. JANSSEN:

Q.    Got it.  Okay.

You can set aside Exhibit 7, Mr. Boland.

(Exhibit Meta-Boland-8 marked.)

MR. JANSSEN:  I now want to show you another article that's been marked as Exhibit 8.

Thank you.  Thank you.

MR. GOLDFARB:  And, Counsel, do you want Mr. Boland to look through the document?

MR. JANSSEN:  You can please review as

CONFIDENTIAL

Page 101

helpful to refresh yourself, but I'll be focusing

questions just on a couple paragraphs in the first

three pages and then the part where Mr. Boland is

referenced, beginning on Page 8 of 25.

THE WITNESS:  You can start.  I may take

extra time around the section if I need it.

BY MR. JANSSEN:

Q.    Got it.

Mr. Boland, this, what's been marked as

Exhibit 8, is an article from Vox.

Have you ever seen this article before,

Mr. Boland?

A.    I have.

Q.    And the title of the Vox article Is "How

to fix Facebook."

Do you see that?

A.    I do.

Q.    And the -- the subtitle below that on the

first page says, "Can Facebook be redeemed?  Twelve

leading experts share bold solutions to the company's

urgent problems."

Did I read that correctly?

CONFIDENTIAL

Page 102

A.    You did.

Q.    The author is listed as Shirin Ghaffary.

Do you see that?

A.    I do.

Q.    And the date is November 8th, 2021; is that correct?

A.    That is correct.

Q.    The article begins -- towards the bottom of that page, it says, "Facebook is broken, and after a recent deluge of damning internal company leaks to the press and Congress, the world has unassailable proof of how troubled it really is."

Did I read that correctly?

A.    You did.

Q.    And then if I could direct your attention to Page 3 of 25 of Exhibit 8.  About halfway down the page, there is a paragraph that begins "So now ..."

Do you see that?

A.    Yes.

Q.    And the article states, "So now is an urgent time to explore ideas old and new - inside and outside the realm of political reality - about how to

CONFIDENTIAL

Page 103

confront a seemingly intractable problem:  Can Facebook be fixed?"

Did I read that correctly?

A.    You did.

Q.    The author goes on, "To try to answer that question, Recode interviewed 12 of the leading thinkers and leaders on Facebook today ...."

And then, if you see, a few lines down from that, you are referenced, correct, Mr. Boland?

A.    That is correct.

Q.    And it says "... to former Facebook executive Brian Boland, who was one of the few high-ranking employees at the company to speak out publicly against Facebook's business practices."

Did I read that correctly?

A.    You did.

Q.    That paragraph references Recode as interviewing 12 of the leading thinkers and leaders on Facebook today.

Do you know what Recode is?

A.    I know that Recode is a publication.  I don't know the relationship to Vox.

Page 104

Q.    Do you know who reached out to you to interview you about the issues addressed in this article?

A.    I'm pretty sure it was Shirin, but not certain.

Q.    And, Mr. Boland, if I can now direct your attention to Page 8 of 25 of Exhibit 8.  About halfway down the page it lists you, "Brian Boland, former Facebook executive."

Do you see that?

A.    I do.

Q.    And then a little bit further down, in bold, it says, "How would you fix Facebook?"

Do you see that?

A.    I do.

Q.    Did Shirin ask you that when she interviewed you for this article?

A.    Yes.

Q.    And then below that question begins some narrative text.

Do you see that?

A.    Yes.

CONFIDENTIAL

Page 105

Q.    And is that the answer that you gave to the author when she asked you how would you fix Facebook?

A.    Yes.

Q.    In the second paragraph there, it says, "The one thing that Facebook could control right now is transparency.  Helping society understand the harms on social media is an important step for fixing the problems."

Did I read that correctly?

A.    You did.

Q.    Mr. Boland, what harms on social media are you aware of that you felt social media companies should but were not adequately disclosing to the public?

MR. SNEED:  Object to form.

THE WITNESS:  At the point of this article, I had an expanded set of concerns from when I left the company.  I, as a part of the Wall Street Journal reporting for their series on Frances Haugen, had been shown an array of documents from inside of Facebook that made up her disclosures and their

Page 106

reporting and introduced me to some of the concerns you're worried about today, with teens and youth, as well as other concerns around human trafficking in the Middle East, around cartel recruitment in Mexico; and started to see that, without that transparency, it was very hard to find these things and to combat them.

