# AMENDED Exhibit 10

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY       ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION, )
_____)

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE
COORDINATION PROCEEDING         ) Lead Case No. for
SPECIAL TITLE [RULE 3.400]      ) for Filing Purposes
SOCIAL MEDIA CASES              ) 22STCV21355
_____)
This Document Relates to:       )
                                )
STATE OF TENNESSEE, ex rel.     )
JONATHAN SKRMETTI, ATTORNEY     )
GENERAL and REPORTER            ) Case No.
                vs.             ) 23-1364-IV
META PLATFORMS, INC.,           )
and INSTAGRAM, LLC,             )
_____)

VIDEOTAPED DEPOSITION OF NATALIE TROXEL, PH.D.
Portland, Oregon
Tuesday, March 11, 2025

Reported by:  MARLA SHARP, RPR, CLR, CCRR, OR CSR
17-0446, CA CSR 11924, WA CSR 3408
Job No. 7225418

Page 12

A    Good morning.

Q    Could you please state your full name for the record?

A    Natalie Rose Troxel.

Q    And where do you live?

A    421 --

MR. JINDAL:  Can I just quickly -- I'd ask that the -- that if she's being asked to give her home address, that we designate this portion of the transcript confidential.  I can explain the basis, if we need to, off the record.

MS. WALSH:  Yeah.

BY MS. WALSH:

Q    I'm going to strike my last question and just say:  In what city do you live?

A    Portland, Oregon.

Q    Okay.  And did you work for the company known as Meta from 2017 to 2022?

A    It was Facebook, but yes.

Q    Okay.  Do you understand that Facebook rebranded itself as Meta sometime after you started working there?

A    Yes.

Q    Okay.  So if I use the word "Meta" today, can we agree that that will refer also to the

company when it was known as Facebook?

A    Yes.

Q    Thank you.  What was your position at Meta?

A    I was a UX researcher.

Q    Okay.  Very briefly, what does "UX research" mean?

A    It's user experience research.

Q    Okay.  And we'll talk about that in more detail later.

For the record, my name is Alex Walsh, and I am a lawyer.  And I represent kids who believe they've been harmed by the use of Meta's products, to include Facebook, Messenger, and Instagram.

Do you understand that?

A    Yes.

Q    And these young people, my clients, they suffer from various mental health conditions, including eating disorders, anxiety, depression, suicidal ideation, and addiction.

Do you understand that?

A    Yes.

Q    And these clients of mine in this litigation, they allege and they believe that it was by using Meta's social media platforms that the use of those platforms caused or contributed to the

mental health conditions they suffer.

Do you understand that?

A    Yes.

Q    Okay.  Now, we're here in Portland, Oregon, taking your deposition today, correct?

A    Yes.

Q    And why are you here today?

A    I was requested to give my testimony by the plaintiffs' attorneys.

Q    Okay.  And do you recall that we told you we would serve you a subpoena unless you appeared voluntarily?

A    Yes.

Q    Okay.  And you chose to forgo being served a subpoena from federal court, correct?

A    Yes.

Q    Okay.  Are you here represented by your own lawyer?

A    Yes.

Q    And who that is?

A    Anit Jindal.

Q    Great.  And there are lawyers from Meta here as well.

Do you understand that?

A    Yes.

Page 15

Q   And did you meet with lawyers from Meta before today?

A   Yes.

Q   Did you meet in person or by Zoom?

A   Zoom.

Q   Okay.  And how long -- when was that meeting?

A   My attorney and I met with them yesterday briefly.

Q   Okay.

A   And I met with some of them via Zoom two or three weeks ago, I want to say, just before I engaged Mr. Jindal as my attorney.

Q   Okay.  So there were two meetings with Meta's lawyers, correct?

A   Yes.

Q   And what were the names of Meta's lawyers who reached out to you the first time?

A   Absolutely can't remember.

Q   Okay.  Was it anyone sitting in this room?

A   I don't think so.

Q   Okay.  And do you understand that there are -- one, two -- three lawyers from Meta sitting in this room?

A   Yes.

Q    When Meta reached out to you to speak with you, why did they want to talk to you, to your understanding?

MR. EPPICH:  Objection.  Foundation.

MR. JINDAL:  I'll join in.

MS. WALSH:  Strike that.

MR. JINDAL:  Sorry.  I'll just --

MS. WALSH:  Strike that.

