**AMENDED Exhibit 11**

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - -
IN RE:  SOCIAL MEDIA ADOLESCENT          :MDL NO.
ADDICTION/PERSONAL INJURY PRODUCTS       :4:22-MD-
LIABILITY LITIGATION                     :3047-YGR
                                         :
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE
- - -
COORDINATION PROCEEDING SPECIAL TITLE  :
(RULE 3,400)                           :
                                       :
SOCIAL MEDIA CASES                     :
_____  :LEAD CASE
                                       :NO. FOR
THIS DOCUMENT RELATES TO:              :FILING
                                       :PURPOSES
STATE OF TENNESSEE, ex rel, JONATHAN   :22STCV21355
SKRMETTI, ATTORNEY GENERAL and         :
REPORTER,                              :
                                       :
      V.                               :
                                       :
META PLATFORMS, INC., and INSTAGRAM,   :
LLC                                    :
                                       :
CASE NO. 23-1364-IV                    :
                        - - -
    CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

        DEPOSITION UNDER VIDEO EXAMINATION OF
                  MARK ZUCKERBERG
                  March 27, 2025
                    VOLUME I
        Videotaped deposition of MARK ZUCKERBERG
taken pursuant to notice, was held at the law
offices of Covington Burling, LLP, 3000 El Camino
Real, Palo Alto, California, beginning at 10:12
a.m., Pacific, on the above date, before Michelle L.
Ridgway, a Registered Professional Reporter,
Certified Court Reporter (NJ-CCR # XI02126),
Certified Realtime Reporter, Certified Shorthand
Reporter  (CA-CSR # 14592), and Notary Public.

CONFIDENTIAL

Page 2

APPEARANCES:

MOTLEY RICE LLC
BY:   PREVIN WARREN, ESQ.
BY:   NELSON L. DRAKE, ESQ.
(In person)
401 9th Street NW
Suite 630
Washington, D.C. 20004
202.232.5504
pwarren@motleyrice.com
ndrake@motleyrice.com
Representing the Plaintiffs

MOTLEY RICE LLC
BY:   JESSICA COLOMBO, ESQ.
(Zoom)
20 Church Street
17th Floor
Hartford, Connecticut 06103
860.218.2739
jcolombo@motleyrice.com
Representing the Plaintiffs

MOTLEY RICE LLC
BY:   ESTHER BEREZOFSKY, ESQ.
(Zoom)
?210 Lake Drive East
Suite 101
Cherry Hill, New Jersey 08002
856-382-4667
Eberezofsky@motleyrice.com
Representing the Plaintiffs

MOTLEY RICE, LLC
BY:   ANNIE E. KOUBA, ESQ.
BY:   JESSICA L. CARROLL, ESQ.
(Zoom)
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
(843) 216-9149
akouba@motleyrice.com
Jcarroll@motleyrice.com
Representing the Plaintiffs

CONFIDENTIAL

Page 47

A.        Well, what the oath said, that I'm   10:13:38
going to tell the whole truth.                     10:13:41

Q.        Okay.  And is there any reason you   10:13:43
wouldn't be able to do that today?                 10:13:44

A.        No.                                       10:13:45

Q.        All right.  You're the founder and   10:13:46
CEO of Meta?                                        10:13:48

A.        Yes.                                      10:13:49

Q.        And you have been for the            10:13:49
last 21 years?                                     10:13:51

A.        Yes.                                      10:13:51

Q.        All right.  Let's start at the       10:13:52
beginning.                                         10:13:53

You attended Harvard College,    10:13:53
correct?                                           10:13:56

A.        Yes.                                      10:13:56

Q.        And you left early in order to get   10:13:57
Facebook off the ground?                           10:13:59

A.        Yes, you could say that.  I mean, I  10:14:00
started Facebook when I was at -- when I was in     10:14:03
school.  So I left in order to scale it.           10:14:05

Q.        All right.  And in those early       10:14:11
years, you relied on the help and support of a      10:14:12
number of people, right?                           10:14:15

A.        Yes.                                      10:14:16

CONFIDENTIAL

Page 48

Q.    Okay.

A.    And still do.    10:14:18

Q.    Yeah.  And one of those people was Sean Parker?    10:14:19    10:14:21

A.    Yes.    10:14:22

Q.    He was the first president of Facebook?    10:14:23    10:14:25

A.    I think, technically, he was the second president.    10:14:25    10:14:29

Q.    Okay.  Were you the first?    10:14:30

A.    No.  I think -- I don't remember the exact corporate structure early on.  But I think Eduardo Saverin might have first held the title.    10:14:31    10:14:34    10:14:37    10:14:41

Q.    All right.  And Mr. Parker introduced you to one of Facebook's early investors, Peter Thiel?    10:14:41    10:14:42    10:14:44

A.    Yes, that's correct.    10:14:46

Q.    All right.  And you've told the press that Mr. Parker was pivotal in helping Facebook transform from a college project into a real company; is that correct?    10:14:46    10:14:47    10:14:50    10:14:53

A.    Yes.    10:14:54

Q.    All right.  And you'd agree a lot of the early lessons you absorbed about strategy    10:14:55    10:14:57

CONFIDENTIAL

Page 49

came from Mr. Parker?                                    10:15:01

A.        He was definitely one of my early   10:15:02

partners.  I mean, I -- a lot of the pivotal --          10:15:05

what was the exact question that you asked me             10:15:08

there?                                                    10:15:09

MR. WARREN:  Can you read           10:15:10

back the question, Michelle.                              10:15:11

THE COURT REPORTER:  Sure.           10:15:17

(Whereupon, the court               10:15:17

reporter read back the requested portions                10:15:18

of the transcript.)                                       10:15:18

THE WITNESS:  Yeah, he was           10:15:18

one of my early partners in this.                         10:15:21

I mean, I think the basic            10:15:24

strategy for Facebook early on was sort of                10:15:25

set as a product before he joined.  But he                10:15:28

certainly helped out a lot with the                       10:15:31

business, and he's -- he's a smart person.                10:15:33

BY MR. WARREN:                                            10:15:34

Q.        Okay.                     10:15:34

MR. WARREN:  Can we roll            10:15:36

Tab 9A.                                                   10:15:39

BY MR. WARREN:                                            10:15:40

Q.        I'm going to play you a video of  10:15:40

you being interviewed.  And we're going to hand          10:15:42

CONFIDENTIAL

Page 51

BY MR. WARREN:                                           10:19:19

Q.      Okay.  I'm going to play you             10:19:19
Exhibit 1.                                               10:19:21

(Video playback.)                       10:19:21

SPEAKER:  Might have come               10:19:26
from somewhere, though, even if it was --                10:19:27
even if it was unintentional, right?  Like,              10:19:29
were you influenced by Peter Thiel or Sean               10:19:31
Parker or people that you had met?                       10:19:34

MR. ZUCKERBERG:  Well, I was             10:19:34
influenced by all of these people once I                 10:19:37
met them.   I hadn't really heard of Peter               10:19:37
Thiel before Sean introduced me.  I'm                    10:19:39
talking about like -- yeah, right after --               10:19:40
yeah, but he was massively influential on                10:19:40
my thinking, right.  Like, a lot of the                  10:19:43
early lessons that I took on how to think                10:19:45
about strategy came from Peter and Sean.                 10:19:48

(End video playback.)                   10:19:52
BY MR. WARREN:                                           10:19:52

Q.      Okay.  That's a video of you,            10:19:52
correct?                                                 10:19:53

A.      Yes.                                     10:19:54

Q.      All right.  You were being              10:19:55
interviewed in 2013 at Y Combinator's Startup            10:19:55

CONFIDENTIAL

Page 52

School?                                                  10:19:59

A.          I think so.                                  10:19:59

Q.          Okay.  And you said in the video            10:20:01
that a lot of the early lessons that you took on         10:20:04
how to think about strategy came from Peter Thiel        10:20:06
and Sean Parker, right?                                  10:20:09

A.          Yeah.  Especially business                  10:20:10
strategy.                                                10:20:12

Q.          Yeah.  Okay.  I'm going to play you         10:20:12
another clip.                                            10:20:13

I'll represent to you this is                            10:20:14
publicly accessible on the website of the news           10:20:15
outlet Axios.  I'm going to introduce this as            10:20:18
Exhibit 2.                                               10:20:22

(Document marked for
identification as (Meta) Zuckerberg
Exhibit 2.)

