# AMENDED Exhibit 13

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT           ) MDL No.

ADDICTION/PERSONAL INJURY PRODUCTS       ) 4:22-md-3047-YGR

LIABILITY LITIGATION                     )

_____)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

SPRING STREET COURTHOUSE

COORDINATION PROCEEDING                  )

SPECIAL TITLE [RULE 3.400]               )

                                         )

SOCIAL MEDIA CASES                       ) Lead Case No.

For Filing Purposes                      ) 22STCV21355

VIDEO DEPOSITION OF JOSHUA SIMONS MP

April 1, 2025

Reporter: John Arndt, CSR, CCR, RDR, CRR

CSR No. 084-004605

CCR No. 1186

Page 2

Deposition of Joshua Simons MP, taken pursuant to Notice of Taking Deposition, before John Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at Mishcon de Reya, LLP, 70 Kingsway, London,  WC2B 6AH, United Kingdom, on April 1, 2025.

APPEARANCES OF COUNSEL

On Behalf of the MDL, personal injury, and school district plaintiffs:
        Motley Rice LLC
        28 Bridgeside Boulevard
        Mt. Pleasant, SC 29464
        843-216-9328
        By: Jessica L. Carroll
            jcarroll@motleyrice.com
            Andrew Arnold
            aarnold@motleyrice.com
            Previn Warren (via videoconference)
            Pwarren@motleyrice.com
On Behalf of the Witness:
        Levy Firestone Muse LLP
        900 17th Street NW, Suite 1200
        Washington, DC 20006
        202-845-3215
        By: Joshua Levy
            jal@levyfirestone.com
On Behalf of Meta Platforms, Instagram, and Siculus:
        Covington & Burling LLP
        620 Eighth Avenue
        New York, NY 10018
        212-841-1166
        By: Gregory L. Halperin
            ghalperin@cov.com
            Brian Reiser
            breiser@cov.com
On Behalf of Meta:
        Bass, Berry & Sims PLC
        100 Peabody Place, Suite 1300
        Memphis, TN 38103
        901-543-5966
        By: Jordan Thomas (via videoconference)
            jordan.thomas@bassberry.com

Page 11

interchangeably today, and that we all understand that it represents the same company.

Other than that -- we've spoken before, have we not?

A.    We have.

MR. HALPERIN:    Object to form.

BY MS. CARROLL:

Q.    Do you -- do you recall when about that was that we spoke?

A.    It was roughly two to three weeks ago, I think, roughly.

Q.    Did plaintiffs' counsel ask whether you would be willing to testify on the record?

A.    They did.

Q.    Appreciate it.  Thank you for your time.

Just to orient the jury as to your background, starting with your education, could you give us your -- where you attended university and any professional degrees thereafter?

A.    Yeah.  I went to college in Cambridge University in the UK, where I studied social and political sciences for three years.  I then worked.  I worked for a think tank.  I worked for the Labour Party for a while.  And I then started a PhD program in Harvard, where I was for -- from 2016 until 2021,

Page 12

studying political science.  I then turned my PhD into a book.

Q.    And you received your PhD from Harvard?

A.    I did, yeah.

Q.    And what was that in?  Was it governance?

A.    It was.  It was a PhD in political science in the government department.  I majored in political theory and political philosophy, and over the course of my PhD, I became interested in machine learning and computer science and data science and statistics, and the connection between those things and democracy, and I wrote a PhD about -- it's called Algorithms and Democracy, which I finished in 2021, and then for a year and a bit afterwards, I turned that PhD into a book which is published by Princeton University Press.

Q.    So was the -- your dissertation or thesis -- that was the manuscript for what became the book that was published in 2023.  Is that correct?

A.    That's correct, yeah.

Q.    Okay.  And you are currently a member of parliament?  You were elected in July?  Is that right?

A.    That's correct.

Q.    And you were in government prior to doing your PhD program at Harvard.  Is that also correct?

A.    My side didn't win an election for quite a

Page 13

long time, so I was in politics but not in government. We were very much in opposition at that point. But yeah, I worked in -- I worked in politics for the Labour Party for about eight months during the year before I went to Harvard.

Q.    How did you become interested in the technology side of your studies?

MR. HALPERIN:   Object to form.

A.    I -- when I was at Harvard, it was actually through my wife, like many good things. She and I -- she was interested in statistics, and I was interested in statistics and central banking, and we got talking and talked about classes that we were both taking.

She suggested a class taught by a woman called Finale Doshi-Velez called Introduction to Machine Learning in the engineering department in computer science, which she said was super interesting, so I enrolled, went to the lectures, and through that class became close to and was learning from a woman called Cynthia Dwork, who is a cryptographer and computer scientist.

