# AMENDED Exhibit 702

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

-----------------------------x

IN RE: SOCIAL MEDIA ADOLESCENT ) Case No. 4:22-md-
ADDICTION/PERSONAL INJURY       ) 3047-YGR
PRODUCTS LIABILITY LITIGATION  ) MDL No. 3047
-----------------------------x

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

COORDINATION PROCEEDING          ) Judicial Council
SPECIAL TITLE [RULE 3.550]       ) Coordination
                                 ) No. 5255
SOCIAL MEDIA CASES               )
_____ ) Judge Carolyn Kuhl

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

V O L U M E   I

VIDEOTAPED DEPOSITION OF JAMES BESER

PALO ALTO, CALIFORNIA

APRIL 2, 2025

9:08 A.M.

Job No.: 7222033

Pages: 1 - 442

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Page 13

-----------

P R O C E E D I N G S

April 2, 2025, 9:08 a.m.

-----------

THE VIDEOGRAPHER:  We're now on the record.  My name is James Vonwiegen.  I'm a videographer for Golkow.  Today's date is April 2nd, 2025, and the time is 9:08 a.m.

The video deposition is being held in Palo Alto, California, in the matter of Social Media Adolescent Addiction/Personal Injury Products Liability Litigation for the United States District Court for the Northern District of California.

The deponent is James Beser.

Counsel will be noted on the stenographic record.

The court reporter is Leslie Todd, California CSR 5129, who will now swear in the witness.

JAMES BESER, and having been first duly sworn, was examined and testified as follows:

HIGHLY CONFIDENTIAL

EXAMINATION

BY MR. DRAPER:

Q.    Good morning, Mr. Beser.  My name is Glenn Draper.  I am one of the attorneys for the kids and families and school districts and other local government agencies who have brought claims against the social media companies, including YouTube.

I had a chance to introduce myself before the deposition got started. We're here in Palo Alto at the offices of Wilson Sonsini to take your deposition.

You are appearing pursuant to a notice of deposition, which we'll go ahead and mark as YouTube Beser Exhibit 1.

(YouTube Beser Exhibit No. 1 was marked for identification.)

BY MR. DRAPER:

Q.    So you get the copy with the sticker on it.  Here's a copy for your counsel.

MS. WADHWANI:  Thank you.

MR. DRAPER:  A copy for me, and an extra one.

BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 15

Q.    I'm going to ask you some more questions about this in a moment.

Sir, this deposition is being taken in what's called an MDL, which stands for multidistrict litigation in federal court, and it will also be used in what is called a JCCP, which stands for Judicial Commission Coordinated Proceeding, in California state court.  I'm actually the attorney for the JCCP, and my colleague Audrey Siegel will be asking you some questions for the MDL later today or maybe tomorrow.  Okay.

You might hear me use both of those terms, MDL and JCCP.  It's just the way these cases are grouped together.  All right?

A.    Mm-hmm.  Yes.

Q.    Great.  Have you ever had your deposition taken before, sir?

A.    No.

Q.    All right.  Ever testified in court before?

A.    No.

Q.    All right.  I'm going to cover basic ground rules for the deposition, okay?

HIGHLY CONFIDENTIAL

Page 16

You've been sworn by the court, which means you're under oath.  That means you're testifying just as though you were sitting in a courtroom before a jury and a judge.  And in fact, you may hear me or your attorney refer to the jury today, even though they're not physically present.

Do you understand?

A.    Yes.

Q.    And that's because this deposition is being recorded.  You can obviously see the camera and the court reporter.  The video and the written transcript may be presented later in court or used for any other purposes authorized under state and federal rules of procedure and evidence.

Have you got any questions about that?

A.    No.

Q.    Great.

It's important that you answer my questions verbally today because the court reporter is taking down everything that we say.  So if you nod or answer with uh-huh or

HIGHLY CONFIDENTIAL

Page 17

uh-uh, it doesn't come through on the transcript clearly.

Do you understand?

A.    Yes.

Q.    It's also really important that we not talk over each other because it's hard for the court reporter to take down two people talking at once.  I will do my best to let you complete your answer before I ask the next question, and if you can do your best to let me complete the question before you begin your response, even though you know what I'm going to say, that would help make sure we have a clean transcript.

Do you understand?

A.    Yes.

Q.    Okay.  I myself personally struggle with this, so I will make mistakes today, and you might too.  It's no big deal. We'll just fix it and go on.  All right?

A.    Sounds good.

Q.    You are represented by an attorney today, correct?

A.    Yes.

Q.    Ms. Neelum Wadhwani, right?

HIGHLY CONFIDENTIAL

Page 18

Right?

