# AMENDED Exhibit 250

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

PURSUANT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------x

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No. 4:22-md-
ADDITION/PERSONAL INJURY        ) 3047-YGR
PRODUCTS LIABILITY LITIGATION   )

------------------------------x


SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

SPRING STREET COURTHOUSE

COORDINATION PROCEEDING            )
SPECIAL TITLE [RULE 3,400]         ) Lead Case No. for
                                   ) Filing Purposes
SOCIAL MEDIA CASES                 ) 22STCV21355
_____   )
                                   )
This Document Relates to:          )
STATE OF TENNESSEE, et al.,        )
     vs.                           )
META PLATFORMS, INC., and          ) CONTAINS HIGHLY
INSTAGRAM, LLC, Case No.           ) CONFIDENTIAL
23-1364-IV                         ) INFORMATION

------------------------------x



VIDEOTAPED DEPOSITION OF NONA YADEGAR

LOS ANGELES, CALIFORNIA

MONDAY, DECEMBER 16, 2024

9:35 A.M.

Job No.: 7040317
Pages: 1 - 418
Reported by: Leslie A. Todd, CSR No. 5129 and RPR

PURSUANT TO PROTECTIVE ORDER

Page 2

Videotaped deposition of NONA YADEGAR, held at the offices of:

MUNGER, TOLLES & OLSON, LLP

350 South Grand Avenue, 50th Floor

Los Angeles, California 90071-3426

(213) 683-9100

Pursuant to notice, before Leslie Anne Todd, California Certified Shorthand Reporter in and for the State of California, who officiated in administering the oath to the witness.

PURSUANT TO PROTECTIVE ORDER

Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

    JAMES J. BILSBORROW, ESQUIRE (Jacksy)
    AARON FRIEDMAN, ESQUIRE
    ASHLEY ARRARAS, ESQUIRE (via Zoom)
    WEITZ & LUXENBERG, LLP
    700 Broadway
    New York, New York 10003
    (212) 558-5856

    EMMIE J. PAULOS, ESQUIRE (via Zoom)
    JEFF GADDY, ESQUIRE (via Zoom)
    LEVIN PAPANTONIO RAFFERTY, LLP
    316 South Baylen Street
    Pensacola, Florida 32502
    (850) 435-7107

ON BEHALF OF SNAP INC.:

    FAYE PAUL TELLER, ESQUIRE
    ALBERTO DE DIEGO-HABEL, ESQUIRE
    LAURA LOPEZ, ESQUIRE
    MUNGER, TOLLES & OLSON, LLP
    350 South Grand Avenue, 50th Floor
    Los Angeles, California 90071-3426
    (213) 683-9100

ON BEHALF OF META DEFENDANTS:
    MONA PATEL, ESQUIRE (via Zoom)
    COVINGTON & BURLING, LLP
    One International Place
    Suite 1020
    Boston, Massachusetts 02110-2627
    (617) 603-8800

PURSUANT TO PROTECTIVE ORDER

Page 4

APPEARANCES (Continued)

ON BEHALF OF GOOGLE LLC and YOUTUBE, LLC
DEFENDANTS:
        ARMANI MADISON, ESQUIRE (via Zoom)
        WILLIAMS & CONNOLLY LLC
        680 Maine Avenue, SW
        Washington, DC 20024
        (202) 434-5547

ON BEHALF OF TIKTOK DEFENDANTS:

        AMY M. PEPKE, ESQUIRE (via Zoom)
        KING & SPALDING, LLP
        1100 Louisiana Street
        Suite 4100
        Houston, Texas 77002
        (713) 751-3200
        CHRIS AYERS, ESQUIRE (via Zoom)
        GIBSON DUNN & CRUTCHER, LLP
        3161 Michelson Drive
        Suite 1200
        Irvine, California 92612-4412
        (949) 451-3800

ALSO PRESENT:
        JULIA BREDRUP (SNAP, INC.) (via Zoom)
        DAVID KIM, Videographer
        CHRIS FAULK, Document Technician
        MARIAM OLADIPO (via Zoom)
        SUZANNE GOMEZ (via Zoom)

PURSUANT TO PROTECTIVE ORDER

Page 21

I'm sorry.

BY MR. BILSBORROW:

Q.      Ms. Yadegar, have you seen this document before?

A.      I believe you pulled this from my LinkedIn in profile.

Q.      Ms. Yadegar, I'll represent to you that this was produced to us by your lawyers in this case.

MS. TELLER:  Objection. Foundation, if that's a question.

