**AMENDED Exhibit 813**

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Deborah Oshuntola                                                1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------------------

IN RE: SOCIAL MEDIA

ADOLESCENT ADDICTION/PERSONAL

INJURY PRODUCTS LIABILITY

LITIGATION,                      Case No.

4:22-MD-03047-YGR

MDL No. 3047

This Document Relates to:

ALL ACTIONS

------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

------------------------------------------

Coordination Proceeding

Special Title (Rule 3.550)  JCCP No. 5255

Judge Carolyn B. Kuhl

SOCIAL MEDIA CASES          Dept. 12

------------------------------------------

February 4, 2025

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

(caption continued)

systems to talk about spam and to train different models on how to recognize spam and remove spam from platform.

Q.    And then in -- let me ask why did you leave Twitter in August of 2016?

A.    So, my contract was up 'cause I was contingent worker and I wasn't able to get -- convert that into a full-time role, and I also wanted to take a bit of a break to figure out what I would do next.

Q.    And the next -- your next employment was at Snap; is that correct?

A.    Yes, that's correct.

Q.    And so tell me a little bit about the role that you were initially hired into in 2017?

A.    I was a trust and safety specialist, and so it was really using my experience that I had gained from working at Twitter in Trust and Safety to similarly look at reports that users made, any complaints that they had, and investigate based on our policy, take action, and get back to the users.

Q.    And so let's -- let's break that down just a little bit.

So, when you say that -- so, how -- how did that work?  How would you have had items that were escalated to Trust and Safety, if that's a fair way to phrase that?

A.    I'd say that they were more -- it was user reports.  So users, the work that I was doing when I started would be users writing in through one of the different ways that you can report content on Snap, explaining their experience or what situation they were in, and then we would see how we could help.

Q.    And in 2017 when you started, was Trust and Safety the only -- the only area at Snap, the only division at Snap that handled those types of user reports?

A.    Sorry, what do you mean by "those types"?

MR. HARE:  Yeah, let me rephrase.  It's a poor question.

Q.    Was Trust and Safety the only

division at Snap that responded to user reports of potentially harmful conduct?

A.    Sorry, I want to make sure I'm being accurate.

As far as I can remember, I think for harmful conduct, it was within the Trust and Safety remit.

Q.    Were there any other divisions at Snap that you would say you all worked closely with in Trust and Safety?

A.    Yes.

So I'm trying to remember back to 2017.  There were teams that did other kind of review work for different products, and also that handled, like, customer feedback that wasn't specific to the user but probably more about the platform that Trust and Safety wouldn't have looked at.

Q.    So, looking at the first bullet point that says:  Worked closely with Policy, Product, and Vendor partner teams to launch, scale and optimize solutions for enforcement of safety policies.

Am I reading that correctly?

A.    Yes.

Q.    How would you work with Policy to -- to enforce?  Would you collaborate with Policy, or would you listen to Policy and apply it to the trust and safety work you did?

A.    As I got more senior in my role, I would still be looking at the complaints that users would write in and if there was an area that not addressed by the policy or was a bit ambiguous with the policy, that would be escalated to the Policy team.  There'd be discussion about the best course of action.  I would provide my perspective really like the user's advocate and that would be taken into consideration, and a policy would be written or redeveloped or clarified based on the escalation that was being worked on.

Q.    And similarly, how would you work with a product to launch, scale, and optimize solutions for the enforcement of

safety policies?

A.    Yeah, one of the concepts that really is forefront at Snap is a safety by design, and so that means before a product is launched, it will be, you know, thought about ahead of time, and so working with Product, at least as part of the Trust and Safety team at the time, would look like advising them what could or couldn't be done from a safety perspective so that that could be built into the product.

Q.    And finally, as it relates to the vendor partner team to launch, scale, and optimize solutions for the enforcement of safety policies, tell me a little bit about your role and how you all collaborated with that.

A.    So, because of the large number of piece of content that are just on a platform, to make sure that we can address every complaint that's coming in, we work with vendor teams and we -- we partner with them, and so it's really important that they understand policies, that they

understand new products that are coming up and how it might change the work that they do. And so part of my work was to make sure that they had that understanding, so undertaking training, providing them with support, making sure that their quality is in place so that they could apply our policies in the way that they should have been.

