**AMENDED Exhibit 869**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT Case No.

ADDICTION/PERSONAL INJURY      4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION  MDL No. 3047

-------------------------------

This Document Relates to:

ALL ACTIONS

----------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
UNLIMITED JURISDICTION

--------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550) Coordination Proceeding

SOCIAL MEDIA CASES            No. 5255

------------------------- VOLUME I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEO-RECORDED DEPOSITION OF

JENNIFER PARK STOUT

Wednesday, March 26, 2025

9:02 AM EST

Reported by:  Denise Dobner Vickery, CRR, RMR

JOB NO.: 7080843

A.        No.

Q.        Okay.  Through 2017 did you have any professional interactions with anybody at Snap?

A.        Through 2017 did I have professional interactions with.

Yes, in fact, I did.  So when I worked at the State Department, I met our CEO, Evan Spiegel, because he was one of a number of tech CEOs that were brought to Washington to convene with the National Security Council at the White House to talk about ways to counter violent extremism.

Q.        Okay.  So this was during the 2014 to 2017 stint you had at the State Department?

A.        Correct.

Q.        Okay.  And your interaction with Mr. Spiegel during that time period related to what you've told us about as far as the combating or counteracting violent extremism related to terrorism?

A.        That's correct.

Q.        Okay.  Any other professional interactions with anybody from Snap during your career from 1998 through 2017?

A.      No, other than the conversations, obviously, that led up to being interviewed and hired for the role.

Q.      Sure.

Nothing in the course of your work on Capitol Hill or in the White House or at the State Department, other than the meeting with Mr. Spiegel, regarding violent extremism?

A.      No.

Q.      How did you come to take a position at Snap?

A.      It was the summer of 2016, and many of my colleagues were planning on staying past the November 2016 election.  I had worked for Secretary Hillary Clinton previously, and many of those around me were also hoping to stay on in a future Clinton Administration.

In that summer, I decided that after close to -- I don't know -- 18 or 19 years in government, I wanted to try again and experience what the private sector was going to be like.  I felt like I knew enough the second time around to know what it was I didn't want to do, and so I was exploring a few offers and opportunities to go into the private sector, of

which Snap was one.

Q.       And how did the Snap opportunity come about?

A.       I was introduced to, at the time, our chief strategy officer.  A man by the name of Imron Khan.  No relation to the Pakistani prime minister.  He was really the -- he served as the chief business officer, chief revenue officer for Snap in the early days.

He reached out to me and asked if I would be willing to consider a role in Washington.  They weren't quite sure exactly what they wanted to fill, and so we had some very casual conversations about what I thought my value could be and what he thought their need would be.

Q.       And what was your -- your pitch on what value you could add to Snap?

A.       My value to Snap was that I understand government, I came from government, I'm inherently a problem solver, and I enjoy solving problems working collaboratively, looking for public-private partnerships and opportunities to collaborate.  I think there are a lot of difficult issues before us, and they

can't all be solved by government and they can't all be solved by industry.

So that approach, I think, is what I brought to my work at Snap, and ultimately I think that might have been what, you know, led me to be hired at Snap.

Q.    Have you always been based here in DC?

A.    I have.

Q.    What was the process to get retained by Snap?

A.    I went through an interview process, a series of interviews.  I met with, you know, chief legal officer, chief people officer, chief communications officer.  I went through kind of a standard panel interview to see if my -- my qualifications, my background would be a good fit for this company.

Q.    Your LinkedIn profile lists you as vice president, global public policy; correct?

A.    Correct.

Q.    Has that been your role and title the entire time you've been at Snap?

A.    No, it was not been.

Q.    Okay.  Can you work me through

your history there?

A.    When I started in January of 2017, my title was director.  I came in as a director. At the time, the company was far smaller.  There weren't that many vice presidents.  To be a director level really was one of the most senior type of levels, but I was then promoted to vice president about 18 months after I started as director.  So those are the only two roles I've had.

