**AMENDED Exhibit 402**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------x
IN RE: SOCIAL MEDIA ADOLESCENT ) Case No. 4:22-md-
ADDITION/PERSONAL INJURY       )          03047-YGR
PRODUCTS LIABILITY LITIGATION  ) MDL No. 3047
------------------------------x


SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

COORDINATION PROCEEDING          ) Judicial Council
SPECIAL TITLE [RULE 3.550]       ) Coordination
                                 ) Proceeding
                                 ) No. 5255
SOCIAL MEDIA CASES               )
_____ )


CONTAINS HIGHLY CONFIDENTIAL INFORMATION


V O L U M E   I


VIDEOTAPED DEPOSITION OF ERIC HAN

MARCH 11, 2025

9:21 A.M.


Job No.: 7150798

Pages: 1 - 430

Reported by:  Leslie A. Todd, CSR No. 5129

MR. MATTERN:  David Mattern on behalf of the TikTok defendants.

MR. CHOW:  Anden Chow on behalf of Eric Han.

THE VIDEOGRAPHER:  The court reporter is Leslie Todd, and she will now swear in the witness.

THE REPORTER:  My name is Leslie Todd.  I am CSR 5129.

ERIC HAN,

and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MURA:

Q.    Good morning, Mr. Han.

A.    Good morning.

Q.    My name is Andre Mura, and I represent the plaintiffs in this litigation.

We haven't met before today; is that right?

A.    That's right.

Q.    Could you please state and spell your full name for the record.

A.    My name is Eric Han, spelled E-R-I-C, H-A-N.

and not another, could you let me know that,
please?

A.      Yes.

Q.      Okay.

MR. MATTERN:  I'm just going to
interpose an objection to treating
TikTok defendants in a collective
form.  I understand your position on
it.  But it's not really appropriate
to treat them as one group entity, and
if your question is -- if you want to
know about the different entities, you
should distinguish them.

MR. MURA:  Okay.

Let's bring up tab 2, please,
which we'll mark as Exhibit 2.

(Exhibit No. 2 was marked for
identification.)

BY MR. MURA:

Q.      Mr. Han, do you recognize this
document?

A.      I do.

Q.      Can you tell me what it is?

A.      It appears to be my LinkedIn
page.

Q.    Okay.  Can you turn to page 2, please.

A.    Yes.

Q.    It says here that you started at TikTok in April 2019.

A.    Yes.

Q.    Is that accurate?

A.    That is accurate.

Q.    Okay.

MR. MURA:  Evan, can you pull up tab 3 and go to slide 2.

BY MR. MURA:

Q.    Mr. Han, if I could ask you to look at the screen.  Does this slide accurately reflect your start date at TikTok?

A.    It does.

Q.    And I'll hand you tab 3, which we've marked as Exhibit 3, just so you have it.

(Exhibit No. 3 was marked for identification.)

MR. MURA:  If we can go back to tab 2, Evan.

BY MR. MURA:

Q.    So according to your resume,

Eric Han                                                      30

you were the United States head of safety for TikTok; is that correct?

A.    That's correct.

Q.    Was that your role the entire time you worked at TikTok?

A.    Yes.  Let me clarify.  My last few months there we moved into USDS, and I was the head of safety there.

Q.    Then you were the head of safety at USDS?

A.    Yes.

Q.    And what is USDS?

A.    USDS, as I remember, was the entity to essentially split TikTok's -- and I'm not a security person or data person -- but housed through data and security within another entity.

Q.    Okay.  And it says here that you worked for TikTok for four years and three months.  Does that sound accurate?

A.    Correct.

Q.    Okay.  And you stopped working at TikTok in June 2023?

A.    Yes.

Q.    Okay.

MR. MURA:  Evan, can we please return to tab 3.  And slide 3.

BY MR. MURA:

Q.    Mr. Han, if I could ask you to look through the slide, does this accurately reflect your end date at TikTok?

A.    I seem to recall I technically ended my end date like in the end of May, but just -- just FYI, I forget what exact date. But yes.

Q.    Okay.

A.    Yeah.

MR. MURA:  So if we could return to tab 2.

BY MR. MURA:

Q.    So can you tell me a little bit about your responsibilities as TikTok's head of safety?

A.    How it started and how it evolved over time?

Q.    Yes.

A.    Great.  I started as -- to bring in the operational and policy element for TikTok U.S.  At the time trust and safety, or what was known as GCDS at the

time, was centralized in Beijing, and TikTok wanted to bring over a U.S.-focused trust and safety team.

So my first few years there was really establishing from the ground up, hiring policy folks, operational folks, which includes moderation, quality, training, other teams like that, floating up strategy and data teams and legal policy operation teams.

The next year after that was, after building foundations around getting off the ground and scaling, was more around adding functions such as threat detection and intelligence to try to get ahead of harms on the platform, and then really collaborating with our global partners across trust and safety, whether that be our global trust and safety team in Dublin or Southeast Asia.

