# AMENDED Exhibit 404

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA


        ******************************
                                        Case No.
        IN RE:   SOCIAL MEDIA ADOLESCENT   4:22-MD-03047-YGR
        ADDICTION/PERSONAL INJURY
        PRODUCTS LIABILITY LITIGATION
        *****************************   MDL No. 3047
        This Document Relates To:


        ALL ACTIONS
        *****************************


          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF LOS ANGELES
                     UNLIMITED JURISDICTION


        *************************
        Coordination Proceeding   Judicial Council
        Special Title             Coordination Proceeding
        (Rule 3.550               No. 5255


        SOCIAL MEDIA CASES
        *************************
        This Document Relates To:
                                   Judge:  Carolyn B. Kuhl
        ALL ACTIONS               Dept. 12
        *************************


           CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER


                   VIDEOTAPED DEPOSITION OF


                       NATALIE MEDOFF


        Held At:   Hilton Santa Monica Hotel & Suites
                   1707 4th Street
                   Santa Monica, California


                      May 20th, 2025
                        9:06 a.m.




        Reported Remotely By:

Spaulding, on behalf of the TikTok defendants.

THE VIDEOGRAPHER:  The court reporter is Maureen Pollard.  Her California CSR number is 14449.  And she will now swear in the witness.

                    *    *    *

Whereupon,

                    NATALIE MEDOFF,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

                    EXAMINATION

BY MR. KLAUSNER:

Q.   Good morning, Ms. Medoff.  How are you doing?

A.   Doing pretty good.  How are you?

Q.   Great.

I understand this is your first deposition.

A.   Mm-hmm.

Q.   Okay.  So typically the way we start things off is we go over some rules of the road, sometimes called admonitions, just an explanation of how things are going to go today

will cause you to be named as a defendant in this case?

A.    I do.

Q.    Okay.  You're not going to be held personally liable for any of the alleged harms that TikTok may have committed, correct?

A.    Yes.

Q.    You understand that?

A.    I do.

Q.    Okay.  You're not at risk of that --

A.    That's a good understanding.

Q.    Okay.  Just want to make sure that's clear.

A.    Mm-hmm.

Q.    Okay.  I want to go over a couple of preliminary matters before we get into some of your actual substantive work at TikTok.

I'm going to hand you a document. I've written Exhibit 1 at the top.

(Whereupon, TikTok-Medoff-1 was marked for identification.)

BY MR. KLAUSNER:

Q.    And I will represent to you that this is a work history that was provided to us by lawyers from TikTok.

Do you understand that?

A.    Yes.

Q.    Okay.  Can you take a minute and look at that and let me know if that looks accurate to you?

A.    It does.

Q.    Okay.  So my understanding is you started work at TikTok in September of 2020, correct?

A.    Yes.

Q.    And then you stopped working in November of 2024?

A.    Yes.

Q.    November 23rd, correct?

A.    Correct.

Q.    And that's about a week before Thanksgiving?

A.    Yes.

Q.    Okay.  What was your job title when you started working at TikTok in September of 2020?

A.    P&P issue program manager.  Program manager is probably fine.

Q.    I'm sorry, what does "PMP issue" mean?

A.     Product and process.

Q.     Oh, P&P?

A.     P&P, yeah.  And then issue was like the specific issue area for minor safety.

Q.     I'm sorry, the word "issue" represents minor safety in this context?

A.     Yeah.  Like there's different -- you know, there was different pillars of trust and safety that were referred to as "issues," and so ours was minor safety.

MR. KLAUSNER:  I'm sorry, I'm not getting -- is there a real-time that we can look at?

MS. FOURNIER:  You have to pull it up within your -- there's a link in the Zoom that it can pull up on your laptop.

MR. KLAUSNER:  Thank you.

Maureen, can I have the last substantive question and answer read back, please?

(Whereupon, the reporter read back the following:

"QUESTION:  I'm sorry, the word "issue" represents minor safety in this context?

ANSWER:  Yeah.  Like there's different -- you know, there was different pillars of trust and safety that were referred to as "issues," and so ours was minor safety.")

BY MR. KLAUSNER:

Q.    And so you mentioned trust and safety.  Is trust and safety a department that you worked within?

A.    Yes.

Q.    Okay.  And when you began work in September of 2020 under the umbrella of trust and safety, who did you report to directly?

A.    Amy Classen.

Q.    And what was her role there at the time?

A.    She was -- what was the title?  She was issue lead.  GIO was what they called it, global something-something.  I don't remember what it stands for.  Global issue owner.  There we go.

