# AMENDED Exhibit 405

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT Case No.

ADDICTION/PERSONAL INJURY      4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION  MDL No. 3047

----------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

-------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550) Coordination Proceeding

SOCIAL MEDIA CASES          No. 5255

-------------------------

This Document Relates to:

ALL ACTIONS

------------------------- VOLUME I

VIDEO-RECORDED DEPOSITION OF MATTHEW TENENBAUM

Tuesday, January 28, 2025

10:01 AM

Job No.: 6966382

Reported by:  Denise Dobner Vickery, CRR-RMR

oath.

- - -

MATTHEW TENENBAUM

called for examination, and, after having been

duly sworn, was examined and testified as

follows:

- - -

EXAMINATION

- - -

BY MR. RYDER:

Q.      Can you please state your full name

for the record and spell your last name for the

court reporter, please.

A.      Sure.  Matthew Tenenbaum.  Tenenbaum

is spelled T as in Tom e n-as-in Nancy e n-as-in

Nancy b-as-in boy a-u m-as-in Mary.

Q.      Good morning, Mr. Tenenbaum.

A.      Good morning.

Q.      We just met off the record.  We

haven't met before.

My name is Chris Ryder.  Along with

my colleague, Keith Verrier, we'll be taking your

deposition today on behalf of the plaintiffs.

You've been sworn by the court

reporter, which means you're under oath.  That

MR. COWAN:  Thanks.

MR. RYDER:  We'll keep a running objection on that.

Let's pull up tab 2, and we will mark this as Exhibit 2.

(Document marked for identification as TikTok-Tenenbaum Exhibit 2.)

BY MR. RYDER:

Q.    Mr. Tenenbaum, this is a screenshot of your LinkedIn profile that we took.  I hope we can just walk through it and discuss your job history at TikTok.

You started working for TikTok in May of 2022; is that correct?

A.    It is.  Though mind if I take a second to read this over?

Q.    Please.

A.    It's been a while.

(Reviews document.)

Okay.  Sorry.  Thank you.

Q.    Yeah.

So your first role was as a senior -- senior product manager; correct?

A.    That is correct.

Q.      Okay.  And your LinkedIn page says that from May 2022 to December 2023 you "Lead Family Pairing, TikTok's suite of parental control tools.  Worked closely with our policy teams, regulatory teams, and digital wellbeing experts to iterate on our suite of tools to better meet the challenges of parenting in a digital age."

Did I read that correctly?

A.      Yes.

Q.      Okay.  And then from December 2023 to the present, you remained a senior product manager, but you switched what product you oversaw; is that correct?

A.      That's correct.

Q.      Okay.  And so you switched from Family Pairing to Age Assurance; right?

A.      Yeah.

Q.      Okay.  So your LinkedIn says for your current job "Spearheading the development and implementation of innovative Age Assurance features to ensure compliance with age restrictions and protect the wellbeing of our platform's diverse user base."

Did I read that correctly?

A.      Yes.

Q.     Okay.  Can you explain to the jury what you do as a product manager at TikTok?

A.     Sure.  Product manager I like to use the metaphor as a diplomat.  So often I sit in between a lot of intersecting business teams.  Everyone has different ideas, different initiatives, different kind of individualized goals, and my object is to pull together the strategy and pull together the people to make things happen.

So as you read off of my LinkedIn, really it's just the theme where I'm organizing folks.  So originally I was working on Family Pairing achieving the project strategy goals around that feature area, and then when I transferred to Age Assurance, the concept of work was the same.  Working with different stakeholders, gathering the ideas, prioritizing them, and then moving them forward to make sure that things get built.

Q.     So is it fair to say then your job tasks didn't switch when you switched from Family Pairing to Age Assurance?

A.     They changed a bit only because the work is a little bit different.  Products always

have their own nuances, but, by and large, the title and function of product manager was the same.

Q.    And in both roles, your job was housed in the Trust & Safety team; correct?

A.    That's right.

Q.    Okay.  And within Trust & Safety is kind of a minor safety team; is that -- is that fair to say?

A.    That's correct.

Q.    Okay.  Who do you currently report to?

A.    I currently report to Rand Lee.

Q.    And what's their role at TikTok?

A.    They are also a product manager. They're just a team lead focusing on our pillar of Age Assurance.

Q.    Okay.  And at one point in time, you reported to a Jordan -- Jordan Furlong; is that correct?

A.    Yes.

Q.    And what is his role at TikTok?

A.    Jordan, to my knowledge, is no longer at TikTok.

Q.    Okay.  When he was a TikTok

when I was the product manager for it, and so for that period, yes, I was driving that part.  But I can't speak to the strategy currently.

Q.      Do you think the purpose of Family Pairing has changed since you moved over to Age Assurance?

A.      I can't speak to it.  I'm no longer responsible for that.

MR. RYDER:  Okay.  Let's turn to what Family Pairing is.  Let's pull up tab 5, and we'll mark this as Exhibit 5.

(Document marked for identification as TikTok-Tenenbaum Exhibit 5.)

BY MR. RYDER:

Q.      This document is titled "Family Pairing 101" on the first page.

Do you see that?

A.      I do.

Give me one sec, though, to thumb through it.

Q.      Yeah.

A.      (Reviews document.)

All right.  Thanks.

