# AMENDED Exhibit 418

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/         )
PERSONAL INJURY PRODUCTS      )   MDL No. 3047
LIABILITY LITIGATION          )
                              )
_____ )
                              )
This Document Relates To:     )
                              )
ALL ACTIONS                   )
                              )
_____ )


 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
              COUNTY OF LOS ANGELES
              UNLIMITED JURISDICTION


COORDINATION PROCEEDING       )
SPECIAL TITLE                 )
[RULE 3.550]                  )
                              )   JCCP NO. 5255
SOCIAL MEDIA CASES            )
_____ )
                              )
This Document Relates To:     )
                              )
ALL ACTIONS                   )
_____ )


ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
HYBRID
VIDEO-RECORDED
DEPOSITION OF REAGAN MAHER
Friday, February 21, 2025, 8:09 a.m.


REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

APPEARANCES


For the Plaintiffs:

BY: MICHAEL M. WEINKOWITZ, ESQ. (VIA ZOOM)
BY: ALICIA ARMSTRONG, ESQ. (VIA ZOOM)
LEVIN SEDRAN & BERMAN
510 Walnut Street
Philadelphia, Pa 19106
(215) 592-1500
MWeinkowitz@lfsblaw.com

BY: AARON BLUMENTHAL, ESQ. (VIA ZOOM)
BY: JAKE SEIDMAN, ESQ.
BY: ANDRE MURA, ESQ. (VIA ZOOM)
Gibbs Law Group LLP
1111 Broadway, Suite 2100
Oakland, CA 94607
(510) 350-9714
ab@classlawgroup.com


BY: JESSICA C. COLOMBO, ESQ. (VIA ZOOM)
Motley Rice LLC
One Corporate Center
Hartford, CT 06103 US Oakland,
860.882.1681
jcolombo@motleyrice.com

BY: JAKE SEIDMAN, ESQ.
BY: ANDRE MURA, ESQ. (VIA ZOOM)
BY: AARON BLUMENTHAL, ESQ. (VIA ZOOM)
1111 Broadway, Suite 2100
Oakland, California 94607
510.350.9717
Amm@classlawgroup.com

BY: FELICIA CRAICK, ESQ. (VIA ZOOM)
BY: CHRIS RYDER, ESQ. (VIA ZOOM)
BY: JESSICA JANSSEN (VIA ZOOM)
Keller Rohrback
1201 Third Avenue, Suite 3400
Seattle, Washington 98101
206.623.1900
Fcraick@kellerrohrback.com

Q.   And is your sort of career at TikTok beginning in March 2021 depicted accurately on this demonstrative?

A.   Yes.

Q.   And you worked from TikTok -- you worked for TikTok for almost -- about four years until October of 2024, correct?

A.   Correct.

Q.   And you started at TikTok in March of 2021, correct?

A.   Correct.

Q.   Did you work for TikTok or ByteDance or both?

A.   I believe my employment was originally through ByteDance.  And then when the U.S. Data Security org was created I believe it was changed to TikTok Inc.

Q.   Do you know when that change took place, approximately?

A.   I think it was January of 2023.

Q.   Okay.  Now, the first position you held at TikTok when you started in March of 2021 was Bay Head of Issue Product & Process, correct?

A.   Yes.

Q.   And you held that position for about ten

months, correct?

A.    Yes.

Q.    From March of 2021 to December of 2021, correct?

A.    Yes.

Q.    And then in January of 2022, you transitioned to a role Product Exploitation Hunt Manager; is that correct?

A.    Yes.

Q.    Is that within the U.S. Trust & Safety area?

A.    Yes.

Q.    And you held that position for one year three months, correct?

A.    Yes.

Q.    Was that a promotion for you?

A.    No, it was not.

Q.    Okay.  Was it a lateral move?

A.    Yes.

Q.    Okay.  And according to your LinkedIn profile, in that position, you built and managed a team of ten data scientists and data analysts responsible for proactive identification and mitigation of product risk; is that accurate?

A.    Yes.

Q.    And by product risks you were referring to the TikTok platform, correct?

A.    Correct.

Q.    Does that also include TikTok LIVE and the TikTok Now feature that are part of the TikTok platform?

A.    Yes.

Q.    March of 2023, did you transition to be the Head of Investigations and Insight within the USDS Safety department?

A.    Yes.

Q.    And what does USDS mean?

A.    United States Data Security.

Q.    Okay.  Was that a promotion for you?

A.    No, it was not.

Q.    Was it a lateral move for you?

A.    I'm not sure I would refer to it as a lateral move as I -- two other teams were consolidated under me.

Q.    Understood.

You held that position for one year and eight months until you left TikTok in October of 2024, correct?

A.    Correct.

Q.    So you worked for TikTok for almost about

four years, correct?

A.    Correct.

Q.    Would you agree with me that the timeline that was marked as Exhibit 2 is a fair and accurate depiction of your employment history at TikTok?

A.    Yes.

(Whereupon, TikTok-Maher Exhibit 2 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    All right.  So now I want to ask you some questions about when you left TikTok.

Why did you leave?

A.    A variety of reasons.

Q.    Can you communicate those to the jury, please?

A.    A shorter commute.  Better work-life balance.  A change in pace.

Q.    Understood.

Was your departure your idea?

A.    Yes.

Q.    So it was voluntary?

A.    Yes.

Q.    When you left, did you sign any sort of end-of-employment agreement?

A.    I may have.  I don't recall.

marked the previous exhibit.  So I'm going to, for the record, say the "In-App survey analysis on user safety perception of TikTok" will be marked as Exhibit 4.  And then this document that I just handed the witness will be marked as Exhibit 5.

Thanks, Evan.

TRIAL TECHNICIAN:  I apologize.  I'm still missing an exhibit, then.  What's 3?  This should be 3 -- that was 3.

MR. WEINKOWITZ:  I think --

MS. ARMSTRONG:  Previous document should be Exhibit 4 -- or -- excuse me.  Previous document is Exhibit 3.  This document is Exhibit 4.

TRIAL TECHNICIAN:  Thank you.

MR. WEINKOWITZ:  Sorry.

(Whereupon, TikTok-Maher Exhibit 4 was marked for identification.)

THE WITNESS:  Okay.  I'm ready.

BY MR. WEINKOWITZ:

Q.    This is a Lark Chat between you and Amy Classen starting in about April -- I'm sorry -- August 26th, 2021, correct?

A.    Yes.

Q.    And you sent and received Chat messages through the company's Lark platform as part of your

job, correct?

    A.    Yes.

    Q.    And Lark was a tool that TikTok and ByteDance provided you and other employees to communicate with each other in their day-to-day work, correct?

    A.    Yes.

    Q.    And you sent and received messages like this as a routine part of your job at TikTok and ByteDance, right?

    A.    Yes.

    Q.    Do you have any reason to believe that the content of this Chat that I've handed you was altered in any way from how it existed when it was produced by TikTok or ByteDance?

    A.    No.

    Q.    And Amy Classen was head of minor safety at TikTok, correct?

    A.    Head of minor safety product, yes.

    Q.    And she was -- you were chatting with her in late August of 2021, correct?

    A.    Yes.

    Q.    Let's go to the second page, if you would. And the Bates -- when I refer to a Bates number, ma'am, if you look at the right-hand corner, there's

a long number.  I generally refer to the last three digits of that number.

A.    Okay.

Q.    Three or four digits so that the record is clear.

So we're on page 2, Exhibit 4, at -- last Bates is 2064.

If you look at the third Chat down, do you see that Amy Classen says, "10 percent of users are underage"?

A.    Yes.

Q.    And underage means under 13, correct?

A.    Yes, I believe so.

Q.    Because TikTok allows 13-year-olds onto the platform, correct?

A.    Correct.

Q.    Ms. Classen says she's going to ban all of them.  And then she says once TikTok launches an appeal process.

Do you see that?

A.    Yes.

Q.    And you respond with an emoji, which I think it's called the "oh my god" emoji?

A.    Yes.

Q.    And you understood that 10 percent of

identification.)

BY MR. WEINKOWITZ:

Q.   Take your time and look at that and let me know when you're ready to answer questions.

You know, why don't we go off the record so that -- you know, I want the witness to have full opportunity to read it but I don't want to burn my time.  So let's go off the record.

(Whereupon, a brief discussion off the record.)

MR. MATTERN:  I object to going off the record.  I think you've put down this document in front of the witness.  The witness needs time to read it and to get the context for it and it's only been a couple of minutes.

