# AMENDED Exhibit 492

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:22-md-03047-YGR
MDL No. 3047

IN RE:  SOCIAL MEDIA ADOLESCENT
ADDICTION/PERSONAL INJURY PRODUCTS
LIABILITY LITIGATION

_____

This Document Relates to:

ALL ACTIONS

_____

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
UNLIMITED JURISDICTION

Judicial Council Coordination Proceeding
No. 5255
Judge:  Carolyn B. Kuhl
Dept. 12

Coordination Proceeding
Special Title (Rule 3.550)

SOCIAL MEDIA CASES

_____

THIS DOCUMENT RELATES TO:
ALL ACTIONS

_____

DEPOSITION OF: VICTORIA McCULLOUGH (TikTok)
*** HIGHLY CONFIDENTIAL ***
FEBRUARY 19, 2025

_____

question.  Can you repeat that one more time?

Q.   So acknowledging Counsel's objection, if I ask you a question about TikTok and your response only applies to ByteDance, will you attempt to clarify that in your answers?

A.   I will.

MR. RYDER:  And we can put that Exhibit aside.  Let's pull up Tab 2, and we'll mark this as Exhibit 2.

(Exhibit 2 was marked.)

BY MR. RYDER:

Q.   Ms. McCullough, let me know when you've had a chance to review.  This is a copy of your work history that TikTok's attorneys provided to us.  Let me know when you've had a chance to review.

A.   Okay.  Okay.  I've reviewed.

Q.   Is this an accurate representation of your work history at TikTok?

A.   It is.

Q.   And when did you start working for TikTok?

A.   In -- yes.  In February, early February of 2021.

Q.   Okay.  And I ask because I saw that

note, and that looked right to me. I'm going to direct your attention to -- do you see the bullet point that says Department(s) about midway through on the first page?

A. Yes, I do see that.

Q. Okay. And in the first bullet point there there's a reference to three different entities with an Outreach Partnership Management. At the very end it notes a start date of July 13th, 2020.

Do you see that?

A. I do see that.

Q. Is that an accurate representation of when you started working for TikTok?

A. That is not accurate.

Q. Okay. So you did start working for TikTok in February of 2021, correct?

A. That's correct.

Q. Okay. So that -- so February 2021 would be the correct start date kind of replacing that July 2020 reference there in that first bullet point, is that correct?

A. That's correct.

Q. Okay. And, again, you see in that kind of first bullet point under Department it lists

Trust and Safety Bay Product Policy, Outreach Partnership Management.

Do you see that?

A.    I do see that.

Q.    And references to T&S refer to Trust and Safety, right?

A.    That's correct.

Q.    Okay.  What does Bay refer to?

A.    This was -- this was early in my time here.  But we were -- the team was essentially divided by regional area, and so at the time our -- it was basically a hub -- we called it hubs at the time, and I was part of the Americas hub, which was based out of the Bay, San Francisco Bay area.

Q.    Okay.  So any reference to Bay or Bay hub would refer to TikTok employees in the Americas, is that correct?

A.    I believe so at that time.

Q.    Okay.  And then the next department listed after that is Trust and Safety Product Policy, Outreach Partnership Management, Bay, is that correct?

A.    That's correct.

Q.    Okay.  And then the third listed there

is Trust and Safety Product Policy, Outreach Partnership Management, Americas, correct?

A.    Yes.  That's correct.

Q.    Okay.  And so those are kind of three distinct teams within Trust and Safety, is that fair?

A.    They are not.  I believe this is more of a reflection of -- as the -- as the team evolved and was built, we were all still a part of the same team, but I think they were changed -- they just changed the name over -- over time I think to -- to be more reflective of the work.

So this looks to be more of different references throughout my four years here in which this team was called, but it was essentially the same, the same team the whole time.

Q.    Okay.  And I know we already talked about that start date there being incorrect, that July 2020 is not your start date.

Do you still work for Trust and Safety, Outreach Partnership Management?  Is that reference to present accurate?

