# AMENDED Exhibit 508

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------x
IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No. 4:22-md-
ADDITION/PERSONAL INJURY       ) 3047-YGR
PRODUCTS LIABILITY LITIGATION  )
------------------------------x
                               )
This Document Relates to       )
                               )
ALL ACTIONS                    )
                               )
------------------------------x

VIDEOTAPED DEPOSITION OF JULIA YAN

LOS ANGELES, CALIFORNIA

JUNE 18, 2025

9:12 A.M.

Job No.: 7375909

Pages: 1 - 389

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

CONFIDENTIAL

Page 18

point in between, you feel like you need a break, you just let me know.  Okay?

A.    Okay.

Q.    The only exception to that rule is if there's a question currently pending, we'll finish the question and then we'll take the break.

A.    Okay.

Q.    Does that make sense?

A.    Yes.

Q.    Okay.  You're comfortable with all those ground rules?

A.    Sorry?

Q.    Are you comfortable with all those ground rules?

A.    Of course.

Q.    Okay.  I'm going to hand you two documents.  This is going to be the resume. And these are going to be marked as Exhibits 1 and 2.

(Exhibit Nos. 1 and 2 were marked for identification.)

BY MR. VERRIER:

Q.    So we're going to mark this document, which is your resume, as Exhibit 1.

CONFIDENTIAL

Page 19

And we're marking this document as Exhibit 2.

Okay.  So if I could turn your attention to the document that's been marked as Exhibit 1.  This is, I believe, intended to be your resume, up until the time you worked at TikTok.

Is that right?

A.    That's right.

Q.    And does it accurately lay out your work history prior to beginning at TikTok?

A.    Yes.

Q.    So from 2015 to '18, you were senior product marketing manager at Amazon?

A.    Correct.

Q.    And then prior to that, you were in consulting?

A.    Yes.

Q.    At the very bottom, under Skills, I note that it says that you speak Chinese.

A.    Yes.

Q.    Are you fluent?

A.    Yes.

Q.    And if I could turn your attention to what's been marked as Exhibit 2, and this is some human resources information

CONFIDENTIAL

Page 20

that's been provided by Bytedance.

Does that -- does that look accurate?

A.    Can I read through it?

Q.    Yes, please, take your time.

A.    (Witness peruses document.)

Okay.  Yeah, based on -- some of the dates I don't remember, quite frankly. It's been a while, so -- the names should be okay.

Q.    So this indicates that you started at Bytedance in October of 2018.  Does that sound right?

A.    Yes.

Q.    And then you remained there until the end of the year 2018?

A.    Yes.

Q.    And then you started at TikTok on January 1st, 2019; is that accurate?

A.    Yes.

Q.    And so beginning on January 1st, 2019, you were officially a TikTok employee?

A.    Correct.

Q.    And was that just a change on paper or did something with your job change?

Page 21

A.       Mainly change on entity on paper.

Q.       I'm sorry?

A.       Mainly the change on paper. The entity changing the company.

Q.       The entity changed, and so your job stayed the same, but you just moved from one employer to the other?

A.       Correct.

Q.       Okay.  And did you go directly from your job at Amazon that ended sometime in 2018 to Bytedance in October of 2018?

A.       Correct.

Q.       So it notes here, if you look to the third or fourth bullet point down, the departments you worked in, that you originally were in User Growth U.S. from October of 2018 through May 29th, 2023?

A.       Correct.

Q.       Is that accurate?

A.       That should be accurate.  I don't remember the exact dates.

Q.       And what was your job title?

A.       I was leading the User Growth, so it should be director of User Growth.

CONFIDENTIAL

Page 22

Q.    And did your job change -- your job title change over the time that you were working in User Growth?

A.    Not that I remember.

Q.    At any point, did you become the head of User Growth?

A.    The head was more of an external/internal title, so yeah.

Q.    So your internal title was --

A.    The director of User Growth.

Q.    -- director?

A.    Yeah.

Q.    And then to the outside world, you were --

A.    Correct.

Q.    -- considered the head of User Growth?

A.    Mm-hmm.

Q.    Was there anybody above you in the -- for User Growth?

A.    For globally, yes.

Q.    Globally.  So you were the top person in the U.S. in User Growth?

A.    For most of the time, yes.

Q.    Okay.  And then it indicates

CONFIDENTIAL

Page 23

that, at some point, May of 20 -- May 29th, 2023, you went to TikTok User Growth AMS.  What is AMS?

