# AMENDED Exhibit 521

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


IN RE: SOCIAL MEDIA ADOLESCENT     ) MDL No. 3047
ADDICTION/PERSONAL INJURY          )
PRODUCTS LIABILITY LITIGATION      ) Case No.
_____    ) 4:22-MD-3047-YGR
This Document Relates to:          )
ALL ACTIONS                        )
_____    )

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
UNLIMITED JURISDICTION

COORDINATION PROCEEDING            ) Lead Case No.
SPECIAL TITLE [RULE 3.550]         ) 22STCV21355
                                   )
SOCIAL MEDIA CASES                 ) JCCP No. 5225
_____    )
                                   )
This Document Relates to:          ) Judge:
                                   ) Carolyn B. Kuhl,
ALL ACTIONS                        ) Dept. 12
_____    )


Tuesday, April 29, 2025


CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER


Videotaped deposition of ROSIE KING,
held at Regus - London, St. James, 4th Floor,
Rex House, 4-12 Regent Street, London SW1Y 4RG,
England, United Kingdom, commencing at 9:22 a.m.
British Summer Time, on the above date, before
Leah M. Willersdorf, Registered Merit Reporter and
Certified Realtime Reporter with the US National Court
Reporters Association, and Fellow of the British
Institute of Verbatim Reporters, Accredited Court
Reporter, Qualified Realtime Reporter (Level 2) and
Certified LiveNote Reporter.


GOLKOW - VERITEXT
877.370.DEPS ph | 917.591.5672 fax
deps@golkow.com

A.    I was giving evidence on behalf of the Met Police.

Q.    Okay.

A.    It was a criminal case.

Q.    And this was as part of your employment?

A.    Yes.

Q.    Okay.

MR. MURA:   James, can you please bring up tab 0.

(TikTok-King-1 marked for identification.)

MR. MURA:   And I am marking tab 0 as TikTok-King-1.   This document has Bates stamps ROSIEKING-DEPOCOPY-MDL, a series of 0s, 14.

BY MR. MURA:

Q.    Ms. King, do you recognize this document?

A.    Yes.

Q.    And what is it?

A.    It's my CV.

Q.    Okay.  Can you please turn to the second page.

A.    Yep.

Q.    Do you see where it says "Education"?

A.    Yes.

Q.    It indicates you went to Queens Mary College [sic]; is that correct?

MR. DRAKE:  Object to form.

THE WITNESS:  Queen Mary's College, yes.

BY MR. MURA:

Q.    Okay.  Where did you go to school, as listed in this resume?

A.    What do you mean?

Q.    I'll just ask my question again because there was an objection.  Sometimes if there's an objection, I may try to rephrase my question, so let me ask my question again.

According to your resume, did you go to Queens Mary College?

A.    Queen Mary's College, yes.

Q.    Okay.  And you attended September 2014 to June 2016, is that correct?

MR. DRAKE:  Objection; leading.

THE WITNESS:  Yes.

BY MR. MURA:

Q.    Okay.  And what degree is specified here?

MR. DRAKE:  Objection.

THE WITNESS:  I did a course for an extended diploma in IT, which is a BTEC course.  It was a Level 3 one.  It's essentially a coursework-based equivalent to A Levels.

///

BY MR. MURA:

Q. Okay. And did you receive any distinctions for your studies?

A. Yes, I achieved the highest grade on the course, which is Distinction*, Distinction*, Distinction*.

Q. Okay. And your resume also lists publications; is that correct?

A. Yes.

Q. And can you tell me about those publications?

A. Yes. So I co-authored a peer-reviewed paper in relation to, essentially, gambling ethics appearing in video games. There was a video game that I was moderating at the time called RuneScape and that was as -- in relation to here, it's listed as "Player Moderator for Jagex," and in that they introduced a, essentially, roulette wheel-type thing which would allow people to spend real-world currency to attain in-game items which then, arguably, could have monies' worth under UK law as a gambling, sort of, value.

And so the legislation at the time was suggesting that this was not gambling and yet, essentially, over the last few years, a lot of different jurisdictions have moved towards the view

that loot boxes and similar things are, in fact, actually gambling.

Q.    Okay.  And your resume indicates that this was an article that was published in Gaming Law Review and Economics.

Do you see that?

