# AMENDED Exhibit 533

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA              )
ADOLESCENT ADDICTION/PERSONAL    )
INJURY PRODUCTS LIABILITY        ) MDL No. 3047
LITIGATION                       )
_____  )
THIS DOCUMENT RELATES TO:        )
ALL ACTIONS                      )
_____
       SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 COUNTY OF LOS ANGELES
                  UNLIMITED JURISDICTION

 COORDINATION PROCEEDING         ) Lead Case No.
 SPECIAL TITLE [RULE 3.550]      ) 22STCV21355
                                 )
 SOCIAL MEDIA CASES              ) JCCP No. 5225
_____)
 THIS DOCUMENT RELATES TO:       ) Judge:
 ALL ACTIONS                     ) Carolyn B.
                                 ) Kuhl, Dept.12


                  THURSDAY, MARCH 27, 2025

        CONFIDENTIAL – ATTORNEYS' EYES ONLY –
             PURSUANT TO PROTECTIVE ORDER

                         ⬚ ⬚ ⬚

            Videotaped deposition of Julie de Bailliencourt, held at the location of the witness in Dublin, Ireland, commencing at 9:13 a.m. Greenwich Mean Time, on the above date, before Carrie A. Campbell, Registered Diplomate Reporter, Certified Realtime Reporter, Illinois, California & Texas Certified Shorthand Reporter, Missouri, Kansas, Louisiana & New Jersey Certified Court Reporter.
                         ⬚ ⬚ ⬚

plaintiffs.

MR. MATTERN:  David Mattern, King & Spalding, on behalf of the TikTok defendants.

MR. DRAKE:  Geoffrey Drake, King & Spalding, for the TikTok defendants.

VIDEOGRAPHER:  The court reporter is Carrie Campbell, and she will now swear in the witness.

JULIE de BAILLIENCOURT, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiffs, as follows:

DIRECT EXAMINATION

QUESTIONS BY MS. ANDERSON:

Q.    Okay.  Good morning, Ms. de Bailliencourt.  As I mentioned, I'm Jennie Lee Anderson.  I represent the school district and personal injury plaintiffs in the litigation that has been consolidated as In Re: Social Media Adolescent Addiction

Litigation.

Thank you for agreeing to sit here today with us.

Can you just begin by stating and spelling your full name for the record?

A.   Sure.  My name is Julie de Bailliencourt.  That's spelled d-e, B-a-i-l-l-i-e-n-c-o-u-r-t.

Q.   And can you please state your address for the record?

A.   My address is in Greystones County, Wicklow.

Q.   And what is your address?

A.   You need my full address?

Q.   Yes.

A.   I am ███████████████████
███████████████████████████

Q.   Thank you.

Now, you just took an oath, and you understand that's the same -- that oath carries the same weight as it would if you were testifying in a court of law.

Do you understand that?

A.   Yes.

Q.   Have you had your deposition

QUESTIONS BY MS. ANDERSON:

Q.    I'm handing you now an exhibit that was provided to us by counsel.  I believe it is your résumé, but you can confirm that.  You can have a chance to take a look at that.

A.    Thank you.

Q.    Ms. de Bailliencourt -- did I pronounce your name correctly?

A.    Yes.  Absolutely.

Q.    Okay.  I just wanted to make sure I didn't get anything wrong there.

Ms. de Bailliencourt, is this -- this is a true and correct copy of your résumé.

Is that correct?

A.    Yes.

Q.    And you provided this to counsel.

Is that correct?

A.    Yes.

Q.    Okay.  And when did you last update this résumé?

A.    Probably in January of this year.

Q.      And are you currently employed?

A.      No.

Q.      Are you looking for employment?

A.      Yes.

Q.      And how long have you been looking for employment?

A.      Since end of December, mid-December.

Q.      Okay.  Starting on page 2, I see you have a section on education.

A.      Yes.

Q.      And looks like you -- you have a bachelor's degree in French, English, German, history, Latin, maths and philosophy.

        Is that correct?

