**AMENDED Exhibit 632**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*****************************

                                        Case No.
IN RE:   SOCIAL MEDIA ADOLESCENT    4:22-MD-03047-YGR
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION

                                        MDL No. 3047
*****************************

This Document Relates To:

ALL ACTIONS

*****************************

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES
UNLIMITED JURISDICTION

*************************

Coordination Proceeding     Judicial Council
Special Title               Coordination Proceeding
(Rule 3.550)                No. 5255

SOCIAL MEDIA CASES          Judge:  Carolyn B. Kuhl
                            Dept. 12
*************************

REMOTE VIA ZOOM

VIDEOTAPED DEPOSITION OF

JORDAN FURLONG

April 11th, 2025
8:04 a.m.

Reported By:
MAUREEN O. POLLARD, CA CSR #14449, RDR

P R O C E E D I N G S


THE VIDEOGRAPHER:  On the record.  My name is James Vonwiegen.  I'm a videographer for Golkow.

Today's date is April 11, 2025, and the time is 8:04 a.m.

This video deposition is being held in Los Angeles, California, in the matter of Social Media Adolescent Addiction/Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is Jordan Furlong.

Counsel will be noted on the stenographic record.

The court reporter is Maureen Pollard, California CSR 14449, and will now swear in the witness.

                    *   *   *

Whereupon,

            JORDAN FURLONG,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. WEINKOWITZ:

Q.    Okay.  Good morning, Mr. Furlong.  How are you?

A.    I'm doing well.  How are you?

Q.    Very good.  We met off the record.  My name is Mike Weinkowitz.  Along with my colleague, Joseph VanZandt, we will be taking your deposition this morning.

Do you understand that?

A.    I do, yes.

Q.    Okay.  Can you state your full name for the record?

A.    Jordan Furlong.

Q.    And can you give us your current address?

A.    Sure.  ███████████████████████████

Q.    And do you own or rent your home -- a home there?

A.    I rent an apartment.

Q.    Do you plan on -- have any plans on moving within the next year?

A.    No.

Q.    What's your date of birth?

A.      ████████████████

Q.      Great.  Thank you.

I know you were sworn in in the North Carolina case against -- AG case against TikTok on March 26, 2024, correct?

A.      That sounds roughly right, yeah.

Q.      And you were interviewed by the California AG named Megan O'Neill in July of '24.

Do you remember that?

MS. FOURNIER:  Objection to form.

THE WITNESS:  I don't remember the exact date, but yes.

BY MR. WEINKOWITZ:

Q.      Okay.  For that interview, were you sworn in?

A.      I don't think so.  I don't remember.

Q.      Okay.  Other than your deposition with the North Carolina AG, have you ever testified in a deposition or a hearing or a trial before?

A.      No.

Q.      Okay.  So I'm going to go through some ground rules.  I know that you heard sort of these ground rules in the AG dep, but I'm going to go through them now.  Let me know if you have any questions as we go through.  Okay?

(TikTok-Furlong-1 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    I am handing you, Mr. Furlong -- I will represent to you that I went to your LinkedIn profile probably last week, maybe the week before, and I printed it out as a PDF.  And when you print out someone's profile as a PDF, it comes in this rèsumè form.

Can you take a minute to look at Exhibit 1, please?

A.    Sure.

Q.    And let me know when you're ready.

(Witness reviewing document.)

A.    I'm ready.

Q.    Okay.  Does this appear to be from your LinkedIn profile?

A.    Yes.

Q.    Can you confirm that it is -- can you confirm that the information on this LinkedIn profile is the information that you put there?

A.    It looks like it, yes.

Q.    Everything accurate?

A.    It looks accurate, yes.

Q.    Okay.  Can you pull up exhibit A-1,

please?  We'll mark this as Exhibit 2.

(TikTok-Furlong-2 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    What this is, is a demonstrative that we took -- that we put together showing the information from your LinkedIn profile about your employment at ByteDance and TikTok.  Take a moment to look at this.  If you want to compare it to what you put on your LinkedIn profile, that will be great.  I have a couple of questions for you.

A.    Yeah, this looks like maybe -- I actually ended up leaving TikTok in October of 2024, but --

Q.    Okay. All right. So other than -- so let's just go back to your LinkedIn profile.

On your LinkedIn profile, you have that you left TikTok in November of 2024, but you -- but you're saying that that's inaccurate, it should be October of 2024?

A.    Yeah.  I must have accidentally put the wrong month.

Q.    Okay.  That's fine.

And so Exhibit 2 is correct except that you left in October of 2024, correct?

A.    Looking at it, yeah.  That sounds right, yeah.

Q.    Okay.  And that's your picture on the top left.  That's from your LinkedIn profile, correct?

A.    Yep.

Q.    All right.  So as depicted on Exhibit 2, in April 2021 you started at TikTok, correct?

A.    Yes.

Q.    And you worked at TikTok until October of 2024, correct?

A.    Yes.

Q.    And we'll actually fix this exhibit so that it says October 2024, and we'll swap it in if that's okay with counsel.

MS. FOURNIER:  That's fine.

MR. WEINKOWITZ:  Great.  Thank you.

BY MR. WEINKOWITZ:

Q.    So you worked at TikTok for about three years and eight months, correct?

A.    I guess that would be April to October. That would be three years and six months, if I'm getting that right.

Q.    Approximately three years and six

Jordan Furlong                                        30

months, right?

A.    Yeah.

Q.    And before that you worked at ByteDance, correct?

A.    Yes.

Q.    And were you employed -- and you started at ByteDance in September 2019, correct?

A.    Yes.

Q.    And you moved to TikTok in April of 2021, correct?

A.    Correct.

Q.    And the entire time that you worked for ByteDance and TikTok, you were employed by ByteDance, correct?

A.    Correct.

Q.    And do you know that ByteDance is a defendant in this case?

A.    I did not know that.  I did not know if it was TikTok and ByteDance or just TikTok.  But that's good to know.

Q.    Okay.  And ByteDance is the Chinese parent of TikTok, correct?

A.    I don't know if the Chinese characterization is correct, but they are the parent company.  TikTok is a business unit of ByteDance,

Jordan Furlong                                31

yes.

Q.    But ByteDance is located in China, correct?

A.    They have offices there.  They have offices all over the place.

Q.    Okay.  So for slightly over nine years, from September 2019 through November of 2024, you worked for ByteDance.  Initially, you worked on a platform called Lark, and then you worked on the TikTok platform, correct?

MS. FOURNIER:  Object to form.

I think you meant five.

THE WITNESS:  It wasn't quite nine years.

BY MR. WEINKOWITZ:

Q.    Sorry.  Yeah.  Got it.

But other than that, it wasn't quite nine years, my question was accurate?  You worked for ByteDance, initially you worked on Lark, and then you worked on the TikTok platform, correct?

A.    Yes.

Q.    Would you agree with me that Exhibit 2 is a fair and accurate depiction of your work history at TikTok and ByteDance with the amendments that we're going to make that you left in October of

2024?

A.    Close enough.  Yeah.  I mean, similar to like working on TikTok as a business unit, I was working on Lark as a business unit within ByteDance. But yeah, I think that's close enough.

Q.    Now that we have an overview of your employment, what I'd like to do is talk about the specific positions that you held.

So from September 19, 2021 -- from September '19 to April 2021, you worked at ByteDance, correct?

A.    Yes.

MS. FOURNIER:  Object to form.

BY MR. WEINKOWITZ:

Q.    Including -- strike that.

According to your LinkedIn profile, you worked on Lark growth and core product, correct?

A.    Yes.

Q.    And would a good description of Lark be it's like Microsoft Teams, it's an all-in-one sort of collaboration tool?

A.    Pretty good description, yes.

Q.    Do you know who described it like that?

A.    Maybe me.

Q.    You did.

Lark had the chat function, correct?

A.    Yes.

Q.    It has e-mail function, correct?

A.    Yes.

Q.    Has a calendar, right?

A.    Yes.

Q.    It has -- you're able to create documents through Lark, right?

A.    Yep.

Q.    And it has a video chat, right?

A.    Yes.

Q.    Was Lark your primary means of communicating with your colleagues at TikTok and ByteDance when you worked there?

A.    Yes.

Q.    Did you work on any other products from September 2019 until April 2021 other than Lark?

A.    The 0 to 1 initiatives mentioned is related to, like, similar or complementary products to Lark, like new products that we were trying to incubate and prototype that were related to, like, collaboration and communication software.  So technically, yes, but it was all within the Lark innovation umbrella.

Q.    Great.  Thank you.

When you were working on Lark in those new innovator products, where were you physically located?

A.    The Bay area.

Q.    Did you have to travel anywhere outside of the Bay area prior to April 2021 for your job?

A.    Yes.

Q.    Where did you travel to?

A.    Let's see.  So I went to China, Singapore.  Up until April 2021, I -- yeah, I spent a little bit of time in the San Francisco office aside from just working out of Mountain View out on the Bay.  I can't remember any other out of California trips right now.  But there's definitely a China and Singapore trip.

Q.    Do you speak and write Mandarin?

A.    I wish.  That would have been super useful.

Q.    Does Lark translate Mandarin to English and English to Mandarin so that you are able to understand if your colleagues in China and Singapore were speaking to you in other languages?

A.    It does, but not perfectly.  So it was only reliable for basic conversation, I would say.

Q.    When you went from Lark -- strike that.

When you went from working on Lark to TikTok, you went to the trust and safety team, correct?

A.    That's right.

Q.    And that was in April of 2021, right?

A.    Yes.

Q.    And did you interview with anybody for the new position at trust and safety for TikTok?

A.    Yes.

Q.    ████████████? Is that who you interviewed with?

A.    I don't think so.

Q.    Anybody else -- who did you interview with?

A.    ████████████████████. And I believe there was a third, but I don't remember.

Q.    ████████████?

A.    I don't -- I'm not sure.

Q.    So let's focus on TikTok, when you worked at TikTok from April '21 to November 2024. Would it be fair to say that the first time you did actual work related to the platform was in April of 2021?

A.    Yeah. That's the earliest that any work would have happened, yes.

Q.    Did you have -- do you have a TikTok account?

A.    I do.

Q.    When was the first time you had a TikTok account?

A.    I'm not sure when I created my account.

Q.    Would it be fair to say you had a TikTok account the entire time you worked on the TikTok platform, from April of 2021 to November of 2024?

A.    Probably, yeah.

Q.    Do you think you may have had a TikTok account before then?

A.    It's likely, yes.

Q.    Did you ever have a Musical.ly account?

A.    I don't think so, no.

Q.    Okay.  Do you have more than one TikTok account?

A.    I don't think so, but I may have created multiple accounts to test features.

Q.    Would it be fair to say that you're familiar with how TikTok functions from a user point of view?

A.    Familiar with some of it.  I wouldn't say I'm like a power user.  And I definitely focused

on certain parts of the platform related to my job.

Q.    Sorry.

Okay.  Did you use it for reasons other than your job?

A.    Yeah.  It's just a fun app to use.

Q.    Do you have any other social media accounts?

A.    Yes.

Q.    Can you tell me what social media accounts you have?

A.    I don't -- let's see.  Instagram, Facebook.  I don't really use Facebook, though.  I have a Snapchat account.  Don't really use it.  I love Twitter.  Twitter is my favorite.

Q.    How about YouTube?  Do you have a YouTube account?

A.    I do, but I rarely use it.

Q.    When you transferred to TikTok in April 2021, you started as a group product manager for digital wellbeing, is that correct?

A.    That was a role I eventually had, but I kept it simple with one title.  I mean, before basically I wasn't a manager and then became a manager, but I was still working on the same things the whole time.

Q.    Okay.  So did you have a title when you first started?

A.    I was just a product manager.

Q.    And how long did you hold that position?

A.    I don't remember exactly when I became a manager right now.

Q.    Okay.  So I'm a little confused.

In April '21 when you went to TikTok and you started working on the TikTok platform, were you then a product manager, or did you become a product manager later?

A.    Yes, I was a product manager before on Lark and my previous companies, was a product manager when I started, but I just wasn't managing a team of PMs until a little bit later.

Q.    Understood.  So I'm sorry.  I didn't mean to cut you off.

At a later point in time, you were a product manager who managed other product managers, correct?

A.    Yep, a product manager manager.

Q.    Right.

So that's when you became a group product manager for digital wellbeing, correct?

A.    Yes.

Q.    And do you remember when that was?

A.    I don't right now off the top of my head.

Q.    Okay.  When you joined -- when you went from working at ByteDance, working on Lark, to working at TikTok, were you in the Bay Hub?

A.    I believe, yes, yes.

Q.    And was the name of your department trust and safety?

A.    Yes.

Q.    And was there a minor safety team in trust and safety that you were working on?

A.    When I first joined?

Q.    Yeah.

A.    It was structured a little bit differently then.

Q.    Okay.

A.    But we -- minor safety was a common topic in things that we were working on, yes.

Q.    When you say it was structured a little differently then, what do you mean specifically?

A.    At the beginning, there was like a safety tools team.  And so part of that was related specifically to minor safety issues.  Some parts

were a little bit more broad, like what digital wellbeing was referring to.  And then eventually the team I was on was referred to as the minor safety team.  So there was a specific team carved out for that within product management.

Q.    Okay.  So let's talk about your departure in October of 2024.  Why did you leave ByteDance and TikTok?

A.    I felt like I had accomplished a lot, and that I was proud of, and I was ready for a new chapter and ready to learn something new.

Q.    Okay.  So your departure was voluntary?

A.    Yes.

Q.    You weren't terminated or laid off?

A.    No.

Q.    At the time that you departed TikTok, were you reporting up to Sandeep Grover?

A.    No.

Q.    Who were you reporting to?

A.    ▨▨▨▨▨.

Q.    And who did ▨▨▨▨▨ report to?

A.    ▨▨▨▨▨▨▨▨.

Q.    All right.  Before ▨▨▨▨, did you report to Sandeep Grover?

A.    No.

money, right?

MS. FOURNIER:  Object to form.

THE WITNESS:  I actually do not know how the monetization for users works and, like, how closely that's tied to time spent on the platform.

MR. WEINKOWITZ:  Can we pull up and mark as Exhibit 3 the deposition transcript from the State of North Carolina Department of Justice in re matter of State versus -- North Carolina versus TikTok, Mr. Furlong's deposition?  And can we hand him a copy of this transcript?

(TikTok-Furlong-3 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    Mr. Furlong, I think you're about to be handed the transcript of your deposition in North Carolina AG versus TikTok matter.

Do you have that?

A.    I do.

Q.    And do you see that you were deposed -- if you look at the front page, this is your transcript from March 26, 2024?

A.    Yes, I see that.

Q.    All right.  So if you could turn -- and you were under oath, correct, in this deposition, right?

A.    Yes.

Q.    If you could turn to page 34, and look at line 20.  The question you were asked was, "As a general principle TikTok makes money from people being on the app," right?

And then your answer was -- can you read your answer to the jury?

A.    "TikTok makes money when people view ads or I guess when they are paid by advertisers, yeah."

Q.    Okay.  The next question is, "So fundamentally when someone spends more time on the app, TikTok gets more money, right?"

And can you read your answer?

A.    "I believe so as a general principle, but I think it's a lot more nuanced than that.

Q.    So do you see that you said as a general principle when someone spends more time on the app TikTok gets more money?  You said that as a general principle, that's right, but it's more nuanced than that, correct?

A.    The nuance I was referring to is I

don't know exactly how monetization works, if it's tied directly to the amount of time spent or not. So, yeah, just not something I really worked on.

Q.    Thank you.

Motion to strike the last part of your answer.  I didn't ask you what you meant.  I asked you if that's what you said.

A.    I'm just trying to provide some context.

Q.    Understood.  Your attorney will have plenty of chance to ask you to follow up and give any context you need.  I would -- I think the jury would appreciate just to get an answer to my questions.  Okay?

MS. FOURNIER:  Objection.  You don't need to lecture him, Mr. Weinkowitz.

MR. WEINKOWITZ:  I wasn't lecturing.  I was just explaining the process.

BY MR. WEINKOWITZ:

Q.    Internally there was -- the idea that TikTok made money from advertising was referred to as the advertising business model, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  Sorry.  What are you referring to?

BY MR. WEINKOWITZ:

Q.    Yeah.  I'm not in the transcript anymore.

A.    Oh, okay.

Q.    Just generally inside TikTok, the idea that Tik▪k made money from advertising, that was referred to inside TikTok as the advertising business model, correct?

MS. FOURNIER:  Same objection.

THE WITNESS:  Colloquially, yeah.

BY MR. WEINKOWITZ:

Q.    And you were aware that the advertising business model encouraged TikTok to design its platform to optimize user time spent on that platform, correct?

A.    That's a pretty broad question.  Can you rephrase it or ask something more specific, please?

Q.    Sure.  I'll get to a document in a minute.

Mr. Furlong, who is Michael Beckerman?

A.    He is a VP of public policy for the US, I believe, or -- yeah.

Q.    Right.  He is a lobbyist that was hired by TikTok, correct?

A.    I don't know if -- yeah, I just know he was like a head of a public policy team.

Q.    You don't know that he was a lobbyist?

A.    I don't know enough to characterize him that way.

Q.    He's based in DC, correct?

A.    I believe that's right, yes.

Q.    He reports directly to TikTok's CEO Shou Chew, correct?

A.    I'm not sure who he reports to today. From what I remember, that's who he reported to before, yes.

Q.    Would you recognize him if you saw him, Mr. Beckerman?

A.    Yes.

MR. WEINKOWITZ:  Can you pull up tab D4, please?  We'll mark tab D4 as Exhibit 4.

(TikTok-Furlong-4 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    That's Mr. Beckerman sitting right behind the shoulder of Mr. Chew as he testifies before Congress, correct?

A.    That's right.

Q.    And do you recall working with Mr. Beckerman on trust and safety digital wellbeing strategy?

A.    Can you be more specific what you mean by that?

Q.    Sure.

MR. WEINKOWITZ:  Can you pull up tab A1, which we'll mark as Exhibit 5?

(TikTok-Furlong-5 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    I am going to give you an opportunity to review this document.  Let me know when you're ready to testify about it.  Okay?

A.    Okay.

MS. FOURNIER:  Mike, just so you know, we don't have anything on the screen or handed to us quite yet.

MR. WEINKOWITZ:  Okay.  Take your time.

MS. FOURNIER:  I just wanted you to know.

MS. CLARK:  Did you say A1 or AD-1(A)?

MR. WEINKOWITZ:  AD-1(A).  I'm sorry. I probably said the wrong thing, I'm sure.

(Witness reviewing document.)

THE WITNESS:  So you want me to review all of this?

BY MR. WEINKOWITZ:

Q.    I want you to familiarize yourself.  I can tell you the pages that I'm going to talk to you about.  If you would sort of -- for the Lark chat, if you would just kind of generally familiarize yourself with it.  I'm going to take you to the specific messages that I'm going to ask you questions about.  And then just eyeball it and let me know when you're ready.  And I'll walk you through it, I promise.

A.    I'm seeing the Lark chat through, I don't know, the first however many seven pages or so.  So I'll read through that.

Q.    Sure.  Let me explain to give you context, then, what this document is.

This is a Lark chat that was produced to us by ByteDance and TikTok.  And you will notice that the seventh page in is a document that says Document Metadata.

A.    Yeah.

Q.    That metadata is the metadata that TikTok produced to us with this document, okay?

A.    Okay.

Q.    All right.  Then what I'll say is the next document, starting on page 9, was a document that was hyperlinked in the Lark chat that was produced to us by TikTok and ByteDance.

And then attached to that document is the document metadata, which is the metadata that came with that document from TikTok to ByteDance, okay.

Now, I'm going to walk you through this, but I just want you to be comfortable with what I handed you.  So just let me know when you're ready to go and we'll walk through it together, okay?

A.    Yeah.  You mentioned the second document metadata is at the very end then?

Q.    No.  What we've done is we've attached the metadata after each document.  So there will be the Lark, the metadata, the hyperlink document and the metadata to that.

A.    Sounds good.

Q.    All right.  So you let me know when you're ready.  If you're ready, let me know and I'll go now.

A.    Review the chat, you mean?

Q.    Review anything you want to make

yourself comfortable with the document so I can ask you questions.

A.    Okay.  I'll need a little while to read through it all because there's a lot of pages here.

Q.    Yeah.  And I'm going to take you paragraph by paragraph by what I want.  So take your time and let me know.

A.    Okay.  Sounds good.

(Witness reviewing document.)

Q.    Mr. Furlong, can I just interrupt you for one second?

A.    Sure.

Q.    I'm happy to give you time to read the document, but if you read the whole thing for a really long time, we're going to be here for a really long time.

A.    Yeah.

Q.    But I'm not going to discourage you.  Just keep reviewing.  I'm going to take you through the parts that we need to take you through.  But if you want to get out of here --

A.    All right.  I just read through the chat.  Why don't we stop there, and we can go from there.

Q.    Sure.  That sounds good.  All right.

So let's start.

This is a Lark chat between you and Michael Beckerman produced to us by TikTok and ByteDance from your work file.

Do you have any reason to dispute that?

A.    No.

Q.    And you were chatting with Mr. Beckerman in the regular course of your job at TikTok and ByteDance about TikTok and ByteDance business, correct?

A.    Looks like it, yes.

Q.    Do you have any reason to believe that the content of this document was changed or altered in any way since it left your file at TikTok?

A.    I have no idea.  It was so long ago.

Q.    Okay.  There are questions that I'm going to ask you for every document.  It's sort of routine.

Let's go to the third chat down.  It's a message from you on August 30th, 2021.

Do you see that?

A.    Yes.

Q.    Do you see that you reach out to Mr. Beckerman in this chat on August 30, 2021, right?

A.    Yes.

Q.    And you forward by hyperlink -- you forward him by hyperlink two documents, correct?

A.    Correct.

Q.    And you tell him you got looped in to helping work on the document, right?

A.    Yeah.

Q.    And you say you heard from ▮▮▮▮▮ that Mr. Beckerman was working on the wellbeing sections, correct?

A.    Correct.

Q.    You tell him you're happy to work on aligning the document with a wellbeing document you had presented two weeks prior?

A.    Yes.

Q.    All right.  And remember that I had asked you whether you worked with Michael Beckerman on a trust and safety digital wellbeing product strategy, and you asked me for a little more detail. This is what I'm referring to.

Does this refresh your recollection?

MS. FOURNIER:  Object to form.

THE WITNESS:  I need to see, like, what the documents are to actually understand that.  But, yeah.

