# AMENDED Exhibit 633

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     ) Lead Case No.
                               ) 22STCV21355
SOCIAL MEDIA CASES             )
_____ )
                               )
This Document Relates to:      )
                               )
ALL ACTIONS                    )
_____ )

Thursday, April 17, 2025

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Deposition of
KATHRYN "RYN" LINTHICUM, held at the offices
of King & Spalding LLP, 50 California Street,
Suite 3300, San Francisco, California,
commencing at 9:01 a.m. PST on the above
date, before Michael E. Miller, Fellow of the
Academy of Professional Reporters, Certified
Court Reporter, Registered Diplomate
Reporter, Certified Realtime Reporter and
California CSR #13649.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

------------

KATHRYN "RYN" LINTHICUM,

having been duly sworn,

testified as follows:

------------

EXAMINATION

------------

BY MR. VANZANDT:

Q.    Good morning, Ms. Linthicum. My name is Joseph VanZandt, and I'm going to be taking your deposition today.

A.    Good morning.

Q.    Can you please state your full name for the record, please.

A.    Kathryn Platt Linthicum.

Q.    Okay.  And is it okay if I refer to you as Ms. Linthicum today?

A.    That's okay.

MR. MATTERN:  Mr. VanZandt, sorry to interrupt, but I don't think the witness can see you.  Is there a way to add a screen so that we can see you?

THE VIDEOGRAPHER:  Give me one second.  The time is now 9:02.  Going

to move residences from where you live right now?

A.    I do not currently plan on it. My lease is technically up in end of May, so we're hoping to renew, but who knows?

Q.    Okay.  Well, good luck with that.

A.    Thank you.

Q.    As we sit here today, you are a former employee of TikTok and ByteDance, correct?

A.    Correct.

Q.    And you worked at TikTok and ByteDance for just over three years, between April of 2021 and May 2024; is that right?

A.    That is right.

Q.    And during your time at TikTok and ByteDance, you were part of the trust and safety division; is that right?

A.    Yes.  I don't know whether it's a division or a team or an org or what you call it, but I was a part of trust and safety.

Q.    And we'll drill down a little more specifically on that in just a little

bit.

Do you have any ongoing professional relationship with TikTok or ByteDance?

A.   I still work in trust and safety, and it's a pretty small-knit community, so I see them at different, like, trust and safety events or through different professional groups that each of our companies have membership in.  I sometimes see folks or hear about updates from them through those.

Q.   Okay.  Do you -- have you done any work for TikTok since you left the company in May 2024, like consulting or any other type of work for TikTok?

A.   No.

Q.   And have you received any compensation for your time preparing for your testimony or sitting for your testimony today?

A.   I have not been paid for this.

Q.   I'm not suggesting you should be, by the way, but I was just asking.

A.   No, I -- that's fine.

Q.    I want to pull up a few documents just to learn a little bit more about your background.  So if we can start with Tab 1, please, I'm going to mark this as Exhibit 1.

(Whereupon, TikTok-Linthicum-1, Curriculum Vitae, was marked for identification.)

BY MR. VANZANDT:

Q.    Ms. Linthicum, we should have someone in the room that can hand you a physical copy of the documents that we go through, and I think it may also be displayed on the screen that you're able to see.

A.    Yes.

Q.    Okay.  I'll give you a moment to get the document in your hand.

Do you have that in front of you?

A.    I do.

Q.    I'll represent to you that TikTok's lawyers produced this document to us.

Do you recognize this document as a résumé that you prepared?

A.      Yes.

Q.      And when was this particular résumé last updated?

A.      May 2024.

Q.      So it does not list your current employment, right?

A.      Correct.

Q.      And we'll talk about that in just a little bit.  Do you see at the top of your résumé, on the top right, you provided a link to your LinkedIn profile?

A.      I do.

Q.      And so we went to your LinkedIn profile and downloaded your résumé from there as well.  So I'm going to pull that up as Tab 2.  I'm going to mark that as Exhibit 2.

        (Whereupon, TikTok-Linthicum-2,
     LinkedIn Profile, was marked for
     identification.)

BY MR. VANZANDT:

Q.      And do you recognize this as your résumé that is available on LinkedIn?

A.      It looks roughly like what I recall from the last time I touched it.

Q.      Yeah.  Fair enough.

And I'll represent to you that I know this doesn't look like the LinkedIn page, but when you right click or print to PDF, this is the format that it comes directly from LinkedIn, okay?

A.    Okay.

Q.    So I want to start here on the bottom half of your résumé where it says Experience.

Do you see that?

A.    Oh, the LinkedIn page?  Yes.

Q.    That's right, the LinkedIn page.  My apologies.  It's just more -- I guess, more current than the other résumé, so I wanted to look at your current employment.

You currently work for a company called Anthropic; is that right?

A.    Anthropic PBC.

Q.    Okay.  And what is Anthropic? What type of company is that?

A.    Anthropic is a company that develops foundational AI models to provide primarily to other customers to use, but they also host Claude online.

Q.    And that company is paid out of

San Francisco; is that right?

A.     Yes.

Q.     And it says that your core focus at that company is child safety and emotional and psychological harm.

Do you see that?

A.     Yes, I do see that.  That's the title of the job posting that HR gave it.

Q.     Understood.

And is that a fair title for the current job that you're doing there?

A.     I am a policy design manager there.  That's a little bit more unwieldy of a title.  I typically refer to it as user well-being as the policy area that I work in, especially because it also covers some additional content areas that don't traditionally fall under those buckets, such as adult sexual activity and human trafficking.

Q.     I want to look now just below that about your TikTok employment.

It says that you were employed with TikTok -- we already discussed the dates, but it looks like three years, two

months.  Looks like you had two different roles.  The first role was between April 2021 and July 2022, and that was trust and safety global policy manager; is that right?

A.    Yes.  The end date of that was a little bit fuzzy because the old global issue policy lead whose role I was taking over was on vacation for a long period of time between July and August, and then our performance cycle and promo cycle doesn't happen until September.

So functionally, that was when I took on the responsibilities of the lead was around August, and then finished up my general policy manager responsibilities end of July.

Q.    Okay.  And it says here during that first role you had -- your core focus was mental well-being and suicide prevention; is that correct?

A.    Correct.  That wouldn't have been the, like, job title itself.  That's more just a general description in the trust and safety world of the areas that I focused on primarily.

Q.    Okay.  And we are going to go back to your longer résumé in just a few moments that has, I think, some more details about the work that you did there, but I want to ask you first about the top employment there under TikTok.

It says between August 2022 and May 2024.  Understanding those dates at the beginning may be slightly off, it says there you were a trust and safety global issue policy lead; is that correct?

A.    Yes.

Q.    And was that a -- was that a promotion or did you just slightly change roles?

How would you describe that change that you had in your position?

A.    It was a little bit of both. We didn't really have an exact org chart at TikTok, so I don't really know how it corresponds with, like, traditional notions of promotion.

But I went from being a, like, individual member of the team that was responsible for an area like a subissue of

policies to the team lead or team manager.

And so for the global end, I was responsible

for doing things like setting roadmaps and

overseeing some other policy managers' work

output to make sure that we were doing our

jobs in the right direction.

Q.    If we scroll down just a little

bit on your résumé, it has ByteDance listed

there.  And then it looks like the identical

roles under ByteDance.

Do you see that?

A.    Yes.

Q.    Those were not separate jobs;

you were working -- it was all in one.  You

were working for both ByteDance and TikTok

during that same time frame; is that fair?

A.    Yes.  So the -- like, my

employment contract and the paychecks that I

was receiving were through ByteDance, but I

worked as well on the TikTok product, and so

for like name recognition and search

optimization, a lot of folks would list

TikTok and ByteDance on LinkedIn or on

résumés just because a lot of folks in the US

don't really know what ByteDance is, but

there's more recognition of TikTok.

Q.   Understood.

We're going to talk more about more specifics about your work at TikTok, but before that, I want to back up a little bit and talk about your background before you joined the company, okay?

A.   Okay.

Q.   So we can pull that down, and let's go back to Exhibit 1.

Ms. Linthicum, this looks like it's a one-pager.  You squeezed as much as you could in on one page on this résumé; is that fair?

A.   It's a résumé.  I really didn't want a second page.

Q.   Yeah.  I understand how that is.

Let's start at the bottom where it talks about your education, okay?

A.   Okay.

Q.   You see down there -- and we have a trial tech who will be kind of pulling stuff up and highlighting as we go, and so sometimes it's easy to follow down on the

screen.

But do you see on the bottom it indicates your education, that you received your undergraduate degree from Reed College with a Bachelor of Arts in psychology back in May of 2014, right?

A.    Correct.

Q.    And then you received a master's degree in clinical psychology from Florida State University in 2020?

A.    Yes, the date of that degree conferral was in May 2020.

Q.    And you earned your master's from Florida State while you were enrolled in a doctoral program there, correct?

A.    Yes.  I was -- I earned it along the way in the doctoral program, and then eventually decided to leave the doctoral program after I had completed my binder stage but before the final dissertation and defense of internship.

Q.    And that doctoral program at Florida State was in clinical psychology; is that correct?

A.    Yes.

Q.    And you were in that program from August 2017 to May 2021; is that right?

A.    Yes, approximately.  I -- when I received the job offer from ByteDance, I took a yearlong leave of absence originally. That was an option that you could do through Florida State, and then I extended it by a second year.

And so functionally, I'm not sure, like, when the exact dates would line up in their system, but, yes, that was when I was more active.

Q.    Let's talk about your experience before TikTok.  I'm just going to start from the bottom here, where it says Reed Research Reactor.

Do you see that?

A.    I do see that.

Q.    And is it fair to say that is a -- would that have been a part-time job, part-time work you did while you were in undergraduate school at Reed College?

A.    Yes, it was my part-time job on campus to help pay for my education.

Q.    I understand.

This doesn't matter too much for this case, but a -- it sounds very interesting, working with a -- was that a nuclear reactor, is that what you were doing?

A.    Yes, I was a reactor operator, senior reactor operator and supervisor at the nuclear reactor on campus.

Q.    Let's go up to your next listed job, Iamalive.org, and it looks like you worked with that organization from 2012 to 2017, right?

A.    Yes, on and off.  That wasn't, like, consistent employment.  It was a volunteer position that varied in the amount that I volunteered with them.

Q.    So it says you first worked there as an online suicide and crisis prevention specialist, right?

A.    I believe the title was online suicide and crisis intervention specialist.

Q.    Apologies if I misstated that.

And then you were a volunteer supervisor in between 2015 and 2017?

A.    Correct.

Q.    And part of your work for that

organization was related to helping or assisting individuals with issues related to suicide; is that right?

A.     Yes.   The organization was an online chat-based crisis intervention service, so similar to how folks can call up, like, 988 in the States and reach suicide prevention specialists and crisis prevention volunteers, I was doing that within an online chat-to-chat setting.

Q.     So you would be one of the individuals chatting with others who had reached out for help; is that fair?

A.     Yes.   During my -- more so during the time that I was -- the first three years there for the online suicide and crisis intervention specialist role.

When I became a supervisor, then typically I would be supervising the individual volunteers who were engaging in the chats and helping to provide guidance and support for that while also sometimes picking up, you know, chats myself, depending on queue volumes and needs.

Q.     Let's go up to your next listed

employment, University of North Carolina,

Chapel Hill, project coordinator.

Do you see that?

A.    I do.

Q.    And were you enrolled at the University of North Carolina at this time?

A.    I did not start as being enrolled there.  So for my last year of employment there, UNC had the ability for employees to enroll as a nondegree-seeking student, and they subsidized, you know, one or two courses a term for people who wanted to do that.

So I enrolled and took two semesters of graduate-level statistics courses as a non-degree-seeking student.

Q.    It says here under the title that you facilitated data collection for 1.75 million NIH-R01 research grant investigating peer influences on behavior; is that right?

A.    That was one of the studies that I worked on.  For my first year there, I was split across two labs in clinical psych and developmental psych, and worked on a few

different grant lines, but that was the primary one that I was doing most of the work and data collection for.

Q.    Going down to the third bullet point it says:  Interfaced with youth, ages 9 through 14, and families for recruitment and data collection purposes.

Is that -- was that interfacing with youth part of the research grant we just discussed, investigating peer influences on behavior?

A.    It was part of that grant and also part of a different grant as well that was under the same lab.

Q.    As part of that work, did you have to get parental consent for minors between the age of nine and 14 to participate in the study?

MR. MATTERN:  Objection to form.

A.    Yes, we did collect parental consent and child assent to participate for at least one of the studies.

For the second one, I'm not a hundred percent sure what the consenting

process was like because it was a large school-based cohort setting, and it was a longitudinal one that had been set up ahead of my time, and so I don't remember the exact details of the consenting process for that study.

