# AMENDED Exhibit 683

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

                    UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
                           -   -   -
    IN RE:   SOCIAL MEDIA ADOLESCENT          :MDL NO.
    ADDICTION/PERSONAL INJURY PRODUCTS        :3047
    LIABILITY LITIGATION                      :
                                              :CASE NO.
    THIS DOCUMENT RELATES TO:                 :4:22-MD-
                                              :03047-YGR
    ALL ACTIONS                               :

           SUPERIOR COURT OF THE STATE OF CALIFORNIA
               FOR THE COUNTY OF LOS ANGELES
                   UNLIMITED JURISDICTION
                           -   -   -
    COORDINATION PROCEEDING SPECIAL TITLE  :
    (RULE 3.550)                            :
                                            :
    SOCIAL MEDIA CASES                       :
    _____:JUDICIAL
                                            :COUNCIL
    THIS DOCUMENT RELATES TO:                :PROCEEDING
                                            :NO. 5255
    ALL ACTIONS                             :
                                            :JUDGE
                                            :CAROLYN B.
                                            :KUHL
                                            :
                           -   -   -

         DEPOSITION UNDER VIDEO EXAMINATION OF
                 AMY ULUCAY (CLASSEN)

                         VOLUME I

                   February 5, 2025

                         Videotaped hybrid deposition of
    AMY ULUCAY (CLASSEN), taken pursuant to notice, was
    held at Regus Conference Center, 520 White Plains
    Road, Tarrytown, New York, beginning at 10:08 a.m.,
    on the above date, before Michelle L. Ridgway, a
    Registered Professional Reporter, Certified Court
    Reporter (NJ-CCR # XI02126), Certified Realtime
    Reporter, Certified Shorthand Reporter (CA-CSR
    # 14592), and Notary Public.

- - -

THE VIDEOGRAPHER:  We are now on the record.

My name is Danny Ortega.  I'm the legal videographer for Golkow Litigation Services.

Today's date is February 5, 2025, and the time is 10:08 a.m.

This video deposition is being held at 520 White Plains Road, Tarrytown, New York, in the matter of Social Media Adolescent Addiction Personal Injury.  The deponent today is Amy Ulucay.

All counsel will be noted on the stenographic record.

The court reporter today is Michelle Ridgway, and she will now swear in the witness.

- - -

... AMY ULUCAY (CLASSEN), having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. LONGER:

Q.        Good morning, Ms. Ulucay.  By

agreement, you've graciously permitted us to refer to you by your maiden name.  So would you please begin by stating your full name, including your maiden name.

A.     Yes.  My name is Amy Marie Ulucay. My maiden name is Amy Marie Classen.

Q.     And just to be clear, during the time that you worked at ByteDance/TikTok, you were under your maiden name, correct?

A.     Yes.

Q.     That's a "yes"?

A.     Yes.

Q.     All right.  So I'm here today to take your deposition.  We're going to -- I'm going to be remote.  I'm not in the room with you.  I hope it's obvious to you.

Who is in the room with you?

A.     My personal counsel?  Is that -- and the stenographer and the videographer.

Q.     Okay.  Is it just one attorney?

A.     There are three attorneys here.

Q.     All right.  And thank you for that.

So tell me your current address.

A.

the sauce.

(Document marked for identification as Ulucay Exhibit 1.)

BY MR. LONGER:

Q.    Ms. Classen, I don't expect you to recognize this document.  I created it.  It was based off of your LinkedIn profile.

Is it correct that you are on LinkedIn?

A.    Yes.

Q.    And is it correct that you provide on your LinkedIn profile information about your career, so to speak?

A.    Yes.

Q.    And am I also correct that you worked -- well, first, to begin, I understand that you graduated from Hamline University in 2011; is that correct?

A.    Yes.

Q.    All right.  And you have a Bachelor of Arts in Latin American studies; is that right?

A.    Yes.  Yes.

Q.    So I'm sure that prepared you to immediately go forth and work for Etsy; is that right?

A.        Yes.

Q.        And that was your first job; is that right?

A.        No.

Q.        Oh.  What was your first job out of college?

A.        Oh, out of college.  I had done -- I worked at a company called Latin American Studies -- I'm sorry -- Latin American Markets for a while as a financial intern there.

I also was a waitress for some time.  I had some internships.  I don't -- yes, that's all.

