# AMENDED Exhibit 697

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/PERSONAL      )
INJURY PRODUCTS LIABILITY          ) MDL No. 3047
LITIGATION                         )
_____    )
THIS DOCUMENT RELATES TO:          )
ALL ACTIONS                        )
_____
       SUPERIOR COURT OF THE STATE OF CALIFORNIA
                COUNTY OF LOS ANGELES
                UNLIMITED JURISDICTION

COORDINATION PROCEEDING            )
SPECIAL TITLE [RULE 3.550]         )
                                   ) JCCP No. 5225
SOCIAL MEDIA CASES                 )
_____    ) Judge:
THIS DOCUMENT RELATES TO:          ) Carolyn B.
ALL ACTIONS                        ) Kuhl, Dept. 12


            WEDNESDAY, DECEMBER 18, 2024

      CONFIDENTIAL - ATTORNEYS' EYES ONLY -
            PURSUANT TO PROTECTIVE ORDER

                    ▯ ▯ ▯

            Videotaped deposition of Amber
Renee Miller Burchell, held at the offices of
Bradley, 1221 Broadway, Suite 2400,
Nashville, Tennessee, commencing at 9:03 a.m.
Central, on the above date, before Carrie A.
Campbell, Registered Diplomate Reporter,
Certified Realtime Reporter, Illinois,
California & Texas Certified Shorthand
Reporter, Missouri, Kansas, Louisiana & New
Jersey Certified Court Reporter.
                    ▯ ▯ ▯

behalf of the Plaintiffs, as follows:

DIRECT EXAMINATION

QUESTIONS BY MR. WEINKOWITZ:

Q.    Good morning, Mrs. Burchell. My name is Mike Weinkowitz.  We are here to take your deposition today under oath.

Do you understand that?

A.    Yes.

Q.    And I want to introduce you to my colleague, Betsy Sugar.  She's in the room.  She will be handing you exhibits.

Okay?

A.    Thank you.

Q.    Please -- you're welcome.

Please state your full name for the record.

A.    Amber Renee Miller Burchell.

Q.    And is your current address ████████████████████████████████████?

A.    Yes.

Q.    And what is your current phone number?

A.    ████████████

Q.    And your date of birth, please?

employment at TikTok.

Okay?

You have a LinkedIn profile, correct?

A.    Yes.

(Burchell Exhibit 2 marked for identification.)

QUESTIONS BY MR. WEINKOWITZ:

Q.    All right.  Can we pull up tab -- Tab A?

I will represent -- and we're going to mark this as Exhibit 2.  I'll represent to you that maybe a month ago, a few weeks ago, I downloaded this off of LinkedIn.

Does this appear to be your LinkedIn profile?

A.    Yes.

Q.    Did you create your LinkedIn page?

A.    Yes, I did.

Q.    Is everything on it accurate?

A.    Yes.

Q.    Any changes you would want to make now?

A.      Any changes I would want to make now?

Q.      To make it accurate or is it -- is it -- {audio interruption}.

A.      Sorry, can you repeat that?

Q.      Yeah.

Are there any changes that you would want to make to make it more accurate, or is it accurate enough?

A.      When did you pull this again? You said three weeks ago?

Q.      About three weeks ago, yeah.

A.      I'm sure at the time it was -- it was fine.

(Burchell Exhibit 3 marked for identification.)

QUESTIONS BY MR. WEINKOWITZ:

Q.      Can you pull up Tab A1?

What we did is we took information off of your LinkedIn profile, and we created a timeline of your employment at TikTok.  I'd like to work through your employment at TikTok and the positions and verify that the information on this timeline is accurate.

Okay?

A.    Okay.

Q.    All right.  So let's focus on that timeline.  The top left corner, that's your picture clipped from your LinkedIn profile.

Correct?

A.    Yes.

Q.    And it looks as though from your LinkedIn profile you started working at TikTok in September of 2020.

Correct?

A.    Correct.

Q.    That's indicated on the -- on the exhibit.

Right?

A.    That -- that's what I'm reading, yes.

Q.    Okay.  You currently work at TikTok.

Correct?

A.    Yes.

Q.    Now, you've been working at TikTok continuously for about four years?  A little over four years?

A.    I've been working for TikTok for four years.

Q.    If we look at the area on the exhibit that's shaded in blue, is it correct that you were a user support associate for about 11 months from September of 2020 to about July of 2021?

