# AMENDED Exhibit 829

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA


     ******************************
                                    Case No.
 IN RE:  SOCIAL MEDIA ADOLESCENT    4:22-MD-03047-YGR
 ADDICTION/PERSONAL INJURY
 PRODUCTS LIABILITY LITIGATION
                                    MDL No. 3047
     ******************************


 This Document Relates To:

 ALL ACTIONS


     ******************************


        SUPERIOR COURT OF THE STATE OF CALIFORNIA
                   COUNTY OF LOS ANGELES
                   UNLIMITED JURISDICTION


 ************************

Coordination Proceeding     Judicial Council
Special Title               Coordination Proceeding
(Rule 3.550)                No. 5255

SOCIAL MEDIA CASES          Judge:  Carolyn B. Kuhl
                            Dept. 12
 ************************



                    VIDEOTAPED DEPOSITION OF

                      JONATHAN D. BRODY


Held At:          Skadden Arps
                  2000 Avenue of the Stars
                  Los Angeles, California


                  February 5th, 2025
                      9:30 a.m.

Reporter:

Maureen O. Pollard, CA CSR #14449

would send it to all of the people that you were friends with on the app?

A.   That's right.

Q.   2014 is the next year we see on the graph, and that's the year you arrived, correct?

A.   Yes.

Q.   And this third one from the bottom says, "Snap Ads."

Do you see that?

A.   Yes.

Q.   And what is that referring to?

A.   I believe that was the first advertisements placed in Snapchat.

Q.   And is advertisements within Snapchat the primary way which Snapchat generates revenue?

A.   The primary way, yes.

Q.   Has Snap had ads ever since 2014?

A.   Yes.

Q.   At any time while you were at Snap did you have any responsibility over Snap ads?

A.   Not directly.

Q.   Did you ever have any responsibility over sales or marketing to brands or those types of things?

MR. MAJOR:   Objection.  Vague.

messages disappearing by default is still there?

A.    Yes.

Q.    2017, "Story Ads," it's a little more than halfway up, what's that?

A.    I believe that those were ads that actually had multiple Snaps in them so that they would -- you would view them as you viewed stories.

Q.    Another mechanism for Snap to generate revenue?

A.    Yes.

Q.    Also in 2017 is "Snap Map," correct?

A.    Yes.

Q.    That's a product you worked on?

A.    Yes.

Q.    In 2018, at the top of the list it says "Discover."

Do you see that?

A.    Yes.

Q.    Can you explain at a high level what Discover is?

A.    Discover was a feature that allowed publishers to have their own presence on the platform to generate content.

Q.    And content for who to view?

A.    People that use Snapchat.

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I think that might be true, but I can't answer with certainty.

BY MR. GADDY:

Q.    As you sit here today there's no other product or feature within Snapchat you could point me to prior to 2022 where Snap offered parental controls?

MR. MAJOR:  Objection.  Vague, and lack of foundation.

THE WITNESS:  Again, I can't say that for sure.

BY MR. GADDY:

Q.    Right.  So the answer is, correct, there is no other product or feature that you can point me to as you sit here today prior to 2022 where Snap offered parental controls?

MR. MAJOR:  Objection.  Vague, asked and answered, lack of foundation.

THE WITNESS:  My answer is that I can't say that for sure.

BY MR. GADDY:

Q.    Flip, if you would, please, back toward the front to Bates ending 550.  You should be looking at a slide that says "Over 750 million

monthly active users."

Do you see that?

A.    Yes.

Q.    Why is the number of monthly active users significant to where it would be included in an Investor Day PowerPoint?

MR. MAJOR:  Objection.  Lack of foundation.

THE WITNESS:  I think it's just an general indication of how many users the application reaches.

BY MR. GADDY:

Q.    And why is it important, the number of users that the application reaches?

A.    It is an indication of how valuable the product is, how many people advertisers can reach, how many people can communicate with each other across the platform, among other things.

Q.    It also says on here that "Snapchat reaches 90 percent of the 13- to 24-year-old population and 75 percent of the 13- to 34-year-old population in over 20 countries."

Do you see that?

A.    Yes.

Q.    Do you agree that in the US Snapchat

was a very popular application?

A.    Yes.

Q.    Do you agree that Snapchat in the US was a very popular application with teenagers?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I believe you could say that, yes.

BY MR. GADDY:

Q.    If you flip the page, you should see a slide that says "Strong Growth in Our Community."

Do you see that?

A.    Yes.

Q.    And it says "383 Million Daily Active Users."

Do you see that?

