**AMENDED Exhibit 847**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR

MDL No. 3047

In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


------------------------------x
IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No. 4:22-md-
ADDITION/PERSONAL INJURY       ) 3047-YGR
PRODUCTS LIABILITY LITIGATION  )
------------------------------x
                               )
THIS DOCUMENT RELATES          )
TO ALL ACTIONS                 )
                               )
------------------------------x



CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF JEREMY VOSS

PALO ALTO, CALIFORNIA

APRIL 4, 2025

10:05 A.M.









Job No. MDLG7280759

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

another exhibit here.  This will be tab 9, which we will mark as Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MR. FREEDMAN:

Q.    And, sir, before -- I'm going to give you a moment to look at the document. Before we do, can we go to that last page again.

A.    Yes.

MS. MENY:  Last page of this document?

MR. FREEDMAN:  Yeah, this slip sheet.

BY MR. FREEDMAN:

Q.    Sir, you're listed as a custodian, right, sir?

A.    Yes.

Q.    The author is Mofette Nathanson, LLC.  Do you see that?

A.    I see that.

Q.    Who is that?

A.    I think it's a public research group, i.e., this is a document that would

have been produced publicly, not -- not for Snap.

Q.    Okay.  And then it says the create date is April 2018, right?

MS. MENY:  He's talking about on the slip sheet.

THE WITNESS:  Yes.

BY MR. FREEDMAN:

Q.    And that's about a year after the power users study we were just looking at, right?

A.    Yes.

Q.    Okay.  Why don't you take a look at that document and let me know when you've familiarized yourself.

A.    (Peruses document.)

Q.    How are you doing, sir?

A.    Just one moment.  (Peruses document.)  Okay.

Q.    Sir, the first page of this document on Bates 368, up top it says:  "Snap Focus Group Part 2:  Who Were the Beta Testers?"

You see that, right?

A.    Yes.

Q.    And under the Summary it says:
"One year ago as Snap was gearing up to go
public, we hosted focus groups with three
distinct cohorts, middle school students,
high school students, and young college
graduates, to understand what Snap meant to
its most ardent users."

I read that correctly, right?

A.    Yes.

Q.    It continues:  "Given the
popularity of these focus groups and the
recent uproar around Snap's app redesign, we
thought it would be topical to run these
groups again to check the pulse of Snap's key
demos."

I read that correctly?

A.    Yes.

Q.    Sir, have you ever seen this
research?

A.    I don't remember this.

Q.    Any idea why you would be
listed as the custodian for this document?

A.    I guess it was shared with me
at some point.

Q.    Any idea why you would be the

thought it would be topical to run these groups again to check the pulse of Snap's key demos."

I read that correctly, right?

A.    Yes.

Q.    So, sir, we can agree that this research is indicating that middle school students, high school students, and young college graduates are Snap's, quote, key demos, right?

MS. DEGTYAREVA:  Objection. Vague, speculation, foundation.

MS. MENY:  Also misstates the document.  Join.

THE WITNESS:  That is what this external researcher says, but I don't think that Snap would agree with that. I mean the 13- to 17-year-old group is only four -- four years of people.  So we have -- it represents a small minority of the people on Snap's platform.

BY MR. FREEDMAN:

Q.    Mr. Voss, is it your testimony that Snap was not aware that 13- to

17-year-olds were its most active users?

MS. DEGTYAREVA: Objection.
Vague, speculation, foundation.

MS. MENY: Join.

THE WITNESS: Yeah, I -- I don't know. It would depend on what features we're talking about mand I would have to see the data.

BY MR. FREEDMAN:

Q. Okay. Well, why don't we jump to the third paragraph. Can you read for me the first sentence of that paragraph.

A. "Our second takeaway is the fact that while Snapchat retains its stranglehold on the middle school cohort, Instagram has clearly become a more significant contender for the high school and post-college cohorts' time, with it being viewed increasingly as a replacement platform, excluding direct messaging functionality."

Q. You agree that this research suggested that Snapchat had a stranglehold on middle school cohort. Right?

MS. DEGTYAREVA: Objection.

Vague, foundation and speculation.

MS. MENY:  Join.

THE WITNESS:  That's what this sentence says.

BY MR. FREEDMAN:

Q.    And so you're asking this jury to believe that Mofette Nathanson knew that Snapchat had a stranglehold on the middle school cohort, but Mr. Voss did not know that.

MS. MENY:  Objection. Speculation, foundation, misstates the document, vague.

THE WITNESS:  Yeah, I think Moffette Nathanson --

MS. DEGTYAREVA:  Join.

THE WITNESS:  -- thinks that but doesn't have access to Snapchat's data.  And I -- I wouldn't have characterized that that way at all. It was highly -- a number of other messaging apps that that age group used a lot.

BY MR. FREEDMAN:

Q.    Well, let's look at some of the

ways that these groups used Snapchat.

If we turn to the Bates ending 369.

That middle school group, it reads:  "This year the middle school group consisted of eighth graders who were 13- and 14-year-olds.  Most participants listed Snapchat and Instagram as their top two apps.  Other apps within the top five were Pinterest, VSCO, YouTube, Spotify and gaming apps like Righter."

I read that correctly, right?

A.    Yes.

Q.    And if we flip to the next page ending 370, right at the top of the page it discusses streaks, right, sir?

A.    Yes.

Q.    Why don't you tell -- read what it says in that paragraph:

A.    "Streaks, which this group loved last year, were only used by a few this year and loathed by the rest.  Most found streaks to be so annoying and said they could be stressful to keep going.  Users felt that maps felt really creepy and can also

unintentionally make people feel left out."

Q.    And that was your understanding of the way in which streaks impacted middle school users, that it made them feel stressed, right?

MS. DEGTYAREVA:  Objection. Vague.  Misstates the document, speculation, and foundation.

