**AMENDED Exhibit 863**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*****************************
                                      Case No.
 IN RE:  SOCIAL MEDIA ADOLESCENT   4:22-MD-03047-YGR
 ADDICTION/PERSONAL INJURY
 PRODUCTS LIABILITY LITIGATION
                                      MDL No. 3047
  *****************************

 This Document Relates To:

 ALL ACTIONS

 *****************************


     SUPERIOR COURT OF THE STATE OF CALIFORNIA
                COUNTY OF LOS ANGELES
                UNLIMITED JURISDICTION

 ***********************

Coordination Proceeding     Judicial Council
Special Title               Coordination Proceeding
(Rule 3.550)                No. 5255

SOCIAL MEDIA CASES          Judge:  Carolyn B. Kuhl
                            Dept. 12
************************
     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

                 VIDEOTAPED DEPOSITION OF

                    CLAUDIA Y. CHAN

Held At:          Munger, Tolles & Olson
                  350 Grand Ave., 50th Floor
                  Los Angeles, California

                   February 7th, 2025
                        9:59 a.m.



Reported By:
MAUREEN O. POLLARD, CSR #14449, RDR

MS. BELL:  Objection to form, and misstates testimony.

THE WITNESS:  I don't think it's -- yeah, I don't think I said I never worked with trust and safety before.

BY MS. FIDLER:

Q.    But you've never conducted an audit with them on the -- on whether your account creation process allows underage users to access the platform?

A.    I talk to them like all the time.  So even though maybe there wasn't an official audit conducted, that's -- you know, everything in the roadmap, all of our features, my trust and safety partners have visibility and transparency into everything that we're doing, and I take their feedback into account.

Q.    And you testified earlier that that visibility is primarily through interoffice communications?

A.    No.  Also launch e-mails, launch reports, feature specs, all the docs as well.

(Whereupon, Exhibit Snap-Chan-7 was marked for identification.)

///

allows Snap employees to make content not visible,

and that in order for accounts to be locked they

have to be directly referred to trust and safety?

MS. BELL:  Objection to form, and lack

of foundation.

THE WITNESS:  I'm not familiar with

Snap Graph.

BY MS. FIDLER:

Q.    Then how do you have knowledge that if

you identify accounts under 13 on Spotlight that you

lock the accounts?  Where does that knowledge come

from?

A.    Just being the age verification owner

across Snap, like I know of all the initiatives that

are going on related to potential under 13.

Q.    And so responding to parental reports

and this so-called Spotlight moderation, are there

any other post-registration account verification

that Snap does?

MS. BELL:  Objection to form.

THE WITNESS:  There's also a pilot we

are working on with an age verification

vendor.

BY MS. FIDLER:

Q.    What vendor is that?

A.    k-ID.

Q.    Was that ever documented?

A.    It should be.  It's very recent, though.  It happened after I left the team.

Q.    Can you give an estimate of what time?

A.    The time of the pilot happening or --

Q.    Yeah, the time of the pilot happening.

A.    Oh, I see.

I don't know the full details.  I'm still like part of some of the Slack channels so I saw they are launching it soon, I just don't know exactly when.

Q.    But it's not launched currently, is that fair?

A.    Yeah, I believe it's not yet in production.

Q.    Were you on the team when they activate -- were you on the team when they began conversations with KDI?

A.    Yes.

Q.    Were you part of those conversations?

A.    Some of the conversations.

Q.    When did those conversations start?

A.    I don't remember.

Q.    Was it within the last six months, last

Q.    Would you agree that the way Snap handles birthday and registration contributes to false age entries?

MS. BELL:  Objection to form.

THE WITNESS:  No.

BY MS. FIDLER:

Q.    Okay.  Let's talk about one choice.

Snap automatically defaults to the birthday field to 18 years old, right?

A.    Yes.

Q.    And so that means that if a user doesn't manually enter their real birthday they are automatically set to 18, correct?

A.    Yes.

MS. BELL:  Objection to form.  Calls for speculation.

BY MS. FIDLER:

Q.    And that means that the option for a minor signing up for -- signing up -- pardon me, strike that.

That means the easiest option for a minor signing up is just to leave the prefilled date as 18, correct?

MS. BELL:  Objection to form.

