**AMENDED Exhibit 958**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

-------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT Case No.

ADDICTION/PERSONAL INJURY      4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION  MDL No. 3047

-------------------------------

This Document Relates to:

ALL ACTIONS

----------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

-------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550) Coordination Proceeding

SOCIAL MEDIA CASES        No. 5255

-------------------------

VIDEO-RECORDED 30(B)(6) DEPOSITION OF

MATTHEW JACKSON

ON BEHALF OF SNAP, INC.

Tuesday, November 19, 2024 10:05 AM EST

Reported by:  Denise Dobner Vickery, CRR, RMR

JOB NO.: 6985191

from the room when that material is shown.

BY MR. GADDY:

Q.    Good morning, Mr. Jackson.  My name is Jeff Gaddy.  We're here in Washington, DC today to take your -- your deposition.

You understand that?

A.    I do.

Q.    Okay.  And do you reside here in Washington?

A.    I do not.

Q.    Okay.  Where do you reside?

A.    Virginia.

Q.    Okay.  And how long have you resided in Virginia?

A.    Since 2018.

Q.    And who do you work for, Mr. Jackson?

A.    I work for Snap, Inc.

Q.    And I understand that you work for Snap within their Trust & Safety department; is that correct?

A.    I do.

Q.    And I understand that you have worked for Snap within their Trust & Safety

department since 2021; is that correct?

A.    Correct.

Q.    What's your current title?

A.    I'm senior manager for Trust & Safety Global Operations & Enablement.

Q.    Okay.  And can you give me from a high-level perspective an overview of the role of Trust & Safety generally at Snap?

A.    Yes.  So Trust & Safety is there as an organization to keep our users safe and respond to user complaints, and to police the platform with information that is made known to us by our users or information that we discover on our own.

Q.    And it's my understanding that Snap's terms of service allow children as young as 13 to become members and users of Snapchat; correct?

A.    I believe that's correct, yes.

Q.    Okay.  And one of the jobs that Trust & Safety has is to maintain a safe environment on Snapchat for -- for its users, including its children users?

A.    Yes, all -- all users.

Q.    All right.  One of the jobs that Trust & Safety has is to protect children on

Snapchat?

MS. BELL:  Objection to form.

THE WITNESS:  I think the job of Trust & Safety is to protect all of our users on our platform.

BY MR. GADDY:

Q.    And that would include?

A.    That would include children.

Q.    Another job that Trust & Safety has is to prevent bad actors from hurting users of Snapchat, including the children?

A.    There's two parts to that.  We have a job to protect against bad actors when we learn of them, which is in a reactive way, and then there's another part, which is to proactively look for them and -- and get them off the platform.

Q.    Okay.  You agree, Mr. Jackson, that tech companies like Snapchat have a responsibility to ensure that their platform is safe for children?

MS. BELL:  Objection to form.

THE WITNESS:  I think that we have a responsibility to keep our platform as safe as possible for all of our users, to include children.

Q.      Okay.  Other than this viral hashed child sexual abuse material image, the only way for Trust & Safety to become involved and aware of bad action happening in these private channels is through an in-app report; correct?

MS. BELL:  Objection to form.

THE WITNESS:   An in-app report and external app reports.

BY MR. GADDY:

Q.      And in-app reporting is one of the things that you worked on at Snapchat after you joined the team; correct?

A.      Could you clarify that?

Q.      Well --

A.      Like when you say "worked on," I didn't develop the tool.  Worked with, yes.

MR. GADDY:  Show you P-SNAP-137 we'll mark as Snap-Jackson Exhibit Number 7.

(Document marked for identification as Snap-Jackson Exhibit 7.)

BY MR. GADDY:

Q.      And from the first page of this document, you can see that this came from your

custodial file and the filename is "April 2022 Trust and Safety - Post SSP Investments."

Do you see that?

A.    Yes.

Q.    And flip the page.  It says at the top "Last updated April 21, 2022."

Do you see that?

