# AMENDED Exhibit 714

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-

ADOLESCENT ADDICTION/              YGR MDL No. 3047

PERSONAL INJURY PRODUCTS

LIABILITY LITIGATION                MDL No. 3047

_____

This Document Relates to:

ALL ACTIONS

_____

30(B)(1)/PMQ FOR GOOGLE/YOU TUBE

VIDEOTAPED DEPOSITION OF

ALICE WU PAULUS

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Wednesday, January 29, 2025

PALO ALTO, CALIFORNIA

Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION OF ALICE WU PAULUS

BE IT REMEMBERED that on Wednesday, January 29, 2025, commencing at the hour of 9:17 a.m. thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared ALICE WU PAULUS, a witness in the above-entitled court and cause, who, being by me first duly sworn, was thereupon examined as a witness in said action.

CONFIDENTIAL

Page 3

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS:
     SIMMONS HANLY CONROY
     112 Madison Avenue, 7th Floor
     New York, New York 10016-7416
     BY:  AN TRUONG, ESQ.
          ELLYN HURD, ESQ.
     Telephone:  (212) 257-8482
     Email:  Atruong@simmonsfirm.com
             ehurd@simmonsfirm.com

FOR THE DEFENDANTS GOOGLE/YOUTUBE:

     WILSON SONSINI GOODRICH &
     ROSATI
     1301 Avenue of the Americas
     40th Floor
     New York, NY 10019-6022
     BY:  BRIAN M. WILLEN, ESQ.
          PRAATIKA PRASAD, ESQ.
     Telephone:  (650) 565-3641
     Email:  Bwillen@wsgr.com
             pprasad@wsgr.com
     And
     WILLIAMS & CONNOLLY LLP
     680 Maine Avenue SW
     Washington, DC 20024
     BY:  ASHLEY W. HARDIN, ESQ.
     Telephone:  202-434-5960
     Email:  Ahardin@wc.com

          COUNSEL APPEARING VIA ZOOM

FOR THE DEFENDANTS GOOGLE/YOUTUBE:

     WILSON SONSINI GOODRICH &
     ROSATI
     953 East Third Street, Suite 100
     Los Angeles, California 90013
     BY:  CALLIE DAVIDSON, ESQ.
     Telephone: (323) 210-2900
     Email: Cdavidson@wsgr.com

CONFIDENTIAL

Page 4

          APPEARANCES OF COUNSEL (Continued)
FOR THE DEFENDANTS GOOGLE/YOUTUBE:
     WILSON SONSINI GOODRICH &
     ROSATI
     701 Fifth Avenue, Suite 5100
     Seattle, Washington 98104-7036
     BY:  MCKINNEY WHEELER, ESQ.
     Telephone:  (206) 883-2684
     Email:  Mckinney.wheeler@wsgr.com
FOR THE META DEFENDANTS:
     SHOOK HARDY BACON
     JPMorgan Chase Tower
     600 Travis Street, Suite 3400
     Houston, Texas 77002
     BY:  HUNTER K. AHERN, ESQ.
     Telephone:  (206) 344.7620
     Email:  Hahern@shb.com
     And
     SHOOK HARDY BACON
     The Plaza In Clayton
     190 Carondelet Plaza, Suite 1350
     St. Louis, Missouri 63105
     BY:  CHELSEA M. MANNERY, ESQ.
     Telephone:  (314) 6900-0208
     Email:  Cmannery@shb.com
FOR THE TIKTOK DEFENDANTS:
     GIBSON, DUNN & CRUTCHER LLP
     310 University Avenue
     Palo Alto, California 94301-1744
     BY:  KEVIN J. WHITE, ESQ.
     Telephone: (650) 849-5358
     Email:  Kwhite@gibsondunn.com

FOR THE DEFENDANT SNAP, INC.:

     MUNGER, TOLLES & OLSON LLP
     601 Massachusetts Avenue NW, Suite 500 E
     Washington, D.C. 20001
     BY:  LYNDSEY N. FRANKLIN, ESQ.
     Telephone:  (202) 220-1109
     Email:  Lyndsey.Franklin@mto.com

CONFIDENTIAL

Page 5

APPEARANCES OF COUNSEL (Continued)

ALSO PRESENT:

        Alejandro Zamora Ruiz, Videographer

        Lance Hoeppner, Exhibit tech

        Raven Norris, in-house counsel, YouTube/Google

        (Via Zoom Videoconference)

        Marissa Urban, YouTube, Product Counsel,

                Responsibility/Kids & Privacy

        Reilly Dunne

        Lauren White

        Faith Lewis

CONFIDENTIAL

Page 26

A.   No.   Except for my husband.

Q.   Okay.  Fair enough.

MS. TRUONG:  I'll go ahead and mark as Exhibit 3 to this deposition.  This is a document that was provided to us yesterday from your counsel. And it's represented to be your current curriculum vitae.

(Whereupon, Deposition Exhibit 3 was marked for identification.)

