# AMENDED Exhibit 740

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:22-MD-3047-YGR

MDL No. 3047

- - - - - - - - - - - - - - - - - -X
IN RE:   SOCIAL MEDIA ADOLESCENT    :
ADDICTION/PERSONAL INJURY          :
PRODUCTS LIABILITY LITIGATION      :
- - - - - - - - - - - - - - - - - -X

THIS DOCUMENT RELATES TO:
ALL ACTIONS
- - - - - - - - - - - - - - - - - -X

    Videotaped deposition of KATHRYN KURTZ taken at the offices of Wilson Sonsini Goodrich & Rosati, 1301 Avenue of the Americas, New York, New York, before Clifford Edwards, Certified Shorthand Reporter and Notary Public, in and for the State of New York on March 28, 2025, at 9:30 a.m. ET.

Page 2

A P P E A R A N C E S:

ON BEHALF OF THE PERSONAL INJURY PLAINTIFFS AND SCHOOL DISTRICTS:

   Jennifer Scullion, Esq.
   Emma DeGroff
   SEEGER WEISS LLP
   55 Challenger Road
   Ridgefield Park, NJ 07660
   212-584-0700
   jscullion@seegerweiss.com

   Jade A. Haileselassie, Esq.
   MOTLEY RICE LLC
   28 Bridgeside Blvd.
   Mt. Pleasant, South Carolina  29464
   843.216.9043
   jhaileselassie@motleyrice.com

ON BEHALF OF DEFENDANT GOOGLE/YOUTUBE:
   Ashley W. Hardin, Esq.
   Joseph S. Sandoval-Bushur, Esq.
   Annie E. Showalter, Esq.
   WILLIAMS & CONNOLLY LLP
   680 Maine Avenue SW
   Washington DC 20024
   202-434-5960
   ahardin@wc.com
   Jsandoval-bushur@wc.com
   Ashowalter@wc.com

Page 3

A P P E A R A N C E S:
(continued)

ON BEHALF OF THE DEFENDANT TIKTOK INC. AND
BYTEDANCE INC.:

   Kevin J. White, Esq.  (via Zoom)
   GIBSON, DUNN & CRUTCHER LLP
   310 University Avenue
   Palo Alto, CA 94301-1744
   650.849.5300
   kwhite@gibsondunn.com
   Eleanor Klemsz, Esq.  (via Zoom)
   FAEGRE DRINKER BIDDLE & REATH LLP
   300 N. Meridian Street, Suite 2500
   Indianapolis, Indiana 46204
   317.237.1446
   eleanor.klemsz@faegredrinker.com

ON BEHALF OF THE DEFENDANTS META PLATFORMS, INC.;
FACEBOOK HOLDINGS, LLC; FACEBOOK OPERATIONS, LLC;
FACEBOOK PAYMENTS, INC.; FACEBOOK TECHNOLOGIES, LLC;
INSTAGRAM, LLC; AND SICULUS, INC.:

   Eben S. Flaster, Esq.  (via Zoom)
   SHOOK, HARDY & BACON L.L.P.
   Two Commerce Square
   2001 Market St., Suite 3000
   Philadelphia, PA 19103
   215.278.2555
   eflaster@shb.com

   Kayla I. Solomon, Esq.  (via Zoom)
   SHOOK, HARDY & BACON L.L.P.
   The Plaza In Clayton
   190 Carondelet Plaza, Suite 1350
   St. Louis, MO 63105
   314.690.0200
   ksolomon@shb.com

Page 4

A P P E A R A N C E S:

(continued)


ON BEHALF OF THE DEFENDANT SNAP INC.:

   Garrett Solberg, Esq.   (via Zoom)

   MUNGER, TOLLES & OLSON LLP

   350 South Grand Avenue

   50th Floor

   Los Angeles, CA 90071-3426

   (213) 683-9100

   Garrett.Solberg@mto.com


ALSO PRESENT:

   Danny Ortega, Videographer

   Matt MacMurchy, Document Technician

   Demarron Berkley, Esq., Google/YouTube

   Dee Lambert  (via Zoom)

   Kristina McVay  (via Zoom)

Page 9

THE VIDEOGRAPHER:  We are now on the record.

My name is Danny Ortega and I'm the legal videographer for Golkow Litigation Services.  Today's date is March 28th, 2025 and the time is 9:35 a.m.

This video deposition is being held at 1301 Avenue of the Americas, New York, New York in the matter of Social -- In Re:  Social Media Adolescence Addiction Personal Injury Products Liability Litigation.

The deponent today is Katie Kurtz. All counsel will be noted on the stenographic record.

The court reporter today is Cliff Edwards and will now swear in the witness.

KATHRYN KURTZ

having first been duly sworn, deposed and testified as follows:

DIRECT EXAMINATION

BY MS. SCULLION:

Q    Good morning, Ms. Kurtz.

A    Good morning.

Q    My name is Jennifer Scullion and I represent the plaintiffs, school districts, as well as students and families in this litigation.

Do you understand that?

A    Yes.

Q    Okay.  Great.

And, Ms. Kurtz, I understand you are appearing here today as a corporate representative on behalf of YouTube LLC; is that correct?

A    Yes.

Q    As well as on behalf of Google LLC; is that correct?

A    Yes.

Q    And just to be clear, YouTube is part of Google; is that right?

A    Yes.

Page 11

Q    Okay.

A    YouTube is owned by Google.

MS. SCULLION:  Okay.  Can we hand out Exhibit 97, please?

Okay.  This is going to be a little bit tricky getting it over the --

COURT REPORTER:  Is this a newly-marked --

MS. SCULLION:  Yes.

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 97, Defendant YouTube and Google's Objections and Responses to Plaintiff's Notice of Oral and Videotaped Deposition, was marked for identification.)

MS. SCULLION:  So we are marking the exhibits in the order in which we have them.

BY MS. SCULLION:

Q    So, Ms. Kurtz, you've been handed what's been marked as Exhibit No. 97.

Do you recognize this as a copy of the notice -- I'm sorry -- of Defendant YouTube and Google's objections and responses to Plaintiff's

Page 12

notice of oral and videotaped deposition pursuant to Rule 30(b)(6) for the school districts and students?

A    I -- I understand that -- that this is a legal document and I'm not -- I have not seen it before.

Q    Okay.

MS. SCULLION:  Let's mark as Exhibit 98, please.

Thank you.

Thanks.

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 98, Agreed Topics for March 28, 2025 YouTube 30(b)(6) Deposition, was marked for identification.)

BY MS. SCULLION:

Q    Let me hand you what's been marked as Exhibit 98.

So just to sort of set the table her,e, do you understand that you are appearing as the corporate representative on certain agreed topics for the deposition today?

A    Yes.

Q    Okay.  And I understand you say you haven't seen Exhibit 97.

Page 13

Have you seen Exhibit 98 before?

A    Yes.

Q    Okay.  And do you understand that Exhibit 98 is a list of the agreed topics for today's deposition?

MS. HARDIN:  I'll just state for the record that Exhibit 98 is a list of agreed topics, but also subject to the objections that we made in Exhibit 97.

You may answer, Ms. Kurtz.

MS. SCULLION:  Correct.

A    Yes.

BY MS. SCULLION:

Q    Okay.  And are you prepared, in fact, to testify today on behalf of both YouTube and Google on each of the topics identified in Exhibit 98?

A    Yes.

Q    All right.  And just to, again, give us some -- some -- some background, could you explain what your current position is with Google or YouTube?

A    My current position is I work at YouTube as the global lead of youth and learning partnerships.

Q    Okay.  And when did you first join

Page 14

YouTube?

A        I joined YouTube in January of 2019.

Q        Had you worked for YouTube before that at any point?

A        No.

Q        Had you worked for Google at any point before that?

A        No.

Q        All right.  In terms of the agreed topics for today's deposition, do you have some personal knowledge with respect to those topics as a result of your position as global lead of youth and partnerships?

A        Yes.

Q        Okay.  But do you understand that these topics, in fact, extend back beyond January 2019, some parts?

A        Yes.

