# AMENDED Exhibit 766

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 443

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


------------------------------x

IN RE: SOCIAL MEDIA ADOLESCENT ) Case No. 4:22-md-

ADDICTION/PERSONAL INJURY      ) 3047-YGR

PRODUCTS LIABILITY LITIGATION  ) MDL No. 3047

------------------------------x


CONTAINS HIGHLY CONFIDENTIAL INFORMATION


V O L U M E  II

VIDEOTAPED DEPOSITION OF JAMES BESER

PALO ALTO, CALIFORNIA

APRIL 3, 2025

9:21 A.M.


Job No.: 7224255

Pages: 443 - 819

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Page 444

Videotaped deposition of JAMES BESER, VOLUME II, held at the offices of:

WILSON SONSINI GOODRICH & ROSATI, LLP

650 Page Mill Road

Palo Alto, California 94304-1001

Pursuant to notice, before Leslie Anne Todd, California Certified Shorthand Reporter in and for the State of California, who officiated in administering the oath to the witness.

HIGHLY CONFIDENTIAL

Page 445

A P P E A R A N C E S

ON BEHALF OF JCCP PLAINTIFFS:

GLENN DRAPER, ESQUIRE

SOCIAL MEDIA VICTIMS' LAW CENTER

Seattle, Washington

(800) 687-1855


AN V. TRUONG, ESQUIRE

REILLY DUNNE, ESQUIRE

ELLYN HURD, ESQUIRE (via Zoom)

SIMMONS HANLY & CONROY

112 Madison Avenue, 7th Floor

New York, New York 10016-7416

(866) 347-4322


ON BEHALF OF THE MDL PLAINTIFFS:

AUDREY SIEGEL, ESQUIRE

SEEGER WEISS LLP

55 Challenger Road

Ridgefield Park, New Jersey 07660

(973) 639-9100

HIGHLY CONFIDENTIAL

Page 446

APPEARANCES (Continued):

ON BEHALF OF GOOGLE LLC and YOUTUBE, LLC
DEFENDANTS:

NEELUM WADHWANI, ESQUIRE

LYDIA WEIANT, ESQUIRE (via Zoom)

WILLIAMS & CONNOLLY LLC

680 Maine Avenue, SW

Washington, DC 20024

(202) 434-5547


ANDREW KRAMER, ESQUIRE

SAVANNAH GRANT, ESQUIRE

CHRIS CHIOU, ESQUIRE

SAMANTHA ALEXANDRIA-BOOTH MACHOCK, ESQUIRE

    (via Zoom)

WILSON SONSINI GOODRICH & ROSATI, LLP

650 Page Mill Road

Palo Alto, California 94304-1001

(650) 849-3182

HIGHLY CONFIDENTIAL

Page 447

APPEARANCES (Continued):


ON BEHALF OF THE TIKTOK DEFENDANTS:

KEVIN J. WHITE, ESQUIRE (via Zoom)

GIBSON DUNN & CRUTCHER, LLP

310 University Avenue

Palo Alto, California 94301-1744

(650) 849-5300


ON BEHALF OF THE META DEFENDANTS:

HANNAH T. SANCHEZ, ESQUIRE (via Zoom)

LAURIE HENRY, ESQUIRE (via Zoom)

SHOOK HARDY & BACON, LLP

2555 Grand Boulevard

Kansas City, Missouri 64108

(816) 474-6550


ON BEHALF OF SNAP INC.:

KAYSIE GONZALEZ, ESQUIRE (via Zoom)

PRISCILA CORONADO, ESQUIRE (via Zoom)

MUNGER, TOLLES & OLSON, LLP

350 South Grand Avenue, 50th Floor

Los Angeles, California 90071-3426

(213) 683-9100

HIGHLY CONFIDENTIAL

APPEARANCES (Continued):

ALSO PRESENT:

    DENISHA BACCHUS, ESQUIRE (In-house Google)

    RAVEN NORRIS, ESQUIRE (In-house Google)

    MARISSA URBAN, ESQUIRE (In-house YouTube)

      (via Zoom)

    JEROME MITCHELL (via Zoom)

    JAMES VONWIEGEN, Videographer

    JIM LOPEZ, Trial Technician

HIGHLY CONFIDENTIAL

Page 455

P R O C E E D I N G S

- - - - - - - - - - - - - - - - - -

THE VIDEOGRAPHER:  We are now on the record.  Today's date is April 3rd, 2025.

