**AMENDED Exhibit 909**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-

ADOLESCENT ADDICTION/              YGR MDL No.

PERSONAL INJURY PRODUCTS           3047

LIABILITY LITIGATION

_____

This Document Relates to:

ALL ACTIONS

_____


VIDEOTAPED DEPOSITION OF

BILL SAPHIR

HIGHLY CONFIDENTIAL

Tuesday, March 25, 2025

SAN FRANCISCO, CALIFORNIA


Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

HIGHLY CONFIDENTIAL

Page 2

VIDEOTAPED DEPOSITION OF BILL SAPHIR

BE IT REMEMBERED that on Tuesday, March 25, 2025, commencing at the hour of 9:08 a.m. thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared BILL SAPHIR, a witness in the above-entitled court and cause, who, being by me first duly sworn, was thereupon examined as a witness in said action.

HIGHLY CONFIDENTIAL

Page 3

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS:

SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, New York 10016-7416
BY:  JAYNE CONROY, ESQ.
     ELLYN HURD, ESQ.
Telephone:  (212) 257-8482
Email:  JConroy@simmonsfirm.com
        ehurd@simmonsfirm.com

FOR THE DEFENDANTS YOUTUBE, LLC AND GOOGLE LLC:

WILSON SONSINI GOODRICH &
ROSATI
1301 Avenue of the Americas
40th Floor
New York, New York 10019-6022
BY:  BRIAN M. WILLEN, ESQ.
     AVISHAI D. DON, ESQ.
Telephone:  (650) 565-3641
Email:  Bwillen@wsgr.com
        adon@wsgr.com
        COUNSEL APPEARING VIA ZOOM
FOR THE DEFENDANTS YOUTUBE, LLC AND GOOGLE LLC:
WILSON SONSINI GOODRICH &
ROSATI
953 East Third Street, Suite 100
Los Angeles, California 90013
BY:  TOMAS ARRIAGA, ESQ.
     CALLIE DAVIDSON, ESQ.
Telephone: (323) 210-2942
Email:  Tarriaga@wsgr.com
        cdavidson@wsgr.com
FOR THE META DEFENDANTS:
SHOOK HARDY BACON
701 Fifth Avenue, Suite 6800
Seattle, Washington 98104
BY:  STEVEN RICH, ESQ.
Telephone:  (206) 344.7631
Email:  Srich@shb.com

HIGHLY CONFIDENTIAL

Page 4

APPEARANCES OF COUNSEL (Continued)
COUNSEL APPEARING VIA ZOOM

FOR THE META DEFENDANTS:

    SHOOK HARDY BACON
    JPMorgan Chase Tower
    600 Travis Street, Suite 3400
    Houston, Texas 77002
    BY:  BRITTANY N. VANEK, ESQ.
    Telephone:  (713) 546-5684
    Email:  Bvanek@shb.com

FOR THE TIKTOK DEFENDANTS:

    GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
    Los Angeles, California 90071-3197
    BY:  MARISSA M. MULLIGAN, ESQ.
    Telephone:  (213) 229-7240
    Email:  Mmulligan@gibsondunn.com

FOR THE DEFENDANT SNAP, INC.:

    MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
    Los Angeles, California 90071-3426
    BY:  KAYSIE GONZALEZ, ESQ.
    Telephone:  ((213) 683-9578
    Email:  Kaysie.Gonzalez@mto.com

ALSO PRESENT:

    Nathan Arndt, Videographer
    Brian Fronzaglia, exhibit tech
    Toni Baker, Google in-house counsel

HIGHLY CONFIDENTIAL

Page 5

INDEX
INDEX OF EXAMINATIONS
PAGE

Morning Session                                            10
Examination By Ms. Conroy                                  11
Afternoon Session                                         130


INDEX OF EXHIBITS
EXHIBIT              DESCRIPTION                  PAGE
Exhibit 1      LinkedIn profile of Bill            14
               Saphir, Bates stamped
               GOOG-3047MDL-05725264
               through
               GOOG-3047MDL-05725265
Exhibit 2      Document entitled,                  42
               "YouTube's effort to get
               people to watch longer" -
               not Bates stamped

Exhibit 3      Performance evaluation,             43
               Bates stamped
               GOOG-3047MDL-02006603
               through
               GOOG-3047MDL-02006608,
               with document slipsheet
Exhibit 4      String of emails, Bates             47
               stamped
               GOOG-3047MDL-02006761
               through
               GOOG-3047MDL-02006767,
               with document slipsheet

Exhibit 5      String of emails, Bates             74
               stamped
               GOOG-3047MDL-03772447
               through
               GOOG-3047MDL-03772449,
               with document slipsheet

