# AMENDED Exhibit 1001

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE: SOCIAL MEDIA            Case No. 4:22-MD-03047-

ADOLESCENT ADDICTION/               YGR MDL No. 3047

PERSONAL INJURY PRODUCTS

LIABILITY LITIGATION                 MDL No. 3047

_____

This Document Relates to:

ALL ACTIONS

_____


            30(B)(6)/PMQ FOR GOOGLE/YOU TUBE

         VIDEOTAPED DEPOSITION OF ERIN TURNER

              Wednesday, January 22, 2025

               SAN FRANCISCO, CALIFORNIA


Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

Page 61

is not in my area.

BY MS. HAILESELASSIE:

Q.   You've never inquired of anyone why that's the case?

A.   No.

Q.   Okay.  I'll have marked now -- I believe it's already been marked Exhibit 4.

(Whereupon, Deposition Exhibit 4

was marked for identification.)

BY MS. HAILESELASSIE:

Q.   And I will represent to you that this is an exhibit from another deposition that we did earlier this year of -- Ms. Weikert -- who just helped us identify the areas that you're going to address with us.  So you're welcome to look through it, but it's mostly a list of names, programs, features and groups within YouTube.  So I'm just directing you to the parts that are relevant to her deposition.

So if you could look at page 9.

Do you see where it says, "Responsible Content & Creators?"

MR. KRAMER:  I'm going to object to the characterization of the document.

But you can go ahead and look through.

Page 62

THE WITNESS:  What page is that on?

BY MS. HAILESELASSIE:

Q.    This is page 9.

A.    Page 9.

Okay.

Q.    Okay.  It lists a couple of things that YouTube suggests we talk to you about, a teen wellbeing classifier and age appropriate classifier.

Do you see that?

A.    I see that, yes.

Q.    Okay.  And I'm just showing you that so you understand what's guiding a lot of my questioning today.

Do you understand?

A.    Okay.

Q.    So the Teen Wellbeing classifier, and then in parentheses, it specifies Volume Impacts Wellbeing.

Are you generally knowledgeable about that product?

MR. KRAMER:  Objection to form.

THE WITNESS:  This is a product my team is responsible for.

BY MS. HAILESELASSIE:

Q.    Is it a product you're generally

Page 63

knowledgeable on?

A. Yes.

Q. Okay. And this is the project termed VIBE as an acronym for volume impacts wellbeing, correct?

A. Correct.

Q. Can you please explain to the jury what a classifier is?

MR. KRAMER: Objection to form.

THE WITNESS: A classifier is a way for us to identify content and make a definition of content, and then use a model to identify that content at scale.

BY MS. HAILESELASSIE:

Q. Would it be accurate to say that it's an algorithm that automatically categorizes content?

MR. KRAMER: Objection to form.

THE WITNESS: You could say it is an algorithm that identifies content that meets a certain definition, a specific definition.

BY MS. HAILESELASSIE:

Q. Okay. So you understand how classifiers are operationalized?

A. Correct.

MR. KRAMER: Objection to the form.

/ /

Page 64

BY MS. HAILESELASSIE:

Q.   Do you have a technical understanding of how they work?

A.   When you say "operationalize," can you give me some more examples of what you mean?

Q.   Well, you agreed that you understand how they're operationalized.

I mean, do you have a technical understanding of how classifiers work?

A.   Well --

MR. KRAMER:   Objection.

Sorry.

Objection to form.  Object. Mischaracterizes testimony.

THE WITNESS:   So I'm -- I'm asking you to -- I responded before asking you to clarify what you mean by "operational."  That means something to me that might be different from what you're asking --

BY MS. HAILESELASSIE:

Q.   What does it mean to you?

A.   -- so I'm asking for clarification.

Q.   What does it mean to you?

A.   To me, that means that we identify the content that we're looking to identify and build a

Page 65

model that can identify that content. And then we deploy that model.

Q. Do you work on the technical aspects of that model?

A. I am --

MR. KRAMER: Objection to form.

THE WITNESS: I am not an engineer.

BY MS. HAILESELASSIE:

Q. Okay. And the teen wellbeing classifier, once it identifies content or categorizes content, is there another step to the functioning of it?

MR. KRAMER: Objection to form.

THE WITNESS: So there are two steps. One is identification of content, and then the treatment of that content.

BY MS. HAILESELASSIE:

Q. Okay. And is there -- are there various types of treatment that might occur?

A. There are a whole range of ways content could be treated.

Q. What -- which ways?

A. Well, can you -- can you be specific about what you're -- what you're asking for?

Q. I -- I can't because my -- that's my question to you, what -- what might it do with the

Page 66

content after it's identified?

MR. KRAMER:  Objection to form.

THE WITNESS:  Well, the goal of the -- of this particular classifier is to identify content and treat it in recommendations.  So in this case, treatment could be dispersing content.

BY MS. HAILESELASSIE:

Q.  And when you say "dispersing," do you mean removing it from recommendations?

MR. KRAMER:  Object to form.

THE WITNESS:  So as you can see in this exhibit, this classifier is volume impacts wellbeing.  And this content is content that is not problematic in a single view.  And so, therefore, the content is -- based on input from our experts, is dispersed.

BY MS. HAILESELASSIE:

Q.  Okay.  When it's dispersed, where does it go?

A.  So dispersion would mean that it is reduced, the concentration of the content would be reduced.

Q.  Okay.  Are there any other classifiers used by YouTube that disperse content related to teen wellbeing other than the teen wellbeing

Page 67

classifier --

MR. KRAMER:  Objection.

BY MS. HAILESELASSIE:

Q.    -- that is listed here?

MR. KRAMER:  Objection to form.

THE WITNESS:  There is a huge amount of -- a huge number of safeguards in place across YouTube for all of our teen and adult users.  This is one of many that are in place to provide a responsible experience.

BY MS. HAILESELASSIE:

Q.    And are any of those that you just mentioned specifically related to teen wellbeing other than the teen wellbeing classifier?

MR. KRAMER:  Objection to form.

THE WITNESS:  I would say all of those support teens to some degree, teen wellbeing.  The goal of -- as you asked me earlier, the goal of responsibility is to have an experience that is providing guardrails on safety and quality, and YouTube has done extensive work in that area for both teen users and adult users.  So this is one of many that will support teens' wellbeing and their experience on YouTube, their experience with content on YouTube.

