# AMENDED Exhibit 1002

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
-----------------------------x
IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.  4:22-md-
ADDITION/PERSONAL INJURY       ) 3047-YGR
PRODUCTS LIABILITY LITIGATION  )
-----------------------------x

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE
COORDINATION PROCEEDING             )
SPECIAL TITLE [RULE 3,400]          ) Lead Case No. for
                                    ) Filing Purposes
SOCIAL MEDIA CASES                  ) 22STCV21355
_____       )
                                    )
This Document Relates to:           )
STATE OF TENNESSEE, et al.,         )
     vs.                            )
META PLATFORMS, INC., and           ) CONTAINS HIGHLY
INSTAGRAM, LLC, Case No.            ) CONFIDENTIAL
23-1364-IV                          ) INFORMATION
-----------------------------x

V O L U M E   I
VIDEOTAPED DEPOSITION OF TANAYA KASAVANA
SAN DIEGO, CALIFORNIA
JANUARY 28, 2025
9:14 A.M.
Job No.: 7026733
Pages: 1 - 350
Reported by: Leslie A. Todd, CSR No. 5129 and RPR

Page 8

P R O C E E D I N G S

-------------------

THE VIDEOGRAPHER:  We are now on the record.  My name is David Kim.  I'm a videographer for Golkow.  Today's date is January 28th, 2025, and the time is 9:14 a.m.

This video deposition is being held in San Diego, California, in the matter of In Re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, MDL 3047, in the United States District Court of the Northern District of California.

The deponent is Tanaya Kasavana.

Will counsel in the room please identify themselves for the record.

MR. AUSTIN:  Good morning.  May it please the Court.  Ron Austin on behalf of the school districts, the plaintiffs in the PSC.

MS. HAILESELASSIE:  I'm Jade Haileselassie.  I'm with Motley Rice, and I'm appearing for the plaintiffs today as well.

Page 9

MS. WADHWANI:  Neelum Wadhwani on behalf of Google, YouTube, and the witness.

MS. YOUNG:  Sophia Young on behalf of YouTube.

MS. BAACHUS:  Denisha Baachus on behalf of Google and YouTube.

MS. MACHOCK:  Samantha Machock on behalf of Google and YouTube.

THE VIDEOGRAPHER:  The court reporter is Leslie Todd, and she will now swear in the witness.

TANAYA KASAVANA,

and having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. AUSTIN:

Q.    Good morning, Ms. Kasavana.

MS. HAILESELASSIE:  Did we check the Zoom to see if anyone was joining remotely?

THE VIDEOGRAPHER:  We -- we have five on remotely now.

MS. HAILESELASSIE:  Okay.  They should announce as well, correct?

Page 10

THE VIDEOGRAPHER:  We do them on the written record --

MS. HAILESELASSIE:  Okay.

THE VIDEOGRAPHER:  -- if that's okay.

MS. HAILESELASSIE:  And will that include Alanna Austin?  She is not in the room, but she is joining.

THE REPORTER:  Yes, it will.

MR. AUSTIN:  Are we ready?  Let's go.

BY MR. AUSTIN:

Q.    Good morning, Ms. Kasavana.  How are you, ma'am?

A.    I'm well.

Q.    Thank you.  Can you introduce yourself to the ladies and gentlemen of the jury, please?

A.    My name is Tanaya Kasavana.

Q.    Okay.  And I've already introduced myself.  My name is Ron Austin, and I'm here today on behalf of plaintiffs, the school districts and the children and families across the country who alleged harm caused by Google and YouTube, and we sued Google and YouTube in

Page 11

federal court.

Are you aware of that?

A.      I am.

Q.      Okay.  We're here in San Francisco this morning to take your deposition.  Have you ever given a deposition before?

A.      I have not.

Q.      Okay.  This is your first rodeo.

A.      It is.

Q.      Yes, ma'am.  Are you committed to testifying truthfully?

A.      I am.

Q.      Yes, ma'am.  Fair enough.

Is there anything that would prohibit you from giving full testimony -- a full deposition today?  Are you tired, sick, on any medications, anything of such?

A.      I am not.

Q.      Yes, ma'am.  Have you had an opportunity to prepare for this deposition?

A.      I have.

Q.      Okay.  And how many hours approximately have you spent preparing for this deposition?

A.      Approximately ten hours.

Page 12

Q.        Approximately ten hours.  Have you a -- have you met with anyone outside of your attorneys in preparation for this deposition?

A.        I have not.

Q.        Have you spoken to anyone outside of your attorneys in preparation for this deposition?

A.        I have not.

Q.        Okay.  And so there are no text messages, no e-mails in reference to the litigation as a whole?

A.        There are not.

Q.        During the course of a deposition, it's a question and answer.  I'll ask a question, and I'll wait and allow you to answer.

You just nodded your head yes, and we all do that.  Please note that this particular deposition is being video and audio taped, and so sometimes if you're making head movements, it's not caught.

So I'm going to ask that you give a verbal answer.  Is that fair?

A.        That's fair.

Q.        I'm also going to ask -- or assume if you answer the question, I will assume you

Page 13

understand the question I'm asking.  Is that
fair?

         A.      Yes.

         Q.      So if I ask a question and you're
unsure what I'm asking, please ask me to repeat
myself.

         A.      I will.

         Q.      Thank you, ma'am.

                 For the record, we usually ask for
your address.  If you don't mind, just give us
your name and give us your address, please.

         A.      My home address?

         Q.      I don't want that on the record.
Just give us your office address, and counsel
will agree to make sure you are available for
whatever reason if you're no longer employed by
Google in the future.

                 MS. WADHWANI:  Well, we can take
         up any questions of availability or
         unavailability or what Google is or is
         not willing to do in the event that
         Ms. Kasavana ultimately leaves Google,
         but we're not going to agree to that
         right now today.

                 MR. AUSTIN:  I was just

Page 14

attempting not to have her put her home address on the record. That's the sole purpose of the question.

MS. WADHWANI: Okay. We will remain in contact with Ms. Kasavana. If that issue comes up, we will definitely talk to you about it, and if we need to make her available, we can provide you with that information.

MR. AUSTIN: Fair enough.

BY MR. AUSTIN:

Q. Ms. Kasavana, which documents did you prepare -- which documents did you review in preparation for your deposition?

MS. WADHWANI: Objection to form, calls for attorney-client privilege, and I'm going to direct the witness not to answer on the basis of privilege.

MR. AUSTIN: Counsel, can you assure us that she has not reviewed any records that was turned over to counsel?

MS. WADHWANI: I can assure you of that.

MR. AUSTIN: Fair enough.

Page 15

BY MR. AUSTIN:

Q.      Ms. Kasavana, in preparation for your deposition, did you take any notes?

A.      I did not.

Q.      Okay.  Do you have any notes that you created once you got notice you were taking -- you were going to have a deposition?

A.      I do not.

Q.      And how long have you been aware that you were going to have to give a deposition?

A.      Maybe about six months.

Q.      About six months now.  And in those six months, how many times have you spoken to your attorneys in preparation?

A.      About four.

Q.      Anyone else?

A.      No.

Q.      Fair enough.  I'm going to show you what we're going to mark as Google-YouTube-Kasavana 1, which is our notice.

                (Google-YouTube-Kasavana
                Exhibit No. 1 was marked for
                identification.)
                MR. AUSTIN:  And for the record,
        moving forward, they will all be marked

Page 16

Google-YouTube-Kasavana, but I may just say "Exhibit" moving forward, and -- I don't want to have to continue to repeat it.

BY MR. AUSTIN:

Q.      Have you seen the notice, ma'am?

A.      I have.

Q.      And are you prepared to testify in connection with this notice?

A.      I am.

Q.      Okay.  Fair enough.

And I didn't clear it up earlier.

Please understand, Ms. Kasavana, that although we're taking a deposition, it's as if we're in court, and so this testimony may be used for the benefit of the ladies and gentlemen of the jury, and as such proceed accordingly.  Is that fair?

A.      I understand.

Q.      Okay.  Thank you.

Ms. Kasavana, I'm going to --

MR. AUSTIN:  We would like to move Exhibit 1 into the record.

BY MR. AUSTIN:

Q.      Ms. Kasavana, you provided us with

Page 17

a current CV; is that correct?

A.      That's correct.

Q.      Okay.  I'm going to show you what we are marking as Google-YouTube 2.

(Google-YouTube-Kasavana Exhibit No. 2 was marked for identification.)

BY MR. AUSTIN:

Q.      And actually, can you identify it for the record, please.

A.      This is my LinkedIn profile.

Q.      Is this -- does your LinkedIn profile differ from your current CV?

A.      This is my current CV.

Q.      Okay.  Have you looked over -- is there anything that's inaccurate or not included on the CV?

A.      No.

Q.      For the -- for my benefit, can you give me your current job title and duties?

A.      I'm the director of product marketing at YouTube for core and responsibility.

Q.      And how long have you had that job?

A.      I've been director since March of 2023.

Page 18

Q.    Okay.  And prior to that position, which position did you hold?

A.    I led the kids and family product marketing team.

Q.    And how long were you in that position?

A.    I joined YouTube in that role in March of 2018.

Q.    Prior to 2018, you were not with Google/YouTube?

A.    I was with Google.  I was in a sales role at Google.

Q.    And so now you -- you work for Google currently but are assigned to YouTube?

A.    That's right.

Q.    Okay.  And tell me about your sales role with Google prior to 2018, please.

A.    Sure.  I joined the company in 2015.  I was part of a group that was helping what we consider traditional brand advertisers figure out how Google and the Google suite of advertising products can best meet their needs.

Q.    Fair enough.

I was given a copy of a notice of a 30(b)(6) deposition, and in it it gave

Page 19

your role -- I'm going to mark it as Google-YouTube Exhibit 3.

(Google-YouTube-Kasavana Exhibit No. 3 was marked for identification.)

BY MR. AUSTIN:

Q.    And I'll give it to you and ask that you turn to page 6.

MS. WADHWANI:  Put the first two aside?

MR. AUSTIN:  Yes, ma'am.  We're moving -- as I'm moving forward, for the record, I'm moving all of these into the record, if you will.  I have now identified them.  I don't want to forget to move them.

MS. WADHWANI:  Yeah, they'll be marked as exhibits to the deposition. Sorry, I'll switch with you and give you the official one.

THE WITNESS:  Okay. And I'm sorry, did you say page 6?

