# AMENDED Exhibit 1003

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*****************************
IN RE:  SOCIAL MEDIA ADOLESCENT   Case No.
ADDICTION/PERSONAL INJURY       4:22-MD-03047-YGR
PRODUCTS LIABILITY LITIGATION
*****************************
This Document Relates To:      MDL No. 3047

ALL ACTIONS
*****************************



VIDEOTAPED DEPOSITION OF
JOHN M. HARDING



Held At:        MORGAN LEWIS
One Market
Spear Tower, 28th Floor
San Francisco, California

March 25th, 2025
9:04 a.m.




Reported By:
MAUREEN O. POLLARD, CSR #14449, RDR

Page 9

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  My name is Alejandro Zamora Ruiz, I am the videographer for Golkow.

Today's date is March 25, 2025, and the time is 9:04 a.m. Pacific Time.

This video deposition is being held at Morgan Lewis at One Market Plaza, Spear Tower, San Francisco, California 94105, in the matter of In Re:  Social Media Adolescent Addiction/Personal Injury Products Litigation for the United States District Court, Northern District of California.

The deponent is John Harding.

Counsel will be noted on the stenographic record.

And the court reporter will now introduce themselves and swear in the witness.

THE STENOGRAPHER:  My name is Maureen Pollard, California CSR Number 14449.

*    *    *

///

Whereupon,

                    JOHN M. HARDING,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

                    EXAMINATION

BY MR. DRAPER:

        Q.    Good morning, Mr. Harding.

        A.    Good morning.

        Q.    My name is Glenn Draper, and I'm one of the attorneys for the kids and families and school districts and other local government agencies who have brought claims against the social media companies including YouTube.  I had a chance to introduce myself before the deposition started.

                We're here in San Francisco today at the offices of the Morgan Lewis law firm to take your deposition.  You are appearing pursuant to a notice of deposition that we will go ahead and mark as YouTube-Harding Exhibit 1.

                (Whereupon, Google-YouTube-Harding-1
                was marked for identification.)

BY MR. DRAPER:

        Q.    And I'll go ahead and hand it to you. And we're going to look at it a little more in-depth

Page 11

in a minute, but it's my habit just to mark those always as the first exhibit.

So this deposition is being taken in what's called an MDL, which stands for multidistrict litigation, in federal court, and it will also be used in what is called a JCCP, which stands for Judicial Commission Coordinated Proceeding, in California state court. So you might hear me use both those terms today, MDL and JCCP. It's just the way these cases are grouped together. Okay?

A. Okay.

Q. Have you ever had your deposition taken before?

A. Yes.

Q. And when? When did you have it taken before?

A. It was quite some time ago, maybe 10, 15 years ago.

Q. And was it a case that had to do with your work at Google or YouTube?

A. Yes.

Q. And what was the context of the case?

A. It was a patent lawsuit.

Q. Patent lawsuit. Okay.

And is that the only deposition you've

Page 12

given before today?

A. Yes.

Q. Ever testified in court before?

A. No.

Q. I'm sure your attorney has covered some of these rules for a deposition, but I just want to go over them again to make sure you have them in mind. Okay?

A. Okay.

Q. You've been sworn by the court reporter, which means you're under oath. You're testifying just as though you were sitting in a courtroom before a jury and a judge, right?

A. Okay.

Q. You understand that?

A. Yes.

Q. Okay. And, in fact, you might hear me or your attorney refer to the jury today even though they're not physically present. Okay?

A. Okay.

Q. And that's because the deposition is being recorded -- you can see the video camera, I'm sure -- and the video and the written transcript may be presented later in court or used for any other purposes authorized under state or Federal Rules of

procedure and evidence.

Do you understand?

A.   I do.

Q.   Any questions about that?

A.   Not right now.

Q.   Okay.  It's important you answer my questions today verbally because the court reporter is taking down everything that we say, so if you nod or answer with something like uh-huh or uh-uh, it doesn't really come through on transcript.

Do you understand?

A.   I do.

Q.   Okay.  And it's really important that we not talk over each other because it's hard for the court reporter to take down two people talking at once.  I'll do my best to let you complete your answer before I ask the next question, and if you could do your best to let me complete the question before you begin your response, that will make sure we have a clean transcript.

Do you understand?

A.   I do.

Q.   Okay.  You're doing great so far.

I'll tell you that I sometimes struggle with this, so you can expect that we're going to

Page 14

have to stop and do it over again to make sure we have a clean record where we're not talking over each other.  It doesn't mean we're doing anything wrong, it's not really a natural way to talk.  But, you know, if I ask you to repeat an answer or to let me make sure I finish an answer -- or finish a question before you begin your response, I'm just doing it to make sure we have a clean record.  All right?

A.    Okay.

Q.    Okay.  If you don't understand my question, just ask me to repeat it or rephrase it and I will.  Okay?

A.    Okay.

Q.    You're represented by an attorney today?

A.    Yes.

Q.    Lauren White, right?

A.    Yes.

Q.    Your attorney might have some objections to some of my questions today.  Let her complete the objection before you respond.  Most of the time I think your attorney is going to tell you to go ahead and answer the question despite the objection, and that's so we can take the transcript

Page 15

to the Judge later, get a ruling on the objection. If the objection is overruled, we don't have to come back and ask the question, we already have the answer. If the objection is sustained, the Judge will toss out the question and the response to it. But it's just so the whole process goes faster. Okay?

A. Okay.

Q. So there will be a few times today -- there may be a few times today where your lawyer tells you not to answer the question, so that's another reason to let her finish the objection before you answer. Okay?

A. Okay.

Q. There will be a few times today where we're all talking at once and we'll have to stop and do everything over sequentially, question, objection, answer, happens most every deposition.

Do you understand?

A. I do.

Q. You can take a break today when you want. I usually like to break about every 90 minutes. If you want one sooner, just ask. The only rule is you have to answer the pending question, right?

Do you understand?

A.    I do.

Q.    Anything that would affect your memory or ability to tell the truth today?

A.    No.

Q.    You haven't taken any medications that might make it difficult to you -- or difficult for you to concentrate or remember?

A.    No.

Q.    All right.  Got a good night sleep last night?

A.    Yes.

Q.    Excellent.

Questions at all kind of before we begin?

A.    No, not right now.

Q.    Okay.  So you're represented today by Lauren White from the Wilson Sansoni firm, correct?

A.    Correct.

Q.    She also represents Google and YouTube.  You understand that?

A.    I do.

Q.    When did you find out we had requested your deposition in this case?

A.    I believe it was five or six weeks ago.

Page 17

Q.    Have you met with Ms. White who represents Google and YouTube to prepare for the deposition?

MS. WHITE:  You can answer that yes or no.

THE WITNESS:  Yes.

BY MR. DRAPER:

Q.    I don't want to ask about the content of any of your meetings with the attorneys, but I want to ask a little bit about the circumstances of those meetings.  Okay?

A.    Okay.

Q.    When was the first time you met with the attorneys?

A.    Soon after I found out about the deposition, about five or six weeks ago, I think.

Q.    Okay.  How many times have you met with them?

A.    Four, I believe.

Q.    And about how long total would you say that you've spent with them preparing for this deposition?

A.    Approximately ten hours.

Q.    Okay.  All right.  So now we're going to get to what we have marked as YouTube-Harding

Page 18

Exhibit 1.  This is the Notice of In-Person Videotaped Deposition of John Harding.

