# AMENDED Exhibit 1010

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.3047
ADDICTION/PERSONAL INJURY       )
PRODUCTS LIABILITY LITIGATION  ) Case No.
_____ ) 4:22-md-3047-YGR
                                )
THIS DOCUMENT RELATES TO:       )
                                )
ALL ACTIONS                     )
                                )
_____ )

Tuesday, March 11, 2025
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Deposition of
WOOJIN KIM held at the offices of Wilson
Sonsini Goodrich & Rosati PC, 650 Page Mill
Road, Palo Alto, California, commencing at
9:09 a.m. PDT on the above date, before
Michael E. Miller, Fellow of the Academy of
Professional Reporters, Certified Court
Reporter, Registered Diplomate Reporter,
Certified Realtime Reporter and California
CSR #13649.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

CONFIDENTIAL

Page 10

-----------

P R O C E E D I N G S

March 11, 2025, 9:09 a.m. PDT

-----------

THE VIDEOGRAPHER:  We're now on the record.  My name is James Vonwiegen.  I'm a videographer for Golkow.  Today's date is March 11th, 2025, and the time is 9:09 a.m.

The video deposition is being held in Palo Alto, California in the matter of Social Media Adolescence Addiction, Personal Injury Products Liability Litigation before the United States District Court, Northern District of California.

The deponent is Woojin Kim.

Counsel will be noted on the stenographic record.

The court reporter is Mike Miller, California CSR #13649, and will now swear in the witness.

///

///

///

Page 11

-----------

WOOJIN KIM,

having been duly sworn,

testified as follows:

-----------

EXAMINATION

-----------

BY MS. TRUONG:

Q.    Good morning, Mr. Kim.

A.    Hello.

Q.    We had briefly met just off the record, but let me just reintroduce myself here.  My name is An Truong.  I'm an attorney for the plaintiffs, and I'll be taking your deposition today on behalf of individual children and school districts who have alleged that they've been harmed by YouTube.

Do you understand that?

A.    Yes.

Q.    Okay.  Have you ever been deposed before?

A.    Yes.

Q.    Okay.  So you kind of know the ground rules, but let me just restate them here.  First and foremost, very important, we

can't talk over each other.  As you can see, we have a court reporter.  He's taking down everything that's being said.  So it's very important that you let me finish talking before you start talking, all right?

A.    Yes.

Q.    Part of that process also is that your attorney is going to be making objections.  We also have to let them have the time and opportunity to do that.

And unless otherwise indicated by your attorney after an objection, you still have to answer the question, all right?

A.    Okay.

Q.    All right.  Verbal answers only.  Again, everything is being taken on the transcript, so hand motions, head nods, ums, like I just did, really not great for the record, so everything has to be verbal.

If at any point I ask you a question that you don't understand, I will ask that you seek clarification, all right?

A.    Okay.

Q.    If you don't seek clarification, I'm going to assume that you

understood the question; is that fair?

A.    Okay.

Q.    I'm going to try to take a break about every hour or every hour and a half.  But this is not intended to be a marathon, so if at any point you want to take a break sooner, just let me know.  The only caveat to that is I will ask that we finish a question or line of questioning before we go off the record, okay?

A.    Okay.

Q.    Earlier you were just sworn in by the court reporter.  You understand that you're under oath today to tell the truth?

A.    Yes.

Q.    And you would have to do so just as if you were before a judge and jury?

A.    Yes.

Q.    Okay.  And, in fact, the deposition today is being videotaped.  Do you understand that portions of that video may be played during trial in this case?

A.    Yes, I do.

Q.    Is there any reason you can't testify truthfully today?

Page 14

A.    No, I don't think there's any reason.

Q.    Okay.  Any medication that could impair your memory?

A.    No.

Q.    Do you have any knowledge about what this case is about?

A.    A little bit.

Q.    Okay.  What is your understanding of what this case is about?

MR. WILLEN:  I'll just admonish you that you should exclude from your answer anything you learned from attorneys working on the case and helping you prep for the deposition.

THE WITNESS:  Of course.

A.    What is my understanding of this case?

BY MS. TRUONG:

Q.    Yes.

A.    It involves multiple plaintiffs related to how YouTube and other platforms or services play a role or how they impact children's wellbeing.

Q.    And when did you first learn

CONFIDENTIAL

Page 15

about this case?

MR. WILLEN:  Again, same admonition.

A.    I don't remember exactly when, but I think -- in the course of work, I think we do talk about what are the outstanding cases that involve YouTube or what are the outstanding proposed regulations and so on and so forth.  I think it came up in that sort of context.

BY MS. TRUONG:

Q.    Okay.  And do you recall around when you learned about the case?

A.    I don't.

Q.    Was it this year?

A.    I think it was earlier than this year.

Q.    Okay.  Sometime last year?

A.    Maybe.

Q.    Okay.  Before last year?

A.    I'm not sure.

Q.    Okay.  Do you understand that Google and YouTube are both defendants in this case?

A.    I guess I didn't know, but

Page 16

maybe I didn't really think of those as
separate entities.

Q.    And is that because Google
acquired YouTube in about 2006; is that
right?

A.    I think that's about right, but
I think it's also because I think a little
bit more narrowly about YouTube, which is
where I work.

Q.    What do you mean you think a
little more narrowly about YouTube?  In
relation to Google?

A.    As in the work that I do
relates to YouTube specifically.  Of course,
I do work with partners and counterparts in
Google on a number of different projects, but
my focus is on improving YouTube products.

And so when you asked did I
know whether this lawsuit is -- relates to
both Google and YouTube, I guess I didn't
really think much about those two as
different entities.  I just kind of assumed a
little bit more that this relates to YouTube.

But now that you mention it, I
guess it makes sense that Google and YouTube

Page 17

are somehow both mentioned.

Q.    Okay.  Let me try to clarify this.

Is it your understanding that YouTube -- YouTube is a product, correct?

A.    Yes.

MR. WILLEN:  Object.

BY MS. TRUONG:

Q.    And YouTube is a separate entity that owns and operates the YouTube product, correct?

MR. WILLEN:  Hold up.

Objection to the form.

A.    I guess the way I think about -- I was talking about YouTube as sort of the company that I work at.

BY MS. TRUONG:

Q.    Okay.  What's your understanding of YouTube in relation -- YouTube, the company, in relation to Google?

A.    YouTube is a subsidiary of Google.

Q.    Okay.  Mr. Kim, when did you learn that you would be deposed today?

CONFIDENTIAL

Page 18

A.    I don't actually remember.

Q.    Okay.  Was it sometime recently or earlier this year, approximately?

A.    I actually don't -- I do remember -- and these things usually come up via e-mail, and then if I don't see that e-mail, then my assistant would let me know that something like this came in.

I don't remember exactly when I had that communication.

Q.    Okay.  Did there come a time that you started prepping for this deposition?

A.    Sorry, say that again.

Q.    Did there come a time when you started prepping for this deposition, preparing for this deposition?

MR. WILLEN:  You can answer that yes or no.

A.    Yes.

BY MS. TRUONG:

Q.    Okay.  When did you start preparing for this deposition?

A.    What do you mean by preparation?

CONFIDENTIAL

Page 19

Q.    When did you start reviewing documents, talking to individuals about the substance of what you thought this deposition would be about?

A.    I met with my counsel here, I think, last week was I think the first time we started discussing this, or it might have been the week before.  I forget exactly when.

Q.    And did you meet with your counsel in person or was it an over-the-phone conversation?

A.    Once in person and then we also had video sessions as well, videoconference sessions, rather.

Q.    The one time in person, how long was that meeting?

A.    I believe it was six and a half hours, including breaks and lunch.

Q.    Okay.  And where did that meeting occur?

A.    Here.

Q.    Here at the Wilson Sonsini Palo Alto office?

A.    Correct.

Q.    And who was present at that

Page 20

meeting?

A.    My -- my, I guess, legal counsel.

Q.    Mr. Willen, sitting here to your left?

A.    My left.  Yes, Mr. Willen.

Q.    Anyone else?

A.    I don't know all their names, but the other counsel here.

Q.    Okay.  I'm sorry, I didn't mean to put you on the spot.  Let me rephrase the question.

Was there any -- were there only attorneys present?

A.    I believe so.

Q.    Okay.  Was it everyone at the table right here to your left down the line?

A.    Yes.

Q.    Okay.  Were there any nonattorneys present at the meeting, to your knowledge?

A.    I don't think so.

Q.    Okay.  During this meeting, did you review any documents?

MR. WILLEN:  You can answer

Page 21

that yes or no.

A.    Yes.

BY MS. TRUONG:

Q.    Okay.  And how did you come to obtain these documents?  Were they compiled by you or were they compiled by someone else?

MR. WILLEN:  Objection to the form.

