# AMENDED Exhibit 1012

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 8

VIDEOGRAPHER: Good morning. We are now on the record. My name is Darnell Brown. I'm the videographer with Golkow.

Today's date is April 24, 2015 {sic}, and the time is now 9:05 a.m.

This video deposition is being held in Palo Alto, California, in the matter of Social Media Adolescent Addiction, for United States District Court, for the Northern District of California.

The deponent is Neal Mohan.

Counsel will be noted on the stenographic record.

The court reporter is Carrie Campbell, CSR number 13921, and will now swear in the witness.

NEAL MOHAN, of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, deposes and says on behalf of the Plaintiffs, as follows:

CONFIDENTIAL

Page 9

DIRECT EXAMINATION

QUESTIONS BY MS. CONROY:

Q.    Good morning, Mr. Mohan.

A.    Good morning.

Q.    I introduced myself earlier. My name is Jayne Conroy, and I represent the plaintiffs in this case.

We also have some folks that are on the Zoom screen, and their names are going to be on the record so you'll know who's here.

And we also have a few exhibits, just so that there's warning to everyone, that have a competitor protective order status. And so when those are coming up, we will take a break or stop the deposition and do something so that we can put others who do not represent YouTube or are not involved directly with YouTube to go into a breakout room.

Okay?

Nothing you need to worry about, just to let that -- so that people don't get nervous online.

A.    Thank you.

Page 10

Q.    Have you ever been deposed before?

A.    I have, yes.

Q.    Okay.  On how many occasions?

A.    I would say about two or three occasions, yes.

Q.    Okay.  And were they in-person depositions?

A.    They were -- they were like this.  I think one maybe might have been on video, but they were -- they were generally like this, this type of a room.

Q.    Okay.  So you sort -- you know the ground rules pretty much?

A.    I do.  I think -- I mean, unless there's anything else specific you'd want to share.

Q.    No, Ms. Campbell is going to keep track --

A.    Okay.

Q.    -- of us when we talk over each other, so that's the worst thing we can do.

A.    Okay.

Q.    Have you ever testified before Congress before?

Page 17

on LinkedIn.

A.    Sure.  Oh, it's right here.

Q.    Yes.  You're free to look at it either on the screen or hardcopy, whatever is easiest for you.

A.    Okay.

Q.    And we'll mark this as Exhibit 1.

And this goes through -- did you develop -- did you create this profile?

A.    I did, yes.

Q.    Okay.  And if we go back to the beginning, it starts with your education and then Accenture, DoubleClick, and then you begin at Google in March of 2008.

Do you see that?

A.    I do see that, yes.

Q.    Okay.  SVP, is that vice president of sales?

A.    No, that's senior vice president.  That was my -- what I was ultimately promoted up into during my time at Google.

Q.    Okay.  And could you describe for me what display and video ads, what that

Page 18

encompassed or what your responsibilities as senior vice president for display and video ads --

A.    Sure.

Q.    -- was all about?

A.    So display and video ads are basically the image ads and video ads that you would see on, really, websites across the internet.  And so, you know, on the -- on the page of The New York Times or Wall Street Journal or what have you, those were called display ads.

And video ads, of course, are the, you know, kind of video, instream ads that would run on websites like YouTube or CNN or kind of where they have video.

And my job was product management for those, so building the products that our advertiser and publisher clients would use to run their businesses.  And so I did that for a number of years.  And that's basically what display and video ads are.

Q.    Okay.  And for approximately how long were you senior vice president at

CONFIDENTIAL

Page 19

Google?

A.    I was -- oh, let's see.  When was I -- this is a long time ago now.

So I was promoted to senior vice president maybe -- I think maybe 2014, maybe 2015, something like that, and by then I moved over to YouTube shortly -- shortly after that.

And I'm technically -- I'll continue to be a senior vice president at Google.

Q.    I see.

So even though you're CEO of YouTube, you're also a senior vice president at --

A.    Yeah --

Q.    -- Google?

A.    -- YouTube is kind of like a --

MR. PETROSINELLI:  Let her finish the question before you answer.

THE WITNESS:  Yeah.  Sorry.  Yes.

QUESTIONS BY MS. CONROY:

Q.    There, we just did it.  See?  But it wasn't -- it wasn't Ms. Campbell

that --

A.    I apologize for that.

MR. PETROSINELLI:  That was her fault.  Don't worry about it.

THE WITNESS:  I'm sorry.  I'm sorry.  Your question was?

QUESTIONS BY MS. CONROY:

Q.    So let me ask you.  So even though you are a CEO of YouTube, you are -- also remain senior vice president at Google?

A.    Correct.

Q.    Okay.  And has your e-mail remained the same the entire time you've been at Google?

A.    Yes.

Q.    And that's -- what is your e-mail?

A.    My e-mail is ▮▮▮▮▮▮▮▮▮▮▮▮.

Q.    Are there any YouTube e-mails?

A.    I do have a YouTube e-mail address.  I guess technically it's ▮▮▮▮▮▮▮▮▮▮.  They all go to the same place.

Q.    Okay.  Can you describe for me your move -- I'm going to call it a move.

Page 21

I'm not sure what it really was -- from Google to YouTube?

