# AMENDED Exhibit 1013

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.3047
ADDICTION/PERSONAL INJURY        )
PRODUCTS LIABILITY LITIGATION  ) Case No.
_____ ) 4:22-md-3047-YGR
                                 )
THIS DOCUMENT RELATES TO:        )
                                 )
ALL ACTIONS                      )
                                 )
_____ )

Wednesday, April 16, 2025
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Fed. R. Civ. P.
30(b)(6) Deposition of YOUTUBE LLC through
its representative, CAITLIN NIEDERMEYER, held
at the offices of Wilson Sonsini Goodrich &
Rosati PC, One Spear Tower, Suite 3300,
San Francisco, California, commencing at
9:11 a.m. PDT on the above date, before
Michael E. Miller, Fellow of the Academy of
Professional Reporters, Certified Court
Reporter, Registered Diplomate Reporter,
Certified Realtime Reporter and California
CSR #13649.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

CONFIDENTIAL

Page 8

-----------

P R O C E E D I N G S

April 16, 2025, 9:11 a.m. PDT

-----------

THE VIDEOGRAPHER:  Good morning.  We're now on the record.  My name is Darnell Brown, and I'm the videographer with Golkow.  Today's date is April 16th, 2025, and the time is 9:11 a.m.

This video deposition is being held in San Francisco, California in the matter of Social Media Adolescent Addiction Litigation before the United States District Court for the Northern District of California.

The deponent is Caitlin Niedermeyer.

Counsel will be noted on the stenographic record.

The court reporter is Mike Miller, California CSR #13649, and will now swear in the witness.

///

///

CONFIDENTIAL

Page 9

-----------

CAITLIN NIEDERMEYER,

having been duly sworn,

testified as follows:

-----------

EXAMINATION

-----------

BY MR. DRAPER:

Q.    Good morning.  My name is Glenn Draper.  I am one of the attorneys representing the families and other governmental industries that have sued YouTube in these social media cases.  I had a chance to introduce myself to you before we went on the record.

Could you just state your name, and spell it, please, for the record?

A.    Yes.  Caitlin Niedermeyer, C-A-I-T-L-I-N, and then Niedermeyer, N-I-E-D-E-R-M-E-Y-E-R.

Q.    Thank you.

And, Ms. Niedermeyer, you are an employee of YouTube, correct?

A.    That is correct.

Q.    What's your current position?

CONFIDENTIAL

Page 10

A.    I'm senior manager for the -- under public policy for YouTube.

Q.    And how long have you held that position?

A.    The senior manager has changed, because it's a promotion, but I have been at YouTube since 2021, and previous to YouTube, I was at Google and had been at Google since 2010.

Q.    Thank you.

You have previously testified in this case, correct?

A.    That is correct.

Q.    All right.  And you understand that today you're not speaking as an individual; you are speaking on behalf of YouTube and Google, correct?

A.    Yes.

Q.    All right.  When I ask you questions today, I'm not asking about your personal knowledge but rather about the knowledge of YouTube, the corporation.

Yes, you understand that?

A.    Yes.

MS. WADHWANI:  And, Mr. Draper,

I'm just going to note for the record, if I believe that one of your questions is out of scope, I will make an objection to scope, and Ms. Niedermeyer understands that she will be answering in her personal capacity in response to my objections to scope.

I won't say that every time, to not waste your time, but when I say objection to scope and Ms. Niedermeyer answers, she'll be answering in her personal capacity.

MR. DRAPER:   And we can hash that out with the Court if we need to.

BY MR. DRAPER:

Q.     Ms. Niedermeyer, you understand that as the corporate representative for YouTube, your testimony today is binding on YouTube?

A.     Yes, I do.

Q.     All right.  And as the corporate representative for YouTube on the topics that we're going to address today, you have an obligation to learn what YouTube, the

CONFIDENTIAL

Page 12

corporation, knows about these topics.

Do you understand that?

A.    Yes, I do.

Q.    All right.  That obligation can be met by reviewing documents, not just from your own custodial file, but from any employee that has knowledge about these topics, or by speaking to current or former employees to find out what they know about these topics.

Do you understand that?

A.    Yes, I do.

Q.    All right.  Did you bring any documents with you today to assist you in testifying?

A.    I did not.

Q.    The topic for today's deposition, I'll just go ahead and read it: YouTube and Google's knowledge regarding alleged impact and risk of harm on users resulting from the named features, or engagement with the YouTube platform, including overuse, habitual use, problematic use, heavy use, unintended use or late-night use and mental health and well-being.

