# AMENDED Exhibit 1023

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 8

THE VIDEOGRAPHER:  We are now on the video record.  My name is David Kim.  I'm a videographer for Golkow Litigation Services.  Today's date is December 11, 2024, and the time is 9:12 a.m.

This video deposition is being held in San Francisco, California, in the matter of in Re: Social Media Adolescent/Addiction Personal Injury Products Liability Litigation, MDL 3047, for the United States District Court of the Northern District of California.

The deponent is Sharon Stovezky.

Counsel in the room, please identify yourselves for the record.

MR. DRAPER:  My name is Glenn Draper.  I'm an attorney on behalf of the -- sorry, I'm appearing on behalf of the plaintiffs.

MS. TRUONG:  An Truong, Simmons Hanly Conroy on behalf of plaintiffs.

MS. LEWIS:  Faith Lewis, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. CHIOU:  Christopher Chiou from Wilson Sonsini representing YouTube and Google.

MS. DAVIDSON:  Callie Davidson from Wilson Sonsini for YouTube and Google.

MR. KEYES:  Andrew Keyes from Williams &

CONFIDENTIAL

Page 9

Connolly on behalf of YouTube and Google.

MR. BERKLEY:  Demarron Berkley, in-house counsel for YouTube and Google.

THE VIDEOGRAPHER:  And on Zoom?

MR. FLASTER:  Eben Flaster from Shook, Hardy & Bacon, along with my colleague Hannah Sanchez on behalf of the Meta defendants.  I am from Philadelphia and she is in Kansas City.  Thank you.

MS. FRANKLIN:  Lyndsey Franklin, Munger Tolles & Olson on behalf of Snap, in Washington D.C.

MS. KUMAR:  Good morning, Poonam Kumar, Gibson Dunn, on behalf of the TikTok defendants.  I am in Los Angeles.

MS. URBAN:  Marissa Urban, YouTube in-house counsel.

MR. ARRIAGA:  Tomas Arriaga, Wilson Sonsini Goodrich & Rosati for YouTube and Google in Los Angeles, California.

THE VIDEOGRAPHER:  Our court reporter today is Elaina Bulda-Jones, and she will now swear in the witness.

SHARON STOVEZKY, called as a witness by the Plaintiffs herein, being first duly sworn by the Certified Shorthand Reporter was thereupon examined and testified as is

CONFIDENTIAL

Page 10

hereinafter set forth.

EXAMINATION

BY MR. DRAPER:

Q.   Good morning, Ms. Stovezky.  My name is Glenn Draper.  I am one of the attorneys for the kids and families and school districts and other local government agencies who have brought claims against the social media companies including YouTube.

I had a chance to introduce myself before the deposition started.  We are here today in San Francisco to take your deposition.  You are appearing pursuant to an amended notice of deposition.

MR. DRAPER:  I'll go ahead and mark that as Google-YouTube-Stovezky Exhibit 1.  I'll hand you a copy of that now.

(Whereupon, Google-YouTube-Stovezky Exhibit 1 was marked for identification.)

MR. DRAPER:  If anybody else wants a copy.

BY MR. DRAPER:

Q.   We're going to look at this a little bit more in a minute, but I thought I would go ahead and get it marked.

This deposition is being taken in what is

Page 11

called an MDL.  That stands for Multidistrict Litigation in federal court.  And it will also be used in what is called a JCCP, which stands for Judicial Commission Coordinated Proceedings in California state court.  It's just the way that these cases are grouped together.

And you might hear me use both of those terms today, MDL and JCCP, okay?

A.   Yes.

Q.   Have you ever had your deposition taken before?

A.   No.

Q.   All right.  Ever testified in court before?

A.   No.

Q.   All right.  Let me cover some basic ground rules for this deposition, okay?

A.   Okay.

Q.   You have been sworn in by the court reporter which means you are under oath, right?

A.   Yes.

Q.   All right.  That means you are testifying just as though you were sitting in a courtroom before a jury and a judge.  In fact, you may hear me or one of the other attorneys refer to the jury even

Page 12

though they are not physically present today, okay?

