# AMENDED Exhibit 1024

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 9

FEBRUARY 26, 2025                    9:36 A.M. PACIFIC TIME

P R O C E E D I N G S


MORNING SESSION

THE VIDEOGRAPHER:  We are now on the record.  My name is Chris Ritona.  I'm the videographer with Golkow.  Today's date is February 26th, 2025, and the time is approximately 9:36 a.m. Pacific.  This video deposition is being held in San Francisco, California at Wilson Sonsini in the matter of the Social Media Adolescent Addiction Personal Injury Products Liability Litigation, for the U.S. District Court, for the Northern District of California, and the deponent today is Dr. Jessica Dzuban.

Counsel's appearances will be noted on the stenographic record.  The court reporter today is Kathleen Maltbie, and she will now introduce herself and swear in the witness.

THE REPORTER:  Good morning.  We are on the record.  Today's date is February 26, 2025.  My name is Kathleen Maltbie.  I am a certified shorthand reporter licensed in the State of California, California CSR No. 10068, also licensed in the states of Nevada and Texas.

Would you raise your right hand, please?

JESSICA DZUBAN, Psy.D.,

having been duly sworn,

was examined and testified as follows:

MS. HAILESELASSIE:  Good morning.  My name is Jade Haileselassie with Motley Rice, and I represent the plaintiffs in this matter, personal injury and also school district plaintiffs.

MS. BREAKELL:  Good morning.  My name is Riley Breakell.  I'm an attorney at Motley Rice, and I also represent the plaintiffs in this matter, personal injury and school districts.

MS. WADHWANI:  I think we're putting appearances on the stenographic record, right?  Or do you want me to go through it?

MS. HAILESELASSIE:  Okay.  Thank you.  I had forgotten we were doing that convention.

EXAMINATION BY MS. HAILESELASSIE

BY MS. HAILESELASSIE:

Q.   Good morning, Ms. Dzuban.  So you've just heard me introduce myself.

Will you please introduce yourself for the jury?

A.   Yes.  Dr. Jessica Dzuban.

Q.   Thank you.

Page 11

And as you heard me say, I'm here today on behalf of the plaintiffs.  There are hundreds of children and school districts who have alleged that the conduct of Google has injured them, and they have filed suit against Google and YouTube in federal court.  So we are here this morning in San Francisco to take your deposition.

You've been sworn in by the court reporter, and you're under oath that you'll testify truthfully today.

Are you committed to testifying truthfully in this matter today?

A.    Yes.

MS. WADHWANI:  Objection to form.  Objection to the preamble.

Just give me a moment before answering.

THE WITNESS:  Okay.

MS. WADHWANI:  Thanks.

THE WITNESS:  Yes.

BY MS. HAILESELASSIE:

Q.    So that means even though we're here in this conference room, you're testifying just as though you are sitting before the judge and jury, and your deposition is being recorded in a number of ways.  It is being videotaped.  There will also be a

HIGHLY CONFIDENTIAL

Page 12

stenographic record, which will be turned into a written transcript.  Either the video or the transcript of your testimony today can be presented later in court or it can be used for any purposes authorized under state or federal law.

Do you have any questions about that?

A.   No.

Q.   I'm sure you've been well prepared by your counsel on what to expect today, but I want to go over some general rules for a deposition, just so we have a record that we're all on the same page as far as that's concerned.

First of all, your responses should be verbal.  And you've already been great about doing that, but in typical conversation, there may be situations where you lapse into nodding or shaking your head.  So if that should happen, I'll just remind you that we need a verbal response on the record so it can be recorded by the court reporter.

Another thing that can happen in conversation is talking over each other.  You may anticipate what I'm going to say.  If that happens, we'll just have to make sure that we get the question on the record and then the answer after it, so it can be, again, clearly reported by the court

Page 13

reporter.

Do you agree?

MS. WADHWANI:  Objection to form.

THE WITNESS:  Agree with what?

BY MS. HAILESELASSIE:

Q.   That we'll try not to speak over each other.

A.   Yes.

Q.   Thank you.

And your counsel will also be making objections, as has already occurred, to my questions today.  That will be to preserve the record, but you will still need to answer the question after the objection unless your counsel tells you not to.

