# AMENDED Exhibit 1029

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT    ) Case No.
ADDICTION/PERSONAL INJURY         ) 4:22-MD-03047-YGR
PRODUCTS LIABILITY LITIGATION     )
_____   )
This Document Relates to:         )
                                  ) MDL No. 3047
ALL ACTIONS                       )

- - -

WEDNESDAY, MARCH 5, 2025

CONFIDENTIAL - ATTORNEYS' EYES ONLY - PURSUANT TO
PROTECTIVE ORDER
- - -

Videotaped deposition of GARTH GRAHAM, held at the offices of Berger Singerman LLP, 201 East Las Olas Boulevard, Suite 1500, Fort Lauderdale, Florida, commencing at 9:27 a.m., on the above date, before Juliana F. Zajicek, a Registered Professional Reporter, Certified Shorthand Reporter, and Certified Realtime Reporter.

- - -

GOLKOW, a Veritext Division
877.370.DEPS
deps@golkow.com

CONFIDENTIAL

Page 7

THE VIDEOGRAPHER:  We are now on the record.  My name is Eric Nelson, and I am a videographer for Golkow, a Veritext division.

Today's date is March 5th, 2025, and the time is 9:27 a.m.

This deposition is being held in 201 East Las Olas Boulevard in Fort Lauderdale, Florida, In Re Social Media Adolescent Addiction Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is Garth Graham.

Counsel will be noted on the stenographic record.

The court reporter, Juliana Zajicek, will now swear in the witness.

(WHEREUPON, the witness was duly sworn.)

GARTH GRAHAM, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. HAILESELASSIE:

Q.   Good morning, Dr. Graham.

A.   Good morning, Counselor.

Q.   How are you?

CONFIDENTIAL

Page 8

A.    I am okay.

Q.    Will you please introduce yourself for the jury?

A.    My name is Garth Graham.  I am the Director of Public Health and Healthcare at YouTube.

Q.    And we've already met, of course --

A.    Yes.

Q.    -- but I'd like to introduce myself to you as well.  My name is Jade Haileselassie, and I'm here today representing children and their families and hundreds of school districts who have claimed that they were injured by Google and YouTube's conduct, and they've sued Google and YouTube in Federal Court.

We're here today in Fort Lauderdale, Florida, to take your deposition.  You have been sworn in by the court reporter, and you're under oath that you will testify truthfully today.  So that means that even though we're here today in this conference room, your testimony has the same weight as if it were occurring before a judge and jury.

And the testimony that you're going to give today is being recorded in several ways.  It's being stenographically recorded, so there will be a written transcript that results, and it's also being videotaped.

Page 9

The written record may be presented later in court or used for any other purpose under the Civil Rules of Procedure or as authorized by state and federal law.

Do you have any questions about that?

A.    No.  Thank you for that -- that information.

Q.    Are you committed to testifying truthfully today to my questions?

A.    Yes.

Q.    I'm sure you are well prepared by your counsel who is defending you today, and others, on what to expect, but I do want to go over the general rules of the deposition --

A.    Please.

Q.    -- so that we have the ground rules on the record and we're all on the same page.

First of all, your responses do have to be verbal.  In normal conversation as we go along, it -- it might become -- it might become comfortable to just say "uh-huh" or "nah," or nod your head or shake your head --

A.    Sure.

Q.    -- so if that happens, I'll just go back and ask you for a verbal response --

A.    Yes or no.

Q.    Correct.  And that's just so the court reporter is able to record your responses accurately.

And the other thing that can happen, and I think it may be happening a little bit already, because you're anticipating what I am saying, is talking over each other.  And so we'll just have to be careful about that, and that's also for the court reporter, because we'll understand each other, but the court reporter can't take down two people speaking at the same time.  So I'll do my best to wait for you to finish and would just ask that you do the same.

In addition, your counsel is going to be making objections and that will also be to preserve the record.  So you'll still need to answer a question if your counsel objects, unless your counsel tells you, "I object and you are not to answer."  So it will go question, objection, answer, and we may have to go back and lay that out again on the record if things get jumbled up.

Do you understand that?

A.    Yes.

Q.    Okay.  Is there anything that would affect your memory today?

A.    No.

CONFIDENTIAL

Page 11

Q.    Okay.  Did you get a good night of sleep last night?

A.    For the most part.

Q.    And we're here in the law office of Berger Seigerman -- Singerman for your deposition.

Are you represented by counsel today?

A.    Yes.

Q.    Okay.  And who is your counsel?

A.    Chris, to my left.

Q.    And is Chris with Wilson Sonsini?

A.    Yes.

Q.    Do you understand that Wilson Sonsini represents Google and YouTube in this litigation?

A.    Yes.

Q.    And do you consider that your interests and Google's interests are aligned for purposes of the litigation?

A.    Yes.

Q.    Okay.  Do you understand that if your interests and Google's interests diverge over the course of the deposition, that it's your obligation to tell the truth regardless of whose interest that serves?

A.    Yes.

Q.    Have you spoken to anyone about your

CONFIDENTIAL

Page 12

deposition other than your lawyers?

A.    Yes.

Q.    Okay.  Who have you spoken to?

A.    My assistant who knows that -- that the deposition scheduling-wise is occurring, my wife to know where I am today, and my -- my son to know where -- where I'm going to be today, because I'm not picking him up from school today.  Let me think.

I also mentioned to some -- someone at work that I won't be able to make a call -- sorry -- that I was not able to make a call because I am prep- -- prepping for a potential deposition -- prepping for a deposition.

Q.    Okay.  I'm sorry, who was that?

A.    Yesterday it was -- I'm sorry, not yesterday.  Early -- it was ▇▇▇▇▇▇ -- ▇▇▇▇▇▇ -- ▇▇▇▇▇▇ on our team.  I can't -- I can't think of last names right now.

Q.    No problem.

A.    Yeah.

Q.    Let me ask this.

A.    Yeah, yeah.

Q.    Any of these people that you spoke to, did you discuss the substance of your --

A.    Oh, no.  No, no, no, no, no, sorry.  I

CONFIDENTIAL

Page 13

just -- all -- I'm going through all of the different people who I've told from a scheduling standpoint that I will be, but no, I have not discussed the substance.

MR. CHIOU:  Dr. Graham, I want you -- if you would please let Ms. Haileselassie finish her question before you respond.  Thank you.

BY MS. HAILESELASSIE:

Q.   It's bound to happen --

A.   Yes --

Q.   No problem.

A.   -- yes, sorry.

Q.   We'll -- we'll learn as we go.

A.   Sorry, let me -- let me go slower.  I apologize.

Q.   Sure.  Was there ever any discussion of this litigation generally amongst you and your colleagues at Google?

A.   About my deposition or about depositions in general?

Q.   Well, about this litigation in particular.

A.   Oh, about this litigation.

Q.   Um-hum.

A.   I think over the -- maybe over the past year or so, this may have come up at different points that this litigation is occurring.  So I -- I'm -- I

Page 14

am -- because, I mean, I am very aware of this litigation clearly, other than this deposition, so I would say that, yes, in general there has been conversation about -- about this litigation.

Q.    Do you recall when you first learned of the litigation?

A.    I don't remember when, but what I remember -- I don't remember exactly when, but I remember in a meeting at somewhere and somebody saying, you know, there is this lawsuit against -- against YouTube or YouTube being included in a lawsuit or something along those lines.  This -- yeah.

Q.    Do you have an understanding of what this litigation is about?

A.    Yes.

Q.    What is your understanding?

A.    The plaintiffs are alleging harm via social media products.

Q.    Do you -- do you understand what kind of harm is being alleged?

A.    The harm is addiction, is being -- being alleged is addiction.

Q.    Okay.  Have you ever been deposed before?

A.    No, I have never been deposed before.

Q.    How many times did you meet for -- with

CONFIDENTIAL

Page 15

your counsel to prepare for today's deposition?

A.    Maybe -- roughly maybe five or six meetings, roughly, maybe six.

Q.    Can you give me a sense of the total time you spent in those meetings?

A.    Do you mean the total times per hour -- I'm sorry -- per -- total hours per meeting?

Q.    Sure.  How long was each meeting?

A.    Yeah.  We met initially for a couple hours maybe the first four meetings, and then this past Monday we met for maybe six hours, seven hours, something -- maybe more seven hours.  Let me do the math here.  Because Monday was maybe seven or eight hours, and then yesterday was maybe five hours. Five, yeah.

Q.    Okay.  And how long did you say the first four meetings were?

A.    Probably about -- the first one was one hour, and then the others, if I remember correctly, was maybe two hours.

Q.    So I'm terrible at math myself.

A.    Me too.  Well, that's why I'm doing the math --

Q.    But it sounds like it may have --

A.    Sorry, I was speaking over you.

Page 16

Q.    I think we were both doing it that time.

It sounds like it was about 20 hours that you were preparing for your deposition.

Does that sound accurate?

A.    That sounds roughly accurate.

Q.    And during your preparation, do you know approximately how many documents you reviewed?

A.    Do you consider if -- if there was a -- a folder that had tabs, do you consider the folder a document or each tab a document?

Q.    Each individual document.

A.    Each individual, okay.

Q.    An approximation is fine.

A.    Yes.  No, no, so I know.  Probably, I'm -- I'm approximating, maybe 15, I -- I think.

Q.    Okay.  Did the documents you reviewed refresh your recollection for purposes of this deposition?

A.    Some of them did.

Q.    Okay.

MS. HAILESELASSIE:  And I'll just ask your defending counsel to confirm for the record that everything Dr. Graham reviewed has been produced in this litigation?

MR. CHIOU:  That's correct, Ms. Haileselassie.

CONFIDENTIAL

Page 17

MS. HAILESELASSIE:  Thank you.

BY MS. HAILESELASSIE:

Q.    Did you take any notes in preparation for your deposition?

A.    No.

Q.    Have you reviewed any of the plaintiff's complaints in this case?

A.    If I'm understanding your question correctly...

Q.    I can clarify.

A.    Please.

Q.    There are individual complaints that have been filed in courts throughout the country.  There's also a master complaint.  So I am referring to any of those, whether you've reviewed the individual complaints for a single plaintiff or the master complaint?

A.    Oh, I have -- oh, I -- I understand what you mean now.  Yes, I have seen the complaint document.

Q.    Okay.  The master complaint for the multidistrict litigation?

A.    Yes, I think that it was the master complaint.

Q.    Okay.  Thank you.

CONFIDENTIAL

Page 18

For the most part in this deposition, we're going to be talking about YouTube and YouTube platforms, but for the record, Google and YouTube are both defendants.  So if I say "Google," I'm talking about Google and YouTube unless I specify otherwise, and if I just say "YouTube," I'm just talking about you -- your work on YouTube, the platform.

So can -- can we a- -- agree that we'll just use that terminology?

A.    Yes.

Q.    Okay.  I'm going to show you Tab A, which we'll have marked as Exhibit 1.  It's your notice of in-person videotaped deposition.

(WHEREUPON, a certain document was marked Google/YouTube-Graham-1, for identification, as of 03/05/2025.)

BY MS. HAILESELASSIE:

Q.    Have you seen your deposition notice before?

A.    Yes.

Q.    Okay.  That's my only question for that one, so you can put that aside.

Where do you currently live?

A.    In Davie, Florida.

Q.    Okay.  I -- I want to talk a little bit

about your background.  What post-secondary degrees do you hold, and what institutions did you receive them from?

A.    I have a master's in public health from Yale School of Public Health, and I have a medical degree from Yale School of Medicine.

Q.    And what year did you graduate from medical school?

A.    2001.

Q.    Did you complete an internship prior to your residency?

A.    Yes.

Q.    Where did you complete your internship?

A.    Massachusetts General Hospital in Boston.

Q.    Okay.  And what was your area of focus in your internship?

A.    Internal medicine.

Q.    Where did you complete your residency?

A.    Also at Massachusetts General Hospital in Boston.

Q.    And what was your specialty?

A.    My overall specialty is cardiology, and I'm also trained in internal medicine.

Q.    Okay.  Did you complete any fellowships?

A.    Yes.

Q.    Where and when did you complete fellowships?

A.    I completed a fellowship at Johns Hopkins, which I completed in 2011, and an interventional fellowship that I completed in 2012, although I may be off -- I may be off by a year or so.

Q.    Your first fellowship at JHU, was that specialized to the area of cardiology?

A.    Yes.

Q.    And the interventional fellowship, can you tell me a little bit more about that?  I'm just not familiar with --

A.    Oh, sorry --

Q.    -- the term.

A.    -- yes, yeah.  It is where you're learning about arteries and putting stents in arteries or managing acute coronary syndromes and managing interventions to improve blood flow during acute coronary syndromes.

Q.    Okay.  Are you board certified?

A.    Yes.

Q.    In -- in which specialties?

A.    Internal medicine and cardiology.

Q.    And when did you first receive board certification?

Page 21

A.    I don't remember the exact dates.

Q.    Okay.  Is your certification current?

A.    Yes.

Q.    Do you re- -- recall when you last renewed it?

A.    For general cardiology, I am on something called a longitudinal renewal, which occurs over five years.  You take multiple tests.  So I am in I think year three of my five-year renewal for general cardiology.

And for internal medicine, let me see, it's every ten years, and I think it's through 2026.  So I must have renewed in 2016, because I know I'm up for renewal for internal medicine in 2026.  So it must -- it must be 2016, roughly.

Q.    Okay.  Have you received any additional degrees, certifications, or specialized training that's relevant to your work with YouTube?

A.    I -- I also teach a course at the Harvard School of Public Health, actually, but in doing that, I prepare for the course.  But -- but your -- no, no, the answer to that is just no, no actual other specialized training.

Q.    Okay.  What is the course that you teach at Harvard?

Page 22

A.    Leadership in health equity.

Q.    Can you please -- you've given us your title.  Can -- can you please describe your current employment?

A.    I work at YouTube, and I am -- my job is to work on getting high-quality health content on the YouTube platform as well as to work on policies around health information and work with different teams on health-related topics.

Q.    Okay.  Which teams do you work with?

A.    I work with the -- the Health team that's at Google.  I'm -- I work with the -- the Google AI Research teams.  I work with the Responsibility Product team.  I work with the -- the Marketing team, the Communications team.  I work with the Trust and Safety YouTube team.  I work with the -- the Youth Partnership team.  I work with the Youth Product team.

I work with -- comms, marketing.  I work with the governor -- Government Affairs and Public Policy team, the GAPP team.  Comms, GAPP, Product, T&S.  Those are the ones that I can recollect -- recollect now off the top of my head.

Q.    Do you think there might be more?

A.    Give me a second.  Let me think of -- of other play -- parts that we work with.  Product, I

Page 23

mentioned T&S, Google Health, Research.

I work with the -- the regional teams, so the Canada team, the Brazil team, the -- the -- the country leads in, you know -- you know, I'm sorry, the country teams in any particular country, in India or, you know, the -- or the UK, you know, other countries. I work with the Learning Partnerships team. I think I mentioned the Youth Partnerships team. The -- we work with the Civics/News Partnerships teams.

I think -- I think that is -- that is most of it. I mentioned youth, learning. It's -- yes, I think -- I think that is most of it.

Q. Are there any teams that you can think of that you don't work with at Google?

A. Don't work with. One second.

There are teams that work on marketing products, or there are teams that work on revenue-generating components within YouTube that we -- we don't work with. And because I don't work with them, I don't even know a lot of who those people are or what those teams do, but I would say being primarily focused on the responsibility end, I -- I don't work with the -- I don't work with the ads or -- or revenue side of -- of YouTube.

Q. That's helpful.

CONFIDENTIAL

Page 24

A.    Yeah.

Q.    Fair enough.

Okay.  So --

A.    And I'm -- and -- and within that, there may be a lot of -- oh, sorry, I didn't mean to cut you off.  I apologize.  That's part of it.  Let me learn a little pause.

Sorry.  Sorry, I'm really sorry.

Q.    So I think I was hearing that there may be some stratification that you're not aware of beneath revenue, is that accurate?

A.    Yes.  My point in saying that is I don't know much in that world, so I'm -- so -- so there was a lot going on.  Because my work is primarily focused on the responsibility end, I don't know what -- what -- and -- and I want to caveat this because if I -- if one of those people may have sent me a question over the years, I may not even know who they are in answering that.  So I wanted -- that's why I was trying to caveat the answer in that, because I don't know.  I can just say to the best of my knowledge, you know, I don't work with them.

Q.    Okay.  That's -- that's fair enough.  What states -- actually, let me follow up on that real quickly.

CONFIDENTIAL

Page 25

When did you first start working at -- at YouTube?

A.    April of 2020.

Q.    And had you ever been employed with Google before that?

A.    No.

Q.    Has your title changed during the course of your employment or has...?

A.    The role -- the role and title hasn't changed except that when I first started, You- -- YouTube Health as an entity wasn't -- wasn't built, and so one of the things I've kind -- kind of added to my title is saying the head of YouTube Health.

And, you know, as we've kind of coalesced YouTube Health as a -- as a concept, that's when we kind of added that part.

Q.    Okay.  Thank you.

In what states are you currently licensed to practice medicine?

A.    Florida, Missouri, Connecticut, Maryland, and North Carolina.  Wait a second.  Hold on.  I'm sorry.  Give me one second here.  Let me -- I just --

Florida, Missouri, Connecticut I know I renewed, Maryland, and North Carolina, yes.

Q.    Okay.  And you mentioned something about

Page 26

Connecticut.  Have all of your licenses been continuously maintained since they were issued?

A.    Yes.

Q.    Okay.  And have any of your licenses ever been suspended, revoked, or restricted?

A.    No.

Q.    Have you ever been denied --

A.    One license.  There was one license that I did not renew, which is Massachusetts.

Q.    Massachusetts --

A.    Yeah --

Q.    -- okay.

A.    -- when I left -- when I left residency, I didn't renew -- renew Massachusetts.

Q.    Okay.  That's what I heard.  I --

A.    Yeah.

Q.    I thought it was Connecticut, but --

A.    Yeah.

Q.    -- so --

A.    No.

Q.    -- Massachusetts you didn't renew?

A.    Massachusetts, I didn't -- I didn't renew, but Connecticut, yeah, because I just recently renewed Connecticut.  Yes.

Q.    Okay.  And have you ever practiced in a

CONFIDENTIAL

Page 27

hospital setting?

A.    Yes.

Q.    When was that?

A.    I practiced at Massachusetts General Hospital as a hospitalist in, I want to say this was 2008 to 2011 or so; and at the University of Florida from 2011 to 2013, at -- at Shands University Hospital in University of Florida; and -- and as a trainee at -- at Johns Hopkins as well and Massachusetts General, I should have said that.

What did I just tell you, Mass General -- oh, I know the other one.  I also practiced at Lawrence -- Lawrence General Hospital in Connecticut. I can't remember the name of the town in Connecticut. Oh, and then I also -- oh, I also practiced at St. Luke's Hospital in Missouri.

Q.    And in all of these, excepting JHU, were you practicing as a generalist?

A.    At -- at -- at St. Luke's, I was practicing as a cardiologist, a general -- is that what you mean, general cardiology or general medicine?

Q.    Well, I'm -- I'm really just trying to determine what -- what exactly you were doing in those positions --

A.    Oh, okay.  Sure.

CONFIDENTIAL

Page 28

Q.    -- so.

A.    No problem.

So general cardiology at St. Luke's and general internal medicine at Mass General and University of Florida; and hospitalist/general internist at Lawrence Memorial.

Q.    Thank you.

Have you ever been denied hospital privileges or had privileges revoked or restricted?

A.    No.

Q.    Have you ever worked in the area of mental health prior to your work with YouTube?

A.    I think as a general internist, you take care of patients who have mental health challenges. So -- so I have taken care of patients -- and maybe not as a cardiologist, but more as a generalist, I have taken care of patients with -- with mental health problems.

Q.    Have you ever received any training specific to mental health?

A.    No.  Other than the training you get as a general internist to take care of mental health problems.

Q.    In your work with YouTube, are there professional guidelines or standards that you apply?

CONFIDENTIAL

Page 29

A.    I need more clarification for that question.

Q.    It seems that your work with YouTube is fairly broad, would you agree?

MR. CHIOU:  Objection to form.

You may respond, Dr. Graham.

BY THE WITNESS:

A.    I don't know what you define as "broad."

BY MS. HAILESELASSIE:

Q.    Are you advising on a wide range of issues in your position?

MR. CHIOU:  Objection to form.

You may respond, Dr. Graham.

BY THE WITNESS:

A.    I am advising on -- on a set of health-related issues, and I guess I -- I'm not sure I would consider them wide ranging, but I am advising on a set of -- of health issues.

BY MS. HAILESELASSIE:

Q.    What health issues do you advise on?

A.    So, for instance, we've -- through COVID, we did a lot of work related to the COVID pandemic, issues around, you know, quality content that may be around -- some of it is around mental health; some of it is around general health outcomes and to, you know,

what degree, you know, the -- the quality of the -- of our content is -- is, how we would be high quality overall.  And so I would say that I advise on a variety of different health topics.

Q.    What percentage of your time at YouTube do you think that you are advising on mental health topics?

A.    Currently or over time?

Q.    Well, let's start with currently.

A.    I would say currently, maybe 50 percent.

Q.    Was there ever a time that it was more than 50 percent since you've been employed with YouTube?

A.    No.

Q.    Can you recall which year you advised the least on -- on mental health?

A.    I would probably say, the beginning when I started we were very focused on COVID, so to the degree the conversation -- I'm sorry -- to the degree that the work was very much focused on managing information on the platform around the COVID pandemic, it was -- it was -- particularly in those early years, it was -- it was -- it was mainly COVID.

But I want -- go ahead.

Q.    How do you stay -- how do you stay current

Page 31

with developments in the field of mental health?

A.    I read what's coming down with -- in journals, I talk about with colleagues.  We have colleagues in Google Health that are primarily focused on mental health, so we exchange information.

I get a lot of journal updates, you know, and so when they're mental health related journal updates, I may click into that.  I read, you know, policy reports as they are unfolding and -- and often check the references and try to read the studies that may be referenced in the report.

So I'm -- so -- so I know what the -- the pertinent studies and data are.  You know, if I go to a conference and I'm speaking on a panel or something, I may, you know, have a conversation with a mental health expert on the panel or -- or make sure to -- to, if I have time, go and, you know, watch what -- what an expert is saying on a particular topic.

So I think between either perusing on the journals or -- or seeing what's coming out with current information, sometimes I may, you know, once I go to a reference of something, then I may PubMed or look through another set of research points to get some more general sense of -- of a particular topic.

Q.    Before you started working at YouTube, did

you ever attend a professional conference or a medical seminar on mental health?

A.    I did.

Q.    Can you recall what the specific substance of the conference was?

A.    The one I remember, just randomly, was -- this is -- this would have been in 20- -- 2012, 2013, '14, around then.  I went to a conference in San Diego that was a forensic -- forensic child psychiatry conference and heard some presentations on, you know, forensic child psychiatry.

Q.    Okay.

A.    That's an example, but I will tell you there are other -- oh, I'm sorry, I didn't want -- I didn't mean to cut you off.

Q.    Oh, what is forensic child psychology --

A.    Oh, forensic child psychology -- forensic child psychiatry -- psychiatry is -- is the field of looking at pathologic -- pathologic psychiatric illnesses that a young person -- and this is because this is child psychiatry, that a -- that a child may experience that may lead to criminal outcomes and may -- you know, may -- may impact -- I'm sorry, I'm sorry -- may lead to legal or -- or criminal outcomes, is -- is kind of the forensic part of the child

Page 33

psychiatry.

So if somebody has, you know -- if there is, like, a child who has done a child shooting or something along those lines, that would fall into that area, that field.

Q.    Were you a speaker at that conference?

A.    No, I was not.

Q.    And since you've been employed with YouTube, have you attended any professional conferences or medical seminars on mental health?

A.    I have because I have -- I just -- I may not remember.  It's -- I go to a different place so often.  I have, though I don't remember conferences specifically, in general.

Q.    Are there any that you've spoken at or presented at?

A.    There possibly -- I am not sure.  I don't -- I don't remember.  I would have to -- I -- I don't remember.  Let me -- give me one second.  Let me think about this some more.

I don't -- what's coming to mind is like recently I spoke at the Milken Institute conference on -- and they were -- the conference was on mental health and -- mental health and impact -- and technology and impacts of mental health on -- on

children, or something along those lines was the topic.

That was probably -- what are we now, March.  I want to say that was in November or December.  That's why I'm having some degree of recency bias.  I am -- and let me -- give me a second. Let me think through some more for --

Q.    Well, let me --

A.    Oh, please.

Q.    -- ask you about that one while --

A.    Yeah.

Q.    -- while you see if you can think of any others.

At that conference, what was your topic that you were presenting on?

A.    At that conference, I think the Milken Institute was presenting a report that they had made, and they were -- and -- and the -- people were just talking about -- sorry.  People were talking about technology and -- and -- and children and -- mental health and children.

Q.    Do you recall if this conference took place during the pendency of this litigation?

A.    It was in November, which I think -- I'm -- I'm not sure when the litigation started.

Page 35

Q.    Was --

A.    I think it was in November.  I think it was in November.

Q.    Was the conference open to the public?

A.    I don't think so, because I remember now, it was -- it was in -- it was an in- -- invited conference.  Like, Milken was inviting people to the conference.

Q.    Okay.  And what was the report about?

A.    The report in general was about social media and kids' mental health.

Q.    Were there any findings or conclusions?

A.    I think overall the report was saying that there were positives and negatives and that policymakers and -- again, to the best of my recollection of this, policymakers and the world needed to be -- there needed to be continued research that needed to be done and that policymakers should be aware of -- of the research and the facts along those lines.

Q.    Did the report offer a litera- -- a literature review?

A.    It did.

Q.    Were there any policymakers in attendance?

MR. CHIOU:  Objection to form.

Page 36

You may respond, Dr. Graham.

BY THE WITNESS:

A.    I am not sure who was in attendance.

BY MS. HAILESELASSIE:

Q.    Did you know any of the attendees?

A.    I did.  I knew or -- knew or knew of the people on the panel with me.

Q.    And who -- who else was on the panel with you?

A.    On the panel, on the panel was the head of -- of one of the centers in SAMHSA, in Substance Abuse and Mental Health Service Administration, HHS. I'm -- I'm blanking on her name right now.  She is head of one of the centers.  But also on the panel was Mark, head of the executive director of the American Academy of Pediatrics.

And then the other person on the panel was a person in the private sector who had worked on a company around mental health and kids.  I -- I did not know him before, and -- and I'm not familiar with the company.  And in the audience I remember was Harold, the last name I'm blanking on, who is president of the Child Mind Institute.  Yeah.

Q.    Okay.  And for clarification, did you -- did you present independently at the Milken

CONFIDENTIAL

Page 37

conference?

A.    I was on the panel.  I was speaking on the panel.  Is that what you mean when you say independent?

Q.    Well, did you have a presentation independent of the report?

A.    No.  I just -- I spoke.  I just spoke.  I did not have a presentation.

Q.    Okay.  Do you recall generally what your remarks were?

A.    Yep.  I spoke about why I cared deeply about this issue, I spoke about working on health disparities because -- I spoke about working on health disparities because I have personally experienced health -- health inequities in my life, and -- and I spoke a lot about always tackling -- wanting to tackle challenging problems.

And then I spoke about why this issue is a challenging problem and that it's multifactorial and that we at YouTube were committed to -- to issues around -- issues around mental health and teens and other communities.  And I spoke about that -- I think -- oh, I know what it -- the main thesis of my -- the main thesis of my -- of my talk was that this was a true -- now I remember.

CONFIDENTIAL

Page 38

The main thesis of my talk was that having worked on health equity in the past, I -- I am not afraid of challenging problems and that I feel very -- I am very passionate about how we bring all of our forces to bear on a particular challenging problem.

And then I segued from health equity into talking about issues around teen mental health and that it was multifactorial problem that was -- needed attention from the -- the public health community, the tech community, meaning companies like ours, you know, the government working -- you know, like, work -- working with SAMHSA and working with other NGOs, and that we should work across silos in general, and that in -- overall in healthcare that there were so many silos in healthcare, and this is one challenge that we should be working across silos in healthcare.

That was a very long answer.  Sorry.  It took me a while to just remember everything about the conversation.

Q.    Understood.

Did you present conclusive scientific evidence that YouTube does not cause mental health issues at that conference?

A.    No.

Q.    Did you present conclusive scientific

CONFIDENTIAL

Page 39

evidence that YouTube does not contribute to mental health issues at that conference?

A.    No.

Q.    Okay.  At this time I want to pull up Tab B and mark it as Exhibit 2.

(WHEREUPON, a certain document was marked Google/YouTube-Graham-2, for identification, as of 03/05/2025.)

BY MS. HAILESELASSIE:

Q.    And I've handed you what's been marked as Exhibit 2.

A.    Yep.

Q.    I really just have one question on this one as well.

Is this your current public LinkedIn profile?

A.    Yes.

Q.    Okay.  You can put that one aside.

Do you recall during your time at YouTube if you've ever received complaints from parents regarding their children's usage of the platform?

A.    Me directly?  Something that has come to me?

Q.    Something that has come to you directly or something that has been brought to your attention.

CONFIDENTIAL

Page 229

BY MS. HAILESELASSIE:

Q.    I am going to have Tab QA marked as Exhibit 18.

(WHEREUPON, a certain document was marked Google/YouTube-Graham-18, for identification, as of 03/05/2025.)

BY MS. HAILESELASSIE:

Q.    I'm showing you what's been marked as Exhibit 18.  This is a document Bates-numbered 04341733.  It is titled "Health 2 pager."  It was produced from your custodial file by Google's attorneys with the last modified date of February 23rd, 2023.

Do you have any reason to disbelieve that this document is what it purports to be?

A.    No, I don't have any reason to believe it's not.

Q.    Okay.  Turning to the bottom of the page ending 1735, do you see the section titled "2023 Success Metrics"?

A.    Yep.

Q.    Okay.  Do you recall that I asked you if you knew how YouTube measured the success of VIBE per the efficacy?

A.    Yes, I remember that.

CONFIDENTIAL

Page 230

Q.    Okay.  Do you see under "2023 Success Metrics" the bullet point, second from the bottom that says, "XX percentage reduction in VIBE impressions"?

A.    Yeah.

Q.    Okay.  And then there is a comment connected to that line.  It says, "My understanding is that harm from VIBE content is in repeated viewing.  Wouldn't a better metric be something like 'percentage sessions with too much VIBE content'"?

Do you see that?

A.    I do.

Q.    Okay.  Is -- does the metric proposed by the commenter seem like a better metric than the one already suggested under the 2023 Success Metrics?

MR. CHIOU:  Objection to form.

You may answer, Dr. Graham.

BY THE WITNESS:

A.    I can't answer that because I'm not sure -- I am not sure what the commenter was trying to get at in general, and so I don't know.

BY MS. HAILESELASSIE:

Q.    Have you seen any metrics reported for VIBE that are reported in the form of reduction in VIBE impressions outside of this document?

A.    I have not seen any -- any, no.

CONFIDENTIAL

Page 231

Q.   Okay.  Do you -- do you have any idea whether the 2023 success metrics used for VIBE, this reduction in VIBE impressions to measure success?

A.   I'm -- I'm sorry, can you repeat that again?

Q.   Sorry.  It appears they haven't plugged in the actual percentage --

A.   Yeah.

Q.   -- so I'm wondering if you know if this is ultimately how YouTube ended up measuring the success of VIBE, by looking at the reduction in VIBE -- in VIBE impressions?

A.   No, I don't know, and in looking at this, I am not -- I think this is a draft document, and I am not sure where -- where this draft went.

Q.   Okay.  We can put that aside.

I'm going to have Z -- Tab ZB marked as Exhibit No. 19.

(WHEREUPON, a certain document was marked Google/YouTube-Graham-19, for identification, as of 03/05/2025.)

BY MS. HAILESELASSIE:

Q.   I'm showing you what's been marked as Exhibit 19.  This is a document Bates number ending 04347047, and the title is "H1 YT Biz Team Meeting

CONFIDENTIAL

Page 232

Dory Brief - 02.14-24."

It was produced by Google's attorneys from your custodial file.  The date on the face of the document is February 14, 2024.

Do you have any reason to disbelieve that this document is what it purports to be?

A.    No, I don't have any reason.

Q.    What is a "Biz Team Meeting Dory Brief"?

A.    So what I -- what this is, is -- what I think this is, I haven't seen it in this format before, but what I think this is, is a -- there is a biz staff meeting and this is a -- a brief on the -- on the questions that are being posed.

Q.    Okay.  And if you turn to the page ending 7048, do you see your email listed at the bottom of the chart under "Exec on Call"?

A.    Um-hum.

Q.    And then under RSVP, it says, via GBC?

A.    GBC.

Q.    What is GBC?

A.    Video.

Q.    Okay.  And does your appearance on this chart mean that you were on the call and able to answer questions?

A.    It says -- it says -- it -- it is saying

Page 233

that I plan -- RSVP to be on -- on this call.  Some of them I have ended up missing even though I was RSVPing for them.  So I don't know what happened in this one.

Q.    Okay.  If you'll turn to the page ending 7051.

A.    Yep.

Q.    Do you see the last question?

A.    Yep.  "Thanks for discussing" --

Q.    Can you read that out loud?

A.    Yep.

"Thanks for discussing teen safety within the responsibility pillar.  Recently, several parents mentioned not allowing their kids/teens to use TikTok, but are finding their kids using YouTube Shorts in similar ways.  Are any parental control options being considered for Shorts specifically?"

Continue to read or just a question?

Q.    So I actually have a question here because there is a hyperlink and it says "Who will respond."

A.    Yeah.

Q.    And it has an email for ███████.

A.    Yeah.

Q.    Do you know who that is?

A.    ███████ is the current VP over responsibility.

Q.    Okay.  And then the fourth bullet point says, "Later last week" -- "later last year we launched VIBE in Shorts."

A.    Um-hum.

Q.    And the second bullet from the last says, "Since launching in Shorts in Q4 such VIBE has reduced these recs by" -- I actually don't know whether this is negative ▉ percent.  That, like, almost doesn't make sense, but what do you think?

A.    I think that's a thingy, like an approximation.

Q.    Okay.  So --

A.    I think.

Q.    So by -- by 2024, VIBE had lost -- launched in Shorts, and is it accurate that the metric YouTube had decided on -- for measuring VIBE success, at least in this context, was a percentage reduction in VIBE impressions?

MR. CHIOU:  Objection to form.

You can answer, Dr. Graham.

BY THE WITNESS:

A.    I -- I am not sure what the product team was using, so I can only guess based -- based on what I see here.

BY MS. HAILESELASSIE:

CONFIDENTIAL

Page 235

Q.    Okay.  Well, the way that they have reported it here is by the percentage reduction in recommendations, correct?

A.    (Reading to self.)

These recs...  I'm sorry, what was the question you asked me?

Q.    Well, maybe it will help if we look at two -- two bullet points up from those --

A.    Yeah.

Q.    -- where it says "reduces content."  This is under -- under the bullet point that says, "Later last year we launched VIBE in Shorts."

And then the next bullet point says, "Reduces content experts have told us could be negative for teen wellbeing if seen in volume."

And then underneath that, it says, "For example, certain beauty videos that create a negative social comparison for a teen."

And then underneath that, it says, "Since launching in Shorts in Q4 such VIBE has reduced these recs by ███ percent."

So doesn't it look to you that they've reported the efficacy of VIBE on Shorts by reporting the number of reduced recommendations?

MR. CHIOU:  Objection to form.

CONFIDENTIAL

Page 298

REPORTER'S CERTIFICATE

I, JULIANA F. ZAJICEK, a Registered Professional Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination of the witness herein, the witness was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my availability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand on this 17th day of March, 2025.

*Juliana F. Zajicek*

JULIANA F. ZAJICEK, Certified Reporter