# AMENDED Exhibit 1042

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/         )
PERSONAL INJURY PRODUCTS      )   MDL No. 3047
LIABILITY LITIGATION          )
                              )
                              )

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VIDEO-RECORDED
30(b)(1)
DEPOSITION OF JOHN HEBDA
(Pages 1 - 239)
Held at Wilson Sonsini Goodrich & Rosati
One Market, Spear Street Tower
San Francisco, California
Wednesday, March 19, 2025, 9:22 a.m.
- - - -

REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

Page 7

THE VIDEOGRAPHER:  Good morning.  We are now on the record.  My name is Miguel Concepcion and I'm a videographer for Golkow.

Today's date is March 19th, 2025, and the time is 9:22 a.m. Pacific time.                    0

This deposition is being held at Wilson Sonsini in San Francisco, California, in Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation for the United States District Court, Northern District of California.

The deponent is John Hebda in his 30(b)(1) capacity.

Remote counsel will be noted on the stenographic record.

Will in-person counsel introduce themselves beginning with the questioning attorney.

MS. CONROY:  Good morning, Mr. Hebda.

Jayne Conroy for the plaintiffs.

MS. HURD:  Ellyn Hurd for the plaintiffs.

MS. TRUONG:  An Truong for the plaintiffs.

MS. HARDIN:  Ashley Hardin on behalf of the Google defendants and the witness.

MS. YOUNG:  Sophia Young on behalf of Google and YouTube.

MR. KRAMER:  Andrew Kramer on behalf of

CONFIDENTIAL

Page 8

Google and YouTube.

MS. NELSON:  Jordan Nelson from Google.

THE VIDEOGRAPHER:  Thank you.

After the court reporter introduces herself, she will swear in the witness.

THE REPORTER:  I am Elaina Bulda-Jones. My CSR Number is 11720.  I will be your reporter for today.

JOHN HEBDA, called as a witness by the Plaintiffs herein, being first duly sworn by the Certified Shorthand Reporter was thereupon examined and testified as is hereinafter set forth.

EXAMINATION

BY MS. CONROY:

Q.   Good morning, Mr. Hebda.

A.   Good morning.

Q.   Have you ever had your deposition taken before?

A.   I have not.  This is my first time.

Q.   Okay.  Well, it's painless.

A.   Thank you.

Q.   Really, the ground rules are try and wait for me to finish my question before you answer it. That's for Elaina's benefit so she doesn't try and

Page 9

figure out what both of us are saying at the same time, although she likely can.

Also, if you need to take a break just let me know or your counsel know. And the only thing I ask is that we not take a break between a question and an answer, okay?

A. Okay.

Q. So generally that's it.

If I ask a question, if you don't understand it but you still answer it, I'm going to assume you did understand it, so...

Otherwise, I think that's about it.

So let me ask you, where do you live?

A. I live in Oakland, California.

Q. Okay. So nearby?

A. Very nearby, yes.

Q. Okay. And have you ever read the complaint in this case? Do you know what a complaint is?

A. I'm not familiar with the legal term "complaint." I can assume what it is but I'm not familiar with exactly what it is and I had -- I saw it. I don't believe I've read it.

Q. Okay. And did you -- are you represented here today by anyone?

Page 10

A.    I am.

Q.    Okay.  By Ms. Hardin?

A.    By Ms. Hardin.

Q.    Okay.  And have you met with Ms. Hardin in preparation for this deposition?

A.    I have.

Q.    On how many occasions?

A.    Three occasions.

Q.    And were those in person or Zoom or telephone conference?

A.    Two in person and one via teleconference -- or -- well -- Google Meet.

Q.    Okay.  That's right.  I have learned --

A.    Yeah.

Q.    -- in these depositions.

A.    We don't use Zoom.

Q.    That's right.  I have to -- yeah.  So forgive me already.

A.    No, it's okay.

Q.    I will mess that up.

Okay.  What is your -- what is your role?  What's your job?

A.    I work at YouTube and I'm the senior director of product operations, claims, and compliance.

CONFIDENTIAL

Page 11

Q.    And how long have you held that title?

A.    Since 2016.

Q.    And where is your office located?

A.    San Bruno, California.

Q.    And do you go there every day or do you have a -- some remote or do you travel?  What's your general work life?

A.    We -- I'm in the office -- or I'm in California most of the time.  I travel occasionally. So last week, for example, I was in New York.

We have a hybrid work schedule at Google.

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████

MS. CONROY:  Let me mark as an exhibit your LinkedIn profile.  It might be a little bit easier.  We don't have to remember dates and things.

THE WITNESS:  Sure.

(Whereupon, Google-YouTube Hebda Exhibit 1 was marked for identification.)

MS. CONROY:  We'll mark that as Exhibit 1.

Q.    And you see there it says "John Hebda, Senior Director, Product Strategy & Operations, Claims, and Compliance," at YouTube.

That's what you just told me --

CONFIDENTIAL

Page 12

A.    Yes.

Q.    -- your current title is.

And so this is -- is this Exhibit 1 LinkedIn profile current, to the best of your knowledge?

A.    It is, yes.

Q.    Okay.  If we could -- you have listed here "Experience YouTube" for 11 years.

Do you see that?

A.    Yes.

Q.    Could you give me just an overview of how you came to be at YouTube back 11 years ago?

A.    Sure.

I was a consultant in the early part of my career and I joined Google in 2012 on a central strategy and operations team that supported Google's chief business officer at the time.

And in 2014, the chief business officer left to go join a different company, and I was thinking about what I wanted to do in my own career at Google.  And at -- I knew at some point -- my intention of coming to Google was to get deeper into one of the products or business units.

And I was approached by a colleague of mine with an opportunity at YouTube to be the chief

CONFIDENTIAL

Page 13

of staff for -- at the time their head of engineering and the CEO.  And it sounded like an interesting opportunity.

So I had a few conversations, one thing led to another, and then in 2014, I joined YouTube in that capacity in October I believe that year.

Q.    Okay.  What kind of -- can you give me a brief description of what you did at -- while you were at Google and with Google Sheets, what was your role or what were your responsibilities?

A.    Sure.

So I didn't -- I didn't work actually with Google Sheets or any of the individual products.  I worked in -- in a part of the organization we call the global business organization.  And that was the part of the organization that included the many-thousand-person sales teams, the marketing teams, and I believe at the time our partnership teams as well, so the folks who work on partnerships with other companies that partner with Google.

And my role was a few things.  First was to help manage the goal setting for that part of the organization.

Second was to help manage some of the performance management and monitoring for that part

of the organization.  So every week our chief business officer had to go tell Larry Page, the CEO at the time, how revenue was performing.  Were we meeting our targets, falling short of our targets, if -- you know, if we were meeting or exceeding or falling short, why, what was driving that.  And so we helped analyze all of that and help prepare the chief business officer for those.

And then we also led and executed a number of projects related to improving overall effectiveness of the organization.  And that could mean finding ways to improve advertising sales in certain regions of the world.  It could mean figuring out ways to better set up the organization for success.

Q.   Okay.  And so would it be fair to say, in effect, you sort of helped structure the goal setting?

A.   We --

MS. HARDIN:  Objection to form.

You may answer.

THE WITNESS:  We ran the process.  So the -- the individuals in the business unit, so the sales and advertising leaders or the partnerships leaders or the marketing leaders, they were

CONFIDENTIAL

Page 15

ultimately the ones who owned and were accountable for structuring the goals, determining which goals were the top priorities, et cetera.

BY MS. CONROY:

Q.   And when you -- when you started there, did you help to design that -- the process at all or was it already in place?

A.   When I started -- Google has had a goal-setting process, I think since -- it was created a long time ago, that was actually instilled upon by one of the folks on the advisory board, John Doerr, so it was very much in place, it was well-running.

And my -- my boss at the time, or my manager, had been running it within this organization and had made some tweaks along the way but it was -- it was very much running and I helped manage a lot of the day-to-day work.

Q.   Okay.  And then you went to YouTube in 2014; is that what you said, October 2014?

A.   That's correct.

Q.   And could you describe for me what your responsibilities were there at YouTube?

A.   So --

Q.   When you started.

CONFIDENTIAL

Page 16

A.    Sure.

When I started at YouTube -- I'll set a little bit of context just to help.

Susan Wojcicki, who was one of the early Google leaders, she had just taken over as YouTube CEO I think four or five months prior to me starting there.  And part of Susan taking over YouTube was to help really bring it to the next phase of its life.

It was a relatively young company at the time that still had a lot of the both employees but also processes from its startup days, which were great as YouTube was growing in its infancy but maybe not as robust as some of the processes in Google work at the time.

And so in my early days, I did a couple things as the chief of staff.  I helped run a lot of the big decision-making meetings at YouTube.  So I helped create some structure behind what we call product reviews, helped manage the agendas for those, which topics would come to product reviews for decision meetings.

I helped run and put more structure into the goal setting and OKR process at the time.

Q.    Let's just slow you down because --

A.    Sure.

Page 17

Q.    -- just for the jury's sake.

OKR.  What does that mean?

A.    Oh, excuse me.  I'm sorry.

OKR.  It stands for objectives -- objective and key results.  And it's -- it's a Google term.  Actually, I think it's now widely known in the industry.  But it effectively means goals.  So most companies, or hopefully all companies, set goals of some fashion.  And OKR is just Google's -- the term Google uses to describe the goals that we set for our teams, our company, our business units, and our employees.

Q.    Okay.  And so when you started, were you sort of bringing some of that goal-setting process from your experience at Google to YouTube?

A.    That's correct.

Q.    Okay.  And were you able to do that?

A.    We were.

Q.    Okay.  How long did it take you?

MS. HARDIN:  Objection to form.

THE WITNESS:  That's a good question.

It took a few years.  When I first came to YouTube, there were many different goals reviewed in different places.  And it took a few years to bring more structure to it so that it was both as rigorous

CONFIDENTIAL

Page 18

as we wanted it to be and as clear as we wanted it to be so the organization understood what the different goals were in the organization, which ones were more important than others.

BY MS. CONROY:

Q.   Okay.  I see you were chief of staff.  So you were -- I'm sure you had other responsibilities. But you were putting those processes in place from 2014 to 2016; is that fair?

A.   Yes.

Q.   Okay.  Then you became director of product strategy and operations.

Was that a promotion?

A.   It wasn't a direct promotion, no.  I stayed at the same job level.  It was a slightly -- it was a slight shift or evolution in responsibilities, I would say.

Q.   Okay.  And how did your responsibilities change or shift?

A.   Yeah.  So at that time, I was the only person at YouTube in a strategy and operations role supporting our product and engineering and design teams.  And when Susan, the CEO, came in I think she realized that there was a need for more support in this area.  And other Google teams had more

built-out functions that helped support the organization in these capacities.

And so at the same time, there were a lot of -- there was a lot of leadership change at YouTube. So eventually, our head of product was hired, Neal Mohan, who is now the CEO. With Neal came a woman, Jenny Flannery O'Connor, who was a bit more senior than I was, and she -- she set out to build -- build more structure and build an actual team for this function, product strategy and operations.

And I was appointed to lead part of that team and I started building out a team effectively from scratch into what is the team I lead now.

Q. And how would you describe that team that you were asked to build out and that you now lead?

A. Yeah. So I can tell -- I'll tell you what I do now. And you can tell me if you want me to go deeper in any place.

But the team has -- that part of the team has three functions. The first is that we support our product engineering and design leaders in what I call setting their near-term strategy, which means effectively in 12 months where do we want to be in this part of YouTube. How do we measure success.

CONFIDENTIAL

Page 20

So what are the things that we would want to measure in order to know if we have gotten there.  And more tactically, what does that mean in terms of goals.  So we support them in setting their goals for their parts of the organization.

The second thing we do is help monitor their performance.  So day in, day out, week in, week out, we help stay on top of how different metrics and goals are performing.  Are we on track, are we not on track.  If we're not on track, why, what's driving that.

And then the third part of what that team does is lead a number of projects, often analytical in nature and often in partnership with data scientists or others in the organization, to help improve our business in various areas.

And "improve" can mean a lot of things. It could mean reducing churn on our subscription products.  It could mean improving the amount of violative content we catch.

And so we do a lot of analysis to help our product and engineering leaders build the things they need to build to improve our products so we can deliver more value to users.

Q.    Would that -- when you say "improve

CONFIDENTIAL

Page 21

business," could that also include improving revenue?

MS. HARDIN:  Objection to form.

THE WITNESS:  Typically, no.  We -- most of the revenue analysis at Google is done within our ads and sales team.  So in my prior role when I was in a central Google team, we did -- my team did some of that work.

But with -- within YouTube, nearly all of our analytical work is focused on the product itself, things like user engagement, creator engagement.

BY MS. CONROY:

Q.   Is any of it focused on revenue?

MS. HARDIN:  Objection to form.

THE WITNESS:  Some -- we partner with our advertising teams in some cases on some projects that involve revenue.  But we -- to my knowledge, we haven't done anything definitely in the last few years directly focused on improving revenue ourselves.

BY MS. CONROY:

Q.   So that's not part of any sort of analytical or data science analysis that you're -- that you, yourself, are doing or overseeing?

CONFIDENTIAL

Page 22

A.    It's -- it's not part of work that we do ourselves.  We do -- our advertising teams, as I mentioned, they also have strategy and operations functions and data scientists like we do.  In order for them to do work on revenue growth and understand drivers of revenue growth they at times need to understand how the YouTube platform performs.  And so we will partner on some of those projects to help them understand how YouTube performs.

But we have not, to my knowledge, done any work directly on revenue by ourselves.  I don't know if that distinction makes sense.

Q.    When you said advertising and sales, is that a YouTube -- are those YouTube employees or are they part of Google?

A.    They are -- their reporting relationship is part of Google.  They report up through another organization.  Our ads organization is central within Google.  There is a team that is devoted to YouTube but they don't report directly to Neal Mohan.

Q.    Okay.  And do you have anyone that reports to you directly?

A.    I do.

Q.    And who is that?  Or how many people, if

CONFIDENTIAL

Page 23

it's easier?

A.    So I have -- my team today is roughly 70 people, and I have, I believe it's eight direct reports, all of whom manage teams of various sizes.

Q.    And can you give me a description of what those -- what kind of teams they direct?

A.    Sure.

So I have -- and can I clarify something?

Q.    Sure.

A.    When talking about revenue analysis, there -- the advertising revenue -- because Google or YouTube makes revenue from a few different sources.  We make revenue from advertising, which is the majority of our revenue.

We also make revenue from our subscription products like YouTube TV and YouTube Premium and YouTube Music and a small number of products.  We call them alternative monetization, or fan funding products, where you can support creators directly through subscriptions to their channels.

I should clarify that we -- my team doesn't do any of the advertising revenue analysis. We do a good amount of analysis on our subscription products to help grow those products, which, in turn, will of course generate revenue for YouTube.

Page 24

Q.   And do your teams also on occasion support some of the creators that you may ultimately receive revenue from?

A.   We do --

MS. HARDIN:  Objection.  Objection to form.

THE WITNESS:  Oh, sorry.

MS. HARDIN:  You may answer.

THE WITNESS:  We do analysis on our creator ecosystem as a whole.  So we don't -- my team doesn't support any creators directly but we will analyze which creators are getting more engagement, which creators are making more money than others, and understand if there's trends related to those.

BY MS. CONROY:

Q.   Okay.  Thank you.

I think you were going to tell me that -- a brief description of the teams that your direct reports oversee.

A.   Yes.  So I have -- it's five direct reports that lead different parts of the product strategy and operations area on my team.  And each one of those -- each one of those individuals is mapped to one or more areas of YouTube and so they

Page 25

support one or more product areas and senior leaders.

The second team is managed by one individual and that team is called the claims team and they manage all of the data that YouTube puts out externally outside of our walls. So they help provide data for things like senior interviews or press and PR, marketing to our sales and advertising teams when they need to share data with advertisers, or things like government transparency reports that we publish around the world.

Q. Do you call that the claims council?

A. We do. That's another term for it. We call it the claims team but it's referred to as claims council as well.

Q. And -- is it fair to say that the claims team, or the claims council, that's the data before it's -- goes public?

A. We had -- yes.

MS. HARDIN: Objection to form.

THE WITNESS: We have a cross-functional group of people, some of whom are on that team but some of whom are other functional leaders on our legal team, on our communications and PR team, on our marketing team. They make up the

CONFIDENTIAL

Page 26

cross-functional claims council.

The claims team is the specific team that reports to me that runs the processes and sets the policies for what we do and do not release.

BY MS. CONROY:

Q.   And along with data, does your team ever release text of any sort?

MS. HARDIN:  Objection to form.

BY MS. CONROY:

Q.   Or just -- when you say "data," what do you mean by "data"?  Maybe that's an easier way.

A.   Numbers and metrics.

Q.   Okay.

A.   We -- we are involved -- as I'm sure you could imagine, every -- everything that we, YouTube or Google, releases with numbers and metrics does include text.  And so in -- transparency reports are a good example, where we release reports to governments around the world.

Those all include some texts and descriptions related to the numbers that we're releasing and so we are involved in the release and management of approvals for both the -- in those cases, the text and the numbers.

Q.   Okay.  And does your -- the claims team,

or the claims council, is that global?

A.    It -- we manage all of the data globally, but the team is situated all in the United States.

Actually, we have a few members in Dublin as well.

Q.    Okay.

A.    So...

But mostly in San Bruno and New York.

Q.    But their responsibilities are worldwide?

A.    That's correct.

Q.    And the other five direct reports, what kinds of teams are those?

A.    So five of the seven -- five are on the product strategy and operations team, and they're the ones that are mapping into different areas.  One leads the entire claims team.  And then one leads our risk and compliance team.

Q.    And what does the risk -- what are the responsibilities of the risk and compliance team?

A.    The biggest responsibilities are to help program manage YouTube's compliance with new regulations that come in and impact us and ensure that we are staying compliant over time.

So what that means is helping document and manage all of the controls we have in place and test

those over time with individuals in the organization.

Q. And can you give me some examples of -- you have five that are on the -- what did you call it -- the product teams? I'm sorry.

A. Product strategy and operations.

Q. Okay. Can you give me some examples of the types of responsibilities they would have?

A. Those are the -- when I was describing that part of the team earlier, each one of those has -- and I'll describe it again -- but they have the same responsibilities but specific to an area of YouTube like our Music and Premium.

Q. That's what I wanted to understand.

So what -- I'm sorry to interrupt you.

A. No.

Q. But -- so some examples of the types of things that they would oversee.

So Music --

A. Sure.

Q. -- would be one?

A. Yes. So the -- they are each mapped to an individual area and I'll describe -- I'll give a few examples of those areas but then I can talk about the types of work that they do within them.

Page 29

So Music and Premium would be one. YouTube TV is another one. Our creator area is another one and the individuals work -- it's almost exclusively with those teams except in areas where we do, you know, work that spans multiple teams.

And they do the same things I mentioned earlier, which is help support those teams in setting their near-term direction and their goals and how we measure success. They help stay on top of the business, day in, day out.

We run a meeting. We run a series of meetings that are effectively what a lot of companies refer to as operating meetings where you will bring the leaders of those teams together at some regular cadence. And it varies by team. It could be every other week. It could be once a month.

And you will look at a number of metrics and key performance indicators to say are we on track against the things that we deemed are top priorities right now. And we'll show stoplight charts with red, yellow, green, and talk about we're doing well here and we're behind in these areas here and really dig in to why we're behind.

And we also, the third thing that those

CONFIDENTIAL

Page 30

folks do in each area are the projects that I mentioned earlier, which is a series of analytical or operational projects that help us improve performance in some fashion based on what's important in those areas at the time.

Q.   Okay.  And I think we'll see some of those documents as we go forward and I'll ask you some more specific questions about it.

But would it be fair to say that what you just described to me is the type of process that you brought from Google to YouTube?

MS. HARDIN:  Objection to form.

THE WITNESS:  We -- the type of process we have at YouTube is something we built over the years.  And we're constantly working to improve it. We did bring parts of it from Google, but I -- I would like to think that the team really, you know, improved upon it over time.

BY MS. CONROY:

Q.   And you oversee that now, as well as overseeing the claims team, or the claims council?

A.   Yes.

Q.   Okay.  What was your -- what were your responsibilities at Hustle Fitness as an advisor?

I'm looking at the...

CONFIDENTIAL

Page 31

A.    Oh.

Q.    Around the middle of your LinkedIn profile.

A.    Yeah.  This was a -- it was a fitness startup trying to provide services effectively for both players and -- youth players and coaches.  And it was started by somebody I knew through -- through a connection of mine, and I was providing strategic advice as the startup was trying to grow and unfortunately went under.

Q.    Okay.  But you were doing --

A.    Did not gain much speed.

Q.    You were doing that concurrently with your responsibilities at that time at YouTube?

A.    That's correct, yes.

Q.    And I see -- was PawnGuru something similar?

A.    Similar.  Yeah.  Very different type of a startup but similar capacity.  You know, advisory.  And it was very -- fairly infrequent.  Maybe calls once a month or every couple months.

Q.    And do you have any other current advisory relationships outside of YouTube or Google?

A.    Do I have -- not -- not that I know of.  I mean, I don't know if, like, coaching youth baseball

CONFIDENTIAL

Page 32

and softball is considered any kind of an advisory
relationship.  But nothing --

Q.   I wasn't really thinking of it that way.

A.   No.

Q.   I thought maybe you were going to give me
a tip on some great startup you were advising.

A.   I wish.

Q.   Okay.  And give me -- can you just give me
a brief description of what you did for Bain?  You
were there for eight years in Chicago and in Chile.

A.   Yes.  I was a consultant, and I worked at
a few different capacities starting as a junior
analyst and progressing up into a management
capacity.  And I worked on a variety of strategic
projects across a number of different industries,
everything from meatpacking to aerospace and defense
to technology to women's hair care, helping
companies grow, helping companies cut cost, mergers
and acquisitions.

And it was -- I loved it.  It was a
phenomenal start to my career that I thought taught
me a lot that has helped me be impactful as I've
joined Google and YouTube.

Q.   Do you do any teaching?

A.   Other than the coaching, not really.  I

CONFIDENTIAL

Page 33

have spoken at a handful of classes over the years, at Northwestern, I think at University of Illinois in the past, but no formal teaching roles.

Q.   Okay.  And I see you have some publications.

Have you had any publications since joining Google?

A.   Have I?  I don't believe so, no.  The ones on LinkedIn are from graduate school, engineering graduate school.

Q.   They looked -- yeah, that's why I --

A.   Quite dated.

Q.   I should have asked you that first, but -- okay.  You can put this away.

A.   Okay.

MS. CONROY:  Let's mark -- so let's mark this one first, the -- the June 25, 2018.

(Whereupon, Google-YouTube Hebda Exhibit 2 was marked for identification.)

BY MS. CONROY:

Q.   Mr. Hebda, I'm going to show you an exhibit but what it involves is -- or what I believe it does, but I'll ask you, is if it involves digital well-being.  So that's what I'm going to be talking to you about and I think I have a document --

CONFIDENTIAL

Page 45

Q.   And you see there's a July 10th, 2018.

███████████   said, "This is awesome, Reid! I think to narrow down the next round of investigation I would recommend running the same numbers for the following in this priority order."

And then going to the next page.

"Teens 13 to 17 (can we inferred age if not stated?)"

Do you see that?

A.   I do.

Q.   Okay.  Let me just ask you a few questions about that.

Do you understand what's meant here by "inferred age"?

A.   I didn't write the e-mail so I don't understand exactly what ████ meant.  But I can say that when we talk about inferred age at Google it often refers to models that our advertising teams own that for primarily advertising purposes we infer the age of users.

Q.   And why is that done for advertisers? What's the reason behind that?

MS. HARDIN:  Objection to form.

THE WITNESS:  I don't -- I didn't build the models and I'm not an expert in all the

Page 46

rationale but I can give you my best understanding
of why we do that.

BY MS. CONROY:

Q.    That would be fine.

A.    I think it's twofold.  I think it's,
first, because when advertisers are advertising on
any product or service or even television they want
to understand who they can target because naturally
certain products are more suited towards certain
people, certain genders, certain ages.

And advertisers want to make sure they are
getting their advertising in front of the right
audience.  And so we -- we have -- we have to help
them understand the audiences in different places.

And I think in -- in certain places at
Google, some users do declare age and some users do
not declare age and there's -- within the Google
account itself, there are occasional users that are
un -- of unknown gender, unknown age, and so
therefore advertising models have to infer that for
advertisers.  Or they might be signed out as well.

Q.    And I recognize your -- this is not your
expertise, but does -- does Google have some way of
inferring age for advertisers?

MS. HARDIN:  Objection to form.  Lack of

foundation.

THE WITNESS:  I -- this is -- again, this is not my area of expertise.  As I mentioned, I believe our advertising teams have models that are able to infer and -- infer age.  I can't speak to the details or accuracy of those, though.

BY MS. CONROY:

Q.    What I was trying to get at, when you say "our advertising teams," are you talking about Google advertising teams or YouTube advertising teams or both?

A.    Oh, I see.

MS. HARDIN:  Objection to form.

THE WITNESS:  I'm actually not sure whether it's a central Google team or the YouTube-specific team.  I would -- I would guess it is likely the central Google team because it's probably something that's consistent across all advertising but I'm not positive.

BY MS. CONROY:

Q.    Okay.  Is there a separate YouTube advertising team; do you know?

MS. HARDIN:  Objection to form.

THE WITNESS:  There is.  It's part of the Google advertising team but there's -- a part of

CONFIDENTIAL

Page 48

that team is directly mapped to YouTube and they build the advertising products for YouTube. But YouTube also leverages services and products from the Google advertising teams, the advertising platforms and things that span across all products.

BY MS. CONROY:

Q. Okay. I take it Google was able to model inferred age by advertisers at least as early as 2018?

MS. HARDIN: Objection to form. Lack of foundation.

THE WITNESS: I don't know when it started. But yes, I believe in 2018 we were modeling inferred age. Not we, at Google.

BY MS. CONROY:

Q. Right.

A. Excuse me.

Q. Okay. And I think you had -- after you had read through this, and, you know, take a look at more of it if you need to, can you describe for me what the problem was here? What -- who was trying to solve this problem and what the back and forth was?

MS. HARDIN: Objection to form. Lack of foundation. Mischaracterizes the document.

CONFIDENTIAL

Page 56

specific ones.

BY MS. CONROY:

Q.   Okay.  But I guess my -- the point of my question is, it may be that the metrics for well-being were -- are still a work in progress or difficult to establish, but there are other things that are talked here that you have been able to establish metrics for?

MS. HARDIN:  Objection to form.

THE WITNESS:  Yes, we -- we have many metrics in place.  The way I think about it is, we have metrics like how many users are coming to the platform, or how much time they spend on the platform.  Different types of engagement.

We have slices of those metrics so we can -- we have a whole pool of users.  We will often slice them by information that we can tell -- within of course all of the privacy restrictions that we have.  We can slice those by country, we can slice those by age, by gender, and so we regularly do that.

And I -- I'm fairly -- you know, fairly certain we did in some fashion here.  I just don't recall the exact output.

///

Page 57

BY MS. CONROY:

Q.   Okay.  And when we're talking about age, I think you mentioned you are able to slice by declared age; is that correct?

A.   That is correct.

Q.   Okay.  And what is meant by "declared age"?

A.   When users create a Google account, Google -- and I will caveat this also by saying I'm not on the Google account team and so I'm not a deep expert here.  I'm speaking more to my own personal experience and recollection.

Q.   And I'm asking when you're using the term "declared age" I'm just asking you --

A.   Yes.

Q.   -- what you understand that to be.

A.   Right.

When users create a Google account, Google, the Google account asks for their age -- or for their birth date, more specifically.  It also asks for their gender, if they choose to share it as well.  And declared age refers to the age based on the birth date that users declare as part of their Google account.

Q.   And have you ever seen any analysis of the

CONFIDENTIAL

Page 58

veracity of that birth date that is provided?

MS. HARDIN:  Objection to form.

THE WITNESS:  Can you be more -- when you say "veracity," can you be more specific?

BY MS. CONROY:

Q.   Have you ever seen any metrics with respect to whether or not someone is telling the truth about their age?

MS. HARDIN:  Objection to form.

THE WITNESS:  I haven't seen any metric specifically but I will say that users tell us what their age is but we don't -- we don't have their ID. We don't -- we're not with them in person and so we don't -- we don't currently have -- my understanding is we don't verify that or we don't have a way to know whether there's veracity to it or -- or not.

BY MS. CONROY:

Q.   And my question is a little bit different.

Have you ever seen any analysis of whether or not -- understanding you're not check --

A.   Yeah.

Q.   -- or someone is not checking with an ID, whether or not what the percentage of people telling the truth about their birth date is?

MS. HARDIN:  Objection to form.

Page 59

THE WITNESS:  I haven't seen that analysis and I don't know that we could do that analysis to know whether somebody is telling the truth or not without actually going out and gathering IDs, verifying that those IDs are valid.

So I'm not saying that hasn't been done at Google but I'm not aware that it has been.

BY MS. CONROY:

Q.   Are you aware of any surveys that attempted to determine that?

MS. HARDIN:  Objection to form.

THE WITNESS:  I'm not aware of any surveys that have attempted to determine that.  Though, again, there's a lot of analysis done around Google with many teams and so it's not to say it hasn't been done.

BY MS. CONROY:

Q.   Yeah.  Now, inferred age is done by the advertising team, correct?

A.   That's correct.

Q.   Okay.  Have you ever seen any metrics with respect to inferred age with respect to looking at an issue like well-being?

MS. HARDIN:  Objection to form.  Lack of foundation.

CONFIDENTIAL

Page 239

STATE OF CALIFORNIA    )

COUNTY OF YOLO         )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

JOHN HEBDA,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720