# AMENDED Exhibit 4

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
-------------------------------
IN RE:  SOCIAL MEDIA            :MDL No.
ADOLESCENT ADDICTION/PERSONAL :4:22-md-3047-YGR
INJURY PRODUCTS LIABILITY      :
LITIGATION                     :
-------------------------------
    SUPERIOR COURT OF THE STATE OF CALIFORNIA
   FOR THE COUNTY OF LOS ANGELES-SPRING STREET
                 COURTHOUSE
COORDINATION PROCEEDING        :
SPECIAL TITLE [RULE 3.400]     :Lead Case No. for
                               :Filing Purposes
SOCIAL MEDIA CASES             :22STCV21355
-------------------------------
This Document Relates to:      :
                               :
STATE OF TENNESSEE, ex rel.    :
JONATHAN SKRMETTI, ATTORNEY    :
GENERAL and REPORTER,          :
                               :
v.                             :
                               :
META PLATFORMS, INC. and       :
INSTAGRAM, LLC,                :
Case No. 23-1364-IV            :
-------------------------------
            T R A N S C R I P T of the
     videotaped deposition of MARGARET GOULD
     STEWART, taken at the offices of BAKER
     BOTTS LLP, 30 Rockefeller Plaza, 44th
     Floor, New York, New York, before
     MARGARET M. REIHL, RPR, CRR, CCR-NJ and
     Notary Public of New York, on October
     21, 2024, commencing at 9:24 a.m.

                 _ _ _

Q.    Okay.  You can put those aside.

Ms. Stewart, did you use to work for Meta?

A.    I did.

Q.    And how long did you work for Meta?

A.    Approximately ten years.

Q.    Okay.  And for most of the time that you worked for Meta, was the company known as Facebook?

A.    Yes.

Q.    Do you recall when Facebook changed its name to Meta?

A.    I believe it was in the -- they announced it, I think, in October of; 21.

Q.    Okay.  And can we agree that I use the term "Meta" in this deposition, I'm referring to the company that used to be known as Facebook?

A.    Yes.

Q.    Okay, thank you.

Let me ask you just another housekeeping item.  Is there any reason, Ms. Stewart, that you feel you are not able to give full and accurate testimony today?

Page 18

A.    No.

Q.    Okay.  I'd like to talk a little bit about your professional experience.

Before you worked for Meta, did you work for YouTube?

A.    Yes.

Q.    And what was your job there?

A.    I was the head of global design for YouTube.

Q.    Okay.  And do you recall approximately the dates of that job?

A.    I think it was 2009 to 2012.

Q.    Okay.  And before you were doing that work for YouTube, did you have -- did you work at Google?

A.    Yes.

Q.    Okay.  And what was your job there?

A.    I was the head of design for search and consumer products.

Q.    And approximately when did you start working at Google?

A.    2007.

Q.    Okay.  And before those few jobs -- well, strike that.

Page 19

Did these jobs that you had at YouTube and at Google, did they involve design and user experience?

A.    Yes.

Q.    And can you briefly tell the jury what that means?

A.    It means that I led the team that researched and developed the user interfaces so that when you use a website or an app, the things that show on the screen and the interactions that happen when you interact with the products.

Q.    Okay.  Prior to working for YouTube and Google, did you have other jobs that involved these same issues?

A.    Yes.

Q.    And where were those jobs?

A.    Previous to Google, I had worked at Wachovia Bank for a couple of years leading web design and usability.  Prior to that, I worked in a number of other technology companies, including Lycos and Tripod.

Q.    Okay.  And all told, Ms. Stewart, how many years have you spent dedicating your professional life to design and user experience?

A.    At this point 30ish years.

Q.    Okay.

A.    Yeah.

Q.    And is it a job or a profession that you feel passionately about?

A.    Yes.

Q.    Okay.  So you told the jury you worked at Meta for over ten years.

What year did you start working at Meta?

A.    2012.

Q.    And when did you leave?

A.    2022.

Q.    And what was your first job at Meta?

A.    I was the director of product design for the business side of the company. And at that time that would have been ads, products and pages.

Q.    Okay.  Now, in 2016 am I correct that you were promoted to be a vice president at Meta?

A.    Correct.

Q.    Okay.  And what was your title?

A.    Vice president of product design.

Page 21

Q.    Okay.  Let me -- well, let me ask you this:

In 2018 did your work as vice president of product design take on a new dimension?

A.    It did.  I initially started a cross functional working group around tech ethics.  And then in, I believe it was January of 2019, that was formalized into a team called responsible innovation that I founded, and we started to build a group of people and had resources to work in that space.

Q.    And when you say "that space," do you mean tech ethics?

A.    Responsible innovation.  Yeah, this was in addition to, at the time, still leading product design teams for various areas of the company.

Q.    And one reminder that I'm going to give you is that we have Madame Reporter here who is writing down all the words that each of us say -- I don't know how she does that -- but to make her job easier, it's really important that we try not to speak over each other.  I will likely do it and I'll try not to, but I

would also ask you not to do that as well, okay?

A.    Yeah.

Q.    Okay.  So let me ask you this: When you referenced "that space" in the answer you previously gave me, did you mean tech ethics?

MR. HALPERIN:  Objection, asked and answered.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    Okay.  And what are tech ethics?

A.    In my mind, it is fully exploring the impact of the products.  That's positive impact but also potentially negative impact, and having processes that help teams navigate those challenges of when there may potentially be harm created by the products that we build.

Q.    Okay.  And that's work that you did at Meta for approximately three years?

A.    Yes.

Q.    And did you take that work seriously?

A.    Yes.

MS. WALSH:  I would like to show a demonstrative.  And if I could have

the Elmo, please.  Ms. Stewart, I'm marking this as Exhibit 2 -- excuse me -- Exhibit 3 to the deposition, and what I've reflected here is a timeline of part of your career at Meta.

(Document marked for identification as Meta-Gould Stewart-003 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.    Do you see this?

A.    Yes.

MR. HALPERIN:  Do you have a copy of Exhibit 3 for counsel?

BY MS. WALSH:

Q.    And what I endeavor to represent here are the years which you were working as a vice president of product design and responsible innovation?

A.    Correct.

Q.    And we may refer back to this throughout your testimony to help the jury keep track of timing of certain events.  Okay.

Now, to give the jury a sense of the work you were doing at Meta and, frankly,

Page 24

also before Meta, I would like to show you your LinkedIn profile.

A.    Can I just make one comment about that timeline, please?

Q.    Certainly.

A.    Some of what we discuss may involve 2018.  This was before the team was formalized and the name was put on the team.  But in the year prior, you may see references to something called the "ethics XFN," and that was an exploratory working group that I was leading during 2018 to explore what it might take to create the team like responsible innovation.  And January of 2019 was when that team was formalized and funded.  Does that make sense?

Q.    Yes.

So Ms. Stewart, is it the case that even prior to 2019 and 2018, you were working to promote tech ethics at Meta?

A.    Correct.

Q.    Okay.  And that became a formal part of your job in 2019, correct?

A.    Correct.

MS. WALSH:  Okay, thank you.  So let's take a look at your LinkedIn

Page 25

profile, and we're going to mark that as Exhibit 4 to your deposition.

(Document marked for identification as Meta-Gould Stewart-4 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.    And do you recognize this to be a current version of your LinkedIn profile?

A.    I do except that in the interest of clarifying some of these breakdowns, I did make some edits recently, and I just want to make sure that this is the most current version. The reason, by the way, is because of the name change, LinkedIn wanted to make it look like a new job, but it was actually just a new name for the company, which is why it's a little confusing.

Q.    Understood.

A.    Is there a way to look at the one that's live just so that I make sure that we're looking at the most current version?  I don't know when this was pulled.

MS. WALSH:  Could we go off the record for a minute to take care of

Page 26

that?

MR. HALPERIN:  Sure.

THE VIDEOGRAPHER:  The time is 9:40.  We are off the record.

(Brief recess.)

THE VIDEOGRAPHER:  The time right now is 9:42 a.m.  We are back on the record.

BY MS. WALSH:

Q.    So Ms. Stewart, we are looking at a copy of your LinkedIn profile, and do you understand this to be the most recent version of your LinkedIn profile?

A.    I do.

Q.    Okay.  And what I want to do is direct your attention to the summary of your professional experience and that very first paragraph under "Summary," which we could blow up on the screen maybe.

Does this -- does this summarize the work experience that we just talked about with the jury?

A.    It does.

Q.    Okay.  And what this says is that you spent -- at this time you had over 25 years

Page 27

of experience leading design for some of the most influential and consequential digital products in the world, correct?

A.    Yes.

Q.    And that includes Google, YouTube and Facebook, correct?

A.    Correct.

Q.    Okay.  And the design practice that you led at Facebook was a global organization of over 400 design and research practitioners; is that right?

A.    Correct.

Q.    Okay.  I want to look now at where you describe the work that you did on the responsible innovation team that you mentioned. And to do that, if we could go to the second paragraph of this document, please, on the first page.

And what this says, Ms. Stewart, is "in her most recent role as vice president of product design and responsible innovation at Meta, Margaret founded and led the central responsible innovation team at Meta/Facebook."

Did I read that correctly?

A.    Yes.

Q.    And does that describe the work that you did at Meta?

A.    Yes.

Q.    And it explains that this team partnered with product and team teams -- well, let me start that over.

And what it explains is that this team "partnered with product and teams across Facebook to proactively surface and address potential harms to people and society in all company products for its community of over 3 billion users."

Did I read that correctly?

A.    Yes.

Q.    Okay.  So let's unpack that for a minute.

This responsible innovation team, you are the one who started that team, right?

A.    Correct.

Q.    And you also led that team?

A.    Yes.

Q.    And based on what you described here, tell us briefly what the mission of that team was.

A.    The mission of the team was to be

Page 29

a central, in a sense, consulting service that could partner with any and all teams across the organization to help teams engage in various processes to help them cultivate foresight around how their product may impact people in society, in positive ways but also in ways where there could be potential harm and then to partner with them to figure out how to mitigate those potential harms.

Q.    And when you were leading this team, did you believe that was an important thing to do, to try to proactively surface and address potential harms?

A.    Yes.

Q.    Okay.  You mentioned that at the time you were leading this team -- and I'm sure this number fluctuated over time -- but there were billions of users of Facebook social media apps; is that right?

A.    Yes.

MS. WALSH:  And I wanted to take a look at -- and I'm going to show the demonstrative for this.  Let's take a look at what those appears were at the time, okay.  And to do that, I'm going

Page 30

to show you what we're going to mark as Exhibit 5 to your deposition.

(Document marked for identification as Meta-Gould Stewart-005 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.      Do you see that on the screen?

A.      I can.

Q.      Okay.  And what we've depicted here is that the company now known as Meta, formerly known as Facebook, has a number of different social media apps that it offers to users, correct?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.      Okay.  And is one of those social media apps Facebook?

A.      Yes.

Q.      And one is Messenger?

A.      Yes.

Q.      And there's also Instagram, correct?

A.      Yes.

Q.      And there's also WhatsApp, correct?

A.      Yes.

Q.      And you mentioned to the jury that the responsible innovation team was a central team.

Does that mean that the work you were doing related to all of the social media apps that Meta offered?

A.      It potentially could.  We did not -- we partnered -- we had the opportunity to partner with all of them.  In my recollection, I'm not sure we had any specific engagements with WhatsApp.  We did do work with, I believe, the other three apps.

Q.      Okay.  And we talked about just a moment ago that when you were doing this work, there were billions of users of these apps, correct?

A.      Yes.

Q.      And among those billions of users, were some of those users kids?

MR. HALPERIN:  Object to form.

BY MS. WALSH:

Q.      Strike that.  I will redo that.

Among these billions of users, were some of these users teenagers?

A.    Yes.

Q.    Okay.  And in the work you were doing in responsible innovation to work to proactively surface and address potential harms that could be caused by these apps, was one of the things you were concerned about potential harms to teenagers using these apps?

MR. HALPERIN:  Object to form.

THE WITNESS:  There were a lot of issues that we were engaged in, so I would not say that it was -- it certainly was not the single issue, and I also wouldn't say that it was the main focus of the team.

BY MS. WALSH:

Q.    Okay.

A.    But there was a specific issue that came up related to youth safety that I ended up getting involved in.

Q.    Okay.  And was that issue cosmetic surgery effects?

A.    Yes.

Q.    Okay.  And that was an issue that

Page 33

your team looked at because of the potential harms that cosmetic surgery effects could create for teenagers?

MR. HALPERIN:  Object to form and foundation.

THE WITNESS:  Yes, it felt like a good example of the kind of thing that the team and I wanted to help with.

BY MS. WALSH:

Q.    Okay.  Let me ask you this, Ms. Stewart, do you have kids?

A.    I do.

Q.    Okay.  And at the time that you were working on this issue of cosmetic surgery effects, were your kids teenagers?

A.    They were.

Q.    And how many kids do you have?

A.    I have three.

Q.    Okay.  And boys, girls?

A.    I have a boy, my middle child is nonbinary, and my youngest is a girl.

Q.    As a mother of three kids, was that the perspectives that you had from being a mom, is that something that had an effect on how you approached issues on the responsible

Page 34

innovation team?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes, I feel that raising teenagers during that team period gave me a perspective on why we needed to be looking at this issue because of my personal proximity to it.

BY MS. WALSH:

Q.    Okay.  And we'll talk about that a little bit more a little bit later in your testimony, but during this time when you were working on this issue of cosmetic surgery effects, were you one of the few executives at Meta who had teenaged kids, the few senior executives who had teenage kids?

MR. HALPERIN:  Object to form and foundation.

THE WITNESS:  As far as I know, there were a handful of executives who had teenage kids.  Many of the executives did not have children or had young children.

MS. WALSH:  Okay.  So I want to talk in more detail now about cosmetic surgery effects, okay.  And I want to

Page 35

let you know that the focus of the questions that I'm going to ask you are about cosmetic surgery effects, okay.

So the jury has heard a little bit about cosmetic effects, but to give them a better sense of what exactly these are, I'd like to show you an exhibit that we're going to mark as 6.

(Document marked for identification as Meta-Gould Stewart-006 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.    Take a minute to familiarize yourself and let me know when you're ready.

A.    (Witness reviews document.)

Okay.

Q.    Do you recognize this document?

A.    I do.

Q.    And what is this document?

A.    This is a document that was prepared in advance or as a part of formalizing a policy proposal around whether we would lift a temporary ban on what the policy team referred to as "cosmetic surgery effects."

Page 36

Q.      And could you estimate around when this document would have been created?

A.      I want to say somewhere in 2019, I believe.

Q.      Okay.  And at the time when you were working in responsible innovation and you were focused on this issue of cosmetic surgery effects, would you have reviewed this document?

A.      Yes.

Q.      Okay.  So we're going to spend some more time on this document, but for now if you could flip to page 3, please.

A.      Yes.

Q.      And I want to direct your attention to the bottom of the page and the photographs that were in the red columns?

A.      Sorry, the red?  It's black and white printout.  Okay, I'm looking at the screen, and I see the colors.

Q.      Yes, okay.  Are these examples of the type of cosmetic surgery effects that were part of the subject of the work that you were doing in responsible innovation?

A.      Yes.

Q.      Okay.  And what the document

Page 37

shows is that the effect on the left-hand side was to enlarge the eyes of the young woman in the photograph, correct?

A.    Yes.

Q.    Okay.  And on the right, the effects that were imposed on this young woman's photograph were to slim her nose and enlarge her lips; is that correct?

A.    Yes.

Q.    And to your understanding, based on the work that you were doing at Meta at the time, are these sorts of effects the type of things that can only be achieved through plastic surgery?

MR. HALPERIN:  Object to form.

THE WITNESS:  Well, let me -- may I back up for just a second?

BY MS. WALSH:

Q.    Please.

A.    The whole scope of these effects were taken into account as we were forming this policy because we were trying to figure out what effects were the ones that we were concerned based on our own work and also advice we were getting from outside experts that could

Page 38

potentially be harmful and, also, definitions that could be used by policy to consider as effects were coming in of what they would allow or disallow.

So this chart is trying to create some categories that could then be used for the people who are reviewing effects to say this is allowed, this is not.

Q.    I see.

A.    And so can you rephrase because I want to circle back to the question, but maybe you can rephrase it or you can restate it.

Q.    Sure.  Yeah.

So these effects, these photos that we're looking at right now, I see on the document that they're -- at the top of the column they're called "cosmetic surgery effects," right?

MR. HALPERIN:  Object to form, misstates the document.

BY MS. WALSH:

Q.    And is that an indication that these -- the effects that are imposed on the photographs of these two young women, that these are effects that could only be achieved through

cosmetic surgery?

A.      Yes.

Q.      Okay.   Let's turn to the next page, and I'd like to focus on the top-left corner, please.   Are these also, to your understanding -- strike that.

To your understanding, do these pictures reflect photographs of young women that have been -- that have a cosmetic surgery effect applied to them?

A.      Yes.

Q.      And we see one where this young woman's lips have been enlarged, correct?

A.      Mm-hmm.

THE COURT REPORTER:   Is that yes?

THE WITNESS:   Sorry, yes.

BY MS. WALSH:

Q.      Another one where the women's lips have been enlarged and her nose has been slimmed, correct?

A.      Yes.

Q.      And then finally one where the woman's eyes have been enlarged and her chin has been slimmed, correct?

A.      Yes.

Page 40

Q.    Okay.  So these also are the effects that have been imposed on the photographs that these young women are effects that could only be achieved through plastic surgery; is that right?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

MS. WALSH:  So with that background, I would like to show you and mark as Exhibit 7 a demonstrative.  It's a summary of what we just looked at.

(Document marked for identification as Meta-Gould Stewart-007 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.    Ms. Stewart, does the demonstrative that I'm showing you now reflect examples of the types of cosmetic surgery effects that were available for people using Facebook to impose on their photographs when you were working on this issue?

MR. HALPERIN:  Object to form and foundation.

MS. WALSH:  Strike that.

Page 41

BY MS. WALSH:

Q.    Ms. Stewart, I'm showing you a demonstrative titled "cosmetic surgery effects."

Do you see that?

A.    Yes.

Q.    And to your understanding, each of these photographs, do they reflect the use of a cosmetic surgery effect?

A.    They do.

Q.    In one example the woman's eyes have been enlarged, correct?

A.    Yes.

Q.    And in another her lips have been enlarged, correct?

A.    Yes.

Q.    On the right-hand side we see a young woman whose eyes have been enlarged and her chin has been slimmed, correct?

A.    Yes.

Q.    In the middle we see a woman whose lips have been enlarged, and she's added freckles; is that right?

A.    Yes.

Q.    In another we see a woman whose nose has been slimmed and her lips have been

enlarged, correct?

A.    Yes.

Q.    And to your understanding, Ms. Stewart, all of these pictures, all of the effects that have been imposed on these photographs, are these all effects that in real life could only be achieved through plastic surgery?

MR. HALPERIN:  Object to form.

THE WITNESS:  I would say that part of what made this tricky to define is that if you were dealing with an expert makeup artist who could do like extremely sophisticated theatrical make up, you could technically achieve some of these things like making the borders of your lips larger in a theatrical way. But I think the way that we were defining it was for the average person and their makeup skills, that they would not be able to achieve these effects, that it would actually have to be through cosmetic surgery.

BY MS. WALSH:

Q.    Okay.  So Ms. Stewart, each of

Page 43

these pictures and the effects that have been imposed on them, for the average woman these are effects that could only be achieved through plastic surgery; is that right?

MR. HALPERIN:  Objection, asked and answered.

THE WITNESS:  That is what we believed, yes.

BY MS. WALSH:

Q.    Okay.  Let me ask you this, Ms. Stewart:  Do these effects sometimes go by different or -- strike that.

When you were working on this issue at Meta, were these effects, did they sometimes go by different names?

A.    Yes.  Both inside the company and outside the company, sometimes you would see them referred to as "beautification filters." We tried to avoid that because it felt like it was an example of the problem that these effects might produce.

Q.    I'm going to put "beautification" in quotes, how about that?

A.    That's right, yes.

MR. HALPERIN:  Do you know, we

Page 44

can't see that.

MS. WALSH:  Sorry, apologies.

BY MS. WALSH:

Q.    Okay.  Anything else that you recall them being referred to as?

A.    I think there may be a term of "selfie manipulation," although I will say that is an extremely broad term that would refer to any manipulation of the selfie photo, and I think that cosmetic surgery and beautification get closer to the topic that we were referring to.

Q.    Okay.  But these are, indeed, examples of selfie manipulation?

A.    Yes.

Q.    What about the term "augmented reality"?

A.    That is also an extremely broad technical term of introducing effects, usually in some kind of view port, of a camera or lenses that you're looking through where effects may be introduced into your environment, but that's an extremely broad category of things.

Q.    Okay.  But are each of these photographs an example of augmented reality?

Page 45

A.      Yes, they can be, yes.

Q.      Keeping these photographs, these selfie manipulations and cosmetic surgery effects in mind, let me ask you this, Ms. Stewart:  When you were working at Meta as the head of responsible innovation, were you concerned that the existence of cosmetic surgery effects like these could contribute to a teenage girl's mental health issues?

MR. HALPERIN:  Obstacle.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.      And given that concern, did you consult with mental health experts outside of Meta to better understand the impacts that cosmetic surgery effects like these could have on a teenager?

MR. HALPERIN:  Object to form.

THE WITNESS:  We consulted with experts.  I would have to review the specific experts to see if they were specifically mental health experts or academics doing research in this area or a combination of those.

BY MS. WALSH:

Q.    Okay.

A.    But we did consult extensively with outside experts in this area.

Q.    Okay.  And whether they were academics or mental health experts, can you summarize for the jury what you learned from these outside experts that you consulted about the potential impacts of these cosmetic surgery effects?

MR. HALPERIN:  Object to form.

THE WITNESS:  My recollection is that the significant majority of them confirmed our hypothesis that these had the potential to be very harmful, in particular to young people, and some of them specifically called out young women.

BY MS. WALSH:

Q.    And can you briefly describe what you learned from consulting these folks about why these could be harmful to young people and, in particular, young women?

MR. HALPERIN:  Object to form.

THE WITNESS:  My recollection, and I would need to reread the documents

Page 47

to get specific, but that the sense of negative comparison, so how I look versus how other people look, or the naturalistic presentation of myself versus the augmented, manipulated, affected view of myself over time, would feed into anxiety, body dysmorphia, depression related to one's appearance.

BY MS. WALSH:

Q. And to unpack that a little bit for the jury, were you concerned about how it could affect a teenage girl to have filters repeatedly applied to her own image?

MR. HALPERIN: Object to form, misstates the testimony.

THE WITNESS: Yes. My concern -- and I should state I'm not an expert in youth safety or youth mental health.

BY MS. WALSH:

Q. Okay.

A. But based on my own experience as a human using these things and also as a parent of teenagers, you know, looking to make sure that the technology they're using is -- is beneficial to them, my concern was that if a

Page 48

product was encouraging or proactively presenting opportunities to in quote "improve your appearance," that over time logically that would send a message to anyone that their appearance naturalistically was not okay as it is, and that that -- that's a concern for all people, but it's particularly concerning to minors who are going through a vulnerable period in their lives through adolescence.

Q.    Now, based on these -- strike that.

So these concerns you've just described, these were based in part on input that the company received from outside experts; is that right?

A.    Yes, yes.

Q.    And this concern was based also on your experience as a mom of teenagers?

A.    Yes.  And not to minimize people who disagreed with this, but I also felt like it was a bit common sense that if you constantly were told that you needed to improve your appearance, that that tells you that your appearance is not okay.

Q.    Ms. Stewart, so based on these

Page 49

concerns, did you, as head of responsible innovation, undertake an effort to have cosmetic surgery effects like these banned from Meta's social media apps?

MR. HALPERIN:  Object to form.

THE WITNESS:  So what I will say is this initiative around this policy was instigated and led by the policy product team.

BY MS. WALSH:

Q.    Okay.

A.    But they -- my recollection is that they reached out to me because of my role in tech ethics at the company because there wasn't another single, logical owner for this topic on the product side to help them form the policy and then align -- socialize it with and align the product teams to be open to maintaining this ban and better defining the guidelines around what was allowed and what was not allowed when it came to camera effects.

Q.    Okay.  So just to break that down and make sure the jury understands, was it people in -- who were in charge of policy for these products who originally came to you and

said we are concerned about these cosmetic surgery effects, and we think we should do something about them?

MR. HALPERIN:  Object to form, misstates testimony.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And what role did they ask you to play in that?

A.    They asked me to help shape the policy but also to socialize it with product leaders with whom I had strong ties.  Because this policy -- because we had cameras in multiple products, that our goal was to see if we could get to a uniform policy across what we would call the family of apps, as opposed to Instagram having its own policy and then Facebook and Messenger, to have a consistent policy and to help them align the product teams around that.

Q.    Okay.  And so the idea -- and we're going back to Exhibit 5 now -- was to try to have a consistent policy across the family of apps that Meta offered?

A.    Correct.

Q.    And we're showing the jury those apps now?

A.    Correct.

Q.    Okay.

A.    I should say -- if you could bring the family of apps back?

Q.    Sure.

A.    I don't believe that it was -- it's not shown here, but the reality labs team was actually where some of these effects were being developed in a team called Spark AR.

Q.    Okay.

A.    So even though there wasn't an app with a camera, that organization was a part of these discussions too because we knew in future years between VR head sets and augmented reality experiences that this policy would effect those products as they came to market as well.

Q.    Okay, understood.

Now, did there, in fact, as a result of the efforts that were instigated originally by people in product policy and that you led, did there come to be -- was there a temporary ban placed on cosmetic surgery effects

Page 52

such as these?

A.    There was.  And my recollection is that -- I would have to look up when this happened, but when the Spark AR platform, which is a developer platform that allows outside designers and engineers to develop effects that might be offered on the platform, when that opened up, we saw there were a set of filters that were created.  And we're seeing, as I recall, fairly high usage that were quite extreme in nature around cosmetic surgery, much more direct than what we're looking at in this exhibit on cosmetic surgery effects.  They actually were filters that outlined nip and tuck diagramming on people's faces, and this was very concerning and something that I think there was fair unanimity about in the company that we did not want those things.

And so there was a temporary ban put on -- and I don't recall what the scope of -- exactly what the scope of the temporary ban was but around cosmetic surgery filters so that the team in policy presumably working with product could have the time to research how pervasive these were, how much usage they were

Page 53

getting and get outside advice on how we might approach whether or not we would allow these.

And at a certain point, we had to revisit whether that ban would be -- sorry, I don't know if you want to -- okay, there was a certain point at which once that temporary ban was put into place by policy, that we had to decide if we were going to continue that ban for another period of time, lift it or make it permanent.

Q.    Okay.  So, Ms. Stewart, let me -- I'm going to move to strike that as nonresponsive --

A.    Okay.

Q.    -- which is okay.

A.    Yeah.

Q.    But let me just ask a question which is:  Did there come a time when cosmetic surgery effects, including ones like these, were temporarily banned?

A.    Yes.

Q.    And do you recall the date or the approximate date when that would have been?

A.    I -- my pandemic brain often mixes up '19, '20, '21, so I literally may be a

Page 54

year off on this.  I think it may have been the fall of 2019.

Q.    Okay.

A.    But I'm sure it's documented somewhere.

Q.    So is your best recollection, Ms. Stewart, that this temporary ban that we just talked about was instituted some time in the fall of 2019?

A.    I believe so.

Q.    Okay.  I'm going to add this to our timeline.

And later was there a decision to --

A.    It may have been 2020.  I apologize but, yeah, okay, go ahead.

Q.    Okay.  Later did -- this is your best recollection, correct?

A.    Yeah.

Q.    Okay.  Later was there a decision made to lift that ban?

A.    There was.

Q.    And can you recall approximately when that would have been?

A.    I believe that would have been in

Page 55

the spring of 2021.

Q.    Okay.  Well, let me ask you this -- hold on one second.

MS. WALSH:  I'm going to show you what's going to be marked as Exhibit 8 to your deposition.

(Document marked for identification as Meta-Gould Stewart-008 was marked for identification and is attached to the transcript.)

BY MS. WALSH:

Q.    Here you go.

A.    Thank you.

Q.    And take a look at that.

And, Ms. Stewart, does looking at that document refresh your recollection that there was a decision made to lift the temporary ban on cosmetic surgery effects as when it happened?

A.    It does.

Q.    And when did that happen?

A.    The decision to lift the ban was communicated in May of 2020.

Q.    Okay.  You can put that document aside for now.

know when you're ready.

A.    (Witness reviews document.)

That's why I'm confused.  It's also included in Exhibit 8 because my e-mail to Mark was, I think, a part of that same thread, but that's great, yeah.

Q.    Okay.  So have you got Exhibit 11 in front of you?

A.    I do.

Q.    Okay, great.

And having looked at this, do you recognize this e-mail?

A.    Yes.

Q.    Okay.  And is this an e-mail chain that includes e-mails that you sent or that you received while you were working at Meta?

A.    Yes.

Q.    And did you receive these e-mails as part of the work that you were doing at Meta?

A.    Yes.

Q.    Okay.  And it's your understanding that these e-mails that you're looking at were -- when they were sent, they were sent by Meta employees as part of the work

Page 81

they were doing at Meta?

A.     Yes.

Q.     Okay.  So let's flip to the e-mail that starts the chain, please, it's on the very last page.

A.     Yes.

Q.     And if you -- and this is an e-mail from Andy McDonnell -- sorry, this is an e-mail from Andy O'Connell, correct?

A.     Yes.

Q.     Sent on March 26, 2020, right?

A.     Yes.

Q.     And it's sent to Mark Zuckerberg and a number of other -- fair to say, senior executives at the company?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.     You understand the people who are highlighted on the exhibit in front of you to be senior executives at Meta?

A.     Yes.

Q.     And the subject is "Pre-read on cosmetic surgery AR effects."

Do you see that?

Page 82

A.    Yes.

Q.    And it says "next Thursday"?

A.    Yes.

Q.    And what Andy O'Connell says to Mark is "Mark, next Thursday we are meeting to decide whether we should continue, modify or lift the temporary ban on cosmetic surgery AR effects that we instituted in October 2019."

Do you see that?

A.    Yes.

Q.    Okay.  And does that confirm your recollection that that temporary ban --

A.    Yes.

Q.    -- went into place in the fall of 2019?

A.    Yes, it does.

Q.    Okay.  Now, it says a pre-read -- well, strike that.

It goes on to say and explains, does it not, that this temporary ban was put into place "in response to expert and press concerns about potential negative well-being impacts (especially on minors)."

Do you see that?

A.    Yes.

Q.    Okay.  And is that consistent with your understanding of why the temporary ban on cosmetic surgery effects was put into place on October of 2019?

A.    Yes.

Q.    Okay.  It then says "the pre-read is attached."

Do you see that?

A.    Yes.

Q.    What is a pre-read?

A.    A pre-read is a briefing document that's prepared for executives in advance of a meeting or review, presumably in this case because a decision needs to be made.  And in order for the conversation to be robust and productive and lead to an informed decision, we would provide an executive group with that report in advance of the meeting so that they can review and all come in with the same information.

Q.    Okay.  And this particular pre-read was intended to provide, among others, Mr. Zuckerberg important information related to this decision about lifting the ban, correct?

A.    Yes.

Q.      And you received the pre-read as well, correct?

A.      Yes.

Q.      And would you have been -- had some involvement in providing information for the pre-read or creating the pre-read?

A.      Yes, I worked with the policy team.  The policy team led and owned the ultimate responsibility for preparing that document since this was a policy question, but I was involved in giving feedback on it.

Q.      Okay.  So let's take a look at the pre-read.  And that is Exhibit 6.  You should have in front of you.

A.      Yes.

Q.      And it says at the top "Cosmetic surgery effects (A/C privilege)."

Do you see that?

A.      Yes.

Q.      And "A/C privilege" means attorney-client privilege?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.      Okay.  Did you put that label,

Page 85

"A/C privileged" on this document?

A.     No.

Q.     Do you happen to know who did?

MR. HALPERIN:  Object to foundation.

THE WITNESS:  Again, policy team had the ultimate ownership of the document, so they would have decided whether or not it needed to be attorney-client privilege.

BY MS. WALSH:

Q.     Okay.  Let me ask you a question, if we could go back for one minute to Exhibit 11.  And if you look at the folks that Mr. O'Connell sent this pre-read to, to your understanding are any of those people lawyers?

MR. HALPERIN:  Object to form, foundation.

THE WITNESS:  I would not be able to -- to my knowledge, I do not believe any of them were in the role of attorney within the company, although some of them may have legal training, but I can't be completely certain.

BY MS. WALSH:

Q.    So you know, for example, or do you know that Joel Kaplan has a law degree?

A.    He very well may.

Q.    But he doesn't act as a lawyer for the company, does he?

A.    He did not at the time, no.

Q.    He's involved in lobbying?

A.    In lobbying, yeah.

Q.    Okay.  Did you ever work with Mr. Kaplan?

A.    No, not directly.

Q.    Okay.  Let's go back to Exhibit 6, please.

If we go down to "Decision needed and options."

Do you see that?

A.    Yes.

Q.    And at the top it says "Should we continue, modify or lift the ban on cosmetic surgery AR effects," right?

A.    Yes.

Q.    And is "AR" a reference to augmented reality?

A.    Yes.

Q.    Okay.  And it explains that that

ban was "instituted in October of 2019,"
correct?

A.    Yes.

Q.    And, again, it notes that the ban
was "in response to expert and press concerns
about potential negative well-being impacts
(especially on minors)," right?

A.    Yes.

Q.    Okay.  And we'll talk about the
different options in a moment, but let's go down
now to the section "Key considerations."

And these key considerations, are
these -- when you referred earlier to the
important information that the senior executives
were -- that you hoped that they would consider
before making this decision, are the key
considerations some of those things?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And the very first key
consideration is well-being and safety concerns,
right?

A.    Yes.

Q.    And it says "There is not yet

Page 88

robust causal evidence about the relationship

between cosmetic surgery AR effects and

well-being," right?

A.   Yes.

Q.   But it says "However, experts

from around the world, APAC included" -- and let

me pause there for a minute.  What is APAC?

A.   That would be -- I believe it

stands for Asia Pacific, and I'm embarrassed to

say I cannot remember what the last two acronyms

stand for, but it refers to that region of the

world.

Q.   Okay.  So this says, "However,

experts from around the world" -- including

experts from APAC, which is the Asian Pacific

region -- "generally agree that these

effects" -- meaning cosmetic surgery effects --

"are cause for concern for mental health and

well-being, especially amongst vulnerable

populations (females, youth, those with a

history of mental health concerns, et cetera.)"

Do you see that?

A.   Yes.

Q.   And that's consistent with some

of the information we've already looked at

regarding input the company obtained from outside experts, right?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And you seem -- and we can underline "youth" and you understand that to include teenagers?

A.    Yes.

Q.    And teenage girls, right?

A.    Yes.

Q.    Okay.  And then it says "Additionally, academic research on related topics (e.g." -- or for example, "well-being impacts of seeing 'ideal' images in media) gives us cause for concern."

Do you see that?

A.    Yes.

Q.    Okay.  And again, this was on the very first page of the pre-read that was provided to Mark Zuckerberg, correct?

A.    Yes, yes.

Q.    And Joel Kaplan and the other people that we saw in that e-mail, right?

A.    Yes.

Q.      Now, it says "See appendix for additional information."

Do you see that the very bottom?

A.      Yes, yes.

Q.      So let's flip back to page 7.

A.      Yes.

Q.      And I want to focus in particular on the description of what you all learned from -- strike that.

Is it your understanding that people within Facebook actually communicated directly with outside experts from around the world about these cosmetic surgery effects?

A.      Yes.

Q.      And I want to focus on what Mr. Zuckerberg and others were told about the results of that outreach.  And what it says is "To augment this review of research, we consulted 21 independent experts around the world.  Here is a summary of our findings."

And, Ms. Stewart, would you mind reading the first bullet point, please?

A.      "These extreme cosmetic surgery effects can have severe impacts on both the individuals using the effects and those viewing

Page 91

the images."

Q.    And, Ms. Stewart, when we talked in the beginning of your testimony about these concerns, is this consistent with the concerns that you intuitively and as a matter of common sense and as a mom had about these concerns about cosmetic surgery effects?

A.    Yes, and I would say that I'm not sure that they would have to be extreme cosmetic surgery effects to have long-term implications, because depending on how you would define -- if you defined "extreme" as the nip tuck, that's obvious.  But some of the ones we were looking to have in scope of this, don't, to me, seem extreme in the way that I think the average person might define.

MR. HALPERIN:  Objection, move to strike as nonresponsive.

BY MS. WALSH:

Q.    So were you -- thank you for helping to explain that.

And when you said you don't think that the effects need to be extreme to have these harmful effects, are these cosmetic surgery effects -- none of these actually

Page 92

reflect surgery lines or --

A.    Correct.

Q.    But do you nonetheless believe that viewing of these and applying these to one own's photograph can have harmful effects?

A.    Yes, and constantly viewing other people's manipulated images but not -- actually, the research bears up that whether or not you know that they've been manipulated, they can have a negative effect.  But I just wanted to point that out because depending on -- they don't provide a definition of what "extreme" means, and I just did not want for it to be understood that we were limiting to it the nip and tuck.

Q.    Understood, yeah, okay.

I'll read the next bullet. "Children are particularly vulnerable, however, many others are vulnerable as well: those with a history of mental health challenges, eating disorders, et cetera."

Do you see that?

A.    Yes.

Q.    And was there a concern that people who may have already had mental health

challenges, including around eating disorders and so forth, that their exposure to these cosmetic surgery effects, that it could make those problems worse for them?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And then it says "Generally, stakeholders support making a distinction between effects achieved via makeup versus those that can only be achieved via cosmetic surgery, though no line will be perfect."

Do you see that?

A.    Yes.

Q.    And was your -- was your view that -- did you hold a view when you worked at Meta that effects that allowed a person to apply makeup to their selfie image, that those should be banned?

A.    No.

Q.    Okay.  In your view, that was okay?

A.    I think that you can go to extremes of trying to protect people, and it seemed like testing how mascara might look on

you seemed like in a different class of risk than changing the shape of someone's face.

Q.    Okay.  So that was a line that you drew in your view of this issue while you were at Meta?

A.    Well, the policy team, again, really was driving the shaping of the policy, and I had input and gave feedback.  But, yes, I agreed with that distinction because when you're developing these policies, it is surprisingly difficult to come up with definitions that can then be operationalized.  And what I mean by that is there's a group of people that are going to be reviewing effects that are being submitted to go into the platform.

Q.    Right.

A.    And you have to have a good enough definition that the people doing those judgment calls can make the call with decent accuracy.  And I think what we decided was the standard makeup effects are something that most of the reviewers would be able to understand and seemed both to our instincts but also the expert advice less potentially harmful than effects that implied that, you know, you should change

Page 95

the shape of your face, in ways that would mostly only be done by cosmetic surgery.

Q. Okay. I noticed that you made the point that the policy team was really driving the shaping of these policies, and you were having input, correct?

A. Yes.

Q. And am I right, Ms. Stewart, this issue of concerns about cosmetic surgery effects, you were not alone in this -- having these concerns at Meta?

MR. HALPERIN: Object to form and foundation.

THE WITNESS: No, I was not.

BY MS. WALSH:

Q. Okay. We'll come back to that in just a minute. But for now let's continue with the pre-read that was provided to Mr. Zuckerberg and others. And if we could down to the next paragraph starting with "Note."

And it says "Note: after the policy development process in November, an additional round of outreach was done with nine experts from APAC and MENA, and these stakeholders reiterated the dangers these

filters have in advancing unrealistic beauty standards and impacting mental health and body image."

Do you see that?

A.    Yes.

Q.    And it says "their feedback was consistent with prior stakeholder feedback."

Do you see that?

A.    Yes.

Q.    And APAC and MENA refer to other geographical areas outside the United States; is that right?

A.    Yes, MENA is, I believe, Middle East and North Africa.

Q.    And in putting together the information that would be provided to Mark Zuckerberg and others on this issue, was it important to you to get views from people in different parts of the world?

A.    Very much so because we have -- a very large percentage of people who use the company's products were outside the United States, and we tried to check ourselves on our American bias around these issues, many issues, not just this one, so it was extremely important

Page 97

to make sure that what we engaged in consequential decision-making, that we approached that from a global point of view.

Q.    Okay.

A.    And one other thing I will say is that this was particularly important because these effects were disproportionately popular in certain parts of Asia.

Q.    Okay.

A.    And, so it was important for us to talk to experts in those markets and to study the effect of like the existence of these but also because these effects were extremely popular there, and so it would have a disproportionate impact on the user base within those countries.

Q.    Okay.  Would you say that this process of understanding the issue of cosmetic surgery effects and the potential harms, that you were sort of Western-centric and just focused on the US?

MR. HALPERIN:  Object to form.

THE WITNESS:  I don't see us as having certainly intentionally American-centric, but this was coming

Page 98

out of the Menlo Park office, and so we always have to recognize that we don't necessarily have the representation within the team to reflect all of the global perspectives that are mirrored -- that exist within our user base.  And so -- but when we got feedback that there were concerns that the Literature Review may not be as global in perspective as it needed to be, that was welcomed feedback.  And so we then did -- or the policy team did another round of expert interviews as you see, but the feedback came back in mirroring the first round.

BY MS. WALSH:

Q.   Okay.  And that's the reference to the additional, roundabout outreach -- we can underline this -- the additional round of outreach done with nine experts from APAC and MENA; correct?

A.   That is correct.

Q.   Meaning the Asia Pacific region and the Middle East, correct?

A.   Yes.

Page 99

Q.    And the feedback that came back there was that filters used by people in those areas, it could also impact mental health and body image, correct?

A.    Yes.

Q.    In fact, the feedback that you got when you made sure to have this global perspective, it was consistent with the feedback that you got from the original set of excerpts, correct?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    Okay.  Let's flip to the next page, and about halfway down there's a reference to "Competitiveness/growth - additional information."

You see that?

A.    Yes.

MS. WALSH:  And we could highlight "competitiveness/growth."

BY MS. WALSH:

Q.    This was also part of the information that was provided to Mr. Zuckerberg before he made the decision to lift the ban --

strike that.

This is also -- this is part of the information that was provided to Mr. Zuckerberg before he made the decision to lift the ban on cosmetic surgery effects, correct?

A.    Yes.

Q.    And it says "Adoption of AR" -- augmented reality -- "effects have grown significantly since we launched 3P effects last half."

Do you see that?

A.    Yes.

Q.    And the graph below, to your understanding, depicts that significant growth, correct?

A.    Yes.  Although, to be fair, it was starting from a launch point of view, so it's natural to assume that there's not going to be a lot of usage before the product exists.

Q.    Fair enough.

A.    But this is a healthy growth curve.

Q.    Okay.  Let's flip forward to page 10, and in particular "additional data and resources."

Page 101

Do you see that?

A.    Yes.

Q.    And this was also part of the information that was provided to Mr. Zuckerberg before he made the decision to lift the ban on cosmetic surgery effects, right?

A.    Yes.

Q.    And it says "AR usage overview (MAP)."

Do you see that?

A.    Yes.  Hold on just a second. This just came undone.

MS. WALSH:  Could we go off the record for a second?

THE VIDEOGRAPHER:  The time right now is 11:21 a.m.  We are off the record.

(Pause.)

THE VIDEOGRAPHER:  The time right now is 11:22 a.m.  We are back on the record.

BY MS. WALSH:

Q.    Okay, Ms. Stewart, now we're looking at a section of this pre-read document that was provided to Mr. Zuckerberg called

"Additional data and resources."

Do you see that?

A.    Yes.

Q.    And underneath that it says "AR usage overview" and in parentheses "MAP."

Do you see that?

A.    Yes.

Q.    And do you understand what "MAP" is a reference to?

A.    It usually references monthly active people using the product.

Q.    Okay. And in this case, it appears that this is referring to people who are using augmented reality, correct?

A.    That is how I read the diagram.

Q.    Okay. And for Instagram, it's 328.99 million, correct?

A.    Yes.

Q.    And it's your understanding that augmented reality was used quite a bit on Instagram?

A.    Yes, although it's important to note that these numbers by Meta scale are not -- we have billions of people using the product, so it would have to be in relation to something

else for me to say is this high or low.  But it's not small numbers.  I will say that, yeah.

Q.    Okay.  But any measure, 328 million people is a lot of people?

A.    Yes.

Q.    Okay.  And that's overall AR usage, correct?

A.    I wouldn't be able to say.

Q.    Oh, okay.  Well, let's flip forward to the next page.  And if we look down to the part that talks about "FaceWarp."

Do you see that?

A.    Yes.

Q.    And FaceWarp, is that a category of AR effect that would include cosmetic surgery effects?

A.    That is what it seems to indicate, yes.

Q.    So "FaceWarp (any effect that distorts the face that includes, but is not limited to, cosmetic surgery effects) are responsible for about 25% of third-party effect try-ons and 35% of stories impressions."

Do you see that?

A.    Yes.

Q.    And then if you look down to the second bullet point, it says "All FaceWarp live effects, at least 20% of try-ons come from cosmetic surgery effects and mainly have been published before policy introduction."

Do you see that?

A.    Yes.

Q.    And this is describing quantitatively how much these cosmetic surgery effects were represented among AR usage by users of the Meta apps, correct?

A.    Yes.

Q.    If you look at these graphs, these are also showing FaceWarp usage as a percentage of AR usage, correct?

A.    I believe that's what it is.

Q.    Okay.  If you look at the title of these graphs.

A.    Yes.

Q.    And you see the little key that shows what the blue and the orange represent?

A.    Yes.

Q.    And blue is non teen and orange is teen, correct.

A.    Yes.

Q.    So this document was specifically calling out how much teenagers were using these face warps, correct?

A.    Yes.

Q.    And in each of the graphs that are given, does it show that these were being used more by teenagers than by non teenagers?

MR. HALPERIN:  Object to form.

THE WITNESS:  It looks like in some cases that is -- that is the case.

BY MS. WALSH:

Q.    In general, in each of these graphs, the orange line, which is for teenagers, is generally above the blue line, correct?

MR. HALPERIN:  Objection, asked and answered.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And this is also information that was provided to Mr. Zuckerberg before he made the decision to lift the ban on cosmetic surgery effects, correct?

A.    Yes.  I do want to point out that this looks like it's the total of FaceWarp usage, not the ones that are specifically

categorized as cosmetic surgery effects.

Q.    Fair enough, okay.

But we know that a portion of the FaceWarp effects --

A.    Yes.

Q.    -- are cosmetic surgery, correct?

A.    Yes.

Q.    So all of this information was provided to Mr. Zuckerberg before he made the decision to lift the ban in May of 2020?

A.    Yes.

Q.    And I've written on here "2018 discussions about cosmetic surgery effects."

The discussions that you were having with people in the company within 2018, did they relate to cosmetic surgery effects?

MR. HALPERIN:  Objection, misstates testimony.

THE WITNESS:  So based on the Exhibit 9, there were conversations, early conversations going on because of explorations that the team -- the teams were doing in the AR space around camera filters, that there was a researcher -- I believe what happened was that there

was a researcher who was trying to get ahead of this to influence some guardrails around that work.

BY MS. WALSH:

Q.    Okay.  So is it accurate to say, as we do on this chart, that discussions about cosmetic surgery effects and their potential harms began as early as 2018, to your knowledge?

A.    Yes, yes.

Q.    And then in late 2019, cosmetic surgery effects were temporarily banned, correct?

A.    Yes.

Q.    But then in May 2020, Mr. Zuckerberg made a decision to lift the ban on cosmetic surgery effects, correct?

A.    Yes.

Q.    Okay.  So does this demonstrative accurately reflect the dates and events that we've been discussing?

A.    I believe so.

Q.    Ms. Stewart, were you the only senior executive who believed -- well, strike that.

To your knowledge, were you the

at that.  Thank you for bringing that up.

So we know that each of these three gentlemen, none of whom had teenagers at the time, wanted to lift the ban.  And if we look back, we know that from the pre-read.  So if we can take a look at that under "Decision needed and options."

So option 1 was to continue the temporary ban, correct?

A.    Yes.

Q.    And in agreement with that, Policy and Comms and responsible innovation team, that was your recommendation, correct?

A.    Yes.

Q.    And what the pre-read to Mr. Zuckerberg explained was that the pros of that option was it "mitigates well-being concerns; no PR/regulatory risk," correct?

A.    Yes.

Q.    And PR is press relations, correct?

A.    Public relations.

Q.    Public relations.  Okay.

And the cons that were acknowledged in this document of lifting the ban

was that it would limit growth, limit voice and

innovation, and then it was arguably

Western-centric.

Do you see that?

A.    Yes.

Q.    And do you believe that the

lift -- that continuing the ban would be

Western-centric?

A.    I think that there was more

concern about this issue in America and Europe

than there was in Asia publicly, that there was

more regulatory rumbling about it.  But I don't

think that that means that the recommendation

itself was Western-centric.  I feel like we

tried hard to bring in a global perspective,

both through our in-country policy team members

but also the experts that we consulted with.

Q.    Option 2 was "lift the ban but

remove these effects from IG recommendation

surfaces."

Do you see that?

A.    Yes.

Q.    And in support of that option

were the Facebook app -- were Facebook app and

Instagram, correct?

Page 129

A.     Yes.

Q.     Also Spark AR, which you mentioned earlier, correct?

A.     Yes.  Messenger.

Q.     And messenger.

Now, when it says "but remove these effects from IG recommendation surfaces," explain to the jury what that means.

A.     So this gets to an important point of how people discover these effects. There's a gallery of effects that you can look through.  Say you want to take, you know, do something fun with your photo, and you want to go into the gallery and peruse and say oh, maybe I'll do this, maybe I'll do this.  That is one way to access one of these effects.  But a much more common way is that you see an image that someone has manipulated with the effect, and you say oh, I like the effect on this particular photo, what this is effect and let me try it. And that's where the virality of these effects is much more seen, is through that discovery by seeing usage of it, you know, out in the wild as opposed to a curated set of effects that the company recommends to people who go into like a

gallery space.

Q.    Okay.

A.    And I don't have the specific numbers, but we know that most of the discovery and certainly virality, in particular through influencers on the platform, was a much larger percentage of how things were discovered than in the gallery itself.

Q.    Okay.

A.    So it's good to not include them in the recommendations gallery, but the question was would that be sufficient to protect, in particular minors, since that's not usually how they're finding them in the first place.

Q.    I see.  So let's see if I can break that down a little bit.

In your view and the view of Policy and Comms, lifting the ban but removing the affects from the IG recommendation services, that was not enough to mitigate and protect against the harms that these cosmetic surgery effects could have on kids?

MR. HALPERIN:  Object to form and foundation.

THE WITNESS:  It was good, but in

Page 131

my mind not sufficient.

BY MS. WALSH:

Q.     Okay.  Let's look --

A.     Let me be clear.  The lifting the ban part wasn't good in my opinion.  Removing the effects from the recommendation services was not the sufficient step to take to protect minors.

Q.     Okay.  And is that, in fact, explained in -- right underneath this option where it says cons "still notable well-being risk (since recs are marginal source of virality)."

A.     Yes.

Q.     And what means, Ms. Stewart, is that removing these effects from the IG recommendation service would not prevent kids from being exposed to them and using them themselves, correct?

MR. HALPERIN:  Object to form.

THE WITNESS:  No.

BY MS. WALSH:

Q.     Now, the pros of this option 2 is "fosters voice and innovation."

Do you see that?

A.    Yes.

Q.    And "lower impact to growth."

Do you see that?

A.    Yes, yes.

Q.    Okay.  And what do you understand "growth" to be a reference to?

A.    It is like the market share, in, you know, in terms of the popularity of these effects, that if they can still be discovered through virality, then we don't see as much diminished growth because they're still accessible to people.

Q.    And does "growth" mean growth in the number of people, including teenagers, who are using the app and how much they're using it?

MR. HALPERIN:  Object to form, asked and answered.

THE WITNESS:  That's usually the definition.

BY MS. WALSH:

Q.    Yeah?

A.    Yes.

Q.    The final option, option 3 is "lift the ban," correct?

A.    Yes.

Q.    And Boz, Mr. Bosworth and Spark AR, that was the recommendation there, correct?

A.    Yes, as well as from Messenger and the internationalization team.

Q.    Okay.  So just to be clear, Spark AR, Messenger and the internationalization team, that's what they recommended.  As we see above, they said they could live with option 2 if they had to, right?

MR. HALPERIN:  Object to form, misstates the document.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And the cons of this approach, just straight up lifting the ban, the highest well-being risk, correct?

A.    Yes.

Q.    Possible bad PR, correct?

A.    Yes.

Q.    And the pros were "fosters voice and innovation; lowest impact to growth", correct, and according to this document, "supports regional perspectives," right?

A.    Yes.

Q.    Okay.  Ms. Stewart, for each of

these options, we see references to growth, correct?

A.    Yes.

Q.    And for option 1, and if we could circle this, the downside of option 1, which was continuing the temporary ban was that it would limit growth, correct?

MR. HALPERIN:  Object to form, misstates the document.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    Okay.  For option 1, which is the one you supported, which was continuing the temporary ban?

A.    Yes.

Q.    The con that is listed was "limits growth," correct?

MR. HALPERIN:  Same objection.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And by that, that we mean growth in how many people are using the Meta social media apps and how much they're using it, correct?

A.    Yes.

Page 135

Q.    And option 2, which is --
involves lifting the ban, one of the pros was
"lower impact to growth" --

MS. WALSH:  If you could circle
limits growth cons above.

BY MS. WALSH:

Q.    And then number 3, which was
lifting the ban entirely, one of the pros was
"lowest impact to growth".

Do you see that?

A.    Yes.

Q.    Okay.  So is it the case, Ms.
Stewart, that the impact on growth, meaning how
many people are using Instagram and Facebook,
how often they're using it, that this was a
major consideration in making this decision?

MR. HALPERIN:  Object to form,
calls for speculation.

BY MS. WALSH:

Q.    To your knowledge?

A.    To my knowledge, yes, although I
will say that there is also a strongly-held
principle around not limiting people in terms of
what they can communicate and how they present
themselves.

Page 136

Q.    Let me stop you there.

And is that -- when you say that, is that reflected in fostering voice?

A.    Fosters voice.

Q.    Okay.

A.    I think -- I just want to present that these decisions always have tensions.

Q.    Yes.

A.    And so it's about what you are deciding to optimize for.

Q.    Right.

A.    And this is kind of a classic thing of people seem to want this, so there's market demand.  Meta as a company believes in prioritizing voice, you know, as like a very primary principle of how they make decisions, and they want to promote innovation in the third-party developer space to allow people to experiment and develop new things.  That's where the "fosters voice and innovation" comes in.

I think what this overview represents is a disagreement on when safety and well-being should be prioritized over voice and growth.

Q.    Okay.  Let me ask you this:

You've identified the different considerations that were at play in making this decision, correct?

A.    Yes.

Q.    And one of them was voice, right, correct?

A.    Yes.

Q.    One of them was innovation, correct?

A.    Yes.

Q.    One of them was growth too, right?

A.    Yes, yes.

Q.    And "growth" means how many people are using these social media apps and how often they're using them, correct?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.    And that consideration weighed in favor of lifting the ban, correct?

A.    Yes.

Q.    Okay.  The other consideration that was at play here was the well-being and safety of teenagers using these platforms,

correct?

A.     Correct.

Q.     And we saw in the prior documents that it was teenagers who tended, for the most part, to be using these AR effects more than anybody else, correct?

MR. HALPERIN:  Object to form.

THE WITNESS:  Correct.

BY MS. WALSH:

Q.     And am I right, Ms. Stewart, that in your view, this was a situation where you felt strongly that the company should be prioritizing the health and safety and well-being of kids and teenagers using these products, correct?

A.     Yes, yes.

Q.     And is it your view that the decision failed to prioritize -- strike that.

Is it your view that the decision that was made was one that didn't prioritize or put first the well-being of teenagers and kids using these apps?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes.

BY MS. WALSH:

Page 307

C E R T I F I C A T I O N

I, MARGARET M. REIHL, a Registered Professional Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

*Margaret M. Reihl*

--------------------------------------------------------

Margaret M. Reihl, RPR, CRR, CLR

CCR License #XI01497

NCRA License #047425

Notary Public of New York