**AMENDED** Exhibit 5

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT |MDL No. 4:22-MD-3047-YGR
ADDICTION/PERSONAL INJURY      |
PRODUCTS LIABILITY LITIGATION  |
        SUPERIOR COURT OF THE STATE OF CALIFORNIA
     COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        |
SPECIAL TITLE [RULE 3.400]      |
                               |
SOCIAL MEDIA CASES             |Lead Case for Filing
_____|Purposes
                               |22STCV21355
This Document Relates to:      |
                               |
STATE OF TENNESSEE, ex. Rel.   |
JONATHAN SKRMETTI, ATTORNEY    |
GENERAL and REPORTER,          |
v.                             |
META PLATFORMS, INC., and      |
INSTAGRAM, LLC,                |
Case No. 23-1364-IV            |
_____|

            VIDEOTAPED DEPOSITION OF NICK CLEGG
                     Volume 1
            Taken on Behalf of the Plaintiffs
   DATE TAKEN:     Thursday, March 20, 2025
   TIME:           9:22 a.m. - 7:29 p.m. GMT
   PLACE:          Covington & Burling LLP
                   22 Bishopsgate, 54th Floor
                   City of London, London EC2N 4BQ
                   United Kingdom

   Examination of the witness stenographically reported by:
        SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR
                        - - -
                GOLKOW, a Veritext Division
                    cs-golkow@veritext.com

Page 26

A.   Oh, sorry.  Yes, it is.  Yes.

Q.   Okay.  Mr. Clegg, you've worked at Meta for six-and-a-half years, right?

A.   I joined in October 2018, so just over, yeah.

Q.   And you've been President of Global Affairs at Meta since March 2022?

A.   Yes.

Q.   Can you tell me about your role and responsibilities?

A.   My role -- my current role and responsibilities or --

Q.   That's right.

A.   So as President, Global Affairs, I oversee two main functions in the company:  One, the policy functions, what's broadly called policy functions, and that covers everything from the content of the company's policies on issues like content moderation, but also how the company interacts with law makers, governments, around the world; and then secondly, and linked to that, also I oversee all the teams that deal with the way in which the company communicates to the outside world and responds to communication from the outside world.

So I think in sort of the broadest sense, a

Page 27

lot of my work has been loosely related to how the company interacts with the outside world, responds to societal concerns and perceptions and seeks to understand and clearly seeks to also protect the reputation of the company as a whole. So that is, I think, in broad terms, my role.

Q. So that would include public relations, right?

A. Public relations would fall under the policy teams, yes.

Q. And did you have, I guess, and just to be clear, you had overall responsibility for public relations at the company?

A. So I had overall responsibility for all of those areas that I mentioned, yes.

Q. And did you have any responsibility for safety and well-being issues?

A. So in terms of the policies that the company pursues, and not the product, nor the enforcement of those policies but how those policies are crafted, most especially what content is and is not allowed, enshrined in the company's community standards, yes, that fell under my overall authority.

Q. And what about age assurance or verification, did that fall in your purview?

A.   Again, as a matter of policy, where do you set that age limit and so on, that would -- that would fall under my -- under my -- under the remit of my teams, yes.

Q.   But as you just mentioned, you did not oversee the development of products or features, right, that was a different team?

A.   That was a different -- yes.  The company is a large company with engineering teams, commercial teams.  It's an advertising business.  In my area it's sort the -- a lot of it is the external facing but also, as I say, the internal adjudication on what policies, where the line should be drawn and so on, and, of course, all those teams seek to work together and the executives overseeing them, myself included, also seek to work together.

Q.   Going back to this document, before you were President of Global Affairs, you were Vice President of Global Affairs, correct?

A.   Yes.

Q.   Was there any meaningful difference in those two roles?

A.   It was definitely a continuum.  It was an extrapolation of one to the other.  I think it evolved a little over time, partly because, like

with all companies, people come and go.  So the COO, Sheryl Sandberg, I think relative -- I can't remember the precise date, relatively shortly after I became President, Global Affairs, left the company, so there were various things that she did that I took over.

And also, when I arrived at the company, my -- the formal reporting structure was such that I reported to her, and after she left, I reported directly to Mark Zuckerberg, and I think it's fair to say that in general terms, after around that point in early 2022, I probably calibrated my time a little bit more -- to be a little bit more outward facing rather than inward facing, yeah.

Q.    And when you were vice president, you still had overall responsibility for those two main functions that you described earlier, policy and communications?

A.    Yes.

Q.    You can put that document away for now.

Mr. Clegg, you're familiar with Molly Russell, right?

A.    I am.

Q.    She was a UK teenager who died from self-harm in 2019.

Page 82

Q.   I appreciate you providing context but just want to focus on the questions that I'm asking, and I appreciate that.

          MS. O'NEILL:  We can put this document away. Let's move to Document 9, which we'll label Exhibit 8, and this is META3047MDL-014-00053599.

          (Meta - Clegg Exhibit 8 was marked for identification.)

BY MS. O'NEILL:

Q.   Mr. Clegg, do you recognize this document?

A.   Yes.

Q.   What is it?

A.   It's a series of e-mails from late April -- late March, early April, 2020.

Q.   And you were a participant in this e-mail chain?

A.   Yes, it looks like it.  Can I just take a minute to read it?

Q.   Yes.  Okay.  This e-mail chain discusses cosmetic surgery AR effects, right?

A.   (Nodding head.)

Q.   Is that augmented reality?

A.   Yes, that's what AR stands for, yep.

Q.   And in other words, these are filters that mimic the effects of cosmetic surgery, right?

Page 83

A.    Yes.

Q.    Looking at the last page, there's an e-mail from Andy O'Connell, right?

A.    There is.

Q.    And Mr. O'Connell explains that at this time the company was deciding whether to continue, modify, or lift a temporary ban on these filters, correct?

A.    That's what it says, yes.

Q.    And Mr. O'Connell also says that the temporary ban was instituted in response to "concerns about potential negative well-being impacts (especially on minors)."

        Right?

A.    That's what it says.

Q.    And that was your understanding of what was happening, right?

A.    It was my understanding that was the decision that was needed to be made one way or the other, yeah.

Q.    And looking at the second page, there's an e-mail from Mr. Zuckerberg, right?

A.    Yes.

Q.    Mr. Zuckerberg says that:  "It has always felt paternalistic to me that we've limited people's

Page 84

ability to present themselves in these ways."

Right?

A.   That's what it says.

Q.   And he says there's -- he's seen or there is no data "that suggests doing so is helpful or not doing so is harmful."

Right?

A.   That's what it says.

Q.   And then he, on the next line, says he's "generally supportive of finding a way to relax or lift these bans."

Right?

A.   That's what it says.

Q.   And you disagreed with Mr. Zuckerberg, right?

A.   At the time I did, yes.

Q.   And in fact, you wrote separately to Ms. Sandberg on Page 1, right?

A.   I did.

Q.   And you told Ms. Sandberg that there are multiple reasons why reversing the ban would be unwise.  Right?

A.   I did.

Q.   And you said those were -- there were multiple reasons of principle and practice, right?

A.    That's what it says.

Q.    And what did you mean by that?

A.    Well, I go on to explain in the e-mail that, again, my role, amongst other things, was to seek to protect the reputation of the company and to anticipate external reactions, aside from and above and beyond the merits or otherwise of the substantive decision which was being discussed, and I felt that reputationally it would be looked at negatively by the press and others, so, as the e-mail suggests, I was particularly focused on the reputational aspects of this change.

Q.    You were worried that if Meta did reverse the ban, it would be seen as, as you put it, "putting growth over responsibility," right?

A.    That's part of my assumption of the way that some people would -- critics of the company would seek to describe it.

Q.    And what do you mean by growth in this context?

A.    I wasn't really using a dictionary definition.  I was just assuming the way that I think people would describe it.  They would -- they would seek to describe it, unfairly perhaps and negatively no doubt, as a commercial move that was

Page 86

driven by commercial and not other factors.

Q.   In looking at the very last sentence of your e-mail, you say:  "We are perfectly within our rights to take a precautionary approach on something as complex and serious as young women's body image and the dangers of cosmetic surgery."

Right?

A.   That's what it says.

Q.   Mr. Zuckerberg decided to reverse the ban, right?

A.   He was very focused on the issues of free expression, whether prohibiting people -- and remember, as Andy O'Connell's e-mail says, it was a temporary ban at the time, so it was always going to be looked at to being lifted, and as per Mark Zuckerberg's e-mail, he was concerned about the effect on free expression, the ability to use these new tools, these new augmented reality tools, and he hadn't seen data because the data was wholly inconclusive about whether it was neg -- whether these tools were negative or not.  Clearly, at that time technology was as it was.  It's changed enormously since and now it's ubiquitous across the Internet with new generative AI tools.

Q.   And I appreciate that context but I'm just

Page 87

going to focus on the question.  Mr. Zuckerberg decided to reverse the temporary ban, correct?

A.    The thing that remained in place at all times was any promotion of -- through these AR tools -- of cosmetic surgery and any use of these tools to show sort of the traces of surgery on the face.  So it -- there were different -- there were different nuances here.  It wasn't just a -- it wasn't just a yes-or-no choice.  I can't remember precisely but I remember there were a number of options that were available and I would need to refresh my memory.  So I don't think it's a question -- no, I don't think it was a question of just fully reversing everything.  I'm not sure if that was the outcome.

Q.    Okay.

A.    And to be fair, Mark Zuckerberg's e-mail is very clear.  He says he wants to see -- he wants to see more detail, he acknowledges it might be difficult to relax the restrictions, he wants just to see what the best plan might be.

Q.    Okay.  Let's look at another document that I think will provide a little more context.

MS. O'NEILL:  Document 10, and we'll mark it, yeah, as Exhibit 9, and it is

META3047MDL-014-00053851.

(Meta - Clegg Exhibit 9 was marked for identification.)

BY MS. O'NEILL:

Q.   Mr. Clegg, do you recognize this document?

A.   I do.

Q.   This is a different branch of the e-mail chain that we were just looking at, right?

A.   It is.

Q.   And it's from -- at least the top e-mail is from May 8th, 2020?

A.   Correct.

Q.   Okay.  And in the next e-mail down Mr. Zuckerberg says:  "I'm supportive of moving forward with option 2 (lifting restrictions but not promoting on IG)."

Correct?

A.   That's what it says.

Q.   Okay.  So he's lifting restrictions on cosmetic surgery filters but is still not promoting them, correct?

A.   That's what it says, yes.

Q.   And that's your understanding of the decision that was made?

A.   I can't honestly remember the details of

option 2 that is referred to in that sentence, so I'd need to look at -- I'm sure it has more details that are alluded to here.

Q.   You then forwarded this e-mail to ███ ████████, right?

A.   I appear to, yes, sir.

Q.   Who is Mr. ████████?

A.   ████████████ was, at that time, my sort of principal personal advisor with the company.

Q.   You worked with Mr. █████████ even before Meta, right?

A.   Oh, I did, yes, for many years, yeah.

Q.   He's a trusted advisor of yours?

A.   Yes, very much so.

MR. IMBROSCIO:  Let her finish.  I know you --

THE WITNESS:  Oh, sorry.

MR. IMBROSCIO:  That's fine.

BY MS. O'NEILL:

Q.   And in your e-mail to Mr. █████████, forwarding this e-mail from Mr. Zuckerberg, you said "Ugh."

A.   That's what it says.

Q.   So you weren't happy with Mr. Zuckerberg's decision at that time?

Page 90

A.    No.    As per the previous correspondence, I would have taken a more conservative approach.

Q.    And others in the company were unhappy, too, like Margaret Gould Stewart, right?

A.    That's my recollection, yes.

Q.    Okay.    Let's look at another document on this.

MS. O'NEILL:    This is 11 and we'll mark it as Exhibit 10, and it is META3047MDL-014-00053863.

(Meta - Clegg Exhibit 10 was marked for identification.)

BY MS. O'NEILL:

Q.    Do you recognize this document?

A.    I do.

Q.    What is it?

A.    Appears to be, I take it -- I don't think it's an e-mail.    I suppose it might be a internal chat communication between myself and Margaret Stuart in May -- mid May 2020.

Q.    And these chats are a way that you communicate with others at Meta?

A.    Yes.    It's a -- like all companies, we have an internal chat system, yeah, so a Work Chat it's called.

somewhat kind of misleading mythology around the technology.

Q.   And in the spirit of lifting the veil, and for the benefit of a jury that may see this deposition down the road, Meta's algorithm ranks -- selects -- selects and ranks and suggests content to users; is that right?

A.   Yes.  If I may, I don't think it's a single algorithm.  It's an algorithmic technology, so there are multiple algorithms which do a number of different things, but you're right in saying that one of the principal, but not only, functions is quite simply to rank the order in which a user will see content when they open Instagram or Facebook, but it's not the only -- there is also -- obviously, algorithms are a very, very powerful tool to downrank or if not remove bad, nefarious content as well.  So it's both a -- it's both a sort of sword and a shield, if I can put it like that.

Q.   Okay.  So it uplifts content and it downranks content?

A.   Amongst other things.

Q.   And Meta's algorithm doesn't create content, correct?

A.   Not --

Q.   Or its algorithms?

A.   No.

Q.   And Meta's algorithms don't change anything that has been posted to Instagram or written on Facebook, for instance, right?

MR. IMBROSCIO:  Object to the form.

A.   Change --

Q.   Doesn't change content.

A.   The content itself?

Q.   That's right.

A.   No.  The algorithms are not -- they're not -- they're not seeking to create content as such, though I should stipulate that, of course, in the age of generative AI, which wasn't really the case then, things have changed significantly.  There is much more synthetic or hybrid content online and I suspect that will continue dramatically.

So I think both the content -- the composition of content on Instagram and Facebook today is very different to what it was in 2021, and I think it will become even more different as these synthetic tools do -- they're not algorithms as such but they're synthetic tools which generate content.

Q.   So, but let's keep it focused to algorithms and not make this more complicated than it needs to

be.

A.    Yeah, sure.  Sure.

Q.    So the algorithms --

A.    Yeah.

Q.    -- do not themselves create content, correct?

A.    As a general -- as a general rule, that is correct.

Q.    And they don't change content, correct?

MR. IMBROSCIO:  Just let her finish before you begin, so the court reporter --

THE WITNESS:  Sorry.  It's a very interesting line of questioning.  That's why I'm --

A.    No, no, they don't.

Q.    Okay.  Now, Meta's algorithms recommend reels or stories, those are two of the types of content or surfaces on which content might be recommended, correct?

A.    Hm-hmm.

MR. IMBROSCIO:  You have to answer audibly.

A.    Yes.

Q.    It -- and Meta's algorithms also recommend users or accounts, correct, to other users, correct?

A.    I'm not 100 percent -- I suppose you could

call that something which algorithms affect.  You mean things like people you may know and --

Q.    (Nodding head.)

A.    Yes.

Q.    Okay.  And Meta's algorithms also recommend groups to users, correct?

A.    Based on the groups you've already been a part of and you seem to enjoy, yes.

Q.    Okay.  And so you mentioned people you may know or PYMK.

A.    Yeah.

Q.    That's one of the recommendation systems, correct?

A.    That's one of the ways in which the system would suggest, you know, would suggest people you want to be connected with.

Q.    Okay.  Accounts you might follow or may follow, that's another kind of recommendation, correct?

A.    Yes.

Q.    And groups you should join, that would be another recommendation system?

A.    Yes.

Q.    Okay.  Okay.  Let's turn to Page 3 of Exhibit 43.  Looking at the pulled-out quote about a

Page 367

So let's turn to Document 15, Document 15 is Exhibit 56, and it is METANMAG-007-00351828, and the attachment is 830.  The MDL number 050-00352023 and 025.

(Meta - Clegg Exhibit 56 was marked for identification.)

BY MS. SINGER:

Q.   Now, Mr. Clegg, this is an e-mail from you, correct?

A.   Yes.

Q.   Okay.  And it's dated 12/26/2022; is that correct?

A.   Yes.

Q.   And it attaches the Instagram Youth Well-being Phase 1 Assurance Audit report, correct?

A.   Yes.

Q.   Okay.  So this was an audit report that you were forwarding on --

A.   Correct.

Q.   -- to others at the company, correct?

A.   Correct.

Q.   Okay.  So it seems that you were attentive to this audit at least, correct?

A.   Well, as the message suggests, I wanted to make sure that it was on another team, in this case

Page 368

the legal team's, radar screen, given the legal and regulatory and other scrutiny on issues like this.

Q. Okay. And if you go halfway down the e-mail, you can see the original e-mail circulating the audit to you and others, correct?

A. I can't quite make it out now. It seems to be to Anna Tchernina, who is the main "To" line, and I can't see the -- I can't see myself on the CC line but I clearly must have been on it.

Q. It definitely got to you, correct?

A. Yeah.

Q. Okay. All right. And so in that e-mail, we're now at 828, it's addressed: "The Internal Audit team has completed the IG Youth Well-being Assurance Audit - Phase 1. This report is rated as 'Significant Improvements Needed' with 3 High, and 14 Medium risk observations."

Have I read that correctly?

A. Yes.

Q. Do you know if this audit, given the legal and regulatory issues you just raised, was discussed with Meta's board?

A. I don't know. I wouldn't know that, no.

Q. Okay.

A. Might have been. I've no idea.

Q.   Okay.   Now, you reviewed and forwarded this audit as part of your official responsibilities at Meta, correct?

A.   Correct.

Q.   And also in the course of Meta's regular business, right?

A.   Correct.

Q.   Okay.   And this is another audit report that is attached to the e-mail, correct?

A.   Correct.

Q.   And this one I think we gave the title "Instagram Youth Well-being Assurance Audit - Phase 1 Audit Report," if you look at 130 [sic], correct, Bates Number 130?

A.   Yes.

Q.   Okay.   And we're going to go to 833.   You can see this is under the heading of "Detailed Results and Management Action Plans," correct?

A.   Hm-hmm.

Q.   Okay.   And the business area is described as limiting interactions, correct?

A.   Yes.

Q.   And the heading in the next column is -- in the same row is "Inconsistent filtering of IIC account recommendation," correct?

Page 370

A.   Yes.

Q.   And that's rated as high?

A.   Yes.

Q.   Which you would agree likely indicates that it's a high severity finding, correct?

A.   It was a high priority finding, yes, yes.

Q.   Okay.  And it says here:  "The IG Well-being Teen --"

And by the way, IIC, just as a reminder, Inappropriate Interactions with Children, correct?

A.   Correct.

Q.   "The IG Well-being Teen Safety team does not always limit teen accounts from being recommended to the IIC potential violators and vice versa."

Have I read that correctly?

A.   You have.

Q.   Okay.  And then the asterisk after "IIC potential violators" corresponds to a foot -- to an asterisk at the bottom of that column, correct?

A.   Yeah.

Q.   Okay.  It indicates that this -- the group they're looking at is IIC Medium potential violators, defined by the product team as users above 18 without a verified tag, having one or more Child Sexual Exploitation Violation in the past 90

days or a Community Integrity classifier for IIC score greater than or equal to .3," correct?

A.   Yes.

Q.   So this is laying out kind of how Meta defines that group of individuals, correct, or at least how the audit team has?

A.   Yeah, correct.

Q.   Okay.  And it says below:  "For example, on a sampled day tested, on the Accounts You May Follow or (AYMF) surface --"

And just to pause there, that's one of the recommendation systems that we've been talking about, correct?

A.   Yes.

Q.   "-- IA identified:  1) 7.2 percent (or approximately 1.4 million out of 19 -- out of approximately 19 million) of potential violator accounts in AYMF were recommended to at least one teen."

Have I read that correctly?

A.   You have.

Q.   And that's in a single day, Mr. Clegg, is that right?

A.   It says here on a sampled day tested.

Q.   Okay.  But a sample day, one day?

Page 372

A.   I assume so, yeah.

Q.   And so, just making sure that we're focused on what this is communicating, in a single day AYS -- AYMF, Accounts You May Follow, a recommendation surface, recommended 1.4 million potential IIC violators to a teenager on Meta's platform.

A.   To at least one teen, that's what it says here, yes.

Q.   Okay.  If that was extrapolated over a year, and I know you won't like my math, but it helps me right size, that would be 500 million matches between potential IIC violators and teenagers on this single surface.

MR. IMBROSCIO:  Object to the form.

Q.   Is that -- is that concerning -- well, is that right?  Does that order of magnitude seem right to you?

MR. IMBROSCIO:  Object to the form; foundation.

A.   I'm not sure whether you can extrapolate from one day to 365, but if you care to do that, you can.

Is it concerning?  I mean, my response is the same in all of this.  This is the company doing what it should do, is identifying areas that are

Page 373

weak, weak of weaknesses.  Some are less serious, some are much more serious, this one included, listing what the mitigation should be.  There is a very clear management action plan here, three steps listing the two owners, two software engineers that should act upon it, setting out a due date for action.

Am I as concerned as anyone else would be by these statistics?  Of course.  Am I relieved to see that we had an internal audit system which was taking these things seriously and rigorously and setting out mitigating steps?  Yes.

I can't, of course, because I don't know what happened afterwards, know whether the software engineers took the appropriate actions, but I'd much rather this was identified as a problem rather than brushed under the carpet.

Q.    So long as it's fixed, right, Mr. Clegg?

A.    That is the whole point of identifying weaknesses, is to seek to make progress on all of these issues.  These are very, very complex systems built at vast scale, billions of people using them day in, day out.  Hundreds of billions of pieces of content are flowing across them every second of the day.  I think it's -- I think it's important that

Page 374

the company looks carefully at how, you know, how their systems are working and what needs to be corrected, what needs to be strengthened, what needs to be improved, yeah.

Q.   And in terms of your forward-looking focus, there are children on these platforms who have been introduced to potential predators in the -- in the period before this happened, correct?

MS. SINGER:  Object to the form of the question; argumentative, foundation.  You can answer.

A.   I can only repeat what the auditors said, that on a sample day they felt that there was 7.2 percent of potential violators -- I don't know what potential violator means, whether they -- whether they would act on that potential who were recommended to at least one teen, nor do I know whether the recommendations were acted on by the teens.  I can only repeat to you what this says here, but I'm pleased that the auditors set it out as clearly as they did and laid out the mitigating steps they felt were necessary, the management action plan and a due date by which those steps should be implemented, and the owners which needed to take those actions.

Q.   And you mentioned, Mr. Clegg, that you don't know if the teens acted on this recommendation.  I assume you'd agree that it's a problem --

A.   Of course.

Q.   -- whether or not a teen actually --

A.   Of course.

Q.   -- initiated the content?  And I know you also initiated the brushed under the carpet.  Do you know if Meta ever disclosed these findings to the public?

A.   I don't know.

Q.   Let's go to the next finding or a next finding on 834.  This is under also "Limiting Interactions," correct?

A.   Yes.

Q.   Okay.  And it says:  "Inconsistent follow list hiding.  The IG Well-being Teen Safety team does not always hide teen accounts from IIC potential violators and vice versa on the 'followers and following' surface.

Are you following me, so to speak?  Do you see where I'm reading?

A.   Yes, I see where you're reading, yes.

Q.   Okay.  And can you explain the "followers and following" surface?

Page 376

A.   Not entirely, no.   This is the first time I've seen this.   I just need to read it.

So this is obviously a surface on Instagram where people can choose to follow each other.

Q.   Okay.   And if you read down at the next paragraph, for example, on this particular day, 11/25/22, which I think was the day after Thanksgiving:   "IA observed that out of 2.5 million IIC potential violators who viewed the follow list surface, 37 percent," a little more than a third, "924,000, were shown at least one unconnected teen account."

Have I read that correctly?

A.   You have.

Q.   And that's also a high risk important finding, is it not, Mr. Clegg?

A.   Definitely.

Q.   Okay.   By the way, it's not -- it's not just high risk to Meta, right, it's high risk to these kids, correct?

A.   Of course.

Q.   So this audit, by the way, to go back to the date, was circulated in December 2022, right?

A.   Yeah.

Q.   And if you go to Page 832, that first

substantive page of the audit?

A. Yeah.

Q. It reads under Objective: "Instagram (IG) leadership has publicly committed to raising the industry standards for helping protect youth well-being and safety online. As part of this work, in 2021 and 2022, IG announced a stricter approach to cater recommendations and implement additional processes for youth. The implementations focused on further reducing the teens' exposure to potential violating or sensitive content or accounts in recommendation surfaces (e.g. Reels, Explore)."

Have I read that correctly?

A. Yes. Yep.

Q. Okay. So this reports that in 2021 and 2022, Instagram announces a stricter approach for these recommendation surfaces, correct, these recommendations?

A. It says here "announced a stricter approach to cater recommendations and implement additional --" I don't quite understand the formula of cater recommendations, but yes, that seems to be the spirit -- the purpose of that sentence, yeah.

Q. To protect kids from inappropriate content?

A. Yes. Yes.

Page 378

Q.   Okay.  And so these findings in 2022 happened one to two years after Instagram announced these changes, correct?

A.   Well, it says here that the changes were announced during 2021 and 2022.

Q.   So, I'm sorry, a year.

A.   Yeah, it's a rolling thing.  I mean, if -- I think there have been around 50-plus measures announced by the company over the last several years in this and related areas in terms of youth safety, parental controls, blocking content between teens and unconnected adults and so on.  It's not a one and done moment.  It's been, I think -- I mean, if you look over the last several years, there's almost a month hasn't gone by where new measures haven't been announced.  So I don't know what specific announcements in 2021 and 2022 are being referred to by the internal audit team here.

Q.   So -- but it is an announcement related to a stricter approach on recommending kids to inappropriate -- potentially inappropriate interactors, correct?

A.   Yes.

Q.   Okay.  And here in 2022, however many recommendations have been rolled out since --

A.    Yeah.

Q.    -- we're finding more than a million kids on a single day introduced to potential violators.

MR. IMBROSCIO:  Object to the form.

A.    The million, what's that referring to? Sorry.  Is that back to the --

Q.    I'm sorry.  A million potential violators introduced to teens.

A.    Sorry.  Which is the million you're referring to?

Q.    On 833, the number we discussed, 1.4 million of potential violator accounts were recommended to at least one teen.

A.    Yeah, according to the internal audit, yes, exactly, on that day, on a sample day, yeah.

Q.    And again, and just to be clear about this testimony, that was occurring in the wake of Meta having publicly announced --

A.    Yeah.

Q.    -- that it was making changes to this process?

MR. IMBROSCIO:  Object to the form.

A.    Yes.  I mean, you're making a point in sort of similar but repeated fashion, which is that there is a gap between how these things are rolled out

Page 380

over time and you have an internal process, whether it's from Antigone Davis or from the internal audit team, making sure that people's feet are kept to the fire and making sure that these things are addressed, brought out into the open and acted upon. That's the process that you can see in action here. I think that's a fair description of what's going on here.

Q.   Okay.  Let's move to Document 16.

THE WITNESS:  Thank you.

(Meta - Clegg Exhibit 57 was marked for identification.)

MS. SINGER:  So Document 16 is Exhibit 57, and it is METANMAG-002-02471121, and the MDL Bates Number is 034-00504910.

BY MS. SINGER:

Q.   So, Mr. Clegg, I'll represent that this was produced from your documents.

MR. IMBROSCIO:  What number --

MS. SINGER:  It's on --

MR. IMBROSCIO:  What is the number on there?

THE WITNESS:  57.

BY MS. SINGER:

Q.   So, Mr. Clegg, if you'd like to take a moment and look at it, just let me know when you're

ready.

A.    Please.

Q.    I'm only going to direct you to small pieces of it, if that helps at all.

A.    Okay.

Q.    Okay.  So this audit, this Phase 2 audit, is dated September 2023.  Do you see that?

A.    I do.

Q.    I know we don't have a cover e-mail but as I represented, it came from your files.  Do you have any reason to believe you didn't receive this audit report?

MR. IMBROSCIO:  Objection.

A.    I don't see the evidence here but I -- if -- you know, clearly these audit reports were circulated to large numbers of people in the company and since I was on previous e-mail chains, I'm assuming I must have been on this distribution list as well.

Q.    Okay.  And if you compare it, you'll see that the team of auditors who prepared this audit are the same as the team in the Phase 1 audit.

A.    Okay.

Q.    And you would expect that each of these audits was produced with a level of skill and

Page 382

independence -- I think you used the word "dispassionate" -- to provide guidance to Meta's executive leadership?

A.    Yes.

Q.    And these audits were prepared in the regular course of Meta's business, correct?

A.    Yes.

Q.    Okay.  And again, to situate ourselves in timing, this September 2023 report is nine months after what I will call the Christmas, the 12/26/22, Phase 1 audit.  You can check the dates on them just to make sure you're with me.

A.    Sure.  Yeah.

Q.    Okay.  All right.  And if you look at 123, which is, again, the first substantive page of this audit, it describes -- da da da -- it describes the Phase 1 audit in the first paragraph -- I'm sorry, the second paragraph:  "In Q4 2022, Internal Audit performed the IG Youth Well-being Phase 1 Assurance Audit which focused on content integrity for teens and interaction restriction controls between teens and potential violators."

Do you see that?

A.    Yeah.

Q.    Okay.  And that's the audit we just

reviewed, correct?

A.    Yeah.

Q.    "In Phase 2 we assessed the design and operating effectiveness of the key controls related to IG teen default restrictive settings, and IGD private messaging restrictions between adults and teens."

Have I read that correctly?

A.    You have.

Q.    All right.  And if we look at --

A.    But if I may, I think the final sentence, the "In addition, the Internal Audit performed remediation validations on the open observations that were identified in the Phase 1 audit," is of significance to understand whether these audits actually have an effect, and the summary of findings said that based on testing in July of '23, the teen default settings for -- applied by default sensitive control, content control, Tag Guide Reels Remix and Mention, TGRM, were operating effectively and management has remediated all the observations from the Phase 1 audit.

I only mention that because, as we discussed earlier, and as you rightly stressed, it's not just the audit that's important, it's how it's acted

Page 384

upon.

Q. So, Mr. Clegg, I'm going to move your -- to strike your answer as not responsive to a question but we'll come back to that.

A. It's responsive to the question about whether acting upon these audits is significant or not, which you asked me earlier.

Q. There was no question pending to you that required that answer.

A. Oh, I see.

Q. But we will come back to the question of whether they were effective.

So, let's look at Page 129. Oh, I'm sorry, let's -- before we leave this page, in terms of the consistent progress -- I'm starting to talk with an accent. "Results Summary: Significant Improvements Needed," is that the heading?

A. Yes.

Q. And the bottom bullet, under the Results Summary: "Inconsistent one-on-one and group messaging restrictions between teens and unconnected adults, including High Risk Adults."

That's one of the findings of this audit?

A. Yeah.

Q. Okay. If we turn to 129, again under the

Page 385

heading "Detailed Result and Management Action Plans," you can see that Number 6 is "IGD Private Messaging Restrictions."  Are you with me?

A.    Yeah.

Q.    Okay.  And remember, we talked about Instagram Direct earlier in this examination, correct?

A.    Yes.

Q.    Okay.  So it says here:  "Inconsistent Private Messaging Restrictions Between Teens and Unconnected Adults," and again, the audit defines unconnected adults -- da da da.

MR. IMBROSCIO:  Just --

Q.    -- which is adults including -- "Adults included in IGD messaging restriction testing are above 21 years old, including high risk adults."

Do you see that asterisk note at the bottom of the page?

A.    Yeah.

Q.    Okay.  "The Messenger Well-being team does not always prevent unconnected adults from initiating one-on-one -- one-to-one threads with teens on Instagram direct.  As a result, teens may be exposed to unsolicited contact from unknown adults which may not fully meet Meta's external

Page 386

commitment."

Have I read that correctly?

A.    Yeah.

Q.    It says with a double asterisk below:  "Meta made an external commitment in the IG Blog Post on 3/17/2021 that unconnected adults cannot initiate a private one-on-one message with a teen on Instagram Direct."

Have I read that correctly?

A.    You have.

Q.    And then returning to the third paragraph: "For example, on June 10, 2023, Internal Audit observed that out of 2.7 million new threads initiated by an adult with a teen globally, 238,000, or nine percent, were from unconnected adults."

Have I read that correctly?

A.    You have.

Q.    You would agree that this is a very significant high risk finding, too, correct?

A.    Correct.

Q.    I won't -- I want to pause for a second, because I'm a parent, you're a parent.  This is pretty frightening stuff, is it not, Mr. Clegg?

MR. IMBROSCIO:  Hold on.  Object to the form of the question, both foundation and

Page 387

argumentative.  You can answer.

A.   It's an audit about how adults and teens are being connected when they shouldn't be, and I think it's a very serious issue and I'm -- and I think it's a good thing that it's tackled so scrupulously by the audit team, and again, that they call out that connection was clearly happening in a way that it shouldn't have done, that was inconsistent with the policies, and that they set out so clearly what needed to be done to remedy that.

I mean, I note in the document that the IG Messenger Well-being team had requested a 30-day -- this is the final bullet point -- a 30-day extension to the standard 60-day remediation guideline for high risk observations, which, again, suggests to me that they were grappling with it but they were finding it complex to do so.

Q.   And, Mr. Clegg, I'm going to move to strike that response as nonresponsive to the question and I'm going to ask you the question again, which is as a parent, is this a frightening finding?

MR. IMBROSCIO:   Hold on.  Object to the form of the question; asked and answered, argumentative.  His answer was fully responsive.

A.   I think my answer was fully responsive.

You're asking me for my subjective emotions when I'm giving you the answer about -- which I think most parents would find more interesting than my own personal emotional reflections -- is do I feel this is evidence of a company trying to identify weaknesses in what it was -- in its platforms and had a plan to deal with it.  That, I think, for most parents is more interesting and important to the welfare of their children than asking me about what my own emotions are about my own.

Q.   So to the point that this would be interesting to parents, did Meta disclose this information to the public?

A.   I don't know -- I don't know --I don't know whether these audit reports were disclosed.

Q.   Do you recall ever seeing this information disclosed publically by Meta?

A.   Meta publishes vast amounts of information on a dally basis.  I don't monitor myself precisely what was published, but this is an internal audit. Like all companies, internal audits are run, as I think it says at the offset, as a -- as a confidential internal exercise.

Again, I think the point of these audits is not to virtue signal but is to see whether the flaws

Page 389

are being fearlessly identified, whether remedies are being scrupulously set out, whether people are being held responsible, and whether actions are being taken to deal with these issues. That, I think, is what most parents would think is something that is incumbent upon a company like Meta.

So, again, I don't know about the Phase 3 of this report. It seems to me it would be important to know whether these gaps, and they are significant gaps, were properly addressed or not.

Q. And here again, Mr. Clegg, we're at September 2023, after announcements in 2021 and 2022 about more rigorous steps that Meta is taking, correct?

A. Yes.

Q. Okay. So I want to go to the blog post that was referenced in this internal audit. Remember we just talked about at blog post on March 17th, 2021, which is highlighted on the screen.

A. Oh, yeah.

Q. Okay. So that's Document 17, which we'll mark as Exhibit 58.

MR. IMBROSCIO: Thank you.

(Meta - Clegg Exhibit 58 was marked for identification.)

Page 678

C E R T I F I C A T E

I, Susan D. Wasilewski, Registered Professional Reporter, Certified Realtime Reporter, Certified Manager of Reporting Services, Certified Realtime Captioner, and Florida Professional Reporter, hereby certify that the witness named herein appeared before me on Friday, March 21, 2025, and was duly sworn.

I FURTHER CERTIFY that I was authorized to and did stenographically report the examination of the witness named herein; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not related to or an employee of any of the parties, nor am I related to or an employee of any of the parties' attorneys or counsel connected with this action, nor am I financially interested in the outcome of this action.

WITNESS my hand this 10th of April, 2025.

_____

Susan D. Wasilewski, RPR, CRR, CMRS, CRC, FPR