# AMENDED Exhibit 12

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

PURSUANT TO PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                    )
ADOLESCENT ADDICTION/PERSONAL          )
INJURY PRODUCTS LIABILITY              ) MDL No. 3047
LITIGATION                             )
_____        )
THIS DOCUMENT RELATES TO:              )
ALL ACTIONS                            )

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES – SPRING STREET
COURTHOUSE

COORDINATION PROCEEDING            )
SPECIAL TITLE [RULE 3.400]         ) Lead Case No.
                                   ) for Filing
SOCIAL MEDIA CASES                 ) Purposes
_____)  22STCV21355

MONDAY, DECEMBER 16, 2024

CONFIDENTIAL - ATTORNEYS' EYES ONLY -
PURSUANT TO PROTECTIVE ORDER
- - -

Videotaped deposition of George
Volichenko, held at the offices of Lieff
Cabraser Heimann & Bernstein, LLP, 275
Battery Street, 29th Floor, San Francisco,
California, commencing at 9:05 a.m. Pacific
Time, on the above date, before Carrie A.
Campbell, Registered Diplomate Reporter,
Certified Realtime Reporter, Illinois,
California & Texas Certified Shorthand
Reporter, Missouri, Kansas, Louisiana & New
Jersey Certified Court Reporter.
- - -

Job No. 7053449

Page 2

A P P E A R A N C E S :

MOTLEY RICE LLC
BY:   PREVIN WARREN
        pwarren@motleyrice.com
        ABIGAIL BURMAN
        aburman@motleyrice.com
401 9th Street NW, Suite 630
Washington, DC   20004
(202) 386-9610

and

MOTLEY RICE LLC
BY:   ANNIE E. KOUBA         (VIA ZOOM)
        akouba@motleyrice.com
        TOPE O. LEYIMU        (VIA ZOOM)
        tleyimu@motleyrice.com
        JODI WESTBROOK FLOWERS (VIA ZOOM)
        jflowers@motleyrice.com
        SARA O. COUCH          (VIA ZOOM)
        scouch@motleyrice.com
        P. GRAHAM MAIDEN       (VIA ZOOM
        gmaiden@motleyrice.com
28 Bridgeside Boulevard
Mount Pleasant, South Carolina   29464
(843) 216-9000

and

MOTLEY RICE LLC
BY:   JESSICA COLOMBO        (VIA ZOOM)
        jcolombo@motleyrice.com
20 Church Street
Hartford, Connecticut   06103
(860) 746-1248

and

PURSUANT TO PROTECTIVE ORDER

Page 24

introduce yourself to the jury.

Where did you grow up?

A.    Hi, everyone.  My name is Georgy Volichenko.  I go by George, but my legal first name is Georgy with a Y.  I grew up in Moscow, Russia.  I came to the US for college when I was 18, so about 16 years ago.  And, yeah.

Q.    Okay.  Can you tell us a little bit about your education?

A.    I went to school at Carnegie Mellon University in Pennsylvania.  I studied statistics, did a bachelor's and master's, and then went on to data science analytics work.  Yeah.

Q.    Okay.  What was your first job after receiving your master's?

A.    My first job was at a company called Comscore, which is an advertising analytics company, and it was in Reston, Virginia.

Q.    Okay.  At some point did you leave Comscore?

A.    I did.  I did.  About three years after I started working there.

PURSUANT TO PROTECTIVE ORDER

Page 25

Q.     Okay.  And where did you work next?

A.     I worked at Facebook before it was called Meta.  So it was 2015 -- 2016 through 2018, for two years.

Q.     Okay.  And what sort of work did you do during that stint?

A.     At Facebook?

Q.     Yes.

A.     I worked for the marketing department, consumer marketing, doing analytics work, helping with measurement of marketing campaigns.

Q.     Okay.  And how was your experience at Facebook during that first stint?

A.     It was pretty great, actually. I went there specifically.  I was following my manager from Comscore, who got a job there and was, you know, kind of hiring for her team.  So it's one of the main reasons I kind of made that jump, is because I wanted to work with her.

We had, you know, a good team, good kind of like office culture.  It was,

PURSUANT TO PROTECTIVE ORDER

Page 26

you know, before any of the remote work transition, so it was -- it was a good time.

Q.    Okay.  Why did you leave?

A.    I left because I wanted to explore other career options, kind of spend some time on introspection and doing some traveling.  Yeah.

Q.    Okay.  Did you have other work before you subsequently returned to Facebook?

A.    Oh, yes.  Yes.  I worked at several startups, yeah, like larger startups, like Strava and Calm, the meditation app. And I even worked at Zillow briefly, the real estate app I'm sure everyone knows.

And, yeah, I didn't -- I didn't get back to working at Meta until much later. Like 2022.

Q.    Okay.

A.    It was a year.

Q.    And you referred to Meta.  When you returned to the company, had it been rebranded as Meta from Facebook?

A.    That's correct.

Q.    Okay.  Did you interview to work at Meta or for a specific product within

PURSUANT TO PROTECTIVE ORDER

Page 27

Meta?

A.    Good question.  So the -- for data science, the interview process is usually general.  Sometimes you get a chance to kind of talk to a specific team.

Q.    Uh-huh.

A.    But that happens pretty much at the end of the interview process when there's some sort of indication that you might be a good candidate.  So my interview process was general.

Q.    Okay.  And where did you wind up working within Meta when you rejoined?

A.    Yeah.  So I had a specific kind of preference to work on an integrity-focused team, which is, you know, a very general term, but -- so my recruiter at the time linked me with -- the team that I ended up working at was teen mental health team within Instagram.

Q.    Okay.  Is there any particular reason you were interested in working on teen mental health issues?

MR. CHAPUT:  Object to the form.

PURSUANT TO PROTECTIVE ORDER

Page 28

You can go ahead and answer.

THE WITNESS:  Yeah.  So --

QUESTIONS BY MR. WARREN:

Q.    Well, let me rephrase the question then.

Were you interested in working on teen mental health issues in particular?

A.    Not in particular.  I think it was a matter of kind of vacancy.

But I had some kind of surface-level experience in my first stint at Facebook on a team called protect and care, I believe it was called, and they were focused on, you know, kind of protecting users from malicious behavior.  Specifically it was something around some bad actors and, like, ways that you could identify that and basically create safeguards for users.  And I thought it was really interesting.

And so when I came back for my second stint and did the interviews, I kind of described that experience and said that something along those lines would be really cool.

And they linked me up with teen

PURSUANT TO PROTECTIVE ORDER

Page 29

mental health.  I think -- could you repeat your question, just to make sure I'm not --

Q.    I can just ask another one.  I think --

A.    Okay.

Q.    -- you answered that one.

Were you excited to work on teen mental health issues?

A.    Yes.  Yes, I was.  I was.

Q.    And why was that?

A.    Because I think, first of all, I think it's a -- it's a nontrivial problem. It involves some really novel challenges that I hadn't previously encountered in my career, so that was exciting.  But also for reasons of just, you know, making a positive difference, I guess, is another reason.

Q.    Do you have any personal experience in your life with teen mental health issues and social media?

MR. CHAPUT:  Object to form.

THE WITNESS:  No, not really.

QUESTIONS BY MR. WARREN:

Q.    Okay.  During your time at Instagram -- and, sorry, let me withdraw the

question.

Did you work specifically on Instagram or on other Meta products?

A. Only Instagram.

Q. Okay. During your time at Instagram, would you say you developed an understanding of its business model?

MR. CHAPUT: Object to the form.

THE WITNESS: I would say --

MR. WARREN: Hold on a second. Counsel, what's the basis for the objection so I can rephrase it if necessary?

MR. CHAPUT: It's vague.

QUESTIONS BY MR. WARREN:

Q. Okay. Mr. Volichenko, let me reask you the question. I just want to know if you think it's vague.

During your time at Instagram, would you say you developed an understanding of its business model?

A. I would say in general terms, yes. I probably developed a better understanding in my first time at Facebook.

Page 31

Q.    Okay.  Could you explain the business model of Instagram then?

MR. CHAPUT:  Object to the form.  Foundation.

THE WITNESS:  I can continue?

QUESTIONS BY MR. WARREN:

Q.    You can.

A.    The business model is -- well, it's based on advertising, right?  So they sell ads.

There's several things that I think are unique about their business model. Well, probably not unique anymore with other kind of companies doing similar stuff, but I think they were the first.  And first offering really good targeting, right?

So you can, as an -- as an advertiser, you can kind of go after users that have specific interests or live in a specific geography and basically just have a lot more -- a lot higher likelihood that people who see your ads will be interested in your product because of targeting.

But also I think that the business model of Instagram and, you know,

Page 32

other social networks very much so is kind of maximizing the amount of time and attention that people kind of dedicate to the platform, thus allowing for just, like, more space and time to present the advertising.

So I think that's, like, a really big part of the business model that maybe we just don't -- I don't know.  It's not a top of mind for people, but it's very important.

Q.    Okay.  Does Meta make more money if its users use Instagram more frequently?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes, absolutely.

QUESTIONS BY MR. WARREN:

Q.    Does Meta make more money if its users use Instagram for longer periods of time?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes.

QUESTIONS BY MR. WARREN:

Q.    And all things being equal,

the data scientist that was before me was also involved in that.  Unfortunately, I don't remember his name.

And then, you know, the rest of the team is definitely there, so software engineers, designer.  There's a content -- was it content designer, which is like a copyrighter.  There's a person who does kind of qualitative research, like a UX researcher.

For all those people, I can't say for sure who was working on a project because it was before my time.

Q.    Are you familiar with the term "p-NAC"?

A.    Yes.

Q.    What is p-NAC?

A.    Yeah.  p-NAC is -- so NAC stands for negative appearance comparison. p-NAC is basically probability.  So P is lowercase, which is often used in statistics as, like, probability.  You know, you've heard of p-values also related to probability.

So p-NAC was a model they

PURSUANT TO PROTECTIVE ORDER

Page 41

developed on my team, and I think this guy Justin, Justin Cheng, was, like, the main kind of the -- the brain behind it.  It was a model that was scoring content, right, on how likely it is to be associated with negative appearance comparison.

So you could imagine, like, for example, like, a picture of a Christmas tree, low p-NAC.  A picture of, like, some beautiful girl in, like, a bikini, posing would be potentially high p-NAC.

Q.    Okay.  And was the p-NAC scoring model part of the solution that the team proposed to address negative appearance comparison?

A.    Yes.

MR. CHAPUT:  Object to form. Foundation.

QUESTIONS BY MR. WARREN:

Q.    Okay.  Was that project subject to a review process?

A.    Yeah, absolutely, like every other project.

Q.    Okay.  And what's your understanding of that review process?

PURSUANT TO PROTECTIVE ORDER

Page 44

MS. KRAMER:  Object to form.  Foundation.

QUESTIONS BY MR. WARREN:

Q.    Let me -- let me withdraw the question.

Do you know if Adam Mosseri approved the negative appearance comparison project?

A.    I know for a fact that he did not approve it.

Q.    What happened?

A.    So the -- well, so the model is only part of the -- part of the solution that was proposed, right?

Kind of the key component is that content gets essentially either down-ranked or completely removed if it has high p-NAC, right?

So -- but only for teens, right?  And all of the stuff that we did was specifically for users who stated that their age is, you know, within our definition of teen, which is 13 to 17.

And so the solution that was proposed is, like, hey, we have this model,

Page 45

can we test kind of down-ranking it for teen users.

And Adam had, like, a very clear -- very clearly kind of denied us that opportunity because -- I believe the reason was that we, as a platform, should not pass judgment on the content because, like, when we start doing that, it might, like, affect content creators.  They will be kind of unsure why their content was potentially down-ranked.  And it's just, like, a can of worms that we don't want to go there.

And -- yeah.  So that was -- that was the reason that it was, like, shut down at that point.

Q.    Do you know how Adam Mosseri communicated his decision concerning the negative appearance comparison project?

A.    I know that there were -- there was an e-mail thread about it with a lot of people weighing in, including -- well, mainly it was ███, my PM.  He was on it and, like, everyone in between, which is a lot of people.

And I'm sure there were other

Page 46

methods of communication that I'm not aware of.

Q.    Are you aware of whether Mr. Mosseri expressed any view in that e-mail chain about negative appearance comparison content relative to other kinds of content on Instagram, how prevalent it was?

MR. CHAPUT:  Object to form.

QUESTIONS BY MR. WARREN:

Q.    Let me reask the question.

Are you aware of whether Mr. Mosseri expressed any view about how prevalent negative appearance content is on the Instagram platform relative to other kinds of content?

MR. CHAPUT:  Object to form.

THE WITNESS:  I'm not.  No, I'm not aware of that.

QUESTIONS BY MR. WARREN:

Q.    Did you come to understand whether Mr. Mosseri's decision not to move forward with the p-NAC project had any impact on the morale of the Instagram mental well-being team?

A.    Well, my impression -- I can't

know for sure, but my impression was that they were pretty disappointed because they spent a lot of time, and they thought -- they thought very -- they believed very strongly in the need for this, right?  And I think there was even, like, some surveys and research that this is a big problem, and they wanted to work on it.

They felt like they had a potential solution, but without -- without being able to, quote/unquote, pass judgment on content, they felt like they had their hands fully tied.

And in combination with the lack of clarity in what's coming next, this was all kind of compounding in a, you know, a low morale.  That was my impression.

Q.    Okay.  And you testified earlier that you came to develop a view as to why the data scientist before you and the data engineer had left.

A.    Yeah.

Q.    What was that view?

MR. CHAPUT:  Object to form. Foundation.

PURSUANT TO PROTECTIVE ORDER

Page 48

THE WITNESS:  My view is that they were likely just didn't see the point in being there.  I mean, there could be other reasons.  And they wanted to -- kind of similar to me, they wanted to make a difference, and they felt like they just didn't have an opportunity to do that.

QUESTIONS BY MR. WARREN:

Q.    Okay.  Now, you talked a bit about the review process that the negative appearance comparison project went through.

In your personal experience, is that typical of the review processes that proposed safety features had to undergo at Instagram?

MR. CHAPUT:  Object to form.

THE WITNESS:  Yes, pretty typical.  I think there's -- depending on the kind of level of how much of the app experience the feature involves, it can go higher up, like in that case to Adam, or it can kind of stop at, like, well-being leadership if it's something that does not -- is

Page 68

QUESTIONS BY MR. WARREN:

Q.    Did the well-being team want to move forward with the intervention to reduce negative appearance comparison?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes.

QUESTIONS BY MR. WARREN:

Q.    Okay.  But they were not allowed to do so by Instagram leadership?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes.

QUESTIONS BY MR. WARREN:

Q.    Okay.  So I'd like to ask you some questions about what your team pivoted to after work on negative appearance comparison came to an end.

Did the team begin work on something called problematic use?

A.    Not immediately after, but shortly, shortly after, yes.

Q.    Okay.  And was problematic use another way of referring to social media addiction?

Page 96

the phrase "screenshot risk"?

A.    Screenshot risk?

Q.    Yeah.

A.    No.

Q.    Okay.  George, were you involved in evaluating to what extent the Take a Break and alternative topics features were actually used by Instagram users?

A.    Yes.

(Volichenko Exhibit 3 marked for identification.)

QUESTIONS BY MR. WARREN:

Q.    Okay.  So I'm going to direct your attention to another document ending in Bates number 399807.  This will be Volichenko Exhibit 3.

And go ahead and take a minute to review this, and just let me know when you're ready.

A.    Okay.

Q.    Okay.  So why don't we start on page 4 of this document.

A.    Okay.

Q.    Does this indicate that you opened this conversation on June 9, 2022?

PURSUANT TO PROTECTIVE ORDER

Page 97

A.    Wait.  Page 4.  Is that -- oh, this page.  Okay.

Q.    You can also look on your screen.

A.    Yes, it does indicate that.

Q.    Okay.  And would you have opened and reviewed this document in the ordinary course of your work at Meta?

A.    Correct, yes.

Q.    Okay.  So flipping back to page 1, just looking at the title, do you see the words "IGWB e-mail review"?

A.    Yes.

Q.    What does IGWB stand for?

A.    Instagram well-being.

Q.    And then it says "mental well-being."

Right?

A.    Yes.

Q.    Is that the name of the specific team you worked for?

A.    Yes.

Q.    And the next part of the title is "H1 2022."

What does H1 mean?

PURSUANT TO PROTECTIVE ORDER

Page 98

A.      First half of 2022.

Q.      Okay.  And then it says, "Goal methodology update V2."

Right?

A.      Yes.

Q.      Okay.  At some point while you were working at the Instagram mental well-being team, did the team reduce its goal for the number of users that would adopt Take a Break?

MR. CHAPUT:  Object to form.

THE WITNESS:  I think so.  I mean, I may be misremembering.

QUESTIONS BY MR. WARREN:

Q.      Okay.  Can you read the first paragraph to the jury, please?

A.      "Thanks for the feedback.  Team will keep meaningful adoption and leave as a percentage but does not believe we have a path to hitting that goal, so would like to request we reduce .6 percent to .25 percent given the tactics we have aligned and prioritized for this half.  I have reflected these changes in V2 proposal below."

Q.      Okay.  Does that refresh your

Page 99

recollection as to whether the team reduced its goal?

A.    Yes.  Just wanted to clarify that it was done early on in my -- in my time on the team, and potentially the -- some of the decisions were -- you know, it was -- it might have been initiated prior to my time as well.

Q.    Okay.  So let's take a look at the table on the first page.

A.    Okay.

Q.    Looking at the first row, what was the team's revised goal in terms of the percentage of weekly active teen Instagram users that adopted Take a Break?

A.    Sorry, are you asking about the goal or the actual amount that --

Q.    The goal.  The goal.

A.    It's unclear for Take a Break specifically.  So what they're saying here is that the goal for adoption, the combined adoption of all the features, was .25 percent.

Q.    Okay.  And if you just look three rows up, is there a row specific to

Page 104

Do you know what the author of this statement is referring to when they refer to a one-way door principle?

A.     I believe I do, yes.

Q.     And what is that?

A.     So one-way door refers to features that once we launch them, we basically cannot disable them, right?

With some -- with some features that I would say have, like -- that are less sensitive, right, you can -- you can in theory, like, enable it.  You know, say it doesn't work or it, like, affects something negatively, you can shut it down.

With features -- with some other features, especially features in this kind of well-being space, once you put it out there, you know, you can't turn it off because -- well, I believe there are multiple reasons, but the most obvious one I can think of is that, like, it just looks really bad, right?  Like the company is, like, doing something to protect the users, but then they're, like, eh, we don't want to protect users anymore.  We're going to turn it off.

Page 105

So that is at least a component of why these one-way door features exist.

And from what I remember, the guidance that we received from ███, our product manager, was that a vast majority of things that we work on would fall into that category, right?

So for Take a Break, for example, if we make it opt-out, when we -- when we test it, right, we enable it for some random sample of users. And let's say it doesn't work. It tanks a bunch of metrics that we can't -- we can't, you know, effect. But for those users, we already have -- it's out there. We can't -- we can't turn it off for them. Which is not the end of the world, but it creates a very fragmented user base, right? It's, like, some people have it, others don't. We, like, lost track of who has it. It gets really messy.

And I don't know if that is really the extent of the reasoning there, but, yeah.

Q.    Okay.  Thank you.

So now that you've explained

Page 122

the time is that, look, TikTok is doing it, opt-out.  They're just kind of enabling it for everyone.  Should we consider doing that.

And, yeah, we just felt like we weren't -- we weren't, again, like, aggressive enough, and we weren't necessarily taking a stance on this matter.

(Volichenko Exhibit 6 marked for identification.)

QUESTIONS BY MR. WARREN:

Q.     Uh-huh.  Okay.

Let me show you another document, and this will be a document ending in Bates Stamp 5017, and we'll mark it as Volichenko 6.

A.     Thank you.

Q.     Do you recall this presentation?

A.     Yes.

Q.     At some point while you were working at Meta, did you have access to this presentation?

A.     I did.

Q.     Okay.  So just starting on the first page, what's the title of this

Page 123

presentation?

A.    "Late Night Use, Instagram Mental Well-Being, Problematic Use, Strategy and Design."

Q.    And do you see some text at the bottom in gray?

A.    Yes.

Q.    Can you read that to the jury?

A.    "A/C Priv, Communities Review, August 4, 2022."

Q.    What does A/C Priv mean?

A.    Attorney-client privilege, I believe.

Q.    Do you recall receiving any kind of instruction regarding when to place the words "A/C Priv" on documents?

MR. CHAPUT:  Object to the form.

QUESTIONS BY MR. WARREN:

Q.    You can answer.

A.    Okay.  I thought there was more coming.

I do recall at some point in my employment at Meta, or maybe Facebook -- prior to my first time that I was working at

Page 124

Facebook, we had some training on when and where to use the A/C Priv label.

Q.    And what was your understanding as to when to use that label?

A.    The gist of it was, like, if you don't feel comfortable it being public, your conversation kind of, like, leaking to the public, and if you feel like it would be, like, a sensitive topic or this conversation might be misconstrued, you should label it A/C Priv, and then it's, like, safe from -- from everyone's eyes.

Q.    Do you know what the letters A/C stand for?

A.    I'm assuming it's attorney-client.

Q.    Okay.

A.    I mean, I'm pretty sure it is.

Q.    Okay. Let's --

A.    Alternating current?  I don't know.

Q.    Okay. Let's start on slide 10.

MR. CHAPUT:  Counsel, sorry. Before you proceed, I don't see the confidentiality designation on the

PURSUANT TO PROTECTIVE ORDER

Page 130

QUESTIONS BY MR. WARREN:

Q.    And what does it indicate?

MR. CHAPUT:  Objection. Foundation.

THE WITNESS:  Yeah, I think this is based on kind of user research.  So this is kind of the more qualitative research that █████ would be doing.

And so some of the findings is that teens feel pressure to be available at all times, there's social norms around kind of being available and being online, and that Instagram is used to kind of wind down before -- like, when you're in bed before going to sleep, and that the existing tools within the operating systems as well as Instagram itself are not sufficient currently.

QUESTIONS BY MR. WARREN:

Q.    Okay.  Let's go back to the executive summary on slide 3, please.

A.    Which slide?

Q.    Slide 3.

Page 131

Could you read to the jury the very last paragraph in dark gray that begins with "Quiet Mode"?

A.    "Quiet Mode:  A controls-based bundle that helps teens manage their relationship with Instagram at night - fewer engagement triggers to pull them into the app, and a less stimulating experience when browsing the app."

Q.    What are engagement triggers?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Engagement triggers would be anything that has the goal of, like, bringing you into the app, or if you're into the app, bringing you into other surfaces, right?

So most of the time we think about badges, which is, like, the little red dot over the app icon on your home screen.  Especially it has some, like -- usually it has, like, a number on it.  That is massively effective as an engagement trigger,

PURSUANT TO PROTECTIVE ORDER

Page 132

especially for people who kind of have this level of kind of OCD-like behavior that they should be all cleared. So you kind of -- I'm going to see what -- what's going on there, right?

And then when you're inside the app, you have the same kind of badge on your inbox icon in the top right corner. Those kinds of things are the engagement triggers.

And part of the functionality of Quiet Mode that we definitely considered -- I don't know if it was, like, launched as part of the main feature -- is suppressing those. So basically we're not -- we're not trying to bring you into the app during Quiet Mode hours with the feature on.

QUESTIONS BY MR. WARREN:

Q. Okay. So is it correct that Meta has the ability to vary the amount of engagement triggers that pull users into Instagram?

PURSUANT TO PROTECTIVE ORDER

Page 133

A.      Yeah.

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes.

QUESTIONS BY MR. WARREN:

Q.      Okay.  So it can increase those engagement triggers to pull in more users?

MR. CHAPUT:  Object.  Object to the form.  Foundation.

THE WITNESS:  Well, they have the ability to, you know, kind of fire them whenever, but usually they are caused by some activity.  You know, you're getting a message or a "like" or whatever, right?  So I don't think they can necessarily increase them because they're tied to events, but they can definitely suppress them.

QUESTIONS BY MR. WARREN:

Q.      Okay.

A.      Turn them off.

Q.      So I guess let me reask the question.

Can Meta vary when, to what extent and to whom it deploys engagement

Page 134

triggers?

A.     Yes.

MR. CHAPUT:  Object to the form.  Foundation.

QUESTIONS BY MR. WARREN:

Q.     Okay.  Going back to this slide, it refers to a, quote, "Less stimulating experience."

Do you see that?

A.     Yes.

Q.     Does Meta have the ability to control whether a browsing experience on Instagram is more or less stimulating?

MR. CHAPUT:  Object to the form.  Foundation.

THE WITNESS:  Yes.

QUESTIONS BY MR. WARREN:

Q.     How does it do that?

MR. CHAPUT:  Object to the form.  Foundation.

THE WITNESS:  Well, there are many possible ways to do that.  I think -- I guess it depends on what -- how you define "stimulating."

I think in this case I would

say, like, you can -- you can, like, limit the number of pieces of content that you are -- you're, like, presenting, putting in front of the user, right?

So, like, I think currently it is a -- it's like an infinite scroll news feed, right? You just keep scrolling and scrolling, and it just keeps showing you more stuff, right, generating content that algorithm thinks you would like -- you are likely to engage with or whatever it is, right?

So even limiting that is a hundred percent in power of Meta. You could -- I think we even talked about, like, making it black and white at nighttime. It'd be, like, easier on the eyes in the dark, but also just less stimulating so you're more likely to, you know, shut down the app and go to sleep. That's one example.

All of these, like, you know, message notifications and these badges

PURSUANT TO PROTECTIVE ORDER

Page 136

and these engagement triggers, they can be suppressed.  Those are some examples, but, you know, you can imagine many solutions here.

QUESTIONS BY MR. WARREN:

Q.    Okay.  George, were you responsible in whole or in part for determining the metrics for success for the Quiet Mode feature?

A.    Definitely in part.  I -- yes.  I don't recall who was all involved.  It was probably some combination of me and people from the product -- product growth analytics team.  Yeah.

Q.    Okay.  And can you turn to slide 7, please?

A.    7.

Q.    I'm actually going to focus you on the comments which are on the next page, but why don't you take a second to review this slide first.

A.    Success Definition.  Okay.  Okay.

Q.    And the slide is entitled "Success Definition."

Page 140

Q.    Okay.  So Ms. ██████ indicates here that "counter-metrics will be IG-critical metrics and surface-specific guardrails for notifs, IGD, active presence, et cetera."

I think you've talked about some of these things, but can you just decode that for the jury, please?

A.    Uh-huh, yeah.  So --

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Counter-metrics, essentially, yes, as you said, guardrails.  So we want to drive some outcome, but at the same time we don't want to harm the ecosystem sort of thing, right?

And the teams that are involved specifically with Quiet Mode are -- and the notification teams, IGD is IG Direct, which is the messaging within Instagram.  Active presence, don't recall, but it's probably some other team that it would be involved somehow, right?

Because when we're suppressing notifications, we're suppressing badges and other stuff. You'll imagine that there will be a -- we'll see kind of a hit on those metrics.

So that's why we would, like -- we need to -- when we -- if and when we see that, we need to go to those teams and be, like, hey, at least we are improving the situation with late night time spent. So maybe you can work with us and give us an approval.

QUESTIONS BY MR. WARREN:

Q.    Okay. How important did those counter-metrics wind up being in shaping the version of Quiet Mode that Meta ultimately released on Instagram?

MR. CHAPUT: Object to form. Foundation.

THE WITNESS: From what I remember, not very important, because we kind of saw a similar thing that we saw previously with Take a Break, is that there's just not -- there's not enough impact across the board, you

Page 142

know.

Like, the late night time spent, I don't remember if we saw, like, a statistically significant impact there or not in our testing. And same thing for these critical metrics and other teams' guardrails. So it's just, like, kind of doing nothing.

And as I was saying, the optimal scenario is that it is doing -- you know, it is reducing our main problematic use metric, in this case late night time spent, and also doing some damage on the -- those guardrails. That's how we know it's, like, moving the needle.

QUESTIONS BY MR. WARREN:

Q. So if counter-metrics related to growth and usage had not been considered, do you think Instagram could have released a version of Quiet Mode that was more protective of teen health?

MR. CHAPUT: Object to form. Foundation.

Page 143

THE WITNESS:  I believe so, yes.

(Volichenko Exhibit 7 marked for identification.)

QUESTIONS BY MR. WARREN:

Q.    Okay.  Let me direct your attention to another document.  This ends in the Bates stamp 504271, and it will be Volichenko 7.

So as a very preliminary matter, is this an e-mail from ███████ ████████?

A.    Yes.

Q.    And are you on the "to" line of this e-mail?

A.    I am, though I -- was I even working there at the time?  I guess -- I guess I was.

Q.    Okay.

A.    It was January.  Yes.  Yes. Yes.  Okay.  Sorry.  Yes.

Q.    I mean, did you have access to your meta.com e-mail after you left the company?

A.    No.

Q.    Okay.  So you would have been

PURSUANT TO PROTECTIVE ORDER

Page 164

financially.  My wife is mad at me to this day.  But that's her problem, right?

Q.    All right.  Thank you, George.

I just have a few more questions about Quiet Mode, and I think we'll be able to wrap at least my portion of the examination relatively soon.

So you've spent a lot of time talking about opt-in versus opt-out.

Was Quiet Mode launched as an opt-in feature or an opt-out feature?

A.    I'm pretty sure, if my memory is accurate, it was launched as an opt-in feature.

Q.    Okay.  Would it have been better for teen safety, in your experience, if it had been launched as an opt-out default for teenagers?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  Yes, I think much like Take a Break, it would have been -- it would have been a good move.

There are some differences,

PURSUANT TO PROTECTIVE ORDER

Page 165

however, because we -- in that case we would need to set, like, a default time window of what constitutes nighttime and, you know, that might be challenging just from a technical perspective.

But also, like, what if you have a teenager that, like, works -- you know, doesn't go to school but, like, works at a -- works a night shift at a toll booth, right?  So they're not, like, sleeping anyway. Maybe that's how they kind of pass time while there's no cars at night.

So there's -- there were, like, circumstantial and kind of, like, tactical things that can make it challenging.  But overall, I think that would have been more effective for sure.

QUESTIONS BY MR. WARREN:

Q.    Okay.  And speaking of default hours, even for the opt-in version of Quiet Mode, did Instagram have to set what the default nighttime hours were going to be?

PURSUANT TO PROTECTIVE ORDER

Page 263

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, George Volichenko, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

CARRIE A. CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
New Jersey Certified Court Reporter
#30XI00242600
Louisiana Certified Court Reporter
#2021012
Notary Public
Dated:  January 3, 2025