# AMENDED Exhibit 14

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                  )
ADOLESCENT ADDICTION/                )
PERSONAL INJURY PRODUCTS             )
LIABILITY LITIGATION                 ) MDL No. 3047
_____) Case No. 4:22-md-03047-YGR
                                     )
This Document Relates To:            )
                                     )
ALL ACTIONS                          )
_____)


        ***** HIGHLY CONFIDENTIAL (COMPETITOR) *****
              PURSUANT TO PROTECTIVE ORDER

                  VIDEOTAPED DEPOSITION OF
                    LARRY BIRNBAUM, Ph.D.
                      AUGUST 15, 2025
                   9:05 a.m. to 6:29 p.m.
                           at
                    Covington & Burling
            850 10th St NW, Washington, DC 20001




Reported By: Amanda Blomstrom, RMR, CRR,
CSR TX #8785/CA #12681/IL #84-3634



              _____
                    GOLKOW - VERITEXT
               877.370.DEPS | fax 917.591.5672
                    deps@golkow.com

HIGHLY CONFIDENTIAL

Page 2

APPEARANCES

FOR THE PLAINTIFFS:

    MOTLEY RICE LLP
    BY: WARREN PREVIN, ESQ.
    BY: ABIGAIL BURMAN, ESQ.
    401 9th Street, NW
    Suite 630
    Washington, D.C. 20004
    202.386.9610
    pwarren@motleyrice.com
    aburman@motleyrice.com

FOR THE STATE OF CALIFORNIA:

    OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
    BY: MEGAN O'NEILL, ESQ.
    455 Golden Gate Avenue
    Suite 11000
    San Francisco, California 94102-7004
    415.510.4400
    megan.oneill@doj.ca.gov

FOR THE STATE OF TENNESSEE:

    OFFICE OF THE TENNESSEE ATTORNEY GENERAL
    BY: CHRIS A. DUNBAR, ESQ.
    UBS Tower
    315 Deaderick Street
    Nashville, Tennessee 37243
    615.741.3491
    chris.dunbar@ag.tn.gov

FOR THE STATE OF NEW JERSEY:

    OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
    BY: MANDY K. WANG, ESQ.
    124 Halsey Street
    Fifth Floor
    Newark, New Jersey 07101
    973.648.2052
    mandy.wang@law.njoag.gov

HIGHLY CONFIDENTIAL

Page 3

APPEARANCES (CONT'D)

FOR THE DEFENDANTS META PLATFORMS, INC., F/K/A
FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC; FACEBOOK
OPERATIONS, LLC; FACEBOOK PAYMENTS, INC.; FACEBOOK
TECHNOLOGIES, LLC; INSTAGRAM, LLC; SICULUS, INC.;
AND MARK ELLIOT ZUCKERBERG:

    COVINGTON BURLING LLP
    BY: MICHAEL N. KENNEDY, ESQ.
    BY: ANDREW J. HENLEY, ESQ.
    One CityCenter
    850 10th Street, NW
    Washington, D.C. 20001
    202.662.5215
    mkennedy@cov.com
    ahenley@cov.com
        -and-
    BY: JUNMO KIM, ESQ.
    The New York Times Building
    620 Eighth Avenue
    New York, New York 10018-1405
    ckim@cov.com

ALSO PRESENT:

    JOHNNATHAN RUFF

LITIGATION TECHNICIAN:
    JUSTIN BILY, Novak

VIDEOGRAPHER:

    DeSHAWN WHITE, Golkow

HIGHLY CONFIDENTIAL

Page 4

ZOOM APPEARANCES

Annie Kouba, Motley Rice
Chris Chiou, Wilson Sonsini
Corin Stigall, CO OAG
Elizabeth Orem, CO OAG
Haylee Privitera, King & Spalding
Jason L. Lichtman, Lieff Cabraser
Jess Carroll, Motley Rice
Josh Olszewski, CA DOJ
Katy Lawrimore, Motley Rice
Krislyn Launer, CT OAG
Kristen Lejnieks, Jones Day
Kristin Huber, Bass Berry & Sims
Lindsey Barnhart, Covington
Lucy Malone, Wagstaff
Mandy Wang, NJ OAG
Matt Donohue, Wilson Sonsini
Mohamed.Said, Munger Tolles
Patrick Gurski
Shaheen.Sheikh, CO OAG
Steve.Kaufmann, CO OAG
Tom
Verna Pradaxay, NJ OAG
Zach Richards

HIGHLY CONFIDENTIAL

Page 25

don't work in neural networks, but I work in the applications of these things to the kinds of problems that are at issue in this case.

Q.    Okay.  You said you're not an expert in clinical psychology, neuroscience, psychiatry, and epidemiology, correct?

A.    That's true.

Q.    Okay.  Are you an expert in any behavioral science?

A.    No.

Q.    And you haven't authored papers in any of the fields I just mentioned?

A.    I've published papers with psychologists, so there might be some papers I've done in psychology, yes.

Q.    What papers are those?

A.    I did a paper with Doug Medin on decision-making, a number of -- maybe a couple decades ago or something like that.  So papers -- there are occasional papers that were published in psychology journals or conferences or the Cognitive Science Conference that would be -- maybe border on

psychology or where I was working with psychologists.

Q.    Okay.  But in those papers, you weren't lending your expertise in those particular fields to those works, correct?

Let me reask the question.

Because you're not an expert in cognitive psychology -- let me reask the question.  Withdrawn.

Because you're not an expert in cognitive science or psychology, when you were coauthoring those papers, those were not the fields in which you were offering expertise, correct?

A.    I think my colleagues were sufficiently competent to judge whatever I was offering and whether it was valuable or not.

Q.    Okay.  You haven't received grant money to study issues within any of the fields that I just mentioned, correct; clinical psychology, neuroscience, psychiatry, epidemiology, behavioral science?

A.    Grants.

I mean, I might have been on a grant that was involved in a cognitive science project of some

HIGHLY CONFIDENTIAL

Page 27

kind, but I -- I can't recall.

Q.    Okay.  So the best of your recollection, you can't --

A.    Best of my recollection.  My focus has been in computer science, obviously.

Q.    Okay.  And you haven't taught courses in any of the fields I just mentioned, which, again, are clinical psychology, neuroscience, psychiatry, epidemiology, and behavioral science?

A.    I mean, I've taught courses that touch on those or I've co-taught courses with faculty members that might touch on those subjects.

Q.    What courses are those?

A.    I mean, I think a long time ago I taught a course in cognitive science, an intro course to cognitive science.  I had to teach an HCI course once.  I mean, I think there is a couple of courses along those lines.  That's not really behavioral science, but it's as close as computer science comes, I suppose, to behavioral science.

Q.    Okay.  But you don't keep yourself abreast of developments in those fields, right?

HIGHLY CONFIDENTIAL

Page 28

A.    It's not my area of professional expertise, no.  In general, things touch on it.

Q.    Okay.  Are you offering any opinions concerning whether use of Meta's products is associated with an increased risk of depression?

A.    I'm not.

Q.    Are you offering any opinions concerning whether use of Meta's products is associated with an increased risk of anxiety?

A.    I'm not.

Q.    Are you offering any opinions concerning whether use of Meta's products can cause an increased risk of any mental health problem?

A.    I'm not.

Q.    Are you offering any opinions whether use of Meta's products by teenagers can lead to an increased risk of eating disorders?

A.    No.

Q.    Suicidality?

A.    No.

Q.    Okay.  Is it fair to say at a general level you didn't examine whether or to what extent

HIGHLY CONFIDENTIAL

Page 29

Meta's products pose risks of harm to users?

A.    I'm not an expert in that area, and I wouldn't offer an opinion in this context around something like that.

Q.    Okay.  Are you familiar with the term "problematic use"?

A.    I am.

Q.    What does that term mean?

A.    It was a term used, I mean primarily within Meta itself, to talk about people generally overusing their services, I think using it too frequently or using it too much time or using it at inappropriate times, things that would interrupt the -- interrupt their lives in ways that might be not helpful to them living a healthy life.

Q.    Okay.  Are you offering any opinions regarding whether Meta's users experience problematic use?

A.    No.

Q.    So you aren't offering any opinions regarding whether the design of Meta's products can lead to problematic use for some people?

HIGHLY CONFIDENTIAL

Page 30

MR. KENNEDY:  Objection to form.

THE WITNESS:  I'm offering opinions about the design of Meta's systems insofar as they lie within my area of expertise, and I think whether they were designed to lead to certain kinds of outcomes, such as problematic -- whether they were specifically designed, for example, in certain ways to encourage problematic use, let's put it that way.

BY MR. WARREN:

Q.    Okay.  I understand the sentence that you just said, but, respectfully, it wasn't quite an answer to my question.  So let me ask it again, and if it's not clear what I'm asking, you just let me know.

Are you offering any opinions regarding whether the design of Meta's products can lead to problematic use for some people?

MR. KENNEDY:  Objection to form; asked and answered.

THE WITNESS:  I -- I think the answer is no.

BY MR. WARREN:

HIGHLY CONFIDENTIAL

Page 134

of -- a kind of a cold start problem for content as well.

So -- so it's intentional in the sense that Meta -- Meta's systems need to gather information about that content in order to be able to properly recommend it to people. But it's -- so they do that. I mean, the alternative would be not introducing new content, I suppose.

So if you believe that a functional requirement of a system should be that it can grow and introduce new content, then it's kind of unavoidable as well.

But it is intentional because they want to be able to introduce new content.

Q. Okay. In any event, we have here listed ten reasons for variability in the user feeds of Instagram and Facebook?

A. Correct.

Q. You agree with that?

Okay. Let's talk about an eleventh.

When you reviewed Meta's source code, did you see any README files that contained references to

HIGHLY CONFIDENTIAL

Page 220

Q.    And "Daily Active Users" is a measure of engagement at the user-wide level, correct?

A.    Correct, yes.

Q.    Okay.  So is it fair for me, in the aggregate, to put a box around all of these proxies and metrics and to label them "User Engagement"?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I think in different ways they are measures of user engagement; sometimes in the aggregate, sometimes with respect to individual items, but, yes.

BY MR. WARREN:

Q.    Okay.  So you're not disputing that Meta's ranking systems employ user engagement objectives, are you?

A.    No.

Q.    Okay.  And you're not disputing that Meta's ranking algorithm optimizes for engagement proxies, right?

A.    Optimizes for engagement proxies.

Meta's ranking system is trying to determine what are the most relevant things, safest

HIGHLY CONFIDENTIAL

Page 233

the natural and intuitive presumption that users will use the system on more days if they find the content that it makes available to them relevant."

Did I read that correctly?

A.    Which paragraph are we on again, 94?

Q.    No, 104.

MR. KENNEDY:  104.

THE WITNESS:  104, okay.

BY MR. WARREN:

Q.    And I can do it again, once you get there.

A.    Yes, it goes on to say other things, but it says that.

Q.    Okay.  And you don't offer a citation in support of that, right?

A.    No.

Q.    Okay.  What methodology, if any, did you follow to verify your intuition or presumption that user engagement metrics are a reasonable proxy for user value?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I -- I view these as, in some sense, arguments, or containing their own

HIGHLY CONFIDENTIAL

Page 234

arguments; in other words, you're free to disagree, and perhaps you do disagree, that -- that, for example, it's a natural and intuitive presumption that if somebody uses the system on more days, it's because they're finding the relevance, safety, and quality of the content it presents to them to be high enough to warrant them to actually use it on more days.  So I put that clause in, intuitive and natural.

I think these are the, I would -- I would dare say that, although I haven't interrogated them, that these are the reasons why Meta's engineers use these.

There is two reasons why they're using any metric that they're using.  One is that they think or hope that it's a proxy for the thing they care about, and the other is that it's measurable and actionable in a certain sense.  So like that they can actually measure it.

And so because they can't measure things on the right, they're looking for proxies on the left.  I -- I think if you -- if anybody thinks that

HIGHLY CONFIDENTIAL

Page 235

they have better proxies, I -- I'm sure the company would be very open to -- to looking at what those would be.

And, in fact, I think that they probably -- I don't know for a fact, but I imagine that this is something they think about quite a bit.

BY MR. WARREN:

Q. Okay. Well, I appreciate your answer. My question was a little bit simpler. And it's really about how you formed the opinions that you have expressed --

A. I based it on --

Q. Sorry, I have to --

MR. KENNEDY: Let him finish.

BY MR. WARREN:

Q. Okay. So my question utilized the word "methodology" very intentionally. So I'll ask it again.

What methodology did you use to verify your natural and intuitive presumption that the proxies of user engagement optimized for by Meta's ranking system are, in fact, a good proxy for user

HIGHLY CONFIDENTIAL

Page 236

value?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I suppose logic and -- and my understanding of how people behave intuitively.

BY MR. WARREN:

Q.    Okay.  Did you cite any peer-reviewed studies on this topic?

A.    I did not.

Q.    Did you cite any Meta internal documents on this topic?

MR. KENNEDY:  Objection to form.

You can answer.

THE WITNESS:  I did not.  I, elsewhere in my report, cite to Meta documents that make it clear that they're aware of the distinction between the proxies and the actual goals of the system and that this is something that they think about and discuss.

MR. WARREN:  All right.  Move to strike everything after "I did not."

MR. KENNEDY:  We disagree.

BY MR. WARREN:

Q.    Now, you said that you principally rely on

how people behave, but you're not a psychologist --

A.    Correct.

Q.    -- as we've established?

A.    I'm not.

Q.    Okay.  And you didn't conduct any user surveys to understand how people behave with respect to these ranking systems, correct?

A.    I did not.

Q.    What's the known or potential error rate of the methodology you used to establish that the proxies on the left are a reasonable way to evaluate the goals on the right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  These are my opinions based on my experience in the field and what I under -- how I understand people who build these systems, and I've built such systems myself, actually think about how to -- how to actually assess things like relevance.

BY MR. WARREN:

Q.    Yeah.

A.    And -- what was your question?  What's the --

Page 238

Q.    What is the known or potential error rate for the technique you used to establish that the user engagement metrics on the left are reasonable proxies for the goals on the right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I'm not a hundred percent sure how one would even go about doing that, but, yeah, I mean, I think it's -- the error rate of the method I used -- the method I used, I think, is logic based on -- we could go through the arguments about whether you agree with me or not on these -- on these things, but I would say fundamentally it comes down to my understanding, experience of the field and, I would say, logic.

BY MR. WARREN:

Q.    Okay.  So your methodology isn't capable of being tested in any scientific way, correct?

MR. KENNEDY:  Objection to form.

THE WITNESS:  Well, I don't agree with that, I suppose.  I think I could give a set of engineers who work in this space lists of features of behaviors that people engage in, and we could, I

suppose, ask them whether they think these are reasonable proxies.  And we could put on that things that are things like, the person ate an ice cream cone after watching the video, or something like that, and we would ask if that was a reasonable proxy.

And I think that -- I think -- I mean, I have nothing to say other than I -- I caveated these with these are my beliefs based on, I think, reasonable -- reasonable and sensible engineering intuitions.

BY MR. WARREN:

Q.    Okay.  So because you didn't actually survey any engineers about this proposition, your methodology around such survey instrument is not capable of being tested, let alone replicated.  True?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I guess -- I guess I would just ask, what are the other engagement -- what are engagement metrics that -- that organizations that are trying to do this utilize, and, you know, are they different from these engagement metrics.

HIGHLY CONFIDENTIAL

Page 240

BY MR. WARREN:

Q.    Because you didn't actually survey any engineers about your proposition, your methodology --

A.    That's correct.  It's based on my experience and intuition.

Q.    -- it's not capable of being tested or replicated?

MR. KENNEDY:  Objection to form.

THE WITNESS:  You could ask other people or you could ask other -- you could ask your experts, for instance.

BY MR. WARREN:

Q.    Okay.  I'm not sure how to disprove your intuition.  How would I go about doing that?

MR. KENNEDY:  Objection to form.

THE WITNESS:  Well, look, I think there's -- we can think of reasons why somebody -- well, I don't want to go through all this.

There's a -- I think we could do a bunch of thought experiments about -- about, you know, for example, would you share a content item with your friends if you didn't think it was interesting or

HIGHLY CONFIDENTIAL

Page 241

relevant in some way.

BY MR. WARREN:

Q. Okay. So I want to make sure I have the bases of this set out. And what I've heard you say is logic; I've heard you say how people behave; and now I've heard you say thought experiments.

A. I would say intuitions about how people behave, because I didn't do any studies; you're correct.

Q. Okay. Have we basically got this down?

MR. KENNEDY: Objection to form.

THE WITNESS: I think so. I mean, that's the methodology I used.

BY MR. WARREN:

Q. Okay. Are you a smoker?

A. No.

Q. Do you know anyone who is a smoker?

A. I know someone who used to be a smoker.

Q. If a smoker increases their use of cigarettes from one to three packs a day, does that indicate cigarettes are more valuable to them?

MR. KENNEDY: Objection to form;

Page 242

incomplete hypothetical.

THE WITNESS:  I wouldn't say yes, but an economist would say yes, I suppose.

BY MR. WARREN:

Q.    But you wouldn't say yes?

A.    It's for this reason that these proxies are inexact measures of value.

Q.    If a user's time spent on Instagram increases from two to three hours a day, do you know with any certainty that the user is getting more value from the platform?

MR. KENNEDY:  Objection to form.

THE WITNESS:  So I -- I certainly believe that there are diminishing returns to most of the aggregate metrics that are involved.

BY MR. WARREN:

Q.    If a user's --

A.    Okay.

Q.    -- time spent on Instagram increases from two to three hours a day, do you know with any certainty that the user is getting more value from the platform?

HIGHLY CONFIDENTIAL

Page 269

A.    Okay.

Q.    Actually, tell you what, let's first do Tab 21.

A.    I guess I should put all of these over here, except the report.

Q.    I'm throwing a lot of paper at you, sir, I'm sorry.

A.    It's okay.

Q.    It's just part of the gig.

This will be Exhibit 22.

(Exhibit Meta-Birnbaum-22 marked.)

MR. KENNEDY:  Give me that other copy, please.

BY MR. WARREN:

Q.    Okay.  Have you seen this document before?

A.    If I -- I believe I have, but if I haven't, I've seen documents that are quite similar. But I think I have seen this document.  I certainly remember the wording under "Goal Map" here and some of these metrics.  So if I haven't seen this, I've seen something very similar to it.

Q.    Okay.  And just to get a clean record.

HIGHLY CONFIDENTIAL

Page 270

Exhibit 22 in front of you has the Bates No. META3047MDL-065-00337077.

Okay.  This appears to be a document titled "H2'23 FB App Goal Map, Goals and Goal Metric Targets."

Do you agree with that?

A.    It does say that.

Q.    Okay.  So it's setting out the goals and goal metric targets for Facebook in the second half of 2023?

A.    Correct.

Q.    And if you look at the bottom, it indicates that the goal metric for business value was revenue-weighted time spent, correct?

A.    Correct.

Q.    Okay.  So just so we have a clear picture here.  As of the second half of 2023, Facebook was measuring business value through a metric called "revenue-weighted time spent"; yes?

A.    That seems to be the case.

Q.    Okay.  And by 2024, at least the latter half, it had shifted to measuring business value

HIGHLY CONFIDENTIAL

Page 307

opinion about whether Meta should have warned

parents, teens, or the public at large about

potential harms flowing from its ranking algorithm;

yes or no?

A.    I am not a business ethicist, so I'm

not -- I'm not offering an opinion on that.

Q.    Okay.

A.    No.

Q.    So before we leave this document, can you

turn to Slide 22, please.

A.    This is the same document?

Q.    Yes, indeed.

A.    Page 22?

Q.    Yes, sir.

A.    Okay.  Thank you.

Q.    What's the title of this slide?

A.    It's called:  Monetizable Users of Value.

Q.    "Monetizable User Value"?

A.    Correct.

Q.    And do you see it defines that term in the

first bullet?

A.    The weighted sum, the time spent,

Page 308

monetization efficiency of that time spent, yes.

Q.    So to put that in plain English.  Meta tracks how much money it can earn from every minute someone spends on Facebook, right?

A.    That's right.

Q.    Okay.  Can you flip one slide forward.

A.    To the previous slide.

Q.    Can you direct your attention to the first bullet at the bottom, please, under "Methodology Details."

A.    This is under the one that begins, "For the first time in recent years"?

Q.    Sorry, I meant the next slide-slide, not the next page.  It begins with "Monetizable User Value - Product Breakdown."

A.    Okay.  Yes.  Thank you.

Q.    Okay.  You see the first bullet at the bottom?

A.    I do.

Q.    Okay.  And that indicates that monetizable user value was a goal metric, right?

A.    Sure.

HIGHLY CONFIDENTIAL

Page 309

Q.    Meaning it's measurable and optimizable?

MR. KENNEDY:  Objection to form.

THE WITNESS:  "Facebook App Fixed MUV."
Yes.

BY MR. WARREN:

Q.    Okay.  You didn't mention monetizable user value as a goal metric in your report, did you?

A.    No.

Q.    Okay.

Time for a break?

MR. KENNEDY:  Sure.

MR. WARREN:  All right.  Take a quick one.
Thank you.

THE VIDEOGRAPHER:  The time is 3:22 p.m.
We are now off the record.

(Recess taken.)

THE VIDEOGRAPHER:  The time is 3:36 p.m.
We are now on the record.

BY MR. WARREN:

Q.    Okay.  Let's switch topics.

You agree that Meta has no means for assessing the relationships among two or more content

HIGHLY CONFIDENTIAL

Page 310

items being considered for inclusion in someone's feed?

A.    In general, that's true.

Q.    And that's known as pointwise optimization?

A.    I think that's what they call it, yes.

Q.    Okay.  And it means that Meta's ranking algorithm considers each piece of content in isolation without reference to other pieces of content that might appear before or after in the finalized slate?

A.    That's correct.  Modulo some additional things, but that's the basic -- the basic architecture is that, yes.

Q.    Did you say "modulo"?

A.    I apologize.  There are some other aspects to it, but the basic architecture is as you've described.

Q.    Okay.  You agree that content that's not otherwise harmful can become harmful when aggregated in the user's feed, true?

A.    I think that's a possibility, yes.

HIGHLY CONFIDENTIAL

Page 319

A. They consistent of separate, separate sets of -- they are separate sets of programs, or, rather, they are -- they consist of sets of programs. If you want to label one set content moderation and call that a system, I -- I don't see an objection to that. I just don't want to leave the implication that content recommendation is -- is not actually intimately connected with it in a variety of ways. That's all.

Q. I think you've made that point now --

A. Okay.

Q. -- like four or five times.

A. And I apologize for being repetitive, but I -- but I --

Q. And it's just not an answer to my question. So you've made the point.

My question is simply: From a software engineering perspective, from the perspective of code, there is a set of programs and protocols that comprise the content moderation system and there is another set of programs and protocols that comprise the content recommendation system.

Page 330

sequence like this is kind of beyond their capabilities, which, in fact, is one of the points in my -- in my -- in my report.

BY MR. WARREN:

Q. Let's posit that the construction of this sequence just happened without there being someone who was orchestrating it in an intentional way with the deliberate goal of harming the user. Okay? Can we posit that? The sequence is just a picture.

A. I don't know how likely the sequence is. I mean, I'd have to go through all the letters. I mean, this is an extremely unlikely sequence, in fact. If you went through --

Q. Okay. Let's change the hypothetical then. Let's say it's a hypothetical that comes from a client example of getting a series of dieting tips that become more and more extreme and that eventually turn into pro-anorexia content and eating disorder-promoting content. Okay? And let's posit that none of those individual pieces of content was violative of any content moderation policy on Meta's platform. Can you accept that hypothetical --

HIGHLY CONFIDENTIAL

Page 331

A.    So --

Q.    -- as we --

A.    -- first of all, thank you for giving me a real example --

Q.    Sure.

A.    -- that actually makes some sense.

Q.    Okay.

A.    I appreciate that.

Q.    And do understand the example?

A.    I do.

Q.    Okay.

A.    Absolutely.

Q.    Okay.  And, again, part of this hypothetical is that no individual piece of content on its own is --

A.    Might be --

Q.    -- violative of a content moderation policy?

MR. KENNEDY:  Let him finish.

THE WITNESS:  Yeah, none of them by themselves might be particularly problematic.

//

HIGHLY CONFIDENTIAL

Page 332

BY MR. WARREN:

Q.    Okay.  So improving the enforcement of content moderation policies in that example is not going to fix the problem with the sequence, is it?

A.    So --

MR. KENNEDY:  Objection to form.

THE WITNESS:  -- a couple of things to say about this.  I mean, so I guess here we're into a particular kind of problem, which I addressed somewhat in my report and which is raised in the Complaints, concerning sort of focusing in on particular areas of content that are problematic and leading to a user seeing a lot of content in a certain -- in a certain area, which, each by themselves might not be a particular problem, but taken together in the aggregate could be -- could be sort of, let's say, potentially harmful or -- or something that they find objectionable or that is emotionally problematic for them.  This, in fact, as a -- as a sort of a potential extrapolative problem of content recommendation systems, which I discuss in my report and which is discussed of course in the

HIGHLY CONFIDENTIAL

Page 333

Complaint and in many of the -- of your experts' reports as well, and, you know, it's a serious problem for the reasons that you are -- and a difficult problem for exactly the reasons that you raise here and that we're now discussing.

And so the question becomes, you know, if you're asking me what do -- what can Meta's Recommendation Systems do about this problem --

BY MR. WARREN:

Q.    Let me pause you there, because I'm not. I'm asking you:  Can Meta's content moderation policies fix that problem?

MR. KENNEDY:  Objection to form.

THE WITNESS:  Can the content moderation policies by themselves with the current technology? It's -- it would be quite difficult.

BY MR. WARREN:

Q.    Okay.  Can better enforcement of content moderation policies fix the problem you just identified?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I think it depends what you

Page 353

harmful sequences be better if they did this?  I think the answer is yes.  Of course, that would also give them the ability to produce harmful sequences through sort of variations, if -- to the extent that variations in -- in -- in relevance constitute a variable reward schedule and insofar as that actually works, then -- then they would also be able to do that deliberately.

But, as you say, they don't, in general -- or, as I just said, they don't in general have that capability.

BY MR. WARREN:

Q.    Okay.  What are filter bubbles?

A.    Filter bubbles are, it's akin to some of the problems we just talked about earlier where, in some sense, it's the -- it's a kind of reasonable extrapolation from the way content recommendation systems work; that, because they try to recommend to you content that they think you prefer based on your previous preferences, that you might get into a state where you're always being presented with content with a similar point of view, for example.  That you're

not -- you're not really able to see a bigger picture, that you're kind of trapped in a certain sense, and you keep being reinforced for your beliefs and you don't see things that might contradict those beliefs, for example, or other points of view.  It's often raised in connection with things like political discussion in the country.

And, you know, I think it's a -- again, it's a plausible extrapolation of how these things operate, like some of the other problems we talked about previously.

I don't know the extent to which it really is a problem.  That would be another kind of computer scientist's job to assess, in some sense.  But I take it for granted that it's a legitimate concern.

Q.   Okay.  And it's a legitimate concern, not just in the context of news and misinformation, right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  It could be.

BY MR. WARREN:

Q.   Okay.  But you have not examined yourself

HIGHLY CONFIDENTIAL

Page 365

Q.    In any event, you don't --

A.    It might.

Q.    -- dispute the possibility that it might, right?

A.    It could.

Q.    Okay.  And, again, to be clear, this phenomenon of rabbit-holing can arise with lots of different types of content, right?

A.    Correct.

Q.    And it arises from the structure of the ranking algorithm, not from any particular kind of content, right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  So to the extent that the system is trying to present you with content that it will hope you find relevant and interesting because you have found similar content relevant and interesting in the past, or people like you have found similar content interesting and relevant in the past, I think this is a plausible extrapolation of the -- of the operations in these systems that this could arise and it probably does arise.

HIGHLY CONFIDENTIAL

Page 366

BY MR. WARREN:

Q.   Okay.

A.   I don't know for sure or the extent to which it does --

Q.   Okay.

A.   -- so -- I apologize, what was your question, though?

Q.   My question was simply that the phenomenon of rabbit-holing is a -- let me withdraw the question.

The phenomenon of rabbit-holing, to the extent it occurs, arises from the operation of the ranking system, not from any particular piece or type of content, right?

MR. KENNEDY:  Objection to form.

THE WITNESS:  That's correct.

BY MR. WARREN:

Q.   Okay.  And the phenomenon of filter bubbles, likewise, arise from the operation of the ranking system, not from any particular piece or type of content, right?

A.   That's correct.

Page 468

Meta's systems can and maybe do apply different weights for teen users?

A.    I've said so in my report.

Q.    Okay.  Did you examine how the ranking systems behaves for teen users in particular?

A.    As compared with how it would -- would for other people or --

Q.    Yeah.

A.    I mean, I -- I generally looked and -- I mean, I generally looked and saw that the weights were different, obviously, for teens.  That's what it means to have a distinct value model.

Q.    Okay.

I'm going to hand you one more piece of code.  This is META3047MDL-SC-001 --

A.    Are we done with this one?

Q.    Yes.

A.    Okay.

Q.    -- -00000007.

A.    Thank you.

Which one am I to look at.

Q.    Can you read the name of the feature at

Page 469

Line 699?

A.    It says, "User is at work or school."

Q.    So Meta had built the technical capability to infer whether a user was at school?

A.    It seems so.

Q.    And the code we looked at previously shows that Meta could infer whether a user was a teen?

A.    We saw that, yes.

Q.    So between the two, Meta could have used these features to suppress notifications to teens during school hours?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I didn't investigate -- my report does not concern the notification mechanisms of -- I was talking about content recommendation.

BY MR. WARREN:

Q.    So you don't know whether Meta did that?

A.    I don't.

Q.    Meta could have used these features to reduce teen engagement with its platforms during school hours, correct?

A.    I don't know the answer to that question.

HIGHLY CONFIDENTIAL

Page 470

Q.    Well, are you aware of whether Meta did that?

A.    You mean did they send fewer notifications based on this; is that what you're trying to ask?

Q.    No.  I'm asking whether Meta changed the value model for teenagers to reduce their usage of the platform during school hours.

A.    I -- I don't think so.

Q.    Okay.  But it --

A.    But I don't know for sure.  But I don't think so.  I saw nothing that looked like that, no.

Q.    Okay.  But it --

A.    And this refers again to the notification algorithm, as far as I can tell.  Well, I think you mentioned that this was about notifications.  Maybe I'm wrong.

Q.    What about that refers to notifications?

A.    It doesn't, and I -- maybe I inferred that.  I thought you had mentioned notifications.

Q.    Well, it was a question I asked you, but --

A.    I see, okay.  So the answer is, I don't

HIGHLY CONFIDENTIAL

Page 471

know.

Q.   Okay.  But it is clear that they had the ability to do that if they wanted to?

MR. KENNEDY:  Objection to form.

THE WITNESS:  Could do --

BY MR. WARREN:

Q.   It's clear, based on this review of code, that Meta could have changed the value model for teenagers to reduce their engagement with their platforms during school hours, correct?

MR. KENNEDY:  Objection to form.

THE WITNESS:  I don't know the answer to that question.  I didn't consider that.

BY MR. WARREN:

Q.   So it's possible?

MR. KENNEDY:  Objection to form.

THE WITNESS:  It might be possible.

BY MR. WARREN:

Q.   Okay.  We have a little bit of housekeeping to do.  I don't have any other substan- -- well, I actually have one more substantive question.

HIGHLY CONFIDENTIAL

Page 481

REPORTER'S CERTIFICATION

DEPOSITION OF LARRY BIRNBAUM, Ph.D.

AUGUST 15, 2025

I, Amanda Blomstrom, a Notary Public in and for the District of Columbia, hereby certify to the following:

That the witness, LARRY BIRNBAUM, Ph.D., was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted to the witness or to the attorney for the witness for examination and signature;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 18th day of August, 2025.

_____

Amanda Blomstrom, CRR, RMR, CLR

Texas CSR No. 8785

California CSR No. 12681