# AMENDED Exhibit 19

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY       ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION   )
_____  )
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE
COORDINATION PROCEEDING          )
SPECIAL TITLE [RULE 3.400]       ) Lead Case No.
                                 ) 22STCV21355
SOCIAL MEDIA CASES               )
_____   )
                                 )
This Document Relates to:        )
                                 )
STATE OF TENNESSEE,              )
ex rel. JONATHAN SKRMETTI,       )
ATTORNEY GENERAL and REPORTER,   )
v.                               )
META PLATFORMS, INC., and        )
INSTAGRAM, LLC,                  )
Case No. 23-1364-IV              )
_____   )

Tuesday, January 28, 2025
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
Video-Recorded Oral Deposition of WENDY GROSS PhD held at the offices of Covington & Burling LLP, 3000 El Camino Real, 5 Palo Alto Square, Suite 1000, Palo Alto, California, commencing at 9:04 a.m. PST on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Reporter and California CSR #13649.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

Page 2

A P P E A R A N C E S:

CALIFORNIA OFFICE OF THE ATTORNEY GENERAL
BY:  MEGAN O'NEILL, ESQUIRE
     megan.oneill@doj.ca.gov
     DAVID BEGLIN, ESQUIRE
     david.beglin@doj.ca.gov
455 Golden Gate Avenue
Suite 11000
San Francisco, California 94012
(415)510-4400
Counsel for State of California

GOZA HONNOLD LLC
BY:  KIRK J. GOZA, ESQUIRE
     kgoza@gohonlaw.com
     GRACE QUINLAN, ESQUIRE
     gquinlan@gohonlaw.com
9500 Nall Avenue
Suite 400
Overland Park, Kansas 66207
(913)451-3433
Counsel for MDL/JCCP Plaintiffs

WAGSTAFF & CARTMELL LLP
BY:  THOMAS P. CARTMELL, ESQUIRE (via Zoom)
     tcartmell@wcllp.com
     LUCY R. MALONE, ESQUIRE (via Zoom)
     lmalone@wcllp.com
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816)701-1100
Counsel for Plaintiffs

ANAPOL WEISS
BY:  PAIGE BOLDT, ESQUIRE (via Zoom)
     pboldt@anapolweiss.com
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
(215)735-1130
Counsel for Plaintiffs

Page 29

skills in performing and evaluating research, right?

A.    Correct.

Q.    And skills in data analytics?

A.    Yes, that is part of a research PhD.

Q.    And before your time at Meta, you held professional roles in which you conducted research and surveys, right?

A.    Correct.

Q.    Including your time as a senior research manager at GfK?

A.    Yes, ma'am.

Q.    And as a statistics specialist for Apple?

A.    Yes.

Q.    So overall, you consider yourself to have expertise in designing, conducting and analyzing market research, right?

A.    Yes.

Q.    And in designing, conducting and analyzing public opinion surveys, right?

A.    Yes.

Q.    And as we just discussed, you

currently work at Meta, right?

A.    I do.

Q.    You're the head of marketing insights for creators and Threads?

A.    Yes, ma'am.

Q.    Can you tell me briefly about that role and your responsibilities?

A.    So I support a team of researchers who are tasked with understanding the needs of creators as it relates to our platforms and then how we tell our brand story of how we support creators across the family of apps.  So that includes Facebook, Instagram, WhatsApp and Threads.

Q.    Before this role, you were the head of marketing insights for Threads?

A.    At Meta we often wear multiple hats, so when -- there was a period in time where I was supporting Threads as the only marketing insights person.  Now I'm supporting Threads with a couple of other people who work on it.

The reality of how cross-platform and cross -- cross-app collaboration works, like there was a period

Page 31

of time where the role that I was working on for Instagram was separate from the role that I was working on for Threads.

Q.    Okay.

A.    So I kind of held both hats at the same time.

Q.    That's fair.

Just kind of moving backwards in time, before these roles that we were just discussing, your profile, at least, says that from September 2021 to April 2024, you were marketing insights lead for the Instagram brand experiences and creators?

A.    Yes.

Q.    Is that right?

A.    Yes.

Q.    I know that's a mouthful.

A.    It is.

Q.    I guess, could you talk about how your role and responsibilities in this position differed, if at all --

A.    Yes.

Q.    -- from your current position?

A.    Over -- starting in September of 2021, I transitioned from an independent

Page 32

contributor role, meaning that nobody reported to me, I wasn't anybody's boss, essentially, into a people manager where I was supporting a team of researchers.

Between September of 2021 and about April-ish of this -- of 2024, last year, the scope and the remit of my team kind of grew and changed as business needs grew and changed.

What we mean by brand experiences are the product features within the Instagram app that ladder into our overall brand for Instagram around connecting people over the creativity that they see on our app.

So there are parts of the Instagram app that are clearly linked to that and things like if you're -- if we want to connect people with their friends, like you talk to people, you know, using DMs, and you reshare content that you see on the app.

There are other parts of the app that exist that my team doesn't really touch or doesn't touch in nearly -- in quite as big of a way. So, for example, the ads

Page 33

experience, that's not part of the remit of my team.

As part of -- so that's kind of the brand experience portion.

The creators and the Threads is really like where I kind of bifurcated the remit of my team at the beginning of this year, so that was on top of thinking about the Instagram product experience from the perception of the consumers that use the app. We think about the product experience and the brand story from the perspective of the creators that use our apps, and we are supporting Threads.

Q.    And I guess moving backwards again, you mentioned briefly that you -- before this position, you were a marketing researcher for Instagram, and that was from November 2018 to September 2021; is that correct?

A.    Yes.  That was my first role at Meta.  I was brought on to support what we called the community product pillar at the time for our marketing XFN counterparts.

So at the time that we

called -- our community pillar had three basic components.  One was around the size of the community and how we help it grow, which I didn't really do that much work related to.

One was around how we connect Instagram users in really positive and meaningful ways to their in-real-life community.  So things like donation stickers and fundraising on Instagram or get-out-the-vote efforts.

And then the third component was how we protect our community from harms that can happen on the app, so this is things like bullying and social comparison and mental health sorts of questions.

Q.    And taking a look at your description of the role for this particular role on the second page of your profile, you wrote that you established the learning agenda for new markets, target audiences and product areas.

Could you explain what established learning agenda means?

A.    Yes.  So as we were thinking about, you know, whether -- this was

Page 35

a new market, so one -- one instance that comes to mind is when Instagram -- Instagram marketing team was looking towards India, for example, a country that we hadn't really spent a whole lot of time understanding or targeting with our marketing efforts, different target audiences.  So in the course of 2020, Instagram marketing started thinking about young adults through get-out-the-vote efforts, and as we spun equity, the equity team started having a much more deeper focus on the experience of black Americans specifically, or product areas, again, with the equity team being a -- one example.

Another example is the mental well-being team.  As we think about how the Instagram marketing team or the Instagram product is moving, what are the questions that we want to have answered from a marketing perspective as we think of how to support the businesses' objectives within those new areas.

So that learning agenda is really just like a really big question around what are those foundational questions that we

Page 36

want to have an understanding of before we, as a marketing org, feel comfortable.

The learning agendas that I put forth, you know, and established within those areas were then copied to other parts of the marketing insights organization, so from Instagram to Facebook or to Reality Labs.

Q.    And you mentioned in that description target audiences.  Target audiences included teens, right?

A.    In my -- so in my entire time at Instagram, teens have been a focus. Instagram is a teen-centric brand, and to ignore the fact that, you know, teens and young people use Instagram is to ignore kind of the heritage and the DNA of the app.

Q.    And, Dr. Gross, you're part of the marketing insights team, correct?

A.    Right.

Q.    And just to be clear, you've been part of that team your entire time at Meta?

A.    Yes, ma'am.

Q.    I want to show you another document.  So you can put that one away.  B1.

Page 45

Peerless Insights?

A.    Yes, ma'am.

Q.    This e-mail, as you mentioned --

A.    Yes.

Q.    -- also involves e-mail addresses from Peerless Insights, right?

A.    Yes.  Young is managing partner.

Q.    And what is Peerless Insights?

A.    They're a third-party quantitative research firm.

Q.    If you look at the second page of the document, you see an e-mail from Ms. Mehta, and if you look at the second paragraph, she says she's also cc'ing you and that you are the research lead on this project, right?

A.    Correct.

Q.    And that's correct?

A.    Yes.

MS. O'NEILL:  Okay.  Let's move to another e-mail.  This is D1, and it will be Exhibit 5, and it's Bates-stamped 014-00255268.

Page 46

(Whereupon, Meta-Gross-5,
E-mail(s) re: Teen Well-being Survey,
META3047MDL-014-00255268 -
META3047MDL-014-00255273, was marked
for identification.)

THE WITNESS:  Can I clarify a previous response?

MS. O'NEILL:  Of course.

THE WITNESS:  I became the lead researcher on this project.  It was one that ████ had kicked off and started before I joined and then transitioned to me.

BY MS. O'NEILL:

Q.    And at the time of the e-mail, that's when you became lead?

A.    Yes.  Thank you for letting me clarify.

Q.    Of course.

So take a look at this document, and let me know if you recognize it.

A.    Yes, it looks like it is an e-mail chain that I had with a number of folks at Peerless who were working on that

Page 47

same mental -- or sorry, the same teen well-being survey that we just chatted about, in addition to somebody else who was at Instagram and helping me at the time.

Q.    And this was from March 2019, right?

A.    Correct.

Q.    And if you look at the very top e-mail, Catherine Wertz from Peerless sent you updated reports, right?

A.    Yes.

Q.    And one of those reports was the US report?

A.    That's what it says, yes.

Q.    And, in fact, that was attached as the Detailed Findings US?

A.    Yes.

MS. O'NEILL:  Okay.  Let's take a look that attachment, which is D2, and it will be Exhibit 6.  And it's 014-00255333.

THE WITNESS:  Thank you.

(Whereupon, Meta-Gross-6, Presentation: Instagram Teen Well-being Study: US Topline Findings,

Page 48

META3047MDL-014-00255333, was marked for identification.)

BY MS. O'NEILL:

Q.    Dr. Gross, do you recognize this document?

A.    Yes.  This is -- or this appears to be the US topline report that the vendor prepared for me that was referenced in that previous e-mail chain.

Q.    And just to be clear, the vendor is Peerless --

A.    Peerless, correct.

Q.    And it's dated February 2019?

A.    Correct.

Q.    Okay.

MR. HALPERIN:  Ms. O'Neill, it looks like I have two documents.  Are these both Exhibit 6?  Are we attaching them together?

MS. O'NEILL:  Yes.  I apologize it's not actually stapled together, but it's just -- this was produced natively so it's the cover.

MR. HALPERIN:  We can clip them afterwards.  I just wanted to make

Page 49

sure the record is clear.

MS. O'NEILL: Thank you.

MR. DOWNING: This is 6?

MR. HALPERIN: The entire thing is 6, both the deck as well as the native slip sheet.

BY MS. O'NEILL:

Q. Dr. Gross, before we dive into the specifics of this research, we established earlier that you received a PhD from Stanford University, right?

A. Yes.

Q. And as part of that program, you gained skills in performing and evaluating research, right?

A. Yes, ma'am.

Q. And when you worked on research at Meta, you made best efforts to ensure that the research was of a high quality?

A. Correct.

Q. And that was true whether you performed the research yourself or if you commissioned it from others, right?

A. Yes, ma'am.

Q. That was important because the

Page 50

goal of performing research for Meta was to provide insights that were valuable to the company, right?

A.    Correct.

Q.    So here, when you commissioned research from Peerless, you had a perspective that Peerless would deliver quality research, right?

A.    Yes.

Q.    Research that would deliver valuable insights to the company?

A.    Yes.

Q.    And part of your role was to ensure that Peerless met those standards of quality, right?

A.    Yes.

Q.    Okay.  Let's look at the actual research.  If you can turn to page 2, there are very small page numbers on the bottom right.

This page describes the methodology of the research that Peerless undertook, right?

A.    Yes, it does.

Q.    The research looked at teens

Page 58

BY MS. O'NEILL:

Q.    And the report also says that one-third of teens reported feeling this way often, right?

A.    Yes, that's what it says.

Q.    Let's move to page 32.

The study made findings about a number of negative experiences teens had on the app, right?

A.    Yes.

Q.    So I want to go through some of those percentages here on the right.

The Peerless Insights researchers reported that 32% of teen monthly Instagram users experience feeling like they have to look perfect, either often or very often, right?

A.    Yes.

Q.    And that 23% of those users feel like they waste too much time often or very often?

A.    Yes.

Q.    And 19% feel like they're missing out on life often or very often?

A.    Yes.

Page 72

I've not been part of.

Q.    Let's get back into the documents and your research and what you work on.

MS. O'NEILL:  This is going to be F1, which will be Exhibit 8, and that's Bates 003-00091410.

(Whereupon, Meta-Gross-8, E-mail(s) re: Teen MH Debrief (Hurrarh!), META3047MDL-003-00091410 - META3047MDL-003-00091413, was marked for identification.)

MS. O'NEILL:  Apologies, it appears this one didn't get stapled.

MR. HALPERIN:  Give me a second.  We may have a stapler in there.

(Technical comments off the stenographic record.)

BY MS. O'NEILL:

Q.    Okay.  Dr. Gross, do you recognize this document?

A.    Yes.  It looks like it is an e-mail exchange that I had with Connie Flude at Creatures of Habit in the fall of 2019.

Page 73

Q.    And in particular, September 2019, right?

A.    Yes.

Q.    And you're discussing research that you commissioned from an organization called Creatures of Habit?

A.    Yes.

Q.    And this is still part of your teen mental health research project, right?

A.    This is part of a deep dive that we did into teen mental health, yes.

Q.    And what is Creatures of Habit?

A.    Creatures of Habit is an independent research firm that we commissioned to do the qualitative research for us.

Q.    And you can see in this second e-mail on the front page that Connie Flude attached an MH debrief, which you then forwarded to Caroline Fearon, right?

A.    Correct.

Q.    Let's look at that attachment.

MS. O'NEILL:  This is F2, and it will be Exhibit 9.  It's Bates 003-00091414.

Page 74

(Whereupon, Meta-Gross-9,

Presentation: Teen Mental Health,

Creatures of Habit - Aug/Sep 2019,

META3047MDL-003-00091414 -

META3047MDL-003-00091504, was marked

for identification.)

THE WITNESS:  Thank you.

BY MS. O'NEILL:

Q.    Okay.  Dr. Gross, do you recognize this document?

A.    Yes.  This was the initial report that Creatures of Habit prepared for us.  Okay.

This is the -- this is the initial debrief that Creatures of Habit prepared for us following qualitative work that we did with them in August of 2019 with teens in US and the UK.

Q.    And this report is dated August-September 2019?

A.    Correct.

Q.    And as with other research you did or commissioned, you made best efforts to ensure that this research was of a high quality, right?

Page 75

A.     Yes.   All of the research that we do, I ensure that it's of high quality. When I partner with vendors, I look for specific areas of expertise.

For Creatures of Habit specifically, the reason that we brought them on to work with us in this project is just their expertise in talking with teenagers about very sensitive issues.

Q.     So you believed that they would deliver high-quality research, right?

A.     Holistically, yes.  Again, every vendor that I've worked with has their own unique strengths and unique places where we need to hold their hands a little bit more.

Q.     Okay.  Let's go to page 91419. So this and the next page convey the topline headlines from this report, right?

A.     Yes.  These are the topline headlines that the vendor pulled out from our conversations with a small number -- I think the total number was 40 teens -- across two different markets.

The individuals that we talked

Page 76

to were very purposefully designed to be a nonrandom subset of teenagers, and so it's incredibly important as we look at the toplines to remember that not only were these -- what teens reported to us, but it's not the general teenage Instagram user that we talked to in this research.

MS. O'NEILL:  Okay.  I'm going to move to strike that as nonresponsive after you affirmed that these are the topline headlines.

BY MS. O'NEILL:

Q.    Let's look at the fifth bullet down.  It starts:  Teen talk of.

So one of the topline headlines of this report was that:  Teens talk of Instagram in terms of an addict's narrative, spending too much time indulging in a compulsive behavior that they know is negative but feel powerless to resist.

Right?

A.    Yes, this is how Creatures of Habit summarized the specific language that this nonrandom subset of teens used when talking about their Instagram usage.

Page 77

MS. O'NEILL:  I'll move to strike as nonresponsive after "Yes."

BY MS. O'NEILL:

Q.    And you would agree, Dr. Gross, that some teens talk about not being able to stop using Instagram even when they feel that it's bad for them?

MR. HALPERIN:  Object to form, foundation.

A.    The teens that I have talked to -- and again, they've not always been a representative or meant to be representative of the general Instagram teenaged user -- use language that is in the teenager vernacular and words that teens -- like I hear my own teenaged children use some of these same words.

There's some -- and hearing teens talk about them, they are somewhat divorced from how people in the medical industry and the mental health profession might use these same words.

BY MS. O'NEILL:

Q.    You would agree that some teens in this research project talked about not

Page 78

being able to stop using Instagram in terms of an addict's narrative, right?

MR. HALPERIN:  Asked and answered.

A.     Some of the teens that we talked to did use some of that language.

BY MS. O'NEILL:

Q.     In looking at the next bullet, one of the topline headlines of this report from Creatures of Habit says that:  The pressure to be present and perfect is a defining characteristic of the anxiety teens face around Instagram.

Right?

A.     Yes.  Again, this is a reflection of what these teenagers told us.

Q.     And you agree that the pressure to be perfect and present are issues that some teens face on Instagram, right?

MR. HALPERIN:  Object to form and foundation.

A.     These are some of the things that teenagers have told us.

BY MS. O'NEILL:

Q.     Okay.  Let's move to 91428.

Page 80

language and the words that teens are using to describe their experiences to us.

As part of the marketing team, you know, as we talked about earlier, part of my role is to understand the language that teens themselves use to talk about their experiences so that we can situate our own communications within that language to ensure that we're actually using words that teens themselves would use.

MS. O'NEILL:  I'll move to strike as nonresponsive after "That is what the report says."

BY MS. O'NEILL:

Q.    Looking at the bottom right, the language in bold, the researchers also state that:  Time-spend was one of the worst aspects of teens' relationship to the platform.

Correct?

A.    That is what we heard in this research of the teens' own self-reported experiences.

Q.    Let's move to 91442.

On the top left, the

Page 85

language on the right, the researchers reported to Meta that Instagram:  is a recipe for low-level mental anxiety that, unchecked, can ladder up to something more serious.

Right?

A.    Yes, that is what this says.

Q.    And you agree that some teens feel anxiety about their use of Instagram, right?

A.    Yeah, some teens have told us that they feel anxiety around their Instagram usage.

Q.    I want to go back to 91418.

You discuss the criteria for participation in this survey, right?

A.    So this -- these are qualitative conversations, but yes.

Q.    I want to just go through the criteria here, the Secondary Criteria.

A.    The actual -- the criteria is actually a bullet above that underneath Themes.

Q.    And can you explain that for us, please?

A.    Yes.  Because we were -- we

Page 100

people on the phone, enable to -- enable to coordinate those really positive social experiences.

And teens are using social media in that same way, which is -- which is contributing to this idea that it's part of their social life.

MS. O'NEILL:  Let's move to a different document, H.  This will be Exhibit 11, and it's 003-00109173.

(Whereupon, Meta-Gross-11, Presentation: Teen Mental Health Deep Dive, META3047MDL-003-00109173 - META3047MDL-003-00109239, was marked for identification.)

THE WITNESS:  Thank you.

BY MS. O'NEILL:

Q.    Dr. Gross, do you recognize this document?

A.    Yes.  This is the final report that I put together from the qualitative research that we partnered with Creatures of Habit to conduct along with a survey of about 2,000 or 2400 Instagram users in the US and the UK.  This would have been in the fall --

Page 101

early fall of 2019.

Q.    And just to be clear, you coauthored this presentation with Caroline Fearon, right?

A.    Yes.

Q.    And this postdated the initial thoughts that we just discussed?

A.    Yes.

Q.    And as with other research -- I'm a broken record on this.  But as with other research you did or commissioned, you made your best efforts to ensure that the research was of a high quality, right?

A.    Yes, that the research was of high quality and that the findings were communicated in a way that addressed the needs of the stakeholders that I was working with.

Q.    Your aim was that this research would deliver valuable insights to the company, right?

A.    Right.  And as I say underneath the objectives, it's to inform outreach teams of how to talk to teens and build meaningful, you know, marketing campaigns in this space

and to inform product teams on decisions.

Q.    And along those lines, I see you've moved to the next page, the second bullet under We Conducted Market Research shows that this research was conducted in order to get a nuanced understanding of teens' perceptions of how Instagram affects their mental health, right?

A.    Yes.  As I mention on the top of this slide, that popular and academic press, you know, there's a wide variety of research that has been published and information that has come out of -- you know, some salacious headlines around, you know, what the effect and the impact is of social media on young people.

In our review of that literature, we found that there are some consistent themes.  One of the unfortunate consistent themes is that there isn't a lot of consistency, that there is a lot of nuance, and that a lot of the research that was done might have been about teens, but it wasn't necessarily with teens.

And so as we were thinking

Page 103

through, you know, what are the products -- what are -- how can product teams support teens in this space, how can outreach teams talk about it, there's actually a startling -- at this time, that there was a lack of information on how teens perceive it themselves, and how teens talk about it, which is what this research was designed to answer.

Q.    Okay.  If you move to the next page on Methodology.  This study was conducted on teens age 13 to 17, right?

A.    Yes.

Q.    And there were three parts to the study, right?

A.    Yes.  The first part was the qualitative portion that we've talked about, that vendor deck earlier.  That included the second follow-up video call.  I believe that in the e-mail -- one of the e-mails that we reviewed, that Connie at Creatures of Habit mentioned the difficulties in setting these up, so these were part of that same qualitative research process -- research part.

Page 104

And then the final was an online survey that we did amongst Instagram users.

Q. And to make sure I'm understanding, those themes that we talked about with the in-person qualitative portion of this study, those were not requirements to participate in the online survey, correct?

A. Correct. The online survey was meant to be a cross section of Instagram users.

Q. It was meant to be a representative sample, right?

A. A representative sample to the best of our ability, yes.

Q. The next page lists several key takeaways, right?

A. Yes.

Q. I want to look at a few of these, starting with number 3.

This key takeaway states that: Teens say Instagram has had a positive impact on their mental health, but those who are unsatisfied with their lives are more negatively affected by the app.

Page 106

A.    Yes.  So first -- the question that leads into this is the question that's listed on the previous page of the number ending in 186.

In the past month, have you felt or experienced any of the following? This was a "select all" question.

For teens that had said I have experienced this, they were asked the follow-up question of that specific issue, do you -- did it start on Instagram.

Q.    And I want to go through those statistics.

So the research found that 39% -- and I'll back up, actually.

I'm just going to talk about the US statistics so we can concentrate on the slightly darker red color here, if that's helpful.

So 39% of teens who had felt that they needed to a create perfect image said that that feeling started on Instagram, correct?

A.    Yes.

Q.    And 41% of teens who felt not

Page 107

attractive said that that feeling started on Instagram, right?

A.    Yes.

Q.    42% of teens who felt like they didn't have enough money said that the feeling started on Instagram, right?

A.    Correct.

Q.    32% of teens who said they did not have enough -- or felt they did not have enough friends said that feeling started on Instagram?

A.    Yes.

Q.    24% of teens who felt that they were not good enough said that that feeling started on Instagram?

A.    Yes.

Q.    24% of teens who felt that their friends were not really their friends said that that feeling started on Instagram.

A.    Correct.

Q.    17% of teens who said they felt that they have to be happy said that feeling started on Instagram?

A.    Correct.

Q.    21% of teens who said they felt

alone or lonely said that that started on Instagram?

A.    Yes.

Q.    10% of teens who said they were down, sad or depressed said that that feeling starting on Instagram?

A.    Correct.

Q.    I'm going to skip this next one because it is cut off.  I don't want to deal with that.

6% of teens who said that they felt that they wanted to kill themselves said that that feeling started on Instagram.

A.    Correct.

Q.    And 9% of teens who said that they felt that they wanted to hurt themselves said that it started on Instagram?

A.    Correct.

Q.    And just to back up, the title of this slide is:  The perfect image, feeling attractive and having enough money are the most likely to have started on Instagram.

Right?

A.    Yes, those are the issues that the highest proportion of respondents who

Page 128

they did reference an addict's narrative.
Most of the time this is an extrapolation of
how the teens themselves were talking about
their Instagram use.

Q.    The survey also concluded that:
Teens recognize that the amount of time they
spend online isn't good for them but that
they lack the willpower to control the time
spent themselves.

Right?

A.    Yes.  This is a reflection of
the qualitative research that we did with
teens.

Q.    And that qualitative research
showed you that teens didn't like the amount
of time that they spent on Instagram, right?

A.    The teens themselves said that
they did not like it.

Q.    And that teens wanted to spend
less time on Instagram, right?

A.    I'll actually rephrase what I
said before.

It wasn't that teens didn't
like it.  It's that they didn't think that it
was good for them.  The teens that we talked

Page 129

to said that they wanted -- that they thought that they should be controlling it.  They didn't think that they could.

Q.    These findings also must have alarmed you, right?

A.    Of course.

Q.    You'd agree that a teen having an addict's narrative about Instagram is a serious problem?

A.    I think that teens feeling this way is a serious problem.  Whether the idea of the -- I don't want to pass judgment on the specific language that teens use.  Their perceptions of how they're feeling is concerning regardless of what the language -- the specific language is.

MS. O'NEILL:  Okay.  We can put that document away.

MR. HALPERIN:  We've been going for about an hour.

MS. O'NEILL:  Yeah, it's a good time.

THE VIDEOGRAPHER:  The time is 11:12.  We're off the record.

(Recess taken, 11:12 a.m. to

Page 152

word externally with people who aren't familiar with this space within the Instagram context.

MS. O'NEILL:  Let's move on to another document, document L.  This will be Exhibit 14, and it's Bates 003-00001846.

(Whereupon, Meta-Gross-14, Presentation: Social Comparison Exploratory Research, META3047MDL-003-00001846 - META3047MDL-003-00001889, was marked for identification.)

THE WITNESS:  Thank you.

BY MS. O'NEILL:

Q.    Do you recognize this document?

A.    I do.  This is a document that Dr. Bhutada and I prepared together as an output of joint qualitative research that we did in March of 2020.

Q.    And this is on social comparison, right?

A.    Correct.  Specifically negative appearance-based social comparison amongst teen girls and young adult women.

Page 153

Q.    And as with all the other research you did or commissioned, you made your best efforts to ensure that this research was of high quality?

A.    Correct.

Q.    And that it would deliver valuable insights to the company, right?

A.    Yes.  Because I partnered with Dr. Bhutada on this, she was, in fact -- she was a user researcher who was embedded within the product team, and this joint effort was meant to inform both product teams around the well-being space as well as outreach teams in communicating Instagram efforts to teen girls and young adult women.

Q.    Let's move to the page ending 1849, and I want to look at the fourth bullet down.

You found that:  Social comparison is worse on Instagram.  Right?

MR. HALPERIN:  Object to form, characterization.

A.    The slide reads that:  Social comparison is worse on Instagram.  I also, similarly to the Teen Mental Health Deep Dive

A.    Where they -- they work together and kind of feed off of each other to create conditions where young women who are already feeling bad about themselves are encountering content that they don't -- that they might not necessarily like and kind of keep going within that route.

BY MS. O'NEILL:

Q.    Let's move to the next page.

You wrote that:  Mental health outcomes related to this can be severe.

Right?

A.    Yes.

Q.    And "this" means the perfect storm of social comparison that we were referring to before, right?

MR. HALPERIN:  Object to characterization.

A.    So this is meant to reflect that -- and why there are specific quotes underneath it is that the teens that -- the teen girls that we talked to very clearly associated this spiral that they were experiencing on Instagram with some, you know, pretty real -- pretty bad outcomes.

Page 166

They, of course, did not necessarily talk about -- did not necessarily label it the labels that we attached to it, like we summarized data and leveled that up a little bit. But they very clearly linked how they were feeling about themselves, how the platform -- their perceptions of how the platform was contributing to it to these long-term, pretty bad outcomes.

BY MS. O'NEILL:

Q. And I just want to go through those outcomes. Those include -- the outcomes that you identified as teens having identified include eating disorders, right?

MR. HALPERIN: Object to form.

A. Yes. We -- we summarized the responses from these, you know, teens and young women as including eating disorders.

BY MS. O'NEILL:

Q. And body dysmorphia?

A. Yes.

Q. Body dissatisfaction?

A. Yes.

Q. Depression?

A. Correct.

Q.    And loneliness?

A.    Yes.

Q.    Now, we saw earlier that you determined that young people felt like they lacked control over the time they spend on Instagram, right?

A.    Yes, that's what they told us.

Q.    And this study identifies several bad experiences that people felt that they were having on Instagram, right?

A.    Yes.

Q.    Pressure to be perfect, right?

A.    Yes.

Q.    Appearance comparison, right?

A.    Yes.

Q.    Spiraling into rabbit holes, right?

A.    Yes.

Q.    And you found that teens felt that Instagram was exacerbating those issues, right?

A.    We found that the teen girls and young adult women that we talked to felt as if Instagram was exacerbating these issues for them.

Page 284

only experimental studies that I've done have been effectiveness of marketing efforts on sentiment.  And it was designed to prove out ROI, return on investment, for marketing campaigns.

Q.    Okay.  So you have done an experiment but that experiment related to a marketing campaign?

A.    Correct.

Q.    You've not been asked and you haven't done any experiments as it pertains to teen mental health and the use of Instagram, correct?

A.    Correct.  I have not been part of any experiment in that way.

Q.    There were a couple of terms I want to make sure I understand.  Let me get to them.

Have you ever heard the term "feeding the spiral"?

MR. HALPERIN:  Object to form.

A.    Yes.

BY MR. GOZA:

Q.    Can you tell us what that is?

A.    I believe that we talked about

the -- or this appears in other research, other research documentation. The idea of feeding the spiral, of how teen girls and young adults refer to it as it relates to negative appearance based on comparison is this notion of, you know, teen girls not feeling so great about themselves, and particularly their looks or their body, and then encountering content that made them feel worse on Instagram.

Q.    Do you have any knowledge or understanding about whether or not Instagram's algorithms can amplify the content that is sent to teenage girls that creates the potential risk of negative appearance comparison?

MR. HALPERIN:  Object to characterization and foundation.

A.    The knowledge that I have is what teen girls and young adult women have explicitly told me about their own perceptions.

I am very tangentially related to our ranking and recommendation systems or what people broadly refer to as the algorithm

Page 286

and how it works to bring specific content to individuals.

BY MR. GOZA:

Q.    Would the discussion of how ranking and recommendations might amplify the negative appearance content that is sent to young teens -- is that something that is outside your bailiwick?

A.    All of the -- the overwhelming majority of how our ranking and recommendation systems work is outside of my remit.

Q.    Have you ever heard anyone in the company raise the concern that the ranking and recommendation algorithms of the company amplify the amount of negative appearance content that can be sent to teenage girls?

MR. HALPERIN:  Object to form.

A.    In my own research, we bring up that teens -- teen girls and young adults attribute some of this to those -- to the algorithms themselves.

BY MR. GOZA:

Q.    Teen girls have reported to you

Page 287

that they believe that the algorithms amplify the amount of material they get?

A.    Correct.  But since I've not been on a product team and I have not studied our algorithms myself, I cannot speak with certainty about if there's a separation between reality and perceptions here.

MR. GOZA:  I move to strike everything after "Correct."

BY MR. GOZA:

Q.    You were asked a few questions about the Wall Street Journal.

A.    Yes, sir.

Q.    Do you recall those?

I have a couple of other questions for you.

Let me hand you what we've marked as exhibit -- I'm sorry, what exhibit is it?  Tab 45, Exhibit 24.

(Whereupon, Meta-Gross-24, E-mail(s) re: WSJ Leaks - Kids/Tweens/Teens, META3047MDL-014-00266094 - META3047MDL-014-00266096, was marked for identification.)

Page 295

MR. HALPERIN:  Are you going to mark something else as Exhibit 26?  Give this back?

MR. GOZA:  Yeah, sorry.

MR. HALPERIN:  Go for it.

MS. QUINLAN:  We have an issue.

MR. GOZA:  Sorry, we do have an issue.  It has the same Bates stamp number on it, but it's not the same document, so I don't know how that would happen.

Let's do this.  Let's just plow ahead and we'll get something -- and we'll get that figured out at a break.

BY MR. GOZA:

Q.    All right.  Let me hand you now what's been marked as Exhibit 26.

(Whereupon, Meta-Gross-26, E-mail(s) re: Message Summary, META3047MDL-044-00075012 - META3047MDL-044-00075021, was re-marked for identification.)

THE WITNESS:  Great.  Thank you.

///

Page 296

BY MR. GOZA:

Q.    That should be Bates stamp META3047MDL-044-00075012.  And go ahead and take a moment, if you want, to read that, at least acquaint yourself with it.

(Document review.)

THE WITNESS:  Okay.  Thank you for giving me that time.

MR. GOZA:  No problem.

BY MR. GOZA:

Q.    First, let me ask you:  Is this an e-mail chain or another Workbooks...

A.    This is a Workplace chat thread.  Workplace chat is kind of an internal way that we can send what are essentially instant messages or text messages to one another through our internal systems.

Q.    And I've seen you and others use this format a fair amount.  Was it commonly used amongst Meta employees?

A.    It is still commonly used amongst Meta employees.

Q.    Okay.  So that was a common way that you-all, as part of your work responsibilities, would communicate with each

other?

A.    Yes.

Q.    All right.  So let's just go through this.

This was after the initial leak in the Wall Street Journal, and I refer to leak meaning documents that were released to the Wall Street Journal and they published.

A.    Yes, this was after that.

Q.    Okay.  And there was actually at this point some response by the company to the leaks, true?

A.    Yes, in reading this document, it looks as if this conversation took place after Facebook released -- or Meta released the annotated text that had been reported in the Wall Street Journal.

Q.    And is it a fair characterization to say that this was a discussion amongst a variety of researchers and how they felt that their work had been misrepresented by Meta?

MR. HALPERIN:  Object to characterization.

A.    This was a conversation

Page 298

between -- it looks like four researchers, about kind of the entire situation broadly.

Like, I'm sure that you can imagine that tempers were running fairly high or emotions were running fairly high, and so we weren't just coworkers. Like we were actually friends, and providing a safe space to vent was part of this.

BY MR. GOZA:

Q. Got it.

Rather than going through the whole thing, I just want to talk to you about three or four entries and get your take on it.

It says here on -- if we look at the entry at 10:04:28 at the bottom of page 1 -- well, let's actually start up a little bit higher at 9:47:29. This is you saying: I might perceive that I somehow felt a little worse after that Q&A, but I can't express causality.

First of all, the Q&A references an open discussion that occurred with some of the team leaders talking about the leaks?

Page 302

they are really criticizing you about and acknowledging it and stop throwing your researchers under the bus and double-crossing journos so that this can all end, please.

Do you see that?

A.    I see where she wrote that, yes.

Q.    Did you also feel like you had been thrown under the bus to some extent?

MR. HALPERIN:  Object to form, assumes facts.

A.    So I wasn't necessarily thrilled with the idea that I was in this situation in general.  I -- for my own leadership chain, I felt incredibly supported by the person who is now my manager, by the person -- you know, by the person who is now my skip level around, you know, leaks happen. Like this was a pretty big one, and, you know, it is why we're all sitting here today.

But just the notion that leaks happen and it was not a reflection on me individually or my work holistically.

BY MR. GOZA:

Q.    But -- and you'll see some

comments. I know you've already read ahead a little bit. But they do make mention in the annotations about some of the findings that you made, and you reference it's not like I made these themes up.

A. Yeah, there is one specific comment that I reference within this document that it is not the -- it's not the substance that I took effect [sic] to. It was the language, the specific language that they used.

Q. Right. Because it made it sound like you did make some of it up.

A. Correct. And I called that out here, right, that it's not -- you know, that the specific language that I used is what they -- what I took offense to, not the fact that the company did these annotations or that the -- or the specific comments on the overwhelming majority of the deck of mine that they commented.

Q. Got it.

And you ask, it says: How can we design -- at 10:17:13 you say: How can we design an experiment to identify the causal

Page 304

mechanism?

Do you see that?

A.    Yes.

Q.    And, of course, that was never done, right?

A.    This was a tongue-in-cheek question, so like we talked a little bit earlier about experiments and how could we design an experiment to identify the causal mechanism.  This is really a tongue-in-cheek question --

Q.    Right.

A.    -- to both highlight like the difficulties of designing that experiment, but also some of the ethical concerns that we might have in doing so.

Q.    If we go -- okay.

If we go to the next page, if we see at 11:05:05, Shruti Bhutada says: Like MZ -- and I'm assuming there she means Mark Zuckerberg?

A.    Yes.

Q.    -- asked Cox -- and I'm assuming she's talking about Chris Cox?

A.    Yes.

Page 305

Q.    -- and Adam, and I'm assuming that's Adam Mosseri?

A.    That's my assumption as well.

Q.    Okay.  To say research used flowery language and asked research leadership to ask their own ICs to flame other ICs' research.

Do you see that?

A.    I see where she said that, yes.

Q.    And then Shruti says:  Research leadership, bahahahaha.  Sorry, but I feel like leadership needs to Google what leadership means.

And then you say:  I get the impression that MZ --

Mark Zuckerberg?

A.    Yes.

Q.    -- decided how to frame the external narrative, that other teams fought back hard and lost.

A.    Yes.

Q.    And how did you get the impression that Mark Zuckerberg was the one who decided this is the way we're going to handle this?

A.    The comment that I wrote at 11:05, which is where I quoted somebody as: Ended up being basically an MZ call on how it was handled.

There's no other context within this document of a chat thread that's, you know, almost four years old now.  I don't know where that came from.  But it was definitely something that was passed to me that I passed along.

Q.    If we go to the next page, 9/30/2021, 11:17, and you say:  My example to ██████ was.

A.    Yes.

Q.    And again, ███ ██████████?

A.    ███ ██████████.

Q.    Yes.

It says:  For example, when reporting on qualitative research results, some conclusions, slash, statements may be researchers' speculation versus what was actually reported by participants makes it sound like I was just guessing or making things up rather than finding the common themes across the qualitative groups.

Page 307

Do you see that?

A.    Yes.  This is in reference to, as I messaged, there was one specific comment in the annotations on the deck that I took offense to, and that was this comment.

Q.    Okay.  And it sounds like -- I mean, you did your best to accurately describe the themes that you were reporting back on in your presentations, true?

A.    Yes.

Q.    And the reason you took offense is because this tried to, in some ways, demean or belittle or diminish the significance of those findings, true?

MR. HALPERIN:  Object to form and characterization.

A.    The thing that I actually objected to with this statement was, you know, kind of what I said at the end, right, that it makes it sound like I was just guessing, right?

So it wasn't that the company was trying to contextualize the research findings or that the company was trying to properly caveat things that I would have

Page 308

caveated in voiceovers, or that the teams who were working on this would know the limitations of the work, like all of those annotations and caveats and contextualizations, like I totally agreed with.

And even just this notion of, you know, researchers summarize and pull out themes, like if they had framed it in that way, would have been completely fine with it too.

The specific thing was that phrasing of maybe researcher speculation. Like, that is the part that sat very unwell with me then and kind of still does now.

The rest of it -- like it's one comment in an entire deck full of comments.

BY MR. GOZA:

Q.    Sure.

And you disagreed with the idea that you were speculating or guessing about the commonality of the themes, true?

MR. HALPERIN:  Asked and answered.

A.    Yeah.  Yes, I was -- you know,

as I mentioned, I was upset with this phrasing of maybe speculation.

BY MR. GOZA:

Q.    And you also gathered that Shruti Bhutada and others were very upset about some of the comments made about their research, true?

A.    Yes, I definitely gather that Drs. Mody and Bhutada were upset with the comments on their research.

Q.    And you had worked with Dr. Mody and Dr. Bhutada on many occasions?

A.    Correct.

Q.    And, in fact, you had published and done presentations together?

A.    Yes.

Q.    Thought they were excellent researchers?

A.    Correct.

Q.    Thought they did the best to try to present to the company true and accurate representations of the studies that they did?

A.    Drs. Bhutada and Mody are excellent researchers.

Page 434

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, WENDY GROSS PhD was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: February 6, 2025