**AMENDED Exhibit 20**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT        )   MDL Number:
ADDICTION/PERSONAL INJURY PRODUCTS   )   4:22-MD-C047-YGR
LIABILITY LITIGATION                  )
_____)

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING               )
SPECIAL TITLE [RULE 3.400]            )
SOCIAL MEDIA CASES                    )   Lead Case No. for
                                      )   Filing Purposes
_____)   22STCV21355
                                      )
This Document Relates to:             )
                                      )
STATE OF TENNESSEE,                   )
ex rel. JONATHAN SKRMETTI,            )
ATTORNEY GENERAL and REPORTER,        )
v.                                    )
META PLATFORMS, INC., and             )
INSTAGRAM, LLC,                       )
Case No. 23-1364-IV                   )
_____)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
VIDEOTAPED DEPOSITION of CHARLES SISMONDO, VOLUME I
Palo Alto, California
October 16, 2024
Job No. 6933318
Pages 1 - 364
Stenographically reported by:
JENNY L. GRIFFIN, RMR, CSR, CRR, CCRR, CRC
CSR No. 3969

Page 3

A P P E A R A N C E S:

ON BEHALF OF THE PLAINTIFFS:
        MOTLEY RICE LLC
        BY:  LANCE OLIVER, ESQ.
             RIDGE MAZINGO, ESQ.
        28 Bridgeside Blvd.
        Mount Pleasant, South Carolina 29464
        843-216-9620
        loliver@motleyrice.com
        mazingo@motleyrice.com

ON BEHALF OF THE PEOPLE OF THE STATE OF CALIFORNIA:
        BY:  BERNARD A. ESKANDARI, ESQ.
        Department of Justice
        Office of the Attorney General
        300 South Spring Street, Suite 1702
        Los Angeles, California 90013
        213-269-6348
        bernard.eskandari@doj.ca.gov

ON BEHALF OF THE PLAINTIFFS INCLUDING THE STATE OF
ARKANSAS:

        ROBBINS GELLER RUDMAN & DOWD LLP
        BY:  AELISH M. BAIG, ESQ.
             TAEVA SHEFLER, ESQ.
        Post Montgomery Center
        One Montgomery Street, Suite 1800
        San Francisco, California 94104
        415-288-4545
        aelishb@rgrdlaw.com
        tshefler@rgrdlaw.com

Page 29

you've never been shown these documents by your counsel?

A.    Not to my recollection.

Q.    Can you start by talking to me a little bit about your educational background?  Where did you go to college?

A.    I went to university at UC Berkeley.  I started as a political science major and took a double major in computer science.

Q.    And then did you get a secondary degree?

A.    No.

Q.    So you don't have a master's degree or a PhD in anything; correct?

A.    Correct.

Q.    How long did it take you to complete this double major?

A.    Four years.

Q.    And then did you immediately enter the workforce after that?

A.    I did.

MR. OLIVER:  Okay.  I'm going to hand you -- or my colleague is going to hand you what we're going to mark as Plaintiffs' Exhibit 2, which I believe you will recognize.

///

Page 30

(Exhibit 2 was marked for identification and is attached to the transcript.)

MR. CHAPUT:  Charles, try and keep your voice up so that we can make sure the court reporter hears you.

THE WITNESS:  Okay.

BY MR. OLIVER:

Q.    While you're looking at that, Mr. Sismondo, I have handed you a printed-out copy of your LinkedIn profile.

Does that seem to be correct?

A.    This seems to be correct, but I haven't finished looking through it.

Q.    Okay.  You agree that this is a copy of your LinkedIn profile?

A.    Yes.

Q.    Mr. Sismondo, did you draft your LinkedIn profile yourself?

A.    I did.

Q.    Okay.  I'll represent to you that we printed this out and saved it in the last two weeks.

Do you have any reason to doubt that?

A.    No.

Q.    If we did that, has your resume, as

Page 31

represented on LinkedIn, changed in any material way in that time?

A.   No.

MR. CHAPUT:  I'm just going to note, there seems to be some sort of marginal comment or tracked change on the last page of this.  I'm not certain what that is, but I just wanted to note that that seems odd if it is just a printout of a webpage.

MR. OLIVER:  Are you talking about the comment that says "Select language, English"?

MR. CHAPUT:  Yes.  I mean, obviously, that by itself is not an issue, but I just noted that it was there and needed to make that record.

BY MR. OLIVER:

Q.   Sir -- Mr. Sismondo, is there anything material missing from this LinkedIn profile as it relates to your experience?

A.   No.

Q.   So as far as you can tell, this is a full and accurate representation of your education and your working experience?

A.   It is a good summary of it.  There's many things I've done in my career that aren't listed on here, but position by position and the highlights are definitely there.

Page 32

Q.    Of course.

Is there anything in particular in your experience or education that's not on this LinkedIn profile that you think is relevant to today's testimony?

And I'm talking education or experience. I'm not talking what you actually did at Meta. We'll get into that.

A.    The thing that would be relevant is the knowledge I have in terms of -- subject matter in terms of well-being that I got from ex-wife in terms of her education in the subject matter of social work.

Q.    So you were married.  What was your ex-wife's name?

A.    ███████████████.

Q.    ████████████████, was what?  Was she a psychiatrist? a therapist?

A.    Just to correct, ███████.  So ██████████ ████████.  She ended up being a social worker specializing in helping people with PTSD.  She, before that education, worked at eating disorder recovery treatment areas.

Q.    How long were you and ███████ -- did I get that right?

CONFIDENTIAL

Page 33

A.    That's correct.

Q.    How long were you and ▮▮▮▮▮ married?

A.    17 years.

Q.    When did you-all divorce?

A.    I believe that it was marked in 2018.  It started in 2017, in the process.

Q.    During your 17 years of marriage, was she always -- strike that.

Her education qualified her in her areas as a social worker.  Did she always have that education during your marriage?

A.    No.

Q.    At what point did she get that education during your 17 years of marriage?

A.    Let me remember the specific time.  It would have been -- it ended in 2010.  She got a master's in social work from USC.  I believe that was a four-year part-time program.  So from 2006 to 2010.

Q.    Before 2010, was she working in, like, a therapy or social work setting?

A.    No.

Q.    Did she have any personal nonwork-related experiences with eating disorders or PTSD?

A.    She was a recovered eating disorder.

Page 34

Q. Did you know that when you married her?

A. Yes.

Q. Okay. Before 2010 when she received her master's, did you-all have occasion to talk about her experience with eating disorders?

A. Yes.

Q. And I gather your answer is that is something that informs your testimony today because you have personal experience with eating disorders?

A. Yes. In terms of knowing about eating disorders, knowing recovery and that, yes.

Q. So did you talk to her about the causes of her eating disorder?

A. Yes.

Q. Did you talk to her about the recovery from her eating disorder?

A. Yes.

Q. She told you it was something that, although you can have recovery from, you're never totally free of it. Is that fair?

MR. CHAPUT: Object to the form.

THE WITNESS: That's not exactly true. She did not have -- once she had recovered for a certain period of time, there was no draw there. She worked to help others in those communities go forward, but

Page 35

I don't think it's accurate to say that there was a persistent thing after that.

BY MR. OLIVER:

Q.    Which eating disorder did she have?

A.    She had both anorexia at one point and bulimia at one point.

Q.    How old was she when she had those?

A.    When she had anorexia, I believe this was in her beginning of university.  I'm probably not going to get the time frames exactly right.

Q.    It's okay.

A.    So that would have been 18 or 19.  She had bulimia to her early 20s.

Q.    How long -- so roughly four years?  Is that what you're telling me?

A.    Yeah.  That sounds about right in the time frame.

Q.    How long did her recovery period take, if you know?

A.    It's kind of hard to peg, like, when recovery starts, when someone enters that.  I would say probably a year and a half to two years, it was the full recovery trajectory before there was no recurrence of . . .

Q.    And did you meet her after she was

Page 36

recovered from her anorexia and bulimia, or did you meet her during?

A.    I met her during.  She was in recovery path at the time, but she had not -- she was still relapsing.

Q.    What types of doctors did she see to help her recover?

MR. CHAPUT:  So I'm going to object at this point.  We're getting pretty deep into the weeds on a nonparty individual's personal health history. And I do not see the relevance of this third party's personal history to this matter, in particular the level of detail we're getting into her specific medical treatment.

BY MR. OLIVER:

Q.    Mr. Sismondo, what types of doctors did your wife see to help her in her recovery?

A.    To my knowledge, she didn't see any doctors in her recovery.

Q.    Did she get any kind of help with her recovery other than support from you?

A.    She was part of support communities that were eating disorder recovery communities.

Q.    So after -- did she have any long-term, to your knowledge, health effects associated with her

Page 37

anorexia and bulimia, like physical effects?

A.    Not to my knowledge.

Q.    After 2010 when she received her master's in social work, she then went on to a career where she worked with people recovering from eating disorders and PTSD; true?

A.    Not true.

Q.    Okay.  What did she do after she received her master's in 2010?

A.    She then pivoted to taking care of her mom, who suffered from dementia.

Q.    Okay.  But at some point she began to work with people who were suffering from eating disorders and PTSD; correct?

A.    So for the eating disorders, that was previous to the master's in terms of the recovery community and setup and then part during her education, kind of like an internship.  And then there was social work internships during that time which were PTSD-focused.

And then I'm not sure what she does postdivorce, but she wasn't working up to the divorce.

Q.    To your knowledge, did she ever have any experience working with people with anxiety and

CONFIDENTIAL

Page 38

depression in a professional capacity?

A.    Not to my knowledge.

Q.    So you -- we began this conversation by you telling me that you had some specific experience that wasn't on your LinkedIn profile; correct?

A.    Yes.

Q.    That specific experience was the fact that your ex-wife has expertise in eating disorders and PTSD; true?

A.    I don't know if I'd call it expertise broadly in terms of, like, a range of depth.  As someone who recovered -- was in it and was part of the recovering community, she has that knowledge, and then in social work training in general in terms of overall treatment.

Q.    You would agree that, about these subjects, she had more knowledge than the average person; true?

A.    Yes.

Q.    You would agree that she had participated to help herself recover and others recover from these diseases; true?

A.    Yes.

Q.    The point you were trying to make when you answered my original question was simply that you

Page 39

know more about these conditions than the average person because of your experiences and conversations with your own wife; true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MR. OLIVER:

Q.   Okay.  So that's not on your LinkedIn profile.

Otherwise, does your LinkedIn profile appear to be a good summary of your experience and your educational qualifications?

A.   As I previously responded, it doesn't have all the details; it has the highlights.  But it's a good run-through, yes.

Q.   Sure.

And as we go through your previous work experience and your educational qualifications, I noted that, other than the experience with your wife, you did not, before joining Meta, have any professional experience with the topic of teen mental health; correct?

A.   That is correct.

Q.   You did not have any professional experience with the topic of mental health at all when you joined Meta; true?

Page 40

A.   True.

Q.   Since joining Meta, not including things that you read as part of your job, you never underwent any formal training in any mental health disorder; true?

A.   True.

Q.   For example, Meta never sponsored classes for the engineers to learn about mental health issues?

MR. CHAPUT:   Object to the form.

THE WITNESS:   Meta did not sponsor any classes for engineers on that subject, no.

BY MR. OLIVER:

Q.   So as we do this, Mr. Sismondo, one of the things that's going to happen is we're going to jump in from -- there's some procedural issues, and then there's some substantive issues.   So occasionally I'm going to jump from substantive topic, something we just discussed, to a procedural topic, something I'm about to ask you about.

At Meta, while you were -- well, first of all, let me get this straight.   You still work at Meta; correct?

A.   That is correct.

Q.   And you changed positions in 2024?

Page 41

A.   That is correct.

Q.   You went from the Instagram well-being team to what?

A.   The citizenship team in Horizon Worlds.

Q.   Horizon Worlds is Meta's metaverse product; is that correct?

A.   It is a part of the metaverse product.

Q.   Can you explain to me what the metaverse product is and then also explain to me what Horizon Worlds is?

A.   Yes.  The metaverse product is associated with their mixed-reality headset, Meta Quest.  And the Horizon Worlds product is a specific platform where creators can create an experience for users.

Q.   So is this a sort of a virtual reality video game?

A.   It can include that.  It's -- you can make game experiences.  You can make other experiences as well.

Q.   What other types of experiences can you make in this metaverse product?

A.   Anything that would be made in terms of an embodied experience.  So you could make a, you know, simulated apartment.  You could make a cooperative puzzle-solving thing.  It's really -- you can think

Page 42

of it like a development platform.  And so a creator can create an experience that's on the mixed-reality headset that people can take part in.

Q.   And the people who take part in the metaverse product that you're talking about would be other users of that product; correct?

A.   Correct.

Q.   You could create sexual experiences on that product; true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  You cannot create public-facing experiences like that on the product because that's against policy.  So that gets caught in in-world review.  If you have a private locked-down experience, that's outside, just as if someone would create an app individually and keep it privately.

BY MR. OLIVER:

Q.   So privately you could create a sexual experience on the platform with another user?

MR. CHAPUT:  Object to the form.

THE WITNESS:  You don't create them with other users.  You create, like, a setting.  It's like creating an app or a world or a flip -- like, that's kind of the analogy.

Page 241

in terms of interventions in the last year that I was with them.

So I don't know what their current state is.  To my knowledge, they are not.

Q.   Since its inception, Instagram's largest audience has been teenagers; right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Completely false.  A vast -- almost -- there's over a billion people on the platform.  In '21 in particular -- I don't know if we've been losing our market share with youth.  So we've actually lost product market fit with youth in that time frame.  So its biggest -- like, just by sheer numbers, youth was not its biggest audience.

BY MR. OLIVER:

Q.   And I misspoke because I used the word "largest," but I have seen -- and we'll look at them.  I mean, you may disagree, but I have seen document after document that says that Instagram's most important audience was youth, was teenagers.  Is that true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Staying relevant with the youth was -- was important for the product.

///

Page 242

BY MR. OLIVER:

Q.   And that -- as long as you've been there, that's always been true; right?

A.   I would actually say that that focus -- so I don't know in terms of 2019 and 2020.  Alarm bells started going off as youth ceased using the platform or engaging the platform as much, which made it a focus of leadership.

It's always been an important cohort, but the emphasis, in terms of the -- it being a priority cohort to focus on from a safety and product standpoint was, I believe, more in 2022.  I can't remember if in 2021 they started getting more focused.

Q.   So I want to go back to the document, but I want to ask you a question.  So you told me that when there -- there was a period of time when youth started leaving the product and it became a focus; right?

A.   That is correct.

Q.   Your best estimate of the time that youth started leaving the product was 2022; is that right?

A.   I --

MR. CHAPUT:  Object to the form.

THE WITNESS:  I think the trend probably

Page 500

BY MR. OLIVER:

Q.   Is it that you don't remember, or is it that there's a better witness to answer that question?

A.   For a comprehensive end-to-end look at parental controls, there's probably a better witness to answer that question.

Q.   Okay.  Who would that witness be, based on your experience?

A.   I would probably talk to a product manager. And I don't remember who the product manager was for that.  But as an engineering manager, being executionally focused, that's more my area of expertise; and in the parental controls realm, it was that there was a shorter stint compared to the other disciplines we were talking about.  But I don't have a specific name.

MR. OLIVER:  Let's mark as Plaintiff's Exhibit 21 META3047MDL-020-00691221.

(Exhibit 21 was marked for identification and is attached to the transcript.)

THE WITNESS:  Can I read the full thing since it's short?

///

CONFIDENTIAL

Page 501

BY MR. OLIVER:

Q.    Yeah.  Please.

A.    Yep.  I've read it.

Q.    So this, Mr. Sismondo, is a conversation from yourself and ███████████; correct?

A.    That is correct.

Q.    It's obviously an internal Meta document; right?

A.    This is correct.

Q.    And it is from the time period of 2020, which is shortly after you joined the Instagram well-being team; true?

A.    This is true.  And it looks like it's right at the start of the pandemic.

Q.    ████████ suggests something about radical things as in specific projects; correct?

A.    At this point in time, the team is brand-new.  I recall this research had just come about.  So this is referring to the initial brainstorming and possible things and how what he's asking for is really appetite for radical thinking, which I believe I'm basically saying that's important.

Q.    And he reports to you or you report to him?

A.    He reports to -- he may have reported

Page 502

directly to me at this time, but he reported to ██████. But I think at this point he's reporting to ██████, who, therefore, reported to me. So he's on my team.

Q.   So ██████ says:

      "I think the radical move is that the team's vision should be to move Instagram out of the position of being uniquely worst for teens' social comparison and body image."

      Did I read that correctly?

A.   You did.

Q.   Do you agree that at the time Instagram was uniquely the worst for teens' social comparison and body image?

A.   What he is talking about is the research we referred to, and that research from the qualitative standpoint showed the teens' opinions were that this was the case.

Q.   And ██████, who worked with you, clearly believed it; correct?

      MR. CHAPUT:  Object to the form.

      THE WITNESS:  That's true.

BY MR. OLIVER:

Q.   And you agreed with him that radical moves

Page 503

were important; right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It's very important for all brainstorming that we think big, that we do radical things that actually really move the needle.  That is what we want to do to make progress.  So if we limit our thinking, we might not benefit our user as much.

BY MR. OLIVER:

Q.  ████████  goes on to say:

"It's the only social media app that's consistently placed into the 'high effect on feeling bad about myself.'"

Correct?

A.  That is what he states.

Q.  And that quote is based on the research you just told me about teenagers saying it has a high effect of making me feel bad about myself; right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That is my understanding.

BY MR. OLIVER:

Q.  Now, what you said in response to him about radical thinking was:

"I think it is really important to

CONFIDENTIAL

Page 642

you do the research at that time.  And . . .

Q.   And, to your memory, is that -- you mentioned earlier a term called "aggregated data."

Was that aggregated data that you would be working on in studying that nighttime usage process?

A.   I can't remember specifically, but most likely yes.

MR. JANSSEN:  Okay.  That's all I have. I'll pass the witness.

Thank you, Mr. Sismondo.  I appreciate it.

THE WITNESS:  Thank you.

EXAMINATION

BY MS. BAIG:

Q.   Good afternoon, Mr. Sismondo.  I'm Aelish Baig.  I'm with Robbins Geller.  We represent the plaintiffs, including the State of Arkansas.  You'll be happy to hear I don't have a lot of questions for you.

I believe you agreed yesterday that during your tenure at Meta, Meta endeavored to expand its youth user base; correct?

MR. CHAPUT:  Object to the form.

BY MS. BAIG:

Q.   Yesterday and today.

A.   Specifically, Instagram was focused on the

Page 643

teen retention and growth.

Q.    Okay.  And it was focused also on increasing teen engagement; correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Teen engagement broadly described by engagement metrics.

BY MS. BAIG:

Q.    And would you agree that it does so, at least in part, by collecting information about its youth users?

MR. CHAPUT:  Object to the form.

BY MS. BAIG:

Q.    For example, collecting information about searches that any particular user might be making.

MR. CHAPUT:  Same objection.

THE WITNESS:  I have no expertise in how we do that side of the business.

BY MS. BAIG:

Q.    Okay.  So you have no understanding as to whether Instagram collects information about its youth users?

A.    Correct.

Q.    And would you agree that Instagram targets advertising to its youth users?

A.    I'm actually not aware of our advertising

CONFIDENTIAL

Page 739

---oOo---

I, JENNY L. GRIFFIN, hereby certify:

That I am a certified shorthand reporter in and for the County of Alameda, State of California;

Prior to being examined, CHARLES SISMONDO, the witness named in the foregoing deposition, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth; that said deposition was taken pursuant to notice at the time and place therein set forth, and was taken down by me in stenotype and thereafter transcribed by means of computer-aided transcription, and that said deposition is a true record of the testimony given by the witness.

I further certify that I am neither counsel for nor related in any way to any party to said action, nor otherwise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name October 30, 2024.

_____

JENNY L. GRIFFIN, CSR #3969

Certified Shorthand Reporter