# AMENDED Exhibit 21

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA              )
ADOLESCENT ADDICTION/            )
PERSONAL INJURY PRODUCTS         )   MDL No. 3047
LIABILITY LITIGATION             )
                                 )
                                 )

 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING          )
SPECIAL TITLE [RULE 3.400]       )
                                 )
SOCIAL MEDIA CASES               )   Lead Case No.
_____)   22STCV21355
This Document Relates To         )
                                 )
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI,               )
ATTORNEY GENERAL and             )
REPORTER,                        )
v.                               )
META PLATFORMS, INC., and        )
INSTAGRAM, LLC.                  )
_____)

        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
                PURSUANT TO PROTECTIVE ORDER
                      VIDEO-RECORDED
                DEPOSITION OF ROBERT CHEN
                     (Pages 1 - 313)
                   Covington & Burling
        3000 El Camino Real, Palo Alto, California
          Tuesday, March 25, 2025, 9:24 a.m.
                      - - - -

REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

HIGHLY CONFIDENTIAL

Page 2

APPEARANCES

For the Plaintiffs:
          BY: AUSTIN BRANE, ESQ.
          Wagstaff & Cartmell
          4740 Grand Avenue, Suite 300
          Kansas City, Missouri 64112
          816.701.1100
          abrane@wcllp.com


For the Defendants Meta Platforms, Inc., f/k/a
Facebook, Inc.; Facebook Holdings, LLC; Facebook
Operations, LLC; Facebook Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC; Siculus, Inc.;
and Mark Elliot Zuckerberg:

          BY: CHRISTOPHER K. EPPICH, ESQ.
          BY: ANNA DUNIN-UNDERWOOD, ESQ.
          BY: CLAUDIA FERNANDEZ, (VIA ZOOM)
          Covington & Burling LLP
          1999 Avenue of the Stars
          Los Angeles, California 90067-4643
          424.332.4764
          Ceppich@cov.com
          BY: JORDAN THOMAS, ESQ (VIA ZOOM)
          Bass, Berry & Sims PLC
          100 Peabody Place, Suite 1300
          Memphis, TN 37203
          (901) 543-5916

For the State of Massachusetts:
          BY: KAITLYN KARPENKO, ESQ.
          BY: PETER DOWNING, ESQ.
          BY: CAMY RUCK, ESQ. (VIA ZOOM)
          Office of the Attorney General
          State of Massachusetts
          1 Ashburton Place, 20th Floor
          Boston, Massachusetts 02108
          617.727.2200
          kaitlyn.karpenko@mass.gov

document to be?

A.   It looks like my LinkedIn profile.

Q.   Okay.  And when you say this looks like your LinkedIn profile, you created the LinkedIn profile, correct?

A.   Yes.

Q.   Okay.  And you posted this profile online on linkedin.com, correct?

A.   Yes.

Q.   And this is a true and accurate copy of the material that you posted online, correct?

A.   Yes.

Q.   Thank you.

Mr. Chen, does this accurately reflect your educational background and current work experience to date?

A.   Yes.

Q.   Okay.  Let's just start a little bit on your educational background.

A.   Uh-huh.

Q.   What is your educational background?

A.   I got a BA in molecular and cellular biology and political science at UC Berkeley.

Q.   Okay.  And when did you obtain that degree, what year?

HIGHLY CONFIDENTIAL

Page 29

A.    I graduated in 2008.

(Reporter clarification.)

BY MR. DOWNING:

Q.    Do you have any other educational degrees?

A.    No other degrees.

Q.    Okay.

A.    High school diploma, but I'm assuming you're...

Q.    Yes, I was after -- after graduating from UC Berkeley.

A.    Yeah.

Q.    Let's then look at your employment history.

I'm going to start from your -- after graduating college.

A.    Okay.

Q.    After graduating from UC Berkeley, did you take a job somewhere?

A.    Yes.

Q.    Okay.  Where did you begin working?

A.    At Accenture.

Q.    Okay.  And I see here on the second page of your LinkenIn profile it says "Accenture, Business Strategy Manager."

Is that your -- was that your title?

HIGHLY CONFIDENTIAL

Page 30

A.    Yes.

Q.    Okay.  And it says September 2008 to October 2015.

Is that the length of time that you were at Accenture?

A.    Yes.

Q.    Okay.  And under that, this describes your work at Accenture as including "Advised technology clients in the SF Bay Area with an emphasis on new product development, business development, and marketing."

Did I read that correctly?

A.    Yes.

Q.    Is that an accurate description of your work experience at Accenture?

A.    I also did a little bit of work in healthcare.

Q.    Okay.

A.    But -- yeah.

Q.    So this is -- but your answer is this is accurate here?

A.    This is accurate here, yeah.

Q.    But then you're also saying in addition you did healthcare work as well; is that correct?

A.    That's correct.

Page 31

Q.   All right.  Let's turn to the front page, page 1 of 2.

A.   Uh-huh.

Q.   Do you see at the bottom, it says "Facebook Product Strategist"?

A.   Yes.

Q.   Okay.  It says October 2015 to September 2019.

Do you see that?

A.   Yes.

Q.   Okay.  So this indicates that you joined Facebook as a product strategist; is that right?

A.   The role as it was then called was market strategist.  Later on the team changed its name.

Q.   Okay.  And this says October '15 to September '19.  That's the time period that you had this role as a product strategist; is that correct?

A.   Yes.

Q.   Okay.  All right.

And can you tell me what team or teams you were on during the time that you were a product strategist?

A.   Yeah.  So we eventually consolidated into a central team.  And that central team was then known as market strategy and then product strategy.

HIGHLY CONFIDENTIAL

Page 32

And I would work with a variety of product teams at Meta.

In terms of the teams that I worked with, I worked on Facebook groups.  I worked on what was initially known as the teens team.  And then it changed to the youth team.

I worked on just, like, Facebook, the app more generally.

And I also did work that connected with a variety -- various, like, messaging aspects of the product.  So that would include Facebook Messenger, Instagram Direct, and WhatsApp.

Q.   Okay.  Who did you report to during the time period that you had the title of product strategist?

A.   I had, per usual at Meta, many managers.

My first manager was ████████████.  My second manager was ████████.  And I think my third manager was ████████.

Q.   Okay.

A.   And my fourth manager was ████████.  And my fifth manager was ████████.

Q.   Were these managers that you had at different times or did they overlap as managers for you?

HIGHLY CONFIDENTIAL

Page 33

A.   Different times.  I have one manager at a time.

Q.   Okay.  And as the product strategist role, did you supervise anyone?

A.   I did not.

Q.   Okay.  All right.

Let me ask you about on page 2 of 2, the top, the first, I guess paragraph there.

A.   Uh-huh.

Q.   You say, "Product strategy for Facebook Inc.'s family of apps, including WhatsApp, Instagram, Messenger, and the main Facebook App. Worked with C-suite and heads of family of apps."

Did I read that correctly?

A.   Yes.

Q.   Okay.  When you say "worked with C-suite and heads of family apps," what do you mean?

A.   So I mean I would be in meetings with a variety of company leadership.  Usually, the interactions would be I would present to them my findings.  And in some instances there would be working sessions where we would be developing a work product.

Q.   When I read "C-suite," I think of like a CEO, CFO, or CTO.

HIGHLY CONFIDENTIAL

Page 34

Can you be a little bit more specific on who or what titles in the C-suite you're referring to here?

A.    Yes.  CFO.

Q.    Okay.

A.    And CPO.

Q.    Okay.  So CFO would be the chief financial officer?

A.    Yes.

Q.    Okay.  And CPO is the chief product officer?

A.    Yes.

Q.    So you're saying that some of your work involved you presenting to the CFO or the CPO; is that right?

A.    Yes.

Oh.  I also presented to the COO.

Q.    Okay.

A.    Once.

Q.    Chief operating officer?

A.    Yes.

Q.    Okay.  Did you ever have an opportunity to present to the CEO?

A.    No.

Q.    Okay.  So you never presented to Mark

HIGHLY CONFIDENTIAL

Page 35

Zuckerberg directly?

A.   No.

Q.   And when you say "heads of family apps," who fits within that umbrella?

A.   It would be the people who led WhatsApp, Instagram, Messenger, or the main Facebook app.

Q.   Okay.

A.   And so at the time -- for a time WhatsApp was led by Chris Daniels.  Messenger was led by Stan Chudnovsky.

And then Facebook was led by probably Chris Cox.  And then Will Cathcart.

(Reporter clarification.)

THE WITNESS:  And then Fidji Simo.

BY MR. DOWNING:

Q.   And you mentioned Instagram in here as well.  Did you --

A.   I did not present to Kevin Systrom.

Q.   I'm sorry.  You said you did not present to Kevin Systrom?

A.   No.

Q.   Okay.  Let's move down to, I guess, the next bullet.  I'll read that here.  It says [as read]:

Developed the overall strategy and

HIGHLY CONFIDENTIAL

Page 36

corresponding measurement framework for the Facebook app in collaboration with the head of Facebook and the small cross-functional team.

Did I read that correctly?

A.    Yes.

Q.    Okay.  When you say "in collaboration with the head of Facebook," who are you talking about there?

A.    Will Cathcart.

Q.    Okay.  And when you refer to the overall strategy and corresponding measurement framework for the Facebook app, what project or what title does that involve?

A.    The work was connected with our -- what we then called our -- social services strategy.  So the idea here was that Facebook had a -- like a core of assets, such as the people that use it, the brand, and whatnot, that could be used to help develop new products, such as Facebook Dating, for example.

And then the measurement framework was a framework that I helped develop to help us understand kind of like the give-and-take between Facebook and any new services or existing services that we had for Facebook.

Q.    Did the measurement framework have a name

HIGHLY CONFIDENTIAL

Page 37

internally?

A.   I think it was just called measurement framework.

Q.   Okay.  Okay.  Let's go down to -- this is another bullet.  This is the third bullet.  I'll read it here.  It says [as read]:

Led strategy sprint for product team; strategy adopted and materials were presented to Facebook's board of directors.

Did I read that correctly?

A.   Yes.

Q.   So this talks about leading a strategy sprint for the product team.

What was the strategy sprint related to?

A.   It was related to teens.

Q.   Okay.  Can you explain a little bit more what -- when you say it's related to teens, in what way?

A.   So the main participants of the sprints were the market strategy team, subsequently known as product strategy.  And we, as a team, did a series of analyses on teens and their app usage and how we as Facebook would want to help improve our product to increase the number of teens on Facebook.

Q.   And this -- this refers to a strategy

sprint.

What does sprint mean in this context?

A.    Oh, yeah.  A sprint means a group of people working together for a short period of time on a particular topic.

Q.    Okay.  And why was there a strategy sprint related to this teen work?

A.    There was a decline in the number of monthly active teens on the Facebook app.  So that was a concern.  And given that concern, it was important to develop a stronger understanding of what might be going on in that space.  And so that's why we brought in a bunch of people together to increase the focus on it.

Q.    Okay.  And this goes on to say that the strategy was adopted.

Adopted in what sense?

A.    Adopted in the sense of -- I forget the exact contents of the strategy.  I think the main thing that was adopted was we stood up a teens product team to work on the teen space to build product for teens.

Q.    Okay.  And the reason to build the product was to stop the teen decline and get more teen users on the Facebook app; is that right?

HIGHLY CONFIDENTIAL

Page 39

MR. EPPICH:  Object to the form.

THE WITNESS:  My understanding was that the teens team was formed to bring teens back to Facebook.

BY MR. DOWNING:

Q.   Okay.  And then I think this is going to be my last question on this bullet, but you talk about the materials were presented to Facebook's board of directors.

Were you involved personally in presenting the material to the Facebook board of directors?

A.   No.

Q.   Okay.

A.   I helped put together the materials, but I did not present on it.

Q.   So when you say you helped put together the materials, what materials did you help put together?

A.   Slides, like PowerPoint slides.

Q.   And based on your understanding, those PowerPoint slides were then presented to Facebook's board of directors; is that right?

A.   That's my understanding.

Q.   Okay.  Do you know who did the presentation to Facebook's board of directors?

HIGHLY CONFIDENTIAL

Page 40

A.    I believe it was ▨▨▨▨▨▨.

Q.    Okay.  And was ▨▨▨▨▨▨ on this team that you were working on?

A.    He was a lead product manager for the teens team.

Q.    Okay.  And do you know if the board did anything in response to receiving the presentation?

MR. EPPICH:  Object to the form.  Foundation.

THE WITNESS:  I do not.

BY MR. DOWNING:

Q.    Okay.  Let me ask you -- going back to page 1 of your LinkedIn profile, you show a different role, and I'll read it.  It says:  Meta product lead, September 2019 to present.

Is this a new role or -- I should say -- strike that.

Is this a change in your role at Meta?

A.    Yes.  I switched from product strategist to product management.

Q.    Okay.  And did you switch in September of 2019?

A.    Yes.

Q.    Okay.  And are you presently in that role?

A.    Yes.

HIGHLY CONFIDENTIAL

Page 41

Q. Okay. And who is your supervisor presently?

A. ▮▮▮▮▮▮▮.

Q. And do you supervise anyone presently in your role as product lead?

A. No.

Q. And let me ask you, above the Meta product lead there's -- it also says: Instagram product lead, April 2024 to present.

Do you see that?

A. Yes.

Q. Do you also have a title within Instagram somehow?

A. I'm indicating that I currently work on Instagram products.

Q. Okay. What product do you currently work on at Instagram?

A. Instagram's website, instagram.com.

Q. Okay. Can you be more specific, like what part of instagram.com do you work on?

A. I focus primarily on the logged-out experience of instagram.com. So if you go to -- if you type in instagram.com on your phone or your computer, and you're not logged in to your Instagram account, that's the experience that I am focused on.

HIGHLY CONFIDENTIAL

Page 112

video record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  12:42.  We're on the video record.

BY MR. DOWNING:

Q.  All right.  Good afternoon Mr. Chen, welcome back.

We are going to jump into another set of documents here.  I have a document which will be marked Exhibit 5 for you to review.

(Whereupon, Meta-Chen Exhibit 5 was marked for identification.)

THE WITNESS:  Thank you.

MR. DOWNING:  For the record I will read in the Bates number, which is META3047MDL-027-00000106.

Q.  Mr. Chen, if you review it generally, then we will go through more specifically some portions of it, so...

Go ahead and do that if you would.

A.  Okay.

Q.  Okay.  Mr. Chen, this document is Exhibit 5.  At the top, you will see a Bates 0102, the first page, it says "MK & Youth Platform Products Reviews."

HIGHLY CONFIDENTIAL

Page 113

Do you see that?

A.    Uh-huh.

Q.    Below that it says [as read]:

Closed group.  129 members.  Summaries of the MK Leads Reviews with SL dot, dot, dot.

Do you see that?

A.    Uh-huh.

Q.    This was a Workplace group at Meta, right?

A.    Yes.

Q.    Okay.  And you are one of the members of this 129-member MK and youth platform product review group, right?

MR. EPPICH:  Object to the form.

THE WITNESS:  I assume I was a member.

BY MR. DOWNING:

Q.    Okay.  And you assume you were a member because of what?

A.    There's a post from me.

Q.    Okay.

A.    Yeah.

Q.    And that's what I was going to get into.

Below that, do you see your name and a circle with your picture in it?

A.    Yes.

Q.    Okay.  That is your picture, correct?

HIGHLY CONFIDENTIAL

Page 114

A.    Yes.

Q.    Okay.  And it says "Robert Chen (PM) is with ███████████████████ ."

Do you see that?

A.    Yes.

Q.    It says August 18, 2018, correct?

A.    Yes.

Q.    Okay.

A.    August 10.

Q.    Oh, sorry, sorry.  Let me read it again.

August 10, 2018.

Thank you for correcting me.

A.    Uh-huh.

Q.    Okay.  This is a post that you made on August 10, 2018, to this Workplace group, correct?

A.    Yeah.

Q.    Okay.  Okay.

Beneath your name and the date is the title Market Landscape Review - August 9th (fka) Competitive Landscape Review.

Correct?

A.    Yes.

Q.    FKA means formerly known as?

A.    I believe so, yes.

Q.    And under that you say, "We discussed

HIGHLY CONFIDENTIAL

Page 118

Instagram," what did you mean?

A.    So I don't remember the specific post. But looking at it now, I think in the context of this post, the long-term retention work was done for Facebook but we hadn't done it for Instagram and so I'm suggesting we could look into the same thing for Instagram.

Q.    Okay.

A.    Long-term retention for Instagram.

Q.    Okay.  All right.

And then there's a heading for Lifetime Value here, right?

Do you see that?

A.    Yes.

Q.    Okay.  And there are three bullets below that, correct?

A.    Uh-huh.

Q.    Okay.

A.    Three top level bullets, yeah.

Q.    Three -- sorry.  You're right.

Three top level bullets.

A.    Uh-huh.

Q.    The first bullet says "LTV work plugs in retention figures from the retention work above."

Did I read that correctly?

HIGHLY CONFIDENTIAL

Page 119

A.    Yes.

Q.    Okay.  So you're talking again about how long-term retention feeds into lifetime value, right?

A.    Yeah.

Q.    Okay.  The second bullet says [as read]:

Because the difference in retention for people who join as teens is so much greater than those who joined later in life, preliminary results suggest that lifetime value for people who joined Facebook as teens is significantly higher.

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then you propose "Next steps." There are two here that you propose, right?

A.    Yeah.

Q.    You propose to refine the model, correct?

A.    Yes.

Q.    And by refine the model you mean refine the model that does the lifetime value calculation?

A.    Yes.

Q.    Okay.  And then you also propose next steps to connect with finance to validate, right?

A.    Yes.

Q.    Okay.  What would it mean to validate with

HIGHLY CONFIDENTIAL

Page 173

BY MR. DOWNING:

Q.    I can re-ask this question.

When you say $270 per teen, is that 270 in profit or in revenue?

A.    It's definitely not profit.  For the lifetime value calculations, I had used average revenue per user.

Q.    Okay.  So you are saying because you had used average revenue per user, this $270 figure is a form of revenue?

MR. EPPICH:  Object to the form.  Vague.

THE WITNESS:  It is like a transformation of the revenue, because the ARPU is the component of the model along with retention and the weighted average cost of capital.

BY MR. DOWNING:

Q.    Okay.

A.    So it's connected to revenue, yeah.

MR. DOWNING:  All right.  Let's continue on to a new document here.  This will be Exhibit 9, Tab 16.

(Whereupon, Meta-Chen Exhibit 9 was marked for identification.)

BY MR. DOWNING:

Q.    Here you go.  Mr. Chen, I have handed you

Page 174

Exhibit 9, which has the Bates number META3047MDL-014-00289025.

A.    Okay.

Q.    Okay.  Mr. Chen, the first page shows an e-mail from ███████████.

Do you see that?

A.    Yes.

Q.    You had mentioned him earlier.

He was one of your supervisors; is that right?

A.    Yes, he was one of my managers.

Q.    Okay.  Was he your manager in -- in October 2018?

A.    I'm not a hundred percent sure, but I think so.

Q.    Okay.  So ███████████ sent an e-mail here to a group that is entitled market_strategy_updates@FB.com.

Do you see that?

A.    Yes.

Q.    Do you know if you were part of that group?

A.    I don't know for sure, but I would expect -- I would think so.

Q.    Okay.  And the subject of this e-mail is

Page 175

Market Strategy Updates - 10/5/18.

Do you see that?

A.    Yeah.

Q.    So this was the market strategy update for October 5, 2018, right?

A.    Yes.

Q.    Okay.  Let me direct your attention to one of the particular sections, Section 2, which is on 0 -- I'm sorry -- 9027.

Do you see where it says:  2 Ecosystems - U.S. User Lifetime Value Phase 1?

A.    Yes.

Q.    Okay.  If you look at the next page, 9028, up above Assumptions there is a bullet that says: POC Robert Chen.

Do you see that?

A.    Yes.

Q.    Okay.  That means that you were the point of contact; is that right?

A.    Yes.

Q.    Okay.  So were you the point of contact on this particular bullet, right, or this particular section?

A.    Yes.

Q.    Okay.  And that's because you had done a

HIGHLY CONFIDENTIAL

Page 176

significant amount of work on lifetime value, right?

A.   That's right.

Q.   Okay.  Let's just flip back to 9025, the first page.

A.   Okay.

Q.   There are Highlights here.

Do you see 1 through 5 Highlights?

A.   Yes.

Q.   Okay.  Highlight 2 says:  Ecosystems - US User Lifetime Value Phase 1.

Do you see that?

A.   Uh-huh.

Q.   Can you read the text that follows U.S. User Lifetime Value Phase 1, that paragraph?

A.   [As read]:

Based on a conservative set of assumptions, we find the lifetime value, LTV, of users in the United States to be between $200 and $350.  People who join FB as 13-year-olds have an LTV of approximately 350, higher than all other teen ages 13 to 18, due to their very high long-term retention.  We should acquire teens as young as possible.  Phase 2 of the work will explore how the assumptions may change.

Q.   Okay.  Thank you.  So in this highlight

Page 177

here, it says that people who join Facebook as 13-year-olds have a lifetime value of approximately $350, right?

A.   Yes.

Q.   So previously, your September 7th e-mail had said $270, right?

A.   I forget exactly.

Q.   Okay.

A.   Sorry.

Q.   Here, do you want to look back at --

A.   Sure.

Q.   This would be Exhibit 8.

A.   Uh-huh.

Q.   Which would be the second page of the e-mail under "Progress."

A.   Yes.

Q.   Okay.  So what I'm trying to understand is that the calculation had now yielded a slightly higher lifetime value for 13-year-olds, right?

MR. EPPICH:  Object to the form.

THE WITNESS:  It looks like it's higher in this October e-mail.

BY MR. DOWNING:

Q.   Okay.  And by higher, it's -- in this October 13th e-mail, it's $350 for lifetime value of

Page 178

a 13-year-old, right?

MR. EPPICH:  Object to the form.

THE WITNESS:  That's -- yeah, that's what the e-mail says.

BY MR. DOWNING:

Q.  Okay.  Mr. Chen, were you involved in the updating of these figures that went from 270 to 350?

A.  I --

MR. EPPICH:  Object to the form.

THE WITNESS:  I was the main person on the team working on this.  So I wouldn't have a reason to think that it was somebody else.

BY MR. DOWNING:

Q.  Okay.

A.  Yeah.

Q.  All right.  Let's -- let's go to the actual details that start on Bates 9027.

Mr. Chen, do you know -- did you help actually draft this portion of the e-mail that talks about US User Lifetime Value, Phase 1?

A.  Most likely.

Q.  Okay.

A.  But I don't remember.  It's been a while.

Q.  Okay.  All right.

Under "Context," I want to ask a couple

HIGHLY CONFIDENTIAL

Page 313

STATE OF CALIFORNIA  )

COUNTY OF YOLO       )

        I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

                        ROBERT CHEN,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

        I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the  _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720