# AMENDED Exhibit 102

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )
  SUPERIOR COURT OF THE STATE OF CALIFORNIA
        FOR THE COUNTY OF LOS ANGELES
           SPRING STREET COURTHOUSE
COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     ) Lead Case No.
                               ) 22STCV21355
SOCIAL MEDIA CASES             )
_____ )
                               )
This Document Relates to:      )
                               )
STATE OF TENNESSEE,            )
ex rel. JONATHAN SKRMETTI,     )
ATTORNEY GENERAL and REPORTER, )
v.                             )
META PLATFORMS, INC., and      )
INSTAGRAM, LLC,                )
Case No. 23-1364-IV            )
_____)

Friday, March 14, 2025
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
     Video-Recorded Oral Deposition of
SHILPA MODY, held at the offices of Covington
& Burling LLP, 3000 El Camino Real, 5 Palo
Alto Square, Suite 1000, Palo Alto,
California, commencing at 9:08 a.m. PDT on
the above date, before Debra A. Dibble,
Fellow of the Academy of Professional
Reporters, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and California CSR #14345.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

CONFIDENTIAL

Page 2

A P P E A R A N C E S:

MILBANK LLP
BY:  GRANT R. MAINLAND, ESQUIRE
     gmainland@milbank.com
     MCKENZIE HARTMANN, ESQUIRE  (via Zoom)
     mhartmann@milbank.com
55 Hudson Yards
New York, New York 10001
(212) 530-5251
Counsel for the Witness

WAGSTAFF & CARTMELL LLP
BY:  LUCY R. MALONE, ESQUIRE (via Zoom)
     lmalone@wcllp.com
4740 Grand Avenue
Suite 300
Kansas City, Missouri 64112
(816) 701-1100
Counsel for Plaintiffs

KENTUCKY OFFICE OF THE ATTORNEY GENERAL
BY:  ZACHARY RICHARDS, ESQUIRE
     zach.richards@ky.gov
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601
(502) 696-5300
Counsel for the State of Kentucky

THE COMMONWEALTH OF MASSACHUSETTS, OFFICE
OF THE ATTORNEY GENERAL
BY:  KAITLYN KARPENKO, ESQUIRE
     kaitlyn.karpenko@mass.gov
     AARON DAVIS, ESQUIRE (via Zoom)
     aaron.davis@mass.gov
     CHRISTINA CHAN, ESQUIRE (via Zoom)
     christina.chan@mass.gov
     CAMY RUCK, ESQUIRE (via Zoom)
     camy.ruck@mass.gov
     PETER.DOWNING, ESQUIRE (via Zoom)
     peter.downing@mass.gov
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
(617) 963-2912
Counsel for the Commonwealth of Massachusetts

CONFIDENTIAL

Page 3

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD LLP
BY:   TAEVA SHEFLER, ESQUIRE
         shefler@rgrdlaw.com
655 West Broadway
Suite 1900
San Diego, California 92101
(619) 231-1058
Counsel for the State of Arkansas

OFFICE OF THE TENNESSEE ATTORNEY GENERAL
BY:   ELIZABETH SPICA, PhD
         elizabeth.spica@ag.tn.gov
P.O. Box 20207
Nashville, Tennessee 37202-0207
(615) 741-3491
Counsel for State of Tennessee, Office of the
Attorney General & Reporter

OFFICE OF THE COLORADO ATTORNEY GENERAL
BY:   KRISTA BATCHELDER, ESQUIRE
         krista.batchelder@coag.gov
         SHAHEEN SHEIKH, ESQUIRE (via Zoom)
         shaheen.sheikh@coag.gov
         CORIN STIGALL, ESQUIRE (via Zoom)
         corin.stigall@coag.gov
         STEPHEN KAUFMAN, ESQUIRE (via Zoom)
         stephen.kaufman@coag.gov
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
 Counsel for the State of Colorado

OFFICE OF THE CONNECTICUT ATTORNEY GENERAL
BY:   TESS SHAW, ESQUIRE (via Zoom)
         tess.shaw@ct.gov
165 Capitol Avenue
Hartford, Connecticut 06106
(860) 808-5318
Counsel for the State of Connecticut

CONFIDENTIAL

Page 4

A P P E A R A N C E S:

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
BY:  LAUREL K. LACKEY, ESQUIRE (via Zoom)
        laurel.k.lackey@wvago.gov
        ABBY G. CUNNINGHAM, ESQUIRE (via Zoom)
        abby.g.cunningham@wvago.gov
P.O. Box 1789
Charleston, West Virgina 25326
(304) 558-8986
Counsel for the State of West Virginia

LIEFF CABRASER HEIMANN & BERNSTEIN
BY:  PATRICK I. ANDREWS, ESQUIRE
        pandrews@lchb.com
275 Battery Street
29th Floor
San Francisco, California 94111-3339
(415) 956-1000
Counsel for Plaintiffs

OFFICE OF THE NORTH CAROLINA ATTORNEY GENERAL
BY:  CHARLES WHITE, ESQUIRE (via Zoom)
        cwhite@ncdoj.gov
1 South Wilmington Street
Raleigh, North Carolina 27601
(919) 707-4480
Counsel for the State of North Carolina

COVINGTON & BURLING LLP
BY:  LINDSEY BARNHART, ESQUIRE
        lbarnhart@cov.com
3000 El Camino Real
5 Palo Alto Square, 10th floor
Palo Alto, California 94306-2112
(650) 632-4700
-and-
COVINGTON & BURLING LLP
BY:  ALEX KENNEDY, ESQUIRE
        akennedy@cov.com
1999 Avenue of the Stars
Los Angeles, California 90067-4643
(424) 332-4827

     -and-

CONFIDENTIAL

Page 5

APPEARANCES
     COVINGTON & BURLING LLP
     BY:  RYAN A. PARTELOW, ESQUIRE  (via Zoom)
          rpartelow@cov.com
     The New York Times Building
     620 Eighth Avenue
     New York, New York 10018-1405
     (212) 841-1000
     -and-
     BASS BERRY & SIMS PLC
     BY:  KATHRYN HANNEN WALKER, ESQUIRE (via Zoom)
          kathryn.walker@bassberry.com
     150 Third Avenue South
     Suite 2800
     Nashville, Tennessee 37201
     (615)742-6200
     Counsel for Defendants Meta Platforms,
     Inc. f/k/a Facebook, Inc.; Facebook Holdings,
     LLC; Facebook Operations, LLC; Facebook
     Payments, Inc.; Facebook Technologies, LLC; Instagram,
     LLC; Siculus, Inc.; and Mark Elliot Zuckerberg

     KING & SPALDING LLP
     BY:  JULY CHOI, ESQUIRE (via Zoom)
          july.choi@kslaw.com
     633 West Fifth Street
     Suite 1600
     Los Angeles, California 90071
     (213)443-4355
     Counsel for Defendants TikTok Inc. and
     ByteDance Inc.

     MUNGER TOLLES & OLSON LLP
     BY:  CORDELL BROWN, ESQUIRE (via Zoom)
          cordell.brown@mto.com
     350 South Grand Avenue
     50th Floor
     Los Angeles, California 90071
     (213)683-9100
     Counsel for Defendant Snap Inc.

CONFIDENTIAL

Page 6

APPEARANCES

ALSO PRESENT:

SYLVIA HUANG, ESQUIRE
Meta Platforms Inc.

RASHEED EVELYN (via Zoom)
Wilson Sonsini

TRIAL TECHNICIANS:

LANCE HOEPPNER

EDDIE FISHER

VIDEOGRAPHER:
DARNELL BROWN
GOLKOW - VERITEXT

CONFIDENTIAL

Page 23

A.    No.  I think this looks pretty accurate.

Q.    Okay.  All right.  I'd just like to look at some of your experience and education.  I think I'm going to go to your education first.

And so if we could turn to the second page of three.  Towards the middle of the page, do you see where it says Education?

A.    Yes.

Q.    Okay.  And so I see there Queen's University, Batchelor of Computing, Cognitive Science, between 2003 and 2007.

Does that reflect your undergraduate studies?

A.    Yes.

Q.    And Queen's University is a college in Canada; is that correct?

A.    Yes.

Q.    Based on your opinion, is Queen's University a prestigious university in Canada?

A.    Reasonably prestigious, yeah.

Q.    Okay.  And then above that we see Harvard University, Doctor of Philosophy

CONFIDENTIAL

Page 24

(PhD), Psychology, between 2010 and 2016.

Do you see that?

A.    Yes.

Q.    And does this reflect that you obtained your PhD from Harvard in 2016 in psychology?

A.    I did, yes.

Q.    Okay.  Great.  Thank you very much.

Okay.  If we could turn to the first page, and look at some of your experience.

So I'd like to look first at your current position.  It says that you are a senior user researcher at Grammarly.

Do you see that?

A.    Yes.

Q.    And your LinkedIn profile says you've been in this position since March 2022; is that correct?

A.    Yes, it is.

Q.    Okay.  And then below that we have just a little blurb about your time there.  Do you see that sentence that begins with "I do mixed-methods research"?

CONFIDENTIAL

Page 25

A.    Yep.

Q.    Okay.  It says:  I do mixed-methods research, generating insights and working with teams on topics ranging from growth to trust to generative AI.

Did I read that correctly?

A.    Yes.

Q.    And does that accurately reflect your current role at Grammarly?

A.    Yeah, it does.

Q.    Let's look at the next position below that.  It says Meta.  And then it says you were at Meta for five years and one month.

Do you see that?

A.    Yep.

Q.    And do you have any reason to dispute that that's how long you worked at Meta?

A.    I was there for five years, exactly, but, no.

Q.    Okay.

A.    Yeah.

Q.    Okay.  And then, let's look at the bottom position here.  It says:  User

experience researcher - Messenger.

Do you see that?

A.    Yes.

Q.    And it says you were in this position between March 2017 and September 2018.

Did I read that correctly?

A.    Yes.

Q.    And beneath that it has a little bit -- some cut off -- I'm only going to read the first sentence.  It says:  I worked with product teams and leadership across Facebook Messenger on topics ranging from new types of ads to quality and performance, to the apps' market position.

Does that accurately and generally describe your role as a user experience researcher for Messenger?

A.    Yes.

Q.    Okay.  Let's look at the position above that.  It says:  Senior quantitative user researcher - Instagram.

Did I read that correctly?

A.    Yes.

Q.    What is quantitative research?

CONFIDENTIAL

Page 27

A.    In this particular role, what that means is that I focused primarily on doing surveys rather than, like, more qualitative methods like interviews.

Q.    Okay.  Stepping back from this role specifically, are you able to tell me generally what quantitative research is?

A.    Yeah.  I would say, like at tech companies, quantitative research is typically survey work, but at some companies it can also include like looking at behavioral metrics in the way that a data scientist would as well.

Q.    Okay.  Are you familiar with the term "qualitative research"?

A.    Yes.

Q.    What is qualitative research?

A.    Qualitative research is typically research done with smaller samples of people, so like things one-on-one interviews that you can only do with a small set of people.

Q.    Okay.  And are you able to tell me the difference, like what are the differences between qualitative research and

CONFIDENTIAL

Page 36

do I understand correctly that survey participants in India and Indonesia were not asked questions in the survey about misinformation topics?

A.     Yeah.

Q.     Great.  Thank you very much.

The third heading on this slide is:  What's A Negative Experience, and there's a question mark there.

Do you see that?

A.     Yes.

Q.     And then it says:  We asked people about seeing or experiencing 14 different negative experiences, which covered many of the areas that the Well-Being team is working on (e.g., bullying and harassment, nudity and sexual content, inauthentic engagement, misinformation).

Did I read that correctly?

A.     Yes.

Q.     And so you surveyed 30,000 Instagram users about 14 different negative experiences, correct?

A.     I did, yes.

Q.     And then beneath that it says:

CONFIDENTIAL

Page 37

The language we used in questions did not map onto our classifiers or policies.  We were aiming to measure subjectively bad experiences, whether or not they were policy violating.  For example, if someone feels they were bullied, even if we wouldn't take down the content, we want to count that experience.

Did I read that correctly?

A.    Yes.

Q.    And would it be fair to say that this slide reflects some high-level methodology that was used in conducting this survey?

A.    Yes.

Q.    Okay.  Great.  Thank you very much.

We can move on to slide four.  And at the top it says:  What We Did.  Correct?

A.    Yes.

Q.    And taking a moment to look at this slide, does this slide also provide us some more methodology information about this survey?

CONFIDENTIAL

Page 44

BY MR. RICHARDS:

    Q.    And are Likert scales used in quantitative research?

    A.    Very frequently, yes.

    Q.    Okay.  Thank you very much.

    We can move on to slide six in this PowerPoint.

    Okay.  At the top of this slide, do you see where it says Perceived Reach?

    A.    Yes.

    Q.    And we discussed a moment ago that that refers to the percentage of survey respondents who experienced these various issues, correct?

    MS. BARNHART:  Object to the definition.

    A.    To the number of -- the percent of respondents who said that they -- yeah. Who said that they experienced these issues.

BY MR. RICHARDS:

    Q.    Okay.  Thank you.

    Beneath that it says:  Overall, the perceived reach of negative experiences on Instagram is quite high.

Page 45

Do you see that?

A.      Yes.

Q.      And that text is in blue on this page, correct?

A.      It is, yes.

Q.      And the text in this top paragraph, the rest of it is black, correct?

A.      Yes.

Q.      As the author of this presentation, were you trying to emphasize that first sentence by altering the color?

MS. BARNHART:  Object to the form.

A.      Yes, I was.

BY MR. RICHARDS:

Q.      Thank you.

And then after that it says: Over half of respondents reported seeing a suspicious account in the last week.  Other problems with high-perceived reach are seeing commercial spam, experiencing inauthentic engagement, and seeing misinformation.

Did I read that correctly?

A.      Yes.

Q.      I want to look at -- generally,

CONFIDENTIAL

Page 151

Q.    Could you do the same thing with the body image circle?

A.    Yep.  So the body image circle is quite far over to the right-hand side.  So it is, I guess, the second-highest proportion of -- out of all these issues, the issue for the -- the second-highest proportion said that Instagram made that experience worse, and it is kind of middling intensity.

Q.    Okay.  I want to just understand the proportion Instagram made it worse.  And I'll use an example, and you tell me if I'm right or wrong.

Is it fair to say, reading this chart, that just over -- or around one-third of respondents answered that Instagram made problematic social media use worse?

MS. BARNHART:  Object to the form.

A.    Yeah.  So this is a -- I'm just noting now that this graph is only looking at teen respondents.

BY MR. RICHARDS:

Q.    Okay.  Thank you.

A.    Yep.  But the -- yeah, the way

CONFIDENTIAL

Page 152

to read that would be, yeah, around one-third, or just over 30%, of teen respondents who said that they'd experienced problematic social media using the follow-up questions about it said that Instagram made that experience worse.

Q.    Okay.  And I'm going to ask a similar question with respect to body image. That comes just after the .20 part of the X-axis -- yeah, the X-axis.  Is it -- am I understanding it correctly that that reflects over 1 in 5 teens reporting Instagram made body image issues worse?

MR. MAINLAND:  Objection to form.

A.    Yeah.  So similar to the other one, it's saying that of the people who said that they had experienced body image issues in the last 30 days and then received this particular follow-up question about it, just over 1 in 5 of them said that Instagram made that experience worse.

BY MR. RICHARDS:

Q.    Okay.  And then you gave me some helpful information about how to

CONFIDENTIAL

Page 153

interpret where various -- you know, body image and social media use fall on this chart.  Could you please do the same thing with respect to social comparison, towards the middle?

A.    Yep.  So social comparison is -- looks like kind of third-most to the right here, so it is, out of all of these different experiences, if we're trying to rank them by what proportion of teens who had experienced them felt that Instagram had made that experience worse, social comparison looks like it's third on that.  And it also looks like middling to high intensity compared to the other experiences.

Q.    And in terms of proportion or fractions, is this just under 1 in 5 of the survey respondents answering that Instagram made social comparison worse?

MS. BARNHART:  Object to the form.

A.    Yeah, it looks like it's around -- somewhere between, you know, 15 and 20%.

* * *

CONFIDENTIAL

Page 205

Q.     Who is ████████ ██?

A.     ████████ ██ was, I believe, either an engineer or engineering manager on the team.  I forget now.

Q.     Okay.  And how regularly -- or did you work with ████████ ██ while you were at Meta?

A.     Yeah, we did.  We worked together.

Q.     How frequently or infrequently would you say?

A.     We were on the, like the same -- worked on the same product team.  But that being said, engineers and researchers don't always spend a ton of time together.

Q.     Okay.  That's helpful.

I want to look at the third chat you send here, where you say:  Justin, just -- Justin did a quick look into this, and it turns out that at the high end, we really do recommend a lot of high-NAC content to teens, exclamation point.

Did I read that correctly?

A.     Yes.

Q.     And did you put "A LOT" in all

CONFIDENTIAL

Page 206

caps here?

A.    I did.

Q.    And then after that it says:
Like for the top 10% of teens, our recs in
Explore are 57% high-NAC, and then there's an
emoji there.  Correct?

A.    Yes.

Q.    And so what are you referring
to here when you say the top 10% of teens?

A.    So --

MS. BARNHART:  Object to the
form, foundation.

A.    Yeah.  So if I -- if I remember
correctly, what I'm talking about here is if
you kind of, you know, kind of graphed, like,
all teens and how -- and, you know, what
percentage of our recommendations in Explore
are -- what I'm calling here high-NAC
content, then for the percent of teens for
which it's the most, like that top 10%, it is
57%.

BY MR. RICHARDS:

Q.    And the NAC here, does that
refer to negative appearance comparison?

A.    Yes.

CONFIDENTIAL

Page 207

Q.    And so you're saying here that of those top 10% of teens, you know, seeing NAC in Explore, 57% of Instagram's recommendations for content were high-NAC, according to this chat, correct?

A.    Yeah.  So I'm saying for 10% of teens, 57% of the recommendations in Explore are high-NAC.  For the other nine -- I guess, just to make sure we understand what that number means, for the other 90% of teens, you know, less than 50% of their recommendations in Explore would be high-NAC.

Q.    Less than 57%, correct?

A.    Yes, sorry, 57%, yes.

Q.    And then I'm going to skip along where you share, perhaps an image or something, and you say below that:  In the strategy doc I'm writing, I'm basically saying let's show less high-NAC content but personalize/target it so we're better balancing potential harm and preferences. The three specific ideas are 1, at the top end, put a limit on how much high-NAC content we recommend to teens (e.g., something below 57%).

Page 218

Q.    And the 60th percentile for teen girls?

A.    It looks like 15%.

Q.    Okay.  And if we compare these two charts that we've looked at so far for teens generally and teen girls, do teen girls or teen -- do teen girls have a higher or lower percentage of high-NAC content on Explore than teens generally?

A.    It looks like teen girls -- at each of these kind of like comparing across these different percentiles, it looks like all of the numbers for teen girls are higher.

Except for -- no, yep, it looks like all of them are higher.

Q.    Okay.  Great.  Thank you very much.

Okay.  We can move on to our next document, which for the display is Z10.

(Whereupon, Meta-Mody-11, E-mail(s), Subj: Re: [Email review] Mental Well-being: Check feedback and 18-month goals for prioritization, META3047MDL-003-00128201 through META3047MDL-003-00128206, was marked

Page 299

can't, exclamation point.  Correct?

A.    Yes.

Q.    And then I want to look just two beneath that where Shruti says:  Yeah, I am not sure how else you would measure well-being.

Did I read that correctly?

A.    Yes.

Q.    And is that in reference to people's perception is literally ground truth because we're asking about personal experiences/feelings?

Is that your understanding?

A.    That is my understanding, yes.

Q.    Okay.  Thank you.

We can turn to the next page ending in 967.

Will you read your -- the first time your name appears on this page at the top?  Will you read the chat you provided at 15:45:20?

A.    Yep.

Yeah, I am really just trying to understand the reasoning behind this. Like I feel like they're absolutely throwing

us under the bus and making us sound incompetent, which is not great obviously, but would feel better to me if there was a good reason to do it.

Q.    And then Shruti replies:  If they focus on flaws in the research as opposed to the public critique, which is about flaws in leadership, they come across as defensive.

Did I read that correctly?

A.    Yes.

Q.    I'm going to skip one, two, three, four, five, six -- about seven lines -- seven chat blocks down, where Shruti says at 15:48:57:  I don't know why they are going about it this way.  Because he didn't. But they are just disqualifying everything they can in the research in case someone takes some finding and makes a big deal about it.  I mean, they are even trying to disqualify the qual work, haha.

And qual there, that means qualitative work, correct?

A.    Yes.

Q.    And did I read that correctly

Page 301

so far?

A.    Yes.

Q.    Would you read your response to that?

A.    Yeah.  I think they're basically trying to discredit the work so much that it's like it didn't get leaked at all.

Q.    And then the next quote from you?

A.    To stop cherry-picking, et cetera.

Q.    And the next?

A.    And they are probably also trying to fight this on all fronts.

Q.    And then Shruti says:  Yeah.
Do you see that?

A.    Yep.

Q.    And then will you read your next two chats?

A.    Like saying, we didn't really know anything, and also, we didn't fail to act because we did build things, and also, we didn't lie.

Q.    Right.  So that chat, it says

CONFIDENTIAL

Page 445

implementing, running, and analyzing it.

The survey compared the experiences of teens who were seeing like counts but had the option to opt in to hiding them, with those of teens who had like counts hidden and had the option to opt out of hiding them.

We found that teens with like counts hidden as the default (and the option to opt out) were significantly less likely to feel worse about themselves because of the number of likes other people received on their Instagram posts.

This research helped develop our understanding of the impact of Daisy controls, and highlighted the potential value of launching it as a default for teens in the future.

Q.    Isn't it right that you testified earlier that Daisy, to your recollection, did not launch as a default with the option to opt out?

A.    I'm not sure whether it did or not.

Q.    Okay.  Dr. Mody, what was your

CONFIDENTIAL

Page 524

C E R T I F I C A T E

I, DEBRA A. DIBBLE, RDR, CRR, CRC, Notary Public, do hereby certify:

That SILPA MODY., the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness;

That pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition;

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand on this 21st day of March, 2025.

_____
Debra A. Dibble
Fellow of the Academy of Professional Reporters
Registered Diplomate Reporter
Certified Realtime Reporter
Notary Public 11/17/2027
CA 14345