# AMENDED Exhibit 113

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              )
PERSONAL INJURY PRODUCTS           )   MDL No. 3047
LIABILITY LITIGATION               )
                                   )
                                   )


 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING            )
SPECIAL TITLE [RULE 3.400]         )
                                   )
SOCIAL MEDIA CASES                 )
                                   )
                                   )  Lead Case No.
This Document Relates to:          )  22STCV21355
                                   )
STATE OF TENNESSEE, ex rel.        )
JONATHAN SKRMETTI,                 )
ATTORNEY GENERAL and REPORTER,)
v.                                 )
META PLATFORMS, INC., and          )
INSTAGRAM, LLC.                    )
                                   )
_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VOLUME 1
VIDEO-RECORDED
DEPOSITION OF DIEGO CASTANEDA, DrPH MPH
(Pages 1 - 405)
Held at the Law Offices of Covington & Burling
415 Mission, San Francisco, California
Tuesday, October 22, 2024, 9:10 a.m.
- - - -
REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

APPEARANCES

For the MDL Plaintiffs:
    BY: PREVIN WARREN, ESQ.
    BY: NELSON DRAKE, ESQ.
    BY: ABIGAIL BURMAN, ESQ.
    BY: KATY LAWRIMORE, ESQ. (VIA ZOOM)
    BY: JESSICA COLOMBO, ESQ. (VIA ZOOM)
    BY: LANCE OLIVER, ESQ. (VIA ZOOM)
    Motley Rice
    401 9th Street, NW, Suite 630
    Washington, DC 20004
    202.386.9610
    Pwarren@motleyrice.com

    BY: MICHAEL M. WEINKOWITZ, ESQ. (VIA ZOOM)
        Mweinkowitz@lfsblaw.com
    Levin Sedran & Berman LLP
    510 Walnut Street, Suite 500
    Philadelphia, Pennsylvania 19106
    215.592.1500
    Mweinkowitz@lfsblaw.com

    BY: MICHAEL LEVIN-GESUNDHEIT, ESQ.
    Lieff Cabraser Heimann & Bernstein, LLP
    275 Battery Street, 29th Floor
    San Francisco, California 94111
    415.956.1000
    Mlevin-gesundheit@lchb.com

For the State of Massachusetts:
    BY: PETER DOWNING, ESQ. (VIA ZOOM)
    Massachusetts Office of the Attorney General
    One Ashburton Place
    Boston, Massachusetts 02108
    617.963.2014
    Peter.downing@mass.gov

Page 3

For the State of Tennessee:
        BY: BRIAN PHELPS, ESQ.
        Office of the Tennessee Attorney General
        UBS Building
        315 Deaderick Street
        Nashville, Tennessee 37202
        615.837.5566
        Brian.phelps@ag.tn.gov

For the State of Arkansas:
        BY: TAEVA SHEFLER, ESQ.
        BY: THOMAS E. EGLER, ESQ.
        Robbins Geller Rudman & Dowd LLP
        One Montgomery Street, Suite 1800
        San Francisco, California 94104
        415.288.4545
        Tshefler@rgrdlaw.com


For the Defendant Snap, Inc.:

        BY: ARIELLA PARK, ESQ. (VIA ZOOM)
        Munger Tolles & Olson LLP
        350 South Grand Avenue, 50th Floor
        Los Angeles, California 90071
        213.683.9100
        Ariella.park@mto.com

For the State of Kentucky:
        BY: MATTHEW C. COCANOUGHER, ESQ.
        Office of the Attorney General
        1024 Capital Center Drive, Suite 200
        Frankfort, Kentucky 40601
        502.696.5300
        Matthew.cocanougher@ky.gov

CONFIDENTIAL

Page 4

For the Defendants Meta Platforms, Inc., f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC: Facebook Payments, Inc.: Facebook Technologies, LLC; Instragram, LLC: Siculus, Inc.; and Mark Elliot Zuckerberg:
        BY: ISAAC D. CHAPUT, ESQ.
             Ichaput@cov.com
        BY: LINDSEY BARNHART, ESQ.
        BY: PAUL BANKS, ESQ.
        Covington & Burling LLP
        415 Mission Street, Suite 5400
        San Francisco, California 94105
        415.591.6000

        BY: REAGAN SCHMIDT, ESQ. (VIA ZOOM)
        Bass, Berry & Sims
        150 Third Avenue South, Suite 2800
        Nashville, Tennessee 37201
        615.742.7934
        Reagan.schmidt@bassberry.com

For the Defendants TikTok, Ltd.; Tiktok, LLC; Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:

        BY: LENNETTE LEE, ESQ. (VIA ZOOM)
        King & Spalding LLP
        633 West Fifth Street, Suite 1600
        Los Angeles, California 90071
        213.218.4011
        Llee@kslaw.com

For the Defendant Alphabet Inc.; Google LLC, and YouTube, LLC:

        BY: MATTHEW DONOHUE, ESQ. (VIA ZOOM)
        Wilson, Sonsini Goodrich & Rosati
        953 East Third Street, Suite 100
        Los Angeles, California 90013
        323.210.2939
        Mdonohue@wsgr.com

CONFIDENTIAL

Page 5

Also present:

Miguel Concepcion, Videographer
Gina Veldman, Trial Technician
Savannah Grant
Kaitlyn Karpenko
Jayden Mougin
Sylvia Huang
Annie Kouba
Matthew Janssen
R Groves
Henry Johnson
Carson Brace
Nicolle Brito
Karen Berger
Nicholas Willing
Keaton Murphy
Megan Paris Rundlet
Grace Quinlan
Aaron Salberg
Elizabeth Orem
Aaron Davis
Elizabeth Spica
Shante Piche
Alexandra Walsh
Jared Rinehimer
Ana Avalos Cuellar
Miles Vaughn
Stephanie Alexander
Laurel K. Lacky
Zach Richards
Camy Ruck
Daniel Keiser
Paige Boldt
Tess Shaw
Mandy Wang
Aaron Salberg
Lucy Malone
Neil Kosslyn
Matthew Ford
Krista Batchelder
Abby Cunningham
Annie Kouba
Christina Chan

Page 31

your LinkedIn profile?

A.    Did I alter the contents of --

Q.    Author.

A.    Author.

Q.    Let me -- let's get a clean record.  Let me ask the question again.

Did you author the contents of your LinkedIn profile?

A.    Yes, I definitely did that.

Q.    Does the LinkedIn profile presented to you at Exhibit 1 accurately reflect your educational background?

A.    Uh-huh.  That looks accurate.

Q.    Does it accurately reflect your work experience?

A.    For everything that's listed here, yeah.

Q.    Does it accurately describe your skills?

A.    Let's see about my skills.

Here they are.  Yep.

Q.    Does it accurately describe your publication history?

A.    There might be some other things that are missing, but that's probably the highlights.  I don't have a lot of publications.

Q.    Okay.  So you said that the LinkedIn

Page 32

profile accurately reflects your work experience for everything that's listed.

Is there any work experience that's not listed?

A.    Let's see.  I worked at the Labor Center during my time at -- at UC Berkeley.  That's not here.  But it was, like, kind of a student kind of thing.  So I think I -- you know, you got to keep your resumé more or less tight.  So I don't list every single thing that I've ever done.

But yeah, I'd say it's accurate over the last, like, how long ago.  13, 14, 15 years now, longer.  Yeah, that's about right.

Q.    Okay.  And you indicated there might be some publications that aren't listed here.

What are those?

A.    I worked in an immunology lab and there was, like, seven -- six or seven articles on immunology that I was, like, a fifth or sixth author.  Those aren't there.

And then -- yeah, in terms of peer -- peer reviewed -- I mean, actually, this isn't even all peer reviewed.  This is just random -- these are all different kinds of publications.

I feel like there may be another -- let's

Page 33

see.  The HIV-related -- there may be another mobile research publication for some research that was done in Papua New Guinea that's not here.  I'd have to look at my CV.

Q.   Okay.  Can you tell me briefly what that research in Papua New Guinea was about?

A.   Yeah, I was working with a -- a co-investigator, another -- two, actually.  And she was interested in using mobile health text messaging to make maternal child care more accessible.  And there was a randomized kind of clustering that was done on this island.  I could be wrong about New Guinea.  I don't know if that's the right island.  I think it might be wrong.  It might be Tahiti.  But somewhere in the South Pacific.

Q.   Somewhere fun?

A.   Yeah.

Q.   My questions today are going to focus primarily on your work at Meta.

When you started working at Meta it was called Facebook, right?

A.   Yes, that is correct.

Q.   And it changed its name to Meta in late 2021?

A.   If that is -- that sounds accurate.

Page 34

Q.   Okay.  So I don't want us to get confused or turned around today so I'll be referring to the company as Meta even when we're talking about the time frame before its name change; is that fair?

A.   Yes.

Q.   And when I use the words Facebook, I'll be referring to the social media app Facebook; is that clear?

A.   Social media -- Facebook social media app, Meta the company, is what you're saying.

Q.   Exactly.  The app will be Facebook.  The company will be Meta.

A.   Yes.

Q.   Okay.  And if that ever becomes unclear in context will you just let me know?

A.   Sure.

Q.   Okay.  And likewise, today we'll be talking a fair deal about Instagram.  In general, I'm going to use that word to talk about the app as opposed to any of Meta's subsidiary companies like Instagram, LLC; is that clear?

A.   Yes.

Q.   Okay.  So let's dive in and start talking about your work at Meta.

Now, you started working for Meta in

Page 35

June 2016, correct?

A.    Yes.

Q.    Your first job there was as a senior user experience researcher and lead for the Facebook Search team, correct?

A.    I was a senior lead experience researcher. I wasn't lead quite yet.

Q.    Okay.  But in that role, you spearheaded international field research across three countries?

A.    Yeah, that came out a little bit later in my tenure there.  But yes.

Q.    Which countries?

A.    I went to Mexico, Vietnam, and the Czech Republic.

Q.    And as part of your work, you applied eye tracking methodology to study click-through behaviors, correct?

A.    Yes.

Q.    What is eye tracking methodology?

A.    It's a technique to basically track where people are looking on a particular -- whatever surface it is.  So you could see where people are looking in real time while they're doing some kind of -- using some kind of experience.

Q.    So you call it a methodology.  But would

Page 66

A.   Yes.

Q.   Okay.  Do you have any reason to dispute that this is a true and correct copy of the article as it appeared in The Atlantic?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I've never seen this article before that I remember.  I mean, I think I've seen a -- I feel like I've seen the headline.  But I -- I think I read -- I think I did read this when we very first started because it was part of -- it was definitely part of our -- our understanding of the kind of grounding and what our -- you know, what we needed to work on.  What we should be working on.

BY MR. WARREN:

Q.   Okay.  And there's an image at the beginning of this article that appears to have the Instagram logo inside of a Dumpster fire, correct?

A.   It looks like that.

Q.   What does that indicate to you?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'd have to read the article to kind of get more context.  But feels like the Instagram brand was in a Dumpster fire, I guess.

BY MR. WARREN:

Q.   Okay.  Can you take a minute to read the

Page 67

first page of the article and let me know when you're done.

A.    Talking about this page here?

MR. WARREN:  This is Exhibit 3, for the record.

The demonstrative that I presented earlier will be marked as Exhibit 2.

(Whereupon, Exhibit Meta-Castaneda-2 and Exhibit Meta-Castaneda-3 were marked for identification.)

THE WITNESS:  I'm finished.

BY MR. WARREN:

Q.    Okay.  The article begins by discussing the experience of someone named Brandon Farbstein, correct?

A.    Yes.

Q.    And according to the article, he was 14 years old when he first joined Instagram?

A.    Looks like the article says that, yeah.

Q.    And according to the article, he received death threats, expletive-laden comments about his appearance, and worse, right?

A.    Yeah.

Q.    And it has a quote from Brandon in the third paragraph.  Could you please read that to the

Page 68

jury.

A.   Sure.

"My entire experience of high school was completely ruined by Instagram harassment.  It's draining, it's anxiety producing.  I'm used to people calling me names, but it's when people say that they're going to kill me or come find my family that really gets me in a sense of pure terror.  Really nothing can prevent or get in the way of that taking over your thoughts and emotions."

Q.   Doctor, is that a problem or a serious problem?

MR. CHAPUT:  Object to the form.

THE WITNESS:  For this individual, that's a serious problem.

BY MR. WARREN:

Q.   Is it fair to say this is an example of a kid receiving an unwanted contact on Instagram?

MR. CHAPUT:  Object to the form.

THE WITNESS:  When you say "unwanted contact," yeah, I think that -- I think that makes sense.

BY MR. WARREN:

Q.   Okay.  I'd like to direct your attention to page 5 of the document.

Page 79

the previous one.

BY MR. WARREN:

Q.   Well, it says here that Instagram would start asking users for their birthday when you open Instagram, right?

A.   Uh-huh.

Q.   Correct?

A.   That looks right, yeah.

Q.   And it says that you'll need to share your birthday to continue using Instagram, correct?

A.   That looks correct.

Q.   Okay.  So in December 2019, Instagram began asking users to voluntarily enter their date of birth, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.  Like -- yeah, according to this document, it looks like starting today, that's what it -- it's asking.  I don't know if that was -- I got to read through this a little bit more carefully but it sounds like that's correct.

BY MR. WARREN:

Q.   Okay.  And starting in March 2021, Meta began requiring users of Instagram to share their date of birth, correct?

CONFIDENTIAL

Page 80

MR. CHAPUT:  Object to the form.

THE WITNESS:  That seems correct.

MR. WARREN:  Okay.  We can take a break now.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  Going off the record at 10:22 a.m.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  And we're back on the record at     a.m.

BY MR. WARREN:

Q.  Hello, again.

A.  Hello.

Q.  So there's one logistical matter that I meant to take care of earlier that we'll do.  So I'm going to hand you now the notices of deposition in this case.

And that will be Exhibit...

MS. VELDMAN:  6.

MR. WARREN:  It's Exhibit 6.

(Whereupon, Exhibit Meta-Castaneda-6 was marked for identification.)

BY MR. WARREN:

Q.  And I'm just going to ask if you've seen these before?

CONFIDENTIAL

Page 126

MR. CHAPUT:  Object to form.

BY MR. WARREN:

Q.   Even though it has a checkmark next to it?

A.   Yeah, I mean, it looks like this is --
what you're saying is accurate.

Q.   Okay.

A.   But I -- you know, I'm just stipulating
that I've never -- I've never seen this before and I
don't know what was going on with the app at the
time.

Q.   Well, you had access to the document,
right, we looked at that already?

A.   It might have been way later that I was
given access.  I'm not sure when that happened.

Q.   Well, that's not right, is it?

Let's look at page 577.

And this is the page that has your name on
it, right, up at the top?

A.   Yep.

Q.   Okay.  And what's the date at the end of
that paragraph?

A.   August 6, 2019.

Q.   August 6, 2019.  All right.

And look at the second page of the
document.

Page 130

planned to be interviewed?

A.   That seems like the --

MR. CHAPUT:  Object to form.

THE WITNESS:  I'm sorry.

That seems like the -- the -- the plan.

BY MR. WARREN:

Q.   Okay.  And the gaps in the existing tools are then articulated at the bottom of that same page, correct, in the table we were looking at?

MR. CHAPUT:  Object to form.

THE WITNESS:  There's three of them here. Yeah, it's -- I don't know what -- yeah, mentions is there.  Tags is there.  Reachability isn't there -- or DM reachability is there.  And then, I don't know, yeah, what private refers to.

BY MR. WARREN:

Q.   Okay.  And the gap identified here is that even though private prevents unconnected users from seeing users content, those accounts can still heavily interact via DMs, tags, and mentions, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  According to this table, at this time, it seems that's the case.  But I don't -- I don't know exactly what was going on with the app.

Page 131

BY MR. WARREN:

Q. Okay. And so the issue is that even if you set your account to private, a stranger could still mention a kid's account in their comment?

MR. CHAPUT: Object to form.

THE WITNESS: Can you repeat that question for me, please?

BY MR. WARREN:

Q. The gap -- there was some gaps involved. One of them is that even if you set your account to private, a stranger can still mention your account in their comment, right?

MR. CHAPUT: Object to the form.

THE WITNESS: If we're talking about unconnected people, yeah, I would agree with that.

BY MR. WARREN:

Q. And a stranger could also tag a kid in their post, right?

MR. CHAPUT: Object to form.

THE WITNESS: Theoretically it seems like that's the case, according to the table.

BY MR. WARREN:

Q. And a stranger could send a kid direct messages?

MR. CHAPUT: Object to the form.

Page 132

THE WITNESS:  According to this table, that seems to be the case.

BY MR. WARREN:

Q.  Okay.  And examples of unwanted interactions like that were reported by The Atlantic in October of 2018, correct?

MR. CHAPUT:  Object to form.  Foundation.

THE WITNESS:  According to this article?

BY MR. WARREN:

Q.  Yes.

A.  Yeah, it seems like there was a couple of instances -- or maybe more, at least the two that you had me read.  That seems like the case.

Q.  Okay.  So I'm going to have you look at another document ending in 901.

And this will be Exhibit 9.

(Whereupon, Exhibit Meta-Castaneda-9 was marked for identification.)

BY MR. WARREN:

Q.  Title of this document is Smart Defaults Write-Up, correct?

And I'll represent to you that this came from your files and was produced to us by your attorneys.

Any reason to doubt that?

Page 135

the document.

BY MR. WARREN:

Q.   Okay.  And do you see the section entitled TLDR?

A.   I do.

Q.   And that's shorthand for too long didn't read?

A.   That is.

Q.   And that's another way of identifying a summary section, right?

A.   Yes.

Q.   So the research concluded in summary that almost all participants thought that younger users and new users should be defaulted to private, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  According to this research, that is the -- that is what -- one of the findings, insights, observations, whatever you want to call it.

BY MR. WARREN:

Q.   Another finding was that almost all participants across ages believe that a young person's account, e.g., anyone below 11 to 13, and in some cases up to 15, should automatically be

Page 139

MR. CHAPUT:  Object to --

BY MR. WARREN:

Q.  Correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's what it says.

BY MR. WARREN:

Q.  Okay.  And directing your attention to further down that same page, "This research study revealed that participants were most sensitive to unwanted contact and interaction," correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That is what that -- that headline says.

BY MR. WARREN:

Q.  "Unwanted contacts were seen as an issue related to safety, security, and privacy."

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yeah, we're just reading through here, yeah.

BY MR. WARREN:

Q.  Why don't you keep reading through.

What does the sub bullet say?

A.  "Unwarranted contacts were seen as an issue related to safety, security, and privacy."

Looks like it also refers to what the

Page 141

that page.

Yes, I do see that.

MR. WARREN:  And I would just move to strike from the record your comment which was nonresponsive to a question.

It's nothing personal but this exercise is one in which I ask questions and you give answers, okay.  So unsolicited comments, I'll just be moving to strike them.

Q.  Can you read what the 14-year-old said in the interview?

A.  "Fake robot accounts DM you and say watch my free sex videos and the person sends it to 50 different kinds of people.  This is kind of like, hey, get a $500 Visa gift card.  I did that one time.  It was the first time I ever saw it.  I was real young.  I thought I am going to get some money.  It asked for my address.  Plain 'ole little me, I was kind of ditzy.  What it said to me after that was, we have your address now, we will stalk you.  I was 11.  I freaked out.  That's probably one of the reasons I got a private account."

Q.  Is that a problem or a serious problem?

MR. CHAPUT:  Object to the form.

THE WITNESS:  This is a serious problem

Page 145

that seems to make sense from this -- this bullet here.

BY MR. WARREN:

Q.   Okay.

A.   And this research.

Q.   Okay.  But that's not actually how the private account mode worked, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  At the time of this research, I don't know exactly.  I don't know what was going on.  I mean, we could look at that table again and discuss it.  But that's -- it seems to be the case, and that's what was investigated here.

BY MR. WARREN:

Q.   Right.  Okay.

Now, you joined the team, it seems like, a couple months after this research was conducted, right?

A.   I think it was, like -- this was October -- was this October -- was this September?

Q.   I think we had looked at a date of September 16th, right?

A.   Yeah, so I think my first day was, like, sometime in January.

Q.   Okay.  While you were working with the

Page 146

Instagram Well-Being team, are you aware of Meta warning kids that the private setting was less protective than they expected it to be?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I wasn't aware of that.

BY MR. WARREN:

Q.   Were you aware of Meta warning kids that as of 2020 they couldn't configure Instagram to prevent strangers from direct messaging them?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not aware of that.

BY MR. WARREN:

Q.   Were you aware of Meta warning kids that there was no way to configure Instagram to prevent strangers from tagging them as of 2020?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'm not -- I wasn't aware of that.

BY MR. WARREN:

Q.   Were you aware of Meta warning kids that there was no way to configure Instagram to prevent strangers from mentioning them in comments as of 2020?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I wasn't aware of that.

Page 147

BY MR. WARREN:

Q.   Okay.   Turn to the bottom of page 7, please.   Specifically, the heading titled Recommendations.

What was the first recommendation coming out of this 2019 research?

MR. CHAPUT:   Object to the form.

THE WITNESS:   Recommendations.

"Defaulting all teen accounts to private mode and explore defaulting all accounts to private mode."

BY MR. WARREN:

Q.   Okay.   Defaulting kids to private mode would have increased the numbers of kids with private accounts, right?

MR. CHAPUT:   Object to form.

THE WITNESS:   Yeah, that's -- that seems to make sense.

BY MR. WARREN:

Q.   What was the second recommendation coming out of this 2019 research?

MR. CHAPUT:   Object to form.

THE WITNESS:   "For private mode defaults, limit tagging, mentioning, and group DMs to connected accounts.   This is more in line with

CONFIDENTIAL

Page 148

users' expectations and desires.  Suggested options.
Off, mutual followers, followers."

BY MR. WARREN:

Q.   Okay.  In other words, the recommendation was that a private account for a kid should, as a default matter, prevent strangers from tagging, mentioning, or direct messaging the kid, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It says, "limit tagging, mentioning, and group DMs to connected accounts."  Yeah.

BY MR. WARREN:

Q.   Okay.  So the answer to my question was yes?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Just say your question one more time.  There's a lot going on here.

BY MR. WARREN:

Q.   No problem.

The second recommendation identified by this 2019 research is that for private -- you know what -- let me ask it this way.

Let's redo it because I got a muddy record and I wasn't sure what you said either, to be honest.

Page 149

What was the second recommendation coming out of this 2019 research?

MR. CHAPUT:  Object to the form.

THE WITNESS:  What this says here is that, "For private mode defaults, limit tagging, mentioning, and group DMs to connected accounts. This is more in line with users' expectations and desires.  Suggested options.  Off, mutual followers, followers."

BY MR. WARREN:

Q.  Okay.  In other words, the recommendation was that a private account for a kid should, as a default matter, prevent strangers from tagging, mentioning, or direct messaging the kid, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's -- in conjunction with that first bullet, that seems to be the case.

BY MR. WARREN:

Q.  And the reason that was a recommendation is because that was more in line with users' expectations and desires, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  According to this research with these groups of people, that is what came out of this.

Page 156

Q.   And the bottom is called Recommendation?

A.   Looks like.

Q.   Okay.  That's helpful.  Thank you very much.

So you can pull that down, Gina.

Now, Doctor, the phrase "smart defaults" refers to the bundle of default settings that were recommended by the 2019 research we looked at, right?

A.   I don't -- I don't know where the name came from.

Q.   Okay.  Well, let's look at page 4 of this presentation if we can.

So this is work that you were involved in called Smart Defaults, right?

A.   I was involved in work to understand smart defaults, yeah.

Q.   Okay.  And the goal of smart defaults was to ship a safer account model for teens, correct?

MR. CHAPUT:  Object to form.

THE WITNESS:  According to this presentation, which I'm not sure how official it is or whatever it was -- not even sure when it -- what format it was in, who it was delivered to.  That's what this -- that's -- it says, "Ship a safer

Page 157

account model for teens."

BY MR. WARREN:

Q.   Okay.   And the first reason identified is to protect teens from unwanted direct messages ASAP to keep them safer where bullying happens most, right?

A.   Yeah, again, I --

MR. CHAPUT:   Object to form.

THE WITNESS:   -- didn't work on that -- this piece of it.   I don't remember working on this document a lot, actually, but that's what it looks like it says.

BY MR. WARREN:

Q.   Yeah.   What does ASAP mean?

A.   ASAP.   I'm going to assume it means as soon as possible.

Q.   Okay.   And the sentence indicates that bullying happens most on unwanted direct messages, correct?

MR. CHAPUT:   Object to form.

THE WITNESS:   According to this sentence, that's what it's indicating.

BY MR. WARREN:

Q.   Okay.   And take a look at the notes at the bottom of this page.

Page 159

THE WITNESS:  I don't -- that I don't know what that -- all that means, what that encompasses.

BY MR. WARREN:

Q.   Well, we talked about interactions before, right?

A.   We did talk about interactions.

Q.   Okay.  And one type of interaction is a direct message?

A.   One type of interaction is a direct message.

Q.   And other types of interactions include mentioning, correct?

A.   Yes.

Q.   Tagging?

A.   Yes.

Q.   Commenting?

A.   Yes.

Q.   Okay.  So take a look again at the notes at the bottom of the slide deck.  Can you read the last three bullet points to the jury, please.

A.   The last three, you said?

Q.   Yes, sir.

A.   Okay.

"I know from research that mentions and tags are expected.  Matching user expectations

Page 160

keeping the experience simple.  We know bullying

happens, though, through mentions and tags and that

private teens are more likely to be bullied this

way.  It's not a safe experience if we don't include

mentions and tags.  We'll have a Frankenstein

privacy model if we only include DMs that will not

match users' expectations and therefore will not be

simple."

BY MR. WARREN:

    Q.    Okay.  And can you turn to page 16 of this

document.  Again, I know this a little bit difficult

to navigate.  It's up on your screen.

        Do you see that?

    A.    I do see this.

    Q.    Okay.  This table identifies three options

for Meta regarding new default settings routines,

right?

        MR. CHAPUT:  Object to the form.

        THE WITNESS:  I think Instagram would --

or whatever, yeah, I'm not sure if it's all Meta.

BY MR. WARREN:

    Q.    Okay.  This table identifies three options

for Instagram regarding new default settings for

teens?

        MR. CHAPUT:  Object to the form.

Page 181

looks like we're working on a framework to show the trade-offs from value and safety. We'll share next week --

(Whereupon, a brief discussion off the record.)

THE WITNESS: Yes, so the e-mail was about ▮▮▮ discussing not creating any new default interaction settings for private accounts.

▮▮▮ Diego, ▮▮▮ and I are working on a framework to show the tradeoffs between value and safety. We will share next week prior to a deep dive.

BY MR. WARREN:

Q. Okay. And just so we have a clear record here.

On March 11th, 2020, ▮▮▮ sent an e-mail to several people, including you, saying that, "We will not create any new default interaction settings for private accounts," right?

A. That appears to be the case.

Q. Okay. And she sent that e-mail nine days after the presentation we looked at a few moments ago, right?

MR. CHAPUT: Object to form. Foundation.

THE WITNESS: That seems -- the dates seem

CONFIDENTIAL

Page 182

to correspond with what you said.

BY MR. WARREN:

Q.   Okay.  And that presentation we had looked at recommended defaulting teens to private accounts as the safest of the three available options, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  I just want to look at that table again.

One of the pros was keep more people safe from unwanted DMs, tags, and mentions.  I think that's what that's referring to along with the other cons and risks and mitigations.

BY MR. WARREN:

Q.   Okay.  I just want to make sure we have a clear record, Doctor, so if you can just answer my question as I ask it.

So ▨▨▨▨▨ sent an e-mail to you and several others saying that Instagram was not going to create any new default interaction settings for private accounts nine days after the presentation recommending defaulting teens to private accounts as the safest of three options?

MR. CHAPUT:  Object to form.

THE WITNESS:  I don't know where we were in the decision-making process here.  So I -- you'd

Page 204

Meta, did the company warn parents that most kids didn't know how to use Meta's safety tools?

MR. CHAPUT:  Object to form.

THE WITNESS:  I don't know what warnings or communications there were.  I don't know that.

BY MR. WARREN:

Q.  Okay.  Let's go back to your Chat with Mr. ███████

A.  Sure.

Q.  Now, you quote this aspect of her note in your Chat with Mr. ███████  You say, quote, Most never actually went into the settings menu.  End quote.  Right?

A.  So -- "Users were more likely to control content at the content level.  In fact, most never actually went to the settings menu."

I guess I -- yeah, maybe that's a quote from this document.  I don't know if I quoted her correctly or not, but...

Q.  Right, but it's what you put in your Chat with Mr. ███████  right?

A.  Definitely what I put in the Chat.

Q.  Okay.  And then you go on to say, "Very few could accurately or confidently so pretty much worst-case scenario," right?

is right now.  But I think that's a -- you know, an ongoing challenge that was, you know, an issue with the age kind of thing.

BY MR. WARREN:

Q.   I'm sorry, I don't think you answered my question.

Instagram is used by some kids under 13, isn't it?

A.   I don't know --

MR. CHAPUT:  Object to the form.

THE WITNESS:  -- what the -- maybe just ask that one more time.

BY MR. WARREN:

Q.   Instagram is used by some kids under the age of 13, isn't it?

MR. CHAPUT:  Object.  Object to the form.

THE WITNESS:  I think that that could be correct.

BY MR. WARREN:

Q.   And we looked at a quote from a teenager who was interviewed in research conducted by Instagram describing an experience when she was 11 years old, right, we looked at that earlier today?

MR. CHAPUT:  Object to form.

CONFIDENTIAL

Page 217

THE WITNESS:  Yeah.

MR. CHAPUT:  Foundation.

BY MR. WARREN:

Q.  So that's at least one example of a user describing their experience on Instagram when they were under the age of 13, right?

A.  Yes.

Q.  So can you now answer my question.

Instagram is used by kids under the age of 13, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'd agree with -- that that's the case sometimes.  I don't think they're supposed to be using it under the age of 13.

BY MR. WARREN:

Q.  Okay.  Instagram has been used by kids at least since it was acquired by Meta in 2012; would you agree?

MR. CHAPUT:  Object to form.

THE WITNESS:  Are you talking about the kids over the age 13 or just kids in general?

BY MR. WARREN:

Q.  Either.

A.  Yeah.  Sure.

Q.  And you agree that if a company's products

Page 227

assess.

BY MR. WARREN:

Q.   Okay.  Again, my question is specific to whether or not Instagram changed default settings that applied to teens on Instagram.

Do you understand the scope of my question?

A.   Just play it back for you.

You're asking me if a decision -- if anything changed from the time before the decision where the -- where the -- we were before.

Q.   Correct.

And my question is this, in 2019, there were no default restrictions on whether strangers could direct message, mention, or tag teens, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That seems correct, based on that table we were looking at earlier.

BY MR. WARREN:

Q.   And in 2020, in March, ███████ communicated the decision to you and others to keep that as it was, to not change anything about that, correct?

MR. CHAPUT:  Object to the form.

Page 236

from -- of -- of how people came onto the -- onto

the -- into the product.  Yeah, I mean, we can talk

through it some more.

Q.    Okay.  Well, Doctor, under either the

best-case or the worst-case scenario, 5.4 million

unwanted direct messages would have been avoided

with the change in defaults, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  According to this graph,

that was the -- that was ███████ prognostication.

BY MR. WARREN:

Q.    Okay.

A.    Based on those settings and all the other

parameters.

Q.    Sure.

And ██████ prognostication on direct

messages that users don't mind receiving is

indicated in the blue columns, right?

A.    100 percent wanted and hundred percent

keep.  Yes.  Yes.

Q.    Okay.  And so the dark blue column

indicates that if every one of those messages was

one that users actually wanted that 9.5 million of

those would be preempted every day, right?

MR. CHAPUT:  Object to the form.

Page 248

MR. CHAPUT:  Objection to form.

THE WITNESS:  The evidence definitely suggested that people don't change their -- they have a hard time understanding their settings.  Or changing them.  Unlikely to change interaction settings on their own.

BY MR. WARREN:

Q.  Right.  And, in fact, the data you reviewed indicated that only about .6 to .8 percent of users actually changed the settings on their own, right?

A.  Can you refer --

MR. CHAPUT:  Object to the form.

THE WITNESS:  Can you refer me to that?

BY MR. WARREN:

Q.  I believe you're on the same page.  But it's slide 22 of Exhibit 16.  This is about five pages from the back.

A.  I'm sorry.  I'll get to it in a second here.

That's what the better interactions test says, but I don't remember what the better interactions test was.

Q.  Doctor, at any point when you were working at Meta, did Meta warn parents that kids received

Page 249

5.4 million unwanted direct messages from strangers every day on Instagram?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.  I'm not aware of that one way or another.

BY MR. WARREN:

Q.  Would it have been possible for Meta to warn parents?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Sure, possibly.  I don't -- you know.

BY MR. WARREN:

Q.  You're aware of that the United States Surgeon General has called on Instagram to implement warning labels, right?

MR. CHAPUT:  Object to the form.  Foundation.

THE WITNESS:  I've heard of some -- I haven't read that report, but -- I think what you're talking about is the Surgeon General's report.

BY MR. WARREN:

Q.  Yeah.  Do you think that's a good idea?

MR. CHAPUT:  Object to form.

THE WITNESS:  I think it's a -- I think it could be a good step to, you know, help people,

Page 253

THE WITNESS:  I was involved in research that tried to uncover what the value -- what the tradeoffs were to make the product sustainable and healthy.

BY MR. WARREN:

Q.  And based on that research, on that trade-off, you made a recommendation, right?

A.  I did make -- I made several recommendations.

Q.  Right.

A.  Yeah.

Q.  And you didn't provide that information to parents to let them make that trade-off, did you?

MR. CHAPUT:  Object to the form.

THE WITNESS:  We communicated this research in our team, product teams.  That's generally how we communicated.

BY MR. WARREN:

Q.  Did you communicate the research outside of the product teams, for instance, to parents?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I did not.

BY MR. WARREN:

Q.  Are you aware of anyone at Instagram doing that?

Page 254

MR. CHAPUT:  Object to the form.

THE WITNESS:  This particular research, I'm not aware of anybody doing that.

BY MR. WARREN:

Q.    Now, you published this note in April of 2020, right?

A.    That is correct.

Q.    And in May, you became a manager, right?

A.    Yes.

Q.    How much money did you make as of May 2020?

A.    I don't remember.  I don't know.

Q.    You don't even have a remote ballpark on what your compensation looked like?

A.    Remote ballpark, as a senior IC5 researcher, I think I was in the 180 range for base salary and then there was, like, options and equity. You know, that kind of thing.  I don't know exactly how much that upped it.  Maybe -- I think I can look at my taxes -- in the two -- the twos, somewhere low twos.  It didn't go up when I became a manager, if that's what you're asking.

Q.    Did the options and equity add $200,000 to your base salary?

A.    No.

Page 260

that seems like that would be accurate.

BY MR. WARREN:

Q.    And, again, this is the state of the world five months after Meta decided not to implement new default settings for kids?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know where we were with smart default settings at that point.  I know we did research.  I made some -- made some recommendations with the 14-day stuff.  You have that reference.  I thought -- I can't remember exactly what came out of that.  But I do remember -- I do think we did move with the smart default settings.

BY MR. WARREN:

Q.    Well, we will talk about what happened.

My question right now is, this is the state of the world five months after you recommended not to implement new default settings for kids in the note that you co-authored in April of 2020?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Looks like.

BY MR. WARREN:

Q.    At any point when you were working at Meta, did Meta notify parents and kids that kids

Page 261

were 38 times more likely to receive inappropriate sex-related outreach from adults in their Instagram messages than they were on Facebook?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.

MR. CHAPUT:  Foundation.

BY MR. WARREN:

Q.  Do you think parents would want that information before deciding to let their kids use Instagram?

MR. CHAPUT:  Same objections.

THE WITNESS:  I think, yeah, parents would deserve to know -- have information that's going to help to keep their kids safe.

BY MR. WARREN:

Q.  Thank you.

I'd like to fast-forward a few months to March of 2021.

MR. CHAPUT:  Counsel, we've been going for over an hour.  Can we take a break?

MR. WARREN:  Sure.

THE VIDEOGRAPHER:  Going off the record at 3:00 p.m.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  And we're back on the

Page 271

THE WITNESS:  I'm not familiar with this blog post or what came out of it.  I don't know what changes happened exactly.  I didn't work on this stuff.

BY MR. WARREN:

Q.   I'm just asking what it said.

A.   Yes, I'm reading the part where it starts with, "Restricting DMs between teens and adults they don't follow."

And it says, "To protect teens from unwanted contact from adults, we're introducing a new feature that prevents adults from sending messages to people under 18 who don't follow them."

Q.   Okay.  And that was March 2021, right?

A.   Yes, but I don't -- I'm not familiar with the feature.

Q.   Okay.  And the SEV report we're looking at from the end of February 2022 indicates that teens were receiving direct message requests from unconnected adults, quote, Breaking public commitment that we made.  End quote.

Do you see that?

A.   I do see that.

Q.   Okay.  And, in fact, a year after Instagram's post, it still allowed several types of

Page 280

happening here with this.  This is not -- I'm not familiar with this at all.

BY MR. WARREN:

Q.  Okay.  Well, let's look at the end of this document.  It says, "Summary of what we know now as of March 3rd, 2022."

Do you see that?

A.  Yes.

Q.  And it says, "50 percent of message requests to predicted teen DAU are from predicted non-teens," right?

A.  Yes.

Q.  And DAU refers to daily active users?

A.  I think so.

Q.  Okay.  So in other words, 50 percent of message requests to daily active users that Instagram predicted were teens were coming from users that Instagram predicted were adults, right?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  Yeah, there's a bunch of, like -- like, notes here that are difficult for me to parse out.  But it sounds like there's somebody, the owner, I think it's ███████ describing some of what they are -- they are seeing happening.

Page 281

BY MR. WARREN:

Q.   Right.  And what they are seeing happening is that half of direct message requests to predicted teens were coming from predicted adults?

MR. CHAPUT:  Object to the form.

THE WITNESS:  If predicted non-teens are adults, yeah.

BY MR. WARREN:

Q.   What else would a non-teen be?

A.   I think it would be predicted of -- yeah, predicted non-teens, yeah, that makes sense.

Q.   It makes sense that those would be adults, right?

A.   Yeah.

MR. CHAPUT:  Object to the form.

BY MR. WARREN:

Q.   And some segment of those messages were adults that Instagram actually predicted were teens but were still allowed to direct message kids.

Let me strike that question.  That was a bad question.

There are some other categories of direct messages described in this summary, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Can you point me to where

Page 289

Q.   Are there any revisions anywhere in this blog post indicating that adults were still capable of direct messaging minors on Instagram?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  Do you want me to compare the documents?

BY MR. WARREN:

Q.   I just want you to read this document and tell me, do you see any caveats or qualifications to the statement we looked at before?

MR. CHAPUT:  Same objections.

THE WITNESS:  Same -- same thing.  I think it's the feature -- just reading from that paragraph, "Restricting DMs between teens and adults they don't follow.  The feature relies on our work to predict people's ages using machine learning technology, and the age people give when they sign up."  So forth.

Yeah, that -- that'd be the only, I guess, caveat if we want to call it.

BY MR. WARREN:

Q.   Okay.  So just to be clear, the text in this blog post is not changed from when it first appeared in March of 2021 as compared to March 2023?

MR. CHAPUT:  Object to the form.
Foundation.

BY MR. WARREN:

Q.  With respect to that -- well -- let me re-ask the question.  I apologize.

It might help to put both of these up side by side.

A.  Yeah, thanks.

Q.  That one particular section.

And this is the section, Gina, called Restricting DMs between teens and adults they don't follow.

MS. VELDMAN:  Exhibit 19?

MR. WARREN:  It's Exhibits 19 and 21.

MS. VELDMAN:  What page is it?

MR. WARREN:  The next one.  Yeah, it's the Restricting DMs between teens and adults.  Thanks, Gina.  Let's get that on the other one, too.

MS. VELDMAN:  This goes to another page.

MR. WARREN:  Can you clip it?

MS. VELDMAN:  No, not side by side.

BY MR. WARREN:

Q.  All right.  So let's restart this.  Sorry.

A.  I can follow it.  Yeah.

Q.  Okay.  So -- so, Doctor, I put before you

Page 291

in Exhibit 19 Instagram's blog post from March 2021 and the same blog post from April 2023.

And my question is, is there any difference between those blog posts and how Instagram describes its feature preventing adults from sending messages to kids?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  Can you turn the page on the one on the right?  All by itself?  Cool.  Perfect.

Looks the same.

BY MR. WARREN:

Q.    Okay.  It looks the same.

You can pull those down.

It looks the same, but we looked at the site-wide emergency event report indicating that, actually, that public commitment was being broken.

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  That's -- that is the speculation by this ████████ I suppose.  I'm not really sure who -- how this all follow -- flows here.  I said I don't -- I'm not familiar with the mechanics or the way this data was understood or -- and then -- and then followed.  But yes.

CONFIDENTIAL

Page 292

BY MR. WARREN:

Q.   Okay.  Do you think it would be common for someone at Meta to submit a site-wide emergency event report just based on speculation?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  I never filed a site-wide emergency.  I think if I would have it would have been pretty -- need to be important.

BY MR. WARREN:

Q.   Okay.  You can put that away.

And I'm going to show you Exhibit 21 -- 22, I'm sorry.  Exhibit 22.

(Whereupon, Exhibit Meta-Castaneda-22 was marked for identification.)

BY MR. WARREN:

Q.   Okay.  I want to fast-forward to April 2024.

Do you know who ███████████████ is?

MR. CHAPUT:  Object to the form.

THE WITNESS:  No.

BY MR. WARREN:

Q.   She is a 17-year-old girl and she happens to be my client.  So I want to show you a series of messages she received a few months ago from a

Page 328

feedback.

Q.   Okay.  And I don't think we covered this before, but just to make sure, your bachelor's degree is in neuroscience and psychology?

A.   It's actually physiology and there's bits of neuroscience in there.  But mostly physiology, animal physiology is the name of it.

Q.   Okay.

A.   No psychology.

Q.   Okay.  And you've got a master's in public health focused on health communication?

A.   Yes.

Q.   Okay.  And you have a Ph.D. from UC Berkeley also in health communication?

A.   It's actually a doctorate in public health.

Q.   Okay.

A.   And --

Q.   I'm sorry, what's the difference?  I don't actually know.

A.   It's a professional degree.  It's a doctorate still, still academically oriented, but with a professional practical kind of aspect to it.

Q.   Got it.  So let me re-ask the question.

You have a doctorate in public health from

Page 329

UC Berkeley, also in health communication?

A.    That's the emphasis.

Q.    Okay.  So in any event, it's fair to say you have experience studying the best ways to communicate public health issues?

A.    Yes.

Q.    Okay.  So let's take a look at the model you worked on which was attached to this thread.  If you flip a page, you will see that.

Do you want to take a minute to review this or have you already done so?

A.    Let me take another -- give me another 30 seconds.  We can speak to it.

Q.    Okay.  So could you read the text at the top to the jury, please.

A.    Sure.

"Specific populations who are more likely have" -- "more likely have social media use like social comparison and online bullying are also most at risk for developing mental health challenges. These behaviors and challenges can develop into a feedback loop."

Q.    Okay.  So let's walk through that feedback loop.  So we start on the left with the list of existing vulnerabilities, right?

Page 337

BY MR. WARREN:

Q.    Okay.  And the existing vulnerabilities in this feedback loop are independent of one another but they can also occur together, right?

A.    That is correct.

Q.    Okay.  So being an adolescent is a vulnerability on its own?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That would be the indication here.

BY MR. WARREN:

Q.    Okay.  But being a female adolescent would combine two vulnerabilities, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It could.

BY MR. WARREN:

Q.    Okay.  And, again, we covered this, but just so the record is clear, you have a bachelor's in physiology?

A.    Yes.

Q.    A master's in public health communication?

A.    Yes.

Q.    And a doctorate -- doctoral degree in public health from UC Berkeley, also in health communication?

Page 341

negative social comparison is.

A.   The definition kind of evolved.  I -- you know, I'd have a hard time being really concrete about it.  I'd need to see somewhere where I wrote it.  And maybe I have -- if there's a document we could talk about that and you can point me to it.

Q.   You don't remember what negative social comparison means?

A.   Not specifically.

(Whereupon, a brief discussion off the record.)

THE VIDEOGRAPHER:  Going off the record at 5:41 p.m.

(Whereupon, a brief recess was taken.)

(Whereupon, a brief discussion off the record.)

THE VIDEOGRAPHER:  And we're back on the record at 5:41 p.m.

BY MR. WARREN:

Q.   Okay.  And your -- and just moving through the model, your model indicates that unhealthy social media use can cause poor sleep?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  Cause, no.  Association,

Page 342

yes.

BY MR. WARREN:

Q.   Okay.  That's fine.  I'm not attempting to put words in your mouth here.  I just want to understand what you were trying to illustrate here.

So you're illustrating that unhealthy social media use is associated with poor sleep, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Can be.  And it looks like there's a relationship in the reverse direction as well.

BY MR. WARREN:

Q.   Right.  And similarly, unhealthy social media use can be associated with poor self-esteem and vice versa?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MR. WARREN:

Q.   Unhealthy social media use can be associated with negative body image and vice versa?

MR. CHAPUT:  Object to the form.

THE WITNESS:  In this model, the way I've written it here or the way I've kind of developed it, yes.

Page 343

BY MR. WARREN:

Q.   Okay.  And poor self-esteem and negative body image are themselves associated, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It looks like -- and I'd really love to visit the other -- the modeling that I -- you know, came from this.  But yes, I -- you know.

BY MR. WARREN:

Q.   Okay.  And your model further indicates that once -- when unhealthy social media use is associated with poor sleep, poor self-esteem, and negative body image, those, in turn, can be associated with mental health challenges, right?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  Yeah, and I don't know what the gray means or the -- I know the bidirectional stuff.  It looks like there's a feedback loop with mental health challenges.  So I think that's what we're kind of elucidating here.

BY MR. WARREN:

Q.   Right.  And what's the feedback loop?

MR. CHAPUT:  Object to the form.

THE WITNESS:  The way I've described this,

CONFIDENTIAL

Page 441

results?

MR. CHAPUT:  Object to the form.  Asked and answered.  Mischaracterizes the testimony and the document.

THE WITNESS:  It looks -- it looks like also there's the eligible piece, which is 9 million, so I don't know if -- it doesn't look like all those people got -- those 35 million ever even saw the tab, the take a break feature.

BY MR. WARREN:

Q.  Okay.  Can you answer my question, please.  I don't think I got an answer.

A.  You were asking me -- just play it back for you.

You're asking me if 99 percent of -- of all teen users in Instagram were going to use take a break?

Q.  We're going to not use.

A.  Yeah.

Q.  Let me ask it again just so it's clear.

Instagram's test results, which you cited in your evaluation to your supervisor, indicated that over 99 percent of kid users of Instagram were projected to not use take a break?

MR. CHAPUT:  Object to the form.

Page 442

THE WITNESS:  If that's the -- that's what the table says, yeah, then that makes sense.

BY MR. WARREN:

Q.    And it is what the table says, right?

MR. CHAPUT:  Object to the form.                    09:34

THE WITNESS:  Sure.

BY MR. WARREN:

Q.    Okay.  Now, I'd like to direct your attention to page 54 of this document.

This indicates that the users who did turn    09:35 on take a break were given a choice of how often to get a reminder to take a break, every 10 minutes, every 20 minutes, or every 30 minutes, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  Yeah, this is a -- this is a    09:35 table, looks like a chart showing what happens with all the variants and time.

BY MR. WARREN:

Q.    Okay.  But I just wanted an answer to my specific question.                                     09:35

Users who turned on take a break could set a reminder to take a break every 10 minutes, every 20 minutes, or every 30 minutes, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I think that's how it            09:36

CONFIDENTIAL

Page 581

STATE OF CALIFORNIA    )

COUNTY OF YOLO         )

        I, ELAINA BULDA-JONES, a Certified Shorthand

Reporter of the State of California, duly authorized

to administer oaths pursuant to Section 2025 of the

California Code of Civil Procedure, do hereby

certify that

                DIEGO CASTANEDA, DrPH MPH,

the witness in the foregoing deposition, was by me

duly sworn to testify the truth, the whole truth and

nothing but the truth in the within-entitled cause;

that said testimony of said witness was reported by

me, a disinterested person, and was thereafter

transcribed under my direction into typewriting and

is a true and correct transcription of said

proceedings.

        I further certify that I am not of counsel or

attorney for either or any of the parties in the

foregoing deposition and caption named, nor in any

way interested in the outcome of the cause named in

said deposition dated the  _____ day of

_____, 2024.

ELAINA BULDA-JONES, CSR 11720

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com