# AMENDED Exhibit 1070

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA            )
ADOLESCENT ADDICTION/          )
PERSONAL INJURY PRODUCTS       )   MDL No. 3047
LIABILITY LITIGATION           )
                               )
                               )


 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     )
                               )
SOCIAL MEDIA CASES             )   Lead Case No.
_____)       22STCV21355
This Document Relates To       )
                               )
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI,             )
ATTORNEY GENERAL and           )
REPORTER,                      )
v.                             )
META PLATFORMS, INC., and      )
INSTAGRAM, LLC.                )
_____)

        CONFIDENTIAL - ATTORNEYS' EYES ONLY
              PURSUANT TO PROTECTIVE ORDER
                   VIDEO-RECORDED
              DEPOSITION OF AZA RASKIN
                   (Pages 1 -188)
                Held at Baker Botts
       101 California, San Francisco, California
           Monday, March 17, 2025, 9:15 a.m.
                     - - - -
REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

Page 2

APPEARANCES

For the Plaintiffs:
        BY: DON MIGLIORI, ESQ.
        BY: NICK MIGLIORI, ESQ.
        BY: PREVIN WARREN, ESQ. (VIA ZOOM)
        Motley Rice LLC
        28 Bridgeside Boulevard
        Mount Pleasant, South Carolina 29464
        843.216.9000
        Dmigliori@motleyrice.com

        BY: MICHAEL M. WEINKOWITZ, ESQ. (VIA ZOOM)
        LEVIN SEDRAN & BERMAN  LLP
        510 Walnut Street, Suite 500
        Philadelphia, PA 19106
        (215) 592-1500
        MWeinkowitz@lfsblaw.com

For the Defendants Meta Platforms, Inc., f/k/a
Facebook, Inc.; Facebook Holdings, LLC; Facebook
Operations, LLC; Facebook Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC; Siculus, Inc.;
and Mark Elliot Zuckerberg:

        BY: ANDREW STANNER, ESQ.
        BY: KHALA JAMES, ESQ.
        BY: GRACE PYO, ESQ.  (VIA ZOOM)
        Covington & Burling LLP
        One City Center
        850 Tenth Street, NW
        Washington, DC 20001-4956
        202.662.5261
        Astanner@cov.com
        Kjames@cov.com
        BY: ALEX AGEE, ESQ. (VIA ZOOM)
        Bass, Berry & Sims PLC
        100 Peabody Place, Suite 1300
        Memphis, TN 38103
        (901) 543-5916
        alex.agee@bassberry.com

CONFIDENTIAL

Page 3

For the State of Massachusetts:

BY: MATTHEW BERGE, ESQ.
Office of the Attorney General
State of Massachusetts
1 Ashburton Place, 20th Floor
Boston, Massachusetts 02108
617.727.2200

For the State of Arkansas:
BY: SNEHEE KHANDESHI, ESQ.
Robbins Geller Rudman & Dowd LLP
One Montgomery Street, Suite 1800
San Francisco, California 94104
415.288.4545
skhandeshi@rgrdlaw.com

For the Defendant Snap:

BY:  JOHN B. MAJOR, ESQ.
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
213.683.9205
john.major@mto.com

For the Defendants TikTok, Ltd.; TikTok, LLC;
Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
BY:  PHILIP GREEN, ESQ.
King & Spalding
1180 Peachtree Street, NE Suite 1600
Atlanta, Georgia 30309
404.572.2728
Pgreen@kslaw.com

CONFIDENTIAL

Page 4

For the Defendants Google and YouTube:
      BY: ANDREW KEYES, ESQ.
            Akeyes@wc.com
      Williams & Connolly LLP
      680 Maine Avenue, SW
      Washington, DC 20024
      202.434.5584


For the State of Colorado:

      BY:  SHAHEEN SHEIKH, ESQ.
      State of Colorado
      Office of the Attorney General
      1300 Broadway, 10th Floor
      Denver, Colorado 80203
      720.508.6000

For the State of New Jersey:
      BY: MANDY WANG, ESQ. (VIA ZOOM)
      Assistant Attorney General
      State of New Jersey
      124 Halsey Street, 5th Floor
      Newark, New Jersey 07102
      609.712.2828


For the State of Tennessee:

      BY: MATTHEW JANSSEN, ESQ.
      State of Tennessee
      Attorney General
      UBS Tower
      315 Deaderick Street
      Nashville, Tennessee 37243
      615.741.3519
      matthew.janssen@ag.tn.gov

Page 10

THE REPORTER:  Okay.  Mr. Migliori.

MR. MIGLIORI:  Thank you.

EXAMINATION

BY MR. MIGLIORI:

Q.    Good morning.

A.    Good morning, sir.

Q.    Could you please state your full name.

A.    Sure.

Aza Raskin.

Q.    Okay.  Mr. Raskin, is this the first time you've given testimony in a deposition?

A.    It is.

Q.    Okay.  Let me give you some ground rules and hopefully this can move along smoothly.

I'm going to ask questions.  Everything I ask is going to be recorded by the court reporter and by camera.  I'm going to ask you to respond to my questions if you understand them.  If you don't, by all means, let me know that.

I'm going to ask that you wait until my question is finished before you answer so that the record can be clean so she can get all of our testimony.

I'm also going to ask you to keep your voice up.  It's a pretty big room.  We've got

Page 11

several attorneys here.  So I want to make sure everyone can hear you clearly.

And I'm going to ask you that you actually articulate your answers verbally; that is, gestures or nods, sounds are hard for the court reporter to document.

Do you have any questions before we start?

A.    No questions.

Q.    Okay.  And if you have a question, by all means, feel free to stop, ask me, or ask your counsel.  Okay?

A.    Great.

Q.    Great.

You're represented here by counsel, correct?

A.    Uh-huh.  That I am.

Q.    Okay.  And we're at your counsel's office here in San Francisco?

A.    I believe so, yes.

Q.    Okay.

Exhibit Number 1 is the notice for today's deposition.

My name is, as I said earlier, Don Migliori, and I represent the plaintiffs in this litigation.

CONFIDENTIAL

Page 12

We met prior to today, correct?

A. Yes, we did.

Q. We met for a couple hours a couple weeks ago?

A. Yes.

Q. And just briefly this morning, correct?

A. That is correct.

Q. Prior to that, we did not have any --

A. No.

Q. -- any interactions or knowledge of each other, correct?

A. We did not.

Q. You have agreed to appear here voluntarily; that is, without the need for subpoena, correct?

A. Uh-huh. I have.

Q. Okay. And that uh-huh is exactly what I'd like to try to --

A. Got it.

Q. -- protect against. Okay.

And you've agreed to testify here truthfully and accurately, correct?

A. Correct.

Q. And you understand that the nature of the questions that I'm going to ask you about today are

Page 13

primarily about your personal experience in the tech industry and in particular your involvement with the development of a web feature that's referred to as infinite scrolling.

Do you understand that?

A.    I do understand.

Q.    Okay.  Could you briefly describe what infinite scrolling is.

A.    Uh-huh.

Infinite scroll is the feature that when you reach the bottom of a website or app the content stops and you would previously have to hit the next button.  You sort of may be familiar, when you scroll down to the bottom of Google, there are search results.  There's a thing, a googolian to hit next down there.

Infinite scroll was removing that; that is, when you scroll to the bottom of the page, it continues to load more content.  And so it never stops.  You just keep scrolling.  That's infinite scroll.

Q.    And we'll get into the details and show some examples a little later on.

But what was your involvement with the development of that feature, infinite scroll?

CONFIDENTIAL

Page 14

A.    I was the inventor, the creator, of that feature, the infinite scroll.  I created it in 2006. This was in the time period, if you remember, there was a map provider website called MapQuest.  If you remember, you would have to, like, click a button to, like, move to see left or right before Google Maps let you just pan around.

The -- a new technology had come out that let you load more content at a technical level onto a page without having to hit refresh or navigate. And I implemented using that feature, the ability for any web page to load more content, as you scrolled more.

Q.    And you implemented that feature, you developed that feature in what year, did you say?

A.    This was 2006.

Q.    Okay.  Before we get into the details of what you did, let's talk a little bit about you.

Tell us about who you are, where you live, what you do.

A.    Yeah.  So, you know, I grew up in the Bay Area.  I -- my mother was a nurse practitioner and did hospice and palliative care.  And my father was very early at Apple.  And he is known for having been the father of the Macintosh project.

CONFIDENTIAL

Page 15

Q. Okay.

A. And so I grew up thinking about how do you articulate care through technology for people.

Q. And is that what you continue to do today?

A. Yeah, that is.

Q. Let's show you what I've marked as Exhibit 2. This is just your LinkedIn page.

(Whereupon, Raskin Exhibit 1 was marked for identification.)

(Whereupon, Raskin Exhibit 2 was marked for identification.)

MR. MIGLIORI: Just as a way to -- do you have -- you gave them all?

MR. WARD: Next time.

(Whereupon, a brief discussion off the record.)

MR. MIGLIORI: And as I understand it, the exhibits as I have them will be in the Chat box of the Zoom that everyone's got.

Q. Okay. In front of you, there's a picture of it and I've given you a hard copy of it.

A. Uh-huh. Yes.

Q. But is this a LinkedIn page you created?

A. Yes, although it is updated by my team.

Q. Okay. Tell us about your education.

CONFIDENTIAL

Page 16

Where did you go to school?

A.    I went to school at the University of Chicago where I did a double major in math and physics.  I actually started a third degree in systems biology but I had to drop that because my father became sick and died my last year of college.

Q.    Okay.  And what year was -- did you graduate from the University of Chicago?

A.    I believe that was 2005.

Q.    Okay.

A.    I also went to Caltech to study dark matter physics and then computational neural systems as a Ph.D. but I left that program to do startup work.

Q.    You mentioned that -- you mentioned your dad.

A.    Yeah.

Q.    Did you work at all with your dad before he passed?

A.    I did.

Q.    How did you work with him?

A.    Actually, in many ways, but, you know, he wrote the book The Humane Interface where he talked about the philosophy of what it was to make technology that was responsive to human needs and

considerate of human frailties, which is how he defined humane, which was the ethos behind which the Macintosh was created.

So I worked with him on his book. I designed the cover. Helped write a whole bunch of -- do thought partnership on a lot of the chapters.

In college, we were working on extending his ideas and we had created a little center called the Raskin Center for Humane Interfaces. And we were actually working on that up until the time that he got pancreatic cancer, same as Steve Jobs had, and actually a lot of early Apple people, and passed away.

And that's how I ended up starting my first company, Humanized, was to extend his work. He became a professor at the University of Chicago, and I ended up TA'ing for his class in a graduate-level class on interface design. And it was with a couple of the other students -- or other students in that class that I ended up starting my first company.

Q. Let's just do this really quickly.

This is Exhibit Number 3. This is an article about your dad.

CONFIDENTIAL

Page 18

(Whereupon, Raskin Exhibit 3 was marked for identification.)

BY MR. MIGLIORI:

Q.   And I just want to direct your attention to the second page, which is a photograph of your dad.

A.   Yeah, which I think I took, in fact.

Q.   Okay.  Is this your father?

A.   This is my father.

Q.   So tell us again about what he did and his role at Apple.

A.   Yeah.  So he is the inventor of the Macintosh and actually a lot of the core interfaces that we use like the mouse that you click and drag, like, it turned out, before him, it was much more complicated to use a mouse.  You had to click one button, move things, click another button.  He invented click and drag.

He really wanted to be able to write music on computers.  And so, you know, back in the day at Apple, Jobs was working on a computer called The Lisa and it could only do characters.  He really wanted the Macintosh to be able to show images on his screen because he wanted to be able to write music.

CONFIDENTIAL

Page 19

So for him technology was about extending the parts of us which are most human in the sense that a cello is a technology or a paintbrush is a technology. So, too, should be computers.

Q. And I imagine this heavily influenced your decisions and education and your career, correct?

A. Yeah, absolutely.

Q. And you mentioned an organization. I think you said it was Humanized?

A. Humanized. Yeah.

Q. So that's something you did with your dad or in honor of your dad?

A. That was to extend the work of my father. So in honor of.

Q. Going back to your LinkedIn page, on the front there's sort of a summary. Maybe we can just use this to sort of get a total picture.

After you started Humanized and went forward in 2006 and on, tell us what you did.

A. Yeah.

So after inventing infinite scroll, Humanized, we ended up getting acquired or really acquihired by Mozilla. And this is when Mozilla was very small. Mozilla makes the Firefox web browser. And I ended up helping to found Mozilla Labs.

CONFIDENTIAL

Page 20

Did a lot of the original work on designing mobile browsers, which Apple and other companies picked up on. Did a lot of work on helping the web be successful. So did things like write the geolocation spec, which means how the internet can access people's location.

Would you like me to continue after that?

Q. So how long were you with Mozilla?

A. I believe it was around three years.

Q. Okay. And then you said -- after that, where did you go?

A. After that, I founded a company called Massive Health, which was saying it is technology companies that have demonstrated the ability to shift human behavior at scale.

The goal for that company was to use the knowledge that we had as product designers to help people live healthier, to shift their eating and exercise behaviors, which we were successful doing. And then we were acquired by the company Jawbone that made Jamboxes, the headpieces, and eventually a health wearable.

Q. And did you work with Jawbone for a while?

A. And I worked with Jawbone for a while, I think also two years, if my memory's -- would have

to go look again.

Q.   And then from Jawbone, where did you go?

A.   After Jawbone, I ended up starting a small company called Post Social actually, which was an attempt to fix what we saw some of the fundamental problems with social media.  But we ended up shutting down that company.

Q.   What year was that?

A.   That was 2016, in that era.

Q.   Okay.  When did you start that company?

A.   I think 2015.  But it's been a little bit since I remember exactly the dates.

Q.   And then from there?

A.   From there, in 2017 and 2018, I started two nonprofits.  One is the Center for Humane Technology.  And the other is Earth Species Project.

One looks at how do we realign technology to meet humanity's best interest.  That side of humane technology.  How do we make technology really work for humans.

And the other we use, that's a frontier nonprofit using AI to translate animal language.

Q.   Okay.  If we go to Exhibit 2 in your LinkedIn page, you talk about both in the summary.

The first paragraph says, "Trained as a

mathematician and dark matter physicist, Aza is the cofounder of the Earth Species Project (ESP) and the Center for Humane Technology."

Those are the two nonprofits you just mentioned?

A.   Exactly.

Q.   And you started them approximately in 2017?

A.   In 2018, sort of about that cusp.

Q.   And interesting.  It says, "Through ESP's work, the technology uses machine learning to decode animal languages."

A.   Yeah.

Q.   Tell us a little bit about that.

A.   Well, what most people don't realize is there's actually already a lot known about animal communication.

So parrot parents, for instance, spend the first, you know, week and a half, two weeks of their chick's life, like, leaned over their chick whispering a unique name per chick that they will then use for the rest of their lives.

And it turns out elephants, dolphins, belugas also all have unique names, often that their mother's teach them, that they sometimes even refer

to each other in the third person.

The history of technology says that when we invent new technology, like the telescope, we point it at someplace which humanity thinks is empty.  And what we discover is everything.  The Hubble telescope I think is the perfect example. You know, in 1995 astronomers pointed the Hubble Telescope at an empty patch of sky, and what they discovered is not emptiness, but the most galaxies humanity had ever seen in one spot.

And that's the general principle, is we invent new technology, we point it at a place that seems like there's nothing, and what we discover is everything.

And that is the technology we're working on now is the frontier AI that lets us understand and listen to the other cultures of Earth.

Q.    That's fascinating.

A.    Yeah.

Q.    More specific to why we're here, you're the cofounder of the Center for Humane Technology.

And it says [as read]:

As cofounder of the Center for Humane Technology and on a quest to reimagine the digital world and reduce social media harms.

CONFIDENTIAL

Page 24

A.    Yes.

Q.    Tell us what that means.

MR. STANNER:  Objection.  Expert testimony.

BY MR. MIGLIORI:

Q.    Go ahead.

A.    Yeah.

As a designer, I'm aware of the asymmetric information that we as technology creators have about how the human mind works versus how a user knows that their mind works.

So as the creator of the infinite scroll, I know, for example, that if you remove what is known as a stopping cue, people's brains don't wake up to ask whether I really want to be here.

So there's a classic study that has bowls of soup that secretly refill from the bottom and when the bowl secretly refilled, people eat a lot more.  I don't remember the exact number.  But I think it's something like 70 percent more.  But it's sort of obvious.

If you had a glass of wine that just kept refilling, like, your mind would never have that moment where you say, oh, I reached the bottom, do I really want another or are you just going to keep

CONFIDENTIAL

Page 25

sipping and keep sipping.

That kind of asymmetric knowledge about how the human mind works is what we wanted to elucidate and make sure that the world knows so that technology can be used not to -- used to help us versus to, like, keep us or harm us.

Q.   And is the Center for Humane Technology the nonprofit through which you have personally focused your efforts to address the issues of social media harms?

A.   Yes, that's exactly right.

Q.   Your LinkedIn page goes on to say that, "He was essential to the creation of the double Emmy award-winning global phenomenon The Social Dilemma on Netflix."

And tell us what The Social Dilemma is and what your role was with it.

MR. STANNER:  Object to the form.  Opinion testimony.

I'm sorry.  Don, can we have an agreement that an objection for one --

MR. MIGLIORI:  Absolutely.

MR. STANNER:  -- is an objection for all?

MR. MIGLIORI:  Absolutely.

THE WITNESS:  The Social Dilemma is a

Page 26

documentary, came out in 2020, that really highlights what the people who made social media know about how it's designed to maximize engagement and intention.

And what even the insiders knew that to do so was to cause great harm to teen mental health, to increase polarized society, to filter bubbles towards creation of greater narcissim in our society. And that these were all predictable, foreseeable, known outcomes of the fundamental business model of social media. And that there was another way that social media can be designed where we can get the benefits without the harms. That was The Social Dilemma.

BY MR. MIGLIORI:

Q. What was your role in the actual production?

A. Uh-huh. I'm both a subject of it, so I was interviewed, and I did a lot of the core conceptual work, so the -- if you watch the film, there are scenes where you're sort of going inside the computer and you get to meet the different algorithms. Those are all -- that's -- that -- they came directly out of my work.

And then I helped write, you know, chunks

Page 27

of the script.

Q.   Okay.  And we will go into that in a little bit.

But was the -- was the Center for Humane Technology part of that Social Dilemma effort?

A.   Yes, they were.  We were sort of the central -- central characters.  And my cofounder for the Center for Humane Technology, Tristan Harris, is sort of the main person in that documentary.

Q.   Okay.  Very briefly, before we put the LinkedIn page aside, if you scroll down -- if you look down to the bottom, it says that you are named FastCompany's Master of Design, and to Forbes and Inc. Magazine's 30-under-30.

What is FastCompany's Master of Design?

A.   That was some kind of award that they gave for the top designer of the year, something like that.

Q.   And do you know what in particular -- was there a particular design that was --

A.   Yeah.  That was awarded to me for my work at Massive Health, which was using design to try to shift people's behavior but in their benefit towards eating healthier and exercising more.

Q.   Okay.  We've talked about the Center for

Page 28

Humane Technology.  And I think you said you started it around 2017?

A.    '17 or '18.  I can't remember because it's right on the cusp.

Q.    All right.  I want to show you a document.

This will be marked as Exhibit Number -- is that 2?

A.    I have 2, yes.

Q.    Exhibit Number --

MR. WARD:  This will be 4.

MR. MIGLIORI:  Oh.  4.  Okay.

MR. WARD:  Yeah.

(Whereupon, Raskin Exhibit 4 was marked for identification.)

MR. MIGLIORI:  This will be Exhibit 4.

Q.    I'm going to represent to you that this was produced to us in this litigation by Meta.  And the way that we can tell that is, if you look on the bottom right, you will see what we refer to as Bates pages.

Mine, of course, is out of order.  Here we go.

Do you see that?

A.    Uh-huh, I do.

Q.    And it should start with page ending with

Page 29

2631?

A.    Yes.

Q.    Is that right?

A.    That is correct.

Q.    All right.  Do you recognize this document?

A.    This appears to be an early, like a 2018, or something like that, funding document.

Q.    And what do you mean by "funding document"?

A.    As in a case for support.  The Center for Humane Technology is funded by philanthropists and by foundations.  And this looks like a case for support that we were giving to them for funding.

Q.    Okay.  And like I said, you didn't produce this to us.  This was something I'm showing you from Meta's production to us, correct?

A.    Yes.

Q.    All right.  Cover page talks about the center and being "Dedicated to reversing the digital attention crisis."

A.    Uh-huh.

Q.    "And realigning technology with humanity's best interest."

What is that referring to, particularly

Page 30

"the digital attention crisis"?

     A.   The --

          MR. STANNER:  Objection.  Calls for expert testimony.

          Go ahead.

          THE WITNESS:  The fundamental diagnosis that the Center for Humane Technology had is that all of the social media companies are -- their business model is for user attention.  So the companies are in a competition to try to maximize the amount of time a user spends with them versus with a competitor.

          And then further, a race for engagement, getting reactions from people.  And the predictable outcome of very powerful companies with a device sitting in your pocket you can use all the time trying to maximize the amount of your attention is going to be, you know, digital -- a digital attention crisis.

BY MR. MIGLIORI:

     Q.   Does the infinite scroll that you developed play a role in the digital attention crisis?

     A.   Absolutely.

     Q.   When you invented the infinite scroll, did

Page 31

you invent it for social media?

A.  I did not.  I invented infinite scroll in 2006.  And that's really before social media was a thing.  I invented it because as a designer I'm constantly thinking about every time I ask the user to make a decision they don't care about, I failed.  How do I make this more efficient and useful for the user.

I wrote it originally for my own blog and was thinking about it in terms of search results.  If you go to Amazon and you search for something and you don't see it, don't make me click the next button, just keep showing me more.  It just makes it more efficient.

And what I was blind to is that the rise of social media was about to happen.  And as that happened, it became this race between companies for attention.  And I watched as this thing I had invented and actually went around and said, like, hey, this is a better interface, to all the major companies, watch as that got sucked up by incentive-incentives and really abused to hurt people.

MR. STANNER:  Objection.  Nonresponsive.  Move to strike opinion testimony.

Page 32

BY MR. MIGLIORI:

Q.   So just to reestablish, you are a cofounder of this center, correct?

A.   Yes.

Q.   And part of its mission is stated here on the first page of this document, correct?

A.   Correct.

Q.   And so in the mission that you set out to address, by this point in 2017, had you already seen how your infinite scroll you developed in 2006 evolved into this phenomenon that you just described?

A.   Yes.

MR. STANNER:   Same objection.

BY MR. MIGLIORI:

Q.   Let's turn to the next page.

This page says [as read]:

Our society is being hijacked by technology.  What began as a race to monetize our attention is now eroding the pillars of our society.

And then you reference here mental health, truth and democracy, social relationships, and our children.

First of all, is this part of the focus of the Center for Humane Technology?

CONFIDENTIAL

Page 33

A.    Yes.

Q.    And remind me, what was the purpose of this deck?  What -- how was it used?

A.    This deck was to explain to funders what giving us money would help us accomplish.

Q.    And in 2018 or so when you started the Center for Humane Technology, was it understood to you, personally, that technology was impacting children in this race to monetize attention?

A.    Yes.

MR. STANNER:  Objection.

BY MR. MIGLIORI:

Q.    And how did you come to understand that in founding this nonprofit?

MR. STANNER:  Same objection.  Improper opinion testimony.

THE WITNESS:  We had a number of parents come to us directly.  And so we could see the effects on children.  We also started the center inside of the offices of Common Sense Media.  And Common Sense Media, I think, is like the premier nonprofit working on the effects of media, and then hence technology on children.  And so we could both have anecdotal evidence, we could see the structure ourselves, and we had data coming in from Common

Page 34

Sense Media.

BY MR. MIGLIORI:

Q.    In 2018, did you have an appreciation that this race to monetize attention had an impact on mental health as depicted in the slide?

MR. STANNER:  Same objection.  Opinion testimony; undisclosed.

THE WITNESS:  Yes.

BY MR. MIGLIORI:

Q.    I'm talking about your understanding.

A.    Uh-huh.

Q.    Yes?

A.    Yes.

Q.    And what was your understanding in 2018 of how that race to monetize attention impacted health?

MR. STANNER:  Same objection.

BY MR. MIGLIORI:

Q.    Mental health.

A.    The way the -- the structure of social media as we saw it, and did a couple of things. One, we could start to see that the -- it goes much deeper than just getting people's attention. Because when you optimize for getting someone's attention, it turns out, instead of just getting them distracted, it's much cheaper for the algorithm

Page 35

to essentially climb inside and get people addicted to needing attention, which immediately has obvious mental health issues.

Then if you're on a web page, and you're having to -- you only get validation, likes, and followers when you post, like, the highlight Reels of your life, and you're aware that I only get likes and attention for doing things that are not representative of who I really am, that sets up a break between what I think people want of me and who I really am, which creates the preconditions for mental health issues, because you're being perceived in a way that you think you need to be, but not how you actually are.

Q. Now, you're not a mental health professional, correct?

A. No.

Q. And so when I ask you these questions, are you answering these questions as a designer and developer of web design?

A. Yes.

MR. STANNER: Objection.

THE WITNESS: Exactly.

BY MR. MIGLIORI:

Q. Is it a component part of being a designer

Page 36

and developer to understand the perceptions of the user?

A.   Yes, that's right.

Q.   Why?

A.   It is our job as designers to be able to get inside the heads of our users so that we can deeply understand what is the experience like to be them.  So that we can make products that work with them.

Q.   And when you focus on the word "humane" in your nonprofit or in the work that you did with your dad, humanize --

A.   Yeah.

Q.   -- does that have an important role in what you're talking about in terms of understanding the user's perception?

A.   Yes.

MR. STANNER:  Continuing objection.

BY MR. MIGLIORI:

Q.   How and why?

MR. STANNER:  Same objection.

THE WITNESS:  Because to be humane is to be responsive to human needs and considerate of human frailties.  That is my father's definition. To do that you have to be very aware of human

CONFIDENTIAL

Page 5

For the Witness, Aza Raskin:
        BY: MICHAEL W. WARD, ESQ.
        Baker Botts LLP
        1001 Page Mill Road
        Building One, Suite 200
        Palo Alto, California 94304-1007
        Michael.ward@bakerbotts.com


Also present:

        Darren Buchbinder, trial technician
        Gina Veldman, trial technician (VIA ZOOM)
        Tim Hunter, videographer
        Rasheed Evelyn, Wilson Sonsini
        Kathleen Lucas, Motley Rice
        James Bilsborrow
        Corin Stigall

frailties, our vulnerabilities, so you can wrap around and protect them.

So, for instance, as a designer, you know that if a user stops using your platform, there is actually -- there are ways of using those human vulnerabilities to get them to come back.

An example might be, after you stop using the platform, if I show you a set of pictures of your friends and say all of these people miss you and they want you to come back, well that's a very effective way of harnessing the vulnerability or how the human mind works of, essentially, social reciprocity and social loss.

And it turns out Facebook exactly did that.  They sent -- they may still do -- what are known as, like, come-back e-mails that include the faces of all of your friends, or many of your friends, that says, like, these people miss you, and they name them by name, even though that's not what the -- what your friends actually said.

So this is an example of how I, as a designer, know how to design a system that, in this case, is inhumane.  Yes.

BY MR. MIGLIORI:

Q.   Okay.

CONFIDENTIAL

Page 41

saying that their -- the CEO of Netflix -- that their chief competitor is sleep?

Like, every time that you are not looking at the platform and doing something else is an opportunity for a competitor to get you to use their platform.  And the more that you are beholden to checking your phone to see did somebody like my photo, has somebody commented in a way that I'm not going to like, did somebody else get more likes than me, that creates anxiety and stress loops.

BY MR. MIGLIORI:

Q.   And does infinite scroll play into that same phenomenon?

A.   Yeah.

MR. STANNER:  Same objection.

THE WITNESS:  Infinite scroll is an intentional removal of stopping cues so that your brain doesn't wake up to catch up with impulses.  So it sort of -- it creates that hypnologic state where you just keep scrolling.  Doomscrolling would not really exist without infinite scroll.

BY MR. MIGLIORI:

Q.   What is the word "doomscrolling"?  I have seen it before.  What does it mean?

A.    It means when you are getting a feed full

CONFIDENTIAL

Page 55

MR. MIGLIORI:  Okay.  And let's go to the next one, Exhibit Number 8.

(Whereupon, Raskin Exhibit 8 was marked for identification.)

MR. MIGLIORI:  Exhibit Number 8 will be an example of TikTok.

Go ahead, Gina.

(Video playing.)

BY MR. MIGLIORI:

Q.    Does Exhibit Number 8 accurately depict the technology that you developed in 2006 in the TikTok format?

A.    Yes.

MR. GREEN:  Object to the form.

MR. MIGLIORI:  Okay.  Is that it, Gina? There is one more, I think.

This will be Exhibit Number 9.

(Whereupon, Raskin Exhibit 9 was marked for identification.)

MR. MIGLIORI:  Go ahead and play it.

This is a YouTube example of infinite scroll.

THE WITNESS:  Uh-huh.

(Video playing.)

///

CONFIDENTIAL

Page 56

BY MR. MIGLIORI:

Q.    Does Exhibit 9 accurately reflect the type of technology that you developed in 2006 for infinite scrolling?

A.    Yes, it is.

MR. KEYES:  Objection to form.

MR. MIGLIORI:  And that should be it, I think, right?

THE WITNESS:  Actually, all of these are very good examples of one of the other things that we know as designers, which is that to maximize -- well, how often somebody will check back, sort of, like, colloquially the addictiveness of something is about -- and it's actually what every casino designer knows -- is when you give somebody a random, variable award, which is to say you give different kinds of, like, stimuli, inputs in a sort of randomish way, in a random sort of pattern, which is exactly what happens every time you scroll.  You don't know what you're going to get.  It's just like pulling a slot machine.  That is the thing that maximizes engagement and retention.

MR. STANNER:  Move to strike. Nonresponsive.  Undisclosed expert testimony.

///

Page 65

social media?

A.    Yes.

Q.    How did you feel in 2012 when you started to do that kind of analysis?

MR. STANNER:  Objection.

THE WITNESS:  It is a very hard thing to realize that something that you made thinking you were helping, when you get on to a bus or a train or you go into a classroom or you're talking with friends and you watch their thumb flicking and flicking and flicking, or when I have watched my friends' kids be unable to get their attention, like kids not getting their parents' attention, because of something like an invention that I had made that is now being used for something else, it's very hard.  Like that is a deep, hard, sick place in the pit of my stomach when I really get in touch with it.

BY MR. MIGLIORI:

Q.    The next paragraph says that [as read]:

Back in 2006, Raskin was trying to solve the clunky experience of next-page button that internet users continually had to click.  Ironically, his goal was to stop disruptions to a user's train of thought.  "My intention was to

Page 66

create something that could focus our attention and control our tempo when on websites and apps."

Do you recall, is that something that you said or would have said?

A.   Yeah, it sounds like exactly something I would say.

Q.   And that was your state of mind in 2006 when you developed it?

A.   Yeah, that's right.

My father had a line, which is, you know, a user's train of thought is sacred.  Anything we do that breaks that train of thought, that takes them out of their agentic doing something and into what the computer wants of you, that was doing something non-humane -- inhumane.

MR. STANNER:  Move to strike as nonresponsive.

BY MR. MIGLIORI:

Q.   The next paragraph says [as read]:

Raskin didn't foresee how tech giants would exploit his design principle, creating apps to automatically serve more and more content without your asking for it - or necessarily being able to opt out.  Finish watching a video on YouTube, the next one loads instantly.  Go on Instagram to look

CONFIDENTIAL

Page 67

at a couple of pictures and you're still mindlessly swiping half an hour later.

Is that how you first started to see your technology being used in the social media context?

MR. STANNER:  Objection to the form. Opinion.  Foundation of this document.

BY MR. MIGLIORI:

Q.    I'm asking what you saw.

MR. STANNER:  Same objections.

THE WITNESS:  Yes, that is what I saw.

BY MR. MIGLIORI:

Q.    Then you're quoted here [as read]:

Quote, I think when I look back, the thing I regret most is not packaging the inventions with the philosophy or paradigm in which they're supposed to be used.  End quote.

Is that something you said?

A.    That is something I said.

Q.    And what did you mean by that?

A.    I meant that every time a designer or a technologist invents a new piece of technology, at the same time they have essentially invented a new class of responsibility.

We didn't need the right to be forgotten until the internet could remember us forever.  And

CONFIDENTIAL

Page 68

we didn't need the right to privacy until Kodak started to produce the mass-produced camera and we could be captured everywhere.

And in the same way, when you invent something like infinite scroll, we didn't need the right to have technology give us our impulse control back until we started to take it away.  That's what I mean by packaging the philosophy of how something should be used while you also make the thing itself.

MR. STANNER:  Move to strike.

BY MR. MIGLIORI:

Q.  There's a quote after that from you.  It says [as read]:

There was a kind of naive optimism about thinking that my inventions would live in a vacuum, and not be controlled by market forces.  End quote.

Is that something you said?

A.  Yes.

Q.  And is that something that -- when did you realize that that was naive optimism?

MR. STANNER:  Object to form.

THE WITNESS:  Sometime between, you know, 2012 and 2017.  It was sort of a growing, gnawing feeling.

///

CONFIDENTIAL

Page 69

BY MR. MIGLIORI:

Q.   The final line of that page says that [as read]:

He deeply regrets the unintended consequences of his invention - hours, even lifetimes - of mindless surfing and scrolling.

Is that consistent with the -- how you felt once you saw how your technology evolved through social media?

A.   Yes.

MR. STANNER:  Object to the form.

BY MR. MIGLIORI:

Q.   Let me show you another article.

This will be Exhibit 11.

(Whereupon, Raskin Exhibit 11 was marked for identification.)

BY MR. MIGLIORI:

Q.   What is CNET?

A.   CNET is a technology news website, maybe magazine.

Q.   Do you recall giving an interview with CNET?

A.   Yes.

Q.   This is a CNET article entitled "Facebook, Twitter are designed to act like 'behavioural

CONFIDENTIAL

Page 188

STATE OF CALIFORNIA    )

COUNTY OF YOLO         )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

AZA RASKIN,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720