**AMENDED Exhibit 883**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )


SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     ) Lead Case No.
                               ) 22STCV21355
SOCIAL MEDIA CASES             )
_____ )


Wednesday, March 26, 2025

CONFIDENTIAL – PURSUANT TO PROTECTIVE ORDER


Video-Recorded Oral Deposition of DAVID B. LUE held at the offices of Kirkland & Ellis LLP, 2049 Century Park East, Los Angeles, California, commencing at 9:16 a.m. PST on the above date, before Michael E. Miller, Fellow of the Academy of Professional Reporters, Certified Court Reporter, Registered Diplomate Reporter, Certified Realtime Reporter and California CSR #13649.

GOLKOW – VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

the target audience?

A.    It was more around they would start an ad and they would wait for eight hours before seeing any feedback that their ad was doing anything in the system.  And it was just not a good advertiser experience.

And so working across different teams to try and improve that initial experience, to know that their dollars are being spent.

Q.    Okay.  And then you started working at Snap in May of 2016; is that fair?

A.    Correct.

Q.    And you were product manager for ranking, serving and marketplace?

A.    Correct.

Q.    And then you were the senior product manager, which -- overseeing all of Snap ad serving, ranking and marketplace; is that right?

A.    Correct.

Q.    And then in January of 2018, you became the head of product ranking and marketplace, where you led multiple product teams within the monetization product

David B. Lue                                     18

organization, right?

A.      That is correct.

Q.      And that oversaw ad ranking, marketplace, targeting and machine -- and the machine learning platform?

A.      Correct.

Q.      Ad targeting, does that refer to the inference model for age and user interest?

A.      Targeting, in its most basic definition, is more around a lot, like, advertisers have a specific set of people they want to target.  You know, Nike may want to target people who are interested in running or who had purchased last season's shoe.  TurboTax may want people who are looking to file taxes.

So targeting is more around trying to match who the advertiser is trying to reach with the right user on the platform.

Q.      Okay.  And so similar to your role at Facebook, you were -- your job responsibilities focused around optimization of the advertisers' experience?

A.      It was something that was --

yes, the advertiser experience is around, you know, it's an investment, they want to make sure that they're seeing positive return on their investment on the platform.

But in order to facilitate that, right, you -- the whole goal is to make sure that we're serving the right ad to the right user at the right time.

Q.   And then it shows that from May 2018 to February 2021, you oversaw the content ranking and revamp of the recommendation engine?

A.   Correct.

Q.   And what did that entail?

A.   Snap has a variety of different content experiences, things like friend Stories, Stories from your friends, and again, there's -- oftentimes there's lots of Stories from your friends, and so deciding which ones to serve earlier, sooner, would just help drive a better experience for the end Snapchatter.

So those are really around, again, similar principle, making sure we're serving the right piece of content to the

David B. Lue                                                    20

right user at the right time.

Q.    And this is -- this relates to Spotlight product?

A.    There's multiple business lines within the content; Spotlight was one of them.

Q.    What are other ones?

A.    Friend Stories.  I believe there's subscriptions and For You.

Q.    And you held this responsibility with all of those areas?

A.    I was responsible for the content ranking portion, so again, this is more around the decisioning engine of -- given we receive content, which of these should we rank and show first.  It was obviously highly cross-functional with many other teams.

Q.    What about friends' recommendation?  Did the recommendation engine touch friend recommendations?

A.    Can you elaborate on, like, what you mean by friend recommendations?

Q.    Well, what does that, friend recommendations, mean to you at Snap in

connection with, you know, the Snapchat app?

A.    I'm not sure.  There's a couple of different areas, so I'm trying to get clarity around, like my exposure is more around the friends' Stories, which is content that your friends would post to their Story for their friends to view, and then our machine learning model would try to figure out which story to rank first.

Q.    Okay.  Snapchat at various times recommends other users and friends to users, correct?

MS. DEGTYAREVA:  Objection, vague and ambiguous.

A.    I believe there's a friend section.  I do not work on that.

BY MR. AYERS:

Q.    Okay.  Your résumé also indicates that you had a team of 12 product managers reporting to you.  Was that right?

A.    It's a combination of product managers and product marketing managers.

Q.    And what's the difference between those two?

A.    The product managers more focus

on the building of a product or feature.
They partner -- their closer counterpart is
the engineering team.

Product marketing is more the
go-to-market dimension, so their counterparts
were more the sales organization and making
sure that what we -- you know, we were
receiving proper inbound and knowing what our
customers were looking for to make sure that
we're building the right thing, as well as
also making sure that what we're building was
properly being brought to market.

Q.    And you've led and been closely
involved in several initiatives at Snap that
relied heavily on telemetry data, right?

A.    Could you elaborate on what you
mean by telemetry data?

Q.    Does that term, "telemetry
data," mean anything to you?

A.    Does it -- it could be a
variety of things.

Q.    Okay.  Does it mean information
that Snapchat automatically collects in the
background, things like when someone opens an
app, views a story, taps on a place, uses a

David B. Lue                                          23

lens, scrolls Spotlight or sends a message?

                MS. DEGTYAREVA:  Objection,

        speculation, assumes facts, compound.

        A.      Sorry, you asked many different

things in there.  Could you repeat maybe the

first part of the question?

BY MR. AYERS:

        Q.      Sure.

                I mean, when we're talking

about telemetry data, is that what we're --

is that the type of information we're talking

about, the stuff that Snapchat would

automatically collect in the background?

                MS. DEGTYAREVA:  Same

        objections.

        A.      You mentioned a couple of

things, for instance -- you said tap the

lens.  I think focus on like the friends, for

example.  So we -- these are actions a user

is directly taking, so if they decided to

watch their Friend A's story, and they reply

to it, that's explicit user interactions that

reflect that they enjoyed that person's

friend story, and we would use that as a --

signals back into our system.

BY MR. AYERS:

Q.    Okay.  So what is your -- I'm just trying to get your understanding of telemetry data.  So what would be your definition of that or understanding of what would be comprised?

MS. DEGTYAREVA:  Objection, vague and ambiguous, asked and answered.

A.    Again, telemetry is such a broad topic, again, that comes back just -- going back to my example, a lot of it was focused on explicit user interactions that were taken that would be helpful to ascertain was what we decided to show the right thing or not.

BY MR. AYERS:

Q.    Okay.  And some of these things would be items that users -- actions users would take, like such as when someone opens up an app or views a story or taps on a place in a map, correct?

A.    Correct.  Those are examples of explicit user interactions.

Q.    Okay.  And those explicit user

David B. Lue                                      25

interactions can be described as telemetry

data, right?

          A.     I believe they're types of

signals.  Again, when telemetry, from my --

is a very broad term again.  So again, that

could mean many different things to me.  But

again, I focus largely on like the explicit

user interactions.

          Q.     Okay.  And you've used

SLQ-based dashboards, correct?

          A.     SL --

          Q.     I'm sorry, SQL.

          A.     SQL, so sequel.  As most

product managers, we rely on dashboards to

understand -- to understand how, like, our

product is behaving and understand, like, the

product metrics.

          Q.     And you've used statistical

modeling, correct?

          A.     Could you be more specific?

Statistical modeling can be applied in all

sorts of different venues and facets.

          Q.     And have you applied it in

connection with your role at Snap?

          A.     As a product manager working on

David B. Lue                                    26

machine learning, statistics are used in the underlying machine learning models.

Q.    Is it fair to say that the telemetry data helped Snap understand how users engage with the Snapchat app, for instance, how they click on things, how long they stay on a feature and whether certain features are working as intended?

MS. DEGTYAREVA:  Objection, vague and ambiguous, misstates the testimony, and compound.

A.    So I think a couple things. Again, telemetry can mean a variety of things, but what I will say is that from -- if I think about a -- a machine learning model system, say we're trying to show you the right ad.  If the person sees the ad and decides to click on it and decides to, say, buy the pair of Nike shoes, as a human, that is a good outcome.  That presumably means they derived value and that is what would -- the positive signals that we would feed that would help inform our next decision round.

BY MR. AYERS:

Q.    So it's common for you to

David B. Lue                                                27

analyze this type of data using SQL?

A.      I was more on the product side, so again, I would lean heavily on our machine learning engineers and data scientists for the actual exact underlying mechanics of how some of the analysis and dashboards were produced.

Q.      But you would review those outputs by the engineers and data scientists using SQL?

A.      Again, I don't know the exact underlying methodology whether they were using SQL or something else, but when we're in weekly meetings, yeah, we would review as a team to understand how the product was performing.

Q.      And you would review those as a team in connection with those product and -- managers?

A.      Yeah, I would say it's generally practice for most product managers to be running meetings with their respective teams and the different product areas and review them as a group.

Q.      You left Snap just last month,

content, and we would decide which of these we thought would pique the users' interest the most.

Q.    Are you aware of -- that Snap has an auto-rejection model in which content that a user tries to upload to Spotlight is submitted through?

A.    I am not familiar with that process.

MR. AYERS:  All right.  Let's take a look at folder F.

(Whereupon, Snap-Lue-5, Content Moderation: Spotlight Age-Gating, SNAP5350932 - SNAP5350960, was marked for identification.)

BY MR. AYERS:

Q.    I'm handing you what's been marked as Exhibit 5 to your deposition.  For the record, Exhibit 5 is Bates-numbered SNAP5350932, and it is titled Content Moderation: Spotlight Age-Gating.

Are you familiar with this document, sir?

A.    I am not.

Q.    And this is dated

September 29th, 2020.

Do you see that there at the top?

A.    I do.

Q.    Would you -- would this fall within your time period where you had responsibility for Spotlight?

A.    Yes, Spotlight ranking.

Q.    And if you look to the custodian of the document on the last page, you'll see that right there in the middle, David Lue is a custodian of this document, right?

A.    Yes, I see my name there.

Q.    Okay.  Do you have any reason to doubt that this document was found within your custodial file at Snap?

A.    I do not have any reason to doubt, correct.

Q.    This is a Quip, correct?

A.    Give me a few minutes to look through this.

(Document review.)

A.    It's a printout, but you're saying it's a Quip, like Q-U-I-P, is that

what you meant?

BY MR. AYERS:

Q.    Yeah.  Right there at the top it says:  This Quip is used for discussion and brainstorming?

A.    Yes.  Yes.

Q.    And then it shows a link to the -- to the MVP Quip, Age in Spotlight Ranking?

A.    I see that.

Q.    And that would be the area in which you had responsibility, right?

A.    Yes, I worked on Spotlight ranking.

Q.    Okay.  And if you look right in the middle of the page under Overview, it states:  We want to build age-gating in Spotlight so that we are serving content categories to the appropriate age groups, and to set a foundation if we ever want to add in user-controlled content-gating.

Right?

A.    I see that sentence.

Q.    Okay.  And so is it fair to say that age-gating was part of the Spotlight

ranking, correct?

A.      Not -- not entirely.  Again, I have never seen this.  A lot of these, my primary responsibilities were, again, largely trying to predict and understand which Spotlight content a person might be most interested in.

I'm not sure -- I've not seen this document on age-gating, and so again, I did not -- I've not seen it, and our focus was more around ranking the content that we thought we had received to show the right piece of content to the user.

Q.      And you did not use the age inference model in connection with Spotlight ranking?

A.      I don't remember.  Again, we had age.  I don't know exactly which age field was being used.  But again, I don't remember the specifics of the actual ranking models themselves.  Again, we were largely focused on making sure that we were just trying to serve the right piece of content.

Q.      But what does that mean, you were focused on serving the right piece of

content?

I mean, were you trying to serve the right piece of content to the appropriate age groups?

A.     So if I zoom out, the -- in Spotlight, more focused on things like did the person actually favorite the piece of content.  So you can -- there's a hard button on -- at least back in 2020, there was ways for users to reflect that they enjoyed the piece of content and could interact with it. They could watch it to completion.  They could share it with friends.

So these were the primary signals that we would use to help fuel the next round of content decisioning.

Q.     And so if you look in the middle of the page, continuing that same paragraph, the document goes on to state: We'll be approaching this at a content level, indicating some content as not appropriate for some age groups, and on a creator level, showing similarly aged creators to similarly aged cohorts.

Do you see that?

A.    I see that passage.

Q.    And so was this important to you in your role in monetization as well as overseeing the Spotlight ranking about making sure that certain content is -- identifying certain content which is not appropriate for some age groups?

A.    So on -- just on the monetization front, again, advertisers will define certain types of users that they want, Gillette probably wants to target people who are in the market for razors, so they will provide age targeting.

On the Spotlight ranking dimension, again, I've not seen this, but we were downstream from these teams, from the content moderation team, the various policy teams, and we were -- our primary focus was to take engagement and try to serve the right piece of content.

We were not -- again, these types of -- again, what I can read here, trying to define rules or -- we were not part of those conversations.  I was not part of those conversations.

David B. Lue                                                89

Q.    So it wouldn't be important to you -- let me strike that.

It wouldn't be relevant to you in your role of overseeing Spotlight ranking of whether there were -- there was content that was not appropriate for certain age groups?

A.    The way I'd phrase it, we were there to -- we were not there the ones defining what was appropriate -- again, we were not part of those conversations, did not work on these teams.

However, as, like, the serving engine, if there were rules or guardrails that these teams decided that they wanted in place, we would work with them to enable them.

Q.    And do you know if there's any rules that were in place for age-gating content during Spotlight ranking?

A.    I don't remember.

Q.    So you don't know one way or another sitting here today; is that fair?

A.    Again, it's been several years. I don't -- I can see what's in front of me.

Again, I know that if the teams upstream decided that they wanted to enforce certain rules, then we would work with them to enact those, because we're the ones ultimately deciding -- the machines that would actually decide to serve.

But again, we were not part of these conversations around deciding the rules themselves.

Q.    Is it fair to say, sir, that Snap was concerned about its perception with parenting groups, regulators and safety partners?

MS. DEGTYAREVA:  Objection, speculation, vague and ambiguous.

A.    Again, I was not part of this conversation.  I can't speak to that.

BY MR. AYERS:

Q.    You don't know one way or another if Snap was concerned with its perception?

MS. DEGTYAREVA:  Objection, speculation, vague and ambiguous.

BY MR. AYERS:

Q.    Is that your testimony?

David B. Lue                                          91

A.      Again, our team's -- our goal was to try and deliver a good Spotlight experience to our community members, and that's what we focused on.  I was not part of those conversations.  I can't speak to that.

Q.      How long were you at Snap?

A.      Close to nine years.

Q.      So nine years, you have no idea whether Snap was focused on its perception with respect to parenting groups, regulators or safety partners?

MS. DEGTYAREVA:  Objection, speculation, vague and ambiguous, asked and answered.

A.      I was not.  Again, as the point person, our goals, we were always making sure that we were delivering value to our community members.

BY MR. AYERS:

Q.      To your advertisers?

A.      I'd say in the case of monetization, can be like value both to advertisers and the Snapchatters.  Again, hopefully we can serve an ad to your favorite retailer.  During my time on Spotlight and

David B. Lue                                    92

content, I was, again, trying to serve you the piece of content that we think you'd find engaging.

Q.    But you don't know one way or another if Snap was delivering content to -- was delivering inappropriate content to certain age groups, right?

MS. DEGTYAREVA:  Objection, vague and ambiguous, speculation.

BY MR. AYERS:

Q.    It wasn't part of your job function?

A.    Again, like within Spotlight, our focus was to make sure that we were -- given the piece of content that were passed on to us from upstream teams, we were trying to make sure we were serving -- showing -- serving the right piece of content.

Q.    But you don't know one way or another how that content was age-gated to the appropriate age groups, right?

A.    I don't remember, and again, our teams were not in these discussions of -- I've never seen this.  We were there -- if we were told certain rules need to be put in

place, we would go in to enforce them.

Q.     And it goes on to state here, sir, right, that:  By building age controls and making an external push with parental groups -- parents' groups, regulators and safety partners, we can shift the external perception of Snapchat.

Right?  That's what it says?

A.     I can see that sentence.

Q.     And if you then move to page 4, which is at Bates ending in 35.

Are you there?

A.     Yeah.

Q.     You'll see right there, there's a section called Creator Age?

A.     Yeah, I see that.

Q.     And then it says, under Creator Age:  Based on a person's inferred age, we should limit the exposure of a young person's Snap to an older audience.

Do you see that there?

A.     Yep, I see that sentence.

Q.     And then there's a chart with a column A for inferred age, which shows the handling of inferred age for different age

groups, right?

A.    I see that table.

Q.    And the table includes six different age groups, right?

A.    You're referring to the columns A through F?

Q.    No, I'm talking -- the row --

A.    The rows.

Q.    It starts at -- underneath Inferred Age --

A.    Okay.

Q.    -- it goes 2 through 7?

A.    Yeah, I see that.

Q.    You see that there?

A.    Yep.

Q.    So you agree with me that there's six different age groups there, right, related to the handling of inferred age?

A.    The -- I see six rows.

Q.    The six rows have different age groups, right?

A.    Yeah, the column A has six different rows of different age groups.

Q.    And those age groups are often

called cohorts, right?

A.      Yep.  And it's one way to
cohort users, correct.

Q.      And those -- if you just go
down with respect to that column, the
different age groups are less than 13, right?
Those are under-13?

A.      Again, I've never seen this
table, but --

Q.      That's what it says, right?

A.      Yeah, it says under-13.

Q.      Right.  And then the next
cohort is ages 13 through 17, right?

A.      Yep, I see that.

Q.      Then the next cohort is 18 to
20?

A.      Yep.

Q.      And then the next cohort is 21
to 24?

A.      Yep.

Q.      And the next cohort is 25 to
34, correct?

A.      Yep, I see that.

Q.      And then there's above age 35,
right?

David B. Lue                                        96

A.    Correct.

Q.    And those comprise the six cohorts related to inferred age, right?

A.    So again, that's what's stated on this table.

Q.    And then across the top row, it is shown with various age buckets, right?

A.    Correct, yep.

Q.    And that goes:  Shown to 13-17, shown to 18-20, shown to 21-24, shown to 25-34 and shown to 35 plus, right?

A.    Yep, I see those columns.

Q.    And then under the Inferred Age, it says for the under-13 cohort, no filtered.  Right?

A.    It says:  No, dash, filtered, right.

Q.    That means those users are filtered out; is that fair?

         MS. DEGTYAREVA:  Objection, speculation.

A.    I have not seen this.  I didn't write this.  I don't know what they're getting at from...

         ///

David B. Lue                                    97

BY MR. AYERS:

Q.    So you don't know what it means to be filtered?

A.    Filter like -- it could mean many things in different contexts.  In this context.  I'm not exactly sure what they're --

Q.    What does filtered mean to you, sir?

A.    I think one would be enabled to be filtered.  You prune them out.

Q.    You what?

A.    You prune them out.  You remove.

Q.    You remove them?  Remove them from what?

A.    Again, totally context dependent.

Q.    Okay.  Well, you're -- again, you oversaw machine learning platform at -- at Snap, right?  That is what you represented on your résumé, that you were the head of product, ranking and marketplace and that you oversaw machine learning platform at Snap, right?

David B. Lue                                    98

A.      Again, I -- there might be some résumé -- more of my time was spent on monetization.  I had a brief stint in content rank and had some exposure on the actual ML platform side.

Q.      So you did not actually oversee the machine learning platform at Snap; is that right?  And you didn't work on it?

A.      Machine platform in this scenario actually refers to just underlying, like, tools built for other internal teams.

Q.      Like Bento?

A.      Like Bento.

Q.      You oversaw Bento and worked in it?

A.      I did not oversee it.  I was a product manager that part-time lent some help to them.  We eventually hired a dedicated product person that -- I don't know who he reports to now.

Q.      But filtered -- in a machine learning model, you would understand that filter would be to exclude -- as excluding that content from the model, right?

A.      In the -- to -- your exact

question is in -- actually, could you repeat the question?

Q.    Yeah.

You indicated, right, that filtering meant to exclude; is that correct?

A.    I think in a generic sense, filtering means to remove.

Q.    Okay.  And so you'd remove it from the results?

A.    I guess, like, remove from results can -- that's more of a generalized statement.  I guess it still varies by context and application.

Q.    When you say to exclude, what do you mean?

A.    I guess in what -- like, so exclude if you say -- you know, you make not eligible.

Q.    What?

A.    You make not eligible or -- yeah, you can remove.

Q.    You make not eligible, okay.

So what this document is saying is, is that it would be -- under your understanding of what filtered would mean, it

Design Proposal, SNAP5919460 -
SNAP5919490, was marked for
identification.)

BY MR. AYERS:

Q.     I'm handing you what's been
marked as Exhibit 6 to your deposition.
Exhibit 6 is Bates-numbered SNAP5919460 and
is titled an AEME Design Proposal.

AEME stands for
Auto-Moderation, Explore, Human Moderation.

Do you see that?

A.     Yes, I do.

MS. DEGTYAREVA:  I object to
the use -- actually, strike that.
It's fine.

BY MR. AYERS:

Q.     You see that, sir?

A.     Yeah, I do.

Q.     Okay.  Are you familiar with
AEME?

A.     Briefly.  It's been several
years.

Q.     What's your understanding of
it?

A.     This was our initial system to

help facilitate -- to help enable Spotlight. We had -- you know, it's a community product, so people are submitting content, and this was meant to help increase that exploration dynamic.

Q.    And so this was a proposal for Snap's Spotlight moderation model, right?

A.    No, it was not.  It was still downstream.  It was not moderation specific. This was more to take content and submissions to Spotlight and make them eligible for viewership.

The primary premise here was, again, Spotlight when people decide to submit and post content and contribute to the ecosystem.  It's a pretty crummy feeling if you spend all this effort and never saw the light of day.  So this is a system to try and help provide a better creation experience.

Q.    All right.  And if you look to page 61 of the document, do you see that, page ending 61, it's the second page.  It's a comment.

A.    Yep.

Q.    This is you, right, your

comment?

A.    Yep.

Q.    And this is a to-do of sorts, right?  And it states:  Include current ingress, slash, egress stats, highlight how low -- how goal of this effort isn't to explore all submissions but rather to help capitalize on our total exploration budget, e.g., exploration budget constraints.

Do you see that there?

A.    I do.

Q.    And this was a comment you left on November 19th of 2020.

Was that during the time that you oversaw Spotlight ranking?

A.    Yes.

Q.    Okay.  So is this a document you prepared?

A.    I don't remember any -- I also don't remember when Spotlight officially launched, so this might have been around that time.

Q.    Okay.  But you're definitely commenting and working on this document, correct?

A.      Yes.

Q.      If you turn to Bates ending in 64, there's a list of pre-filters, right?

A.      Yeah, I see that header.

Q.      There's a header, Pre-Filters, Auto-Moderation Modeling and Thresholds.

Right?

A.      Yep, I see that.

Q.      And so what's the purpose of pre-filters?

A.      Can you give me a minute to read this a little bit?

(Document review.)

BY MR. AYERS:

Q.      If you look on the next page, 65, you also make several comments, right, indicating that you're one of the authors of this document?

A.      Okay.  So could you repeat your question?

Q.      What are the purpose of the pre-filters?

A.      So the -- again, I think these are copied from a Spotlight content moderation content filters doc.  I think,

from what I remember, the general premise is that there's an abundance of submissions to Spotlight.  A lot of people have -- want to express their creativity, and there are more things submitted than we can possibly show or consider.

And we want to try and -- you know, the whole goal is to make sure that we were serving, you know, engaging content, and if there are things, submissions that we believe we can -- up front that might not be aligned with that initiative, then given our limited kind of exploration budget, we'd want to prioritize other ones.

So if I -- for instance, if I look at this low media quality, I think some people might have posted Snaps that were very blurry, and so ostensibly, that would result in not a good, you know, consumer viewing experience.  So those would be just removed up front to make way for potentially other engaging content.

Q.    All right.  So the filtering out would be -- it would be, to your -- consistent with your definition of filtered

David B. Lue                                    122

earlier, to exclude that content from eligibility, right?

A.    I don't remember the exact -- like, the earlier, but I guess in this context from what I can see in these bullet points, it is removing Snaps that we believe, for instance, that might be blurry or might not be the right aspect ratio for the experience.

Q.    But you're excluding them from eligibility to be seen on Spotlight, correct?

A.    I don't remember if we excluded them to be eligible at all or maybe perhaps just to deprioritize and make way for content that we think might have been higher quality.

Q.    All right.  And if you actually go to Bates ending in 67, you'll see that you have a comment listed there at D8, right?

And you write:  Since presumably, after pre-filters and auto-moderation, the Snap will then either be Live or Rejected.

Right?  Do you see that?

A.    I see that.

Q.    And doesn't that accurately

reflect what the pre-filters are doing, that they're excluding those Snaps from going live?

A.    From what I can gather here -- again, I don't remember writing this, but yeah, from what I see here, pre-filters and auto-moderation, like, the Snap will either be live or rejected.  So if rejected means filtered out, then it might mean filtered out.

Q.    And that's what it means, right?  Rejected means filtered out, so the content won't go up on Spotlight for others to see?

A.    Yeah, I think, like, filter and eligible, like you can be rejected for all sorts of reasons.

Q.    All right.  So if you go back to 64, you'll see that there is -- it says, in the middle of kind of the filtering-out list, there's Filter out Snaps from minor -- from minors, right?  You see that there?

A.    Yep, I see that bullet.

Q.    Then it says:  Threshold, inferred age, less than 13.

CERTIFICATE

I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, DAVID B. LUE was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

<%20911,Signature%>
_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649

Dated: April 7, 2025