# AMENDED Exhibit 168

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              )
PERSONAL INJURY PRODUCTS           )    MDL No. 3047
LIABILITY LITIGATION               )
                                   )
                                   )

 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     )
                               )
SOCIAL MEDIA CASES             )    Lead Case No.
_____)    22STCV21355
This Document Relates To       )
                               )
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI,             )
ATTORNEY GENERAL and           )
REPORTER,                      )
v.                             )
META PLATFORMS, INC., and      )
INSTAGRAM, LLC.                )
_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VOLUME 1
VIDEO-RECORDED
DEPOSITION OF ARTURO BEJAR
(Pages 1 - 351)
Held at Baker Botts
1001 Page Mill Road, Palo Alto, California
Monday, April 7, 2025, 9:20 a.m.
- - - -
REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

Page 2

                    APPEARANCES

For the Plaintiffs:
        BY: TOM CARTMELL, ESQ.
        BY: JACK HYDE, ESQ.
        BY: KATHLEEN HUDNALL
        BY: MAUREEN MURPHY, ESQ. (VIA ZOOM)
        BY: LUCY MALONE (VIA ZOOM)
        BY: ANGELA PRIEST (VIA ZOOM)
        BY: ROB GROVES, ESQ. (VIA ZOOM)
        BY: TRICIA L. CAMPBELL, ESQ. (VIA ZOOM)
        BY: JONATHAN P. KIEFFER, ESQ. (VIA ZOOM)
        BY: LINDSEY SCARCELLO, ESQ. (VIA ZOOM)
        Wagstaff & Cartmell
        4740 Grand Avenue, Suite 300
        Kansas City, Missouri 64112
        816.701.1100
        Tcartmell@wcllp.com
        jhyde@wcllp.com

        BY: LEXI J. HAZAM, ESQ. (VIA ZOOM)
        Lieff, Cabraser, Heimann & Bernstein
        275 Battery Street, 29th Floor
        San Francisco, California 94111
        415.956.1000
        Lhazam@lchb.com
        BY: ALEXANDRA WALSH, ESQ. (VIA ZOOM)
        Anapol Weiss, LLP
        14 Ridge Square, NW, 3rd Floor
        Washington, DC 20016
        771.224.8065
        Awalsh@anapolweiss.com

        BY: GRACE QUINLAN, ESQ. (VIA ZOOM)
        BY: KIRK GOZA, ESQ. (VIA ZOOM)
        Goza & Honnold, LLC
        900 Nall Avenue, Suite 400
        Overland Park, Kansas 66207
        913.451.3433

CONFIDENTIAL

Page 3

For the Witness, Arturo Bejar:
          BY: MICHAEL W. WARD, ESQ.
          BY: CHINMAYI MANJUNATH, ESQ.
          Baker Botts LLP
          1001 Page Mill Road
          Building One, Suite 200
          Palo Alto, California 94304-1007
          650.739.7500
          Michael.ward@bakerbotts.com
          Chinmayi.manjunath@bakerbotts.co

For the Defendants Meta Platforms, Inc., f/k/a
Facebook, Inc.; Facebook Holdings, LLC; Facebook
Operations, LLC; Facebook Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC; Siculus, Inc.;
and Mark Elliot Zuckerberg:
          BY: PHYLLIS A. JONES, ESQ.
          BY: CECILIA BOBBITT, ESQ.
          BY: PATRICK NUTTER, ESQ.
          BY: MARIAH K. WATSON, ESQ. (VIA ZOOM)
          BY: GAVIN JACKSON, ESQ. (VIA ZOOM)
          BY: HUNTER BJAZEVICH, ESQ. (VIA ZOOM)
          BY: CONNOR KENNEDY, ESQ. (VIA ZOOM)
          BY: PAUL SCHMIDT, ESQ. (VIA ZOOM)
          Covington & Burling LLP
          OneCity Center
          850 Tenth Street, NW
          Washington, DC 20001-4956
          202.662.6000
          Pajones@cov.com

          BY: KATHRYN WALKER, ESQ. (VIA ZOOM)
          Bass Berry & Sims
          21 Platform Way South, Suite 3500
          Nashville, Tennessee 37203
          615.742.7855
          Kwalker@bassberry.com
          BY: MEREDITH MANDA, ESQ. (VIA ZOOM)
          BY: ALYSSA J. METCALF, ESQ. (VIA ZOOM)
          Davis Polk & Wardell LLP
          450 Lexington Avenue
          New York, New York 10017
          212.450.3563
          Meredith.manda@davispolk.com

CONFIDENTIAL

Page 4

For the State of Indiana:
        BY: CORINNE GILCHRIST, ESQ. (VIA ZOOM)
        Office of the Attorney General Todd Rokita
        302 W Washington Street, Suite 5
        Indianapolis, Indiana 46204
        317.232.6201
        Corinne.gilchrist@atg.in.gov


For the State of New York:

        BY: NATHANIEL KOSSLYN, ESQ.
        Office of the Attorney General of New York
        28 Liberty Street
        New York, New York 10005
        800.771.7755
        Nathaniel.kosslyn@ag.ny.gov

For the State of West Virginia:
        BY: ABBY CUNNINGHAM, ESQ. (VIA ZOOM)
        Office of the West Virginia Attorney General
        1900 Kanawha Boulevard, E
        Room 26
        Charleston, West Virginia 25305
        Abby.g.cunningham@wvago.gov


For the State of Massachusetts:

        BY: DOUG MARTLAND, ESQ.
        BY: CHRISTINA CHAN, ESQ.
        BY: CORY TASLEY (VIA ZOOM)
        Office of the Attorney General
        State of Massachusetts
        1 Ashburton Place, 20th Floor
        Boston, Massachusetts 02108
        617.727.2200

CONFIDENTIAL

Page 5

For the State of Tennessee:
          BY: BRIAN PHELPS, ESQ.
          BY: CHRIS DUNBAR, ESQ.
          BY: ELIZABETH SPICA, ESQ. (VIA ZOOM)
          BY: SHANTE PICHE (VIA ZOOM)
          BY: KEATON MURPHY, ESQ. (VIA ZOOM)
          State of Tennessee
          Attorney General
          UBS Tower
          315 Deaderick Street
          Nashville, Tennessee 37243
          615.741.3519

For the State of Arkansas:
          BY:  AELISH BAIG, ESQ. (VIA ZOOM)
          Robbins Geller Rudman & Dowd LLP
          One Montgomery Street, Suite 1800
          San Francisco, California 94104
          415.288.4545
          aelishb@rgrdlaw.com


For the Defendant Snap:

          BY: PRISCILA CORONADO, ESQ. (VIA ZOOM)
          BY: MAGGIE BUSHELL, ESQ. (VIA ZOOM)
          Munger, Tolles & Olson LLP
          350 South Grand Avenue, 50th Floor
          Los Angeles, California 90071
          213.683.9239
          Priscila.coronado@mto.com


For the Defendants TikTok, Ltd.; Tiktok, LLC;
Tiktok, Inc.; ByteDance Ltd.; and ByteDance, Inc.:
          BY: LENNETTE LEE, ESQ. (VIA ZOOM)
          King & Spalding LLP
          633 West Fifth Street, Suite 1600
          Los Angeles, California 90071
          213.218.4011
          Llee@kslaw.com

CONFIDENTIAL

Page 6

For the Plaintiffs:
         BY: LANCE OLIVER, ESQ. (VIA ZOOM)
         BY: ANNIE E. KOUBA, ESQ. (VIA ZOOM)
         BY: JODI FLOWERS, ESQ. (VIA ZOOM)
         BY: PREVIN WARREN, ESQ. (VIA ZOOM)
         Motley Rice LLC
         28 Bridgeside Boulevard
         Mt. Pleasant, South Carolina 29464
         843.216.9057


For the State of Connecticut:

         BY: TESS SCHNEIDER, ESQ. (VIA ZOOM)
         Office of the Attorney General
         165 Capitol Avenue
         Hartford, Connecticut 06106
         860.808.5318


For State of California:

         BY: MEGAN O'NEILL, ESQ. (VIA ZOOM)
         California Department of Justice
         Office of the Attorney General
         455 Golden Gate Avenue, Suite 11000
         San Francisco, California 94102-7004
         415.510.4400

For the State of New Jersey:
         BY: VERNA PRADAXAY, ESQ. (VIA ZOOM)
         BY: MANDY WANG, ESQ. (VIA ZOOM)
         Assistant Attorney General
         State of New Jersey
         124 Halsey Street, 5th Floor
         Newark, New Jersey 07102
         609.712.2828

CONFIDENTIAL

Page 7

For the State of Arizona:
        BY: NATHAN WHELIHAN, ESQ. (VIA ZOOM)
        Office of the Attorney General
        2005 N. Central Avenue
        Phoenix, Arizona 85004
        602.542.5025

For the Plaintiffs:
        BY: PAIGE BOLDT, ESQ. (VIA ZOOM)
        Watts Guerra, LLP
        4 Dominion Drive, Building 3, Suite 100
        San Antonio, Texas 78527
        210.448.0500

Also present:
    Hayley Chang, Meta (VIA ZOOM)
    Tyler Smith, Meta
    Jim Lopez, trial tech
    Chris Reynolds, trial tech
    James Vonwiegen, videographer
    Tara Lamer (VIA ZOOM)
    Nicole Lopez (VIA ZOOM)

CONFIDENTIAL

A. No.

Q. And is anybody compensating you to be here to testify?

A. No.

Q. I want to talk about your background at Meta and your work in some detail, but first I want to ask you some specific questions.

First, do you have expertise in the area of social media user safety?

A. I do, yes.

Q. And how many years have you worked in that area?

A. I mean, I think if we go from today, it would go back to 1994. So that would be, like, 30 years, give or take.

Q. Would that area that would -- strike that.

Would that area include the safety of kids on social media?

A. Yes, it would.

Q. And how did -- strike that.

Did you work at Meta in the area of online safety and security?

A. Yes, I did.

Q. Including online safety and security of kids?

Page 18

A.   Yes.

Q.   Did your work at Meta include assessing whether Meta was adequately protecting and preventing harms to kids on Meta's social media apps?

A.   Yes.

Q.   And did your work include making recommendations to Meta's senior leadership about how to protect kids and prevent harms on Meta's social media apps?

A.   Yes, I did.

Q.   How long did you work on social media safety and security at Meta?

A.   My first stint there was six years, and then I came back and I worked on that for another three years.

Q.   So eight years total?

A.   Eight years total, yeah.

Q.   Are you prepared today to talk about your work in safety and security at Meta?

A.   I am, yes.

Q.   Are you also prepared today to discuss your assessment as to whether Meta's Instagram platform is safe for kids?

A.   I am, yes.

Q.    Right up front I want to ask you, based on your 30 years of experience as a user safety and security expert, including your eight years of work at Meta, what is your assessment as to whether Meta adequately protects kids on its social media app Instagram?

A.    Meta does not adequately protect kids on Instagram.  And I believe that's true today.

Q.    Now, while you were working at Meta as its online safety expert, did you take those concerns for the safety of kids of Meta's Instagram -- related to Meta's Instagram app all the way to the highest level of the company?

A.    I did, yes.

Q.    All the way to the highest executives of the company?

A.    Yes.  I took them to Mark Zuckerberg and Sheryl Sandberg and Adam Mosseri and people who lead the company.

Q.    Did you tell Mr. Zuckerberg that you thought Meta did not adequately understand the harms that Instagram users, including kids, were experiencing?

A.    Yes, I did.

Q.    What did you tell Mr. Zuckerberg as far as

Page 123

Q.   Okay.   What about hate?   Hate is 25 percent, seen any hate speech or threats that you feel don't belong on Instagram.

Do you see that?

A.   Yeah, I see that.

Q.   And is that one out of every four people said they had seen that?

A.   That's correct.

Q.   Explain nudity, please.

A.   So the question is, have you seen any nudity or sexual content that you feel doesn't belong on Instagram?  And 23 percent, approximately one in four people, said yes in the last seven days.

Q.   What about violence?

A.   Have you seen any violent content that you feel doesn't belong on Instagram?  And then you get one in five people said yes in the last seven days.

Q.   Child safety is 19 percent.  And is the question asked, seen anything on Instagram that made you worried that a child was unsafe?

A.   That's correct.

Q.   So almost one in five people said they had seen that in the last week?

A.   That's correct.

Q.   Eating disorders is 18 percent.  Seen

CONFIDENTIAL

Page 124

anyone on Instagram who was promoting eating disorders or unhealthy weight loss; is that correct?

A.    That is correct.

Q.    So almost one in five there, too, right?

A.    That is correct.

Q.    What is solicitation?

A.    Seeing anybody on Instagram trying to sell -- buy or sell sexual activity or services.

Q.    That's 17 percent?

A.    That's correct.

Q.    What is NCII?  Is that nonconsensual inappropriate interactions?

A.    That's correct.

Q.    What was the question there?

A.    Have you seen any nudity or sexual content on Instagram that you were worried was shared without the person's permission?

Q.    Is that -- I may be wrong, but is that something that happens with sextortion?

A.    It happens on sextortion and it happens on revenge porn.

Q.    SSI, what does that mean?

A.    Have you seen anyone on Instagram who you were worried might hurt themselves or commit suicide?

Page 144

MS. JONES:  Excuse me.

Objection to the form.  And foundation.

THE WITNESS:  I was not aware of any team working on addiction in 2019.

BY MR. CARTMELL:

Q.    And did you at any time while you were there from '19 to '21 see that Instagram or Meta had actually published any internal research on addiction or problematic use?

A.    I did not.

Q.    What about warning the public of the increased risk to kids of addiction or problematic use from Instagram, did they ever warn the public, kids, or parents of that?

A.    They did not.

Q.    Do you believe, based on your expertise as a child safety expert, that Instagram did enough to actually try to prevent or substantially reduce addiction or problematic use to kids on Instagram?

MS. JONES:  Objection to the form. Foundation.

THE WITNESS:  They did not.

(Whereupon, Meta-Bejar Exhibit 10 was marked for identification.)

(Whereupon, a brief discussion off the

Page 161

And to this day, today, when a teenager gets an unwanted nude, what do they do?  I keep testing this regularly in the hope that there is going to be something, which is the first step.

Q.   Okay.  So -- and did you discover, when you were looking, whether or not actually kids were using the reporting flow and they had a meaningful amount of kids reporting harms?

MS. JONES:  Objection.  Foundation.  Form.

THE WITNESS:  When we looked at the reporting tools that they provide, one of the things that we found is of the people who have had -- who told us they had a bad experience, only 1 percent of them finished submitting feedback through the reporting tool.  Like, one in a hundred people actually used the tool all the way through.

I believe, based on prior experience and the way this is assigned, that that number for teenagers is likely much lower.

And then, like, how can you prevent harm if you're not letting people tell you when it's happening.

BY MR. CARTMELL:

Q.   Is one of the things that you did when you were at Meta from 2019 to 2021 as their safety

Page 163

BY MR. CARTMELL:

Q. You mentioned that there were no metrics in place; is that right?

MS. JONES: Objection to form.

BY MR. CARTMELL:

Q. Strike that.

You mentioned that one of the steps to have an appropriate safety framework is that there needs to be metrics in place for safety, correct?

A. Correct.

Q. Do you believe that Instagram had appropriate metrics in place for safety?

A. They did not.

Q. Do they today? Do you know?

A. I don't know.

Q. Real quick, I want to ask you about when you went back in 2019, did you actually also look at the Facebook reporting flow?

A. Yes, I did.

Q. And did you actually also find that the Facebook reporting flow was flawed?

A. Yes, I did.

Q. What did you find?

A. So I found that they had brought back a lot of the changes that we had done, which led to

more accurate reports and reducing the number of reports that needed to be reviewed.  And so I spoke to the -- both the product manager and the engineering manager for their team at Facebook that was responsible for the reporting tools.

Q.    And what did you find out?

A.    I found out that, in the words of the engineering manager -- well, I'm not going to -- let me tell you what I found out and -- and as a result of the conversations I had with all of them.

So this is not one person, but it was, like, multiple people said this.  The manager for the team, the product manager, and the engineering manager.

And what I learned from talking to them was that they had had some difficulty maintaining some of the older flows that were based on previous infrastructure.  So they removed the flows, at which point reporting went up significantly, and they did not have enough people to review.

So they adjusted the flow to add something called friction, which is add steps that make people drop off, so they don't complete the task, and that they had always added a blue button that people clicked in the knowledge that they believe they had

CONFIDENTIAL

Page 165

submitted a report when the blue button dismissed the flow.

And this was something that everybody that I spoke to within that part of the company was aware of.  And I found that very problematic.

Q.   Was Meta actually making design changes to the Facebook reporting flow to discourage reporting?

MS. JONES:  Objection.  Foundation.

THE WITNESS:  That is correct.

BY MR. CARTMELL:

Q.   And did Meta actually intentionally include what you called a blue button to try to lower the amount of reporting?

MS. JONES:  Same objection.

THE WITNESS:  That is correct.

BY MR. CARTMELL:

Q.   Let me ask you.  Your reaction to that, you said it was problematic.

Did that tell you anything about Meta's commitment to safety?

MS. JONES:  Objection to the form.

THE WITNESS:  Yes, it did.

BY MR. CARTMELL:

Q.   What did it tell you?

A.   Not a priority.  It's more important to

Page 166

reduce the number of reports that you get than it is to make a better product that helps people tell you what the harm is and then do the work of going and reducing that harm.

Q.   You mentioned that you also did an assessment of the safety tools and features on Instagram during your stint during 2019 to '21; is that right?

A.   That's right.

Q.   When you did an assessment of Instagram's safety tools and features, did you find that there were any that were effective at preventing or substantially reducing harms to kids on Instagram?

A.   I believe that at the time there were no tools that were effective at reducing the harm that kids were experiencing on Instagram.

Q.   I have seen that you described Instagram's safety tools and features as placebo; is that right?

A.   I have, yes.

Q.   What does that mean?

A.   It means that they are tools that sound good but that don't effectively -- or reduce real-world harm.  And so they -- I think that they, like, sound really good in the press and sound good for regulators or people trying to pass legislation,

CONFIDENTIAL

Page 183

feasible. And then as new technologies entered, it would have gotten so much more effective than it originally was.

BY MR. CARTMELL:

Q. I want to switch gears a little bit, but still talking about number four.

Is actually age verification a part of an appropriate safety framework?

A. Yes, it is.

Q. In other words, do you believe Instagram should have had appropriate age verification in place to keep kids safe on Instagram?

A. Yes, I do.

Q. Let's talk about your first stint at Meta when you were working on the Facebook app and they purchased Instagram. Okay?

A. Yes.

Q. In 2012 they purchased Instagram, correct?

A. Correct.

Q. And then between 2012 and 2015 was the period of time that you were at Meta and working some in conjunction with Instagram's leaders; is that correct?

A. That is correct.

Q. At that time in 2012 to 2015, on Instagram

CONFIDENTIAL

Page 184

what was the required minimum age for a kid to have an account?

A.   At the time, on Instagram, there was a "don't ask, don't tell" policy.

Q.   Okay.  Was there a written --

MS. JONES:  Let me just object to that answer as nonresponsive to the question.

Go ahead.

THE WITNESS:  Okay.

BY MR. CARTMELL:

Q.   I'll restate the question.

In 2012, from that time until you left in 2015, at Meta, was there a written policy related to the minimum required age for kids on Instagram?

A.   There was not.

Q.   Was the required age that people discussed 13?  In other words, was there a terms of service or something that stated that you had to be -- a kid had to be 13 to be on Instagram?

A.   No.

MS. JONES:  Objection to the form.

BY MR. CARTMELL:

Q.   What was your understanding while you were at Meta from 2012 to 2015 about Instagram's age verification policy?

afraid to hit it because of that.  And then they are worried they are going to get somebody else in trouble.

So we knew that the word report did not work for teens to select that as an option.  And in 2011 or '12 we changed that word to be something else that teens would feel comfortable clicking so we could get the information about the things that they were having.

MS. JONES:  Let me just object again to the narrative nonresponsive answer.  And just to be very clear, we're going to seek to strike all of these answers as being speeches.  They are not responsive to your questions.

Go ahead.

MR. CARTMELL:  Well, I'm just going to respond to that one because I think it calls for a response.

Okay.  We will move on.

Q.  Was eating disorder content and body image content something that Meta knew was frequent on Instagram?

MS. JONES:  Objection.  Foundation.

THE WITNESS:  Yes.

///

CONFIDENTIAL

Page 270

BY MR. CARTMELL:

Q.   And did Meta know from its internal research that there was content that was frequent on Instagram that was promoting or encouraging body image issues and eating disorders?

MS. JONES:   Objection to the form and lacks foundation.

THE WITNESS:   Yes.

BY MR. CARTMELL:

Q.   Were you using this example to show the Instagram Well-Being leads that this type of content was frequent on Instagram and not violating the community standards?

A.   Yes.

Q.   Was that because you were telling the Instagram leads -- strike that.

Did you do that because you were telling the Instagram leads that there was harm to girls and kids on Instagram from this type of content?

A.   Yes.

Q.   Did Instagram ever, that you know of, warn parents or the public that it knew there was content that was frequent on Instagram that was promoting or causing or contributing to cause eating disorders and body image issues?  Do you know?

CONFIDENTIAL

Page 307

about one in five within a week that had experienced. And we looked at the question, right, related to that. Do you recall what the question is?

A. Yeah. In the last seven days, did you see nudity or unwanted sexual content on Instagram.

Q. Okay. "Unwanted advances."

Let's pull up the actual questions, Jim, if you don't mind. It's dot 5. Okay.

So for "Unwanted advances," the question was, it's up there on the right, in the questions, "Have you ever received unwanted sexual advances on Instagram?"

What was the actual response rate for that for the teenagers?

A. So for 13- to 15-year-olds, 13 percent, one in eight said yes in the last seven days.

Q. One in eight within the last seven days and some had multiple; is that right?

A. That is correct.

Q. Did that concern you?

A. Absolutely.

Page 319

them.

Is that true?

A.   That's correct.

Q.   For nudity, it was 87.1 percent of the people who -- I guess that's who produced that nudity, they didn't know them; is that right?

A.   That's correct.

Q.   Unwanted sexual advances, it was 93.8 percent of the people who were making these unwanted sexual advances, the respondent didn't know that person.

Do you see that?

A.   That's correct.

Q.   What is the significance of these things to you?

A.   It means that they are experiencing these issues from strangers and interactions facilitated by the product design of Instagram.

Q.   It's the design -- strike that.

Is it the design of the actual platform that facilitates that?

MS. JONES:  Objection.  Form.  Foundation.

THE WITNESS:  That is correct.

BY MR. CARTMELL:

Q.   Explain that, please, if you can.

Page 329

BY MR. CARTMELL:

Q.    Do you know whether or not the company destroyed the BEEF emotions data because the company was under scrutiny related to Frances Haugen's leak of research to the public?

MS. JONES:  Objection.  Foundation.

THE WITNESS:  I don't know that.

BY MR. CARTMELL:

Q.    Let me wrap this up.  But if Meta asked Kyle Andrews to delete the emotions data from the BEEF survey, what, if anything, does that tell you about the safety as a priority for Meta?

MS. JONES:  Objection.  Foundation. Mischaracterizes the evidence.

Go ahead.

THE WITNESS:  That safety is not a priority, that the harm that teens are experiencing and how bad it is is something to be hidden or removed, that things that parents and everybody should know about the reality of a harming place on Instagram, that that is something that Meta doesn't want people to know.

BY MR. CARTMELL:

Q.    Were any of the BEEF survey findings made public by Meta?

A.    They were not.

Q.    Do you believe Meta should have made the BEEF survey findings available to the public?

A.    Absolutely.

Q.    Including parents?

A.    Parents need to know.  Yes, including parents.  Absolutely.  So important.  I cannot stress this enough.  How do you know what goes on when you hand your kid the phone and you help them install the app.  How are you going to know what they are going to experience without this data.  You are blindfolded as a parent.

Q.    You talked earlier today about the importance of transparency; is that correct?

A.    That is correct.

Q.    Can sharing research like these BEEF results and findings be -- and being transparent with the public and parents help reduce harm to kids on Instagram?

A.    Yes, it's absolutely essential.

Q.    Do you believe that Meta's lack of transparency by failing to inform the public of its research, like BEEF, has contributed to harms to kids on Instagram?

MS. JONES:  Objection.  Foundation.

CONFIDENTIAL

Page 331

THE WITNESS:  Yes, absolutely.

BY MR. CARTMELL:

Q.   Can publishing data like this from the BEEF findings actually serve as a warning to kids and parents and the public that Instagram can lead to harmful experiences?

MS. JONES:  Objection.  Foundation.

THE WITNESS:  Yes, it can.  It helps you have an informed conversation with your kids about the things that they might be experiencing when they go online, and that's the least you can do as a parent.

BY MR. CARTMELL:

Q.   Meta does have a website that it has where it publishes -- strike that.

Meta does have a website where it publishes what it calls safety data, correct?

A.   That's correct.

Q.   It's called the Transparency Center, correct?

A.   That's correct.

Q.   Could Meta put this BEEF data and their internal research related to harms to kids on the Transparency website?

A.   They could and they should.

CONFIDENTIAL

Page 346

algorithms so that you do not recommend this to a teenager on any surface.

MS. JONES:  Excuse me, Counsel.

I'm going to object to the nonresponsive narrative answer.

BY MR. CARTMELL:

Q.    This time period is in September of 2021, right?

A.    That is correct.

Q.    Do you think Meta should have taken those measures you just stated much earlier than that?

A.    Absolutely.

Q.    You think that Meta should have told parents and the public about the risk of harm from self -- suicide and self-injury content on Instagram?

A.    Absolutely.

Q.    They should have warned about that; do you believe?

A.    Absolutely.

Q.    Was it well-known among the well-being team at Meta and others that suicide and self-injury and self-harm content was easily accessed on Instagram by kids?

MS. JONES:  Objection.  Foundation.

CONFIDENTIAL

Page 347

THE WITNESS:  Yes, it was.

MR. CARTMELL:  Why don't we break for tonight if it's okay for you.

THE VIDEOGRAPHER:  Time is 6:43.  We're off the record.

(Whereupon, the deposition was adjourned at 6:43 p.m.)

CONFIDENTIAL

Page 482

want to ask you about a few things.

But tell me, what was the general topic of Mr. Zuckerberg's post?

A.   I mean, there's a sentence says, We care deeply about issues like safety, well-being, and mental health.  And that was just not my experience of the previous two years.

Q.   In the first full paragraph, it says (as read):

"At the heart of these accusations is the idea we prioritize profit over safety and well-being.  That's just not true."

Do you see that?

A.   I do.

Q.   Based on your experience at Meta, as Meta's well -- excuse me.  Strike that.

Based on your experience at Meta from 2019 to 2021, as Meta's online safety consultant, was that your experience, what Mr. Zuckerberg said?

A.   My experience was that they prioritize engagement and growth over safety and well-being.

Q.   And you've provided to us in your testimony lots of examples of that; is that true?

A.   Correct.

Q.   He says in this second paragraph, as you

CONFIDENTIAL

Page 436

for -- for good.

Q.   Could you ever convince the leadership at Meta to do something like that for kids?

A.   I could not.

Q.   And that type of intervention or a playbook, as you described, safety tools and safe -- let me restate it.

Those types of safety tools and features that you say Meta could have implemented, when was that available and feasible for a company like Meta to do that?

MS. JONES:   Objection.   Foundation and form.

THE WITNESS:   2010.

BY MR. CARTMELL:

Q.   At this time, in 2021, we're talking about when the BEEF results come back and addiction is not being monitored, has Meta warned the public, including kids or their parents, that there is an increased risk of addiction or problematic use from the use of Instagram?

A.   It had not.

Q.   Okay.   You can put BEEF aside.   I want to switch gears, and I want to ask you now, after you got the BEEF results and your team did, the

CONFIDENTIAL

Page 581

the platform was not a priority.

Q.   As someone who's worked in the area of online safety for many years, do you think it would have been prudent for Meta to build parental supervision tools much, much earlier than 2022?

MS. JONES:  Objection to the form. Foundation.

THE WITNESS:  Absolutely.  I think that at the moment that Instagram had all of these sort of features that allowed contact and content and it was made available to young people, that that is the moment at which they should have started developing and continued to develop tools that meaningfully supported parents and kids in the partnership of being safe online.

BY MR. PHELPS:

Q.   Based on this press release, is it your understanding that the parental tools that the company launched in 2022 was an opt-in feature?

A.   Yes.

Q.   Based on this press release, is it your understanding that the parental supervision tools the company launched in 2022 was something you had to navigate into the settings to activate?

MS. JONES:  Objection to the form.

Page 582

THE WITNESS:  Yes.

BY MR. PHELPS:

Q.    What impact would those features of parental supervision have for adoption and effectiveness based on your industry experience?

MS. JONES:  Objection.  Foundation.  Calls for speculation.

THE WITNESS:  It would mean that the feature would not be adopted and then as such would not be effective as a safety feature.

BY MR. PHELPS:

Q.    Do you know whether the company had teams measuring the effectiveness of these parental supervision tools in 2022?

A.    I did not have visibility on that.

Q.    If you were trying to assess the effectiveness of this tool, would you want to know if there were teams measuring and improving the tool within the company?

A.    Absolutely.

Q.    And that -- that's, yet again, the concept that a press release and launching a tool is really just the first step into ensuring its success?

MS. JONES:  Objection to the form.

THE WITNESS:  Correct.  There has to be a

CONFIDENTIAL

Page 1207

STATE OF CALIFORNIA    )

COUNTY OF YOLO    )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

ARTURO BEJAR,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720