# AMENDED Exhibit 220

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT    MDL No. 3047

ADDICTION/PERSONAL INJURY         Case No. 4:22-md-

PRODUCTS LIABILITY LITIGATION     -03047-YGR (PHK)

This Document Relates to:

ALL ACTIONS

_____

VIDEOTAPED DEPOSITION OF

EMILIO FERRARA, Ph.D.

HIGHLY CONFIDENTIAL

WEDNESDAY, AUGUST 13, 2025

LOS ANGELES, CALIFORNIA

Reported By:

KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER

California CSR 10068, Nevada CCR 995, Texas CSR

12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR

HIGHLY CONFIDENTIAL

Page 11

AUGUST 13, 2025                    9:13 A.M. PACIFIC TIME

P R O C E E D I N G S


MORNING SESSION

THE VIDEOGRAPHER:  Here begins the videotaped deposition of Dr. Ferrara.  Today's date is August 13, 2025.  The time on the record is 9:13 a.m.  My name is Tim Hunter, your legal videographer.  Our court reporter is Kathleen Maltbie.

Counsel, would you please introduce yourselves and state whom you represent for the record, starting with noticing counsel, and the witness will be sworn.

MR. OLIVER:  Good morning.  Lance Oliver from MotleyRice, and I represent the MDL personal injury plaintiffs and school district plaintiffs in this Multidistrict litigation.  With me, my paralegal, Katy Lawrimore.

MS. BARNHART:  Lindsey Barnhart, Covington & Burling, for the Meta defendants, and I'm joined by my colleague, Patrick Nutter.

MS. SHEIKH:  Shaheen Sheikh for the State of Colorado on behalf of the MDL State Attorney Generals.

HIGHLY CONFIDENTIAL

Page 12

MR. PHELPS:  Brian Phelps and Jimmy Webb for the State of Tennessee from our office here as well.  Good morning, everybody.

MR. OLIVER:  Is that everybody?

MS. AGEE:  Alex Agee, Bass Berry & Sims, for Meta.

MS. DAVIDSON:  Callie Davidson from Wilson Sonsini for defendants Google and YouTube.

MR. OLIVER:  Anybody else?

Great.

Dr. Ferrara, are you ready to begin?

THE WITNESS:  Yes.

THE REPORTER:  Good morning.  My name is Kathleen Maltbie.  I am a certified shorthand reporter, License No. 10068.  Today's date is August 13th, 2025.

Would you raise your right hand, please?

EMILIO FERRARA, Ph.D.,

having been duly sworn,

was examined and testified as follows:

MR. OLIVER:  We're ready to go, Madam Court Reporter?

THE REPORTER:  Yes.

EXAMINATION BY MR. OLIVER

/ /

HIGHLY CONFIDENTIAL

Page 13

BY MR. OLIVER:

Q.   Good morning, Dr. Ferrara.  It's afternoon my time.  My name is Lance Oliver.  As I said earlier, I represent the plaintiffs in this litigation.  I'm with the law firm of MotleyRice.

Are you ready to proceed?

A.   Good morning.  I'm ready.

Q.   Can you state your full name for the record?

A.   Emilio Ferrara.

Q.   I understand from reading the materials you introduced to us that you have been deposed at least one time in the past; is that correct?

A.   Yes.  Not in this exact format, though.

Q.   Okay.  How was the format different?

A.   I was deposed, testified at a trial in front of a judge.

Q.   So you were deposed and there was a judge present at the deposition?

A.   Correct.

Q.   Okay.  Because you've only -- have you ever been -- other than that deposition, have you ever been deposed at any other time?

A.   No.

Q.   Because you've only been deposed once in

HIGHLY CONFIDENTIAL

Page 14

the past, I'm going to go over some ground rules about how this works.  You may know these things, but it will help to refresh your memory, I hope.

The court reporter is doing her best to take down all of my questions and all of your answers, and that requires us to speak as slowly as we can.

Can you agree to do that?

A.    I do.

Q.    That will also require you to give audible yes-or-no answers to questions.  In other words, there's no nodding of heads or saying nuh-uh or uh-huh.

Do you understand?

A.    I understand.

Q.    It will also require you and I to pause. I will need a pause before you answer sometimes, and you will need a pause to make sure that your counsel has a chance to lodge an objection if she sees fit.

Can we agree that we will do our best to do that?

A.    I agree with that.

Q.    You understand you are under oath today, correct?

A.    I do.

Page 15

Q.   You understand that that oath applies with the same full force and effect here as it would in a courtroom as if you were in front of a jury or in front of the judge?

A.   I understand.

Q.   Occasionally, and probably more than occasionally, given the differences in accents here, I'm going to ask a question that you may not understand.  That's okay.  However, if I do ask a question that you don't understand, can we agree that you will ask me to clarify my question?

A.   I will.

Q.   If you do not ask me to clarify your question, do you understand that your answer to that question will stand?

MS. BARNHART:  Object to the form.

THE WITNESS:  I understand.

BY MR. OLIVER:

Q.   Occasionally, your attorney, Ms. Barnhart, is going to object, as she just did.

Do you understand that unless she instructs you not to answer, you still have to answer my question?

A.   I understand.

Q.   This is a deposition.  It is not an

HIGHLY CONFIDENTIAL

Page 16

inquisition.  I will do my best to take breaks on a regular basis.

Can we agree that if you need a break for any reason, you will ask me?

A.   I will.

Q.   There's one exception to that rule, and that is, if I ask a question and the question is pending, you must answer the question before taking a break.

Do you understand that?

A.   I do.

Q.   I'm going to ask a lot of questions today. Some other lawyers might as well.  Many times those questions will call for a yes-or-no answer.

Is there any reason you have trouble giving yes-or-no answers?

A.   No.

MS. BARNHART:  Object to the form.

THE WITNESS:  Nothing that I can think of.

BY MR. OLIVER:

Q.   Occasionally you will want to explain after giving me a yes-or-no answer.

Can we agree that you will first give me the yes-or-no answer and then offer your explanation?

Page 17

MS. BARNHART:  Object to the form.

And why don't we just start asking questions, Counsel.  These are inappropriate.

BY MR. OLIVER:

Q.   Dr. Ferrara, did you hear my question?

A.   I heard your question.

If I will be able to answer with a yes or no, I will do that.

Q.   Okay.  Thank you.

Do you agree that's a reasonable request?  Correct?

MS. BARNHART:  Object to the form.

THE WITNESS:  It's gonna depend on the question.

MR. OLIVER:  We're going to mark as Exhibit 1 the notice of deposition and Schedule A in this case that we issued for Dr. Ferrara.

BY MR. OLIVER:

Q.   Dr. Ferrara, really quickly, did you receive a box of documents that we're going to use in this case?

MS. BARNHART:  We did, Mr. Oliver.

MR. OLIVER:  Okay.  And, Ms. Barnhart, you didn't open those until now, I assume?

MS. BARNHART:  Correct.

HIGHLY CONFIDENTIAL

Page 18

MR. OLIVER:  Okay.  So Dr. Ferrara has not seen those documents?

MS. BARNHART:  Correct.

MR. OLIVER:  Okay.  Thank you for that.  I just wanted to get that on the record.

All right.  Madam Court Reporter, we'll mark as Plaintiffs' Exhibit 1 the notice of deposition for Dr. Ferrara's deposition.

BY MR. OLIVER:

Q.   Dr. Ferrara, have you seen this document --

(Whereupon, Deposition Exhibit 1 was marked for identification.)

MS. BARNHART:  Hold on.  Mr. Oliver, you got to give us a minute.  We both have to stop talking in order to mark this exhibit, so let's just give it a second.

Do you want me to do those?  Do you want me to do the stickering?

(Discussion held off record.)

MS. BARNHART:  Mr. Oliver, we're set now.

MR. OLIVER:  Okay.  I'll try to give you the appropriate amount of time.  And maybe I'll just ask, you know, if we're ready to go forth.

/ /

HIGHLY CONFIDENTIAL

Page 131

BY MR. OLIVER:

Q.   Dr. Ferrara, we've marked as Plaintiff's Exhibit 8 an article that you contributed to in the association for the advancement of artificial intelligence; is that correct?

A.   Yes.

Q.   It's from 2025, correct?

A.   Yes, I believe so.

Q.   Do you stand by the fact that your name is on this article?

MS. BARNHART:  Object to the form.

THE WITNESS:  My name is on this article. I am a coauthor of this paper.

BY MR. OLIVER:

Q.   Do you believe that since you've endorsed the article, it's a reliable publication?

A.   I stand by the quality of my research and I consider my research reliable.  I would say that in general, as I established earlier, the fact that some statements are in the paper, because perhaps they are part of literature review, doesn't necessarily mean that I agree or that I validate those statements.

But in general, yes, I would stand by the article.

Page 132

Q.   Okay.  If you look under the abstract, Mr. Ferrara, it says (as read):

> TikTok, a platform with over a billion predominantly adolescent users, has become a key space where eating disorder content is shared with increasing concerns about its impact on vulnerable populations.

Did I read that correctly?

A.   Yes.

Q.   Do you understand that TikTok is a defendant in this case?

A.   I do.

Q.   Do you understand that teenagers, in particular, teenage females, are vulnerable populations when it comes to eating disorders?

A.   I think I have a commonsensical understanding of that, but I don't have any specific expertise in the medical domain to consider myself an expert or knowledgeable about this specific aspect.

Q.   Under the introduction, there is a statement that -- it's about the third or fourth sentence down.  It says (as read):

HIGHLY CONFIDENTIAL

Page 133

COVID-19 has made the landscape of eating disorders more challenging.

Do you see that?

A.   Yes.

Q.   Right after that, it says (as read):

Research shows that during this period, there was an increase in symptomology and diagnosis.

Did I read that correctly?

A.   You did.

Q.   Do you understand that to be true?

A.   I frankly have no element to speak to any of that, because the research that is cited, once again, here is part of a literature review, and we are just trying to establish the landscape of publications in these areas.

So I personally not -- I'm not even familiar with any of the names that I see listed here.  I -- I can check the references to -- to tell you definitively if that's the case, but I don't think I have read any of those papers, so I cannot speak to the validity of that.

Q.   You see the section in this paper on page, I believe it's 7, that's titled "Multimodal

HIGHLY CONFIDENTIAL

Page 134

Analysis"?

A.    I see the section, yes.

Q.    Okay.  What is the Multimodal Analysis section?  Can you just tell me?

A.    Multimodal analysis in general refers to the process of looking at more than one data or content modality at the same time.  For example, looking at text plus images or video plus audio, video plus text, et cetera, et cetera.  When you combine two or more different modalities of information, that's a multimodal analysis.

Q.    And this section is -- is this a section that you contributed to, a multimodal analysis?

A.    In general, I contributed to the study, design and met, of course, with the students many times.  So I think it's fair to say that I contributed to the whole project and work.

I don't know if, by contributing to this section, you imply -- excuse me -- whether I wrote it or contributed to the writing.  In that case, I don't recall exactly at this moment whether I wrote any of the specific words or revised any of the specific sentences.

Q.    Okay.  If you look with me at the bottom of the second column, there's a sentence that begins

HIGHLY CONFIDENTIAL

Page 135

with "Together" --

A.   Yes.

Q.   -- in the last paragraph.

Do you see that?

A.   Yes.

Q.   It says (as read):

Together, these themes
illustrate how TikTok has become a
critical space for addressing
eating disorders and body image
concerns, highlighting the
platform's dual role in the
challenging, harmful cultural
norms and potentially perpetuating
them.

Did I read that correctly?

A.   You did.

Q.   Do you know who drafted that sentence?

A.   I don't recall off the top of my head if it was drafted by one single person or it was perhaps revised over different iterations by multiple people.  I don't remember.

Q.   Certainly, because it made it into the final publication, you did not object to including it in the publication, correct?

HIGHLY CONFIDENTIAL

Page 136

A.    With the same caveats that I made already a few times, that for the sake of time, I'm not going to repeat, yes, I did not object to the inclusion of the sentence, yes.

Q.    You don't -- other than your Keck School of Medicine experience we talked about earlier, Mr. Ferrara, you don't have any special background in healthcare, do you?

A.    I do not have any formal training or background in healthcare, that's correct.

Q.    And you are not going to be offering any opinions about features of Instagram that are harmful other than the content moderation structure; true?

MS. BARNHART:  Object to the form and the characterization.

THE WITNESS:  My expert opinion is about the content moderation system, so Meta Platforms inclusive, Instagram, yes.

BY MR. OLIVER:

Q.    You're not going to offer any opinion about whether Meta's features on Instagram can cause depression?

A.    I am not going to offer any opinions in any thoughts about general causality or causation

HIGHLY CONFIDENTIAL

Page 137

with regard to any of these issues that fall in the medical domain, depression and so on.

Q.   Okay.  You would give the same answer for eating disorders, correct?

A.   Correct.

Q.   You would give the same answers for suicidality, correct?

A.   Yes.

Q.   And do you agree that social media can contribute -- well, strike that.

Are you going to offer any opinions about the concept of addiction and Instagram?

A.   No, I'm not an expert on addiction.  I don't have any -- any expertise on that, so I'm not going to offer any opinions on addiction.

Q.   You have never been a Meta employee, have you?

A.   I have not.

Q.   Have you ever designed a content moderation classifier?

A.   Yes.

Q.   For what company or for what purpose?

A.   I designed such classifiers both in the context of my, let's say, day-to-day research activity as well as in the context of my engagement

HIGHLY CONFIDENTIAL

Page 138

with Amazon, specifically, content moderation systems that the Alexa AI relies upon.

Q.   You have -- you never designed or worked on the content moderations for Meta's products, correct?

A.   I have never worked for Meta products or Meta in any -- in any of their products in any capacity.

Q.   And the answer would be the same for YouTube, Snap and TikTok, correct?

A.   Correct.

Q.   So do you understand that in this case, there are a number of individual plaintiffs that will have trials?

A.   I understand that, yes.

Q.   Do you understand that some of the plaintiffs are teenage men and women?

A.   I understand.

Q.   Do you understand that some of the plaintiffs are school districts?

A.   I understand.

Q.   You did not look at any of the viewing histories on Instagram of any of the individual plaintiffs?

A.   I missed the first part of your question.

HIGHLY CONFIDENTIAL

Page 139

Can you repeat it?

Q.   Sure.

You didn't look at any information specific to any individual plaintiff, did you?

A.   No, I did not.

Q.   So that would include school districts as well, right?

A.   That's correct.

Q.   Meta's content moderation structure or infrastructure has changed over time, right?

A.   Yes.

Q.   Okay.  You did not create -- I didn't see it in your report, a timeline of when the relevant changes took place over a certain period of time, did you?

MS. BARNHART:  Object to the form and the characterization.

THE WITNESS:  I -- I believe that these systems change continuously, and they are constantly undergoing refinement and over the course of different iterations and improvements, they -- they constantly evolve.

So I don't believe it would be -- I don't believe a timeline -- an exact timeline would have been useful for the purpose of the -- of the -- of

HIGHLY CONFIDENTIAL

Page 140

the report, since there are hundreds, if not thousands, of such classifiers and such systems.

BY MR. OLIVER:

Q.   Well, you couldn't tell the jury in this case what the state of the content moderation engine was at any particular time that an individual plaintiff was using it, correct?

A.   I don't think that's, let's say, entirely accurate because Meta is quite transparent when it comes to documenting publicly the different iterations of their policy guidelines.

And, therefore, it is -- in practice, it's possible to go back to a specific date and look at the state of the policy guidelines for those particular time frames and their analysis.

So I think if required, I -- I could be able to do that.

Q.   Okay.  Let me -- this is helpful.  Let me just make this really easy.

What you're -- you believe it's possible to do that, correct?

A.   I think so.

Q.   Okay.  But you haven't done it to date, right?

A.   Correct.  I have not done that.

HIGHLY CONFIDENTIAL

Page 141

Q.   It's not -- it's not in your report or your rebuttal report; true?

A.   You're right.

Q.   Okay.  Thank you.

You understand that the plaintiffs, the individual plaintiffs in this case, the teenagers, allege that they saw both violating and borderline content in their Instagram feeds.

Do you understand that?

A.   I guess at a high level, I understand that's part of the claims.  I don't expect to understand the legal definitions of, you know, what would qualify content as violent or any other --

Q.   I'm sorry.  I didn't say "violent."  I said "violating."

A.   Violating.  Sorry.

Q.   So just so we're clear, when I say "violating content," that's a technical word you understand, right?

A.   If by "violating content" you mean content that violates the policies of Meta, yes, I understand what you're saying.

Q.   Correct.  I'm using that term the same way your report uses it.

Does that make sense?

HIGHLY CONFIDENTIAL

Page 142

A.    Yes.  Yes.  Thank you for the clarification.

Q.    So now we have a clear understanding of what's going on, let me reask the question, because you didn't understand, and that's okay.

Do you understand that the plaintiffs -- the teenage plaintiffs in this case allege that they saw both violating and borderline content in their Instagram feeds?

A.    Yes.  I understand that now.

Q.    You would agree with me that if that, in fact, happened, whatever they received in their Instagram feed was not stopped by the content moderation engine, right?

MS. BARNHART:  Object to the form.

THE WITNESS:  I'm not entirely sure that I understand exactly what you mean by "the content wasn't stopped by the content moderation system," so I can't definitively answer that.

It's possible that the content was, for example, stopped after it was exhibited or shown to a particular user, if that makes sense.

BY MR. OLIVER:

Q.    And that does make sense.  Let me just try to clarify.  That's a fair -- fair clarification.

HIGHLY CONFIDENTIAL

Page 143

My point is this:  If our plaintiffs received violating or borderline content, whatever happened with the content moderation engine, that's not really relevant related to the fact they received it.  That just happened and it happened, right?

MS. BARNHART:  Object to the form.

THE WITNESS:  I'm not sure really that I understand what you mean by what happened happened.

I think I agree with you that if the content that the plaintiffs claim to have seen, indeed, was surfaced, then, yes, that's what happened.  If that's true, that's what, you know, Meta Platforms surfaced to those users.

BY MR. OLIVER:

Q.   So if that happened, Meta Platforms surfaced the content to those users, correct?

MS. BARNHART:  Object to the form.

THE WITNESS:  Yes, I am assuming that that is true.  So, yes, I'm agreeing with you that platform -- the platform in question --

(Simultaneous speaking - inaudible.)

(Reporter clarification.)

BY MR. OLIVER:

Q.   That would mean that either the content

HIGHLY CONFIDENTIAL

Page 144

moderation classifier did not cover that content, and that would be borderline content, right?

MS. BARNHART: Object to the characterization and the form.

And I'll again request, Mr. Oliver, please let the witness finish his answers before starting your next question.

BY MR. OLIVER:

Q. I'm sorry. I didn't mean to cut you off. Did I cut you off?

A. The court reporter interjected. The court reporter interjected for a minute, because she wasn't able to catch on record. I don't know if she wants me to repeat.

MS. BARNHART: I'd just suggest we go on at this point.

Mr. Oliver, be careful going forward. You are speaking over the ends of his questions on our end -- sorry, the ends of his answers.

MR. OLIVER: I'll just have to pause. I think it's a delay, because I'm not perceiving it here.

BY MR. OLIVER:

Q. What I'm trying to establish is this: If our plaintiffs claimed that they received some bad

HIGHLY CONFIDENTIAL

Page 145

content in this case, you agree that they do allege that, correct?

MS. BARNHART:  Object to the form.

THE WITNESS:  I agree that that's what's alleged, yes.  That's my understanding.

BY MR. OLIVER:

Q.    Okay.  If the content moderation engine did not stop that content from getting to them, one possibility is the content did not violate Meta's policies, correct?

A.    Yes.

Q.    Okay.  Therefore, the content moderation engine wouldn't have stopped something that's non-policy violating, right?

A.    Correct.

Q.    And that content could include something that you defined as borderline content, right?

MS. BARNHART:  Object to the form.

THE WITNESS:  Well, I wouldn't define it.  I think you're utilizing the language that Meta adopts for borderline content.

So if that's the case, then yes, Meta has a category for borderline content that I believe is defined as content that doesn't explicitly violate a policy, but perhaps comes close to a possible

HIGHLY CONFIDENTIAL

Page 146

violation under certain contexts or circumstances.

BY MR. OLIVER:

Q.   So one possibility of bad content getting to a plaintiff is that it's borderline content that doesn't actually violate Meta's policy, right?

A.   Yes.

Q.   And another possibility of bad content getting to the teenage users is that the content moderation engine simply did not catch that piece of violating content, right?

A.   I --

MS. BARNHART:  Object to the form.

You can answer.

THE WITNESS:  Yes.  I don't necessarily agree on the qualification of the content as "bad" or not.  I wouldn't be able to, you know, deterministically say whether each of the pieces of content that plaintiffs have been supposed to were bad or not, and according to what definition.

But in general, I think your statement is correct.  One of the possibilities of why any content is served to a user is because it was not flagged and moderated automatically by the content moderation system, and also because if this was borderline, it was not flagged and moderated by

HIGHLY CONFIDENTIAL

Page 147

human review -- by the human review process that Meta Platforms have in place to analyze borderline content.

BY MR. OLIVER:

Q. You would agree with me then, that in terms of what the individual plaintiffs saw on their Instagram feeds, your testimony is not relevant to that because you just don't know, right?

A. I do not know what the plaintiffs saw on these platforms. That's -- that is an accurate statement. Certainly, I don't have a good understanding of all the materials that the plaintiffs claim to have seen.

I would, however, reject that particular characterization regarding to whether my testimony is relevant to that, since I'm speaking with regard to the way the content moderation system itself works.

And, therefore, any content that is served on these platforms, the Meta Platforms and any content that is instead moderated and not served by the Meta Platforms, for whatever the reason, sort of falls within the scope of content moderation system and my expert opinion on this -- on this subject.

Q. Okay. You agree with me -- and maybe you

HIGHLY CONFIDENTIAL

Page 148

don't understand this.

Do you understand that the school district's claims are not necessarily tied to the concept that their students are getting bad content?

A.   I think it's fair to say that I don't think I understand exactly what that means or what are the implications of that.

Q.   Okay.  One of the claims, for example, is that students are distracted by social media and, therefore, they can't pay attention to their studies.

Do you understand that?

A.   I understand that, if explained that way, yes.

Q.   Okay.  And you understand that high school teenagers or junior high school teenagers could be distracted by social media for many, many reasons that have nothing to do with violative content, right?

MS. BARNHART:  Object to the form.  Beyond the scope.

THE WITNESS:  Well, I assume that teenagers, or really anybody, can be distracted by many things.  So I'm not sure I understand exactly the nature of the question.

Page 149

BY MR. OLIVER:

Q.    The nature of the question -- let me try to do a better job.  I'm certainly not faulting you. Let me try to do a better job.

Social media platforms could, for example, feed a teenager a lot of information about ESPN sports statistics, correct?

A.    I assume that that would be the case, could be the case, yes.

Q.    Sure.

And if that teenager stayed up all night reading those sports statistics and was constantly distracted at school because they were tired, that phenomenon has nothing to do with content moderation, right?

MS. BARNHART:  Object to the form. Incomplete hypothetical.

THE WITNESS:  I think that the general -- the general level, I -- I can agree with you.  Of course, with the caveat that if one is talking about content that is policy violating or potentially policy violating, then that would affect content moderation systems and therefore fall within the broader scope of things that I am opining about.

I don't think personally that the ESPN or

HIGHLY CONFIDENTIAL

Page 150

sports would generally fall under, potentially, policy-violating content, but there might be exceptions to that, especially related to, perhaps, violence or graphical images, et cetera.

BY MR. OLIVER:

Q.   Dr. Ferrara, do you -- are you personally on social media platforms?

A.   Yes.

Q.   Which ones are you on?

A.   I believe I have accounts on a variety of different platforms including Meta Platforms, but not exclusively.  I -- off the top of my head, I cannot enumerate all the accounts that I have, because I have subscribed, over the course of the last, perhaps, 20 years or more, to different platforms.

The accounts or the platforms that I use these days are a very small number, and they have changed over time.

So to answer your question directly, I certainly have more accounts than I utilize that have been registered under my name, but perhaps are inactive or -- or simply unutilized.

Q.   Why don't you tell me which social media platforms you currently use?

Page 151

A.    I think the platforms that I use more frequently include Reddit and LinkedIn.  I also occasionally utilize Facebook.  I believe I have accounts for platforms such as Threads, Instagram, Bluesky, and perhaps some other platform.

I do not utilize those platforms almost at all, if not at all, or perhaps very, very rarely.

I don't believe I have any accounts or any active accounts on many other platforms, including some of the platforms that have been discussed in this litigation, such as Snapchat, I don't believe I have an account, and I don't utilize it.

I have a Google account, which means that I also automatically have a YouTube account, and I utilize Google products as well as YouTube as a -- as a service.

So I think that counts towards your question of what accounts I have.  Off the top of my head, I think that's a fairly comprehensive list of platforms that I currently use.

Q.    You referenced earlier that you are married or you have a partner?

A.    I am married, yes.

Q.    I note from my research that you have -- you have one daughter?

HIGHLY CONFIDENTIAL

Page 152

A.    I'm sorry, what?

Q.    You have a daughter or son?

A.    I do have one daughter and one son.

Q.    Okay.  You have one daughter and one son.

Your daughter is the older of the two; is that correct?

A.    Yes.  My daughter is the older.

I am going to point out that your audio is breaking up April.

Q.    How old is your daughter today?

A.    ▮▮▮▮▮▮▮▮▮▮▮

(Reporter clarification.)

THE WITNESS:    ▮▮▮▮

BY MR. OLIVER:

Q.    Okay.  How old is your son?

A.    Sorry, I was repeating myself for the court reporter.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Q.    And have you and your wife set any rules about the use of social media for your children?

A.    ▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL

Page 153

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓

A.   I don't think that particular discussion occurred.  So I guess, you know, we'll see when that particular issue manifests, if it manifests.  But I don't have a discussion in mind where we agreed upon or set any -- any specific rules about that.

Q.   What rule or limit would you set for your children with regard to social media▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓

MS. BARNHART:  Object to the form.  Calls for speculation, well beyond the scope.

THE WITNESS:  I think that in general, I believe that all technologies need to be utilized in moderation.  And social media as a tool, as a technology, is no -- no exception to that.

So I guess the closer analogy that I can think of today would be perhaps the use of television, for example.  And I think that perhaps good guidelines could come from thinking about the rules and the -- and the limits that we expect our children to -- to follow when it comes to, for example, their utilization of television today.

HIGHLY CONFIDENTIAL

Page 154

BY MR. OLIVER:

Q.   What are those rules today for television?

A.   I think they are relatively straightforward.  Too much of any technology is bad, and there are -- there are -- there are limitations that they -- that are also, depending on the type of content that somebody is consuming.  Of course, if a child is looking at entertainment, I don't know, Peppa Pig, for example, and other cartoons, probably it's a bad idea to -- to exceed hours and hours of these contents.

But if -- if my children are consuming, perhaps, educational content and they are learning, then perhaps it's okay to spend more time.

So I think it depends on -- on the child, it depends on the context, it depends on what they are consuming, it depends, of course, on the -- on the -- on all these factors together.

I think the simple rule is if we say that that's the last episode of whatever cartoon or if we say that's the -- after the end of this movie, we are stopping, the children understand that and they follow that.

Q.   I believe you may have alluded to this before, Dr. Ferrara, and I didn't ask you a question

HIGHLY CONFIDENTIAL

Page 155

about it, but I think you did tell me.  I just want to make it clear.

You agree that there is a difference between the content moderation infrastructure, which you are talking about, and the recommendation engine, which you are not opining about; is that true?

A.    Yes.  The two systems are distinct, although they are interlocked in many ways. However, yes, you are correct that I am speaking specifically of the content moderation system.  I understand there are other experts speaking about the recommendation systems.

Q.    So you will not be offering any opinions about the recommendation systems?

A.    I did not offer any opinions in my expert report on the recommendation system, and I will not offer opinions on matters that are exclusive of the recommendation system, yes, you are right.

Q.    Well, the -- the content moderation engines will sometimes remove content or prevent it from getting to users, correct?

A.    I think in general, it's fair to simplify this pipeline, this workflow by thinking that, oftentimes, the content moderation system will act

HIGHLY CONFIDENTIAL

Page 156

on an action content before this particular content reaches the algorithmic recommendation.

I don't know the details of what happens after that. I haven't revised technical documents about the way the algorithmic recommendation systems processes this content. That is not filtered by the content moderation system, so I cannot speak about what happens past that point.

But I agree with you that in general, it's fair to say that on most cases -- in most cases, the recommendation system will operate on content that has past the stage of content moderation systems, yes.

Q. And a recommendation engine is different because it surfaces or promotes content to users, correct?

MS. BARNHART: Object to the form. Beyond the scope.

THE WITNESS: Speaking out of my sort of general knowledge as a computer scientist, I can tell you that that specific definition that you provided is perhaps not exact. Certainly not comprehensive or entirely accurate either. I think that if you want to characterize the job that a recommendation system does, you would probably say

HIGHLY CONFIDENTIAL

Page 157

that the recommendation system helps ranking the content that is being served to users and providing content that is in line with the users' interests. And that, of course, it would account for the nature of the content.

And that's the way that I see content recommendation systems interacting with content moderation systems when it comes to the nature of the content.

BY MR. OLIVER:

Q.   Look at paragraph -- take a minute to pick up your report and look at paragraph -- we're going to go through a series of questions in your report, and I'm going to ...

A.   I have the report in front of me.

Q.   Okay.  Look at paragraph 16 with me.

MS. BARNHART:  16?  1, 6?

MR. OLIVER:  Yes.  1, 6.

THE WITNESS:  I have page 16 in front of me.

BY MR. OLIVER:

Q.   Paragraph 16.  Sorry.

A.   Oh.

Q.   So -- you got it?

A.   Yes.  I can see that.

HIGHLY CONFIDENTIAL

Page 333

CERTIFICATE OF REPORTER

I, Kathleen A. Maltbie, Certified Shorthand Reporter licensed in the State of California, License No. 10068, the State of Nevada, CCR 995, and the State of Texas, CSR 12212, hereby certify that deponent was by me first duly sworn, and the foregoing testimony was reported by me and was thereafter transcribed with computer-aided transcription; that the foregoing is a full, complete, and true record of proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

In witness whereof, I have hereunto set my hand this day:

_____ Reading and Signing was requested.

_____ Reading and Signing was waived.

\_\_\_x\_\_\_ R*Kathleen Maltbie*ed.

_____

_____

KATHLEEN A. MALTBIE

RPR-RMR-CRR-CCRR-CLR-CRC-RDR

California CSR 10068, Nevada CCR 995

Texas CSR 12212