# AMENDED Exhibit 413

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


------------------------------x
IN RE: SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL  )
INJURY PRODUCTS LIABILITY      ) Case No. 4:22:MD-
LITIGATION                     ) 03047-YGR
                               ) MDL No. 3047
------------------------------
                               )
THIS DOCUMENT RELATES TO:      )
                               )
ALL CASES                      )
                               )
------------------------------x




V O L U M E   I


VIDEOTAPED 30(b)(6) DEPOSITION OF THE TIKTOK AND

BYTEDANCE ENTITIES, by and through their

Designated Representative,

SAMANTHA KERSUL

OLYMPIA, WASHINGTON

WEDNESDAY, JULY 30, 2025

8:56 A.M.


Job No.: 7474532

Pages: 1 - 56

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

SAMANTHA KERSUL,

having first been duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. RYDER:

Q.    Good morning.  Can you please state your full name for the record, and spell your last name for the court reporter?

A.    Sure.  Samantha Diane Kersul, K-E-R-S-U-L.

Q.    Good morning, Ms. Kersul.  I know we spoke off the record briefly.  My name is Chris Ryder.  I'm counsel for plaintiffs.  I'll be taking your deposition today.  You've been sworn in by the court reporter, which means you are under oath.  Do you understand that?

A.    Yes.

Q.    And do you understand that you are obligated to tell the truth to the best of your ability?

A.    Yes.

Q.    Do you understand you're testifying just as though you were sitting in a courtroom before a judge or a jury?

A.    No.

Q.    Did you have any role in collecting documents produced as part of this litigation?

A.    No.

Q.    Did you request any materials from other TikTok employees that were not provided to you?

A.    No.

Q.    Did you request any materials from other TikTok employees?

A.    No.

Q.    So you prepared with TikTok's counsel, and spoke with Ms. Crimmins and Mr. Ebenstein, and also reviewed documents with TikTok's counsel.

Is there anything else you did to prepare for the deposition today?

A.    No.

MR. RYDER:  Let's pull up tab 36, and mark this as Exhibit 2.

(Exhibit No. 2 was marked for identification.)

BY MR. RYDER:

Q.    Ms. Kersul, do you recognize

this document?

        A.      I do.

        Q.      And what is it?

        A.      This is my resume.

        Q.      Okay.  And this is a copy of your redacted resume that has your address left off; is that correct?

        A.      Yes.

        Q.      Okay.  I'll represent to you that TikTok produced this as part of this litigation for your deposition today.  Do you have any reason to dispute that?

        A.      No.

        Q.      Okay.  How long have you worked at TikTok?

        A.      Since January 10th, 2022.

        Q.      Okay.  And what was your first role when you joined TikTok?

        A.      I was the state government affairs manager.

        Q.      And that is your current title as well; is that correct?

        A.      Yes.

        Q.      So your job title has not changed?

A.      No.

Q.      Have your job responsibilities changed --

A.      Yes.

Q.      -- since you joined TikTok?

A.      Yes.

Q.      And how so?

A.      Well, you know, it's evolved. So I -- now, my region looks differently as we've grown. So I oversee ten states instead of the whole country. I oversee the execution of our relationship with the national PTA. I, you know, take on various responsibilities for the team, including, you know, serving as the point person with the PMOs on the budget, and those sort of things.

Q.      Okay. And you mentioned that your region has grown. What is that referring to?

A.      Well, my -- our regions are the states that we oversee. And so when I was hired, I was the only state manager, so I had the whole country. And then as we've grown to a team of six, my region has shifted to focus more on the ten states closer to me.

Q.    Okay.  And what is the region, what states are covered -- well, strike that.

What is the region you now cover?

A.    So I cover the Northwest, Mountain West, Alaska, and Hawaii.

Q.    I don't want to quiz you, but what are the ten states covered in your region?

A.    No problem.  Alaska, Hawaii, Washington, Oregon, Idaho, Montana, North and South Dakota, Wyoming, and Colorado.

Q.    I'm not going to count to ten, but that was impressive.  If you were to tell somebody who didn't know what your main job responsibilities were at TikTok, what would you say?

A.    Executing our state government affairs strategy across the Pacific Northwest, Mountain West, Alaska, and Hawaii.

Q.    Okay.

A.    That's how I would sum it up.

Q.    And part of your job is lobbying, correct?

A.    Correct.

Q.      And what does that entail?

A.      I work with state government officials, agencies, to talk about who we are as a company, who we're not.  You know, work with them on policies that they are considering.  Those sorts of things.

Q.      And you are a registered lobbyist for TikTok; is that correct?

A.      I am.

Q.      How long have you been a registered lobbyist for TikTok?

A.      I've been a registered lobbyist in various states, depending on where I've been engaging, since I started in January of 2022.

Q.      And how many states are you a registered lobbyist for TikTok in?

A.      That's a challenging question, because I -- my region has shifted.  And so sometimes I might still turn up on a lobbying report, even if I'm not currently lobbying in that state.  So I'm not actually sure what the exact number is right now.

Q.      Do you know whether you're a registered lobbyist in more than ten states

for TikTok?

A.    I think I might be, yes.  I should be a registered lobbyist in my ten states, but also, you know, a handful of other states that I've since handed over.

Q.    And that would be the ten states you identified earlier in your region?

A.    Right.  And then, you know, some others that I more recently covered, but now go with another manager.

Q.    Okay.  And do you do any lobbying with the federal government as well?

A.    I don't.  We have a federal team for that.

Q.    So your role is confined as a lobbyist in the ten states in your region; is that correct?

A.    Yeah, that's where -- where I'm focused.

Q.    And what are some of the causes that you've lobbied on TikTok's behalf for?

A.    Sure.

MR. GREEN:  Object to the form.  You can answer.

THE WITNESS:  Yeah, I lobby on

a number of issues, including data privacy, teen online safety. I'm trying to think, there's so many. E-commerce is a new one. Various issues. Anything that really comes up that impacts the company, where a legislator may ask for our input or, you know, what we're already doing, so that they could understand the issue as they engage in writing the policy.

BY MR. RYDER:

Q.    And have you lobbied against legislation that would require companies like TikTok to verify the age of all of its users?

MR. GREEN:  Object to form. Beyond the scope of the deposition. But to the extent you can answer in your personal capacity, go ahead.

THE WITNESS:  I have not formally opposed any legislation. What was the specific bill, though, that you were referring to?

BY MR. RYDER:

Q.    Well, I'll show a document in a second, but you mentioned you've not formally

opposed any legislation.  What do you mean by formally opposed?

A.    Well, there's a difference between engaging on legislation that you might have concerns with -- you know, there's a lot of details in bills that sometimes get overlooked -- and then actually going and opposing legislation, and, you know, telling a legislator that we're going to testify against it.

Q.    Okay.  Have you personally testified against any legislation in your role at TikTok?

A.    No.

Q.    Have you helped prepare any others to testify against legislation in your job at TikTok?

A.    I have provided feedback to trade associations that share concerns with legislation.

Q.    And what trade associations have you provided feedback to?

A.    Trade associations we no longer belong to, but that would include NetChoice, and the State Privacy & Security Coalition.

MR. GREEN:  Thank you.  I'm looking at the document.  I just want to lodge an objection.  I don't see anything in this document within the scope of the context that the notice of deposition provides.  So I would object as outside the scope, and instruct Ms. Kersul to answer questions related to this document in her personal capacity, to the extent she can.

MR. RYDER:  I'll note for the record, I have yet to ask a question about the substance of the document.

MR. GREEN:  Okay.

MR, RYDER:  And we'll get to that.

BY MR. RYDER:

Q.    So, Ms. Kersul, you see a document in front of you titled U.S. TikTok March/April OKRs, correct?

A.    I do.

Q.    And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.      No.

Q.      Okay.  And TikTok produced this as part of Julia Yan's custodial file.  Do you have any reason to dispute that?

A.      No.

Q.      And the document is dated April 19th, 2019.  Do you have any reason to dispute that?

A.      No, I do not.

Q.      Okay.  And do you know who Julia Yan is?

A.      I don't know.

Q.      Have you heard that name before?

A.      It sounds familiar, but I can't recall.

Q.      If I represented she is the head of growth at TikTok, do you have any reason to dispute that?

MR. GREEN:  Object to the form.

THE WITNESS:  Quite -- quite possibly.  I -- I --

MR. RYDER:  I'll withdraw the question.

BY MR. RYDER:

Q.      It's fair to say, you don't --

you don't know her or her background, correct?

A.    No, I don't know her personally.  I don't know her title.

Q.    Okay.  And you did not speak with her in preparing for your deposition today, correct?

A.    No.

Q.    Okay.  And if you'll look at the second document I handed you, we will mark this as Exhibit 8.

(Exhibit No. 8 was marked for identification.)

BY MR. RYDER:

Q.    This should also have the title of U.S. TikTok March/April OKRs.  Do you see that?

A.    Mm-hmm, yes.

Q.    And then if you go to the last page, there is a declaration and certification of translation.  Do you see that?

A.    Yes.

Q.    Okay.  So I'll represent to you that both that translation page and the remainder of this document were produced to us as a certified English copy of the other

exhibit we were looking at.

A.      Mm-hmm.

Q.      Do you have any reason to dispute that, sitting here today?

A.      No.

Q.      Okay.

MR. RYDER:  I'll note, counsel, certainly my understanding is as long as we produced the metadata for the first sheet, that's how we've been handling it in other depositions.

MR. GREEN:  Then what?  You said as long as you produced the metadata, then --

MR. RYDER:  Actually, strike that.  I'll strike that.  I have no question.

MR. GREEN:  Since we're going -- for the record, I lodge the same objection to Exhibit 8, and questions related to it, as Exhibit 7.

MR. RYDER:  Sure.  And I'll note that's a standing objection over both documents, to the extent we're flip-flopping between the other one.

MR. RYDER:  Sorry, this is Exhibit 8.  This is the translated copy.

BY MR. RYDER:

Q.     Ms. Kersul, if you go to page 2, you should see a bold -- about halfway through the page, with a number 2.  Do you see that?

A.     I do.

Q.     Okay.  And the second OKR listed says, "Drive market growth through user, content and product diversification/ generalization:  Generalization of the population, content, and gameplay."

Did I read that correctly?

A.     Yes.  Yes.

Q.     Okay.  And underneath the note, the objective is to "Attract and retain users with proven high engagement to have a healthier age composition."  Do you see that?

A.     Yes.

Q.     And then there are some -- there's some points below that say, "KR."  Do you see that?

A.     Yes.

Q.     And KR is a key result, correct?

A.      Yes.

Q.      And KR 1 says, "Attract teen male users," correct?

A.      That's what that says, yes.

Q.      And if we go two lines beneath that, it notes, "Key population groups to introduce high school boys, game and emoticon enthusiasts."  Did I read that correctly?

A.      I'm sorry, this text is kind of difficult to read.  So I'm trying to --

Q.      Sure.  Yeah, if you go one line above KR 2, it starts with "Key population."

A.      I see it.  Yes.

Q.      And it says that "Key population groups to introduce."

A.      Yes.

Q.      Are -- and then it lists "High school boys, game and emoticon enthusiasts," correct?

A.      That's what that says.

Q.      So in 2019, a key result for TikTok to drive growth was to attract teen male users, correct?

MR. GREEN:  Consistent with the standing objection I've had, I do

MR. GREEN:  Same objection.

THE WITNESS:  For this quarter in 2019, that's what she drafted, right?  But that's the limit of my understanding.  And, you know, any other -- you know, her pursuing this is beyond anything I would know.

BY MR. RYDER:

Q.    And if we could actually go back to that same page we were just on, the second page.  If we go one line beneath KR 1, it starts with "Marketing Programs."  Do you see that?

A.    Yes.

Q.    So going back up, right, it notes that the key result number 1 is to attract teen male users, correct?

A.    I see that.

Q.    And if we go to the edge of that first line, it states, "Through marketing programs and UG/ALGO cold start tests."  Did I read that correctly?

A.    You read that correctly.

Q.    And these are the methods through which Ms. Yan was proposing TikTok attract teen

and we will mark this as exhibit -- I believe we're on 9.

(Exhibit No. 9 was marked for identification.)

BY MR. RYDER:

Q.    Ms. Kersul, you should have in front of you a document entitled U.S. Product Design UR.  Do you see that?

A.    I do.

Q.    And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    And this is a Lark chat, correct?

A.    It appears to be a Lark chat.

Q.    And I believe we discussed this last time, but Lark is a messenger application that TikTok employees -- TikTok employees use to communicate with each other at work, correct?

A.    More or less.  It's sort of more inclusive than that, but yes.

Q.    Okay.  Employees can also share documents --

A.    Yes.

Q.    -- over it at work as well,
right?

A.    Right, yes.

Q.    And for messages, it's kind of
similar to what other folks might use as Slack
or Teams, correct?

A.    Correct.

Q.    Okay.  And so the title, then, of
this Lark chat would be U.S. Product Design UR,
correct?

A.    Yes.

Q.    Okay.  And if we look at the
first message sent in the chat, it's dated
June 12th, 2019.  Do you see that?

A.    I do.

Q.    Okay.  And if we look at some of
the names listed, these would be the
participants in this Lark chat, correct?

A.    Correct.

Q.    So the first name we see is --
and I will apologize for some of my
pronunciations, is that a ▮▮▮▮▮▮▮▮▮   Do you
see that?

A.    Yes.

Q.    And then beneath, we see a second

message sent by Alex Zhu.  Do you see that?

A.   Yes.

Q.   And Alex Zhu use is the co-founder of Musical.ly, correct?

A.   I believe so, yes.

Q.   And he then later became president of TikTok, and TikTok's head of product, correct?

A.   To my understanding, yes.

Q.   Okay.  And have you ever met Mr. Zhu?

A.   No.

Q.   Okay.  You are familiar with his name?

A.   Yes.

Q.   Okay.  Have you ever met Mr. Zhang?

A.   No.

Q.   Okay.  Did you speak with either of them in preparing for your deposition today?

A.   No.

Q.   Have you -- well, strike that.

Did you review this document in preparing for your deposition today?

A.   No.

Q.    And I want to direct your attention to the bottom of page 2.  So this is the Bates ending 0623.

A.    Okay.

Q.    And do you see a message, it starts -- I was getting confused by myself.

Do you see there's just the name of the individual who sent the message at the very bottom, this is Alex Zhu, and this was sent on June 12th, at 2:02:49?  Do you see that at the very bottom?

A.    I do see that.

Q.    And then the actual substance of the message spills on to the next page.

A.    Yes.

Q.    Do you see that?

A.    Yep.  Yes.

Q.    And Mr. Zhu writes, "High schoolers - we know a high schooler is a core audience of our platform and their perceptions on the platform vary a lot (by gender, by grade, and by school).  Need to do more research."

Did I read that correctly?

A.    You read that correctly.

Q.      And that indicates he also would have participated in this chat or seen that message, correct?

MR. GREEN:  Object to the form.

THE WITNESS:  Sometimes people are tagged who aren't in groups, so I'm assuming so, but I don't -- I can't know for sure.

BY MR. RYDER:

Q.      You don't know for sure?

A.      I can't know that.

Q.      Okay.  I appreciate that.  We can set that exhibit aside.

MR. RYDER:  And let's pull up tab 5.  We'll mark this as Exhibit 10.

(Exhibit No. 10 was marked for identification.)

THE WITNESS:  Thank you.

BY MR. RYDER:

Q.      And, Ms. Kersul, you should have a document in front of you entitled High School Research.  Do you see that?

A.      I see that.

Q.      And the Bates ends in 02609790 on the first page.  Do you see that?

A.    Yes.

Q.    And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    The metadata TikTok produced says this document was created December 13th, 2019. Do you have any reason to dispute that?

A.    Nope, that's what it says.

Q.    Okay.  And did you review this document in preparing for your deposition today?

A.    I did not.

Q.    Okay.  And the custodian listed is Drew Kirchhoff.  Do you have any reason to dispute that?

A.    No.

Q.    We spoke about him a little bit earlier, do you recall that?

A.    I think so, yes.

Q.    And you were unaware of what his role at TikTok is?

A.    Yes.

Q.    Or was, correct?

A.    Correct.

MR. GREEN:  Object to the form.

THE WITNESS:  I would just need some more time with this to be able to answer that accurately.  I just don't know.

BY MR. RYDER:

Q.    Let's go to page 3 of the document.  This is the Bates that's going to be ending in 9792.

A.    Okay, I'm there.

Q.    And in the second paragraph, it states, "We would like to see if this cluster is really mainstream, and whether the popular kids in high school are actually using TikTok," correct?

A.    That's an -- that's accurate on the statement, yeah.

Q.    Okay.  And then it goes on to say, "We would like to better understand how mainstream TikTok is in high school, and whether or not all high schoolers are using TikTok or just specific niche groups."

Did I read that correctly?

A.    You read that correctly.

Q.    The final sentence says, "What's

provided by Mr. Ebenstein that addressed TikTok's relationship with the National PTA?

A.    I believe so.

Q.    Okay.  From the testimony you reviewed, do you have any reason to dispute or disagree with any -- any of Mr. Ebenstein's testimony about TikTok's relationship with the National PTA?

A.    No.

Q.    Okay.

MR. RYDER:  Let's pull up tab 11, and we'll mark this as Exhibit 12.

(Exhibit No. 12 was marked for identification.)

BY MR. RYDER:

Q.    Ms. Kersul, you should have in front of you a document titled TikTok Tips For Parents Handbook.  Distribution:  Local High School PTAs.

A.    I see that.

Q.    Is that correct?  Okay.  For the record, the Bates in the bottom right ends in 08377053.

Do you see that?

A.    Yes.

Q.    Okay.  And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    And the metadata TikTok produced says this document came from Eric Ebenstein's custodial file.  Do you have any reason to dispute that?

A.    No.

Q.    The metadata also says that the document was created July 20th, 2021.  Do you have any reason to dispute that?

A.    No.

Q.    And have you seen this document before?

A.    I actually have not seen this document.

Q.    Okay.  So you've not seen or reviewed this document in preparing for this deposition, correct?

A.    No.

Q.    Have you seen other documents relating to the TikTok Tips For Parents Handbook?

A.    Yes.

Q.     Okay.  And you're familiar with the TikTok Tips For Parents Handbook, correct?

A.     Yes, it's had a couple different names, but yes.

Q.     Okay.  And what -- what other names has that -- has the TikTok Tips For Parents Handbook gone by?

A.     I can't tell you exactly, but it's basically, you know, a guide for parents.  We've had a guide for educators, those sorts of things.  But, yes, same -- same context.

Q.     Okay.  And the contents of the documents are all --

A.     Yes.

Q.     -- similar, correct?

A.     Yes.

Q.     Okay.  Do you know what the current iteration of the Tips For Parents Handbook is called?

A.     I would -- I would have to go back to be a hundred percent sure, but it's easy to find.

Q.     Okay, that's fair.  It's not a memory competition, so that's okay.

A.    Sure.  And available online, and we bring them to conferences and things.

Q.    Okay.  Does TikTok distribute this guide directly or is it distributed through the National PTA?

A.    When we do -- so both.  A little bit of both.  And we're currently trying to work on how to more effectively do this, but printing is expensive.  But we go to certain events with the National PTA, where we spotlight a school, and we have a booth there, where we're talking about how to stay safe online.

And we provide copies of the Parents Guide.  And the PTA is there as well, the National PTA and the local PTA are both there.  So it's their event.  We just show up and provide resources.

Q.    Okay.  Are there any other channels through which TikTok distributes the TikTok For Parents Guide?

A.    Yes.  Well, I mean, I've brought them with me to different conferences.  We have them available.  Legislators often like these guides as well,

MR. RYDER:  And I want to jump in there on scope, and push back on --

MR. GREEN:  Can you repeat the question?

MR. RYDER:  Yeah.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be addictive?

A.    Not to my knowledge, no.

Q.    And when you say knowledge, are you speaking in your personal capacity or in your capacity as a corporate designee?

A.    I'm speaking as TikTok.

Q.    Okay.  And as part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be associated with compulsive use?

A.    No.

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may result in excessive use that could be harmful?

MR. GREEN:  Object to the form.

THE WITNESS:  No.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be harmful to the mental health of school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  Not -- not that I can recall.

BY MR. RYDER:

Q.    Okay.  And again, just for clarity of the record, you're speaking in your --

A.    I'm speaking as TikTok.

Q.    Okay.  Thank you.  As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be associated with an increased risk of depression in school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be

associated with an increased risk of anxiety in

school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No.

BY MR. RYDER:

Q.    As part of any outreach to

schools or school districts, has TikTok ever

communicated that using TikTok may be

associated with an increased risk of

suicidality in school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No, but I will --

I would like to say that, you know,

because these things we take so

seriously, you know, we do incorporate

digital wellness, and having a healthy

online experience that doesn't just

start or stop on our platform as part

of sort of that curriculum that we do

talk about with parents and educators.

BY MR. RYDER:

Q.    And, Ms. Kersul, I'll move to

strike that testimony as nonresponsive to my

question.  Certainly if you have additional

testimony you want to provide, you'll be able

to do so with your counsel on redirect.

MR. GREEN:  And I object to the objection or motion, whichever one it was.

MR. RYDER:  Objection and motion are noted.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be associated with an increased risk of self-harm in school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No, and we take that very seriously.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be associated with an increased risk of eating disorders in school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No.  And we also take that very seriously, and provide resources on our platform.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be associated with an increased risk of body dysmorphia in school-aged children?

A.    No.

MR. GREEN:  Object to the form.

You can answer --

THE WITNESS:  No.  No.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok may be harmful to the mental health of school-aged children?

MR. GREEN:  Object to the form.

THE WITNESS:  No.  And the reason I think it's important to say that these things are in our guides is because you had said, in our outreach to schools, but through the National PTA, we're distributing resources on how to address these very real and troubling issues.

And that is, you know, a

preventative measure that we're taking because these things that you're listing are all violative of our community guidelines, and something we take seriously to protect teens on TikTok, so --

BY MR. RYDER:

Q.     As part of any outreach to schools or school districts, has TikTok ever communicated that schools may be harmed by student TikTok use?

MR. GREEN:  Object to the form.

THE WITNESS:  No.

BY MR. RYDER:

Q.     As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok during school hours can lead to disruption in the classroom?

MR. GREEN:  Object to the form.

THE WITNESS:  No.

MR. GREEN:  And by the way, can I just for efficiency sake, can I have a standing objection to this line of questions?

MR. RYDER:  The standing

objection is noted.

MR. GREEN:  Thank you, sir.

BY MR. RYDER:

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok during school hours can distract students?

A.    No.

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that using TikTok during school hours can distract teachers?

A.    No.

Q.    As part of any outreach to schools or school districts, has TikTok ever communicated that students can receive TikTok notifications during school hours?

A.    Can you repeat that?

Q.    Happy to.

As part of any outreach to schools or school districts, has TikTok ever communicated that students can receive TikTok notifications during school hours?

A.    No.

Q.    As part of any outreach to

schools or school districts, has TikTok ever communicated that students can post on TikTok during school hours?

A.    Not to my knowledge, no.

Q.    And in preparing for your deposition today, did you review any documents bearing on your answers to my -- to those -- to this series of questions?

MR. GREEN:  Object to the form, the predicate of the question.

THE WITNESS:  I reviewed so many documents, I'm not sure if those were specific to any of the documents I reviewed in preparation.  I don't know.

BY MR. RYDER:

Q.    Do you know roughly how many documents you reviewed in preparing for your deposition?

A.    I -- I could not -- I cannot tell you.  I just don't know.

Q.    Did you review more than a hundred documents in preparing for your deposition?

A.    No, not more than a hundred.

to prepare to testify about this topic?

A.    I went over the -- you know, sort of the scope of the deposition to understand.  And again, I spoke with Eric Ebenstein, and I reviewed, you know, some documents of previous agreements.

Q.    Okay.  So TikTok had agreements with the National PTA, correct?

A.    Yes.

Q.    And in reviewing Mr. Ebenstein's deposition transcript, did you come across any testimony regarding TikTok's agreements with the National PTA?

A.    I -- I can't recall exactly what he said to me, and what I read.

Q.    Okay.  And what agreements does TikTok have with the National PTA?

A.    Well, we have an agreement that, you know, goes over the scope of our relationship with them, and the way that, you know, we execute that relationship.

Q.    Okay.  And what is the scope of TikTok's relationship with the National PTA?

A.    Well, right now, we -- we give what are called Create With Kindness grants.

So most of the money that we're giving is going directly to schools across the country, where those schools can put into place sort of what you had referred to earlier as a trust and safety night, or a digital wellness night.  So they can talk about online safety, and then use that money to put towards the event.

And then we also do sort of flagship or marquee events, is what we call them.  And those are spread throughout the school year.  And those are a little higher dollar events to execute, but that involves the National PTA also coming.  TikTok will show up.  And also, you know, just to be there to have a student panel, and all kinds of things, where, you know, we're really driving home the importance of digital online safety.

Q.    And you referenced higher dollar events.  What did you mean by that?

A.    Meaning the grants are for -- I believe right now, they're $3,500 -- 3,000 or $3,500.  And then the marquee events are closer to 15 to $20,000.

Q.    And is that money that TikTok is paying?

A.    We give this -- all this money, a hundred percent of this money is to the National PTA.  And the National PTA then allocates it, how they see fit.

Q.    Okay.  And how long has TikTok had a formal relationship with the National PTA?

A.    Our formal relationship began in 2019.

Q.    And it's still ongoing today, correct?

A.    It is.

Q.    Okay.  And does TikTok have annual agreements it signs with the National PTA about the work it does with them?

A.    Yes.

Q.    Okay.  Beyond any grant money, does TikTok pay the National PTA as part of its agreements with the National PTA?

A.    We don't have -- well, I think some of the money does go towards their, you know, operations to actually execute some of the events, because these marquee events are

hosted by the National PTA.

So, you know, how they allocate those dollars is a little bit up to them, as long as the event is executed, right?  But we're not paying them.  We're mostly -- we're paying for, you know, certain things in the contract to be executed.

Q.    Okay.  And do you recall seeing any testimony from Mr. Ebenstein on TikTok's payment of any funds to the National PTA?

A.    I don't recall.

Is there something specific that I can speak to?

Q.    Just to be clear, you don't -- sitting here today, you don't recall seeing any of Mr. Ebenstein's testimony touching on --

A.    How the money is being spent or how --

Q.    I'll strike the question.  I'll strike the question.

A.    Okay.  I'm not -- sorry, I'm not understanding the question.

Q.    No, that's okay.  I'll strike the question.  I'll withdraw it.

Did TikTok have any agreements

THE WITNESS:  Well, we do that with family pairing.  We allow a parent to set those parameters for their teens.  What we do as a platform, you know, is another story.  I'm not sure.  But we do already allow what you're suggesting.  We allow every parent to make that determination for their teen.

BY MR. RYDER:

Q.    Okay.  And that's an individual determination parents can make through family pairing, not a platform-wide decision made as a default setting, correct?

A.    That is correct.  And that's why we work with the National PTA, so that we can make sure parents are aware of these trust and safety features.

Q.    Okay.

A.    And digital wellness features.

Q.    And TikTok has never implemented any default setting that prevents kids from accessing TikTok during the school day, correct?

A.    Correct.

Q.      Okay.   So since 2018, TikTok has not implemented any default setting that prevents kids from accessing TikTok during school hours, correct?

MR. GREEN:   Same objection.

THE WITNESS:   That is correct. And that's -- you know, again, there's a lot of factors that I listed off earlier, that make it a feasibility issue.

MR. RYDER:   Let's pull up tab 14, and we'll mark this as Exhibit 13.

(Exhibit No. 13 was marked for identification.)

BY MR. RYDER:

Q.      And, Ms. Kersul, you should have in front of you a document entitled Options for Changes to Push Notifications for Younger Users.

Do you see that?

A.      I do.

Q.      And for the record, the Bates is ending in 06098751.  Do you see that in the bottom right corner on the first page?

A.      Yep.

Q.    Okay.  And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And the metadata TikTok produced says this document was created August 26th, 2020.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And then if you go to the last page of the document, this is going to be the Bates ending in 8756, there's a sign off on the very end, ███████████.  Do you see that?

A.    I do.

Q.    Okay.  And do you know who ███████ ██████ is?

A.    I don't.

Q.    Do you know whether or not they were a TikTok employee?

A.    I don't -- I'm not -- I'm assuming so, but I don't know.

Q.    Okay.  And have you seen this document before?

A.    I might have, but I'm having a hard time recalling right at this moment,

so --

Q.    Okay.  Do you know whether or not you would have seen this document in your ordinary work at TikTok or in preparing for this deposition?

A.    This was a couple of years before I started, so I -- I probably would have only seen it in the deposition prep.  We didn't have push notifications at night when I started, and I don't know of any changes that have been made since I started.

Q.    Okay.  And do you see the background section on the very first page of the exhibit?

A.    Yes.

Q.    Okay.  And it notes, "There is significant concern among policymakers, parents, and the media about the impact of screens on young people's wellbeing."  Did I read that correctly?

A.    Yes.

Q.    And TikTok was aware of these concerns, correct?

A.    They were aware that policymakers, yeah, had concerns.

Q.    Okay.  And it notes policymakers, parents, and the media, correct?

A.    Yes.  Parents and the media, okay.

Q.    Okay.  And at the end of the paragraph, it states that "One of our conclusions was that when assessing and addressing TikTok's potential wellbeing impacts, we should consider not just how long children are using TikTok for, but also when in the day they are doing so."

Did I read that correctly?

A.    Yes.

Q.    Okay.  And then if we go down two paragraphs, this is going to be a very short paragraph starting "in addition."  The document notes, "It seems intuitive that use of TikTok during the school day could risk influencing educational outcomes."  Did I read that correctly?

A.    Yes.

Q.    And what does risk influencing educational outcomes mean?

A.    I'm reading the same document as you.  I -- I'm -- I don't want to

hear you.

A.    I could probably find it.  I just -- yeah, I didn't speak with anybody about when that went into effect.

Q.    Okay.  And did you review any documents outlining policy changes to when push notifications are provided in preparing for your deposition today?

A.    I might have.  I would have to think about it.  But I mean, I can't recall specifically what documents I looked at regarding push notifications.

Q.    Okay.  And in looking at this document, TikTok is considering changing when notifications are sent, right?

A.    Right.

Q.    Okay.  And if we go to the bottom of page 2, you'll see we kind of have this weird spillover with headings.  And the substance, we see there is a heading that says, "Desired Outcomes."  Do you see that?

A.    Yep.

Q.    Okay.  And then if we go on to the next page, this is Bates ending in 8753, there's a series of desired outcomes listed.

Do you see that?  This is at the very top of the page.

A.    Yes.

Q.    Okay.  And the first desired outcome listed is to "Reduce risk to young users of TikTok use displacing sleep time and interfering with the school day."  Do you see that?

A.    Yes.

Q.    Okay.  The -- and is that still a desired outcome?  Strike that.

Is that still one of TikTok's desired outcomes?

A.    I would say, of course, having a healthy relationship with the platform is a desired outcome of ours for all users, including -- or especially under 18, so yes.

Q.    And the second desired outcome is to "Increase credibility of our efforts to position TikTok as an industry leader in minor protection."  Did I read that correctly?

A.    Yes.

Q.    And is that still one of TikTok's desired outcomes?

A.    Yes.

Q.    Okay.  So by not reducing the number of notifications during the day, TikTok could protect its daily average user count and retention metrics, correct?

MR. GREEN:  Object to the form, and the predicate behind it.

THE WITNESS:  That's what this says -- yes, that's what this document says.

BY MR. RYDER:

Q.    Okay.  And then there are also some cons listed below for the "do nothing" option, correct?

A.    Yes.

Q.    Okay.  And the first con is that "Sending young users notifications up until midnight risks negatively affecting their sleep and therefore their health and wellbeing."

Did I read that correctly?

A.    Yes.

Q.    And is that -- would that con still be true today?

A.    Yes, and our policies reflect that.

Q.    Okay.  And then the second con

listed is, "there is also a risk of interfering with their study at school."

Is that correct?

A.    That's what is listed in this document, yes.

Q.    Okay.  And then the third con listed says, "We may face pressure to adjust the status quo when the age appropriate design code comes into force in 2021.  Waiting until that point" -- pardon me.  Let me drink some water, and take that one again.

The third con listed states, "We may face pressure to adjust the status quo when the age appropriate design code comes into force in 2021.  Waiting until that point would put us in a reactive position and miss the opportunity for positive messaging around the change."  Did I read that correctly?

A.    You read that correctly, and a number of our provisions around ADC, we were, in fact, compliant before the law came out into effect, so --

Q.    And what was the age appropriate design code?

A.    It's basically a guiding --

well, this one was out of the EU set of principles, essentially, which companies needed to comply when they were developing new products and considering, you know, the benefits or the risks to younger users.

And so, you know, out of that came a lot of provisions, like family pairing. We were the first company to have family pairing, for example. But that -- it started in the EU, and now it's in the United States, or it's in the courts, but it's in the United States. But we're already doing it anyway.

Q.    Okay. And then the summary notes underneath of the "do nothing" approach is "Not recommended." It said it "Does not comply with the TikTok platform principle to put our users first"; is that correct?

A.    Yes.

Q.    And is that still a TikTok platform principle?

A.    Yes.

MR. GREEN: I'm not trying to interrupt you. Maybe when this document is done, when you get to a

answered that question.

BY MR. RYDER:

Q.      And what was your answer to that question?

A.      I -- we were developing and having these -- we were having these conversations, and would have to develop it, as we did with the push notifications at night.

Q.      So TikTok did have the ability to impose limits on push notifications sent to kids under 18 during the school day in 2020, correct?

A.      During -- we had the ability to impose limits for under 18 during specific hours.

Q.      Okay.  And I want to -- I want to go back to -- and this is page 8755 -- there's the second con listed that says "There is also a risk of interfering with their study at school."  Do you remember seeing that?

A.      Yes.

Q.      In 2020, did TikTok tell students or their parents that sending notifications during the school day may pose a risk of

interfering with study at school?

A.    No, not to my knowledge.

Q.    At any point since 2020, has TikTok told students or their parents that TikTok notifications may pose a risk of interfering with study at school?

A.    Not to my knowledge.

Q.    Okay.  At any point since 2020, has TikTok told teachers or school administrators that TikTok notifications may pose a risk of interfering with study at school?

A.    Not to my knowledge.

Q.    Has TikTok ever told the National PTA that TikTok notifications may pose a risk of interfering with study at school?

A.    Not to my knowledge.

Q.    And just to clarify on the "not to my knowledge" in those last couple of answers, is that --

A.    TikTok.

MR. RYDER:  Okay.  Thank you.  Let's take a break and go off the record.

THE VIDEOGRAPHER:  The time is now 12:37 p.m., and we are now off the

identification.)

THE WITNESS:  Thank you.

BY MR. RYDER:

Q.    And Ms. Kersul, I just handed you a document with the title "MS + PM push notification restrictions for teens."

Do you see that?

A.    I see that.

Q.    The Lark chat, for the record, in the bottom right ends in 07915057.

Do you see that?

A.    Yes.

Q.    Okay.  And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And if we look at the very first message in the chat sent by someone with a -- Mandarin characters, do you see that?

A.    I do.

Q.    Okay.  It's sent on January 12, 2023, correct?

A.    Yes.

Q.    We can see from this very first message that Christina Crimmins invited Jordan

Furlong, ██████████████████, ██████████ another name in Mandarin characters, and ████ ████████ to this chat, correct?

A.    Yes.

Q.    And I know we've spoken about Ms. Crimmins and Mr. Furlong.  Do you know who ████████████████████████ is?

A.    No.

Q.    Okay.  And are you familiar with the name ██████████?

A.    I'm not.

Q.    Okay.  And what about ████ ██████████

A.    Yes.

Q.    And what is his role at TikTok?

A.    Again, I don't know anybody's title apparently.  But he is somebody who has worked very closely with product on trust and safety.

Q.    Okay.  And do you know what the name is in Mandarin characters?

A.    I don't know that name, no.

Q.    Okay.  That makes two of us.

And have you seen this Lark chat before?

A.    It looks familiar.  Yes, I believe I have.  Yes.

Q.    Okay.  And did you see this document in preparing for your deposition today?

A.    Yes.

Q.    Okay.  And did you speak to any of the individuals listed in the first message you participated in this chat?

A.    Only Christina Crimmins.

Q.    Okay.  Did you speak to Ms. Crimmins about this particular Lark chat?

A.    I believe this was part of a larger conversation.

Q.    Okay.  And what was that conversation -- strike that.

Was that conversation about limits placed on notifications for users during the school day?

A.    Our conversation was really -- one moment.  I'm just reading here.

Yeah, around conversations that we had -- that the company has had and her team has had around placing push notifications on the platform during the

school day and -- as well as other digital wellness features.

Q.    Okay.

A.    Yeah.

Q.    Actually, I want to zoom back out just to the title briefly.  MS refers to minor safety, correct?

A.    That's my understanding.

Q.    Okay.  And then does PM refer to project manager or project management?

A.    I actually don't know.

Q.    Okay.  And if we look at the first substantive message, so after all these individuals are invited, we see a message on the first page from Christina Crimmins sent on January 12, 2023.

Do you see that?

A.    I do.

Q.    And in the second paragraph of her message, she states, "I think GR is interested in a broad swath disabling of all push notifications from approximately 9:00 a.m. to 3:00 p.m. for teens.  (Today's discussion mentioning a 5 percent drop in DAU.)"

Did I read that correctly?

A.    Yes.

Q.    And what does GR refer to?

A.    Government relations.

Q.    Okay.  So she's saying that TikTok's government relations team is interested in a broad swath disabling, correct?

A.    That is what she is saying, yeah.

Q.    Okay.  And, again, DAU refers to daily active users, correct?

A.    Yes.

Q.    Okay.  And she goes on to state that she's brainstorming a more nuanced approach that still grants us the, quote, TikTok has disabled push notifications to teens during the school day, end quote, headline, correct?

A.    Yes.

Q.    And was that something that was important to TikTok at that time?

MR. GREEN:  Object to the form.

THE WITNESS:  Well, I know that this is something -- this is a conversation that -- or cell phone use in general in schools has come up

across the country, and that is why GR had -- brought this up as an internal conversation. And so our conversation was an -- sort of an exploratory question on is that something that would make sense to do.

So when we talk about it being a priority for TikTok, you know, as things come up, we explore them and we talk about them and to see what the feasibility is. And that's what our, you know, approach to Christina's team was.

BY MR. RYDER:

Q.    Okay.

A.    Yeah.

Q.    And here she indicates that the government relations team is the one raising this issue or seeing if these -- if the broad swath disabling of notifications is possible, correct?

A.    Correct.

Q.    Okay. And this is then members of other teams discussing whether or not that's feasible or what the implications of those

limits would be, correct?

    A.    Correct.

    Q.    Okay.  And then she lists three approaches down beneath saying, "A first conceptual pass at a balanced approach."

    Do you see that?

    A.    Yes.

    Q.    Okay.  And the first item listed is to outright disable all limited reach push notifications during school hours, correct?

    A.    Yes.

    Q.    And what are the limited-reach push notifications?

    A.    I'm not exactly sure what we're considering.  We have different kinds of push notifications, though.  You know, we even have Amber Alerts on the platform which would be a push notification.  So I'm not sure which notifications are in that particular bucket, though.  I assume -- let me read the whole thing.

    Right.  I -- I'm not sure what we determine is limited reach, strong reach, or must reach.  But it would absolutely be associated with the severity or the

importance of the notification.  But I don't know how we define that.

Q.    Okay.

A.    It looks like we have definitions available in this link.

Q.    Okay.  And so you -- you didn't discuss with Ms. Crimmins what --

A.    I did not discuss that particular part of it, no, no.

Q.    -- these types of -- what reach notifications were, correct?

A.    Right.

Q.    Okay.  The second then notes to default strong-reach push notifications after school hours with option to opt in, correct?

A.    Right.

Q.    And then the third is to leave, quote, must-reach push notifications as is, correct?

A.    Correct.

Q.    Okay.  Then on the bottom of the second page, Ms. Crimmins writes -- do you see the very last page -- I'll read the last message she sends on the second page.  This is at -- it starts with "@▮▮▮▮▮▮"

A.    Yes.

Q.    She says, "Out of a discussion with Shou re: teen protections, we need to get more concrete with a proposal on an approach to restrict push notifications during school hours for teens, trying to slow down the commitments so we can get a true assessment of impact."

Did I read that correctly?

A.    Yes.

Q.    And Shou refers to TikTok's CEO, Chew Shou, correct?

A.    Correct.

Q.    So Ms. Crimmins is indicating that she had spoken with Mr. Shou regarding restricting push notifications during school, correct?

A.    Yes.

Q.    And TikTok was slowing down any commitment to restricting push notifications before it could get a, quote, true assessment of the impact, correct?

MR. GREEN:  Object to the form of the question.

THE WITNESS:  That's what this says.

Q.     -- 5063.  ███████  says, "Hi Jordan.  Glad I can help.  There is no other issue with this feature.  The only reason we didn't develop it is because of the priority."

Did I read that correctly?

A.     You did read that correctly.

Q.     And he's referring to the ability to limit push notifications during the school day, correct?

A.     Right.

MR. GREEN:  Object to the form.

BY MR. RYDER:

Q.     So TikTok had the technical capability to mute push notifications during school hours for kids at this point in time, correct?

A.     According to this.

Q.     And the reason he identifies -- strike that.

The reason TikTok did not limit or mute push notifications during school hours, as ███████ identifies, is that it was not a priority, correct?

MR. GREEN:  Object to the form of the question.

(Exhibit No. 18 was marked for identification.)

MR. RYDER:  This is another hardy document.

THE WITNESS:  Thanks.

MR. GREEN:  Is it 18?

MR. RYDER:  Correct.

BY MR. RYDER:

Q.    And Ms. Kersul, I just handed you a document bearing the Bates stamp ending 06477967; is that correct?

A.    Yes.

Q.    Okay.  And the document states, "Project M. Teen protection weekly syncs," correct?

A.    Yes.

Q.    Okay.  And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    And the metadata TikTok produced says this document came from the custodial file of both Christina Crimmins, Eric Ebenstein, and Jordan Furlong.

Do you have any reason to dispute

that?

A.    No.

Q.    The metadata also states the document was created March 29, 2023.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And then if we go to the front page, the face of the document itself references that it was updated on March 29th, correct?

A.    Yes.

Q.    Okay.  And have you seen this document before?

A.    It's kind of printed interestingly, so I'm -- I'm not sure if I have or not.

Q.    Okay.

A.    It's big.

Q.    It is.

And it's so big I'll direct your attention to Page 75.  This is Bates ending 8041.  I'll also have it pulled up on the screen if that's easier, but let me know --

A.    41?

Q.    8041, correct.

A.    8041.  Gotcha.  Okay.

Q.    And there's a -- a chart on this page.

Do you see that?

A.    Yes.

Q.    The top left entry states, "Push notifications disabled at disruptive times for teens."

Do you see that?

A.    Yes.

Q.    Okay.  On the far right -- strike that.

In the second entry to the right, it notes there was an impact analysis about disabling push notifications during school hours for minors.

Do you see that?

A.    I do.

Q.    And the results of that impact analysis were a loss of 0.03 percent to 0.05 percent DAU and no stay duration loss, correct?

A.    Yes.

Q.    And, again, DAU refers to daily active users, correct?

A.    Yes.

Q.    So this means that disabling push notifications for minors during the school day dropped TikTok's daily active user count by .03 percent to .05 percent, right?

MR. GREEN:  Object to the form.

THE WITNESS:  It appears to be true, according to this, yes.

BY MR. RYDER:

Q.    Okay.  And daily active user is one of the metrics TikTok was concerned about in limiting push notifications during the school day, correct?

MR. GREEN:  Object to the form.

THE WITNESS:  I wouldn't say we were concerned.  I think it's one of the factors that we looked at, in addition to efficacy and feasibility and other things.  But that's one -- one piece, you know, of data.  That's one data point.

BY MR. RYDER:

Q.    Okay.  And, ultimately, the chart says "not move forward," right?

A.    Right.

Q.    And so this means that TikTok did

not disable push notifications during school hours for minors, correct?

A.     That's what this says.  Yes.

Q.     And in part, TikTok did not disable push notifications based on the finding that it dropped its daily active user count to .0 -- from .03 to .05 percent, correct?

A.     I don't get that from this document at all.  This one little box here doesn't tell us why that decision wasn't made and why others were made.

But, no, it wasn't -- I'm -- in isolation, anything to do with duration time.

Q.     Well, there's not other factors listed describing why this feature was not moved forward, correct?

MR. GREEN:  Object to the form.

THE WITNESS:  Well, this is a hyperlink to an actual doc for the whole project.  So without knowing what that says, I wouldn't -- I wouldn't be able to give you more information.  But I know that, you know, based on how Lark docs work, that this would give us, you know --

there's a whole sheet of information that may or may not tell us more.  But this doesn't tell us enough to answer your question.

BY MR. RYDER:

Q.     And do you know whether you would have reviewed the hyperlink document in preparing for your deposition?

A.     No.  I'd have to see it.

Q.     It's not a document, to your knowledge, that you've seen today, correct?

MR. GREEN:  Object to the form.

THE WITNESS:  I would have to see it.  I don't recall.

BY MR. RYDER:

Q.     Let's set that exhibit aside.

Let's pull up tab 20 and mark this as Exhibit 19.

(Exhibit No. 19 was marked for identification.)

BY MR. RYDER:

Q.     Thank you.

And, Ms. Kersul, the document I just handed you should be bearing the Bates number on the bottom right, 00014343.

Do you see that?

A.    I do.

Q.    And this is a Lark chat, correct?

A.    It is.

Q.    And you can see on the first page that Jordan Furlong is a participant in this Lark chat, correct?

A.    Mm-hmm.  Yes.

Q.    And then we also see another name in Mandarin characters, correct?

A.    Yes.

Q.    And we see in Jordan's first message, he sends -- he says, "Hey, ██████"  correct?

A.    Yes.

Q.    Okay.  TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

A.    No.

Q.    And this was produced as part of Jordan Furlong's custodial file.  Do you have any reason to dispute that?

A.    No.

Q.    Okay.  And we can see in the very first page, that first message is dated

February 8, 2023, correct?

A.     Yes.

Q.     And then I want to direct your attention to page 4.  It's the Bates ending 4346.

And do you see a message that Jordan sends on November 13th, 2023?  It's kind of the longer block post.

A.     I do.

Q.     Okay.  And he states that TikTok has been under investigation in the United States for one and a half years; has recently been prompted to solve various problem areas related to the teen safety and wellbeing.  One of these specific areas of interest in screen time addiction.

Did I read that correctly?

A.     Yes.

Q.     Okay.  And then four bullet points below, so this is the second last to the bottom, Mr. Furlong notes, Defaulting on push notification schedule during school -- during common school times to prevent distraction, correct?

A.     Yes.  I'm reading that and --

oh, okay.  Yes.  I understand it now.  Yes.

Q.    Okay.  So at this point in time, TikTok employees considered including -- strike that.

At this point in time, TikTok employees, including Mr. Furlong, were still considering limiting push notifications sent during the school day, correct?

A.    It has been an ongoing conversation, yes.

Q.    And is it a conversation that's still ongoing at TikTok?

A.    Yes.

Q.    Okay.  And here Mr. Furlong identifies the reason to limit those notifications is to prevent distraction, correct?

A.    Yes.

Q.    Okay.  And is that still a basis TikTok considers in assessing whether to limit push notifications sent during the school day?

MR. GREEN:  Object to the form of the question.

THE WITNESS:  There are a number of reasons that it's an ongoing

discussion, mostly centered around, you know, what schools and school districts and individual communities are doing and asking for, and what the role of a technology company is in that conversation.

BY MR. RYDER:

Q.    What are some of the things that TikTok has heard from schools and school districts on limiting push notifications during the school day?

A.    Actually, most of the conversations with -- that we've heard from regulators and lawmakers and schools through our activations with the National PTA aren't so much around social media, but around cell phone use in general, which is why they've been turning -- you know, a lot of schools have implemented policies at, you know, the school district or the school level to mitigate use overall.  Most people I'm talking to and have spoken with, including lawmakers, are not targeting social media companies or think it's an individual app-by-app problem, but that it's more of an

issue with the use of the phone.

Q.    So to clarify, TikTok has heard from school districts, in part through the National PTA, that technology use, writ large, is a distraction for students during the school day, correct?

MR. GREEN:  Object to the form of the question.

THE WITNESS:  Not in part through the PTA.  Exclusively through the PTA.  All conversations that I've had with parents or teachers or schools is exclusively through the National PTA.  The National PTA has, in fact, not taken an official position on this particular issue because it's so community focused, which is part of why we can be so confident that we are doing, you know, a good job of -- through our family pairing and making it highly customizable so that families can make decisions that are right for them.

We believe that's a more holistic way of looking at this from

an app perspective.  And then, of course, if schools want to go further, then they should feel free to do so.

BY MR. RYDER:

Q.    Okay.  Let's go to the next page. This is the Bates ending in 143 -- sorry.  This is Bates ending 4347.  Jordan sends a longer message with a list of product ideas on the bottom of the page.

Do you see that?

A.    Yep.

Q.    And these are product ideas for limiting notifications during the school day, correct?

A.    Yes.

Q.    The first idea he lists is only send outside of school hours, 9:00 a.m. to 3:00 p.m., correct?

A.    Yes.

Q.    And there's a sub point under that that says, "Maybe give users a choice to receive during school hours or not.  Maybe a parent could control this via family pairing too," correct?

A.    Yes.

Q.      And in 2023, TikTok did not choose to only send notifications outside of school hours, correct?

A.      That is correct.

Q.      And TikTok has not made a choice to limit notifications outside of school hours to date, correct?

MR. GREEN:  Object to the form.

THE WITNESS:  We have implemented that through family pairing and through an individual's choice, so --

BY MR. RYDER:

Q.      But not as a matter of default setting, right?

A.      Correct.

Q.      Okay.  The second option Mr. Furlong lists is to batch push notifications at 5 p.m., in parentheses, correct?

A.      Yes.

Q.      And what does he mean by "batch push notifications"?

A.      Combining all push notifications into one -- one package deal,

one notification.

Q.    So users wouldn't receive notifications for a set period of time, and then would receive all of those push notifications in a batch, and, by his example, that would be at 5 p.m., correct?

A.    Right.  Right.

Q.    Okay.  And Mr. Furlong notes, in sub point C there, that this could be the most impactful, correct?

A.    The -- yes.  Yes.

Q.    And has TikTok chosen to implement -- well, strike that.

In 2023, did TikTok choose to implement batched push notifications?

A.    Not to my --

MR. GREEN:  Objection.

THE WITNESS:  Oh, I'm sorry.

MR. GREEN:  Object to the form of the question.

BY MR. RYDER:

Q.    Go ahead.

A.    Not to my knowledge.

Q.    And to date, has TikTok chosen to implement batched push notifications?

MR. GREEN:  Object to the form of the question.

THE WITNESS:  I would have to double check.  I -- I'm -- can't be sure.  I don't think we have, but we may have and I just don't know it.

BY MR. RYDER:

Q.    And did you review any policies regarding TikTok's -- well, strike that.

Did you review any policies touching on batched push notifications in preparing for your deposition today?

A.    I review our policies almost on a weekly basis for the rest of my job that don't have anything to do with this deposition, and I -- and I cannot remember, so --

Q.    Okay.

A.    -- I just don't know.

Q.    Okay.  The third option listed is to reduce the total number of push notifications sent, correct?

A.    Yes.

Q.    And then it notes in parentheses, current cap equals fifteen per day, promotional

six per day, correct?

A.    Yes.

Q.    And is that a cap that was in place at that time -- well, strike that.

Has -- in 2023, did TikTok put a cap on the total number of push notifications a user could receive?

A.    According to this, that is the cap as of this comment that they make.  I'm not sure when exactly that cap was put into place and if the cap has changed since.

Q.    Okay.  So sitting here to- -- as of today, does TikTok have a cap on the total number of push notifications sent to users?

A.    I believe we do.  I don't know what that cap is by the number, though.  But I believe we do have a cap.

Q.    And why did TikTok choose to put a cap on the total number of push notifications sent to users?

MR. GREEN:  Object to the form. It's outside the scope.

Go ahead and answer.

THE WITNESS:  I would be speculating, but I don't -- I don't

think it's a -- very popular to get lots of notifications.  People don't like it.  So I imagine we capped it to keep users happy.

BY MR. RYDER:

Q.    Okay.  And we can set that exhibit aside.

I think I just asked you when we were looking at that last document whether TikTok could have turned off push notifications for kids during school hours as a default setting in 2023.  Correct, that I asked the question?

A.    Yes.

Q.    Okay.  And you answered that TikTok had the technical ability to turn off push notifications for kids under 18 during 2023, correct?

MR. GREEN:  I object to the extent it misstates the testimony and it's been asked and answered.

Subject to that, you can answer again if you can.

THE WITNESS:  I -- I'm trying to think back to what I -- I said.

I -- I don't know how to answer that now.

BY MR. RYDER:

Q.    I'll ask you a follow-up question.

A.    Okay.

Q.    I'll withdraw the question.

A.    I'm sorry.

Q.    Sitting here today, could TikTok -- strike that.

Does TikTok currently have the technical ability to turn off push notifications for kids under 18 during school hours as a default setting?

MR. GREEN:  Same objection.

THE WITNESS:  TikTok has the ability to set hours -- set parameters around the hours for push notifications for under 18, yes.

BY MR. RYDER:

Q.    Okay.  And I want to pivot slightly.  I know we've been talking about things TikTok has considered or looked at in the past.  I want to briefly talk about any innovations TikTok is currently considering.

Is TikTok currently considering placing additional limits on push notifications sent to kids under 18 during school hours?

A.     The push notification conversation is ongoing among various teams.

Q.     And what changes are TikTok's various teams considering in further limiting push notifications sent to kids under 18 during school hours?

A.     I don't think I understand the question.

What changes are we considering around limiting push notifications other than just turn -- for -- during certain hours, just turning them off?  Are you -- I'm -- I'm --

Q.     So my question is more general.

A.     Okay.

Q.     I'd like to know -- I'd like the jury to know what innovations or updates TikTok is currently considering regarding push notifications sent to kids during the school day.  So my -- my -- I'll phrase that as a question.

What innovations or updates, if

any, is TikTok currently considering regarding push notifications sent to kids during the school day?

A.      Okay.  Yeah, I'm sorry.  I thought I had answered that because, you know, it's an ongoing conversation where we look at things like feasibility, the efficacy, our -- you know, who is asking for this, are those needs not being met by our current -- current, you know, standards with -- or family -- family pairing.

There's just a number of safety features that we already have in place.  And part of the reason we're partnering with the National PTA is to make sure that families understand all the tools that are already available to them, and the individual users understand that too.  So I don't know exactly what specific innovations around push notifications you're asking for, changes you're asking about.  But I do know it's an ongoing conversation and that we're continuously looking at this wholistically. And right now we have very robust trust and safety features in place.

A.       Correct.

Q.       Let's pull up tab 22 and mark this as Exhibit 25 -- 26.

(Exhibit No. 26 was marked for identification.)

BY MR. RYDER:

Q.       And the document in front of you should bear the Bates number on the bottom ending in 00381606.

Do you see that?

A.       Yes.

Q.       The title of the document is "Summary of Findings - TTN 30-Day Post-Launch Feature Investigation."

Do you see that?

A.       Yes.

Q.       And do you know what TTN refers to?

A.       TikTok Now.

Q.       And can you tell the jury what TikTok Now is.

A.       Well, it isn't anything anymore.  It was short-lived.  It was launched on TikTok as sort of a competitor product to "BeReal," where a user would be

prompted to take a picture of whatever they were doing in that moment for a period of time, I believe it was an hour, and then it would go away.  But it didn't last, I think, even a year.  Maybe it lasted a year.  So it's no longer a thing.

Q.    And TikTok produced this document as part of this litigation.  Do you have any reason to dispute that?

MR. GREEN:  Object to the form.

THE WITNESS:  I don't have any reason to dispute that.

BY MR. RYDER:

Q.    Okay.  And the custodians listed in the metadata TikTok produced are Reagan Maher and ███████████  correct?

A.    Yes.

Q.    And the date produced in the metadata is August 4th, 2022, correct?

A.    Yes.

Q.    And then if we go to the first page of the document itself, it notes that it was updated on November 3rd, 2022, by Reagan Maher, correct?

A.    Yes.

Q.    Okay.  And have you seen this document before?

A.    I believe I have.

Q.    Okay.  And have you seen or reviewed this document in preparing for your deposition today?

A.    Yes.

Q.    Okay.  And I'll direct your attention to finding number 3, which is on page 3, which is ending in the Bates 1608.

Do you see that?

A.    Yes.

Q.    And point 3 in bold states that, parentheses -- in brackets, it says, "TikTok Now posting patterns."

Do you see that?

A.    Yeah.

Q.    Next to it, it says, "TikTok Now, L1/L2 users were posting during school hours particularly in time zones on the West Coast and in Hawaii," correct?

A.    Yes.  There it is.  Yes.

Q.    And so for this document, TikTok was able to see when students were posting on TikTok Now, correct?

A.       Yes.

Q.       And concluded that L1 and L2 users were posting during school hours, correct?

A.       Yes.  And you've just pointed out one of the reasons that TikTok Now is no longer a thing.  And -- it's very difficult when you have six time zones in the country to have a -- you know, everything geared towards a one-hour time block in a day.  It just wasn't practical.  So -- yes.

Q.       And it notes that --

A.       Because it would be dinner for the East Coast, and it would be middle of the school day maybe for someone in Hawaii.

Q.       And to your point, TikTok also can see that users were posting during school hours in specific time zones, and it lists West Coast and Hawaii, correct?

A.       Sure.  That's not a precise geolocation, right.  We collect geolocation by IP address or, you know, proximity to, like, a city.  But -- so we would know if somebody was on the West Coast or Central Time Zone or -- or Mountain or whatever.  My

point is is that when you have something like this that doesn't exist anymore, what time zone might work or make sense for the East Coast just can't make sense for Alaska or Hawaii or even -- or even the West Coast.

Q.    And how is TikTok able to know when students were posting during school hours?

A.    Well, I don't know how they collected data on Tik- -- for the TikTok Now portion of the platform versus, you know, what they do now.  But I'm assuming they were tracking metrics and just seeing the volume that was coming in.  I -- but I don't know how that was categorized.

Q.    Okay.  And TikTok is also able to determine what time zone a user is in, correct?

A.    Yes.  So we collect -- in the United States, we collect your -- we know your IP address, so, you know -- my app knows I'm in Olympia, Washington, but it couldn't send a car to pick me up.  That's all I mean is, you know, if you've got two neighboring school districts, for example, they -- they wouldn't know necessarily which school I'm at.

Q.    Okay.  Let's go to the next page. There's a numbered paragraph number 2.

Do you see that?

A.    Yes, I see it.  I see it.

Q.    And it states that, "Although the peak posting time generally falls outside local school hours, we still observed significant posting from L1/L2 users during school hours (defined as 8:00 a.m. to 2:00 p.m.)," correct?

A.    That's what that says.

Q.    So, again, TikTok is able to see when users are posting within that time frame, correct?

A.    Yes.

Q.    Okay.  The -- and here school hours is defined as 8:00 a.m. to 2:00 p.m., correct?

A.    Right.  So we've been seeing 9:00 to 3:00, and now we see 8:00 to 2:00, yes.  Yes.

Q.    And so to the extent that TikTok is able to identify a time window, it can see when users are posting within that window?

A.    It appears we -- we can tell, yes.  But, as I said -- you know, okay, so we

can tell your age, you know, category, and we can tell what time you're posting.  But getting very hyper- localized is the challenge.

Q.    Sure.  Is it -- TikTok has to paint with a broad brush when it's trying to determine school hours and whether a user may be posting during those school hours, correct?

A.    Right.  And where they're posting from, right.  So if they're home sick, it's winter break, you know, maybe they're on vacation with their family instead of at school, I don't -- I don't know the number of reasons that someone wouldn't be at school during, you know, 9:00 to 3:00 or 10:00 to 2:00.

Q.    Okay.  And then it goes on to say, "Specifically, we identified more than 190,000 TikTok Now posts" --

A.    Uh-huh.

Q.    -- "about 14 percent of the population by L1 and L2 users on weekdays in California and Texas," correct?

A.    That's what that says, yes.

Q.    And if we think back to some of

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  August 21, 2025.

<%14542,Signature%>

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)