# AMENDED Exhibit 444

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT Case No.

ADDICTION/PERSONAL INJURY      4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION  MDL No. 3047

----------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

-------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550) Coordination Proceeding

SOCIAL MEDIA CASES         No. 5255

-------------------------

This Document Relates to:

ALL ACTIONS

------------------------- VOLUME I

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEO-RECORDED DEPOSITION OF ERIC EBENSTEIN

Tuesday, March 11, 2025

10:08 AM EST

Reported by:  Denise Dobner Vickery, CRR, RMR

JOB NO.: 7101211

CONFIDENTIAL

Page 19

Exhibit 1.)

DOCUMENT TECH:  Exhibit 1.

BY MS. YEATES:

Q.    Can you see that, Mr. Ebenstein?

A.    Not really.  It's -- that's a little bit better.  Thank you.

Q.    I'll represent to you that I downloaded this from your LinkedIn page.

Can you confirm that this is your LinkedIn profile?

A.    That looks right, yes.

Q.    Okay.  And at the bottom of your profile, it states that you attended Cardozo School of Law and obtained a JD; is that correct?

A.    Yes.

Q.    Have you ever practiced law?

A.    No.

Q.    If you look at the top of your profile, you're currently employed by TikTok; is that right?

A.    Yes.

Q.    And you began working at TikTok six years ago in February 2019; is that correct?

A.    Yes.

CONFIDENTIAL

Page 20

Q.      And the first person -- excuse me.

The first position that you held at TikTok was director of public policy; is that right?

A.      Yes.

Q.      And who did you report to in that position?

A.      ███████.

Q.      In September 2022, you became the senior director of public policy; is that correct?

A.      I can't remember the exact date, but that that sounds accurate, yes.

Q.      Was that a promotion?

A.      Yes.

Q.      Is that your current position at TikTok, senior director of public policy?

A.      Yes, it is.

Q.      Who do you report to in this position?

A.      Michael Beckerman.

Q.      And what is his title?

A.      Vice president public policy, I think, of the Americas maybe.

Q.      And who does Mr. Beckerman report

CONFIDENTIAL

Page 21

to?

A.      Shou Chew.

Q.      And what is his title?

A.      CEO TikTok.

Q.      If you look towards the bottom of your LinkedIn profile, there's a section titled Volunteering.

Do you see that?

A.      I do.

Q.      Shows that you're a member of the board of directors of the Family Online Safety Institute; is that correct?

A.      Yes.

Q.      And you had been a member of the board of directors of that institute since September 2021; is that right?

A.      Yes.

Q.      Is the Family Online Safety Institute also referred to as FOSI?

A.      Or FOSI, yes.

Q.      And TikTok is a sponsor of FOSI; correct?

A.      Yes.

Q.      And it pays an annual fee to FOSI in order to be a sponsor; is that right?

CONFIDENTIAL

Page 22

A.        Yes.

Q.        And how much is that fee?

A.        To the best of my memory, the annual sponsorship is around $40,000.

Q.        Does TikTok provide additional funding to FOSI other than the annual $40,000 contribution?

A.        Over the years at different times, we've sponsored either special projects or events for additional money, yes.

Q.        Since when has TikTok been a sponsor of FOSI?

A.        I don't remember exactly the date. My guess is the time sounds like some late 2019, maybe early 2020.  I can't recall exactly.

Q.        And during that time period, what's the highest contribution that TikTok has provided to FOSI in one year?

A.        I don't recall.

                MS. YEATES:  Can we pull up tab 131 and mark it as Exhibit 2, please.

                (Document marked for identification as TikTok-Ebenstein Exhibit 2.)

                DOCUMENT TECH:  Exhibit 2.

CONFIDENTIAL

Page 23

MS. YEATES:  Yes.  Thank you.

BY MS. YEATES:

Q.     Mr. Ebenstein, do you recognize this document?

A.     Yes.

Q.     Okay.  And it was produced from your custodial file.

Do you understand that?

A.     Yes, I do.

Q.     The metadata shows that this document is dated March 22, 2023.

Does that sound right?

A.     Yes.

Q.     Okay.  And the title is EE Cross Panel Review; correct?

A.     Yes.

Q.     And what is EE Cross Panel Review?

A.     EE are my initials.  I think I titled this myself.  A cross panel review is what's required at TikTok to be considered for a promotion at higher levels.

Q.     You drafted this document?

A.     Yes.

Q.     If you look at the section titled Background, it starts with:

Page 24

"I've been a proud TikTok employee for over four years, making me one of the most tenured employees in the United States."

Right?

A.    Correct.

Q.    Okay.  And then it goes on to say:

"I established, located and staffed the initial DC office and started all of our policy and political outreach."

Correct?

A.    Yes.

Q.    Okay.  And then at the bottom of that section you write:

"My external title has been elevated from Director of Public Policy to Senior Director of Public Policy to reflect my senior role for external facing audiences."

Right?

A.    Yes.

Q.    And the next section is titled Vision for the Region.

Do you see that?

A.    Yes.

Q.    Can you read the first four sentences of that section into the record,

please?

A.       Sure.

"I lead the State and Local Government Relations team inside of U.S. Public Policy.  I currently have two direct reports with two more being hired.  I am responsible for all policy and lobbying work across the 50 U.S. States and local jurisdictions.  Additionally, I am the lead lobbyist in states and am responsible for hiring external teams of lobbyists in 19 states, such as New York, California, Texas, Florida and more to protect our interests there."

Q.       And the next sentence, please?

A.       Sure.

"These lobbyists help us to strategically identify, rank order and engage on the thousands of state bills that are introduced every state legislative session."

Q.       And it's describing part of your role at TikTok and your vision for the region; right?

A.       Yes.

Q.       Okay.  Let's turn to page 8 at Bates 713442.

Page 26

The bottom of this page, there's a section titled Strategize with Senior Leadership on Policy Issues that Influence the Organization.

Do you see that?

A.    Yes.

Q.    And can you read the first bullet?

A.    Yes.

"I began this workstream by helping to prepare Michael Beckerman for his Senate testimony.  I was chosen for this role owing to my experience meeting with members of Congress and their staff, and my deep institutional knowledge of the company.

Q.    And the second bullet.

A.    It's cut off here, but the part I can see.

"Because of my value in this role, Michael chose me to be a key member of additional executive team member prep sessions. I was on a handful of staff to be in a small group.

Q.    Can we go to the next page.

A.    "Setting to prepare V for the Senate hearing in multiple final weeks of

Page 27

'murderboard' sessions."

Q.      Who is V?

A.      Former TikTok chief operating officer.

Q.      And what is his full name?

A.      They/them goes by V last name Pappas.

Q.      And what is a murderboard?

A.      A prep session.

Q.      Murderboard refers to prep sessions to prepare for testimony before Congress; is that right?

A.      In this case Congress.  It can be other -- other venues or types of preparation.

Q.      Can you read the fourth and fifth bullets, please.

A.      Are those the one where you're curser is?

Q.      Yes.

A.      Oh, those two.  Sure.

"I was next tasked with preparing Shou for his DC NGO meetings, where he briefed our external partners on Project T and began meeting with DC policy press.

"All of the above led to my most

Page 28

recent assignment, joining the Shou 'murderboard' sessions for his House hearing.  I played the role of both Democrat and Republican Congressmen, asking difficult questions in a hostile manner to prepare him for his testimony."

Q.      And Shou is referring to TikTok's CEO Shou Chew; correct?

A.      Yes.

Q.      Which House hearing were you preparing for Mr. Chew for this at this time?

A.      The House Energy and Commerce Committee hearing.

Q.      And what was he testifying about?

A.      They asked him a wide range of questions pertaining to the company and his role as CEO.

Q.      And part of your role at TikTok was to interface and prep high-level executives for testimony, including Congressional testimony; correct?

A.      As assigned, it was a relatively small portion of my responsibility, but when asked to participate, I did.

Q.      Who did you provide this EE Cross

THE WITNESS:   I can't see that on where that is on my set of documents.  I'd be happy to look at it if I can find it.

MS. YEATES:  Can we go back to that, please?

DOCUMENT TECH:  Do you have the time stamp by any chance?

MS. YEATES:  20:11.

BY MS. YEATES:

Q.    And in this message, ██████████ wrote to you:

"Had a great call with FOSI. They're aligned with us using them as third party spokespeople and will do what we want re a press release."

And you sent her thumbs up in response; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   I see that, yes.

BY MS. YEATES:

Q.    Can we please go to the message Bates ending 4722, on September 24, 2019 with a 19:21 time stamp.

CONFIDENTIAL

Page 51

Can you read what you wrote to ▮▮▮▮▮▮▮ there?

A.      Yes.

"Talked to the PTA people again. They need a few months to plan good events, and Safer Internet Day is kind of the huge bellwether in the beginning of next year.  That makes sense.  If we want, they'd deassociate some of the regional how-to TikTok events and have them be spaced out later in the year, but they argue against it."

Q.      And then you sent another message right after that.

Can you read that message as well?

A.      Sure.  One second.  Let me just move you on mine.

"They'll also do whatever we want going forward in the fall after we're all signed off.  They'll announce things publicly.  Their CEO will do press statements for us.  They'll co-brand Connect Safely's 'How to TikTok Guide.' If we want them involved with a GLAAD project, they'll do that."

Q.      Okay.  National PTA; correct?

A.      Sorry.  You broke up a little bit.

CONFIDENTIAL

Page 52

Can you repeat?

Q.      The "they" in this message is National PTA; correct?

A.      I believe so, yes.

MS. YEATES:  Can we pull up tab 1, please.  Can you please mark this as Exhibit 5.

(Document marked for identification as TikTok-Ebenstein Exhibit 5.)

DOCUMENT TECH:  Exhibit 5. Sounds good.

BY MS. YEATES:

Q.      Do you recognize this document, Mr. Ebenstein?

A.      I don't recall this document, no.

Q.      You understand it was produced by TikTok from your custodial files?

A.      I do, yes.

Q.      And you see that this is an e-mail between you and ██████████ at National PTA; correct?

A.      Yes.

Q.      And what is her position with National PTA?

CONFIDENTIAL

Page 55

agreement.  I don't recall if I was the signature party or if somebody else at the company did, but the agreement looks right.

MS. YEATES:  Can you please pull up tab 3.1.  Mark this as Exhibit 7.

(Document marked for identification as TikTok-Ebenstein Exhibit 7.)

DOCUMENT TECH:  Ebenstein 7.

BY MS. YEATES:

Q.    And, Mr. Ebenstein, at the bottom, this document states sponsorship agreement National PTA and ByteDance.

Do you see that?

A.    I do.

Q.    And do you recognize this as the signature page for the sponsorship agreement in 2019?

A.    I do, yes.

Q.    And you executed this 2019 sponsorship agreement between ByteDance and National PTA; correct?

A.    Yes, correct.

Q.    And you executed it on October 15, 2019; right?

CONFIDENTIAL

Page 56

A.      That's the date I see there, yes.

Q.      Okay.  Let's go back to the agreement, please.

ByteDance is the parent company of TikTok; is that right?

A.      It's one of the entities. ByteDance, Inc. I think was -- is the parent company.

Q.      And did you see that ▮▮▮▮▮▮ executed the agreement on behalf of the National PTA?

A.      I did see that.

Q.      Go down to Section 3. Payment.

It says "ByteDance agrees to pay a total of $175,000 to National PTA"; correct?

A.      Yes.

Q.      And that was the contribution that ByteDance provided National PTA in 2019; right?

A.      Yes.

Q.      Were additional funds provided to National PTA in 2019?

A.      I don't recall.

Q.      Can you pull up Schedule A at Bates 78239.

And this Schedule A is titled

CONFIDENTIAL

Page 57

Programmatic Scope of Work (October 2019 through September 2020); correct?

A.      Yes.

Q.      And the second bullet under Fall.

"National PTA will provide grants to the field made possible by ByteDance."

Correct?

A.      Yes.

Q.      And right above that in bullet 1, the scope of work includes:

"National PTA and ByteDance will have a planning meeting with a focus on developing a work plan to meet the obligations of the agreement, to include: discussion of creating, reviewing, and/or co-branding TikTok educational resources; grant process; and a state PTA Reflections pilot."

Correct?

A.      Yes.

Q.      Will you look at Late Fall/Winter.

"National PTA and ByteDance will collaborate to produce and provide resources to grantees on how to be a TikTok content creator for PTAs who opt-in to Safer Internet Day experiences."

CONFIDENTIAL

Page 58

Correct?

A.    Yes.

Q.    Let's take a look at Schedule B at Bates 78241, and schedule B is titled Promotional Scope of Work (October 2019 through September 2020); right?

A.    Yes.

Q.    Under General at Section 1.1.

"Throughout the Term, PTA will feature ByteDance on the 'sponsors and partners' acknowledgement web page within the PTA website and link back to ByteDance's designated web page."

Right?

A.    Yes.

Q.    Go down to Section 2. PTA Connected, please.

The last sentence of Section 2.2 states:

"No mention may be made of the total financial investment ByteDance is making to support this program."

Correct?

A.    Yes, that's what it says.

MS. YEATES:   Go to tab 5,

Page 59

please.  Display it, please.

DOCUMENT TECH:  Ebenstein 8.

(Document marked for identification as TikTok-Ebenstein Exhibit 8.)

BY MS. YEATES:

Q.      Mr. Ebenstein, do you recognize this document?

A.      I need a second to take a look at it, please.

Q.      Sure.

A.      (Reviews document.)

I don't recognize it, no.

Q.      You understand it was produced from your custodial file at TikTok; correct?

A.      Yes.

Q.      If we look at the top, this is an e-mail from an ███████████ at TikTok to ██████ ███████ at National PTA, cc'ing you and some others at PTA and TikTok; correct?

A.      Yes.

Q.      Will you please go to the last page of the document, which is the first e-mail in the chain.

Yes, it starts at the bottom

CONFIDENTIAL

Page 60

there.  Thank you.

And this e-mail was written by ████████████ at National PTA on April 13, 2020; correct?

A.    That's what it says there, yes.

Q.    ████████████ says:

"Happy Monday!  I feel like this is going to be a huge week for PTA and TikTok."

Right?

A.    Yes.

Q.    And then she provides a working list with bullets.

Do you see that?

A.    I do.

Q.    And the first bullet says:

"Is it still the plan to put up the newsroom post tomorrow (Tuesday) on TikTok announcing the COVID-19 relief commitments to National PTA, both the $2 million direct to PTA and the matching donation?"

Is that right?

A.    It says that, yes.

Q.    And this indicates that TikTok provided $2 million directly to National PTA in 2020; is that correct?

CONFIDENTIAL

Page 61

A.    Yeah.  During COVID, TikTok gave a number of contributions unrestricted to different partners.  I was thrilled that PTA was a recipient of $2 million of those funds.

MS. YEATES:  Can we go to tab 13, please.

DOCUMENT TECH:  Ebenstein 9.

(Document marked for identification as TikTok-Ebenstein Exhibit 9.)

MS. YEATES:  Thank you.

BY MS. YEATES:

Q.    Mr. Ebenstein, do you recognize this document?

A.    I don't, no.

Q.    You understand it was produced by TikTok from your custodial file?

A.    Yes, I do.

Q.    And if you look at the top, this is a June 10, 2020 e-mail from ███████████ at National PTA to you; correct?

A.    Yes, it is.

Q.    I'd like to go to the last page, which is the first e-mail in the chain.

This e-mail is from ████████████

CONFIDENTIAL

Page 62

at Narrative DC to ███████████ at National PTA and others at PTA; correct?

A.    That's what it says, yes.

Q.    And it's dated June 10, 2020; correct?

A.    Yes.

Q.    Who is ██████████?

A.    He is a staffer at a firm called Narrative.

Q.    And is Narrative a communications firm that is hired by TikTok?

A.    I don't know how to describe them, but we have a relationship with them, yes.

Q.    Is it a PR firm?

A.    Again, I'm not sure how I would describe them.  I'm not -- I'm not in PR.  I don't know how that -- if that's how they describe themselves as.  I'm not sure.

Q.    Does TikTok have -- strike that.
      In 2020, did TikTok have a contract with Narrative?

A.    I don't recall.  I wasn't the key person in the relationship.  So I'm not sure the timing or specifics.

Q.    Are you aware whether at some

CONFIDENTIAL

Page 63

point TikTok had a contract with Narrative?

A.      At some point we did, yes.

Q.      And ███████ writes to ████
██████ at National PTA:

"Thank you again for your help in promoting the IL PTA editorial last month examining the value of TikTok's family pairing feature and the app's over-rearching 'trust and safety' priorities."

Right?

A.      It says that, yes.

MR. DRAKE:  Objection.  I think it was misread but...

MS. YEATES:  Strike that. I'll do it again.  Thank you.

MR. DRAKE:  Yeah.

BY MS. YEATES:

Q.      On June 10, 2020 ███████████ at National PTA and stated:

"Thank you again for your help in promoting the IL PTA editorial last month examining the value of TikTok's family pairing feature and the app's overarching 'trust and safety' priorities."

Correct?

CONFIDENTIAL

Page 64

A.        It says that, yes.

Q.        Okay.  And then ▇▇▇▇▇▇ continued:

"Michael Beckerman over at TikTok found that to be of enormous value and has encouraged my team to work on duplicating that effort in some additional states."

Right?

A.        It says that, yes.

Q.        Go to THE e-mail above where ▇▇▇▇▇▇▇▇▇ responds to ▇▇▇▇▇▇

On June 10, 2020, ▇▇▇▇▇▇▇▇ at National PTA wrote to ▇▇▇▇▇▇ at Narrative DC.

Do you see that?

A.        I see that, yes.

Q.        And the subject is Question: Further Engagement with State PTA Chapters Regarding TikTok's Trust and Safety Features; right?

A.        I see that, yes.

Q.        And in response to ▇▇▇▇▇▇ identifying additional states, ▇▇▇▇▇▇▇ writes:

"With some of the states you've

Page 90

Q.        And Hill is Capitol Hill?

A.        Yes.

Q.        And then at the next message, can you read your response to ██████████ please?

A.        "Strong. ██████████ can find out for you what their connections to the good Senator are like."

Q.        Who is the "good Senator" you're referring to?

A.        I don't recall.

MS. YEATES:  Can you pull up tab 29.1 and mark it as Exhibit 15, please.

(Document marked for identification as TikTok-Ebenstein Exhibit 15.)

DOCUMENT TECH:  Ebenstein 15.

BY MS. YEATES:

Q.        And, Mr. Ebenstein, Exhibit 15 was linked as an attachment to that Lark chat we were just looking at in Exhibit 14.

Do you understand that?

A.        If you say so, sure.

Q.        Do you recognize this document?

A.        I don't.

CONFIDENTIAL

Page 91

Q.        Do you understand that it was produced as part of your custodial file and attached to the Lark chat; correct?

A.        If you say so, yes.

Q.        And the title of this document is 2024-2025_TikTok_National PTA Sponsorship Agreement_Draft; correct?

A.        Yes.

Q.        And it states:

"The Sponsorship Renewal Agreement (this Agreement) is effective as of March 1, 2024 (the Effective Date) by and between TikTok Inc. (Sponsor or TikTok) and National Congress of Parents and Teachers (Organizer or National PTA)."

Correct?

A.        Correct.

Q.        And if we go to Section 2 at Fee: Invoice it states:

"Fee.  As the only consideration due to Organizer related to the Purpose, Sponsor will pay Organizer a total amount equal to Three Million dollars (the Fee)."

Correct?

A.        Yes.

CONFIDENTIAL

Page 92

Q.    And so in 2024, TikTok was paying National PTA $3 million; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   I have to look to see what ultimately got executed, but that sounds to be the right ballpark.

BY MS. YEATES:

Q.    That's definitely more than TikTok had paid to National PTA in previous years; right?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall the numbers year-over-year.

BY MS. YEATES:

Q.    Do you recall there being a substantial increase in the amount that TikTok paid to National PTA in the 2024 year?

MR. DRAKE:  Object to form.

THE WITNESS:   My recollection is that the work that we were doing with PTA was important, effective work, and a higher sponsorship amount could mean more of that type of work, which I was supportive of.

BY MS. YEATES:

Page 93

Q.    I'll move to strike that as nonresponsive.

Do you recall in 2024 that TikTok substantially increased its funding to National PTA?

MR. DRAKE:  Object to form.

THE WITNESS:   I believe we increased the amount we paid to National PTA, yes.

BY MS. YEATES:

Q.    Let's turn to Schedule A at Bates 624489, and this is titled Schedule A: Scope of Work; correct?

A.    Yes.

Q.    And at 1.1 this notes that the PTA website will link back to TikTok's website; correct?

A.    It says to "TikTok's designated web page."

Q.    Turn to Section 8 at 624493, please.

This section is titled TikTok-PTA Events; correct?

A.    Yes.

Q.    And under A, Community-Level/

CONFIDENTIAL

Page 94

Campus Marquee Events, it states:

"National PTA will produce up to five marquee community-level/campus events exclusively with TikTok as official sponsor and cohost, to be held in locations within the contiguous United States selected by National PTA with input from TikTok."

Correct?

A.      Yes.

Q.      Can we go to Section 9, please.

Section 9 is titled PR/Media and PTA Storytelling; correct?

A.      Yes.

Q.      And the A under that section, it states:

"Organizer will make a National PTA spokesperson available to provide positive but non-endorsing quotes or statements regarding TikTok's sponsorship of PTA, regarding PTA Connected and related activities/educational themes tied to this scope."

Right?

A.      Yes.

MS. YEATES:  Okay.  We can take that down.  Thank you.

CONFIDENTIAL

Page 114

foundation.

THE WITNESS:  I see that, yes.

BY MS. YEATES:

Q.    And is it your understanding that TikTok provided funding to Common Sense Networks as part of its partnership?

MR. DRAKE:  Objection. Foundation.

THE WITNESS:  I see that here, yes.

MS. YEATES:  Can we go to tab 65, please.  Which exhibit number is this?

DOCUMENT TECH:  I apologize. Exhibit 22.

(Document marked for identification as TikTok-Ebenstein Exhibit 22.)

MS. YEATES:  Thank you.

BY MS. YEATES:

Q.    Mr. Ebenstein, do you recognize this as a Lark chat between you and your TikTok coworker ▇▇▇▇▇▇▇▇?

A.    Yes, I see that.

CONFIDENTIAL

Page 115

Q.      Can you please go to the second page at Bates 719762.

And at the top of the page, on May 16, 2023, you sent ████████ a list with a title CSN Proposal for Teen Awareness Program.

Do you see that?

A.      I do, yeah.

Q.      And CSN refers to Common Sense Networks; correct?

A.      That's correct.

MS. YEATES:  Can we pull up tab 65.1, please.

DOCUMENT TECH:  Ebenstein 23.

(Document marked for identification as TikTok-Ebenstein Exhibit 23.)

BY MS. YEATES:

Q.      Mr. Ebenstein, Exhibit 23 was produced as an attachment to the Lark chat between you and ████████ that we just viewed Exhibit 22.

Do you understand that?

A.      If you say so, yes.

Q.      And this document is titled TikTok Teen Education and Awareness Program and

CONFIDENTIAL

Page 116

dated May 2023; correct?

A.       Yes, that's accurate.

Q.       Under Objective it states:

"TikTok and Common Sense Networks (CSN) have shared interest in collaborating on the well-being of TikTok's teen users.  The objective is to deliver an education and awareness program designed to educate parents, educators, teens, and the industry on TikTok's teen experience and empower teens to take ownership of their digital lives."

Correct?

A.       That's what it says, yes.

Q.       And TikTok worked with Common Sense Networks to develop materials to be shared with schools, parents and teens; right?

A.       I'm sorry.  Could you repeat that question?

Q.       TikTok worked with Common Sense Networks to develop materials to be shared with schools, parents and teens; correct?

A.       I don't believe so, no.

Q.       Under this objective, the objective between TikTok and Common Sense Networks is to deliver an education and

CONFIDENTIAL

Page 117

awareness program to educate parents, educators, and teens; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   That's what the line says, yes.

MS. YEATES:  Can you pull up tab 17, please.

DOCUMENT TECH:  Ebenstein 24.

(Document marked for identification as TikTok-Ebenstein Exhibit 24.)

BY MS. YEATES:

Q.    Mr. Ebenstein, do you recognize this document?

A.    Let me look through it.

(Reviews document.)

No, I don't.

Q.    You understand that TikTok produced this document as part of your custodial file; correct?

A.    If you say so, yes.

Q.    And the metadata shows this document is dated June 10, 2020.

Do you have any reason to dispute that?

Page 118

A.      If you say so, no.

Q.      And the document is titled TikTok Who We Are; right?

A.      That's what it says at the top, yes.

Q.      Can you turn to the last page Bates 34071.  The bottom there's a section titled Partnerships.

Do you see that?

A.      Yes, I do.

Q.      And there's a second bullet.  This states:

"TikTok has a partnership with the Family Online Safety Institute (FOSI), an international nonprofit organization dedicated to making the online world safer for children and their families.  Through this partnership, TikTok and FOSI have launched an interactive tool where parents can download a guide for TikTok Parental Controls."

Correct?

A.      I see that there, yes.

Q.      And FOSI is described as a nonprofit organization; right?

A.      I see that there, yes.

Q.      And this does not indicate that TikTok provides funding to FOSI; correct?

A.      It doesn't say anything one way or the other about funding.

Q.      In the next bullet:

"TikTok has a partnership with ConnectSafely, a Silicon Valley, California-based nonprofit organization dedicated to educating users of connected technology about safety, privacy and security. We engaged ConnectSafely to draft and publish a 'Parent's Guide to TikTok' as well as to work together on important issues and events such as Safer Internet Day."

Correct?

A.      That's what it says there, yes.

Q.      And ConnectSafely is described as a nonprofit organization; correct?

A.      I see that there, yes.

Q.      And this does not indicate that TikTok was providing funding to ConnectSafely; correct?

A.      It doesn't say anything about funding in that paragraph.

Q.      The final bullet:

CONFIDENTIAL

Page 125

Yes, what you said was -- what you read was accurate.

Excuse me.

Q.    And the second bullet under TikTok Goals is:

"Make EduTok the go-to tool used in K through 12 schools to support everyday coursework (content creation)."

Correct?

A.    That's what it says, yes.

MS. YEATES:  Can you pull up 118.2, please.

DOCUMENT TECH:  Ebenstein 27.

(Document marked for identification as TikTok-Ebenstein Exhibit 27.)

BY MS. YEATES:

Q.    Mr. Ebenstein, Exhibit 27 is a document that was attached to the Lark chat between you and your colleagues at Exhibit 25.

Do you understand that?

A.    If you say so, yes, I do.

Q.    And the title of the document is CLF - Curriculum Integration Program: Partnership Strategies, with a date of April 28,

CONFIDENTIAL

Page 126

2020; is that right?

A.      I see that there, yes.

Q.      Under Context, at the last sentence it states:

"As a mobile app already popular with high school and college students, TikTok is uniquely well-positioned to be an urgently needed solution for teachers and students across the income spectrum, in a variety of school contexts."

Correct?

A.      That's what it says there, yes.

Q.      Okay.  And the next section under Curriculum Integration Program Goals, the goals include:

"Make TikTok a meaningful tool for classroom educators during distance learning and beyond.

"Create opportunities for teachers to build curricular content on TikTok at scale.

"Inform the development of tools and features that make TikTok an essential platform for educators and learners."

Did I read that correctly?

A.      Yes, you did.

Page 157

Q.        Okay.  And in the message above that, ████████████ writes to you "This, but for NDAs"; correct?

A.        That's what it says, yes.

Q.        And NDA refers to non-disclosure agreements; correct?

A.        Yes.

Q.        TikTok had an NDA with National PTA; correct?

A.        I don't recall if we did or did not.

MS. YEATES:  Can you pull up tab 135, please.

DOCUMENT TECH:  Ebenstein 35.

(Document marked for identification as TikTok-Ebenstein Exhibit 35.)

BY MS. YEATES:

Q.        Mr. Ebenstein, do you recognize the document that's been marked as Exhibit 35?

A.        I do not.

Q.        You understand that TikTok produced this e-mail from your custodial file; correct?

A.        If you say so, yes, I do.

CONFIDENTIAL

Page 158

Q.    Okay.  And at the top of this document, there's an e-mail from ███████████ at National PTA on April 6, 2020 to you at your TikTok e-mail address; correct?

A.    That is correct.

Q.    And the subject is NDA; is that right?

A.    I see that, yes.

Q.    We can go to the first e-mail in the chain at Bates 4317189.

At the very bottom, there's an e-mail from you on April 3, 2020 to █████ ████████ at National PTA, and you say:

"Are we under an NDA with you all, and if not, can we get one for you guys real quick so you can look something over for us? Who would the right person be to have their name on the NDA?"

Right?

A.    I see that written there, yes.

Q.    And ████████████ from the National PTA writes back to you that same day and says:

"Authorized signatory on NDA is ████████████, CAE, Executive Director.

"Not 100% sure if we have separate

CONFIDENTIAL

Page 159

NDA from agreement but our existing agreement has extensive confidentiality clause that essentially puts NDA in place by default."

Correct?

A.      I do see that, yes.

MS. YEATES:  Can we go back to Exhibit 34, please.

Counsel, I would like to request that TikTok and ByteDance produce any NDAs they have with National PTA, FOSI, Common Sense Networks and/or ConnectSafely.

MR. DRAKE:  What was it?

THE WITNESS:   Sorry.  Could you repeat that?

BY MS. YEATES:

Q.     Yeah.  That was for Mr. Drake.

MR. DRAKE:  Oh, I'm sorry.  I didn't realize I was getting a question. Can you repeat it?

MS. YEATES:  I'd like to request that TikTok and ByteDance produce any NDAs they have with National PTA, FOSI, Common Sense Networks, and/or ConnectSafely.

Page 174

notion that this is a real thing."

Is that what Mr. Beckerman wrote?

A.    It is.

Q.    And you respond:

"@Michael Beckerman yes.  Jamie, ██ and I are working on a letter that we'd ask PTA to distribute with/for us."

Right?

A.    Correct.

Q.    And what was the emoji from Mr. Beckerman in response?

A.    I think that means fight on.

Q.    Did you provide a letter from National PTA to these school districts?

A.    I don't recall.

MS. YEATES:  Can you pull up 123.2, please.

DOCUMENT TECH:  Ebenstein 39.

(Document marked for identification as TikTok-Ebenstein Exhibit 39.)

BY MS. YEATES:

Q.    Do you recognize the document that has been marked as Exhibit 39?

A.    I do not.

CONFIDENTIAL

Page 175

Q.    You understand that this document was produced by TikTok from your custodial file; correct?

A.    If that's what you say, yes, I do.

Q.    And it was linked to the previous exhibit as an attachment to the Lark chat that we were just looking at?

A.    If that's what you say.

Q.    (Audio dysfunction).

Do you understand that?

A.    Yes.  Sorry.  If that's what you say, yes, I do.

Q.    The document is titled PTA email: monthly challenges; right?

A.    Yes, with the challenges in quotation marks.

Q.    And it says:

"Dear PTA Leaders:  Some of you may be aware of various lists circulating of offline team dares that are being suggested as future TikTok challenges.  Several PTAs have reached out to National PTA and TikTok to flag these lists, and we wanted to share message from Eric Ebenstein and ██████████ who are PTA's primary contacts at TikTok with these lists."

CONFIDENTIAL

Page 176

Correct?

A.      Only to add that, again, TikTok challenges is in quotation marks but, again, correct.

Q.      And the message that the National PTA is sharing from you and ███████ at TikTok is posted in the next paragraph; correct?

A.      That's the next paragraph of the text is here, yes.

Q.      And can you read that, please?

A.      Sure.

The first not highlighted paragraph?

Q.      Correct.

A.      Sure.

"We are hearing of offline teen dares being suggested as future 'TikTok challenges' and want to be clear - dangerous challenges and illegal behavior are not allowed on our platform and will be removed.  While we do not currently see evidence of these supposed 'challenges' on our platform, our safety teams have and will continue to work tirelessly to enforce our Community Guidelines and remove violative content, including content promoted --

Page 177

promoting 'devious licks.'  We expect teens to use common courtesy whether they are online or offline."

Q.      Next paragraph there is a link to the TikTok Guide for Parents; correct?

A.      Yes, I see that.

Q.      And in the comment bubble at the top of the document, it says:

"@Eric Ebenstein does this work for you?  I think you could take parts of it and repurpose for Santa Clara if you plan to respond directly."

Right?

A.      I see that wording, yes.

Q.      And you respond thumbs up?

A.      Correct.

Q.      Did you reach out to anyone at the Santa Clara School District?

A.      I don't recall.

Q.      Let's go back to Exhibit 37, please, Bates 3236096.

And Exhibit 37 is a Lark chat between you and your colleagues that we talked about earlier, Mr. Ebenstein, and on September 30, 2021, Jamie Favazza sends a

CONFIDENTIAL

Page 184

Exhibit 41.)

BY MS. YEATES:

Q. Mr. Ebenstein, do you recognize the document that has been marked as Exhibit 41?

A. No, I do not.

Q. You understand that Exhibit 41 was produced by TikTok from your custodial file; correct?

A. If you say so, yes, I do.

Q. And the metadata with this document shows it's dated October 5, 2021.

Do you have any reason to dispute that?

A. If you say so, no, I do not.

Q. And the document is titled Challenge Challenges; right?

A. I see that at the top, yes.

Q. And there's a sample quote at the top from Senator Blumenthal that says:

"Despite TikTok's platitudes about prevention, perilous challenges - now slapping teachers - are still present.  TikTok can detect, delete & deter them."

Do you see that?

A. I see the sample quote attributed

CONFIDENTIAL

Page 185

to a Twitter page, yes.

Q.      And the next link is to an Ohio News Time article titled South Carolina Teacher Slaps As Part of a New TikTok Challenge.

Do you see that?

A.      I see that link, yes.

Q.      And the sample quote after that link says:

"Dr. Sarah Levens, a UNC Charlotte professor who studies psychology and social media, warns parents about the many dangers of social media."

Right?

A.      That's what it says there, yes.

Q.      And it continues:

"Dr. Levens said that because of how new social media is, not enough research has been done to show its impact on children in the long run.  But Levens said the research available cries out for danger."

Correct?

A.      That's the language on the text box.

Q.      And the next sentence says:

"'TikTok doesn't have parental

Page 186

controls, it doesn't have children's algorithms and adults' algorithms,' Levens said."

Correct?

A.    That's what it says there.

Q.    And under Current Responses, there's a reference to the PTA newsblast from October 2 to 75,000 recipients.

Do you see that?

A.    Yes, I do.

Q.    And that's referring to a letter that was sent out by National PTA with a message from TikTok; right?

A.    They describe it as a -- as a PTA newsblast.  I'm not sure if that's a letter or an e-mail or something else.

Q.    You recognize the statement below as the statement that you provided to National PTA that we saw in previous exhibits?

A.    I don't recognize it and I don't know who provided it.  I don't think this was my writing.

Q.    We'll come back to that.

If we go to the next page, it says -- it shows TikTok Tips for Parents; correct?

CONFIDENTIAL

Page 187

A.    That's correct.

Q.    And that's a document that TikTok and National PTA created together; right?

A.    Yes.

Q.    And under that it says:

"Response to Come - October 4 - Specific TikTok focused eblast from PTA President ████████ along with a template for PTAs to send out to their 75,000 members/parents."

Right?

A.    I see that there, yes.

Q.    And "language will be taken from/ similar to this draft which, we shared with them."

Correct?

A.    Yes.

Q.    Response to Follow says:

"Post October 4 PTA email - Will share language and template to DOE contact for inclusion on their 30,000 person listserv.  Will send to other advocates, friendly NGOs and key contacts to share across their connections."

Correct?

A.    Yeah, that's how it reads.

Q.      Suggested Additional Responses.

"Proactive outreach to 'Officer Gomez,' Dr. Revens, Senator Blumenthal, California school district that emailed Shou, DC area school districts."

Correct?

A.      That's what it says there, yes.

Q.      I think that's a typo.

That's referring to Dr. Levens earlier in the document; right?

A.      Let me look.

Yeah, I imagine they're talking about the same person.

Q.      And then under Potential PR Strategies, it says tweet or share -- sorry. Strike that.

Under Potential PR Strategies, it says:

"Tweet/share from official accounts PTA letter and call to action, Eric Han (interview with ██████████ and ConnectSafely?), share/leak internal research on source of meme, other external-facing communications."

Right?

A.      That was read correctly.

Q.   And Eric Han works at TikTok; correct?

A.   No.  He was a former employee.

Q.   What was Eric Han's title when he worked at TikTok?

A.   I don't recall.

Q.   Did you work with Mr. Han?

A.   Some, yes, I did.

Q.   Was Mr. Han a TikTok employee in October 2021?

A.   I believe so, yes.

Q.   Before we go back to the first page, can you read the message from TikTok on teen safety that was sent out on the PTA newsblast on October 2nd?

A.   This last big paragraph here at the bottom?

Q.   Yes.

A.   Sure.

"A message from TikTok: Teen Safety:

"We are hearing of offline teen dares being suggested as future 'TikTok challenges' and want to be clear: dangerous challenges and illegal behavior are not allowed

CONFIDENTIAL

Page 190

on our platform and will be removed.  While we do not currently see evidence of these supposed 'challenges' on our platform, our safety teams have and will continue to work tirelessly to enforce our Community Guidelines and remove violative content, including content promoting 'devious licks.'  We expect teens to use common courtesy whether they're offline -- sorry -- whether they're online or offline.  TikTok is committed to reaching parents and guardians by supporting messages on the importance of ongoing conversations with teens about being good citizens online and offline, as we are doing through our collaboration with National PTA.  We want to make you aware of the TikTok Guide for Parents we created with National PTA, as it contains critical information about the parental controls available to families on TikTok as well as digital safety information."

Q.    Mr. Ebenstein, do you recall that you and ███████ had provided this statement to National PTA?

A.    I don't recall, no.

Q.    Can we pull up Exhibit 39, please.

Mr. Ebenstein, we looked at

CONFIDENTIAL

Page 191

Exhibit 39 earlier and in the first paragraph it states that the National PTA wanted to share a message from Eric Ebenstein and ███████████ with state PTAs; correct?

A.      I see that first paragraph, yes.

Q.      And are the next two paragraphs identical to the paragraph that you just read in Exhibit 41 that was sent out with the PTA newsblast on October 2nd?

A.      I would need to see them side to side to make sure that they were identical.

MS. YEATES:  TJ, are you able to do that?

DOCUMENT TECH:  Side to side with Exhibit 40?

MS. YEATES:  41.

DOCUMENT TECH:  41.

THE WITNESS:   Is there a way to make it a little -- yeah, thank you -- to make it a little bigger.

(Reviews document.)

Much of the substance is the same.  I mean, there's a quote in the first page that I don't see in the body of the second page, and I don't see who

CONFIDENTIAL

it's sent from the right side, if it's attributed to me or sent from me, as the document on the left side says.

BY MS. YEATES:

Q.      On October 2nd, the PTA sent out a newsblast with a message from TikTok teen safety in Exhibit 41 that was drafted by you and ███████████ at TikTok; correct?

A.      I don't think I wrote this.  I can't see who it was sent from.  So I'm not sure, no.

Q.      Do you think Exhibit 37 is incorrect where it says that the National PTA is sharing a message from Eric Ebenstein and ████ ████████

MR. DRAKE:  Object to form.

THE WITNESS:   I don't know who wrote this.  So I can't determine the veracity of it.  I mean, the substantive messaging is great, but I don't know who it came from.

BY MS. YEATES:

Q.      Were you aware that TikTok drafted information for PTA to send out on TikTok teen safety in a newsblast?

A.    I don't recall when this was.  It was, I think, quite some time ago.  So I'm not -- I don't remember it, no.

Q.    Okay.  And if we look at Exhibit 39 that includes the information that was sent out in Exhibit 41 in the eblast, there's a comment to you @Eric Ebenstein "does this work for you"; right?

MR. DRAKE:  Objection.  Asked and answered.

THE WITNESS:    I see the comment that you're referring to.  You've read it accurately.

BY MS. YEATES:

Q.    And you responded thumbs up; right?

MR. DRAKE:  Same objection.

THE WITNESS:    That's correct.

BY MS. YEATES:

Q.    Okay.  Let's go back to Exhibit 41.

The National PTA also sent out a TikTok Tips for Parents that was drafted by TikTok in connection with National PTA; correct?

A.    I'm sorry.  What are you referring

CONFIDENTIAL

Page 222

of students from 8 to 17; correct?

A.        I see that written here yes.

MS. YEATES:  Can we go to tab 97, please.

DOCUMENT TECH:  Ebenstein 47.

(Document marked for identification as TikTok-Ebenstein Exhibit 47.)

BY MS. YEATES:

Q.        Mr. Ebenstein, do you recognize Exhibit 47?

A.        No, I don't.

Q.        You understand that Exhibit 47 was produced by TikTok from your custodial file?

A.        If you say so, yes, I do.

Q.        And this document is a Lark chat between TikTok employees titled PTA/FOSI Working Group; correct?

A.        Yes, it is.

Q.        We go to the bottom of 84464, please.

There's a message from ███████ on February 26, 2020.

Do you see that?

A.        Yes, I see that.

Page 223

Q.        What is ████████████ title at TikTok?

A.        She no longer works at TikTok.  I don't recall her title.

Q.        In 2020, she was a colleague of yours at TikTok; is that right?

A.        Yes, that's right.

Q.        And on February 26, 2020, ████████████ sends a message that says:

"████████████████████  No other companies or speakers.  Only ████████.  2 parents are facilitating student panel.  Re other companies or safety experts: This is something that the National PTA battles with local PTA on. National PTA said they are considering creating a matrix/rubric for the local leader to use on deciding whether or not someone is a speaker that is relevant and a good fit."

Correct?

A.        I see that here, yes.

Q.        Can you scroll down to 84466, please.  ████████████ is a colleague of yours at TikTok; correct?

A.        Not currently, no.

Page 224

Q.        In 2020, was ████████████ a colleague at TikTok?

A.        I don't believe she was in 2022, no.

Q.        In 2020, was ████████████ a colleague of yours at TikTok?

A.        Yes, she was.

Q.        And what was her title?

A.        I don't recall.

Q.        All right.  Please scroll up to the page before.  There is a message from ████ ████ on February 28, 2020 and she says "Good looking crowd," and then shares a photo; right?

A.        Yes, that's right.

Q.        And this is a photo of a PTA event; correct?

A.        I don't know what this is a photo of.  I don't recall this at all.

Q.        Can you read your response to the photo?

A.        Sure.

          "Holy crap that's a lotta people."

Q.        And then ████████████ writes on February 28, 2020:

          "It's packed.  Unfortunately the

Page 225

news crews cancelled because there's some late breaking news."

Right?

A.    I see that, yes.

Q.    And she sends another message thereafter.

"I'm sort of glad the crews cancelled.  This student panel is primarily under 13 and they're all talking about what they post, why they post and how they know they're not supposed to have an account."

Correct?

A.    I see that message, yes.

Q.    Can you read your response to that message, please?

A.    Sure.  I say:

                    ████████████ what.  How is PTA letting that happen?"

Q.    And after the "what" you have a question mark and two exclamation points; correct?

A.    That's correct.

Q.    And ████████ responds:

"I don't know.  But seriously dodged a bullet.  That would have been on CBS

CONFIDENTIAL

Page 226

ABC and KCAL9."

Right?

A.    I see that's written there, yes.

Q.    And then she sends another message right thereafter that says:

"They also showed some of their videos on the monitor."

Correct?

A.    I see that, yes.

Q.    And then ▮▮▮▮▮▮▮ writes on that same day:

"@Eric Ebenstein unfortunately they asked for questions from the crowd and a parent asked 'how old were you when you started using social media.' All of them said between ages 8 through 12 and admitted to lying about their birth date to get around it.  One girl said she's 20 on Instagram."

Is that right?

A.    I see that message there.

Q.    And that message was to you; correct?

A.    Correct.

Q.    And then ▮▮▮▮▮▮▮ responds at ▮▮▮▮▮▮▮:

Page 227

"They were introduced with their grades and showed their TikTok accounts as part of the intro.  It's learnings for the future."

Correct?

A.    I see that message, yes.

Q.    And what did you respond to that message?

A.    ▬▬▬▬▬ we need a quick post mortem on this one so I can talk to ▬▬."

Q.    And you're referring to ▬▬ ▬▬▬▬ at National PTA; correct?

A.    Yes.

Q.    And then further down on March 4, 2020, ▬▬▬▬ sends another message.

"▬▬▬▬▬▬▬▬ I added you to an email with ▬▬▬▬▬, the ▬▬▬▬ PTA president.  She needs China talking points to share with concerned parents.  Sharing screenshot here for @Eric Ebenstein awareness."

Correct?

A.    I see that, yes.

Q.    And what was your response?

Can we go down to the next message from Mr. Ebenstein, please.

A.    Thank you.

CONFIDENTIAL

Page 228

███████████ let's be sure to connect with her via phone rather than over email.  I'm sure ██████ has what she needs, but feel free to reach out if you want any additional talkers."

MS. YEATES:  Can we go to tab 92, please.

DOCUMENT TECH:  Ebenstein 48.

(Document marked for identification as TikTok-Ebenstein Exhibit 48.)

BY MS. YEATES:

Q.    Mr. Ebenstein, do you recognize Exhibit 48?

A.    No, I don't.

Excuse me one second.

Can you grab a bottle of water from there?  So I don't have to unplug?

Q.    Would you like to take a break, Mr. Ebenstein?

MR. DRAKE:  Yeah, we've been going about a little over an hour.

THE WITNESS:  Sure.  A break would be great, if you don't mind.  Thank you.

Case 4:22-md-03047-YGR    Document 2896-6    Filed 03/30/26    Page 63 of 151

CONFIDENTIAL

Page 242

BY MS. YEATES:

Q.    Mr. Ebenstein, do you recognize Exhibit 51?

A.    No, I don't.

Q.    You understand that TikTok produced Exhibit 51 from your custodial file; correct?

A.    If you say so, yes.

Q.    And this is a Lark chat between you and your colleague at TikTok, Eric Han; correct?

A.    Yes.

Q.    And if we go to Bates 1081104, there's a message to you from Eric Han on June 17, 2029 at 18:38.

Do you see that?

A.    Yes, I see that.

Q.    And he writes:

"For sure.  The kidtech is still very early, though I'd like to understand what our product roadmap is internally (if any) for kids/minors.  We have the under 13 version of the app, though, anecdotally, we're still seeing quite a few kids slipping through the cracks (which makes sense, since an age-gate is easy to

Page 243

circumvent)."

Do you see that?

A.      Yes, I see that.

Q.      And then Mr. Han continues in his message to you:

"They also push a product around progressive permissions (for example, App is unlocked after a verified parent grants access). Sounds like something we can build internally, though not sure what the appetite is."

Right?

A.      I see that written there, yes.

Q.      Then if we go farther down in the chat at 1081108, there is a message from Eric Han to you on September 3, 2019 at 20:01.

Do you see that?

A.      Yes, I do.

Q.      And Mr. Han writes to you:

"Hey Eric.  Do you have a doc that lists all our current partnerships relating to safety issues?      myself, and
(TikTok4Good) all have similar objectives relating to owning our safety narrative (which includes understanding what partnerships we currently have).  Any info you have on our

CONFIDENTIAL

Page 244

current status will help us organize better and reduce redundancies.  Thanks."

                    Did I read that correctly?

        A.        Yes, you did.

        Q.        And what is your response?

        A.        I wrote:

                    "Hey.  I don't but happy to send you some of the ones I'm aware of so we can put one together.  Makes a lot of sense."

        Q.        Okay.  Let's go to the next page, please.

                    On September 4, 2019, you sent Mr. Han another message listing TikTok's current partnerships relating to safety issues; correct?

        A.        Sorry.  Could you repeat that again?

        Q.        Can we blow up the message on September 4, 2019 at 8:53, please.

                    On September 4, 2019, you sent Mr. Han a message providing him a list of TikTok's current partnerships relating to safety issues; correct?

        A.        Reading the message, it doesn't look like these were current partners.  We hadn't -- I say here "We've yet to pay for any

CONFIDENTIAL

Page 245

of these," but I think it's fair to say these were the people I was in contact with at their respective organizations.

Q.      These are the people that you agreed to provide to Mr. Han in response to his question about current partnerships relating to safety issues; right?

A.      These are the people I sent to him in response to his question about who I was working at those organizations.

Q.      Great.  Can you read that message for us?

A.      Sure:

"NCMEC, ███████████████
██████    FOSI ████████████
ConnectSafely ████████, National PTA: ████
███████.  We've yet to pay for any of these, but they've been approved/are in the works so I think they meet the requirements.  Eventually, I assume, the OA issues will get worked out.  Let me know if you need more/different."

Q.      What was OA?

A.      It was or is like TikTok's internal payment system.

Q.      Can we go down to the message that

Page 246

you sent to Mr. Han on September 19, 2019 at 18:30.

September 19, 2019 time-stamped 18:30, please.

It's Bates 1081110.  The second message at the top, please.  Thank you.

Mr. Ebenstein, can you read the message that you sent to Mr. Han on September 19, 2019, please?

A.    Sure.

"Quick background on ██████ -- he's based in Palo Alto and I had also already connected him to ████.  Great minds and all that... he's been through the LA office once before with ███████.  He witnessed some content moderation (something I'm eager to experience as well).  Hoping he can connect with both of you at separate times for in-depth understanding of our business so that he can serve as a public advocate for us in the face of all the criticism we've been taking.  His organization produces those 'how-to' guides, and has made them for all of our competition.  Should be a good shield for us going forward."

Q.    And the ██████ you're referring to

CONFIDENTIAL

Page 247

there is ███████████ at ConnectSafely; correct?

A.      Yes, that's correct.

Q.      And Mr. Han gives you a thumbs up; right?

A.      Yes, he does.

MS. YEATES:  Can we go to tab 87, please.

DOCUMENT TECH:  Ebenstein 52.

(Document marked for identification as TikTok-Ebenstein Exhibit 52.)

BY MS. YEATES:

Q.      Mr. Ebenstein, do you recognize Exhibit 52?

A.      I do not.

Q.      Do you understand that Exhibit 52 was produced by TikTok from your custodial file; right?

A.      If you say so, yes.

Q.      And this document is a Lark chat between you and your colleague at TikTok, ████████ ███████  correct?

A.      Yes.

Q.      Can we please go to the fourth page at Bates 931571.

CONFIDENTIAL

Page 257

BY MS. YEATES:

Q.      Mr. Ebenstein, do you recognize Exhibit 55?

A.      No, I don't.

Q.      You understand that TikTok produced Exhibit 55 from your custodial file; correct?

A.      If you say so, yes.

Q.      And Exhibit 55 was produced as an attachment to Exhibit 54, which is a Lark chat between you and ████████████ and ████████

Do you understand that?

A.      If you say so, yes, I do.

Q.      And this is the one-pager that ████████████ was referring to when she suggested it could be shared with a Hill audience; correct?

A.      If you say this is the attachment. I don't know if she suggested or asked, but I assume this is the one that you're talking about that she's referring to.

Q.      And the title of this document is Keeping TikTok a safe and supportive place for families and teens; right?

A.      I see that language at the top,

CONFIDENTIAL

Page 258

yes.

Q.    The metadata states this document date is May 26, 2021.

Do you have any reason to dispute that?

A.    If you say so, no, I do not.

Q.    You look at the first section Tools for families, this says:

"Family Pairing lets a parent or guardian link their TikTok account to their teen's - enabling them to manage a variety of content and privacy settings."

Correct?

A.    Yes, that's correct.

Q.    This does not notify -- strike that.

This does not include information stating that a teen can unlink their account from Family Pairing, does it?

MR. DRAKE:  Object to form.

THE WITNESS:    I don't see anything in there about the language you suggest, no.

BY MS. YEATES:

Q.    This does not contain information

stating that parents would not be notified by TikTok if their child created multiple accounts; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't see anything in there with the language you mentioned.

BY MS. YEATES:

Q.     This does not notify parents or the public that Family Pairing does not prevent young users from creating multiple accounts; correct?

A.     I'm sorry.  Can you repeat that once more?

Q.     This section does not notify parents or the public that Family Pairing does not prevent young users from creating multiple accounts; correct?

A.     There's nothing in there about that, no.

Q.     This does not notify parents or the public that a child can unlink their account from Family Pairing without the parents' consent, does it?

A.     I don't see anything in there --

Page 260

MR. DRAKE:  Object.

THE WITNESS:   Sorry.

I don't see anything in there about that, no.

BY MS. YEATES:

Q.      This does not tell parents or the public that parents will not be notified by e-mail or phone if their child unlinks their TikTok account from their parent's Family Pairing account; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't see any language like that in there, no.

BY MS. YEATES:

Q.      Nothing on this page tells parents or the public that a parent would have to set Family Pairing for every account their child had on TikTok; correct?

A.      First -- the paragraph -- the view just shifted.

The first line says:

"Family Pairing lets a parent or guardian link their TikTok account to their teen's" individually.

So I think that could be taken a

CONFIDENTIAL

Page 261

couple of different ways.  Each account.

Q.    Does this inform parents that even if they use the Family Pairing feature to link their children's account that their child could create a new account that is not linked to the parent's?

MR. DRAKE:  Object to form.

THE WITNESS:  No, nothing like the language you're suggesting is in there.

BY MS. YEATES:

Q.    Does anything here inform parents or the public that Family Pairing does not prevent predators or groomers from contacting, following or interacting with teens on TikTok?

A.    There are a suite of separate safety settings that handle those issues that you're talking about.

Q.    Family Pairing does not address that concern, does it?

MR. DRAKE:  Object to form. Vague.

THE WITNESS:   Family Pairing does what it says in the -- in the highlighted paragraph here.  Linking

Page 262

their account for a variety of content and privacy settings.

BY MS. YEATES:

Q.    Let's look at the Privacy by default section.

This section talks about different privacy features that are associated with different teenage age groups; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   Yeah, this shows some of the different safety settings that teens age up through the platform with.

BY MS. YEATES:

Q.    This section does not inform parents or the public that young users can circumvent age-gating by lying about their age, does it?

MR. DRAKE:  Object to form.

THE WITNESS:   This section is about the various account safeguards for -- for different aged teenagers on the platform.

BY MS. YEATES:

Q.    Does this include a disclosure

CONFIDENTIAL

Page 263

that young users can circumvent age-gating by lying about their age?

A.    This section doesn't say anything about lies.

Q.    Does this disclose to parents and the public that TikTok does not verify a user's age?

A.    TikTok has an industry standard neutral age-gate to make sure that the right aged teens are on the platform.

Q.    Move to strike as nonresponsive.

Does this section disclose that TikTok does not verify a user's age?

MR. DRAKE:  Objection.  Asked and answered.

THE WITNESS:   You need to be 13 to be on TikTok.  The age-gate doesn't ask you what your age needs to be.  It asks you to put in your birth date to try to make sure you're put into the right product.

BY MS. YEATES:

Q.    Move to strike as nonresponsive.

Does TikTok verify a user's age when an account is being created?

CONFIDENTIAL

Page 280

A.       If you say so, yes, I do.

Q.       And this is a Microsoft Teams meeting invitation to you -- to a variety of people, cc'ing you on August 17, 2021.

Do you see that?

A.       Yes, I see that.

Q.       And you're cc'ed at your TikTok e-mail address; right?

A.       Yes, I see that.

MS. YEATES:  Can we pull up 18.1, please.  This is Exhibit 57.

DOCUMENT TECH:  Ebenstein 57.

(Document marked for identification as TikTok-Ebenstein Exhibit 57.)

BY MS. YEATES:

Q.       Mr. Ebenstein, do you understand that Exhibit 57 is an attachment to the Teams invitation that was sent to you as Exhibit 56?

A.       If you say so, yes.

Q.       Do you recognize this document?

A.       I recognize the TikTok Guide for Parents, yes.

Q.       This is a guide that was a collaboration between TikTok and National PTA;

CONFIDENTIAL

Page 281

correct?

A.      Yes, that's what that says.

Q.      And National PTA distributed this document to PTAs, schools, and parents; is that right?

A.      I believe that's what they did, yes.

Q.      And the goal of distributing this document was for schools and parents to review the information in this TikTok Guide for Parents; correct?

A.      Yeah.  The goal was that if these groups were going to use TikTok, that this was information that would be useful to how they could have a safe experience on the platform.

Q.      If this document contained potential harms to young people from TikTok use, schools and parents would have seen that; right?

MR. DRAKE:  Object to form. Calls for speculation.

THE WITNESS:  This document was meant to have useful information on how to use the platform under a variety of different terms, not everything in the entire world.

Page 282

BY MS. YEATES:

Q.      Move to strike as nonresponsive.

Mr. Ebenstein, given that the National PTA distributed this document to schools and parents, if it had contained potential harms to young people from TikTok use, schools and parents would have seen that information; correct?

MR. DRAKE:  Objection.  Calls for speculation.

THE WITNESS:   I don't know what people who received this guide saw or didn't see, other than what was written in this guide.

BY MS. YEATES:

Q.      If potential harms to young people from TikTok use was written in this guide, then schools and parents would have seen those harms; correct?

MR. DRAKE:  Objection.  Calls for speculation.

THE WITNESS:   If -- all I can say is that if something was written in this guide, then people who read this guide would have seen what was written in

Page 283

this guide.

BY MS. YEATES:

Q.      Can we turn to 1196388?

MR. DRAKE:  Are we ready for a break now or are we still using this?

Oh, I'm sorry.

MS. YEATES:  We're still on this document.

MR. DRAKE:  You were turning to Bates numbers.  I'm sorry.

MS. YEATES:  No problem.

BY MS. YEATES:

Q.      The second page of the TikTok Guide for Parents has a Welcome section.

Do you see that?

A.      Yes, I do.

Q.      And under Welcome it says:

"Whether you are a parent, guardian, or teacher, you are one of the most important adults in a teen's life.  We encourage you to talk regularly with your teens about their digital lives and how they can be responsible and safe in all online activities. We understand each family is different, which is why we offer a range of tools and features to

CONFIDENTIAL

Page 284

help you take an active role in your teen's TikTok experience."

Did I read that correctly?

A.    Yes, you did.

Q.    Can we turn to the Connections section at 1196392.

Under connections, the TikTok Guide for Parents state:

"The full TikTok experience is for people 13 and over, and along with an age-gate, we've given the app a 12+ App Store rating so that you can enable device-level restrictions on your teen's phone."

Correct?

A.    Yes, that's what's written there.

Q.    The next paragraph says:

"In the U.S., we accommodate those under the age of 13 in TikTok for Younger Users, a view-only experience with curated content and additional safety and privacy protections. TikTok partners with Common Sense Networks to help make sure content is both age-appropriate and safe for an audience under 13."

Correct?

A.    Yes, that's what's written there.

CONFIDENTIAL

Page 285

Q.    This does not disclose that under 13-year-old users can use the TikTok app if they lie about their age; right?

A.    There's nothing written in there that reflects what you said.

Q.    This does not disclose that age-gating is easily circumvented; right?

MR. DRAKE:  Object to form. Assumes facts.

THE WITNESS:   I'm not an expert on age-gating, but nothing in this page reflects what you said.

BY MS. YEATES:

Q.    This does not disclose that TikTok provides funding to Common Sense Networks; correct?

A.    Correct.

Q.    And we looked earlier at the partnership agreement where TikTok paid Common Sense Networks a minimum of 5 million; right?

A.    That's correct.

Q.    And that is not disclosed in this document?

A.    I don't see that on the page, no.

Q.    Can we turn to page 7 at Bates

CONFIDENTIAL

Page 286

1196393.

This page is titled Private versus Public Accounts.

Do you see that?

A.      Yes, I do.

Q.      The first sentence:

"By default, for those 13 to 15 years old, your account starts as private."

Correct?

A.      Yes, that's what it says there.

Q.      And nothing on this page discloses that if a 13 to 15-year-old lied about their age when forming their TikTok account that the account would start as public by default, does it?

A.      I don't see language reflective of what you said in there, no.

Q.      And it describes a private account as one that "while others on TikTok can search for you, they must request and be approved as a friend in order to contact or see your content"; is that right?

A.      That's what it says there, yes.

Q.      And a public account "means any TikTok community member can view your videos and

post comments or reactions to engage with content you've created and shared"; right?

A. That's the way it's written there, yes.

Q. Can we go to 13 at Bates 1196399.

Family Pairing was not available for accounts that were created on mobile web or computer browsers; is that right?

MR. DRAKE: Object to form and lacks foundation.

THE WITNESS: I'm not sure. I'm not in products. So I'm not sure where Family Pairing was and wasn't.

BY MS. YEATES:

Q. Okay. We look at the paragraph at the bottom here, it says:

"TikTok's parental controls are only available for the TikTok mobile app, and are not available on mobile web or computer browsers."

Do you see that?

A. I do see that, yes.

Q. And above that the section is titled Family Pairing and it says:

"Family Pairing links a parent or

guardian's TikTok account to their teen's and, once enabled, the parent can directly manage a number of safety controls for their teen's account."

Correct?

A.      Yes, that's what it says.

Q.      This TikTok Guide for Parents section on Family Pairing does not disclose that Family Pairing does not prevent young users from creating multiple accounts, does it?

A.      This section only talks about the Family Pairing feature.  It doesn't reflect what you mentioned.

Q.      Does this section in TikTok's Guide for Parents on Family Pairing inform parents that their children can unlink their accounts from Family Pairing?

A.      This section explains the features of how Family Pairing can be made to work, not what you're talking about in your question.

Q.      Does this section in the TikTok Guide for Parents on Family Pairing inform parents that they would not be notified if their child unlinked from Family Pairing?

A.      This section explains what Family

CONFIDENTIAL

Page 289

Pairing does.  It doesn't have language reflective of what you said.

Q.    Does this section in the TikTok Guide for Parents on Family Pairing inform parents that they will not be notified if their child creates multiple accounts?

A.    This section is about how Family Pairing works.  It doesn't have language about what you're talking about.

Q.    Does this section in TikTok's Guide for family -- for Parents on Family Pairing inform parents that they would have to set Family Pairing for every account that their child had on TikTok?

A.    This section explains the various features of Family Pairing.  It doesn't have specific mention of what you're talking about.

Q.    Does anything in the TikTok Guide for Parents that TikTok and National PTA created inform parents or schools that schools may be harmed by student TikTok use?

A.    I'll need to look through the entire guide.  Give me a minute, please.

(Reviews document.)

I don't see anything reflective of

CONFIDENTIAL

your question in this guide, no.

Q.    Does anything in this TikTok Guide for Parents inform parents or schools that student TikTok use could lead to school disruption?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't believe anything in the guide addressed your question, no.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that student TikTok use could lead to damage to schools?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't believe anything in the guide reflects your question.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that schools may suffer harm from student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't know that there's anything in the guide that

Page 291

is about that subject.

BY MS. YEATES:

Q.      Does anything in the TikTok Guide for Parents inform parents or schools that students are receiving TikTok notifications during the school day?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't believe there is anything in the guide about what you're asking.

BY MS. YEATES:

Q.      Does anything in the TikTok Guide for Parents inform parents or schools that students are posting on TikTok during school hours?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide that I'm aware of that's reflective of your question.

BY MS. YEATES:

Q.      Does anything in the TikTok Guide for Parents inform parents or schools that classrooms could be interrupted by students receiving TikTok notifications?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide is reflective of your question that I'm aware of.

BY MS. YEATES:

Q.   Does anything in the TikTok Guide for Parents inform parents or schools that schools may need to divert or increase resources to address youth mental health due to TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide that is reflective of your question.

BY MS. YEATES:

Q.   Does anything in the TikTok Guide for Parents tell parents or schools that schools may need to hire additional counselors to address mental health and behavioral issues caused by students' TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide is reflective of your question.

BY MS. YEATES:

Q.   Does anything in the TikTok Guide for Parents inform parents or schools that

Page 293

schools may have to train staff on the harmful effects of social media as a result of student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:  Nothing in the -- in the guide is reflective of that.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that schools may need to create educational materials addressing social media addiction in response to student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:  Nothing in the guide handles that area.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that TikTok use may lead to addiction?

MR. DRAKE:  Object to form.

THE WITNESS:  I'm not aware of anything in the guide responsive to that question.

BY MS. YEATES:

CONFIDENTIAL

Page 294

Q.      Does anything in the TikTok Guide for Parents inform parents or schools that TikTok use may lead to compulsive use of the platform?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide is about that.

BY MS. YEATES:

Q.      Does anything in the TikTok Guide for Parents inform parents or schools that schools may have to spend time and resources investigating crimes resulting from student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide about that.

BY MS. YEATES:

Q.      Does anything in the TikTok guide inform parents or schools that TikTok use could lead to anorexia?

MR. DRAKE:  Object to form.

THE WITNESS:   Nothing in the guide is about that.

BY MS. YEATES:

Q.      Does anything in the TikTok Guide

Page 295

for Parents inform parents or schools that TikTok use could lead to depression?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.     Does anything in the TikTok Guide for Parents inform parents or schools that TikTok use could lead to self-harm or suicide?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.     Does anything in the TikTok Guide for Parents inform parents or schools that TikTok use could lead to sleep disorders?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.     Does anything in the TikTok Guide for Parents inform parents or schools that TikTok use could lead to body dysmorphia?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing

in the guide about that.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that schools may have to repair property damage resulting from student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that schools may need to spend and divert staff time to confiscate cell phones from students for using TikTok --

MR. DRAKE:  Object to form.

BY MS. YEATES:

Q.    -- during school hours?

MR. DRAKE:  Sorry.

THE WITNESS:   Nothing in the guide that I'm aware of in that.

BY MS. YEATES:

Q.    I'm going to repeat that because the objection was in the middle of my question.

Does anything in the TikTok Guide

Page 297

for Parents inform parents or schools that student TikTok use may cause schools to spend or divert staff time to confiscate cell phones from students who are using TikTok during school hours?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that schools may need to expend or divert resources to respond to threats made against schools and students over the TikTok platform?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

BY MS. YEATES:

Q.    Does anything in the TikTok Guide for Parents inform parents or schools that student TikTok use may cause schools to expend, divert or increase resources?

MR. DRAKE:  Object.

BY MS. YEATES:

Q.    Strike that.

CONFIDENTIAL

Page 298

The last one.  Let me try it again.

Does anything in the TikTok Guide for Parents inform parents or schools that student TikTok use may cause schools to expend, divert or increase technology resources in an attempt to limit students' access to the TikTok platform during school hours?

MR. DRAKE:  Object to form.

THE WITNESS:   There's nothing in the guide about that.

MS. YEATES:  Thank you.  Let's take a break.

THE VIDEOGRAPHER:  Okay. Stand by.

The time is 5:23 PM.  We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  The time is 5:35 PM.  We're back on the record.

MS. YEATES:  Can you pull up tab 89, please.

DOCUMENT TECH:  This is going to be Ebenstein 58.

(Document marked for

Page 323

(Document marked for identification as TikTok-Ebenstein Exhibit 62.)

BY MS. YEATES:

Q.      Mr. Ebenstein, do you recognize Exhibit 62?

A.      No, I don't.

Q.      You understand that this document was produced by TikTok from your custodial file; correct?

A.      If you say so, yes, I do.

Q.      And you understand that Exhibit 62 is an attachment to Exhibit 61, which was the Lark chat between you and your colleagues titled State Dream Team; correct?

A.      If you say it was, then yes.

Q.      This document is titled Quarterly Review Dashboard, State and Local Policy Team ; right?

A.      I see that there, yes.

Q.      I will represent to you that the metadata shows this document is dated March 19, 2024.

Do you have any reason to dispute that?

CONFIDENTIAL

Page 324

A.    If you say so, no, I do not.

Q.    At the top of the document it says "Lead: Eric Ebenstein"; right?

A.    Yes, I see that.

Q.    The first page, Quarter 1, 2024 Team Highlights.

Do you see that section?

A.    Yes, I do.

Q.    Can you read the first two bullets under that section, please?

A.    Sure.

First bullet says:  "The team is actively tracking 267 priority bills in 44 states across our priority tracker."

The second bullet reads:  "The State Team has onboarded 15 additional new firms, expanding our coverage to 36 states."

Q.    And bullet number 4 states: "Washington - Successfully defeated an outright TikTok ban"; correct?

A.    Yes.

Q.    And that was one of your 2024 team highlights?

A.    That's what it says in the document here, yes.

Page 330

here and for 95 percent of the time today has been listening to you read documents into the record, or you've asked him to read documents into the record.

There have been very few questions presented today. So my ask is that over -- overnight tonight perhaps the plaintiffs team could take a look at their outline and see if we can be as efficient as possible.

Because we object to and are opposed to sitting here for another three or four hours tomorrow listening to you read documents. The documents say what they say. They don't need to be read into the record.

That's not required under any evidentiary rule, and it's disrespectful of Mr. Ebenstein's time.

MS. YEATES: Well, I would object to that. I certainly don't think it's disrespectful of anyone's time.

I think this is a deposition that is a trial deposition and will likely be shown to a jury, and it's

CONFIDENTIAL

Page 335

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

*Denise D. Vickery*

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028

# Exhibit 444B

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

CONFIDENTIAL

Page 336

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

------------------------------

IN RE: SOCIAL MEDIA ADOLESCENT   Case No.

ADDICTION/PERSONAL INJURY        4:22-MD-03047-YGR

PRODUCTS LIABILITY LITIGATION    MDL No. 3047

--------------------------------------------------

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

UNLIMITED JURISDICTION

-------------------------

Coordination Proceeding   Judicial Council

Special Title(Rule 3.550)  Coordination Proceeding

SOCIAL MEDIA CASES         No. 5255

-------------------------

This Document Relates to:

ALL ACTIONS

------------------------- VOLUME II

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEO-RECORDED DEPOSITION OF ERIC EBENSTEIN

Wednesday, March 12, 2025

10:00 AM EST

Reported by:  Denise Dobner Vickery, CRR, RMR

JOB NO.: 7101217

CONFIDENTIAL

Q.      Did you watch Mr. Chew's January 31, 2024 testimony before the Senate judiciary committee on television?

A.      Yes, I did.

Q.      You understand that there was a written statement of the testimony that Mr. Chew would be providing to the Senate Judiciary Committee on January 31, 2024 as well?

A.      Yes, I'm generally aware he submitted, you know, a written statement before his testimony.

MS. YEATES:  Can we pull up tab 145, please, and mark that as an exhibit.

DOCUMENT TECH:  Ebenstein 63.

(Document marked for identification as TikTok-Ebenstein Exhibit 63.)

BY MS. YEATES:

Q.      Mr. Ebenstein, do you recognize Exhibit 63 as a written statement of Mr. Chew's testimony to the Senate Judiciary Committee on January 31, 2024?

A.      Let me look through it, please.

(Reviews document.)

Page 348

I can't be certain, but this looks like what it's titled as.

Q.    In your role as director of public policy at TikTok, you helped Mr. Chew prepare for the statement to the Senate Judiciary Committee; correct?

MR. DRAKE:  Objection.  Asked and answered.

THE WITNESS:  No.  The work I did was preparing him for the question and answer segment of -- of the hearing. I was not involved in the -- in the written statement.  I don't recall being involved in the written -- written statement.

BY MS. YEATES:

Q.    Okay.  So in addition to the written statement that we're looking at in Exhibit 63, there was a question and answer session with the Senate Judiciary Committee that you prepared Mr. Chew for; is that right?

A.    Yes.

Q.    Can we turn to Bates in the same document 7838837.

Do you see there's a section in

Mr. Chew's statement to the Senate Judiciary Committee titled TikTok's Partnerships?

A.    Yes, I do.

Q.    Can you please read the fourth bullet of that statement relating to TikTok's partnerships?

A.    Yes.

"We worked with ConnectSafely - a nonprofit dedicated to educating users of connected technology about safety, privacy, and security - to develop a TikTok-specific guide for parents and teens."

Q.    And Mr. Chew describes ConnectSafely as a nonprofit; correct?

A.    That's what's written there, yes.

Q.    Did Mr. Chew inform the Senate Judiciary Committee that TikTok provided funding to ConnectSafely?

MR. DRAKE:  Object to form. Document speaks for itself.

THE WITNESS:    I don't see anything in this section about that, no.

BY MS. YEATES:

Q.    Can you please read the fifth bullet under TikTok's Partnerships in Mr. Chew's

Page 350

statement to the Senate Judiciary Committee?

A.      Sure.

"TikTok's Top 10 Tips for Families guide for the Family Online Safety Institute offers information on several tools to help teens manage how they interact with other users and who can see their videos.  It includes information about privacy restrictions, content, comments, and messages."

Q.      Did Mr. Chew inform the Senate Judiciary Committee that TikTok provides funding to the Family Online Safety Institute?

A.      I don't see anything in that section about that, no.

Q.      Can we turn to page 6 of this document, Bates 783839.

There's a section titled TikTok's Other Efforts to Promote a Safe Experience for Younger Users.

Do you see that?

A.      Yes, I do.

Q.      And that section continues on to the next page.  Can we scroll down to that, please.

The third paragraph from the

bottom, can we blow that up, please.

Part of Mr. Chew's testimony to the Senate Judiciary Committee in January 2024 talked about Family Pairing; correct?

A.    Yeah, I see Family Pairing mentioned in this section.

Q.    And Mr. Chew informed the Senate Judiciary Committee "With Family Pairing, parents and guardians can link their TikTok accounts to their teens' accounts and set particular controls for screen time, direct messaging, search, and content, amongst others"; is that right?

A.    That's correct.

Q.    Mr. Chew did not inform the Senate Judiciary Committee or the public that parents would not be notified by Family Pairing or by TikTok if their child created multiple accounts on the platform; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   This section was specific to what Family Pairing does, not what teen or other users may do.

BY MS. YEATES:

Q.    In this testimony before the

Senate Judiciary Committee on January 2024, did Mr. Chew inform the Senate Judiciary Committee or the public that parents would not be notified by TikTok if their child created multiple accounts?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall what was said during oral testimony, but I don't see anything about that in this section here.

BY MS. YEATES:

Q.    And in his testimony before the Senate Judiciary Committee in January 2024, did Mr. Chew inform the Judiciary Committee or the public that TikTok's Family Pairing feature allows young users to unlink their accounts from their parents at any time?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall what was said in oral testimony, but I don't see anything written here.

BY MS. YEATES:

Q.    In his testimony before the Senate Judiciary Committee in January 2024, did Mr. Chew inform the Judiciary Committee or the

Page 353

public that parents would not be notified by e-mail or phone if their child unlinked their account from Family Pairing?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall what was discussed in oral testimony, but I don't see that in the written testimony here.

BY MS. YEATES:

Q.    Did Mr. Chew inform Senate Judiciary Committee or the public that a child can unlink their account from Family Pairing without obtaining the parent's consent?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall everything discussed in oral testimony, but I don't see that written here.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that if a child created multiple accounts, the parent would have to set Family Pairing for every account their child has on TikTok?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall

CONFIDENTIAL

Page 358

answer period.

BY MS. YEATES:

Q.    Is that in this written statement?

A.    Not that language, no.

Q.    Did Mr. Chew tell the Senate Judiciary Committee or the public that TikTok use may be associated with any type of harm to teens?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was covered in the question and answer period.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that TikTok use could lead to disruptions in schools?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed in the question and answer period.

BY MS. YEATES:

Q.    Do you see that in this written statement?

A.    Let me take a look back.

(Reviews document.)

CONFIDENTIAL

Page 359

Not that language, no.

Q.     Did Mr. Chew inform the Senate Judiciary Committee or the public that student TikTok use could lead to damage in schools?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was covered during the question and answer period.

BY MS. YEATES:

Q.     Is that in this written statement?

A.     No.

Q.     Did Mr. Chew inform the Senate Judiciary Committee or the public that students were posting on TikTok during school hours?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed during the question and answer period.

BY MS. YEATES:

Q.     Is that in this written statement?

A.     No.

Q.     Did Mr. Chew inform the Senate Judiciary Committee or the public that students were receiving TikTok notifications during school day?

CONFIDENTIAL

Page 360

MR. DRAKE:  Object to form.

THE WITNESS:   I don't know if that was covered during the back-and-forth at the hearing.

BY MS. YEATES:

Q.      Is that in this written statement?

A.      I don't believe so.

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that classrooms could be interrupted by students receiving TikTok notifications during school hours?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that student TikTok use could lead to any harm in schools?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.      Is it in this written statement?

A.      No.

CONFIDENTIAL

Page 361

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that student TikTok use may cause schools to divert or increase resources to provide additional mental health resources to students?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:   No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that student TikTok use may cause schools to hire additional counselors in response to increased mental health and behavioral issues?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:   No.

CONFIDENTIAL

Page 362

BY MS. YEATES:

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may have to train staff on the harmful effects of social media as a result of student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.      Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:  No, it's not.

BY MS. YEATES:

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may have to create an educational material addressing social media addiction as a result of TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.      Is it in this written statement?

MR. DRAKE:  Object to form.

CONFIDENTIAL

Page 363

THE WITNESS:   No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may have to spend time and resources investigating crimes that result from student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:  I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is it in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:   No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may have to repair property damage resulting from student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is it in this written statement?

MR. DRAKE:  Object to form.

CONFIDENTIAL

Page 364

THE WITNESS:   No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to expend or divert staff time to confiscate cell phone and other devices as a result of student TikTok use during the school day?

MR. DRAKE:  Object.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Object.

THE WITNESS:  No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to expend, divert or increase time and resources to communicate with parents and guardians regarding these mental health behavioral and attendance issues as a result of student TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall

CONFIDENTIAL

Page 365

if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Objection.

THE WITNESS:  No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to respond to threats made against schools and students on TikTok?

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:   No.

BY MS. YEATES:

Q.    Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to expend, divert and increase resources, including technology resources, in an attempt to limit students' TikTok use during school hours?

MR. DRAKE:  Object to form.

CONFIDENTIAL

Page 366

THE WITNESS:    I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.      Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:  No.

BY MS. YEATES:

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to invest in physical barriers, such as magnetic pouches, to keep students from accessing TikTok during school hours?

MR. DRAKE:  Objection.

THE WITNESS:    I don't know if that was discussed at the hearing.

BY MS. YEATES:

Q.      Is that in this written statement?

A.      No.

Q.      Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to develop new or revised teaching plans to address students' altered learning habits, including reduced attention and inability to communicate effectively, as a result of student TikTok use?

CONFIDENTIAL

Page 367

MR. DRAKE:  Object to form.

THE WITNESS:   I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.     Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:  No.

BY MS. YEATES:

Q.     Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may need to provide additional learning support to address students' declining achievement as a result of the negative impact of problematic social media use on students' ability and capacity to learn in connection with students' TikTok use?

MR. DRAKE:  Object to form.

THE WITNESS:   I'm sorry.  Could you repeat that one again?

BY MS. YEATES:

Q.     Did Mr. Chew inform the Senate Judiciary Committee or the public that schools may have to provide additional learning support in response to student TikTok use?

MR. DRAKE:  Object to form.

CONFIDENTIAL

Page 368

THE WITNESS:    I don't recall if that was discussed at the hearing.

BY MS. YEATES:

Q.    Is that in this written statement?

MR. DRAKE:  Object to form.

THE WITNESS:  No.

MS. YEATES:  Thank you, Mr. Ebenstein.  I have no further questions at this time of the deposition.

I may have additional questions later in the deposition.  Now I will pass the deposition to my colleague, Chris Ryder.

I do need to leave -- I do need to leave my portion of the deposition open to the extent TikTok produces additional documents or any privileged challenges are resolved that result in additional documents being produced from your custodial file.

I appreciate your time.  Thank you.

MR. DRAKE:  We object to that.

I also don't understand the differences between your portion of the

CONFIDENTIAL

Page 369

deposition and Mr. Ryder's portion of the deposition, but needless to say, we can litigate that issue later.

MS. YEATES:  I was just describing, by way of stopping in the middle that I'll say at the end of the deposition, the deposition needs to stay open to the extent that additional documents are produced from Mr. Ebenstein's custodial file or any privilege challenges are resolved that lead to the production of additional documents, we may need to bring Mr. Ebenstein back.  Thank you.

MR. DRAKE:  Sure.  We oppose that and we look forward to the opportunity to litigate that issue before the judge.

THE VIDEOGRAPHER:  Mr. Ryder, before you start, may we just go off the record real quick?

MR. RYDER:  Yes.

THE VIDEOGRAPHER:  Time is 10:27 AM.  We're going off the record.

(A recess was taken.)

CONFIDENTIAL

Page 370

THE VIDEOGRAPHER:  The time is 10:36 AM and we are back on the record.

EXAMINATION

BY MR. RYDER:

Q.      Good morning, Mr. Ebenstein.  My name is Chris Ryder.  I'm an attorney with Keller Rohrback, and I also represent the plaintiffs in this matter.

How are you doing?

A.      Good morning.  Fine.  Thank you.

MR. DRAKE:  Mr. Ryder, before we begin, can you clarify which -- which plaintiffs you're asking questions on behalf of and how that contrasted with Ms. Yeates?

MR. RYDER:  Sure.  I am representing the JCCP plaintiffs today.

MR. DRAKE:  Okay.  Thank you.

BY MR. RYDER:

Q.      Mr. Ebenstein, do you understand you are still under oath; correct?

A.      Yes.

Q.      Without divulging any conversations you've had with counsel, can you tell me your understanding of what this lawsuit

Page 371

is about?

A.      My limited understanding is alleged claims of, I think, addiction and possible damage from social media use.

Q.      Do you understand that children are involved in this lawsuit?

A.      I'm not aware --

MR. DRAKE:  Object to form.

THE WITNESS:   Sorry.

I'm not aware of the ages of the plaintiffs, no.

BY MR. RYDER:

Q.      You understand that individuals are involved in this lawsuit?

A.      Yes.

Q.      Okay.  And do you understand that school districts are also plaintiffs in this lawsuit?

MR. DRAKE:  Object to form.

THE WITNESS:  Yes.

BY MR. RYDER:

Q.      Do you understand that some of the individual plaintiffs in this case allege they have anxiety?

A.      I'm not familiar with that

Page 372

information, no.

Q.      Okay.  Do you understand that they have alleged that their anxiety has been caused or worsened by social media?

A.      I'm not aware of that claim, no.

Q.      Do you understand that some of the individual plaintiffs in this case allege they have body dysmorphia?

A.      I'm not aware of that claim, no.

Q.      Okay.  Do you understand that they have alleged that their body dysmorphia has been caused or worsened by social media?

A.      I'm not aware of that claim, no.

Q.      Do you understand that some of the plaintiffs in this case have depression?

A.      I have no knowledge of that.

Q.      Do you understand that some of the plaintiffs in this case allege they have engaged in self-harm?

A.      I have no knowledge of that, no.

Q.      Okay.  Do you understand that they have alleged they engaged in self-harm because of social media?

A.      I have no knowledge of that, no.

Q.      Are you concerned to hear that

Page 373

kids and their families are alleging that social media has caused or worsened these types of injuries?

A.    I have no knowledge of those -- those claims.  So I don't have any -- anything I can say about that.

Q.    Are you concerned when individuals say that they've been harmed by their TikTok use?

A.    I am not familiar.  I don't know that I've ever had a conversation or a claim put to me about that kind of information.  So I'm not aware of that, no.

Q.    If someone were to approach you and say that they've been harmed by using TikTok, would that concern you?

MR. DRAKE:  Object to form.  Incomplete hypothetical.

THE WITNESS:   If someone came to me and told me they were harmed by -- by anything, I would feel badly about that.  Sure.

BY MR. RYDER:

Q.    Mr. Ebenstein, do you have a TikTok account?

CONFIDENTIAL

Page 374

A.       Yes, I do.

Q.       When did you first create yours?

A.       I don't remember exactly, but probably sometime in late 2018 or early 2019.

Q.       Okay.  Do you have more than one TikTok account?

A.       No.

Q.       What is your username?

A.       I believe it's ▮▮▮▮▮▮▮▮▮▮▮▮

Q.       So you're familiar with how TikTok functions from a user's perspective?

A.       I like to have a general understanding of how the platform works, yes.

Q.       Do you have any other social media accounts?

A.       Yes.

Q.       What other social media accounts do you have?

A.       I have an account on X formerly known as Twitter.  I have a Facebook account.  I use YouTube on occasion, but I can't recall if I'm logged in as a user or I just use it generally.

Those are the main ones that come

CONFIDENTIAL

Page 375

to mind.

Q.      You have a personal e-mail;
correct?

A.      Yes, I do.

Q.      And that's a Gmail account; right?

A.      Yes, it is.

Q.      And is it
████████████████@gmail.com?

A.      Yes, it is.

Q.      Do you have any other personal
e-mail accounts?

A.      I have a very old Yahoo account
that I think I use for fantasy sports, and
that's it.

Q.      What fantasy sports do you play?

A.      For that account, it's primarily
basketball and football, if I recall correctly.

Q.      And you have a work e-mail; right?

A.      Yes, I do.

Q.      What is your work e-mail?

A.      My work e-mail is
████████████████@tiktok.com.

Q.      And do you have any other work
e-mails?

A.      No, I don't.

CONFIDENTIAL

Q.    Do you have any e-mails ending in @bytedance.com?

A.    As I understand it, that's one e-mail with different aliases, but the e-mail that I send from and the e-mail that I know -- I think I receive from is the @tiktok.com exchange.

Q.    So if someone were to e-mail ████████@bytedance.com, is it your understanding that you would still receive that e-mail?

A.    I believe that to be accurate, yes.

Q.    Okay.  Have you ever sent work-related e-mails using your personal Gmail account?

A.    I don't believe so, no.  I want to keep those as separate as possible.

Q.    Okay.  Have you ever received work-related e-mails at your personal Gmail account?

A.    I don't believe so, no.  I wouldn't share that e-mail address with anyone to do with work.

Q.    Okay.  Is it possible that

CONFIDENTIAL

Page 377

individuals could have gotten that e-mail from somewhere else and then sent you e-mails related to your work at TikTok?

MR. DRAKE:  Objection.

THE WITNESS:   I have no recollection -- recollection of that. Even random e-mails that I get from strangers are @tiktok.com if they're trying to guess what my e-mail address is.

MR. RYDER:  TJ, pull up tab 139.  We'll introduce this as the next exhibit.

(Document marked for identification as TikTok-Ebenstein Exhibit 64.)

BY MR. RYDER:

Q.    Mr. Ebenstein, are you able to see the document we just pulled up?

DOCUMENT TECH:  I'm uploading it right now.  Just give me one quick second.

MR. RYDER:  Okay.  Thank you, TJ.

BY MR. RYDER:

CONFIDENTIAL

Page 378

Q.    And, Mr. Ebenstein, just let me know when you're able to see and view the exhibit.

A.    Sure.

DOCUMENT TECH:  Ebenstein 64 is up.

MR. RYDER:  Thank you.

THE WITNESS:  Yes, I see that.

BY MR. RYDER:

Q.    This is an e-mail you forwarded from your bytedance.com e-mail address to your gmail.com address; correct?

A.    Yes.

Q.    Okay.  And this e-mail shows that you forwarded an attached image originally sent by printer@bytedance.com; correct?

A.    Yes, that's what that says.

Q.    And this was sent on November 12, 2019; correct?

A.    That's what this says, yes.

Q.    And your personal Gmail was not something provided to you by TikTok or ByteDance; right?

A.    That's correct.

Q.    Do you have any recollection of

Page 379

what the PDF attached was?

A.      No, I do not.

Q.      Is it common for you to forward e-mails from your work account to your personal Gmail account?

A.      No, it is not common.

Q.      You have no reason to dispute that you didn't forward this yourself; right?

MR. DRAKE:  Object to form.

THE WITNESS:   I see what the document here says.  I -- I believe it's accurate.

BY MR. RYDER:

Q.      No one else has access to your bytedance.com e-mail account; correct?

A.      I'm not aware of anyone else who does.

MR. RYDER:  Let's take that exhibit down.

TJ, can we pull up tab 140 next and mark that as the next exhibit.

DOCUMENT TECH:  Ebenstein 65.

(Document marked for identification as TikTok-Ebenstein Exhibit 65.)

CONFIDENTIAL

Page 380

BY MR. RYDER:

Q.    Mr. Ebenstein, do you recognize this document?

A.    No, I do not.

Q.    I'll represent to you this was produced by TikTok as part of your custodial file.

Do you have any reason to dispute that?

A.    If you say so, no.

Q.    This is an e-mail forwarded from the Gmail account ▮▮▮▮▮▮▮▮@gmail.com to your work e-mail ▮▮▮▮▮▮▮@bytedance.com; correct?

A.    Yes, I see that.

Q.    And the e-mail is sent February 27, 2019; right?

A.    I see that, yes.

Q.    And the subject line says, BGR memo on today's Senate Commerce hearing on data privacy; correct?

A.    That's what it says, yes.

Q.    Okay.  And there's also an attachment to this e-mail; right?

A.    I don't see that.  I see it's

CONFIDENTIAL

Page 381

referenced, but I don't see that the attachment, no.

Q.    Okay.  Based on that language, including attachments and the .docs, is it your understanding that a document would have been attached to this e-mail?

MR. DRAKE:  Object to form.

THE WITNESS:    I guess it's possible.  I'm not sure how it works. Sometimes things say attachment and it's an old e-mail.  If this is the way it -- if this is the way it says it here, then it's entirely possible, yes.

BY MR. RYDER:

Q.    The forwarded e-mail was originally sent by ███████████ of BGR Government Affairs to your personal e-mail; right?

A.    Yes.

Q.    And that was sent on February 28, 2019; correct?

A.    Correct.

Q.    And was sent to your personal Gmail account; right?

A.    Yes.

CONFIDENTIAL

Page 382

MR. RYDER:  Let's take that down.

And, TJ, can we pull up tab 140.1 and mark that as the next exhibit.

DOCUMENT TECH:  Ebenstein 66.

(Document marked for identification as TikTok-Ebenstein Exhibit 66.)

BY MR. RYDER:

Q.     Mr. Ebenstein, I'll represent to you this is the attachment to the last e-mail we just looked at.

Do you have any reason to dispute that?

A.     If you say so, no, I do not.

Q.     Okay.  And this is a memo regarding a Senate Commerce Committee hearing on data privacy; is that correct?

A.     Let me look at the memo for a minute.  Excuse me.

(Reviews document.)

Yes, that looks accurate.

Q.     Okay.  And the memo itself is dated February 27, 2019; correct?

A.     Yes, correct.

Page 383

Q.    And at the top, the "To" line is to BGR Group Clients; correct?

A.    Yes, that's what it says.

MR. RYDER:  And, TJ, can we actually go back to the last exhibit, please.  Thank you.

BY MR. RYDER:

Q.    So ▮▮▮▮▮▮▮ forwarded this memo directly to you; correct?

A.    That's what it looks like here, yes.

Q.    And his e-mail states that he's a principal at BGR Government Affairs; correct?

A.    Yes.

Q.    What is TikTok's relationship with BGR Government Affairs?

A.    I'm not aware that TikTok has a relationship with BGR.  This was about a week after I started work, and ▮▮▮▮▮ was a former lobbyist of mine who likely didn't have my new work e-mail and was trying to do me a favor.

Q.    And you see there's actually an e-mail below in the chain from a ▮▮▮▮▮▮▮▮▮; is that right?

A.    I see that, yes.

Page 384

Q.      His e-mail states that you should "feel free to share clients who are interested in this topic"; correct?

A.      It says that, yes.

Q.      This privacy --

THE VIDEOGRAPHER:  Mr. Ryder, sorry.  We have to go off the record. The court reporter is requesting.  Times is 10:50 AM.  We're going off the record.

(A recess was taken.)

THE VIDEOGRAPHER:  Time is 10:51 AM and we're back on the record.

BY MR. RYDER:

Q.      Thanks for bearing with me, Mr. Ebenstein.

A.      Sure.

Q.      Live with technology.  Can't live without it.

I will retake my question since I believe I was in the middle of it before we had to go off the record.

Data privacy is important to your work at TikTok; correct?

MR. DRAKE:  Object to form.

THE WITNESS:  Yes.

CONFIDENTIAL

Page 385

MR. RYDER: You can take this exhibit down.

TJ, can you pull up tab R34. It should be in a separate folder.

Thank you, and mark this as the next exhibit.

DOCUMENT TECH: Ebenstein 67.

(Document marked for identification as TikTok-Ebenstein Exhibit 67.)

BY MR. RYDER:

Q. Mr. Ebenstein, do you recognize this document?

A. No, I do not.

Q. I'll represent to you this was produced by TikTok as part of your custodial file.

Do you have any reason to dispute that?

A. If you say so, no.

Q. This is an e-mail from ███████ ███████ sent to both your gmail.com e-mail address and your bytedance.com e-mail address; correct?

A. I see that there, yes.

Page 386

Q.        And the date of the e-mail is March 2, 2020; correct?

A.        Yes, I see that.

Q.        Okay.  Do you recall receiving this e-mail?

A.        No, I do not.

Q.        ▮▮▮▮▮▮▮▮▮ tells you she's a producer of a documentary about adolescent teen suicide; is that correct?

A.        I see that, yes.

Q.        Okay.  And in the third paragraph she notes you are a member of FOSI and the Internet Matters coalition; right?

A.        I see that, yes.

Q.        And she hopes you'd be interested in supporting a screening program for the documentary; right?

A.        I see those words, yeah.

Q.        Do you recall whether you responded to this e-mail?

A.        I don't recall, no.

                MR. RYDER:  You can take this exhibit down.

                Pull up R33 and mark it as the next exhibit.

CONFIDENTIAL

Page 479

DOCUMENT TECH:  Ebenstein -- sorry.  Ebenstein 82.

(Document marked for identification as TikTok-Ebenstein Exhibit 82.)

MR. RYDER:  Thank you, TJ. Too eager.

BY MR. RYDER:

Q.      Mr. Ebenstein, you see a document in front of you saying "TikTok Family Pairing Guide for Parents, A collaboration between TikTok and National PTA"?

A.      Yes, I do.

Q.      Do you recognize this document?

A.      Yes, I do.

Q.      What is it?

A.      It's a picture of a physical guide that was sent out to parents.

Q.      Okay.  And TikTok distributed this via direct mail; right?

A.      I don't remember who distributed it, but I do believe it was through direct mail, yes.

Q.      Okay.  And you said it was sent out to parents; right?

CONFIDENTIAL

Page 480

A.    I believe that was the -- the goal, yes.

Q.    Okay.  Be fair to say this was a mass mailer?

A.    Yeah, I think that's fair.

Q.    Okay.  Did you have any role in drafting this guide?

A.    I was generally involved in this project, but I don't think any of the language is my language here.

Q.    Okay.  Yesterday you testified you worked with the National PTA as a sponsor; correct?

A.    Yes, that's correct.

Q.    Okay.  Let's go to page 5 of the document.  This is Bates ending 654.

Do you see a chart on the right-hand side that talks about different settings in Family Pairing?

A.    Yes, I see that chart.

Q.    Okay.  And the first setting listed is "Screen Time Management"; right?

A.    I see that, yes.

Q.    It says "Decide how long your teen can spend on TikTok each day"; right?

Page 484

decrease user attention?

MR. DRAKE: Object to form.

THE WITNESS: I'm not aware of those studies.

BY MR. RYDER:

Q. Are you concerned that you're not aware of studies being conducted about the effects of screen time use?

MR. DRAKE: Object to form and lacks foundation.

THE WITNESS: No, I'm not on those teams. I'm not concerned.

BY MR. RYDER:

Q. If you learned that an internal study showed that screen time limits do not decrease TikTok's stay duration, is that something you'd want to share with parents and children who use TikTok?

MR. DRAKE: Object to form. Foundation as well.

THE WITNESS: If I find out -- found out about a study like that, I'd want to know what we were doing to continue to improve and iterate on the product.

CONFIDENTIAL

Page 485

MR. RYDER:  Okay.  TJ, if you pull up tab R28 and mark this as the next exhibit.

DOCUMENT TECH:  Ebenstein 83.

(Document marked for identification as TikTok-Ebenstein Exhibit 83.)

MR. RYDER:  Thank you.

BY MR. RYDER:

Q.    Mr. Ebenstein, you should have a document in front of you titled [A/B Analysis] Screen Time Dashboard & Screen Time Breaks.

You see that?

A.    Yes, I see that.

Q.    Okay.  I'll represent to you that TikTok produced this document as part of your custodial file.

Do you have any reason to dispute that?

A.    If you say so, no.

Q.    Okay.  And the metadata TikTok produced says this document was created September 27, 2021.

Do you have any reason to dispute that?

CONFIDENTIAL

Page 486

A.    No.

Q.    Okay.  Do you see the Executive Summary on the first page here?

A.    Yes, I see that.

Q.    Okay.  And in bold underneath, it says:

"We are providing users with a dashboard, opt-in weekly notifications, and opt-in break reminders for users who want to better manage their time spent on TikTok."

Right?

A.    Yes, I see that.

Q.    So these are some of the screen time tools we've been discussing TikTok offered in Family Pairing; right?

A.    I believe also offered outside of Family Pairing, but yes.

Q.    Okay.  And underneath there's a hypothesis; right?

A.    Yes.

Q.    Okay.  And the hypothesis is:

"By providing these more valuable tools and more broadly notifying users of our screen time management offering, we will see an increase in feature adoption and awareness."

Page 487

Right?

A.      Yes, I see that.

Q.      And there's nothing in the hypothesis about users having a decrease in screen time; correct?

MR. DRAKE:  Object to form.

THE WITNESS:  No, the hypothesis references increasing feature adoption and awareness.

BY MR. RYDER:

Q.      And that would refer to feature adoption and awareness of Family Pairing and, like you, said these other screen tools that might exist outside of Family Pairing; right?

A.      That's correct.

Q.      Okay.  And then there's a heading underneath that says "Expectations Met" with a checkmark.

You see that?

A.      Yes, I do.

Q.      Okay.  And it notes:

"Slight drop in stay duration (-0.07%) as we expected, but no impact to other core metrics (retention, publish, active days)."

Did I read that correctly?

CONFIDENTIAL

Page 488

A.        Yes, you did.

Q.        And then it notes that:

"This aligns with leadership's guidance (1) keep stay duration impact within a reasonable threshold (2) no impact to retention."

Did I read that correctly?

A.        Yes, you did.

Q.        And are you familiar with these metrics -- strike that.

Are you familiar with the core metrics listed in parentheses?

A.        I've heard those terms before. I'm familiar with them, yes.

Q.        What does retention mean?

A.        Remaining a user of the platform.

Q.        What does publish mean?

A.        Produce content.

Q.        And what does active days mean?

A.        Days active on the platform.

Q.        Okay.  So it's saying those metrics were not impacted by the rollout of these screen time tools in 2021; right?

MR. DRAKE:  Object.

THE WITNESS:  Correct.

CONFIDENTIAL

Page 489

BY MR. RYDER:

Q.    Do you know who leadership would be when it refers to this alignment of leadership's guidance?

A.    I don't.  I don't know who -- who wrote the doc or which leadership they'd be referring to.  It wasn't me.

Q.    Okay.  And then there's a sub-bullet point below that says:

"An explanation for no correlation with L1+2 is that minors do not have executive function to control their screen time, while young adults do (this is supported by our partners at Stanford Brainstorm)."

Did I read that correctly?

A.    Yes, you did.

Q.    And based on the chart we looked at in a previous exhibit, L1 refers to kids who are 13 through 15; right?

A.    That sounds correct.

Q.    And L2 is kids who are 16 through 17?

A.    I believe so, yes.

Q.    So combined, is your understanding this is referring to kids 17 and under -- strike

CONFIDENTIAL

Page 490

that -- is it referring to kids 13 through 17?

A.    I believe so, yes.

Q.    Okay.  Are you aware of whether TikTok ever published these results?

A.    I'm not aware, no.

Q.    And do you know whether TikTok shared these results with groups like the National PTA or FOSI?

A.    Not to my knowledge, no.

Q.    Do you know whether TikTok has publicly recognized that minors do not have executive function to control their screen time?

MR. DRAKE:  Object to form.

THE WITNESS:   I'm not aware if that's been discussed publicly.

BY MR. RYDER:

Q.    But it is noted in this document; correct?

MR. DRAKE:  Object to form.

THE WITNESS:   Sorry.  What's noted in this document?

BY MR. RYDER:

Q.    That minors do not have executive function to control their screen time?

MR. DRAKE:  Object to form.

CONFIDENTIAL

Page 494

A.      Yes, that's correct.

Q.      You talk to parents about TikTok; correct?

A.      Yes, that's correct.

Q.      And you also talk to teachers and school administrators about TikTok; right?

A.      Occasionally, yes.

Q.      Okay.  And you talk to some of these external stakeholders about TikTok's safety features; right?

A.      Yes, I do.

Q.      And that would include Family Pairing; right?

A.      Yes.

Q.      And TikTok has other employees that also talk to external stakeholders about TikTok's safety tools; right?

A.      Yeah.  We have a large Trust & Safety team, in addition to the Public Policy team that I sit on.

Q.      Okay.  I think yesterday we confirmed you started working for TikTok in 2019; is that right?

A.      That's correct.

Q.      Okay.  Since you started working

CONFIDENTIAL

Page 495

for TikTok in 2019, can you recall any time when TikTok told the public that TikTok use may be addictive for teens?

MR. DRAKE:  I'll object to form.  Lacks foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.    Okay.  Can you recall any time that TikTok told the public that TikTok may be associated with compulsive social media use?

MR. DRAKE:  Object to form and foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.    Can you recall any time when TikTok told the public that using TikTok may pose an increased risk of anxiety?

MR. DRAKE:  Object to form and foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.    Can you recall any time when

CONFIDENTIAL

Page 496

TikTok told the public that using TikTok may pose an increased risk of depression?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:  I don't recall any communications like that.

BY MR. RYDER:

Q.    Can you recall any time when TikTok told the public that using TikTok may pose an increased risk of engaging in self-harm?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:  I don't recall any communications like that.

BY MR. RYDER:

Q.    Can you recall any time when TikTok told the public that using TikTok may pose an increased risk of a user attempting suicide?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:  I don't recall any communications like that.

BY MR. RYDER:

Q.    Can you recall any time when

Page 497

TikTok told the public that using TikTok may pose an increased risk of obtaining an eating disorder?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.     Can you recall any time when TikTok told the public that using TikTok may pose an increased risk of having body dysmorphia?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.     Can you recall any time when TikTok told the public that using TikTok may pose a risk that a child will be sexually abused by a third party?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:   I don't recall any communications like that.

Page 498

BY MR. RYDER:

Q.    Can you recall any time when TikTok told the public that TikTok may be associated with any type of harm to teen users?

MR. DRAKE:  Object to form. Lacks foundation.

THE WITNESS:   I don't recall any communications like that.

BY MR. RYDER:

Q.    Switch gears a little bit.  Go back to Lark.

You mentioned yesterday that Lark is one of the primary methods of communication for TikTok employees; right?

A.    Yes.

Q.    You used --

MR. DRAKE:  Mr. Ryder, we're -- we're over 1:00 now on the East Coast.  So we're going -- we're going to need to pause if we could sometime very soon to take a lunch break.

MR. RYDER:  No.  Yeah, I appreciate that, Geoff.  I have -- I mean, I don't know how much you have in terms of redirect.  I think I maybe have

CONFIDENTIAL

Page 556

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

_Denise D. Vickery_

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028