# EXHIBIT B

# Books & Treatises

Litigation Services Handbook: The Role of the Financial Expert                    ˄

└ PART II DEVELOPING A DAMAGES ANALYSIS

　　└ Chapter 4 Damages Theories and Causation Issues

John Wiley & Sons, Inc., Litigation Services Handbook The Role of the Financial Expert, 6th Edition, Chapter 4 Damages Theories…

## Chapter 4 Damages Theories and Causation Issues[*]



**-------------- Page 120 --------------**

### 4.1 INTRODUCTION

This book describes approaches, issues, and nuances associated with damages claims of many types—intellectual property, antitrust, government contracts, and accountant liability, to name a few—and provides guidance to practitioners involved in those types of cases. To set the context for a deeper understanding of these areas, this chapter provides an overview of the fundamentals of causation and other legal standards, a general framework for selecting a damages theory, and guidance on developing a model to calculate damages. It also summarizes the most commonly accepted damages theories and models, describes accepted methods and elements that practitioners use in measuring damages claims, and discusses the



**-------------- Page 121 --------------**

practical aspects of expert testimony related to damage causation issues.

Accepted damages theories and elements can differ widely between state and federal court systems, in different jurisdictions, and for various types of matters. We cannot discuss all potential differences in this chapter. Practitioners should discuss the appropriate standards and elements of damages with counsel before investing time and effort on a wrong approach. Accordingly, this chapter provides a general framework to prepare an effective analysis and will help practitioners identify relevant questions when they begin to assess damages.

Historically, based on the English court system, two types of civil courts existed in the United States: courts of law and courts of equity. Courts of law made their judgments in accordance with federal or state law and awarded monetary damages as their remedy. Courts of equity, on the other hand, used a set of principles based on fairness, equality, moral rights, and natural law, rather than a strict interpretation of the law. In a court of equity, relief came in the form of an action, rather than the payment of money.[1] The wide variety of equitable remedies includes:[2]

- **Rescission:** undoing (or reversing) the actions taken under a contract;
- **Reformation (or rectification):** restructuring the terms of a contract to prevent an inequitable outcome;

## (h) Discounting

Many empirical studies on discounting require consideration of capital market risk.[93] For example, in a present value analysis, the practitioner discounts cash flows to a specific date, and the discount factor the practitioner uses should reflect in some cases the market and industry effects of each period. Experts can estimate the appropriate discount rate.

Practitioners often use the capital asset pricing model (CAPM) to estimate the appropriate discount rate (see **Chapter 10**). CAPM defines the return of a firm as the risk-free rate of return (usually measured by the return on short-term U.S. Treasury bills) plus the difference between the return on the market and the risk-free rate of return (otherwise known as the risk premium) times the firm's beta (the measure of the firm's market risk).[94] A practitioner using the CAPM could develop a discount factor for the present value analysis that would incorporate not only the effects of cash flows occurring in different time periods but also the return that the market and the specific firm experienced. Hence, an expert could more precisely measure what an expected cash flow occurring in Period 6 would equal in Period 0.

Practitioners must also deal with the effect of leverage (or debt). The presence of debt that a company must pay before the shareholders receive any return makes the shareholders' investment riskier. The discount factor for a firm's assets will



--------------- Page 150 ---------------

therefore differ from the discount factor for the firm's equity by the amount of risk represented by debt.[95] If the practitioner measures lost cash flows after deducting interest, the practitioner should use the firm's equity beta in developing the correct discount rate. In contrast, if the practitioner measures lost cash flows before deducting interest, the practitioner should use the firm's asset beta in developing the correct discount rate (or use the firm's weighted average cost of capital).

## (i) Prejudgment Interest

A practitioner who has used a discounted cash flow analysis to evaluate the plaintiff's lost profits will need an interest rate to bring those cash flows forward to the time of the trial from the base point of the analysis—and if enough time passes between the trial and recovery, to the time of the final judgment. (This assumes that the jurisdiction or particular cause of action permits prejudgment interest—see **Chapter 16**.) At the very least, this interest rate should reflect the value that the plaintiff's funds have lost owing to inflation. This measure, however, will not compensate the plaintiff for the opportunity costs of the use of its funds.[96]

Some experts suggest using the defendant's debt rate[97] while others invoking a similar theory prefer the risk-free rate[98] to measure prejudgment interest. Others suggest using the plaintiff's cost of capital—that is, a measure of the opportunity cost to the plaintiff (of course, at this point the defendant can argue that by doing so the plaintiff seeks consequential damages). The defendant's borrowing rate offers another measure because it regards the plaintiff's claim as an investment (albeit an involuntary one) in the defendant.[99]

Because confusion still abounds in the courts as to the meaning and proper application of lost profits, lost business value, appropriate valuation dates, discount rates, and risk factors, practitioners should address these issues early in the process through discussion with counsel to ensure proper consideration of jurisdictional nuances and accepted approaches for the type of matter at issue.

## (j) Damages for Different Types of Cases

Certain types of cases have developed a body of case law and have established precedents for methods of calculating damages that nearly all practitioners use and nearly all courts recognize as the most appropriate means of measuring damages. Examples include royalty rate calculations in patent matters, market share analyses in antitrust matters, trendline analysis in business interruption insurance cases, and event studies in securities cases. The courts broadly (or even universally) apply some of these precedents; other precedents are jurisdictional or even specific to a judge. We advise discussion with counsel to discern or confirm these differences.

We also note that while some damages methods have academic support (for

 **Page 151**

example, see **Chapter 27** for a discussion of the use of event studies in securities cases), other damages measurement methods do not. Damages measurement methods lacking an economic basis or support within the academic community carry additional risk. In *Uniloc USA Inc. v. Microsoft*,[100] the Federal Circuit unanimously struck down the use of the 25 percent rule in patent damages cases (see discussion in Section **20.6(m)** of **Chapter 20**). Although the court noted that this measurement method had general acceptance, the court also stated that this measure of damages was unrelated to the facts in the case and was inadmissible under the *Daubert* guidelines.

**4.6 DEVELOPING AN EFFECTIVE DAMAGES CLAIM**

Experts have no prescribed or universally accepted model for developing a damages claim, but those with experience employ methods that will improve the efficiency and effectiveness of the process and the results.

**(a) Learn the Background**

Experts should first understand the facts of the case and the liability issues related to causation of the alleged damages. They should review the relevant pleadings in the case that address damages (including the complaint and answer) and discovery-related documents such as interrogatories, depositions, and requests for admissions. Counsel often amends complaints and answers, so experts should review the most current pleadings. In addition, they should discuss the case background and liability assumptions with counsel to confirm the basis giving rise to the claim. For some matters, the expert will find media coverage in either mainstream or industry-specific sources. A search of the Internet can also yield useful background information for some matters.

With the participation of counsel, the expert can obtain relevant background factual information from representatives of the company for whom the expert performs the analysis. However, one should scrutinize with professional skepticism any information obtained from a party to the litigation to avoid accepting potential bias in that information. Industry research and company-specific research often yield a wealth of information that provides insight into the substantive issues of the case; this can also prove useful when the expert develops assumptions for the damages analysis. The benefits of learning the case background extend beyond the obvious need to understand the firm's operations and the effect thereon of the events in question; they also help the expert identify other potential factors that affected the operations and incorporate them in the analysis.

**(b) Understand Causation and Its Effect**

The harmful acts identified in the complaint will likely provide a framework to

**Page 152**

begin understanding causation and effects of the harm. However, most complaints and pleadings lack substantive proofs of cause and effect; these are the requirements of trial

and often the province of the expert to prove. The expert should use the knowledge gained in learning the background of the case to begin associating the

-------------- **Page 153** --------------

defendant's injurious acts with the plaintiff's damages. Other experts in the case (economists, industry experts, engineering and other technical experts, and medical professionals) often establish causation. Nevertheless, the expert should not blindly accept the conclusions of others without exercising due professional skepticism in applying these conclusions to the facts of the case and observed effects on the business. This becomes less complex when experts can establish causation through their own work, but is nearly always a necessary step. Triers of fact will look for a nexus between the actions of the defendant and the damages to the plaintiff and will expect experts to establish that connection based on their own work or through that of other experts. Practitioners can accomplish this through a combination of applying logic to the facts, using targeted analytics, and rebutting other possible explanations. Knowledge of company practices, industry conventions, technical methods, competitive behavior, accounting requirements, and economic principles are all important in analyzing potential effects and building the foundation for causation arguments.

**(c) Identify the Damages Theory**

As discussed throughout the chapter, many facets of damages analysis depend on the applicable law of specific jurisdictions or the circumstances of each case. Accordingly, we iterate that experts should work with counsel to ensure that the damages categories in the model comport with those pled and with the law from both a liability and a quantum perspective. For example, the expert should discuss and understand whether the plaintiff is seeking rescission of the contract, or affirmation of the contract with correction of the breach, or recovery of costs, or some other remedy. Ascertaining the objectives of the legal action will shed light on the available remedies and in turn the damages theories that can underpin a damages claim. Sometimes the plaintiff seeks a combination of equitable remedies and other legal remedies, such as damages. The plaintiff could have suffered losses for which it seeks compensation or could have lost opportunities for which it seeks restitution. Some cases have claims for both, which may be recovered so long as there is no duplication of the losses. Understanding the damages theory will allow the expert to identify appropriate models for an informed discussion with counsel.

**(d) Select the Damages Model**

Several factors affect the selection of an appropriate damages model:

- An understanding of the background of the case;
- Knowledge of the causation of damages and the effect on the company of the defendant's injurious actions;
- Verification of acceptable damages theories for the jurisdiction and matter at hand;
- Practices accepted by professional peers and academics;
- Consistency with the damages suffered; and
- Avoidance of redundancy (if using multiple models).

For example, a royalty rate model is both commonly accepted and well suited to assessing patent infringement damages because it applies an appropriate valuation of the patented technology to the effect of lost sales usurped by the infringing party. Once experts identify the appropriate model and confirm its use with counsel, they should begin to build the damages claim.

**(e) Build the Damages Model—Lost Profits Scenario**

A discussion of all the various methods of preparing damages claims could fill an entire book. Other chapters in this book provide guidance on particular types of litigation and the claims that naturally ensue in those matters. Thus, we limit this discussion to the development of a lost profits claim, although most of the steps identified (if not the specific procedures described) pertain to most damages analyses. Our scenario presents the steps from the viewpoint of the plaintiff, but the same activities occur regardless of which side of the litigation the expert represents. One develops knowledge about important factors and considerations—for example, background facts, contract terms, causation, damages theory (including recovery objectives), and ramifications of the breach—before building the damages model, which concerns the quantum of loss claimed.

*(i) Identify the Damage Period* While the attorneys will likely have already identified the key dates relevant to the damage period, the length of this period has important implications for revenue and cost measurements; the expert should critically review the attorney's assumptions. For example, over a long-enough period, almost all costs vary, and over a short-enough period, almost all costs remain fixed. With a shorter period, experts will subtract fewer indirect cost items from the lost sales revenues to estimate lost profits. In any event, experts who ignore this issue can arrive at the wrong answer even though they have correctly made all the other assumptions in the analysis. At a minimum, the expert must ascertain whether the lost profits apply only to the period of the contract term or have ramifications beyond the contract that the expert will express as an ongoing detrimental impact to the business. Identifying this period will define one of the most important parameters of the damages claim.

*(ii) Identify Assumptions and Estimates Needed for the Particular Case* Experts who calculate lost profits damages must understand how to create a but-for world

--------------- **Page 154** ---------------

because such claims require assessing what would have happened to a business had the defendant's injurious acts not occurred. When experts need to make conjectures, they develop and rely on supportable assumptions and estimates that must hold up under the counterparty's scrutiny. Thus, experts should identify the elements of a damages analysis as:

- Undisputed facts, or
- Estimates (and the estimation process), or
- Assumptions (and the support for those assumptions).

An overabundance of estimates and assumptions can lead to a damages claim that experts will find difficult to defend.

Experts frequently ground undisputed facts in lost profits claims in either the contract terms or certain verifiable key metrics (for example, actual sales volumes, revenues, and fixed-cost items). They obtain this information through data that are readily available or subject to independent confirmation. Experts sometimes need to make estimates concerning many key financial components of the model (for example, levels of sales returns, bad debts, purchase volumes and discounts available, and ramp-up rates on new product introductions). They base these on analyses of historical results achieved, regression analysis of relevant variables, or other analytical procedures. Assumptions usually involve broader parameters of the but-for world (e.g., inflation rates, price and demand elasticity, relevant market size and share, and interest rate trends). Some experts do not recognize any practical distinction between estimates and assumptions and use the term *assumptions* in referring to all subjective factors in the analysis.

*(iii) Build the Foundation for the Damages Claim* The process of building the foundation for the damages claim is partly defensive and partly practical, but is always necessary. Without

*(viii) Tax Considerations* In many litigation analyses, the expert must consider the effects of income taxes. This includes the average tax rate, the marginal tax rate, the effective tax rate, or even the marginal effective tax rate.[109] For example, a firm's weighted average cost of capital calculation includes the marginal corporate tax rate, whereas a firm's adjusted present value uses the effective tax rate.[110]

In addition, when experts complete their lost profits calculations, they should decide whether to calculate the damages on a pretax or after-tax basis. Because the government taxes a lost profits award, some experts prefer to calculate the award on a pretax basis. This advice, however, can lead to an over- or underestimation of damages by its failure to recognize changes in tax rates. Alternatively, one could calculate the award on an after-tax basis and then gross up the damages amount by the current tax rate (i.e., divide the after-tax damages by one minus the current tax rate). For example, suppose the plaintiff would have made $100 on a pretax basis during year one and, had it generated those funds in year one, it would have paid $46 in federal income taxes. (This example ignores present value and state tax issues.) Thus, the plaintiff would have had $54 more but for the defendant's wrongdoing. The plaintiff's case goes to trial in year seven, after the marginal corporate federal income tax rate has dropped to 34 percent. On one hand, if the court awards the plaintiff the pretax $100 in year seven, it will pay only $34 in federal taxes and on an after-tax basis will have $66, $12 more than the amount needed to make it whole. On the other hand, had the court awarded the grossed-up amount of the plaintiff's lost profits on an after-tax basis, the plaintiff would have received $82 [= $54/(1 - 0.34)], paid $28 in taxes, and have $54 left. In this example, the plaintiff would have benefited had the damages award been paid on a

-------------- Page 162 --------------

pretax basis. The results go in the opposite direction if the tax rate increased. (Chapter 18 discusses the tax treatment of damages awards.)

## 4.7 PRACTICAL ASPECTS OF EXPERT TESTIMONY ON DAMAGE CAUSATION

Lawyers sometimes ask liability experts to evaluate whether the defendant has engaged in wrongful conduct without regard to whatever harm has flowed from the conduct. Likewise, they frequently instruct damages experts to assume causation.

These practices, when pursued without proper consideration, can lead to mismatches between the expert evidence and the facts of the case. For example, expert testimony quantifying the amount of damages lacks relevance unless one can show that the damages resulted from the defendant's wrongful acts. Similarly, proof that an audit conducted pursuant to generally accepted auditing standards (GAAS) would have detected a misstatement in a company's financial statements is irrelevant unless the misstatement caused the plaintiff's injury.

As these examples illustrate, cases involving financial matters often require expert testimony to resolve whether the defendant's wrongful conduct caused the plaintiff's damages. Such expert testimony is frequently challenged on the following grounds:

- Causation is a fact question that depends on the testimony of fact witnesses rather than experts.
- Causation is a legal issue, on which experts should not offer an opinion.

The following discussion addresses these issues. Each case it reviews arises under **Federal Rule of Evidence 702**, which provides that a court can admit expert testimony relating to scientific, technical, or other specialized knowledge to assist the trier of fact in understanding the evidence or determining a fact in issue so long as it complies with the following requirements:

- ○ The testimony is based on sufficient facts or data.
- ○ The testimony is the product of reliable principles and methods.
- ○ The witness has applied the principles and methods reliably to the facts of the case.

These requirements ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."[111] They apply to all witnesses offered as experts.[112]

**(a) Admissibility of Expert Testimony**

The failure to properly consider causation jeopardizes the admissibility of expert

--------------- Page 163 ---------------

testimony on damages. In evaluating the admissibility of expert testimony under Rule 702, a trial court must consider whether the "expert testimony … is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[113] Damages experts who fail to consider causation risk a ruling that their testimony lacks this essential tie to the facts of the case.

For example, in *Concord Boat Corp. v. Brunswick Corp.*,[114] the U.S. Court of Appeals for the Eighth Circuit overturned a $133 million antitrust judgment based in part on the conclusion that the trial court should have excluded the damages-related testimony of the plaintiff's financial expert. The court found that the expert's damages model "was not grounded in the economic reality of the … [relevant] market, for it ignored inconvenient evidence."[115] Among other things, the damages model "failed to account for market events that both sides agreed were not related to any anticompetitive conduct."[116] Based on this and other "deficiencies in the foundation of the opinion," the court held that the expert's conclusions were speculative and unhelpful to the trier of fact.[117]

*Concord Boat* teaches that an expert cannot ignore whether the plaintiff's calculated damages flow from the defendant's conduct or other events. Indeed, even if the court had not excluded the expert's testimony there, the damages calculation would still have been vulnerable to attack as the expert would presumably have been hard-pressed to calculate on the witness stand the extent to which his damages calculation would have changed in response to changes in the facts.

**(b) Expert Testimony versus Fact Testimony**

Expert testimony on causation can prove more reliable than fact testimony in financial cases. A breach of contract case in the U.S. Court of Appeals for the Federal Circuit illustrates this situation.

*California Federal Bank v. United States*[118] is one of a series of so-called *Winstar* cases in which banks that purchased failing thrifts during the savings and loan crisis of the late 1980s and early 1990s sought to recover for damages caused by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) in 1989. This act effectively negated beneficial financial statement and regulatory capital provisions of banks' earlier contracts with the federal government to acquire failing thrifts. In *California Federal*, the plaintiff bank, CalFed, alleged that the enactment of FIRREA forced it to sell certain assets, including a large number of adjustable-rate mortgages (ARMs), to meet the act's new regulatory capital requirements.[119]

The court held that the government breached its contract with the bank, thus establishing liability. CalFed sought lost profits as damages for this breach, arguing that, but for FIRREA's enactment, it would have retained more ARMs, which would

--------------- Page 164 ---------------

have yielded substantial profits. The government countered that FIRREA did not cause the sale of ARMs, which shrunk the size of the bank, and that other factors existed that would have caused the sale irrespective of the changes in regulatory capital requirements effected by the act.

The government sought to debunk the plaintiff's lost profits claim through a financial expert who testified about the economics of the relevant market and presented an analysis of the operations and financial performance of CalFed. Among other considerations, the expert explained a principle familiar to most financial experts: one would expect the sale of the ARMs to have produced the same amount of profit as retaining them because, in a liquid market, the fair value of the ARMs at the time of their sale would have included the present value of the future cash flow if CalFed had retained them.

The trial court relied on the government's expert in finding that "it was the recession in the California real estate market in the early 1990s that 'caused CalFed to shrink the bank,' not the changes in regulatory requirements that resulted from the enactment of FIRREA."[120] On appeal, CalFed argued that "it was improper for the [trial] court to rely on the testimony of the government's experts rather than the testimony of CalFed's fact witnesses, who testified about their own intentions [i.e., but for FIRREA, they would have retained the ARMs]."[121] The Federal Circuit rejected this argument, explaining that

> the court, sitting as finder of fact, was entitled to weigh the credibility of CalFed's fact witnesses, taking into account their interest in the outcome of the litigation. At the same time, the court was entitled to consider the government's expert testimony to the extent that it shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment.

> The expert testimony on which the court relied in this case provided an explanation of why a bank such as CalFed might well have chosen to dispose of the ARMs, even in the absence of a breach ..., and why the sale of the ARMs did not necessarily result in a loss to CalFed. The expert testimony thus satisfied the requirement of **Rule 702 of the Federal Rules of Evidence**, which permits expert testimony to be admitted "to assist the trier of fact to understand the evidence or to determine a fact in issue."[122]

Accordingly, the court held that "the inability to prove by a preponderance of the evidence that profits would have been made but for the breach" barred the bank from recovering lost profits.[123]

*CalFed* demonstrates not only how a financial expert can properly present evidence to support or undercut a causation theory but also that such evidence can prove even more useful and credible than fact testimony that appears self-serving to the

 -------------- Page 165 ---------------

finder of fact under the circumstances.

### (c) Expert Sensitivity to Alternative Outcomes

In cases in which but-for causation becomes an issue, the expert must prepare to address alternative outcomes. For example, suppose a former client brings a claim against a law firm for improper representation in a bankruptcy proceeding. The plaintiff/debtor contends that, but for the defendant law firm's bad advice, the bankruptcy judge would have confirmed a different plan that provided a superior outcome to either historical equity interests or creditors. The plaintiff's contention hinges on proving that the alternative plan would have: