# EXHIBIT A

*Express Scripts, Inc., et al. v. Anne Arundel County, Maryland*, Misc. No. 1, September Term, 2025, Opinion by Booth, J.

**CERTIFIED QUESTION—MARYLAND COMMON LAW OF PUBLIC NUISANCE**

Pursuant to a certification order from the United States District Court for the District of Maryland, the Supreme Court of Maryland ("Supreme Court") was requested to answer the following questions:

1. Under Maryland's common law, can the licensed dispensing of, or administration of benefit plans for, a controlled substance constitute an actionable public nuisance?

2. If so, what are the elements of such a public nuisance claim, and what types of potential relief can a local government plaintiff seek when asserting such a claim?

The Supreme Court held that the licensed dispensing of, or administration of benefit plans for, a controlled substance does not constitute an actionable public nuisance under Maryland common law. Maryland has not expanded the public nuisance doctrine beyond the traditional historical principles embodied in the common law—namely, that a public nuisance action was not regarded as a tort but was instead a public action by a government entity to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct. The Court has never recognized a government actor's ability to recover damages for public nuisance.

The Court determined that it did not need to decide whether to expand Maryland's common law of public nuisance because Anne Arundel County's complaint against licensed pharmacies and pharmacy benefit managers fails to satisfy a primary requirement of a public nuisance action—specifically, that the defendants' conduct of dispensing opioids, and the administration of benefit plans for opioids, affects a common public right. Moreover, even if the County were able to establish that the alleged conduct interfered with a common public right, the Court recognized that judicial restraint is the best course given the extensive federal and state statutory and regulatory framework that governs the highly complex conduct of the licensed prescribing, dispensing, and administration of benefit plans related to opioids. Common law public nuisance is an inapt vehicle to address complex societal problems, which are best left to the legislative branch.

United States District Court for
 the District of Maryland
Case No.: Civ. No. 1:24-cv-00090-MJM
Argued: September 9, 2025

IN THE SUPREME COURT

OF MARYLAND

---

Misc. No. 1

September Term, 2025

---

EXPRESS SCRIPTS, INC., *et al.*

v.

ANNE ARUNDEL COUNTY, MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

---

Opinion by Booth, J.
Killough, J., concurs.
Watts, J., concurs and dissents.

---

Filed: March 23, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case comes to us from the United States District Court for the District of Maryland (the "District Court") pursuant to a certification order[1] requesting that we answer the following questions:

1. Under Maryland's common law, can the licensed dispensing of, or administration of benefit plans for, a controlled substance constitute an actionable public nuisance?

2. If so, what are the elements of such a public nuisance claim, and what types of potential relief can a local government plaintiff seek when asserting such a claim?

We answer "no" to the first question. We hold that the licensed dispensing of, or administration of benefit plans for, a controlled substance does not constitute an actionable public nuisance. As discussed herein, Maryland's public nuisance common law has not been expanded beyond the traditional historical principles—namely, that an action for public nuisance brought by a governmental entity on behalf of the public was not regarded as a tort, but instead as a basis for public officials to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct. Although damages may be available in a private nuisance action (as they were under the common law), this Court has never recognized a government actor's ability to recover damages in a public nuisance action.

We do not need to decide in this case whether to expand our common law of public nuisance because the County's complaint fails to satisfy a primary requirement of a public

---

[1] Under the Maryland Uniform Certification of Questions of Law Act, Md. Code (2020 Repl. Vol., 2025 Supp.), Courts & Judicial Proceedings Article ("CJ") §§ 12-601 *et seq.*, the court certifying the question shall issue a certification order containing "(1) [t]he question of law to be answered; [and] (2) [t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" CJ § 12-606(a).

nuisance action—specifically, that the Defendants' conduct of dispensing opioids, and the administration of benefit plans for opioids, affects a common public right.  But even if the County were able to establish that the alleged conduct interfered with a public right, we would nonetheless decline to expand our common law of public nuisance here given the extensive federal and state statutory and regulatory framework that governs the highly complex conduct of the licensed prescribing, dispensing, and administration of benefit plans related to opioids.

## I

### Certification Order and the Parties' Contentions

The certification order, and the operative complaint referenced therein, set forth the following procedural history and facts, which we accept for the purpose of answering the certified questions of law.  *United Bank v. Buckingham*, 472 Md. 407, 412–13 (2021).

Appellee Anne Arundel County, Maryland ("the County"), a charter county of the State of Maryland, brings this action against Express Scripts, Inc.; Express Scripts Administrators, LLC; Medco Health Solutions, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; OptumRX, Inc.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Maryland CVS Pharmacy, L.L.C.; and CVS Pharmacy, Inc. (collectively, "the Defendants").

The County's lawsuit consists of a single public nuisance claim against the Defendants, all of whom fall within three distinct categories: pharmacy benefit managers

("PBMs"), mail-order pharmacies, or retail pharmacies.[2]  The County contends that the Defendants caused and maintained a public nuisance by collaborating and partnering with opioid manufacturers in deceptive and dangerous marketing of opioids for financial gain, and by spurring opioid abuse by placing these drugs on formularies[3] with preferred status and without restriction on their approval for use.

The County's public nuisance claim against the PBM Defendants arises out of their actions to facilitate and encourage the use of opioids, allegedly flooding the market with opioids through their formulary and benefit management decisions.  As to the mail-order and retail pharmacy Defendants, the County's public nuisance claim arises out of those Defendants' actions in filling prescriptions for opioid medications in allegedly excessive quantities and in an allegedly unsafe manner.

The County seeks the following relief: (1) a finding that the Defendants have created a public nuisance and are jointly and severally liable; (2) an injunction permanently enjoining the Defendants from "engaging in the acts and practices that caused the public

---

[2] Defendants Express Scripts, Inc., Express Scripts Administrators, LLC Medco Health Solutions, Inc., OptumRx, Inc., Caremark PCS Health L.L.C., and Caremark, L.L.C. offer pharmacy benefit management services.  Defendants CVS Pharmacy, Inc. and Maryland CVS Pharmacy Service, L.L.C. operate retail pharmacies, and Defendants ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Optum Rx, Inc., Caremark PCS Health, L.L.C. and Caremark L.L.C. operate mail-order pharmacies.

[3] A formulary is "[a] list of prescription drugs covered by a prescription drug plan or another insurance plan offering prescription drug benefits." U.S. Ctrs. for Medicare & Medicaid Srvs., *Formulary*, HealthCare.gov, https://perma.cc/MT57-HWGD; *see also* Md. Code (2017 Repl. Vol., 2025 Supp.) Insurance Article ("Ins.") § 15-1601(h) (defining "formulary" as "a list of prescription drugs used by a purchaser").

nuisance"; (3) an order directing the Defendants to pay for the abatement of the public nuisance; (4) an award of compensatory damages "in an amount sufficient to fairly and completely compensate the County for all damages alleged" in the operative complaint; and (5) costs, filing fees, pre-and post-judgment interest, and attorney's fees.  As the County emphasizes in its brief, it is seeking, among other things, damages to reimburse it for past, present, and anticipated costs of public services related to opioid misuse, such as law enforcement and drug and addiction programs.

The Defendants argue that the County's claim is inconsistent with Maryland's common law doctrine of public nuisance and would represent an unprecedented expansion of the action.  The Defendants contend that in 250 years, this Court has never recognized a public nuisance claim that is untethered to the use of real property.  The Defendants also assert that a common law public nuisance claim is permitted only when the alleged conduct interferes with the property rights of the public at large.  The Defendants argue that because neither licensed dispensing of, nor administration of benefit plans for, a controlled dangerous substance has a connection to property and does not implicate any public right, neither can give rise to a public nuisance under Maryland law.

The Defendants point out that the highest courts in Oklahoma, Ohio, and Maine—the only state high courts to consider the issue—have rejected the expansion of public nuisance to claims related to prescription opioids.  Similarly, the supreme courts of Rhode Island, New Jersey, and Illinois have rejected efforts to expand their respective common laws of public nuisance to other product-based claims.  The Defendants contend that these out-of-state trends align with the Third Restatement of Torts, which recognizes that the

4

"common law of public nuisance is an inapt vehicle" for addressing the type of conduct that the County challenges. Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020).

The Defendants also argue that the County's attempt to bring a common law nuisance claim is preempted by the General Assembly's comprehensive statutory and regulatory authority over the practice of pharmacies and the provision of PBM services. The Defendants assert that, through comprehensive legislation, the General Assembly has occupied the entire regulatory field applicable to pharmacies and PBMs, including enforcement provisions, thereby abrogating any common law applicable to the subject.

Given this regulation of pharmacies and PBMs, the Defendants contend that applying the public nuisance doctrine to the conduct alleged by the County in this case would be tantamount to the Court usurping legislative authority by making a policy determination about the circumstances in which pharmacies and PBMs can be liable for conduct that the State licenses and regulates—a determination that would expose countless businesses to "limitless" tort liability for lawful activity.

For its part, the County asserts that in *Tadjer v. Montgomery County*, 300 Md. 539 (1984), this Court adopted the definition of public nuisance as outlined in the Restatement (Second) of Torts § 821B (1979), which defines it as "an unreasonable interference with a right common to the general public." According to the County, the public nuisance definition set forth in the Second Restatement is consistent with this Court's "decades-old formulation" of the doctrine. The County cites to this Court's decisions in cases such as *Adams v. Commissioners of Trappe*, 204 Md. 165 (1954) and *Jewel Tea Corporation v.*

5

*Town of Bel Air*, 172 Md. 536 (1937) in further support of its position that its claim falls within this Court's public nuisance jurisprudence.

The County argues that Maryland has never required that the alleged conduct at the source of the public nuisance involve real property. Rather, the County asserts that the alleged conduct must simply affect a general right based upon public health or safety. The County rejects the Defendants' characterization of its claim as being novel and contends that its claim is consistent with the English common law from which Maryland public nuisance law originates. The County points out that, as early as the 1660s, England's "common nuisance" definition included "apothecaries who sell products unfit for human consumption."

According to the County, we should answer the first question presented in the affirmative, and as to the second question, this Court should "reiterate" the elements of public nuisance under Maryland law, "as it has existed for decades," namely that: (1) "the conditions must interfere with a public right, hurting the public at large, not an individual victim"; (2) "the defendant's conduct must be unreasonable because it is unlawful, substantially interferes with public health or safety, or is unreasonable in relation to surrounding circumstances"; and (3) "the unreasonable conduct must be a cause of the harmful conditions." In addition to the equitable relief that a local government may seek to abate a public nuisance, the County argues that we should hold that a local government may seek damages for an injury to the public generally.

The County also contends that its common law claim is not preempted by Maryland's statutes and regulations governing pharmacies and PBMs. The County

6

argues that because neither the Maryland Pharmacy Act nor Maryland's PBM statute address or remedy public harms, the General Assembly has not abrogated its common law claim.

The Defendants and the County both cite to English common law and numerous Maryland cases in support of their respective positions concerning the parameters of Maryland's public nuisance law. At bottom, we hold that our common law of public nuisance is neither as limited as the Defendants suggest, nor is it as expansive as the County asserts. Our cases have not limited a public nuisance action to conduct that interferes with real property. By the same token, we have never adopted an expansive common law public nuisance tort in the manner asserted by the County.

Before we delve into nuisance law, we first discuss the comprehensive statutes and regulations that establish professional standards for prescribing and dispensing prescription medications. In addition to the statutes and regulations that govern the operations of pharmacies and PBMs generally, federal law and Maryland law contain concurrent and overlapping statutes and regulations that tightly regulate prescription opioids—from the licensed individual who prescribes the medication, to the patient, and to all stages of the distribution and supply chain.

7

## II

## Statutory Framework Applicable to Pharmacies and PBMs

### A.  The Maryland Pharmacy Act

The General Assembly has enacted the "Maryland Pharmacy Act,"[4] which establishes a comprehensive statutory and regulatory regime governing pharmacy practice and the operation of pharmacies in the State.  Md. Code (2021 Repl. Vol., 2025 Supp.), Health Occupations Article ("HO"), Title 12.  The Act provides detailed statutory oversight over the dispensing of prescription drugs, covering the entire process from the initial authorization of the prescribed drug by the authorized prescriber[5] to the distribution by the licensed pharmacy.[6]  Anyone who wishes to practice pharmacy in Maryland must obtain a license, *id.* § 12-301(a), and a separate permit is required to establish or operate a pharmacy, *id.* § 12-401.    Mail-order and non-resident pharmacies[7] that deliver prescriptions in Maryland are expressly subject to the Act.  *Id.* § 12-403(c)(17), (e)–(g).

---

[4] *See* Md. Code (2021 Repl. Vol., 2025 Supp.), Health Occupations Article ("HO") § 12-801 (designating the short title for Title 12).

[5] HO § 12-101(b) states that "authorized prescriber" "means any licensed dentist, licensed dental hygienist with prescriptive authority [], licensed physician, licensed podiatrist, licensed veterinarian, advanced practice registered nurse with prescriptive authority[], licensed nurse anesthetist, or other individual authorized by law to prescribe prescription or nonprescription drugs or devices."

[6] Under the Maryland Pharmacy Act, "'[p]harmacy' means an establishment in which prescription or nonprescription drugs or devices are compounded, dispensed, or distributed."  HO § 12-101(t).

[7] "'Nonresident pharmacy' means a pharmacy located outside this State that, in the normal course of business, as determined the Board, ships, mails, or delivers drugs or devices to a person in this State pursuant to a prescription."  HO § 12-101(q).

In addition to establishing licensing procedures and pharmacist qualifications, *id.* §§ 12-302–12-306, the Act creates a Board of Pharmacy to regulate pharmacy practice, *id.* § 12-201.  The Board is exclusively responsible for adopting "rules and regulations that are necessary to protect the public health, safety, and welfare and that establish standards for practicing pharmacy and operating pharmacies, including": "methods of advertising and promotion;" "standards for filling and refilling prescriptions;" and "a code of conduct that specifies which behaviors are either required or prohibited in the practice of pharmacy."  *Id.* §12-205(a)(3), (4) (citation modified).  Pursuant to this delegation of authority, the Board has adopted detailed rules and regulations.  *See generally* Code of Maryland Regulations ("COMAR"), Title 10, Subtitle 34.

Between the Maryland Pharmacy Act and the rules promulgated by the Board, there are provisions addressing wide-ranging aspects of pharmacy practice and the operation of pharmacies.[8]  Among its many statutory conditions for operation, a licensed pharmacy is required to "ensure that a licensed pharmacist" is "immediately available on the premises to provide pharmacy services at all times the pharmacy is in operation[.]" HO § 12-403(c)(3).  Notably, the statutory scheme ensures that the licensed pharmacist—not the licensed pharmacy—is responsible for filling prescriptions in accordance with the

---

[8] For example, the Act and its implementing regulations address substitution of generic drugs, HO § 12-504; prescription labeling requirements, *id.* § 12-505; emergency refills, *id.* § 12-506; pharmacy locations, *id.* § 12-403(c)(2); supervision of the pharmacy, *id.* § 12-403(c)(3), (4); pharmacy equipment, *id.* § 12-403(c)(11); drug storage, *id.* § 12-403(c)(12); staffing levels, *id.* § 12-403(c)(15), (16); requirements when prescription drugs are sent by mail, *id.* § 12-403(17); pharmacy security, COMAR 10.34.03.06; and retention of prescription records, *id.* 10.34.20.03.

pharmacist's professional judgment. *See id.* § 12-403(c)(7) (stating that a licensed pharmacy "[m]ay not offer pharmaceutical services under any term or condition that tends to interfere with or impair the free and complete exercise of professional pharmaceutical judgment or skill").

The Maryland Pharmacy Act and its implementing regulations set forth specific rules concerning the standards by which a pharmacist may fill or refuse to fill a prescription. In particular, a pharmacist may do so as long as the decision is based on his or her professional "judgment, experience, knowledge, or available reference materials." *Id.* § 12-501(a). And if a pharmacist has reason to believe that a prescription was not written for a legitimate medical purpose, in the ordinary course of a prescriber's practice, the pharmacist must verify with the prescriber that the prescription is medically legitimate before filling it. COMAR 10.34.10.08.[9] If, after consulting with the prescriber, and based

---

[9] COMAR 10.34.10.08 states:

   A. If, based on generally accepted professional standards for the practice of pharmacy, a pharmacist has reason to believe, or should have reason to believe, that a prescription for a controlled dangerous substance was not issued for a legitimate medical purpose in the usual course of the prescriber's practice, the pharmacist may not dispense the controlled dangerous substance until the pharmacist:
     (1) Consults with the prescriber; and
     (2) Verifies the medical legitimacy of the prescription.

   B. If, after consulting with the prescriber, and based on generally accepted professional standards for the practice of pharmacy, a pharmacist has reason to believe that the prescription for a controlled dangerous substance was not issued for a legitimate medical purpose in the usual course of the prescriber's practice, the pharmacist shall:
     (1) Refuse to dispense the drug; and

on generally accepted professional standards for the practice of pharmacy, a pharmacist has reason to believe that the prescription for a controlled dangerous substance was not issued for a legitimate medical purpose in the usual course of the prescriber's practice, the pharmacist is required to refuse to dispense the drug, and must report the incident to the regulatory board that licenses the prescriber. *Id*.

The Act also establishes an enforcement scheme to ensure compliance with its provisions.[10] The Act authorizes discipline of pharmacists, including suspension or revocation of licenses and permits, and civil penalties. HO §§ 12-313, 12-314. The Act permits the commencement of civil actions to enjoin the unauthorized practice of pharmacy or any conduct that could subject a pharmacist to discipline. *Id.* § 12-319.

Finally, in addition to the various civil enforcement provisions, the General Assembly has provided that a person who violates certain provisions of the Maryland Pharmacy Act "is guilty of a misdemeanor," and on conviction is subject to a fine not exceeding $1,000, or, in some instances, imprisonment not exceeding 1 year, or both.

---

(2) Report the incident to the regulatory board that licenses the prescriber.

[10] In terms of enforcement, the Maryland Pharmacy Act authorizes the Board to enter any permitted pharmacy in the State to inspect for compliance with federal and State laws and regulations. HO § 12-413. The Board is empowered to "suspend or revoke any pharmacy permit if the pharmacy: (1) is conducted so as to endanger the public health or safety; (2) violates any of the standards specified in" HO § 12-403; "or (3) otherwise is not conducted in accordance with the law." *Id.* § 12-409(a) (citation modified). The Board may also "impose a penalty not exceeding $10,000," and any penalty collected is paid "into the General Fund of this State." *Id.* § 12-410(a), (c). A person against whom the Board seeks to take action is entitled to notice and a hearing in accordance with the Administrative Procedure Act, *id*. § 12-411(b), and may petition for judicial review thereafter, *id*. § 12-412(a).

11

*See id.* § 12-707 (enumerating the subtitles or sections of Title 12 that are criminal offenses).[11]

### B. State Legislation Governing PBM Services

The General Assembly has likewise enacted comprehensive legislation regarding the provision of PBM services. Before we describe the legislation that governs PBMs, it is useful to first generally describe what a PBM is.

PBMs manage prescription drug plan benefits for insurers. They serve as "intermediaries between prescription-drug plans and the pharmacies that beneficiaries use." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 83–84 (2020). "When a beneficiary of a prescription-drug plan goes to a pharmacy to fill a prescription, the pharmacy checks with the PBM to determine that person's coverage and copayment information." *Id*. at 84. "After the beneficiary leaves with his or her prescription, the PBM

---

[11] The Maryland Pharmacy Act also covers wholesale distribution of prescription drugs. Subtitle 6C of Title 12 of the Health Occupations Article, titled the "Wholesale Distributor Permitting and Prescription Drug Integrity Act," governs "the normal distribution channel" for prescription drugs from the manufacturer to a distributor, and ultimately to a pharmacy. *See* HO § 12-6C-01(l). We do not need to discuss the wholesale distributor permitting statutory and regulatory scheme in detail. For our purposes, we simply note that the General Assembly has enacted a detailed regulatory framework associated with the distribution of prescription drugs consistent with regulations promulgated by the U.S. Food and Drug Administration, including permitting and inspection requirements, reporting requirements and records retentions, disclosures of information, deliveries, returns, and exchanges. *See generally id.*, Title 12, Subtitle 6C. The Board of Pharmacy is authorized to adopt regulations governing wholesale distribution. *Id*. § 12-6C-07. The General Assembly confers considerable enforcement authority in the Board for violations of the subtitle. Specifically, "[i]f a person knowingly violates any provision of this subtitle or any regulation adopted under this subtitle, the Board may impose a fine not to exceed $500,000." *Id.* § 12-6C-11(a)(1).

reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment. The prescription drug plan, in turn, reimburses the PBM." *Id*. Although PBMs "play no role in the physical distribution of prescription drugs, by handling negotiations and payments within the supply chain, PBMs have a significant impact on the total drug cost for payors, patient access to medications, and determining how much pharmacies are paid." Kathleen A. Birrane, Maryland Ins. Admin., Report of the Maryland Insurance Administration on *Rutledge v. Pharmaceutical Care Management Association* and its Impact on Title 15, Subtitle 16 of the Maryland Insurance Article (Jan. 5, 2022), https://perma.cc/JYK4-RV7T. "PBM activities typically include the creation of formularies, the negotiation of drug discounts, the creation of pharmacy networks, the processing of claims, and the review of drug utilization." *Id*. "In addition to cost management and drug price negotiations, PBMs may offer a variety of administrative services to a health plan, all related to prescription drug benefits." *Id*.

Maryland began regulating PBMs in 2008.[12] The comprehensive regulatory framework for PBMs is set forth in Title 15, Subtitle 16 of the Insurance Article ("Ins."). PBMs[13] must register with the Commissioner of the Maryland Insurance Administration,

---

[12] *See* 2008 Md. Laws, Chs. 202, 204, 206, 262, 279.

[13] Ins. § 15-1601(q) states that "pharmacy benefits manager" "means a person that performs pharmacy benefits management services." "Pharmacy benefits management services" means:

(i)    the procurement of prescription drugs at a negotiated rate for dispensation within the State to beneficiaries;

(ii)   the administration or management of prescription drug coverage provided by a purchaser for beneficiaries; and

13

which is the State agency vested with the authority to promulgate and implement regulations, and to oversee enforcement of the statute and regulations. *See* Ins. §§ 15-1604, 15-1619, 15-1642.

Maryland legislation establishes certain requirements related to: (1) PBMs' contracts with pharmacies and health plans,[14] *id.* §§ 15-1628–1631; (2) therapeutic interchanges of a substitute drug for the one that was originally prescribed, *id.* §§ 15-1633–1639; and (3) treatment of certain types of drugs when setting reimbursement amounts, *id.* § 15-1612.   The General Assembly requires that each PBM have a "pharmacy and therapeutics committee"—a committee that makes therapeutic recommendations concerning formulary decisions and utilization management.  *Id.* §§ 15-1613–15-1618. The Insurance Commissioner is authorized to adopt regulations for the implementation of

---

> (iii)    any of the following services provided with regard to the administration of prescription drug coverage:
> 1.  mail service pharmacy;
> 2. claims processing, retail network management, and payment of claims to pharmacies for prescription drugs dispensed to beneficiaries;
> 3. clinical formulary development and management services;
> 4. rebate contracting and administration;
> 5. patient compliance, therapeutic intervention, and generic substitution programs; or
> 6. disease management programs.

*Id.* § 15-1601(p)(1).

[14] The statute contains several requirements for these contracts, including: required disclosures related to the maximum allowable cost pricing; dispute resolution processes regarding cost pricing and reimbursements; prohibited fees and reductions in payments; audits; internal review processes; and retroactive denials or modifications of approved claims.  Ins. §§ 15-1628–15-1631.

14

the statutory provisions related to a PBM's pharmacy and therapeutics committee.  *Id*. § 15-1619.

The General Assembly has also enacted legislation addressing PBM functions related to formulary design and utilization management.  As to formulary design, a PBM is required to "ensure that its pharmacy and therapeutic committee has" "a process to evaluate medical and scientific evidence concerning the safety and effectiveness of prescription drugs, including available comparative information on clinically similar prescription drugs, when deciding what prescription drugs to include on a formulary[.]" *Id.* § 15-1617(2).  Concerning utilization-management tools, the statute requires that a PBM, through its therapeutic management committee, adopt a process to "evaluate medical and scientific evidence concerning the safety and effectiveness of prescription drugs when recommending utilization review requirements, dose restrictions, and step therapy requirements[.]" *Id*. § 15-1617(3).

The General Assembly has vested authority in the Insurance Commissioner to enforce the regulatory regime, including the authority to issue orders requiring a PBM to: "(1) cease and desist" from identified violations; "(2) take specific affirmative action to correct the violation;" or "(3) make restitution of money, property, or other assets to a person that has suffered financial injury because of the violation[.]" *Id*. § 15-1642(c)(1)–(3).  The Commissioner may file a petition in the circuit court in any county to enforce an order, and "[i]f the Commissioner prevails in an action brought under this section, the Commissioner may recover, for the use of the State, reasonable attorney's fees and the costs of the action." *Id*. § 15-1642(d)(4), (5).  "In addition to any other enforcement

15

action, the Commissioner may impose a civil penalty not exceeding $10,000 for each violation of this subtitle." *Id*. § 15-1642(e).  Finally, the enforcement authority granted under § 15-1642 "does not limit any other regulatory authority of the Commissioner" provided under the Insurance Article.  *Id*. § 15-1642(g).

III

### Statutory and Regulatory Framework Applicable to Prescription of Controlled Substances

In addition to the general statutory and regulatory schemes discussed above, there are concurrent and overlapping federal and state statutory schemes that regulate prescriptions for controlled substances such as opioids.

#### A.  The Federal Controlled Substances Act

Congress enacted the Comprehensive Drug Abuse Prevention and Control Act in 1970,[15] which was "prompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers[.]" *Gonzales v. Raich*, 545 U.S. 1, 12 (2005).  Title II of that Act—the Controlled Substances Act (sometimes hereinafter referred to as the "CSA")—establishes a comprehensive framework for regulating drugs and substances that pose a risk of abuse and dependence

---

[15] The Comprehensive Drug Abuse Prevention and Control Act of 1970 consists of three titles.  Title I relates to the prevention and treatment of narcotic addicts, formerly through the Department of Health, Education and Welfare, now the Department of Health and Human Services.  *Gonzales v. Raich*, 545 U.S. 1, 12 n.19 (2005) (citing 84 Stat. 1238).  Title II addresses drug control and enforcement as administered by the Attorney General and the Drug Enforcement Administration ("DEA").  *Id.* (citing 84 Stat. 1242).  Title III concerns the import and export of controlled substances.  *Id.* (citing 84 Stat. 1285).

in the United States.  21 U.S.C. §§ 801–971.[16]  The "main objectives of the" CSA "were to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances."  *Raich*, 545 U.S. at 12.  "Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels."  *Id*. at 12–13.

"To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the" CSA.  *Id*. at 13 (citing 21 U.S.C. §§ 841(a)(1), 844(a)).  The Act "categorizes all controlled substances into five schedules."  *Id*. (citing 21 U.S.C. § 812).[17]  "The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body."  *Id.* at 13–14 (citing 21 U.S.C. §§ 811, 812).  "Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, and use of the substances listed therein."  *Id*. at 14 (citing 21 U.S.C. §§ 821–830).

---

[16] 21 U.S.C. § 801 states, in pertinent part:

The Congress makes the following findings and declarations:

(1) Many of the drugs included within this subchapter have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people.
(2) The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people.

[17] A "controlled substance" is defined under the Controlled Substances Act (the "CSA") as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V" of the CSA's subchapter addressing control and enforcement.  21 U.S.C. § 802(6).

Most opioids are classified as schedule II substances, which have a "currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions." 21 U.S.C. § 812(b)(2)(B). However, they have "high potential for abuse[]" which can lead to "severe psychological or physical dependence." *Id.* § 812(b)(2)(A), (C). As such, other than in emergency situations, no schedule II drug may be "dispensed without the written prescription of a practitioner," and "[n]o prescription for a controlled substance in schedule II may be refilled." 21 U.S.C. § 829(a), (f); *see also* 21 C.F.R. § 1306.12(a).[18] "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his [or her] professional practice[.]" 21 C.F.R. § 1306.06.

The regulations promulgated under the CSA state that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] medical practice." *Id.* § 1306.04(a). The regulations further provide that "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing

---

[18] The regulations authorize an individual practitioner to issue "multiple prescriptions authorizing the patient to receive a total of up to a 90-day supply of a Schedule II controlled substance provided" that certain conditions are met, including that: (1) each separate prescription "is issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice;" (2) the "individual practitioner concludes that providing the patient with multiple prescriptions in this manner does not create an undue risk or diversion or abuse;" and (3) the "issuance of multiple prescriptions as described in this section is permissible under the applicable state laws[.]" 21 C.F.R. § 1306.12(b)(i), (iii), (iv).

practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *Id*.

The CSA and its implementing regulations, which are promulgated by the Drug Enforcement Administration ("DEA"), "set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping." *Raich*, 545 U.S. at 13–14 (citing 21 U.S.C. §§ 821–830 and 21 C.F.R. § 1301 *et seq*. (2004)). All those who manufacture, distribute, prescribe, or dispense controlled substances must register with the DEA, the enforcer of the Controlled Substances Act. 21 U.S.C. §§ 822, 823. All regulated entities in the supply chain, known as "registrants," must "provide effective controls and procedures to guard against . . . diversion of controlled substances." 21 C.F.R. § 1301.71(a). "Diversion" refers to the transfer of controlled substances "into other than legitimate medical, scientific, and industrial channels[.]" 21 U.S.C. § 823(b)(1); *see also Raich*, 545 U.S. at 10.

This statutory scheme recognizes that having excessive quantities of controlled substances—and opioids in particular—available in the United States has the potential for diversion and can contribute to overdose deaths and abuse. *Id*. § 826(a), (i).[19]

---

[19] The CSA has enhanced considerations for opioid quotas, which are set forth in 21 U.S.C. § 826(i), which states, in pertinent part:

> (1)(A) In establishing any quota under this section . . . for fentanyl, oxycodone, hydrocodone, oxymorphone, or hydromorphone (in this subsection referred to as a "covered controlled substance"), the Attorney

19

Accordingly, the CSA and its corresponding regulations require the DEA to annually determine aggregate production quotas for each basic class of schedule II substances to be manufactured for each calendar year. *Id.*; 21 C.F.R. Part 1303. Information concerning the quotas is required to be annually submitted to identified congressional committees. 21 U.S.C. § 826(i)(2)(B).

In addition to regulatory provisions related to filling prescriptions, *see generally* 21 C.F.R. Part 1306, the CSA and implementing regulations establish oversight over registrants, including provisions for labeling and packaging, such as warnings to patients, 21 U.S.C. § 825; 21 C.F.R. Part 1302; recordkeeping and reporting requirements, 21 U.S.C. § 827; 21 C.F.R. Part 1304; and security requirements, 21 C.F.R. §§ 1301.71–1301.76.

---

General shall estimate the amount of diversion of the covered controlled substance that occurs in the United States.

(B) In estimating diversion under this paragraph, the Attorney General—
  (i) shall consider information the Attorney General, in consultation with the Secretary of Health and Human Services, determines reliable on rates of overdose deaths and abuse and overall public health impact related to the covered controlled substances in the United States; and
  (ii) may take into consideration whatever other sources of information the Attorney General determines reliable.

(C) After estimating the amount of diversion of a covered controlled substance, the Attorney General shall make appropriate quota reductions, as determined by the Attorney General, from the quota the Attorney General would have otherwise established had such diversion not been considered.

The CSA and its corresponding regulations include significant civil enforcement provisions[20] and establish criminal statutory offenses[21] for violations of particular provisions. The CSA requires federal cooperation with state, local, and tribal agencies "concerning traffic in controlled substances and in suppressing the abuse of controlled substances." 21 U.S.C. § 873. To that end, the CSA authorizes the Attorney General to, among other things, enter into contractual agreements with state and local law enforcement agencies "to provide for cooperative enforcement and regulatory activities under this chapter." *Id*. § 873(a)(7).

Finally, we note that Congress expressly declared that the CSA was not intended to "occupy the field" in a manner that prohibits state law on the same subject matter. *Id.* § 903.[22] We turn to the concurrent statutory scheme enacted by the General Assembly.

---

[20] Various provisions of the CSA detail the civil enforcement tools available including administrative inspection warrants, 21 U.S.C. § 880; forfeitures, *id.* § 881; and injunctions, *id.* § 882. The DEA also has the authority to revoke or suspend a registrant's registration. 21 C.F.R. § 1301.36.

[21] It is unlawful for any person to knowingly or intentionally "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[]" unless expressly authorized by the subchapter. 21 U.S.C. § 841(a)(1). The penalties for violating subsection (a) in the case of a schedule II substance are set forth in § 841(b)(1)(C). The CSA establishes various other federal statutory criminal offenses, including unlawful possession, *id.* § 844(a); attempt and conspiracy, *id.* § 846; continuing criminal enterprises, *id.* § 848; maintaining drug-involved premises, *id.* § 856; and endangering human life while illegally manufacturing a controlled substance, *id.* § 858.

[22] 21 U.S.C. § 903 states:

No provision of this subchapter shall be construed as indicating an intent on the part of Congress to occupy the field in which that provision operates, including criminal penalties, to the exclusion of any State law on the same

### B. *Maryland's Controlled Dangerous Substances Act*

The General Assembly has enacted the Maryland Controlled Dangerous Substances Act[23] (sometimes hereinafter referred to as the "MCDSA"), which is a comprehensive statutory and regulatory scheme that is consistent with the Controlled Substances Act. *See* Md. Code (2021 Repl. Vol., 2025 Supp.), Criminal Law Article ("CR") Title 5.[24]  The MCDSA expressly contemplates coordinated and cooperative enforcement among federal and state agencies and officials.[25]

The MCDSA provides for the same closed regulatory system that exists under the CSA—establishing a "uniform law to control the manufacture, distribution, possession,

---

subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

[23] *See* Md. Code (2021 Repl. Vol., 2025 Supp.), Criminal Law Article ("CR") § 5-1101 (designating the short title for Title 5).

[24] The General Assembly's legislative findings and purpose of Title 5 of the Criminal Law Article are virtually identical to some of the congressional findings and declarations under the CSA outlined in note 16 above.  Specifically, CR § 5-102(a) states:

(a) The General Assembly finds that:
   (1) many of the substances listed in this title have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the people of the State; but
   (2) the illegal manufacture, distribution, possession, and administration of controlled dangerous substances have a substantial and detrimental effect on the health and general welfare of the people of the State.

[25] *See, e.g.*, CR § 5-201(a) (describing efforts to ensure cooperation "with each unit that enforces any federal, state, or local law relating to controlled dangerous substances"); *id*. § 5-310 (requiring the Department to notify the DEA of any order suspending or revoking registration and each forfeiture of a controlled dangerous substance under the

and administration of controlled dangerous substances" to "ensure their availability for legitimate medical and scientific purposes[,]" while at the same time "prevent[ing] their abuse, which results in a serious health problem to the individual and represents a serious danger to the welfare of the people of the State." *Id.* § 5-102(b)(1).

Maryland has adopted five schedules of "controlled dangerous substances"[26] that overlap with the federal schedules. *Id.* §§ 5-401–406. Most opioids are schedule II substances, *id.* § 5-403, and, subject to some limited exceptions, may not be dispensed without a written prescription or an electronic prescription from an authorized provider, *id.* § 5-501.[27]

---

subtitle); *id.* § 5-810(b)(2)(ii), (iii) (where an individual who holds a professional license is convicted of a drug crime, requiring the court to determine, among other things, "whether the public will be protected if the individual continues to perform tasks authorized by the license" and "whether the nature and circumstances of the drug crime merit referral to the licensing authority").

[26] CR § 5-101(g)(1)(i) defines "controlled dangerous substance," which includes "a drug or substance listed in Schedule I through Schedule V[.]"

[27] The MCDSA defines "authorized provider" as:

(i)      a person licensed, registered, or otherwise allowed to administer, distribute, dispense, or conduct research on a controlled dangerous substance in the State in the course of professional practice or research; or

(ii)      a pharmacy, laboratory, hospital, or other institution licensed, registered, or otherwise allowed to administer, distribute, dispense, or conduct research on a controlled dangerous substance in the State in the course of professional practice or research.

*Id.* § 5-101(d)(1).

All manufacturers, distributors,[28] dispensers, and authorized providers of controlled dangerous substances are required to be registered by the Department of Health. CR §§ 5-301–5-310. In addition to the registration requirements specified in the subtitle, an authorized provider who prescribes or dispenses a schedule II substance must also be registered with the State's Prescription Drug Monitoring Program, which we discuss below. Among other things, Subtitle 3 of Title 5 of the MCDSA: (1) imposes record keeping requirements consistent with federal law, *id.* § 5-306; (2) authorizes the Department to inspect a registrant's establishment, *id.* § 5-305; and (3) establishes the statutory bases on which a registration may be suspended, revoked, or denied, *id.* § 5-307, which are independent of any criminal prosecution or other proceeding under State law, *id.* § 5-308(c). "Proceedings to deny, revoke, or suspend a registration or renewal of a registration" are "conducted in accordance with the Administrative Procedure Act." *Id.* § 5-308(b). The Department has the authority to immediately suspend a registration

---

[28] CR § 5-303 establishes specific registration requirements for manufacturers and distributors of controlled dangerous substances included in the five schedules. A registrant may distribute schedule II substances only in accordance with an order form issued by the Department or an order form issued under federal law. *Id*. § 5-303(d). Prior to issuing a registration, the Department "shall consider" whether: (1) the registrant maintains "effective controls against diversion of particular controlled dangerous substances and any Schedule I or Schedule II substances compounded from a controlled dangerous substance into other than legitimate, medical, scientific, or industrial channels; (2) compliance with applicable federal, State, and local law; (3) any convictions of the applicant under federal, State, and local laws relating to the manufacture, distribution, or dispensing of controlled dangerous substances; (4) the applicant's experience in the manufacture and distribution of controlled dangerous substances and the effectiveness of the applicant's controls against diversion; and (5) any other factor that is relevant to and consistent with public health and safety." *Id*. § 5-303(b).

24

"simultaneously with the institution of proceedings if the Department finds that an imminent danger exists to public health or safety." *Id.* § 5-308(d).

Consistent with the closed regulatory system established by its federal CSA counterpart, the MCDSA similarly establishes a statutory scheme of criminal offenses for when controlled dangerous substances are manufactured, distributed, or sold in a manner other than that authorized by law.[29] Notably—and related to our nuisance law discussion below—the General Assembly has established one particular violation of the MCDSA as the statutory crime of "keep[ing] a common nuisance." *Id.* § 5-605(b).[30]

Subtitle 9 of Title 5 sets forth criminal and civil liability for registrants who fail to abide by the statutory scheme, regulations, and the conditions of the registration.[31]    The

---

[29] For example, the MCDSA makes it a crime to "possess or administer to another a controlled dangerous substance, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice." CR § 5-601(a) (citation modified).  It is also a crime to "distribute or dispense a controlled dangerous substance" except as authorized by the Act.  *Id.* § 5-602(a)(1).

[30] CR § 5-605(b) prohibits a person from keeping a "common nuisance," which is defined in subsection (a) as a "dwelling, building, vehicle, vessel, aircraft, or other place: (1) resorted to by individuals for the purpose of administering illegally controlled dangerous substances;  or (2) where controlled dangerous substances or controlled paraphernalia are manufactured, distributed, dispensed, stored, or concealed illegally."  A person who violates CR § 5-605 is guilty of a felony and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $15,000 or both.  *Id.* § 5-607(a).

[31] For example, it is a criminal offense for a registrant to "manufacture, distribute, or dispense a controlled dangerous substance to another registrant or other authorized person[]" "[u]nless authorized by the registrant's registration[.]" CR § 5-902(b).  It is also a crime for an authorized provider to "prescribe, administer, manufacture, distribute, dispense, or possess a controlled dangerous substance" "except" "in the course of regular professional duties" and "in conformity with this title and the standards of the authorized provider's profession relating to controlled dangerous substances[.]"  *Id.* § 5-902(c).  Upon

25

statute also establishes additional crimes by registrants who distribute certain controlled dangerous substances, including schedule II substances, in violation of other statutory provisions of the MCDSA. *Id.* §§ 5-903, 5-904.[32]

### C. The Maryland Prescription Drug Monitoring Program

To combat prescription drug abuse and diversion, all 50 states and the District of Columbia have created state-level prescription drug monitoring programs—electronic databases that gather information from pharmacies on dispensed prescriptions for controlled substances. Maryland's Prescription Drug Monitoring Program ("the Program") was established in 2011 to address issues of prescription drug abuse and diversion. 2011 Md. Laws, Ch. 166, *codified at* Md. Code (2023 Repl. Vol., 2025 Supp.), Health-General Article ("HG") Title 21, Subtitle 2A.[33]

---

a finding of a "knowing[] and intentional" violation of any provisions of Section 5-902, the person is "guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 2 years or a fine not exceeding $100,000 or both." *Id*. § 5-903(e)(1). "In all other cases, a person who violates this section is subject to a civil penalty not exceeding $50,000." *Id*. § 5-903(e)(2).

[32] A registrant manufacturer or distributor who knowingly or intentionally distributes a schedule II substance in violation of the scope of the registration authorized under CR § 5-303(d) "is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 2 years or a fine not exceeding $100,000 or both." *Id.* § 5-904(b)(1); *see also id.* § 5-904(a). In all other cases, a person who violates § 5-904(a)(1) is subject to a civil penalty not exceeding $50,000. *Id.* § 5-905(b)(2). A person who willfully distributes a schedule II substance except in accordance with the order form issued under the registration provisions of the statute is guilty of a felony and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $100,000 or both. *Id.* § 5-904(a)(2), (b)(3).

[33] The General Assembly enacted Maryland's Prescription Drug Monitoring Program ("the Program") in response to the "growing problem" of prescription drug abuse in Maryland and across the country. *See* Fiscal & Pol'y Note, S.B. 883 (Ch. 166, 2011) at

"To carry out its mission,"[34] the Program monitors the prescribing and dispensing of all five schedules of controlled dangerous substances. HG § 21-2A-02(c). The Program is administered by the Secretary of the Department of Health, in consultation with a statutorily created 20-member Advisory Board,[35] and is required to adopt regulations to

---

16.   Since its enactment in 2011, the General Assembly has made modifications to the Program as it has been rolled out.  *See* 2013 Md. Laws, Ch. 177; 2014 Md. Laws, Ch. 92; 2015 Md. Laws, Ch. 381; 2016 Md. Laws, Ch. 147; 2017 Md. Laws, Ch. 40; 2019 Md. Laws, Ch. 364; 2020 Md. Laws, Ch. 290.

[34] The express "mission of the Program" is to: "(1) [a]ssist prescribers, pharmacists, and public health professionals in: (i) [t]he identification and prevention of prescription drug abuse; and (ii) [t]he identification and investigation of unlawful prescription drug diversion; and (2) [p]romote a balanced use of prescription monitoring data to assist appropriate law enforcement activities while preserving the professional practice of health care providers and the access of patients to optimal pharmaceutical care."  HG § 21-2A-02(b).

[35] The Advisory Board is comprised of the following members: (1) the Secretary of the Department of Health, or the Secretary's designee; (2) the President of the State Board of Pharmacy, or the President's designee; (3) the Chair of the State Board of Physicians, or the Chair's designee; (4) the President of the State Board of Nursing, or the President's designee; (5) the President of the State Board of Dental Examiners, or the President's designee; (6) the President of the State Board of Podiatric Medical Examiners, or the President's designee; (7) the Chair of the Maryland Health Care Commission, or the Chair's designee; (8) four physicians and one nurse practitioner with expertise in clinical treatment using controlled dangerous substances, including pain management, substance abuse, and behavioral disorders; (9) one pediatrician; (10) three pharmacists who represent the perspective of independent and chain pharmacies; (11) a local law enforcement official; (12) the Secretary of State Police, or the Secretary's designee; (13) the President of the Maryland Association of County Health Officers, or the President's designee; (14) an academic or research professional; and (15) two Maryland residents who represent the perspective of patients, appointed by the Secretary.  HG § 21-2A-05(b).

The Board's duties include making recommendations related to the design and implementation of the Program, including regulations, legislation, and sources of funding, including grant funding, and other sources of federal, state, or private funds. HG § 21-2A-05(f)(2).  The Board is also required to submit an annual report to the Governor and General Assembly that includes: (1) the number of prescribers and pharmacists registered with and

27

carry out the Program.  HG § 21-2A-04.  All prescribers and pharmacists are required to

be registered with the Program, after completing training and instruction.  *Id*. § 21-2A-

04.01.

Subject to certain statutory exceptions,[36] a prescriber is required to request and

assess at least the prior four months of prescription monitoring data[37] for a patient before

initiating a course of treatment that includes prescribing or dispensing an opioid.  *Id*. § 21-

2A-04.2(a)(1)(i), (iii).[38]  If a pharmacist has a reasonable belief that a patient may be

---

using the Program; (2) the number of disclosures made to federal law enforcement agencies or State or local law enforcement agencies; (3) an analysis of the impact of the Program on patient access to pharmaceutical care and on curbing prescription drug diversion in the State; (4) the number of providers who received outreach and education from the Program; and (5) any recommendations related to modification or continuation of the Program.  *Id*. § 21-2A-05(3).

[36] HG § 21-2A-04.2(b) sets forth certain statutory exceptions from the prescriber's requirement to obtain prescription monitoring data before prescribing an opioid.  These exceptions include, among other things, amounts indicated for a period not to exceed three days, or circumstances in which a patient is receiving treatment in an inpatient unit at a hospital, hospice care, or is suffering from a terminal illness, or to treat or prevent acute pain for a period of not more than 14 days following a surgical procedure, fracture, significant trauma, or childbirth.  *Id*.

[37] "'Prescription monitoring data' means the information submitted to the Program for a monitored prescription drug."  HG § 21-2A-01(p).

[38] If a patient's course of treatment requires prescribing or dispensing an opioid for more than 90 days, the prescriber must request the monitoring data at least every 90 days until the course of treatment has been completed, and to assess it before deciding whether to continue prescribing the medication.  HG § 21-2A-04.2(a)(1)(ii).

In addition to the prescriber's statutory requirements under Maryland's Prescription Drug Monitoring Program, the General Assembly has enacted statutory requirements for health care providers who prescribe opioids that are intended to prevent and address prescription opioid misuse.  For example, subject to certain statutory exceptions, when treating pain, "a health care provider, based on" his or her "clinical judgment" is required

28

seeking a monitored prescription for any purpose other than the treatment of an existing medical condition, the pharmacist is also required to "request prescription monitoring data to determine if the patient has received other prescriptions that indicate misuse, abuse, or diversion of a monitored prescription drug[.]" *Id.* § 21-2A-04.2(e)(1).

Each dispenser is required to submit, by electronic means, prescription monitoring data to the Program at least once every 24 hours. COMAR 10.47.07.03.B. For each monitored prescription drug, the dispenser is required to report data required by the American Society for Automation in Pharmacy standards, in addition to other required information, including the prescription number, the date the prescription was issued, the date the prescription was filled, whether the prescription was new or a refill, the metric quantity of drugs dispensed and units, the number of days' supply of the drug dispensed, the patient's identifying information, and certain identifying information related to the prescriber, including the prescriber's DEA registration number. *Id.* 10.47.07.03.A.

Prescription monitoring data collected by the Program is privileged and confidential and may not be disclosed to any person except as specifically authorized by law. HG § 21-2A-06(a). However, the Program is required to disclose prescription monitoring data, in accordance with regulations promulgated by the Secretary, to certain individuals and

---

to prescribe the "lowest effective dose of an opioid" and at "[a] quantity that is no greater than the quantity needed for the expected duration of pain severe enough to require an opioid that is a controlled dangerous substance[.]" HO § 1-223(b). When a health care provider prescribes an opioid for pain under subsection (b), he or she is required to advise the patient of the benefits and risks associated with the opioid. *Id*. § 1-223(d). A violation of these subsections is "grounds for disciplinary action by the health occupations board that regulates the health care provider who commits the violation." *Id*. § 1-223(e).

agencies, including the patient, prescribers, dispensers, authorized licensed health care practitioners, federal, state, and local law enforcement agencies for purposes of individual investigations, licensing entities, and authorized administrators of another state prescription drug monitoring program. HG § 21-2A-06(b); COMAR 10.47.07.05.

The Program is required to (1) review prescription monitoring data for possible indications of misuse or abuse of monitored prescription drugs, (2) report the possible misuse or abuse, and (3) provide education to the prescriber or dispenser. HG § 21-2A-06(c)(1). If the Program's review indicates a possible violation of law or possible breach of professional standards, the statute creates a process for addressing the possible violation or breach, starting with outreach and education. *Id*. § 21-2A-06(c)(2). If the Program determines that such efforts are inadequate, it may refer the matter to the Office of Controlled Substances Administration—an office created by statute within the Department of Health. *Id.* § 21-2A-06(d)(4).

In connection with any investigation into any potential violation of the law or breach of the professional standard, the Program is also required to obtain clinical guidance and interpretation of the prescription monitoring data from a statutorily created technical advisory committee. *Id.* §§ 21-2A-07, 21-2A-06(3).[39] If the Office of Controlled

---

[39] The purposes of the technical advisory committee are to: (1) review requests for information from the Program made under various statutory provisions of the Program, and (2) provide clinical guidance and interpretation to the Program regarding indications of possible misuse or abuse of a monitored prescription drug or a possible breach of the prescriber or dispenser's professional standards. HG § 21-2A-07(b). The committee consists of members appointed by the Secretary of the Department of Health, including: (1) a board certified anesthesiologist; (2) a certified addiction medicine specialist; (3) a pharmacist licensed and practicing in the State; (4) a medical professional licensed and

Dangerous Substances, in consultation with the technical advisory committee, and after notice to the prescriber or dispenser, determines that there has been a violation of the law or breach of professional standards, the office is required to "take any action authorized by law regarding the violation or breach, including providing the prescription monitoring data and records to the appropriate licensing entity for possible disciplinary action." *Id*. § 21-2A-06(d)(4)(ii)(2).  The Program establishes civil and criminal penalties for violating its provisions.[40]

As we noted at the outset, the action that is the subject of the certification order does not involve a proceeding authorized by one of the many statutes discussed above.  Instead, it is brought by a county under Maryland's common law of public nuisance.  In answering

---

practicing in the State, who is treating cancer patients; (5) a board certified physician specializing in the treatment of patients with pain, who is licensed and practicing in the State; (6) two medical professionals, licensed and practicing in the State with expertise or experience in providing care for patients with substance-related or mental health disorders; (7) a dentist licensed and practicing in the State; and (8) a medical professional licensed and practicing in the State in the field of internal medicine or family practice. *Id*. § 21-2A-07(c).

[40] "A dispenser who knowingly fails to submit prescription monitoring data" to the Program "as required under the subtitle shall be subject to a civil penalty not exceeding $500 for each failure to submit required information." HG § 21-2A-09(a).  A person who knowingly discloses, uses, obtains, or attempts to obtain by fraud or deceit, prescription monitoring data in violation of the subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding one year or a fine not exceeding $10,000 or both. *Id*. § 21-2A-09(b)(1).  In addition to the penalties provided under paragraph 1 of subsection b, a prescriber, pharmacist, or their delegate who knowingly discloses or uses prescription monitoring data in violation of the subtitle is subject to disciplinary action by the appropriate licensing entity. *Id*. § 21-2A-09(b)(2).  A prescriber or pharmacist who violates the registration requirements under § 21-2A-04.1 or the prescription monitoring requirements under § 21-2A-04.2 is also subject to disciplinary action by the appropriate licensing entity. *Id*. § 21-2A-09(b)(3).

the certified question, it is instructive to discuss: (1) the English common law of nuisance, and the doctrine's adoption generally in the United States; (2) Maryland cases involving public nuisance and private nuisance, and the differences between the two types of actions; and (3) the General Assembly's codification of particular nuisance statutes, as well as comprehensive statutory schemes that address conduct that would have been considered public nuisances under common law.

## IV

### Nuisance Law

It is an understatement to say that public nuisance is difficult to define. As one learned treatise notes, "there is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance.' It has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked into a pie. There is general agreement that it is incapable of any exact or comprehensive definition." W. Page Keeton, *Prosser & Keeton on Torts* § 86 (5th ed. 1984) (footnotes omitted); *see also City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1110 (Ill. 2004) (citation modified) ("Because the concept 'eludes precise definition,' public nuisance has been 'negatively defined' by distinguishing it from other tort actions, such as trespass.").

32

As discussed below, the elusive nature of public nuisance has its roots in English common law. Although its evolution is complex and sometimes murky, we briefly examine its history, outlining only its general contours.[41]

### A. Public Nuisance Origins in English Common Law

Nuisance cases can be traced to the last half of the twelfth century. Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 790–91 (2003). The earliest cases involved what would be considered a private nuisance today. *Id.* at 792. A landowner was able to seek a remedy (either abatement or damages) in royal courts where conduct occurring on the property of an adjoining landowner interfered with the landowner's possession of his land. *Id*. By way of example, such cases included "those seeking compensation for the flooding of plaintiff's land because the defendant had failed to repair his sea walls, and actions for failure to repair roads, bridges, and fences." *Id*. at 796.

By the fourteenth century, the common law recognized a private individual's right to bring an action for "special damages" upon proving a public nuisance where the landowner could establish a special injury or damages greater than the injury suffered by the public as a whole. *Id*. at 799–800. Notably, although a private individual could recover damages for special injuries arising from a public nuisance, "there is no historical

---

[41] For a comprehensive discussion of the history and evolution of the common law of public nuisance in England, see Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741 (2003).

evidence" that the Crown "was ever able to sue for damages to the general public resulting from a public nuisance." *Id*. at 782.

By contrast, public or common nuisance[42] cases were handled by local criminal courts. *Id*. at 795. The King's Bench, which supervised the jurisdiction of the local criminal courts in the seventeenth century, required that an indictment of any person prosecuted in these courts for public nuisance state that the alleged conduct of the defendant was harming the public at large. *Id*. The paradigmatic public nuisance case involved the blocking of a public road or navigable waterway. Thomas W. Merrill, *Is Public Nuisance a Tort?*, 4 J. Tort L. 1, 9 (2011).[43] "The right to use a road or navigable stream" was "understood to be a public right, in the sense of a privilege enjoyed by all members of the community." *Id*. A blockage, therefore, was considered to be an injury common to the general public. *Id*. at 9–10. The available remedies for public nuisances

---

[42] William Sheppard, a seventeenth-century treatise writer, described "common nuisances" that were subject to abatement and criminal prosecution, to include:

> matters affecting public highways and waterways; polluting the air with houses of office, laying of garbage, carrion or the like, if it be near the common high way, victuallers, butchers, bakers, cooks, brewers, malsters and apothecaries who sell products unfit for human consumption; running lewd ale-houses; and subdividing houses in good neighbourhoods that become hurtful to the place by overpestring it with poor.

Gifford, *supra*, at 795 (citation modified).

[43] With the exception of footnotes 45 and 47, all references to Professor Merrill's work are to the article entitled *Is Public Nuisance a Tort?*, 4 J. Tort L. 1 (2011).

were limited to abatement and criminal prosecution.  Gifford, *supra*, at 795.  "Actions for

damages were not available in such cases."  *Id*. at 796.[44]

By the seventeenth century, Parliament began passing laws establishing the variety

of conduct that the courts could consider to be a public nuisance—"thus beginning a pattern

of legislative bodies declaring certain activities to be public nuisances that continues to this

day."  *Id*. at 798.  The "disparate origins of public nuisance were brought together" by a

treatise writer, William Hawkins, in his 1716 publication of *Pleas of the Crown,* "the first

comprehensive treatment of English criminal law that sought to provide definitions of each

offense and categorize the crimes."  *Id*.  Indeed, scholars have characterized Hawkins's

impact on the law of public nuisance as "profound":

> As might be expected, Hawkins had problems fitting everything into his tidy
> scheme, and ended up with an annoying pile of bits and pieces left over.
> These he seems to have dealt with by taking the vague heading "common
> nuisance," using it as a residual category, and stuffing into it all the things
> that he could fit in nowhere else.  Having done so, he fashioned a definition
> of the concept broad enough to cover everything he had grouped within it …
> The definition of common nuisance which he fabricated to cover all this is
> "an offence against the publick, either doing a thing which tends to the
> annoyance of all the King's subjects, or by neglecting to do a thing which the
> common good requires."

*Id*. (quoting J. R. Spencer, *Public Nuisance—A Critical Examination*, 48 Cambridge L.J.

55, 65–66 (1989)).  Hawkins's "'definition' is the basis of the definition for a single offence

of public nuisance which appears in almost every book on tort or criminal law today."  *Id*.

at 799 (quoting Spencer, *supra*, at 66); *see also* W. Prosser, *Private Action for Public*

---

[44] "In addition to these 'public nuisances' handled by the local criminal courts, the King's Bench had residual power to criminally prosecute any misconduct that threatened the public good."  Gifford, *supra*, at 795.

*Nuisance*, 52 Va. L. Rev. 997, 1000 (1966) (explaining that "the crime [of public nuisance] comprehends a very miscellaneous and diversified group of petty offenses, all based on some interference with the interests of the community, or disruption of the comfort or convenience of the general public"). [45]

## B.  Public Nuisance Laws in America

### 1.  Early Application of the Common Law

The English law of public nuisance "was adopted without significant change in colonial America" and, thereafter, in the United States.  Gifford, *supra*, at 800.  Early public nuisance cases generally fell into two categories: obstruction of either public highways or navigable waterways. *Id.* "Less common were a loose amalgamation of minor offenses involving public

---

[45] Blackstone's definition of "public nuisance" has been similarly described as a "hodge-podge of activities or conditions[,]" in which he conjures up a general description of this catalogue of ills, which he characterized as "'the doing of a thing to the annoyance of all the king's subjects, or neglecting to do a thing which the common good requires.'" Thomas W. Merrill, *Public Nuisance as Risk Regulation*, 17 J. L. Econ. & Pol'y 347, 357–58 (2022) (quoting 4 William Blackstone, Commentaries on the Laws of England 166–69 (1769)). Blackstone identifies the following activities or conditions as constituting a public nuisance:

(1)     Obstructing a public way;
(2)     Engaging in conduct that constitutes a private nuisance to multiple persons;
(3)     Operating a disorderly establishment, such as a brothel or a gambling house;
(4)     Running a lottery;
(5)     Storing large quantities of explosives, as well as making, selling, or setting-off fireworks;
(6)     Eavesdropping and publicly quarrelsome behavior.

4 William Blackstone, Commentaries on the Laws of England 166–69 (1769).

morals or the public welfare that were classified as either public nuisances or common nuisances, including lotteries, other forms of gambling and wagering, keeping a disorderly house or tavern, enabling prostitution, and using profane language." *Id*. at 800–01. Public nuisance cases were brought as criminal prosecutions or actions by private individuals seeking compensation for special damages. *Id*.; *see also* Merrill, *supra*, at 11. Cases often blurred the lines between private nuisance and public nuisance. Gifford, *supra*, at 801.

Starting in the 1840s, the rise of industrialization broadened the scope of public nuisance claims alleging new types of injuries, like "water pollution and air pollution resulting from industrial enterprises." *Id*. at 802. As Professor Gifford observes, "[g]enerally, the rationale for extending a common nuisance cause of action to these new fact patterns was not discussed." *Id*. "Presumably, the justification for extending public nuisance to these fact patterns lay either in the long tradition of finding noxious trades to be public or common nuisances or in the fact that often the 'unpleasant and unwholesome vapors' resulted from the spoiling of water." *Id*.

With the American industrial transformation—which typically preceded government regulation—state legislatures often utilized public nuisance statutes as a "stopgap measure," which gave states the ability to terminate unwanted conduct, "either through criminal prosecutions or, more directly, through abatement actions." *Id*. at 804. Two different types of public nuisance statutes emerged: (1) statutes generally giving the "power to prosecute or abate conduct described in broad terms as constituting a public nuisance" and (2) statutes—often enacted in tandem with the first category of statutes—

37

declaring "a set of specific offenses to constitute public nuisances through a series of specific statutes." *Id*.

Professor Gifford observes that "[t]he onset of the Progressive Era and the New Deal saw a substantial reduction in both governmental actions for public nuisance, whether criminal prosecutions or suits seeking injunctive relief against public nuisance[s]." *Id*. at 805.[46] "A principal reason" for the decline, Professor Gifford posits, "was that the development of comprehensive statutory and regulatory schemes that substituted other means of regulation for many former targets of public nuisance prosecutions." *Id*. at 805–06.[47]

Until the 1970s, public nuisance actions were understood to be criminal prosecutions or government enforcement actions to abate a public nuisance. *Id.* at 745–46; *see also* Merrill, *supra*, at 5 (explaining that "before the publication of the Restatement (Second) of Torts, public nuisance, even when brought as a civil action, was universally understood to be based on the defendant's maintenance of a condition that was also a crime"). A public nuisance action was not considered to be a civil tort. Merrill, *supra*, at

---

[46] According to Professor Gifford, "a Lexis search for written opinions for public nuisance from Jan. 1, 1930 to Dec. 31, 1969, suggests that the number of criminal prosecutions for public nuisance was reduced by at least fifty percent compared with the previous thirty year period." Gifford, *supra*, at 805 n.331 (citation modified).

[47] For example, the Rivers and Harbors Act of 1890 promulgated by Congress prohibited unauthorized obstructions in navigable waters. Merrill, *Public Nuisance as Risk Regulation*, *supra*, at 362–63. Other statutes, such as the Food and Drug Act and the Meat Inspection Act of 1906, were enacted to regulate unadulterated or mislabeled food and drug products—areas in which public nuisance had been used to address harms to public welfare. *Id*. at 363. Over time, "the legislation established a significant regulatory agency"—the Food and Drug Administration ("FDA")—"with extensive powers to prevent a variety of threats to public health from consumable products." *Id*.

5. The marked absence of public nuisance from American tort law is perhaps best reflected by its exclusion from the First Restatement of Torts. *Id.* at 20. Notably, when the treatise was approved, it included a chapter on private nuisance but made no mention of public nuisance. *Id.*; *see generally* Restatement (First) of Torts (1939). "The 'Introduction' to the private nuisance chapter explained that public nuisance was not included because public nuisance is 'an offense against the State,' unlike private nuisance, which is a tort." Merrill, *supra*, at 20.[48] Public nuisance underwent a seismic shift within the American Law Institute with the adoption of the Second Restatement of Torts.

> 2. *The Second Restatement—The Adoption of a New Definition of Public Nuisance*

>> a. The Rejection of Prosser's Definition

When the American Law Institute decided to revise the Restatement of Torts, it appointed William L. Prosser, Professor of Law at Berkeley, as the Reporter. *Id.*[49] When

---

[48] The Introduction explained:

> A public nuisance is an offense against the State, and as such is subject to abatement or indictment on the motion of the proper governmental agency. A private nuisance is a tort to a private person, and actionable by him as such.

Restatement (First) of Torts, Scope and Introductory Note to Ch. 40 (1939).

The Introduction's description of public nuisance was consistent with the contemporary view expressed by scholars prior to the adoption of the Second Restatement. *See* Merrill, *supra*, at 11 (citing J. A. Jolowicz & T. Ellis Lewis, Winfield on Tort 392 (7th ed. 1963) and John Salmond, The Law of Torts 83 (14th ed. 1965)); *see also* William L. Prosser, *Private Action for Public Nuisance*, 52 Va. L. Rev. 997 (1966) (stating that public nuisance is "always a crime").

[49] At the time, Prosser was regarded not only as the "foremost expert" on torts, but also "practically the only living expert on public nuisance[.]" Merrill, *supra*, at 20. Prosser

Prosser submitted his proposed draft of public nuisance for the Second Restatement, it contained a significant limitation—conduct considered to be a public nuisance had to be a crime. *Id.* at 23–24.[50]  In connection with his submission, Prosser included an explanatory note in which he cited "eight English and American commentaries and nine American judicial decisions (which Prosser said were representative of many more), all of which equated public nuisance with criminal liability." *Id.* at 24.  "Prosser added that he had failed to 'uncover a single case in which it was held that there was a public nuisance although there was not a crime[,]' although he added that there was one case in which the criminal character of the conduct was not mentioned and another case where the defendant, a municipal corporation, was immune from criminal prosecution." *Id*. (citing Restatement (Second) of Torts (Am. L. Inst., Tentative Draft No. 15, 1969)).

Prosser's draft was met with opposition by some members of the Institute.  Merrill, *supra*, at 24; Gifford, *supra*, at 806.  The public nuisance discussion at the Institute was occurring at a time in this country when the environmental movement was gaining traction.[51]  Merrill, *supra*, at 24.  Some members of the Institute were concerned that equating public nuisance with criminal liability would restrict its use in emerging

---

had written two articles on nuisance law.  *See* William L. Prosser, *Nuisance Without Fault*, 20 Tex. L. Rev. 399 (1942); William L. Prosser, *Private Action for Public Nuisance*, *supra.*

[50] Section 821B of Prosser's proposed draft provided: "A public nuisance is a criminal interference with a right common to all members of the public."  Restatement (Second) of Torts § 821B (Am. L. Inst., Tentative Draft No. 15, 1969).

[51] Notably, the 1970 American Law Institute's plenary session occurred immediately after the first "Earth Day" on April 22, 1970.  Merrill, *supra*, at 24.

environmental cases.  *Id*. at 24–25; Gifford, *supra*, at 806–07.  As Professor Merrill describes, "[a]fter a heated debate, in which Prosser's defense of the draft as a faithful restatement of the weight of authority was parried by earnest calls to go on record in support of the emergent environmental movement, a motion was passed recommitting the provisions on public nuisance to the Reporter for further consideration."  Merrill, *supra*, at 25 (citing Presentation of Restatement of Law (Second) of Torts (Am. L. Inst., Tentative Draft No. 16, 1969)); *see also* Gifford, *supra*, at 807.[52]  Prosser was "distraught" by the plenary session's rejection of his draft on public nuisance, and subsequently submitted his resignation as Reporter.  Merrill*, supra*, at 25; Gifford, *supra*, at 807 n.342.

Prosser was replaced as the Reporter by John C. Wade, Dean of Vanderbilt Law School.  Merrill, *supra,* at 25.  Wade redrafted the definition of public nuisance and substituted the word "unreasonable" for the word "criminal."  *Id.* at 26.  The new definition of "public nuisance" thus read: "A public nuisance is an unreasonable interference with a right common to all members of the public."  *Id*. (citing Restatement (Second) of Torts (Am. L. Inst., Tentative Draft No. 17, 1971)).  The new definition was adopted in 1972. *Id.*  With the substitution of a single word, the definition of "public nuisance" underwent a drastic expansion in the Second Restatement.

### b.  The Expanded "Public Nuisance" Definition

The expanded definition of public nuisance was adopted by the American Law Institute in 1972 and was published in the Second Restatement in 1979.  It provides:

---

[52] The vote to recommit was 85 to 51.  Merrill, *supra*, at 25 n.95 (citing Presentation of Restatement of Law (Second) of Torts (Am. L. Inst., Tentative Draft No. 16, (1969))).

(1)    A public nuisance is an unreasonable interference with a right common to the general public.

(2)    Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B (1979).

Subsection (1) defines public nuisance as "an unreasonable interference with a right common to the general public." The only terms of limitation within this definition are that: (1) a defendant's conduct must interfere with a right "common to the general public[,]" and (2) such interference must be "unreasonable." Section 821B then goes on to define three factors to be used in guiding courts as to the meaning of "unreasonable." As Professor Gifford aptly observes, factors (a) and (c) "are articulated in very amorphous, open-ended language." Gifford, *supra*, at 809.

Section 821C of the Second Restatement, titled "Who Can Recover for Public Nuisance[,]" establishes the circumstances under which a *private individual* may recover damages for a public nuisance. Specifically, for a private individual to seek damages arising from a public nuisance, that individual "must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the

42

general public that was the subject of the interference."[53]  *Id*. at 808 (citing the Second

Restatement).  The Second Restatement mentions damages only in the context of a private

individual action pursuant to the special injury exception—there is nothing in the Second

Restatement about public officials recovering damages for a harm to the public generally.

We will return to our discussion of the nuisance sections outlined in the Second

Restatement when we address the County's argument that this Court has adopted the

expansive public nuisance definition described in Section 821B and that the County's

public nuisance claim asserted here is consistent with Maryland's common law.  But first,

we discuss nuisance law in Maryland.

### C.  *Maryland's Common Law of Nuisance*

Like English common law, nuisances in Maryland "are classified as public and

private."  *Adams v. Comm'rs of Trappe*, 204 Md. 165, 170 (1954).  We have described

---

[53] Section 821C of the Second Restatement, titled "Who Can Recover for Public Nuisance[,]" states:

(1) In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

(2) In order to maintain a proceeding to enjoin to abate a public nuisance, one must
(a) have the right to recover damages, as indicated in Subsection (1), or
(b) have authority as a public official or public agency to represent the state or a political subdivision in the matter, or
(c) have standing to sue as a representative of the general public, as a citizen in a citizen's action or as a member of a class in a class action.

Restatement (Second) of Torts § 821C (1979).

43

"public nuisance" as "an injury to the public at large or to all persons who come into contact with it[,]" whereas a "private nuisance is an injury to an individual or a limited number of individuals only." *Id.* Nuisances are also classified as "nuisances per se" and "nuisances in fact." *Id.* (citation modified). A nuisance per se "is an act, occupation, or structure which is a nuisance at all times and under any circumstances regardless of location or surroundings." *Id.* A classic example of a nuisance per se is an unlawful encroachment in a public street. *Id.* at 172. A nuisance in fact is not a nuisance per se, but is an act, occupation, or structure that becomes a nuisance "by reason of the circumstances, location, or surroundings." *Id.* at 170.

A survey of our case law reveals that, to date, we have adhered to the traditional principles of both public and private nuisance and have not expanded either action beyond parameters established by the common law. We discuss both public nuisance actions and private nuisance claims because conduct that may be considered a public nuisance can give rise to a private nuisance claim, and our case law often discusses public and private nuisance concepts together. Additionally, given that the General Assembly has the right to codify and modify the common law—and has done so with respect to an array of conduct that would be considered a nuisance at common law—we also touch upon various legislative enactments that enable the State and its agencies as well as local governments to vindicate public rights arising from statutorily defined public nuisances.

    *1. Cases Involving Government Action to Enjoin Nuisances Per Se*

Maryland has long recognized the paradigmatic common law public nuisance action involving obstructions to public streets, highways, and navigable waters. *See, e.g., Caine*

44

*v. Cantrell*, 279 Md. 392, 399 (1977) (affirming orders to abate public nuisances requiring the removal of structures encroaching into a public street and beyond the mean high-water line, "title to which is vested in the State of Maryland, and held for the benefit of the inhabitants of the State"); *Liller v. State Highway Admin.*, 25 Md. App. 276 (1975) (affirming the circuit court's entry of an injunction in a case brought by the State Highway Administration to abate a public nuisance arising from a stockpile of excavated waste material located on private property that caused a landslide onto a public highway, and to require the removal of the pile to avoid future encroachments); *Maxa v. Comm'rs of Harford County*, 158 Md. 229 (1930) (affirming a decree of the court of equity granting the county's request for an injunction preventing the arbitrary and constant encroachment upon a public landing by three residents in the community, which constituted a public nuisance); *Arnsperger v. Crawford*, 101 Md. 247, 258 (1905) (observing that "[t]he obstruction of the King's highways always constituted a public nuisance and was therefore indictable by common law"); *Phila., Wilmington & Balt. R.R. Co. v. State*, 20 Md. 157, 161–64 (1863) (affirming a judgment in favor of the State upon an indictment charging the railroad company with erecting and maintaining a nuisance upon a public highway where the width of a bridge was too narrow and impeded the passenger's transportation or passage).

In *Adams v. Commissioners of Trappe*, 204 Md. 165 (1954), this Court discussed the common law public nuisance principles applicable to obstructions of public roads, which we determined to be a nuisance per se. In that case, we affirmed a circuit court's abatement order in an action filed by the town commissioners against a property owner

45

who had constructed a gas pump in a public sidewalk adjacent to a public street in a manner that obstructed motorists' vision and placed a gasoline storage tank under the surface of a street, all in violation of the town code. *Id.* at 170.

In affirming the lower court's determination that the encroachments constituted a public nuisance, we described the distinction between a private and public nuisance, explaining that a "public nuisance is an injury to the public at large or to all persons who come into contact with it[,]" whereas a "private nuisance is an injury to an individual or a limited number of individuals only." *Id.* We cited to English common law in which courts had equitable jurisdiction to prohibit "purprestures on public property"—which translated in modern parlance to "encroachment[s] upon public rights and easements, such as highways, streets, public squares, bridges and other public accommodations." *Id.* We explained that "the right of the public to use the streets" is "absolute and paramount," and accordingly, "they must be kept free from all nuisances, obstructions and encroachments which destroy or materially impair their use as public highways." *Id.* at 171.

In *Whitaker v. Prince George's County*, 307 Md. 368, 372 (1986), the county sought, and was awarded, a permanent injunction enjoining property owners from operating a prostitution business that the county described as "a blatant house of ill repute, a bawdyhouse" and that constituted "a nuisance per se." Thereafter, the county filed a motion for contempt, alleging that the property owners were continuing to operate the prostitution business in violation of the injunction. *Id.* at 373. The circuit court found the property owners to be in willful contempt of the court for continuing to operate a bawdyhouse contrary to the court's order. *Id.* The property owners were ordered to post

bonds guaranteeing that they would not engage in prostitution. *Id.* The property owners appealed. *Id.* at 374.

This Court was asked to consider whether the county could maintain an equitable action to abate or enjoin the existence and maintenance of a prostitution business. *Id.* at 377. The property owners argued that, because the keeping of a bawdyhouse or disorderly house generally constituted a criminal offense, the county therefore had an adequate remedy at law through the enforcement of criminal laws, and thus, the property owners asserted that the county could not bring an equitable action seeking injunctive relief. *Id.* We rejected the property owners' argument, explaining that where "the enforcement of the criminal law is merely incidental to the general relief sought" and the conduct in question "constitute[s] a nuisance or a danger to the public health and public welfare and a more complete remedy is afforded by injunction than by a criminal prosecution, a court of equity may, on the request of the duly constituted authority, grant the relief sought by injunction." *Id.* at 377–78. Citing to *Hamilton v. Whitridge*, 11 Md. 128 (1857)—a private nuisance case in which this Court upheld an injunction awarded to a landowner that prohibited the neighbor from operating a bawdyhouse—this Court upheld the injunction, stating that "we believe that the operation of a bawdyhouse constitutes a public nuisance whereby equity jurisdiction would lie to afford a more complete remedy than is obtainable by law." *Id.* at 379.

Cases involving government entities seeking to abate nuisances arising under the common law are few and far between. In the last 70 years or so, *Whitaker* and *Commissioners of Trappe* appear to be the only cases decided by this Court involving a

47

governmental entity seeking to abate a common law public nuisance in a civil enforcement action as opposed to a private nuisance action brought by an individual or individuals asserting a special injury arising from a nuisance. [54]

### 2. Private Nuisance Cases

The most common type of nuisance cases in our jurisprudence involves private nuisances—civil suits filed by a private property owner or group of property owners seeking to enjoin conduct occurring on an adjoining or nearby property that substantially interferes with the use and enjoyment of their properties. These cases often involve conduct that would have been considered a public or common nuisance under the common law but are

---

[54] Although *Whitaker* and *Commissioners of Trappe* involved civil enforcement actions under the common law, we discussed some limitations applicable to a statutory nuisance in *Becker v. State*, 363 Md. 77 (2001). In that case, this Court was asked to determine whether, in connection with a statutory nuisance action for abatement arising from a property's use for illegal drug activity, the District Court of Maryland had the authority to order that a two-story structure be destroyed. *Id.* at 80. In holding that there was no such authority, we pointed out that "[n]uisance abatement statutes have their roots in common law public nuisance abatement principles." *Id*. at 87. We also explained that "[a]n action to enjoin a nuisance is an equitable one[,]" and that "[w]hile courts may have considerable latitude in fashioning injunctive orders to abate nuisances, there are well-established limitations upon this latitude." *Id*. at 87–88. "One general limiting principle[,]" we observed, "is that an injunction abating a nuisance 'should go no further than is absolutely necessary to protect the rights of parties seeking such injunction.'" *Id*. at 88 (quoting *Singer v. James*, 130 Md. 382, 387 (1917)). Particularly given the constitutional prohibition against taking private property without compensation, we noted that we have consistently held that "destruction of property to abate a nuisance is a drastic remedy and may not be resorted to where the property constitutes a nuisance because of its *use*. If a building is a nuisance, in and of itself," *i.e.*, because of its dangerous or unsafe condition, "it may be demolished for the purpose of abating the nuisance." *Id*. at 88–89. Applying the doctrine of constitutional avoidance, we concluded that the statute in question did not authorize the court to order that a structure used in connection with the illegal activity be destroyed. *Id*. at 92–93.

filed by a private property owner seeking either an order for abatement or damages because the conduct in question interferes with his or her use and enjoyment of private property.  For example, a livestock feed lot or refinery may produce pests or odors over such a wide area that it affects the rights of the public, but at the same time, nearby private landowners may suffer an extraordinary interference with the use and enjoyment of their own land by virtue of their proximity to the nuisance.  *Wietzke v. Chesapeake Conf. Ass'n*, 421 Md. 355, 374 (2011).  Although these cases involve private nuisance claims, our case law often describes the property owner's claim simply as one to abate a "nuisance," and our discussion often describes both actions.  *See, e.g.*, *Tadjer v. Montgomery County*, 300 Md. 539, 551–54 (1984) (discussing both public and private nuisance principles in connection with third-party claims for indemnification and damages against a county arising from an explosion caused by a landfill operation); *Wietzke*, 421 Md. at 373–74 (arising in the context of a private nuisance case and discussing both public and private nuisance and explaining some of the differences between the two actions); *Bishop Processing Co. v. Davis*, 213 Md. 465, 472 (1957) (stating that "a nuisance may be either private or public in character, and when it is both, it is termed mixed" (citing 66 C.J.S., *Nuisances*, § 2)).

Despite the fact that these are private suits alleging injury to the use and enjoyment of real property—in contrast to a criminal or civil enforcement action filed by the state or local government asserting that a public nuisance is interfering with a public right—they are instructive in contrasting the differences between the two actions, particularly given that the parties in the case at bar have cited many of them to support their respective positions.

49

"A private nuisance as 'a nontrespassory invasion of another's interest in the private use and enjoyment of land.'" *Rosenblatt v. Exxon Co.*, 335 Md. 58, 80 (1994) (quoting § 821D of the Second Restatement). Private nuisance cases involve the application of the "long settled" law that "an individual may file a bill to restrain the continuance of a public nuisance if it injures or impairs the value of his [or her] property." *Bishop Processing Co.*, 213 Md. at 473 (quoting *Five Oaks Corp. v. Gathmann*, 190 Md. 348, 352 (1948)). Cases applying these principles often cite to opinions from English chancery courts, which had equitable power to enforce the Latin maxim "*sic utere tuo ut alienum non laedas*"—which translates to "use your own property in such a way that you do not injure the property of another." *See, e.g., Bishop Processing Co.*, 213 Md. at 473; *Fox v. Ewers*, 195 Md. 650, 657–58 (1950); *Five Oaks Corp.*, 190 Md. at 352; *Singer v. James*, 130 Md. 382, 386 (1917); *Woodyear v. Schaefer*, 57 Md. 1, 13 (1881); *Murray v. McShane*, 52 Md. 217, 226 (1879); *Dittman v. Repp*, 50 Md. 516, 522 (1879); *Adams v. Michael*, 38 Md. 123, 125 (1873).

In the context of this case, we do not need to discuss the specific elements necessary to establish a private nuisance. For our purposes, it is sufficient to note that a finding of nuisance requires evidence of an unreasonable and substantial interference with a plaintiff's use and enjoyment of his or her property. *Leatherbury v. Gaylord Fuel Corp.*, 276 Md. 367, 377 (1975); *Hamilton Corp. v. Julian*, 130 Md. 597, 560 (1917). The alleged injury to the use and enjoyment of property must be of such a nature as to diminish materially the value of the property and to seriously interfere with the ordinary comfort and enjoyment of it. *Carr's Beach Amusement Co. v. Annapolis Roads Prop. Owners'*

*Ass'n*, 222 Md. 392 (1960); *Meadowbrook Swimming Club v. Albert*, 173 Md. 641 (1938); *Adams v. Michael*, 38 Md. 123 (1873).

A significant difference between private nuisance and public nuisance is that the latter is an unreasonable interference with the rights of the community at large, and was historically punishable as a crime, *see Rosenblatt*, 335 Md. at 79 n.7; *Burley v. Annapolis*, 182 Md. 307 (1943), whereas private nuisance is a tort. A plaintiff injured by a nuisance may seek damages or injunctive relief if the plaintiff suffers an injury that is different in kind from that suffered by other members of the public. *See Cook v. Normac Corp.*, 176 Md. 394, 397 (1939) (explaining that private individuals cannot seek redress for a "mere public wrong" arising from a defendant's disregard of an ordinance, rather, they have "relief only against damages to themselves, distinct in character from any to the public"); *see also Hamilton*, 11 Md. 146–47 (discussing cases in which a private action was brought where the underlying conduct constituted a public nuisance, but special damages were alleged); *Houck v. Wachter*, 34 Md. 265, 269 (1871) ("The obstruction of a highway is a common nuisance, and being a wrong of a public nature, the remedy is by indictment; it is not in itself a ground of civil action by an individual, unless he has suffered from it some special and particular damage, which is not experienced in common with other citizens."); *Garitee v. City of Balt.*, 53 Md. 422, 436–37 (1880) ("The general rule doubtless is, in regard to which there is but little disagreement among the authorities, that no person can maintain a private action for injuries resulting from a common nuisance, unless he can show that he has sustained some special damage therefrom different from that sustained by the public generally."); *Woodyear*, 57 Md. at 3 ("If the facts alleged be true, the remedy is

51

by indictment for a nuisance.  If complainant has suffered special and peculiar damage, beyond and different from that which affects the public at large, he has his remedy by action at common law.”).

Our nuisance case law is replete with decisions in which we have affirmed a lower court's order for injunctive relief in favor of a private property owner where the conduct on an adjoining or nearby property was causing an injury "shown to be of such a character as to diminish materially the value of the property" and "seriously interfer[ing] with the ordinary comfort and enjoyment of it." *Bishop*, 213 Md. at 473 (quoting *Five Oaks Corp.*, 190 Md. at 352) (animal processing plant producing nauseating odors); *see also Corbi v. Hendrickson*, 268 Md. 459, 460 (1973) (nightclub operation causing excessive noise to nearby residential properties); *Gorman v. Sabo*, 210 Md. 155, 158 (1956) (radio playing at an excessive and unreasonably high volume); *Fox*, 195 Md. at 654 (parking and storing trucks containing asphalt, which were started at early morning hours thereby creating loud noises and the asphalt mixture created a nauseating odor); *Meadowbrook Swimming Club*, 173 Md. at 644 (amusement venue with outdoor dancing and bands causing excessively loud noise); *Woodyear*, 57 Md. at 5 (slaughterhouse operation releasing animal matter into stream causing sickening odors and a dam that "is little better than a cesspool"); *Dittman*, 50 Md. at 521 (factory operation's vibrations causing walls to shake on adjoining property). This Court has also affirmed an order for injunctive relief where a property was being used in a manner that constituted a crime to the detriment of the adjacent property owner.  *See Hamilton*, 11 Md. at 143 (enjoining the operation of a bawdyhouse or house of ill-repute, which constituted criminal conduct).

### 3. Cases Declining to Expand Nuisance

In contrast to the cases described above, we have rejected claims that have attempted to expand the boundaries of nuisance beyond the traditional common law parameters. In *State ex rel. Bohon v. Feldstein*, 207 Md. 20 (1955), for example, we considered several claims brought by family members of a deceased tenant against a landlord after the tenant died from asphyxiation arising from the discharge of carbon monoxide fumes into his apartment due to an improperly vented hot water heater. The plaintiffs' declarations contained four counts—including three negligence-type counts based upon sections in the Restatement that establish a landlord's liability for a tenant's bodily injury arising from dangerous conditions, and where the landlord knew or had reason to know of the condition. *Id.* at 24. The fourth count alleged a private nuisance. *Id.* at 27. Although this Court determined that the plaintiffs could maintain one or more causes of action that sounded in traditional negligence,[55] we affirmed the trial court's ruling sustaining the defendant's demurrer with respect to the private nuisance count. *Id.* at 34. We cited Prosser for the proposition that nuisance was not "a separate tort" subject to its own rules but involved "types of damage—the invasion of two quite unrelated kinds of interests, by conduct which is tortious because it falls into the usual categories of tort liability." *Id.* at 35 (quoting W. Prosser, *Prosser on Torts* 557 (1st ed. 1941)). We noted

---

[55] Although we determined that the trial court properly sustained the defendant's demurrers based upon some procedural errors and language in the plaintiffs' declaration, we concluded that plaintiffs should be permitted to amend their declaration "on account of the seriousness" of the plaintiffs' claims. *See State ex rel. Bohon v. Feldstein*, 207 Md. 20, 35 (1955). We therefore remanded the cases for new trials.

that we had "found no Maryland case in which recovery has been allowed by a tenant against a landlord on the theory of nuisance" based upon the injuries alleged by the plaintiffs, and we saw "no reason to extend the definition of nuisance." *Id.* We stated that in cases such as the one brought by the plaintiffs, recovery was limited to a theory of negligence. *Id.*

We turn to *Tadjer v. Montgomery County*, 300 Md. 539 (1984)—the case upon which the County relies for its assertion that we have adopted the Second Restatement's expansive definition of public nuisance. Given the County's reliance on this case, it is useful to discuss it in some detail.

The case was filed by a plaintiff who sued nine defendants as a result of injuries he sustained in an explosion of methane gas at the autobody shop where he worked, which was owned by one of the litigants in the case. *Id.* at 542. The plaintiff alleged that the explosion was caused by the emission of methane gas from the accumulation of trash and garbage below the property. *Id.* at 544. Prior to the autobody shop operation, the county had leased the property in question and operated a public landfill. *Id.* at 543–44. After the county ceased using the property as a landfill, the property owner leased it to the owner of the autobody shop. *Id.* at 544. In connection with the autobody operation, the county issued building and occupancy permits. *Id.*

Some of the defendants filed third-party claims against the county, alleging that the county was (1) negligent in issuing permits for the autobody shop; (2) negligent in its landfill operations; and (3) liable because it created and maintained a nuisance on the property. *Id.* at 543. The trial court granted a demurrer on the third-party claims, ruling

54

that the claims against the county were barred by governmental immunity. *Id*. at 545. The Appellate Court affirmed the trial court's judgment. *Id*.

In explaining the issue before us, we stated that the "petition for certiorari is limited to the issue of governmental immunity[,]" and, therefore, our discussion would be "limited to that issue and the conflict between the concepts of governmental and proprietary functions." *Id*. We then proceeded to consider whether the various conduct by the county alleged in the third party-complaint was a governmental function (and therefore subject to governmental immunity), or proprietary function (and therefore subject to potential liability). *Id*. at 546. We determined that the county's issuance of permits was governmental in nature and that the county was therefore entitled to immunity for claims associated with the permits. *Id*. at 547, 550. As for the county's landfill operations, we held that we were unable to determine at the pleading stage whether the county was undertaking a governmental or proprietary function. *Id*. at 548–50. We pointed out that the declaration simply reflected that the county had "derived 'substantial income'" from the landfill operation, and we had no way of knowing the amount of the income. *Id*. at 549. We explained that if the income simply covered the county's expenses, we would agree that this landfill operation was a governmental function. *Id*. On the other hand, if the income substantially exceeded the county's expenses, it would be a proprietary function. *Id*. at 549–50. On the negligence claim related to the county's operation of the landfill, we determined that no final judgment should have been entered, and that the matter should proceed to trial. *Id*. at 550.

With respect to the nuisance claim, we noted that both the circuit court and the

55

Appellate Court had found the action to be barred by the defense of governmental immunity. *Id*. We pointed out that we had "never applied a proprietary-governmental function distinction to suits against municipalities based upon nuisance," and that courts generally made no such application. *Id.* Having concluded that the claim was not barred by governmental immunity, we therefore determined that it would be "wise to examine the terms private and public nuisance." *Id*. at 551.

We quoted the definition of private nuisance as expressed in § 821D of the Second Restatement, which states that a "private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Id*. (citation modified). We also cited several other treatises, including W. Prosser, *Law of Torts* §§ 86, 89 (4th ed. 1971). *Id.*

Turning to public nuisance, we cited two sources: (1) Prosser, *Law of Torts*, *supra*, at § 88, and (2) § 821B of the Second Restatement. *Id.* at 551–52. We block quoted both sections in their entirety and without any analysis or discussion of either. We also quoted Prosser for the proposition that "[t]o be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." *Id*. at 552 (quoting Prosser, *Law of Torts*, *supra*, at § 88). Additionally, we quoted comment g of § 821B of the Second Restatement, which explains that for conduct to become a public nuisance, it must interfere with a right "common to all members of the general public." *Id*. In addition to these treatises, we cited to two public nuisance cases—*Commissioners of Trappe*, 204 Md. at 169–72, which we discussed above, and *Burley*, 182 Md. at 307, which we will discuss in more detail below.

56

We noted that, in *Burley*, we concluded that the third-party claims did not set forth an "alleged breach of duty on the part of the [c]ounty to the original plaintiff or to the public generally." *Id*. at 554. Concerning private nuisance, we noted that there was no allegation that any land was invaded. *Id.* As for public nuisance, we observed that the declaration did not "allege a breach of a duty by the [c]ounty to the original plaintiff which would fit under the Restatement's version of a public nuisance." *Id.* We rejected what we considered the third-party plaintiffs' attempt to reframe the negligence action as "nuisance counts" by "using somewhat different terms." *Id.* Concluding that the county could not be liable for either public or private nuisance, we determined that the "trial judge correctly sustained demurrers to the nuisance counts although for the wrong reason." *Id*.

We discuss below what effect, if any, *Tadjer* had on our public nuisance jurisprudence. For purposes of our discussion here, it is sufficient to note that the case was about governmental immunity, and that we determined that the third-party complaint did not allege a claim for either public or private nuisance.

In *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58 (1994), we considered whether the plaintiff, an occupant of commercial property could maintain a nuisance action against a previous occupant whose activities during its occupancy allegedly caused the property to become contaminated by toxic chemicals. The plaintiff contended that his nuisance action was viable because the defendant's contamination of the property during its occupancy interfered with the plaintiff's subsequent use and enjoyment of it. *Id*. at 67. We disagreed and affirmed the circuit court's entry of summary judgment in favor of the defendant. *Id.* at 80.

57

We noted that the plaintiff cited "no legal authority for his claim that the law provides a cause of action in nuisance to a subsequent occupant of land against a prior occupant for activities conducted on the land during the prior occupancy." *Id.* at 79. Nor did "our review of the authorities reveal any support for this position." *Id.* We pointed out that, in prior cases, we "considered the application of the theory of nuisance with regard to the rights of the community at large, in a situation involving a public nuisance," *id.* at 80 (citing *Tadjer*, 300 Md. 539), "and the rights of adjoining property owners, in the context of a private nuisance," *id.* (citing *Wash. Suburban Sanitary Comm'n v. CAE-Link Corp.*, 330 Md. 115 (1993)). Notably, we explained our understanding of the doctrines of public and private nuisance as follows: "A public nuisance is a *criminal offense involving an interference with the community at large*, as in the case of the obstruction of a highway. A private nuisance, as is claimed here, is a civil matter, involving the disturbance of an individual's rights in land." *Id.* at 79 n.8 (emphasis added) (citing Prosser and Keeton, *Law of Torts* § 87 at 618 (5th ed. 1984)). We observed that the plaintiff's request that we expand the doctrine of private nuisance was inconsistent with the definition of private nuisance as set forth in § 821D of the Second Restatement, noting that other courts that had been asked to consider similar claims had rejected them. *Id.* at 80.

As reflected in our discussion of these cases, we have adhered to a faithful application of English common law nuisance principles that have been applied for centuries. Notably, between the late twentieth century and into the twenty-first century, there are very few cases involving private nuisances decided by this Court or the Appellate Court, and even fewer

58

cases in which a government files a civil enforcement action under the common law to abate a public nuisance. One likely reason for the dearth of common law cases is the General Assembly's various legislative enactments that provide specific tools for enforcement.

### D. The General Assembly's Enactment of Nuisance Statutes

Over time—consistent with the trends at the federal level, as well as in other states— the General Assembly has enacted numerous statutory schemes that are intended to prohibit or regulate conduct that would have been a public nuisance under the common law. Where a statute or code provision defines the conduct that may be considered a "public nuisance" and delineates the boundaries for enforcement, individuals who may be subject to enforcement actions have fair warning that the conduct in question might constitute a public nuisance, and the courts have an objective standard to apply when considering the government's claim. These legislative enactments embrace a wide range of conduct, and it is not possible to discuss every statute, regulation, or local provision that addresses conduct that would have been a public nuisance under the common law. However, it is instructive to touch upon a few as part of our discussion.

The General Assembly has codified certain common law nuisances as criminal offenses, such as the sale and manufacture of drugs in certain places,[56] and the criminal penalty for the common law nuisance of "keeping a disorderly house."[57] On the civil

---

[56] *See* CR § 5-605(b).

[57] *See* CR § 10-202 ("A person who keeps a disorderly house is guilty of a misdemeanor and on conviction is subject to imprisonment not less than 10 days and not exceeding 6 months or a fine not less than $50 and not exceeding $300 or both."). In *Ward v. State*, 9 Md. App. 583, 586 (1970), the Appellate Court explained that although the

side, the General Assembly has defined certain conduct as constituting a "public nuisance" and authorized State and local officials to pursue civil enforcement actions on behalf of the public.  For example, one State law authorizes certain individuals to bring an action to abate a nuisance, which is defined as a property used for assembling or manufacturing of controlled dangerous substances or for prostitution.[58]  Two statutes of recent vintage define public nuisances to include the sale of "firearm-related products,"[59] as well as causing "damage to public infrastructure that causes" the infrastructure's closure to the public.[60]

---

penalty is prescribed by statute, the public nuisance offense of "keeping a disorderly house" was not codified, and therefore retained its common law meaning.

[58] *See* Md. Code (2023 Repl. Vol., 2025 Supp.), Real Property Article ("RP") § 14-120(a)(5) (defining "nuisance"); *id.* § 14-120(b), (c) (authorizing certain individuals to bring actions to abate a nuisance).

[59] The General Assembly enacted Subtitle 25 to Title 3 of the Courts and Judicial Proceedings Article, titled "Civil Actions for Public Nuisance Against Firearm Industry Members[,]" in 2024.  2024 Md. Laws, Ch. 714.  CJ § 3-2502 defines as a "public nuisance" certain conduct undertaken by the firearm industry under its provisions related to the sale, manufacture, distribution, importation, or marketing of certain firearm-related products.  The legislation authorizes the Attorney General, a county attorney, or the Baltimore City Solicitor to bring an action against a firearm industry member "for a public nuisance caused by a violation of Section 3-2502."  *Id.* § 3-2503.  The state or local government may seek injunctive relief, restitution, compensatory and punitive damages, reasonable attorney's fees and costs, and any other appropriate relief.  *Id.*

[60] After the collapse of the Francis Scott Key Bridge, the General Assembly enacted Subtitle 26 to Title 3 of the Courts and Judicial Proceedings Article, titled "Public Nuisance Caused by Common Carriers."  2025 Md. Laws, Ch. 454.  The legislation defines "common carriers," and "public infrastructure," *see* CJ § 3-2601, and provides that "[a] common carrier or an employee of the common carrier may not cause damage to public infrastructure that necessitates the closure of the public infrastructure."  *Id.* § 3-2602(a)(1).  A violation of the statutory provision is "a public nuisance," for which the State or local government may seek injunctive relief, declaratory relief, and compensatory damages of the cost of the repair or replacement of the affected infrastructure.  *Id.* § 3-2602(a)(2), (b), (c)(1).  In addition, the

Other statutory schemes confer authority upon administrative agencies to abate statutorily defined nuisances. Under state law, the Secretary of the Environment and the Secretary of Health have concurrent "responsibility for the general care and sanitary interests of the people of the State,"[61] and to investigate suspected nuisances, as defined by statute.[62] The statutes describe categories of infrastructure, substances, materials, and trades for which both secretaries have the authority to promulgate regulations,[63] and outline enforcement procedures they are authorized to take on behalf of the public, including

_____

statute provides that the common carrier "may be liable to the State or local government for civil penalties of $1,000 per day for each day the public nuisance continues until the public infrastructure is sufficiently repaired for public use or is replaced." *Id*. § 3-2602(c)(2).

[61] For the responsibility and authority of the Secretary of the Environment, see Md. Code (2014 Repl. Vol., 2025 Supp.), Environment Article ("EN") §§ 10-101, 10-102. The responsibility and authority of the Secretary of Health is set forth in HG §§ 20-301.1, 20-302.

[62] "Nuisance" is defined in Section 20-301 of the Health General Article as "a condition that is dangerous to health or safety including": "an inadequately protected swimming pool; an unprotected open ditch; an unsanitary outhouse; a foul pigpen; an improperly functioning sewage system; an unkempt junkyard; an unkempt scrap metal processing facility; an excessive accumulation of trash or garbage; a dead animal; a contaminated water supply; an inadequately protected water supply; a rodent harborage; [and] poor housekeeping that could endanger the health of the owner, occupant, employee, or a neighbor." HG § 20-301(a)(1)–(13) (citation modified). "Nuisance" also includes "any condition that may endanger health that may be transmitted by means including: running streams; surface drainage; air currents; birds; domestic animals; or human beings." *Id*. § 20-301(a)(14)(i)–(vi) (citation modified).

[63] The Secretaries of Health and the Environment are both authorized to adopt rules and regulations governing the character and location of plumbing, drainage, water supply, offensive trades, and disposal of any wastewater material, including sewage or garbage. EN § 10-103; HG § 20-303. They are also authorized to adopt rules and regulations governing the sanitary conditions of streets, cesspools, outhouses, and any sanitary feature connected with any of these. *Id*.

61

undertaking investigations and issuing abatement notices,[64] filing summary abatement

procedures,[65] and bringing actions to enjoin any person from committing any nuisance

subject to the Environment and Health-General Articles of the Maryland Code.[66]  Any

person who violates a rule or regulation promulgated by the Secretary, or who refuses or

neglects to comply with a statutory notice issued by the agency or with a court order to

abate a condition, is guilty of a misdemeanor and subject to fines.[67]

In addition to codifying certain common law nuisances as criminal offenses, as well

as authorizing various state agencies to pursue civil enforcement actions on behalf of the

public, the General Assembly has also granted counties and municipalities the authority to

address certain types of public nuisances[68] and to generally enact ordinances to protect the

---

[64] EN § 10-202; HG § 20-307.  Additionally, county health officers also have the authority to investigate nuisances and "any condition in the county that is dangerous to human health;" and "sanitary conditions of schools, places of business, and places of employment in the county."  EN § 10-201(a)(1), (2); HG § 20-306(a)(1), (2).

[65] EN § 10-203; HG § 20-308.

[66] EN § 10-205; HG § 20-305.

[67] EN §§ 10-301–10-304; HG §§ 20-309–20-312.

[68] *See*, *e.g.*, Md. Code, Local Government Article ("LG") § 13-401(c) (granting authority to the governing body counties subject to its provisions with the authority to: "(1) prevent and remove nuisances; and (2) prevent the introduction of contagious diseases into the county"); *id.* § 13-401(d) (granting the governing body of the county with the authority to approve the location of certain uses that affect public health: "(1) soap manufacturing; (2) fertilizer manufacturing; (3) slaughterhouses; (4) packinghouses; and (5) any other facility that may involve conditions that are unsanitary or detrimental to health").  Additional statutes apply to statutorily-defined nuisances in particular jurisdictions, and delineate procedures for addressing nuisances, including notice requirements and enforcement procedures.  *See, e.g.*, RP §§ 14-123 (Baltimore City), 14-124 (Prince

health, comfort, and general welfare of their citizens.[69]   In exercising this authority, counties and municipalities have adopted various provisions in local codes that address public nuisances, including making certain conduct punishable as a misdemeanor, or subject to civil liability as a municipal infraction and subject to civil fines and abatement.[70]

Anne Arundel County is one such charter county, and, accordingly, has the authority to enact local laws expressly granted by the General Assembly.  Section 14-125.1 of the Real Property Article grants the State's Attorney and County Attorney for Anne Arundel County the authority to "abate a nuisance located within the boundaries of Anne Arundel County" and to seek "injunctive and other equitable relief in the District Court[.]"  Md. Code (2023 Repl. Vol., 2025 Supp.), Real Property Article ("RP") § 14-125.1(d)(1).  The statute contains a definition of "nuisance" that applies within the boundaries of Anne Arundel County, which is tied to uses of private property in violation of the local code.[71]

---

George's County), 14-125 (Baltimore County), 14-125 (Anne Arundel County), 14-125.2 (Harford County).

[69] *See, e.g.*, LG § 5-202(5) (granting municipalities the express authority to enact ordinances to "protect the health, comfort, and convenience of the residents of the municipality").

[70] *See, e.g.*, *id.* Title 6, Subtitle 1 (authorizing municipalities to designate violations of code provisions as misdemeanors or civil municipal infractions and outlining the adjudication process).

[71] Specifically, RP § 14-125.1(a)(4) states that "nuisance" means:

(i)     An act or condition knowingly created, performed, or maintained on private property that constitutes a local code violation and that:
          1. Significantly affects other residents of the neighborhood;
          2. Diminishes the value of neighboring property; and

63

*Id.* § 14.125.1(a)(4).  Prior to bringing a nuisance action under RP § 14-125.1, the County

is required to give 60 days' notice to the offending party that a nuisance exists, and that

legal action may be taken if the nuisance is not abated.  *Id.* § 14.125.1(4)(d)(3)(i).

### E.  The General Assembly's Enactment of Other Regulatory Schemes Intended to Protect the Public Health, Safety, and Welfare

The General Assembly has enacted other statutes with regulatory and civil

enforcement mechanisms that are intended to protect the health, safety, and welfare of the

people of this State from conditions that would have constituted public nuisances under

common law.  Although these statutes may not specifically define the conduct as a

"nuisance," they provide a mechanism for the appropriate public agency to take

enforcement action in the name of public health, safety, and welfare.  For example,

returning to William Sheppard's definition of common nuisance as including "apothecaries

who sell products unfit for human consumption," in the modern era, such conduct is

regulated under both federal and state law.  *See* Food, Drug, and Cosmetic Act, 21 U.S.C.

---

      3.  A.  Is injurious to public health, safety, or welfare of neighboring residents; or

          B.  Obstructs the reasonable use of other property in the neighborhood;

(ii)     A property where the tenant, owner, or other occupant has been convicted of violations of § 10-201 [disturbing the public peace and disorderly conduct] or § 10-202 [keeping a disorderly house] of the Criminal Law Article for conduct occurring on, in, or in relation to the property; or

(iii)    A property to which police or other law enforcement agencies have responded to complaints or calls for service 10 or more times within any 30 day period.

§§ 301-399i; Maryland Food, Drug, and Cosmetic Act, HG §§ 21-201–263.  And most notably, for purposes of the instant matter, as discussed *supra* in parts II and III, the General Assembly has enacted comprehensive statutory and regulatory schemes that govern the licensed prescribing and dispensing of controlled substances by prescription.

Given the extensive statutory and regulatory framework applicable to a range of various conduct, government enforcement actions to abate nuisances are typically brought pursuant to statutory schemes or local code provisions that define the conduct that constitutes a nuisance.  Below, we discuss a few cases in which this Court and the Appellate Court have invalidated government action where the purported nuisance conduct was not a nuisance per se or in fact, and where it was not statutorily defined and therefore lacked an objective standard for enforcement.

### F. Cases In Which the Court Has Rejected Local Government's Nuisance Actions

In *City of Baltimore v. Radecke*, 49 Md. 217 (1878), this Court considered the validity of an ordinance enacted by the City of Baltimore that required a city permit to erect and use a steam engine within city limits and that gave the mayor the authority to revoke the permit and require its removal upon six months' notice.  Failure to comply with the removal notice subjected the violator to daily fines.  *Id.* at 227.  The ordinance did not specify any criteria or regulations for a steam engine's construction, location, or use, nor did it specify any standards that the mayor was required to consider in entering a removal order.  *Id.* at 230. The city brought an enforcement action after the mayor revoked the permit of a business owner, who used a steam engine in connection with his business pursuant to a lawfully issued

65

permit, and who did not comply with the removal order. *Id*. at 227–28. After the business owner challenged the validity of the ordinance, *id.* at 226, this Court determined that the portion of the ordinance that conferred such broad discretionary authority in the mayor to order a removal of a steam engine was void, *id.* at 231.

At the outset, the Court noted that a steam engine was not a public nuisance per se where it did not obstruct a street, and there was no evidence that it was a nuisance in fact. *Id*. at 227–28. The Court determined that an ordinance that conferred unfettered discretion in a public officer to order a steam engine's removal and subject the permit holder to fines for noncompliance was void because it laid "down no *rules* by which its *impartial execution* can be secured or partiality or oppression prevented." *Id*. at 230. In other words, the ordinance had no standards for enforcement, and therefore could lead to selective enforcement arising from favoritism or other improper motives. *Id*.

In *Jewel Tea Company v. Town of Bel Air*, 172 Md. 536 (1937), an out-of-state company filed a complaint to enjoin the town from enforcing an ordinance that declared door-to-door solicitation to be a nuisance and punishable as a misdemeanor unless the solicitor had a license, which cost an annual fee of $25. The bill exempted local farmers and merchants who regularly did business in the city. *Id.* at 538. The plaintiff sold coffee and tea through solicitors who went door to door. *Id.* After one of the company's solicitors was arrested for door-to-door sales without a permit, the town bailiff advised that he would not be prosecuted if he purchased the license, but that a failure to do so would result in a fine for each sale of goods. *Id.* The company asserted that the ordinance was void because the town did not have the authority to declare door-to-door sales to be a public nuisance,

66

and that the ordinance was discriminatory in violation of the Commerce Clause. *Id.* at 538–39. This Court agreed and declared that ordinance was void. *Id.* at 540.

The Court explained that "[n]uisances may only be so declared when they are so by common law, or by statutory definition." *Id*. at 539–40. The Court noted that the town's power to declare door-to-door sales a public nuisance was derived from its authority to enact ordinances "to preserve the health of the town and to preserve and promote the peace, order and good government" of the town. *Id.* at 540 (citation modified). The Court stated that it "fail[ed] to see how the solicitation or conduct of a legitimate mercantile business or trade can be resolved into a health, safety, or general welfare regulation by suppression by a town ordinance." *Id.* The Court further determined that the ordinance discriminated against nonresidents and was therefore unconstitutional. *Id.*

In *Burley v. City of Annapolis*, 182 Md. 307 (1943), we considered whether the city's revocation of a billiard table license was a proper exercise of the city's authority to abate a nuisance. Under the city code, the city had the power to license billiard tables but contained no conditions for the issuance of the license. *Id.* at 309. Gambling was illegal, but billiard tables were exempted from unlawful gambling activity. *Id.* at 309–10, 313. After the property owner pled guilty to one count of gambling, the city revoked his billiard license. *Id.* at 308. Thereafter, the property owner filed a petition for a writ of mandamus against the city seeking to compel the return of his license to operate two billiard tables. *Id.*

In support of its decision to revoke the property owners' billiard license, the city argued that it was acting under its nuisance powers, that a gambling house was a nuisance, and that in revoking the billiard table license, it was preventing a nuisance. *Id*. at 311.

67

Based upon the record, the Court determined there was no evidence that the property owner's use of the property was a nuisance per se, reasoning that "one conviction does not make the premises a gambling house and a nuisance *per se*" because "a nuisance necessarily involves the idea of continuance." *Id*. at 313 (citation modified). Nor was there evidence that the property was continuing to be used as a gambling house. *Id.*

Moreover, although the city code gave the city the authority to enact ordinances to prevent and remove nuisances, there was no evidence that the city had, in fact, adopted such an ordinance. *Id*. The Court rejected the city's nuisance argument, explaining that in order to act pursuant to its nuisance powers, the city "must first prescribe by general ordinance what are nuisances, and make provision for their removal." *Id*. at 313. The Court determined that the city's action in revoking the license was "arbitrary and unwarranted." *Id*. at 315.

In *Miller v. Maloney Concrete Company*, 63 Md. App. 38 (1985), the Appellate Court considered whether a county board of appeals, which was authorized under the county code to determine whether particular conduct created a public nuisance, erred in concluding that a concrete company that had been in operation for 45 years constituted a public nuisance. The case arose after the concrete company's landlord and a community association filed a petition with the county board of appeals alleging that the concrete company's operation constituted a public nuisance. *Id.* at 42. The witnesses complained of: (1) dust emanating from the plant; (2) traffic congestion and safety hazards from the trucks; and (3) water and mud on the street leading from the property. *Id.* at 42–43. Based upon the evidence, the board concluded that the plant operation constituted a public

68

nuisance, imposed certain conditions on its continued operation, and stated that if the company failed to comply with the conditions, it would refer the matter to the county attorney for enforcement proceedings. *Id.* at 44–45. After the concrete company appealed, the circuit court reversed, ruling in part that the board of appeals had no authority to adjudicate or enforce public nuisances, and that the board's action violated the company's right to due process of law. *Id*. at 45–46.

The Appellate Court affirmed. Writing for the court, Judge Wilner noted that the county code made the public nuisance provisions a criminal offense, which triggered concerns over vagueness. *Id*. at 49. "The need for basic standards is particularly apparent[,]" explained the court, "when the subject of the statute is that elusive concept of nuisance." *Id*. The court further reasoned that, "[i]n light of that expansive concept of the term, the [Maryland Supreme] Court has recognized the need for some definitional limitations when criminal sanctions are involved." *Id*. at 49–50 (citing *Jewel Tea Co*., 172 Md. at 539–40 and *Commissioners of Trappe*, 204 Md. at 173–74). The court observed that there were no: (1) standards set forth in the county code; (2) constraints on the board's authority; or (3) definition of "nuisance" or reference to the common law requirements. *Id*. at 50. Without these constraints, the court concluded that "a nuisance is essentially what the board says it is[]" or—in the words of Humpty Dumpty—"'it means just what I choose it to mean—neither more nor less.'" *Id*. at 50 (quoting *Through the Looking Glass* by Lewis Carroll). The court explained that, without any standards in the county code, the board was "authorized to prohibit that which may be perfectly legal under the zoning laws, the air quality control law, the noise control law, and indeed under the common law of

69

nuisance[.]" *Id*. at 53.  Finally, the court noted that "for a public nuisance to exist, there must be some interference with a public right." *Id*. (citation modified).  The court stated that the evidence, "was, at best, equivocal" in that the principal complaint involved trucks illegally parked on the street, which was addressed under the town code through parking regulations.  *Id*.  The court concluded that the code provisions did not comport with due process of law.  *Id*. at 54.

### G.  Some Conclusions About Maryland's Nuisance Common Law

Based upon the above survey, we distill several conclusions pertaining to Maryland's nuisance common law.

First, we have consistently described public nuisance as requiring "an injury to the public at large or to all persons who come into contact with it[.]" *Comm'rs of Trappe*, 204 Md. at 170; *Wietzke*, 421 Md. at 374 (quoting *Comm'rs of Trappe*, 204 Md. at 170); *see also Tadjer*, 300 Md. at 552–53 (citing to comment g of § 821B of the Second Restatement, which explains that a public nuisance requires an "interference with a public right[,]" which is "one common to all members of the general public").  Our cases have not limited a public nuisance action to conduct that interferes with real property.

Second, although on occasion our cases discuss public and private nuisance together, *see Tadjer*, 300 Md. at 550–53; *Wietzke*, 421 Md. at 373–75, they are distinct actions, and we have consistently followed the common law principles that define each action.  Public nuisance involves an unreasonable interference with the rights of the community at large and was historically punishable as a crime.  *See Rosenblatt*, 335 Md. at 79 n.7; *Burley*, 187 Md. 307.  By contrast, private nuisance is a tort involving a

nontrespassory invasion of another's interest in the private use and enjoyment of land. *Rosenblatt*, 335 Md. at 58. A plaintiff in a private nuisance action may be entitled to injunctive relief or damages if the plaintiff establishes that he or she has suffered an injury that is different in kind from that suffered by members of the public. *See Cook*, 176 Md. at 397; *Houck*, 34 Md. at 269; *Garitee*, 53 Md. at 436–37.

Third, in the private nuisance context, our case law is replete with examples in which we have affirmed a lower court's order for injunctive relief in favor of a plaintiff private property owner where the plaintiff satisfies the traditional common law elements—namely that conduct occurring on an adjoining or nearby property is causing an injury shown to be of such a character as to materially diminish the value of the property and seriously interferes with the plaintiff's ordinary comfort and enjoyment of his or her property. *See, e.g.*, *Bishop*, 213 Md. at 473–74; *see also Corbi*, 278 Md. at 197; *Gorman*, 210 Md. at 161; *Fox*, 195 Md. at 660–62; *Meadowbrook Swimming Club*, 173 Md. at 647–49; *Woodyear*, 57 Md. at 10–12; *Dittman*, 50 Md. at 521–23; *Hamilton*, 11 Md. at 145–48. By contrast, we have declined invitations to expand the private nuisance action beyond its traditional common law formulation. *See Feldstein*, 207 Md. at 35 (explaining that we saw "no reason to extend the definition of nuisance[,]" and determining that any recovery was limited to a theory of negligence); *Tadjer*, 300 Md. at 554 (observing that the third-party plaintiffs had not alleged that any land of the original plaintiff had been invaded and that "[w]hat the third-party plaintiffs have attempted to do in their nuisance counts is simply to frame an action in negligence using somewhat different terms"); *Rosenblatt*, 335 Md. at 80 (rejecting plaintiff's request to expand the doctrine of private nuisance as being inconsistent with the

71

traditional common law formulation of the tort as involving an interference by an adjoining or nearby property, as opposed to an interference on the same land arising from a prior occupant's use).

Fourth, there are very few cases in this Court or in the Appellate Court involving civil enforcement actions brought by the government under the common law to abate a public nuisance. One likely reason for this is the numerous statutes that provide an enforcement framework that enable a government entity to abate conduct that would have been considered a public nuisance at common law. The handful of cases from the twentieth century in which this Court or the Appellate Court have upheld orders for injunctive relief based upon a common law public nuisance action involve the paradigmatic nuisances per se—obstructions to public roads or landings, *see Commissioners of Trappe*, 204 Md. at 165; *Maxa*, 158 Md. at 229; *Liller*, 25 Md. App. at 276, or the criminal conduct of operating a house of prostitution, *see Whitaker*, 307 Md. at 368. On the other hand, this Court and the Appellate Court have not hesitated to invalidate a local government's attempt to regulate conduct where (1) the alleged conduct was not a nuisance per se under the common law nor defined as a nuisance by statute or a code; or (2) the enforcement action was determined to be arbitrary or unreasonable. *See, e.g.*, *Radecke*, 49 Md. at 217; *Jewel Tea Co.,* 172 Md. at 536; *Burley*, 182 Md. at 307; *Miller*, 63 Md. App. at 38.

Fifth, there is nothing in our case law that reflects this Court's adoption of an expansive tort of public nuisance based upon the definition contained in § 821B of the Second Restatement. As discussed in parts IV.B.1 and 2, the Second Restatement's

72

adoption of the public nuisance definition made its debut in the 1970s and represented a change from the First Restatement. To be sure, our discussion of public nuisance in *Tadjer* included a block quote of § 821B. 300 Md. at 552. However, that case did not involve a public nuisance action by a government entity—our discussion of public nuisance arose in the context of a discussion of private and public nuisance theories within the context of a private suit where we rejected the third-party plaintiffs' attempts to expand nuisance concepts beyond their traditional application. And our opinion made it clear that "[t]he petition for certiorari [was] limited to the issue of governmental immunity[]" and, therefore, our discussion would be "limited to that issue and the conflict between concepts of governmental and proprietary functions." *Id.* at 545. There is nothing in that opinion that reflects or suggests that this Court adopted an expansive tort of public nuisance based upon the definition set forth in § 821B—a point that is made clear by the complete lack of discussion of any elements that would comprise such a tort action. Moreover, we cited to other treatises and our own case law as part of that discussion. *Id.* at 550–54. Finally, as noted above, in *Rosenblatt*—a case decided after *Tadjer*—we described public nuisance in the traditional sense as "a criminal offense involving an interference with the community at large, as in the case of the obstruction of a highway." 335 Md. at 79 n.8.

Sixth, there are no cases from this Court or the Appellate Court involving common law public nuisance actions in which the government was seeking to recover damages for an injury to the public based upon a common public right. The relief sought in these cases was limited to injunctive relief. *See Comm'rs of Trappe*, 204 Md. at 165; *Whitaker*, 307

73

Md. at 368.  This is unsurprising given that there is no historical evidence that the

government was able to sue for damages to the general public resulting from a public

nuisance.[72]  *See* Gifford, *supra*, at 745–46; Merrill, *supra*, at 17.

—————————

[72] The County argues that this Court has "long recognized that a public nuisance plaintiff, whether a government or private party, may recover damages for past harms." To support its position, the County cites *Whitaker v. Prince George's County*, 307 Md. 368, 378–79 (1986), which, in turn, quoted *Hamilton v. Whitridge*, 11 Md. 128, 144–46 (1857).  We disagree with the County's assertion that these cases establish the principle that a county can seek recovery of damages in the manner asserted by the County here. As discussed herein*, Whitaker* involved the issue of whether a county could seek civil injunctive relief where the underlying conduct involved criminal conduct of running a prostitution business, and the county had a remedy at law in the form of a *criminal prosecution.*  307 Md. at 377–78.  *Hamilton,* an 1857 case involving a *private* nuisance action to abate a prostitution operation on an adjacent property, included a discussion about remedies that were available under the common law, including a private individual's ability to recover damages where the property owner sustained an injury from a public nuisance different from the public generally.  11 Md. at 146–48.  Neither of these cases support the proposition that this Court has recognized a government's ability to recover damages on behalf of the public for a public nuisance.  And our cases make clear that damages are available only where the injury is different in kind from the injury suffered by the public.  *See Cook v. Normac Corp.*, 176 Md. 394, 397 (1939); *Woodyear v. Schaefer*, 57 Md. 1, 3 (1881); *Garitee v. City of Balt.*, 53 Md. 422, 436–37 (1880); *Houck v. Wachter*, 34 Md. 265, 269 (1871).

Nor do we find support in *Owners' Realty Co. of Baltimore City v. City of Baltimore*, 112 Md. 477 (1910), another case cited by the County, for the position that this Court recognizes money damages for failure to abate a public nuisance.  That case involved a city ordinance that authorized the city to impose a front-foot paving assessment on property owners for paving an adjacent private alley.  112 Md. at 576. After the property owner failed to pay the assessment, it was placed in the hands of the tax collector.  The property owner challenged the ordinance, contending that: (1) the city's acts of paving the alley and assessing the property owner's property was ultra vires and void; (2) the ordinance was void as unreasonable; and (3) the city failed to properly advertise before it undertook the paving of the alley.  *Id*. at 577.  This Court rejected the property owners' assertions and upheld the circuit court's dismissal of the property owners' case.  *Owner's Realty Co.* involved, in part, whether the city had the authority to declare a private alley a public nuisance and adopt an ordinance establishing an assessment on adjacent property owners.  The case does not support the County's

Having examined our case law, it is clear that we have not adopted a tort of public nuisance that broadly adopts the Second Restatement's definition of "reasonableness" that would enable a governmental entity to seek damages in the manner asserted by the County in this instance.

## V

### Whether to Recognize an Expanded Tort of Public Nuisance that Would Encompass the County's Allegations

The question then becomes *whether* we should adopt such a tort. The County requests that this Court hold that a local government plaintiff suing for public relief can seek legal and equitable relief, including abatement of a nuisance condition. The County's emphasis on legal relief, of course, is the ability to seek damages.

The Defendants assert that not only would the adoption of an expanded public nuisance tort run contrary to the traditional boundaries of our public nuisance doctrine, but that it would be inconsistent with the Third Restatement as well as the trends in other jurisdictions. Moreover, the Defendants assert that an expansive public nuisance tort would swallow more traditional torts and result in the judicial branch usurping legislative policy-making decisions concerning conduct that impacts broader societal concerns.

### A. National Trends Recognizing that Public Nuisance is an "Inapt Vehicle" to Address Societal Problems

Returning briefly to § 821B of the Second Restatement, we first note that the expanded definition of public nuisance has been criticized for going far beyond the

---

assertion that this Court has recognized a general common law right to money damages in the manner sought here.

common law.[73]  Section 821B is also notably different from other torts set forth in the

Second Restatement.  Aside from supplying a definition of "public nuisance" and non-

exhaustive, open-ended factors that a court might consider in determining whether an

interference with a public right is "unreasonable," neither § 821B nor the series of sections

that follow stipulate what is required for a public nuisance action in terms of the act, duty,

standard of care, injury, causation, and defenses.[74]  By contrast, the Second Restatement

---

[73] *See, e.g.*, Merrill, *supra*, at 26, 28 (observing that no effort was made "to show that the new definition was supported by precedent," and that "authority to condemn activity as a public nuisance was severed from any link to history or legislative proscription, and given over to courts based on their independent analysis of the needs of the public" (citation modified)); Gifford, *supra*, at 808–09 (observing that "[t]he language of section 821B of the Restatement goes substantially beyond the previous law in allowing a finding of the tort of public nuisance[,]" and "serves . . . as an invitation for judges and jurors to provide their own definitions of what constitutes 'unreasonable interference' and 'a right common to the general public' without the guidance generally provided by precedents").

[74] As Professor Gifford observes:

[N]o judicial consensus has emerged on some of the core issues that should establish the parameters of the tort of public nuisance.  For example, what exactly is the public nuisance for which the defendant may be held liable?  Is it defendants' conduct or the harm itself? . . . Similarly, courts disagree as to whether the plaintiff in a public nuisance action must prove underlying tortious conduct by the defendant—an intentional tort, negligence, or a strict liability tort—or whether the existence of an objectionable condition itself establishes the tortious liability.

Gifford, *supra*, at 748–49.

76

sections that address private nuisance not only define the tort, *see* § 821D,[75] but also lay out the elements, *see* § 822.[76]

Notably, the comments to § 821B, as well as the sections that follow, contain several references to the fact that only *private plaintiffs* are permitted to recover damages—where they can show a special or particular harm of a kind different from that suffered by members of the public. *See e.g.*, Restatement (Second) of Torts § 821B, cmt. h (1979) (explaining that a public nuisance "does not afford a basis for recovery of damages in tort unless there is particular harm to the plaintiff, as stated in § 821C"); *id.* § 821B cmt. i ("To maintain a damage action for a public nuisance, one must have suffered damage different in kind from that suffered by the general public; this is not necessarily true in a suit for abatement or injunction."); *id.* § 821C (explaining that for a private individual to seek damages arising from a public nuisance, that individual "must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of the interference"). Other courts have made the

---

[75] Section 821D of the Second Restatement, titled "Private Nuisance[,]" states: "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land."

[76] Section 822 of the Second Restatement sets forth the "General Rule" with respect to a private nuisance claim, stating:

> One is subject to liability for a private nuisance if, but only if, his [or her] conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
> (a) intentional or unreasonable, or
> (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

same observation.  *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1138 (Ill. 2004) (noting that "[n]o mention is made in section 821C or the comments that follow of the ability of a public official or entity to recover damages in an action for public nuisance brought on behalf of the general public").

We further observe that, with the adoption of the Third Restatement—48 years after the adoption of the expanded "public nuisance" definition in the Second Restatement—the American Law Institute acknowledges that an expansive common law public nuisance tort is an "inapt vehicle" for a government entity to seek recovery in the form of economic damages arising from products that may create widespread societal concerns.  Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020).

Section 8 of the Third Restatement, titled "Public Nuisance Resulting in Economic Loss[,]" states: "An actor whose wrongful conduct harms or obstructs a public resource or public property is subject to liability for resulting economic loss if the court concludes that the claimant's losses are distinct in kind from those suffered by members of the affected community in general."  Comment b to § 8 notes that "[a]n action by a public official will commonly lie to abate the nuisance by injunction but *may not involve monetary recovery for harm done*." *Id.* § 8 cmt. b (emphasis added).  Notably, the drafters of the Third Restatement address the attempts by government actors to bring tort suits based on public nuisance to recover economic damages for products such as tobacco, firearms, and lead paint.  The comment recognizes that liability based on public nuisance "has been rejected by most courts, and is excluded by this section, *because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue*." *Id.* § 8 cmt. g (emphasis added).

78

The comment explains that "[m]ass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake." *Id.*  The drafters explain that, if another body of law does "not supply adequate remedies or deterrence," then "*the best response is to address the problems at issue through legislation that can account for all the affected interests.*" *Id.* (emphasis added).

The Third Restatement reflects a national trend of courts refusing to allow products-based public nuisance claims for economic damages.  *See, e.g.*, *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 730 (Okla. 2021) (rejecting the state's suit against prescription opioid manufacturers brought under the state's general public nuisance statute); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 116 (Mo. 2007) (en banc) (rejecting city's argument that its nuisance claim regarding lead paint was for an injury to public health); *In re Lead Paint Litig.*, 924 A.2d 484, 494 (N.J. 2007) (declining to expand public nuisance to cover lead paint claims and explaining that "were we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance");[77] *State v. Lead Indus.,*

---

[77] In addition to the Oklahoma Supreme Court, other state supreme courts have rejected common law nuisance claims related to the prescribing, sale, or dispensing of opioids in different contexts.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 265 N.E.3d 1, 11 (Ohio 2024) (holding that the Ohio Product Liability Act expressly abrogated all common law public nuisance claims arising from the sale of a product); *E. Me. Med. Ctr. v. Walgreen Co.,* 331 A.3d 380, 393–94 (Me. 2025) (holding that non-profit hospitals failed to state a claim for common law and statute-based public nuisance against a business and individuals who were involved in marketing and distributing prescription opioids).

*Ass'n Inc.*, 951 A.2d. 428, 452–58 (R.I. 2008) (holding that the state failed to establish, among other things, that lead paint injuries were an infringement of a "public right" and explaining that "[t]he enormous leap that the state urges us to take is wholly inconsistent with the widely recognized principle that the evolution of the common law should occur gradually, predictably, and incrementally"); *Beretta U.S.A. Corp.*, 821 N.E.2d at 1116 (rejecting the city's claim for public nuisance against gun manufacturers and expressing "reluctan[ce] to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it"); *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 96 (N.Y. App. Div. 2003) (rejecting the state's complaint against handgun manufacturers, wholesalers, and retailers and stating that, giving a greenlight to a common law public nuisance action based upon the societal effects of gun violence, would "likely open the courthouse doors to a flood of limitless, similar theories of public nuisance against a wide and varied array of other commercial and manufacturing enterprises and activities"); *Dist. of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 648–51 (D.C. 2005) (en banc) (declining to expand public nuisance to cover guns).

### B. *The County Has Failed to Establish that the Alleged Conduct Affects a Public Right.*[78]

Ultimately, we do not need to decide in this case whether to recognize an expansive tort of public nuisance based upon the definition contained in § 821B of the Second

---

[78] In her concurring and dissenting opinion, Justice Watts dissents from part V.B., in which we discuss and hold that the County has failed to establish that the alleged conduct affects a public right. *See* Concurring and Dissenting Slip. Op. at *1. In Justice Watts's

Restatement in the manner urged by the County here because the County's complaint fails to satisfy a primary requirement of a public nuisance action—namely, that the Defendants' dispensing of opioids, and administration of benefit plans for opioids, affects a common public right. As discussed above, our case law is clear: To maintain an action for a public nuisance, the government must establish that the conduct in question interferes with a public right. *See Comm'rs of Trappe*, 204 Md. at 170 (explaining that we have consistently described public nuisance as requiring "an injury to the public at large or to all persons who come in contact with it"); *Wietzke*, 421 Md. at 374 (quoting *Comm'rs of Trappe*, 204 Md. at 170); *see also Tadjer*, 300 Md. at 552–53 (citing to comment g of § 821B of the

---

view, "conducting such an analysis is at odds with the Majority's decision to exercise the principle of judicial restraint by leaving the matter to the General Assembly." *Id*. We disagree. The concurring and dissenting opinion correctly points out that the General Assembly can establish a public right by statute. Here, however, the complaint alleges a common law nuisance. Under Maryland common law, the government may bring an action for public nuisance and obtain injunctive relief where it establishes that the conduct in question interferes with a public right. *See, e.g., Whitaker v. Prince George's County*, 307 Md. 368 (1986); *Caine v. Cantrell*, 279 Md. 392 (1977); *Adams v. Comm'rs of Trappe*, 204 Md. 165 (1954); *Maxa v. Comm'rs of Harford County*, 158 Md. 229 (1930). The certified questions necessarily require that we determine whether the County has sufficiently pleaded an action for common law public nuisance. To do so, we must determine whether the County has established a necessary element—that the alleged conduct interferes with a public right. Without undertaking this analysis, we are not completely answering the certified questions.

The concurring and dissenting opinion also criticizes our "reliance" on out-of-state case law. Concurring and Dissenting Slip. Op. at *5–7 (citing *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004); and *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021)). To be clear, we are not relying on the laws of those states. We simply find the analytical frameworks applied by the courts in those cases persuasive in determining whether the County has established that the alleged conduct interferes with a public right here.

Second Restatement).  No case of this Court has recognized a broad *public right* to be free from all potential harms associated with the prescribing and dispensing of opioids.

Comment g to § 821B of the Second Restatement explains that "[a] public right is one common to all members of the general public.  It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured."  Another treatise states:

> To be considered public, a nuisance must affect an interest common to the general public rather than peculiar to one individual or several.  A public nuisance is that which affects an entire neighborhood or community, or is an injury to the public at large or to all persons who come in contact with it. However, a nuisance, to be a public one, need not necessarily affect the entire community or cause hurt, inconvenience, or injury to all of the public.  A "public right," for purposes of a public nuisance, is more than an aggregate of private rights by a large number of injured people; rather, a public right is the right to a public good, such as an indivisible resource shared by the public at large, like air, water, or public rights-of-way . . .

58 Am. Jur. 2d *Nuisances* § 31, Westlaw (database updated Feb. 2026).

In *Beretta U.S.A. Corp.*, the Illinois Supreme Court examined whether there is a "public right" to be free from "unreasonable jeopardy to health, welfare, and safety, and from reasonable threats of danger to persons and property, caused by the presence of illegal weapons" allegedly made possible by gun manufacturer's actions and inactions.  821 N.E.2d at 1114.  In that case, the plaintiffs described in their complaint the harms that allegedly resulted from the possession and use of illegal firearms in the city of Chicago: "a higher level of crime, death and injuries to Chicago citizens, a higher level of fear, discomfort and inconvenience to the residents of Chicago, and increased costs to the

plaintiffs to investigate and prosecute crimes caused by the illegal possession and use of the firearms brought into Chicago." *Id*. at 1115–16 (quoting the complaint).

The Illinois Supreme Court "quer[ied] whether the public right asserted by the plaintiffs [was] merely an assertion, on behalf of the entire community, of the individual right not to be assaulted." *Id*. at 1116. In posing the question, the court stated:

> [W]e do not intend to minimize the very real problem of violent crime and the difficult tasks facing law enforcement and other public officials. Nor do we intend to dismiss the concerns of citizens who live in areas where gun crimes are particularly frequent. Rather, we are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another.

*Id.* To highlight the potential breadth of a holding that the unlawful use of any lawful product may amount to an interference with a public right, the court provided the following examples:

> [T]he purchase and consumption of alcohol by adults is legal, while driving under the influence is a crime. If there is public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

> Similarly, cell phones, DVD players, and other lawful products may be misused by drivers, creating a risk of harm to others. In an increasing number of jurisdictions, state legislatures have acted to ban the use of these otherwise legal products while driving. A public right to be free from the threat that other drivers may defy these laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others.

*Id.* The Illinois Supreme Court concluded that there was "no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by the plaintiffs." *Id*. Because the court concluded that the plaintiffs' claim did not meet other required elements of a public nuisance action under Illinois state law, the court determined that it did not need to "decide whether to break new ground by creating such precedent." *Id*.

In *State ex rel. Hunter v. Johnson & Johnson*, the Supreme Court of Oklahoma refused to expand the state's public nuisance law to claims against licensed opioid manufacturers, determining that the state had "failed to show a violation of a public right in this case." 499 P.3d at 727.[79] The court explained that "a public right to be free from the threat that others may misuse or abuse prescription opioids—a lawful product—would

---

[79] In *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 722 (Okla. 2021), the Supreme Court of Oklahoma reversed a $465 million judgment against Johnson & Johnson ("J&J") for "creating a public nuisance in the marketing and selling of its opioid products." Although the case arose under Oklahoma's nuisance statute, the court explained that it codified the common law, and the public nuisance statute had not been amended since its enactment in 1910. *Id*. at 724. The court explained that over the past 100 years, Oklahoma's public nuisance liability had been limited to defendants (1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive activity that rendered the property uninhabitable. *Id*. The court held that "[a]pplying the nuisance statutes to lawful products as the State requests would create unlimited and unprincipled liability" arising from manufacturing, marketing, and selling of lawful products. *Id*. at 725. The court also determined that, among other things, (1) the state had failed to show a violation of a public right; (2) J&J had no control over its product through the multiple levels of distribution; (3) regulation of prescription opioids was a matter for the federal and state legislatures and their agencies; (4) there was no ability for J&J to abate the alleged nuisance; (5) no case of that court over the past 100 years had allowed the state "to collect a cash payment from a defendant to address social, health, and criminal issues arising from conduct alleged to be a nuisance[;]" and (6) the imposition of liability for public nuisance in this case could "hold manufacturers perpetually liable for their products" without regard to any statute of limitations. *Id.* at 729.

84

hold manufacturers, distributors, and prescribers potentially liable for all types of use and misuse of prescriptions medications." *Id*.

Turning to the County's complaint in this case, it alleges that the Defendants "collaborated with opioid manufacturers, partnering with them in the deceptive, dangerous marketing of these often lethal drugs and, in exchange for rebates and other payments from opioid manufacturers, placed opioids on formularies with preferred status and with little to no limits on their approval for use." Additionally, the County alleges, "instead of reporting illegitimate prescribing and sales uniquely visible to them in the extensive data they collect, the Defendants ignored evidence of misuse, addition, and diversion and used their data to boost their profits and manufacturers' sales at the expense of public health and safety." The County describes in its complaint the harms it alleges result from the Defendants' licensed dispensing of, and administration of benefit plans for controlled substances as follows:

> Defendants' acts and omissions offend, significantly and unreasonably interfere with, and cause damages to the public rights common to all, such as public health, public safety, public peace and public comfort. Defendants had control over their conduct in Anne Arundel County and that conduct has had an adverse effect on the public right. The public nuisance caused by Defendants has significantly harmed the county and a considerable number of county residents.

As discussed above, in enacting the CSA and the MCDSA, Congress and the General Assembly have expressly determined that the sale of certain controlled substances "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people" and of the "people of the State [of Maryland.]" 21 U.S.C. § 801; CR § 5-102(a)(1). The licensed dispensing of opioids and the

85

administration of benefit plans for opioid medications are lawful activities. When opioids are dispensed by a licensed pharmacist pursuant to a prescription written by a licensed health care provider, in the exercise of the prescriber's and pharmacist's professional judgment, opioid consumption is not only lawful but may be medically necessary. In other words, opioids do not cause harm to everyone who consumes them. These drugs are not unfit for human consumption—unlike an apothecary who sold medicine unfit for human consumption under the common law. Instead, these medications can be beneficial and medically necessary for treating pain when prescribed and dispensed correctly within the licensing scheme applicable to such conduct.

When opioids are diverted, misused, or abused, such conduct can cause individuals to become addicted. Substance abuse and addiction, of course, have a well-documented adverse effect on the community. We do not intend to dismiss the universally recognized concerns related to the opioid epidemic that are not unique to Anne Arundel County, but that affect the State,[80] and indeed the entire nation.[81]

---

[80] From 2014 to 2024, there have been over 20,000 deaths in Maryland due to unintentional fatal overdoses of opioids, with overdose-related deaths peaking in 2021. *See Fatal Overdose: Current Overview*, Md. Dep't of Health Overdose Data Portal (Nov. 10, 2025), https://perma.cc/9LEP-B2QZ. Between November 2024 and October 2025, there were 5,889 non-fatal, opioid overdose-related visits to emergency departments across the State. *Id.*

[81] According to the United States Centers for Disease Control and Prevention (CDC), between 1999 and 2023, approximately 806,000 people across the country died from an opioid overdose, including overdose deaths involving prescription and illegal opioids. *Understanding the Opioid Overdose Epidemic*, Ctrs. for Disease Control and Prevention (June 9, 2025), https://perma.cc/9QSF-B4ZY.

But we decline to recognize a public right to be free from the adverse effects associated with a lawful product being diverted, misused, or abused. To recognize a general common law "public right" would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be used lawfully.

For example, obesity is a major global public health challenge. In 2022, 2.5 billion adults across the globe were overweight, which included more than 890 million adults who were obese—approximately 1 in 8 people in the world.[82] Global estimates show that obesity in adults has more than doubled since 1990, with the number of adolescents living with obesity nearly quadrupling since then as well.[83] Increasing consumption of fast food has been linked to weight gain and other adverse health outcomes.[84] Although consuming fast food can have a significant, unreasonable, and adverse effect on public health, it would

---

The Secretary of the Department of Health and Human Services, pursuant to the Public Health Service Act in 42 U.S.C. § 247d(a), declared a public health emergency as a result of the opioid epidemic. *See Declarations of a Public Health Emergency*, HHS Admin. for Strategic Preparedness & Response, https://perma.cc/PK3L-RUTL. Since the public health emergency was first declared in October 2017, it has been renewed every 90 days by both Trump administrations as well as the Biden administration.

[82] *Fact Sheets: Obesity and Overweight*, World Health Org. (Dec. 8, 2025), https://perma.cc/F58B-QUDG (citing NCD Risk Factor Collab., *Worldwide Trends in Underweight and Obesity from 1990 to 2022: A Pooled Analysis of 3663 Population-Representative Studies with 222 Million Children, Adolescents, and Adults*, 403 The Lancet 1027 (2024)).

[83] *Id.*

[84] *See, e.g.*, Jennifer M. Poti et al., *The Association of Fast Food Consumption with Poor Dietary Outcomes and Obesity Among Children: Is It the Fast Food or the Remainder of the Diet?*, 99 Am. J. Clinical Nutrition 162 (2014).

be ill-conceived to address public health concerns by allowing public nuisance claims to proceed against fast food chain restaurants.

We decline "to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1116. Recognizing such a public right would have a profound and boundless impact on tort liability in this State. We determine that the better course is judicial restraint. The General Assembly is far better suited to address societal concerns related to opioid diversion and abuse.

### C. Common Law Public Nuisance Claims Are Inapt Where the Conduct Is Heavily Regulated

Even if the County were able to establish that the licensed dispensing of, or administration of benefit plans for opioids interfered with a common public right, and we were inclined to recognize an expanded common law tort of public nuisance, we would nonetheless decline to recognize an expanded tort here given the extensive statutory and regulatory framework that governs the conduct. The County's complaint in this case is inconsistent with comment f to § 821B of the Second Restatement, which we find to be highly instructive.

Comment f states that "[a]lthough it would be a nuisance at common law, *conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability*." (Emphasis added). Additionally, the drafters of the Second Restatement caution that a court should be reluctant to use its equitable powers to impose

an injunctive remedy on an activity that is highly regulated by statute. The drafters

commented:

> [I]f there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations . . . . The variety and complexity of a problem and of the interests involved and the feeling that the particular decision should be a part of an overall plan prepared with a knowledge of matters not presented to the court and of interests not represented before it, may also promote judicial restraint and a readiness to leave the question to an administrative agency if there is one capable of handling it appropriately.

*Id.* § 821B cmt. f. As the Illinois Supreme Court observed when discussing this particular

comment, "[l]itigation should not be used to achieve legislative goals." *Beretta USA Corp.*,

821 N.E.2d at 1123.

The limiting principles described in comment f militate against recognizing an

expanded common law public nuisance tort broad enough to cover the dispensing of

opioids. As discussed above, the distribution of prescription opioids involves a complex

subject matter that is a highly regulated activity under both federal and state law. Under

the closed regulatory system established by the CSA and MCDSA, opioids may not be

manufactured, distributed, dispensed, or possessed except in a manner authorized by those

statutes. Conduct undertaken in violation of the CSA and MCDSA is subject to criminal

prosecution. The regulatory scheme covers the entire supply chain—from the federal

quotas that govern overall production, to the manufacturers and wholesale distribution, to

the retailers, and ultimately, the medical prescribers and pharmacists who prescribe them.

Each step in the process is subject to licensure requirements and oversight by various

89

overlapping federal and state agencies, each of which has concurrent enforcement authority, including the ability to inspect, revoke licenses, bring civil enforcement proceedings, including injunctive relief, fines and penalties, and, in the case of more egregious violations, prosecutions for criminal offenses.

The statutes require the exercise of independent professional judgment by the prescriber and pharmacist, with regulatory oversight by the professional licensing boards. The professionals who prescribe and dispense opioids are required to exercise specific professional judgment standards unique to the prescription of opioid medications. The statutory scheme subjects the professionals who prescribe and dispense them not only to professional disciplinary action, but also to potential criminal prosecution depending on the circumstances and the severity of the violations.

In addition to the CSA and the MCDSA, the General Assembly has enacted the Program to address issues of prescription drug abuse and diversion. The Program is required to review prescription monitoring data for possible indications of misuse or abuse and is also required to report the same. Given the complexity of the subject matter, in undertaking its review and reporting requirements, the Program is required to obtain clinical guidance and interpretation of prescription monitoring data from the Technical Advisory Committee.

Overlapping the multi-layered, technical statutory and regulatory system that applies to opioid prescriptions specifically, the Maryland Pharmacy Act and the applicable provisions of the Insurance Article add an additional regulatory layer that governs pharmacy practices and PBM services generally. Acknowledging the complexity of

90

matters related to formulary decisions and utilization management, the General Assembly requires that each PBM have a "Pharmacy and Therapeutics Committee" that makes therapeutic recommendations concerning formulary decisions and utilization management. The General Assembly also outlines statutory requirements related to a PBM's formulary decision and utilization management. Finally, the General Assembly has vested the Insurance Commissioner with oversight and broad enforcement authority, including the ability to obtain injunctive relief, restitution, and the imposition of civil fines and penalties.

To the extent that the County seeks to impose tort liability for the Defendants' *lawful conduct* undertaken pursuant to the federal and state regulatory schemes that authorize the lawful dispensing of opioids and the administration of benefit plans for licensed opioids, Congress and the General Assembly have determined that the social utility of the licensed dispensing of opioids outweighs the gravity of the harm in permitting their lawful dispensing. We decline to extend tort liability upon the basis of public nuisance where the Legislature has sanctioned the conduct by declaring it to be lawful.

To the extent that the County is seeking to impose tort liability on the Defendants for alleged *unlawful* conduct, we also decline to extend common law public nuisance given the complex regulatory framework that has been established under federal and state law to address (1) *whether* the conduct is, *in fact*, unlawful; and (2) the criminal, administrative, and civil administrative enforcement remedies that are specifically enumerated within the statutory and regulatory schemes that govern the conduct. The agencies entrusted by the Legislature with these responsibilities are better suited than judges or juries to determine in the first instance whether highly regulated and complex activity complies with the

91

overlapping federal and state regulations that govern the conduct of opioid dispensing and the administration of benefit plans. [85]

## VI

## Conclusion

In conclusion, we hold that that the licensed dispensing of, or administration of benefit plans for, a controlled substance does not constitute an actionable public nuisance under Maryland common law.  Maryland has not expanded the public nuisance doctrine beyond the traditional historical principles embodied in the common law—namely, that a public nuisance action was not regarded as a tort but was instead a public action by a government entity to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct.  This Court has never recognized a government entity's ability to recover damages for public nuisance.

We further determine that we do not need to decide in this case whether to expand Maryland's common law of public nuisance because the County failed sufficiently to allege that the Defendants' conduct affects a common public right.  We decline to recognize a public right to be free from the adverse effects associated with a lawful product being diverted, misused, or abused.  To recognize a general common law "public right" to be free from any potentially injurious harm associated with a lawfully licensed product being diverted, abused, or misused would permit nuisance liability to be imposed on an endless

---

[85] The Defendants assert that the County's common law claims are preempted by the extensive statutory scheme.  The County disagrees.  Given our holding that the County has failed to assert a legally cognizable claim for public nuisance, we do not need to reach the preemption issue.

list of manufacturers, distributors, and retailers of manufactured products that are intended to be used lawfully, when such products are misused and cause injury.

Moreover, even if the County were able to establish that the alleged conduct interfered with a common public right, we would nonetheless decline to expand Maryland's common law of public nuisance to govern the conduct alleged in the County's complaint given the extensive federal and state statutory and regulatory framework that governs the highly complex conduct of the licensed prescribing, dispensing, and administration of benefit plans related to opioids. Complex societal problems are best suited for the Legislature, and judicial restraint is the appropriate principle to apply here.

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY.**

93

United States District Court for
 the District of Maryland
Case No.: Civ. No. 1:24-cv-00090-MJM
Argued: September 9, 2025

IN THE SUPREME COURT

OF MARYLAND

---

Misc. No. 1

September Term, 2025

---

EXPRESS SCRIPTS, INC., *et al.*

v.

ANNE ARUNDEL COUNTY, MARYLAND

---

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

---

Concurring Opinion by Killough, J.

---

Filed: March 23, 2026

I respectfully concur with the Majority Opinion. I agree with the Majority Opinion's main holding that a public nuisance claim does not need to be tethered to a real property interest, but that the County here failed to adequately allege the violation of a public right. As discussed below, the County's complaint does not establish a violation of a public right, because the harm from opioid dispensing is individualized and attenuated, not universal and unavoidable. So, on the specific facts of this case, I join with the Majority in answering "no" to question one.  Because we answer "no" as to the first question, there is no need to address question two.

I write separately, however, because I believe that the Majority's holding is too broad.  The Majority states that it "do[es] not need to decide in this case whether to expand Maryland's common law of public nuisance." [Maj. Slip Op. at 80].  Yet, its holding that "the licensed dispensing of, or administration of benefit plans for, a controlled substance does not constitute an actionable public nuisance," [Maj. Slip Op. at 1], reads as having decided precisely that question.  I do not think that these conclusions are easily reconcilable.  The first is a narrow, fact-bound disposition; the second is a categorical rule that shuts the courthouse door to all future public nuisance suits of this kind.  There is daylight between "this complaint fails to state a public nuisance claim" and "this category of conduct can never be a public nuisance."  This is a broader framing than I believe the analysis supports.  I agree with the Majority's conclusion in this case, but I respectfully disagree with how far that reasoning gets us.

In answering the certified question, I do not believe it is necessary to forecast whether or how Maryland's common law of public nuisance will develop in the future.

2

The Majority's assertion that "Maryland's public nuisance common law has not been expanded beyond the traditional historical principles," [Maj. Slip Op. at 1], is accurate as a description of what this Court has done to date. But the Majority deploys it as something more—as a justification for declining to develop the doctrine further, as though the absence of prior expansion is itself a reason to resist future development. That is not how common law works. The common law is not a fly in amber, preserved in a fixed state at some arbitrary point in its history. As this Court has recognized, "the common law is not static. Its life and heart is its dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems[.]" *Felder v. Butler*, 292 Md. 174, 182 (1981). And "this Court has authority under the Maryland Constitution to change the common law." *Cooper v. Rodriguez*, 443 Md. 680, 731 (2015) (citing *Bowden v. Caldor, Inc.*, 350 Md. 4, 27 (1998)). I agree that expansion of public nuisance should be gradual, principled, and sensitive to the institutional limits of the judiciary. But the Majority's framing implies that any development of the doctrine is suspect—a position that, if applied consistently, would have frozen the common law centuries ago. The proper course is to decide the case on its facts and allow future cases to define the doctrine's boundaries as they arise.

I further do not entirely agree with the Majority's analysis on what constitutes an adequate public right violation for purposes of a cognizable public nuisance claim. In my view, a public right is characterized by two considerations: (1) the nature of the right and (2) the extent of the violation of said right. The nature of the right pertains to whether the defendant violated a right to a public good, such as health, safety, air, water, or public

3

rights-of-way. *See* 58 Am. Jur. 2d *Nuisances* § 31, Westlaw (database updated Feb. 2026). On the other hand, when evaluating the extent of the violation of the right, a court must ask whether "[t]he public nuisance is an injury to the public at large or to all persons who come into contact with it[.]" *Adams v. Comm'rs of Trappe*, 204 Md. 165, 170 (1954).

Here, the County has satisfied the first consideration but not the second. The County's allegations that the "[d]efendants' acts and omissions offend . . . the public rights common to all, such as public health, public safety, public peace, and public comfort" identify rights that are of the kind appropriately vindicated via public nuisance tort suits. Stated differently, the nature of the rights defendants allegedly violated are rights to various public goods. That said, the County's complaint does not fulfill the second prong. *See Adams*, 204 Md. at 170. As the Majority Opinion correctly notes, [Maj. Slip Op. at 86], "opioids do not cause harm to everyone who consumes them." Unlike an obstruction on a public right-of-way, which impacts all who seek to traverse a throughway, opioid consumption does not harm all who encounter it. And unlike air pollution, which directly affects everyone in the state of Maryland, opioid consumption, at best, only affects the public at large as a secondary byproduct.

The County's reasoning further demonstrates this point. For instance, the Respondent argues that "[w]orsened addiction-related health outcomes can overwhelm the [community's] hospitals or other public health resources. This conduct also impacts public safety by contributing to increases in addiction-related crime and creating exposure dangers to non-users, including emergency responders." Resp't. Br. at 40 (internal citations and quotation marks omitted). While this may be true, the County's theory of harm to the

4

public at large is at least one step removed, if not more, from the group of people directly harmed by the diversion, misuse, or abuse of opioids.  As such, it is too attenuated to fulfill the extent of harm consideration.  The harms the Defendants' actions and omissions allegedly caused, though profoundly serious, are pervasive enough to implicate "an aggregate of private rights by a large number of injured people" but not a public right.  58 Am. Jur. 2d *Nuisances* § 31, Westlaw (database updated Feb. 2026).  It is this distinction— between harm that is direct, universal, and unavoidable by virtue of the public's ordinary use of a shared resource and harm that is attenuated, selective, and particularized—that animates the second consideration in my framework and that the County's complaint fails to satisfy.

Therefore, I agree with the Majority's conclusion that "the County's complaint fails to satisfy a primary requirement of a public nuisance action—namely, that the Defendants' dispensing of opioids, and administration of benefit plans for opioids, affects a common public right."  [Maj. Slip Op. at 81].  However, I am not prepared to foreclose the possibility that the diversion, misuse, or abuse of a lawful product could be the subject of a successful public nuisance government action in the future, nor am I willing to categorically "decline to recognize a public right to be free from the adverse effects associated with a lawful product being diverted, misused, or abused" as the Majority does.  [Maj. Slip Op. at 87]. In my opinion, the County's claim here fails not because it was tethered to a lawful product or the public's right to be free from the adverse effects of its diversion, misuse, or abuse thereof, but rather because the County offers no principle for distinguishing a harm to the public at large from a widespread aggregation of individual injuries.  In other words, the

5

County's conception of a "public right" does not distinguish between a harm that affects everyone at large or everyone that interacts with the nuisance (contaminated drinking water) and harm that is widespread but ultimately affects a subset of the public that encounters the alleged nuisance (opioid consumption).  Without such a distinction, any product that causes sufficient individual harm would give rise to a public nuisance claim—effectively collapsing the boundary between public nuisance and mass tort as well as providing state and local governments boundless enforcement power.

To illustrate, consider a licensed food manufacturer introducing an ingredient in food distributed to children through a county school lunch program that is FDA-approved. Later, it is discovered that the ingredient is toxic and that the manufacturer knew or should have known that it would be harmful to children but distributed it anyway.  The product is lawful, the manufacturer is licensed, the ingredient was FDA-approved at the time.  The harm is universal across the exposed population, non-attenuated, and affects a public good, namely the public's right to health and safety.  Under the Majority's framing, a county lawsuit based on the public nuisance doctrine would arguably be foreclosed in this hypothetical, because the product was lawfully manufactured and distributed within a regulatory scheme.  Such a scenario would also underscore why the existence of a regulatory framework should not serve as a categorical bar to public nuisance claims—regulatory schemes, however comprehensive, may contain gaps that leave the public without an adequate remedy.  Here, the FDA had approved the additive, but the manufacturer possessed information that the regulatory scheme never had the opportunity to consider.

6

Consider, by contrast, a potentially harder case. A social media company whose algorithm preferentially serves content that the company's own internal research shows causes mental health harm in adolescents—not as an unintended byproduct, but as a deliberate design choice that maximizes engagement. The platform is lawful, the company operates under applicable regulations, and individual users choose to create accounts. Whether such a claim could satisfy either consideration in my framework is unclear. The nature of the right—adolescent mental health—may qualify as a public good, but it lacks the concreteness of clean water or unobstructed roadways. And the extent of the violation raises difficult questions: exposure may be widespread, but whether it affects every adolescent who comes in contact with the platform or the public at large in a non-attenuated manner is a fact-dependent inquiry that cannot be answered in the abstract. I do not purport to resolve these questions here.

I raise these hypotheticals to illustrate that the two-consideration framework requires genuine analytical engagement with the facts of such cases—an engagement that the Majority's categorical rule forecloses. The logic of the Majority's holding extends well beyond controlled substances such as opioids to any lawful products manufactured and distributed against a background of pervasive regulation. If a future court applies the Majority's reasoning by analogy to food products, social media, or other licensed commercial activity, the categorical framing gives them a template for doing so.

Furthermore, to the extent the Majority rests its holding in the alternative on the presence of a complex statutory and regulatory framework here, [Maj. Slip Op. at 88-92], I respectfully disagree. The presence of a complex regulatory framework is one factor

7

among many a court should consider when determining whether the court should exercise restraint and whether the activity or product in question is unreasonable. Unless Congress or the General Assembly expressly prohibited public nuisance actions when fashioning the regulatory framework or the activity in question is definitively illegal, the availability of a complex statutory and regulatory framework should not be a dispositive factor as to the role the court plays in a public nuisance action and as to the reasonableness of an activity or a product. This reasoning is partly in line with comment f to § 821B of the Second Restatement, which cautions against judicial excess in public nuisance suits in heavily regulated areas while ultimately leaving the issue of whether restraint is warranted to the discretion of the court. Restatement (Second) of Torts § 821B cmt. f (1979) ("The variety and complexity of a problem and of the interests involved and the feeling that the particular decision should be a part of an overall plan prepared with a knowledge of matters not presented to the court and of interests not represented before it, *may* also promote judicial restraint and a readiness to leave the question to an administrative agency if there is one capable of handling it appropriately.") (emphasis added).

Finally, though I agree with the Majority's observation that "[t]his Court has never recognized a government entity's ability to recover damages for public nuisance," [Maj. Slip Op. at 92], I see no need to prohibit prospective money awards for abatement in public nuisance actions brought by a government entity, nor do I read the Majority Opinion as doing so given that we do not reach the second certified question here. Moreover, in its analysis of the economic damages question, the Majority relies on the Third Restatement to blanketly deem public nuisance doctrine as an "'inapt vehicle' to address societal

8

concerns." [Maj. Slip Op. at 75] (citing Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020)). I disagree with this characterization. Comment g appears in a volume of the Third Restatement titled "Liability for Economic Harm," and it is specifically addressed to the question of whether government entities may recover *economic damages* through public nuisance for mass product harms. That is a considerably narrower proposition than the one for which the Majority deploys it. To treat comment g as a categorical indictment of public nuisance as a vehicle for addressing societal problems— rather than as a limitation on *damages remedies* in a particular class of cases—is to read the Third Restatement, in my view, more broadly than its drafters intended. Whether a public nuisance action is an appropriate vehicle for addressing a given social concern should be determined on a case-by-case basis, with due regard for the public right potentially implicated, the relief sought, and the adequacy of existing statutory remedies.

For the foregoing reasons, I respectfully concur.

9

United States District Court for
the District of Maryland
Case No.: Civ. No. 1:24-cv-00090-MJM

Argued: September 9, 2025

IN THE SUPREME COURT

OF MARYLAND

Misc. No. 1

September Term, 2025

_____

EXPRESS SCRIPTS, INC., *et al.*

v.

ANNE ARUNDEL COUNTY, MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed:  March 23, 2026

Respectfully, I concur in part and dissent in part.  I join the Majority's conclusion that the licensed dispensing of, or administration of benefit plans for, a controlled substance does not constitute an actionable public nuisance under Maryland common law.  See Maj. Slip Op. at 92.  I also join the Majority's decision declining to expand Maryland's common law of public nuisance to govern the conduct alleged in the County's complaint.  See Maj. Slip Op. at 92-93.  As the Majority aptly states, the General Assembly is best suited to address the type of complex societal problems that this case presents; thus, this Court should exercise judicial restraint in deciding the questions raised in the case.  See Maj. Slip Op. at 92-93.  I write separately to dissent from the Majority's inclusion of an analysis addressing whether the County established that the alleged conduct affects a common public right.  See Maj. Slip Op. at 80-88, 92.  In my view, conducting such an analysis is at odds with the Majority's decision to exercise the principle of judicial restraint by leaving the matter to the General Assembly.

Given the Majority's decision to defer to the General Assembly regarding whether to expand Maryland's public nuisance law, see Maj. Slip Op. at 93, reaching the merits of the County's complaint is premature.  Deferring to the General Assembly necessarily entails leaving it to the General Assembly to decide whether to enact a statute expanding Maryland's public nuisance law, and if it decides to do so, what the statute would look like.  Because the General Assembly has not acted, the Majority should not have concluded that the County's complaint failed to allege a violation of a common public right.  See Maj. Slip Op. at 80-88, 92.  In reaching this conclusion, the Majority defined a public right as excluding a "right to be free from the adverse effects associated with a lawful product being

diverted, misused, or abused." Maj. Slip Op. at 87. At the same time, the Majority correctly concluded that "there is nothing in our case law that reflects this Court's adoption of an expansive tort of public nuisance based upon the definition contained in § 821B of the Second Restatement." Maj. Slip Op. at 72.

> Yet, the Majority insists:
>
> The certified questions necessarily require that we determine whether the County has sufficiently pleaded an action for common law public nuisance. To do so, we must determine whether the County has established a necessary element—that the alleged conduct interferes with a public right. Without undertaking this analysis, we are not completely answering the certified questions.

Maj. Slip Op. at 81 n.78. The Majority's rationale for roving into the very area that it expressly and prudently determined should be left to the General Assembly is flawed in at least three important respects: (1) our case law—Maryland common law—has not adopted the "interference with a public right" as a necessary element of a common law public nuisance action; rather, in our case law discussing the limited type of common law nuisance actions that have been recognized, we have described a "public nuisance" as "an injury to the public at large or to all persons who come into contact with it," Wietze v. Chesapeake Conf. Ass'n, 421 Md. 355, 374, 26 A.3d 931, 943 (2011) (citation modified); (2) the questions certified to this Court are fully answered by the exact conclusion that the Majority reaches—Maryland's common law of public nuisance should not be expanded to apply to the allegations set forth in the County's complaint, *i.e.*, the answer to question 1 is "no" and there is no need to address question 2; and (3) in holding that the County's

- 2 -

complaint fails to allege the violation of a common public right, the Majority has done just what it concluded this Court should not do—expand the common law of public nuisance.

None of our case law addressing public nuisance has adopted the language of the Restatement (Second) of Torts defining a public nuisance as the interference with "a common public right[,]" Maj. Slip Op. at 73, 81, or as the interference with a public right, let alone determined that either definition is as an essential element of a common law public nuisance action. See Adams v. Comm'rs of Town of Trappe, 204 Md. 165, 102 A.2d 830 (1954); Tadger v. Montgomery Cnty., 300 Md. 539, 479 A.2d 1321 (1984); Wietzke, 421 Md. 355, 26 A.3d 931. We have explained that "[t]he general [rule] is universally accepted that a municipal corporation may invoke the aid of a court of equity to restrain or remove any unlawful obstruction or encroachment in a street which constitutes either a public nuisance or an unreasonable interference with the free use of the way by the public." Adams, 204 Md. at 170-71, 102 A.2d at 834. We have defined a public nuisance as "an injury to the public at large or to all persons who come in contact with it[.]" Id. at 170, 102 A.2d at 834.

We have mentioned a public nuisance as involving the interference with a common public right in the context of setting forth the definition of a public nuisance in section 821B of the Restatement (Second) of Torts, which we have not adopted. See Tadger, 300 Md. at 552-53, 479 A.2d at 1327-28. More recently, in the framework of a private nuisance case, we observed that, "[s]ince its inception, [] the doctrine of nuisance has evolved to protect the property rights of the public as well, where a right common to the general public has been interfered with." Wietzke, 421 Md. at 374, 26 A.3d at 943 (citation modified).

- 3 -

In describing the difference between a public and private nuisance, we again explained that "public nuisance is an injury to the public at large or to all persons who come in contact with it, while private nuisance is an injury to an individual or a limited number of individuals only." Id. at 374, 26 A.3d at 943 (citation modified).

By concluding that interference with a public right is a necessary element of a common law public nuisance action and that such an action does not necessarily involve an interference with real property rights, the Majority has expanded an actionable public nuisance under Maryland common law. See Maj. Slip Op. at 7, 80. And, relying on case law from other jurisdictions that it found persuasive, the Majority has concluded that the allegations in the County's complaint exceed the parameters of the expanded definition. See Maj. Slip Op. at 82-85. The definition of a public nuisance and a description of its essential elements is more complex and elusive than the majority opinion lets on. In theory, public nuisances can stem from the use of real property, the sale of merchandise, the commission of a crime, or other means. In our State, there are numerous statutes already setting forth that certain things are public nuisances. Defining an essential element of a State-wide public nuisance action deserves more than a determination based on the examination of the two cases from other jurisdictions chosen by the Majority.

As the General Assembly has yet to define a common public right—or to decide whether it will do so—this Court cannot know what such a definition might entail or whether the County's complaint would fall short. Accordingly, the Majority's definition of a common public right in this context and its conclusion that the County's complaint fails to meet that standard is premature. Should the General Assembly choose to adopt the

- 4 -

definition of a public nuisance in section 821B of the Restatement (Second) of Torts and codify a public nuisance action, it will be in the position of having to address the Majority's definition of a common public right and potentially overrule the majority opinion.

Likewise, the Majority's reliance on City of Chicago v. Beretta U.S.A. Corp., 821 N.E.2d 1099 (Ill. 2004), and State ex rel. Hunter v. Johnson & Johnson, 499 P.3d 719 (Okla. 2021), to support its definition of a common public right is contrary to its decision to defer to the General Assembly. See Maj. Slip Op. at 82-85, 88, 93.  In both cases, the Supreme Courts of Illinois and Oklahoma declined to recognize a "public right to be free from the threat that others may use a lawful product to break the law."  Beretta U.S.A. Corp., 821 N.E.2d at 375; see also State ex rel. Hunter, 499 P.3d at 727 (declining to recognize "a public right to be free from the threat that others may misuse or abuse prescription opioids—a lawful product[.]").  The Majority relies on these cases to conclude that this Court likewise declines to recognize such a common public right. See Maj. Slip Op. at 82-85, 88.

Yet, Illinois public nuisance law sounds in Illinois's common law, and Illinois courts have adopted the Restatement (Second) of Torts's definition of public nuisance. See Beretta U.S.A. Corp., 821 N.E.2d at 365-66, 370-72.  Each state's common law evolves independently through its own judicial decisions and interpretations; thus, Maryland's common law is distinct from Illinois's.  By relying on Illinois common law to define the parameters of a common public right under Maryland common law, see Maj. Slip Op. at 82-84, the Majority incorporates another jurisdiction's rule without knowing whether the Maryland General Assembly would enact a public nuisance statute that is consistent with

- 5 -

Illinois's approach. Moreover, unlike the Supreme Court of Illinois, this Court has not adopted "a[] . . . tort of public nuisance based upon the definition contained in [the Restatement (Second) of Torts]." Maj. Slip Op. at 70-72. The Majority correctly points out that in Tadjer, 300 Md. 539, 479 A.2d 1321—the case that the County relies upon for its assertion that we have adopted the Second Restatement's expansive definition of public nuisance—there is a "complete lack of discussion of any elements that would comprise such a tort action." Maj. Slip Op. at 73. Because this Court does not know whether the General Assembly will enact a statute adopting the Second Restatement's definition of public nuisance, defining a common public right based on case law from other jurisdictions derived from the Second Restatement is premature.

In a similar vein, Oklahoma's public nuisance law sounds in both Oklahoma common law and the Oklahoma nuisance code[1]—which includes a public nuisance statute.[2] State ex rel. Hunter, 499 P.3d at 724-25, 727; see also 50 Okl. St. Ann. § 2 (defining a public nuisance). For the same reason that Maryland's common law is distinct from Illinois's, Maryland's common law is distinct from Oklahoma's. By relying on Oklahoma common law to define the parameters of a common public right under Maryland common law, see Maj. Slip Op. at 84-85, the Majority again prematurely incorporates

---

[1]Oklahoma's nuisance code was modeled after North Dakota's nuisance code, and both codes remain identical to this day. See State ex rel. Hunter, 499 P.3d at 726.

[2]Oklahoma's public nuisance statute codifies Oklahoma's common law of public nuisance as it existed in 1910. See State ex rel. Hunter, 499 P.3d at 724 ("Oklahoma's nuisance [code] codifies the common law. . . . Oklahoma's nuisance [code] and public nuisance statute[] became law in 1910. The Legislature has never amended the public nuisance statute." (Citation modified)).

another jurisdiction's rule without knowing whether the Maryland General Assembly would enact a public nuisance statute consistent with Oklahoma's approach. This Court cannot know whether the General Assembly will model Maryland's public nuisance statute after Oklahoma's—if it enacts a public nuisance statute at all. Consequently, defining a common public right based on law derived from Oklahoma's public nuisance statute is premature.

Lastly, the Majority's decision to define a common public right and conclude that the County's complaint does not meet that definition is contrary to the principle of judicial restraint itself. Judicial restraint, in part, involves a court limiting the exercise of its power by "declin[ing] to alter [the] common law" when doing so is more appropriate for the General Assembly. See Felder v. Butler, 292 Md. 174, 183-84, 438 A.2d 494, 499 (1981) (declining to alter common law in area "pervasively regulated" by the General Assembly); see also Harrison v. Montgomery County Bd. of Educ., 295 Md. 442, 460, 456 A.2d 894, 903 (1983) ("[I]n considering whether a long-established common law rule—unchanged by the [General Assembly] and thus reflective of this State's public policy—is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly . . . .").

The Majority decides, and I agree, that judicial restraint is the appropriate principle to apply in this case. See Maj. Slip Op. at 88, 93. The distribution of prescription opioids is subject to an "extensive federal and state statutory and regulatory framework" and opioid diversion and abuse is a "[c]omplex societal problem[.]" Maj. Slip Op. at 93. The General Assembly can hold hearings, receive evidence, and make findings of fact, enabling it to

- 7 -

address complex policy questions in a way that this Court cannot.   Accordingly, the General Assembly is best suited to address whether to expand Maryland public nuisance law to allow a government entity to seek monetary damages.  See Maj. Slip Op. at 93.

However, by defining a common public right and concluding that the County's allegations fell short, see Maj. Slip Op. at 80-88, the Majority does precisely what judicial restraint cautions against: it alters the common law in an area where legislation from the General Assembly is more appropriate.   In my view, applying the principle of judicial restraint, there is no need for this Court to define a common public right and decide whether the County's allegations meet that definition.   By declining to expand Maryland common law and leaving the question to the General Assembly, this Court has resolved the case and done all that is required.

For the above reasons, respectfully, I concur in part and dissent in part.