# EXHIBIT B

*Mayor & City Council of Baltimore v. B.P. P.L.C., et al.*; *Anne Arundel County, Maryland v. B.P. P.L.C., et al; City of Annapolis v. B.P. P.L.C., et al.,* No. 11, September Term, 2025, Opinion by Booth, J.

**FEDERAL DISPLACEMENT/PREEMPTION OF STATE LAW CLAIMS**

The Supreme Court of Maryland considered three consolidated cases—one case filed in the Circuit Court for Baltimore City and two cases filed in the Circuit Court for Anne Arundel County. In these cases, the Mayor and Council of Baltimore City ("Baltimore"), Anne Arundel County, and the City of Annapolis, (collectively, the "local governments") filed state common law tort claims against 26 multinational oil and gas companies to recover damages caused by global greenhouse gas emissions. Specifically, the local governments asserted five causes of action against the Defendants, all arising under Maryland law: (1) public nuisance; (2) private nuisance; (3) trespass; (4) negligent failure to warn; and (5) strict liability failure to warn.

The local governments argued that the Defendants, individually and collectively, are responsible for extracting, processing, producing, promoting, and marketing fossil fuel products, the normal and intended use of which has led to the emission of a substantial percentage of the total volume of greenhouse gases released into the atmosphere for over 50 years. The local governments contend that the Defendants deceived consumers and the public about the dangers associated with their fossil fuel products when they knew of a direct link between their products and climate change threats, causing sea levels to rise, as well as other physical and environmental impacts, resulting in inundation, destruction, and/or other interference with the local governments' property and citizenry.

The Circuit Court for Baltimore City and the Circuit Court for Anne Arundel County granted the Defendants' motions to dismiss. After an appeal to the Appellate Court of Maryland, in which the cases were consolidated, this Court issued a bypass writ of certiorari to determine whether Maryland local governments may bring the state common law tort claims against the 26 companies to recover damages caused by global greenhouse gas emissions.

The Supreme Court of Maryland affirmed the judgments of the lower courts dismissing the complaints. The Court held that the local governments' state law claims are displaced and preempted by federal law. The Court determined that the local governments, through their state law claims, are attempting to regulate air emissions. The Court explained that, for over a century, the United States Supreme Court has held that cases involving regulations of interstate pollution arise under federal law. Under the United States Supreme Court's jurisprudence, any state law claims are displaced by federal common law. Moreover, as the United States Supreme Court held in *American Electric Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011), the Clean Air Act, 42 U.S.C. § 7401, *et seq.* (1970), displaces applicable federal common law. Applying the preemption framework adopted by the

United States Supreme Court in *International Paper Company v. Ouellette*, 479 U.S. 481 (1987), the Supreme Court of Maryland held that the Clean Air Act does not authorize the broad state law claims under its saving clause.  Finally, the Supreme Court of Maryland held that federal common law would not extend to apply to the local governments' claims that regulate international conduct.  The United States Supreme Court has made it clear that the political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign policy concerns.

The Supreme Court further held that, even if the local governments' state law claims were not displaced or preempted by federal law, the local governments failed to state legally cognizable claims under state law for public nuisance, private nuisance, trespass, and negligent and strict liability failure to warn.

**PUBLIC NUISANCE**

The Supreme Court held that the local governments failed to state a claim for public nuisance under Maryland law.  As this Court explained in *Express Scripts, Inc. v. Anne Arundel County, Maryland*, ___ Md. _____ (filed March 23, 2026), Maryland has not expanded the public nuisance doctrine beyond the traditional historical principles embodied in the common law—namely, that a public nuisance action was not regarded as a tort but was instead a public action by a government entity to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct.  Additionally, this Court has never recognized a government entity's ability to recover damages for public nuisance.  Moreover, assuming without deciding that there is a public right to be free from adverse effects of climate change, the Court stated that it nonetheless declines to expand Maryland's common law of public nuisance to govern the conduct alleged in the local governments' complaints given the extensive federal statutory and regulatory framework that governs the highly complex conduct of regulating air emissions.

**PRIVATE NUISANCE**

The Supreme Court held that the local governments failed to state a claim for private nuisance because that tort requires that the plaintiff establish an injury to property that is different in kind from that suffered by the public generally.  Here, the injuries alleged by the local governments are not unique or different from any injuries suffered by the public generally.

**TRESPASS**

The Court held that the local governments' trespass claim exceeds the bounds of the tort established in this Court's case law, which holds that when an adjacent property is invaded by an inanimate or intangible object, the defendant must have some connection or control over that object for a trespass action to lie.  The Court agreed with the Circuit Court for

Baltimore City that the link between the Defendants' activities and the harms alleged by the local governments, which are caused by human activities around the world, are far too attenuated to constitute the Defendants' connection or control over the rainfall and storms that invaded the local governments' property.

**STRICT LIABILITY/NEGLIGENCE ARISING FROM FAILURE TO WARN**

The Court held that the local governments failed to state claims for strict liability and negligent failure to warn. The Court determined that the duty the local governments seek to impose is a duty to warn the entire human race of the effects of climate change. The Court stated that finding such a duty would stretch Maryland tort law beyond manageable bounds.

Circuit Court for Baltimore City
Case No.: 24-C-18-004219

Circuit Court for Anne Arundel County
Case No.: C-02-CV-21-000250

Circuit Court for Anne Arundel County
Case No.: C-02-CV-21-000565

Argued: October 6, 2025

<u>IN THE SUPREME COURT</u>
<u>OF MARYLAND</u>

No. 11
September Term, 2025

MAYOR & CITY COUNCIL OF BALTIMORE
v.
B.P. P.L.C., et al.

ANNE ARUNDEL COUNTY, MARYLAND
v.
B.P. P.L.C., et al.

CITY OF ANNAPOLIS
v.
B.P. P.L.C., et al.

Fader, C.J.,
Watts,
Booth,
Gould,
Eaves,
Killough,
Battaglia, Lynne A.
  (Senior Justice, Specially Assigned)

JJ.

Opinion by Booth, J.
Fader, C.J., concurs.
Gould, J., concurs.
Watts, J., concurs and dissents.
Killough, J., concurs and dissents.

Filed: March 24, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

The question presented in this case is whether Maryland local governments may bring state common law tort claims against 26 multinational oil and gas companies to recover damages caused by global greenhouse gas emissions. We hold that they may not.

For the reasons set forth more fully herein, we determine that state common law has never applied to the conduct alleged by the local governments. We determine that the local governments, through their various state law claims, are seeking to regulate air emissions beyond their jurisdictional boundaries. For over a century, the United States Supreme Court has held that cases involving regulation of interstate pollution arise under federal law. Under the United States Supreme Court's jurisprudence, we conclude that any state law claims are displaced by federal common law. Moreover, as the United States Supreme Court held in *American Electric Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011), the Clean Air Act, 42 U.S.C. § 7401, *et seq.* (1970), displaces applicable federal common law. Applying the preemption framework adopted by the Supreme Court in *International Paper Company v. Ouellette*, 479 U.S. 481 (1987), we hold that that the Clean Air Act does not authorize the broad state law claims under its saving clause. Additionally, to the extent that the local governments seek recovery for harms caused by foreign emissions, foreign policy concerns would foreclose a federal common law action targeting emissions emanating from beyond our borders.

Finally, we hold that, even if the local governments' state law claims were not displaced or preempted by federal law, they fail to state claims under Maryland law for public and private nuisance, strict liability and negligent failure to warn, and trespass. We discuss the legal deficiencies pertaining to each of these state law claims below.

This appeal comprises three consolidated cases—one filed in the Circuit Court for Baltimore City and two filed in the Circuit Court for Anne Arundel County.  These cases took an extended detour through the federal courts arising from the oil and gas companies' unsuccessful attempts at removal.  We briefly recount the circuitous route that brought these cases to this Court.

**I**

**Procedural History**

### A.  Baltimore City Case

#### 1.  Complaint

In July 2018, the Mayor and City Council of Baltimore ("Baltimore") filed suit against 26 major oil and gas companies ("the Defendants")[1] in the Circuit Court for Baltimore City.  Baltimore asserts that the Defendants substantially contributed to greenhouse gas pollution, global warming, and climate change by extracting, producing, promoting, refining, marketing, distributing, and selling fossil fuel products (*i.e.*, coal, oil, and natural gas).  Baltimore contends that the Defendants deceived consumers and the

---

[1] The Defendants consist of BP entities (BP P.L.C.; BP America, Inc.; and BP Products North America Inc.); Crown Central entities (Crown Central Petroleum Corporation; Crown Central LLC; and Crown Central New Holdings LLC); Chevron entities (Chevron Corp. and Chevron U.S.A. Inc.); Exxon Mobil entities (Exxon Mobil Corp. and ExxonMobil Oil Corporation); Shell entities (Royal Dutch Shell PLC and Shell Oil Company); Citgo Petroleum Corp.; ConocoPhillips entities (ConocoPhillips; ConocoPhillips Company; Louisiana Land & Exploration Co.; Phillips 66; and Phillips 66 Company); Marathon entities (Marathon Oil Company; Marathon Oil Corporation; Marathon Petroleum Corporation; and Speedway LLC); Hess Corp.; and CONSOL entities (CNX Resources Corporation; CONSOL Energy Inc.; and CONSOL Marine Terminals LLC).

2

public about the dangers associated with their fossil fuel products when they knew for nearly 50 years of a direct link between their products and climate change threats. With that knowledge, Baltimore alleges, the Defendants (1) employed a "coordinated, multi-front effort to conceal and deny their own knowledge of those threats"; (2) discredited "publicly available scientific evidence"; and (3) created persistent doubt within the public sphere about the "reality and consequences of the impacts of their fossil fuel pollution."

According to Baltimore, the "Defendants, individually and collectively, are responsible for extracting, processing, producing, promoting, and marketing fossil fuel products, the normal and intended use of which has led to the emission of a substantial percentage of the total volume of greenhouse gases released into the atmosphere" for over 50 years. The Defendants' conduct that caused these emissions, Baltimore asserts, includes, but is not limited to, their: (1) "extraction, refining, and/or formulation of fossil fuel products;" (2) "introduction of fossil fuel products into the stream of commerce;" (3) "wrongful promotion of their fossil fuel products and concealment of known hazards associated with use of those products;" and (4) "failure to pursue less hazardous alternatives available to them[.]" The above-described conduct is allegedly a "substantial factor in causing the increase in global mean temperature and consequent increase in global mean sea surface height and disruption to the hydrologic cycle, including, but not limited to, more frequent and extreme droughts, more frequent and extreme temperatures, and the associated consequences of those physical and environmental changes since 1965."

The Defendants' conduct is alleged to have (1) "actually and proximately caused the sea levels to rise," (2) "increased coastal erosion," (3) "increased the destructive

3

impacts of storm surges," (4) "exacerbated the onshore impact of regular tidal ebb and flow," (5) "disrupted the hydrologic cycle," (6) "caused increased frequency and severity of drought," "extreme precipitation events," and "heat waves," and (7) "caused consequent social and economic injuries associated with the aforementioned physical and environmental impacts . . . resulting in inundation, destruction, and/or other interference with" Baltimore's "property and citizenry." These environmental events have purportedly caused, among other things, infrastructure damage during floods, automobile accidents and power outages when winter storms hit, and public-health illnesses amid heat waves.

At bottom, Baltimore attempts to shift the burden of its climate change costs onto the Defendants. Specifically, Baltimore "seeks to ensure that the parties who have profited from externalizing the responsibility for sea level rise, extreme precipitation events, heatwaves, other results of the changing hydrologic regime caused by increasing temperatures, and associated consequences of those physical and environmental changes, bear the costs of those impacts on" Baltimore, rather than the City, "local taxpayers, residents, or broader segments of the public." Baltimore, however, alleges that it "does not seek to impose liability on the Defendants for their direct emissions of greenhouse gases and does not seek to restrain the Defendants from engaging in their business operations."

Baltimore asserts five causes of action against the Defendants, all arising under Maryland law: (1) public nuisance; (2) private nuisance; (3) strict liability for failure to

4

warn; (4) negligent failure to warn; and (5) trespass.[2]  To remedy its injuries, Baltimore seeks compensatory and punitive damages, disgorgement of profits, and equitable relief, including the abatement of the alleged nuisances and an injunction against future nuisances.

    2.  <u>Removal Proceedings</u>

After Baltimore's suit was filed in state court in July 2018, the Defendants timely removed Baltimore's complaint to the United States District Court for the District of Maryland.  The Defendants asserted eight different grounds for removal under statutory grants of federal jurisdiction and various legal theories.  *Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019).  In response, Baltimore filed a motion to remand its complaint to the Circuit Court for Baltimore City.  *Id.* at 550.  The district court granted Baltimore's motion to remand in June 2019, rejecting each of the Defendants' eight grounds for removal.  *Id.* at 574.  The Defendants appealed the district court's remand order to the United States Court of Appeals for the Fourth Circuit.  *Mayor & City Council of Balt. v. BP P.L.C.*, 952 F.3d 452 (4th Cir. 2020).  That court reasoned that it could analyze the propriety of removal only under the federal officer removal statute and that it lacked appellate jurisdiction over the remaining seven grounds for removal.  *Id.* at 461.  The Fourth Circuit ultimately held that federal officer removal was improper, affirming the district court's remand order on that sole ground.  *Id.* at 461–70.

---

[2] In the complaint, Baltimore also alleged design-defect claims and violations of the Maryland Consumer Protection Act, Md. Code (2025 Repl. Vol.), Com. Law §§ 13-101–501.  Baltimore has not appealed the dismissal of those counts.  Accordingly, those claims are not before us.

The Defendants appealed to the United States Supreme Court, which vacated the Fourth Circuit's opinion and remanded the case for further proceedings. *BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230 (2021). The Supreme Court held that the Fourth Circuit was not divested of appellate jurisdiction over the Defendants' other theories of removal and remanded the case to that court for it to consider all the bases for removal included in the district court's remand order. *Id.* On remand, the Fourth Circuit evaluated the remaining theories of removal proffered by the Defendants and affirmed the district court's order granting Baltimore's motion to remand. *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022).[3] The Supreme Court denied the Defendants' petition for writ of certiorari, *BP P.L.C. v. Mayor & City Council of Balt.*, 143 S. Ct. 1795 (2023), and the case was remanded to the Circuit Court for Baltimore City.

3. Circuit Court's Ruling on Defendants' Motion to Dismiss

When the case returned to state court, the Defendants filed a motion to dismiss the complaint for failure to state a claim upon which relief could be granted. In their motion, the Defendants asserted that the complaint must be dismissed because Baltimore's claims are preempted by federal common law and the Clean Air Act. Assuming the individual claims are not preempted by federal law, the Defendants contended that each of the claims

---

[3] The removal grounds asserted by the Defendants were as follows: (1) federal common law; (2) substantial issues of federal law, as well as foreign affairs, under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005); (3) complete preemption under the Clean Air Act, 42 U.S.C. §§ 7401–7671q; (4) federal enclaves; (5) the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b)(1); (6) the bankruptcy removal statute, 28 U.S.C. § 1452(a); (7) the admiralty jurisdiction statute, 28 U.S.C. § 1333(1); and (8) the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 196 (4th Cir. 2022).

alleged by Baltimore are legally deficient under state law.  After Baltimore filed a response and following a hearing, the circuit court issued a memorandum opinion and order in July 2024 granting the Defendants' motion to dismiss.

In its memorandum opinion and order, the court ruled that, regardless of how Baltimore characterized its complaint, "the Constitution's federal structure does not allow the application of state law claims like those presented by Baltimore."  The court explained that "[g]lobal pollution-based complaints were never intended by Congress to be handled by individual states."  The court also determined that the Clean Air Act "speaks directly to the domestic emissions issues in this case[]" and thus preempts Baltimore's claims.  The court also ruled that "[f]ederal common law is still required to apply to extraterritorial aspects of claims challenging undifferentiated global emissions."

In addition to ruling that the claims were preempted by federal law, the circuit court also concluded that Baltimore failed to state claims under Maryland law.  The court dismissed Baltimore's nuisance claims because it concluded that Maryland's common law of public nuisance applied only to "cases involving a defendant's use of land[,]" and did not apply to "product liability cases."  The court dismissed the failure-to-warn claims because the court determined that they were based on a duty to "warn the world[.]" Regarding trespass, the court found the theories of harm too "attenuated to constitute the control necessary to establish liability" under existing law and declined to "extend trespass liability beyond where the Maryland Supreme Court has previously allowed."[4]

---

[4] As previously noted, *see supra* n.2, the court also dismissed Baltimore's design defect and MPCA claims, and Baltimore did not appeal the dismissal of those claims.

### B. *Anne Arundel County and Annapolis Cases*

#### 1. *The Complaint*

In February 2021, Anne Arundel County ("the County") and the City of Annapolis ("Annapolis") each filed nearly identical suits in the Circuit Court for Anne Arundel County against a similar list of defendants as those named in the Baltimore litigation, with minor exceptions. The County and Annapolis both amended their complaints in June 2024. Although the allegations set forth in the County's and Annapolis's complaints are substantively similar to Baltimore's (a point conceded by the local governments in their brief), we briefly touch upon the allegations set forth in the County's and Annapolis's nearly identical operative complaints, which total approximately 350 pages.

The County and Annapolis assert that the "Defendants are directly responsible for the substantial increase in all $CO_2$ emissions" for the past 50 years. The County and Annapolis allege that the "Defendants' individual and collective conduct, including, but not limited to, their": (1) "introduction of fossil fuel products into the stream of commerce while knowing but failing to warn of the threats posed to the world's climate;" (2) "wrongful promotion of their fossil fuel products and concealment of known hazards associated with the use of those products;" (3) "public deception campaigns designed to obscure the connection between their products and global warming and the environmental, physical, social, and economic consequences flowing from it;" and (4) "failure to pursue less hazardous alternatives[,]" which actually and proximately caused the County's and Annapolis's injuries. "In other words," according to the County and Annapolis, the "Defendants' concealment and misrepresentation of their products' known dangers—and

8

simultaneous promotion of their products for uses Defendants knew were harmful—drove consumption, and thus greenhouse gas pollution, and thus the climate crisis."

As examples of the tortious conduct that allegedly caused the injuries, the County and Annapolis specifically identify the Defendants' internal corporate policies and communications, their membership and financial contributions to organizations that engaged with the public and government on climate change, and their external communication and advertising on the matter.

The County and Annapolis assert the same state law causes of action as those alleged by Baltimore and seek the same relief—compensatory damages, disgorgement of profits, and equitable relief, including the abatement of the alleged nuisances and an injunction against future nuisances.

### 2. Removal Proceedings

Following the same playbook as the Baltimore litigation, the Defendants removed the case to federal court. *City of Annapolis, Maryland v. BP P.L.C.*, No. CV SAG-21-00772, 2022 WL 458226 (D. Md. Sept. 29, 2022). The County and Annapolis filed motions to remand to state court, which the district court granted. After the Defendants appealed, the Fourth Circuit affirmed the district court's judgment, concluding that there was no valid basis for removal. *Anne Arundel County, Maryland v. BP P.L.C.*, 94 F.4th 343 (4th Cir. 2024).

### 3. Circuit Court's Proceedings on Motion to Dismiss

Upon the case's return to the circuit court, the Defendants filed a motion to dismiss, and the County and Annapolis filed responses in opposition. The Circuit Court for Anne

9

Arundel County entered an order in January 2025 dismissing the cases "on the grounds of preemption for essentially the same reasons" as the dismissal of Baltimore's case.

### C. Appellate Proceedings

Baltimore, the County, and Annapolis each appealed to the Appellate Court of Maryland. The Appellate Court consolidated the cases after the Defendants jointly moved to consolidate the appeals. The Defendants filed an unopposed bypass petition for writ of certiorari with this Court, and the local governments collectively filed a cross-petition for writ of certiorari. We granted certiorari and ordered that the case be transferred from the Appellate Court to this Court.

## II

### Questions Presented and Parties' Contentions

The questions before us can be distilled as follows: (1) whether the state law claims asserted by the local governments are displaced or preempted by federal law; and, if not, (2) whether the claims are legally cognizable under state law.

The local governments assert that the circuit courts erred in dismissing their state law claims. According to the local governments, the courts (1) "fundamentally misconstrued" their cases, (2) erred in concluding that the claims involve the regulation of emissions, (3) "recharacterized" their claims as being "entirely about addressing the injuries of climate change," and (4) did not accept the local governments' description of the goals of their complaint. Had the circuit courts properly considered the claims asserted, the local governments contend, the courts would not have found that the claims were preempted by the structure of the United States Constitution, the Clean Air Act, and "a

10

defunct body of federal common law that the" Clean Air Act displaced.  The local governments assert that the courts erred in failing to consider the claims, and reasonable interferences to be drawn therefrom, in the light most favorable to the local governments. Viewing the allegations in the complaint through the correct lens, the local governments argue that their claims do not regulate air emissions and urge us to follow the decisions of the Supreme Courts of Hawaii and Colorado, which have determined that similar claims relate only to a defendant's "use of deception to promote the consumption of fossil fuel products," and do not concern emissions standards.  *See City & County of Honolulu v. Sunoco LP*, 537 P.3d 1173 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025) (No. 23-947) ("*Honolulu*"); *County Comm'rs of Boulder County v. Suncor Energy USA, Inc.*, No. 24SA206, 2025 WL 1363355 (Co. 2025), *cert. granted*, ___ S. Ct. ___, 2026 WL 490537 (2026) ("*Boulder*").  The local governments assert that remedying the deceptive and commercial conduct as alleged in their complaints is "within the core of" their "state police powers."

The local governments also contend that they have pled actionable claims under Maryland law, and that the Circuit Court for Baltimore City erred in dismissing Baltimore's claims for private and public nuisance, trespass, and failure to warn.

The Defendants argue that the circuit courts did not mischaracterize the local governments' claims.  They assert that we should follow the Court of Appeals for the Second Circuit, which considered similar claims and rejected the contention that they simply relate to deceptive marketing and promotion and do not involve air emissions.  *See City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d. Cir. 2021).  According to the

Defendants, when the local governments' claims are viewed for what they are—attempts to regulate global conduct through claims for damages and injunctive relief related to injuries arising from climate change—the claims are preempted by the structure of the United States Constitution and federal law.

The Defendants also argue that the Circuit Court for Baltimore City did not err in determining that each of the state common law claims failed to satisfy key elements necessary to establish the claims under state law.

### III

### Standard of Review

The questions before us are matters of law that we review de novo. *Plank v. Cherneski*, 469 Md. 548, 569 (2020). They arise from the circuit courts' dismissal of the complaints on the ground that they fail to state a claim upon which relief can be granted. We review a circuit court's grant of a motion to dismiss without deference to determine whether it was legally correct. *Wheeling v. Selene Finance LP*, 473 Md. 356, 374 (2021). We assume the truth of all relevant and material facts that are well pleaded, as well as the inferences that can be reasonably drawn from those pleadings, in the light most favorable to the nonmoving party. *Id*. "A motion to dismiss on this ground may only be granted when the allegations presented do not state a cause of action." *Id*. "In the interest of judicial efficiency, we may affirm the judgment of a trial court to grant a motion to dismiss on a different ground than that relied upon by the trial court, as long as the alternative ground is before the Court properly on the record." *Forster v. State, Off. of Pub. Def.*, 426 Md. 565, 580–81 (2012); *see also City of Frederick v. Pickett*, 392 Md. 411, 424 (2006)

12

(stating that an appellate court can affirm a dismissal on any ground adequately shown by the record, whether or not relied upon by the trial court).

IV

**Federal Law Background**

To address the Defendants' arguments that the local governments' claims are displaced or preempted by federal law, it is instructive to discuss the United States Supreme Court's and lower federal courts' cases that have addressed interstate pollution. Before we turn to the cases, however, we discuss two landmark environmental statutes that Congress enacted in the 1970s to address pollution—the Clean Water Act and the Clean Air Act. We describe this statutory framework because these laws play prominent roles in the discussion of the applicable case law, as well as in our preemption analysis.

### A. Federal Statutes

#### 1. The Clean Water Act

Although Congress enacted the Federal Water Pollution Control Act in 1948, it was significantly reorganized, and Congress expanded the law in 1972 to become what is now commonly referred to as the "Clean Water Act." 33 U.S.C. § 1251 *et seq*. (1972). Congress enacted the Act "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." *Id*. § 1251(a). Among its core provisions, the Clean Water Act prohibits discharging pollutants into waters of the United States, except as authorized by a permit issued under the National Pollution Discharge Elimination System ("NPDES"). *See id*. §§ 1251(a)(1), 1311(a), 1342(a)(1). An NPDES permit places limits—called "effluent limitations"—on the type and quantity of pollutants that can be released into the Nation's

13

waters.  The Act authorizes the U.S. Environmental Protection Agency ("EPA") to issue and enforce these permits, *id.* §§ 1319, 1342(a)(1), as well as to delegate its NPDES permitting authority to a state, *id.* §§ 1342(b).[5]  We address additional provisions of the Act in the context of our discussion of case law below.

> 2.  *The Clean Air Act*

The Clean Air Act is a comprehensive federal law that regulates air emissions from stationary and mobile sources.[6]  42 U.S.C. § 7401 *et seq.* (1970).  "It is an intricate regulatory regime intended to 'protect and enhance the quality of the [n]ation's air resources so as to promote the public health and welfare and the productive capacity of its population.'" *N.Y. Pub. Inst. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319–20 (2d Cir. 2003) (quoting 42 U.S.C. § 7401(b)(1)).  In *Massachusetts v. EPA*, the Supreme Court held that the Act authorizes federal regulation of emissions of carbon dioxide and other greenhouse gases.  549 U.S. 497 (2007).

"The Clean Air Act regulates air quality through a federal-state collaboration." *Ohio v. EPA*, 603 U.S. 279, 283 (2024) (citation modified).  In a nutshell, the EPA is

---

[5] The Clean Water Act is vast and extraordinarily complex.  We touch upon only key aspects of the Act for the limited purpose of providing context for the Supreme Court's and lower federal courts' displacement and preemption analysis of nuisance claims related to interstate pollution brought under federal and state common law.

[6] The Clean Air Act regulates air pollution from stationary sources, 42 U.S.C. §§ 7401–7431, and establishes emission standards for moving sources, including motor vehicles, *id.* §§ 7521–7554, aircrafts, *id.* §§ 7571–7574, clean fuel vehicles, *id.* §§ 7581–7574; acid deposition control, *id.* §§ 7651–7651o; and stratospheric ozone protection, *id.* at §§ 7671–7671q.  It also provides a means for citizen suits, *id.* § 7604, and outlines a permitting process for emission standards, *id.* §§ 7661–7661f.

required to set "national primary or secondary ambient air quality standards" (or "NAAQS") for common air pollutants,[7] which "represent[] 'the maximum airborne concentration that the public health can tolerate.'" *West Virginia v. EPA*, 597 U.S. 697, 707 (2022) (quoting *Whitman v. Amc. Trucking Ass'ns, Inc.*, 531 U.S. 457, 465 (2001)); *see also* 40 C.F.R. pt. 50 (2013). "States bear 'primary responsibility' for deciding how a NAAQS should be attained." *Oklahoma v. EPA*, 605 U.S. 609, 615 (2025) (quoting 42 U.S.C. § 7401(a)(3)). This is accomplished through "state implementation plans" or state proposals that ensure compliance with the NAAQS for each criteria pollutant. *See* 42 U.S.C. § 7410. Through its state implementation plan, each state is required to "'provid[e] for [the] implementation, maintenance, and enforcement' of a NAAQS within their jurisdictions." *Oklahoma*, 605 U.S. at 615 (quoting 42 U.S.C. § 7410(a)(1)). The Clean Air Act authorizes the states to decide how to measure ambient air quality, 42 U.S.C. § 7410(a)(2)(B), and pick "emission limitations and other control measures[,]" *id.* § 7410(a)(2)(A).

"While states are responsible for promulgating" state implementation plans, "they must do so consistently with extensive EPA regulations governing preparation, adoption by the state, and submission to the EPA, 40 C.F.R. § 51, and all [state plans] must be

---

[7] The Clean Air Act broadly defines "air pollutant" to include "any air pollution agent or combination of such agents, including any physical, chemical . . . substance or matter which is emitted into or otherwise enters the ambient air." 42 U.S.C. § 7602(g). The EPA has established national primary or secondary ambient air quality standards ("NAAQS") for six pollutants—carbon monoxide, lead, nitrogen dioxide, ozone, particulate matter, and sulfur dioxide. *See* Env't Prot. Agency, *Criteria Air Pollutants* (Jan. 23, 2026), https://perma.cc/37CF-4DR8; *see also* 40 C.F.R. pt. 50 (2013).

submitted to the EPA for approval before they become final." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 299 (4th Cir. 2010) (citing 42 U.S.C. § 7410(a)(1), (k)(2) & (3)).[8] Once a state implementation plan is approved, "its requirements become federal law and are fully enforceable in federal court." *Id.* (citing § 7604(a)) (additional citations omitted).

Although states are accorded flexibility in determining how their state implementation plans are structured, the plans must "include enforceable emission limitations and other control measures, means, or techniques" to ensure that each state meets NAAQS. 42 U.S.C. § 7410(a)(2)(A).[9] "States are also tasked with enforcing the limitations they adopt in their [plans]." *Tenn. Valley Auth.*, 615 F.3d at 299. "They must regulate 'the modification and construction of any stationary source within the areas covered by the [state implementation plan],' 42 U.S.C. § 7410(a)(2)(C), and must

---

[8] If the EPA does not approve a state implementation plan, then the EPA must issue a "Federal implementation plan" for the noncompliant state within two years. 42 U.S.C. § 7410(c)(1). A state can avoid this outcome only if it corrects the deficiency and gains EPA approval for its revised state implementation plan before the EPA promulgates the federal plan. *Id.* § 7410(k)(3), (c)(1).

[9] A state must designate every area within its borders as "attainment," "nonattainment," or "unclassifiable" with respect to each NAAQS, 42 U.S.C. § 7407(d), and the state implementation plan must include permitting programs for stationary sources that vary according to the classification of the area where the source is or is proposed to be located, *id.* § 7410(a)(2)(C), (I). Areas that comply with the NAAQS are "attainment areas" and areas that do not comply are "nonattainment areas." *See generally id.* § 7410. To prevent attainment areas from getting dirtier, the Prevention of Significant Deterioration program requires a new or modified "major emitting facility" of "any air pollutant" in those areas to obtain permits and install the "best available control technology" for their emissions. *Id.* § 7475(a)(4). The Clean Air Act defines a "major emitting facility" as any stationary source with the potential to emit 250 tons per year of "any air pollutant" (or 100 tons per year for certain types of sources). *Id.* § 7479(1).

implement a permit program that limits the amounts and types of emissions that each permit holder is allowed to discharge, 42 U.S.C. §§ 7661a(d)(1), 7661c(a)." *Id.* "Sources are prohibited from operating without such a permit," 42 U.S.C. § 7661a(a), "and each permit is intended to be a source-specific bible for Clean Air Act compliance containing in a single, comprehensive set of documents, all [Clean Air Act] requirements relevant to the particular polluting source." *Tenn. Valley Auth.*, 615 F.3d at 299–300 (citation modified).

Notably, "states must design these plans with their neighbors in mind." *Ohio*, 603 U.S. at 283. "Because air currents can carry pollution across state borders, emissions in upwind States sometime affect air quality in downwind States." *Id*. at 283–84. "To address that externality problem," the Act contains a "Good Neighbor Provision," which provides that state plans "must prohibit emissions 'in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State' of the relevant air-quality standard." *Id*. at 284 (quoting 42 U.S.C. § 7410(a)(2)(D)(i)(I)).

Additionally, before new construction or modification of a source of emission may begin, a state implementation plan must provide "written notice to all nearby States the air pollution levels of which may be affected by such source at least sixty days prior to the date on which commencement of construction is to be permitted[.]" 42 U.S.C. § 7426(a)(1)(B).

"In addition to this framework, there are a number of checks built into the system to prevent abuses and to address concerns about emissions." *Tenn. Valley Auth.*, 615 F.3d. at 300. As noted above, the EPA retains the ultimate authority over NAAQS to determine what level of emissions are acceptable and has the responsibility to modify those levels as

17

necessary. 42 U.S.C. § 7409(b)(1), (2). The Clean Air Act provides a process for what is commonly referred to as a "Section 126 petition," which gives a state the authority to ask the EPA to find that specific sources of air pollution in other states are significantly contributing to non-attainment or interfering with maintenance of federal air quality standards in the petitioning state. *Id.* § 7426(b). We touch upon additional provisions of the Act as relevant to our discussion of the case law.

### B.  What is Federal Common Law?

Prior to Congress's enactment of the extensive environmental legislation comprising the Clean Water Act and Clean Air Act, disputes concerning interstate water and air pollution were governed by federal common law. Before we discuss the cases applying federal common law in the interstate pollution context, we first provide an overview of what federal common law is, including its rationale and the limited number of situations in which it arises.

The Supreme Court famously pronounced in *Erie Railroad Company v. Tompkins* that "[t]here is no federal general common law." 304 U.S. 64, 78 (1938). Although the Court declared that there is no *general* federal common law, it has recognized that there are some limited areas in which federal common law, or a federal rule of decision is "necessary to protect uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (citation modified); *see also Rodriguez v. Fed. Deposit Ins. Corp.*, 589 U.S. 132, 136 (2020) (explaining that federal common law still exists in certain contexts and "often plays an important role").

18

Federal common law exists in only a "few and restricted" enclaves, *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963), where a federal court is "compelled to consider federal questions 'which cannot be answered from federal statutes alone,'" *City of Milwaukee v. Illinois and Michigan* ("*Milwaukee II*"), 451 U.S. 304, 314 (1981) (citation modified). Once Congress speaks directly to those questions, "the need for such an unusual exercise of lawmaking by federal courts disappears." *Id*. The Court of Appeals for the Second Circuit has aptly described federal common law as the functional equivalent of "legal duct tape"—a "'necessary expedient' that permits federal courts to address issues of national concern until Congress provides a more permanent solution." *City of New York*, 993 F.3d at 90 (quoting *Milwaukee II*, 451 U.S. at 314).

"Despite its utility," our constitutional architecture "restricts federal common law to a 'modest role.'" *Id*. (quoting *Rodriguez*, 589 U.S. at 136). There are good reasons for the limitation. Where federal common law exists, it "pre-empt[s] and replace[s]" state law, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *see also Milwaukee II*, 451 U.S. at 313 n.7 (explaining that "if federal common law exists, it is because state law cannot be used"). "It thus threatens a potent mix of judicial lawmaking and encroachment on our federalist structure." *City of New York*, 993 F.3d at 90.

The few and restricted categories in which federal common law exists "fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop substantive law[.]" *Tex. Indus., Inc.*, 451 U.S. at 640 (citation modified); *see also Am. Elec. Power Co., v. Connecticut* ("*AEP*"), 564 U.S. 410, 421 (2011) (acknowledging

19

that federal common law "addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (citation modified)).

The Supreme Court has stated that "absent some congressional authorization to formulate substantive rules of decision, federal common law exists only in such narrow areas as those concerned with" (1) "the rights and obligations of the United States"; (2) "interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations"; and (3) "admiralty cases." *Tex. Indus., Inc.*, 451 U.S. at 641 (footnotes omitted).[10] "In these instances, our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control." *Id.*

"As these narrow categories suggest, the mere existence of a federal interest does not intrinsically call for a corresponding federal rule." *City of New York*, 993 F.3d at 90 (citing *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 692 (2006)).

---

[10] In *Atherton v. Federal Deposit Insurance Corporation*, 519 U.S. 213 (1997), the Court declined to fashion a general federal common law standard of care for officers and directors of federally insured institutions. As part of its discussion, the Court cited cases in which it had created federal common law. *Id.* at 225–26; *see, e.g.*, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (concerning controversy between two states over administration of water rights); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (concerning liability of independent contractors working for the federal government); *U.S. v. Standard Oil Co. of Cal.*, 332 U.S. 301, 305 (1947) (pertaining to question of federal government's entitlement to recover losses for tort against servicemember); *Howard v. Lyons,* 360 U.S. 593, 597 (1959) (concerning liability of federal officers in the course of official duty); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 425 (1964) (arising in context of relationships with other countries).

"There also must be a conflict between that federal interest and the operation of state law." *Id*. (footnote omitted) (citing *Empire Healthchoice Assurance, Inc.*, 547 U.S. at 692); *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (stating that conflict between federal interest and use of state law is required to be a "precondition for recognition of a federal rule of decision"); *Boyle*, 487 U.S. at 507. That said, the conflict between state law and federal interests does not need to be "intractably severe before federal common law may spring into action." *City of New York*, 993 F.2d at 90. Indeed, as the Supreme Court has explained, the necessary conflict "need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the [s]tates have traditionally occupied." *Boyle*, 487 U.S. at 507 (internal citation omitted). "But conflict there must be." *Id*. at 508.

### C. Cases Applying Federal Law to Claims Arising from Interstate Pollution

Interstate water and air pollution are areas that the Supreme Court and lower federal courts have determined are governed by federal common law and, therefore, leave no place for the application of state law. As the Court of Appeals for the Second Circuit observed, "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York v. Chevron Corp.*, 993 F.3d 81, 91 (2d. Cir. 2021) (citing *AEP*, 564 U.S. 421; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487–89 (1987); *Milwaukee II*, 451 U.S. 304, 327–28, 327 n.19; *Illinois v. City of Milwaukee* ("*Milwaukee I*"), 406 U.S. 91, 102–03, 102 n.3 (1972); *New Jersey v. City of New York*, 283 U.S. 473, 477, 481–83 (1931); *North Dakota v. Minnesota*, 263 U.S. 365, 374 (1923); *New York v. New Jersey*, 256 U.S. 296 (1921); *Georgia v. Tenn. Copper Co.*,

21

206 U.S. 230 (1907); *Missouri v. Illinois*, 200 U.S. 496 (1906); *Native Vill. of Kivalina v. ExxonMobil Corp.* ("*Kivalina*"), 696 F.3d 849, 855 (9th Cir. 2012); *Illinois v. City of Milwaukee* ("*Milwaukee III*"), 731 F.2d 403, 406–11 (7th Cir. 1984); *Texas v. Pankey*, 441 F.2d 236, 240 (10th Cir. 1971)).

     1.  *Milwaukee I*

In *Milwaukee I*, the Supreme Court approved of the use of a public nuisance claim under federal common law for a suit brought by Illinois against the City of Milwaukee and other Wisconsin cities. 406 U.S. at 91. Illinois alleged that the cities were discharging 200 million gallons of raw or undertreated sewage into Lake Michigan in violation of Illinois law. *Id*. at 93. Illinois asked the Court to exercise original jurisdiction over the matter and abate the nuisance. *Id*. Although the Court declined to exercise original jurisdiction, it allowed the action to proceed in the federal district court. *Id.* at 101, 108. The Court stated that "[w]hen we deal with air and water in their ambient or interstate aspects, there is a federal common law[.]" *Id.* at 103. The Court quoted the Tenth Circuit's decision in *Texas v. Pankey* for the following "controlling principle:"

> As the field of federal common law has been given necessary expansion into matters of federal concern and relationship (where no applicable federal statute exists, as there does not here), the ecological rights of a State in the improper impairment of them from sources outside the State's own territory, now would and should, we think, be held to be a matter having basis and standard in federal common law and so directly constituting a question arising under the laws of the United States.

*Id*. at 99–100 (quoting *Pankey*, 441 F.2d at 240).

The Court acknowledged that Congress had "enacted numerous laws touching interstate waters[,]" *id.* at 101, but determined that "[t]he remedy sought by Illinois is not

22

within the precise scope of remedies prescribed by Congress[,]" *id*. at 103. "[I]n time," the Court presciently noted, "[i]t may happen that new federal laws and new federal regulations may" preempt "the field of federal common law of nuisance." *Id*. at 107. But until such a time came to pass, the Court concluded, federal courts would be "empowered to appraise the equities of the suits alleging creation of a public nuisance by water pollution." *Id*.

       2.  *Milwaukee II* and *Milwaukee III*

Within months after the *Milwaukee I* decision, Congress passed the Clean Water Act. The Supreme Court granted certiorari in *Milwaukee II* to consider the effect of the Clean Water Act on the previously recognized federal common law nuisance cause of action. 451 U.S. at 304.

In *Milwaukee II*, the Court began by recounting the litigation history that ensued following its decision in *Milwaukee I*. *Id.* at 310–12. Illinois filed a complaint in the federal district court, seeking abatement of the public nuisance that the Wisconsin cities were allegedly creating by their discharges. *Id*. at 310.[11] While that litigation was pending, the Clean Water Act was enacted, and the EPA promulgated regulations concerning specific effluent limitations that were required to be incorporated into discharge permits, including the discharge permits applicable to the Wisconsin cities. *Id*. at 310–11. Pursuant to the EPA's delegation of authority under the Act, a Wisconsin state agency issued discharge permits to the Wisconsin cities' treatment plants. *Id*. at 311. The cities did not

---

[11] The State of Michigan intervened in the federal common law nuisance suit, seeking the same relief as Illinois. *City of Milwaukee v. Illinois & Michigan* ("*Milwaukee II*"), 451 U.S. 304, 309 (1981).

23

comply with the permit requirements, and the state agency brought an enforcement action in state court. *Id*. The state court entered a judgment requiring discharges from the cities' treatment plants to meet the effluent limitations request set forth in the permits and establishing a detailed timetable for completion of planning and additional construction to control sewage overflows. *Id*.

In the meantime, the litigation in the Illinois nuisance suit was ongoing in the federal district court. *Id*. Two months after the state court entered its judgment, the district court rendered a decision finding that Illinois had proved the existence of a nuisance under federal common law, arising from the Wisconsin cities' discharges of both inadequate treatment of its sewage, as well as from overflows. *Id*. The district court ordered the cities to eliminate all overflows and to achieve the specified effluent limitations on treated sewage. *Id*. The district court's order also specified a construction timetable for the completion of overflow facilities. *Id*. at 311–12. The conditions established by the district court's order in terms of overflows and effluent limitations went "considerably beyond" the terms of the cities' permits issued pursuant to the Clean Water Act and the state court's enforcement order. *Id*. at 312. The Wisconsin cities appealed. *Id*.

The Supreme Court held that the Clean Water Act displaced the federal common law and that Illinois had no federal common law remedy available. The Court began by explaining that the creation of federal common law was justified only when "Congress has not spoken to a particular issue" and "there exists a significant conflict between some federal policy or interest and the use of state law[.]" *Id*. at 313 (citation modified). The Court stated that it has "always recognized that federal common law is subject to the

24

paramount authority of Congress." *Id*. at 313 (citation modified). Because federal common law "is a necessary expedient," the Court explained, "when Congress addresses a question previously governed by a decision rested on federal common law[,] the need for such an unusual exercise of lawmaking by federal courts disappears." *Id*. at 314 (citation modified). The Court noted that this point was recognized in *Milwaukee I*, as well as in *Pankey*, which was "the lower court decision extensively relied upon in that case[.]" *Id*. at 314.

In conducting its displacement analysis, the Court examined the legislative history and the text of the Act and concluded that Congress's clear intent was to establish an "all-encompassing program of water pollution regulation." *Id*. at 318. The Court explained that the establishment of such a program—which did not exist when *Milwaukee I* was decided—"strongly suggests that there is no room for courts to improve on that program with the federal common law." *Id*. at 319. Next, the Court analyzed the particular claims at issue, which involved discharge effluent limitations, and noted that the problem of effluent limitations had been "thoroughly addressed through the administrative scheme established by Congress[.]" *Id*. at 319–20. The Court held that "[f]ederal courts lack authority to impose more stringent effluent limitations under federal common law than those imposed by the agency charged by Congress with administering this comprehensive scheme." *Id*. at 320. The Court did not view the overflow claims any differently, noting that the permits specifically addressed the problem of overflows. *Id*. The Court also pointed out that the enforcement action brought by the state agency in state court resulted in a judgment that required the elimination of overflows by a certain date. *Id*. at 322.

Given the comprehensive regulatory scheme and the enforcement action that addressed the effluent limitations and overflows, the Court stated that there was "no 'interstice' to be filled by federal common law[.]" *Id.* at 323. The Court explained that "[a]lthough a federal court may disagree with the regulatory approach taken by the agency with responsibility for issuing permits under the Act, such disagreement alone is no basis for the creation of federal common law." *Id.* The Court further concluded that the "invocation of federal common law" by the lower federal courts "in the face of congressional legislation supplanting it is peculiarly inappropriate in areas as complex as water pollution control." *Id.* at 325. The Court pointed out that the technical nature of the subject matter was undoubtedly the reason that Congress "vested authority to administer the Act in administrative agencies possessing the necessary expertise" and that the general area was "particularly unsuited to the approach inevitable under" a federal common law regime, which Congress had criticized as being "sporadic" and "ad hoc[.]" *Id.* Finally, the Court observed that Congress provided ample opportunity for a state affected by a neighboring state's permitting agency to seek redress. *Id.* at 326. At bottom, the Court concluded, Illinois's basic grievance was that the permits issued to the cities did not impose stringent enough controls on their discharges. *Id.* The Court rejected this argument as presenting a valid basis for the imposition of federal common law. *Id.* The Court concluded that "[i]t would be quite inconsistent" with Congress's statutory scheme of vesting permitting authority agencies with the necessary authority "if federal courts were in effect to 'write their own ticket' under the guise of federal common law after permits

26

have already been issued and permittees have been planning and operating in reliance on them." *Id*.

Although the Court held that the federal legislation now occupied the field—thereby displacing federal common law—the Court left open the question of whether injured parties still had a cause of action under state law. *Id*. at 310 n.4. The case was remanded for further consideration, which led to *Milwaukee III*.

In that case, Illinois filed a nuisance action against Milwaukee under Illinois statutory and common law, seeking to abate the alleged pollution of Lake Michigan. *Illinois v. City of Milwaukee* ("*Milwaukee III*"), 731 F.2d 403 (7th Cir. 1984). The Seventh Circuit ultimately remanded the case for dismissal of Illinois's claim, finding that the Clean Water Act precluded the application of one state's law against a pollution source located in another state. *Id*. at 414. The decision was based in part on the court's conclusion that the application of different state laws to a single "point source"[12] would interfere with the carefully devised regulatory system established by the Clean Water Act. *Id*. The court also concluded that the only suits that were not preempted were those alleging violations of the laws of the polluting or "source" state. *Id*. at 413–14. As we discuss below, the Seventh Circuit's decision created a circuit split with the Second Circuit's decision in *Ouellette*.

---

[12] A "point source" is defined by the Clean Water Act as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

### 3. *Ouellette*

In *International Paper Company v. Ouellette*, the Supreme Court considered whether the Clean Water Act preempted a common law nuisance suit filed in the Vermont federal district court under Vermont law when the source of the alleged injury was in New York. 479 U.S. 481, 483 (1987). The suit was brought by property owners against a pulp and paper mill company that discharged a variety of effluents into Lake Champlain. *Id.* at 483–84. The discharge pipe was located in New York and ended a short distance before the state boundary line that divided the lake. *Id*. at 484. The property owners alleged that the pollutants made the water "foul, unhealthy, smelly, and unfit for recreational use," thereby diminishing the value of their property. *Id.* (citation modified). The owners sought $20 million in compensatory damages, $100 million in punitive damages, and injunctive relief that would require the paper company to restructure part of its water treatment system. *Id*.

The paper company moved to dismiss, claiming that the Clean Water Act preempted the property owners' state law claims. *Id*. Reaching a different conclusion than the Seventh Circuit's decision in *Milwaukee III*, the Vermont federal district court concluded that the Clean Water Act did not preempt the state law nuisance claims. *Id.* at 485. The court acknowledged that federal law normally governs interstate pollution, but it found that two provisions of the Clean Water Act—§§ 510 and 505(e).[13] (together, the "saving

---

[13] The saving clause is contained in the original Clean Water Act as §§ 510 and 505. Section 510 of the Clean Water Act, codified at 3 U.S.C. § 1370, provides: "Except as expressly provided . . . , nothing in this chapter shall . . . be construed as impairing or in

clause")—made it clear that federal law did not entirely preempt the states' rights to control pollution. *Id.* The district court held that a state action to redress interstate pollution was not preempted, concluding that there was no interference with the Clean Water Act because a state's "imposition of compensatory damage award and other equitable relief merely supplement[ed] the standards and limitations imposed by the Act." *Id.* at 486–87 (citation modified). The district court also found that the use of state law did not conflict with the ultimate goal of the Clean Water Act, since the objective in each case was to decrease the level of pollution. *Id.* at 487. The district court certified its decision for interlocutory appeal, and the Second Circuit affirmed for the reasons stated by the district court. *Id.* The Supreme Court granted certiorari "to resolve the circuit conflict on this important issue of federal pre-emption." *Id.*

The Supreme Court affirmed the denial of the paper company's motion to dismiss, but "reverse[d] the decision below to the extent it permit[ted] the application of Vermont law to [the] litigation." *Id.* The Court held "that when a court considers a state-law claim concerning interstate water pollution that is subject to the" Clean Water Act, "the court must apply the law of the state in which the point source is located." *Id.*

The Court reviewed the evolution of federal law in the sphere of interstate water pollution, including its decisions in *Milwaukee I* and *Milwaukee II*, and the enactment of

---

any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." Section 505(e), codified at 3 U.S.C. § 1365(e), states: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief[.]"

29

the Clean Water Act. In summarizing *Milwaukee I*, the Court stated that its "opinion in that case affirmed the view that the regulation of interstate water pollution is a matter of federal, not state, law[.]" *Id*. at 488. The Court explained that "*Milwaukee I* therefore held that these cases should be resolved by reference to federal common law; the implicit corollary of this ruling was that state common law was preempted." *Id*. The Court explained that *Milwaukee I* recognized that "future action by Congress to regulate water pollution might pre-empt federal common law as well." *Id*. The Court then discussed its decision in *Milwaukee II* and its assessment that the Clean Water Act was a "complete rewriting" of the statute considered in *Milwaukee I*, and the statutory provisions were "the most comprehensive and far reaching" provisions that Congress had ever passed in that area. *Id*. at 489 (citation modified) (citing *Milwaukee II*, 451 U.S. at 318–18). The Court stated its holding in *Milwaukee II* that "federal legislation now occupied the field, pre-empting all *federal* common law." *Id*. (emphasis in original). The Court noted that *Milwaukee II* "left open the question of whether injured parties still had a cause of action under *state* law." *Id*. That window, noted the Court, resulted in the remand and decision of the Seventh Circuit in *Milwaukee III*.

The Court observed that the Clean Water Act recognizes that states "should have a significant role in protecting their own natural resources[,]" *id*., pointing out the provisions of the Act that allow the federal government to delegate to the state the authority to administer the NPDES program with respect to point sources in the state, and the state's ability to require discharge limitations more stringent than those required by the federal government, *id*. at 490. The Clean Water Act, explained the Court, "establishes a

30

regulatory partnership" between the federal government and the *source state*. *Id*. (citation modified).

By contrast, the Court explained that the Act "contemplates a much lesser role for States that share an interstate waterway with the source (the affected States)." *Id*. The Court observed that "[e]ven though it may be harmed by discharges, an affected State only has an advisory role in regulating pollution that originates beyond its borders." *Id*. The Court noted that the affected state does not have the authority to block the issuance of the permit if it is dissatisfied with the proposed standards, nor may it establish a separate permit system to regulate an out-of-state source. *Id*. at 491. The Court concluded that the "Act makes it clear that affected States occupy a subordinate position to source States in the federal regulatory program." *Id*.

Turning to the question presented—"whether the Act pre-empts Vermont common law to the extent that law may impose liability on a New York point source[]"—the Court began its analysis by stating the standards governing a court's consideration whether a federal statute preempts state law: (1) "that it is not necessary for a federal statute to provide explicitly that particular state laws are pre-empted"; (2) preemption "may be presumed when the federal legislation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation"; and (3) "in addition to express or implied pre-emption, a state law also is invalid to the extent that it actually conflicts with a federal statute" and that "such a conflict will be found when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 491–92 (citation modified).

31

The Court determined that "[a]lthough Congress intended to dominate the field of pollution regulation, the saving clause negate[d] the inference that Congress left no room for state causes of action." *Id*. at 492. Examining the plain text of the saving clause, as well as the Act as a whole, its purposes and legislative history, the Court concluded that if "affected States were allowed to impose separate discharge standards on a single point source, the inevitable result would be a serious interference with the achievement of the full purposes and objectives of Congress." *Id*. at 493–94 (citation modified). Determining that Congress did not intend to "undermine this carefully drawn statute through a general saving clause," the Court concluded that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source." *Id*. at 494 (citation modified).

The Court next turned to the issue of "whether Vermont nuisance law stands as an obstacle to the full implementation of the [Act]," explaining that "it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution." *Id*. (citation modified). The Court stated that a "state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Id*. The Court determined that the application of Vermont law against the paper company would allow the property owners "to circumvent the NPDES permit system, thereby upsetting the balance of public and private interests so carefully addressed by the Act." *Id*. Specifically, the Court pointed out, the Clean Water Act envisions a balancing of interests between the goal of the elimination of water pollution, and "competing public and industrial uses," while also taking into account technological feasibility. *Id*. at 494–95.

32

The Court concluded that "[a]n interpretation of the saving clause that preserved actions brought under an affected State's law would disrupt this balance of interests." *Id.* at 495.[14] The Court determined that "[a]pplication of an affected State's law to an out-of-state source" would also "undermine the important goals of efficiency and predictability in the permit system." *Id.* at 496. The Court observed that the property owners' interpretation of the saving clause would subject a source to "a variety of common-law rules established by the different States along interstate waterways[]" and noted that "[t]hese nuisance standards often are vague and indeterminate." *Id.* (citation modified). Moreover, the Court

---

[14] The Court further elucidated the problem with such an interpretation as follows:

> If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State. The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State. Such penalties would compel the source to adopt different control standards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits. This case illustrates the problems with such a rule. If the Vermont court ruled that [the property owners] were entitled to the full amount of damages and injunctive relief sought in the complaint, at a minimum [the paper company] would have to change its methods of doing business and controlling pollution to avoid the threat of ongoing liability. In suits such as this, an affected-state court also could require the source to cease operations by ordering immediate abatement. Critically, these liabilities would attach even though the source had complied fully with its state and federal permit obligations. The inevitable result of such suits would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state sources.

*Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987).

33

pointed out that "[t]he application of numerous states' laws would only exacerbate the vagueness and resulting uncertainty." *Id.*

The Court stated that Congress, through the Clean Water Act, "carefully defines the role of both the source and affected States," and that the "delineation of authority represents Congress's considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution." *Id.* at 497. The Court concluded that "[i]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure." *Id.*

Although the Court held that the Clean Water Act preempted the application of Vermont's nuisance common law to a New York point source, the Court stated that did not mean that the property owners did not have a remedy. *Id.* The Court pointed out that the "saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State." *Id.* (emphasis in original). The Court noted that the Clean Water Act allows states to impose higher standards and higher statutory restrictions, which preserve common-law suits applying the laws of the source state. *Id.* at 498. The Court determined that such an interpretation of the saving clause would not frustrate the goal of the Act. First, the Court explained, it would not "disturb the balance among federal, source-state and affected state interests." *Id.* at 499. Second, the Court reasoned, "restriction of suits to those brought under source-state nuisance law prevents a source from being subject to an indeterminate number of potential regulations." *Id.* Moreover, the Court stated that "States can be

34

expected to take into account their own nuisance laws in setting permit requirements." *Id*. The Court concluded that the Clean Water Act "pre-empts state law to the extent that the state law is applied to an out-of-state point source." *Id*. at 500.

4. *American Electric Power Co., Inc. v. Connecticut ("AEP")*

All of the above cases involved water pollution. *AEP* involved air emissions and claims concerning global warming. 564 U.S. at 410. In that case, eight states, New York City, and three private land trusts brought a public nuisance suit under federal common law against the five largest emitters of carbon dioxide in the United States. *Id.* at 418. The plaintiffs sought to redress those emitters' "contribut[ions] to global warming[.]" *Id.* In terms of relief, they sought an injunction "requiring each defendant to cap its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade." *Id*. at 419 (citation modified). Determining that the Clean Air Act already "provides a means to seek limits on emissions of carbon dioxide from domestic power plants[,]" the Supreme Court held that the Clean Air Act "displaces any federal common-law right to seek abatement of" greenhouse gas emissions. *Id*. at 424.

The Court started its discussion by pointing out that, in *Massachusetts v. EPA*, it held that the Clean Air Act authorizes federal regulation of carbon dioxide and other greenhouse gases. *Id*. at 416. The Court noted that following its decision in *Massachusetts*, the EPA undertook greenhouse gas rulemaking efforts. *Id*. at 416–18. The Court held "that the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." *Id*. at 424.

35

In so holding, the Court touched upon the regulatory framework of the Act, including the authority vested in the EPA to identify categories of stationary sources that "caus[e], or contribut[e] significantly to, air pollution, which may reasonably be anticipated to endanger public health or welfare." *Id.* (quoting 42 U.S.C. § 7411(b)(1)(A)). The Court also pointed out that the "Act provides multiple avenues for enforcement[]" and summarized the various statutory mechanisms for enforcement. *Id.* at 425.

In determining that the Clean Air Act displaced the application of federal common law, the Court noted that Congress, through the Clean Air Act, designed the EPA as the "expert agency" to undertake complex balancing of interests involving greenhouse gas emissions, stating:

> The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance.

*Id.* at 427. The Court commented on the difficulties presented by district court judges lacking the "scientific, economic, and technological resources an agency can utilize in coping with issues of this order." *Id.* at 428. The Court concluded that having individual federal judges determine in the first instance what amount of carbon dioxide emissions is unreasonable, and then decide what level of reduction is "practical, feasible, and economically viable," in not only the underlying case, but also in numerous other cases, could not "be reconciled with the decisionmaking scheme Congress enacted." *Id.* at 428–29.

36

Finally, the Court noted that the plaintiff also sought relief under state laws and pointed out that the Second Circuit had addressed those claims because it held that federal common law governed. *Id*. at 429. In light of its "holding that the Clean Air Act displaces federal common law" and citing to *Ouellette*, the Court stated that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." *Id*. The Court quoted that portion of the *Ouellette* holding that the Clean Water Act does not preclude aggrieved individuals from bringing "a nuisance claim pursuant to the law of the *source* State[.]" *Id*. (quoting *Ouellette*, 479 U.S. at 489). Because "[n]one of the parties have briefed preemption or otherwise address the availability of a claim under state nuisance law[,]" the Court left "the matter open for consideration on remand." *Id*.

Although the United States Supreme Court has not addressed whether the Clean Air Act preempts state law claims for damages against gas, oil, and energy companies for injuries related to greenhouse gas emissions, lower federal courts have concluded that such claims are preempted.

### 5. *Native Village of Kivalina v. ExxonMobil Corp.*

In *Native Village of Kivalina v. ExxonMobil Corporation*, a small city in Alaska brought a public nuisance action under federal common law against numerous oil, energy, and utility companies for their emissions of greenhouse gases. 696 F.3d 849, 854 (9th Cir. 2012). Unlike in *AEP*, the plaintiff did not seek abatement of emissions, but rather, damages for global warming-related injuries, including sea-level rise and severe erosion. *Id.* at 853.

Despite the difference in remedies, the United States Court of Appeals for the Ninth Circuit concluded that *AEP* controlled. The court reasoned that the displacement of federal common law does not turn on the nature of the remedy, but instead, on the cause of action. *Id*. at 856–57 (noting that the "Supreme Court has instructed that the type of remedy asserted is not relevant to the applicability of the doctrine of displacement").

### 6. *City of New York v. Chevron Corp.*

In *City of New York v. Chevron Corporation*, the City of New York filed a lawsuit in federal court, asserting state common law causes of action for public nuisance, private nuisance, and trespass against five oil companies stemming from the companies' production, promotion, and sale of fossil fuels around the world. 993 F.3d 81, 88 (2d Cir. 2021). The city sought compensatory damages for past and future costs of climate-proofing its infrastructure and property, as well as an equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the companies fail to pay the court-ordered damages. *Id.* The companies filed motions to dismiss the city's complaint. *Id.* The district court granted the motions and dismissed the city's complaint. *Id.* After the city appealed, the United States Court of Appeals for the Second Circuit affirmed. *Id.* at 88, 86.

The court held that the city could not maintain a nuisance suit seeking to recover damages for harms caused by global greenhouse gas emissions under New York law. *Id*. at 91. The court observed that the city was requesting damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet. *Id*. at 92–93. The court determined that "[s]uch a sprawling case is simply beyond the limits of state

38

law[,]" in part because a substantial damages award like the one requested by the city would effectively regulate the producers' behavior far beyond New York's borders. *Id*. at 92.

As an initial matter, the court rejected the city's attempt to characterize its complaint as "merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy." *Id*. at 91. The court determined that "[a]rtful pleading" could not "transform the City's complaint into anything other than a suit over global greenhouse gas emissions." *Id*. In other words, explained the court, "it [was] precisely *because* fossil fuels emit greenhouse gases—which collectively exacerbate global warming—that the city [wa]s seeking damages." *Id*. (citation modified). The court concluded that a substantial damages award like the one requested by the city would effectively regulate the producers' behavior far beyond New York's borders. *Id*. at 92–93 (citing *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012)). Indeed, the Second Circuit concluded, the goal of the city's lawsuit was "perhaps even more ambitious" than imposing emission regulations—the city was effectively attempting to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id*. at 93. The court concluded that the city's claims could not be brought under state law, and any claims must arise under federal common law.

Having determined that any claims made by the city must arise under the federal common law, the Second Circuit next determined that under *AEP*, the Clean Air Act displaced federal common law nuisance suits seeking to abate domestic transboundary emissions of greenhouse gases. *Id*. at 95. The court also agreed with the Ninth Circuit's

39

reasoning in *Kivalina* and held that the Clean Air Act also displaces the city's common law damages claims. *Id*. at 96.

The court next addressed the city's argument that if the Clean Air Act displaced federal common law, then the city's state law nuisance claims may "snap back into action" unless specifically preempted by statute. *Id.* at 98. The court summarized the city's view of the Clean Air Act "as having vaporized any preemptive effect that federal common law had on state law, thereby requiring us to engage in a traditional statutory preemption analysis." *Id*. The court stated that "the City's position is difficult to square with the fact that the federal common law governed this issue in the first place." *Id*. The court pointed out that under Supreme Court precedent, where a federal statute displaces federal common law, it does so in a field in which states have not traditionally occupied. *Id*. (citing *Boyle*, 487 U.S. at 507). "Consequently," the Second Circuit reasoned, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id*.

Recognizing that Congress could grant states the authority to operate in an area of national concern, the court turned to the text of the Clean Air Act and concluded that the Act does not authorize the type of state law claims the city sought to prosecute. *Id*. at 99. The court determined that among the Act's expansive set of enforcement mechanisms, the only provisions that might plausibly authorize the type of state law claims pursued by the

40

city were the provisions that constitute the saving clause, 42 U.S.C. §§ 7604(e) and 7416.[15] *Id*. The court concluded that, like the nearly identical saving clause in the Clean Water Act, the saving clause in the Clean Air Act, "plainly permit[s] states to create and enforce their own emissions standards applicable to in-state polluters[.]" *Id*. Returning to the city's claims as they applied to domestic conduct, the court concluded that they did not fall within the "slim reservoir of state common law." *Id*. at 100.

Finally, the Second Circuit turned to the city's claims that concerned foreign emissions. *Id*. The court noted that the Clean Air Act's "silence on the issue of extraterritorial reach, the fact that the Act contemplates the need for reciprocal protections from foreign nations, and the State Department's lead role in setting foreign policy on environmental matters, all plainly demonstrate the Clean Air Act regulates only domestic emissions." *Id*. at 101. As a result, the court reasoned, the Clean Air Act could not displace the city's federal common law claims to the extent that they seek recovery for harms caused by foreign emissions. *Id*. That said, the court stated that "foreign policy concerns foreclose New York's proposal here to recognize a federal common law cause of action targeting emissions emanating from beyond our national borders." *Id*.

The court determined that extending the federal common law to address claims relating to foreign emissions would trigger "broad concerns over separation of powers, intrusion on the political branches' monopoly over foreign policy, and judicial caution with respect to creating (or extending) federal common law causes of action." *Id*. at 102. The

---

[15] We discuss the Clean Air Act's saving clause in more detail in our analysis below.

41

court concluded that holding producers accountable for purely foreign activity would require them to internalize the costs of climate change, which would "presumably affect the price and production of fossil fuels abroad." *Id*. at 103.  The court also pointed out that it would "bypass the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement." *Id*.  "Such an outcome," the court reasoned, "would obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *Id*. The court further determined that "condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *Id*.  The Second Circuit agreed with the district court that "any federal common law claim against the [p]roducers that is not displaced by the Clean Air Act" fails given "the need for judicial caution in the face of delicate foreign policy considerations." *Id*.

Against the backdrop of these federal cases, we turn to the state law claims asserted by the local governments in the cases before us.

V

**Federal Displacement/Preemption Analysis**

### A.  Baltimore's State Tort Claims Are Displaced by Federal Common Law

As reflected in the above survey of cases, for more than a century, the Supreme Court and lower federal courts have held that interstate pollution is an inherently federal area necessarily governed by federal law.  *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481,

42

488 (1987) (stating that "the regulation of interstate water pollution is a matter of federal, not state, law"); *AEP*, 564 U.S. at 421, 422 (reiterating that "air and water in their ambient or interstate aspects" are "meet for federal law governance"); *City of New York*, 993 F.3d at 91 (collecting cases); *Kivalina*, 696 F.3d at 855 (stating that "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air and water pollution"); *Pankey*, 441 F.2d at 240 (explaining that the impairment of the ecological rights of a state from sources outside the state's own territory is a "matter having basis and standard in federal common law" and "constituting a question arising under the laws of the United States"); *Kansas v. Colorado*, 206 U.S. 46, 97 (1907) (explaining that allowing the law of one state to govern disputes regarding pollution emanating from another would violate the "cardinal" principle that "[e]ach State stands on the same level with all the rest[,]" by permitting one state to impose its laws on another state and its citizens). Federal law governs such controversies because they "touch[] basic interests of federalism[]" and implicate a "uniform rule of decision[.]" *Milwaukee I*, 406 U.S. at 105 n.6. And because "borrowing the law of a particular State would be inappropriate[]" to resolve such interstate disputes, federal law must govern. *AEP*, 564 U.S. at 422.

Given that federal law governs claims alleging injuries caused by interstate and international emissions, we start by asking whether the local governments' state law

claims, in fact, involve the regulation of interstate pollution and are therefore permitted, if at all, only under federal law.[16]  The answer is yes.[17]

_____

[16] The circuit courts below, as well as the Defendants and their amici, the United States, and 24 states, explained in support of their position that the inapplicability of state law to injuries allegedly caused by interstate and international emissions arises from the structure of the United States Constitution.  Given that federal common law originates from principles of federalism and is developed to address a uniquely federal interest where state law is not applicable, we agree.  *See AEP*, 564 U.S. at 421 (explaining that "federal common law addresses subjects within national legislative power where Congress has so directed or *where the basic scheme of the Constitution so demands*") (emphasis added); *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) (observing that there are some areas involving uniquely federal interests that "are so committed by the Constitution . . . to federal control that state law is preempted"); *cf. Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 246 (2019) (explaining that the federal "Constitution implicitly forbids" states from applying their own law to certain matters "because the interstate nature of the controversy makes it inappropriate for state law to control") (citation modified).  Such exclusively federal areas include "interstate and international disputes implicating the rights of States or our relations with foreign nations" and "areas in which a federal rule of decision is necessary to protect uniquely federal interests."  *Tex. Indus.*, 451 U.S. at 641–42.  Although we undertake a federal displacement/preemption analysis through the framework applied in *Ouellette* and *City of New York*, we agree with the Defendants and their amici that the development of federal common law is rooted in the same federalism principles that underpin the structure of the United States Constitution.

[17] We pause for a moment to recognize that, at first blush, our conclusion may appear to be at odds with the United States Court of Appeals for the Fourth Circuit's analysis of Baltimore's claims in the removal context.  *See Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 214, 216 (4th Cir. 2022) (concluding that Baltimore's claims "do not involve the regulation of emissions" and do not "disturb foreign relations").  The court acknowledged, however, that the Defendant's alleged deception mattered only insofar as it "drove consumption, and thus climate change."  *Id.* at 234.

Our analytical lens is different from that applied by the Fourth's Circuit in the *removal* context, which required it to apply a "heightened standard unique to the removability inquiry" to determine whether Baltimore's state law actions arose under federal law.  *Id.* at 203.  The issue before the Fourth Circuit was whether the Defendants' anticipated defenses could singlehandedly create federal question jurisdiction under 28 U.S.C. § 1331 in light of the well-pleaded complaint rule.  *Id*. at 197–98; *see Caterpillar Inc. v. Williams*, 482 U.S. 386, 398 (1987) (noting that "the fact that a defendant might

The beginning point for our federal displacement/preemption inquiry is whether the local governments' claims in which they seek damages for alleged impacts of climate change, is tantamount to regulation of interstate or international pollution as the Defendants assert, or whether the claims are limited to deceptive and misleading commercial conduct that lies within the "core" of the local governments' state police powers, as argued by the local governments.

At the outset, we observe that the local governments' claims are similar to New York's claims that the Second Circuit analyzed in *City of New York*, 993 F.3d 81. Like New York, the local governments allege that the Defendants "have known for decades

---

ultimately prove that a plaintiff's claims are preempted under [federal law] does not establish that they are removable to federal court" (citation modified)). "A plaintiff's complaint 'may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.'" *Baltimore*, 31 F.4th at 198 (quoting *Caterpillar*, 482 U.S. at 393).

Relatedly, the Fourth Circuit was required to determine whether the doctrine of complete preemption applied, which is a recognized exception to the well-pleaded complaint rule. *Id.* Complete preemption is a jurisdictional doctrine that has the effect of transforming a state law cause of action into one arising under federal law because Congress has occupied the field so thoroughly as to leave no room for state law causes of action at all. *Id.* By contrast, ordinary preemption—one of the defenses asserted before this Court—"is not a jurisdictional doctrine because it simply declares the primacy of federal law, regardless of the forum or the claim." *Id.* (citation modified).

The Fourth Circuit ultimately concluded that the face of Baltimore's complaint did not raise claims under federal common law. *Id.* at 200–07. The court made it clear that the Defendants' merits-based ordinary preemption defense was reserved for the state court on remand. *Id.* at 198–99. Because the court was concerned only with removal jurisdiction and the application of complete preemption, it did not "delve into the[] defenses at Defendants' disposal[,]" including ordinary preemption. *Id.* at 198 n.2. Those issues, of course, are before this Court.

45

that their fossil fuel products pose a severe risk to the planet's climate[]" but "downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant change to [plaintiffs'] climate and landscape." *City of New York*, 993 F.3d at 86–87. The local governments assert that the Defendants are "responsible for global warming and should bear the brunt of these costs[]" even though "every single person who uses gas and electricity . . . contributes to global warming[]." 993 F.3d at 86.

We reject the local governments' narrow reading of their complaints to suggest that they only seek redress for "deceptive and misleading commercial conduct" within the sphere of their local powers and authority. As noted above, the local governments allege that the Defendants substantially contributed to greenhouse gas pollution, global warming, and climate change by extracting, producing, promoting, refining, marketing, distributing, and selling fossil fuel products (*i.e.*, coal, oil, and natural gas). The claims are not limited to deceptive and misleading commercial conduct.

Even assuming that the claims were limited to allegations of deceptive and misleading marketing, we reject the assertion that their sweeping claims may be pursued under state law. Although we are required to view the local governments' allegations in the light most favorable to them, we are not required to defer to their characterization of the nature of their claims. No amount of creative pleading can masquerade the fact that

46

the local governments are attempting to utilize state law to regulate global conduct that is purportedly causing global harm.[18]

Assuming the truth of the local governments' allegations, they claim that the Defendants engaged in worldwide conduct—which allegedly inflated fossil fuel consumption, increased greenhouse gas emissions, accelerated global warming, and thereby created hazardous conditions in Baltimore, Annapolis, and Anne Arundel County—including sea-level rise, flooding, storm surges, and heat waves. Put another way, the local governments allege that the Defendants engaged in *worldwide deception* and caused *worldwide injuries* in the form of cumulative emissions. The local governments cannot escape this inescapable conclusion: they are seeking to apply Maryland law to regulate conduct that occurs outside their jurisdictional borders, as well as within the State's borders. The local governments' police powers do not extend beyond their respective borders, and certainly do not authorize the policing of global conduct.

The nature and scope of the damages sought by the local governments further reflect that their claims seek to regulate conduct outside Maryland that is causing global

---

[18] We respectfully disagree with the Supreme Courts of Hawaii and Colorado in their analysis of similar claims and in their conclusion that such claims do not seek to regulate emissions or seek damages for interstate emissions. *City & County of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1181 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025) (No. 23-947); *County Comm'rs of Boulder County v. Suncor Energy USA, Inc.* ("*Boulder*"), No. 24SA206, 2025 WL 1363355, at *10 (Co. 2025), *cert. granted*, ___S. Ct. ___, 2026 WL 490537 (2026) (No. 25-170). Our view of the claims here aligns with the dissent in the *Boulder* case. *See Boulder*, 2025 WL 1633355, at *13, *16 ("While Boulder's state law claims masquerade as tort claims for damages, a closer look at the substance of those claims' allegations reveals that Boulder seeks to effectively abate or regulate interstate emissions," which "state law remains incompetent" to do.) (Samour, J., dissenting).

warming.  The local governments seek damages for injuries "caused by anthropogenic greenhouse gas emissions," which are "*all due to anthropogenic global warming.*"  To state the obvious, global warming is created by global consumption.  Given that Maryland accounts for only a fraction of global carbon dioxide emissions,[19] Maryland's emissions alone cannot possibly be responsible for causing the local governments' alleged injuries.  In other words, if the Defendants had labeled their products differently in Maryland to warn Marylanders about the dangers of fossil fuel consumption, and every human, government, corporation, or other entity that consumes fossil fuels every day heeded those warnings, it would have been but a drop in the bucket in terms of the effects of greenhouse gas pollution, global warming, or climate change.  Viewing the allegations of the complaint in the light most favorable to the local governments, they are necessarily seeking damages for harms attributed to *all interstate and international emissions combined*—plain and simple.  Baltimore mentions "emissions" 115 times in its complaint.  The local governments cannot, in one breath, disavow any intent to address interstate and global emissions, and in another, identify such emissions as the single source of their harms.

---

[19] As of 2023, the United States is responsible for 11% of global greenhouse gas emissions.  Ctr. for Climate and Energy Sol., *Global Emissions: Greenhouse Gas Emissions by Top Emitters, 2023*, https://perma.cc/7V6E-G6HQ.  Maryland's carbon dioxide emissions represent less than 0.1% of the nation's carbon emissions.  U.S. Energy Info. Admin., *Energy Related CO2 Emission Data Tables*, Table 1 (2023), https://perma.cc/P73Q-UG97.  Maryland's emissions constitute a small percentage of the United States' emissions, let alone the globe's.

We agree with the Second Circuit that "[s]uch a sprawling case is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92. A substantial damages award like the ones the local governments seek would effectively regulate the Defendants' behavior far beyond Maryland's borders. Because greenhouse gases, once emitted, become well mixed in the atmosphere, *AEP*, 564 U.S. at 422, they cannot be traced to their source, as they quickly diffuse and comingle in the atmosphere. *City of New York*, 993 F.3d at 92. Any actions that the Defendants take to mitigate their liability in Baltimore, Annapolis, and the County will undoubtedly have a significant impact across every state and country. One cannot isolate these local governments' claims from the continuum of the harmful effects of global warming on the entire planet. Addressing the local governments' alleged injury requires the application of Maryland law to out-of-state and international conduct. Indeed, the fact that the United States and 24 states[20] have filed amicus briefs in support of the Defendants "aptly illustrates that this is an interstate matter raising significant federalism concerns." *Id.*

The local governments once again attempt to recast the sweeping scope of their lawsuit by pointing out that they are not "asking the court to enjoin or reduce fossil-fuel production or emissions." We are unpersuaded by the local governments' myopic view of their claims or their attempt to ignore or minimize the effect that a significant damages award would have on both domestic and international attempts to regulate pollution—

---

[20] The states of Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and Wyoming filed an amicus brief in support of the Defendants.

matters which are solely within the purview of federal law. That these local governments are seeking damages—as opposed to injunctive relief related to the imposition of pollution standards—does not alter our conclusion. As the Supreme Court has recognized, "'regulation can be effectively exerted through an award of damages,' and 'the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (citation modified) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572, n.17 (1996) (observing that "[s]tate power" can be wielded as much by the "application of a state rule of law in a civil lawsuit as by a statute[]" and explaining that "principles of sovereignty and comity" mean "that a [s]tate may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States"). Environmental tort claims force defendants "to change [their] methods of doing business[.]" *Ouellette*, 479 U.S. at 495. Clearly, the local governments are seeking to impose damages on the Defendants for injuries allegedly caused by the effect of interstate and international greenhouse gas emissions on global climate change. As a result, the local governments' claims fall squarely within the inherently federal areas of interstate pollution and foreign affairs and may therefore only be brought under federal law.

Allowing each of the 50 states (and the countless individual local governments located within them) to impose their own preferred policy solutions for climate change—with each state naturally focused on *local* rather than national or international impacts, would create a plainly "irrational system of regulation" that would lead to "chaotic

50

confrontation between sovereign states." *Ouellette*, 479 U.S. at 496 (citation modified);

*see also City of New York*, 993 F.3d at 93 (observing that "states will invariably differ

in their assessment of the proper balance between . . .  national and international

objectives").  We agree with the Second Circuit's conclusion that "to permit th[ese]

suit[s] to proceed under state law would further risk upsetting the careful balance that

has been struck between the prevention of global warming, a project that necessarily

requires national standards and global participation on the one hand, and energy

production, economic growth, foreign policy, and national security, on the other." *City

of New York*, 993 F.3d at 93; *see also AEP*, 564 U.S. at 427; 43 U.S.C. § 1802(1)

(declaring that some regulatory goals of promoting oil and natural gas resource

management policies are "to achieve national economic and energy policy goals, assure

national security, reduce dependence on foreign sources, and maintain a favorable

balance of payments in world trade").  We therefore conclude that any state law claims

are displaced by federal common law.[21]

---

[21] It is an understatement to say that we view the allegations set forth in the local governments' complaints—and the analytical framework that follows therefrom—differently from the dissent.  We briefly explain these differences here.

The dissent asserts that the local governments have brought a "fraud case, and the CAA has nothing to say about fraud." Dissenting Slip. Op. at *4.  According to the dissent, the "local injuries" for which the local governments seek damages are "caused by local impacts of a global phenomenon, and they are alleged to have resulted from a fraud, not from an emissions policy." *Id*. at *5.  The dissent posits that because this case alleges a fraud, the local governments' claims arise from the "state's historic police powers," and therefore, we must apply a preemption framework to the local governments' claims in a manner similar to cases such as *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019); *Altria Group, Inc. v. Good*, 555 U.S. 70 (2008); and *Cipollone v. Liggett Group, Inc.*, 505

51

U.S. 504 (1992). Dissenting Slip. Op. at \*\*2, 7, 19–22, 33–38, 48, 50, 53, 73. These cases, of course, did not involve interstate pollution. *See Va. Uranium*, 587 U.S. at 761 (holding that the Federal Atomic Energy Act did not preempt Virginia's ban on uranium mining); *Altria Group, Inc.*, 555 U.S. 70; *Cipollone*, 505 U.S. at 504 (holding in each case that the Federal Cigarette Labeling and Advertising Act did not preempt state law claims brought against tobacco and cigarette manufacturers).

The dissent's reliance on these cases flows from the fact that the dissent does not view the local governments' claims as pertaining to or affecting interstate emissions, and therefore, the dissent determines that the Supreme Court's analytical framework applied in *Ouellette* has no application. The dissent also contends that we have "conflate[d] displacement and preemption[,]" which the dissent states are "distinct doctrines with distinct standards and distinct consequences." Dissent Slip. Op. at \*48–49.

Of course, as our opinion reflects, we disagree with the dissent's characterization of the local governments' claims, and the analytical framework that the dissent argues is applicable here. First, we disagree with the dissent that the claims relate only to fraud or deceptive marketing claims arising under state common law and that the claims are within the local governments' "traditional police powers." We will not repeat our reasoning or analysis here other than to reiterate that the local governments are clearly attempting to utilize state law to address global conduct that is purportedly causing global harm. The ultimate conduct is the use of greenhouse gases across the globe, and the ultimate harm asserted by the local governments arises from global emissions. The local governments' police powers do not extend beyond their respective borders and certainly do not authorize the policing of worldwide conduct. We simply do not view the local governments' claims in the same manner as the dissent or as the high courts of Hawaii and Colorado. Rather, our analysis aligns with the dissent from the high court of Colorado in *Boulder*, 2025 WL 1363355, at \*12, and the Second Circuit in *City of New York*, 993 F.3d at 98.

Second, because we determine that the local governments, through their state law claims, are attempting to address air emissions, the correct analytical framework is to consider the claims through the lens of *federal law*—which is the same framework that the Second Circuit applied to similar claims in the *City of New York*. That is, we recognize that historically, claims involving interstate pollution arose under federal common law, which displaced state law. *See AEP*, 564 U.S. at 421, 422. With the enactment of the Clean Air Act, federal common law claims, in turn, were displaced by that federal statute. *See id.*; *City of New York*, 993 F.3d at 95. The final step in the analysis arises under the analytical framework established by *Ouellette*—that is, where federal common law previously governed the conduct (such as matters affecting interstate water and air pollution) and is displaced by a legislative enactment (such as the Clean

52

### B. *The Clean Air Act, In Turn, Displaces Any Federal Common Law Claims that the Local Governments May Have Where National Emissions Are Involved*

Having determined that any claims the local governments may have would arise under federal law, we next conclude that any federal common law claims would be displaced by the Clean Air Act. We can make short work of this analysis given the Supreme Court's holding in *AEP*. *See City of New York*, 993 F.3d at 95 ("In the wake of *AEP*, it is beyond cavil that the Clean Air Act displaced federal common law nuisance suits seeking to abate domestic transboundary emissions of greenhouse gases."); *see also Kivalina*, 696 F.3d at 856 (explaining that the court "need not engage in" the "complex issue and fact-specific analysis" of whether federal common law is

---

Water Act and the Clean Air Act), we consider whether Congress has authorized the states to regulate the conduct through statutory enactments or the application of state common law. 479 U.S. at 492. We determine that this framework, which the Second Circuit applied to similar claims, is the correct one.

The dissent also criticizes our decision not to stay this case pending the United States Supreme Court's decision in *Boulder*, 2026 WL 490537, at *1. In *Boulder*, the United States Supreme Court granted certiorari to determine two questions:

1. Whether federal law precludes state-law claims seeking relief for injuries allegedly caused by the effects of intestate and international greenhouse-gas emissions on the global climate.

2. Whether this Court has statutory and Article III jurisdiction to hear this case.

*Id*. We decline to stay this case for two reasons. First, we believe that it could be useful for the United States Supreme Court to have the benefit of a high court's analysis that is different from that expressed by our colleagues on the high courts of Colorado and Hawaii. Second, given the Supreme Court's decision to direct the parties to brief the second question presented above, the Supreme Court may not even reach the merits.

53

displaced by the Clean Air Act "because we have direct Supreme Court guidance" and citing to *AEP*).

We agree with the Second and Ninth Circuits that the Clean Air Act displaces not only claims for abatement, but it similarly displaces the local governments' common law damages claims. *City of New York*, 993 F.3d. at 96; *Kivalina*, 696 F.3d at 857–58; *see also Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21–22 (1981) (holding that displacement of a federal common law injunction action necessarily implies that a damages action brought for the same claim is also displaced). Whether the local governments' claims are styled as an action for injunctive relief against the Defendants to stop them from producing fossil fuels, or as an action for a substantial damages award that would alter their conduct vis-à-vis the production of fossil fuels, the practical effect is the same.

Nor does the fact that the local governments are seeking to hold the Defendants liable for emissions released by third parties—*i.e.*, the worldwide consumers of fossil fuel products who purchased and consumed more fuels, allegedly because of deceptive marketing practices—alter our conclusion. "If an oil producer cannot be sued under the federal common law for its own emissions, *a fortiori* it cannot be sued for someone else's." *City of New York*, 993 F.3d at 97 (citation modified). Any claims that the local governments could assert under federal common law are clearly displaced by the Clean Air Act.

### C. *Applying the* Ouellette *Preemption Framework to the Local Governments'*
###    *Claims, Any State Law Claims Are Preempted*

We also agree with the Second Circuit's conclusion that, given the federalism

concerns undergirding the entire rationale of federal common law,[22] "state law does not

suddenly become presumptively competent to address issues that demand a unified

federal standard simply because Congress saw fit to displace a federal court-made

standard with a legislative one[.]" *City of New York*, 993 F.3d at 98. We recognize,

however, that Congress can grant states the authority to operate in an area of national

concern. But "resorting to state law on a question previously governed by federal

common law is permissible only to the extent authorized by federal statute." *Id*. at 99

(citation modified) (quoting *Milwaukee III*, 731 F.2d at 411); *see also Ouellette*, 479

U.S. at 492.[23] In other words, where federal common law previously governed the

conduct (such as matters affecting interstate water and air pollution) and is displaced by

---

[22] *See Milwaukee II*, 451 U.S. at 313 n.7 (explaining that "if federal common law exists, it is because state law cannot be used"); *Boyle*, 487 U.S. at 507 (noting that where a federal statute displaces federal common law, it does so not "in a field which the States have traditionally occupied") (citation modified).

[23] We agree with the Second Circuit that the case law applying preemption in the context of state law claims that were once displaced by federal common law, which, in turn, is displaced by Congress through a legislative enactment such as the CAA, "is admittedly not a model of clarity[.]" *City of New York*, 993 F.3d at 98. As the Second Circuit observed, "[a]lthough the Supreme Court in *Ouellette* appeared to rely, at least in part, on the traditional preemption analysis under which courts should not lightly infer preemption of state law claims," the *Ouellette* Court also found support for its ultimate conclusion—that the Clean Water Act had preempted state-law nuisance claims—by looking to *Milwaukee I*, which held that, even in the absence of a federal statutory scheme, "the control of interstate pollution is primarily a matter of federal law[.]" *Id.* at 103 n.11 (citation modified) (citing *Ouellette*, 479 U.S. at 492 (citing *Milwaukee I*, 407 U.S. at 107)).

a legislative enactment (such as the Clean Water Act and the Clean Air Act), we must determine whether Congress has authorized the states to regulate the conduct through statutory enactments or the application of state common law.

As discussed above, *Ouellette* provides the analytical framework that applies here. The Court held that the Clean Water Act preempted Vermont's nuisance suit under Vermont law for harms experienced in Vermont but caused by New York-sourced pollution. 479 U.S. at 483–84, 492. Relying on the Clean Water Act's "comprehensive" and "pervasive regulation" of water pollution, as well as "the fact that the control of interstate pollution is primarily a matter of federal law," the Court framed the inquiry as whether the Clean Water Act "specifically preserved" the application of state law to water pollution that originated from another state. *Id.* The Court answered no, holding that the statue "contemplate[d] a much lesser role" for states seeking to regulate out-of-state pollution, *id.* at 490, and precluded "applying the law of an affected State" to impose liability on "an out-of-state source[,]" *id.* at 494.

Critically, the Court interpreted the Clean Water Act's saving clause, 33 U.S.C. § 1370—which permits states to adopt and enforce stricter standards than required by the Act—to permit liability under state law only if "pursuant to the law of the *source* State." *Ouellette*, 479 U.S. at 497. A contrary rule, the Court reasoned, would subject regulated entities "to an indeterminate number of potential [state] regulations," *id.* at 499, "undermine the important goals of efficiency and predictability in the [EPA's] permit system," *id.* at 496, and "undermine" the statute's comprehensive "regulatory structure," *id.* at 497.

56

Applying the Supreme Court's analytical framework to the local governments' claims, we conclude that the Clean Air Act does not authorize the type of state law claims that they assert.  As discussed above, the Clean Air Act is a comprehensive federal law that sets forth detailed source- and pollution-specific control programs for nationwide air regulation.  The Act grants the EPA authority to establish nationwide standards based upon its expert judgment when the EPA determines that emissions from, for example, stationary sources and new vehicles meet applicable statutory standards for regulation. 42 U.S.C. §§ 7411, 7521.

Although certain aspects of the Act embrace federal-state collaboration—such as the attainment of NAAQS through state implementation plans—the plans must be consistent with EPA regulations and submitted to the EPA for approval before they are final.  "[S]tates are not granted unfettered discretion to impose any environmental regulations they choose[.]"  *City of New York*, 993 F.3d at 81.  Rather, the Act simply "permit[s] each State to take the first cut at determining how best to achieve EPA emissions standards *within its domain*."  *AEP*, 564 U.S. at 428 (emphasis added).  The Act carefully defines roles for states, including the state implementation plan process, in which states implement EPA-promulgated standards for in-state sources.

The Clean Air Act specifically addresses the problem of "air pollution emitted in one State, but causing harm in other States."  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014).  Congress added the Good Neighbor Provision to "tackle [that] problem" by requiring remedial action taken by the *source state*—because downwind states "lack[ed] authority to control" out-of-state emissions.  *Id.*; 42 U.S.C.

57

§ 7410(a)(2)(D)(i). Other provisions of the Clean Air Act afford affected states other narrow avenues for voicing their cross-boundary pollution concerns to the EPA for relevant pollutants. *See, e.g.*, 42 U.S.C. § 7607(d)(5) (permitting "any person to submit written comments, data, or documentary information[,]" and providing that "interested persons" have "an opportunity" to orally present "data, views or arguments"); *id.* § 7475(a)(2) (noting that proposed permits for major emitting facilities must be subject to a "public hearing"); *id.* § 7410(a)(1) (establishing that state implementation plans be submitted "after reasonable notice and public hearings"). As this scheme makes plain, each state is responsible for controlling air pollution within its borders—subject to EPA oversight—and the Act contemplates no role for states reaching out and applying their law in other states.

And although the Clean Air Act "provides multiple avenues for enforcement[,]" *AEP*, 564 U.S. at 425—several of which contemplate state involvement—"only two could even plausibly authorize the type of state-law claims pursued" by the local governments. *City of New York*, 993 F.3d at 99. Those enforcement mechanisms set forth in two provisions of the Act—42 U.S.C. §§ 7604(e) and 7416—are commonly and collectively referred to by federal courts as the "saving clause." Specifically, Section 7604(e) is a citizen-suit saving clause, which states: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief[.]" Section 7416 includes a states' rights saving clause, which states: "Except as otherwise provided[,] . . . nothing in this chapter shall preclude or deny the right of any State or political

58

subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution[,]" except that the "State or political subdivision may not adopt or enforce any emission standard or limitation" that is "less stringent than the standard or limitation" set by federal law.

Several federal circuit courts of appeals have concluded that the saving clause of the Clean Air Act is materially identical to the saving clause in the Clean Water Act and have adopted the same interpretation that the Supreme Court adopted in *Ouellette*—that the saving clause authorizes state regulation only "pursuant to the law of the source state." 479 U.S. at 497 (citation modified); *see City of New York*, 993 F.3d at 99 (observing that the saving clause in the Clean Air Act and the Clean Water Act are "nearly identical" and that the saving clause of the Clean Air Act, "when read together, plainly permit states to create and enforce their own emissions standards applicable to in-state polluters"); *see also North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 304 (4th Cir. 2010); *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 195–96 (3d Cir. 2013). "This no doubt holds true for both state legislation and common law claims under state tort law." *City of New York*, 993 F.3d at 100; *Merrick*, 805 F.3d at 690–91.

"[F]or example, a New York resident could bring a nuisance suit against a Connecticut-based emitter under Connecticut law without upsetting the Clean Air Act's carefully balanced scheme, even if the alleged harm occurred in New York." *City of*

59

*New York*, 993 F.3d at 100; *see also Ouellette*, 479 U.S. at 498–99 (explaining in the Clean Water Act context why the application of the source state's common law would not upset the balance among federal, source-state, and affected-state interests).  The local governments' claims here are far different and exceed the bounds of the Clean Air Act's saving clause.

Indeed, the Court's concern in *Ouellette* about source state entities being subject to the application of "vague" and "indeterminate" "nuisance standards" is even weightier in the greenhouse gas context than the water-pollution context.  479 U.S. at 496.  While air pollution is generally "heedless of state boundaries[,]" *EME Homer City Generation*, 572 U.S. at 496, any alleged greenhouse gas effects are not traceable to any particular domestic or global source.  If *all* emissions attributable to the producers' products are deemed collectively responsible for that indivisible harm under one affected state's law, any one emitter could face an ill-defined patchwork of liability across all 50 states.  To permit such suits would undermine "this carefully drawn statute through a general saving clause," *Ouellette*, 479 U.S. at 494, and would "serious[ly] interfere . . . with the achievement of the full purposes and objectives of Congress," *id*. at 493–94 (citation modified).  "We thus cannot allow non-source states to ascribe to a generic savings clause a meaning that the Supreme Court in *Ouellette* held Congress never intended." *City of New York*, 993 F.3d at 100 (quoting *Tenn. Valley Auth.*, 615 F. 3d at 304).  Accordingly, we determine that the Clean Air Act does not authorize the local governments' state law claims and conclude that such claims concerning domestic emissions are barred by federal law.

### D. The Local Governments' Nuisance Claims Impermissibly Encroach on Foreign Policy Concerns that Are Best Left to the Legislative and Executive Branch

As discussed above, the local governments' claims govern emissions conduct that occurs both domestically and internationally. As such, the "question cannot be answered by reference to the Clean Air Act alone." *City of New York*, 993 F.3d at 100. "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255 (2010) (citation modified) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)). "Put more bluntly, 'when a statute gives no clear indication of an extraterritorial application, it has none.'" *City of New York*, 993 F.3d at 100 (quoting *Morrison*, 561 U.S. at 255).

The Clean Air Act contains no such clear indication. "Indeed, the statutory scheme is silent about extraterritorial reach, except to authorize the EPA Administrator to mitigate domestic air pollutants that have caused or contributed to air pollution in a foreign country—and even then, only if that country provides reciprocal protections to the United States." *Id.* at 100; 42 U.S.C. § 7415.[24] "In addition, Congress has tasked 'the State Department—not [the] EPA—to formulate United States foreign policy with reference to environmental matters relating to climate.'" *City of New York*, 993 F.3d at 101 (quoting *Massachusetts*, 549 U.S. at 534). "Together, the statute's silence on the issue of

---

[24] For discussion of the dearth of statutory provisions and cases on the extraterritorial application of domestic environmental laws, *see* Jonathan Remy Nash, *The Curious Legal Landscape of the Extraterritoriality of U.S. Environmental Laws*, 50 Va. J. Int'l L. 997, 1004 (2010).

extraterritorial reach, the fact that the Act contemplates the need for reciprocal protections from foreign nations, and the State Department's lead role in setting foreign policy on environmental matters, all plainly demonstrate that the Clean Air Act regulates only domestic emissions." *Id.*

However, even if such claims could proceed as a matter of federal common law, like the Second Circuit, we conclude that foreign policy concerns would foreclose "a federal common law cause of action targeting emissions emanating from beyond our national borders." *Id.*

In both *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) and *Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018), the Supreme Court declined to extend the scope of federal common law actions brought under the Alien Tort Statute in part due to foreign policy concerns. As the Second Circuit observed, "[a]lthough the reasoning of *Jesner* and *Kiobel* is, at times, specific to the context of the [Alien Tort Statute] and violations of the laws of nations, these cases also rest on broad concerns over separation of powers, intrusion on the political branches' monopoly over foreign policy, and judicial caution with respect to creating (or extending) federal common law causes of action." *City of New York*, 993 F.3d at 102; s*ee Jesner*, 584 U.S. at 265 (explaining that the "political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns"); *Kiobel*, 569 U.S. at 116 (noting that Congress, not the Judiciary, has "the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain") (citation modified); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)

62

(cautioning that "the potential implications for the foreign relations of the United States of recognizing [new private causes of action for violating international law] should make courts particularly wary of impinging on the discretion of the Legislative and Executive branches in managing foreign affairs"); *Nahl v. Jaoude*, 968 F.3d 173, 180 (2d Cir. 2020) (noting that *Sosa* requires courts to consider "prudential concerns" such as "foreign policy concerns raised by the executive branch" when an action for a violation of international law is available to litigants).

We agree with the Second Circuit's conclusions concerning the problems associated with courts recognizing federal common law claims that may concern disputes of international import. To hold the Defendants responsible for foreign activity would necessarily require them to internalize the costs of climate change, which, in turn, would presumably affect the price and production of fossil fuels abroad. *City of New York*, 993 F.3d at 103. It would also bypass the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework[25] and the Paris

---

[25] The international climate change legal landscape largely consists of the United Nations Framework Convention on Climate Change ("UNFCCC") and subsequent agreements that have grown out of it. The UNFCCC is a global treaty that was adopted in 1992 and aimed to facilitate international responses to climate change. United Nations Climate Change, *About the secretariat*, https://perma.cc/4GV3-CS9Q. The UNFCCC secretariat (UN Climate Change) was formed after the adoption of the UNFCCC and is the United Nations entity "tasked with supporting the global response to the threat of climate change." *Id.* The UNFCCC is the "parent treaty" of both the 1997 Kyoto Protocol and the 2015 Paris Agreement. *Id.* The U.S. Senate ratified the UNFCCC in 1992. United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107.

63

Agreement.[26]  *Id.*  "Such an outcome would obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly infringing" on the prerogatives of Congress and the President.  *Id.*

Simply put, "condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation

Adopted in 1997 and entered into force in 2005, the Kyoto Protocol "operationalizes" the UNFCCC "by committing industrialized countries and economies in transition to limit and reduce greenhouse gases (GHG) emissions in accordance with agreed individual targets."  United Nations Climate Change, *Process and Meetings: The Kyoto Protocol*, https://perma.cc/KX43-37NL.  Developed countries have a "heavier burden" for emission reductions, as the Protocol "recognizes that they are largely responsible for the current high levels of GHG emissions in the atmosphere."  *Id.*  Under President Clinton, the United States signed the Kyoto Protocol in 1998, but the treaty was never ratified by the Senate, and, as such, the treaty is not binding on the United States.

[26] The Paris Agreement is another international treaty on climate change that was adopted in December 2015 and entered into force in November 2016.  United Nations Climate Change, *Process and Meetings: The Paris Agreement*, https://perma.cc/4S6A-Y3MB.  Its "overarching goal" is to limit the increase of the global average temperature.  *Id.*  Under the Agreement, countries submit national climate action plans—known as "nationally determined contributions (NDCS)"—that detail both long-term and short-term actions the countries will take to reduce their GHG emissions, as well as the steps they will need to take to "build resilience" to adapt to the effects of climate change.  *Id.*  Under President Obama, the United States was a signatory of the Paris Agreement, but during President Trump's first term, President Trump withdrew the country.  The United States, under President Biden, then rejoined the Agreement, *see* Depositary Notification, Acceptance by the United States of America, Paris Agreement, Reference C.N. 10.2021.Treaties-XXVII.7.d (Jan. 20, 2021), but President Trump recently withdrew the country again, Exec. Order No. 14162, 90 Fed. Reg. 8455 (2025).

Despite Congress's recognition that climate change occurs "on a global basis," and that "[i]nternational cooperation for the purpose of sharing the benefits and costs of a global effort to understand climate is essential[,]" 15 U.S.C. § 2901(5), the United States is not currently a party to global efforts and cooperation—much less Baltimore City, Annapolis, or Anne Arundel County.

64

on a topic of global concern." *Id.* Accordingly, to the extent that the local governments could bring a federal common law claim against the Defendants that is not displaced by the Clean Air Act, it would nonetheless fail under the reasoning supplied by *Kiobel* and *Jesner* and the need for judicial caution in the face of delicate foreign policy considerations.

**VI**

**Analysis of State Law Claims**

Even had we not determined that the local governments' state law claims are displaced or preempted by federal law, we would nonetheless affirm the circuit courts' dismissal of the state law claims as a matter of law. As noted above, the local governments asserted five causes of action against the Defendants, all arising under Maryland law: (1) public nuisance; (2) private nuisance; (3) strict liability for failure to warn; (4) negligent failure to warn; and (5) trespass. To remedy their harms, they seek compensatory and punitive damages, disgorgement of profits, and equitable relief, including the abatement of the alleged nuisances and an injunction against future nuisances. For the reasons set forth below, we conclude that each of the local governments' claims fail to state legally cognizable claims under Maryland common law.

### A.  *Public Nuisance Claims*

Under their public nuisance theory, the local governments assert that the "Defendants, individually and in concert with each other, have created, contributed to, and/or assisted in creating, conditions that significantly interfere with rights general to the public, including the public health, public safety, the public peace, the public comfort, and the public convenience." The nuisance, according to the local governments, is "substantial

65

and unreasonable," and will "cause and continue to cause far into the future, significant harm to the community," which "outweighs any offsetting benefit."

The local governments do not state a claim under Maryland common law for public nuisance. As we discussed in *Express Scripts, Inc. v. Anne Arundel County,* "Maryland has not expanded the public nuisance doctrine beyond the traditional historical principles embodied in the common law—namely, that a public nuisance action was not regarded as a tort but was instead a public action by a government entity to pursue criminal prosecutions or seek injunctive relief to abate harmful conduct." *Maryland*, ___ Md. ___, at *92 (filed March 23, 2026). "This Court has never recognized a government entity's ability to recover damages for public nuisance." *Id.* To the extent that the local governments are seeking damages for public nuisance, such recovery exceeds the bounds of Maryland's public nuisance doctrine. Moreover, assuming without deciding that there is a public right to be free from adverse effects of climate change, "we would nonetheless decline to expand Maryland's common law of public nuisance to govern the conduct alleged in the" local governments' complaints "given the extensive federal . . . statutory and regulatory framework that governs the highly complex conduct" of regulating air emissions. *Id.* at *93. Congress has entrusted the EPA with balancing air emissions and societal reliance on fossil fuels. Where the legislature has, through the enactment of comprehensive legislation, entrusted such highly complex matters to an agency having expertise of the same, we decline to expand common law nuisance to address the same conduct.

With respect to any equitable claims asserted by the local governments to abate a public nuisance, again assuming without deciding, that there is a public right to be free

66

from adverse effects of climate change, this Court has never recognized a local government's ability to bring an action to abate conduct that is occurring well beyond the boundaries of the jurisdiction, nor are we aware of any authority granted by the General Assembly to pursue such extraterritorial claims.[27]  Quite simply, the notion that a local government such as Baltimore, Annapolis, or Anne Arundel County may pursue state law nuisance claims against the Defendants—seeking injunctive relief to abate injuries arising from global greenhouse effects arising from worldwide conduct—is so far afield from any area of traditional state or local responsibility that it cannot be seriously contemplated.

### B. Private Nuisance Claims

The local governments also assert that the Defendants' conduct constitutes a private nuisance.  The local governments posit that they each own, occupy, and manage extensive real property within their borders, and that the effects of climate change have caused, and will continue to cause, substantial and unreasonable interference with the public's use and enjoyment of government property.  Viewing the allegations in the complaint in the light

---

[27] In Maryland, local governments only have such authority as is granted by the General Assembly.  Although the General Assembly has granted each of the local governments various authority to abate public nuisances within their boundaries, the authority does not extend extraterritorially.  For example, the General Assembly has granted the State's Attorney and County Attorney for Anne Arundel County the authority to seek "injunctive and other equitable relief in the District Court" for "abatement of a nuisance[.]" Md. Code (2023 Repl. Vol., 2025 Supp.), Real Property Article ("RP") § 14-125.1(d)(1), (b).  The statute contains a definition of "nuisance" that applies *within the boundaries of Anne Arundel County*, which is tied to uses of private property in violation of the local code. *Id.* § 14-125.1(a)(4).  The public nuisance claims asserted in this case by Anne Arundel County far exceed the authority granted by the General Assembly in this nuisance abatement statute.

most favorable to the local governments, although climate change may have adverse effects on public property, such effects do not give rise to a cause of action for private nuisance.

As we explained in *Express Scripts, Inc.*, public nuisance involves an unreasonable interference with the rights of the community at large, "whereas private nuisance is a tort[,]" and "[a] plaintiff injured by a nuisance may seek damages or injunctive relief if the plaintiff suffers an injury that is different in kind from that suffered by other members of the public." *Id.* at *51 (citing *Cook v. Normac Corp.*, 176 Md. 394, 397 (1939); *Houck v. Wachter*, 34 Md. 265, 269 (1871); *Garitee v. City of Balt.*, 53 Md. 422, 436–37 (1880)).   Assuming without deciding that there is a general public right to be free from adverse effects of climate change, the local governments, as owners of public land, fail to establish that they have suffered an injury that is different in kind from that suffered by members of the public.  The local governments allege injuries arising from climate change, including sea level rise, storm surges, extreme precipitation events, and heat waves, which have caused "consequent social and economic injuries associated with the aforementioned physical and environmental impact."  But this "inundation, destruction and/or interference" with the local governments' property and citizenry are not unique in kind or different from injuries suffered by the public generally—that is, there are no allegations of special damages.

Expanding the doctrine of private nuisance in the manner asserted by the local governments would eliminate the distinction in our common law between public and private nuisance—a step we decline to take.

68

## C. Trespass

Turning to the trespass claim, the local governments contend that the Defendants caused "flood waters, extreme precipitation, saltwater, and other materials to enter" their property, rendering it unusable. The local governments assert that the "Defendants' introduction of fossil fuel products into the stream of commerce was a substantial factor in causing harms and injuries to" the local governments' public and private property. The Defendants' acts and omissions, posit the local governments, are indivisible causes of the injuries because "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gases quickly diffuse and comingle in the atmosphere." The local governments assert that the Defendants' wrongful conduct, as recounted in the complaint, was committed with actual malice in that the Defendants had "actual knowledge that their products were defective and dangerous, and acted with conscious disregard for the probable dangerous consequences of their conduct's and products' foreseeable impacts upon the rights of others," including the local governments. In addition to injunctive relief and compensatory damages, the local governments seek an award of punitive damages in an amount "sufficient to punish the[] Defendants for the good of society and to deter Defendants from ever committing the same or similar acts."

The common law tort of trespass is generally defined as an "intentional or negligent intrusion upon or to the possessory interest in property of another." *Litz v. Md. Dep't of Env't*, 446 Md. 254, 276–77 (2016) (citation modified). We have stated that "exclusive

69

control over the adjacent land or over the invading force is" not an essential or necessary element "for an action for trespass to lie[.]" *Rockland Bleach & Dye Works Co., Inc. v. H.J. Williams Corp., Inc.*, 242 Md. 375, 386–87 (1966) (citation modified). "However, *when an adjacent property is invaded by an inanimate or intangible object[,] it is obvious that the defendant must have some connection with or some control over that object* in order for an action in trespass to be successful against him[]" or her. *Id*. at 387 (emphasis added).

In *Rockland,* a general contractor working for the State Roads Commission, placed considerable fill at the base of a construction project, which was adjacent to plaintiff's reservoir that supplied over 600,000 gallons of water each day to plaintiff's bleach and dye works company. *Id*. at 379. A rainstorm washed the earth from the fill into the reservoir, completely blocking its intake and feeder pipes. *Id*. at 380. This Court reversed a directed verdict for the defendant on the trespass claim. *Id*. at 384. The defendant argued that it had insufficient control because it was obliged to follow the drainage plan designed by the State Roads Commission. *Id*. at 386. We rejected defendant's argument, determining that the contract documents conferred "very significant amounts of control" over the fill materials at issue. *Id*. at 387. In contrast, in *JBG/Twinbrook Metro Limited Partnership v. Wheeler*, we held that a gas company contracting with a station owner to sell the company's gas was not liable in trespass for the subsurface percolation of gas onto adjacent property because the company had "insufficient control" over the gasoline. 346 Md. 601, 626 (1997).

The local governments have not provided any Maryland case law that supports their sweeping trespass claim, nor have we found any. This is not a case in which dangerous products were directly deposited into and directly entered the land and water of the

70

plaintiff, where the defendant exercised some measure of control over the matter invading plaintiff's property. The local governments seek to establish a trespass upon a determination that the Defendants' "substantial contribution" to climate change—through their marketing of products, the use of products in every part of the world, and the emissions from that use—caused rainfalls, flooding, and other material to enter upon their property without their consent. We determine that this sweeping cause of action roves too far to establish a trespass claim. Given that global gases in the atmosphere attributable to anthropogenic sources cannot be traced to their original source, and are attributable to *all* human activity, to find an actionable trespass action, we would be forced to conclude that these Defendants exercise some connection or control over all human activity that causes global warming. We agree with the Circuit for Baltimore City that the link between the Defendants' activities and the harms alleged by the local governments, which are caused by *human activity around the world*, is far too attenuated to constitute the Defendants' connection to or control over adverse global climate effects that have invaded the local governments' property.

### D. Failure to Warn

Finally, we turn to the local governments' failure to warn claims. The local governments assert a strict liability failure to warn claim, as well as a negligent failure to warn claim. The factual assertions underlying the failure to warn claims are the same. The local governments assert that the Defendants "had a duty to issue adequate warnings to the" local governments, "the public, consumers, and public officials of the reasonably foreseeable or knowable severe risks posed by their fossil fuel products." According to the

71

local governments, the "Defendants knew or should have known from their internal research divisions and affiliates and/or from the international scientific community, of the climate effects inherently caused by the normal use and operation of the fossil fuel products, including the likelihood and likely severity of global warming" and the "associated consequences of physical and environmental changes."

The local governments contend that the "defendants breached their duty of care by failing to adequately warn any consumers or any other party of the climate effects that inevitably flow from the intended use of their fossil fuel products."  "Given the grave dangers presented by the climate effects that inevitably flow from the normal use of fossil fuel products," the local governments assert that "a reasonable extractor, manufacturer, formulator, seller, or other person responsible for introducing fossil fuels into the stream of commerce, would have warned of those known, inevitable climate effects."  As a result of the Defendants' failure to warn, the local governments allege that they have "sustained, and will sustain substantial damages and expenses," including "damage to publicly owned infrastructure and real property, and injuries to public resources[.]"  The local governments further assert that this wrongful conduct was committed with actual malice, and they therefore request an award of punitive damages.

A failure to warn claim brought under either negligence or strict liability requires the plaintiff to show four elements: (1) that the defendant owed a duty to warn; (2) that the defendant breached that duty; (3) there was a direct causal connection between the defendant's failure and the alleged injuries; and (4) that the plaintiff was harmed. *Gourdine v. Crews*, 405 Md. 722, 738 (2008).  "The major distinction between an action in strict

72

liability in tort and one founded on traditional negligence theor[ies] relates to the proof which must be presented by the plaintiff." *Gourdine*, 205 Md. at 741 (quoting *Harig v. Johns-Mansville Prods. Corp.*, 284 Md. 70, 84 (1978)).

In our failure to warn cases, "negligence concepts and those of strict liability have 'morphed together[.]'" *Id*. at 743 (citing *ACandS, Inc. v. Asner*, 344 Md. 155, 168 (1996); *Phipps v. Gen'l Motors Corp.*, 278 Md. 337, 351 (1976); *Mazda Motor of Am., Inc. v. Rogowski*, 105 Md. App. 318, 325 (1995)). "Duty, thus, is an essential element of both negligence and strict liability causes of action for failure to warn." *Id.*

"The existence of a legal duty is a question of law, to be decided by the court." *Id.* at 732 (citing *Doe v. Pharmacia & Upjohn Co., Inc.*, 388 Md. 407, 414 (2005)). "With respect to determining whether a duty exists, we often have recourse to the definition in W. Page Keeton, et al., *Prosser and Keeton on The Law of Torts* § 53 (5th ed. 1984), which characterizes 'duty' as an 'obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Id.* at 745 (citation modified). "While foreseeability is often considered among the most important" factors in determining whether a duty exists, "its existence alone does not suffice to establish a duty under Maryland law." *Id*. at 746 (quoting *Patton v. United States of Am. Rugby Football*, 381 Md. 627, 637 (2004)); *see also Valentine v. On Target, Inc.*, 353 Md. 544, 551 (1999) (noting that "not all foreseeable harm gives rise to a duty; there are other factors to consider").

73

"Duty requires a close or direct effect of the tortfeasor's conduct on the injured party." *Gourdine*, 405 Md. at 746. In *Gourdine*, we quoted Prosser and Keeton § 41 as follows:

> As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. *Some boundary must be set to liability for the consequences of any action, upon the basis of some social idea or policy of justice.* This limitation is to some extent associated with the nature and degree of the connection in fact between the defendant's acts and the events of which plaintiff complains. Often to greater extent, however, the legal limitation on the scope of liability is associated with policy—with our more or less inadequately expressed ideas of what justice demands.

*Id*. at 747 (emphasis added) (citation modified) (citing W. Page Keeton, *Prosser and Keeton on The Law of Torts* § 41 (5th ed. 1984)).

In that case, we held that a manufacturer did not owe a common law duty to a motorist, who was killed when a driver, who was taking a combination of insulin medications, suffered a debilitating episode while operating her car, and struck the motorist's vehicle. *Id*. at 745–54. Examining other cases in which we held there was no duty, we concluded that imposing a duty to warn in such circumstances would create "a duty to [warn] the world, an indeterminate class of people," which we had "resisted[.]" *Id.* at 750 (quoting *Pharmacia & Upjohn*, 388 Md. at 407); *see also Pharmacia & Upjohn*, 388 Md. at 420–421 (holding that an employer, who employed a husband who became infected with HIV while handling the virus in the course of his employment in a research laboratory, owed no duty to the employee's wife, who became infected after engaging in unprotected marital relations).

74

In *Valentine*, we held that a gun dealer owed no duty to the public to exercise reasonable care in the display and sale of handguns to prevent the theft and illegal use of the handguns by others against third parties, noting "that a duty may exist to the public at large without any evidence of a relationship between the parties, is simply too foreign to our well-established jurisprudence to sufficiently advocate a different result than the one we have reached." 353 Md. at 555–56. We further explained that "[o]ne cannot be expected to owe a duty to the world at large to protect it against the actions of third parties, which is why the common law distinguishes different types of relationships when determining if a duty exists. The class of persons to whom a duty would be owed under these bare facts would encompass an indeterminate class of people, known and unknown." *Id*. at 553.

We determine that the duty the local governments seek to impose is, indeed, a duty to warn the entire human race of the effects of climate change. We have resisted efforts to find such a duty under our common law and continue to do so here. Finding such a duty would stretch tort law beyond any manageable bounds. Accordingly, we agree with the Circuit Court for Baltimore City that the local governments failed to state a claim for duty to warn under both strict liability and negligence theories.

## VII

## Conclusion

For the foregoing reasons, we hold that the local governments' claims are preempted by federal law. To the extent that the claims are not preempted, the local governments have failed to state claims under Maryland common law upon which relief can be granted.

75

**IN CASE NO. 24-C-18-004219, JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT, MAYOR AND CITY OF BALTIMORE.**

**IN CASE NOS. C-02-CV-21-00250 AND C-02-CV-21-000565, JUDGMENT IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS, ANNE ARUNDEL COUNTY, MARYLAND, AND THE CITY OF ANNAPOLIS.**

Circuit Court for Baltimore City
Case No. 24-C-18-004219

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-000250

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-000565

Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2025

_____

MAYOR & CITY COUNCIL OF
BALTIMORE
v.
B.P. P.L.C., ET AL.

_____

ANNE ARUNDEL COUNTY, MARYLAND
v.
B.P. P.L.C., ET AL.

_____

CITY OF ANNAPOLIS
v.
B.P. P.L.C., ET AL.

_____

Fader, C.J.
Watts
Booth
Gould
Eaves
Killough
Battaglia, Lynne A. (Senior
Justice, Specially Assigned),

JJ.

_____

Concurring Opinion by Fader, C.J.

_____

Filed: March 24, 2026

Respectfully, I concur in the Majority's well-written and well-reasoned opinion. I agree with the Majority that the local governments' state law claims are preempted by federal law. I therefore join fully in Parts I through V of the Majority opinion.

The determination that the local governments' state law claims are preempted fully resolves the case before us. Accordingly, I would stop there. I would not address the alternative argument that the preempted claims fail to state cognizable claims under Maryland common law. The common law is not static. I see no reason to resolve competing contentions concerning the scope of the common law in this area until we are presented with a case that requires us to do so. Accordingly, I do not join Part VI of the Majority opinion.

Circuit Court for Baltimore City
Case No.: 24-C-18-004219

Circuit Court for Anne Arundel County
Case No.: C-02-CV-21-000250

Circuit Court for Anne Arundel County
Case No.: C-02-CV-21-000565

Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2025

MAYOR & CITY COUNCIL OF BALTIMORE
v.
B.P. P.L.C., et al.

ANNE ARUNDEL COUNTY, MARYLAND
v.
B.P. P.L.C., et al.

CITY OF ANNAPOLIS
v.
B.P. P.L.C., et al.

Fader, C.J.,
Watts,
Booth,
Gould,
Eaves,
Killough,
Battaglia, Lynne A.
(Senior Justice, Specially Assigned)

JJ.

Concurring Opinion by Gould, J.

Filed: March 24, 2026

I join the Majority's thorough and well-reasoned opinion in full. I write separately only to explain why, in my view, the plaintiffs' theory of liability is incompatible with tort law.

I

In the plaintiffs' view, this is a case about deceptive marketing to consumers. They contend that their complaints merely alleged that the defendants misled consumers about the climate dangers of fossil fuels, thereby increasing fossil-fuel consumption and increasing the harm associated with climate change.

But a fair reading of the plaintiffs' lengthy complaints reveals that their claims of misrepresentation take two forms. *First*, the plaintiffs alleged a generalized deception at the brand level. The complaints point to advertising campaigns and corporate messaging—slogans, branding, and statements about the industry's environmental commitments. For example, BP adopted the slogan "Beyond Petroleum" and a green sunburst logo while investing a negligible fraction of its capital in non-fossil energy; Shell advertised liquefied natural gas as a "cleaner-burning" fuel and a "critical component of a sustainable energy mix"; and Exxon touted algae biofuels while spending 0.2% of its capital on low-carbon energy sources.

*Second*, the plaintiffs alleged that the defendants engaged in a decades-long campaign to deceive policymakers, including members of Congress and government regulators. This campaign, the plaintiffs alleged, distorted the legislative and regulatory processes with false information, thus preventing, for example, the adoption of stricter

emissions controls and "Kyoto-like measures" that would have constrained the industry's conduct.

Viewing the complaints in light of *both* of these types of deception allegations, the path to recoverable damages under tort law cannot avoid the regulatory problem that the preemption doctrine is designed to address. Aggregate emissions are a function of both what the regulatory system permits and how much consumers choose to consume within that context. That is, a consumer who encountered Shell's advertisements and bought Shell's product was choosing among options that regulators had already defined and constrained.

So, to calculate the damages caused by the defendants' deception, a jury would first need to determine—without resort to rank speculation—what the regulatory environment would have looked like if the defendants had not engaged in the alleged campaign—that is, what Congress would have enacted, what the Environmental Protection Agency ("EPA") would have required, and how global emissions trajectories would have changed as a result. Only after resolving those issues could the jury attempt to determine—again, without resort to rank speculation—how consumer behavior might have differed, how those differences would have affected the climate, and how the plaintiffs' jurisdictions would have been impacted as a result.

As the Supreme Court explained in *American Electric Power Co. v. Connecticut*, determining the appropriate level of greenhouse-gas regulation requires an "informed assessment of competing interests" involving scientific, economic, and technological considerations—an assessment Congress assigned to the EPA, not to courts. 564 U.S. 410,

427-28 (2011). The EPA has access to scientists, engineers, and economists, and bases its decisions on a technical record developed through notice-and-comment procedures. The EPA also has access to evolving information and can recalibrate its regulatory approach and pivot as needed.

A jury, by contrast, deliberates once, on a record assembled by adversarial litigants. Juries are simply not equipped to undertake the analysis the plaintiffs' claims require.

II

There is a mismatch between the structure of tort law and the nature of the harm alleged here. Tort law generally asks whether a defendant's conduct created a foreseeable risk of harm to the plaintiff. That framework presupposes that harm can be traced, in some meaningful sense, to discrete acts by discrete actors.

Climate harm is different. No single extraction decision, no single sale of fuel, and no single consumer transaction creates a foreseeable risk of harm to any identifiable person. The harm alleged here could arise only from the aggregate effect of fossil-fuel consumption across the globe and across generations. Where the risk of harm exists at that level of aggregation, the legal tool designed to address it must likewise operate at an aggregate level. Tort law is not up to the task.

Accordingly, I join in full the Majority opinion.

Circuit Court for Baltimore City
Case No. 24-C-18-004219

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-000250

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-000565

Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2025

_____

MAYOR & CITY COUNCIL OF
BALTIMORE
v.
B.P. P.L.C., ET AL.

_____

ANNE ARUNDEL COUNTY, MARYLAND
v.
B.P. P.L.C., ET AL.

_____

CITY OF ANNAPOLIS
v.
B.P. P.L.C., ET AL.

_____

Fader, C.J.
Watts
Booth
Gould
Eaves
Killough
Battaglia, Lynne A. (Senior
Justice, Specially Assigned),

JJ.

_____

Concurring and Dissenting Opinion by Watts, J.

_____

Filed: March 24, 2026

Respectfully, I concur and dissent.  I join the conclusion expressed in Justice Killough's concurrence and dissent that the claims raised by local government Plaintiffs are not displaced or preempted by federal law.  See J. Killough Concurring and Dissenting Slip Op. at 15.  I agree with the concurrence and dissent's conclusion that the local governments have brought fraud and deceptive marking claims that survive federal displacement and preemption.  See J. Killough Concurring and Dissenting Slip Op. at 23-26, 34.  I do not join the conclusion of the concurrence and dissent, however, that the public nuisance and negligent failure to warn claims should go forward.  See J. Killough Concurring and Dissenting Slip Op. at 72-73.[1]  In particular, although I agree that none of the various claims are preempted by federal law, the circumstance remains that Maryland does not have a recognized common law public nuisance tort under which a local government may recover money damages or one that proscribes the conduct alleged.

---

[1]The Majority holds that, even if Plaintiffs' "state law claims were not displaced or preempted by federal law, they fail to state claims under Maryland law for public and private nuisance, strict liability and negligent failure to warn, and trespass."  Maj. Slip Op. at 1.  The Concurrence and Dissent agrees that Plaintiffs failed to state a claim for private nuisance and trespass, and agrees that Plaintiffs failed to state a claim for strict liability failure to warn, although on different grounds; the Concurrence and Dissent, however, would allow the claims for public nuisance and negligent failure to warn to proceed.  See J. Killough Concurring and Dissenting Slip Op. at 74-75.

Chief Justice Fader's concurrence makes the point that, because the Majority concludes that the claims are displaced or preempted by federal law, there was no reason for the Majority to assess whether the local governments adequately pled the causes of action.  See C.J. Fader Concurring Slip Op. at 1.  I share Chief Justice Fader's view that, as a result of having concluded that the claims are displaced and preempted by federal law, there is no reason for the Majority to have addressed the issue of the viability of any of the various claims.  See C.J. Fader Concurring Slip Op. at 1.  Because I would hold that the claims are not displaced or preempted by federal law, I note that I am of the view that the local governments have not stated viable claims for the causes of action pled.  See Maj. Slip Op. at 1.

As is the circumstance in <u>Express Scripts, Inc., et al. v. Anne Arundel Cnty., Md.</u>, Misc. No. 1, Sep. Term, 2025, these cases raise complex issues, including the questions of whether money damages should be available to a municipality that brings a public nuisance claim and whether there should be a public nuisance tort under which municipalities can seek redress for the type of injuries alleged and, if so, what the elements of the tort ought to be.  As expressed in my concurring and dissenting opinion in <u>Express Scripts</u>, I would conclude that, in its current posture, Maryland common law does not provide for the type of public nuisance claim pled by the local governments and that whether there should be such a tort involves matters of policy and scope for the General Assembly to determine. <u>See</u> J. Watts Concurring and Dissenting Slip Op. at 7-8, <u>Express Scripts, Inc., et al. v. Anne Arundel Cnty., Md.</u>, Misc. No. 1, Sep. Term, 2025.

In sum, I join the concurrence and dissent's conclusion that the local governments have brought claims that survive federal displacement and preemption.  <u>See</u> J. Killough Concurring and Dissenting Slip Op. at 15.  I concur with the Majority's conclusion that the public nuisance claims should be dismissed, <u>see</u> Maj. Slip Op. at 65, 75, but not because they are displaced or preempted by federal law, but for a different reason—namely, the existence and contours of public nuisance claims in Maryland such as the ones brought by the local governments is a matter for the General Assembly to determine.  Although the Majority need not have reached the matter, given the current status of our common law, I am in accord with the decision that the local governments have not stated legally cognizable claims for any of the causes of action.  <u>See</u> Maj. Slip Op. at 1.

In addition, I would have granted Appellees' Motion to Stay Proceedings, even

- 2 -

though the Supreme Court of the United States has requested briefing on the issue of jurisdiction in <u>Suncor Energy (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.</u>, Docket No. 25-170.  The issue of whether claims like the ones brought by the local governments in these cases are displaced or preempted by federal law is ultimately a question for the Supreme Court of the United States, not this Court.

For the above reasons, respectfully, I concur and dissent.

Circuit Court for Baltimore City
Case No.: 24-C-18-004219

Circuit Court for Anne Arundel County
Case No.: C-02-CV-21-000250
Case No.: C-02-CV-21-000565

Argued: October 6, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 11

September Term, 2025

MAYOR & CITY COUNCIL OF BALTIMORE

v.

B.P. P.L.C., et al.

ANNE ARUNDEL COUNTY, MARYLAND

v.

B.P. P.L.C., et al.

CITY OF ANNAPOLIS

v.

B.P. P.L.C., et al.

Fader, C.J.,
Watts,
Booth,
Gould,
Eaves,
Killough,
Battaglia, Lynne A.
  (Senior Justice, Specially Assigned)

JJ.

Concurring and Dissenting Opinion by Killough, J.,
which Watts, J., joins in part.

Filed: March 24, 2026

Federal preemption of state law is disfavored.  Where Congress has not spoken clearly, the presumption runs against preemption—not toward it.  *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  So, when a state court decides a question of federal preemption, its task is strictly defined: determine what Congress said, not what a court thinks Congress might have preferred, and not what the defendants say the case is about.  Courts that answer a federal preemption question through policy preference, rather than text and precedent, usurp a function the Constitution assigns to Congress alone.

That discipline should be at its zenith when the claims before the court arise from a state's historic police powers—powers the Constitution reserves to the States and that the United States Supreme Court has long cautioned may not be stripped away without a clear congressional mandate.  *See Va. Uranium, Inc. v. Warren ("Virginia Uranium")*, 587 U.S. 761, 773 (2019) (plurality majority).  It demands, in particular, that state courts not extend preemption doctrine into territory the Supreme Court has never sanctioned.  Here, the Majority does precisely that.  It applies the federal common law displacement doctrine to claims that are facially about deceptive marketing rather than emissions—something no court, state or federal, has previously done.  Every case the Majority cites for that proposition involved claims brought against direct emitters of pollutants for the consequences of their emissions—not claims against marketers for the consequences of their deception.  This Court assumes what those courts established.

The Majority does not exercise the requisite discipline in determining whether Maryland state law is preempted.  Reading the Majority Opinion, one may be forgiven for

2

believing that the local government Plaintiffs' claims stem from BP's and the other Defendants' emissions of pollutants under a federal permit regulated by the Environmental Protection Agency ("EPA"). However, their claims are decidedly not that. *See Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178, 216 (4th Cir. 2022) (explaining, when considering Baltimore Plaintiff's deceptive marketing claims at issue here, "Baltimore's . . . state-law claims do not involve the regulation of emissions."); *see also BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 234 (2021) (describing Plaintiffs' claims in these matters as "failure to warn").

BP and the other Defendants are petroleum producers and marketers who are alleged to have misled consumers about their products. In contrast, the Clean Air Act's ("CAA") regulatory framework targets the source of the air pollution—not producers and marketers. Br. for the U.S. as Amicus Curiae, *Shell PLC v. City & Cnty. Of Honolulu*, 2024 WL 5095299, at *17–18 (2024). While BP does indeed operate refineries that are stationary sources subject to CAA permits, the operation of those refineries has nothing to do with BP's downstream marketing of petroleum products to consumers who then burn them. Instead, the greenhouse gases Plaintiffs identify as the causal mechanism of harm came from end users burning the fuel Defendants sold to them. This distinction elides the Majority and, in turn, informs the Majority Opinion's erroneous conclusion and its decision to relinquish police powers traditionally reserved to the States.

What makes the Majority's ratification of Defendants' framing all the more troubling is that Defendants' constitutional structure, displacement, and preemption arguments all depend on a single premise that this Court was not entitled to assume: that

3

Plaintiffs' claims are about interstate emissions. Remove that premise—as the controlling standard of review on a motion to dismiss requires—and each one of Defendants' theories fails. The constitutional structure argument fails because the Constitution's federal structure has never been held to foreclose state authority over deceptive marketing. The displacement argument fails because displacing federal common law over interstate pollution says nothing about deceptive marketing, an area federal common law never governed. And the CAA preemption argument fails because the CAA has never addressed deceptive marketing.

It is clear from the Majority Opinion that it did not decide the case Plaintiffs brought. Rather, it decided the case Defendants described. BP and the other Defendants recast these complaints as suits about emissions, global climate regulation, and the imposition of Maryland tort law on the energy decisions of billions of people worldwide. They invoked the Clean Air Act, the EPA regulatory authority, and the specter of a patchwork of state tort regimes supplanting a uniform federal emissions policy. It was a compelling, if misleading, frame, and the Majority accepted it entirely.

But not a *single* emissions regulation is implicated in this case. Plaintiffs do not challenge any EPA permit. They do not seek to compel reductions in any Defendant's emissions. And they do not ask this Court to set a standard that conflicts with any federal rule. Plaintiffs allege that Defendants knew their products were causing catastrophic harm, concealed that knowledge from the public for decades, and profited from the resulting delay in response. That is a fraud case, and the CAA has nothing to say about fraud.

4

For example, the City of Baltimore expressly alleged that it "does not seek to impose liability on Defendants for their direct emissions of greenhouse gases and does not seek to restrain Defendants from engaging in their business operations."  What the City seeks is cost-shifting, compensation for infrastructure damage during floods, power outages during winter storms, and public health costs during heat waves that its local taxpayers are bearing. Those are local injuries caused by local impacts of a global phenomenon, and they are alleged to have resulted from a fraud, not from an emissions policy.  Anne Arundel County and Annapolis allege that the Defendants' "concealment and misrepresentation of their products' known dangers—and simultaneous promotion of their products for uses Defendants knew were harmful—drove consumption, and thus greenhouse gas pollution, and thus the climate crisis."  The Majority quotes the complaints' description of the causal chain running from deception to consumption to emissions to harm, and then treats that chain as proof that the claims are about emissions.  But a fraud claim does not become an emissions regulation simply because the fraud caused environmental harm down the line. *Cf. Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518–20 (1992) (plurality opinion) (deciding that tobacco plaintiffs' fraud claims do not become a marketing regulation— which *is* federally regulated in the tobacco industry—simply because the fraud is connected to how the products are marketed); *Altria Grp. Inc. v. Good ("Altria Group")*, 555 U.S. 70, 80–87 (2008) (adopting the *Cipollone* plurality's reasoning to similar claims and issues, converting it into binding law).

What Defendants accomplished—and what the Majority ratified—was a classic strawman.  They stripped out the fraud allegations in the complaints, replaced them with

5

an emissions regulation theory Plaintiffs expressly disclaimed, then argued that the resulting fictional lawsuit is displaced by non-existent federal common law and preempted by the Clean Air Act. Of course, a suit demanding that Defendants emit less would be preempted. But Plaintiffs filed no such suit, and no amount of table pounding changes this fact.

Whether BP and the other Defendants are right that this lawsuit is a backdoor attempt to regulate emissions is a question that cannot be answered on a bare complaint. Discovery might have revealed that the deception allegations were pretextual—that what Plaintiffs really wanted was to force Defendants to reduce the amount of carbon producing fuels they produce and sell. It might have revealed the opposite—that Plaintiffs do not care a whit about emissions or regulatory outcomes. They simply want to be compensated for the increased costs they have incurred and will incur in the future as a result of what Defendants concealed from the public about the catastrophic results of climate change.

That is precisely why the motion to dismiss standard exists: to test the legal sufficiency of what is alleged, not to resolve contested factual questions about what Plaintiffs are "really" trying to accomplish. On the face of these complaints, the claims sound in deception. Defendants are alleged to have concealed what they knew. They misrepresented the science. They funded disinformation campaigns directed at Maryland consumers and regulators. The Clean Air Act has no provision addressing any of that conduct. The Majority's conclusion that these cases are tantamount to emissions regulation is not a finding—it is a prediction about what discovery would show, dressed up as a legal conclusion and deployed to close the courthouse door before discovery could confirm or

refute it.  That is not how motions to dismiss work.  And it is not how preemption analysis works.

By accepting Defendants' framing that the complaints seek to regulate emissions, the Majority bypassed the controlling preemption analysis entirely.  Nowhere does the Majority apply, much less distinguish, any case that establishes that marketing is a traditional state field, *see, e.g.*, *Altria Group*, 555 U.S. at 77; *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)—or *Virginia Uranium*'s requirement that preemption depend on what the state did, not why it did it, *see Virginia Uranium*, 587 U.S. at 772 (plurality majority), 774 (lead opinion) (collecting cases).  Nor does the Majority acknowledge that the presumption against preemption operates with greatest force precisely in fields like consumer protection and deceptive marketing.  *Altria Group*, 555 U.S. at 77.

Instead, the Majority's only meaningful engagement with the presumption against preemption comes in its summary of *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), and the Second Circuit's snap-back analysis, *id.* at 90, which quotes *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988), for the proposition that when federal common law is displaced by statute, it occurs in a field States have "not traditionally occupied," and therefore the standard presumption against preemption does not apply.  But that syllogism only works if the field is correctly identified as interstate pollution.  Here it is not.  *See Mayor & City Council of Balt.*, 31 F.4th at 207 ("Baltimore's Complaint does not desire relief under [the CAA].").  The face of Plaintiffs' complaints sounds in deceptive marketing, and on a motion to dismiss the allegations of the complaint are taken as true.

7

The Majority instead accepts Defendants' defenses as true and uses the conclusion of its analysis (i.e., "this case is really about emissions") as a premise of its analysis (i.e., "there is nothing for state courts to do about emissions claims because those claims are governed by federal common law, which the CAA displaced").  That reasoning is circular.  Courts decide the cases before them, not the cases defendants wish had been filed.

The Second Circuit's acknowledgement that this area of the law "'is admittedly not a model of clarity,'" deserves more weight than the Majority gives it.  Maj. Slip Op. at *55 n.23 (quoting *City of New York*, 993 F.3d at 98).  The Majority quotes that admission, and then proceeds as if the doctrine is perfectly settled.  That is not how an unclear doctrine should be used.  An admittedly unclear doctrine cannot overcome the presumption against preemption, it confirms it.  A court that acknowledges doctrinal confusion and then applies that confused doctrine to extinguish historic state police powers on a motion to dismiss has inverted the analytical order the presumption requires.

But even on its own terms—accepting Defendants' characterization—the Majority's preemption analysis does not hold together.  The entire architecture of the Majority's conclusion that the local governments' state law claims are preempted by the Clean Air Act rests on three pillars—the United States Supreme Court's decisions in *Am. Elec. Power Co., Inc. v. Connecticut ("AEP")*, 564 U.S. 410 (2011), *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), and *Massachusetts v. EPA*, 549 U.S. 497 (2007).  Yet, a careful examination of those cases reveals that they do not bear the weight the Majority places on them.

In both *AEP* and *Ouellette*, the defendants were identifiable, actual emitters of pollutants operating under federal permits and were sued over *their* emissions.  Not so here.  BP and the other Defendants were not sued because of what they emitted.  They were sued over what they concealed.  That factual distinction is not incidental—it is the reason why neither case controls, and it is the reason the Majority's analysis rests on a foundation those cases do not supply.

*AEP* addressed only the displacement of federal common law by the Clean Air Act.  The Court held that the CAA, through the EPA's authority to regulate greenhouse gas emissions from stationary sources, displaced any federal common law right to seek abatement of those emissions.  *AEP*, 564 U.S. at 424.  On the precise question that matters here—whether the CAA also preempts state law claims—the U.S. Supreme Court was explicit and unambiguous: "[T]he availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act."  *Id.* at 429 (italics in original).  It left that question expressly open for consideration on remand.  *Id.*  The Majority today treats as settled law a question the Supreme Court of the United States deliberately declined to answer.  That alone should give this Court pause.  Moreover, the displacement holding in *AEP* rested on the defendants' status as direct, identified, permitted emitters whose own emissions were the subject of the suit.  That predicate is absent here.  Extending *AEP*'s displacement rationale to petroleum marketers whose alleged wrong is deception, not emission, is not an application of *AEP*—it is an expansion into territory the U.S. Supreme Court expressly left open.

9

*Ouellette* fares even worse as a foundational pillar. That case did not involve the Clean Air Act at all. It arose under the Clean Water Act ("CWA"), and the specific question before the Court was whether Vermont nuisance law could be applied to a New York paper mill discharging effluent through an identifiable pipe into Lake Champlain—a discrete point source, in an identified source state, causing identifiable downstream harm in an affected state. *Ouellette*, 479 U.S. at 483–84. And critically, *Ouellette* did not hold that all state law claims were preempted. It held precisely the opposite with respect to the claims that matter here: nuisance suits brought under the law of the source state were specifically preserved and not preempted by the CWA. *Id.* at 497–99. The entire *Ouellette* structure—source state, affected state, permit requirement, identifiable point source—was built around the structure of the CWA's permitting regime. *See id.* at 489–91. To transplant that architecture wholesale onto this case—where Defendants are not direct emitters but upstream producers and marketers, where there is no identifiable source state in the *Ouellette* sense, and where no CAA permit governs the conduct at issue—is not faithful application of precedent. Simply put, *Ouellette* was built around a single paper mill discharging effluent through an identifiable pipe. There is no BP smokestack for the Majority to point to here.

In addition, the continued vitality of the third pillar of the Majority Opinion, *Massachusetts v. EPA*, is in substantial doubt and will need clarification from the United States Supreme Court. Indeed, the premise of the Majority's preemption conclusion—that the CAA so comprehensively occupies the field of greenhouse gas regulation that no room remains for state law—became significantly harder to sustain after the EPA's February

10

2026 rescission of the Greenhouse Gas Endangerment Finding, which concluded the CAA never provided statutory authority to regulate greenhouse gases for climate purposes. *See infra* Section III.F. The Majority does not acknowledge the rescission. Not once. Whatever the ultimate legal validity of the rescission, a preemption argument premised on federal comprehensiveness cannot rest on a foundation the federal government is simultaneously dismantling in its own proceedings without at least acknowledging the tension.

The Majority's conclusion is also at odds with the considered legal judgment of other authorities that deserve more than the Majority's silence. In 2024, the United States filed an amicus brief in the Hawaii climate litigation urging the Supreme Court to deny certiorari and arguing that claims grounded in deceptive marketing are not preempted by the CAA, because plaintiffs in those cases "do not allege the violation of a duty not to pollute." Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *1, 16–17.[1] The federal government's position at that time was that the CAA "regulates pollution," not "deceptive marketing," and that *AEP* and *Ouellette* are inapposite to tortious marketing claims. *Id.* at *14–18. The current federal administration has since reversed that position.[2] But a change

---

[1] The Majority ignores the United States amicus brief in the Hawaii case where the federal government concluded that the Hawaiian tortious marketing claims were not preempted by the CAA. Given the centrality of this point to the case at bar, it is a notable gap in the Majority's analysis.

[2] The United States amicus brief in this case is a remarkable admission that the prior legal position of the United States that deceptive marketing claims do not necessarily conflict with the CAA—filed just months earlier in the Hawaii certiorari proceeding—was not the result of new legal analysis, but rather the result of a change in administration. A

11

in administration does not rewrite the text of the Clean Air Act, and it does not resolve the question the U.S. Supreme Court expressly left open in *AEP*. A shift in executive branch litigation posture is entitled to no weight in construing a federal statute.

This Court's conclusion is also in significant tension with the judgments of the only two state supreme courts to have considered materially identical claims.[3] The Supreme Court of Hawaii held that deceptive marketing-based climate tort claims are not preempted by federal law. *City & Cnty. of Honolulu v. Sunoco LP*, 153 Haw. 326, 334 (2023). The Supreme Court of Colorado reached the same conclusion. *Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.*, 2025 WL 1363355, at *2 (Colo. 2025). The Supreme Court of the United States has granted certiorari in the Colorado case. *Suncor Energy, Inc. v. Comm'rs Boulder Cty.*, 2026 WL 490537, at *1 (U.S. Feb. 23, 2026). Whatever the Supreme Court ultimately decides about the scope of federal preemption in climate tort litigation, that decision will come from that Court, not from ours.

Defendants themselves believed these complaints presented federal claims—that was their entire theory of removal when they tried removing the Baltimore Plaintiff's claims to federal court. Defendants had four separate opportunities to convince federal

---

shift in litigation posture driven by a change in political administration is not a legal argument. It is entitled to no weight in construing a federal statute whose text did not change between administrations. The legal analysis in the 2024 brief stands on its own; the legal analysis in the 2025 brief stands on its own; and this Court must evaluate each on its merits, not on the basis of which administration filed it.

[3] The Majority gives short shrift to the Hawaii and Colorado Supreme Court decisions in a footnote of its opinion and asserts that they are aligned with the dissent in the Colorado case. Maj. Slip Op. at *47 n.18.

12

courts of their position: the district court, the first Fourth Circuit panel, the Supreme Court, and the Fourth Circuit on remand after being directed to consider every removal theory Defendants advanced. *See Mayor & City Council of Balt. v. BP P.L.C.*, 388 F. Supp. 3d 538, 560–61 (D. Md. 2019) (Judge Hollander rejected all eight grounds for removal and remanded), *as amended* (June 20, 2019), *aff'd,* 952 F.3d 452 (4th Cir. 2020), *vacated and remanded,* 593 U.S. 230 (2021), and *aff'd,* 31 F.4th 178 (4th Cir. 2022). Not one of those courts agreed. The Fourth Circuit declined to recharacterize the Baltimore Plaintiff's claims and held that its "state-law claims do not involve the regulation of emissions[,]" *Mayor & City Council of Balt.*, 31 F.4th at 216, and remanded the case to state court, *id.* at 238.

If these complaints truly presented federal claims, it defies logic that four federal tribunals would have missed it. And critically—they were not limited to the face of the complaint. In removal proceedings, federal courts are authorized, indeed required, to look beyond a plaintiff's pleading labels to determine whether a cognizable federal claim is actually present, regardless of how the plaintiff has characterized it. *See, e.g.*, *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983) (explaining that "original federal jurisdiction is unavailable unless it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims, or that one or the other claim is 'really' one of federal law[]"); *id.* at 22 (citing *Avco Corp. v. Aero Lodge No. 735, Int'l Assn. of Machinists & Aerospace Workers*, 376 F.2d 337, 339–40 (6th Cir. 1967), *aff'd*, 390 U.S. 557 (1968), for the proposition that "it is an independent corollary of the well-pleaded complaint rule that a

13

plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint.").

The artful pleading doctrine and the complete preemption inquiry exist precisely to prevent plaintiffs from defeating federal jurisdiction by strategic labeling. The Fourth Circuit applied those doctrines, "looked under the hood," and unearthed no federal claim in the Baltimore Plaintiff's complaint. The Fourth Circuit's opinion is exhaustive by any measure. It considered, analyzed, and rejected every theory the defendants advanced for why these complaints belong in federal court—the same theories the Majority accepts today without the analysis the Fourth Circuit performed. This Court reaches the opposite conclusion without fully acknowledging that history and by inverting what the removal standard actually authorized the Fourth Circuit to do. *See also District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 149 (D.C. Cir. 2023) (unanimously rejecting identical removal theories advanced by BP, Chevron, Exxon, and Shell, and holding that consumer protection claims against energy companies for deceptive marketing of fossil fuels do not arise under federal common law).

In short, the Majority has extinguished the state law claims of three Maryland local governments on a motion to dismiss, before a single document has been produced and before any factual record has been developed. It has done so on the basis of a preemption and displacement framework that neither of its three foundational cases actually established, applied that framework to claims that have nothing to do with Defendants' own emissions, and applied it in disregard of the presumption against preemption that the U.S. Supreme Court has long held runs in favor of the States. And it has reached that result

14

contrary to the Supreme Court's preemption framework, the prior legal analysis of the United States on deceptive marketing claims, the conclusions of the only two state supreme courts to have addressed the question, and four federal court's characterizations of these exact same claims and at the precise moment when the federal regulatory floor that supposedly forecloses all state remedies is being dismantled by the executive branch. That is not a sound basis for the result the Majority reaches, and the local governments deserve the opportunity to be heard on the merits of their claims. In its haste to close the courthouse doors, the Majority has built its edifice on sinking ground.

Accordingly, I respectfully dissent from the Majority's conclusion that Plaintiffs' state law claims are preempted by federal law. I would hold that the claims should proceed past the motion to dismiss stage for resolution on a developed factual record. I join the Majority's disposition of the private nuisance and trespass claims. I concur in the Majority's judgment on the strict liability claims but write separately because I reach that result on different grounds. I dissent from the Majority's disposition of the public nuisance and negligent failure-to-warn claims for the reasons set forth below.

## I. BACKGROUND

### A. The Duty Alleged, Not the Subject Matter, Controls

The question presented asks whether the U.S. Constitution and federal law preempt state law claims for injuries caused by out-of-state greenhouse gas emissions on the global climate. That framing builds in an answer by describing the claims in terms of what they *touch* rather than what they *allege*. The proper preemption inquiry does not ask what a complaint is about in general terms. It asks what legal duty the plaintiff alleges the

15

defendant violated. *Cipollone*, 505 U.S. at 523–24; *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 385 (2015).

The duty alleged here is not a duty to reduce emissions. It is a duty not to deceive. Plaintiffs do not ask this Court to order Defendants to emit less, to comply with a different standard, or to alter their operations in any way. They ask for damages for an alleged decades-long campaign of misrepresentation about what Defendants knew and when they knew it. Properly framed, the question before us is this: does the Clean Air Act preempt state law claims for deceptive marketing? The answer to that question is no.

### B. The Parties' Contentions

Plaintiffs allege that Defendants orchestrated a pervasive, decades-long disinformation campaign designed to mislead consumers and the public about climate change and the central role their fossil fuel products play in causing it. Beginning at least as early as the 1960s, Plaintiffs allege, Defendants researched global warming, accurately foresaw its catastrophic effects, protected their own assets against those dangers, and then publicly concealed and misrepresented those risks through paid surrogates and coordinated messaging. Plaintiffs allege this deception drove increased consumption, accelerated climate-related harms, and caused the flooding, sea-level rise, extreme storms, and extreme heat their residents have already suffered and will continue to suffer. Because the liability-triggering conduct is deception-based, Plaintiffs argue their claims are not preempted by displaced federal common law, the CAA, or the Constitution, a conclusion they say is confirmed by the only two state supreme courts to have considered materially identical claims—one of which the Supreme Court of the United States has since agreed to review.

16

Defendants contend that however labeled, these suits seek to impose Maryland tort liability for the global effects of a century of fossil fuel consumption—conduct so diffuse in origin and global in consequence that no single state's tort law can constitutionally reach it. They argue that the Constitution's structure implicitly precludes any single state from governing controversies of inherently interstate and international character, regardless of how they are pleaded. Defendants further contend that the CAA occupies the field of greenhouse gas regulation, displacing any state-law damages regime for harms caused by those emissions, and that allowing such claims would undermine Congress' chosen framework and impose a patchwork of state tort rules on a uniform national problem.

### C. What the Clean Air Act Actually Covers

"The CAA was enacted in 1963, and Congress declared that its express purpose was to 'protect the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population[.]'" *Mayor & City Council of Balt.*, 31 F.4th at 215 (quoting Clean Air Act, Pub. L. No. 88-206, § 1, 77 Stat. 392, 393 (1963) (codified as amended at 42 U.S.C. § 7401(b)(1))). It established federal regulation of "air pollution from stationary sources, emission standards for moving sources, noise pollution, acid raid, and stratospheric ozone protection." *Id.* (citing 42 U.S.C. §§ 7401–7515, 7521–90, 7641–42, 7651-51o, 7671-71q). But "'air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the *primary responsibility of the States and local governments*[.]'" *Id.* (quoting Clean Air Act Amendments, Pub. L. No. 101-549, §

17

108, 104 Stat. 2399, 2468 (1990)) (emphasis in original).  Nothing in the CAA's language, explicitly or implicitly, regulates tortious marketing.

## II.  GOVERNING PREEMPTION PRINCIPLES

### A.  The Presumption Against Preemption

The Supremacy Clause of the U.S. Constitution provides that federal law and the Constitution "are the supreme Law of the Land."  *Virginia Uranium,* 587 U.S. at 767 (plurality majority)[4] (citing Art. VI, cl. 2) (cleaned up).  But federal law has limits the Constitution itself imposes.  Congress unquestionably "has the power to preempt state law."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  Courts have found preemption where Congress intended federal law to occupy a field entirely, where state and federal law directly conflict, where simultaneous compliance with both is impossible, or where state law stands as an obstacle to the full purposes of a federal enactment.  *Id.* at 372–73.  And where Congress has directly addressed preemption in the

---

[4] While the *Virginia Uranium* Court reached a majority decision on the judgment to affirm the lower court's decision that the Virginia state law was not preempted, the majority was split as to the reasons.  Therefore, the lead opinion written by Justice Gorsuch, and joined by Justice Thomas and Justice Kavanaugh, is a plurality opinion that generally only carries persuasive value.  But the concurring opinion written by Justice Ginsburg, and joined by Justice Sotomayor and Justice Kagan, explicitly tells the reader where all six justices do agree.  *Id.* at 781 (Ginsburg, J., concurring).  In those places where we can ascertain where all six justices agree due to Justice Ginsburg's guidance, I annotate the citation with "plurality majority."  Where Justice Ginsburg and her concurring colleagues do not agree with the lead opinion's reasoning, I annotate the citation with "lead opinion." And where a proposition is only supported by the concurring majority, I annotate the citation with "concurring."  Moreover, considering the current Supreme Court's decisions in *West Virginia v. EPA*, 597 U.S. 697 (2022); *Sackett v. EPA*, 598 U.S. 651 (2023); *Loper Bright Enters. v. Raimondo ("Loper Bright")*, 603 U.S. 369 (2024)—explained further *infra* Section II.C—had *Virginia Uranium* been decided today, the majority of today's court may have joined Justice Gorsuch's lead opinion.

18

text of a statute, that express provision governs; there is no need to search the broader statutory scheme for implied preemptive intent.  *See Cipollone*, 505 U.S. at 517.

But federal supremacy is not federal omnipresence.  The Constitution reserves to the States their historic police powers, and courts have long been instructed that those powers are not preempted by federal law unless Congress clearly said so.  *Altria Group*, 555 U.S. at 77 (citing *Rice*, 331 U.S. at 230).  The starting point in any preemption analysis is the presumption against preemption.  *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 486 (2017).  That presumption operates with particular force when the state power at issue is one the States have traditionally exercised, and that Congress has never expressly claimed.  *Id.* at 486–88; *see Altria Group*, 555 U.S. at 77; David R. Hodas, *State Law Responses to Global Warming: Is it Constitutional to Think Globally and Act Locally?*, 21 PACE ENVTL. L. REV. 53, 69 (2004) ("[A] federalism doctrine that bolsters the relative power of the states and protects the dignity of state sovereignty is essential."); Kamaile A.N. Turcan, *The Bogeyman of Environmental Regulation: Federalism, Agency Preemption, and the Roberts Court*, 109 MINN. L. REV. 2529, 2565–66 (June 2025) ("The presumption [against preemption] operates most strongly when the federal government looks to regulate in fields of law that were traditionally the purview of the states.").  When considering whether a federal law preempts state law, the Supreme Court said in *Virginia Uranium* that it is never "enough for any party or court to rest on a supposition (or wish) that 'it must be in there somewhere.'"  587 U.S. at 767 (plurality majority); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("As [the Supreme] Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored

19

from any statutory text.") (citing *Virginia Uranium*, 587 U.S. at 778, two sentences later for a similar proposition).

*Virginia Uranium* is instructive beyond the formulation that there is a presumption against preemption. There, the Supreme Court held that the federal Atomic Energy Act ("AEA") did not preempt Virginia's ban on uranium mining, even though the AEA granted the Nuclear Regulatory Commission considerable authority over the nuclear fuel life cycle. *Virginia Uranium*, 587 U.S. at 765–66 (lead opinion), 786 (concurring). The argument for preemption—that federal dominance of one phase of the fuel cycle implicitly extended to adjacent state-regulated activities—was precisely the kind of inference the Court refused to draw. *See id.* It did not matter that Virginia's mining ban may have been motivated in part by radiation safety concerns that would fall within federal authority. *Id.* at 774–77 (lead opinion). Preemption analysis, the Court explained, should "depend[] on *what* the State did, not *why* it did it." *Id.* at 774 (lead opinion) (emphasis in original). Because uranium mining on private land was an activity the AEA had never addressed, the federal statute provided no basis for preemption, much less "judicial inquiry into state legislative purpose[.]" *Id.* at 772 (plurality majority). "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law[.]" *Id.* at 767 (plurality majority).

The parallel to this case is direct and compelling. The Majority finds preemption not because the CAA addresses deceptive marketing but because the Majority believes that the CAA's comprehensive regulation of greenhouse gas emissions implicitly extends to state law claims whose subject matter touches those emissions. That is precisely the

20

inference *Virginia Uranium* forbids. The activity Plaintiffs seek to regulate—deceptive marketing—is one the CAA has never addressed. The federal statute therefore provides no basis for preemption, whatever the Majority's policy instincts about the appropriate forum for climate-related litigation.

That conclusion is confirmed by the U.S. Supreme Court's treatment of analogous deceptive marketing claims in the heavily regulated tobacco context. In *Altria Group*, the Court held that Maine fraud claims against a cigarette manufacturer were not preempted by the Federal Cigarette Labeling and Advertising Act—a statute that, unlike the CAA, actually contained express preemption provisions directed at advertising and marketing. 555 U.S. at 72–73, 78–79. The Court held that even express preemption provisions did not reach state fraud claims, because "the duty not to deceive . . . has nothing to do with" what the federal act regulated. *Id.* at 81. Critically, the trial court in *Altria Group* made the same error the Majority makes here: it "recast" the plaintiffs' fraudulent marketing claim as something the federal statute did address, then held the recast version preempted. *Id.* at 75. The U.S. Supreme Court affirmed the lower appellate court's reversal of that decision. *Id.* at 73. When the defendants argued that permitting state fraud claims would defeat the federal statute's purpose of preventing nonuniform warning requirements, the Court was unmoved: "fraud claims 'rely only on a single, uniform standard: falsity.'" *Id.* at 79–80 (quoting *Cipollone*, 505 U.S. at 529).

The principle that emerges from *Virginia Uranium*, *Altria Group*, and their predecessors does not depend on ambiguity. The CAA is not ambiguous about deceptive marketing. It is silent. Congress did not address it, qualify it, or gesture toward it. Where

21

a federal statute has never spoken to the subject a state law regulates, the presumption against preemption is not even tested—there is simply nothing in the federal scheme to conflict with the state claim.  Silence is not preemption.  Under the principles this Court is bound to apply, it never has been.  The local government Plaintiffs' claims target deceptive conduct.  They do not target emissions.  Under *Virginia Uranium* and *Altria Group*, that is the end of the preemption inquiry.

### B.   Deceptive Marketing Is a Field of Historic State Authority

Before determining whether Congress displaced a state power, a court must identify what power is at issue.  That identification matters because the presumption against preemption is not uniform—it operates with greatest force when the State exercises authority it has traditionally held, and that the federal government has never claimed.  Here, the field is deceptive marketing, and it has always belonged to the States.  *See, e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (Marketing is "a field of traditional state regulation.") (citing *Packer Corp. v. Utah*, 285 U.S. 105 (1932)).  Every state in the union regulates deceptive business practices under its own consumer protection laws.  *See* Carolyn Carter et al., *Unfair and Deceptive Acts and Practices*, Nat'l Consumer L. Ctr., ch. 1.3 (11th ed. 2025), https://library.nclc.org/book/unfair-and-deceptive-acts-and-practices/13-nature-and-strengths-udap-statutes, *archived at* https://perma.cc/6ZMV-VA3A ("All fifty states, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands have enacted at least one statute with broad applicability to most consumer transactions, aimed at preventing consumer deception and abuse in the marketplace.").

22

The federal government has never asserted exclusive authority over deceptive marketing claims. The Federal Trade Commission Act prohibits unfair and deceptive practices, but it provides only federal enforcement; it does not displace state law remedies, and it was never understood to do so. *See id.* Alongside that federal floor, States have historically provided their own causes of action for fraud, misrepresentation, failure to warn, and deceptive promotion. And, importantly, it is within "the States' traditional authority to provide tort remedies to their citizens[.]" *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984).

The stakes of displacing that authority are not abstract. States have a substantial interest in ensuring fair trade practices in their markets. *See Edenfield v. Fane*, 507 U.S. 761, 769 (1993) (collecting cases); *see also, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 (1978). Deceptive marketing distorts consumer decision-making, undermines public confidence in commerce, and causes concrete economic harm to businesses and individuals who rely on honest dealing in the marketplace. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137 (2014); *Legg v. Castruccio*, 100 Md. App. 748, 769 (1994); Md. Code Ann., Com. Law § 13-102. Stripping Maryland of the power to address that harm— and vesting it exclusively in a federal environmental agency whose statute says nothing about marketing—would be a profound incursion into Maryland's sovereign authority. *See Bates v. State Bar of Ariz.*, 433 U.S. 350, 383 (1977) ("[T]he leeway for truthful or misleading expression that has been allowed in other contexts has little force in the commercial arena."). Consumer protection, Maryland's General Assembly has

23

recognized, "is one of the major issues which confront all levels of government[.]"  Md. Code Ann., Com. Law § 13-102(a)(1).  That authority cannot be taken from the States by implication or inferences.  The Constitution does not work that way, the Supreme Court has said it does not work that way, and the consequences of holding otherwise will reach far beyond this litigation and these Defendants.

### C. Congress Must Speak Clearly Before Displacing Historic State Authority

The presumption against preemption of historic state powers has always required clear congressional intent.  Recent U.S. Supreme Court decisions in *West Virginia v. EPA*, 597 U.S. 697 (2022), *Sackett v. EPA*, 598 U.S. 651 (2023), and *Loper Bright Enters. v. Raimondo ("Loper Bright")*, 603 U.S. 369 (2024), have crystallized that legal principle: when a claimed federal power would displace authority traditionally exercised by the States, Congress must have said so expressly in the statutory text.  *See* 109 MINN. L. REV. at 2533 ("[T]hese cases replace the longstanding rebuttable presumption against preemption with an affirmative demand that Congress articulate its intent to preempt state law expressly in the text of the operative statute implemented by agencies.").  Implication, inferences, and the general sweep of a regulatory scheme are not enough.

In *West Virginia*, the Supreme Court held that when an agency claims authority of great economic and political significance—authority that would represent a fundamental transformation of its regulatory role—Congress must have clearly granted it.  597 U.S. at 721–23.  The Court cautioned against reading into a statute something that would essentially be a "fundamental revision of the statute, changing it from one sort of scheme

24

of regulation into an entirely different kind." *Id.* at 728 (internal quotations omitted) (cleaned up).

Applied here, transferring from the States to the EPA exclusive authority over deceptive marketing of fossil fuel products would be precisely that kind of transformation without an express mandate from Congress that the Supreme Court forbade in *West Virginia*. The CAA is a statute that relates to the regulation of emitters of pollutants. Reading it to preempt state fraud law would convert it into something it has never been—a comprehensive commercial regulation statute stripping states of consumer protection authority they have exercised since before the federal government existed. That is not a revision courts should make on Congress' behalf, and *West Virginia* says they may not.

In *Sackett*, the Supreme Court added a further requirement: when the power at issue lies at the core of traditional State authority, Congress must use "exceedingly clear language" to displace it. 598 U.S. at 679 (internal quotations omitted). The Court refused to find that the Clean Water Act extended federal jurisdiction to a landowner's backyard simply because the EPA argued that the statutory language, read expansively, might reach it. *Id.* at 676–77. As the Court put it, Congress does not "hide elephants in mouseholes" by tucking fundamental expansions of federal power into vague or ancillary statutory provisions. *Id.* at 677 (internal quotations omitted). Thus, not only must a Congressional mandate be expressed, but it must also be "exceedingly clear." *Id.* at 679.

The difficulty for the Majority here is the same difficulty the EPA faced in *Sackett*: neither the Defendants nor the Majority can point to a single word in the CAA's text that grants the federal government authority to preempt a state's right to regulate tortious

25

marketing within its own borders.  *See Sackett*, 598 U.S. at 679–80.  The CAA does not mention marketing.  It does not mention fraud.  It does not mention deception.  It does not mention consumer protection.  If Congress intended to occupy that field, it hid that intention so thoroughly that it left no trace in the statute.

Finally, in *Loper Bright*, the U.S. Supreme Court held that courts may not defer to an agency's expansive interpretation of its own statutory authority, because statutory interpretation is the judiciary's role.  *Id.* at 412–13.  The significance for this case is immediate.  The Majority's preemption analysis rests not on anything Congress said about deceptive marketing but on a judicial inference that the EPA's broad authority over GHG emissions implicitly extends to displace state fraud claims.  That is precisely the kind of agency-driven expansion of authority *Loper Bright* prohibits courts from ratifying.  As the *Turcan* article summarizes: "properly promulgated agency regulations are federal law and would preempt inconsistent state law; but that assumes the regulations are valid in the first instance—an assumption that is now questionable if Congress did not expressly authorize the agency to promulgate the type of regulations that would preempt state law."  109 MINN. L. REV. at 2570.  Congress did not expressly authorize the EPA to displace state deceptive marketing law.  The CAA's silence on that subject is deafening and is not a gap for courts to fill.  It is the answer.

### D.  The Governing Principles Applied

Three principles emerge from this line of cases and govern the analysis here.  This Court is required under Article 2 of the Maryland Declaration of Rights to apply federal

26

law as interpreted by the U.S. Supreme Court, and those interpretations speak with one voice.

*First*, there is a strong presumption against preemption whenever a federal statute is construed to displace a historic state power.  That presumption is not a tiebreaker.  It is the starting point, and it requires clear affirmative evidence of congressional intent before it yields.

*Second*, when Congress intends to strip States of a power they have traditionally exercised, it must say so in the statutory text with exceedingly clear language.

*Third*, where preemption is premised on a constitutional limitation such as the Commerce Clause, the state action at issue must have more than an attenuated or remote effect on interstate commerce—indirect market influence does not clear that bar.

The Supreme Court reaffirmed all three principles in *Learning Res., Inc. v. Trump ("Learning Resources")*, 2026 WL 477534 (U.S. Feb. 20, 2026), reiterating its "long expressed 'reluctance to read into ambiguous statutory text' extraordinary delegations of Congress's powers[,]" *id.* at *7 (quoting *West Virginia*, 597 U.S. at 697) (Roberts, C.J., concurring) (plurality opinion), and cautioning against finding broad executive or agency authority "on an uncertain statutory basis[,]" *id.*[5]  The Court was addressing presidential tariff authority, but the principle applies with equal force here: where defendants— invoking the Government's authority—claim that the EPA holds exclusive power to

---

[5] In *Learning Resources*, while a majority of the Court agreed as to the judgment, Justices Sotomayor, Kagan, and Jackson only agreed with Chief Justice Roberts' reasoning in Parts I, II-A-1, and II-B of his opinion.  *See id.* at *36–39 (Kagan, J., concurring); *id.* at 39–41 (Jackson, J., concurring).

displace a historically state-governed field, that claim requires textual foundation. It has none—not in the text of the CAA, not in its structure, and not in its history. The federal government has filed an amicus brief in this case arguing that the EPA, through the CAA, holds sole authority to regulate deceptive marketing of greenhouse gas emissions. That is precisely the kind of expansive agency-power claim *Learning Resources* and its collected precedents treat with skepticism.

As noted, the CAA does not mention deceptive marketing and never has. Under the principles this Court is bound to apply, that silence is not a drafting oversight to be corrected by judicial inference. It is Congress' answer. And the answer is no. As the U.S. Supreme Court held in *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988), "[t]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." The CAA provides no text governing deceptive marketing and no federal rule of decision to replace the state law it purportedly displaces. Preemption that leaves neither state nor federal law in its place is not preemption—it is a legal void, and this Court has no authority to create one.

## III. THE CLEAN AIR ACT DOES NOT PREEMPT PLAINTIFFS' CLAIMS

The Majority's preemption analysis begins from a false premise—that Plaintiffs have sued BP and the other Defendants based on their greenhouse gas emissions. That premise is incorrect. That is not just my conclusion, that is also the conclusion of at least four federal court tribunals. The Defendants removed the case to federal court precisely because they believed, and argued, that these were federal claims disguised as state law claims. That was the entire theory of removal. The district court rejected it and remanded.

28

*See Mayor & City Council of Balt.*, 388 F. Supp. 3d at 560–61 (Judge Hollander rejected all eight grounds for removal and remanded), *as amended* (June 20, 2019), *aff'd,* 952 F.3d 452 (4th Cir. 2020), *vacated and remanded,* 593 U.S. 230 (2021), and *aff'd,* 31 F.4th 178 (4th Cir. 2022).  When these parties and claims were before the Fourth Circuit in 2020, that court addressed only federal officer removal and affirmed remand on that ground alone, holding it lacked appellate jurisdiction over the other seven grounds.  952 F.3d at 461, 471. The United States Supreme Court then vacated that decision in 2021, holding the Fourth Circuit did have jurisdiction over all eight grounds and had to consider them all.  593 U.S. at 246–47.  On remand, the Fourth Circuit addressed all eight grounds and again affirmed remand, *see* 31 F.4th at 216, which the Supreme Court then declined to review, *BP P.L.C. v. Mayor & City Council of Balt.*, 143 S. Ct. 1795, 215 L. Ed. 2d 678 (2023).

The Majority argues that the federal court's analysis of these claims in the removal context is inapposite because of the unique standard employed when considering removal jurisdiction.  Maj. Slip Op. at *51 n.21.  But this assertion betrays a fundamental misunderstanding of the removal procedure and cuts precisely the wrong way.  In removal proceedings, federal courts are not limited to accepting a plaintiff's characterization of its claims.  While the well-pleaded complaint rule instructs removal courts to "look no further than the plaintiff's properly pleaded complaint" because "a plaintiff is the master of the claim," it establishes a baseline.  *Mayor & City Council of Balt.*, 31 F.4th at 197–98 (internal quotations omitted).  The artful pleading doctrine and complete preemption inquiry are explicit exceptions to the well-pleaded complaint rule designed to authorize courts to look past that baseline and find federal claims that plaintiffs have deliberately

29

obscured.  *See, e.g.*, *Franchise Tax Bd. of Cal.*, 463 U.S. at 13, 22.  The entire purpose of these doctrines is to prevent plaintiffs from artfully pleading state law labels onto what are in substance federal claims.  The Fourth Circuit applied them.  Defendants argued before that court—as they argue here—that these complaints are "necessarily and exclusively governed by federal common law" and constitute "interstate-pollution claims that arise under federal common law."  *Mayor & City Council of Balt.*, 31 F.4th at 199.  The Fourth Circuit was empowered to look beyond the face of the complaints, examine the substance of those arguments, and find federal claims if they were there.  *Id.* at 198–99.  It found none.

This Court, by contrast, was bound by the motion to dismiss standard to accept Plaintiffs' allegations as true and draw all reasonable inferences in their favor.  *Eastland Food Corp. v. Mekhaya*, 486 Md. 1, 20 (2023).  This motion to dismiss standard is not much different than the well-pleaded complaint rule other than that the well-pleaded complaint rule is a jurisdictional doctrine.  Under the motion to dismiss standard, this Court "is to assume the truth of the factual allegations of the [well-pleaded] complaint and the reasonable inferences that may be drawn from those allegations in the light most favorable to the plaintiff."  *Heavenly Days Crematorium, LLC v. Harris, Smariga & Assocs., Inc.*, 433 Md. 558, 568 (2013).  Under this standard, essentially a cousin of the well-pleaded complaint rule, it was not authorized to look past those allegations to divine what Plaintiffs were *really* trying to accomplish.  The irony is inescapable: the court with greater authority to find hidden federal claims found none.  The court bound to accept Plaintiffs' characterization found federal claims over Plaintiffs' objection.  The Majority was less

30

deferential to Plaintiffs under the more plaintiff-protective standard. That is not a difference in procedural posture. It is a contradiction of the basic legal standards governing both proceedings, and the Majority's single sentence dismissing the Fourth Circuit's analysis does not begin to explain it.

The Majority also invokes the phrase "'heightened standard unique to the removability inquiry'" as a description of the constraint under which the Fourth Circuit operated, suggesting the Fourth Circuit's characterization of these claims as deceptive marketing claims was a product of that constrained standard rather than a substantive reading of the complaints. *See* Maj. Slip Op. at *44 n.17 (quoting *Mayor & City Council of Balt.*, 31 F.4th at 203). But that phrase does not appear in the Fourth Circuit's description of its own standard. It appears at page 203 of the Fourth Circuit's opinion in the court's explanation of why *City of New York* was inapplicable—precisely because that case was filed directly in federal court and never had to apply the well-pleaded complaint rule at all. *See* 31 F.4th at 202–03. The Fourth Circuit was not acknowledging a limitation on its own analysis. It was identifying an analytical deficiency in the very template the Majority adopts. The Fourth Circuit stated directly that *City of New York* "suffers from the same legal flaw as Defendants' arguments" and "essentially evades the careful analysis that the Supreme Court requires." *Id.* at 203. Paradoxically, the Majority has taken the Fourth Circuit's criticism of the Majority's own analytical template and converted it into a defense of that template. The Majority's own citation refutes its argument.

The Majority's insistence that its holding is consistent with the Fourth Circuit's analysis is contradicted at every turn by that court's actual holdings. Contrary to the

31

Majority's central thesis in this case, the Fourth Circuit held that the Baltimore Plaintiff's state law claims "do not involve the regulation of emissions." *Id.* at 216. It "resoundingly agreed" with Baltimore that the suit has "nothing to do with any body of federal common law"— rejecting the foundation on which the Majority's entire preemption structure rests. *Id.* at 195. It specifically rejected Defendants' attempt to characterize Baltimore's claims as "interstate-pollution claims that arise under federal common law"—the same characterization the Majority accepts without examination. *Id.* at 195, 199. It found that Defendants "never establish a significant conflict between Baltimore's state law claims and any federal interests"—a finding the Supreme Court has described as fatal to the creation of federal common law. *Id.* at 200. It held that the CAA does not completely preempt Plaintiffs' state law claims (a more demanding standard than an ordinary preemption analysis on a motion to dismiss), leaving unexplained how the Majority clears the lower bar of ordinary preemption when the higher bar was found uncleared. *Id.* at 214–20. It held that Baltimore's complaint "does not desire relief under the CAA"—refuting the Majority's causal chain argument that deception driving consumption driving emissions transforms these claims into emissions regulation. *Id.* at 207. And it held that Baltimore's claims do not "disturb foreign relations" and that Defendants failed to identify any express foreign policy conflicting with state tort law—the same foreign affairs argument the Majority accepts. *Id.* at 213–14, 216. Eight grounds for removal considered. Eight rejections. The Majority accepts the premise underlying every one. I simply disagree with my colleagues that the Majority Opinion here is consistent with the Fourth Circuit's analysis.

32

The Majority's final argument—that its opinion is consistent with the Fourth Circuit because that court performed a complete preemption analysis while the Majority applies ordinary preemption—is its most curious argument, because it concedes the central failure this dissent identifies throughout Sections III.A through C. *See* Maj. Slip Op. at *44 n.17. The Majority never actually performed an ordinary preemption analysis. Ordinary preemption requires this Court to identify the legal duty the plaintiff alleges was violated, determine what field that duty occupies, and ask whether the CAA speaks to that duty either expressly, through field occupation, or through direct conflict. *See Cipollone*, 505 U.S. at 516–17; *Altria Group*, 555 U.S. at 76–77; *Oneok*, 575 U.S. at 385–86. The Majority performs none of these steps. It never identifies the duty alleged. It never identifies a CAA provision that speaks to that duty. It never identifies an actual conflict between the state law duty and a specific federal requirement.

What the Majority offers instead is circular reasoning based on a false premise: these claims are about interstate emissions regulation, therefore the *Ouellette* framework applies, therefore the claims are preempted because *Ouellette* preempts interstate pollution regulation claims. The characterization does all of the analytical work, and the characterization was never established—only assumed. That is not an ordinary preemption analysis. It is field preemption applied to a field the Majority defined by assuming its own conclusion, the precise analytical move the presumption against preemption forbids. *See Virginia Uranium*, 587 U.S. at 767 (plurality majority) ("Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law."). The result is what Section III.C below describes in detail:

33

displacement/preemption alchemy—the fusion of *AEP*'s displacement rationale and *Ouellette*'s preemption framework, applied to claims neither case addressed, in a sequence neither case authorized, to avoid an analysis both cases left open.  The Majority insists this is ordinary preemption.  It is not ordinary.  And it is not analysis.

### A.  The Majority Ignores the Controlling Framework

The Majority's preemption analysis contains a conspicuous and consequential absence.  The Supreme Court has twice held that state law fraud and deceptive marketing claims survive federal preemption even when the subject matter of those claims is federally regulated: *Cipollone* and *Altria Group*.  Those cases establish the controlling framework for evaluating whether a state tort claim grounded in deception is preempted by a federal regulatory statute.  They require courts to identify the legal duty the plaintiff alleges was violated and hold that a duty not to deceive is not displaced by federal regulation of the underlying product or activity.  The Majority cites *Cipollone* and *Altria Group* but engages with neither.  It does not explain why the analytical framework they establish does not govern claims against petroleum marketers that are structurally identical to the claims against tobacco companies those cases preserved.  Acknowledging the existence of controlling precedent and declining to engage with it is not a distinction.  It is a concession that no distinction is available.

Instead of engaging in the Supreme Court's prescribed analysis, the Majority does the opposite on a motion to dismiss and looks past the complaints' allegations and substitutes its own characterization of what the claims involve.  The Majority acknowledges the local governments' argument that their claims are limited to deceptive

34

and misleading commercial conduct, then summarily rejects it, concluding that the claims "are not limited to deceptive and misleading commercial conduct[]" without performing the legal analysis that conclusion requires.  Maj. Slip Op. at *46.[6]  In its place, the Majority offers a rhetorical flourish: "No amount of creative pleading can masquerade the fact that the local governments are attempting to utilize state law to regulate global conduct."  *Id.* at *46–47.  That is not a legal conclusion based on an analysis of the controlling authority.  It is an assertion dressed as one, and it substitutes judicial conjecture for the standard of review this Court just recited.[7]  Courts in this posture do not get to look past a complaint's allegations to divine their underlying purpose, *see, e.g.*, *Virginia Uranium*, 587 U.S. at 774–77 (lead opinion)—particularly when Plaintiffs have expressly stated in both their complaints and their briefing that they "do not seek to impose liability on Defendants for

---

[6] The Majority's response to the dissent's preemption analysis is to repeat its conclusion.  *See* Maj. Slip Op. at *51 n.21.  The Majority does not engage with the dissent's argument that the duty-based inquiry *Oneok*, *Cipollone*, and *Altria Group* require governs here—an omission that is fatal to its analysis.  It does not distinguish those cases other than to say they did not involve interstate pollution.  It does not explain why the duty alleged here—a duty not to deceive—falls outside their reach.  It simply reiterates that "the local governments are clearly attempting to utilize state law to address global conduct[.]"  *Id.*  That characterization is not only counterfactual to the allegations in the complaints, but also antithetical to the motion to dismiss standard, which requires courts to accept those allegations as written, not rewrite them in Defendants' favor.  Repetition is not rebuttal.  Reasserting a conclusion does not answer the argument that the conclusion was never established.

[7] The Majority also asserts that "[e]ven assuming that the [Plaintiffs'] claims were limited to allegations of deceptive and misleading marketing, we reject the assertion that their sweeping claims may be pursued under state law."  Maj. Slip Op. at *46.  That assertion cannot be reconciled with the Supreme Court's *Altria Group*/*Lorillard* doctrine establishing that marketing is a traditional state field and the Majority's failure to even mention those cases, much less an attempt to distinguish them.

35

their direct emissions of greenhouse gases and do not seek to restrain Defendants from engaging in their business operations."

Having substituted its own characterization for Plaintiffs' allegations, the Majority then attempts to justify that substitution with a word count. The Baltimore complaint, the Majority observes, uses the word "emissions" 115 times—which the Majority treats as dispositive evidence that the claims are really about regulating emissions and therefore fall within the CAA's preemptive scope. Maj. Slip Op. at *48. This argument does not survive scrutiny. The frequency with which a complaint uses a word tells a court nothing about the legal duty that is the predicate of the claim. A products liability complaint against a tobacco company will use the word "smoke" hundreds of times. A complaint against a pharmaceutical manufacturer for fraudulent marketing will use the name of the drug and its chemical effects repeatedly. A failure-to-warn claim against the manufacturer of a defective airbag will necessarily discuss how the airbag deploys. That does not mean the claim is about regulating automotive safety standards. In none of those cases has any court held that the subject matter of a complaint determines preemption. What determines preemption is the duty whose violation the plaintiff alleges. *See Oneok*, 575 U.S. at 385–86; *Cipollone*, 505 U.S. at 523–24. The Supreme Court has been explicit: the preemption inquiry requires the court to identify "the *target* at which the state law *aims*[.]" *Oneok*, 575 U.S. at 385 (italics in original). The Majority identifies that target by counting words rather than analyzing duties. That is not the *Oneok* inquiry.

A fraud claim against a company that concealed the health risks of its product will necessarily discuss those health risks at length. That discussion does not transform a fraud

claim into a product regulation claim, and no court has ever held that it does. The local governments' extensive discussion of greenhouse gas emissions and climate effects is the same thing: a description of the mechanism of harm, not an assertion of a duty to control that mechanism. The duty alleged is a duty not to deceive—a duty that arises from common law fraud and products liability principles that predate the Clean Air Act by decades and that the CAA nowhere addresses.

The Majority's word-count approach also proves too much. Under its logic, any state tort claim that discusses out-of-state conduct extensively enough becomes preempted by whatever federal regulatory scheme touches that subject matter—not because Congress said so, not because there is a direct conflict between the state duty and a federal standard, but because the plaintiff thoroughly describes the mechanism of harm at issue in the case. The Supreme Court rejected exactly this approach in *Altria Group*. *See* 555 U.S. at 82–83. If the Majority's word-count approach were correct, *Altria Group* would have come out the other way. So would *Cipollone*, whose complaint necessarily discussed cigarettes and their health effects at length. The entire line of cases holding that fraud and deceptive marketing claims survive preemption even when the subject matter is federally regulated would be in question. Because the Majority opinion ignores *Altria Group* and *Cipollone*, it offers no account of that inconsistency.

Had the Majority applied *Cipollone* and *Altria Group*—as it was required to do— the result here would have been different. Those cases establish that a duty not to deceive survives federal preemption even when the subject matter is federally regulated. The CAA

37

does not preempt a duty not to deceive, and the Majority's silence on *Cipollone* and *Altria Group* offers no basis for concluding otherwise.

What the Majority's word-count approach implicitly concedes is equally significant. By resting its preemption conclusion on the rhetorical content of the complaints rather than on an analysis of what the Clean Air Act actually forecloses, the Majority signals that it cannot identify a specific CAA provision, a specific EPA regulation, or a specific congressional purpose that is actually in conflict with the duty the local governments allege. There is a reason for that: no such provision exists. The CAA does not regulate deceptive marketing. The EPA has no rule governing corporate communications about climate science. Congress, in enacting the CAA, did not speak to the question of whether fossil fuel companies owe their customers and the public a duty of honest dealing about the environmental consequences of their products. Where Congress has not spoken, there is nothing to preempt. Counting the word "emissions" does not supply what the statutory text omits.

Defendants and the Majority further contend that allowing Plaintiffs' claims to continue would constitute a de facto regulation of greenhouse gas emissions because a damages award might influence Defendants' behavior, and this de facto regulation is preempted by the CAA.[8] Maj. Slip Op. at *47–50. That argument has been considered and rejected. The mere fact that tort litigation may influence market behavior does not render it preempted. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005) (citing

---

[8] Presumably, the only behavioral shift sought by Plaintiffs in this case is for BP and the other Defendants to stop deceiving the public about fossil fuels.

38

*Cipollone*, 505 U.S. at 524). As the Supreme Court instructed in *Bates*, "[t]he proper inquiry calls for an examination of the elements of the common-law duty at issue . . . it does not call for speculation as to whether a jury verdict will prompt [a regulation of emissions]." *Id.* Tort law has always exerted a quasi-regulatory effect on conduct without becoming preempted by every federal statute that touches the same industry. If it were otherwise, state products liability law would have been preempted decades ago.

The inquiry prescribed by the Supreme Court is disciplined: what legal duty does the plaintiff allege the defendant violated? Here the answer is plain—a duty not to deceive. No provision of the Clean Air Act governs that duty. No EPA regulation sets a standard for corporate honesty. No congressional committee report so much as mentions tortious marketing. The Majority cannot find preemption in the CAA because it is not there. What it finds instead is a policy preference—the conclusion that these cases should not proceed —and works backward to a doctrinal rationale. That is what the Majority cannot find: a provision of the Clean Air Act that speaks to the duty alleged.

Lest it be lost on anyone, courts in this posture do not investigate complaints for hidden purposes. On a motion to dismiss, they read them "in the light most favorable to the plaintiff[.]" *Eastland Food Corp.*, 486 Md. at 20. Courts are required to assume the truth of well-pleaded allegations and draw reasonable inferences in the plaintiff's favor. *Id.* The Majority does the opposite and draws all inferences in the Defendants' favor. Its sole justification is an unexplained assertion that courts need not defer to Plaintiffs' characterization of their own claims—a proposition for which the Majority cites no authority, because none supports it. The cases the Majority relies upon do not support it.

39

*Ouellette* was decided on summary judgment, on a developed factual record, and against defendants who were identified point-source emitters operating under federal permits.[9] *AEP* involved coal-fired power plants whose emissions were the undisputed subject of the suit. Neither case involved the question that is contested here: whether, on a bare complaint, a court may look past a plaintiff's express allegation of a duty not to deceive and substitute the defendant's characterization on what the allegations in the case concern. The answer to that question on a motion to dismiss is no. It has always been no. The Majority does not explain why it should be yes in this case, and it cites no authority holding that it is.

The Majority claims to be "[v]iewing the allegations of the complaint in the light most favorable to the local governments[.]" Maj. Slip Op. at *48. But it never identifies which facts support its conclusion that these claims involve global emissions regulation. The City expressly alleged that it "does not seek to impose liability on Defendants for their direct emissions of greenhouse gases." That is a well-pleaded fact. "[T]he local governments are attempting to utilize state law to regulate global conduct that is purportedly causing global harm[,]" *id.* at *47, in stark contrast, is not a well-pleaded fact— it is an allegation. The Majority does not acknowledge it, much less explain how a court accepting all well-pleaded allegations as true can simultaneously ignore the most directly

---

[9] Justice Gould's concurrence, whatever its ultimate merits, addresses questions that have no place in a motion to dismiss analysis. Every element of causation and damages Justice Gould identifies as problematic is an element the Plaintiffs would need to prove at trial—that is precisely where those arguments belong. If anything, his concurrence reinforces the point that dismissal of these cases, as in *Ouellette*, should be on a developed factual record.

relevant one.  The Majority's conclusion that "the ultimate harm . . . arises from global emissions[,]" *id.* at *51 n.21, confuses the mechanism of harm with the duty alleged— precisely the substitution *Oneok* prohibits, 575 U.S. at 385.

There is a final and consequential omission to the Majority's analysis that deserves explicit mention.  The Majority quotes *Boyle*, 487 U.S. at 507—which involved the immunity of a military contractor, not preemption—for the proposition that the conflict required for federal common law displacement "need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the [s]tates have traditionally occupied."  Maj. Slip Op. at *21 (internal citations omitted).  In doing so, the Majority unwittingly identifies the question it never answers: is deceptive marketing a field the States have traditionally occupied?  It certainly is—as the U.S. Supreme Court has confirmed in *Lorillard*, *Cipollone*, and *Altria Group*.  Had the Majority asked that question, *Boyle*'s own language would have required it to apply the more demanding preemption standard.  It never asked and its omission is not incidental.  Without it, the Majority's result was not possible.

## B.   Neither AEP Nor Ouellette Support the Majority's Holding

Even setting aside the Majority's failure to apply the controlling *Cipollone/Altria Group/Oneok* inquiry, the two cases the Majority does rely upon—*AEP* and *Ouellette*—do not support the weight placed on them.[10]  A careful examination of what those cases actually held, who the defendants were, what conduct was at issue, and what questions

---

[10]  It is also important to note that, at oral argument, Defendants conceded that *AEP* was the strongest case in support of their position.

41

were left open reveals that neither case controls here. The Majority's opinion is an extension of precedent into territory neither case addressed, in service of a result neither case required.

*AEP* arose from a public nuisance suit brought by eight states, New York City, and three private land trusts against the five largest domestic emitters of carbon dioxide in the United States—coal-fired power plants that were directly and continuously pumping greenhouse gases into the atmosphere under federal operating permits. 564 U.S. at 418–19. The plaintiffs sought an injunction requiring each defendant to cap its emissions and reduce them by a specified percentage each year. *Id.* at 419. The defendants were emitters. *Id.* at 415. The claims were about emissions. *Id.* The relief sought was a cap on emissions. *Id.* The Court held that the Clean Air Act, by vesting authority in the EPA to regulate those very emissions from those very sources, displaced the federal common law nuisance cause of action the plaintiffs had asserted. *Id.* at 424. The displacement rationale is intelligible only in that context: the EPA was already doing, through its statutory authority, exactly what plaintiffs wanted a federal court to do through common law.

That is all *AEP* held. The Court did not hold that the CAA preempts state law claims. It did not hold that deceptive marketing claims are preempted. It did not hold that upstream fuel producers who are not themselves direct emitters are insulated from state tort liability. On the contrary, the Court was explicit and unambiguous on the state law question: "[T]he availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act" and "[n]one of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law" so that question

42

should be answered on remand.  *Id.* at 429 (italics in original).  The Majority today treats as resolved a question the Supreme Court of the United States deliberately and expressly declined to answer.[11]  That is a foundational error from which the Majority's entire analysis does not recover.

The distinction between *AEP*'s defendants and Defendants here is not a technicality—it goes to the heart of the preemption analysis.  The *AEP* defendants were direct emitters operating coal-fired power plants whose emissions were directly regulated by the CAA's New Source Performance Standards and the EPA's greenhouse gas rulemaking under § 111, 42 U.S.C. § 7411.  *AEP*, 564 U.S. at 416–18.  The displacement rationale depended entirely on the existence of an EPA regulatory program that already addressed the identical conduct plaintiffs sought to govern through federal common law.  Defendants here are not coal-fired power plants.  They are upstream fossil fuel producers and marketers—companies that extracted, refined, and sold fuel products, and that allegedly conducted decades-long campaigns of deception about the climate consequences of those products.  Federal common law no longer exists in this area—nor did it ever exist with regard to deceptive marketing—and no provision of the Clean Air Act regulates the marketing of fossil fuel products.   No EPA rule sets standards for corporate

---

[11] The Majority also cites *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (9th Cir. 2012), throughout its opinion.  But like *AEP*, that case is of little help to the Majority because it is a federal common law nuisance case that involved claims against the defendant for its own emissions, not for deceptive marketing.  In short, *Kivalina* is a straightforward application of *AEP*'s displacement holding to a federal common law claim by direct emitters.

communications about climate science.  No CAA permitting regime applies to a fuel producer based on the downstream emissions of its customers.  When Congress has not spoken to the conduct at issue, there is nothing to preempt state law.  *See Milwaukee v. Illinois & Michigan ("Milwaukee II")*, 451 U.S. 304, 316 (1981).  And there is absolutely nothing to displace *state law* because, as explained *infra* Section III.C, displacement is what happens when Congress speaks to an area formerly regulated by *federal common law*.  *See* Jonathan H. Adler, *Displacement and Preemption of Climate Nuisance Claims*, 17 J.L. ECON & POL'Y 217, 222, 233–47 (2022) ("Displacement concerns which branch of the federal government is responsible for the development of legal standards.  Preemption concerns the effect of federal common law on the laws of the several States.").

This precise distinction was drawn by the United States Department of Justice ("DOJ") in its 2024 amicus brief in the Hawaii climate litigation.  The DOJ explained that *AEP* is inapposite to claims like those here, because plaintiffs bring "tortious marketing" claims—not claims alleging a "violation of a duty not to pollute[]"—and that the CAA "does not categorically preempt [Plaintiffs'] deceptive-marketing claims."  Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *14–18, *18 n.3.  The Majority's opinion does not engage with this analysis, does not explain why it is wrong, and does not acknowledge that it represents the considered legal position of the federal government—the same federal government whose later reversal of that position the Majority implicitly credits.

The Majority also relies on the Second Circuit's decision in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), as though it forecloses the deceptive marketing distinction.  It does not.  The DOJ itself explained in 2024 that *City of New York* is

44

distinguishable because the claims in that case "targeted fossil-fuel products themselves" and were framed as challenges to the production and sale of fossil fuels as such. Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *20. The causal chain in *City of New York* ran directly from the products themselves: defendants produced fossil fuels, those fuels were combusted, emissions caused climate change, and New York City was harmed. 993 F.3d at 88–89. In other words, the duty implicitly alleged was a duty not to produce and sell products whose inherent properties cause global warming.

In the present case, the causal chain is different. Defendants allegedly knew their products were contributing to climate change. Plaintiffs' complaints allege that Defendants deliberately concealed that knowledge through a sustained disinformation campaign. Plaintiffs claim that deception prevented consumers and governments from responding, causing consumption to continue at higher levels than it otherwise would have, accelerating harm as a result. Selling the product is not the wrong. Lying about what the product does is the wrong.

That distinction matters legally because it changes what remedy would satisfy the claim. In *City of New York*, the only way to cure the wrong is to stop or limit production. Here, the wrong is cured by holding Defendants accountable for the consequences of their deception—relief that requires no alteration of Defendants' operations and no conflict with any emission standard. The Majority suggests that even a deception-based damages award could effectively regulate production by making fossil fuel marketing financially punishing. Maj. Slip Op. at *47–50. But the Supreme Court resolved that tension in *Cipollone*: a damages award for deception does not become preempted simply because it

45

might influence behavior in a federally regulated industry.  505 U.S. at 522.  The proper inquiry is the duty alleged, not the practical effect of a verdict.  *Oneok*, 575 U.S. at 385–86.  That is Supreme Court authority, not a pleading argument, and the Majority does not engage with it.[12]

In any event, *City of New York* did not resolve the deceptive marketing question. The plaintiff there "targeted fossil fuel products themselves," while Plaintiffs here target the deception the Defendants employed to conceal what they knew about those products. Different causal chain, different duty, different legal theory.  Using *City of New York* to foreclose a theory it never addressed is precisely the analytical move the Supreme Court cautioned against in *Oneok*, where it held that preemption requires "detailed examination" of "the *target* at which the state law *aims*[.]"  575 U.S. at 385 (emphasis in original).  The target here is deception.  *City of New York* never aimed at that target.

*Ouellette* is, if anything, an even weaker foundation for the Majority's holding.  That case did not involve the Clean Air Act.  It involved the Clean Water Act, an identifiable paper mill in New York discharging effluent through a specific pipe into Lake Champlain, and harm to Vermont property owners on the other shore.  *Ouellette*, 479 U.S. at 483–84. The defendant was a point source.  *Id.*  There was an identified source state.  *Id.* at 483. There was an identified affected state.  *Id.* at 484.  There was a permit issued to the defendant under the Clean Water Act's comprehensive permitting regime.  *See id.* at 495.

---

[12] Nor does the Majority engage with the District of Columbia Circuit Court's persuasive explanation that "there is no link" between Defendants' regulated activities "and the damages at issue in this lawsuit."  *District of Columbia*, 89 F.4th at 157.  This case is explored further in the next section.

The entire analytical structure of *Ouellette* was constructed around and for that specific factual and statutory structure. *Id.* at 495–99. It was designed for a world of identified point sources discharging through identifiable pipes into bounded bodies of water. It was not designed for multinational petroleum marketers whose alleged wrong is not emission but deception, and whose products were combusted by billions of end users across the globe.

Transplanting *Ouellette*'s framework to this case requires answers to foundational questions—which source state? which permit? which identifiable emitter?—that *Ouellette* presupposes but this case cannot provide.[13] Here, there is no "source state" in the *Ouellette* sense. There is no permit requirement—or any CAA permit—governing a fuel producer's marketing conduct. There is no regulatory scheme under the Clean Air Act that assigns these Defendants to a source state, an affected state, or any defined role in an interstate permitting system. The *Ouellette* structure has no footing here because Defendants do not fit the factual predicate that analysis requires.

The Majority is aware of this problem and uses it—paradoxically—to strengthen rather than undermine its preemption holding, reasoning that because greenhouse gases

---

[13] As noted above, the procedural posture in this case compounds the error. *Ouellette* was not decided on a motion to dismiss. It was decided on a developed factual record that established with precision the identity of the defendant, the location of the discharge, the nature of the permit, and the downstream harm to identifiable property owners. *Ouellette*, 479 U.S. at 483–86. The *Ouellette* framework was built on those established facts. Applying that framework to dismiss a complaint before discovery has identified any analogous facts is not application of *Ouellette*. It is assumption of the very predicates *Ouellette* requires.

cannot be traced to their source, allowing state lawsuits would create an even more chaotic regulatory patchwork than the water pollution context in *Ouellette*. Maj. Slip Op. at *59–60. But this reasoning misapplies *Ouellette* in a fundamental way. The globally diffuse, untraceable nature of atmospheric greenhouse gases is not a reason to apply *Ouellette*'s approach more aggressively—it is a reason to question whether *Ouellette* and its progeny applies at all. A doctrine built around the identifiability of sources and source states cannot be extended, by force of analogy, to cases where that identifiability is absent. The absence of *Ouellette*'s predicate conditions is a reason to look elsewhere for the governing rule, not a reason to apply the framework anyway and reach a more sweeping result.

### C. The Majority Conflates Displacement and Preemption

Defendants presented this Court with an argument structured, whether intentionally or not, to allow the Court to sidestep the demanding preemption analysis that *Cipollone*, *Altria Group*, and *Oneok* require—and in doing so produced the error most fatal to the Majority's analysis: the conflation of displacement and preemption. By leading with the argument that these claims are really about interstate emissions—and therefore governed by federal common law—Defendants gave the Court a threshold characterization question to answer instead of a preemption question. If the Court accepted that characterization—that the case is about emissions—the displacement of federal common law by the CAA would follow almost automatically from *AEP*, and the harder question—whether the CAA actually preempts state deceptive marketing claims—would never need to be asked. The Majority accepted that offer. The conflation of displacement and preemption that follows is the consequence: a holding assembled from *AEP*'s displacement rationale and

48

*Ouellette*'s preemption framework, applied to claims neither case addressed, in a sequence neither case authorized, to avoid an analysis both cases left open.

A careful examination of the case law illustrates that displacement and preemption are distinct doctrines with distinct standards and distinct consequences. Collapsing them produces a result neither doctrine independently supports. Displacement is what happened in *AEP*. "When Congress legislates to displace federal common law, the statute governs the extent to which state law is preempted." *District of Columbia*, 89 F.4th at 152–53 (citing *Milwaukee II*, 451 U.S. at 312–13).[14] The *AEP* Court was explicit: "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest congressional purpose' demanded for preemption of state law." *AEP*, 564 U.S. at 423 (quoting *Milwaukee II*, 451 U.S. at 317) (cleaned up).

The bar is lower for displacement of federal common law because "it is primarily the office of Congress, not the . . . courts, to prescribe national policy in areas of special federal interest[.]" *AEP*, 564 U.S. at 423–24. Federal common law is generally disfavored, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), and should only be created by courts in exceptional circumstances where Congress has not spoken, *see Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981). But once Congress has spoken, the need for judicially created federal common law "disappears." *Milwaukee II*, 451 U.S. at

---

[14] The suit in *District of Columbia* is virtually identical to the ones brought here. 89 F.4th at 149 n.1. There, plaintiffs were also "alleging that energy companies have promoted fossil fuels while concealing their impacts on climate change." *Id.* While the *District of Columbia* court was considering the issues in the removal context, as explained *supra* Section III regarding the Fourth Circuit's removal opinion, its conclusions regarding similar issues and plaintiffs are persuasive.

49

314. The legislative action via statute, for example, becomes the leading authority on whatever question the federal common law had directly spoken to. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) ("[I]n our constitutional system the commitment to the separation of powers is too fundamental for us to pre-empt congressional action by judicially decreeing what accords with 'common sense and the public weal.'"). Displacement wipes out federal common law. It says nothing about state law.

Preemption is a different and more demanding inquiry—one that, as explained above, the CAA cannot satisfy with respect to deceptive marketing claims. *See supra* Sections II and III.A and B. Preemption must be analyzed under the CAA as a statutory matter, not derived from displaced federal common law. *See District of Columbia,* 89 F.4th at 153 ("Whether the District's suit may go forward thus depends on the preemptive effect of the Clean Air Act, not on the preemptive effect of federal common law."). The Majority moves from *AEP*'s displacement holding directly to preemption of state law without accounting for that difference or the presumption against preemption that applies. *See id.* at 153. *AEP* itself said otherwise: the Court expressly left the state law question open and noted that preemption is a separate inquiry governed by the preemptive effect of the federal statute. 564 U.S. at 429. The Majority performed that separate inquiry, but under *Ouellette*'s framework—built for point-source emitters under the Clean Water Act, not for fuel marketers under the Clean Air Act. Maj. Slip Op. at *55–60.

What Defendants are actually asking—and what the Majority ratifies—is something more aggressive than just a misapplication of *AEP*. They are asking this Court to constitutionalize that misapplication—to treat the historical existence of federal common

50

law over interstate pollution as itself constitutionally dispositive, rendering the statutory preemption inquiry irrelevant.  Under that theory, once a court has identified a subject as having been governed by federal common law, no further analysis is needed—the Constitution forecloses state law regardless of what Congress said or did not say.  But that theory, as the Supreme Court has recognized, would call into question the constitutionality of saving clauses and cooperative federalism provisions throughout federal law.  *See Isla Petroleum Corp.*, 485 U.S. at 503–04.  If Defendants are right, Congress could not authorize state law remedies in any field that has ever been governed by federal common law: not in water pollution, not in air pollution, not in any area judges have once deemed suitable for a uniform federal rule.  That cannot be the law.  Congress' prerogatives include the right to decide for itself the extent to which federal law should preempt state law, and courts are not authorized to override that choice by elevating the prior existence of federal common law into a constitutional trump card.

That theory is also an attempt to bypass the statutory preemption analysis altogether—an analysis that, as demonstrated above, the CAA cannot satisfy with respect to deceptive marketing claims.  If the Constitution forecloses state law the moment federal common law has ever governed a field, courts need never ask whether Congress spoke clearly, whether a saving clause preserves state remedies, or whether the presumption against preemption applies.  The difficulty of that statutory analysis is not a reason to bypass it through constitutional inference.  It is a reason to perform it carefully.

All three of the theories Defendants advanced—that the Constitution's federal structure independently forecloses state law, that state law cannot revive once federal

51

common law is displaced, and that the CAA preempts these claims under *Ouellette*—appear in the Majority's opinion.  The problem is that the Majority never performed the analysis those theories require.  The Majority never explains whether any one of them is independently sufficient, whether they depend on each other, or how they interact.  That failure is not a matter of drafting.  It is a matter of analysis.  Each theory rests on a different predicate, and none of those predicates are established here.

The Majority reverses the sequencing that the Supreme Court established in *AEP*.  The core of the Majority's preemption holding—pages 43 through 60 of its opinion—contains no independent analysis.  The Majority opens by announcing a "federal displacement/preemption inquiry[,]" Maj. Slip Op. at *45, fusing two doctrinally distinct concepts into a single hyphenated phrase.  But *AEP* establishes a specific order of operations.  *First*, ask whether the CAA displaces federal common law.  *AEP*, 564 U.S. at 423.  *Second*, separately ask whether the CAA preempts state law.  *Id.* at 429.  Those are two distinct questions asked in that sequence.  The Majority reverses the sequence.  It first declares state law claims "displaced by federal common law"—which misuses displacement doctrine—and then in its next section says, "[h]aving determined that any claims the local governments may have would arise under federal law, we next conclude that any federal common law claims would be displaced by the Clean Air Act."  Maj. Slip Op. at *53.  That is backwards.  It treats step two as the predicate for step one.  This is a foundational error that allows the Majority to avoid the preemption analysis it was required to perform.

52

As established by the U.S. Supreme Court in *Oneok* and *Altria Group*, the threshold question in any preemption analysis is what subject matter the state law claim actually occupies: what duty is alleged, what conduct is targeted, and what field of law governs that conduct. *See supra* Sections I.A and III.A; *infra* Section III.D. The Majority never asks that question. Instead, the Majority immediately overlays *City of New York* as its analytical template, asking not what the preemption doctrine requires, but whether the complaints here resemble the complaint the Second Circuit considered in that case. The Majority's answer rests on a word count: Baltimore's complaint mentions "emissions" 115 times. Moreover, *City of New York* is not binding authority on this Court. It is a persuasive decision from a federal circuit court, and its reasoning is only as persuasive as the premises underlying it. Notwithstanding the Fourth Circuit criticism of the applicability of the *City of New York* decision to these facts,[15] the Majority adopted those premises without examination.

The Majority then states without any legal authority that even if the claims were genuinely limited to deceptive marketing, they still could not proceed under state law. Maj.

---

[15] *See Mayor & City Council of Balt.*, 31 F.4th at 203–04. Quite fittingly, the Fourth Circuit described the *City of New York* as "suffer[ing] from the same legal flaw as Defendants' arguments: It fails to explain a significant conflict between the state-law claims before it and the federal interests at stake before arriving at its conclusions." *Id*. at 203. And the Fourth Circuit is not the only tribunal that has rejected identical arguments posed by Defendants BP, Exxon Mobil, Chevron, and Shell. The D.C. Circuit also rejected the argument that federal common law persists for jurisdictional purposes even after being displaced on the merits. *See District of Columbia*, 89 F.4th at 152 ("We can find no support for the suggestion that federal common law has the Schrödinger quality advanced by the Companies—where one does not know if it is alive or dead until the case is removed to federal court.").

Slip Op. at *47–48.  It offers no authority for that proposition because there is none.  And it concludes that "any state law claims are displaced by federal common law[,]" *id.* at *51, using the word "displaced" for a doctrine that describes when a *federal statute* replaces *federal common law*, *see AEP*, 564 U.S. at 423.

The constitutional structure argument requires that interstate emissions are the relevant field—a predicate the Majority assumes by accepting Defendants' characterization of the claims rather than reading the complaints as written.  The displacement argument requires that federal common law once governed the specific claims at issue.  But federal common law never governed deceptive marketing, and the Majority never establishes that it did.  The *Ouellette* argument requires that these Defendants are the functional equivalent of a point-source emitter operating under a federal permit, a predicate that is flatly contradicted by the record.  The Majority assumes all three predicates without establishing any of them.  That is not analysis.  It is conflation.

The willingness to invoke every theory Defendants offered—without scrutiny, without acknowledging the distinct predicate each requires, and without explaining how theories resting on different premises can simultaneously support a single holding—is a measure of how far the Majority's opinion strays from the discipline the U.S. Supreme Court's preemption jurisprudence requires.[16]  Defendants', and amici United States',

---

[16] It is also worth noting that the Majority's novel preemption holding is unnecessary on its own terms.  Public nuisance and deceptive marketing claims of the kind Plaintiffs assert, carry within them significant built-in limiting principles that courts apply at summary judgment and beyond.  Causation—the requirement that plaintiffs demonstrate a traceable causal chain from specific defendants' conduct to specific local harms—is a

argument that the federal structure of the U.S. Constitution implicitly preempts Plaintiffs' claims, notably, was advanced as a fallback after the statutory and displacement arguments proved inadequate on their own terms, and it is a theory no appellate court has independently accepted as sufficient. *See Cnty. Comm'rs of Boulder Cnty.*, 2025 WL 1363355, at *11. The U.S. Supreme Court declined to review it in the Hawaii litigation at the urging of the United States. *See Sunoco LP v. City & County of Honolulu*, 145 S. Ct. 1111 (2025); *Shell PLC v. City & County of Honolulu*, 145 S. Ct. 1111 (2025); Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *6–7. The Majority's decision to treat it as established law in this case—without analysis, without citation to a case that has so held, and without acknowledging the Supreme Court's recent refusal to endorse it—is not a minor oversight. It is the Majority's analytical method in miniature: accepting without examination what the controlling cases require courts to demonstrate, not assume.

The Majority's uncritical adoption of *City of New York*, the Second Circuit's snap-back reasoning, as applied here, is questionable at best. *City of New York* rejected the argument that state law claims "snap back into action" once federal common law is displaced by statute, unless Congress specifically preserves them. 993 F.3d at 98. The Second Circuit held that "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id.* (citing *People of Ill.*

---

demanding standard. Product identification presents a related challenge: Plaintiffs must demonstrate which Defendants' products caused which portion of the harm. These are not trivial hurdles.

55

*v. City of Milwaukee ("Milwaukee III")*, 731 F.2d 403, 410 (7th Cir. 1984)).  The premise underlying that conclusion is that where "federal common law exists, it is because state law cannot be used."  *Id.* at 90 (quoting *Milwaukee II*, 451 U.S. at 313 n.7).  Accepting without examination the premise that the relevant field is interstate pollution, over which States have never had primary authority, then the Second Circuit's logic is internally coherent.  Federal common law governs nuisance claims involving emissions.  On those facts, state law never had authority to begin with, so there is nothing to snap back.

That logic does not survive the field identification problem the Majority never solves.  The "snap back" reasoning only works if the relevant field is correctly identified as interstate pollution.  Here it is not.  Deceptive marketing is a different field—one the States have always governed and federal common law never touched.  The Colorado Supreme Court rejected that premise directly, concluding that claims grounded in deceptive marketing occupy a different field than interstate emissions regulation regardless of how the causal chain is traced.  *See Cnty. Comm'rs of Boulder Cnty.*, 2025 WL 1363355, at *8–10.  Moreover, as explained earlier in this section, federal common law only exists where the legislature has not yet spoken.  And once the legislature speaks, everything it says and does not say becomes the supreme law in that now legislated area.  If state law addresses an area not preempted by the legislature, then it sure can "snap back."  But even if there were a "snap back" problem, it does not arise here because State authority over deceptive marketing was never removed.  The Second Circuit's confused displacement reasoning in *City of New York*, *see* 993 F.3d at 98–100, correctly applied, confirms rather than undermines that conclusion: the presumption against preemption protects traditional state

56

fields; deceptive marketing is a traditional state field; and nothing in the displacement of federal common law over a different field—interstate pollution—removed that protection.

No federal court—not one—has ever preempted a state law deceptive marketing or consumer protection claim under the Clean Air Act. Not in the climate context. Not in any context. The Majority cites no such case because there is no such case. What the Majority describes as a settled analytical framework is displacement/preemption alchemy. Its holding is assembled from pieces of cases that addressed different defendants engaged in different conduct, involving different claims, and arising under different statutes—fused together for the first time by this Court to produce a result none of those cases ever reached. Courts do not preempt state law claims on theories no court has ever accepted. When a court applies established doctrine, its result can be checked against the cases it cites. When a court applies doctrine that has never been applied before, to claims it has never reached and defendants it has never covered, it is not applying precedent. It is making it. That is a legislative function, and it requires the clear congressional mandate the Majority never found.

### D.  CAA's Saving Clause Preserves State Remedies

Even if the Majority's *Ouellette* analysis were otherwise sound, the CAA's saving clause would independently preserve Plaintiffs' claims. The CAA's structure is that of "a regulatory floor, not a ceiling." *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197–98 (3d Cir. 2013). Section 7416, titled "Retention of State Authority," provides that "nothing [aside from exceptions previously mentioned] in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any

57

standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution[,]" except that state emission standards may not be "less stringent" than applicable federal standards. 42 U.S.C. § 7416. The CAA further states that "[a] primary goal of [the CAA] is to encourage or otherwise promote reasonable Federal, State, and local governmental actions, consistent with the provisions of [the CAA], for pollution prevention." *Id.* § 7401(c). Congress built State authority into the statute's structure. The Majority reads that authority out of it.

While courts should "not interpret a saving clause as preserving a state law that would so conflict and interfere with a federal enactment that it would defeat the federal law's purpose or essentially nullify it[,]" *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1213–14 (9th Cir. 2020), that conflict must be an actual conflict, not one which *might* occur, *see, e.g*, *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 593 (N.D. Cal. 2020) (finding no conflict preemption where defendants speculatively argued that the state law claims could conflict with the federal statute); *Silkwood*, 464 U.S. at 248 ("[S]tate law is . . . preempted to the extent it actually conflicts with federal law[.]"). The Majority identifies no provision of the CAA that would be nullified or defeated by holding petroleum marketers liable for allegedly deceiving the public about climate science. It cannot, because there is none. The CAA regulates emissions, not honesty. Those are different things, and the conflict between them is imaginary.

The U.S. Supreme Court's *Oneok* decision confirms this analysis. There, the Court held that the Federal Natural Gas Act did not preempt state antitrust claims against pipeline

58

companies even though the pipelines were extensively regulated under federal law, because the Act "was drawn with meticulous regard for the continued exercise of state power[.]" *Oneok*, 575 U.S. at 384–85 (internal quotations omitted). The Court focused on the target of the state law—antitrust claims aimed at retail pricing practices firmly within state authority—and held that field preemption requires "detailed examination" convincing the Court that the "matter falls within the pre-empted field as defined by [the Court's] precedents." *Id.* at 385. The CAA, like the Natural Gas Act, was drawn with meticulous regard for state authority—its saving clause expressly says so. And the target of Plaintiffs' state law claims—deceptive marketing—falls firmly within state authority, just as retail pricing practices did in *Oneok*. The Majority's contrary conclusion does not reckon with *Oneok*'s analysis or explain why the result should differ.

The Majority's logic, taken to its conclusion, produces a further problem it does not acknowledge. If the existence of prior federal common law over interstate pollution means that state law cannot be operative without express congressional authorization—as the Majority's fusion of displacement and preemption implies—then the CAA's own saving clause is rendered a nullity. Congress enacted that clause to preserve state authority. Under the Majority's approach, that congressional choice is overridden not by anything Congress said, but by the sheer fact that courts once governed this field through federal common law. That inverts the constitutional hierarchy. It is Congress, not prior judicial lawmaking, that determines the scope of federal preemption. The saving clause is Congress speaking. The Majority's approach makes it speak to nothing.

59

### E.  Engine Manufacturers Distinguished

A comparison to a case where the Supreme Court did find CAA preemption of state law—*Engine Mfrs. Ass'n ("Engine Manufacturers") v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004)—illustrates precisely why preemption is unwarranted here.  In *Engine Manufacturers*, the Court was tasked with deciding whether a local California agency could regulate the "*purchase* of vehicles, rather than their *manufacture* or *sale*[,]" *id.* at 249 (emphasis added), when the CAA includes a preemption clause that "prohibits the adoption or attempted enforcement of any state or local 'standard relating to the control of emissions from new motor vehicles or new motor vehicle engines[,]'" *id.* at 251 (quoting 42 U.S.C. § 7543(a)).  The lower courts reasoned, and defendants argued, that "'[w]here a state regulation does not compel manufacturers to meet a new emissions limit, but rather affects the purchase of vehicles, as the [rules from the local agency do], that regulation is not a standard.'" *Id.* at 251–52 (quoting *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 158 F. Supp. 2d 1107, 1118 (C.D. Cal. 2001)).  The Court disagreed.  *See Engine Manufacturers*, 541 U.S. at 252.  It explained that other sections in the CAA proved that "Congress contemplated the enforcement of emission standards through purchase requirements[]" showing that purchase regulations could be standards.  *Id.* at 254.  It also found that "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense" because "[t]he manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them."  *Id.* at 255.  For these reasons and others, it held that "at least certain aspects of the [local agency's rules] are pre-empted."  *Id.* at 258.

60

That is the opposite of this case.  The CAA contains no express preemption provision addressing marketing, deception or a duty of fossil fuel companies to communicate honestly about the climate consequences of their products.  *Cf. Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 596, 590, 600–02 (6th Cir. 2024) (holding that state consumer protection claims based on defendants' misrepresentations to consumers regarding emissions were not preempted by CAA); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg, Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1003 (N.D. Cal. 2018) (holding that claims based on marketing deception were not preempted by the CAA).  Congress considered preemption when it drafted the CAA and included provisions explicitly limiting what states may regulate—42 U.S.C. §§ 7543 and 7573 among them.[17]  None of those provisions contemplate regulating the marketing of fossil fuel products.  That deliberate congressional choice confirms the *expressio unius exclusion alterius* principle the Supreme Court applied in *Cipollone*: "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."  505 U.S. at 517.  Congress drew the boundary of CAA preemption.  Deceptive marketing is outside it.  Courts are not authorized to redraw that boundary because the subject matter feels sufficiently related to what Congress did address.

---

[17]  While the text of the CAA supports this point, the legislative record provides the cherry on top.  *See* National Research Council, *State and Federal Standards for Mobile-Source Emissions* 65–75 (2006).

*F. The EPA's Rescission Undermines the Majority's Preemption Architecture*

The EPA's recent rescission of the 2009 Greenhouse Gas Endangerment Finding concluded that the CAA never provided statutory authority to regulate greenhouse gases for the purpose of addressing global climate change—the very premise on which *Massachusetts v. EPA* rested. *See* Rescission of the Greenhouse Gas Endangerment Finding, 91 Fed. Reg. 7686, 7711–12, 7717–18, 7726–27 (Feb. 18, 2026). Though the rescission does not reach every greenhouse gas emission finding made by the EPA, and its legal validity is already being challenged in court,[18] the direction is unmistakable—the federal government is in retreat. *See* 91 Fed. Reg. at 7723–27.

The Majority's reliance on *AEP* and *Massachusetts v. EPA* is now even less persuasive in light of that rescission. The *AEP* Court's displacement holding rested on the premise that Congress had delegated to the EPA authority to do what plaintiffs wanted courts to do—regulate GHG emissions from power plants. *AEP*, 564 U.S. at 416–17, 424. The *Massachusetts v. EPA* Court established that the CAA covers greenhouse gases. The Majority's holding, read together with the rescission, produces a result the *Massachusetts v. EPA* court never contemplated: nobody can address the problem in Maryland. Not the state or local governments, because today's decision has barred them from the courthouse to litigate deceptive marketing. Not the federal government, which has abandoned the field. That is not a result the Clean Air Act was designed to produce. And it is a result that

---

[18] *See Am. Pub. Health Ass'n v. EPA*, No. 26-1037 (D.C. Cir. filed Feb. 18, 2026); *Venner v. EPA*, No. 26-1038 (D.C. Cir. Feb. 18, 2026).

62

this Court should not impose—let alone on a motion to dismiss, before a single document has been produced.

The Majority's rationale would bar the States from the courthouse while the federal government simultaneously abandons the field. The Clean Air Act does not mandate such an absurd result, and it is not one this Court should impose here—particularly on a motion to dismiss. *See Silkwood*, 464 U.S. at 251 ("It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.").

## IV.  THE COMMERCE CLAUSE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants and their amici argue that even if the CAA does not preempt Plaintiffs' claims, the Commerce Clause and its dormant counterpart do. That argument fails, and this Court need not reach it at all.

"The Commerce Clause of the [United States] Constitution grants Congress the power 'to regulate Commerce with foreign Nations, and among the several States[.]'" *Maine v. Taylor*, 477 U.S. 131, 137 (1986) (quoting Art. I, § 8, cl. 3) (cleaned up). But the Clause "includes a negative component[]" called the Dormant Commerce Clause ("DCC"). *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 157 (2023) (Alito, J., concurring). The DCC says that a State violates the Commerce Clause "when [a state] law discriminates against interstate commerce or when it imposes 'undue burdens' on interstate commerce." *Id.* at 160 (quoting *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018)). When evaluating whether a state regulation violates the DCC, courts implement a balancing test, which says that "[l]aws that even-handedly regulate to advance a legitimate local public interest . . .

63

will be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* at 160–61 (cleaned up). Moreover, it should go without saying that States do not violate the Commerce Clause simply by regulating local marketing activity despite a product or business' interstate nature. *See Packer Corp.*, 285 U.S. at 112 ("Whatever may be the limitations upon the power of the state to regulate solicitation and advertisement incident to an exclusively interstate business, the commerce clause interposes no barrier to its effective control of advertising essentially local.").

Defendants and the United States (through the DOJ), and 24 of our sister states,[19] as amici, argue that allowing Plaintiffs to hold Defendants accountable for deceptive marketing would violate the DCC. In its amicus brief in the matter before this Court, the DOJ argues that the United States Constitution bars Plaintiffs' claims based on the Commerce Clause.[20] And while the DOJ in *City & Cnty. Of Honolulu* did not address

---

[19] The Majority finds significance in the fact that the United States and twenty-four states filed amicus briefs in support of the Defendants, suggesting this "'aptly illustrates that this is an interstate matter raising significant federalism concerns.'" Maj. Slip Op. at *49 (quoting *City of New York*, 993 F.3d at 92). With respect, the filing of amicus briefs reflects the political salience of an issue, not its legal resolution. Courts have always faced politically charged questions, and the number of voices urging a particular outcome has never been a substitute for legal analysis. If anything, the fact that this question has attracted such intense political interest from state governments across the country—states whose own regulatory interests and policy preferences on fossil fuel production vary considerably from Maryland's—is a reason for this Court to be more cautious about getting ahead of the U.S. Supreme Court, not less. Maryland's sovereign interest in protecting its residents from deceptive conduct within its borders is no less legitimate because other states have chosen different policy priorities. The Tenth Amendment reserves those judgments to each state, not to a coalition of its neighbors.

[20] In its amicus brief in this Court, the United States also argues that allowing Plaintiffs to bring their tortious marketing claims would violate the Due Process clause of

64

these constitutional arguments because they had "not been addressed by the Hawaii Supreme Court" nor the "trial court[,]" it said that the "constitutional arguments may ultimately be held to foreclose [plaintiffs'] state-law claims to the extent they are based on emissions or other conduct outside Hawaii." Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *6–7. As the DOJ counseled against review of the Due Process Clause and the Commerce Clause arguments in *City & Cnty. Of Honolulu*, this Court should also not prematurely review these arguments. *Id.* at *7. As Plaintiffs state in their supporting brief, the trial court in Baltimore City did not, nor did the trial court in Annapolis, address these two constitutional provisions. Until the trial court sufficiently reviews whether Plaintiffs' claims are barred by the Due Process Clause and/or the Commerce Clause of the United States Constitution, this Court should stay silent on the issue.

Nevertheless, under the DCC's balancing test, a court would be hard-pressed to find that holding businesses accountable for deceptive marketing imposes a clearly excessive burden on interstate commerce in relation to the putative local benefits. Deceptive marketing is a legitimate local interest. *See Governor of Md. v. Exxon Corp.*, 279 Md. 410, 435 (1977) ("The promotion of the economic welfare is a legitimate interest of a state[.]"); *Edenfield*, 507 U.S. at 769 ("[T]here is no question that [a State's] interest in ensuring the accuracy of commercial information in the marketplace is substantial.") (collecting cases).

---

the United States Constitution. But that argument is based on the idea that Plaintiffs are attempting to hold Defendants accountable for activities beyond state lines. As explained, Plaintiffs are attempting to hold Defendants accountable for tortious activities that occurred in the state. So, this argument is inapplicable insofar as Plaintiffs are only bringing tortious marketing claims against Defendants for marketing that occurred within state lines. Thus, this argument will not receive attention outside of this footnote.

And "[a] State has a legitimate interest in regulating activities conducted within its borders[.]" *Mallory*, 600 U.S. at 162.

Moreover, any burden on interstate commerce would be slight, especially since, as previously explained, each state has similar tortious marketing laws. *See, e.g.*, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 472 (1981) (explaining that the state regulation at issue imposes a minor burden on interstate commerce where the product can still move freely across the state's border and the inconvenience to the company in dealing with different States' requirements is "slight").

Finally, there is "no approach with a lesser impact on interstate activities" for holding businesses accountable for deceptive marketing. *Minnesota*, 449 U.S. at 473 (internal quotations omitted). Tortious marketing claims are the way that States' and their citizens hold businesses accountable for such a harm. So, here, while there may be an incidental burden on interstate commerce, it is not clearly excessive in relation to the putative local benefits.

*Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978), and *Sackett v. EPA*, 598 U.S. 651 (2023), illustrate how the Court has previously applied these principles when analyzing whether a federal statute preempts state law.

In *Exxon Corp.*, the statute at issue was a Maryland statute regulating retail oil service stations in the state. *See* 437 U.S. at 119–20. The oil companies argued "that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas." *Id.* at 128. The Court responded that "[i]n the absence of a relevant congressional declaration of policy, or a showing of a specific

66

discrimination against, or burdening of, interstate commerce, [it could not] conclude that the States are without power to regulate in this area." *Id.* at 128–29. The oil companies also argued that the state law was preempted because it created a conflict with federal law. *Id.* at 130. But the Court found that "the existence of such *potential* conflicts is entirely too speculative in the present posture of [the] case" and such "hypothetical conflict is not sufficient to warrant pre-emption." *Id.* at 131 (emphasis added).

In *Sackett*, the EPA argued that it could regulate the water on plaintiff's land because Congress gave it that authority under its Commerce Clause power to regulate "channels of interstate commerce[]" which includes "certain navigable waters." *Sackett*, 598 U.S. at 686–87 (Thomas, J., concurring). But Justice Thomas, joined by Justice Gorsuch, explained that, while the EPA's claim was correct, it only had the narrow power to regulate those waters "to keep them open and free from any obstruction to their navigation and to remove such obstructions when they exist." *Id.* (internal quotations omitted). It did not have the power to regulate "activities that merely affect water-based commerce[.]" *Id.* at 688 (internal quotations omitted).

The Commerce Clause was designed to prevent States from erecting barriers to interstate trade—from discriminating against out-of-state products, burdening the free movement of goods, or regulating conduct occurring beyond their borders. It was not designed to immunize multinationals from state tort liability for deceiving the residents of the states in which they operated. As the Supreme Court recognized in *Exxon Corp.*, the mere fact that a product moves in interstate commerce does not place its marketing beyond a state's regulatory reach. 437 U.S. at 128–29. And the hypothetical conflicts Defendants

conjure—that a Maryland verdict might influence conduct in other states or ripple through national energy markets—are precisely the kind of speculative burdens the Court in *Exxon Corp.* held insufficient to establish preemption or constitutional invalidity. *Id.* at 130–31. On this record, on a motion to dismiss, before any factual development of how Defendants' marketing reached Maryland consumers and what its effects were, these constitutional arguments are not ripe for resolution. The 2024 DOJ correctly counseled the Supreme Court to leave them for the trial court in the first instance. Br. for the U.S. as Amicus Curiae, 2024 WL 5095299, at *6–7. We should do so.

## V. FOREIGN AFFAIRS PREEMPTION

The Majority's foreign affairs analysis has a structural problem it never addresses: it is directed at the wrong claims. The Majority's entire foreign affairs section concerns federal common law causes of action targeting international emissions—the theory the Second Circuit rejected in *City of New York*. Maj. Slip Op. at *61–65. But Plaintiffs are not asserting federal common law claims for international emissions. They are asserting state tort claims for deceptive marketing conduct directed at Maryland consumers. The Majority disposes of the foreign affairs preemption question in the same analytical breath as it disposes of international federal common law claims, as though the two were interchangeable. They are not. That conflation repeats, in the foreign affairs context, the same error the Majority makes throughout.

The "foreign affairs power" is a federalism limit on state power that "resides in the President's fundamental executive powers" and "in certain powers granted to Congress, such as the power to regulate commerce with foreign nations[.]" 21 PACE ENVTL. L. REV.

68

at 67. Therefore, "duly ratified treaties and the federal statutes that implement them are the supreme law of the land" and preempt inconsistent state laws. *Id.* at 75; *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416–17 (2003). But where no treaty or statute "expressly" preempt an area of law, preemption "rest[s] on [an] asserted interference with the foreign policy those agreements embody." *Garamendi*, 539 U.S. at 417. In such cases, and where the preemption question applies to a historic state police power, courts should "consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted" by foreign policy. *Id.* at 420.

The Majority and Defendants fail to engage in the balancing analysis required by *Garamendi*. Both fail to discuss the States' historic power to regulate deceptive marketing and fail to consider that historic power's strength. There is no discussion deciding how serious a conflict must be shown before declaring the state law preempted by foreign policy. Therefore, the Majority holds that the foreign affairs power preempts Plaintiffs' state law deceptive marketing claims because they said so. The *Garamendi* Court says that is not enough.

Most fatal to Defendants' foreign affairs preemption argument is that they do "not identify any express foreign policy of the federal government that conflicts with state tort law. . . [n]or do the [D]efendants indicate how [Plaintiffs'] claims pose an obstacle to our federal government's dealings with any foreign nation." *Cnty. Comm'rs of Boulder Cnty.*, 2025 WL 1363355, at *11 (citing *Mayor and City Council of Balt.*, 31 F.4th at 213–14). The Majority *sua sponte* invokes the Paris Agreement and the U.N. Framework

69

Convention—but only by borrowing that reference from *City of New York*, not by independently analyzing whether those instruments have any preemptive effect on state tort law. *See* Maj. Slip Op. at *63–64. Those agreements address international obligations to reduce emissions. Plaintiffs do not seek to alter emissions obligations, international or otherwise. A Maryland verdict holding petroleum marketers liable for deceiving their customers does not rewrite the Paris Agreement, does not alter any nation's emissions commitments, and does not implicate any diplomatic channel the United States uses to address climate change. State law is not preempted merely because it has "some incidental or indirect effect in foreign countries"— "that is true of many" unobjectionable state laws and has never been sufficient. *Clark v. Allen*, 331 U.S. 503, 517 (1947). Moreover, the President's policy preference—outside of any statutory or constitutional authority—for avoiding state tort regimes that might complicate foreign climate negotiations has no preemptive effect on state law absent congressional agreement. The Supremacy Clause gives priority to "the Laws of the United States," not the "priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020) (internal quotations omitted).

Consider *Massachusetts v. EPA*. When the EPA denied a petition to regulate greenhouse gases from motor vehicles in 2003, it argued in part that doing so "might impair the President's ability to negotiate with key developing nations" on emissions reductions. *Massachusetts*, 549 U.S. at 533 (internal quotations omitted). The Supreme Court rejected that rationale, holding that vague allusions to foreign affairs consequences could not justify the EPA's refusal to exercise its statutory authority. *Id.* at 533–34. The same logic applies here with equal force: if speculative foreign affairs concerns could not excuse the EPA

70

from acting on its statutory mandate, they cannot foreclose state courts from hearing claims that fall within the States' historic authority over deceptive marketing. As Professors Lin and Burger have observed, the Supreme Court's rejection of EPA's foreign affairs argument in *Massachusetts v. EPA* signals that "similar allusions" should not "foreclose the availability of state common law claims[.]" Albert C. Lin & Michael Burger, *State Public Nuisance Claims and Climate Change Adaptation*, 36 PACE ENVTL. L. REV. 49, 65–66 (2018) (quoting *Massachusetts*, 549 U.S. at 533).

In sum, no treaty, no statute, and no executive agreement addresses deceptive marketing of fossil fuels. The foreign affairs doctrine does not fill that void.

## VI.  THE INDIVIDUAL TORT CLAIMS

With respect to the individual tort claims, I join the Majority's decision to affirm the Baltimore City Circuit Court's finding that Plaintiffs in that matter along with Plaintiffs in the other matters should have their private nuisance and trespass claims dismissed for failure to state a claim.

I also concur with the Majority's decision to affirm the Baltimore City Circuit Court's finding to dismiss Plaintiffs' strict liability failure-to-warn claim in that case. And I agree that the other Plaintiffs' strict liability failure-to-warn claims should also be dismissed. But dismissal should be on the ground that oil and gas or other fossil fuels, are lawful and widely used consumer products, and do not generally give rise to strict liability absent an actionable defect or ultrahazardous activity. *See Gourdine v. Crews*, 405 Md. 722, 740 (2008) (listing the elements of a strict liability failure-to-warn claim). Imposing broad strict liability would extend tort law beyond its historical and doctrinal limits.

71

I respectfully dissent from the Majority's opinion regarding Plaintiffs' public nuisance and negligent failure-to-warn claims. I would reverse the Baltimore City Circuit Court's finding that Plaintiffs' public nuisance and negligent failure-to-warn claims should be dismissed for failure to state a claim. Consequently, I would hold that each Plaintiffs' public nuisance and negligent failure-to-warn claims may proceed to discovery as Plaintiffs have stated a claim in which relief may be granted.

Though the application of nuisance law must be carefully constrained to prevent open-ended liability, I do not believe that our case law categorically bars public nuisance claims arising from lawful products, including fossil fuels. What matters is whether the defendant's conduct unreasonably interferes with a right common to the public, including public health, safety, or comfort. Cases such as *Adams v. Comm'rs of Trappe*, 204 Md. 165 (1954), and *Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019), make clear that liability may attach when a defendant substantially participates in creating widespread harm, even absent direct control or land invasion. In this case, the allegations that Defendants deceptively marketed and suppressed information about foreseeable harms to Maryland residents, thereby causing localized and concrete public-rights impacts, are sufficient to state a public nuisance claim and survive the motion to dismiss stage. Properly cabined, this approach preserves accountability while avoiding the open-ended regulation of lawful commercial activity.

The Baltimore City Circuit Court's decision on Plaintiffs' failure-to-warn claims should also be reversed insofar as those claims are localized. Plaintiffs may pursue their claims if they plausibly allege that Defendants knew or should have known of the risks and

72

suppressed or misrepresented that information. However, there is no global duty to warn every user worldwide, which would violate due process and exceed the bounds of foreseeability.

## CONCLUSION

The Majority's preemption holding rests on a false premise, applied through the wrong framework, to claims none of its foundational cases addressed. The Clean Air Act regulates emitters. It has never regulated deception. No provision of the CAA, no EPA rule, and no congressional purpose conflicts with state authority to hold corporations accountable for lying to their customers. That the Majority reached a different conclusion is possible only because it never engaged the controlling authority: *Cipollone* and *Altria Group* establish that state fraud and deceptive marketing claims survive federal preemption even when the subject matter is federally regulated, and the Majority offers no explanation why they do not govern here. Had the Majority engaged those controlling cases, the reframing of these complaints as emissions regulation cases could not have survived scrutiny. The States have always governed deceptive marketing. Where Congress has not spoken clearly, the presumption runs against preemption—not toward it. Nothing in federal law currently takes that authority away from Maryland. Novel arguments designed to bypass that conclusion—by constitutionalizing displacement doctrine or recharacterizing fraud claims as emissions regulation—are not a substitute for the preemption analysis the controlling cases require. The Majority performed neither.

I do not presume to know how the Supreme Court will ultimately resolve the question of whether state law claims like these are preempted by federal law. That question

73

is now before that Court, and it will answer it in due course.  What I am confident of is this: whatever the Supreme Court decides, it will decide it by applying its own preemption precedents to the claims as actually pleaded—not by recharacterizing those claims into something Plaintiffs disavowed, and not by superimposing a displacement theory designed for federal common law onto causes of action that exist entirely under state law.  The discipline this Court did not exercise here is the discipline the Supreme Court will apply in deciding this question.

The Majority "believe[s] that it could be useful for the United States Supreme Court to have the benefit of a high court's analysis that is different from that expressed by our colleagues [in Colorado and Hawaii]."  Maj. Slip Op. at *51 n.21.  With respect, that is not this Court's role.  A state supreme court's role on a question of federal law that the Supreme Court has accepted for review is not to stake out a position designed to influence that court's deliberations.  It is to apply the law the Supreme Court has already articulated.  That is what this dissent attempts to do.  The Majority, by its own account, is doing something else.

For the reasons above, I dissent from the Majority's preemption decision.  Justice Watts has authorized me to state that she joins in my dissent of the Majority's preemption decision.  I join the Majority's decision that Plaintiffs failed to state a claim on their private nuisance and trespass claims.  I concur in the Majority's decision that Plaintiffs failed to state a claim on their strict liability failure-to-warn claims, though on different grounds.  And I dissent from the Majority's decision that Plaintiffs failed to state a claim

74

75

on their public nuisance and negligent failure-to-warn claims, which I would allow to proceed.