# EXHIBIT 75

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              )
PERSONAL INJURY PRODUCTS           )   MDL No. 3047
LIABILITY LITIGATION               )
                                   )
    SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
      COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING            )
SPECIAL TITLE [RULE 3.400]         )
                                   )
SOCIAL MEDIA CASES                 )   Lead Case No.
_____)       22STCV21355
This Document Relates To           )
                                   )
STATE OF TENNESSEE, ex rel.        )
JONATHAN SKRMETTI,                 )
ATTORNEY GENERAL and               )
REPORTER,                          )
v.                                 )
META PLATFORMS, INC., and          )
INSTAGRAM, LLC.                    )
_____)
        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
           VIDEOTAPED DEPOSITION OF ANTIGONE DAVIS
                        VOLUME 1
                     MARCH 4, 2025
                    (Pages 1 - 376)
                9:09 a.m. to 6:59 p.m.
                 Covington & Burling
          850 10th St NW, Washington, DC 20001

   Reported By: Amanda Blomstrom, RMR, CRR, and
   CSR TX #8785/CA #12681/IL #84-3634

CONFIDENTIAL

Page 44

Q.     For youth safety --

A.     -- in there too.

Q.     -- who are the people who are coordinating that at Meta?

A.     There are a number of people.  I'll try -- my guess is I'm going to forget somebody, but I'll try to name as many of them as -- as I can.

So Guy Rosen is one individual.  He works on Integrity.

Naomi Gleit runs a lot of this youth XFN and the team there.

I'm trying to remember across the different -- across the different teams.  So let me -- just give me two seconds.

Well, within my team, you have ▮▮▮▮▮ ▮▮▮▮ and you have Ravi Sinha that -- one who holds the broader youth, and one who holds the child safety.  They also have people who report in to them. But they would be the other -- other two sort of in that -- in that group.

You have, from the Communications Team, Liza Crenshaw, and you have ▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL

Page 45

From our, I don't -- I guess our Public Affairs, also partially Research, you have David Ginsberg. You have someone by the name of Miki Rothschild. I'm just trying to remember as many of the names as I -- as I can for you.

Those are the names that -- that I can remember off the top of my head. There are more. So I don't -- I don't mean to be not fully inclusive.

Q. I understand.

But those are the people you recall who are currently responsible for overseeing youth safety; is that --

A. Yeah. But --

Q. -- right?

A. -- there are definitely more of them.

Q. Okay.

A. I would just have to probably spend a lot of time to think through the full list --

Q. Okay.

A. -- but, yeah.

Q. And those are the people in the currently -- currently in those positions, correct?

CONFIDENTIAL

Page 46

A.   Yeah.   There have been people before, for example, she's no longer with the company, but Karina Newton, for example, was someone who was very -- worked very specifically on that in relation --

Q.   Okay.

A.   -- to Instagram.

Q.   Okay.   What role does Communications play in the overall youth safety effort at Meta?

A.   Well, they are both there to help us communicate out our efforts but also to hear and take in concerns.   They get inquiries about various things, so they're pretty familiar with the external concerns, and also to share those concerns for people so we understand what people are thinking about and worrying about.

Q.   We talked a little bit about research dealing with youth safety.   Help me understand how Meta decides what research to do and what research not to do.

A.   I prob- --

MR. IMBROSCIO:   Objection to the form;

Page 47

asked and answered.

You can answer.

THE WITNESS:  I'm probably not the best person to answer that question.  I don't know how they decide the different pieces of research that they're going to do or not do.

BY MR. KAUFMANN:

Q.   Do people on your team ever ask for research to be done?

A.   I don't want to say no, because I don't know for sure, but I'm sure at different points in time we've suggested that we should do research into different areas.  My team relies a lot, in the work that we do, on talking to external researchers to understand their research.

Q.   Based upon the research that Meta does, does Meta make changes or adjustments to avoid harm to youth users?

MR. IMBROSCIO:  Object to the form.

THE WITNESS:  We do use our research to try to improve our products and to under -- to change things based on -- on what we learn.

CONFIDENTIAL

Page 111

A.    We don't -- I don't know if we know specifically.  We are aware that people try to lie and/or not share their accurate age.

Q.    Okay.  Now, you mentioned that Meta put in place certain tools or machine learning to help detect the age of individuals; is that right?

A.    We've tested a number of different things around -- over the years.  I think, again, as I've said, this is an industry-wide challenge to understand the age.  We've tried using various signals to get us more accurate age.  We've tried using different methods.  We're now -- we've recently launched age estimation, Google recently launched age estimation.

This is a true industry challenge that people have not been able to easily solve, which is why we've been pushing, in part, for this legislation at the OS level where they have that parent -- at least parent-attested age of minors.

Q.    Okay.  So Meta's first use of tools for age verification was related to Facebook Dating in late 2022; is that correct?

CONFIDENTIAL

Page 112

A.    I don't know that it was the first use.  I do know that we use tools there to try to block minors from accessing Dating.

Q.    Okay.  You would agree that Facebook and Instagram weren't designed for users under the age of 13?

A.    Yes.  That's in our Terms of Service.  We don't want -- we want to prevent those from being -- under the age of 13 from being on the platform.

Q.    You would agree that use of Meta's platforms by under-13 users could be harmful to those users?

MR. IMBROSCIO:  Object to the form.

THE WITNESS:  I -- I wouldn't necessarily make that statement about any one kid.  But what I can say is that our platform was designed with those meant to be 13 and above.

BY MR. KAUFMANN:

Q.    In addition to excluding under-13 users, Meta has policies, tools, and features to exclude certain content from teen users; is that right?

A.    To -- there's some that we gate

CONFIDENTIAL

Page 113

from -- from people who are under the age of 18.
There is some that we don't recommend to people who
are under the age of 18.  When something violates our
policies, we're going to remove it entirely.

Q.    And when you say there -- there is
something that you "gate," you're talking about
making an effort to prevent that from reaching a teen
account; is that right?

A.    Correct.

Q.    Okay.

A.    People -- not Teen Accounts as what we
talked about from -- the new launch of Teen Accounts,
but from teens, from those --

Q.    Okay.

A.    -- under the age of 18.

MR. KAUFMANN:  If we could look at what we
premarked as COAG 4.

This is 10?

MS. SHEIKH:  (Nodding head.)

(Exhibit Meta-A_Davis-10 marked.)

THE WITNESS:  Can I get a little water,
please.  That's why I went to this one.

CONFIDENTIAL

Page 225

A.    So I said "or was."  She's not at the company anymore.  Was part of the --

Q.    Okay.

A.    -- Privacy Policy Team.

Q.    So your testimony is that ▮▮▮▮▮▮▮▮▮ has left the company?

A.    Correct.

Q.    Thank you.

Let me read the second sentence here. ▮▮▮▮▮▮▮▮▮ says, "As you know, we're kicking off a lot of work streams related to teens and U13s."

Did I read that correctly?

A.    Yes.

Q.    Okay.  She goes on to say, "One is to commission external research to support our product and policy positions, and to build support among key stakeholders who will advocate on our behalf."

Did I read that correctly?

A.    Yes.

Q.    Okay.  So here Ms. ▮▮▮▮▮ is saying she's putting together a research plan to commission external research, right?

CONFIDENTIAL

Page 226

A.    Yes.

Q.    And the topic of that is teens and -- and U13s, right?

A.    Correct.

Q.    Okay.  And the reason to commission external research was to support Meta's product and policy positions, right?

A.    So it might be helpful to provide some context.

One of the things that the industry struggles with is -- has been I think already asked -- is how to address the issue of under-13s trying to go on platforms that were designed for the people who are over 13..  and so many of our counterparts, like YouTube, have offerings for those who are under 13 that are designed for those who are under 13.  It's one way of managing the interest in being online and putting them into the appropriate experience.

And I think that this research is in relation to trying to understand how to address the issue of under-13s and provide something that would

CONFIDENTIAL

Page 227

be an alternative to people who are trying to get on to the platform.

Q.    I think I understand the -- the context you put it in, but just let me make sure I understand.

The -- the ultimate point, you're saying, outside of the context, is that it is or is not correct that Meta was commissioning this external research because it wanted to support its products and policy positions?

A.    It was hoping to develop a potential product for under-13s that would be more appropriate for under-13s to address that challenge, and so it was looking to do research to support doing something like that.

Q.    Okay.  And Meta was planning to talk to a third-party PR consultant about this project, right?

A.    I'm not sure what you're referring to, to --

Q.    Well, maybe we'll -- why don't we continue through the email chain, and we may then provide that answer.

CONFIDENTIAL

Page 228

A.     Okay.  Sorry.

Q.     No -- no problem.

All right.  If you can turn to Bates ending in 3056, there is a further writing from Ms. ███████.  She writes at the top of this page, "I put together a tentative plan for three projects to commission that we'd like to share with the PR consultant today."

Do you see that?

A.     Yes.

Q.     Okay.  So Meta was planning to share projects with a PR consultant, right?

A.     Yes.  Again, I think for context, based on what I'm reading here, in order to do something like provide a service to under-13, we wanted -- it sounds like what she's saying is, we want to be able to demonstrate that it's of value, demonstrate what the challenges are.  She mentions the -- what's in the other document, but she mentions the current legal and regulatory regime is not working.

Q.     Okay.

A.     And I think they want to share it with a

CONFIDENTIAL

Page 376

REPORTER'S CERTIFICATION

DEPOSITION OF ANTIGONE DAVIS

MARCH 4, 2025

I, Amanda Blomstrom, a Notary Public in and for the District of Columbia, hereby certify to the following:

That the witness, ANTIGONE DAVIS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted to the witness or to the attorney for the witness for examination and signature;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 14th day of March, 2025.

_____

Amanda Blomstrom, CRR, RMR, CLR

Texas CSR No. 8785

California CSR No. 12681

Illinois CSR No. 84-3634