# Exhibit 76

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT |MDL No. 4:22-MD-3047-YGR
ADDICTION/PERSONAL INJURY      |
PRODUCTS LIABILITY LITIGATION  |
        SUPERIOR COURT OF THE STATE OF CALIFORNIA
    COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING        |
SPECIAL TITLE [RULE 3.400]     |
                               |
SOCIAL MEDIA CASES             |Lead Case for Filing
_____|Purposes
                               |22STCV21355
This Document Relates to:      |
                               |
STATE OF TENNESSEE, ex. Rel.   |
JONATHAN SKRMETTI, ATTORNEY    |
GENERAL and REPORTER,          |
v.                             |
META PLATFORMS, INC., and      |
INSTAGRAM, LLC,                |
Case No. 23-1364-IV            |
_____|

VIDEOTAPED DEPOSITION OF NICK CLEGG
Volume 1
Taken on Behalf of the Plaintiffs
DATE TAKEN:    Thursday, March 20, 2025
TIME:          9:22 a.m. - 7:29 p.m. GMT
PLACE:         Covington & Burling LLP
               22 Bishopsgate, 54th Floor
               City of London, London EC2N 4BQ
               United Kingdom

Examination of the witness stenographically reported by:
    SUSAN D. WASILEWSKI, RPR, CRR, CMRS, CRC, FPR
                    - - -
            GOLKOW, a Veritext Division
              cs-golkow@veritext.com

Page 118

MS. O'NEILL:  That works for me if that works for you.

THE WITNESS:  Okay.  Sure.

MS. O'NEILL:  Okay.  We can go to Document 17, which we'll mark as Exhibit 15.

(Meta - Clegg Exhibit 15 was marked for identification.)

THE WITNESS:  Thank you.

MS. O'NEILL:  And it's Bates stamped META3047MDL-003-0019950.

BY MS. O'NEILL:

Q.   Do you recognition this document?

A.   I do.

Q.   What is it?

A.   Can I just read it for a second before --

Q.   Yes.

I'll just ask again, do you recognize this document?

A.   I do.

Q.   And what is it?

A.   It's a series of e-mails from 2021 about a so-called contingency request made for resources related to a well-being product strategy.

Q.   And you're a participant in this e-mail chain, right?

A.    I am.

Q.    Let's go to Page 2.  At the bottom of the page is an e-mail from you to Mr. Zuckerberg in August of 2021, right?

A.    Yes.

Q.    And then looking to the next page, you write that "KX, Pratiti and ███ have put together the proposal below," right?

A.    Yes.

Q.    And who are KX, Pratiti and ███?

A.    Pratiti and ███ were, at the time, involved in the company's research work on a range of topics, so they were sort of researchers, and KX, I think at the time he -- he was a very long-standing employee at the company, I think he was actually one of the earliest employees of all, and I think at the time his principal focus was leading some teams related to health, sort of health work that the company had.

Q.    And why are you sending this request to Mr. Zuckerberg instead of those three?

A.    Oh, I think it was just a matter of seniority.  I think they came to me and, clearly, as per the second sentence in that first paragraph, I had also liaised with Chris Cox and Alex Schultz and, in a sense, I was, you know, a sort of mailbox,

not quite a mailbox but I was -- I was a senior executive representing on behalf of a collective effort reflected in this note, because this is a note which is asking for extra resources outside the normal way in which resources are allocated. So that's generally, like all organizations, not an easy thing to do, and it's generally only done -- or it's only usefully done, because it's a sort of a process of advocacy by -- against many other competing resources and when resources have already been allocated formally, done by a senior executive.

Q. And you felt strongly about this proposal enough to sponsor it to Mr. Zuckerberg?

A. Oh, I wouldn't have sponsored it if I didn't think it was good idea.

Q. And in fact --

A. But to stress, I did so knowing, as I think I said very clearly, that, you know, this was something that would have to be weighed up against many other contingency requests.

Q. And in fact, you, in the second line of your e-mail, you strongly endorsed this proposal, right?

A. That's what it says.

Q. And when communicating with Mr. Zuckerberg, who you directly report to, you, of course, do your

Page 121

best to present issues accurately and completely, right?

A.   Of course, but also, as is very clear, it's an exercise in advocacy, because he is having to weigh up lots of different requests for additional resources over and above the resources which have been already annually allocated, so it's an advocacy exercise as well, of course, as an exercise in accuracy.

Q.   Let's look at the first line of your e-mail just to get more details on this proposal.  You say that the proposal is "for additional investment to strengthen our position on wellbeing across the company."  Right?

A.   Sorry.  Yes, yes.

Q.   And in the next paragraph you say that "this work has become increasingly urgent over recent months."  Right?

A.   Yes.  That paragraph is referring to the fact, as the subsequent sentences elaborate on, that as a matter of sort of public reputational and political concern, it was something that was clearly of high priority.

Q.   Indeed you wrote that politicians are "expressing concerns about the impact of our

Page 122

products on young people's mental health."

Right?

A.    Yes.  I'm just reflecting, as per my role, what I'm hearing from policymakers around the world.

Q.    So your main rationale for this investment was to be responsive to politician and policymaker concerns?

MR. IMBROSCIO:  Object to the characterization.

A.    My general role in the company is to seek to make sure the company is responsive to, you know, a wide range of societal concerns.  You can't be responsive to all of them but this was an area which I felt, you know, merited further work, and indeed further work, of course, continued.

Q.    Looking at the last paragraph of your e-mail before you signed Nick, starting "Nonetheless," you note that despite the work the company has done, "we need to do more and we are" -- excuse me -- "and we are held back by a lack of investment on the product side which means that we're not able to make changes and innovations at the pace required..."

Right?

A.    That's what it says, yes.

Q.    And you meant here that there is a lack of

investment in the teams and people who actually make changes to the app, is that what you meant by product side?

A.   I think if you take the whole paragraph, what I meant was I felt that the way that the company was organized was disjointed and fragmented. It's something which I -- a theme I often referred to, that I felt we could deliver more bangs for our bucks, if I could put it like that, by being better organized across many -- across many teams.

Q.   And following up on that, just to look at your sentence along those lines, you say:  "Our wellbeing work is both under-staffed and fragmented across teams."

Right?

A.   Yes.  I think -- I can't remember where but somewhere else in the document, or maybe it's the previous document, it says that there were around 90 engineers working in this area but in a way that was some disparate, so I think this issue of not just absolute numbers but how they're organized and whether people are pulling in the same direction was something that as a senior executive I am always keen to seek to improve upon.

Q.   In turning to the next page, at the bottom,

Page 124

under the chart, you note that "we selected the top topics that key experts and policy stakeholders advocate are important for us to focus on, and where we are currently underinvested."

Right?

A.    That's what it says.

Q.    And then going on to the next page, you note that these topics, which are problematic use, bullying and harassment, connections and SSI, "are also highly aligned with what teens want Facebook and Instagram to prioritize."

Right?

A.    That's what it says, yes.

Q.    Let's go back to the third page and look at the actual request, so this is the page ending 190952.

A.    Uh-huh.

Q.    And under "Well-being products strategy headcount request," you say:  "We are not on track to succeed for our core well-being topics, including problematic use, bullying & harassment, connections, and SSI)."

Right?

A.    That's what it says.

Q.    That's what you wrote, right?

A.    Yep.  Yes.

Q.    And then you say:  "These issues affect everyone, especially Youth and Creators."

Right?

A.    Yes, that's what I wrote.

Q.    And then you note that Mr. Jin and his team have "developed a product strategy that will get us on track for success over the next two years."

Right?

A.    Yes.

Q.    And then you say while much of the funding can come out of other areas, a few critical things will likely not.  Right?

A.    That's what it says, yeah.

Q.    And there are two critical things in particular that you identify, right?

A.    Correct.

Q.    Can you read the first one?

A.    "Establishing a central cross-Family team: One of the core gaps right now is each team approaches well-being differently (if at all), and no one owns end-to-end success in each area across all audiences; staffing this is a prerequisite for company long-term success, and will let us achieve more out of the family of app investments.  [25 XFN

Headcount]."

Q.    Just for the jury and for our benefit, what is a cross-family team?

A.    A cross-family -- where do I say cross-family team?

Q.    In the heading.

A.    Sorry.  Central and cross-family team. Forgive me.  That means a team which is able to operate across all the different domains in the company and across all the different products as well, so Instagram, Facebook, Messenger, AR, VR. It's a company which, you know, has an increasing proliferation of products and it's clear that, at that time at least, I felt that a central team needs to pull together some of this work.

Q.    And when you say 25 XFN headcount, what does XFN refer to?

A.    I forget what the acronym actually stands for, cross something something.  Anyway, I think -- well, what it means in the company at least is bringing people together from different teams, so trying to create a horizontal functionality across the vertical teams doing their different things, yeah.

Q.    So people with different skill sets, so

Page 127

engineers, user experience researchers, and the like?

A.    It's not so much defined by what their expertise is.  It's just that their functionality is one that seeks to operate across different teams.

Q.    Can you -- well, actually, before we go to the second one, just to confirm, you were requesting 25 new positions to form a central cross-family team for well-being, right?

A.    Yes.  It -- at that time the suggestion was that 25 additional heads in this contingency request were required for cross-team work.

Q.    And can you read the second point in your e-mail, please?

A.    "Accelerating work around Problematic Use on FB/IG:  This is the topic where we have the largest cap relative to competitors and external expectations as well as minimal current staffing. [20 ENG for FB/IG]."

Q.    What is problematic use?

A.    Problematic use, I think, is a loose term for -- to describe people who or users who find that they are using the product excessively, or whether they're finding the experience not a wholly positive one.

Page 128

Q.   And to sum up, this is a request for 20 engineers for Facebook and Instagram to work on problematic use, right?

A.   That's what it says, yes.

Q.   Okay.  So in total, your request sought 45 new positions, including 20 engineers, right?

A.   That's what -- yes, that's what it -- yep.

Q.   And in the next paragraph you say that you "recommend at a minimum staffing these up for 2022." Right?

A.   Yes.

Q.   And if we look at the chart below, we see that this request is in fact the minimum recommended, right?  That's in the middle column?

A.   Yes.

MR. IMBROSCIO:  If I may, Megan, just -- the print is really small.

MS. O'NEILL:  Oh, sorry.

MR. IMBROSCIO:  Just to let the --

THE WITNESS:  Oh, here you can see it, yes.

MR. IMBROSCIO:  You can see it a little bit better on here --

THE WITNESS:  Oh, yeah.

MR. IMBROSCIO:  -- as a general matter. Sorry.

A.   Sorry.  I was --

MR. IMBROSCIO:  Mr. Clegg and I are about the same age and probably have the same issues with reading small print.

A.   I was squinting.  Yes, I can see that, yes.

Q.   Great.  And then the ideal option is actually 40 XFN and 84 ENG, right?

A.   That's what it says.

Q.   So more than double in total than the minimum recommended, right?

A.   That's what it says, yes.

Q.   Okay.  And looking at those top boxes, the ideal option would fully centralize and staff up all topics and product gaps for the four priority topics we discussed, right?

A.   That's what it says.

Q.   And the minimum recommended would not, right?

A.   It doesn't say that.  It -- I mean, I can only read what it says here.  It describes it somewhat differently to the ideal thing.

Q.   We -- yeah, we can go through that more -- in more detail.  It says that it would -- the minimum recommended approach would "centralize tracking across all topics, and strategy and

measurement for Problematic Use and Connections" only.

Right?

A.    Yes.

Q.    It would "staff up Problematic Use product work across Facebook and Instagram," but not the other priority topics, right?

A.    That's what's implied, yes.

Q.    Okay.  And this request, again, was made in August, right?

A.    Yes, in keeping with, as I say, exceptional out-of-cycle contingency requests, it was made in August.  The normal annual cycle of -- I can't remember what the calendar is but it was -- it was at a different time of the -- a different time of the year, so this was out of that normal annual headcount allocation exercise.

Q.    And just to refresh ourselves on this e-mail, at the top of the page it was a request for "additional investment to strengthen our position on wellbeing across the company," right?

A.    That's what it says in the first sentence, yes.

Q.    And in the next paragraph, first line, you describe this work as urgent, right?

Page 131

A.    In the context of the concerns expressed by policymakers that I describe in that paragraph.

Q.    Okay.  And in the paragraph further down, starting "Nonetheless," you said:  "We need to do more and we are held back by a lack of investment on the product side."

Right?

A.    That's the -- that's what the sentence says, yes.

Q.    Okay.  But Mr. Zuckerberg didn't reply to this urgent request in August, right?

MR. IMBROSCIO:  Object to the form.

A.    Well, I'm not sure whether he did or not by e-mail but -- yeah, I would have had, at the time, ongoing contact with Mr. Zuckerberg as CEO, so...

Q.    He didn't reply to your e-mail as shown in this document, right?

A.    Not that I -- not that I see here, no.

Q.    Let's look at that first page.  You write again to Mr. Zuckerberg in November, right?

A.    Yes, November the 10th.

Q.    Okay.  And then if we flip to the next page, in the paragraph starting "Funding the central product team," you say that your original ask from August of 25 XFN and 20 ENG was not funded, right?

Page 132

A.    That's what it says, yes.

Q.    And that's your understanding, it was not funded?

A.    Yes.  As I say, it was -- this was a -- yeah, this was a contingency out-of-cycle request. It would be pretty -- I mean, this was always -- it's always a difficult thing to get additional headcount in any material way outside of the normal budget allocations, so it would have come as no surprise to me at all that original ask was not funded.

Q.    And who decided to not fund it?

A.    Well, it would have been a decision which the CFO, who is responsible for the overall allocation of resources, would have been involved in, but, as I say, both the CFO and the CEO, Mark Zuckerberg, would receive numerous requests from across the company outside the normal all -- and as a matter of good sort of housekeeping, I think they always made it quite clear that they would set the bar very high for those exceptional contingency requests to be met.

Q.    And I understand the context but, to your understanding, who made the decision to not fund this request?

Page 133

A.    Well, since I don't have the -- since I don't have the full thread here, I can see that later on the CFO, Susan Li, replies that the -- she says:  "I'll defer to Mark on the decision here (and we have a budget meeting on Monday), but unfortunately, XFN heads are running more constrained than engineering."

Q.    So just going back to the August request as opposed to the later one you make in November, do you know who made the decision to not fund that request?

A.    I'm assuming it must have been communicated to me, if not by e-mail then by Susan Li.  I honestly -- I can't -- I can't recall it.  As I say, it was a contingency request amongst many, so...

MS. O'NEILL:  Okay.  Let's go to Document 18, and we'll mark this as Exhibit 16.  It is Bates stamped META3047MDL-003-00188992.

(Meta - Clegg Exhibit 16 was marked for identification.)

THE WITNESS:  Right.

MR. IMBROSCIO:  16?

MS. WANG:  18 or -- sorry.

MS. O'NEILL:  Of, 16, 16.

MR. IMBROSCIO:  Exhibit 18 is -- or

Page 134

Document 18 is Exhibit --

MS. O'NEILL:  It's my Document 18 but it is Exhibit 16.

MR. IMBROSCIO:  You're killing, Megan.

MS. O'NEILL:  I know.  I usually use letters and I decided numbers this time.  It was not a good idea.

MR. IMBROSCIO:  We'll take it as 16.

MS. SINGER:  It means a need for a break.

MS. O'NEILL:  We're getting close.

MR. IMBROSCIO:  After this doc, we'll take a break.

BY MS. O'NEILL:

Q.  Mr. Clegg, do you recognize this document?

A.  I do.

Q.  And what is it?

A.  Can I just read it quickly?

Q.  Sure.  And I'll let you know I'm only going to be asking questions on the first three pages, so not on the text of the article that's attached or that's reproduced.

A.  Okay.

Yes, thanks.

Q.  Okay.  What is this document?

A.  This is a series of e-mails in September

Page 135

2021, between myself and various folk at Meta.

Q. Okay. And so this was about a month after the August 2021 headcount request we were just discussing, right?

A. Yes.

Q. And this e-mail chain involves a Wall Street Journal article, correct?

A. Yes.

Q. Okay. If we look at Page 2, at the very bottom we see an e-mail from Andy Stone, right?

A. Yes.

Q. And on the next page we see the text of that e-mail. The first line, Mr. Stone says: "I wanted to share the full text of the Wall Street Journal's story about Instagram youth research."

Right?

A. Yes.

Q. And then he does reproduce the text of that article and the article is titled "Facebook Knows Instagram Is Toxic For Teen Girls, Company Documents Show." Right?

A. That's what it says, yes.

Q. Going back to that previous page, Mr. Stone sent this e-mail to several people and he copied the Small Group.

Page 136

A.   Yes.

Q.   Are you a part of the Small Group?

A.   Yes.

Q.   And what is the Small Group?

A.   Small Group is, as the name implies, just the handful of sort of senior executives in the company who run the company in its various ways.

Q.   And who is in -- who else is included in that Small Group aside from you?

A.   Oh, the CFO, the CMO, the CTO, the COO, the general counsel, the head of AR/VR, the app leads. It's changed a lot.  It's sometimes not been that small and then it got small again, so sometimes it's a bit of a misnomer, to be honest, but...

Q.   It doesn't sound very small.

A.   No.

Q.   Okay.  If we look at the first page of the document, at the very bottom we see that there is an e-mail from Pratiti Raychoudhury, right?

A.   Hm-hmm.

Q.   And who is Ms. Raychoudhury?

A.   Pratiti Raychoudhury, at that time, had responsibility for some of the research functions in the company.

Q.   If we look at Ms. Raychoudhury's e-mail at

Page 137

the top of the second page --

A.    Yes.

Q.    -- and in particular the second paragraph of her e-mail --

A.    Yes.

Q.    She says:  "I know I am preaching to the choir, but given last week's events, I feel even more convinced that we need to make more progress on the well-being on the product side."

Right?

A.    That's what it says, yes.

Q.    And by last week's events, you understood her to mean the publication of the Wall Street Journal article?

A.    Yes.  I think as per her first sentence, the preceding sentence, I had responded publicly to the Wall Street Journal article.  I remember being, as I still am, incensed by the headline because it is absolutely not what the company documents show at all.  I thought it was a grotesque mischaracterization of our work and of the research that we did.  So she was clearly thanking me for having responded in that way, and then went on to say that she wanted -- she felt this was a, you know, this was a catalyst for her to repeat her

Page 138

views that more work could be done.

Q.   Okay.  So again, she said she feels "even more convinced that we need to make progress on well-being on the product side."

Right?

A.   That's what it says, yes.

Q.   And then she says:  "From everything I am hearing (second hand) that there will be no headcount."

Right?

A.   That's what it says.

Q.   Did you understand this to refer to the headcount request that we were just discussing?

A.   I assume so.

Q.   And that was the one that was not funded, right, in August?

A.   Well, I clearly had questions because I then reply to her asking under whose headcount ask would this have been included, so I think I -- I think I was a little confused what she was referring to.

Q.   Going back to her e-mail, she then says that:  "The plan that the team had put together is bare minimum to get us to parity with TikTok."

Right?

A.   That's what it says, yes.

Page 139

Q.    Did you understand her to mean parity with what TikTok was doing in the well-being space?

A.    I assume she meant whatever that is included in that link but I don't -- I can't -- I can't remember what the -- what that link alludes to.

Q.    And the link says "TikTok expands mental health resources," right?

A.    Yes.

Q.    Moving to Page 1, and looking at your e-mail at 3:11 p.m., toward the top, you ask about the timing of the H/C cycle, right?

A.    Yes.

Q.    That's, just to be clear, that's headcount cycle?

A.    Yes.

Q.    And you ask whether there is an ask that you could resurface, right?

A.    Yes.

Q.    And in fact, you did resurface an ask for well-being headcount later that year, as we were just discussing?

A.    In November, yeah.

Q.    And I know we said we would take a break but I am just going to return to that last --

A.    Sure.

Page 140

MR. IMBROSCIO:  No, absolutely fine, yeah.

Q.    -- exhibit.  So I think it makes sense to --

MR. IMBROSCIO:  Whenever you're ready.

A.    Back to that document?

Q.    Yeah.

A.    The previous one?

Q.    Yeah.  So that was Exhibit 15.

A.    Yep.

Q.    And we'll be quick and then we can --

A.    Sure.

Q.    -- we can all break.  Okay.  So just to reorient ourselves, this was -- this is the e-mail chain that we had been discussing that contains your headcount request, right?

A.    Yes.

MR. IMBROSCIO:  Exhibit 15.

MS. O'NEILL:  Exhibit 15, that's correct.

Q.    And as we discussed earlier, you wrote again to Mr. Zuckerberg in November, right?  That's on the first page of the document.

A.    On November the 10th, yes.

Q.    And you said:  "Circling back re: investment needed to strengthen Meta's position on well-being." Right?

A.    Yes.

Q.   And then you say:  "This investment is important to ensure we have the product roadmaps necessary to stand behind our external narrative of well-being on our apps."

Right?

A.   Yes.

Q.   Okay.  And then going to the second page, at the top you say:  "A number of us have met and agreed upon a revised investment proposal."

Right?

A.   Yes.

Q.   Who did you meet with?

A.   I can only conjecture that it would have been with those who originally surfaced the proposal for this contingency headcount ask to me, so KX, Pratiti, and others, but I can't -- I can't tell you with any greater precision exactly whom I met and when.

Q.   And you all agreed on two points, right?

A.   That's what it says, yeah.

Q.   Can you read the first point?

A.   Do you mean the XFN points?  There are two -- there are two two points.

Q.   Yeah.  Thank you for asking to clarify.  I actually mean the first of the two points, so

Page 142

"Agreement on..."

A.    Yeah.    So Number 1:    "Agreement on the need to fund a central product team to organize cross-company strategy, execution and measurement (as per our approach to other societal issues or privacy).

"2.    Alignment that product work must map to and support our external narrative (as part of Project Beyond.)"

Q.    Okay.    In looking at Point 1, you meant -- you were referring to a centralized team to make sure that well-being strategy, execution and measurement is organized and consistent across the entire company, right?

A.    Yeah.    It's the same theme, that I clearly was anxious that the company should act more as the sort of sum of its parts.    I think it was quite a sort of consistent matter of organizational observation on my part, that -- which is, I think, not unsurprising in most complex organizations, that sometimes people need to be cajoled into working more in harness with each other, yeah.

Q.    And then moving to 2, which, just to refresh ourselves, was "alignment that product work must map to and support our external narrative," right?

And by this you meant that, you know, ensuring that Meta does what it says it does externally and vice versa, making sure that those two aspects match up, right?

MR. IMBROSCIO:  Object to the characterization.

A.   I have to say I'm not -- I'm not entire -- I can't -- I genuinely can't remember what Project Beyond was, because I suspect you're going to ask me what it was.

Q.   Yes.

A.   I honestly can't remember.  There are so many acronyms and labels and names.  I just genuinely don't know what that meant, and I suspect, again, because of my responsibility for how the company explained itself, amongst other things, and showed up externally, that I just -- I guess I wanted some work to be done to make sure that, you know, the left hand was knowing what the right hand was doing.

So I think both -- I think both items, in a sense, relate to the same thing but I just wanted closer -- I wanted the sort of stitching between the different teams' products, presentational and otherwise, to be -- to be brought more closely

Page 144

together.

Q.   Looking at the next paragraph, you note that "Funding the central product team remains our biggest gap."

Right?

A.   Yes.

Q.   And then in the following paragraph, because your August request was denied, you scaled down the request, right?

A.   That's what it says, yes.

Q.   And you -- that's what you wrote, right?

A.   Yes, yes, yes.

Q.   And you gave two options, right?

A.   I'm not sure they're options.  I think I -- I think they're -- are they options?  I think -- it just says "make necessary progress in two ways," so I'm not sure if they're an either/or.  Is what you were suggesting, an either/or?

Q.   That's what I am suggesting.

A.   Ah.

Q.   And I'm wondering if that's your understanding as well.

A.   Can I just read it again?

Q.   Yes, feel free.

A.   Sorry.  I stand corrected.  Yes, they are

Page 145

either/or.  So one is a slightly more maximist version of the other, yeah.

Q.    Great.  And just to go through those quickly, the first option is 25 XFN and zero ENG, meaning engineering, to form a central well-being product pod with two topic pods within it.  Right?

A.    That's what it says, yeah.

Q.    And then the second option is for 7 XFN and zero engineers, and that would be only for a central well-being pod, right?

A.    Yep.

Q.    And you describe that as, in the last line, "the bare minimum needed to meet policymaker inquiries."  Right?

A.    That's what it says, yeah.

Q.    Flipping to Page 1 of the document, there is an e-mail from Naomi Gleit, right?

A.    Hm-hmm.

Q.    And who is Ms. Gleit?

A.    Naomi Gleit is, again, one of the most long-standing employees in the company, has done various roles.  I have a feeling she worked, at that time, as a sort of central product and sort of central issues role, and I certainly recall that she oversaw a central team dealing with a number of what

Page 146

I'd loosely call social issues.

Q.   Okay.  And she writes in her e-mail:  "Mark, for what it's worth, this is my #1 'below the line' project to fund on Social Impact."

Right?

A.   Yes.

Q.   And she says:  "We've also scaled this request back to ask for XFN only and zero engineers given there are none."

Right?

A.   Yes.

Q.   And then, as you noted earlier, Susan Li then says that she will defer to Mr. Zuckerberg on the decision here, right?

A.   Yes.

Q.   And Ms. Li was a member of Meta's finance department, right?

A.   She's now the CFO.  I don't know at what point she became CFO.  Maybe -- maybe she was in effect the deputy CFO at the time.  Is that right?  I can't remember when she made the transition.

Q.   I don't recall either.

A.   Yeah.

Q.   Regardless, she was -- whether she was CFO or not, she was in the finance department, right?

Page 147

A.    Yes, yes, yes.

Q.    And she states that there was a budget meeting that Monday, right?

A.    An upcoming meeting.

Q.    Oh, yes, there was going to be a budget meeting on Monday.

A.    That's what it says, yeah.

Q.    Were you at that meeting?

A.    I can't remember, and I'm not -- I wouldn't normally be there.  I wouldn't normally seek to -- I always have enough meetings, so I was never keen to jump into additional ones.  I don't think that was a meeting I would normally -- I think normally that would be a meeting with Mark and the CFO and the finance team, maybe the COO, but it usually wasn't a -- it wasn't a big meeting.

Q.    Okay.  And, ultimately, this request in November for additional headcount was denied, right?

A.    It did not happen in this form, no, it didn't.  I -- my recollection of it is, but again, you may have material which will jog my memory more, but my recollection of it is that we did make -- well, firstly, I remember there was a debate about whether the sort of central coordinating function that I advocated in both the notes in August and

Page 148

November was really necessary given that there were some central teams already.  So there was an organizational debate about whether this was actually duplicative of some central functions that already existed; and that, secondly, that a number of sort of headcounts were moved around from existing teams to do a lot of this work, which, of course -- I mean, the records show -- I think by - I think within weeks we were -- we were announcing new measures related to well-being on Instagram, like "Take a Break" and, you know, really important tools like that, so clearly the work continued and the resources were found to do the work.  Sorry.

Q.    Yeah.  But just to be clear, no headcount was allocated as part of this request that you made, right?

A.    This contingency request, not in exactly the form this was required but, to be honest, I -- my philosophy always was it's far more important than all this internal sausage making, you know, interaction is what is the out -- final outcome.  Is the product changing and evolving?  Is the company doing the work?  Is the research being commissioned? Are there new tools for well-being, for kids, for parents, being shipped?  And the answer to all of

Page 149

that was yes, so that was certainly my recollection of that period of time.

Q.   And who made the decision to not allocate headcount per your request?

A.   Well, as before, I can't remember how it was communicated.  It would have been communicated through the finance department.  Who exactly took the decision in the -- was it a recommendation from the finance department, was it a decision that Mark Zuckerberg made?  It would clearly be a decision taken by the CFO and the CEO with the CEO, of course, with final authority.

Q.   So the CF -- excuse me.  Mr. Zuckerberg had final authority, right?

A.   Well, he's the CEO and the founder of the company, so, yes, of course he has a considerable amount of authority, but you're asking me a much more specific question, which is who adjudicated on this specific altered requested, altered from August in November in a meeting that I was not in and for which I don't have a -- at least a recollection of exactly how it was communicated to me.  I just can't answer that question.  It would have been a culmination of those people.

Q.   Then --

Page 150

A.   But by -- sorry, but I should stress but by the sounds of it, the CFO or if it was Susan Li, the Deputy CFO at that time, did not look favorably on the request before it was even being discussed with Mark Zuckerberg.

MS. O'NEILL:  Okay.  I think that's all the questions I have on this document, so probably a good time to take a break.

THE VIDEOGRAPHER:  All right.  We are going off the record at 12:45 p.m.

(Recess from 12:45 p.m. until 1:30 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 1:30 p.m.

BY MS. O'NEILL:

Q.   Good afternoon, Mr. Clegg.

A.   Good afternoon.

Q.   We're going to dive back into some documents.

MS. O'NEILL:  So can you pull up 42.A?  And this is going to be marked as Exhibit 17, and it is Bates stamped META3047MDL-064-00000101.

(Discussion off the record.)

(Meta - Clegg Exhibit 17 was marked for identification.)

BY MS. O'NEILL: