# Exhibit 115

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              )
PERSONAL INJURY PRODUCTS           )   MDL No. 3047
LIABILITY LITIGATION               )
                                   )
                                   )

 SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
   COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING     )
SPECIAL TITLE [RULE 3.400] )
                            )
SOCIAL MEDIA CASES          )   Lead Case No.
_____)   22STCV21355
This Document Relates To    )
                            )
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI,          )
ATTORNEY GENERAL and        )
REPORTER,                   )
v.                          )
META PLATFORMS, INC., and   )
INSTAGRAM, LLC.             )
_____)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VOLUME 1
VIDEO-RECORDED
DEPOSITION OF SHAYLI JIMENEZ
(Pages 1 - 356)
Covington & Burling
415 Mission Street, San Francisco, California
Tuesday, February 11, 2025, 9:12 a.m.
- - - -
REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

Page 274

Chat.

BY MR. PHELPS:

Q. And presumably it's because you thought this image was relevant to Instagram, right?

A. I wouldn't say that necessarily.

Q. Okay. And, Jim, can you expand the Chat just a little bit more.

So let's just break that down.

You say [as read]:

Oh, my gosh, y'all, IG is a drug.

Right?

A. Yes.

Q. And then ▮ says [as read]:

LOL, I mean, all social media.

Right?

A. Yes.

Q. And you say [as read]:

Seriously, it is! We are causing reward deficit disorder because people are binging on IG so much they can't feel reward anymore, like the reward tolerance is so high.

Right? That's what you say here?

A. That's what I said.

Q. And then you shared this image, right?

A. Yes.

Page 275

Q. And my question to you is, you thought this image was relevant to this discussion about IG being a drug and causing reward deficit disorder, right?

A. I wouldn't put it like that. I shared this image to basically provide some sort of explanation for why people may not be enjoying Instagram, because we had previous discussions about people not -- about increasing the value that people get out of Instagram.

Q. And one reason people may not have enjoyed Instagram is because they had fallen into the cycle illustrated in this schematic.

Is that what you are saying?

MS. BARNHART: Object to the characterization.

THE WITNESS: I don't know that at all.

BY MR. PHELPS:

Q. That was a hypothesis you were sharing with your colleagues, right?

A. In the context of this Chat, it's not a -- it's not a hypothesis that I was seriously considering. It's just a casual Chat. Like I said, that was following on another conversation about people trying to increase the value of Instagram for

Page 276

our users.

Q. But in the context -- you are saying in this casual Chat you said, quote [as read]:

We are causing reward deficit disorder because people are binging on IG so much they can't feel reward anymore.

And you are -- your testimony is that is just a casual statement?

A. There is a shared context amongst us researchers in this Chat. Believe it or not, we throw around hypotheses, frameworks, and things like this on a pretty normal, regular basis to spark conversation, to provoke thought, to inform new hypotheses and the like. So this is not to imply that this is a real thing. This is a casual conversation amongst us researchers, who -- like I said, this is contextual to another conversation that we had had before.

Q. Okay. And do you see the word "hypothesis" anywhere in this Chat?

A. It's not in this Chat, but, like I said, there is a shared context and a shared understanding among researchers. These are all researchers in this conversation.

Q. Okay. And so a hypothesis that you are

Page 277

throwing out there for discussion is that IG is a drug? That's your testimony?

A. No.

Q. What did you mean when you said "IG is a drug"?

A. When I said, "Oh, my gosh, y'all, IG is a drug," it's -- you see I started the conversation. It's to grab their attention. It's a joke.

Q. You thought this concept that IG was a drug was a joke?

A. In this context, shared between myself and other researchers, it's a hyperbole for some problems that we were discussing around needing to possibly increase the value that users were getting from Instagram.

Q. Okay. And you say, you followup, the next thing you say after IG is a drug is "seriously, it is," exclamation mark, right?

A. Yes.

Q. And you don't say JK, LOL, right?

A. I don't need to say JK, LOL. As you can see, ▮ said LOL and made another hyperbolic statement. So it's implied.

Q. Okay. Either way, you put this -- as part of this lighthearted conversation, you put in a

70 (Pages 274 - 277)

CONFIDENTIAL

Page 278

schematic about addiction that originated from an academic article analyzing alcohol addiction, right?

MS. BARNHART: Object to the characterization.

THE WITNESS: I -- like I mentioned, I never saw that article. So where it came from, that is irrelevant to this conversation. And as I mentioned before, this type of Chat amongst researchers is very, very common in the sense of sharing things we find, sparking ideas, and conversation around it.

BY MR. PHELPS:

Q. Okay. And was -- was your decision to share this schematic, was that a -- kind of a continuation of the joke?

MS. BARNHART: Object to the form. Characterization.

THE WITNESS: In a way. It's to continue the thought, but the conversation -- it's not that the whole conversation is a joke, but it is a casual conversation amongst researchers exchanging ideas and hypotheses.

BY MR. PHELPS:

Q. I want to make sure I understand, because you said -- I'm looking at your testimony. You

Page 279

said, "When I said, oh, my gosh, y'all, IG is a drug, I started the conversation to grab their attention. It's a joke."

So the first sentence is a joke, right?

A. The first sentence is a conversation starter.

Q. It's not a joke or it is?

A. It's -- depends on how you define a joke. The way that I'm defining a joke is saying something exaggerated, something that is going to catch their attention.

Q. Okay. Well, you testified that that sentence was a joke.

So how did you mean that?

A. Like I just said, it's an exaggeration. It's a hyperbole. It's a joke in that it's an exaggerated statement to catch their attention.

Q. Okay. When you say " seriously, it is!" is that still part of the joke?

A. That is still part of the way that we converse in the sense of exaggeration or exclamation.

Q. So it is part of the joke still?

MS. BARNHART: Object to the characterization. Asked and answered many, many,

Page 280

many times.

BY MR. PHELPS:

Q. Okay. Let's go to the next. You say [as read]:

We are causing reward deficit disorder because people are binging on IG so much that they can't feel reward anymore, like their reward tolerance is so high.

Is that statement serious or is that statement a joke?

A. That statement is not a fact or anything researcher-based. It's a hypothesis I'm throwing out there as a follow-on to the joke, jokingly, but something to share, to share with my like-minded research colleagues. These are things that we exchanged amongst -- exchange among each other often, our frameworks and different artifacts.

Q. Okay. And so -- when you share this image, is this image, to your mind, a continuation of the joke or is this serious?

MS. BARNHART: Object to the form.

THE WITNESS: In the context of this Chat, it is additional -- additional content for the conversation that we're having.

///

Page 281

BY MR. PHELPS:

Q. And is it part of the joke or not? I'm just trying to understand that.

MS. BARNHART: Object to the form. Asked and answered.

THE WITNESS: So what I was explaining is, amongst researchers, we share different artifacts and frameworks and content that are relevant -- like this is relevant to the conversation. The conversation is started off in a big exaggerated way, and this chart just follows on to that.

BY MR. PHELPS:

Q. Okay. So we're transitioning to a more serious part of the discussion? Do I understand that?

A. It's more serious in the sense that we are considering the chart or we're continuing the conversation, and it's not all of -- it's not just me grabbing their attention. I have their attention. Now we're discussing.

Q. Now we're taking it a little more seriously, because you thought this chart was relevant to Instagram, right? This is a discussion about Instagram?

MS. BARNHART: Objection to the

71 (Pages 278 - 281)

CONFIDENTIAL

Page 282

characterization. Asked and answered.

THE WITNESS: I am not going to say that this chart is relevant to Instagram because this chart has no basis in any Instagram research or data. It's just a chart that is demonstrative of what I mentioned earlier, about reward deficit disorder, so to provide some additional context to what I'm talking about in the previous statement.

BY MR. PHELPS:

Q. And the previous sentence says "we," meaning IG, "are causing reward deficit disorder," right? Is that right?

A. So I'm saying we, referring to Instagram, are causing reward deficit disorder. But this is not a validated statement. Like I said, it's a hypothesis. It's an idea. It's a thought that I'm throwing out there to my fellow researcher colleagues.

Q. Got it.

Let's unpack this schematic a little bit.

The arrow at the top is preoccupation and anticipation.

Do you see that?

A. Yes.

Q. Okay. And you would agree that -- would

Page 283

you agree that users could become preoccupied or have anticipation for Instagram?

A. I don't know.

Q. You don't. Okay.

A. I don't know.

Q. And then the -- there is an arrow from preoccupation and anticipation to binge intoxication.

Do you see that?

A. Yes.

Q. And you -- that concept of binging comes up in your Chat. You see that, right? People are binging so much on IG.

Do you see that?

A. Yes.

Q. And so you had an understanding that people could binge on Instagram, right?

MS. BARNHART: Object to the characterization.

THE WITNESS: I don't know that to be -- I don't know that.

BY MR. PHELPS:

Q. But you said people are binging on IG, right? You said that?

A. I'm speaking from my own experience.

Page 284

Q. Okay. And so we see binge intoxication here. And then the arrow between preoccupation and anticipation towards binge intoxication is -- the executive function disorder.

Do you see that? That's the arrow that connects those first two boxes.

A. Yes.

Q. And then from binge intoxication, there is another arrow to withdrawal negative affect. Do you see that?

A. Yes.

Q. And there, kind of under that arrow, is this concept rewards deficit disorder, right?

A. Yes.

Q. And that's getting -- you say in the Chat -- you describe reward deficit disorder as people effectively can't feel rewards anymore. Their tolerance is too high.

Right?

A. What I'm referring to in this Chat, as it pertains to Instagram, is that people are getting content, they receive content, and after some time, that content -- the content that we're giving them isn't giving them value anymore.

Q. And the reward tolerance is so high,

Page 285

right?

A. I don't know that.

Q. Okay. But that's what you said, right?

A. Like I said, the context of this Chat is throwing out an idea to my fellow research colleagues, somewhat jokingly, about why people may be less satisfied on Instagram now.

Q. Okay. And so this part -- so when you're talking about this chart, this is -- you are taking this chart somewhat jokingly?

A. I can't take it completely literally and it wasn't intended to be literal to Instagram because I've -- I have no studies or data that have ever tried to track this or, like, see if this exists on Instagram. I don't know.

Q. You don't know whether that's been tested or not?

A. I don't know.

Q. Okay. We see from withdrawal negative affect to stress surfeit disorder, right?

A. Yes.

Q. And that takes us back to the top of the circle, right?

A. Yes.

Q. Do you know if users might experience

72 (Pages 282 - 285)

CONFIDENTIAL

Page 318

when you said [as read]:

I know Adam doesn't want to hear it. He freaked out when I talked about dopamine in my teen fundamentals leads review but it's undeniable.

Were you telling the truth when you wrote that?

MS. BARNHART: Object to the form.

THE WITNESS: I may have been exaggerating, the way that I've been, you know, sensationalizing most of this conversation.

BY MR. PHELPS:

Q. Okay. And so you think this is further sensationalism by you; is that right?

A. I -- I think it is, to some extent, an exaggeration.

Q. Okay. And we've talked now many times about references to dopamine in your teen fundamentals review, right?

A. Yes.

Q. And you put a lot of work into that teen fundamentals review, right?

A. Yes.

Q. You read a textbook, right?

A. I would not say I read that textbook completely, but I referred to it, yes.

Page 319

Q. Yeah, and you read this teenage brain book, too, right?

A. Yes, I did.

Q. Okay. And based on that review, you included the word "dopamine" in your presentation about teen fundamentals that went to IG leads, right?

MS. BARNHART: Object to the characterization.

THE WITNESS: I used the term "dopamine" in my speaker notes, yes.

BY MR. PHELPS:

Q. Okay. And that was manifested in the physical slides that we have been looking at today, right?

A. What do you mean?

Q. The speaker notes are reproduced in the slides that we have been looking at today, right?

A. Yes.

Q. Okay. And the reference here is to Adam Mosseri when you talked about Adam freaked out, right?

A. This is referring to Adam Mosseri.

Q. He's the head of Instagram?

A. Yes.

Page 320

Q. And what do you mean when you said, "He freaked out when I talked about dopamine in my teen fundamentals leads review"?

A. I don't remember exactly what I mean. I just remember him having a reaction.

Q. Tell me about that reaction.

A. I don't remember what it was. It was just a notable reaction when I used that term.

Q. And in what sense notable?

A. I -- I don't know, maybe he might have made a face. I'm not sure. I don't remember exactly what happened.

Q. Do you have any memory at all about his response to that besides him maybe making a face?

A. I don't -- I honestly do not remember what exactly his reaction was. I just remember him having a reaction.

Q. Was it a negative reaction or a positive reaction?

MS. BARNHART: Object to the form.

THE WITNESS: I'm not sure. I'm -- I don't think it was positive but I can't remember what the reaction was.

BY MR. PHELPS:

Q. Okay. That was your first -- that was

Page 321

within, like, your first half on Instagram, right?

A. Yes.

Q. And is going in front of IG leads, I mean, that's a significant thing for an employee to do, right?

You would agree with that?

A. Well, it depends on your role.

Q. For you, as a new member of the Instagram team, I mean, that was, you know, a significant moment as you are going into Instagram and trying to establish your credibility, your first big presentation to Mr. Mosseri, that was a significant moment for you, right, professionally?

MS. BARNHART: Object to the form.

THE WITNESS: It was a milestone in the workstream.

BY MR. PHELPS:

Q. Yeah.

A. Yes.

Q. And -- but you can't tell me -- you can't tell me anything other than he might have made a face about how he reacted to your presentation?

A. I don't want to make it up. I really don't remember.

Q. Okay. Do you remember him saying anything

81 (Pages 318 - 321)