# EXHIBIT 1

E-Served: Jan 14 2026  10:48AM PST  Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

**01/12/2026**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ A. Rosas _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
# FOR THE COUNTY OF LOS ANGELES

### *Social Media Cases*
### JCCP5255
### (Lead Case: 22STCV21355)

**Dept. 12 SSC**
**Hon. Carolyn B. Kuhl**
**Date of Hearing: January 9, 2025**

**Court's Directive as to Re-Filing of Documents in Compliance With the Court's Rulings Set Forth Below:**

**With respect to all filings related to the underlying motions at issue in the Motions to Seal addressed below, the filing party must, within 30 days, (1) for documents that were filed with  redactions in the public file and that contain no information that may remain under seal under this court's rulings below, file an unredacted copy of such documents in the public record; and (2) for documents that contain some information that may remain under seal under this court's rulings, (a) file a properly redacted version of that document in the public record  containing only approved redactions, and (b) file an unredacted copy of that document under seal with the court, adding to the top of such filing "Sealed by Order of the Court (date)."  When re-filing any document pursuant to this Order, put a legend at the top of the pleading that states "Originally filed (date)."**

**Unless any party objects within 10 days, the court will dispose of all documents previously filed provisionally under seal in connection with any of the Motions discussed below.**

**Defendants' Omnibus Motion to Seal (Motions for Summary Judgment and Adjudication)**

Court's Ruling:  The Motion is granted as to the redacted portions of Bates SNAP4877814 (i.e., Ex. 21 to Ayers Declaration filed on September 15,

1

2025).  The Motion is granted as to Google's URL addresses for internal, non-public webpages and documents.  The Motion is also granted as to non-deposed, non-executive current and former employees' names and identifying information (including email addresses), which may be redacted from the public record.  The Motion is denied as to all other documents.

On October 30, 2025, this court issued an order largely denying Defendants' motion to seal documents filed in connection with briefing on Defendants' *Sargon* motions.  (October 2025 Ruling).  Defendants had moved to seal four categories of information: (1) the names and other identifying information of their non-party, non-executive employees (and the email addresses of all employees); (2) the average daily usage statistics of Snapchat for 13–17 year old users in the United States for the first quarter of 2025; (3) excerpts of two expert reports depicting Meta's user figures, metrics, and benchmarks; and (4) information identifying non-party, non-employee individuals.  The court ruled that only the following information was entitled to remain under seal:

> (1) the names and other identifying information of Defendants' non-executive employees who have not been deposed in the MDL or JCCP proceedings, and, (2) as to executive employees and persons who have been deposed in the MDL or JCCP proceeding, personal identifying information other than their names.

(October 2025 Ruling, at p. 1.)

Defendants now move to seal certain documents that were filed in connection with briefing on motions for summary judgment/adjudication. Defendants move to seal three general types of information: (1) names and other identifying information (i.e., email addresses) of non-executive employees; and (2) information that Defendants claim constitutes their confidential financial, commercial, and/or technical information; (3) information of non-parties.

"The court may order that a record be filed under seal only if it expressly finds facts that establish: (1) There exists an overriding interest that overcomes the right of public access to the record; (2) The overriding interest supports sealing the record; (3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; (4) The proposed sealing is narrowly tailored; and (5) No less restrictive means exist to achieve the overriding interest." (Cal. Rules of Court, rule 2.550, subd. (d).) "A party requesting that a record be filed under seal must file a motion

2

or an application for an order sealing the record. The motion or application must be accompanied by a memorandum and a declaration containing facts sufficient to justify the sealing." (Cal. Rules of Court, rule 2.551, subd. (b)(1).) "The court must not permit a record to be filed under seal based solely on the agreement or stipulation of the parties." (Cal. Rules of Court, rule 2.551, subd. (a).)

A party seeking to have a record sealed must offer facts to establish that the "overriding interest supports sealing the record," and that "[a] substantial probability exists that the overriding interest will be prejudiced if the record is not sealed." (California Rules of Court, rule 2.550, subd. (d)(2)-(3).) "*Substantial probability* is a higher standard than *reasonable likelihood*, the latter of which has been construed to mean something less than more probable than not yet greater than something that is merely possible." (*Marino v. Rayant* (2025) 110 Cal.App.5th 846, internal citations, quotation marks, and brackets omitted; italics added.) As one court put it, the party moving to seal the documents must make a "specific showing of serious injury" resulting from the public filing of the confidential documents. (*Universal City Studios, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1273, 1282.)

*Information of Non-Executive, Non-Deponent Employees*

"Meta, [Google], and Snap seek to seal only non-executive current and former employee names of those who have not been deposed, and other identifying information (like email addresses), to protect employees' privacy and safety." (Defs' Mot., at p. 3.) This court has already ruled that such information is entitled to remain under seal. Defendants may therefore redact such information from the records before they are re-filed in the public record.

*Snap's "Commercially Sensitive Information"*

"Snap seeks to seal only portions of the following seven (7) documents: SNAP5288444; SNAP1220888; SNAP2298677; SNAP2913168; SNAP3721616; SNAP6108881; SNAP3117707. Snap is providing the Court with highlighted versions of these seven documents to reflect the portions that it will not seek to seal, as set forth in the accompanying November 4, 2025 Declaration of Laura M. Lopez" (Lopez). (Defs' Mot., at p. 5, fn. 3.)

Defendants submit a declaration by Abby Tran (Tran) in support of this sealing request. Tran is "a Product Manager for the Core Messaging Product at [Snap]." (Tran Decl., ¶ 1.) Tran has worked to ensure that new product features align with Snap's safety standards. (Tran Decl., ¶ 2.) Tran claims:

3

> 3. The twelve (12) documents … contain trade secrets, confidential product or business information, or data that, if disclosed publicly, would cause significant competitive harm to Snap. Specifically, Snap is requesting narrowly tailored sealing, including only partial sealing for seven of the below documents, to capture only the specific information that would cause competitive harm to Snap if publicly disclosed.
>
> 4. These documents fall into three general categories, each of which poses risks to Snap's competitive standing and/or the safety of its users, as described further below: (I) proprietary product development, analytics, and roadmapping; (II) safety and moderation frameworks; and (III) financial forecasting and strategy.

(Tran Decl., ¶¶ 3-4.) The court notes that information regarding Snap's functioning and its safety features is directly relevant to the claims in this litigation.  The public's interest in accessing such information when it is filed in this litigation for the purposes of a merits adjudication is thus very strong.

Tran claims that "the document at Bates SNAP4877814[, which] has been produced in the above-captioned case and is Exhibit 21 to the September 15, 2025 Declaration of Christopher Ayers ISO Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ('Ayers Declaration') … contains non-public information concerning Snap's work in augmented reality [or "AR"] and generative artificial intelligence, including its proprietary 'Lens' feature."  (Tran Decl., ¶ 6.)  Trans claims that "[d]isclosure would reveal Snap's research priorities, methodologies, and engineering design philosophy, and would provide competitors insight into Snap's strategic priorities in emerging technologies, enabling them to anticipate or replicate Snap's proprietary innovations and erode Snap's competitive advantage."  (Tran Decl., ¶ 6.)  Given that AR does not appear to be at the center of the upcoming bellwether trials (or the relevant motions for summary judgment), and in light of Tran's statements regarding how such information could be used by Snap's competitors, the Motion is granted as to the redacted portions of Bates SNAP4877814 (i.e., Ex. 21 to Ayers Declaration filed on September 15, 2025).

The same conclusion cannot be reached as to the other documents mentioned by Tran in her declaration.  These documents are highly relevant to this litigation, as they deal with user engagement, safety features, and potentially how Snapchat's design was driven by maximizing user engagement in the pursuit of maximizing revenue.  For example, Snap

4

attempts to seal "research and analysis concerning user engagement with Snapchat's Stories feature," "internal financial and operational strategy for aligning product and monetization priorities," "analysis and data regarding user visitation behavior on Snap Map," and "internal strategy materials related to Snap's safety initiatives and parental perception efforts." (Tran Decl., ¶¶ 14-17.) Such information lies at the very heart of a determination of Snap's liability. Yet, Tran's Declaration fails to provide sufficient facts to show that such information is indeed trade secret information, or that the release of such information would likely lead to any specific injury to Snap. The court notes that Tran has not identified the specific portions of the documents that she believes must be sealed to avoid future harm to Snap's business. In this situation, the public right to access the court record prevails over unclear claims of prejudice. The Motion is thus denied as to these Snap documents.

*Google's "Confidential Trade Secret Information"*

Google seeks to seal numerous types of information in numerous documents. The categories of information are: (1) internal databases/user data; (2) age detection systems; (3) content moderation policies, procedures, and classifiers; (4) competitor analyses; (5) offerings and operations; (6) financial planning and budgeting information; (7) engagement metrics; (8) URLs to internal webpages. In support of its request to seal around 100 different documents, Google has submitted a 10-page declaration by Ian McMeans (McMeans).

McMeans "served as a Software Engineer at Google since 2017." (McMeans Decl., ¶ 1.) McMeans provides no other basis for the court to assess his qualifications to offer relevant testimony regarding the documents.

With respect to internal databases/user data, McMeans claims that Google is attempting to seal information regarding "how it collects and stores data concerning YouTube users." (McMeans Decl., ¶ 3.) McMeans claims that Google keeps such information confidential because, if made public, "it could create security risks from bad actors seeking to target specific categories of user information in [Google's] possession." (McMeans Decl., ¶ 4.) This statement is too vague to make a specific showing of serious injury. Google must do more than merely claim that release of data may hypothetically allow unidentified bad actors to access other unidentified data in Google's possession. McMeans suggests that the information could also be used to "identify individual users, including for purposes of harassing, threatening, and/or doxxing those users." (McMeans Decl., ¶ 3.) But McMeans fails to offer any facts to explain or support this claim. For

5

example, there is no evidence that would allow this court to reach any conclusion as to the likelihood of a "doxxing" arising from the filing of the data in the public record of this litigation.  Nor does McMeans specifically identify which information might be used to dox individual users and which information could "create security risks from bad actors seeking to target specific categories of user information in [Google's] possession."

With respect to age detection systems, McMeans offers the following paragraph in support of Google's sealing request:

> YouTube maintains information about the operation of its age detection systems as confidential trade secret information because, if made public, it would permit bad actors (as well as the users these systems are intended to protect) to circumvent them. YouTube also keeps this information confidential because it could be used to facilitate replication of YouTube's proprietary methods by competitors without incurring the corresponding development costs or risks, depriving YouTube of the economic value and competitive advantage that flows from its investment and innovation and giving those competitors an unfair advantage. This trade secret information includes, for example, specific details regarding how YouTube's age detection systems function and the criteria used by YouTube's systems for age detection. This information is highly valuable to competitors developing their own age detection systems, and the value of this information to YouTube relies on its continued secrecy.

(McMeans Decl., ¶ 6.)  However, the actual information that Google seeks to seal is not highly technical.  For example, under paragraph 6 of the McMeans declaration, Google seeks to seal the following language:

> The model ingests user activity data to generate a confidence score indicating how likely it is that a particular user is an adult; it does not and cannot estimate the age of the user. Based on the confidence score, the model assigns a binary label predicting whether or not the user is likely under or over the age of 18, and inferred teens will be placed in a "minor mode" experience. If the model erroneously infers that the user is likely under the age of 18, the user has the option to complete an age assurance flow that gives them multiple ways to verify that they are over 18 years old.

6

(McMeans Decl., Draper Decl., Ex. 72, at p. 1.)  McMeans, a software engineer, provides no factual evidence to show that Google's business would be harmed if an unidentified competitor copied YouTube's age verification procedures.  Most importantly, age verification has been an important issue in this litigation such that the public's interest in viewing this type of information is very high.  The Motion is thus denied as to such information.

As for content moderation policies, procedures, and classifiers, McMeans offers the following paragraph in support of Google's sealing request:

> YouTube maintains information about its content moderation policies, procedures, and classifiers as confidential trade secret information because, if made public, bad actors could circumvent those policies, procedures, and classifiers to evade YouTube's content moderation processes or otherwise exploit YouTube's content moderation systems. Beyond the risk of circumvention, there is also documented evidence that bad actors have engaged in drastic measures based on disagreement with content moderation decisions, including real world violence. YouTube also keeps this information confidential because it reflects proprietary methods developed through significant investment and could be used by competitors to replicate YouTube's proprietary methods without incurring the corresponding development costs, giving those competitors an unfair advantage. This trade secret information includes, for example, detailed internal descriptions of the lines YouTube draws when enforcing its content guidelines, and granular information about specific content criteria/characteristics against which YouTube will or will not enforce a particular content guideline.

(McMeans Decl., ¶ 7.)  McMeans fails to explain how the specific information referenced could be used to evade content moderation systems.  Nor is the sealing request narrowly tailored to technical information that might be used by a competitor to somehow undercut Google's business.  For example, McMeans' declaration is meant to support a request to seal the fact that Google distinguishes between "mindless and addictive content" and "learning videos," which have some "educational value."  (See McMeans Decl., Draper Decl., Ex. 81, at pp. 1-2.)  By way of another example, Google seeks to seal the following language based on paragraph 7 of the McMeans declaration: "Teens are at a developmental stage where they are forming their identity

7

and sense of place in the world, so they are more heavily influenced by messages they see repeatedly in content than adults. This can have positive or negative effects on their wellbeing (link to wellbeing framework)." (McMeans Decl., Draper Decl., Ex. 111, at p. 1.)  McMeans' declaration does not justify an order sealing such information.  The Motion is thus denied as to "content moderation policies, procedures, and classifiers."

With respect to "competitor analyses," McMeans offers the following paragraph in support of the sealing request:

> YouTube maintains information regarding its analyses of competitors as confidential trade secret information because that information provides insights into YouTube's competitive strategic decision-making, encompassing the identification and evaluation of competitors, competitive threats, market opportunities and strategic priorities. If available to competitors, this proprietary strategic intelligence would give those competitors an unfair advantage by enabling them to determine how YouTube evaluates competitors' behavior and would allow those competitors to adjust their own strategies to counteract or preempt YouTube's strategic priorities and otherwise undermine YouTube's competitive position. This trade secret information includes, for example, internal analysis of research findings related to usage of competitors' platforms and how those findings compare to YouTube.

(McMeans Decl., ¶ 8.)  McMeans' explanation of his basis for making these factual claims regarding, for example, "how YouTube evaluates competitors' behavior," is limited by his claim that he is a software engineer.  It remains unclear why a software engineer would be qualified to offer testimony as to the real effect on Google of releasing Google's evaluations of competitors' behavior.  McMeans' declaration thus does not support an order sealing this information.  The information itself includes, for example, the results of a survey asking respondents to indicate how often they watch videos on YouTube and TikTok; from this information and the McMeans declaration, the court is unable to conclude that the release of such information would cause Google to suffer any important competitive harm.  The Motion is denied as to these documents.

The next category of documents is "product and project operations." McMeans broadly claims that this "information reveals insights into YouTube's non-public product and feature launches, competitive priorities, and strategic decision-making and could be used to replicate YouTube's

8

proprietary methods, features, and projects or preempt planned features without incurring the corresponding development costs or risks, depriving YouTube of the economic value that flows from its investment and innovation and giving competitors an unfair advantage if that information were revealed." (McMeans Decl., ¶ 9.) This category includes "information regarding launched product and project operations," and "information regarding past/deprecated product and project operations." (McMeans Decl., ¶¶ 10-11.) From paragraph 9 through 12 of McMeans declaration, it is difficult to actually identify the specific nature of the information Google seeks to seal. McMeans adds that the information "includes," (i.e., is not limited to) "details of YouTube's internal strategy for the development and launch of new features, including descriptions of how those features function at a technical level." McMeans' declaration does not support a finding that the disclosure of this information would risk serious injury to Google's business. The sealing request is also not narrowly tailored. For example, Google seeks to seal language like the following: "To have healthy ecosystem we must also cultivate a community - a place where users have a sense of belonging. We must make it fun and easy for creators to engage with viewers and other creators, and for viewers to engage back." (McMeans Decl., Draper Decl., Ex. 18, at p. 2.) That YouTube believed it needed to create a "sense of belonging" among users is simply not trade secret information, the release of which would commercially harm Google. The Motion is denied as to these documents.

McMeans offers the following two paragraphs to justify an order sealing "financial planning and budgeting information":

> 13. YouTube maintains information regarding current/ongoing financial planning and budgeting as confidential trade secret information because that information reveals insights into YouTube's non-public product and feature launches in development, competitive priorities, and strategic decision-making, and could be used to replicate YouTube's proprietary methods, features, and projects or preempt planned features, giving competitors an unfair advantage if that information were revealed.
>
> 14. This disclosure of this information has market-moving impacts, and disclosure of such data outside of the context of proper disclosure vehicles (such as SEC filings) could cause confusion, adversely impact investor confidence, and cause unwarranted market reactions. This category of trade secret information includes, for example, non-public budget figures and spend-to-date details for

9

particular projects intended to achieve specific strategic goals.

(McMeans Decl., ¶¶ 13-14.)  This sealing request concerns a single document: Draper Declaration, Exhibit 31.  McMeans, a software engineer, has simply failed to show that he is qualified to offer testimony regarding the nature of (1) the information under seal, or (2) the likely effect of allowing such information to be filed in the public record.  For example, McMeans is not qualified to offer his opinion that disclosure of the information could "adversely impact investor confidence, and cause unwarranted market reactions."  The court notes that the request is not narrowly tailored, as Google purports to seal the document to the extent it merely lists publicly accessible webpages.  (See McMeans Decl., Draper Decl., Ex. 31, at pp. 2-3.)  The Motion is denied as to this document.

As for "engagement metrics," McMeans addresses four different subtypes of engagement metrics: (1) daily active users; (2) watch time; (3) feature-specific engagement metrics; and (4) age-specific engagement metrics.  McMeans argues that such information constitutes protected trade secrets because "disclosure of this information has market-moving impacts, and disclosure of such data outside of the context of proper disclosure vehicles (such as SEC filings) could cause confusion, adversely impact investor confidence, and cause unwarranted market reactions."  (McMeans Decl., ¶ 15(a); see also ¶ 15(c), (d).)  As noted above, McMeans is not demonstrated that he is qualified to offer such testimony regarding "investor confidence" and "market reactions."  With no real explanation, McMeans claims that information regarding "watch times" "reveal[s] insights into YouTube's competitive priorities and strategic decision-making."  (McMeans Decl., ¶ 15(b).)  As with other categories of information, it is impossible for this court to even conclude which information fits into this category.  For example, McMeans claims that the highlighted information on page 1 of Exhibit 118 to the Draper Declaration includes "watch time" data (see McMeans Decl., Appx. K.)  However, the highlighted portions of this page of Exhibit 118 include email addresses, links to websites, and the statement that "[s]hort-form mobile native creators want to be provided everything they need to make a video and build an audience."  (McMeans Decl., Draper Decl., Ex. 118, at p. 1.)  Accordingly, McMeans declaration does not support an order sealing these documents.

As for URLs, McMeans states:

> YouTube keeps URLs to internal, non-public webpages and documents confidential as trade secret information because, if made public, there is a serious risk that large numbers of

10

> unauthorized users could attempt to access these private webpages and documents. This would flood Google's systems designed solely for internal employee traffic, thereby disrupting or disabling business operations. This trade secret information consists of direct links to these private pages that the public could attempt to access without additional login credentials.

(McMeans Decl., ¶ 2.)  URLs for internal, non-public webpages and documents, as distinct from the webpages and documents themselves, would seem to have little probative value in the litigation.  McMeans, as a software engineer, has a basis to opine as to how internal webpages and communications could be accessed or disrupted by outside unauthorized users.  The court will allow URLs to internal, non-public webpages and documents to be redacted.

*TikTok User Data Metrics*

ByteDance "seeks to seal user data metrics that are used in monitoring user engagement with and performance of various features on the TikTok platform from the last two years."  (Defs' Mot., at p. 13.)  In support of this sealing request, ByteDance has submitted a declaration by Noreen Yeh (Yeh), who is "an electronic discovery analyst … work[ing] within TikTok's electronic discovery group."  (Yeh Decl., ¶ 1.)  Yeh claims to be "familiar with electronic documents, TikTok's preservation policies, and collection processes."  (Yeh Decl., ¶ 1.)

Yeh claims that certain exhibits to the Declaration of Felicia Craick in Support of Plaintiffs' Oppositions to Motions for Summary Judgment (Craick Decl.) filed on September 15, 2025, contain ByteDance's information that is maintained confidential by ByteDance.  Yeh claims that the documents "concern user data metrics that are used in monitoring user engagement with and performance of various features on the TikTok platform from the last two years."  (Yeh Decl., ¶ 4.)  Yeh claims that the data, if released, would give TikTok's competitors an unfair advantage:

> TikTok competes with many companies, including companies that facilitate the ability of users to share, communicate, and discover content and information online. TikTok faces intense competition in its business. As a result, TikTok takes great care to protect information related to metrics and business strategy. Usage statistics and metrics are key indicators of the TikTok platform's performance and competitive position in the market. Among other things, the

11

disclosure of these data will provide competitors with the latest insight into TikTok's user engagement trends over time and across features, among a pertinent demographic of users. In addition, usage statistics and metrics are used to evaluate the effectiveness of platform features or policies relative to TikTok's competitors, and for the company to plan for future platform features or policies. Making usage statistics and metrics over the last two years public would risk revealing TikTok's strategy regarding platform features or policies to its competitors. And TikTok also relies on usage statistics and metrics to guide its strategy with partners, including advertisers, and in its negotiations with those partners. Making this information public— particularly given its recency—would harm TikTok's ability to negotiate with its partners.

(Yeh Decl., ¶ 5.)  Yeh has failed to offer facts to explain why, as "an electronic discovery analyst," Yeh would be qualified to testify as to how the usage data could be used by competitors or advertisers to harm ByteDance's business.  Moreover, the claims of harm are too generalized to make a *specific* showing of serious injury.  Weighed against this weak showing is the fact that usage metrics are highly relevant to Plaintiffs' claims at trial, such that the public has a significant interest in having access to such information when it is submitted for the purposes of resolving merits issues.  The Motion is thus denied as to these documents.

Yeh also argues that exhibits 69 and 122 should be filed under seal because they "relate to TikTok's responses to the Committee on Foreign Investment in the United States (CFIUS)."  (Yeh Decl., ¶ 7.)  Yeh presents the following legal argument in support of ByteDance's sealing request:

"CFIUS filings are protected as confidential pursuant to 5 U.S.C. § 552(B), 50 U.S.C. § 4565(C), 31 C.F.R. § 800.702, and 32 C.F.R. § 286." *Vizio, Inc. v. LeEco V. LTD.*, 2018 WL 5303078, at *3 (C.D. Cal. July 27, 2018); see also *SeeDevice Inc. v. Korean Broad. Sys.*, 2025 WL 864668, at *1 (C.D. Cal. Feb. 3, 2025) (sealing CFIUS disclosures). Companies provide information to CFIUS with an expectation of confidentiality, which in turn motivates rigorous disclosures and candor. Requiring companies to publicly disclose these documents in unrelated litigation would undermine the confidentiality of the CFIUS process and cause harm to TikTok's competitive position in the market.

(Yeh Decl., ¶ 7.)  However, as "an electronic discovery analyst," Yeh has failed to show that she is a qualified to offer her conclusory opinion that disclosure would "would undermine the confidentiality of the CFIUS process and cause harm to TikTok's competitive position in the market."

In one of the cases cited by Yeh in her declaration, the court found that it was proper to seal "documents relating to information about contemplated investments filed confidentially" when those documents were filed in connection with a pleading challenge.  (*SeeDevice Inc. v. Korean Broadcasting System* (C.D. Cal., Feb. 3, 2025, No. CV 24-07779-MWF (PDX)) 2025 WL 864668, at *1.)  This ruling was based on a factual finding that the information could harm the party's "competitive standing."  (*Id.*)  In the other case cited by Yeh, the court recounted the procedural history as follows:

> The Court permitted portions of the LeLe Opposition and Wessel Declaration to be filed under seal because this is a non-dispositive motion and because the sealed portions contain information filed by Vizio and LeEco with the Committee on Foreign Investment in the United States ("CFIUS"); and the CFIUS filings are protected as confidential pursuant to 5 U.S.C. § 552(B), 50 U.S.C. § 4565(C), 31 C.F.R. § 800.70231 C.F.R. § 800.702, and 32 C.F.R. § 286. *See* Application to File Under Seal (Dkt. 69). However, these confidentiality requirements are subject to "limited exceptions," and those exceptions provide that information may be made public "as may be relevant to any administrative or judicial action or proceeding." *In re Glob. Crossing Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003) (citing 50 U.S.C. § 2158, *et seq.*; 31 C.F.R. § 800.70231 C.F.R. § 800.702). Accordingly, the Court will not seal its own references to this material, because the materials cited by the Court are "relevant" to this judicial action. *See id.*

(*Vizio, Inc. v. LeEco V. LTD.* (C.D. Cal., July 27, 2018, No. SACV171175DOCJPRX) 2018 WL 5303078, at *3, fn. 2.)  The cited authority thus stands for the proposition that documents filed with the CFIUS can maintain their confidential status.  But mere confidentiality is not enough to entitle a party to file a document under seal in California state court in connection with a motion bearing on the merits of a case; the party requesting a sealing must also offer facts to make a specific showing of serious injury.  Here, Yeh's declaration fails to support a conclusion that filing the CFIUS documents in question "would undermine the confidentiality

13

of the CFIUS process and cause harm to TikTok's competitive position in the market."  Yeh is not qualified to offer this conclusion; and Yeh fails to offer any facts in support of it.

*Information of Non-Parties*

Snap "seeks to redact the names, images, and other identifying information of non-party, non-employees."  (Defs' Mot., at p. 14.)  Snap attempts to support this sealing request with a declaration by Lopez, who claims that six documents contain Snapchat usernames and/or images of Snapchat users.  Snap has failed to show that such information, which is shared on a publicly accessible social media platform, is entitled to privacy.  The Motion is thus denied as to these documents.

## Defendants' Omnibus Motion to Seal (Non-General Causation and Data Expert *Sargon* Motions)

Court's Ruling:  The Motion is granted as to (1) identifying information of non-deponent, non-executive employees; (2) to the specific information identified by Felicia Chen that is found in (a) the June 13, 2025, Expert Report of Dr. John Chandler, Ph.D. (Figure 4 at p. 35 and Figure 3 at p. 33); and (b) the July 3, 2025, Expert Rebuttal Report of Kevin Lane Keller, Ph.D. (Figures 6.A and 6.B at pp. 52, 53, Figures 8.A and 8.B at pp. 57, 58 and Figures 9.A and 9.B at pp. 60, 61); and (3) paragraphs 67 and 68 of the June 13, 2025 Istook declaration.  The Motion is denied in all other respects.

Defendants move to seal certain documents that were filed in connection with the parties' briefing on non-general causation and data expert *Sargon* motions, which were set for hearing on November 10, 2025.

*Identifying Information of Non-Deponent, Non-Executive Employees*

Defendants "seek to seal the names and other identifying information of non-executive employees who were not deponents in this case (and other identifying information, such as email addresses, of all employees)."  (Defs' Mot., at p. 6.)  This court has already concluded that such information may be sealed.  The Motion is thus granted as to this information.

14

*Information of Non-Parties*

"Snap and Meta seek to seal the personally identifying information, including images, of non-party, non-employee individuals whose identities are irrelevant to these cases, contained in a handful of records." (Defs' Mot., at p. 6.)  It appears that the information was posted on the platforms. (See, e.g., Simonsen Decl., ¶ 2.)  Defendants have failed to demonstrate that an individual has a protectable privacy interest in his name and image when these are posted on a publicly available social media platform, or that any such interest would outweigh the public's right to access the record.

*Meta's Confidential Business Information*

In order to support its request to seal different categories of confidential business information, Meta has submitted declarations by the following Meta employees/officers: (1) Max Eulenstein (Eulenstein); (2) Felicia Chen (Chen); and (3) Jeremy Nuger.

Eulenstein is "Vice President and Co-head of Product of Instagram." (Eulenstein Decl., ¶ 1.)  He "joined Meta in 2011 and was previously Director of Product Management." (Eulenstein Decl., ¶ 1.)  Eulenstein describes the information Meta seeks to seal as follows:

> 4. The excerpts and image at issue discuss which of Meta's users drive activity on the platforms—specifically, which group of users drives a significant portion of that activity. It also describes the percentage of activity these users drive on Meta's platforms. Competitors can use this information to understand how value is created on Meta's platforms and emulate the behavior leading to that value. They can also use it to position themselves in the market and thereby strategically undercut Meta. For example, competitors could attempt to entice users driving value on Meta's platforms to join their platforms and/or leave Meta's platforms, which would undercut Meta.
>
> 5. These excerpts also reveal information about the number of users on Meta's platforms within a particular stated age cohort and information about Meta's modeling of ages. Competitors can use this information to better understand the demographics of Meta's users and the efficacy of Meta's modeling of those demographics.
>
> 6. This information would provide competitors with another competitive advantage they would not otherwise have. Competitors could use this information to test the

15

accuracy of their own internal estimates of usage of Meta's platforms, which they otherwise would not be able to do. In other words, if a competitor estimated (but did not know) which users drive value on Meta's platforms, possessing this information would provide them with information to either confirm that their data is accurate or confirm that it is not accurate, requiring them to adjust. In either circumstance, competitors would not be able to do that without this information, just as Meta cannot without those competitors' information.

(Eulenstein Decl., ¶¶ 4-5.)  In short, Meta seeks to seal information showing which age groups tend to use Meta's platforms.  Such information is directly relevant to this litigation.  The public has a significant interest in accessing such information, as it is at the heart of a determination of Meta's liability. Eulenstein has failed to provide sufficient facts to make a specific showing of serious injury that might arise from competitors being able to access such usage data.  For example, Eulenstein has failed to provide facts showing that the data could be used by a competitor "to entice users driving value on Meta's platforms to join their platforms and/or leave Meta's platforms." Eulenstein does not show how an understanding of "the demographics of Meta's users and the efficacy of Meta's modeling of those demographics" would lead to serious injury.  Nor does Eulenstein adequately explain how Meta would be seriously injured if a competitor could "test the accuracy of their own internal estimates of usage of Meta's platforms."  Surely, the fact that minors constitute an important customer base for Meta's platforms is no secret; no competitor needs to wait for more precise data to attempt to compete with Meta for this age cohort.  The Motion is thus denied with respect to the records addressed by Eulenstein.

Chen is "Director, Corporate Financial Planning & Analysis at Meta." (Chen Decl., ¶ 1.)  Chen "joined Meta in 2016 and [has] held various positions in financial planning and analysis."  (Chen Decl., ¶ 2.)  "In [her] role at Meta, [she is] familiar with Meta's policies and practices related to financial planning & analysis (including budgets and forecasts)."  (Chen Decl., ¶ 2.)  Chen's declaration adequately supports an order sealing the records discussed therein:

> 4. On page 35 of the June 13, 2025, Expert Report of Dr. John Chandler, Ph.D., the image labeled Figure 4 contains confidential and proprietary information that could cause Meta competitive harm if publicly disclosed. The same image appears on page 33, as figure 3, of the July 11, 2025, Expert Report of Dr. John Chandler, Ph.D. This image

16

discussed "ad load" on Meta's platforms. At a high level of generality, ad load refers to the advertising displayed for a user. Meta's ad load model is thoroughly researched and requires careful calibration. This image depicts specific results of research into and analysis of ad load metrics. If a competitor of Meta's knew the results of Meta's non-public research into ad load optimization, the competitor could adjust their strategies in response. Because ad load considers, among other things, user engagement and revenue, the competitor would be able to maximize its own user engagement and revenue modeling and decisions at Meta's expense. This would harm Meta's business.

5. On pages 52 and 53 of the July 3, 2025, Expert Rebuttal Report of Kevin Lane Keller, Ph.D., the images labeled Figure 6.A and 6.B contain confidential and proprietary information that could cause Meta competitive harm if publicly disclosed. Those images reflect, respectively, daily Instagram and Facebook revenue from ads by age bracket from January 2018 to March 2024. This would reveal to competitors Meta's revenue broken down by specific age cohorts, which is valuable information that is not publicly disclosed. One way in which this could be competitively harmful is that competitors may use the data in making offers, presentations, and pitches to investors. They could use the data to argue that investors should invest in them, rather than in Meta, by comparing this non-public data to their own proprietary data. A lack of investment that Meta would otherwise have, based on competitors' use of Meta's internal data, would limit Meta's ability to invest in its business and retain talent.

6. On pages 57 and 58 of the July 3, 2025, Expert Rebuttal Report of Kevin Lane Keller, Ph.D., the images labeled Figures 8.A and 8.B contain confidential and proprietary information that could cause Meta competitive harm if publicly disclosed. Those images reflect, respectively, daily average advertising revenue per user on Instagram and Facebook from July or October 2021 to March 2024. These images disclose Meta's advertising revenue over time for adults and for minors. Competitors could use this information to identify which user segments are most valuable to Meta. In turn, they could use that information to prioritize acquisition or retention efforts for those segments. That would cause Meta competitive harm. For instance, competitors could compare their own

17

performance against Meta's and adjust their strategies (e.g., by adjusting their platform development, marketing, and/or sales efforts).

7. On pages 60 and 61 of the July 3, 2025, Expert Rebuttal Report of Kevin Lane Keller, Ph.D., the images labeled Figures 9.A and 9.B contain confidential and proprietary information that could cause Meta competitive harm if publicly disclosed. Those images reflect, respectively, daily average advertising legal revenue per 1,000 ad impressions on Facebook and Instagram from January 2018 to March 2024. These images disclose non-public information about Meta's pricing strategies and figures, including because they break down revenue of ad impressions by age cohort. If competitors had this information, they could implement pricing adjustments to undercut Meta's competitiveness among advertisers. For instance, a competitor could offer bid subsidies to encourage advertisers to target a given cohort on their platform, thereby strategically undercutting Meta's competitiveness with advertisers.

(Chen Decl., ¶¶ 4-7.)  Chen specifically identifies the relevant portions of the documents; she uses facts to explain the specific injury that would result from the filing of the information of the public record; and Chen is qualified to offer her testimony as to these topics.  Though Plaintiffs are correct that more generalized evidence touching on the fact that Meta generates profits through advertising to minor users is relevant at trial, Plaintiffs have not shown that the more specific evidence and evidence bearing on pricing strategies mentioned here is highly relevant to issues bearing on liability. Therefore, as to this specific evidence, the public interest in disclosure is lower, while the potential harm to Defendant is high.  Thus, the Motion is granted as to the specific materials identified that are found in (1) the June 13, 2025, Expert Report of Dr. John Chandler, Ph.D.; and (2) the July 3, 2025, Expert Rebuttal Report of Kevin Lane Keller, Ph.D.

Nuger is "Data Engineering Director at Meta."  (Nuger Decl., ¶ 1.) Nuger manages "multiple data engineering teams which are responsible for metrics, including metrics that are used for measuring the overall health of Meta's business."  (Nuger Decl., ¶ 1.)  Nuger's declaration is offered in support of a request to seal excerpts of three expert reports of Dzmitry Asinski: "Paragraph 20 of the Moore and KGM reports and paragraph 22 of the RKC report contain two identical sentences that are sensitive."  (Nuger Decl., ¶ 2.)  "These sentences define how Meta calculates 'impressions' and 'views' on its platforms. Impressions and views are engagement metrics that

18

are important for Meta's business." (Nuger Decl., ¶ 3.) In essence, the cited paragraphs from the Asinski reports state that Meta treats a "view" or "impression" as occurring when a particular percent of a total image is visible to the user for a particular amount of time. Nuger claims:

> 5. For instance, if individuals were aware of the ways that Meta calculates impressions and views, and the thresholds for activity qualifying as an impression or a view, it would permit individuals to "farm" engagement and otherwise cheat the impressions/views system. As another example, competitors could use this information to claim or develop more favorable incentives and partnership programs based on actual or claimed engagement and viewership changes to their own services compared to Meta's.
> 6. These would cause Meta competitive harm, and take advantage of its systems, by distorting engagement figures or manipulating competitor systems to achieve a competitive benefit.

(Nuger Decl., ¶¶ 5-6.) Given the nature of the content found in the Asinski declaration, the court cannot conclude that such information could be used to cause serious injury to Meta. Moreover, paragraph 6 of Nuger's declaration fails to provide sufficient facts to describe this supposed injury. The Motion is thus denied as to these documents.

*Google's Confidential Business Information*

Google offers a declaration by McMeans in support of a request to seal the following types of information: (1) internal databases/user data; (2) age detection systems; (3) competitor analyses; (4) financial planning and budgeting information; and (5) engagement metrics. These are the same types of information Google sought to seal in the prior motion to seal. And McMeans' declaration is not relevantly different from his prior declaration in support of sealing such information. The sealing request is thus denied for the same reasons Google's prior request was denied.

*TikTok User Data Metrics*

ByteDance "seeks to seal user data metrics that are used in monitoring user engagement with and performance of various features on the TikTok platform from the last [two] years." (Defs' Mot., at pp. 15-16.) ByteDance previously sought to seal this type of information in the prior motion to seal; there, as here, ByteDance relied on a declaration by Yeh.

The Yeh declaration submitted in support of the instant sealing request is not relevantly different from the declaration offered in support of the prior sealing request.  The instant request is thus denied for the same reasons given in connection with the prior motion to seal.

*Meta Information Related to Child Safety*

"Meta seeks to seal two short excerpts in the report of Dr. Istook that disclose information about its safety systems … ."  (Defs' Mot., at p. 13.)

Meta submits a declaration by Ravi Sinha (Sinha) in support of the request.  Sinha is "Head of Child Safety Policy at Meta."  (Sinha Decl., ¶ 1.) "Previously, [Sinha] served as a federal prosecutor in the U.S. Department of Justice with a focus on prosecuting child exploitation and sex trafficking cases."  (Sinha Decl., ¶ 1.)  Sinha identifies two specific portions of the June 13, 2025 Istook declaration that Sinha attests "could enable online predators and other bad actors to avoid detection and/or enforcement on Meta's services."  (Sinha Decl., ¶ 2.)  The "information concerns Meta's detection, reporting, and prevention systems, policies, or processes regarding child sexual exploitation, including child sexual abuse material … ."  (Sinha Decl., ¶ 3.)  "Disclosure of the above-listed information could enable online predators and other bad actors to evade detection and/or enforcement." (Sinha Decl., ¶ 4.)  "The first excerpt (in paragraph 67) would provide bad actors with knowledge of a limitation on online platforms' ability to assess the content discussed in that excerpt. If bad actors were aware of that limitation, they could use it to evade detection, including attempting to spread CSAM."  (Sinha Decl., ¶ 5.)  "The second excerpt (in paragraph 68) would provide bad actors with knowledge of a vector that they could use to spread illicit content. In particular, if bad actors were aware of the threshold discussed in this excerpt, they could take steps to keep their activity below the threshold to attempt to evade Meta's systems."  (Sinha Decl., ¶ 6.)

Sinha is clearly qualified to offer the testimony as to how bad actors could use the identified information.  Sinha identifies the precise information which he discusses and explains how such information could be used by bad actors to evade Meta's detection and enforcement mechanisms.  The Sinha declaration thus adequately supports a sealing of paragraphs 67 and 68 of the June 13, 2025 Istook declaration.  The Motion is granted as to these two paragraphs.

**Meta Defendants' Omnibus Motion to Seal (Motions Heard on October 20, 2025)**

Court's Ruling:  The Motion is granted. The identifying information of non-deponent, non-executive employees may remain under seal.

Meta moves for an order sealing certain portions of the briefing heard at the October 20, 2025 hearing.  "Meta does not seek to seal anything in those filings other than names and other identifying information of non-executive employees to protect their privacy and safety."  (Meta's Mot., at p. 3, internal italics omitted.)  As the court has previously concluded, such information may properly remain under seal.

**Defendants' Omnibus Motion to Seal (Motions in limine)**

Court's Ruling: The Motion is granted as to (1) identifying information of non-deponent, non-executive employees; (2) the referenced third parties' names, email addresses, and TikTok user IDs and handles found in exhibits 27 and 28 to the declaration of Felicia Crack in Support of Oppositions to TikTok Motions in Limine 1-6; and (3) the referenced excerpts of depositions of Drs. Matthew Shear, Adriana Galvan, and Neil Malhotra which were filed as Exhibits 62, 63, and 64 (respectively) to the Omnibus Declaration of Isaac Chaput in Support of Joint Motions in Limine (Sept. 5, 2025), which reference information concerning the children of the experts and the children's ages.  The Motion is otherwise denied.

Defendants move for an order sealing certain portions of the parties' motions in limine.  The information Defendants seek to seal can be divided into the following four groups: (1) identifying information of non-deponent, non-executive employees; (2) information of non-parties; (3) Google's confidential information that it claims is protected trade secret information; and (4) a discussion regarding non-party children.

*Identifying Information of Non-Deponent, Non-Executive Employees*

As this court has previously determined, such information may properly remain under seal.  The Motion is thus granted as to this information.

*Information of Non-Parties*

21

ByteDance "seeks to redact the names, personal e-mail addresses, TikTok user IDs and handles, and compensation information of non-party, non-employees contained in two exhibits." (Defs' Mot., at p. 7.)

In support of this request, ByteDance submits a declaration by its counsel of record in this litigation: David P. Mattern (Mattern). Mattern states:

> I have reviewed the exhibits attached to the Declaration of Felicia Crack in Support of Oppositions to TikTok Motions in Limine 1-6. Based on my review and in consultation with the TikTok Defendants, Exhibits 27 and 28 contain confidential personal information of nonparties to this litigation. Specifically, these exhibits contain full names, personal e-mail addresses, TikTok user IDs and handles, and compensation information for dozens of TikTok users. These users are not employees of TikTok or parties to this litigation. Some of them have been compensated via the "TikTok Creator Fund," which rewards creators based on the performance of their content. TikTok does not publicly disclose individual creator compensation, and in any event their personal information and compensation information are irrelevant to the issues in this case.

(Mattern Decl., ¶ 3, internal footnotes omitted.) The documents are internal TikTok documents—not documents/information posted on the public-facing side of a social media platform.

In order to protect the privacy of the third parties, the court grants the Motion as to those third parties' (1) names, (2) email addresses, and (3) TikTok user IDs and handles. Once such information is redacted, there is no need to redact the compensation information, as such information cannot be tied to any identifiable individual.

*Google's Confidential Information*

Google once again seeks to seal information regarding (1) internal database/user data, (2) age detection systems, and (3) engagement metrics. In support of this request, Google once again submits a declaration by McMeans that is not relevantly different from the prior declaration submitted by McMeans in support of a prior request to seal. The instant request to seal by Google is denied for the same reasons the court denies a

22

sealing request as to similar information when ruling on a prior motion to seal.

*Discussion Regarding Non-Party Children*

Defendants seek to seal the portions of deposition testimony where experts were asked about their children. "In each of these depositions, the expert was questioned about how many children they had and their children's ages (in connection with their social media use)." (Simonsen Decl., ¶ 3.) This information has no relevance to this litigation. Accordingly, there is a sufficient privacy interest in the number and ages of an expert's children to justify sealing the information. The Motion is granted as to these portions of the depositions.

**Defendants' Omnibus Motion to Seal (Motions to Exclude General Causation Experts)**

Court's Ruling: The Motion is granted as to (1) identifying information of Defendants' non-party, non-executive employees; and (2) Exhibit E to the Declaration of Adam S. Davis in support of Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Testimony of Dr. Drew Cingel. The Motion is otherwise denied.

Defendants move for an order sealing certain portions of the parties' briefing on the motions to exclude testimony of general causation experts, set for hearing on September 17, 2025. Defendants seek to seal the following types of information: (1) identifying information of their non-party, non-executive employees; (2) "an exhibit that provides a detailed report of Snap's proprietary product development"; and (3) "portions of one document on the grounds that it contains sensitive information about YouTube's content moderation systems." (Defs' Mot., at p. 3.)

The Motion is granted as to identifying information of Defendants' non-party, non-executive employees.

In support of its request to seal Exhibit E to the Declaration of Adam S. Davis in support of Plaintiffs' Opposition to Defendants' Motion to Exclude the Expert Testimony of Dr. Drew Cingel, Snapchat submits a declaration by Abby Tran. Tran claims the document is a "Product Report." "The Product Report discloses, among other things, the development of new Snap features and the status of those projects, including features that, to-date,

have not yet been launched or shared with the public. The Product Report also discloses the results of internal product testing and Snap's strategic insights." (Tran Decl., ¶ 3.)  The Product Report appears to list technical information regarding certain platform features.  Tran claims:

> Disclosure of this information to the public or to Snap's competitors would cause significant harm to Snap. The Product Report contains confidential and trade secret product decisions and plans that are proprietary and necessary to Snap's core business. The information would be valuable to Snap's competitors because it would enable them to gain a competitive edge by understanding Snap's product roadmap—including the development of features that have not yet been launched or shared with the public. If made public, competitors could use this information to, among other things, anticipate and counter Snap's initiatives, accelerate development of similar features, or otherwise undermine Snap's competitive position in the market.

(Tran Decl., ¶ 4.)  The request is narrowly tailored.  Tran has adequately identified the specific document Snap seeks to seal.  And Tran has provided sufficient testimony to make a specific showing of serious injury arising from the disclosure of this single exhibit.  Plaintiffs have failed to explain how the specific information in this Product Report would be directly relevant to a liability determination at trial.  The Motion is granted as to this exhibit.

Google, for its part, moves to seal "a compendium of short strategy outlines ('2-pagers') that detail various YouTube strategic efforts, including (in certain sections) sensitive internal details about YouTube's content moderation classifiers, non-public terms and metrics related to content moderation, and proprietary information on content moderation processes, which are competitively sensitive and YouTube treats as confidential." (Defs' Mot., at p. 7-8.)  Google claims that "[a]llowing these materials to become public could aid bad actors in circumventing YouTube's content moderation efforts." (Defs' Mot., at p. 8.)  In making these factual claims, Google relies on a declaration by Christopher Chiou, who is counsel of record for Google in this litigation.  However, it does not appear that a declaration by Chio was filed (or served on CaseAnywhere) in support of the instant sealing request. The request must therefore be denied.  The court also notes that Mr. Chiou, as counsel in this litigation, is not qualified to give testimony on the question of, for example, whether certain information could be used by "bad actors in circumventing YouTube's content moderation efforts."  The Motion is thus denied as to Google's sealing request.

24

**Defendants' Omnibus Motion to Seal (I.P. Motions for Summary Judgment)**

Court's Ruling:  The Motion is granted as to non-deposed, non-executive current and former employees' names and identifying information (including email addresses), which may be redacted from the public record.  The Motion is denied as to all other documents.

Defendants move for an order sealing certain portions of the parties' motions for summary judgment with respect to Plaintiff I.P.  Defendants seek to seal three categories of information: (1) the names of non-executive employees who are not deponents in this case; (2) TikTok's user data metrics that ByteDance sought to seal in Defendants' Omnibus Motion to Seal (Motions for Summary Judgment and Adjudication); and (3) YouTube information that Google sought to seal in Defendants' Omnibus Motion to Seal (Motions for Summary Judgment and Adjudication).

As this court has held, the names of non-executive, non-deponent employees may properly remain under seal.

However, the information ByteDance and Google seek to seal in the instant Motion is not entitled to remain under seal.  Under this court's ruling on Defendants' Omnibus Motion to Seal (Motions for Summary Judgment and Adjudication), the same information has already been ordered to be placed in the public record.  Accordingly, ByteDance and Google do not have any privacy interest in this now public information.

Date: 1/12/2026

Carolyn B. Kuhl / Judge
Judge of the Los Angeles Superior Court

25