# Exhibit 40

A.    The Commission should clarify how persistent identifiers will be treated under the COPPA Rule to promote interactive, social experiences for teens online.

A number of websites and online applications currently rely on social media "plugins" to facilitate the communication of ideas and content online.  These social media plugins can help enrich users' social, cultural, and educational experiences in many innovative ways.  For instance, some businesses are using web-based learning communities to support new levels of social exchange and interaction that, in turn, promote and foster student motivation and educational development.  Some examples include applications on Facebook such as "weRead," which enables people to find and review books and get book recommendations from their friends, or "Flashcard Exchange," which allows students to browse for or create flashcard sets on any subject and use study tools to aid with memorization. Other Facebook applications like "Causes" provide an online platform for individuals and organizations to raise funds for charitable causes.

Operators of websites and applications that arguably are directed to children sometimes include social media plugins on their sites or online services to reach teens and parents who also may visit or use their products and services.  For example, a website or application that is attractive to users between the ages of 9 and 14 may be deemed to be "directed to children" if the site or service features models under the age of 13, childish language, kid-friendly music, animated characters, and child-oriented activities and incentives, even though a sizable number of its users may be 13 years old or older.[23]

We urge the Commission to clarify that operators may include social media plugins on child-oriented websites without triggering COPPA's requirements.

1.    *Background on Facebook's social plugins.*

Facebook offers a number of social plugin tools, including the Facebook "Like" and "Recommend" buttons that developers may integrate into their websites and online applications using a line of HTML code.[24]  Importantly, Facebook specifically designed its social plugins so as not to share information that people provide on Facebook with third-party sites.  To do this, the social plugin pulls content directly from Facebook's website and sends it to the person's browser, allowing, in effect, a part of Facebook to appear on a non-Facebook site.

When a person who has never visited Facebook.com before visits a website with a social plugin, Facebook will receive and record through social plugins a limited list of standard browser information, including:  (i) the website being visited, (ii) the date and time, (iii) the IP address of the computer, and (iv) information about the browser type and operating system.  The transmission of this information is part of the normal operation of the Internet:  the information is sent to Facebook so that its servers can communicate with the person's browser and load the Facebook functionality onto the webpage.

In addition to this technical information, if the person has visited Facebook.com in the past, Facebook will record information that has been stored in a "cookie" that was previously set when the person visited our site.  For people who have visited Facebook.com using their browser, we place a cookie on their browser that identifies the individual browser but does not include personally identifying

---

[23] *See* 16 C.F.R. § 312.2.

[24] Facebook, Social Plugins, http://developers.facebook.com/docs/plugins/ (last visited December 20, 2011).

CONFIDENTIAL                                                                                     META3047MDL-065-00153100

information, such as name or contact information.  This browser-identifying cookie helps us keep Facebook and the people who use it safe.  For example, we want to know if the same browser is attempting to visit Facebook thousands of times in just a few seconds as part of a coordinated denial of service attack.  Cookies help us prevent such attacks, and the more coverage of browsers visiting Facebook, the more effective this security feature is at protecting the people that use Facebook.

When a person is logged into Facebook and then visits a third-party site with a social plugin, the amount of information we record differs as needed to provide the personalized, social experience that people request when they login to Facebook.  Specifically, when a person is logged in to Facebook, we use a cookie to confirm that the person is logged in to a specific Facebook account so that we can customize the content presented through the social plugin with information about a person's friends and ensure that when someone clicks the "Like" button, the "Liked" information is associated with the right account.

Facebook also has agreed to several new policy commitments around the retention of user data.  These commitments include amendments to our data retention policy for social plugin impression logs.  Specifically, under our revised policy, for people who are not Facebook users or who are Facebook users in a logged out state, Facebook will take two steps with respect to the data that it receives and records through social plugins within 10 days after such a person visits a website that contains a social plugin.  First, Facebook will remove from social plugin impression logs the last octet of the IP address when this information is logged.  Second, Facebook will delete from social plugin impression logs the browser cookie set when a person visits Facebook.com.[25]

2.    *The inclusion of social plugins on child-directed sites should not trigger COPPA.*

By expanding the definition of "personal information" to include persistent identifiers, such as IP addresses and cookie IDs, the proposed COPPA Rule creates ambiguity about whether social media plugins can be included on websites and online services that are directed to children absent verifiable parental consent.  As explained below, the better reading of the proposed COPPA Rule is that websites may use these social plugins without triggering COPPA's requirements. The Commission could avoid this ambiguity by focusing the definition of "personal information" on those uses of persistent identifiers which cause the Commission concern — namely, online behavioral advertising.[26]  Alternatively, the Commission could explicitly state that the inclusion of social plugin tools on child-directed sites results in neither a "disclosure" nor a "collection" of children's personal information online for purposes of COPPA.

With respect to users who are logged in or are logged out of Facebook and who visit a child-directed site, COPPA's requirements clearly are not triggered.  These users represented to Facebook when they created their Facebook account that they are at least 13 years old.  Unless Facebook obtains

_____

[25] *See* Ireland Data Protection Commissioner, *Report of Audit*, at 74 (Dec. 21, 2011), http://dataprotection.ie/documents/facebook%20report/report.pdf/report.pdf.  As the Irish Data Protection Commissioner recognizes, from time to time litigation is filed against Facebook that requires the company to retain data for purposes of such litigation, including social plugin data.

[26] *See* Children's Online Privacy Protection Rule, 76 Fed. Reg. at 59,811–12 (noting that "methods of marketing online have burgeoned in recent years" and stating that parental consent will be required where persistent identifiers are used for the purpose of "behaviorally targeting advertising to the child").

12

                                    META3047MDL-065-00153101

actual knowledge that a particular user is under the age of 13, such as where Facebook is contacted by a concerned parent who has discovered his or her child misstated the age information, circumstantial information that a user could be a child because he or she visited a child-directed website does not trigger COPPA.[27]  In addition, the statute is clear that a "child" is an individual under the age of 13.[28]  The statute prevents the Commission from restricting the collection or disclosure of personal information from a user who is 13 years old or older, even if such collection or disclosure occurs on websites and applications that are directed to children.  The Commission therefore is foreclosed from expansively interpreting COPPA to reach these users.

With respect to individuals who do not have Facebook accounts, inclusion of social media plugins does not result in a "disclosure" to or a "collection" by Facebook for two reasons.

First, Facebook uses the persistent identifiers that it collects for limited purposes that support the internal operations of the social plugin tool that the website operator included on the website.  The Commission appropriately recognized "that when a persistent identifier is used only to support the internal operations of a Web site or online service" then "the concerns underlying COPPA's purpose are not present."[29]  Facebook's social plugin tool records IP address and cookie ID for limited purposes, such as ensuring that the social plugin is working properly.  Significantly, this information is not used for online behavioral advertising purposes.  Because Facebook's use of IP address and cookie ID is used "to aid the functionality and technical stability of Web sites and online services and to provide a good user experience," the Commission clearly "does not intend to limit operators' ability to collect such information from children."[30]  Facebook encourages the Commission to make this point more explicit within the COPPA Rule.

Second, with respect to the IP address, Facebook is taking reasonable measures to render the user's IP address de-identifiable.  The Commission has explained that no collection occurs if personal information is removed from a child's posts before they are made public in online forums.[31]  Similarly, the Commission has suggested that operators can avoid collecting personal information so long as it is immediately altered or hashed in such a way "that [it] can no longer be reconstructed into [its] original form."[32]  The proposed COPPA Rule reinforces these longstanding policies by replacing the "100% deletion standard" with a more relaxed standard; an operator does not "collect" personal information as long as the deletion technologies it uses are "reasonably designed to capture all or virtually all

---

[27] *See* Fed. Trade Comm'n, *Frequently Asked Questions about the Children's Online Privacy Protection Rule*, at Question 39, 41(a)  (Oct. 7, 2008), http://www.ftc.gov/privacy/coppafaqs.shtm#teen; Children's Online Privacy Protection Rule, 76 Fed. Reg. at 59,806 (refusing to replace the "actual knowledge" standard with a lesser "reasonable efforts" or "constructive knowledge" standard that would "require operators to ferret through a host of circumstantial information to determine who may or may not be a child").

[28] *See* 16 C.F.R. § 312.2 (defining "collection" as the "gathering of any personal information *from a child*" and "disclosure" as the "release of personal information collected *from a child*" or "[m]aking personal information collected *from a child* by an operator publicly available" (emphasis added)).

[29] Children's Online Privacy Protection Rule, 76 Fed. Reg. at 59,812.

[30] Id. at 59,809–10.

[31] Fed. Trade Comm'n, *Frequently Asked Questions about the Children's Online Privacy Protection Rule*, at Question 41(b) (Oct. 7, 2008), http://www.ftc.gov/privacy/coppafaqs.shtm#teen.

[32] *Id.* at Question 45.

CONFIDENTIAL

META3047MDL-065-00153102