# EXHIBIT 85

Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---------------------------------------------x

PEOPLE OF THE STATE OF CALIFORNIA, et al.

Plaintiffs,

-against-

META PLATFORMS, INC., Instagram, LLC,

Meta Payments, Inc., Meta Platforms

Technologies, LLC,  et al.,

Defendants.

---------------------------------------------x

VIDEOTAPED DEPOSITION of ADAM ALTER, Ph.D.,

taken by the Defendant, pursuant to Notice, held at 450

Lexington Avenue, 10th Floor New York, NY 10163, on

December 12, 2025, at 8:41 a.m., before a Notary Public

of the State of New York.

*******************************************

Page 226

influence analysis framework, and my expertise and my experience examining such messages and how consumers generally understand those messages to draw conclusions about how the constellation of messages will have been interpreted by consumers, and the messages shared.

And I'm very clear with each message about how that would have happened.

Q.      So is that a no, you did not undertake an analysis of the comments or reactions, as a check on your hypotheses as to how consumers would have interpreted Mr. Zuckerberg's statement?

MR. SLOTHOUBER:  Objection.  Form. Compound.

Q.      It's a very simple question.  Is that a piece of work that you did, an analysis of the comments and reactions?

MR. SLOTHOUBER:  Objection.  Compound. Form.

A.      That specific analysis with this specific post was not an analysis I undertook.  There were other analyses that I believe gave me a sort of proxy for consumer response to statements, including, for example, my experience speaking to consumers across time, and noticing a rise in skepticism, which I've already described to you.

Page 227

That evidence was certainly relevant to my understanding of how consumer sentiment has shifted.  So in this case, I did not look at this specific post and how consumers responded.

Q.    Was there any company statement in this case, for which you systematically reviewed contemporaneous consumer reactions, such as in comments and online reactions, as a check on your hypotheses on consumer interpretations?

MR. SLOTHOUBER:  Objection.  Form. Compound.

A.    That was not an analysis I sought to undertake and instead applied the social influence analysis framework and my expertise, and many data points I had collected over time to answer that question.

Q.    At -- the last sentence of paragraph 388, says:

"Thousands of these views, reactions and/or comments to Mr. Zuckerberg's posts comprised Massachusetts users."

Do you see that?

A.    Yes.

Q.    You didn't undertake that state-specific analysis with respect to any state other than Massachusetts; is that right?

A.    That's correct, in this particular instance.

Page 228

But there are other places where I focus on what are called prioritized markets, and at paragraph 391, for example, I break out some of the states. But in this particular paragraph, I focused only on Massachusetts.

Q.      And in paragraph 391, you mention five states, right, out of the 31 or 32 that are at issue in these proceedings?

A.      Yes, that's correct.

Q.      But you didn't systematically assess exposure to even the message gists with respect to specific states in these proceedings?

MR. SLOTHOUBER:  Objection.  Form. Compound.

A.      My assignment, and also my intention was not to examine exposure at the state level, but rather to look at exposure broadly.

And since many of the media outlets that I described here, and the word of mouth processes are universal and apply across the entire country, and are viewed by people across the entire company, I did not perform a breakout analysis to capture exactly what proportion of viewers was in each state.

Q.      Well, if we look at paragraph 387, for instance, one of the new sources you reference there as transmitting the message or message gist, the last item

Page 316

statement and as we discussed earlier, the implication here is that there is -- first, she says they're not on Instagram, and then by following up, she's implying that they're not on Instagram because they're immediately removed as soon as they're detected.

As I discuss elsewhere in the report and as you see in testimony from various personnel at the company, this process of removing people from the platform when they're detected is slow, imperfect, and the ability to detect them is an over-claim.

And so when you look at all of the evidence, the underlying evidence, this is an inflation of the true nature of the platform's ability to find and remove those individuals.

And read in context, this entire statement here from Ms. Davis reads to say either if you begin at the beginning that there are, as a matter of fact, no people on Instagram under the age of 13, but then later on she's not saying there are lots of them, she's saying because we have an effective mechanism for removing them, they're not a lot of them on Instagram, indeed there may be very few, that's how that reads to a consumer.

Q.    Have you spoken to a single consumer who expressed that reading of this sentence, this series of

Page 317

sentences?

Simple question, have you spoken to a single consumer who told you they interpreted that statement in this way?

A.    I could point you to the same forms of evidence and the same approach I used for understanding the other statements in context.  The same application of the same expertise, background, principles that I used to understand such statements in other contexts, internal documents at Meta, the large gap between what was known at Meta and what this statement implies and so on to unpack what consumers would have understood and the gulf between that and the true nature of the situation at the company.

Q.    So the answer is, no, you have not spoken to a single consumer who has told you that they interpreted Ms. Davis's statements in the way that you just posited?

A.    I'll say again, you can see the approach that I used in my report to unpacking these statements, what they mean, explaining the relevance of the context, and explaining the various models that I use and the approach I use to understand how consumers would understand those statements.

Q.    Yep, I understand what you did do.  I'm asking a different question.  You have not spoken to a single

consumer who told you they interpreted Ms. Davis's statements at this hearing in the way that you posit, correct?

MR. SLOTHOUBER:  Objection.  Form. Asked and answered.

A.    That's not the approach I took.  As I said, I had a different approach which was to examine using a model, using lots of experience, having done similar things in the past as an expert on such communications in many contexts, including this one, that read in context, this statement says to a consumer or audience based on the principles of linguistic psychology and otherwise, that either they're not on Instagram, or if we find them, we very quickly remove them.  And I've explain how I arrive at that conclusion here and in the report.

Q.    Based on the principles of linguistics, et cetera, as you said, but not one person has told you that they interpreted this statement the way you posit, correct?

MR. SLOTHOUBER:  Objection.  Form. Asked and answered.

A.    My assignment was not to interview people directly.  I did not feel that was the best way to go about unpacking the interpretation of these statements,

Page 319

and I'm very transparent about how I engage in the process of translating how they would be received by and understood by consumers.

Q.    Right.  And not only did you not interview individual users to see whether any of them interpreted the statements the way you posit, you also didn't conduct a systematic survey to assess whether consumers interpreted the statements the way you posit, correct?

A.    As I said much earlier on today, we discussed my methodological approach, and I explained that whenever I begin work on a question like this, or a set of assignment questions, or a set of assignment statements, I examine the evidence, I examine the facts and the context, and I determine, as I do in every case, the most appropriate methodologies to use, and that's what I did in this case as I do in all cases, and these were the approaches that I used in this case.

Q.    You're not changing your testimony from earlier that you didn't do a survey in this case, right?

A.    I'll say what I said, I believe, earlier, which was that there was some survey evidence in this case and I looked at the archival evidence that Meta itself had collected and sometimes that evidence was relevant to various questions.  But I did not run a primary survey myself, because as I said earlier, that was not my

Page 350

A C K N O W L E D G M E N T


STATE OF NEW YORK      )

                                :ss

COUNTY OF              )


          I, ADAM ALTER, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of the 12th day of December, 2025; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.




    _____

 ADAM ALTER


Signed and subscribed to before me, this                    day of                    , 2025.


_____

Notary Public, State of New York

Page 351

C E R T I F I C A T E

STATE OF NEW YORK        )

                         ) ss.:

COUNTY OF QUEENS )


            I, BROOKE E. PERRY, a Notary Public

within and for the State of New York, do hereby

certify:

            That ADAM ALTER, the witness whose

deposition is hereinbefore set forth, was duly

sworn by me and that such deposition is a true

record of the testimony given by such witness.

            I further certify that I am not related

to any of the parties to this action by blood

or marriage; and that I am in no way interested

in the outcome of this matter.

            IN WITNESS WHEREOF, I have hereunto set

my hand this 16th day of December, 2025.

            _____

            BROOKE E. PERRY