**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR |
| People of the State of California, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Meta Platforms, Inc.,<br><br>        Defendant. | ORDER GRANTING IN PART AND DENYING IN PART RULE 702 MOTIONS TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS<br><br>Re: Dkt. No. 2701 |

Defendant Meta Platforms, Inc. ("Meta") moves to exclude the opinions of Drs. Adam Alter and Ravi Iyer on methodological grounds and other failings. Having carefully considered the papers submitted, as well as oral argument from counsel on April 15, 2026, and for the reasons set forth more fully below, defendant's motion to exclude the opinions of Alter and Iyer (Dkt. No. 2701) is **DENIED IN PART AND GRANTED IN PART**.[1]

## I.    BACKGROUND

As noted, defendant challenges the opinions of plaintiffs' experts Alter and Iyer. Alter opines that (1) Meta engaged in deceptive marketing communications and (2) Meta's platforms, or portions thereof, target children. Iyer (1) opines that Meta's safety tools and features, such as Teen

---

[1] The Court has reviewed the sealing motions filed to request redacting portions of the briefing related to this motion (Dkt. Nos. 2702, 2775, 2891) and finds that there is no basis to seal anything.  Therefore, the motions are hereby **DENIED**.

Accounts, are ineffective at preventing harmful experiences, and (2) proposes design changes that would remedy those harms.

## II.     LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

It is long well understood that experts who are "qualified . . . by knowledge, skill, experience, training, or education," and whose opinions otherwise meet Rule 702's requirements, may offer opinions not based on personal knowledge or observations. Fed.R.Evid. 702.

## III.     MOTIONS TO EXCLUDE GENERAL CAUSATION OPINIONS

### A.  DR. ADAM ALTER

Dr. Alter describes his assignment as one to:

> [A]ssess public statements that Meta made about the health and safety impacts of its products. . . . and to determine: a. the messages that a reasonable consumer would understand Meta to be conveying; and b. whether these messages, affirmatively and/or through omission, would have the capacity or tendency to mislead a reasonable consumer, based on my consideration of factual assumptions provided by counsel, as well as my own review of internal Meta documents produced in discovery. Additionally, I have been asked to determine whether these statements were likely to reach consumers, thereby affecting the extent to which young users access Meta's products.

(Trial Report of Dr. Adam Alter ("Alter Rep."), Dkt. No. 2702-4, Ex. 1 ¶¶ 27–29.) Dr. Alter received a Ph.D. in social and cognitive psychology from Princeton University in 2009. Since that time, he has held positions as Professor of Marketing at New York University's ("NYU") Stern School of Business, New York, and as a Professor in NYU's Psychology department. Alter has

2

published dozens of academic articles and has served as an editor of academic journals in the fields of marketing, consumer behavior, and psychology. (*Id*. at ¶ 16.)  Defendant does not challenge his qualifications to opine on communications and marketing topics.

### 1. Factual Narrative and State of Mind Testimony

Defendant first seeks to exclude Dr. Alter's opinion that Meta intended to shape consumer perceptions (Opinion D). Alter's Opinion D states that:

> Meta was aware that consumers had major concerns about the effects of its platforms on the health and safety of the users of those platforms. Its knowledge of those concerns informed its communications strategy. Meta knew that uncertainty or concern about platform safety could hamper the growth of its platforms, engagement with those platforms, and, ultimately, Meta's financial performance. Thus, to protect its brand and long-term viability as a company, Meta disseminated messages that were designed to shape consumer perceptions of the health and safety of its platforms in the company's favor.

(Alter Rep. at 2.) Meta objects to this opinion on two grounds in particular:  One, Alter merely summarizes defendant's documents and public statements to argue what Meta "knew," which the factfinder can do on its own. Two, Alter improperly speaks to Meta's state of mind when he opines on how Meta intended, or "sought" to shape consumer perceptions with its communications.  (*Id.* ¶ 102.)

The Court agrees.  Nothing in this opinion reveals testimony based on specialized expertise. Experts should not be a conduit for attorney argument.  Further, an expert cannot generally speculate as to someone's state of mind.  If the evidence is offered for some other purpose, plaintiffs may seek permission at trial.  The motion as to Opinion D is granted.

### 2. "Credence Good" Opinion

Next, Meta challenges Alter's Opinion A describing social media as a "credence good." Alter's Opinion A states that:

> Social media platforms are rapidly-evolving and opaque technology products about which consumers have less information than do the products' manufacturers. Social media platforms are thus "credence goods," meaning that it is difficult or impossible for consumers to evaluate such products or services even after those consumers have used them, because those consumers lack the knowledge or expertise necessary to conduct their own independent evaluations.

(Alter Rep. at 1.) Alter further explains that a credence good is one where the consumer is "often forced to trust the information provided to them" because they lack "the technical knowledge to fully understand how new or complex technology works." (*Id*. ¶¶ 53, 56.) Because consumers "are rarely privy to insights from internal (and undisclosed or unpublished) research and product development, or internal discussions surrounding the provider's goals or priorities," Alter concludes there exists an "information asymmetry between the providers and the users of technology products." (*Id*. ¶ 56.) As a result of that asymmetry, "users must rely heavily on company messaging for their understanding of the technology's functions and full effects." (*Id*.) For social media in particular, Alter opines that "consumers tend to place considerable weight on a company's statements about the safety of its products" given the platforms' technological complexity and consumer uncertainty about their downstream effects. (*Id*. ¶ 57.)

Defendant first challenges this opinion on the basis that "credence good" is a term from economics upon which Alter, as a marketing professor and not an economist, is not permitted to opine. It is true that Rule 702 requires an expert to have relevant qualifications. *U.S. v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000). However, plaintiffs adduce evidence that the concept of "credence goods" is not confined to economics, but is routinely employed in the field of marketing, including in a marketing textbook authored by Meta's responsive expert. (*See, e.g.*, Dkt. No. 2702-7, Ex. 4 ("Given the difficulty of assessing and interpreting product attributes and benefits for experience and ***credence goods***, brands may be particularly important signals of quality and other characteristics to consumers for these types of products") (emphasis supplied.) Moreover, Alter's

analysis of social media as a "credence good" focuses on the impact of consumer messaging, squarely within his expertise. This argument is rejected.

Meta asserts additional methodological critiques of Alter's Opinion A, none of which persuade the Court to exclude it. First, Meta argues that Alter does not cite published evidence concluding that social media is a "credence good," and so he has no basis for drawing that conclusion. In fact, Alter cites a number of academic articles that provide empirical support for his conclusion that certain features render social media platforms "credence goods," including that the features can cause harms that are difficult for laypersons to perceive, are poorly understood by consumers, and that social media companies have greater access to research and data regarding their impacts.

Meta also criticizes Alter's Opinion A on the basis that he elsewhere cites evidence that consumers and parents are skeptical of social media and that independent analysis about the health effects of social media is now publicly available. Meta contends this contradicts his conclusions that consumers rely on Meta's communications to learn about the product. The Court disagrees. This evidence is not mutually exclusive with Alter's conclusion regarding asymmetry between social media companies' and consumers' understandings of the platforms' effects, and as such goes to weight, not admissibility.

The motion as to Opinion A is denied.

### 3. Lack of Reliable Methodology for Opinions Regarding How a Reasonable Consumer Understood Meta's Statements

Next, defendant argues that Alter's Opinions B, C, F, and G should be excluded because they lack a reliable methodology. Opinion B describes the tactics Meta used to "influence consumer perception" and Meta's purpose in doing so. Opinion C states at a general level that consumers in this context tend to rely on the truthfulness and accuracy of company communications about health and safety. Opinion F states that parents and teens worry about

whether Meta's platforms are addictive and that Meta's health and safety claims were "meaningful and important to a significant number of consumers." Opinion G draws conclusions about the misleading nature of Meta's communications, contrasting the message conveyed by Meta's public statements about health and safety, for example, with internal warnings that users were experiencing harm and addiction on its platforms.

Meta argues that Alter's conclusions about how specific statements are likely to be interpreted by consumers, because they were not based on empirical research, amount to mere speculation and would not help a jury. Courts do, however, admit expert marketing testimony based on the expert's own "experience, review of relevant literature, and review of the record," as Alter has done here. *In re Juul Labs, Inc. Marketing, Sales Practices and Products Liability Litigation*, 2022 WL 1814440, at *4 (N.D.Cal. 2022). Indeed, a marketing expert "may synthesize [defendant's] branding and messaging strategies . . . and explain how he expects messaging themes (including those he identifies) influenced consumer beliefs." *In re Johnson & Johnson Talcum Powder Products Marketing*, 2026 WL 161184, at *231 (D.N.J. 2026); *see also Montera*, 2022 WL 1225031, at *6 (expert testimony "concerning general marketing principles, the marketing strategies at play . . . and Defendant's intended message and target audience [is] admissible.") Alter's Opinions B, C, and G synthesize Meta's messaging strategies to opine on what those communications were likely to convey to consumers. As such, they are admissible so long as they are couched in terms of what the expert would expect to occur as opposed to a statement of what did in fact occur.

*Opinion F*, however, states that Meta's statements about health and safety were "meaningful and important to a significant number of consumers." (Alter Rep. at 2.)  As referenced above, courts distinguish "between a marketing expert's testimony on a company's marketing strategies and testimony on how those messages were actually received," and reject expert

testimony about "how consumers actually interpreted the messages" unless supported by evidence. *Montera*, 2022 WL 1225031, at *6. As such, an expert "may testify about how the advertising themes [they] identif[y] *could* influence consumer perceptions but may not testify that [defendant's] marketing *in fact* influenced consumer perceptions" unless they have evidence for the latter. *In re Johnson & Johnson*, 2026 WL 161184 at *32. Although Alter does cite evidence that teens and parents are worried about whether social media platforms are safe (Alter Rep. ¶¶ 104-113), he has not identified evidence for the distinct proposition that Meta's statements on those topics were "meaningful and important" to consumers. (Alter Rep. at 2.) In fact, his report makes clear that he simply infers the latter from the former. (*See id*. ¶ 398) (Meta's "statements were meaningful and impactful because parents, youth, and other decisionmakers are inherently concerned about youth well-being and safety.") As a result, Alter's testimony concerning how consumers actually interpreted Meta's intended message is not admissible. *See Montera,* 2022 WL 1225031 at *6.

The motion on this ground is denied except as to the noted portion above.[2]

### 4. Opinions that Meta's Statements were False or Misleading

Meta next contends that Alter's opinions that Meta's statements were false or misleading (Opinions E and G) lack a reliable basis and are state-of-mind testimony.

---

[2] Defendant lodges three additional objections to Opinions B, C, F, and G. None require exclusion. Defendant objects to portions of Alter's report that characterize Meta executives' use of the term "addictive" as meaning the lay sense of the word, rather than an official diagnosis. Meta offers no argument why this would require exclusion, nor why any consumer would think Meta's business executives are offering opinions about clinical diagnoses. Second, Meta contends that Alter's opinions are impermissibly based on Opinions A and D. As already noted, those opinions are admissible. Finally, Meta contends that Alter impermissibly considers the impact of Meta's statements on other members of the public, not just consumers. Alter explains, however, that in this context, a consumer is not merely "a single individual buying and then consuming a specific product," and so corporate communications are often directed to individuals and organizations, other than the end-user, who are involved in consumer decisions, such as parents and school boards. (Alter Rep. ¶ 48.) Meta offers no authority finding this interpretation of consumer inadmissible, and so the Court does not sustain the objection.

Meta objects that Alter merely analyzes company documents and marketing strategies, which the factfinder could do on its own. As noted above, courts have found, however, that a "marketing professional's review and analysis of company documents to extrapolate marketing strategies, coupled with the expert's experience and background" can be a reliable methodology capable of assisting a jury. *In re: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation*, 2016 WL 807377, at *5 (E.D.Pa. 2016) (collecting cases). As already discussed, marketing experts are permitted to opine on "what a company intended to convey through their marketing," as Alter does. *Montera*, 2022 WL 1225031, at *5.

Meta also objects that Alter's testimony that Meta's statements are false or have a "tendency to mislead" invade the province of the factfinder. *See In re Apple Inc. Securities Litigation*, 2023 WL 4556765, at *3 (N.D.Cal. 2023). Again, the expert's role is limited. While Alter may explain how his expertise informs how a company may use certain kinds of messages to communicate particular messages, he cannot serve as a conduit for attorney argument when a reasonable juror is fully capable of making a factual decision without expert opinion. As an example, his opinion that Meta has "repeatedly failed to invest and fund internally recommended initiatives related to well-being and safety," requires no expertise. A jury can determine for itself that a corporation is not acting consistently with its public statements by observing contrary priorities in corporate documents. (Alter Rep. at 2-3; *See Tylenol*, 2016 WL 807377, at *6.)

The Court will allow Alter's opinions so long as they are presented within the confines described above. The parties should meet and confer to ensure that the presentation of evidence occurs within those parameters.

**5. Opinions that Consumers were "Exposed" to Meta's Statements**

Meta next seeks to exclude Alter's Opinion H on the basis that it lacks a reliable methodology for concluding that consumers were exposed to Meta's statements. In Opinion H, Alter concludes that:

> There is strong empirical evidence and theoretical justification for concluding that the information conveyed by Meta's statements was transmitted to, and spread further by, consumers. Several factors make the significant diffusion of such statements among consumer audiences likely. These include the importance of the subject matter, the high levels of uncertainty among consumers, the types of audiences receiving Meta's message and their communication styles, and the size of Meta's audience. Meta's own marketing documents acknowledge that it intended its external messaging related to safety and wellbeing to reach important markets such as Massachusetts, Illinois, New York, and California, among others,

Alter concludes that Meta's statements were spread widely based on the presence of five factors—the statements' subject matter, the social nature of the issue, consumer uncertainty, and both the type and the size of the audiences hearing the statements—each of which, in his view, make retransmission likely. (Alter Rep. ¶ 386.) Additionally, Alter cites illustrative examples of retransmission, such as instances of Meta's at-issue statements being published in newspaper and magazines reports, that he concludes provide "independent substantiation of the theoretical considerations outlined above." (Alter Rep. ¶¶ 387-393.) Meta contends that Alter provides no justification for applying those five factors and lacks evidence, beyond anecdotes that the statements were actually diffused.

Meta is correct that Alter does not proffer conclusive evidence regarding the extent to which Meta's statements were in fact received and reshared by consumer audiences. However, Opinion H does not appear to be that far-reaching. Rather, Alter provides a basis for his conclusion that it is *likely* that the statements had a wide reach, given his experience in the industry. Fundamentally, this is an issue of weight not admissibility.

The motion on this ground is denied.

9

### 6. Opinions that Meta Intended to Attract Child Users

Meta also seeks to exclude Alter's Opinions L, M, and O, which conclude that Meta "intended to attract and retain teen and tween users" and that Meta "viewed young teens and child users as valuable and important," as impermissible state of mind testimony based on Alter's review of Meta's internal documents. As already discussed, a marketing expert may testify to what messages defendant's communications were intended to convey based on their review of defendant's documents so long as it is presented appropriately. *Supra* Section III(A)(1).[3]

The motion on this ground is denied.

### 7. Opinions that Meta's Platforms are Directed at Children

Meta seeks to exclude Alter's Opinions M–P, which conclude that Meta's platforms target children under the age of 13, on the basis that they (1) involve impermissible legal conclusions and (2) lack a reliable methodology.

On the first, Meta takes issue with Alter's characterization of Meta's platforms as "directed to children" because that term is used in the COPPA statue and relevant federal regulations. 15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2(1). In the Ninth Circuit, experts' use of terms that recur in the law is not necessarily improper; rather, the inquiry is whether the expert is "foisting legal conclusions on the jury." *United States v. Diaz*, 876 F.3d 1194, 1199 (C.A.9 (Cal.), 2017) ("[I]f the terms used by an expert witness do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion.")

---

[3] Defendant also contends that Alter failed to engage with counter-evidence, specifically Meta's policy prohibiting children under 13 from joining Meta's platforms. Alter acknowledges that "Facebook's official policy is that users must be 13" but describes actions that Meta took targeting children that Alter concludes are inconsistent with that stated policy. Alter Rep. at 565. Defendant's argument seems to boil down to a complaint that he does not give them enough credit. This goes to the weight of Alter's testimony, not its admissibility.

10

Alter can explain how the platforms are directed to children, but he strays too far when he concludes that "The Instagram platform as a whole is directed to children," (Opinion M) and "The Facebook platform as a whole is directed to children," (Opinion O). The Court strikes those sentences but admits the remainder of those opinions. Similarly, Alter's testimony that "Instagram features accounts that are directed to children," (Opinion N) and "Facebook features accounts that are directed to children," (Opinion P) may be permitted as modified (for example, "target children") that avoids giving the jury the impression that Alter is instructing them on the ultimate issue of whether those platforms or parts of them are directed to children.

As to methodology, Meta again contends that Alter may not conclude that Meta viewed having child users on Meta's platforms as "desirable," because that is impermissible state-of-mind testimony. For the reasons already discussed, this is not a bar to admissibility. *Supra* Section III(A)(1).

Next, Meta contends that Alter impermissibly draws conclusions about child-directedness based on Meta designing its platforms to appeal to teens, who Alter defines as over the age of 13, rather than children or tweens, who are under 13. The Court disagrees. Alter adduces evidence that "Instagram executives perceived tweens to be similar to teens, and recognized that an app that appeals to young teens similarly appeals to tweens;" that Meta "aggregated ages 11 to 15 to form a monolithic group" in internal research; and that Instagram and Facebook implemented features and content accordingly designed to appeal to both teens and tweens. (Alter Rep. at 5; *Id*. ¶ 425; ¶¶ 426-29.) This is sufficient for purposes of admissibility.

Finally, Meta objects on methodological grounds to the portions of Alter's report that discuss examples of child influencers and celebrities on Meta's platforms, arguing that these are cherry-picked examples. However, Alter makes clear that he uses those examples to show how the platform appeals to young users, not to draw conclusions regarding the prevalence of under-13

accounts (a proposition for which the "cherry-picking" objection would be more relevant). Meta likewise objects to the empirical evidence Alter cites regarding the number of children on Meta's platforms because he did not conduct the research himself. Alter may not testify to the specific results of studies he did not conduct, but defendant does not contend that any of his opinions attempt to do so (and they do not).

The motion on this ground is denied with the exception of the opinions noted above. The parties shall meet and confer to ensure that the evidence is presented in accordance with the Court's guidance.

### B. DR. RAVI IYER

Dr. Iyer describes his assignment as one to opine on:

> How Meta can structure its Platform algorithms to address unwanted, negative, and harmful experiences; [h]ow Meta can remedy the issues associated with certain extended use features such as quantification of engagement, infinite scroll and autoplay, notifications, and ephemeral content to address unwanted, harmful, and negative experiences; and [w]hether Meta's safety tools and features, including Teen Accounts, sufficiently remedy the unwanted, harmful, and negative experiences associated with Platform algorithms and certain extended use features.

(Expert Report of Dr. Ravi Iyer ("Iyer Rep."), Dkt. No. 2702-5, Ex. 2 ¶ 38.) Iyer received his Ph.D. in Social Psychology from the University of Southern California (USC) in 2011 and is currently Managing Director of the Psychology of Technology Institute at USC. From 2018 to 2022 he managed data science, research, and product teams at Facebook. Defendants do not challenge his qualifications.

Iyer's testimony opines that Meta's current safety tools for teens are insufficient to mitigate harmful user experiences (Opinions 3 and 4); that certain design changes would mitigate those harmful experiences (Opinion 1); and that those design changes can be feasibly implemented. Meta seeks to exclude Iyer's testimony in its entirety because, in Meta's view, his opinions are not supported by a reliable scientific methodology, including failing to quantify what constitutes

"sufficient" mitigation, conducting an unbiased literature review, or conducting tests regarding the feasibility of his proposed changes.

Expert testimony rooted in "a sufficient basis in education and experience," is admissible. *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010). Iyer appropriately relies on his experience and background in psychology, product design, and technology—and supported by internal documents and publications cited in his report—to assess whether Instagram and Facebook's features are likely to avoid harm and how they could be better redesigned. Iyer's opinions on whether Meta's current protective features are sufficient are reasonably based in his assessment of the design of those features and relevant psychology literature. (*See, e.g.*, Iyer Rep. at 43-44 (Meta's "Teen Accounts fail to address . . . the engagement-driven algorithms that undermine self-control and perpetuate the very behaviors these tools seek to mitigate. . . to the best of my knowledge, Teen Accounts still are subject to algorithms that are optimized for engagement rather than quality or explicit preference, and . . . effectively leave in place powerful engagement-based algorithms that can overwhelm the self-control of youth, whose inhibition systems are still developing.")

His opinions on feasibility of implementation are similarly rooted in his relevant experience as well as Meta's own designs. (*See, e.g.*, Iyer Rep. ¶ 34 ("Meta already has some quality and preference signals available and has demonstrated that altering the composition of its algorithms to prioritize these signals reduces unwanted usage and increases the safety of users . . . For example, Instagram Reels algorithms incorporate user preference signals on how likely a user is to click "Interested," while Facebook Feed recommendations consider how likely a user is to click "X" to hide a post.") Meta's objections that Iyer is insufficiently precise about certain terms, such as what constitutes "sufficient" mitigation or harm, may be useful to impeach his testimony. They do not, however, provide an adequate basis for excluding his opinions.

The motion to exclude Iyer's opinions is denied.

## IV.    CONCLUSION

The motion to exclude the opinions of Dr. Adam Alter and Dr. Ravi Iyer is **GRANTED IN PART** as to the portions of the opinions discussed above and **DENIED** as to the remainder.  Per the instructions above, the parties are **ORDERED** to meet and confer to ensure that the presentation of evidence occurs within the parameters set in this Order.

This Order terminates Dkt. Nos. 2701, 2702, 2775 & 2891 in Case No. 22-md-03047.

**IT IS SO ORDERED.**

Dated:  May 20, 2026

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**