So it was a broad array that expanded from very clear and compelling documents from Frances Haugen that seemed to have been created by people internal to the company that were concerned about or highlighting some of these issues as well.

BY MR. JANSSEN:

Q.    And you referenced the issues surrounding teens and youth, that that -- that we've brought a consumer protection enforcement action concerning. What was it about the issues affecting teens and youth that was concerning to you at the time of this interview and article?

MR. SNEED:  Object to form.

THE WITNESS:  My feeling is that there's enough concerning internal research that I know that

Facebook downplays but I just couldn't understand as a parent -- and a lot of the leaders of the company are parents -- how there could even be the possibility that your product was harmful to teens and youth, and you wouldn't make it a major priority to figure that out.

And it's an incredible amount of hubris or carelessness or disregard to assume that you know better as a company and corporate leader when you could get help.

I don't believe these problems are easy problems.  They're very difficult.  But there are experts around the globe who have long been willing to help figure out what's happening on Facebook.  If today I told you that I believe that Facebook was harmful to teens and youth, that's an opinion.

The company doesn't provide any ability for us as a society to know, and that, for me, is a problem.

BY MR. JANSSEN:

Q.    Can I next ask you, Mr. Boland, to turn to the last part of your section of this Vox article,

CONFIDENTIAL

Page 108

which is on page of -- 10 of 25 of Exhibit 8.  And about a third of the way down Page 10 of 25, you see there's a bolded question that says, "Do you think Facebook can be reformed with Mark Zuckerberg at the helm?"

Do you see that, Mr. Boland?

A.    I do.

Q.    Did Shirin ask you that question when she interviewed you for purposes in this article?

A.    Yes.

Q.    And is what's written below there the answer that you gave when being interviewed for this article?

A.    Yes.

Q.    Can you please read for the jury the answer that you gave to that question as part of this reporting.

A.    "There's a chance, with strong regulatory oversight, that they'll be forced to change - but his nature is not to move in this direction.  If we want Facebook and Instagram to be responsible and safer, then I don't think you can have him and the current

CONFIDENTIAL

Page 109

leadership team leading the company."

Q.    So that this segment of the article summarizing your interview ends with you saying that, "If we want Facebook and Instagram to be responsible and safer, I don't think you can have him and the current leadership team leading the company."

Mr. Boland, why is it that Facebook and Instagram cannot become responsible and safer with Mr. Zuckerberg and the current leadership team leading the company?

MR. SNEED:  Object to form.

THE WITNESS:  My feeling then and my feeling now is that they don't meaningfully care about user safety.  It's not something that they spend a lot of time on.  It's not something that they think about.  And I really think they don't care.

BY MR. JANSSEN:

Q.    And was that driven home when you saw the headcount issues regarding safety resources that you described earlier in your testimony today?

MR. SNEED:  Object to form.

THE WITNESS:  That was one of a growing

Page 117

Q.    Okay.   Thank you, Mr. Boland.

You can set aside Exhibit 9.

One piece of housekeeping I, again, forgot to do with Exhibit 6.  If I could ask you to pick that up again, and I could direct your attention back to the Bates number ending 1925.  It's the three emails:  the one from Ms. Li on Friday, April 4th, at 4:53; the one from Mr. Wehner, Friday, April 4, 2014, at 4:43 p.m.; and the one from Ms. Sandberg on April 4, 2014, 4:30 p.m.

Mr. Boland, are those emails on this Exhibit 6 true and accurate copies of the emails that you received in the ordinary course of your employment at Facebook?

A.    I would assume so, yes.

Q.    Okay.  That's all for that.  Thank you for doing that.

(Exhibit Meta-Boland-10 marked.)

BY MR. JANSSEN:

Q.    I want to show you a document that's been marked as Exhibit 10 to your deposition.

Mr. Boland, have you seen Exhibit 10

CONFIDENTIAL

Page 118

before?

A.    Yes.

Q.    What is Exhibit 10?

A.    This is a post that I wrote on our blog outlining why I was deleting Facebook and my concerns about the company broadly.

Q.    And you did this on the blog that you maintain with the Delta Fund; is that correct?

A.    That is correct.

Q.    And you posted this on the blog, is that on January 7th of this year, 2025?

A.    That is correct.

Q.    The title of your blog post is, "Deleting Facebook."  And then right below that you write, "Why I'm Deleting Facebook Tomorrow."

Correct?

A.    That is correct.

Q.    And then you begin your post by stating, "Tomorrow I will delete my Facebook account.  Before I do, I want to share" my -- "share why I made this decision and believe it matters.

"I quit Facebook in 2020 because I was

CONFIDENTIAL

Page 119

deeply concerned that Mark Zuckerberg and Meta's leadership weren't serious about addressing the harm created on their platform.  Over time, it became clear to me that Facebook's priorities were growth and power, not the safety or well-being of its users."

Did I read that correctly?

A.     You did.

Q.     And you've testified over the course of today's examination as to why it became clear to you that Facebook's priorities were growth and power, not the safety or well-being of its users, correct?

A.     That is correct.

Q.     And then, in the next paragraph, you write in your blog post, "I didn't plan to become a public critic when I left the company.  Leadership dismissed my concerns, and I second-guessed myself until January 6, 2021."

Did I read that correctly?

A.     You did.

Q.     You referenced that leadership dismissed your concerns.  What concerns did you convey to

leadership that they dismissed in response?

A. That was my drive to build better research transparency and external accountability into our products and into a set of services that I felt would have provided a phenomenal opportunity to understand anything harmful on the platform and received no support and received pushback that I was wrong.

Q. Is this what you were testifying to earlier about your proposal for how you might remain at the company --

A. That is correct.

Q. -- past 2020?

And that you referenced Mr. Bosworth being most vocal about his response?

A. That is correct.

Q. And then in the next paragraph you write, "On January 11th, a Meta leader deflected responsibility ...."

And is that a reference to deflecting responsibility for the January 6th attacks on the Capitol?

A. That is correct.

Page 121

Q.    And at the end of that paragraph, you write, "Worse, this was just another example of its leadership dodging accountability."

Did I read that correctly?

A.    You did.

Q.    Sitting here today, can you give any additional examples of when Meta leadership dodged accountability for a problem?

MR. SNEED:  Object to form.

THE WITNESS:  It was similar to the 2016 election and whether any external interference had happened on the platform, and the company speaking out publicly without really knowing what was happening internally.  That's one example.

For a lot of the other examples around things that would happen on the platform, whether it was suicides on video or whether our News Feed was showing certain types of content or not, the exercise was often approached as a response to the press exercise that would try to frame things as general societal issues rather than potential product issues.

BY MR. JANSSEN:

CONFIDENTIAL

Page 122

Q.    Is it your understanding, sitting here today, that the company is dodging accountability for teen mental health harms related to Instagram use?

MR. SNEED:  Object to form and foundation.

MR. GOLDFARB:  Object to form.

THE WITNESS:  To my knowledge, I don't believe that they have tried hard or potentially tried beyond the most minimal amount to understand whether they're harmful to teen mental health.

BY MR. JANSSEN:

Q.    Moving down in your blog post.  You write, "A Pattern of Neglect and Harm.  The latest news that Meta is ending its fact-checking program and scaling back user protections is the final straw for me. This is the same company whose platform contributed to genocide in Myanmar, harmed teenage users and enabled political and racial polarization across the globe.  Instead of addressing these harms, Meta consistently prioritizes growth over public safety."

Did I read that correctly?

A.    You did.

Q.    And then, if you look at the last sentence

Page 123

on that first page of Exhibit 10, you write,

"This move was part of a broader pattern:  when

transparency threatens profits, Meta chooses

secrecy."

          Did I read that correctly?

     A.    You did.

     Q.    Is it fair to characterize Meta as a

secretive company?

          MR. GOLDFARB:  Object to form.

          MR. SNEED:  Object to form; vague.

          THE WITNESS:  I would, and did,

characterize Meta as a secretive company.

BY MR. JANSSEN:

     Q.    And why would you characterize them in

that way?

     A.    First, there is no push towards

transparency and partnering with the world to

understand the platform.  There is no sort of way for

external -- whether you're sharing data externally,

there's no way to invite -- or, there's no efforts to

invite people in to help with oversight and feedback

and ensure the company's operating in ways that are

Page 124

the best for society.

And with the way that the company goes after critics generally and whistleblowers to discredit them, it's clear that -- to me, that the company doesn't like external voices criticizing the company.

Q.    If you could please turn to the second page of your blog post.  In the second-to-last paragraph on that page, you write, "For me, the choice is clear.  I no longer want to support a company whose values and actions are deeply misaligned with mine.  If you feel the same, I encourage you to consider your role in enabling Meta's power."

Did I read that correctly?

A.    You did.

Q.    After you posted this to your Delta Fund blog on January 7th, did you, in fact, delete your Facebook accounts?

A.    I did.

Q.    Have you since rejoined the platform in any way?

Page 246

reading and hearing from former employees that research teams have been decreased, that the freedom of research teams to research their own interests has decreased felt like a broad step away from transparency and understanding of the product.

Q.    And you said "at the end of the company," and I think you meant to say "at the end of your tenure at the company"; is that right?

A.    Yes.

I don't have the app anymore, but I know it still exists.

Q.    All right.  You can put that document aside.

So I know you just spent a lot of time talking about advertising, and we're not going to go into any specific documents.  And I actually want to ask you to step back for a minute.  Can you explain, at a very high level, not using any kind of advertising terminology, how Facebook makes money from its ad business.

MR. SNEED:  Object to form.

THE WITNESS:  Every day a lot of people --

and I think we're in the billions now -- use Facebook and Instagram, meaning that they show up to these places and they spend time looking at posts from their friends, family, from businesses, and influencers, and from a broad array of content.

That creates a relatively unprecedented amount of time and attention that people who run businesses and sell things, like toothpaste, would love to be able to influence how those people think and feel and buy their products. That's what a lot of advertising businesses do.

And so showing ads inside of Instagram or Facebook is a great starting place to be able to build an ads business where advertisers want to spend a lot of money and pay the company. If you go beyond that and you make it so that the ads are incredibly personalized so that you're seeing, as a person spending that time, an ad that's incredibly relevant to you, you're more likely to click on it, you're more likely to purchase a product, you're more likely to be a valued customer of that business, which makes Facebook and Instagram incredibly valuable to those

Page 248

businesses.

And then if I can help you measure that so that you're not just hoping that the ads that you put on Facebook deliver growth for your business but I actually faithfully measure those ads, you will have the confidence as a business to show more ads on Facebook.

And that's as simple as the model is, is that it's really relevant ads that grow businesses, that reach people who are spending a massive amount of time on those places.

BY MS. SINGER:

Q.   Okay.  So I take it that it's fair to say that Meta's financial success is, at least in part, perhaps in large part, dependent on its ability to add, retain, and engage its users in order to deliver those ads?

A.   Ab- --

MS. SINGER:  Object to form.

THE WITNESS:  Absolutely correct.

BY MS. SINGER:

Q.   And I think you testified earlier that

CONFIDENTIAL

Page 282

engaging.

BY MR. WARREN:

Q.    Do you think he should have engaged with you in order to understand your criticisms better?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  I think he should have prior to that article and subsequently to that article, as I think the company should have engaged on those concerns beforehand.

BY MR. WARREN:

Q.    Earlier in your testimony, you used the phrase "move fast and break things."

Do you recall saying that?

A.    I do.

Q.    Did you come up with that phrase?

A.    I did not.

Q.    Who came up with it?

A.    I don't know who actually created that phrase, but that was a very common poster and mantra in the early days of Facebook.

Q.    When you say it was a "poster," do you

CONFIDENTIAL

Page 249

advertising was the primary or the largest source of Facebook's revenue; is that right?

A.    That is correct.

Q.    And how do you know that?

A.    I was involved in the financial reporting of the company at the time I was there.

Q.    Okay.  And I think this was part of what you just said, but revenues Met- -- sorry.

Meta's revenue is dependent upon advertisers' willingness to continue to do business with the company, correct?

A.    That is correct.

Q.    And you talked about Meta's delivery of ads to targeted audiences, but that's a key part of its ad business, correct?

A.    That is correct.

Q.    And in order to deliver targeted ads -- and I know you talked about this in granular detail -- Meta relies on user data, correct?

A.    That is correct.

Q.    And that includes a user's age and gender, correct?

CONFIDENTIAL

Page 282

engaging.

BY MR. WARREN:

Q.    Do you think he should have engaged with you in order to understand your criticisms better?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  I think he should have prior to that article and subsequently to that article, as I think the company should have engaged on those concerns beforehand.

BY MR. WARREN:

Q.    Earlier in your testimony, you used the phrase "move fast and break things."

Do you recall saying that?

A.    I do.

Q.    Did you come up with that phrase?

A.    I did not.

Q.    Who came up with it?

A.    I don't know who actually created that phrase, but that was a very common poster and mantra in the early days of Facebook.

Q.    When you say it was a "poster," do you

CONFIDENTIAL

Page 283

literally mean that it was a poster on the walls of Facebook?

A.    It literally was a poster on the walls.

Q.    Do new employees at Meta receive a pamphlet known as the Red Book?

A.    Yes.  But I think that was after I was a new employee.

Q.    Okay.  Have you seen a copy of the Red Book?

A.    I have, but I didn't actually get one.

Q.    Do you know if the Red Book uses the phrase "move fast and break things?

MR. SNEED:  Object to form --

MR. GOLDFARB:  Objection to form --

THE WITNESS:  I don't.

MR. SNEED:  -- foundation.

MR. GOLDFARB:  -- foundation.

BY MR. WARREN:

Q.    What did you understand "move fast and break things" to mean as it was used by employees at Meta?

MR. SNEED:  Object to form; foundation.

Page 284

THE VIDEOGRAPHER:  Counsel.

MR. GOLDFARB:  Oh, thank you.

THE WITNESS:  The idea being that it was really important to build products quickly and put them out on the market quickly, and that sometimes you would put out products that didn't work correctly, that may break an existing system; but that constant movement, constant building, constant iteration was more important than building something that wouldn't break.

BY MR. WARREN:

Q.   Are you familiar with the motto "safety first"?

A.   No.

Q.   Is "move fast and break things" a motto that puts safety first?

MR. SNEED:  Object to form.

THE WITNESS:  I don't think so.

BY MR. WARREN:

Q.   Mr. Boland, in your testimony earlier today, you described some examples of Facebook moving fast and breaking things.

CONFIDENTIAL

Page 285

Do you recall that?

MR. SNEED:  Object to form and characterization of testimony.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.    And one of the examples you testified about concerned Facebook Live.

Do you remember that?

A.    Yes.

Q.    Specifically, and you can tell me if I'm mischaracterizing your testimony, I believe you testified that Facebook Live was utilized to broadcast suicides and suicide attempts; is that correct?

A.    That's correct.

Q.    What do you recall about Facebook Live being used to broadcast suicides and suicide attempts during the 11 years you worked at the company?

MR. GOLDFARB:  Objection to form.

THE WITNESS:  I remember that when the product first came out, that that was an example that teams were confronted with; that those tragedies had

CONFIDENTIAL

Page 286

been broadcast on Facebook's Live product after it was launched.

BY MR. WARREN:

    Q.    Were you aware of teenagers using Facebook Live to broadcast suicides and suicide attempts?

    A.    I had read articles about it.

    Q.    Did that trouble you?

    A.    It did.

    Q.    Why did it trouble you?

    A.    I think it's -- any human should be troubled that their product or company or something that they're a part of would have that kind of outcome.

    Q.    Before Meta released Facebook Live, did it guard against the possibility that the feature could be used in that way?

        MR. SNEED:  Object to the form.

        MR. GOLDFARB:  Objection to form.

        THE WITNESS:  Not to my knowledge.

BY MR. WARREN:

    Q.    Could it have done so?

    A.    I don't believe it could have necessarily

Page 287

prevented people from harming themselves, but I do believe the company could have taken steps to better understand whether they were broadcasting those events.

Q.    What sort of steps could Facebook have taken?

MR. GOLDFARB:  Objection to form.

THE WITNESS:  I think the teams could have looked at the data around the conversations, the types of things that were being said, which, I believe ultimately the company took some steps to better understand and mitigate, that don't feel like they couldn't have done beforehand.

BY MR. WARREN:

Q.    Why didn't Facebook take those steps, to the best of your knowledge?

A.    Again, the goal of teams is to create products and put them out in the world and see what happens.  So it was a growth imperative to make Live Video a product and release it, as opposed to slowing down and really trying to think through all the negative ways that it could be used.

CONFIDENTIAL

Page 422

REPORTER'S CERTIFICATION

DEPOSITION OF BRIAN BOLAND

APRIL 25, 2025

I, Amanda Blomstrom, a Notary Public in and for the District of Columbia, hereby certify to the following:

That the witness, BRIAN BOLAND, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted to the witness or to the attorney for the witness for examination and signature;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 29th day of April, 2025.

_____

Amanda Blomstrom, CRR, RMR, CLR

Texas CSR No. 8785

California CSR No. 12681

Illinois CSR No. 84-3634