MR. JINDAL:  -- join the objection.

BY MS. WALSH:

Q    What is your understanding of why Meta's lawyers reached out to you?

A    I wasn't entirely sure at first.  The e-mail said that I had been included on a witness list and that they wanted to speak with me about that.

Q    Okay.  And at that time, did Meta's lawyers ask if they could represent you for this deposition?

A    At what time?

Q    During the first interaction that you had with them.

A    Yes.

Q    Okay.  Did they offer to represent you free of charge?

A    Yes.

Q    And what was your response?

MR. JINDAL:  I'm going to object.  I think the -- to the extent it was for the purposes of obtaining legal counsel, I think that would be privileged, and I'll instruct the witness not to answer.

We can confer off the record about this if you have concerns about it.

BY MS. WALSH:

Q    Did you at any time understand Meta's lawyers to be representing you?

A    No.

Q    Did you at any time seek legal advice from them?

A    I don't think so.

Q    Did -- to your understanding, did they at any time ever provide legal advice to you?

A    I don't think so.

MS. WALSH:  Okay.  Counsel, based on that, I would ask you to reconsider your instruction not to -- your instruction to Ms. Troxel not to answer.

MR. JINDAL:  Understood.  You can proceed.

MS. WALSH:  Okay.

BY MS. WALSH:

Q    Okay.  What was your response when Meta's

Page 18

lawyers offered to represent you free of charge for purposes of this deposition?

A     I think I thanked them and also asked them what other options I had for representation.

Q     Okay.  And can you explain to the jury -- well, strike that.

Is it fair to say that you declined Meta's offer to represent you for free for purposes of this deposition?

A     Yes.

Q     And why did you decline that offer?

A     I felt that I would be more comfortable with independent representation.

Q     Okay.  And why did you feel you'd be more comfortable with independent representation?

A     And -- having my own attorney made me feel like that attorney would actually be working for me and my best interests, and there wouldn't be a conflict of interest with them also representing Meta.

Q     Okay.  So you were concerned that there could be a conflict of interest, given some of the testimony you might give in this deposition, between you and Meta?

MR. EPPICH:  Object to form.

THE WITNESS:  I thought it was possible.

BY MS. WALSH:

Q    Okay.  And so how long did that first conversation with Meta's lawyers last?

A    I want to say, like, half an hour, maybe -- maybe 45 minutes or so.

Q    Okay.  In addition to them offering to represent you free of charge and you declining that offer, what else did you discuss?

MR. EPPICH:  Object to form.

BY MS. WALSH:

Q    On a gener- -- just -- you can just tell me generally.

A    They gave me a little bit of information about, like, what a deposition is, their understanding of why I was on the witness list.  I think they asked some questions about when I had worked at Facebook and the nature of the work I had done there.

We talked a little bit about the logistics of, you know, would this be in person or kind of remote, that kind of thing.

Q    Okay.  And then you said that you met again with Meta's lawyers yesterday; is that right?

A    Yes.

Page 20

Q    And at that time you had retained your own independent lawyer, correct?

A    Yes.

Q    And was your lawyer present for that meeting?

A    Yes.

Q    Okay.  And how long did that meeting last?

A    About ten minutes.

Q    Okay.  Great.  Have you and I met before today?

A    Briefly yesterday, yes.

Q    Okay.  And how long would you say our meeting lasted?

A    Fifteen, 20 minutes maybe.

Q    Okay.  And, just generally, what did we discuss?

A    A little bit about the deposition itself, some of the logistics.  You introduced yourself to me.  I think it was so I wouldn't be as nervous.  I honestly can't remember anything else about the meeting.

Q    I'm a memorable person, apparently.

A    Sorry.

Q    That's okay.  No.  That's fine.  Okay.
Prior to meeting with me, did you meet with

Page 21

other lawyers representing the plaintiffs in this action?

A    Yes.

Q    And when was that?

A    I can't remember exactly.  It was several months ago.

Q    And do you remember the names of those lawyers?

A    No.

Q    And about how long did that meeting last?

A    I'd say it was an hour or two.

Q    Okay.  And during that meeting, did you discuss some of the issues that you worked on as a researcher at Meta?

A    Yes.

Q    Okay.  Okay.  Let me -- Madam Court Reporter went over some of this, but I want to talk a little bit more about the logistics of a deposition.

Have you given a deposition before?

A    No.

Q    Okay.  So I would reiterate the advice that it is very important for us to not speak over each other.  Okay?

A    (Nodded head.)

Page 22

Q    And the next thing is that when I ask you a question, you have to answer verbally.

Like, now -- or do you understand that?

A    Yes.

Q    Okay.  Good.  Okay.  So when I ask you a question, you can't shake your head or nod your head.  You have to answer "yes" or "no."  Okay?

A    (Nodded head.)

Q    And there may be times -- it's already happened -- where there may be objections to some of the questions that I ask.  Okay?

A    Yes.

Q    And unless your lawyer instructs you not to answer, do you understand that you're required to answer the questions even though there's an objection?

A    Yes.

Q    And we can take a break at any time that you like.  You just need to let me know.  Okay?

A    Okay.

Q    The only exception to that is if there's a question pending.  You have to answer the question before we take a break.  Is that okay?

A    Yes.

Q    Okay.  And you swore an oath to tell the

truth at the beginning of this proceeding; is that right?

    A    Yes.

    Q    And do you understand that that's the same oath that you would swear if you were testifying in court before a judge and a jury?

    A    Yes.

    Q    And, in fact, you understand that this videotape may well be played to a jury in the cases being brought by my clients?

    A    Yes.

    Q    Okay.  So we're here in Portland where you live now.

         Is Portland also where you grew up?

    A    No.

    Q    Okay.  Where did you grow up?

    A    San Diego.

    Q    Okay.  There's a little more rain here.

    A    A fair bit, yeah.

    Q    Okay.  I'm going to ask you some questions about your educational background.  And to help us walk through that, I'd like to hand you what we're going to mark as Exhibit 1 to your deposition --

    A    Okay.

    Q    -- which is your LinkedIn profile.

Page 24

(Deposition Exhibit 1 was marked for identification.)

BY MS. WALSH:

Q    And while Ms. Boldt is providing counsel copies of this, could you take a look at this and let us know if you understand this to be your profile on LinkedIn?

A    Yes, it looks like my LinkedIn profile.

Q    Okay.  And looking at it now, does it appear to be your up-to-date profile from LinkedIn?

A    Yes, it appears so.

MS. WALSH:  Okay.  If we could publish this, please.

BY MS. WALSH:

Q    And let's start with -- on the last page with your education.  Okay?

A    Okay.

Q    Where did you attend college, Ms. Troxel?

A    I did my undergraduate at Reed College in Portland, Oregon.

Q    And what did you major in?

A    Psychology.

Q    And what drew you to psychology?

A    I've always been curious about how people become the people that they are and how people

handle the context of their environment and how that shapes who we become.

Q    Okay.  So psychology was your major?

A    Yes.

Q    And when did you graduate from Reed College?

A    2007.

Q    And after you graduated from Reed College, did you go on to obtain a master's degree?

A    Yes.

Q    And where did you do that?

A    UC Davis.

Q    University of California?

A    Yes.

Q    Okay.  And what was your master's degree in?

A    Psychology.

Q    And was it any particular type of psychology?

A    Developmental psychology.

Q    What does "developmental psychology" mean?

A    It's primarily focused on children and adolescents, but it's how people develop and change cognitively, socially, emotionally over the life span.

Page 26

Q    Okay.  So during that time, did you develop an understanding of things that could affect how children and adolescents develop?

A    Yes.

Q    Including things that could negatively affect how children and adolescents develop?

A    Yes.

MR. EPPICH:  Object to form.

BY MS. WALSH:

Q    During that time, did you come to understand how certain factors could negatively affect how children and adolescents develop?

MR. EPPICH:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q    Okay.  Now, after your master's degree, did you go on to get even more education in the field of developmental psychology?

A    Yes.

Q    And did you get your PhD?

A    Yes.

Q    And where did you do that?

A    Also at UC Davis.

Q    And was your PhD also in developmental psychology?

Page 27

A    Yes.

Q    And did you have any particular focus during your PhD?

A    Yes.

Q    And what was that?

A    Part of the time there, I was focused on psychology and law.  So children's involvement in the legal system, their ability to act as witnesses in court cases, for example.

Q    Mm.

A    But most of my work there was on children's social-emotional development and the development of pro-social emotions and pro-social orientations like empathy and compassion.

Q    Can you tell the jury a little bit more about this term "pro-social emotions and orientations"?

A    Yes.

Q    Please do.

A    Okay.  So pro-social emotions are things like empathy, sympathy, compassion, altruism would be a pro-social orientation.  So they're emotions and, like, clusters of behavior that orient an individual towards being pro-social and trying to develop community, trying to develop positive social

Page 28

ties to the people around them.

Q    Okay.  What drew you to focus your work on this concept of pro-social development?

A    I'm not entirely sure.  It just seemed really nice.  It was interesting.  I don't think that there was -- there's a lot of research -- at least at the time there was a lot of research in psychology that was really focused on what can go wrong in development.  And there was less focus on what can go right and how to make things go right.

And I really liked the idea of having my work be something that was building something and was more positively oriented.

Q    Okay.  And did you write a thesis?

A    I did.

Q    And what was that about?

A    Which thesis?

Q    Ah.  Did you write a doctoral thesis as part of obtaining your PhD?

A    Yes.

Q    And what was that about?

A    It was about attachment theory.  So young children's attachment with their primary caregiver and how that contributes to their development of empathy and how that, in turn, contributes to their

Page 29

development or lack of their development of behavioral, emotional, and psychological problems as they enter early school-age.

Q    Okay.  Now, Ms. Troxel, after you completed your PhD, were you interested in obtaining a job that would allow you to continue to pursue your interest and promote this pro-social aspect of development?

A    Yes.

Q    And you took a job at Meta?

A    Yes.

Q    And did you believe that working at Meta was something that would allow you to continue and further develop your interest in and commitment to pro-social development?

A    I wasn't sure, but I thought it had the possibility for it.

Q    Okay.  Would you have taken the job at Meta if you didn't think that that possibility existed?

A    I don't think so.

Q    Okay.  And what led you to believe that working at Meta would allow you to help contribute to pro-social development?

A    I knew that billions of people used Meta products and that it was something that was a part

Page 30

of a lot of people's everyday lives.  And I just kind of figured somewhere in there there must be something that could be done better, could be done to positively affect people's lives.

Q    Okay.  And did you throughout -- well, let me ask you this.

You told the jury earlier that you began working at Meta in 2017; is that right?

A    Yes.

Q    And you stopped working at Meta in 2022; is that right?

A    Yes.

Q    And during the time that you were there, did you maintain your desire to use your work at Meta to help contribute to pro-social development?

A    In general, yes.

Q    Okay.  And were you able to do that?

A    Not directly, I don't think.

Q    Okay.  Can you elaborate?

A    I don't know if the things that I did ultimately contributed to pro-social development or not.  I think that some of the work that I did on some of the teams had the capacity to do that.

Q    And to the extent there were impediments to your work having that effect, what were they?

Page 31

MR. EPPICH:  Object to form, misstates testimony.

BY MS. WALSH:

Q    Strike that.

Did you encounter impediments to -- while you were at Meta to achieving your goal of having your work promote social -- pro-social development?

A    Yeah.

Q    And what were some of those impediments?

A    Some of it was, I think, the nature of the company.  I think that I had joined the company perhaps a little naive about what the company would want to do and some of what the company was building and how much of an influence I would be able to have on things.

I think some of it was that technically children under 13 aren't supposed to be using the products.  So there wasn't going to be a focus on young children's development, for example.

And I think some of it was just the focus, the prioritization of the company.

Q    When you say the "prioritization of the company," what do you mean by that?

A    That the company wasn't prioritizing positive child development.

Page 32

Q    In your experience, what was the company prioritizing?

A    Revenue.

Q    And by "revenue," do you mean making money?

A    Yes.

Q    And how, in your experience, did Meta seek to prioritize revenue and making money?

MR. EPPICH:  Objection.  Foundation.

THE WITNESS:  It seemed like when I was there, that Meta was trying to increase engagement, trying to increase how much time people spent using their apps in an effort to have more eyeballs on the apps for a longer period of time, which can get them more advertising revenue.

BY MS. WALSH:

Q    And did you experience situations where the -- well, strike that.

Was that frustrating to you at times?

A    Yeah.  Sure.

Q    And did you experience specific situations where research that you had done you believed could translate to a positive experience -- or strike that.

Did you experience situations where you believed that research you had done could translate

Page 33

to positive improvements of the product but that research wasn't used to improve the product?

MR. EPPICH:  Object to form.

THE WITNESS:  What do you mean by "improve the product"?

BY MS. WALSH:

Q    By "improve the product" -- well, let me ask you.

Was part of your work in UX research aimed at trying to improve the social media products that Meta offers?

MR. EPPICH:  Object to form.

THE WITNESS:  I think the work that I did was aimed at better understanding the user's needs and the user's experiences so that I could make recommendations for how to change the product that would focus more or be more aligned with users' needs and experiences and expectations.

I don't know if we would consider that improving the product or not, but --

BY MS. WALSH:

Q    Did your research -- were there instances where your research led you to conclude that there was a change to the product that could be made that could make the product better align with people's

Page 34

expectations and needs?

THE WITNESS:  Yes.

MR. EPPICH:  Object to form, foundation.

BY MS. WALSH:

Q    And were there situations where those changes that you were -- and did you recommend changes based on that research?

A    Yes.

MR. EPPICH:  Object to form.

BY MS. WALSH:

Q    And were there situations where your recommendations were rejected?

A    Yes.

Q    And in any of those situations, do you believe that your recommendations were rejected because of what you called the company's prioritization on revenue?

MR. EPPICH:  Object to form, foundation.

THE WITNESS:  I think that those changes were rejected because the changes would have limited certain metrics, like engagement.  And if we make the inference that engagement leads to revenue, then yes.

BY MS. WALSH:

Q    Okay.  Can you give the jury an example of

Page 35

that?

A    My favorite example is that when I worked on Messenger, we would get very consistent feedback in research.  People hated a particular, like -- it seems minor, but they hated a particular feature of Messenger.

And, at least at the time, when you added a new friend on Facebook, it would automatically add them as a contact on Messenger.

Q    Mm-hmm.

A    And it would prompt the user to wave at their new friend in Messenger.  And, boy, people hated that.  They told us they hated that in almost every piece of research I ever did even though it was never about that.

And I, a couple of times, recommended, "Hey, we should maybe get rid of that feature. People seem to really hate it."  And I was told that we could not get rid of that feature because it increased a metric called "two-by-two messaging."

Q    What is two-by-two messaging?

A    My recollection of two-by-two messaging is that it's anytime there is at least two people in a text exchange where each person contributes at least one message.  So it's, like, a volley, a

Page 36

back-and-forth between at least two people.

Q    Okay.  And was it your understanding that this was an important metric for Meta?

MR. EPPICH:  Object to form, foundation.

THE WITNESS:  It's my understanding that it was an important metric, at least to the Messenger org.

BY MS. WALSH:

Q    Okay.  Let's take a look -- we've started already to talk about some of your work at Meta.  I want to do it in a more systematic way.

A    Okay.

Q    Before I do this, and so I don't forget, you testified earlier that technically children under 13 are not supposed to be using Meta's social media platforms.

Do you recall that testimony?

A    Yes.

Q    During the time you worked at Meta, did you become aware that children under 13 were, indeed, using Meta's social media platforms?

MR. EPPICH:  Object --

THE WITNESS:  Yes.

MR. EPPICH:  -- to form, foundation.

///

Page 69

THE VIDEOGRAPHER:  The time is 10:25, and we are off the record.

(Recess taken from 10:25 a.m. to 10:44 a.m.)

THE VIDEOGRAPHER:  The time is 10:44 a.m., and we are back on the record.

BY MS. WALSH:

Q    Okay.  Ms. Troxel, before the break, we were talking about user controls.

Do you remember that?

A    Yes.

Q    Okay.  And during your time at Meta, were you in favor of improving the user controls that were available to people who were using Meta's social media platforms?

MR. EPPICH:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q    Okay.  And tell us about some of the work you did that was aimed at improving the user controls available to people using Meta's platforms.

A    So after I moved from the Health team to the RRL team, the Responsible Ranking and Legitimacy team --

Q    Mm-hmm.

Page 70

A    -- I started working with product teams within that kind of area to figure out how to give users more control over what's in their feed.

And some of the things that we were talking about and we were testing were things like moving to a chronological feed or moving to a friends and family, like a -- kind of a friends-only feed or a groups-only feed and giving the users the option of kind of toggling between these different feeds --

Q    Mm-hmm.

A    -- so that they could have more control over what they were seeing at any given time on their news feed.

Q    Okay.  And let's start by talking about the chronological feed concept.

And to do that, let me ask you, first, are you familiar with the concept of infinite scroll?

A    Yes.

Q    What is infinite scroll?

A    Infinite scroll is how Facebook and Instagram are currently operating where you can just scroll and scroll and scroll and there will never be an end to the content.

Q    Okay.  And it's your understanding that that's how Facebook operates today, correct?

Page 71

A     That's my understanding, yes.

Q     And -- well, let's focus on the time you were at Meta too.

Is it your understanding that's how Instagram operated, with an infinite scroll, at the time you were at the company?

A     Yes.

Q     Okay.  And were there discussions around potential concerns with the infinite scroll model?

A     Yes.

Q     And what concerns were -- what concerns did you have about infinite scroll at the time you were at Meta?

A     I had concerns based on research I had done and conversations I had had with other people in the company that infinite scroll allowed people to use the product more than they wanted or more than they had intended to and that there not being an end or a point where they've caught up could really exacerbate people's use of or problematic use of the products.

Q     Okay.  You used the term "problematic use."

Was that also a term of art that was used at Meta while you were there?

A     Yes.

Page 72

Q    And what does problematic -- what was -- what was your understanding of what that term meant, as used at Meta?

MR. EPPICH:  Object to form, foundation.

THE WITNESS:  My understanding is that "problematic use" doesn't have, like, a set amount of use as problematic.  It's -- depends on the individual what is or isn't problematic.

But it's basically, for any given individual, the overuse of a product, of either Facebook or Instagram, in this case, where they're using it more than they want or more than they intend and they feel like it's having negative effects or interfering with their life in some way.

BY MS. WALSH:

Q    Does the concept -- when you were working at Meta, did you understand the concept of problematic use to relate to user controls?

MR. EPPICH:  Object to the form, foundation, calls for expert testimony.

THE WITNESS:  To some degree, yes.

BY MS. WALSH:

Q    Okay.  When you were at Meta and discussing the concept of problematic use, was the term "addiction" also used?

Page 73

MR. EPPICH:  Object to form.

THE WITNESS:  Probably, but I'm not sure I specifically remember that.

BY MS. WALSH:

Q   Okay.  So you told the jury that a concern you had was that the infinite scroll feature of, say, Instagram could contribute to problematic use, correct?

A   Yes.

MR. EPPICH:  Object to form.

BY MS. WALSH:

Q   And so were you involved in research about how -- about alternatives to infinite scroll?

A   Yes.

Q   And what were those alternatives?

A   Primarily chronological feeds.

Q   Okay.  And would a chronological feed end at some point?

MR. EPPICH:  Object to form, foundation.

THE WITNESS:  I don't know if it would end. At some point, you would get caught up to the last thing you had seen or, like, to the -- yeah, to the last thing that you had seen on your previous session.

///

Page 74

BY MS. WALSH:

Q    Okay.  And did your work at Insta- -- at Meta -- did you -- did there come a time when you made recommendations -- you and others made recommendations about offering users alternatives to infinite scroll?

A    Yes.

Q    And what was the response to those recommendations?

A    I believe I was laughed at the first time I brought it up, but it was -- it was just a nonstarter.

Q    And do you recall who it was who laughed at you when you brought it up?

A    I think it was one of the product managers.

Q    Okay.  And after he or she was done laughing, did they explain why they thought this idea of moving away from the infinite scroll was so funny?

MR. EPPICH:  Object to the form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q    And what was that explanation?

A    That we wouldn't be able to do something like that because it would lower engagement.

Page 300

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

CASE:                IN RE: SOCIAL MEDIA ADOLESCENTADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

DEPOSITION DATE: MARCH 11, 2025

JOB NUMBER:      7225418

I, Marla Sharp, certified stenographic reporter licensed in California, Oregon, and Washington, hereby certify that the foregoing video-recorded videoconference deposition of NATALIE TROXEL, PH.D., was taken remotely before me on March 11, 2025; that the witness was remotely duly sworn by me; that all of the testimony, colloquy, and objections made were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof; that review of the transcript was neither requested nor waived before completion of the deposition; ( ) that the witness has failed or refused to approve the transcript; and that I am neither financially interested in the action nor a relative or employee of any attorney of any party.

In witness whereof, I have subscribed my name and signature this date, March 21, 2025.

_____

Marla Sharp, RPR, CLR, CCRR

CA CSR 11924, OR CSR 17-0446, WA CSR 3408