MR. WARREN:  Again, I'll be                              10:20:22
handing your counsel a copy of the                       10:20:23
transcript for his own reference purposes.               10:20:25
And we will play the clip which is Tab 10A.              10:20:27

MR. SCHMIDT:  And I'll just                              10:20:35
object to this clip on the grounds that you              10:20:35
forsook the deposition of Mr. Parker,                    10:20:41
including after the --

CONFIDENTIAL

Page 82

A.          This thing that is called the          10:49:13

"Document Slipsheet"?          10:49:18

Q.          Yes, sir.  I'll represent to you          10:49:20

that this is the metadata from the document.          10:49:21

Do you have any reason to dispute          10:49:25

that?          10:49:27

A.          No.          10:49:27

Q.          Okay.  And Kenzie Snyder is          10:49:27

identified as the author and the custodian,          10:49:31

correct?          10:49:32

A.          Yes.          10:49:35

Q.          And she is a user experience          10:49:35

researcher at Meta?          10:49:39

A.          I am not sure.  I don't think I'm          10:49:40

familiar with her.          10:49:43

Q.          Okay.  So I'm going to show you          10:49:43

another exhibit.  This will be Exhibit 7.          10:49:45

(Document marked for          10:49:48

identification as (Meta) Zuckerberg

Exhibit 7.)          10:49:59

BY MR. WARREN:          10:49:59

Q.          Do you have that in front of you,          10:50:08

sir?          10:50:09

A.          Yes.          10:50:09

Q.          Okay.  And I'm happy to represent          10:50:09

CONFIDENTIAL

Page 83

to you that this is a screen shot of Kenzie 10:50:13
Snyder's LinkedIn profile. 10:50:17

Q. Do you have any reason to dispute 10:50:19
that? 10:50:20

A. No. 10:50:20

Q. And what is her job title 10:50:21
identified as? 10:50:22

A. "Senior UX Research Leader at 10:50:23
Instagram." 10:50:31

Q. Okay. 10:50:31

A. "Research Lead on Threads." 10:50:31

Q. Okay. And she's identified as a 10:50:33
Ph.D., correct? 10:50:35

A. Yes. 10:50:36

Q. And can you turn to her educational 10:50:36
background, a couple pages. She identifies as 10:50:39
having a Ph.D. in social psychology from Columbia 10:50:48
University, correct? 10:50:51

A. Yes, it looks like it. 10:50:52

Q. Okay. And it looks like she also 10:50:53
has her bachelor's in psychology and journalism? 10:50:55

A. Yes. 10:50:59

Q. Okay. So let's go back to the 10:51:00
document that we were looking at previously, 10:51:03
Exhibit 6. 10:51:06

CONFIDENTIAL

Page 87

A.        No.                                    10:53:50

Q.        All right.  Have you followed the    10:53:50
advice of your company's researchers and alerted    10:53:52
people to the effect your products have on users'    10:53:55
brains?                                         10:53:58

MR. SCHMIDT:  Object to the        10:53:59
characterization.                               10:53:59

THE WITNESS:  Yeah.  I don't        10:54:00
agree with the characterization of what         10:54:02
you're saying.  I mean, it's -- we do a lot     10:54:04
of research to understand how our products      10:54:05
work and how to make them better for people     10:54:09
in the community.                               10:54:11

I don't know that any single        10:54:12
finding -- and none -- also I haven't read      10:54:14
this whole thing.  So, I mean, it's not         10:54:16
clear that, you know, one or two                10:54:18
paragraphs, based on this, is -- even kind      10:54:20
of suggests what you're implying it             10:54:23
suggests.                                       10:54:26

But -- but overall -- sorry.        10:54:28
What was -- what were you even getting at?      10:54:30
What was even the question?                     10:54:32

MR. WARREN:  Yeah.  I'm             10:54:33
going to move to strike that as                 10:54:33

CONFIDENTIAL

Page 88

nonresponsive.  I don't even think you

remember my question.

BY MR. WARREN:

Q.        Let me ask the question again.

Your researcher, who has a Ph.D. in social psychology, says:  "We need to alert people to the effect that the product has on their brain."

My question is, did you?

MR. SCHMIDT:  Object to the harassing preamble.

THE WITNESS:  Did we -- did we what?

BY MR. WARREN:

Q.        Did you alert people to the effect that your products have on their brains?

A.        Well, I mean, I think we've published a lot of the research that we've had.  I mean, we study a lot of these different things.

I'm not sure what -- what kind of format are you suggesting that we would -- that we would communicate this in.  I mean, we published a lot of the research that we do.  We are open in terms of talking about how we're addressing certain issues within the products.

But, again, I mean, I'm not even

CONFIDENTIAL

Page 89

sure what this study is or the extent of whether    10:55:26

the conclusions that she's drawing here are even    10:55:31

accurate.  So it's not clear whether there's    10:55:33

something specific here to alert people about.    10:55:36

Q.        Okay.  So you -- if you don't    10:55:38

believe these conclusions are accurate, does it    10:55:40

stand to reason you haven't alerted people to the    10:55:43

conclusions?    10:55:46

A.        I haven't read this document or    10:55:47

seen it before, and the --    10:55:49

Q.        That's not my question.    10:55:49

A.        Well, you asked me to read two    10:55:50

paragraphs, which I think are -- sound somewhat    10:55:53

sensationalist.  And I have not had a chance to    10:55:58

kind of read the document.  I don't know what the    10:56:03

rest of it says or if it even supports the    10:56:05

conclusions here.    10:56:07

Q.        Okay.  My question is fairly    10:56:09

straightforward.    10:56:10

Your researcher at your company    10:56:11

indicates here that there are certain features of    10:56:16

your products that are designed to exploit    10:56:19

insecurity or provide a dopamine rush.    10:56:21

I'm not asking whether you agree.    10:56:24

I'm not asking you to characterize that.    10:56:26

CONFIDENTIAL

Page 90

I'm asking you:  Is that what one      10:56:29
of your researchers said in this document?      10:56:31
Let's just start there.      10:56:33

A.      Well, I think that that's what      10:56:34
these two paragraphs say --      10:56:35

Q.      Thank you.      10:56:37

A.      -- without having a look at the      10:56:37
whole rest of the document --      10:56:39

Q.      Thank you.      10:56:40

MR. SCHMIDT:  Just a second.      10:56:40
You can't -- you can't interrupt him in the      10:56:40
middle of his answer.      10:56:41

You can finish your answer.      10:56:42

THE WITNESS:  I mean, I --      10:56:43
without having gone through the rest of the      10:56:43
document, I can't really say if that's the      10:56:45
fullness of what the document says or if,      10:56:47
you know, what this person wrote here is      10:56:50
even the fullness of their research or what      10:56:52
they think.      10:56:54

But you're asking me to      10:56:55
basically comment on what someone else      10:56:56
wrote in a thing that I've not seen.      10:56:58

BY MR. WARREN:      10:57:00

Q.      I'm not asking you to comment on      10:57:01

CONFIDENTIAL

Page 91

what they wrote.  I want to be really clear about    10:57:02

my question, okay, because I don't think this is a    10:57:05

particularly controversial question.    10:57:09

Your researcher did write in this    10:57:11

document -- and maybe they wrote other things in    10:57:12

the document, and you can take your time to look.    10:57:14

But your researcher did write in    10:57:16

this document that that are features of your    10:57:18

products that are designed to exploit insecurity or    10:57:20

provide a dopamine rush to increase the amount of    10:57:22

time users spend on your platform.    10:57:25

They wrote that, right?    10:57:27

A.    I mean, that's what these    10:57:28

paragraphs say.    10:57:30

Q.    Okay.    10:57:31

A.    I disagree with the    10:57:32

characterization, and I'm not sure what's in the    10:57:33

rest of the document.    10:57:34

Q.    And my question is simply this:    10:57:35

Have you alerted people to those    10:57:36

effects that they have on their brains, yes or no?    10:57:39

MR. SCHMIDT:  Objection.    10:57:43

Foundation.    10:57:43

THE WITNESS:  Yeah.  And    10:57:44

I've tried to answer this a few times.    10:57:44

CONFIDENTIAL

Page 92

First, it's not clear if what is written here is actually true.  So in that case, I'm not sure what you'd be trying to alert people about.

But more broadly, we study these topics in a number of ways and communicate about this publicly through research that we do, through public comments and discussions that we have.  So, more broadly, I do think that we're engaged in discussions about these issues.

But whether we commented on a specific thing here that I'm not even sure is true, I -- I'm not sure.  I doubt it.

And I think if this ended up being the way that we felt about this as a company, we would have communicated it more.  But I generally disagree with the characterization here.

BY MR. WARREN:

Q.    Okay.  So you're not aware of any actual specific disclosure about these, in part, because you, yourself, don't agree with them; is that right?

CONFIDENTIAL

Page 93

A.    Yes.    10:58:39

Q.    Okay.  So, Mr. Zuckerberg, Sean    10:58:41
Parker is not the only former Facebook executive    10:58:45
who has publicly voiced concerns about the impact    10:58:48
of Meta's products on human psychology, is he?    10:58:52

MR. SCHMIDT:  Objection.    10:58:56
Foundation.    10:58:57

THE WITNESS:  You asked    10:58:57
about employees or?    10:58:58

BY MR. WARREN:    10:59:00

Q.    I asked about former Facebook    10:59:00
executives.  Let me -- let's have the question read    10:59:02
back.    10:59:04

THE COURT REPORTER:  Sure.    10:59:16

(Whereupon, the court    10:59:16
reporter read back the requested portions
of the transcript.)    10:59:16

MR. SCHMIDT:  Same    10:59:16
objection.    10:59:17

THE WITNESS:  No.  I think    10:59:17
there have been other employees and    10:59:19
executives who have had questions.    10:59:21

BY MR. WARREN:    10:59:23

Q.    Okay.  Let's talk about Chamath    10:59:23
Palihapitiya.  He was another early Facebook    10:59:26

CONFIDENTIAL

Page 94

executive?                                                    10:59:28

A.          Yes.                                        10:59:28

Q.          He worked there from about 2007 to          10:59:28
2011 in the vice president role?                              10:59:31

A.          Sounds about right.                         10:59:35

Q.          Okay.  And he reported to                   10:59:36
Facebook's COO at the time, Sheryl Sandberg?                 10:59:37

A.          I think that's right.                       10:59:40

Q.          Okay.  And she reported, of course,         10:59:42
directly to you?                                             10:59:44

A.          Yes.                                        10:59:44

Q.          You were in regular communication           10:59:45
with Mr. Palihapitiya when he worked at Facebook,            10:59:47
yes?                                                         10:59:52

A.          Yes.                                        10:59:52

Q.          All right.  Did you consider him a          10:59:53
friend?                                                      10:59:55

A.          I mean, we mostly worked together.          10:59:55

Q.          Okay.  Did you ever socialize               11:00:01
together?                                                    11:00:03

A.          Back then, maybe a bit.                     11:00:03

Q.          Okay.  What do you remember about           11:00:06
that?                                                        11:00:07

A.          Not very much.  It was a long time          11:00:08
ago.                                                         11:00:10

CONFIDENTIAL

Page 101

is the clip we just watched an interview of Chamath    11:05:59

Palihapitiya at Stanford University?    11:06:05

A.    It seems like it.    11:06:06

Q.    All right.  And you became aware of    11:06:07

Mr. Palihapitiya's statements shortly after he made    11:06:09

them, correct?    11:06:11

A.    I don't remember, but probably.    11:06:12

Q.    Okay.  In fact, he wrote to you    11:06:14

shortly after the interview we just watched?    11:06:15

A.    I don't remember that.    11:06:17

Q.    Okay.  We're going to look at    11:06:19

document bearing the Bates stamp    11:06:20

META3047MDL-022-00046397, and we'll mark this as    11:06:25

Exhibit 9.    11:06:36

(Document marked for    11:06:36

identification as (Meta) Zuckerberg    

Exhibit 9.)    11:06:38

BY MR. WARREN:    11:06:38

Q.    Okay.  I ask that you direct your    11:07:09

attention to the last page, which is an e-mail from    11:07:11

Mr. Palihapitiya to you, Sheryl Sandberg, and    11:07:15

Elliott Schrage, on December 11, 2017.    11:07:19

Do you agree that's what it says?    11:07:23

A.    The last page?    11:07:25

Q.    Yes, sir.    11:07:37

CONFIDENTIAL

Page 102

All right.  Do you see the e-mail                11:08:04
from Mr. Palihapitiya to you and other people?   11:08:05

A.       Yes.  Yes.                              11:08:09

Q.       Okay.  The e-mail is dated Monday,      11:08:09
December 11, 2017?                               11:08:11

A.       Yes.                                    11:08:12

Q.       Mr. Palihapitiya begins by saying,      11:08:12
he's "really sorry about all the pickup today."  11:08:14

Did I read that right?                           11:08:17

A.       That's what it says.                    11:08:19

Q.       And you understood that to be a         11:08:20
reference to news articles that picked up        11:08:21
Mr. Palihapitiya's comments at Stanford?         11:08:25

A.       That's how I read it now, yes.          11:08:28

Q.       Okay.  And he also says that when       11:08:29
he spoke, he "didn't do a good enough job        11:08:31
separating me as an individual versus me as a    11:08:36
former executive."                               11:08:38

Do you see that?                                 11:08:39

A.       Yes.  That's what it says.              11:08:40

Q.       Okay.  And he says he "could have       11:08:47
been crisper."                                   11:08:48

Do you see that?                                 11:08:49

A.       I see it.                               11:08:51

Q.       And at no point in this e-mail does     11:08:52

CONFIDENTIAL

Page 103

Mr. Palihapitiya disavow his comments about    11:08:53

short-term, dopamine-driven feedback loops,    11:08:56

correct?    11:08:59

MR. SCHMIDT:  Object to the    11:08:59

characterization.    11:09:00

THE WITNESS:  I mean, it    11:09:01

doesn't really discuss the substance of    11:09:06

what he said at all.    11:09:07

BY MR. WARREN:    11:09:09

Q.    Okay.  And so for that same reason,    11:09:10

he also does not disavow his comments about the    11:09:11

impact of rewards from short-term likes, like    11:09:14

hearts and signals, correct?  Hearts and likes.    11:09:18

I'm sorry.    11:09:20

Let me re-ask the question.  Let me    11:09:20

withdraw that.    11:09:21

At no point does Mr. Palihapitiya    11:09:22

disavow his comments about the impact of rewards    11:09:25

from short-term signals like hearts and likes,    11:09:27

correct?    11:09:29

A.    That's correct.  He isn't talking    11:09:30

about the substance of his comments at all here.    11:09:34

Q.    All right.  Mr. Zuckerberg, you    11:09:36

didn't personally respond to his e-mail, did you?    11:09:38

A.    I don't remember.    11:09:40

CONFIDENTIAL

Page 104

Q.        Is there anything in this e-mail        11:09:41
chain indicating that you did respond to him      11:09:44
personally?                                        11:09:46

A.        Let me read it.                          11:09:46

Nothing that I've seen so far.  I                 11:10:15
mean, it doesn't mean that I didn't, but I don't  11:10:16
remember responding.                               11:10:18

Q.        Have you spoken to Mr. Palihapitiya     11:10:18
at all since he made his comments in 2017 at       11:10:22
Stanford University?                               11:10:25

A.        It's possible.                           11:10:25

Q.        Okay.  Let's play a clip.               11:10:31

MR. WARREN:  This is going                         11:10:34
to be Exhibit 9 -- I'm sorry.  This is             11:10:35
Exhibit 10.                                         11:10:39

(Document marked for                               11:10:40
identification as (Meta) Zuckerberg
Exhibit 10.)                                        11:10:48

MR. SCHMIDT:  And what page                        11:10:48
is this?                                            11:10:49

MR. WARREN:  I couldn't tell                       11:10:52
you which page it is.  I'm sorry.  But we          11:10:53
can find that on a break for you.                  11:10:55

MR. SCHMIDT:  Okay.  It                            11:10:57
defeats the point a little bit of sharing         11:10:58

CONFIDENTIAL

Page 106

hadn't spoken is because of this speech, which I     11:11:47
don't actually think that's the case.     11:11:51

Q.     Okay.  My question was just whether     11:11:53
you agreed this was a video clip of     11:11:54
Mr. Palihapitiya getting interviewed on The Tucker     11:11:58
Carlson Show.     11:12:01

Do you agree with that?     11:12:01

A.     Yes.     11:12:02

Q.     Okay.  And that's a fairly recent     11:12:02
interview?     11:12:04

A.     I think so, yes.     11:12:04

Q.     Okay.  And so given that you     11:12:06
haven't spoken to Mr. Palihapitiya since at     11:12:09
least 2017, stands to reason that you have not     11:12:11
spoken to him about his concerns about the impact     11:12:14
of your product on people's brains, correct?     11:12:17

A.     That's correct.     11:12:20

MR. SCHMIDT:  Objection.     11:12:22

BY MR. WARREN:     11:12:23

Q.     Did you make any efforts to examine     11:12:23
whether his comments at Stanford University were     11:12:25
accurate?     11:12:27

A.     Not specifically what he was     11:12:28
talking about.     11:12:31

I mean, we've studied these topics,     11:12:32

CONFIDENTIAL

Page 107

like -- and I think we've talked about this a                11:12:35

number of times already.  We've done a lot of                11:12:36

research into the effects of the products and how            11:12:38

to make them better for people.                              11:12:40

                    But, I mean, I don't view him or         11:12:42

the things that he's saying, at a high level, as             11:12:44

something that, in particular, need to be                    11:12:46

investigated.                                                11:12:48

    Q.          Okay.  And just to be clear, my              11:12:49

question wasn't about your company.  My question             11:12:52

was about you.                                               11:12:55

                    Did you personally make any effort       11:12:55

to investigate the accuracy of what                          11:13:00

Mr. Palihapitiya was saying about the impact of              11:13:03

your products on people's brains?                            11:13:06

                    MR. SCHMIDT:  Objection.                 11:13:08

  Asked and answered.                                        11:13:09

                    THE WITNESS:  Not other than             11:13:10

  following up on the research that we do                    11:13:11

  internally.  And when I -- when I'm                        11:13:13

  personally following up on something,                      11:13:16

  it's -- I'm not the one who is personally                  11:13:18

  doing the research at the company.                         11:13:20

                    The way that I follow up on              11:13:22

  it is by having a program at the company                   11:13:23

CONFIDENTIAL

Page 108

that can study and do research to    11:13:25

understand things so we can make our    11:13:27

products better.    11:13:29

BY MR. WARREN:    11:13:30

Q.        All right.  Can you please turn to    11:13:30

the first page of this document.    11:13:32

I'd like to direct your attention    11:13:34

to the e-mail from Sheryl Sandberg sent on Tuesday,    11:13:37

December 12, 2017.    11:13:43

Do you see that?    11:13:44

A.        The fourth one down?    11:13:44

Q.        That's correct.    11:13:52

A.        Yes.    11:13:54

Q.        And she writes to several other    11:13:54

employees of Facebook:  "He is writing something.    11:13:58

If we want to influence that, we should pick out    11:14:03

what he said and what we think is correct.  For    11:14:06

example, on dopamine, this is explosive."    11:14:08

Did I read that correctly?    11:14:11

A.        Yes.    11:14:13

Q.        Did you speak to Ms. Sandberg about    11:14:14

whether Mr. Palihapitiya's comments about dopamine    11:14:17

were explosive?    11:14:20

MR. SCHMIDT:  Objection.    11:14:21

Foundation.    11:14:22

CONFIDENTIAL

Page 153

specific things, no.                                    12:34:07

Q.        Okay.  Mr. Zuckerberg, you have        12:34:09
appeared before congressional committees on a       12:34:11
number of occasions, correct?                       12:34:14

A.        Yes.                                   12:34:15

Q.        And you've been asked by members of   12:34:16
Congress about the topic of social media addiction, 12:34:18
correct?                                            12:34:21

A.        I think so.                           12:34:21

Q.        In fact, you were asked whether       12:34:24
your products were addictive during a hearing of    12:34:26
the House of Representatives Energy and Commerce     12:34:28
Subcommittee, correct?                              12:34:34

A.        I don't remember specifically, but    12:34:34
I think this topic has come up at some of the       12:34:36
congressional hearings I've testified at.           12:34:39

Q.        Okay.  I'd like to play you a clip    12:34:42
from that hearing, which we'll mark for             12:34:44
identification as Exhibit 19.                       12:34:46

MR. WARREN:  Again, Counsel,        12:34:49
we'll be handing you a transcript.                  12:34:50

MR. SCHMIDT:  Do you want to        12:34:52
see the transcript of these as we show              12:34:53
them?  Would that help you?                         12:35:00

THE WITNESS:  I mean, either        12:35:00

CONFIDENTIAL

Page 154

way.                                                          12:35:02

MR. SCHMIDT:  Okay.  If you                                   12:35:02

want them, let me know.                                       12:35:02

THE WITNESS:  Okay.

MR. SCHMIDT:  Can you tell

me what page you're playing from.

TRIAL TECH:  72.

MR. SCHMIDT:  Okay.                                           12:35:04

MR. WARREN:  And the clip                                     12:35:04

I'll be playing is also available online,                    12:35:07

on C-SPAN's website.                                          12:35:08

Can we roll 29A.                                              12:35:11

(Document marked for                                         12:35:13

identification as (Meta) Zuckerberg

Exhibit 19.)                                                 12:35:14

(Video playback.)                                            12:35:14

SPEAKER:  In 1994,                                           12:35:16

Democratic congressman Henry Waxman chaired                  12:35:18

a hearing with the CEOs of our nation's                      12:35:20

largest tobacco companies.  During his                       12:35:22

opening statement he stated, and I quote,                    12:35:24

"Sadly, this deadly habit begins with our                    12:35:29

kids.  In many cases they become hooked                      12:35:32

quickly and develop a lifelong addiction                     12:35:35

that is nearly impossible to break."                         12:35:38

CONFIDENTIAL

Page 155

So, Mr. Zuckerberg and 12:35:40 Mr. Dorsey, you profit from your company's 12:35:42 hooking users to your platforms by 12:35:46 capitalizing on their time. So, yes or no, 12:35:48 do you agree that you make money off of 12:35:52 creating an addiction to your platforms? 12:35:55

Mr. Zuckerberg? 12:35:58

MR. ZUCKERBERG: 12:35:59 Congressman, no, I don't agree with that -- 12:36:00

SPEAKER: Thank you. That's 12:36:03 all I needed, a yes or a no. 12:36:04

(End video playback.) 12:36:06

BY MR. WARREN: 12:36:08

Q.      So that we have a clear record, 12:36:09 Mr. Zuckerberg, that was a video clip of you 12:36:10 testifying before Congress on March 25th of 2021, 12:36:12 yes? 12:36:17

MR. SCHMIDT: And if I may 12:36:17 just object that he wasn't allowed to 12:36:18 answer your question, in the question that 12:36:20 he was asked. 12:36:22

MR. WARREN: Well, there's 12:36:22 not -- there's not much I can do about 12:36:22 that. 12:36:25

MR. SCHMIDT: You could use 12:36:27

Page 156

a question.  There is a lot to answer.  But    12:36:28
we can put that aside.    12:36:28

MR. WARREN:  I doubt we'd be    12:36:28
able to find a question where he wasn't    12:36:31
interrupted by a senator.  It's harder than    12:36:33
you think.    12:36:35

MR. SCHMIDT:  I don't doubt    12:36:36
that.    12:36:37

BY MR. WARREN:    12:36:37

Q.    Mr. Zuckerberg, so we have a clear
record, that's a video clip of you testifying    12:36:37
before Congress, yes?    12:36:39

A.    Yes.    12:36:40

Q.    Okay.  And that was March 25, 2021,    12:36:40
thereabouts?    12:36:43

A.    I don't remember the exact date.    12:36:44

Q.    Okay.  And, of course, when you    12:36:45
testified, you understood your obligation not to    12:36:48
knowingly provide false information to Congress,    12:36:51
yes?    12:36:54

A.    Yes, of course.    12:36:54

Q.    Okay.  And, similarly, you    12:36:55
understood your obligation not to knowingly conceal    12:36:56
information from Congress?    12:37:00

A.    Yes.    12:37:00

CONFIDENTIAL

Page 171

off Senator Ossoff.    12:50:54

MR. SCHMIDT:  Noted.  I'll    12:50:58

object to showing him the clip where he    12:50:59

couldn't explain what he was trying to say.    12:51:01

MR. WARREN:  All right.    12:51:02

BY MR. WARREN:    12:51:02

Q.    Mr. Zuckerberg, that was you    12:51:02
answering questions at the hearing of the Senate    12:51:03
Judiciary Committee or some committee of the    12:51:08
Senate?    12:51:10

A.    Yes, I think so.    12:51:11

Q.    All right.  So three times before    12:51:11
Congress you've testified under oath that you don't    12:51:13
give your teams goals of increasing the amount of    12:51:15
time people spend on your platforms, correct?    12:51:18

A.    Yes.    12:51:20

Q.    Okay.  But isn't it the truth that    12:51:21
your company has expressly set goals, not just for    12:51:22
how much time people spend on your platform, but    12:51:27
how much time teenagers spend on your platforms?    12:51:29

A.    I mean, maybe in the past, before    12:51:34
we changed that.    12:51:36

But for several years at this    12:51:37
point, our practice is not to give teams goals to    12:51:40
specifically optimize or increase time spent.    12:51:44

Page 172

The -- I mean, I think that my     12:51:47
answer, when I was talking -- answering the     12:51:50
senator's questions here, characterizes my views on     12:51:52
this pretty clearly.     12:51:56

But I think there's a very big     12:51:58
difference between building something that is     12:52:00
useful and, therefore, people want to use it more     12:52:01
because it's useful, versus giving a team a goal to     12:52:04
try to increase the amount of time that people     12:52:07
spend.     12:52:10

So if we build something that's     12:52:10
useful and, therefore, people want to use it more,     12:52:12
I don't think that's bad.  That's good, right?  You     12:52:15
built something that's more useful in people's     12:52:19
lives.     12:52:21

But that's pretty different from     12:52:21
saying that we're going to give people -- the teams     12:52:23
a goal, specifically, to, like, make it so people     12:52:26
are spending more time on the products.     12:52:29

Q.     Okay.  I'm going to show you a     12:52:30
document bearing the Bates stamp     12:52:32
META3047MDL-046-00012613.     12:52:37

And we're done with those,     12:52:44
Mr. Zuckerberg.     12:52:46

We'll mark this one as Exhibit 23.  12:52:46

CONFIDENTIAL

Page 177

A.        It looks like it.  Give me a chance    12:57:05
to read what I wrote here.    12:57:07

Okay.    12:57:46

Q.        You can put that document to one    12:57:47
side.    12:57:49

I'm now handing you a document    12:57:49
bearing the Bates stamp META3047MDL-003-00133741.    12:57:52
We'll mark this for identification as Exhibit 24.    12:58:04

(Document marked for    12:58:07
identification as (Meta) Zuckerberg
Exhibit 24.)    12:58:07

BY MR. WARREN:    12:58:07

Q.        Okay.  This is a copy of an    12:58:22
e-mail -- well, let me withdraw that.    12:58:23

I'll represent to you that this    12:58:26
document was produced to us by Meta's lawyers and    12:58:28
came from your company's internal files.    12:58:31

Do you have any reason to dispute    12:58:34
that?    12:58:35

A.        No.    12:58:35

Sorry.  I got a few copies of this.    12:58:36

Q.        Okay.  This is a copy of an e-mail    12:58:39
you sent to Susan Li and David Wehner, correct?    12:58:44

A.        It looks like it, yes.    12:58:48

Q.        And the subject of this e-mail is    12:58:49

CONFIDENTIAL

Page 178

"H1 '16 Company Goals:  Feedback required," yes?    12:58:51

A.    Yes.    12:58:56

Q.    And H1 '16 will be referring to the    12:58:59
first half of 2016, yes?    12:59:04

A.    Yes.    12:59:06

Q.    Okay.  And in this e-mail you set    12:59:06
out some company goals for the next three years.    12:59:07
That's why it says, "3 Year Arc," correct?    12:59:10

A.    I guess so.  I mean, I really don't    12:59:15
remember this that specifically.  But that, I    12:59:24
think, is what -- what it looks like.    12:59:27

Q.    Okay.  And the first goal is    12:59:29
25 billion in revenue, yes?    12:59:32

A.    It looks like it.    12:59:34

Q.    And the second goal is time spent    12:59:37
increases by 12 percent, correct?    12:59:39

A.    Yes.    12:59:41

Q.    Okay.  You can put that document to    12:59:42
one side.    12:59:44

I'm going to hand you a document    12:59:45
bearing the Bates stamp META3047MDL-003-00134687.    12:59:47
We'll mark this for identification as Exhibit 25.    12:59:58

(Document marked for    13:00:01
identification as (Meta) Zuckerberg
Exhibit 25.)    13:00:02

CONFIDENTIAL

Page 179

BY MR. WARREN:                                           13:00:02

    Q.     Once again, I'll represent to you     13:00:19
that this was produced to us by Meta's lawyers and      13:00:21
came from your company's internal files.                13:00:23

        Any reason to dispute that?            13:00:26

    A.     No.                                   13:00:27

    Q.     Okay.  This is an e-mail from ███    13:00:28
███ to you and several others, correct?                 13:00:34

        MR. SCHMIDT:  Object to                13:00:40
characterization.                                       13:00:41

        THE WITNESS:  It looks like            13:00:44
it.                                                     13:00:44

        MR. SCHMIDT:  It looks like            13:00:46
it's from -- maybe I misheard your                      13:00:47
question.  Let me withdraw it.  I'm sorry.              13:00:48
I misheard your question.                               13:00:50

BY MR. WARREN:                                          13:00:52

    Q.     I'm sorry.  What was the answer,      13:00:52
Mr. Zuckerberg?                                         13:00:54

        Let me get --                          13:00:54

    A.     I think it was yes, but I...           13:00:54

    Q.     Let's just get a clean record.        13:00:57

        Mr. Zuckerberg, this is an e-mail      13:00:59
from ██████ to you and several others,                  13:01:00
correct?                                                13:01:02

CONFIDENTIAL

Page 180

A.          Yes, it looks like it.          13:01:03

Q.          Okay.  And what was ████████          13:01:04
role in the company?          13:01:06

A.          I think he might have had a few          13:01:10
different roles, so I don't -- I don't remember          13:01:12
exactly what his role was at this point.          13:01:14

Q.          What are the roles that you can          13:01:16
recall?          13:01:17

A.          I think he came in and was          13:01:18
originally working on partnerships.          13:01:23

Q.          Okay.  And ████████ --          13:01:28

A.          No, no, no.  I'm sorry.  I think          13:01:31
he -- that's a different person that I have in          13:01:33
mind.  I think he might have been -- I think          13:01:34
████████ this ██████ was a product manager.          13:01:38

Q.          Okay.  And I'm sorry to cut you          13:01:40
off.  I thought you were done.          13:01:42

          ████████ is sending you materials          13:01:43
for a discussion the following day about team          13:01:46
strategy and goals, correct?          13:01:50

A.          It looks like it.          13:01:51

Q.          Okay.  He says in the third          13:01:55
paragraph:  "We focused this conversation on the          13:01:56
key 2017 bets that we believe are most likely to          13:01:59
set us up for success with teens and kids," yes?          13:02:03

CONFIDENTIAL

Page 181

A.        That's what it says.        13:02:05

Q.        Okay.  Let's take a look at the        13:02:14
deck, which is two pages forward.  I'll represent        13:02:16
to you this is the attachment to that e-mail.        13:02:21

MR. WARREN:  Counsel, will        13:02:27
you accept that representation?        13:02:29

MR. SCHMIDT:  Yes, if you're        13:02:30
representing it.        13:02:31

MR. WARREN:  Indeed I am.        13:02:32

BY MR. WARREN:        13:02:33

Q.        Mr. Zuckerberg, the title of this        13:02:35
deck is "2017 Teens Strategic Focus," yes?        13:02:37

A.        It looks like it.        13:02:41

Q.        I'll have you flip a couple pages        13:02:43
to the page ending in 692.        13:02:45

A.        Okay.        13:03:17

Q.        Okay.  What's the title of this        13:03:17
slide?        13:03:19

A.        "2017 Top-Line Goal."        13:03:19

Q.        And what's the strategic goal        13:03:23
identified?        13:03:25

A.        It says, "Time Spent Share."        13:03:25

Q.        How is that defined?        13:03:30

A.        I don't know.  Does it say here?        13:03:32

Q.        Well, underneath, it says:  "What        13:03:37

CONFIDENTIAL

Page 182

percent of all, under, or equal to 18 smartphone    13:03:41

and tablet time is an FB experience?"    13:03:45

Do you see that?    13:03:48

A.    Yes.    13:03:48

Q.    Okay.  What's the operational    13:03:49

metric identified for this goal?    13:03:52

A.    I mean, I'm just reading what it    13:03:53

says here, but it says aggregate total time spent.    13:03:57

Q.    And there's an example of that    13:04:00

underneath, right, 15 billion minutes per day    13:04:01

across the Facebook family?    13:04:04

A.    Yes.    13:04:05

Q.    Okay.  You can put that document to    13:04:06

one side.    13:04:08

Mr. Zuckerberg, as part of Meta's    13:04:08

strategic focus on teens, it set specific    13:04:12

quantitative goals for how much time teenagers    13:04:17

spend on its platforms, correct?    13:04:21

A.    I mean, this document -- and I    13:04:23

think how we discussed this in 2017 and before --    13:04:26

yes, I think we focused on time spent as one of the    13:04:31

main engagement goals.    13:04:35

And I think after some time during    13:04:37

2017 and beyond for -- at this point -- about the    13:04:39

last ten years, we've primarily focused on other    13:04:43

CONFIDENTIAL

Page 183

metrics and have retired giving teams goals based          13:04:47

on time spent.                                             13:04:52

Q.        Okay.  I'm going to hand you a          13:04:53

document Bates-stamped META3047MDL-014-00382310.           13:04:54

MR. WARREN:  We'll mark this          13:05:06

for identification as Exhibit 26.                          13:05:07

(Document marked for          13:05:09

identification as (Meta) Zuckerberg                        13:05:10

Exhibit 26.)                                               13:05:10

MR. WARREN:  And the          13:05:10

document also includes the attachment,                     13:05:10

which begins with the next consecutive                     13:05:12

Bates number.                                              13:05:15

BY MR. WARREN:                                             13:05:16

Q.        This is an e-mail to you from 2017,     13:05:23

attaching a number of pre-reads ahead of meetings          13:05:26

the following day, correct?                                13:05:29

A.        It looks like it.                       13:05:30

Q.        Okay.  And I'll represent that I've     13:05:34

included in this exhibit the first listed                  13:05:36

attachment, which is identified as "17_H2 2017             13:05:38

Instagram Strategy.pdf."                                   13:05:46

Can you turn to that attachment,          13:05:48

please.                                                    13:05:51

MR. WARREN:  And, Counsel,          13:05:51

CONFIDENTIAL

Page 184

will you accept that representation?    13:05:52

MR. SCHMIDT:  I don't know    13:05:53
that you need me to, but yes, I will, if    13:05:53
you're making it.    13:05:57

MR. WARREN:  All right.    13:05:57

BY MR. WARREN:    13:05:58

Q.    This is called "H2 2017 Instagram    13:05:58
Strategy," yes?    13:06:01

A.    Yes, it looks like it.    13:06:03

Q.    And it includes a section called    13:06:08
"Goals."    13:06:11

Do you see that?  It's just on the    13:06:12
first page.    13:06:38

A.    Oh.  Oh, right at the top.  Okay.    13:06:38

Q.    Okay.  So just so we have a clean    13:06:43
record, it says, "H2 2017 Instagram Strategy," and    13:06:45
then it says "Goals," correct?    13:06:49

A.    Yes.  That looks like the first    13:06:52
section.    13:06:54

Q.    Okay.  And Row 4 says, "U.S. teen    13:06:54
DAP Accounts."    13:06:58

Do you see that?    13:06:59

A.    Yes.    13:07:00

Q.    And DAP means daily active people,    13:07:03
yes?    13:07:07

CONFIDENTIAL

Page 185

A.          Yes.                                      13:07:07

Q.          So that's a measure of how many          13:07:07
people are on the platform in any given day?          13:07:10

A.          Yes.                                      13:07:12

Q.          Okay.  And the goal set                  13:07:12
is 12.1 million U.S. teen daily active people          13:07:19
accounts, correct?                                    13:07:24

A.          It looks like it.                        13:07:24

Q.          Okay.  And Row 10 says, "Time            13:07:25
spent," yes?                                          13:07:27

A.          Yes.                                      13:07:28

Q.          And the goal set is 28 minutes?          13:07:31

A.          Yes.                                      13:07:35

Q.          Please flip to the page ending in        13:07:39
2310.                                                 13:07:42

Do you see the heading titled,            13:07:51
"Grow Time Spent Through Interests"?                  13:07:54

A.          I do.                                     13:07:57

Q.          And the first line under the table       13:07:58
says:  "We have increased time spent by +16 percent   13:07:59
in the last year through feed ranking and other       13:08:05
wins."                                                13:08:12

Do you see that?                          13:08:13

A.          I do.                                     13:08:13

Q.          And then look at the table.  This        13:08:14

CONFIDENTIAL

Page 186

indicates that the first half goal is 28 minutes    13:08:15

and the second half goal is 31 minutes, correct?    13:08:19

      A.      It looks like it, yes.    13:08:21

      Q.      In other words, the goal is to    13:08:28

increase time spent?    13:08:29

      A.      Again, if you're asking about this    13:08:31

document from 2017, then at the time, yes.  And    13:08:34

since then, we have deprecated having time spent    13:08:38

goals.    13:08:43

      Q.      Okay.  You can put that document to    13:08:43

one side.    13:08:45

      I'm showing you a document bearing    13:08:46

the Bates stamp META3047MDL-050-00330868.    13:08:47

      (Document marked for    13:09:01

identification as (Meta) Zuckerberg

Exhibit 27.)    13:09:01

      MR. WARREN:  And I'll be    13:09:01

introducing -- I'll be marking this for    13:09:02

identification as Exhibit 27.    13:09:05

      And it includes one of the    13:09:06

attachments.  That attachment begins with    13:09:07

the Bates number META3047MDL-050-00330880.    13:09:11

BY MR. WARREN:    13:09:25

      Q.      Okay.  So, Mr. Zuckerberg, this is    13:09:26

an e-mail sent to you on June 3, 2019, correct?    13:09:29

CONFIDENTIAL

Page 194

Q.        And that's what you were hoping to    13:16:41
achieve for Instagram by 2026, yes?            13:16:43

A.        Yeah.  I mean, I think that these     13:16:48
are the basic qualitative statements around if 13:16:49
we're -- if we're succeeding.  And if our strategy 13:16:53
is delivering the value for people that we expect 13:16:55
it to, then these are some of the outcomes that we 13:16:58
might expect to see in the world.              13:17:01

Q.        Mr. Zuckerberg, if users spend more  13:17:03
time on their Instagram or Facebook feed, then, 13:17:09
generally speaking, they'll see more ads, yes? 13:17:13

A.        Generally speaking, yes.             13:17:15

Q.        And that's also true for Instagram   13:17:17
Reels and Explore, right?  If users spend more time 13:17:19
on those surfaces, they'll see more ads, yes?  13:17:22

A.        In general, yes.  I mean, it varies   13:17:25
per person and by a bunch of different categories. 13:17:28
But in general, yes.                           13:17:31

Q.        And you don't deny that the more     13:17:33
ads get seen, the more ad revenue Meta earns, yes? 13:17:35

MR. SCHMIDT:  Objection.                        13:17:41
Foundation.                                     13:17:42

THE WITNESS:  There are                         13:17:42
other things that go into -- I mean, our        13:17:43
revenue is mostly based on whether people       13:17:44

CONFIDENTIAL

Page 195

engage with the ads, not how many ads are                13:17:47

seen.                                                     13:17:50

But, in general, the more                                13:17:50

ads that people see, the more opportunities              13:17:52

we have to show people relevant ads.                     13:17:56

BY MR. WARREN:                                           13:17:57

Q.      Which means the more advertising                 13:17:58

revenue you have a chance to earn, yes?                  13:17:59

MR. SCHMIDT:  Objection.                                 13:18:02

THE WITNESS:  Yeah.  In                                  13:18:03

general, from a business perspective, I                  13:18:03

think that that's roughly correct.                       13:18:05

BY MR. WARREN:                                           13:18:07

Q.      Okay.  Mr. Zuckerberg, isn't it                  13:18:07

true that the design of Facebook and Instagram           13:18:10

makes it hard for addicted users to quit?                13:18:13

A.      I don't agree with that.                         13:18:17

Q.      Okay.  Let's turn back to an                     13:18:19

exhibit that we looked at earlier.  And this is          13:18:22

Exhibit 14.                                              13:18:29

We're going to go to the page                            13:18:35

ending in 203 of this document.                          13:18:52

A.      203?                                             13:19:09

Q.      Yes, sir.                                        13:19:10

A.      Okay.                                            13:19:13

CONFIDENTIAL

Page 224

Q.        You can put that document to one side.                                                          14:08:01
14:08:04

I'm going to hand you a document bearing the Bates stamp META3047MDL-074-00027496. We'll mark this for identification as Exhibit 31.                                                          14:08:12
14:08:15
14:08:20

(Document marked for identification as (Meta) Zuckerberg Exhibit 31.)                                                          14:08:26
14:08:26

BY MR. WARREN:                                                          14:08:26

Q.        And, again, I'll represent that this was produced by Meta's lawyers and obtained from your company's internal files.                                                          14:08:27
14:08:28
14:08:30

Do you have any reason to dispute that?                                                          14:08:32
14:08:33

A.        No.                                                          14:08:34

Q.        Have you seen this document before?                                                          14:08:39

A.        I don't think so.                                                          14:08:40

Q.        All right.  The document is titled, "Problematic Use On-Platform Measurement," correct?                                                          14:08:46
14:08:48

A.        Yes.                                                          14:08:52

Q.        What's the date of the document?                                                          14:08:57

A.        It's a range, from December 2022 to January 2023.                                                          14:09:00
14:09:08

Q.        Okay.  And it indicates on the front page that it was authored by Elena Davis and                                                          14:09:08
14:09:11

CONFIDENTIAL

Page 225

Josh Latshaw.  Do you know who those people are?  14:09:15

A.          I'm not familiar with them.  14:09:19

Q.          Do you have any reason to dispute  14:09:22
that they are X-Meta Well-being researchers, as  14:09:23
suggested underneath?  14:09:30

A.          Not particularly.  14:09:31

Q.          And unfortunately this document was  14:09:32
produced to us without page numbers.  14:09:34

MR. WARREN:  So, Paul, we've  14:09:37
taken the liberty of adding those in the  14:09:38
bottom right-hand corner.  I take it you  14:09:40
won't object to that?  14:09:44

MR. SCHMIDT:  I will not  14:09:44
object to that.  Thank you.  14:09:46

MR. WARREN:  All right.

MR. SCHMIDT:  Thank you for
flagging.

MR. WARREN:  Yes.  14:09:47

BY MR. WARREN:  14:09:47

Q.          Please flip to Page 2,  14:09:47
Mr. Zuckerberg.  14:09:49

A.          Okay.  14:09:57

Q.          Okay.  Please direct your attention  14:09:57
to Number 2 in the left-hand column.  14:09:59

This indicates that your  14:10:03

CONFIDENTIAL

Page 226

researchers surveyed approximately 30,000 youth and    14:10:04

30,000 adult Instagram users in 12 countries,    14:10:08

correct?    14:10:12

A.        That's what it says.    14:10:12

Q.        That's more than 24 people?    14:10:16

A.        Definitely.    14:10:18

Q.        And the goal here was to advance    14:10:21

Meta's "understanding and measurement of potential    14:10:23

problematic use on our platforms," correct?    14:10:26

A.        That's what it says, yes.    14:10:28

Q.        If you look at the first finding,    14:10:34

it indicates that:  "Users' perceived control can    14:10:37

be validly measured across age cohorts, assessing    14:10:43

low attentiveness and low capability to change    14:10:47

platform use."    14:10:55

Do you see that?    14:10:56

MR. SCHMIDT:  I think you    14:10:56

missed some words.    14:10:57

MR. WARREN:  Well, I'll read    14:10:58

it again since I may have missed some    14:11:00

words.    14:11:02

BY MR. WARREN:    14:11:02

Q.        Mr. Zuckerberg, the first finding    14:11:03

in this document is that "Users' perceived control    14:11:04

can be validly measured across age cohorts with    14:11:06

CONFIDENTIAL

Page 227

questions assessing low attentiveness around     14:11:09

platform use (i.e., spending more time, checking     14:11:12

and consuming content without realizing it) and low     14:11:16

capability to change platform use (i.e., low     14:11:20

confidence in ability to reduce time, checking, or     14:11:23

interactions)."     14:11:25

              Did I get that correctly?     14:11:26

    A.      Yes, you read that correctly.     14:11:28

    Q.      So that's a -- that's a big     14:11:29

sentence, so let me break that down.     14:11:30

              Low attentiveness here is defined     14:11:32

as spending more time checking and consuming     14:11:37

content without realizing it, yes?     14:11:39

    A.      It seems like that's how they are     14:11:41

defining it, yes.     14:11:54

    Q.      Okay.  And low capability to change     14:11:55

platform use is defined as low confidence in     14:11:57

ability to reduce time, checking or interactions;     14:12:01

is that fair?     14:12:05

    A.      That seems to be how they are     14:12:06

defining it, yes.     14:12:10

    Q.      Okay.  And it looks like what they     14:12:12

are doing is measuring those two phenomena across     14:12:13

age cohorts; is that fair?     14:12:19

    A.      They say they -- that it has been,     14:12:20

Page 228

can be, validly measured across age cohorts, but    14:12:47
I'm not sure how they do that.    14:12:50

Q.    Okay.  Let's take a look at how    14:12:54
they did that.  Can you please turn to Page 9.    14:12:55

This page identifies the specific    14:13:09
survey questions that your researchers asked    14:13:12
related to low attentiveness and low capability,    14:13:15
correct?    14:13:19

A.    Sorry.  I'm still just reading.    14:13:19

Q.    Of course.  Take your time.    14:13:27

A.    Okay.  I'm on Page 9.    14:13:55

Q.    All right.  Thank you, sir.    14:13:56

This page identifies the specific    14:13:57
survey questions that your researchers asked    14:13:59
related to low attentiveness and low capability,    14:14:02
correct?    14:14:05

A.    Does it say that these are the    14:14:05
questions they asked?    14:14:21

Q.    The heading indicates that they    14:14:22
were conducting an on-platform survey.    14:14:26

Do you agree with that?    14:14:29

A.    Yes.  I agree that they said that    14:14:31
they measured them in an on-platform survey.    14:14:36

Q.    All right.  And does that suggest    14:14:40
to you that the questions that follows are the    14:14:40

CONFIDENTIAL

Page 238

A.        Yes.                                    14:28:28

Q.        Those were your words, yes?             14:28:28

A.        Yes.  I mean, this is talking about     14:28:31
a specific product that is being developed in this    14:28:32
context.                                          14:28:34

But I think in a lot of contexts,    14:28:35
that sentiment is accurate, although not all, and     14:28:37
there's nuance in all of this.  But broadly, yes.     14:28:40

Q.        Okay.  You can put that to one         14:28:44
side.  We're done with that.                      14:28:46

Mr. Zuckerberg, Meta has repeatedly     14:28:47
denied that increased use of Facebook and Instagram   14:28:52
by teens has any correlation with increased harms     14:28:56
to their mental health, correct?                  14:29:01

MR. SCHMIDT:  Objection.                14:29:03
Foundation.                                       14:29:04

THE WITNESS:  I'm not sure              14:29:05
what you're referring to there.                   14:29:07

BY MR. WARREN:                                     14:29:09

Q.        Okay.  So let me show you another      14:29:09
exhibit.  We'll mark this for identification as       14:29:13
Exhibit 33.                                       14:29:15

(Document marked for                   14:29:18
identification as (Meta) Zuckerberg               
Exhibit 33.)                                      14:29:19

CONFIDENTIAL

Page 239

BY MR. WARREN:                                          14:29:19

Q.        And I'll represent to you that this    14:29:19
was obtained from the Senate Judiciary Committee's    14:29:21
website.                                               14:29:27

Do you have any reason to dispute    14:29:27
that this is publicly available on the Senate's    14:29:36
website?                                               14:29:39

A.        No.                                     14:29:39

Q.        Okay.  And this is a letter from    14:29:40
Facebook, dated December 23, 2020, yes?               14:29:42

A.        It looks like it, yes.

Q.        Just going off the front page --    14:29:55
I'm sorry.  I did not mean to talk over you.  Could    14:29:57
you answer again?                                     14:30:00

A.        It looks like it, yes.           14:30:00

Q.        Okay.  And it indicates that it's    14:30:02
responding to questions, for the record, from the    14:30:03
Committee on the Judiciary's November 17, 2020,       14:30:06
virtual hearing, correct?                             14:30:10

A.        Yes, that's what it looks like.    14:30:11

Q.        Okay.  Can you direct your        14:30:16
attention to Page 125.                                14:30:18

A.        Sure.                            14:30:21

Q.        And by the way, I'm happy to      14:30:21
represent to you that November 17, 2020, hearing is    14:30:26

CONFIDENTIAL

Page 240

one of the clips that we watched earlier today.    14:30:30

MR. WARREN:  Counsel, will    14:30:34
you accept that representation?    14:30:35

MR. SCHMIDT:  Sure, if    14:30:37
you're making that representation.  I don't    14:30:38
think you need me to, but...    14:30:40

BY MR. WARREN:    14:30:43

Q.    Okay.  So Meta was asked the    14:30:43
following question, Numbered Question 109:    14:30:49

"Is Facebook able to determine    14:30:53
whether increased use of its platform among teenage    14:30:56
girls has any correlation with increased signs of    14:31:00
anxiety within this demographic, through the    14:31:03
information collected from its suicide detection    14:31:07
algorithm or other technology?"    14:31:09

Did I read the question correctly?    14:31:11

A.    Yes, I think you did.    14:31:13

Q.    And how did your company respond?    14:31:27

A.    It looks like we said no.    14:31:30

Q.    Okay.  So let me direct your    14:31:33
attention back to Exhibit 6, which is one of the    14:31:35
documents that we looked at earlier in the day.    14:31:41

THE WITNESS:  Will you send    14:31:46
that back to me?    14:31:47

MR. SCHMIDT:  Yeah.  We're    14:31:48

CONFIDENTIAL

Page 241

getting it for you.                                          14:31:49

THE WITNESS:  Okay.                    14:31:50

Are we done with this?                 14:31:53

BY MR. WARREN:                                               14:31:56

Q.      We are for now.  We'll be coming     14:31:56
back to it.                                                  14:31:59

A.      Okay.                                      14:32:02

Q.      Okay.  This is the internal           14:32:05
document called "Youth Empathy Framing" that we             14:32:06
looked at earlier, yes?                                     14:32:10

A.      Yes.                                       14:32:11

Q.      Can you flip to the second page,      14:32:12
please.                                                     14:32:15

Do you see the heading titled,         14:32:19
"Known Negative Effects of FB and/or Social Media           14:32:21
in General on Teens"?                                       14:32:26

A.      Yes.                                       14:32:28

Q.      The last bullet says, "Increase in    14:32:36
anxiety."                                                   14:32:40

Did I read that correctly?             14:32:41

A.      Yes, you read that correctly.              14:32:42

Q.      Can you turn to the next page.  The    14:32:50
bottom of this page references the youth empathy            14:32:59
team's anticipated work in the second half of 2017          14:33:03
and the first half of 2018, correct?                        14:33:05

CONFIDENTIAL

Page 242

A.        Sorry.  Can you say that again.        14:33:08

Q.        The bottom of this page references        14:33:10
the youth empathy team's anticipated work in the        14:33:12
second half of 2017 and the first half of 2018,        14:33:16
correct?        14:33:19

A.        Let me read it.        14:33:19

Q.        Let me withdraw the question.        14:33:28

There's a heading in the document        14:33:36
that says, "Q4 2017 + Q1 2018."        14:33:37

Do you see that?        14:33:43

A.        Yes.        14:33:43

Q.        All right.  So this document was        14:33:44
created before the responses that Facebook provided        14:33:44
to the Senate Judiciary Committee in December 2020,        14:33:46
correct?        14:33:50

A.        It doesn't have a date on it, but I        14:33:51
assume from that, that the answer is yes.  But I        14:34:04
don't know the exact date.  It seems like that's        14:34:08
knowable.        14:34:11

Q.        Okay.  Let's go back to the        14:34:12
responses to the committee that's in front of you.        14:34:14

A.        Okay.        14:34:17

Q.        And that's Exhibit 33.  And we'll        14:34:17
go back to the same page that we were looking at,        14:34:22
which is Page 125.        14:34:25

CONFIDENTIAL

Page 274

going to respectfully move to strike                    15:07:57

everything after the first sentence.                    15:08:00

MR. SCHMIDT:  You can't --                    15:08:01

you can't interrupt him mid answer.                     15:08:01

MR. WARREN:  I did not                    15:08:03

interrupt him in mid answer.                            15:08:04

MR. SCHMIDT:  I think you                    15:08:05

were still speaking.  Were you still                    15:08:06

speaking?                                               15:08:08

THE WITNESS:  Yeah, but it's                    15:08:08

fine.                                                   15:08:09

MR. WARREN:  Okay.                    15:08:10

MR. SCHMIDT:  I'll state for                    15:08:10

the record, you're gracious.  It's not                 15:08:10

fine.                                                   15:08:12

Please don't interrupt.                    15:08:13

MR. WARREN:  I didn't.                    15:08:13

I'm going to move to strike                    15:08:14

everything after the first sentence which              15:08:14

was nonresponsive to my question.                       15:08:16

MR. SCHMIDT:  And we'll                    15:08:18

oppose that motion.                                     15:08:19

BY MR. WARREN:                                          15:08:20

    Q.      Mr. Zuckerberg, 3.1 percent of             15:08:21

billions of users is a lot of people, wouldn't you     15:08:22

CONFIDENTIAL

Page 275

agree?                                                    15:08:25

        A.        Yes.  3 percent of billions of         15:08:26

people is a lot of people.                                15:08:30

        Q.        Okay.                                   15:08:32

        A.        It's not -- not the majority, but       15:08:32

it's -- obviously, it's millions of people.               15:08:35

        Q.        Yeah.  Okay.  As a parent yourself,     15:08:38

do you think you have a right to know if a product        15:08:46

your kid is using is addictive?                           15:08:49

                MR. SCHMIDT:  Objection.                  15:08:52

  Foundation.                                             15:08:52

                THE WITNESS:  I think that                15:08:53

there's a lot to sort of unpack in that.                  15:08:56

                I know there's a lot that's               15:08:59

just hard to exactly know.  So as a parent,               15:09:10

I definitely care about the impact of                     15:09:14

anything that my kids use.  And because of                15:09:16

that, myself, or my wife, are probably                    15:09:19

going to look into whether the products                   15:09:24

that we give our children are good to use.                15:09:26

                And we also don't just give               15:09:28

it to them.  We also kind of oversee how                  15:09:30

they are used.  And our kids are younger,                 15:09:33

et cetera.                                                15:09:35

BY MR. WARREN:                                            15:09:35

CONFIDENTIAL

Page 336

BY MS. CHAN:                                              16:50:47

Q.          So, Mr. Zuckerberg, this is an              16:50:48

email chain where you write the original e-mail          16:50:48

starting at the bottom of the first page, which is       16:50:49

dated February 7, 2016, at 2:53 p.m., correct?           16:50:51

A.          Sorry.  You are talking about on            16:50:56

the --                                                   16:51:26

Q.          The very bottom of the first page           16:51:26

of the original first e-mail in this chain, which        16:51:28

is from you, on Sunday, February 7, 2016, at             16:51:30

2:53 p.m.; is that correct?                              16:51:35

A.          Sorry.  What is the question?  Was           16:51:37

that the e-mail that I wrote?                             16:51:41

Q.          Yes.                                         16:51:42

A.          Yes, it looks like it.                       16:51:44

Q.          And you write the first e-mail in           16:51:45

the chain.  And this is the first e-mail in the          16:51:47

chain, correct?                                          16:51:49

A.          It looks like it.                            16:51:50

Q.          And this is the way it got produced         16:51:56

to us and printed out.  But you see your subject         16:51:58

line, based on the e-mail above, was "Live              16:52:01

lockdown"?                                               16:52:06

A.          Yeah, I see that.                            16:52:07

Q.          Okay.  And then the e-mails in this         16:52:08

CONFIDENTIAL

Page 337

thread were sent in the normal course of your work    16:52:10

at Meta?    16:52:14

A.        I assume so.  What -- I'm not sure    16:52:15

what that means.    16:52:20

Q.        Within the scope of your work at    16:52:21

Meta?    16:52:23

A.        Yeah.  Yeah.    16:52:23

Q.        Great.  And in the first sentence    16:52:24

of the e-mail that you wrote on February 7, 2016,    16:52:26

at 2:53, states:  "I'm excited about pushing ahead    16:52:29

as fast as we can on Live because it is the most    16:52:35

unique and promising new development in two spaces    16:52:39

we care about deeply but are behind in: video and    16:52:42

teens."    16:52:46

Did I read that correctly?    16:52:47

A.        Yes.    16:52:48

Q.        And "Live" here refers to the    16:52:50

product feature that exists on both Instagram and    16:52:51

Facebook today that allows users to both stream and    16:52:55

watch realtime video content; is that correct?    16:52:58

A.        I believe so, yes.    16:53:01

Q.        And you were noting here that the    16:53:04

Live product was the most promising way to grow in    16:53:05

the space of teen users, which was a space Meta was    16:53:09

behind on; is that right?    16:53:12

Page 425

something like YouTube Kids or a kids version of an    18:52:23

app.  I don't know if that's sort of the research    18:52:27

that we had on that.    18:52:30

Q.    Because they have kind of similar    18:52:30

interests to a 13 and 14-year-old?    18:52:32

A.    Or maybe they just -- maybe it's    18:52:34

just aspirational.  Maybe they wanted to be more    18:52:38

like the other teens.  I'm not sure.  I think we    18:52:40

need to study that more.    18:52:42

But I think that that's -- I think    18:52:43

by the time that they are close enough to being 13    18:52:44

and being able to use those services, I think they    18:52:46

kind of just want to use those services, not just a    18:52:49

kid version.    18:52:53

Q.    We can put that document aside.    18:52:54

Mr. Zuckerberg, you are aware, as a    18:52:59

general matter, that some users of Instagram and    18:53:00

Facebook are under 13, right?    18:53:03

A.    What do you mean as a general    18:53:05

matter?    18:53:07

Q.    I'm not talking about individual    18:53:08

users, but you are aware, generally, that some    18:53:10

users of Instagram and Facebook are under 13,    18:53:12

right?    18:53:15

A.    Yeah.  I mean, anytime we become    18:53:15

CONFIDENTIAL

Page 426

aware that a specific person is using the service    18:53:17

under the age of 13, we kick them off the service    18:53:20

because we don't allow people under the age of 13    18:53:23

to use the services.    18:53:27

But I think what you're getting at    18:53:28

is that some people under the age of 13 lie and say    18:53:28

that they're older in order to use the service.    18:53:33

And that's a thing that I think all of these    18:53:35

different services sort of struggle to police.    18:53:38

Q.    Okay.  And you've known for some    18:53:38

time that some users are -- of Instagram and    18:53:40

Facebook are under 13, right?    18:53:43

A.    I think we're generally aware in    18:53:44

the way that you're saying, that there are people    18:53:48

who are under the age of 13 who lie about their age    18:53:52

in order to get around the controls that different    18:53:55

apps have.    18:53:58

Q.    Okay.  I'd like to turn to    18:53:59

Document R.    18:54:02

(Document marked for    18:54:03

identification as (Meta) Zuckerberg

Exhibit 65.)    18:54:04

BY MS. O'NEILL:    18:54:04

Q.    And this will be Exhibit 65.  And    18:54:10

it's Bates-stamped META3047MDL-155-00000602.    18:54:15

CONFIDENTIAL

Page 680

(Short break.)    14:55:04

THE VIDEOGRAPHER:  The time    14:55:04

is 2:57 p.m. Pacific Time.  We're back on    14:57:32

the record.    14:57:35

- - -

EXAMINATION

- - -    14:57:36

BY MR. WARREN:    14:57:36

Q.    Good afternoon, Mr. Zuckerberg.    14:57:37

I'll direct your attention to    14:57:38

Exhibit 89.  Do you see the top right-hand corner    14:57:41

of that?    14:57:43

This indicates that the paper was    14:57:45

published as part of something called "CHI    14:57:47

Conference on Human Factors in Computing Systems    14:57:51

Proceedings" in Glasgow, Scotland.    14:57:54

Do you agree with that?    14:57:56

A.    I'm not actually sure what that    14:57:59

refers to.  It also says New York.    14:58:08

Q.    Okay.  Do you know how many parents    14:58:10

of teens attended the CHI Conference on Human    14:58:13

Factors in Computing Systems Proceedings in    14:58:18

Glasgow, Scotland?    14:58:21

A.    I do not.    14:58:22

Q.    Do you know how many parents of    14:58:22

CONFIDENTIAL

Page 681

teens read this paper?                                    14:58:24

A.          No, I do not.                                 14:58:25

Q.          It's important that the research             14:58:27
you publish is accurate, right?                           14:58:29

A.          We definitely try to do accurate             14:58:31
research.                                                 14:58:37

Q.          Right.  Because if --                         14:58:37

A.          It's not very helpful if it's not            14:58:37
accurate.                                                 14:58:38

Q.          Exactly.                                      14:58:39

And if it's not accurate, people                          14:58:39
could get the wrong idea and misleading impression        14:58:40
about the safety of your platforms, correct?              14:58:43

A.          Well, I think it's important that            14:58:44
research is accurate, just in order to be valuable        14:58:46
overall.  But, you know, science is an ongoing            14:58:50
iterative process, so --                                  14:58:53

Q.          Mm-hmm.  Okay.                                14:58:54

MR. SCHMIDT:  You can't                                    14:58:55
interrupt him.                                            14:58:56

Please finish your answer.                                14:58:57

BY MR. WARREN:                                            14:58:58

Q.          Were you done?                                14:58:58

A.          I'll let you go.  We have a short            14:58:59
period of time, so I'll let you get through the           14:59:01

CONFIDENTIAL

Page 682

things that you want.    14:59:04

Q.    Thanks.  I appreciate that.    14:59:04

Let's take a look at Exhibit 39.    14:59:05

You were shown this before, yes?    14:59:07
This is an e-mail that Mr. Ginsberg sent to you on    14:59:11
the second page, correct?    14:59:14

A.    Yes.    14:59:15

Q.    Yes.  And at the bottom of the    14:59:25
e-mail that he sent to you, he said that    14:59:27
"Problematic use prevalence was 55 percent mild and    14:59:31
3.1 percent severe."    14:59:35

Do you see that?    14:59:36

A.    I see the reference that you're    14:59:36
referring to, yes.    14:59:41

Q.    All right.  What's 55 percent plus    14:59:42
3.1 percent?    14:59:44

A.    58.1, I would assume.    14:59:45

Q.    58.1 percent.  Right.    14:59:49

And this e-mail was sent April 8,    14:59:51
2019, correct?    14:59:53

A.    That's what it says.    14:59:54

Q.    Okay.  Let's go back to Exhibit 89,    14:59:58
the paper that we were just looking at.    15:00:02

A.    Okay.    15:00:04

Q.    I'll direct your attention to the    15:00:05

CONFIDENTIAL

Page 683

second page, which your counsel asked you a        15:00:07

question about.        15:00:09

            And I direct your attention to the        15:00:10

top left corner where it says, "We estimate as an        15:00:13

upper bound that 3.1 percent of Facebook users in        15:00:18

the U.S. experience problematic use."        15:00:22

            Did I read that correctly?        15:00:23

    A.        I think you read that correctly.        15:00:25

    Q.        Okay.  Does it say 58.1 percent?        15:00:30

    A.        No.  Although, you know, I mean,        15:00:34

just in the interest of time, I'm not going to go        15:00:38

through and try to read this whole paper now.  So        15:00:41

I'm not sure if it references that somewhere else.        15:00:44

            I mean, Ginsberg is referencing a        15:00:48

mild prevalence stat here that I would imagine he        15:00:51

got from somewhere and didn't just make up.  So I        15:00:55

assume that it's from this or other research.        15:00:59

            MR. WARREN:  I move to        15:01:01

  strike that as nonresponsive, everything        15:01:01

  after "No."        15:01:04

            MR. SCHMIDT:  Object to the        15:01:05

  motion to strike.  It's not proper.        15:01:06

BY MR. WARREN:        15:01:07

    Q.        Does it say 3.1 percent of Facebook        15:01:07

uses in the U.S. suffer from severe problematic        15:01:10

CONFIDENTIAL

Page 688

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, MARK ZUCKERBERG, have the opportunity to read and sign the deposition transcript.


_____
MICHELLE L. RIDGWAY,
Certified Shorthand Reporter,
(CA-CSR # 14592)
(Certified Court Reporter
(NJ-CCR # XI02126)
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public
Dated:  April 1, 2025


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)