She helped with the cryptography the U.S. census, and she was an expert in fairness in artificial intelligence, trying to work out what it means to have

Page 14

fair AI.

And so I with Cynthia Dwork got a reading group together of computer scientists and political scientists and engineers, and Cynthia Dwork then agreed to join my PhD committee, so it had a mix of folks from government, computer science, and law, and then it was through her that I ended up writing the PhD about computer science.

Q.   Very interesting.  I'm going to introduce our first exhibit, which is just a printout of your LinkedIn profile.  I will represent to you that this is how it prints when you print from LinkedIn.

So I just want you to review that and make sure what is listed on your LinkedIn profile is accurate.

THE REPORTER:  And is that Exhibit 1?

MS. CARROLL:  It is.

THE REPORTER:  Thank you.

[Exhibit 1 marked for identification.]

BY MS. CARROLL:

Q.   Mr. Simons, is this an accurate representation of your education and experience?

A.   It is, yeah.

Yeah, I mean, the only thing, just to mention, is that the method of my employment at Facebook changed several times over the course of the period of time I

Page 15

was there.  I was initially hired as a contractor, and then I became a full Facebook employee on a part-time basis after a period of being a contractor.

Q.    Do you recall the time period or approximate time period for that change?

A.    Yeah, in broad terms, I do.  In the summer of 2018, I was a contractor, and then that contracting period came to an end.  I was then rehired as a contractor on a rolling basis rather than a fixed-term period, and then after that, I was hired as a Facebook employee, STE part-time full Facebook employee.

MR. LEVY:  Explain STE.

A.    STE means short -- I'm actually not sure what STE means.  Yeah, I'm not sure what STE means.  I actually never quite knew what STE means.  But it was a -- I was a full Facebook employee with all the same benefits as employees, but it wasn't a full-time position, because I was also doing my PhD at the same time, which in the team that I was in was a common form of employment.

There were a couple of other folks employed on the same basis.  And then when I moved to the UK, I became a full Facebook employee on a part-time basis in the same arrangement, but through the UK rather than the U.S.

Page 16

BY MS. CARROLL:

Q.    If you recall, what was the impetus for the change in the employment status, like -- or from contractor to employee?  Was that something that you raised, or was it something that they offered?

MR. HALPERIN:  Object to form.

A.    It was something that my manager, ███████ ███████, and her manager, ████████████████████, discussed with me explicitly.  They were concerned that given the seniority of executive that I was talking to and engaging with, that my employment as a contractor rather than a full-time employee of Facebook would raise some risks for them.

I didn't fully understand what those were.  They didn't explain those to me.  But they were concerned about risks to them, and so they thought it would be better to hire me as a Facebook employee.

BY MS. CARROLL:

Q.    Okay.  Thank you.  We can put that aside for now.

[Exhibit 2 marked for identification.]

BY MS. CARROLL:

Q.    I'll go ahead and introduce our second exhibit, which is -- we're going to -- the second exhibit will be excerpts from your book.  Obviously due

to copyright reasons, we're not putting the full publication into evidence.  But this is something I think we will reference throughout.  But to start, I'd just like to understand what prompted the writing of this book for you.

THE VIDEOGRAPHER:  Which document is this?

MS. CARROLL:  This is the second one.

THE VIDEOGRAPHER:  Does it have a label?

MR. ARNOLD:  B.

THE VIDEOGRAPHER:  B.

MR. HALPERIN:  We'll object to the preamble.

THE VIDEOGRAPHER:  I don't see a B in here.

MR. ARNOLD:  Oh, so there isn't a digital copy of this document.

THE VIDEOGRAPHER:  There isn't?  Okay.

MR. ARNOLD:  We just have the hard copies.

THE VIDEOGRAPHER:  No worries.

BY MS. CARROLL:

    Q.    Go ahead, Mr. Simons.

    A.    So for me, I'd spent at this point five -- four-and-a-half, five years doing a PhD at Harvard studying what machine learning is, what AI is, and why it matters for democracy.

I had also spent several years working at the heart of a team at Facebook whose job it is to think about how you build AI with vulnerable people in mind to protect people, and what I learned from both that academic work and then also from being inside Facebook as a company and seeing the journey of that work, seemed really, really important to get out there into the world as a matter of fundamental importance to our society, our democracy, and what it means to be a citizen of a democracy.

So I had a conversation -- Princeton actually approached me at a political science conference, and I had a conversation with an editor there who was really interested in helping me to tell the story of those ideas to an audience that was broader than just the narrow audience that you read in an academic PhD.

Q.    Thank you.  Do you -- you mention throughout your book an experience, accountability, and language gaps.  Can you explain what those are?

MR. HALPERIN:  Object to foundation. Assumes facts not in evidence.

A.    These I think are one of the most fundamental reasons, these gaps, why there's a disjunct between the things has happen inside technology companies and the debate that all of us as citizens who

Page 19

are subject to their power have.

And the heart of it is that AI is complicated. It requires training in statistics and computer science and these disciplines that most of us don't have training in.

And what that means is that some of the language that technology companies use to talk about what they're doing doesn't make any sense to or is hard to unpick if you are a citizen, or frankly even experts, lawyers, judges, politicians.

And the way I saw it at this point, I had had the privilege of an incredible education in which I had got some training in the basics of statistics and how machine learning works, and had a lot of training in communication and explanation, and therefore part of my job in this book was an explanatory job to bridge the gap as described, so that folks who don't know anything about AI or Google or Facebook can understand the basics of how they work and what it means for the people they impact and the effect they have on individuals and on society.

THE VIDEOGRAPHER:  Excuse me.

[Discussion off the record.]

BY MS. CARROLL:

Q.    Could you provide for the jury an

off the record for a second?

MS. CARROLL:  Yeah.

THE VIDEOGRAPHER:  We are going off the record at 11:13 AM.

[Discussion off the record.]

THE VIDEOGRAPHER:  We are back on the record at 11:13 AM.

BY MS. CARROLL:

Q.    Mr. Simons, did you ever raise any concerns with your superiors at Meta about Meta's prioritizing engagement over other considerations?

MR. HALPERIN:  Object to form.

A.    Yes, I did.  And some of those who I raised that concern with were themselves concerned.  I can give some examples if that would be helpful.

BY MS. CARROLL:

Q.    Are there specific individuals that you can name that you spoke with?

A.    Yes.  I had a conversation on several occasions with a senior VP, Margaret Stewart, who was VP of Responsible Innovation, and she and I discussed the fundamental purpose of the team that I had been asked to join and help build, which was to embed principles, consideration of harm and safety of users, early in the AI design progress.

And Margaret Stewart's view -- she reported it to me -- was that that was necessary for engineers across the company to think about harm, user harm -- before a model was rolled out and deployed.  And we discussed on numerous occasions how to get those principles embedded in the AI design process at Facebook, and to my knowledge, while I was there, they never were.

Q.    What was the source of the emphasis?

MR. LEVY:  I don't know that he was done with his answer to your question.

BY MS. CARROLL:

Q.    Oh, excuse me.  Were you finished?

A.    There were -- most of the products that I worked with, whether it was in the advertising delivery system, an engineering called ▇▇▇▇▇▇▇▇, the News Feed system, ▇▇▇▇▇▇▇▇, Guy Rosen, ▇▇▇▇▇▇▇▇, or the Instagram product, my whole job was to develop principles that would be embedded in the AI design process at Facebook, and the whole point of doing that was that it would not just invite but require engineers and product leaders to think about harm before a product was designed, not after the fact, and in each of those cases, those senior engineers and product leaders reported the need for something like that to

Page 57

happen, and in the end my team was folded and disbanded and folded into the -- another part of the organization, and so those principles never were deployed in the product design process.

And you know, the essence of that meant that engagement was prioritized over those principles that could have been embedded in Facebook's systems.

Q.    Were there a lot of individuals of differing backgrounds like yourself attempting to promote this user safety work within the organization?

A.    There were not many, no.  In my team when I joined it, I was the only person with a political science or a kind of nonengineering background in the team.

I think two others joined over the period that I was an employee at Facebook, and what was important and different about the team that I was working in was that we weren't in the policy or legal or comms bit of Facebook, and those parts of the company were always sort of disrespected by the main product engineering AI side of the company, that that was where the pride was, that was where the promotion opportunities were, the money, and because we were in that, we were embedded within it, that what made my role and the role of the others who got hired with my kind of same background on

Page 60

Responsibility XFN, ███████████ in the advertising delivery system, was how do we build the case inside Facebook that we have to do this, that we have to change the way AI is built to consider safety, harm earlier on in the process?  And ultimately we would always come back to Mark Zuckerberg had to support it for it to happen.

BY MS. CARROLL:

Q.    Was there an understanding amongst the Responsible AI team at the time when you were working with the company of why it wouldn't be a priority for Mark Zuckerberg?

MR. HALPERIN:  Object to form and foundation.

A.    Whether or not Mark Zuckerberg would support the need to embed responsible considerations of safety into AI design at Facebook, whether he would support that, was at the first stage of my period as an employee of Facebook a matter of debate.  Different people had different views about where he would land.

What I found over the course of my employment was that every time we were involved in a decision that he actually made, that decision tended to be not to support the need for those principles to be embedded.

And rarely was an explicit rationale given for

Page 61

that decision, but it always had the effect of prioritizing the existing system, engagement, meaningful social interactions, over the other considerations that we were inviting to be inside the system.

So the broad pattern of decisions was that if we were proposing something that would reduce engagement that went up for the executive team, Mark Zuckerberg, to review, the decision that came back would prioritize the existing system of engagement over other safety considerations.

BY MS. CARROLL:

Q.   Thank you.  I'm going to introduce Exhibit Number 3.  It's F.

[Exhibit 3 marked for identification.]

MS. CARROLL:  Can we put a clean copy on the -- here, I can put it on this and not this one.  I don't know why there's highlighting on this one and not that one.  It's not my highlighting.

MR. REISER:  I have a spare.

MR. HALPERIN:  She's talking about the screen.

MS. CARROLL:  On the record.  Yeah.  I don't want to -- I don't want to have -- I'll put it on this thing over here.  I don't want to misrepresent

Page 62

this document.  I don't know why it has --

MR. ARNOLD:  Okay.  We can --

MS. CARROLL:  All right.

MR. ARNOLD:  Let's go off the record.

MS. CARROLL:  Yeah, let's off the record for one second.

THE VIDEOGRAPHER:  We are going off the record at 11:25 AM.

[Discussion off the record.]

THE VIDEOGRAPHER:  We are back on the record at 11:27 AM.

BY MS. CARROLL:

Q.    Mr. Simons, you have Exhibit 3 in front of you, which is a letter written in response to request for public comment to the Federal Trade Commission. And it is written by representatives from the Shorenstein Center on Media, Politics and Public Policy, submitted by ███████████.  Are you familiar with Mr. █████?

A.    I am.  We wrote a paper together at one point.

Q.    He writes on the first page, or they write to the FTC, "Our chief concern" -- and I'll represent that as far as we know, this is how it was produced to us, the highlighting.

Page 63

"Our chief concern is that this is the business model that sits at the core of the major platform companies in and of itself that has caused these harms, and yet we do not have" -- "yet we have yet to see regulatory enforcement at the national level that can treat these side effects."

What is your understanding -- strike that.

What was your understanding of the business model of Facebook while you were an employee?

MR. HALPERIN:  Object to form.  Vague.  Misstates the document.

A.    The main exposure that I had while I was an employee at Facebook directly to the interaction between the systems -- Facebook's AI systems that I was working on -- and the business model, how revenue was generated and profit was made, was the ad delivery system, which I worked on intensively in the summer of 2018 with a senior engineer in that system who explained to me the connection between the way the system is designed and the revenue that it generates for the company.

BY MS. CARROLL:

Q.    Thank you.  Is it -- was it your understanding when you worked for Facebook, Meta, that the business goals were prioritized over user safety?

Page 64

MR. HALPERIN:  Object to form and foundation.

A.    The -- the most important way that I observed the relationship between the business goals and choices about the design of the system while I was at Facebook was in specific examples of cases that went up to senior executives, and then the decisions that happened in those rooms.

In a few cases I was in the rooms where the discussion happened.  In other cases, I was helping to prepare the team to go to review with Mark or the executive team, and then would download the review afterwards.

One specific example that I discussed with the advertising executive -- well, sorry, the engineer in the advertising team -- ████████████ , who I mentioned -- we talked about the ad delivery system, which is where AI design and revenue most directly interact.  And we talked in particular about the organic bid component of that system, which basically defines what's of value to someone, to a person using that system.

He used an example of a mum who had just had a child, that the system knows that you've just had a child, that you're a new mum because of all the data

Page 65

that it has about you, and it was showing mum -- women who just had children ads for things that would sort of make them feel bad about their body in some way, you know, like body cream or body adjustment surgery or whatever.

And the conversation we talked about was whether -- what's of value to a user in the organic bid component -- you could change that. You could redefine it. So instead of making people feel -- click on ads because they feel shame about their body after they've had a baby, maybe there would be some kind of higher-order goal that you could put into that component of the ad delivery system like, how do I breastfeed, or you know, are there any downsides to bottle? Whatever.

And ▉▉▉▉ talked about how he'd, you know, worked on some different ways of changing that component of the ad system, but had been unable to get those things rolled out, because ultimately they were less efficient or effective, and what that meant in that context was they would result in fewer ads being clicked on and therefore less revenue generated by the ad delivery system.

BY MS. CARROLL:

Q.    Thank you.  On Page 6 of this document,

Page 67

BY MS. CARROLL:

Q.    Was addiction or addictive properties a part of that discussion with anyone during your time at Facebook?

A.    Yes.  And in some of the documents that I wrote whilst I was at Facebook, addiction was one of the types of harm or the mechanisms by which harm was reproduced that I talked about with senior executives -- Margaret Stewart, ███████, to name two examples -- in those documents themselves.

And in particular, the question we talked about was, given that the whole News Feed system is aimed at engagement, that's a set of repeated patterns of behavior -- clicking, liking, sharing, and on so -- the best way to increase engagement is addiction in some way, you know, is to get people doing those forms of engagement.

And so the type of content that the News Feed system made viral was the kind of content that would make you feel, make users feel whatever they needed to feel to produce that type of behavior.  And so I talked with News Feed executives as well as Margaret and ███████ about that feedback loop, essentially, of a system designed to promote engagement that produced content that kept people on the platform, coming back

Page 68

to the platform, and what to do about that system.

Q.    Is "feedback loop" an industry term?

MR. HALPERIN:  Object to foundation.

A.    We talked a lot about loops in particular, and feedback loops as a kind of loop.  Loops is a machine learning term, and the way that machine learning can -- it's almost performative by producing -- by predicting something, it can make that thing come true, especially in a closed system like Facebook.

So if you predict a particular form of engagement, the system is likely to display more of that form of engagement over time, and therefore it is so important, what you choose to train and build a system to do, creates the future on that platform.

And so for example, ████████, who had worked really deeply in the advertising delivery system before he led Responsible AI -- we talked a lot about how AI really raised the stakes of the impact and choices about the impact in all of Facebook's systems.

BY MS. CARROLL:

Q.    Did Mr. ██████ also work for Facebook?

MR. HALPERIN:  Object to foundation.

A.    I believe when I started working with him he had had some role at the company.  I don't recall

Page 73

Actually, no.  Strike that.  We're going to do -- let's do G.

[Exhibit 5 marked for identification.]

MR. ARNOLD:  I'll --

MS. CARROLL:  Yes.

BY MS. CARROLL:

Q.   While Mr. Arnold is passing that around -- what is a WIP?  What does WIP stand for?

A.   That was an internal Facebook term for a work-in-progress document.

Q.   Work in progress.

A.   Thank you.

Q.   Was this document here, "Ethics at Facebook: Principles and Processes," created and shared on an internal platform within Meta?

MR. LEVY:  Take a minute to look through it.

A.   Okay.

MR. HALPERIN:  Object to foundation.

A.   Yes, as I remember it, it was created on Quip.

BY MS. CARROLL:

Q.   What is Quip?

A.   Quip -- I don't know is Quip's an acronym or what, but it was the internal kind of Microsoft Word

Page 74

of Facebook.  It was Facebook's own internally built document system that we were instructed at this point only to use Facebook's internal document system, and not any others.

Q.    And as you've reviewed this document, you'll notice there are lots of others individuals making comments on this Quip document.  Is that a normal -- strike that.

Was that, during your time with the company, a normal way of communicating progress on a project with team members in the normal course of business?

MR. HALPERIN:  Object to form.

A.    Yes, commenting in a Quip with each other was a -- was a normal way to make progress on a project at Facebook when I was there.

BY MS. CARROLL:

Q.    Did you -- were you the author of this Quip?

A.    I was.  Others edited sections of it, and as you can see from the comments, fed into it.  But I was the author of it.

Q.    How did this come about?  Why did you start this document or write what was here?

MR. HALPERIN:  Object to form.

MR. LEVY:  Objection.  If you could

Page 75

clarify the question.

MS. CARROLL:   Sure.

BY MS. CARROLL:

Q.    When you started this Quip, if I'm referring to that correctly, what was the purpose of doing so?

A.    So at this point in my time at Facebook, this was the sort of end of 2018 to the best of my recollection, and I had spent nearly half a year at the company talking to senior engineers, data scientists, product designers, folks from policy, law -- a very wide range of different parts of Facebook and its systems.

And ████████████████████████, who was the leader of Responsible AI, and ████████████, who reported to him and who was my manager, asked me to essentially round up the work I'd done and produce suggestions and proposals which would then go to senior executives inside the AI part of the organization and then in other bits of the organization that followed from that work, and so the purpose of this document was to be sent to senior executives to summarize what work I had done so far.

Q.    Thank you.  Turning to the very last page of this document -- and I apologize that this is not

Q.    In it, you discuss what machine learning is.  Is that correct?

A.    Correct.

Q.    And "Three Substantive Challenge" -- "Challenges."  The third one is where I'd like to focus.  And I'll represent that the third one is, "Filter Bubbles and Autonomy."

Can you explain what that meant at this time of writing this while you were with the company, and why it was a challenge?

MR. HALPERIN:  Objection.  Compound.

A.    So I could take each bit, what I was writing about and why I thought that was a challenge.

This section in the document was based on my conversations with ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ in ads, because in both of those systems, there's a section of the system, a part of the system.  In News Feed it's called user value, and in ads it's called the organic bids.  And those bits of the system are supposed to define what's good for users.

And the words "user value" or "organic bids" -- you have to really get into it and speak to the people who build it to understand, what does that actually mean?  And in both cases, what they really do is define what's of value in terms of proxy.  And a proxy means

Page 81

what's really of value to me is my happiness and the well-being of my family.

The way Facebook measures that is how many posts do I share from my wife, for example. Now, that's not really what I care about. I don't really care about how many posts I share from my wife. I care about her happiness. But they can't measure that, so they measure shares.

And the problem with optimizing for proxies is that because they're not really what we care about, they reinforce the proxy, and not the thing we really care about. So for example, in resharing posts, optimizing for resharing might be -- might mean that I'm full of love for my wife and that's why I share posts, or it might mean that I'm full of hate or fear or anxiety, and that's why I share loads of things.

And what consistently across News Feed in the user value component and the ad system in the organic bids component -- what the engineers building them reported to me is that by defining value in terms of those proxies -- clicks, likes, shares, plays -- you ended up incentivizing repeated patterns of behavior on the tool that were in the end undesirable, and sometimes actively harmful for the users of the tool themselves. In both cases they had a problem with that

and wanted to figure out what to do about it.

BY MS. CARROLL:

Q.    Can you remind for the jury what ███████ ███████'s role was in the organization when you -- at this time in 2018?

A.    ███████████████ was a very experienced engineer within the News Feed ranking system.

Q.    And this phenomenon that you've described of filter bubbles was understood by ███████████ at this time in 2018.  Is that correct?

MR. HALPERIN:  Objection.  Calls for speculation.  Foundation.

A.    ███████████████ told me that he was working on understanding filter bubbles and the connected concept of polarization, which also something that ███████████, who comments in this document, and who I worked with, was also looking into at Facebook AI research.

BY MS. CARROLL:

Q.    Thank you.  Let's turn to 8035.  Top of the page, second comment.  You mentioned previously ███████████.  What was ███████████████ role within the company in 2018?

A.    ███████████ at this time that I was working with him was a senior member of the marketing

Page 100

sense?

THE VIDEOGRAPHER:  We are going off -- we are going off the record at 12:32 PM.

[A recess was taken.]

THE VIDEOGRAPHER:  We are back on the record at 12:48 PM.

BY MS. CARROLL:

Q.    I think we are going to move to Exhibit 9, which is K.  "A Vision for Responsible AI."

[Exhibit 9 marked for identification.]

BY MS. CARROLL:

Q.    Do you have the document, Mr. Simons?

A.    I do.  Sorry.  Yeah.

Q.    Is this another example of a Quip?

A.    This is another Quip.

Q.    Are you familiar with this Quip titled, "A Vision for Responsible AI (Was 'SAIL 2020')"?

A.    I am.

Q.    If you recall, who was the author of this document, or the original creator of this Quip?

A.    The primary author of the document was ██████████████████████, who was the leader of Responsible AI.

Q.    What did you understand at the time was the purpose for this document or Quip?

Page 101

A.    The purpose of this document was to set out the mission and the strategy and the need for the Responsible AI team using all the work it had done to date to get senior exec buy-in for the team for its objectives and to increase its headcount.

Q.    And did this include work that you had contributed to?

MR. HALPERIN:  Objection.  Leading.

A.    I was one of the key people contributing to this document as ▮▮▮▮ wrote it.  He and I had several meetings to discuss it, and he directly drew from some of the earlier memos that I had written that we have talked about today.

BY MS. CARROLL:

Q.    On the third page ending in 3672.  Last paragraph, starting with, "Engineering excellence should also apply to AI."

The last sentence in bold says, "Explicitly reward ML engineering excellence."  And let me read that in full in this sentence.

"It will be essential to explicitly reward ML engineering excellence and to give ML practitioners space and permission to adopt best practices."

Did Mr. ▮▮▮▮ write that?

A.    I don't recall if he specifically wrote

Page 103

systems?

MR. HALPERIN: Object to foundation.

A. Yes. When I was working in the Responsible AI team, we worked with senior engineers in many systems, in the News Feed system, the integrity system, the ad system. And it came up repeatedly the theme that engineers were incentivized to build systems that maximized the objectives.

Those systems were set by executives, so in the News Feed case, that was meaningful social interactions. And if the systems they were building boosted those metrics, they were rewarded and promoted and given headcount, and if it had a deleterious effect on meaningful social interactions -- for example, in News Feed -- they were not.

And that was, in most of the conversations that I had, a really significant obstacle for embedding responsibility considerations in AI design in Facebook's products, because that was bound to have the effect of reducing engagement, and therefore there would be resistance to it, given the performance rewards that existed at Facebook.

BY MS. CARROLL:

Q. Did you have an understanding at this time of whether there was a monetary incentive in the

Page 104

performance structure of engineers?

MR. HALPERIN:  Object to foundation and form.

A.    Yes.  One of the things I discussed with senior engineers in News Feed and ads was bonuses, for instance, that were awarded to those teams who significantly boosted engagement as defined in different ways in different systems, and fundamentally, by boosting engagement, what these systems were aiming to do is boost the amount that a user interacts on the platform, the time they spend on it, the frequency they -- with which they visit the platform, and that produces more ad revenue.

And in an example, for instance, of the principles that Margaret Stewart and I and the Responsible AI team were seeking to embed in the product, if those principles would reduce engagement, and therefore reduce revenue, it was expected that we would encounter senior opposition to embedding them in the system, and part of the context for this document that we're discussing was to make the case that doing this is the right thing to do, even though it might reduce engagement and therefore reduce profit.

BY MS. CARROLL:

Q.    Thank you.  And to remind the jury, who

about them was used to make inferences, about either other demographic features or how it was used to train models that were then integrated in the system.

And the success state was describing a state of affairs in which there was a really simple, clear explanation by Facebook to users about how their data was used across the Facebook product.

Q.    And then if we'll turn to Bates ending in 3677.  Middle of the page.  Mr. ████████ writes in a bullet, "Sophisticated reinforcement learning might increase the problem of tech addiction in Stories, News Feed, or Instagram."

What did you understand that to refer to in this document?

A.    So that comment was based on a conversation that ████████, Margaret Stewart, and I had had in which we discussed whether AI was the primary driver of addiction in users of the product.

And when ████████ writes about sophisticated reinforcement learning, what he means is one of the most advanced forms of AI that Facebook were using at that point to optimize for engagement, and the risk that that might supercharge problems of addiction across those products.

Q.    If you turn to Bates ending in 3685.

Page 114

Q.   Do the decisions -- strike that.

Did your understanding of the decisions made by engineers building these machine learning models ever involve specific substance or context of a particular piece of content?

A.   Could you explain what you mean by the context of a piece of content?

Q.   Let me see.  It might be easier to point you to a document and not try to act like I understand all of this.

Let's go back to Exhibit 2 in your book.  Let's go to Page 137.

[Discussion off the record.]

MR. ARNOLD:  You don't -- you don't have a digital copy of this?

THE VIDEOGRAPHER:  Not of the book.

MR. ARNOLD:  No?

THE VIDEOGRAPHER:  But I was saying she could use the ELMO so people on Zoom can see.

MR. ARNOLD:  Oh, I see.

MS. CARROLL:  Thank you.

[Discussion off the record.]

BY MS. CARROLL:

Q.   Mr. Simons, in your book you discuss an analogy using a public square.  And I'm going to direct

Page 120

rank that high on their News Feed.

And so using the analogy in the book, when someone's entering a public square, it's a bit like the people who are handing out leaflets or literature or information thinking, "Okay, we want that person to go and do jumping jacks in the middle of the square while shouting loudly about something. We know from everything we've observed in the past that this kind of leaflet is most likely to get this person coming into the square to do jumping jacks and shout loudly, so we're going to give them that leaflet first."

And that's the basic way that the ranking system determines how to order the thousands of things it could show to anyone, and therefore determine what you open when you open Facebook on your phone.

BY MS. CARROLL:

Q.    So going back to Page 137. Towards the bottom of the page here, where it says -- it starts with, "Although." "Although the corporation."

Do you see where I am?

A.    Yes.

Q.    It says, "Although the corporation cannot determine which pamphlet each individual receives as they enter the square, the corporation doesn't much care about each individual. What it cares about are

Page 121

aggregate effects, how the collective mood responds to different ways of ranking information and ideas. Similarly, Facebook designs News Feed by considering how best to maximize its topline metric, not the particular content to show individuals."

Did I read that correctly?

A.    You did.

Q.    And is that a fair representation of your understanding of how Meta ranked information during your time with the company?

A.    It is.  And it stems specifically from my conversations with News Feed and integrity product leaders, VPs, and engineers in the wake of -- the aftermath of the meaningful social interaction rollout in 2018.

Q.    Thank you.  Is there anything else or any other specific examples from your time with the company that you think -- scratch that.

Are there any other examples that you personally encountered during your time with the company where Meta chose profits over user safety?

MR. HALPERIN:  Object to form. Foundation.  And misstates testimony.

A.    Yes, there are -- there are several which I can mention.  I guess the first and in some ways most

Page 122

important is that the team that I was hired to help build, the Responsible AI team -- it was responsible -- its job was to require Facebook teams to care about and think about harm and user harm and safety before they rolled out products.

That Responsible AI team was not kept in the AI organization where it could do that.  It was folded into a part of the company where it could not do that.  So the failure of that team to be given the mandate to do what it was asked to do demonstrated to me that the business model was prioritized over the safety of users.

A specific part of that, where it was really brought home to me and others like Margaret Stewart in the company, as she said to me, was the embedding of principles.  We pushed repeatedly to embed principles in the early stages of AI design so that senior product executives would have to explain how they were embedding principles of safety in AI design, and to my knowledge, those principles were never integrated into the AI design process.

The -- the examples from News Feed I think are most -- were most striking to me at the time, and to those I spoke to in News Feed like ███████████ or Guy Rosen, the meaningful social interactions shift was

Page 123

widely understood to increase the sharing of content that provoked feelings of shame or disgust or fear or pride -- social emotions where I compare myself to you and you compare yourself to others in your community.

And that meant more interaction in the Facebook system, and that meant more user engagement on the system, and that generated more revenue for the company, but it was -- you know, there were multiple research projects that I was part of understanding the harm that that caused users in provoking those social emotions.  To my knowledge, meaningful social interactions is still the primary driving thing that motivates Facebook's News Feed.

And then the toxicity model that I talked about a few times was a striking example to me, because it was a clear case of when a model had been trained and built by a team who wanted to reduce the prevalence of a harmful type of content.  Saying that people with big noses are bad is harmful to Jewish people, and they trained a model to detect that kind of content.  It could have reduced it.

It went all the way up to Mark Zuckerberg for review, and then for whatever reason, didn't get rolled out.  And that was a repeated pattern of -- that I observed in which models that could have done good,

Page 124

could have been rolled out, it went up to senior leadership, and then they were not rolled out.

And the final example I would give is the one where product design and revenue most closely intersect, which is the ad delivery system. That is the system that generates revenue for Facebook. That is the heart of its business model.

The component of that system that I worked really hard to understand with senior engineers who built that system called organic bids that defines what's of value to a user. Instead of saying to a new mum -- you know, offering her things that would be of real benefit to her as she learned how to be a mom, the ad system was, as the engineer explained it to me at that point, showing ads that would, again, provoke those social emotions of shame or like body cream or body alteration surgery.

That ad delivery system could have been changed to redefine what actually is of value to a user, but that would have reduced the revenue that that ad delivery system generated, and again, to my knowledge, those changes were never rolled out.

So again, to me, that seemed, you know, to the engineers that I was talking to like ▮▮▮▮▮▮▮▮▮▮ as a decision to prioritize the revenue that that system

Page 125

generated over the safety of the users that it

impacted.

BY MS. CARROLL:

Q.    Thank you.  I think this will -- this is

my last question.

Did -- strike that.

During your time at Meta, did the company to

your knowledge ever warn users of the potential risks

posed by decisions made in their ranking in content

moderation systems?

MR. LEVY:  To his knowledge?

MS. CARROLL:  Yes, to his knowledge.

MR. HALPERIN:  Object to form and

foundation.

MS. CARROLL:  I can ask it again.  Let me

state it again more clearly, now that I've got --

BY MS. CARROLL:

Q.    While you were employed by Meta, to your

knowledge, did the company ever warn users about the

potential risks posed by the decisions the company was

making in the design of their ranking and content

moderation systems?

MR. HALPERIN:  Object to form and

foundation.

A.    I was not aware of any efforts by Facebook

to warn users of the potential impact on them of Facebook's ranking model design.  This was something that I explicitly talked about with, for example, Margaret Stewart in the context of Facebook's responsibility to vulnerable users in particular, to warn them about different risks on the site, and that was one of the motivating forces behind the work on principles that Margaret and I did together, and to my knowledge, that work was not embedded in the product design process at Facebook.

MS. CARROLL:  Thank you, Mr. Simons. That's all from plaintiffs.  We can go off the record.

THE VIDEOGRAPHER:  We are going off the record at 1:36 PM.

[A recess was taken.]

THE VIDEOGRAPHER:  We are back on the record 2:06 PM.

EXAMINATION

BY MR. HALPERIN:

Q.    Good afternoon, Dr. Simons.  My name is Greg Halperin.  I represent Meta in this litigation.

You and I met this morning.  Is that correct?

A.    That is correct.

Q.    You talked about various criticisms in your testimony with the plaintiff lawyers this morning

Page 237

C E R T I F I C A T E

I, John Arndt, a Certified Shorthand Reporter and Certified Court Reporter, do hereby certify that JOSHUA SIMONS MP, prior to the commencement of the examination, was sworn by me on April 1, 2025, to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_____

JOHN ARNDT, CSR, CCR, RDR, CRR

CSR NO. 084-004605

CCR NO. 1186