A.    Yes.

Q.    All right.  Your attorney might have objections to some of my questions today.  Let her complete the objections before you respond.

Understand?

A.    I understand.

Q.    All right.  Most of the time your attorney I suspect will tell you to go ahead and answer the question despite the objection, and that's so we can take the transcript to the judge, get a ruling on the objection, and if the objection is overruled, we don't have to come back to ask the question because you've already answered it.  Right.

There may be a few times when your lawyer tells you not to answer the question.  That's another reason to make sure you let her finish the objection before you answer, but you should take your queues about the objections and whether to answer from your attorney.

Do you understand?

HIGHLY CONFIDENTIAL

Page 19

A.    Yes.

Q.    All right.  I expect there will be a few times today where we're all talking at once, and we'll have to stop and do it over sequentially, like question, objection, answer.  Happens most every deposition.  It's not a problem.  We'll just -- we'll just do it over a little bit more slowly.  All right?

A.    Sounds good.

Q.    Okay.  You can take a break today.  I like to break myself around every 90 minutes, but if you need one sooner, just ask.  The only rule is you have to answer the pending question, so you can't run out while there is a question pending.

Understand?

A.    Understand.

Q.    All right.  Anything that would affect your memory or your ability to tell the truth today?

A.    No.

Q.    You haven't taken any medications that might make it difficult for you to concentrate or remember?

A.    No.

HIGHLY CONFIDENTIAL

Page 20

Q.    Got a good night's sleep?

A.    Yes.

Q.    Fantastic.

Any questions before we kind of move into the substance?

A.    No.

Q.    All right.  As you said, you're represented by Ms. Wadhwani today.  You understand she represents Google and YouTube as well?

A.    I understand.

Q.    All right.  When did you find out that we had requested your deposition in this case, sir?

A.    Sometime in the second half of last year.  I don't remember --

Q.    Okay.  So it's been a while.

A.    Yeah, it's been several months.

Q.    Okay.  Have you met with Ms. Wadhwani or other attorneys representing Google and YouTube to prepare for this deposition?

A.    Yes.

Q.    All right.  I don't want to ask about the content of any of your meetings

HIGHLY CONFIDENTIAL

Page 21

with your attorneys, but I want to ask a little about the circumstances of those meetings.  Okay?

A.    Okay.

Q.    When was the first time you met with them?

A.    I don't recall exactly, but I believe it was this year.

Q.    This year being 2025, so sometime in the last three months.

A.    It may have been the end of last year, but, yes, sometime in the last three or four months.

Q.    Okay.  How many times have you met with them?

A.    I don't recall exactly, but somewhere on the order of five.

Q.    And how long total would you say you have spent with your attorneys preparing for this deposition, sir?

A.    I don't recall exactly, but I would estimate it to be about ten hours.

Q.    All right.  Let's go ahead and look at what we have marked as YouTube Beser Exhibit 1.  This is a copy of the deposition

HIGHLY CONFIDENTIAL

Page 22

notice for today's deposition.

Have you seen this document before, sir?

MS. WADHWANI:  This is Exhibit 2.

MR. DRAPER:  This is Exhibit 1. Yeah.

MS. WADHWANI:  Oh, sorry.  I'm sorry.  You are correct.  I saw Riley preparing a document and I jumped ahead.  I apologize, Mr. Draper.

MR. DRAPER:  That's okay.  We marked it a few minutes ago, but we're still on Exhibit 1.

THE VIDEOGRAPHER:  Can we go off the record for two minutes?

MR. DRAPER:  You want to go off the record for two minutes?

THE VIDEOGRAPHER:  I'm sorry, the --

MR. DRAPER:  Yes.

THE VIDEOGRAPHER:  The time is 9:16, and we're off the record.

(Pause in the proceedings.)

THE VIDEOGRAPHER:  The time is

HIGHLY CONFIDENTIAL

Page 23

9:19.  We're back on the record.

BY MR. DRAPER:

Q.    Okay, sir, we had to break for a little technical issue, but we are back on the record.

We're looking at what we have previously marked as YouTube Beser Exhibit 1. This is a copy of your notice of deposition.

And my question to you, sir -- I can't remember if you answered it or not, so I'm going to ask it again -- have you seen this before?

A.    I do not believe I've seen this document.

Q.    All right.  If you look at page 2 and 3, the deposition notice asks that you bring certain documents with you.  Your attorneys may have brought those.  I'm just going to ask about those document requests. Okay?

MS. WADHWANI:  And, Mr. Draper, I'll just note for the record that Google and YouTube reached a mutual agreement several months ago regarding what would be produced or what would

Page 24

not be produced --

MR. DRAPER:  Yeah.

MS. WADHWANI:  -- for any particular witness.  Of course, Mr. Beser is not aware of that agreement, but we have produced documents for Mr. Beser in advance of this deposition consistent with our agreement.

MR. DRAPER:  I'll cover that.

BY MR. DRAPER:

Q.    Okay.  So, Mr. Beser, the first request is for all documents and communications used to refresh the witness's recollection.

Sir, in your preparations for this deposition, did you review any specific documents or communications?

MS. WADHWANI:  And that's just a yes or no right now.

THE WITNESS:  Yes.

MR. DRAPER:  Okay.  And so for your attorney, the question is, have all of the documents and communications that he reviewed been

HIGHLY CONFIDENTIAL

Page 25

produced and marked in this litigation?

MS. WADHWANI:  Yes.

MR. DRAPER:  Great.

BY MR. DRAPER:

Q.    Number 2, sir, is a copy of your CV, and we have received from your counsel a copy of your LinkedIn profile which contains that kind of information, and why don't we go ahead and mark that as Exhibit 2 at this time.

(YouTube Beser Exhibit No. 2 was marked for identification.)

THE WITNESS:  So put this one away?

MS. WADHWANI:  You might need to hold on to --

BY MR. DRAPER:

Q.    Yeah, I'm not quite done with that.  We're just going to mark that one as Exhibit 2.  And I'm not going to refer to it, so you can just kind of put it aside.

A.    Okay.

Q.    All right.  Number 3 asks for your employee custodial file, and that has

Page 26

been produced to us.

Number 4 asked for any documents relied on by the witnesses in preparation to testify at this deposition.  I think we've covered that with our stipulation.

MS. WADHWANI:  Correct.

BY MR. DRAPER:

Q.    Did you take any notes, sir, to help prepare for this deposition?

A.    No.

Q.    All right.  And I think that's all we need to cover with that.  So we can put that one aside.

MS. WADHWANI:  You can sit it here face down, that way if Mr. Draper wants to refer back to an exhibit he has reviewed, it's easy for us to find it.

THE WITNESS:  Okay.  Sounds good.

BY MR. DRAPER:

Q.    All right.  I'm going to ask you some questions about your background now, sir.

HIGHLY CONFIDENTIAL

Page 27

You attended the University of Michigan where you obtained a degree in electrical engineering and computer science in 1999.  Correct?

A.    Correct.

Q.    After you graduated from the University of Michigan, you worked at DoubleClick, the advertising company that provides internet ad services until 2002.  Is that right?

A.    That's right.

Q.    All right.  Did you meet Mr. Mohan when you were at DoubleClick?

A.    Yes.

Q.    Did you know him or work for him?

A.    I worked for Neal for part of that time.

Q.    Oh, interesting.  Okay.

In 2002, you returned to school to get your MBA at the University of California at Los Angeles?

A.    Yes.

Q.    After receiving your MBA, you worked for several startups, including

Page 28

5to1.com and Xoom, but with an X?

A.    That's correct.

Q.    Is that pronounced Zoom?

A.    It's pronounced Zoom.

Q.    Okay.  All right.  In 2010, you started at Google as a group product manager for ads, correct?

A.    Correct.

Q.    And then in 2016, you came to YouTube to work as the product manager for YouTube Kids.  Is that right?

A.    Correct.

Q.    All right.  And then in 2017, your position changed to senior director of product management for youth at YouTube.  Is that right?

A.    I sort of collapsed a lot of stuff during the YouTube times for space.

Q.    Okay.

A.    So it was not in 2017 that I was promoted.  I got promoted twice while at YouTube.  The years, I think it was, the first promotion was in 2019.  And the second promotion -- that was to director.  And the second promotion at YouTube to senior

HIGHLY CONFIDENTIAL

Page 29

director was something like 2022, '21 maybe.

Q.    Okay.  So do I have your current position correct, senior director of product management for youth at YouTube?

A.    Yes, that is correct.

Q.    All right.  I have also heard your position described as the director of the youth vertical at YouTube?

A.    That would be a fine way to describe it.

Q.    Okay.  What does that mean, "youth vertical"?

A.    So the youth vertical is sort of a shorthand for the safety and responsibility of under 18 users on YouTube. That's broken out into a couple different areas of work, depending on sort of the ages of the children under 18 we're talking about. If we're discussing very young kids, that includes the YouTube Kids' app, as well as what we call "made for kids" content across YouTube.  So there's a lot we do with the creators who make kids content, et cetera.

Moving a little bit older for the, you know, tweens 9 to 12, we have a

HIGHLY CONFIDENTIAL

Page 30

product built for tweens that is a supervised -- we call it Supex internally, you may have seen that, but it's a supervised experience for parents to supervise their somewhat older kids on the YouTube main app. That is completely managed sort of on my team.

And then when we manage -- talk about teens and what we do for teens, it's much more of a matrix across YouTube.  Lots of different teams participate.  Of course, it's a big matrix for everything, but really teens -- I really focus -- my team really focuses on the responsibility aspects of teens.  So safety quality specifically.

Q.    All right.  So as part of your role as senior director of product management for youth, you're involved in the design and application of safety features designed to protect kids under 18 in various ways.

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  So not fully. There are other teams, as I mentioned,

HIGHLY CONFIDENTIAL

Page 31

like trust and safety that manages some aspects of safety, like our community guidelines enforcement, et cetera. So, you know, we partner closely with those kinds of teams. But everything beyond community guidelines, it's a pretty fair generalization to say what you said.

BY MR. DRAPER:

Q. All right. My next question is how does your job differ from Matt Halprin's job as global head of trust and safety at YouTube?

A. So Matt Halprin manages the policy development and enforcement. He, you know, doesn't have product teams. He doesn't launch products, right. His team comes up with the policies that you might see on our help center, you know, the content guidelines, things like creators, and you might get a strike. That's based on our policy if you're a creator and you do something against our community guidelines. His team develops all of that policy, and then -- and I might be missing a few things,

so this is my understanding of it, but I believe it's really kind of two parts. Building the policy, publishing the policy, and then enforcing the policy with teams of people who would, you know, look at videos, right, and kind of make a judgment call based on that policy.

Q.    So one way I have seen it described is that Mr. Halprin looks at individual videos, and then the youth team handles more kind of infrastructure changes that apply kind of across the board.

MS. WADHWANI:  Objection to form.

THE WITNESS:  So I might get more specific in that there is a trust and safety product management team that is kind of a peer to my team, and they partner more closely with, you know, enforcing through technological interventions to find, you know, violative videos that, for instance, might get in -- queued in a reviewer pipeline that a human would look at, right?  That's not my --

Page 33

BY MR. DRAPER:

Q.    That's classifiers.

A.    They -- yes, you could probably simplify it to that.

Where my team, I'm -- I roll up into a different part of the organization that much -- much more focuses on search and discovery, so our recommendation engine, our search.  And, you know, does build classifiers, but amongst other things, to, you know, look at kind of corpora of videos, if you will, bodies of videos.

Q.    All right.  Let me ask you some questions about your day-to-day work at YouTube.

What are the different ways that you communicate with your coworkers at YouTube?

A.    Lots of ways.  We e-mail.  We have lots of meetings.  We build documents, you know, written documents, PowerPoint -- well, Google slides, presentations.  We chat.  You know, kind of normal course of business stuff.

Q.    Are you one of those people who

Page 43

at the document to see the chats, and I want to make sure since there are different groups represented on this document.

MR. DRAPER:  I am talking about the group of people that is defined in the "to" field up here.

THE WITNESS:  As I mentioned, this was a best practice for us as a team, so it should not have been a surprise for them.

BY MR. DRAPER:

Q.    All right.  Let me show you another document.  This one we will mark as YouTube Beser Exhibit 4.

(YouTube Beser Exhibit No. 4 was marked for identification.)

MR. DRAPER:  And for the record, it was produced by the attorneys for YouTube and Google and is designated Bates number 00788582.

BY MR. DRAPER:

Q.    You can go ahead and take a look.  I'm only going to ask you about a small part of it, so I don't think it's worth

HIGHLY CONFIDENTIAL

Page 44

looking through the whole thing.

A.    Okay.

Q.    Are you ready for me to go ahead and ask some questions about this document?

A.    If you could just give me one moment, please.

Q.    Sure.

A.    (Peruses document.)  Okay.

Q.    All right.  If you look at the last page, you will see that you are one of the custodians for this document.  Do you see that?

A.    Yes.

Q.    All right.  The document is titled on the first page "Responsibility Team Meeting Notes."  Do you agree?

A.    That's what the document says.

Q.    All right.  What was the responsibility team?

A.    I've never seen this document, or at least I do not recall seeing this document.  It could refer to lots of things, you know.  We do refer to ourselves as a responsibility team, but lots of other teams

do as well for different types of issues.

Q.    All right.  If you look at the first entry dated 5/28/2020, there's a bullet point, and the first bullet point is -- it says "Sharon," but I think it's pronounced Sharone (phonetic), "focusing on medical health and mental health."

Do you see that?

A.    I do.

Q.    That refers to Sharon Stovezky who is a member of your team?

A.    No, Sharon does not report to me.

Q.    She does not report to you.  Okay.

Do you have any reason to believe this document is not what it appears to be, a record of the meetings of the responsibility team at YouTube?

Going back to 2016, if you look at the end of the document, the entries are in reverse chronological order, so the first entry is November 30th, 2016, and then the most recent entry is May 28th, 2020, on page 1.

Page 46

MS. WADHWANI:  Objection to form.

THE WITNESS:  I don't know what this document was.

BY MR. DRAPER:

Q.    Is there anything that strikes you as unusual?  You've seen documents in this format at YouTube?

A.    Nothing particularly unusual. It looks like meeting notes.

Q.    Great.

So if you could just look at the page that's designated 8601.

Sir, 8601 includes a record of the meetings of the responsibility team at YouTube for December 14th, 2018.  Do you see that?

A.    At the bottom of the page, yes.

Q.    All right.  And then the first bullet point is for launches and milestones. Do you see that?

A.    I do.

Q.    And then on the second page, which is 8602, there is another bullet point that says "Mailing lists."

Page 47

A.    I see it.

Q.    Do you see that?

A.    Yes, I see that.

Q.    All right.  And you see that it identifies some new mailing lists, correct?

A.    That's what it appears to do.

Q.    All right.  And then there is the second from the bottom, a hollow bullet point that says:  "Three chat rooms (by default) history off."

Do you see that?

A.    I see that.

Q.    All right.  So for the youth team, you told me it was best practice to kind of keep history off in the chats.  For this responsibility team, it seems it's also a practice to keep history off in the chat rooms.  Do you agree?

MS. WADHWANI:  Objection to form, foundation, mischaracterizes prior testimony.

THE WITNESS:  Again, this wasn't my team.  I don't know what team norms they had.

BY MR. DRAPER:

Q.    But at least in this instance, they are by default keeping history off in their chat rooms?

MS. WADHWANI:  Objection to form.

THE WITNESS:  That's what the document says.

BY MR. DRAPER:

Q.    All right.  Have you talked with people on other teams outside the youth team and either told them or been told by them to keep history off in the chats?

A.    I don't recall.

Q.    Would it surprise you that other teams also at YouTube also have a practice of keeping history off in their chats?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Well, I can only speak for my team, which was it led to a lot of confusion for junior folks who would go back in time and take things out of context.  And so it wouldn't surprise me if other teams

HIGHLY CONFIDENTIAL

Page 49

did similar.

BY MR. DRAPER:

Q.    Did anyone ever tell you that you should have history off on your chats? Anybody senior to you ever tell you that?

A.    I don't recall ever being told that.

Q.    Do you have an official work phone?

A.    I'm not exactly sure what that means.  I have a phone that is not paid for by Google.

Q.    Okay.  So I would call that not.

A.    Not.  Yeah, I don't know what official means, but I don't think.

Q.    All right.  So you use your personal phone occasionally for business purposes?

A.    I have my e-mail on there and my chat.

Q.    All right.  Do you ever text with other YouTube employees from your personal phone?

A.    Very rarely.

Q.   Ever text about business things or -- you know, I'm not interested if you text about going out to dinner on Tuesday night, but --

A.   No, the texts are usually to coordinate, say, like a weekend meeting or something.  It's usually -- I can only recall logistic texts.

Q.   Okay.  Mr. Beser, do you agree that a corporation should not release an application designed for teens and younger kids without knowing that the application is safe for them?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So I take a little bit of issue with the word "safe" because that is a relative term.  So I think that I would find a problem saying it's safe to any given person at any given time.  The word "safe" can mean different things.

BY MR. DRAPER:

Q.   Sure.  Do you agree that a corporation should not release an application

HIGHLY CONFIDENTIAL

Page 51

designed for teens or younger kids without knowing what the safety hazards are for that application?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I agree that when you are launching a product for youth, it is important to have a high degree of responsibility, which would mean knowing what the risks are.

BY MR. DRAPER:

Q.    And do you agree that a corporation that wants to release an application designed for teens and younger kids should test the application for safety before releasing it?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I would agree that you would need to have some information about where the risks are, which could come through testing. Again, that's a bit of a broad term. But yeah.

BY MR. DRAPER:

Q.      All right.  And do you agree that a corporation should not add features to an application designed for teens and younger kids without knowing that the added features will be safe or at least knowing what the potential hazards are?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I agree that before you launch features for teens and young children, you should have a good sense of where the risks are.

BY MR. DRAPER:

Q.      And does that include mental health risks?

A.      The word "mental health" can be used in different ways in different contexts. So I don't know maybe what you mean by mental health, but -- maybe you could define that a little more.

Q.      Sure.  We're talking about software applications here, right?

A.      Yes.

Q.      So there's not a lot of physical risks with a piece of software.  Do

HIGHLY CONFIDENTIAL

Page 53

you agree?

A.    I can only speak for YouTube, and I agree that there's no physical risks.

Q.    Okay.  And so the risks associated with a product like YouTube are how it would affect the mental health of the user.  Do you agree?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I do not agree because I actually -- you just -- I need a little bit more definition of what you mean by mental health.  It is a broad term that can mean different things in different contexts.

BY MR. DRAPER:

Q.    What does it mean to you?

A.    So at YouTube we take a lot of care before we launch products for teens and little kids or children.  We work closely with our experts to define such terms as "mental health," which are used quite loosely in press or et cetera.

We try and define those terms into specific risk areas.

HIGHLY CONFIDENTIAL

Page 54

And so we go -- that's how -- at least for my team, we can then turn it into an actionable plan where we can go and address those risks a priori to a launch.

BY MR. DRAPER:

Q.    Do you agree -- scratch that. I think you answered that.

Do you agree that a corporation

with an application designed for teens and younger kids that learns that the application can harm children should make changes to the application to improve its safety as soon as possible?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I agree that if you learn that there is an issue, you should respond very, very quickly to address those issues.

BY MR. DRAPER:

Q.    All right.  And do you agree that a corporation with an application designed for teens and younger kids that learns the application can harm children should warn the children and their parents of the potential harm as soon as the corporation learns of it?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I don't agree. Sometimes you just go fix things. Right.  Parents have a lot of -- you know, parents are busy.  Parents may

Page 56

not understand the issue.  Parents may just expect that it's fixed.

So every particular issue if we, you know, involve parents, it would overload them.  And kids may not even read.  So how -- you know, so I don't agree with that blanket statement.

BY MR. DRAPER:

Q.     Are there instances where you do think you should warn the parents?

A.     I think that it's incumbent on companies like YouTube in this youth -- youth area to ensure that parents understand the choices that they're making and what might -- you know, what benefits it might have, and the benefits are vast, and what -- you know, what might also be an outcome.

BY MR. DRAPER:

Q.     So you said that you might just prefer to fix the problem, rather than warn parents.

If there -- you know, fixes don't happen overnight often.  Sometimes they take study, and sometimes they take

HIGHLY CONFIDENTIAL

Page 57

engineering work to complete the fix.

In that circumstance, do you think you should warn the parents between the time that you have discovered the risk and the time that you can do something to fix it?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I think in some circumstances.

BY MR. DRAPER:

HIGHLY CONFIDENTIAL

Page 150

we take global goals for YouTube Kids.

BY MR. DRAPER:

Q.    Just bear with me for a moment, please.

Okay.  Let's move on to another document.  The document that I'm going to show you now, sir, we will mark as YouTube Beser Exhibit 15.

(YouTube Beser Exhibit No. 15 was marked for identification.)

MR. DRAPER:  For the record, this document was produced by Google and YouTube's attorneys and is Bates marked as 01608261.

BY MR. DRAPER:

Q.    There is a copy for your counsel.

MS. WADHWANI:  Thank you.

BY MR. DRAPER:

Q.    And here is a copy for you, sir.

A.    Thank you.  (Peruses document.)

Q.    You tell me when you are ready to continue, sir.

A.    Okay.

Page 151

Q.   All right.  This document is titled "YouTube Kids Vision and Strategy for 2006 -- 2016 Q2."  You agree, sir?

A.   That's what it says.

Q.   And if you look at the last page, you are listed as the custodian for this document.

A.   Yep.

Q.   And if you go back to the first page, right underneath where it says "Vision and Strategy Q2 2016," it has your name. Yes?

A.   Correct.

Q.   Did you give this presentation, sir?

A.   I do not remember how this presentation was used.

Q.   Okay.  If you look at the metadata, sir, back on the last page, it lists you as the author of the document.  Do you see that?

A.   I do.

Q.   Do you -- did you have input in the creation of this slide deck, sir?

A.   Yes.

HIGHLY CONFIDENTIAL

Page 152

Q.    Okay.  I know you did because you commented on the slide -- slide deck in here.  And I didn't write down the page that you commented on, but let me find it.

Oh, I got it here.  The pages aren't numbered, unfortunately, but it's after a slide that says "Search and Discovery."  It has a -- it's a page that looks like this (indicating).

A.    Okay.

Q.    Right.  And there's just a comment from you dated April 23rd, 2016.  Do you see that?

A.    I do.

Q.    All right.  So obviously you had seen this document at the time it was being prepared.

A.    Yes.

Q.    All right.  Is there any doubt, sir, that this document is what it appears to be, a slide deck dealing with the strategy and vision for YouTube Kids in 2016?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I -- it's what --

HIGHLY CONFIDENTIAL

Page 153

that's what it says.

BY MR. DRAPER:

Q.    Right.  That's what it looks like, right?

A.    Sure.

Q.    And there isn't anything in here that leaps out at you and says, Nope, that's not what it is?

A.    No.

Q.    All right.  YouTube Kids did not operate in a vacuum.  Correct?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Can you be more specific?

BY MR. DRAPER:

Q.    Sure.  Part of the strategy for YouTube Kids was to feed users to YouTube as they got older.

A.    So the way we thought about, and sort of maybe continue to think about it today, is YouTube is going to get used by kids.  Right.  It's an app on a phone. Parents hand their phones to their kids. YouTube is there.

Page 154

So kids will use YouTube. It's written in our North Star principles, right. And so if they're going to use YouTube, we want them to use YouTube in the most age-appropriate, safe and high quality way as possible.

Q. One of the goals for YouTube Kids was to create the next generation of YouTube users. Do you agree?

A. So I'd like to point out that I started on the kids team. This is probably one of the first things I saw or commented on.

Q. Right.

A. So we were trying -- I was learning and figuring out a lot. Right. So I just want that to be noted that a lot of these things might have been hot takes.

And again, I don't know what we used this deck for. It might have been my own scratch pad. There is actually a slide that says "Scratch pad." So I might have just been trying to get my thoughts organized.

Q. Okay. If you will just look at

HIGHLY CONFIDENTIAL

Page 155

the -- the second slide here, sir, it -- it is entitled or has a caption that says "YTK Vision."  That of course stands for YouTube Kids.  I'm sorry.

A.    I'm ahead of you, sir.  My bad.

Q.    Right there, that one.  Right. You see where it says "YTK Vision."  That of course stands for YouTube Kids vision, correct?

A.    Yes.

Q.    All right.  And it says: "Create the next generations of YouTube users."  Yes?

A.    That's what the slide says.

Q.    All right.  The thought was that if you get kids hooked on YouTube Kids at an early age, say four to eight, they stick with YouTube as they get older and remain YouTube users, right?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I mean the slide lists out different age groups and has arrows.  But as I mentioned before, we are sort of assuming everyone uses

HIGHLY CONFIDENTIAL

Page 156

YouTube, and so we want to make sure when those users are on YouTube, we have them in the safest and most appropriate place.

BY MR. DRAPER:

Q.    You say you assume everyone uses YouTube.

A.    Mm-hmm.

Q.    I've seen it characterized a little bit differently, that the goal is for all kids to use YouTube.  Would you agree with that characterization?

MS. WADHWANI:  Objection to form.

THE WITNESS:  The -- so again, this slide deck, I don't remember exactly what we used it for.  It was like maybe my first month possibly on the product.  So irrespective of what's said here, I wouldn't say that the goal is for all kids to use YouTube.  I think our goal is to be as valuable as possible.

YouTube is used in schools. I've seen statistics like 95 percent

HIGHLY CONFIDENTIAL

Page 157

of teachers have used YouTube in the last, you know, month or quarter or year in classrooms.  And, you know, YouTube is an incredible learning device.  We see it as the library, but organized for kids and to actually help them find things that they might want to go deeper on.  It is one of the biggest search engines in the world.

So, yeah, kids are going to use YouTube.

MR. DRAPER:  For the record, sir, I move to strike the nonresponsive portion.

BY MR. DRAPER:

Q.    So still on this -- this same slide, for kids younger than eight, it has a statistic under it where it says, "Under 8, ███ ███████ addressable users."  Do you see that?  In blue?

A.    I see that.

Q.    Right.  And then for tweens, it also says ████ ████████ addressable users, correct?

HIGHLY CONFIDENTIAL

Page 158

A.    That's what the slide says.

Q.    Addressable users, I think you know from your marketing experience, is the total potential market?

MS. WADHWANI:  Objection to form.

THE WITNESS:  It can mean that. I don't recall exactly what was meant here, but -- it can mean that.

BY MR. DRAPER:

Q.    Okay.  And so this identifies, and it says actually underneath the slide, "█████ ████████ kids under 13."

Is that -- that's more than in the United States, you would agree?

A.    Yes.

Q.    Right.  That's worldwide.

A.    Yes.

Q.    All right.  And YouTube wanted to reach every one of them, all █████ ████████, correct?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I don't know what YouTube wanted.  I certainly didn't

Page 159

know in Q2 2016 when I had been at the company for a very short period of time.

And as I mentioned before, we just assumed YouTube is going to get used by kids.

BY MR. DRAPER:

Q.    By every kid in the world?

A.    If they find --

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  If they find it valuable and useful.

BY MR. DRAPER:

Q.    All right.  Let's look at the next slide, please.

The next slide has a heading. It reads "YouTube Kids growth strategy:  Become a daily tool for all U13 kids globally."

Right?  Do you see that?

A.    I do see that.

Q.    Have you ever heard that goal referred to as every kid, every day?

HIGHLY CONFIDENTIAL

Page 160

A.    I don't recall that.

Q.    All right.  And the strategy you'll see -- you can see on here is twofold, grow activations, right?  So more kids are on the platform.  Yes?

MS. WADHWANI:  Objection to form.

THE WITNESS:  It says, "Grow reach."  So, yeah -- grow people downloading the kids app.

BY MR. DRAPER:

Q.    Right.  And then on that upward pointed arrow right to the left of it, it says "Activations."

A.    Okay.

Q.    Right.  So grow activations, grow reach, so more kids are on YouTube. Right?

MS. WADHWANI:  Objection to form.

THE WITNESS:  More users are downloading and onboarding YouTube Kids app is what that would mean, I would guess.

BY MR. DRAPER:

Page 161

Q.    All right.  And then the other part of the strategy is the lower bar, the arrow pointing to the right, "Encourage engagement."  Yes?

A.    No, I would not characterize this as our strategy.  As I mentioned, this is a slide deck I built within the first, you know, few weeks or days of starting the project --

Q.    Yeah.

A.    -- I was learning.  If I did this deck, and I can't remember if I did it, but I certainly participated in it at a minimum, so it was a place for sketching down some ideas so that I could talk to people and learn more about how -- you know, how to think about this area that was brand new for me.

Q.    You're allowed to change your mind, but at the time what you put down is the strategy was twofold, grow reach and encourage engagement.  Right?

MS. WADHWANI:  Objection to form.

THE WITNESS:  The slide says

Page 162

that.  That doesn't make it the strategy.

BY MR. DRAPER:

Q.    And along those two axises -- axes on the left, "Activations," and on the bottom, "DAV."  That stands for daily active viewers, correct?

A.    That's what it stands for.

Q.    Okay.  And then there's a black arrow pointing upwards to the right.  Do you see that?

A.    Yes.

Q.    And it's labeled "Goal," correct?

A.    Correct.

Q.    And it's pointing to a figure "TAM," total addressable market, "███ ███████."  Right?

A.    That's what the slide says.

Q.    Every kid, every day, globally.

MS. WADHWANI:  Objection.

BY MR. DRAPER:

Q.    That's the goal.

MS. WADHWANI:  Objection to form.

HIGHLY CONFIDENTIAL

Page 163

THE WITNESS:  That's not the goal.

BY MR. DRAPER:

Q.    That was the goal at this time.

MS. WADHWANI:  Objection to form.

BY MR. DRAPER:

Q.    Do you disagree?

A.    No, I disagree.  This was a slide that was made to sketch down some ideas when I first started at this job so that I could get feedback and understand better this area.

Q.    All right.  So where it says: "YouTube grow strategy, become a daily tool for all U13 kids globally," that wasn't right.  You didn't mean that.

A.    Well, it's evolved --

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  I think being a tool for kids is an important part of what YouTube Kids can do.

BY MR. DRAPER:

Page 164

Q.    Daily tool.

A.    Well, the idea of a tool is all I'm commenting on.  And daily is not something that, you know, once I started to understand better this area, you know, was something that didn't last very long.

Q.    Yeah.  Sir, I'm not saying you're not allowed to change your mind.  I'm just saying that at this time the goal was all kids every day, all around the world.

A.    No.

MS. WADHWANI:  Objection to form, asked and answered.

BY MR. DRAPER:

Q.    Okay.

MS. WADHWANI:  When you are at a good point, we've been going about an hour and 20.

MR. DRAPER:  Yeah, let's take a break.  Thank you.

THE VIDEOGRAPHER:  The time is 11:42.  We're off the record.

(Recess.)

THE VIDEOGRAPHER:  The time is 11:55.  We're back on the record.

HIGHLY CONFIDENTIAL

Page 439

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  April 4, 2025.

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)