BY MR. BILSBORROW:

Q.      Is this a fair and accurate copy of your resume?

A.      Yes.

Q.      You created it?

A.      Yes.

Q.      Do you update your resume when necessary?

A.      Yes.

MS. TELLER:  Objection.  Vague.

BY MR. BILSBORROW:

Q.      Is this resume up to date?

A.      I think so.  Yes, it appears to be.

Q.      Let me ask you about a few items on

Page 22

the resume in particular.

You're an attorney?

A.    I don't know what the definition of "attorney" is in terms of like active status with the bar, which I don't believe I have, but I would have to check on that.  But I -- I have a JD.

Q.    You have a JD.  For the jury, a law degree, correct?

A.    Yes, I have a law degree.

Q.    You went to law school?

A.    I went to law school.

Q.    And you at some point were a practicing attorney, correct?

A.    Yes, for a short time.

Q.    You received your law degree from Columbia University in New York?

A.    Yes.

Q.    When you were at Columbia, you were the student body president, correct?

A.    Student senate president was the technical term, but yes.

Q.    And after you graduated, you practiced at a law firm, correct?

A.    Yes.

Page 23

Q.      Latham & Watkins?

A.      Yes.

Q.      Was that in New York or somewhere else?

A.      I was a summer associate in Los Angeles and a practicing lawyer in New York City.

Q.      You were a practicing lawyer after law school from October 2013 to November 2014; is that right?

A.      I believe so, yes.

Q.      Did you have any particular specialty you were practicing in?

A.      No.

Q.      Why did you leave Latham & Watkins after just over a year?

A.      I didn't feel inspired by the practice of law at a corporate law firm.  Sorry to all present.

Q.      You're honest.

        After you left Latham & Watkins, you took a job as director of trust and safety at Whisper app.  Do you see that?

A.      Yes.

Q.      What is Whisper app?

A.      It no longer exists.

PURSUANT TO PROTECTIVE ORDER

Page 24

Q.      What was Whisper app?

A.      It was an app that generated an image for you to be able to share information on top of -- roughly.

Q.      I'm sorry.  Generate information to share --

A.      Generate -- it was image -- it was a stock image-based, text-based sharing system. Sorry.  That's not a great way to say it.

Q.      What did you do as director of trust and safety at Whisper app?

A.      I lead the various teams that rolled up to our safety efforts.

Q.      And you were with Whisper from November 2014 to June 2016?

A.      Yes.

Q.      And in July 2016, you started at Snap, correct?

A.      Correct.

Q.      You started in -- at Snap in the trust and safety department, correct?

A.      Yes.

Q.      You actually started as the head of trust and safety at Snap.

A.      I started in -- no, I did not start

PURSUANT TO PROTECTIVE ORDER

Page 25

as the head of trust and safety.  I kind of -- I collapsed in each of these sections, less -- you know, lesser roles that then ended with these.  I started as the online safety lead.

Q.    Did you have any other positions in trust and safety other than online safety lead and the head of the department?

A.    I don't believe so.  I would have to like look at my very particular -- I don't have a record of that, but I don't believe so.

Q.    Do you remember who was head of trust and safety when you started in July of 2016?

A.    There was no specific head of trust and safety.  It was led -- the department and other functions were led by ███████████, who I believe had a broader title than just trust and safety.

Q.    Do you recall when you became head of trust and safety at Snap?

A.    No.  There was a time where -- when I came in, trust and safety was split across three leads, and then at some point I was promoted to manage the entire team.  I would have to look at records to know the exact date.

Page 26

Q.      What were your primary responsibilities as head of trust and safety at Snap?

A.      As head of trust and safety, I was in charge of our user-generated content policies, various educational materials for parents and other stakeholders, and reviewing reports and actioning them.

Q.      When you say "reviewing reports and actioning them," are you referring to reports of harmful content on the app?

A.      Reports -- any reports of potential community guideline violations.

Q.      Which could include harmful content, correct?

A.      Yes.

Q.      Your resume indicates that you had some responsibility for global content moderation and enforcement operations.

Do you see that?

A.      Yes.

Q.      What did -- what did that entail?

A.      As I said, the team was responsible for reviewing reports.  During my time we scaled our review operations to be global and to have

PURSUANT TO PROTECTIVE ORDER

Page 27

locations throughout the world that could assist in that moderation.

Q.    During the time that you were head of trust and safety, did you have responsibility to moderate Snapchat's public-facing surfaces, like Discover or Spotlight?

A.    I can't recall specifically, and we would have certainly advised had there been questions of it, but I think at that time the teams that ran those surfaces might have been more responsible for them.

Q.    So is it fair to say that your primary content moderation responsibility was over user-to-user communications?

A.    Yes.

Q.    We just referenced Snap's -- Snapchat's surfaces.  Is that a term you're familiar with?

A.    No, but I understand what one would mean by using the term "surface."

Q.    I've seen some of the documents refer to the Discover surface or the Spotlight surface.  Is that generally just a reference to those portions of Snapchat?

MS. TELLER:  Objection.  Vague.

Page 28

THE WITNESS:  I can't say because I don't know what you're referring to, but that's what I would assume, just the colloquial meaning of the word "surface."  It's definitely not like a technical term that we use.

BY MR. BILSBORROW:

Q.    Your resume also indicates that during the time that you were in the trust and safety department at Snap, you had some responsibility for safety policy development.

Do you see that?

A.    Yes.

Q.    What safety policies were you involved or responsible for developing?

A.    That's what I referred to when you first asked what I did, which was our user-generated content policies, meaning documentation that defined the guidelines and the enforcement actions that needed to be taken as a result.

Q.    What is user-generated content?

A.    Content made and posted and sent by the user themselves.

Q.    Okay.  So when you refer to

PURSUANT TO PROTECTIVE ORDER

Page 29

user-generated content policies, that's a reference to policies that govern what users can post and send to other users.  Fair?

A.      Yes.

Q.      Were you in charge or responsible for developing any other safety policies during your time with trust and safety other than the user-generated content policies?

A.      Like a specific, defined set of policies?  I don't think so.  But I certainly would be involved in conversations around policy development, but I was not on the policy team.

Q.      According to your resume, you also had responsibility for design and implementation of in-app reporting during the time that you were head of trust and safety, true?

A.      Yes.

Q.      Tell me about your experience with the design and implementation of in-app reporting.

MS. TELLER:  Objection.  Vague.

THE WITNESS:  We worked with the design team and engineers, and various folks got together to design a Snapchat reporting flow and tool that was another

PURSUANT TO PROTECTIVE ORDER

Page 30

level of sophistication from what we had in app at that time.

BY MR. BILSBORROW:

Q.      When you were working with the design team to design this in-app reporting flow, was it possible for users on Snapchat to make in-app reports?

A.      Yes.

Q.      What -- what was different about the implementation of in-app reporting that -- that you were responsible for?

A.      I -- it's like been a long time, so I don't remember the specifics.  But in order to generate reports when I first joined, the report would then populate in Zendesk, and was like not entire -- like it wasn't a tool completely run by Snapchat.  So in this case what would happen was the report would then generate in an internal tool, instead of an external service that we used for customer service.

Q.      As the head of trust and safety at Snap from July 2016 -- or at some point between July 2016 and July 2018, did you have any responsibility for transparency reports?

A.      You know, I can't recall.

Page 31

Q.      You're familiar with transparency reports, correct?

A.      Yes.

Q.      What is your understanding of Snap's transparency reports?

A.      At some --

MS. TELLER:  Objection. Foundation.

THE WITNESS:  At some point I was responsible for them, but I don't -- I don't -- I don't recall that I was at this time.

BY MR. BILSBORROW:

Q.      Ms. Yadegar, as head of trust and safety, did you have direct reports?

A.      Yes.

Q.      Who was your direct -- who were your direct reports?

A.      I have no recollection of them.

Q.      Do you recall who you reported to?

A.      ████████████

Q.      Anyone else?

A.      She's the only person I reported to in that role.

Q.      How big was the trust and safety

PURSUANT TO PROTECTIVE ORDER

Page 133

BY MR. BILSBORROW:

Q.      How about this:  If Snap knows that part of its platform is posing a risk to minor safety -- minor user safety, Snap should warn minor users of that risk.  Do you agree?

MS. TELLER:  Objection.  Vague, incomplete hypothetical, asked and answered.

THE WITNESS:  I think we have a responsibility to educate our community about the risks that can -- they can experience using Snapchat.  One of the ways to do that could be to warn them, yes.

BY MR. BILSBORROW:

Q.      And that would be Ethics by Design, right?

MS. TELLER:  Objection.  Vague.

THE WITNESS:  I have no idea what Ethics by Design is.

BY MR. BILSBORROW:

Q.      Well, take a look at point number 2 on slide 464.  It says:  "We want to empower our community with the tools and knowledge to control their experiences when using our products,

PURSUANT TO PROTECTIVE ORDER

Page 415

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  January 6, 2025.

*Leslie Anne Todd*

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)