Q. And I'm going to skip ahead to the last one that says: Led initiative centered around the customer experience and improve policy, efficacy, tooling and operational design to increase enforcement quality and reduce risk.

Specifically what kind of initiatives did you lead? What do you mean by that?

A. That's a great question.

So, at the time, it would have been kind of just thinking about ways that we can make our processes more efficient or, kind of like I mentioned earlier, looking at our policy and seeing where

there's room for improvement in terms of like the way the vendors were understanding it or if there had been a product that rolled out and we thought users would use it one way and they end up using it a different way and we need a policy to readjusting it in terms of what we were seeing come through from the user's side, kind of giving that feedback to the Policy Team so that they could develop policy again.

Q.    And I see that you were in that initial role for right at two years, and then it seems that you were elevated to a senior trust and safety specialist in February 2019.  Is that correct?

A.    That's correct.

Q.    How did your role change when you were promoted to a senior trust and safety specialist?

A.    I think it just became a bit more being an escalation point for more junior members of the team.

Honestly, I think I'd been doing

a bit of the role in my other specialist anyway. So I didn't really feel like a change just as much of a recognition of the work I'd been doing already.

Q.    Just kind of a natural progression already?

A.    Mm-hm.

Q.    And then I see in it looks like there's a little gap between September 2019 and August 2020.

Is that -- did you leave Snapchat, or is that -- tell me a little bit about what was going on during that year?

A.    No, I didn't leave Snap.

Q.    I apologize. I'm misreading that, aren't I?

That -- that September 2019, the senior augmented reality moderation specialist September 2019 to August 2020, correct?

A.    Yes, that's correct.

Q.    All right. Apologies.

Tell me -- tell me a little bit

about that role and that change of roles and what that encompassed.

A.    So, while I was a trust and safety specialist at the end of February 2017 -- sorry, at the end of the year 2017, Snapchat launched a Lens Studio and so that had been all reviewing the content that came from that platform was under the trust and safety agreement, and so from December 2017 I was working on what we call lenses and reviewing them, and that was lenses submitted by community members.

And so one of the projects I worked on as a trust and safety specialist and then senior specialist was lenses and the review of them, and so I did that hand in hand with my trust and safety work, and then as lenses grew as a platform, as that work also grew and it became its own workflow and it was in 2020 when it was like really officially -- or actually, I guess, 2019, yes, 2019 when it officially became its own workflow and then 2020 when it became its own team, separate team.  So

that's reflected in my transition from being a trust and safety specialist to a senior augmented reality moderation specialist.

Q.   So, you said that in late 2017, Snap developed Lens Studio; is that correct?

A.   Yes.

Q.   What exactly is Lens Studio?

A.   Lens Studio is a desktop app that anyone in the world can use to create their own lens.

Q.   And tell me like I've never used Snapchat before what is a lens?

A.   A lens is what Snap calls its augmented reality product that allows you to overlay what's computer technology that allows you to overlay something on top of the real world.  So the whole point is to improve, augment, the real world reality.

Q.   So, and you said that Lens Studio allowed users or the community to develop lenses.  Is that fair?

A.   That's correct.

MR. DARBY:  And this is SNAP0030424.

(Snap-Oshuntola-3, email thread ending 5/26/2017, Bates SNAP0030424, was marked for identification, as of this date.)

BY MR. HARE:

Q.    Take a moment to review that document, please.

And before we get into the document, so, we're going to go back to 2017 when you were in your initial role at Trust and Safety for a little while.

Now, that was your role at that time, correct?

A.    Yes.

Q.    And so, what are we looking at here generally?

A.    This is an email escalating a user complaint.

Q.    And so just to -- to back up. This is an email and I see in the "from" it's from ██████████████

Is that your email address?

A.    It is.

Q.    And is email a common way that you communicate with other employees about work at Snapchat?

A.    Yes.

Q.    And that was true in 2017?

A.    Yes.

Q.    And is that still true today?

A.    Yes.

Q.    And has your -- your email address, is it still ███████████, or has that ever changed?

A.    It's still d██████████.

Q.    Okay.

And ████████████████ is in the "to" line.

And I think I recall you mentioning ████████████ earlier?  Who is ████████?

A.    She was my manager at the time.

Q.    And also copied I see Nona Yadegar and ██████████████

A.    Yes.

Q.    Who are they?

A.    Nona was, I think she was the manager or policy person.  I don't know, she's had a couple of roles.  I don't remember what her role was at that time.

█████ was, I believe he was a product manager for Safety at the time.

Q.    And so, scrolling down to the -- to the bottom of the document, you say: Hey ███.  A user has written in complaining about the content within custom stories that has been -- that have been Geofenced at their school.  The reported user currently has no story content up.

Am I reading that correctly?

A.    That's correct.

Q.    So, and I believe you said a minute ago that we were looking at a email of you escalating a user generated report.

Is that fair?

A.    Yes.

Q.    So, earlier we talked about, kind of, the way the process works while within Trust and Safety for moderating

potentially violating conduct.

Is that fair?

A.    That's correct.

Q.    So, in this instance --

MR. HARE:  Well, strike that question.

Q.    Was it common of -- at -- in your role in 2017 that you would email your manager to escalate concerns during your moderation?

A.    Every now and then, yes.

Q.    What other ways would you escalate?

A.    I think mostly email.

Q.    Okay.

And so, reviewing this it says that "complaining about content within custom stories."

What is a custom story?

A.    I don't remember.

Q.    Fair enough.

It says "custom stories have been Geofenced at their school."

Do you know what Geofenced

means?

    A.    I don't remember.

    Q.    Okay.

          And if we -- we look up a little bit higher, and it looks that the school referred to is Tigard High School, according to your email on -- at 10:41 a.m.

          Is that correct?

    A.    Yes.

    Q.    And you mention that the -- you believe he's referring to group stories.

          Do you see that?

    A.    Yes.

    Q.    What is a group story?

    A.    So, I'm trying to make sure I'm thinking about the right features so I can answer the question accurately, but I don't think I remember.  I'm sorry.

    Q.    Well, if we go back up to that same email from 10:41 a.m. your second sentence says:  The IT director has written in saying that CSE content was posted on custom stories where the school was Geofenced.

Am I reading that correctly?

A.    Yes.

Q.    What is CSE content?

A.    That stands for child sexual exploitation.

Q.    Okay.  And is child sexual exploitation, would that be something that was commonly moderated during your role in 2019 at Snapchat?

MS. BELL:  Objection to form.

BY MR. HARE:

Q.    You can answer.

A.    I don't know that I would say commonly moderated.

I think -- sorry, could you repeat the question, please?

Q.    Sure.  I'll ask it in another way.

During your time at Trust and Safety, if you came across CSE content, would you routinely escalate that to your manager?

A.    There was a process.  Any kind of CSE content would actually be, like,

the process I remember is if there was actual CSE found, that would be reported to NCMEC, which is the National Center For Missing and Exploited Children, and potentially also law enforcement.

I don't know that the process, like not every single CSE case would have been escalated via email.  So this I think the escalation was maybe because it was a new feature.  I -- I don't know.  I don't know.

Q.   Let me ask during 2017, what was described to you as someone who reviewed for Trust and Safety of what would constitute CSE?

MS. BELL:  Objection to form.

You can answer.

A.   The definition of CSE?

Q.   Correct.

A.   From my understanding, it was laid out by NCMEC and there's, like, A1, A2, B1, B2, I believe B3 content and those different categories, and I might be misstating the different categories, or it

could be outdated.  It's been a while since I worked in Trust and Safety specifically.  But that refers to different ages and different types of nudity, sexual acts performed to or by minors.

Q.    And so it covers -- are you -- do you recall --

MR. HARE:  Well, strike the question.

Q.    We'll go to the -- we'll go to the -- the top email that you responded and you said:  A user said she is unable to take down content because she is no longer in the area.

Am I reading that correctly?

A.    Yes.

Q.    Was it a feature of Snapchat that you had to be geographically located in an area to remove content?

A.    I don't think so.

Q.    Do you recall why this user could not report -- or, could not remove content that -- for the reasons of being

outside an area?

A.    No.  I think I was just saying what the user's complaining about.  But users often are confused about our features and how they work.  I don't think it's a thing that you cannot take down content because you're not in the area.  That doesn't sound familiar as a feature.

Q.    And I know it's been a long time, but do you recall how this particular incident was resolved?

A.    I don't.

Q.    Fair enough.

MR. HARE:  We're going to show you now another document that we are going to mark as Exhibit 4.

MR. DARBY:  This is now 1209002.

(Snap-Oshuntola-4, email thread ending 10/11/2017 (redacted), Bates SNAP130902-006, was marked for identification, as of this date.)

BY MR. HARE:

Q.    And what are we looking at in this email?  Or, in this document, Ms.

Oshuntola?

A.    Sorry, give me a second.

Q.    Sure, take your time.

A.    (Witness reads document.)

Q.    Well, rather than telling me what the document is, are you familiar, after having reviewed the document?

A.    I don't remember it, but yes.

Q.    Well, turn with me, if you will, to the fourth page.  If you look at the bottom right corner it will end in '005.

A.    Mm-hm.

Q.    And it appears to be the first email in this thread and started on Friday, October 6th, 2017 at 2 -- 8:22 a.m. and that you emailed via T&S Team Leads.

What is TS Team Leads?

A.    It's an email alias that just included all of the team leads in the Trust and Safety team.

Q.    Is it --

A.    Trust and Safety team leads.

Q.    Is it like a listserv, or how does that work?

A.    I don't know the technical definition of listserv.  I think so.

Q.    Fair enough.

So, when you say it's an alias, can anyone who's on the TF -- TNS team leads email via that email address?

A.    Yes.  So anyone who's on that alias would receive the email.

Q.    So they would receive it.

Could you also send it via that email address as well, like it appears that you did on this email?

A.    I don't know.  I don't think in 2017 I would have been on the team leads alias.

Q.    But I am reading that correctly that it says it was sent via the TMS team leads?

A.    Yeah, that's what it says, yeah.

Q.    So, if we look at the email:  Hi all.  An educator followed up to ask if we can gate the area around their school because child porn is being shared by students in Geofenced stories.

I know we asked a little bit about stories and Geofenced earlier. I don't know if I saw the two in the last email combined.

Do you know what a Geofenced story is?

A. I don't remember.

Q. And then in the -- if we look down past the next one it says: ZD link 13802510.

What does ZD link stand for?

A. Zen -- that stands for Zendesk. So that would be the CRM tool that was used.

So when, as I mentioned earlier, users can write in to complain or talk about their -- their experience. When they write in, we would, kind of, handle that through Zendesk.

Q. So it's just a -- a mechanism for reports to be generated to Snap's moderation team. Is that fair?

A. Yes.

Q. And if we look down at the

message, and from your understanding in drafting this email, was this the message that was sent by the user who reported it?

A.    Sorry, can you please ask the question again?

Q.    Sure.

If you -- if you notice that there's a message and a colon and then a paragraph and another sentence that is a little bit lighter font.

Would it -- is it your recollection that this is the message that was submitted by the user?

A.    I don't remember, but from the way it's listed out, I would -- yeah, I think it's what was in the original --

Q.    And --

A.    -- CMS ticket.

Q.    Sorry, I didn't to cut you off there.

In the message it says:  The recurring issue of Geofenced stories that are linked in our -- to our ZIP code 68504 around our building.  We have 2200

students in our building which makes it
next to impossible to have all students
blocked or not participate in these
inappropriate snaps.  Our administrative
team has been working to shut down these
Geofenced stories when we were -- when we
are aware they exist by contacting
students to have them eliminated from --
to have them eliminate the posted snaps.
However, this is interfering significantly
with the daily operations of our building
as this takes continual monitoring to
safeguard the children within our care.
Our biggest concern is the child
pornography being post -- that is being
posted, screen shot, and distributed via
Snapchat.  What can we do have to have the
Geofence accounts eliminated from our
area?

     Is that fair?

A.    Yes.

Q.    And again just because I don't
recall seeing these words put together
earlier, but do you recall what a

Geofenced account is?

A.    A Geofenced account?

Q.    As -- as mentioned in the very last sentence there.

A.    I don't think there was such thing as a Geofenced account.

Q.    And it looks, I see in bold and the email says:  Should I follow up asking for user names and send the crime snippet? We don't have language at the moment on whether or not we can gate areas.

Was that the user saying that, or was that you?

A.    That was me.

Q.    Okay.

And what do you mean -- what did you mean by that, those questions?

A.    So, one, as I am -- had mentioned earlier, there's a specific process for whenever someone says that, or alleges child pornography content, or CSE, part of our investigation requires reviewing those accounts to make sure that to check for child sexual exploitation, or

CSAM, and so I -- I think it was just trying to -- I was trying to understand what next steps to take because there were various -- there were various processes that had, kind of been, kicked off by this type of message being sent.

The second question was that, like, the language that we send out to users has to be approved and we didn't have any messages at the time, I guess, that were about area gating or ZIP codes or things like that.

From what I recall, honestly I'm not the best person to ask 'cause I don't know how the feature worked technically, I don't think there was any kind of -- I -- I feel like I remember people being confused about how this feature worked and, you know, kind of asking a lot about writing these, kind of, baked-in assumptions and being like this is not how the product works.

I think also in terms of user names, there's nothing that we can do if

someone writes in and they don't, kind of, write in with a user name.  We need a user name to research.  We can't like -- doesn't -- there's no system that, as far as I am aware and based on this email, that just providing a ZIP code would -- like I don't -- you can't put in Snapchat as a ZIP code and come up with, again as far as I'm aware, come up with an area and come up with a school.  So just looking at this message that was sent, it's really difficult to actually try and investigate what the person is reporting.  And in this case, we would have been concerned about the alleged child pornography.

    Q.    So just to make sure I understand it, is it -- was it your understanding that the user was asking Snapchat to shut down or create a barrier around their school to prevent child pornography from occurring, a geographical barrier?

    A.    My understanding based on what I'm reading is, one, this person was

confused about how various features worked.

They were also alleging child pornography occurring on Snapchat and asking to have a feature removed because they found it to be a lot of work on their end.

Q.    Do you think that's a fair request from the school?

A.    In what term?  In what sense?

Q.    To ask the company that is -- creates a product that is being utilized at their school for allegedly child pornography, for asking that company to take a mitigating action.

A.    I think anyone can ask anything.

Q.    But I'm just asking do you think that's a fair request for the -- for the school?

A.    Yes.

Q.    And if you turn with me to the first page, without going through the exact -- the email in full, what was the ultimate resolution for this ticket or

this user-generated report?

A.    It let them know that -- well, sorry.  I think, just looking through the thread, I think there were multiple messages sent back and forth with this user.  The final, or on this thread, one of the messages that was sent told them that custom stories can't be disabled, gave them information about the terms of service, asked them to provide user names, how they could find a user name and how they could make the report and then also law enforcement because, and a lot of that was because of the alleged child pornography.  Like I mentioned before, the biggest concern from our perspective would be make sure we were able to investigate and if there was child pornography happening, being able to report that content to NCMEC and law enforcement.

MR. HARE:  Let's go to, let's go to the next document, tab 28.

Q.    Before we move on, let me ask this.

Deborah Oshuntola                                          386

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.  You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within forty-five (45) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

A C K N O W L E D G M E N T


STATE OF              )

                              :ss

COUNTY OF             )


        I, DEBORAH OSHUNTOLA, hereby

certify that I have read the transcript of

my testimony taken under oath in my

deposition of February 4, 2025; that the

transcript is a true and complete record

of my testimony, and that the answers on

the record as given by me are true and

correct.


        _____
                DEBORAH OSHUNTOLA