Q.    Okay.  When you were a director, who were you reporting to?

A.    In every during the course of my eight-plus years, I reported to the general counsel.

Q.    And who is that now?

A.    That today is Mike O'Sullivan, but previously it was Chris Handman.

Q.    Okay.  How long has Mr. O'Sullivan been in that position?

A.    He's been in that role, I want to say, for close to seven years.

Q.    Do you have any legal training?

A.    I don't.

Q.    Okay.  I've seen reference from

time to time to the exec team at Snap.

Do you know what that means?

A.    I do.

Q.    What does that mean?

A.    The exec team stands for the executive leadership team.  That is, I would say, as close to the C-suites as you would maybe call it a different gathering in -- in maybe another corporation.  It's the -- it's the senior leadership team that provides guidance and leadership and governance, I guess, for the company.

Q.    Okay.  And who is on the exec team?

A.    Members of the exec team are -- I think it's roughly, like, 15 people.  They are all those that are direct reports to the CEO, as well as a few others who have seniority and occupy key roles.

Q.    Are you a member of the exec team?

A.    I am.

Q.    How long have you been a member of the exec team?

A.    I think I've been a member for I want to say roughly three years.  At the

time -- earlier the exec team was comprised only of direct reports to the CEO. At some point, I think roughly three years ago, they expanded that to be more inclusive of other key roles who, you know, the CEO and the exec team wanted to have on hand to help the company make decisions and be guided by additional information.

Q. Can you tell me who the individuals are that are members of the exec team that are not reporting to Mr. Spiegel?

A. Yes. Well, some of this has changed slightly with -- there are often reorganizations. So I may not have this perfectly right.

But another person who is on the exec team is a woman by the name of Claudia Teran. She is deputy general counsel. She reports also to our general counsel. So she is a peer of mine, who handles a huge portion of our legal work. So she is a member of our exec team.

Our chief people officer, who is a direct report to Evan, his deputy has also been a member of the exec team. So that's like the

deputy chief people officer, not a direct report to our CEO.

Q.    What's his name?

A.    Her name is Lisa Duron.  Uh-huh.

Q.    Her.

A.    A gentleman by the name of Doug Hott.  He is not the CFO.  He reports to the CFO.  He is essentially the number 2 behind our chief financial officer.

I mean, that's -- I may be missing one or two others.

Q.    Is there anybody else from policy department included on the exec team?

A.    No.

Q.    Just you?

A.    Just me.

Q.    What does it mean to be a member of the exec team?

A.    You're -- practically speaking, I think you're expected to provide the CEO and the leadership with more visibility into the work that you and your team is doing, and that the work is important enough to be regularly put on staff meeting agendas, leadership meeting agendas, board meeting agendas.

Jennifer Stout                                                63

quick messages too; correct?

A.      Yes, but not every -- yes, it could, but sometimes people did not have the same notifications on their phone the way that they did for Snapchat.  So you'd have to sometimes double hit them up multiple ways.

Q.      Okay.  When your titles changed from director to -- to vice president, did your duties and responsibilities change at all?

A.      Not really.  I think it was a representation of the growing team that I had.

Q.      What are your duties and responsibilities in the time you've been at Snapchat, whether as the director of public policy or the vice president of global public policy?

A.      Uh-huh.  So my job is to manage the external teams known as probably traditional government relations/government affairs teams that exist in many of Snap's key markets globally.  So that's major markets, you know, in Europe, in the Asia Pacific region, in the Middle East, and all those public policy leads whose job it is to interface with governments, regulators, nonprofits, other experts reported

to me.

I then have an internal team, actually two internal teams.  A public -- a platform policy team.  That's the internal policy team that sets community guidelines.  Our policies around advertising, policies, and standards around how content appears both from users and publishers.  It's really kind of the standard setting function.

And then I have a team that is called our platform safety team, and that platform safety team is incredibly cross-functional.  They interface with our trust and safety team, our law enforcement team, product, engineering, operations, to really interface with key safety experts and organizations, bring in information that we are hearing from those key experts, have that be understood by our internal teams, and then also push out what our approach to safety so that people understand what Snap is doing and look for ways to collaborate.

MR. GADDY:  Show you what I'll mark as Exhibit Number 2.  This is P-SNAP-164.

P-SNAP-196.

(Document marked for identification as Snap-Stout Exhibit 45.)

BY MR. GADDY:

Q.    Now, did you know Ms. Stout when you wrote that letter to CARU in 2017 that at the time the Snap registration process actually defaulted to a date of birth of the year 2000 which would automatically make any new user that signs up 16 or 17 years old based on the fact that it was in the year 2017?

MR. BLAVIN:  Objection to form.

THE WITNESS:  No, I'm not -- I'm not aware of that.

MR. GADDY:  I'm going to show you P-SNAP-196, Exhibit Number 45.

(Document marked for identification as Snap-Stout Exhibit 45.)

BY MR. GADDY:

Q.    And let me explain to you really quickly what this e-mail is, and then if you want to read it --

A.    Okay.

Q.    -- I'll let you do that.

A.      Okay.

Q.      But I'll give you a little bit of context.

A.      All right.

Q.      This is an e-mail from May 31st of 2018.

Do you see that?

A.      I do.

Q.      And the subject line is "13-17 daily active users."

Do you see that?

A.      I do.

Q.      And I'll represent to you that what has happened is whatever department it is at Snap that monitors the use of the product by certain age groups --

A.      Yes.

Q.      -- is, to put it scientifically, wigging out because they're seeing a huge drop-off in teenage users on the app, and they're trying to figure out why it is that that's happening.

Does that concept make sense?

MR. BLAVIN:  Objection to form.

THE WITNESS: Maybe. I'm -- okay.

BY MR. GADDY:

Q. Okay. I'll give you a little bit more. Just want to make sure you're tracking with me.

A. Okay.

Q. And so what they're going to do and what you'll see in this e-mail chain is they start trying to figure out, oh, my goodness, why are we losing all these teenage users?

And what they find is that it has to do with the default birthday at signup being the year 2000, and that there were so many people that signed up and just clicked "OK" with the default birthday that it automatically made them teenagers.

And now you see in 2018, what would happen with somebody that signed up with a default birthday of 2000? They would become an 18-year-old; right?

MR. BLAVIN: Objection to form.

THE WITNESS: All right. So sorry. So the question is? What is your

question?

BY MR. GADDY:

Q.    Well, why don't you take a moment to read it.

A.    Okay.  Great.

Q.    I just wanted to give you --

A.    Yeah.  Thank you.

Q.    -- some clarification.

A.    Okay.

MR. BLAVIN:  And I think we'd object to these lines of questioning as really outside the scope of what we agreed the 30(b)(6) testimony was going to be, which was a description of the general nature and extent of the collaborations with governments and nongovernmental organizations.

THE WITNESS:  (Reviews document.)

Okay.

BY MR. GADDY:

Q.    All right.  Let's go to -- do you have Bates on this one?

A.    No, I don't.

Q.    Okay.  I'm going to go to this

page here.  (Indicates).

A.      Okay.

Q.      On my copy, it's Bates 568.  And at the very bottom, there's an e-mail from an individual named ███.

Do you see that?

A.      Yes.

Q.      It says "We synched the inferred age table."

You talked about you understand Snap has an inferred age model as well; correct?

A.      Yes.

Q.      "And the drop in 13-17 is softer than the supplied age."

Earlier I used entered age.

You understand they're using supplied age for the age that the user has entered at registration?

A.      I see that.

Q.      O the drop in 13-17 amongst the inferred age "is softer than the supplied age using your dashboard."

If you flip to the next page, in the middle of the page it says:

"One of the reasons for 13-17

bleeding."

Do you see that?

A.    I see that.

Q.    And you understand that the bleeding is kind of slang for losing users in that demographic?

A.    Yes.

Q.    It says:

"I believe part of the problem is that default year in the registration flow is year 2000 and that's why top birthday year for us is 2000 by far."

Do you see that?

A.    I see that.

Q.    If you look down at the bottom of that page, do you see a screenshot of the signup carousel that would be provided to users when they sign up for Snap?

A.    Yes, I see this.

Q.    And flip back, if you don't mind, really quickly just to check me on the date. This e-mail from ███ is May 29, 2018.

You see that?

A.    Yes.

Q.    And if you go and look at that

signup mechanism, you see how it defaults to --

back on Bates 569 -- you see how it defaults to

the same date in the year 2000.

Do you see that?

A.      Yeah, I'm just --

MR. BLAVIN:  Objection to

form.

THE WITNESS:  I'm not sure

what I'm looking at.  If someone has, you

know, changed that or manipulated that to

be May 29th.  I don't know, but I see

this is what looks like the registration

flow.

BY MR. GADDY:

Q.      Okay.  If we go back up and we

kind of look at that, let's look at it.  Let's

read it again.

"One of the main reasons for 13-17

bleeding:  I believe part of the problem is that

default year in the registration flow is year

2000 and that's why top birthday year for us is

2000 by far."

You with me?

A.      I see that.

Q.      It says:

"All those users which didn't change the year have been turning 18 starting this January."

Do you see that?

A.    I see it.

Q.    Does that make sense to you?

MR. BLAVIN:  Objection to form.

BY MR. GADDY:

Q.    Conceptually?

A.    (Reviews document.)

Yes, I see it.

Q.    It says:

"So, starting January you will see a drop in the 13-17 bucket and move to 18-20 bucket because of this registration issue when you look at supplied age."

Do you see that?

A.    I see it.

Q.    You understand what's being expressed here is, number one, at least in this period of time that's being talked about, Snap was defaulting the date of birth, the year portion of the date of birth to the year 2000; correct?

years of age.  True?

A.        Today, correct.

MR. GADDY:  Okay.  Why don't we take a few minutes.  I think I'm close.  I probably have 15, 20 minutes, but I want to get organized.

MR. BLAVIN:  Okay.

THE VIDEOGRAPHER:  Time is 4:01 PM.  We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 4:19 PM and we are back on the record.

BY MR. GADDY:

Q.        Ms. Stout, I want to ask you a couple of questions regarding some of the comments or statements that Snap made to CARU on the issue of the back-buttoning.

Do you know what I'm referring to there?

A.        I do.  I am familiar with that.

Q.        Okay.  If you want to start flipping.  I think it's page 12 -- it was my count -- into the document P-SNAP 198, which is the history of the correspondence back-and-forth.

It's a --

A.    Can you give me the exhibit number?  Sorry.  48?  No.

MS. TESHUVA:  44.

THE WITNESS:   44.

MR. GADDY:  44.  Thank you.

BY MR. GADDY:

Q.    And it's going to be the October 8, 2018 letter, and it's a little bit more than halfway through the page.  And what you'll see when you get there is a heading that says "New Functionality to Prevent 'Back-Buttoning.'"

Let me know when you're there. Then I'm going to ask you some general questions about that, and then I'll ask you about the letter itself.  Okay?

A.    Okay.  Okay.  I'm here.

Q.    Okay.  Now, one of the things I think we can agree on is if a user goes to create a Snapchat account and inserts a date of birth that indicates they are under the age of 13, Snapchat does not allow them to create an account; correct?

A.    I'm sorry.  I was flipping through

to get to the right page.  I apologize.  Can you repeat your question?

Q.      Of course.

One of the things I think you and I would agree on is if a new user of Snapchat is trying to register and they enter a date of birth that indicates they are under the age of 13, they're going to be rejected and not allowed to create an account; correct?

A.      That's correct.

Q.      Okay.  And the issue of back-buttoning involves the concern that a user who is rejected and not allowed to create an account on any platform, whether it's Snap, TikTok, whatever, may figure out, gee, it might have been because of the age I entered, and so they just click back on their -- on their browser or on their phone on their mobile device and go back to the signup page, enter a new date of birth that shows they are over the age of 13 and, therefore, are permitted to create an account.

That's the issue being addressed when it relates to back-buttoning; correct?

MR. BLAVIN:  Objection to

          form.

                    THE WITNESS:    I'm not the
          technical expert here, but that's my
          understanding of what back-buttoning
          could mean, to try to start over again.
BY MR. GADDY:
     Q.     Sure.
            And as you see here in this letter
under the "New Functionality to Prevent
'Back-Buttoning'" --
     A.     Yes.
     Q.     -- Snap writes to CARU:
            "In your May 1, 2017 letter, you
expressed concerns that children could
circumvent Snapchat's age screen by
'back-buttoning' and entering an age of 13 or
above after they were blocked from registering
for providing an age under 13."
            Do you see that?
     A.     I do.
     Q.     That's consistent with what we
just described?
     A.     Yes.
     Q.     It says:
            "In response to your concerns, we

have been investigating and developing a method

to prevent 'back-buttoning' in mobile apps."

Do you see that?

A.    Yes, I see that.

Q.    And you understand mobile apps

means on the phone; correct?

A.    Correct.

Q.    It says:

"Functionality that, as we

discussed, did not previously exist or could not

be used consistent with platform requirements

and COPPA and is not to our knowledge used by

any other mobile app."

Do you see that?

A.    I see that.

Q.    You go on to say, or Snap does.

A.    ▮▮▮▮▮▮ does.

Q.    ▮▮▮▮▮▮ does?

A.    Yes.

Q.    Snap goes on to say:

"We are pleased to inform that

recently, we have developed technology that -

like session cookie - prevents users from

immediately re-attempting registration with an

age of 13 or above."

Do you see that?

A.    I do.

Q.    And that would be a good thing from Snap's perspective, but also CARU's perspective, of preventing new users from immediately falsifying their age after they had entered an accurate age and been rejected. True?

MR. BLAVIN:  Objection to form.

THE WITNESS:  Yeah.  I mean, my recollection is that we were testing and trying all sorts of different things. Trying to be creative about how we could, you know, really prevent under 13s from registering on Snapchat.

And one of these ideas of a back-button, that my understanding was didn't exist with other mobile apps, was being tested here.

BY MR. GADDY:

Q.    You say:

"We are pleased to inform you that recently, we have developed recent technology that - like session cookie - prevents users from

immediately re-attempting registration with an age of 13 or above.  This technology implements a client-side data store to temporarily prevent re-registration attempts if the first attempts fail -- excuse me -- if the first attempt fails due to entry of an age under 13."

You see that?

A.    Yes.

Q.    Fair to say you weren't the expert on the coding and the programming for that.  That was the product design person; right?

A.    That's right, yes, and, I mean, I didn't draft this.  This is ███████, who is, you know, closer to the product team but...

Q.    Well, I'm saying you as in Snap because you're testifying on Snap's behalf right now; right?

A.    Sorry.  Can you repeat your question?

Q.    Sure.

What -- I think you got me.

You, Jen Stout, were not the person involved in doing the coding or the designing of this back-buttoning technology?

A.    That's correct.

Jennifer Stout                                                      849

Q.      Okay.   ███████   wasn't either?

A.      That's correct.

Q.      Okay.  Somebody at the Snap product and design team was doing that and then passed along to -- to ████████   and you the new technology that had been developed at Snap and what it was doing to prevent the back-buttoning issue; correct?

A.      That's my recollection.

Q.      Goes on to say:

        "As always, the registration flow will be neutral and will not tip users off that they will be locked out if they enter an age under 13."

        Do you see that?

A.      I do.

Q.      It says:

        "We are testing this feature, but it is already available in some versions of the app and we anticipate broadening availability in the coming months."

        Do you see that?

A.      I do.

Q.      And this was in 2018 that it's -- that Snap is making that representation to CARU;

correct?

A.    Yes.  October 2018.

Q.    Okay.  And one of the -- some of the pushback that you gave me a little bit earlier was that CARU would have utilized -- well, let me strike that.

In fact, Snap did not actually roll out this new technology that it developed in 2018 because of the negative impacts on growth and engagement on Snapchat.  True?

MR. BLAVIN:  Objection to form.

THE WITNESS:   My understanding is that we did roll out, to some extent, this back-buttoning session cookie to some subset of our users on the mobile device to try to see how it would perform, and ultimately with the goal of preventing new user -- younger users under the age of 13 from signing up.

My understanding -- this is probably second- or thirdhand -- of why it wasn't more broadly rolled out is because it didn't work the way it intended it to work.

Not only was it preventing possibly under 13s from signing up, but it was not functioning well at all in preventing nearly all users from signing up, and so I think there were some changes that were attempted to be made to this potential session cookie issue.

There was also a question as to the timing of the session cookie. There was a lot of concern about how long the session cookie could last.

The session cookie being forever you could imagine would be problematic because if you put in a session cookie because somebody who is 12 was trying to register for an account and was going to turn 13 in a month, but that session cookie lasted -- I don't know -- forever or two months, then when that young person turned 13, that old session cookie was preventing them from signing up.

So we were getting a lot of feedback secondhand, I'm relaying to you, on why this was really kind of an

imperfect solution.  So those were just some of the understandings that I was picking up from the product team.

BY MR. GADDY:

Q.    Okay.  Fair to say it wasn't broadly rolled out and made available as it was stated here in this letter to CARU; correct?

MR. BLAVIN:  Objection to form.  Misstates the document.

THE WITNESS:  Yeah.  At this time of this letter, which was October of 2018, we were -- in this paragraph:  "We are still testing this feature, but it is already available in some versions of the app and we anticipate broadening availability in the coming months."

This was October of 2018.  Our work with CARU went on for nearly another year.  I think we went back and forth many times and actually worked with them on how, you know, this technology and other technologies could be applied.

So my knowledge -- to my knowledge, this doesn't exist today.

MR. GADDY:  Show you

P-SNAP-893, which we'll mark as Exhibit Number 49.

(Document marked for identification as Snap-Stout Exhibit 49.)

BY MR. GADDY:

Q.    If you flip to the first page you'll see a short message report, and this is actually a Snap message related to your account.

Do you see your username there ▮▮▮▮?

A.    I do.

Q.    And it says -- it's two messages in March and April of 2019, and it's messages between you and I'm going to presume that's ▮▮▮▮▮▮, another policy person in -- I think you said he was in Australia?

A.    "▮▮▮"? ▮▮▮▮▮▮▮?  No, this is ▮▮▮▮▮▮, who was my -- he was in the UK.

Q.    UK?

A.    He was the policy person based in London.

Q.    Okay.  Let's look at the message.

If you flip the page, you see the first message on the right-hand side is

Jennifer Stout                                                    854

3/19/2019.

               You see that?

        A.     I do.

        Q.     So that would have been about five
months after this letter to CARU in October of
'18, in which you talked about the
back-buttoning feature and the anticipation of
broadening availability of that; correct?

        A.     Let me just read it before I
answer what it is about because I don't recall
this.

        Q.     Well, I'm just asking about the
timing.

        A.     I know but I --

        Q.     I'm happy to let you read.

        A.     I don't know because it is -- let
me just read it.  It's just two paragraphs.

               (Reviews document.)

               Okay.

        Q.     Timing-wise you with me?  Five
months after the October 18 e-mail or -- excuse
me -- October 18 letter to CARU in which you --
Snap makes references and representations to
CARU that it's testing the feature, the feature
is already available in some versions, and Snap

anticipates broadening availability in the coming months?

    A.     Yes, I'm tracking the timing.

    Q.     Okay.  In the first message, it says:

        "Mike, ███████, Jacob Agatha, Peter Sellis and ████ and I met to discuss ways in which we could consider how to build a tighter age gate/verification process.  Jacob mentioned the testing Product did in November 2017 that took two categories of users and tested back-button cookies for users that inputted an age under 13."

        Do you see that?

    A.    I do.

    Q.    That's one of the things that we've been talking about; correct?

    A.    Yes.

    Q.    It says:

        "One group of users were locked out for 5 minutes."

        You see that?

    A.    I do.

    Q.    "Another group was locked out for 24 hours."

You see that?

A.    Correct.

Q.    No suggestion here about locking people out permanently; right?

A.    No.

Q.    Okay.  It says:

"In both cases, there is material impact to user acquisition and retention.  His conclusion was that feature would have a negative impact on daily new users and daily active users."

Correct?

A.    I see that.

Q.    And fair to say that Snap never told CARU that as it continued to test these back-button cookies that it had told CARU it was going to roll out, that it decided not to implement those features because that feature would have a negative impact on daily new users and daily active users?

MR. BLAVIN:  Objection to form.  Misstates testimony.

THE WITNESS:   I think you're extrapolating something from a period of time that I think is worth explaining.

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

<%15207,Signature%>
DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028