And then my last year there was, as noted, the transition to USDS.  It might have been more than a year of me focusing on that, helping the company migrate the entity over into USDS.

Q.    When you started did you have trainings?

A.   What kind of training?

Q.   To educate yourself about the TikTok platform and how it works.

A.   There is generally onboarding within tech companies, so company culture, ways of working, how to use the infrastructure, things like that, yes.

Q.   Okay.  And over time did you develop an understanding of how the platform works?

A.   Yes.

Q.   And did you develop an understanding of what features were available on the platform?

A.   Some features more than others just by the nature of our work.  I can't say that I was an expert in the same way, for example, a product manager would be across the entire product service.

Q.   Okay.  And would those features include safety features?

A.   Yes.

Q.   Did you develop an understanding of how those features were performing in the field?

A.    I had a understanding, though not a -- as in-depth as our safety product team or what was known at the time as the product and process team, which was a separate team from ours.

Q.    Okay.  Did you develop an understanding of the motivations behind the platform's design?

A.    Motivation.  I believe I had an understanding, yes.

Q.    Okay.  Did your role include talking to the public about trust and safety?

A.    The public meaning different creators or just in general?

Q.    You tell me.

A.    Yeah, I talked to creators, and sometimes NGOs, governments, and the media.

Q.    Okay.  And what does "trust and safety" mean?

A.    My definition of "trust and safety"?

Q.    Based on your work at TikTok.

A.    Based on my work.  Trust and safety is generally the team to ensure that any of what's in our community guidelines and

development of our community guidelines are enforced in -- as accurately and as efficiently as possible.

Q.    Did you have a role in setting those guidelines?

A.    When I joined, there was community guidelines already established. When we started hiring policy folks, we started looking at what needed to change and evolve from there.  And policy development is a rolling evolution.  So yes.

Q.    Did you have the ability to propose changes to the guidelines?

A.    Yes.

Q.    Did you have the ability to propose different safety features?

A.    I had the ability to suggest; though that wasn't my team that held the responsibility or the -- the power to do so.

Q.    And when you made these types of suggestions, who would you make them to?

A.    For the first few years, there -- and I'm sorry, I'm having trouble recalling the names -- but it's -- there were different leaders across product.  I don't

tracking how many children were using TikTok at night, and I believe your testimony was you didn't recall whether there were such metrics.

A.    I don't recall.

Q.    Do you have a sense of how much sleep children need?

A.    I don't have a sense.

MR. MURA:  Can we bring up tab 9, please.

(Exhibit No. 9 was marked for identification.)

BY MR. MURA:

Q.    So this is tab 9, which we're marking as Exhibit 9.

A.    (Peruses document.)  Okay.

Q.    Sir, what is this document?

A.    It looks like a paper from a journal.

Q.    And as the head of safety, did you ever review papers from journals?

A.    Not myself personally, though I know policy folk, sometimes operations, product managers who had -- have access to journals.

Q.    And did you have access to journals?

A.    I can't be confident if I did. I might -- I might have had a login to LexisNexis, though I don't remember using it often.

Q.    And did the company ever store journals?

A.    I'm unsure.

Q.    Okay.  And this is titled "Journal of Clinical Sleep Medicine"; is that right?

A.    Yes.

Q.    And the title is "Recommended Amount of Sleep for Pediatric Populations:  A Consensus Statement of the American Academy of Sleep Medicine."

Do you see that?

A.    I do.

Q.    And do you see when this was published?  At the bottom.

A.    2016.

Q.    2016.

And do you see where it says "Consensus recommendations"?

A.      I do.

Q.      And there's a bullet that reads:  "Teenagers 13 to 18 years of age should sleep eight to ten hours per 24 hours on a regular basis to promote optimal health."

Do you see that?

A.      I do.

Q.      So according to this document, there was a consensus of the American Academy of Sleep Medicine in 2016 that teenagers needed eight to ten hours of sleep; is that right?

MR. MATTERN:  Objection to form.

THE WITNESS:  It would appear from this paper that that's their consensus recommendation.

BY MR. MURA:

Q.      And TikTok had data to track teenagers' app usage; is that correct?

MR. CHOW:  Objection. Foundation.

THE WITNESS:  Repeating the question, if TikTok had data to track

yeah.

Q.    And if you didn't read them, would you discuss them with your colleagues?

A.    If I didn't read them?

Q.    Would they read them and discuss them with you?

A.    I don't recall a time where it was brought up.

MR. MURA:  Could we pull up tab Han 16.

(Exhibit No. 17 was marked for identification.)

MR. MURA:  This is marked as Exhibit 17.

BY MR. MURA:

Q.    Mr. Han, do you see the URL at the bottom?

A.    I do.

Q.    And that's the same URL we just saw in the document that we were looking at; is that correct?

A.    Let's see.  Yes.

Q.    Okay.  And it's the same title, "Why we're making changes to Direct Messaging," correct?

A.    Yes.

Q.    And this is a post authored by Cormac Keenan, head of trust and safety.

A.    Yes.

Q.    Correct?

A.    Correct.

Q.    And you used to work with Cormac Keenan?

A.    Say that again.

Q.    You used to work with Cormac Keenan?

A.    Yes.

Q.    You used to report to him, correct?

A.    I had a dotted line to him in my last year there.

Q.    And what does dotted line mean?

A.    Dotted line doesn't mean you're reporting to someone, but it's somewhat of a formal way to recognize that that's an important relationship.

Q.    Have you read this article before?

A.    I likely had at the time, but I don't recall specifically.

Q.      Okay.  Can you turn to the second page, please, looking at the bottom. The language in italics.

A.      Mm-hmm.

Q.      Do you see where it says:  "On April 30, existing users and new users who do not meet the age requirements to use Direct Messaging will no longer have access to it"?

A.      I do.

Q.      And the date below that is 16 April 2020.

A.      I do.

Q.      Okay.  So that would have been April 30th of 2020, correct?

A.      Correct.

MR. MURA:  Can we pull up tab Han 3, slide 7.

BY MR. MURA:

Q.      Sir, does this slide accurately reflect the date we just discussed when TikTok limited direct messages to users 16 or older?

MR. MATTERN:  Objection to form.

THE WITNESS:  Oh, I see.

April 2020.  Yes.

BY MR. MURA:

Q.     Okay.  So this feature was not in place when you joined TikTok, correct?

A.     Based on this slide and document, correct.

Q.     And it was not available when TikTok launched in the U.S., correct?

A.     Correct.

Q.     Do you know when TikTok set direct messages to off by default for 16- to 17-year-olds?

A.     I do not.

MR. MURA:  Can we pull up tab Han 17, TikTok Newsroom.

We'll mark this as Exhibit 18.

(Exhibit No. 18 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay.

BY MR. MURA:

Q.     Mr. Han, this is another article from TikTok's Newsroom, correct?

A.     Correct.

Q.     Have you seen this article

work.

Q.    So you don't recall whether a teenager could unlink their account from a family paired account?

A.    I don't remember if there was a mechanism.

Q.    Do you recall whether a teenager could simply go ahead and open up a different TikTok account to evade Family Pairing?

A.    I believe that's -- yeah, that's a scenario that can happen.

Q.    Okay.  And Family Pairing was not mandatory; is that correct?

A.    Correct.

MR. MURA:  Can we pull up tab 19.  This is TIKTOK3047MDL-098-04111887, which we are marking as Exhibit 20.

(Exhibit No. 20 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay, I skimmed it.

BY MR. MURA:

Q.    Okay.  Are you ready?

A.      Yes.

Q.      Okay.  What is this?

A.      This seems like a -- I believe a Lark conversation with ▮▮▮▮ and I.

Q.      Okay.  This is a Lark conversation between you and ▮▮▮▮▮▮ correct?

A.      I believe so, yes.

Q.      And this is from July 2021, correct?

A.      It looks like 2020 from the timestamps.

Q.      Okay.  Correct.  Sorry, July 2020.

And who is ▮▮▮▮▮▮

A.      ▮▮▮▮▮▮ was the head of product and process for global trust and safety.

Q.      Okay.  Do you see near the top of the page ending in 898?

A.      Ending 898.

Q.      At 7/21/2021.

A.      7/21.

I'm only getting -- the first page starts with 7/24.  Yeah, the earliest

page I have is 7/24.

Oh, I see.  I'm sorry.  I got it.  Thank you.

Q.    So this is a printout of a Lark chat that starts in 2020, but it continues into 2021; is that correct?

A.    Correct.

Q.    Okay.  So we're looking at a message from 7/21/2021, and you're the author of that message, correct, at 12:41 a.m.?

A.    Correct.

Q.    And there you wrote:  "From IG, giving users more choice about what they see regarding sensitive content."

Do you see that?

A.    Yes.

Q.    And then you have a link to an article.  Do you see that?

A.    Yes.

Q.    And then right below that ▮▮▮▮▮▮▮▮▮ responds:  "I predict approximately zero usage.  Anything often gets very low usage."

Do you see that?

A.    I do.

it.  I believe it was opt-out, though.

I'm sorry.  I'm confusing my language.  It was not automatically turned on when you joined the platform.

BY MR. MURA:

Q.    So it was opt-in; is that correct?

A.    Yes, it was opt-in.

MR. MURA:  Okay.  Let's look at tab 23.

This is TIKTOK3047MDL-004-00144763.  It's Exhibit 25.

(Exhibit No. 25 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay.

BY MR. MURA:

Q.    Do you recognize this document?

A.    I don't recognize this document, but I recognize some names and terms in it.

Q.    Okay.  Do you see that the metadata of this file indicates that you authored it in April of 2020?

A.    I do.

Q.    Do you have any reason to doubt that?

A.    No.

Q.    Do you see at the top where it says "Rabbit holes -- no doubt about it; it will happen"?

A.    Yes.

Q.    And then it goes on:  "You can burn a half hour very easily; find yourself in a very bizarre mode (part of the psychological wellness) -- trying to figure out how to incentivize this while also acknowledging business goals."

A.    I do.

Q.    What is a rabbit hole?

A.    A rabbit hole is where -- what we referred to as -- some call it digital cul-de-sacs, some call it filter bubbles.

THE REPORTER:  Some call it what?  I'm sorry.

MR. CHOW:  Cul-de-sacs.

THE WITNESS:  Yeah, cul-de-sacs.

THE REPORTER:  Start over

Eric Han                                          210

again.  Some call it?

THE WITNESS:  Cul-de-sacs, some
call it filter bubbles, when you get
put into a product experience that's
focused on one type of content or one
topic of related content.

BY MR. MURA:

Q.    So a rabbit hole occurs when
the algorithm gets stuck showing a user the
same type of content over and over again.  Is
that right?

A.    More or less, yes.

Q.    Okay.  And that content could
sometimes be harmful to the user, correct?

MR. MATTERN:  Objection to
form.

THE WITNESS:  There were
acknowledgements that, yes, there were
areas that we would want to disperse
certain rabbit holes that would
potentially violate our policies.

BY MR. MURA:

Q.    And based on this document, you
were aware that rabbit holes were a problem
on TikTok in April 2020, correct?

mind they were notes from our Content Advisory Council, it wasn't so much a -- TikTok can do this, but the concept of which that we should be concerned about.

BY MR. MURA:

Q.    Okay.  You should be concerned about rabbit holes, you're saying?

A.    Yeah, in general -- in general, yes.

Q.    Okay.  Because rabbit holes can cause body image issues; is that correct?

A.    That's something that we wanted to investigate.

Q.    And rabbit holes was something that occurred on TikTok, correct?

A.    I don't remember when ▇▇▇▇ ▇▇▇▇ team started taking a look at validating that with data.  And that's something he would -- he would know.

Q.    Okay.  Well, the top of the document says "Rabbit Holes - No Doubt About It.  It Will Happen."  Correct?

A.    Yes.

Q.    Back on page 1, do you see

where it says:  "Real contagion effect.

Suicidal ideation and behavior, and the way

that it is talked about on the platform."

Do you see that?

A.    I do.

Q.    Is your understanding of this

that TikTok rabbit holes may create a

contagion effect spreading suicidal ideation

and behavior on the app?

MR. CHOW:  Objection.  Form.

THE WITNESS:  I think, again,

based on the notes and talking to the

council, it was more highlighting what

can be possible and getting ahead of

it.

BY MR. MURA:

Q.    So this document is

highlighting that TikTok rabbit holes can

create a contagion effect related to suicide

ideation, correct?

MR. CHOW:  Objection.  Form.

THE WITNESS:  I think again,

based on the notes in the context of

the document, it was more of an

acknowledgment that because we have

community guidelines to prevent exploitation on the platform, it is our job to make sure that we're investigating it.

BY MR. MURA:

Q.    But you have community guidelines to prevent something, correct?

A.    Yes.

Q.    And you have guidelines to prevent something because it's happening, correct?

A.    There's an acknowledgment that the world will -- or people would want to exploit it, correct.

Q.    And this statement is acknowledging that there's a real contagion effect with respect to rabbit holes that may create suicidal ideation, correct?

MR. CHOW:  Objection.  Form.

THE WITNESS:  The -- the part where I'm trying to be very clear on, is that when we're talking to our Content Advisory Council, because they're academics, NGOs, advocates, et cetera, we often talked about these

Eric Han                                                           220

concepts across the internet versus,

Hey, what's actually happening at

TikTok in the moment.  They wouldn't

know that because they're external

council, and I think that -- that's

important within the context of the

notes.

          MR. MURA:  Okay.  I'll move to

strike the answer as nonresponsive.

BY MR. MURA:

     Q.    Sir, I'm asking you a question

about this document.

     A.    Yes.

     Q.    This document is acknowledging

that there's a real contagion effect with

respect to rabbit holes that may create

suicidal ideation, correct?

          MR. CHOW:  Objection.  Form.

          THE WITNESS:  There is

conversation and possibility about

rabbit holes across the internet.

Yes, we were talking about that.

BY MR. MURA:

     Q.    And that's what the document is

saying, correct?

from a product perspective, which I know many folks on ████████████ team was -- was trying to prioritize.

BY MR. MURA:

Q.    And is that the design change that was being discussed with the Wall Street Journal?

A.    Just based on the sentence, it seems they're referring to content classification.

MR. MURA:  Okay.  Can we pull up tab 26.

This is TIKTOK3047MDL-060-01110548.  It's Exhibit 28.

(Exhibit No. 28 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay.

BY MR. MURA:

Q.    Have you seen this document before?

A.    Based on its content, I likely have, though I don't have a strong memory of it.

Q.    And this document was found in

your files.  Do you have any reason to dispute that?

        A.      It looks like the author was ▮▮▮▮▮▮▮▮▮▮ who ran incident management, and this was postmortem.  So it makes sense.

        Q.      And you were the custodian, correct?

        A.      Correct.

        Q.      And you worked on the Wall Street Journal algorithm investigation response, correct?

        A.      Response to --

        Q.      The response to this article.

                MR. CHOW:  Objection.  Form.

                THE WITNESS:  I helped lead and manage how to actually address the problems that we saw.

BY MR. MURA:

        Q.      I'll -- I'll ask it again.  Did you work on the response to the Wall Street Journal article?

                MR. CHOW:  Objection.  Form.

                THE WITNESS:  Just to be specific about it, like the actual solutions or working with folks

internally?

BY MR. MURA:

Q.    As head of safety, did you work on -- on a response in terms -- in terms of safety to the problems that the Wall Street Journal had identified in its article?

MR. CHOW:  Objection.  Form.

THE WITNESS:  I will describe my role in it.  My role was from a leadership perspective encouraging leaders across trust and safety teams, TikTok helping manage what the problem was, and then deferring to our product engineering, other leaders that were building it from there.

BY MR. MURA:

Q.    Okay.  Do you see the title "Postmortem"?

A.    I do.

Q.    "Wall Street Journal Algorithm Investigation"?

A.    Yes.

Q.    Do you see where it says:  "The Wall Street Journal ran a series of bot TikTok accounts to investigate TikTok's AI

and For You feed with a particular interest in our approach to minor safety."

A.    Yes.

Q.    And this is referencing the stories that the Wall Street Journal ran, correct?

A.    Yes.

Q.    And those stories were discussing how children could fall into negative rabbit holes on TikTok, correct?

MR. CHOW:  Objection.  Form.

THE WITNESS:  From my memory, yes.

BY MR. MURA:

Q.    It goes on:  "About a dozen of the Journal's 31 minor accounts ended up being dominated by a particular theme.  Even when the Journal's accounts were programmed to express interest in multiple topics, TikTok sometimes zeroed in on single topics and served them hundreds of videos, about one in close succession."

Do you see that?

A.    I do.

Q.    And do you see where it says

"Wall Street Journal published two stories regarding their experiment"?

A.    I do.

Q.    On page -- on the next page or the page ending in 554, do you see where it says "Business Impact"?

A.    I do.

Q.    And it says:  "Why do we need to solve this problem from a trust and safety perspective?"

Do you see that?

A.    I do.

Q.    And it says:  "Gaps in our product protections for minors can particularly have downstream reputational and revenue impact."

Do you see that?

A.    I do.

Q.    Then it goes on:  "For example, one Wall Street Journal article has put approximately 20 to $30 million of revenue over the next 12 months at risk."

Do you see that?

A.    I do.

Q.    And then a little later under

the hyperlink, it says:  "Our business partners hold us to high standards on user safety and issues uncovered by the Wall Street Journal's investigation, pose significant risks to the TikTok brands, impacting user growth."

Do you see that?

A.     I do.

Q.     At the bottom of the next page, do you see where it says "Current Team"?

A.     Yes.  Yep.

Q.     And then underneath that it says "algo"?

A.     Yes.

Q.     And on the right-hand side there's a column "Proposed Projects and Comments."  Do you see that?

A.     Yes.

Q.     And across from algo, it says: "Dedicated resources on filter bubbles as filter bubble projects were deprioritized in 2020."

Do you see that?

A.     Yes.

Q.     And that's consistent with your

testimony today?

MR. CHOW:  Objection to form.

MR. MATTERN:  Objection to form.

THE WITNESS:  That is -- my memory of this is in reference, as I already said, which was we presented filter bubble work that we were doing manually to ▅▅▅▅▅▅▅ but it wasn't prioritized at the time.

BY MR. MURA:

Q.   So this is referring to the deprioritization of resources on filter bubbles, correct?

A.   It is -- it says it in the statement, though I can't be a hundred percent sure, that was referencing my conversation with ▅▅▅▅▅▅▅

Q.   Okay.  So you don't know if this was referencing your conversation?

A.   Right.

Q.   Okay.  Do you know if other employees of TikTok had also raised these concerns?

A.   I can't be sure if other folks

Eric Han                                    247

did, but other folks were involved in -- when we were looking into it.

Q.    Were other members of your team also concerned that filter bubble projects had been deprioritized?

A.    The core --

MR. CHOW:  Objection.  Form.

THE WITNESS:  When we look at any problem, it involves policy operations, data, et cetera, so that project team was likely involved and aware.

BY MR. MURA:

Q.    And do you recall if they were also concerned?

A.    As noted, we were always concerned.

Q.    And were you concerned with this specific issue?

A.    Yes, we were.

MR. MURA:  Can we pull up tab 27.  This is Exhibit 29.  It's TIKTOK3047MDL-038-LARK-00188509.

(Exhibit No. 29 was marked for identification.)

A.      Yes.

MR. MURA:  Okay.  Can we pull up tab 28, please.

This is Exhibit 30, and it's TIKTOK3047MDL-004-00144753.

(Exhibit No. 30 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay.

BY MR. MURA:

Q.      What is this document?

A.      Based on the title, "Minor Safety Policy Annual Review."

Q.      Have you seen it before?

A.      This is not ringing a bell, no.

Q.      I'll represent to you that this document came from your files.  Do you have any reason to doubt that?

A.      I see it came from my files, and it also says I'm the author, which I'm confused about.  I generally would recognize the document, but a lot of this is new to me. But it might ring a bell as we talk about it.

Q.      Okay.  But you're identified as an author, correct?

A.      Correct.

Q.      And the date of the document is February 2020; is that right?

A.      Right.

Q.      The document is titled "Minor Safety Policy Annual Review (2020)." Correct?

A.      Yes.

Q.      And do you see "Assumptions of Minor Safety"?

A.      I do.

Q.      The first bullet point says: "Minor Safety is an urgent issue that we must address effectively."

Do you see that?

A.      I do.

Q.      "We need to be more creative in terms of minor safety."

Correct?

A.      I see that.

Q.      "Minor users are a protected group."

A.      I see that.

Q.      "Social media is inherently dangerous, and all minors are at risk when

they engage on the platform."

A.    I see that.

Q.    To your knowledge, did TikTok ever tell parents that social media is inherently dangerous?

MR. MATTERN:  Objection to form.

THE WITNESS:  I don't know if they addressed that specifically, though I know the comms team had Newsroom articles, as we've seen.

BY MR. MURA:

Q.    To your knowledge, did TikTok ever tell parents that all minors are at risk when they engage on the platform?

MR. CHOW:  Objection.  Form.

THE WITNESS:  I don't recall. I don't believe so.

BY MR. MURA:

Q.    Do you agree that minor safety is an urgent issue that TikTok must address effectively?

A.    Do I believe it now or when this document was created?

Q.    When this document was created.

THE WITNESS:  I assume if ▬▬▬▬ is an employee, then I would assume so.

BY MR. MURA:

Q.   And you recognize the stakeholder?

A.   I recognize Sean Kim, yes.

Q.   And he was an employee, right?

A.   Yes.

Q.   And what was his role?

A.   He was, if I recall correctly, the head of U.S. products.

MR. MURA:  Can we turn to tab 31 -- oh, 33, my apologies.

This is Exhibit 35.

(Exhibit No. 35 was marked for identification.)

THE WITNESS:  (Peruses document.)  Okay.

BY MR. MURA:

Q.   Do you recognize this article, sir?

A.   I do.

Q.   What is it?

A.   It was a -- comms team asked if

I would be willing to participate talking about how I manage my time and prioritize my well-being, things like that.

Q.    Is the comms team the communications team?

A.    Yes.

Q.    And that's the communications team at TikTok?

A.    Yes.  To clarify, I forget who, I think it might be CNBC, they reached out to the comms team, I believe.

Q.    Okay.

A.    Yeah.

Q.    And they asked you to speak on this article?

A.    My comms team did, yes.

Q.    Okay.  So you spoke -- you gave this interview with TikTok's blessing.  Is that fair to say?

A.    Yes.

Q.    Okay.  And this article was published in July of 2022?

A.    Yes.

Q.    And it's by CNBC?

A.    I think so.  From my

recollection -- yeah, I see CNBC.

Q.    Okay.  And the title of the article is "How TikTok's head of U.S. safety still finds a way to log off social media while on vacation."

A.    Yes.

Q.    Do you see that?

A.    Yes.

Q.    And that's a picture of you --

A.    Yes.

Q.    -- there?

A.    Yes.

Q.    And presumably your dog?

A.    Yes.

Q.    And you supplied this photo, right?

A.    I did.

Q.    It's a very nice photo.

A.    Thank you.

Q.    And so you participated in the creation of this story, right?

A.    I participated in being interviewed, yes.

Q.    Okay.

A.    Yep.

Q.    Do you see on the third page where it says, "Tips to stop checking social media on vacation"?

A.    Yes.

Q.    And the article quotes you as saying:  "I've used an app called Freedom that limits my access to certain sites and apps."

Do you see that?

A.    Yes.

Q.    "Other times I'll just delete social media, like Reddit, Twitter, Instagram, and TikTok off my phone."

Do you see that?

A.    Yes.

Q.    "The challenge is always sticking to it."

Do you see that?

A.    I do.

Q.    What is this Freedom app?

A.    I don't know if it's still around, but it was essentially time limits on your -- on apps that you don't want to access.

Q.    So this was an independent app

that you would download?

A.    Yes.

Q.    And you would use this download to help limit your access to an app like TikTok; is that right?

A.    Yes.

Q.    Alternatively, you would delete TikTok from your phone, correct?

A.    Yes.

Q.    And that was sort of how you handled the challenge of sort of being inundated by social media.  Is that fair?

MR. MATTERN:  Objection to form.

MR. CHOW:  Objection.

THE WITNESS:  I wouldn't categorize it inundation.  I think this is me and it speaks to my trip to Malaysia, and this is obviously very personal, but seeing where my grandpa and grandma grew up, where they passed away, and wanting to feel like -- to be there present with my parents because it was a very emotional moment.  So, yeah, it was just about

being present.

BY MR. MURA:

Q.    Well, I'm very sorry to hear about that, your loss.

A.    Thank you.

Q.    Did you use this app at other times?

A.    Sometimes I would use it.  And I use another app now, actually, the -- when I want to focus on something.  So whether that is I really want to get work done or I want to focus if I'm playing music with my wife, we oftentimes turn it off for -- just to make sure that we're being present with each other.

Q.    Okay.  Does your wife also use it?

A.    No.

Q.    Have you ever recommended this app to friends?

A.    I've recommended it to my friend who was having trouble focusing on his work, but that was mostly to block out news apps.

MR. MURA:  Okay.  Can we pull

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  March 22, 2025.

<%14542,Signature%>
_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# Exhibit 402B

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------x
IN RE: SOCIAL MEDIA ADOLESCENT ) Case No. 4:22-md-
ADDITION/PERSONAL INJURY       )         03047-YGR
PRODUCTS LIABILITY LITIGATION  ) MDL No. 3047
------------------------------x


SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

COORDINATION PROCEEDING          ) Judicial Council
SPECIAL TITLE [RULE 3.550]       ) Coordination
                                 ) Proceeding
                                 ) No. 5255
SOCIAL MEDIA CASES               )
_____ )


CONTAINS HIGHLY CONFIDENTIAL INFORMATION


V O L U M E   I I


VIDEOTAPED DEPOSITION OF ERIC HAN

MARCH 12, 2025

9:07 A.M.


Job No.: 7150808

Pages: 431 - 635

Reported by:  Leslie A. Todd, CSR No. 5129

that I sent to somebody.

Q.     And this is a Lark message that you sent on June 18th, 2019?

A.     Yes.

Q.     And I'll represent to you that it was produced from your files.  Any reason to dispute that?

A.     No.

Q.     Do you see the second sentence that starts "We still"?

A.     Yes.

Q.     And there it says:  "We still have the under-13 version of the app, though anecdotally we're still seeing quite a few kids slipping through the caps -- the cracks, which makes sense since an age gate is easy to circumvent."

       Did I read that correctly?

A.     Yes.

       MR. MURA:  Can we turn to tab 62.  This is TIKTOK3047MDL-183-LARK-08031400, and it's Exhibit 58.

       (Exhibit No. 58 was marked for identification.)

       THE WITNESS:  (Peruses

Eric Han                                                          478

document.)  Okay.

BY MR. MURA:

Q.    Sir, what is this document?

A.    It looks like it's a Lark chat or Lark group with our global trust and safety team and myself.

Q.    And it's from August 2021; is that right?

A.    That's right.

Q.    And the Lark chat is titled "T&S Offsite 2021, Learning Day Context and Conditions."

A.    Yes.

Q.    And I'll represent that it came from your files.  Any reason to dispute that?

A.    No.

Q.    Any reason to believe it was altered in any way?

A.    No.

Q.    Do you see the last message on the last page, on 8/27/2021, 16:02?

A.    Yes.

Q.    And you write:  "I have to hop off for other calls, but thanks for the invite.  Super informative.  Looking forward

to more next week."

A.    Yes.

Q.    And at the very bottom of the page ending in 44 and the top of the page ending in 45, do you see where ███████████ posts?

A.    Ending 44 and 45.  I do see it, yeah.

Q.    And ████████████ is another member of trust and safety; is that right?

A.    He's the head of product and process.

Q.    Head of product and process?

A.    Yes.

Q.    So the head of product and process writes:  "We don't yet have great measurements of minor safety."

Do you see that?

A.    I do.

Q.    And then he goes on to say, towards the middle of the paragraph:  "We've heard your feedback about measuring real world harm for both children and adults, and we're going to develop a measurement of that in this by month."

Do you see that?

A.    I do.

Q.    And he goes on to say:  "We're still figuring out the best way to do this and would welcome thoughts or things we should learn from Douyin."

Do you see that?

A.    I do.

Q.    What is Douyin?

A.    Douyin is the Chinese version of TikTok.

Q.    Would the teams regularly look to Douyin to learn about their features?

MR. MATTERN:  Objection to form.

THE WITNESS:  From my experience, not so much from my team, though I have heard other folks, especially on product, that were more closely engrained with the product teams say things like this, but not too frequently.

BY MR. MURA:

Q.    When you say that Douyin is the Chinese version of TikTok, it's owned by

ByteDance, correct?

A.    I don't exactly remember the --

the reporting lines or who owns what, though

I do think it is a ByteDance product.

Q.    It's a ByteDance product,

right?

A.    Yes.

Q.    Just like TikTok, right?

MR. CHOW:  Objection.  Form.

THE WITNESS:  Again, I -- I

don't know what the -- I know

there's -- how it's set up, I'm not

sure what the ownership structure is

all the time.

MR. MURA:  Okay.  Let's turn to

tab 61.  This is Exhibit 59.

(Exhibit No. 59 was marked for

identification.)

THE WITNESS:  (Peruses

document.)  Okay.

BY MR. MURA:

Q.    What is this document?

A.    This look like -- looks like

it's a Lark group where I believe it was an

automated bot that would produce stories

related to TikTok and ByteDance.

Q.    And this Lark chat is titled "Global News Updates"; is that right?

A.    Yes.

Q.    And it's from October of 2021; is that right?

A.    Yes.

Q.    And I'll represent to you that this came from your files.  Do you have any reason to doubt that?

A.    No.

Q.    Turn to the page ending in 402.

A.    Okay.

Q.    Do you see where it says "Post: Title:  Text," it's from 2021-10-23?

A.    Yes.

Q.    What is this Lark message discussing?

A.    This looks like an example of what I believe was an automated newsbot that collected news from around the world around ByteDance or TikTok.

Q.    Okay.  Can you read the third bullet, please.

A.    China -- Number 3, "China

neutral Douyin launches mandatory five-second pauses in videos feed to cure user addiction."

Q.    So this is reporting that Douyin launched a mandatory five-second pause in video to curb user addiction; is that right?

MR. MATTERN:  Objection to form.

THE WITNESS:  It seems like it based on the title.

BY MR. MURA:

Q.    And that we established was a product of ByteDance; is that right?

A.    I believe so.

Q.    The Chinese version of TikTok?

MR. MATTERN:  Objection to form.

THE WITNESS:  I believe so, yes.

BY MR. MURA:

Q.    Were you aware that Douyin had launched mandatory five-second pauses for its users to curb addiction?

MR. MATTERN:  Objection to

form.

THE WITNESS:  I don't recall the exact details there, but I -- I do remember there -- of course, and China is a different regulatory environment from elsewhere, so perhaps their features or attention was different from other parts of the globe.

BY MR. MURA:

Q.     And when you say "different regulatory environment," are you saying that they were more attentive to curbing addiction?

MR. MATTERN:  Objection to form.

THE WITNESS:  No.  More in my experience, and this is what I mentioned within the 2018 policies, there were more strict guidelines. For example, you can't critique a government or kingdom, things like that.

So just speaking to my experience, I can see why there were sometimes different strategies between

China and the rest of the world.

BY MR. MURA:

Q.    But this is not talking about regulations, right?

MR. MATTERN:  Objection to form.

THE WITNESS:  I don't recall this exact feature.  I'm just speaking to my experience.

BY MR. MURA:

Q.    Okay.  But this document is just reporting that Douyin launches mandatory five-second pauses in video feed to curb user addiction, correct?

MR. MATTERN:  Objection to form.

THE WITNESS:  Based on the title, yes.

BY MR. MURA:

Q.    Okay.  To your knowledge, did TikTok ever adopt mandatory five-second pauses in video feeds to curb user addiction?

MR. MATTERN:  Objection to form.

THE WITNESS:  I don't recall a

feature like that.

BY MR. MURA:

Q.      Are you aware of anything in the United States regulatory environment that would prohibit TikTok from launching mandatory five-second pauses in video feeds to curb user addiction?

MR. MATTERN:  Objection to form.

THE WITNESS:  I'm not aware.

BY MR. MURA:

Q.      I just have a few more questions for you, Mr. Han.

What was your salary the last year that you worked at TikTok?

A.      I don't remember the exact number.  I think it might have been ███████ ██████ a year, but I could be wrong.

Q.      And was that just salary or did that include bonus?

A.      It included bonus.  Bonus was dependent on rating and different factors, so bonus changed year over year.

Q.      And do you remember what your bonus was the last year?

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Eric Han, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

<%31964,Signature%>

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  July 1, 2025