Q.    And the issue of which she was the global owner was minor safety?

A.    Correct.

Q.    That was her issue?

A.    Yes.

Q.    And she was responsible for that?

A.    Correct.

Q.    And did you work directly under her?

A.    Yes.

Q.    Okay.  And do you know who she reported directly to?

A.    She -- I think it was ▮▮▮▮ I think ▮▮▮▮ -- she had like the -- they did this weird thing back then where they would have two -- like a dotted line and a direct manager.

So I believe it was ▮▮▮▮▮▮▮ was the dotted line, and then direct was ▮▮▮▮ which is the first name on this, ▮▮▮▮ And it may have shifted around, but I don't have good recollection of that.

Q.    Okay.  And do you know what their actual titles were?

A.    No.

Q.    And when you joined in September of 2020, do you know who was in charge of trust and safety?

A.    Yes.  It was Yuyi.

Q.    Full name?

A.    That was the only -- that was --

just Yuyi was the only way they referred to her.

Q.    Okay.  And how do you spell that?

A.    Y-U-Y-I, I believe.

Q.    And did your role -- strike that.

Did your job title at TikTok change over the years that you worked there?

A.    Not really.  It stayed mostly the same.  Our departments changed, but my title was program manager basically the whole time.

Q.    And can you walk me through that department change you just alluded to?

A.    Yes.  I will do my best.

So we were issue P&P, and then they made a big org change at some point that made us product.  It changed minor safety -- it went from issue P&P to minor safety products.  And that was when ███████ joined.  Oh, gosh.

But, yeah, but my job like pretty much more or less stayed the same.  That was when we grew the team as well.

Q.    Okay.  So for the entire four years and change that you worked for TikTok, you were a -- what was it again?

A.    Program manager.

Q.    Program manager.  So let me just

start this over so it's clean.

So for the entire four-plus years that you worked at TikTok, you were a program manager in the minor safety sphere?

A.    Correct.

Q.    Okay.

A.    They changed it to youth safety and wellbeing at the end.

Q.    Okay.  Around when did they make that change?

A.    Right before I left.

Q.    Okay.  Why did your employment at TikTok end?

A.    It just is no longer in alignment with what I would like to do with my life.

Q.    Can you elaborate on that?

A.    Capitalism, not into it.  Not into working a 9-to-5 that is very demanding.  I'm changing careers.  I'm doing something that's more in alignment with what I want to do.

Q.    And when you say "capitalism," you mean something that is profit driven, correct?

A.    Correct.

Q.    And TikTok's drive for profits did not align with what you wanted to do the rest of

your professional life, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  I would say that TikTok is too specific of an answer.  I would say it's more of a general feeling, like any tech company, any job that is around there.

BY MR. KLAUSNER:

Q.    And the issue with the drive for profits is that oftentimes capitalist businesses put profits over the wellbeing of consumers, correct?

A.    That I don't agree with.

MS. FOURNIER:  Object to form.

THE WITNESS:  I don't necessarily agree with that because I cannot speak to it.

BY MR. KLAUSNER:

Q.    Okay.  Well, what is your issue or your disagreement with the capitalist drive for profits that does not align with what you want to do with your life?

A.    Exploitation, extraction, ruining the earth.  Shall I go -- you know, it just doesn't -- it doesn't feel good.  I did it for a

decade.

MR. KLAUSNER:  Maureen, can I have that answer read back again, please?

(Whereupon, the reporter read back the following:

"ANSWER:  Exploitation, extraction, ruining the earth.  Shall I go -- you know, it just doesn't -- it doesn't feel good.  I did it for a decade.")

BY MR. KLAUSNER:

Q.    So you've come to believe that tech companies are engaging in exploitation, extraction, and actions that are ruinous to the earth, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  I would say that they are not supportive of our growth as humanity.

BY MR. KLAUSNER:

Q.    And you consider TikTok to be one of these companies that engages in this practice, correct?

A.    I acknowledge --

MS. FOURNIER:  Object to form.

THE WITNESS:  Sorry.

I acknowledge that TikTok is a for-profit company.

BY MR. KLAUSNER:

Q.    Okay.  I'm going to hand you a document, 2, and I'm going to write on it Exhibit 2.

(Whereupon, TikTok-Medoff-2 was marked for identification.)

BY MR. KLAUSNER:

Q.    And, Ms. Medoff, you recognize that we are looking at a Lark communication, correct?

A.    Correct.

Q.    And Lark was a means of communicating internally with your colleagues at TikTok, correct?

A.    Correct.

Q.    And you communicated with your colleagues at TikTok via Lark pretty regularly, correct?

A.    Correct.

Q.    In fact, that was the regular means of communication outside of in-person communication at TikTok internally, correct?

A.    Correct.

Q.    Did you routinely e-mail your

off the record, and the time is 10:10 a.m.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 10:26 a.m.

BY MR. KLAUSNER:

Q.    Ms. Medoff, I'm going to hand you a document, and we're marking it Exhibit 4.

(Whereupon, TikTok-Medoff-4 was marked for identification.)

BY MR. KLAUSNER:

Q.    Ms. Medoff, I've just handed you a document marked as Exhibit 4.

Do you see it in front of you?

A.    Yes.

Q.    And it is a document titled TikTok Online Panel, Summary of Findings, July 2020.

Did I read that correctly?

A.    Correct.

Q.    You see there's a Bates number at the bottom of the first page ending in 002, correct?

A.    Correct.

Q.    Have you seen this document before?

A.    Not that I recall.

remember this file at all, but it's possible.

Q.   Okay.  If I could direct you to the second-to-last page of the document, it's actually a printout of the metadata that we received with this document.

Do you see that?

A.   This one?

Q.   Yes.

Do you see where it says "Document Metadata"?

A.   Yeah.

Q.   Certainly you understand what metadata is?

A.   I sure do.

Q.   And do you see about a quarter of the way down the page where it says "Custodian," there's a list of names, including yours, correct?

A.   Oh, yeah, mm-hmm.

Q.   Okay.  As you sit here now, you don't recall seeing this document?

A.   No, I don't.  I remember Internet Matters, but I don't remember this document at all.

Q.   Okay.  Do you recall seeing

documents like this during your time at TikTok?

A.    Like specifically from Internet Matters or just, like, in general?

Q.    Documents that summarize findings.

A.    Oh, yeah, of course.

Q.    Okay.  And I think you might even have said that in preparing for the deposition you refreshed your recollection by looking at, in part, studies and study findings, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  They were not study findings, no.

BY MR. KLAUSNER:

Q.    Did you look at studies?

A.    With studies, yeah.  Like very high level, like again -- yeah, very high level, so not like definitive.  I wouldn't say that they were definitive findings.

Q.    Okay.  So if we could go to the page ending in 004.  Actually let's forget that.  Strike that.

MS. FOURNIER:  You can just look at the end numbers.

THE WITNESS:  Oh, yeah, yeah.

///

apps such as TikTok."

Did I read that correctly?

A.    Yes.

Q.    Were you aware when you were working at TikTok some children felt a compulsion to continue using the app?

A.    No.

Q.    If you go to the page ending in 036. And let me know when you're there.

Do you see where it says at the top "Evening 1: A 'normal' night (during lockdown*)'?

A.    Mm-hmm.

Q.    And if you look at the rightmost column, it states, "1-145 notifications received between 8-10pm."

Do you see where it says that?

A.    Yes.

Q.    When you were working at TikTok in age assurance, were you aware that some users -- some children were receiving upwards of 145 notifications within a two-hour time period?

A.    No.

Q.    And I'm not trying to be specific to those numbers, but generally speaking were you

A.   Correct.

Q.   Okay.  So this working group is having its first meeting as of around October 2020, correct?

A.   Yes.

Q.   So if you could turn to the page ending 9598, and let me know when you're there.

A.   9598, I don't think those -- I don't have those numbers.  Mine just have --

Q.   Maybe it's cut off at the bottom?

MS. FOURNIER:  Yeah, no, the ones we have are not labeled that way.

MR. KLAUSNER:  Okay.  We'll move on from that document and come back to it.  I think it's a printing error of two documents put together.

BY MR. KLAUSNER:

Q.   Okay.  Can you set that aside for now?

A.   Yes.

Q.   Okay.  Thank you.

I'll hand you a document marked as Exhibit 8.

(Whereupon, TikTok-Medoff-8 was marked for identification.)

BY MR. KLAUSNER:

Q. And do you see on the first page it says Underage Users: Detection, Safety, Privacy, and Age-Appropriate Design at the top?

A. Yes.

Q. And do you see the Bates number at the bottom ending 8048?

A. Yes.

Q. And if I represent to you that TikTok produced this as part of your custodial file, do you have any reason to dispute that?

A. Yeah, that's possible.

Q. Does this document look familiar to you?

A. No. I didn't write this.

Q. Okay. Do you see on the first page --

A. Yeah.

Q. On the first page about two-thirds of the way down -- actually about half of the way down it says, "This document will seek to answer the following questions:"

Do you see that? And there is a list of questions below that?

A. Yes.

existence of any legal barriers preventing the creation of a Kids Mode outside of the US?

A.    I wasn't aware, but I'm sure there's different laws in different countries, so it's possible, but...

Q.    So you're saying that for US Kids Mode there was a third-party content moderator that determined what content should be available on the app?

A.    Yeah.

Q.    Okay.  And it's your belief that that content moderation could not have translated to other English-speaking countries throughout the world like in the UK or --

A.    I guess I would say "content moderation" is probably not the right word. Content curation is a better way to say it.

Maybe it could have worked.  I mean, it just never was a viable option.  I didn't work on it personally, I read some of the documents, but I knew it was a huge undertaking.

Q.    If you could turn to the page ending in 049.  Do you see the heading Age-Assurance?

A.    Mm-hmm.

Q.    And underneath it says, "Focused on

developing mechanisms, processes, and product

solutions to better understand the age of our

users globally, and processes in place to remove

underage users."

        Did I read that correctly?

    A.    Yes.

    Q.    And then below that it asks the

questions, "How do we proactively prevent

children (under 13) from accessing the app?"

        Do you see that?

    A.    Yes.

    Q.    And the answer is on the page, "We

rely on an age-gate (self declaration) in all

markets."

        Right?

    A.    Yes.

    Q.    So at least as of the time of this

document, the only thing preventing a child

under 13 from accessing the main TikTok

experience is if they enter in a birth date

indicating they are younger than 13, correct?

    A.    Correct.

    Q.    And if a child enters a birth date

saying they're over 13, they can access the main

TikTok experience?

A.    Correct.

Q.    Okay.  Another question on this page is, "How do we reactively detect children who are accessing the app?  How do we reactively detect underage minors (under 16) who are accessing the age-gated features?"

Did I read that correctly?

A.    Yeah.

Q.    Okay.  And underneath that it says, "We currently have an underage-model to detect underage users in White T markets and KR."

Correct?

A.    Yes.

Q.    KR is South Korea?

A.    Yes.

Q.    Okay.  What are "White T markets"?

A.    No idea.

Q.    And under that it says, "This model pushes users into underage account queue that is reviewed by moderators."

Correct?

A.    Yeah.

Q.    Okay.  And you said that this document is referring to global?

A.    Yes.  This was not done in the US.

Q.    Right.  This push into an underage account queue that is reviewed by moderators was not being done in the US?

A.    Correct.

Q.    Was there any technological barrier to doing that in the US?

A.    I have no idea what the restrictions were in the US because I was not working on it.

Q.    But I'm asking you if you're aware of any technological --

A.    The technology is there.

Q.    Right.

So absent any legal barriers that you may or may not be aware of or regulatory barriers, TikTok technologically had the means to implement this model in the US, correct?

A.    Yes.

Q.    If you go to the next page, you see at the top -- and this is the page ending in 050.

A.    Mm-hmm.

Q.    Do you see where it says, How can we improve on this?

A.    Yes.

Q.    And if we skip down a few lines, it

that's not like a technology issue.

MR. RYDER:  We can go ahead and set this exhibit aside.

And if we can pull Tab 31, we will mark this as Exhibit 22.

(Whereupon, TikTok-Medoff-22 was marked for identification.)

BY MR. RYDER:

Q.    Ms. Medoff, you should have just been handed a document that is a Lark chat between you and ███████████

Do you see that?

A.    Yes.

Q.    And the Bates number on the bottom of the first page ends in 4516.

Do you see that?

A.    Yes.

Q.    And the first message of the chat is dated April 7, 2022, correct?

A.    Yep.

Q.    And who was ██████████████

A.    ███████████  at that time -- again, people's roles changed so often that it was hard to keep track of.  He was in the EU.  He was some sort of lead in the EU.  He used to be more

an understanding why those efforts were being halted?

A. No.

Q. Okay. Did TikTok have a process for underage appeals in the US at that time?

A. I'm trying to -- it might not have been launched then yet. I don't know. I don't know. I don't remember when everything was launched exactly.

Q. It's not a quiz at this point. I think we'll see some other documents.

It's fair to say that might have been something percolating in the US at that time, is that fair?

A. Yes. I was not the person to implement underage appeals in the US.

Q. Okay. In your second message on the next page, you note that, "Underage bans in Q1 2022 are just over 20 million, a total increase of approximately 5 million from Q4 2021."

Did I read that correctly?

A. Yep.

Q. You go on to note that, "Underage bans has been steadily increasing because ops have been adding more moderator headcount,

correct?

A.    Correct.

Q.    Okay.  And the number here referencing the 20 million Q1 2022, this does not account for all underage accounts on TikTok, right?

A.    This just -- this accounts for the accounts that are banned.

Q.    Right.  Meaning there were still non-banned underage accounts on TikTok after Q1 2022?

A.    There possibly could be accounts that were missed, yes.

Q.    Okay.  And removing underage accounts is something TikTok continued to work on throughout 2022, correct?

A.    Correct.

Q.    And something TikTok continued to work on in 2023, correct?

A.    I would assume so.  I wasn't working on it directly by 2023.

Q.    Was it your --

A.    That's fine.

Q.    I apologize.

      Was it your general understanding

that TikTok was still engaging in efforts to remove underage accounts in 2023?

A.    Yes.

Q.    And in 2024, you wouldn't have any knowledge?

A.    I don't know anything from 2024, yeah.

Q.    Does it concern you that TikTok was reporting it had so many underage accounts at this time?

A.    I feel like "concern" is a -- right, I mean, it concerned me in the sense that I didn't want them to be there.  It didn't surprise me, though, because children lie.

Q.    And that's something TikTok was aware of, correct?

A.    I think that all you have to do is look at the age-gate and understand that it's easy to put in whatever.

Q.    And other employees at TikTok understood that, too, right?

A.    Yeah, yes.

Q.    Okay.  Is that why you think there were so many accounts removed in Q1 of 2022?

A.    No.  The reason that many accounts

were removed in Q1 of 2022 was because of the new underage detection models.

MR. RYDER:  We can take that exhibit down.

Q.    Shift gears a little bit.  I know we've been talking about underage users.  I believe a different term we talked about earlier -- strike that.

I believe Mr. Klausner asked you earlier about your definition of the word "minors," and I believe your testimony was that in your team minors refers to individuals between the ages of 13 and 17.

Is that correct?

A.    Minors on the platform, yes.

Q.    Okay.  And another phrase TikTok uses to describe that population is "hidden minors," correct?

A.    Correct.

Q.    Is that an accurate description of what hidden minors are?

A.    Yeah, hidden minors are basically users who are over the age of 13 but under 18 and who are using the platform with full access as if they were 18.

TikTok requires the users to verify their age using some other metric, correct?

A.    Yes, there's a few different -- they have a few different methods that they could choose from.

Q.    Okay.

MR. RYDER:  Let's pull up Tab 29, and I believe this is Exhibit 27.

(Whereupon, TikTok-Medoff-27 was marked for identification.)

A.    I remember this.

BY MR. RYDER:

Q.    And, Ms. Medoff, was that your testimony that you remember this document?  Is that correct?

A.    Yes.

Q.    Okay.  And you should have in front of you a document titled Underage Appeals, Introduction and Discussion.

Do you see that?

A.    Yep.

Q.    And the Bates number on this opening page ends in 3213, is that correct?

A.    Yes.

Q.    Okay.  And the face of the document

itself states that it is dated March 2021.

Do you see that?

A.    Yep.

Q.    Okay.  Did you author this document?

A.    It was a collaboration between myself and Amy Classen.

Q.    And at that time she was one of --

A.    She was --

Q.    -- one of the owners within the minor safety space, correct?

A.    She was my manager.

Q.    I want to direct your attention to slide or page 4.  This is the Bates ending 0003.  And there's a pyramid image on the slide.

Do you see that?

A.    Yes.

Q.    And it notes on the heading that age assurance is an enormous component of TikTok's overall safety strategy for minors.

Do you see that?

A.    Yeah.

Q.    And you agree with that sentiment, correct?

A.    I do.

Q.    Okay.  And then do you also see

there are speaker notes underneath the slide?

A.    Yep.

Q.    Okay.  And they note that, "Beyond our baseline legal compliance obligations, age assurance is the foundation of every Minor Safety privacy and safety strategy at TikTok."

Did I read that correctly?

A.    Yes.

Q.    And you agree with that sentiment, correct?

A.    I do.  I did.

Q.    It goes on to note that, "Understanding the age of our users - and removing underage users - is critical for ensuring that we provide an experience that is age-appropriate, safe, and takes into consideration the unique developmental capacities of minors."

Did I read that correctly?

A.    Yeah.

Q.    And do you agree with that sentiment as well?

A.    Yes.

Q.    And finally it notes that, Unless TikTok knows the age of its users, it cannot do

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD,

Registered Diplomate Reporter, CSR No. 14449 for

the State of California, the officer before whom

the foregoing deposition was taken, do hereby

certify that the foregoing transcript is a true

and correct record of the testimony given; that

said testimony was taken by me stenographically

and thereafter reduced to typewriting under my

direction; and that I am neither counsel for,

related to, nor employed by any of the parties

to this case and have no interest, financial or

otherwise, in its outcome.

Dated this 20th day of May, 2025.


<%21527,Signature%>
_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449