MR. RYDER:  And, counsel, I'm

going to note for the duration of my examination, I'm going to represent that the exhibits will have been produced by TikTok as part of Mr. Tenenbaum's custodial file.  I'm happy to mention that as we introduce exhibits, but I'm just going to make a standing representation that.

MR. COWAN:  It's your depo, counsel.

BY MR. RYDER:

Q.    Okay.  So this was produced by TikTok lawyers.  According to the metadata produced to us by TikTok, this was created on August 29, 2023.

Do you recognize this document?

A.    I do, yes.

Q.    Is it fair to say this is a summary of what Family Pairing is?

A.    This document is meant to kind of simplify for a broad audience internally how Family Pairing works and the different components within it.

Q.    Okay.  So do you see the first section is a title that says "What is Family

comment on their linked teens' videos; correct?

A.    That's correct.

Q.    Parents can also select who can view their teens' liked videos; correct?

A.    That's correct.

Q.    And then parents can also restrict who can send messages to their teen's account; right?

A.    As long as that teen is over 16, correct.

Q.    Okay.  And there's a list of FAQs towards the bottom of the document.  I have this on page 5.

If you go to question 6 on page 6, do you see the question:

"How does a Family Pairing link get cancelled?"

A.    Uh-huh.

Q.    Okay.  So it says:

"Family Pairing can be exited by either the parent or teen user.  Teens can unlink from the Family Pairing home page.  Parents can select a teen from Family Pairing and unlink from there.  If the teen unlinks, the settings implemented by the parent will remain locked for

48 hours."

Did I read that correctly?

A.        You did, yes.

Q.        So a kid can unlink from Family Pairing at any time; right?

A.        That's correct.  Though the parent will, of course, be notified and their settings -- the teen's settings will be locked for 48 hours.

Q.        But a parent can't prevent a teen from unlinking; right?

MR. COWAN:  Form.

THE WITNESS:   I can't speak to what happens off the platform.

But if the teen navigates -- if any user navigates to that section, they can cancel the link, as the document describes.

BY MR. RYDER:

Q.        So there's no mechanism on the TikTok app that would allow a parent to prevent unlinking; is that fair?

A.        That's correct.

Q.        Okay.  And then the only limit is that the settings that the parent sets through Family Pairing stay in place for 48 hours; right?

MR. COWAN:  Sure.

THE VIDEOGRAPHER:  Okay.

Stand by.  Time is 10:58 AM and we're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 11:14 AM and we're back on the record.

BY MR. RYDER:

Q.    Thanks for coming back, Mr. Tenenbaum.

Do you understand that you're still under oath; correct?

A.    I do.

Q.    Okay.  I want to briefly go back to unlinking.

How is a parent notified when a kid unlinks from Family Pairing?

A.    There are a few different notifications that I worked on.  There is the in-app popup, an in-app inbox message, as well as a push notification.

Q.    So the notification would be coming from the TikTok app; is that correct?

A.    That's correct.

Q.    So if a parent is not an avid TikTok

user, would they be notified that their kid has unlinked?

MR. COWAN:  Form.

THE WITNESS:   The amount of time that the parent uses the app doesn't really factor in.  That's why we covered such a broad range of methods.  Push it doesn't really care about how often you open the app, and the in-app notices are there to just make sure there's additional awareness.

BY MR. RYDER:

Q.    For a parent to receive a push notification, they would have to have push notifications for TikTok enabled on their device; correct?

A.    That's correct.

Q.    Okay.  So TikTok does not send an e-mail notification when a kid unlinks from Family Pairing?

A.    Not to my knowledge, no.

Q.    And TikTok does not send a text message to a parent when a child unlinks from Family Pairing; correct?

A.    Not to my knowledge, no.

that same question, counsel.

THE WITNESS:   My answer here is as a product manager when I was covering Family Pairing was that that list was very individual and through our consultations we worked to understand what those individual potential harms were and build the best tools we could to empower parents and guardians to address them for their teens' individual needs.

BY MR. RYDER:

Q.   Okay.  Let's switch topics a little bit.

TikTok wants parents to sign up and use Family Pairing; is that fair?

A.   I would maybe clarify here.

The sign-up part isn't really a part of the factor.  We definitely want parents to use Family Pairing, though.

MR. RYDER:  Okay.  Let's pull up tab 14.  We'll introduce this as Exhibit 14.

(Document marked for identification as TikTok-Tenenbaum Exhibit 14.)

Matthew Tenenbaum                                    104

BY MR. RYDER:

        Q.      Mr. Tenenbaum, let me know when
you've had a chance to review the document.

        A.      Thanks.

                (Reviews document.)

                Thank you.  I'm ready.

        Q.      Okay.  So this is a Lark chat;
right?

        A.      That's correct.

        Q.      Can you tell the jury what Lark is?

        A.      Sure.  Lark is like I'm sure many
folks use a workplace tool.  It's our in-house
communications and work tool.  So it involves
chats.  It involves documents.  It's very similar
to Teams or Google Workspace if folks are using
those.

        Q.      All right.  And so you use Lark as a
regular part of your job at TikTok; correct?

        A.      That's correct.

        Q.      Okay.  And you use it to communicate
with your coworkers?

        A.      That's correct.

        Q.      Would you say you use Lark to
communicate with your coworkers more than e-mail?

        A.      I would say I don't use e-mail or

almost never use e-mail.  I primarily use Lark.

Q.      Okay.  Is that the case for other TikTok employees as well?

A.      I can't speak for other folks.  I think it's a fair assumption, though.

Q.      Okay.  Is it fair to say it's a common mode of communication for TikTok employees?

A.      Yeah, it's our main workplace tools.

Q.      Okay.  So you also use it to share documents with team members?

A.      That's correct.  It's also the platform that the documents are hosted through.

Q.      Okay.  So then you use Lark to discuss things like Family Pairing when you were the product manager over Family Pairing; right?

A.      That's correct.

Q.      Okay.  And when we're looking at your Lark chats with other TikTok employees, is it fair to say you're speaking in your capacity as a TikTok employee?

A.      That's correct.

Q.      Okay.  And then depending on the time frame, that would either be as the product manager over Family Pairing or the product manager over Age Assurance; is that fair?

A.      That's fair.

Q.      Okay.  So let's look at the exhibit.

This is a Lark chat that has your name and some Mandarin characters.  We ran a translate just on the name and believe it is a ████ ████ or ████████

Does that name sound familiar to you?

A.      Yes, I think I recognize that name.

Q.      Okay.  Do you know who that -- strike that.

Do you know what their role at TikTok is?

A.      At the time of this chat, just from the context of reading the document, they were our partner for the research project that we were aiming to accomplish.  I don't remember their exact role or their title, but in the context of this conversation, they were supporting our user research goals.

Q.      Okay.  And then I'm going to direct you to page 3 of this document.  This is Bates ending 039.  And then I'm going to ask you to look at your first message, which is going to look like the third entry.  It's a message dated May 25,

2023.

Do you see that?

A.      I do.

Q.      Okay.  So you say:

"The Family Pairing linking funnel is a cliff.  Around a million potential users a week will enter Family Pairing each week and when they reach the QR screen over 90% of them drop."

Did I read that correctly?

A.      You did.

Q.      So you were aware that many parents weren't signing up for Family Pairing; correct?

MR. COWAN:  Object to form.

THE WITNESS:   I think we should clarify a bit here.

What's being discussed is a funnel.  Meaning we're not talking about individuals' intent.  We're just talking about a metric that shows when the user navigates to a certain step, they drop off.

It's impossible to know the intent -- the intent behind that action. We can just use that to make certain inferences.

In this case, we're using that understanding to help work on our process of making linking easier.

BY MR. RYDER:

Q.      That's fair.

So putting intent aside, you were aware that when people enter Family Pairing, reached the QR screen, the vast majority of them did not end up linking with their teen's account; is that fair?

A.      I wouldn't characterize that because this does not account for multiple returns.  So it's entirely possible someone started the process or got the idea, and then came back later.  That level of nuance is not included in this conversation.

MR. RYDER:  Okay.  You can set this exhibit aside.

Let's pull up tab 15.  We'll mark this as Exhibit 15.

(Document marked for identification as TikTok-Tenenbaum Exhibit 15.)

BY MR. RYDER:

Q.      And, Mr. Tenenbaum, let me know when

that, what I mean to say is exactly what the
message says.

We wanted to make things easier to
use.  So we had this very mature, very robust set
of tools that were really helpful in a lot of
ways, but we want to make sure that not only could
parents use them, but use them more easily.

And as you can see here, the
hypothesis at the time was:  If we have this
mature robust set of tools, now how do we get
parents' opinions on how to make them more usable?

I referred earlier to this idea that
we wanted to make Family Pairing more actionable.
This is an extension of that same strategy.

MR. RYDER:  Okay.  We can set
that exhibit aside.

Let's pull up tab 18.  We'll
mark this as Exhibit 18.

(Document marked for
identification as TikTok-Tenenbaum
Exhibit 18.)

THE WITNESS:  Thank you.

BY MR. RYDER:

Q.     And let me know when you're ready to
discuss the document.

A.        (Reviews document.)

All right.  Thank you.  I'm ready.

Q.        Okay.  So this is a Lark chat between you and Jordan Furlong; correct?

A.        That's correct.

Q.        We'll go over some specific messages, but the chat largely looks like it has messages from January and February of 2023.

Was Jordan Furlong your boss or kind of your direct report at that time?

A.        I was Jordan's direct report at that time, yes.

Q.        Thank you.

Okay.  Like to direct your attention to page 3.  This is Bates ending 938, and I'm going to have you look at your fifth message.  So this is a message dated February 2, 2023 military hours has it at 15:19:46.

Do you see that?

A.        I do.

Q.        Okay.  You say:

"I just checked in FP and linking with a teen also automatically disables their daily screen time limit."

Did I read that correctly?

A.      You did.

Q.      Okay.  You then go on in the next message to say:

"Since we're going to enable it by default, I can write up a separate PRD or we can try to sneak retaining the teen's limit into the default work you're doing."

Did I read that correctly?

A.      You did.

Q.      Okay.  Then Jordan responds by asking:

"Even if the setting hasn't been enabled?"

Did I read that correctly?

A.      You did.

Q.      Then if you want to jump to the next page, the conversation continues.  You say:

"Yeah is done automatically by the link.  So if Teen User has a limit set to 60 minutes, they pair with Parent.  Limit is reset to 'Off.'"

Did I read that correctly?

A.      You did.

Q.      Okay.  Jordan then sends a message saying:

"Dangerous question, but do you know why lol."

Did I read that correctly?

A.      You did.

Q.      I'm assuming "lol" is parlance for laughing out loud; is that -- is that fair?

A.      That's correct.

Q.      Okay.  Then he asks a follow-up question:

"Or is it just a design flaw."

Did I read that correctly?

A.      You did.

Q.      Okay.  You respond.  You say:

"It's this one.  It's ALWAYS this one."

Did I read that correctly?

A.      You did.

Q.      And do you know what those characters are next to the text in that message?

A.      Based off what I've seen so far, it seems that Lark system messages are shown in brackets.  So, and knowing myself, I know that that's an emoji.  So I'm assuming that when you see that, it just reflects an emoji.

Q.      Okay.  Underneath you go on to say:

"Well actually it's a design flaw introduced by speedy development that didn't care about edge cases since urgency was more important than quality."

Did I read that correctly?

A.    You did.

Q.    Jordan replies:

"So weird to me when these things happen.  We're held to such a higher standard."

Did I read that correctly?

A.    You did.

Q.    And, Mr. Tenenbaum, I'm going to ask you to read your next message out loud to the jury.

A.    Sure.  The message reads from Matthew Tenenbaum on February 2, 2023.

"Haha Family Pairing is where all good product design goes to die it seems."

Q.    Then can you also read your next message on the following page to the jury.

A.    It reads from Matthew Tenenbaum 2023 February 2.

"It makes some sense though, it really hasn't been anyone's priority outside of urgent action in response to regulators."

Q.      And those are both messages that you sent to Jordan Furlong; correct?

A.      I sent those messages, yes.

Q.      Okay.  So Family Pairing wasn't a priority to TikTok unless a regulator was pressuring it; right?

MR. COWAN:  Object to form.

THE WITNESS:  I have to disagree with that.

You can read my messages as someone who is really passionate about this and is dealing with a lot of work that they're trying to do and is really excited about.  I would say that this is all hyperbole at best and just me venting to a peer at worst.

BY MR. RYDER:

Q.      But you did say on February 2, 2023:

"It really hasn't been anyone's priority outside of urgent action in response to regulators."

You said that correct?

A.      I said it, but like I said, this is the context of the conversation and where I was at really motivated in wanting to do a lot.

previous answers, that was me engaging in hyperbole because I was venting to a coworker and wanted -- was emphasizing how much I wanted to do.

BY MR. RYDER:

Q.    Did you engage in hyperbole about this specific issue other times?

A.    It's impossible to say.

MR. RYDER:  Okay.  Well, let's pull up tab 19.

(Document marked for identification as TikTok-Tenenbaum Exhibit 19.)

MR. COWAN:  After this, can we maybe break for lunch?

MR. RYDER:  Yeah.  So I actually have this and then one more exhibit.  So we should be under -- I'll try to wrap it up in five minutes if that works for you?

MR. COWAN:  Five minutes is fine.

BY MR. RYDER:

Q.    Okay.  And, Mr. Tenenbaum, let me know when you have a chance to review the

document.

A.        Okay.  Thank you.

          (Reviews document.)

          I'm ready.  Thank you.

Q.        Okay.  So this is another Lark chat; right?

A.        That's correct.

Q.        This is a Lark chat between you and ▮▮▮▮▮▮

A.        That's correct.

Q.        Who is ▮▮▮▮▮▮▮▮

A.        ▮▮▮▮▮ is another product manager in the company.  I don't remember off the top of my head what team he was working on at that time.

Q.        Okay.  He's someone you worked with when you were product manager over Family Pairing?

A.        He was more of a peer, but yes, we did work together on some things.

Q.        Okay.  I'm going to direct your attention to page 2 of this document.  This is Bates ending 642, and I'm going to direct you to the second to last message is dated June 5, 2023. It starts with the phrase "It's sad."

          Do you see that?

A.        I do.

AFTERNOON SESSION

(1:28 p.m.)

MATTHEW TENENBAUM

called for continued examination and, having been

previously duly sworn, was examined and testified

further as follows:

EXAMINATION (CONTINUED)

THE VIDEOGRAPHER:  The time is

1:28 PM and we're back on the record.

MR. RYDER:  Thanks for coming,

Mr. Tenenbaum.  Get a nice lunch.

I'd like to pick up again on

unlinking with Family Pairing.

We're going to pull up

exhibit -- sorry.  We're going to pull up

tab 21.  We'll mark that as Exhibit 21.

(Document marked for

identification as TikTok-Tenenbaum

Exhibit 21.)

BY MR. RYDER:

Q.      And before I ask you any questions

about the document, Mr. Tenenbaum, you understand

you're still under oath; correct?

A.      Understood and just give me a second

to read it.

Q.      Yep.  Yep.  Please let me know when you're ready.

A.      (Reviews document.)

Okay.  I'm ready.  Thank you.

Q.      This is a Lark chat between yourself and ▉▉▉▉▉▉▉; correct?

A.      That's correct.

Q.      And who's ▉▉▉▉▉▉▉▉▉?

A.      ▉▉▉▉▉▉▉▉ was a policy leader on the Trust & Safety team.  You'll have to forgive me.  I don't remember what her title or, like, official role level was.

Q.      Okay.  I want to direct your attention to the second to last message on the first page.  You start -- it's a message dated November 8, 2023.  You start with "Hey there."

You see that?

A.      I do.

Q.      Okay.  You say:

"Hey there!  Wanted to follow up on what you've been hearing externally about Family Pairing.  You mentioned folks' concerns on unlinking, but was there anything else that came up often?  I'm in the midst of 2024 planning so this kind of feedback is super helpful."

Q.      And you don't think lifting that lock has any impact on utility of Family Pairing?

A.      I can't speculate too much here, but I feel like that is a necessary and useful precaution to help balance the different interests at play.

Q.      So earlier you testified, "I definitely disagree with anything that says there's an easy way to dismantle the utility of Family Pairing"; is that correct?

A.      That's correct.

Q.      But if a child unlinks their account, the limits that Family Pairing imposed can be removed; right?

            MR. COWAN:  Object to form.

            THE WITNESS:  Well, that's true.  Again, there's a couple of days of delay.  The parent is notified.  I don't think it's fair to characterize that as easy.

BY MR. RYDER:

Q.      But is it fair to say that unlinking does impact the utility of Family Pairing?

A.      I think it's fair to say that unlinking is a function of Family Pairing and one

that we considered in our design both in the fact that we offer it.  You can see what some of those reasons in my message with ███ about some of the risks we want to mitigate.  But also in the fact that we have parent awareness, lockdown of settings.  We keep those settings as well just so when the lock is lifted, those settings are still in place.

Q.     Okay.  So you mentioned the settings being in place.

Isn't it true that at one point in time, if a child unlinked their account, their privacy settings would automatically reset to default?

A.     That's correct.  There was a bug that we found where for a period of time there was a reset, and we found it and we fixed it.

MR. RYDER:  Okay.  Let's pull up tab 22.  We'll mark this as Exhibit 22.

(Document marked for identification as TikTok-Tenenbaum Exhibit 22.)

THE WITNESS:   Thank you.

BY MR. RYDER:

Q.      And let me know when you've had a chance to review the document.

A.      (Reviews document.)

Okay.  Thank you.  I'm ready.

Q.      So this is a Lark chat between you and Jordan Furlong; correct?

A.      That's correct.

Q.      I'm going to direct your attention to page 7.  This is the Bates number ending 132, and let me know when you're there.

A.      I got it.  Thank you.

Q.      Okay.  Do you see that first message on this page sent by you?  It is dated December 2, 2022?

A.      I do, yes.

Q.      You say:

"Happy Friday everyone!  I'm excited to announce that we launched a pretty critical fix to Family Pairing yesterday.  Previously, any teen who linked or unlinked with their parent would have their privacy settings reset to default. This meant 16+ year old users who had set their accounts to private, disabled comments, or blocked downloads of their videos would suddenly have everything set public and open."

Did I read that correctly?

A.      You did, yes.

Q.      Did TikTok ever disclose this bug to parents?

MR. COWAN:  Form.

THE WITNESS:  We don't have a policy of disclosing bugs, to my knowledge.

BY MR. RYDER:

Q.      And that would be true for any bug related to Family Pairing; correct?

A.      Like I said, I'm not aware of any disclosure policies relating to bugs in general.

Q.      Okay.  We can set that aside.

You mentioned earlier there was a concern related to linking about whether TikTok can verify the parent/child relationship; right?

A.      You mean referring to a previous document or to this document?

Q.      I'm just asking you.  We're not talking about a document.  Just in general.

We talked earlier, right, about you and others at TikTok, there was a general concern about the linking aspect of Family Pairing where you didn't want to lock it down too tight because

A.      Yes, that's what the document says.

Q.      Next one says:

"Feature will not directly impact night stay duration on platform level."

Did I read that correctly?

A.      Yes.

MR. RYDER:  You can set that document aside.

Let's pull up tab 31, and we'll mark this as Exhibit 31.

(Document marked for identification as TikTok-Tenenbaum Exhibit 31.)

THE WITNESS:   Thank you.

BY MR. RYDER:

Q.      And let me know once you've had a chance to review it.

A.      (Reviews document.)

Got it.  Thank you.

Q.      This document is titled "[A/B Analysis] Enable Weekly Screen Time Updates for Minors."

Do you see that?

A.      I do, and just want to clarify that I'm not the author of this document.

Q.      Okay.  And like the last exhibit, this is a report on an A/B survey; right?

A.      Yes, this is an A/B test result.

Q.      Okay.  But it's specific to the Weekly Screen Time Update?

A.      Based off of the title, this is for enabling Weekly Screen Time Updates for minors.

Q.      Okay.  And you see the Executive Summary on page 1; right?

A.      I do.

Q.      And if you go to the first bullet point.  My apologies.  It says:

"The feature update for Enable Weekly Screen Time Updates for Minors could improve minor visibility of Screen Time Management, and increase feature adoption rate."

Do you see that?

A.      I do.

Q.      Okay.  And then there's a couple bullet points down that starts with "While improving visibility."

Do you see that?

A.      I do.

Q.      Okay.  It says:

"While improving visibility and

adoption of screen time management, the update does not have a negative effect on DAU, Stay Duration, and Retention."

Did I read that correctly?

A.    Yes, that's what it says.

Q.    Does TikTok tell parents about results like this?

MR. COWAN:  Object to form.

THE WITNESS:   To my knowledge, it's not a practice to disclose A/B test results publicly.

BY MR. RYDER:

Q.    And that's true for any kind of feature?

A.    To the best of my knowledge, no.

Q.    Okay.

A.    We don't disclose A/B test results publicly.

Q.    Okay.  So it's also true TikTok doesn't disclose A/B test results for anything related to Family Pairing; right?

A.    Correct.

MR. RYDER:  Okay.  We can set that exhibit aside, and let's pull up tab 32.

THE WITNESS:  Thank you.

(Document marked for identification as TikTok-Tenenbaum Exhibit 32.)

MR. COWAN:  Is that 32 now?

THE WITNESS:  Yeah.

MR. RYDER:  Yes, Exhibit 32.

BY MR. RYDER:

Q.    And, Mr. Tenenbaum, let me know once you've had a chance to review this.

A.    (Reviews document.)

Thank you.  I'm ready.

Q.    This is a document titled "Post-Launch Report of Screentime Management Upsell for Minors."

Do you see that?

A.    I do, and want to clarify that I'm not the author of this document, and also that this scope of work was not under my remit at the time that I was working on Family Pairing.

Q.    Okay.  This was produced to us by TikTok as part of your custodial file.

Do you have any reason to dispute that?

A.    I was not part of that process.

Q.       Okay.  The metadata TikTok produced also says this is dated November 11, 2022.

I'm going to direct you on the first page about halfway down.  There's a little bold that says "Key summary."

Do you see that?

A.       I do.

Q.       I'll direct you to the bottom bullet point on this page.  It says:

"No negative impact on the average session duration for minors."

Did I read that correctly?

A.       Yes, that's what the document says.

Q.       Okay.  Again, this is relating to the screen time limit feature; right?

A.       Based off of this document, it's referring to a feature that upsells Screen Time Management tools to minors.

Q.       Okay.  So the feature designed for Screen Time Management did not have any impact on the average session duration for minors; right?

A.       I might have to object to how you're framing that question.

But, again, for this report the bullet says here that there was no negative impact

to session duration.  Beyond that, I can't speculate as this wasn't my scope of work.

Q.      That is what the document says; right?

A.      That's what this bullet says, yes.

Q.      Okay.  I'll redirect your attention to page 7, which is going to be Bates ending 234. And at the bottom of that page, there is a column that says "Guardrail Metrics."

Do you see that?

A.      I do.

Q.      Okay.  So, again, this is referring to the guardrail metrics specific to this feature; right?

A.      I would assume so, yes.

Q.      Okay.  And then there's two bullet points next to that, and the first one says "Stay Duration"; correct?

A.      That's correct.

Q.      Okay.  And next to that it says "No statistically significant change"; right?

A.      That's what it says, yes.

Q.      So that means in this test, the feature did not have any statistically significant change on user stay duration; right?

A.      It would appear based off of how this table is set that is correct, but the table is a little confusing.  You'll have to give me a second.

Q.      Okay.

A.      (Reviews document.)

Ah.  Sorry.  To clarify my answer, it appears the table just shows based off of the A/B experiment that there was no statistically significant change for this, echoing that bullet we were discussing earlier.

Q.      We can set that exhibit aside.

So earlier we discussed whether guardrail metrics had any relationship to revenue; right?

A.      You had raised the question around that question, yeah.

Q.      And you said that wasn't within your realm of knowledge or responsibility; right?

A.      My --

MR. COWAN:  Form.

THE WITNESS:   Sorry.

My responsibility was on the features I was responsible for, and those would have guardrail metrics defined for

those.

BY MR. RYDER:

Q.    Okay.  And for the features that you worked on while you were the product manager for Family Pairing, are you aware of any guardrail metrics that were tied to TikTok's revenue?

A.    Not to my scope of work, no.

Q.    Okay.  Let's go back to Exhibit 20.
This has already been produced.

A.    Oh, yes.  Sorry.

Q.    Not to worry.
Let me know when you've had a chance to re-review.

A.    (Reviews document.)
Okay.

Q.    All right.  This is a Lark chat between you and ███████████  right?

A.    That's correct.

Q.    Okay.  And if you go to the top of page 4, this is Bates 109.
It's a continuation of a message from the previous page you sent on March 13, 2023.
Do you see that?

A.    I do, yes.

Q.    Okay.  And on top of page 4, there's

Did I read that correctly?

A.    Yes, that's what the message says.

Q.    And then the second one that you said and wrote to Jordan Furlong is:  "Do we set a global standard or do we localize?"

Do you see that?

A.    Yes, that's what the message says.

Q.    And then the last point that you raised with Jordan Furlong was:  "Do we allow teens to adjust/disable this or is it locked?"

Is that -- did I read that correctly?

A.    Yes, that's what the message says.

Q.    And ultimately TikTok does allow muting of notifications, does it?  Doesn't it?

A.    Yes, that was one of the features we later built in that year.

Q.    But it does not lock muting of notifications during school hours, does it?

A.    We allow users and parents through Family Pairing to customize the hours during which notifications are muted.

Q.    All right.  Actually, I want to go back to Exhibit 19, which you looked at previously with Mr. Ryder.

MR. COWAN:  Shoot.  What exhibit was this?  No, the last one we just looked at.  What number?

MR. VERRIER:  That was 36.

MR. COWAN:  Thank you.  I got it.

BY MR. VERRIER:

Q.    So this one is a Lark chat.  At the bottom, it bears the Bates number 22641.

You want to take a second to refresh yourself?

A.    Okay.  Thank you.

Q.    The second -- I want to direct your attention to page 1.

Now, first off, this is a Lark chat that you had with [REDACTED]  is that right?

A.    That's correct.

Q.    And this was on May 8, 2023.  The chart -- the chat moves forward to June 12, 2023; is that right?

A.    That looks correct, yes.

Q.    So on page 1, the second point down.  This is a May 8, 2023 message from you.  You say:

"The weird data point is that 85% of 'teen' users are age gated 18+."

Did I read that correctly?

A.     Yes, that's what this message says.

Q.     So that means that 85 percent of TikTok users who are actually teenagers under 18 indicate that they're 18 or older when they sign up for TikTok; is that right?

MR. COWAN:  Form.

THE WITNESS:  No.

To clarify, what we were discussing was a bit of exploration that our data science did to consider what age category users were for the two Family Pairing roles.

I need to clarify that, at this time, we had found this data point, and shortly afterwards we uncovered some tracking issues that make all of this irrelevant.

The reason it turns out that you see 85 percent is because we had an issue with how this number was pulled that mixed the labels for parent and teen.  Meaning this data has no -- is not accurate at all.

BY MR. VERRIER:

Q.      Well, putting aside any sort of future evaluation you did, at the time you wrote ███████████, you were accurately reporting to him the data that you were looking at; is that right?

A.      At the time, I was sharing the results of that report, yes.

Q.      And that report, when it says "age gated 18+," that means that the user has -- is over 18; is that right?

MR. COWAN:  Form.

THE WITNESS:   To clarify, in this context, when we say "age gate," we mean date of birth at registration is 18+.

BY MR. VERRIER:

Q.      So if you consider the date of birth at registration on TikTok, the user is now currently 18+?

A.      Correct.  That's what this category is referring to.

Q.      And so when it says "85% of 'teen' users are age gated 18+," it means that using the data that was available to you when you wrote this message, 85 percent were indicating an age of 18+; is that right?

MR. COWAN:  Object to form.

THE WITNESS:   Now, what I'm saying is that there's a weird data point that showed that 85 percent of teen role Family Pairing users were found to be age gated over 18 years old.

BY MR. VERRIER:

Q.     And ███████████ responds "LMAOOO." I think he has seven Os, which I think we understand probably to mean "laughing my ass off"; is that right?

A.     I would assume so, yes.

Q.     Yeah.  And then he says in the next line:

"'Cuz we are idiots to think a kid these days will not cheat the system."

Did I read that correctly?

A.     That's what the message says, yes.

Q.     And by "cheat the system," he means lie when they register and enter their date of birth; right?

A.     I can't say what was in ███████ head at the time, but I think it's a fair assumption.

MR. VERRIER:  That's actually all I have back from that document.  Tab

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA      )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

<%15207,Signature%>

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028

# Exhibit 405B

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT Case No.

ADDICTION/PERSONAL INJURY      4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION  MDL No. 3047

----------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

-------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550) Coordination Proceeding

SOCIAL MEDIA CASES          No. 5255

-------------------------

This Document Relates to:

ALL ACTIONS

------------------------- VOLUME II

VIDEO-RECORDED DEPOSITION OF MATTHEW TENENBAUM

Wednesday, January 29, 2025

10:02 AM

Job No.: 6966385

Reported by:  Denise Dobner Vickery, CRR-RMR

actually --

MR. VERRIER:  This is Exhibit 40.

(Document marked for identification as TikTok-Tenenbaum Exhibit 40.)

THE WITNESS:  Thank you.

(Reviews document.)

BY MR. VERRIER:

Q.     You can let me know when you've had a chance to look at it.

A.     Thanks.

(Reviews document.)

Yeah, I'm ready.  Thank you.

Q.     So this is a Lark chat between you and a colleague that begins on November 16, 2022; is that right?

A.     It appears so.  I can't make out the name.

Q.     Yeah.  The name is in Mandarin characters; is that right?

A.     It appears so.

Q.     Yeah.

A.     But like I said, I can't read Chinese.

Q.      Okay.  And from the context, we'll see if you can figure out who you were talking to.

But in the meantime, if you could look at the bottom of page 1, you are writing about "an in-app upsell for Family Pairing."

Do you see that?

A.      In that.  Oh, yes.

Q.      And you say that this is part of a P00 project requested by Shou, Michael Beckerman, and Sandeep Grover.

Do you see that?

A.      I do.

Q.      And who is Michael Beckerman?

A.      Michael Beckerman is, to my knowledge, our head of Public Policy.

Q.      And who is Sandeep Grover?

A.      Sandeep is our head of Trust & Safety or head of Trust & Safety product, I should say.

Q.      And the P00 project they're referring to -- I should say -- strike that.

The P00 project you're referring to is Project M; is that right?

A.      Based on the context, it would appear so.

Q.    And these are the executives who are giving you the orders to expedite some of these initiatives; is that right?

A.    When I said the "executive-sponsored project," I meant that there was a lot --

Q.    Okay.

A.    -- but these were the key stakeholders to simplify it for sharing with colleagues.

Q.    Okay.  And if I move ahead two pages, if you'll take a look at the page that ends in the Bates number 1893.

You'll see that at the very top you write a note.  It says "@Michael Beckerman."

Do you see that?

A.    I do.

Q.    Does that mean that this message is going to Michael Beckerman?

A.    No.  It just means I've tagged him for easier reference.

Q.    Okay.  So you write:

"Michael Beckerman and the TnS leaders came together with Shou on 'Project M,' which is a P00 project to ship a number of teen safety -- safety safety features ASAP."

Did I read that right?

A.    Yes, that's what the message says.

Q.    And "TnS" is Trust & Safety; right?

A.    That's correct.

Q.    Okay.

"This upsell, which was a bit stuck, became highly desirable because it is a very, very loud way to build awareness around Family Pairing."

Do you see that?

A.    I do, yes.

Q.    And when you note that it was "a bit stuck," is that part of what you're discussing when you say this allowed you to expedite certain initiatives once you were into Project M?

A.    No, actually.

For the upsell, one of the things that we were thinking about was just how to best target it, and so there was a lot of back and forth on the question of how do we best implement the targeting to maximize the impact.

Q.    Looking to the next sentence:

"That's why it's a popup on the FYF and not an inbox notification."

"FYF" means For You feed?

A.    That's correct.

Q.    "We're using both the upsell and the targeting strategy as part of our discussions with regulators."

Did I read that correctly?

A.    Yes, that's what the message says.

Q.    And then your colleague writes back:

"Is this due to the recent chaos in U.S. news?"

Is that accurate?

A.    That's what the message says.

Q.    And you respond "Pretty much."

Did I read that correctly?

A.    Yes, that's what the message says.

MR. VERRIER:   Okay.  You can put that document aside.

(Document marked for identification as TikTok-Tenenbaum Exhibit 41.)

THE WITNESS:   Thank you.

(Reviews document.)

I'm ready.  Thank you.

BY MR. VERRIER:

Q.    And this is a Lark chat between you and Jordan Furlong, ███████████ and ████████ on

February 15, 2023; is that right?

A.    It appears so, yes.

Q.    And the title of it is "Family Pairing + P&S"; is that correct?

A.    That's correct.

Q.    What does the "P&S" stands for?

A.    I believe it stands for privacy and security.

Q.    And if I could turn your attention to on page 1 the very first entry by Jordan Furlong at 17:51:51, he says in the last paragraph of that post:

"In case you're unfamiliar, Project M is a set of product changes we're making as a way to demonstrate our commitment to minor safety and wellbeing.  We've been asked by leadership to release these by March 23rd since that's when Shou is testifying in front of Congress."

Did I read that correctly?

A.    Yes, that's what the message says.

Q.    And right below it, you've seem to have affixed an emoji to it.

Do you see that?

A.    I do.

(Counsel conferring.)

MR. VERRIER:  Can we go off the record for a second?

THE VIDEOGRAPHER:  The time is 10:37.  We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  Time is 10:38 AM.  We're back on the record.

BY MR. VERRIER:

Q.    Okay.  We're handing you the next document --

A.    Thank you.

Q.    -- which will be marked Exhibit 44.

(Document marked for identification as TikTok-Tenenbaum Exhibit 44.)

BY MR. VERRIER:

Q.    First page bears the Bates number ending in 1027303.

A.    (Reviews document.)

Okay.  I'm ready.  Thank you.

Q.    Okay.  This is another Lark chat between you and ████████████    This one beginning on February 16, 2023; is that right?

A.    That's right.

Q.      And if I could turn your attention to the -- it's really the message at the very bottom of the first page from ███████████████ at February 17, 2023, and she says:

"Hello again!  Wondering if you could share the PRDs for the screentime limit in the family pairing PRDs when you get a chance? I'd also love to put in a monthly or bi-weekly for us if you're up for it.  USDS is trying to figure out where we can be a partner to your team and help advocate for pushing things through (under the guise of U.S. compliance needs)."

Did I read that correctly?

A.      That's what the message says, yes.

Q.      And what is "USDS"?

A.      You'll forgive me, I don't remember exactly what it stands for, but they're our U.S.-based organization that helps manage U.S. user data.

Q.      And then she continues:

"It seems like this congressional hearing is making Shou piss in his pants (lol) and so I want to strike while the iron is hot and capitalize on this momentum to help advocate for improvements in family pairing."

Did I read that correctly?

A.      That's what her message says, yes.

Q.      And you affixed a heart emoji to this message; is that right?

A.      That's correct.

Q.      And if you could turn to the next page, which ends with the Bates numbers 27305. The second message down, ██████████████ says:

"Does M stand for minor?"

And you answer "Haha yep."

Do you see that?

A.      I do.

Q.      And the next message from ██████████████ says:

"Hey Matt, I have an idea for the addiction/screen time proposal for Project Aspen."

Did I read that correctly?

A.      That's what the message says, yes.

Q.      And what is Project Aspen?

MR. COWAN:  Hold on.  I need to take a break because of a privilege issue.

THE VIDEOGRAPHER:  The time is 10:42 AM.  We're going off the record.

(A recess was taken.)

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

<%15207,Signature%>
DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028