MR. WEINKOWITZ:  Okay.  I don't want any complaints that we go late, then.

THE WITNESS:  Okay.  I'm ready.

BY MR. WEINKOWITZ:

Q.   Thank you.  All right.

So I handed you Exhibit 9, which is, appears to be a Forbes article, "How TikTok Live Became A Strip Club Filled With 15-Year-Olds."  Correct?

A.   Yep.

Q.   Do you recognize this document?

A.   I do.

Q.   Fair to say you read this at the time that you worked for TikTok, right?

A.   Yes.

Q.   And this is the document that you forwarded to ▆▆▆▆▆▆ in the Lark message which is Exhibit 7, correct?

A.   Correct.

Q.   And the sub title is "Livestreams on the social media app are a popular place for men to lurk and for young girls - enticed by money and gifts - to perform sexually suggestive acts."

Correct?

A.   Yes.

Q.   And it was -- this article was published on April 27, 2022, correct?

A.   Yes.

Q.   Same day that you sent it to ▆▆▆▆▆▆ in the Chat, right?

A.   Yes.

Q.   All right.  If you turn to the second page of the document, it's a long article, we're not going to -- we'd be here all day if we read everything.

But if you look at page 2, second paragraph down -- I'm sorry -- fourth paragraph down, it's talking about MJ, a 14-year-old girl, being paid to flash and expose herself to adult men.

Do you see that?

A.   The fourth paragraph says she was 14. Broadcasting with friends.

Yes, it looks like it refers to the first part on the flash.

Q.   Right.  Specifically, it says [as read]:

These exchanges did not take place between adults at nightclub.  They took place on TikTok LIVE where MJ, who said she was 14 years old, was broadcasting with friends to 2,000 strangers on a recent Saturday night.

Did I read that correctly?

A.   Yes.

Q.   Next paragraph down says [as read]:

A Forbes review of hundreds of recent TikTok livestreams reveals how viewers regularly use the comments to urge young girls to perform acts that appear to be -- I'm sorry -- that appear to toe the line of child pornography - rewarding those who oblige with TikTok gifts which can be redeemed for money or off-platform payments to Venmo, PayPal, or

Cash App accounts that users list in their TikTok profiles.

Did I read that correctly?

A.    Yes.

Q.    So when you worked at TikTok you knew that kids under 16 could host livestreams even though they weren't supposed to, correct?

A.    Correct.

Q.    And you knew they could receive gifts even though they weren't supposed to, correct?

A.    Correct.

Q.    TikTok only let users livestream if they say they were 16 or older, correct?

A.    Correct.

Q.    At this time, at the time of this article, in 2022, correct?

A.    Yes.

Q.    But TikTok didn't check their real age at signup.  There was only age gating but no age verification at signup, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  I -- I did not work on age verification, but -- so I can't speak to when it was launched or if it was, even.

///

BY MR. WEINKOWITZ:

Q.   But at this time you knew that when individuals signed up for TikTok all they had to do was give their date of birth, correct?

A.   Correct, yes.

Q.   You knew that the company didn't do any verification to make sure that those dates of birth were accurate, correct?

A.   Again, I didn't work on age verification, but that was my understanding.

Q.   And so you knew that kids could lie, they could say they were 18 and get access to livestreaming and gifts, correct?

A.   Correct.

Q.   And you knew that kids could sign up through platforms like Facebook and Google and they could get access to TikTok and livestreaming without giving their age or date of birth, correct?

MR. SHUR:   Objection as to form.

THE WITNESS:   I knew that -- that if -- if kids signed up for TikTok through a platform that they would be granted an automatic 18-plus experience due to a gap in the product, yes.

BY MR. WEINKOWITZ:

Q.   And that includes 11-year-olds, right?

A.    Yes.

Q.    And 10-year-olds, right?

A.    It could, yes.

Q.    And 9-year-olds, right?

A.    Yes.

Q.    And those children would have access to the livestream and gifting features, correct?

A.    Yes.

Q.    All right.  Let's go to the bottom of page 4.

THE WITNESS:  Can I take a quick break? Is that possible?

MR. WEINKOWITZ:  You may.

THE WITNESS:  Okay.

MR. WEINKOWITZ:  Yep.  You may.

Let's take five minutes.

THE VIDEOGRAPHER:  The time is 9:59 a.m. Pacific time.  We're going off the record.

(Whereupon, a brief recess was taken.)

10:06 20                   THE VIDEOGRAPHER:  The time is          a.m. Pacific time.  We're back on the record.

BY MR. WEINKOWITZ:

Q.    Okay.  Thank you for coming back.

We were looking at Exhibit 9, just the Forbes article.  If you could turn to page 4,

please, where we're going to -- and if you could look at the bottom paragraph.

There's a section called -- of this article called "TikTok, where gifts change hands."

Do you see where I'm at?

A.   Yes.

Q.   And it reads -- the article reads, under that section [as read]:

The wildly popular social media app best known for its lighthearted videos and dance routines is, beneath the surface, a cash cow - one where money and gifts are often sent by adults to minors. Top legal, law enforcement and children's safety experts told Forbes that such activity on livestreams can enable predators to groom targets for online and offline sexual abuse and sextortion, warning of the consequences of unfettered access to girls' bedrooms and bathrooms where most of the streaming occurs.

Did I read that correctly?

A.   Yes.

Q.   And you worked on a project called Project Meramec, correct?

A.   Correct.

Q.   Out of curiosity, how did Meramec get its

name?

A.   I -- I don't actually remember my rationale.  But it's the name of a river somewhere and I had -- I had a reason, but I don't remember it anymore.

Q.   So you named Project Meramec, correct?

A.   I did, yes.

Q.   Were you the leader on Project Meramec at the company?

A.   Yes, I was.

Q.   And Project Meramec occurred before this Forbes article was published, correct?

A.   Correct.

Q.   And isn't it true that one of the risks of livestreaming identified in Project Meramec was predators grooming children on TikTok and the creation of child pornography?

A.   One of the risks identified was the potential of child grooming, yes.

Q.   How about the exchange of child pornography, was that not one of the identified risks?

A.   I don't recall writing that in my report.

Q.   Let's go to page 5 of the article.

I am in the middle of the page, starts

MS. ARMSTRONG:  10.

MR. WEINKOWITZ:  And the color version will be 11.

(Whereupon, TikTok-Maher Exhibit 10 and TikTok-Maher Exhibit 11 were marked for identification.)

BY MR. WEINKOWITZ:

Q.    So before I give you a chance to look at these, I want to tell you why I'm giving you two versions.

I'll represent to you that these are two different versions of the same document.  The black-and-white version was a PDF that we located in your file that was produced to us by TikTok and ByteDance.

The color version, Exhibit 11, is a native version of the same file that we found in the custodial file of Adam Wang.  The reason I am giving you both is, A, I like the colors -- no, I'm kidding -- the color version has notes in it that I want to ask you about.

The black-and-white version, because it came as a PDF in your file, did not have the notes.

So I believe that you should have on the color version sticky tabs for the pages that I'm

going to ask you about.  So I promise you that I won't ask you about any other page.  So if that facilitates you reviewing the document, I hope that does, I -- what I'd like you to do is, is I'd like you to have both documents in front of you as we're talking so that you can compare them if you need to or feel comfortable to, if that's how you want to proceed.

          And my first question to you when I start is, do these appear to be the same document?

          So take your time, review it, let me know when you're ready to go.

          Do you have any questions from that of me?

     A.   No.

     Q.   Okay.

     A.   Okay.  I'm ready.

     Q.   I'm sorry.  I had my mute on.  Thank you.

          Have I given you a fair and adequate opportunity to compare the two PowerPoint decks that we are attaching as Exhibit 10 and 11?

     A.   Yes.

     Q.   Do you agree that they appear to be copies of the same slide deck?

     A.   Yes.

     Q.   The title of the slide deck is "TikTok

LIVE & US Safety Summit."  PowerPoint.  Safety Summit.  Correct?

A.    Yes.

Q.    And dated May 2022, correct?

A.    Yes.

Q.    Did you assist in putting this presentation together and making a presentation using this slide deck?

A.    Yes, I did.

Q.    And PowerPoint slide decks like Exhibit 10 and 11 were regularly used as part of TikTok and ByteDance's business for employees to present information internally, correct?

A.    Yes.

Q.    And you worked on this presentation in the course and scope of your regular work at TikTok, correct?

A.    Yes.

Q.    Do you have any reason to believe that either Exhibit 10 or Exhibit 11 were altered in any way from the original --

A.    No.

Q.    -- out of your file?

A.    No.

Q.    Thank you.

A.    That seems to be accurate.

Q.    Let's -- I'm sorry, let's turn to slide 8. It's another question-and-answer presentation.

Do you see that?

A.    Yes.

Q.    And the question on slide 8 is, "There are 110,000 creators going LIVE every day in the U.S. How long do they go LIVE on average?"

Did I read that question accurately?

A.    Yes.

Q.    The answer is 60 minutes, correct?

A.    Yes.

Q.    Was that accurate as of May 2022?

A.    I assume so, yes.

Q.    Okay.  And that's the date of the slide deck, right?

A.    Yep.

Q.    Go to slide 16, please.

Slide 16 has a question, what is -- "What's our business model?"  Right?

A.    Yes.

Q.    And it has an answer, "Creator monetization and platform monetization are two sides of the same coin."  Correct?

A.    Yes.

Q.    Monetization means to make money, correct?

A.    Yes.

Q.    And that was true as of May 2022 when this slide deck was presented, correct?

A.    Yes.

Q.    Slide 21, please.  I'm going to spend a little time on this slide.

The title of the slide as -- is, "As LIVE grows rapidly, we are facing increasing scrutiny from users, media regulators, and society."

Did I read that correctly?

A.    Yes.

Q.    And the "we" in that sentence is TikTok, correct?

A.    Yes.

Q.    All right.  Underneath the title it says -- hold on one second.

Under the title to the right-hand side do you see that there is checked -- a checked red square?

A.    Yes.

Q.    Looks like a key, correct?

A.    Yep.

Q.    It says "Dominant negative perception." Right?

A.   Yep.

Q.   And at the bottom of the slide, very, very small, under page 21, it gives a source for the data in the slide, correct?

A.   Yep, I see "Source."

Q.   And if you look at the screen -- Evan's blown it up for you -- it says "LIVE BHT conducted in U.S."  Correct?

A.   Yes.

Q.   Is that a study that was conducted by TikTok and ByteDance to derive these statistics?

A.   I don't know.

Q.   Okay.

A.   I'm not --

Q.   You don't know --

A.   I'm not familiar with BHT.

Q.   I'm sorry.

(Whereupon, a brief discussion off the record.)

BY MR. WEINKOWITZ:

Q.   Sorry, I did what I said I wouldn't do, which is ask a question before you were done.  I apologize.

All right.  So let's look under "TikTok LIVE."

Do you see where I'm at?

A.   Yes.

Q.   There's a -- a box of checked -- a checked -- I'm sorry -- a dotted red box.

Do you see that?

A.   Yes.

Q.   And that's dominant negative perception for TikTok LIVE, right?

A.   Yes.

Q.   And it looks like in this study there were 753 respondents that knew about TikTok LIVE, correct?

A.   Yep.

Q.   Right under "TikTok LIVE" it says "753." Right?

A.   Yep.

Q.   And the first dominant negative perception is, "Underage hosts going LIVE."

Do you see that?

A.   Yes.

Q.   And 37 of the 753 had that perception, correct?

A.   I guess.  I'm not entirely sure how these numbers -- if that's just a count, then yes.

Q.   Well, actually, if you look to the left, I

think it's a percentage.  Do you see negative percentage -- negative perception -- it says percentages respondents?

A.    Yeah, I see --

Q.    On the very --

A.    Yep.

Q.    I think -- do you understand that that 37 percent -- 37 is 37 percent, correct?

A.    Okay.  Yes.

Q.    All right.  And the next one down, 35 percent of the respondents said -- had a -- it said that TikTok LIVE was addictive, correct?

A.    Yep.

Q.    All right.  And do you recall, ma'am, in the Lark Chat between you and ███████████ that we looked at earlier, it said exacerbate addictive behavior and/or harm that may already be occurring due to minors using gifting feature, right?

A.    I do recall that message was sent by ████ ██████ not ████████████

Q.    I'm sorry.  I have it written wrong in my outline.  But ████████████
      You do recall that message, right?

A.    Yes.

Q.    And there it is up on the screen, correct?

A.    That's on the screen, yes.

Q.    And that's the one that you had the monkey emoji, correct?

A.    That is correct.  The monkey emoji was a response to my overall concern about the new PRD. It was not specifically related to the addictive comment.

Q.    Okay.  And if we go back to this study we see that 35 percent of respondents thought that TikTok LIVE was addictive, correct?

A.    That is what the survey says, correct.

Q.    Okay.  And then the next -- the next dominant negative perception down is, "Negative impact on minors."  32 percent had that perception, correct?

A.    Correct.

Q.    All right.  So let's turn to slide 22, next slide.

Do you see that these are quotes from people that were surveyed about TikTok?

A.    Yes.

Q.    First one says, "It feels like they are just trying to make money or get famous."  Right?

A.    Yes.

Q.    Second one is, "It's also very addicting

and harmful to everyone but especially seems to harm teenagers."  Correct?

A.    Yes.

Q.    And "addicting and harmful" were precisely the words that Ms. O'Connor used in the e-mail -- in the Lark message that we just talked about, correct?

A.    I believe so, yes.

Q.    And this is back to the present -- back to the PowerPoint.  This is an internal presentation in TikTok from May of 2022, correct?

A.    Yes.

Q.    It says "addicting and harmful."  Correct?

A.    Yes, it does.

Q.    And "addicting and harmful" are underlined and in red, correct?

A.    Yes, they are.

Q.    And so somebody must have done that inside TikTok, made them highlighted and -- I'm sorry -- red and underlined, correct?

A.    Presumably, yes.

Q.    So my question to you is, to the best of your knowledge, ma'am, did TikTok or ByteDance tell users/parents that TikTok LIVE was addicting and harmful to underage users?

MR. SHUR:  Objection as to form.  Asked

and answered.

THE WITNESS:  I've answered this question several times.  I will repeat.

I'm not familiar with any communications from TikTok to parents about anything.  Including whether or not it is addicting and harmful.

BY MR. WEINKOWITZ:

Q.    Have you ever been on the TikTok LIVE -- strike that.

Have you ever been on the TikTok Newsroom?

A.    Yes.

Q.    Do you ever read anything with TikTok Newsroom?

A.    On a few occasions.

Q.    Okay.  And the TikTok Newsroom is a place where TikTok puts press releases that it communicates with the public, correct?

A.    Yes.

Q.    Have you ever seen any TikTok TV ads?

A.    Yeah, I think so.

Q.    Okay.  And on the TikTok Newsroom and in the TikTok TV ads, have you ever seen TikTok or ByteDance tell users or parents that TikTok LIVE was addicting and harmful to underage users?

A.    Not that I recall.

Evan, it's the slide that says "Project Meramec & Forbes Response."  It might be one up or one back.

A.   Yeah, I'm in it on my -- in my hard copy. The screen was not showing the correct slide but now it is.

Q.   Now it is.  There we go.  Sorry about that.  Okay.

So this slide says "Project Meramec & Forbes Response."  Correct?

A.   Yes.

Q.   And under it, there are "Key Findings," correct?

A.   Yes.

Q.   And key means the most important findings or the main findings from Project Meramec, right?

A.   Correct.

Q.   And you were the project leader on Project Meramec, correct?

A.   Correct.

MR. MATTERN:  I'm sorry, Mike, sorry to interrupt.  You keep saying "Project Meramount."  I think you mean Meramec.  Just wanted to --

MR. WEINKOWITZ:  I'm saying Meramec.  You may not be hearing it but that's what I'm saying and

that's what's coming up on the record.

MR. MATTERN:  Okay.

MR. WEINKOWITZ:  So I'll try to be more clear.

So I don't know where I was.

Q.   You were the project leader on Project Meramec, correct?

A.   Yes.

Q.   You helped prepare this slide?

A.   Yes.

Q.   And the notes say that you are -- you are to present, correct?

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   Okay.  And did you ever make the presentation?

A.   Yes, I did.

Q.   Who did you present to?

A.   There were about 20 leaders from trust and safety and livestream business team, as well as V Pappas, the COO at the time.

Q.   When did this presentation take place?

A.   May 2022.

Q.   And was it live or over Zoom or some other

form of --

A.   It was live.

Q.   It was live.

Where was it?

A.   In L.A.

Q.   And who was the highest level person from the organization at that meeting?  Was that V Pappas?

A.   Yes, V Pappas entered the room during my presentation.  She had not been there until then.

Q.   Okay.  So she had -- when your presentation started V Pappas came in and heard your entire presentation, correct?

A.   She did not hear my entire presentation. She came in sometime in the middle.

Q.   Okay.  And do you know if that presentation was recorded in any way?

A.   I don't think it was, no.

Q.   Okay.  So let's look at some of the key findings.

In the first column, it's "Minor Safety."

Do you see that?

A.   Yes.

Q.   First bullet point, it says [as read]:

Signups via platform grant users 18-plus

experience enabling them to host and receive gifts.

Do you see that?

A.   Yes.

Q.   And that refers to users who sign up for TikTok via Google or Facebook or Instagram, correct?

A.   Correct.

Q.   And do you know whether you recommended that TikTok tell parents or users or the public that kids could sign up via Google or Facebook or Instagram and get access even if they were under the age of 13?

A.   I did not make that recommendation, no.

Q.   Okay.  The second bullet point, it says "L1 hosts."  So is that children under 15 or 16?

A.   I believe --

Q.   L1.

A.   -- L1 is under 16.  If I recall correctly.

Q.   Okay.  So it's -- reading it with that interpretation, it says children under 16 who host are at risk of grooming.

Do you see that?

A.   Yes.

Q.   Okay.  Did you ever recommend to the company, TikTok or ByteDance, that it tell parents, users, or the public that children under the age of

16 who hosted livestreams were at risk for grooming?

A.   No, I did not make that recommendation.

Q.   Wouldn't it be a good thing to put on the Transparency Center that we just looked at?

MR. SHUR:  Objection as to form.

THE WITNESS:  I don't make the decisions on what's posted on the Transparency Center.

BY MR. WEINKOWITZ:

Q.   But wouldn't it be a good idea to put that information on the Transparency Center so that parents could know that that's happening on TikTok?

MR. SHUR:  Same objection.

THE WITNESS:  I can't comment on whether or not I think that that is the appropriate mechanism for the Transparency Center.

BY MR. WEINKOWITZ:

Q.   Are you a parent?

A.   I am a parent, yes.

Q.   If you knew that children, your children under the age of 15 could be groomed on TikTok, wouldn't you want TikTok to let you know that?

A.   I feel that as a parent it's my responsibility to protect my kids.  And that there are risks everywhere.  It's my responsibility to understand where they are and make sure my kids are

safe.

Q.    You can't protect your children unless TikTok tells you what those risks are, right?

MR. SHUR:    Objection as to form.

THE WITNESS:    I believe that these types of risks can happen everywhere and it's not reasonable in every single scenario in anyone's life for them to be warned of a potential harm.  Every time I get in the car I'm not going to need someone to tell me that I could get in a car accident.

BY MR. WEINKOWITZ:

Q.    Okay.  So you don't want to be warned if your children could be groomed on TikTok, you think that that's not reasonable for them to warn you?

MR. SHUR:    Objection as to form.

THE WITNESS:    Again, I think these risks are everywhere, and it's not necessarily reasonable, no, to expect a platform like TikTok to make that warning.

BY MR. WEINKOWITZ:

Q.    Understood.

Next key finding.  "Transactional LIVE Gifting."

Do you see that?

A.    Yes.

Q.    First one says, "Significant Revenue from Transactional Gifting."  Correct?

A.    Yes.

Q.    And that's -- revenue is money, correct?

A.    Yes.

Q.    That means that TikTok gets significant revenue from transactional gifting, correct?

A.    Yes.

Q.    Now, if you go into the slide notes, the notes for the slide -- sorry -- it says that TikTok LIVE feature is causing kids who are hosting to be exploited.

Do you see that?

A.    Where exactly are you?

Q.    I'm sorry.

It's -- if you go down it says "Live Interaction Enables Exploitation of Live Hosts."

Do you see that?

A.    Yes.

Q.    Okay.  And that is something that you communicated during your presentation, correct?

A.    Yes.

Q.    And was V Pappas in the room when you communicated that?

A.    I don't remember when she walked in the

room.

Q.   20 other people from inside the company that were in the room, correct?

A.   Yes.

Q.   And did -- that's sort of consistent with, is it not, the Forbes article, "How TikTok [Live] Became A Strip Club For 15-Year-Olds."  Correct?

A.   Yes.

MR. SHUR:  Objection as to form.

BY MR. WEINKOWITZ:

Q.   And did TikTok or ByteDance tell users or parents or the public that there are risks of exploitation for children that use the livestream feature?

MR. SHUR:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  No further comment on that question.

BY MR. WEINKOWITZ:

Q.   Well, you don't get to do that.  You have to answer the question.

MR. SHUR:  She's answered the question over a dozen times and you keep asking the same question over and over again expecting a different answer.

MR. WEINKOWITZ:  I don't.

A.    Yes.

Q.    This is a -- Exhibit 14 is a Lark Chat between you and Jamie Favazza, the Global Head of Trust and Safety Communications, in late April of 2022.

Do you see that?

A.    Yep.

Q.    It was produced to us in this litigation by ByteDance and TikTok out of your file.

Do you have any reason to dispute that?

A.    No.

Q.    And you were communicating in the Chat with Ms. Favazza who is a TikTok or ByteDance employee in the regular course of your work at TikTok, correct?

A.    Yes.

Q.    You have no reason to believe that this Chat was altered in it -- from its original form in your file, do you?

A.    No.

Q.    Okay.  Let's look at the very first two messages.

It looks like on April 21, 2022, you sent Jamie Favazza a document, PC and livestream investigation point doc, right?

A.    Yes.

Q.    And you say, "We did this in Jan/Feb."
Right?

A.    Yes.

Q.    Okay.  And that would be January/February
of 2021, correct?

A.    Yes -- no.

Q.    2022?

A.    2022.

Q.    '22.  Sorry.

2022, correct?

A.    Yes.

Q.    And you refer to the Forbes article,
right?

A.    Yes.

Q.    And that's the Forbes article titled "How
TikTok [Live] Became A Strip Club Filled With
15-Year-Olds."  Right?

A.    Yes.

Q.    And can you please read to the jury what
you said in the sentence -- second sentence of your
Chat starting with, "We did this."

A.    [As read]:

We did this in Jan/Feb and everything this
Forbes article is addressing are things we already

knew, at least on my team, and that are absolutely true.

Q.   And you didn't just write that they were true, you wrote that they were absolutely true, correct?

A.   Correct.

Q.   Those were your words in 2022, correct?

A.   Correct.

Q.   All right.  And if you go -- the next sentence, it says [as read]:

It was elevated to Vanessa the first week of March and then to Shou, Wenjia, and Adam a couple weeks after that.

Did I read that correctly?

A.   Yes.

Q.   Those are the top executives at TikTok that you are talking about, correct?

A.   Yes.

MR. WEINKOWITZ:  Let's pull up slide 21A, which we'll mark as Exhibit 15.

(Whereupon, TikTok-Maher Exhibit 15 was marked for identification.)

BY MR. WEINKOWITZ:

Q.   At the top right is V Pappas.  And that's the COO of TikTok, correct?

A.    Yes.

Q.    And that's who you were talking about, correct?

A.    Yes.

Q.    And to the left of her is Shou Zi Chew who is the TikTok CEO, correct?

A.    Yes.

Q.    And that's who you were talking about, correct?

A.    Yes.

Q.    And Adam Wang, who is below Mr. Chew, is the Global Head of TikTok LIVE, correct?

A.    Yes.

Q.    And he was one of the executives you were talking about in that text, right?

A.    Yep.

Q.    And Zhu Wenjia is the Global TikTok R&D Chief, correct?

A.    That's what the slide says.  I don't remember his exact title.

Q.    Okay.  Do you have any reason to dispute that that was his title?

A.    No.

Q.    That he was one of the executives that you were talking to, correct?

A.    Yes.

Q.    Talking about, correct?

A.    Yes.

Q.    Now, let's continue looking at your message to Jamie Favazza.

We -- the second-to-last sentence you say [as read]:

I've been on a crusade to fix this problem for months now and honestly I'm frustrated to not have succeeded before this article.

Did I read that correctly?

A.    Yes.

Q.    And that's what you wrote at the time, correct?

A.    Yes.

Q.    And you were frustrated, correct?

A.    Yes.

Q.    You were trying to fix TikTok's -- TikTok LIVE -- strike that.

You were trying to fix serious dangers for kids from TikTok's -- TikTok LIVE, correct?

A.    Yes.

Q.    And some of those dangers were called out in the Forbes article, right?

A.    Yes.

Q.   And that's a Forbes article that you said was absolutely true, correct?

A.   Yes.

Q.   You say you were on a crusade for months, right?

A.   Yes.

Q.   And part of that crusade was elevating safety issues to the highest executives inside TikTok, correct?

A.   Yes.

Q.   You even used the word "elevated." Correct?

A.   Yes.

Q.   Because you cared about kids being harmed on TikTok, did you not?

A.   Yes.

Q.   And you knew from your work on Project Meramec that there was a risk of kids being groomed and harmed by adult predators on TikTok, correct?

A.   Yes.

Q.   And you cared about underage children -- you cared -- strike that.

     You cared about the fact that underage children of 8, 9, 10, or 11 could get onto TikTok by signing up through Google, Facebook, or Instagram,

correct?

A.   My concern was more so on the teenagers. We did not see 8-, 9-, 10-year-olds anywhere near as often as we saw teens.

But yes, I was concerned about kids on TikTok.

Q.   And you just used the words "anywhere near" so that means that you saw some 8-, 9-, and 10-year-olds, correct --

A.   I don't --

Q.   -- on TikTok?

A.   I don't recall -- I don't recall ages in any sort of numbers.  There may have been a handful that could have been eight.  But I don't recall the numbers.

Q.   Understood.

Your job was to protect kids, and you were frustrated, right?

A.   My job was to investigate risks on TikTok that could result in harms against all TikTok users. And I was frustrated, yes.

Q.   And you wouldn't have called it a crusade unless it was a serious issue, right?

A.   Yeah, that's correct.

Q.   You personally pushed for action to fix

the serious dangers to kids that the Forbes article was calling out, correct?

A.   Yes.

Q.   And it was so concerning to you that you even escalate the issue to V Pappas, the chief operating officer, correct?

A.   I did not escalate it to V Pappas myself. I sent my report to Eric Han, the head of trust and safety, and I believe that he escalated it to V Pappas.

Q.   Okay.  So that's what you mean when you say it was elevated to V Pappas the first week of March, correct?

A.   Yes.

Q.   All right.  Let's look at the next text down.

In this next message, which is about two minutes after that first message, you explain more about why you're so frustrated, correct?

A.   Yes.

Q.   You say [as read]:

Put simply, senior leaders know about this issue.  There are some ongoing projects to fix parts of it, and frankly, I'm hoping this article --

And underline this part, Evan.

-- puts a fire behind other potential solutions.  I've been advocating for like not allowing hosts whose livestream are closed to cash out the gifts received during the livestream.  You recall me saying that during the Ukraine scam problem.

Did I read that correctly?

A.    Yes.

Q.    And you do say "senior leaders know about this issue."  Correct?

A.    Yes.

MR. WEINKOWITZ:  And pull up 21A, please, again.  The last exhibit.

Q.    Those are the senior leaders, correct?

A.    Yes.

Q.    Were you referring to any other senior leaders?

A.    Was I referring to them?

Q.    To anybody else other than them?

A.    I was probably referring to all the leaders that I had sent it to directly, Eric Han and his direct reports.

Q.    Would it be fair to say that you brought the dangers of TikTok LIVE features to the attention because they had the power to implement the safety

changes?

A.   Yes.

Q.   You had already proposed specific fixes, hadn't you?

A.   Yes, I had.

Q.   And you even used the word "fix" in your message to Ms. Favazza, correct?

A.   Yes.

Q.   And one of those fixes was to stop closed stream hosts from cashing out, correct?

A.   Correct.

Q.   You weren't just complaining, were you, about actively pushing for change, correct?

A.   Can you rephrase your question?

Q.   Yeah, it's a bad question.

You hoped that the Forbes article would spur action inside the company, correct?

A.   Yes.

Q.   And that's what you mean when you say [as read]:

I'm hoping this article puts a fire behind other potential solutions I've been advocating.

Correct?

A.   Yes.

Q.   And so from your perspective, the Forbes

article may have been a good thing because it might put pressure on leadership to finally take action to protect kids the way you were recommending, correct?

A.   Yes.

Q.   Let's look at -- continue on, as a matter of fact, next Chat down, Ms. Favazza responds to you, correct?

A.   Yes.

Q.   She thanks you.  She says, "Thank you so much," exclamation point, right?

A.   Yes.

Q.   She says, "The only silver lining in press like this is that they do tend to spark a fire" --

          Underline "spark of fire," please.

          -- "so hopefully we can get things fixed sooner."  Right?

A.   Yes.

Q.   And what she's referring to is the -- is the Forbes article, "How TikTok Live Became A Strip Club With 15-Year-Olds."  Correct?

A.   Correct.

Q.   She's referring to that and refer as a silver lining, correct?

A.   Correct.

Q.   She actually wrote that the press coverage

tends to spark a fire, correct?

A.    That's what it says, yes.

Q.    To get things fixed sooner, correct?

A.    That's what it says, yes.

Q.    These -- she's sharing with you her experience as the Global Head of Trust and Safety Communications, right?

MR. SHUR:  Objection as to form.

THE WITNESS:  Jamie was the global head of communications, yes.

BY MR. WEINKOWITZ:

Q.    And she's -- okay.

And she's telling you the press coverage tends to spark a fire, correct?

A.    Yes.

Q.    And as someone who handles press at TikTok you would expect that Ms. Favazza understood how TikTok responds to media scrutiny, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  I'd never worked in public relations.  So I don't know if I can comment or have an opinion.

BY MR. WEINKOWITZ:

Q.    Well, she's -- she's the person who works in public relations, correct?

Q.    And monetization means the process of making money, correct?

A.    Yes.

Q.    Do you recall having a conversation with ██████████ in March of 2022 about the Forbes article?

A.    No, because the Forbes article came out in April.

Q.    Okay.  Do you recall having any conversation with ██████████ in 2022 about issues related or around the Forbes article?

A.    In 2022, yes.

MR. WEINKOWITZ:  Okay.  Let's pull up Tab G4.

Take your time.  Let me know when you're ready.

Thank you.  16.

(Whereupon, TikTok-Maher Exhibit 16 was marked for identification.)

THE WITNESS:  Okay.  I'm ready.

BY MR. WEINKOWITZ:

Q.    Okay.  Have I given you a fair and adequate opportunity to review Exhibit 16?

A.    Yes.

Q.    This is a Lark Chat between you and ██████████

███████ starting in around March 21st, 2022, correct?

A.  Yes.

Q.  And this Lark Chat was produced in this litigation by TikTok and ByteDance from your files.

Do you have any reason to dispute that?

A.  No.

Q.  And you were communicating in this Chat with ███████████ and other TikTok -- well, ████████ ███████ in the course of your regular work at TikTok, correct?

A.  Correct.

Q.  And you have no reason to believe this Chat was altered from its original form in your file, do you?

A.  No.

Q.  All right.  Turn to the fourth page, if you would, it ends in Bates 8270.

Do you see your first Chat there, your first communication?

A.  Yep.

Q.  It's on April 27, 2022, at 15:51:32.

You send ████████ the Forbes article, "How TikTok Live Became A Strip Club Filled With 15-Year-Olds."  Correct?

A.  Yes.

Q.   And he responds, "Ugh."  Right?

A.   Yep.

Q.   And then he asks you, "Has leadership said anything about it?"  Right?

A.   Yes.

Q.   And you responded, "Oh, yes, it's as if they can't remember reading our Project Meramec doc."  Correct?

A.   Project Meramec, yes.

Q.   Sorry.

And when you answer, "Oh, yes" --

Evan, can you pull up G21A, whatever exhibit number that is again.

When you say, oh, yes, that leadership had something to say, you're referring to these executives, correct?

A.   I'm not sure if I was referring to them at the time.  I'm -- was probably more referring to my direct leadership because at this point we were just starting the sort of escalation response.

Q.   Okay.  And who is your direct leadership that you are referring to?

A.   Eric Han, head of trust and safety, and his direct reports.

Q.   And who are his direct reports?

A.    ███████████████    Tara Wadhwa.  Maybe ████████████████ at the time because she was my direct manager.  I don't know if she had Tara between her and Eric.

Q.    Okay.  Thank you.

And you say "they can't remember reading our Project Meramec doc."  That's the internal project that you led that focused on understanding the risks associated with TikTok livestream feature, correct?

A.    Correct.

Q.    And particularly in younger users, right?

A.    Right.

Q.    All right.  And then ██████ says, "That or if they've spent more than 30 seconds on LIVE."

Right?

A.    Right.

Q.    You do the "yes" emoji, right?

A.    Yep.

Q.    And then you say [as read]:

What blows my mind the most, the people working in LIVE apparently don't spend any time on the platform, correct?

A.    Yes, that's what it says.

Q.    Who are you referring to?  Who are those

people?

A.   I was probably referring mostly to the policy team.

Q.   Who are they?  What are their names, the policy team?

(Whereupon, a brief discussion off the record.)

THE WITNESS:  ████████████████████
████████

BY MR. WEINKOWITZ:

Q.   Anyone else?

A.   ███████████████ led the policy livestream team but she was as concerned as me.  So that's not who I'm referring to here.

Q.   And then what you do is is you actually post the findings from Project Meramec, correct?

A.   Yes.

Q.   Those were the findings that you shared with senior leadership in February, correct?

A.   Correct.

Q.   And we're going to look at those in a minute but I want to look at your next text.

On the next page, read what -- to the ladies and gentlemen of the jury what you write.

A.   [As read]:

Honestly, though, this was right up front for Shou, Wenjia, and Adam in late February.

MR. WEINKOWITZ:  Could you pull up -- I forgot what number it was -- that slide again, Evan -- actually, G4B, please.

Q.    Is that who you're referring to, ma'am?

A.    Yes.

Q.    That's Wenjia, Zhu Wenjia, Global TikTok R&D Chief, correct?

A.    Yep.

Q.    And that's Shou Zi Chew, the TikTok CEO, correct?

A.    Correct.

Q.    And Adam Wang, the Global Head of TikTok LIVE, correct?

A.    Correct.

Q.    And you say [as read]:

Honestly, though, this was right up front for all of those executives on the slide.

Correct?

A.    Yes.

Q.    And you put "right up front" in capitals, correct?

A.    Correct.

Q.    And you meant to emphasize those words,

correct?

A. Yes.

Q. And this is the second text messages we've seen where you're saying that the top leaders at TikTok knew about the harms to kids as your Project Meramec found, correct?

A. Yes.

Q. After you say [as read]:

Honestly, this was right up front --

strike that.

Let's look at your next -- that message to ▮▮▮▮▮▮▮▮ after you say that this was right up front to the executives.

You say [as read]:

And I have been fighting about fixing this for months with people who didn't think the harms are severe enough.

Correct?

A. Correct.

Q. And you say you were trying -- you were fighting about fixing this with -- for months with people.

Who are those people?

A. The primary individual was ▮▮▮▮▮▮▮▮

Q. And what was her title?

A.   I believe she managed the ANSA policy development work.

Q.   And the harms that you were talking about are harms to children and teenagers from hosting livestreams, correct?

A.   The harms were not solely children and teenagers.  It was my concern around the prevalence of the transactional sexual content and any viewers. That did include children and teenagers.

Q.   And children who were under 13 who were gaining access to TikTok by signing up using Google, Facebook, Instagram and/or.  Correct?

(Whereupon, a brief discussion off the record.)

BY MR. WEINKOWITZ:

Q.   And ▮▮▮▮▮▮▮▮▮ responds [as read]:

Right, you mentioned this to me on like day one of me being here.

Correct?

A.   Correct.

Q.   And you do a crying emoji, right?

A.   Yes.

Q.   And if you look to the very last page, ▮▮▮▮▮▮▮▮ says "can't say you didn't tell them." Right?

A.    Yes.

Q.    And you understood the "them" to be the senior leadership at TikTok, correct?

A.    Yes.

MR. WEINKOWITZ:  Okay.  Let's take a break.

THE VIDEOGRAPHER:  The time is 11:40 a.m. Pacific time.  We're going off the record.

(Whereupon, a brief recess was taken.)

(Whereupon, TikTok-Maher Exhibit 17 was marked for identification.)

THE VIDEOGRAPHER:  The time is 12:35 p.m. Pacific time.  We're back on the record.

BY MR. WEINKOWITZ:

Q.    Okay.  Ms. Maher, thank you for coming back.  I appreciate it.

We are still going to be looking at Exhibit 16.  And we're still on page ending in Bates 271, which is page 5.

All right.  So before we broke and before we read the rest of these Chats I indicated that we were going to go back to your key findings that you circulated in -- forwarded in this Chat.  So let's get back there.

You see that you write, right before the

Chat message where you write, "Honestly, though, this was right up front for Shou, Wenjia, Adam in late February," you forward your -- the key findings for Project Meramec, correct?

A.    Yes.

MR. WEINKOWITZ:  And let's pull up G4A, which we'll mark as Exhibit 18.

(Whereupon, TikTok-Maher Exhibit 18 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    So what -- this is a more legible copy that was attached to this Lark Chat so that it's a little easier for everybody to read, okay?

A.    Okay.

Q.    And it was produced to us attached to the Lark Chat that you were having with ██████████

Any reason to dispute that?

A.    No.

Q.    All right.  And these are the key findings from Project Meramec that you forwarded in the Chat conversation, correct?

A.    Yes.

Q.    And these are the ones that were right up front for senior leadership in February 2022, correct?

A.   Yep.

Q.   So let's take a look at the key findings. We'll look at bullet point number one.

Bullet point number one reads [as read]:

Signups via Google, slash, Meta automatically grant users an 18-plus experience.

Did I read that correctly?

A.   Yes.

Q.   So if a child signs up for TikTok via Google or Meta, meaning Facebook or Instagram, they are automatically given an 18-plus experience, correct?

A.   Yes.

Q.   Even if that child is 10 or 11 years old, correct?

A.   Yes.  The company was not aware that this was happening.

Q.   You were aware that this was happening, correct?

A.   I became aware of this happening through my investigation, yes, and brought it to my -- brought it to leadership.

Q.   Correct.

So you were aware, you worked for the company, you were aware that this was happening, and

this was a finding in Project Meramec that you brought to senior leadership, correct?

A.   Correct.

Q.   All right.  Next sentence says "112K L1-Hosted Lives in January."

Do you see that?

A.   Yes.

Q.   All right.  That means L1 is kids under 16; is that right?

A.   Yes.

Q.   So that means 112,000 children under 16 posted TikTok LIVEs in January, correct?

A.   Correct.  But I'll clarify that L1 was for -- was 13- through 15-year-olds.

Q.   Okay.  So it was even younger.  It could have been 112,000 13- to 15-year-olds hosting TikTok LIVE in January, right?

A.   Yes.

Q.   And that's 112,000 in one month, correct?

A.   Correct.  And then some of those --

Q.   And that's --

A.   One more point of clarification.

Many of those were the same hosts.  So that was a total count of livestreams.  That is not the total count of individuals.

Q.    Understood.

Something that senior leadership was told, correct?

A.    Yes.

Q.    Next [as read]:

We suspect many L1 hosts, which are kids 13 to 15, signed up for TikTok via Google/Meta surpassing the age gate and getting an 18-plus experience, correct?

A.    Correct.

Q.    That's something that senior leadership was told, correct?

A.    Yes.

Q.    Next sentence [as read]:

The lack of an age gate does not prohibit age-gated features, including host LIVEs, sending and receiving gifts, and direct messages.

Did I read that correctly?

A.    Yes.

Q.    So if you were a user that was 9, 10, or 11 years old and you signed up for TikTok through Google or Meta -- Facebook and Instagram -- those kids would not be redirected into Kids Mode, correct?

A.    I -- I believe that's the case.

Q.   They would have access to the main 18-plus TikTok platform, correct?

A.   Correct.

Q.   They would get the 18-plus TikTok LIVE experience, correct?

A.   I believe so.  I -- yes, I think that's right.

Q.   And they were able to send and receive gifts.  That's what this quote means, correct?

A.   Yes.

Q.   And that -- they were able to -- they were able to exchange direct messages, correct?

A.   Yes.

Q.   And that's something that senior leadership was informed about, correct?

A.   Yes.

Q.   All right.  The next bullet point under key findings of Project Meramec.  It says [as read]:

Significant revenue from gifting 1 million gifts sent to violating livestreams in January.

Correct?

A.   Yes.

Q.   Revenue means money, correct?

A.   Yes.

Q.   Significant means a lot, correct?

A.    Yes.

Q.    And that money and revenue goes to TikTok, right?

A.    Through a revenue sharing process --

Q.    Right.

A.    -- we're part of the host, yes.

Q.    TikTok makes money, correct?

A.    Yes.

Q.    And then it says [as read]:

LIVE primary line of business is live gifting.

Does that mean TikTok LIVE's primary line of business is live gifting?

A.    Yes, the primary revenue stream and livestream is the gifting feature.

Q.    And at this time if a child of the age of 11 was on TikTok, they would be able to use this gifting feature, correct?

A.    Can you repeat the question?

Q.    Yes, ma'am.

I said at this time if a child at the age of 11 signed up for TikTok through Google or Facebook, they would have access to this gifting function?

A.    Yes.

Q.   And you brought that to senior leadership's attention, correct?

A.   I brought this to Eric Han and his leadership team.

Q.   Okay.  And how many -- who is his leadership team?

A.   ██████████████████  Tara Wadhwa, and ████████

Q.   Next is [as read]:

Roughly 1 million gifts were sent to livestreams that were closed as a result of violation -- a violation in 2022 presenting a PR risk that TikTok is profiting off violations.

Did I read that correctly?

A.   Yes.

Q.   And PR means public relations, correct?

A.   Yes.

Q.   And that means a risk of bad press, right?

A.   Yes.

Q.   Every time someone buys a gift on TikTok, TikTok receives a portion of the money, right?

A.   I believe so.  I don't know all the details of how it works.  But I think that's right.

Q.   Okay.  Sorry.  I didn't mean to cut you off.

So for each of these 1 million gifts sent in the one month of January 2022 to a stream TikTok later closed for a violation, TikTok received money, right?

A.   Yes.

Q.   And that's why it was a PR risk, that TikTok might be profiting off of these violations, correct?

A.   Yes.

Q.   And that PR risk actually came true with the Forbes article, right?

A.   Yes, I would say so.

Q.   Do you recall in the Chat with ██████ when you said, "I've been fighting about fixing this for months with people who didn't think the harms are severe enough."

Do you remember that Chat?

A.   Yeah.

Q.   To the best of your knowledge, did TikTok tell users, parents, or the public about the very harms that you were referring to relating to a livestream?

MR. SHUR:   Objection as to form.

THE WITNESS:   I'm not familiar with the content or substance of any communications from

TikTok to parents.

BY MR. WEINKOWITZ:

Q.    Those harms included children being groomed by predators of TikTok, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  Can you rephrase the question?

BY MR. WEINKOWITZ:

Q.    Yes, ma'am.

The harms that you were referring to in that particular Chat included the potential for children to be groomed by predators on TikTok?

A.    That was one of our concerns, yes.

Q.    Now, not only did you communicate with Jamie Favazza, ▮▮▮▮▮▮ but there were other employees that you expressed your frustration to, correct?

A.    Yes.

Q.    ▮▮▮▮▮▮ you worked with her at TikTok, correct?

A.    Yes.

Q.    And she was a data -- data analyst, product livestreams, correct?

A.    Yes.

Q.    Do you recall communications with

A.    Yes, I believe I spoke about that with them.

Q.    And would you have done that over Lark Chat?

A.    Probably.  I think we had some meetings, too.

MR. WEINKOWITZ:  Can we pull up G10, which we'll mark as Exhibit...

MS. ARMSTRONG:  24.

MR. WEINKOWITZ:  24.

(Whereupon, TikTok-Maher Exhibit 24 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    Take your time.  Let me know when you're ready.

A.    Okay.

Q.    Okay.  Did I give you a fair and adequate opportunity to review Exhibit 24?

A.    Yes.

Q.    This is a Lark Chat between you and ███████

███████████████████

Do you see that?

A.    Yep.

Q.    And you're chatting with your colleagues at TikTok in the course of your regular work, right?

A.    Yep.

Q.    And no reason to believe that this Chat was altered from its original form in your file, do you?

A.    No.

Q.    Do you see that these communications are between May 1 and 19 -- May 1 and May 19, 2022?

A.    I think they start at May 18th, not May 1st.

Q.    Yeah, that's right.  May 18th and -- let me just ask that question again.

Do you see that these communications were between May 18 and 19, 2022?

A.    Yes.

Q.    All right.  Let's look at the first page, if you would.  The very first message.

In this first message you say that there are 1,200 -- 122,806 LIVE rooms were closed for violations in January.

Do you see that?

A.    Yes.

Q.    And that would have been January of 2022?

A.    Yes.

Q.    And there were 100,939 L1s, so kids under 16, right?

A.    Yes.

Q.    Hosted livestreams in January 2022, correct?

A.    Yes.

Q.    And that could not just be kids that were 16, but as young as 11, correct, and even younger?

A.    It's possible.  But we also had L0s, which were, I believe, meant for 13 and under.  So the L1s was assumed to be 13 through 15.

Q.    Okay.  Did you not look at the L0s?

A.    I don't recall.

Q.    ▇▇▇▇▇▇▇▇▇▇▇ he's head of ecosystems for TikTok.  Did he report to you?

A.    No.

Q.    All right.  So let's see what he says in the next -- second -- the next -- not the next Chat but the next one after that.

He says looking at the first and third questions, L1 -- that's under 16, right?

A.    Yes.

Q.    -- hosted rooms -- "hosted room should be treated as violation and closed, correct?"

And then he says, "Does it mean we only have 22,000 other violative rooms in January?"

Do you see that?

A.    Yes.

Q.    And so you respond, if you look at the next page, "No, because most of the L1-hosted LIVES weren't violated."

Do you see that?

A.    I do.

Q.    And what that means is no, most of the 13- to 15-year old hosted TikTok LIVEs weren't violated, right?

A.    Yes, I believe so.

Q.    And so that means that there are 13- to 15-year-olds on TikTok LIVE and TikTok didn't shut those LIVE rooms down, correct?

A.    I -- I believe that's the case.

Q.    Go to Chat -- I'm sorry, go to page 3 ending in Bates 387.  And if you would look at the third-to-last Chat from you on May 19th -- hold on a second -- yeah, on May 19, 2022, at 3:29:13.

Do you see that?

A.    Yep.

Q.    And you in that Chat say, "We did not investigate the minor hosts beyond this."

And then it says, "54.3 percent of our L1 hosts" -- that's hosts that are 13 to 15, correct?

A.    Yes.

Q.    -- "signed up for TikTok through another platform, Google, Meta, Twitter, Apple, and Instagram."

Do you see that?

A.    Yes.

Q.    And here you say 54.3 percent of those kids got on the platform those -- through those other platforms, correct?

A.    Correct.

Q.    And those kids weren't age-gated, correct?

A.    I believe that's correct.

Q.    And so that means that 45.7 percent of the users must have signed up for TikTok a completely different way, right?

A.    I -- I don't know.

Q.    The 54.3 percent that signed up for TikTok through another platform, they should have been age-gated, correct?

A.    Can you rephrase?

Q.    Sure.

The 54.3 percent of children that got onto TikTok through Google, Facebook, Twitter, or another platform that were under 13, they should have been age-gated, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  I think you're saying under 13.  But L1 is 13 through 15.  I'm a little confused.

BY MR. WEINKOWITZ:

Q.   Okay.  So if an 11-year-old gets onto TikTok through Google, right, or Facebook, or Meta -- I'm sorry -- or Instagram, that 11-year-old should have been age-gated but was not, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  Everyone should be age-gated.  The product gap was that the age gate was not pushed if anyone signed up via platform.

BY MR. WEINKOWITZ:

Q.   Understood.

Look at the next Chat down, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ he tells you that, "Adam mentioned that L1" -- which is under 15 -- "model is not currently accurate."  Correct?

A.   Yes.

Q.   Who is Adam?

A.   Adam Wang.

MR. WEINKOWITZ:  Can you pull up G4B or whatever that -- whatever the picture is with that Mr. Wang so the jury can see.

Q.   Adam Wang is to the right, right?  He's

BY MR. WEINKOWITZ:

Q.   And I will give you an opportunity to review it.  You tell me when you're ready to go.

A.   Okay.

Q.   Have I given you a fair and adequate opportunity to review Exhibit 27?

A.   Yes.

Q.   All right.  The title of this document is, "Summary of Findings - TTN" -- that's TikTok Now, right?

A.   Yes.

Q.   -- "30-Day Post-Launch Feature Investigation [USDS TnS:TDP_PEx] 22 November 3."

Did I read that correctly?

A.   Yeah.

Q.   More or less.

And you updated this document on November 3rd, 2022, correct?

A.   I guess so.  That's what it says there.

Q.   Do you recognize this document?

A.   Yes.

Q.   And this was something that you either created, in whole or in part, in the course of your regular work at TikTok?

A.   Yes, I reviewed this document.  My direct

report wrote it.

Q.    And you have no reason to believe it was altered from how it existed in your files, do you?

A.    No.

Q.    All right.  The first sentence says, "TikTok Now (TTN) was launched on September 15, 2022, in the U.S. as an in-app feature."

Did I read that correctly?

A.    Yep.

Q.    And this is a report of 30 days post-launch of TikTok Now, correct?

A.    Yes.

Q.    And what this is a report of -- strike that.

So it says, in the first paragraph [as read]:

Now that this feature has been launched, PEx conducted a 30-day post-launch feature investigation of TTN, TikTok Now, where we analyze data, tested the features, reviewed public feed, interviewed internal stakeholders, and scanned online discussions and coverage.

Did I read that correctly?

A.    Yes.

Q.    What is PEx?

Q.    TikTok learned that -- that kids were chatting on TikTok Now to avoid parental supervision, right?

MR. SHUR:  Objection as to form.

THE WITNESS:  Can you rephrase?

BY MR. WEINKOWITZ:

Q.    Sure.

TikTok learned that kids were chatting on TikTok Now to avoid parental supervision?

MR. SHUR:  Objection as to form.

THE WITNESS:  According to this report, there was some comments that suggested some kids were doing that.

BY MR. WEINKOWITZ:

Q.    Okay.  So let's look at the bottom of this paragraph.  It starts with, "Users discussed."

Do you see where I'm at?

[As read]:

Users discuss that their parents check their messages on platforms such as Messenger but do not check TikTok Now, TTN, comments and explain that they are chatting on TTN to avoid parental supervision.

Do you see that?

A.    Yes.

Q.    And then it gives specific examples, does it not?

A.    Yes.

Q.    All right.  Let's pull up the first specific example.  It says [as read]:

I say let's ease into it about texting. I'll just mention your name a lot -- some emojis -- I'm too scared to actually text you cause of your mom.  Could easily text you on Insta or on iMessage but your mom.

Did I read that correctly?

A.    Yes.

Q.    Now, let's look at the observation under number 3 on the bottom of page 3.

Do you see where I'm at, "Observations"?

A.    Yeah.

Q.    All right.  Number 3.  "TTN Posting Patterns."  TTN, which is TikTok Now, right?

A.    Yep.

Q.    L1 to L2, which is 13 to 17 users, right?

A.    Yep.

Q.    "Were posting during school hours, particularly in time zones on the West Coast and in Hawaii."

Did I read that correctly?

A.    Yes.

Q.    As part of this investigation TikTok learned that 13- to 15-year-old kids were posting during school hours, correct?

A.    Yes.

Q.    So TikTok Now sends a daily notification, right?

A.    Yes.

Q.    And what this found was those notifications were happening during school hours, correct?

A.    First, yes, for some kids.

Q.    For some kids.

And then that was compelling or prompting those children during school hours to host on TikTok, correct?

A.    Yes.

Q.    And according to this document, it is generated randomly -- TikTok Now notifications "is generated randomly once for the entire United States between 8:00 a.m. and 10:00 p.m. Eastern."

Did I read that correctly?

A.    Yes.

Q.    And TikTok analyzed TikTok Now posting times by kids under 18, right?  In the two states

with the most TikTok Now users, California and
Texas, to see if kids under 18 were posting during
school and sleep hours, right?

A.    Yes, that's what it says.

Q.    All right.  And you also looked at the
State of Hawaii, correct?

A.    The State of Hawaii?

Q.    Yes, ma'am.

A.    I think so.

Q.    All right.  And then it says -- I'm sorry,
did I cut you off?

A.    I just was looking for where we talked
about Hawaii.

Q.    If you look at page -- I think it's
page 4, Bates 558, number 1 in the middle, sort of
halfway down the page, it talks about Hawaii,
California, and Texas.

Do you see that?

A.    Yep.

Q.    All right.  And then number 2, it says [as
read]:

Although peak posting times generally
falls outside local school hours, we still observe
significant posting from kids under 18 during school
hours defined as 8:00 a.m. to 2:00 p.m.

Do you see that?

A.    Yeah.

Q.    Now, can you understand how distracting it might be for a kid receiving a TikTok Now notification during class?

MR. SHUR:   Objection as to form.

THE WITNESS:   Can you reframe?

BY MR. WEINKOWITZ:

Q.    Sure.

And you understand that it might be distracting for a kid to receive a TikTok Now notification while at school during class?

MR. SHUR:   Same objection as to form.

THE WITNESS:   Assuming they have a phone with them in the middle of class, yeah, that would be distracting.

BY MR. WEINKOWITZ:

Q.    And TikTok Now encourages immediate engagement, does it not?

A.    Within a few minutes, I believe.

Q.    So if a kid gets a TikTok Now they are encouraged to immediately respond, correct?

A.    That's what the app is designed to do, yes.

Q.    And if that happens during school hours,

that could be very distracting for the child, correct?

A.    Again, assuming that's -- that they have their phone with them.  And a lot of schools don't allow phones to be available to kids during the school day.

Q.    Understood.

But if they did allow kids to have the phones during school day, a TikTok Now notification would be distracting, would it not?

A.    Yes.

Q.    Teachers are trying to keep students focused and must find it very difficult to deal with such an interruption.

Would you agree?

MR. SHUR:  Objection as to form.

THE WITNESS:  I've never been a teacher so I -- I'm not sure how many distractions they must deal with.

BY MR. WEINKOWITZ:

Q.    Well, adding one more would be -- make it much more difficult to teach.

Would you not agree with that?

MR. SHUR:  Objection as to form.

THE WITNESS:  I think being a teacher is

hard no matter what.

BY MR. WEINKOWITZ:

Q.   And TikTok Now shouldn't make it harder, correct?

MR. SHUR:   Objection as to form.

THE WITNESS:   I think teaching is hard no matter what.

BY MR. WEINKOWITZ:

Q.   If a teacher has to stop class to discipline a student from using TikTok Now, that disrupts the entire class, does it not?

MR. SHUR:   Objection as to form.

THE WITNESS:   It may disrupt the entire class.

BY MR. WEINKOWITZ:

Q.   And if students are focused on TikTok Now instead of their lessons, that takes away from instructional time for the whole class, does it not?

MR. SHUR:   Objection as to form.

THE WITNESS:   Can you reframe?

BY MR. WEINKOWITZ:

Q.   Yes, ma'am.

If a student is focused on responding to a TikTok Now in the middle of the lesson, it directly takes away from instructional time for that student

and for others, correct?

MR. SHUR:  Objection as to form.

THE WITNESS:  Yes, sure.

BY MR. WEINKOWITZ:

Q.  All right.  Let's go to -- back to the document.

Number 2 under the paragraph we just read starting with the word "Specifically."

It says, "Specifically, we" -- that is TikTok Now, right?  Do you understand that to be TikTok or TikTok Now, "we"?

A.  TikTok.

Q.  Okay.  "Specifically, we" -- TikTok -- "identified" --

A.  It's specifically -- I'm sorry.  It's specifically "we" as in my team that wrote this paper.

Q.  Right.  And your team works for TikTok, correct?

A.  Yes.

Q.  So specifically your team that works for TikTok identified more than 190,000 TikTok Now posts, about 14 percent of the population by kids under 18, on weekdays in California and Texas, correct?

STATE OF CALIFORNIA   )

COUNTY OF YOLO        )

I, ELAINA BULDA-JONES, a Certified Shorthand

Reporter of the State of California, duly authorized

to administer oaths pursuant to Section 2025 of the

California Code of Civil Procedure, do hereby

certify that

REAGAN MAHER,

the witness in the foregoing deposition, was by me

duly sworn to testify the truth, the whole truth and

nothing but the truth in the within-entitled cause;

that said testimony of said witness was reported by

me, a disinterested person, and was thereafter

transcribed under my direction into typewriting and

is a true and correct transcription of said

proceedings.

I further certify that I am not of counsel or

attorney for either or any of the parties in the

foregoing deposition and caption named, nor in any

way interested in the outcome of the cause named in

said deposition dated the  _____ day of

_____, 2025.

<%7056,Signature%>

ELAINA BULDA-JONES, CSR 11720