A.    I -- I still work in Trust and Safety Outreach and Partnerships.  However, I work now and started last year on the TikTok US Data

Security Team managing their Outreach in Partnerships for Trust and Safety.

Q.    Then the second point below lists: Trust and Safety Product Policy, Outreach Partnership Management, Americas.

Do you see that?

A.    I do see that.

Q.    Again, kind of under that same qualification, would you say this is just a different articulation of the team that you're working for evolved, is that right?

A.    That's correct.

Q.    Okay.  Do you think the start and end dates listed there in that second bullet point are correct?

A.    Yes.  That seems to be reflective of the April 20 -- yeah, April 20th date seems reflective of my -- my last day with that team before I moved over to US Data Security.

Q.    Okay.  And then like you said that last bullet point, US Data Security Trust and Safety you started working there in April of 2024, correct?

A.    That's correct.

Q.    Okay.  And you still work there today,

correct?

A.    I do.

Q.    Okay.  Since February of 2021, has there been any period where you were not a TikTok employee?

A.    There has not been.

Q.    And why did you join the US Data Security team?

A.    Yes.  It was a -- it was a new opportunity.  The -- the head or my current manager, Susie Loftus, was a teammate of mine on the former Trust and Safety -- the Trust and Safety team that I was a part of before, and I just really valued her leadership.

And when she moved over to US Data and Security, there was an opportunity to be able to go and work for her and essentially start this Outreach and Partnerships function within US Data Security, so that's the opportunity I was seeking out at the time.

MR. RYDER:  You can take that exhibit down.

BY MR. RYDER:

Q.    Ms. McCullough, do you think it's important to protect kids who use TikTok?

Page 57

disorder eating content on the platform.  So that's, again, kind of where -- the scope of our team.

MR. RYDER:  You can set that aside. Let's pull up Tab 12, and we'll mark this as Exhibit I think this is 6.

THE EXHIBIT TECH:  Six, correct.

MR. RYDER:  Six.  Okay.  Thank you.

(Exhibit 6 was marked.)

BY MR. RYDER:

Q.    Ms. McCullough, this is a demonstrative showing the images from the TMZ article we just looked at with stills from some of her videos.  Do you see that?

A.    Yes.  It's just -- it's one -- one page, is that right, what we're looking at?

Q.    Currently, yes.

A.    Okay.  Okay.  Yes.  I see that here.

Q.    Okay.  And in an earlier message ████ ████ referred to this account as a problematic eating disorder account, right?

A.    Yes.  I believe she did.

MR. RYDER:  Okay.  And, Vince, if you click through, you should be able to view the message that was sent, and this was from

Page 58

Exhibit 4.

Q.   Do you see that?

A.   Yes.  I do see that.

Q.   And again write:  Another TikTok employee is calling this a problematic eating disorder account reflecting that the account is managed by TikTok and part of TikTok's creator fund, right?

A.   Yes.  That's what it says here.

MR. RYDER:  And, Vince, let's go back to Exhibit 4.

Q.   And, Ms. McCullough, if you're looking at a separate version, this was the chat between you and ███████████████████   Let me know when you have that back in front of you.

A.   Okay.  I'm back there.

Q.   Okay.  And I'm going to direct your attention to Page 4, so this is the Bates ending in 3465.  Let me know when you're there.

A.   Okay.  I'm there.

Q.   Okay.  And so we were just looking at this chat, right?

A.   Yes.

Q.   And in your second message you send the link to ██████████ with the TMZ article that

included the images we were just looking at, right?

A.    Yes.  That's correct.

Q.    Okay.  And in response to the TMZ article ██████ says:  Jesus, right?

A.    Yes.  He does.

Q.    Okay.  And he goes on to say:  So many questions, but I see the challenge.  I suppose it doesn't qualify as SGC or highly imitable dangerous conduct, right?

A.    Yes.  That's what he says.

Q.    And what does SGC mean?

A.    It stands for shocking and graphic content.

Q.    And can you explain to the jury what kind of content would qualify as shocking and graphic content?

A.    In my time I didn't network as closely on this but -- around this particular issue area. But from what I understand, this could mean things like blood or gore or -- it's -- yeah, any -- any kind of content that sort of has those types of violent characteristics, that kind of thing, it could -- it could qualify as shocking and graphic content under our community guidelines.

Q.    Okay.  And so ████████ is saying his view is it doesn't fall under that category, right?

A.    That seems to be what he's saying here.

Q.    Okay.  And he goes on to say, quote: In any case it seems we should divest monetarily. If it doesn't violate our guidelines, what about that other group - feed integrity or something like that?

Did I read that correctly?

A.    That's what it looks like he says here, yes.

Q.    When he's saying:  "We should divest monetarily," he's referring to TikTok, right?

A.    Yes, I believe so.

Q.    Okay.  So this would be to stop providing Ms. Cooney with funding from the creator fund, right?

A.    I believe so, yes.

Q.    Okay.  And in response to ████████ you say:  Sharing the memo, ████████ and ████████ worked on.

Do you see that?

A.    Yes.  I do see that

MR. RYDER:  Let's actually pull that

up, so this is going to be Tab 13, and we'll mark this as Exhibit 7.

(Exhibit 7 was marked.)

BY MR. RYDER:

Q.    And let me know when you've had a chance to review this.

A.    Okay.  Okay.  I've finished reading the document.

Q.    Okay.  So it is a document titled: Justification to Remove Eugenia Cooney from Creator Fund/TikTok Management.

Do you see that?

A.    I see that.

Q.    Do you recognize this document?

A.    I do.  I -- I -- yes, I do.  I think -- don't remember a lot of details, but I remember when -- why we drafted this.

Q.    Okay.  You can see there the authors are members of your team, we discussed them, ███ ███████████████████████████████████ is that right?

A.    Yes.  It looks like it.

Q.    Okay.  And these are all -- you can see their titles.  Two of them are members of the Outreach Partnership Management team, right?

Page 62

A.    Yes.  They were.

Q.    And then it looks like ▇▇▇▇▇▇▇▇ worked for the Mental Health Policy -- or she's a Mental Health Policy Specialist from North American Regional Policy, is that right?

A.    Yes.  That's correct.

Q.    Okay.  So if we look at Page 1 in the Executive Summary, you can see it's discussing removing Ms. Cooney as a creator -- a managed creator.  Do you see that?

A.    Excuse me.  Yes.  I do see that.

Q.    Okay.  And it links to her TikTok account and calls her a, quote:  Controversial influencer who is widely known in the eating disorder community for having anorexia nervosa, is currently a part of TikTok's creator fund and has been a managed creator for the past three months.

Did I read that correctly?

A.    Yes.  It looks like that's what it says there.

Q.    Okay.  It goes on to say that she has participated in the official TikTok live battle - Road to Superstar about five times so far.

Is that right?

A.    That's what it says there, yes.

Page 63

Q.    Do you know what the TikTok live battle - Road to Superstar is?

A.    I don't.  This is the area where I don't remember -- I don't remember this part.  No. I don't know what the Road to Superstar is.

Q.    And it goes on to say that:  Most of the controversy surrounding this creator stems from her historical and current struggle with anorexia nervosa which has resulted in an extremely thin appearance.

Did I read that correctly?

A.    Yes.  That's what it says.

Q.    Okay.  And then if we go to the next page, Page 2 of the document, there's a heading that says:  Risks with Keeping her Account Managed.

Do you see that?

A.    Yes.  I do see that.

Q.    Okay.  And it goes on to say that:  Her account has only been managed for three months and we have already received a PR inquiry about this from the Washington Post.

Did I read that correctly?

A.    Yes.  That's what it says.

Q.    And, again, the "we" is referring to

Page 64

TikTok, right?

A.    I believe so.

Q.    Okay.  So that means TikTok would have received inquiry from the Washington Post, right?

A.    Yes.

Q.    Okay.  And so if the earlier messages we saw about this were in October, then TikTok would have been managing her account since around July of 2023, right?

A.    Yes.  I believe so.

Q.    Okay.  The document goes on to say: Media coverage around TikTok's decision to manage and profit from Eugenia's account could lead to a negative news and reputational news cycle around eating disorders, mental health and youth safety.

       Did I read that correctly?

A.    Yes.  That's what it says.

Q.    Okay.  And then if we go to the next page, do you see that top paragraph is one bullet point and it's kind of the last entry of this section.  Do you see that?

A.    Yes.  I do see that.

Q.    Okay.  It says:  Additionally, based upon the appearance of the creator and media reports on her health, it appears that she is high

risk of death from her anorexia nervosa.

Did I read that correctly?

A.    Yes.  That's what it says.

Q.    Okay.  Do you see the last sentence in this paragraph starting with "highlighting"?

A.    Yes.  I do see that.

Q.    Yeah.  Can you please read that sentence to the jury?

A.    Sorry.  Will you say that one more time?  Just is it that last sentence that you're --

Q.    Yeah.  The last sentence starting in the word "highlighting," highlighting her account, do you see that?

A.    Yes.  Yes.  Starting there.

Q.    Okay.  So I'm going to ask you to read that sentence to the jury, please.

A.    Okay.  Highlighting her account to grow her following may invite more harm to users in the case of her death.

Q.    Okay.  And then in the next section it provides some more information about her, and it calls her -- it says, quote:  She is one of the most polarizing figures on the internet due to her known eating disorder.

Did I read that correctly?

A.    Yes.  That's what it says.

Q.    And it notes that:  She started her social media journey on YouTube but has a presence on Instagram, YouTube, Discord and TikTok, right?

A.    Yes.  That's what it says.

Q.    Okay.  And it links to her TikTok account, right?

A.    Yes.  It appears to.

Q.    Okay.  Then if we go down to the next heading do you see it says:  Eugenia Cooney's TikTok?

A.    Yes.  I see that.

Q.    And at this point in time she has 2.6 million followers, right?

A.    Yes.  That's what it says.

Q.    And it notes that her account has been reported over 80,000 times, correct?

A.    Yes.  That's what it says.

Q.    And then if we go to the next page, so this is Page 4 of the document, there's a heading that says:  External Expert Feedback.

Do you see that?

A.    Yes.  I do.

Q.    Okay.  And it notes that:  We regularly

get feedback from both our US Eating Disorder Organizations, the National Eating Disorder Association, NEDA, as well as other international partners about Eugenia Cooney's account.

Did I read that correctly?

A.    Yes.   That's what it says.

Q.    Okay.   And then if you go down another two bullet points it states:   It has been recommended that her account be age gated, not recommended, and has advised us to prepare tailored resources in the very realistic case of her succumbing to her eating disorder due to her large following online.

Did I read that correctly?

A.    That's what it says.   Yes.

Q.    And then the next point goes on to say: Her account triggers patients daily and her name is used in call centers around the United States, specifically coming from TikTok calling into The Alliance's helpline.

Did I read that right?

A.    Yes.   That's what it says.

Q.    Okay.   What is The Alliance helpline?

A.    The Alliance is one of TikTok's Trust and Safety's eating disorder partners.   I think

Page 68

their full organization name is maybe The Alliance Against Eating Disorders, so but they go by The Alliance for short.

Q.    Okay.  So people were seeing TikTok posts from Ms. Cooney who is managed by TikTok and calling into this helpline for help with her eating disorders, right?

A.    That's what I remember.  ▮▮▮▮▮  who managed that relationship, I remember her saying that The Alliance had been sharing those updates, yes.  And it's obviously here in the document, too.

Q.    Okay.  And then the next point says: TikTok has confirmation that Eugenia's account triggers those recovering from or actively struggling with an eating disorder and that if her account is surfaced by anyone, but especially a young person, it could influence or inspire them to explore how to look similar or develop disordered eating.

Did I read that correctly?

A.    That's what it says here.  Yes.

Q.    Okay.  And then do you see the next section has a heading:  YSW Expert Feedback.

Do you see that?

Page 69

A.    Yes.  I do see that.

Q.    Okay.  I know we discussed this a while ago, but YSW means youth safety and well-being, right?

A.    That's correct.

Q.    Okay.  So in the second bullet point here it reads:  In consultations with TikTok partner Digital Wellness Lab, Dr. Michael Rich (Pediatrician at Boston Children's Hospital) TikTok has been cautioned about the accessibility/normalization of eating disorder content, and its impacts on this type of content on kids and teens.  Dr. Rich pointed out that anything content that equates weight loss with health is potentially problematic.  Dr. Rich also pointed out how for youth/minors, eating disorder-related content might make it seem like normative behavior to lose weight.

Did I read that correctly?

A.    That's what it says here.

Q.    Okay.  And then if we go to the next page there's another bullet point that references Dr. Bryn Austin.  Do you see that?

A.    Oh, I see that here.  Okay.

Q.    And it says:  Dr. Austin is an

epidemiologist and behavioral scientist-Professor of Pediatrics at the Harvard Medical School, right?

A.    Yes.   That's what it says.

Q.    Okay.  And if we go down about halfway through that paragraph you'll see it says:  During an eating disorder - youth safety day, Dr. Austin suggested that TikTok should incorporate warning labels (access to help lines, etc.) in eating disorder-like content, right?

A.    Yes.   That's what the document says.  I -- yes.  That's what it says.

Q.    Okay.  And then it goes on to say: Lastly, in particular for teens and younger users, Dr. Bryn suggested that promoting and having accessibility to eating disorder content on teen's FYP is "more likely to cause harm".

Did I read that right?

A.    Yes.   That's what it says.

Q.    And FYP means For You Page, correct?

A.    Yes.

Q.    When TikTok collected this feedback from these experts, did the experts know that Ms. Cooney was a managed creator with TikTok?

A.    I -- this was ▮▮▮▮ on the Trust and

Outreach team for Trust and Safety.  So we're --

we're here just to serve the user and creator

community and make sure we're bringing in those

voices.

So I think in some way I know that

TikTok is -- is really striving to take safety

seriously, but I also think that the fact that our

team exists in the way that it does, sort of

really signals that we're eager -- eager to learn

from those who can really help us make the user

experience safer.

MR. COWAN:  Thank you for your time

today.  I'll -- I'll pass the witness for

now.

THE VIDEOGRAPHER:  Can we go off the

record and switch?

MR. COWAN:  Let's go off the record and

switch.

THE VIDEOGRAPHER:  Off record 1:33 p.m.

(Thereupon, a break was taken.)

THE VIDEOGRAPHER:  On record 1:40 p.m.

MR. RYDER:  Welcome back,

Ms. McCullough.

Vince, can we pull up Exhibit 6 which

is the demonstrative and can we click through

to the second page so it has the Lark chat?

There we go.

REDIRECT EXAMINATION

BY MR. RYDER:

Q.    Ms. McCullough, can you see the image we looked at before?

A.    Yes.  Yes.  I see that.

Q.    Okay.  And, again, these are images that were pulled from the TMZ article you shared with ███████    right?

A.    Yes.  I believe so.

Q.    Okay.  And, again, Ms. Cooney's account was managed by TikTok, right?

MR. COWAN:  Object to form.

A.    That's my understanding, yes.

Q.    Okay.  And earlier we discussed about TikTok's justification for divesting her from money from the creator fund, right?

A.    Yes.  That's what the -- the document we walked through is about, yes.

Q.    Okay.  Which means that TikTok was paying her at the time, right?

MR. COWAN:  Object to form.

A.    Yes.  I believe so.

Q.    And TikTok never told its eating

I, JANINE N. LEROUX, Court Reporter and Notary Public, certify that the facts stated in the caption hereto are true, and that at the time and place stated in said caption the witness named in the caption hereto remotely appeared before me.

I further certify that after being duly sworn by me the witness was examined by counsel for the parties, and that said testimony was taken in stenotype by me and later reduced to computer-aided transcription, and that the foregoing is a true record of the testimony given by said witness.

The foregoing deposition has been submitted to the witness for reading and signing.

JANINE LEROUX - COURT REPORTER
NOTARY PUBLIC