A.    I am not sure.  Internal title.

Q.    Nothing changed with your job?

A.    Nothing changed.

Q.    Okay.  And you stayed in that position from May 29th, 2023 to December 13th, 2023?

A.    Yes.

Q.    And during that time, you were still the leader of User Growth in the United States?

A.    So during that time -- during that time, I was taking a leave at that time.

Q.    Okay.  And that's from the period May 29th, through -- of '23 through 12/13/23?

A.    The leave started end of 2022.

Q.    Okay.  And did you cease working at TikTok after December 13th, 2023?

A.    That's right.

Q.    Why did you leave TikTok?

A.    It was in many years, I wanted to change, so --

Q.    Did you go to another job?

LLC, TikTok, Inc., Bytedance Limited, and Bytedance, Inc. Do you see that?

A.    Yes.

Q.    And they're collectively referred to as TikTok in this notice.

A.    Okay.

Q.    Throughout the course of the deposition, I'll probably just refer to TikTok, unless it's obvious why we should do otherwise. Is that okay?

A.    Okay.

Q.    And if you feel like you need to distinguish between the entities, could you just -- you can feel free to let us know.

A.    Okay.

Q.    All right. Thank you.

So you first started at TikTok in 2018. And that was fairly soon after they had acquired Musical.ly; is that right?

A.    Yes.

Q.    And were you hired as part of the effort to kind of turn Musical.ly into a new entity that had broader appeal?

MS. LEE:    Objection. Lacks foundation.

CONFIDENTIAL

Page 29

THE WITNESS:  I was hired to be part of the company.

BY MR. VERRIER:

Q.    Was it TikTok at the time?

A.    I believe the entity was called Bytedance at that time.

Q.    And then it turned into TikTok right after you began?

A.    Yes.

Q.    And you were hired initially in the growth area; is that right?

A.    Yes.

Q.    And you were looking to grow the number of users on the app?

A.    Yes.

Q.    And what types of things -- does that involve acquiring new users?

A.    Yes.

Q.    And then also it involves retaining users; is that right?

A.    Yes.

Q.    And what types of things would you do to acquire new users?

A.    The type of things including running marketing campaigns that will drive

CONFIDENTIAL

Page 30

users to download the TikTok app to join the platform.

Q.   And would those be things like advertising on other social media sites or things like that?

A.   Correct.

Q.   Did you also advertise on TikTok itself?

A.   No.

Q.   No.  And what types of things would you do to retain users?

A.   On the retention side, it's mainly through monitoring the user activity, and that will drive campaigns within the -- for example, on figuring out what kind of feature that we can build to have higher retention.

Q.   And when you first started at TikTok, the app had a bit of a perception problem, didn't it?

MS. LEE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not aware of the perception problem.

BY MR. VERRIER:

CONFIDENTIAL

Page 135

BY MR. VERRIER:

Q.    Okay.  You can put that document aside.

I am marking -- I am handing you a document that I have marked as Exhibit 16.

(Exhibit No. 16 was marked for identification.)

BY MR. VERRIER:

Q.    This is an e-mail, the first page bears the Bates number ending in 8836.  Now, Ms. Yan, this is an e-mail chain that includes Alex Zhu, Vanessa Pappas, and yourself; is that correct?

A.    Correct.

Q.    And the first e-mail in the chain, if you turn to the second page, is on or about March 15th, 2019.  And then the last e-mail in the chain is March 28th, 2019; is that correct?

A.    Yes, that's correct.

Q.    And if we turn to the first e-mail in the chain, it's written by somebody whose name appears to be ████████ is that correct?

A.    It seems to -- yes, based on the

CONFIDENTIAL

Page 136

e-mail address.

Q.    Do you know that person?

A.    Yeah, he is from -- one of the growth team member.  Not under me, but a different team.

Q.    And you're -- Alex Zhu is one of the recipients, right?

A.    I see that.

Q.    And also Vanessa Pappas and yourself, correct?

A.    Yeah, I was in the cc line.

Q.    I see.

A.    Mm-hmm.

Q.    And ▮▮▮▮▮ is writing, "Based on our discussions about U.S. user growth meeting, the goal for U.S. market is user generalization."  Did I read that correctly?

A.    Yes.

Q.    And on March 15th of 2019, I assume you would have attended the U.S. user growth meeting; is that right?

A.    I wouldn't make that assumption, because there are meetings -- I did not attend many growth meetings.  So it's hard for me to tell which growth meeting he's referring to,

CONFIDENTIAL

Page 137

based on what he says here.

Q.    He then continues, "L2 male and even other tribes would be our target users." Did I read that correctly?

A.    You read that correctly.

Q.    "So we have aligned to do a test on changing paid acquisition strategy.  The age targeting will be removed for paid ads acquisition."  Did I read that correctly?

A.    Yes.

Q.    So TikTok is going to test removing age targeting in their paid ads?  Is that accurate?

MS. LEE:  Objection.  Lacks foundation.

THE WITNESS:  Hard for me to make that conclusion here.  I think that's what ██████ said here is to -- aligned to do a test to -- it's a test, based on what he says here, that they align on.

BY MR. VERRIER:

Q.    I'm sorry, go ahead.

A.    No, I'm good.

Q.    And then under the next sentence,

CONFIDENTIAL

Page 138

it says, "Adjustment Method."  Do you see that?

A.    Yes.

Q.    It says, "Focus on our target user's acquisition and CPI, removed user age targeting."  Do you see that?

A.    Yes.

Q.    And then he notes, in parentheses, referring to the age targeting, "Which means no longer limit ads exposure to just 18 plus user."  Did I read that correctly?

A.    You read that correctly.

Q.    And if you look at the next e-mail up in the chain, March 15th, 2019, at 4:26, Alex Zhu writes, "Confirmed," right?

A.    Yes.

Q.    And if you move to the first page, and you go two e-mails up, at March 27th, 2019, at 10:00 p.m., you wrote to Vanessa and Alex; is that right?

A.    Yes, based on the e-mail.

Q.    And you say -- if you look at the first sentence of your e-mail -- the first line of your e-mail, the second sentence, which begins about 80 percent of the way down the first line, "Can you please confirm that we can

CONFIDENTIAL

Page 139

start removing age filters on our paid channels in the U.S. market?"  Do you see that?

A.    I see that.

Q.    Moving one line up, do you see Vanessa Pappas -- I should say, one e-mail up -- Vanessa Pappas responds, "Approved, assuming all existing assets go through new policy"; is that right?

A.    Yes.

Q.    And then Alex Zhu also responds, "Approved"; is that correct?

A.    Yes.

Q.    So that's actually all I have for that document.

MR. VERRIER:  Do you want to take a -- I don't know what time you're thinking lunch.  I can do another document or so, but --

MS. LEE:  Up to -- if the court reporter wants to take a break.  Lunch is ready.  So it's up to you.

MR. VERRIER:  We can do another one unless everyone has -- I mean, I don't know.  How are you feeling?

THE WITNESS:  Sure.  We can

CONFIDENTIAL

Did I read that correctly?

A.      You -- no, because it should read as total -- I believe this one was the total minus L1 minus L2F.

Q.      Yeah, thank you.  Okay.  So that says, "Optimize paid acquisition activities across all channels to drive 70 percent daily new users diversified percentage, total minus L1 minus L2F, while meeting the return on investment standard."

Is that accurate?

A.      Yes.

Q.      Okay.  Thank you.

A.      Mm-hmm.

Q.      You can put that document aside, too.

(Exhibit No. 23 was marked for identification.)

BY MR. VERRIER:

Q.      This would be -- okay.  I'm handing you an exhibit that has been marked as Exhibit 23.  And this is a document titled, "L45 Key Points" -- "Tribes Key Points."  Is that correct?

A.      Yes.

CONFIDENTIAL

Page 181

of four primary tribes."  Do you see that?

A.    Yes.

Q.    There's the "Sports meme gamer," right?

A.    Yes.

Q.    "Country" is the second one, right?

A.    Yes.

Q.    "Daily life" is the third one, right?

A.    Correct.

Q.    And "G Life" is a fourth one, right?

A.    Yes.

Q.    And if you turn to the next page, do you see the heading that says, "The reptilian brain and TikTok content:  A metaphor"?

A.    Yes.

Q.    And reading from below the graphic, it says, "The reptilian brain composed of the basal ganglia, striatum, and brainstem is involved with primitive drives related to thirst, hunger, sexuality, and territoriality, as well as habits and procedural memory, like

CONFIDENTIAL

Page 182

putting your keys in the same place every day without thinking about it, or riding a bike. Avoidance of pain, repetition of pleasure, repetitive evaluation of agreeable versus disagreeable."

Did I read that correctly?

A.     Yeah, you read that correctly.

Q.     And then the next page asks, in the first sentence, "Is TikTok content reptilian?"

Did I read that correctly?

A.     You read that correctly.

Q.     And then right below that, it says, "The tribes and the content they consume perhaps are representative of the reptilian brain or idiot brain, where quick impulse rewards fuels consumption."  Did I read that correctly?

A.     You read that correctly.

Q.     "Journalists have called TikTok digital crack cocaine with dopamine hits to the brain in the pleasure center of the brain."  Did I read that correctly?

A.     You read that correctly.

Q.     You can put that document aside.

CONFIDENTIAL

Page 254

remember the timeline exactly.  I believe Snapchat was involved in TikTok prior to when I joined.

BY MR. MIGLIORI:

Q.    Let me show you Exhibit 36.  And I use the word introduction, because the title of this particular e-mail chain is "Snap Introduction."

A.    Mm-hmm.

Q.    It's Bates number that is TIKTOK3047MDL-023-00673467, and sequential. The top e-mail is ██████ from TikTok.  Who's ██████

A.    ██████ is a marketing manager.

Q.    And it's dated June 21st of 2019, so it's just maybe nine months or so after you started, correct?

A.    Yes.

Q.    And ██████ writes to several people, including you, correct?

A.    Correct.

Q.    And the title is "Snap Introduction."  And it talks about various things.  When we do e-mails, we start from the back.  So let's just start -- you'll see on the

CONFIDENTIAL

Page 255

last page, the metadata, this was a document that was produced from your custodial file. Do you see that?

A.    Yes.

Q.    You have no reason to doubt that your counsel produced this to us from your custodial file, correct?

A.    Correct.

Q.    You have no reason to doubt that this was produced to us in this form without any alteration, correct?

A.    Correct.

Q.    You have no reason to doubt that this was kept in the ordinary course of business at TikTok, correct?

A.    Correct.

Q.    All right. If you start from the back to front, unlike the Lark conversations, these go backwards/forwards. If you start on page 3485, there's conversation back and forth between ████████ at TikTok. You said he's in Marketing, correct?

A.    Correct. He's under my Marketing team.

Q.    He's in your Marketing team?

CONFIDENTIAL

Page 256

A.    Yes.

Q.    So he's within Growth, but on your Marketing team?

A.    Correct, correct.

Q.    All right.  So he actually reports to you?

A.    Yes.

Q.    All right.  So ▉▉▉▉▉▉ writes to ▉▉▉▉▉▉ at TikTok.  Do you remember ▉▉▉▉▉▉ ▉▉▉▉▉?

A.    I don't remember.

Q.    I'm sorry, at Snap.

All right.  So ▉▉▉▉▉▉▉▉▉ are talking back and forth about starting this strategy.  Do you see that, back in June of 2019?

A.    I see that.

Q.    And part of the discussion back and forth is defining, among things, how Snapchat gets paid, right?  If you look at the top -- if you look at the bottom of page 3484, ▉▉▉▉▉▉▉▉ writes, "Happy Monday.  To clarify, by signing up to Snap Ads Manager, Bytedance has agreed to both the Snap payment and self-self advertising terms, a legally

CONFIDENTIAL

Page 257

binding contract."

So that's the vendor relationship that you were talking about earlier, correct?

A.    Correct.

Q.    All right.  So in this context, Bytedance and TikTok are the customer, and Snapchat is the vendor, correct?

A.    Correct.

Q.    And what Snapchat is to do for Bytedance and TikTok is put ads on its platform to try to get users to TikTok using the Snap platform as a way of reaching out to new potential users, correct?

A.    Correct.

Q.    All right.  Let's go forward a little bit.  If you go to the page that ends in 3480, there's an e-mail from ███████████ dated June 14th, 2019, to ██████ and the team, including you.  And in this, ████████████ from Snapchat says, "It was great to connect earlier this week.  In summary, campaign highlights." Do you see that?

A.    I see that.

Q.    "Age:  13 to 20 is the most efficient age group.  Consider breaking out 13

CONFIDENTIAL

Page 258

to 20, and 21 plus."

Do you see that that was part of the campaign highlight for this vendor relationship within your department?

A.    It's written in the e-mail.

Q.    Yeah, okay.  "Gender:  Female targeting is outperforming male targeting."  So in June of 2019, at least, in the Snap analyses, female targeting was more successful than male targeting.  Do you see that?

A.    Based on the e-mail, yes, that's what he says.

Q.    All right.  "Androids are slightly more efficient than Apple iOS systems."  Do you see that?

A.    I see that.

Q.    "Story ads are top performing ad formats.  Roll out more story ads."  What's a story ad?

A.    I don't remember.  It should be one of the ad formats within Snapchat.

Q.    It's one of these instances where I'll show you a little later in the document to help you refresh.  And then "Bid type:  Target cost bid is driving the most efficient."  And

CONFIDENTIAL

Page 259

then it says, "Recent ad rejections."  Do you see here that there are a list of a few ads that were suggested but rejected by Snapchat?  Do you see that?

A.    I see that.

Q.    The first one rejected is a picture, it seems like, of a guy.  It looks like he may be making a handgun gesture.  And the document says that the ad was rejected: "The ad seems to promote, glorify, or excel feature weapons, ammunitions, or explosives."  I'm sorry, this is how it was produced to us, so I don't know exactly how it's cut off.

"This may include physical gestures that," something, "in the use of a weapon.  It's all happening on TikTok."  Do you see that that was one of the rejected ads that was reported out by Snapchat early on?

A.    That is what it shows in the e-mail.

Q.    Okay.  Let's look at the next one that's rejected.  Snapchat says it was rejected.  It's an ad that says, "Guy who misses his opportunity to own Gandalf's staff."  And it says, "This ad contains letterboxing

Page 260

(i.e., rectangular boxes without graphics, animation, or located on the top or the bottom of a creation), the majority of the ad.  This includes textured content.  Please adjust and encourage a vertical full screen."

One of the things that seems to appear frequently is the importance of vertical advertising in dealing with TikTok ads.  Do you -- is that something you recall?

A.    I don't recall.

Q.    And maybe because of mobile phone use, that verticals were important.  That is, they fill the screen differently when it was a vertical versus a horizontal ad or a cropped ad?

A.    I wouldn't want to make any conclusion, because I think that's Snapchat rule, not TikTok's rule.

Q.    Okay.

A.    It's on their platform.

Q.    But you see at least, formatting-wise, that ad was rejected, correct, according to this?

A.    That's what the explanation seems to say.

CONFIDENTIAL

Page 261

Q.    Okay.  And then there was a TikTok ad that was rejected and said, "This ad contains content that must be targeted for the appropriate audience (includes ads related to alcohol sales," something "services, gambling, or other material that can only be shown to individuals above a certain age.)"

Do you see that?

A.    I see the notes.

Q.    And so that's another TikTok ad that, in the early stages of this relationship with Snapchat, was kicked out because of the imagery relating to alcohol use or gambling, potentially.  Do you see that?

MS. LEE:  Objection.  Lacks foundation.

THE WITNESS:  That's based on what Snapchat's algorithm indicates. I think that their moderation system detects images different -- you know, in a certain way.  And so they made certain conclusions.  That's really -- yeah, that seems to be what they indicate.

BY MR. MIGLIORI:

Page 262

Q.    That was their prerogative, right?  If it's going to be on their platform, they get to have their own moderation, too, correct?

A.    Right.  That's their moderation. But hard for me to make any conclusion on what the ad really was.

Q.    Yeah, and that's fine.  It said, "The ad seems to promote."  I don't even know that they're saying that it does.  I think they're saying, we're not going to use this because we don't want the suggestion of it, correct?

A.    Right.  This is mostly video, based on the image.

Q.    But in any event, the campaign highlights that it's mostly female, and ages 13 to 20 is the most efficient age group so far in the campaign.  That's a summary of where they are at, right?

A.    Could you repeat that question?

Q.    Sure.  If you go to page 3481 -- at least 3481 -- I'm sorry, 80.  My bad.  I keep saying the wrong number, and it won't be right, no matter how loud I say it.

CONFIDENTIAL

Page 263

"Campaign Highlights."  13 to 20 is still the most efficient age group for the campaign, right?

A.    That's what it says.

Q.    And it's more effective for females than males, correct?  Correct?

A.    That's what the message says.

Q.    Let's go up.  This is something that's just a curiosity.  In talking about the billing, it says, "Bill to Musical.ly, Inc."

Do you see that above?

A.    I see that.

Q.    Do you know why, in June of 2019, the billing was going to go to Musical.ly Musical.ly has long since been converted to TikTok USA, correct?

A.    Correct.  I'm not sure.  It's done by the Finance team, and -- that handles this.

Q.    If you go to page 3479, █████████ in your department, your marketing group within Growth, writes to ███████ and says, "Thank you for the insights above.  Very helpful.  Will ramp up on certain campaigns before the weekend."

CONFIDENTIAL

Page 264

So taking the advice about the campaigns, there was at least, according to this, a decision to ramp it up, to go further with Snapchat, correct?

MS. LEE:  Objection.  Lacks foundation.

BY MR. MIGLIORI:

Q.    That's what it says here, correct?

A.    I'm reading the last sentence -- okay.

Q.    It's on the screen, in case you're not certain where I was.

A.    That's what it says on the e-mail.

Q.    Okay.  And like I said, █████ -- I'm sorry, ████████ worked for you directly, correct?

A.    Correct.

Q.    So this was a decision within user group, correct -- User Growth?

A.    Yes.

Q.    All right.  And if we go to the page -- the next page, which is 3478, there's a reference here to you.  This is on Sunday,

Page 265

June 16th, 2019, "Hello, ██████ will anyone from Snap's sales team be at Cannes Mobile Lions this upcoming weekend?  It would be great to put them in touch with Julia while she's there."

Q.    Do you remember going to Cannes?

A.    It was a marketing conference.

Q.    Okay.  And do you remember meeting with anybody from Snapchat while you were there?

A.    I don't recall.

Q.    If you look of the top line of the same page, it says, "From my understanding, ██████████████ our chief business officer, will be in attendance."  Do you remember meeting ████████████

A.    Not ████████ I remember they had an event there, but I don't remember meeting ████████

Q.    If you go to page 4, there is an invite.  They actually sent you an invite to a party in Cannes.  Do you see that, "Join us on the terrace"?

A.    I see that.  It was not a party. It was their open house.  There was a lot of

Page 266

people there.

Q.     Okay.  Do you remember going to it?

A.     Yeah, going there.

Q.     And then do you remember making any decisions or having any substantive conversations with anybody from Snapchat about TikTok and its use of Snap as a platform to increase growth?

A.     Not at this specific event.

Q.     Okay.  If we go to the front of the exhibit, sort of kind of wrapping this one up.  Let's see, if you go to page 3471, there's a reference here that "Snapchat wants to scale up as fast as possible."  Do you recall sort of -- you had ██████ saying that he wants to ramp up, you have Snapchat here saying, let's scale as fast as possible.

Do you remember there being sort of an urgency or a strong support of moving full steam ahead with Snapchat at this stage?

A.     I don't remember.  I don't even remember who ██████ is here.

Q.     Okay.  So there is a back and forth about maybe there being two accounts with

CONFIDENTIAL

Page 267

TikTok.  And it says that there may be an account out of -- I'm going to say this wrong, and forgive me, out of the Baidu account?

A.    Baidu account.

Q.    Baidu?  Was there also a Snapchat relationship at the same time through China?

A.    Based on this message, it could indicate that, because Baidu is a Chinese company.

Q.    Okay.  Was it related to your company?

A.    Which company, Baidu or --

Q.    Yes.

A.    Baidu, no -- Baidu is like Google for China, a search engine company.  They -- from my memory, they do have ad sales platform -- service.

Q.    Got it.  The page before that, 3468, ███████████ in your department says to ██████ "It's great to hear that Snapchat is driving high quality users, strong ROI, high LTV."  What does that mean, LTV?

A.    I believe we went over it earlier, lifetime value.

Q.    Okay.  "We're excited to help you

Page 268

ramp up further." And then the decisions is actually made. If you go to the first page, there's actually a suggestion that the spend is going to go from 50 to $100,000 next week to 350 -- I'm sorry, $300,000. So it's fair to say that by June 21st, 2019, your department is very actively pursuing its relationship with Snapchat to promote new user growth, correct?

MS. LEE: Objection to form.

THE WITNESS: Can I read this first?

BY MR. MIGLIORI:

Q. Sure. Take your time.

A. Could you repeat that question?

Q. The top line, it says, "Hi ████ " this is from ████████████ at Snap, "confirming your LOC has been increased to $300,000." What does LOC stand for, do you know?

A. I'm thinking the same thing. I don't know what LOC stands for.

Q. Okay. You see that below, ████████ says, "We are currently at 3,000 to 3,500 estimate of our daily spend, to be at 9,000 to 10,000 by next week. Could you confirm that

CONFIDENTIAL

Page 269

the LOC ceiling can be raised?  As you can see in our dashboard, we need it raised to a minimum of 50 to $100,000 by next week."

So line of credit, maybe?

A.    I wouldn't want to speculate that.  It could be a line of credit.  It could be something else.

Q.    It seems pretty reasonable, though, that what we're talking about is cash flow, and what they are borrowing against in order to keep this campaign moving quickly, right?

MS. LEE:  Objection.  Lacks foundation.

THE WITNESS:  Again, it's more a finance term, that we -- usually the finance teams deal with.

BY MR. MIGLIORI:

Q.    But this is coming right out of your department, right?

A.    Correct.  And then we usually go by the finance guidance on how we deal with billings.

Q.    Your department here is representing to Snapchat that you're going to

CONFIDENTIAL

Page 270

increase your daily spend from 3,000 to 9 to $10,000 next week.  Do you see that?

A.    Correct.  That's what it says here.

Q.    All right.  So that's at least -- in your cross-functionality, that's at least coming out of your department.  You're going to start spending about $10,000 a day -- up to $10,000 per day in Snapchat for this purpose, correct?

A.    Based on this sentence here.

Q.    And Snapchat reports back and says, we're going to increase your LOC, whether it's a line of credit or not, to 300,000, correct?

A.    Yeah, based on the e-mail.

Q.    So my question was simply, you're ramping up at this point, right?  Based on the initial feedback of the campaign and the growth from Snapchat, you're not backing off, you're increasing your spend, correct?

MS. LEE:  Objection to form.

THE WITNESS:  Based on the e-mail conversation, it -- it said we're changing the 3,000 to 9,000,

CONFIDENTIAL

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  June 19, 2025.

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)