A.    Yes.

Q.    And is that accurate?

A.    Yes.

Q.    Let's go to the first page, please, and we'll start at the bottom.  The first thing you have listed at the bottom is Community Moderator at MailOnline.

Do you see that?

A.    Yes.

Q.    Can you please tell me what you did there?

A.    So that was, essentially, comment moderation but it was also monitoring articles for legal compliance.  MailOnline is a newspaper for the Daily Mail, but it's the online version where users can interact through the Comments section.

Q.    And that was from March 2018 to May 2019?

A.    Yes.

MR. DRAKE:  Objection; form.

///

BY MR. MURA:

Q.    And so as part of that work, you would identify legal issues and areas of risk; is that correct?

A.    Yes.

MR. DRAKE:  Objection; leading.

BY MR. MURA:

Q.    Before you started at MailOnline, what was your past training in trust and safety work?

A.    I volunteered with YouTube for a number of years.  I believe it started in 2013 and it went up until sometime in 2022.  I wouldn't say that it's necessarily training; it was more through hobbies, but I was identifying abusive content and I was often advising the trust and safety team on policy matters.

Q.    When you say you were volunteering, were you working for YouTube or...

A.    I was unpaid.

Q.    Okay.

A.    Yeah.

Q.    The next entry says "Community Content Moderator, Trust and Safety – TikTok."

Do you see that?

A.    Yes.

Q.    And it indicates the dates of employment

as May 2019 to November 2019; is that correct?

A.    Yes.

MR. DRAKE:  Objection; form.

BY MR. MURA:

Q.    Is that accurate?

A.    Yes.

Q.    And what did you do at TikTok?

A.    I was a content moderator.  I believe one of the other terms for it was community content management specialist, and so this, essentially, involved reviewing videos which came into queues and then there was also things like private messaging and some other people had different responsibilities, like user age rating and things like that.

Q.    Was part of your job to ensure user safety?

A.    Yes.

MR. DRAKE:  Object to form.

BY MR. MURA:

Q.    Was part of your job flagging safety issues that you saw at TikTok?

MR. DRAKE:  Objection; leading.

THE WITNESS:  I feel like that is a responsibility for anyone on a trust and safety team.

///

BY MR. MURA:

Q.   Okay.  Do you see the next entry, "Community Moderator - Trust and Safety for Byte"?

A.   Yes.

Q.   And do you see that the dates listed here are May 2020 to November 2020?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.   And then there is a description.

Do you see that?

A.   Yes.

Q.   This was after you left TikTok; is that correct?

A.   Yes.

Q.   And what was your role here?

A.   It was, essentially, the same sort of thing, in that I was reviewing short-form videos for -- and comments and any kind of other user content, like direct messages, for safety issues that may relate to, you know, anything from policy violations through to risk to life.

Q.   And next, do you see an entry "Head of Trust and Safety for Byte/Clash"?

Do you see that?

A.    Yes.

Q.    And the dates you listed here are December 2020 to March 2022.

MR. DRAKE:  Objection to form.

BY MR. MURA:

Q.    Do you see that?

A.    Yes.

Q.    Is that accurate?

A.    Yes.

Q.    What did you do there?

A.    So I was, basically, taking over the trust and safety department and, with that, the company was sort of going through a influx of new people.  It was around the time when Donald Trump was talking about banning TikTok, ironically, actually.  And there was a very large influx of minor users and the main thing that I was focusing on was trying to manage that, mainly by banning them and then handling the data deletions.

But it was, essentially, running the moderation teams, dealing with any emergencies that came through.  This may include, for example, if there was child abuse imagery that was uploaded or if someone had posted something that made us believe that their life was in danger.

MR. DRAKE:  I'll motion to strike the nonresponsive portions of the answer.

MR. MURA:  I'll object.

BY MR. MURA:

Q.   Did this include child protection matters?

A.   Yes.

MR. DRAKE:  Objection; leading.

BY MR. MURA:

Q.   And you mention here NCMEC.

Do you see that?

A.   Yes.

Q.   And IWF reporting.

Do you see that?

A.   Yes.

Q.   Can you explain to me what that is?

A.   Yeah.  So NCMEC is the National Center for Missing & Exploited Children, which is a US body that platforms are supposed to report to as a matter of law when they come across child abuse content.  This includes anything from grooming messages through to child abuse imagery straight out.  And the UK equivalent of that is IWF, Internet Watch Foundation.

Q.   And right after that, it says:

"Developed the community guidelines, provided guidance to moderators and oversaw quality

assurance."

Do you see that?

A.    Yes.

Q.    Can you please explain that work to me?

A.    Yes.  So I'll break it into parts.
Developing the community guidelines:  I rewrote the
entire rule set that the users had, to address issues
that started occurring with the larger influx of
users.  I was addressing things to try and sort of --
a safety-focused scope on everything, to pre-empt
harms as opposed to react to them, to try and minimize
the damage that could later occur.

And then with the providing guidance to
moderators, this would be where I would sample what
they were doing and I would give them feedback on
their escalations or any other reports that they were
making, and I would also review the content at random,
make sure that the actions being taken were accurate
in relation to the guidelines, and that it was fair to
the users.

So that is the guidance to moderators and
quality assurance part.

Q.    And next, you have listed "Intelligence
Researcher for the Metropolitan Police."

Do you see that?

I noticed it and flagged it.

BY MR. MURA:

Q.    And how often would US content end up in the UK queue?

A.    Quite frequently because the content would cross over when it was applied either a General status or certain policies would allow flowing into different markets.

MR. MURA:  Let's pull up tab 2.  This is TIKTOK3047MDL-066-LARK-00942348, which I am marking as Exhibit 3.

(TikTok-King-3 marked for identification.)

BY MR. MURA:

Q.    Ms. King, why don't you take a look at this and let me know when you've had a chance to review it.

A.    Thank you.

Q.    Ms. King, what is this document?

A.    These are conversations between myself and the head of trust and safety.

Q.    And by "the head of trust and safety" --

A.    Yuyi Fu.

Q.    Yuyi Fu.  And you see your name at the top and Yuyi Fu -- or Fu Yuyi?

A.    Yuyi, yes.

Q.    And did you start this Lark chat?

A.    Yes.

Q.    And the date of it is August 23, 2019.

Do you see that?

A.    Yes.

Q.    You start the message by saying:

"Yuyi, I have seen you on a number of occasions talk about planning for future safety operations and the optimization of processes.  I've been involved in moderation for many years and have always taken a deep interest in understanding why things are done in certain ways and how to improve them.  I've previously helped other companies, including YouTube, with issues relating to user-generated content and policy, primarily focusing on safety matters."

Do you see that?

A.    Yes.

Q.    Next, you say:

"I joined the company on the 14th of May 2019 and was encouraged to maintain an outsider perspective on issues by ▮▮▮▮▮▮▮ "

Do you see that?

A.    Yes.

Q.    And when you say you joined the company,

are you referring to TikTok and ByteDance?

A.   Yes.

MR. DRAKE:  Object to form.  It's vague and ambiguous.

BY MR. MURA:

Q.   And who is ████████

A.   ████████  at the time was my boss's boss.

Q.   And when you say your boss's boss, who was your boss?

A.   My boss was ████████.

Q.   So this ████████ was ████████'s boss?

A.   At the time, yes.

MR. DRAKE:  Object to form.

BY MR. MURA:

Q.   And what did you mean by "maintain an outsider perspective"?

A.   So by maintaining an outsider perspective, it's looking at what was happening from how users would see it, and looking at things without, sort of, isolating the opinion or, sort of, like, narrowing the focus.

Q.   And next, you say:

"Attempting to understand the approach better, I found myself often discussing existing policies with colleagues and, for a brief amount of

time, even going as far as drafting a new-approach framework, which later was discouraged following business changes."

Do you see that?

A.    Yes.

Q.    And then you wrote:

"I am writing to you primarily to raise some concerns, both from an outside and inside perspective..."

Do you see that?

A.    Yes.

Q.    What did you mean by "outside and inside perspective"?

A.    Well, outside -- the way that users would look at a lot of these things is if they were posting about abuse, for example with the social media elements, if they were posting, you know, saying someone is harassing me or someone is harassing this person, or something's gone terribly wrong, even if it's, like, on Twitter, they -- that's an outside perspective.  It's a user's view.

Inside perspective is, sort of, the content moderator's view, the way that it would be seen internally, as in on a trust and safety team, like what concerns would you have about what's

happening or not happening.

Q.    And when you wrote that you went "as far as drafting a new-approach framework which later was discouraged following business changes," what did you mean by "discouraged following business changes"?

A.    So part of the stuff that I was doing with the consent of ▮▮▮▮▮ was I was drafting policy documents.  My line manager was not happy with me doing that.  I believe the switch happened when ▮▮ ▮▮▮ stopped being ▮▮ s boss and then it switched to ▮▮▮▮

Q.    And what were the goals of this policy document?

A.    It was to try and address issues that I had seen whilst moderating and other issues that had come up in discussion with colleagues.

Q.    Were you trying to improve user safety?

A.    Yes.

Q.    And when you say you were discouraged, who discouraged you?  Is that ▮▮▮

A.    Yes.

Q.    Next, you wrote:

"The root concern is that there is very little to no flow of information within the department, and to other departments.  It is difficult

to open conversation about concerns as a result, even when regarding a large risk to TikTok as a product and consequently ByteDance as a whole.  Escalation of concerns, both process and policy wise, as well as safety in general, currently lead to a lot of dead-ends or non-answers."

Do you see that?

A.   Yes.

Q.   And then you went on to write:

"An example of previously raised, non-addressed issues include concerns about minors appearing in videos; it is the law in all EU countries for users to be age 13-16 depending on the jurisdiction but we currently do not action videos uploaded by obvious minors (as indicated by factors such as behaviour, body development such as hands, and voice)."

Do you see that?

A.   Yes.

Q.   What do you mean by "we currently do not action videos"?

A.   As in similar to the things mentioned earlier where people would post videos and it could be a very obvious child.  We wouldn't, like, go and straight out ban the user and, like, delete the data

or anything; it would be, essentially, flagging it through adding a child tag and then it would kind of, like, go off somewhere else.

There was a user rate queue, but I didn't have enough interaction with that to be able to determine what it did.

Q.   And then you say:

"... nor do we have permission to action users who proactively state in their user profile that they are under the age required to own an account."

Do you see that?

A.   Yes.

Q.   At the time you wrote this, what was the age required to own a TikTok account?

MR. DRAKE:  Object to form, it's vague and ambiguous and overbroad as to jurisdiction.

THE WITNESS:  13.

BY MR. MURA:

Q.   And that was true for the US?

A.   I believe so, yes.

MR. DRAKE:  Object to form, lacks foundation.

(Stenographer clarification.)

MR. DRAKE:  That question lacked foundation.

THE STENOGRAPHER:  And your answer?  Sorry.

THE WITNESS:  Yes, I believe that it was 13 for the US as well.

THE STENOGRAPHER:  Thanks.

BY MR. MURA:

Q.    So even if a user said in their profile that they were 9 years old, the company did not allow you to remove the account as being under 13; is that correct?

MR. DRAKE:  Object to form, leading.  It's overbroad.  It's vague.

THE WITNESS:  I did not have a way of dealing with that, no.  I could flag it, but I never saw anything happen based off of that alone.

BY MR. MURA:

Q.    Next, you say:

"Previously in the United States, TikTok/Musical.ly encountered a very similar issue in regards to the collection of minors' data."

Do you see that?

A.    Yes.

Q.    So you were aware that it was illegal in the United States for the company to fail to remove users under 13 from the TikTok app, correct?

A.    Yes.

MR. DRAKE:  Objection; leading, lacks foundation.

BY MR. MURA:

Q.    You can answer.

A.    Yes.

Q.    And then you go on to say:

"Another example is in direct reference to user safety; upon discovery of an account exhibiting predatory activity, I excalated it to the predator reporting group."

Do you see that?

A.    Yes.

Q.    Can you please explain what you meant by that?

A.    Yeah.  So this was in relation to an account that had videos of minors uploaded onto it, that had obviously been self-produced by the minors but the predator was using it to, sort of, save the videos as, like, a collection or storage, and the same person was then sending grooming messages to minors.

Q.    And what is the predator reporting group?

A.    It's, basically, the way that we would contact the child safety team about grooming attempts.

Q.    And was one of your roles as a moderator

to escalate sexual predators to this group?

MR. DRAKE:  Objection; leading.

THE WITNESS:  Yes.

BY MR. MURA:

Q.   And next, you say:

"The account was banned, however despite the user having saved many inappropriate videos of children..."

Do you see that?

A.   Yes.

Q.   What did you mean by "inappropriate videos of children"?

A.   They appeared to be, if I am remembering correctly, masturbation material under a blanket for that one, I think.

Q.   And then it says:

"... the user was not escalated to law enforcement or any other group..."

Do you see that?

A.   Yes.

Q.   And then you write:

"In contrast to common practice..."

Do you see that?

A.   Yes.

Q.   Can you please explain what you meant by

that?

A.   Yeah.   From my understanding of how other platforms deal with this kind of issue, at least through my exposure with YouTube's child safety team, they would report everything, including all comments that someone would make and they would also, like, report all of the videos when they did a NCMEC report, so they would give all of the user data over to NCMEC so then they could then pass it on to law enforcement.

Q.   And what was TikTok and ByteDance's practice?

MR. DRAKE:   Object to form.

THE WITNESS:   I don't know the instructions that the team were given; however, I did note that there was an incident where they said that they did not report the content because it was past a certain age.   And this was also something that I mentioned -- through these conversations with Yuyi, Yuyi said that it's not something that ByteDance do, to send off all of the comments to NCMEC.

MR. DRAKE:   Motion to strike as nonresponsive.

MR. MURA:   I'll object.

BY MR. MURA:

Q.   And then you go on to say:

"A few weeks ago, ▮▮▮▮▮▮▮▮ routed a suggestion of mine to another team in regards to the visibility of the reporting button."

Do you see that?

A.   Yes.

Q.   What is the reporting button?

A.   So in the app, the users have the ability to flag content, which is to raise attention of it to a moderator, and that is typically in relation to if they think the content is violative or dangerous or something like that.

So the reporting button was in the Sharing menu options, and this was about -- basically, I thought that it was counterintuitive to have an option for flagging bad content in -- you know, bundled in with options for sharing good content.  It seemed like it wouldn't be the easiest way for someone to find it, and so the suggestion was to add it to the top level of the user interface.  But that didn't end up happening.

But then an experiment was done where the reporting option was moved to the left side of the list in the sharing options and it resulted in, like, 39 percent -- I think it was 39 percent, yeah, increase in reporting volume.

BY MR. MURA:

Q.    So the next sentence, you wrote:

"The reporting button is currently within the sharing options, which is unusual as sharing content has positive connotations, rather than the negative idea surrounding reporting something for being abusive."

Do you see that?

A.    Yes.

Q.    And is that what you mean by the reporting button was in an odd place?

A.    Yes.

MR. DRAKE:  Objection; leading.

BY MR. MURA:

Q.    And that was because a normal user would not want to hit Share when they saw inappropriate content; is that right?

MR. DRAKE:  Objection; leading.

THE WITNESS:  I would believe that, yes, because it's otherwise easier for them to just scroll to a different video than to actually report it.

BY MR. MURA:

Q.    And then you wrote:

"The reporting option was listed on the far right of the sharing option which meant it had to

be scrolled to in order to be found."

Do you see that?

A.    Yes.

Q.    Can you please explain what the issue is there?

A.    Yeah.  So if you did open the sharing menu, you would see a number of interaction options, for example, share to other apps, share to WhatsApp, Twitter, wherever, or send through text message.  But because there are so many options, the user interface can only fit so many buttons within the sub-menu, and that meant that the reporting option being on the far right, you had to swipe to the left to be able to get the reporting button to even come into view on your screen.

Q.    So are you saying that even if a user clicked on Share, the reporting option would be off screen?

MR. DRAKE:  Objection; leading.

THE WITNESS:  If it were through the sharing menu, yes.

BY MR. MURA:

Q.    And so a user would have to know that the option was there and scroll to it; is that right?

A.    Yes.

CERTIFICATE OF COURT REPORTER

I, LEAH M. WILLERSDORF, Registered Merit Reporter, Certified Realtime Reporter, Fellow of the British Institute of Verbatim Reporters, Qualified Realtime Reporter Level 2, and Certified LiveNote Reporter, do hereby certify that:

ROSIE KING appeared before me on Tuesday, April 29, 2025, was sworn by me and was thereupon examined by counsel; that the testimony of said witness was taken by me stenographically; that the foregoing is a true and accurate record to the best of my knowledge, skill and ability; that I am neither a relative nor employee of any party to the action in which this testimony was taken; that I am neither relative nor employee of any attorney or counsel employed by any party thereto; and, further, I am not financially or otherwise interested in the outcome of the action.

_____
LEAH M. WILLERSDORF
RMR, CRR, FBIVR, ACR, QRR2, CLR

(May 01, 2025)