A.      No.  This is the equivalent of graduating from high school, I guess.

Q.      Thank you.

A.      Those are the -- the topics that were covered.

Q.      Okay.  So when you were in high school, your primary area of studies included those listed here.

        Correct?

A.      Yes.

Q.    Okay.  And then you went to college in Paris, that's nice, and you majored in modern literature.

Is that correct?

A.    I completed the first year with this particular university before switching to a different establishment and focusing on journalism.

Q.    Okay.  And why did you switch schools?

A.    I found that the university -- or the topics I had chosen only led to teaching, and I didn't think it was necessarily what I wanted to do career-wise. And so I preferred to go into something more -- what I perceived to be more dynamic than teaching.

Q.    Okay.  And so you switched universities and got a degree in journalism.

And could you pronounce the name of that school?  I don't want to --

A.    École supérieure de journalisme.

Q.    Okay.  Thank you.  I'm glad I asked and didn't attempt to say that on my

own.  Thank you.

Okay.  And then you later got a diploma in applied project management at University College in Cork.

Do you see that?

A.    I do.

Q.    And that's correct?

A.    Yes.

Q.    And what is an applied project management degree?

A.    It's a degree that certifies project managers.

Q.    And is -- is that a -- how long does that program take?

A.    I think it took a year.

Q.    Okay.  And what prompted you to take on that challenge?

A.    I was working at the time and taking on additional responsibilities, including project management, and felt this could help strengthen my overall approach.

Q.    Okay.  And the formal education you've listed here, is that the extent of your formal education?

A.    Yes.

Q.    Anything else that you've --
classes you've taken?

A.    Oh, I would have taken online
training or other classes related to, like,
managing people, conflict resolution, that
type of thing, but I think that's the -- the
bulk of it.

Q.    Okay.  And you don't have any
training in -- as an engineer.

Do you?

A.    No.

Q.    And you don't have any training
in computer science of any kind.

Is that correct?

A.    No.

Q.    And you don't have any training
in psychology.

Is that correct?

A.    Uh-huh.

Q.    And you don't have any training
in neuroscience.

Is that also correct?

A.    That's correct.

Q.    And other than math in high
school, do you have any training in -- in the

sciences?

A.    No.

Q.    Okay.  So let's start with the most recent, and that is your time at ByteDance.

MR. MATTERN:  Objection to form.

QUESTIONS BY MS. ANDERSON:

Q.    If I could direct your attention there.

So ByteDance is the parent company of TikTok.

Is that correct?

A.    Yes.

MR. MATTERN:  Objection to form.

QUESTIONS BY MS. ANDERSON:

Q.    And you indicate that you were a global head of product policy there from ███████████████████

Correct?

A.    That's correct.

Q.    Are you aware that your LinkedIn page indicates that you were there until June of 2024?

A.   No.

Q.   Okay.  Which is more accurate, June or May, since there's a conflict?

A.   I left in May.  I got paid for the month of June, or part of the month of June.

Q.   Okay.  Now, so when you were global head of product policy, did you have individuals who were reporting directly to you?

A.   Yes.

Q.   And how many people reported directly to you?

A.   It varied over the years, but at the time of leaving, six or seven.

Q.   And when you -- when you started in that position -- I realize you were -- that you were in a different position prior to becoming global head of product policy.  When you first started there, how many direct reports did you have?

A.   Probably about the same number, five, six, seven.

Q.   And who were your direct reports?

A.    At my time of leaving or at --

Q.    At time of leaving.

A.    So my direct reports included ██████████ Tara Wadhwa, ████████████ ████████████████ And I'm forgetting somebody.  Oh, and ████ Did I mention ████ Whose surname escapes me.

Oh, ██████████ I think that's it.

Q.    And who -- do you recall any other direct reports you had prior to -- or withdraw the question.

Do you remember any other direct reports that you had during the course of your time as ████████████████ ██████

A.    Yes.

Q.    And who do you recall?

A.    Starting from my time of employment?

Q.    While you were ████████████ ████████████ I'm wondering if other than the individuals that you listed here, do you recall other people who reported directly to you?

A.    ██████████    reported to me, although that was prior to June.  I think that would be it.

Oh, no, I do recall, sorry. ██████████ -- I forgot her surname, and ████████ did report to me for some time in 2021.

Q.    Okay.  And during that time, who were you reporting to?  When you were global head of product policy, who were you reporting to?

A.    I reported to Cormac Keenan until December 2023, when I reported to Sandeep Grover.

Q.    And can you describe generally your duties as globe of head -- as global head of product policy?

A.    Ensuring the efficient running of the teams that fell under my remit, making sure that we understood potential policy gap on how to improve them or remediate them, and support the business in providing high quality moderation.

Q.    What do you mean by "potential policy gap"?

A.      My team being responsible for content policies.  So these are mainly contained in the community guidelines.  We want to make sure that the policies were in the right place for the safety of the -- the platform.

Q.      When you say you "want to make sure the policies were in the right place," can you just -- can you elaborate?

A.      Sure.

Let's say a new trend emerges on the platform related to, I don't know, trend related to bullying, for example.  We just want to make sure that we assess this and that our moderators understood the trend to be violating our policies so that the teams could remove the content associated with the trend.

Q.      And were you -- can we go off the record for just a second?

VIDEOGRAPHER:  We're going off the record at 9:46 a.m.

(Off the record at 9:46 a.m.)

VIDEOGRAPHER:  We are back on the record at 9:47 a.m.

A.    I do.

Q.    Why did you say that?

A.    [REDACTED] was actively looking at borderline sexualized content and I assumed as a joke that he was probably being served some more of this content.

Q.    Okay.  Because --

A.    In the context of his job, which was kind of --

Q.    Okay.

A.    He was focused on this topic.

Q.    Yeah.  Part of the way a filter bubble can develop is if you start interacting with certain types of content, you might receive more of that same type of content in the future.

Right?

A.    Yes.

(de Bailliencourt Exhibit 29 marked for identification.)

QUESTIONS BY MS. CRAICK:

Q.    Okay.  Let's look at FC3.

MS. ARMSTRONG:  Exhibit 29.

QUESTIONS BY MS. CRAICK:

Q.    I've handed you what's been

marked as Exhibit 29.  Let me know when you're ready.

A.    Is it okay if I take a minute just to scan through it?

Q.    Uh-huh.

A.    Thank you.

Q.    Okay.  So this is a Lark chat titled "Global policy huddle."

Do you see that?

A.    Yes, I do.

Q.    And under the second message, you can see your name participating in the Lark chat with an emoji.

Right?

A.    Uh-huh.

Q.    So you're participating in this Lark chat in the regular course of your job at TikTok.

Right?

A.    (Witness nods head.)

Q.    And you have no reason to believe it's altered in any way --

A.    No.

Q.    -- from how it existed in your files?

Okay.  Let's go down to the second page, ending in 1706.

There is a message from Tara Wadhwa around 4:21 p.m.

Do you see that?

A.    Yes, I do.

Q.    And can you remind me what her role was at this time?

A.    At that time she was in US safety and working on policy.

Q.    Okay.  And she says, "Hi, everyone, the INV team" --

Is that investigations team?

A.    Yes.

Q.    "Hi everyone, the investigations team has developed an in-depth RCA."

Do you see that?

A.    Yes, I do.

Q.    And RCA is regional creator audit?

A.    No.  Root cause analysis.

Q.    Okay.  Root cause analysis.

A.    Yeah.

Q.    Got it.  Thank you.

So, "Hi, everyone, the investigations team has completed an in-depth root cause analysis."

Right?

A.    That's correct.

Q.    Okay.  "We reviewed 1,166 videos and did this report.  We dropped everything else."

Do you see that?

A.    I do.

Q.    And then in her next message she says, "Sobering analysis around eating disorder content."

Do you see that?

A.    I see it, yes.

Q.    "Especially heartbreaking, out of the 1,166 videos reviewed, 88 percent of them have been reviewed by L1 and L2 minor users."

Do you see that?

A.    I see it, yes.

Q.    And L1 refers to users that TikTok predicts are 15 and under?

A.    I forgot the classification.

Q.    Okay.

A.      Yeah.

Q.      Do you understand that L1 and L2 are both minor users?

MR. MATTERN:  Objection to form.

THE WITNESS:  I wouldn't have been able to recall today exactly the way it's broken down.

QUESTIONS BY MS. CRAICK:

Q.      Okay.  But what it says is "viewed by L1 and L2 minor users."

Right?

A.      Yeah.

Q.      "The majority of videos viewed by L1 and L2 users come from the For You page, 88 percent."

Do you see that?

A.      Yes.

Q.      And then it has someone's name.

Could you pronounce that?

A.      Oh, it's ███

Q.      ████

A.      Yes.

Q.      And is that ████████?

A.      That's exactly right, yeah.

Q.    Okay.    ███████ has this, and I've asked ███████████████ to see how they can use this analysis to expedite filtering and bursting bubbles for L1 and L2 users."

Do you see that?

A.    I see it, yeah.

Q.    Okay.  And do you recall that around this time The Wall Street Journal had published an article about TikTok's algorithm pushing eating disorder content to teenage girls?

MR. MATTERN:  Objection to form.

THE WITNESS:  I don't recall the topic.  I just remember The Wall Street Journal publishing something related to filter bubbles.

QUESTIONS BY MS. CRAICK:

Q.    Okay.  And you loved this comment by Tara.

Right?

A.    Yes, I did.

Q.    Okay.  So FYP is For You page.

Right?

A.    That's it.

Q.    Okay.  And so when it says the majority of VV, videos viewed, by L1 and L2 users come from the FYP, the For You page, that means those users are seeing that when they're scrolling through TikTok's For You page as opposed to searching them out and finding them another way.

Correct?

A.    I think for the particular of this data analysis, it looks like these other findings that would have been highlighted, yes.

Q.    So that would mean that 88 percent of these eating disorder videos viewed by minor users were suggested to them by TikTok's algorithm and appeared on their For You page.

Right?

MR. MATTERN:  Objection to form.  Characterizes the document.

THE WITNESS:  So I haven't -- I don't recall the analysis.  I don't know who did the analysis, whether it was reviewed by, you know, data scientists.

So I think as like a point-in-time assessment, it looks correct.

QUESTIONS BY MS. CRAICK:

Q.    Okay.  And you said that this was -- you believe this was an analysis relating to filter bubbles.

Correct?

MR. MATTERN:  Objection to form.

THE WITNESS:  The conversation, I don't think, mentions, like, what started the -- the starting pointing for this assessment.  I just know that I recall that around the same time we had been working on filter bubbles and discussing it and obviously who were using this to accelerate some of the work that we had done.

But I don't know whether The Wall Street Journal came first or, you know, I -- yeah.

QUESTIONS BY MS. CRAICK:

Q.    Okay.  Are you aware of any communications from TikTok or ByteDance to

the public or parents or users that TikTok

may cause or contribute to eating disorders

in kids or teens?

MR. MATTERN:  Objection to form

and foundation.

THE WITNESS:  No, but I'm not

sure how appropriate that may be.

(de Bailliencourt Exhibit 30

marked for identification.)

QUESTIONS BY MS. CRAICK:

Q.     Okay.  Let's look at FC4.

MS. ARMSTRONG:  Exhibit 30.

QUESTIONS BY MS. CRAICK:

Q.     Feel free to take a look at

this, and let me know when you're ready.

A.     Thank you.

Thank you.

Q.     Okay.  So I want to talk a

little bit about grooming now.

This is a Lark chat titled

"Critical inquiry-The Telegraph."

Do you see that?

A.     Yes.

Q.     And this is a Lark chat you're

participating in with a number of your

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Julie de Bailliencourt, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

<%31964,Signature%>

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  April 14, 2025