BY MR. WEINKOWITZ:

Q.    Okay.  But do you understand that around this time, August 30th, 2021, you were talking and working with Mr. Beckerman on a wellbeing section and a wellbeing document?

A.    I can see from here that I was talking to him about these two different documents that we had.

Q.    Okay.

A.    Yeah.

Q.    Mr. Beckerman isn't a mental health professional, correct?

A.    I don't believe so.

Q.    And he's not a doctor or a psychologist, is he?

A.    I don't believe so.

Q.    He doesn't have a Ph.D in any sort of field related to wellbeing, does he?

A.    Not to my knowledge.

Q.    All right.  So let's look at the hyperlinked document that you sent to him.  It is attached.  It is -- it starts at page 9.

And when I call out a Bates number, I will call out the last three digits of the number that are at the bottom of the page.  So the Bates

number here is 166.

Do you see that?

A.    I do, yeah.

Q.    The title of this document is Trust & Safety Digital Wellbeing Product Strategy.

Do you see that?

A.    Yes.

Q.    And the product that's being referred to here is the TikTok platform, correct?

A.    Yes.

Q.    This was produced by TikTok and ByteDance in this litigation from your file.

Do you have any reason to dispute that?

A.    No.

Q.    And this was the document that you forwarded to Mr. Beckerman by hyperlink, correct?

A.    If this is the same link, maybe.  I assume so.

Q.    I'll represent to you that it was produced to us by TikTok and ByteDance as that hyperlink.  Do you have any reason --

A.    Yes.  I can't verify the link maps to this, but that seems to be that document, yes.

Q.    All right.  If we could turn to page 19, please.

A.    What's the Bates number?

Q.    Bates number -- I'm sorry.  You're right.  I should have called that out.

Ending in 176.

And just so you know, Mr. Furlong, you have the paper document in front of you.  Everything that we're going to be talking about is going to be highlighted and shown on the screen so you can get a good reference point, okay?

A.    Okay.

Q.    All right.  In the middle of this page is a section called Risks.

Do you see that?

A.    Yes.

Q.    All right.  And the first sentence says -- first bullet point under risks is, "The advertising-based business model encourages optimization for time spent in the app."

Did I read that correctly?

A.    Yes.

Q.    And that's a reference to TikTok's business model, correct?

A.    Yes.

Q.    And "time spent in the app" means how much time a TikTok user spends on TikTok, correct?

A.    Correct.

Q.    All right.  Now, the second sentence, it says, "In a user," and then there's a hyperlink, of over 2,300 -- "In a user" hyperlink "of over 2,300 users in February 2020, when respondents were asked to give a score out of 5 to indicate strength of agreement with the statement 'I spend too much time on TikTok,' the average response was 4.0."

Did I read that correctly?

A.    Yes.

Q.    And is that basically saying that in February 2020, TikTok surveyed over 2,300 TikTok users?

A.    It looks like that's what that's suggesting, yeah.

Q.    And when asked whether they spent too much time on TikTok, four out of five of them, or 80 percent of them, said yes, correct?

A.    Four out of five, 80 percent.  Yes. Whatever is in that document, yes.

Q.    I'm sorry.  I didn't mean to cut you off.

And of those 2,300 users, 1,840 thought they spent too much time on TikTok, correct?

A.    I don't think that's accurate.  I think

A.    I was on the minor safety team.

Q.    Okay.  Let's go back to Exhibit 5, which is the document we've been working.

MR. WEINKOWITZ:  You know what, why don't we take a break because I need to get something to drink because my voice is cracking.  So can we take a minute, take a break?  We'll be back in five.

THE WITNESS:  Sounds good.

THE VIDEOGRAPHER:  9:21, going off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 9:31.  We're back on the record.

MR. WEINKOWITZ:  Okay.  Just before we start, I was reminded I forgot to mark the clip of the Reagan Maher deposition as Exhibit 6.  So I'm marking the Maher video clip as 6.

(TikTok-Furlong-6 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    Okay.  Let us go back to Exhibit 5, and we're on -- still on Bates 176, and we are going to look at the second bullet point which I will read to

you.   The second bullet point under Risks in this internal company document says, "The TikTok product experience utilizes many coercive design tactics that detract from user agency such as infinite scroll, constant notifications, and the 'slot machine' effect."

Did I read that correctly?

A.    Yes.

Q.    And this was a document that you sent to Mr. Beckerman in August of 2021, correct, by hyperlink?

A.    If that's the same hyperlink in the chat we were looking at, then yes.

Q.    And let's focus specifically on this paragraph in detail.  It says, "many coercive design tactics," and that specifically refers to the TikTok product experience, correct?

A.    Yes.

Q.    And the adjective that you chose to put in front of "design tactics" is the word "coercive," correct?

A.    Yes.

MR. WEINKOWITZ:  Can we pull up AD-C1 which we'll mark as Exhibit 7?

///

that we approached that.

BY MR. WEINKOWITZ:

Q.    Okay.  Do you know whether TikTok or ByteDance ever communicated to parents, to users, or to the American public that there was, in fact, a slot machine effect for certain features on TikTok?

A.    It's not as -- I don't know.  I can't speak for the comms team.  I'm not sure.

Q.    Okay.  All right.  Let's go back to Exhibit 5 which we started talking about, and back to page Bates 176.  I still have more questions about this.  Actually, no.  Let's go to page 185, Bates ending in 185, which would be PDF 1A.

MS. ARMSTRONG:  I just want to clarify for the record, AD demonstrative 1 is Exhibit 11.  AD demonstrative 2 is Exhibit 12.

MR. WEINKOWITZ:  Thank you.

(TikTok-Furlong-11 and TikTok-Furlong-12 were marked for identification.)

MS. FOURNIER:  One minute, Mike.

MR. WEINKOWITZ:  I'm sorry.  I confused everybody.  Sorry.

///

BY MR. WEINKOWITZ:

Q.   All right.  We are on PDF 28, page Bates 185.  We're back in the document that you hyperlinked and sent back in 2021 called Trust and Safety Wellbeing Product Strategy, right?  We're on pages Bates 185.

Are you with me?

A.   Yes.

Q.   All right.  There's a section there called "Industry Shift Preparation."

Do you see that?

A.   Yes.

Q.   First paragraph, "Mistakes made by first generation social media companies have become clear as we...uncovered that ad-based business models create incentive for companies to grow at the expense of their users."

Did I read that correctly?

A.   Yes.

Q.   And the second sentence says, "Infinite scroll, video auto-play, and constant notifications are some of the powerful coercive design tactics that we" realize are -- I'm sorry -- "that we are realizing tend to benefit companies and advertisers more than users."

Did I read that correctly?

A.    Yes.

Q.    So it's the second time in this document that we've seen the phrase "coercive design tactics," correct?

A.    Sounds right.

Q.    And this time it says that coercive design tactics benefit companies and their advertisers more than users, right?

A.    That's what this is saying.

Q.    And here it lists the same three examples that we saw before, but it adds one, right?

A.    Are you referring to video autoplay?

Q.    I am.

A.    Then yes.

Q.    That's a new one, right?

A.    I believe so, yes.

Q.    And the adjective you chose here for the coercive design tactics was --

MR. WEINKOWITZ:  And underline this in red.

Q.    -- powerful, right?

A.    Yes.

MR. WEINKOWITZ:  Can you pull up tab AD-1A demonstrative 2.

Musical.ly was rebranded and then became the TikTok that was available in the US?

A.    My understanding was that Musical.ly was acquired by ByteDance, and then they did something to the app to make it into TikTok.  I don't know if it was just a rebrand.  I assume there's a lot more that went into it than just that.  But yeah.

Q.    All right.  So let me see if I can save us a lot of time.  It will depend on your answers to your questions here.

Do you know whether when TikTok launched in the United States it had filters and effects?

A.    I don't know.  That's so far before my time.  That was before I was even at ByteDance.  So I don't know.

Q.    So let me -- let's pull up A-5, and I will explain what A-5 is.

MS. ARMSTRONG:  Exhibit 15.

(TikTok-Furlong-15 was marked for identification.)

MR. WEINKOWITZ:  Thank you.

BY MR. WEINKOWITZ:

Q.    A-5 are the TikTok defendants' answers

and objections -- supplemental answers and objections to a set of interrogatories. So let me explain what that means.

In litigation the parties get to ask each other questions. You may know this. I don't know. But the parties get to ask each other questions, and those questions are called interrogatories. And then the parties get to object to each other's interrogatories. And then after time eventually they answer each other's interrogatories.

And what I've handed you is a set of answers by TikTok and the ByteDance defendants in this case to certain questions that we asked them in the litigation.

And so I want to -- I want to -- you don't have to read the whole thing. I mean, there's all kinds of -- there's all kinds of stuff in here, objections and yada-yada-yada. What I want to do is I want to ask you about one of their answers to the question and see if you have anything to say about it.

All right. So if we can go to page -- first off, if we could go to the very last page of the document. There's a verification by a ▆▆▆▆

████ on behalf of the TikTok defendants.

Do you see that?

A.    Yes.

Q.    The only reason I'm showing you this is to show that the TikTok defendants have sworn under the penalty of perjury that what they say in these documents are accurate.

Do you see that?

A.    Yeah, I do.

Q.    All right.  Let's go to page 44.  All I want to ask you about is number 7 at the bottom of the page.  It says "Image Filters."

Do you see that?

A.    Yeah, I do.

Q.    It says, "This feature has been available since the TikTok Platform launched in the US."

Do you see that?

A.    Yes.

Q.    All right.  Do you have any reason to dispute what the TikTok and ByteDance defendants have answered about image filters, that they've been available since the TikTok platform launched here in the United States?

A.    No.

A.    I don't know what my opinion on that was in early 2024.

Q.    Let me see if I can refresh your recollection.

MR. WEINKOWITZ:  Can we turn -- can we pull up DF-1.

MS. ARMSTRONG:  Exhibit 16.

(TikTok-Furlong-16 was marked for identification.)

MR. WEINKOWITZ:  DF-1, D as in dog.

BY MR. WEINKOWITZ:

Q.    Same drill.  Take a look.  Let me know when you're ready.

(Witness reviewing document.)

A.    All right.  I have it.

Q.    Okay.  I've given you a fair and adequate opportunity to read the document, right?

A.    No, but happy to just go through it with your questions.

Q.    Well, let me give you a fair and adequate opportunity.  I don't want to be unfair to you, Mr. Furlong.

A.    No.  I just meant like of how we were doing it before.

Q.    Okay.

A.    Like read through everything, I thought we could just jump to, like, your question --

Q.    Okay.

A.    -- just give it context, yeah.

Q.    Good.  Okay.  Got it.  I just didn't want to be unfair to you.

This is a Lark chat produced to us by TikTok and ByteDance titled "Jordan Furlong - ███████ ███████████ "

Do you see that?

A.    Yes.

Q.    And TikTok and ByteDance produced this document from your work file.  Do you have any reason to dispute that?

A.    No.

Q.    All right.  ████████████ was a co-worker of yours at TikTok, correct?

A.    Yes.

Q.    I think at the time, according to at least his LinkedIn profile, he was ███████ ████████████████████████████████████████████

Does that sound about right?

A.    Yes.

Q.    And this is a chat conversation between you and ████████████ in January and February of 2024

about work-related issues at TikTok and ByteDance, right?

A.    Looks like it.

Q.    And no reason to believe that this document was altered in any way since it left your file at TikTok or ByteDance, right?

A.    I can't speak to what other people think about this document.

Q.    No, no.  When I ask that question, what I'm asking you is do you think that after TikTok sent this document to us we altered or did anything crazy to it.  That's what that --

A.    I have no reason to think that, no.

Q.    All right.  So let's go to PDF 4 which ends in Bates 555.  And I am going to look at the chat that's sort of in the middle of the page after where you say "1 sec."  Okay?  It's a message on February 20 -- I'm sorry, February 21, 2024, at 20:48:44.

Do you see where I'm at?

A.    Yes.

Q.    ███████ asked you, "What's the current topic of discussion?", and whether it was about beauty filters, right?

A.    Yes.

Q.    And you confirmed that the topic involved beauty filters and social comparison, correct?

A.    Yes.

Q.    Then you state that Ryn had suggested disclosing use of beauty filters to viewers, right?

A.    Yes.

Q.    And Ryn is Ryn Linthincom --

A.    Yes.

Q.    -- one of your colleagues at TikTok, right?

A.    Yes.

Q.    And their title was trust and safety global issue policy lead.

Does that sound about right?

A.    Something like that, yeah.

Q.    And was the suggestion that TikTok label when a user is using a beauty filter so that another person knows that the filter is being used?

A.    Sorry.  Can you repeat that question?

Q.    Yes, sir.

Was Ryn's suggestion to you that TikTok label when a filter, a beauty filter, was being used so that somebody seeing it would know that a filter was being used?

A.    That's what I take from the message. Ryn offered the idea of disclosing beauty filters to viewers.

Q.    All right.  Now let's go to page 5. And remember I asked you if you thought in 2024 that TikTok was behind industry standard, and you said you didn't remember what you thought at that time.

Let's look at what you write on February 21, 2024.  You respond and say, "With the context that we are behind the industry in this problem space and there has been a lot of back and forth with Herman's team on this subject."

Did I read that correctly?

A.    Yes.

Q.    And you do say that TikTok was behind industry, correct?

A.    Looks like that's what I said, yeah.

Q.    Meaning addressing this issue which is about beauty filters, correct?

A.    Sounds like that's what I'm saying, yes.

Q.    So let me just -- if TikTok was launched in 2018, this is nearly seven years after TikTok was launched, correct?

A.    2018 to 2024, six years, yeah.

Q.    Yeah.  So it's -- and TikTok at this point six years later is behind industry standards. That's what you say, correct?

A.    That doesn't mean any progress wasn't made.  Just means that we're maybe not where we want to be in the industry.

Q.    Understood.

Before you left TikTok, you were aware that TikTok and ByteDance were considering restricting some appearance filters for users under the age of 18, were you not?

A.    Sorry.  Can you say that one more time?

Q.    Yes, sir.

Before you left TikTok, you knew -- you were aware that TikTok and ByteDance were considering restricting some appearance filters for users under the age of 18, right?

A.    There was -- yeah, I was aware of, like, debate going on about that, yes.

Q.    You are familiar with TikTok's Newsroom, right?

A.    A bit, yeah.

Q.    Well, that's where TikTok publishes press releases and other things about -- I mean the platform, right?

Q.    She was a colleague of yours at TikTok?

A.    Yes.

Q.    Sound about right that in 2023 she was global program manager, youth safety trust and safety?  Does that sound about right?

A.    Yes.

Q.    And do you recall in 2023 ▮▮▮▮▮▮ informing you about an increase in proposals at TikTok related to launching artificial intelligence generated filters and effects?

A.    I do not remember that.

Q.    Okay.  Do you recall any concerns that she expressed to you about that?

A.    Not right now.  That's like two years ago.

Q.    Can you pull up tab DF-9, please?

        MS. ARMSTRONG:  Exhibit 20.

            (TikTok-Furlong-20 was marked for

            identification.)

BY MR. WEINKOWITZ:

Q.    Take a look.  Let me know when you're ready.

A.    Let's do it.

Q.    All right.  This is a chat -- a Lark chat that was produced by TikTok and ByteDance in

this litigation as part -- from your file.  Do you have any reason to dispute that?

A.    No.

Q.    And the title of the chat is "MS filters & effects," right?

A.    Yes.

Q.    Any reason to believe that this chat was altered in any way from when it left your file?

A.    No.

Q.    All right.  And you're chatting with two of your colleagues at TikTok, right, ██████ ████████ and Christina Crimmins, about the TikTok platform, right?

A.    Yes.

Q.    Christina Crimmins, at this point was she your supervisor?

A.    I believe so, yes.

Q.    Was her title global issues owner, minor safety?

A.    We weren't big on titles, but that sounds roughly right.

Q.    Was she also ████████████ s supervisor?

A.    Yes.

Q.    Okay.  Let's go to page -- let's look at page 1 ending in Bates 295, and let's look at the

very first message.  It looks like ▮▮▮▮▮▮▮▮ invited you and Ms. Crimmins to a chat on April 28th of 2023, correct?

A.    I'm sorry.  April 28th or February?

Q.    Sorry.  February.  You're right.  Let me reask the question.

It looks like ▮▮▮▮▮▮▮▮ invited you and Ms. Crimmins to a chat on February 28, 2023, right?

A.    Yes.

Q.    And then the second message, it looks like it's a recalled message, right?

A.    I don't know.

Q.    Okay.  Third message down, it says, "hey guys!"  This is ▮▮▮▮▮▮▮▮ on February 28, 2023.

She says, "hey guys!  tl;dr."

What does tl;dr mean?  Do you know?

A.    Too long, didn't read.  In other words, a summary.

Q.    "We've been experiencing an increase in proposals that are related to AI filters and effects that can be damaging user's wellbeing," specifically --

MR. WEINKOWITZ:  Underline this in red,

please.

Q.    -- "minors and I would like to understand 1. your plans @Jordan Furlong and 2. how we can collaborate to come up with strategies to influence developing safer effects and recommending some improvements."

Did I read that correctly?

A.    Yes.

Q.    And so she's asking you how the two of you can collaborate on coming up with strategies to influence and develop safer effects, right?

A.    Yes.

Q.    And this is in February of 2023, correct?

A.    Yes.

Q.    She's clearly concerned that AI filters and effects are being developed that can be damaging to users' wellbeing, specifically minors, right?

A.    Yeah.  I'm just not clear what she means by an increase in proposals.

Q.    Understand.

Minors are children under the age of 18, correct?

A.    Yes.  And above -- 13 and above, 13 to 18.

Jordan Furlong                                    152

Q.    Understood.  So let's start --

A.    13 to 17.

Q.    Got it.  13 to 17.

All right.  So let's read the last sentence.  It says -- and this might answer your other question, what you raised -- "Relevant thing to mention, that influencing the effects team has been a challenging experience due to the risks of negatively impacting UG metrics."

Did I read that correctly?

A.    Yes.

Q.    So in the first sentence she's asking you to come up with strategies to influence and develop safer effects, and she uses the word "safer," right?

A.    Yep.

Q.    And then she tells you that she's been having -- her team has been experiencing an increase in proposals related to AI filters and effects, right?

A.    Yes.

Q.    And she's talking about the effects -- the effects team, right?

A.    I think she's talking about the effects, like in the product experience that would

be, yeah, worked on be the effects team.

Q.   Right.

And she says -- she tells you that she believes that the filters can be damaging to users' wellbeing, specifically minors, right?

A.   They can be, yes.

Q.   And then she explains further in the last sentence that she has -- it "has been a challenging experience," right?

A.   She says "challenging experience," yes.

Q.   ▮▮▮▮▮▮▮▮▮▮ is in trust and safety, right?

A.   Yes.  We're on the same team.

Q.   And she's trying to work with the effects people on the product side of the business, right?

A.   Yes.

Q.   And she's explaining her experience with them as challenging, correct?

A.   On this topic, yes.

Q.   And she's coming to you and hoping that you will collaborate with her, correct?

A.   Yes.

Q.   And she specifically explains why it's challenging in the last sentence of her message,

Q.    And you know that it was noted that the filter uses machine-learning technology to alter faces making them resemble supermodel-like features, right?

A.    Yes.

Q.    The press reports about bold glamour were not good, correct?

A.    Correct.

Q.    Do you recall approximately the date that the bold glamour filter was released?

A.    No.

MR. WEINKOWITZ:  All right.  Can we pull up Tab BF-7 and hand the witness a copy of BF-7, which is a large document.

MS. ARMSTRONG:  Exhibit 23.

(TikTok-Furlong-23 was marked for identification.)

MR. WEINKOWITZ:  Thank you.

BY MR. WEINKOWITZ:

Q.    When you get that, I'm going to have to do some explaining.  Okay?

A.    That's a large one.

Q.    All right.  What I have handed you, let me explain this, and I'm going to give you plenty of time with it.

What TikTok produced and ByteDance produced to us was an Excel spreadsheet.  What we -- they have also produced to us metadata that went to that Excel spreadsheet.

What you have in front of you, Exhibit 23, let me sort of just explain it, the top page is what's called a slipsheet that has the Bates number and shows that it was an Excel spreadsheet.

Do you see that?

A.    Yes.

Q.    All right.  Second page is the -- second and third pages are the metadata that came with the Excel spreadsheet.  Okay?

A.    Yes.

Q.    If you look at the second page of the metadata, you can see that you are the custodian of this spreadsheet.  It came out of your file.

Do you see that?

A.    Yes.

Q.    All right.  So then what we did was we were able --

A.    What does "custodian" mean?

Q.    That's something you'll have to talk to your lawyers about, but basically it means it came out of your file.

A.    Okay.

Q.    All right.  So then what we did was we print -- and we needed to use this size paper to make this readable -- but we printed all of the sheets in the Excel spreadsheet out, and that's what you have.

And what I've done is, to help you and help me, is there are -- is a color sticky tab to the left for each of the sheets with their name on it.  The first sheet that you can see in blue is called "New."  The second sheet was called "Net." The third sheet was called "Old 2023."

Then we -- those tabs there, 69, 286, and 300, are what I'm going to talk to you about. The next one is in pink, the next sheet, you know, etcetera, etcetera.  Right?  That's how this is organized so that we can sort of quickly get through this.

So what I'm going to do is I'm going to let you -- the next thing I'm going to do is I'd like to pull up --

MR. WEINKOWITZ:  Vince, what is the PowerPoint that we have that summarizes the rows?  I don't have --

TRIAL TECH:  That would be BF-7A.

MR. WEINKOWITZ:  Can you pull up BF-7A for me?  All right.  And hand this to the witness.

MS. ARMSTRONG:  Do you want to mark this as an exhibit?

MR. WEINKOWITZ:  Yes, please.  Thank you.

MS. ARMSTRONG:  It will be Exhibit 24.

MR. WEINKOWITZ:  You know, actually what I'd like to do with this is I'd like to mark this as Exhibit 23A.

(TikTok-Furlong-23A was marked for identification.)

MS. FOURNIER:  I can take parts of this and just put it up on --

THE WITNESS:  I don't know if I've ever seen this spreadsheet before.  So that might preempt some questions.

MR. WEINKOWITZ:  It doesn't, but --

MS. FOURNIER:  I'm sorry, Mike.  So I understand, I think, what you're doing, but I just want to confirm.

So I assume this is pieces of -- these are things that are in the tab.  You pulled them out together and put them in a line so

it's on a single page so that you can
actually look at them.

MR. WEINKOWITZ:  If you let me finish
and mark -- I'm going to mark the whole
package, you'll know precisely what I'm
doing.

MS. FOURNIER:  Okay.

MR. WEINKOWITZ:  So Tab 23A are the
rows 69, 286, and 300 marked in yellow on
23 from the sheet called "Old 2023" that I
am going to ask the witness about.  They
are the only rows that I'm going to ask the
witness about.  And they include the header
row so that it's easy for the witness to
answer my questions.

MS. FOURNIER:  Okay.

BY MR. WEINKOWITZ:

Q.    So what I would ask you to do,
Mr. Furlong, is if you could have 23 with you and
23A with you, familiarize yourself with 23, if you
could, and familiarizing yourself with 23 look at
the rows I'm going to ask you about.  And they
are -- they have yellow tabs on 23.  And make sure
that they're the same.  Okay?  And then I'll ask you
questions.

I really don't like using spreadsheets, but sometimes you've got to do what you've got to do.

(Witness reviewing document.)

A.    You said this corresponds to the "Old 2023" tab in the bigger spreadsheet, right?

MS. FOURNIER:  That's what he said.

BY MR. WEINKOWITZ:

Q.    Yes.

MS. FOURNIER:  Yep.  Go to the next one.

THE WITNESS:  I don't see the -- I don't see the filters listed in this 23A on that page.

MS. FOURNIER:  Well, here's -- okay.

Mike, would you let us take a five-minute break?  I am following you.  I think it will help me show him what we're doing, and we can come back on the record.

MR. WEINKOWITZ:  Yes.

MS. FOURNIER:  I'll leave the microphone on so you can hear it, though.

MR. WEINKOWITZ:  Yes.  Thank you.

Off the record.

THE VIDEOGRAPHER:  The time is 11:19.

We're off the record.

(Discussion off the record.)

THE VIDEOGRAPHER:  The time is 11:21.

We're back on the record.

BY MR. WEINKOWITZ:

Q.    Okay.  Mr. Furlong, I've handed you Exhibit 23 which we've explained on the record, and I've also handed you Exhibit 23A.  And your counsel was remarkably gracious and professional and explained to you what Exhibit 23A was in relation to 23.

Do you understand that Exhibit 23A are the rows of the spreadsheet in Exhibit 23 that I'm going to ask you about?

A.    Yes.

Q.    And definitely would you agree with me it would be more useful to look at 23A than having to deal with the big 23 to talk about those rows, right?

A.    I'm staying with 23A.

Q.    Okay.  So let me go back and sort of qualify the document.  I want to talk about 23 and let you know what it is, and we'll go from there.

Exhibit 23 was a document that was produced to TikTok and ByteDance as an Excel

spreadsheet that came out of your file.

Do you have any reason to dispute that?

A.    No.

Q.    All right.  And do you have any reason to believe that Exhibit 23 was in any way altered or fussed with by us or anybody after it left your file at TikTok?

A.    No.

Q.    All right.  I am going to attach as part of Exhibit 23 the paper copy that you've been handed and the actual Excel spreadsheets in their native format that were produced to us by TikTok, and so let me now ask you some questions about 23A.

Looking at 23A, the first thing that I would like to look at is PDF 19, row 26.  Do you see where I'm at?  The effects name is Bold Glamour.

Do you see that?

A.    I see it.

Q.    And under the column that says Release Date, do you see that it says February 24, 2023?

Do you see that?

A.    Yes.

Q.    Under the column that says USCAAU, there is a Y for yes, correct?

A.    Yes.

Q.    Is it a fair reading of this document to conclude that TikTok released the bold glamour filter in the United States, Canada, and Australia on February 4, 2023?

A.    If this spreadsheet is accurate, then I would agree, yes.

Q.    Okay.  I'm going to do the same exercise for the next two filters.

The next filter, page 20, row 300 is a filter called Teenage Look.

Do you see that?

A.    Yes.

Q.    And under Release Date, which is column E, it says February 17, 2023.

Do you see that?

A.    Yes.

And my answer will be the same for the next two, by the way.

Q.    Okay.  I have to do this.  I appreciate that, and I appreciate you wanting to get us out of here, but I have got to do this for technical reasons, unless, of course, TikTok lawyers want to stipulate that they released these -- that TikTok released these filters on these dates.  Maybe?

A.    If these are accurate, then I would

agree with you that that -- that it's accurate.  I just didn't manage this spreadsheet.  I haven't seen it before.  So I don't know.  All I can tell you is what's on here.

MR. WEINKOWITZ:  Ms. Fournier, can you stipulate?

MS. FOURNIER:  I cannot at this moment do that.

BY MR. WEINKOWITZ:

Q.    Okay.  So according to the document it looks as though on February 17, 2023 Teenage Look launched in the United States and Canada, correct?

A.    According to this spreadsheet, yes.

Q.    And according to this spreadsheet the Body Shrinking effect was released on April -- I'm sorry, August 2, 2023 in the United States and Canada and Australia, correct?

A.    Yes.

Q.    All right.  And does it -- would it surprise you, sir, if you go to TikTok.com that there's an entire page for the bold glamour filter?

A.    Right now?

Q.    Yes.

A.    Right now, I mean, it would be surprising to see a full page for any filter, yeah.

Q.    Let's go.  Let's go to the page.

A.    All right.

MR. WEINKOWITZ:  Do you need -- can you X out of that?

Q.    All right.  Did you notice that I didn't need to put my date of birth in to access this page?  Did you notice that?

A.    No, I wasn't looking.

Q.    Yeah.  I didn't put my date of birth in, right, and I'm able to access the page, right?

A.    I didn't see what you did before opening the page.

Q.    Okay.  Do you see that the URL is TikTok.com, and the effect is Bold Glamour?

A.    Yeah, looks like a standard page we'd have for every effect.

Q.    Right.

Okay.  And do you see that there are -- under the Bold Glamour title, there's 274,900,000 videos?

A.    274.9 million videos, yes.

Q.    And there's an icon that shows the bold glamour filter, correct?

A.    Yes.

MR. WEINKOWITZ:  Can we pull up Tab

BFB -- I'm sorry, BF-7B1?

MS. ARMSTRONG:  Exhibit 24.

(TikTok-Furlong-24 was marked for

identification.)

MR. WEINKOWITZ:  Thank you.

BY MR. WEINKOWITZ:

Q.    BF-7B1 is a screenshot of the filter.
Do you see that at the left is the same -- what do
you call it -- icon with an example of the bold
glamour filter?

A.    Yes.  Yeah.

Q.    On the bottom it's the same URL number?

A.    Maybe.  Probably.

Q.    All right.  And would it be -- would it
surprise you, sir, that the teenage look filter has
a page on TikTok.com

A.    No.  It looks like there's a page for
every filter.

Q.    All right.  So let's go to the teenage
look filter on TikTok.com which is B -- we're going
to the live page.  Again, we're not -- I'm not
putting in my birth date.  I'm just closing this.
And I can see the filter, right?  Right?

A.    Yeah, it looked like you just went to a
different web page, yeah.

Q.    And I didn't have to put my date of birth in to see this page, right?

A.    I didn't see you do that, no.

Q.    Okay.  And up at the top is Teenage Look, and then there's a different sort of cartoon icon.  And there's a bunch of videos that show the teenage look effect, right?

A.    Yes.  Www.

      All right.  Can you pull up BF-7B?

      MS. FOURNIER:  Exhibit 25.

         (TikTok-Furlong-25 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    What we did is we screenshot it off the TikTok.com, the Teenage Look page, and we were able to download one of the videos.  So let's take a look at one of the videos that depicts the Teenage Look filter.

      (Video clip played.)

BY MR. WEINKOWITZ:

Q.    All right.  We just saw a picture depicting both the Bold Glamour and Teenage Look filters.

      Do you see that?

A.    Yes.

Q.    And we're going to mark as the next exhibit number the clip that we downloaded for that.

MS. ARMSTRONG:  Exhibit 26.

(TikTok-Furlong-26 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    Thank you.

In that video, Zhangsta explains how the new video filters works, does she not?

A.    Based on her understanding, yes.

Q.    Based on her experience she was actually showing it, right, showing the filters?

A.    I don't know if she can speak to how it was implemented by the TikTok engineering team.

Q.    Do you have any reason to believe that what she said was wrong?

A.    No.  I'm just saying that was her understanding.

Q.    Understood.  We have pulled up BS-73, which we'll mark as Exhibit --

MS. ARMSTRONG:  27.

(TikTok-Furlong-27 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    I stopped the clip.  What we did was we

stopped at video at 4:61 and 22:90, and we clipped them onto this exhibit.

Do you see that?

A.    Yes.

Q.    And if you look at the top of the clip, the first one, on 4:61, she says was created using machine learning, right?

A.    That's what it says, yes.

Q.    And then it shows the bold glamour filter, right?

A.    On the right, it looks like it, yeah.

Q.    Any reason to dispute that, right?  No reason to dispute that, right?

A.    No.

MR. WEINKOWITZ:  All right.  Can you pull up BF-7B4, which we'll mark as the next exhibit?

MS. ARMSTRONG:  Exhibit 28.

(TikTok-Furlong-28 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    In this exhibit we have a screenshot from the video of Zhangsta without any filter, with the bold glamour filter, and then with the teenage look filter.

Any reason to dispute that?

A.    Not based on the video I just watched.

Q.    This is a reasonable and accurate depiction of the video, correct?

A.    It seems so, yes.

Q.    Remember we talked about the body shrinking filter a little bit earlier?

A.    Yeah.

Q.    Would it surprise you that TikTok.com has a body shrinking filter page?

A.    Like I said, there's probably a page for every filter.

Q.    Let's look at the body shrinking page -- filter page.

All right.  I'm not putting in my birth date.  Can you X out of that?  And we are at the body shrinking filter page.

Do you see that?

A.    Yes.

Q.    You can see that by looking at the URL, right?

A.    Yes.

Q.    All right.  Do you see the second row down, first video over, a young woman in a pink shirt?

A.    Yes.

Q.    All right.  Can we go -- can we pull up tab BF-7B5?

MS. ARMSTRONG:  Exhibit 29.

(TikTok-Furlong-29 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    This is a screenshot of the body shrinking filter page.  Remember we saw the young woman in the pink shirt?  We were able to download the video showing the effect.

MR. WEINKOWITZ:  Can you play the video?

(Video clip played.)

Q.    Any reason to believe that that's not an accurate depiction of the body shrinking filter that appears on TikTok.com

A.    No.

Q.    These three filters we looked at were released after the TikTok document we saw about the ugly side of beauty filters, were they not?

A.    I need to double-check the dates.  But yeah, that other call was in 2022, or whenever it was, and this is 2023, then yes.

Q.    We just talked about three filters --

about the ugly side of beauty filters, correct?

A.   Yes.

Q.   All right.  So now what we're going to do is we're going to focus on 2022, the year before those filters were launched.  Okay?

A.   Sounds good.

MR. WEINKOWITZ:  Pull up tab BF-6, please.

MS. ARMSTRONG:  Exhibit 30.

(TikTok-Furlong-30 was marked for identification.)

BY MR. WEINKOWITZ:

Q.   Thank you.

Same deal.  Take your time.  Let me know when you're ready to go.

A.   Let's do it.

Q.   Okay.  Let's do it.  This is a document produced by TikTok in this litigation and ByteDance from your file.  Any reason to dispute that?

A.   No.

Q.   All right.  Any reason to think that it was altered or fussed with in any way prior -- strike that -- after it left your file?

A.   No.

Q.   Can you turn to PDF 5, which ends in

Bates 106?

A.    Yes.  I'm there now.

Q.    Thank you.

Do you see that your name appears at the end of the document?

A.    Yes.

Q.    And if you look at the metadata page, you see that you are the custodian of this document. So that means it came out of your file.

A.    I see that.

Q.    All right.  So let's go back to the front of the first page of the document ending in Bates 215.

A.    Sorry.  I don't -- you mentioned my name at the end of the document.  It's essentially Chinese characters.  I don't know what that means. But that seems like relevant context, if you're referencing my name back there.

Q.    I can tell you what it means is it's the Chinese thumbs-up emoji.

A.    I see.

Q.    Would that make sense to you?

A.    Yeah, yeah.

Q.    Okay.  All right.  So title of the document, first page, is Filters & Effects: advice

from EU/US GR/PR.

Did I read that correctly?

A.    Yes.

Q.    All right.  And what is EU/US?  Is that the European Union and the United States?

A.    Yes.

Q.    And GR/PR, you tell me what that is.

A.    Government relations and public relations.

Q.    Okay.  And if we look at the Background section, it says, "In Europe and US, platforms (including TikTok) are under scrutiny from the media and policymakers about the type of filters and effects that lead to a negative body image."

Do you see that?

A.    Yes.

Q.    Okay.  And again, this document is dated -- and if you look at the metadata, you will see that the document was created on January 27, 2022, and last modified on January 27, 2022, correct?

A.    Yeah, it looks like they were created and modified at the same time.  But that's what it says.

Q.    So this document existed before the

body shrinking, bold glamour, and teenage look filters were launched if this was in 2022, correct?

A.    And if that spreadsheet was correct, yes.

Q.    And we saw press reports, right, about the bold glamour filter, and they were from 2023.

You recall that, right?

A.    Yeah.

Q.    Okay.  So let's go to the second sentence.  It says -- after it says, "It is important to understand this issue and to ensure the filters and effects we offer our community do not perpetuate a narrow and unattainable standard of beauty."

Do you see that?

A.    Yes.

Q.    And that was written in this TikTok document before bold glamour, body shrinking, and teenage look were launched in 2023, correct?

A.    Yes.

Q.    Now, if you go to --

A.    I just want to be clear that those are done by a separate team.  I never worked directly on the filters.  So I want to make sure you understood that.

Q.    I understood that.  But you are on all of these documents that I'm using, correct?  You are on this document, correct?

A.    I believe I'm on it to the extent that the thumbs-up meant that I read it.

Q.    And this document came out of your file, correct?

A.    I guess so.  I don't know what my -- yeah.

Q.    All right.  And this document in 2022 is two years before November 2024 when TikTok announced it would take action, put age restrictions for certain filters, appearance filters for teens under 18, right?

A.    Right.  And that was after I left and done by another team that I did not work on.

Q.    Understood.

Let me ask you a question.  In the break, did you speak with your lawyers about your testimony at all?

A.    I don't think so.

Q.    Did you speak with your lawyers about how you were testifying or what you were testifying about?

A.    I think that's privileged information,

right?

Q.    No, it's not, because I'm not asking you about the content.  You can answer that question.

A.    Yes.  I talked to them about how I was testifying, yes.

Q.    Let's go back to the document.

The next section is a section about What is self-image?, right?  After Background is What is self-image, right?

A.    I see it on the screen.

Q.    And the next section after that is What is body image?, right?

A.    Yes.

Q.    And the next section discusses Who is most likely to experience...body image?, right?

A.    Yes.

Q.    And we can't read the whole thing because we don't have all day, but if you look at the second bullet point under Who is most likely to experience negative body image?, it says, "Adolescents," right?

A.    Yes.

Q.    "Body image and appearance concerns are particularly prevalent during adolescence which is a

critical moment of intense identity exploration and development."

Did I read that correctly?

A.    Yes.

Q.    "The messages teens receive about how they should (and shouldn't) look become integrated into their self identity and negative feedback can be hard to move past."

Did I read that correctly?

A.    Yes.

Q.    The next -- and we can't spend all day reading the whole document, but it often talks about the other categories or groups of folks that are most likely to experience negative body image, right?

A.    Yeah.  It talks about other potential people, yes.

Q.    Like women and girls are more disproportionately affected by body image.  That's the first bullet point, right?

A.    Yes.

Q.    And then "Sexual orientation," it says that folks that are in sexual minority groups tend to experience poorer body image than heterosexuals, right?

A.    That's what it says, yes.

Q.    And there's a bullet point for Ethnicity, Certain ethnic groups or people of color, they experience additional appearance pressure due to racialized appearance standards, right?

A.    That is what it says.

Q.    And folks with disabilities, folks that have weight issues that are larger than other people, they experience poorer body image, right?

A.    I can see the full page.

Q.    Right.

And I just want the jury to understand what TikTok understood in 2021 as to who filters could create negative body self-image for, right? Not just young people, right?

A.    I can't speak for TikTok, but yeah.

Q.    Well, this is a TikTok internal company document, correct?

A.    Yes.  Everything we're looking at is.

Q.    Right.

Okay.  Let's look at some of the impacts, which is on page 3 ending in Bates 104. That's right.  I'm sorry.  I'm in the wrong place.

Let's go to page 2 ending in 103.  Here in this internal company document from TikTok it

talks about What impacts can negative self-image have, right?

A.    Yes.

Q.    First bullet point, "Mental health and wellbeing: body dissatisfaction is associated with increased risks of depression, anxiety and eating disorders.  There are" some -- "there are also some links to suicidal ideation."

Do you see that?

A.    Yes.  I see the full page that you have shown right now.

Q.    Do you know that some of the plaintiffs in this case are claiming injuries, including depression, anxiety, eating disorder, suicidal ideation and suicide?  Do you know that?

A.    I've heard that it's related to these topics, yes.  I don't know the specifics about all of the complaints.

Q.    Understood.

Next section down, How are filters connected to negative self-image for young people?  Right?

A.    Yes, that's what it says.

Q.    It says, "As discussed above, young people (especially girls) are at heightened risk of

experiencing negative body image.  Whilst the causes are multifaceted, the digital environment has created additional challenges for young people."  Correct?

A.    Yep, I can see the whole paragraph.

Q.    Right.  And that's what's written here.

And TikTok operates in the digital environment, correct?

A.    Yes.

Q.    Next sentence, "Through photo editing tools and public approval systems through the form of 'likes', social media provides young people with the opportunity to hone their image, curating a version of themselves that they think will be acceptable in the digital world - typically highly idealized."  Correct?

A.    Yes.

Q.    And this was written in this TikTok document before bold glamour, teenage look, and body image -- I can't remember the name of the filter now -- before those three filters were launched in 2023, correct?

A.    It appears so from the metadata date.

Q.    All right.  Let's -- now we can turn to page 3, which ends in Bates 104.

A.    10 what?

Q.    104.  Sorry.  Middle, first section, full section of this -- on this page is about -- it's about, Filters that negatively impact self-image for other high risk groups?

Do you see that?

A.    I see it, yes.

Q.    Okay.  And there are examples of filters that negatively impact self-image for other high risk groups that are in this document listed, correct?

A.    Yeah, I see all of them.

Q.    Second bullet point is "'Thin' filters which imply being thinner (often hyper thin) is aspirational," correct?

A.    Yes.

Q.    That is a type of filter that is identified in this TikTok document in 2022 that is an example of a filter that negatively impacts self-image for other high risk groups, correct?

A.    Yes.

Q.    And after thin filters was identified as one, TikTok launched the body shrinking filter, correct?

A.    Yes.

Q.    And even today, anyone can go to the body shrinking filter page on TikTok.com to see examples, correct?

A.    I guess so.

Q.    Even children, because it doesn't ask anybody for a date of birth or have an age gate, correct?

A.    They can go to a page where they see videos that use those filters, yes.

Q.    Third bullet point down, "'Beautifying' filters that enhance lips, narrow chins and noses and slim cheeks etc which imply that changing these features is aspirational."

That is an example of a filter that negatively impacts self-image as set forth in this TikTok document in 2023, correct?

A.    Yes, that's what's written here.

Q.    And we saw earlier that the bold glamour filter was launched a year after this document, correct?

A.    Yes.

Q.    And even today anyone can go to the bold glamour filter page on TikTok.com and see examples of the bold glamour filter, right?

A.    Yes.

Q.    And that includes children because there is no age gate to access that material on TikTok.com, correct?

A.    Yes.  They can see a page where it clearly labels that there's a bunch of videos there using that filter, yes.

Q.    The fourth bullet point that has an example of filters that negatively impact self-image for other high risk groups, it says, "'Age' filters which imply wrinkles and other signs of aging are unattractive or even scary," correct?

A.    You cut out for a second.

Q.    Let me then start over again.

The last bullet point, which has an example of a filter that negatively impacts self-image for other high risk groups is, "'Age' filters which imply wrinkles and other signs of aging are unattractive or" are scary, correct?

A.    Yes.

Q.    And it was after this document that identifies age filters as negatively impacting self-image that TikTok launched the teenage looks filter in 2023, correct?

A.    Yeah.  The filters we were talking about before, yes.

Q.    And you can even today go to TikTok.com, as we saw, and see examples of the teenage look filter, correct?

A.    Yes.

Q.    And you don't need -- there's no age gate.  So somebody as young as 10 years old can go to that page and they can see examples of that filter, correct?

A.    That's right.

Q.    Let's turn to the very last page of the document, which is 5.  That's at 106, Bates 106. Are with you me?

A.    Yes.

Q.    I'm sorry.

On this page of the document there is a series of Examples of negative media/policy attention.

Do you see that?

A.    Yes.

Q.    And what's -- there are a series of hyperlinks to articles and news reports about beauty filters and their dangers, correct?

A.    Yes.

MR. WEINKOWITZ:  All right.  Let's look at -- let's pull up BF -- sorry -- yeah,

BF-6, hyperlink 6.

MS. ARMSTRONG:  Exhibit 31.

(TikTok-Furlong-31 was marked for identification.)

BY MR. WEINKOWITZ:

Q.    Take your time and let me know when you're ready.

A.    I'm ready.

Q.    Okay.  Hyperlink 6, if you -- and if you could keep Exhibit 30 next to you so that you can see that I'm referring to the correct document. Do you see that the sixth hyperlink down is an article from the -- I'm sorry, is an article from the Telegraph in the UK, "Social media giants accused of fueling body dysmorphia filters"?

Do you see that on Exhibit 30?

A.    Yeah.

Q.    And the document that we just marked is that article, correct?

A.    Yep.

Q.    And the title of the article again is "Social media giants accused of fueling body dysmorphia with filters tell MPs they are 'playful.'"

Do you see that?

A.    I see what you have on the screen, yeah.

Q.    And the article was published December 16th of 2020, correct?

A.    Yes.

Q.    2020 was four years before November of 2024 when TikTok restricted filters for underage users, correct?

A.    Yep.

Q.    2020 is three years before TikTok released the bold glamour, teenage look, and body shrinking filters in '23, correct?

A.    Yep.

Q.    2020 is one year before the date of the internal TikTok document that we saw that describes the ugly side of beauty filters, correct?

A.    Yes.

Q.    If you look at the first -- on the first page, second paragraph, it mentions the Women and Equalities Committee.

Do you see that?

A.    Yes.

Q.    And according to this 2020 article, that committee told TikTok, Snapchat, and Facebook that their filters had impacted young people's

mental health, right?

A.    It says "a young person's mental health."

Q.    "A young person's mental health," okay.

And TikTok was specifically included in those concerns, correct?

A.    Spelled wrong, but yes.

Q.    Fourth paragraph down, the article talks about how the popular filters allow users to change their appearance, right?

A.    Sorry.  Say that again.

Q.    The fourth paragraph down, in the fourth paragraph down, the article talks about how the popular filters allow users to change their appearance, correct?

A.    Yes.

Q.    Such as removing blemishes, right?

A.    Yes.

Q.    Changing skin tone and slimming the face, right?

A.    Yes.

Q.    That sounds somewhat familiar to the body -- to the bold glamour filter that TikTok launched three years later in '23, right?

A.    Yes.

Q.    If you look at the article's title, one of the concerns about the body -- about the filter is that it is fueling body dysmorphia, correct?

A.    That's what this article says, yes.

Q.    Remember on December 2021 in the internal TikTok document about the ugly side of beauty filters we saw the word "body dysmorphia" specifically mentioned?

A.    Maybe.  I don't remember, yeah.

Q.    Okay.  And it also included Snapchat dysmorphia, correct?

A.    Yes.

Q.    At the time this article was published in December 2020, TikTok was aware of the Telegraph article, was it not?

A.    Based on that document, it being listed, then someone who wrote that was aware of it, yes.

Q.    And the concerns in this document -- strike that.

       And TikTok was aware in December of 2020 about the concerns raised in this document that filters were fueling body dysmorphia, correct?

A.    I can't speak for TikTok in December of 2020 because I wasn't working on it and I don't know

who might have seen this article when it came out.

Q.    Do you know ███████████████

A.    Yes.

Q.    Look at the fourth paragraph of the article.  It quotes ████████████ as a TikTok -- who was a TikTok colleague of yours, correct?

A.    Yes.

Q.    ███████████ must have been aware of this article if she was quoted in the article, correct?

A.    Like I said, I wasn't working on TikTok, so, you know, I can't speak for ████████████████.  But it looks like she was aware at that time, yes.

Q.    And according to this article she was the ████████████████████████████████ correct?

A.    That's what it says.

MR. WEINKOWITZ:  Can we go -- all right.  Let's go back to where all the hyperlinks are listed in the other document, and we're going to look at the eighth hyperlink now.

Can you pull up the eighth hyperlink.

MS. ARMSTRONG:  Exhibit 32.

Q.    The eighth hyperlink -- well, let's

look at this first.  The eighth hyperlink is another Telegraph article, "Reality bound jarring digital filters makes easy appear beautiful."

Do you see that, December 20?

Strike that.

MS. FOURNIER:  What number is this?

MR. WEINKOWITZ:  Strike it, strike it, I'm screwed up here.  Give me a minute.

Let's go off the record for a second.

I got my numbers all screwed up.  Give me one minute.

THE VIDEOGRAPHER:  12:11.  We're off the record.

(Pause.)

THE VIDEOGRAPHER:  The time is 12:12. We're back on the record.

BY MR. WEINKOWITZ:

Q.    Okay.  We're in Exhibit 30 which is the internal TikTok document called "Filters & Effects: advice from EU/US GR."  We are on pages Bates ending in 106.  We are discussing all of the examples of negative media policy attention that were hyperlinked in the back, and I'd like to talk about hyperlink number 8.  It is a November 2020 argument from an article in -- called TikTok Time Warps Body

Shaming.

Do you see that, Mr. Furlong?

A.    I see that URL, yeah.

MR. WEINKOWITZ:  All right.  Can we pull up Tab BF-68, hyperlink 8, please.

MS. ARMSTRONG:  Exhibit 32.

(TikTok-Furlong-32 was marked for identification.)

MR. WEINKOWITZ:  Thank you.

BY MR. WEINKOWITZ:

Q.    Let me know when are ready, sir.

A.    Yeah, I have it now.

Q.    This is a title -- do you see that this is the hyperlinked article from the eighth hyperlink in Exhibit 30?

A.    Yeah, it looks like the same one, yeah.

Q.    The title of the article is "TikTok's TimeWarpScan Is Just Another Body-Shaming Tool."

Do you see that?

A.    Yes.

Q.    It says, "The Effect Allows Users to Distort the Proportions of Their Bodies," correct?

A.    Yes.

Q.    Sounds a lot like the body shrinking filter that we saw, doesn't it?

MS. FOURNIER:  Object to form.

THE WITNESS:  Yes.

BY MR. WEINKOWITZ:

Q.    Did you say -- I didn't hear the answer.  You said yes.  Okay.

And the date of this article is November 18th of 2020, correct?

A.    Yes.

Q.    If you turn to page 2.  It says, "Since the filter distorts proportions, some people are warping themselves to create 'perfect noses,' larger butts, and flatter stomachs."

Did I read that correctly?

A.    Yes.

Q.    "By dragging the phone along to create larger body parts or sucking in their stomachs, TikTokers can reimagine their feature - and it's not healthy," correct?  Did I read that --

A.    Yeah, you read it correctly.

Q.    And this article was published in 2020, correct?

A.    It looks like it, yeah.

Q.    Four years before November of 2024 when TikTok restricted filters for under 18 users, correct?

A.    Yeah, before they made that announcement, yes.

Q.    And three years after this article was published, TikTok released filters like bold glamour, teenage look, and body shrinking, correct?

A.    Yes.

Q.    Turn to page 6 of the article, please. Underneath the picture, do you see that the article specifically refers to body dysmorphia?

A.    Yes.

Q.    And it mentions -- turn to page 7.  The article mentions that these type of filters promote eating disorders and unhealthy eating habits.

Do you see that?

A.    Yeah, I do.

Q.    That was written in 2020, correct?

A.    Still is, yeah.

Q.    We're going to look at the -- go back to Exhibit 30, please.  We're going to look at the tenth hyperlinked article.  It's an article from thequint.com, "TikTok beauty feature extremely problematic."

Do you see that?

A.    I see the hyperlink, yeah.

MR. WEINKOWITZ:  Can you pull up Tab

BF-6 which is hyperlink 10?

MS. ARMSTRONG:  Exhibit 33.

(TikTok-Furlong-33 was marked for

identification.)

BY MR. WEINKOWITZ:

Q.    Do you see Exhibit 33 is the article
that was hyperlinked from thequint.com about "Why
TikTok's 'Enhanced Beauty' Feature Is Extremely
Problematic"?

A.    Yes.

Q.    And this is published June 11, 2020,
right?

A.    Yes.

Q.    Again, another article raising concerns
about TikTok's filters in 2020, right?

A.    Yes.

Q.    And the article is about a new enhanced
beauty feature that TikTok released, right?

A.    Sounds like it, yeah.

Q.    Last paragraph, first page says, This
is Not my face - but TikTok makes it easy to pretend
otherwise.  The app released an update with Enhanced
Beauty features.  Now it's possible to instantly
change your jaw structure and nose, to smooth out
All your pores, to allow on layers of makeup with

the click of a button, to make your eyes brighter, teeth whiter, even shinier.  In an instant, I can be a whole new me.

TikTok has nearly 800 million monthly active users.  About 41 percent of those are even between 16 to 24 years.  My instinct is a lot of -- my instinct is a lot are younger - they just don't have the stats, she wrote.

Did I read that correctly?

A.    Almost, but yeah, in general, yeah.

Q.    Well, the way that filter it described, does it not sound like the bold glamour filter that was released in 2020?

A.    It does.

Q.    And this was written in 2020, correct?

A.    Yes.

Q.    Let's look at the second hyperlink on Exhibit 30 which is to an article in the MIT Technology Review.

Do you see that?

A.    Yeah, I see it.

MR. WEINKOWITZ:  All right.  Pull up BF-6.

MS. ARMSTRONG:  Exhibit 34.

///

(TikTok-Furlong-34 was marked for identification.)

BY MR. WEINKOWITZ:

Q.   Do you see that I've handed you, Exhibit 34, which is the hyperlinked article from Exhibit 30?

A.   Yeah, I have it now.

Q.   And it's an article that was published on April 2, 2021.

Do you see that?

A.   Let me pull -- I don't see the date.

Q.   Look at the screen.  Look at the screen, sir.  I'm sorry.

A.   Yeah, I see it there, yeah.

Q.   All right.  And the article was published in the MIT Technology Review, correct?

A.   I think so.

Q.   Look at --

A.   Yeah, I see it on the top now, yeah.

Q.   Sorry about that.

The title of the article is "Beauty filters are changing the way young girls see themselves," right?

A.   Yes.

Q.   And the subtitle is "The most

widespread use of augmented reality isn't in gaming:

it's the face filters on social media.  The result?

A mass experiment on girls and young women."

Did I read that correctly?

A.    Yes.

Q.    And that article was in 2021, correct?

A.    Yes.

Q.    Turn to page 3.  If you look at the

third full paragraph down, last sentence, do you see

that TikTok's beauty filters are mentioned in this

article?

A.    Yes.

Q.    "TikTok's beauty filter, meanwhile, is

part of a setting called 'Enhance,' where users can

enable a standard beautification on any subject."

Do you see that?

A.    Yes.

Q.    Right above that it refers to Snapchat,

correct?

A.    Yes.

Q.    "Snapchat offers a gallery of filters

where users can swipe through beauty-enhancing

effects on their selfie camera," correct?

A.    Yes.

Q.    And this is 2021, three years before

TikTok released bold glamour, teenage look, and body shrinking, right?

A.   Yeah.

Q.   All right.  I'm not going to go through all of those hyperlinks, which I'm sure you're very happy about.

I'm almost done with my part.  So if you'll bear with me?

MR. WEINKOWITZ:  What we're going to do is if you could pull up BF-31, please, slide 1.

MS. ARMSTRONG:  Exhibit 35.

(TikTok-Furlong-35 was marked for identification.)

MR. WEINKOWITZ:  Thank you.

BY MR. WEINKOWITZ:

Q.   What we're going to do, sir, is we're going to build a timeline with the documents that we've talked about in your testimony.  Okay?  We start with a blank timeline.

MR. WEINKOWITZ:  If you pull up Tab BF-31, slide 2.

BY MR. WEINKOWITZ:

Q.   Do you see that we have an August 18th -- August 2018, TikTok launched in the

United States back in August of 2018, is that correct?

A. I believe so, from what we talked before, yeah.

Q. Okay. And so in this Lark message from June of -- I'm sorry, strike that.

In this Lark message which is dated June 2021, this would have been less than three years after TikTok launched in the US, correct?

A. Yeah. If it launched in 2018, it would have been about three years, yeah.

Q. Okay. So less than three years after TikTok launched in the US, you were being hired to address user addiction and safety problems, correct?

A. That's what he wrote, yes.

Q. Okay. So what I'd like to do next is I want to discuss some of the problems that you were hired to address.

MR. VANZANDT: If we can go to Tab JV-A2.

MR. YANG: Exhibit 39.

(TikTok-Furlong-39 was marked for identification.)

BY MR. VANZANDT:

Q. It will be Exhibit 39.

A.    I have it here now.

Q.    Okay.  Please feel free to review and familiarize yourself with the document, and I will be kind of pointing you to certain parts of the document.  Okay?

A.    Sounds good.  Okay.

Yeah, this looks like a very old, early days document, yeah.  But yeah, let's go ahead.

Q.    Okay.  I think you're right about that, about it being a very old document.  So let's look at it.

I will represent to you that TikTok and ByteDance's lawyers produced that document to us from your work files as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And if you can -- if you look at the screen here, we're displaying the metadata for this document.  And do you see that the date it was created was February 7th of 2021?

A.    Yeah.

Q.    Okay.  And that was about two months before you officially joined TikTok, is that correct?

A.    That's right.

Q.    Okay.  What I do want to point your --
I'm sorry, point your attention to page 2 of the
document, Bates ending 109.  Do you see on the right
side there's a comment box?  Looks like there's your
name in the comment box.

Do you see that?

A.    Yes.

Q.    It says -- it looks like there -- it
looks like you left a comment to that, a thumbs-up.
And it says the date of that is February 13th of
2021.

Do you see that?

A.    Yeah.

Q.    So that would have been before you
joined the TikTok team, is that correct?

A.    That's right.

Q.    Okay.  And so you would have reviewed
and commented on this document before you were part
of the TikTok team?

A.    So if I remember correctly, I believe
this is, like, the document I wrote to, like, pitch
my role and that it should exist on the TikTok team.
This is like a proposal or an application as like an
internal transfer that ended up making its way to
the team who works on these things.  And after they

read it and we talked, they ended up deciding to create a role for me to, like, pursue these things.

So that's why it was before I moved over because this was me hoping that I could go and work on these -- you know, this work, yeah.

Q.    Okay.  Thank you for that clarification.

So let's look at the document itself. If we could go back to the first page, please.

Do you see at the top the title of the document is "Digital Wellbeing on TikTok"?

A.    Yeah.

Q.    And below that it says, "Define and validate TikTok's digital wellbeing problems."

Do you see that?

A.    Yes.

Q.    So I want to now skip to the bottom of the page.

Do you see where it says "Validation"?

A.    Yes.

Q.    And then it lists, starting there and then going over to the next page, a few studies and research related to the topic of digital wellbeing, is that fair?

A.    Yeah.

Q.    Okay.  So I actually want to look on the next page, the top of page 2.  Do you see that it lists a -- it quotes actually some research conducted by Pew Research?

A.    Mm-hmm.

Q.    Pew Research is not part of TikTok, correct?

A.    Correct.

Q.    Pew Research is an independent research organization, is that right?

A.    That's correct.

Q.    And do you understand that Pew's findings are frequently cited by scholars and policymakers and the media?

MS. FOURNIER:  Objection to form.

THE WITNESS:  I could say it's like a reputable source of information that, you know, I think is like helpful to reference, consider as an input, yeah.

BY MR. VANZANDT:

Q.    Okay.  Thank you.

I want to look at the quote here that's included in this TikTok internal document.  It says, "The long-term effects of children growing up with screen time are not well understood but early signs

are not encouraging: poor attention spans, anxiety, depression and lack of in-person social connections are some of the correlations already seen, as well as the small number of teens who become addicts and non-functioning adults."

Did I read that correctly?

A.    Yes.

Q.    And just below that statement there's another section of the document in bold that says "User addiction to TikTok."

Do you see that?

A.    Yes.

MR. VANZANDT:  Vince, could you underline "User addiction to TikTok," please?

Q.    And the first sentence of that section says, "Addiction to technology is a ubiquitous problem that TikTok and most other platforms deal with today."

Did I read that correctly?

A.    Yeah.

Q.    Mr. Furlong, do you understand the word "ubiquitous" to mean widespread?

A.    Yes.

Q.    And then the paragraph then goes on to

say, "Addiction takes many forms such as overall time spent on an app, deprioritizing other important areas of life, and generating self-worth based on number of likes."

Do you see that?

A.    Yes.

Q.    And then it continues, "all of which and countless others have made us realize the consequences for optimizing for engagement and" user -- I'm sorry -- "for engagement and retention metrics," is that correct?

A.    That's what it says, yes.

Q.    Now I want to skip down to the Priority Justification, and it's the section just below that. And the priority that we're talking about is digital well-being, is that correct?

A.    Right.

And again, this is like a proposal I'm making as an outsider working on Lark.  You know, I don't have any inside TikTok information, just saying here is what I'm finding as I search the internet and watch this documentary.  So I think that context is pretty critical for this too.  It's an outside of TikTok document when it was written.

Q.    Right.

would be considered the social media industry, is that correct?

A.    I suppose so.  I'm not sure who wrote it and if that's what they meant.

Q.    Okay.  As you discussed with Mr. Weinkowitz earlier, because of TikTok's advertising-based business model, the more time TikTok users spend on TikTok the more money TikTok makes from advertisements, is that correct?

A.    I think it's more about viewing ads, which is probably correlated with more time spent but not directly related.  But, so, yeah, that's my understanding.

Q.    Okay.  But as we discussed before, Mr. Furlong, you joined the company to address TikTok user addiction problems, right?

A.    It's more broad than that.  It was like how do we improve people's digital wellbeing with the amount of time spent on the platform being one of the areas that bubbled up.

MR. VANZANDT:  I want to now go to tab JV-A4.  This is going to be Exhibit 42.

(TikTok-Furlong-42 was marked for identification.)

A.    I have it here now.

BY MR. VANZANDT:

Q.   Okay.  Do you see that this is a document entitled "Digital Wellbeing Product Strategy"?

A.   Yes.

Q.   Okay.  And I'll represent to you that TikTok and ByteDance's lawyers produced this to us in this litigation from -- as being from your work files.  Any reason to dispute that?

A.   No.

Q.   Okay.  And if you see the metadata page that's on the screen here, the date of this document is September 23, 2021.

Do you see that?

A.   Yes.

Q.   Okay.  And so this would have been -- strike that.

This would have been about six months after you joined the company, is that correct?

A.   About five months after I joined TikTok, yes.

Q.   Okay.  Thank you for that clarification.

So let's go back now to the first page of the document.  Do you see there under the title

it asks the question "What is Digital Wellbeing"?

A.    Yes.

Q.    I want to go down to where it says "DW Hierarchy," just below that.

And "DW" there would be digital wellbeing, correct?

A.    Yes.

Q.    And so number 1 listed there in the hierarchy says "Safety," and it equals "safety by design."

Do you see that?

A.    Yes.

Q.    Do you agree, Mr. Furlong, that if a social media company is going to value the digital wellbeing of its users, the first priority should be a safely designed platform?

A.    I think it's very important, yes.

Q.    And then number 2 in the hierarchy there is the word "Agency."

Do you see that?

A.    Yes.

Q.    And this document defines agency.  It says, "Agency equals the capacity of individuals to act independently and to make their own free choices."

Do you see that?

A.    Yes.

Q.    So according to this document, developing a responsible digital wellbeing approach requires, first, prioritizing safety and, second, prioritizing agency, correct?

A.    According to this.  That was like the proposal I was making as a way to carve out like what does digital wellbeing mean, since it's such a large term, versus what the rest of trust and safety was doing at the time.

Q.    Thank you.

So you personally wrote this document?

A.    Yes.

Q.    Okay.  So let's go over to the next page.  It's Bates ending 040.

A.    I guess just to clarify, it looks like this is the external version, which is, more than anything, a copy that was produced for probably a meeting with a partner.  So I think in general the information is the same.  But some of the information from the original version may have been tweaked or something if we didn't want to share that with them, yeah.

Q.    Okay.  Understood.

Let's go to the bottom half of this second page, please.

A.    Sure.

Q.    Do you see the title of that section called "User Problems"?

A.    Yes.

Q.    And then underneath it, it says, "1.1. Compulsive Usage and Lack of Agency."

Do you see that?

A.    I do.

Q.    Okay.  So we just discussed agency. This is the first time we're seeing the term compulsive use or compulsive usage.  So I want to just pause and talk about those terms for a moment. Okay?

A.    Okay.

Q.    As we just saw, the word agency is defined in this document as "the capacity of individuals to act independently and make their own free choices," right?

A.    Mm-hmm.

Q.    And therefore, would you agree that the lack of agency is when users do not have the capacity to act independently and make their own free choices?

Q.    Okay.  We can pull this down.  Thank you.

Mr. Furlong, whether you call it addiction or compulsive use or lack of agency, during your time at TikTok you understood there were people who spent more time than they would like on TikTok, is that correct?

A.    Yes.

Q.    Okay.  So let me go back to the prior exhibit I had up, I think Exhibit 40, under the User Problems that we were looking at before.

A.    Yes.

Q.    Okay.  So I want to look back at some of this text.  Under the bold heading there, Compulsive Usage and Lack of Agency, it says, "We have learned from," and then you see that there's a hyperlink.  That hyperlink would have been a link to an internal study, is that right?

A.    I'm not sure.

Q.    Okay.  So let's skip the link.

It says, "We have learned from" hyperlink "that our users' biggest usage deterrent is that they think the platform is addictive."

Do you see that?

A.    I do.

Q.    Okay.

MR. VANZANDT:  Vince, can you underline the word addictive?  Thank you.

Q.    And then do you see a reference to the app store reviews that we looked at earlier?

A.    Yes.

Q.    Okay.  Going down to the next paragraph, it says, "This issue is further supported by external research and reveals other more concerning effects as well."

Do you see that?

A.    Yes.

Q.    It goes on to say -- well, let me say this.

Do you see that it next cites research, external research from Common Sense Media?

A.    I see that link, yes.

Q.    Okay.  And so the sentence before that says, "According to a study of 1,600 8 to 18 year olds, 8 to 12 year olds use almost 5 hours of entertainment screen media per day and teens use over 7 hours per day, with 62 percent over 4 hours and 29 percent over 8 hours."

Did I read that correctly?

A.    That's correct, yes.

Q.    And the next sentence says, "This compulsive usage correlates with a slew of negative mental effects like loss of analytical skills, memory formation, contextual thinking, conversational depth, empathy, and...anxiety."

Did I read that correctly?

A.    Yes.

Q.    And that is -- that's referring to the use of screen media in general, correct, not just TikTok?

A.    It looks like it's just citing information from that report, from Common Sense Media.

Q.    Okay.

A.    Or in the Pew Research one, in that -- yeah, it's probably the Pew Research one.

Q.    Yeah.  I'm sorry if I misread that one before.

So the last sentence we just read was citing Pew Research there, correct?

A.    It looks like it, yeah.

Q.    Okay.  Now, the next sentence that I want to look at I believe refers specifically to TikTok.  It says -- I'm sorry.  Strike that.

The next sentence after the Pew

Research article there says, "Various similar studies to Pew's also conclude that compulsive usage interferes with essential personal responsibilities like sufficient sleep, work/school responsibilities, and connecting with loved ones."

Do you see that?

A.    Yes.

Q.    So I want to go down to the very next sentence, the top of the next paragraph.  There do you see that you wrote in this document, "In sum, compulsive usage on TikTok is rampant and our users need better tools to understand their usage, manage it effectively, and ensure being on TikTok is time well spent."

Do you see that?

A.    Yes.  And I would have loved to have included actual data from TikTok on this rather than referencing third-party research.  So that would have been a great addition.

Q.    Okay.  And you actually do in the hyperlink -- just after that you provide a hyperlink to something, ByteDance dot something something.  That appears to be an internal link, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  It looks like an internal

Q.    And this is a document that you co-wrote back in June of 2022, correct?

A.    I don't know who wrote that.

Q.    Okay.  Do you acknowledge that on the front -- the first page of this, it notes that it was co-produced by you and two other individuals?

A.    That's what's written, yes.

MR. VANZANDT:  Okay.  So we can pull that down.

Let's go to Tab JV-A9.  This is going to be Exhibit 46.

(TikTok-Furlong-46 was marked for identification.)

BY MR. VANZANDT:

Q.    Do you see that this is a document titled "Screen Time Management One Pager"?

A.    Yes.

Q.    And do you see at the top there that it says @Jordan Furlong with a date of July 6, 2022?

A.    I do.

Q.    Does that mean that you wrote this article -- or this document?

A.    Yes.

Q.    Okay.  And I'll represent to you TikTok and ByteDance's lawyers produced this to us from

your work files.  Any reason to dispute that?

A.    No.

Q.    I want to look at page 2 of the document.  It's the second page, Bates ending 815 at the bottom.  It says, "Description:  What is it?"

A.    Yep.

Q.    And this is really just -- I'm trying to get a sense of what this document is about.  And so if you look at the second sentence, it says, "This one pager refers to a suite of screen time management features to help users be more mindful and controlling of their time spent on TikTok."

Do you see that?

A.    Yes.

Q.    So that gives an overview as to what this document is going to talk about?

A.    Yeah.

And I would just add that it just -- for someone who cares about what's going on with that project or area of work, this is where they can get the most important information.

Q.    Okay.  Thank you.

Let's go now to the next page, please.  The top part there where it says, "Problem:  What problem is this solving?"

Do you see that?

A.   Yeah.

Q.   It says, "Some users spend more time on TikTok than they would like to, interfering with important areas of personal life like work, school, family time, and sleep."

Did I read that correctly?

A.   Family time and sleep.  But yeah.

Q.   Thank you for that.

It then says, "We can break down this problem into two areas."  If we zoom out, we can see what those two areas are on this page.

Do you see that the first area reference is controlling the amount of time spent on the app?

A.   Yes.

Q.   Okay.  And then under number 1 there it says, "Objective harmful usage (6 hours plus per day = 99th percentile)."

It goes on to say "Currently this is 10" -- is this 10 million?

A.   Yes.

Q.   -- "10 million users/1.3 percent daily active users," is that correct?

A.   That's what I wrote, yes.

Q.    Okay.  And so the amount of time spent on the app is listed under the -- is listed as one of the two problems that this is seeking to address, correct?

A.    Yes.  And in this section, controlling the amount of time spent on the app was an attempt to say what are, like, the specific problems we're trying to solve as it relates to screen time management.

One is someone just has a sense of using the app too much, which is number 2.

Number 1, I would say, is an attempt to say that there should be a ceiling.  You know, at a certain point, like this is just too much time.

But that is a very controversial topic that did not have any sort of answer across all the people we spoke with.  And so this was just a stab at that based on two research articles that I had looked at for the sake of the thought experiment.  But not because this was an established standard that was accepted outside of, like, basically this document.  So, yeah.

MR. VANZANDT:  Okay.  Move to strike as nonresponsive.

I want to move on down to -- if we

Jordan Furlong                                    282

could zoom out of that document.  Let me see the whole document, please.  Okay.  Appreciate that.  Strike that.

Q.    Let's go now to point number 2, the bullet point number 2.  It says, "Controlling when the app is used at night."

Do you see that?

A.    Yeah.

Q.    And below that it says, "Screen time can interfere with essential personal responsibilities like sufficient sleep, work/school responsibilities, and connecting with loved ones." And then it cites some research article.

Do you see that?

A.    Yes.  Some article, it looks like.

Q.    Okay.  Okay.  Then it then goes on to say -- strike that.

Would you agree that if screen time interferes with essential personal responsibilities like work, school and sleep, that can be problematic for users?

A.    I would say that if you're doing anything -- you know, you're watching TV, you're going for a walk, you're reading a book, that there's a possibility that interferes with time that

could be otherwise spent, spending time with people you care about.  Maybe those things are late at night and it conflicts with your sleep schedule or you should be doing homework.  So I think it's -- yeah, that's how I think about this.

Q.    Okay.  So the next sentence says, "We know that TikTok contributes to this problem anecdotally, but we have low confidence that we can solve for this problem throughout the day."

Is that what that says?

A.    Yes.

Q.    Okay.  So if we look at the bullet points below --

MR. VANZANDT:  Vince, you can back out of that?

Q.    -- there's some bullet points below that.  The first bullet point says, "Screen time and social media use at night are associated with delayed and inadequate sleep."

Is that what you wrote?

A.    It's what I wrote.  And yeah, if screen time is going to conflict with sleep, then obviously you need not to be using your screen -- your phone at night.  So kind of an obvious statement.

Q.    Okay.  And then the next statement you

wrote is, "Screen time before bed is linked with inadequate sleep."

Do you see that?

A.    That's what's written, yes.

Q.    Okay.  And then the next bullet point says, "External research suggests a causal relationship between social media use at night and delayed sleep."  Correct?

A.    Right.  Again, like if you're using your phone at night and it goes past your bedtime, then obviously that will delay your sleep.

Q.    Mr. Furlong, would you agree that it's important for minors especially to get adequate sleep?

A.    Yes.  Sleep is important.  I love sleeping.

Q.    Is it important for minors that are in school to do their schoolwork?

A.    Of course.

Q.    And do you agree that it's important for minors to be focused on school when they are at school?

A.    Yes, I do.

Q.    Would you agree that if a student is tired at school because they stayed up too late on

TikTok the night before that that can be problematic for the student?

A.    Yeah, definitely.

Q.    And that can be problematic for the school, correct?

A.    Could be.

Q.    So let's go down below that on the second main bullet point where it says, "Users are active on TikTok."

Do you see that?

A.    Yes.

Q.    So it says, "Users are active on TikTok when they should be sleeping.  Usage data indicates this is an issue for more than 20 percent of minors, and suggests adults are impacted as well."

Do you see that?

A.    Yes.

Q.    And then just below that it lists 19 percent of L1 -- and it defines that as users between the age of 13 and 15.

Do you see that?

A.    Yes.

Q.    So that's 19 percent of users between 13 and 15 and 25 percent of users between 16 and 17, daily active users, are active on TikTok between

careful to not hurt too much, correct?

A.    Yeah.  Guardrails can either be referred to as things that you actively don't want to move down or things that you want to monitor and have a good sense of what the impact was in case there was some effect to it.

Q.    Okay.  So some of the -- well, strike that.

MR. VANZANDT:  Let's go to Tab JV-A -- actually, I think it's the prior exhibit.  Give me just one second.

THE WITNESS:  Yeah, we reviewed this already.

BY MR. VANZANDT:

Q.    What exhibit is that?

A.    46.

Q.    46.  Thank you.  Appreciate that.  So that is Exhibit 46.  I want to go back to that.

If we could go to -- it's the second page of the document Bates ending 815.

A.    Yep.

Q.    Well, actually let's go to the third page.  I'm sorry.  I'm screwing this up.

Page 7, how about that, page ending 820.

A.    Sounds good.

Q.    Trying to get to what I'm talking about here.  There we go.  Perfect.

The bottom half of that document there, do you see where it says "Core Target Metrics"?

A.    Yes.

Q.    And then below that there's something called "Drag Metrics."

Do you see that?

A.    Yeah.

Q.    And are drag metrics the same thing as guardrails that we just discussed?

A.    Yes.  It seems similar enough, yeah.

Q.    Okay.  And so this document as we talked about before was discussing TikTok's screen time management features at that time, right?

A.    Yes.

Q.    And here under Drag Metrics -- or beside Drag Metrics in brackets it says, "Metrics you don't want to hurt, which will be monitored post launch."

Do you see that?

A.    Yes.

Q.    And the first metric there is "Retention," is that right?

A.    Yes.

Q.    And retention is a metric that refers to people coming back to use the app again, is that correct?

A.    That's right.

Q.    And the next one listed is "Stay Duration."

Do you see that?

A.    I see that, yeah.

Q.    And stay duration is how long a user stays on the app, is that correct?

A.    Yes.

Q.    And beside stay duration, in parentheses it says, "Don't want to hurt too much." Correct?

A.    Correct.

Q.    And then beside that it says, "Previous discussions with" -- is that -- do you know how to pronounce that?

A.    Wenjia.

Q.    Wenjia.  "Previous discussions with Wenjia about this resulted in guidance to accept up to 5 percent decrease for extreme users and minors."

Do you see that?

A.    Yes.

Q.    Okay.  Who was Wenjia?

A.    He was a head of product.

Q.    Okay.  His name was -- was it Zhu Wenjia?

A.    Yeah, his last name was Zhu.

Q.    Okay.  His last name was Zhu.  Okay. So that's Z-H-U.

MR. VANZANDT:  So let's pull up Tab JV-D7, please.  This will be Exhibit 49.

(TikTok-Furlong-49 was marked for identification.)

BY MR. VANZANDT:

Q.    This is a demonstrative exhibit that I've created.  Do you see that?  Do you recognize that to be an image of Zhu Wenjia?

A.    Yep, that's him.

Q.    Now, Mr. Zhu reports directly to the CEO and founder of ByteDance, correct?

A.    Sounds right, but I'm not 100 percent sure, yeah.

Q.    Okay.  And is he based out of Beijing, China?

A.    I don't know where he's based.

Q.    Okay.

A.    I have think he's in Singapore, but

could pin it to that month necessarily, but yeah.

MR. VANZANDT:  Okay.  Let's pull up Tab ST5.  This is going to be Exhibit 58.

(TikTok-Furlong-58 was marked for identification.)

THE WITNESS:  All right.  I have it.

BY MR. VANZANDT:

Q.    Do you see that this is a Lark message chain titled "Minor Screen Time Analysis"?

A.    Yes.

Q.    Okay.  I'll represent to you that TikTok and ByteDance's lawyers produced this to us as being part of your work file.  Any reason to dispute that?

A.    No.

Q.    Do you see that you actually started this message chain there on December 15th of 2022?

A.    Yes.

Q.    And you invited several people to the chat, do you see on there?

A.    I do.

Q.    Okay.  We'll talk about some of those as we go, but we'll just skip -- we'll skip identifying who they are right now.

MR. VANZANDT:  Let's go to the first

part of the substantive message.  Scroll down just a little bit, please.  There we go.  Thank you.

Q.    You say, "Hi All, after discussing this with ▉▉▉ -- and is that a reference to ▉▉▉ ▉▉▉▉▉?

A.    Yep.

Q.    What was ▉▉▉▉▉▉'s role?

A.    Another product manager.

Q.    Okay.  Was he part of trust and safety?

A.    No.

Q.    Okay.  What division was he in?

A.    He was on the privacy and responsibility team.

Q.    Okay.  "After discussing this with ▉▉▉, hoping we can quickly pull together an impact analysis of more aggressively curbing minors' screen time on TikTok.  I quickly jotted down some simple ideas of how we could do this for us to consider, but wanted to suggest we first evaluate the impact of turning on the daily screen time limit."

Do you see that?

A.    Yep.

Q.    Okay.  Now, you note turning on the daily screen time limit, and I believe that's a

function we discussed earlier.  But by your indication that that's something that can be turned on, that was a capability TikTok already had at this time in 2022, right?

A.    Correct.

Q.    Okay.  But up to this point it was a function that was not turned on?

A.    Right.  And we had to change it because before you had to set up a PIN code.  So we couldn't turn it on because -- or it would be strange to turn it on because we would be defining a PIN code for people and we needed a good way for them to remember it.  So it wasn't just as simple as turning on the feature.  So we had to make some design changes as well.

Q.    Okay.  But up to this point in December of 2022 that feature had not been available for users, right?

A.    It was not automatically turned on for users, yes.

Q.    Okay.  Thank you for that distinction.

So below the message you list several -- I think you refer to them as simple ideas, right?

A.    Yes.

Q.    So some of those simple ideas were --
the first one is "Hard lined restrictions."

Do you see that?

A.    Yeah.

Q.    The next one was "Hard cap on amount of
time minors can spend on TikTok."

Do you see that?

A.    Yes.

Q.    Next, "Hard cap on amount of time
minors can spend on TikTok at night."

And then the last one is "Hard capped
bedtime for minors, after which they cannot access
the app?"

Did I read those correctly?

A.    Yes.

Q.    Now, in the context of screen time
management, a hard cap refers to a cap on the amount
of time spent or a certain behavior to prevent
someone from using the app longer than a certain
amount of time, right?

A.    That's right.

Q.    So what makes these limits hard capped
is that the user would not be able to override the
limits, correct?

A.    Correct.

Jordan Furlong                                          360

Q.    For example, they couldn't override them just by simply entering a -- some kind of passcode, right?

A.    Correct.

Q.    And you would agree that if a limit on usage time is optional and a user can bypass it, that is not considered a hard cap?

A.    Correct.

Q.    So you list some other options below that, Configuration changes, Daily screen time limit on by default for minors with some different time options out there.

Do you see that?

A.    Yep.

Q.    And then you list a few more there, Screen time breaks on by default for minors.  So that was not something that was already on by default, right?

A.    Correct.

Q.    Okay.  Then you note, too, there actually in A/B testing one of them was "Night screen time management on by default for minors," and then "Enable weekly screen time notifications for minors."

Do you see that?

A.    Yeah.

Q.    Then below that at -- can you help me with those two names there at the beginning?

A.    ███ and ███

Q.    ███ and ███   Did I say that right?

A.    Yes.

Q.    Okay.  And what were ███ and ███ s roles?

A.    They're data analysts.

Q.    Okay.  So in the second sentence of your request there, you say, "We'd like to estimate the total decrease in stay time if we were to turn on daily screen by default for minors, based on age gate data."

Do you see that?

A.    Yeah.

Q.    Okay.  And in this context, the stay time, that's the same as the stay duration, the guardrail that we looked at earlier, right?

A.    Yes.

Q.    Okay.  And then you ask for their help to get a data picture about some of the issues listed below, correct?

A.    Correct.

Q.    Okay.  And you were asking for data

about the number of users that were between 13 and 17, correct?

A.    Yes.

Q.    And then you list -- I won't read -- I won't read the other ones, but you see you asked for a couple of additional data points there, right?

A.    Yes.

Q.    So let's go now -- flip over to the next page.

So Isha responds to you, and this is in December of 2022, it says, "Hi Jordan Furlong.  Can you please give more context as to why we want to aggressively curb minors' screen time?  Any thoughts on how this will impact user experience for minors?"

Do you see that?

A.    Yes.

Q.    And then ███████████████ responds and says, "Context: there is intensifying criticism at the highest levels of US and EU politicians about addiction-related harm among teens on TikTok."

Correct?

A.    Correct.

Q.    So in ██████ response he did not say that the reason TikTok was looking to aggressively curb minors' screen time was due to concerns about

teens' mental health, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  That's not what he said here, no.

BY MR. VANZANDT:

Q.    Okay.

A.    But I bet if you asked him, he would agree that's a concern.

Q.    What he wrote here back in 2022 was that it was due to criticism at the highest levels of US and EU politicians, right?  That's what he wrote?

A.    That's what he wrote.

Q.    Okay.

A.    Which was one part of the picture.

Q.    All right.  Let's look at the second part.  Let's go on to the next part of the picture.

He follows up by saying "In January, the Republican Party will gain a majority in the US House of Representatives and are likely to more aggressively push for limitations on TikTok."

Do you see that?

A.    Yes.

Q.    And then if we can scroll down a little further.  Josh then responds with two separate

links.  Do you see one of them -- the first one appears to be -- it's actually a TikTok link, but it's referencing a 60 Minutes video.

Do you see that?

A.    Yes.

Q.    I think we're going to come back and look at that later.

And then the next one, he lists -- it looks like something gallagher.house.gov.  Do you reference that to be a website from a US politician?

A.    Sounds like it.

Q.    And the title there at the end of that URL is "Gallagher TikTok digital fentanyl addicting our kids."

Is that what it says?

A.    Yes.

Q.    And then ▮▮▮▮ responds again and says, "Hence, GR has urgently asked what kinds of significant, noteworthy, industry-leading changes we might be able to announce quickly in the hope of reducing or redirecting some of this pressure."

Right?

A.    That's what he wrote, yes.

Q.    Let's go to page 6 of this document.

A.    Yes.

Q.    So in your message, you had proposed several hardline or hardcap restrictions.  Do you recall?

A.    Yes.

Q.    Here we have global -- I'm sorry, governmental regulations recommending limits that are not hard-capped, that teens can turn off, correct?

A.    I was laying out a bunch of ideas for the sake of a brainstorm.  And then separately from their perspective, they think this is a good idea.

Q.    Okay.  So let's go -- let's move forward about a week in time and pull up tab ST6.

        MR. VANZANDT:  This is going to be Exhibit 59.

            (TikTok-Furlong-59 was marked for identification.)

BY MR. VANZANDT:

Q.    Do you have a copy of that in front of you?

A.    I do.

Q.    Thank you.

        Do you see this is a document titled "Screen Time Restrictions for Minors"?

A.    Yes.

Q.    And if we look at the metadata on the back of this last page, I think this is dated December 22nd, 2022.  Do you see that?  Or 21st?

A.    Yes.

Q.    Okay.  And so that's about a week after the Lark that we were just looking at which was December 15th, correct?

A.    Correct.

Q.    Okay.  You see here on this document it lists that you're the author of this document?

A.    Yes.

Q.    Okay.  And do you recall drafting this document?

A.    Not very vividly, no.

Q.    Okay.  So let's go back and look at it, the first page.  Ill represent to you that the lawyers for TikTok and ByteDance produced this document to us as part of your work files.  Any reason to dispute that?

A.    No.

Q.    So I want to look at the Objective listed at the top of this document.  It says, "Identify opportunities to improve stakeholders' perception of TikTok as safe for teenagers."

Do you see that?

A.     Yes.

Q.     Okay.  So this does not say that the objective is to make TikTok safer for teenagers, correct?

A.     This does not say that, yes.

Q.     Okay.  Do you see that the next part of the document, I think, references maybe that same 60 Minutes video we saw earlier.

Do you see that?

A.     Yes.

Q.     It's titled "We give 'spinach' to kids in China," and maybe is that supposed to be "opium to kids in America"?

A.     Probably.

Q.     Okay.  And you're familiar with that 60 Minutes piece?

A.     Yes.

Q.     Okay.  And if we go on down -- scroll down the document.  It looks like you go on to list some different options for the team to consider.

Maybe it's the -- I'm sorry.  Page 2.  Let's go to page 2.  Do you see at the top there "Options Considered"?

A.     Yes.

Can I add more context to the

Objectives section, please?

Q.    You know, Mr. Furlong, I'd rather you answer my questions.  Your lawyer will have a chance to ask you questions later on.

A.    All right.  I think the full picture of this is important and so that we're not cherry-picking useful tidbits.

Q.    Thank you for that.  I'll move to strike that as nonresponsive to any question.

So let's look at the options that you laid out here.  It says the "Options Considered." And you list out -- just generally speaking in the document, you see that you list several options, the first one being labeled "Moderate" there.

Do you see that?

A.    I see it written there, yes.

Q.    Okay.  So I want to look at these a little out of order.  I'm going to actually start with number 2.

A.    Go ahead.

Q.    Okay.  So it says, number 2, "[Moderate]."  It says, "Build 'cool down period' feature that requires a 10-minute" -- with a question mark -- "10 minute break from the app after hitting a daily limit to discourage bypassing the

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD, Registered

Diplomate Reporter, CSR No. 14449 for the State of

California, the officer before whom the foregoing

deposition was taken, do hereby certify that the

foregoing transcript is a true and correct record of

the testimony given; that said testimony was taken

by me stenographically and thereafter reduced to

typewriting under my direction; and that I am

neither counsel for, related to, nor employed by any

of the parties to this case and have no interest,

financial or otherwise, in its outcome.

Dated this 13th day of April, 2025.

<%21527,Signature%>
_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449

# Exhibit 632B

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*******************************
                              Case No.
 IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
 ADDICTION/PERSONAL INJURY
 PRODUCTS LIABILITY LITIGATION
                              MDL No. 3047
    *******************************

 This Document Relates To:

 ALL ACTIONS

    *******************************


      SUPERIOR COURT OF THE STATE OF CALIFORNIA
                COUNTY OF LOS ANGELES
                UNLIMITED JURISDICTION

 *************************

Coordination Proceeding    Judicial Council
Special Title              Coordination Proceeding
(Rule 3.550)               No. 5255

SOCIAL MEDIA CASES         Judge:  Carolyn B. Kuhl
                           Dept. 12
 *************************


                   REMOTE VIA ZOOM

              VIDEOTAPED DEPOSITION OF

                   JORDAN FURLONG


                  April 12th, 2025
                    8:03 a.m.



Reported By:
MAUREEN O. POLLARD, CA CSR #14449, RDR

PROCEEDINGS

THE VIDEOGRAPHER:  This is the continuation of Jordan Furlong's deposition in the matter of Social Media Adolescent Addiction/Personal Injury Products Liability Litigation.

The court reporter is Maureen Pollard.

You may continue the deposition.

*    *    *

Whereupon,

JORDAN FURLONG,

being previously duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified further as follows:

EXAMINATION

BY MR. VANZANDT:

Q.    Good morning, Mr. Furlong.

A.    Good morning.

Q.    Do you understand that you are still under oath today?

A.    Yes, I do.

Q.    Okay.  And is there any reason this morning why you would not be able to give honest and accurate testimony?

A.    No.

Q.    Since we adjourned the deposition last night, have you done any additional preparation for your testimony today?

A.    No.

Q.    Have you reviewed any documents?

A.    No.

Q.    And have you discussed your testimony or this deposition with anyone?

A.    No.

Q.    Okay.  Thank you.

So I want to go back to where we left off yesterday, Exhibit 59.  Do you --

A.    I have it right here, yeah.

Q.    Okay.  Thank you.

So I know we were in the middle of looking at this document, and then we got sidetracked a little bit and looked at the focus groups.  But I want to finish looking at the options that we were talking about.

So if we could go to the second page, please.  I want to look at the top option there that's number 1.  Do you see that the first option that you listed here in this document was labeled "Moderate"?

Do you see that?

A.    I do.

Q.    It says, "Enable existing screen time management features by default for minors to address most common use cases of daily total usage (Daily screen time limit), taking breaks (Screen time breaks), and nighttime usage."

Did I read that correctly?

A.    Yes.

Q.    Oh, I didn't mean to leave off the last part.  It says, "Sleep reminders - currently A/B testing," right?

A.    Yes.

Q.    And this was the option that was actually recommended, is that correct?

A.    According to this, yeah.

Q.    Okay.  Now, did you recommend this, or does that recommendation indicate the group's decision?

A.    I don't remember.

Q.    Okay.  So if we look at the Impact Estimate, it says, "Enabling the daily screen time limit by default for Minors, on average, the estimated daily stay duration for Minors would be reduced by 10 minutes during weekdays, and

15 minutes during weekends."

Did I read that correctly?

A. Yes.

Q. Okay. And then if we go down, we see the pros and the cons of these options. It says, the pros, "Less Stay Duration impact than hard lined restrictions." Is that correct?

A. Yes.

Q. And then the cons listed, it says, "Less effective at drastically reducing screen time since interventions can be bypassed and therefore might not be a compelling change to regulators." Is that correct?

A. Yes.

Q. Okay. Now, this was December 2022 when TikTok was looking at these options. And is it correct that this option 1 that we just discussed is ultimately part of the screen time management features that TikTok chose to put in place and implemented in 2023?

MS. FOURNIER: Object to form.

THE WITNESS: Part of it is, yeah. We ended up enabling the daily screen time limit by default for minors.

///

BY MR. VANZANDT:

Q.    Okay.  So out of the options that we looked at on this page, TikTok chose to implement the screen time management feature that would have less impact on stay duration but would less effectively drastically reduce screen time use of minors, is that correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  Yes.  But there's several other reasons why it was a good idea, too.  It wasn't strictly about that.

BY MR. VANZANDT:

Q.    Okay.  Understood.  Thank you.

MR. VANZANDT:  Okay.  Can we pull up Tab JV-D12?

THE WITNESS:  Okay.

BY MR. VANZANDT:

Q.    And I'm sorry, Mr. Furlong.  I'll represent to you that I don't have a printed version of this to give to you so this is just a demonstrative exhibit.  This is based off Exhibit 58, and I superimposed the exhibit number there on the document.

Do you recall looking at this?

A.    Yes.

the platform, correct?

A.    Right, that would have -- unless it was through the Family Pairing experience, but yeah.

MR. VANZANDT:  Okay.  I want to go to Tab ST9, please.  I'm going to mark this as Exhibit 63.

(TikTok-Furlong-63 was marked for identification.)

THE WITNESS:  I have it.

BY MR. VANZANDT:

Q.    Okay.  Do you see that this is a Lark message chain labeled "[P&C] U18 screentime data"?

A.    That's correct.

Q.    And I'll represent to you that TikTok and ByteDance's lawyers produced this to us from your work files.  Any reason to dispute that?

A.    No.

Q.    And you see that you participated in this message?

A.    Yes.

Q.    Okay.  What is -- at the top there in the brackets, what does "P&C" mean?

A.    Privileged and confidential.

Q.    Okay.  And so Sandeep Grover starts off by sending a message.  And what was his role?

A.    He was the head of product for trust and safety.

Q.    Okay.  And so looks like maybe he starts off with the word "and," so I'm not sure what "the final step of the funnel" refers to.

But if we go on past that, it says "of the users who" -- strike that.  Let me start over.

The date of this document, let's start there.  The date of this document is November 29, 2023.

Do you see that?

A.    Yes.

Q.    And this would have been approximately eight months after the 60-minute screen time default for minors was put in place?

A.    I'm not exactly sure when it was launched, but it looks like it was after that, yeah.

Q.    Okay.  So just to be fair, it would have been -- you would agree it would be several months after it would have been launched?

A.    Yeah, at least a few months, yeah.

Q.    Okay.  Thank you.

So the question Mr. Grover asked starting with the second sentence, he says, "Of the users who extend after 60 minutes are hit, what

percentage are done within additional 30 minutes (our current cool off period) and what percentage would spend more than 30?"

Do you see that?

A.    I do, yeah.

Q.    And then below that you invite ██████ --

A.    ██████

Q.    -- ██████ thank you, to the chat.  And what was ██████ s role?

A.    She was a data analyst.

MR. VANZANDT:  Okay.  And then if we scroll down, I want to go to -- we'll skip ██████ response.  Go down to the message below that from ██████, please, just below where it says "Title."  I'm sorry.  Yeah, keep going.  Keep going, please.  I'm sorry.  Yeah, that's what I'm looking for.  Thank you.

Q.    So do you see that on November 30th of 2023 ██████ responds to Sandeep's message?  Do you see that?

A.    Yes.

Q.    Okay.  And it says, "Among user records we can find from the log table, 85 percent stay

within additional 30 minutes after hitting,

11 percent stay between 30 and 60 minutes and 4

percent stay more than 60 additional minutes."

          Do you see that?

     A.    Yes.

     Q.    Okay.  And this is dated several months

after the screen time -- the default screen time

limit for minors was put in place indicating that

minors were continuing to use TikTok past the

60-minute limit, correct?

     A.    Yes.  I think one thing that's not

obvious here, though, is the 85 percent number, it's

a pretty big drop-off from 85 percent to 11 percent

for the next interval of usage.

          And maybe one way to look at that is

there's a lot of people that could be dropping off

within a few minutes after seeing the limit, but we

would need to dig into that to better understand

that, yeah.

     Q.    Okay.  So what that's saying, the

85 percent, is that there's 85 percent of the users

who are hitting the screen time limit that are then

staying on somewhere between 1 and 30 minutes, is

that fair?

     A.    Yeah, or like .1 seconds and

30 minutes.

Q.    Okay.

A.    It looks to me like there's this kind of front-loaded distribution because there's such a big drop-off in the subsequent intervals of time.

Q.    Regardless of the 85 percent, the 11 percent were staying beyond 30 minutes, is that correct?

A.    That's what it looks like, yeah.

Q.    Okay.  And then 4 percent beyond 60?

A.    Yes.

Q.    Bear with us just a second, please.

Mr. Furlong, is it fair to say that TikTok understood that relying on teens to limit and control their own screen time would not provide teens the help that they needed?

MS. FOURNIER:  Object to form.

THE WITNESS:  I would slightly rephrase to say our perspective was that we thought it was important to provide a more supportive experience for teens and to proactively nudge them towards using features and experiences that could help them.

///

BY MR. VANZANDT:

Q.    As we looked at yesterday from the focus groups that TikTok conducted, at least the teenagers in those focus groups indicated that they desired something other than themselves to limit their screen time.

Do you recall that?

A.    Yes, I remember that.

Q.    And then TikTok knew from internal data that teenagers liked the executive function to control their own screen time, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  That was an impression that I can say that I had in my role.

MR. VANZANDT:  Let's pull up Tab ST8. This is going to be Exhibit 64.

(TikTok-Furlong-64 was marked for identification.)

THE WITNESS:  I have it here.

BY MR. VANZANDT:

Q.    Do you see that this is a document titled "[A/B Analysis] Screen Time Dashboard & Screen Time Breaks"?

A.    Yes.

Q.    And I'll represent to you that TikTok

and ByteDance's lawyers produced this to us as being from your work files.  Any reason to dispute that?

A.    No.

Q.    And did you draft or prepare this document?

A.    I believe so.

Q.    Okay.  Let's actually, if we could, go look at the metadata on the last page, please.  And I'll represent to you that according to this -- it does not have you as the author -- but do you see the date of the document, created May 31, 2023?

A.    Yes.

Q.    Okay.  And from your recollection, does that sound like the time frame this document would have been created?

A.    I would have expected that to be earlier.

Q.    Okay.  And I will represent to you -- you may be right about that.  So if we can go to the document, there is --

A.    Because it looks like the create date is after the last modified date, which doesn't make sense.

Q.    Yeah.  That's what I was confused about.  Thanks for pointing that out.

If you actually go to page 5, Bates ending 904.

A.    Yeah.

Q.    Under where it says "Analysis."

A.    Yeah.

Q.    It says it's analyzing data and analysis from April '22 to May '22?

A.    Yeah.

Q.    So is that closer to the time frame that you would have envisioned this document being from?

A.    Yeah, because this is one of, like, the big first things that I launched, so it should have been like closer to when I took the role on.

Q.    Okay.  Thank you.  Appreciate that.

So if we could now go back to the first page of the document.

I'm sorry, are you ready?

A.    Yeah.  Go ahead.

Q.    Okay.  Thank you.

So if we look -- kind of focus on the first two-thirds part of the document, it starts off with an Executive Summary, and it says, "We are providing users with a dashboard, opt-in weekly notifications, and opt-in break reminders for users

who want to better manage their time spent on TikTok," is that right?

A.    Yes.

Q.    And then the Hypothesis is, "By providing these more valuable tools and more broadly notifying users of our screen time management offering, we will see an increase in feature adoption and awareness."

Do you see that?

A.    That's right.

Q.    And then below that it says "Expectations Met."  And is it fair to say that this is reporting the results of the A/B testing on these features that we just discussed?

A.    Yes.

Q.    Okay.  And so it says that there was a "Slight drop in stay duration (.07 percent) as we expected, but no impact to other core metrics (retention, publish, active days)."

Do you see that?

A.    Yes.

Q.    Then it goes on to say, "This aligns with leadership's guidance (1) keep stay duration impact within a reasonable threshold (2) no impact to retention."

Do you see that?

A.    Yes.  I think there's a more helpful way to analyze this if you would like me to.

Q.    Okay.  Let's -- if you don't mind, let's finish going through this first part of the document.

A.    Sure.

Q.    And then the next sentence says, "This drop in stay duration is correlated with L3 users and medium to heavy users of the platform."

Do you see that?

A.    Yes.

Q.    Okay.  Then if we go to -- I'm going to come back to this.  Let's skip forward to page 903, Bates ending 903.

MS. FOURNIER:  Counsel, we don't have -- our copies don't have it, so just give us a minute once you pull up the page that you want to look at and he can visually figure out where you are.

TRIAL TECH:  Page 4 of the document.

MS. FOURNIER:  Thank you.

MR. VANZANDT:  Apologies for that.

MS. FOURNIER:  No worries.

THE WITNESS:  Yeah.  I see it now.

BY MR. VANZANDT:

Q.    So I want to just focus on the chart there in the middle.  Those are the age bands that we talked about yesterday, is that right?

A.    Yes.

Q.    And so this is saying for L1, those are users below 15 -- and to be fair was that defined generally 13 to 15?  Is that how it would have been?

A.    Yes.

Q.    Okay.  And so based on the data that's being reported this time from 2022, it's saying that the average daily usage for users between 13 and 15 was 1.74 hours.

      Do you see that?

A.    Yes.

Q.    And then it has the different, maybe not quartiles, but the different percentages there on the right with the bottom 50 percent being 1.28 hours, is that right?

A.    Yes.

Q.    And then if we go to the upper 90 percent, so would it be fair to say like for the top 10 percent of users in that age category?  Would that be a fair way to look at it?

A.    Roughly, yes.

Q.    Okay.  So for the top 10 percent of users between -- ages between 13 and 15, it's reporting 4.04 hours per day average usage, correct?

A.    Looks like it from this chart, yeah.

Q.    Then if we go down below that, L2, for users ages 15 to 17 it's reporting average daily usage of 1.23 with the lower range being .81 hours per day and the upper range being 2.96 hours per day, correct?

A.    Yes.

Q.    Okay.  So I want to -- with that in mind, I want to go back to the first page.

A.    Sure.

Q.    If we could zoom in to the middle of it.

Do you recall from the findings of this study that there was -- that there was a drop in stay duration that was correlated with L3 users? And L3 would have been those between 18 and 25 years old, right?

A.    Yeah.  I'm not exactly sure what that means from a data perspective, though.  I don't exactly remember.

Q.    Okay.  So let's go just below it now. Do you see the next bullet point, it says, "An

explanation for no correlation with L1 plus L2 is that minors do not have executive function to control their screen time, while young adults do."

Do you see that?

A.    Yes.

Q.    And then in parentheses there it says, "this is supported by our partners at Stanford Brainstorm," correct?

A.    Yes, that's what it says.

What I would additionally want to look at, though, to understand this is if we're looking at an aggregate number, like the average impact across all users, then the change in stay duration might not be detectable.

What I would -- so I would want to drill in to look at for the people who did uptake this, because we're in this early stage of growing adoption and spreading awareness of these tools, what was the impact to their usage.

But because it was such a large user base, the average movement is probably a lot smaller than the people who actually saw and uptook these features.  So I think that would be a helpful lens to get the full picture of the impact of the launch.

MR. VANZANDT:  Bear with me just a

second.  I do want to say motion to strike for everything past "Yes, that's what it says."

We can pull that down, please.

So I want to go to Tab ST 10, please.  This will be Exhibit 65.

(TikTok-Furlong-65 was marked for identification.)

MS. FOURNIER:  This also came to us without Bates numbers.

MR. VANZANDT:  Apologies for that.  Just for the record, then, let me please read in the Bates number for this document.  It's TIKTOK3047MDL-197-04799946.

THE WITNESS:  I have the document.

BY MR. VANZANDT:

Q.   Do you see this is a document labeled "[P&C]" -- that's private and confidential?

A.   Privileged and confidential.

Q.   Privileged and confidential.

-- "U18 Balanced Engagement Index (BEI)."  Is that correct?

A.   Yes.

Q.   I'll represent to you that TikTok and ByteDance's lawyers produced this to us as being --

well, strike that.

I'll represent that TikTok and ByteDance lawyers produced this to us as part of this litigation.  Any reason to dispute that?

A.    No.

Q.    Okay.  And the dates are messed up on the metadata so we're going to skip that.

I want to actually look on page 2.  I just want to direct you to a comment, the bottom right.  Do you see that you are -- somebody added you in this document in a comment there?

A.    Yeah, I see that.

Q.    So you would agree that you would have reviewed and participated in this discussion?

A.    Looks like it, yeah.

Q.    Okay.  And then the document doesn't give us -- the metadata doesn't give us a date, but do you see that your comment -- actually, if we go to page 13, I'll just try to orient us with a date.  Page 13 of this document, and it's the one where you have a comment on the bottom right.  It's comment 38 if that's helpful.

A.    Oh, yeah, I see it.

Q.    Okay.  So I'm really just bringing us here just to look at the date.

Do you see that the date of your comment on this is July 7, 2023?

A.    Yes.

Q.    Okay.  And so this is a document that you reviewed and participated in as part of your work with ByteDance and TikTok, is that correct?

A.    Yes.

Q.    Okay.  And the date of your comment is July 2023.  Do you have any other recollection as to the date of this document?

A.    No, not off the top of my head.

Q.    Okay.  So if we can go back to the first page, Mr. Furlong, I'd like you to look -- just kind of scroll maybe the first two or three pages, just kind of look big picture.  I'm not asking you to read it all.

MR. VANZANDT:  Vince, if we could move forward to page 2 and 3 real quick.  Keep going, please.  I'm sorry.  Just keep scrolling through, Vince, if you don't mind.  Okay.  That's good.  There.

Q.    Mr. Furlong, do you see there's some boxes on the right side of maybe page 4 or 5 that say "Redacted - Attorney Client"?

A.    Yeah, I do.

Q.    So those images would not have existed in this document back when you reviewed it, correct?

A.    Sorry.  Say that one more time.

Q.    Sure.  Let me just say this.  Well, strike that.

Those redactions, those boxes that say "attorney client," those would not have existed when you were reviewing this document internally at TikTok, correct?

A.    I don't believe so, no.

Q.    Okay.  And so other than the redacted – attorney-client privilege documents, do you have any other reason -- do you have any reason to believe that the content of this document has been altered in any way?

A.    No, I don't have a reason to believe that.

Q.    Okay.

A.    Sorry.  There's also other redacted comments that -- yeah, on the next page, for example, but, yeah, same thing.

Q.    Okay.  Thank you.

So I want to go to page 3 of the document.  It's Bates ending 49, which I know does not help you right now.  But page 3 of the document

Jordan Furlong                                          438

where it says "Success Metric Proposal."  Do you see that?

A.    I do.

Q.    And then below that there is --

MR. VANZANDT:  Just below that, Vince, where it says "2023 Q3 Metric."

Q.    Do you see that?

A.    Yes.

Q.    Okay.  And then there's some data that we're going to look at below that.

Would it be fair to say that the data that's being analyzed in this portion of the document would be data that was pulled from Q3 of 2023?

A.    Probably, but I can't tell because I can't see the data.

MR. VANZANDT:  Okay.  Can we back out a little bit?  Yeah.

Q.    Actually the data we're going to look at is on the following page where it says "Minor Behavior Study."

Do you see that?

A.    Yes.

Q.    Okay.  So we just looked at the previous page that referenced data from Q3 of 2023.

Reviewing this data, do you have any other recollection as to the date that this data may have been pulled from?

A.    No.  And a lot of the -- like a lot of this work and data analysis was done by the data team.  It was more of a report that they did and then we reviewed together to figure out how can we create this metric.

Q.    Okay.  And so as a TikTok employee reviewing this document, what would you have -- what -- strike that.

I'm just trying to figure this out here where you believe this data where it says "On average minors spend 1.8 hours per day," do you -- are you able to look at this document and determine when that data was analyzed?

A.    Not based on what I'm seeing here, no.

Q.    Okay.  And you could -- you have the document there with you.  If you don't mind, if you could just kind of -- if you could just kind of look through and see if there's anything that refreshes your recollection as to when that data comes from.

(Witness reviewing document.)

A.    There's mention on this page about August '23.  That's the page after the redacted

comments.  It says "Distribution data range, August '23," so probably somewhere around there.

Q.    Okay.  So would it be fair to say that the data being analyzed in this document is from somewhere around August of 2023?

A.    That would be my guess.

Q.    Okay.  And that --

A.    Yeah.  It made mention of that, yeah.

Q.    Okay.  Thank you.

So August '23 would be a few months after TikTok had implemented the default screen time limit for minors earlier in the year, is that correct?

A.    Yes.

Q.    Okay.  So let's go back to page 4 of this document, and I believe Vince has it up on the screen here.

And this is internal data analysis from TikTok, correct?

A.    Yes.

Q.    So I want to look at the first bullet point.  It says, "On average, minors spend approximately 1.8 hours per day on our platform." Is that right?

A.    Yes.

Q.    You'll agree that that little squiggly line means approximately?

A.    Yes.

Q.    Then it says, "3 percent of minors are heavy users whose daily use duration is more than six hours."

Do you see that?

A.    Yes.

Q.    And do you recall yesterday we looked at a document where TikTok referred to users who used TikTok more than six hours a day as objectively harmful usage?

A.    Yeah.  That was phrasing that I used to try to put a line in the sand of what too much time could be in a way that people could generally agree with it.  And that was based off of two reports that I'd found online.  But unfortunately there was not, like, a generally accepted threshold at the time.

Q.    Okay.  If we go down to where it says "Excessive users."

Do you see that?

A.    Yes.

Q.    It says, "Excessive users are users who continuously use TikTok for more than 80 minutes at day or more than 60 minutes at night."  Is that

that down.

Vince, I want to pull up Exhibit 59, please.

BY MR. VANZANDT:

Q.    I know we looked at this exhibit before, but I want to look at a part we did not review the first time around.

So if you could go to page 6 of the document.  I believe it might be the last page or next to last page.  There at the bottom where it says "Douyin"?

A.    Yes.

Q.    Okay.  So you see where it says "Douyin's stance"?

A.    I do.

Q.    Am I pronouncing that correctly?

A.    Douyin.

Q.    Douyin?

A.    Yes.

Q.    Okay.  So Douyin is a social media app that is also owned by ByteDance, is that correct?

A.    Yes.

Q.    And Douyin operates only in China, is that correct?

A.    I believe so, yes.

Q.    Whereas TikTok is available outside of China, is that correct?

A.    Yes.

Q.    Both platforms are owned by the same company, ByteDance?

A.    Yes.

MR. VANZANDT:  Okay.  So let's pull up Tab JV-B10.  This will be Exhibit 66.

(TikTok-Furlong-66 was marked for identification.)

BY MR. VANZANDT:

Q.    Mr. Furlong, this is a demonstrative I've created just to help us visualize this a little bit.

Do you recognize the ByteDance logo there at the top?

A.    Yes.

Q.    And then on the left side, do you see Douyin's logo on the left?

A.    I see Douyin on the left, yeah.

Q.    And then do you recognize TikTok's logo on the right?

A.    Yes.

Q.    And then the description I have beneath both of those is accurate, correct?  Douyin is

available in China only and TikTok is available outside of China, correct?

A.    Yeah.  I don't know what the Douyin logo looks like or the -- so yeah.  The other parts you said are right, yeah.

Q.    Okay.  Thank you.

Douyin is essentially the Chinese version of TikTok, right?

A.    There's a lot of similarities between the platforms, yes.

Q.    For example, the platforms are both short form video platforms, correct?

A.    Yes.

Q.    They both have For You pages, infinite scroll, notifications, correct?

A.    I assume Douyin does.  I've never used it, so I'm not 100 percent sure.  Yeah.

Q.    You did, though, internally analyze the screen time management features that Douyin implements on their app, correct?

A.    Yeah.  Just -- you know, just in general, like a good practice when you're evaluating your roadmap and what to build is looking at other similar products, so we looked at, you know, Facebook and Instagram and all these other ones as

Jordan Furlong                                        451

well just to get a sense of what was going on with other apps.

Q.    Facebook and Instagram, Snap, those are not owned by ByteDance, right?

A.    Correct.

Q.    Okay.  So I want to go back now to Exhibit 59 where we just were.  So here in this document it says "Douyin's Stance."  Below a hyperlink it says, "Screen time management feature set overview.  Important to note that they use...age model to deliver interventions," right?

A.    Yes.

Q.    And the "they" is a reference to Douyin, correct?

A.    Sounds like it.

Q.    Okay.  And so the reason it's important to note that they use age modeling to deliver interventions is because that's different from what TikTok does, right?

A.    I don't remember why I wrote that's important to note as much as -- yeah.

Q.    Okay.

A.    Just noteworthy, yeah.

Q.    Okay.  At the time when you wrote this, did TikTok use age modeling to deliver youth

interventions?

A.    I'm not sure of all the ways that age modeling is used.  I never directly worked on it.

Q.    As a product manager in the trust and safety department, do you know one way or another whether age modeling was used at TikTok at the time you were at the company?

A.    I know that it was used at TikTok, yes.

Q.    Do you know if it was used to deliver minor usage interventions?

A.    I don't believe it was used for screen time features that I worked on, but yeah.

Q.    So age modeling essentially uses technology to analyze images of a user, other characteristics about their profile to estimate their true age, is that right?

A.    I don't know.  I didn't work on the models.

Q.    Do you have any understanding as to what age modeling is?

A.    At a high level, it's used to estimate ages is my understanding.  But I don't know the techniques or datasets they looked at to make those estimates.

Q.    Okay.  But you write here that Douyin

does, in fact, use age modeling to deliver interventions, right?

A.    That's what's written here, yeah.

Q.    And then below that it says -- it lists some screen time management tools.  And then if we go over to the next page it's going to list those out in bullet point format.

Do you see the first tool listed here -- the first tool of Douyin that's listed here is a "Proactive reminder video that shows after 40 minutes of cumulative usage or 20 minute single session."

Do you understand that?

A.    Yes.

Q.    Okay.  And do you -- well, strike that.

Do you understand that to be similar to TikTok's Take A Break videos?

A.    Yes.

Q.    And do you understand that at Douyin users cannot just swipe past these proactive reminder videos?

A.    I don't know that.

Q.    Okay.  The next one is "Toast reminder after one hour of cumulative time during the week or two hours of cumulative time on the weekends."

Do you see that?

A.    Yes.

Q.    Now, a toast reminder is typically something that pops down over the top of the screen for a user, right?

A.    Yes.

Q.    Okay.  So based on this, if a user used TikTok for an hour during the week, they would get a reminder that popped down on their screen about the amount of time they had used?

A.    This is for Douyin users it sounds like, not TikTok.

Q.    That's right, Douyin.

A.    That's what this sounds like, yes.

Q.    Okay.  And the next one is a "Full screen reminder that requires a 15 minute break after."

Do you see that?

A.    That one, yes.

Q.    Okay.  Let me strike that and start over.  I skipped one on accident.

So the next one is "Full screen reminder that a user can swipe through," right?

A.    Yes.

Q.    So that would be -- is it your

understanding that that would be -- something would come over the screen of the user that they see, the full screen, but the user could swipe that away and keep using it, right?

A.    Yeah.  There may be more to it, but that's the essence of it, yeah.

Q.    Okay.  Then the next one is "Full screen reminder that requires a 15 minute break after," right?

A.    Yes.

Q.    And that sounds similar to the pull-down feature that we looked at yesterday that was -- that Stanford Brainstorm told you about, correct?

A.    Sounds similar, yeah.

Q.    And that's something here -- it's saying that's something Douyin actually has, right?

A.    Yes.  But, again, I didn't get to, like, use the app because it's not available here, so I couldn't see these, so I don't know the specifics of exactly how they worked, but yeah.

Q.    But based on your understanding that -- this description, does that make you believe that's how it works?

A.    That would be my guess, yeah.

Q.    Okay.  And then the last one here is a mask reminder, and it says, "can't be bypassed by the user," right?

A.    Yes.

Q.    Okay.  Now, mask reminder is not a reminder to wear a mask, correct?

A.    I doubt it.

Q.    Okay.  But that's something that -- is it your understanding that's something that would mask or block the screen that the user could not bypass?

A.    Yes.

Q.    And that would essentially serve as a hard cap on users of Douyin, right?

A.    Sounds like it.

MR. VANZANDT:  I want to go now to Tab DY-1.  This will be Exhibit 67.

(TikTok-Furlong-67 was marked for identification.)

THE WITNESS:  I have it.

BY MR. VANZANDT:

Q.    Do you see that this is a document titled Douyin DY Notes + Questions?

A.    DW notes, but yeah.

Q.    DW notes, I'm sorry.

And so DW is digital wellbeing, right?

A.    Yes.

Q.    And I'll represent to you this is a document that TikTok and ByteDance's lawyers produced to us in this litigation as being from your work files.  Do you have any reason to dispute that?

A.    No.

Q.    Do you see on the metadata sheet your name listed there as one of the custodians?

A.    Yes.

Q.    And the date of this document there, it said it was created September 29, 2021, correct?

A.    Yes.

Q.    So we can go back to the first page of the document.

Do you have any reason to believe that the contents of this document have been altered in any way?

A.    No.

Q.    So if we look at the middle part of the screen, do we see the same list of features that we just discussed?

A.    It's different phrasing, so I'm not exactly sure if it's the same.  But there's some that look more similar than others, yeah.

Q.    Fair enough.

And so the list of features here and those that we just discussed from the last document were Douyin features that are being discussed in TikTok internal documents, correct?

A.    Yes.

Q.    Okay.  And do you understand -- let me just ask this.

Do you remember the background of this particular document?

A.    I think just to understand what Douyin has and if there's anything to learn from that and how we might translate that into TikTok.

Q.    Okay.  So if we could go -- if we pull back away from that, I think there's something that says "Questions" at the bottom.  I just want to look all the way over to the right.

Do you recall that you had asked a series of questions to a ByteDance employee that works on Douyin, and then that individual answered the questions for you?  Do you recall that?

A.    I remember that that happened, but I don't remember the specifics of the conversation because it was so long ago now.

Q.    Okay.  And do you see in the comment 1

there to the right, it says, "Answers from [REDACTED]"?

A.    [REDACTED]    yeah.

Q.    [REDACTED].    Okay.

And do you understand that to be an individual who works -- who was a ByteDance employee that worked on Douyin?

A.    At least at that time, yes.

MR. VANZANDT:    So we can pull out of that, please.

Q.    I want to look at some of this discussion under "Questions" where it says "Strategy."

Do you see there that the question asked is -- well, the first one is kind of a statement.  "Key distinction in our work is Douyin's focus on addiction, while ours is on agency."

Do you see that?

A.    Yes.

Q.    And the "our" there in that sentence is reference to TikTok, correct?

A.    Yes.

Q.    Then the question is asked, "Was agency/choice as the optimization function considered at the beginning of the Douyin project?"

Right?

A.    Yes.

Q.    Okay.  So just below that you see the bullet point that indicates that that's a response to the question?

A.    Looks like it.

Q.    Okay.  So now the "our" that we're going to be looking at is a reference to Douyin, right?

A.    Yes.

Q.    It says, "Our original intention is that Douyin, as a large short video platform, should shoulder responsibilities, so as early as 2018, Douyin launched a time management tool to guide users to 'allocate time rationally and to use Douyin healthily.'"

Do you see that?

A.    Yes.

Q.    Do you agree that a social media company who offers its platforms to the public, especially to youth, should shoulder social responsibilities?

A.    I believe so, yes.

Q.    Here it's indicating that Douyin launched time management tools as early as 2018, right?

A.    Yeah, according to this text, yeah.

Q.    And that's the same year that TikTok was launched in the United States, correct?

A.    I believe so, yes.

Q.    Now, I want to go down to another question that you asked, the main bullet point in the middle that says, "What are your success metrics aside from compliance?"

It says, "Douyin anti-addiction has two goals, the first is aimed at the whole population, hoping to enhance the user's sense of control, enhance the public's positive perception of Douyin's efforts to make users not indulge in short videos," right?

A.    Yep.

Q.    Then I want to skip down to the last full sentence of that same paragraph.  So it said there was two goals, and it just mentioned the first.  It says, "The second is aimed at special groups, including teenagers" --

MR. VANZANDT:  Can you underline "teenagers," Vince?

Q.    -- and middle-aged and elderly people, to truly and effectively control the extreme length of time and try their best to help them avoid the

problems brought about by long-term brush Douyin."
I don't know what that means.  Maybe that's a
translation error.

A.    Yeah.  This message may have been fully
translated from Chinese to English which would
explain some of the awkward phrasing.

Q.    Okay.

A.    Yeah.

Q.    And that was a feature of Lark that
would automatically translate from Chinese to
English?

A.    Yes.

Q.    Okay.  If we now see the paragraph
below that, it says, "Therefore, the core index of
measurement is to measure users' perception of
Douyin's efforts to prevent addiction for the whole
population, and will cooperate with research and
measurement."

Then it says, "For special groups" --
and recall special groups include teenagers, right?

A.    Yes.

Q.    "For special groups, it is to reduce
the proportion of users who use Douyin for a long
time."

Do you see that?

A.    I do, yeah.

Q.    Okay.  So according to this document, one of the stated goals of Douyin's well-being efforts was to reduce the proportion of users who use the app for a long time, correct?

A.    That's right.

Q.    And that includes teenagers, right?

A.    Yes.

MR. VANZANDT:  So I want to pull up demonstrative exhibit X1.  This is one I'm just going to have on the screen.  Mark this as Exhibit 68.

(TikTok-Furlong-68 was marked for identification.)

BY MR. VANZANDT:

Q.    Mr. Furlong, can you see that on the screen?

A.    Yes.

Q.    Do you see on the left is -- strike that.

I'll represent to you this is a demonstrative I've created.  On the left is Exhibit 46 that we looked at yesterday.

And do you recall the statement that we looked at from your supervisor at the time that

efforts was to reduce the amount of time special groups, including teenagers, spend using on the app, correct?

A.    Yes.

MR. VANZANDT:  Okay.  We can pull that down.

We've been going a little bit over an hour.  Why don't we take a five-minute break.

MS. FOURNIER:  Okay.

THE VIDEOGRAPHER:  The time is 9:12. Off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 9:24. We're back on the record.

BY MR. VANZANDT:

Q.    Mr. Furlong, I'd like to go back to Exhibit 67 that we were reviewing together.

A.    Sounds good.

Q.    The bottom of the third page and the discussion will spill over to the fourth page.

A.    All right.  I'm there.

TRIAL TECH:  I'm sorry, Counsel, what exhibit?

MR. VANZANDT:  67.  That's it.  So

actually if we could see the bottom of the page just above that just to orient us.

BY MR. VANZANDT:

Q.    Okay.  Do you see at the bottom, Mr. Furlong, in bold it says "Execution," and the question asks, "What are the time management tools? Results?"

Do you see that?

A.    Yeah.

Q.    Okay.  And so spilling over to the next page, the response from the individual from Douyin says, "For teenagers (18 under)" -- do you understand that to mean under 18?  Or how would you interpret that?

A.    Yeah, that sounds right.

Q.    Okay.  So "For teenagers under 18, the methods are 1) real-name authentication guidance for users who may be teenagers, and enter the youth mode after real-name authentication."

Let me just pause there.

MR. VANZANDT:  We can leave it on the screen, please.

Q.    So it says that for users that may be teenagers that they -- strike that.

It says here that Douyin uses real-name

authentication.  Do you understand what real-name

authentication is?

A.    No, I don't.

Q.    Okay.  Did you ever inquire with Douyin

as to what real-name authentication is?

A.    I don't remember.

Q.    Do you know whether TikTok ever used

real-name authentication?

A.    I don't know what it is so I don't

know.

Q.    Okay.  When users are signing up for

TikTok accounts, do they have to enter a real name,

or can they enter in whatever name they want?

MS. FOURNIER:  Object to form.

THE WITNESS:  I'm not sure what

restrictions there are putting in a name

when you sign up.

BY MR. VANZANDT:

Q.    Okay.  According to this document,

Douyin does not rely only on the self-reported age

of the user.  Would you agree with that?

A.    I don't know.  Like I said, I haven't

used the app and wasn't -- yeah, we were talking

about something not related to sign-up.

Q.    Okay.  But in order to know which users

to implement protection features, you have to know who is a minor, right?

A.     Yes.

Q.     And you would agree from the digital wellbeing perspective that the tools you and your team are building can only be helpful to the individuals who are identified as minors on the app?

A.     No.  We built some features to be default on for minors, but most if not all of the features we built were available to everybody.

Q.     So let's take, for example, the 60-minute screen time default limit we talked about for users between 13 and 17.

If an individual creates -- a 13-year-old creates a profile but then enters a date of birth showing they're 21, their profile would not have the 60-minute default limit, correct?

MS. FOURNIER:  Object to form.

THE WITNESS:  If they are able to do that, yes, then the feature would go off of the -- yeah, I believe that's right.

BY MR. VANZANDT:

Q.     And do you understand that users of TikTok are, in fact, able to do that?

A.     I'm not exactly sure how those

guardrails work.  I didn't work on that.

MR. VANZANDT:  Okay.  Let's pull up a document then.  It's Tab DY-3.  That will be Exhibit 69.

(TikTok-Furlong-69 was marked for identification.)

THE WITNESS:  I have it.

BY MR. VANZANDT:

Q.   Do you see that this is a document entitled "Privileged and Confidential Trust and Safety"?  Is that what's in the brackets?

A.   Yes.

Q.   Privileged and confidential means that it's not to be released outside of TikTok, is that right?

MS. FOURNIER:  Object to form.

THE WITNESS:  Honestly I'm not exactly sure what that means.

BY MR. VANZANDT:

Q.   Okay.  Then it goes on to say "Feature - Minor Safety 2022 H2 Roadmap," right?

A.   Yes.

Q.   I'll represent to you that TikTok and ByteDance's lawyers produced this document to us as part of this litigation.

And I want to direct your attention to page 3 of the document.

A.    Okay.  I'm there.

Q.    I'm sorry.  At the very bottom of the document it says, "Foundation:  Age assurance."

Do you see that?

A.    Yes.

Q.    It says, "In order to protect minors, we need to know who on our platform is a minor."

Would you agree with that?

A.    Yes.

Q.    It says, "This pillar is focused entirely on validating users' ages and giving them the tools to verify their age when we get it wrong, or require it for areas with" high risk.

Do you see that?

A.    "Higher risk," yes.

Q.    "Higher risk."  Thank you.

If we go now to page 8.  It's going to be Bates ending 862.  Do you see in the middle where it says, "1.1 Age Determination"?

A.    What was the Bates number?

Q.    862 I believe is the Bates number.

A.    Okay.

Q.    Yeah.

A.    By the way, I'm not sure if it was implied, but I don't think I wrote this, or I'm not sure if I wrote it or -- so...

Q.    Okay.

A.    Yeah.

Q.    So let's look in the middle there where it says "1.1 Age Determination (Account ban)." Below that it says, "While users create accounts on TikTok, they are shown a screen to enter their date of birth (age gate)."

Right?

A.    Yes.

Q.    "Using this data to personalize the user experience on TikTok is a default mode of operation until date."

And you recall the date of this document was 2022?

A.    Yeah.

Q.    And the next sentence says, "However, relying on age gate turns out to be less effective because there is no way for us to ensure that users are accurately entering their true date of birth."

Right?

A.    Yes.

Q.    So, Mr. Furlong, you would agree that

in order to properly protect minors on the platform,
it's important for TikTok to know who actually is a
minor on the platform?

A.    Yes.

Q.    Okay.  Thank you.

MR. VANZANDT:  We can pull that down.

I want to go back to Exhibit 67,
please.  Go back to the third page that we
were on.  Yeah, the top part there, the
first paragraph where we left off.

BY MR. VANZANDT:

Q.    And I want to continue reading to where
I got.

So continuing reading there after the
highlight, it says, "In the youth mode, it can only
be used for 40 minutes a day."

Do you see that?

A.    Yes.

Q.    The "it" it's referring to is the
Douyin app, right?

A.    I believe the youth mode of Douyin,
yes.

Q.    Okay.  It says, "For users with
real-name authentication of 14 to 18, after using it
for more than a period of time, a blocking layer

appears (users need to continue to use Douyin after a period of forced rest)."

            Do you see that?

    A.    Yes.

    Q.    So that's indicating that for users on Douyin, another social media app owned by ByteDance, that the users between 14 and 18 years old have periods of forced rest after using the app for a period of time, right?

    A.    That's what it sounds like, yeah.

    Q.    That also sounds like the Stanford cool down feature that we talked about yesterday, right?

    A.    Yes.

    Q.    That's a feature I think you said you supported, that you loved, and that was never implemented across the board for minors of TikTok, correct?

    A.    Correct.

            MS. FOURNIER:  Object to form.

BY MR. VANZANDT:

    Q.    I'm sorry, what was your answer?

    A.    That's right.

    Q.    If we keep going just below that, it looks like that the forced rest was not just for minors.  So if we see it says, "For the middle-aged

and elderly (50 plus), the method is to let users who use Douyin for a long time have a reminder mask (users can manually turn off) and a block mask (users need to continue to use Douyin after a period of forced rest)."

Do you see that?

A.    Yes.

Q.    Then it says, "For all users, the main means are reminder video, top reminder push, time management tools, reminder mask layer, all of which are filled with exquisite, interesting and meaningful content and styles, while cooperating with the dissemination and publicity inside and outside Douyin Station."

Do you see that?

A.    I see that, yes.

Q.    Can we go now to the next bullet point below that -- actually the next main question there says, "Mask reminder - can't be scratched away?"

Do you see that question?

A.    Yes.

Q.    And then the response to the question says -- it asks, "Are you asking about the blocking layer here?  The blocking layer cannot be crossed away, and users need to take a break before they can

continue to use Douyin.  The blocking layer is mainly used for teenagers, and middle-aged and elderly people who use Douyin for a long time."

Right?

A.    Yes.

Q.    Okay.  And TikTok did not have a similar blocking layer that would require a period of forced rest for users who use TikTok for a long time, right?

A.    Aside from Family Pairing, but yes.

Q.    So this document is from -- that we looked at -- that we are looking at, this document is from 2021.  And in 2021 ByteDance had implemented this feature for Douyin users in China but had not implemented this feature for TikTok users in the United States, correct?

A.    That's my understanding, yes.

Q.    We'll look at one more thing on this document where it says "results."

MR. VANZANDT:  Vince, my apologies.  Let me see -- go to the next page, please.  Is that it?

A.    I don't see "results."

BY MR. VANZANDT:

Q.    Okay.  I'm sorry, "results" is not

A.     Yes.

MR. VANZANDT:  Okay.  We can pull this exhibit down, please.

Q.     Mr. Furlong, are you familiar with the Youth Safety News Bulletin that TikTok maintained internally?

A.     Vaguely.  I remember it being a group chat in Lark where you could see news.

Q.     I want to look at that.  It's going to be a long document when you get it, but I promise we're not going to review too much of it.

MR. VANZANDT:  This will be Tab DY-4. This will be Exhibit 70.

(TikTok-Furlong-70 was marked for identification.)

BY MR. VANZANDT:

Q.     Certainly familiarize yourself with it. I am going to be asking you about something that's on Bates 715, and I'll ask you some questions really before we get there just about the document in general.

A.     About the whole document?

Q.     No, no.  I'm just going to ask you a couple questions about, like, what the document is in general, and then I'm going to go to Bates ending

with 715.

A.    Okay.

(Witness reviewing document.)

A.    All right.  I'm on 715.

Q.    Okay.  So before we go there, do you recognize this as a Youth Safety News Bulletin that was maintained internally at TikTok?

A.    Vaguely, yeah.

Q.    And this would be a collection of news reports, research, government statements, just external statements about TikTok that the company would collect, correct?

A.    I believe so.  I think I maybe only occasionally looked at it and did not personally maintain any of it.

Q.    Okay.  But you would have had access to it and did at least look at it some, right?

A.    I believe so.  I don't think I spent a lot of time with it.

Q.    Let's go Bates ending 715.

A.    I'm there.

Q.    What we're going to look at first is the middle of the page where it says "Key news announcements" under the date September 24, 2021.

Do you see that?

A.    Yes.

Q.    So the second bullet point there lists an article, it says "BBC," and it has a hyperlink. And do you see that the number -- it doesn't have a title.  But do you see the number of the hyperlink is 58625934?

A.    Yes.

Q.    If we go over now to the next page of the document ending in Bates 716, do you see the bottom bullet point there under "Wider industry & society"?

A.    Yes.

Q.    It lists that same hyperlink with the BBC article with that same number?

A.    It looks like the same, yeah.

Q.    Okay.  And so I'll represent to you that hyperlink actually still works, and so we went and clicked that and pulled that article, and I want to show that to you next.

That's an article that TikTok knew about internally back in 2021, right?

A.    It was at least shared in this chat.

MR. VANZANDT:  Okay.  So let's pull up Tab DY-5.  This will be Exhibit 71.

///

(TikTok-Furlong-71 was marked for identification.)

BY MR. VANZANDT:

Q.    And I'll represent to you, Mr. Furlong, that this is -- we followed that link and that's the same article that's referred to internally.  Okay?

A.    Sounds good.

Q.    I want to look at a little bit of this article with you.

First off, do you see the date of this, September 20, 2021?

A.    Yes.

Q.    So the title of it is "China:  Children given daily time limit on Douyin - its version of TikTok," right?

A.    Yes.

Q.    And then if we go below the picture, it says "Douyin, China's version of TikTok, will limit use of the platform for children to 40 minutes a day."

Right?

A.    Yes.

Q.    And then keep reading below, it says, "The rules will apply to users under 14, who have been authenticated user their real names, and who

will be able to access it between 6:00 o'clock and 22:00."

Do you understand that to be 10:00 o'clock p.m.?

A.    Yes.

Q.    Okay.  So this is saying that users under 14, after they have been authenticated using their real name will be able to use the app between 6:00 a.m. and 10:00 o'clock p.m. at night, right?

A.    Yes.

Q.    Okay.  And do you know whether or not users who sign up on TikTok have to be authenticated using their real names?

MS. FOURNIER:  Objection.  Form.

THE WITNESS:  I'm not sure what -- again, I'm not sure what real-name authentication means, so I'm not sure.

BY MR. VANZANDT:

Q.    So it goes on to say, "Parent company ByteDance announced the app's Youth Mode in a blog.post, saying it is the first short-video company in the industry to have these limits."

So, again, ByteDance is TikTok's parent company as well, correct?

A.    Yes.

Jordan Furlong                                        484

Q.    But in 2021 these changes were being announced only for Douyin users in China, not for TikTok users in the United States, correct?

A.    Yes.  But users under 14 wouldn't have access to TikTok, so...

Q.    Users under 14 would not have access to TikTok?

A.    I'm sorry, under 13 wouldn't have access to TikTok.

Q.    But that would depend on knowing the user's age, correct?

A.    Yeah, that's just the policy, that under 13 can't be on the app.

Q.    So I want to keep reading here in the article.  It says, "According to Douyin's user agreement there is no minimum age on the platform, but under 18s must obtain the consent of a legal guardian.  On sister app TikTok the minimum age is 13."

Is that what you were just referring to?

A.    Yes.

Q.    Okay.  So I want to go back.  We saw a reference to a blog post from ByteDance, and there was a link to that.  If we can go back and do that,

the first section.  I'm sorry, it's the same article.

So Exhibit 71, do you see in bold under the picture, it says, "Parent company ByteDance announced the app's Youth Mode in a blog.post."

Do you see that?

A.    Yes.

Q.    Okay.  And so we clicked that link, and that's still an active link, and it took us to the blog post from ByteDance announcing these restrictions, and I'll represent to you that it was entirely in Mandarin, the whole post.  So we had that translated, so I'm going to -- I'm going to mark a series of exhibits.  I'm going to do these as -- so I'm going to do these as 72A, 72B, and 72C, and I'll explain these to you as you get them.

MR. VANZANDT:  So that's going to be Tab DY-8 -- I'm sorry, DY-8A, DY-8B, and DY-8C.

(TikTok-Furlong-72A, TikTok-Furlong 72B, and TikTok-Furlong-72C were marked for identification.)

THE WITNESS:  All right.  I have C now.

BY MR. VANZANDT:

Q.    So first off let's do 72A.  That's the

Jordan Furlong                                                    486

one on the screen here.  And I'll represent to you

that's what popped up when we clicked the link that

said blog post.

Do you see that appears to be in

Mandarin?

A.    Yes.

Q.    And so what 72B is we had this document

translated into English, and 72B is a Declaration

and Certification of Translation.  If you could zoom

into the -- just above where it says Specific

Description of Documents, the first part of that, do

you see that it -- the language of the text there,

the title of the document is "All Douyin users under

14 with real-name registration are in youth mode"?

Do you see that?

A.    Yes.

Q.    Okay.  So I will represent to you that

we had this document translated, and this is the

certification of that translation.  And then 72C is

that document in an English version.

A.    Got it.

Q.    Okay.  Thank you.

So I want to go just through a few of

this.

Do you see at the top it's the same

title that we just looked at, correct?

A.    Yes.

Q.    And the date of this document is September 7, 2021?

A.    Yes.

Q.    And so I'm going to start off reading this.  And do you recall that the description from the BBC article said that this was a blog post from ByteDance, right?

A.    Yes.

Q.    It says, "To further strengthen the protection of youth, we announced, before Children's Day, that we will implement the most stringent youth protection measures in the history of the platform, i.e., all Douyin users under 14 with real-name registration will go directly into youth mode and they cannot get out of this on their own."

Is that right?

A.    Yes.

Q.    It then goes on to say, "Recently, we have implemented this initiative, namely, all Douyin users under 14 with real-name registration are all in the youth mode, and all newly registered users in the" full feature will also enter that mode directly.

Jordan Furlong                                              488

Right?

A.    "In the future," yeah.

Q.    "The future."  Thank you.

Then it says, "If you are a Douyin user under 14 with real-name registration, you will find...you are in youth mode when you open Douyin, in which you can only use it for 40 minutes a day and you cannot use it from" 6 p.m. to 6 a.m. the next day."

Do you see that?

A.    "10 p.m. to 6 a.m.," but yes.

Q.    Thank you for correcting me there.

And do you understand that description of that to be a hard cap on users under the age of 14?

A.    Sounds like it.

Q.    Okay.  Now, you recall yesterday we looked at an exhibit that had data indicating that 20 percent of minor users on TikTok used the app between 12:00 a.m. and 5:00 a.m.  Do you recall that?

A.    Not 100 percent sure, but I know what you're referring to.

Q.    Okay.  So despite having that data, are you aware of any feature that TikTok has implemented

any hardline restrictions on minors using TikTok between certain times like between 10:00 p.m. and 6:00 a.m.?

A.    Yeah.  They won't receive push notifications during that time and -- yeah, then otherwise it would just be like the other proactive defaults that we turned on, or Family Pairing is what they might run into during that time.

Q.    Okay.  But other than that, there's no hard cap on usage for minors between certain times like between 6:00 p.m. and -- I'm sorry, between 10:00 p.m. and 6:00 a.m., right?

A.    Not aside from Family Pairing, correct.

Q.    Okay.  So last thing I want to look at on this document, if we can pull it back up, is that there's an image.  Looks like there may be a screenshotted image -- yeah, thank you.

And do you see this appears to be an image of the Douyin app?

A.    It looks like a pretty ugly picture. I'd be surprised if that's what Douyin looked like, but it may be, yeah.

Q.    Well, we had to also translate this image as well, just to be fair.

So do you see on the left side of the

can, replace that exhibit with a new Exhibit 2.

MR. VANZANDT:  Vince, do you have that?

TRIAL TECH:  Currently getting that.

MR. VANZANDT:  Okay.

BY MR. VANZANDT:

Q.    Mr. Furlong, does this updated Exhibit 2 now accurately depict the time that you worked for TikTok between April 2021 and October 2024?

A.    Yes.  It says November here, but like I said, I left in October, yes.

MR. VANZANDT:  Okay.  Thank you.

Mr. Furlong, that's all the questions I have for you right now.  Thank you very much for your time and your courtesy.

And I do reserve my right to ask further questions after your counsel asks questions.

Thank you.

THE WITNESS:  Sounds good.  Thank you.

EXAMINATION

BY MS. FOURNIER:

Q.    Okay.  So, Mr. Furlong, as you know, my name is Kristen Fournier, and I have some questions for you on behalf of TikTok.

Q.    Okay.  And then you can see -- who is that picture right there in September in a little circle?

A.    Me.

Q.    And I think you just testified you had nothing to do with filters, right?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  I never worked on filters, no.

BY MS. FOURNIER:

Q.    So if you wanted to give a fair and accurate depiction of filter work at TikTok, would a more accurate demonstrative be something that looks a little bit more like that?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  I think so.

BY MS. FOURNIER:

Q.    Okay.  All right.  So I'd like, if we can, to actually build on this idea, though, of a timeline because I think it is a useful way to speak with the jury.

MS. FOURNIER:  We can go back to -- we can turn off the ELMO.

Q.    So I think what I'd like to do is pull up Exhibit 2 which I know just got swapped out.  If

we pull up the formal Exhibit 2 that's now been put into the record.

And you just confirmed that this is an accurate portrayal of your time at ByteDance and then as well as TikTok working on digital wellbeing, correct?

A.    Yes.

Q.    All right.  And if we can now allow Mr. Vives to pull up his screen, we just used that last night to modestly adjust.

Does this look pretty similar to you, except for the time below?

A.    Yes.

Q.    So we're going to use this format that Mr. Weinkowitz put together, and we're going to build this from a timeline perspective.

During your discussions with both Mr. Weinkowitz and with Mr. VanZandt -- we'll call this 77.  I think we're at 77.  And we'll start building off from 77.

(TikTok-Furlong-77 was marked for identification.)

BY MS. FOURNIER:

Q.    You talked a little bit about features that existed at the time that you moved over into

MS. FOURNIER:  Okay.  So if we can go back then, Mike, to 77.

Q.    You'll see we add -- Jordan, we've added a line here that covers that entire piece in the Newsroom, screen time breaks, screen time dashboard, screen time upsell.

Do you agree that those are the three features covered in that particular Newsroom update?

A.    We also launched the inbox notifications feature with that launch which you can turn on and it would send you a weekly notification telling you how much time you spent on the app the previous week, comparing that to this week, as another measure to help you become more aware of your usage and, therefore, informed how you wanted to set limits for using the platform.

Q.    So if I was using my ELMO a minute ago, you would want me to write in "Inbox" there, it sounds like?

MR. WEINKOWITZ:  Objection.  Form.

THE WITNESS:  I would, yes.

MS. FOURNIER:  Okay.  I will call this version -- and we'll also make an updated one and swap it in, let's see, A, B, C, D, E.  We'll call this 77E, and we'll have a

corrected 77E that then carries forward.

MR. WEINKOWITZ:  Objection to the form.
Objection.

(TikTok-Furlong-77E was marked for
identification.)

BY MS. FOURNIER:

Q.    Okay.  Let's go back then to our
Newsroom, and I'd like to look at something that
posted in March of 2023.  "New features for teens
and families on TikTok."

I think we talked the other day about
additional work done to manage time at a 60-minute
daily screen time limit.

Do you remember a discussion about
60-minute daily screen time limits?

A.    Yes.

MR. WEINKOWITZ:  Objection to the form.
Objection to the preamble.  Objection,
leading.

BY MS. FOURNIER:

Q.    Okay.  And can you tell the ladies and
gentlemen of the jury a little bit about the
60-minute daily screen time limit?

A.    So we got to a point where we had built
some basic features that we felt were broadly

applicable and that a lot of people could benefit from, whether they were minors or adults or anyone.

And then we then wanted to look at scenarios for more proactively supporting minors and helping them build understanding of using the app and digital literacy and just in general being more supportive of avoiding excessive usage. So we decided to turn on the daily screen time limit for them.

And based on the research we had done about what a conservative approach would be or, like, the right approach would be, we landed on 60 minutes.

Q. Did you partner with anyone to come up with this particular feature?

A. Yes. So we had an internal kind of, like, subject matter expertise team that would help us with literature reviews. I believe for that feature it was -- her name was ▮▮▮▮▮▮ who helped us understand, like, the literature, and she had more of a research background to kind of legitimize that decision internally.

Then we also for kind of big product changes like this tended to review our plans with trusted external partners. We primarily talked with

Digital Wellness Lab and Stanford Brainstorm, yeah, so...

Q.    Once this feature was rolled out, could people exceed the 60-minute limit?

MR. WEINKOWITZ:  Objection.  Leading.

THE WITNESS:  Yes.

BY MS. FOURNIER:

Q.    How would a user do that if they needed to do that?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  They would input a PIN code.

BY MS. FOURNIER:

Q.    And was -- how was a PIN code assigned?

A.    Just a standard four digits for everyone.

Q.    And why did you decide to implement a PIN code approach?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  So a lot of the status quo was, you know, a popup coming up on other apps, for example, and you'd click a button and continue watching.

We had a precedent of the way the feature worked before of inputting a PIN

BY MS. FOURNIER:

Q.     What -- can you tell us what you take as the meaning of that comment, which is a continuation of the part you were shown before?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  That we need to better define the problems we want to solve with data so that we could build thoughtful validated solutions, but that there was support for minors across a variety of features we had discussed.

BY MS. FOURNIER:

Q.     And is this comment here at 4 more consistent with the opinion you kept expressing about what you saw as some of the direction for your team?

MR. WEINKOWITZ:  Objection to the form.

THE WITNESS:  Yes.

BY MS. FOURNIER:

Q.     Okay.  One final topic.

If we could go to Exhibit Number 67, which should be about three in.  And if we could please go to the second page and go towards the bottom of the page, where it starts "Are all features built in response to regulation?"

And, Mr. Furlong, can you just read the question and the answer to that question for us as a first start?

A.      "Are all features built in response to regulation?  Was anything built proactively?  Why?"

"The relevant means for teenagers are mainly for regulation and supervision, such as users under the age of 14 with real name authentication will be forced into the youth mode.  Most of the other means are for active construction, hoping to enhance users' positive perception of Douyin.  The functions can be seen in this document."

Q.      So I want to stop, and there are two things I want to address first here.

First is you said you are not familiar with real-name authentication, is that right?

A.      Correct.

Q.      In the United States, at birth are you given a unique identifying number?  Do you know one way or another?

A.      I don't know.

MR. WEINKOWITZ:  Objection.

BY MS. FOURNIER:

Q.      Is there a process in the US to apply as a child for a unique identifying number?

MS. FOURNIER:  Okay.  Those are all my questions at the moment.

MR. WEINKOWITZ:  Great.  Thank you.  We will take a break, and we'll be back.

What time is it there?

THE VIDEOGRAPHER:  The time is 11:44.  We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 12:11.  We're back on the record.

MS. FOURNIER:  I'm just going to for cleanup administrative purposes, these documents are getting dropped into the exhibit space, but I wasn't putting them into the transcript.  So let me fix that now.

Exhibit 78 is the Newsroom release of August 1, 2018.

(TikTok-Furlong-78 was marked for identification.)

MS. FOURNIER:  Exhibit 79, the Newsroom release of February 13, 2020.

(TikTok-Furlong-79 was marked for identification.)

MS. FOURNIER:  Exhibit 80, Newsroom

FURTHER EXAMINATION

BY MR. WEINKOWITZ:

Q.    All right.  Mr. Furlong, are you ready to go and ready to get out of here?

A.    Yes.

Q.    All right.  Can we pull up Exhibit 67? Do you --

A.    I'm waiting for docs.

Q.    I'm sorry?

A.    I'll just refer to the screen.

Q.    Oh, yeah.

MS. FOURNIER:  The stockpile has gotten a little --

THE WITNESS:  I've got this mountain.

BY MR. WEINKOWITZ:

Q.    Yeah.  And I don't think I'm actually using any new documents.  So if you refer to the screen.  And if you need to move anywhere, please let us know, but let's just start.

Exhibit 67 is an exhibit that the TikTok-ByteDance lawyer asked you questions about, right?

A.    Yes.

Q.    And remember her questions were about why Douyin had certain safety features for kids that

TikTok did not?

MS. FOURNIER:  Object to form.

THE WITNESS:  Can you specify the question?

BY MR. WEINKOWITZ:

Q.    Yeah.  Remember that she had you read that Douyin had certain safety features because of regulations or Chinese law?

A.    Yes.

Q.    There's nothing that would have stopped TikTok from putting those safety features on TikTok in the United States if it wanted to, correct?

A.    Correct.

Q.    All right.  So do you recall, sir, that you testified that when the -- strike that.

You testified in response to the TikTok-ByteDance lawyer's questions that you did not work on beauty filters, correct?

A.    Correct.

Q.    And counsel did that clever thing where she took my timeline and she scratched out your face, right?

A.    Yes.

Q.    All right.  Pull up Exhibit 16, please, at Bates 556.

Jordan Furlong                                          589

Isn't that like, sir, if somebody is an alcoholic and they're at a bar having drinks and the bartender comes up to them and says, You shouldn't have any more drinks, and the person at the bar just swipes them away, isn't it the same thing?

MS. FOURNIER:  Object to form.

THE WITNESS:  No, it's not.

BY MR. WEINKOWITZ:

Q.    No, it's not.  Okay.

MR. WEINKOWITZ:  So let's pull up AAV-1.

MS. ARMSTRONG:  Exhibit 91.

(TikTok-Furlong-91 was marked for identification.)

THE WITNESS:  I have 90.

MS. FOURNIER:  Is that 90 or 91?

MS. ARMSTRONG:  It is 91.

MR. WEINKOWITZ:  We've marked AAV-1.

(Discussion off the record.)

BY MR. WEINKOWITZ:

Q.    Can you take a look?  It's on your screen.

A.    I see it on my screen, yeah.

Q.    It's "[T&S] Screen Time Upsell for Minors."

Do you see that?

A.    Yes.

Q.    This is a document produced to us by ByteDance and TikTok from your files.  Do you have any reason to dispute that?

A.    No.

Q.    And the metadata that was created with this document which was -- a metadata that came with this document which is attached has the creation date as January 10, 2022.

Do you see that?

A.    Yes.

Q.    And under -- do you see the first page has information?

MS. FOURNIER:  Mike, can you adjust your mic?  You're getting a little muted.  You were real clear most of the time.

MR. WEINKOWITZ:  Sorry.  I put documents over it.

MS. FOURNIER:  There you go.  Yep.

MR. WEINKOWITZ:  Okay.  My bad.

BY MR. WEINKOWITZ:

Q.    Do you see on the front page under Basic Information in the chart your name appears?

A.    Yes.

Q.    Okay.  And it says "T&S PnP feature," right?

A.    Yes.

Q.    And that's trust and safety and product and policy, right?

A.    Yes.

Q.    Was this document prepared by you in the regular course, or did you contribute to this document in the regular course of your business?

A.    I think it was primarily written by Jesse, but I took over at a certain point.

Q.    Okay.  Any reason to believe it was altered in any way since it was produced to us out of your file?

A.    No.

Q.    If you can turn to page 5, which is Bates 273.  Do you see there's a section called "What are we building?"

A.    Yes.

Q.    It says, "Adding in a screen time management upsell to teens when they are on the app for 100 minutes (default screen time management setting) in a single day."

Do you see that?

A.    Yes.

Q.    And then it says, "This will lead users directly to the screen time management tool so that they can quickly turn it on, however they have a clear option to dismiss this upsell."

Correct?

A.    Yes.

Q.    So even when the upsell -- even when the upsell appears, the user can just dismiss it, correct?

A.    Because we don't want to annoy people, yes.

Q.    Okay.  If you look at "Why build it?", it says -- do you see where I'm at, "Why build it?"

A.    Yes.

Q.    Next section, it says, "Our own survey research recently showed us that 59 percent of teens tell us that they need a screen time management tool, yet only 37 percent are aware that it exists."

Did I read that correctly?

A.    Yes.

Q.    All right.  And it specifically -- now if you look at the pie chart on the next page. And -- do you see that?

A.    Yes.

Q.    And 59 -- it shows that 59 percent need

a screen time management tool, correct?

A.    Yes.

Q.    And the next one shows 37 percent are aware that the tool exists on TikTok, correct?

A.    According to that survey, yes.

Q.    And the next pie chart, according to that survey, says 15 percent, it's labeled "reported usage," correct?

A.    Yes.

Q.    And the last pie chart says that .6 percent actually use it, according to that survey, correct?

A.    At that time.  That drastically changed over the time that I was there.

MR. WEINKOWITZ:  Motion to strike after yes -- or "at that time."

BY MR. WEINKOWITZ:

Q.    Then underneath the image it says, "Currently, this tool only exists behind a somewhat hidden series of menus," correct?

A.    Correct.

MR. WEINKOWITZ:  All right.  Underline "somewhat hidden series of menus," please.

Q.    All right.  And then there's some -- at the end of that page there's some quantitative data.

getting launched like just after TikTok was released, so...

Q.    Okay.  Was there anything preventing ByteDance from launching TikTok with the same screen time management features that ByteDance used with Douyin in China?

A.    Not to my knowledge.

Q.    All right.  Do you recall discussing something called Family Pairing with TikTok's counsel?

A.    Yes.

Q.    And you were aware of and directly worked with the Family Pairing feature while you worked at TikTok and ByteDance, correct?

A.    Yes.

Q.    When TikTok first launched in the States, Family Pairing was not offered as a feature, correct?

A.    I think -- I forget exactly the timeline, but it sounded like it was launched after, yes.

Q.    Okay.  So does Family Pairing -- strike that.

The Family Pairing feature is something that allows parents to link their own TikTok account

Jordan Furlong                                                           631

A.      I do, yes.

Q.      Okay.  Thank you.

So if you look at the second document ending in 4756, the Bates ending there, do you see that that is a message that you sent on September 2, 2021?

A.      Yeah.

Q.      Okay.  And it looks like you're messaging with someone named ▓▓▓▓ or ▓▓▓▓?

A.      Yes.

Q.      Does that refresh your recollection as to who you may have been communicating with --

A.      Yes.

Q.      -- the Mandarin characters?

A.      Yes.

Q.      And who is ▓▓▓▓

A.      She was a peer of mine.

Q.      Okay.  And was she a ByteDance employee?

A.      Yeah.  She was another product manager on my team.

Q.      Okay.  Thank you.  We can put that second one away.  Now we are going to go back to the first.  Apologize for all the jumping around.

So if we go back to Exhibit 97, Bates

6724 at the end.

A.    Okay.

Q.    Do you see at the top you send a message on September 1, 2021?

A.    Yes.

Q.    You say, "I have heard about an FP bug" -- is that Family Pairing?

A.    Yes.

Q.    -- "where the teen can easily bypass or disable Family Pairing.  I haven't tested so I don't know the specifics, but wondering if you know what I'm talking about?  Sounds worth fixing this bimonth."

Do you see that?

A.    Yeah.

Q.    Okay.  What does "bimonth" mean?  I've seen that referred to a few times.

A.    Just two months.  We used to plan work in sections of two months.

Q.    Okay.  Thank you.

So do you see below that ▮▮▮▮ responds "It's not a bug, I suppose..."?

A.    Yes.

Q.    And then the next message, it says, from Lufan, "The current logic is we provide an

'unlink' option (though hidden) to the paired teens, and once they did, their parental settings will stay for an extra 48 hours as a sort of 'punishment.'"

Do you see that?

A.   Yes.

Q.   Does that help you recall that there was a function within Family Pairing that would allow teens to unlink their account from their parents' accounts?

A.   Yes, along with the rationale for it underneath, which is useful text.

Q.   Okay.  So let's -- yeah.  Thank you for that.  Let's look at that.  It says, "The reason why we provided this unlink for teens is 1. for them to escape from malicious pairing."

Was that a problem you were dealing with frequently, malicious Family Pairing?

A.   I don't know.  This was Lufan's experience with the app.

Q.   Are you aware of any malicious Family Pairing activities during your time there?

A.   I'm not sure.  It was more so worked on by other people on my team.

Q.   Then it says number "2. respect their autonomy (given Family Pairing is available for

users theoretically above 13)," right?

A.    Yes.

MR. VANZANDT:  Can you underline the word "theoretically," please?

Q.    It's theoretical because unless there's some type of age verification, it's impossible to know the actual age of a user, correct?

A.    I don't know what she was getting at there.

Q.    Okay.  So let's go back now to Exhibit 97.  It's the other version of this chat.  I apologize for the jumping around.  But it's page ending 754.  I believe it's the first page, the top page of that document.

A.    Yes.

Q.    And Lufan asks in this message, "What we can do is to level up the punishment if the teen unpairs - for example, freeze the teen's account for 48 hours (and suggest the teen communicating with the parent upon this decision)."

Do you see that?

A.    Yes.

Q.    And you respond, "What do you think of removing that?  I understand the tradeoff but think that we should remove it given that this renders the

feature kinda useless."

Do you see that?

A.    Yes.

Q.    And you were recommending that the option for a child to unlink their account from their parents should be removed from the platform, right?

A.    I was asking her what she thought of that.

Q.    Okay.  And then -- okay, well, strike that.  Sorry, I can't strike what you said.

Below that you see in the sentence, you say, "but think that we should remove it."

Do you see that?

A.    Right.  And this was a few months into the job trying to understand the historical context from somebody who had a lot more experience working on the feature.

Q.    But at the time you wrote that you thought that it should be removed from the platform, right?

A.    That's what I wrote here.

Q.    And then you give another option below, it says, "Other option: teen can send a request to parent to unlink, which they can approve from their

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, CSR No. 14449 for the State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 13th day of April, 2025.

<%21527,Signature%>
_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449