Q.    So at least for the first part that you referenced where you were part of interfacing with youth and families, a minor would not have been able to participate in a study if their parents did not consent, correct?

A.    Correct.  And if the minor themselves did not assent, they also would not have been able to participate regardless of the parent consent.

Q.    So the last bullet point listed here says:  Researched adolescent digital communication on social media about suicide, self-injury, and body image.

Is that right?

A.    Yes.

Q.    And then it appears that maybe you left UNC to start your doctoral program at FSU; is that correct?

A.    I did.

And just to clarify as well, the researched adolescent digital communication, that was a separate line of research and separate set of studies from the one that the previous bullet was talking about and from the grant overall.  That was like a few different projects, so they had different processes.

Q.    Okay.  Thank you.

Let's go now to your next employment, the American Association of Suicidology.

Do you see that?

A.    I do see that.

Q.    And so there -- well, let me just say this.

It looks like you continued work related to suicide prevention, research, and support; is that accurate?

A.    Yes.  My passion is in suicide prevention and research and trying to understand this phenomenon better and be able to prevent it in the world.

Q.    Now, go up to the next one --

the next employment listed there is with Florida State University.  And would that have been work you were doing during your doctoral program at Florida State?

A.    Yes.

Q.    Under the main title there it says:  Designed, executed and communicated quantitative research, including investigations into machine learning and risk prediction, and suicide intervention ethics.

Is that correct?

A.    That is correct.

Q.    And again, this looks like continued work in the area that you said you're passionate about, which is suicide, right?

A.    Suicide prevention, yes.

Q.    Thank you for that clarification, suicide prevention.

And it also notes here that -- on the last bullet point, that you provided clinical therapy -- I'm sorry, clinical services, therapy and assessment, to youth, families and adults.

Do you see that?

A.     I do see that.  As a part of a clinical psychology doctoral program, you would typically spend a few years giving -- providing therapy and assessment services under supervision of licensed clinicians to be able to start to build skills and learn in that area.

Q.     And was that specific or related to suicide prevention or was that more general issues?

A.     It was both.  I -- part of being a well-rounded clinician in training is that you learn about a lot of different areas, so it included everything from neuropsych assessment, which is not related at all to -- I took a few terms of advanced practicum, which was focused more on high-risk suicide cases.

Q.     We can pull this down, please.

By my count, it appears that you have authored or coauthored about a dozen academic literature -- literature articles.

Does that sound accurate?

A.     That sounds about correct of published peer-reviewed papers.

Q.     Okay.  I'm going to pull up Tab 3, please, and I'll mark that as Exhibit 3.

(Whereupon, TikTok-Linthicum-3, Google Scholar page, was marked for identification.)

BY MR. VANZANDT:

Q.     And I'll represent to you that I pulled your Google Scholar page from Google.

Have you ever seen this before?

A.     I have.

Q.     Okay.  And I will -- it looks like, I think, counting and then going over to the next page, that it is right at 12 peer-reviewed articles that you've published; is that right?

A.     I think that the -- I don't think so because the last one on this page -- or the "When and to what extent do peers influence youth behavior," I don't believe that that was a peer-reviewed article.  I think that was a paper that was presented at a symposium by the first author.

I believe the rest of them are

publications of peer-reviewed articles.

Q.    And would it be fair to say that your research and publications have been related to topics of psychology, well-being, and suicide?

A.    Generally speaking, I think, yes.

Q.    And according to Google Scholar here on the top right, your articles that you've authored or have been a coauthor of have been cited over 700 times in other academic articles.

Any reason to dispute that?

A.    I do not know how they calculate but don't have any reason to dispute.

Q.    Okay.  Thank you.

I want to shift back and talk a little bit more about your work and your role at TikTok within the trust and safety team. And I want to actually go back to Exhibit 1. Sorry for jumping around a little bit, but we're going to go back to Exhibit 1, and I'm just going to focus on the top part up there under ByteDance and TikTok global.

Do you see that?

A.    I do see that.

Q.    So the first -- I want to -- I know we talked about these roles a little bit through, like, your LinkedIn profile, but I wanted to dig in a little deeper.

So your first role here is issue policy manager, well-being and suicide prevention, and that was from April of 2021 to July 2022, right?

A.    Yes.

Q.    With the caveats you mentioned earlier about the -- how the dates at the end could be off.

A.    Correct.

Q.    So I'm seeing, like, a slightly different title here, slightly different on LinkedIn.  Understanding there may be some variations on what those titles were specifically called, but these were the only two roles you did hold at the company, right?

A.    Correct.  I think the title language sometimes shifted around and was ambiguous or changed to, like, communicate what the role was for.  Like, in the sake of

a résumé it's to apply to different companies, so you want to make sure that they know what you were actually covering.

Q.     Thank you.  I want to make sure I was not missing anything there.

It says under the title there describing your initial role with TikTok, it says:  Developed and maintained content policies related to suicide, self-harm, eating disorders and dangerous acts.

Is that correct?

A.     Yes, it does say that.

And just to clarify, I was on the global team still there, so the content policies that I was working on and developing were primarily aimed at non-US countries because I didn't work directly on US policy.

Q.     Was there a specific team that worked on US policy?

A.     There were specific individuals and then a specific team that was brought on board to work on US policy.  I think that when I began in April 2021, that was still in a little bit of a transition state, but the first person that I know that was working

specifically on these issues for US and Canada was bundled in as well to that was Alexander Corbet.

Q.    And when you say global policies, are you referring to outside the United States, everywhere else around the world, except China?

A.    Yes.  We did not work on anything to do with China or Douyin because they don't have TikTok there, so, yeah, it would have been the other operating regions outside of US, Canada and China.

Q.    So ByteDance -- and I think you just mentioned it, but ByteDance owns and operates another platform called Douyin in China; is that right?

MR. MATTERN:  Objection to form.

A.    Yes, TikTok, to my knowledge, doesn't exist in China and it's just -- it's a different platform.

BY MR. VANZANDT:

Q.    And did you ever do any work related to Douyin?

A.    No.

Q.    So going back to your description of what you worked on here, were you aware in your role at TikTok of risks to TikTok users related to suicide?

MR. MATTERN:  Objection to form.

A.    I don't think I would put it that way.  I think that the company was -- like, wanted to make sure that they were putting together a suite of policies that was responsible, you know, for the industry that covered a wide range of topics, and one of the standard ones for trust and safety includes topics of mental health.

And so it's not, you know, directly in terms of risk to user, but more so these are, you know, sensitive topics as a whole, that there are different, you know, communication standards around throughout the world, and so we -- like, companies develop policies that are around this topic area.

BY MR. VANZANDT:

Q.    In your time at TikTok, did you ever become aware of risks related to self-harm for TikTok users?

MR. MATTERN: Objection to form.

A.    I became aware of allegations of risk. I think that posing it as causal risk doesn't really align with actually what the scientific consensus is of how suicide and self-harm risk operates and develops either across a life span or within an individual.

MR. VANZANDT: Okay. Move to strike everything after "became aware of allegations of risk."

MR. MATTERN: Objection.

BY MR. VANZANDT:

Q.    Okay. I'm going to go back -- go down to the first bullet point listed there. It says: Wrote evidence-based policies to address user safety concerns.

Do you see that?

A.    I do see it.

Q.    What are the user safety concerns you're referring to there?

A.    So these were concerns primarily centered around content that showed users that were engaging in active acts of

self-harm or active, you know, acts of suicide or, like, had expressed suicide ideation or experience -- like, lived experience with eating disorders, either past or present, on the platform.

So primarily around the content that users who may have been struggling with these were presenting on the platform, wanting to make sure that we were responding to those in a manner that was appropriate for helping to foster the individual safety and protect also the way that they, you know, operate so that that way they weren't overly stigmatized while also making sure that in areas of, for instance, ongoing active risk, they would be properly escalated to law enforcement or to officials to be able to get help.

Q.    During your time at TikTok, did you become aware of any user safety concerns that were not related to content?

MR. MATTERN:  Objection to form.

A.    I don't think so.  I'm, like, struggling to answer that a bit because user

safety is a pretty broad term, and a part of trust and safety is that you evaluate, like, risks in general, but that's not one-to-one with safety concerns or safety outcomes.

BY MR. VANZANDT:

Q.    The next bullet point says: Leveraged knowledge of machine learning and risk frameworks to improve algorithm-driven feed safety, without sacrificing average video viewership or average session time metrics.

Do you see that?

A.    I do see that.

Q.    What do you mean here by the phrase "algorithm-driven feed"?

A.    So I had worked on a project that looked at content dispersion in the For You feed, so thinking through are there ways of structuring the For You feed that would help to either promote well-being or not -- like, provide for diversity to the feed, and so that's what I'm referring to there.

At the time -- I want to clarify too that, like, average video

viewership or average session time metrics were not actually anything that we were concerned with as a part of that project, at least on my team's end.

It's represented on my résumé because frequently when you're applying to jobs externally, someone who is from more of the business side of the team will be doing the initial review, and so it's more standard to include that language for résumés when you know that you're going to be screened by, like, an HR VP or someone on the product side versus someone working directly within trust and safety. So I just want to be clear on that.

MR. VANZANDT: Move to strike as nonresponsive to any question starting with "at the time I want to clarify."

MR. MATTERN: Objection.

BY MR. VANZANDT:

Q. So you did write that in your résumé, though, right? You wrote that you did that work at TikTok without impacting business metrics like average session time or

average video viewership, right?

MR. MATTERN:  Objection to form and characterizes document.

A.    I did write that down.  It's not something that was a part of the project or the approach at the time in terms of, like, considerations for the actual project launch and, like, with these, like, metrics tracking at least from my end on the trust and safety side.

BY MR. VANZANDT:

Q.    Is it your testimony that -- strike that.

Is it your testimony that this metric tracking that you referred to was not part of the work that trust and safety did at TikTok?

MR. MATTERN:  Objection to form and characterizes testimony.

A.    I don't know that I could speak for the entire trust and safety organization as a whole.  For the role of -- that I was performing as a product policy manager, our goal was to write and make recommendations for evidence-based policies without respect

to how it would necessarily impact core business metrics like user time, engagement length, things like that.

We were really focused on recommendations and asked to give recommendations that reflected safety and risk mitigation versus business -- like, without consideration of business considerations.

BY MR. VANZANDT:

Q.    So is it your testimony that during the time you worked at TikTok and ByteDance that on any of the projects you worked on, that you did not have to consider any of those business considerations?

MR. MATTERN:  Objection to form, and asked and answered.

A.    They were not a part of my direct, like, things that I had to include in my proposals, policies, advocating for the direction that I felt like the company should go.

I don't know whether they were a part of, you know, other considerations as a part of the projects as a whole that I

worked on.

Q.      You certainly saw within the company, though, individuals who were concerned about metrics like average session time and average video viewership, right?

MR. MATTERN:  Objection to form, foundation.

A.      I saw documents that indicated that some of these metrics were core business considerations on the product side, which is pretty typical for tech and business units.

I also knew from talking with some folks on more of the product side that they were interested in items like screen time because they wanted to be able to build interventions for monitoring and facilitating mindful engagement and screen time as well as some of the, like, take a break or screen time management tools that trust and safety product, I think, worked to launch.

BY MR. VANZANDT:

Q.      I want to go back up to where you're describing the work that you did as part of your role, and when you say that -- let me just read that bullet again.

It says:  Leveraged knowledge of machine learning and risk frameworks to improve algorithm-driven feed safety, without sacrificing average video viewership or average session time metrics.

Is that last statement after the comma -- is that truthful and accurate?

MR. MATTERN:  Objection to form, and asked and answered.

A.    To the best of my knowledge, when we were doing, like, a retrospective after launch, that was accurate.  And that's why it wound up in my résumé a few years later.

BY MR. VANZANDT:

Q.    The next bullet point says: Aligned with emergency and incident management teams to resolve global high-profile content escalations.

Do you see that?

A.    I do see that.

Q.    What do you mean by high-profile -- high-profile content escalations?

A.    So the way that moderation

works, just because of the overwhelming volume of content that's uploaded, you know, every minute of every day is that there are tiers of moderation that occur.

So, you know, I, as a global policy manager, would not review every single video that was uploaded or flagged, and we also had teams that were in charge of specific regional markets, for instance, or specific moderation groups.

And so by high-profile, what I mean is that the topic was ambiguous enough or the attention on it was global enough in nature that the decisions to be made about the content and the response and whether it fit within our policies or not had to be escalated to a subject matter expert past all of those initial layers.

Q.    Were there particular topics or categories that were considered high profile? For example, suicide, would that be one?

A.    It wouldn't inherently be considered high profile if it was a -- something that was clearly defined and answered within our policy content areas

itself or, like, didn't necessarily cross all the borders or didn't have a representation of, like, inherent risk within it.

But suicide was considered to be one of the more, like, sensitive or imminent risk topic areas in general because frameworks included things like -- like, suicide attempts that were done that were filmed and posted, which we wanted to make sure were handled appropriately and with deference to best practices.

So it was, like -- I wouldn't characterize it as high profile, but more so just that we had different -- different layers and different types of safety responses and different focus, depending on some of the potential topic areas or harmful outcomes.

So, like, it makes sense that you would have a different workflow for something to deal with suicide or well-being than you would for, like, spam coupons posted to platform.

Q.    The next one there says:  Wrote consumer-facing content and guides on

well-being, lived experience disclosure, and mental health.

How would those consumer-facing writings be presented to consumers?

A.      We posted them in the Safety Center, so we had some how-to guides about safe disclosure of lived experience with mental health as well as how to support a friend or someone that you see online who is posting about their mental well-being when you have concerns about it.

And those were developed in partnership with, you know, experts at the American Association of Suicide Prevention and some of the other organizations that we worked with.  But I believe they were hosted in the Safety Center.

And then during campaigns that we ran, we would also sometimes reference them or post links to them within, like, in-app activation campaigns.  So, for instance, during Mental Health Awareness Month, we might have a link to the pages in the Safety Center as a part of the awareness or the banner that we had accessible to users

more generally.

Q.      Is the Safety Center a place where TikTok would communicate risk to users and parents and the public?

A.      I wasn't in charge of the Safety Center, so I don't know whether that's, like, something that it was necessarily used for.  On my team, we used it to, you know, communicate guides that would help to increase safety overall and psychoeducation about these topic areas because that was something that, you know, we wanted to -- we knew there was less education necessarily, just as a whole, about how safe messaging works around these topics areas.

And so we wanted to do some proactive education to help to make sure that people would be more likely to adhere to some of our platform guidelines that were developed for safety and communication around these topics.

MR. VANZANDT:  Okay.  Move to strike everything after "something that it was necessarily used for."

MR. MATTERN:  Objection.

BY MR. VANZANDT:

Q.    The Safety Center certainly could have been used to communicate risks to parents and the public, right?

MR. MATTERN:  Objection to form.

A.    I don't know.  It's -- I didn't really work on minor safety there, and some of the decisions about communicating to parents would have been on the minor safety team's end.  So I'm not sure what conversations they had around that.

BY MR. VANZANDT:

Q.    So are you aware of any risk that TikTok communicated to users, the public or the parents through the Safety Center?

MR. MATTERN:  Objection to form, foundation.

A.    I'm really mostly familiar with the pages that I worked on, and I think that we had potentially some communication about the fact that different ways of speaking about topics, like suicide and eating disorder, could impact other people with lived experience in different ways.  And so

that's why we encouraged and had guidelines around safe messaging.

But I don't remember the content details enough of the page to be able to say one way or another for sure.

Q.   So going back up to your next role at TikTok, it says your next role was global issue policy lead, mental health.

Was that a more -- is it fair to say that was more of a broader or more general role than your first role?

A.   It included a different set of responsibilities, including, like, doing things like roadmapping and overseeing different content areas.

When I was in my first role, I was primarily focused on suicide and self-harm policies as like my very primary focus, whereas this one was more generally on mental health.

There was also a reorg at the time, and so dangerous acts moved out of the team's portfolio, and we had come to realize over time that just having policies around, like, the traditional trust and safety areas

that other companies typically had, so suicide, self-harm, eating disorders didn't meet the bar that we wanted for safe content policy.

And so we had expanded our focus to include some topics like negative affect, like more general body image issues, and we had been running some campaigns and partnerships around other mental health topics as well.

And so the scope basically changed a bit to reflect that broader focus on mental health as a whole versus the very, very specific kind of clinical phenomenon that had been most platforms' focuses to date earlier.

Q.    Okay.  Going down to the second bullet point it says:  Coordinate with minor safety and well-being product teams to launch core product teen safety protections.

Do you see that?

A.    I do see that.

Q.    And is that -- strike that.

And that's accurate, right? That's part of the work that you did at

TikTok?

A.    It's accurate.  I think that that work was primarily driven by the minor safety and product teams, and so I served as an advisor on some of the mental health considerations there, both in the child safety and the adult, primarily for things that went across the life span.

But it's emphasized here because, at the time, my résumé was being used to apply towards child safety and minor safety roles, and so I wanted to emphasize the fact that I was familiar with this population and had coordinated with other teams to do similar work in the past.

Q.    So the statement is not inaccurate, correct?

MR. MATTERN:  Objection to form, asked and answered.

A.    Yes, it's not inaccurate on my résumé.  It's just, I think, it was very much a consultant role with the teams that were actually in charge of it versus something that was central to my portfolio of work.

///

BY MR. VANZANDT:

Q.    The next-to-last bullet point says:  Serve as spokesperson for media, government and external consultations on mental health and well-being.

Do you see that?

A.    I do see that.

Q.    You used the phrase "spokesperson."  Does that mean that you would have spoken on behalf of TikTok and ByteDance?

A.    I did for various opportunities.

Q.    And so you actually did have the opportunity to do that, to speak externally on behalf of the companies?

A.    I did.  There were some events that I was asked to do that for, and I did.

Q.    Did you undergo media training as part of that role?

A.    Yes, I did.

Q.    Okay.  I want to -- we can pull that down.

I want to establish a little bit of a timeline.  I'm not going to draw it

Q.    I'm going to have some questions for you as well.

A.    Okay.

Q.    And I'll just remind you, you're still under oath.  And my co-counsel had gone over some of the ground rules with you.  Those ground rules are still going to apply to my testimony -- or my questions for you, okay?

A.    Okay.

Q.    And I know we've been going long.  I'm going to try to go a little faster.  If I have sort of yes-or-no questions, I'll just ask you yes or no; is that fair?

A.    I think that's fair, but I'd like to be able to provide whatever context is necessary to answer the question.

Q.    Okay.  If I need context, I'll ask you, okay?

A.    Well, I'll respond as best as I can.

Q.    All right.  In your work as part of trust and safety, do you recall working on a feature on the TikTok app called

Beauty Retouching?

A.    I remember providing some analysis and contribution to discussion around the feature.  I didn't work on it directly myself because that would have been technically owned by core product and on the trust and safety side by other teams.

Q.    And what is the Beauty Retouching feature?

A.    The beauty retouching feature is -- I don't remember whether it was technically categorized as a filter or an effect in app, but the core of it was when you opened up the camera to record yourself in the TikTok app, they had some sliders of things that you could change to adjust your appearance, so things like skin smoothing, teeth whitening and a few other components.

Q.    Can we pull up Tab 19, please. I'm marking as Exhibit 6 TIKTOK3047MDL-054-LARK-00552309.

(Whereupon, TikTok-Linthicum-6, Camera "Beauty Retouching" panel effects launch - TnS Mental Health recommendations [May 2023],

TIKTOK3047MDL-054-LARK-00552309 –
TIKTOK3047MDL-054-LARK-00552326, was
marked for identification.)

BY MR. MURA:

Q.    Do you recognize this document?

A.    I do recognize the document.

Q.    And what is this document?

A.    This was a document that I believe I mostly wrote and/or contributed heavily to that was aligning across different trust and safety teams our concerns with an A/B test that was launched about -- by core product for changes to the Beauty Retouch panel.

Q.    And I'll represent to you this was produced to us by the lawyers for TikTok and that it came from your files.  Any reason to dispute that?

A.    No reason to dispute.

Q.    And this document is titled Camera Beauty Retouching Panel Effects Launch.

Do you see that?

A.    I do see that.

Q.    And TnS Mental Health

recommendations?

A.      I do see that.

Q.      And May 2023?

A.      I do see that.

Q.      And the first sentence says:
This document summarizes TnS concerns with
the testing and launch of an updated beauty
effects retouching panel for users.

Do you see that?

A.      I do see that.

Q.      And then do you see where it
says Background towards the bottom of the
page?

A.      I do see that.

Q.      And there it says:  The Mental
Health issue policy team became aware of a
product change to TikTok effects on May 23rd,
2023 through a viral video criticizing the
change on platform.

Do you see that?

A.      I do see that.

Q.      And then there's a URL.  Do you
see that URL?

A.      I do see that URL.

Q.      And that's the URL that's

to the jury, these were all posted on May 23rd, 2023, correct?

A.    That's what the dates listed on the tags are.

Q.    Okay.  And that's the date when trust and safety became aware of this product change through this video, correct?

MR. MATTERN:  Objection to form, characterizes document.

A.    To my recollection, we were not a part of the PRD review process from core product on this, and so we became aware when I saw this video on my For You feed. Presumably it would have been May 20 -- 23rd, but I'm not certain, honestly, of the exact date that it was served into my feed.

BY MR. MURA:

Q.    Okay.  Well, let's look at -- back to Exhibit 6.  It was this document.

A.    Oh.  Yes.

Q.    Do you see in Background where it says:  The policy -- the Mental Health issue policy team became aware of a product change to TikTok effects on May 23, 2023 through a viral video.

Do you see that?

A.    Yes, so presumably the date was May 23rd, 2023.

Q.    Okay.  Now, the next sentence in that Background section says:  These changes are currently fully launched in ROW and undergoing a 90% traffic A/B test, 4 groups, in US, Canada, Australia and New Zealand regions.

Do you see that?

A.    I do see that.

Q.    Okay.  And ROW, does that mean rest of world?

A.    Yes, that was the shorthand we used for rest of world.  Of note, that's rest of world, not necessarily including China.  It was like rest of world, not -- like, for the markets that we worked on as a global team.

Q.    And the statement about undergoing 90% traffic A/B test in US, Canada, Australia and New Zealand, that means that TikTok was testing the Beauty Retouching effects product on 90% of the traffic in those four countries; is that correct?

A.      Again, I wasn't involved with the exact A/B test design or launch of A/B test, so typically how we would interpret it, to my understanding, how it's put forth is that 90% of the traffic from these regions were split into four groups that may have had different conditions for each of those groups for the testing.

Q.      Okay.  But fair to say that there was wide testing of the Beauty Retouching effects product on a substantial percentage of traffic in those four countries?

MR. MATTERN:  Objection to form.

BY MR. MURA:

Q.      Based on the document?

A.      I think -- well, so I think that it would -- it would be accurate to characterize that 90% of people were assigned to one testing condition, I think, to my understanding.  But -- or, like, to some testing condition there, but that doesn't necessarily mean that every person was actually exposed to the changes because

different conditions have different configurations applied presumably in most A/B tests.

Q.   Okay.  And as of May 23rd, 2023, according to this document, the beauty effects product feature was available in the United States, correct?

MR. MATTERN:  Objection to form.

A.   I believe that some version of it was available in app.  I don't know the exact form of it at that time.

BY MR. MURA:

Q.   And that would have been in the United States, correct?

A.   Yes, I believe so in the United States.

Q.   Let's go to page 2, which is ending in Bates number 310 at the bottom.

Do you see a list under "Retouch settings are presented to users as follows"?

A.   I do see that list.

Q.   Okay.  And the first item in that list says that, quote:  Retouching

effects are turned on by default for all users.

Do you see that?

A.    I do see that.

Q.    And then it says, in parentheses, including minors.

Do you see that?

A.    I do see that.

Q.    And on by default means the user did not need to take any action, correct?

A.    For the people in the test conditions for which that was true, then yes.

Q.    Okay.  And that would be true also of minors, correct?

A.    If a minor was -- was assigned to a condition that included that change, then presumably, yes, because there wasn't, to my recollection, an exclusion criteria in the design for minor users.

Q.    And below the list there's a paragraph that starts "PR teams."

Do you see that?

A.    I do see it.

Q.    And it says, quote:  PR teams

had reviewed the original update proposal, and warned that it was medium to high risk to launch.

Do you see that?

A.    Yes, I do see that.

Q.    Okay.  And it goes on to say: The proposal also passed global legal compliance review.

Correct?

A.    Yes, I do see that.

Q.    Global legal compliance, those are lawyers, correct?

A.    I believe so.  There was a team that was in charge of it, so I'm not sure if all of them were lawyers or they were all just within that job function.

Q.    And that's separate from trust and safety, correct?

A.    Correct.

Q.    And according to this document, the PR team thought this feature had a, quote, medium to high risk to launch.

Do you see that?

A.    I do see that.

Q.    And lower down in the

paragraph, do you see where it says, quote:

keep our users from severe risk of harm.

Do you see that language?

A.    Yes, I do.

Q.    And here -- you said you

worked -- you helped write this?

A.    I did.

Q.    Okay.  And here you're

outlining in this document trust and safety's

recommendations from a mental health and

well-being perspective; is that right?

A.    Yes.  This was something that

we had concerns when we found out about the

configuration of this from a mental health

and well-being perspective, and so that's why

we wrote this doc, was to be very clear about

what the concerns were that we had with the

A/B testing that we had found out had been

launched.

Q.    And in writing this document,

you and your team wanted to keep users from

severe risk of harm; is that right?

A.    I mean, the goal of my team was

to keep users, like, in ways that were safe

and protective on the platform, so we wanted

to mitigate potential for that, yes.

Q.    Right.  The potential to severe risk of harm that this feature would have caused, correct?

A.    I wouldn't say that this feature would have caused, but that aspects of this feature have been associated with in literature.

Q.    Okay.  So --

A.    Or not the feature itself, but the broader underlying, like, presumed mechanisms that would impart risk there because it wasn't, like, there isn't a direct research literature on this feature on TikTok.

Q.    But what you-all wrote was: Had we been consulted earlier in the process -- and you talk about -- you would have welcomed the opportunity -- and then you write:  to keep our users from severe risk of harm.

Do you see that?  I'm just asking if that's what you wrote in the document.

MR. MATTERN:  Objection to

form, characterizes document.

A.    Those are two parts that are disparate across the sentence in the document.

BY MR. MURA:

Q.    Okay.  Let's read the whole sentence:  Had we been consulted earlier in the process, we would have welcomed the opportunity to work together across teams to resolve the portions of the proposal that conflict with global expert recommendations and best practices and keep our users from severe risk of harm while maximizing benefits to users and the company.

Did I read that correctly?

A.    You did read that correctly.

Q.    Okay.  And this also says that the proposal passed global legal compliance review, correct?

A.    Yes, because global legal compliance review doesn't necessarily include all of the subject matter expertise from our team.

Q.    Okay.  And then it goes on to say:  To our knowledge, no trust and safety

product policy team members were contacted for review or informed of the planned changes at any time.

Did I read that correctly?

A.      You did read that correctly. We weren't always a part of the review process.  We were mostly focused on policy work because we were product policy, and so it wasn't standard for every product change to go through our team.

Q.      Okay.  So there were product changes that did not go through trust and safety?

A.      I wouldn't say that did not go through trust and safety.  I don't know about the process as a whole for product launch, just because I wasn't on the product launch team.

I do believe that there was trust and safety review that happened, but I think that that was more on the -- if I remember correctly, the, like, legal privacy side or something as well.

Q.      Okay.  But what's written here is:  To our knowledge, no trust and safety

product policy team members were contacted for review or informed of the planned changes at any time.

Correct?

A.     Yes, product policy was a much smaller team within trust and safety, and to our knowledge, from talking with folks across those teams, no one had been pulled in to consult or review on this, and so this was our document, kind of putting together what our product policy concerns were from some of these teams.

Q.     Do you see just below that where it says Key Concerns and Recommendations in bold?

A.     I do.

Q.     And the paragraph reads:  Key Concerns and Recommendations.  Several of the changes increase risk to our users, especially minors, and directly contradict external expert recommendations we received regarding beautying effects.

Do you see that?

A.     Beautifying effects, but yes.

Q.     Beautifying effects, thank you.

A.      Yes, I see that.

Q.      Okay.  And then it says:  They cross several policy "red lines" that the Mental Health issue vertical holds with regards to features that may impact body image and individuals suffering from eating disorders.

Do you see that?

A.      I do see that.

Q.      And then it says:  As currently implemented, the changes have high potential to lead to negative body image and increase body dysmorphia symptoms, especially among teenage girls.

Do you see that?

A.      I do see that.

Q.      So according to this document, the beautifying effects or Beauty Retouching feature crossed several policy red lines, correct?

A.      Yes, it crossed red lines within our policy team.

Q.      And a red line is something you shouldn't do, correct?

A.      A red line is something that we

recommend not doing.  I think that there's arguments globally about where red lines should be placed, but for our team, this was something that we felt had strong enough evidence of potential for risk behind it that, like, we -- it shouldn't have been done.

Q.    Based on your knowledge, what policy red lines is the document referring to?

A.    I'd have to go back and look at documents, but from my perspective, a policy red line that we held was that people should consent into changes that are being applied to their face, facial structure, and that we shouldn't be implementing recommendations where there was -- or implementing features where there was sufficient research evidence and expert recommendations that there could be risk to users, to the extent that there was for nonconsensual altering of facial shape.

Q.    So does a -- does turning the beauty effect feature on by default cross a red line?

A.    It did for me personally as the lead of the team.  I can't speak for the company as a whole or for everyone.  There was a lot of differences between cultures in terms of how this is thought of and represented, and so it's not something that is a static issue or a universally held red line even within expert circles.

But for me, as the policy lead, it crossed what I felt was a red line in terms of how evidence-based policy should be written.  But again, that could also be influenced by some of my interpretation of the research and thoughts and experiences.

Q.    And does the beauty effect feature being on without notifying the user, does that cross a red line?

A.    Again, it crosses a red line that I think that I held as the mental health policy lead.  Again, that also is something that varies drastically in terms of cultural norms.  And a lot of societies and cultures, even just like your iPhone camera or your Android or whatever will have retouching built in by default, so it wouldn't be

regarded as something that is a universal red line.

Q.    Does a beauty effect feature being available to minors cross a red line?

MR. MATTERN:  Objection to form.

A.    I mean, I think that for me personally, again, that was regardless of age and not minors.  I had some specific concerns about minors too, but to me personally, that felt like more of a universal red line.

BY MR. MURA:

Q.    And what specific concerns did you have about minors?

A.    Minors are typically -- well, so I want to be specific.  It's not minors as a whole that I would have as much concern with.  It's mostly the, like, adolescent development period just because this is a time when teenagers are particularly susceptible to, like, social influence and social rewards.

And so because of the increased paying attention to social contexts, that was something that I was worried about as well as

bodies change a lot over puberty, and that can lead -- or that can be associated with, you know, feelings of discomfort as body changes or, you know, social norming against each other.

And so because of the context of maturation and development, I think that things that promote a -- or, like, that have a chance of sending a meta message that there's like a correct way to look just seemed riskier to me.

Q.    Does a beauty effect feature that alters users' facial structure cross a red line?

MR. MATTERN:  Objection to form.

A.    That one is a little bit more murky in some ways.  I think that the consent issue is important, and then we had recommended that beautifying features that altered facial structure and that couldn't be mimicked with makeup should not be available to users under a certain age just because of that sensitive developmental period.

When it gets to adults, I think

it can be risky too, but there are still kind of freedom of expression and consent issues there to consider as well.

BY MR. MURA:

Q.    And we read the next sentence to the jury.  It reads:  As currently implemented, the changes have high potential to lead to negative body image and increase body dysmorphia symptoms, especially among teenage girls.

MR. MURA:  Can we please underline "high potential to lead to negative body image and increase body dysmorphia symptoms" for the jury, and "especially among teenage girls."

BY MR. MURA:

Q.    Do you see that?

A.    I do.

Q.    Does that cross a red line?

MR. MATTERN:  Objection to form.

A.    I mean, from a trust and safety perspective, we don't want to cause harm.  I think that, like, in terms of, like, high potential to lead to negative body image and

increased body dysmorphia symptoms, again, like I want to underscore that it's individual and the science isn't settled there.

But this was some -- this was an area where we felt like there was enough research evidence that on the trust and safety mental well-being end, we wanted to really strongly recommend and advocate for the fact that this went against our recommendations and the recommendations of experts.

BY MR. MURA:

Q.    Let's read the next sentence to the jury.  It goes on to say, quote:  The changes go against past public statements made by our safety communication teams to defend company reputation, and recommendations produced by GR colleagues across multiple regions.

Correct?

A.    Correct.

Q.    What is GR?

A.    Government relations.

Q.    So according to this document,

TikTok's safety communications teams or individuals had made public statements in the past to defend the company reputation; is that right?

A.    I mean, I think that that's the job of a PR branch of a company, so yes, I believe.

Q.    And were those statements by the PR team about negative body image?

A.    I honestly don't remember what this referred to directly.  I know that we wanted to promote mental well-being and healthy body image and had worked with our PR team to be accurate about how we can communicate thoughtfully about this issue, but I don't know what this is referring to specifically.

Q.    And according to this document, the beauty -- beautifying effects feature was launched and the launch itself went against those public statements, correct?

A.    Again, I'd need to know which public statements were actually being directly cited or referenced here, but to my understanding, it went against some public

statements that had been made previously by the company or by individuals.

And that's part of why I think this wound up being, like -- we wanted, when writing this document, to represent that it wasn't just our safety team that had concerns with it.  It also had concerns from other teams about it, and so we were all recommending that this be rolled back, which they did within, I think, 48 hours.

Q.    What other teams had concerns?

A.    I think -- let me look back at the signatories, but the effects policy team, global safety communications, outreach and partnerships management, youth safety and well-being, minor safety product management.

Q.    And this was launched without the involvement of those teams?

MR. MATTERN:  Objection to form.

A.    My understanding and recollection is that they hadn't -- the people who at least signed off here had not seen it.  I don't know whether some of the teams had ever seen it or not, but I believe

it was more of a, like, core product set of signatories that had done the evals and sign-offs versus some of these more specialized TnS teams.

BY MR. MURA:

Q.    And the individuals who signed off here, are they fairly senior individuals on their teams?

MR. MATTERN:  Objection to form.

A.    Not necessarily, and I think not necessarily within the overall structure of the company.  They were mostly the people who worked most directly with subject matter expert teams, either internally or externally on these issues, so kind of a really specialized and niche corner of the company.

BY MR. MURA:

Q.    So would you agree that they were knowledgeable in this area?

A.    I mean, I think it depends on which statements you're ascribing them to be knowledgeable of.  We wanted to write a well-rounded document, and so, like, I wouldn't necessarily say that, like, some of

these individuals are directly knowledgeable about the ins and outs of clinical research, and I wouldn't say that I'm directly knowledgeable of, like, PR or GR concerns just because that's outside of my realm of expertise and job scoping.

Q.    Fair enough.

But the document says that these teams signed off and aligned with the recommendation, correct?

A.    They did.

Q.    Okay.

A.    Well, with the recommended mitigation strategies that we were proposing here, not with the original PRD form, just to clarify.

Q.    Let's look at the next sentence here.  It says:  Finally, the changes directly contradict expert recommendations, which are among the most unanimous set of recommendations the Mental Health issue vertical has ever received from external consultations.

Did I read that correctly?

A.    You did.

Q.    What were those expert recommendations?

A.    I mean, I'd need to go back and look at the exact wording from the expert recommendations, but to my recollection, that we should not be applying, nonconsensually, changes to a person's facial structure and image, and that, like, effects can be really fun for, like, creativity or, like, have certain purposes, but that -- especially like bone-shaping beautifying effects that are applied without consent are particularly risky.

Q.    Does it contradict any other recommendations?

A.    It contradicted our own team's recommendation when we found out that this launched.

Q.    And the document continues: More experts agree on how we should approach effects than on how we should approach restricting explicit suicide and eating disorder content.

      Do you see that?

A.    I do.

Q.     And the document then says these expert recommendations are, quote:  in a topic area that is currently subject to high public scrutiny and legal inquiries in multiple P0 regions with potential to ban TikTok.

Do you see that?

A.     I do.

Q.     What is a P0 region?

A.     A P0 region is one that is, to my knowledge, considered to be, like, particularly important for some reason or another, whether it's that there is a specific cultural, you know, norm, value approach there that is -- that makes it more highly sensitive to certain area of policy or recommendations than another, or whether it's because of things like active DAU rates or, like, I don't know, presumably other things that go into a business' calculation of how they judge different regions.

That wasn't really something that we paid attention to or, like, were familiar with the calculation of as the policy team.  It was put in here to highlight

to people who were on the core product and business side that this is a region that they have stated that they care particularly about for whatever reason.

Q.   And one of the reasons you gave was whether it's because of things like active DAU rates.

Can you say more about that?

A.   If you are -- so this is from my perspective as someone who, like, didn't really have to consider it in my day-to-day recommendations, but if you are launching a change in a region where there is, you know, 200 million users versus 20 million users, you are likely to be impacting just a broader segment of the global population than you would be in a different region.

So, I don't know, presumably it would impact more people there, but that doesn't make the impact, like, less important from an individual-to-individual basis.

Q.   And where it says here "with the potential to ban TikTok."

Are regions with the potential to ban TikTok typically listed as P0?

A.    I wouldn't know about those calculations.  I think we just highlighted there because there was a lot of back-and-forth around banning TikTok in the US at this point, and again, we wanted to ensure that the people with more of the business side who might read this document were -- you know, we had highlighted that this is also something that they talk about.

Q.    So the United States was one of the P0 regions contemplated in the sentence?

A.    I believe so, especially because we were talking specifically about changes that had impacted the US, among other regions.

Q.    I'd like to go to the -- just below this paragraph, there's a table.

Do you see that?

A.    I do see that.

Q.    And the far-left column in the table says Launch Feature.

Do you see that?

A.    I do see that.

Q.    And the next column is Risk/Harm Severity.

Do you see that?

A.     I do see that.

Q.     And then it says Key Concerns.

Do you see that?

A.     I do see that.

Q.     And followed by Suggested Changes to Mitigate Risk?

A.     I do see that.

Q.     Followed by Benefits of Implementing the Proposed Change?

A.     I do see that.

Q.     And finally, Suggested Time Frame?

A.     I do see that.

Q.     And that's the suggested time frame for the proposed change; is that right?

A.     Yes.

Q.     So this table represents the trust and safety team's opinions about how to approach various aspects of Beauty Retouching panel; is that right?

A.     It represents the opinions and recommendations of the specific trust and safety teams that had signed off on it. Trust and safety is a massive organization

with a ton of different functions, and so this was primarily the ones who had checked off the boxes.

Q.    Okay.  The ones who checked off the boxes, that's on the first page?

A.    That is.

        MR. MURA:  Okay.  Can we go back to that first page for one second and blow it up.  Just the checked boxes, please, and the team signed off.

BY MR. MURA:

Q.    Is this the checked boxes that you're referring to?

A.    These are the checked boxes that I'm referring to.

Q.    And the first name is your name; is that correct?

A.    It is.

Q.    Global Mental Health Issue Policy?

A.    Yes.

Q.    And then we have North America Regional Mental Health Policy?

A.    Yes.

Q.     TnS Global Safety
Communications?

A.     Yes.

Q.     Global Effects Feature Policy?

A.     Yes.

Q.     Global Mental Health Outreach
Partnerships Manager?

A.     Yes.

Q.     Global Youth Safety and
Well-Being?

A.     Yes.

Q.     North America Youth Safety and
Well-Being Policy Manager?

A.     Yes.

Q.     Minor Safety Product
Management?

A.     Yes.

Q.     USDS Product Policy?

A.     The interim, yes.

Q.     USDS Issue Policy?

A.     Yes.

Q.     And these were the groups --
none of them were consulted before the
launch, correct?

A.     To my knowledge, no.

Q.     Okay.  Let's go back to the charts.  It's at the bottom of 311.  Thank you.

So the first feature listed in this table, it says filters:  are turned on by default for all users, including minors.

Do you see that?

A.     I do see that.

Q.     And according to the document, this feature had a, quote:  high risk of causing severe psychological harm.

Is that right?

A.     Yes.

Q.     This document also says that one of the reasons this feature had a high risk of harm is that, quote:  For users who are posting, this feature, quote, may increase the risk of feelings of body dissatisfaction or body dysmorphia.

Do you see that?

A.     Yes.

Q.     Did TikTok ever tell parents or children that it had designed and launched a feature that may increase the risk for feelings of body dissatisfaction and body

dysmorphia?

MR. MATTERN:  Objection to form.

A.    I don't know what TikTok did or did not communicate.  This was an A/B test and not a full-feature launch, and so I don't know what the processes were for that.

BY MR. MURA:

Q.    But this feature was available publicly to some users, correct?  We saw a video where it does --

A.    I mean, I think like in terms of A/B testing, yes.  For the users that had been assigned to the group, it would have been on their specific profiles if they had updated.

Q.    Okay.  And it says here that there was a high risk of causing severe psychological harm to users, to TikTok users, from this feature, correct?

A.    It does say that.

Q.    Okay.  And so my question is: To your knowledge, did TikTok ever tell parents or children that it had launched a feature that may increase the risk of

feelings of body dissatisfaction and body dysmorphia?

MR. MATTERN:  Objection to form.

A.    I don't know since I wasn't involved in product or A/B test launch communications.

BY MR. MURA:

Q.    Okay.  And then we have trust and safety's recommendation for this feature was to make it default to off, correct?

A.    That was one of the recommendations that we made.

Q.    Okay.  Turning the feature to be off by default would not do any harm that the feature had already done, correct?

MR. MATTERN:  Objection to form.

A.    I'm not sure that I understand the question as stated.  Can you restate it?

MR. MURA:  I'll strike it.

BY MR. MURA:

Q.    Let's look at the next row at the bottom of 313.  Do you see this other table?  Do you see where it says that instead

of being default on, the Beauty Retouching panel would just be made available to users of all ages?

A.    Yes, I do.

Q.    Okay.  And right next to that option, the table says that it would pose a medium risk to users.

Do you see that?

A.    I do.

Q.    Okay.  So trust and safety had made a recommendation, and that recommendation would still result -- would still pose a medium risk of harm, correct?

MR. MATTERN:  Objection to form.

A.    I wouldn't characterize it as trust and safety as a whole making a recommendation.  Again, it was very specific teams within trust and safety, including my own.

And what our thoughts of -- our thoughts were from consultation with experts and from our read of the literature is that this carried risk, especially to minors, for specific types of changes.

BY MR. MURA:

Q.    Okay.  So the suggestion was to adopt this change, and the analysis was this would pose a medium risk to users, correct?

A.    Overall, a medium risk, but specific elements of the panel would have been low risk and certain elements would have been potentially higher risk, which is why some of the recommendations went into further detail about which specific types of effects and recommendations we were requesting or recommending to have, like, disabled, made available, not made available, et cetera, based on our read of the literature and recommendations.

There's a trade-off here between, like, safety expression, benefits and harm in that there are -- there is some research about certain types of effects or appearance changes actually also leading to beneficial outcomes, and so we wanted to be really scoped in the recommendations that we were making to align with experts and the strength of research evidence that was presented.

Q.      And next to where it says medium, there's a third column.

Do you see that?

A.      I do.

Q.      And this third column indicates that this feature, quote, may have disproportionate negative impact on minors.

Do you see that?

A.      I do see that.

Q.      And then the document recommendations, quote, immediate age-gating here.

Do you see that?

A.      Yes, I believe that we recommended age-gating for appearance-focused structural changing effects to be set in consultation with the teams that had specialized knowledge within these areas and consultations with experts.

Q.      And immediate age-gating here would mean that only users whose birth date indicated that they were adults could use the feature; is that correct?

A.      We didn't give any specific age ranges here in this recommendation, and

again, it depends on which specific effect from the retouch panel you were talking about, but for things like structural reshaping, that would have been something that we recommended be gated to 18 or older users, just because we felt like it was a riskier time period for them.

Q.    And when you say because we felt that like it was a riskier period for them, you're referring to anyone under 18?

A.    I'm referring to adolescents as a whole because of the maturation process. Again, it's very individual in terms of person to person and context to context about how it actually will impact someone is what we see from the feature.

But just overall, considering the population and the life stage, it seemed like it would be something that might have, like, possibilities of increased risk.

MR. MURA:  David, I promised you lunch at around this time.

MR. MATTERN:  Can we go off the record?

MR. MURA:  Let's go off the

record.

THE VIDEOGRAPHER:  The time is now 12:13.  Going off the record.

(Recess taken, 12:13 p.m. to 12:56 p.m. PDT)

THE VIDEOGRAPHER:  The time is now 12:56.  Back on the record.

BY MR. MURA:

Q.    Ms. Linthicum, I'll just remind you you're under oath.

A.    Yes.

Q.    Okay.  Thank you.

We were talking about this chart that's displayed in front of you.

Do you see the fourth column where it says "Specifically"?  It's the entry where it says "short-term"?

A.    I'm sorry, I think I'm on the wrong -- yes, I do.

Q.    Okay.  And here the document recommends, quote:  allowing access to makeup retouching options, and potentially skin-smoothing, blemish removing options, but no other retouching features.

Do you see that?

A.    I do see that.

Q.    And when it says "no other retouching features," those are changes that would be to underlying facial structures; is that right?

A.    Yes, the next i.e. clarifies that that's what we were referring to.

Q.    And this launch had included filters that changed underlying facial structures, right?

A.    I believe it had, and that's why we were concerned about it.

Q.    And the next entry in the table -- this is ending on 315, so if you turn over a couple of pages, do you see where it says "Structural reshaping"?

A.    I do.

Q.    And this table shows some of the structural reshaping features or goes over them; is that right?

A.    Yes.

Q.    And it says:  Structural reshaping of the face available, in parentheses, face roundness, eyes, nose, lips, brows.

Do you see that?

A.      I do see that.

Q.      And right next to that it says "high" for the risk.

Do you see that?

A.      I do see that.

Q.      And then it explains:  High risk of causing severe psychological harm to TikTok users.

Do you see that?

A.      I do see that.

Q.      So structurally reshaping of the face, according to this document, this feature had a high risk of causing severe psychological harm, correct?

A.      I think it depends on the, like, exact individual and the, you know, person that you're talking about, but we considered it to be something that was relatively higher to the extreme end of risk on the risk scales that we were using.

Q.      And this feature may increase risk of user feelings of body dissatisfaction.

That's what the document says,

correct?

A.    Yes.  In research, not TikTok specific, but more generally, it seemed I had read some studies that were fairly well designed that showed that there were associations of negative body image in certain individuals with increased use of facial restructuring features, and so that's why it says it may increase risks for users.

Q.    And according to this document, this feature may increase risk of user feelings of body dysmorphia; is that right?

A.    Yes, it says that, again, based on more general research, not TikTok specific.

Q.    And according to this document, this feature may increase users' desire for cosmetic surgery.

Do you see that?

A.    I do see that.

Q.    And it continues on to the next page.  According to this document, this feature may increase users' drive for thinness.

Do you see that?

A.    I do see that.

Q.    And according to this document, it may increase risk of eating disorder symptoms.

Do you see that?

A.    I do see that.

Q.    To your knowledge, did TikTok inform children or parents that restructuring your face's roundness or eyes or nose or lips or brows, any structural reshaping, had a high risk of causing these severe psychological harms?

MR. MATTERN:  Objection to form.

A.    I don't know.

BY MR. MURA:

Q.    Let's look at the next feature, which is on page 317 -- the next table, excuse me.

Do you see on the left where it says users recording a video are not notified that their faces are retouched?

A.    It says:  Users recording with the camera are not notified on main screen that their face has been retouched.

Q.      Thank you.

Do you see that?

A.      I do see that.

Q.      Okay.  And then it says that the risk is high.

Do you see that?

A.      I do see that.

Q.      Did TikTok ever tell parents or children that there was a high risk of harm associated with launching filters that defaulted to on with no indication that a user's face was being retouched?

MR. MATTERN:  Objection to form, characterizes document.

A.      I don't know about that, and I think there's also some confusion in this document and other questions about filters versus effects, and those are sometimes used interchangeably and sometimes not used interchangeably.  And there were some that were always shown with labels that they had been applied and some that were not.

BY MR. MURA:

Q.      And, to your knowledge, are you aware whether TikTok ever informed parents or

children of the information that we're

reviewing now?

      A.    I don't know.

          MR. MATTERN:  Objection to

  form.

          THE WITNESS:  Oh, sorry.

BY MR. MURA:

      Q.    And this feature contradicted

expert recommendations, correct?

          MR. MATTERN:  Objection to

  form.

      A.    It contradicted recommendations

that we had solicited, like practically

solicited from external organizations and

received from some groups that we had

consulted with.

BY MR. MURA:

      Q.    So TikTok had solicited expert

recommendations on these topics?

      A.    Yes.  Well, we had a roster of

external experts that we consulted on topics

to do with suicide, body image, more

generally, mostly from the product policy

perspective, because we wanted to make sure

that the changes that we were making or the

recommendations that we were making were evidence informed and in line with not just, you know, what folks internal to the company would say, but also with what some of the leading researchers in the world would characterize the evidence as.

Q.    And this feature was launched even though it does not align with those expert recommendations, correct?

MR. MATTERN:  Objection to form.

A.    I would have to look back to understand when different consultations occurred, but in general, we had concerns over this feature contributing to negative body image, and we had had some consultations around different, like, approaches to effects that might increase or reduce risk of these effects to users, so presumably.

BY MR. MURA:

Q.    And so your answer is presumably?

A.    Can you repeat the main question?

Q.    Well, just to be clear, this

document says that this feature does not align with expert recommendations, correct?

A.    Yes, I think it didn't align with our understanding and our conversation with experts about the best practices for filters and effects as a whole.

I don't recall whether the statement was specific to any consultations that we had done about this in particular versus effects policy as a whole, which were different.

Q.    And according to this document, users were not notified when they're watching content where other people's faces have been retouched, correct?

A.    Can you state where you're looking at?

Q.    This is -- yes.  Let's move on to the next page, my apologies, 318.

A.    Hmm.

Q.    And do you see there's a table that says:  Users viewing content recorded by others are not notified when retouching has been applied?

A.    I do see where it says that.  I

want to be specific there in the context of your earlier question of this is very specific to the retouching feature that was involved in this A/B test for effects as a whole.

There were stickers with links to the effects that were applied to the corner of the videos where users were using those effects, so I just want to be really clear about what this is referring to specifically in terms of user -- other users not being notified that a retouching has been applied.

Q.    Okay.  And it says that that risk is high, correct?

A.    Yes.

Q.    Did TikTok ever warn users that there was a high risk of harm associated with launching filters that defaulted to on with no indication that they were watching videos that had been retouched?

MR. MATTERN:  Objection to form.

A.    I don't know.

///

BY MR. MURA:

Q.    Let's look at the page ending in 319, please, the next page.  The table that starts with the word "Effects."

Do you see that?

A.    I do.

Q.    And it says:  Effects of minimally invasive cosmetic procedure available, parentheses, skin smoothing and retexturing, teeth whitening, undereye lightening.

Do you see that?

A.    I do.

Q.    And this document recommends that the filters that structurally altered users' faces be made unavailable.

Do you see that?

A.    Can you point me to where you're looking?

Q.    Yes.

MR. MURA:  Can we go off the record?

THE VIDEOGRAPHER:  The time is now 1:07.  Going off the record.

(Recess taken, 1:07 p.m. to

1:09 p.m. PDT)

THE VIDEOGRAPHER:  The time is now 1:09.  Back on the record.

MR. MURA:  I can strike that last question and ask you a different question.

BY MR. MURA:

Q.    So looking at page 319, it discusses effects of minimally invasive cosmetic procedures available.

Do you see that?

A.    I do see that.

Q.    And it says:  Skin smoothing and retexturing, teeth whitening, undereye lightening.

Do you see that?

A.    I do see that.

Q.    And the document indicates that these retexturing features have a medium to high risk of harm.

Do you see that?

A.    I do see that.

Q.    And it says next to that column:  May increase risk of psychological harm to users, including feelings of body

dissatisfaction, body dysmorphia, desire to engage in low-risk cosmetic procedures.

Do you see that?

A.    I do see that.

Q.    Did TikTok ever inform parents or children that these retouching features had a medium to high risk of causing psychological harm?

MR. MATTERN:  Objection to form.

A.    I don't know.

BY MR. MURA:

Q.    If we go down to the feature spanning pages 319 to 320, do you see on the left-hand column it says:  Preset, default filter settings are applied to users' faces when they open the retouch menu?

A.    I do see that.

Q.    And we saw in the video before that the user -- the user, the individual there, had talked about having their teeth automatically whitened on a scale.

Do you remember that?

A.    I do remember that.

Q.    I believe the number was 20.

A.      That seems like, yes.

Q.      And the article continues:
"Put in the context of the pandemic, teens are on social media more.  That means they're potentially exposed to more content that could potentially trigger the development or maintenance of an eating disorder."  Numerous studies have documented the negative effects of social media on people with eating disorders, but there are some especially concerning aspects specific to TikTok.

Did I read that correctly?

A.      I believe so, from the article.

Q.      Okay.  Let's turn to Tab 32.
And this is TIKTOK3047MDL-060-01155277, which I'm marking as Exhibit 17.

(Whereupon,

TikTok-Linthicum-17, Brief Summary for

Negative Affect Project Mar 9,

TIKTOK3047MDL-060-01155277 -

TIKTOK3047MDL-060-01155279, was marked

for identification.)

BY MR. MURA:

Q.      The metadata of this document reflects it was found in your files.

Do you have any reason to dispute that?

A.      No reason to dispute.

Q.      And the title of this document is "Brief summary for negative affect project, March 9th."

Do you see that?

A.      I do see that.

Q.      And it says Project Background.

Do you see that?

A.      I do.

Q.      And it says:  In July 2021, WSJ, Wall Street Journal, flagged TikTok's algorithms revealed the risk of users entering, quote, rabbit holes, i.e., filter bubbles, where users may get stuck in a loop of content featuring negative affect.  So we initiated this project.

Do you see that?

A.      I do see that.

Q.      Do you recall working on a response to this Wall Street Journal article?

A.      I recall examining the methodology and claims that the article made. I don't know whether I worked, like, directly

on the responding to the article or the comms team, but I was very involved in helping to design the safety features and mitigation mechanisms for the behaviors that we didn't want to see or were considered to be not ideal from a well-being perspective after the article came out.

Q.    And according to this document, TikTok initiated a project to address rabbit holes after the Wall Street Journal published this article about TikTok's algorithm and the risk of rabbit holes, correct?

MR. MATTERN:  Objection to form.

A.    I believe that it would have been around that time we became aware of -- or at least I became aware of that and was drawn into the project after that publication.

BY MR. MURA:

Q.    Let's bring up Tab 33.  This is TIKTOK3047MDL-128-LARK-06658443, and I'm marking that as Exhibit 18.

(Whereupon,

TikTok-Linthicum-18, [P&C] XFN WSJ

Escalations Bi-Weekly Sync Lark
Document,
TIKTOK3047MDL-128-LARK-06658443 –
TIKTOK3047MDL-128-LARK-06658471, was
marked for identification.)

BY MR. MURA:

Q.    The metadata reflects this
document was found in your files.  Do you
have any reason to dispute that?

A.    No.

Q.    And this document is entitled
[P&C] XFN Wall Street Journal Escalations
Biweekly Sync.

Do you see that?

A.    I do see that.

Q.    And can you explain what P&C
XFN means?

A.    P&C means private and
confidential or privileged and
confidential -- I forget what the actual
technical term is.  And XFN means
cross-functional, so people who were from
different functions across the company.

Q.    And biweekly sync refers to
meeting biweekly; is that correct?

A.      Approximately biweekly.  I think that meetings get pushed around a lot, so I wouldn't say that it was exactly every biweekly on the dot.

Q.      Okay.  And this was a regular cross-functional team meeting; is that fair?

A.      I believe so, for the course of the project.  There were a lot of different resources and job functions that had to be involved in this project, and so it was helpful to coordinate across all of the different departments that were working to improve this.

Q.      Okay.  And it says:  Wall Street Journal Escalations in the title, and a little -- if you go down in the document, you'll see Wall Street Journal escalations again.

Do you see that?

A.      I do.

Q.      And it says:  Wall Street Journal published three articles in the past stating that the TikTok algorithm would lead people into a negative filter bubble that is hard to escape.

Do you see that?

A.    I do see that.

Q.    So this was -- these were meetings in relation to this Wall Street Journal escalation; is that correct?

A.    They weren't directly about the Wall Street Journal escalation articles. They were more so about the evolution of the safety strategy and the recommendation mitigation and the, like, technical changes that were being made, in part, to, like, mitigate and respond to some of the behavior that was seen in the Wall Street Journal articles.

Q.    And above that it says: Meeting US Safety, Algo.

Do you see that?

A.    Yes.

Q.    So is that indicating that this was a cross-functional team that consisted of employees from trust and safety and the algorithm team?

A.    I believe so.

Q.    And do you see the first topic titled Negative Filter Bubble Project

Background?

     A.     Yes.

     Q.     Okay.  And that refers to the Wall Street Journal escalations, correct?

     A.     I think it refers to the issue of negative filter bubbles as a whole.

     Q.     Let's go to Tab 34.  I'm marking TIKTOK3047MDL-028-00830053 as Exhibit 19.

          (Whereupon,

          TikTok-Linthicum-19, Dispersion

          Working Group Presentation,

          TIKTOK3047MDL-028-00830053 –

          TIKTOK3047MDL-028-00830065, was marked

          for identification.)

BY MR. MURA:

     Q.     And the metadata reflects that this was in your files.

          Any reason to dispute that?

     A.     No reason to dispute.

     Q.     And this is a PowerPoint presentation by the, quote, Dispersion Working Group, correct?

     A.     Yes.

     Q.     And the dispersion working

group was working to address rabbit holes on TikTok; is that correct?

A.    Not exactly.  So this was a working group that was set up because there were -- there were a series of groups that were set up to address rabbit holes or filter bubbles for certain topics, but each of those groups had functioned sometimes independently, sometimes overlapping each other, and so what we needed was a more general unified strategy for how to use dispersion as a tool in the policy and safety bucket as well as more of a templatized run book for people who were interested in leveraging it to address issues within their topic.

So this was a working group that was set up more within the product policy team to look at the process and speed up and align how teams could launch dispersion projects in a way that was, you know, faster, lower effort cross-functionally and more standardized in terms of what they were being used to mitigate concerns of.

Q.    And this slide deck is from --

this PowerPoint presentation is from February 2023.

Do you see that?

A.     Yes.

Q.     And do you see your name there?

A.     Yes.

Q.     You're one of the presenters?

A.     I was.

Q.     And can you turn to one slide over -- actually, slide 4, I believe.  It's page 4.

Do you see on this slide the headlines from Wall Street Journal articles?

A.     Yes.

Q.     So on the bottom of this slide, it says:  Inside TikTok's Algorithm:  A Wall Street Journal Video Investigation.

Do you see that?

A.     I see that title.

Q.     And then at the top do you see: "The Corpse Bride Diet":  How TikTok Inundates Teens With Eating Disorder Videos.

Do you see that?

A.     I do see that.  It's a little bit different from the methodology that was

used, but I see that that's the title of the article that they went with.

Q.    And do you see another article in the middle on the right, the print is smaller, but it says:  How TikTok Serves Up Sex and Drug Videos to Minors.

Do you see that?

A.    I do.

Q.    Was the Wall Street Journal reporting the first time you became aware of rabbit holes?

A.    It was the first time that I became aware of rabbit holes within the TikTok context and applied with this specific definition.

The concept of rabbit holes as a whole I had heard of before, primarily associated with political party, political affiliation and, like, political posts on other platforms.

Q.    Please pull up Tab 35, which I will mark as Exhibit 20.

(Whereupon,

TikTok-Linthicum-20, Wall Street

Journal Video, How TikTok's Algorithm

Figures You Out, Media File, was

marked for identification.)

BY MR. MURA:

Q.    I'm introducing a YouTube video as Exhibit 20.  I can hand you a printout of the title card.  I'll represent to you this is the YouTube video of the Wall Street Journal titled How TikTok's Algorithm Figures You Out.

A.    Thank you.

Q.    Do you recall watching this video before?

A.    I do believe I watched it, yes.

Q.    Okay.  We're going to play a portion from 0:24 to 1:32 for the jury, and then I'll have some questions for you, okay?

A.    Okay.

(Whereupon, the media was played in the deposition room.)

BY MR. MURA:

Q.    The Wall Street Journal investigation, when it was discussing rabbit holes, it was, in part, discussing rabbit holes about themes of sadness and heartache.

Do you remember that?

MR. MATTERN: Objection to form.

A.      I remember the Wall Street Journal article had some of those themes highlighted -- or one of them did.

BY MR. MURA:

Q.      And those types of videos, TikTok referred to them as, quote, negative affect, quote; is that right?

A.      Those were some of the subsets of videos that comprised negative affect videos. It wasn't always around those specific themes. Mostly it was aligned with what we think of as negative affect more in the cycle, and so like some videos that, like, for instance, had like -- like, themes of loneliness or isolation or things like that would also be considered negative affect even if they were not necessarily within the categories that you just mentioned.

MR. MURA: Next let's play minute 1:37 to 3:41 for the jury.

(Whereupon, the media was played in the deposition room.)

MR. MATTERN: I'm just going to

reported was about the depression and mental health videos, and those were the proportions that they stated.

BY MR. MURA:

Q.    And it said that the bulk of the remaining 7% of the videos were ads, correct?

A.    That's what they reported.

Q.    Okay.  Let's go to Tab 36, and we'll mark this as Exhibit 21.

(Whereupon,

TikTok-Linthicum-21, Wall Street

Journal Article, How TikTok Serves Up

Sex and Drug Videos to Minors, was

marked for identification.)

BY MR. MURA:

Q.    This is a copy of a Wall Street Journal article, correct?

A.    It appears to be so.

Q.    And the title is How TikTok Serves Up Sex and Drug Videos to Minors, correct?

A.    That's what it looks like.

Q.    And the -- right underneath the title it says:  The popular app can quickly

drive young users into endless spools of adult content, including videos touting drug use and promoting pornography sites.

Do you see that?

A.    That's what it says.

Q.    And this was one of the articles that was featured in the PowerPoint we looked at before, where you were a participant in that PowerPoint.

Do you remember that?

A.    Yes.  I think that that was one of the headlines that had been pulled into that.  This area wasn't one that I had worked on directly because it was outside of my issue area, but that working group had members who had worked on that previously.

Q.    And this article is from September 8th, 2021; is that correct?

A.    That's what it appears like based on the date listed.

Q.    Do you recall reading this article at the time?

A.    I honestly don't remember if I actually read this article or not at the time.  It was of interest given the Wall

Street Journal reporting, but this wasn't my issue area and I wasn't focused on minors, so I don't know whether I read the article or read it in full or not.

Q.    Let's pull up Tab 37 next, and this is Exhibit 22.

(Whereupon,

TikTok-Linthicum-22, Wall Street

Journal Article, The Corpse Bride

Diet: How TikTok Inundates Teens with

Eating-Disorder Videos, was marked for

identification.)

BY MR. MURA:

Q.    This is another article from the Wall Street Journal; is that correct?

A.    It appears so.

Q.    And the title of this article is "The Corpse Bride Diet":  How TikTok Inundates Teens With Eating Disorder Videos.

Do you see that?

A.    Yes, I see that.

Q.    And underneath it, it says: The app's algorithm can send users down rabbit holes of narrow interest, resulting in potentially dangerous content such as

emaciated images, purging techniques,

hazardous diets and body shaming.

Do you see that?

A.    I do see that.

Q.    And this is from December 17th,

2021?

A.    That's what it looks like.

Q.    Do you recall reading this

article?

A.    I do remember reading this

article.  This was within my issue area.

Q.    And were you aware of the

problems raised in this article before

reading it?

MR. MATTERN:  Objection to

form.

A.    I don't believe so

specifically.

BY MR. MURA:

Q.    And this was one of the

articles that prompted TikTok to address

rabbit holes, correct?

MR. MATTERN:  Objection to

form.

A.    We wanted to address rabbit

holes, and this was one of the articles that placed increased emphasis on this being an issue for this specific type of content.

And so, yes, it's one of the articles that pushed us to include parameters around this as a part of our overall strategy from the policy team of addressing body image and eating disorder issues.

BY MR. MURA:

Q.    Let's pull up Tab 38, which we'll mark as Exhibit 23.

(Whereupon,

TikTok-Linthicum-23, ED - Response to

Shou Lark Document,

TIKTOK3047MDL-078-LARK-01859676 -

TIKTOK3047MDL-078-LARK-01859682, was

marked for identification.)

BY MR. MURA:

Q.    This is TIKTOK3047MDL-078-LARK-01859676.  And I'll represent to you that this came from your files.

Any reason to dispute that?

A.    No reason to dispute that.

Q.    Do you remember this document?

A.     I don't remember this document specifically, but I remember working on some of the CCDH report, and so it's natural that I would have been probably tagged or potentially written part of this.

Q.     And the title says ED.  Is that eating disorder?

A.     I believe it is eating disorder in this context.

Q.     And Response to Shou.  Would that be Shou Chew, the CEO?

A.     Yes.

Q.     Can you turn to the page ending in 678.  There is a bullet at the bottom that says:  Feed dispersion.

Do you see that?

A.     Yes.

Q.     And it says:  Following multiple escalations in 2021 that said TikTok's FYP sent users -- that's the For You feed?

A.     FYP is For You Page.

Q.     For You Page, excuse me. Right.

That TikTok's For You Page sent

users into filter bubbles of eating disorder and extreme diet and fitness, EDF, content, in November 2022 we launched feed dispersion efforts for such content in 60 global English-language markets.

Do you see that?

A.    I do see that.

Q.    What is feed dispersion?

A.    Feed dispersion was a project that we worked on in collaboration with the policy team and the algo teams to essentially rate limit the presentation of videos that matched a certain topic area that policy had decided would not be ideal to have clustered together.

So instead of, you know, potentially having, like -- having multiple videos with themes of, like, diet and fitness together in a row, it would ideally rate limit to no more than, like, one out of eight, one out of every 16, kind of whatever you set it to, in terms of videos that had those themes and content that were presented within a For You feed load.

Q.    So the next sentence says:

This has resulted in an improvement in EDF bubble users by 52%.

Do you see that?

A.      I do see that.

Q.      That's extreme diet and fitness bubble users, correct?

A.      I believe so.  I don't know what exactly the sample is or the percent that is being referred to here.  That's just not something I remember from that time.

Q.      Well, right above it says "extreme diet and fitness" and then "EDF" in quotes, and then it uses EDF again.  So fair to assume that that's what it's referring to?

A.      I agree that EDF means extreme diet and fitness in both contexts.

Q.      Okay.  Even after the solution was implemented, it was still possible for the algorithm to push a user into an eating disorder rabbit hole.

Correct?

MR. MATTERN:  Objection to form.

A.      I don't know.  Again, like, looking at this sentence, I'm not sure what

don't recall?

MR. MATTERN:  Objection to form.

A.    My testimony is that there were -- to my knowledge, there were dispersion interventions that had been launched at that time as well as a suite of policies that directly related to suicide and self-harm because you tailor the approach to the individual components of the topic at hand.

BY MR. MURA:

Q.    Let's look at Tab 46.  This is TIKTOK3047MDL-150-LARK-07275923, and we're marking this as Exhibit 30.

(Whereupon, TikTok-Linthicum-30, (P&C) P0: Businessweek feature - March 10 deadline Lark Document, TIKTOK3047MDL-150-LARK-07275923 - TIKTOK3047MDL-150-LARK-07275929, was marked for identification.)

BY MR. MURA:

Q.    I'll represent to you that this came from your files.

Any reason to dispute that?

A.     No reason to dispute that.

Q.     This is a Lark chat, correct?

A.     Yes, it looks like a Lark chat.

Q.     And the title is (P&C) P0:
Businessweek feature - March 10 deadline.

Do you see that?

A.     I see that.

Q.     What is P&C?

A.     I think privileged and
confidential.

Q.     And P0 is -- you testified
about this before.  Is it fair to say it's
high priority?

A.     Yes, relative to other rankings
here.

Q.     And when it says confidential,
that means it was not supposed to be released
outside of this group; is that fair?

MR. MATTERN:  Objection to
form.

A.     I don't think it had to do with
release beyond the group itself.  I think
that it had to do with whether lawyers were
weighing in about the matter or not.  But I

didn't title the Lark chat, so I'm not a hundred percent sure.

BY MR. MURA:

Q.    But this was confidential to TikTok, correct?

MR. MATTERN:  Objection to form.

A.    As far as I know about how confidentiality works as a nonlawyer, presumably.

BY MR. MURA:

Q.    Well, you were careful not to share this with the public, right?

MR. MATTERN:  Objection to form.

A.    I was careful not to share any of my work with the public because I work behind the scenes, unless I was representing TikTok as a spokesperson.

BY MR. MURA:

Q.    So do you see at the bottom of page 1 where Suzy Loftus says:  Can we please add Ryn Linthicum?

A.    I do see that.

Q.    And Suzy Loftus, is that the

head of USDS Trust and Safety?

A.     I don't remember her exact title, but she was high up in USDS Trust and Safety.  I think maybe on the risk and response side originally.  I'm not sure if it was over the whole org.

Q.     And you used an emoji and appear to be part of this Lark chat; is that fair?

A.     Yes.

Q.     And this chat is about a forthcoming Businessweek article, correct?

A.     Give me a moment to look through, just to double-check.

(Document review.)

A.     It looks like it.

BY MR. MURA:

Q.     At the bottom of page 2, do you see where ▇▇▇▇▇▇▇ makes a post titled USDS TnS Update?

A.     I do.

Q.     And who is ▇▇▇▇▇▇▇?

A.     I believe she was on the USDS side for investigations or risk and response.  I'm not sure which.  But she helped to do

investigations and analysis work.

Q.    And do you see where the post says:  Hey all, we've completed a review of -- and then there's a redaction -- and it says:  account which can be found below.

Do you see that?

A.    I do.

Q.    So this is a Lark chat that postdates a review of an account that was discussed in the Business Weekly [sic]?

MR. MATTERN:  Objection to form.

A.    In theory, yes, considering that it's appearing in this chat.  I wouldn't be able to confirm one way or another without actually seeing the name and the title.

BY MR. MURA:

Q.    And it goes on:  Overall, user -- it's referring to a TikTok user, right, and those are redacted -- was repeatedly shown videos surrounding SSH-related topics, and he likely fell into an SSH filter bubble.

Do you see that?

A.    I do see that.

Q.      And remind the jury what SSH is?

A.      Suicide and self-harm.

Q.      So this would be a suicide, self-harm rabbit hole; is that correct?

MR. MATTERN:  Objection to form.

A.      It would be a suicide and self-harm filter bubble.

BY MR. MURA:

Q.      Do rabbit hole and filter bubble mean the same thing, or do you prefer filter bubble?

A.      They don't always mean the same thing.  We set, typically, a more conservative standard for what a filter bubble meant, and we had our own metrics for it versus what folks have generally considered to be a rabbit hole at large.

Q.      Okay.  Can we agree that this chat is indicating that this individual likely fell into a suicide, self-harm filter bubble?

A.      I think that that's what Rebecca is saying here and reporting back.

Q.    Do you see back at the top where it says "Hey all" again?

If you continue after the "but," it says:  we have high confidence in this based off an in-depth review of the content.

Do you see that?

A.    I do see that.

Q.    And then do you see a little below where it says "Based on a review"?  Do you see that language under Videos?

A.    I do see that.

Q.    It says:  Based on a review of approximately 7,500 videos in the two weeks leading up to the user's death, and it has some dates, nearly 10% violated our community guidelines, mostly for suicide and self-harm.

Do you see that?

A.    I do see that.

Q.    And you recall that in the previous Lark chat we saw, you indicated that TikTok would not release this user's specific feed log to the media, correct?

MR. MATTERN:  Objection to form.

A.      Again, I couldn't confirm whether it was this user or a different one, but we did talk about not releasing a user's feed log to the media who had died recently.

BY MR. MURA:

Q.      And do you recall that the media, specifically Businessweek, did report on this death?

A.      I don't remember every media report that came out, but presumably so.

Q.      Let's look at Tab 47, which we're marking as Exhibit 31.

(Whereupon,

        TikTok-Linthicum-31, Bloomberg

        Article, TikTok's Algorithm Keeps

        Pushing Suicide to Vulnerable Kids,

        was marked for identification.)

BY MR. MURA:

Q.      This is an article from Businessweek, correct?

A.      This is.

Q.      And the previous Lark chat was entitled Businessweek Feature, and that's the same name of the publication here, correct?

A.      Yes.

BY MR. MURA:

Q.    Do you know if TikTok ever took any action in response to these reports?

MR. MATTERN:  Objection to form.

A.    They predate my time, so no.

BY MR. MURA:

Q.    Let's go to Tab 51.  This is going to be TIKTOK3047MDL-078-LARK-01818485, and we'll mark it as Exhibit 35.

(Whereupon,

TikTok-Linthicum-35, [T&S][INV]

Project Argus - US Filter Bubble on

SSH/ED Lark Document,

TIKTOK3047MDL-078-LARK-01818485 -

TIKTOK3047MDL-078-LARK-01818488, was

marked for identification.)

BY MR. MURA:

Q.    This document was produced from your files.

Any reason to dispute that?

A.    No reason to dispute.

Q.    Have you seen this document before?

A.    I have.

Q.     And the title is T&S INV Project Argus - US Filter Bubble on SSH/ED.

Do you see that?

A.     I do see that.

Q.     Can you translate that for us a little bit?

A.     Trust and safety.  INV would be the investigation team.  Project Argus was, I guess, the name of the project that they gave themselves.  And then filter bubble would have to do with filter bubbles and dispersion, and then SSH/ED would be suicide, self-harm, eating disorders.

THE VIDEOGRAPHER:  The time is now 5:35, going off the record.

(Recess taken, 5:35 p.m. to 5:48 p.m. PDT)

THE VIDEOGRAPHER:  The time is now 5:48.  Back on the record.

BY MR. MURA:

Q.     This document says Global Investigations.

Do you see that?

A.     Yes, I do see that.

Q.     And the date is 7 March 2023.

Do you see that?

A.    I do see that.

Q.    And under Executive Summary, do you see where it says that Project Argus is: a proactive effort to identify risks before it is made known to users or to the public via news channels, so as to eventually reduce escalations.

Is that right?

A.    I believe so.

Q.    Okay.  And then it goes on to say:  This report will focus on the result of test account created for the US market.

Do you see that?

A.    I do see that.

Q.    And then it says Results, and under that it has a bulleted list of four.

Do you see that?

A.    I do see that.

Q.    The first one is:  Ease of discoverability of SSHDA content in US.  And then it says:  High.

Do you see that?

A.    I do see that.

Q.    And then:  Ease of entering a

filter bubble of SSHDA content in US.

Do you see that?

A.    I do see that.

Q.    And this document says:  High.

Do you see that?

A.    I do see that.

Q.    Then it says:  Density of a filter bubble of SSHDA content in US.

Do you see that?

A.    I do see that.

Q.    And it says "High" again.

Right?

A.    I do see that.

Q.    On page 3 in the section on findings, do you see where it says:  Filter bubble is fully created.

Do you see that?

A.    Under 3?

Q.    Yes.

A.    Yes, I do see that.

Q.    And it says:  by 3:00 p.m., total searching and liking length, and then it says 1.5 hours?

A.    I do see that.

Q.    And then under number 5, do you

correct?

A.    Yes, content that would fall under that bucket presumably.

Q.    Okay.  Let's look at Tab 52, please.  This is TIKTOK3047MDL-078-Lark-01835091.  This is Exhibit 36.

(Whereupon,

TikTok-Linthicum-36, North America SSH/ED Planning/Roadmapping Agenda Lark Document, TIKTOK3047MDL-078-LARK-01835091 - TIKTOK3047MDL-078-LARK-01835095, was marked for identification.)

BY MR. MURA:

Q.    I'll represent to you that this came from your files.

Any reason to dispute that?

A.    No reason to dispute it.

Q.    Have you seen this before?

A.    I don't know.  It's not familiar to me at the moment, but I honestly don't know whether or not I saw it before.

Q.    And the title is North America SSHED Planning/Roadmapping Agenda.

Do you see that?

A.      I do see that.

Q.      And do you see at the back page the metadata shows that this document was created on May 4th, 2023?

A.      I do see that.

Q.      Okay.  If you look above there, you'll see your name.

Do you see that?

A.      Yes, I do see that.

Q.      Okay.  So going back to the pages ending in 094 and 095, at the bottom of 094 there's a chart.  Do you see that?  And it continues onto 095.

A.      I do see that.

Q.      And it has columns that appear to be labeled Audience, Suicide or Self-Harm, Negative Affect, Eating Disorders/Extreme Diet and Fitness, and Mental Health.

Do you see that?

A.      Yes, I do see that.

Q.      And on page ending in 95, so the next page, do you see on the left where it says Violative/NR Content.

Do you see that?

A.      Violative, slash, NR Content, yes.

Q.      And does that refer to videos that violate TikTok's community guidelines?

A.      Not necessarily.  So it would refer -- I mean, I -- I don't know because this seems like it was put together by the North American team for their off-site.

But presumably how I would interpret it and the slang that we used was that this would cover buckets of titles that were covered by our community guidelines, not all of which would result in a violation outcome.  Some of them would result in what was called an NR or a not recommend outcome.

Q.      And do you see under the column Suicide or Self-Harm, for minors, do you see where it says:  Filtered by Extreme Risk UPM and General UPM?

A.      I do see where it says that.

Q.      Does UPM stand for unapproved prediction model?

A.      I don't know in the context of this document.  That potentially would make sense, but I don't know.

Q.    Okay.  But this document is referring to two algorithms that TikTok uses in the moderation context to identify videos that are predicted to violate TikTok's community guidelines; is that correct?

A.    Again, I don't know.  I would presume so given the context, but not having remembered seeing this document or interacting with it, I just don't know the context for it.

Q.    And these moderation algorithms are separate and distinct from TikTok's recommendation algorithm; is that correct?

MR. MATTERN:  Objection to form.

A.    I don't know how they interweave with it, just because I'm not on the technical algo implementation side, so there are a lot of -- like I think people speak of the algorithm as a monolith or the recommendation algorithm as a monolith, but I think it's actually, to my understanding, like an interwoven of a lot of different layers of algorithms, and so safety algorithms were included as a part of the

recommendation stack.

BY MR. MURA:

Q.    So it would be more accurate to say algorithms, plural?

A.    To my understanding of how it worked.  But again, I was not focused on algorithm implementation.

Q.    And when the document says filtered, that means that TikTok uses algorithms, plural, to try to remove videos from minor users' For You feeds that are predicted to violate TikTok's community guidelines, correct?

MR. MATTERN:  Objection to form and characterizes document.

A.    There -- to my understanding, I believe they did.

BY MR. MURA:

Q.    Okay.

A.    At least on a global level. I'm not sure about the US context, which is what this document would be referring to, because I didn't work on the, like, US/North America team directly.

Q.    Okay.  And those would be

moderation algorithms, correct?

A.    Not necessarily.

Q.    Okay.

A.    They would be -- there's, like, multiple types of algorithms, including some that are embedded for safety within the recommendation feed itself that don't necessarily have to do with, like, what gets sent to a moderation queue or not what gets sent to a moderation queue or how those are prioritized, at least to my understanding.

Q.    Below, do you see where it says Borderline High/Moderate Harm?

A.    I do see.

Q.    And do you see the column Negative Affect?

A.    I do.

Q.    And there it indicates that TikTok applies dispersion; is that correct?

A.    Yes, borderline high content was considered to be things that we dispersed through the negative affect dispersion project.

Q.    And that's a project that you worked on?

A.    I worked on it in conjunction with ███████ from the US side, because I was on global, so I helped to design the strategy overall and do some of the inclusion and exclusion based on, like consultations --

(Clarification requested by the stenographer.)

A.    -- conversations with external experts as well as, like, reading of general research articles around the topic of negative affect, and so I helped to design the overall negative affect strategy for dispersion.

And ███████ was the policy person on the US side for implementation and to sign off for design decisions in that region or the recommendations that we made for the US region.

BY MR. MURA:

Q.    So according to this document, TikTok was dispersing negative affect rabbit holes or filter bubbles, correct?

A.    According to this document, the strategy that was in place for negative affect borderline content that wasn't covered

by CG titles in the US at the time was
dispersion outcome.

Q.    Do you see where it says:
Eating Disorders/Extreme Diet and Fitness?

A.    Yes.

Q.    And in that column it also says
that TikTok applied dispersion.

Do you see that?

A.    I do see that.

Q.    So the document is indicating
that TikTok disperses eating disorder rabbit
holes.

Do you see that?

A.    I see, like, Eating Disorders/
Extreme Diet and Fitness.  "Extreme Diet and
Fitness" was the term for the dispersion
project used there.

Q.    Okay.  And the document is
indicating that TikTok is using dispersion
for those types of filter bubbles or rabbit
holes, correct?

A.    Yes.  And for the eating
disorders one in particular, that would be in
addition to moderation that was used for more
eating disorder-specific titles as well.

Q.    Do you see the column for Suicide Or Self-Harm?

A.    I do.

Q.    And do you see in that column that it says:  No strategy?

A.    I do.

Q.    Okay.  So this document is indicating that there's not a dispersion strategy for suicide or self-harm rabbit holes or filter bubbles, correct?

A.    I think not one that is specifically tailored for those topic areas at the time, at least, as represented in this document for the US market, as those were handled by CG titles.

Q.    We can put that aside.

Did TikTok ever tell users that they could fall into harmful rabbit holes or filter bubbles?

MR. MATTERN:  Objection to form.

A.    I don't know.

BY MR. MURA:

Q.    Did TikTok ever tell users that they could get stuck in a rabbit hole or

filter bubble promoting suicide?

A.    I don't know.

MR. MATTERN:  Objection to form.

BY MR. MURA:

Q.    Did TikTok ever tell users that they could get stuck in a rabbit hole or filter bubble promoting self-harm?

MR. MATTERN:  Objection to form.

A.    I don't know.

BY MR. MURA:

Q.    Did TikTok ever tell users that they could get stuck in a rabbit hole or filter bubble promoting eating disorders?

MR. MATTERN:  Objection to form.

A.    I don't know.

BY MR. MURA:

Q.    Let's bring up Tab 53, please. This is TIKTOK3047MDL-024-LARK-00043559, and we'll mark it as Exhibit 37.

(Whereupon,

TikTok-Linthicum-37, [T&S] Issue

Policy: Feed dispersion for negative

name in the corner?

A.     Yes.

Q.     Okay.  Turn to slide 19, please.  The top says Looking Ahead.  It's Bates ending in 185.

Do you see where it says:  Our K-12 school administrators are devoting an average of 10-20 hours per week to some aspect of social media's influence, ranging from the distribution of inappropriate photos and videos to bullying and threats.

Do you see that?

A.     I do see that.

Q.     Do you have any reason to dispute those figures?

A.     It's a quote from a school district person, so no.

Q.     And this quote is from a school district leader in Massachusetts, correct?

A.     That's what it's attributed to.

Q.     Let's pull up Tab 55, please.  This is TIKTOK3047MDL-055-LARK-00698648.  This is Exhibit 39.

(Whereupon,

TikTok-Linthicum-39, TikTok Now -

Community Safety FAQs Lark Document,
TIKTOK3047MDL-055-LARK-00698648 –
TIKTOK3047MDL-055-LARK-00698651, was
marked for identification.)

BY MR. MURA:

Q.      This is a Lark document; is
that correct?

A.      I believe so.

Q.      And I'll represent to you that
it was found in your files.

Any reason to dispute that?

A.      No reason to dispute that.

Q.      Do you see the title is
TikTok Now – Community Safety FAQs?

A.      I think it's Community Safety
F-A-Qs.

Q.      FAQs, thank you.

And do you see under where it
says "Key risks"?

A.      I do see "Key risks."

Q.      And do you see where it says:
Many of the safety features and settings
TikTok is known for will not be available for
at least the first month after the
introduction of TikTok Now.

Do you see that?

A.    I do see it.

Q.    And then it goes on:  As this is a TikTok product, it's difficult to defend this lag given regulatory pressure, competitive pressure with other platforms rolling out more robust family safety controls, and it will highlight a tension between what we say (safety is our priority) and what we do.

Do you see that?

A.    I do see that.

I -- sorry.  I'm looking through because I don't think I've actually looked at this document before.  It mostly concerns minor safety, which is a different vertical for me, so I just wanted to make sure that I hadn't commented on it or there wasn't anything that indicated otherwise.

Q.    Take your time to look through it.

A.    Yeah.

(Document review.)

A.    I don't remember this document.

///

BY MR. MURA:

Q.    Do you see where it says: Family Pairing will not be available in the TikTok Now app – the timeline for development is TBD?

A.    I see where it says it on this paper, yes.

Q.    To your knowledge, did TikTok ever implement family pairing in the TikTok Now app?

MR. MATTERN:  Objection to form, characterizes document.

A.    I don't know.  I didn't work on family pairing.

BY MR. MURA:

Q.    So you don't know if it was ever made available in the TikTok Now app?

MR. MATTERN:  Objection to form, characterizes document.

A.    Again, I didn't work on family pairing, so I don't know.

BY MR. MURA:

Q.    Do you see where it says: Teens will receive notifications to engage with TikTok Now during school hours?

A.     I do see that.

Q.     And teens receiving notifications during school hours is listed here as a key risk, correct?

MR. MATTERN:  Objection to form, characterizes document.

A.     Yes.

BY MR. MURA:

Q.     And according to this document, it's a key risk because there's a risk that children will be prompted to use TikTok Now during school, correct?

MR. MATTERN:  Objection to form.

A.     I think it was considered a key risk of the launch as in, like -- as -- because the -- to my understanding, the minor safety team and the safety and well-being team did not want to have push notifications to kids in school as their focus, you know, is on youth well-being and focus on learning.

BY MR. MURA:

Q.     You said the minor safety team did not want that, but this is documenting that teens will receive notifications to

engage with TikTok Now during school hours.

Do you see that?

MR. MATTERN:  Objection to form, characterizes document.

A.    I do see that written here.

BY MR. MURA:

Q.    TikTok could have restricted TikTok Now from sending notifications to children during school hours, correct?

MR. MATTERN:  Objection to form.

A.    I don't know.  I don't know the design of the app or the engineering behind it, and so I'm not sure, like, what the constraints were from a technical perspective there.

BY MR. MURA:

Q.    Are you aware of any inability of TikTok to restrict TikTok Now from sending notifications to children during school hours?

MR. MATTERN:  Objection to form.

A.    Again, I don't know the technical specifications behind the

document -- or behind the design for this, so

I wouldn't be able to say one way or another.

BY MR. MURA:

Q.    Let's look at Tab 56.  This is

TIKTOK3047MDL-042-LARK-00267739, and this is

marked as Exhibit 40.

(Whereupon,

TikTok-Linthicum-40, [P&C] [T&S

internal only] Core Group MS - TTN

Lark Document,

TIKTOK3047MDL-042-LARK-00267739 -

TIKTOK3047MDL-042-LARK-00267747, was

marked for identification.)

BY MR. MURA:

Q.    This is a Lark chat, correct?

A.    Yes, it appears to be a Lark

chat.

Q.    And the metadata indicates that

it was found in your files.

Any reason to dispute that?

A.    No reason to dispute that.

Q.    And the title is, again,

Privileged and Confidential, Trust & Safety

Internal Only.

Do you see that?

                        CERTIFICATE

          I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
and Notary Public, do hereby certify that
prior to the commencement of the examination,
KATHRYN "RYN" LINTHICUM was duly sworn by me
to testify to the truth, the whole truth and
nothing but the truth.

          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

          I DO FURTHER CERTIFY that pursuant
to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
before the conclusion of the deposition.

          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.


  <%20911,Signature%>
_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649


Dated: April 21, 2025