Q.        All right.  And I take it that you were interested in another career and you moved on?

A.        Yes.  Yes.

Q.        Okay.  And the first job that you found was identified on this exhibit --

MR. LONGER:  Oh, and by the way, let's mark this as Exhibit 1.

BY MR. LONGER:

Q.        And on Exhibit 1, you see Etsy.  Is it correct that you worked there from March 12th to -- 2012 to June 2014?

A.        Yes.

Q.         And is it also correct that you were the senior trust and safety agent there?

A.         Yes.

Q.         All right.  And your next job, is it correct that you worked at Meetup?

A.         Yes.

Q.         And how long did you work there?

A.         To be honest, I don't remember the exact dates.  They are the ones that are listed on LinkedIn.  So if this came from LinkedIn, I would be referencing this too, in terms of the dates, so...

Q.         Okay.  So approximately September 2016 to January -- I'm sorry.

June 2014 until May 2018; is that -- is that approximately right?

A.         Oh, yeah.  Yes.  Yes.  Mm-hmm.

Q.         All right.  And what was it that led you to leave Meetup?

A.         I, at that point in my career, had done quite a bit of sort of generalist trust and safety work, and as you can see, I'd done program management, policy management, operations work, and the only area that I had yet to grow into was in people management and in operations management.

So I left to head up a trust and safety department at another global social media company in order to learn those skills.

Q.    That's something that interests you, people management and operations management?

A.    Yes.  Yes.

Q.    Fair enough.

All right.  And then you were employed at a company called Amino Apps; is that correct?

A.    Yes.

Q.    And is it also correct you were there approximately May 2018 to January 2020?

A.    Yes.

Q.    All right.  So that was about one year and nine months, if my math is correct.  Is that fair to say?

A.    Yes.

Q.    And what caused you to move on from Amino Apps?

A.    The company was shutting down.  They ended up laying everybody off.

Q.    All right.  And I take it you were looking for a job.  And your next job was with whom?

A.        With ByteDance.

Q.        All right.  And is it correct that you worked for ByteDance from April 2020 until -- this is November 2021, but I understand you -- is that incorrect, that you left earlier than November 2021?

A.        Meaning -- yeah, it was, I think, October.

Q.        Right.

A.        Yes.

Q.        My understanding is that your last day at ByteDance was October 15, 2021.

A.        Yes --

Q.        Does that --

A.        -- I think that is correct.

Q.        All right.  But this comes off of your LinkedIn, so it's approximate dates?

A.        Yes.

Q.        Is that where you're going?

Okay.  And I literally pulled from your LinkedIn profile.

But is it correct that when you left --

MR. LONGER:  Vince, if you'd bring that back up, it would be easier to read.

BY MR. LONGER:

Q.      -- you were the global head of minor safety, and you were leading a team of program managers to design and implement the minor safety product roadmap, which included detection and moderation strategies, data analytics, and trend monitoring, and strategic partnerships; is that correct?

A.      Yes.

Q.      And you had core areas of oversight, including age assurance, predator detection, product design for minor privacy and safety, and content classification?

A.      Yes.

Q.      Great.  And there came a time when you left -- well, let me -- let me go back.

When you joined ByteDance, did you know that it had a platform called TikTok?

A.      Yes.

Q.      And did you know TikTok was launched in the United States and elsewhere in May 2017?

A.      I don't know that I knew the founding date, necessarily.

Q.      All right.  Did you know that it

MR. WEINKOWITZ:  Fred, do you want to take a break so we can get you the document?

MR. LONGER:  Yeah.  I was thinking maybe that's -- can we go off the record, please.

THE VIDEOGRAPHER:  The time right now is 12:30 p.m.  We are off the record.

(Brief pause.)

THE VIDEOGRAPHER:  The time right now is 12:35 p.m.  We're back on the record.

BY MR. LONGER:

Q.      Ms. Classen, we're going to move on while we clean up the issue with the exhibits.

So the next document I'd like to speak to you about is what I'm going to call Exhibit Number 7.  It's Tab E-9.

(Document marked for identification as Ulucay Exhibit 7.)

BY MR. LONGER:

Q.      Ms. Classen, do you have that before you, Exhibit 7?

A.      Yes.  "Underage Detection and Appeals Questions."

Q.      Perfect.

Are you familiar with this document?

A.        Yes.

Q.        Okay.  This -- is it something that you wrote?

A.        Yes.

Q.        How do you know that you wrote it?

A.        I remember this, I believe.  This is part of a larger document.

Q.        Is that right?

A.        I --

Q.        So I'll just -- I'll accept that. I don't know that.

A.        Okay.

Q.        I believe, the way it was produced to us, is just this.

So real quick, do you see on the first page it talks about, underneath the heading that you just described, "underage user metrics"?

A.        Yes.

Q.        All right.  And -- and this refers, globally, that there are around 37 million underage accounts accessing the platform, correct?

A.        So in terms of the actual metrics being used here, all of this, just to be clear, was conjecture and estimates that the data analysts were doing.  So these were not confirmed underage

users that we were aware of.

But, yes, this was the estimate --

Q.    All right.  But those estimates were coming to you to implement a policy -- I'm sorry -- to implement a program that policy wanted you to perform to get underage users off the platform, right?

A.    Yes.

Q.    Okay.  And what was the estimate that they gave you for the United States?

A.    4,758,841.

Q.    All right.  And those are kids under the age of 13, right?

A.    Yes.  13 or 14.

Q.    So -- okay.  And that's a lot more than 250,000, right?

A.    Yes.

Q.    And 250,000, as you told us, was a big deal.  What's 4.75 million?  A bigger deal?  Is that right?

A.    It's definitely a larger number, yes.

Q.    Okay.  And -- and so if I look at this right -- let's just see.  Down a block, the under-16 users who are accessing live stream, lower

So you see a message. ████████ ████████ says, "I think the unregistered user experience is only pitched as a safer/age appropriate product in the U.S."

Do you see that?

A.          Yes.

Q.          Okay.  And then ████████ responds:

"What I'm not happy is the response from comms - 'yah, we don't know how to address that yet so we just don't talk about it,'" right?

A.          Yes.

Q.          On there he's talking about the unregistered user experience, right?

A.          Yes.

Q.          And to the best of your knowledge, did TikTok tell users and parents that the unregistered user experience doesn't meet community expectations of an age-appropriate experience?

A.          No.

Q.          Okay.  I'd like to talk -- switch gears a little bit and take this down and talk about TikTok's safety center and reporting, okay?

A.          Yes.

Q.          So first, for the safety center, you would agree that it's important for TikTok to

help the users understand how to protect themselves while using the app, right?

A.          Yes.

Q.          Okay.  And you would also agree that it's important for TikTok to help parents understand how to monitor and protect their children while using TikTok, right?

A.          Yes.

Q.          Okay.  And it's key that that information be easy to find, right?

A.          Yes.

Q.          Okay.  And when you started at TikTok, you knew that the safety center was hard to navigate and find, right?

A.          That's very possible.  I don't recall specifically, but that's very possible.

Q.          Okay.  Let's -- one more question relating to reporting in the safety center.

It's also important for TikTok to provide users with the ability to report what is sometimes referred to as child sexual abuse material, right?

A.          Yes.

Q.          And for the jury, that's what's colloquially known as child pornography, right?

A.          Yes.

Q.          And TikTok has a responsibility to report CSAM, or child pornography, to NCMEC, right?

A.          Yes.

Q.          To the National Center for Missing and Exploited Children, right?

A.          Yes.

Q.          And one way that TikTok finds CSAM and removes it is from user reports, right?

A.          Yes.

Q.          Okay.  I'm going to pull up Tab FC-5 and mark that as Exhibit 24.

(Document marked for identification as Ulucay Exhibit 24.)

BY MS. CRAICK:

Q.          I'm going to represent to you that the metadata that TikTok produced says that it was dated May 13, 2020, and you are the custodian.

Do you see that?

A.          Yes.

MS. CRAICK:  And, Vince, do we have the PowerPoint here, or do we need to load that in?

We do.  Excellent.  Okay.

BY MS. CRAICK:

Q.          So this is something you put

together when you first started at TikTok, right?

A.        It might be.  I need to see the rest of this.

Q.        Sure.  So we can scroll through some of it.

Does this ring any bells?

A.        I'm just not sure if I created this document or if this was ███████████.

Q.        Let's go to the notes for Slide 1. And you can see your name at the bottom there, where you are commenting on it.

Do you see that?

A.        Yes.

Q.        And there's also some comments from your boss, ████████████    right?

A.        Yes.

Q.        Okay.  And he says, in the second comment -- sorry.  Let's start with the first comment.

He says, "TikTok's safety videos are superb but never shown."

Do you see that?

A.        Yes.

Q.        It's important for the safety videos to be shown for them to be effective, right?

A.          Yes.  Absolutely.

Q.          He also says, in the second comment, "Easy/intuitive reporting button ability? TikTok's is horrible.  Not sure others are much better."

Do you see that?

A.          Yes.  This -- this is ringing a bell now.  What we're doing here is our sort of standard gap analysis.  So figuring out where we can be better.

Q.          Yeah.  So you're identifying problems that exist so you can potentially solve them, right?

A.          Yes.

Q.          Okay.  And he says that if TikTok wants to be serious about safety and give our words some credence, we need to allow people to easily report problems.

Do you see that?

A.          Yes.

Q.          Were you aware that at this time, in order to report something like child sexual abuse material or child pornography, a user would have to press the share button, and that's where the report feature was?

A.          Yes, I do recollect that now.

Q.          Okay.  And you would agree, right, that it's not intuitive for a user to press the share button when they come across child pornography, right?

A.          Yes.

Q.          And the share button is usually used to send something they find interesting or funny to their friends, for example, right?

A.          Yes.

Q.          Okay.

MS. CRAICK:  Okay.  We can pull up -- we can take this down and pull up Tab FC-6 and mark this Exhibit 25.

(Document marked for identification as Ulucay Exhibit 25.)

BY MS. CRAICK:

Q.          So the metadata indicates that this is May 18, 2020.  You were the custodian.  And the title is "Competitive Analysis."

A.          Yes.

Q.          In the file path.

Okay.  So we can go back and look at the document.  This looks like it's part of the same project as the slideshow we were just looking

at; is that right?

A.        Yes.

Q.        And do you remember if these are notes that you wrote or someone else on your team wrote?

A.        Yes.  So we actually referenced this earlier as well.  This project was an initial competitive analysis that I was asked to do.  In reality, so much of the information in this -- I was brand new to the company, so much of it was unvetted, mostly just notes, and, honestly, largely inaccurate.

So we should know that going into this, as we review this.

Q.        Okay.  Let's look at some of the comments that you make about the TikTok platform, the one where you are supposed to be the head of minor safety.

And it says at the beginning, "Clear/intuitive reporting: TikTok sucks here."

Do you see that?

A.        Yes.

Q.        It also says, "Behavioral design, cognitive design/nudges to encourage right behavior/discourage bad ones.  Instagram has

re-think.  TikTok has nothing but launching something.  Not sure about others."

          Do you see that?

     A.     Yes.

     Q.     And one way that TikTok can make the platform safer is engaging in design tactics in order to encourage good behavior and discourage bad ones, right?

     A.     Yes.

     Q.     And that's something, like maybe a popup comes up when someone is doing something risky or dangerous, encouraging them to think twice, right?

     A.     Yeah.  We call those just-in-time notices.

     Q.     Okay.  And if we scroll down to the second page, under the easy reporting, you'll see here, it says, "Reporting is buried under the 'share' button."

          Do you see that?

     A.     Yes.

     Q.     And that's what we were talking about earlier, where, in order to report child pornography, users would have to press the share button, right?

A.          Yep.

Q.          Okay.  It also discusses parental controls.

Do you see that?

A.          Yes.

Q.          And then it says -- sorry.

MS. CRAICK:  Vince, could you back out?

Can you scroll down to the next page.

Okay.  We can move on from this document.

Let's pull up FC-7 and mark that as Exhibit 26.

(Document marked for identification as Ulucay Exhibit 26.)

BY MS. CRAICK:

Q.          Okay.  So, again, metadata shows that this is May 14, 2020, you are the custodian, and you can see the title is, "[Minor Safety/Bay Hub] Safety Center Feedback Template."

Do you see that?

A.          Yes.

Q.          And this is something you worked on in the regular course of your job at TikTok, right?

A.          I don't recall this -- this work or this doc.

Q.          Okay.  Minor safety, that certainly was your role at TikTok, correct?

A.          Oh, yes.  Okay.  I was thinking that this was just safety center feedback.

Okay.  Yeah.  I don't remember this document, but yes.

Q.          Okay.  And you have no reason to doubt if TikTok says it was in your custodial file, right?

A.          No.

Q.          Okay.  I mean you have no reason to believe it was altered from how it was in your file, right?

A.          No.

Q.          Okay.  So let's look at the third bullet point here, "The current Safety Center."

It says:

"The current Safety Center is not sufficient to meet the needs of our users for several reasons.

"1, the content is not organized in a structured or digestible way that provides real value to the user.

"2, the information architecture is not scalable to accommodate our growing safety offerings.

And "3, the tone, design and in-app placement does not resonate with our key demographics and related parties (re: parents)."

Do you see that?

A.      Yes.  This is a part of another gap analysis that we were doing, to identify areas we can make improvements.

Q.      And you're identifying problems here with the safety center, right?

A.      Yes.

Q.      Anyway, you concluded that it's not sufficient to meet the needs of your users at this time, right?

A.      Yes.

Q.      Okay.  Let's scroll down to the next page.

So you see the bullet point that says, "What information/topics/issues do you wish were present in the Safety Center that are not?"

A.      Yes.

Q.      It says, "It feels like the 'Online Safety Center'" -- at the bottom -- "is actually

the main hub of information but it's so buried, I thought we just didn't have any of this information after ten minutes of searching around."

Do you see that?

A.        Yes.

Q.        And that's a problem, right, because it's not reasonable to expect people to spend ten minutes looking to see if TikTok has information on safety, right?

A.        Yeah.  This is a gap we've identified.

Q.        Okay.  It says, "I also think pointing users to nonprofit groups in harassment and bullying is inappropriate.  It really isn't a 16-year-old's responsibility to reach out to a nonprofit to learn more.  We have an obligation to be a lot more on top of this and own our end of the bargain," right?

A.        Yes.

Q.        And that's TikTok's end of the bargain, right?

A.        Yes.

Q.        Okay.  And TikTok, as we talked about earlier, has an obligation to protect kids on its platform, right?

A.        Yes.

Q.        It also says, "The additional steps to link to our 'other' help center is awkward and really buries information."

Do you see that?

A.        Yes.

MS. CRAICK:  And then if you keep scrolling down.  Keep scrolling down.

Okay.  And blow that up.

BY MS. CRAICK:

Q.        You see it says, "No company can reasonably expect minors to read through Help Centers.  In my dream world, we would bake important nudges into the product."

Do you see that?

A.        Yes.  We ended up building out those nudges into the product, for a number of things.

Q.        And you agree that no company can reasonably expect minors to read through the help center, right?

A.        It's the last thing that a teen would want to read.

Q.        Okay.  All right.  I'm going to switch gears.  Let me know if you need a break at

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, AMY ULUCAY (CLASSEN), have the opportunity to read and sign the deposition transcript.

<%31569,Signature%>
_____
MICHELLE L. RIDGWAY,
Certified Shorthand Reporter,
(CA-CSR # 14592)
(Certified Court Reporter
(NJ-CCR # XI02126)
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public
Dated:  February 7, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# Exhibit 683B

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR

MDL No. 3047

In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING          )
SPECIAL TITLE [RULE 3.400]       ) Lead Case No.
                                 ) 22STCV21355
SOCIAL MEDIA CASES               )
_____ )
                                 )
This Document Relates to:        )
                                 )
ALL CASES                        )
_____ )


Monday, February 10, 2025

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER


Continuing Remote Video-Recorded Oral Deposition of AMY ULUCAY (CLASSEN), VOLUME 2, held remotely at the location of the witness, commencing at 10:01 a.m. EST on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Reporter and California CSR #13649.


GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

The court reporter today is

Mike Miller, California CSR No. 13649,

and will now swear in the witness.

------------

AMY ULUCAY (CLASSEN),

having been previously duly sworn,

testified as follows:

------------

EXAMINATION

------------

BY MS. CRAICK:

Q.    Good morning.  Thank you for coming back today.

A.    Good morning.

Q.    Where are you today?

A.    I'm at my house.  Do you need my address?

Q.    Yes, please.

A.    It's ██████████████████████
████████████████████

Q.    Thank you.

And you understand you're still under oath, correct?

A.    Yes.

Q.    And is there any reason why you

cannot give truthful testimony today?

A.    No.

Q.    Did you speak with your counsel after we finished our deposition on Wednesday?

A.    We just exchanged texts about the logistics of this meeting.

Q.    Okay.  Did you talk about your testimony at all?

A.    No.

Q.    Okay.  And did you rehearse anything about what you were going to say today?

A.    No.

Q.    After we left off, or when we left off, we were discussing child sexual abuse material or child pornography and grooming.

Do you recall that?

A.    I will need a refresher, yeah.

Q.    Okay.  I learned part of your job in minor safety at TikTok was trying to address child sexual abuse material, child pornography and grooming on TikTok, right?

A.    Yes.

Q.    Okay.  I'm going to pull up Tab FC10 and mark that as Exhibit 30.

(Whereupon, Ulucay Exhibit 30,

Addressing Minor Safety Notes,

TIKTOK3047MDL-042-LARK-00237494 –

TIKTOK3047MDL-042-LARK-00237494.00018,

was marked for identification.)

BY MS. CRAICK:

Q.    Let me know when you see that.

A.    Yes, I can see it.

Q.    Okay.  And I will represent to you that this document, according to the metadata, is dated June 25th, 2020.

Do you see that?

A.    Yes.

Q.    And it says that it was in your files.  You're a custodian.

Do you see that?

A.    Yes.

Q.    Okay.  So the title of this document is addressing minor safety notes.

Do you see that?

A.    Yes.

Q.    And is this something you put together in the course of your job at TikTok?

A.      Yes, I think so.

Q.      Okay.  And this was part of your regular work at TikTok, right?

A.      Yes.

Q.      And you have no reason to believe it was altered from its original form in your file, right?

A.      No.

Q.      Okay.  So at the beginning it says that the primary purpose of this document is to assess the current landscape of Minor Safety projects across ByteDance and to increase transparency into cross-functional initiatives.

Do you see that?

A.      Yes.

Q.      And ByteDance is the company that runs TikTok, right?

A.      Yes.

MS. FOURNIER:  Object to form.

BY MS. CRAICK:

Q.      And then what is cross-functional initiatives?

A.      Meaning projects that are happening across the company that may not be

centralized out of, for instance, my team, right?  So the product teams could have launched something, the engineers could have launched something that could have impacted or been beneficial for minor safety but didn't happen, you know, from us launching it, for instance.  But there was already ongoing work, of course, before I got to the company.

Q.   Okay.  So then if we scroll down a bit, in bold it says:  Child Sexual Exploitation Must Be Addressed to Ensure the Safety of Minors.

Do you see that?

A.   Yes.

Q.   And can you read the first bullet point under that heading?

A.   A journalist is twice as likely to find child sexual exploitation on TikTok than our competitors.

MS. CRAICK:  Okay.  And, Vince, can you underline that?

BY MS. CRAICK:

Q.   So by the next bullet point it says:  That said, we have significantly less

child sexual abuse material on our platform than our competitors, meaning our biggest problems are predation, grooming and facilitating access to child sexual abuse material.

Do you see that?

A.   Yes.

Q.   So TikTok has -- at least at this time in 2020, has significantly less child pornography on it than Instagram, Snapchat, Facebook, YouTube, right?  That's what this is saying?

A.   Yes, uh-huh.

Q.   But the biggest problems for TikTok in June 2020 are predation, grooming and facilitating access to child sexual abuse material, right?

A.   Yeah, the biggest problems within this competitive analysis for minor safety.

Q.   Okay.  So let's talk about some of the other things in this document.

I believe we talked about, on Wednesday, that you understand TikTok has an obligation to report child pornography to

NCMEC or the National Center for Missing and Exploited Children, right?

A.    Yes.

Q.    And on the second page, it says:  We are underreporting child sexual abuse material because we're not tagging minor nudity, slash, sexual activity.

Do you see that?

A.    Yes.

Q.    Okay.  And it says there's another issue:  We do not have a workflow for removing known sex offenders that are reported to us by users, police or the media.

Right?

A.    Yes.

Q.    Okay.  And then let's look at page 4.

Here in the middle of the page it says:  We don't have any models to detect high-risk children who might be at a higher risk of predation.

Do you see that?

A.    Yes.

Q.    What is a high-risk child?

A.    I don't know what I was

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, AMY ULUCAY (CLASSEN) was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

<%20911,Signature%>

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: February 11, 2025