A.    Yes.

Q.    And was -- if you look at the green-shaded area on the exhibit, was your next position social media support senior associate?

A.    Yes.

Q.    And did you hold that position for three months, from July 2021 until September 2021?

A.    Yes.

Q.    In the green shading and the blue shading on the exhibit are -- {audio interruption}?

MR. DRAKE:  Yeah, we're having a problem again, Michael.  I'm sorry.

QUESTIONS BY MR. WEINKOWITZ:

Q.    The information regarding your user support associate position and the

social media senior associate position on this exhibit are accurate?

A.    To my understanding, yes.

Q.    Did you hear my question?  I'm not sure.

A.    Yeah, I don't think you heard my answer.  I said, yes, to my understanding.

Q.    Okay.  I'm sorry, I didn't hear your answer.  I apologize.

Your next position in September 2021, did you become USDS user operation lead, young user and age assurance?

A.    I became a user support lead. USDS didn't exist at the time.

Q.    So I took this from your LinkedIn profile, directly off of it.

Is this inaccurate?

A.    I am a USDS employee, so I updated the title.

Q.    Understood.

What does USDS stand for?

A.    United States data security.

Q.    Did you hold that position for about three years until about August of 2024?

A.    Yes.

Q. Was your next position, in August of 2024, community risk control manager at TikTok?

A. It started as community engagement but was recently changed to community risk control program manager.

Q. And that was a title change?

A. That was a title change. Title change only.

Q. And did you -- and have you been in that position since August of 2024?

A. Since August 12th, yes. August 12, 2024.

Q. Is that the position you currently hold?

A. Yes.

Q. I want to go back and ask you some specific questions about each of the positions that you held. Let's start with the user support associate.

Am I correct that you were in a -- in that position you were in a department called TikTok USA operations?

A. Yes.

Q. And were your managers ▮▮▮▮▮

█████ and █████████?

A.    Yes.

Q.    Did you have any other managers in that position?

A.    In that position, not to my recollection.

Q.    In that position, did anyone report to you?

A.    I did not have any direct reports in that position.

Q.    Where did you physically work in that position?  Was it remote?  Was it hybrid?  Did you go to an office?

A.    During that position, it was remote.

Q.    And what did you do as a user support associate?

A.    As a user support associate, I responded to user feedback.

Q.    So just so that I understand that, if a user or a user's family member, parent, calls -- contacts TikTok, you were one of the individuals on behalf of TikTok that would respond to that inquiry?

A.    Yes, I responded to user

inquiries.

Q.    So your job was communicating with TikTok users and their parents and others who contacted TikTok.

Correct?

MR. DRAKE:  Object to form.

THE WITNESS:  I responded to user inquiries.  There were -- yes, I responded to user inquiries.  That's correct.

QUESTIONS BY MR. WEINKOWITZ:

Q.    So let's focus on your next position, social media support senior associate, that's shaded in green.

Was that a promotion for you?

A.    Yes.

Q.    Were you in the same department, TikTok USA operations, in that position?

A.    Yes.

Q.    Was your manager ▬▬▬▬▬▬?

A.    Yes.

Q.    Did you have any other managers for that position?

A.    I did not.

Q.      Did anyone report to you in that position?

A.      I did not have any direct reports.

Q.      Where did you physically work?

A.      Remote.

Q.      Okay.  What were your job duties and responsibilities in that position?

A.      We responded to user inquiries made on our Twitter social support page.

Q.      So you've had a social support page that was on Twitter, and users and parents of users could communicate with TikTok through that page.

        Correct?

A.      Users on Twitter.  So Twitter users would DM or tag us, and we would respond to them or their tweets.

Q.      When you say "DM," you mean direct message?

A.      Direct message, private message, yes.

Q.      When you were responding to those messages and those communications from people outside of TikTok, you were responding

on behalf of TikTok.

Correct?

MR. DRAKE:  Object to form.

THE WITNESS:  I was working for TikTok and responding from a TikTok cial media handle, yes.

QUESTIONS BY MR. WEINKOWITZ:

Q.    You weren't responding on behalf of yourself as Amber Miller.  You were responding as an employee for TikTok.

Correct?

A.    I was responding as a TikTok employee.

Q.    Did you -- you may have answered this.

Did you manage any employees in that position?

A.    I did not.

Q.    Okay.  In both of those positions, both user support associate and social media support senior associate, when you were communicating with people outside of TikTok, did you use any sort of standard operating procedure to guide your communications?

A.      Would you please repeat that question?

Q.      Sure.  If I can.

Focusing on your user support associate position at TikTok and then your subsequent social media support senior associate, I'm looking at those two positions.  When you were communicating with people, users, parents, family members, outside of TikTok, were there standard operating procedures that governed how you were to communicate with those individuals?

A.      So I answer this correctly, can you define what you mean by "outside of TikTok"?

Q.      So if a user, anybody that isn't employed from TikTok and is using TikTok, or their family member or a third party, like a principal or a teacher, if they communicated to you in user support in those two positions, did you have a standard operating procedure that you followed in responding to those individuals?

A.      Gotcha.

Yes, we had SOPs that we

followed.

Q.    Looking at your next position, USDS user operations lead, young user and age assurance, understanding that you amended that to say that there was a title change.

You had that position for three years until August of 2024.

Correct?

A.    Yes.

Q.    Was that a promotion for you?

A.    I think you said was that a promotion?

Q.    Yes, I'm sorry.

Was that a promotion for you?

A.    Yes, it was.

Q.    Sorry about that.  I don't know what's going on with the audio.

A.    That's okay.

Q.    Were you initial -- in that position, were you initially in TikTok USA operations but then the department changed to US data security, US TnS operations user support operations?

A.    I don't recall exactly when it changed, but, yes, it -- the title of the

department did change at some point.

Q.    Did it change more than once?

A.    I believe so, yes, but I'm not a hundred percent sure.  But I do believe it did.

Q.    In that position, did you have a series of four managers:  ███████████, then ███████████  then ███████████  then Andy Tomlinson?

A.    Yes, that sounds correct.

Q.    Did you have any other managers other than those?

A.    Not to my recollection.

Q.    Did anyone report to you in that position?

A.    Yes.

Q.    Who reported to you?

A.    In what time frame do you mean?

Q.    Can you give me who reported to you chronologically in the entire time frame?

A.    It was about 20 people.  It might be a little hard for me to list them all off.

Q.    Let me read some names to you, and tell me if they reported to you.

Okay?

A.    That would be great.  Thank you.

Q.    ███████████    Did he report to you?

A.    Yes.

Q.    ██████ -- and I'll spell this. ████████████████████?

A.    Yes.

Q.    ███████████████ did she report to you?

A.    Yes.

Q.    ███████████████ did she report to you?

A.    Can you repeat that one?

Q.    I'm sorry.  ████████████

A.    Yes.

Q.    ████████████████

A.    Yes.

Q.    Did he or she re -- ████████ ████, did he report to you?

A.    Yes.

Q.    █████████, did he or she report to you?

A.    Yes.

Q.    ▮▮▮▮▮▮▮▮?

A.    Yes.

Q.    ▮▮▮▮▮▮▮▮▮?

A.    Yes.

Q.    ▮▮▮▮▮▮?

A.    Yes.

Q.    ▮▮▮▮▮

A.    Yes.

Q.    ▮▮▮▮▮▮

A.    Yes.

Q.    I'm sorry.  ▮▮▮▮▮▮▮

A.    Yes.

Q.    ▮▮▮▮?

A.    Yes.

Q.    ▮▮▮▮▮

A.    Yes.

Q.    ▮▮▮▮

A.    Yes.

Q.    ▮▮▮▮▮?

A.    Can you repeat that last one?

Q.    It's ▮▮▮▮▮, ▮▮▮▮, ▮▮▮▮▮

A.    ▮▮▮, yes.

Q.    And ▮▮▮▮▮▮?

A.    Yes.

Q.    Anybody else that we didn't mention?  I didn't mention?

A.    To the best of my knowledge, that sounds like the full list.

Q.    Okay.  And in the position of US operations lead young user and age assurance, where did you physically work?

A.    It was a hybrid role.  The first part of that role was remote, and then we went into office, I believe, in 2022.

Q.    And where is the office located?

A.    In downtown Nashville.

Q.    Can you describe your job duties and responsibilities?

      What did you do in that position?

A.    In my user support lead role?

Q.    Yes.

A.    My job was to ensure that my team was following our processes correctly for responding to underage users and making sure that they were fulfilling their job responsibilities.

Q.    Did you have any responsibility

Amber Miller Burchell                    40

for drafting or putting together standard

operating procedures for those employees to

follow when they were communicating with

users, users' family members or others that

contacted TikTok?

        A.      Yes.

        Q.      Were you a primary author of

those SOPs?

                MR. DRAKE:  Objection.  Form.

                THE WITNESS:  Which SOPs?

                MR. WEINKOWITZ:  What's the --

        what's the objection, Geoff?

                MR. DRAKE:  It's over --

                MR. WEINKOWITZ:  What's wrong

        with my --

                MR. DRAKE:  It's overbroad.

        It's also vague.

QUESTIONS BY MR. WEINKOWITZ:

        Q.      How about -- I even forgot what

my question was.  Hold on a second.

                Disregard that.  Let's just

move on.

                (Burchell Exhibit 4 marked for

        identification.)

QUESTIONS BY MR. WEINKOWITZ:

Q.    I'm not sure if I marked the timeline as Exhibit 3, but we'll mark that as Exhibit 3.

Let's go to A2, Tab A2, which we'll mark as Exhibit 4.  This was produced by the TikTok and ByteDance lawyers.

Is that your résumé?

A.    It is.

Q.    Top left corner says, "Last updated:  May 1, 2024."

Do you see that?

A.    Yes.

Q.    Is that when you last updated this résumé?

A.    Yes.

Q.    Did you use this résumé for any purpose?

A.    I used this résumé when I applied for my current role.

Q.    And have you used this résumé for applying for any positions outside of TikTok?

A.    This particular résumé, I have not.

Q.    Have you applied for positions outside of TikTok?

A.    I have before, but not in a while.  Not in a long time.

Q.    I'm sorry, I didn't mean to cut you off.

A.    No, I'm sorry.

Q.    Is everything on the résumé true and accurate?

A.    To the best of my knowledge, yes.

Q.    Is there anything that you would change or correct?

A.    Not at the moment.

Q.    I've got a few questions for you about the résumé.

If we look under Relevant Experience, you have listed user support lead, and you have that starting in September 2020.

Is that accurate?

A.    So for being a user support lead for that particular role, I did not start that role in September 2020, no.

Q.    Okay.  So why does that -- why

do you have that indicated -- strike that.

Why do you have user support lead starting in September 2020 on your CV?

A.   So this particular CV was used for an internal role that I applied for.  So it's TikTok-ified, if you will.  And I wanted to highlight my most recent experience and my relevant experience, which was being a user support lead.

Q.   Okay.  And is that -- is that the same reason why you don't have your other positions listed here?

A.   Yes, because -- since I was applying for a role internally, they would -- they would have that information and know that.

Q.   Do the bullet points that you have under Relevant Experience accurately reflect what you did at TikTok in -- as a user support lead?

A.   To the best of my knowledge, yes.

Q.   Okay.  A couple of these bullet points I want to ask you.

The first one says, "Manage

Amber Miller Burchell                                    44

day-to-day operations for ten high-performing

associates, with overarching team of 30,

specializing in young user, under 18,

escalations and business account inquiries."

Did I read that correctly?

A.      Yes, you read that correctly.

Q.      What did you mean by

"specializing in younger user, under 18,

escalations"?

A.      So our team -- our team, our

queue in user support, was called the younger

users' queue.

Q.      What do you mean by

"escalations"?

A.      Escalations could mean case

inquiries.  It's a fancy word for case

inquiries.

Q.      Can you describe to the jury

what you mean?  What a case inquiry is?

A.      A case inquiry is when a user

submits feedback to the user support team.

Q.      Okay.  So when you say "user,"

that's somebody outside of TikTok that is a

user of the TikTok platform, and they submit

information to TikTok, and you're in the

organization that responds to the person.

Correct?

A.    Well, not -- you know, we use the term "user," but not everyone who submits feedback is necessarily a TikTok user.

Q.    Okay.  So some people who submit feedback could be the parent?

A.    It could be the parent.  Could be -- could be anybody.  Not necessarily -- it's not a parent or a user.  It could be anybody.

Q.    Like the teacher of a TikTok user, correct?  They could submit an inquiry?

A.    Sure.  Yeah.

Q.    Third bullet point, "Cross-trained 100 individual specialists within the user operation org to mitigate a backlog, resulting in a volume reduction of 11.2 percent and an SLA increase from 13 percent to 90 percent in 30 days."

Do you see that?

A.    Yes.

Q.    What did this cross-training involve?  What was your --

A.    Yeah.  This particular

Amber Miller Burchell                                46

cross-training involved myself and my two

senior associates cross-training other

associates in user support on how to work

13-plus age verification cases and --

specifically.

Q.    Did you ever train any

employees at TikTok on how to handle

parental -- parent inquiries about users who

were 13 to 17?

A.    Did I train them on how to

handle those cases?

Q.    (Nods head.)

A.    Yes, I did train our team how

to handle parental inquiries.

Q.    Number -- Item Number 5,

"Streamlined age assurance initiatives

alongside external stakeholders, COPPA, US

government, to ensure the process for

parental deletion requests and third-party

reports of under 13" -- "U13 users is

compliant."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And when you see U13,

it's what you-all mean -- {audio

interruption} -- in TikTok, U13?

A.    I'm sorry, the audio is cutting out again.  Do you mind repeating that?

Q.    Sure.

You have U13 there.  That means under 13, correct?

A.    Correct.

Q.    And when you write here, "ensure the process for parental deletion requests," what is that referring to?

A.    The process for parental deletion requests, that is referring to if a parent writes in requesting the deletion of their underage user's account, under 13.

Q.    Okay.  So you streamlined the process for how to handle that, correct?  Is that what that bullet point means?

A.    It means that I participated in some projects for it.  About it.

Q.    But were you involved in developing any standard operating procedures for handling parental deletion requests?

A.    Can you repeat that question for me, please?

Q.    Sure.

Were you involved in developing any standard operating procedures for how to handle parental deletion requests?

A.    I was involved with helping create SOPs on how my team needed to respond to these parental deletion requests, yes.

Q.    I want to shift gears now, and I'd like to talk about how users, a parent, a family member or a teacher or a principal, can communicate with TikTok.

Okay?

A.    Okay.

Q.    If a user or a parent wants to contact TikTok support, there are a few ways to do it.

Right?

A.    I want to note that I've not been on the team since August, so not sure of anything after August.  But, yes, there are a few different ways.

Q.    You can only tell me what you know, and if you want to just focus before August, that's totally fine with me.

A.    Okay.

Q.    One of the ways a parent can

an exact date.  It would have been maybe end of last year.

MR. WEINKOWITZ:  All right.

Let's take a quick break.

VIDEOGRAPHER:  The time is 10:06 a.m., and we're off the record.

(Off the record at 10:06 a.m.)

VIDEOGRAPHER:  The time is 10:19 a.m., and we're on the record.

QUESTIONS BY MR. WEINKOWITZ:

Q.    I wish to go back for a minute. I'm told that the user feedback work exhibit that I questioned the witness about I did not mark as Exhibit 6, so I want to mark that now as Exhibit 6.

Okay.  We're on the SOPs now.

Can you please hand the witness Tab B and Tab B1?

And, Zach, can you please put the front page of each of those side-by-side?

(Burchell Exhibits 7 and 8 marked for identification.)

QUESTIONS BY MR. WEINKOWITZ:

Q.    Ma'am, I think you should have in front of you two exhibits.

Could you just take your time, review them and let me know when you're ready for me to ask some questions?

A.      Yes.  Oh, my.

Q.      We'll mark, while I'm doing this, the first as Exhibit 7, and that is the US User Support SOP: Younger Users/U12 {sic}, which is Bates TIKTOK3047MDL-004-00131967, first Bates number.

The second I'm going to mark as Exhibit 8.  That's the USDS User Support SOP: Younger Users, plus age appeals, and that's at TIKTOK3047MDL-05600922470 first Bates.

Take your time.  Let me know when you're ready to go.

A.      I'm ready.

Q.      These are documents that were produced to us in this litigation by TikTok and ByteDance.

Any reason to dispute that, ma'am?

A.      No.

Q.      Do you see that on both Exhibit 7 and Exhibit 8 your name is on the front of the documents?

A.    I do see that.

Q.    Would you agree with me that both of these are business documents prepared by you and your colleagues at TikTok?

Correct?

A.    These are SOPs for TikTok, yes.

Q.    Are these -- is it the regular practice at TikTok to create, comment or use these type of SOPs?

A.    It is common to use SOPs.

Q.    Is there any reason to believe that the content of either of these documents was altered in any way from how it existed in TikTok's files?

A.    Can you -- can you explain what you mean by that or rephrase it?

Q.    This is one of those things that we have to ask.

So my question to you is, is these are produced by TikTok and ByteDance to us in this litigation.

Do you have any reason to believe that these were changed in any way, both -- you know, after they were sent to us?

A.    Got it.  I wouldn't be aware of

any of that, no.

Q.    I'm going to ask those questions just to check some boxes.

All right.  So looking at the first one, which is Exhibit 7, the title of that document is "US User Support:  Younger Users/U13."

Correct?

A.    That is the title, yes.

Q.    You are listed as the project owner.

Correct?

A.    Yes, I am.

Q.    What does it mean to be the project owner?

A.    It was because I was the user support lead for the younger users work stream, and so I would have been the main point of contact for this particular SOP since it was used by my team.

Q.    Did you help draft any of this SOP?

A.    I helped -- I helped update and add some things to it, yes.

Q.    Were you responsible for

following this SOP?

        A.      Was I individually responsible?

        Q.      Yes, ma'am.

        A.      This SOP was for myself and my team to utilize.  Also, I think I said this earlier, it was also guidelines as well.  But, yes, this was for our team.

        Q.      Thank you.

                And US user support, US means United States.

                Correct?

        A.      That was the chunk of what we used to do, but as you can see in the background, at the time of this particular SOP, we handled feedback from users in Canada, Australia and New Zealand as well.

        Q.      And you're looking at -- under Background it says, "This document outlines how to handle U13," which is under 13, "slash, younger user account inquiries for our users in the United States, Canada, Australia and New Zealand.  The younger user queues handle any cases that deal with younger users or age issues," and then it has a series of issues.

Correct?

A.    It says "with younger users or age issues," not necessarily just younger user issues.

Q.    It says, "Last updated 12/19/21."

What does that signify?

A.    So that, to me, means that this is an older version of the SOP that -- you know, I don't know when this was pulled, but it looks like this SOP, when this was pulled, it was last -- this version was last updated at December 19, 2021.

Q.    Okay.  So was it in effect on December 19, 2021?

A.    It would have been an SOP that we used on December 19, 2021.  Or an SOP we looked at --

Q.    Do you know when -- sorry.

A.    No, I'm sorry.

Q.    Go ahead.

A.    I'm done.

Q.    Do you know when this SOP was first created?

A.    That is a great question.  I

did not create this SOP, so I would not know that information unless I have access to the live document.

Q.    Do you know who created this SOP?

A.    I actually don't.

Q.    Do you know when you first utilized this SOP in your job at TikTok?

A.    It would have been end of 2020 at some point, but I don't know an exact date.

Q.    Was there an SOP that existed before the end of 2020 that's different from this one?

A.    Possibly.  I don't remember. That was so long ago, and I don't remember.

Q.    If we looked at the next SOP, which is the Exhibit 8, it's the "USDS User Support SOP:  Younger Users plus age appeals."

Do you see that?

A.    I see that.

Q.    Okay.  Your name is on here along with ▮▮▮▮▮▮▮▮, on the first page.

Correct?

to respond to those requests.

QUESTIONS BY MR. WEINKOWITZ:

Q.    What does that macro say?

A.    I have not looked at those macros in quite a while, so I don't want to recite something to you off the top of my head inaccurately.

Q.    Okay.  So let's -- okay.  So let's turn to Bates number 2052 of the first SOP, Exhibit 7.

Will you pull it up?  It's -- we're going to the macros in the back, Zach.

A.    Is this on the same version of the SOP we're looking at or is this on a later version?

Q.    This is on the -- this is on the 20 -- the version that was last updated 12/19/21.

A.    Okay.

Q.    Which is Exhibit 7, I think.

A.    Okay.  Thank you.

Q.    And if you'll see on the screen, at Bates 2052 -- and if you want to flip back a couple of pages, you'll see that this is a list of macros.

Right?

A.    Yes.

Q.    And the macro, that second one down -- I'm sorry, the third one down says, "Parent Deletion."

Right?

A.    Yes.

Q.    And it says, "Parent deletion request for a child age 13 to 17."

A.    I see that.

Q.    So this -- when a parent calls in and they request that their kid's TikTok account be deleted, and that kid is age 13 to 17, right, this is a macro of what TikTok tells the parents.

Right?

A.    This is the macro that is one of the responses we could use, yes.

Q.    Okay.  Can you -- can you read to the ladies and gentlemen of the jury what you tell that parent with this macro?

A.    In this particular macro, "Hi there.  Thank you for reaching out.  TikTok is an app for individuals of all ages. However, we provide appropriate experiences

based on a user's age.  It appears that your child's account is in the appropriate age experience, and we will not be able to delete the account for you.  You can read" -- "You can read about our terms of use related to age here," the URL, "best, the TikTok team."

Q.    That macro tells the parents that TikTok is not going to delete the account.

Correct?

A.    It tells the -- it tells the parents what I just read out, yes.

Q.    Okay.  "We will not be able to delete the account" is a more polite way of saying we won't delete the account.

Correct?

MR. DRAKE:  Object to form.

THE WITNESS:  If the user is over 13 and in an over-13 account, they're in the correct space.

QUESTIONS BY MR. WEINKOWITZ:

Q.    And that's a choice that TikTok made, to not delete that account.

Correct?

It could have actually

physically deleted the account if TikTok wanted to, correct?

MR. DRAKE:  Object to form.

THE WITNESS:  I don't know how to answer that.  Our team is just following policy that was not written by us.

QUESTIONS BY MR. WEINKOWITZ:

Q.    It was a policy that was written by someone else at TikTok on behalf of TikTok.

Correct?

A.    I'm unsure, but I'm assuming so, yes.

Q.    Can we go back to page 49 of this document, please?  Ending in Bates 2015.

So you -- mom or dad calls in. Their kid is 13 to 17 years old.  They want their kid's TikTok account deleted.

TikTok sends out this macro and says that they're not going to delete it, effectively.

Let's say mom or dad pushes back on the same ticket.  Can you read the note as to how TikTok responds on the policy?

MR. DRAKE:  Object to form.

THE WITNESS:  I'm going to read this out.  "Note:  If the parent writes back after you send the parent deletion request, age 13 to 17 macro response, push back on the same request of deletion, you cannot respond.  Add an internal note of NRN, cannot delete account."

QUESTIONS BY MR. WEINKOWITZ:

Q.    So in other words, TikTok doesn't respond to the parent pushing back.
Correct?

A.    It's hard for me to answer because the parent could have, you know -- I don't know.  It's hard -- that's what this reads, but kind of hard to say.  It kind of depends on what the parent wrote back and said.

Q.    Okay.  So let's just focus on the policy, which is TikTok's official policy at the time.  And it says, "If the parent writes back after you send the parent deletion request, age 13 macro, response to push back on the same request of deletion" --

responsible for handling any feedback that users submitted about that process.  So I don't necessarily always know the why behind something happening.

Q.    I think my question was a little different.  I asked, what do you recall about why those accounts didn't have a date of birth associated?

A.    And I don't know.

MR. DRAKE:  Yeah.  Object to form.

(Burchell Exhibit 12 marked for identification.)

QUESTIONS BY MS. CRAICK:

Q.    I'd like to pull up Tab R and introduce that as the next-numbered exhibit, if someone could tell me what the next number -- I don't know if we're on 12 or something else.

MS. SUGAR:  12.

QUESTIONS BY MS. CRAICK:

Q.    So this is Exhibit 12.  This is a document titled "Facebook and Google Age Gate Update" dated April 6, 2022, and updated May 16, 2022.

Do you see that?

A.    Yes.

Q.    And you're listed as one of the project owners.

Right?

A.    I am listed on this doc, yes.

Q.    And could you explain to the jury again what it means to be a project owner?

A.    In this particular sense, in this particular doc, this is an SOP outlining how my team should handle any inquiries received about this update and what my team should do if they were to receive an inquiry about this update.

Q.    And inquiries from whom?

A.    From users.

Q.    Did you write this document?

A.    I did.

Q.    And this was created as part of your regular course of your job at TikTok.

Right?

A.    Yes.

Q.    And who is ██████████?    What was her role at TikTok?

A.                          was a senior -- is -- was and is a senior associate on the younger users user support team.

Q.       And was this document circulated to the other people you supervised at TikTok?

A.       It was.

Q.       The document says that -- under the first bullet point, "All users based in the US that signed up originally using either Facebook or Google are going to receive a push notification asking for their date of birth."

Do you see that?

A.       I see that.

Q.       And then if we go down to the second page, bullet point 3, it has a heading "Why is this necessary?"

Do you see that?

A.       Yes.

Q.       And could you read the first bullet point there?

A.       "We have found an issue in the account creation process where users creating a TikTok account using a Facebook or Google

login are not asked to input their birthday."

Q.    Okay.  So before this update, kids who created a TikTok account using either a Facebook or a Google login were not asked by TikTok for their birthday.

Right?

A.    I would not be the expert on this process being built out, so I don't -- I can't confidently answer that.

Q.    You were the project owner of this document.

Right?

A.    Of this document, not the age-gate process.

Q.    And this says, "We have found an issue in the account creation process where users creating a TikTok account using either a Facebook or a Google login are not asked to input their birthday."

Right?

MR. DRAKE:  Object to form.

THE WITNESS:  You -- what you just read, yes, that is on the SO -- this SOP.

QUESTIONS BY MS. CRAICK:

Q.    And so TikTok also said, "This needs to be fixed in order to make sure every user on the platform is in the correct experience for their age."

Right?

MR. DRAKE:  Object to form.

THE WITNESS:  That is what the bullet says, yes.

QUESTIONS BY MS. CRAICK:

Q.    Because if you don't know a kid's age, they might not be in the correct experience.

Right?

A.    They may be.  They may not be.

Q.    So it's possible that a kid could be 10 years old and in the 18 and over TikTok experience if you don't know the kid's age.

Correct?

A.    It's possible.

Q.    And TikTok launched in the United States in 2017, 2018.

Right?

A.    I --

MR. DRAKE:  Object to form.

THE WITNESS:  The policy was to identify if a user was under the age of 13 or not.

QUESTIONS BY MS. CRAICK:

Q.    And in order to make that identification, were you trying to see whether or not they look under 13, or were you trying to see whether or not they look under 12 or under 11?  Under a different age?

MR. DRAKE:  Object to form.

THE WITNESS:  In an earlier version of the policy, 9 was used as a, like -- as a starting -- as a starting place to identify what age a user looked like, but we were still trying to identify if a user was under 13 or not.

QUESTIONS BY MS. CRAICK:

Q.    So why don't we look at that real quick.  We can pull back up Exhibit 7 and go to page 49.

And to remind the jury, this is the user support SOP for younger users/users under 13, and this is the document where

you're listed as project owner.

A.    The old --

Q.    Are you there?

A.    The old version, correct?  From 2021?

Q.    Yes.

A.    Got it.

Q.    This was from 2021.

A.    Yeah.

Q.    And at the bottom of page 49, you see a heading that says, "Third Party Deletion Request, U13"?

Do you see that?

A.    I see that.

Q.    And it says, "When a third party, teacher, grandparent, friend, et cetera, reports a suspected underage user, we review the information given, plus visual signals on the reported account, and determine if the user is under 13 or not."

Right?

A.    I see that.

Q.    And then it has a note that discusses visual signals.

Do you see that?

A.      I see that.

Q.      And can you read what it says there?

A.      "Visual signals are defined as any" -- excuse me -- "are defined as any visual indicator of the account holder being under 13 years old."

Do you want me to keep going?

Q.      Yes, please.

A.      "To help operationalize this subjective determination, we target 9-year-old appearance, behavior or environmental signals as a good calibration point."

Q.      And, Zach, can you underline the "target 9-year-old appearance"?

A.      I read that.

Q.      At this point in 2021, TikTok was looking at whether the kid looks 9 years old or younger as one of the criteria.

Right?

MR. DRAKE:  Object to form.

THE WITNESS:  We were still looking to see if the user was -- if the account holder was under 13, but,

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Amber Renee Miller Burchell, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

<%31964,Signature%>

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  January 2, 2025