A.    Yes.

Q.    Can you explain why there would be such a difference in the number of daily active users, 383 million, versus the monthly active users, which was 750 million?

A.    Some people only use the product a subset of days, not every day of the month.

Q.    Okay.  And that's why you'd see higher number for the monthly users?

A.    Yes.

Q.    And do you see the graph that's presented on this page?  And if you look at the key at the bottom it has North America in yellow, and you can then see the number of daily active users presented on this graph from 80 million starting at the beginning of 2019 through 100 million at the beginning of 2023?

A.    Yes.

Q.    Did you have an idea when you were at Snap of approximately how many teenagers in the US were using Snapchat?

A.    I had a vague high-level understanding.

Q.    And what was that?

A.    I believe it was kind of this percentage based, so this kind of 90-percent-plus number.

Q.    90-plus percent of teenagers were using Snapchat?

A.    That is what I understood that to mean.

Q.    Safe to say that's tens of millions of teenagers in the US were using Snapchat?

A.    I don't know the exact number.

Q.    But fair to say it's tens of millions?

MR. MAJOR:  Objection.  Asked and answered.

THE WITNESS:  I don't know how many teenagers there are in the US.

BY MR. GADDY:

Q.    Flip towards the back of this one.  On Bates ending 4594, there's a slide entitled "Long-Term Value Creation."

Have you got it?

A.    Yes.

Q.    And you see the very first entry there says, "Path to 1 billion monthly active users over the next two to three years."

Do you see that?

A.    Yes.

Q.    And again that's -- that was a goal that Snap had, to increase the use of its app from the 750 million monthly active users it had at the time all the way up to over a billion, correct?

A.    I believe so.

Q.    And the reason for that goal would be some of the things that you told us earlier, to show the popularity of the app, to show the reach that advertisers could have, and to show the amount or the type of revenue that could be generated from Snapchat?

MR. MAJOR:  Objection.  Compound, lack

of foundation.

THE WITNESS:  And also to bring a product that we thought was valuable for people to more people.

BY MR. GADDY:

Q.   The fourth entry down next to the light bulb says, "Innovate to drive growth in content engagement."

Do you see that?

A.   I do.

Q.   And one of the things that Snap looked at was not only how many individuals got on the app on either a daily or a monthly basis, but was how much time those individuals spent on the app, correct?

A.   Yes.

Q.   And from a revenue-generation perspective, in kind of a benefit to advertisers perspective, the longer individuals stayed on the app, that was a better thing for Snap, correct?

MR. MAJOR:  Objection.  Compound, lack of foundation.

THE WITNESS:  Oftentimes.  Not always.

BY MR. GADDY:

Q.   Sorry, I'm not following.

The question is, from a revenue-generation perspective and from the perspective of touting the advantages of advertising on Snap to advertisers, the longer individuals stayed on the platform, that was better for Snap, correct?

MR. MAJOR:  Objection.  Compound, and asked and answered.

THE WITNESS:  It's more nuanced than that.  I think as a general measure, fairly effective, but it's not about how much time as much as it's about, you know, how they're spending that time and the content that they watch.

But, yes, generally I think that is a measure that could measure the effectiveness for advertisers.

BY MR. GADDY:

Q.    You agree that the more monthly active users on Snap the more revenue Snap is going to generate, generally?

A.    Not necessarily, but generally those things would move together.

Q.    Likewise, the more time spent on the application by its users, the more revenue Snap is

going to generate, true?

        A.    Again, not necessarily, and not in all cases, but generally.

        Q.    Is it also your general understanding that the more revenue Snap generates, the higher the stock price is going to go?

                MR. MAJOR:  Objection.  Foundation, speculation.

                THE WITNESS:  It's hard to say what the stock price is going to do, and certainly not in all cases, but generally, yes.

BY MR. GADDY:

        Q.    Mr. Brody, I'm happy to keep going. We've been going about an hour.  Whenever you want to take a break, let me know.

        A.    I'm okay.  Thank you.

                MR. MAJOR:  Take like two minutes?

                MR. GADDY:  Sure.

                THE VIDEOGRAPHER:  We are now going off the record, and the time is 10:35 a.m.

                    (Whereupon, a recess was taken.)

                THE VIDEOGRAPHER:  We are now going back on the record, and the time is 10:42 a.m.

                    ///

understanding that the US market was the most valuable market for Snap?

MR. MAJOR:  Objection.  Vague, and lack of foundation.

THE WITNESS:  I was broadly aware that that was a valuable market for us.

BY MR. GADDY:

Q.    I mean, according to this chart it's not quite but almost twice the value of the next closest market, correct?

A.    Yes.

Q.    Was that consistent with your understanding that the US market -- not just that it was a valuable market, but that it was the most valuable market and significantly the most valuable market for Snap?

MR. MAJOR:  Objection.  Compound, lack of foundation.

THE WITNESS:  I'm not sure I was specifically aware of the exact details of how valuable it was compared to the next best, next most valuable.

BY MR. GADDY:

Q.    And if you flip the page one more time, you see a chart that says "Monthly Average Revenue

Per User by Country."

Do you see that?

A.    Yes.

Q.    And it lists -- again, just looking at the first 12 months post-registration, and you see that once again the US is at the top of the monthly average revenue per user.

Do you see that?

A.    Yes.

Q.    Flip about three slides and go to slide 70, and you'll see a slide entitled "US Monthly Average Revenue Per User by Age Group."

Do you see that?

A.    Yes.

Q.    And again this is just looking at the first 12 months post-registration.

Do you see that?

A.    Yes.

Q.    And according to this chart, the most valuable age group to Snap from the perspective of annual revenue per user was the 13- to 17-year-old age group.

Do you see that?

MR. MAJOR:  Objection.

Well, are you just asking him if the

document says that?

MR. GADDY:  Yeah.

THE WITNESS:  I believe this is showing that by month 12 the ARPU by age group for 13- to 17-year-olds is higher than that of other demographics.

BY MR. GADDY:

Q.   Sure.  And that's a fair clarification.

13 to 17 is not the highest the entire time, correct?

A.   Correct.

Q.   But by month 12, the 13- to 17-year-old demographic is the most valuable demographic age-wise to Snap, true?

MR. MAJOR:  Objection.  Vague, lack of foundation.

THE WITNESS:  This suggests it's the highest ARPU by that point.

BY MR. GADDY:

Q.   When you say "ARPU," you're meaning annual revenue per user?

A.   Yes.

Q.   Was that consistent with your understanding while you were at Snap that the 13- to 17-year-old demographic was the most valuable over a

sure.  I suppose that that is somebody who Snap could create monetary value from at that age instead of later.

BY MR. GADDY:

Q.    Sure.  A user that is onboarded by Snap at age 13 is going to produce revenue for Snap at age 13, 14, 15, 16, 17, and 18, and then forward assuming they keep using the platform, as opposed to a user that Snap doesn't onboard until they're 18 years of age and they don't have the benefit of that earlier revenue, correct?

MR. MAJOR:  Objection.  Compound, vague.

THE WITNESS:  That seems generally correct.

BY MR. GADDY:

Q.    And, I mean, from a monetary perspective and a revenue-generation perspective, it's to Snap's benefit to onboard users as early as possible to maximize the amount of time that a user is in this 13 to 17 demographic bracket where they are, as we saw in the previous charts, the highest revenue-producing demographic on Snapchat, correct?

MR. MAJOR:  Objection.  Vague, compound.

THE WITNESS:  That seems generally correct.

BY MR. GADDY:

Q.   Looking from the perspective of the lifetime revenue that is likely to be generated by a user of Snapchat, the earlier Snap is able to onboard that user, the more revenue Snap is likely to generate from that user, correct?

MR. MAJOR:  Objection.  Lack of foundation, vague.

THE WITNESS:  I believe that's what these charts indicate.

BY MR. GADDY:

Q.   You can put that one aside.

In fact, because of the earning potential from the youngest users of Snapchat, fair to say that onboarding the youngest users, 13-year-olds, was the most critical aspect of onboarding users at Snapchat?

MR. MAJOR:  Objection.  Lack of foundation, and vague.

THE WITNESS:  I can't say that specifically.

BY MR. GADDY:

Q.   You could say that from a general

allowed people to do that.

Q.   Sure.  My question is about on the Snapchat app --

A.   I'm not sure.

Q.   -- not at the operating system level.

Are you aware of any product or product feature that ever has existed on Snapchat that allowed a 13 to 17-year-old kid to have time limits set for them for how long they could spend on the app?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I can't say for sure.

BY MR. GADDY:

Q.   Are you ever aware of Snapchat itself through its app instituting any time -- instituting any time limits or limitations on the number of times the app could be opened on a daily basis by a 13 to 17-year-old user?

MR. MAJOR:  Objection.  Vague and compound.

THE WITNESS:  I can't say for sure.

BY MR. GADDY:

Q.   Are you aware of any product or feature that Snapchat ever offered on its application that would provide a warning or a notification to kids 13

to 17 that they were spending too much time on the application?

          MR. MAJOR:  Objection.  Vague again.

          THE WITNESS:  I don't believe so.  I can't say for sure.

BY MR. GADDY:

     Q.    Are you aware of any product or product feature ever offered by Snapchat on the Snapchat application that would provide any type of warning about how spending excessive time on the application could be harmful?

     A.    I can't say for sure.

     Q.    If you flip to the Bates ending 185. This is the continuation of that section about the younger users, and you see number 5 says, "This age cohort is also very valuable for advertisers."

          Do you see that?

     A.    I do.

     Q.    And was that consistent with your understanding that the younger demographic, the 13 to 17-year-old teenagers, was a very valuable demographic for advertisers?

     A.    Is that -- I'm not sure that that is the cohort this is referring to from just this one line.

Q.    If you go back to the first page of the document, this is number 5 --

A.    I see it.

Q.    -- under "Maintaining deep penetration of younger demos in established markets," right?

A.    Yes.

Q.    And that's the one where we saw the bullet point talking about winning with 13-year-olds, right?

A.    Yes.

Q.    And it's the one where it said, "This generation can't live without our app."

Correct?

A.    Yes.

Q.    And if we go back to where we are on number 5, it says, "This age cohort" -- again referring to the youngest demographic -- "is also very valuable for advertisers."

Right?

A.    Yes.

Q.    It says, "Snapchat Generation" -- what's that?

A.    I can't say for sure, but I imagine that is the generation that is -- that uses Snapchat most.

Q.    "Snapchat Generation has [$2 trillion] in purchasing power, making up over [40 percent] of global consumers."

Do you see that?

A.    Yes.

Q.    And that's what Snap is thinking about when they're saying that this group of kids, the teenagers, is the cohort that's very valuable to advertisers, correct?

MR. MAJOR:   Objection.  Lack of foundation, calls for speculation.

THE WITNESS:  Yeah, I'm not sure.  I can't say for sure.

BY MR. GADDY:

Q.    And fair to say that over the years Snap has designed, made different products or features of Snapchat which are designed to increase the number of users of the platform, fair?

A.    I think it's more nuanced than that. The primary reason we designed features was to make the application more valuable, which would sometimes and often indirectly lead to more people wanting to use that product and get that value from it.

Q.    Sure.

And one of the things that some of the

A.    I believe there were products offered to that end, yes.

Q.    When you say "products offered," you mean products offered by Snap, correct?

A.    Yes.

Q.    I show you what we'll mark as Exhibit Number 6.  This is P-SNAP-0660.

(Whereupon, Exhibit Snap-Brody-6 was marked for identification.)

BY MR. GADDY:

Q.    And you can tell me if I'm wrong, but my understanding is this document is a Quip.  Are you familiar with Quips?

A.    Yes.

Q.    Can you give me at a high level an understanding of what a Quip is?

A.    It was another kind of collaborative document-type product like Google Docs.

Q.    And what did Snap or you specifically use Quips for?

A.    Oftentimes it was used to outline a new product or feature's functionality, to communicate it to those that would need to help develop it.

Q.    And if you flip the page and look inside this one, this is from October 19, 2027 --

or, excuse me, 2017.

Do you see that at the top?

A.    Yes.

Q.    And the title of this Quip is "[Cheetah] Discover Feed User Spec."

Do you see that?

A.    Yes.

Q.    First tell me what Cheetah is and what that means.

A.    Cheetah was a project name for a redesign of the application.

Q.    Give me kind of a high level of what happened in the Cheetah redesign and kind of the outcome of the Cheetah redesign.

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  A lot happened in the Cheetah redesign.  It was a while ago and I can't specifically recall the details.

BY MR. GADDY:

Q.    Is that the one where Stories went away as a toggle on the bottom menu?

A.    To my recollection, I believe Stories moved from the right side of the app to the left side of the app as part of this change, among many other changes.

Q.    Okay.  The title is "[Cheetah] Discover Feed User Spec."  And then it says "Feature Overview."

Do you see that?

A.    Yes.

Q.    It says, "Create a flexible and focused stories design.  An infinite feed of ranked, interesting content."

Correct?

A.    Yes.

Q.    And you can go back and look at it if you like, but my memory is that when we looked at that product timeline feature on that graph, that Discover went live in 2018.  Does that sound about right to you?

A.    I recall that being what it showed on that sheet.  My memory of Discover was actually that it launched in its first iteration in 2014 or 2015.

Q.    Okay.  Okay.

A.    It evolved.  Over the years the name meant different things.

Q.    Sure.  Okay.  Can you -- I appreciate that.

Can you walk me through kind of the history of what you now think of as Discover as far

as what it looked like when it launched and how it may have changed over time?

A.   Yeah.   I have a vague recollection of this stuff, so at a high level the initial iteration of Discover had a finite number of publishers that were available that were creating content on some cadence.

Over time the number of publishers offered increased, and the types of publishers broadened, and some users and creators on the platform showed up in Discover.

The UX and the interface evolved over that period of time as well.

Q.   In this document the next entry says "Feature Goals."

Do you see that?

A.   Yes.

Q.   And the goals for -- within this particular document was, "Deeper engagement and more time spent with public stories."

Do you see that?

A.   Yes.

Q.   And engagement and time spent are two of the factors that we saw earlier in that revenue formula, correct?

A.    Yes.

Q.    It goes on to say, "Drive an endless scrolling experience of interesting content."

Do you see that?

A.    Yes.

Q.    And you agree that one of the goals of this particular project that were being worked on for Discover was to drive endless scrolling?

MR. MAJOR:  Objection.  Vague, foundation, speculation.

THE WITNESS:  I'm not sure what "drive" means, but according to this document, that was outlined as a goal.

BY MR. GADDY:

Q.    In your own words can you tell us what "endless scrolling" means?

A.    I assume this means an experience where you can scroll endlessly.

Q.    Do you have an understanding of why that would drive -- or why that would assist in the goals that are listed there as far as deeper engagement and more time spent?

MR. MAJOR:  Objection.  Vague, compound, foundation.

THE WITNESS:  Seems like if a user does

of, you know, feedback channels, voice of the customer reports, things of that like.

Q.    Are you aware of any qualitative A/B testing that was done for the feature in this document that we were talking about as far as driving the endless scrolling experience?

A.    I don't have specific recollection of the feedback or what steps were taken.  I do have recollection that there was feedback from users for this.

Q.    And do you recall whether or not Snap solicited feedback specifically on the areas of addictive use, compulsive use, or those types of topics?

A.    I don't recall specifically.

Q.    Do you recall whether or not Snap did any research as it relates to this specific feature into the impact that it may have on schools or what it might do to children and their attention while at school?

MR. MAJOR:  Objection.  Compound, vague.

THE WITNESS:  I don't recall specifically.

///

Q.    And tell me really quickly what is --
it says "Channel #Product-Feedback."  Is that kind
of like a group Slack message?

A.    Yes.

Q.    And who would be members of the product
feedback channel?

A.    I believe anybody at Snap, any team
member, could be a member of this.  I think it was
an open channel.

Q.    And what was kind of your general
understanding of the purpose of the product feedback
channel?

A.    For people to provide feedback on the
product.

Q.    "Product" being Snapchat?

A.    Yes.

Q.    Flip if you would, please, to the Bates
ending 939.  And there's a message from ███████
Let me know when you've got it.

A.    Yep.

Q.    And who is ███████

A.    I'm not sure.

Q.    She says, "I saw this Tweet and thought
I'd share."

      Do you see that?

A.    Yes.

Q.    The images are embedded so we printed the image separately.  It's at the back of the document.  Let's go to that and we can see the Tweet that she shared.  You should have it at the very back where you can read the whole thing so it's not cut off.

Have you got it?

A.    Yes.

Q.    The Tweet she shares says, "I think snapchat filters can influence body dysmorphia because it literally changes your eyes/nose/face shape."

Do you see that?

A.    Yes.

Q.    Fair to say that she's correct, that Snapchat offered lenses or filters in the beauty or beautification section that would change the appearance of the Snapchatter's eyes and/or nose and/or face shape?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  The point of many of the filters were to change the appearance, costume, shape, etcetera, of users, yeah.

///

BY MR. GADDY:

Q.    Sure.  And obviously I know there's silly lenses that will change those types of facial features in unrealistic and silly ways, but I'm asking specifically about the beauty or beautification filters.

They would also augment eyes, nose, face shape in ways that would make the Snapchatter appear, quote-unquote, more beautiful, true?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I don't recall specifically what was categorized as "beauty."  The things that I recall being deemed beauty related would have been the skin smoothing and the different lighting options.  I don't know that that was the extent of it, but that's what I recall.

BY MR. GADDY:

Q.    It goes on to say, "if you're constantly using these filters you start hating your actual appearance because ur used to people complementing your false features ya get me?"

Do you see that?

A.    Yes.

Q.    Does that concept that is being

expressed by this Snapchat user make sense to you?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I understand what they're getting at.

BY MR. GADDY:

Q.    Do you have an appreciation that that can be a real mental health concern?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  I'm not sure I understand that question, an "appreciation" for that.

BY MR. GADDY:

Q.    What she's saying is if you're constantly using these filters you start hating your actual appearance because you're used to people complementing your false features.  My question is, do you appreciate that as a legitimate mental health concern or problem?

MR. MAJOR:  Objection.  Vague, lack of foundation, improper opinion testimony.

THE WITNESS:  I think that could happen, and if that were happening, it would not be ideal.

BY MR. GADDY:

Q.    And I'm asking you because in this period of time in 2020, I think you're the head of

page that says "Percentage of Snap Senders Having Streaks by Age."

Do you see that?

A.    Yes.

Q.    And do you see here, consistent with what we saw on the earlier slide, that the highest percentage is those in the 13 to 17-year-old age bracket?

A.    Yes.

Q.    And is that consistent with your understanding that the younger users were the more prominent users of Snapstreaks?

A.    Again, I think there's some incidental usage of Snapstreaks here.  They were the more frequent communicators in general which would lead to more of them having streaks.

Q.    That makes sense.

While we're kind of talking about the concepts of Snapchat use by teenagers in the context of schools, are you aware of Snap ever taking any action or implementing any type of product design feature that would have disallowed the use of Snapchat on school property?

MR. MAJOR:  Objection.  Vague, foundation.

THE WITNESS:  I'm not sure.

BY MR. GADDY:

Q.    Are you aware of that ever happening?

A.    I'm not aware.

Q.    Are you aware of Snap ever rolling out a design component or design feature that would have prevented the use of Snapchat by school-aged children during school hours?

A.    Not that I'm aware of.

Q.    As to the first of those two questions that I asked about, and disallowing the use of Snapchat on school property, Snap had the ability to understand locations as far as where its users were, correct?

A.    Sometimes, in some cases.

Q.    I mean, you were involved in the Snap Map feature, correct?

A.    Yes.

Q.    And that was a feature that would display a map and allow Snap users to see where they were and where their friends were, and those types of things, correct?

A.    Those that opted into granting the application location permission and then those that opted into sharing their location with friends would

appear there, yes.

Q.    And was there technology that -- let me ask a different question first.

As the Snap Map kind of evolved over time, in addition to users just being able to see where their friends were on the map, they could also see locations on the map, correct?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  What do you mean by "locations"?

BY MR. GADDY:

Q.    Sure.

Like they could see the local coffee shop on the corner and click on the coffee shop?

A.    Sure, yes.

Q.    And maybe this wasn't immediately a feature, but once they clicked on that coffee shop they could then see Snaps or Stories that were either put out by the coffee shop or tagged by folks while they were at this coffee shop and things like that, correct?

A.    Yes.

Q.    And Snap had the technology available to kind of geolocate and geofence different areas that it would display on the map, like the coffee

shop in that example?

MR. MAJOR:  Objection.  Vague, compound.

THE WITNESS:  Yes.

BY MR. GADDY:

Q.    Okay.  And fair to say that another location that you could view or see on the map would be schools, middle schools or high schools?

A.    I'm not sure whether or not that was presented on the map.

Q.    Okay.  Are you aware of Snap ever doing anything with its geolocation or geofencing capabilities to prevent access to Snapchat by individuals that were on school properties during school hours?

MR. MAJOR:  Objection.  Vague.

THE WITNESS:  Not that I'm aware of.

BY MR. GADDY:

Q.    I show you what I'll mark as Exhibit Number 24.  This is P-SNAP-0686.

(Whereupon, Exhibit Snap-Brody-24 was marked for identification.)

BY MR. GADDY:

Q.    And this is another document from your custodial file.  The file name is "Streak Restore -

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD,

Registered Diplomate Reporter, CSR No.

14449 for the State of California, the

officer before whom the foregoing

deposition was remotely taken, do

hereby certify that the foregoing

transcript is a true and correct record

of the testimony given; that said

testimony was taken by me

stenographically and thereafter reduced

to typewriting under my direction; and

that I am neither counsel for, related

to, nor employed by any of the parties

to this case and have no interest,

financial or otherwise, in its outcome.

Dated this 12th day of February,

2025.


<%21527,Signature%>
_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449