MS. MENY:  Join.  Also misstates his testimony.

THE WITNESS:  That is not my understanding, no.

BY MR. FREEDMAN:

Q.    Okay.  Let's turn to the high school group, the second paragraph here.  It reads:  "This group reported deep engagement with Snapchat (all reported Snapchat as one of their top two apps), but also said Snapchat was stressful and distracting."

Sir, do you have any reason to believe that these high school students were lying?

MS. DEGTYAREVA:  Objection. Vague, speculation, foundation.

MS. MENY:  Join.  Also vague

and ambiguous.

THE WITNESS:  I -- I don't know the conversations or how many conversations they had.  I don't know anything about the research they did for this paper.

BY MR. FREEDMAN:

Q.    So no reason to think that what is reported here is inaccurate?

MS. DEGTYAREVA:  Objection. Vague, speculation, foundation, misstates the testimony.

MS. MENY:  Join.

THE WITNESS:  No, I don't think that they're trying to be inaccurate. No.

BY MR. FREEDMAN:

Q.    It continues on.  Can you read for me the next sentence?

A.    "One participant remarked that its addictiveness had affected her academic performance.  Although this group uses Snapchat often" --

Q.    We're just going --

A.    You want me to stop there.

Q.    Yeah, we're just going to read that next sentence.  Can you do that one more time for the one participant sentence.

A.    "One participant remarked that its addictiveness had affected her academic performance."

Q.    Sir, you would agree with me that Snap was aware that Snapchat was addictive for high school age children. True?

MS. DEGTYAREVA:  Objection. Vague, speculation, foundation --

THE WITNESS:  No.

MS. DEGTYAREVA:  -- misstates the document.

THE WITNESS:  Sorry.

MS. MENY:  Join.

THE WITNESS:  No.

BY MR. FREEDMAN:

Q.    Mr. Voss, did you ever conduct any analysis or tests on the impact that Snapchat had on the academic performance of high school aged children?

MS. MENY:  Objection.  Vague.

THE WITNESS:  Not that I

recall.

BY MR. FREEDMAN:

Q.    Do you remember directing anybody else to do so?

MS. MENY:  Same objection.

THE WITNESS:  Not that I recall.

BY MR. FREEDMAN:

Q.    Do you remember anybody telling you that they had done that research?

MS. MENY:  Objection.  Vague.

THE WITNESS:  Not that I recall.

BY MR. FREEDMAN:

Q.    Okay.  Can you read for me the next sentence.

A.    "Although this group uses Snapchat often, they also reported it as a major source of angst unlike other apps."

Q.    Sir, because you claim that you've never seen this research before, the conclusions in this report were never used by you in informing product changes, true?

MS. MENY:  Objection.  Vague.

MS. DEGTYAREVA:  Join.

(Exhibit No. 13 was marked for identification.)

THE WITNESS: (Peruses document.) Okay. Okay.

BY MR. FREEDMAN:

Q. Sir, this is another e-mail that you are on, right, sir?

A. Yes.

Q. Within a couple of days of the e-mail we were just looking at, true?

A. I don't remember when the other one was. Yes, I guess this is a few days before.

Q. And if you flip to the -- this e-mail is entitled: "Re: Snapchat distribution streak greater than three." True?

A. Yes.

Q. If you flip to the page ending 345, the e-mail at the bottom, that's another e-mail from ███████████ right?

A. Yes.

Q. And Ms. █████ says in the first bullet point: "22 percent, 35.6 million of DAU, have at least one Snapstreak increase."

Right, sir?

A.    Yes.

Q.    If you flip to the bullet point, it's the fourth black bullet point.

A.    Okay.

Q.    It says:  "Snapstreak users are younger, 13 to 17, compared to other DAU."

I read that correctly, right, sir?

A.    Yes.

Q.    Does that refresh your recollection that Snapstreak users tend to be younger?

A.    I think you said the majority. It says 47 percent, so -- and that was in 2017.  So, you know, I think what I said, by the time I left Snap -- well, even in 2017, it was not a majority.  Obviously, there are a lot of users within this bucket who are 13 to 17.

Q.    So, sir, we can agree that Snapstreak youngers tend to be -- Snap -- scratch that.

We can agree that Snapstreak users tend to be Snap's youngest users, true?

MS. DEGTYAREVA:  Objection.
Misstates the testimony and the
document, speculation, and foundation.

MS. MENY:  Join.  Also vague.

THE WITNESS:  Yeah, what --
what do you mean by "tend to be"?

BY MR. FREEDMAN:

Q.    Well, 47 percent of Snapstreak
users are in the 13 to 17 age bucket, right,
sir?

A.    That's right.  In 2017.  In
January of 2017.

Q.    Sure.  How about in this
document as we read it, it says:  "47 percent
of Snapstreak users are in the 13 to 17 age
bucket."  True?

A.    That's right.

Q.    Then right below that it says:
"The biggest age groups for streak users are
16, 15 percent; 17, which is 12 percent; and
15, which is 10 percent.  Right, sir?

A.    Yes.

Q.    And if we flip to page ending
347, the top chart there has "Daily active
user age distribution," right, sir?

CERTIFICATE OF CERTIFIED SHORTHAND

REPORTER

The undersigned Certified

Shorthand Reporter does hereby certify:

That the foregoing proceeding was

taken before

me at the place and time therein set forth,

at which time the witness was duly sworn;

That the testimony of the witness and all

objections made at the time of the

examination were recorded stenographically by

me and were thereafter transcribed, said

transcript being a true and correct copy of

my shorthand notes thereof; That the

dismantling of the original transcript will

void the reporter's certificate.

In witness thereof, I have

subscribed my name

this date:  April 8, 2025.


<%14542,Signature%>

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129