THE WITNESS:  I don't know if that's

A.    No.  We only talked about the UI treatments, agnostic of any region at all.

Q.    So I just handed you what's been marked as Exhibit 13 to your deposition.  Do you recognize this e-mail?

A.    Yes.

Q.    And the subject of it is "[Launch Report] UK Registration Age Gating," correct?

A.    Mm-hmm.  Yes.  Sorry.

Q.    And this is from April 2023?

A.    Yes.

Q.    So there's a lot of attorney redactions on here, as you'll see, but if you scroll -- if you go over to page 7 which ends in Bates number 2268192, at the very bottom ▮▮▮▮▮ begins an e-mail.

Who is ▮▮▮▮▮, or ▮▮▮▮▮ if I'm mispronouncing his name?

A.    He's one of the engineers I work with.

Q.    And he says, "Hi team, Per UK regulations requirements, we're changing the registration birthday page UI to make the default date of birth more neutral as compared to defaulting it to 18 years old based on the current date."

Do you see that?

A.    Yes.

Q.    And then there's, The feature will include this change, and it looks like it shows a blank date.

So Snap launched that UK users would now see a blank date instead of the auto-filled birthday, is that correct?

A.    Yes.

Q.    And Snap tracked whether this change had any effect on new user registrations?

A.    It was one of the metrics we looked at in the A/B test.

Q.    So Snap was concerned on how changing the default age date to a blank would affect new user registrations, is that fair?

MS. BELL:  Objection to form.

THE WITNESS:  In general for all of our A/B studies, registration success is one of the many metrics we look at.

BY MS. FIDLER:

Q.    If you go over to the page that ends in 197, it says, The result is slightly negative and almost neutral compared to another treatment.

And then it gives some metrics.

Do you see where it says, "Estimated

the record, and the time is 2:06 p.m.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 2:14 p.m.

BY MS. FIDLER:

Q.    Hi, Ms. Chan.

Can you pull back out Exhibit 7, please.

A.    Yes.  Yeah.

Q.    This is the Slack message between you and Mr. Jaklitsch that we looked at earlier, correct?

A.    Yeah.

Q.    And this is from January of 2024, correct?

A.    Mm-hmm.

Q.    And so this is after the Ofcom -- or, excuse me, the UK age gating change, correct?

A.    Yes.

Q.    On the second page you write, "we actually have not touched the US birthday flow in reg."

And then you add a sad face emoji, right?

A.    Yeah.

Q.    So that confirms that after UK -- after Snap launched a UK version it had never changed the US regulation flow, correct?  Or, excuse me, registration flow.

A.    As of that specific time frame we had not updated it yet.

Q.    And you still haven't, correct?

A.    It's actually been in A/B testing.

Q.    But A/B testing has not implemented, right?

A.    Not 100 percent ruled out.

Q.    Yes.  So sitting here today, when a US teenager creates an account on Snapchat they will still see the default birthday of age 18, correct?

A.    Yes.  That's what's in production.

Q.    I'm going to hand you what's been -- actually strike that.

Ms. Chan, earlier you testified that you had no evidence that under 13 users were on Snapchat and that Snap would never conduct research on users under the age of 13, is that correct?

A.    I don't recall saying we had no evidence of under 13, since we do proactively delete and block anyone we identify as under 13.

what they mean by "the particular date they want."

BY MS. FIDLER:

Q.   Would you expect the e-mail to say it makes clear that once they've set their birthday and not the date that they want?

MS. BELL:  Objection to form.

THE WITNESS:  I'm personally kind of confused by this bullet point myself.

BY MS. FIDLER:

Q.   Me too.  You can set that aside.

Mrs. Chan, were you employed at Snap in May of 2019?

A.   I was.

Q.   Generally would you agree that official public statements made by Snap's senior leadership is a reflection of the company's policies and practices?

MS. BELL:  Objection to form.

THE WITNESS:  I would like to think so.

BY MS. FIDLER:

Q.   Do you know who ████████████ is?

A.   I actually don't know who that is.

Q.   You never heard of ████████████?

A.   No.  I've been at the company for a

long time, so there's a lot of names.

Q.    That's fair.

Do you know who ██████████ is?

A.    No.

Q.    Would it surprise you if I told that you ██████████ was the senior director of international public policy?

A.    I just don't know those names.

Q.    Fair enough.

Are you aware that in May of 2019 that both of these individuals testified before the UK digital culture and medium sports committee?

A.    No.

Q.    Were you ever made aware that they were asked about how Snap's age verification system works at that hearing?

MS. BELL:  Objection.  Lack of foundation.

THE WITNESS:  Maybe, but it's been so many years, like it's hard for me to remember.

BY MS. FIDLER:

Q.    Are you aware that Mr. ██████ admitted that Snap's age verification system was effectively useless in stopping underage users from signing up?

MS. BELL:  Objection.  Lack of foundation.

THE WITNESS:  I don't know the details of the trial or what he testified.

BY MS. FIDLER:

Q.    But that's a serious admission from one of Snap's senior public policy officials, wouldn't you agree?

MS. BELL:  Objection to form, and lack of foundation.

THE WITNESS:  I don't have context as to why he said that.

BY MS. FIDLER:

Q.    But you would agree if he said it that's a serious admission, right?

MS. BELL:  Same objections.

THE WITNESS:  I don't know if I'm qualified to say whether that's true or not.

BY MS. FIDLER:

Q.    Well, if Snap's age verification system was effectively useless, that wouldn't be good, right?

MS. BELL:  Objection to form.

THE WITNESS:  Again, I don't know what

he meant when he said that.

BY MS. FIDLER:

Q.    Well, I'm just asking you generally, if Snap's age verification system was effectively useless, that would be bad, right?

MS. BELL:  Objection to form.

THE WITNESS:  Again, I'm just like surprised, and I don't know why he said that.

BY MS. FIDLER:

Q.    I'm not asking you why he said it.  I'm asking you, if Snap's age verification system was indeed effectively useless, that would be bad, correct?

MS. BELL:  Objection to form.

BY MS. FIDLER:

Q.    It wouldn't be good, right?

MS. BELL:  Objection to form.

THE WITNESS:  I think what I can say is our goal is to let people put in their accurate birthday, so I don't -- I just don't know how to answer that because that's so counter to, like, what I've been working on for the last six years or so.

MS. FIDLER:  I'm going to strike that

as nonresponsive.

BY MS. FIDLER:

Q.    I'd like you to answer my question.

If Snap's age verification system was effectively useless in stopping underage users from signing up, that would be bad, correct?

MS. BELL:  Objection to form.

THE WITNESS:  My personal opinion is that any user input age gate is not going to be as accurate as, like, actual age verification and identity verification, which is why that's a solution we're working towards.

BY MS. FIDLER:

Q.    I'm going to hand you what's been marked as Exhibit 16.

(Whereupon, Exhibit Snap-Chan-16 was marked for identification.)

BY MS. FIDLER:

Q.    Ms. Chan, I'll represent to you that this is a printout of a Business Insider article from the -- covering the testimony that ▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮▮ gave.

Do you see the second bullet point on the first page, it says, "▮▮▮▮ admitted that the

system is effectively useless in stopping underage users from signing up to the Snapchat app."

Do you see that?

A.   I see that.

Q.   If you go over to the second page, the article describes how a member of Parliament tested age -- tested Snap's age verification system himself, correct?

A.   Which --

Q.   I can read it to you.  It says, "Labour MP Ian Lucas asked a series of questions about how age-verification works on the platform.  He demonstrated a flaw in the system by trying to sign up to the app during the hearing and putting in his date of birth as 2008.

"When he was rejected as underage, meaning he was under the age of 13, he tried again with his real age and was able to create an account - his argument being that an underage user can easily bypass Snapchat's system."

Do you see that?

A.   I see that now, yeah.  Thanks for reading that.

Q.   No problem.

And then MP Lucas says, "'Your age

verification system does not work for a popular way of signing up to Snapchat.  Do you agree?'"

And ███████ -- Mr. ████████, the senior official of public policy, said, On initial signup, we certainly agree.

You're responsible for age verification at the initial signup, correct?

MS. BELL:  Objection to the preamble. Lack of foundation.

THE WITNESS:  Yeah, I think I mentioned age verification is a cross-functional initiative.  I own the product side of our age gate and registration.

BY MS. FIDLER:

Q.    As the product manager for age verification, what changes did Snap implement after Mr. ████████ publicly admitted the system wasn't working?

MS. BELL:  Objection.  Lack of foundation.

THE WITNESS:  Sorry, I just want to make something clear.

So I'm the PM of activation and so that includes registration, login, and new user onboarding.  Age verification is a feature

as part of registration, but it's a cross-function owned initiative, so I'm not the only person who is working on age verification.

I just wanted to make that like super clear. Like I'm not -- like that's not my only job.

BY MS. FIDLER:

Q. But it's one of your main jobs, correct?

A. It's part of the registration flow, which is why it would fall into my team's roadmap.

(Whereupon, Exhibit Snap-Chan-17 was marked for identification.)

BY MS. FIDLER:

Q. I'm going to hand you Exhibit 7, but keep that -- oh, 17, pardon me. Keep Exhibit 16 on the side.

A. Okay.

Q. This is a 2020 Quip called "Age Gating in Registration." Correct?

A. Yes.

Q. And you're listed as the PM, right?

A. Yep.

Q. No other PMs are listed?

A.    I'm the PM for registration.

Q.    Okay.  So you're the product manager for age verification, and no other PMs are, correct?

MS. BELL:  Objection to form.

THE WITNESS:  So I work on this very closely, again, with the very large cross-functional team, and I'm one of -- I'm one of many stakeholders in age gating. From a very functional, like, product feature perspective, because the engineering team partners with me, like I would be the main person working with the engineering team on a day-to-day basis.

BY MS. FIDLER:

Q.    Right.

But from the product management side who manages the product of age verification, that is your job, correct?

A.    I would say it's me plus David Boyle on the product side.

Q.    So as the PM responsible for age verification, what changes did Snap implement after Mr. ███████ publicly admitted that the system wasn't working?

MS. BELL:  Objection.  Lack of

foundation.

THE WITNESS:  So over the past few years I think I've mentioned we tried different types of UI treatments for the way people can enter their birthday, and that's like internal things that we wanted to do in the age gating process.

And then externally we've discussed with vendors on an actual, like, just non-user reported age gating, which is identity verification.

BY MS. FIDLER:

Q.    To this day when a user under the age of 13 inputs their birthday as under 13 into Snapchat, does it do exactly as the Business Insider article describes where a user is kicked back to the page and they're immediately able to log back in?

MS. BELL:  Objection to form.

THE WITNESS:  I don't know what this Business Insider article means, to be honest.

BY MS. FIDLER:

Q.    I'm sorry, can you describe what UI treatments are?

A.    Oh, yes.

So UI just means user interface.  And when you think about inputting data on a mobile app, there are multiple ways you can do it.  So one is -- for birthdays specifically one is like a scrollable picker.  The other could be like typing in through your keyboard, like, the dates.  So those are like the types of user interfaces.

Q.    So those are the different user interfaces treatments that you described.  None of them are actually implemented, correct?

A.    So the one that's implemented in the UK is like the neutral dash day picker.

Q.    I understand that.

But none of them were implemented in the US, right?

A.    Those have been A/B testing globally.

Q.    And again for the record, A/B testing is not launched, correct?

A.    Not yet in production 100 percent.

Q.    So sitting here today, Snap's age verification system works exactly how it did when Ofcom raised concerns and when Mr. ███████ testified in front of the UK committee, is that accurate?

MS. BELL:  Objection.  Lack of foundation.

THE WITNESS:  So since this time frame we've done a lot of different A/B tests on various treatments, and we've also engaged vendors on discussing like potential -- like identity verification.

We've also talked to Google and Apple about a device-level identity verification as well as solutions.

MS. FIDLER:  I'm going to move to strike that as nonresponsive.

BY MS. FIDLER:

Q.    What I'm asking is if sitting here today -- not your A/B testing, not your pilots that you're discussing with vendors, I'm asking sitting here today does Snap's age verification in the US for US teenagers work exactly how it did when Ofcom raised concerns in 2023 and when ▮▮▮▮▮▮ testified in front of the UK committee in 2019?

MS. BELL:  Objection.  Lack of foundation.

THE WITNESS:  So in our production app the experience -- I don't know like exactly the time frame, but the experience is that it defaults to the 18 age and people can scroll through it.

Claudia Chan                                                    223

BY MS. FIDLER:

Q.    So it does default to age 18, which is the concern that Ofcom raised.  Sitting here today that's how US teenagers experience Snapchat.  It also still -- if a user under 13 enters a birthday under the age of 13, they're immediately able to try again.  That's true, correct?

MS. BELL:  Objection to form, and lack of foundation.

THE WITNESS:  So functionally that's the way it works, but I want to make sure that the context is that we've tried a lot of different treatments, and we're working on a non-user inputted birthday gate as well which we think will be more effective.

BY MS. FIDLER:

Q.    But trying to implement it is not the same as being implemented, correct?

MS. BELL:  Objection.  Argumentative.

THE WITNESS:  So there's a lot of due diligence that goes into it, so we've been doing that process, and that's part of the implementation process.

BY MS. FIDLER:

Q.    Due diligence since 2019?

Claudia Chan                                   257

and we want to make sure that's also heavily protected.

So there's a lot of privacy concerns, data concerns, legal concerns that I would want to work with cross-functional stakeholders, so it would not just be an easy terms of service update.

BY MS. FIDLER:

Q.    And you testified earlier that the atlas team that you worked with frequently houses user data.  Don't they house user reported age?

A.    I believe so.

Q.    So what's the privacy concern, then?  Because it's already housed within atlas, correct?

A.    Yes.

MS. BELL:  Objection to form.  Compound.

THE WITNESS:  I think what you're asking, though, for is the accuracy or perceived accuracy of the reported age, which is very different from an inferred age.

So what I'm talking about is not the reported age because obviously like user consented to giving us that information.  I

think what you're talking about is like the accuracy of that.

BY MS. FIDLER:

Q.    No.  What I'm asking about is the reported age that you collect during account registration, which is your responsibility, correct? You testified earlier that it was you and David Boyle who were responsible for age verification on the product side, right?

A.    Yes.

Q.    And during that process you collect ages from your users when they enter their date of birth, yes?

A.    User reported age, yes.

Q.    And you testified shortly ago that you have no data or metrics or otherwise audit or track to ensure that that data, the reported ages of its users, is accurate.  Is that what you testified to?

MS. BELL:  Objection to form.

THE WITNESS:  So what I mean is that if you want to actually try to tell if a reported age is accurate or not, we would have to build an actual inference model on the growth side, which would require a lot of new data, a lot of new ways of even like

thinking of storing all of this, like,

detail data.

So we don't have that, and it would not

be an easy fix.

BY MS. FIDLER:

Q.    And have you ever tried?

A.    I personally haven't.  I know Nik

started thinking about it, which is probably like

maybe what this doc is about, but I don't want to

assume like that's...

Q.    And when you left the growth team in

November 2024, had Snap developed any way to

ascertain whether the reported age of its users was

accurate?

MS. BELL:  Objection to form.

THE WITNESS:  I don't have experience

with that personally.

BY MS. FIDLER:

Q.    Sounds like a lack of due diligence.

MS. BELL:  Objection.  Argumentative.

If you have a question, please ask your

question.

BY MS. FIDLER:

Q.    Would you agree?

A.    I don't agree with that.

MS. BELL:  Objection to form.

BY MS. FIDLER:

Q.    Would you agree that Snapchat has been collecting user reported ages since at least 2015?

A.    I'm not sure before I joined the company.

Q.    Well, at least since you joined the company in 2018?

A.    Reported age, yes.

Q.    So for more than six years Snap has not attempted any way to ascertain whether the reported ages of its users is accurate, is that your testimony?

MS. BELL:  Objection to form.

THE WITNESS:  I don't even know how we would get that information, as I mentioned earlier.

BY MS. FIDLER:

Q.    Okay.  So we just talked about how you help ensure that Snap's terms of service are communicated to its users, is that right?

A.    Yes.

Q.    And do you know if Snap's terms of service prevent -- prohibit users from having multiple accounts?

BY MS. FIDLER:

Q.    And so to your knowledge there's no internal studies or reports analyzing how difficult it is for users, particularly minors or their parents, to delete accounts?

A.    Not that I've seen.

Q.    Does Snap allow users to pause their accounts?

A.    Users can deactivate their accounts.

Q.    And by deactivation, do you mean the 30-day cool-off period before accounts are deleted?

A.    Yes.

Q.    So Snap doesn't allow users to pause their account and then log back in after 30 days, is that correct?

A.    Not after 30 days.  Before 30 days they can.

Q.    Do you know that other social media platforms like Facebook, Instagram, and TikTok all allow users to temporarily pause their accounts?

A.    I didn't know they all had that.

Q.    Do you dispute that they do?

MS. BELL:  Objection to form.

THE WITNESS:  I just don't know.

///

BY MS. FIDLER:

Q.    Ms. Chan, I'm going to hand you three different documents.  They'll be collectively marked as Exhibit 28.  I'll represent to you that they are printouts from Instagram Help Center website, Facebook's Help Center online, and as well as TikTok's.

(Whereupon, Exhibit Snap-Chan-28 was marked for identification.)

MS. BELL:  Can we mark one 28A, another 28B --

MS. FIDLER:  We'll just mark them as separate exhibits.  I was trying to speed up the process, but...

(Whereupon, Exhibit Snap-Chan-29 and 30 were marked for identification.)

BY MS. FIDLER:

Q.    Here's the first one.  This is Exhibit 28 (handing).

Let me know if you need time to review the documents.

A.    Okay.

(Witness reviewing documents.)

A.    Okay.

Q.    You see that each of the three

platforms allow users to temporarily pause their account or deactivate their account?

A.    Yeah, I see that.

Q.    And that's different than the 30-day deactivation period that Snap offers, correct?

A.    It's slightly different, yeah.

Q.    Well, slightly different as in that users on TikTok, Facebook, and Instagram can pause their account for as long as they want and the account will still be present when they log back in, whereas Snapchat only offers 30 days and then their account will be deleted, is that fair?

A.    Yes.

MS. BELL:  Objection to form.  Lack of foundation.

BY MS. FIDLER:

Q.    So fair to say that a pause function lets users take a break without permanently deleting their account, right?

MS. BELL:  Objection to form.  Lack of foundation.

THE WITNESS:  We have deactivation and deletion as well in Snapchat.

BY MS. FIDLER:

Q.    But the deactivation period at Snap is

30 days, and if a user does not log back in for 30 days, then their account is deleted, correct?

A.    That is how the process works now.

Q.    So fair to say it's more of just a deletion service, there just happens to be a cooldown period?

MS. BELL:  Objection to form.

THE WITNESS:  We make it clear that it's deactivating for 30 days and then goes to deletion.

BY MS. FIDLER:

Q.    And do you see on Facebook's where it says if you deactivate your account, you can reactivate it whenever you want, there's no time limit on that?

A.    Yes.

Q.    And do you see on TikTok's where TikTok says deactivating -- or, "Deactivating your TikTok account allows you to put it on a temporary hold. When you're ready to get back on TikTok, you can reactivate it anytime."

Do you see that?

A.    Yep.

Q.    And then do you see on Instagram's where it says, "If you temporarily deactivate your

account" -- and there's no time limit listed on that.

So that's fundamentally different than the 30 days that Snapchat offers, agreed?

MS. BELL:  Objection to form.  Lack of foundation.

THE WITNESS:  It looks different.

BY MS. FIDLER:

Q.    Would you agree that account pausing is particularly important for teens who may need to step away from social media for their mental health, academic focus, or personal well-being?

MS. BELL:  Objection to form, and lack of foundation.

THE WITNESS:  I'm not an expert in that area so I don't know how to answer that.

BY MS. FIDLER:

Q.    But this is your product focus, right, or one of your product focuses?

MS. BELL:  Objection to form. Misstates testimony.

THE WITNESS:  The feature we have is that people can deactivate their account, and then if they don't log in after 30 days, it will be deleted.

BY MS. FIDLER:

Q.    And that's different than the services that the other platforms offer, yes?

MS. BELL:  Objection to form.  Lack of foundation.

THE WITNESS:  The product feature is different.

BY MS. FIDLER:

Q.    But Snap is aware that users on Snapchat want this feature, correct?

MS. BELL:  Objection to form.  Lack of foundation.

THE WITNESS:  I've seen people ask for it, but they also -- people ask for a lot of features on Snapchat so I don't know if I would characterize it as like a lot of people asking for it.

BY MS. FIDLER:

Q.    But some users are, right?

A.    There are users that deactivate their account.

(Whereupon, Exhibit Snap-Chan-31 was marked for identification.)

BY MS. FIDLER:

Q.    Ms. Chan, I'm handing you what's been

marked as Exhibit 31 to your deposition.  This is a December 2023 Quip that's called "Pause Account MVP," and you're listed as the product manager.

Do you see that?

A.    Yeah.

Q.    What does "MVP" mean?

A.    Minimally viable product.

Q.    And what does minimally viable product mean?

A.    It just means like the first version of a feature.

Q.    So fair to say it's like a version of a product with just enough features to be usable?

A.    Yeah.

Q.    And this Feature Overview outlines what we just talked about, that it offers -- that Snapchat offers the ability to delete accounts, but users have 30 days to log back in or their accounts are purged?

A.    Yeah.

Q.    That's what we just talked about.

And it says, "We receive customer feedback that Snapchatters would like the ability to pause or deactivate their account instead of going straight to deletion.  This feature will give users

the ability to do that."

          Correct?

     A.    Yes.

     Q.    So this is a feature that Snap recognized that users wanted, but never implemented it, correct?

          MS. BELL:  Objection to form.

          THE WITNESS:  We had this on our roadmap, but it had not been implemented yet.

BY MS. FIDLER:

     Q.    And Snap has never taken -- never done, to your knowledge, any research on the effects of whether the inability to pause an account but, instead, only have 30 days to log back in can lead to compulsive use, correct?

          MS. BELL:  Objection to form, and lack of foundation.

          THE WITNESS:  I have not personally seen that research.

BY MS. FIDLER:

     Q.    But Snap has done a lot of research on how to get users to come to the platform or user registration or creation, correct?

          MS. BELL:  Objection to form.

mischaracterizes testimony.

THE WITNESS:  I think what I mentioned were a couple of, you know, the high priority considerations, and one of them is creating and building a data infrastructure that's privacy centric in which we feel comfortable with collecting data.

BY MS. FIDLER:

Q.  Do you believe that Snap does not have the financial capability to build out such resource?

MS. BELL:  Objection to form.

THE WITNESS:  I personally don't think it has anything to do with the financial capability.  It's more of designing that complicated system with privacy engineering and legal.

BY MS. FIDLER:

Q.  So Snap does have the financial resources to do it?

MS. BELL:  Objection to form.  Asked and answered.

THE WITNESS:  Yeah, I think so.

BY MS. FIDLER:

Q.  And then earlier you walked with counsel step by step through the account creation

process.

Do you recall that?

A.    Yep.

Q.    We're going to walk through that together.

A.    Okay.

Q.    And this is a screen mirroring that I'm doing.

I think the first step that you indicated was that Snap required a first and last name.  Is that fair?

A.    Yes.

Q.    Okay.  I'll enter a first and last name of XY and no last name.  And I'm able to continue on to the next step.

Next step, it defaults to 18.  Continue on to the birthday, and it automatically generates my username for me.

Do you see that?

A.    I see that.

Q.    And then I believe you testified that the next step was that Snap required phone or e-mail verification.  Is that right?

A.    It should be password.

Q.    Oh, password?  Okay.  We'll do a

password of Snap11111.  Okay.

And then the next step would be an age -- e-mail or phone verification, right?

A.    Yes.

Q.    So I'm going to do an e-mail verification, and I'm going to type in snap@snapsnapsnapsnapchat.com.

Agree that's not a real e-mail?

MS. BELL:  Objection to form.  Calls for speculation.

BY MS. FIDLER:

Q.    And I'm able to create an account and move on to onboarding.  Is that fair?

A.    Yeah, I see it live.

MS. FIDLER:  No further questions.

THE VIDEOGRAPHER:  Do you want to switch?

MS. BELL:  No.  We're done.

THE VIDEOGRAPHER:  Okay.  This concludes the video deposition of Claudia Chan.  We are now going off the record.

The use of time was Ms. Fidler used 6 hours and 30 minutes, and Ms. Bell used 16 minutes.

And we are now off the record at

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, CSR No. 14449 for the State of California, the officer before whom the foregoing deposition was remotely taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 17th day of February, 2025.

<%21527,Signature%>

_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449