A.    Yes.

Q.    And it says "Trust and Safety - Post SSP Investments"; correct?

A.    Yes.

Q.    I understand SSP stands for Snap strategic planning?

A.    Or plan.  Yeah.  Yes.

Q.    Okay.  And tell me from a high level what is an SSP?  Is this an annual thing?  Is it a budget?

A.    The SSP process is the mechanism by which teams across Snap put forward their goals and objectives as well as their resource requests for the following year.  In addition, they talk about what they did in the -- in the current year.

So yeah, that's generally what the Snap strategic plan is, and that is presented to the executive ranks and Evan.

Q.      Okay.  And that's something that happens on an annual basis?

A.      Yes.

Q.      For when do you meet in one year to do the SSP for the next year?

A.      The SSP process generally starts in August, late August, early September and it completes -- again, it can vary October to November depending on a variety of factors, and that -- that's the process.

Q.      And it involves a presentation to you said the executive team and Evan?

A.      Yes.

Q.      And Evan you're referring to Evan Spiegel?

A.      Yes, Evan Spiegel.  Yeah.

Q.      Okay.  And who's -- and if it's easier to give me titles, that's fine, but who's on the executive team?

A.      I think basically the -- the C-level of the company.  So all the chiefs of whatever the organization.  So, you know, your chief financial officer, your chief marketing officer, communications officer, security officers.  All the chiefs of those.

To my understanding, there are also just senior executives who might not have a C-suite title.  They might be a senior vice president.

I think the easiest way that I could -- I could say is most -- all the people who report to Evan are on Exec, and there are additional people who do not necessarily report directly to Evan but are also on Exec, as I understand it.

Q.    Okay.  Is there a representative of Trust & Safety on that Exec team?

A.    From -- like a member of the actual Trust & Safety team on Exec?

Q.    Correct.

A.    No, there is not.

Q.    Is there a member of Trust & Safety that participates in the SSP session?  Kind of obviously Trust & Safety presents what it wants out of the SSP, but is there a Trust & Safety representative on decision-making group as far as on the Exec plus Evan team?

A.    A little bit of nuance, but my answer would be yes in the sense that -- and there's been org changes.

But when I came to Snap, Trust & Safety rolled up into vice president called ▆ or his name -- not called.  His name was ▆▆▆.  ▆▆▆ reported to an individual named Jerry Hunter.  And Jerry Hunter was the executive member, a member of Exec, where Trust & Safety fell under his purview.

So in that sense, there was a representative of the Trust & Safety org on Exec because that org rolled up into Jerry's org, and to my understanding, ▆▆▆ was placed on Exec at some point before -- I mean, he left the company in August of 2023, if I recall, but prior to August 2023, he was given a position on Exec, and Trust & Safety reported in to ▆.  So there was both Jerry and ▆ as members of Exec where Trust & Safety rolled up into them.

Q.    When you -- when you make this presentation asking for what you want in Trust & Safety for the -- for the coming year, is this an in-person meeting?  Is this over Zoom?  Is it just a written material that is submitted to the -- to the team?  How does that work?

A.    It is -- it is both in-person and distributed I think is the term.  So people can --

who are not able to make it in-person are able to -- to use Teams to -- to join.

But the way that it works is, a document is created prior to the meeting and that document is known as the SSP doc.  It goes through collaboration, and that doc is then sent ahead of the meeting to Exec.  Exec will review it.  They might have questions or comments, and then during the meeting further discussion as appropriate occurs.

Q.    Have you ever attended one of these meetings where the presentation is being made for what you want or what Trust & Safety wants in the SSP?

A.    Yes, I have.

Q.    Okay.  And where do those meetings occur?

A.    They occur in Santa Monica.

But let me just be very clear on. Are you asking if I -- if I attended in-person or did I attend?

Q.    Good clarification.

So did you attend in-person?

A.    I did not attend in-person.

Q.    Okay.  Did you attend via Zoom or

some other type?

A.      I attended virtually, yes.

Q.      Okay.  How many times have you attended?

A.      Give me a moment to do some.

I attended this year in 2024 virtually.  In 2023 I attended virtually, but it was not called an SSP.  It was renamed to OP, which is an operational plan.  And in 2022, I can't recall if I attended the meeting in 2022.  And 2021 I was not there.

Q.      Okay.  The times that you have attended, whether in-person or virtually, did -- was Mr. Spiegel in attendance?

A.      Yes, he was.

Q.      Was he an active member of the discussion and the decision-making team from your perspective?

A.      From my perspective, yes, he was.

Q.      All right.  Would he ask questions about the proposal and the reasons behind the proposal?

A.      Yes, he would.

Q.      Okay.  Would he offer comments or his opinion on different requests that Trust &

Safety was making to kind of guide the conversation?

A.    Yes, he would.

Q.    Okay.  And did you perceive him to be an integral part of the decision-making team about the types of initiatives that would or would not be approved for Trust & Safety?

MS. BELL:  Objection to form.

THE WITNESS:    The question one more time.  Did I perceive Evan to be an integral part of the?

BY MR. GADDY:

Q.    Decision-making team that would make decisions about the SSP that would be approved or would not be approved for Trust & Safety?

A.    Yes.

MS. BELL:  Objection to form.

THE WITNESS:  Yes.

BY MR. GADDY:

Q.    Okay.  And from your perspective, do you perceive him to regularly be involved with the business and the operations of the business and to have opinions and provide guidance on decision-making that the business should make?

A.    A bit of nuance.

When you say "the business," are you referring to Trust & Safety or other parts of the Snap business?

Q.    Well, good clarification.

So why don't we start broad with the business as a whole.

Do you have a perception of his involvement and whether or not he is involved in -- in the ongoing business activity of Snap?

MS. BELL:  Objection to form.

THE WITNESS:   I do have that perception very generally that he is involved in the business of Snap at large.

BY MR. GADDY:

Q.    What perception do you have, if any, about whether or not he is a "buck stops here" decision-maker when it comes to the decisions that Snap made -- makes about how to run its business?

MS. BELL:  Objection to form.

THE WITNESS:   From all of my interactions with Evan, obviously not necessarily a personal interaction, I've seen him to take a high degree of ownership and accountability for the

decisions made at Snap.

BY MR. GADDY:

Q.    Okay.  Mr. Jackson, one of the initiatives that was very important to Trust & Safety end of 2021 rolling into 2022 was the concept of in-app reporting; correct?

A.    Some nuances.

From my understanding, in-app reporting existed prior to 2021 and 2022.  I think the initiative was more appropriately titled the "in-app reporting refresh."

Q.    The refresh was an important initiative to Snap end of 2021 rolling into the planning for the 2022 year; correct?

A.    I can't speak to 2021, but in 2022 when I was stood up or I was further along, the in-app -- the refresh was an important initiative that year.

Q.    Okay.  And the reason that the refresh was such an important initiative is because Snap was aware that there were significant gaps in the ability of users to use in-app reporting to alert Trust & Safety about harms on the app; correct?

MS. BELL:  Objection to form.

THE WITNESS:    That was my understanding, yes.

BY MR. GADDY:

Q.    Okay.  So let's go back to the document.  This is Exhibit Number 7, P-SNAP-137.

And the top of the document was "Trust & Safety - Post SSP Investments."

And if you go down to the Summary, the first bullet point says:

"While the redesign" -- you called it a refresh.

You see here they're calling it redesign?

A.    Okay.

Q.    It says:

"While the redesign of in-app reporting and Abacus were included in SSP, the projected volumes may be higher than the actual forecast, especially for in-app reporting v3."

Correct?

A.    That is what it says, yes.

Q.    Fair to say -- and we'll dive into the document in a moment -- but when Trust & Safety had done some planning about the redesign of in-app reporting, they had tried to forecast or

anticipate the workload they would get from the redesign; correct?

A.    That is correct.

Q.    And that's something that Trust & Safety normally does is they think, well, gee, if we're going to edit our platform in this way, what is that going to do to our workload, how do we think about staffing, those types of things; right?

A.    Again, just a little bit of nuance.

Trust & Safety in combination with data science and finance much, but yeah, our partners within the company.  Yeah.

Q.    And that's something that Trust & Safety with those other partners had done for the redesign of in-app reporting, and now they're realizing that the volumes of new reports are higher than what they forecasted; correct?

A.    That's what it's saying, yeah.

Q.    Okay.  If you go down to the section that says "Problem We're Solving."

Do you see that?

A.    Yes.

Q.    It says:

"A key product area that we are

investing in is the In-App Reporting Redesign."

Correct?

A.      Yes.

Q.      It says:

"Although this was included in SSP,
the estimated volumes were lower than our current
forecast."

Now, this is in April of 2022;
correct?

A.      Yes.

Q.      Okay.  And as we've covered,
Snapchat has been around since 2011; correct?

A.      Correct.

Q.      Okay.  Next it says:

"In-app reporting is a critical
safety tool."

Let me pause there.

Do you agree with that, Mr. Jackson,
that the ability of a user to report in-app is a
critical safety tool?

A.      I do.

Q.      Okay.  It says:

"In-app reporting is a critical
safety tool that has significant gaps: 96.7% of
existing account reports don't get reviewed

today."

Do you see that?

A.      I do.

Q.      Do you agree that that was a significant safety gap that existed with Snap's platform in April of 2022?

MS. BELL:  Objection to form.

THE WITNESS:   So a little bit of nuance.

On this one, I think it's just important to note that the 96.7 is talking about account reports, not just overall reports, and it's important for that nuance because it can read as if almost 97 percent of reports were not being reviewed.

But what we were specifically targeting with this sentence and this refresh is the notion of an account report, which is reporting an individual account as opposed to a piece of content.

So we have nomenclature that talks about content reporting and account reporting and chat reporting.  This was the account reporting and that was a gap

because we did not have a way to report accounts.

BY MR. GADDY:

Q.    Okay.  I appreciate the nuance, Mr. -- Mr. Jackson, but back to my question.

Do you agree that the fact that 96.7 percent of existing account reports were not being reviewed as of April 2022 was a significant safety gap within Snapchat?

A.    Yes.

MS. BELL:  Objection to form.

THE WITNESS:  Yes, I do.

BY MR. GADDY:

Q.    It says:

"And the content menu reporting no longer reflects our internal policies."

That's not good; right?

MS. BELL:  Objection to form.

THE WITNESS:  No.

BY MR. GADDY:

Q.    "Or what we report out on the Transparency Report."

Do you see that?

A.    Yes.

Q.    That's also not a good thing;

correct?

MS. BELL:  Objection to form.

THE WITNESS:   No, it is not.

BY MR. GADDY:

Q.     It says:

"The main goal of this redesign is to route existing unreviewed account reports to Trust & Safety for review and to streamline data at every stage of the reporting pipeline."

Do you see that?

A.     Yes.

Q.     Why is it a bad thing that the content reporting menu didn't reflect Snap's internal policies?

MS. BELL:  Objection to form.

THE WITNESS:   I'm trying to refresh my recollection.

From a user's perspective, when they encounter harm on the platform -- because I think you have to take the whole paragraph together.

When a user encountering harm on the platform and they go to report it, what you want to do is make it so that what they're reporting is going to be

understood and routed correctly.

And here what we were understanding is that there was too much friction to getting what the user was trying to report, and so our internal policies had many different categories of harm.

And what the in-app refresh did was simplify the categories of harm so that the user didn't have to go through multiple menus in order to get to just report it, and on the back end we're going to figure -- we're going to do the work to figure it out as opposed to having a lot of subcategories of those harms.

That's what they meant by the no longer reflecting the internal policies.  The internal policies had a lot of subcategories of harm, and then part of the refresh was to bundle them together so that we can just get to a main harm very quickly.  The user just says, this is what I'm dealing with, and then from there we'll -- we'll take it

and -- and action it.

BY MR. GADDY:

Q.      All right.  Fair to say that in addition to the problem being too much friction, which I think is the words you used, maybe the biggest problem that's being highlighted here in that paragraph is 96.7 percent aren't being reviewed at all; correct?

A.      Right.  We did not have an account reporting workflow, and that was a gap.

Q.      Right.

And that was a serious safety gap; correct?

MS. BELL:  Objection to form.

THE WITNESS:  Yes.

BY MR. GADDY:

Q.      Okay.  I mean, we've looked at multiple documents this morning that had just horrific instances in them where young people were experiencing some of the most tragic harms; correct?

MS. BELL:  Objection to form.

THE WITNESS:  Yes.

BY MR. GADDY:

Q.      And one of the things that you said

as we were looking through those was, if the accounts weren't reported, we didn't know about it at Trust & Safety and we couldn't do anything about it.

You recall that?

MS. BELL:  Objection to form.

THE WITNESS:   I do.

BY MR. GADDY:

Q.    Okay.  And what we're seeing here is that in April of 2022, 96.7 percent of the existing account reports don't get reviewed today; correct?

A.    Correct.  And, again, the context that I'm giving is, this sentence is a truism. It's highlighting that we had this gap, but we did not have a process to report an account as a whole, independent from any piece of content, and that we were trying to fix this gap.

Q.    And that's a gap, a safety gap that Snap is just now addressing here in this April 2022 document; correct?

A.    Correct.

Q.    If you go to the next paragraph, it says:

"We were incorporating feedback from

customers to simplify the reporting feature and menu options while staying ahead of compliance headwinds that require certain types of abuse to be easily reportable from the first screen of a reporting feature."

Do you see that?

A.    I do.

Q.    What do you -- do you have an understanding of what's meant there by "compliance headwinds"?

A.    I'd need more context.  They could be referring to -- I don't know.  I'd need more context.

Q.    Okay.  Well, when I think of somebody say, we're facing headwinds, I think of a challenge or an obstacle or a hindrance.

Is that how you would interpret the word also?

MS. BELL:  Objection to form.

THE WITNESS:   That's what headwinds generally means, yes.

BY MR. GADDY:

Q.    Okay.  And this document says "compliance headwinds that require certain types of abuse to be easily reportable."

I mean, Mr. Jackson, you agree this type of abuse that we've seen today should be easily reportable; right?

A.    I do.

Q.    I mean, going back to the corporate mantra of kindness, I mean, you agree that Snap has a moral obligation to make sure that children can report accounts that are engaging in the type of behavior that you've experienced at Snap in Trust & Safety; correct?

MS. BELL:  Objection to form.

THE WITNESS:   As I've said before, I think Snap has a responsibility to -- to ensure that.

BY MR. GADDY:

Q.    You wouldn't call it compliance headwinds, would you, when you're trying to take steps to make it safer for children?

MS. BELL:  Objection to form.

THE WITNESS:   Just to clarify.  Are you asking if I would write that?

BY MR. GADDY:

Q.    Correct.

A.    I would not.

Q.      I want to get to the second half of the sentence, but I think I got to start over because it's long.  So it says:

"We are incorporating feedback from customers to simplify the reporting feature and menu options while staying ahead of compliance headwinds that require certain types of abuse to be easily reportable from the first screen of a reporting feature, as well as mitigating substantial risk incurred from not reviewing account reports."

Do you see that?

A.      I do.

Q.      You agree that Snap was incurring substantial risk from not reviewing these reports?

MS. BELL:  Objection to form.

THE WITNESS:   I do.

BY MR. GADDY:

Q.      Do you agree that children on Snapchat were at an increased risk of harm because Snap was not reviewing these in-app reports?

MS. BELL:  Objection to form.

THE WITNESS:   I can't answer that question without sort of understanding the data behind it, but I

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

<%15207,Signature%>

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028