MS. TRUONG:  And for the record, the Bates Number is -05713724.

BY MS. TRUONG:

Q.   Ms. Wu, do you recognize this document?

A.   Yes.  It's my LinkedIn profile.

Q.   Did you author the contents of this profile?

A.   Yes.

Q.   Does it accurately reflect your educational background and work experience?

A.   Yes.

Q.   If we can just turn to the last page. Let's start chronologically at the beginning.

It says you graduated from UC Berkeley in 2001; is that correct?

A.   Correct.

CONFIDENTIAL

Page 27

Q.    Okay.  And then you started at Google in February of 2006; is that correct?

A.    Yes.

Q.    Were you working anywhere from 2001 to 2006?

A.    Yes.  I was actually a -- a legal assistant in law firms.

Q.    Okay.  Do you have a law degree?

A.    No.

Q.    All right.  So in February of 2006, you started at Google as a senior strategist, legal consumer products; is that right?

A.    Correct.

Q.    And honing in on this legal description, were you providing any legal advice at that time?

A.    No.  I -- I was on the legal operations team.

Q.    Legal operations team.

Were you working with other attorneys?

A.    I was working with a product counsel group.

Q.    And who was your supervisor in that role?

A.    ██████████████.

Q.    Can you spell that last name?

A.    ██████████.

CONFIDENTIAL

Page 28

Q.   Okay.  And what types of issues were you handling in this role?

A.   I supported several different consumer products, and my day-to-day was processing copyright DMC complaints.  That was a large -- large part of the work volume.  Handling some defamation complaints, and then also reporting CCM detected on our products.

Q.   Okay.  When you say "consumer products," what products were you working on?

A.   It was Google photos at the time, the DMC complaints, supporting web search blogger, Google's blogger platform.  Those were the main three.

Q.   Okay.  And then towards the end here in the last sentence, it says (as read):

You created and project managed the early iterations of Google's transparency report before the company published these externally.

Do you see that?

A.   Yes.

Q.   What is Google's transparency report?

A.   It is an annual -- now it is an annual report, both Google and YouTube issues it, where we

Page 29

share out our removal volumes across a range of -- whether it's legal or content enforcement issues that we remove from our products on a quarterly basis.

Q.    And when you say it's an annual report from Google and YouTube, is it Google and YouTube have separate reports or they're all combined in one?

A.    Google and YouTube have separate reports, but at -- in that role, I was working on just Google products.

Q.    Okay.  And you said that the annual report is a report regarding removal volumes --

A.    Yes.

Q.    -- is that correct?

And you said regarding Google's legal based and content based.

Am I understanding that --

A.    Correct.  Correct.  Actually, I need to correct.  I don't believe it's an annual report, I think it's quarterly.

Q.    Okay.  Quarterly or biquarterly.  I forget the cadence.

(Reporter clarification.)

MR. WILLEN:  It's important to have a

Page 30

clean transcript.

MS. TRUONG:  I'll do that too.  I think I've been talking over people as well.

BY MS. TRUONG:

Q.   And what -- what is the purpose of the Google transparency report, as you understand it?

A.   It's just to be more transparent with external community on what we find and remove that violates our policies.

Q.   By "external community," do you mean the public?

A.   Yes.

Q.   Does the Google transparency report publish any safety issues?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I -- when I worked on the transparency report at Google during this period, we were just reporting legal removals.  I don't know what the Google transparency reports on today.

BY MS. TRUONG:

Q.   And when you created this project, was it your position that it was important for a company like Google to be transparent to the public about what was happening?

MR. WILLEN:  Objection to the form.

Page 31

THE WITNESS:  When I created this project, during my time on the legal team, it was just an internal report.

BY MS. TRUONG:

Q.   Okay.

A.   That was distributed within the legal team and the products that we supported.

Q.   Okay.  And when it became a public report, were you supportive of that change?

A.   Yes.

Q.   Okay.  And is that because you think that the public should be aware of safety issues that were happening at Google?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Sure.  Yes.

BY MS. TRUONG:

Q.   Okay.  And during the time you were working here, I know you put at the top, "Google."

Did you -- what's the distinction here between when you say you're working at Google versus YouTube?

A.   So at the time when I was working here, Google hadn't acquired YouTube yet.

Q.   Okay.

A.   Google acquired YouTube, I want to say, in

Page 32

2008. And so soon after that acquisition, I moved to YouTube. That's the next -- that's the next role on my -- on my profile. So after YouTube was acquired, then I moved to YouTube to -- to join their team.

Q. Okay. And that was in August of 2009; is that right?

A. Correct.

Q. And this role that you have listed, senior manager, Trust & Safety - YouTube Ads Monetization, was that the role that you transitioned into in August of 2009?

A. Yes.

Q. Okay. And what prompted this change?

A. I mean, YouTube is a cool product, and someone -- someone I worked with at Google in my role there had moved to YouTube and she reached out. She was the manager of this team, and she reached out to me about an opportunity, and so I joined --

Q. Okay.

A. -- her team.

Q. And did you have any say in what team you joined?

A. Yes. It was the pol- -- it was what was then called the Policy and Abuse team.

Page 33

Q.    Trust & Safety was then called the Policy and Abuse team?

A.    Yeah.  Back in -- back in 2009, Trust & Safety wasn't really an industry term yet.

Q.    Okay.

A.    And so the team that I joined was called Policy and Abuse.

Q.    Okay.  And was that Policy and Abuse specific to ads and monetization?

A.    The -- the team itself, you know, was responsible for a lot of different areas.  Policy, content policy, abuse, legal support, copyright.

And when I joined, I joined this -- again, this small team that had the -- you know, kind of -- doing a lot of different things.  And there was an opportunity -- no one was thinking about ads.  And so because no one was thinking about it and I was new, I took it.

Q.    Okay.  And earlier you had said Trust & Safety is sort of this industry term now?

A.    Mm-hmm.

Q.    Do I recall correctly?

In the context of your work at YouTube, what -- what was the Trust & Safety team doing?

What was its purpose?

Page 34

MR. WILLEN:  Objection to the form.

THE WITNESS:  Very similar to what Trust & Safety teams do today.  You know, for all the companies and platforms that had this team, we were responsible for developing the policies that, you know, determined what's allowed and not allowed on our services, and then removing them when we're made aware of them.

BY MS. TRUONG:

Q.   Okay.  And if I -- if you go into your description for this senior manager, Trust & Safety - YouTube Ads Monetization, the second sentence says (as read):

You built a global team of policy specialists and content moderators who are responsible for the enforcement of YouTube's advertiser-friendly guidelines.

Do you see -- do you see that?

A.   Yes.

Q.   Is this focused on what type of content should or shouldn't be on YouTube then?

MR. WILLEN:  Objection to the form.

THE WITNESS:  This was focused on what kind of content should not have ads run against

Page 35

them.

BY MS. TRUONG:

Q. Okay. And why would you want to restrict ad monetization on some content versus others?

A. Because some content isn't appropriate for advertising. Yeah. That's what we mean by brand safety. Like, it's not -- like, the monetization standard, what both YouTube and the creator should -- should monetize, should earn ad revenue from, you know, these were the standards that dictated them.

Q. Okay. And is ad monetization the primary way in which YouTube made money?

MR. WILLEN: Objection to the form.

THE WITNESS: At the time, yes.

BY MS. TRUONG:

Q. Okay. And ad monetization can happen through contextual advertising; is that correct?

A. Yes.

Q. And if I understand that correctly, that would be based on the content of what's being viewed in that moment, correct?

MR. WILLEN: Objection to the form.

THE WITNESS: I don't know if I would say it's based on the content that's viewed, but the

Page 36

content category.

BY MS. TRUONG:

Q. Okay. How would you describe contextual advertising?

A. Advertisers can target their ad campaigns based on cont- -- content categories that they select in the, like, creation of these campaign settings.

Q. So, for example, they could target children's content?

MR. WILLEN: Objection to the form.

THE WITNESS: No. They could -- we didn't have a children's content category setting.

BY MS. TRUONG:

Q. Okay. What types of categories did YouTube have?

A. Like, entertainment.

Q. Okay.

A. Music, sports, categories like those.

Q. Okay. And then is another way advertising can be done is through personalized advertising?

MR. WILLEN: Objection to the form.

THE WITNESS: Yes.

BY MS. TRUONG:

Q. Is that sometimes also referred to as

Page 37

targeted advertising?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I don't know.

BY MS. TRUONG:

Q.  Okay.  Focusing on personalized advertising, what does that mean?

What type of advertising is that?

A.  Campaigns that are targeted to the user that's -- like, targeted to the audience.

Q.  Okay.  And how would you target the audience?

What information would you need to do that?

MR. WILLEN:  Objection to the form.

THE WITNESS:  In the ad settings, you can target based on demographic geo, gender.

BY MS. TRUONG:

Q.  And in the context of YouTube ad and monetization, is it correct that YouTube is able to collect data points about users?

For example, YouTube can collect information about what they watch, what they searched for, the channels they land on and that information can be used to facilitate targeted advertising?

CONFIDENTIAL

Page 38

MR. WILLEN:  Objection to the form.

THE WITNESS:  This was not really my scope or my wheelhouse, so I can't really speak to that.

BY MS. TRUONG:

Q.  Okay.  Okay.  In the last sentence of this job description -- I'm sorry, the second to last sentence, it says (as read):

Scaled enforcement of brand safety policy by codeveloping proprietary content ratings classification system with video ads and engineering team.

Do you see that?

A.  Yes.

Q.  What is a content ratings classification system?

A.  That's what -- so one of the products that I oversaw was YouTube content ratings.  And it is similar to MPA ratings, TV ratings.  It was our proprietary system that would scan YouTube videos at upload time, and then depending on content signals, in the context that our machine-learning algorithms could determine from these videos, we would issue -- we would classify that video one of, I believe, five content ratings.

Page 39

Q.   And I -- I think you used the analogy of film ratings.

A.   (Nods head.)

Q.   So, like, rated G?

A.   G, PG, PG13.

Q.   Thank you, I only had one example in my head.

Okay.  And then you said the classification is intended to create these ratings, and then it works off of content signals?

A.   So the --

Q.   What's --

A.   I'm sorry to cut you off.

Q.   What's the signal?

A.   It could be, you know, a title, the visual, the visual stream itself.  Audio.  It could be one of many different signals.

Q.   Who decides what signals should be used?

MR. WILLEN:  Objection to the form.

THE WITNESS:  That -- the engineering team.

BY MS. TRUONG:

Q.   Okay.  If we move to your next position, from February 2018 to November of 2020, you're now in the position of global lead, Trust &  Safety -

Page 40

Child Safety, Kids and Family Experiences, Crisis Response.

Q.    You had your hands full?

A.    Oh, yes.

Q.    Okay.  What does it mean to be a global lead?

A.    So I was responsible -- I had, under my remit, global teams, you know, based in the U.S., San Bruno mostly, Dublin, Singapore, India, working in these spaces.

Q.    By "these spaces," you mean Trust & Safety, but the subcategories here, child safety, kids and family experiences and crisis response.

A.    Correct.  I had dedicated teams in each of those verticals.  We called them verticals.

Q.    Verticals.

Who was your supervisor in this position?

A.    Matt Halprin.

Q.    And about how many direct reports did you have?

A.    Gosh.  Let's see.  I would say total, maybe somewhere around 60.

Q.    60?

A.    Yeah.

Q.    Okay.  And was someone in this role before

CONFIDENTIAL

Page 41

you took it over?

A.   No.  I don't -- there were people doing this role.  There were, of course, people doing these roles, but we started -- as an organization, we started verticalizing, so we just had specific people dedicated to each of these verticals.  And I was the -- the first vertical lead definitely for kids and family, I believe -- I remember there was someone doing child safety prior to me, but the first vertical lead for kids and family experiences and crisis response.

Q.   Who was doing child safety before you?

A.   This -- this woman, █████████ (phonetic).

Q.   █████████?

A.   Yeah.

Q.   And in the context of child safety, what was the focus of your work?

A.   It spanned several different content issues, but at the core of it, it's protecting minors from harm on YouTube, and, you know, protecting them as creators and when they appeared in YouTube videos.

Q.   So I want to try to unpack this because protecting minors from harm seems like a big

Page 42

category.

In that context of protecting minors from harm, were you doing some specific type of work?

A.   We were developing the policies for child safety.  These policies include CSAM, and, of course, CSAM policies already existed.  So the policies in CSAM, other sexually explicit activity. When minors are, you know, shown in videos being physically harmed, child abuse, you know, any kind of violent context involving minors, when they are doing harmful and dangerous acts, pranks and challenges involving minors, when they're engaged in age-inappropriate behavior, that was kind of -- those were the examples of the policies that we had that my team would continue updating and iterating with the different emerging trends and risks we were seeing, as well as also enforcing against these videos when we detect them and then removing the ones that are violative of our policies.

Q.   So was your focus in this role primarily content-based?

A.   Correct.  The focus of my role in all of these verticals is very much content-based.

Q.   Okay.  That's helpful.  Thank you.

So with respect to kids and family

Page 43

experiences, understanding it was content-based, what types of things were you doing in that vertical?

A.    So a little different from child safety where really our focus was protecting -- or safeguarding the actual human being that we see in videos, kids and family experiences, the focus is really ensuring that minors using YouTube are viewing age-appropriate content for them.

Q.    Okay.  In your description here, you have listed YouTube Kids and supervised experiences.

Do you see that?

A.    Yes.

Q.    Okay.  Does that fall within -- I'm sorry, strike that.  I got ahead of myself.

MR. WILLEN:  Oh, yeah, I see.

BY MS. TRUONG:

Q.    I'm sorry, it -- where it says (as read):

Developed content safety policy for YouTube Kids.

Do you see the line?

A.    Mm-hmm.

Q.    (As read):

YouTube's flagship product for our youngest users and the policies

Page 44

enforcement framework for

Made-for-Kids, YouTube's COPPA

compliance solution.

Do you see that?

A.    Yes.

Q.    What is Made-for-Kids?

A.    Made-for-Kids is also a content policy
that is used to train a machine learning algorithm
that we have that essentially defines and describes
content that we believe is predominantly targeted or
appealing -- I'm sorry, let me use the word
appealing to younger kids, like preschool,
elementary-aged kids.

Q.    What's the age range for preschool to
elementary?

A.    Zero to 12.

Q.    12.

Is Made-for-Kids applied on YouTube Kids
or YouTube main?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Made-for-Kids is applied to
YouTube main.

BY MS. TRUONG:

Q.    Okay.  And let me take a step back.

When we talk about the YouTube platform,

CONFIDENTIAL

Page 45

do you understand that YouTube has a main platform?

A.    Yes.

Q.    Okay.  And then there's also a YouTube Kids platform; is that correct?

A.    Correct.

Q.    We had talked previously that this launched in about 2014-2015; is that correct?

A.    The kids app, yes.

Q.    Okay.  And in this last sentence in the first paragraph, it says (as read):

You also assess child safety risks for new YouTube products and features.

Do you see that?

A.    Yes.

Q.    Do you agree that it's important for companies to assess these types of risks with respect to their products?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.    That this is a continuing obligation with respect to the product, so as people start using it, they continue to have to assess risk with respect to child safety?

Page 46

MR. WILLEN: Objection to the -- excuse me. Objection to the form.

THE WITNESS: Yes.

BY MS. TRUONG:

Q. Okay. And then in the last paragraph, you say you were the global lead of the YouTube crisis response team.

Do you see that?

A. Yes.

Q. What is the YouTube crisis response team?

A. This was a team we operated 24/7 to respond to any escalations, content escalations that arise around the world, that then is recorded with -- content from those things are recorded and uploaded to YouTube.

Q. Okay. What type of content escalations would fall within the crisis rapid response team?

A. Anything from natural disasters to terrorist attacks.

Q. Okay. All right. Home stretch.

Your last -- your last position with YouTube was November of 2020 to August of 2022; is that correct?

A. Yes.

Q. And here you were director,

Page 47

Trust & Safety?

A.   Yes.

Q.   Okay.  Can you tell me what the difference is director, Trust & Safety versus global lead of Trust & Safety?

A.   It -- I was promoted to a director.

Q.   You got more money?

A.   Yes.  And in this role, the main change from a scope perspective is I was no longer leading the crisis response team in this role.  And so still child safety, still kids and family experiences, and then content ratings kind of took the third slot when I left the crisis response.

Q.   Okay.

A.   Vertical.

Q.   Who was -- I'm sorry?

A.   When I -- when I left the crisis response team.

Q.   Who was your supervisor in this role?

A.   Matt Halprin.

Q.   And about how many direct reports did you have in this role?

A.   I think 50 to 55.

Q.   Was someone in this role prior to you taking it on?

A.   So I was -- child safety and kids and family was still me, and then content ratings, content -- content ratings, I had a team on the Google side that then when content ratings transitioned over to YouTube, I was -- it -- it rolled up under my -- my leadership, my team.

Q.   Okay.  And the first sentence here says that you were accountable for YouTube's responsibility initiatives.

Do you see that?

A.   Yes.

Q.   And responsibility is capitalized.

Is that because it's a term of art of some kind at YouTube?

A.   A term of art?

Q.   Yeah.

Does it mean -- what do you mean here, YouTube's responsibility initiatives?

A.   YouTube, you know, we -- we had an internal north star where responsibility is our top priority.

Q.   What is a north star at YouTube?

MR. WILLEN:  Objection to the form.

THE WITNESS:  It's -- I'm using it colloquially.  It's -- you know, it's kind of a

mission statement that aligns in our company around regardless of what you're working on or what team you're on.

BY MS. TRUONG:

Q.   So regardless of what project you're working on, you should keep that north star in mind and aim to achieve that at all times?

MR. WILLEN:  Objection to the form.

THE WITNESS:  That's how I interpret it.

BY MS. TRUONG:

Q.   Okay.  And the sentence continues (as read):

Accountable for YouTube's responsibility initiatives that protect youth creators and viewers on the platform, a top priority across the company.

Do you see that?

A.   Oh yeah, still on the first sentence.

Q.   Yes.

A.   Yes.

Q.   I'm sorry.

Was the protection of youth creators and viewers always a top priority at YouTube during your time there?

CONFIDENTIAL

Page 50

A.   Yes.  Based on my experience.

Q.   Okay.  Who determines what is or isn't a top priority at YouTube?

A.   Our senior leadership team.

Q.   And who is on the senior leadership team?

MR. WILLEN:  Objection.  Are you talking -- what time are we talking about?

BY MS. TRUONG:

Q.   Let's talk about the time that you were director of Trust & Safety.  So November 2020 to August of 2022.

A.   Our CEO, Susan Wojcicki, chief product officer, Neal Mohan, our chief technology officer, Scott Silverman, chief legal officer, who, during my time, majority of my time there was Niko Austin (phonetic).  Yeah, so the C-suite.

Q.   The C-suites.  Okay.

If you go down to the second paragraph here, you have sub-bullet one.  It says that you (as read):

Protect and educate tweens and teens in the areas where they're most vulnerable online and quickly identifying and removing violative content and accounts.

Page 51

Do you see that?

A.    Yes.

Q.    With respect to accounts, did you work at all with removing underage accounts?

A.    Yes.

Q.    And what age range did that apply to?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Twelve and under.

BY MS. TRUONG:

Q.    And why were accounts for 12 and under removed from YouTube?

A.    Because we didn't allow 12 and under accounts according to our TOS, our terms of service.

Q.    Do you know why that policy is in place?

MR. WILLEN:  Objection to the form. Excuse me.

THE WITNESS:  No.

BY MS. TRUONG:

Q.    Do you know who makes the decision of whether or not to keep that policy in place?

MR. WILLEN:  Objection to the form.

THE WITNESS:  No.

BY MS. TRUONG:

Q.    Would that be a C-suite level decision.

A.    Yes.  I haven't really thought about it.

CONFIDENTIAL

Page 52

Q.   Okay.  And then the second bullet says that you (as read):

Work with enriching the world's families with appealing and safe quality content (YouTube Kids and supervised experiences).

Is that right?

A.   Yes.

Q.   Okay.  In the context of YouTube Kids, I think we discussed this earlier, you said it was mostly content-based; is that right?

A.   Yes.

Q.   What about for supervised experiences, is it the same or did you have a broader range of issues you were working on there?

A.   Also content-based.

Q.   Okay.  And then the last number, Number 3, it says (as read):

Improve the consumer experience with more age-appropriate default settings and controls.

Do you see that?

A.   Yes.

Q.   Okay.  What age-appropriate default

Page 53

settings were you working on?

A.    This was the content ratings classification product.  Again, the G, PG.

Q.    Okay.  And what about age-appropriate controls?

A.    So how -- so how the content ratings -- it's essentially like a classification system.  And then other teams across YouTube, even Google, could leverage this system to build -- to build their own controls on top of, on top of that system.

Q.    Okay.  And then it looks like in September of 2022 -- actually, no.

In August of 2022, you left YouTube, Google; is that correct?

A.    Correct.

Q.    And then you joined Etsy, correct?

A.    Yes.

Q.    Was there anything in particular that prompted that move?

A.    I was just ready for a change.  I've been at Google for, gosh, it was almost 16 years at the time, and so just ready for something new.

Q.    Ms. Wu, as someone who has worked as YouTube and in particular the Trust & Safety and child safety departments, do you agree that it is

important for YouTube to protect children on the YouTube platform?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.   Do you agree that YouTube has a responsibility to ensure that its platform was safe for children?

MR. WILLEN:  Same objection.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.   Do you agree that if there were aspects of the YouTube platform that was not safe for children, YouTube should address those safety issues?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.   It should try to fix those issues?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Correct.

BY MS. TRUONG:

Q.   Do you agree that YouTube should inform parents of any safety issues with respect to the YouTube platform?

MR. WILLEN:  Objection to the form.

Page 55

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.    That YouTube should inform the public generally of any safety issues with respect to its platform?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I -- that, again, was -- I was just very much focused on the content, but there were teams where that was their, you know -- they were -- they oversaw the external communications.  I was very much more focused internally on the contents.

BY MS. TRUONG:

Q.    Okay.  Understood.

Asking just a broader question about whether you agree that YouTube should inform the public generally about any safety issues involving its platform?

MR. WILLEN:  Excuse me.  Just objection to the form.

THE WITNESS:  Yes.  And that is one of the reasons why we have a quarterly transparency report.

BY MS. TRUONG:

Q.    Earlier you had stated that 12 and under users were not allowed on YouTube based on the terms

Page 56

of service; is that correct?

A. Yes.

Q. Okay.

MR. WILLEN: Sorry.

BY MS. TRUONG:

Q. How does YouTube ensure that under -- 12 and under are not on the platform?

A. In the -- I'm -- that's a lot -- a little bit out of my purview, it's -- actually, it is out of my purview, but in the -- in the account signup flow on YouTube main there are protections in place.

Q. Were you involved in the account signup flow during your time at YouTube?

A. No.

Q. Okay. If I had questions about how that flow worked at YouTube, who would I ask?

A. Someone in the product or engineering team.

Q. Product or engineering team?

A. Mm-hmm.

Q. And is there someone on the product or engineering team that deals specifically with account creation flow for children?

MR. WILLEN: Objection to the form.

THE WITNESS: I really don't remember.

Page 57

BY MS. TRUONG:

Q.   Okay.  Are you aware that children can access the YouTube platform in a signed-out mode?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Sure.  Young people can view YouTube in logged-out mode.

BY MS. TRUONG:

Q.   What's logged-out mode?

A.   Same as signed out.

Q.   Signed out.  Okay.

In other words, you don't need a YouTube account to access YouTube; is that right?

MR. WILLEN:  Objection to the form.

THE WITNESS:  You don't need a YouTube account to view the content.

BY MS. TRUONG:

Q.   Okay.

A.   However, in -- when you're not logged into an account, the content experience is different. The content that we show in signed-out mode is -- is different.  We restrict lots of types of content. Mostly for safety reasons, content safety when you're log -- not logged in.

Q.   What about the feature experiences on YouTube; is there a change when you're signed out?

CONFIDENTIAL

Page 58

MR. WILLEN:  Objection to the form.

THE WITNESS:  I don't know.

BY MS. TRUONG:

Q.   Okay.  And let me clarify.  By "features,"
I mean, the way videos are recommended on YouTube.

There's no change to that whether you're
signed out, right?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I don't know.

BY MS. TRUONG:

Q.   Okay.  I'm going to mark --

MR. WILLEN:  Are we done with this?

MS. TRUONG:  Yes.  We can set those aside.

MR. WILLEN:  Thank you.

MS. TRUONG:  -- as Exhibit 4 to this
deposition a document that's Bates Number -03877873.

(Whereupon, Deposition Exhibit 4
was marked for identification.)

MS. TRUONG:  While we tee that up, I'll
just note for the record, it's an email sent from
the email account of ███████████████ dated
April 18 of 2014.

MR. WILLEN:  Thanks.  That's for you.

BY MS. TRUONG:

Q.   Ms. Wu, just at the top there, that email,

CONFIDENTIAL

Page 59

is this your work email is this --

A.   Yes.

Q.   -- at Google?  I'm sorry.

Is this the email you use to communicate regarding any business communications?

A.   Yes.

Q.   Okay.  The subject line here says "Unicorn Update."

What is unicorn?

MR. WILLEN:  Have you had a chance to look at the document?

THE WITNESS:  Yeah.  I'm looking at it right now.

MS. TRUONG:  I'm sorry.

MR. WILLEN:  Why don't you give her a chance to take a look at it.

THE WITNESS:  So unicorn, from what I remember -- I haven't heard that or thought about it in a very long time.  But unicorn was a cross -- it was a cross Google initiative that was focused on exploring different product experiences for kids.

BY MS. TRUONG:

Q.   Okay.  If we can flip to the page with the Bates Number ending -7876 at the bottom.  And I'm going to start with the email from █████████████ .

CONFIDENTIAL

Page 60

Date is Tuesday, April 8th, 2014 at 8:52 p.m. Just let me know when you get there.

A.   Yes.  I'm here.

Q.   Okay.  Who is ▮▮▮▮▮▮▮▮▮▮?

A.   Well, I know ▮▮▮▮▮.  I don't recall -- recall what role she was in at the time, but you can see her little tag handle.  She's a policy advisor. She was on the Google Trust & Safety policy team.  I also don't see my -- I'm not a recipient on ▮▮▮▮▮'s email.

Q.   Understood.

I think at some point you are looped in -- into this conversation --

A.   Yes.

Q.   -- is that correct?

A.   Yes.  But I -- I'm not on that -- yeah, looped in later, I guess.

Q.   Okay.  Why don't we do this.  Let's go to the page with Bates Number -7874 at the top.  I think this is your first active response on this email chain.  And it's Friday, April 18, 2014 at 9:12 a.m.

Do you see that?

A.   Yes.

Q.   Okay.  If you could just take a moment

Page 61

review this.

A.    Okay.

Q.    Okay.  In this email, you're discussing the ads decision with respect to YouTube Kids; is that correct?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I don't -- I'm sorry, I don't want to speculate.  I don't recall.  This was a long time ago.

BY MS. TRUONG:

Q.    Okay.  You see the second sentence where it says (as read):

My first reaction to hearing the news was concerning as well, but after having various conversation with folks and time to carefully think through the implementation of ads under the current serving controls we have, I think we can pull this off responsibly.

Do you see this?

A.    Yes.

Q.    Okay.  What is this in response to?

A.    So I know it was -- this email chain is

Page 62

about ads on kid-friendly content.  What I don't recall is if it was actually ads in the kids app.

Q.   I see.

A.   What I do remember is we actually launched the kids app without ads.

Q.   Kids was launched -- YouTube Kids app was launched --

A.   Was launched with no ads.

Q.   Okay.  So what is the -- when you say the news was -- you were concerned about the news as well, what did you mean by that?

A.   I don't recall.

Q.   Okay.

A.   And this was a very long time ago.

Q.   Okay.  When you say, "The ads decision is supported by Susan," are you referring to Susan Wojcicki -- am I saying her name right -- the CEO at the time?

A.   Yes.

Q.   How do you pronounce her last name?  I don't want to butcher it throughout this.

A.   Wujiski.

Q.   Wujiski.  Okay.

And in the second paragraph, you discuss (as read):

CONFIDENTIAL

Page 63

Content licensing agreement with many of content owners, like Disney, Cartoon Network and Sesame Street, where we're contractually bound to monetize their content.

Do you see that?

A.   Yes.

Q.   It appears to me that -- that this was a consideration as to why kids content was being monetized in some aspect at this point; is that right?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.  On YouTube main app.

BY MS. TRUONG:

Q.   On YouTube main app.

And if we can just go to the last page of the document, I know you said you weren't in on this email originally, though, you were looped.  I want to ask broadly about this paragraph where it references (as read):

Unicorn policy principals, ten things we know to be true.

Do you see that?

A.   Yes.

Q.   Okay.  So -- and it looks like those ten

Page 64

things are then bullet points.  The third bullet being (as read):

> Parents will have meaningful choice about their children's' experience.

Do you see that?

A.    Yes.

Q.    Do you agree with that statement?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.    In the context of your work in Trust & Safety and child safety, do you agree that meaningful choice means informed choice?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I -- I believe meaningful choice is, like, content experiences that they can select on what's best for their kids and their families.

BY MS. TRUONG:

Q.    So in this context, you -- you view "meaningful choice" as having choice of content?

MR. WILLEN:  Objection to the form.

THE WITNESS:  YouTube Kids app, supervised experiences, that they have more choice on the

CONFIDENTIAL

Page 65

content experience they feel is most appropriate and suitable for their family.

BY MS. TRUONG:

Q.   Okay.  And would you agree that in order to execute their choice between those experiences, they should be informed about all the risks and benefits of what they're choosing?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. TRUONG:

Q.   Okay.  I'm going to mark as Exhibit 5 to this deposition a document with Bates ending -01621450.

(Whereupon, Deposition Exhibit 5 was marked for identification.)

MR. WILLEN:  Thanks.  Let's put that there.  This is for you.

BY MS. TRUONG:

Q.   Ms. Wu, if you just want to take a moment to review it and let me know when you're ready.

A.   Okay.

Q.   Okay.  If we go to the page with Bates ending -1453, we'll start at mid page, Monday, March 6, 2017, an 11:52 email from you to ███████████; is that right?

CONFIDENTIAL

Page 82

A. Yes.

Q. Okay. As the director of Trust & Safety, were you involved at all on how the recommendation algorithm was operated on the YouTube Kids platform?

A. No. That was not within my remit.

Q. Okay. What about how the algo- -- recommendation algorithm worked on YouTube main with respect to kids?

MR. WILLEN: Objection to the form.

THE WITNESS: No.

BY MS. TRUONG:

Q. Okay. The next sentence says (as read):

Unlike on traditional YouTube, YouTube Kids auto plays new videos without warning with no option to turn off the feature.

Do you see that?

A. Yeah.

Q. Were you involved at all on how auto play was provided on YouTube Kids?

A. No.

Q. What about how auto play was provided on YouTube main?

A. No. Again, my -- my team, me and my team, Trust & Safety at large, we were focused on content,

Page 83

not product features.

Q.    Was there -- let me go back.

You said on Trust & Safety, you had three verticals; is that right?

A.    Mm-hmm.

Q.    It was, at one point, rapid response, but that got taken off your plate, mainly child safety; is that correct?

A.    Mm-hmm.

Q.    Kids experience, correct?

A.    Yes.

Q.    And content ratings?

A.    Content ratings.

Q.    Was there a vertical that dealt with sort of the recommendation algorithm in children?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Not in Trust & Safety.

BY MS. TRUONG:

Q.    Not in Trust & Safety.  Okay.

If you turn to the page with Bates Number -9686, there's a paragraph that says (as read):

Studies have shown that too much screen time for preschool-aged children can lead to damage in

regions of the brain related to literacy, language, processing and speech.

Do you see that?

A.   Yes.

Q.   The paragraph goes on to discuss additional studies with how screen time can impact children negatively; is that fair?

A.   Yes.

Q.   As part of your work in Trust & Safety, did you ever encounter this type of research?

MR. WILLEN:   Objection to the form.

THE WITNESS:   My team and I did not -- oh, no.

BY MS. TRUONG:

Q.   Was that --

A.   Sorry.

Q.   Sorry.

MR. WILLEN:   Sorry, what's the question?

THE WITNESS:   No.  We did not encounter this research.

BY MS. TRUONG:

Q.   Okay.  Was this an area that you would have looked into as part of your work on Trust & Safety?

CONFIDENTIAL

Page 85

MR. WILLEN:  Objection to the form.

THE WITNESS:  No.

BY MS. TRUONG:

Q.   Okay.

A.   We -- we were focused on content safety, content appropriateness.  There were other teams focused on digital wellbeing.

Q.   Who was the team focused on digital wellbeing?

MR. WILLEN:  Objection to the form.  Are we talking about at this time?

MS. TRUONG:  At this time.

THE WITNESS:  You'd have to -- so ████████████████████  comes to mind, and I know there were product teams in the -- individuals on the product team focused on digital wellbeing.

BY MS. TRUONG:

Q.   Okay.  What about at the time that you left YouTube, which was in about 2022, who was handling digital wellbeing at that time?

A.   I want to say ██████.

Q.   And what's ██████ --

A.   Actually, I'm sorry, I think ██████ -- I know she ended up -- she's no longer at YouTube, but I don't know when she left.

CONFIDENTIAL

Page 242

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

___x___  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Re *Kathleen Maltbie*  iested.

_____

KATHLEEN A. MALTBIE
RPR-RMR-CRR-CCRR-CLR-CRC-RDR
California CSR 10068, Nevada CCR 995
Texas CSR 12212