Q        And you are prepared, though, to testify on behalf of YouTube and Google with respect to those topics for the period before January 2019; correct?

A        Yes.

                MS. HARDIN:  Objection to form.  The scope is 2015 forward.

Page 15

MS. SCULLION:  I apologize.  I didn't -- I didn't mean to -- to say anything different from that.

BY MS. SCULLION:

Q     But I'm just saying, you understand you are going to testify today about things that happened before you joined YouTube?

A     Yes.

Q     Okay.  Great.  And did you do anything to prepare yourself in order to testify on today's topics?

A     Yes.

Q     What did you do?

A     I spoke to some of my colleagues at YouTube.  I spoke to some of my colleagues at the Google Workspace for Education team, and I spoke to my attorneys.

Q     Okay.  You said your colleagues at YouTube, as well as the Google Workspace for Education team?

A     (The witness nods head.)

Q     Okay.  Who at --

MS. HARDIN:  I'm sorry, you have to give a verbal answer --

THE WITNESS:  Yes.

Page 16

MS. HARDIN:  -- for the court reporter.

A    Yes.  Yes.

BY MS. SCULLION:

Q    Who at YouTube did you speak with?

A    I spoke with Cristos Goodrow, VP of engineering.  I spoke with Raj Iyengar, product manager.  I spoke with Tanaya Kasavana in YouTube marketing, and I spoke with Jonathan Katzman, product director.

Q    When you say Jonathan Katzman is a product director, for which product?

A    For learning.

Q    So within YouTube, learning is considered to be a product; is that right?

A    Is --

MS. HARDIN:  Objection to form.
You may answer.

A    Within -- within YouTube, learning is considered a content vertical.

BY MS. SCULLION:

Q    Okay.  And we'll get back to -- in a minute to what a vertical means.

Anyone else within YouTube that you spoke with to prepare for today's deposition?

Page 17

A     No.

Q     And from -- for the Google Workspace for Education team, who did you speak with there?

A     I spoke with ██████████████ of -- in product.  I spoke with ██████████████ in marketing, I spoke with ████████████████████████ [sic] in the program management team.  I spoke with ██████████████, also in the product management team.

Q     And for -- starting with ██████████, do you know which product she's on the management team for?

          MS. HARDIN:  Objection to form.

A     Mary Spence works on the Google Workspace for Education team.

BY MS. SCULLION:

Q     Okay.  Got it.  And, I'm sorry, I -- I went too quickly.

          Is it ████████████ you also spoke with?

A     ████████████ --

Q     Or do I have the wrong name?  Hold on.

██████████████

A     ██████████.

Q     She's also part of the Google Workspace for Education product team?

A     She works on the -- on the program

Page 18

management team --

Q    Okay.

A    -- not the product management team.

Q    I apologize.  I miswrote.  Okay.

And what -- what is the program management team?  How is that different from the product management team?

A    The program management team is working with the users, the end users, of the Google Workspace for Education team, not -- not defining the product.

Q    Okay.  And when it comes to Google Workspace for Education end users, those would include school districts?

MS. HARDIN:  Objection as to form.

BY MS. SCULLION:

Q    Is that right?

A    Yes.

Q    Okay.  Do -- are students also end users of the Google Workspace for Education?

MS. HARDIN:  Objection.  Form.

A    The Google -- the Google Workspace for Education Suite of tools is -- is a suite of tools that's used by schools, administrators, teachers, and students as a delivery mechanism for educational

Page 19

content and productivity tools.

BY MS. SCULLION:

Q    Got it.

But you referred to ▮▮▮▮▮▮▮▮ working with end users of the Google Workspace for Education.

Does that mean that she's working with students in that regard?

MS. HARDIN:  Objection to form.

A    No.  That program management team works specifically with the schools and the administrators that are the -- that are the customers of the Google Workspace for Education suite.

BY MS. SCULLION:

Q    Okay.  Meaning that those are the folks who pay Google for the Google Workspace for Education; right?

MS. HARDIN:  Objection to form.

A    Pay, or much of the Google Workspace for Education suite is -- is a free service.

BY MS. SCULLION:

Q    Okay.  Okay.  Anyone else at Google that you spoke with in order to prepare for today's deposition?

A    No.

Page 20

Q    All right.  And everyone you spoke with at YouTube is a -- a current YouTube employee; is that right?

A    Everyone that I spoke with at YouTube is a current employee, yes.

Q    Okay.  And is everyone you spoke with at Google also a current Google employee?

A    Yes.

Q    All right.  Did you speak with any former YouTube employees to prepare for today's deposition?

A    No.

Q    Did you speak with any former Google employees to prepare for today's deposition?

A    No.

Q    Okay.  And just to make absolutely sure, other than counsel, is there anyone else that you spoke with to prepare for today's deposition that you haven't already identified for us?

A    No.

Q    Okay.  Have you ever testified before in deposition?

A    No.

Q    Okay.  And I'm sure Ms. Hardin and her colleagues have done a -- a great job in preparing you and explaining what's going to happen today, but

Page 21

do you understand that you are here to testify under oath in response to my questions?

A    Yes.

Q    Okay.  As we go through the day, I'm sure there will come times where a question may not be clear to you or you may not understand it.

If that's the case, will you let me know that specifically?

A    Yes.

Q    Okay.  And do you understand that unless you do that, I will assume that you did understand my question?

A    Yes.

Q    Fair?

A    Yes.

Q    Okay.  Great.  And, you know, from time to time we will take breaks.

If you think you need a break, would you please let me know and we will try to do that unless a question is -- is -- is pending or the middle -- like, a line of questioning, we just want to sort of get that done; is that good?

A    Yes.

Q    Okay.  Great.  Is there any reason that you can't give your best testimony today?

Page 22

A    No.

Q    Are you taking any medications that, you know, interfere with any of your cognitive abilities?

A    No.

Q    Okay.  Great.  So one of the topics -- the agreed topics for today, looking at Exhibit 98, is on the first page under group A, topic 13, which is "efforts by YouTube to create a school-appropriate experience for using YouTube in the classroom."

Do you understand that?

A    Yes.

Q    All right.  I'd like you to first help us out with some of the basics.

In terms of efforts by YouTube to create a school-appropriate experience, is there a team within YouTube that has been responsible for that over the years?

MS. HARDIN:  Objection to form.

A    No, there has not been a specific team at YouTube that has been tasked with creating a school-specific version of YouTube.

BY MS. SCULLION:

Q    Are there folks from multiple teams

Page 34

YouTube in the classroom.

I want to ask the witness that question.

BY MS. SCULLION:

Q    So was YouTube for Schools, as of 2015, one aspect of -- of efforts by YouTube to create a school-appropriate experience for using YouTube in the classroom?

MS. HARDIN:  Objection to form.

A    It is my -- it is my understanding that managed restricted mode launched in 2015 and that prior to 2015, there had been an effort called YouTube for Schools, which was a selection of videos that were chosen that would be appropriate for educators.

And managed restricted mode was to -- was the -- was the solution that was to replace that.

BY MS. SCULLION:

Q    Okay.  And do you know whether YouTube for Schools was deprecated in 2016?

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Okay.  You -- you just don't know either way?

Page 42

But if you understand that in your personal capacity, you may answer.

BY MS. SCULLION:

Q    I don't want to ask you in your personal capacity.

I'm -- I'm -- I'm just asking as far as background for how students use YouTube to -- to further their learning journeys, which is topic A2.

MS. SCULLION:  Is it still your position it's outside the topic to ask these questions?

MS. HARDIN:  I -- the -- the scope of topic two is -- is how a user might use YouTube to further a learning journey.

I don't believe how a particular account is set up or what the exact domain is, is -- is necessarily within the scope of that.

MS. SCULLION:  Right.

BY MS. SCULLION:

Q    So I'm trying -- what I'm trying to understand are the various ways in which students -- again, K through 12 students in fact use YouTube, first of all, just in the classroom.

Page 43

So for students who are at schools that do use the Google Workspace for Education, if the administrator has enabled YouTube as an additional service for -- for students, are students able to access YouTube using a -- a school-based account?

MS. HARDIN:  Objection to form.

You may answer.

A     If -- when a school adopts the Google Workspace for Education suite of tools, all of their students within that school network will have a -- a school-specific log-in for that Workspace for Education account.

Once they have that log-in, they have access to all of the core services of the Google Workspace for Education suite.  Within that there are, as we, mentioned classroom, slides, docs.

There is a video embed player, the Player for Education, which allows teachers to assign videos, single videos, that they want to use within any of those different core services, so within -- if they want to assign a video within Google Classroom, if they want to assign it to be watched in -- in their lesson plan or as homework.  That would be one way that a student would be able to access YouTube video.

Page 44

They can't go further than that video. It's only the video that the teacher assigns. There are no links back to YouTube and there are no recommendations or no ads, and there are no cookies. If a -- so that is -- that is one way.

The additional way would be if the school when they create their Google Workspace for Education suite and accepts the terms of service, they can choose to enable additional services. YouTube is one of those additional services, but it's off by default.

If they choose to turn it on, then they would set the level of access that they want students within their network to have, and then students would have access to YouTube based on -- on their determination.

Although, if they do set it on, they are required to get parental consent for that -- each student's usage of those additional services, and that's true for all additional services outside of the core suite.

BY MS. SCULLION:

Q    Okay.  So thanks.  That -- there's a lot there and we'll come back to it.

But there also are schools that are not

Page 45

using Google Workspace for Education though that still allow teachers and students to use YouTube as part of the classroom experience; correct?

A       Yes.

Q       Okay.

          MS. HARDIN:  Objection.

          MS. SCULLION:  Okay.

          MS. HARDIN:  Sorry, objection to form.

          Just give me a second to get my objection in.

BY MS. SCULLION:

Q       Okay.  And so you started to talk about some of the more granular ways in which YouTube is used in the classroom.  I just want to sort of walk through those.

          So let's first talk about, sort of, like, physical classroom, which I think we just need to clarify at this point in time; right.

          So physical classroom, you could have a teacher showing a YouTube video to the class; right?

          MS. HARDIN:  Objection to form.

A       Yes.

BY MS. SCULLION:

Q       Okay.  And they could be doing that by

Page 51

the class a YouTube video; correct?

A     Yes.

Q     Okay.  Teachers can use a YouTube video as part of a flipped classroom experience; correct?

MS. HARDIN:  Objection to form.

A     Yes.

BY MS. SCULLION:

Q     All right.

A     They can assign a video to be watched outside of the classroom.

Q     They can also assign a video to be watched inside the classroom; correct?

A     Yes.

Q     Okay.  And you also mentioned that there can be YouTube videos embedded in, you call it, now Player for Edu- -- using Player for Education; correct?

A     Yes.

Q     Okay.

A     That is how a teacher would assign -- if a teacher were to assign a video as homework in a lesson plan, whether it was inside the classroom or outside the classroom, they would assign it through Google Classroom as an embedded video, which again, through the Player for Education means it is that

Page 52

video and that video only, which is a -- which is a cookieless, ads-free experience with no links back to YouTube. That is the preferred method for teachers to assign videos.

Q    And can you remind me, when was Player for Education launched?

A    The Player for Education was launched in 2020. And prior to that, there was also a cookieless, ads-free embed player as part of the Google Workspace for Education suite for embedded videos that would be delivered through Google Classroom. It just was not available broadly outside of the Google Workspace for Education suite.

When we saw the demand for video during the pandemic with 1.4 to 1.7 billion children outside of physical classrooms and learning online, we began a project internally to look at how we could create a -- an ads-free, cookieless video embed player that could be used broadly.

Q    So I -- I -- I appreciate the answer.

Just going to -- if you could just answer just the questions I -- I ask, it's going to be a little easier. Because I asked just when it was launched.

So launched in 2020, that's Player for

Page 53

Education.

What the prior embed player -- did that have a name?

MS. HARDIN: Objection to form.

A We have -- we have referred to it as the cookieless player. I think it has had other names, but none of them were -- none of them were publicly used, so it has used a number of different names.

BY MS. SCULLION:

Q Okay. We'll -- we'll refer to that's the cookieless player for today; is that good?

A Cookieless player.

Q Okay. And the -- the cookieless player, that could be embedded into, for example, Google Slides; right?

A The -- the -- the -- the previous embed player could be used within Google products, yes.

Q Including Google Slides, for example?

A Yes.

Q Okay. Okay. And just going back again to looking through the list of the ways in which students can use YouTube as part of the classroom, you mentioned that YouTube videos can also be embedded in third-party platforms; correct?

MS. HARDIN: Objection to form.

Page 54

A    Yes.

BY MS. SCULLION:

Q    All right.  And another way that students can use YouTube in the classroom is by creating YouTube videos; correct?

MS. HARDIN:  Objection to form. Lack of foundation.

A    If an -- if an administrator sets access to YouTube as an additional service within -- within their Google Workspace for Education account, they can set the mode and make that available if that is something that they choose for -- for end users to be able to determine -- teachers, if -- if students can create videos.

But as a -- but that -- that's set at the administrator level.  As part of the default as an under-18 user, no, students can't create and upload videos.

BY MS. SCULLION:

Q    But they -- but they can if the school gives them the --

A    If the school --

Q    -- access; correct?

MS. HARDIN:  Go ahead.

A    If a -- if a school -- if a school sets

Page 55

teachers as -- as administrators to allow approving of videos.

BY MS. SCULLION:

Q    Okay.  And students can also, or at least could at some point, upload videos and share them on YouTube within the classroom; correct?

MS. HARDIN:  Objection to form.

A    No, not within the core services of -- of YouTube -- of Google Workspace for Education.

If YouTube was enabled as an additional service and the permissions were set that teachers assigned videos for students create -- to create, but that would have been done at -- at a school administrator level.

That's not a part of the suite of tools that are available to schools by default.

BY MS. SCULLION:

Q    And students can also use YouTube in the classroom, again, if -- if given access, by themselves searching on YouTube and watching the videos; right?

MS. HARDIN:  Objection to form.

A    If a school decides to turn on access to YouTube as an additional service, then they can set -- it's on by default then for accounts that are

Page 56

designated as under 18.  With that, there are a number of restrictions that are in place for under-18 accounts.

And then the administrator would set the level of access that they wanted those students to have.  And had they done that, made those decisions and then gotten parental consent, a student would have the ability to use YouTube as a supplemental tool to search on their own.

BY MS. SCULLION:

Q    And for schools that aren't using Google Workspace for Education, those students could just go in and search on YouTube as part of the classroom experience; correct?

A    The managed --

MS. HARDIN:  Objection to form. Lack of foundation.

A    The managed restricted mode controls are available at the -- at the domain level even outside of Google Workspace for Education.

So a network -- so a school network administrator could set managed restricted mode at their domain network level regardless of whether they were a Google Workspace for Education user.

Page 60

"effective."  I don't know how we would measure that.

We don't have access to -- we don't have access to who is using the video, how they are using the video, we don't know which students are using videos within the Player for Education, we don't know which teachers are assigning it, and we don't know what their outcomes are afterwards.

So -- so I -- I don't have any measurement of -- of efficacy.  I have directional guidance from teachers that they value YouTube in the classroom.

BY MS. SCULLION:

Q    Okay.  So just make sure I understand what you are saying.

Has YouTube done anything to actually measure the effectiveness of YouTube used in the classroom to improve students' learning, actually measured it?

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Okay.  So does YouTube have any data that shows YouTube -- use of YouTube by K through 12 students results in better grades?

Page 61

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Does it have any data to show that use of YouTube by K through 12 students results in better test scores?

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Does it have any data to show that the use of YouTube by K through 12 students results in better graduation rates?

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Does it have any data that shows that the use of YouTube by K through 12 students improves their reading skills?

MS. HARDIN:  Objection to form.

A    No.

BY MS. SCULLION:

Q    Does it have any data that shows that the use of YouTube by K through 12 students improves their math skills?

MS. HARDIN:  Objection to form.

Page 63

not asking you questions in your personal capacity.

And we disagree as to your interpretation of -- of the topic.

If we are talking about YouTube's efforts, it's -- surely, part of that is looking at or not looking at the effectiveness of -- of those efforts. I mean, I just -- I don't see how that's not fairly part of the efforts.

MS. HARDIN: I -- I'm not sure how --

MS. SCULLION: Okay.

MS. HARDIN: -- we are going to bridge the gap.

MS. SCULLION: Okay.

MS. HARDIN: But that's my -- that's my objection. It's been noted for the record.

We'll take it, as we will the whole day, question by question.

MS. SCULLION: Okay.

BY MS. SCULLION:

Q    Ms. Kurtz, are YouTube's efforts with respect to its work on use of YouTube in classrooms,

Page 64

are they guided in part by YouTube's understanding of the effectiveness of its efforts?

MS. HARDIN:  Objection to form.

A    The -- we don't measure -- we don't -- we don't measure the -- we don't measure the effectiveness.

We measure -- we -- what we look for are signals of user intent and desire.  So we know that teachers really value YouTube video.  We've heard that for many, many years.

We saw, particularly in the pandemic, a very significant increase in the usage of learning content, specifically academic content.

We understand that users on the platform are seeking academic content for a number of concepts that would be considered academic concepts within, sort of, core curriculum standards and our -- our entire platform is a user-driven platform.

So what we look at is user intent and satisfaction with the content that we have and then ways to further and make consumption of that content easier and more effective.

So insofar as we are looking at how teachers are engaging with YouTube content, we are

Page 65

trying to make it easier for them to do it.

And one of the things that we heard is that teachers wanted to be able to show YouTube video even if their school had made the determination that they wanted to block assess to YouTube --

BY MS. SCULLION:

Q    Okay.

A    -- which led to the building of a player that would allow teachers to embed videos within learning tools and platforms without having broad access to YouTube.

Q    Okay.  And in terms of signals of intent and desire, is actual watch time one of those signals?

MS. HARDIN:  Objection to form.

A    Watch time is a signal, as well as search queries is a signal.

BY MS. SCULLION:

Q    Okay.  Okay.  And can you explain -- I'm sorry, so watch time, this is a phrase used within YouTube to literally indicate number of -- of hours or amount of time spent, I should say, watching YouTube videos; correct?

MS. HARDIN:  Objection to form.

Page 126

Thanks.

There you go.

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 8, Document Titled "YouTube Edu Opportunities in 2016," Bates-Labeled GOOG-3047MDL-04734419 through -4422, was marked for identification.)

BY MS. SCULLION:

Q     Ms. Kurtz, we've handed you what's been marked as Exhibit Number 8, which is Bates-stamped -- I'm just going to read the -- the final numbers for the Bates stamp -- -04734419 through -4422.

Do you have that document in front of you?

A     Yes.

Q     Have you seen Exhibit 8 before?

A     No.

Q     Let's look at Exhibit Number 8.

Do you see Exhibit Number 8 is entitled "YouTube Edu Opportunities in 2016"; correct?

A     Yes.

Q     And if you look in the upper right-hand corner, you can see that it's dated September 17th,

Page 127

2015; do you see that?

A    Yes.

Q    And in the first para- -- so first of all, is the format of Exhibit 8 something you are familiar with within YouTube?

MS. HARDIN:  Objection to form.

A    It -- it looks like a -- like a doc, like a Google Doc.

BY MS. SCULLION:

Q    Okay.  So looking at the first paragraph at the top of the first page, it states, So far, our -- it says -- YT Edu efforts have focused on unblocking the HTTPS rollout and turning down YT4S; do you see that?

A    Yes.

Q    Do you understand that YT Edu refers to YouTube Edu?

A    Yes.

MS. HARDIN:  Objection to form.

BY MS. SCULLION:

Q    And that the reference to YT4S is a reference to YouTube for Schools?

A    I'm -- I'm unfamiliar with that abbreviation.  I -- I will --

Q    Are you familiar with the use of the --

the number four to stand in for the word "for"?

MS. HARDIN:  Objection to form.

A     Yes.

BY MS. SCULLION:

Q     And in terms of YouTube's education opportunities, one of the things that had done in 2015 was to deprecate or turn down YouTube for Schools; correct?

MS. HARDIN:  Objection to form.

A     I -- I -- I'm not familiar with that -- with that acronym as it's written, but I -- am I -- I am aware of -- of that effort.

BY MS. SCULLION:

Q     Okay.  And then the next heading on this page says, The opportunity in education.

Do you see that?

A     Yes.

Q     And the document then goes on to describe some stats -- some statistics with respect to Google and education; do you see that?

A     Yes.

Q     Some statistics with respect to the percentage of schools that were filtering video content; do you see that?

MS. HARDIN:  Objection to form.

Page 129

A    Yes.

BY MS. SCULLION:

Q    Third bullet -- yeah, third bullet point discusses a survey done by YouTube with respect to filtering in the classroom; correct?

A    Yes.

Q    And there's a bullet about the use of, it says, Dasher MRM; do you see that?

A    Yes.

Q    And "MRM," that stands for managed restricted mode; correct?

A    Yes.

Q    And do you understand that a dasher refers to a dasher account?

A    I do.

Q    Okay.  And am I correct that a dasher account is an account through a -- strike that.

What's a -- what's a dasher account?

A    A dasher account is an account that is set up as a Google for Workspace -- a Google for Workspace in Education account that would be a user account.

Q    You said it much better than I did. Thank you so much.

Okay.  And then the last bullet point

says, During the school year, there's an 80 million watch time hour/day difference between Thursday and Saturday.

Do you see that?

A     Yes.

Q     And it goes on to say, Increasing usage in schools, it says, M through F -- that's Monday through Friday; right?

A     Yes.

Q     -- could decrease this gap.

That's what it says; right?

A     Yes.

Q     Okay.  So in terms of this 80 million watch time hour/day gap, do you see the chart on the right-hand side of the page?

A     Yes.

Q     And that's -- if you look in the upper right-hand part of that chart, it's showing the data that illustrates that 80 million hour/day watch time gap; correct?

MS. HARDIN:  Objection to form.

A     Yes.

BY MS. SCULLION:

Q     And so going back to that bullet point discussing the 80 million watch time hour a day

Page 131

difference, the document is -- is saying that --
right -- that if you look on Saturdays, you see
YouTube usage is much higher than it is Monday
through Friday; correct?

MS. HARDIN:  Objection to form.

A     Yes.

BY MS. SCULLION:

Q     Okay.  And, again, this document is
referring to this as a, quote, opportunity in
education; correct?

MS. HARDIN:  Objection to form.
Foundation.  Mischaracterizes the
document.

You may answer.

A     It -- it says, Opportunities in 2016,
yes.

BY MS. SCULLION:

Q     Well, it says -- there's also that
heading in the middle of the page --

A     Oh, yes.

Q     -- before this whole analysis that says,
The opportunity in education; right?

MS. HARDIN:  Same objections.

A     Yes.

Page 132

BY MS. SCULLION:

Q    Okay.  And then if you go to the next heading on the page, the proposal, the pitch, right, is to invest in dasher MRM to meet this hour per day opportunity; correct?

MS. HARDIN:  Objection to form.  Foundation.  Mischaracterizes the document.

A    Yes.

BY MS. SCULLION:

Q    Okay.  And then the document goes -- goes on in that first paragraph under the heading, "Pitch," to explain:  We launched very basic filtering options, but we're not meeting school's needs.

Do you see that?

A    Yes.

Q    And that's referring to when managed restricted mode was launched in 2015, it was only providing very basic filtering options for schools; correct?

MS. HARDIN:  Objection to form.  Foundation.  Mischaracterizes the document.

A    According to the authors of this

document, they -- they described the filtering options as very basic.

BY MS. SCULLION:

Q    Okay.  Do you know who ████████████ is with respect to YouTube?

A    No.

Q    Okay.  So in describing the opportunity for YouTube Edu in 2016, the author is at least in part referring to an opportunity to decrease this 80 million watch time hour a day difference between Thursday and Saturday; correct?

MS. HARDIN:  Objection to form.  And foundation.

A    That -- that is what the document's author is proposing.

BY MS. SCULLION:

Q    Okay.

A    Or putting forward as an opportunity, I should say.

Q    Okay.  And if you go to the next page of the exhibit, and there's a heading that says at the top, Build out existing MRM feature set; do you see that?

A    Yes.

Q    And so just want to understand, there's,

Page 148

Q    So move to strike.

So the -- the question is just that YouTube -- you've testified YouTube is part of the Google ecosystem; yes?

MS. HARDIN:  Objection to motion to strike.

A    I mean, actually, I'd -- I'd like to -- I'd like to amend that to say that -- that YouTube is a part of the Alphabet ecosystem, as Alphabet is our -- is a -- is the parent company of Google and I understood you were using those interchangeably.

BY MS. SCULLION:

Q    Okay.  So it's fair to say that if onboarding kids into the Google ecosystem leads to brand trust and loyalty over their lifetime, one way to onboard kids into that ecosystem is through use of YouTube in schools; right?

MS. HARDIN:  Objection to form.  And foundation.

A    One -- one opportunity for users to interact with Google products is through YouTube.

BY MS. SCULLION:

Q    Okay.  Including using YouTube in -- in the classroom; right?

MS. HARDIN:  Objection to form.  And

Page 149

foundation.

A    Using YouTube -- using YouTube in a classroom is one of the ways that young people will experience YouTube -- or could experience YouTube, I should say.

BY MS. SCULLION:

Q    Okay.  And it's one of the ways that they could then interact with the -- the Google ecosystem, through YouTube; right?

MS. HARDIN:  Objection to form.  And foundation.

A    It is one of the ways that they could interact with YouTube within the context of a Google product.  And I -- and I -- and I can't characterize the onboarding as it's one of the touch points that -- that one might have.

BY MS. SCULLION:

Q    Okay.  And, in fact, this document goes on to explain in the first bullet point that investing in schools helps onboard kids into the -- into the Google's ecosystem; right?

MS. HARDIN:  Same objection as -- as to the scope based on questions about this document that don't relate to YouTube.

Page 156

BY MS. SCULLION:

Q    Okay.  So -- so the answer is yes, that kids were using Chromebooks in part to watch YouTube in -- in the classroom; right?

MS. HARDIN:  Objection to form.  And misstates the testimony.

A    No.  My -- my testimony -- my testimony is that insofar as YouTube videos are a part of what is assigned and a -- and a student is doing, depending on what device they would be using, that is the device and -- and the method by which they would access YouTube.

BY MS. SCULLION:

Q    Uh-huh.

A    If that school is a school that uses Chromebooks, then when a student has an assignment to interact with YouTube, that would happen through that Chromebook.

Q    Right.  They would use the Chromebook -- if -- if they had a Chromebook assigned to them and they were assigned to watch a YouTube video, they would use the Chromebook to watch the video; right?

MS. HARDIN:  Objection to form.

A    It's not my understanding that the Chromebook is a vehicle to do anything other than

Page 157

the delivery of the lesson plan, whatever that lesson plan is.

BY MS. SCULLION:

Q    I -- I -- I -- I don't understand why this is so hard.

One of the things that kids could do in the classroom on Chromebooks is watch a YouTube video if it was assigned to them as part of their classwork; correct?

MS. HARDIN:  Objection to form.  And it's argumentative.

MS. SCULLION:  It is not argumentative.  It's a purely factual question.

BY MS. SCULLION:

Q    Can you answer the question as YouTube's corporate representative here today?

MS. HARDIN:  The question is vague. And objection to the form.

MS. SCULLION:  It is -- it is -- no.

BY MS. SCULLION:

Q    You can answer the question.  It's a very simple, factual question.

A    I believe I've answered that question.

Q    No, respectfully, you have not.

Page 158

Are you able to answer the question I've asked?

MS. HARDIN: Objection to the form.

A    I believe that I have answered that question and the framing as the -- I cannot accept the framing of the question as the sole purpose of using YouTube is not what a school's Chromebook -- the device is a facilitator of whatever the school is assigning the students to do regardless of the device that it is.

BY MS. SCULLION:

Q    Right. Didn't say it was -- it was solely for use for YouTube.

But if a student was assigned to watch a YouTube video and they have been given a school-issued Chromebook, one of the things they would be doing on that Chromebook was watching the assigned videos; right? That's it.

MS. HARDIN: Objection to form.

A    If a teacher assigns their student or their class YouTube videos to watch and the school has given those students Chromebooks, they would watch that YouTube video on the school-issued Chromebook.

Page 162

that we removed from the Player for Education to remove any -- any possibility of distraction.

BY MS. SCULLION:

Q    And that wasn't until 2020; is that right?

A    The -- the Player for Education launched in 2020.

Q    Okay.  Even after the Player for Education launched in -- in 2020 --

A    2022, my apologies.

Q    Thank you.

A    2022.

Q    And I'm -- I'm glad you clarified that because I -- I had understood it was 2022.  You said 2020, so I went with it.

Okay.  So just to be clear, when did Player for Education launch?

A    The Player for Education launched publicly in 2022.

Q    Okay.  So -- but before Player for Education launched, students watching YouTube videos in class would sometimes see ads; correct?

MS. HARDIN:  Objection to form.

A    Students watching YouTube within the Google Workspace for Education suite would have

Page 163

experienced ads if YouTube had been turned on as an
additional service.

There was a cookieless, ads-free embed
player within the Google Workspace for Education
suite prior to the Player for Education that did not
have ads.

BY MS. SCULLION:

Q    Okay.  But to the extent that they were
just watching it outside of the embed before --
and -- and outside of Player for Education, they
would see ads; right?

MS. HARDIN:  Objection to form.

A    If a school had -- had chosen to turn on
access to YouTube for their students, then those
students would have experienced ads.

BY MS. SCULLION:

Q    Okay.  Another persistent complaint that
YouTube received from schools was concern about
inappropriate content for kids on YouTube; right?

MS. HARDIN:  Objection to form.

A    One of the complaints that teachers would
have would be around, I would say, level
appropriateness of content.

And as one of the controls within managed
restricted mode, administrators can determine the

Page 164

level of access that they want to have based on content ratings.

So there is strict restricted mode, there is moderate restricted mode.  Strict restricted mode would be limited to content that was rated approximately for ages to nine.  And moderate restricted would be for content rated approximately for users up to 13.

BY MS. SCULLION:

Q    I'm going to hand you --

MS. SCULLION:  Can we have exhibit 27, please?

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 27, Slide Deck, Bates-Labeled GOOG-3047MDL-01614173, was marked for identification.)

BY MS. SCULLION:

Q    I'm going to hand you what has been marked as Exhibit Number 27.

And you'll see that we have put some tabs on there.  I'm only going to be asking you about the -- the tabbed portions of -- of the document.  It is otherwise a lengthy document.

So, Ms. Kurtz, looking at Exhibit 27,

Page 166

need to read every single page, but she does need to generally familiarize herself with the document.

MS. SCULLION:  We can take this one document at a time, but if it really gets to be excessive, we are going to have to do something about this.

MS. HARDIN:  There's no question pending.

THE WITNESS:  Huh?

MS. HARDIN:  I don't think there's a question pending.

THE WITNESS:  Okay.  It's just -- looks like there ARE multiple documents within this document, but I don't know for sure.

Okay.

BY MS. SCULLION:

Q    Okay?

A    (The witness nods head.)

Q    Ms. Kurtz, you've had a chance to look through the document?

A    Yes.

Q    Okay.  So, again, looking at the second page of the document, which is up here on the screen

Page 167

entitled "Agenda," do you see the second bullet point says it concerns learning at YouTube?

A     Yes.

Q     Okay.  If you'll go to the -- what should be the first tab in the document for you, and that's page 13.

Do you see this document -- this page describes a snapshot of learning at YouTube today?

A     Yes.

Q     Okay.  If you go to the next page, please, the document describes the many challenges with using YouTube for learning; do you see that?

A     Yes.

Q     Okay.  And on the right side, do you see the two boxes -- well, the first at the top says that one of the challenges was hard to discover content.

Do you see that?

A     Yes.

Q     And describes that the -- that was because it was disorganized and unclear video quality/credibility; correct?

A     Yes.

Q     And -- and as it states here, leaving users with -- with the question which of these will

Page 168

best help me learn; right?

A     Yes.

Q     Okay.  And then the box below that says the -- another major challenge -- another challenge of using YouTube for learning was hard to stay engaged.

Do you see that?

A     Yes.

Q     And explains that, as first, YouTube too good at distraction; right?

A     Yes.

Q     Okay.  And also weak episodic organization; do you see that?

A     Yes.

Q     And describes, you know, the experience as, quote, hard to do my homework when I could be watching Will Ferrell; right?

A     Yes.

Q     Okay.  And -- and that's in reference to on the middle of the screen, you see the snapshot of -- of YouTube right there?

A     Yes.

Q     And in the main screen, it looks like there's meant to be a video with respect to some multiplication learning; do you see that?

Page 169

A    Yes.

Q    But on the right side --

A    It's a Khan Academy video.

(Whereupon, the court reporter requests clarification.)

A    Sorry, I just said it's a Khan Academy video.

BY MS. SCULLION:

Q    Okay.  A Khan Academy video describing multiplication; correct?

A    Algebra.  Linear equations.

Q    Okay.  I apologize, yeah, my -- my brain read "X" as multiplication.  That was -- okay.  Yes, algebra.  Thank you.

And the right side next to the video display window, what is that column?  Is that the "watch next" column?

MS. HARDIN:  Objection to form.

A    Yes.  Those are recommendations.

BY MS. SCULLION:

Q    Okay.  Those are recommendations that are -- that YouTube is making to the user; right?

A    Yes.

Q    So in this instance, user watching the Khan Academy video on algebra linear equations is

getting the recommendations from YouTube on the right side; correct?

MS. HARDIN:  Objection to form.

Lacks foundation.

A     Yes.

BY MS. SCULLION:

Q     And one of those recommendations is a video entitled "Will Ferrell Hilarious Acceptance Speech At The... cocksandballs123."

Do you see that?

A     Yes.

Q     And that's what the comment on the right side of the page is referring to in terms of, "hard to do my homework when I could be watching Will Ferrell"; right?

MS. HARDIN:  Objection to form.

A     Just to clarify, as I understand it though, this is all the use case of individual users learning on YouTube.

And the -- and the feedback that we've gotten from those users learning on YouTube as a platform is not what I thought we were talking about as student complaints or feedback that we had heard about distractions within classroom settings as the default experience of YouTube as an assigned video

within an embed situation.  And anything above and beyond that would be turned on by the school's choice.

This -- this feedback here is specifically feedback that we've gotten from the self-directed learning experience on the platform that is not limited to student feedback, it's just user feedback.

We don't -- I don't -- I just wanted to clarify that this is -- this is user feedback on YouTube main outside of the school setting.

BY MS. SCULLION:

Q    Well, we'll come back to whether this also is experienced in the -- in the school setting; okay?

So underneath the -- sorry, in the bottom half of the same page, again there's bullet points describing the various challenges with using YouTube for learning; do you see that?

A    Yes.

Q    Okay.  And the third bullet point down says, trustworthiness; do you see that?

A    Yes.

Q    And that's describing an inability to check how legitimate the source is; right?

Page 189

complaining because managed restricted mode still let kids upload highly inappropriate content to YouTube; right?

MS. HARDIN:  Objection to the form. Objection to the lawyer testimony.  And objection that that lawyer testimony misstates the document and the witness' prior testimony.

MS. SCULLION:  Well, we'll -- we'll look at the documents that -- that discuss this.

BY MS. SCULLION:

Q    So when managed restricted mode was launched, if a school administrator chose even strict restricted YouTube access and students were then accessing YouTube, that strict restricted corpus, they still were redeliv- -- were going to be delivered targeted ads to the extent that they weren't watching through the -- through the embedded player; right?

MS. HARDIN:  Objection to form. Lack of foundation.

A    YouTube ads for accounts 18 and under are not personalized ads.  So insofar as a student is accessing YouTube as part of an additional service

Page 190

that has been turned on, they will have ads and they will have all of the limitations of an under-18 user account unless a school --

BY MS. SCULLION:

Q    Okay.

A    -- has changed that status, which is set to default under 18 to over 18.

Q    Got it.

A    Under-18 accounts do not have personalized ads.

Q    So I misspoke by saying targeted, and I apologize for that.  I did not mean to.

So to the extent that a school administrator chose even strict restricted mode, the students using YouTube not in the embedded player would still be seeing ads; correct?

MS. HARDIN:  Objection to form.

A    If the student was using -- was using the sanctioned use of YouTube within a school setting in a self-directed mode or directed to go to YouTube, they would experience ads if it were not embedded within another service.

BY MS. SCULLION:

Q    And even in strict restricted mode outside of an embedded player, would students still

Page 191

be getting recommendations for additional videos from YouTube?

MS. HARDIN:  Objection to form.

Excuse me.

A    If students are accessing YouTube outside of being assigned a video in an embedded solution or surface, then they would have access to YouTube with the features of YouTube that include recommendations.

BY MS. SCULLION:

Q    Okay.  And...

(Whereupon, there was a discussion off the record.)

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 44, Slide Deck Titled, "Product: The Case for YouTube in Schools Via GSuite for EDU," Bates-Labeled GOOG-3047MDL-03233306, was marked for identification.)

MS. SCULLION:  Yeah, okay.  Let me hand you what's been marked as Exhibit 44.

BY MS. SCULLION:

Q    Ms. Kurtz, we've handed you what's been

Page 192

marked as Exhibit No. 44 and the document is Bates-stamped -0323306 in the bottom right-hand corner.

And, again, I'm only going to ask you, I can tell you, about three pages in the document.

But just to orient you to the document, if you look at the very last page, you should see something that says document slip sheet.

Do you see that?

A    Yes.

Q    Okay.  So I'll represent to you that the document slip sheet is produced and printed out based on the metadata for the document that Google and YouTube provided to us when they produce the document to us.

And one of the things that the metadata tells us, if you look in the middle of the slip sheet, is the create date and the last modified date for the document.

Do you see those two entries?

A    Yes.

Q    And I'm just pointing out to you that there is a date on here of September 25th, 2018, both for the create date and for the last modified date, just to orient you to the document; okay?

Page 193

A    Yes.

Q    Okay.  Great.  So if you go to the second page of the document, you see that the document is entitled "Product:  The Case for YouTube in Schools Via GSuite for EDU."

Do you see that?

A    Yes.

Q    Okay.  And if you go to the fourth page of the document, you'll see a box entitled "Why this matters."

Do you see that?

A    Yes.

Q    And in describing why it matters, first, there's at the top of the page a discussion about, it's the right thing to do for our users and partners; do you see that?

A    Yes.

Q    Okay.  And the partners that are referenced there are the content creators; correct?

MS. HARDIN:  Objection to form.

BY MS. SCULLION:

Q    Do you see where it says under "Partners," schools are a top priority for content creators?

A    Yes.

Page 194

Q      Okay.  And then the second half of the document discussing why this matters is -- discusses the larger business context; right?

MS. HARDIN:  Objection to form.

A      Yes.

BY MS. SCULLION:

Q      And within the larger business context, if you look at the last bullet point, one aspect of that was seeing this as an opportunity.

Do you see that?

MS. HARDIN:  Objection to form.

Mischaracterizes the document.

A      Yes.

BY MS. SCULLION:

Q      And within the opportunity, the opportunities included the first bullet point which says, Robust paid content market for edu content delivery; right?

MS. HARDIN:  Objection to form.

A      Yes.

BY MS. SCULLION:

Q      The second bullet point says, Pipeline of future users; do you see that?

A      Yes.

Q      Okay.  And remember, we had looked at

another document that referenced that same idea

about introducing folks into the Google ecosystem

and building future users; do you recall that?

MS. HARDIN:  Objection to form.  And

lack of foundation.

A     I do.

BY MS. SCULLION:

Q     Okay.  And then it also says there's an

opportunity here for pipeline of future creators as

well; correct?

A     Yes.

Q     All right.  Now, if you go to the next

page of Exhibit 44, it discusses an understanding of

the problem in schools.

Do you see that?

A     Yes.

Q     And the problem being addressed here as

described in the -- in the first bullet point is

with respect to whether students are allowed to

use -- whether teachers -- sorry -- and students are

allowed to use YouTube in school; right?

MS. HARDIN:  Objection to form.

A     That -- that is what this slide says.

BY MS. SCULLION:

Q     Okay.

Page 249

Bates stamp -- is Bates-stamped -05491766.ecm through -05491769.ecm.

And -- sorry, strike that.

So do you see -- have Exhibit 63 in front of you?

A    Yes.

Q    Okay.  And have you seen Exhibit 63 before?

A    Not that I am aware of.

Q    Okay.  If you look on the first page of Exhibit 63, you see that it says in the first line, "Update," and it lists the date of July 12th; do you see that?

A    I see that, yes.

Q    Okay.  And then about halfway down that same first page, do you see that it indicates that the last significant update for this one-pager was July 10th, 2023?

A    Yes.

Q    Okay.  And, again, if you look at the metadata slip sheet, you can see the create and last modified date are both in July of 2023; do you see that?

A    Yes.

Q    Okay.  And if you go to the last page of

Page 250

Exhibit 63, you see there's a paragraph number two, which begins with, Is it -- is this worth our time to fix?

Do you see that?

A    Yes.

Q    And in that discussion, in the third sentence, the document states, MRN -- MRM tends to be trivially easy for students to bypass if they clear cookies, sign out, open an incognito tab, or switch devices; do you see that?

A    Yes, I see that.

Q    And, again, MRM, that stands for managed restricted mode; right?

A    Yes.

Q    So these were known ways that students could bypass managed restricted mode; correct?

MS. HARDIN:  Objection to form.

Lacks foundation.

A    As -- as I understand -- and I have not read this document closely and have not seen it before -- but as I understand it, this would be referring specifically to MRM when it would be used outside of the Google Workspace for Education suite as a network setting that a network -- that any network administrator would set for their browsers,

Page 251

whether they are in a school setting or a workspace setting, there is -- there are network controls; MRM is one of those.

So I -- I -- as my understanding of looking at this briefly, this would be referring to MRM at a network level for a user outside of the Google Workspace for Education who had not deployed a third-party website blocker or one of the -- one of the commonly available tools that are called lockdown browser tools.

BY MS. SCULLION:

Q    Okay.  So if a school was not using Google Workspace for Education but was using managed restricted mode, your understanding is that this document is speaking to that kind of circumstance; correct?

MS. HARDIN:  Objection to form. Misstates the testimony.

MS. SCULLION:  I can -- I can -- I can just withdraw and -- and restate it.

BY MS. SCULLION:

Q    You testified earlier that schools can use managed restricted mode even if they are not using Google Workspace for Education; correct?

A    Yes.

Page 252

Q    Okay.  And in terms of the ability to bypass managed restricted mode as discussed on the last page of this document, your understanding is this is speaking to ways that students could bypass managed restricted mode if their school was using managed restricted mode outside of the Google Workspace for Education; is that right?

MS. HARDIN:  Objection to form.

A    This is a rather dense document with a lot of very technical things in it.

It is my cursory understanding that since it doesn't appear to reference Google Workspace for Education anywhere that I can see, that -- that it may be referring to that -- to that use case.

BY MS. SCULLION:

Q    Okay.  And according to this document, in -- in that use case it is trivially easy for students to bypass the managed restricted mode restrictions; correct?

MS. HARDIN:  Objection to form. Foundation.  Misstates testimony.

A    According to this document in 2023, a loophole and workaround was discovered where managed restricted mode could be signed -- could be bypassed if a network advisor had not deployed any additional

Page 253

lockdown browser tools, is what I believe this document is referring to.

BY MS. SCULLION:

Q    Do you know whether YouTube has taken any steps to inform school administrators of -- I think you used the term "loophole" -- of this loophole in managed restricted mode when it's used outside of Google Workspace for Education?

MS. HARDIN:  Objection to form. Foundation.  Mischaracterizes the document.

A    I -- I -- I'd like to state that this -- that this claimed that students are finding so-called loopholes.

But as I stated before, YouTube doesn't have a -- a promotional path or direct communication with schools broadly and we do have publicly available web pages around directions for network administrators around how to set up and configure their YouTube access.

In addition, there are many third-party browser -- lockdown browser tools that are used within a multitude of settings that can also determine what browsers have access to set at the administrator level.

Page 254

BY MS. SCULLION:

Q    Right.  So, Ms. Kurtz, but if a school administrator, let's say, in a small school district, doesn't have a lot of resources, deployed managed restricted mode after it was rolled out in 2017, they are not using Google Workspace for Education, but they have taken on this managed restricted mode.

You are saying it would be up to them to go back and -- and look at updated documentation to see that, oh, there's this loophole and here's how you fix it?  That's what you're saying?

MS. HARDIN:  Objection to form.
Foundation.  And misstates the document and the prior testimony.

A    Insofar as any school is allowing access to any online materials for their students, it -- it would be the school's network administrator to determine the best way to -- to allow that access to their students.

And so publicly available documents are updated routinely and when bugs are found, they are fixed.

But any school that is -- that is using online materials and directing their students to

Page 255

online materials has a network administrator that decides how best to deliver and set those.

BY MS. SCULLION:

Q    Does YouTube even put out, like, a press release saying, Hey, school administrators, network administrators, you should be aware that there's this loophole and go look at the documentation to see how to fix it?  Does it even do that?

MS. HARDIN:  Objection to form. Foundation.  Assumes facts not in evidence.  Misstates the documents and the prior testimony.

A    Again, if there were -- if there is -- if there is a bug, it is the -- it would be the -- the thing that we would do routinely is to understand bugs and to address bugs and to fix bugs.

And, again, not -- not fully understanding exactly what has happened in this situation, it would be my understanding that a network administrator would be aware of the tools available to them to determine the level of access that they want students on their network to have, given all of the publicly available tools there are, to create lockdown browsers.

In addition to which, we have publicly

Page 256

available web pages that are designed specifically for network administrators to determine how to do that.

BY MS. SCULLION:

Q    So it's -- it's on them to go -- go find the fact that there's this loophole and that they need to fix it; is that right?

MS. HARDIN:  Objection to form. Asked and answered.  Argumentative.

BY MS. SCULLION:

Q    You can answer.

A    I -- I -- I believe that I have answered.

Q    Okay.

MS. SCULLION:  Let's take a quick break so we can see if we can get close to done.

THE VIDEOGRAPHER:  Time right now is 4:20 p.m.  We are off the record.

(Whereupon, there was a recess taken from 4:20 p.m. to 4:40 p.m.)

THE VIDEOGRAPHER:  Time right now is 4:40 p.m.  We are back on the record.

MS. SCULLION:  Welcome back, Ms. Kurtz --

THE VIDEOGRAPHER:  Counsel, your

Page 262

And if you go to the -- should be the first tab in your document, which is page -9014, and you see that this page is entitled "Managed Restricted Mode (MRM)"; do you see that?

A     Yes.

Q     Okay.  And going to the comments at the bottom of the slide it says, MRM has been historically under-resourced.

Do you see that?

A     I do.

Q     And it explains, in terms of under-resourced it says, about 0.5 PM from G Suite; do you see that?

A     I do.

Q     And my understanding, that -- is that means about a half-time product manager from Google Workplace for Education; is that right?

MS. HARDIN:  Objection to form.

BY MS. SCULLION:

Q     Workspace for Education, I apologize.

MS. HARDIN:  Lack of foundation.

A     Yes, that -- that is what that would refer to.

BY MS. SCULLION:

Q     Okay.  And --

Page 263

A       Approximately half-time for a product manager.

Q       Thank you.

And then it goes on to explain 20 percent time from YouTube; do you see that?

A       Yes.

Q       And the slide then explains that this historical under-resourcing of MRN [sic] -- I'm looking at the end of the sentence -- has led to increasingly common user issues and emerging business risks; do you see that?

A       Yes.

Q       All right.  And let's go to the next page of the exhibit where the slide explains at the top, The YouTube experience in G Suite is broken; do you see that?

MS. HARDIN:  Objection to form.

A       I do.

BY MS. SCULLION:

Q       Okay.  And, in fact, if you turn to the next page of the exhibit, it continues again with a slide describing the YouTube experience in G Suite is broken.

Do you see that?

MS. HARDIN:  Objection to form.

Page 282

BY MS. SCULLION:

Q    So the question, again, is factually, when YouTube is providing information to administrators to decide whether to keep YouTube default off or turn it on, to seek parental consent, to not, does YouTube include words in information it provides administrators that says, Please be aware that the use of YouTube by your students may have negative impacts on their health?

MS. HARDIN:    Same objections.

A    We do not provide information around harms we don't see.

We see within school settings that teachers and students are finding the YouTube content valuable and we give schools the information that.  They need to decide what they believe is going to be best within their setting, within their school, for individual students.

Because YouTube is not a part of core services, it's an additional service, they have to make that choice.  They have to do so based on what they believe is best for their school and they then have the ability and authority and decision-making to decide how best to do that at the various levels, ensuring that they also get the consent of parents

Page 283

along the way.

BY MS. SCULLION:

Q     Now, do you think that YouTube should have told school administrators that one of the things YouTube aspired to with respect to its app was that the app should be addictive?

MS. HARDIN:  Objection to form. Foundation.  And outside the scope of the notice.

BY MS. SCULLION:

Q     Well, in terms of the scope of the notice, in terms of -- of a warning -- whether YouTube should provide a warning, you've said that YouTube doesn't think it should provide information about harms that don't exist.

That was your testimony; right?

MS. HARDIN:  Objection to form.

BY MS. SCULLION:

Q     Right?

That was your testimony earlier?

MS. HARDIN:  Same objection.

A     My -- my -- my testimony -- again, I think this has been asked and answered.

My testimony was that within school settings, we understand that YouTube is a valuable

Page 345

MS. HARDIN:  Objection to form.

Hold on one second.

In a school?

MS. SCULLION:  Yeah.

MS. HARDIN:  Objection to form.

A    The -- the parental consent is a component of the Google Workspace for Education. I'm not aware of how that works in managed restricted mode --

BY MS. SCULLION:

Q    Okay.  Thanks.

A    -- outside of the Google Workspace for Education suite.

Q    You also testified that Google provides a suggested form of disclosure for schools to use when seeking parental consent; is that right?

A    Yes.

Q    Okay.  And in the suggested form of disclosure that Google provides to schools, does that form say anything one way or the other about what the health literature indicates concerning wellness factors that are effected -- affected, sorry -- that are affected by digital video watching?

MS. HARDIN:  Objection to form.  And

Page 346

foundation.  And assumes facts not in evidence.

A    The parental consent template form that is given to schools as a resource for them, should they decide to use it, is not required.  It also includes language about what is included based on what the school has decided to include.

It does not include any information about any potential harms that we don't believe exist within the appropriate use of YouTube within a school setting.

BY MS. SCULLION:

Q    Does it include any information about any potential harms with respect to the use of YouTube within a school setting?

MS. HARDIN:  Objection to form. Foundation.  Vague.

BY MS. SCULLION:

Q    And to be clear, I'm asking because you qualified it as any potential harms that we don't believe exist.

And I'm just asking, more completely: Does it include any information about any potential harms within the appropriate -- sorry -- that exist within -- for the use of YouTube within a school

Page 347

setting?

MS. HARDIN:  Same objections.

A    It doesn't include any information about harms that we don't believe are there.  And we understand YouTube to be valuable to teachers and students.

BY MS. SCULLION:

Q    Okay.  So just to be super clear, does the suggested disclosure form include any information at all about whether YouTube is or is not potentially addictive to students?

MS. HARDIN:  Objection to form. Foundation.  Assumes facts not in evidence.  Asked and answered.

A    I -- I do believe that I've answered that question.  And I -- I can't accept the premise of the question.

The -- the parental consent form is about the use of YouTube video as determined by the school at the level that they determine it to be and it is a -- a notification to parents about that use case.

BY MS. SCULLION:

Q    Okay.  And if I understand correctly, it's YouTube's position that it does not believe that the risk of addiction exists with respect to

Page 348

students' use of YouTube in a school setting and, therefore, does not include any information about any such risks in its suggested disclosure form; is that right?

MS. HARDIN:  One second.

Objection to the form.

You may answer the question.

A    We don't provide any warnings about harms that we don't believe exist.

BY MS. SCULLION:

Q    Okay.  Do you provide any warnings about harms that you do believe exist?

MS. HARDIN:  Objection to form.

Foundation.

A    We don't believe that the use of YouTube is in -- by students in classroom settings is inherently harmful.

BY MS. SCULLION:

Q    Okay.  So there's -- so then there's no disc- -- no -- no disclosure of any risks of -- of harm in the suggested disclosure; correct?

MS. HARDIN:  Objection to form.

Foundation.  Asked and answered.

A    I want to just clarify that it's not suggested language.  It is -- it is offered language

Page 349

as a template.

Schools are free to use any language that they want and would actually have to customize that template since all of the decisions that they choose to make are -- are blank based on what it is that they've decided to do.

BY MS. SCULLION:

Q   So I -- so -- so understood.  In this template that's provided for schools to decide what they are going to do or not do with it, are there words in there at all that disclose any risk of harm at all from use -- sorry -- for students using YouTube in school setting?

MS. HARDIN:  Objection to form.  Foundation.  Asked and answered.

A   I -- I believe that I have answered that question, that the --

BY MS. SCULLION:

Q   Okay.

A   -- that the -- that the language that is offered as a service to the school, should they choose to use it, describes the level of -- of access to YouTube that the school has chosen to enable.

Q   Okay.  Does the word "addiction" appear

in the template that Google provides to schools for potential use and --- and disclosure?

MS. HARDIN:  Objection to form.  And foundation.

A    No.

BY MS. SCULLION:

Q    Okay.  Does reference to sleep deprivation appear in the template that Google provides to schools?

MS. HARDIN:  Objection to form.  And foundation.

A    No.

BY MS. SCULLION:

Q    Does social isolation appear in the template that Google provides to schools?

MS. HARDIN:  Objection to form.  And foundation.

A    No.

BY MS. SCULLION:

Q    Is there any discussion of cognitive impairments in the template that Google provides to schools?

MS. HARDIN:  Objection to form.  And foundation.

A    No, because it isn't our understanding

Page 351

that the things that you are referencing that -- that YouTube video when used by teachers is an additive experience to students and their -- and their understanding of materials, which is why teachers value it as much as they do.

MS. SCULLION:  Okay.  Can we mark Exhibit 102, please?

(Whereupon, Exhibit Google/YouTube-Kurtz 30(b)(6) - 102, Slide Deck Entitled "Literature Review: Effects of Watching Digital Videos on Viewer Well-Being," Dated April 2018, Bates-Labeled GOOG-3047MDL-00874191, was marked for identification.)

BY MS. SCULLION:

Q    Ms. Kurtz, I've handed you what's been marked as Exhibit 102, which is Bates-stamped -874191.

And, again, we have placed tabs in here to indicate the pages that we intend to ask you about.

Have you seen Exhibit 102 before?

MS. HARDIN:  Ms. Scullion, object. This is outside of the scope of the

Page 358

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of New York, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn, and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to any of the parties to said suit, nor am I an employee of any party to said suit, nor of any counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 10th day of April, 2025.

_____

Clifford Edwards

New York Notary ID Number:   01ED6430906

Notary commission expires:   3/28/2026