This is a continuation of James Beser's dep in the Social Media Adolescent Addiction/Personal Injury Products Liability Litigation.  The time is 9:21 a.m.

The court reporter is Leslie Todd, California CSR 5129, who will now swear in the witness.

JAMES BESER,
and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. SIEGEL:

Q.    Good morning, Mr. Beser.  I hope you had a pleasant evening last night.

A.    Good morning.  You too.

Q.    Okay.  So we'll go ahead and get started.  First, just sort of as a recordkeeping issue, yesterday my colleague introduced one of your performance reviews

HIGHLY CONFIDENTIAL

Page 456

that was produced by counsel as part of your personnel file.

MS. SIEGEL:  I'm going to go ahead and mark as the next exhibit, which is Exhibit 39, the remainder of what was produced.

(YouTube Beser Exhibit No. 39 was marked for identification.)

THE WITNESS:  All right.

BY MS. SIEGEL:

Q.    If you could just take a look at that and confirm that those look like your performance reviews.

MS. WADHWANI:  There's a document here that does not appear --

MS. SIEGEL:  Yeah, thank you. I agree, this does not look like part of your performance.

MS. WADHWANI:  All right.  So take a moment to look through that carefully, kind of shuffle through each of those documents to make sure that it reflects your performance reviews.

MS. SIEGEL:  We're not going to

HIGHLY CONFIDENTIAL

Page 462

schools if it's accessed by students on their phones.  Is that true?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I am aware that users -- sorry, students can bring up their device and -- and access non-school related material on their device.

BY MS. SIEGEL:

Q.    Including YouTube?

A.    I would assume including YouTube.

Q.    Are you aware of any concerns from teachers or school administrators that the use of YouTube by kids before or during school can lead to issues with learning?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I am aware of some of that feedback.

MS. SIEGEL:  Okay.  Can we mark as the next exhibit, which will be Exhibit 40, Bates number 01640828.

(YouTube Beser Exhibit No. 40 was

Page 463

marked for identification.)

THE WITNESS:  Thank you.

BY MS. SIEGEL:

Q.    Okay.  And I will direct you to the first e-mail in time.  And it says: "Dear families:  I just want to touch base about a conversation I had about screen time with kids.  I know I mentioned this at back-to-school night, and it's something my children's TK teacher and K teachers addressed with me.  But if it is at all possible to limit children's screen time before school, that would be beneficial."

Do you see that?

A.    I do.

Q.    Do you recall this e-mail?

A.    I do recall this e-mail.

Q.    What was the context of this e-mail?

A.    This e-mail was from my, I believe, son's teacher to -- to the class, and I was on that e-mail.

Q.    Okay.  And then it says on -- in the second paragraph, it says:  "Not in the article - teachers are struggling widely

HIGHLY CONFIDENTIAL

Page 464

with an increase of fine motor issues in their classrooms and children that struggle with impulse control and instant gratification, and there's much talk among us about how the increase with these things is tied to the increase in iPad/iPhone use."

Do you see that?

A.    Yes.

Q.    Did this concern you that -- that your son's principal was concerned about the use of YouTube and screens prior to the start of school?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Just to correct you quickly, this was my son's kindergarten teacher.

BY MS. SIEGEL:

Q.    I apologize.

A.    That's okay.

And, yeah, I thought it was some feedback.  We get lots of feedback from lots of places.  I remember Ms. ██████████, she's a delightful woman, and I wanted to take that feedback seriously, as we always do

HIGHLY CONFIDENTIAL

Page 465

when we hear such things.

As you can see, I forwarded it along to the team, and there's some discussion here about where the proper team to address such an issue might be.  As you can see from ████  ███████████ , we should check on -- he refers to the Unicorn team here, which is the device level supervision team at Google, not at YouTube, which I agreed at the time was the right place to address some of the concerns raised in the e-mail.

Q.    Sure.  So in short, in response to this e-mail, you did ask to see if there was something -- sorry.  Strike that.

Can you -- your response actually says -- when you forward it, it says:  "FYI - we could think about doing something different by day part at some point."  Right?

A.    Yeah.  If I put "FYI" in front of it, it's, Here's an initial hot take, and, you know, the team should think more deeply about it.

Q.    Sure.  And if you look at Raj

HIGHLY CONFIDENTIAL

Page 466

Iyengar's response at the top --

A.    Okay.

Q.    -- it says:  "I actually discussed this with" -- I can't pronounce that name.

A.    ███████.

Q.    "I actually discussed this with ████████ earlier this week, in the context of potentially revamping the timer."

And then it says:  "55 percent of Unicorn accounts have no time issue schedules set typically for bedtime cutoff."

So it looks like over half of the Unicorn users were using the feature of a time -- time cutoff, and that 35 percent had daily usage limits.

Do you see that?

A.    I do see that.

Q.    So it looks like Mr. Iyengar agreed that it might be a good idea to set particular time limits on the use of YouTube. Is that fair?

MS. WADHWANI:  Objection to form.

And just so the record is clear

HIGHLY CONFIDENTIAL

Page 467

for the court reporter, the statement in the question, "So it looks like over half the Unicorn users were using a feature of a time cutoff" was not in the document itself.  Ms. Siegel was reading it and inserting something.

So I just want to make sure we have the quotes in the right place about what the document says versus your question.

THE WITNESS:  Yeah, let me read that bullet.

"55 percent of Unicorn accounts," right.  So Raj is relaying back to the team what he learned from the Unicorn team about the Unicorn timer, which is the right place for such limits to exist, at the device level.

BY MS. SIEGEL:

Q.    Okay.  Who is ███████ ██████████?

A.    ██████ ███████████ was my eng partner on the YouTube team up until like '22, '23.

HIGHLY CONFIDENTIAL

Page 468

Q.    And it looks like that suggestion was to check the usage on Unicorn timers to see if it's worthwhile doing something similar, right?  So the idea being -- well, right.  That's what it says?

MS. WADHWANI:  Objection to form.

THE WITNESS:  The sentence is ambiguous.  We should really check the usage on Unicorn timers to see if it's worthwhile doing something similar.  I actually don't know if he's referring to Unicorn doing more or YouTube. Either way, when we look at this problem and we get feedback like this and we think about it, every time we think about it the proper and most impactful place would be to have a parent control at the device level.

Q.    Did you express any -- did you express to anyone on the Unicorn team that you thought it would make sense to create a timer by time of day?

A.    So Raj mentions he discussed this with ███████.  I don't know the nature

HIGHLY CONFIDENTIAL

Page 469

of that conversation.

Q.    Is ████████ on the Unicorn team?

A.    He was at the time.

Q.    Okay.  And did you -- since 2018, have there been any further discussions or conversations at YouTube about creating a time of day parent- -- parental control?

A.    We talk about all kinds of ideas and, you know, look at all the options available that are reasonable to address feedback and make the product better.  And whenever we come to this issue of timers, it's a tricky thing as just one app on a phone or one website in the web.  Right.

So device level continues to be the best use of a parent control for something like this.  Parents are busy, parents have a lot coming at them, and it makes the most sense to give them the choices that are the most meaningful.  And at Google, that would mean in this context a timer -- potentially a timer at the device level.

Q.    You work with the Unicorn team for other parental control settings, right?  Fair to say?

HIGHLY CONFIDENTIAL

Page 470

A.    Yes.

Q.    Okay.  And so in your conversations with the Unicorn team on other parental controls, have you raised the possibility of doing a time-of-day setting?

A.    I don't recall exactly if I raised it, but I do know that the Unicorn team has launched a school time feature.  I don't know if -- exactly the details of that feature, but I would assume that they were hearing this feedback from a lot of places.

Q.    Okay.  Great.

Is the -- is the school time feature that you just discussed, was that launched at the end of last year in August of 2024, on or around?

A.    That sounds about right.

Q.    Or at least it was announced in August 2024?

A.    Sounds about right.

Q.    Okay.  I'll mark for you as the next exhibit, Exhibit 41, which is a printout from Google's web page.

A.    Okay.

(YouTube Beser Exhibit No. 41 was

HIGHLY CONFIDENTIAL

Page 471

marked for identification.)

BY MS. SIEGEL:

Q.    And if you look on the second page, it says:  "We regularly engage with parents when designing products and often hear from parents who do not want their children distracted at school, but still want to be able to get in touch in case of emergency."

Do you see that?

A.    I do see that.

Q.    Do you have any idea why it was not until recently that that product was launched?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I don't know all the inputs to the decision for the Unicorn team on this topic.

BY MS. SIEGEL:

Q.    Okay.  Are you aware of whether -- or rather, strike that.

Have you seen complaints dating back to 2020 for requests for an app control timer in Family Link?

HIGHLY CONFIDENTIAL

Page 472

A.      That does not ring a bell, but Family Link, I believe since launch, does allow parents to set app level blocks and I believe times -- time usage per day.

Q.      And just to be clear, can you explain what Family Link is versus YouTube controls?

A.      Of course.  Family Link is the service by Google that is a set of parental controls focused on helping parents manage their child's Android device usage.  So it has rules in place about what apps the kid is able to download.  It has filters for websites, things like that, timers.  You know, the device has a, you know, allowable usage at the device level, right.

And then per app, such as YouTube or YouTube Kids, you can go in and set -- they have a pretty sophisticated calendaring feature where you can pick day of week, time of day, sort of allow device time on/off controls.

MS. SIEGEL:  Okay.  Let's go ahead and mark as the next exhibit Bates number 01804303, and that's

HIGHLY CONFIDENTIAL

Page 476

any of those discussions.

MS. SIEGEL:  Let's go to the next exhibit, which is going to, be for the record, 00252982.  And this is exhibit --

MS. WADHWANI:  Oops, sorry. Sorry.

MS. SIEGEL:  -- Exhibit 43.

(YouTube Beser Exhibit No. 43 was marked for identification.)

THE WITNESS:  Okay.

BY MS. SIEGEL:

Q.    And this is another document that was produced in your custodial file, it likes like, as part of the Unicorn Dog Food discussion group.  Is that fair?

A.    Can I get acquainted with the document, please?

Q.    Yeah.

A.    (Peruses document.)  Okay.

Q.    Okay.  And so here, this is a request -- or this -- if you look at the first e-mail in time, it says:  "My son was using his phone around 2:30 p.m., and I revised bedtimes to be 10:00 p.m. to

Page 477

p.m. during school days."

A.    I do see that.

Q.    And so basically that -- that is an indication that the bedtime limitation -- strike that -- that individuals are interested in using the bedtime time setting to apply to schools as well.  Is that fair?

MS. WADHWANI:  Objection to form, foundation --

THE WITNESS:  It sounds --

MS. WADHWANI:  -- calls for speculation.

Go ahead.

THE WITNESS:  Yeah, it sounds like ▇ is interested in that.  I don't know if that's a user request that they saw at scale.

BY MS. SIEGEL:

Q.    Okay.  And then if you look at an e-mail March 3rd, 2021, ▇ ▇ replies: "I have the same problem.  Bedtime configured from 6:30 to 4:00 p.m., so when homework is done and I want to open things up 30 minutes early, I have to poke at the bonus time

Page 478

button" --

I'll stop there.

A.     Mm-hmm.

Q.     But is that person expressing that they're similarly having to use the bedtime feature in order to lock apps during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I mean just reading what ███ wrote, it sounds like she's describing a similar use as ██████.

BY MS. SIEGEL:

Q.     Okay.  And is this -- do you recall in 2021 whether there were any conversations at either YouTube or with the Unicorn team to create a time of day use restriction at this point?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Yeah, I don't recall.

MS. SIEGEL:  Okay.  We'll mark the next exhibit, which is Exhibit 44.

HIGHLY CONFIDENTIAL

Page 479

And for the record, this is -- this is Bates numbered 01804655.

(YouTube Beser Exhibit No. 44 was marked for identification.)

BY MS. SIEGEL:

Q.    Okay.  And there is another -- this is another e-mail, right, to the Unicorn Dog Food discussion, and it has a third person, ████ ████, who says:  "I am also using bedtime to keep device locked during the day, 7:15 to 4:00 p.m. the next day."

Do you see that?

A.    I see that.

Q.    And so that's at least three Dog Fooders who mentioned that they were needing to use time control apps awkwardly or inappropriately in order to lock the children from using their devices at school or certain apps at school.  Is that fair?

MS. WADHWANI:  Objection to form, foundation, mischaracterizes the document.

THE WITNESS:  I'm just reading what ████ wrote.  He's using bedtime to keep device locked during the day

Page 480

7:15 to 4:00 p.m. the next day.  He believes that is not the intended use case.  That's what he wrote.

BY MS. SIEGEL:

Q.    Okay, great.

MS. SIEGEL:  Let's go to the next exhibit, which is going to be 01805840.

(YouTube Beser Exhibit No. 45 was marked for identification.)

BY MS. SIEGEL:

Q.    And this is another e-mail approximately eight months later, later in November of 2021, that was sent to the Dog Food -- the Unicorn Dog Food discussion group.

And if you go to the second page of the e-mail, which is 5841, the third -- what's marked number 3, it says: "Another idea is location-based controls so can prohibit use of certain apps in places like school or other classes."

Do you see that?

A.    I do.

Q.    Okay.  And then if you go to

Page 481

the first page -- well, okay.

And if you go about midway down -- or actually, strike that.

So is this a third person -- yet another person who's sort of expressing that they would like to be able to limit the use of certain apps at school?

MS. WADHWANI:  Objection to form, foundation, mischaracterizes the document.

THE WITNESS:  Yeah, I mean I would have to familiarize myself with the whole e-mail.  It's quite lengthy.

But the thing you pointed out is, you know, Google or parents musing about different ways to improve Family Link controls.

BY MS. SIEGEL:

Q.    Okay.  We can -- you can put that aside, and we can move to the -- well, this idea was to use a -- strike that.

This idea that was presented here was to use a location-based setting in order to block the device.  Is that fair?

MS. WADHWANI:  Objection to

HIGHLY CONFIDENTIAL

Page 482

form.

THE WITNESS:  That's what the e-mail has suggested.

BY MS. SIEGEL:

Q.    Right.  And so is YouTube or Google actually either able to determine the location where the app is opened or YouTube is being used?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  So I don't work on location signals.  I can't really speak to what we can and cannot do.  I know that location is a complicated area with lots of privacy concerns and different levels of technical ability, like precise location versus other things.  And that's as much as I really know about that issue.

MS. SIEGEL:  Let's go ahead and mark as the next exhibit, Exhibit 46.  And this is an e-mail Bates numbered 01641974 and is dated June 22nd, 2018.

(YouTube Beser Exhibit No. 46 was marked for identification.)

HIGHLY CONFIDENTIAL

Page 490

an under 13 on YouTube, we take immediate steps to remove that account.

BY MS. SIEGEL:

Q.    So, yes, YouTube is aware that users under the age of 13 access YouTube main without adult supervision?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I -- I can't know whether the adult is there or not. YouTube cannot know if the adult is there or not.  When we learn of unsupervised under-13 usage on YouTube, we take immediate and appropriate steps to remove that account.

BY MS. SIEGEL:

Q.    Is your testimony -- strike that.

Do you believe that the majority of under 13 -- let's introduce the next exhibit.

Is one of the ways that -- that underage users, meaning users under the age

HIGHLY CONFIDENTIAL

Page 491

of 13, access the user -- the YouTube platform, by using a platform without logging in?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So, by definition, we don't know much about the user when they're using signed out.

BY MS. SIEGEL:

Q.    Is that a "yes"?

MS. WADHWANI:  Objection to form, asked and answered.

THE WITNESS:  I'm saying when a user is signed out, there is less we know about the user.  So we don't know.

BY MS. SIEGEL:

Q.    And some of those users you believe are under the age of 13?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So YouTube signed out is very easy to access, and it's very likely that some of those users

HIGHLY CONFIDENTIAL

Page 492

are under 13.  Whether they're being supervised by a parent or not is discouraged, and when we do learn that an underage user is accessing YouTube unsupervised, we take immediate and appropriate action to terminate.

MS. SIEGEL:  Let's enter the next exhibit.  Can you get for me Bates number 01735688.

BY MS. SIEGEL:

Q.    Before we enter that, you mentioned earlier that when YouTube detects an underage account, that they ask for age verification.  Is that correct?  I may be paraphrasing.

MS. WADHWANI:  Objection to form, mischaracterizes the testimony.

THE WITNESS:  Would you mind repeating the question?

BY MS. SIEGEL:

Q.    Sure.  You mentioned earlier that YouTube does have a process for detecting U13 accounts; is that right?

A.    We do.  For instance, if we can detect an under 13 or a probably -- or

HIGHLY CONFIDENTIAL

Page 493

probabilistically under 13 user in a video, for instance, and we do not -- and there's policy on this, right -- and we do not detect or believe there is adult supervising, it will go to an age verification flow.

Q.    How -- strike that.

How does YouTube detect an under 13 account?  Is that by reviewing videos?

A.    So I have only surface level knowledge of the process.  ███  ████  ██ ████████  ████████  █████  ██████  ███████  ██████  ██  █████  ██████  █████████  ███  █████  ██.  I don't know all the things that go into that.

But then I do know that ███  ████ ██████  ██  ██  ███  ████████  █ ██████  ███████  ████████  ███  ███  ███  ███ ██████  ████  ██  ██  ███  ████████  ██  █ ██████  ███  ██  █  █████████  ███  ████████ ██████  ███  ██  ███  ████████████  ██ ██████  ██  ███  ██████  ██████████  ██ ████████

Q.    Do you know if those signals are limited to ████  ████████; in other words, based on ████████ versus what -- the individual watches?

Page 550

change."

Does that indicate that -- that it was anticipated that under 13 users would be identified and that that would have a negative impact on other products?

MS. WADHWANI: Objection to form, foundation, mischaracterizes the document.

THE WITNESS: The document -- all I know is what the document says. It doesn't get into those details.

BY MS. SIEGEL:

Q. Sure. No problem. You can put that aside.

A. Okay.

Q. We'll go to the next exhibit, which is 1608369.

All right. We'll -- we'll skip that one for now.

All right. Let's go to the next exhibit which is tab 17, 1607593.

(YouTube Beser Exhibit No. 53 was marked for identification.)

THE WITNESS: Thank you.

MS. WADHWANI: Mr. Beser needs

HIGHLY CONFIDENTIAL

Page 551

the exhibit copy.

MS. SIEGEL:  Of course.

BY MS. SIEGEL:

Q.    All right.  This is an e-mail from -- from yourself to a group of individuals.  And you can take a second and read the e-mail.  It's not that long.

A.    (Peruses document.)  Okay.

Q.    Okay.  And it looks like here we are -- we are -- you guys were -- strike that.

It looks like here there was a discussion about how to promote Red to YouTube Kids users; is that right?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So I didn't read every word, but from what I can tell, it's trying to promote YouTube Red, which is now YouTube Premium, which was launching for the families -- to the parents, who would be the ones to actually purchase a premium subscription.

BY MS. SIEGEL:

HIGHLY CONFIDENTIAL

Page 552

Q.      Okay.  And about three-quarters down the page, there's an e-mail from ██████ ██████ , who says:  "Why don't we target all users who consume our kids content on YT?" Right?

A.      That's what it says.

Q.      And then you respond that: "Most of the technical capabilities exist."

Do you see that?

MS. WADHWANI:  Objection to form, mischaracterizes the document.

Go ahead.

BY MS. SIEGEL:

Q.      Oh, ████ ██████.

A.      Yeah, ████ ██████ said that.

MS. WADHWANI:  My prior objection stands.

THE WITNESS:  So I see ████ ██████ says that, yeah.

BY MS. SIEGEL:

Q.      Okay.  And so do you have any -- any reason to dispute ████ ██████'s statement that most of the technical capabilities exist to target users who consume kids content?

HIGHLY CONFIDENTIAL

Page 553

A.    I'm sorry.  I'm just reading it a little -- I don't really know what he means.  It's a little word salady.

Q.    Do you know if one of the reasons that YouTube has avoided using its age inference models to detect users under 13 is to avoid potential COPPA penalties?

MS. WADHWANI:  Objection to form, foundation, argumentative.

THE WITNESS:  So that's sort of unrelated to this document, actually.

BY MS. SIEGEL:

Q.    Sure.

A.    Okay.  Age assurance is technically challenging.  Building age inference models accurately is something that's -- that has evolved a lot over time, gotten a lot better.

The -- building that accurately for under 18 is hard.  Building for under 13 is thought to be very, very hard, and unproven.  I can't think of a successful signal that has launched in the area of inferring under 13s.

For instance, we know that

HIGHLY CONFIDENTIAL

Page 554

parents co-watch with their kids a lot.  And so are you -- you know, just because you watch Peppa Pig doesn't mean that you're an unsupervised child on YouTube.  Right?

Q.    Would YouTube know if a user had watched Peppa Pig and a series of other -- strike that.

What if a user's history was exclusively Peppa Pig and had no other adult content, would that indicate that the user was more likely to be a child?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I haven't looked at that problem to know.  It's very hard to know, right, if they're using a parent's device, if the parent just isn't a YouTube user.  There could be lots of reasons that an all Peppa Pig watched stream might still be the parent account and be watched with the parent.

BY MS. SIEGEL:

Q.    Okay. Let's -- let's move on. We're going to talk about now digital

A.    I'm sorry, which bullet is this?

Q.    Number II -- well, it's Roman numeral II.

A.    It's number II?  I see.  "Asks that go beyond what is required by U.S. law." Yes.

Q.    Does YouTube only respond to -- sorry, strike that.

Is YouTube's aim to be -- to do no better than what is required by law?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Absolutely not. We are very user focused in how we approach the area of families, and the YouTube Kids app is obviously under that remit.

In fact, if you go to Crosswalk, which we talked about earlier, that was narrowly focused on children's privacy and data usage, but in fact, in our response to that, we went further and not only depersonalized ads for Crosswalk or

Page 676

"made for kids" videos, but also made a lot of investment, and continue to, in the areas of safety and quality to the recommendations.

So we are incredibly and very proudly user first and principled in our approach. And this is a document specifically addressing a letter from lawmakers, and therefore, I believe that is why they are focused on U.S. law in this document.

BY MS. SIEGEL:

Q. Is that why YouTube determined to turn default protective measures on for all -- all 18 users, whether inferred or declared in the U -- in the EU where it was required, but not in the U.S. where it was not required?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I do not believe that is accurate. You're referring to our response to AADC in the European union where we did a number of changes to our default settings. At the same

HIGHLY CONFIDENTIAL

Page 677

time we rolled out many of those changes to global-declared teens as well.

BY MS. SIEGEL:

Q.      Right.  But for global-declared teens, the defaults were rolled out only for declared 18.  Correct?

A.      When we know that it's a teen, we intervene.

Q.      And in the EU, those default measures are applied to users who are either declared or inferred 18.  Is that correct?

A.      That is correct.  In the EU, they had a specific law that, you know, inferred teen --

First, let me talk about that. That is a probabilistic assertion of a user. It is not known that they are a teen.  And it was a law -- obviously, we will be compliant with the law in the regions where we operate, and therefore we made that change.

But age assurance was early and the signal quality has improved a lot.  It wasn't something that we felt comfortable rolling out in other markets.  There's a lot

Page 678

that goes into that.

So, you know, there's a lot of downsides to doing age inference. Again, it's a probabilistic signal. It gets it wrong a lot. So it could be very disruptive for, for instance parents, who are co-watching with their kids. If we get it wrong, it would be very annoying for a parent to suddenly have their Android device disabled because their kid was using their phone. Right.

So there are tradeoffs, and the technology was early, right. And so, you know, we've been -- it was something we had to do to adhere to the law, but the technology was very early and made a lot of mistakes. Stuff like that is reasons that went into the decision to restrict to declared teens globally.

Q. When you say that their Android device would be disabled, I thought that the digital wellbeing tools were things like turning off autoplay, turning on digital wellbeing reminders.

Is there a part of the AADC

HIGHLY CONFIDENTIAL

Page 679

that would automatically turn off or disable an Android phone?

A.    Well, it's not a direct -- it's not about the law.  It's about the implementation of inference.  It is a probabilistic signal.  It is not perfect, and it wasn't -- was more imperfect at the time.

You can see that in the numbers.  You know, I don't recall exactly what they were, but it made a lot of mistakes, and there's downsides to those mistakes that are very disruptive for users.  Of course, you know, it's up to lawmakers to create laws however they see fit for their, you know, constituencies, and if they made it a law, then those downsides for users aren't really our choice.

Q.    Have they made it -- strike that.

YouTube recently announced that it was expanding its -- strike that.

YouTube recently announced that it would use age inference globally, including in the United States, for things like digital wellbeing features being turned

HIGHLY CONFIDENTIAL

Page 680

on by default.  True?

A.    I believe what we said was that we are looking to expand age inference to the U.S.  The technology has improved a lot. Things like ChatGBT, like these machine learning systems have gotten a lot more sophisticated.  Right.  You can do a lot more today.  I think everyone who's used, you know, an LLM can sort of see that in practice.

And what we announced was that we believe the -- well, we didn't say it this way.  But, you know, the signal is now ready for rollout in the broader set of places, such as in the U.S.  I do not believe that we have said specifically what we would do once we infer a teen outside of the European Union.

Q.    I appreciate that clarification.

At the time or recently, has there been legislation proposed in the United States requiring YouTube to use an inferred age?

MS. WADHWANI:  Objection to

HIGHLY CONFIDENTIAL

Page 816

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:   April 6, 2025.

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)