HIGHLY CONFIDENTIAL

Page 6

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Document natively produced, Bates stamped GOOG-3047MDL-01098414, with document slipsheet | 93 |
| Exhibit 7 | Document natively produced, Bates stamped GOOG-3047MDL-03550745, with document slipsheet | 115 |
| Exhibit 8 | Email from Bill Saphir to Reid Watson, Bates stamped GOOG-3047MDL-03550745, with document slipsheet | 122 |
| Exhibit 9 | Document entitled, "Approvals," Bates stamped GOOG-3047MDL-05208444, with document slipsheet | 130 |
| Exhibit 10 | String of emails Bates stamped GOOG-3047MDL-03774607 through GOOG-3047MDL-03774611, with document slipsheet | 132 |
| Exhibit 11 | Email from Bill Saphir to Bill Saphir, Bates stamped GOOG-3047MDL-03775037 through GOOG-3047MDL-03775038, with document slipsheet | 134 |
| Exhibit 12 | String of emails, Bates stamped GOOG-3047MDL-03777247 through GOOG-3047MDL-03777249, with document slipsheet | 138 |

HIGHLY CONFIDENTIAL

Page 7

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 13 | Email from ███████ ███████ to Bill Saphir, dated March 3rd of 2023, Bates stamped GOOG-3047MDL-03782097 through GOOG-3047MDL-03782098, with document slipshseet | 150 |
| Exhibit 14 | Email Bates stamped GOOG-3047MDL-01539544 through GOOG-3047MDL-01539546, with document slipsheet | 157 |
| Exhibit 15 | Document natively produced, Bates stamped GOOG-3047MDL-01474783, with document slipsheet | 161 |
| Exhibit 16 | Email from Bill Saphir to Bill Saphir, Bates stamped GOOG-3047MDL-03782332 through GOOG-3047MDL-03782340, with document slipsheet | 165 |
| Exhibit 17 | String of emails Bates stamped GOOG-3047MDL-03781377 through GOOG-3047MDL-03781413, with document slipsheet | 170 |
| Exhibit 18 | Document entitled, "YouTube Second Party Integration Summary," Bates stamped GOOG-3047MDL-05536177.ECM through GOOG-3047MDL-05536193.ECM with document slipsheet | 181 |

HIGHLY CONFIDENTIAL

Page 8

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Exhibit 19 | String of emails, Bates stamped GOOG-3047MDL-03784569 through GOOG-3047MDL-03784571, with document slipsheet | 199 |
| Exhibit 20 | Email from ██████████ Bates stamped GOOG-3047MDL-04151539 through GOOG-3047MDL-04151540, with document slipsheet | 216 |
| Exhibit 21 | Document entitled, "YOUTUBE accounts and identity overview," Bates stamped GOOG-3047MDL-00009463 through GOOG-3047MDL-00009472, with document slipsheet | 222 |
| Exhibit 22 | String of emails Bates stamped GOOG-3047MDL-03767483 through GOOG-3047MDL-03767485, with document slipsheet | 224 |
| Exhibit 23 | Document entitled, "Early steer on reuse of DMA for AADC," Bates stamped GOOG-3047MDL-02946819 through GOOG-3047MDL-02946833, with document slipsheet | 225 |
| Exhibit 24 | Email from Bill Saphir to Bill Saphir, Bates stamped GOOG-3047MDL-05090900, with document slipsheet | 234 |

HIGHLY CONFIDENTIAL

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 25 | Email from ███████████ ████████████ Bates stamped GOOG-3047MDL-05091144 through GOOG-3047MDL-05091146, with document slipsheet | 239 |
| Exhibit 26 | Document natively produced, Bates stamped GOOG-3047MDL-01157591, with document slipsheet | 246 |
| Exhibit 27 | Email from ███████████████████, Bates stamped GOOG-3047MDL-03786080 through GOOG-3047MDL-03786083, with document slipsheet | 248 |
| Exhibit 28 | Document entitled, "Check new narrative here," Bates stamped GOOG-3047MDL-03198904 through GOOG-3047MDL-03199024, with document slipsheet | 254 |
| Exhibit 29 | Document entitled, "YT P13n Control & Transparency Strategy (2024)," Bates stamped GOOG-3047MDL-03791466 through GOOG-3047MDL-03791484 | 255 |

HIGHLY CONFIDENTIAL

Page 10

MARCH 25, 2025                    9:08 A.M. PACIFIC TIME

P R O C E E D I N G S


MORNING SESSION

THE VIDEOGRAPHER:  We are now on the record.  My name is Nathan Arndt.  I'm the videographer for Golkow.  Today's date is March 25th, 2025, and the time is 9:08 a.m.  This deposition is being held in San Francisco, California, in re Social Media Adolescent Addiction Personal Injury Products Liability Litigation, for the United States District Court of the Northern District of California.  Our deponent is Bill Saphir.

Will counsel please identify themselves for the record.

MS. CONROY:  Jayne Conroy for the plaintiffs.

MS. HURD:  Ellen Hurd for the plaintiffs.

MR. WILLEN:  Brian Willen for the defendants.

MR. DON:  Avishai Don for the defendants.

MS. BAKER:  Toni Baker for Google.

THE VIDEOGRAPHER:  Our court reporter is Kathleen Maltbie, and she will now swear in the

HIGHLY CONFIDENTIAL

Page 11

witness.

THE REPORTER:  Good morning.  This morning it is March 25th, 2025.  My name is Kathleen Maltbie.  I am a certified shorthand reporter, License No. 10068, also licensed in Nevada and Texas.

Would you raise your right hand, please?

BILL SAPHIR,

having been duly sworn,

was examined and testified as follows:

EXAMINATION BY MS. CONROY

BY MS. CONROY:

Q.    Good morning.  Is it Saphir, Mr. Saphir?

A.    Mm-hmm.

Q.    My name is Jayne Conroy.  I'm going to be asking you some questions today.  And just a couple of ground rules.  If you can, wait until I finish my question before you start answering it, even though our court reporter, Kat, can probably take it down, we'll try to make today easier for her.

If you need to take a break, let me know. We'll unhook ourselves from the mics.  The only thing I ask is that you not request a break when I've asked a question and you haven't answered it yet.

HIGHLY CONFIDENTIAL

Page 12

Is that okay?

A.   Mm-hmm.

Q.   And one other thing that we're going to try and remember is, when you answer a question, please try to do it verbally without an "mm-hmm." So try to say "yes" or "no" or whatever.  That makes it easier for the court reporter too.

A.   Okay.

Q.   Thank you.

Have you ever been deposed before?

A.   No.

Q.   Okay.  Did you -- are you represented here today by a lawyer?

A.   I guess so, yes.

MR. WILLEN:  Hope so.

BY MS. CONROY:

Q.   And without telling me about any of the conversations you've had with your lawyer, have you met with your lawyer in advance of this deposition?

A.   Yes.

Q.   Okay.  On how many occasions?

A.   Twice.

Q.   And were they in person or on some other -- like, on the phone or something?

A.   Once in person, once -- once on -- over --

HIGHLY CONFIDENTIAL

Page 13

over GVC.

Q.   That's right.  We had to remember.
It's not Zoom, right?

A.   Right.

Q.   And where was the in-person meeting?

A.   Next door, the office next to us.

Q.   Okay.  And we're here in a law office in
San Francisco?

A.   Say again.

Q.   And we're here in a law office in
San Francisco?

A.   Yeah.

Q.   Okay.  And where do you -- ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

▮   ▮▮▮▮▮▮▮▮.

▮   ▮▮▮  ▮▮▮▮▮▮▮▮▮▮

▮   ▮▮▮

▮   ▮▮▮▮▮▮▮▮▮▮

A.   No.

▮   ▮▮▮▮▮▮▮▮▮▮

▮   ▮▮▮▮.

▮   ▮▮▮  ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

▮   ▮▮.

Q.   I'm going to mark as Exhibit 1 your

HIGHLY CONFIDENTIAL

Page 14

LinkedIn profile.  So we'll pass you a copy of this so you can take a look at it.

(Whereupon, Deposition Exhibit 1 was marked for identification.)

BY MS. CONROY:

Q.    How old are you, Mr. Saphir?

A.    ███

Q.    Scary to say that, isn't it?

A.    It is.

Q.    This -- have you seen this LinkedIn profile before?

A.    Yes.

Q.    Okay.  And is it current?

A.    Yes.

Q.    And I see that it says you're the principal engineer, director of engineering at Google.

Is that -- that's your current title?

A.    No.  My title is director of engineering.

Q.    Okay.

A.    I started off as principal engineer and they -- if you have more than a larger -- a team larger than a certain size, you are turned into a director of engineering.

Q.    Do you have a team that reports to you?

HIGHLY CONFIDENTIAL

Page 15

A.   Yes.

Q.   Okay.  And how many -- how many individuals are on that team?

A.   Around 65.

Q.   And where are they located?

A.   Mostly in San Bruno.  A couple are remote, and a couple are in Mountain View.  A few are in Mountain View.

Q.   Mountain View is also in California, correct?

A.   Yes.

Q.   And I see you've been at Google, and as you said, you started as a principal engineer.
     You started in May of 2011, correct?

A.   That's right.  I did not start as a principal engineer, no.

Q.   What was your title when you started --

A.   Senior engineer.

Q.   And did you begin -- when did you begin to do work for YouTube?

A.   From the beginning.

Q.   And it says here right underneath San Bruno (as read):

          Lead for recommendations,
          infrastructure at YouTube.

HIGHLY CONFIDENTIAL

Page 16

Do you see that?

A.    That's right.

Q.    And what does that mean?

A.    My team is called the discovery infrastructure team, and we build all of the plumbing that other engineers use to build discovery services.  So discovery services, any page where we show you a bunch of videos that you -- that you can select from.

Q.    And those are the page that someone that goes on to YouTube can see?

A.    Yeah.

Q.    And when it says "recommendations," what does that mean?

A.    Recommendation is a -- any -- any content that is selected by -- by YouTube to show to a user who is using YouTube.  It's not a precisely-defined term.

Q.    Okay.  For how long have you been the lead -- just approximately -- the lead for recommendations infrastructure at YouTube?

A.    Probably -- probably maybe seven years, seven or eight years.

Q.    And who was your predecessor, if you know?

A.    Well, in this role, ██████████.  So --

Page 17

and he left more -- he left at least ten years ago, so maybe ten years, yeah.

Q.   Okay.  And did you have -- before you became lead, did you have involvement in the recommendations infrastructure at YouTube?

A.   Yes.

Q.   Okay.  And was that true from the time you started at YouTube?

A.   Yes.

Q.   And you -- you described for me that you -- you would build the plumbing for the infrastructure; is that correct?

A.   Yes.

Q.   Can you give me a little bit more of an explanation of the types of things that would go into building the infrastructure or doing the plumbing?

A.   Yes.  So what I mean by that is -- it includes a bunch of things.  One is the APIs that engineers use to build recommendation services.

Q.   Let me just stop you there.

What does "API" stand for?  We have a jury, so ...

A.   Application programming interface.

Q.   Thank you.  You can continue.

HIGHLY CONFIDENTIAL

Page 18

A.    It includes some of the data sources that we use, especially for personalization, notably, watch history.  It includes -- and that -- that type of data is used for personalization and also is used for training ML models.

We own the infrastructure that orchestrates the training of -- of ML, machine learning, models, and the infrastructure for some of the data sources that are used for -- for building recommendations.

Q.    When you're talking about infrastructure to train machine learning modules, you're talking about machine learning for better selection of recommended videos?

A.    Yes.

Q.    And when you're talking about the infrastructure for data sources, what type of sources are you talking about?

A.    So number one, information about users who use YouTube.  So, for example, watch history.  But other information also that's, you know, linked to that user.  Other data sources where we're more of a middleman, in a way, are information about videos that we might want to recommend, information about channels, information about playlists and data

HIGHLY CONFIDENTIAL

Page 19

sources that provide sort of -- we call them candidates or -- or lists of videos that we might consider for recommending.

Q.   And has the machine learning models been available to you since you started in 2011?

A.   No.  We didn't use machine learning when I started.  My guess is that would have started around 2013 or so.

Q.   Did you help develop that?

A.   No.

Q.   Who did that?

A.   The name that I associate most with that is ███████████████ .

Q.   And so then did machine learning become available to you as part of your abilities to recommend videos?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Can you -- can you say what you mean by "available to me"?

BY MS. CONROY:

Q.   Well, you talked about part of your responsibilities were to collect videos for recommendations.  Does that make sense to you?

Is that what you did?

A.   I wouldn't -- I wouldn't call it collect

HIGHLY CONFIDENTIAL

Page 20

videos.  Let me give a little more background here to help understand.

The team that I joined was originally called the personalization team.  And the focus of that team was video recommendations on the YouTube home page.  Since that time, the scope has -- has gradually grown, so, for example, recommendations on the watch page didn't become something my team worked on until, you know, much later, maybe 2019 or 2020.

And we had the -- so, for example, the first use of machine learning, I believe, was -- was on the -- on the watch page.  So when that was first introduced, my -- my team wasn't -- wasn't using it directly.  And the -- historically -- so my team does not own any of the machine learning models.  So we don't train the models, we don't determine what the -- what objectives they are trained with.  And for the most part, those models are owned by the teams that actually build the features that are actually trying to improve recommendations on -- on YouTube.

What my team owns there, and this is more recent, is the infrastructure that allows us to coordinate the training of these models.  You know,

Page 21

they have to read from certain data sources and they -- they need to be -- have some simple test run before they're released into production. They have to be staged in various places before they reach production, so that kind of connecting the model trainers with the data and all of the coordination involved there is the kind of work that my -- my team does.

So that's why when you talk about machine learning models, like, my team doesn't use them, we just facilitate their training and use.

Q. Thank you. That was helpful.

The -- the teams that do machine learning, are they part of YouTube?

A. Yes.

Q. And do they have a name?

A. There are several teams. For example, there's a home page team. There is a watch next team, watch next being the recommendations on the watch page. There's a Shorts team for Shorts recommendations. There are many other teams that are, you know, increasing distance organizationally who work, for example, on the classifiers for videos, whether it has to do with responsibility or Trust & Safety or Kids, whatever the topic, those

HIGHLY CONFIDENTIAL

Page 22

are all different teams that own their own ML models.

Q.    And an ML model is a machine learning model?

A.    That's right.

Q.    And your team and you help coordinate those -- the individuals and the teams working with the machine learning models with the sources that are going to collect the data from?

A.    That's right.

Q.    And can you tell me what those sources area?

Where are they collecting the data from?

MR. WILLEN:  Objection to the form.

THE WITNESS:  There are many -- I think I mentioned them earlier.  There are many different sources having to do with data about users, data about videos, data about playlists.

BY MS. CONROY:

Q.    Slow down for a second.

Data, what are you saying, data what?

A.    Data about --

Q.    Data about, okay.

A.    Yeah.

About users, about videos, about channels,

Page 23

about playlists.  The recommendations involves --
you know, generating recommendations involves
combining all of that -- all of that data.

Q.   And is that data housed at YouTube?

A.   Not at -- not at YouTube.  It's housed in
Google data centers.

Q.   And you have access to that data that's
housed in Google?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I don't personally have
access.

MR. WILLEN:  Excuse me.

THE WITNESS:  The -- the systems that
actually -- you know, the computers that generate
recommendations do.

BY MS. CONROY:

Q.   I see on Exhibit 1 you have some prior
experience, Numenta, where you were director of
engineering.

Do you see that?

A.   Yes.

Q.   And what kind of a business was Numenta?

A.   Numenta, I -- I'm not sure I would
characterize it as a business right now, but it --
it's attempting to build machine learning models in

Page 24

a way that faithfully represents what the -- how the human brain works.

Q.   And did you work on building machine learning models while you were there?

A.   I did not.  Similar to at YouTube, my role there was primarily about the -- the infrastructure and the plumbing.

Q.   And why did you leave Numenta to go to Google?

A.   After -- I think I had worked there about five years, and we did not have a product, I was interested in working on something that people were using.

Q.   Okay.  Did you receive, for want of a better term, on-the-job training when you started at Google?

A.   Maybe clarify the question?

Do you mean formal training, like classes or --

Q.   Well, did -- was there any sort of formal training or apprenticeship or anything like that, or did you just go right in and begin working?

A.   I went right in and began working, yeah.

Q.   Did you know anyone that was at Google when you started?

HIGHLY CONFIDENTIAL

Page 25

A.   Yes.

Q.   Who was that?

A.   ███████████   was one of them.

Do you want a full list of everyone that I remember knowing at Google from that time?

Q.   No.

I meant -- what I was -- did anyone else from Numenta go to Google with you?

A.   ████████   was from -- from Numenta, and he went before I did, I think.

Q.   And where -- where did he work?  Was he -- strike that.

Was he at YouTube?

A.   Yes.

Q.   What did he do?

A.   I don't remember exactly.  Yeah.  I don't -- I don't remember.

Q.   Okay.  That's fine.

A.   He did -- he did not -- he was not on my team.

Q.   Did he work on infrastructure?

A.   I -- I think so, yeah.  As far as I know, he did not work on, like, a user-facing feature.

Q.   You used the word "personalization."

What does that mean in the -- in the

HIGHLY CONFIDENTIAL

Page 26

context of YouTube?

A.    That is a -- first of all, it's a fuzzy definition, and I would say it often depends -- you know, the details depend on context.  Broadly speaking, any time we change a -- the experience of a user coming to YouTube or we provide an experience that is based, at least in part, on information that we have about that user.

Q.    That's the -- were you -- I'm sorry, were you finished?

A.    Yes.

Q.    Have you seen personalization abbreviated to p13n?

A.    Yes.

Q.    And can you explain for the jury what p13n means?

A.    Right.  If you -- if you spell out the word personalization, there are 13 letters between the P and the N.

Q.    Okay.  And that's where the p13n comes from?

A.    That's right.  It's much easier to type or write.

Q.    And personalization, as you said, kind of broadly speaking is when you provide an experience

HIGHLY CONFIDENTIAL

Page 27

to a user that's based on information that you -- and I'm using "you" as YouTube -- has about the user?

A.    Yes.  That's right.

Q.    And what kind of information, broadly, does YouTube have about a user?

MR. WILLEN:  Objection to the form.

THE WITNESS:  So especially in the context of personalization, I -- I think there's a -- there's a list that we have documented on a -- on a public website.  I think it's the how -- how YouTube works.  So that will have things that I don't remember, but, you know, most importantly is watch history, the record of videos that a user has watched on YouTube.  Includes likes and dislikes, channel subscriptions, dismissals, which is a product feature where the user can say they're not interested in a video.

And there are probably a few others. Those are -- those are some of the important ones.

BY MS. CONROY:

Q.    What about the age of the user?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.  We have, for example, the age of a -- of a user that they specified when

Page 28

they signed up for their account.

BY MS. CONROY:

Q.    Is that also referred to as declared age?

A.    That's right.  Declared age.

Q.    What about gender?

A.    ███████████████████  █████████

█  ████████████ .

Q.    Do they provide an address or what country they're in?

MR. WILLEN:  Sorry.  Objection to the form.

THE WITNESS:  Yeah, I -- I don't actually know.  I do know that we don't use an address, and I -- I don't know about country.

BY MS. CONROY:

Q.    You mentioned that they sign up for an account.

Where do they do that?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I -- I don't have any special knowledge about that.  It's not -- no part of YouTube.

BY MS. CONROY:

Q.    When you say, "it's not part of YouTube," do they sign up for an account at Google?

HIGHLY CONFIDENTIAL

Page 29

A.    It's a Google account, yes.

Q.    Okay.  Are you familiar with the term "GAIA account"?

A.    Yes.

Q.    That's G-A-I-A, all capitals?

A.    I don't know about capitals, but that's how you spell it, yes.

Q.    Okay.  And what is that?

A.    That means -- that's a -- a Google account.  And every Google account is -- is identified -- is associated with a number that we call a GAIA ID.

Q.    And so when you are providing an experience for a user based on the information that they provide to you, that is coming from the GAIA account?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes, if they are signed in when they use YouTube.  And if they're signed out, the corresponding ID is just a -- a number.  It's called a visitor ID.  And there's no account associated with visitor ID, that's specific to -- to a device.

BY MS. CONROY:

Q.    Do you select watch history connected to a

HIGHLY CONFIDENTIAL

Page 30

visitor ID?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

BY MS. CONROY:

Q.   By "you," I mean, you know, YouTube.

A.   YouTube, yes.  Uh-huh.

I should -- should qualify, you know, users have the ability to turn off collection, but by -- by default, yes.

Q.   So what you just said, they have the ability to turn off collections, so a user can -- there's some process by which a user could turn off the ability of YouTube to see their watch history?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I wouldn't characterize it as turn -- the way you phrased it wasn't right, but -- but they can turn off the -- YouTube's collection of history.

BY MS. CONROY:

Q.   And what -- what does that -- what's the practical application of that?

Does it just -- does YouTube then just not collect or is it something else that's happening?

MR. WILLEN:  Objection to the form.

THE WITNESS:  What that means from a maybe

HIGHLY CONFIDENTIAL

Page 31

technical perspective is that we don't -- we don't store that information in serving systems where it can be used for -- for personalization, personalization and a few other things. So, for example, if you're signed in and you've watched a video, it shows a red bar under the video showing that you've watched it. So, you know, that -- source of that feature is watch history, so that also isn't there for videos that you watched when your history was turned off.

BY MS. CONROY:

Q. And what that actually means is if someone has turned off -- did you call it the watch time? What did you --

MR. WILLEN: Sorry.

BY MS. CONROY:

Q. I think you said you turn off the collection.

MR. WILLEN: Objection to the form. I don't know what the question is. Sorry.

BY MS. CONROY:

Q. I'm trying to use the correct term.

When you said they can -- they can turn off, is it --

(Simultaneous speakers - inaudible.)

HIGHLY CONFIDENTIAL

Page 32

THE WITNESS:  We usually -- we usually say they turn off watch history.

BY MS. CONROY:

Q.  Watch history, okay.

And when they turn off watch history, that means that you don't -- "you" meaning YouTube -- are unable to use that history for personalization?

A.  Yes.  That's right.

Q.  Okay.  Is it fair to say that it does not mean that the watch history is not collected, just means it's not used for personalization?

MR. WILLEN:  Objection to the form.

THE WITNESS:  ███  ████████████████

████████████████████████████████████████

████████████████████████  ███████████████

█████████████████████████  We can't use it for personalization.  And then that -- that -- that data ████████████  is not retained.

BY MS. CONROY:

Q.  When you say that data is not retained, it's not retained with the ████████████

MR. WILLEN:  Objection to the form.

THE WITNESS:  No.  We can talk about it separately.  So with -- with a GAIA ID, for example, it means that it is deleted or anonymized within --

Page 33

within 60 days.

BY MS. CONROY:

Q.   And if after 60 days a user changes their setting and allows watch history collection, does that just start up fresh?

MR. WILLEN:  Objection to the form.

THE WITNESS:  I'm not sure how to interpret "start up fresh."

BY MS. CONROY:

Q.   Well, is there -- is there any ability to go back and find their previous watch history after 60 days, or is it -- when I say "start fresh," is it starting up again on the date that they changed the setting?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Right.  The -- the data that -- any data that was collected while history is off is gone.  So it's only -- only for new activity after they re-enable the setting.

BY MS. CONROY:

Q.   Are you familiar with the term "inferred age"?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.

/ /

Page 34

BY MS. CONROY:

Q.   Okay.  And what does that mean to you in a -- obviously talking about YouTube or Google?

A.   It means a -- I might describe it as a -- a guess about -- about the user's age.

Q.   And have you -- have you ever had anything to do with building an infrastructure or an ability to guess a user's age?

A.   No.

Q.   Okay.  Who does that?

A.   There's an ads team that does that.

Q.   And that's A-D-S?

A.   Yes.

Q.   Is that short for advertising?

A.   Yes.

Q.   And are they part of Google or YouTube?

A.   Google.

Q.   And why do they guess a user's age?

        MR. WILLEN:  Objection to the form.

        THE WITNESS:  I -- I don't know. That's -- that's an ads thing.

BY MS. CONROY:

Q.   If they -- if they do guess a user's age, do you know one way or the other whether that is or becomes part of the personalization of a user?

Page 35

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.  When it's available, we may use inferred age.

BY MS. CONROY:

Q.   And how would it -- when you say -- when you said when available, how would it become available to you?

A.   The ads team would make it available.

Q.   And why would they do that?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Why would they do that?

I -- I can't -- at some level, I can't speculate on -- on why.  But they do make it available, and it's regularly available for some fraction of -- of users.

BY MS. CONROY:

Q.   Do you ever ask for it?

A.   It has been available, you know, for -- I don't recall when it became available and how this initially started.  But certainly for -- for quite a while it's been -- it's available in our -- in our systems.

Q.   Do you think it's been available since 2015?

A.   I'd say probably.  I don't know for sure.

Q. And when you say "been available," it means it's something that you can -- in your position, can use that data if you deem it useful to you?

MR. WILLEN: Objection to the form.

THE WITNESS: My responsibility there and what -- of course, not me personally -- that -- ███

████████████████████████████████████████████

█████████████████████████

BY MS. CONROY:

Q. So you're -- you're able to -- once the data -- once -- let me strike that.

Once the ads team makes that data available to YouTube, you can facilitate the use of that data to other teams within YouTube?

A. Yeah. To the -- to the systems that those other teams are building.

Q. And have you ever done that?

MR. WILLEN: Objection to the form.

THE WITNESS: I have not personally done that. Our -- my -- the systems that my team owns, you know, make that data available, you know, subject to all of the standard, you know, reviews that teams have to go through before we give them access to data.

HIGHLY CONFIDENTIAL

Page 37

BY MS. CONROY:

Q.   And is it fair to say that you, or anyone on your team at YouTube, has not been involved in the infrastructure of the ads team inferred age data?

MR. WILLEN:  Excuse me.  Objection to the form.

THE WITNESS:  That's right.  We have not been involved.

BY MS. CONROY:

Q.   And do you do any quality control or anything like that at YouTube with respect to that data that's available for you to facilitate for your teams to use?

MR. WILLEN:  Objection to the form.

THE WITNESS:  So -- I think I can interpret that question a couple of ways, but I'll say, so we don't do any -- there's no -- we don't evaluate whether it's correct, you know, how correct is it or how many -- you know, when it's available and when it's not.  Except part two, I think in the past, we have noticed that signal wasn't being made available at all, and, you know, escalated that to the ads team as a -- as a bug.  So we -- we would do kind of that level of -- of quality control if -- if

it seems to be completely missing for a while.

BY MS. CONROY:

Q.   All right.  Let me see if I understand what you're saying.

So you -- you at YouTube are looking to facilitate access to that data, and you find out for some reason the data is not accessible, you call that a bug, and so you may get involved to figure out why you can't see that data?

MR. WILLEN:  Objection to the form.

THE WITNESS:  Yes.  That's right.  So in the overall scheme of things, ███████████████  ████████████████████████  I -- I mention that because I believe we have had outages, so to speak, where it was not available for weeks at a time. █████████████████████████████████████████  ██████████████████  but someone noticed, and -- and we then asked the ads team about it.

And I was answering that in the context of do you do quality control.  Like, that's kind of the level of our involvement in, you know, the quality of the data.

BY MS. CONROY:

Q.   Okay.  Why in the overall scheme of things ███████████████████████████?

HIGHLY CONFIDENTIAL

Page 39

A.    Let me start by defining a term.  So when -- when we use an ML model, we -- "we" meaning our systems -- send it -- a lot of data, data about maybe about the user, data about the videos, whatever it is the ML model is trying to tell us something about.  And so those -- each piece of data is called a feature.

So inferred demographics, ███ age ███ ███████, ███ used as a feature for ML models.  And there are one of, I think, thousands of features that are -- that are provided to the -- to the model.  And, you know, I have no -- no personal knowledge about, you know, which features are -- are -- you know, most influence the model predictions, because I don't work for the models themselves.  But if that data is not there, you know, I don't ███████████████████████ ███████████████████  ██████████████████ ██████████████████████████ ██████████ ██████████████████ ███████████████  █████████████████████ ████████████████ ███████████

Q.    And that would be -- that's -- you would -- ███████████████████████ ████████████████████████████

Page 40

MR. WILLEN:  Objection to the form.

THE WITNESS:

If the -- the data is -- and that's what I know most about.  If the data is used for other purposes where it might be more important than, you know, that -- it's all a matter of when it might get escalated to me.  That's how I -- how I view the importance.

BY MS. CONROY:

Q.  And that's because you are -- you're sort of the expert or the leader in the infrastructure at YouTube, right?

A.  Because my team would be responsible for addressing, you know, a problem that was reported, yeah.

Q.  Okay.  And so you're gauging -- when you're answering me with respect to whether it's important, you're basing that on your everyday crises, and that's just not a typical everyday crisis?

MR. WILLEN:  Objection to the form.

THE WITNESS:  That's right.  In particular, I'm saying that I -- I don't really know

HIGHLY CONFIDENTIAL

Page 41

much about the machine learning models themselves, so that's kind of my indirect indicator of importance.

BY MS. CONROY:

Q.   And when you hear about problems, how does that happen?

Does somebody call you, or is it -- does it come over on some electronic system, or how -- how does your team get alerted to problems?

A.   It depends very much on the kind of problems.  Sometimes people will file a bug. There -- there is an on-call team of system reliability engineers that -- that may get paged for particularly serious problems.  We have, typically, business hours support for problems, but, you know, people are available by -- via phone if there's a -- a big emergency outside of business hours.  That's quite rare.

Q.   Are you available 24/7 for those big emergencies?

A.   Un- -- well, any time I have my phone with me, it's -- it's set to break through do not disturb.  So in that sense, yes.  Those, these days, almost never come to me.

Q.   That's because your team can handle it?

HIGHLY CONFIDENTIAL

Page 42

A.    That's right.

Q.    Let me show you what's been marked as Exhibit 2.

(Whereupon, Deposition Exhibit 2 was marked for identification.)

BY MS. CONROY:

Q.    And you're free to look through this, but I'm actually just going to show you the picture because that's you, isn't it, there on the right?

A.    Sure is, yes.

Q.    Okay.  And who is that in the middle?

A.    That's Cristos Goodrow.

Q.    Okay.  And do you still work with him?

A.    Yes.

Q.    Okay.  And who is that on the left?

A.    That is ▮▮▮▮▮▮▮▮  I don't believe he's at Google anymore.

Q.    Can you tell who any of the others are?

A.    I think that's probably ▮▮▮▮▮▮▮▮ in the hat.  Guy named ▮▮▮ who is next to me.  Those are the ones that I recognize.

Q.    Do you know what office that was at?  San Bruno?

A.    That must have been San Bruno, yeah.

Q.    Are you still working in that office?

HIGHLY CONFIDENTIAL

Page 264

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

___x___ Reading and Signing was not requested.

_Kathleen Maltbie_

_____

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212