Page 68

BY MS. HAILESELASSIE:

Q.   Okay.  Are there certain categories of content that the teen wellbeing classifier is seeking to disperse?

A.   Yes.

Q.   What are they?

A.   So these -- the -- this classifier covers several categories.  I actually have a question for you.  I have a -- maybe something that might be ...

MR. KRAMER:  Can we go off the record?

THE VIDEOGRAPHER:  Time is now 11:11.  Going off the record.

(Off video record only.)

MS. HAILESELASSIE:  There's a pending question.

THE REPORTER:  I'm sorry, do you agree to go off the record?

MS. HAILESELASSIE:  There's a pending question.

MR. KRAMER:  Is it a privilege concern?

THE WITNESS:  I have a question about the time period.

MR. KRAMER:  Oh, sorry.  We can go on the record.  I thought it was a privilege concern.

THE WITNESS:  I wasn't sure if it would be

Page 69

privileged or not.

Maybe the question is for you.

Is the question of the time period?

MR. KRAMER:  Sorry, can we go back on the record?

THE VIDEOGRAPHER:  Time is now 11:11. Back on the record.

THE WITNESS:  Can you clarify the time period you're looking for?

BY MS. HAILESELASSIE:

Q.   So if -- if it started as one thing and then it evolved, then that is part of my question as well, and we can explore that a bit.  But I am just trying to find out what -- what is covered by the teen wellbeing classifier, the categories of --

A.   Okay.

Q.   -- of content?

A.   So we're always expanding and improving these, and this -- this classifier currently covers five categories of content.

So one category is physical -- social comparison of physical appearance.  Another category is social aggression.  More recently, we have added -- let's see.  We've added three new categories.  We've added financial -- wealth

Page 70

obsession, hostility and disrespect towards others. I'm trying to remember the third one.  I can't remember the third one off the top of my head, but we have five categories.  So this has expanded since it was launched.

Q.   Okay.  That's -- that's fine.  If you think of it later, we can come back to it and you can just let me know you remembered the last one.

Are you generally knowledgeable about the creation of VIBE, the origins of the VIBE product?

A.   Yes.

Q.   Okay.  And I think you've already answered this, but it sounds like VIBE was created in recognition of the fact that there is some content, although not prohibited, it is problematic to youthful viewers when viewed repeatedly; is that accurate?

MR. KRAMER:  Objection to form.  Lack of foundation.  Mischaracterizes testimony.

THE WITNESS:  So as I mentioned earlier, there is a very extensive -- there are a very extensive set of classifiers intended to deliver responsible experience for all of our users, including teens on YouTube.  And we looked at where we had small gaps to fill in.  And this was one area

Page 71

that we identified together with our expert committee.

And as you -- you asked me -- the nature of the content is content that is not violative, not borderline, but potentially, for some users, in volume may have some effect on their wellbeing.

BY MS. HAILESELASSIE:

Q.    Okay.  So it's the volume that's the -- that's the issue, more so than the content, correct?

A.    Yeah, that's correct.

Q.    Okay.  ████████████████████
████████████████████████████████████████
████████████    And then in parentheses, it says (as read):

████████████████████████
████████████████████
████████████████████████████████
████████████████████████

A.    I think there's some inaccuracy here. So --

Q.    Okay.  Well, and let me step back for a minute, because I don't think we have actually defined MFK, but that is made for kids, right?

A.    MFK is made for kids.

Q.    What is -- what is the inaccuracy?



Page 73

A.    The --

MR. KRAMER:  Objection to form.

BY MS. HAILESELASSIE:

Q.    Okay.  We'll probably come back to this.

If you'll just turn to the page 15.  At the top under "Digital Wellbeing Features," you were listed along with the teen wellbeing features.  I'm just getting there myself.  (As read):

Teen wellbeing classifier (to reduce concentration of non-violative content that is potentially harmful to teens in

high volume.)

Do you see that?

A.    Yes.

Q.    Is that the same thing that we've just looked at, VIBE?

A.    Yes.

Q.    And do you know what the 2022 in parentheses refers to next to this classifier?

A.    That refers to when this was -- this work was launched.

Q.    All right.  I'm going to have marked Exhibit 5 -- you can put that one to the side. Thank you.

Okay.  Actually, before we take a look at 5, does your work -- so your work extends to YouTube Kids, correct?

A.    Yes.

Q.    And do you work on YouTube shorts?

A.    My -- our signals are applied to YouTube shorts.

(Whereupon, Deposition Exhibit 5

was marked for identification.)

BY MS. HAILESELASSIE:

Q.    Okay.  So taking a look at what has been marked as Exhibit 5, this Bates -02480437 is an

Page 180



Q.   Okay.   We can put this to the side.   I'm going to mark Exhibit 10.

(Whereupon, Deposition Exhibit 10 was marked for identification.)

BY MS. HAILESELASSIE:

Q.   This is an email with the Bates ending -02490539.  And it is an email from ▮▮▮▮▮▮▮▮ to you, Ms. Turner.

Who is ▮▮▮▮▮▮▮▮?

A.   ▮▮▮▮▮▮▮▮ is a member of the new GAPP team.

Q.   What is the GAPP team?

A.   Government affairs and public policy.

Q.   This email is dated April 17th, 2023.
And what is the subject?

A.   The subject says (as read):

[Just us] regarding

privileged -- Re: privileged KOF

pov: on biggest teen protection

needs.

Q.   Okay.  And if you will turn to -0540, do you see your message to ▮▮▮▮ starting this thread?

MR. KRAMER:  Objection to the form.

BY MS. HAILESELASSIE:

Q.   Is that the first email in the thread, or email to ▮▮▮▮▮▮▮▮?

A.   I'm just reading -- I'm just reading this here.

I -- I can't really tell from this whether this was the first email in that thread.  But I don't know -- yeah.  I can't tell for sure if this was -- if there was something before that.

Q.   Okay.  Well, I will represent to you, I haven't removed anything from this document, and did not -- did not see any others with earlier emails, but I understand you're telling me that you can't

Page 182

represent that that is the initial one in the thread. But at least on this document, there is an email on April 5th, 2023 at 9:55 p.m.

And you are writing to -- is it ██████ and ██████ Is that correct?

A. That's what it says here.

Q. Okay. Do you know who ██████ is?

A. ██████ is another member of the same team ██████ is on.

Q. And that's --

A. Government affairs and public policy.

Q. Okay. And your message starts off (as read):

Privileged. ██████, please advise.

Do you see that?

A. I do.

Q. Who is ██████, if you know?

A. That would have been ██████████, who is one of the recipients on this email.

Q. Okay. And will you please read your email?

A. (As read):

Privileged: ██████, please advise. Hi, ██████████████, during

Page 183

Q2 I am leading an xfn team (those
on cc) to pull together our
holistic teen wellbeing road map
and a go-to market plan for H2.
One thing we'd like to understand
from a KOF point of view is our
biggest opportunity areas.  We have
a weekly working session with most
on this thread.  Can you make time
to join us next week to share your
point of view on the top three to
five issues?  We're looking for a
rough stack ranking.

Q.    Okay.  So what -- what is the information
you're trying to get from them?

A.    We take a broad view in trying to
understand from our users what's happening with
their needs and also other stakeholders in the -- in
the marketplace.  So, for example, keeping formers
and regulators so we can pull together a holistic
picture of what our user needs and risks might be.

Q.    And KOF is key opinion formers?

A.    That's correct.

Q.    You mentioned regulators.

Are regulators key opinion formers?

A.    That is a broad term that we use, but typically they -- they could be.

Q.    Who else would be a key opinion informer?

MR. KRAMER:    Objection to the form.

THE WITNESS:    That -- that is the term that typically our government affairs team would use.    I don't know who else would fall into that bucket.

BY MS. HAILESELASSIE:

Q.    Would it include users of YouTube?

MR. KRAMER:    Objection to the form.

THE WITNESS:    Users are -- are our biggest priority.    We are very user centered in understanding their needs, but we also like to understand the landscape as a whole and what other issues may be of impact to our users.

So regulators and how they are seeing the needs of our users are an important data point for us.

BY MS. HAILESELASSIE:

Q.    Are users included in the term "key opinion formers"?

MR. KRAMER:    Objection to the form.

THE WITNESS:    They are -- they are not.

/ /

Page 8

JANUARY 22, 2025                    9:38 A.M. PACIFIC TIME

P R O C E E D I N G S


MORNING SESSION

THE VIDEOGRAPHER:  We are now on the record.  My name is Darnell Brown, and I'm the videographer with Golkow.  Today's date is January 22nd, 2025, and the time is 9:38 a.m.

This video deposition is being held in San Francisco, California, in the matter of Social Media Adolescence Addiction Personal Injury, for the United States District Court, for the Northern District of California.

The deponent is Erin Turner.

Counsel, could you please identify yourselves.

MS. HAILESELASSIE:  My name is Jade Haileselassie.  I'm with MotleyRice, and I represent the plaintiffs in this action, both the personal injury plaintiffs and the school districts.

MS. TRUONG:  An Truong, Simmons Hanly Conroy, for plaintiffs as well.

MR. KRAMER:  Andrew Kramer from Wilson Sonsini for YouTube.

MS. VALLES:  Lizette Valles from Wilson

Page 9

Sonsini for YouTube.

MR. BERKLEY: Demarron Berkley, in-house counsel for YouTube and Google.

THE VIDEOGRAPHER: Counsel over Zoom?

MR. WHITE: Kevin White of Gibson Dunn & Crutcher on behalf of TikTok defendants.

MS. URBAN: Marissa Urban on behalf of YouTube.

MR. FLASTER: This is Eben Flaster with my colleague Katelyn Romeo from -- excuse me. Shook, Hardy & Bacon, LLP, in Philadelphia, representing the Meta defendants. Thank you.

THE VIDEOGRAPHER: The court reporter is Kathleen Maltbie, who will now swear in the witness.

ERIN TURNER,

having been duly sworn,

was examined and testified as follows:

EXAMINATION BY MS. HAILESELASSIE

BY MS. HAILESELASSIE:

Q. Good morning, Ms. Turner. You've already heard me introduce myself, and I have had a chance to meet you, but I want to introduce myself again.

I represent the plaintiffs, as you heard me say, in this action. The plaintiffs are hundreds of personal injury plaintiffs, and those are

Page 10

children and their parents, and I also represent school districts.  And many of those plaintiffs allege they have been injured by the conduct of YouTube.

Do you understand that?

A.    Yes.

Q.    And we're here this morning in San Francisco to take your deposition.  You've been sworn in by the court reporter, and you're under oath that you're going to testify truthfully.

Are you committed to doing that today?

A.    Yes.

Q.    And that means, even though we're here in this lovely courtroom -- this conference room, your deposition today has the same effect as if you were testifying before a judge and a jury, even though they are not here.  It is being videotaped and is also being recorded stenographically.  There's a written record that's going to be produced.  And either the video or the written record can be presented in court, or used for any purpose that's authorized under the state and federal rules.

Do you understand that?

A.    Yes.

Q.    Do you have any questions about that?

Page 11

A.    No.

Q.    Okay.  And I'm sure -- I'm sure you've been well prepared by your counsel for the proceedings today, but just so we have a record that's on the record that we're all on the same page, I do want to go over some ground rules.

So I think the court reporter has already mentioned a few of them, and you're already doing some of it, just responding verbally, so that's right.  But I would just go over that, put it on the record.  So we talked about your responses should be verbal.  It's very natural in conversation, as you go along, that you might nod your head or shake your head, but the court reporter can't record that.  So in the event that that happens, I'll just remind you.

Another thing that happens that's pretty natural in conversation is that we might speak over each other.  But what we'll try to do today is I'll finish my question, your counsel may have an objection, and even if your counsel objects, you should still answer the question.  There may come a point where we do speak over each other and have to go back and do it in order, question, objection, answer.  That kind of happens often in depositions.

Page 12

But if it does, nobody is doing anything wrong, we've just kind of lapsed into that natural conversation situation.

Do you -- do you understand?

A.   Yes.

Q.   Okay.  And you can take a break at any point.  I generally like to go for about an hour and a half, but if you need to take a break, the only thing that I would ask is that if there's a pending question, that you do answer the question and then I'm happy to let you take a break.  You're certainly not captive to this -- to this questioning today.

Do you understand?

A.   Yes.

Q.   Okay.  Is there anything that would affect your memory today?

A.   No.

Q.   Did you get a good night's sleep last night?

A.   Yes.

Q.   Is there anything that would affect your ability to tell the truth today?

A.   No.

Q.   Okay.  And we are here today in San Francisco in the office of Wilson Sonsini.

Page 13

Are you represented by the attorneys here at Wilson Sonsini?

A.   Yes.

Q.   Did you sign an engagement letter with them?

A.   No.

Q.   Okay.  Are you paying them to represent you?

A.   Let's go back.  When you say they're representing me, what do you mean?  They're representing YouTube, and I'm an employee of YouTube.

Q.   Okay.  Have you signed an agreement with -- and when you say "YouTube," you consider yourself an employee of YouTube?

A.   I'm an employee of Google, and I specifically work at YouTube, which is owned by Google.

Q.   Okay.  And it's your understanding that Wilson Sonsini represents Google?

A.   Correct.

Q.   Okay.  And represents YouTube as well, obviously?

A.   Yes.

Q.   Okay.  And have you signed an agreement

Page 14

with -- I'm gonna say "Google."  When I refer to "Google," please understand that unless I specify, I am referring to Google and YouTube as well.

A.    Mm-hmm.

Q.    Have you -- have you signed an agreement with Google regarding your representation?

A.    No.

Q.    Okay.  Do you consider that your interests are the same as Google's in this litigation?

MR. KRAMER:  Objection to form.

THE WITNESS:  Can you clarify?

MR. WHITE:  Counsel, could we get a stipulation that an objection for one is an objection for all?

MS. HAILESELASSIE:  Of course.

THE WITNESS:  I'm not sure I understand the question.  Can you clarify what you mean?

BY MS. HAILESELASSIE:

Q.    Sure.

Sometimes in litigations, interests can diverge.  So the reason I'm asking this is really to preface the question.  If -- if you feel at any point today that -- that your interest diverge with Google's, do you understand that you would still be obligated to tell the truth even though you're

Page 15

represented by Google's attorneys?

A.   Yes.

Q.   Okay.  And that's really all I was getting at.

Okay.  So I think I've already covered this, but just for the record, we're going to be talking about YouTube as a platform in this deposition, and then Google is -- do you understand them to be the parent company of YouTube?

A.   Yes.

Q.   And so when I'm referring to YouTube, I am referring to the platform.

Have you spoken with anyone, other than your attorneys, about your deposition?

A.   Only my manager.

Q.   Okay.  And who is your manager?

A.   James Beser.

Q.   Did you discuss your potential testimony with Mr. Beser?

A.   No.

Q.   Did you discuss the litigation generally with Mr. Beser?

A.   Only that I was going to be deposed.

Q.   And you haven't had any other conversations with employees of Google regarding

Page 16

your deposition?

A.   No.

Q.   Have you had conversations with any former employees about the -- about your deposition?  Any former -- strike that.

Have you had any discussions with former employees of Google about your deposition?

A.   No.

Q.   How many times did you meet with the attorneys at Wilson Sonsini about your deposition?

A.   A handful of times.

Q.   Was it five times or less than five times?

A.   That sounds about right.

Q.   And when you met with your attorneys at Wilson Sonsini, how many hours did you meet with them on each occasion, approximately?

A.   A couple of hours.

Q.   A couple of hours approximately five times; is that accurate?

MR. KRAMER:  Objection to form.

THE WITNESS:  That sounds about right.

BY MS. HAILESELASSIE:

Q.   Okay.  So about ten hours in meetings with your attorneys ahead of your deposition?

A.   Give or take, that sounds about right.

Page 17

Q.   Okay.   Somewhere between ten and 15 hours, do you think?

A.   Probably less.

Q.   Okay.   Less than 15, but more than ten?

A.   I would say ten is about right.

Q.   Okay.   And did you review any documents in preparation for your deposition?

A.   Yes.

Q.   Approximately how many documents did you review?

A.   Also probably around ten.

Q.   Okay.

MS. HAILESELASSIE:   And just for the record, are all of those documents that were produced in this litigation?

MR. KRAMER:   They are.

BY MS. HAILESELASSIE:

Q.   Okay.   At this time, I'm going to have marked your notice of deposition.   So -- sorry, this is Tab A.

MR. KRAMER:   Sorry, Jade, I didn't want to interrupt.   I got a note that it's hard for people on Zoom to hear the witness and Jade.

THE VIDEOGRAPHER:   Time is now 11 -- time is now 9:49.   Going off the record.

Page 18

(Whereupon, a recess was taken from 9:49 a.m. to 9:54 a.m.)

THE VIDEOGRAPHER: Time is now 9:54. We're back on the record.

MS. HAILESELASSIE: Okay. Thank you.

BY MS. HAILESELASSIE:

Q. So before we went on break, I was marking what is going to be -- and I'll just say this for the first exhibit, we've got a great naming convention here, it's GoogleYouTube Turner 1. And it is your notice of deposition.

(Whereupon, Deposition Exhibit 1 was marked for identification.)

BY MS. HAILESELASSIE:

Q. Have you seen your deposition notice before?

A. Yes.

Q. Okay. And I -- I think other than the start time, that all looks to be in order?

A. Yes.

Q. Okay. Thank you. And you can -- you can put that aside.

I am going to have marked now Tab B. This is your CV from LinkedIn that was produced by the attorneys for Google in this case.

Page 273

done.  I don't know what other teams may have done.

BY MS. HAILESELASSIE:

Q.  Okay.  I'm marking Exhibit 17.  I just have a couple questions on this one.

(Whereupon, Deposition Exhibit 17 was marked for identification.)

BY MS. HAILESELASSIE:

Q.  This is -- it's titled "Outline of ███ promo."  It has a Bates number of -02509749.  And it was produced by Google's attorneys from your custodial file.  You're the only custodian on it.  You are also the author.

Does this document have to do with your subordinate, ███████ promotion?

A.  Yes, it does.

Q.  And was this a report that you were preparing in support of her promotion?

A.  That's correct.

Q.  Okay.  I just want to come down to the bottom of -9749.

Can you read Numbers 1 and 2 going over to the top of -9750?

Can you read it aloud?

A.  Sorry, you are asking me to read it?

Q.  Yes, please.

Page 274

A.    (As read):

████ is in the bull's-eye of two of YouTube's biggest challenges, and she has shown she's more than capable of leading multiple strategies -- multiyear strategies and delivery end to end. Number 1, supporting teen wellbeing via content classifiers and treatments, one of the biggest concerns in society today among parents, law makers and teens themselves.  Identifying what content has the potential to negatively impact some teens in repetition required extensive research with experts, thoughtful template iteration and model score reviews to avoid overreach, novel metric approaches to define concentration per recommendation surface and to sample accordingly, and had strong narratives to executives who were skeptical when this work was started, but

Page 275

exceedingly happy it had already been done when the regulatory tide shifted abruptly this year.

Number 2, driving responsible teen watch time growth. An existential issue, YouTube is losing ground to teens with TikTok and other competitors. ████ was asked to step in and develop a strategy in Q1 when the year had already started. She dove deep into the user research and recommendation system with her eng partners to turn around a strong set of pillars and treatments with amazing speed. Through rapid execution, the team delivered XX launches, and she's worked hard -- within three quarters, she's worked hard to refine and clarify the big ideas.

Q. Thank you.

So does -- does this document refresh your recollection as to YouTube's fierce competitiveness with TikTok and other social media competitors?

Page 276

MR. KRAMER:  Objection to the form.

THE WITNESS:  YouTube -- can you say more about -- you said fierce competition.

BY MS. HAILESELASSIE:

Q.   You said YouTube is losing ground with teens to TikTok and other competitors, right?

And you said that responsible -- well, let me just --

Right?  You wrote that?

A.   I -- I wrote that, correct.

Q.   Okay.  And driving responsible teen watch time growth is an existential issue for YouTube, right?

A.   That's --

MR. KRAMER:  Objection to form.

THE WITNESS:  That is what this summary says.

BY MS. HAILESELASSIE:

Q.   Okay.  And did you -- did you mean by that that YouTube might one day cease to exist if it cannot responsibly grow teen watch time?

MR. KRAMER:  Objection to form.

THE WITNESS:  I wouldn't agree with that characterization.  ████ was asked to look at how content was relevant to this audience in an interim

Page 277

basis, and came up with a strategy to do so as related -- as stated here.

BY MS. HAILESELASSIE:

Q. Okay. But you -- you did write that driving responsible teen watch time growth is an existential issue and that YouTube is losing ground with teens to TikTok and other competitors.

I want to -- I want to just go back up to the -- let's talk about what's under that. So you said she deep dove this, and then there was some pushback -- sorry, that is up in paragraph 1, there was some pushback from executives when this work was started, right?

MR. KRAMER: Objection to the form.

THE WITNESS: When we start any new project, we will often get questions on the work. And so that's what I'm referring to. But that's every single project that is new gets some skepticism. And ultimately, that work was -- was still approved and moved very quickly. So this is speaking more to her ability to explain the need and get approval to move forward with the work.

BY MS. HAILESELASSIE:

Q. Do you understand what was driving the skepticism in this particular case?

Page 278

MR. KRAMER:  Objection to form.

THE WITNESS:  As I mentioned, any new project is going to have some skepticism because it's committing -- whether -- whether it's modernizing the app or working on responsibility, it's something where there'll be new resources and commitments.  And so it's the job of my team or any team to explain why this work should be an investment.

BY MS. HAILESELASSIE:

Q.   Do you recall which executives were skeptical?

A.   I don't recall.

Q.   And what you expressed here is that those skeptical executives were happy when the regulatory tide shifted abruptly, right?

A.   That's what I stated here.

Q.   Okay.  So I don't -- I don't think there's anything you mentioned here about these executives being happy with the product itself and the results of the product.

It was just when the regulatory tide shifted, right?

MR. KRAMER:  Objection to the preamble.  Objection to the form of the question.

Page 279

THE WITNESS: So this is not a comprehensive summary of the response from executives. We got quite a bit of support in rapidly executing the project and on the fact that it was launched. In a review like this, there is a word limit, and so this is a highly summarized snippet that doesn't provide the full context on the support from executives for this project.

BY MS. HAILESELASSIE:

Q. Okay. I just want to have you go back to Exhibit 16. Page 94, slide 94.

Begins "teen wellbeing is a huge problem."

Do you see the statistic 42 percent of U.S. high school students said they felt persistently sad or hopeless?

A. I'm just looking to catch up with you. Which deck are we looking in?

Q. Exhibit 16, page -- slide 94.

Do you see that statistic?

A. I'm -- I'm looking for the same page. Give me just a second here. Oh, yes.

Q. And do you see also the quote (as read):

Teen girls who persistently felt sad or hopeless increased dramatically from 2011 to 2021

jumping from 36 percent to 57 percent.

A.    I see these stats.

Q.    Okay.  Do you understand that period from 2011 to 2021 to be a period during which there was widespread adoption of social media applications, including YouTube?

MR. KRAMER:  Objection to form.

THE WITNESS:  So there's a couple of points.  These are stats, as I mentioned.  We look broadly to understand what's happening in the world and make sure that we're proactively addressing risks.  That doesn't mean that these are issues on YouTube.  And second, YouTube is not a social media app.  We don't have a social graph.  So I would not put us in the bucket where there's social media apps.

BY MS. HAILESELASSIE:

Q.    Do you agree that one of the primary purposes of YouTube is to create communities around video?

MR. KRAMER:  Objection to form.

THE WITNESS:  Our mission at YouTube is to give users a voice and show them the world.  That's our stated mission.

BY MS. HAILESELASSIE:

Q.   Do you agree that a component of that mission is building communities around video?

MR. KRAMER:   Objection to form.

THE WITNESS:   I can't speak to that. That's something that I don't work on.  I don't know if we have a team that works on that.  But that's not what I work on.

BY MS. HAILESELASSIE:

Q.   Okay.  And users have the ability to like, comment and subscribe on YouTube, correct?

MR. KRAMER:   Objection to form.

THE WITNESS:   They have the ability to subscribe to channels, that's correct.

BY MS. HAILESELASSIE:

Q.   And they have the ability to like videos, right?

MR. KRAMER:   Objection to form.

THE WITNESS:   They have the ability to like videos.

BY MS. HAILESELASSIE:

Q.   And they have the ability to comment and interact with other users through comments on videos, correct?

MR. KRAMER:   Objection to form.

Page 282

THE WITNESS:  It depends.

BY MS. HAILESELASSIE:

Q.  And they have the opportunity to interact with creators in a live video format, right?

MR. KRAMER:  Objection to form.

THE WITNESS:  It depends on -- on the surface.  So those areas are not areas that I work on.  I can't speak to all the protections, but I know that we have a lot of limits on, for example, our supervised experiences versus other -- versus regular YouTube.  But I can't speak to all the -- all the protections in place.

BY MS. HAILESELASSIE:

Q.  So you don't know whether it's possible for people to like, comment and subscribe on YouTube?

MR. KRAMER:  Objection to form.

THE WITNESS:  Can you be more specific? Which people?

BY MS. HAILESELASSIE:

Q.  You don't know whether it's possible for users to like and comment on videos?

MR. KRAMER:  Objection to form.

THE WITNESS:  But which users?  Because it depends on your age, and it depends on whether

you're supervised or not.

BY MS. HAILESELASSIE:

Q.   You were saying that YouTube is not a social media application.

But it does have these social factors built into the fabric of its platform, does it not?

MR. KRAMER:  Objection to form.

THE WITNESS:  Well, from my point of view, a social media -- what defines a social media application is a social graph, which we do not have.

BY MS. HAILESELASSIE:

Q.   There are social aspects to YouTube, correct?

MR. KRAMER:  Objection to form.

THE WITNESS:  From my point of view, what defines -- as I said earlier, what defines social media application is a social graph.  That's my point of view.

BY MS. HAILESELASSIE:

Q.   Okay.  Exhibit 16, page 109, there is a comment from you.  (As read):

I like the strong problem statement, however, I'm wondering if it leans too much into mental health on sadness and hopelessness

Page 291

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.

_____ Reading and Signing was waived

___x___ Re                                    iested.

*Kathleen A. Wilkins*

_____

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212

# AMENDED Exhibit 1001

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE: SOCIAL MEDIA            Case No. 4:22-MD-03047-

ADOLESCENT ADDICTION/               YGR MDL No. 3047

PERSONAL INJURY PRODUCTS

LIABILITY LITIGATION               MDL No. 3047

_____

This Document Relates to:

ALL ACTIONS

_____


30(B)(6)/PMQ FOR GOOGLE/YOU TUBE

VIDEOTAPED DEPOSITION OF ERIN TURNER

Wednesday, January 22, 2025

SAN FRANCISCO, CALIFORNIA


Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

Page 2

VIDEOTAPED DEPOSITION OF ERIN TURNER

BE IT REMEMBERED that on Wednesday, January 22, 2025, commencing at the hour of 9:38 a.m. thereof, before me, Kathleen A. Maltbie, RPR-RMR-CRR-CCRR-CLR-CRC-RDR, a Certified Stenographic Shorthand Reporter, in and for the State of California, Nevada and Texas, personally appeared ERIN TURNER, a witness in the above-entitled court and cause, who, being by me first duly sworn, was thereupon examined as a witness in said action.

Page 3

                    APPEARANCES OF COUNSEL
  FOR THE PLAINTIFFS:
        MOTLEY RICE LLC
        28 Bridgeside Boulevard
        Mount Pleasant, South Carolina 29464
        BY:   JADE A. HAILESELASSIE, ESQ.
        Telephone:   (843) 216-9000
        Email:   Jhaileselassie@motleyrice.com

        And

        SIMMONS HANLY CONROY
        112 Madison Avenue, 7th Floor
        New York, New York 10016-7416
        BY:   AN TRUONG, ESQ.
        Telephone:   (212) 257-8482
        Email:   Atruong@simmonsfirm.com
  FOR THE DEFENDANTS GOOGLE/YOUTUBE:
        WILSON SONSINI GOODRICH &
        ROSATI
        650 Page Mill Road
        Palo Alto, California 94304-1050
        BY:   ANDREW KRAMER, ESQ.
              LIZETTE VALLES, ESQ.
        Telephone:   (650) 565-3641
        Email:   Akramer@wsgr.com
                 lvalles@wsgr.com
        WILSON SONSINI GOODRICH &
        ROSATI
        953 East Third Street, Suite 100
        Los Angeles, California 90013
        BY:   CHRISTOPHER CHIOU, ESQ.
              CALLIE DAVIDSON, ESQ. (VIA ZOOM)
        Telephone: (323) 210-2900
        Email: cchiou@wsgr.com
                 Cdavidson@wsgr.com

Page 4

                    COUNSEL APPEARING VIA ZOOM
FOR THE PLAINTIFFS:
     RON AUSTIN LAW
     400 Manhattan Boulevard
     Harvey, Louisiana 70058
     BY:  RON A. AUSTIN, ESQ.
     Telephone:  (504) 227-8100
     Email:  raustin@ronaustinlaw.com

FOR THE DEFENDANTS GOOGLE/YOUTUBE:

     WILSON SONSINI GOODRICH &
     ROSATI
     12235 El Camino Real
     San Diego, CA 92130-3002
     BY:  SAMANTHA ALEXANDRIA-BOOTH MACHOCK, ESQ.
     Telephone:  (858) 350-2227
     Email:  Smachock@wsgr.com

FOR THE META DEFENDANTS:

     SHOOK HARDY BACON
     Two Commerce Square
     2001 Market Street, Suite 3000
     Philadelphia, Pennsylvania 19103
     BY:  EBEN S. FLASTER, ESQ.
          KATELYN ROMEO, ESQ.
     Telephone:  (215) 278-2549
     Email:  Eflaster@shb.com
               kromeo@shb.com

FOR THE TIKTOK DEFENDANTS:

     GIBSON, DUNN & CRUTCHER LLP
     310 University Avenue
     Palo Alto, California 94301-1744
     BY:  KEVIN J. WHITE, ESQ.
     Telephone: (650) 849-5358
     Email:  Kwhite@gibsondunn.com
ALSO PRESENT:
     Demarron Berkley, in-house counsel, YouTube and
          Google
     (Via Zoom Videoconference)
     Marissa Urban, in-house counsel, YouTube
          Product Counsel

Page 61

is not in my area.

BY MS. HAILESELASSIE:

Q.   You've never inquired of anyone why that's the case?

A.   No.

Q.   Okay.  I'll have marked now -- I believe it's already been marked Exhibit 4.

(Whereupon, Deposition Exhibit 4 was marked for identification.)

BY MS. HAILESELASSIE:

Q.   And I will represent to you that this is an exhibit from another deposition that we did earlier this year of -- Ms. Weikert -- who just helped us identify the areas that you're going to address with us.  So you're welcome to look through it, but it's mostly a list of names, programs, features and groups within YouTube.  So I'm just directing you to the parts that are relevant to her deposition.

So if you could look at page 9.

Do you see where it says, "Responsible Content & Creators?"

MR. KRAMER:  I'm going to object to the characterization of the document.

But you can go ahead and look through.

Page 62

THE WITNESS:  What page is that on?

BY MS. HAILESELASSIE:

Q.  This is page 9.

A.  Page 9.

Okay.

Q.  Okay.  It lists a couple of things that YouTube suggests we talk to you about, a teen wellbeing classifier and age appropriate classifier.

Do you see that?

A.  I see that, yes.

Q.  Okay.  And I'm just showing you that so you understand what's guiding a lot of my questioning today.

Do you understand?

A.  Okay.

Q.  So the Teen Wellbeing classifier, and then in parentheses, it specifies Volume Impacts Wellbeing.

Are you generally knowledgeable about that product?

MR. KRAMER:  Objection to form.

THE WITNESS:  This is a product my team is responsible for.

BY MS. HAILESELASSIE:

Q.  Is it a product you're generally

Page 73

A.    The --

MR. KRAMER:  Objection to form.

BY MS. HAILESELASSIE:

Q.    Okay.  We'll probably come back to this.

If you'll just turn to the page 15.  At the top under "Digital Wellbeing Features," you were listed along with the teen wellbeing features.  I'm just getting there myself.  (As read):

Teen wellbeing classifier (to reduce concentration of non-violative content that is potentially harmful to teens in

Page 74

high volume.)

Do you see that?

A.    Yes.

Q.    Is that the same thing that we've just looked at, VIBE?

A.    Yes.

Q.    And do you know what the 2022 in parentheses refers to next to this classifier?

A.    That refers to when this was -- this work was launched.

Q.    All right.  I'm going to have marked Exhibit 5 -- you can put that one to the side. Thank you.

Okay.  Actually, before we take a look at 5, does your work -- so your work extends to YouTube Kids, correct?

A.    Yes.

Q.    And do you work on YouTube shorts?

A.    My -- our signals are applied to YouTube shorts.

        (Whereupon, Deposition Exhibit 5
         was marked for identification.)

BY MS. HAILESELASSIE:

Q.    Okay.  So taking a look at what has been marked as Exhibit 5, this Bates -02480437 is an

Page 180



Q.   Okay.  We can put this to the side.  I'm going to mark Exhibit 10.

(Whereupon, Deposition Exhibit 10 was marked for identification.)

BY MS. HAILESELASSIE:

Q.   This is an email with the Bates ending -02490539.  And it is an email from ███████████ to you, Ms. Turner.

Who is ███████████?

A.   ███████████ is a member of the new GAPP team.

Page 181

Q.   What is the GAPP team?

A.   Government affairs and public policy.

Q.   This email is dated April 17th, 2023.

And what is the subject?

A.   The subject says (as read):

[Just us] regarding

privileged -- Re: privileged KOF

pov: on biggest teen protection

needs.

Q.   Okay.  And if you will turn to -0540, do you see your message to ████ starting this thread?

MR. KRAMER:  Objection to the form.

BY MS. HAILESELASSIE:

Q.   Is that the first email in the thread, or email to ██████████?

A.   I'm just reading -- I'm just reading this here.

I -- I can't really tell from this whether this was the first email in that thread.  But I don't know -- yeah.  I can't tell for sure if this was -- if there was something before that.

Q.   Okay.  Well, I will represent to you, I haven't removed anything from this document, and did not -- did not see any others with earlier emails, but I understand you're telling me that you can't

Page 182

represent that that is the initial one in the thread.  But at least on this document, there is an email on April 5th, 2023 at 9:55 p.m.

And you are writing to -- is it ▇▇ and ▇▇?  Is that correct?

A.   That's what it says here.

Q.   Okay.  Do you know who ▇▇ is?

A.   ▇▇ is another member of the same team ▇▇ is on.

Q.   And that's --

A.   Government affairs and public policy.

Q.   Okay.  And your message starts off (as read):

Privileged.  ▇▇, please advise.

Do you see that?

A.   I do.

Q.   Who is ▇▇, if you know?

A.   That would have been ▇▇▇, who is one of the recipients on this email.

Q.   Okay.  And will you please read your email?

A.   (As read):

Privileged: ▇▇, please advise.  Hi, ▇▇▇, during

Page 183

Q2 I am leading an xfn team (those on cc) to pull together our holistic teen wellbeing road map and a go-to market plan for H2. One thing we'd like to understand from a KOF point of view is our biggest opportunity areas. We have a weekly working session with most on this thread. Can you make time to join us next week to share your point of view on the top three to five issues? We're looking for a rough stack ranking.

Q. Okay. So what -- what is the information you're trying to get from them?

A. We take a broad view in trying to understand from our users what's happening with their needs and also other stakeholders in the -- in the marketplace. So, for example, keeping formers and regulators so we can pull together a holistic picture of what our user needs and risks might be.

Q. And KOF is key opinion formers?

A. That's correct.

Q. You mentioned regulators. Are regulators key opinion formers?

Page 184

A.    That is a broad term that we use, but typically they -- they could be.

Q.    Who else would be a key opinion informer?

MR. KRAMER:  Objection to the form.

THE WITNESS:  That -- that is the term that typically our government affairs team would use.  I don't know who else would fall into that bucket.

BY MS. HAILESELASSIE:

Q.    Would it include users of YouTube?

MR. KRAMER:  Objection to the form.

THE WITNESS:  Users are -- are our biggest priority.  We are very user centered in understanding their needs, but we also like to understand the landscape as a whole and what other issues may be of impact to our users.

So regulators and how they are seeing the needs of our users are an important data point for us.

BY MS. HAILESELASSIE:

Q.    Are users included in the term "key opinion formers"?

MR. KRAMER:  Objection to the form.

THE WITNESS:  They are -- they are not.

/ /

Page 273

done.  I don't know what other teams may have done.

BY MS. HAILESELASSIE:

Q.  Okay.  I'm marking Exhibit 17.  I just have a couple questions on this one.

(Whereupon, Deposition Exhibit 17 was marked for identification.)

BY MS. HAILESELASSIE:

Q.  This is -- it's titled "Outline of ████ promo."  It has a Bates number of -02509749.  And it was produced by Google's attorneys from your custodial file.  You're the only custodian on it.  You are also the author.

Does this document have to do with your subordinate, ████████, promotion?

A.  Yes, it does.

Q.  And was this a report that you were preparing in support of her promotion?

A.  That's correct.

Q.  Okay.  I just want to come down to the bottom of -9749.

Can you read Numbers 1 and 2 going over to the top of -9750?

Can you read it aloud?

A.  Sorry, you are asking me to read it?

Q.  Yes, please.

A.    (As read):

████████ is in the bull's-eye of two of YouTube's biggest challenges, and she has shown she's more than capable of leading multiple strategies -- multiyear strategies and delivery end to end. Number 1, supporting teen wellbeing via content classifiers and treatments, one of the biggest concerns in society today among parents, law makers and teens themselves.  Identifying what content has the potential to negatively impact some teens in repetition required extensive research with experts, thoughtful template iteration and model score reviews to avoid overreach, novel metric approaches to define concentration per recommendation surface and to sample accordingly, and had strong narratives to executives who were skeptical when this work was started, but

Page 275

exceedingly happy it had already been done when the regulatory tide shifted abruptly this year.

Number 2, driving responsible teen watch time growth. An existential issue, YouTube is losing ground to teens with TikTok and other competitors. ▮▮▮▮ was asked to step in and develop a strategy in Q1 when the year had already started. She dove deep into the user research and recommendation system with her eng partners to turn around a strong set of pillars and treatments with amazing speed. Through rapid execution, the team delivered XX launches, and she's worked hard -- within three quarters, she's worked hard to refine and clarify the big ideas.

Q.    Thank you.

So does -- does this document refresh your recollection as to YouTube's fierce competitiveness with TikTok and other social media competitors?

Page 276

MR. KRAMER:  Objection to the form.

THE WITNESS:  YouTube -- can you say more about -- you said fierce competition.

BY MS. HAILESELASSIE:

Q.   You said YouTube is losing ground with teens to TikTok and other competitors, right?

And you said that responsible -- well, let me just --

Right?  You wrote that?

A.   I -- I wrote that, correct.

Q.   Okay.  And driving responsible teen watch time growth is an existential issue for YouTube, right?

A.   That's --

MR. KRAMER:  Objection to form.

THE WITNESS:  That is what this summary says.

BY MS. HAILESELASSIE:

Q.   Okay.  And did you -- did you mean by that that YouTube might one day cease to exist if it cannot responsibly grow teen watch time?

MR. KRAMER:  Objection to form.

THE WITNESS:  I wouldn't agree with that characterization.  ████ was asked to look at how content was relevant to this audience in an interim

Page 277

basis, and came up with a strategy to do so as related -- as stated here.

BY MS. HAILESELASSIE:

Q.    Okay.  But you -- you did write that driving responsible teen watch time growth is an existential issue and that YouTube is losing ground with teens to TikTok and other competitors.

I want to -- I want to just go back up to the -- let's talk about what's under that.  So you said she deep dove this, and then there was some pushback -- sorry, that is up in paragraph 1, there was some pushback from executives when this work was started, right?

MR. KRAMER:  Objection to the form.

THE WITNESS:  When we start any new project, we will often get questions on the work. And so that's what I'm referring to.  But that's every single project that is new gets some skepticism.  And ultimately, that work was -- was still approved and moved very quickly.  So this is speaking more to her ability to explain the need and get approval to move forward with the work.

BY MS. HAILESELASSIE:

Q.    Do you understand what was driving the skepticism in this particular case?

Page 278

MR. KRAMER: Objection to form.

THE WITNESS: As I mentioned, any new project is going to have some skepticism because it's committing -- whether -- whether it's modernizing the app or working on responsibility, it's something where there'll be new resources and commitments. And so it's the job of my team or any team to explain why this work should be an investment.

BY MS. HAILESELASSIE:

Q. Do you recall which executives were skeptical?

A. I don't recall.

Q. And what you expressed here is that those skeptical executives were happy when the regulatory tide shifted abruptly, right?

A. That's what I stated here.

Q. Okay. So I don't -- I don't think there's anything you mentioned here about these executives being happy with the product itself and the results of the product.

It was just when the regulatory tide shifted, right?

MR. KRAMER: Objection to the preamble. Objection to the form of the question.

Page 279

THE WITNESS: So this is not a comprehensive summary of the response from executives. We got quite a bit of support in rapidly executing the project and on the fact that it was launched. In a review like this, there is a word limit, and so this is a highly summarized snippet that doesn't provide the full context on the support from executives for this project.

BY MS. HAILESELASSIE:

Q. Okay. I just want to have you go back to Exhibit 16. Page 94, slide 94.

Begins "teen wellbeing is a huge problem."

Do you see the statistic 42 percent of U.S. high school students said they felt persistently sad or hopeless?

A. I'm just looking to catch up with you. Which deck are we looking in?

Q. Exhibit 16, page -- slide 94.

Do you see that statistic?

A. I'm -- I'm looking for the same page. Give me just a second here. Oh, yes.

Q. And do you see also the quote (as read):

Teen girls who persistently felt sad or hopeless increased dramatically from 2011 to 2021

Page 280

jumping from 36 percent to 57 percent.

A.    I see these stats.

Q.    Okay.  Do you understand that period from 2011 to 2021 to be a period during which there was widespread adoption of social media applications, including YouTube?

MR. KRAMER:  Objection to form.

THE WITNESS:  So there's a couple of points.  These are stats, as I mentioned.  We look broadly to understand what's happening in the world and make sure that we're proactively addressing risks.  That doesn't mean that these are issues on YouTube.  And second, YouTube is not a social media app.  We don't have a social graph.  So I would not put us in the bucket where there's social media apps.

BY MS. HAILESELASSIE:

Q.    Do you agree that one of the primary purposes of YouTube is to create communities around video?

MR. KRAMER:  Objection to form.

THE WITNESS:  Our mission at YouTube is to give users a voice and show them the world.  That's our stated mission.

Page 291

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.

_____ Reading and Signing was waived

___x___ Re                                  iested.

*Kathleen A. Wilkins*

_____

KATHLEEN A. MALTBIE
RPR-RMR-CRR-CCRR-CLR-CRC-RDR
California CSR 10068, Nevada CCR 995
Texas CSR 12212