BY MR. AUSTIN:

Q.    Page 6, yes, ma'am.

Go down to "Marketing Related to Youth/Parents."

A.      Sure.

Q.      Are the things listed there your responsibility?

A.      The YouTube marketing core responsibility and youth.

Q.      Yes, ma'am.

A.      That's right.

Q.      Is there anything that was your responsibility that's not included here?

MS. WADHWANI:  Objection.  Form.

BY MR. AUSTIN:

Q.      Are there any other duties that you have that's not included under this heading?

MS. WADHWANI:  Same objection.

Did you hear the question?

THE WITNESS:  No.  I'm sorry.

MR. AUSTIN:  I'm sorry.

THE WITNESS:  I thought you objected, and so I was being quiet.

MS. WADHWANI:  Oh, no, I'm sorry.  When I -- unless I direct you not to answer a question --

Page 21

THE WITNESS:  Got it.

MS. WADHWANI:  -- when I lodge my objections, you should go ahead and answer.

THE WITNESS:  Got it.

MS. WADHWANI:  So, Mr. Austin, would you like the court reporter to read back your question?

MR. AUSTIN:  Please, ma'am.

THE WITNESS:  I apologize.

THE REPORTER:  "Are there any other duties that you have that's not included under this heading?

MS. WADHWANI:  And I have an objection to form to that question.

Now go ahead and answer.

THE WITNESS:  So all of my responsibilities are covered by core responsibility and youth, which is the title listed here.

BY MR. AUSTIN:

Q.    Fair enough.

And finally, I'm going to mark Google-YouTube-Kasavana 4, which is our initial disclosures.

Page 22

(Google-YouTube-Kasavana Exhibit No. 4 was marked for identification.)

BY MR. AUSTIN:

Q.    And I'm going to ask you to turn to page 2.

And midway down, do you see your name?

A.    I do.

Q.    Okay.  And can you read exactly what we have by your name, please.

A.    On the left-hand side or the right-hand side?

Q.    Let's try the right-hand side.

A.    "Tanaya Kasavana likely has discoverable information, including regarding marketing related to parental controls and youth safety features on YouTube."

Q.    Is that statement accurate?

A.    That is accurate.

Q.    Do you have any other information that's not included on this disclosure?

MS. WADHWANI:  Objection to form.

Page 23

THE WITNESS:  No, I believe that this captures my role.

BY MR. AUSTIN:

Q.    Fair enough.  Thank you.

MR. AUSTIN:  We're going to move that as well.

BY MR. AUSTIN:

Q.    Let's go to Bates number 2603564.  Go to page 5 -- Exhibit 5.

I'm going to show you what we're marking as Google-YouTube-Kasavana 5, which is "YouTube Kids:  Brand Crisis Response Marketing Playbook."

(Google-YouTube-Kasavana Exhibit No. 5 was marked for identification.)

MS. WADHWANI:  Can she have a moment to look at the document?

MR. AUSTIN:  Yes, ma'am.

BY MR. AUSTIN:

Q.    And I'm going to direct you to the pages I need you to go to.  I don't -- we don't necessarily need to look at every page.

A.    (Peruses document.)

Q.    Ms. Kasavana?

Page 70

Q. And so that's, yes, it would be considered a global issue?

A. Yes.

Q. Okay. Fair enough. A local issue as well, a regional issue as well?

A. Yes.

Q. Does YouTube send out a rapid response team using third parties to handle local issues -- local and regional issues?

A. What do you mean --

Q. Do you use a third party to help you, let's say, triage problems that may happen locally or regionally?

MS. WADHWANI: Objection to form.

Go ahead.

THE WITNESS: Can you give me an example of a third party? I'm not sure.

BY MR. AUSTIN:

Q. Any third party that's -- any party that's not in-house YouTube. Does YouTube use the PTA -- does YouTube use any third-party vendor to help handle or deal with problems that may occur -- may occur locally or regionally?

Page 71

MS. WADHWANI:  Objection to form.

THE WITNESS:  I can't speak for all of YouTube, but in marketing, we have a partnership with the Parent-Teacher Association.

BY MR. AUSTIN:

Q.     Any other association outside of the PTA?

A.     We've had partnerships with Common Sense networks.

Q.     Anyone else outside of PTA and Common Sense network?

A.     I can't speak to the exhaustive list, but those are some examples.

Q.     And those are credible third-party vendors that y'all use?

MS. WADHWANI:  Objection to form.

BY MR. AUSTIN:

Q.     Or partnerships that you have. Are they credible?

A.     I believe so.

Q.     All right.  Let's go to page 10. Can you read the title?

Page 91

Q.        Thank you for that.

Can we turn to page 20, please.

Can you explain that graph to us, please.

MS. WADHWANI:  Objection to form.

THE WITNESS:  So this is a chart that maps the communications to users by that same matrix.

BY MR. AUSTIN:

Q.        Okay.  And why does a low risk, high visibility issue -- low risk, high visibility issue receive the same treatment as the high risk, low visibility?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Can you repeat that question?

BY MR. AUSTIN:

Q.        The low risk -- I'm sorry -- why do the low risk, high visibility issues receive the same treatment as the high risk, low visibility?

MS. WADHWANI:  Same objections.

THE WITNESS:  I mean, this is --

Page 92

we don't have infinite resources, so this is a framework proposed at the time of how to prioritize.

BY MR. AUSTIN:

Q.    And so you're saying because of budgetary concerns for Google/YouTube, that these two scenarios are treated the same?

MS. WADHWANI:  Objection to form, mischaracterizes prior testimony.

THE WITNESS:  I didn't reference budget.  It's --

BY MR. AUSTIN:

Q.    You said infinite --

MS. WADHWANI:  Can she finish her answer, please?

MR. AUSTIN:  Yes.  I'm sorry.

BY MR. AUSTIN:

Q.    I'm sorry, ma'am, were you finished?

A.    That's okay.

All of these teams have what I would say are our day jobs, right, what we come in every single day to work on to make our products better.  And what this is showing is in the case of an escalation, how we can ensure that

Page 93

we are getting the right information back to our users in a way that also takes into consideration people's time and responsibilities.

BY MR. AUSTIN:

Q.    Ma'am, for the ladies and gentlemen of -- benefit of the ladies and gentlemen of the jury, can we go through exactly what YouTube -- Google/YouTube do in response to these?

A.    So I want to clarify that this is not all of YouTube -- this doesn't represent all of the teams.  This represents the marketing team.

So there are teams.  Right, this was a marketing doc.  There are teams that sit outside of marketing that also are focused on answering user questions, feedback.  Like we have a -- we have other teams in addition to marketing.  So I do want to make sure that I clarify that.

Q.    Yes, ma'am.

A.    Okay.

Q.    But in relation to marketing and for you, can you give the ladies and gentlemen of the jury, tell them how exactly it's

handled.

A.    So sorry, which --

Q.    So both of them.  They're both the same.

A.    -- which quadrant?

Q.    And so the -- the low risk, high visibility issues receive the same treatment as the high risk, low visibility.  So it's highlighted on our screen.

Can you go through it for the ladies and gentlemen of the jury and explain what they do.

A.    Sure.

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  So e-mail, we have e-mail marketing newsletters.  Those are subject to users wanting to opt in to those e-mails, which is why it's saying targeted.

On the social channels, if the -- if there is an opportunity to reply or direct message the user with more information, that can be helpful to

Page 95

them.  That's the next bullet.

Search engine -- SEM is shorthand for search engine marketing. So we constantly -- back to the point of investing a lot of time and effort to make sure that parents are educated on the tools that we provide and the features, we run search engine marketing always to answer queries.  So, you know, what products, what parental controls does YouTube have.  Right.  So that's that.

BY MR. AUSTIN:

Q.    Right.  And so we --

MS. WADHWANI:  Wait.  Let her --

MR. AUSTIN:  I'm sorry.

MS. WADHWANI:  -- finish, please.

BY MR. AUSTIN:

Q.    Are you finished with that?

A.    I was going to finish the rest of the bullets.

Q.    You can, and then I'll come back.

A.    Okay.

Page 96

Q.    Sorry.

A.    So search engine marketing then drives to the website, which is the next -- which is the next bullet. The website aggregates all of the helpful information. It has how-to videos on how to set up the parental controls. It helps break down and answer frequently answered questions.

And then advocates, you know, one of the things that we see in research with parents -- you've heard the adage, "It takes a village." Right. Parents have trusted partners that they turn to. The National PTA is one of those. Right. It's an incredible organization of parents who are dedicated.

And so when we are -- we want to make sure that those trusted voices also have the correct information so that they can also make sure to distribute that information to users such that it's helpful to them.

Q.    Thank you very much for that answer, ma'am.

Now, if we can go back to SEM. What exactly -- can you tell the ladies and gentlemen, after all the good things that SEM

Page 97

does, can you tell the ladies and gentlemen of the jury what actions does YouTube take?

MS. WADHWANI:  Objection to form.

BY MR. AUSTIN:

Q.     On the document, what does it say?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So SEM, so let's just explain how SEM works.

BY MR. AUSTIN:

Q.     You --

A.     Because that's important.

Search engine marketing is -- search engine marketing is -- if we as a brand or a product can decide to run marketing -- to run search ads in response to queries to a user's searches, and so that is an evergreen investment that we make, YouTube parental controls, so on and so forth.

And so the reason that you see no action here is because it's working as intended. It's just evergreen.

Q.     And so in this particular

Page 98

scenario when we're dealing with low risk, high visibility and high risk, low visibility, when it comes to SEM, YouTube takes no action, correct?

MS. WADHWANI:  Objection to form, mischaracterizes --

BY MR. AUSTIN:

Q.    As it relates to what's on this document, ma'am.

MS. WADHWANI:  Objection to form.

Go ahead and answer.

THE WITNESS:  That's because we have evergreen search engine marketing -- "evergreen" meaning always on -- to answer and to help -- to help parents understand all of the tools and controls and features that we offer.

BY MR. AUSTIN:

Q.    Fair enough.

On the sheet of paper, it says "no action," correct?

A.    It does.

Q.    Okay.  And let's go to website. It says, "What do you do in reference to the

Page 99

website?"

A.    Similarly, the website is -- exists and is updated on a continuous basis to reflect the product changes that we make when we roll out new features.  So that's an evergreen initiative.

And so in response to this, we don't need to take further action because it's just something that we make sure is maintained and up to date with the most helpful information for parents and caregivers at all times.

Q.    Fair enough.  So you take no action there, correct?

MS. WADHWANI:  Objection to form, mischaracterizes testimony.

BY MR. AUSTIN:

Q.    Yes, ma'am?

MS. WADHWANI:  Objection to form.

BY MR. AUSTIN:

Q.    Is that correct?

A.    Yes.

Q.    Okay.  Thank you.

Now, it says -- on the "Advocates" it says -- what does it say, "Reactive" --

Page 100

A.    "Reactive comms."

Q.    Okay.  And so for the -- for the low risk, high visibility, and the high risk, low visibility, you have a reactive approach to the problem, correct?

A.    That is not correct.  What --

Q.    Does it not say that on this page, ma'am?

A.    Well, let me explain what "reactive comms" means.  So what "reactive comms" means in the situation of, take Momo, for instance, where as we are monitoring and we are learning very quickly and validating that none of those videos exist on YouTube, and it is a viral hoax, one of the things that we do is we arm those partners with the truth such that -- and what "reactive" means is we're not asking them to go out and proactively tell their parents, but we want them to have the authoritative information of what is happening such that if there are parents -- if there are parents or PTA leaders -- I'm going to use the PTA as an example -- if PTA leaders, you know, local school districts are calling in to National PTA, they have the correct information.

That's what we mean by "reactive."

Page 101

It's that we are not asking them to go out and make a statement. We're just saying, Hey, as a partner to us, and as a trusted voice to parents and communities, we want you to have the accurate information. That's what that means when we say "reactive comms."

Q.    Thank you, ma'am.

So if you go to high visibility, high risk, it differs greatly in terms of how you respond socially, correct?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Yeah --

BY MR. AUSTIN:

Q.    It responds -- and for SEM, the response greatly differs from the previous scenario, correct?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I don't necessarily agree with your characterization of "greatly differs." It's different in that we're saying we -- we might do a proactive post that reaches all users, but you can also see

Page 105

It is the same. We take all of this feedback. That's what I said before. There's a standard procedure and process for us to constantly be monitoring feedback from our users across a variety of channels, and there's a standard procedure internally as a cross-functional team where we take that feedback, and we look at our products and we look at our policies, and we make sure that we are being the best that we can be for our family. The difference that you're seeing here on this chart is just the communication.

And so again, I just -- I want to make very clear that like we are -- we are taking that feedback, all feedback, we take feedback across a variety of our channels, and we funnel it into our process.

BY MR. AUSTIN:

Q.      Thank you, ma'am.

Let's move to page 27.

Ma'am, this is what a -- do you have it? Look on your screen.

A.        I do.

MS. WADHWANI:  Thank you.

BY MR. AUSTIN:

Q.        And this is an e-mail from the PTA; is that correct?  A PTA e-mail, parents' concerns -- or parents' comments?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I believe this is an illustrative mock.

BY MR. AUSTIN:

Q.        Can you read the first -- can you read the title of the first paragraph.

A.        "Combatting misinformation in schools - partner with the Parent-Teacher Association and access their newsletters and e-mail lists for important YouTube Kids responses."

Q.        Why is there an emphasis on misinformation?

A.        This is -- it goes back to the example -- the Momo example is a really good example, right.  We've seen, right, in these cases where inaccurate information is being spread and it's being spread quickly.

Page 107

And we want -- again, this all comes back to making sure that we can give our parents and our caregivers and our users and -- the right information of what is happening and what we're doing about it.  So that's what "combatting misinformation" refers to.

Q.    Okay.  The title of this presentation is what, crisis management; is that correct?  So this entire document is about crisis management.  Is that fair?

MS. WADHWANI:  Objection to form, mischaracterizes the document.

THE WITNESS:  This document is in the spirit of continuous improvement.  You'll see us do this across everything.

So I would say that this document is kind of reflecting on escalations that had happened and taking learnings, and coming with, you know, perspectives on how we can always be better.

BY MR. AUSTIN:

Q.    Why not emphasize on trends or signs that are potentially disturbing?

MS. WADHWANI:  Objection to

Page 108

form.

THE WITNESS:  I'm not sure I understand the question.

BY MR. AUSTIN:

Q.    You emphasize -- you're emphasizing misinformation or crises -- or crisis.  Why not emphasize on trends?  Why you don't put an emphasis on what's going on with trends or -- or videos that are potentially disturbing?

MS. WADHWANI:  Same objection.

THE WITNESS:  The context of this slide (indicating) within -- again, within the document is -- one of the dynamics we observed was in the case, again, Momo, just misinformation, inaccurate information, like basically spreading very quickly.

So again, this slide is about how can we get -- set the facts straight.  It doesn't mean -- there are many things that we do beyond that, but this slide is about simply the fact that we had observed a lot of incorrect information spreading very quickly.

Page 109

BY MR. AUSTIN:

Q.    Do you ever communicate with PTAs where there's a real risk that isn't necessarily trending?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Our partnership with the PTA is rooted in getting helpful information about our products and policies out to PTA members.  Like they're a phenomenal partner that way.

BY MR. AUSTIN:

Q.    Right.  But wouldn't it be awesome if your phenomenal partner were armed with information that there were potentially -- there were harmful videos that was trending so that they could get that out to their students, their administrators, their superintendents?

Do you not think that that's extremely important -- if in fact the PTA is a trusted partner, would you not consider it crucial that you arm them with the information of harmful content that is trending so that

Page 110

they could get in front of it from the school district level, from the teacher level, from the principal level, to help them combat the problem?

MS. WADHWANI:  Objection to form, compound, foundation.

Go ahead.

THE WITNESS:  I'm trying to understand your question.  I want to -- this is not the only reason or scenario where we partner with the PTA.

BY MR. AUSTIN:

Q.    I understand.  I didn't ask you if that was the only reason.

I'm asking, do you ever give them that information so they can arm their superintendents, their principals and their teachers with harmful content or harmful videos that is trending to help them protect their children or their students?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So I want to -- again, your use of "harmful," just I don't -- I don't necessarily agree with

Page 111

your use of "harmful."

There are many things we do.  So if you want to use the case of pranks, we have community guidelines against pranks.

BY MR. AUSTIN:

Q.    Do you ever inform the PTA of potentially disturbing or harmful videos that is trending?

MS. WADHWANI:  Objection to form.

THE WITNESS:  As a -- as a part of everything that we do, we might -- that's what reactive comms might be about, right, like keeping our partners abreast of situations.

BY MR. AUSTIN:

Q.    Do you ever communicate with the PTA where there's a real risk that isn't necessarily trending?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I can't speak on behalf of everybody that works with the PTA at YouTube.

Page 112

BY MR. AUSTIN:

Q.      This relates to who you work with at the PTA.  How about that?  Let's start with that.

A.      I think -- again, as the document outlines, if we -- we give parents all the information that we can that might -- and we've outlined in this document different ways that we do that.  There are other teams that also do that.  And so there may be times where we might be including the PTA in that.  But I can't speak for every single -- every single piece of feedback that a user might have.

BY MR. AUSTIN:

Q.      So is that a "no"?

MS. WADHWANI:  Objection.  Form, asked and answered.

THE WITNESS:  Yeah, that's not -- I'm saying like over the years, it -- it is entirely possible.

BY MR. AUSTIN:

Q.      Do you ever instruct the PTA on recommended counseling services or coping mechanisms they can use when a high risk -- when a high risk video has lots of views, even

Page 113

once the video has been removed?

MS. WADHWANI: Objection to form.

THE WITNESS: The premise of that question of high risk and coping, I'm not sure that I agree with. But as I've stated before, we give the PTA the relative -- the relevant information of what -- what we are doing and, yeah, of how YouTube is addressing.

BY MR. AUSTIN:

Q. Sorry, ma'am. Was that a -- another "no"?

MS. WADHWANI: Objection to form, objection to the mischaracterization of prior testimony, asked and answered.

THE WITNESS: Yeah, I understand that you are looking for a yes, no, on every single one of these questions. The challenge with that is that there's -- there's just more nuance here.

BY MR. AUSTIN:

Q. Do you remember -- can you cite

to the ladies and gentlemen of the jury any time that you, your marketing department, have offered or suggested counseling services or coping mechanisms for disturbing videos that were seen by school age children to the PTA? Have you -- or to the schools themselves, have you suggested any sort of counseling for them, any coping mechanisms?

MS. WADHWANI:  Objection to form, compound, asked and answered.

THE WITNESS:  The premise of that question is that our -- watching these videos require counseling.  And again, I'm not a medical expert, so as far as I can recall, no, I don't believe that we have provided the PTA with counseling services.

BY MR. AUSTIN:

Q.    Or suggestions.  Not that you've done -- suggestions of resources that they can access.

MS. WADHWANI:  Objection to form.

THE WITNESS:  Sorry.  Who can access?

Page 115

BY MR. AUSTIN:

Q.    The students or the teachers who's seen the disturbing videos, the administrators who's having to deal with the kids who have seen the disturbing videos, have you suggested any resources, any counseling resources, any resources that they could tap into to help them manage the problems?

MS. WADHWANI:  Objection to form, asked and answered.

THE WITNESS:  I have not, as far as I can recall.

BY MR. AUSTIN:

Q.    Thank you for that, ma'am. Let's move on.

MS. WADHWANI:  We've been going about an hour and 10 minutes.  Should we take a break?

MR. AUSTIN:  Have we been going that long?

MS. WADHWANI:  Yes.

MR. AUSTIN:  Ouch.  That means I'm in trouble.  We can take a break.  I was supposed to do that at the first hour.  But that's on me.  I'll fix it.

Page 116

We can take a break, yes.

THE VIDEOGRAPHER:  We are now going off the record, and the time is 11:45 a.m.

(Lunch recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 12:28 p.m.

MR. AUSTIN:  Thank you, sir.

BY MR. AUSTIN:

Q.    Ms. Kasa- --

A.    Kasavana.

Q.    I'm sorry.

A.    That's okay.

Q.    Ms. Kasavana, let's see if we can get started and I can get myself in gear.

We're going to turn to Exhibit 7, which is going to be marked as Google-YouTube-Kasavana starting with Bates number GOOG-3047MDL-00117952.

(Google-YouTube-Kasavana Exhibit No. 7 was marked for identification.)

BY MR. AUSTIN:

Q.    The title is "YouTube Kids

Q.     Yes.  Okay.  Can you turn to page 8.

Can you read the graphs?

A.     It says -- is this the slide (indicating)?

Q.     Yes, ma'am.

A.     So it's actually very difficult because the words are black and the background is black.  So I'm actually not sure that I -- like I can actually read --

Q.     Can you see it?

A.     Not on this.

Q.     I know.  Read it from the screen.

A.     Oh.  So I can't see the headline.

MR. AUSTIN:  Back it down, please.

BY MR. AUSTIN:

Q.     Can you see the headline on the screen?

A.     Yeah.  Okay.

"An audience core to YouTube."

Q.     Okay.

A.     "92 percent of online teens and millennials are YouTube users versus 85 percent

Page 169

Facebook users and 50 percent Snapchat users."

Q.    So 92 percent, that population are YouTube users above any of the other platforms, correct?

A.    I mean --

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  We have a ton of different use cases.  Like we help them with algebra homework.  When they are interested in learning how to play the guitar.  Music and podcasts are huge. We have YouTube TV.

So, yes, we -- we have -- we serve a lot of different purposes.

BY MR. AUSTIN:

Q.    Can you read the next one, please?

A.    "69 percent teen YouTube users say they visit at least daily."

Q.    Okay.  And underneath that.

A.    "More than teen daily users as Snapchat and Tumbler combined."

Q.    And can you read the next one,

please.

A.    "70 plus" -- "70 percent logged-in watch hours come from teens and millennials."

MS. WADHWANI:  Are you okay --

THE WITNESS:  Oh, I'm okay. Sorry.

BY MR. AUSTIN:

Q.    So also a lot of kids signed out also viewing as an option, correct?  So kids also signed out is an option for viewing, correct?

A.    Logged-out viewing is a state that we support for all users.

Q.    Turn to page 16, please.

A.    Can you --

MS. WADHWANI:  Wait.  Just make sure --

THE WITNESS:  I'm on a different page than what's on the screen.

MS. WADHWANI:  Just give her a chance to get the page and look at it.

BY MR. AUSTIN:

Q.    When you get it, can you read the title, please.

A.    "They're obsessively engaged."

Page 171

Q.      Why use the word "obsess"?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Yeah.  So if you look at how it's used, they're obsessed over their interests.  One of the things -- again, I am not a medical expert; I am not a child psychologist; I'm not an adolescent expert.

That being said, in consultation with our OLs (phonetic), some of the hallmarks of teenagers are they're discovering their sense of self, and they're discovering their place in the world and in their peer group, and one of the things they do when they are discovering their sense of self that really builds from when they're little, like their curiosities, is they just have unique interests and passions, and they go really deep on it.

I don't -- you know, like sneaker culture or anime or whatever it is.  So that's the spirit of -- they obsess over their interests because, you

Page 175

sharing functionality in the YouTube Kids app.

Q.    So the answer is you don't know if kids have the ability to share videos?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Well, what do you mean by kids?

BY MR. AUSTIN:

Q.    What do you mean by "kids"?  How do you define "kids"?

A.    So -- I'm thinking through the lens of if you are under 13, you can't have an account on YouTube.

Q.    This video, this document we're talking about is age 13 to 17, so let's deal with 13 to 17 first, and then we'll deal with those below 13.

Can those 13 to 17 share videos?

A.    Yeah, we have a sharing functionality.

Q.    Okay.  Are there any time restrictions on when they're able to do that?

MS. WADHWANI:  Objection to form.

THE WITNESS:  No, we have

Page 176

bedtime reminders and take-a-break reminders, but not that I know of.

BY MR. AUSTIN:

Q.    So there are no restrictions on the time when they can be shared?

A.    What I'm thinking is we have the options for parental supervision for teenagers. So I just -- I don't -- I can't recall all of the parental controls that we offer at every age case.

But, for example, if a family is using Family Link, like they can set the hours of access to YouTube.  So that's why it's kind of difficult for me to answer, like, what is a very absolute question because it depends.

Q.    Can you turn to page 49, please.

Can you read the title.

A.    Thank you.  "The Rise of," quotes, "Obsessive Watching Behavior."

Q.    The first column is what, "must see factors"?

A.    Yeah.  It says "The must see factor."

Q.    How many users does that have?

A.    It's saying less than 60 percent of

Page 177

teens and millennials channel subscribers watch new videos released by their favorite creators or channels within 24 hours.

Q.      How many video -- how many users report watching video -- new videos within one minute of posting?

A.      About -- of --

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  Of teens and millennials, about 15 percent.

BY MR. AUSTIN:

Q.      So does that mean that 15 percent of teens that uses YouTube on a regular basis could be watching videos during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  First of all, that 15 percent applies to both teens and millennials.  So we don't have a breakdown on this slide between teens and millennials.  Right.  I don't see that here.  So I do want to clarify

that.

And then what was your question?

BY MR. AUSTIN:

Q.      Does that mean that 15 percent of teens that use YouTube on a regular basis could be watching videos during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  As I just said, I can't -- I can't -- this slide doesn't tell you that.

BY MR. AUSTIN:

Q.      Does the slide tell you what percentage of -- does it tell you what percentage are watching new videos within one minute?

MS. WADHWANI:  Objection to form.

BY MR. AUSTIN:

Q.      How -- yes, does it tell you which percentage of teens are using or watching new videos within one minute of posting?

MS. WADHWANI:  Objection to form.

Page 179

THE WITNESS:  It tells you of teens and millennials.

BY MR. AUSTIN:

Q.    And so of teens and millennials, does that mean that of that 15 percent of teens and millennials, they are watching new videos during school hours?

MS. WADHWANI:  Objection to form, foundation, asked and answered.

THE WITNESS:  Not necessarily. Right.  Like -- the data is not on this slide to say that conclusively.

BY MR. AUSTIN:

Q.    Ma'am, can we agree that school hours are from 7:30 a.m. to 3:30 p.m. generally across the nation?

MS. WADHWANI:  Objection to form, foundation?

THE WITNESS:  Sure.

BY MR. AUSTIN:

Q.    So that we can agree that that's generally the school hours from coast to coast.

MS. WADHWANI:  Objection to form, foundation.

Page 180

THE WITNESS: 7:30 a.m. to 3:30.

BY MR. AUSTIN:

Q.    P.m.

A.    Sure.

Q.    Okay. And so if we can establish that the school hours are 7:30 a.m. to 3:30 p.m. coast to coast, and 15 percent of teens and millennials are watching videos within the first minute of them being posted, then those videos that are being posted between 7:30 a.m. and 3:30 p.m. are being viewed or watched by teens and millennials during school hours?

MS. WADHWANI: Objection to form, foundation, asked and answered.

THE WITNESS: I mean, again, this slide does not directly answer that question.

BY MR. AUSTIN:

Q.    Ma'am, are you denying that this slide indicates that 60 percent of teens and millennials -- 15 percent of teens and millennials watch videos posted within one minute of them being --

A.    I'm not. I'm not denying -- it

says 15 percent of teens and millennials of that entire cohort. It does not break down between teens or millennials watch within 60 seconds.

Hypothetically, if you want to do a hypothetical, it is conceivable. It might be during recess; it might be during a free period; it might be walking to the bus. So --

Q. And it might be during --

MS. WADHWANI: Can she finish her answer, please?

MR. AUSTIN: I'm sorry.

THE WITNESS: Right. Like again, it's such a broad question between -- they might be watching an algebra video. Right. Like the question of is it conceivable that they are watching between the hours of and 3:30? It's conceivable.

But again, when during that time? What are they watching? Is it actually part of the teacher's lesson plan?

BY MR. AUSTIN:

Q. We agree that -- I'm sorry, we would agree that 15 percent are watching

Page 182

videos within the first minute.  Is --

A.    15 percent of teens and millennials.

Q.    -- 15 percent of teens and millennials.  You're not disagreeing with that, correct?

A.    I'm not disagreeing that --

Q.    And you're not -- sorry, ma'am. Sorry.  Sorry.

A.    That's okay.

I'm not disagreeing with the fact that 15 percent of the entire cohort of teens and millennials.

Q.    And we're not disagreeing that school time is from 7:30 a.m. to 3:30 p.m., correct?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  No, I -- I feel like that can be an average representative of the school day.

BY MR. AUSTIN:

Q.    And so we would agree that 15 percent of those kids or those teens and millennials who are watching videos within the

Page 183

first minute of them posting are doing it during the traditional school hours.

MS. WADHWANI:  Objection to form, asked and answered.

THE WITNESS:  You're making a huge leap.  You don't have data on this slide that shows the -- when the most popular times of upload.  Right.  Like you're just -- you're making a leap from the data that's on this slide into a huge statement.

And so, no, I don't agree.  Like I'm -- what I'm trying to tell you is I see the one stat here.  But you also don't have the data about the most frequent uploads or the time period. There's 24 hours in the day.

BY MR. AUSTIN:

Q.    Eight of those are during school hours, correct?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Sure, but --

BY MR. AUSTIN:

Q.    Okay.

Page 184

A.       -- all of those eight hours are not equal.

Q.       So one-third of those hours are during day hours, during school hours, correct?

MS. WADHWANI:  Objection to form, foundation.

BY MR. AUSTIN:

Q.       Correct?

A.       Okay.

Q.       And the other third would be overnight hours, so from 11:00 to 7:00.

So if we're following that, the school hours actually represent half of the available viewing time.  It's only eight hours, but if you figure 16 hours a day when you're actually up and moving, the eight hours during the school time represents 50 percent of the time that young people are awake.  You would agree with that?

MS. WADHWANI:  Objection to form, foundation.

BY MR. AUSTIN:

Q.       That teens and millennials are awake.

Page 185

MS. WADHWANI:  Same objections.

THE WITNESS:  On weekdays -- we don't even have weekdays versus weekend broken out here.  Right.  That's what I'm saying.  I'm just saying you're missing critical data, and I do think you're making leaps.

BY MR. AUSTIN:

Q.    Yes, ma'am.  Let's move on.

The second column is -- where are we going?

MS. WADHWANI:  Hey, Ron, when you're at a good point, we've been going about an hour and 20 minutes.

MR. AUSTIN:  Okay.

MS. WADHWANI:  Thank you.

THE VIDEOGRAPHER:  Okay.  We are now going off the record, and the time is 1:46 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 2:06 p.m.

MR. AUSTIN:  Thank you.

BY MR. AUSTIN:

Page 186

Q.      So, Ms. Kasavana, can you turn to page 50, please.

Can you read the title?

A.      One second.  I'm just trying to see everything on this slide.

"For teens, YouTube isn't just a time filler.  They watch it in their 'prime time,' peaking 6:00 to 8:00 p.m."  "Prime time" in quotes.

Q.      And if we go down -- I'm trying to get to -- does the graph depict that watch time for teens peak at just over 75 million for active users?

A.      So, give me a second because this is pretty hard to see with the black on black.

MS. WADHWANI:  Counsel, I'm not blaming you, but it's hard to read --

MR. AUSTIN:  Yes, yes, ma'am.

MS. WADHWANI:  -- the words underneath, and it's hard to read this graph that you've identified.

THE WITNESS:  Sorry.  I think someone is like highlighting stuff, and it's actually --

MR. LOPEZ:  Yeah, I'm trying to

help you out.

THE WITNESS:  Oh, I so appreciate that.  It's actually becoming a little bit harder for me.

MR. LOPEZ:  Oh.

THE WITNESS:  Okay.  Do you mind --

MR. LOPEZ:  Sure.

THE WITNESS:  Yeah, maybe just -- okay.  Let me just try and read the axes and the legends.

(Peruses document.)

So --

BY MR. AUSTIN:

Q.    Oh, sorry.  If you look to the left side of the graph where it starts.

A.    Yeah.  The y-axis goes to 100 million.

I think what's difficult to understand is across the bottom, like what's the 1, 2, 3, 4.  Like that's what I --

Q.    It's the hours of the day.

A.    Oh, is that 6 -- okay.  That's the military time.  Right, 6:00 p.m.?

MR. LOPEZ:  It's --

Page 188

THE WITNESS:  Okay, thank you.
Sorry.  This one is hard to see.

MS. WADHWANI:  Did you see that
or you want him to put it back?

THE WITNESS:  Yeah.  So --
Right.  Okay.  So it's just showing
between 6:00 and 8:00 p.m. is when --

BY MR. AUSTIN:

Q.      It says peak time.

A.      Yeah.

Q.      And 75 million users?

A.      I don't know that that's 75 million
users.

Q.      75 million --

A.      Like that --

Q.      So --

A.      It's actually not clear.  Like we
don't have a legend.  Right.  So you don't know
if that is 75 million total hours watched across
all teens.  You don't know if that's --

Q.      Look at -- I'm sorry.  If you
look at it, I think it's -- on the left side,
it will indicate it's -- the users -- the
number of users, and it says 75 million.  It
goes up to 100 million, but it peaks between

Page 189

the hours of 6:00 and 8:00 at 75 million.

MS. WADHWANI:  Where does it say "users"?

THE WITNESS:  Yeah, that's what I'm asking.

MS. WADHWANI:  25 million to 100 million?  I'm just trying to understand where you're looking at, Counsel.

MR. AUSTIN:  Yes.  Do you see where it's highlighted, 100 million, 75 million?

MS. WADHWANI:  Yeah, we're just looking for the word "user," I think.

THE WITNESS:  Yeah, like what's the --

MS. WADHWANI:  And what those figures represent because -- you helpfully highlighted the bottom axis is hours of day divided by 50.  We're just trying to see if there's a similar description on the side where you want to take us.

BY MR. AUSTIN:

Q.    Yeah, I'm just saying what else would it be outside of users?

Page 190

A.    Oh, it could be aggregate watch time; it -- I mean, it could be minutes.  Like -- the point is it's missing, and it's missing a label.

Q.    Okay.  And so what I'm going to have to do is I'm going to have to -- so I'm going to have to ask you -- so I'm going to have to ask you -- I'm going to ask the questions this way, and I will have to supplement because of the way that it says.

I will ask you to stick with me.  And indicated across the bottom, it gives the hours, and you see here it peaks at 6:00 to 8:00 p.m.

Can you see that?

A.    Yes.

Q.    Okay.  And on the left side, it has 100 million, 75 million on the legend on the left side.  Do you see that?

A.    I do see that.

Q.    Okay.  I'm going to represent to you that that's the number of active users at those particular hours.  So at its peak between 6:00 and 8:00, it's 75 million --

MS. WADHWANI:  Objection to --

Page 191

BY MR. AUSTIN:

Q.    -- users.

MS. WADHWANI:  Objection to form.

Counsel, and can we go off the record for a moment?

MR. AUSTIN:  Yes, ma'am.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 2:13 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We're now going back on the record, and the time is 2:17 p.m.

BY MR. AUSTIN:

Q.    Ms. Kasavana, we were on page 50, and we were trying to figure out the legend.  And on this particular document, we indicated that at least between the 6:00 and 8:00 hours, it peaked for the amount of watch hours for users, correct, at 75 million if we go to the left side; is that correct?

A.    That's correct.  We don't know what the unit of 75 million is.

Page 192

Q. We don't know if it's 75 million watch hours --

A. Correct, right.

Q. -- or 75 million users.

A. Right.

Q. Is that fair?

A. That's fair.

Q. Okay. And so if it's 75 million watch hours, that could actually represent a billion people watching it for 75 -- explain that to me. I'm trying to better understand here, and I'm lost, so please help me.

A. So why the unit really matters is if it's 75 million total watch hours in a -- you know, in a period of two hours across a billion users, right, you would -- on average you could divide like the total number of users and the total time spent. Right.

So back to your -- kind of what you did earlier, right, three -- three chunks of eight in 24 hours. So similarly, you could -- it just -- it makes a difference, like is it the number of users or is it the total amount of time that's being spent across --

Q. That time period.

A.      -- all of those users?  Right, but across --

Q.      6:00 to 8:00 --

A.      -- a billion users.

Q.      Correct.  So it could be a billion users between 6:00 and 8:00 gobbling up 75 million watch hours.  Is that correct?

A.      It could be.  We're missing data, though.  Right.  Like we don't have a billion users on this slide.  I don't think we have the total number of users anywhere.

Q.      That's fair.

A.      Okay.

Q.      That's -- that's fair.

A.      Okay.

Q.      That's fair.  It's a bad slide.  For whatever reason, it's black on black, it's hard to see.

A.      Totally.

Q.      And so just for the benefit of the ladies and gentlemen of the jury, from 6:00 to 8:00, we do know that there's 75 million, whether it's watch hours or users, being observed during that time.

MS. WADHWANI:  Objection to

Page 194

form, foundation.

BY MR. AUSTIN:

Q.      Correct?

A.      Yeah.

Q.      It could be either 75 million users, according to this, or 75 million watch hours, according to this, between the hours of 6:00 and 8:00.

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  It could also be 75 million minutes, 75 million seconds. Like the point is we don't know.

BY MR. AUSTIN:

Q.      And so -- fair enough.

A.      We don't know the unit.

Q.      Fair enough.  And I think when we went out, when we were off the record, counsel explained to me the next slide would have indicated that it's 75 million watch hours.  So if we --

MS. WADHWANI:  Although hearing -- because I'm a lawyer, and not working at YouTube, I'm going to defer to Ms. Kasavana's testimony right now

where she doesn't know the metric, and it could represent not hours or minutes.

So I just say that, Counsel, I apologize if I inadvertently led you astray. I have no intention of doing that, and your question speaks that they -- putting in that assumption is my fault, but I defer to her.

MR. AUSTIN: That's fair enough.

BY MR. AUSTIN:

Q. So if we go to the next slide where we're being explained -- under here, I think that if you look, this would indicate the number of watch hours if we're looking at this chart; is that correct?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I don't -- so I'm having a -- hours and days with my device. So I'm having the same -- like the slide doesn't give us the unit on the y-axis again for the 2.4 billion.

BY MR. AUSTIN:

Q. And so if we look down at the bottom, I know it says internal -- "YouTube

Page 196

internal analysis."  Can you look down at the bottom on this one where it's blocked off, what exactly is that down there?

A.      The YouTube internal analytics?

Q.      No, I'm sorry.  Underneath that that's blocked off.

MS. WADHWANI:  Is there a way to highlight it?  It's very hard to read on the screen.

MR. AUSTIN:  No, the middle here.

THE WITNESS:  The hours of day split by device?

MR. AUSTIN:  No, that's -- off the record for a second, please.

THE VIDEOGRAPHER:  Okay.  We're now going off the record, and the time is 2:22 p.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 2:28 p.m.

MR. AUSTIN:  Thank you.

BY MR. AUSTIN:

Page 197

Q.     Ms. Kasavana, do you ever remember a time where YouTube has calculated watch time in seconds or minutes when looking at macro matrix?

A.     We look at a lot of different stats, and honestly this is predominantly product and data science's areas.

So, yeah, I -- yes, I've seen minutes.

Q.     When looking at it from a macro standpoint?

A.     We look at a bunch of different analytics all the time.

Q.     It's a "yes" or a "no."

MS. WADHWANI:  Objection to form.

THE WITNESS:  I mean, I honestly can't recall.  I mean, like we -- I look at so much data, and so does the product team and the data science team.

BY MR. AUSTIN:

Q.     So then that would be a "no"?

MS. WADHWANI:  Objection to form.

THE WITNESS:  That was not my

answer.

BY MR. AUSTIN:

Q.      The answer is?

MS. WADHWANI:  Objection to form, asked and answered.

THE WITNESS:  I feel like I just said that I -- I can't recall.  I look at a lot of data.

BY MR. AUSTIN:

Q.      Fair enough.

And so if we go back to this exhibit that we were looking at, can we agree that the peak hours are between 6 to 8 -- and 8:00 p.m. as for --

A.      Sorry, what side are we on?  Because I'm looking at the millennial side now.

Q.      I'm looking -- go back to the prime time, the one with teens.

A.      So -- so the bar graphs are the highest between 6:00 and 8:00 p.m.

Q.      Between 6:00 and 8:00 p.m.  And if we go over to the left, it's 75 million, and you don't know if it's hours, users or minutes.  We'll -- but it's 75 million, nonetheless.

Page 199

Would you agree?

A.    Yeah, 75 million is on the axis.

Q.    Okay.  And so if you go over, ma'am, a couple of spots to the left during school hours, what is it at 2:00 p.m.?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Thank you.

Because I'm not -- that's military time.

BY MR. AUSTIN:

Q.    65 million?

A.    Yeah, I think, give or take.

Q.    Okay.  And now what about p.m., 65 million?

A.    A little less than that.

Q.    Okay.  And what about a.m.?  60 million?

A.    Yes.  It continues to decline.

Q.    So you would agree that a.m., 10:00 a.m. -- 9:00 a.m., 10 a.m., a.m., 2:00 p.m. are all during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  If it's a weekday.

BY MR. AUSTIN:

Page 200

Q.        You would agree that the 9:00, the 10:00, the 11:00, the 12:00, 1:00 and p.m. showing 65 million, whatever that unit is, it's during school hours.

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Yeah, it could be.

BY MR. AUSTIN:

Q.        Is it safe to say that there is -- the difference between the peak time of 6:00 and 8:00 and the difference in school time is less than 10 million?

MS. WADHWANI:  Objection to form, foundation.

BY MR. AUSTIN:

Q.        Whether we're talking about users or hours or minutes or seconds.

MS. WADHWANI:  Same objection.

THE WITNESS:  Well, you have the box highlighted now between 9 and 14, and that starts at 50, so the difference between 50 and 75 is 25.

BY MR. AUSTIN:

Q.        And nonetheless, the school hours, the school -- the use during school

Page 201

hours is fairly close to the peak hours.
Would you agree with that?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I don't know how to characterize "fairly close."

BY MR. AUSTIN:

Q.    Okay.

A.    It's a third less.

Q.    Okay.  So if the peak hours are 75 million, and 2:00 p.m., it's 65 million --

A.    Okay.

Q.    -- then would you agree that during school hours, the amount of usage -- and I'd say it's fairly close, but let's just say it's less than 10 million whatever units we are counting it by in usage of viewage -- viewers?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  If you're saying at the 14, it's at 65, and at 18 is at 75, those are the bar charts.

BY MR. AUSTIN:

Q.    So you would agree that there's

Page 202

as much usage during school time as there are during peak hours?

A.    I didn't say that.

MS. WADHWANI:  Objection to form, foundation.

Go ahead.

Did you want her to answer your question or you want to withdraw it?

MR. AUSTIN:  I want her to answer my question.

THE WITNESS:  I did not say it's the same.

BY MR. AUSTIN:

Q.    I didn't say the same.  I said close to the same, ma'am.

On this chart, what is the difference in the peak hour and the 2:00 p.m. hour -- the peak hour and the 2:00 p.m. school hour in terms of views, whatever the measurement is?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  So it looks like the peak hour, it peaks at 19, and that's over 75 million.  It looks like

Page 203

it's close to 85 million.  And at 14,
you're at 65 million.

BY MR. AUSTIN:

Q.      Is 65 million, whatever the
measure is, at 65 million hours users, minutes
that kids are not paying attention to school,
are using your app versus participating in
school?  Would you agree with that?

MS. WADHWANI:  Objection to
form, foundation.

THE WITNESS:  Not necessarily.
What this bar chart does not show,
alongside the actual units, is what
they're doing.  They could be listening
to music while studying in the library.
You don't know -- it doesn't provide the
data.

So I would just say based on the
information in this bar chart, your
premise of they're not paying attention,
like, I can't substantiate that.  I
can't agree with that.

BY MR. AUSTIN:

Q.      And so if my clients -- if my
clients have scenarios where the kids are on

Page 204

YouTube and refusing to get off of YouTube, not school related, during those school hours, would you agree then that the YouTube in this chart, the 65 million or so, are being used inside of the school hours in a non-school-related manner?

MS. WADHWANI:  Objection to form, foundation, hypothetical.

THE WITNESS:  Yeah, I -- I am reacting to the data that's on the slide in front of me.

BY MR. AUSTIN:

Q.    Yes, ma'am.  And I'm saying to you that if superintendents and principals are testifying that students are using unauthorized YouTube time, refusing to get off of YouTube time during school hours, this chart will substantiate the fact that -- that fairly high usage, at least up to 65 million usage during that time?

MS. WADHWANI:  Objection to form, foundation, hypothetical.

THE WITNESS:  Here's what I will say:  We don't want kids to be distracted in school.  We want kids to

Page 205

be focused in school and we want kids to learn. It's why Family Link announced school time mode where parents can limit their kids to have access to YouTube.

Again, we provide parents the control. We hear the concerns. We take those concerns really seriously. I don't want -- I want kids to pay attention. I want my own kids to pay attention and I want all kids to pay attention. So we build features and tools and parental controls to help with that.

BY MR. AUSTIN:

Q. Does YouTube not think that it's problematic that the nation's children are being distracted by its app during school hours to the tune of within, let's call it, 80 or 85 percent of YouTube's peak hours of usage? Do YouTube not take any responsibility for that?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I think we show we deeply care. I just -- I just

Page 206

referenced a parental control that we've launched such that you can actually not allow any access during the school hours.

BY MR. AUSTIN:

Q.      Thank you.  When did that program launch?

A.      We announced it last year.

Q.      Oh, 2023 or 2024?

A.      2024.

Q.      And what about the kids who were attempting to get educated in 2023, and what about the superintendents and the principals who were attempting to educate the children in 2022, and what about the principals and superintendents trying to educate their kids in 2021 and 2020 and 2019, 2018, 2017, 2016, 2015, where were those controls?  What happened to those children?

MS. WADHWANI:  Objection to form, compound.

BY MR. AUSTIN:

Q.      Why were they sacrificed?

MS. WADHWANI:  Objection to form, compound, foundation,

Page 207

argumentative.

THE WITNESS: I don't disagree -- I don't agree with your characterization that they were sacrificed.

We have been -- we take the role of YouTube really seriously. We hear concerns. We provide parental controls. There were and there are more parental controls than just school time. Administrators have control over access to YouTube.

Again, we're always listening and working towards providing as many features and controls and tools that we can provide.

BY MR. AUSTIN:

Q. Ma'am, was there anything preventing YouTube from putting restrictions in place or parental controls in place in 2015 or 2016 or 2017 or 2018 or 2019, 2020, 2021, 2022? Was there anything preventing them from putting those parental guidelines in place, saving those children, saving those superintendents, saving those principals?

Page 208

Anything preventing them?

MS. WADHWANI:  Objection to form, foundation, argumentative.

THE WITNESS:  I can't speak on behalf of YouTube, and I certainly cannot speak on behalf of YouTube before I even joined.

What I can tell you is that we come in every single day thinking about how we can be the best platform, and part of being the best platform is hearing from teachers and students and parents how much of an aid we are in their learning journey.

And I'd also remind you that whether or not kids go to school with a device is not in our -- is not something we decide.

BY MR. AUSTIN:

Q.    Ma'am, would you concede that the chart contains non-sanctioned usage during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I don't know if I

understand the question.  What do you mean by --

BY MR. AUSTIN:

Q.     Non-sanctioned --

A.     -- non-sanctioned?

Q.     -- use.  So usage that's not sanctioned by the school.  Would you concede that this chart contains non-sanctioned watch time during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Not necessarily. I understand, and you have stated that like your clients have said that.  That doesn't represent every teacher, every administrator, every school out there. It's not that we don't take those concerns seriously.

Again, I've just pointed to more controls that we have launched.  But we also hear how valuable YouTube is in complimenting formal learning, both formal and informal.

BY MR. AUSTIN:

Q.     Ma'am, did YouTube put anything

Page 210

in place from 2018 when you got there to 2022 to prevent non-sanctioned watch time during school hours?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  So YouTube provides school administrators controls.

BY MR. AUSTIN:

Q.    How could schools prevent teens from accessing YouTube videos?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I remind you that I'm in marketing.  So the depth of the product roadmap and the product controls and how -- what those controls are in an enterprise setting versus a consumer setting, I can't speak to like the nitty-gritty.  I just know in my role that we also provide school administrators controls for them to, you know, deploy as they see fit.

BY MR. AUSTIN:

Q.    Ma'am, if you go back to this chart, can you look at the 11:00 hour?

Page 211

A.    Do you mind highlighting -- thank you.

Q.    11:00 p.m.  I'm sorry, 11:00 p.m.

And how many users do you see at that hour?  Let's go -- yeah, at that hour.

A.    So as a reminder, we haven't established that it's users.

Q.    Whatever the -- the matrix is.

A.    Okay.  It's important -- like it's important that we are able to represent what's on the slide.

Q.    Yes, ma'am.

A.    And there is no legend on the slide.

Q.    Yes, ma'am.

A.    Okay.

Q.    Whether we're talking about users, watch time hours, minutes, can you tell me at 11:00 p.m. how many million?

A.    30 million.

Q.    30 million.

And this is for teens, correct, ma'am?  This slide is made for teens, correct?

MS. WADHWANI:  Objection to

form.

THE WITNESS:  Yeah, the headline says "Teens."  What it also doesn't say, is this teens globally.

BY MR. AUSTIN:

Q.     Okay.  And so, ma'am, how much sleep should a teen get on a school night?

A.     I'm not --

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  I'm not a medical expert.  I can't tell you how many hours a teen should have.  I can tell you that teens listen to music while studying at night.  I can tell you there are a lot of use cases.

BY MR. AUSTIN:

Q.     And when was this report made, ma'am?

A.     So I think per the slip sheet, this is 2016.

Q.     It's updated in 2016, so is this a 2015 document?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Sorry.  Where does it say that?  I'm not really familiar with slip sheets, so...

BY MR. AUSTIN:

Q.     And so 2016.  And so at least as of 2016, YouTube was armed ^ Ck with the data in that report, correct?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I mean, this slide is in this deck which was created in 2016.

BY MR. AUSTIN:

Q.     Okay.  And so YouTube, if it wanted to, could have made changes to protect students by putting restrictions in place -- or the parental controls that you put in place last year as far back as 2016; is that correct?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  So again, I don't agree with the characterization of protecting children.  Like we have been the entire time.  There -- school mode

Page 214

is just -- is an evolution of the parental controls that already existed in Family Link.  Family Link has existed before last year.

BY MR. AUSTIN:

Q.    Was there anything preventing YouTube from putting parental controls in place in 2017?

MS. WADHWANI:  Objection to form.

BY MR. AUSTIN:

Q.    Or 2018 or 2019 or 2020?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Yeah, again, there were parental controls -- there are parental controls that existed.

YouTube Kids app as a separate app for kids existed since 2014 or '15. There are timers in that app.  Like there -- there's a litany of things that have existed since 2016.

BY MR. AUSTIN:

Q.    Let's move on to Exhibit 9, please.

Page 248

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 3:49 p.m.

BY MR. AUSTIN:

Q.     I'm going to show you --

Good afternoon, Ms. Kasavana.

A.     Good afternoon.

Q.     Ma'am, I'm sorry.

I will show you what's being marked as Google-YouTube-Kasavana 10.

(Google-YouTube-Kasavana Exhibit No. 10 was marked for identification.)

BY MR. AUSTIN:

Q.     It bears Bates number 00128842. It's titled "PTA versus CSM Exploration."

THE REPORTER:  I'm sorry, I can't hear you.

MR. AUSTIN:  I'm sorry.

BY MR. AUSTIN:

Q.     It bears Bates number 00128842 titled "PTA versus CSM Exploration.  The Point Qualitative Findings," dated June 8, 2021.

The slide deck itself is

Page 249

undated, but the metadata would indicate, if you go to the last page, July 27, 2021.

Okay.  This document was June 8, 2021.

They produced this in reference to being from your custodial file.

Do you have any reason to believe that is not what it purports to be?

A.    So I -- I don't recall this document.  It doesn't mean that it might not be a part of my files, because, like I said before, lots of documents get shared with me.

Q.    Have you had an opportunity to review it?

A.    Sorry.  Do you -- are you giving me an opportunity to review it?

Q.    Yes, ma'am.  I'm just asking, have you -- I'm trying to move.

A.    Oh, yeah -- I mean, can I take a second to look at this document?

Q.    Yes, ma'am.  I'm trying to follow my marching orders.

A.    (Peruses document.)  Okay.

Q.    I'm going to ask you to go to slide 3.

Page 250

MS. WADHWANI:  What page -- the page numbers are at the bottom.

THE WITNESS:  Page number?

BY MR. AUSTIN:

Q.    Can you read the section labeled "Background," please.

A.    "The YouTube Kids & Family team currently has a partnership with the Parent-Teacher Association (PTA).  They are exploring another partnership with Common Sense Media (CSM), with a contract getting finalized over the next few weeks."

Q.    Okay.  Turn to slide 6 titled "Key Insights."

A.    I'm there.

Q.    And will you please read the third insight, please.

A.    "While awareness of CSM is low, those who are familiar think of it as a credible, well-established organization with a track-record of providing guidance on the safety of media for kids."

Q.    And read the last insight on the page.

A.    "CSM is seen as the strongest fit

Page 251

for providing recommendations for app and video content.  Parents react well to the recommended -- to the recommended content due to its green check mark and branding that feels vetted, safe and is eye-catching."

Q.    Okay.  And in the next column, it's a little hard to read, but I think you can see it on the screen.  Would you please read through all those boxes.

MS. WADHWANI:  Can you see it?

THE WITNESS:  Okay.  So these are the implications.

BY MR. AUSTIN:

Q.    Yes, ma'am.

A.    "Because parents rely heavily on word of mouth and their own research, explore ways for parents to share read -- to share/read reviews from other parents in an unbiased forum.

"Communicate the role and scope of the National PTA, including how and why the PTA provides guidance for parents of young kids in addition to school age kids.

"Consider moving forward with a partnership with CSM, as it has strong associations with safeguarding kids.  Collaborate

Page 252

to increase awareness of this organization.

"Further explore the potential to pursue endorsements by both the PTA and CSM, as together they would provide expertise for both educational and safe content."

Q.    Do these implications involve assessing partnerships with the National PTA and CSM?

A.    I think as the title or the background slide said, that we had -- at the time we have a partnership with the PTA, and we're exploring another partnership with CSM.

Q.    Is one of the purposes of those partnerships with the National PTA and the CSM to endorse content on YouTube?

A.    So again, I'm not the author of this, and there are other teams that actually manage partnerships at YouTube.

But I think that this research was looking at a variety of different ways of how we might partner together and how that might be helpful for parents.

Q.    And what's the purpose of seeking such an endorsement to provide parents guidance for videos on YouTube?

Page 253

MS. WADHWANI: Can you --

THE WITNESS: Yeah, can you -- the implications, can you blow that up?

So what was your question again?

BY MR. AUSTIN:

Q. I said, was the purpose of seeking such endorsements to provide parents guidance for videos on YouTube?

MS. WADHWANI: Objection to form.

THE WITNESS: Yeah, it -- as written here, it was -- the implication was to explore the potential to pursue endorsements by both the PTA and CSM.

BY MR. AUSTIN:

Q. Can you read the title on slide 7. Under "Common Sense."

A. Sorry. Was the question to read the title?

Q. Can you read the title on slide 7. Yes, ma'am. I sorry.

A. "PTA and CSM At a Glance."

Q. Under "Common Sense Media," do you see where the perception of the organization is rated positive?

A.      The perception of the organization is rated positive.

Q.      Okay.  Do you agree with that assessment?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I agree that that's what the -- this study showed.

BY MR. AUSTIN:

Q.      Please turn to slide 9.  Can you please read the title starting with "Parents."

A.      And, sorry, you wanted me to read the title?

Q.      The title, yes, ma'am.  I'm sorry.

A.      "Parents and engaged citizens alike trust recommendations from friends, family and teachers or unbiased online reviews more than organizations guidance."

Q.      Can you read the five bullet points under "Most Trusted."

A.      "Most Trusted Resources For Content.

"Family & friends, especially parents of other young kids.

Page 255

"Teachers.

"Unbiased reviews from other parents (not sponsored or posted by content provider).

"Educational content providers like PBS Kids and Noggin.

"Reviewing content for oneself."

Q.    Do you agree that YouTube identified school teachers as one of the most trusted resources for parents when it comes to content?

A.    So I would point out that I was just looking at the methodology of this.  The methodology cited for the research that was fielded, and this is a 15-question, online, qualitative exploration.

So this is qual, which, you know, plays a role in market research, but qual is directional in nature.  They talked to 41 parents -- or, actually, 26 parents.

So, based on qualitative, like a focus group, amongst 26 parents, teachers -- yes, teachers are a trusted voice in parents' lives.

Q.    Do you have any reason to disbelieve that?

Page 256

MS. WADHWANI: Objection to form.

THE WITNESS: No. I think that the data here based on the qual with 26 parents states that teachers are a trusted -- a trusted source.

BY MR. AUSTIN:

Q. Do you have any reason to disbelieve -- qualitative or not, do you have any reason to believe that school teachers are a trusted source?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I think that conceptually, teachers are seen as valuable members of the community.

BY MR. AUSTIN:

Q. Is that a "yes" or a "no"?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I think in general, yes, I feel like teachers are trusted.

BY MR. AUSTIN:

Q. Can you think of a scenario

Page 257

where teachers would not be a trusted resource for parents when it comes to content?

MS. WADHWANI:  Objection to form, foundation, hypothetical.

THE WITNESS:  Yeah, again, I can't speak for all parents and all teachers.  Right.  Like I think broadly speaking, teachers play an important role in parents' lives because they teach their children.  But I -- I don't think we can say every single parent implicitly trusts every single teacher and their approach, right, and their choices.  There are a lot of parents at my school that are complaining about their teachers.

BY MR. AUSTIN:

Q.    Turn to slide 16, which is entitled "While Awareness."  Do you see that?

Can you read that for me, please?

A.    The headline?

Q.    Yes, ma'am.

A.    "While awareness of CSM is low, parents who are familiar with it view it as a

Page 258

credible resource to provide guidance on the safety of kids' apps, shows, and movies."

Q.    Please read the paragraph under "CSM gives guidance for overall safety."

A.    "CSM Gives Guidance For Overall Safety.  Parents think of CSM as a guide specifically related to video, technology and media content for kids.  CSM's focus is on assessing the safety of content with which children interact."

Q.    Was this perception of CSM by parents YouTube's primary concern in forming a partnership with CSM?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Sorry.  That was like a nested question.  What's the question?

BY MR. AUSTIN:

Q.    Was the perception of CSM by parents YouTube's primary concern in forming a partnership with CSM?

MS. WADHWANI:  Same objection.

THE WITNESS:  Not necessarily. I think there are a lot of factors that

we consider when engaging any third party in a partnership.  I think the way parents feel about CSM would be one of those factors.

BY MR. AUSTIN:

Q.    Okay.  Based on these market insights, did YouTube pursue a partnership with CSM?

A.    So, again, I don't -- in marketing, we are not the team responsible.  We have a partnership's team.  They -- CSM -- my understanding is CSM actually approached us for a partnership.  And we were -- we did have a partnership with them.

Q.    Okay.  So a partnership did come to fruition.

A.    There was -- YouTube and CSM did have a partnership.

Q.    Did the benefit of a partnership accrue only to YouTube?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Again, I'm not responsible for that partnership, and I can't speak to the details of that

Page 260

partnership.  But in my experience, partnerships are only engaged when they are mutually beneficial to both parties.

BY MR. AUSTIN:

Q.      Does YouTube maintain its partnership with CSM today?

A.      I believe that it has come to an end.

Q.      And it's no longer?

A.      I believe so.  But again, I'm not responsible for that, so I can't speak to like --

Q.      Fair enough.

Can you please read the paragraph on the next slide 17, beginning with "CSM is viewed."

A.      Sorry, 17?

Q.      Yes, ma'am.

A.      Okay.  "CSM is viewed as a trusted expert that provides recommendations and guidance to parents regarding safe technology and media for kids.  Parents believe they are an unbiased -- they are an unbiased, nonprofit organization.  Unlike the PTA, no parents shared negative experience with or perceptions of CSM."

Q.      So in comparing the National PTA

Page 261

and CSM, did YouTube determine that CSM was more favorable -- more favorably perceived by parents than the National PTA?

MS. WADHWANI: Objection to form, foundation.

THE WITNESS: I don't think that it's -- that it's more or less favorable. It breaks down what each is good for. Right. Like the strengths of each partnership. And it makes a lot of sense. Right. If you take a step back and think about what the PTA's role is and what their scope is, they are a parent-teacher bridge. Right. And they exist at all of the districts, they exist in all the schools.

Common Sense Media, like, their entire focus is children's media. So they're just -- they're different kinds of partners.

BY MR. AUSTIN:

Q. Can you please read what Even K. said about CSM -- Evan K., I'm sorry.

A. "Safety. Promotes safe use of media with kids.

Page 262

"Trusted. They thoroughly review media that is appropriate for kids.

"Independent. They offer unbiased opinions."

Q. Then on the last page of slide 19, can you please read the title.

A. "Among options, CSM stands out most visually and feels vetted, safe; while PTA offers a subtle education angle and 'experts' feel too vague to trust."

Q. So what's being depicted there?

A. So based on what I see -- and again, I'm not the author of this -- but based on what I see here, this looks like they put into testing concept mocks of the PTA or CSM, potentially a partnership with them where they're choosing content or endorsing content, and their logo would be in the product.

Q. Do you view Common Sense Media as a trustworthy organization? Do you view them as a trustworthy organization?

A. Yeah. They're a -- a nonprofit, a reputable nonprofit. There are two arms of Common Sense, though. There's the nonprofit arm and there's the for-profit arm.

Page 263

Q.    In general, do you think Common Sense Media is perceived to be an organization that promotes high quality research?

A.    I think that Common Sense Media is one of many organizations that engages in research.

Q.    YouTube opted to do a partnership with CSM versus those organizations?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Again, I don't lead the partnerships team.  The partnerships team would be best suited to speak to the partners, you know, that they -- they score partnerships with.

BY MR. AUSTIN:

Q.    How would you describe Common Sense Media to a person who don't know anything about it?

MS. WADHWANI:  Objection to form.

THE WITNESS:  So, again, there's two parts that I know of, and my knowledge is working knowledge.  There's

Page 264

a for-profit arm; there's a non-for-profit arm.  The non-for-profit arm is focused on like children's media.

And so they put out a lot of like ratings on movies or TV shows and help parents understand per their rubric what might be recommended for what age group.

BY MR. AUSTIN:

Q.    So that's the nonprofit or the for-profit?

A.    I actually don't know.  Because again, I don't manage those partnerships. It's -- it's not in my responsibility.

Q.    Would you agree that Common Sense Media provides advice, research and community outreach to support kids' mental, physical and emotional health, and explores tech's efforts on the effects on well-being?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Yeah, it's hard for me to agree to that, because I -- like I don't know where you're getting it from.  Like, if we want to look at

Page 265

their website together, that would be different.

BY MR. AUSTIN:

Q.       Do you think Common Sense Media is an authority on kids' mental, physical and emotional health with regards to online media?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Again, I think they are a nonprofit, and they are one of many nonprofits.

BY MR. AUSTIN:

Q.       They are a nonprofit that YouTube opted to partner with because of the high favorability they got from parents. Correct?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Again, that's not what I said.  We have had partnerships with the PTA as well.  Different partners might fulfill different objectives at any one time, and at any one time we have many, many partners. We've talked about the Kids and Family

Page 266

Advisory Committee.  We've talked about FOSI.

Like we -- you know, in our efforts to do the right thing and to build the best products and to build the most positive experiences for all of our users, we partner with a lot of experts and academics.

So, again, they're just one or two of many.

MR. AUSTIN:  Let's move to Google-YouTube-Kasavana 11, please.

(Google-YouTube-Kasavana Exhibit No. 11 was marked for identification.)

BY MR. AUSTIN:

Q.    Okay.  I'm now showing you what's been marked as Exhibit 11, a report entitled "2019, The Common Sense Census:  Media Use by Tweens and Teens."  The Bates number on this document is 00136856.

I think Google/YouTube attorneys produced this in reference to your custodial file.

Do you have any reason to

Page 329

time on.

So what I -- what I -- you had me read out loud, there are three sections of this overall presentation. There is the context setting, there is the product options for compliance, and there is our strategy in the next 12 months.

My contributions were -- or my team's contributions were on one slide in the first section around the context.

You are now in the Section 2, which is product options for compliance. I do not as a marketer weigh in on the product options. Again, the product options are driven by the product team, the engineering team, the legal team, the compliance -- the gap team.

BY MR. AUSTIN:

Q.    So if you go back to 8715.

Is this part of what you worked on?

A.    This is part of what I worked on.

Q.    Okay.  And so read the title to me.

Page 330

A.      "Social media teen impact a major social issue, not just with regulators."

Q.      Okay.  And so here part of your work was dealing with the social impact -- the social media teen impact on major social issues, not just -- so including, but not limited to, with regulators, correct?

A.      So what we are saying here is, first of all, social media.  Okay.  We don't consider ourselves social media.

Second of all, what this is -- the context that we're showing, and we've talked about this a number of times today, right, because in my role as marketing, what is in my remit is to understand feedback, both good and concerns that might be out there.

And so what this slide is showing, right, and we've talked about this in the past. We've talked about press articles.  We've talked about other -- other forms of feedback for us to understand what our users are feeling.

Q.      And again it says, "Not just to regulators."  And so part of what you were doing, part of your marketing was dealing with these issues in addition to dealing with

Page 331

regulators, correct?

A.    Part of --

MS. WADHWANI:  Objection to form.

Go ahead.

THE WITNESS:  Part of what we are doing, as I've said before, is to understand the landscape and the broader context within which our users are experiencing our products.

And so what you can see here, right -- again, these are all about social media.  Right.  They're all about social media.  We do not consider ourselves social media.  But what we understand, right, and what we saw are concerns being raised about the role of social media with teenagers.

And so that's part of the broader landscape.  Right.  That's part of the context setting for which -- for -- within which we operate.

BY MR. AUSTIN:

Q.    And that broader landscape in which you operate also included regulation --

Page 339

A.    "Super, interactive."

Q.    Okay.  And so if you go to the next box over there, it says what, "How likely a 'social' feature?"

A.    That's right.

Q.    Okay.  And so here they had a big X on it, correct, this document?

A.    I see that.

Q.    And so at any time did YouTube intend to market to the KOFs, if they got rid of all of these features, how would that play into whether or not they would be regulated?

MS. WADHWANI:  Objection to form, foundation.

THE WITNESS:  Again, I can't speak to that.  I do not create, nor do I have those conversations with KOFs.

I feel like I -- again, the team that -- the teams that are primarily interfacing with those within the context of upcoming evolving legislation is our public policy team, our legal team.  Like those are the primary teams.

BY MR. AUSTIN:

Q.    What's SMP?

Page 340

A.      Social media platform is what I assume, based on this context.

Q.      Okay.  And so from your perspective from marketing, would you market to any other decision makers or any other politicians who were not a KOF?

MS. WADHWANI:  Objection to form.

THE WITNESS:  My remit is to focus on parents.

BY MR. AUSTIN:

Q.      And so would parents be considered KOFs?  Would parents have a direct or indirect pipeline into their elected officials in terms of what legislation they want and/or do not want put in place?

MS. WADHWANI:  Objection to form.

THE WITNESS:  I mean, through the nature of elected representatives representing their constituents, and parents are constituents, sure.

BY MR. AUSTIN:

Q.      Okay.  Fair enough.  So you indicated that YouTube does not or did not

Page 341

consider themself a social media platform. Correct?

A.    That's correct.

Q.    And so in this document here, it says what, "YouTube" what?

A.    "YouTube no longer SMP if we remove social features."

Q.    And so at least in this document, YouTube acknowledges that in fact they are a social media platform, and the only way for them to not be a social media platform is if they were to eliminate these features. Correct?

MS. WADHWANI:  Objection to form, foundation, compound.

THE WITNESS:  No, that's not necessarily correct.  Right.  The whole point of legislation -- it all comes down to how the authoring body decides to define "social media."  It can be that -- the way that Utah or the legislators in Utah want to define "social media," but similarly in Arkansas, the way they define "social media," we were scoped out.  Right.

Page 342

And so the point is, from a -- from an internal perspective, if you side-by-side compare us to some of the features that TikTok has or Snapchat has or Meta has, right, like we don't have a social graph.  That is the bedrock.

And so we can -- you know, we can view ourselves not as social media, but it really just comes down to how the legislator who holds the pen is defining, right, what they consider.

And again, this is for our legal teams and our public policy teams.  This is not for marketing to lead.

BY MR. AUSTIN:

Q.    Thank you.  On this document here, at least YouTube was considering themself a social media platform as it relates to this document.  Can we agree with that premise?

MS. WADHWANI:  Objection to form, foundation, asked and answered.

THE WITNESS:  Yeah, again, this is at the time of whatever was in the Utah proposed legislation, whatever

Page 343

text, however that had been written. Which, again, I am not a public policy. I don't -- I don't have a legal -- I don't know.  Right.

But my understanding is that throughout the course of a bill, it might change.  So if at that point, if at the point in time where this conversation happened, there may have been features that they called out that we had.  That still doesn't mean that we consider ourselves social media because we don't have a social graph.

BY MR. AUSTIN:

Q.      Okay.  You agree that at least there at that time that they considered themselves a social media platform.  Whatever time and space this was created, wherever they were in the legislative process, at least at that moment in time, they considered -- YouTube considered itself a social media platform.  Can we agree to that?

MS. WADHWANI:  Objection to form --

THE WITNESS:  No, not --

Page 344

MS. WADHWANI:  -- asked and answered.

THE WITNESS:  Not necessarily. They are responding to however the Utah bill is defining "social media."  That does not mean that YouTube agrees with that definition.

BY MR. AUSTIN:

Q.    Okay.  Does YouTube have shorts like TikTok?

A.    Do we have short-form video?

Q.    Yes, like TikTok.

A.    That's a format.

Q.    Okay.  Does -- do they have LateNite co-stream?  Do they have any of these features listed here?

A.    I actually don't know what LateNite co-stream refers to.

Q.    Does YouTube have any of those features listed?

A.    Yeah, we have some of these features.

Q.    Okay.  And so if they have those features, according to YouTube, they would be considered a social media platform, correct?

Page 345

A.    According to -- I feel like I've answered this.  Again, according to Utah's interpretation -- and again, I am not the person responsible for interpreting those texts -- but according to however the bill that Utah legislators had put together, if they specified those -- and again, I don't know.  I didn't read that text.

MS. WADHWANI:  Counsel, we need to take a break, please.

MR. AUSTIN:  Okay.

THE VIDEOGRAPHER:  Okay.  We are now going off the record, and the time is 6:00 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now going back on the record, and the time is 6:03 p.m.

MS. WADHWANI:  I believe we're concluding Day 1 of this deposition, and we will resume tomorrow.  Thank you.

THE VIDEOGRAPHER:  Okay.  This concludes the video deposition, Volume 1, of the video deposition of Tanaya Kasavana.

Page 346

We are now going off the record. And the time is 6:03 p.m. And the total used today was 6 hours and 20 minutes by Mr. Austin.

MS. WADHWANI: Thank you.

THE VIDEOGRAPHER: We're now off the record.

(Whereupon, the deposition of TANAYA KASAVANA was adjourned at 6:03 p.m.)

Page 347

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:    February 5, 2025.

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)