Have you seen this document before?

A.    Let me take a look.

Q.    Sure.

A.    I don't believe I have.

Q.    Okay.  There is on page 2 a request that you bring certain documents with you to the deposition, and I'd like to go through those document requests and see if you have any of those documents with you even though you haven't seen the notice.  Okay?

A.    Okay.

Q.    Are you there?  Do you see on the bottom around line 21 at page 2 --

A.    I see this.

Q.    Right.

-- "Please Take Further Notice," and then it has a list.

A.    Okay.

Q.    Okay.  Number 1 is, "All documents and communications used to refresh the witness's recollection."

When you were meeting with Ms. White or other attorneys for Google and YouTube, did you

Page 19

review any documents or communications?

MS. WHITE:  You can answer that yes or no.

THE WITNESS:  Yes.

BY MR. DRAPER:

Q.    Okay.  Did those documents or communications refresh your recollection about the events that were described in those documents or communications?

A.    No.

Q.    No.  Okay.

MR. DRAPER:  Have all of the -- and this is directed to your attorney actually, not to you.

Have all of the documents that the witness reviewed been produced and marked with a Google Bates stamp in this litigation?

MS. WHITE:  They have.

MR. DRAPER:  Okay.

BY MR. DRAPER:

Q.    Okay.  Number 2, sir, is a copy of your curriculum vitae.  And your attorneys forwarded us yesterday a copy of your LinkedIn profile that has a list of your professional history and

Page 20

accomplishments.  So that will suffice for that one.

Number 3 is the employee custodial file.

MR. DRAPER:  An, was that produced in this case.

MS. TRUONG:  Yes.

MR. DRAPER:  Great.  We got it.

BY MR. DRAPER:

Q.    Did you make any notes to help you for this deposition, sir?

A.    No.

Q.    Okay.  That takes care of number 5.

All right.  I don't want to ask about any of the rest of them.

Okay.  Let me ask you a little bit about your background, okay?  So you're currently the vice president of engineering for YouTube Music and YouTube Premium?

A.    That's correct.

Q.    Okay.  And who do you report to in that role?

A.    Scott Silver.

Q.    Okay.  And you have had that position since 2017?

MS. WHITE:  Objection.

Page 21

Is there a question?

MR. DRAPER:  Yes, that's a question.

BY MR. DRAPER:

Q.    Have you had that position since 2017?

A.    Yes.

Q.    All right.  Prior to that you were the vice president of engineering for emerging experiences at YouTube, right?

A.    That's correct.

Q.    Okay.  You had that position from 2015 to 2017, correct?

A.    That's correct.

Q.    Okay.  And emerging experiences means that you worked on the engineering for non-core YouTube experiences, things like YouTube Living Room, right?

A.    Correct.

Q.    YouTube Living Room is a version of YouTube designed to be seen on a television and watched similar to Netflix?

A.    That's correct.

Q.    Okay.  And you also worked on YouTube Live which involves live broadcasts on YouTube?

MS. WHITE:  Objection.  Is there a question?

Page 22

MR. DRAPER:  Yes, that's the question.

BY MR. DRAPER:

Q.    Did you work on YouTube Live which involves live broadcasts on YouTube?

A.    Yes.

Q.    Okay.  And you also worked on YouTube Gaming, correct?

A.    Correct.

Q.    And YouTube Music, correct?

A.    That's correct.

Q.    All right.  And you would agree with me that music and gaming are two areas that are critical for YouTube's efforts to attract young users?

MS. WHITE:  Object to form.

THE WITNESS:  We view them as key efforts for all of YouTube's users.

BY MR. DRAPER:

Q.    Okay.  And isn't it true that most of the music and gaming users are on the younger side at YouTube?

MS. WHITE:  Object to form.

THE WITNESS:  I don't actually have that data in memory.

///

Page 23

BY MR. DRAPER:

Q. Okay. All right. Before you were vice president of engineering for emerging experiences, you were an engineering director at YouTube from 2010 to 2014, is that right?

A. That's correct.

Q. Okay. And in that role you were part of the core engineering team, right?

A. That's correct.

Q. Okay. And you worked on things like building out YouTube's infrastructure and operations, video ingestion processing, streaming, playback, data warehouse, that kind of thing, right?

A. That's correct.

Q. All right. And before you were an engineering director you were an engineering manager at YouTube from 2007 to 2010, right?

A. That's correct.

Q. Okay. The engineering manager position at YouTube was your first job at YouTube, correct?

A. That's correct.

Q. All right. And prior to that you were a software engineer at Google from 2005 to 2007?

A. That's correct.

Q. All right. And at Google, one of the

Page 24

things you worked on was the Google video player, is that right?

A.    That's correct.

Q.    All right.  Okay.  That's your background out of the way.  I want to ask you some things about your day-to-day work at YouTube now.  All right?

A.    Okay.

Q.    What are the different ways you communicate with your coworkers at YouTube?

A.    We use Gmail, we use Google Chat, we talk in person, we use Google Meet for videoconferencing, occasionally phone calls.  And then we use documents like Google Docs, Google Sheets, Google Slides.

Q.    Okay.  And I've seen in the documents fairly often offsite meeting notes.  Is that kind of a regular thing that's done at YouTube?

          MS. WHITE:  Object to form.

          THE WITNESS:  Teams will have, like, offsite strategy meetings or fun events, yes.

BY MR. DRAPER:

Q.    Okay.  All right.  Are you one of those people who routinely cleans out their e-mail inbox?

Page 25

A.    What do you mean by "clean out"?

Q.    Well, there are some people -- I'm not one of them, but there are some people who will delete e-mails when they've read them or when they think they no longer need them, and then there's other people, I am one, who like never delete anything and just let it sit.

A.    I don't delete my e-mails generally.  I use Gmail's archive feature which keeps them but removes them from my inbox.

Q.    Okay.  Do you have any form of auto delete that applies to your e-mails, sir?

A.    I don't believe so.

Q.    Okay.  I've seen lots of Google slide presentations in the YouTube documents.  Seems like a pretty common way to present information to fellow YouTube employees, right?

A.    Yes.

Q.    Do you keep a file of the Google slide presentations you've worked on?

MS. WHITE:  Object to form.

THE WITNESS:  I don't keep a file.  Google Slides just has them all.

BY MR. DRAPER:

Q.    Okay.  All right.  Do you work on a

Page 26

laptop or a desktop?

A.    Primarily a laptop.

Q.    Okay.  And do you keep any work files, e-mails, Google slide presentations stored locally on your computer as opposed to stored in a larger company-wide storage system?

A.    No.  I use the cloud storage.

Q.    So you mentioned Google Chats.  Is that a common or uncommon feature that you use to communicate with people at YouTube?

A.    It's fairly common.

Q.    All right.  I understand that Google Chats has a setting, I think it's called "history off," so that chats aren't saved for more than a short period.

Do you understand that?

A.    I've heard of that feature.

Q.    Okay.  Do you know how it works?

A.    I do not.

Q.    Is it your habit to leave history on, or do you usually have history off?

A.    I don't do any changes to the history settings.

Q.    Okay.  Have you ever been asked by anyone at YouTube to turn history off in a specific

Page 27

chat string?

A.    I don't believe so.

Q.    Do you have an official work phone provided to you by YouTube for your business purposes?

A.    No.

Q.    Do you have a personal phone?

A.    I do.

Q.    Do you ever use your personal phone to communicate with other YouTube employees about work?

A.    Yes.

Q.    Do you text with other YouTube employees about work from your personal phone?

A.    No.

Q.    So how do you communicate with them from your personal phone?

A.    Voice calls.

Q.    Voice calls.  Okay.

Mr. Harding, do you agree that a corporation should not release an application designed for teens and younger kids without knowing that the application is safe for them?

MS. WHITE:  Object to form.

THE WITNESS:  I think when we release applications we try to balance the needs of

Page 28

a large number of users.

BY MR. DRAPER:

Q.    Okay.  Do you agree that a corporation should not release an application designed for teens and younger kids without knowing that the application is safe for them?

MS. WHITE:  Same objection.  Asked and answered.

THE WITNESS:  I think, as I said, we try to balance the needs of a wide variety of users with the best knowledge we have about how to optimize across that broad user base.

BY MR. DRAPER:

Q.    Okay.  So does that mean as long as you've optimized across that broad user base, if it's not safe for a particular segment of that user base like kids or younger, or teens, then that's okay in your book?

MS. WHITE:  Object to form.

THE WITNESS:  I think, as I said, we're trying to balance.  There's not a perfect solution for all users, and so we're always trying to find the best trade-off we can across the needs of users, creators,

Page 29

everyone in our ecosystem.

BY MR. DRAPER:

Q.    Okay.  So you're willing to accept some safety hazards for kids and teens as long as it balances or optimizes for the larger intended group of users for the product?

MS. WHITE:  Object to form.

THE WITNESS:  I don't think it's possible to build a product that's perfect for everyone, so we are always trying to find a balance straight off.

BY MR. DRAPER:

Q.    Do you agree that a corporation that wants to release an application designed for teens and younger kids should test the application for safety before releasing it?

MS. WHITE:  Object to form.

THE WITNESS:  I think we test a large number of aspects of our products before we release them.

BY MR. DRAPER:

Q.    So yes?

MS. WHITE:  Object to form.

THE WITNESS:  I believe we should and we do test for a large number of aspects of

the product.

BY MR. DRAPER:

Q.    Test it specifically for safety?

MS. WHITE:  Object to form.

THE WITNESS:  I'm not -- that's not my area of the product so I'm not familiar with what we do.

BY MR. DRAPER:

Q.    So I'm not really asking you for your knowledge of what YouTube has done in that regard, I'm asking you how you, John Harding, feel as a person who is sitting here in front of me.

Do you think a corporation should test a product for safety before releasing it to teens and young kids?

MS. WHITE:  Object to form.

THE WITNESS:  I think similar to what I said that we do, I think companies should test for a large number of aspects. Appropriateness for their users is one of those.

BY MR. DRAPER:

Q.    Okay.  Do you agree that a corporation that wants to add features to an application that's designed for teens and younger kids should test the

Page 31

new features for safety before releasing them?

MS. WHITE:  Object to form.

THE WITNESS:  I think similarly to launching, when updating products, testing them out is a good idea, yes.

BY MR. DRAPER:

Q.    Okay.  Do you agree that a corporation with an application designed for teens and younger kids that learns the application can harm children should make changes to the application to improve its safety as soon as possible?

MS. WHITE:  Object to form.

THE WITNESS:  I think, yes, if companies learn they have problems in their products, improving them is a great idea.

BY MR. DRAPER:

Q.    Do you agree with -- scratch that.

Do you agree that a corporation with an application designed for teens and younger kids that learns the application can harm children should warn the children and their parents of the potential harm as soon as the corporation learns of it?

MS. WHITE:  Object to form.

THE WITNESS:  I think there's a wide way that companies can communicate with

Page 32

users about products, and so I don't know what the specific form of communication is appropriate.  Depends on the products, the users, the context.

BY MR. DRAPER:

Q.    Yeah, I'm not asking how the company should warn children and their parents.  I'm just asking you if you think the company should warn the children and their parents, however they decide to do that, as soon as they learn of a potential harm associated with the application.

MS. WHITE:  Object to form.

THE WITNESS:  I think it is good for companies to communicate with users about how to appropriately use their products, yes.

BY MR. DRAPER:

Q.    Okay.  "How to appropriately use their products."  I guess I'm asking a slightly different question than that.

If a corporation learns that an application is potentially harmful to kids and teens that use the application, should the corporation warn the parents about that specific harm?

MS. WHITE:  Objection to form.

Page 33

THE WITNESS:  I'm not sure how to answer in the general because I think it would depend on the specifics of that situation.

BY MR. DRAPER:

Q.    Let's say a corporation learns that when kids or teens use its product it can cause interference with sleep patterns.  Should they warn the parents and the children about that?

MS. WHITE:  Objection to form.

THE WITNESS:  Again, I think it would depend on the details.  This is -- I'm an engineer, and so product design and communications design is sort of out of my area of expertise.

BY MR. DRAPER:

Q.    You're an engineer, but I'm not asking you how they do it, I'm just -- you're a person too -- do you have kids?

A.    I do.

Q.    And you're a parent.  Do you think that a company that learns about a potential harm to kids and teens from the use of an application should warn the parents and the kids about that potential harm?

MS. WHITE:  Objection to form.

Page 34

THE WITNESS:  I think, again, it depends on the case.  If it's a rare thing and you're putting a, you know, popup in front of everybody that uses a product, that's probably not a great balance.

So that's why I say I think the right answer depends on what the particular risk is, what the particular communication needs to be to put in front of them.

So I don't know what the right -- I don't know whether a warning -- I'm not sure even what you mean necessarily by a warning, so I'm having trouble figuring out how to answer.

BY MR. DRAPER:

Q.   Okay.  All right.  I was looking forward to talking to you today because I think your early career is kind of interesting to me.

So you were at Google working on Google video player in 2005 and 2006, right?

A.   That's correct.

Q.   All right.  And then at that time Susan Wojcicki, who would become the long-term CEO of YouTube, she was also at Google Video, right?

A.   That's correct.

Page 40

founded, the founders knew they wanted to have a video hosting site but they weren't sure exactly what type of video hosting site it would be?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't know what their plans were when they founded it.

BY MR. DRAPER:

Q.   Did you know that they considered having YouTube be a video dating site?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I heard lots of different stories about founding lore of the company.

BY MR. DRAPER:

Q.   Is that one of them?

A.   That is one of the stories.

Q.   Okay.  All right.  Would you agree with me that in the time that you have been at YouTube since 2007, growth, however it's been measured, has been an important goal at YouTube.

MS. WHITE:  Objection to form.

THE WITNESS:  Growth of value is probably the main thing we look at, are we delivering value for the ecosystem.

Page 41

BY MR. DRAPER:

Q.    However it's measured, growth has been an important goal at YouTube in the time you've been there?

MS. WHITE:  Objection to form.

BY MR. DRAPER:

Q.    Correct?

MS. WHITE:  Objection to form.

THE WITNESS:  Growth of the value that we're delivering through the product, yes.

BY MR. DRAPER:

Q.    I see.

When you were the engineering director at YouTube from 2010 to 2014, one of your jobs was to make sure that the YouTube infrastructure, the equipment and software that makes YouTube run, video ingestion, processing streaming, one of your jobs was to make sure that infrastructure was capable of handling the growth that was planned, right?

MS. WHITE:  Objection to form.

THE WITNESS:  That's correct.

BY MR. DRAPER:

Q.    All right.  From early on YouTube set very ambitious goals for itself in terms of growth, right?

Page 194

Q.    Okay.  And this document is an e-mail from ███████████ on behalf of ████████ at Google to ████████ at Google.

Do you recognize any of those names?

A.    Yes.

Q.    And who are they, please?

A.    ████████████ was a product manager.  I don't -- I don't know what Kubrik is.  ████████████, the name is familiar, but I don't recall what he did.

Q.    Okay.  All right.  And this is an e-mail string dated June of 2012, correct?

A.    That's what it appears to be.

Q.    All right.  And if you look, sir, at the bottom of the second page, ████████████ is described as the engineering manager for Player at YouTube.

Do you see that?

A.    I do.

Q.    Do you recall that position?

A.    I recall that as a position.

Q.    Okay.  Do you agree that since this document was found in your custodial file that it was sent to you somehow?

MS. WHITE:  Objection.  Lacks

Page 195

foundation.

THE WITNESS:  I don't know how things would end up in whatever custodial file it is.

BY MR. DRAPER:

Q.   All right.  Any reason to think that this document is not what it appears to be, an e-mail between coworkers at YouTube?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  That's what it seems to be.

BY MR. DRAPER:

Q.   All right.  If you look at the part of the e-mail on the first page that was sent on June 7, 2012 from ▮▮▮▮▮▮▮, it's designated as "Notes from iOS Creator App review."

Do you see that?

A.   I do.

Q.   All right.  And then down below that it says "Value prop."

Do you see that?

A.   I do.

Q.   All right.  And the last item for Value prop is, "Goal is not viewership, it's viewer

addiction."

Do you see that?

A.    I do.

Q.    Okay.  So you would agree with me that at least ███████ had in mind to make the YouTube application addictive as of June of 2012?

MS. WHITE:  Objection.  Lacks
foundation, mischaracterizes the document.

THE WITNESS:  I don't know what he had
in mind.  The context of this document is
about a video creation app, so that last
sentence doesn't even make sense because
the video creation app -- that's what
Kubrik was, Kubrik was a code name for our
video creation app that we built at one
time.  I don't know, that wasn't even built
for viewers, it was built for creators.

BY MR. DRAPER:

Q.    And was it going to be integrated into the YouTube application?

A.    I don't think so.

Q.    Was it released separately ever?

A.    I'm not sure if it ever released.  I think it did, but I'm not sure.

Q.    I'm sorry, you said you didn't know

Page 197

whether it was integrated into the YouTube app at any time?

A.    It was not.

Q.    It was not.

All right.  YouTube achieved its 1 billion hours per day watch time goal on schedule in 2016, correct?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't recall, but that sounds correct.

BY MR. DRAPER:

Q.    All right.  And from there YouTube set another extremely ambitious goal.  Do you recall what that was?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I do not.

BY MR. DRAPER:

Q.    Do you recall YouTube setting a goal for 4 billion hours of watch time by 2020?

A.    I do not.

Q.    Did YouTube ever warn children or parents that it would exploit their psychological vulnerabilities in order to achieve its watch time

goals?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't know.  Can you repeat the question?

BY MR. DRAPER:

Q.    Sure.

Did YouTube ever warn children or parents that it would exploit their psychological vulnerabilities in order to achieve its watch time goals?

MS. WHITE:  Same objection.

THE WITNESS:  I don't know what warnings we may or may not have done.

BY MR. DRAPER:

Q.    Did YouTube ever warn children or parents that it would ignore their intent in coming to the platform in order to keep them on longer?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  These questions are implying something I'm not sure I agree with, but I don't know what warnings we did or did not issue.

///

Page 199

BY MR. DRAPER:

Q.    Did YouTube ever warn children or parents that it would send them notifications in order to bring them back to the YouTube application daily?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I don't know what warnings were or weren't issued.

BY MR. DRAPER:

Q.    Did YouTube warn parents and children that YouTube would Autoplay the next video in hopes that they would just continue watching rather than consider whether they wanted to stay on the platform?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, there's a lot of implied behaviors I don't know that I agree with, but I also still don't know what warnings we do or don't issue.

BY MR. DRAPER:

Q.    All right.  Did YouTube ever warn parents or children that they would try to create a fear of missing out so that kids came back to the

Page 200

application every day?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I don't agree with the framing of the question, but I still don't know what warnings we do or don't issue.

BY MR. DRAPER:

Q.    And did YouTube ever warn parents or children that it had set out to create an addictive application?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I don't agree with the premise, and I don't know what warnings we do or don't issue.

BY MR. DRAPER:

Q.    All right.  Do you agree with me, sir, that by 2017 or 2018 addiction to social media was a concern both inside and outside of YouTube?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  It's out of my area of responsibility and so I wasn't tracking when things would have been on radar.  We

Page 201

don't typically think of YouTube as social media, we're a video distribution platform, so the framing wouldn't apply. But maybe I misunderstood the question.

BY MR. DRAPER:

Q. Why don't you think of YouTube as a social media platform?

A. We're primarily about creators distributing video to an audience. It's not a social interaction platform. Again, it's video distribution/consumption for creators to build businesses on.

Q. At one time YouTube had the ability to send direct messages from user to user, correct?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: That is correct.

BY MR. DRAPER:

Q. And that feature was created in hopes of fostering communities and allowing people to discuss privately videos that they were watching?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: I believe the direct messaging existed before we bought YouTube,

Page 218

BY MR. DRAPER:

Q.    This document has been marked as YouTube-Harding Exhibit 18.  There's a copy for you, and a copy for you (handing).

Go ahead and take a look, please.

This document was produced by the attorneys for Google and YouTube and is Bates number 00632685.

(Witness reviewing document.)

A.    Okay.

Q.    All right.  So if you look at the last page, you will see that you are listed as one of the custodians for this document.

Do you see that?

A.    I see that.

Q.    All right.  And this document is entitled "Digital Wellbeing, Problem Statement and Background."

Do you see that?

A.    I see that.

Q.    Okay.  This document is not dated, but the metadata indicates it's from November of 2019.  That's on the last page.

Do you see that?

A.    I see that.

Q.    Okay.  Great.

Back to the first page.  We go back and forth and back and forth.  There are a number of names that are listed after Digital Wellbeing, Brian Marquardt, ███████ , ████████████████████ , Reid Watson.

Do you see those?

A.    I do.

Q.    I think we've already established that you recognize Reid Watson as an employee of YouTube.

How about Brian Marquardt?

A.    I do.

Q.    What was his position?

A.    He was a product manager.

Q.    ███████████ ?

A.    Yes.

Q.    What was his position?

A.    He was in the UX organization, I believe a UX researcher.

Q.    All right.  ███████████ , or ███ ?

A.    I do not recognize that name.

Q.    ███████████ ?

A.    I do recognize that name.

Q.    And what was his position?

A.    I don't know.

Q.    Okay.  Any reason to believe this document is not what it appears to be, a planning document for YouTube discussing digital wellbeing?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't know if it's a planning document.  Appears to be a document discussing digital wellbeing.

BY MR. DRAPER:

Q.    From YouTube?

A.    Those are YouTube employees, yes.

Q.    Okay.  All right.  Let's look at the first sentence.  It says, "In 2017, excessive screen time and 'tech addiction' became a major topic of concern."

Do you see that?

A.    I do.

Q.    All right.  And when it says "excessive screen time became a concern," it's talking about it being a concern outside of YouTube?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not familiar with the document, so I don't know what --

///

Page 221

BY MR. DRAPER:

Q.    Sure.

A.    -- the framing is there.

Q.    If you look further in this paragraph, it cites examples from media sources from France and China, right?

Do you see that?

A.    I do.  It's a little confusing the way the hyperlinks are included here.

Q.    And it says, "These concerns have led to growing expectations for major tech companies to take more responsibility."

I read that correctly?  Yes?

A.    Yes.

Q.    And then it says Google "looks to YouTube for leadership in supporting wellbeing," right?

MS. WHITE:  Objection. Mischaracterizes the document, and lacks foundation.

THE WITNESS:  Skip over part of this, but roughly, yes.

BY MR. DRAPER:

Q.    Okay.  I was paraphrasing a little bit, but more or less that's what it says?

Page 222

A.   Yes.  It says, "Google prioritized wellbeing...and looks to YouTube for leadership."

Q.   All right.  So at the same time -- scratch that.

At this same time, 2017, excessive usage was becoming a concern internally at YouTube, correct?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Are you saying the document says that?

BY MR. DRAPER:

Q.   No.  I'm asking you.

A.   Oh.  I don't know.  I would not have been in those conversations.

Q.   Okay.  So do you recall any conversations around the 2017, 2018 time frame about excessive use or heavy use of the product?

A.   I don't recall being in those conversations, no.

Q.   Do you -- scratch that.

Some people inside YouTube believed responsible growth was about limiting session duration independent of content at least for kids. Did you ever hear anything like that?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Not that I recall.

BY MR. DRAPER:

Q.    Okay.  Some YouTubers were questioning whether creating an endless stream of videos was the right thing to do for kids.  Were you involved in any of those questions, any of those discussions?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Not that I recall.

BY MR. DRAPER:

Q.    Did you share any of those concerns yourself?

MS. WHITE:  Objection.

BY MR. DRAPER:

Q.    Were you worried that watching a lot of YouTube maybe isn't good for kids?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Not that I recall, no.

BY MR. DRAPER:

Q.    Did you have rules for your own kids about how much YouTube they were able to watch?

A.    I have rules for my kids on how much

Page 224

device time they get overall.

Q.    Okay.  And I don't want to inquire too much, but about how old were they in this time frame, 2017, 2018?

A.    They were born in █████ and █████, so they would have been ██ and ██.

Q.    Pretty young.

All right.  So if we look at the second paragraph of this document, it gives some statistics about teen use of tech generally, right?

Do you see those?

A.    Let me take a look.

(Witness reviewing document.)

MS. WHITE:  Objection.

Mischaracterizes the document.

THE WITNESS:  Sorry, can you repeat your question for me, please?

BY MR. DRAPER:

Q.    Sure.

My question was, the second paragraph, the first part of it talks about some statistics relating to screen use kind of in general, right?

MS. WHITE:  Same objection.

THE WITNESS:  I see that.

///

Page 225

BY MR. DRAPER:

Q.    Okay.  And then the last sentence says, "We developed a" -- and then it's got a hyperlink, and then it continues, "for wellbeing, focused on 3 concern areas, impacting users 13-24 disproportionately."

Right?

A.    I see that.

Q.    Okay.  And the hyperlink is for Double Rainbow, right?

A.    That's what it seems to say, yes.

Q.    All right.  And Double Rainbow, that was the document we looked at at Exhibit 8.  Do you remember talking about Project Double Rainbow?

A.    I don't remember the term "Double Rainbow."  That looks familiar from this morning, though.

Q.    Okay.  Well, we're going to talk about this in some detail in a little bit.  But first let's continue on with this one.

So after talking about screen use generally, the document has some specific statistics about use of YouTube by young people, right?

MS. WHITE:  Objection.

Mischaracterizes the document.

Page 226

THE WITNESS:  It seems to have some metrics in here, yes.

BY MR. DRAPER:

Q.    All right.  And so one of those metrics is that 10 percent of 13 to 24 year olds on YouTube habitually watch more than two hours a day, excluding music, right?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  That's what's written here.

BY MR. DRAPER:

Q.    All right.  And, "13 percent of 18-24 year olds reported 'I regret how long I stayed on YouTube' in the past week."

Right?

MS. WHITE:  Same objection.

THE WITNESS:  That's what's written here.

BY MR. DRAPER:

Q.    All right.  And they're both under the header of "Habitual heavy use."  Yes?

A.    That is what's written there, yes.

Q.    All right.  Have you heard that phrase before, "habitual heavy use"?

Page 227

A.    I don't believe I have.

Q.    The next bullet point is for "Late night use."

Do you see that?

A.    I do.

Q.    And it says, "7 percent of teens on YouTube watch past midnight on school nights."

Correct?

A.    That is what's written here.

Q.    And when it talks about 7 percent of teens on YouTube, it's talking about declared teens, right?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not familiar with the document, so I don't know how they're determining that.

BY MR. DRAPER:

Q.    All right.  Are you familiar with the distinction between declared teens and inferred teens at YouTube?

A.    I've heard of the distinction, but I don't understand the details of how they're defined.

Q.    You understand that a declared teen is someone who would be a teenager according to the

Page 228

birthday they enter when the account is created?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  As I said, I'm not familiar with the details of how they're defined.

BY MR. DRAPER:

Q.    Okay.  Are you aware that many teens and younger children create accounts with misrepresented birthdays to make themselves appear older than they are?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm aware that that sometimes happens in the world.

BY MR. DRAPER:

Q.    And specifically at YouTube?

MS. WHITE:  Same objection.

THE WITNESS:  I have heard that that can happen at YouTube.

BY MR. DRAPER:

Q.    All right.  So the reason that I ask is, assuming the 7 percent of teens is declared teens, in actuality there might be more actual teens using YouTube late at night than are represented

Page 229

here because some of them might be accounts that have misrepresented their age?

MS. WHITE: Objection. Lacks --

BY MR. DRAPER:

Q. Does that make sense?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: Not entirely. Again, I don't know what version they're using here, but if you were to change the numerator, you would also need to change the denominator, and so it's unclear what impact that would have on the percentage.

BY MR. DRAPER:

Q. Does YouTube -- scratch that.

In 2017, did YouTube use inferred age to determine the age of teenagers in the United States?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: I do not know.

BY MR. DRAPER:

Q. The document goes on to say that 30 percent of users 18 to 24 say YouTube has cut into their sleep.

Page 230

Do you see that?

A.    I do.

Q.    All right.  And then the next bullet point is "Unintentional use," and it says, "Among users 18-24 years old, 23 percent report 'losing track of time on YouTube.'"

Do you see that?

A.    I do.

Q.    "20 percent report 'procrastinating on YouTube.'"

Do you see that?

A.    I do.

Q.    "And 20 percent report YouTube 'interfered with work, school, or homework.'"

Correct?

MS. WHITE:  Objection to form.
Mischaracterizes the document.

THE WITNESS:  That's what's written here.

BY MR. DRAPER:

Q.    All right.  And so at this time in 2017, 2018, YouTube's focus on digital wellbeing was concentrated on these areas, habitual heavy use, late night use, unintentional use.

Do you agree?

Page 231

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't know.  I don't know -- again, I don't know the context of what the document was, what it was used for, how representative the authors' views were.

BY MR. DRAPER:

Q.    All right.  Could you turn the page, please?  Do you see a section entitled "Proposed Solutions"?

A.    I see that.

Q.    All right.  And the text immediately under that, it says, "YouTube launched some successful and needed quick wins at I/O."

Do you see that?

A.    I see that.

Q.    What is I/O?

A.    I'm not familiar with the document, but I would assume Google I/O, the developer conference that Google holds annually.

Q.    Okay.  And it says that those efforts garnered positive press.  Yes?

A.    That's what it says.

Q.    All right.  And then it says, "they are

Page 232

mobile-phone-only MVPs."

What does that mean?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, not familiar with the document.  Typically MVPs in this context would probably mean minimum viable products.

BY MR. DRAPER:

Q.   Minimum viable products.

A.   That's a term we use for sort of the first complete-enough version of an idea or a feature or a product.

Q.   Okay.

A.   Coherent enough to be able to ship.

Q.   Okay.  That makes sense with the next context.  It says, "they haven't been iterated on, and they're only a first step in addressing Habitual Heavy Use, Late Night Use, and Unintentional Use."

In that context minimum viable products makes perfect sense, right?

MS. WHITE:  Objection.  Mischaracterizes testimony.

THE WITNESS:  That still seems like a reasonable interpretation of what MVP means

here.

BY MR. DRAPER:

Q.   Okay.  All right.  So from the context it appears that although these were released at I/O, they haven't been refined or improved since then, correct?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I'm not familiar with the document.  All I have is the context that's written here seems to be saying whatever launched then had not been iterated on yet.

BY MR. DRAPER:

Q.   Okay.  All right.  There is a footnote there in that first sentence.

Do you see that?

A.   Yes.

Q.   All right.  And the footnote identifies what these quick wins were.  They were the "Take a Break reminder, Time Watched Profile & notification controls."

Right?  Do you see that?

A.   I see the footnote saying that.

Q.   All right.  And then towards the end of

Page 234

that sentence it says, "6.7 million users enabled Take a break reminders."

Do you see that?

A.    I do.

Q.    Do you agree that 6.7 million users is a miniscule number when you consider YouTube had over a billion active users at this time?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't.  The scale of a metric depends on what the target audience for a feature would be.

BY MR. DRAPER:

Q.    Certainly it's a very, very small segment of YouTube users that had enabled the take a break reminders at this time?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Yeah, I'm not familiar with the feature or what we thought the right number was for that or what YouTube's metrics were at that time to contextualize.

BY MR. DRAPER:

Q.    6.7 million is a very small percentage of 1 billion.  That we can agree on, right?

A.    Yes.

Q.    Okay.  You actually majored in math, as I recall, right?

A.    Yes.

Q.    All right.  So I'm glad you agree with me on that one.  I couldn't impeach you on it.

Okay.  And then it says 37 million users have viewed the time watched profile, right?

A.    Yes.

Q.    All right.  So that's more than used the take a break reminder, but it's still a pretty small number compared to YouTube's total number of active users at that time?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, these are all relative metrics.  I think at that time we had probably fewer than 37 million users of the YouTube Music app and thought of that as successful.  So, again, it's all relative to what the intended size would be.

BY MR. DRAPER:

Q.    Okay.  But going back to these math questions, we agree that 37 million is a pretty

Page 236

small percentage of a billion?

A.    That is true.

Q.    Okay.  So still looking at the Proposed Solutions section of this document.

A.    Okay.

Q.    For "Habitual Heavy Use," the proposed solutions are better data on time watched profile, right -- I'm sorry, "Build on Time Watched Profile." Scratch that whole thing.

Okay.  For "Habitual Heavy Use," the proposed solutions are "Richer data to enable deeper insight," correct?

MS. WHITE:  Objection.

BY MR. DRAPER:

Q.    Do you see that headline?

A.    I see that headline.

Q.    All right.  "Contextual alerts to encourage positive behaviors," you see that's the next headline down?

A.    I see that's the next headline.

Q.    And on the next page, "Daily limits to help users maintain control," right?

MS. WHITE:  Objection. Mischaracterizes the document.

THE WITNESS:  I see that headline.

Page 237

BY MR. DRAPER:

Q.    Right.

And then the third bullet point down from that one -- I'm sorry, the second bullet point down from that one lists "Possible actions:"

Right?

A.    I see that.

Q.    Okay.  And those possible actions include "app gray-scaling," right?

A.    I see that.

Q.    All right.  And that's changing the appearance of the app to provide a visual reminder that in this context the user has been using the application for a certain amount of time.  You agree that's what they mean when they talk about app gray-scaling?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I haven't heard that term.  I don't know what it means.

BY MR. DRAPER:

Q.    Okay.  Then it talks about "hidden recs."

Do you see that?

A.    I do.

Page 238

Q.    And that's talking about hiding the recommended content after a user has been on for a certain amount of time so that they no longer receive recommendations during that session, is that right?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I'm not familiar with the doc, I haven't heard that term before.  I don't know what that means.

BY MR. DRAPER:

Q.    Was app gray-scaling ever implemented as part of the effort to reduce habitual heavy use?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I don't know.

BY MR. DRAPER:

Q.    Were hidden recommendations ever used as part of the effort to reduce habitual heavy use?

MS. WHITE:  Same objection.

THE WITNESS:  I don't know.

BY MR. DRAPER:

Q.    The last bullet point under this section says, "In the future, limits could be set by parents for teens via a managed account (YouTube or

Page 239

Family Link)."

Do you see that?

A.    I do.

Q.    That was implemented, but not until 2024, correct?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not familiar with the feature.

BY MR. DRAPER:

Q.    Do you know whether the teen has to agree to be supervised before the managed account function will work in Family Link?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not familiar with how that works.

BY MR. DRAPER:

Q.    All right.  Do you know that if the teen wants, they can decline to have a supervised account in Family Center?

MS. WHITE:  Same objection.

THE WITNESS:  I'm not familiar with how it works.

///

Page 240

BY MR. DRAPER:

Q.    All right.  Below this it talks about efforts to combat late night use, right?  The first one is having a dark theme that would reduce blue light emitted.  The dark theme would come on at night.

Have you ever heard of that implementation of a "dark theme"?

MS. WHITE:  Objection. Mischaracterizes the document.

THE WITNESS:  I've heard of dark themes for application UI and in general and at YouTube.

BY MR. DRAPER:

Q.    Okay.  And do you understand that they're intended to reduce the amount of blue light that is emitted?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  That, I'm not familiar with.

BY MR. DRAPER:

Q.    Was a night theme ever implemented at YouTube?

MS. WHITE:  Objection.  Lacks

Page 241

foundation.

THE WITNESS:  I don't know.

BY MR. DRAPER:

Q.    All right.  Under the section entitled
"Bedtime settings," there's a group of things listed
under "Possible actions."

Right?  Do you see that?

A.    Yes.

Q.    That includes "gray-scaling of the
app."  You don't know whether that ever took place?

MS. WHITE:  Objection.  Asked and
answered.

THE WITNESS:  Again, not familiar with
the doc, not familiar with the term, don't
know whether it launched.

BY MR. DRAPER:

Q.    "Hidden recommendations," you don't
know whether that was implemented?

MS. WHITE:  Same objection.

THE WITNESS:  As I said before, don't
know what the feature is or whether it was
implemented.

BY MR. DRAPER:

Q.    All right.  Let's keep going in this
document.

Page 242

There's a section called "Measuring Success," and that is on page 2688.

Yes?  Do you see that?

A.    I see that.

Q.    All right.  Measuring Success has three goals for 2019, correct?

MS. WHITE:  Objection.

Mischaracterizes the document.

THE WITNESS:  I see the document -- that written in the document.

BY MR. DRAPER:

Q.    Right.  "For 2019, we want to achieve 3 goals."

That's what it says?

A.    That's what it says.

Q.    Yes.  I didn't misrepresent the document in any way, did I?

A.    That's what it says.

Q.    All right.  The first bullet point says, "Increase awareness of wellbeing tools from 12 percent to 50 percent among core YouTube users."

Right?

A.    That is what it says.

Q.    All right.  So in 2018 you would agree with me that most core YouTube users didn't even

Page 243

know these tools existed, right?

MS. WHITE:  Objection to form.  Lacks foundation, mischaracterizes the document.

THE WITNESS:  I'm not familiar with the document or the data.  All I have is what's written there.  I don't know how they're measuring.

BY MR. DRAPER:

Q.    Well, I mean, it says they're measuring awareness of wellbeing tools among core YouTube users, right?

A.    That is what it says.

Q.    And they want to increase that awareness from 12 percent to 50 percent, right?

A.    That is what it says.

Q.    And 12 percent is not remotely close to half, is it?

MS. WHITE:  Objection.  Argumentative.

THE WITNESS:  12 percent is 12 percent.

BY MR. DRAPER:

Q.    Okay.  So most core YouTube users were not aware of these wellbeing tools in 2018?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I'm not familiar

Page 244

with the document or the data.  All I can
see here is it suggests it was 12 percent
at the time.

BY MR. DRAPER:

Q.    All right.  And then it says, "Increase
usage of wellbeing tools from 7 million to 50
million users."

Right?

A.    That is what it says.

Q.    Even 50 million users is a small number
for a company that has over a billion users at this
time, like YouTube, right?

MS. WHITE:  Objection.  Lacks
foundation.

THE WITNESS:  As I said before, large
or small is all relative to the target for
a given feature.  YouTube is a very large
product.  Very few things that we do are
ever intended to be used by even 50 percent
of users, let alone 100 percent.

As I mentioned, we're quite happy with
our Music app with tens of millions of
users even today.  So small and large is a
relative judgment.

///

Page 245

BY MR. DRAPER:

Q.    Then it says, "Establish baseline for wellbeing tool effectiveness (based on user surveys) and begin driving measurable improvement."

Correct?

A.    That is what it says.

Q.    So at this time YouTube was not measuring the effectiveness of its wellbeing reminders, was it?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Again, I'm not familiar with the document.  I don't know what we were or were not measuring at the time.

BY MR. DRAPER:

Q.    Well, if it says in 2019 they want to establish a baseline for wellbeing tool effectiveness, that suggests in 2018 they did not have such a baseline, right?

MS. WHITE:  Objection. Mischaracterizes the document, lacks foundation.

THE WITNESS:  All I have to go on is what's written here.  It says they want to establish a baseline.

Page 246

BY MR. DRAPER:

Q.    And you agree with me that implies they didn't have such a baseline before they established it, right?

MS. WHITE:  Same objection.

THE WITNESS:  It could be they didn't have one, it could be they wanted a fresh one, it could be they had some inaccuracy. It's hard to say.

BY MR. DRAPER:

Q.    At this time all that YouTube was doing was measuring how often their reminders were displayed, they were not measuring the effectiveness of them at all, isn't that true?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  This was all well outside of my area of responsibility.  I don't know what they were or weren't doing.

BY MR. DRAPER:

Q.    All right.

MS. WHITE:  We've been going over an hour.  Is this an okay time to take a break?

MR. DRAPER:  Can I just do one more

Page 247

short document that kind of goes with this one?  And then I think we'll be -- it won't take probably more than five minutes.

MS. WHITE:  Okay.  Five minutes sounds good.

(Whereupon, Google-YouTube-Harding-19 was marked for identification.)

BY MR. DRAPER:

Q.    All right.  Sir, I'm going to show you what we've marked as YouTube Exhibit 19 -- I'm sorry, YouTube-Harding Exhibit 19.  Here is a copy for you, here is a copy for your attorney.  It's a short one.

Sir, this is an e-mail from Reid Watson to Erin Turner, correct?

A.    Can I take a look?

That's what it appears to be.

Q.    All right.  And it's dated February 1st, 2023, correct?

A.    That is what it says.

Q.    All right.  We've already established that Reid Watson you know to be someone who is an employee at YouTube, correct?

A.    That's correct.

Q.    Do you know Erin Turner?

Page 320

BY MR. DRAPER:

Q.    Experiments showed that a large number of people who came to YouTube just to watch a video would simply leave the site without watching if they were required to sign in?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Is that a question?

BY MR. DRAPER:

Q.    Yes.  Are you aware of that?  Do you agree with that?

MS. WHITE:  Same objection.

THE WITNESS:  Again, not familiar with the experiments.  I don't know what the data would have said.

MR. DRAPER:  Do we have that infinite scroll document?  Let's look at that one.

Okay.  So the next one we're marking as -- yeah, that one.  I'm going to mark that one as Exhibit 25.

(Whereupon, Google-YouTube-Harding-25 was marked for identification.)

BY MR. DRAPER:

Q.    Here is a copy for you, sir (handing).

A.    Thank you.

Page 321

MR. DRAPER: Here is a copy for Ms. White (handing).

Q. Okay. So we're going to go back to this document about infinite scroll. This is a document that was produced by the attorneys for Google and YouTube and is designed -- or designated as Bates number 00885643. The document is entitled "Supporting & Accelerating Strategic Initiatives."

And, sir, if you look at the last page, you will see that you are listed as one of the custodians for this document.

Do you see that?

A. I see that.

Q. All right. Back to the first page, please. Under the title "Supporting & Accelerating Strategic Initiatives," there is a series of names. One of those names is Cristos. Do you suppose that's probably Cristos Goodrow?

A. Yes.

Q. One of these names is Andy Berkheimer. We've already seen an e-mail from him today, correct?

A. Yes.

Q. And one of these names is Woojin K. That's Woojin Kim. You understand him to be a

Page 322

senior executive at YouTube?

A.    Yes.

Q.    All right.  Any reason to doubt that this document is what it appears to be, a document exchanged among senior YouTube managers discussing supporting and accelerating strategic initiatives?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I'm not familiar with the document or what's in it, but that is the title of the document.

BY MR. DRAPER:

Q.    And it appears to be -- to involve numerous YouTube senior executives?

A.    Yes, it does.

Q.    Okay.  So the first section is entitled "Problem Statement and Background."

Do you see that?

A.    Yes.

Q.    All right.  And the second sentence of that section reads, "However, Facebook and Instagram have been able to scale up monetization faster than YouTube."

Do you see that?

A.    I do.

Page 323

Q.    And then after a hyperlink it continues, This "is due to the feed-based consumption model of those platforms."

Did I read that correctly?

A.    I think so.  It's a little confusing with the way the hyperlink is injected.

Q.    Yeah.

Okay.  So let's look at the next page. And the second paragraph on the next page -- it's 5644 -- starts off, "In 2019, we'd like to focus on this opportunity, investing in the following changes:"

Right?  Do you see that?

A.    I see that.

Q.    All right.  And if you look down at the third change that they want to focus on, it says, "Infinite feed: Infinitely extend Watch Next so that it becomes an endless discovery feed for new content."

Right?  Did I read that correctly?

A.    I believe you did.

Q.    And then below that it says, "More ads: Interleaving and ranking ads throughout the endless feed could generate 47 percent more ad slots on watch, with minimal anticipated adverse impact on

Page 324

the user experience."

Right?

A.    That is what it says.

Q.    All right.  So my question at the beginning of all this was that infinite feed was added to Watch Next in order to improve YouTube's monetization.  Having seen this now, do you agree that that's true, sir?

MS. WHITE:  Objection.  Mischaracterizes the document, and lacks foundation.

THE WITNESS:  I'm not familiar with the document, I haven't had a chance to read the whole thing.  This seems to say that is one consequence of extending Watch Next.  I can't tell without reading the whole thing what their motivation would have been.

BY MR. DRAPER:

Q.    All right.  You say, "extending Watch Next."  I think what you meant to say was adding infinite scroll to Watch Next?

MS. WHITE:  Objection.  Mischaracterizes the testimony.

THE WITNESS:  Again, I'm not familiar with the document.  It says, "Infinitely

Page 325

extend Watch Next."

BY MR. DRAPER:

Q.    Right.  I think we're talking about the same thing.  Right?  Infinite scroll, it just never stops?

MS. WHITE:  Objection. Mischaracterizes testimony.

THE WITNESS:  It might be a nuance in terms.  The way I understand this is there's content available, it doesn't scroll on its own, it's just you can keep looking for more.

BY MR. DRAPER:

Q.    You just keep swiping, it's going to keep showing up?

MS. WHITE:  Objection. Mischaracterizes testimony.

BY MR. DRAPER:

Q.    Right?

A.    Again, not familiar with the feature, but that sounds correct.

Q.    All right.  Okay.  I'm going to move on to another document.

You would agree with me, sir, that continued growth remains an important goal at

Page 326

YouTube even today?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  Continuing growth of user value, creator value, business value, yes.

BY MR. DRAPER:

Q.    Right.

And part of that goal is continuing to refine the recommendation system for YouTube?

MS. WHITE:  Objection.  Lacks foundation, vague.

THE WITNESS:  Improving our recommendations is one way we hope to deliver more value for all of those users.

BY MR. DRAPER:

Q.    And that includes pushing out the time horizon that YouTube can predict with its algorithm?

MS. WHITE:  Objection.  Lacks foundation, vague.

THE WITNESS:  I'm not sure what you mean.

BY MR. DRAPER:

Q.    All right.  Well, let's look at a document, then.  This would be 6768.

///

Page 333

drive watch time?

MS. WHITE:  Objection.
Mischaracterizes the document, lacks
foundation.

THE WITNESS:  I didn't write this, so
I'm not sure, but when we talk about
predicting, the model would not be
necessarily trying to affect future
actions, this would be trying to predict
what user actions they would take.

BY MR. DRAPER:

Q.    Right.  Well, that's how the
recommendations model works, right?  It estimates if
I show -- "I" being YouTube, right -- if YouTube
shows the user this video, there is an estimate of
how long that user will remain on the platform, will
remain consuming YouTube videos, right?  That's what
the recommendation does, it's a giant prediction
engine?

MS. WHITE:  Objection.  Lacks
foundation.

THE WITNESS:  It is making predictions
of a number of different possible outcomes.
This talks about user actions and
satisfaction and valued watch time.

Page 334

BY MR. DRAPER:

Q.    Right.

A.    So my read of this is that it is trying to predict what will happen over a longer time period.

Q.    Exactly.

Doesn't that kind of scare you a bit --

MS. WHITE:  Object --

BY MR. DRAPER:

Q.    -- that the recommendation system is going to get so good that it's going to be able to not only predict what we're going to do in the short-term, but now it's going to start predicting what we're going to do in the longer term, even days ahead?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  We're always trying to improve our machine learning models to better understand what users will value, and so being able to take a longer time horizon for a user I think allows us to better understand what they will value.

BY MR. DRAPER:

Q.    Have you heard that the goal behind

Page 335

every view at YouTube is to drive long-term watch time, long-term engagement?  Have you ever heard that?

      A.    Not that.  I've heard the goal to drive long-term value.

      Q.    And the goal of the recommendation system is not only to predict what will happen, but to influence what will happen by showing you particular videos that are going to cause you to do certain things?

          MS. WHITE:  Objection.  Lacks foundation.

          THE WITNESS:

BY MR. DRAPER:

      Q.    I think I understand that.

          Okay.  Another topic.

          YouTube Shorts is a feature that YouTube released in 2020, correct?

      A.    I don't recall exactly when it

Page 336

released, but that sounds right.

Q. All right. And unlike traditional YouTube which is sometimes referred to as long-form video, YouTube Shorts when it was released limited the length of videos to 60 seconds so they come at a faster pace, right?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: I think it's correct that they were limited to 60 seconds. That was what was accepted for short-form video at the time.

BY MR. DRAPER:

Q. All right. And are you aware that there was some concern at YouTube that short-form videos are more addictive than traditional long-form videos?

MS. WHITE: Objection. Lacks foundation.

THE WITNESS: I'm not aware of discussions about addictiveness at the time.

BY MR. DRAPER:

Q. Have you ever heard that at all at YouTube, that short-term stuff is more addictive

Page 337

than the long -- sorry, the short-form videos are more addictive than the long-form videos?

MS. WHITE:  Same objection.  Asked and answered.

THE WITNESS:  I have not heard short form is more addictive than long form.

BY MR. DRAPER:

Q.    All right.  YouTube Shorts has its own player that can be accessed from the YouTube home page, is that right?

A.    I believe so.

Q.    And additionally YouTube has worked Shorts into its home page and Watch Next recommendations, correct?

MS. WHITE:  Objection.  Lacks foundation.

THE WITNESS:  I do know home will recommend short-form content.  I'm not sure if it's there on Watch Next.

BY MR. DRAPER:

Q.    Are you aware of any efforts at YouTube to shorten the video length even more?

A.    Yes.

Q.    Okay.  We're going to talk about one of those.

Page 338

Let's go ahead and mark our next exhibit.

MR. DRAPER:  6857.

(Whereupon, Google-YouTube-Harding-27 was marked for identification.)

MR. DRAPER:  I'm sorry, what number is this?

MS. TRUONG:  27.

BY MR. DRAPER:

Q.    YouTube-Harding Exhibit 27 is a document that's been produced by the attorneys for Google and YouTube and is designated Bates number 01846857.

We haven't seen one of this type of document today, sir, but this is an e-mail from you to you dated December 13, 2023.  Right?

MS. WHITE:  Objection. Mischaracterizes the document, lacks foundation.

THE WITNESS:  There's an e-mail header in here, but it doesn't look like a normal e-mail.

BY MR. DRAPER:

Q.    Right.  Because what this really is is a collection of Google Chat postings or texts,

Page 350

CERTIFICATE OF COURT REPORTER


I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, CSR No. 14449 for the State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 4th day of April, 2025.

_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449