A.    Documents that I looked at, I didn't produce them; they were given to me by my counsel.

BY MS. TRUONG:

Q.    And about how many documents did you look at?

A.    I'm not sure.  Maybe ten, maybe fewer than ten, a little bit more.

Q.    Do you remember what the documents were?

MR. WILLEN:  I think we're getting pretty close to where we're going to shut this down based on privilege, but you can -- I guess you can answer that question:  Do you remember what the documents were?  You can answer it yes or no.

Page 22

A.      Yes.

BY MS. TRUONG:

Q.      Okay.  And, to your knowledge, were those documents produced in this litigation?

A.      To my knowledge, yes.

MS. TRUONG:  Mr. Willen, can we get a confirmation that all the documents were produced in this litigation?

MR. WILLEN:  To the best of my knowledge, they were.

MS. TRUONG:  Thank you.

BY MS. TRUONG:

Q.      Okay.  And then, Mr. Kim, you had indicated that in addition to the one time in-person meeting, you had several videoconferences; is that right?

A.      I said I had a videoconference session.  Several?  One or two.

Q.      You recall one or two?

A.      Yeah, I don't know if it was two or one.

Q.      Okay.

A.      Probably two.

Q.    About two?  All right.

And how long were those video conferences?

A.    They were significantly shorter than the in-person one.

Q.    So the in-person one you said was about six and a half hours, so what is your approximation for the video conferences?

A.    My guess here today, sitting here today, is probably two hours each, three hours each.

Q.    Okay.  And were there attorneys present on those calls?

A.    Yes.

Q.    Some of the same attorneys here today?

A.    Some of the same attorneys here.

Q.    Okay.  To your knowledge, were there any nonattorneys on the call?

A.    Not that I'm aware of.

Q.    Okay.  And did you review any documents on these video conferences?

MR. WILLEN:  You can answer that yes or no.

Page 24

A.    I think yes, in one of them.

BY MS. TRUONG:

Q.    Were they the same documents you had reviewed in the in-person?

MR. WILLEN:  You can answer that yes or no.

A.    Actually, I don't recall.

MR. WILLEN:  Or I don't recall.

MS. TRUONG:  You missed an option.

MR. WILLEN:  Yeah.

BY MS. TRUONG:

Q.    And were those documents provided to you or did you compile them yourself?

A.    They were provided to me.

Q.    And, to your knowledge, were those produced during this litigation?

A.    To my knowledge.

MS. TRUONG:  Can you confirm that, Mr. Willen?

MR. WILLEN:  To my knowledge.

MS. TRUONG:  Okay.

BY MS. TRUONG:

Q.    And, Mr. Kim, aside from

talking to your attorneys, did you discuss this deposition with anyone at work?

MR. WILLEN:   You can answer that yes or no.

A.    Yes.

BY MS. TRUONG:

Q.    Who did you discuss it with?

A.    My assistant, for one.

Q.    And did you discuss any substance or was that just to tell her you would be out of office?

A.    Not related to substance.

Q.    Okay.  Anyone else at your work?

A.    My colleagues sitting to the -- to the left and right of me.

Q.    Who are those colleagues?

A.    ███ █████████ is my, I guess, colleague who works in design.  Cristos Goodrow is an engineering colleague.

Q.    And did you discuss with ██████ the substance of the deposition?

A.    No.

Q.    Did you discuss with Cristos the substance of the deposition?

Page 26

A.    No.  No.

Q.    Are you aware that Cristos Goodrow was previously deposed in this case?

MR. WILLEN:  You can answer that, but again, exclude from your answer anything that you were told or learned from your attorneys in preparation for the deposition.

A.    Yes, I knew he was deposed.

BY MS. TRUONG:

Q.    Had you talked to Mr. Goodrow about his deposition at any point?

A.    Talked to him about the deposition?  Yes.

Q.    Okay.  What did you and Mr. Goodrow discuss about his deposition?

A.    He and I, I guess, have a lot of review forums that we share, that we host, we attend, and we discussed his deposition in the context of he won't be able to attend some of these meetings, that I would have to cover for him, so to speak.  So those are the things that we talked about.

Q.    Did you say review forms or forums?

Page 27

A.    Forums.  Forums.

Q.    Like just work meetings?

A.    A work meeting, yes.  Yes.

Q.    Okay.  And after Mr. Goodrow was deposed, did you discuss with him the substance of his deposition?

A.    No.

Q.    Have you reviewed his deposition transcript?

MR. WILLEN:  So, again, you can answer that, but you should exclude anything that may or may not have occurred during the preparation for the deposition with your attorneys.

A.    The answer is no.

BY MS. TRUONG:

Q.    Okay.  Anyone else?  Did you talk to anyone else about this deposition aside from your attorneys?

A.    There are others at work that I had to tell that I would be unavailable to speak because of the deposition.

Q.    Okay.  Aside from discussing sort of unavailability at work, did you talk to anyone about the substance of the

beyond those.

Q.    And the -- the other possible depositions, were they all related to your work at Google?

A.    All the other depositions I've had all relate to my prior work at Google.

Q.    Have you ever provided trial testimony?

A.    How does that differ from deposition?

Q.    Have you ever provided testimony in a court in person before a judge and jury?

A.    I have not.

Q.    Have you ever provided any other type of testimony under oath?

A.    I don't think so.

Q.    Okay.  For example, a congressional hearing?

A.    No.

MS. TRUONG:  Okay.  Let's mark as Exhibit 1.  It's going to be your LinkedIn profile, also characterized as your curriculum vitae that was provided to us yesterday from your

Page 34

counsel.

(Whereupon, YouTube-Kim-1, LinkedIn Profile, was marked for identification.)

MS. TRUONG:  Also being put up on screen for you.

BY MS. TRUONG:

Q.    And, Mr. Kim, as we go through this deposition, I will be providing you with exhibits.  Please take whatever time you need to review them, and just let me know when you're ready, okay?

A.    I am ready.

Q.    All right.  Do you recognize this document?

A.    Yes.

Q.    Is this your LinkedIn profile?

A.    It appears so.

Q.    Okay.  And is the information in here information that you've put together?

A.    Yes.

Q.    When was the last time you updated your LinkedIn profile?

A.    I believe in 2024.

Q.    Okay.  And as you review this

CONFIDENTIAL

Page 35

document here, is there anything inaccurate being presented in this profile?

A.    I would say this is current and also the historical information is also accurate.

Q.    Okay.  And I'm sorry, you said it's also current?

A.    Correct.

Q.    All right.  So let's focus just on the first page here where we go through your YouTube and Google experience.  We'll start with Google here.

It indicates that starting in August of 2008, you were employed at Google; is that correct?

A.    That's correct.

Q.    And if you go down a little more, you helpfully provide a history at Google, and you say from 2008 to 2013, you were product manager, senior product manager, group product manager, Google Display Ads; is that right?

A.    Yes.

Q.    And if I understand this correctly, the three titles you have here,

Page 36

product manager, senior product manager, group product manager, are separate titles and indicate that you were promoted during this time period into each of those roles; is that correct?

A.    That's correct.

Q.    In other words, you didn't hold these three titles simultaneously?

A.    That's correct.

Q.    Okay.  And it says here that during this time, 2008 to 2013, you were working on Google Display Ads; is that correct?

A.    2008 to 2013, yes, I was working on Google Display Ads.

Q.    What is Google Display Ads?

A.    It refers to display advertising services.

Q.    So I don't have a tech background, so I don't know what that means.

Can you explain to me what a display advertising service is?

A.    There -- unlike text ads that you see on some of the search engines where the ad is composed of three or four lines of

text with a link, display ads refer to more graphical ads; banner ads is another way to say it. And they can be static image. They can include animated image. Sometimes they include video creative assets.

There's some instances when text ads are also shown in these display ad inventory slots, so it's a combination of those things.

Q. Okay. And can display ads also be interactive, in other words, a user can see an ad and click on it to take them somewhere else?

A. In most cases users could click on these ads and the user would be taken to the advertiser's landing page.

Q. And in terms of display ads, did Google Display Ads engage in targeted advertising?

MR. WILLEN: Object to form.

A. How would you define targeted here?

BY MS. TRUONG:

Q. Let me rephrase it.

What is targeted advertising in

Page 38

the sense of online advertising in your
experience?

     A.     It can mean a number of
different things.

     Q.     Like what?

     A.     When I started in 2008, when we
talked about targeted or targeting in
general, they meant they were relevant to the
context in which they were shown.

     Q.     And did that understanding
change at some point?

     A.     The general concept that a
targeted ad is relevant to the context hasn't
changed.  That's still pretty accurate in
terms of describing targeting today.

     Q.     Okay.  What about "personalized
advertising"?  What does that term mean to
you in your experience with display ads?

               MR. WILLEN:  Objection to the
     form.

     A.     So let's say -- you could -- a
personalized ad could also mean a number of
different things.

               I don't know, is there maybe --
ads can be personalized in many different

CONFIDENTIAL

Page 39

ways.

BY MS. TRUONG:

Q.    I'm sorry, I didn't get that.

A.    Ads can be considered personalized in many different ways.

Q.    One way it could be personalized is based on data that's gathered about an Internet user; is that right?

MR. WILLEN:  Objection to the form.

A.    One way that ads could be considered personalized is that it's relevant to the context in the sense that it's relevant to the user context.

BY MS. TRUONG:

Q.    What types of data points would be used to determine what is or isn't relevant to the user context?

MR. WILLEN:  Objection to the form.

A.    One -- one example would be what was then -- now, this is -- now, my work in display ads dates back to, as you see, 2008 to 2017, so this may be outdated.

But back during those times,

Page 40

one way by which ads could be relevant to the user context was via what's called -- what was called retargeting in the industry back in those days.

BY MS. TRUONG:

Q.    And what is retargeting?

A.    The broad concept of retargeting is that when a user visits an advertiser's website, the advertiser remembers who the user is.  And when I say user, it's really a proxy for user, which is a browser cookie.  This is how things operated back then.

It remembers the browser cookie and then goes to advertising networks, like Google Display Network, but there are many other ad networks back in those days, and tells us that they want to target that user or that browser cookie.

And when we see that browser cookie on other web pages that are serving Google's display ads, we would show that advertiser's ad.  So from the user's perspective, you go to an e-commerce site, and then later on you go to another website,

CONFIDENTIAL

Page 41

and you'll see an ad from that e-commerce site that you had visited.

Q.    So back when you were working at Display Ads, one way an advertiser could engage in retargeting was to track a user via their browser cookie from one website to another; is that correct?

MR. WILLEN:  Object to the form.

A.    It's technically a little bit more complicated than that.  So I don't know if that is a completely accurate rendition of what happens.

BY MS. TRUONG:

Q.    Let me rephrase this.

The purpose of retargeting is to see what a user did on one page and then follow them to another and deliver a targeted advertising to that user on a different page; is that right?

MR. WILLEN:  Objection to the form.

A.    I guess I would say it a little bit differently.  The purpose of retargeting was for advertisers to be able to find users

CONFIDENTIAL

Page 42

that would be highly interested in their product and in their services.

BY MS. TRUONG:

Q.      And they would find those users by using the browser cookies that would track the user activity online; is that correct?

MR. WILLEN:  Objection to the form.

A.      Again, this is -- this is -- this may be outdated technology at this point, and I don't really know how things operate today.

Back then, the underlying technology was cookies in general.  Exactly how these cookies, I guess, worked across these websites is somewhat complex, and it's not as simple as an advertiser saying here's a cookie, please find me this user.  It's a little bit more complex than that.

BY MS. TRUONG:

Q.      Okay.  How would the advertiser match the browser cookie to the user for retargeting purposes?

A.      So I believe what happened was -- because cookies generally stay within

CONFIDENTIAL

Page 49

MR. WILLEN:   Objection to the form.

A.   So I think -- first, we should probably clarify.  When you say Google pixel, I don't know if you mean something a little bit more broad and more general.

The example that I was giving, because you were asking me about one example, an example of how user data or user context is formed.  I was giving you one example that was retargeting.

And I explained how retargeting works with a retargeting pixel.  And for retargeting's purposes, how a user, a particular browser ID, traverses the Internet, I don't think was all that interesting.

So I guess you're starting to ask about a use case that I don't think we really try to capture with retargeting, if that makes sense.

BY MS. TRUONG:

Q.   Is there a different term in advertising that captures this use case that I'm talking about?

CONFIDENTIAL

Page 50

A.    What is it that you're trying to ask about?

Q.    I'm asking about the concept of personalized advertising, where companies aggregate data points about a user based on their Internet activity, use that information to infer behavioral information about them, and then, in turn, provide targeted and personalized advertising.

Are you familiar with this broad concept?

MR. WILLEN:  Objection to the form.

A.    So in terms of, I guess, understanding the user context by which we did -- we -- by which we matched and served ads, retargeting is one example way of creating that user context.

There is the broader umbrella that we did call interest-based advertising, IBA, that included retargeting, but also included what we back then called interest category marketing.

BY MS. TRUONG:

Q.    And what is interest category

Page 51

marketing?

A.    That's where we build an understanding of what interests a user might have based on -- I think partly based on their -- where we have visibility into them across the web, and we create interest categories that we associate with those users.  And again, back in those days, users were proxies for users.  They were, you know, web browsers.

Q.    Uh-huh.

A.    And we would show ads -- or we would show ads from advertisers who wanted to show their ads matched up against some of these interest categories.

Q.    All right.  And you said this was partly based on where we -- and by we, I think you mean Google -- have visibility into them.

How would you obtain visibility into them?

A.    So one example is on the websites where we serve the display ads, we would obviously see the user because we're about to show an ad to them.  So you can

CONFIDENTIAL

Page 52

imagine all the websites where we are showing the ads. Those are all places we see the user.

And then we can look at what site those are, what is on the page, what is the content of the page, because we are oftentimes able to look at the contents around the ad slot on the page. And that's one way of building the understanding of where do we see this user cookie.

Q.    Is another way of building this understanding also having Google cookies be present on various websites?

A.    Again, having Google cookies be present is a bit of a weird way to phrase it. Is there a different way you want to ask the question?

Q.    Okay. Let me give you an example.

For example, Google Analytics, right, Google Analytics has a cookie associated with Google Analytics; is that right? It's _GA, I think.

A.    I think there is a cookie associated with Google Analytics.

CONFIDENTIAL

Page 62

BY MS. TRUONG:

Q.     That's okay.

MS. TRUONG:  Mr.  Willen.

MR. WILLEN:  I take responsibility.

BY MS. TRUONG:

Q.     Let me repeat the question.

YouTube, then, in 2008, as a Google property, didn't fall within that scope of work, the third-party ecosystem scope of work; is that correct?

A.     That's correct.  My recollection is that the work I did did not involve YouTube's ad inventory.

Q.     Okay.  Generally, though, were you aware of whether YouTube was utilizing display ads on the YouTube platform at that time?

A.     Display ads as in Google's display ads or --

Q.     Or any display ads.

A.     I don't remember.

Q.     So going back to Exhibit 1, in 2013 to 2017, it says you became director of product management at Google Display Ads; is

Page 63

that correct?

A.    Yes.

Q.    What was the change in work here, if any?

A.    Through -- throughout, you know, between 2008 and 2017, I generally increased my scope, all mostly within Google Display Network product area.

Q.    Okay.  And during this time, 2013 to 2017, were you working at all with the YouTube platform?

A.    I'm pretty sure I would have had some meetings with -- with the -- meetings, maybe interactions, more broadly, with people who worked on advertising products for or advertising services for the YouTube property.

But the work that I did wasn't really for YouTube domain.

Q.    Okay.  And then from 2017 to 2019, now your title is director of product management at YouTube; is that correct?

A.    That's correct.

Q.    What prompted that change from Google Display Ads to YouTube, if anything?

Page 74

overuse issues?

A.    I guess now we're maybe decoupling ourselves from, you know, the year 2017.  I think -- there is -- there were other folks at the time, I guess, looking at screen time, potential overuse during the time period that I was at YouTube.  But exactly when those types of projects started, I wouldn't be able to tell you.

Q.    Did there come a time when your work on Responsibility expanded to include screen time and overuse?

A.    The area of Responsibility was -- was focused on a very specific set of topics, and screen time and overuse types of issues were not scoped into that.  There were other parts -- other folks, other teams that would have thought about those issues, apart from the Responsibility team.

Q.    All right.  Let's go back to your time, 2017 to 2019, as director of product management.  We talked about your work with Search and Knowledge, and then the expansion to Responsibility.

Did there come a time where you

Page 75

expanded to include any other work in this role?

A.    Between '27 [sic] and 2019, somewhere -- somewhere during that time period, I also expanded my scope to pick up Discovery, Discovery product area.

Q.    What is the Discovery product area?

A.    That team is responsible for recommendations, content recommendations.

Q.    What do you mean by content recommendations?

A.    Maybe video recommendations is a better way to put it, since we mostly deal with videos on our site.

These are the videos that we recommend on the YouTube home page or -- and also what we call the Watch Next panel at YouTube, which is the panel of recommended videos that appear below a video that you're watching.

Q.    Okay.  Do video recommendations impact any other aspect of the YouTube platform?

MR. WILLEN:  Objection to the

worked on.

If you're going by the list of projects in the top YouTube box there, I would say during my time as director, I also looked after the news vertical. Sometimes we classify that under Responsibility, so that's also included there.

BY MS. TRUONG:

Q. During your time as director of product management, were you overseeing the YouTube app?

A. What I referred to here as the YouTube app is internally what we call the main app project area. That was not part of my responsibility back in 2017 to 2019 as director of product management.

Q. Did it become part of your responsibility from 2019 to present when you became VP of product management?

A. It became part of my responsibility somewhere during that time, but not in 2019.

Q. And on your LinkedIn profile you also indicate at some point you were involved with YouTube Kids; is that

Page 84

correct -- I'm sorry, YouTube Kids app.

A.    That's correct.

Q.    And at what time were you involved on the YouTube Kids app?

A.    So both the main app and the YouTube Kids app became part of my responsibility -- my guess is 2021, maybe 2022.  Probably 2022 is my guess.

Q.    All right.  And then you say search and recommendations, which we talked about.  That was part of your role as director of product management; is that correct?

A.    Correct.

Q.    Did it continue to be part of your role when you became VP of product management in 2019?

A.    Yes.

Q.    And then responsibility we talked about, that was part of your role as director of product management, correct?

A.    So what I wrote here as responsibility includes kids and youth safety, but that was not -- so I guess this is -- I wrote this for, I guess, ease of

Page 85

understanding from people outside of YouTube, but what we call, capital R, Responsibility product area within -- within YouTube focuses on what you see in that list, excluding kids and youth safety. I guess this is why you were asking all those questions.

Q. You got me.

A. Yeah.

So as director of product management, the Responsibility area I worked on had to do more with civic/election, controversial content, not kids and youth safety.

And kids and youth safety came into my scope along with the YouTube Kids app around 2022.

Q. And you had said responsibility within YouTube considered capital R; is that correct?

A. As in it's a product -- a project area that carries the name Responsibility.

Q. And the project area Responsibility did not include kids and youth safety. Is that what you're testifying to

today?

A.    I guess it might depend also on who you ask, because the Trust and Safety team might say a little bit -- something different maybe, because they're organized a little bit differently.

When -- when -- these are maybe a little bit arbitrary, how we organize things.  The Responsibility project team focused on civic/election integrity, controversial content types of projects, and then we had youth and kid safety being done by another team, at least from the product management side.

If you look at Trust and Safety side, it is all one team, so maybe they see Responsibility project area as more maybe one and the same across those projects, subprojects.  But it really depends on, I think, who you ask.

Q.    So from your perspective and your review of your work at YouTube, you put kids and safety here -- kids, slash, youth safety as a reflection of your involvement with the YouTube main app and YouTube Kids;

Page 87

is that correct?

A.    Sorry, say that again.

Q.    You put kids, slash, youth and safety as reflecting your work on YouTube main and YouTube Kids app; is that correct?

It's not intended to reflect that YouTube Kids and safety was part of your work in the project area of Responsibility?

A.    So regardless of how you slice it, organize these things, all the projects listed here are in my scope today.

Q.    Is kids, slash, youth and safety part of your project area Responsibility?

A.    Kids and youth safety is part of the responsibility I have today.

Q.    Okay.

MR. WILLEN:  Do you want to take a break or you...

(Conference off the record.)

MS. TRUONG:  Let's try to just get through this first.  I think I only have like maybe five more minutes.

MR. WILLEN:  Let's do that.

BY MS. TRUONG:

Q.    Mr. Kim, the next thing you have on here is Learning/Edu/News verticals.

Do you see that?

A.    Yes.

Q.    Was this part of your work when you were director of product management or did it become part of your work when you became VP of product management?

A.    So news vertical area, as I was trying to clarify earlier, sometimes we bucket it under Responsibility project area, and that was part of my responsibilities as director of product management.

And then Learning/Edu, that is actually one team, learning, academic, educational, learning.  That product area is something that I picked up around the same time, exactly the same time as YouTube Kids and YouTube main app.  I think I said that was 2022.  That's my best guess.

Q.    Is Learning, slash, Edu, does that involve Google in the Classroom?

A.    We work with Google Classroom product area, which is posted over in the

Google side of the company.  My team does not manage the Google Classroom product.

Q.    And what is -- what is a vertical?

A.    Vertical as in, I guess, topic vertical, business vertical; gaming, for example, is another vertical of interest to YouTube.

Q.    So it -- just to clarify.  It's not some term of art.  It's just describing an area of work?

A.    That's right.

Q.    At least in this LinkedIn profile.

A.    That's right.

MS. TRUONG:  Can we go off the record?

THE VIDEOGRAPHER:  The time is 10:40.  We're off the record.

(Recess taken, 10:40 a.m. to 10:55 a.m. PDT)

THE VIDEOGRAPHER:  The time is 10:55.  We're back on the record.

BY MS. TRUONG:

Q.    Mr. Kim, we had discussed

(Whereupon, YouTube-Kim-6, Pulse Review Responsibility Metric, Feb 2018 Presentation, GOOG-3047MDL-02031811, was marked for identification.)

MS. TRUONG:  For the record, we have tabbed the pages only because the document was printed in negative, so they don't -- native, so we don't have page numbers.

BY MS. TRUONG:

Q.    Just let me know when you've had an opportunity to review this.

(Document review.)

A.    Okay.

BY MS. TRUONG:

Q.    Okay.  So this is another document where the metadata indicates that you were the author.  The title page says Pulse Review Responsibility Metric, February 2018.

Is that all correct?

A.    Yes.

Q.    All right.  What's a pulse review?

CONFIDENTIAL

Page 143

A.      Pulse refers to a review forum that -- it's a recurring meeting series where we bring topics to review, either for decision-making or for sharing or for information, with the product and engineering leads.  Back then, that would have been our CPO and head of engineering.

Q.      Who was that?

A.      Back then, the CPO was Neal Mohan, and then the head of engineering was Scott Silver.

Q.      Could anything be taken to a pulse review or was there some type of criteria for what could be elevated to this?

A.      There is both a written set of criteria as well as just, I guess, common sense on what's a good topic to review with those folks, just given that -- how busy they are.

Q.      When you say common sense, is it usually more important topics?

A.      Generally so.

Q.      And the responsibility metric here, is that referring to Responsibility, capital R?

Page 144

A.    This, I think, may happen before we adopted the terminology -- the name Responsibility, but the same general area that -- or this is the early days of that same general -- what became that same general area that we talked about as, capital R, Responsibility.

Q.    In Exhibit 5, I think your timeline indicated that Responsibility occurred in 2017; is that right?

A.    What are we looking at?

Q.    If you look at the prior exhibit, Exhibit 5, at the --

A.    Oh.  Yeah.

Q.    -- third page in, I think your timeline indicates Responsibility was in early 2017; is that right?

A.    I think work that eventually became that area I think started in 2017.

Q.    Okay.  But your recollection today is that Exhibit 6, which was the one we're currently on, this is not the Responsibility topic area, capital R; it's something else?

A.    No, sorry.  What I mean is --

CONFIDENTIAL

Page 155

Scope.

A.    I see it.

Q.    Okay.  So the first one, project scope for Project Spiderman says: Exploring all possible dimensions to wellbeing and positive impact.

A.    I see it.

Q.    All right.  Do you know what, if anything, happened to this scope area?

MR. WILLEN:  Objection to the form.

A.    Um...

(Document review.)

A.    Let me just take a look at this deck.

BY MS. TRUONG:

Q.    Sure.

A.    This Project Spiderman is not a name that I remember, so let me just make sure.

(Document review.)

A.    Okay.  So, sorry, your question was what?

BY MS. TRUONG:

Q.    With respect to that first

Page 156

listing point, exploring all possible dimensions to wellbeing and positive impact, do you know what, if anything, happened to this scope area?

MR. WILLEN:  Objection to the form.

A.     I think as -- as listed here, this concept of Project Spiderman, it sounds like -- it looks like -- now, I actually don't remember this deck, but it does look like this was a proposal for a new project that was maybe related to many of the other Responsibility work that we talked about, because I see that, on one of the slides, it lists out many of the things that became Responsibility.

And then it shows that focus of this deck, Project Spiderman, is a -- is a component that is maybe not obviously within the scope of what became, capital R, Responsibility.  So it seems like this was a proposal for a new type of project.

And I see the lists of individuals in the working group listed on the final page before the appendix, which is

Page 157

all the folks that were working on, capital R, Responsibility.

As scoped here, this project and this set of people did not work on, you know, kids content.

Some of the wellbeing pieces that were mentioned before around -- where is that slide? -- sleep, productivity and happiness, those are things that were not captured in the work that this set of individuals worked on; however, in terms of this notion of positive impact; range of verticals that include news and social issues, extra emphasis on vulnerable groups, that includes protected groups; mix of user, company and opinion leader perspectives, which we also call COFP; global perspectives.

So many of these elements we do -- we did capture in the, capital R, Responsibility area.

And then aside from that Responsibility project area with the list of individuals that are captured here, just before the appendix, other than those individuals, we also have other teams, namely

Page 158

like the kids and youth product area, that looked at some of these other issues over the years.

I don't know if they looked at these -- these types of topics, wellbeing topics back in 2018, because that's a time when I didn't manage that team.

And also, you know, some of the broader safety concerns, other than maybe some of the specific things like sleep, but there's a broader notion of safety that's something that -- there's many teams at Google or YouTube that worked on those, including Trust and Safety.

So it's a little bit hard to give you a straight simple answer on did we work or not work on this list of things here.

BY MS. TRUONG:

Q. Okay. The third line item here, it says: Extra emphasis on vulnerable groups, parentheses, kids, teens, protected groups.

Do you agree that kids and teens are vulnerable groups?

A. I believe that kids, teens and

also what's listed here as protected groups -- I do think that they just require special attention, and we've, you know -- we've said this externally, we've said it internally many times:  When it comes to kids and youth, responsibility and safety is our top priority.

MS. TRUONG:  We can set that deck aside.

MR. WILLEN:  It's 12:30.  Maybe this is a good time to break for lunch, if you're moving on to a new...

MS. TRUONG:  Yeah, that's fine. We can go off record.

THE VIDEOGRAPHER:  The time is 12:29.  We're off the record.

(Recess taken, 12:29 p.m. to 1:21 p.m. PDT)

THE VIDEOGRAPHER:  The time is 1:21.  We're back on the record.

MS. TRUONG:  Okay.  Let's mark this next document as Exhibit 7.  For the record, it's Bates starting 00785670.

(Whereupon, YouTube-Kim-7,

Page 274

BY MS. TRUONG:

Q.    In the work that this individual from User Advocacy, Trust & Safety did?

A.    Correct.  I don't know who this person is.

(Whereupon, YouTube-Kim-16, Autonav Default State Presentation, GOOG-3047MDL-04626757, was marked for identification.)

BY MS. TRUONG:

Q.    Just let me know when you've had a chance to review Exhibit 16.

(Document review.)

THE WITNESS:  Okay.

BY MS. TRUONG:

Q.    All right.  So this document was part of your custodial file, and the title page says Autonav Default State.

It indicates here right below that Reid W.  Am I reading this correctly that this refers to Reid Watson?

A.    That's right.

Q.    And this deck is from May of 2019.

CONFIDENTIAL

Page 275

In May of 2019, was this still when you were transitioning between director of product management and VP of product management?

A.    So I think 2019 towards the end of the year is when I got promoted to VP.  By May of 2019, my scope probably included Search, Knowledge, Responsibility pieces, but also Discovery, Recommendation and Discovery.

Q.    Okay.  Did it include at that time autonav?

A.    So it does say autonav.  I'm guessing that refers to autoplay, so assuming that autonav and autoplay are synonyms, I think autoplay as a feature, I think was a bit of a shared project between the Discovery team, which would build the recommendations for watch next, and the top watch next recommendation becomes -- at least at the time -- became the video that got autoplayed.

So it was shared responsibility between the, quote/unquote, the back-end team, which is the Discovery team, and then the main app team, which would actually build the feature, the UI feature.  So I think at

CONFIDENTIAL

Page 276

the time, it was a shared responsibility.

Q.    At the time of this deck, May of 2019, was Reid Watson part of your team?

A.    No, he was on the main app side.

Q.    Okay.  If we flip to the next tab, the slide title is Background: What is Autoplay?

A.    Yes.

Q.    This really just seems to set out sort of the basic functioning of autoplay at that time in May of 2019.

Any issue with what's reflected here?

A.    I think it is an accurate rendition of what was -- what was true back then.

Q.    Okay.  And if we go to the next tab, it is a slide that starts with:  At launch, autoplay was enabled by default.

Do you see this?

A.    I do.

Q.    Okay.  And I think we discussed before, you were not involved with the launch of autoplay; is that right?

CONFIDENTIAL

Page 277

A.     The original 2015 launch, I was not involved in that.

Q.     Okay.  So you have no basis to say one way or the other whether this is accurate, what's represented here?

A.     That's correct.

Q.     All right.  If we go -- just turn to the next page, it says:  However, the situation has changed in recent years.

Go to that second main bullet point:  We've identified unintentional use as a top Digital Wellbeing issue.

And under that, with respect to autoplay, the second bullet point says:  Autoplay's share of watch time doubles at night, possibly indicating sleep disruption.

Do you see that?

A.     I do see it.

BY MS. TRUONG:

Q.     Okay.  Do you have any issue with what's represented here?

A.     I mean, we spoke to this topic at length.  I wonder what that link links out to, "doubles at night."

Q.     You're reading is when it's

CONFIDENTIAL

Page 278

underlined blue like this it's a link to another document?

A.    I would imagine so.  And my guess, if I have to make a guess, is that document we spent a few good minutes on just now.

Q.    Okay.  If that's the case, your same testimony would be --

A.    All the same --

I'm sorry, I didn't mean to interrupt.

Q.    That's okay.

A.    All the issues I had there carry directly over here.

Q.    Okay.  Let's skip the next tab and we'll go to one that says YouTube Kids App at the top.

A.    Okay.

Q.    The first bullet here says: Today, the YouTube Kids app does not have an autoplay toggle.

Do you see that?

A.    I do.

Q.    All right.  So earlier we were talking about a blog post where we weren't

Page 279

sure if autoplay existed on YouTube Kids but there was no way to turn it on or off or it had just been launched at that time.

Does this clarify for you what the situation was?

MR. WILLEN:  Objection to the form.

A.      That's a good question.  I don't know.  Because my interpretation of that document that we were looking at before, just going off of reading that document, was that we introduced autoplaying functionality for the first time.  I think you took a different interpretation, which was we always had autoplaying behavior, but that you thought we introduced just the control around it.

Yeah, I don't know if this clarifies it any better.  I would imagine this is something that's easily -- something you can find out easily.

Q.      All right.  The third bullet point here says:  Digital wellbeing tools are less developed on YouTube Kids.

Any reason to dispute this

Page 280

statement?

MR. WILLEN:  Objection to the form.

A.     I don't know exactly what tools they were -- Reid Watson was scoping into this.

BY MS. TRUONG:

Q.     Okay.  And then we can skip the next tab and go to the one where the top of the slide says:  What would we have to do?

And the third bullet point here says:  Experiment with turning autoplay off by default for 1% of users.

A.     I see that.

Q.     Thanks.

Is it correct, then, that before considering whether to change the autoplay default setting, the recommendation here was to do an experiment first on a smaller subset of users?

MR. WILLEN:  Objection to the form.

A.     That seems to be the recommendation.  That seems to be a reasonable recommendation.

CONFIDENTIAL

Page 281

BY MS. TRUONG:

Q.    If you go to the very last tab, it says:  What percentage of users have each autonav state.  This does say it's web only. Do you read web only as in web browser only and it's not considering mobile apps?

MR. WILLEN:  I'm sorry, what page are you on?

MS. TRUONG:  The very last tab here.  That tab right there.

BY MS. TRUONG:

Q.    At the top it says:  What percent --

MR. WILLEN:  I'm missing a page.

THE WITNESS:  I think web only was this.

A.    So I see that there's two pages that look similar to one another, one marked mobile, the other marked web, so I interpret this to be desktop web and mobile web, which is a minority of our overall user base.

BY MS. TRUONG:

Q.    And here in this chart there's a line item that says:  Never touched the

Page 282

setting.

Do you see that?

A.    I do.

Q.    Is this measuring the percentage of users who have changed the default setting?

A.    That's -- that would be my interpretation.

Q.    Okay.  So on the mobile app, it seems to indicate that most users never changed the default setting; is that right?

MR. WILLEN:  Sorry --

A.    On mobile, 28% of users --

(Sotto voce document review.)

THE WITNESS:  Hang on a second.

(Document review.)

THE WITNESS:  Sorry, I just saw a number of these tables that look very similar to one another --

MR. WILLEN:  Yeah, I want to make sure we're looking at the same page.  I know there's no numbers, but...

Are you talking about:  What percentage of users have each autonav

Page 283

state, parentheses, mobile only, that page?

MS. TRUONG:  Yeah.

MR. WILLEN:  Okay.

THE WITNESS:  I think it's...

(Document review.)

THE WITNESS:  I see a slightly conflicting set of numbers throughout this deck.  I see also on the backside of your tab number 5, a similar table with slightly different numbers.

Which one would you like to focus on?

BY MS. TRUONG:

Q.    The Tab 5 page you're looking at is:  What would the metrics impact be?  Is that right?

A.    That's right.  It seems to have similar concept but slightly different actual numbers.

Q.    Okay.  In either case, though, it appears that, generally, the numbers reflect that most people don't change the default setting.

MR. WILLEN:  Objection to the form.

CONFIDENTIAL

Page 284

A.    I disagree.  It seems like it's -- okay.

In the case of mobile, 32% of our daily active users seemingly don't change the setting and keep the default setting. I'm assuming that's what never changed means, which leaves 34% who actively set it to be on.  And then the remaining 32%, 33 -- 34%, the remaining 34% to be actively turning it off or rather -- actually, I don't know if that's true.  Because there's also the multiple states case.

What I do know is that, in general, I do know that this is a feature, at least today, because I do manage it nowadays, it's a feature that's well understood by users, and we do see users toggling on and off frequently even throughout the day, same user, multiple different states.

So this seems to be, back in 2019, already that -- it sounds like it was about equally split among users who actively turn them on, users who actively turn them off, and users who leave the default setting as is.

Page 285

And as it says here and as is reasonable, some portion, if not the majority portion of who don't touch the setting are likely keeping it because they understand what the setting is, and they also prefer the setting to be in that state, which would mean, if you net it out, it's actually -- this is really what drove the decision-making around this, I think, at least that's the decision-making framework I have.

If greater the majority of users actually want to keep it on, it's a feature that we should default on.  I believe that's a good thing for viewers.

Viewers are voting with their feed, that they like it.

Now, you might look at desktop and say, well, it's 73%, never changed, what's up with that, and I think our understanding of autoplay is that desktop and mobile have very different use cases.

Desktop oftentimes is background music use case as people turn on YouTube, play music in the background as they do productive work in the foreground, in

Page 286

which case you would want autoplay to be on.

And so it's -- you know, it's -- that's how I would interpret this data.

And as you can see, we expect to see a site-wide loss of negative 1% watch time if we do what? If we default disable it? That's what it means. 1% is -- I mean, it's watch time -- valued watch time would likely be different and likely be smaller, is my guess.

1% impact is negligible. I -- it's not something that would drive a meaningfully sensitive decision.

BY MS. TRUONG:

Q.     And --

A.     And then I -- there's so many things to point out here that are just being, I guess, misinterpreted.

We go back to the document that was put together by a team that was not my team that talked about 19% of US watch time is driven by autoplay. You can see here in this document, which seems to have -- at least this is coming from Reid Watson, who is

Page 287

generally a reliable character -- that the watch time on this interface from autoplay is actually pretty small.

And this is talking about not driven by autoplay, but coming from autoplay, so it's actually very clear what is intended here. It says iOS and Android app, 6%.

Q. This --

A. These are all fairly small numbers.

Q. On this last tab where it said: What would the metric be, you had said, I think, 1% was negligible; is that right?

A. 1% -- sitewide loss of 1%, it is a meaningful loss, because annually we used to set a goal on the order of improving total watch time on the order of valued watch time on the order of 6%, 8%, things like that. So 1% is a meaningful chunk of that.

However, for a major decision that we thought was a safety issue that caused harm to users, we would be more than willing to throw away 1% of watch time any day of the week.

Q. Okay. And then it says:

CONFIDENTIAL

Page 288

Impact on DAU.  Is that daily active users?

A.    Daily active users.

Q.    Is expected to be neutral. When the term "neutral" is used in these contexts, does that mean zero impact?

A.    Lost in the noise.

Q.    What does that mean, lost in the noise?

A.    As an insignificant impact, so insignificant you can't measure it.

Q.    And earlier when you were looking at these metrics, I think you had said it speaks to you that most people wanted autoplay on, and so in your opinion -- let me find it.

You had said:  Majority of users actually want to keep it on.  It's a feature we should default on.  I believe that's a good thing for viewers.

Is that right?

A.    Because the majority of viewers, according to this data and other data I've seen, want to keep it on, I see that as a good feature for viewers.

We are, of course, offering a

CONFIDENTIAL

Page 289

control for viewers, a very prominent one, a very well-understood one with high usage rates, where users know how to turn it off, on and off, according to their user journey, their needs in the moment.

So all things considered, I think it's a feature that makes sense to keep it on because that's how users want it, with the option of giving them a very prominent control, easy-to-understand control to turn it off if they want to.

And I -- so that's why I generally believe -- I do hold the belief that autoplay is actually a good thing for viewers. And when I say good thing, I mean, both in the sense of it's what users seem to want. You could argue what users want and what is good for users may be two different things. I get that.

And, you know, it's a feature that they want, but also in the sense that -- and perhaps this is a bit more of a well-informed hypothesis than something proven by data, but it informs my belief.

I would rather have viewers

Page 290

consuming videos in terms of safety among the videos that we recommend versus them going through and fishing and constructing a manually constructed series of videos that they end up watching because -- because what's on the YouTube platform, we have very robust and very thorough and expansive community guidelines to prevent all sorts of harmful content, and we continue to work on it.

What is available on the -- on the YouTube platform in terms of video corpus is much larger than the set of videos that are eligible to be recommended through our systems because we feel like they are high quality enough.

And so both in terms of search ranking, the system that drives the search results, but also recommendation systems that actually furnishes these recommendations, those are systems that can take into account information quality and quality of the video to more visibly show higher quality videos, and that is in stark contrast to -- as a user, if you're going around and constructing

Page 291

your own journey and series of videos to watch based on the channels that you subscribe to, that's something we don't have -- we don't have any control in terms of quality.

And so I do think in terms of health and safety, recommendations actually creates a higher quality series of videos than what one can construct manually.

Q.    Okay.

A.    So these are different reasons why I actually do believe autoplay is a good thing for viewers, not because of our business, because as I told you, these are insignificant numbers in terms of raw watch time.

We don't think about watch time.  We think about valued watch time.  I don't even think about revenue.  That's not a factor in any of my consideration.

So those are all the reasons why I think autoplay is actually a good thing.

Q.    You had stated that the autoplay is a prominent feature.  What do you

Page 292

mean by that?

A.    It's highly prominent in the UI.

Q.    What does that mean?

A.    Visible.  Highly visible, in a highly visible spot.  It is right on the player in mobile.  In desktop, I believe it's right below the player.

And we chose those spots to make sure that it is a control that -- it's not hidden in some far corners of the app, but it's right there.

Q.    So someone can easily click on or off --

A.    Yes.

Q.    -- the autoplay?

MS. TRUONG:  Let's mark this next --

You can put that aside.  We're going to mark this next document.

This is going to be Exhibit 17 with Bates starting 0652560.

(Whereupon, YouTube-Kim-17, Autoplay Off by Default YTPR Presentation, GOOG-3047MDL-04652560 -

CONFIDENTIAL

Page 217

starting 04715769.

(Whereupon, YouTube-Kim-12, Pulse Teen Responsibility Northstar Principles & H2 Roadmap, GOOG-3047MDL-04715769, was marked for identification.)

(Document review.)

THE WITNESS:  This is a fairly lengthy document.  Is there a portion of it that you want me to focus on?

MS. TRUONG:  Yeah, the tabbed pages would be great.

THE WITNESS:  Okay.

MR. WILLEN:  You should read the whole thing.

(Document review.)

THE WITNESS:  Okay.

BY MS. TRUONG:

Q.    Ready?

A.    (Nods head.)

Q.    All right.  So if we go to that first page, it says it's a July 18, 2023 Pulse Teen Responsibility Northstar Principles and H2 Roadmap; is that correct?

A.    Yes.

CONFIDENTIAL

Page 218

Q.    Okay.  The teen responsibility reference here is, is this a subset of your Responsibility, capital R, or something else?

A.    It's not.

Q.    Unrelated to your Responsibility, capital R?

A.    Correct.  This teen responsibility would be hosted out of the youth team, Kids and Youth team.

Q.    And that's with Jay Beser?

A.    Yes.

Q.    And in 2023, you were fully in your role at this point as VP of product management at YouTube; is that right?

A.    Fully in the sense that I'm overseeing the full scope of projects that we walked through under the LinkedIn profile?

Q.    Correct.  Is that right?

A.    Correct.

Q.    And that includes YouTube main as well as YouTube Kids; is that right?

A.    Yes.

Q.    If we to go the first tab here in the comments, it says:  The bad news is that we've been less active on teen

Page 219

responsibility recently.  Our last major launch and announcement was in 2021.

Do you know anything about this activity on teen responsibility?

A.    Sorry, where are you looking?

Q.    I'm looking here in the notes at the bottom.  Starts with:  The bad news is that we have been less active on teen responsibility.  Our last major launch and announcement was in 2021.

MR. WILLEN:  Objection to the form.

A.    That's what's written here, yes.

BY MS. TRUONG:

Q.    Do you know anything about this inactivity on teen responsibility?

A.    I wouldn't call it inactivity. I think -- so let's see.  August 2021, I think that we just looked at the blog post that's referenced here that seems to be the major announcement, major launch and announcement that's referenced here.

Q.    Is that Exhibit 11?

A.    I think so.  I mean, I'm

CONFIDENTIAL

Page 220

looking at the slide where -- under the heading of last major launch in 2021, I think that's in reference to Exhibit 11, the blog post.

Q.    All right.

A.    Now, inactivity is probably an unfair characterization in that I believe there's been a rich set of projects that we've had in this youth area, kids area, since 2021, since August 10, 2021.  So I don't think inactivity is a fair characterization.

But in terms of, I guess, the features that we write blog posts about, quote/unquote, major, visible, maybe the feeling was that -- of the team was that, that we hadn't had any major external announcements.

A lot of the things that matter to users that we don't often talk about, though, happens in the back end, through, you know, changing our, you know, Discovery systems, search systems.  Those are oftentimes less visible as features.

And I only mentioned that

CONFIDENTIAL

Page 221

because I think, as I read through this, there's a reference to some of the projects that seem to have landed at this point by then -- before this deck was written, like VIBE, which we may not have talked about when this deck was written, but it's actually quite a major improvement to, I think, the youth experience.

And then I would also say that this specifically talks about teenagers as a segment in terms of teen responsibility, but the way we think about user base, the younger user base is, there's kids, tweens and then teens.

And so I think we've also had a lot of activity in -- across all three of those segments, and this teen responsibility doesn't seem to be referencing younger kids or tweens, is how I kind of read it, sitting here today.

Q.    Okay.  When you distinguish between kids, tweens and teens, what are the age brackets for each of these that you're envisioning?

A.    So perhaps pausing on age

CONFIDENTIAL

Page 222

brackets for a second, the way we map it to our products is YouTube Kids, SupeX, supervised experiences, and then teen supervision that we launched after this was written.

Q.    So for teens, it would be 13 and up?

A.    13 to 18 is sort of the range that we talk about as being teenagers whenever we -- oftentimes when we talk about this area.

Q.    All right.  And you said that there might be some back-end changes that aren't being discussed here, and your example was VIBE; is that right?

A.    That was one example, and I only mentioned it because I saw it in this slide deck somewhere.

Q.    Sure.  Let's turn to the third tab because I think that is where it's mentioned.

A.    Third tab, okay.

Q.    The top of the slide says: Product Principles reflected in upcoming October Moment.

If you give a look at the middle box, it says Wellbeing, and on -- one of the subsections is VIBE.

A.    Yes, I see that.

Q.    Is this the project you're talking about where there's a back-end change happening?

A.    That's correct.

Q.    Okay.  But at this point in July of 2023, VIBE had not yet launched; is that right?

A.    Maybe -- maybe that's -- sorry, I thought I read it somewhere in this text that it was actually already launched.

(Document review.)

BY MS. TRUONG:

Q.    And I will clarify I'm asking because it says launching VIBE, which appears to indicate prospective.

A.    I understand.

If you turn to -- there's no Bates numbers here.

Q.    That's okay, we can figure it out?

A.    This one here just before take

Page 224

a break reminder and locks.

Q.    Got it.

A.    It's on the left side.  Right above that red box that's outlined it says: Treatment/Surfaces, Watch Next VOD - launched in Q1, for example.

So the VIBE is a project where there's a lot of work that's put into defining what these categories of content are, and then building the systems around it, and then the third step, as, I guess, listed in this checklist is launching it across the different surfaces within YouTube.

And I do remember this is one where we launched it surface by surface, so it seems like when this deck was written, it was launched in one surface already with a few more surfaces slated, I guess, the same month that this was written.

Q.    What's the distinction between these four surfaces?

A.    So it lists Watch Next VOD. VOD would be in reference to regular videos on YouTube as opposed to Shorts, so VOD and Shorts is sort of one way to segment the

Page 225

corpus of videos we have.

Watch Next Surface would be on the watch page, the set of video recommendations that we surface below the video you're watching.  So seems like for VOD watch pages, the Watch Next panel is where we had launched this treatment by the time this was written.

Home VOD, VOD on Home, so homepage, YouTube homepage with respect to the VOD recommendations that was launching.  As it says, launching that month, when this deck was written.

Shorts on Home, so we have Shorts that we recommend as thumbnails on the home screen.  Experiment design pre-reviewed with EMCO, live this week.  So it seems like an experiment is going live that week.

Shorts IP.  IP refers to Infinite Playback.  That's once you click on a Short, you get into the Shorts experience where we call it IP, Infinite Playback, but it's a swipable experience that lets users go from short form video to short form video.

Q.    What is VIBE?

CONFIDENTIAL

Page 226

A.      So VIBE is -- I think it had a different name before, but VIBE was a project conceived to -- let me -- if I could rewind.

I think one of the things that we heard from partners we worked with, experts we worked with, that we work very closely with what we call owls.  There's a group of child development psychologists and academics that are very well tuned into this area of children's experience in general, and so we have that advisory board, we call it external advisory board.  So experts like that.

We already read the same books that our critics are reading.  Jonathan Hite has a book that we've read.  We're very well tuned into the feedback that's out there, so, you know, we've been hearing about this concern that on online platforms, whether it's social media or a video platform like ours -- I don't consider ourselves social media -- on these platforms that there is -- there's a category of content that might be benign and useful when consumed in moderation.  It depends on the content type.

Page 227

And they are more harmful if you are repeatedly exposed to that category of content. And the prime example that we used to use was makeup tutorials. Perfectly fine if you're watching one or a handful of videos to learn how to put on makeup if you're a young girl.

But if your -- if your online video consumption diet is overwhelmingly based on that, then you might walk away with a -- perhaps a skewed sense of or a narrow sense of what physical beauty means.

Q.    Okay.

A.    So we hear about these concerns.

And so VIBE was a program, a project that we designed to try to identify what are those types of content categories, how do we identify those categories of content at scale, and then how do we recommend them in a way where we're not recommending creating an experience where it's high concentration of those types of videos.

Q.    And VIBE stands for volume

Page 228

impacts wellbeing; is that right?

A.    I'm not sure.  Does it?

Q.    It's okay --

A.    What would the B stand for in this case?

Q.    It's wellbeing.  Is that not accurate?

MR. WILLEN:  Do you want to testify?

MS. TRUONG:  I have a document, we can talk about it.

THE WITNESS:  Very well, perhaps.

MS. TRUONG:  It wasn't meant to be a brain teaser.  I thought was an easy one.

THE WITNESS:  All right.

BY MS. TRUONG:

Q.    In implementing VIBE, was the intent that it would only be for teen users?

MR. WILLEN:  Objection to the form.

A.    I think, in general, these types of concerns we heard were a little bit more correlated or more specific to teenage

CONFIDENTIAL

users just because based on sort of their life stage and their cognitive development and things like that.

We did debate whether to make it more broadly available to all users, including adult users, and I forget exactly where we landed on that debate.

My recollection is that we launched it only for 13 to 17 audience still for the initial launches at least. Whether that's changed at this point, I don't -- I can't quite say. I can't say. I don't remember.

BY MS. TRUONG:

Q.    And in terms of determining who was 13 to 17 for purposes of implementing VIBE, that's based on the user's declared age for users in the US; is that right?

A.    For users in the US, that -- when I say 13 to 17, that would be based on declared age.

Q.    And for users who are logged out of YouTube, there -- they would have no declared age, is that right, so those teenagers would not benefit from the VIBE

Page 230

program at all?

MR. WILLEN: Objection to the form.

A.    In that scenario, I don't remember if we decided to just launch VIBE for all logged-out users, all logged-out sessions.

BY MS. TRUONG:

Q.    If you didn't launch VIBE for all logged-out sessions, though, in the scenario where a teenager is using YouTube in the logged-out state, they wouldn't benefit from VIBE; is that right?

MR. WILLEN: Objection to the form.

A.    In the scenario, if we haven't launched it for -- if we haven't launched VIBE treatment for logged-out users and a teenager was using YouTube in a logged-out state, and if we didn't have, as a result, knowledge of their age, then it follows that that user would be consuming YouTube in a way that's not influenced by VIBE.

BY MS. TRUONG:

Q.    Okay. And then earlier you

Page 231

referenced Shorts IP, Infinite Playback.

How long has Infinite Playback been on Shorts?

MR. WILLEN:  Objection to the form.

A.    Infinite Playback as sort of the user UX pattern, so to speak, I think has been part of the Shorts product ever since Shorts' introductions.

BY MS. TRUONG:

Q.    And does -- outside of Shorts, does YouTube main have an Infinite Playback or infinite scroll feature?

MR. WILLEN:  Objection to the form.

A.    How would you -- how would you define Infinite Playback?

BY MS. TRUONG:

Q.    Well, how does Infinite Playback work in Shorts?

A.    So this is, again, one of those things where -- well, I mean, it's a different class of things.

Infinite Playback is a little bit like -- capital I, capital P.  It's very

Page 232

specific to Shorts; like Shorts Infinite Playback means you scroll through Shorts.

We don't have a concept like that in -- outside of the Shorts player.

Q.    Okay.  Is Infinite Playback the same as infinite scroll?

A.    I don't think so.

Q.    Okay.  Are you --

A.    I don't consider it the same.

Q.    What is the distinction -- well, let me start with this.

What is infinite scroll, in your opinion?

A.    Perhaps a more generalized description of scrolling infinitely.

Q.    Okay.  And what's the distinction, then, between scrolling infinitely versus scrolling infinitely through Shorts videos?

MR. WILLEN:  Objection to the form.

A.    So like I said, Infinite Playback is -- it's like a very specific -- it's like a brand name, internal brand name, let's say, right?  It's like -- it describes

very specific behavior that is exclusively associated with the Shorts player, in my view.

Maybe other people disagree, but unlikely.  Most people probably say that's a Shorts thing.

BY MS. TRUONG:

Q.    Okay.  Is there an infinite scroll feature on YouTube main?

A.    Hard to call it a feature. Infinite scroll feature sounds like something we wouldn't say.

Q.    Okay.  I'm not trying to use bad terminology.

A.    Sure.

Q.    Does infinite scroll exist on YouTube main?

MR. WILLEN:  Objection to the form.

A.    I -- you could say that the home feed is -- I don't know if it's actually infinite, though, but perhaps you're trying to describe the home feed as infinite scroll. I wouldn't -- I don't think I would describe it that way.

Page 234

BY MS. TRUONG:

Q.      And what I'm trying to get at is:  On the home feed, a user could just keep scrolling and never reach the end of the screen, and there's continually content being populated; is that right?

MR. WILLEN:  Objection to the form.

A.      It's probably incorrect in that it probably does have an end.

BY MS. TRUONG:

Q.      At some point it has an end; is that your testimony?

A.      I believe so.

Q.      At what point does the end kick in?

MR. WILLEN:  Objection to the form.

A.      It could be a long while.  So, I mean, it could be a long feed.  Is it literally infinite?  No.  Would I call it a infinite scroll?  No, I don't think I've ever called it that because does infinite scroll have certain meaning?  Is it overloaded with certain meaning?  I don't know, I don't call

CONFIDENTIAL

Page 235

it that.

But home feed does have quite the scroll depth.

MR. WILLEN:  We've been going for a while.  I don't know how you're feeling.

THE WITNESS:  I'm fine.

MR. WILLEN:  Okay.

THE WITNESS:  Would you advise that I take a break?

MR. WILLEN:  That is up to you but...

MS. TRUONG:  I only have a couple more questions, and I know there was request for a break on this side, so we can break in a few minutes if that's okay with everyone.

MR. WILLEN:  You want to finish --

MS. TRUONG:  I just want to finish this.

MR. WILLEN:  That's fine, if it's relatively discrete.

MS. TRUONG:  Got it.

///

Page 236

BY MS. TRUONG:

Q.    Let's switch to the next tab, just one page over from where we were, and it starts with:  Today, YouTube doesn't have good parent supervision options for teens.

A.    I see it.

Q.    Okay.  Do you have any knowledge of this problem here back in 2023?

MR. WILLEN:  Objection -- excuse me.  Objection to the form.

A.    I believe this specifically refers to the absence of teen supervision product that's designed specifically for teenagers in that three-way segmentation I mentioned of kids, tweens and teens because, obviously at this point, as listed here, we already have SupeX for the under-13 crowd, and then we, of course, have YouTube Kids for an even younger crowd.

And what was missing at this point -- what we had been working on was a supervision product, specifically designed for the over-13 crowd, so that's -- I believe that's what this slide is referring to.

///

Page 237

BY MS. TRUONG:

Q.    Okay.  As we sit here today, is there a supervision product for the over-13 crowd yet?

A.    There is.

Q.    And what is that product?

A.    It's called Teen Supervision.

Q.    And how does that work?

A.    Probably described here somewhere.

In -- maybe it's actually better to...

(Document review.)

A.    Okay.  Maybe there's not a good summary slide here, but in general, what teenagers over 13 and tweens under 13 require in terms of supervision is different for both legal and regulatory reasons, because there's that concept of age of consent, but also, based on rough sort of life stage that those users would be in.

And so in general, we -- actually, that's probably well-captured here on this slide.  Do you see what it is?

MR. WILLEN:  You want to just

Page 238

read something from it so it's clear.

A.    So as we said, a -- we -- what you see in this slide:  Kids must be protected.  Kids want to use YouTube, and we strive to serve their varied interests and creativity.  We help parents/caregivers make the right choices for each and every kid.

Going back to kids must be protected, therefore reaching and engaging them on YouTube is a privilege.

Like these, Safety, Quality Parent Oversight, was very much like our -- we call it the northstar principles.  That's sort or the guiding light for all the work that we do across these areas.

So this was for kids, and, as you can see in that red sticker overlaying on top of that kids principles:  Younger kids NSPs, younger kids northstar principles, not appropriate or helpful for teen problems.

So that's how we felt at the time because teenagers obviously want more independence.  They are more able to, you know, navigate the world on their own.  So giving them the parent oversight that we

Page 239

built for tweens is -- you know, our experts would say is inappropriate and unhelpful.

And so we're coming up with working with those experts, having a better understanding of, well, then what is the actual requirement for teenagers that's different from tweens?

And it revolves around many of the similar concepts. Here we go. So slide -- this one (indicating). Actually, this deck is about teen supervision, as you can probably see.

So you can look at this slide right here (indicating). There's Safety, Wellbeing and Agency. Those are the -- the northstar principles for our teen users, and many of the things that you see here are the things that we have built into teen supervision or still in the process of building into teen supervision.

So, for example, instead of giving full-on parental control over teens' usage of YouTube, we anchored in this concept of agency, so a super -- a parent supervising a teenager would get some reports on how they

Page 240

are using YouTube but not as detailed as what we would provide to SupeX parents.

Teen Supervision parents would not have visibility into watch history, but tween SupeX patients would.  So there's like differences like that that optimize to what teens need.

BY MS. TRUONG:

Q.    Okay.  And we can turn to the last tab.  There are some speaker notes at the bottom, and it says timing for Teen Supervision likely to be H2 2024.  That's not the last tab.

MR. WILLEN:  I don't know what tab you're on.

MS. TRUONG:  All right.  It's one page over, next page.

MR. WILLEN:  12 --

MS. TRUONG:  And then at top it says:  FYI:  Google declared Code Purple.

Do you see that?

A.    Yes.

BY MS. TRUONG:

Q.    And then if you go to the

CONFIDENTIAL

Page 241

bottom, there's a speaker note that says --
it's talking about Teen Supervision and it
says:  Timing likely to be H2 2024.

            Do you see that?

        A.      I do.

        Q.      Okay.  Does that align with
your understanding that at some time at the
end of last year, Teen Supervision was
launched by YouTube?

        A.      It might have been earlier than
end of last year.  I do think -- yeah, I
think it was 2024, maybe closer to mid-2024,
less end of 2024.

        Q.      Sort at some point in mid-2024,
YouTube implemented a program where teens 13
through 17 could have supervision by their
parents, right?

            MR. WILLEN:  Objection to the
    form.

        A.      So we launched a Teen
Supervision product around that time.

BY MS. TRUONG:

        Q.      Okay.

            MR. WILLEN:  Why don't we take
    a break now.

Page 242

MS. TRUONG:  Yep.

THE VIDEOGRAPHER:  The time is 3:16.  We're off the record.

(Recess taken, 3:16 p.m. to 3:37 p.m. PDT)

THE VIDEOGRAPHER:  The time is 3:37.  We're back on the record.

MS. TRUONG:  Let's mark as Exhibit 13 a document with starting Bates 04613300.

(Whereupon, YouTube-Kim-13, E-mail(s) re: Launched: Autoplay on youtube.com, GOOG-3047MDL-04613300 - GOOG-3047MDL-04613301, was marked for identification.)

(Document review.)

THE WITNESS:  Okay.

BY MS. TRUONG:

Q.    This document is an e-mail dated March 27th, 2015.  It was part of your custodial file.  And my question is:  Are you perhaps part of one of these listservs in the either "From," "To" or "Bcc" field?

A.    That's my guess, ███████████████████ is probably the one.

CONFIDENTIAL

Page 330

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, WOOJIN KIM was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the a

_____

MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: March 24, 2025