A.    So I moved over from Google to YouTube towards the end of 2015, and I moved in the capacity as chief product officer.  So my responsibility at YouTube was really building our products for our -- for our viewers, our consumers, also for our creators, the content creators, that upload their video content to YouTube.

And so that's -- those are the areas that I looked after.  Trust and safety was a part of that as well.

Q.    Had you had any responsibilities with respect to YouTube before your move in 2015?

A.    Yeah.  So I didn't have formal responsibilities over the products as I described, but in my capacity leading our display and video ads business, I was responsible for the advertising that was on YouTube.

So I did work with YouTube in the capacity of building advertiser products that, you know, resulted in the ads that ran

CONFIDENTIAL

Page 104

VIDEOGRAPHER:  Yep, looks good. I closed the rooms.

(YouTube-Mohan Exhibit 7 marked for identification.)

QUESTIONS BY MS. CONROY:

Q.    Okay.  We'll mark as the next exhibit, 7, a document with the Bates 04703742 through 46.

You're free to look at this. I'm only going to be asking you about -- a little bit about the first page.

A.    Okay.

Q.    This is a document that says, "Global age inference model 2023, YouTube only."  And the author is ███  ██████ ████████, and it's dated October 21, 2022.

A.    Yes, and I will have to read it here because it's also in tiny font.

Q.    Do you know ████  █████?

A.    I do, yes.  She's a product manager.

Q.    Okay.  And is she at YouTube?

A.    I believe she is still at YouTube.

Q.    And if you just take a look at

CONFIDENTIAL

Page 105

the very top, Background, it says, "Youth is a key YouTube initiative in 2023, and responsibly growing the youth segment is a top priority for YouTube across multiple product strategies."

Do you see that on the screen?

A.    I do see that, yes.

Q.    Okay.  And then I'm going to be looking at number 1, which says, "Youth North Star."

Okay?

A.    Okay.

Q.    It says, "Declared age has a low recall but high precision for under 18."

Do you see that?

A.    "Declared age" -- okay.  Yes.

Q.    And helpfully, it goes on to explain exactly what that means.

"Meaning those who say they are under 18 are likely to be under 18, but only a small fraction of those who are actually under 18 are declaring accurately."

Do you see that?

A.    I do see that, yes.

Q.    "To set a higher bar for

CONFIDENTIAL

Page 106

safety, we'd like to expand our protections, globally, to users that could be minors, independent of their declared age."

Do you see that?

A.    Uh-huh, yes.

Q.    And is that -- so that's something that ▮▮▮▮▮▮ was working on as a product manager at YouTube?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  I don't remember exactly what ▮▮▮ was working on.  She may have been working on this effort in conjunction with many other people. I'm trying to remember what team she was actually on.

I don't think she was the person solely responsible for that, but she might have been one of the people who was involved.  I think she was on our -- maybe on our identity teams but not on the youth team.

So I don't remember exactly what she was working on.

QUESTIONS BY MS. CONROY:

Q.    Okay.

A.    But I do -- so, yes, that's what I'd say about ▇.

Q.    Okay.  Do you recall ever hearing about this, that only a small fraction of those who are actually under 18 are declaring accurately?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  I don't remember hearing about this exactly, and, again, I don't have the context on this document or who ▇ wrote this with or where she got this data.

I do remember kind of the general kind of gist of this, which is, as the statement says, we believe that that declared signal for people who say they're under 18 to be very high quality signal, obviously. They're declaring that.

And as I said, it -- sometimes it's in conjunction between the child and the parent, and lots of households

CONFIDENTIAL

Page 108

manage it that way.  So in that sense it sort of explains why we started there, because it was a very high quality signal and remains a very high quality signal.

And -- but of course this is saying that we couldn't -- we wanted to expand on that, part of it because we obviously wanted to comply with the law in Europe and in the UK, as we just discussed earlier, but also because I think it was a capability that we wanted to understand more broadly and get higher quality on to sort of build those sort of multiple rings of defense or -- that I was describing.

And also, if this was an accurate signal, then there were -- there would be product capabilities that we could have.

I mean, as I said, lots of young people use YouTube as a, you know, learning platform, as a platform to connect, and so how would we -- how

CONFIDENTIAL

Page 109

would we enable all of those.

So that general concept I do recall through our efforts.

QUESTIONS BY MS. CONROY:

Q.    So it's -- what you're saying is, it is a high-quality signal when someone declares that they are under 18.

Correct?

A.    That's what this is referring to, yes.  That's what this is saying.

And I generally believe that to be the case because of kind of what I was describing, which is, like, yes, the child might be under 18, the minor might do it on his or her own, but oftentimes what we found is it was something that they did in conjunction with their parents or their caregivers.  And so in that sense, it was -- it was an accurate signal.

Q.    But --

A.    Kind of accurate, positive signal.

Q.    Right.

But at least as ██   ████ found, it was certainly not high quality if

Page 110

only a small fraction of those who are actually under 18 declare themselves to be under 18?

MR. PETROSINELLI:  Object to the form.

QUESTIONS BY MS. CONROY:

Q.    That's a different problem, right?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  It's a -- again, it's one aspect of this, which is, like, is there a particular use case we can go after with the declared age, yes.

You know, this use case that I'm describing here in conjunction with parents, minors declaring it themselves, does that cover everything?

It doesn't cover the case of minors not being truthful or, you know, circumventing what their parents might ask them to do.  Just like, you know, back in the cave, kids would

CONFIDENTIAL

Page 111

take the car keys kind of a thing, right?

That -- that's -- so this is, I think, alluding to that particular aspect of that -- of that use case.

QUESTIONS BY MS. CONROY:

Q.    And then if you go to the very bottom of the first page, she goes on and says, "We either need to design around that or partner more closely with the Google teams driving" --

A.    You have to highlight where you're reading.

Q.    Oh, I'm sorry.  Going too fast. It might be easier to look up here.

MR. PETROSINELLI:  It's right here.

THE WITNESS:  Yeah, okay.  Got it.

QUESTIONS BY MS. CONROY:

Q.    And I'll start -- you can take a look at it.  It says, "As shown above" --

A.    Uh-huh.

Q.    -- ███████████ ██████ ██████

████████ █████ ████████ ██████ █████████ ███

CONFIDENTIAL

Page 112

████████  ████  ████████  ████  ███  ███████████

██  ████████████

Does that sound right to you?

A.    Yes.  I think this is kind of alluding to that previous conversation about who develops the capabilities, where the experts are, around all of those Google account signals.

So, yes, that first sentence, I think, is a reflection of what we were talking about on that other document as well.

Q.    And then she goes on and says, "We either need to design around that or partner more closely with the Google teams driving this work stream to determine together how to drive faster improvements in this space."

Do you see that?

A.    Yes, I see that.

Q.    Is that any -- is that anything you have been involved in as CEO of YouTube, to see if you could drive faster improvements in this space or getting the Google teams to work together with the YouTube teams?

MR. PETROSINELLI:  Object to

the form.

THE WITNESS:  Yeah, I think so.
And, you know, the very -- the first sentence of this paragraph sort of, I think, gives the context of it, which is, like -- you know, it was this recognition that this kind of inference capability wasn't ready to be globalized for quality reasons or, you know, underlying sort of ground truth reasons.

So is that a concept that we potentially were consider -- would want to consider adding to kind of the arsenal of safety measures that we have?  Yes, that's what this is.

I mean, as ███████ at least in her opinion, is highlighting here, the inference capabilities were not ready from a product quality standpoint to be globalized.

And so did we want to do work to move that effort along?  If that's what this is referring to, then I think the answer there would be --

Page 114

would be yes.

Because it does take time.  It oftentimes takes years to actually build the technology, build the ground truth, build the quality of these models.

As I said, you know, even to this year, even to this day, we have expressed the desire to do it, but, you know, it's not a guarantee.  Like we have work to do to actually get there in terms of precision recall.

MR. PETROSINELLI:  You want to take a break?  It's about an hour anyway, so let's --

MS. CONROY:  Okay.  Let's do that, and we'll get ourselves set up and tell folks -- when we come back, we'll tell people.

VIDEOGRAPHER:  The time is now 11:16.  Going off the record.

(Off the record at 11:16 a.m.)

VIDEOGRAPHER:  The time is now 11:30.  Back on the record.

CONFIDENTIAL

Page 136

blog alludes to a couple of them, like Common Sense Media, which is a very well-respected child development, well-being organization that we've partnered with for a numbers of years.

And I can't recall if they actually communicated this, including some of the limitations, of course. None of these -- you know, all of these products are sort of meant to be this kind of multiple layers of defense as opposed to a standalone thing.

So the blog, again, was one of those -- it was just in -- in the context of a number of different touch points around communicating how our products work or...

Q.    At this point in time, inferred age is being used in the EU.

Correct?

A.    Sorry.  The -- in 2023, inferred age was being used, again, you know, in accordance with the law.

Q.    Okay.  And so if there are tools for teens that are available to users, those would be available to teens that are declared under 18 as well as those who are

CONFIDENTIAL

Page 137

inferred to be under 18.

Correct?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Well, I think as this blog points out, that wasn't -- that wasn't quite the case.

So, for example, there's features in here that we rolled out in the US first before we rolled them out in Europe.  So we, of course, want to get our capabilities and our products and features, in this case including this recommendation dispersion product, all -- to all of our users as globally as possible, but again, some of this is a limitation of technology and resources that we have to roll out features.

So in this particular case, we did make it available to young people in the US before we made it available to users in other parts of the world. So that was a difference.

And so -- but that was a

CONFIDENTIAL

Page 138

limitation of the technology.  Because the way that this recommendation classifier works is



And so it's correct that it wasn't available in Europe immediately, but we have tried to make it so that available -- that it will be available for our European users. And I think we followed up on that subsequently to make it available for it.

So that's the nature of the product development, just like as I was saying about inference, which is,

Page 139

we rolled it out in accordance with the law in Europe.

But of course it was -- it was a good product, but it wasn't at the level from a precision recall standpoint where, if it wasn't for the law, that it would be, you know, a globally applicable product.

So, you know, products and features, ultimately we want them to be global and available everywhere, but sometimes they start in a particular region or a particular country and sort of grow from there, just like this particular feature did.

QUESTIONS BY MS. CONROY:

Q.    The well-being tools are now available in the UK.

Correct?

A.    The well-being, Take a Break, Bedtime reminders, are available.  This dispersion is available.

I couldn't tell you every single language/country pair where it's available because, again, these classifiers

have to get built, trained on ground truth and usage patterns for each country, language pair.

So -- but I do believe that that -- that dispersion is available in the -- in the UK.

Q.    And so under 18 users, whether they have declared themselves to be under 18 or not, in the UK would receive -- the classifier would work for them.

Correct?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Again, I can't remember exactly when we rolled that out.  In my -- so I'm not sure how many years subsequent to this announcement we rolled it out in the UK.

But I believe -- in fact, I think we did it relatively recently, if I'm not mistaken.  So it might be a brand new thing.

QUESTIONS BY MS. CONROY:

Q.    So in the UK, you are using the

CONFIDENTIAL

Page 141

inferred age for the application of the -- I'm going to call it the classifier or the repeat video issue?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Yes, I just -- I can't -- I unfortunately can't tell you exactly when.  I believe it was relatively recent, but -- and again, for those same reasons that I was mentioning, which is, we want to get these classifiers to a -- to a level that we feel comfortable that we can layer on top of our recommendations.

Now, of course, just because it wasn't available in the UK at the same time it was available in the US doesn't mean that we didn't have other safeguards in place in all of these other places.  It was of course built on top of our existing recommendation architecture, all of the safety standards that we have in recommendations.

You know, the recommendations

Page 142

feature is ultimately they're recommending content. And all of the content on YouTube, of course, is subject to all of our community guidelines and how they work in terms of what's allowed, what's not allowed.

And so all of that, all of those safeguards, apply globally. And so that was whether you're a UK user, a US user.

Now, this concept of sort of dispersing repeated content is something that we started in the US, but we want to fast-follow now that we feel like we have a -- you know, a product. And our child development experts speak very highly of this capability, and so I'd like to roll it out globally as quickly as possible. It's a feature that we're very proud of.

QUESTIONS BY MS. CONROY:

Q.    But it's still not available to under 18 users who are declared as older than 18 in the United States?

CONFIDENTIAL

Page 143

MR. PETROSINELLI: Object to the form.

THE WITNESS: Sorry. So it is available -- it is for under 18 users.

In the US, we have this effort now to bring a lot of that inference technology that we've sort of refined and honed after years in Europe to the US, if that's your question.

And this capability was started in the US, is not globally everywhere. We'd like for it to be globally everywhere.

So it's kind of like these two things are crossing, but of course it's all part of our ultimately getting to a global usage, as I articulated, in terms of our kind of all-children principle.

QUESTIONS BY MS. CONROY:

Q.    Right.

But as of 2023, and as of April of 2025, this is not available to someone under 18 in the United States who has declared their age to be over 18 because the

Page 144

inference model is not yet active in the US. Correct?

MR. PETROSINELLI: Object to the form.

THE WITNESS: Correct. We do not have the inference model here in the US for the reasons I highlighted before, which is, you know, we rolled it out in accordance with the law in Europe.

It has gotten dramatically better. I think it has gotten to the point where I -- we feel comfortable, or at least I feel comfortable, stating our intention of rolling it out here in the US.

But we have work to do to get it to roll out. I want it to be a very high quality classifier before we roll it out because of all those costs that I talked about in terms of false positives and false negatives. So that is work that's underway today.

QUESTIONS BY MS. CONROY:

Q.    Do you know if any of the

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/PERSONAL      )
INJURY PRODUCTS LIABILITY          ) MDL No. 3047
LITIGATION                         )
_____        )
THIS DOCUMENT RELATES TO:          )
ALL ACTIONS                        )
  _____
     SUPERIOR COURT OF THE STATE OF CALIFORNIA
             COUNTY OF LOS ANGELES
              UNLIMITED JURISDICTION

COORDINATION PROCEEDING        ) Lead Case No.
SPECIAL TITLE [RULE 3.550]     ) 22STCV21355
                               )
SOCIAL MEDIA CASES             ) JCCP No. 5225
_____)
THIS DOCUMENT RELATES TO:      ) Judge:
ALL ACTIONS                    ) Carolyn B.
                               ) Kuhl, Dept.12
           THURSDAY, APRIL 24, 2025
    CONFIDENTIAL - ATTORNEYS' EYES ONLY -
          PURSUANT TO PROTECTIVE ORDER

                  - - -

          Videotaped deposition of Neal
Mohan, held at the offices of Wilson Sonsini
Goodrich & Rosati, 650 Page Mill Road, Palo
Alto, California, commencing at 9:05 a.m.
Pacific Time, on the above date, before
Carrie A. Campbell, Registered Diplomate
Reporter, Certified Realtime Reporter,
Illinois, California & Texas Certified
Shorthand Reporter, Missouri, Kansas,
Louisiana & New Jersey Certified Court
Reporter.
                  - - -

Page 164

MR. PETROSINELLI:  You got --

THE WITNESS:  Sorry.  Yes, I do.

QUESTIONS BY MS. CONROY:

Q.    And that is active in the United States as well, correct, that teen-supervised account?

A.    The teen-supervised account, but I think you're referring to the Family Center here.

Q.    Well, I believe in the UK it's called -- or in Europe it's called Family Center, but in the US it's called teen supervision?

A.    If -- I believe it's called Family Center in -- they're two separate things.

Q.    Okay.

A.    There's the supervised experiences, and then there's this Family Center, which, within a couple of taps, if you open up the YouTube app, you can get to, and it basically shows you what it's -- what it's describing here.

Q.    It shows you the number of

CONFIDENTIAL

Page 165

up -- your teen's uploads, subscriptions and comments?

A.    Yes.  That's the design.

Q.    And is that true in the US as well?

A.    Yes.

Q.    And it's called Family Center in the US?

A.    Yeah.  We spell it differently here, but...

Q.    All right.  Just one of those little --

A.    Yeah.

Q.    -- complicating things.

It would not, however, inform a parent of a teenager if the teenager had inaccurately declared their age.

Correct?

A.    Well, this is -- this is describing something a little bit different. So let me just clarify here, which is, this is a new feature, which is actually being able to link together two accounts.  And so this is really just based on two accounts wanting to be linked together, and I believe

CONFIDENTIAL

Page 166

it actually works independent of age.  I'll have to confirm that.

But the idea here is to -- again, this is input that we got from our child development experts -- is to really -- especially for teenaged users, is to strike the balance between actually giving them some agency and autonomy and freedom and parental control.

So this feature describes basically a parent being able to go into Family Center or -- I think it here also is a link.  It might actually take you to the help center.  I'm not sure where this blog links to.

But then you get an invitation that goes to the account of the child, the teen in this case, and those two accounts can then be linked.  And when those two accounts are linked, then you see all of these types of things.

And so it's not dependent on that sort of criteria that you're describing. It's like back to the point that I was making, which is, in addition to, you know,

Page 167

those sort of 10, 12 different other safeguards that I was describing, including some of them highlighted here, we built yet another capability, which is parents and sitting down with their children, saying, hey, I'm comfortable with you using YouTube. I would love to have this type of a link.

As you can see, it gives the linking account access to some information, particularly the information that child development experts told us that are -- that is most important.  And when there's sort of that voluntarily linking happening, then this is what's made available.

So it's a bit of a different feature than sort of, like, something that's turned off or on by default, depending on the age, just to describe it.

Q.    Does this -- it says that it shows something, including the number of uploads.

Does it identify the uploads?

A.    It does not identify the uploads in this case, but it will also -- it does what you -- if you continue to read that

CONFIDENTIAL

Page 168

paragraph, it does something that at least the experts told us was the more important piece, which is actually the notification at the moment of upload.

And this is actually a really good example of what I was describing before, which is, it's important to have multiple safeguards in place as opposed to just anchoring on sort of this 18-plus sort of boundary, what content versus not, because what the -- what child development experts have told us is actually the more important pieces are around the creation and the upload piece and the sharing piece and the commenting piece.

And so we wanted to design something that actually addressed that particular use case because it might turn out that parents are very comfortable with using YouTube.  You know, it's a learning application.  You know, 90 percent-plus of teachers use it in the classroom every single day.

And so we didn't want to restrict that sort of really positive use

CONFIDENTIAL

Page 169

case of YouTube at the -- but wanted to make it -- make it having a feature that actually addressed the things that some subset of parents may particularly be concerned about, which is uploading content, posting, et cetera.

And so that's where this sort of, like, Family Center account linking piece came in. Because the idea was, give teens the ability to explore, develop new interests, learn new things, but also give parents some insight into behavior that they might deem to be areas that they might want to check in on more.

And so as this highlights here, this was something that was done not just in partnership with our advisory council experts, but was also with, you know, pretty well-respected, highly regarded, child development experts like common sense networks, Common Sense Media, et cetera.

So, then, you know, this is another feature that, you know, I'm very proud of that we sort of layered on top of it, because it is one of those things that we

CONFIDENTIAL

Page 170

were told facilitates that conversation between parents and their teens, just like parents and teens have conversations around, you know, when to get your driver's license and all of those other things that teens, you know, go through as rites of passage.

Q.    Do you recall if it was ever discussed whether to add watch time into what is a shared insight?

A.    I can't remember exactly what set of features were discussed or not, but I do remember this general concept of actually having the features address those types of things that were most important to parents and what the experts sort of called out and sort of layering on those things from there. Because we had things on the watch time side like the Take a Breaks, et cetera, and this particular thing was trying to get at sort of threading that needle in terms of what -- you know, what we would hear from experts, which is, yes, this broad corpus is important.

So if a young person spends three hours on YouTube, you know, learning how to do algebra, that might be okay.  But

this concept in a global sense.

Now, as I described in terms of the recommendation dispersion before, different technologies are in different states for different parts of the world. As we've talked about in the case of inference, it was in different states, just like it was for the dispersion piece.

But the concept, ideally, is for this under 18 piece. And the idea behind this paragraph, just to put it into context, is what I was alluding to before, which is, advertising is the means by which content on YouTube and, you know, for that matter, really in other parts of the internet, too, is available to families of all kind of economic situations. And so that's why the -- the post, I felt like it was important to address that because it takes money to produce this content, of course.

(YouTube-Mohan Exhibit 12 marked for identification.)

Page 177

QUESTIONS BY MS. CONROY:

Q. Okay. Let's take a look at what we're going to mark as Exhibit 12, which is a large document, but I'm going to direct you to -- look through it, but I'm going to direct you to some pages when you're ready.

A. Okay.

Q. And it's GOOGLE 05867998 through 8083. And the title is, "Age Assurance Follow-Up, Global Velocity, January 27, 2025."

A. Okay.

MR. PETROSINELLI: And do you want to say what slides you're going to want him to particularly look at?

QUESTIONS BY MS. CONROY:

Q. I will.

You may want to -- what I'm going to ask you about, it looks like there's a little bit of discussion at the very beginning about your statement in your February 2025 best -- big bets for the company.

And then I'm going to look at slide 9. I'm going by the -- I'm going by

Page 178

the GOOGLE pages now.

A.    Okay.

Q.    Slide 22.  Slide 24.

A.    I'm sorry, do you see the GOOGLE pages?

MR. PETROSINELLI:  Yes, this right here.  She's just reading off -- so 9 would be this.

THE WITNESS:  I see.  Okay.

9 -- you said 9 and then 24?

QUESTIONS BY MS. CONROY:

Q.    Yeah.

And then a couple after that, but that will give you a --

A.    Okay.

Q.    That will give you a start.

A.    All right.  Let me just leaf through this quickly.

Sorry, you said 24.  Right?

Q.    Did I?

MR. PETROSINELLI:  22 and 24.

THE WITNESS:  22.  Okay.

Okay.  I've -- I haven't looked at every page, but I have glanced at it.

Page 179

QUESTIONS BY MS. CONROY:

Q.      I'm going to ask you a question, and you take your time if you want to look at something more.

A.      Okay.

Q.      Let's just look at page 2, which is a slide that just says, "Age assurance announcement."

A.      Uh-huh.  I see that.

Q.      Would this -- would this have been something you saw?

A.      Would I have seen this deck?

I may have seen this deck, yeah.

Q.      Okay.

A.      I think so.  Again, I don't remember the specifics of it, but this would be logical for me to have seen this deck. Maybe presented to me in a meeting or something.

Q.      I will represent to you that there are some earlier versions of this, and I used the most recent one, January 27th of 2025, because this was an age assurance follow-up, so -- and I did see some of the

CONFIDENTIAL

Page 190

A.    Not that I'm aware of.  It doesn't mean that they haven't, but that's not -- that's not -- I'm not aware of it.

Q.    Okay.  Then if you move to slide 22.

A.    Okay.  22.

Q.    See if there's any kind of a -- this is part of the appendix --

A.    I --

Q.    -- and --

A.    This is what I have.

Q.    Yeah.

A.    Okay.

Q.    I was just going to show you that it's part of --

A.    Oh, sorry.

Q.    If you go back a few, there's an introductory slide that says "appendix."

A.    Yeah.

Q.    Just so that you'd see it.

And then this slide, 22, says, "Business Impact."

Right?

A.    Yes, I see that.

Q.    And this would be the business

Page 191

impact ██ ██████.

Correct?

A.    I'm not sure.

Do you mind if I just --

Q.    Yeah, take a look.

A.    -- read this, take a look at what this is?

Okay.

Q.    Does that help you answer the question of ██████ ████ █ █ ████████ ████████ █ ████████

A.    ████ █ ██████ ████ █ █ ██████████ ████████ ████████ █ ████████ ████████ ████████ ███.

Q.    And so was ████████ █ ██████ █ ████████ █ ████████ █ ████████ ████████ ██████████ ████ █ ████████ ████████ ████████ █ ████ █ ████ █ ████ ████████ █ ████ ████████ ████████████████ █ ████

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  █ █ ████ ████ ██████ ████████ ████ ████ ████ ████████ ██ ██ ████ ████ ██████ █ ██ ████ ██ ████ ████ ████ █ ████ ████████ ████ █ ████ ████ ████ ████████ █ ████████

CONFIDENTIAL

Page 192



QUESTIONS BY MS. CONROY:

Q.    And so just to be -- to be clear about what we're -- what we're looking at here, there is a movement announced by you on February 11th of 2025, to machine-learn the age of users so that you could determine who was under 18, either inferred or

CONFIDENTIAL

Page 193

declared.

Right?

A.    (Witness nods head.)

Q.    And then that age assurance has a financial component or a business impact.

Correct?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Yes.  The -- there's, as we've talked about,

And I think what this slide sort of teases out is that despite this business impact, it's something that we, you know, declare that we wanted to do at YouTube because the

CONFIDENTIAL

Page 194

models have gotten to the point where we could have a pretty good inference model.  And so we're willing to take that financial hit in this particular case in the interest of rolling out that model.



But we're going to -- our plan, at least, is to still continue to move forward despite the business impact.

QUESTIONS BY MS. CONROY:

Q.    So when I look, I see 1 point -- I'm looking right at the top.  It says,

CONFIDENTIAL

Page 195

█████  ██  ███  ████████

Do you see that?

A.    I see that sentence, yeah.

Q.    And then the first bullet says,

████  ██████  ██  ██  █████████████  ██  ███
█  ██████  ██  ████████

█           ██  ██  ████  ██  ██  ███  ██████

█  █████  █████  ███  ███  ██  ██  ██  █████████

█  █████  ██  ██████  ██  █  █████  ██  ██  ████████

█  ███  ████  ███  ██  ██  █████  █  █████  ██  █████  █

█  ██████

███████

MR. PETROSINELLI:  Object to
the form.

THE WITNESS:  ████  ████  █████

█     ████  ████  █  ████  ████████  ██

█           ████  ███  ██  ██  ████████  ██

█           ████  █████████  ███  ███  ██  ███  ██  █

█           ████  ██  ██  ███████████  ███  ███

█           ████  ██  ████  █████  ██  █████  █████

█           ████  ██  ████  █  ████████  ██  ███  █████

█           █████████

█           ████  █████  ██  ██  █  █████  ██  █

█           █████  ██  █████  ████████  ██  ███  ████

Page 196



QUESTIONS BY MS. CONROY:

Q.

A.

CONFIDENTIAL

Page 197

Q.

once you do age assurance, you are likely to have more users who had declared themselves to be over 18 show up as actually under 18.  And consequently, those individuals cannot have personalized ads.

Correct?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Those individuals will not have personalization

CONFIDENTIAL

Page 198



QUESTIONS BY MS. CONROY:

Q. ██████████████████████?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:

CONFIDENTIAL

Page 199



-- some number of users who might be above 18 are now for some reason classified as below 18.  And so, therefore, they get a degraded ad experience as well.

Page 200

QUESTIONS BY MS. CONROY:

Q.    And on the flip side, up until the day that the US implements age inference, personalization does take place with a number of users who are under 18 but have declared themselves to be over 18?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:

But, yes, the inference model -- if your question is, will the inference model include more users as a result of it that get these sort of depersonalized ads, then -- then, yes,

CONFIDENTIAL



Page 205

Q.    And when I look at the top, ▮

A.

Q.

MR. PETROSINELLI:  Object to
the form.

THE WITNESS:

QUESTIONS BY MS. CONROY:

Q.

A.

CONFIDENTIAL

Page 206

█████ ███ ██ ██ █ ██ ██ ██ ██ ██ ██ ██ ██ ██ ██ █

█ ████ ████ █ ███ ██ ██ █████████ █

█ ███ ██ █ █ ████ ██████

█ █████ █ █ ███████

Q.    Conceptually, would you agree with me that if there is a particular amount of money that can be calculated for implementing age inference in the United States, you could also conceptualize money that has been earned in the past years because of the absence of age inference?

MR. PETROSINELLI:  Object to the form.

THE WITNESS:  Yeah, conceptually I could see that.  And, you know, as I said, the majority of that gets paid out to our creators in the case of YouTube.

So -- but in this case, despite this impact, it's something that we've declared that we want to move forward with. ██ ███ ███ █ ██ ██ ██

█████ ██ ██ ██ █ ██ ███ ██

██ ██ █ █ ██ ████ ███

█████████ ██████ ██ ██

CONFIDENTIAL

Page 207



QUESTIONS BY MS. CONROY:

Q.

A.

CONFIDENTIAL

Page 230

2:47.  Going off the record.

(Off the record at 2:47 p.m.)

VIDEOGRAPHER:  The time is now 2:55.  Back on the record.

CROSS-EXAMINATION

QUESTIONS BY MR. PETROSINELLI:

Q.    Mr. Mohan, good afternoon.  As you know, I'm Joe Petrosinelli.  I represent Google and YouTube.  Just a few questions.

Can you tell us your educational background?

A.    Sure, yes.  I have a bachelor of science in electrical engineering from Stanford University, and I have an MBA from the Stanford Graduate School of Business.

Q.    And at some point did you come to work at Google?

A.    I did, yes.

Q.    What year was that?

A.    2008.

Q.    And what were your jobs at Google?

A.    For a long portion of my career at Google I was responsible for our display and video ads business.  Ultimately I was the

Page 231

SVP of that business until about -- towards the end of 2015.

Q.    And then what happened at the end of 2015?

A.    The end of 2015, I moved over to YouTube in the capacity of chief product officer.

Q.    And what were your responsibilities as the chief product officer of YouTube?

A.    The primary responsibility was oversight of building all of our products for our users, for our creators, and also looking after our content policies and content moderation because those two things go hand-in-hand.

Q.    And you're now the CEO of YouTube?

A.    Correct.

Q.    And when did you become the CEO of YouTube?

A.    In February of 2023.

Q.    Mr. Mohan, what is YouTube?

A.    YouTube is a video-watching, creating and sharing site, application.  It's

where users from all over the world come to watch video content, whether it's sports or music or their favorite content creators. And so that's what YouTube is.  It's a streaming service that allows people to consume video content.

Q.    Do you consider YouTube to be a social media platform?

A.    No, we don't.

Q.    Why not?

A.    You know, YouTube really is -- it's a streaming service.  It's a place where you go and watch video content, just like you do -- most of our consumption happens in the US on television screens now.  And so just like you watch any other video service on TVs and other places, you watch YouTube.

So the primary use case on YouTube is the consumption of video versus a place where you go to share content or connect with your social graph or what have you.

Q.    Can children use YouTube?

A.    Yes, kids can use YouTube.  In fact, one of the applications that we built

Page 233

at YouTube is called YouTube Kids.  I think it just a few months ago celebrated its ten-year anniversary.  And that's a product that's designed specifically for young kids and their parents.

And, you know, minors also use the main app, and we have a number of features on the main app for them as well.

Q.    What is supervised experience?

A.    Supervised experiences would be one of those features, which is a feature that parents and their children can use to manage their experience on the main YouTube app.

It has settings for a reduced, more limited corpus of content that parents can set up in discussion with their minor children.

Q.    Does YouTube offer any features that are directed toward children using the platform safely?

A.    There are a number of features that we've built over the years that are focused on allowing kids to get the rich benefits of YouTube, the learning platform or

Page 234

what have you, but to do it in a safe manner, including things like Take a Break reminders, Bedtime reminders, the dispersion of content in our recommendation algorithms that would be problematic if seen together but, if dispersed, not so.  And a number of other features and parental controls.  The ability for parents and teens to be able to link their accounts so that parents have some supervision over them.

And so a number of features like are what we've built over the course of the last several years.

Q.    And have some of those features been added after 2015 when you first came to YouTube?

A.    Yes.

Q.    And why did YouTube add those features?

A.    You know, we have -- it goes back to our philosophy of living up to responsibility is our primary priority.  And always seeking to continue to improve our products.  It's building multiple layers of defense to make sure that users reap the

CONFIDENTIAL

Page 235

rewards and the benefits of a platform like YouTube but do it in a safe manner.

Q. And does YouTube make information about these features and how they work available to parents?

A. Yes, extensively. Primarily through our help center, which is a part of the product, but also through documentation on our website, through blog posts, through newsletters and a number of different places like that.

Q. From what you've observed in your time working at YouTube, first as the chief product officer and now as the CEO, has YouTube taken seriously the safety of its users?

A. Absolutely. It's one of our top priorities.

Q. And from what you've observed in your time working at YouTube, first as chief product officer and now as CEO, has YouTube been committed to the safety of children who use its platform?

A. Of course. Absolutely. It's a top priority.

Page 236

Q.    Just a few more questions, Mr. Mohan.

You were asked some questions earlier about Google's ads demographic model.

Do you remember that?

A.    Yes, I remember that conversation.

Q.    Do you know the specifics of how the ads demographics model operates?

A.    No, I'm not an expert on that. I haven't -- I haven't been responsible for ads business for quite some time.

Q.    And do you know what data or signals that tool uses?

A.    The ad -- the ads --

Q.    Yeah.

A.    -- the ads tool?

I couldn't tell you the specific signals.

Q.    And do you know how that ads model compares to the -- compares to the data used or modeling for the AADC age inference model?

A.    I do not, no.

Q.    Okay.  Mr. Mohan, in your time

working at YouTube, first as the chief product officer and now as the CEO, have you ever felt that the company has prioritized profits over user safety?

A.      I have never felt that way.

Q.      And in your time working at YouTube, first as the chief product officer and now as the CEO, have you ever felt that the company prioritized watch time over user safety?

A.      No.

Q.      In your time working at YouTube, first as the chief product officer and now as the CEO, have you ever seen the company choose a strategy that put making money ahead of protecting the safety of children who use the platform?

A.      I have not.

Q.      Would you ever work for a company that you thought was causing harm to children?

A.      I personally would never.

MR. PETROSINELLI:  That's it for me.

MS. CONROY:  I have no further

CONFIDENTIAL

Page 238

questions.  Thank you.

VIDEOGRAPHER:  Plaintiff's counsel total --

MR. FLASTER:  Excuse me. Before you -- before you go off the record -- I'm sorry, this is Eben Flaster, Shook Hardy.  I don't have any questions for the witness, but I do want to make a statement for the record.

Joe, can I do that?

MR. PETROSINELLI:  Sure.

MR. FLASTER:  Okay.  So, again, Eben Flaster from Shook, Hardy & Bacon on behalf of Meta defendants.

I just want -- I would object to the protocol employed by the plaintiff's counsel for handling the highly confidential competitive documents and information during the deposition.

Specifically, outside counsel for codefendants Meta, TikTok and Snap were essentially forced into a breakout room during the Zoom depo for

about 30 to 40 minutes with no ability to regain access to the deposition until allowed to do so.

So that procedure was inconsistent with the provisions in the protective order governing highly confidential documents. Those provisions were designed to address a situation involving in-house attorneys for the companies, not outside counsel.

Despite plaintiff counsel's representation, we've participated in literally dozens of these company witness depositions, and this has never happened before.

So I just wanted to make that statement.

I don't know if counsel for TikTok or Snap have any additional comments or if they want to join my objection, but I wanted to make that statement for the record.

MS. KUMAR: This is Poonam Kumar from Gibson Dunn on behalf of

CONFIDENTIAL

Page 240

the TikTok defendants.  We join in that as well.

MS. KONSTANTINOVSKY:  This is Julia Konstantinovsky from Munger Tolles & Olson on behalf of Snap, and we also join in the objection.

MR. FLASTER:  That's all. Thank you.

MR. PETROSINELLI:  Thank you.

VIDEOGRAPHER:  Okay. Plaintiff's counsel's total time on the record was 4 hours and 1 minute.

Defense counsel's total time on the record was 7 minutes and 30 seconds.

The time is now 3:04.  This concludes the deposition.  We're going off the record.

(Off the record at 3:04 p.m.)

- - - - - - -

CONFIDENTIAL

Page 241

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Neal Mohan, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action

_____
CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  April 28, 2025