CONFIDENTIAL

Page 13

Are you prepared to testify about this topic on behalf of YouTube today?

MS. WADHWANI:  Objection to form.  And I'll just note that the named features that the parties agreed to were Autoplay, Infinite Scroll, Infinite Playback, Algorithmic Content Recommendations, Video Filters, Notifications and YouTube Shorts.

MR. DRAPER:  I have a list of named features from the master complaint that's a little bit broader than that, but I'm not sure that I'm going to get into any of those that aren't on that list.  We can cross that bridge if we get to it.

MS. WADHWANI:  The parties agreed to those named features, and if it becomes an issue, Mr. Draper, we'll take it up.

MR. DRAPER:  Great.

BY MR. DRAPER:

Q.    All right.  Ms. Niedermeyer, what did you do to prepare for the deposition today?

Page 14

A.    I met with counsel.  I reviewed a large number of documents.

Q.    Okay.

A.    I spoke to former and existing employees of YouTube.  I reviewed previous testimony.  And then I have extensive kind of personal knowledge.

Q.    Great.

When did you learn you would be speaking on behalf of YouTube on this topic?

A.    The week before last, I believe.

Q.    Okay.  And so when did you first meet with the Google and YouTube counsel about this topic?

A.    Last Friday.

Q.    And can you tell me -- have you had -- have you met more than once with them?

A.    Yes.

Q.    Can you tell me an estimate of the total length that you've spent with Google and YouTube's counsel preparing for this deposition?

A.    Probably around 15 to 20 hours.

Q.    All right.  And you mentioned

CONFIDENTIAL

Page 15

you reviewed a large number of documents to prepare to address this topic on behalf of YouTube?

A.    Yes.

MR. DRAPER:  Have all of the documents -- and this is directed to your counsel.

Have all of the documents that Ms. Niedermeyer reviewed been produced in this litigation?

MS. WADHWANI:  Yes.

MR. DRAPER:  All right.

BY MR. DRAPER:

Q.    Ms. Niedermeyer, did you select the documents yourself or were they presented to you by YouTube's counsel?

A.    They were presented to me by YouTube's counsel, and they offered to also let me review testimony, which I reviewed.

Q.    Okay.  Did you make any effort to look at any documents that were not presented to you by YouTube's counsel?

A.    I primarily focused on the documents that were presented to me by YouTube's counsel.

CONFIDENTIAL

Page 16

Q.    Yeah.  Let me ask that question again because I don't think your answer quite got there.

Did you make an effort to look at any documents that you identified, above and beyond those that were presented to you by YouTube counsel?

A.    No, I focused on the documents that were presented to me by YouTube's counsel.

Q.    All right.  Thank you.

You mention you talked to current and former YouTube employees?

A.    That's correct.

Q.    Can you tell me which employees you talked to to prepare for the topic today?

A.    I can't remember the specific names, but there were members of the marketing team, the UX team, and the, kind of, UX research team.

Q.    Okay.  You don't remember any specific names?

A.    ▮▮▮▮ was one of the people that I spoke with.  I'm trying to remember the others.  I don't remember the two other

CONFIDENTIAL

Page 17

individuals.

Q.    All right.  So there were three total?

A.    I believe so.

Q.    All right.  Ms. Niedermeyer, does YouTube agree that a corporation should not release an application designed for teens and younger kids without knowing the potential negative impacts and risks of harm resulting from engagement with that application?

MS. WADHWANI:  Objection to form, scope.

A.    In general, when YouTube rolls out a new product or feature, we do extensive work to make sure that that product or feature is ready for the demographic that it is available to, including teens, on our YouTube main platform.

BY MR. DRAPER:

Q.    Does YouTube agree that a corporation that wants to release an application designed for teens and younger kids should first test the application to learn the potential negative impacts and

CONFIDENTIAL

Page 18

risks of harm resulting from engagement with the application?

MS. WADHWANI:  Objection to form and scope.

A.    Again, in general, before we roll out a product or feature to our users, we do extensive research, testing, et cetera, to make sure that it's prepared to roll out.

BY MR. DRAPER:

Q.    Does YouTube agree that a corporation should not add features to an application designed for teens and younger kids without knowing the potential negative impacts and risks of harm resulting from engagement with those features?

MS. WADHWANI:  Objection to form and scope.

A.    Again, before we roll out any feature or product, we make sure to extensively research the feature, do testing, review media reports, et cetera.

BY MR. DRAPER:

Q.    Okay.  Does YouTube agree that a corporation with an application designed for teens and younger kids that learns

CONFIDENTIAL

Page 19

engagement with the application negatively impacts youth and causes harm to children should make changes to that application to improve its safety as soon as possible?

MS. WADHWANI:  Objection to form and scope.

A.    Can you repeat the question?

BY MR. DRAPER:

Q.    Sure.

Does YouTube agree that a corporation with an application designed for teens and younger kids that learns engagement with the application negatively impacts youth and causes harm to children should make changes to the application to improve its safety as soon as possible?

MS. WADHWANI:  Same objections.

A.    Again, in general, before we roll out a feature, we make sure that we've done extensive testing, UXR research, experimented with the feature in order to roll out as kind of age-appropriate experience as possible, and we continue to do due diligence to make sure that that feature is operating in a kind of safer,

CONFIDENTIAL

Page 20

age-appropriate way for all of our users.

MR. DRAPER:  I'm going to come back to that.

But could you just explain the nature of your objection to the objection?  Scope is fine, but I want to make sure that I didn't make a mistake.

MS. WADHWANI:  You're asking about any corporation.  One, this goes to expert testimony, and she's not here to speak about what corporations generally should do.  There's a foundation objection as well.

MR. DRAPER:  Okay.

BY MR. DRAPER:

Q.    So you mentioned, Ms. Niedermeyer, that YouTube continues to monitor features when they roll out.  So if YouTube learns from this monitoring that a feature is potentially harming children or teens, does YouTube believe it should make changes to that feature as soon as possible?

MS. WADHWANI:  Objection to scope.

Page 21

A.    Again, yes, in general, we do extensive work prior to rolling it out, and then once it's live and rolled out, we do all of the due diligence to make sure that we're getting user feedback, that we're, again, paying attention to reporting externally, that we're paying attention to the latest literature.

We also have a Youth Advisory Council that we ongoingly consult with to make sure that our products are age appropriate and kind of a safer space for youth.

BY MR. DRAPER:

Q.    And just to hit the nail on the head, if YouTube learns of a problem through that process, does YouTube believe that it needs to make changes as soon as possible?

MS. WADHWANI:   Objection to form.

A.    Yes.  If there was a case where we identified something was not working as intended, we would take action to kind of modify.

///

CONFIDENTIAL

Page 22

BY MR. DRAPER:

Q.      All right.  Last one of these.

Does YouTube agree that a corporation with an application designed for teens and younger kids that learns engagement with the application negatively impacts youth and causes harm to children, should warn the children and their parents of the potential harm as soon as the corporation knows of it?

MS. WADHWANI:  Objection to form.  Objection to scope.

A.      Can you repeat the question, please.

BY MR. DRAPER:

Q.      Sure.

Does YouTube agree that a corporation with an application designed for teens and younger kids that learns engagement with the application negatively impacts youth and causes harm to children, should warn the children and their parents of the potential harm as soon as the corporation learns of it?

MS. WADHWANI:  Same objections.

A.      Again, you're asking me a question about generally YouTube's

Page 23

perspective about corporation responsibility rather than a YouTube-specific question.

But yes, I think in general we would want to make sure that we were -- we, as a company, were taking action -- appropriate action if some specific concern was substantiated and we took action to address that concern.

BY MR. DRAPER:

Q.    And would that action include warning children and parents as soon as YouTube learns of the harm?

MS. WADHWANI:  Objection to form and scope.

A.    Can you repeat the question? Because now you've interjected YouTube in the question.

BY MR. DRAPER:

Q.    Would the action that you described include warning in children -- I'm sorry, warning children and parents as soon as YouTube learns of the potential harm?

MS. WADHWANI:  Objection to form and scope.

A.    So I think you've combined a

couple of things. You were referencing potential harm, and you -- I'd like you to repeat the question, please.

BY MR. DRAPER:

Q. Let me try and rephrase it.

Does YouTube believe that it, YouTube the corporation should warn children and parents whenever YouTube learns that a YouTube feature is potentially harmful to teens and younger kids?

MS. WADHWANI: Objection to form. Objection to scope. This is not a topic about warnings. This is talking about knowledge of potential risk and harm of named features. These questions are inappropriate.

A. Again, in general, I would disagree with part of your statement, which is that YouTube has identified that some -- something has potential harm, so I think I disagree with the kind of basis of your question.

BY MR. DRAPER:

Q. Okay. So my -- I'm not trying to suggest that YouTube has learned of that,

although we're going to talk about that later on in the deposition.

But, hypothetically speaking, if YouTube learned that one of its features was harming children and teens, does YouTube believe it should warn children and parents about that feature?

MS. WADHWANI:  Objection to form, calls for speculation.

Objection to scope.

A.    So again, in this hypothetical situation, I actually think that our company does extensive work to make sure that we're not rolling out features that could cause harm, and if there were features that could cause harm that were identified on the platform, we would take action and make sure that those features were kind of working as intended for that specific demographic.

BY MR. DRAPER:

Q.    What I don't hear you saying is that YouTube thinks it has an obligation to warn parents and children if it learns of a potential issue on its platform.

MS. WADHWANI:  Objection to

CONFIDENTIAL

Page 26

form, asked and answered, calls for a
legal conclusion.  Objection to scope.

A.    Again, I don't think this is as much as a warning.  I said that we design our products to be as age appropriate and safe as possible, so if we identified a problem with a specific feature, we would take quick action to address it, not just warn a parent.

BY MR. DRAPER:

Q.    So your answer is ambiguous to me because you said YouTube would take quick action to address any problems it becomes aware of, not just warn the parents.

Does part of that quick action that YouTube would take include issuing a warning to parents and children about the feature, or would YouTube simply try to make corrections without issuing a warning?

MS. WADHWANI:  Objection to form, compound, asked and answered, exceeds the scope.

A.    Again, I'm not going to hypothesize on whether or not we would warn users.  What I will tell you is that YouTube develops and rolls out experiences that are

CONFIDENTIAL

Page 27

age appropriate and responsible for all of our users, including our younger users.  And if we learn about something that has kind of a cause-and-effect impact to youth, we would take action to, again, adjust our product experiences to make sure that it is most appropriate for younger users.

MR. DRAPER:  Okay.  The first named feature that I want to talk to you about is Age Verification.

MS. WADHWANI:  Objection to scope.  That is not an agreed-upon feature, Mr. Draper, and you've already taken a 30(b)(6) on the topic of Age Assurance and Age Verification.

So this is completely out of the scope, and Ms. Niedermeyer is not prepared to talk about this today.

MR. DRAPER:  This is about harms and YouTube's knowledge of harms.

MS. WADHWANI:  From named features.

MR. DRAPER:  From named features.  And named features in the

Page 28

complaint include Age Verification, so I --

MS. WADHWANI:  Named features in the agreement between the parties as to the scope of this 30(b)(6), which is not an agreement about the scope of the complaint, is Autoplay, Infinite Scroll, Infinite Playback, Algorithmic Content Recommendations, Video Filters, Notifications and YouTube Shorts.

The parties did not agree for purposes of Topic 6.1 to address age verification.

MR. DRAPER:  Why don't we go off the record and take a break, and I want to talk to another attorney that's working on this case.

MS. WADHWANI:  Is there a way in which we can proceed with other questions and come back to this, just because we are taking up Ms. Niedermeyer's time?

MR. DRAPER:  No, there's not a way to do that.  Sorry.  But I am

CONFIDENTIAL

Page 29

committed to having her done and out of here by 1:00 today.

MS. WADHWANI:  Your intention is to keep -- you don't have any other questions besides age verification today that you can jump to that are on these named features?

MR. DRAPER:  I have other questions, and I'll ask them in the order I think is appropriate.

MS. SIEGEL:  Let's go off the record.

MR. DRAPER:  Let's just go off the record.

THE VIDEOGRAPHER:  The time now is 9:31, going off the record.

(Recess taken, 9:31 a.m. to 10:00 a.m. PDT)

THE VIDEOGRAPHER:  The time is now 10:01.  Back on the record.

BY MR. DRAPER:

Q.    Ms. Niedermeyer, we're back on the record after a short break.  Did you have an opportunity to talk to YouTube's counsel on the break?

CONFIDENTIAL

Page 71

Q.      It's only when concentrated by the YouTube algorithm that it becomes potentially harmful?

MS. WADHWANI:  Objection to form.

A.      Again, the research that we were presented with in 2021 stated -- or suggests that there are certain categories of content that could be potentially problematic for some teens if viewed in volume.

And as soon as we learned about this research from our Youth Advisory Council, we did work to further investigate, just as we do with any kind of media reporting, research that exists, literature reviews, et cetera.

BY MR. DRAPER:

Q.      Change in topic.

YouTube has a large number of filters that allow YouTube creators to alter the appearance of their face and body, correct?

MS. WADHWANI:  Objection to form, foundation.

A.      Sorry, can you repeat your

Page 72

question.

BY MR. DRAPER:

Q.    Sure.

YouTube has a large number of filters that allow YouTube creators to alter the appearance of their face and body, true?

MS. WADHWANI:  Same objections.

A.    That is not true.

BY MR. DRAPER:

Q.    YouTube doesn't have filters? Is that what you're telling me?

MS. WADHWANI:  Objection to form.

A.    What I'm telling you is that we do not have filters in the way that you just described them.  The types of -- that is what I'm telling you.

BY MR. DRAPER:

Q.    As YouTube's corporate representative, you are telling me that YouTube does not have filters that change the appearance of a creator's face and body in the videos?

MS. WADHWANI:  Objection to form.

CONFIDENTIAL

Page 73

A.    So again, the way that you had asked me the question was above and beyond the types of filters that we have.

The types of filters that we offer are filters that can change the background of a video, similar to what you can do with a camera.  We have filters that enable you to put kind of fun masks on, like cartoon characters, et cetera, similar to what you would do with something like FaceTime.  And then we have very limited makeup filters.  That's kind of the scope of filters that we offer.

BY MR. DRAPER:

Q.    You have filters that change people's eye color?

A.    I think we may have filters that adjust eye color.

Q.    You have filters that make people's teeth brighter?

A.    Yes.

Q.    You have filters that give people freckles?

A.    I don't know about freckles.

Q.    You do.

Page 74

These filters are popular at YouTube.  A lot of creators use them?

MS. WADHWANI:  Objection to scope?

A.    In general, creators often test these types of features, but yes, users, I think, value this type of thing.

Also, these are types of kind of effects that you get in a number of applications.  You have the ability to smooth out certain skin or add colors to background through kind of general camera features, just to be clear.

BY MR. DRAPER:

Q.    YouTube is aware that there are studies that have been published showing the use of filters promotes body dysmorphia and depression because people can't live up to the unrealistic beauty standards in real life?

MS. WADHWANI:  Objection to form.

A.    So we are aware that there is general media reporting and research on certain types of beauty filters, which we do

not describe our filters as, as having an impact on some of the things that you mentioned, like body dysmorphia.

So when there are filters that allow kind of dysformation [sic] or kind of anything that could be done surgically, yes, there is research that exists out there.

And to be clear, users provided feedback.  We also looked at the research, and we don't have those types of filters in place.  So I just want to be clear on what we have and what we don't have.

BY MR. DRAPER:

Q.    YouTube permits third-party filters?

A.    We allow third-party filters, yes.

Q.    YouTube once considered a feature that would label videos that employed filters so that viewers would know that the images had been altered, true?

MS. WADHWANI:  Objection to scope.

A.    I don't know the specifics about that.

CONFIDENTIAL

Page 76

BY MR. DRAPER:

Q.      YouTube elected not to go forward with that feature; isn't it true?

MS. WADHWANI:  Objection to scope.

A.      Again, I don't know the specifics of that.

BY MR. DRAPER:

Q.      All right.  Change in topic.

One of the impacts of engaging with the YouTube platform is addiction, and I want to ask you about that now, all right?

MS. WADHWANI:  Objection to form, argumentative.

A.      Yeah, can you please repeat your statement?

BY MR. DRAPER:

Q.      Sure.

One of -- well, it's a prefatory.  Here's the first question for you, okay?

A.      Okay.

Q.      YouTube designed its platform with the intention that it be addictive, correct?

CONFIDENTIAL

Page 77

MS. WADHWANI:  Objection to form, argumentative, scope.

A.    Not correct.

BY MR. DRAPER:

Q.    And YouTube is aware that some features on the YouTube application contribute to addiction of users, correct?

MS. WADHWANI:  Objection to form.

A.    Not correct.

BY MR. DRAPER:

Q.    YouTube intended certain features on its application to contribute to addiction, right?

MS. WADHWANI:  Objection to form and scope.

A.    Not correct.

BY MR. DRAPER:

Q.    All right.  Let me show you a document that has been produced by YouTube and Google attorneys.  It's designated 00767071.

(Whereupon, YouTube-Niedermeyer-3, YouTube Main App Deep Dive with Neal and Matthew

CONFIDENTIAL

Page 161

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, CAITLIN NIEDERMEYER was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the a

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: April 16, 2025