A. Okay.

Q. And that's because this deposition is being recorded. Obviously you can see the camera. That video and the written transcript that the court reporter is making may be presented later in court or used for any other purposes authorized under the state and federal rules.

Do you have any questions about that?

A. No.

Q. All right. It's important that you answer my questions verbally today -- and you are doing a great job so far -- because the court reporter is taking down everything that we say. So if you nod or answer with something like "uh-huh" or "huh-uh," it doesn't come through on the transcript very cleanly.

So please make sure you answer my questions verbally, okay?

A. Okay.

Q. And it's really important that we not talk over each other because it's hard for the court reporter to take down two people talking at once. I will do my best to let you complete your answer before I ask the next question. And if you could do

Page 13

your best to let me complete the question before you begin your response, that will help make sure we have a clean transcript.

Understand?

A.    Yes.

Q.    Great.  I'll tell you right now, I'm terrible at that part.  So there will be times when your attorney will tell me to not step on your answer today.  So it happens to all of us.  Don't worry about it, okay?

A.    Okay.

Q.    If you don't understand my question today, just ask me to repeat it or rephrase it, and I'm happy to do that, okay?

A.    Okay.

Q.    You are represented by an attorney today, correct?

A.    Yes.

Q.    Chris Chiou?

A.    Yes.

Q.    All right.  Your attorney might have some objections to some of my questions today.  Let him complete the objection before you give the response. I think most of the time, your attorney will tell you to go ahead and answer the question despite the

Page 14

objection.

And that's so we can take the transcript to the judge later, we can get a ruling on the objection. But if the objection is overruled, we don't have to come back and ask the question again. We already have the response.

So there may be a few times when your lawyer tells you not to answer the question. And that's another reason to make sure you let Mr. Chiou finish the objection before you answer, okay?

A.    Okay.

Q.    And I expect there will be a few times today when we are all talking at once and we will have to stop and do it all over again sequentially, right, question, objection, answer. That happens most every deposition.

It doesn't mean you are doing anything wrong, I'm doing anything, or Mr. Chiou is doing anything wrong. It's just the way it is, okay?

A.    Okay.

Q.    All right. You can take a break at any time today. I generally like to take breaks about every 90 minutes, but if you want one sooner, just ask, okay?

A.    Okay.

CONFIDENTIAL

Page 15

Q.   All right.  The only rule about breaks is you have to answer the pending question.  Do you understand?

A.   Yes.

Q.   All right.  Anything that would affect your memory or your ability to tell the truth today?

A.   No.

Q.   You haven't taken any medications that may make it difficult for you to concentrate or remember?

A.   No.

Q.   Okay.  All right.  Do you have any questions about kind of the ground rules for the deposition?

A.   No.

Q.   All right.  Mr. Chiou, you mentioned, is representing you today.  He also represents Google and YouTube.  You understand that?

A.   Yes.

Q.   All right.  Have you ever met with Mr. Chiou or other attorneys representing Google and YouTube to prepare for this deposition?

A.   Yes.

Q.   All right.  I don't want to ask about the content of any of your meetings with the attorneys,

CONFIDENTIAL

but I want to ask a little bit about the circumstances of those meetings, all right?

When was the first time that you met with attorneys for Google and YouTube to begin preparing for this deposition?

A.    A few weeks ago.  I don't recall the exact date.

Q.    Okay.  How many times have you ever met with them?

A.    A handful.

Q.    Less than five?

A.    Maybe about five.

Q.    Okay.  And how long total would you say you have spent with the attorneys for Google and YouTube preparing for this deposition?

A.    Maybe about 15 to 20 hours.

Q.    All right.  If we can go ahead and look at the document that we have marked as Exhibit 1.  This is the amended notice of deposition for your deposition today.

Have you seen this document before?

A.    I have.

Q.    Okay.  When is the first time you saw it?

A.    Last week.

Q.    Okay.  And if you look at page 2 and 3,

CONFIDENTIAL

Page 17

you will see there is a list of documents that you are requested to bring to this deposition.

Do you see that?

A. Yes.

Q. All right. The first item on the list is: All documents and communications used to refresh the witness's recollection.

Did you review any documents to refresh your recollection for today's deposition?

A. Not outside of my preparation meetings.

Q. Okay. But at your preparation meetings you did?

A. Yes.

Q. About how many documents did you look at?

A. Maybe between 10 and 20 pieces of materials.

Q. Okay. And did you bring any of those with you today?

A. I did not.

Q. Okay. I think we have a stipulation in place where as long as those documents have been produced in discovery, you're not required to disclose them specifically.

MR. DRAPER: So have all of the documents that she relied on to refresh her recollection been

CONFIDENTIAL

Page 18

previously produced in this case?

MR. CHIOU:  That's correct, Mr. Draper.

MR. DRAPER:  All right.

Q.    We asked you for a copy of your CV, and we were provided a copy of your LinkedIn profile.  Why don't we go ahead and just mark that as Exhibit 2 for the time being.  I'll have some questions on this in just a minute, but we will go ahead and get it marked?

(Whereupon, Google-YouTube-Stovezky Exhibit 2 was marked for identification.)

MR. DRAPER:  I say Exhibit 2.  It's actually Google-YouTube-Stovezky Exhibit 2.  We have a great protocol.  Anybody else want one?

MR. CHIOU:  Sure.

BY MR. DRAPER:

Q.    All right.  Continuing on with the document requests in the exhibit notice, Number 3 is the employee or former employee custodial file.  And I'll represent to you that we have produced or Google and YouTube has produced a large number of documents and designated them as your custodial file.  You will hear me refer to those documents today during the deposition, okay?

But you don't have to bring those, thank

CONFIDENTIAL

Page 19

God, because there are like 37,000 of them.  So -- but we're going to talk about those.

Did you take any notes in -- to prepare for this deposition?  That's Item Number 5?

A.    I did not.

Q.    Okay.  And I don't think for -- any of the rest of them are applicable.  All right.  So we can put this away for the time being.

And let's go ahead and I'm going to ask you a couple of questions about your background, and some information that is on your LinkedIn profile that we have marked as Google-YouTube-Stovezky Exhibit 2.

So you have a bachelor's degree in economics and computer science from Harvard University that you obtained in 2015; is that right?

A.    Yes.

Q.    Okay.  And it looks like you might have done an internship with Facebook in the summer of 2013?

A.    Yes.

Q.    All right.  And then in the summer of 2014, you, again, did what looks like an internship with Bain Capital which is a private equity firm?

A.    No.  Bain & Company is a consulting firm.

CONFIDENTIAL

Page 20

Q.    Oh, okay.  Is that the outfit that Mitt Romney used to run or is it not?

A.    Separate.

Q.    Separate, all right.

And then you went back to work for Bain Consulting after graduating from Harvard?

A.    Yes.

Q.    All right.  What kind of work did you do in that year after you graduated when you were working for Bain Consulting?

A.    I was working in the private equity group conducting due diligence for clients wishing to buy private companies.

Q.    Okay.  So there would be merger and acquisition, and then you would look at the company's documents to make sure everything that they were representing was true and just to get a better idea about the company that was being acquired?

A.    No.  I was doing the business diligence and whether they should buy it at all.

Q.    Okay.  All right.  And then in June of 2016, you went to work for Google as an associate product manager for Google Calendar?

A.    Yes.

CONFIDENTIAL

Page 21

Q.    Did you work with Jyoti Ramnath at all on Google Calendar?

A.    I have.

Q.    On Google Calendar?  I know you have probably worked with her at YouTube.

A.    She left a few months after I joined Google Calendar.

Q.    Oh, okay.  And then in 2017 you started working on Google Assistant and did that approximately for a year?

A.    Yes.

Q.    All right.  And it looks like you have a patent related to your work for Google Assistant; is that right?

A.    Yes.

Q.    What -- tell me about that patent.

A.    It's a patent that relates to the ability of a machine learning model to break up a conversation that has multiple intents in the sentence and rewrite them as two separate queries. So that the Google Assistant could respond to queries such as turn on the lights in the kitchen and in the bedroom.

Q.    I see.

A.    Instead of failing.

Page 22

Q.   Okay.  And then in 2018, you went to work for YouTube?

A.   Yes.

Q.   All right.  Your first job was on the news feature for YouTube?

A.   Yes.

Q.   Did that for about a year?

A.   Yes.

Q.   And then your next job at YouTube was as product manager for borderline content, correct?

A.   Yes.

Q.   All right.  And this was an effort by YouTube to reduce recommendations of videos that could misinform users in harmful ways, yes?

A.   Yes.

Q.   And also to reduce recommendations of content that comes close, but does not quite violate YouTube community standards?

A.   Yes.

Q.   All right.  And it says your work in this area led to YouTube cutting recommendations of videos like these by two-thirds?

A.   Yes.

Q.   When did you achieve that goal?

A.   I personally didn't achieve that goal.  It

was a team goal.

Q. Okay. When did the team achieve that goal?

A. Around 2019 -- 2018 to 2019.

Q. How long had they been working on that; do you know?

A. Before -- prior to the achievement?

Q. Yeah.

A. About a year and a half or so.

Q. And then in August of 2019, you became senior product manager for health and mental health at YouTube. Is that the right title?

A. Yes.

Q. Okay. And in that job, you were trying to raise the information quality around health and mental health content, both by reducing the harmful content and raising high-quality evidence-based content, right?

A. Yes.

Q. All right. And you did that job until fairly recently, January of 2024?

A. Yes.

Q. All right. And your current position which you have had since January 2024 is senior product manager for search and discovery?

CONFIDENTIAL

Page 24

A.   Yes.

Q.   All right.  Can you tell me a little bit about that position, please, kind of what is your job there?

A.   Yes.  I work on developing machine learning models, identify content that may be off-putting or -- to some users or harmful to other brands such as overly sexualized content or clickbaited content.

Q.   Okay.  Since you are working for search and discovery, search and discovery are the surfaces for YouTube where algorithmic recommendations are made?

A.   Mostly discovery.

Q.   Okay.  And so search is where the user inputs something into a search box, right?  And then based on that input and other information that is available to the algorithm, the algorithm recommends what it thinks the user is searching for, what it thinks the user wants to view?

MR. CHIOU:  Objection to form.

You can go ahead and answer, Ms. Stovezky.

THE WITNESS:  Based on the query there would be a rank list of results based on the relevance to that specific username.

Page 25

BY MR. DRAPER:

Q.    But if you and I type the same query into a search box on YouTube, we will get different results, won't we?

MR. CHIOU:  Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  It depends on the query.

BY MR. DRAPER:

Q.    Right.  So if, for example, we both type in Egypt into a search box, and I am really interested in travel and I might get some results that talk about different sites to see in Egypt.

But if you are really interested in politics and have a history of looking at videos related to Middle East politics, you are probably going to get something that is more focused on that area, right?

MR. CHIOU:  Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  I don't work on search ranking, so it really depends on the query.  I don't know how to answer that affirmatively.

BY MR. DRAPER:

Q.    Okay.  Can you tell me how the ranked list is generated?

Page 36

BY MR. DRAPER:

Q.   Uh-huh.

A.   And so I think it would really depend on whether you have a meaningful way to warn, whether you know enough to warn.  So I would need to do more research on that specific application to see what the available options are.

Q.   Okay.  All right.  You have a strong interest in mental health that predates your work in this area for YouTube, correct?

MR. CHIOU:  Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  Aligns with the same timeline about my interest and my work.

BY MR. DRAPER:

Q.   Okay.  One might even say it's been a passion for you?

A.   Yes.

Q.   Okay.  You were hand-selected by YouTube to be the senior product manager for health and mental health in September of 2018, a role that did not exist before you filled it?

MR. CHIOU:  Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  I wouldn't say that is

accurate.

BY MR. DRAPER:

Q.    Okay.  In your role as senior product manager for health and mental health, you relied on expert clinical review and opinions to categorize harmful content on YouTube?

A.    Yes.

Q.    Okay.  You developed machine learning models to make predictions at scale about what content would be harmful to users?

A.    Not me personally, but I was on a team that did that.

Q.    Okay.  And across all of your projects involving mental health, you had to leverage clinical expertise from reputable sources?

A.    Yes.

Q.    You conducted in-depth literature reviews, deep dives with YouTube search and discovery teams, and intensive user experience research?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you can answer.

THE WITNESS:  I collaborated with the user research team that did those things.

BY MR. DRAPER:

Q.    Okay.  And you did in-depth literature

CONFIDENTIAL

reviews?

A.    Not my -- not personally, but I commissioned them and worked with researchers.

MR. DRAPER:  Okay.  Let's go ahead and mark as exhibit -- Google-YouTube-Stovezky Exhibit 3.

(Whereupon, Google-YouTube-Stovezky Exhibit 3 was marked for identification.)

BY MR. DRAPER:

Q.    A document with the Bates number 01526486.

A.    Okay.

MR. DRAPER:  You want a copy?  You can have a copy.

MR. CHIOU:  Thank you.

MR. DRAPER:  I got multiple copies here. It's a surprise.

BY MR. DRAPER:

Q.    Ms. Stovezky, the document that we have just identified and marked as an exhibit, I will represent to you was produced by the attorneys for Google and YouTube.  And there is a -- what is called a slip sheet on the back, tells us where the document came from, and you will see that you are listed as the custodian.

A.    Uh-huh.

CONFIDENTIAL

Page 83

search and discovery wants to reduce filter bubbles. That's what they list as their responsibility, correct?

A. That was a proposal at the time.

Q. Okay. And what happened with that proposal, if you know?

A. I wasn't working on it directly, so I wouldn't be able to give a full answer.

Q. Okay. Did YouTube do anything in 2018 to warn child users and their parents that they could be exposed to this borderline or gray content on the YouTube application?

MR. CHIOU: Objection to form.

Ms. Stovezky, you can answer.

THE WITNESS: I wasn't working on the kids or youth team, so I wouldn't be able to answer that question.

BY MR. DRAPER:

Q. Okay. You were working on the mental health team in 2018. Actually you were senior product manager for health and mental health, right?

A. Not in 2018.

Q. 2019. Okay. So in 20 -- let's see. In April of 2019, you were the product manager for borderline content, right?

CONFIDENTIAL

Page 84

A.    Yes, for that first project here.

Q.    This first project team that they are talking about reducing harmful and gray content?

A.    Yes.

Q.    So in 2019, when you were working as the product manager to reduce harmful or gray content, what did YouTube do to warn child users and their parents that they could be exposed to quantities of this borderline or gray content on the YouTube application?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you can answer.

THE WITNESS:  Yeah.  Again, I was working on -- my role was in the content side.  I wasn't working on the user side or on the kids or youth team, so I wouldn't be able to answer that.

BY MR. DRAPER:

Q.    Who would I ask that question to?

A.    The kids team, the youth team.

Q.    And tell me who would that individual be in 2018/2019.

A.    I would start with James Beser.

Q.    Okay.  All right.  Can we go back to what we marked as Exhibit 8, please, the teen well-being document.

the algorithm's tendency to focus a user's feed on this particular type of content that makes them harmful?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you can answer.

THE WITNESS:  I wouldn't say that that is accurate.  I believe the harm is in the concentration of the messages.

BY MR. DRAPER:

Q.   Right.  And the concentration is a function of the algorithm recommending many of those videos rather than it's a function of the content of any one of those videos?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you can answer.

THE WITNESS:  I believe -- I believe it's a combination of the user choice to watch this content over and over again, and then the algorithm getting signal that the user is particularly interested in this type of content.

BY MR. DRAPER:

Q.   Okay.  If you could go back to 01372620, which is the document that we looked at that had the pictures of the -- of the negative social comparison related to shading of a person's nose, right?

A.    Yes.

Q.    There are, on the back of that page of 2620, there are notes, speaker notes.

A.    Right.

Q.    Okay.  And you will see on the example, it says, "Social comparison video, which is okay on its own" -- right? -- "but sometimes the Watch Next feed may have many more videos that repeatedly make negative social comparison of physical features." Right?

A.    Right.

Q.    Do you know who the speaker was for this presentation?

A.    I'm not sure.

Q.    Okay.  Do you agree that the potential mental health harm comes from the Watch Next feed having many more videos that repeatedly make the same negative social comparison?

MR. CHIOU:  Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  I would say it's a combination of the user kind of urged to watch or choice to watch more content this way.  And then the loop of it feeding that signal into the recommendation system.

Page 96

BY MR. DRAPER:

Q.   Are teens more likely to seek out this type of content?

MR. CHIOU:  Objection.

BY MR. DRAPER:

Q.   Negative social comparison content?

MR. CHIOU:  Pardon me, Mr. Draper. Objection to form.

You can answer, Ms. Stovezky.

THE WITNESS:  The only accurate thing I know for sure is that teens seek to watch content from other teens.

MR. DRAPER:  Okay.  Okay.  I'm going to show you a document now that we will designate as Google-YouTube-Stovezky Exhibit 10.

(Whereupon, Google-YouTube-Stovezky Exhibit 10 was marked for identification.)

MR. DRAPER:  This is a really long one. So I have included a couple of tabs in it to help us get located here.  Obviously the tabs are mine. They are not part of the original document.  For the record, this is Document 00793501.

BY MR. DRAPER:

Q.   So this is a document that unhelpfully doesn't have a title page.  The title page is blank

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              )
PERSONAL INJURY PRODUCTS           )   Case No.
LIABILITY LITIGATION               )   4:22-MD-03047-YGR
                                   )
This Document Relates To:          )   MDL No. 3047
ALL ACTIONS                        )
                                   )
                                   )

                        - - - -

                    CONFIDENTIAL

                   VIDEO-RECORDED

          DEPOSITION OF SHARON STOVEZKY

                 (Pages 1 - 267)

           Held at the Law Offices of

       Wilson Sonsini Goodrich & Rosati

        One Market, Spear Street Tower

           San Francisco, California

     Wednesday, December 11, 2024, 9:12 a.m.
                        - - - -

REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

A.   Yeah, yes.

Q.   Okay.  Actually, I want to be precise and make sure that we are correct here.  If you look at the description of the project, it actually says, "potentially negative interaction videos."

But that's a mistake, right?  It should be potentially negative impact videos?

A.   That's correct.

Q.   Okay.  All right.  Got another long one for you.

MR. DRAPER:  This one we will mark as YouTube-Google-Stovezky Exhibit 12.

(Whereupon, Google-YouTube-Stovezky Exhibit 12 was marked for identification.)

BY MR. DRAPER:

Q.   I'm going to see if I can find my highlighting.  All right.  I'm going to go for it here.  For the record, this document is 00808421.

A.   You did give me your copy.  Do you want it?

Q.   Yeah.  What the heck.  I'll swap with you.  Okay.  You can have that one.

A.   You are sure?  This is still the highlighted one.

Q.   Did I highlight both of them, or did I

Page 156

BY MR. DRAPER:

Q. And, if anything, those numbers are understated because there is a whole additional category of VIBE videos that was added later that may not be counted in this count?

MR. CHIOU: Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS: That's possible.

BY MR. DRAPER:

Q. Did YouTube warn youth users and their parents that if they watched a recommended video that had a potentially negative impact on their mental health, there was a two-thirds chance that the YouTube algorithm would recommend an additional potential negative impact video in their Watch Next panel?

MR. CHIOU: Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS: Not to my knowledge.

BY MR. DRAPER:

Q. Did YouTube warn youth users and their parents that if they watched a recommended video that has potentially negative impact on their mental health, there was a 45 percent chance that the YouTube algorithm would recommend another two of

Page 157

those potential negative impact videos to the user?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  Not to my knowledge.

BY MR. DRAPER:

Q.    Okay.  So if we could look at the next page, please.  It's a slide entitled "What does high volume or concentration look like according to OWLS?"

Do you see that?

A.    Yes.

Q.    Owls is how YouTube refers to outside experts that it consults with, correct?

A.    Owls is a specific group of child experts that the youth team uses.

Q.    Okay.  They are outside experts, meaning they are people that YouTube contracts with but they are not YouTube employees?

A.    That's correct.

Q.    Okay.  All right.  And this slide has several examples of Watch Next panels.  And in the first one on the left, five of eight of the videos recommended in the Watch Next panel contain potential negative impact, social comparison of physical features videos, right?

A.    Correct.

Q.    All right.  And underneath that, it says, "All Owls said this volume was too much," right?

A.    Yes, that's what it says here.

Q.    All right.  And that means that of the outside experts that YouTube consulted, all of them agreed that having five of eight of these potential negative impact VIBE videos in a Watch Next panel was too many, meaning that this could potentially have a negative impact on the user's well-being?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  That's correct.

BY MR. DRAPER:

Q.    All right. And the center example shows three of eight of these potential negative impact VIBE videos in a Watch Next panel, and underneath that, it says, "Many of the Owls said that there was no difference between the first feed and this feed. Both sent the same social comparison message."

I read that correctly?

A.    Yes.

Q.    All right.  So all of the outside experts that YouTube consulted agreed that three of eight potential negative impact VIBE videos in a Watch

Page 159

Next panel was too many and could have a potential negative impact on the user's mental health?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  You said "all."  It says here "many."

BY MR. DRAPER:

Q.   Right.  "Many said that there was no difference," fair enough.  All right.

And then on the right side -- well, scratch that.

I said "all."  I should have said the consensus was that it was too many because that's what it says at the top of the -- top of that example.  Do you agree?

A.   Yes.

Q.   Okay.  All right.  On the right side is another example of a Watch Next panel.  And it indicates that there was split feedback on this Watch Next panel.  This example has two of these potential negative impact VIBE videos out of eight.  And the Owls' responses were split.  Some thought it was neutral while some thought it was slightly negative.

So two of eight might have a potential

CONFIDENTIAL

Page 160

negative impact on the user's well-being, correct?

A.   Correct.

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  Correct.

BY MR. DRAPER:

Q.   All right.  If you look at the next slide, it's entitled "Goal, reduce amount of VIBE concentrated panels in Watch Next."  And it says, "On Watch Next, the VIBE panel either has three plus VIBE videos or two plus if the watch video is VIBE," right?  I read that correctly?

A.   Yes.

Q.   And what that means is, the video that the user is watching counts, right?  So if that user is watching a potential negative impact video, and three of those videos in total is too many, then the video they are watching counts as one and having two others in the Watch Next panel would be to many?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  Yes.

BY MR. DRAPER:

Q.   Okay.  Did YouTube ever warn young users or their parents that if they watched a potential

Page 161

negative impact VIBE video on these topics, like social comparison or social aggressions, that there was a 45 percent chance that the YouTube algorithm would expose them to a number of similar videos that YouTube's consulting experts had determined could be harmful to their mental health?

MR. CHIOU:  Objection to form.

Ms. Stovezky, you may answer.

THE WITNESS:  Not to my knowledge.

BY MR. DRAPER:

Q.    That was fast.  We got through that one. Move on to the next one.

You will be glad to know I'm getting to the bottom of the barrel there.

MR. DRAPER:  Okay.  So this document we will mark as YouTube-Google Exhibit 13.  Thankfully there is no highlighting on it.

(Whereupon, Google-YouTube-Stovezky Exhibit 13 was marked for identification.)

BY MR. DRAPER:

Q.    You can have that one.

Okay.  If you look at the slip sheet on the back, this is a document that was produced by Google and YouTube.  The sole custodian is Ms. Stovezky, and it is actually -- it's in the kind

CONFIDENTIAL

Page 267

STATE OF CALIFORNIA    )

COUNTY OF YOLO         )

    I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

                SHARON STOVEZKY,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2024.

ELAINA BULDA-JONES, CSR 11720