Do you understand?

A.   Yes.

Q.   You can take a break at any point today. What we will try to do is go for about an hour.  If we're making good progress on a section or a document, we may go a little longer.  But should you need to take a break, just let me know, and as long as there's not a question pending, then we can go ahead and do that.

Do you understand?

A.   Yes.

HIGHLY CONFIDENTIAL

Page 14

Q.    Is there anything that would affect your memory today?

A.    No.

Q.    Did you get a good night of sleep?

A.    I did.

Q.    And is there anything that would affect your ability to tell the truth today?

A.    No.

Q.    We're in the office of Wilson Sonsini.

Are you represented by attorneys from Wilson Sonsini?

A.    No.  I'm --

Q.    Okay.  Who -- who are you represented by today?

A.    By Neelum Wadhwani.

Q.    And have you signed an engagement letter with Ms. Wadhwani?

A.    I -- no.

Q.    Are you paying Ms. Wadhwani to represent you?

A.    No.

Q.    Okay.  Who is -- who is paying for your representation?

A.    Neelum is representing YouTube, and I believe being paid by Google YouTube.

Q.   Have you signed a common interest agreement with -- with Google or YouTube?

A.   I'm not even sure what that is, so I don't think so.

Q.   Have you -- have you signed any kind of agreement with any of the defendants in this litigation, either Google, YouTube or TikTok, or any law firm related to this representation?

MS. WADHWANI:  Objection to form.

THE WITNESS:  No.

BY MS. HAILESELASSIE:

Q.   Okay.  Do you consider that your interest is -- that your interest is the same in this litigation as the defendants?

MS. WADHWANI:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  Sorry, can you repeat the question?

BY MS. HAILESELASSIE:

Q.   So have you decided that your interest and Google's interest are aligned for purposes of this litigation?

MS. WADHWANI:  Objection to form.  Calls for a legal conclusion.

She's not a lawyer.

Page 16

THE WITNESS:  I -- I feel like I have my own interest in this as to giving information about my time working there, but I can't presume to know what Google's interests are in this case.

BY MS. HAILESELASSIE:

Q.   Fair enough.

Do you currently work for TikTok?

A.   Yes.

Q.   Do you understand that TikTok is also a defendant in this action?

A.   Yes.

Q.   Have you spoken to anyone about this deposition, other than Ms. Wadhwani or other lawyers from her firm?

A.   I have informed a handful of people that I'm being deposed, without further details.

Q.   Okay.  For clarification, you have -- have you -- have you only informed people of the date and time of the deposition and the fact that you are being deposed?

A.   The date, the time, and the subject matter, depending on the person.

Q.   Did any of the people you spoke with about your deposition, other than your lawyers, work at Google?

HIGHLY CONFIDENTIAL

Page 17

A.    Did anyone work at Google that knows about the deposition?  Yes.

Q.    Was that someone you spoke to about your deposition?

A.    That I informed that I was being deposed, yes.

Q.    Okay.  Who was that?

A.    ███████████████████████, Garth Graham, one of my former managers, informed him I was being deposed.  I believe that's all.

Q.    Okay.  Sorry.  For clarification, are those two different people?

A.    Correct.

Q.    Okay.  What is ████████████████ name?

A.    ██████████████.

Q.    Did any of the people that you spoke with other than your lawyers work at TikTok?

A.    Yes.

Q.    And who did you speak to at TikTok?

A.    I spoke to a couple people who I wasn't able to complete work for this week, just informed them that I was being deposed.  I informed my manager, my manager's manager, given I needed the time off.  I informed TikTok's legal team to make sure --

Page 18

MS. WADHWANI: You don't need to speak about communications you had with TikTok's legal team, but -- so you can stop with that, that you informed them about the deposition.

THE WITNESS: Correct. I informed them. Yeah. And I think a couple other people were wondering why I was out of office this week. But, again, just that I was being deposed.

BY MS. WADHWANI:

Q. Okay. And, again, for clarification, did you speak with any of these people about the substance of your testimony today?

A. No. Absolutely not.

Q. Have you been deposed before?

A. No.

Q. How many times did you meet with your lawyers to prepare for this deposition?

A. Maybe four, five times.

Q. And how long were those meetings?

A. I think there was an initial call that was maybe 30 minutes to an hour, and then a two-hour phone call or -- yeah. And then four hours for two days, that I can remember.

Q. Four hours on each of two days?

A. Each of the two days, correct.

Q.   So is it you spent about 11 hours in preparation; is that right?

A.   That sounds about right.  It may have been plus or minus, yeah.

Q.   Did you review documents in preparation for your deposition?

A.   Yes.

Q.   Do you know approximately how many documents you reviewed?

A.   Maybe ten.  I did not keep track.

Q.   Did the documents you reviewed refresh your recollection for purposes of your deposition?

A.   Certain project names, yes.

Q.   Okay.  And I'll just ask your defending counsel.

MS. HAILESELASSIE:  Have -- were all of the documents that Dr. Dzuban reviewed produced in this litigation?

MS. WADHWANI:  Yes, they were.

MS. HAILESELASSIE:  Thank you.

BY MS. HAILESELASSIE:

Q.   Did you take any notes in preparation for your deposition?

A.   I did not.

Q.   Have you reviewed any of the plaintiffs'

HIGHLY CONFIDENTIAL

Page 20

complaints in this case?

A.   No.

Q.   Have you talked about this litigation generally with your coworkers at TikTok?

A.   No.  I mean, that it's happening.  People know that this lawsuit is happening, but not about details.

Q.   Do you understand what the litigation is about?

A.   Yes.

MS. WADHWANI:  And let me just say, you can answer that question to the extent that you don't reveal any conversations you have had with lawyers, conversations -- other than conversation with a lawyer, based on your understanding of that or any other sources other than lawyers, you can testify to.

THE WITNESS:  All of my understanding of what this case is about has been in discussion with lawyers.

MS. WADHWANI:  Okay.  So you -- so I'm going to instruct you not to answer.

THE WITNESS:  Yes.

BY MS. HAILESELASSIE:

Q.   Okay.  What is your understanding about

Page 21

what this lawsuit is about?

MS. WADHWANI: So Dr. Dzuban just testified that her understanding is based on communications with counsel, and so I'm going to instruct her not to answer that question.

MS. HAILESELASSIE: Okay. I'm not asking her what counsel said. I'm asking her for her understanding.

MS. WADHWANI: Correct. But her understanding is based on her communications with counsel.

BY MS. HAILESELASSIE:

Q. Have you ever read reports about this litigation, public reports?

A. No.

Q. Were you aware of the litigation before you knew you'd be deposed for it?

A. Yes.

Q. And how were you aware of it?

A. During my time at YouTube, I was informed by legal counsel that --

MS. WADHWANI: That -- that --

THE WITNESS: Okay.

MS. WADHWANI: That's enough.

THE WITNESS: Okay.

BY MS. HAILESELASSIE:

Q.   At this time, I just want to ask if you'll commit to staying in touch with Ms. Wadhwani and your attorneys regarding your whereabouts, whether or not you're working at TikTok, so you can be located in the event you need to be deposed at a live trial.

Will you agree to that?

MS. WADHWANI:  I mean, Jade, if you need to reach her, you can always reach out to me and we can work out.  But we're not going to agree to -- at this moment, to necessarily produce her or not produce her at your request.  So as per the normal course, if you are seeking Dr. Dzuban in the future, please give me a call and I'm happy to talk to you.

MS. HAILESELASSIE:  Understood.

BY MS. HAILESELASSIE:

Q.   We are going to look at tab A, which is going to be marked as Exhibit 1.

(Whereupon, Deposition Exhibit 1 was marked for identification.)

BY MS. HAILESELASSIE:

Q.   Dr. Dzuban, I'm showing you what's been marked as Exhibit 1.  Actually, our -- and I'll just say this once for the record.  Our naming convention

HIGHLY CONFIDENTIAL

Page 23

here is rather clunky.  It is Google YouTube Dzuban Exhibit 1.  For the rest of this deposition, I will just refer to the exhibits by their numbers.  But I'm showing you what's been marked as Exhibit 1, and it's the notice of your videotaped deposition.

Do you see that?

A.    Correct.  Yes.

Q.    Have you seen your deposition notice before?

A.    I believe so.

Q.    Thank you.  You can put that one aside for now.

I want to ask you a few questions about your background.

What degrees do you hold and which institutions did you receive them from?

MS. WADHWANI:  Objection to form. Compound.

Go ahead.

THE WITNESS:  You want my highest degree or all of them?

BY MS. HAILESELASSIE:

Q.    Post secondary.

A.    Secondary is high school?

Q.    Correct.

Page 24

A.    I have an associate's degree from Skyline College in liberal studies, I have a bachelor's degree from San Francisco State in humanities, I have a master's degree in clinical psychology from California Institute of Integral Studies, and I have a doctorate in clinical psychology from that same school.

Q.    What year did you receive your doctorate in psychology -- in psychology?

A.    2011.

Q.    What was the focus of your dissertation?

A.    My dissertation was focused on reducing recidivism rates in state prisons, or factors that reduce risk of recidivism in state prisons.

Q.    Are you currently licensed to practice psychology?

A.    I am.

Q.    In which states do you hold a license?

A.    California.

Q.    When did you first obtain your license?

A.    2012.

Q.    And have you ever been suspended or revoked?

A.    No.

Q.    Please describe your current employment.

HIGHLY CONFIDENTIAL

Page 25

A.    I currently work at TikTok as the global head of mental health policy.

Q.    How long have you held that position?

A.    Since September 2024.

Q.    What are your primary responsibilities?

A.    I oversee all policy development for any matters related to mental health.  I also serve as subject matter expert sort of across partnerships, products, youth safety in relation to mental health.

Q.    And where were you employed before your current position?

A.    My job before was at Google as YouTube's global head of mental health.

Q.    And in that position, what were your responsibilities?

A.    My core work was I oversaw all of our product and content partnerships as it related to mental health, and then served as an internal subject matter expert across policy, product, government relations, sort of whatever teams needed the help.

Q.    And what was your position prior to -- to global head of mental health for YouTube?

A.    I was the -- I was employed by Google as a chief mental health advisor for YouTube, and I also

HIGHLY CONFIDENTIAL

Page 26

was a clinical co-lead for benefits for employment mental health for the company.

Q.   What are your areas of specialization?

A.   Anxiety, complex childhood trauma, young adult identity development, grief and loss, crisis stabilization, critical incident response.  Those are my primary specializations, clinically.  I would say now, with my work, also translational science of synthesizing research and external expertise or expertise in the space for program and products intervention and policy design.

Q.   And are all of those areas of specialization relevant to your current job?

A.   A lot of them are, yes.

Q.   And were they relevant to your prior position with YouTube as global head of mental health?

A.   Yes.

Q.   How so?

A.   In particular, crisis stabilization was a big part of the role of understanding how to support users in acute distress.  So that was a big piece. And then certainly as a translational scientist, while I was sort of an internal subject matter expert, I wasn't, you know, the world's expert in

HIGHLY CONFIDENTIAL

Page 27

anything.  So I would work with the world's experts on various topics, synthesize expert consensus, synthesize external research and make sure clinical integrity wasn't lost in implementation, whether that be policy, product, partnerships.

Q.   When you say, "understanding how to support users in acute distress," how would you determine that users were in acute distress?

A.   Typically, it's through search query signals, so what's called, like, an SOS search query that indicates somebody may be at high risk or seeking content that may not be -- that may be harmful.  So suicide, self-harm, disordered eating-related queries.

Q.   Okay.  I'm -- we're going to look at tab B, and it's going to be marked as Exhibit 2.

(Whereupon, Deposition Exhibit 2 was marked for identification.)

MS. WADHWANI:  Thank you.

BY MS. HAILESELASSIE:

Q.   I'm showing you now what has been marked as Exhibit 2.

Is this your current public LinkedIn profile?

A.   Let me take a look.

Case 4:22-md-03047-YGR     Document 2883-13     Filed 03/26/26     Page 45 of 59

HIGHLY CONFIDENTIAL

Page 80

A.    Maybe it's good to differentiate.  Parent complaints, I imagine, would go through a certain channel.  User feedback would be solicited by YouTube directly through UX research, for example, or online surveys.

I -- that is the category that I worked most heavily with, was UX feedback, expert feedback, advocacy groups, things of that nature.  I will say sometimes they would share parents' concerns, but, again, I did not work directly with parent complaints.

Q.    But you did sometimes learn of what the complaints were, correct?

A.    I was -- I don't know if I would call them complaints as much as concerns or curiousness. Parents, for example, very often misunderstood how the platform worked, and when they learned about our efforts, how the platform worked and user safety efforts, most times, they would be pleasantly surprised.

Q.    So when you were hearing about these parents' concerns, did you ever hear anyone voice the concern that YouTube was affecting their child's attention span?

MS. WADHWANI:  Objection to form.

Page 81

THE WITNESS:  Not that I can remember.

BY MS. HAILESELASSIE:

Q.  Do you recall ever hearing any concerns from parents that YouTube was affecting their child's development?

MS. WADHWANI:  Same objection.

THE WITNESS:  Not that I can remember.

BY MS. HAILESELASSIE:

Q.  Do you recall ever hearing concerns from parents who were concerned that YouTube was affecting their child's mental health?

MS. WADHWANI:  Same objection.

THE WITNESS:  Yes.

BY MS. HAILESELASSIE:

Q.  What were those concerns?

A.  The concerns centered around youth, basically either affecting their body image, the content affecting their body image or content exposing them to instructional content on how to engage in risky behaviors.

Q.  And who -- who spoke with you about those concerns?

A.  American Academy of Pediatrics is one. It's difficult because we worked with so many youth advocacy groups, it's sometimes difficult to

HIGHLY CONFIDENTIAL

Page 82

remember who exactly it came from.  So I think it would be easier for me to talk about the youth advocacy groups we worked with in relation to mental health.  But I wouldn't -- I remember for sure AAP, but the other ones I wouldn't be confident in saying exactly where it came from.

Q.  Is it accurate to say that parents were reporting their concerns to these groups, and then these groups were filtering the concerns to YouTube?

MS. WADHWANI:  Objection to form. Foundation.

THE WITNESS:  Potentially.  I'm not confident in saying yes to that.

BY MS. HAILESELASSIE:

Q.  How would parents report a concern to YouTube directly if they had one?

MS. WADHWANI:  Objection to form. Foundation.

THE WITNESS:  I don't -- I'm actually not sure.

BY MS. HAILESELASSIE:

Q.  Did you ever -- outside of expert groups and external experts, did you ever hear concerns voiced in any form, whether it was public reports or research about the affect of any type of social

Page 83

media or digital media on the attention spans of minors?

MS. WADHWANI:  Objection to form.

THE WITNESS:  There was research that certainly pointed to correlations, but not causation.  And so similarly to the hypothesis I provided earlier, a lot of the research pointed to external factors that were affecting attention span more.  So broadly.  Like, there's a lot of correlation, for example, with the launch of the iPhone with attention spans, but, again, it's -- they can't say the introduction of the iPhone necessarily caused attention behaviors, but it's interesting that attention trends have been affected systemically for youth and adults over time.  But, again, not the causation behind that.

BY MS. HAILESELASSIE:

Q.  Did you ever advise on the YouTube Shorts product?

A.  No.

Q.  Did you ever hear complaints about attention span from parents related to Shorts in public reporting?

A.  Not that I can remember.

Q.  Okay.  We're going to go to tab W.  Will

establish principles that could help YouTube advocate before Congress and global governments?

MS. WADHWANI: Same objections.

THE WITNESS: I believe the intent was to inform -- to be a thought leader in the space and a partner in the space to inform local governments to create informed legislation.

BY MS. HAILESELASSIE:

Q. So all I'm essentially asking is whether this last goal that you've read is a goal of this working group, and this is on a slide that says, "Why this working group." And I'm a little confused about the pushback about that.

MS. WADHWANI: Is there a question?

MS. HAILESELASSIE: I don't think -- I don't think I'm going to get an answer to this, and I am -- I'm a little confused about why you don't want to answer this question, but I am willing to just move on from this.

MS. WADHWANI: We object to your characterization of Dr. Dzuban's responses. She has answered them, but I appreciate you moving on.

MS. HAILESELASSIE: Okay. We'll just look briefly at tab BB, which we'll mark as Exhibit 13.

/ /

(Whereupon, Deposition Exhibit 13

was marked for identification.)

MS. WADHWANI:  Thank you.

BY MS. HAILESELASSIE:

Q.  Exhibit 13 is Bates number ending -04187318, and it's entitled "Affirmative principle 6, mental health and wellbeing."  It was produced to us by Google's attorneys from your custodian file.  You're the only custodian, and the last modified date is April 4th, 2023.

I'll give you a second to look at it, and then my question will be, do you recall working on this document?

A.  I remember giving feedback on this principle.

Q.  Okay.  Do you think that you drafted any part of this document?

A.  I believe I suggested edits to this document, but I don't remember -- I was not the -- the author of this and don't remember if I --

Q.  Okay.

A.  I'm just reading here, sorry.

Yeah.  I don't remember if I did it live or in writing or how it came about.

Q.  Okay.  Looking at the proposed principle

HIGHLY CONFIDENTIAL

Page 225

language, this -- this looks like this is definitely a more fleshed out version than what we were just looking at.

Do you mind reading the principle as it's laid out here, the proposed principle language?

MS. WADHWANI:  Objection to the preamble.

THE WITNESS:  (As read):

Number 6, platform should offer age-appropriate features to support wellbeing and mental health; platform should have age-appropriate content safety and quality policies and product features that support the social emotional development of under 18 users and protect their mental health.  Specifically, they should mitigate risks related to overuse, content that is likely to have a negative effect on their wellbeing or mental health, and content that encourages users to participate in activities that are risky for their wellbeing or mental health.

These mitigations should be

strongest for the youngest users.

In addition to broader mitigations, platform should be encouraged to raise developmentally appropriate authoritative mental health content to younger users who are seeking related information.  Finally, platform should be required to offer age-appropriate product interventions for under 18 users seeking self-harm information, which indicates that they could be in a crisis.

BY MS. HAILESELASSIE:

Q.   Do you recall what language you contributed to this proposed principle language?

MS. WADHWANI:  Objection to form.

THE WITNESS:  No, I do not.

BY MS. HAILESELASSIE:

Q.   You are mentioned in two comments here, comment 4 is to Erin Turner and says (as read):

Language below incorporates feedback from Jessica.

Do you see that?

A.   Yes.

HIGHLY CONFIDENTIAL

Page 227

Q.    And then comment 10, which is attached to the last part of the last sentence, which indicates they could be in crisis, is also to Erin Turner and asks (as read):

Is it okay to add back in?  I think key opinion formers need the context.

And then you're copied on that as well.

So are the key opinion formers that this was intended for the legislators?

A.    I believe so.

Q.    Okay.  So the consideration about whether to include language is with legislators in mind?

MS. WADHWANI:  Objection to form. Foundation.

THE WITNESS:  I -- I believe so.  Yeah. It mentioned KOFS here specifically.

BY MS. HAILESELASSIE:

Q.    Okay.  We can put that one aside.

Okay.  We're going to go to tab X, which will be Exhibit 14.

(Whereupon, Deposition Exhibit 14 was marked for identification.)

BY MS. HAILESELASSIE:

Q.    Exhibit 14 is a document ending

HIGHLY CONFIDENTIAL

Page 262

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

___x___ Reading and Signing was not requested.

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          Case No. 4:22-MD-03047-

ADOLESCENT ADDICTION/                  YGR

PERSONAL INJURY PRODUCTS

LIABILITY LITIGATION                MDL No. 3047

_____

This Document Relates to:

ALL ACTIONS

--


30(B)(6)/PMQ

VIDEOTAPED DEPOSITION OF

JESSICA DZUBAN, Psy.D.

HIGHLY CONFIDENTIAL

Wednesday, February 26, 2025

REPORTED REMOTELY VIA ZOOM

SAN FRANCISCO, CALIFORNIA


Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR